# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name _____ **Sharon L. Levine, Esq.** _____

Firm _____ **Lowenstein Sandler LLP** _____

Address _____ **65 Livingston Avenue** _____

City, State, Zip _____ **Roseland, NJ 07068** _____

Phone _____ **973-597-2500** _____

Email _____ **slevine@lowenstein.com** _____

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⊙**Bankruptcy** ◯**Adversary**

◯ **Appeal** **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** <u>10/15/2013</u> **Time of Hearing:** <u>10:00 am</u> **Title of Hearing:** <u>Hearing - Eligibility Objections</u>

Please specify portion of hearing requested: ◯**Original/Unredacted** ''◯ **Redacted** '''◯**Copy** *2nd Party)

⊙Entire Hearing ◯ Ruling/Opinion of Judge ◯ Testimony of Witness ◯ Other

Special Instructions: <u>**Entire Day Transcript**</u>

---

**Type of Request:**

⊙Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

''''''◯CD - $30; FTR Gold format''/''You must download the free ''''''FTR Record Player™ onto your computer from

''''''''''''''''''''''''y y y (Ihti qrf leqo ''

**Signature of Ordering Party:**

/s/ Sharon L. Levine _____ Date: **12/9/2013**

By signing, I certify that I will pay all charges upon completion of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2243-15 Filed 12/09/13 Entered 12/09/13 18:07:52 Page 1 of 2
13-53846-swr Doc 1984 Filed 12/09/13 Entered 12/09/13 13:44:15 Page 1 of 2 1251
2386

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## **TRANSCRIPT ORDER FORM**

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name    **Sharon L. Levine, Esq.**

Firm    **Lowenstein Sandler LLP**

Address    **65 Livingston Avenue**

City, State, Zip    **Roseland, NJ 07068**

Phone    **973-597-2500**

Email    **slevine@lowenstein.com**

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:**    **13-53846**

**Chapter:**    **11**

**Hearing Judge** **Hon. Steven Rhodes**

◉ **Bankruptcy**    ○ **Adversary**

○ **Appeal**    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/16/2013_   **Time of Hearing:** _10:00 am_   **Title of Hearing:** Hearing - Eligibility Objections

Please specify portion of hearing requested: ○ **Original/Unredacted** ○ **Redacted** ○ **Copy** *2nd Party)

◉ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: **Entire Day Transcript**

---

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 'r gt 'r ci g (14 calendar days)

○ Expedited Transcript - $4.85 'r gt 'r ci g (7 working days)

○ CD - $30; FTR Gold format '/ You must download the free FTR Record Player™ onto your computer from _y y y Onti qrf leqo_

**Signature of Ordering Party:**

/s/ Sharon L. Levine    Date: **12/9/2013**

By signing, I certify that I will pay all charges upon completion of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date    By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2243-15 Filed 12/09/13 Entered 12/09/13 13:44:15 Page 3 of
13-53846-swr Doc 1985 Filed 12/09/13 Entered 12/09/13 18:08:59 Page 1 of 2
2386
1253

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

13-53846-tjt   Doc 2243-5   Filed 12/09/13   Entered 12/09/13 13:34:15   Page 4 of
13-53846-swr   Doc 1983   Filed 12/09/13   Entered 12/09/13 18:08:35   Page 2 of 2
2386
1254

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name **Sharon L. Levine, Esq.**

Firm **Lowenstein Sandler LLP**

Address **65 Livingston Avenue**

City, State, Zip **Roseland, NJ 07068**

Phone **973-597-2500**

Email **slevine@lowenstein.com**

**Case/Debtor Name: City of Detroit, Michigan**

**Case Number: 13-53846**

**Chapter: 11**

**Hearing Judge** Hon. Steven Rhodes

'⦿ **Bankruptcy** ◯ **Adversary**

◯ **Appeal** **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/21/2013 **Time of Hearing:** 1:00 pm **Title of Hearing:** Hearing - Eligibility Objections

Please specify portion of hearing requested: ◯ **Original/Unredacted** "◯ **Redacted** "'"◯**Copy** *2nd Party)

⦿ Entire Hearing ◯ Ruling/Opinion of Judge ◯ Testimony of Witness ◯ Other

Special Instructions: _____

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

'"""""◯CD - $30; FTR Gold format"/"You must download the free
"""FTR Record Player™ onto your computer from
""""""""""""""""'y y y (bti qrf(eqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine _____ Date: 12/9/2013

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date By

Order Received:

Transcript Ordered

Transcript Received

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

13-53846-tjt Doc 2243-5 Filed 12/09/13 Entered 12/09/13 13:24:15 Page 6 of 7
13-53846-swr Doc 1986 Filed 12/09/13 Entered 12/09/13 18:32:45 Page 92 of 1256
2386

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name **Sharon L. Levine, Esq.**

Firm **Lowenstein Sandler LLP**

Address **65 Livingston Avenue**

City, State, Zip **Roseland, NJ 07068**

Phone **973-597-2500**

Email **slevine@lowenstein.com**

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⦿ **Bankruptcy** ◯ **Adversary**

◯ **Appeal** **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/23/2013 **Time of Hearing:** 9:00 am **Title of Hearing:** Trial - Eligibility Objections

Please specify portion of hearing requested: ⦿ **Original/Unredacted** "◯ **Redacted** "◯ **Copy** *2nd Party)

⦿ Entire Hearing ◯ Ruling/Opinion of Judge ◯ Testimony of Witness ◯ Other

Special Instructions: **Entire Day Transcript**

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

""""◯CD - $30; FTR Gold format"/"You must download the free """"FTR Record Player™ onto your computer from """"""y y y (hti qrf(eqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine Date: **12/9/2013**

By signing, I certify that I will pay all charges upon completion of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date By

Order Received:

Transcript Ordered

Transcript Received

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $520.22 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name **Sharon L. Levine, Esq.**

Firm **Lowenstein Sandler LLP**

Address **65 Livingston Avenue**

City, State, Zip **Roseland, NJ  07068**

Phone **973-597-2500**

Email **slevine@lowenstein.com**

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⦿ **Bankruptcy** ◯ **Adversary**

◯ **Appeal** **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/24/2013 **Time of Hearing:** 9:00 am **Title of Hearing:** Trial - Eligibility Objections

Please specify portion of hearing requested: ◯ **Original/Unredacted** "◯ **Redacted** "" ◯ **Copy** *2nd Party)

⦿ Entire Hearing ◯ Ruling/Opinion of Judge ◯ Testimony of Witness ◯ Other

Special Instructions: **Entire Day Transcript**

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

'"""◯ CD - $30; FTR Gold format"/"You must download the free """FTR Record Player™ onto your computer from """y y y (Inti qrf (eqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine Date: **12/9/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2243-5 Filed 12/09/13 Entered 12/09/13 13:40:15 Page 9 of
13-53846-swr Doc 1983 Filed 12/09/13 Entered 12/09/13 18:35:03 Page 1 of 2
2386    1259

# Instructions

**Use.**  Use this form to order transcript of proceedings.  Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.**  Complete the entire order form.  Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Filing with the Court.**  All requests must be electronically filed by attorneys.  Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.**  Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal.  Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court.  Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.**  The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee.  Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.**  The Transcriber will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

>  Ordinary.  A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber.  The charge is $3.65 per page effective November 19, 2007.

>  14-Day.  A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber.  The charge is $4.25 per page effective November 19, 2007.

>  Expedited.  A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber.  The charge is $4.85 per page effective November 19, 2007.

>  CD.  Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order.  The ordering party will be notified by telephone when the CD is ready.  Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD.  The charge is $5202 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

### Order Party: Name, Address and Telephone Number

Name: **Sharon L. Levine, Esq.**

Firm: **Lowenstein Sandler LLP**

Address: **65 Livingston Avenue**

City, State, Zip: **Roseland, NJ 07068**

Phone: **973-597-2500**

Email: **slevine@lowenstein.com**

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⦿ **Bankruptcy** ◯ **Adversary**

◯ **Appeal** **Appeal No:** _____

### Hearing Information (A separate form must be completed for **each** hearing date requested.)

Date of Hearing: **10/25/2013** Time of Hearing: **9:00 am** Title of Hearing: Trial - Eligibility Objections

Please specify portion of hearing requested: ◯**Original/Unredacted** "⦿ **Redacted** "◯**Copy** *2nd Party)

⦿ Entire Hearing ◯ Ruling/Opinion of Judge ◯ Testimony of Witness ◯ Other

Special Instructions: **Entire Day Transcript** _____

### Type of Request:

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

""""◯CD - $30; FTR Gold format"/"You must download the free
""""FTR Record Player™ onto your computer from
"""""""""""""""y y y (nti qrf (eqo "

### Signature of Ordering Party:

/s/ Sharon L. Levine Date: **12/9/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2243-5 Filed 12/09/13 Entered 12/09/13 18:44:15 Page 1 of 2
13-53846-swr Doc 2969 Filed 12/09/13 Entered 12/09/13 18:17:57 Page 11 of 1261
2386

# Instructions

**Use.**  Use this form to order transcript of proceedings.  Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.**  Complete the entire order form.  Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Filing with the Court.**  All requests must be electronically filed by attorneys.  Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.**  Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal.  Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court.  Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.**  The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee.  Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.**  The Transcriber will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary.  A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber.  The charge is $3.65 per page effective November 19, 2007.

> 14-Day.  A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber.  The charge is $4.25 per page effective November 19, 2007.

> Expedited.  A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber.  The charge is $4.85 per page effective November 19, 2007.

> CD.  Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order.  The ordering party will be notified by telephone when the CD is ready.  Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD.  The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name _____ **Sharon L. Levine, Esq.** _____

Firm _____ **Lowenstein Sandler LLP** _____

Address _____ **65 Livingston Avenue** _____

City, State, Zip _____ **Roseland, NJ 07068** _____

Phone _____ **973-597-2500** _____

Email _____ **slevine@lowenstein.com** _____

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** _ **Hon. Steven Rhodes**

'⦿ **Bankruptcy** ○ **Adversary**

○ **Appeal** **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/28/2013_ **Time of Hearing:** _9:00 am_ **Title of Hearing:** _Trial - Eligibility Objections_

Please specify portion of hearing requested: ○ **Original/Unredacted** "○ **Redacted** ""○ **Copy** *2nd Party)

⦿ Entire Hearing ○ Ruling/Opinion of Judge ○ Testimony of Witness ○ Other

Special Instructions: **Entire Day Transcript** _____

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

○ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

'"""○ CD - $30; FTR Gold format"/ "You must download the free
"""" FTR Record Player™ onto your computer from
"""""""""""" "y y y 0hti qrf (eqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine ____ Date: **12/9/2013** ___
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date        By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2249-5 Filed 12/09/13 Entered 12/09/13 13:14:45 Page 13 of
13-53846-swr Doc 1990 Filed 12/09/13 Entered 12/09/13 18:10:46 Page 13 of 2
2386
1263

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> <u>Ordinary</u>. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> <u>14-Day</u>. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> <u>Expedited</u>. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> <u>CD</u>. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
**TRANSCRIPT ORDER FORM**

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

**Order Party: Name, Address and Telephone Number**

Name     **Sharon L. Levine, Esq.**

Firm     **Lowenstein Sandler LLP**

Address     **65 Livingston Avenue**

City, State, Zip     **Roseland, NJ 07068**

Phone     **973-597-2500**

Email     **slevine@lowenstein.com**

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:**     **13-53846**

**Chapter:**     **11**

**Hearing Judge** **Hon. Steven Rhodes**

◉ **Bankruptcy**    ◯ **Adversary**

◯ **Appeal**    **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/29/2013    **Time of Hearing:** 9:00 am    **Title of Hearing:** Trial - Eligibility Objections

Please specify portion of hearing requested: ◉ **Original/Unredacted** "◯ **Redacted** "◯ **Copy** *2nd Party)

◉ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: **Entire Day Transcript**

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

"""""◯ CD - $30; FTR Gold format"/"You must download the free
"""""FTR Record Player™ onto your computer from
"""""""""""""""""y y y Oti qrf Ceqo "

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date    By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ Sharon L. Levine     Date: **12/9/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

13-53846-tjt Doc 2243-15 Filed 12/09/13 Entered 12/09/13 13:14:15 Page 15 of
13-53846-swr Doc 1991 Filed 12/09/13 Entered 12/09/13 18:19:48 Page 1 of 2
2386    1265

# Instructions

**Use.**  Use this form to order transcript of proceedings.  Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.**  Complete the entire order form.  Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Filing with the Court.**  All requests must be electronically filed by attorneys.  Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.**  Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court.  Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.**  The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee.  Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.**  The Transcriber will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary.  A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber.  The charge is $3.65 per page effective November 19, 2007.

> 14-Day.  A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber.  The charge is $4.25 per page effective November 19, 2007.

> Expedited.  A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber.  The charge is $4.85 per page effective November 19, 2007.

> CD.  Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order.  The ordering party will be notified by telephone when the CD is ready.  Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD.  The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name _____ **Sharon L. Levine, Esq.** _____

Firm _____ **Lowenstein Sandler LLP** _____

Address _____ **65 Livingston Avenue** _____

City, State, Zip _____ **Roseland, NJ 07068** _____

Phone _____ **973-597-2500** _____

Email _____ **slevine@lowenstein.com** _____

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⊙ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **11/4/2013**   **Time of Hearing:** **9:00 am**   **Title of Hearing:** Trial - Eligibility Objections

Please specify portion of hearing requested:   ○ **Original/Unredacted** "○ **Redacted** "○ **Copy** *2nd Party)

⊙ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: **Entire Day Transcript** _____

---

**Type of Request:**

⊙ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

○ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

""""○ CD - $30; FTR Gold format"/"You must download the free
""""FTR Record Player™ onto your computer from
""""""""""""""""y y y 0nti qrf Ceqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine   Date: **12/9/2013**

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date   By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2243-15 Filed 12/09/13 Entered 12/09/13 18:20:29 Page 17 of 2
13-53846-swr Doc 1991 Filed 12/09/13 Entered 12/09/13 18:04:05 Page 17 of 2   1267
2386

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name **Sharon L. Levine, Esq.**

Firm **Lowenstein Sandler LLP**

Address **65 Livingston Avenue**

City, State, Zip **Roseland, NJ 07068**

Phone **973-597-2500**

Email **slevine@lowenstein.com**

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

' ◉ **Bankruptcy**    ○ **Adversary**

○ **Appeal**    **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 11/5/2013    **Time of Hearing:** 9:00 am    **Title of Hearing:** Trial - Eligibility Objections

Please specify portion of hearing requested: ○ **Original/Unredacted** '' ○ Redacted '''' ○ Copy *2ⁿᵈ Party)

◉ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: **Entire Day Transcript**

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

○ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

'''''''○ CD - $30; FTR Gold format''/''You must download the free
'''''''FTR Record Player™ onto your computer from
''''''''''''''''''''''''y y y (hti qrf (eqo ''

**Signature of Ordering Party:**

/s/ Sharon L. Levine    Date: **12/9/2013**

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date    By

Order Received:

Transcript Ordered

Transcript Received

# Instructions

**Use.** Use this form to order transcript of proceedings. Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.** Complete the entire order form. Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Filing with the Court.** All requests must be electronically filed by attorneys. Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.** Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court. Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.** The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee. Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.** The Transcriber will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> <u>Ordinary</u>. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber. The charge is $3.65 per page effective November 19, 2007.

> <u>14-Day</u>. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber. The charge is $4.25 per page effective November 19, 2007.

> <u>Expedited</u>. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber. The charge is $4.85 per page effective November 19, 2007.

> <u>CD</u>. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order. The ordering party will be notified by telephone when the CD is ready. Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD. The charge is $520.22 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name **Sharon L. Levine, Esq.**

Firm **Lowenstein Sandler LLP**

Address **65 Livingston Avenue**

City, State, Zip **Roseland, NJ 07068**

Phone **973-597-2500**

Email **slevine@lowenstein.com**

**Case/Debtor Name: City of Detroit, Michigan**

**Case Number: 13-53846**

**Chapter: 11**

**Hearing Judge Hon. Steven Rhodes**

'⦿**Bankruptcy** ◯**Adversary**

◯ **Appeal** **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 11/7/2013 **Time of Hearing:** 9:00 am **Title of Hearing:** Trial - Eligibility Objections

Please specify portion of hearing requested: ◯**Original/Unredacted** "'◯ **Redacted** "'"◯**Copy** *2nd Party)

⦿ Entire Hearing ◯ Ruling/Opinion of Judge ◯ Testimony of Witness ◯ Other

Special Instructions: **Entire Day Transcript** _____

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

"""◯CD - $30; FTR Gold format"/"You must download the free
"""FTR Record Player™ onto your computer from
"y y y 0nti qrf 0eqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine Date: 12/9/2013

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt Doc 2243-15 Filed 12/09/13 Entered 12/09/13 13:24:15 Page 21 of 1271
13-53846-swr Doc 1995 Filed 12/09/13 Entered 12/09/13 18:22:17 Page 13 of 2
2386

# Instructions

**Use.**  Use this form to order transcript of proceedings.  Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.**  Complete the entire order form.  Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Filing with the Court.**  All requests must be electronically filed by attorneys.  Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.**  Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal.  Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court.  Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.**  The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee.  Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.**  The Transcriber will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber.  The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber.  The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber.  The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order.  The ordering party will be notified by telephone when the CD is ready.  Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD.  The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

13-53846-tjt  Doc 2249-5  Filed 12/09/13  Entered 12/09/13 18:22:17  Page 22 of
2386
13-53846-swr  Doc 1995  Filed 12/09/13  Entered 12/09/13 13:24:15  Page 22 of 1272

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

---

**Order Party: Name, Address and Telephone Number**

Name ___ **Sharon L. Levine, Esq.** ___

Firm ___ **Lowenstein Sandler LLP** ___

Address ___ **65 Livingston Avenue** ___

City, State, Zip ___ **Roseland, NJ  07068** ___

Phone ___ **973-597-2500** ___

Email ___ **slevine@lowenstein.com** ___

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⦿ **Bankruptcy**     ◯ **Adversary**

◯ **Appeal     Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _11/8/2013_     **Time of Hearing:** _9:00 am_     **Title of Hearing:** _Trial - Eligibility Objections_

Please specify portion of hearing requested:   ◯ **Original/Unredacted** '"◯ **Redacted** '"'◯ **Copy** *2nd Party)

◉ Entire Hearing     ◯ Ruling/Opinion of Judge     ◯ Testimony of Witness     ◯ Other

Special Instructions: **Entire Day Transcript** ___

---

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

◯ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

'''''''◯ CD - $30; FTR Gold format'/'You must download the free
'''''FTR Record Player™ onto your computer from
''''''''''''''''''''''''_y y y (hti qrf (eqo_ "

**Signature of Ordering Party:**

/s/ Sharon L. Levine ___ Date: **12/9/2013** ___
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
            Date        By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt  Doc 2243-15  Filed 12/09/13  Entered 12/09/13 13:44:15  Page 23 of
13-53846-swr  Doc 1996  Filed 12/09/13  Entered 12/09/13 18:23:05  Page 13 of 2
2386    1273

# Instructions

**Use.**  Use this form to order transcript of proceedings.  Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.**  Complete the entire order form.  Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Filing with the Court.**  All requests must be electronically filed by attorneys.  Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.**  Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal. Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court.  Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.**  The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee.  Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.**  The Transcriber will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

>   Ordinary.  A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber.  The charge is $3.65 per page effective November 19, 2007.

>   14-Day.  A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber.  The charge is $4.25 per page effective November 19, 2007.

>   Expedited.  A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber.  The charge is $4.85 per page effective November 19, 2007.

>   CD.  Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order.  The ordering party will be notified by telephone when the CD is ready.  Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD.  The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

13-53846-tjt  Doc 2249-15  Filed 12/09/13  Entered 12/09/13 18:24:05  Page 24 of
13-53846-swr  Doc 1996  Filed 12/09/13  Entered 12/09/13 18:23:05  Page 24 of 1274
2386

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

---

**Order Party: Name, Address and Telephone Number**

Name _____ **Sharon L. Levine, Esq.** _____

Firm _____ **Lowenstein Sandler LLP** _____

Address _____ **65 Livingston Avenue** _____

City, State, Zip _____ **Roseland, NJ  07068** _____

Phone _____ **973-597-2500** _____

Email _____ **slevine@lowenstein.com** _____

**Case/Debtor Name:** **City of Detroit, Michigan**

**Case Number:** **13-53846**

**Chapter:** **11**

**Hearing Judge** **Hon. Steven Rhodes**

'⊙ **Bankruptcy**    ○ **Adversary**

○ **Appeal**    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 12/3/2013    **Time of Hearing:** 10:00 am    **Title of Hearing:** Bench Decisions

Please specify portion of hearing requested:   ○ **Original/Unredacted** "○ **Redacted** "'"○ **Copy** *2nd Party)

⊙ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: **Entire Day Transcript** _____

---

**Type of Request:**

⊙ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25'r gt'r ci g (14 calendar days)

○ Expedited Transcript - $4.85'r gt'r ci g (7 working days)

'"""○ CD - $30; FTR Gold format"/"You must download the free

"""FTR Record Player™ onto your computer from

"""""""""""""""y y y (hti qrf (eqo "

**Signature of Ordering Party:**

/s/ Sharon L. Levine _____ Date: **12/9/2013** _____
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date    By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt  Doc 2243-15  Filed 12/09/13  Entered 12/09/13 13:24:35  Page 25 of 2<br>
13-53846-swr  Doc 1997  Filed 12/09/13  Entered 12/09/13 18:23:58  Page 25 of<br>
2386    1275

# Instructions

**Use.**  Use this form to order transcript of proceedings.  Complete a separate order form for each hearing date for which transcript is ordered.

**Completion.**  Complete the entire order form.  Do *not* complete the shaded area which is reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Filing with the Court.**  All requests must be electronically filed by attorneys.  Debtors without counsel or parties without PACER access may mail or deliver the request to the court.

**Withdrawal of Request.**  Decision to withdraw transcript request requires ordering party to (1) contact chambers; (2) notify transcriber; and (3) electronically file a notice of withdrawal.  Debtors without counsel or parties without PACER access may mail or deliver the withdrawal to the court.  Failure to do so will result in payment obligation to the Transcriber.

**Deposit Fee.**  The Transcriber will notify you if a deposit fee is required and of the amount of the deposit fee.  Upon receipt of the deposit, the Transcriber will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee.

**Completion of Order.**  The Transcriber will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the Transcriber will notify you of the balance due which must be paid to the Transcriber prior to receiving the completed order.

**Type of Request:**

> Ordinary. A transcript to be delivered within thirty (30) calendar days after receipt of the order by the Transcriber.  The charge is $3.65 per page effective November 19, 2007.

> 14-Day. A transcript to be delivered within fourteen (14) calendar days after receipt of the order by the Transcriber.  The charge is $4.25 per page effective November 19, 2007.

> Expedited. A transcript to be delivered within seven (7) calendar days after receipt of the order by the Transcriber.  The charge is $4.85 per page effective November 19, 2007.

> CD. Audio requests of a hearing are ordinarily completed within two (2) business days after receipt of an order.  The ordering party will be notified by telephone when the CD is ready.  Payment to the court (checks made payable to "Clerk of U.S. Bankruptcy Court") is required prior to picking up the CD.  The charge is $52.00 per CD.

**Note:** Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the next *delivery* rate.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE: CITY OF DETROIT,      .      Docket No. 13-53846
     MICHIGAN,               .
                    .      Detroit, Michigan
                    .      October 15, 2013
            Debtor.      .      10:00 a.m.
. . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

For the State of    Michigan Department of Attorney General
Michigan:           By:  MARGARET A. NELSON
                    P.O. Box 30758
                    Lansing, MI  48909
                    (517) 373-1124

For AFSCME,         Lowenstein Sandler, LLP
AFL-CIO, and Sub-  By:  SHARON L. LEVINE
Chapter 98, City   65 Livingston Avenue
of Detroit        Roseland, NJ  07068
Retirees:           (973) 597-2374

For Detroit       Clark Hill, PLC
Retirement Systems- By:  ROBERT GORDON
General Retirement 151 South Old Woodward, Suite 200
System of Detroit,  Birmingham, MI  48009
Police and Fire    (248) 988-5882
Retirement System
of the City of
Detroit:

APPEARANCES (continued):

```
For the Official        Dentons
Committee of            By:  CLAUDE D. MONTGOMERY
Retirees:               620 Fifth Avenue
                        New York, NY  10020
                        (212) 632-8390

For the Inter-          Cohen, Weiss & Simon, LLP
national Union,         By:  BABETTE A. CECCOTTI
UAW:                         PETER D. DECHIARA
                        330 West 42nd Street, 25th Floor
                        New York, NY  10036-6976
                        (212) 356-0227

For the Flowers         Law Offices of William A. Wertheimer
Plaintiffs:             By:  WILLIAM WERTHEIMER
                        30515 Timberbrook Lane
                        Bingham Farms, MI  48025
                        (248) 644-9200

For the Detroit         Erman, Teicher, Miller, Zucker &
Fire Fighters             Freedman, P.C.
Association, the        By:  BARBARA A. PATEK
Detroit Police         400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI  48034
tion and the           (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

Interested             KRYSTAL CRITTENDON
Party:                 19737 Chesterfield
                       Detroit, MI  48221

For Retired            Strobl & Sharp, PC
Detroit Police         By:  LYNN M. BRIMER
Members                300 East Long Lake Road, Suite 200
Association:           Bloomfield Hills, MI  48304-2376
                       (248) 540-2300

For Detroit            Silverman & Morris, PLLC
Retired City           By:  THOMAS R. MORRIS
Employees              30500 Northwestern Highway, Suite 200
Association,           Farmington Hills, MI  48334
Retired Detroit        (248) 539-1330
Police and Fire
Fighters Association,
Shirley V. Lightsey,
and Donald Taylor:
```

APPEARANCES (continued):

```
For David Sole:         Jerome D. Goldberg, PLLC
                        By:  JEROME GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001

For the United          U.S. Department of Justice
States:                 Civil Division
                        By:  MATTHEW J. TROY
                        P.O. Box 875
                        Ben Franklin Station
                        Washington, D.C.  20044
                        (202) 514-9038

For Center for          Vanessa G. Fluker, Esq., PLLC
Community Justice        By:  VANESSA G. FLUKER
and Advocacy:           2921 East Jefferson, Suite 200
                        Detroit, MI  48207
                        (313) 393-6005


Court Recorder:         Letrice Calloway
                        United States Bankruptcy Court
                        211 West Fort Street
                        21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Good morning, everybody.  I'd like to

4  take appearances from the attorneys who will be speaking here

5  today first.  Can we do that?

6      MR. BENNETT:  Thank you, your Honor.  Bruce Bennett,

7  Jones Day, on behalf of the city.

8      MS. NELSON:  Good morning, your Honor.  Assistant

9  Attorney General Margaret A. Nelson on behalf of the State of

10  Michigan.

11      MS. LEVINE:  Good morning, your Honor.  Sharon

12  Levine, Lowenstein Sandler, for AFSCME.

13      MR. GORDON:  Good morning, your Honor.  Robert

14  Gordon of Clark Hill on behalf of the Detroit Retirement

15  Systems.

16      MR. MONTGOMERY:  Good morning, your Honor.  Claude

17  Montgomery, Dentons U.S., for the Official Committee of

18  Retirees.

19      MS. CECCOTTI:  Good morning, your Honor.  Babette

20  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.

21      MR. WERTHEIMER:  Good morning, your Honor.  William

22  Wertheimer on behalf of the Flowers plaintiffs.

23      MS. PATEK:  Good morning, your Honor.  Barbara Patek

24  of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

25  Detroit Public Safety Unions.

1     MS. CRITTENDON:  Good morning, your Honor.  Krystal
2   Crittendon, interested party.

3     MS. BRIMER:  Good morning, your Honor.  Lynn M.
4   Brimer appearing on behalf of the Retired Detroit Police
5   Members Association.

6     MR. MORRIS:  Good morning, your Honor.  Thomas
7   Morris of Silverman & Morris on behalf of the Retiree
8   Association parties.

9     MR. GOLDBERG:  Good morning, your Honor.  Jerome
10   Goldberg on behalf of interested party David Sole.

11     MR. TROY:  Good morning, your Honor.  Matthew Troy,
12   Department of Justice, Civil Division, on behalf of the
13   United States.  It is not my intention to speak this morning,
14   your Honor, unless you have specific questions regarding our
15   filing from Friday.

16     THE COURT:  Thank you, sir.  Mr. Gordon.

17     MR. GORDON:  Thank you, your Honor.  I just wanted
18   to provide the introduction relative to our proposed
19   allocation of the time and order of presentation here this
20   morning.  As your Honor can see from the document that was
21   filed, there are 11 objectors who wish to speak, and, of
22   course, they all have important points to make, but -- and we
23   very much appreciate the cooperation amongst all of them.  It
24   was a good and constructive process.  Not only was that easy,
25   but everyone has been very cooperative, and we've allocated

1    the time accordingly to various parties to have the

2    opportunity to speak today.

3         You will note, your Honor, a couple things.  One, we

4    did not allocate the full 120 minutes in the morning.

5    There's a few minutes left over.  Similarly, in the afternoon

6    there's about five minutes left over of the 90 minutes.

7    That, of course, is not intended to necessarily waive our

8    opportunity to have the full time, but we thought that would

9    build in some flexibility and some error margin as people

10   stand up and sit down to make sure that we fit within the

11   time frame.

12        Also, as footnote one indicates, the presentation

13   order does not necessarily tie -- correspond discretely with

14   each of the issues as listed in your scheduling order, your

15   Honor.  There is some correlation, but various parties, as

16   the Court, I'm sure, can understand, have a number of issues

17   that they would like to address.  There will be some overlap.

18   The parties are going to try to overlap as little as

19   possible, but it was not really feasible to try to identify

20   discrete issues that each party was going to take on, so

21   instead the hope is that as each party comes to the podium,

22   they'll try to give you a little bit of a road map as to the

23   particular issues that they're going to touch upon.

24        THE COURT:  Thank you, and thank you for your

25   extraordinary effort in coordinating this.  I'm sure it was a

1   challenge.  And I also want to thank all of the attorneys for

2   cooperating with Mr. Gordon and with the Court in trying to

3   organize this as best we can.  So we're going to start then

4   with AFSCME's counsel, and we're going to try to run the

5   timing mechanism for your convenience.  Kelli, have we got

6   that available?  I'm sorry.

7           MS. LEVINE:  They were teasing me that if I'm

8   nervous, it'll take 20 minutes, but if I remember to speak

9   slowly, it'll take 35.

10          THE COURT:  Okay.  So for 35 minutes you may

11  proceed.

12          MS. LEVINE:  Thank you, your Honor.  First, we

13  appreciate the opportunity.  We think these issues are

14  extremely important, and we're glad that we have the

15  opportunity to speak.  Second, as Mr. Gordon correctly noted,

16  the parties who are speaking here today have made a concerted

17  effort to divide up the time and to try not to duplicate our

18  comments, so in that regard we're reserving the right to rely

19  on the filed objections along with the other arguments of

20  other counsel simply because we won't have time to do it all

21  ourselves.

22          With that, your Honor, we started this endeavor by

23  looking at PA 436 specifically concerned, as you might

24  imagine, with the pension issues and with the fact that we

25  believe that the Michigan Constitution provides for

1　protections for vested pension benefits, and then that

2　potentially conflicted with PA 436, and, therefore, we

3　started looking at the issue of whether PA 436 was, in

4　fact -- was, in fact, unconstitutional in that it allowed a

5　Chapter 9 filing in light of the pensions -- in light of the

6　pension restriction in the Constitution.

7　　　In addition to that, we were looking at the

8　governor's authorization in allowing the Chapter 9 filing in

9　light of PA 436 and in light of the Michigan Constitution and

10　grappling with the issue of whether or not that authorization

11　without any contingencies caused this Chapter 9 filing to be

12　unconstitutional as applied.

13　　　In addition to that, we grappled with the ripeness

14　issue as to whether or not all of these issues should be

15　raised now or whether they should be raised in connection

16　with a plan of adjustment, specifically, your Honor,

17　grappling with the issue as it was presented to us by our

18　members where we have folks literally sitting at their

19　kitchen table deciding whether or not they can take medicine

20　today or do they have to start taking it every other day, do

21　they feed themselves, do they feed their children, do they

22　pay rent, so we came to this Court anxious to have some of

23　these issues decided quickly.

24　　　On top of that, as it turns out, involved in the

25　mediations and the other efforts with regard to the serious

1   issues that are confronting Detroit, we do think

2   understanding your Honor's views of the rules of the game

3   could be useful for the parties in that process, but that's

4   really by way of introduction because what we've done, your

5   Honor, in addition to that, is we started researching how we

6   thought PA 436 fit in the overall scheme of Chapter 9 and, in

7   looking at those issues, delving into whether or not Chapter

8   9 itself was, in fact, unconstitutional, which is what we

9   will address before your Honor this morning.  And I'd like

10  to, with the Court's permission, set the table a little bit

11  but promise to get into Bekins and some of the cases that are

12  cited by folks who disagree with our views later on in the

13  comments.

14         So I'd ask you, your Honor, to come back with me, if

15  you will, to elementary and high school when we first started

16  talking about what the Constitution is and what it means,

17  and, respectfully, when we go back, we remember that the

18  framers of the Constitution were fleeing an oppressive,

19  overbearing, centralized government.  So when we started

20  looking at how we framed our Constitution, we were very

21  careful to make sure that there was a federal Constitution

22  that was extremely limited only to specific rights that we

23  believed should transcend every single state in the union,

24  and we've come to call those the unalienable rights, and they

25  refer to things like freedom of speech and freedom of

1  religion.  And under the Tenth Amendment, your Honor,
2  everything else is reserved for the states, so specifically
3  reserved for the states are the state municipal governments'
4  rights to handle their own financial management.  And this is
5  done, your Honor, not to protect the states, which would have
6  been as suggested by the New Jersey plan, but was actually
7  done to protect the individual citizens, as suggested by the
8  Virginia plan, and the specific rationale behind protecting
9  the individual citizens was in order to have accountability
10  from our government and particularly, more importantly, from
11  our local governments, which were viewed as being more
12  accessible to the citizens that they were -- that they were
13  supposed to be taking care of.  So, for example, if somebody
14  infringes on my right of free speech or my right of freedom
15  of religion, I know I point my finger to D.C., and I look at
16  the federal government, and I say to the federal government,
17  who is accountable for those federally protected rights,
18  "Make them stop," but if somebody says to me that there's an
19  inappropriate use of the power over the financial management
20  of a state municipality, of, for example, Detroit, I look to
21  my local government.  I look to my local politicians and my
22  local leaders, and I say, "I'm holding you accountable," and
23  we saw that working well very recently with the mayor of
24  Detroit -- with the prior -- apologies -- prior mayor of
25  Detroit, so this direct accountability, which is a

1  cornerstone of how we -- of how we run our country and how we
2  run this democracy, is there for a reason, and it's not there
3  to protect the states.  It's there to protect the citizens.
4  The Constitution doesn't start "We the states."  It doesn't
5  say, "I the general federal government."  It starts, "We the
6  People."  So now, as we indicated in our brief, we believe
7  there is what we've called this unholy alliance between the
8  state giving authorization to the federal government to run
9  this Chapter 9 process.  And what we said there, your Honor,
10 is that the states are, in essence, ceding the responsibility
11 and the accountability for their own financial management, so
12 by turning over under Chapter 9 to the federal government and
13 being able to hide behind the bankruptcy process and this
14 Court, we lose that accountability that's a cornerstone of
15 what our Constitution requires of us, and we've seen that
16 already.  We saw that debtor's counsel correctly noted in an
17 internal e-mail exchange back in January of 2013 that making
18 this a federal issue provides political cover, and we've seen
19 it in the depositions where we're talking to the EM and the
20 governor, and they are talking about the fact that they're
21 not exactly sure what's going to happen with the pensions.
22 The bankruptcy process takes care of that.  And we would
23 respectfully submit, your Honor, that we're seeing play out
24 in real time and real life the exact loss of accountability
25 that the Constitution was designed to protect, so --

1    THE COURT:  Well, but hasn't state consent been a

2  cornerstone of the Supreme Court's Tenth Amendment

3  jurisprudence?

4    MS. LEVINE:  Your Honor, we'll talk about the

5  consent in Bekins, and we don't believe that what we're

6  saying here today is inconsistent with state consent.  And if

7  your Honor will give me a little bit more leeway, we'll reach

8  that point --

9    THE COURT:  Sure.

10    MS. LEVINE:  -- because we understand the issue.  So

11  one of the comments that's being made is that in order for

12  there to be -- that the reason why we can't do it at the

13  state level, the reason why the state municipal governments

14  can't do it is because it violates the contract clause, and

15  by violating the contract clause, you can't do a plan of

16  adjustment unless you have a hundred percent consent.

17    Now, we would respectfully submit, your Honor, that

18  there's two responses to that, and they are -- and I'll admit

19  they're diametrically opposed, but under either response you

20  don't get to the place where you get to take it away from the

21  states.  Number one, if you believe, as suggested, that you

22  need a hundred percent consent at the state level because of

23  the contract clause, then we would respectfully submit that

24  the states can't cede control to the federal government and

25  then suddenly it becomes legal to do a plan of adjustment

 1  without a hundred percent consent.  And, your Honor, in doing
 2  that, we're actually just reading from the Constitution
 3  itself.  The contract clause is in Section 10 of Article I of
 4  the Constitution.  Section 10, Article I, of the Constitution
 5  has three subsections, one, two, and three.  In the first
 6  section, it talks about no state shall enter into treaties
 7  with foreign countries, print money, and it's the contract
 8  clause.  Under sections two and three, not where the contract
 9  clause sits, it says, "No State shall without the consent of
10  Congress," so by the plain reading of the Constitution, if
11  "no state shall" means no state shall, then no state shall do
12  it with or without the consent of Congress, and the framers
13  clearly understood that if they wanted the states to be able
14  to do it with the consent of Congress, they could have done
15  what they did in the two other subsections and basically
16  said, okay, instead we'll do it -- we'll do it with a federal
17  municipal bankruptcy statute where the federal government
18  will consent, and, therefore, you can violate the contract
19  clause.  So our first point is under the contract clause, "no
20  state shall" means no state shall, and if we're going to be
21  intellectually honest with ourselves, that applies regardless
22  of whether or not Congress consents because it's not, as in
23  Section 10, the second and the third paragraph, "No State
24  shall without the consent of Congress."
25          THE COURT:  What Supreme Court case law supports

1  this interpretation?

2         MS. LEVINE:  Your Honor, we respectfully submit that

3  it's Ashton.

4         THE COURT:  The case that Bekins overruled?

5         MS. LEVINE:  Well, we don't believe that Bekins

6  overruled it, and if I can keep going, the alternative

7  approach -- and, frankly, the plain meaning of the statute we

8  don't believe yet -- or I'll admit we haven't found yet a

9  constitutional case that comes right out and says it is or it

10  isn't done this way, but it is the plain reading of the

11  Constitution, which we thought was --

12         THE COURT:  Okay.

13         MS. LEVINE:  -- a good place to start.  But moving

14  past that, let's assume -- and we believe the better answer

15  is that there has to be a way to adjust debts.  Then we go

16  back to where we started, your Honor, which is this is

17  absolutely a state municipal right.  What Bekins was looking

18  at -- and remember Bekins was decided in -- right in the

19  middle of the Great Depression.  Okay.  And so up until

20  the -- up until just before Bekins was decided, there was no

21  municipal federal bankruptcy law at all.  It wasn't really

22  contemplated by the framers, and I'll get into that a little

23  bit more in a minute, but what Bekins found was we now have

24  this new federal municipal bankruptcy law.  There is no state

25  counterpart, so the only option that's available to the state

1   and the only way that the state can be accountable to its

2   citizens to fix this problem if there is no other option

3   available is to then consent to the federal court stepping in

4   and doing this.  Consistent with that, your Honor, we

5   believe, is Asbury Park, and we would respectfully submit

6   that Asbury Park was decided after Bekins.  It was decided --

7   it wasn't a unanimous decision, but there was only one

8   concurrence, so there was no dissent.  It was drafted by

9   Judge Frankfurter, hardly, you know, a slouch, and it

10  specifically upheld Bekins but further found that a state --

11  in that case, New Jersey -- could correctly under its state

12  municipal authority do a plan of adjustment that did not

13  require 100 percent of consent, and in dealing with this

14  issue, it found that to be consistent with Bekins because

15  Bekins was looking at a situation where there was no state

16  alternative for the state to choose, and the state only had

17  one alternative, and it made the alternative to rely on the

18  federal statute.  And it further found -- and I'm going to

19  quote just for a moment, Judge, but in dealing with this

20  issue, the Court posed and then answered this very question.

21  "Can it be that a power that was not recognized until 1938,"

22  which is a federal municipal bankruptcy law, "when so

23  recognized, was carefully circumscribed to reserve full

24  freedom" -- that's how Bekins interprets it -- "to the States

25  has now been completely absorbed by the Federal Government -

1   that a State which, as in the case of New Jersey, has after

2   long study devised elaborate machinery for the autonomous

3   regulation of problems as peculiarly local as the fiscal

4   management of its own household, is powerless in this field?

5   We think not."  And we think that's very telling, your Honor.

6   And by the way, Asbury Park is still good law.  Like Bekins,

7   which it is consistent with, it has not been overruled, so

8   the -- then we were grappling with, well, why hasn't anybody

9   looked at this issue.  What happened after Asbury Park was

10  that the Bankruptcy Act incorporated a federal municipal

11  bankruptcy statute, which is a predecessor to 903, which

12  specifically includes a provision that provides, like 903,

13  that no state can enter into a plan of adjustment unless

14  there is a hundred percent consent.  We find that interesting

15  that it's the federal statute.  Basically, that's Article --

16  that's Chapter 9 saying Chapter 9 is constitutional, and the

17  states can't enter into an alternate separate plan of

18  adjustment with less than a hundred percent because Chapter 9

19  says so.  It's a circular argument, we would submit, your

20  Honor, that can't possibly be the reason why the states can't

21  enter into a plan of adjustment, especially in light of

22  Asbury Park, with less than a hundred percent consent.

23        In addition to that, the other telling conclusion in

24  Asbury Park was when they addressed head on the issue of the

25  contract clause, they determined that the contract clause is

1  not violated when you don't actually violate the underlying

2  contract.  They were analogizing it to like the property

3  rights, so while you have a contract right and that can't go

4  away or you have a property right and that can't go away,

5  what they were talking about in Asbury Park was what's the

6  remedy, and the remedy in a Chapter 9 -- and we would

7  respectfully submit the remedy in a state -- appropriate

8  state plan of adjustment is to take what is now a valueless

9  right -- contract right because the state municipality is

10  insolvent and create a plan of adjustment that, like in the

11  corporate bankruptcy setting, creates value for a right that

12  had no value.  We're not doing away with the contract, and a

13  lot of the cases that come after that -- for example, United

14  Trust that talks about taking away the bonds or changing the

15  bonds -- Asbury Park says you're not taking away the

16  contract, you're not taking away the bonds, you're not taking

17  away our retiree benefits.  All you're doing is you're

18  saying, "Look, there's not enough money here to pay for it.

19  We can't get it through taxation.  We need to -- we need to

20  fashion a remedy."  And that, your Honor, we would

21  respectfully submit is consistent with Bekins, with Asbury

22  Park, and with an appropriate reading of the contract clause.

23       Turning now to the bankruptcy clause, there is a --

24  there is a provision that provides for a national bankruptcy

25  statute.  How can Chapter 9 be unconstitutional if we have

1   a -- if we have a bankruptcy clause that says there's a

2   national uniform bankruptcy statute?  Number one, we're

3   directing our comments specifically at Chapter 9.  We're not

4   saying there is no statute that could be -- that could fit

5   within the parameters.  But that said, one of the things we

6   would observe about the bankruptcy clause is when the framers

7   framed the Constitution, it was inconceivable to them that

8   there would be a national municipal bankruptcy law.  To this

9   day there is no national municipal bankruptcy law in the EU.

10  And while Chapter 11 provides a very viable way to enable

11  commerce and Chapter 7 provides a very viable way for there

12  to be a fresh start -- and we've avoided debtor's prison and

13  all of the things that the framers were focused on at the

14  time -- there was no -- and there wasn't until the Great

15  Depression a national municipal bankruptcy law.

16          Second, we think there's a problem with Chapter 9

17  specifically because the requirement of the national

18  bankruptcy law is that it be uniform, so whether I'm here in

19  Detroit or in any other state or city in the country, I know

20  what the -- I know what the criteria is to be a corporate

21  debtor.  It's right in the Code.  I know what the criteria is

22  to be a Chapter 7 debtor.  It's right in the Code.  But

23  because Chapter 9 is struggling with the difference of the

24  separation of what's a federal power and what's a state

25  power -- and we respectfully submit struggling in a way that

1    didn't work -- Chapter 9 is not a uniform statute.  There are

2    some states that have objective standards so that everybody

3    in their particular state has to meet a certain criteria in

4    order to be a Chapter 9 debtor.  There are some states that

5    don't even have the ability to be a Chapter 9 debtor, and

6    then there are some states, like Michigan, where even though

7    there's a statute that purports to authorize Chapter 9

8    filings, it is completely and totally subjective with regard

9    to who qualifies, whether they get authorization to file, and

10    whether or not there are any contingencies that are attached

11    to what they do when they're in that filing.

12         THE COURT:  Okay.  So how do you distinguish the

13    cases that uphold the nonuniformity of exemptions in Chapter

14    7?

15         MS. LEVINE:  Your Honor, one of the -- two responses

16    to that.  First of all, we understand the case law that says

17    that you can have conformity in a geographic location, so we

18    understand, for example, that if every state had an objective

19    standard the way every state has its own exemptions in

20    Chapter 7, that that could meet the criteria for uniform

21    standards, but we're saying something different.  In Chapter

22    9 we don't know that every state has a standard or that

23    they -- and if they don't have a -- and if they don't have a

24    standard for becoming a Chapter 9 debtor, there is no default

25    back to that which is provided under the Code.  In other

1    words, in Chapter 7, if I like Detroit's exemptions, I use

2    Detroit's exemptions.  If I like the federal exemptions, I

3    use the federal exemptions.  But there is no place where I

4    don't get to be a debtor or I don't get exemptions.

5            THE COURT:  Well, but still the question remains how

6    does a nonuniformity among states in authorizing or not

7    authorizing Chapter 9 or in having different standards for

8    seeking Chapter 9 protection make the federal law nonuniform?

9            MS. LEVINE:  Well, your Honor, if you take that to

10   its natural conclusion, you can say that I have a federal law

11   that basically says you can do whatever you want, but because

12   I'm saying you can do whatever you want to everybody, it's

13   uniform.  We would respectfully submit that that doesn't --

14           THE COURT:  Isn't that just about what the Chapter 7

15   exemption cases say?  Beyond that, federal law outside of

16   Chapter 9 applies state property law, generally speaking,

17   and, of course, the property law differs from state to state

18   to state.

19           MS. LEVINE:  Yes.  And that goes back to the line of

20   cases that talk about geographic, that they can be -- that

21   they can be uniform within a geographic area.  The difference

22   between all of those cases -- and then I'll let the point

23   rest because you are the Judge, and we may have to agree to

24   disagree --

25           THE COURT:  I'm just asking questions.

1    MS. LEVINE:  But the -- but we view that, as I said

2  earlier, that those exemptions, those criteria are published.

3  Okay.  So even if I know that I'm not going to follow -- that

4  if I'm going to follow state law with regard to UCC

5  priorities or if I'm going to follow state law with regard to

6  exemptions, in a specific geographic area I know exactly what

7  that is.  In the states that have the subjective test with

8  regard to whether or not to file a Chapter 9, Detroit has a

9  different standard than Lansing and has a different standard

10  than other cities, and that's the issue, and the issue -- and

11  not only that, but none of those cities know what that

12  standard is.  And I'll leave it there.

13    THE COURT:  Okay.

14    MS. LEVINE:  Your Honor, the other argument that's

15  out there is, well, doesn't the state have -- doesn't the

16  state have the ability to cede control if there's federal

17  aid.  Your Honor, we would respectfully submit that's a very

18  different situation.  If you're looking at a situation, for

19  example, like Sandy or like Katrina where the federal

20  government is saying we're going to give you money under

21  specific terms and conditions, that's different.  Nobody is

22  saying to Detroit or nobody is saying to every single Chapter

23  9 debtor if you file Chapter 9, you get "X" amount of money

24  from the United States of America, and in exchange for that,

25  you have to follow these certain rules.  There's a difference

 1  between entering into a contract for money and for support
 2  than ceding control just to do the plan of adjustment with no
 3  financial support.
 4       THE COURT:  Well, but the cases in which the Supreme
 5  Court has held the Tenth Amendment is violated by the federal
 6  government or the federal government's legislation involve
 7  what's called commandeering.  Is there any of that here?
 8       MS. LEVINE:  Well, your Honor, we think that's -- we
 9  think that is, in part, what is happening here.  The
10  commandeering is they're taking away the state's right or
11  the -- to do their own financial management.
12       THE COURT:  But only because the state showed up.
13       MS. LEVINE:  But that's not true, and this is where
14  we go back to the Bekins --
15       THE COURT:  Is there anything in Chapter 9 that
16  compelled the state to authorize the city to file this case?
17       MS. LEVINE:  Yes, and this is -- and this is where
18  the argument comes.  Okay.  In Bekins there was no state
19  alternative at all.  In Asbury Park -- so, therefore, the
20  Bekins Supreme Court made the decision that the state had no
21  choice if it wanted to adjust its debt but to come to the --
22  but to come to the federal court.  In Asbury Park there was a
23  state alternative to the federal statute that was -- and that
24  was permitted by both the federal statute and the state
25  statute, so the arguments outside of the federal statute that

 1  said you can't go to federal -- you can't do it statewide,
 2  you have to go to federal court under the commerce clause and
 3  otherwise, were rejected for some of the reasons that we're
 4  discussing here today.  In Chapter 9 four year -- or the
 5  predecessor to Chapter 9, four years after Asbury Park, the
 6  Bankruptcy Code in its municipal statute said we can adjust
 7  debts at the federal level if you use the Bankruptcy Act, now
 8  the Bankruptcy Code, but you, states, cannot because of how
 9  we read the commerce clause only -- state municipal
10  governments cannot adjust debt except with a hundred percent
11  consent, so what the -- so what Chapter 9 says to the
12  governor is if you want to do a plan of adjustment without a
13  hundred percent consent, you must come to the federal
14  government, number one.  Number two, your Honor --
15       THE COURT:  Well, but the commandeering cases
16  address situations where the state and -- the federal
17  government imposes on the state to carry out some federal
18  program, some federal policy.  How does that work here?  So,
19  for example, in the New York case, which involved the waste,
20  right, nuclear waste or whatever, the state was forced to
21  take title to it under certain circumstances, and the Court
22  held that the state couldn't be imposed upon to do that to
23  carry out the federal policy of how to dispose of this waste.
24  How is that analogous here?
25       MS. LEVINE:  Well, your Honor, the reason why we

1  believe it's analogous is because in order to do a plan of

2  adjustment, arguably there's no other way to do that without

3  using Chapter 9 unless you have a hundred percent consent,

4  and that's the commandeering.  The requirement that there be

5  a hundred percent consent unless you're the federal

6  government means that the state has no ability to do a plan

7  of adjustment unless it cedes control to the federal

8  government and to the bankruptcy process.

9          Your Honor, I'm coming up on time.  If I -- unless

10  your Honor has more questions, if I could just close briefly.

11          THE COURT:  Well, the other question I have for you

12  is what about the cases that hold that the lower courts are

13  to apply Supreme Court precedent until the Supreme Court

14  itself overrules it, and this is, of course, the Bekins case?

15          MS. LEVINE:  Well, your Honor, our -- we would

16  respectfully submit that Asbury Park was decided after

17  Bekins.  Right now where the Supreme Court sits is that

18  Bekins stands for the proposition that in the face of no

19  state alternative, which is what existed there, you can turn

20  to the federal statute.  Asbury Park stands for the

21  proposition that side by side an appropriate municipal

22  bankruptcy law and an appropriate state law, that's where the

23  state gets to choose, and if the state, as it did in Asbury

24  Park, chooses an appropriate state law that does permit for

25  the adjustment of debt, then the state is accountable to its

1  citizens.  If the state chooses the municipal law, then the

2  state is accountable to its citizens.  But either way, it's a

3  true state decision.  Consistent with both of those cases, we

4  find ourselves here in Detroit with a situation where there

5  is prohibited by Chapter 9, we believe unconstitutionally, no

6  ability to have that second state decision.

7       THE COURT:  Just so I understand, your argument is

8  that the current Chapter 9 is different enough from Bekins

9  because of its exclusivity that Bekins is not binding on this

10  Court.

11       MS. LEVINE:  Correct, and secondarily that Bekins

12  never reached the issue because regardless of whether or not

13  Bekins had an inappropriate -- the Bekins statute had an

14  inappropriate clause, the state wasn't looking to have a

15  separate -- you know, here we have PA 436 looking to try and

16  pigeonhole itself into the strictures of Chapter 9 reviewing

17  Chapter 9 as unconstitutional.

18       Your Honor, we believe your Honor is faced with a

19  difficult decision here.  We understand that Detroit is --

20  all that's happening here is difficult.  Detroit is in dire

21  financial straits, and it's not lost on any of us that the

22  decisions that you make with regard to the criteria for

23  eligibility, particularly with regard to Chapter 9, will have

24  implications for blighted cities throughout the United

25  States.  We also understand that constitutional issues are

1  difficult issues.  We heard -- you know, we've been grappling

2  since 9/11, for example, with the balancing between homeland

3  security and individual privacy rights.  We started talking

4  earlier about the First Amendment, and as a society we

5  grapple between where does First Amendment end and where does

6  a hate crime, for example, begin.  This is no less an

7  important constitutional issue because of the impact this

8  will have on state sovereignty and the ability of its

9  citizens to hold its own municipal leaders accountable.

10  Your Honor spent a long time listening to a lot of

11  individual objectors here in this courtroom talk about how

12  bad they felt things were in Detroit trying to deal with the

13  fact that their firemen were using garden hoses, you know,

14  street lights are out, all of these things, and your Honor

15  was clearly sympathetic.  And it was -- and concluded that

16  hearing, we believe correctly so, by saying that this was a

17  great day for democracy, but we would also add, your Honor,

18  that despite the fact that these things are at the forefront

19  of your mind and you want to do what's right, that doesn't

20  necessarily mean that you can do what's expedious -- what's

21  expedient.  Democracy is hard, and we would respectfully ask

22  that your Honor consider these issues with the same depth and

23  consideration that you've considered everything in this case

24  to date.  Thank you.

25  THE COURT:  Thank you.  Mr. Montgomery also for 35

 1   minutes.

 2        MR. MONTGOMERY:  Yes, sir.  Thank you.

 3        THE COURT:  You may begin.

 4        MR. MONTGOMERY:  Good morning.  Your Honor, my task

 5   today is to discuss with you constitutionality as applied,

 6   the standing and ripeness issue that the U.S. government has

 7   posed to our constitutionality as applied to argument, and to

 8   identify for you the predicate of that unconstitutionality as

 9   applied, which, of course, we believe is the unconstitutional

10   behavior of Emergency Manager Orr and the governor in the

11   context of PA 436.

12        I'd like to set the stage briefly for you, your

13   Honor, on the question of standing by setting up two lines

14   of -- view of history here.  One is that in 1963 the State of

15   Michigan amended its Constitution to protect the pensions of

16   municipal workers.  Partly in reliance on that protection, a

17   small minority of the millions of people who have lived and

18   worked in the city went to work directly for the city.  Of

19   those, thousands of people who worked, about 23,000 people

20   are alive today who are retirees of the City of Detroit,

21   their beneficiaries and surviving spouses.

22        Now, those 23,000 people have been, in our view,

23   stalked by the emergency manager, who, with the blessing and

24   support of his advisors, has proposed to eliminate pensions

25   through a Chapter 9 process.  On July 16th the emergency

manager sought permission from the governor to file a Chapter
9. On July 18 the governor, with full knowledge of the plans
of his emergency manager, gave unconditional permission to
the emergency manager to file that Chapter 9 petition. And
the first overt harm has, in fact, now been announced. On
October 11, the city mailed its books to the retirees
announcing the termination of the retiree health insurance
program for those same 23,000 people.

Now, the committee that I represent, your Honor,
consists of nine individuals, including retirees, deferred
vested, retirement eligible, surviving spouses and
beneficiaries, all of whom are protected by the pension
clause, all of whom are adversely affected by the harm that
was just announced by the city. Each has or represents
vested accrued pension benefits, and they are participants in
the city's retirement health system.

The retiree committee consists of creditors
appointed by the U.S. Trustee to act in connection with the
case under 1102 and we think, therefore, have standing under
1109. Now, the 1109 standing of being an interested party
may not be sufficient for either standing or ripeness on a
constitutionality issue, but we say to you -- we ask your
Honor to look at the current situation in the following
analogy. When can somebody turn and defend themselves when
they are being threatened with harm? We think that you don't

1 actually have to wait until the harm has befallen you if the
2 threat is imminent, if the threat is capable of redress by
3 the Court, and it is identifiable. The redress by the Court
4 is, of course, denial of eligibility to the city. The threat
5 is loss of pensions as announced by the emergency manager.

6 THE COURT: Of course, if eligibility is denied, the
7 city is also denied its right to deal with all of its other
8 debts, isn't it?

9 MR. MONTGOMERY: Your Honor, that may be a temporary
10 delay because if your Honor holds that the current
11 authorization papers are not constitutional or if accepted,
12 despite their lack of constitutionality, the challenge to
13 Chapter 9 becomes insurmountable, we think that the
14 reasonable thing this Court could do if it were so inclined
15 would be to deny the city its eligibility for the reasons of
16 the challenge to the pension clause and then invite the city
17 to come back with either a conditional acceptance by the
18 governor or otherwise correct their manifest intent to
19 violate Article IX, Section 24.

20 THE COURT: Well, what do I do if in Detroit two, as
21 you propose, the bondholders come in waving the state
22 contracts clause?

23 MR. MONTGOMERY: Well, your Honor, first, we think
24 that there is a difference between Article IX, Section 24,
25 and both the federal contracts impairments clause and the

 1  state's own contracts impairment clause.  We think that can
 2  be found in two places.  First, there are extra words that
 3  can be found in Article IX, Section 24.  In its entirety,
 4  Article IX, Section 24, has a phrase that appears at the end,
 5  which says "shall not be diminished or impaired thereby," the
 6  entire phrase, if I may, your Honor, "The accrued financial
 7  benefits of each pension plan and retirement system of the
 8  state and its political subdivisions shall be a contractual
 9  obligation thereof which shall not be diminished or impaired
10  thereby," and, of course, your Honor, the second funding
11  clause, which is, "Financial benefits arising on account of
12  service rendered in each fiscal year shall be funded during
13  such year and such funding shall not be used for financing
14  unfunded accrued liabilities."  Your Honor, that is, to my
15  mind, certainly textually quite different than the state's
16  own simple contract impairment clause, and we think
17  meaningfully it's different.  What Section -- Article IX,
18  Section 24, does for -- in our view, your Honor, is tell the
19  state that no matter what you are doing, you cannot take a
20  step to adversely affect those accrued financial benefits,
21  and we cite, of course, the Seitz case, which is the judicial
22  probate case in which judges in the State of Michigan asked
23  for protection of their pensions, and the Michigan Supreme
24  Court agreed.  We think it's also consistent with the
25  Musselman case, which the Michigan Supreme Court said that,

1  again, the funding of retirement benefits that were otherwise

2  protected or protectable had to be done, and the state could

3  not take any action to not do that.  Now, of course, that's a

4  mandamus case in which the Court denied mandamus, but the

5  legal proposition was squarely stated.

6          We also think the advisory opinions that the Court

7  entered with respect to the tax exempt nature of retirement

8  benefits clearly show that the Michigan Supreme Court looks

9  to see if the state is doing something to impair the actual

10  benefit.  And that particular advisory opinion dealing with

11  the tax exempt nature of retirement benefits, the Michigan

12  Supreme Court said, no, merely taxing you or removing the

13  special exemption is not an impairment of the financial

14  benefit itself, so we step back and we ask your Honor to say,

15  okay, is a plan proffered by the emergency manager with the

16  knowledge and support or blessing of the governor authorized

17  by a statute an unconstitutional series of events?  Is the

18  emergency manager's action unconstitutional, is the

19  governor's action unconstitutional, or is the statute itself?

20  Knowing that there is a judicial predilection for the

21  narrowest possible reading of major problems, we submit to

22  you that your Honor can start with the emergency manager's

23  plan.  Stop it.  No eligibility if the emergency manager's

24  plan is to be put forward.  If that isn't enough because the

25  governor authorized it, then you have to challenge the

1  governor.

2       THE COURT:  Let me rewind the clock here just --

3       MR. MONTGOMERY:  Sure.

4       THE COURT:  -- a couple of minutes and ask you about

5  this nonimpairment provision in the Constitution.  The

6  question we all are struggling with is what is the meaning,

7  the substantive meaning of that provision in the context of a

8  political subdivision that doesn't have the money to comply

9  with it?  What's the meaning of it?

10      MR. MONTGOMERY:  First, I think this might be a good

11 opportunity to agree with your Honor that impairment in the

12 classic sense is something the Bankruptcy Code, of course,

13 has dealt with for many years by saying the allocation of

14 assets is not all by itself impairment.  I think we -- I

15 think it's fairly well established that just because a

16 creditor gets less than a hundred cents does not mean that

17 their contract is impaired.  On the other hand --

18      THE COURT:  I thought that's exactly what it meant.

19      MR. MONTGOMERY:  That's if the state does it, but

20 that's not that the -- remember the -- it was not a taking of

21 property by the federal government to authorize the

22 Bankruptcy Code.  It was --

23      THE COURT:  Oh, if that's what you mean --

24      MR. MONTGOMERY:  Yes.

25      THE COURT:  Absolutely.

1          MR. MONTGOMERY:  Totally.

2          THE COURT:  Absolutely, sure.

3          MR. MONTGOMERY:  But it is a taking of property if

4    the emergency manager says to its retirees, "I, either by

5    virtue of a plan I put in or otherwise, am taking your right

6    to receive pension benefits in the future," which is what he

7    is proposing.  He is not merely proposing to alter the

8    funding system in violation of Article IX, Section 24.  He is

9    proposing to actually eliminate or reduce already accrued

10   financial benefits.

11         THE COURT:  Right, so what's -- how do we give

12   meaning to nonimpairment, as you propose is constitutionally

13   required, if the city doesn't have the money to pay?  What

14   does it -- what's the meaning of that requirement?

15         MR. MONTGOMERY:  Well, your Honor, I think that if

16   there is to be some allocation -- let's back up for half a

17   moment.  Let us assume for the moment that, in fact, the city

18   has proposed to utilize all of its assets to deal with it, so

19   we're not talking about a situation in which the city has

20   capacity on its balance sheet or cash flows to deal with

21   something that it just refuses to do.  We think that the

22   proper answer is not for the federal government to invite the

23   state to violate its own Constitution but to have the state

24   adjust its own laws, have the state, using its people, its

25   either constitutional ratification process or the state

1  through its legislative process create the system for

2  adjustments that Asbury Park tells us is still at least

3  viable.  Putting that aside, whether or not Asbury Park is or

4  is not still --

5          THE COURT:  Well, but hang on, Mr. Montgomery.  If

6  the pension right is as inviolate as you say it is, the

7  legislature can't adjust the pensions either.

8          MR. MONTGOMERY:  No, but it can adjust other

9  people's assets, other people's entitlements.  It can make

10  the accommodations to its Constitution that may be required.

11  It has the capacity to levy.  It has the capacity to change

12  property rights.  The state legislature has those property --

13  and the only thing we are asking this Court to consider --

14          THE COURT:  Well, let me ask this question then.

15          MR. MONTGOMERY:  Yes, sir.

16          THE COURT:  Is it your position that because of this

17  nonimpairment requirement in the Michigan Constitution, the

18  State of Michigan is a guarantor of retirees' pension rights?

19          MR. MONTGOMERY:  We have not garnered nor do we

20  propose to express a view today whether or not the state is a

21  guarantor.  What we are proposing to express a view today is

22  that no state actor can do something in violation of the

23  state Constitution and have that act be other than void ab

24  initio.  And if those acts are void ab initio, the requisite

25  authorizations either don't exist or, if this Court has the

1    power to accept those authorizations notwithstanding their

2    unconstitutionality under Michigan law, then your Honor is

3    engaged not in aiding the sovereignty of the state, as

4    suggested was required by Bekins, but you are aiding -- you

5    are going in the direction of derogation of the sovereignty

6    of the state.  And why do I say that?  Because you are

7    telling the people of Michigan they can't control their own

8    Constitution, they can't control their own legislature, they

9    can't control their own executive officers, and we think that

10   is a pure Tenth Amendment problem.

11        You mentioned earlier in discussion with Ms. Levine

12   the commandeering issue.  It is absolutely true, as you have

13   identified, that first states must act in aid, not in

14   derogation of sovereignty.  That's the Bekins.  Under Printz

15   they can't compel a state official to do something that is

16   otherwise the subject of a federal program.  They can invite,

17   they can entice, but they can't commandeer.  That's the

18   Printz -- that's the Brady Bill decision.  And in the New

19   York versus United States case, which, again, your Honor

20   identified, you can't compel ownership of radioactive waste.

21   Again, you can create programs, you can create enticements,

22   you can create an exhaustive federal regulatory scheme that

23   keeps the states out of regulating the business, but here the

24   federal government can't, by virtue of the Tenth Amendment,

25   keep the states out of regulating the financial obligations

 1  of its citizens.  It can't keep the states out of the

 2  business of deciding when their elected officials can or

 3  cannot do something, and it is that issue that causes the as

 4  applied problem as opposed to the facial and validity issues

 5  that were raised by AFSCME in the arguments of Ms. Levine.

 6  We think it --

 7            THE COURT:  I want to -- well, I want you to focus

 8  on why the mere filing of this case resulted in an imminent

 9  threat to the pension rights of the retirees of the city

10  because the filing itself didn't result in anyone's payments

11  being reduced; right?

12            MR. MONTGOMERY:  Well, I will note for you they --

13  on the healthcare side, they apparently are.

14            THE COURT:  Well, but that's not a result of the

15  Chapter 9.

16            MR. MONTGOMERY:  Well, actually, I don't think that

17  could be done under state law because these are all

18  collectively bargained -- or mostly collectively bargained,

19  and to the extent they were collectively bargained,

20  they're --

21            THE COURT:  Well, but with or without the Chapter 9,

22  Mr. Orr was free to do that or not under state law.

23            MR. MONTGOMERY:  Or not under state law.

24            THE COURT:  There's nothing about Chapter 9 that

25  impacts his decision to do that.  He hasn't asked, at least

1   as far as I know, the Court's permission to do that.

2          MR. MONTGOMERY:  No.  As far as we know, he hasn't

3   asked either.  So if I may answer the question, which, if I

4   understood it correctly, was why is the mere filing --

5          THE COURT:  An imminent injury.

6          MR. MONTGOMERY:  -- an imminent threat, first, I go

7   back to the factual predicate that I think underlays this,

8   that the mere threat of filing -- excuse me -- the mere

9   threat of a filing is not the harm all by itself, but it was

10  preceded by an announced plan, the June 14 proposal, and a

11  series of other events that the emergency manager undertook

12  and statements made, which evidenced -- evidenced -- a desire

13  to violate the state Constitution.  Now, the only way in the

14  emergency manager's own mind that he can do that is if he has

15  access to the Bankruptcy Court because he believes it will

16  trump the state constitution with respect to pension

17  protections.  Now, right or wrong, it is the -- it is the

18  threat that those pension benefits will be eliminated as part

19  of a plan, a series of steps of which have already been

20  undertaken, the most recent of which was the filing of the

21  Chapter 9 petition.  The problem we face, at least in my

22  view, your Honor, is that the world that you face today for

23  deciding whether or not the emergency manager's actions are

24  or are not constitutional under Michigan law is different in

25  the eligibility context than we think you're going to be

1  faced with at a plan confirmation context.  Once you're

2  inside the box of bankruptcy -- excuse me -- everyone,

3  putting aside whether -- how vigorously we will try to get

4  state law to say something different, but everyone seems to

5  suggest that the priority schemes and the allocation schemes

6  of the Bankruptcy Code preclude a contrary result that would

7  be allowable under state law.

8          THE COURT:  Oh, but you're going to fight that.

9          MR. MONTGOMERY:  But, your Honor, I've lost before,

10  and I might lose again.  The issue of --

11          THE COURT:  Well, but if you lose, it will be on

12  legal grounds.

13          MR. MONTGOMERY:  But, your Honor, it will be.  If we

14  are fighting this issue at the back end of the case and we

15  are arguing, as we will if we are required to, that

16  notwithstanding 109, that the emergency manager can't propose

17  a plan in good faith in which he violates his constitutional

18  rights for --

19          THE COURT:  Constitutional obligations, yeah.

20          MR. MONTGOMERY:  Constitutional obligations.  I

21  apologize.  For that to be a viable argument, in effect, you

22  have to rule today, your Honor, that it would be a violation

23  of his constitutional obligations because if it's not a

24  violation in the context of adhering to the Bankruptcy Code

25  provisions, which some cases say only provide with respect to

1    prospective obligations -- that is, a new pension plan would

2    be subject to the protections -- well, we're not talking

3    about a new pension plan, your Honor.  We're talking about

4    one that's been around for 60 or 70 years now, and we're

5    talking about a retirement plan that has people who are a

6    hundred years old.

7         THE COURT:  Suppose the plan is confirmable because

8    it results in the consent of those impaired after

9    negotiation.

10        MR. MONTGOMERY:  Your Honor, if our understanding of

11   the law is correct, it's going to be very hard for a state

12   official to agree in good faith to propose a plan that

13   impairs financial benefits without a hundred percent of the

14   retirees consenting either under 109 or under state law, and

15   so the -- in order to get to the point where a less than 100-

16   percent majority of the retirees are accepting the plan, you

17   have to have decided that state law doesn't control the

18   exercise of those rights.

19        THE COURT:  Suppose you or one of your objecting

20   colleagues decides to assert that the Michigan Constitution

21   requires the state to guarantee the federal -- the retirees'

22   pension.

23        MR. MONTGOMERY:  Well, your Honor, the -- again, you

24   are asking for advisory hypotheticals here, but --

25        THE COURT:  Well, but that's what looking at

1   ripeness is all about.

2           MR. MONTGOMERY:  The issue will be then not whether

3   or not the bankruptcy process has harmed the retirees because

4   it will have -- if the state is a guarantor or arguably a

5   guarantor, it must be sued, query whether or not that lawsuit

6   can be brought in the Bankruptcy Court or some other place,

7   and, secondly, the -- under the <u>Sittler</u> case, I believe,

8   there is a question of whether or not there's a cause of

9   action for damages for unconstitutional behavior.  There may

10  be a remedy, an injunction against unconstitutional behavior,

11  but the Michigan Supreme Court has not yet adopted a per se

12  rule that says if there is a violation of the state

13  Constitution --

14          THE COURT:  Suppose the state agrees that the

15  Constitution obligates it to guarantee the city's pension

16  obligations.

17          MR. MONTGOMERY:  Then the state will have remedied

18  the harm caused by the bankruptcy, your Honor, but the harm

19  was still being caused by the bankruptcy.

20          THE COURT:  What harm?

21          MR. MONTGOMERY:  The harm was the diminution of

22  pension benefits.

23          THE COURT:  Well, but if the state backs it up,

24  there's no diminution.

25          MR. MONTGOMERY:  Yeah.  If, as part of a plan of

1    arrangement, the state backstops -- you're right, your

2    Honor -- then the -- this is like a situation --

3            THE COURT:  Okay.  Okay.  If I'm right about that,

4    then why is the issue ripe now as opposed to then?

5            MR. MONTGOMERY:  This is like the landlord case, if

6    I may, your Honor, in which the -- I think it's <u>Bennett</u>

7    versus <u>City of San Jose</u>, which, if I may, your Honor, since

8    we didn't brief this issue, I can give you the cite for, but

9    as I'm looking for the citation, I believe that case stands

10   for the proposition that a landlord need not await the actual

11   failure to collect more rent than he could under the new

12   ordinance.  He's allowed to challenge the ordinance when it's

13   being passed.  All right.  We think this situation is very

14   similar to that.  We have a situation in which the emergency

15   manager has undertaken an act, has sought the aid of this

16   Court, and the question is do we have to wait for this Court

17   to, in effect, put it to us before --

18           THE COURT:  No, no.  The question isn't that.  The

19   question is do you have to wait for the emergency manager to

20   actually propose a plan that impairs pensions -- that's the

21   question -- and then object to that on constitutional

22   grounds.

23           MR. MONTGOMERY:  In the <u>Thomas More Law Center</u> case,

24   your Honor, the -- which is the commerce clause challenge to

25   minimum coverage provisions under the Affordable Care Act,

1  three and a half years in advance, the Sixth Circuit found

2  standing because notwithstanding the fact that it was a long

3  way off and many things could occur, including Congress

4  changing the law, different rules being applied, that was

5  enough because there was nothing the party asserting the

6  claim had to do in order to become injured.  Now, yes, there

7  were things that any member of the law center group could do

8  that could escape the harm, but the fact that they had to

9  undertake affirmative steps to escape the harm was enough.

10      Here the only thing we can do to escape the harm

11  which the emergency manager has announced he will undertake

12  is to escape, and the only way to escape is through the gates

13  that your Honor is standing at the door of.  You are the

14  keeper of the protection for the retirees.  You are the one

15  who can stop the emergency manager from doing what is

16  unconstitutional under Michigan law.  And apparently, by the

17  way, both the state and the city are inviting you to rule on

18  constitutionality issues, you know.  They are perfectly

19  comfortable with your going down that road, your Honor, and

20  notwithstanding our hesitancy --

21      THE COURT:  Does that make an otherwise not ripe

22  issue ripe?

23      MR. MONTGOMERY:  No, obviously not, your Honor, but

24  we do think that where there's -- where the voluntary

25  cessation by the city or the temporary cessation or the

 1   temporary abandonment of its statements that, oh, we are

 2   going to impair the pensions does not create a situation that

 3   moots the controversy nor do we think it eliminates the

 4   ripeness of the controversy because your Honor can still see

 5   the identifiable harm and can still issue an order that

 6   redresses that identifiable harm by telling the city it may

 7   not enter the portals of your courtroom.

 8          Now, your Honor, I think we have, in effect,

 9   distinguished the Barnwell case, which is cited by, I

10   believe, the U.S. government, because that was an ad hoc

11   committee of citizens instead of an 1102 committee.  Here

12   we're clearly creditors.  Here 1109 grants us statutory

13   standing as parties of interest, and I think we have

14   indicated to you that the harm is factual, imminent, and you

15   are at the gates.

16          One other thing I might want to sort of identify in

17   this ripeness issue, why now as opposed to what, why later,

18   of course, your Honor is familiar with the City of Stockton

19   case, and we are not urging you to adopt that case obviously,

20   but it does suggest that once in Chapter 11, the State of

21   California couldn't decide which rules it was going to

22   follow.

23          THE COURT:  Chapter 9?

24          MR. MONTGOMERY:  Right, in Chapter 9, the same thing

25   your Honor might decide here; that is, once inside Chapter 9,

1   the city is not free to do whatever it wants to do except
2   with respect to its own property and its own future
3   governance.  That you cannot touch in any way, shape, or
4   form, but that doesn't mean that you have to approve a plan
5   that violates what your Honor thinks are the rules of the
6   road.  And it is that danger that you would be called upon to
7   make a ruling inconsistent with Michigan law at the back end
8   of the case that has us asking you at the front end of the
9   case to prevent the city from engaging in that dialogue.
10          Now, the -- I think worth making as a final, if you
11  will, point -- and, again, later this afternoon you will hear
12  a more fulsome discussion, I believe, on all of the issues
13  associated with PA 436, but I think the void ab initio issue
14  is important to our constitutionality position; that is, were
15  it not for the fact that under Michigan law an
16  unconstitutional act is considered void ab initio, we think
17  you might be able to go down the road of accepting the
18  authorization papers as having been legitimately delivered to
19  your Honor without fear of violating our view of how Chapter
20  9 would be unconstitutional as applied; that is, if Michigan
21  law did not regard unconstitutional acts as void ab initio,
22  then all you would be faced with is a remediable situation
23  rather than an absence of action or an absence of
24  authorization action.  And with respect to the void ab initio
25  cases, we have cited those in our brief, your Honor, and we

1   think that you should accept as a truism, if you will, the
2   simple words actually uttered by Attorney General Schuette in
3   his paper that the city lacks authority under Michigan law to
4   propose a plan that diminishes accrued pension rights.  It
5   similarly lacks power to consent to any proposed action that
6   would violate the Michigan Constitution.  The proposed action
7   was the petition.  The proposed action was the petition as
8   part of a plan to eliminate the pension rights induced -- the
9   emergency manager got the governor to say yes to an act that
10  was unquestionably contrary to the pension clause.  As a void
11  ab initio act, that means that the legitimacy of the filing
12  is called into question, pure question of state law for your
13  Honor to rule upon, pure question of whether or not, in fact,
14  the city has obtained valid authorization papers -- pretty
15  hard to be valid if the underlying actions are void ab
16  initio, which is the norm under Michigan law, and we think,
17  therefore, your Honor has two ways to go down the path of
18  blocking eligibility independently of the factual disputes
19  under 109.  One is to hold that it's unconstitutional, the
20  authorization was unconstitutional because it was part of a
21  scheme to eliminate the pension rights or to say even if it
22  wasn't void ab initio, the acceptance of those actions by
23  this Court raise a huge constitutional challenge under the
24  Tenth Amendment to Chapter 9 itself.  Obviously the principle
25  of limiting federal constitutionality challenges would favor

 1  finding that the narrower ground would be that the emergency

 2  manager couldn't have filed his papers.  And I think, your

 3  Honor, just because I must, I just want to argue we are not

 4  arguing -- we are not rearguing today all those issues which

 5  we were in front of your Honor before several weeks ago about

 6  Stern v. Marshall and whether or not the Court should do

 7  that.  We are in front of you.  You have determined that you

 8  have the power to decide issues of state and federal

 9  constitutionality.  We are asking you to exercise that power

10  and to preclude the city's eligibility.

11        THE COURT:  So if you don't -- we have a little time

12  left.  I have some more questions for you.

13        MR. MONTGOMERY:  Sure.  Happy to engage, your Honor.

14        THE COURT:  One is sort of a procedural one.  You

15  mentioned that you didn't brief the ripeness issue.  Would

16  you like an opportunity to do that?

17        MR. MONTGOMERY:  That would be fine, your Honor.

18        THE COURT:  I'd leave it to your discretion.

19        MR. MONTGOMERY:  Yes, yes.

20        THE COURT:  How much time --

21        MR. MONTGOMERY:  We'd be happy to do that, your

22  Honor.

23        THE COURT:  How much time would you like?

24        MR. MONTGOMERY:  Give us a week, your Honor.

25        THE COURT:  Okay.  You have a --

1    MR. MONTGOMERY:  Yeah.  Give us a week.  It'll be --

2    if you don't mind, we'll submit it to you on the first day of

3    the trial.

4        THE COURT:  Okay.  I want to ask you about a couple

5    of entries in the brief that you did file.

6        MR. MONTGOMERY:  Okay.

7        THE COURT:  On page 27, you say -- and I want to

8    quote here.  This is the brief you filed at Docket Number

9    805.

10       MR. MONTGOMERY:  Yes.

11       THE COURT:  You say, "As noted by the Sixth Circuit

12   in City of Pontiac Retired Employees Association, 213 Westlaw

13   4038528 at *1-2, the Michigan legislature evidenced an

14   unconstitutional, and undemocratic purpose in crafting PA

15   436," close quote.  Similarly, on page 29 of that brief you

16   say, "The Michigan legislature, the Governor, and the

17   Emergency Manager have each made clear that abrogation of

18   municipal retirement compensation rights was the legislative

19   intent of the Act," referring to PA 436, "and is a central

20   purpose of this bankruptcy.  That intent also was recently

21   recognized by the 6th Circuit in City of Pontiac Retired

22   Employees Association," same cite at *3.  I have to say, Mr.

23   Montgomery, that I have studied that opinion by the Sixth

24   Circuit several times, and I cannot find these references.  I

25   cannot find where the Sixth Circuit addressed or even

1  suggested anything about the constitutionality of PA 436.  Am

2  I missing something or was this a mistake?

3         MR. MONTGOMERY:  Well, unless my memory fails me,

4  your Honor, I think what we're referring to is the fact that

5  the Sixth Circuit said that PA 4, which was the immediate

6  predecessor of 436, had each of those purposes, your Honor,

7  and that, therefore, by extension --

8         THE COURT:  Perhaps so, but the Court didn't say

9  anything about PA 436.

10        MR. MONTGOMERY:  Well, other than that it was

11  adopted despite the fact that the referendum had overruled PA

12  4 and that it was virtually the same but for -- I believe the

13  phrase was an add-on for --

14        THE COURT:  The Sixth Circuit did not say anything

15  about the purpose or intent of PA 436.

16        MR. MONTGOMERY:  But it did as to 4, your Honor.

17        THE COURT:  It did.

18        MR. MONTGOMERY:  And it says 4 -- 436 is the same as

19  4.  That's how we got there.  Rightly or wrongly, that is how

20  we got there, your Honor.  We say if the Sixth Circuit

21  identified a purpose of PA 4 as being the impairment of

22  pension --

23        THE COURT:  Well, since you're going to file an

24  amended brief --

25        MR. MONTGOMERY:  Yes, sir.

1          THE COURT:  -- I want you to tell me very

2     specifically where in this <u>City of Pontiac</u> case the Court

3     said anything or suggested anything about the

4     constitutionality of PA 436.

5          MR. MONTGOMERY:  All right.  Your Honor, we will --

6          THE COURT:  I agree with you it addressed it at

7     length with regard to PA 4 and expressed grave concerns about

8     it, but that's not the act before this Court today, so I

9     invite you to do that in your --

10         MR. MONTGOMERY:  Of course.

11         THE COURT:  -- new brief.

12         MR. MONTGOMERY:  We'll add that discussion to our

13    ripeness supplemental brief.

14         THE COURT:  All right.  Thank you.

15         MR. MONTGOMERY:  Thank you, your Honor.

16         THE COURT:  Ms. Brimer, you may proceed for ten

17    minutes, please.

18         MS. BRIMER:  Thank you, your Honor.  Lynn M. Brimer

19    appearing on behalf of the Retired Detroit Police Members

20    Association.  Your Honor, your concluding arguments or

21    discussion with Mr. Montgomery leads directly into the

22    discussion that I will have with you this morning, and that

23    has to do with the constitutionality of PA 436 under the

24    Michigan Constitution, your Honor.  And first and foremost,

25    your Honor, I'd like to point out that in our brief we

1    noted -- and we cited the _Schimmel_ case -- we noted that PA

2    436 was passed in what we believe is derogation of the

3    Michigan referendum provision in Article II, Section 9, of

4    the Michigan Constitution.  It is well worth noting at the

5    outset of this discussion, your Honor, that that issue was

6    not addressed by either the city or the State of Michigan in

7    the pleadings they have filed.

8         With that, your Honor -- and I'll address that a bit

9    briefly later, your Honor.  Article I, Section 1, of the

10   Michigan Constitution specifically provides that, "All

11   political power is inherent in the people.  Government is

12   instituted for their equal benefit, security and protection."

13   Consistent with that maxim, Article II, Section 9, of the

14   Constitution specifically provides -- and it's a lengthy

15   provision, your Honor, so I'll read the relevant

16   provisions -- "The people reserve to themselves the power to

17   propose laws and to enact and reject laws, called the

18   initiative, and the power to approve or reject laws enacted

19   by the legislature, called the referendum.  The power of the

20   referendum does not extend to acts making appropriations for

21   state institutions or to meet deficiencies in state funds."

22   As has been noted, your Honor, in a handful of cases that we

23   can find that address this case, this provision of referendum

24   is so significant and vital to our Constitution that Article

25   II, Section 9, further provides that, "No law as to which the

1  power of referendum properly has been invoked shall be

2  effective thereafter unless approved by a majority of the

3  electors voting thereon at the next general election."

4         As this Court is aware, I'm sure, on November 6,

5  2012, by referendum, the people of the State of Michigan

6  rejected Public Act 4 on a vote of 52 to 48 percent.  That

7  was the Local Government and School District Act --

8  Accountability Act.  On December 26, Governor Snyder approved

9  Public Act 436, the Local Financial Stability and Choice Act,

10  a virtually identical law to Public Act 4.

11         In order to avoid subjecting Public Act 436 to

12  referendum, two very minor spending provisions were tacked on

13  at the back end.  Section 34 of the Act provides that for the

14  fiscal year ending 9-30, 2013, $780,000 is appropriated to

15  administer the Act, in essence, to pay the salaries of the

16  emergency managers appointed thereunder, and Section 35

17  provides that $5 million is appropriated for the same time

18  frame for the professionals such as lawyers and financial

19  consultants that are engaged under the Act.  The spending

20  provision was not at all a general spending provision for the

21  State of Michigan but a very limited provision relating

22  directly to the Act.

23         We have researched, your Honor, and cannot find a

24  single instance where the voters of Michigan have

25  specifically rejected a law and shortly thereafter the

1   governor passes a very similar law, if not identical, and

2   tacked on a spending provision in an effort to remove it from

3   the otherwise democratic process of the State of Michigan.

4          There are a handful of cases in Michigan that do

5   address the referendum.  In the case of Kuhn v. Department of

6   Treasury at 384 Mich. 378, 1971, the Michigan Supreme Court

7   specifically provided or held that the phrase in the preamble

8   of that -- the Income Tax Act of 1967, which provides that

9   the Act is for the purpose of meeting deficiencies in state

10  funds was not, in fact, sufficient when at the time the state

11  did not have any state deficiencies in its funding, and,

12  therefore, that provision in the preamble did not, in fact,

13  remove the Income Tax Act of 1967 from the power of

14  referendum.  Unfortunately, in that case the plaintiff had

15  not complied with the requirements for referring the matter

16  to the -- or the law to the referendum, and so the Court was

17  not able to render any further opinion regarding that

18  language and its impact on the -- whether or not that case

19  had -- that law had it been brought to referendum.  However,

20  it's instructive to this Court.  The law at issue in that

21  case had not previously been rejected on referendum, so,

22  therefore, it does have some influence in how this Court

23  should interpret how the Michigan Supreme Court may view the

24  two spending provisions tacked onto Public Act 436.  Public

25  Act 4 had, in fact, been rejected by the state through a

1  proper referendum.  The spending provisions were added on in

2  an effort to remove the case -- the law from the referendum

3  in derogation of the provision in Article II, Section 9,

4  which provides specifically that no law to which the power of

5  referendum had been properly applied shall be effective

6  thereafter unless approved by a majority of the electors

7  voting thereon at the next general election.

8      THE COURT:  Okay.  So I have this question for you

9  regarding this argument, and it's, again, a ripeness question

10  and a standing question.  How does any party have standing to

11  challenge the constitutionality of PA 436 on this ground or

12  why is it ripe until such a party has complied with all of

13  the legal requirements to have a referendum regarding that

14  put on the ballot and it being rejected because the law isn't

15  subject to a referendum because of this appropriations

16  provision?

17      MS. BRIMER:  I don't believe, your Honor, that by

18  adding on the spending provision, which on its face took

19  Public Act 436 out of the referendum provision of the

20  statute -- if that is the case, your Honor, then you have

21  read out the referendum from the Michigan Constitution.  I

22  think this is precisely the mechanism by which the

23  constitutionality of the law now should be challenged.  When

24  that law was then relied upon for purposes of the appointment

25  of an emergency manager, that is precisely, I believe, your

1    Honor, how this would come to a court for review.  On its
2    face, the governor attempted to remove this from the
3    referendum.  It was removed from the referendum, but you
4    can't read that out of the law and read out of the
5    Constitution the second provision, which requires that any
6    law that has been rejected by referendum be resubmitted to
7    the electorate.

8         I see I'm running out of time, your Honor.  What I
9    would like to note, your Honor, is that while you are correct
10   that the Sixth Circuit did not specifically rule on 436 --
11   I've read that case closely several times -- 436 was not
12   before the Court, and, as you'll recall, some of the matters
13   at issue in that case were what precisely is before the Court
14   because some of the arguments had not even been preserved on
15   appeal.  However, I think the tone of the Sixth Circuit when
16   it said, "Apparently unaffected that voters had just rejected
17   Public Act 4, the Michigan Legislature enacted, and the
18   Michigan governor signed, Public Act 436.  Act 436 largely
19   reenacted the provisions of Public Act 4, the law the
20   Michigan citizens had just revoked.  In enacting 436, the
21   Michigan Legislature included a minor appropriations
22   provision, apparently" -- they didn't say "in fact," but
23   "apparently to stop Michigan voters from putting Public Act
24   436 to a referendum."  I think that gives us a tone, and I
25   also think it's noteworthy, your Honor, that despite the fact

1  that the city noted on page 15 of Exhibit A to their
2  consolidated response to the objections that we had raised
3  this specific issue, it is not addressed.  It is not
4  responded to by either the state or the city.  It stands
5  unrefuted at this point, your Honor.

6      THE COURT:  Thank you.

7      MR. GOLDBERG:  Good morning, your Honor.  Jerome
8  Goldberg appearing on behalf of interested party David Sole,
9  who is a city retiree, as is his wife, Joyce Sole.

10     THE COURT:  And you may proceed for ten minutes,
11 sir.

12     MR. GOLDBERG:  Thank you, your Honor.  While I
13 certainly concur with many of the eloquent arguments put
14 forth by counsel prior to myself, I want to approach the
15 issue from a somewhat narrower point of view from the prism
16 of Michigan state law and specifically from the Michigan --
17 how Michigan state law views the issue of statutory
18 construction.

19     As we know, 11 U.S.C. 109 states that a local
20 municipality must be specifically authorized by state law to
21 file a Chapter 9 bankruptcy.  The phrase "authorized by law"
22 refers to the law of the state, and I cited <u>Bekins</u> for that
23 principle.  States act as gatekeepers to their municipalities
24 and access to relief under the Bankruptcy Code.

25     As we all know, the basis for the state law

1   authorizing the filing of this Chapter 9 is Public Act 436,

2   and Public Act 436 has several different provisions that I

3   think it's worth looking at to get an understanding for why

4   we believe the failure to include a contingency to bar the

5   impairment of pensions is violative of state law.  It

6   provides the emergency -- Section 1551(c) provides the

7   emergency manager with the power to carry out the

8   modification, rejection, termination, and renegotiation of

9   contracts.  Section 1552 provides the emergency manager again

10  with the power to reject, modify, or terminate, one, terms of

11  an existing contract.  Section K gives the emergency manager

12  the power to reject, modify, or terminate an existing

13  collective bargaining agreement.  Section 12 contains

14  provisions for the renegotiation of debt, and it's laid out

15  in Section 12.  But what Section 1552(m) -- Section 12(m),

16  when it deals with the question of pensions, it explicitly

17  includes within the section, within the statute, the --

18  states that the emergency manager must fully comply with

19  Article IX, Section 24, of the Michigan Constitution, which

20  is the constitutional prohibition on diminishing or impairing

21  contract.  In addition, Section 1558 states that the governor

22  may place contingencies on a local government in order to

23  proceed.

24          When you view the statute -- the authorizing statute

25  from the prism of the Michigan rules on statutory

1  construction -- and I cited the <u>Pohutski</u> case, which many --

2  is the seminal case on statutory construction in the State of

3  Michigan, <u>Pohutski</u> -- the Michigan Supreme Court in <u>Pohutski</u>

4  stated, "When parsing a statute, we presume every word is

5  used for a purpose.  As far as possible, we give effect to

6  every clause and sentence.  'The Court may not assume that

7  the Legislature inadvertently made use of one word or phrase

8  instead of another.'  Similarly, we would take care to avoid

9  a construction that renders any part of the statute

10  surplusage or nugatory."  And, in addition, Michigan courts

11  follow the doctrine of expression unius exclusion alterius,

12  the expression of one thing is the exclusion of another.

13      We would submit that in construing Public Act 436 as

14  a whole, in construing it as a whole, any -- you can't allow

15  for the filing of a Chapter 9 unless the Chapter 9 includes

16  the contingency for not impairing the pension rights under

17  Article 24.  Otherwise it would negate that section or

18  declare that section void, and that would be an express

19  violation of the Michigan Rules of Statutory Construction,

20  which the Court is bound to follow at this stage in the

21  proceeding because in the eligibility proceeding, it is state

22  law, state law that is dominant.  We believe, based on --

23      THE COURT:  But aren't there many, many, many

24  conditions that the governor could have put on the filing in

25  order to assure the emergency manager's compliance with state

1    law?

2           MR. GOLDBERG:  There are certainly different --

3           THE COURT:  Equal protection, due process of law,

4    freedom of speech.

5           MR. GOLDBERG:  But what I'm submitting, your

6    Honor --

7           THE COURT:  There are lots of constitutional rights.

8           MR. GOLDBERG:  Certainly.  But what I'm submitting

9    is we have to look at the statute as it is written.  That's

10   what the Michigan courts rule over and over again.  Those are

11   the fundamental rules of statutory construction enunciated by

12   the Michigan Supreme Court in case after case.  In this case,

13   we look at the words of the statute.  We don't read into the

14   statute.  We look at the words of the statute.  This statute

15   contains an explicit guarantee of pensions, a guarantee --

16          THE COURT:  Well, and the governor says --

17          MR. GOLDBERG:  It includes Article IX.

18          THE COURT:  The governor says the filing will comply

19   with state law, doesn't he?

20          MR. GOLDBERG:  Well, the governor may say it, but

21   the governor is not the final arbiter, your Honor.  That's

22   what the Court is for, and what we -- and the governor is not

23   above the law.

24          THE COURT:  Why isn't that a sufficient protection?

25          MR. GOLDBERG:  I'm sorry.

1          THE COURT:  Why isn't that a specific -- a

2   sufficient protection?

3          MR. GOLDBERG:  Why isn't what the governor says a --

4          THE COURT:  No.  Why isn't the fact that this Court

5   will apply state law a sufficient protection?

6          MR. GOLDBERG:  Well, we would submit, your Honor,

7   that state law at this stage of the proceeding, at the

8   authorization stage, is the determinative factor.  Once we go

9   into the -- once you make the eligibility determination, as

10  Mr. Montgomery indicated and as the case law as I've read it

11  indicates as well, that's where federal law -- there's a

12  question of federal supremacy over state law, but at this

13  stage it's state law that is determinative, and the state law

14  in this case explicitly mandates a contingency for the

15  guaranteeing of pensions.  Otherwise we've written that

16  section --

17         THE COURT:  If we're going --

18         MR. GOLDBERG:  -- out of the authorization

19  statute --

20         THE COURT:  If we're going to look at --

21         MR. GOLDBERG:  -- and that's an explicit violation

22  of statutory construction.

23         THE COURT:  If we're going to look at statutory law

24  and every word of it, how do you deal with the city's

25  argument that the word "thereby" in the constitutional

1  provision only prohibits the impairment of pensions by the

2  state or its political subdivisions; it does not prohibit the

3  impairment of pensions by a United States Bankruptcy Court?

4        MR. GOLDBERG:  That's exactly the point, your Honor.

5  That's exactly the point.  At this stage of the proceeding,

6  according to Bekins, according to Harrisburg, and according

7  to every case I've read, according to Collier's, it's state

8  law that is determinative.  That's why --

9        THE COURT:  And that's what I'm asking.

10        MR. GOLDBERG:  That's why the question --

11        THE COURT:  And that's exactly what I'm asking you

12  about.  If we're going to read every word of the statute and

13  apply every word of the statute, including the word

14  "thereby," why doesn't state law permit the Bankruptcy Court

15  to impair pensions?

16        MR. GOLDBERG:  Because the authorization statute

17  that this Court is relying upon, which it has to rely upon

18  because otherwise there would be no Chapter 9 filing, there

19  has to be a specific authorization under state law; correct?

20  I mean there are 20 -- many states don't have one.  You have

21  to rely on the state law.  That state law contains an

22  explicit clause that impair -- pensions cannot be impaired.

23  It's not just written in one place actually.  It's written in

24  two places in that statute.  Again, I'm submitting that down

25  the road, if we get past this eligibility question on this,

1  perhaps what you said is correct.  At that point federal

2  law -- you make the determination based on federal law, but

3  right now you are duty bound to make that determination based

4  on your examination of state law and by applying the state

5  law --

6          THE COURT:  What is the --

7          MR. GOLDBERG:  -- principles of statutory

8  construction.

9          THE COURT:  What is the exact state law language in

10  PA 436 that you rely on?

11         MR. GOLDBERG:  I rely on the language -- here, let

12  me find it right here.

13         THE COURT:  Okay.

14         MR. GOLDBERG:  "The emergency manager shall fully

15  comply with the public employee retirement system investment

16  act and Section 24 of Article IX of the state Constitution,

17  and any actions taken shall be consistent with the pension's

18  qualified status"; that he's -- this emergency manager has to

19  abide by the constitutional impairment.

20         THE COURT:  So my question for you remains if this

21  Bankruptcy Court were to approve a plan -- and I want to say

22  here I have no predisposition on this issue at all.  This is

23  strictly hypothetical legal talk to figure out where we are.

24  If this Court were to approve a plan that impairs pensions --

25  again, not presuming at all that it will -- but if it did, is

1  that the city impairing pensions, or is that the Bankruptcy

2  Court impairing pensions because --

3          MR. GOLDBERG:  That would be impairing --

4          THE COURT:  -- the law prohibits the city from doing

5  it?  There's a question about whether it prohibits the

6  Bankruptcy Court from doing it.

7          MR. GOLDBERG:  That's precisely why I'm making the

8  argument, your Honor.  There is a -- there is a question as

9  to whether -- once we get past the eligibility and this Court

10  is looking at the plan, whether this Court then has the

11  authority under federal law to ignore the state law and state

12  constitutional protection.  I'm not saying it does, but

13  there's at least a question, and a lot of the case law

14  indicates that, but we're not at that stage right now.  We're

15  at the eligibility stage, and clearly at the eligibility

16  stage it's state law that predominates.  It's state law

17  that's determinative, and it's state law that this Court has

18  to look at, not federal law but state law that this Court has

19  to look at in making its determination as to whether the

20  authorization meets the muster.  And what I would submit,

21  that under state law principles, as I indicated, we look at

22  the authorization statute, we look at the plain language of

23  the statute, and we look at the Michigan rules on statutory

24  construction as a -- and there's no way to allow for a filing

25  that would not have a contingency that bars the impairment of

```
 1   pensions.  It's interesting to me you raised before to Mr.
 2   Montgomery --
 3               THE COURT:  Actually, your time has expired, so I do
 4   have to ask you to wrap up.
 5               MR. GOLDBERG:  Okay.  Well, I'll make one last
 6   point.  You raised very briefly to Mr. Montgomery why not
 7   every contract, but, as I indicated, other contracts are
 8   provided for the impairment of those contracts under the PA
 9   436.  It's the impairment of pensions that's explicitly taken
10   away from the authority of the emergency manager, and I
11   submit because of that that any authorization that doesn't
12   include a contingency barring the impairment of pensions
13   would violate Michigan state law and violate the Bankruptcy
14   Code, in essence, itself.  Thank you.
15               THE COURT:  Thank you.
16               MS. CRITTENDON:  Good morning, your Honor.  Krystal
17   Crittendon, and I want to thank the Court for giving me the
18   opportunity to speak this morning.
19               THE COURT:  Welcome, and you may proceed for five
20   minutes.
21               MS. CRITTENDON:  Thank you, your Honor.  Before the
22   Court goes any further, I would just ask that the Court step
23   back and look at the process and how we got to where we are
24   from a legal foundational standpoint, and to that end, I make
25   three objections, your Honor.
```

1        First, the City of Detroit does not have a duly

2 appointed emergency manager because there was no EM or EFM

3 law in place at the time that appointment was made.  As the

4 Court knows, in 2011, Public Act 4, commonly known as the

5 Emergency Manager Act, repealed Public Act 72.  In November

6 of 2012, the people of the State of Michigan repealed Public

7 Act 4 by referendum.  Pursuant to Michigan law -- and this is

8 at MCL, Michigan Compiled Law, 8.4 -- "Whenever a statute, or

9 any part thereof shall be repealed by a subsequent statute,

10 such statute, or any part thereof, so repealed, shall not be

11 revived by the repeal of such subsequent repealing statute."

12 In short, that is saying that when PA 4 repealed Public Act

13 72 and PA 4 was then repealed by referendum, PA 72 was not

14 revived.  It did not spring back to life.

15        On March 14, 2013, a contract was purportedly

16 entered into between the State of Michigan and Kevyn Orr

17 appointing him EFM for the City of Detroit.  However -- under

18 PA 72.  However, because PA 72 was not alive at that time,

19 that appointment was not legal and is defective, and for that

20 reason, Mr. Orr is not a duly appointed emergency manager for

21 the City of Detroit.

22        The second argument, even had there been an

23 emergency manager law in place, Mr. Orr would not have been

24 an EFM at the time PA 436 came into place because his

25 contract, the contract between he and the state, was expired

1  on the day that PA 436 came into place, so he would not have

2  been grandfathered in under PA 436.

3          Finally, under Chapter 9 of the Bankruptcy Code,

4  there is no ability for there to be an involuntary

5  bankruptcy, and because the municipality would had to have

6  filed the petition, and in this case the municipality, being

7  the mayor and City Council, did not file the petition, the

8  petition filed by Mr. Orr was defective, and the filing

9  should be dismissed.

10          For those reasons -- and I see that my yellow light

11  is on -- time goes really really quickly when you have five

12  minutes, but I'd answer any questions the Court has.

13          THE COURT:  Hoe much time is left when the yellow

14  goes on, Kelli?  Do you know?

15          THE CLERK:  Three minutes.

16          THE COURT:  It's three minutes, so you only --

17          MS. CRITTENDON:  Okay.

18          THE COURT:  -- had two under green and three under

19  the yellow, so --

20          MS. CRITTENDON:  Okay.  Thank you, your Honor.

21          THE COURT:  -- you may proceed.

22          MS. CRITTENDON:  Mr. Orr's contract at Section 2.2

23  of that contract provides that his contract was effective on

24  Monday, March 25th, and terminated at midnight on Wednesday,

25  March 27th.  Midnight March 27th was a Wednesday morning at

1    12 o'clock a.m.  The new emergency manager law, PA 436, did

2    not take place -- did not become effective until Thursday,

3    March 28th.  Under 14 -- MCL 141.1572, it provides that an

4    emergency manager or emergency financial manager appointed

5    and serving under state law immediately prior to the

6    effective date of this Act shall continue under this Act as

7    an emergency manager for the local government.  Because the

8    City of Detroit was without an emergency manager or emergency

9    financial manager for one full day before the Emergency

10   Manager Act, PA 436, became effective, Mr. Orr could not

11   continue in that capacity, as used in this section, because

12   he was without a contract.

13          Finally, I would just say there are a number of

14   cases under the federal Bankruptcy Court law that talk about

15   involuntary bankruptcies.  This is akin to an involuntary

16   bankruptcy when someone other than the City of Detroit, which

17   is its mayor and City Council, filed the petition.  And for

18   those reasons, the petition was defective.  Section 109 of

19   the Bankruptcy Code talks to the authorization of the state

20   to approve a bankruptcy if filed by a municipality.  In this

21   case, that is not what happened.  It was the state

22   effectively filing the petition and approving the petition

23   being that the emergency financial manager, assuming that we

24   had one, would be an operative of the state and not an

25   operative of the City of Detroit.  Thank you, your Honor.

1      THE COURT:  Is the contract on which you rely in the

2  record of the case?

3      MS. CRITTENDON:  I don't believe it is.  I do have a

4  copy of the contract with me if the Court would like to see

5  it.  I'm assuming that one of the parties --

6      THE COURT:  If you'd like me to consider it, you

7  should --

8      MS. CRITTENDON:  I will file it.

9      THE COURT:  -- file it.

10      MS. CRITTENDON:  I will, and I will file a brief

11  that memorializes everything that was said today.

12      THE COURT:  All right.

13      MS. CRITTENDON:  Thank you, your Honor.

14      MR. MORRIS:  Good morning, your Honor.  Thomas

15  Morris on behalf of the Retiree Association parties.  The

16  Retiree Association parties who I represent include two

17  individuals.  There was some discussion about the committee's

18  standing to raise certain objections.  The committee argued

19  those objections very ably.  We concur in those objections,

20  and that includes the concurrence of those individuals.  We

21  trust that would take care of any standing issue if there

22  were one.  And the comments that preceded us -- preceded me

23  were very ably made, so I'm just going to address a very few

24  points.

25      One is a point the Court -- a question the Court had

 1    raised about the "thereby" language in the pensions clause.
 2    It's important for the Court to note that it's the city that
 3    files any plan, the city that proposes any plan, negotiates
 4    any plan.  Chapter 9 precludes the Court from appointing a
 5    trustee, from converting the case, from interfering with the
 6    city's ability to manage its fiscal affairs.  A case cannot
 7    be filed involuntarily under Chapter 9.  As the Bekins court
 8    said, quoting from the legislative history on page 51, "The
 9    taxing agency itself is the only instrumentality which can
10    seek the benefits of the proposed legislation."  We think
11    it's clear that any action to impair the pensions by the city
12    would, first of all, be improper, but, second of all, it
13    would be the city's action.

14            Now, the city has taken the position that somehow
15    the pensions clause of the Michigan Constitution is
16    preempted, and we disagree with that, but the city can't have
17    it both ways.  They have a theory -- they've made a number of
18    multiple arguments, but they have a theory that once they got
19    into Bankruptcy Court -- or if they get -- are found
20    eligible, then the pensions clause is off.  Well, if that's
21    the case -- and it's not the case, but if that were the case,
22    then it would be the action of the authorization of the
23    filing and the action of the city in filing the case which
24    would be impairing the pensions.  What happens if the city is
25    found ineligible?

1          THE COURT:  Well, but that's true only if as part of

2     eligibility the Court ruled on the issue of pension rights

3     and ruled in the city's favor.

4          MR. MORRIS:  This ties in with arguments that were

5     made by other counsel, and if Public Act 436 enables the city

6     to impair the pensions, then Public Act 436 in that respect

7     is unconstitutional.  It's inconsistent with the pensions

8     clause.  Of course, the pensions clause is part of the

9     Michigan Constitution, the supreme law of our state, and the

10    Public Act 436 must comply with it.  Public Act 436, in fact,

11    gives recognition to the pension clause and acknowledges it,

12    and it even authorizes the governor to make compliance with

13    the pension clause a precondition.  However, that didn't

14    happen in this case, and that's one of the -- one of the

15    issues that has been raised by other counsel.

16         Your Honor, if the city is found to be ineligible,

17    from the standpoint of the retirees, the city will have to

18    make a choice.  It can choose to comply with the pensions

19    clause and not impair pensions, just say we're going to

20    comply with the Michigan Constitution, or it can negotiate

21    with the retirees through their associations.  That process

22    was shortcut here, and that will be one of the factual issues

23    we've raised.

24         Now, if the city goes forward with a plan that does

25    not impair pensions, one of the Court -- one of the questions

1  the Court had was what happens then, what happens if the city

2  just doesn't have the money.  Well, there's an issue of

3  whether the state is liable.  There's the potential issue.

4  But those are all issues apart from -- they're nonlegal

5  issues.  The most the retirees can ask for is that the city

6  doesn't impair the pensions.  The ultimate solution for the

7  retirees comes elsewhere.  Will the city have -- will the

8  state have to step in to help the city?  Will the city have

9  to do other things to raise money?  I don't know, but those

10  are beyond our legal issues.

11        Your Honor, the city holds the key on this issue of

12  eligibility.  It can agree to comply with the Michigan

13  Constitution or it can negotiate with the retirees and reach

14  a resolution.  The proper outcome here is for the city to go

15  back -- as Section 109 intends, go back and either not impair

16  the pensions, which is our preference, or negotiate with the

17  retirees.  Thank you.

18        THE COURT:  Thank you.

19        MS. FLUKER:  Good morning, your Honor.  Vanessa

20  Fluker on behalf of Center for Community Justice and

21  Advocacy.

22        THE COURT:  Would you repeat your name for me,

23  please?

24        MS. FLUKER:  Vanessa Fluker.

25        THE COURT:  Okay.  Thank you.

1    MS. FLUKER:  F-l-u-k-e-r.  Your Honor, the issue I'm

2   raising today before this Court with respect to eligibility

3   is a failure of the emergency manager to comply with the

4   statutory mandates under PA 436, Section 16, which is

5   actually Section 1556.  That section specifically mandates,

6   and I quote, "an emergency manager shall," not "may," not

7   "might, "shall, on his own -- his or her own or upon the

8   advice of the local inspector if a local inspector has been

9   retained, make a determination as to whether possible

10   criminal conduct contributed to the financial situation

11   resulting in the local government's receivership status.  If

12   the emergency manager determines that there is a reason to

13   believe criminal conduct has occurred, the manager shall

14   refer the matter to the attorney general or local prosecuting

15   attorney for investigation."  There has been some extensive

16   arguments about the tenets of statutory construction, so I

17   won't go through Pohutski step by step, but we're all aware

18   that you must adhere to the plain unambiguous language of the

19   statute.

20        In this particular instance, two of the city's

21   largest creditors, UBS and Bank of America, have been found

22   convicted -- criminally convicted in UBS's case of criminal

23   conduct involving municipal bonds.  In fact, the SEC fined

24   UBS $47,207,180 in Case Number 11-2539, U.S. District Court,

25   New Jersey.  Three UBS executives were indicted and convicted

1  of fraud related to municipal bond rigging, and that was in
2  New York, Southern Division, Case Number 10-1217.  A Bank of
3  America executive was indicted July 19th, 2012, for bid
4  rigging of fraud municipal bonds.  And what's so significant
5  about this, in the criminal conviction with the SEC case, the
6  civil penancy case, it involved a Detroit bond.  This
7  provision cannot be ignored, and the mere fact that it's
8  mandatory because it indicates "shall" is very significant.
9  In fact, it is common knowledge at this point that the
10  emergency manager had knowledge of this information and did
11  not act on it.  In his deposition on August 30th, 2013, he
12  was specifically asked on these issues,

13          "Are you aware of issues that have come out with
14      regard to the LIBOR specifically with UBS and Bank
15      of America in the setting of using the LIBOR as a
16      standard?
17          Answer:  I am aware.
18          Question:  Are you aware that UBS has been sued
19      by the Securities and Exchange Commission for
20      rigging in regard to municipal bonds?
21          In past years?
22          There was a final judgment -- yes, in past
23      years.
24          Answer:  Yes.  I've heard that.  I have not read
25      the final judgment.

1          Question:  Are you aware that Bank of America

2          has been investigated for potential bond rigging

3          with regard to the municipal bond market?

4          Answer:  I am aware that Bank of America has

5          been investigated.  The exact specifics of the

6          investigation I am not aware of."

7      This clearly shows that there is not just a

8  noncompliance with 1556, there's a knowing noncompliance with

9  1556.  There should have been a criminal investigation, which

10  is mandated by the statute, and, in essence, is necessary to

11  even get to the point of making a recommendation for a

12  bankruptcy.  How can you say that we need bankruptcy when you

13  don't know whether there is going to be fraud determined and

14  there may be funds that may be necessary to be paid back to

15  the city that can offset any debt, which also goes to the

16  issue of how are you saying that you're eligible for

17  bankruptcy when you really don't know what the debt is based

18  on the potentiality of fraud in these municipal bond

19  transactions, who are also standing --

20      THE COURT:  Are you saying that the emergency

21  manager, whose term in office is limited by law, was required

22  to await what could be years of litigation to determine these

23  issues and UBS's liability before filing bankruptcy?

24      MS. FLUKER:  I don't think he had to determine years

25  of litigation, but I think that it would be very evident that

1  you would look at least at the debt that you're alleging that

2  the city owes, and if there is common knowledge of such

3  information, which this is -- this is not something that you

4  have to wait years in litigation.  This has been all over the

5  news, the Internet, and everything else.  And as he admitted

6  in his deposition, he was aware of it, and that being the

7  case, that actually heightens the duty, in addition to the

8  mandatory language of Section 1556, which says "shall."

9         THE COURT:  Shall do what?

10        MS. FLUKER:  The statute specifically says the

11  emergency manager shall, on his or her own or upon the advice

12  of a local inspector, make a determination -- there had to be

13  a determination made -- whether there was criminal conduct

14  that affected the financial situation of the city.  Even if

15  he didn't know all this, say for some reason this

16  information -- I see my time is up.  I'll just complete this

17  sentence.  Say this information he had no knowledge of.

18  There was -- we just don't know about it.  He still had a

19  duty to make a determination.  Well, in my estimation,

20  there's been no criminal conduct that contributed to the

21  financial situation of the city.  This provision was not

22  complied with at all, and you cannot try to exercise one part

23  of the statute by totally ignoring and having noncompliance

24  with another.  Therefore, I would request that this Honorable

25  Court deny eligibility for the reasons set forth by all the

1  objectors.

2          THE COURT:  Thank you.

3          MS. FLUKER:  Thank you.

4          THE COURT:  Mr. Gordon, may I have your attention,

5  please?

6          MR. GORDON:  Yes, your Honor.

7          THE COURT:  Are you up next?

8          MR. GORDON:  I am.

9          THE COURT:  Okay.  Do you want to give part of your

10  argument now, or do you want to take a lunch break now and

11  then do your entire argument after lunch?  I leave it to you.

12          MR. GORDON:  If it's okay with the Court, I would

13  prefer the latter, to just start after lunch.

14          THE COURT:  Okay.  All right.  We will take our

15  lunch break now, and we will reconvene in an hour and a half,

16  so that'll be 1:20, please.  Twenty after one we'll

17  reconvene.

18          MR. GORDON:  Thank you, your Honor.

19          THE CLERK:  All rise.  Court is in recess.

20      (Recess at 11:48 a.m., until 1:20 p.m.)

21          THE CLERK:  Court is in session.  Please be seated.

22  Recalling Case Number 13-53846, City of Detroit, Michigan.

23          THE COURT:  Good afternoon, everyone.  It looks like

24  everybody is here.  Actually, Mr. Gordon, with your

25  permission, before I hear from you, I have a follow-up

1    question for one of your colleagues.

2            MR. GORDON:  By all means, your Honor.

3            THE COURT:  Ms. Brimer, would you resume the

4    lectern, please?

5            MS. BRIMER:  Should I bring something with me, your

6    Honor?

7            THE COURT:  Possibly.

8            MS. BRIMER:  I didn't know I was going to the

9    principal's office.

10           THE COURT:  No, no, no.  It's nothing like that.

11   You argued that the enactment of PA 436 violated the people's

12   referendum rights because PA 436 was so similar to PA 4.

13           MS. BRIMER:  Yes, your Honor.

14           THE COURT:  That was your argument.  Was there a

15   statutory basis for that argument, or was it just based on

16   the people's right of referendum?

17           MS. BRIMER:  It's based on the constitutional right

18   of referendum, your Honor.

19           THE COURT:  Okay.  So there's not a statute we

20   should be looking for on that.

21           MS. BRIMER:  Not that I'm aware of, your Honor.

22           THE COURT:  All right.  That was it.

23           MS. BRIMER:  Thank you, your Honor.

24           THE COURT:  That was it.  Okay.  Mr. Gordon.

25           MR. GORDON:  Thank you, your Honor.  Just to give

1   your Honor a little bit of a road map of the things that I

2   want to touch upon, if that's of help, I thought I would

3   touch upon some of the issues regarding the state law

4   consent, some of the issues that have been raised this

5   morning, then move on to a discussion of some other

6   considerations relevant to the difference between the

7   pensions clause and the contract clause, and then address the

8   issue of what would happen if the Court ruled in our favor

9   that the accrued pension benefits cannot be impaired and what

10  that means for the restructuring, and I think I can add some

11  important information there. And then finally, if there's

12  still time, I would touch upon the collateral estoppel

13  <u>Webster</u> issue, which is in our papers.

14         So, your Honor, we will start with the consent

15  issues under 109(c)(2), and to be clear, in our papers, while

16  we talk -- touch upon the possibility of PA 436 being

17  unconstitutional as applied, the thrust of our papers is that

18  PA 436 needs to be read and can be read in a way that's

19  consistent with the pensions clause and so forth so that

20  there's no need to get to issues of constitutionality.

21  109(c)(2) clearly is an issue that is an issue purely of

22  state law. It is a threshold issue. It is an eligibility

23  issue, and we want to emphasize that it stands on its own,

24  and it can't be conflated with plan confirmation issues.

25         THE COURT: And with apologies, I have to stop you

1   there with this question.  There seems to be a general thread
2   of assumption that whether a state has given authorization
3   under 109(c)(2) is a question of state law, as you just said.
4   I have to say that's not altogether clear to me.  It seems to
5   me there might very well be an argument that the standard as
6   to whether the state has given proper authorization is a
7   federal standard, not a state standard.  Why?  Because in
8   addressing cases in the amendment right next door to Article
9   X -- that is, Article XI -- sorry -- Amendment XI, the 11th
10  Amendment, when we talk about sovereign immunity, the issue
11  of whether a state has given its consent or its waiver of
12  sovereign immunity is a question to be determined by federal
13  law, not state law.
14          MR. GORDON:  Your Honor, in that regard, I think
15  that the Tenth Amendment is different, and it looks first to
16  respect the contours of what is reserved to the states in the
17  first instance, so here I think you have to start with
18  whether there is valid -- I think, at a minimum, the question
19  is is there valid state authorization for submitting a
20  political subdivision of the state to the jurisdiction of the
21  federal government and the federal courts.  I would at least
22  put it that way.  And so that does turn on state law, and we
23  would submit that all portions of state law need to be looked
24  to and harmonized in that regard, and that's sort of the
25  holding of Harrisburg, which we submit is instructive here

1    and which has not been really in any way refuted by the city.

2    And even the United States Attorney has stated that Congress

3    reserved to the state the right to regulate, and I quote,

4    "under what terms," end quote, its political subdivisions may

5    avail themselves of Chapter 9, so it really is a matter, I

6    believe, of state sovereignty, and it's up to the state to

7    determine how and when a political subdivision can avail

8    itself, and how it does that is in part expressed by the will

9    of the people, as embodied in the pension clause, and it

10   needs to be respected.

11         The response of the city and the state is on two

12   levels.  One, first of all, it is asserted that the actions

13   of the governor in authorizing do not conflict with the

14   pensions clause because the authorization itself didn't

15   create any impairment and that it's unclear whether the city

16   will ultimately seek to impair, and if such impairment

17   occurs, it won't be the city or the state that has done it.

18   It'll be the Bankruptcy Court.  Respectfully, we say that

19   those arguments are all unavailing.  First of all, one of the

20   things that I think has not been made clear this morning is

21   some of the things that have come out in discovery.  I don't

22   actually think these things are relevant, but I'll get to why

23   I think they're not relevant in a minute, but I think it's

24   important for the Court to know that in discovery propounded

25   by the Retirement Systems or conducted by the Retirement

1  Systems, the city has admitted that it was an explicit intent

2  in the restructuring plan proposed in June and in the

3  bankruptcy recommendation letter submitted on July 16th by

4  Mr. Orr that accrued pension benefits needed to be impaired.

5  The city has also admitted in admissions that its intent in

6  the Chapter 9 case is to impair and diminish accrued pension

7  benefits, so there is absolutely nothing speculative about

8  that.  The governor has also testified that he was aware that

9  accrued pension benefits may be impaired.  He also testified

10  that he understood that he could put conditions on the

11  consent and authorization and that he chose not to.  Mr. Orr

12  also testified that he could not guarantee that if a

13  consensual plan couldn't be achieved, that he would not

14  resort to cramdown provisions in order to cram down upon the

15  retirees.  So there really is nothing speculative here, and

16  for anyone to say that it is speculative is really -- I mean

17  it just is not -- it's just not factual.

18          THE COURT:  Well, but what would be the --

19          MR. GORDON:  The other thing is that --

20          THE COURT:  What would be the impact on that

21  argument if the state, under this Constitution, does have a

22  legal constitutional obligation to guarantee the pension

23  payments, an issue not yet determined?  And I don't mean to

24  suggest the outcome of that by raising this possibility.

25          MR. GORDON:  Your Honor, I mean if the -- the

 1   problem is that today is the day for eligibility, and we
 2   don't know that today.  If the state came forward today and
 3   said that they would backstop, you know, the full accrued
 4   pension benefits, that might be a different situation, but it
 5   not being here today, that isn't --

 6        THE COURT:  And you're not prepared to say here
 7   today that you're not going to request that conclusion, are
 8   you?

 9        MR. GORDON:  No.  I will not say that, but that's --

10        THE COURT:  That would not be in your client's best
11   interest.

12        MR. GORDON:  Of course not.  Of course not, but that
13   has not been determined today.  The state is not coming
14   forward today.  And eligibility goes to whether this Court
15   even has jurisdiction, and what the city is asking is for the
16   Court to essentially suspend the issue of whether it even has
17   jurisdiction in order to get everybody together, and really
18   you're putting the will of the people and the protections of
19   the Michigan Constitution in jeopardy or being held in the
20   hold while the city wants to move forward with its proposals
21   and bring people to the table, and I would submit that that's
22   inappropriate.  This is an eligibility hearing, and the
23   governor's responsibility is an affirmative responsibility to
24   uphold the Constitution.  To suggest that we don't know
25   what's going to happen down the road reduces his obligation

1    to sort of a wink and nod type of standard, and we submit

2    that that is just inappropriate.  He is to uphold the

3    people's will.

4            THE COURT:  Well, he's to uphold the law.

5            MR. GORDON:  The other thing is, your Honor, that to

6    say that someone other than the state or the emergency

7    manager would be the one impairing the benefits is just not

8    correct.  As the Court well knows, the city is the one that

9    would have to propose the plan.  The Court would not propose

10   the plan.  Essentially what is happening here would be that

11   the governor, through the authorization, is delegating

12   authority that he does not have.  He does not have the

13   authority to abrogate the state Constitution.  By authorizing

14   the emergency manager to pursue the bankruptcy -- again,

15   we're at the eligibility stage -- he cannot give authority to

16   the emergency manager that he does not have, so the question

17   becomes --

18           THE COURT:  The argument is he doesn't have the

19   authority to impair the pensions.

20           MR. GORDON:  That's correct.  If he wanted to do

21   that, he'd have to go get a constitutional amendment.

22           THE COURT:  And -- okay.

23           MR. GORDON:  So he does not have the authority to

24   delegate or to bestow upon anybody else the ability to

25   impair, so the question really is why wouldn't we put a

1   condition today saying that you can move forward in the

2   Chapter 9, but you can't impair the accrued pension benefits?

3   That to us complies with the requirements of the state

4   structure, and there has absolutely been no explanation of

5   why that wouldn't be done today.  We think that's the real

6   question is why wouldn't you -- why wouldn't the governor put

7   that condition in or why can't the Court imply that as a

8   matter of law?

9          If I may, your Honor, I'd like to move on to the

10  pensions versus contracts issue.

11         THE COURT:  Well, hold on one second.  The Sixth

12  Circuit has actually addressed -- I know you're concerned

13  about time --

14         MR. GORDON:  Okay.

15         THE COURT:  -- the issue of how to determine

16  eligibility in bankruptcy, now not in Chapter 9, but it did

17  so in Chapter 13 because there is a factual eligibility issue

18  there, has to do with debt limits, and there are times when

19  creditors say that the debtor's debts are above the debt

20  limits, and, therefore, the debtor is not eligible, so the

21  Sixth Circuit -- the case is Pearson if you're familiar with

22  it.  It says -- it recognizes that at the eligibility stage

23  of a bankruptcy, you don't want to go through the process of

24  fixing claims, but there is this law that sets debt limits,

25  so we have to give it some respect.  So the solution it came

1   up with in that context was we're just going to look at

2   whether the debtor in good faith asserts that its debts are

3   below the debt limit.  And for those of you who want it, it's

4   773 F.2d 751, 773 F.2d 751, a 1985 case from the Sixth

5   Circuit.  Pearson is P-e-a-r-s-o-n.  Why not apply a similar

6   standard to eligibility here?

7           MR. GORDON:  Because there's no good faith issue

8   here.  The question is very simple and can be solved today.

9   Are you going to impair pension -- accrued pension

10  obligations?  You can't.  The law says so.  So put the

11  condition on it today, and we move forward.

12          THE COURT:  So your assertion is that it wouldn't

13  even be a good faith argument by the city.

14          MR. GORDON:  Doesn't matter what their intention

15  actually is.  The condition should be applied today because

16  that is how -- that is the only way a --

17          THE COURT:  It wouldn't be a good faith --

18          MR. GORDON:  -- political subdivision can avail

19  itself --

20          THE COURT:  It wouldn't be a good faith argument for

21  the city to assert that although the Michigan Constitution

22  prohibits it from impairing pensions, it does not prohibit

23  the Bankruptcy Court from impairing pensions.  That would not

24  be a good faith argument?

25          MR. GORDON:  No, your Honor.  I think that that's

1  something that can and should be dealt with today.  Let me

2  give an example.  What if the only debts of the city today --

3  as we stand here today were pension obligations?  Would you

4  say then we should wait and see what happens?  We know what

5  would happen.  Is it any different because there's other

6  creditors in the room?

7         THE COURT:  Well, do we know --

8         MR. GORDON:  I haven't --

9         THE COURT:  Do we know -- do we know what would

10  happen?  Do we know, for example, that there would be no

11  agreed upon negotiation?  Do we know, for example, that the

12  state won't fill in the gap?

13         MR. GORDON:  Well, let's -- I can talk about that.

14         THE COURT:  Now would be the time.

15         MR. GORDON:  If you want to talk about that, I'll

16  skip to that.  I'll skip to that since that seems to be

17  something that is troubling your Honor or at least on your

18  mind.  We have emphasized --

19         THE COURT:  A question.

20         MR. GORDON:  We have emphasized that the Retirement

21  Systems aren't saying the city can't proceed with a Chapter 9

22  case.  It simply must condition the case upon the

23  preservation of the pensions clause.  And certainly in some

24  people's minds this begs the question of whether in the event

25  the Court agreed and ruled that accrued pension benefits may

1    not be impaired, could the city still effectively reorganize

2    and restore itself to financial health through a bankruptcy,

3    and while we've indicated that there is still information

4    that we need -- and it's material information -- we continue

5    to do so -- I believe I can stand here today and say that

6    based upon the information that we do have, it is clear that

7    the city can effectively reorganize even if accrued pension

8    benefits cannot be impaired.

9         Just some thoughts and facts for your Honor.  The

10   city talks about $18 billion in debt, but $6 billion of that

11   $18 billion is special revenues that are supported by the

12   Detroit Water and Sewer System, so now you really have $12

13   billion of debt that needs to be supported by the general

14   fund and other cash flows from the enterprise funds and so

15   forth.  Of that $12 billion of debt, roughly half, six

16   billion, is OPEB healthcare actuarially calculated.  Another

17   two billion is unsecured bond debt.  So fully two-thirds of

18   the $12 billion of debt is very much subject to restructuring

19   and compromise in bankruptcy.  Those are unsecured claims.

20   That's two-thirds of the $12 billion of debt right there.  So

21   there's a tremendous opportunity to unburden the city of the

22   debt obligations -- of these debt obligations and the demands

23   on its cash flow.

24        In addition, although not critical to this position,

25   above the line in the emergency manager's restructuring plan

1    proposed in June is the swap periodic payment, which is

2    soaking up $50 million a year in casino tax revenues.  And as

3    the Court knows -- and, again, I'm not going to argue it

4    here, but, as the Court knows, the Retirement Systems have

5    objected to the treatment of the swaps as secured in those

6    revenues both because the lien is not valid and, even if

7    valid, it does not reach the post-petition revenues.  Also --

8    and if it was determined to be an unsecured claim, then you

9    have a $300 million claim now that is given unsecured status

10   and can also be a compromise in the bankruptcy.

11        Also, it should be kept in mind that we're talking

12   about accrued benefits that need to not be impaired.  There

13   are obviously prospective benefits that could be impaired, so

14   there are a number of different ways that the city can

15   achieve real relief from its debts.  Obviously it spreads the

16   pain in different directions, but we've -- but by looking at

17   it, your Honor, there is absolutely an opportunity to do

18   something.  And when they --

19        THE COURT:  Isn't there also a question of fact as

20   to what the underfunded liability is for pensions?

21        MR. GORDON:  And let me get to that.  It's also

22   critical for the Court to understand that if the Court ruled

23   in our favor and said that there cannot be an impairment of

24   the accrued benefits, that does not mean the Retirement

25   Systems walk away from the table.  The Retirement Systems has

 1  said that they are committed to working with the city to be
 2  part of the solution here.  That means a number of things.
 3  The city has indicated that it needs to devote significant
 4  cash flows in the next five years, according to the proposal
 5  in June, $1.25 billion in the next five years for
 6  reinvestment in the city.  The Retirement Systems don't
 7  object to the concept and understand that the city needs to
 8  reinvest, but after that five years, that reinvestment is
 9  done.  The cash flows of the city become much larger again,
10  and they will improve at five years and the next five years
11  and the next five years.  And the Retirement Systems can be
12  flexible because the Retirement Systems issues, the pension
13  issues, are long-term issues.  They're not short-term issues.
14  So if there are cash flow issues, the Retirement Systems can
15  work with that.  The $3-1/2 billion number that's been thrown
16  out there is not an amount that is due today if the pension
17  systems are not frozen and closed.  That is an actuarial
18  calculation of what will be due over the next 30 years to
19  bring the funding level up to what it needs to be.  That's
20  not the amount that is due on a cash flow basis tomorrow or
21  the next day, so there is flexibility there.
22          Also, it should be understood that over time if the
23  economy improves or interest rates rise, and/or, the
24  underfunding level may go up or down, so there's a lot of
25  things in play there, and when you take that all together,

1  we --

2       THE COURT:  And I certainly appreciate and commend

3  your clients' willingness to work with the city, but

4  prudentially from the standpoint of ripeness apart from

5  constitutional issues, doesn't that suggest putting off until

6  plan confirmation the issue of the constitutional right?

7       MR. GORDON:  Your Honor, again, I would submit that

8  that is conflating eligibility, which is one question, with

9  what can be done under a plan.  If this Court does not have

10  jurisdiction because the authorization was not appropriate,

11  if you're putting -- what you're suggesting -- or the city is

12  suggesting is you're putting the uncertainty -- you're

13  putting at risk a state protected benefit in order to

14  leverage people to get in a room and negotiate.  And I

15  suggest, as a matter of jurisprudence, that is inappropriate.

16       I wanted to also mention, your Honor, other benefits

17  of a ruling in favor of the concept that the pension benefits

18  cannot be impaired.  It, in fact, would help the city in its

19  restructuring in other ways.  Absent a ruling on this issue

20  in favor of the nonimpairment of pension benefits, the

21  parties will struggle to negotiate in the shadows of this

22  unresolved issue.  What will happen is that the parties will

23  have to negotiate on a dual path against the backdrop of

24  still having these arguments under the pensions clause, under

25  Section 943, and so forth that are all or nothing arguments

1    that would -- if ruled on in a certain way, would come to the

2    conclusion that you can't impair us at all.  So it makes the

3    negotiations very difficult, and it also obviously -- as long

4    as that matter is not resolved or if it's not resolved in

5    favor of the pension systems, it becomes -- it makes the case

6    much more litigious and encumbers the entire process.  If the

7    Court rules in our favor -- and, again, these are just, you

8    know, some additional thoughts for the Court because I

9    understand the struggle.  If the Court rules in our favor,

10   there will be less moving parts for the city to deal with and

11   for the parties to deal with, and it makes the negotiation

12   process much more streamlined.  And if at some point in time

13   that decision were reversed and there was a decision that

14   said that the pension clause can be abrogated or impaired in

15   some fashion, having to revise the negotiations at that point

16   and spread the pain around a different way is a lot easier

17   than starting from the other end.  If you start from the end

18   that we're at now, it's very hard, again, for the parties to

19   negotiate.  And if the -- and if it's determined ultimately

20   that you can't abrogate the pension clause, then you're

21   really going back to square one, and we've lost a ton of time

22   in the negotiation process.  We submit that it's much easier

23   to negotiate against a backdrop that says that the pension

24   clause must be upheld.

25           Moreover, a ruling in our favor in that regard helps

1   the city in other ways.  It calms the workforce knowing the

2   accrued and prospective accrued pension benefits will be

3   protected.  This will enable the city to retain its most

4   talented personnel.  In addition, the ultimate commitment of

5   funds to the Retirement Systems as opposed to financial

6   creditors benefits the city because the systems will also

7   invest in the city, as they always have done.  And a majority

8   of the pensioners live within the city and pay taxes and

9   consume goods and services in the city, so the Retirement

10  Systems are an economic engine that really is part of the

11  solution for the city, so I want to address all those.

12          THE COURT:  Well, but so were the bondholders and

13  the bond investors.

14          MR. GORDON:  They don't live in the city, and they

15  aren't putting money back into the city, your Honor.  They

16  are not part of that economic engine, and if they get paid

17  their debt service, there's no --

18          THE COURT:  Hang on.

19          MR. GORDON:  -- guarantee that they're going to

20  reinvest in the city.

21          THE COURT:  Didn't I read in the newspaper that the

22  city just got $350 million?

23          MR. GORDON:  I'm sorry.

24          THE COURT:  Didn't I just read in the newspaper that

25  the city just got $350 million to help with its reinvestment?

 1          MR. GORDON:  No, your Honor.  What we read was that

 2    there's a proposal to secure unidentified assets at this

 3    point but probably to encumber all sorts of assets of the

 4    city in order to get $350 million of which 200 million would

 5    immediately go out to pay swap participants who don't deserve

 6    to get paid anything as a secured creditor, and then the

 7    other 150 million is going to be used in some ways that's

 8    been unidentified, so basically you're encumbering assets of

 9    the city for purposes that don't benefit the city in any

10    demonstrable way at this time, so I would disagree with that

11    characterization.

12          THE COURT:  Okay.

13          MR. GORDON:  So, your Honor, for all those reasons,

14    I think that if the Court were to rule, again, as a pragmatic

15    matter, in favor of finding that this case should not move

16    forward without the condition that there cannot be an

17    impairment and that the pension clause must be upheld, it

18    does not mean this case comes to an end by a long -- quite

19    the opposite.  In our opinion, it makes this case much more

20    manageable.  It makes the negotiations easier.  And it, in

21    our minds, provides a much clearer path to a consensual

22    resolution.

23          THE COURT:  So you think I can find them eligible

24    and find that pensions can't be impaired?  How do I do that

25    because the issue is yes or no, the city is eligible.

1    MR. GORDON:  That's correct, your Honor.  You would

2  have to -- it would be up to the city to either -- and the

3  state to either agree to -- well, there's a couple different

4  ways.

5    THE COURT:  This is the refiling scenario?

6    MR. GORDON:  You could either -- you could either

7  rule that the obligation to uphold the pension clause is

8  implied by law because otherwise you don't have valid

9  authorization, there isn't valid state authorization, or you

10  can provide the option to the state and the city to

11  explicitly confirm that process.

12    THE COURT:  Oh, I see.  So you're saying I can read

13  into the authorization the nonimpairment of pensions even

14  though the governor explicitly rejected that.

15    MR. GORDON:  The governor actually didn't.  The

16  governor testified that he didn't know whether he had to

17  uphold that, and he decided to choose not to put the

18  condition on it and leave it to the courts, which we suggest

19  is not necessarily appropriate but is --

20    THE COURT:  So he rejected the concept of

21  conditioning his authorization on nonimpairment of pensions.

22    MR. GORDON:  He did, but he also said he was

23  basically deferring to the courts as to how that should play

24  out, which is ironic because the Webster court has already

25  ruled on that issue.

1    Your Honor, I'll turn to the pensions clause, which

2  is the contracts clause, if I may.

3    THE COURT:  Sure.

4    MR. GORDON:  The concept that the pensions clause is

5  the same thing as the contracts clause just applying to

6  pensions does violence to the language of the pensions

7  clause, as has already been discussed.

8    THE COURT:  Right.

9    MR. GORDON:  I won't get into that.  Obviously we've

10  pointed out that the pensions clause is more specific and

11  that it was enacted long after the contracts clause and that

12  those things together, as a matter of the canons of

13  construction, would indicate that the pension clause must

14  mean something more and something different from the

15  contracts clause.

16    THE COURT:  Right.  So what more and what different?

17    MR. GORDON:  Well, it starts with looking at why and

18  the environment in which these things were done and looking

19  at the actual language of the two clauses.  The contracts

20  clause was adopted back when the government was being formed,

21  and it helps sort of support the structure of the government

22  as it's being developed in terms of federalism and making

23  sure that states don't impair their -- pass laws that impair

24  their own contracts or pass laws that favor their citizens

25  over other citizens.  That was the general nature of it.  And

1    it's directed, you'll note, to the legislature of the state.

2    The state shall not pass laws that will impair contracts.  So

3    that's the contracts clause.  Now you fast forward --

4          THE COURT:  That's the federal contracts clause.

5          MR. GORDON:  And the state, as well as the state

6    contracts clause.  So then you fast forward -- I don't know

7    how long -- 150 years to 1963, and you're talking about the

8    constitutional convention and the pensions clause, and what's

9    going on at that point in time?  Well, pensions are not being

10   funded.  They're underfunded across the state I'm told to the

11   tune of maybe $600 million, and guess what?  Front and center

12   is the City of Detroit that was not paying pensions for its

13   teachers' pensions funds.  So the convention decided it

14   needed to do two things.

15         THE COURT:  Well, at that point they were also not

16   being treated as contracts; right?  They were being treated

17   as gifts I think was the phraseology.

18         MR. GORDON:  As gratuities.  That's correct, your

19   Honor.  So the convention decided it needed to do two things.

20   The convention decided, first of all, to avoid municipalities

21   digging a deeper hole, they were going to put a provision in

22   the Constitution that said that local governmental units will

23   fund their current year's employer contributions in that year

24   to help avoid digging a deeper hole.  Secondly, to protect

25   the accrued and unfunded liabilities and to move away from

1   the concept that they are a gratuity, the convention said
2   we're going to call it a contract but not a contract in the
3   sense of a contract but subject to the bankruptcy.  I mean
4   there was no -- there was no talk about bankruptcy, nor was
5   there any talk about the contracts clause in this regard.
6   They talked about this is going to be a contract that's in
7   the concept of a solemn binding obligation that will be paid
8   over time, so it is a contract.  There's a contractual right,
9   and it shall not be diminished or impaired, meaning it will
10  be paid over time by the state and its political
11  subdivisions.  It is absolute.  There is no -- there is no --
12  as the attorney general's papers say themselves, there is --
13  it's impermeable unlike the contracts clause, which has
14  developed over time to say otherwise.  Now, the difference is
15  in part --
16          THE COURT:  But how can the -- how can the state
17  contract -- how can the state promise that given that under
18  the federal Constitution it can't print money?
19          MR. GORDON:  It's a matter of insuring that what
20  dollars are available are devoted where they need to be
21  devoted.
22          THE COURT:  Suppose there's not enough then.
23          MR. GORDON:  I don't know the answer to that
24  question, your Honor, but that's not the issue we have here
25  today.  As I've told you, I think that there is enough money

1    here.

2         THE COURT:  It's an important issue.

3         MR. GORDON:  There is -- I'm sorry.

4         THE COURT:  It is an important issue.

5         MR. GORDON:  It's an important issue, but --

6         THE COURT:  It demonstrates that there's a

7    constitutional right there.  It is stated there, but what's

8    it worth?  What's it worth?  I mean Ms. Levine posed that

9    question.  What's it worth if the entity that has the

10   obligation doesn't have the means?

11        MR. GORDON:  First of all, I mean every situation is

12   different.

13        THE COURT:  Yeah.

14        MR. GORDON:  Does it have the means today or will it

15   have the means tomorrow, over time?  Musselman, a state

16   Supreme Court case, says, though, that the pension clause

17   cannot be abrogated in the face of financial exigency.

18   That's what it says.  If there's a need to amend the state

19   Constitution, then it needs to be amended, but it can't be

20   abrogated by one branch of the government.  The will of the

21   people has spoken.  The Constitution is a limit, and it

22   circumscribes the power of the government.  The government

23   can't say, "Gee, we've got an exigency here.  I guess we're

24   going to ignore the state Constitution."  It cannot do that.

25   The contracts clause is different, and this is the point --

1  part of the point is there are contracts and then there are

2  contracts.

3        THE COURT:  Is there any other constitutional right,

4  state or federal, that is that absolute, any other?

5        MR. GORDON:  Sure.

6        THE COURT:  And even freedom of the press has its

7  exceptions.

8        MR. GORDON:  Well, you know, if you look at even the

9  attorney general's papers, you couldn't -- the legislature

10 can't pass laws that would abrogate freedom of religion,

11 freedom of speech, things of that nature, and it puts the

12 pension clause on the same level.  It is absolute in that

13 regard.  There are contracts, and there are --

14       THE COURT:  We have laws that limit speech.  Can't

15 threaten the President; can't yell "fire" in a crowded

16 theater.  You can't commit libel.

17       MR. GORDON:  So that maybe there's some regulation

18 on the federal level, but this is a state issue.  It is an

19 issue that has been -- it is the will of the people of the

20 state.

21       THE COURT:  Even the contracts clause has its

22 limits; right?

23       MR. GORDON:  Contracts clause does.  The reason is

24 different, though.  There are contracts, and then there are

25 contracts.  And if you look at, for example, you know, some

1   contracts fall under the contracts clause, but the pensions
2   were determined to be different, and that's why you have a
3   pensions clause.  That's the whole point of it.  The
4   contracts clause recognizes that when you contract with the
5   government, there is an inherent reserve police power to act
6   in the public's welfare, and, therefore, to the extent
7   necessary, in certain situations they can impair contracts.
8   That's the contracts clause.  Then you have the pensions
9   clause.  It doesn't say that it is subject to the contracts
10  clause.  It elevates pensions to a different level, and the
11  reason is fairly clear.  If you look at the Musselman case,
12  in particular, again, Musselman says that Michigan
13  governmental -- and I quote.  This is from 448 Mich. 503
14  where it talks about the pension clause being absolute and
15  that it -- and it recognizes that the pension clause protects
16  pensions for work performed, so I quote, "Michigan
17  governmental units do not have the option, however, of not
18  paying retirement benefits.  Unlike highway construction or
19  police protection, which a governmental unit can choose to
20  receive less of, it is impossible to receive less service
21  from the pensioner.  The pension payment is payment for work
22  already completed, or deferred compensation," end quote.
23  What's being referenced there is the complete difference --
24  the relationship between the public employer and labor is
25  different than the relationship between the public employer

1   and a bondholder.  A bondholder makes an investment.  There's

2   risk involved.  That is understood, and that risk is factored

3   into the pricing of the bond.  A laborer has -- the

4   relationship with the employer is different.  The laborer

5   works.  The employer pays.  And to the extent that part of it

6   is deferred compensation in the form of a pension, so be it,

7   but it's for -- but what the pension clause protects is

8   accrued benefits.

9              THE COURT:  Isn't there an argument that labor takes

10  risks with its employer, too?

11             MR. GORDON:  Not in the State of Michigan, your

12  Honor, and I want to emphasize that.  Michigan is only one of

13  seven or eight states in the country that has this clause.

14  This is unique to Michigan and the seven or eight other

15  states involved.

16             THE COURT:  Excuse me one second.  I want you to

17  ignore --

18             MR. GORDON:  Oh.

19             THE COURT:  No.  I want you to ignore that yellow.

20  My staff advises me that Ms. Levine didn't use seven of her

21  minutes, so I'm going to yield them to you.

22             MR. GORDON:  Thanks, Sharon.

23             THE COURT:  So reset the clock at ten.  I assume

24  that's okay with you.

25             MR. GORDON:  Yes, absolutely, your Honor.  I can't

1  even remember where we were now.  Where were we?

2        THE COURT:  Oh, I'm sorry.  I interrupted your train

3  of thought.  Well, take another minute to recollect --

4        MR. GORDON:  Oh, yes.  I think I finished that

5  point, I suppose.  It really is that, you know, some contract

6  rights are just contract rights, and other contract rights do

7  rise to the level of property rights, and that's in the

8  United States Trust Company of New York versus New Jersey,

9  the Supreme Court case, 431 U.S. 1.  In Michigan AFT Michigan

10  versus Michigan, 297 Mich. App. 597, the Court held that

11  withheld salary of public school employees constituted the

12  taking of property in violation of substantive due process

13  and the takings clause, so there are relationships,

14  contractual relationships relative to accrued benefits for

15  labor, pension obligations, that are treated as property.

16        THE COURT:  Is there a State of Michigan case that

17  holds that pension rights are property rights?

18        MR. GORDON:  Well, this relates to salary of public

19  school employees.  I don't know --

20        THE COURT:  Right.  So I was asking you about

21  pensions.

22        MR. GORDON:  About pension obligations specifically?

23  I would have to check on that, your Honor, but I believe that

24  there are pension cases in the state that talk about pension

25  rights as property, including in such a situation, as you can

 1  imagine, as divorce settlements.  There are pension
 2  obligations that become property that get part of a property
 3  settlement even, but that's just one example, but I can get
 4  you --
 5          THE COURT:  Well, we have to be careful here because
 6  a contract right is in the bundle of property rights.  Every
 7  contract is property of the parties to the contract; right?
 8          MR. GORDON:  Yes, your Honor.  I'm not sure that all
 9  contract rights rise to the level if they're abrogated of a
10  taking, but here vis-a-vis the pension --
11          THE COURT:  Right.  That's exactly the point.
12          MR. GORDON:  That's right, but the pension clause --
13          THE COURT:  So when the federal, you know,
14  Bankruptcy Court discharges creditors' contract rights
15  against debtors, which we do all day every day, we're not
16  taking the creditors' property rights even though we are
17  discharging those contracts or if we are it's not a Fifth
18  Amendment violation; right?
19          MR. GORDON:  True.  By the same token, there are
20  other property rights that are determined under state law
21  that -- cases such as Butner and Travelers respect the state
22  law property interest, and it flows through the bankruptcy.
23          THE COURT:  Right, but the point is that it has to
24  be a property right under state law over and above what would
25  be the contract right, like, for example, a security

1    interest.

2         MR. GORDON:  Or a state constitutionally protected

3    right that is impermeable we would submit, your Honor.

4         THE COURT:  Okay.

5         MR. GORDON:  It's like a nondischargeable debt, your

6    Honor, and it doesn't mean that it can't be dealt with in a

7    way that doesn't impair it but gets dealt with in a way that

8    is -- you know, provides some flexibility for the

9    reorganizing entity, but it's a nondischargeable debt.

10        THE COURT:  Well, nothing in Chapter 9 provides for

11   any nondischargeable debts, is there?

12        MR. GORDON:  I'm stating it by analogy, your Honor,

13   obviously.

14        THE COURT:  Okay.  All right.

15        MR. GORDON:  By putting the condition on that you

16   can't impair, it becomes a nondischargeable debt essentially,

17   and the state has that authority to place the appropriate

18   conditions on the filing of the bankruptcy to protect the

19   statutory structure.  And it's not just statute.  I mean this

20   is -- the difference here again, this is really unique.  It's

21   not like California or Alabama.

22        THE COURT:  Hypothetically, a state legislature

23   passes a law authorizing municipalities to file Chapter 9 so

24   long as the plan provide -- the municipality's plan provides

25   for a priority of payment, and it turns out that that

1  priority of payment legislatively required by the state

2  legislature is different from the Bankruptcy Code.  Let's

3  assume that.  Would it be your position that no municipality

4  could file Chapter 9 in that case because the state law

5  contravenes the superior -- or the supreme federal law?

6       MR. GORDON:  Well, that's an interesting question

7  because it sounds more like one of those situations where

8  once you're in bankruptcy, you have to accept the structure

9  of the Bankruptcy Code itself, and that highlights --

10       THE COURT:  That's exactly what the city is arguing

11  here.

12       MR. GORDON:  And that highlights the point here that

13  eligibility has to be dealt with at the eligibility stage and

14  that -- and to put off the question of whether you can impair

15  the pension clause leads to those vagaries of questions

16  about, "Well, now we're in bankruptcy.  Does the Bankruptcy

17  Code have vitality and in what regard?"  No.  You don't get

18  to those questions unless you have valid state authorization.

19  You don't have valid state authorization unless you've taken

20  into account what provisions need to be there to protect the

21  state Constitution and other statutes, and that's sort of

22  what Harrisburg talks about.  You may have facial authority

23  under one statute, but you got to look at the other statutes.

24  And in here in this case it's --

25       THE COURT:  So in my hypothetical you would say

1  there's no valid authorization.

2        MR. GORDON:  I would say that the state may be very

3  disappointed if it authorizes and allows the debtor into

4  bankruptcy only to find that the -- that part of the

5  protection goes away.

6        THE COURT:  It's hard for me to be concerned about

7  how the state feels.  Is it your position that there would be

8  no authorization, no proper authorization in that case?

9        MR. GORDON:  Let me understand the hypothetical

10  then.  I know time is short.  The hypothetical is that the

11  state would pass a statute that says that you can file

12  Chapter 9, but the priority of payments is going to be --

13        THE COURT:  But here are the priorities.  Here are

14  the priorities.  You got to pay bonds first, and, you know,

15  you got to pay --

16        MR. GORDON:  Perish the thought.

17        THE COURT:  Sorry?

18        MR. GORDON:  Perish the thought, but go ahead.

19        THE COURT:  Okay.  Perish the thought all you like,

20  but this is the hypo.

21        MR. GORDON:  Yes.

22        THE COURT:  You got to -- you pay the bonds first,

23  and you got to pay trades, and then you got to pay employees'

24  wages, and then you pay pensioners last, and understand,

25  everyone who's listening to this, this is strictly

 1   hypothetical.  It's inconsistent with the Bankruptcy Code.
 2   I'm sorry.
 3          MR. GORDON:  I forgot about the overflow.  Sorry.
 4          THE COURT:  Well, and this is being recorded.
 5   Anyway, it's inconsistent with the Bankruptcy Code.  However,
 6   whatever hypothetical you create, and the governor says, you
 7   know, "We've got to comply with state law.  I'm authorizing
 8   this bankruptcy, but the municipality's plan has to comply
 9   with the state law that sets forth these priorities."  Is
10   that a proper authorization or not?
11          MR. GORDON:  I would say not.
12          THE COURT:  Okay.
13          MR. GORDON:  Well, it's --
14          THE COURT:  Now you're saying that when state law
15   says the priority has to be given to pensions --
16          MR. GORDON:  Well, let me back up.
17          THE COURT:  -- that's not proper if it's
18   inconsistent with the Bankruptcy Code.
19          MR. GORDON:  Actually, I would say -- no.  I would
20   say that the authorization is proper, but, again, a portion
21   of that authorization is actually going to come into conflict
22   with the Bankruptcy Code itself, so I think it's just a
23   flawed concept.  So if you had that provision in there, I --
24   you know what?  The difference is -- let me think about this.
25   I think the difference is the cases such as Vallejo and

1  others dealt with situations where someone tried to cherry

2  pick various provisions of the Bankruptcy Code after they got

3  into bankruptcy.  It didn't involve the actual state

4  authorization.  So here I think if you were presented with

5  that, you would have two choices.  You would either have to

6  acknowledge that state authorization as is and agree to that

7  structure and say that will supersede the Bankruptcy Code

8  because that's the only way the state is allowing you to get

9  into bankruptcy, or you would have to dismiss the case.

10         THE COURT:  Which should I do?

11         MR. GORDON:  In that situation, I think you would

12  give the state the opportunity to decide, but in the first

13  instance, if the state doesn't do anything, you would have to

14  dismiss that case because you don't have the authority to

15  amend the Bankruptcy Code.

16         THE COURT:  I would have to give them the

17  opportunity to revise the authorization?

18         MR. GORDON:  That's correct, your Honor.  They'd

19  either have to amend the --

20         THE COURT:  How could --

21         MR. GORDON:  -- authorization or understand that if

22  they go into --

23         THE COURT:  How could the governor provide an

24  authorization that's inconsistent with the state statute?

25         MR. GORDON:  He couldn't.  He would either have to

1  go back and --

2          THE COURT:  What's there to revise?

3          MR. GORDON:  -- change the statute -- he'd either --

4  he has two choices.

5          THE COURT:  Oh, go back and change the statute.

6          MR. GORDON:  There are two choices.  Either the

7  Court agrees to allow the case to go forward with that

8  structure because that's the only way the state will

9  authorize it and that's what 109(c)(2) talks about, or if

10  this Court for some reason believes that that is in conflict

11  with the Bankruptcy Code, then this -- I guess I don't know.

12  The state could either -- the state would have to go back and

13  amend its statute in some fashion.  I don't really know, but

14  I think that if the state --

15          THE COURT:  Or if it's constitutional, amend its

16  Constitution?

17          MR. GORDON:  Wait.  What couldn't be done is that

18  this Court could not accept the authorization and then say,

19  "I'm cherry picking.  I'm not allowing that part of the state

20  statute to stand because that is the only way that they got

21  into bankruptcy in the first place."  That's my answer, your

22  Honor.  All right.  Can I move on?

23          THE COURT:  You can.

24          MR. GORDON:  We're really out of time here probably,

25  I notice, in a minute, but I just wanted to touch upon

1  collateral estoppel because I promised I would unless your

2  Honor has a different --

3  THE COURT:  No, no.  You argue what you like.

4  MR. GORDON:  As far as collateral estoppel is

5  concerned, your Honor, the city and the state have argued

6  that there was not a full fair opportunity to litigate in the

7  Webster matter.  We've addressed that in our papers.  We

8  believe that that is not accurate.  There was full briefing.

9  Both sides filed cross-motions for summary disposition, so

10  they addressed the merits of the matter.  The Court

11  acknowledged that there had been briefing and oral argument

12  before it entered its order.  The city and the state also

13  argued that there was no privity between the city and the

14  defendants in Webster, but on September 19th, your Honor, the

15  city argued in this court that there was a common interest

16  agreement between the city and the state and that there was

17  common interest with respect to the financial situation of

18  the city and the bankruptcy, so privity is certainly there.

19  And then finally the city and the state argued that the state

20  court doesn't have authority or jurisdiction to rule on

21  eligibility issues.  The Webster court didn't rule on

22  eligibility issues.  It doesn't mention 109(c)(2) of the

23  Bankruptcy Code.  It merely ruled on the interplay between

24  two state statutes, PA 436 and the pensions clause, and ruled

25  that those two had to be harmonized and that, therefore, any

1  authorization of a bankruptcy under PA 436 must comport with

2  the pensions clause or otherwise it was unconstitutional, so

3  it did not infringe on this Court's jurisdiction in that

4  regard.  So we think that collateral estoppel is valid and

5  applies here under the Webster judgment.

6          THE COURT:  Thank you.

7          MR. GORDON:  Thank you, your Honor.

8          MS. CECCOTTI:  Good afternoon, your Honor.  Babette

9  Ceccotti for the UAW.

10         THE COURT:  Good afternoon.

11         MS. CECCOTTI:  And with admittedly some trepidation,

12  I am also going to cover the authorization under state law,

13  and I think -- I guess I'd like to start with just a couple

14  of threshold comments.  First, I think the exchange that

15  you've had with Mr. Gordon and perhaps with others -- and I'm

16  sure it's not going to be limited there -- will probably lead

17  you to conclude that at least some of the issues that you've

18  slated as purely legal will -- are better served awaiting the

19  outcome of the trial.  I'm just -- you know, Mr. Gordon took

20  you through a series of numbers.  There are all kinds of

21  facts and information that are probably best developed

22  through the evidentiary record, and that may well inform your

23  Honor's views of a number of the questions that you've asked

24  here today so far, so I'll just start with that observation.

25  I'd like to just, if I might, also --

```
 1          THE COURT:  Well, just so the record is clear -- and
 2   I may have indicated this before even perhaps in writing --
 3   it's certainly not the Court's intention to rule on these
 4   issues before the trial, and to the extent any of the facts
 5   that come out at trial bear on these, sure, they'll be taken
 6   into account.
 7          MS. CECCOTTI:  Thank you, your Honor.
 8          THE COURT:  But I did hold out to all of you that
 9   one of the purposes of today's hearing was to see whether
10   there are any genuine issues of material fact in advance of
11   the trial so that you can address those at the trial, and I
12   intend to do that.
13          MS. CECCOTTI:  Thank you, your Honor.  I guess
14   the -- let me just interject another thought into the
15   exchange that you had with Mr. Gordon on your hypothetical, a
16   couple of thoughts.  First, the -- and I will -- I'm going to
17   start and go through this in a little more organized way, but
18   I just wanted to make sure I get this point out.  It's
19   important to keep in mind that as inviolable and as absolute
20   and as definitive as those of us on the objectors' side
21   believe the pension clause is and as much as we believe that
22   it was the right of the citizens of the Michigan -- of
23   Michigan to so provide in adopting it, remember that we are
24   here in the public sector.  We are not in the private sector
25   where there is a federally regulated and federally
```

 1   established pension insurance system so that when plans get

 2   underfunded, when plan sponsors are overburdened, there is a

 3   system that takes over.  And I would have to say all --

 4   certainly the lion's share of the decisions that have come

 5   down on this topic arise because of the -- because of the way

 6   that that system is constructed.  There's a federal agency

 7   that provides a safety net.  You know, there are moral hazard

 8   issues.  There's a whole balancing that goes on in that

 9   system.  We don't have that here.  Michigan pensioners have

10   Article IX, Section 24.  That's it.  That's what they have.

11   So as, you know, perhaps a -- it might take a bit of a leap

12   to see that that section means what it says and really,

13   really, really means what it says, I think it's important to

14   bear in mind that that is a safety net for pensions for

15   Michigan pensioners.  Okay.

16          So, now, to try to get back a little bit towards

17   more of an organized progression here on the 109(c)(2)

18   issues, the governor, as we've been discussing, had issued

19   the letter of authorization -- the letter of authorization

20   without any contingencies, so I think it's in -- and your

21   Honor asked the question this morning -- a couple of

22   questions this morning that have to do with, you know,

23   where's the impairment and where's the harm and questions of

24   that nature, and why wasn't the governor's reference to 943

25   sufficient.  So I think what's important to do first is take

1  a look at -- briefly just take a look at the authorization

2  letters.  And, again, this is without reference to any

3  testimony or anything else that you're going to hear next

4  week.  You know, just looking at the letters that were

5  attached to Mr. Orr's declaration, the July 16th

6  authorization makes quite plain in his situational

7  overview -- he says for an extended period of time, the city

8  has simply failed to make the investments required to provide

9  its residents with an adequate quality of life as limited

10  resources have been diverted elsewhere.  He says the city's

11  urgent need to address large and growing legacy liabilities

12  and other substantial debts is self-evident.  Failure to

13  address these liabilities will prevent -- excuse me --

14  prevent the city from devoting sufficient resources to

15  providing basic and essential services to its residents.

16  Indeed, significant additional resources are required to

17  improve health and safety.  And he goes on to say that the

18  city must devote a larger share of its revenues to

19  effectively providing basic essential services to current

20  residents, attract new residents and businesses to foster

21  growth and redevelopment, ultimately begin -- and ultimately

22  begin what will be a long process of rehabilitation and

23  revitalization for the city.  The city's debt and legacy

24  liabilities must be significantly reduced to permit this

25  reinvestment.  Plain as day in Mr. Orr's letter.  He

1    incorporates his entire proposal, the -- I don't have the
2    whole thing here.  I've just got some of it.  This is the
3    June 14th proposal.  Goes to the governor, and the governor
4    writes back again providing the authorization and saying in
5    part that he's reaffirming his confidence that Mr. Orr has
6    the right priorities when it comes to the City of Detroit.  I
7    am reassured to see his prioritization of the needs of
8    citizens to have improved services.  I know we share a
9    concern for the public's -- for the public employees who gave
10   years of service to the city and now fear for their financial
11   future in retirement, and I'm confident that all of the
12   city's creditors will be treated fairly in this process.  We
13   all believe that the city's future must allow it to make the
14   investment it needs in talent and infrastructure all while
15   making only promises it can keep.  So I think it's very clear
16   from these letters -- excuse me -- as it is abundantly clear
17   from the proposal that the city is proposing to take
18   resources from what it's calling the legacy liabilities or,
19   fill in the blank, accrued pensions, and divert those
20   resources to the list that Mr. Orr has laid out here,
21   reinvestment and services and the like, so when we talk about
22   not impairing the pensions and who took what action and when
23   does the impairment happen, the governor's letter, we submit,
24   in fact, is the impairment because it has -- the governor is
25   stating that he is acknowledging Mr. Orr's priorities,

 1  including the priorities to take money from the pensions and
 2  use them to pay other things.  And so when the pension clause
 3  talks about -- excuse me.  I'm sorry.  I just lost my brief.
 4  I apologize, your Honor.  I think I -- I have it.  So when we
 5  talk about the text of Article IX, Section 24, "The accrued
 6  financial benefits of each pension plan and retirement system
 7  of the state and its political subdivisions shall be a
 8  contractual obligation thereof which shall not be diminished
 9  or impaired thereby," and we look and we are -- we see that
10  among the records in the constitutional convention is the
11  explanation that Article IX, Section 24, quote, "requires
12  that accrued financial benefits of each pension plan and
13  retirement system of the state and its political subdivisions
14  be a contractual obligation which cannot be diminished or
15  impaired by the actions of its officials or governing body,"
16  the impairment occurs when the governor signs this
17  authorization with no contingencies.  That's when it happens.
18  So not impairing thereby, meaning -- means very specifically
19  this document, and the "this" I'm holding up here now is the
20  governor's consent.  Now, why is --
21            THE COURT:  Oh, but this raises two questions.
22            MS. CECCOTTI:  Sure.
23            THE COURT:  Is there a scenario in which the city
24  would have the ability to meet its pension obligations in the
25  very long term unless it makes the kind of investments that

1   Mr. Orr and Mr. Snyder have suggested should be part of the

2   city's priorities?  That's question number one.  Question

3   number two is actually a much more important question, and

4   that is is question number one a question for now, or is it a

5   question for plan confirmation?

6          MS. CECCOTTI:  It is absolutely a question for now

7   because --

8          THE COURT:  What's the answer then?  How can the

9   city maximize its chance of paying its pension obligations

10  unless it makes the kind of investments that Mr. Orr and Mr.

11  Snyder are talking about?

12         MS. CECCOTTI:  It may be that the investments

13  themselves or the idea for the investments is fine.  The

14  question is can it get there lawfully by taking money from

15  pensioners?  That is the question that the state Constitution

16  answers by saying no.  Now, as Mr. Gordon pointed out or as I

17  think is evident from his presentation, there's a lot of

18  numbers here, Judge.  There were numbers in Mr. Orr's

19  request, his July 16th request.  You're going to hear an

20  awful lot about those numbers and what they are and what they

21  are not, so I would suggest that the notion that we somehow

22  have already today, quote, no reasonable alternative in the

23  words of PA 436 I would suggest very much should await your

24  Honor's review of the evidence on all of that, so --

25         THE COURT:  Okay.

 1          MS. CECCOTTI:  I realize it's a question that has

 2     been on your mind all day, but I really think unless you

 3     really want us up here freelancing numbers -- and you really

 4     don't -- that it is best to simply --

 5          THE COURT:  I'll grant you that one.

 6          MS. CECCOTTI:  Right; right.  But I guess my point

 7     is the answer cannot be because the problem seems hard, we're

 8     just going to try to find a way to say perhaps that this

 9     language doesn't mean what it says because I think once you

10     start down that road, you run into all kinds of problems.

11     You run into the Chapter 9 dual sovereignty problems.  You

12     run into problems of who gets to decide what, right, whether

13     this Court gets to construe Article IX, 24, to, in fact, say

14     it can be invaded.  These are problems that are simply too

15     thorny -- certainly too thorny to start with, and maybe we'll

16     see where your Honor is after the evidence.

17          Okay.  So why isn't the reference to 943(b) enough,

18     and I think -- and I think you've heard it, but just to say

19     it again and hopefully crystalize it a bit, I think the

20     governor assumed in wording the letter the way that he did

21     that somehow this all gets sorted out, and I think that seems

22     to be a lot of the presumption here, and I must say I am not

23     in full company with those who say that once you cross the

24     threshold of 109(c) using state law that somehow you can

25     start, you know, running around employing federal supremacy.

1    I think that that -- we'd probably have a lot more
2    conversations about that with a lot more time with a lot more
3    specificity before we get there.  We think -- and we spent a
4    bunch of time on this in our brief, Judge, and given your
5    handling of the Addison case you probably didn't need all of
6    this, but our view is that you must look -- in order for
7    Chapter 9 to be constitutional, you have to look at all of
8    these pieces that import or give recognition to the state
9    law.  Just to take you back to another colloquy that you had
10   with Mr. Gordon and why I think maybe that the Chapter 13
11   example isn't a good fit here, 109(c) says that an entity may
12   be a debtor under Chapter 9 if and only if such entity is
13   specifically authorized to be a debtor under such chapter by
14   state law.  So while we're all here today obviously under
15   109(c) and 109(c) is in the Bankruptcy Code and so you're
16   right -- the law that must be applied is state law, and the
17   Court decides whether -- you, the Court, you, the Bankruptcy
18   Court, decide under 109(c) whether, in fact, the municipality
19   is specifically authorized to be a debtor under Chapter 9 by
20   state law or by a governmental officer empowered by state
21   law.  And so I think that that may help to distinguish the
22   Sixth Circuit case that you discussed with Mr. Gordon, but it
23   also points out that getting through the door is a state law
24   question.  903 and 904 are obvious limitations on the Court's
25   authority.  943 is a limitation on the plan.  All of these

1   things work together, and I think your Honor's opinion

2   actually in the Addison case on the motion to intervene was

3   exactly right in recognizing the limitations not only of the

4   Court's caution in addressing the questions precisely because

5   of the questions that 903 -- the issues that 903 and 904

6   import into the bankruptcy process, but another observation

7   which takes me back to the letters and the taking of the

8   money from the pensioners and putting it towards something

9   else, which is, I think, your court -- your observation in

10  that case that Chapter 9 is about debt adjustment and should

11  not be overburdened I think applies very well here, too, and

12  I think, again, when we get to the trial and the full array

13  of the plan and everything else comes out and we start

14  talking about that in the evidentiary context, I think that

15  it is at least a question as to whether or not this issue

16  that we're all talking about here is in a narrow sense debt

17  adjustment or whether it is more than debt adjustment and

18  whether that shouldn't inform the Court's caution in ensuring

19  that the state law is being adhered to.

20      And I guess -- and I don't often get to the point of

21  imploring at the podium.  It's not always pretty, but I'm

22  going to break my rule on this whole subject of where is the

23  impairment.  To me it's like a shell game.  Okay.  Under

24  which of these cups is the impairment; right?  Is the

25  impairment -- I've told you where I think the impairment is;

1   right?  I don't think the Court impairs.  The debtor proposes

2   the plan.  Under Chapter 9 only the debtor can propose the

3   plan.  The debtor was supposed to have come up with something

4   that passes muster to meet the 109(c) criteria in advance of

5   getting to this point, and they --

6           THE COURT:  Well, but the proposal of a plan, the

7   filing of a plan which proposes to impair pensions doesn't

8   result in the reduction of anyone's pension check any more

9   than the filing of the case did.

10          MS. CECCOTTI:  Your Honor, I --

11          THE COURT:  That doesn't happen until the Court

12  confirms it under law.

13          MS. CECCOTTI:  And, your Honor, then why are we

14  talking about it?  Why are we talking about it?

15          THE COURT:  Answer that question.

16          MS. CECCOTTI:  If it hadn't been --

17          THE COURT:  I'm having my issues with that very

18  question.  Why are we talking about it?

19          MS. CECCOTTI:  We're talking about it because it's

20  in their proposal.  We're talking about it because it was in

21  the authorization that went to the governor.  We're talking

22  about it because the governor clearly recognized it or at

23  least recognized it sufficiently to draft the letter that he

24  did.  We're talking about it because despite weeks and weeks

25  and weeks, no one has disabused the pensioners of the notion

1  that their pension rights are -- that they are intending to

2  impair their pension rights.  That's why we're talking about

3  it.  It simply does not -- here they are in Chapter 9; right?

4  They're in Chapter 9.  They've got the benefit of the

5  automatic stay.  They've gotten their stay against the pre-

6  petition lawsuits.  They want to have a bar date motion.

7  They're getting all of the -- you know, all of the features,

8  right, of Chapter 9.  And the threshold question that has to

9  be asked is can they be here, and the threshold question can

10  only relate to the form in which they show up on the court's

11  doorstep.  And the form in which they show up on the court's

12  doorstep is the June 14th proposal, which is abundantly clear

13  on the subject of invading -- impairing accrued pensions.

14  What else would the Court -- what else would we be dealing

15  with?  What else would your Honor be dealing with if not for

16  the fact that they evidenced their plan?

17        THE COURT:  I think the answer to that question may

18  be the governor's authorization.  He says we are here to

19  adjust the city's debts in conformity with law.

20        MS. CECCOTTI:  He says that at that end we do that,

21  but what does it mean -- what is supposed to go on before we

22  get there?  It can't be that we have a sort of quasi eligible

23  debtor going through all of the -- you know, using all of the

24  processes I just described and then we have a big

25  conflagration at the end.  I mean it just --

1          THE COURT:  Why not?

2          MS. CECCOTTI:  Chapter 9 presupposes through the

3    front door under state law, specially authorized under -- by

4    state law.  That is what 109(c) says.  It is plain as day.

5    And state law means state law, and it requires giving -- if

6    they hadn't put in this -- the pages --

7          THE COURT:  So in response to my question to Mr.

8    Gordon, you would say that if state law requires a different

9    priority scheme than the Bankruptcy Code, the municipality is

10   eligible only if the Court is willing to enforce that state

11   law priority scheme rather than the Bankruptcy Code priority

12   scheme?

13         MS. CECCOTTI:  I think that I would say that if a

14   state legislature -- we're not talking about the Constitution

15   here.  You're just talking about, in effect, the PA 436 of

16   whatever that state is.  I would say that those are the

17   terms.  We have -- we allow the states -- states have a

18   variety of authorization.  Some of them have no

19   authorization.  It is a state-by-state --

20         THE COURT:  Every bankruptcy case that has addressed

21   that question has held the other way, hasn't it?

22         MS. CECCOTTI:  Well, I don't know the answer to

23   that, your Honor.  In the Chapter 9 context?

24         THE COURT:  Yes, in the Chapter 9 context.

25         MS. CECCOTTI:  Okay.  Well, I --

1      THE COURT:  Every Bankruptcy Court has held once

2  you're in the door, it's the Bankruptcy Code priorities that

3  apply, not the state law priorities --

4      MS. CECCOTTI:  Right.  Well, right.  And now we're

5  getting into the --

6      THE COURT:  -- because the state consents to the

7  Bankruptcy Code or it doesn't.

8      MS. CECCOTTI:  Well, and I would say that a state

9  that passes a law such as your Honor proposed maybe, in fact,

10  looked at those cases and said, no, we don't really want to

11  go there.  We want to -- you know, we'll let you go if it's

12  this other way.  I think the through the door -- once we're

13  in the door -- I know what Harrisburg says.  You know, I have

14  a lot of trouble with it just because I think that the

15  doctrine has not evolved in a sufficiently precise manner.

16  You don't always see what the conflict is.  You have to come

17  up with notions of what the purpose is.  Remember the ancient

18  Supreme Court cases here said bankruptcy is about discharge;

19  right?  So can states have discharge laws?  So we're way, way

20  far away from that now, so I think -- again, I think we'd

21  have to have a lot more conversations about what happens

22  through the door.  Right now we're talking about you're at

23  the door, and you're at the door, and you're presenting

24  yourself, and what you're wearing, right, is something that

25  says we are going to violate Article IX, Section 24.

1    Just want to see if there is anything -- see if I've

2    left anything out here that I wanted to cover.  I have some

3    minutes here.  I guess I could barter away my minutes, Judge,

4    or I could give them to you to barter them away.  Let me just

5    take a quick moment here.  I think -- I mean, again, I think

6    we're going to get to the point of duplication if I continue

7    unless, your Honor, you'd like to ask me anything else.  I

8    think I've hit the points I wanted to hit.

9         THE COURT:  Okay.  Thank you.

10        MR. WERTHEIMER:  William Wertheimer, your Honor, on

11   behalf of the Flowers plaintiffs.  As I'm sure your Honor

12   will recall, although it seems like ages ago now, the Flowers

13   plaintiffs were plaintiffs in one of the state court cases

14   that preceded the bankruptcy, a state court case in which we

15   were making the claim that under state law the governor was

16   required to recognize Article IX, Section 24, if and when he

17   authorized a bankruptcy.  I'm not here to speak on bankruptcy

18   law.  When I heard the reference to Asbury Park, I thought of

19   the street in northwest Detroit.  I'm not a bankruptcy

20   lawyer.

21        THE COURT:  Okay.

22        MR. WERTHEIMER:  I just want to speak briefly on the

23   state law, which it was my understanding at the stay

24   proceedings everybody kind of understood, including the city

25   attorneys, that although our claim was being delayed, it was

1    not being changed in terms of its nature; that is, that this

2    Court would decide as a matter of state law whether this

3    bankruptcy was properly authorized.  It was just that the

4    forum was changing.

5          And I'd just like to make three points as to that

6    state law, three areas where I think this Court can look to

7    what it should do in deciding what I believe is that state

8    law issue; that is, the basic eligibility issue.  If you look

9    at the equivalent of legislative history of Article IX,

10    Section 24 -- that is, the constitutional convention

11    record -- there is certainly references to the fact that has

12    been mentioned here today that it was meant in part to deal

13    with the fact that pensions had been considered not to be a

14    matter of contract, but the only specific reference that I

15    found in that record -- and no one has cited anything to the

16    contrary -- is the comment of Mr. Van Dusen, which I -- with

17    the Court's permission, I'll take the liberty to quote.  It's

18    not long.  "An employee who continues in the service of the

19    public employer in reliance upon the benefits which the plan

20    says he would receive would have the contractual right to

21    receive those benefits" -- he didn't stop there -- "and" --

22    he didn't say "meaning" -- he said "and," in addition -- and

23    I think this goes to what Mr. Gordon was getting at, "and

24    would have the entire assets of the employer at his disposal

25    from which to realize those benefits."  That was the

1  understanding of Mr. Van Dusen.  There's no contrary
2  understanding on the record as to what the idea was on behalf
3  of the people who were writing Article IX, Section 24.
4  That's point number one, and I think if you look at what
5  Emergency Manager Orr did in his June 14th proposal, Mr. Van
6  Dusen, were he alive to take a look at it, would say, "That's
7  not what I meant," because on June 14th what Mr. Orr proposed
8  and he continues to propose is the retirees get treated like
9  any other creditor.  He didn't say words to the effect of
10  "all the assets of the employer," so that's the first piece
11  of state law in the broad sense of the term that I think you
12  can look to.

13  The second piece is the <u>Webster</u> and the <u>Flowers</u>
14  cases and the retirement case.  And I'm not repeating
15  Mr. Gordon's argument relative to collateral estoppel or the
16  res judicata argument.  I'm simply pointing out that as --
17  excuse me -- as Mr. Gordon indicated, that case was fully
18  briefed, and a state court judge looked at the exact issue --
19  well, maybe not exact but very close to the issue that is in
20  front of you, and that state court judge, after full
21  briefing, decided that in a manner consistent with our
22  position.  And I would point out there is no contrary law
23  anywhere.  I recognize this Court -- the cases that say you
24  look to the definitive ruling from the highest state court
25  and all that, but Judge Aquilina's decision -- decisions,

1  well-reasoned, are all that's out there.  She's a state court
2  judge deciding this issue.  That's the second piece of state
3  court law that, as far as I can tell, is out there.

4  There's one other, and that is we have the state
5  attorney general.  This isn't law, but the state attorney
6  general enters an appearance a little late in the game.  The
7  governor has already authorized the bankruptcy.  However, the
8  state attorney general, as an officer of the state, as the
9  chief legal officer of the state, tells this Court that
10  Article IX, Section 24, binds the emergency manager in
11  bankruptcy.  Now, we all know that that gets into the issue
12  of is it at the eligibility stage or the plan stage, and I --
13  that's been dealt with.  My point is simply that a state
14  officer, the attorney general of the state, saying that the
15  emergency manager in bankruptcy is bound by Article IX,
16  Section 24, is consistent and supports our position that the
17  governor, when he goes to authorize that bankruptcy, is also
18  bound by Article IX, Section 24.  And with all due respect to
19  the governor, we think it's up to this Court to hold the
20  governor to that.

21  THE COURT:  All right.  Thank you, sir.

22  MR. WERTHEIMER:  Thank you.

23  MS. PATEK:  Good afternoon, your Honor.  Barbara
24  Patek on behalf of the Detroit Police Command Officers
25  Association, the Detroit Police Lieutenants & Sergeants

1   Association, the Detroit Police Officers Association, and the

2   Detroit Fire Fighters Association defined in this case as the

3   Detroit Public Safety Unions.  As the Court is aware, these

4   are the men and women who provide the police and fire

5   protection that are essential to the survival of the city,

6   and these are exactly the essential services that Chapter 9

7   was designed to preserve and protect.

8          I want to use my time this afternoon to talk a

9   little bit about ripeness, talk very briefly about the

10  supremacy clause and the tension between the supremacy clause

11  and the Tenth Amendment, and then to try to answer some of

12  the questions that the Court has raised with some of the

13  other objectors today.

14         On the issue of ripeness and why this is a question

15  for eligibility, I think that goes to the very nature of

16  Chapter 9, which precisely because of the sovereign immunity

17  and the sovereignty of the State of Michigan, this Court, as

18  it's recognized in so many hearings, is limited in what it

19  can order the city to do.  In that respect, this -- not that

20  every bankruptcy isn't a consensual process and not that

21  every bankruptcy doesn't involve a lot of negotiating.

22  Chapter 9 is unique because it incorporates -- it's a largely

23  consensual process at some level precisely because this Court

24  cannot trump the state's sovereignty in particular

25  situations.  And in that regard, if one talks about imminent

1  harm, there is -- you know, it's in the record.  Mr. Gordon

2  alluded to the fact that the stay authorized the city to come

3  in this court for a very public purpose, and that purpose was

4  to impair the accrued vested pension rights of its public

5  servants.  That question, as the city points out in its

6  papers, no court has ever said they can't do it, and no court

7  has ever said they can.  It's an unanswered question.  We're

8  entitled to know what our rights are, and to suggest that by

9  knowing what our rights are in the door that is to knowing

10 what -- to know what the proper authority is here would

11 somehow skew the process or cause people to walk away from

12 the table I think is wrong.  This is a hard question that the

13 Court has to answer, but the Court is here to follow the law.

14 I think this is -- there is imminent harm to these

15 individuals here, and there's a second piece of that by

16 virtue of the vacuum in which there's no legal precedent on

17 this issue, and that is -- I'm just going to throw out to the

18 Court the idea that this is one of those issues where it's

19 capable of repetition but evading review.  If every time this

20 gets kicked down the road to confirmation, nobody is ever

21 going to know what their rights are when this issue comes up.

22 I submit that Michigan is a little bit unique, but I think

23 that there are plenty of reasons that this issue is ripe for

24 adjudication today.

25          I'd like to take a crack at some of the questions

1   that the Court raised.  You raised the issue of what if the
2   state law requires a different scheme of priorities than is
3   authorized by the Bankruptcy Court.  I think if you step out
4   of the weeds on that question and I think you look at what
5   the Code says here, the state has to give its consent to come
6   into Chapter 9.  And in giving its consent, the state agrees
7   to certain provisions of Chapter 9.  I think a state that
8   authorizes such a scheme simply can't give its consent to
9   come into Chapter 9.  I think that's the simple answer to
10  that question.
11          THE COURT:  So your answer then in that hypo would
12  be not eligible?
13          MS. PATEK:  Correct.  I also think -- the Court
14  asked the question and raised the 11th Amendment, and I'm
15  going to go out on a limb here on this and the question of
16  sovereign immunity because I think the answer to a lot of the
17  issues before the Court and whether or not, in fact, the city
18  can impair these rights or use the Court to impair those
19  rights is in some ways answered by the Code.  Section 106 of
20  the Code addresses the sections of the Code under which the
21  state waives its sovereign immunity.  109 is not one of them,
22  and I think that makes the eligibility issue as it's framed
23  by 109 a question of state law.  And the other place, if
24  we're going to jump ahead to where we'll be down the road,
25  where the state does not waive its sovereign immunity is

1    under Section 943.  We know there are some places where to

2    consent to come into this Court and get relief the state has

3    to agree to conform to the rules.  365 is one of those that

4    you've got <u>Bildisco</u>.  If you're going to come in and you look

5    at -- that's a place where the state has to agree, consent to

6    be governed by the federal rules.  The other place is the

7    automatic stay.  But when you get down the road to the plan

8    that only the city can propose, the state does not waive its

9    immunity, and that --

10        THE COURT:  I think you might be overanalyzing my

11   question about sovereign immunity.  I was only analogizing to

12   the 11th Amendment cases that hold that the issue of whether

13   sovereign immunity is waived is a federal issue, not a state

14   issue.  I didn't mean to suggest, as you appear to understand

15   here, that there is -- that there are 11th Amendment issues

16   in this case.

17        MS. PATEK:  I'm not suggesting that you are, your

18   Honor, but I'm suggesting that -- and this sort of brings us

19   back to where Ms. Levine started out this morning with this

20   concept of -- this very basic concept, and one of the things

21   that makes this case so hard and one of the things that all

22   the commentators agree makes Chapter 9 so hard is this

23   tension.  We have a federalist system.  There are rules of

24   the road that were set up by the founders.  We have a limited

25   system of federal government.  All the other powers are

1    reserved to the states and the individuals.  And there's no
2    question that wasn't done so that we could have big and
3    powerful states.  That was done by the founders so that the
4    individuals close to the ground would have their rights
5    preserved, and I think within the structure of Chapter 9 and
6    within the limits of the Tenth Amendment, that the state
7    simply cannot use Chapter 9 to impair an express
8    constitutional promise.  And I want to talk about that issue
9    for just one moment.  This pensions clause is in a very
10   unusual place.  Okay.  This is -- I think it's fair to say --
11   you talk about there is a contracts clause in the state
12   Constitution just like there's a free speech clause and there
13   are a lot of things that mirror the Bill of Rights, but, as
14   Ms. Levine told us this morning, if somebody is violating my
15   free speech rights, I'm not in state Circuit Court.  I'm
16   looking to the federal courts and the federal government to
17   protect those rights.  If you're talking about fiscal
18   management, then that's a state issue, and in this case this
19   state and the people of this state chose to enshrine that
20   right to vested accrued -- this isn't all pension benefits,
21   this isn't future benefits, just what people have already
22   earned -- in its state Constitution and say those cannot be
23   impaired.
24          The Court asked the question about what if there's
25   not enough money, which sort of brings me back to the first

1  issue I was talking about.  This Court has to rule on the

2  legal issue that's before it, and if there's not enough money

3  just like if you're in a Chapter 11 that you don't want to

4  see liquidation, that's a hard question that the creditors,

5  including the pensioners, including my clients, have to

6  answer along with the city and try to solve this problem

7  within the limits of Chapter 9 because if we don't solve the

8  problem, the only remedy is a dismissal.

9          THE COURT:  Well, I guess even that answer troubles

10  me because if the Court holds here that there is this pension

11  right that cannot be impaired and because the governor didn't

12  condition this filing on the city recognizing that right in

13  the bankruptcy, what would happen upon dismissal?  There'd be

14  this court holding that there's this unconditional absolute

15  right not to have pensions impaired.  On behalf of your

16  retirees, you couldn't negotiate that, could you?  How could

17  you?

18          MS. PATEK:  I can't negotiate that upon my retirees,

19  but I suggest to the Court there is a solution to this

20  problem, and the solution is for the city to come back again

21  and to authorize -- have the state authorize the filing

22  within the confines of the Constitution, and we move forward

23  on that basis.  I don't -- I understand that this has -- you

24  know, we talk about the elephant in the room, but the larger

25  part, the healthcare benefits, are not protected, and the

1  city has already said effective yesterday -- and these aren't

2  my clients, but -- we're done providing that. It's a

3  significant claim. I don't want to minimize that, but I

4  think it is something, given our constitutional structure,

5  that has to be dealt with in the confines of these

6  proceedings, and there are negotiations. There's a huge

7  consensual component to this, and that doesn't stop if the

8  Court rules the way that we've asked to rule.

9       I see my time is up. I just want to wrap up very

10 quickly, and I guess I would say we came into court on the

11 first day, and we supported the city, and we've supported the

12 city in many respects throughout this. We agree that there

13 should be the stay. There has been the breathing space. But

14 I think this is a hard, difficult question. As Ms. Levine

15 said, democracy is hard. This restructuring plan has to be

16 devised in accordance with applicable law, and the city on

17 the front end has to agree that it's going to -- it's going

18 to do so, and in the absence of that, I think they're not

19 eligible. Thank you, your Honor.

20      THE COURT: All right. Thanks to each of you.

21 We'll take our afternoon break now and reconvene at 3:20, a

22 half an hour from now, for the city's arguments.

23      THE CLERK: All rise. Court is in recess.

24     (Recess at 2:50 p.m., until 3:20 p.m.)

25      THE CLERK: Court is in session. Please be seated.

1  Recalling Case Number 13-53846, City of Detroit, Michigan.

2          THE COURT:  And it looks like everyone is here.

3          MR. BENNETT:  Good afternoon, your Honor.

4          THE COURT:  Mr. Bennett, you may proceed.

5          MR. BENNETT:  Good afternoon, your Honor.  Bruce

6  Bennett of Jones Day on behalf of the city.

7          THE COURT:  The only thing I would ask of you, sir,

8  is to leave enough time before our closing time today for me

9  to ask some questions of Mr. Todd.  Doesn't need to be now.

10 It can be whenever it's convenient for all of you.

11         MR. BENNETT:  Okay.

12         MR. TROY:  Mr. Troy, your Honor.

13         THE COURT:  Mr. Troy.  I'm so sorry, sir.  And so I

14 want to do that today because I'm not sure what his travel

15 plans are.

16         MR. BENNETT:  Okay.  Your Honor should feel free to

17 interrupt me if you think I'm getting too close to the end.

18 And I actually have one procedural question that I'd like to

19 get settled, too, which really has to do with whether you're

20 expecting or would benefit from oral argument at the

21 beginning of the next -- opening argument at the beginning of

22 the next phase because that's -- so I don't know if --

23         THE COURT:  You mean tomorrow?

24         MR. BENNETT:  No.  On the evidentiary phase

25 beginning next week.

1          THE COURT:  Oh, well not so much oral arguments as

2   opening statements.

3          MR. BENNETT:  Opening statements is what I mean.

4          THE COURT:  Yes.

5          MR. BENNETT:  Okay.  Great.

6          THE COURT:  Yes.  I think opening statements are

7   very important.

8          MR. BENNETT:  Okay.  I want to start with some

9   general comments, some of which are designed to respond to

10  things that came up this morning and some of which I think

11  just help, I think, set the stage for what at least the city

12  believes is happening in this Chapter 9 case.  And I want to

13  start by saying that the purpose of the Chapter 9 case is to

14  adjust the city's debts, and that means all of their debts,

15  obligations evidenced by bonds, obligations under other

16  contracts, obligations to provide healthcare, and pension

17  obligations.  And so that there isn't any confusion, there's

18  been a lot of reference to statements that were made.  I

19  think the statement most cited and the one that I think is --

20  it's the same as all the other ones that have been made -- is

21  that there must be -- the statement was there must be

22  significant cuts in accrued vested benefits.  It's been cited

23  often, and it's true.

24          I want to make a couple of clarifications.  I don't

25  think anyone for the city ever said we were going to

1  eliminate pensions.  This has been about the underfunding

2  amounts.  It is the underfunding amounts that are problems.

3  I think your Honor understands that, but I think it's

4  important to remind everybody else that we've never said that

5  the objective is to eliminate pensions.  The objective is to

6  address the underfunding situation.

7       Now, why did we make that statement?  The

8  statement --

9       THE COURT:  Well, let me just put it right to you.

10  Is it your intent to propose a plan to reduce pensioners'

11  monthly checks?

12       MR. BENNETT:  To be very technical about it, what we

13  have -- what we have -- what we have noted is that it is

14  impossible for the city to fill the underfunding gap in the

15  existing pension trusts, and we have also said that likely

16  requires changing the amounts of pension benefits.  Now --

17       THE COURT:  By "changing," you mean reducing?

18       MR. BENNETT:  Reducing.  Now, I do want to -- I'm

19  going to skip a couple points and then come back.

20  Notwithstanding the fact that the Chapter 11 case has been

21  filed, it remains the city's hope that these adjustments will

22  be achieved on a consensual basis pursuant to agreements

23  reached with the holders of the obligations.  That is still

24  the objective.  And, of course, we are participating in

25  mediation that's intended to facilitate that goal, and,

frankly, we'll meet with anyone anyplace anytime to try to achieve that goal. And we're going to discuss at certain points certain statements that have been made by others in this case about this problem which may suggest that those discussions are going to be particularly difficult, but I want there to be absolutely no confusion about where the city -- where the city stands on this.

And by the way, the filing doesn't say how ultimately this case is going to end, whether it's going to -- whether we're going to have a consensual plan, whether we're going to have a nonconsensual plan, whether it'll be partly a consensual plan or partly a nonconsensual plan. And although the city did make a proposal that certainly contemplated cuts to the underfunding obligation and ultimately to benefits that absolutely is a part of the June 14th proposal, it was a proposal in an out-of-court negotiation, and I want to submit -- and we're going to come back to this point later -- it can't possibly be impermissible to ask to reduce benefits, particularly when you can demonstrate a need to do so. And so far, frankly, that's what the city did pre-petition, and so far that's what the city has done post-petition. We haven't filed a plan yet. It will come soon. And there has not been a request for cramdown, so -- and I think as we get into other parts of the argument -- the fact that we don't quite know what's

1   coming later may have some bearing on some of the legal

2   points that your Honor has talked about and that others have

3   talked about earlier today.

4        THE COURT:  Is it the city's position that the State

5   of Michigan does not have the obligation under the Michigan

6   Constitution to guarantee the city's underfunding?

7        MR. BENNETT:  I don't know if the city has a

8   position.  I will tell you that I have read all of the

9   materials probably more than anyone else in the city's team,

10  and I don't think the state has an obligation to guarantee

11  the pension obligations of a municipality.  I think actually

12  when you look at the --

13       THE COURT:  Isn't it in the city's best interest to

14  say that -- or to assert that the state does have that

15  obligation?

16       MR. BENNETT:  I don't know whether it is or is not

17  in the city's best interest to even take a position on that

18  point, and that's why I said I don't think the city has a

19  position on that point, but I have done a lot of the work,

20  and I think I've made up my own mind as to what I think is

21  there.  I do think it's in the city's position that if we

22  could get money from the state, we would want it, and it

23  would be a great thing, and I'm reasonably certain that that

24  sentiment has been expressed on more than one occasion.

25       THE COURT:  Well, is there any reasonable prospect

1  that the state will comply with that request in the absence

2  of a legal obligation -- a determined legal obligation?

3          MR. BENNETT:  I don't know the answer to that

4  question.  Thus far the state has been of the view that the

5  city has to reorganize based upon its own financial

6  resources.

7          Okay.  The next point I wanted to touch on is the

8  fact that there are a large array of state and federal

9  statutes that say in all kinds of different ways that the

10  city is obligated to pay its debts.  In fact, they say that

11  the city is obligated to pay its debts in all kinds of

12  different ways.  And the city itself and the state has no --

13  and we'll get into this in much more detail -- no ability in

14  order to overcome those laws or very, very, very limited

15  ability to overcome those laws.  One important point about

16  them that didn't --

17          THE COURT:  You mean comply with those laws?

18          MR. BENNETT:  No.  To overcome them to get past them

19  if they can't pay all of their obligations.  And, again, it's

20  a situation that the city is going to prove it's in, but

21  that's for another hearing.  The point I wanted to make here

22  that I don't think was made earlier today was that a lot of

23  these priorities collide with each other in all kinds of

24  different ways.  We heard, by the way, about the all assets

25  at their disposal comment that was, I guess, from the

1  constitutional convention.  Assuming for a second that that

2  is what was intended, the problem is is that the legislature

3  has also passed a law that describes certain debts -- the

4  obligation to pay certain debts as a, quote, "first budget

5  item," close quote.  I don't remember the rest of the

6  sentence, but those words are there.  There's also other

7  state statutes that don't actually grant a lien but that say

8  proceeds of certain things must be used in certain orders to

9  pay.  And when you sit down and try to figure out in any

10  environment where you don't have enough, how do you fit all

11  these different things together, you run into a problem very,

12  very, very quickly.  And these are the provisions, by the

13  way, that are protected by the federal contracts clause and

14  also by the Michigan contracts clause because many of these

15  provisions are in ordinances or resolutions that form part of

16  bond contracts, and others are in ordinances and resolutions

17  that form part of employment contracts.  So you wind up -- if

18  you look at the world before you even start talking about

19  bankruptcy, you don't just have coherent commands, this is

20  how you pay and this is how you go about doing it and

21  everything works, you have a whole bunch of priorities that

22  actually don't work, and this, frankly, is --

23          THE COURT:  Well, but the objecting parties say all

24  of those contract obligations that have protection merely

25  under the contracts clause, federal or state, can be adjusted

1  consistent with state and federal law, but the pension

2  obligation under the state Constitution is inviolate.

3      MR. BENNETT:  And we'll get to that if you'll give

4  me a chance.  I will explain why --

5      THE COURT:  Okay.

6      MR. BENNETT:  -- they are, in fact, no different,

7  but I guess my point here is that outside of bankruptcy, you

8  have a -- you don't have coherence, and this is really to the

9  whole point of does it really make any sense to have a rule

10 that says if the state conditions its filing a proceeding

11 based upon complying with its priorities, what do you even

12 have.  And in many circumstances, you have something that is

13 just not meaningful in the context of where there's not

14 enough to go around.  I think that's the narrow point for the

15 time being.  We will generalize when we get to the whole

16 issue of how the --

17     THE COURT:  Okay.

18     MR. BENNETT:  -- different clauses work.  I also

19 want to say that contrary to the papers that were filed --

20 and I'm now referring to the UAW's papers -- the June 14th

21 proposal didn't take broad aim at the city's workers and

22 retirees.  It was very, very carefully drafted to try to

23 treat as many classes of creditors the same as we possibly

24 could denying preferences to any except in cases where we

25 were legally compelled to provide them.  We thought and the

1    emergency manager thought that that was the best way to go

2    about the problem that confronted us, and, of course, we're

3    not under any illusion that that's going to be the last word

4    on this question.  There will be negotiations.  There will be

5    a plan filed, which I'm certain will differ from the proposal

6    that was issued on June 14th in part to respond to creditor

7    input, and it will be subjected to enormous and exacting

8    procedures by this Court before it is ever confirmed.

9         I also want to spend just a second about the point

10   that was made using some of the letters, the letters that

11   were exchanged between the emergency manager and the

12   governor.  If your Honor hasn't already, I commend you to

13   read all of them, not just the parts that were quoted.  I

14   think it's -- I think to fairly summarize the points made in

15   both letters, the city has been -- the city services, city

16   residents, the ability of the City of Detroit to be a city

17   that provides adequate services to its residents has

18   gradually been lost as a result of the constant and

19   consistent diversion of current tax revenue paid by current

20   tax revenue to legacy liabilities, including but not limited

21   to pension claims.  That is the problem.  It is not as if

22   everything is fine, let's take some money from pensioners and

23   put it to the benefit of residents to make things better.

24   The diversion already occurred.  State law has been followed.

25   Pensions have not been impaired or diminished.  A consequence

1  has been that the resources available for services, that the

2  resources available for investment have, in fact, been

3  significantly impaired and significantly diminished to the

4  point that lots of the city's infrastructure is no longer

5  serviceable, thus the reference to need for investment.  It's

6  not for the new and wonderful.  It's to put back things that

7  really need to be updated and, in fact, replaced because

8  they're worn out, and it's to restore budgetary items,

9  budgets that have, in fact, been cut too great.  And I think

10  that sense -- if you read the entire document, you will see

11  that that is the historical view of the current situation.

12  Again, it will be proved next week.  And the solution is in

13  part a reinvestment program.  Again, just to be technically

14  correct, it's 1.25 billion over ten years, not over five

15  years.  Five years would be better.  I don't think anyone

16  thinks we can afford it.

17          I think the next point and the last point I'm going

18  to make by way of introduction is really to address one of

19  your Honor's questions, which is what happens if the city

20  can't adjust its debts.  I think we have to start with the

21  following.  Most business owners and residents are smart

22  enough and sophisticated enough to figure out that it's a

23  problem to be the highest -- residents of the highest taxed

24  jurisdiction in the State of Michigan where somewhere between

25  42 and 65 cents of every dollar is spent on something other

 1   than services to current residents.  That is not a stable

 2   situation.  That is just not going to work out well.  The

 3   consequence will be continuing declines in revenue.  It may

 4   be that debts of all kinds would be paid for awhile, but

 5   ultimately debts of all kinds will not be paid, and no

 6   provision of any Constitution will change this.  Thus, the

 7   stakes are very high not just for the city but also for its

 8   residents and its creditors, and I think that puts a very

 9   sharp point on your Honor's question about what is a

10   constitutional provision worth when you're confronting an

11   economic crisis such as this.

12        Unless your Honor wants to hear much about it, I was

13   next going to talk about your jurisdiction to decide the

14   eligibility question, but no one else raised it on oral

15   argument, and since it wasn't raised on oral argument, I'll

16   leave it to the papers unless your Honor has any particular

17   questions with respect to that point.

18        THE COURT:  No.

19        MR. BENNETT:  And I'd like to take the same

20   prerogative that if I intentionally pass over a topic because

21   it wasn't covered today, if it's in our papers, we still care

22   about it.

23        THE COURT:  Of course.

24        MR. BENNETT:  I'm just going to try to use time

25   wisely.  So the first place I'm going to spend some time is

1   on the constitutionality of Chapter 9, and I'm going to do it
2   a little bit differently because I think, frankly, if we do a
3   really careful look at Bekins -- and I'm going to call it
4   Bekins because it's a really big company in California that
5   has -- the name is spelled B-e-k-i-n-s, and everybody calls
6   it Bekins, but I don't know what the correct pronunciation in
7   this particular case is concerned.  A very careful analysis
8   of Bekins -- and believe it or not, the Cardozo dissent in
9   Ashton is going to provide us with the guidepost to answer a
10  lot of the questions that may not be constitutional questions
11  but that ultimately are resolved by those cases.  First, I
12  have to say because it's important that it isn't this Court's
13  place to overrule Bekins.  Bekins has been the law for lots
14  of years.  And as the U.S. Attorney pointed out, it's not
15  only that Bekins hasn't been overruled, it's actually never
16  been challenged or questioned or otherwise suggested to be
17  worthy of reconsideration by anything that the Supreme Court
18  has done.  And, moreover, in all of the discussion that your
19  Honor heard about why Bekins should not be regarded as good
20  law anymore, no one actually said that the -- that Chapter 9
21  has been changed in any material way from the law that was
22  before the Court in Bekins, and that's because in all the
23  ways that mattered it really hasn't changed, not just -- not
24  by a little but really not at all.  However, we don't want
25  the Court to write an opinion that says, well, you feel

1    constrained not to overrule Bekins.  You think it should be

2    overruled.  So I'm going to spend some time talking about why

3    Bekins is absolutely right and why Asbury Park and anything

4    else didn't change anything.

5        Let me start with just a quick word on Asbury Park.

6    Even to the Supreme Court, if you read their own words,

7    Asbury Park is kind of considered an outlier.  It has -- the

8    Supreme Court has never since approved a municipality's

9    modification of its own contract on the basis of emergency or

10   anything else.  Every time it's been asked to, it's basically

11   talked about Asbury as being, number one, confined to its

12   facts and extraordinary situation and not reflective of a

13   broad doctrine.  This same argument was made to Judge Bennett

14   in the Jefferson County case, and he commented on it.  I

15   think we've cited to that case in our papers.  He does an

16   even better job than I just did of explaining why Asbury is

17   an outlier.  It doesn't provide much comfort to any

18   municipality thinking it's going to modify its debts without

19   the help of the Bankruptcy Code and is no good reason to

20   reconsider Bekins.

21       Now, the next thing I want to talk about is what

22   Bekins really does, and the -- a reality that you can find in

23   Bekins if you're looking really hard, but unfortunately you

24   have to look really hard, is that there were two

25   constitutional provisions at stake when the Chapter 9's

1    predecessor was subject to Supreme Court review.  One was the

2    Tenth Amendment, and some people have talked about that.  And

3    the second part was the contracts clause.  And when you read

4    Bekins, the Court kind of touches on all the different

5    features that matter but isn't particularly careful about

6    matching up which features were needed to overcome which

7    constitutional problem.  And, frankly, in there we're going

8    to find the answers to a lot of the -- a lot of the other

9    questions that come up in this case.

10         So let's start with the Tenth Amendment.  Of course,

11   the Tenth Amendment, if you quote the whole thing -- and when

12   your Honor confronted earlier, I'm not sure the first six or

13   so words were quoted, "powers not delegated to the United

14   States by the Constitution, nor prohibited by it to the

15   states are reserved to the states respectively, or to the

16   people."  For starting purposes, "powers not delegated to the

17   United States" are important words, and one of the things

18   Bekins very clearly says is uniform laws on the subject of

19   bankruptcies are delegated to the United States and that laws

20   on the subject of bankruptcies include municipal debt, and I

21   think they used "composition" as opposed to "adjustment," but

22   composition statutes.  So it's actually not a close call that

23   the -- at least as far as the Supreme Court is concerned --

24   and I think that's all that matters for this purpose is that

25   we're going to have a municipal Bankruptcy Code that at least

1  covers subjects of bankruptcy and that those are clearly

2  federal functions. Where a Bankruptcy Code applicable to

3  municipalities --

4        THE COURT: Well, but we know from several Supreme

5  Court cases that the mere fact that Congress legislates

6  within its authority does not necessarily by itself mean that

7  it's consistent with the Tenth Amendment.

8        MR. BENNETT: Well, actually I think --

9        THE COURT: Right? You've got Printz --

10       MR. BENNETT: Well --

11       THE COURT: -- in New York at a minimum that hold

12  that.

13       MR. BENNETT: Well, that was the commandeering

14  point. We'll get to commandeering. There's no commandeering

15  in the Bankruptcy Code.

16       THE COURT: Well, I don't mean to suggest that there

17  is, but in the laws that Congress passed that the Supreme

18  Court held unconstitutional there, they were legislating

19  within their commerce clause or other enumerated power.

20       MR. BENNETT: Okay. In the radioactive waste case,

21  the New York case, it was because they used means that were

22  inappropriate that offended the solvency -- excuse me --

23  offended the sovereignty of the states. In the Bankruptcy

24  Code -- in the context of the Bekins case, I think when you

25  read the case, they were worried about something different.

1   They were worried about the -- in _Ashton_ the majority was

2   clearly worried about the bankruptcy parts going too far and

3   intruding on insolvent -- on sovereignty issues that weren't

4   actually close enough to the core bankruptcy problem.  That's

5   where we got the governmental and political powers type

6   exception that we have today, and so -- but I don't think

7   there is -- your Honor is correct.  If the way that the --

8   that Congress chose to legislate on the subject of

9   bankruptcies affecting municipalities was to tell state

10  courts what state courts had to do, then you would

11  conceivably have a problem, but there's nothing about the

12  Bankruptcy Court that tells -- state any things what states

13  have to do.  What the Bankruptcy Code tells courts, what it

14  tells federal courts what they should do when confronted with

15  a municipality that petitions for relief and petitions for

16  relief with proper authorization.  And so I don't think that

17  is -- that doesn't implicate the second half of the Tenth

18  Amendment.  It only implicates the first half of the Tenth

19  Amendment, and, quite frankly, it's protected by it.

20          And this is going to come up with something later.

21  When we think about the issue of priorities -- and that's a

22  word that encompasses lots of different things, and we can

23  break it down further if we need to -- priorities are at the

24  core of the subject of bankruptcy, absolutely solidly in the

25  core, so a point I want to make and we'll come back to is

1    that we're not really dealing with the part of the Bankruptcy

2    Code that gets closest to offending sovereignty.  We are

3    really dealing with -- when we talk about where pension

4    claims stand in the world and where they can be impaired, we

5    are dealing something that is core to the subject of

6    bankruptcies.  It's not at the edge of the things that made

7    the difference between the constitutionality and

8    nonconstitutionality of the Bankruptcy Code under the Tenth

9    Amendment.

10            THE COURT:  Well, I think possibly your colleagues

11    on the other side might take issue with that because they

12    analogize the pension right to a property right, which is a

13    matter of state law, at least under our present Bankruptcy

14    Code.  It probably doesn't need to be, as a matter of

15    constitutional law, but it is.

16            MR. BENNETT:  We will come later, and believe it or

17    not, it's going to be implicated in other aspects of the

18    Chapter 9 case not having anything to do with pensions to

19    where the line is between a priority and a property right.

20    When we talk later -- I'll get to it later.  I have a whole

21    section on why in this instance a pension is an unsecured

22    claim and not a property right.

23            THE COURT:  Okay.

24            MR. BENNETT:  If we -- just to take a short part

25    about it now, as I read the cases, there are some cases that

1    talk about an entitlement to money being a property right,

2    but in every single one of those cases the money was there,

3    so, for example, it was in a bank account and the balance was

4    there.  In another circumstance, you were dealing with a --

5    an entity was reducing the amount of money that was supposed

6    to be paid to an employee, but there was a hundred cent

7    dollars there, and the three percent that was going to be

8    carved out was going someplace else.  There is no

9    constitutional case that deals with a promise that there -- a

10   promise that might or might not be satisfied because there's

11   not enough money and say that kind of a promise is a property

12   right.  So I think that if you -- if we apply carefully the

13   Supreme Court cases -- and when I get to them, I'll remember

14   the citations -- we are going to find that an unsecured

15   promise where the actual sum of money can't be pointed to

16   because it's not there yet, that's not a property right and

17   never has been, and so the Fifth Amendment is not implicated

18   here.  This is absolutely a contracts clause case, and we'll

19   get to the contracts clause -- clauses in a second.

20          Okay.  So I want to -- last point with respect to

21   the Tenth Amendment, of course, Bekins says it's

22   constitutional under the Tenth Amendment.  The Bankruptcy

23   Code, in particular, its part relating to municipalities,

24   it's constitutional under the Tenth Amendment.  It finds that

25   the combination -- that apart from the fact that it's subject

1    to bankruptcies, it finds that the fact that the Code, then

2    the Act, had carefully carved out governmental and political

3    powers, kind of the -- that is, the relationship between a

4    municipality and its subjects -- it's carved that out.  It

5    says that is an appropriate safeguard to states retaining

6    sovereignty, and they say, "And, oh, by the way, there's a

7    consent requirement."  So those two things, the consent

8    requirement, the -- what I'll call the 903-904 carveout, and

9    the fact that the uniform laws on the subject of bankruptcies

10   are fair game for the federal government, those three things

11   are the three points that the <u>Bekins</u> court says it's okay for

12   Tenth Amendment purposes.

13         Now, it's time to work about -- talk about the

14   contracts clause problem.  Your Honor is clearly familiar

15   with what the contracts clause problem is.  You have a

16   contracts clause -- and I have a cheat sheet for everyone.

17   I've provided my colleagues on my left with a copy during the

18   break.  If your Honor --

19         THE COURT:  Sure.

20         MR. BENNETT:  -- will, I'd like to pass up --

21         THE COURT:  If you'd like me to look at it, sure.

22         MR. BENNETT:  -- copies.  And here we have the three

23   clauses that we need to talk about, the federal contracts

24   clause, the state contracts clause, and the pensions clause.

25   As far as the <u>Bekins</u> court is concerned, it's talking only

1    about the federal contracts clause, and where I'm going is
2    it's not going to make any difference.  And what the
3    Bekins -- the Bekins court doesn't think that consent of the
4    state has anything to do with getting beyond this clause
5    probably because it knows that there's no consent out to the
6    contracts clause.  Instead, it finds that the reason why that
7    the municipal bankruptcy act is constitutional is because the
8    entity that is actually impairing or changing contracts is
9    not the state.  It's not the municipality acting by the
10   state.  It is the court itself.  And the key quote is the
11   state invites the intervention of the federal, my word,
12   bankruptcy power to save its agency -- that's really a
13   synonym for municipality -- which the state itself is
14   powerless to rescue.  And the reason the state is powerless
15   to rescue it is because of the contracts clause.  Through its
16   cooperation with the national government, the needed relief
17   is given.  So under -- so as far as Bekins is concerned,
18   under Chapter 9 the federal government, through its courts,
19   is the pertinent actor.
20          Now, you could write this more elegantly, and it
21   wasn't in our briefs because I actually didn't find it until
22   last night, and that is Ashton.  You know, I have to
23   confess --
24          THE COURT:  That is what, sir?
25          MR. BENNETT:  Pardon?

1           THE COURT:  What did you say it was?

2           MR. BENNETT:  Ashton.  Until yesterday I'd never

3    read Ashton.  After all, everybody knew it had been overruled

4    by Bekins.  But I read it last night, and I got to the end,

5    and I realized there was a dissent by Cardozo.  And I read it

6    because it was by Cardozo because he writes really well.  And

7    he took this particular issue head on, and so I'm going to

8    read a lot of sentences from it.  It's on page 142.  And

9    here's what he says.  He, of course, is dissenting, so he's

10   finding the last version constitutional, and he gets to the

11   contract clause problem.  And by the way, one of the things

12   about Cardozo's dissent is that he's also much better about

13   dividing the Tenth Amendment analysis from the contracts

14   clause analysis.  He kind of does it explicitly separately.

15   And he says this.  This is about the contracts clause.  "The

16   act does not authorize the states to impair through their own

17   laws the obligation of existing contracts.  Any interference

18   by the states is remote and indirect."  I'm going to skip

19   some things, some citations and some things that aren't that

20   important, and get to something that's more important.  "If

21   contracts are impaired, the tie is cut or loosened through

22   the action of the court of bankruptcy approving a plan of

23   composition under the authority of federal law.  There, and

24   not beyond in an ascending train of antecedents" -- it's an

25   amazing sentence -- "is the cause of the impairment to which

1    the law will have regard," skipping some citations.

2    "Impairment by the central government through laws concerning

3    bankruptcies is not forbidden by the Constitution.

4    Impairment is not forbidden unless effected by the states

5    themselves.  No change in obligation results from the filing

6    of a petition by one seeking a discharge, whether a public or

7    a private corporation invokes the jurisdiction."  We're going

8    to use that sentence again when we talk about whether -- how

9    much we have to decide today.  "The court, not the

10   petitioner, is the efficient cause of the release."

11        For some reason Cardozo didn't participate in

12   Bekins.  The Bekins court, I think, said the same thing.  I

13   just think they said it a lot less clearly and a lot less

14   elegantly.

15        So I think this is very informative about the right

16   way to think about who is doing what and will become

17   important when we get to the authorization problem, which

18   we're going to be at very soon, but I want to --

19        THE COURT:  Where do you think in Bekins the

20   majority of the court or the court itself said the same

21   thing?

22        MR. BENNETT:  The words I read at the -- I'm sorry.

23   I got to find the back pages.  The words I started with,

24   the -- it's at page 54.  The state invites the intervention

25   of the federal bankruptcy power to save its agency -- means

1    municipality -- which the state itself is powerless to

2    rescue -- that's the reference to the contracts clause.

3    Through its cooperation with the national government, the

4    needed relief is given.  I think the -- I think they're doing

5    exactly the same thing and just managed to do it in a lot

6    fewer words but with -- losing a teeny bit of precision in

7    the process, but it is the same thing.  They are basically

8    adopting the Cardozo view of why the bankruptcy law is

9    constitutional under the contracts clause, the federal

10   contracts clause.

11          And, you know, I quoted these words, but there are

12   words before it and words after it that basically zeroes in

13   on that they're dealing with this particular issue at this

14   particular point in time.  This is just as much as they say.

15          The Bekins court, of course, there's no dissenting

16   opinions.  There's two judges that say they dissent for the

17   reasons expressed by the majority in Ashton.  That's all they

18   do.  And so that may well be one of the reasons why the court

19   was a little bit less careful.  Of course, what Cardozo said

20   isn't precedent.  It's just very, very clear thinking,

21   elegantly written about exactly the problem we have in this

22   courtroom today, and I think it's awfully persuasive, and I

23   think it is reflective, although certainly done better, than

24   the work that was done by the Bekins court.

25          A couple of other constitutional issues before we

1   move on to the authority points and the different contracts

2   clauses.  AFSCME does take the position in their papers that

3   the contracts clause continues to constrain all municipal

4   bankruptcies.  Of course, the federal contracts clause we

5   know from the Supreme Court does not.  We'll talk about

6   whether there's any difference in the state courts soon.  But

7   why AFSCME takes that position is they know full well that if

8   the contracts clause is easily bypassed by a municipal

9   bankruptcy case -- and we think that it is for precisely the

10  reasoning of Judge -- Justice Cardozo -- then this is over

11  because the contracts clauses, as we're about to get to, are

12  very, very similar.  They're almost identical to each other,

13  and they're identical in all the ways that matter.  We will

14  go through it very carefully.

15          There was next the point that was made about

16  accountability.  I don't think there's any confusion about

17  accountability.  I think, again, I appeal to Cardozo's

18  language but also to Bekins on this point.  If you don't like

19  the powers that a court has in Chapter 9, write your

20  Congressman.  If you don't like the way Detroit was managed

21  so that it wound up in Chapter 9, don't let the people who

22  used to be in office be in office again in Detroit.  If you

23  don't like the emergency manager and don't think he was

24  qualified and don't like what he was doing, write the

25  governor or your state legislator.  There is no

1  accountability question if you break it down in the way that

2  Cardozo broke it down.  And by the way, the other thing

3  Cardozo says and I think also Bekins says, there's nothing

4  wrong with asking.  You have to ask if you're going to do

5  this consensually.  The emergency manager on behalf of the

6  city had to ask the retirement funds directly, retirees more

7  indirectly, to reduce or change benefits in order to

8  accommodate the needs of current city residents and the

9  ability of the city to survive.  They could also ask the

10  Court to exercise its authority to help, too.  That doesn't

11  mean they are the one loosening the knot or cutting the knot.

12          We talked about Asbury Park.  Anti-commandeering

13  cases.  Again, I think -- well, the federal government's

14  brief does a much nicer job on this than I ever could in

15  pointing out that the essence of the commandeering cases are

16  the federal direction to state actors -- in this case, maybe

17  it would be state judges or the emergency manager or the

18  governor -- to do something in a particular way.  And, in

19  fact, the -- that's not what happens.  That is not the

20  structure of Chapter 9 at all.  The structure of Chapter 9 is

21  that there is certain power that is vested in this Court, and

22  that power can be used in certain ways.  Frankly, your Honor

23  can't tell the city what kind of plan to file, but your Honor

24  can say whether or not you will approve a plan that is filed,

25  so the request has to be made by the city, and the power has

1   to be exercised by your Honor.  Again, the city itself is

2   powerless to escape the contracts clause, but it does not --

3   at no point does the federal government say I have a policy

4   that I am going to ask the states or demands that the states

5   implement for me.  That doesn't happen anywhere in Chapter 9,

6   and, frankly --

7        THE COURT:  Well, but Ms. Ceccotti doesn't agree

8   with that.  What she says is Congress says if you want to

9   adjust your debts, we prescribe the priority scheme to the

10   exclusion of the state.  The state can't come in with its own

11   notion of what the priorities should be so that the division

12   of sovereignty that results violates the Tenth Amendment.

13        MR. BENNETT:  Well, first, there's a logical failure

14   there, and it has to do with Asbury Park.  The UAW starts

15   with the proposition that there is some kind of viable state

16   restructuring process that can actually work and that the

17   federal government took it away from them and made the

18   bankruptcy -- the Chapter 9 exclusive.  That isn't reality.

19   Asbury Park, as we've seen, first of all, is an unbelievably

20   exceptional case, which, by the way, the end holding is that

21   that restructuring was done for bonds and made bonds better.

22   That is the holding at the end of the day or the key facts at

23   the end of the day in Asbury Park.  Asbury Park is not and

24   never has been construed to be -- and no one cited any case

25   to your Honor showing that in the period of time before

1    Congress claimed the field for itself that there was any

2    viable municipal debt adjustment opportunity created by what

3    we have to call the Asbury Park exception to the contracts

4    clause.  And if you believe everything in the UAW's belief --

5    brief and believe their interpretation of the pensions

6    clause, it gets even worse, that even if there were -- was

7    Asbury Park wiggle room and then in the absence of the

8    Bankruptcy Code the pensions clause is absolute, you have

9    worse than nothing.  You have worse than the almost

10   meaningless Asbury Park exception.  So I don't think it's

11   coercion for the -- for Congress to say you can't do

12   something that you can't do.  And I think the prohibition on

13   competing state municipal schemes is, frankly, recognition

14   that they're not possible or workable, and, again, no one has

15   been able to show you either before or after that provision

16   of the Bankruptcy Code what this wonderful municipal scheme

17   is out there that would have been a choice.  Cardozo doesn't

18   think there's any choice.  Bekins doesn't think there's any

19   choice.  And that's the same court that decided Ashton, so

20   I -- about the same time actually or Blaisdell was about the

21   same time.  Ashton may have been later.  This is a -- I

22   think -- I don't think Congress coerced anybody.  I don't

23   think that's possible on the facts.

24            Okay.  So to summarize, we've shown that Chapter 9

25   is constitutional and that, in particular, it does not offend

1  the contracts clause in the United States Constitution. I

2  think along the way we've demonstrated that the state's

3  authorization of a municipality's resort to Chapter 9 for

4  relief from contracts generally does not constitute a state

5  impairment of contract because otherwise no -- not a single

6  Chapter 9 would work. We have also along the way noted that

7  the filing of a petition itself doesn't constitute impairment

8  of anything in any event and that if there is an impairment,

9  it's by the federal Bankruptcy Court, so now let's look at

10 our contracts clause cheat sheet and try to find out whether

11 there's any difference because of the fact that there's a

12 state contracts clause or because there's a pensions clause.

13     First, with respect to the state contracts clause, I

14 don't think anyone has suggested to the Court that this is

15 any different than the federal contracts clause, and, in

16 fact, there isn't. There's no difference, and no one

17 suggested it, so -- but, by the way, Justice Cardozo, again,

18 as -- more elegantly and more precisely but -- and the Bekins

19 court both would believe that the state contracts clause --

20 okay -- is also focused on the state. It doesn't bind the

21 federal government. And since the federal government is the

22 relevant actor, the state contracts clause does not impose

23 any obstacle at all to a municipality invoking Chapter 9

24 relief.

25     The only thing I want to pause to say is it couldn't

 1   be otherwise because if it were otherwise -- I skipped a

 2   step.  Every state -- at least every state I looked at, so

 3   there may be an exception, but every state has a state

 4   contracts clause.  It's not surprising.  Copied it from the

 5   federal Constitution.  So if it were the case that the

 6   state's contracts clause was different than the federal

 7   contracts clause and that it was a barrier to invoking

 8   Chapter 9 relief, then every single bondholder in every

 9   single -- I should say every single lawyer for every single

10   bondholder in every prior Chapter 9 case has probably been

11   guilty of malpractice because they might have been able to

12   escape their prior Chapter 9 cases -- and there are now

13   hundreds on the books -- on this basis alone.  But, again,

14   for the reasons expressed in Bekins and more elegantly by

15   Judge -- Justice Cardozo, they can't.

16        So now we finally get -- we reach the pensions

17   clause also quoted in front of you, and we say, okay, is this

18   pensions clause any different than --

19        THE COURT:  But hang on.  Isn't there a difference

20   between reconciling the bankruptcy clause with the federal

21   contracts clause on the one hand and trying to reconcile how

22   a state that prohibits itself from impairing contracts with

23   taking advantage of the bankruptcy power that the federal

24   court has enabled -- or that the federal Congress has enabled

25   because of the sovereignty of the state?

1          MR. BENNETT:  No difference.  Why?  Let's remember.

2     The reason why I spent so much time talking about why was the

3     Debt Adjustment Act under the Bankruptcy Act constitutional

4     as far as the federal contracts clause was concerned -- it

5     wasn't about the language of the federal contracts clause.

6     It was because the state isn't an actor.  The federal

7     contracts clause acts only on states.  The relevant actor is

8     the federal government.  It's the Bankruptcy Court.  That was

9     the reason why there was no federal contracts clause problem

10    with the Bankruptcy Act in Bekins, and it was the only

11    reason -- the only part of the opinion that had to do with

12    the federal contracts clause part of the problem.  The state

13    contracts clause acts again only on the state, not on the

14    federal government.  Accordingly, if you believe -- and the

15    Supreme Court has held that the relevant actor for purposes

16    of untying or cutting the knot is the federal Bankruptcy

17    Court and not the state, then the state contracts clause

18    forms no additional barrier to the use of the Bankruptcy Code

19    than the federal contracts clause did.  They are the same,

20    and they are both not relevant for the same reason.

21          THE COURT:  And your position is that it's a matter

22    of federal law that the pertinent actor is the federal court,

23    not the state entity that's in bankruptcy?

24          MR. BENNETT:  The Supreme Court told us along the

25    way to approving the Bankruptcy Act the first -- for

1  municipalities the first time that it's --

2  　　　THE COURT:  So even if the state law were to say

3  it's the city that's the pertinent actor, that's not relevant

4  because it's a federal law question.

5  　　　MR. BENNETT:  Correct.  So for purposes of federal

6  law, the Supreme Court has told us it's the federal

7  Bankruptcy Court that is the relevant actor.

8  　　　So now we get to the pensions clause, and we've got

9  to find that there's a difference.  And I think I want to

10 start here.  This is going to be somewhat repetitive of the

11 brief.  There's nothing in the pensions clause that says

12 anything like, quote, "and the state shall not authorize any

13 municipality to commence a bankruptcy case that would allow a

14 federal court to impair or diminish pension claims."  It just

15 doesn't say that.  And, of course, it is words like that that

16 the objectors are saying have to be imported into the

17 pensions clause.

18 　　　It's hard, I think, because at the end of the day,

19 apart from the fact that the pensions clause is, quote, "more

20 specific," and it's, of course, more specific because they

21 were looking at pensions because the law in Michigan at the

22 time they were looking at the pensions clause was that

23 pensions weren't a contract.  That's the only reason it's

24 more specific.  It wasn't because -- there's no other

25 evidence for why it was more specific.  The only

1  difference -- the only words that are different are the

2  words, quote, "be diminished." Excuse me. Quote,

3  "diminished or." That's the only difference. "Impaired" is

4  used in all of them. "Prohibition of impairment" is used in

5  all of them. All of them are absolute about prohibitions of

6  impairment.

7          And I'm going to take this in two steps. First of

8  all, the objectors say --

9          THE COURT: Well, but hang on. There's the next

10  sentence, which you didn't include on here, the next sentence

11  of the pension clause.

12          MR. BENNETT: Okay. The funding sentence?

13          THE COURT: Yes.

14          MR. BENNETT: Okay. Well, frankly, that's not

15  focusing on today, and it sounds like it's a --

16          THE COURT: Well, but the objectors argue that this

17  additional consideration that the Michigan Constitution gave

18  to pensions which it didn't give to contracts elevates it,

19  makes it, if not absolute, more absolute than contracts.

20          MR. BENNETT: Well, let's talk about -- I

21  specifically wanted to talk about that because --

22          THE COURT: Okay.

23          MR. BENNETT: -- first of all, why is it -- we

24  should ask ourselves question number one. Why is it that the

25  federal contracts clause and the state contracts clause

1    became less than absolutely binding?  It wasn't because of

2    the inadequacies of the language.  It was -- in fact, what

3    the courts have done is they put the word "substantial" in

4    front of the word "contract," so an insubstantial impairment

5    doesn't count, and a substantial impairment has some extra

6    hurdles that you have to go over before you can make it.  So,

7    frankly, if what they were trying to do was to tighten the

8    pensions clause and make it more distinctive -- and if they

9    went to the books because, of course, all of the cases, you

10   know, Worthen versus Thomas, Home Building & Loan Association

11   versus Blaisdell, these are like cases from the mid-'30s, so

12   they were all on the books in 1961 through 1963, so they knew

13   that, and they knew that the problem was the incorporation of

14   the substantialness concept.  So if they were really after

15   solving that problem, why didn't they just put the words

16   right before "impairment" "substantial or insubstantial

17   impairment"?  And they could have tightened it up in the way

18   that it had been loosened.  They could have prohibited

19   substantial and insubstantial impairments.  That would have

20   dealt with -- if they were trying to say we're opting the

21   pensions out of the judge-made doctrines and exceptions that

22   have burdened the federal contracts clause and the state

23   contracts clause, that's how they might do it.

24          Now, by the way, it would be irrelevant to this

25   argument because remember the pensions clause, just like the

 1  state contracts clause, just like the federal contracts

 2  clause, acts on states and municipalities.  It doesn't act on

 3  the Bankruptcy Court.  It doesn't act on the federal

 4  government.  And once again, if the right actor -- if the

 5  actor that unties the knot or cuts the knot is the federal

 6  Bankruptcy Court and the federal government and not the state

 7  and not the municipalities, as the Supreme Court says, then

 8  the pensions clause, even with the words "substantial or

 9  insubstantial" in front of it, doesn't get you all the way

10  home.  What they next needed to do in the pensions clause is

11  to say by enacting the pensions clause and giving it -- and

12  making pensions special, we now want to do something else.

13  We really want to say -- objectors thinks the Constitution --

14  that the convention -- that the conventioneers really wanted

15  to say, well, in a municipality that has material pension

16  claims, they can't resort to a federal court to seek relief.

17  That's what they really want us to find in the pensions

18  clause.  But, frankly --

19        THE COURT:  No, no.  I don't hear that at all.  What

20  I hear is you are welcome to come in that door so long as the

21  city's assets, according to Mr. Dusen, are first allocated to

22  pensions.

23        MR. BENNETT:  Well, if there was a lawyer around

24  there at the constitutional convention who was doing

25  research -- and I suspect that there was -- they should be

1  charged with figuring out that the only way to stop the
2  federal courts -- if there is even a way, but the only way to
3  stop federal courts from having the power to impair contracts
4  that maybe a state can't impair is to cut off the -- is to
5  basically say the state cannot ever go to a federal court for
6  a federal -- then it was called composition, you know,
7  federal debt composition case.

8         And the other point that your Honor should note is
9  that -- and we say this in our papers -- during the entire
10  constitutional convention, for years before and almost
11  continuously thereafter, the State of Michigan had authorized
12  the municipalities to file Chapter 9 cases, so if they were
13  really elevating pensions in the way of taking them --
14  distancing themselves from the federal power to impair them
15  and they knew, open paren, one, that the federal debt
16  composition scheme had been determined to be constitutional
17  by the Supreme Court in part because the federal court was
18  doing the work of impairing contracts and they knew -- they
19  have to be presumed to know that Michigan had opted in and
20  had continuously all through the period -- in fact, I think
21  in our papers we say when they repealed it.  I think they
22  repealed it around 1980 when general authorization was all
23  that was necessary, so they kind of covered the entire
24  period.  No one ever said, gee, we better as hell change
25  this.  And in all of the legislative history of the

1  constitutional convention, you don't have a word about

2  bankruptcy and pensions, and the words that you do have --

3  the words that were quoted to you in the papers just filed --

4  I have to find it.  Okay.  Here's AFSCME's best quote from

5  the official record of the constitutional convention, 2

6  Official Record, page 3402.  This is a new section that

7  requires that accrued financial benefits of each pension plan

8  and retirement system of the state and its political

9  subdivisions be a contractual obligation which cannot be

10  diminished or impaired by the action of its officials or

11  governing body.  It's in AFSCME's papers, paragraph -- the

12  new ones, the supplemental papers.  Actually, those are

13  amended and restated, paragraph 19, page 11.  Same brief,

14  paragraph 142, page 71.  Pension benefits constitute, quote,

15  "deferred compensation for work performed which should not be

16  diminished by the employing unit after the service has been

17  performed," close quote.  Those are the quotes that you were

18  offered by AFSCME about the seriousness and importance of the

19  work done in the constitutional convention from 1961 to 1963,

20  this against the background where it's been the law of the

21  land, at least as far as the Supreme Court is concerned,

22  since 1930 -- I can't remember exactly.

23       THE COURT:  So is it your view that the only

24  effective way that the Michigan Constitution could have

25  provided the protection for pensions that the objectors seek

1   here is by the Constitution prohibiting a Chapter 9 filing?

2           MR. BENNETT:  Prohibiting authorization of a Chapter

3   9 filing or -- yes, your Honor.  That's exactly what they

4   would have had to do, and that's not the kind of thing that

5   they can do by implication.

6           I want to talk a little bit more because I think

7   there's a lot of stress that's put on the words "diminished

8   or," and there is the assertion that "diminished or" has to

9   be given some meaning, but, frankly, the only meaning it

10  could be given is to somehow expand "impaired."  I don't

11  personally think it does expand "impaired," and there's -- I

12  want to point out before moving on with a whole bunch of

13  authority to that effect that it's really dangerous for a

14  court to decide that "diminished or" added anything to

15  "impaired" because if the Court decides that "diminished or"

16  filled some gap that's related to the word "diminished and

17  impaired," then in the next case someone is going to come to

18  your Honor and say, "You know that state contracts clause?

19  There's no 'diminished' there, and 'impaired' has to mean

20  less than 'diminished or impaired' in the pensions clause."

21  So it's actually a good thing that there's law out there on

22  this subject -- we had it in our brief -- that basically says

23  that if you run into one of these problems where you've got a

24  list and you want to say that they all have an independent

25  and separate meaning, you've got to propose an independent

 1    and separate meaning for the terms on the list that actually
 2    solve the problem.  And in this case, trying to find an extra
 3    meaning for "diminished or" -- again, it's consistent with
 4    its place in the sentence -- does -- creates a mess in the
 5    state contracts clause in Article I, Section 10.

 6            Apart from that, it turns out that when you go look
 7    at the books -- and this is not in our papers because this
 8    was an issue raised in the responsive papers -- is that every
 9    time we found the definition of "impair" in the cases or in
10    dictionaries, it includes diminishment, which should not be
11    terribly surprising.  It's a very common sense answer.  But
12    if you want a list -- and you might need them in connection
13    with putting together an opinion -- you could start with the
14    Bank of Minden case, which is a Supreme Court case, 256 U.S.
15    126 at 128.  Then if you want to go to the Sixth Circuit,
16    Riverview Health Institute, 601 Fed. 3d 505.  Black's Law
17    Dictionary, Webster's Third, and then there's a bunch of
18    state courses -- state cases from other states that all say
19    the same thing.  I could read the quotes, but I'll save the
20    time because it really is kind of a commonsensical -- a
21    common -- it's common sense that "impaired" has to include
22    "diminished."  "Impaired" is much broader than "diminished,"
23    and every so often this is either a -- there's a rhetorical
24    flourish that works its way in, and this may well be what
25    that is, and that's all it can be.

1          Okay.  Moving on to the issue of whether or not the

2    authorization to file Chapter 9 is ineffective because the

3    emergency manager or the governor recognized that impairment

4    of pension benefits may be necessary.  I don't want to add

5    additional arguments to the constitutional provisions.

6    That's not the purpose of this section.  The purpose of this

7    section is to deal with the point made, I think, by only one

8    or two of the objectors that the -- that there's an

9    instruction to the emergency manager to comply with the

10   pension statute, and that should apply to the filing of a

11   Chapter 9 case as well.  I'm sure your Honor has your own

12   copy of the Local Financial Stability and Choice Act, Act

13   436, and when you look at the -- most importantly, when you

14   look at the Chapter 9 authorization section, there is no

15   instruction that the emergency manager comply with the

16   protections affecting pensions.  By the way, that may well

17   make sense.  There are a whole bunch of other provisions that

18   talk about what the emergency manager is supposed to do out

19   of court, and not surprisingly it talks about him having to

20   comply with many laws and to pay many debts and to do many

21   things.  He resorts to Chapter 9 when he can't accomplish

22   those things out of court.  And if one thought that anything

23   about the emergency manager law meant to say that the

24   emergency manager had to in Chapter 9 continue to not impair

25   pensions, you would think it would belong in the section that

1    is applicable when the emergency manager files Chapter 9.

2            In addition, I think the part that was read to your

3    Honor earlier this morning has a lead-in clause that didn't

4    make it into the record.  It reads, "If the emergency manager

5    serves as sole trustee of the local pension board, all of the

6    following should apply," and that's where the provision that

7    was located was read to you, so there is nothing in the

8    emergency manager law -- and, in fact, the structure of the

9    emergency manager law itself suggests that a lot of bets are

10   off in a Chapter 9 context that may not be -- including

11   things that the emergency manager is supposed to try to

12   accomplish if he's in an out-of-court world.

13           Next argument, failing to condition authorization on

14   nonimpairment of --

15           THE COURT:  One second.  Does that suggest that in

16   order to accomplish what Mr. Orr thinks is necessary to

17   accomplish with regard to pensions, he needs to be a trustee

18   of the plan?

19           MR. BENNETT:  No.  It's that -- no.  He has the

20   right to remove trustees of the plan for other purposes, and

21   these are these extra requirements that are imposed upon him

22   just in those circumstances that it -- I think when your

23   Honor gets a chance to look at it -- what did I do with it?

24   I had it here a second ago, so I'll give you -- let me give

25   the exact section referenced so it's easy to find.

1          THE COURT:  Okay.

2          MR. BENNETT:  The part I read from is in Section

3    12(m), and it is confined to that relatively narrow

4    circumstance.

5          Okay.  First of all, on the issue of whether or not

6    the governor's failure to put conditions on authorization

7    makes the authorization invalid, we indicate in our brief

8    that we don't think that conditions on authorization could be

9    valid, that -- and as I think -- I think I got ahead of

10   myself earlier, so I don't want to take too much time in

11   covering it again now, but we're talking here about one of

12   the core subjects of bankruptcy, which is priorities, who

13   gets paid when there's not enough to go around.  If that's

14   not a core subject of bankruptcy -- not in the core versus

15   related, but if that's not the absolute center of the subject

16   of bankruptcies, I don't know what it is.  And we've cited a

17   lot of law, and your Honor has pointed out there are many

18   cases, none decided the other way, that say particularly in

19   the context of things touching on priorities and who gets

20   paid first and who gets paid second, who doesn't get paid at

21   all, that the -- that you buy the Bankruptcy Code as a whole.

22   You buy the scheme as a whole.  You don't buy parts of it.

23   And in this sense federal law is supreme because once there

24   is a proper bankruptcy case before the Court, it is the

25   federal priority scheme that applies.  It is legitimate that

1  the federal priority scheme applies because it's legislation

2  on the subject of bankruptcies, and because it's legislation

3  on the subject of bankruptcies, it is absolutely supreme,

4  period, end of story.

5       So, as to your Honor's hypothetical, if anyone walks

6  into the federal court and says, "I want federal judicial

7  relief.  I want to use that federal power to untie and cut

8  knots, but I want the ultimate distribution or really any

9  part of the distribution to be conducted in accordance with

10 my terms," whether they're found in a statute or in a state

11 Constitution, it doesn't matter.  The federal law on this

12 issue is supreme, and it's supreme over Constitutions and

13 over statutes, period, end of story.

14      It seems kind of small when done with that to point

15 out that 436 permits but doesn't require conditioning.  We

16 can imagine a whole bunch of conditions that might have been

17 very sensible and that might not offend federal jurisdiction

18 like it could have been -- there could have been suggestions

19 or requirements as to exactly how the emergency manager

20 should interact with other elected representatives or with

21 other people.  Actually, the governor does have one -- it's

22 not quite a condition.  It's a suggestion, but I think he'd

23 be offended if it wasn't followed, which is he wants Mr. Orr

24 to continue to communicate with the governor and the

25 treasurer relating to what he's doing.  So I think we can

1    think of several things that could be -- that you could use

2    for the PA 436 conditioning power that would be perfectly

3    okay, but going in and saying, "Gee, as a matter of this

4    particular state law" -- and, by the way, it's -- the

5    governor would -- to do that, he's got to ignore the

6    conflicts that I discussed earlier between a law that says

7    thou shall not impair this one with another law that says

8    you're the first money out.  It's mind-boggling what he'd

9    have to reconcile, but the instruction would be, yeah, this

10   one we really meant and the others we didn't really mean,

11   follow that one first.  I think that that would be an invalid

12   authorization.  I think the Court would have to say that

13   authorization isn't okay for federal court purposes.  I think

14   as a prudential matter, the federal court should not get

15   involved in a case where the authorization is conditioned in

16   a way that would offend the federal scheme, but understanding

17   that there may be very extreme and difficult circumstances

18   involved, a creative federal court might want to give people

19   some time to kind of take a couple steps back and figure out

20   how to do it better.

21           THE COURT:  Let me ask about Section 943.

22           MR. BENNETT:  I need to get a case if you're going

23   to do that because I -- from the --

24           THE COURT:  This is the Bankruptcy Code.

25           MR. BENNETT:  Yeah.

1          THE COURT:  943(b)(4).

2          MR. BENNETT:  Right.  There's actually one case

3    that's dealt with that previously, and I think it's --

4          THE COURT:  Let me just get my question out.

5          MR. BENNETT:  Okay.

6          THE COURT:  Thank you.  So the question is what does

7    this section mean if it doesn't mean that the state can

8    dictate the priorities?

9          MR. BENNETT:  Because it says "from taking any

10   action necessary to carry out the plan," and I --

11         THE COURT:  What does that -- what does that

12   language mean?  What meaning does it have?  How does it come

13   into effect?

14         MR. BENNETT:  Okay.  I think the best way to work

15   through that is the Sanitary Improvement District Number 7

16   case, 98 B.R. 970, and this is a really fascinating case

17   because the facts gave you every conceivable issue under the

18   sun in terms of the interpretation of this section.  What

19   happened in Sanitary Improvement District is that the debtor

20   had -- you know, had claims against it.  Let's call them a

21   hundred.  I'm using representative numbers, not the actual

22   numbers.  As a result of the bankruptcy case, they issued

23   paper, and I think it was like 60.  Okay.  And the -- but the

24   paper that was 60 had in it a provision that said that if the

25   debtor paid it in full within a certain number -- within a

1  certain number of months -- I think it was 18 months -- after

2  the bankruptcy case is over, it only had to pay 95 cents on

3  the dollar or something like that, and so the creditors came

4  in, and they attacked the whole plan, pointed to a state law

5  that says thou shall pay your bonds.  By the way, there are

6  laws like that in Michigan, too.  And the court decides very

7  easily that the takedown from a hundred to 60, well, that's

8  supremacy clause bankruptcy.  You can do that notwithstanding

9  state law.  What you can't do, though, is because state law

10 says you have to pay bonds at a hundred percent of principal,

11 you can't have the five-percent discount feature because

12 that's -- after the bankruptcy, you issued this new bond, you

13 know, with 60 being the new hundred, but you've said that you

14 can still pay that off at a discount.  That violates

15 943(b)(4).  So what this case illustrates is that this looks

16 at the obligations after they've been restructured and says

17 that the Bankruptcy Court does the restructuring.  By the

18 way, very consistent with the Cardozo and the Bekins view of

19 the world, you -- and you're finished.  The bankruptcy --

20 there's a confirmation order.  New instruments are issued.

21 Those instruments, the ones that you walk out of Bankruptcy

22 Court with, have to be instruments that you can perform in

23 accordance with state law.

24        THE COURT:  So this provision, in your view, says

25 nothing about the requirement of the plan itself or the order

1    confirming plan to comply with state law.

2         MR. BENNETT:  I don't know if there's any case that

3    says that.  There may be.  I think <u>Sanitary and Improvement</u>

4    <u>District Number 7</u> has got it right, that it does not say

5    anything about the Bankruptcy Code restructuring process.  It

6    only acts on the debt that is issued after the case is over.

7         I don't think I have to spend time on it, so I'm

8    going to skip over -- again, it's in our papers.  There's an

9    assertion in the papers that the Tenth Amendment is not

10   reserved -- that the Tenth Amendment reserves every issue

11   relating to municipal pensions to the states.  I think we've

12   dealt with that enough in the constitutional section, and I

13   don't have to deal with -- this really is the -- an argument

14   was built, constructed based upon the fact that in the case

15   of ERISA the federal government didn't make ERISA -- didn't

16   make states or municipalities applicable to ERISA, didn't

17   create the insurance program, PBGC, and the assertion is made

18   because the federal government chose not to go into those

19   areas, they must have done that because they were absolutely

20   precluded from doing so, ergo they are precluded from using

21   the bankruptcy power to modify pensions.  I think that fails

22   logically in a lot of places, but most importantly maybe to

23   start with is that it's not clear that there is no possible

24   way for the federal government to apply the ERISA statute or

25   the PBG statute to state municipalities, maybe to states but

not to municipalities, and -- at all, by the way, and that
Congress didn't may have reflected political realities at the
time and not actual constitutional limitations, so I think
the starting point of that argument just fails, and I think
we've seen that federal -- that a federal bankruptcy power
can be applied by the federal court to obligations.  Pensions
are clearly within the federal bankruptcy power, no dispute
in the private context.  There's nothing different about
Chapter 9 context.  And so there is no such part of the Tenth
Amendment that constrains this aspect of the subject of
bankruptcies.

        The next point is a really important one, and I
could easily have started with it, and I know your Honor has
been concerned with it throughout, which is whether or not
your Honor really has to deal with the -- whether or not
pensions can be impaired in bankruptcy in the context of
authorization.  I hope it's clear to your Honor that the city
is perfectly comfortable with you dealing with it now or
perfectly comfortable with dealing with it later.  We don't
think that this is -- some of these things may be a little
bit conceptually difficult and complex, but the
constitutional law on the subject is really pretty clear, and
so we're prepared to have it decided.  We think that there's
only one way to decide it.  There is, though, a way for your
Honor to decide not to decide it, which is to find -- and the

1    next to the last sentence I read from Justice Cardozo in his

2    dissent where he says, "just the filing is not doing

3    anything," we say that, too.  It is starting a bankruptcy

4    case.  I have said at the beginning -- I mean it -- there is

5    nothing inevitable.  A cramdown of revisions to pension

6    benefits, a cramdown of a particular treatment of the

7    underfunded portion of the pension obligation is not

8    necessarily the way this case is going to end, and it's not

9    necessarily the next step in this case.  We just don't know.

10   The next -- obviously right now mediation is an important

11   milestone.  The next important milestone is the plan, and

12   since your Honor has been around the Bankruptcy Courts for a

13   good long time, you know that the plan that we file before

14   the end of this year is not likely to be the plan that we

15   ultimately confirm.  It would be actually a good exercise for

16   different people to figure which amended plan is going to be

17   the plan.  The bottom line is nobody really knows.  And so it

18   is possible to adopt Justice Cardozo's view that no change in

19   obligation results from the filing of a petition by one

20   seeking a discharge whether a public or private corporation

21   invokes the jurisdiction and basically say since nobody has

22   done anything yet, we're not going to decide anything more.

23   You could do that.  I will say that the -- I think that the

24   assertion that there is an imminence that -- an imminence of

25   harm represented by the filing of the Chapter 9 case that

 1  requires this Court to act is, frankly, not a fair statement
 2  of the law.  I think one of the more important cases is
 3  Donohue.  It's been cited by objectors.  The most important
 4  part -- Donohue is the Nassau County financial restructuring
 5  case, and the most important part of Donohue that led the
 6  Court to act I think is mentioned by the Court.  It's kind of
 7  near the end of the opinion.  The Court says the law, the
 8  ordinance that gave the county executive all the powers,
 9  "provides expansive and seemingly limitless power to the
10  County Executive without any reasonable restraints other than
11  the procedural mechanism of an executive order."  This case
12  would be a lot simpler if all Kevyn Orr had to do to
13  reorganize the debts of Detroit was to say how he wanted to
14  do it and sign it as an order.  He doesn't think he has that
15  power.  I don't think he has that power.  No one in this room
16  thinks he has this power.  We've talked about the fact that
17  to get to a debt adjustment plan that is nonconsensually
18  confirmed, it has to be filed.  There has to be disclosure
19  statement approved.  There has to be voting.  There has to be
20  more discovery.  There has to be a confirmation hearing, and
21  there has to be an order of this Court.  That is a very
22  different procedure or array of protections than was
23  available in the Donohue case, which is, frankly, the closest
24  case to this one in terms of the kinds of things that we're
25  talking about here.  If your Honor goes through the other

1    cases that have been cited for the proposition of imminent

2    harm, you will find that in all of them there was no judicial

3    step going to occur before the harm might be inflicted.  In

4    all of --

5         THE COURT:  Let me ask that question here.  Can

6    you -- are you willing to identify here on the record or can

7    you identify here on the record any conceivable circumstance

8    in which retiree benefits, pensions won't be impaired by a

9    plan?

10        MR. BENNETT:  You know, your Honor, at this point

11   there are a number of major things that I don't know, and I

12   will say I don't know that there won't be money from outside,

13   although I tend to doubt it.  I don't know that.  I do not

14   know whether there will be -- whether certain other assets

15   will, in fact, be available to the city to address its debts,

16   and I will point out in this regard that while the objectors

17   have cited over and over and over again a pleading filed by

18   the attorney general asserting the primacy of pension claims,

19   they've all managed to have forgotten a formal opinion he's

20   given concerning the accessibility of certain assets in this

21   bankruptcy case, particularly the art, and -- but I have no

22   idea, number one, what's going to happen with that, and I

23   have no idea what the -- whether or not there will, in fact,

24   be a transaction involving the departments of water and

25   sewerage and whether those transactions will deliver material

1  dollars.  So while I'd be kidding myself and kidding the

2  Court and kidding everyone here if I said that I thought it

3  was anything but likely that there would be some impairment

4  of the underfunding claims in this case, it's not fair to ask

5  me and I don't think I could say that there's no scenario

6  where impairment will not be necessary.  I just don't think I

7  can even say that today.

8          THE COURT:  Okay.  Even with that much of a

9  disclosure here, why isn't that enough to say there's an

10  impairment here?

11          MR. BENNETT:  I'm sorry.

12          THE COURT:  Why isn't that enough to say at this

13  point in time there's an impairment?

14          MR. BENNETT:  Well --

15          THE COURT:  There's a sufficient impairment to get

16  past ripeness anyway.

17          MR. BENNETT:  You know, I don't think you can say

18  there's impairment because the Supreme Court has told us

19  there is not.  There won't be impairment, your Honor, until

20  you say so.  Is there a risk of impairment?  There's a risk

21  of impairment.  Is the risk of impairment enough to make this

22  ripe?  And the answer is is that -- I think this is the

23  answer when -- I mean the Donohue case is a good example, but

24  I think it ripples through all the others, which is that if a

25  court is presented with a situation where there's a risk of

 1  impairment and the impairment can occur before there's

 2  another opportunity or requirement that people show up in

 3  front of a judge, then they start thinking about whether

 4  there's interim harm, but there's not a single case that has

 5  been cited to you that says there is imminent harm in

 6  circumstances where no one is going to suffer anything until

 7  and unless a court enters an order after notice,

 8  opportunities for discovery, opportunities for hearing, and

 9  all the other protections that are available in connection

10  with a plan confirmation process in a Bankruptcy Court.  It's

11  just totally different.  The cases are dealing with a totally

12  different situation, particularly the Donohue case.

13          Do you have -- we're 20 minutes to.

14          THE COURT:  Twenty till five.

15          MR. BENNETT:  Do you want to save time for your

16  questions or --

17          THE COURT:  If you want to stop now, and we'll pick

18  it up with the government's attorney, that's fine with me,

19  and then we'll pick up the balance of your argument tomorrow.

20  Is that what you're --

21          MR. BENNETT:  I think it's a good break point.

22          THE COURT:  Okay.

23          MR. BENNETT:  I have very minor things left.

24          THE COURT:  Good.

25          MR. TROY:  Matthew Troy, your Honor, Department of

1  Justice, Civil Division, on behalf of the United States.  If

2  it makes any difference to your Honor or the other parties, I

3  am here for tonight and can be available tomorrow as well.

4       THE COURT:  I appreciate that, but since you're

5  here, let's have at it.

6       MR. TROY:  Fair enough.

7       THE COURT:  Well, my primary questions relate to how

8  you address the arguments here that the objecting parties

9  made in response to your brief regarding ripeness.

10       MR. TROY:  To be honest with you, your Honor, I've

11  only reviewed those very quickly because I filed the brief on

12  Friday and then went back to furlough status.  And on

13  Monday --

14       THE COURT:  That.

15       MR. TROY:  And on Monday --

16       THE COURT:  Well, would it be your preference to

17  have overnight to think about how to respond to the

18  objectors' concerns regarding ripeness?

19       MR. TROY:  Sure.  I can do that.

20       THE COURT:  Would that be your preference?

21       MR. TROY:  That would be, yeah, a more fulsome

22  discussion, I think.

23       THE COURT:  All right.  Then you are excused, and I

24  will hear from you tomorrow regarding that.  Do you want to

25  stop for the day now and pick it up tomorrow?

1      MR. BENNETT:  Your pleasure, your Honor.  I can keep

2  going, but I can also stop.  I'm not going to -- I don't

3  have -- less than 30 minutes left, in fact, significantly

4  less than 30 minutes left.

5      THE COURT:  Well, do you think you can finish in the

6  20 minutes that are left before five?

7      MR. BENNETT:  I'll try.

8      THE COURT:  All right.  Then I would invite you to

9  try.

10      MR. BENNETT:  Let me just get a little bit

11  reorganized.  Okay.  The next topic on my list is collateral

12  estoppel, and, your Honor, I think with respect to collateral

13  estoppel, a couple of points are worth focusing on.  First of

14  all, our very, very first point on this -- and I think it's

15  dispositive -- is that when this case was filed, this Court

16  had the most exclusive jurisdiction it ever gets about

17  anything, absolutely exclusive interest -- exclusive

18  jurisdiction under 1334(a) to decide matters in the case, and

19  eligibility is a matter in the case.  And the assertion by

20  the objectors is that the Webster court really didn't decide

21  eligibility.  The Webster court was deciding some abstract

22  issues of state law.  And, your Honor, two things.  Number

23  one, the objectors can't even say that without mentioning the

24  eligibility determination, and here I'm looking at the

25  funds -- Mr. Gordon's brief at page 32.  The Webster judgment

1   rules squarely on the constitutionality of PA 436 and the

2   governor's authorization of the emergency manager to proceed

3   under Chapter 9 in light of the pensions clause of the

4   Michigan Constitution.  There was absolutely no confusion in

5   the judge's mind or anyone around that courtroom's mind that

6   what they were trying to do was to get an early determination

7   of eligibility.  It might have succeeded, but this case was

8   actually filed first.  And by the way, although the attorney

9   general will probably have more to say about this, there was

10  no adjournment sought for purposes of filing the Chapter 9

11  case, and the transcript shows no such thing.  And they know

12  more about the circumstances than I do, and they can address

13  it tomorrow when it's their turn.

14      But there's an even more important point, which is

15  that the order that was entered by the judge purports to

16  enjoin the emergency manager directing him to have the case

17  dismissed and not file another one, so I just -- I can't

18  abide the assertion and the record does not support the

19  assertion that what happened in that court was not an effort

20  at an eligibility determination, so, number one, that was

21  within the exclusive jurisdiction of this Court.  If it was

22  within the exclusive jurisdiction of this Court, it wasn't

23  within the jurisdiction of that Court to do anything about

24  it, and, therefore, any judgment that was entered after the

25  filing for that reason alone is void.

1          Now, second point we make is that the automatic stay
2    applied as well because the entire event, even though the
3    city was not a party, was an effort to gain control over the
4    city's assets and an effort to enhance collection of the
5    debt.  Again, there can't be much dispute about that, open
6    paren, one, partly because of the way the whole proceeding
7    evolved and how everyone understood it, but more importantly,
8    here again we have the judge explicitly talking about the
9    Chapter 9 case and attempting to stop the Chapter 9 case
10   because of the perception that the Chapter 9 case might
11   impair pensions, and those kinds of acts are clearly within
12   the automatic stay.  Again, I think that the --
13          THE COURT:  Just to be clear, you're talking about
14   the automatic stay of Section 362 --
15          MR. BENNETT:  Yes.
16          THE COURT:  -- the Bankruptcy Code.
17          MR. BENNETT:  Correct, the Bankruptcy Code's
18   automatic stay, or 942.  The other half of it is in the -- is
19   in Chapter 9 as well.
20          Full and fair opportunity to litigate.  Again, I
21   would ask the Court to look at the record in that case.
22   There had been -- it is certainly true that a whole bunch of
23   briefs that were filed -- I don't think the hearing where
24   this all occurred had previously been calendared and noticed
25   to anybody.  The hearing was set on an emergency basis, and

1   someone got on the phone and called for the attorney

2   general's office because they thought it might be a good idea

3   to tell him about it about an hour before the hearing.

4   That's actually not the way things are fully and fairly

5   litigated in any courts I visit, and I don't think that when

6   your Honor ticks through the procedural elements of what

7   happened in that case in Lansing is going to be convinced

8   that there was a full and fair opportunity to litigate.

9           THE COURT:  Let me ask you just a sort of

10  administrative question regarding this.  Do we have in our

11  record here all of the pleadings and papers and dockets and

12  transcripts from that case?

13          MR. BENNETT:  I don't know if they're there yet.

14          MS. NELSON:  I believe I can answer that, your

15  Honor.  Assistant Attorney General Margaret Nelson.  It's my

16  understanding, no, those have not been submitted.  I do have

17  all of the transcripts, which I was prepared to present to

18  the Court when I make my argument, which now appears to be

19  tomorrow.  If the Court would like the submission of the

20  pleadings, we'll be happy to do that, although it's --

21          THE COURT:  Well, my understanding is that some of

22  the pleadings have been attached to various briefs, but I'm

23  just not sure if it's everything.

24          MS. NELSON:  There was only a -- there was --

25          THE COURT:  Just to --

1          MR. BENNETT:  We'll get it in.

2          THE COURT:  Yeah, exactly.  Just to be complete --

3          MS. NELSON:  Yes.

4          THE COURT:  -- let me make my request to you that

5    our record here include everything from that case, including

6    the docket.

7          MS. NELSON:  There's three cases, your Honor.

8          THE COURT:  Okay.

9          MS. NELSON:  And so -- that were filed separately --

10         THE COURT:  Well, but I think the --

11         MS. NELSON:  -- so I will submit everything --

12         THE COURT:  I think the one that's at issue here is

13   the one in which a judgment was entered.

14         MS. NELSON:  Correct.

15         THE COURT:  That's the one I need.

16         MS. NELSON:  So you want everything in the case in

17   which the judgment was entered the next day, including the

18   docket entries.

19         THE COURT:  Thank you.

20         MS. NELSON:  Would you also like the Court of

21   Appeals materials --

22         THE COURT:  Yes.

23         MS. NELSON:  -- because the Court of Appeals

24   materials were --

25         THE COURT:  Yes.

 1          MS. NELSON:  -- filed and a stay order entered

 2     thereto?

 3          THE COURT:  Just for --

 4          MS. NELSON:  Webster?

 5          THE COURT:  For completeness, yeah.  All right.  I

 6     have to -- I have to pause here.  I've been advised that the

 7     people in our overflow room couldn't hear this exchange, so I

 8     will just restate it for the record.  The attorney general's

 9     representative has agreed to provide to the Court in this

10     case the complete record from the Webster litigation not only

11     at the trial court level but at the Court of Appeals level,

12     including all pleadings and papers, transcripts, and docket

13     entries, the docket itself.  You may proceed, sir.

14          MR. BENNETT:  Okay.  Lastly, the last factor with

15     respect to collateral estoppel, your Honor, is the issue of

16     whether or not the judgment would be binding on the city in

17     any event.  Of course, the city was not a party to those

18     proceedings.  The assertion is made that the -- that there is

19     privity between the city and the state because they have a

20     common legal interest in some matters in connection with this

21     Chapter 9 case.  Frankly, I don't think those are the same

22     standard, and I think we covered that in our papers, but I

23     will say one other thing is that to the extent that there --

24     that the plaintiffs in those cases believed that the city was

25     in privity with the state with respect to those cases is an

1  additional reason why the automatic stay applied from the
2  very beginning because if they thought that they were in a
3  case with the state really trying to bind the city, then it
4  is perfectly clear that they violated the automatic stay.

5          I don't think I have any other material topics that
6  I think we need to cover based upon the argument by others.
7  If I've missed something or if your Honor has any questions,
8  I'd be happy to take them.  Otherwise I'll allow the attorney
9  general to take the floor tomorrow.

10          THE COURT:  Um-hmm.

11          MR. BENNETT:  We'll be done early.

12          THE COURT:  Okay.  Good.  We'll be in recess now
13  until 10 a.m. tomorrow morning.

14          MS. NELSON:  Your Honor, before you leave the bench,
15  may I just ask do you want those pleading -- do you want
16  everything submitted electronically?

17          THE COURT:  Yes, yes, in the record of this case.
18  Thank you.

19          THE CLERK:  All rise.  Court is adjourned.

20      (Proceedings concluded at 4:51 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett              October 20, 2013
_____     _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,          .        Docket No. 13-53846
        MICHIGAN,                 .
                                  .        Detroit, Michigan
                                  .        October 16, 2013
                    Debtor.       .        10:00 a.m.
. . . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

For the State of       Michigan Department of Attorney General
Michigan:              By:  MARGARET A. NELSON
                       P.O. Box 30758
                       Lansing, MI  48909
                       (517) 373-1124

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT GORDON
General Retirement     151 South Old Woodward, Suite 200
System of Detroit,     Birmingham, MI  48009
Police and Fire        (248) 988-5882
Retirement System
of the City of
Detroit:

For the Inter-         Cohen, Weiss & Simon, LLP
national Union,        By:  BABETTE A. CECCOTTI
UAW:                   330 West 42nd Street, 25th Floor
                       New York, NY  10036-6976
                       (212) 356-0227

APPEARANCES (continued):

```
For the United        U.S. Department of Justice
States:               Civil Division
                      By:  MATTHEW J. TROY
                      P.O. Box 875
                      Ben Franklin Station
                      Washington, D.C.  20044
                      (202) 514-9038


Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2     be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning, everybody.

4          ATTORNEYS:  Good morning, your Honor.

5          THE COURT:  Okay.  Who's up?

6          MS. NELSON:  Good morning, your Honor.  Assistant

7     Attorney General Margaret Nelson on behalf of the State of

8     Michigan in response to the objections that are currently

9     pending legal issues before the Court.  Before I begin, if I

10    may approach, I would like to present the Court with two

11    cases -- well, actually an order and a case decision that I

12    will be referring to later in my arguments --

13          THE COURT:  Okay.

14          MS. NELSON:  -- the state's rebuttal or response to

15    arguments that were raised yesterday.  The state's focus with

16    respect to the legal objections raised to the City of

17    Detroit's eligibility focused principally on the

18    constitutionality of Public Act 436 and the lawfulness of the

19    governor's authorization thereunder to the city and the

20    emergency manager to proceed in bankruptcy under Chapter 9.

21    The objectors essentially identified four principal bases for

22    contending that Public Act 436 is unconstitutional.  The

23    first is in the context of Section 18(1) when they allege

24    that it fails to protect public pensions from inclusion in

25    the bankruptcy proceedings initiated by the local government

1    as authorized by the state.  Second, they allege that Public

2    Act 436 violates the home rule provisions of Michigan's

3    Constitution under Article VII.  Third, they allege that 436

4    improperly delegates authority to the emergency manager and

5    thereby violates the separation of powers provisions within

6    Michigan's Constitution.  And, fourth, they argue that Public

7    Act 436 lacks adequate standards to guide the emergency

8    manager's actions in bankruptcy, thereby creating, I'm

9    assuming, a due process violation, although they aren't

10   specifically clear with respect to that.  Principally, the

11   arguments presented yesterday addressed Sections 18(1), and

12   that will essentially be the focus of my response this

13   morning, your Honor.

14        THE COURT:  Excuse me for just one second.  I meant

15   to say this at the beginning of our session here this

16   morning.  Ms. Levine, due to time constraints, you did not

17   address your home rule argument yesterday.  I hope you'll

18   give that a priority when you do get the microphone again.

19        MS. NELSON:  Thank you, your Honor.  In addressing

20   the constitutionality of this provision and, in fact, the

21   overall statute -- state statute itself, the Court must be

22   guided by specific principles of state law in addressing

23   constitutionality of statutes.  First -- the first principle

24   that the Court must be guided by is that statutes are

25   presumed to be constitutional, and courts have a duty to

1  construe a statute as constitutional unless its

2  unconstitutionality is clearly apparent on its face, and for

3  that proposition, your Honor, I cite you to a case relied on

4  by principally all of the objectors, and it's also cited by

5  the City of Detroit, In re. Request for Advisory Opinion of

6  the Constitutionality of 2011 Public Act 238, and that's

7  found at 490 Mich. 295.

8  THE COURT:  Of course, that's not exactly the

9  standard when the challenge is that the law was enacted in

10  some unconstitutional manner.

11  MS. NELSON:  Correct, your Honor, and that's the

12  next principle.

13  THE COURT:  Okay.

14  MS. NELSON:  So when you're construing the statute

15  itself in a facial challenge to the statute which is

16  presented here initially, the unconstitutionality must first

17  be apparent on its face.  And the reason the In re. Request

18  opinion is so significant is because it is a direct analysis

19  of the very constitutional provision that's at issue here,

20  and it directs the Court to the second principle of

21  construction that's applicable to this analysis, and that is

22  the principle of construction given to constitutional

23  provisions under Michigan law.  The objective in reviewing a

24  constitutional provision is to effectuate the intent of the

25  ratifiers who adopted the constitution, not the drafters but

1    the ratifiers.  And the lodestar principle, for purposes of

2    this review, is that of common understanding, so, in other

3    words, the Court must determine the common understanding of

4    the terms and give sense to the words used that would have

5    been most obvious to those who voted to adopt that particular

6    constitutional provision.  That, again, is emphasized in the

7    In re. Advisory Opinion with respect to 2011 Public Act 38 at

8    page 308.  And it's significant here, your Honor, for two

9    purposes, for the two reasons that are essential to the

10   analysis here.  The Michigan Supreme Court has already done

11   this principle analysis in the context of Article IX, Section

12   24, with respect to the impairment of pensions and squarely

13   addresses the issue that the objectors have been arguing to

14   this Court is created or is significant here.  In this

15   advisory opinion, the Michigan Supreme Court concluded that

16   Article IX, Section 24, does essentially four things.  It was

17   the obvious intent of the provision to ensure public pensions

18   be treated as contractual obligations that once earned could

19   not be diminished.  There's no question of that.  Second, the

20   provision is designed to say that when an employee benefit

21   comes due, a pension -- when the employee's pension benefit

22   comes due, he or she has a contractual right to receive it.

23   Third, the accrued financial benefit of a pension is the

24   pension income itself, and, fourth, diminishing or impairing

25   the accrued financial benefit means the actual reduction of

 1   pension income.  In other words, the loss -- the actual loss
 2   of pension income is the impairment.  That's significant to
 3   the issue raised by the objectors in the context of the
 4   facial challenge to 436 and as this Court has addressed
 5   questions on yesterday.  Clearly 18(1) of 436 does not on its
 6   face cause or commit an actual reduction of pension income,
 7   and that is the definition, and that is the application of
 8   impairment this Court must apply because that is the
 9   determination of the Michigan Supreme Court's common
10   understanding of impairment or diminishment in the context of
11   Article IX, Section 24.
12        So what does that mean to this discussion?  Going
13   back to the statutory interpretation principles, the Court
14   must look at the language of the statute and determine if
15   it's ambiguous or not, the clear meaning, and construe it in
16   a way that gives meaning to the legislature's intent.  Here
17   the legislature clearly did not intend to impair public
18   pensions through the use of the bankruptcy process in terms
19   of its authorization.  So 18(1), by authorizing the
20   bankruptcy filing or authorizing the government to -- or the
21   governor to authorize the bankruptcy filing and ultimately
22   making that filing does not commit an impairment because it
23   does not cause an actual diminishment in pension benefits as
24   defined by the Michigan Supreme Court.  So on its face, 436
25   is constitutional and in accord with Article IX, Section 24.

1    Need there be any further discussion with respect to

2 that?  Actually not.  And there is additional case law, your

3 Honor, that's cited within that advisory opinion which

4 confirms that.  The Court relies very heavily on the Studier

5 versus Michigan Public School Retirement Board case from a

6 few years prior to that, and I have the cite for the Court if

7 it cares for that because essentially the same analysis was

8 done in that case.  Studier is found at 472 Mich. 642, and

9 the discussion of the interpretation of Article IX, Section

10 24, begins at page 6 -- let me make sure I have the right

11 page here -- 656, so it's consistent.  And, in fact, that

12 court, the Studier court, criticizes Musselman and the

13 analysis made in the Musselman decisions as to what the

14 intent of the drafters and the ratifiers was in the context

15 of adopting Article IX, Section 24.

16    So with respect to that first issue on which the

17 constitutionality of 436 hinges in terms of the arguments

18 raised by the objector, the Michigan Supreme Court has

19 addressed that.  This Court is obligated to apply the

20 definition of Article IX, Section 24, identified and applied

21 by the Michigan Supreme Court, and so in that context,

22 Section 18, Sub 1, does not impair -- actually impair and,

23 therefore, does not violate Article IX, Section 24, by

24 failing to carve out any protections for those pensions.

25    Similar analysis is required then of the

1   authorization provided by the governor.  As we've argued, as

2   the Court has noted, essentially in the context of the

3   ripeness arguments that have been made and the questions that

4   it has been asked, the authorization clearly applying that

5   application made by the Michigan Supreme Court does not cause

6   an actual impairment of pension benefits.  Doesn't matter

7   what the intent might be.  Doesn't matter if the governor

8   chose not to impose contingencies.  In order for the legal

9   process to operate in the context of the Bankruptcy Code, as

10  this Court noted, there is no actual impairment worked or

11  caused by the authorization; therefore, the authorization is

12  in total compliance with Article IX, Section 24, and allows

13  this matter to proceed through the appropriate legal

14  processes established under the Bankruptcy Code.

15          With respect to the home rules provisions analysis,

16  your Honor, Article VII, Section 22, of Michigan's

17  Constitution recognizes that there are obligations and

18  responsibilities imposed on local governments separate and

19  apart from the state; however, the constitutional provision

20  also recognizes that these duties, obligations,

21  responsibilities, and authorities of the local governments

22  are subject to the control and change by state law.  Very

23  clearly, this constitutional limitation on the powers and

24  authorities of municipalities has been recognized in

25  legislation, specifically the Home Rule Act, which we cite in

1   our brief, at MCL 171.1 et seq. and particularly at Section

2   MCL 117.36, which is -- which essentially codifies the

3   limitations of Article VII, Section 22.

4        What the objectors' argument fails to recognize is,

5   first, local governments are not sovereign. Second, they are

6   creatures of the state. Third, the federal government and

7   the federal courts have long recognized those limitations on

8   local governments, and, fourth, they are subject to control

9   by the state legislature in that the state may change the

10   laws, authorities, powers of local governments at any given

11   time. And the federal courts have consistently recognized

12   that most recently in the <u>Sailors</u> decision that's cited in

13   our brief, which is exactly what has occurred here. Because

14   the local governments derive their power and authority from

15   the state and are, in fact, creatures of the state, the state

16   has the power to change that authority and to change the

17   course, the shape, and the force and authority of their

18   governments. This statute, Public Act 436, is just such a

19   law, and it has that purpose.

20        THE COURT: Well, but to what extent are the home

21   rule powers of a city derived from the Michigan Constitution

22   as opposed to statute?

23        MS. NELSON: The Michigan Constitution has limited

24   recognition of home rule authority, and in the language of

25   Article VII, Section 22, it recognizes that all resolutions

1   and ordinances of the local governments are subject to the
2   Constitution and laws of the state, so, in other words, case
3   law has recognized, as does the codification of these
4   limitations in the Constitution, that the legislature may
5   impact and affect any municipality's ordinances, any
6   municipality's laws, forms of government, funding, or any
7   other aspect of authority granted it directly from the state,
8   so to the extent that 436 has the purpose of addressing
9   emergency financial crises in local communities, that is
10  exactly the type and purpose of the law recognized under
11  Article VII, Section 22, an authority that is given to the
12  legislature over its local communities.
13        THE COURT:  So is there any limitation in the
14  Michigan Constitution on the legislature's power and
15  authority to control the form of government for the City of
16  Detroit?
17        MS. NELSON:  In the form of adopting their charter
18  provisions, yes.  The city can in its charter, which is then
19  submitted to the voters for approval, identify its form of
20  government, how its officials will be elected, and allocate
21  the power and authority granted to those officials through
22  the Constitution and the laws of the State of Michigan, and
23  that's what has occurred.  However, the legislature retains
24  authority through the Home Rule Act to even alter or amend
25  ordinances and charter provisions; in other words, the

1    legislature can pass a law that in its application and effect
2    would render a charter provision or a city ordinance
3    unconstitutional.  For example, with respect to taxation, the
4    state can cap the amount of tax -- or the level of taxation
5    that a community might be able to impose, mills or things
6    like that.  If a charter provision had been adopted that
7    established a higher level, it would be subordinate to the
8    state law, so in the same -- in that context, because the
9    legislature retains authority under Article II to promulgate
10   legislation and does not commit to any specific type or form
11   or purpose of legislation with respect to cities, that can
12   change.  It recognizes the legislature's continuing authority
13   to change the law and the effect that those changes in law
14   will have on the operations of its local communities vis-a-
15   vis its ordinances and its charters.  So the two, yes, work
16   in tandem.  The communities do have the authority to identify
17   their forms of government, how their officials will be
18   elected, and how that will be implemented, but at the same
19   time, the legislature, for example, controls the election
20   laws, identifies how elections will be handled, taxation.

21           THE COURT:  But the question the objection raises
22   here is doesn't the state's appointment and imposition of an
23   emergency manager on the City of Detroit change its form of
24   government by abrogating the powers of the City Council and
25   the mayor to the emergency manager?

1          MS. NELSON:  Absolutely, it does, and the

2    legislature clearly, as we've identified in our brief, has

3    the authority to do that under both the Home Rule Cities Act

4    and under the various provisions of the Constitution that

5    control forms of government and the authority of the state

6    over its local communities.  The local communities --

7          THE COURT:  So is it too simplistic to say that the

8    city sets its own form of government through its charter

9    unless the state dictates otherwise through its legislation?

10         MS. NELSON:  Absolutely, and that's the whole point

11   of the home rule --

12         THE COURT:  It's not too simplistic --

13         MS. NELSON:  It's not too simplistic.

14         THE COURT:  -- to put it just that way.

15         MS. NELSON:  It's just that way, and it's clear in

16   both the constitutional provision, and it's clear under the

17   Home Rules Cities Act, which implements those limitations

18   that are imposed on local governments vis-a-vis Article VII,

19   Section 22.  The federal courts have recognized that as --

20   and, again, I cite the Court to the Sailors decision from the

21   United States Supreme Court, which recognizes the overarching

22   authority of the state.  Because local governments are

23   creatures of the state, the state can determine what it's --

24   what authority it's going to give, what its local officials

25   will look like, what its forms of government will look like.

1          Second, I would also point out, your Honor, that

2     this is essentially a temporary situation, so this isn't the

3     state dictating that this is how the city is going to be

4     operating forever.  There are limits on this, and there are

5     authorities in Public -- authority in Public Act 436 given to

6     the local officials to petition the state to remove the

7     emergency manager, so there is --

8          THE COURT:  Right, but none of that is

9     constitutionally required.  If I understand you correctly,

10    the legislation could say the governor picks the mayor of the

11    City of Detroit.

12         MS. NELSON:  Well, potentially it could, yes, but it

13    doesn't.  It doesn't have to.  They chose not to.

14         THE COURT:  So but bottom line, your position is

15    that in no sense is the city charter supreme or preemptive

16    over state legislation.

17         MS. NELSON:  Absolutely not, or over the state's

18    Constitution.  In fact, it's the reverse, and that's very

19    clearly the relationship established in Article VII, Section

20    22, and in the Home Rules Act statute itself that codifies

21    those provisions.

22         The next challenge -- and I might also point out, as

23    we did in our brief, your Honor, there is a parallel example

24    in the Home Rule Village Act itself which does essentially

25    the same thing, so we're not just talking about cities, but

1  we're talking about all local governments.  The Home Rule
2  Cities Act, the Home Rule Village Act, all operate in the
3  same way.  Now, the forms of government where there might be
4  some differences are principally townships and school
5  districts, although they, too, are creatures of the state.
6  While the Court -- or the -- I'm sorry -- while the
7  legislature gives them some different authorities, it still
8  gives them those authorities and those powers in the same way
9  that it does its cities and villages and other local forms of
10 government.
11        The objectors also challenge the constitutionality
12 of 436 with respect to Article VII, Section 21, and Section
13 34.  Section 21 is a taxation essentially provision, and it
14 limits the authority of local governments to tax, borrow
15 money, and contract debts, so this is another example of the
16 authority that the state exercises over its local
17 communities.  436 recognizes and imposes these same
18 limitations on the emergency manager that the law imposes on
19 its public officials who are operating their local
20 governments, and it provides the state oversight and control
21 of these matters in the same way that it does its local
22 government officials, especially when they are under a
23 financial emergency.  So, in effect, 436 treats the emergency
24 manager no differently than it does local officials in the
25 context of the local government's authority to tax, to borrow

1    money, or to contract debts, so there is no unconstitutional

2    actions at work here merely because the emergency manager is

3    now the one operating the city making those decisions as

4    opposed to the elected officials.

5           Similarly, Article VII, Section 34, merely

6    establishes the standard for interpreting the authority

7    granted by Constitution and state law, so, in other words, it

8    says the Michigan legislature retains authority to define and

9    modify the powers, duties, and obligations of its local

10   governments, which are derived from the state in the first

11   instance.  It says that those powers given to the local

12   governments must be construed with deference to the local

13   government, but it still recognizes that those powers come

14   from the state, from the legislature, and can be changed in

15   any instance where the legislature believes that it's

16   appropriate to do so.

17          Finally, your Honor, as we've argued in our brief --

18   and there were no arguments presented to the Court

19   yesterday -- 436 is not an unconstitutional delegation of

20   authority under Article III, Section 2.  It's not delegating

21   legislative power to the emergency manager.  It allows the

22   emergency manager to simply execute the same executive powers

23   that the elected officials of the community would have within

24   the context of authority granted it under 436, principally in

25   Section 12(1), which identifies all of the various powers and

1  authorities.  There are controls.  There are restraints.

2  There are reviews required, approvals from the treasurer for

3  many of these at the state level or approval from the

4  governor for some of these actions that have to be done, and

5  there are also limitations on the emergency manager's

6  authority to make actions without the approval of the local

7  government, a significant difference between Public Act 4.

8  For example, with respect to the sale of assets or the

9  distribution of assets, the value of the assets will

10  determine the extent to which the local government must also

11  be involved in many of these decisions, so it is not -- and

12  to the extent that the objectors are arguing that there are

13  insufficient standards by which to guide the emergency

14  manager, I would submit the emergency manager is guided by

15  the same standards that would have applied to the local

16  officials when they were exercising that power, and there's

17  no argument from the objectors that those standards applied

18  to and by the local elected officials are inadequate for

19  their exercise of that authority, and those are the standards

20  that guide the emergency manager's actions as well.  So not

21  only is this an appropriate delegation of authority by the

22  state under its constitutional and statutory authority and

23  its role in relation to its local governments, it is also

24  sufficient for purposes of guiding the emergency manager's

25  actions both as to -- under the law and in relation to the

1   oversight provided by the State of Michigan.

2           Yesterday, your Honor, there was an argument made by

3   Krystal Crittendon with respect to the Court's -- the

4   jurisdiction and the authority essentially of the emergency

5   manager to file this action.  I have provided the Court a

6   copy of an order issued by the Michigan Court of Appeals on

7   November 16th, 2012 -- I brought a copy for Ms. Crittendon,

8   but she's not here today -- which squarely resolves that

9   issue.  And if I'm understanding her -- following her

10  argument correctly, her argument is that because the

11  emergency manager was appointed under Public Act 72, that

12  that was an improper appointment because the repeal of Public

13  Act 4 did not revive Public Act 72 under the state's repealer

14  statute.  That was --

15          THE COURT:  That was part of her argument.

16          MS. NELSON:  Right.  That has been an issue, and

17  that's the part that I'm addressing with respect to this

18  order, your Honor.  That particular issue has been raised in

19  at least four different cases challenging the appointment of

20  various emergency managers after the suspension of Public Act

21  4 under the referendum process and subsequently under its

22  rejection.  And the order that I have provided to you is in

23  the case of Robert Davis versus Roy Roberts.  It's Court of

24  Appeals Docket Number 313297, and it squarely rejects that

25  argument.  Quite frankly, this was a quo warranto action, so

1 it directly attacked the authority of the emergency manager,

2 Roy Roberts, who is the emergency manager for the Detroit

3 Public School System, to hold that position because of his

4 appointment under Public Act 4 and then subsequently under

5 72.  The Court of Appeals indicated the plain language of MCL

6 8.4, which is the repealer statute, includes no reference to

7 statutes that have been rejected by referendum.  The

8 statutory language refers only to statutes subject to repeal,

9 and judicial construction is not permitted here because this

10 language is clearly unambiguous.  Accordingly, under the

11 clear terms of the statute, MCL 8.4 does not apply to the

12 voters' rejection of referendum of Public Act 4.  Even if the

13 rejection of Public Act 4 is deemed to operate as a repeal

14 subject to 8.4, the voters rejected Public Act 4 in its

15 entirety by way of the referendum, and this, in fact, revived

16 Public Act 72.  So I think -- I believe that addresses Ms.

17 Crittendon's objection with respect to jurisdiction, and I

18 just wanted the Court to have that authority for when she

19 submits her supplemental brief.

20    Finally, your Honor, the other issue that I would

21 like to address relates to the Retired Detroit Police Member

22 Association's argument with respect to the referendum process

23 and the validity of 436 as a result of the referendum

24 process.  I first take exception to the representation that

25 an appropriation of $5,780,000 total is an insubstantial or

1  insignificant appropriation with respect to the state, but I
2  would point out to the Court the argument fails for two
3  principal purposes or reasons.  First, Public Act 436 is
4  significantly different than Public Act 4, so Ms. Brimer's
5  argument that it's identical fails on that ground alone, and
6  the very example that she provides in terms of the
7  appropriation is one of the major differences.  Public Act
8  436 imposes the requirement on the State of Michigan to pay
9  the salaries of the emergency managers.  Neither Public Act 4
10 nor Public Act 72 had that requirement.  So it, in fact,
11 required an appropriation in order to have -- so that the
12 state agency -- in this case, Treasury -- that's
13 administering that aspect of the statute would be able to
14 make that expenditure.  Under state law a state agency must
15 have an appropriation in order to be able to make an
16 expenditure, and that's exactly what happened in this
17 instance.  In addition, the $5 million that was appropriated,
18 as was pointed out yesterday, is for the purpose of paying
19 for consultants, attorneys, and others that are going to be
20 assisting the local communities that are in a financial
21 emergency with their restructuring.  That was not part of
22 Public Act 4 or Public Act 72 either, so on those two
23 grounds, that is a difference.  There are many other
24 substantial and significant differences between these two
25 statutes, but even without any difference, your Honor, the

1  case that I have handed you, <u>Reynolds</u> versus the <u>Bureau of</u>
2  <u>State Lottery</u>, resolves this issue, and I would point the
3  Court to page 604 and 605 of that opinion.  In this case --
4  although somewhat factually different, in this case a 1994
5  act that controlled fund-raising abilities of political
6  campaigns to use bingo and other types of gaming to raise
7  monies was being challenged by referendum.  There was a
8  challenge to the signature process that went to the Court of
9  Appeals and then back down to the Board of Canvassers.  The
10 Board of Canvassers split and didn't certify the statute, so
11 it went back up -- or the referendum -- excuse me -- back up
12 to the Court of Appeals.  While that process was in play, the
13 legislature adopted a new act that was identical, word for
14 word identical to the challenged 1994 act, and the governor
15 signed it, and it went into effect.  The 1994 act then was
16 ultimately certified on the ballot, went through the
17 referendum and was rejected by the voters.  The parties that
18 had moved for that referendum then dismissed their appeal
19 case, applied for a bingo license to raise money, were
20 rejected under the new law, and then brought this challenge,
21 a declaratory challenge, arguing that the new statute was
22 invalid because it violated the referendum process.  In
23 addressing that issue, the Court of Appeals analyzed and
24 interpreted the referendum provision, and that is the portion
25 of the opinion that I refer the Court to.  It begins at page

1  604 and continues onto 605.  And in there the Court very

2  clearly said the referendum provision and the purpose for the

3  referendum in terms of its definition and use of the term

4  "enacted law" means only the particular law supported by a

5  majority of legislators and signed by the governor and no

6  more.  They went on to hold that when a law enacted by the

7  legislature is referred to the people, the reference to a

8  particular definite act and not by implication the general

9  principle or subject matter at issue.  So, in other words, it

10  is the act itself, not the general purpose or the particular

11  purpose of the act, that is subject to the referendum.  And

12  because it is the specific act that is the subject of the

13  referendum, the legislature is not precluded from

14  subsequently adopting a new law that is either identical to

15  or dealing with the same subject matter or purpose.  The

16  Court continued, "nothing in the Michigan Constitution

17  suggests that the referendum had a broader effect than

18  nullification of the 1994 Public Act 118," the act at issue

19  in that case.  We cannot read into our Constitution a general

20  preemption of the field that would prevent further

21  legislative action on the issues raised by the referendum.

22  The legislature remained in full possession of all its other

23  ordinary constitutional powers, including legislative power

24  over the subject matter addressed in 1994 Public Act 118.

25          THE COURT:  Well, how do you or how does this case

1 deal with the argument that that kind of very strict

2 interpretation of the referendum power of the people makes a

3 mockery of it?

4       MS. NELSON: I disagree that it makes a mockery of

5 it, your Honor, because prior to this analysis, the Court of

6 Appeals went through the very same review and applied the

7 very same review standards in terms of the common

8 understanding of the provisions of the constitutional act or

9 provision that was in play as the Supreme Court did in the In

10 re. Advisory Opinion and in Studier and in all of those cases

11 dealing with the interpretation of the Constitution. And the

12 Court very clearly said that the common understanding of the

13 terms in that provision require this outcome, so any other

14 alternative would have been contrary to both the

15 constitutional standard of review that the Supreme Court

16 requires, and a different outcome would have been contrary to

17 the very meaning and common understanding of that provision,

18 so --

19       THE COURT: Well, but what --

20       MS. NELSON: I'm sorry. Go ahead.

21       THE COURT: What's the point of giving the people

22 the right of referendum to reject a statute if the same

23 Constitution is read to give the legislature the authority to

24 reenact word for word the same statute that the voters just

25 rejected? What's the point?

1          MS. NELSON:  Well, the point is that that then

2    becomes a political issue in and of itself, and do the people

3    then want to continue to keep those legislators in office.

4    That makes it a different question than the referendum of the

5    actual law.  That then makes it a political question and a

6    question of political will, which I think is a different

7    analysis than what is required here for purposes of our case.

8          THE COURT:  Well, but why put the people to that?

9          MS. NELSON:  Well --

10         THE COURT:  The people spoke.

11         MS. NELSON:  The people spoke in the context of

12   Public Act 4.  I will agree, and --

13         THE COURT:  Okay.  But the position you're arguing

14   for is a much broader one, which is even if law number two is

15   word for word the same as law number one, law two prevails --

16         MS. NELSON:  That's what the case --

17         THE COURT:  -- or it remains in effect.

18         MS. NELSON:  That's correct.  That's what the case

19   law says, but I'm also pointing out that in this instance law

20   number two --

21         THE COURT:  Doesn't the --

22         MS. NELSON:  -- is not word for word the same --

23         THE COURT:  Okay.

24         MS. NELSON:  -- and addresses --

25         THE COURT:  Hold that argument for just a moment

1  because --

2          MS. NELSON:  Sure.

3          THE COURT:  -- I am interested in that, but where is

4  the substance of the right of referendum that the

5  Constitution gives the people if the legislature has the

6  authority to thumb its nose at it like that?

7          MS. NELSON:  Well, the right of referendum remains

8  because the people could initiate a referendum with respect

9  to the next bill.  I know that's not --

10          THE COURT:  To which the question remains why put

11  the people to that?

12          MS. NELSON:  It certainly does beg the question,

13  your Honor, and that's why my response to you and the only

14  response I think that's applicable is that it becomes a

15  matter of political will, and there are other ways for the

16  people to address that issue, and that is elect --

17          THE COURT:  Well, they've already expressed their

18  political will.  Why do they have to do it twice, three

19  times, an infinite number of times?

20          MS. NELSON:  Well, that's -- because that's how the

21  Court has interpreted that particular referendum.

22          THE COURT:  This is the Court of Appeals, not the --

23          MS. NELSON:  This is --

24          THE COURT:  -- Michigan Supreme Court.

25          MS. NELSON:  Yes, but leave to appeal was denied by

1  the Supreme Court.  Now --

2          THE COURT:  Means nothing.

3          MS. NELSON:  It means nothing other than it wasn't

4  interested in taking this particular issue at that particular

5  time, so I'm referring the Court, yes, to a Court of Appeals

6  decision, which is the last court decision on this particular

7  issue.  I'm not saying that I agree with that or that many --

8  that everybody agrees with it.  I'm just simply saying that

9  is the law, the most current law applicable on this

10  particular issue.  This is how the Court of Appeals has

11  interpreted, and the Supreme Court allowed that

12  interpretation to stand, and so this is the interpretation

13  that has to be applied in the context of the argument raised

14  by the Retired Detroit Police Members Association.

15          THE COURT:  Am I bound by this decision?

16          MS. NELSON:  I'm sorry.  What?

17          THE COURT:  Am I bound by this decision?

18          MS. NELSON:  I believe that you are because it's the

19  last highest court decision on this particular issue, and

20  leave to appeal was denied by the Supreme Court.

21          THE COURT:  What are the three or five most

22  significant differences then between PA 4 and PA 436?

23          MS. NELSON:  The first one is one that we've already

24  discussed in terms of the transfer of authority to fund this

25  proposition.  The second one is -- the second most critical

1   one is the options that are made available to the local
2   governments that didn't exist under 4 or 72.  Public Act 436
3   creates four choices for the local governments once a
4   determination of a financial emergency has been identified.
5   They can choose either the appointment of an emergency
6   manager, the negotiation of a consent decree.  They can
7   submit to neutral mediation, which, if unsuccessful, then
8   they must proceed in Chapter 9, or they can opt to go right
9   into Chapter 9, of course, with the approval of the governor.
10  There are several options -- or changes within the context of
11  the authority that's set out in Section 12(1) for the
12  emergency manager, particularly with respect to the assets of
13  the city and who has to be involved in the process in terms
14  of if there's going to be a lease or sale of assets of over a
15  certain value.  I believe it's 50,000.  The local officials
16  have to be involved in that process as well.  A third
17  significant difference that didn't exist under either prior
18  laws is the ability of the local government to present
19  alternative plans, and an example is what's going on with
20  Belle Isle.  Under 436 the local government can object to or
21  reject a proposal made by the emergency manager, and they
22  have the opportunity to present an alternative plan.  I
23  believe it's to the emergency financial loan board.  It's
24  either to the emergency manager financial loan board or the
25  treasurer -- an alternative proposal that could achieve the

1    same amount of savings, so they have the authority and the
2    ability to object and present their own proposal for
3    clarification.

4         Another significant change is the limitation on the
5    term of the emergency manager.  Under Public Act 436, the
6    term is limited to 18 months.  Additionally, another change
7    is the fact that the local government may petition for
8    removal of the emergency manager anytime before the
9    expiration of that 18 months.  So those are some of the more
10   significant differences.

11        Another major -- excuse me.  Another major
12   difference is the creation of the transition advisory board
13   that will participate with the local community or the local
14   government once the emergency manager is -- emergency is
15   deemed resolved and the emergency manager steps down, and
16   that, for example, is a process that's taking place in
17   Pontiac at the moment.  The emergency manager there has
18   stepped down, and so there are certain relationships that
19   have been established to assist the local government with
20   transition back into control of its financial operations and
21   obligations.  And one of the reasons for that was to address
22   the criticisms that the emergency managers have never proved
23   successful.  Many of these communities, once the emergency
24   manager steps down, find themselves within a year or two
25   struggling again and back into the same circle, same process,

1    and so that's a very significant and substantial change as

2    well.

3            Those are the some of the major highlights.  There

4    are a number of other ones in the process of how you initiate

5    the financial review, the factors that are to be considered

6    by the financial review team as they evaluate the cities.

7    There are also some differences in terms of the authority of

8    the emergency manager with respect to removing officials from

9    office or appointing officials to take their place.  That's

10   been an issue in Detroit as well with respect to certain of

11   the city council members.  So there are some major -- but

12   those are the major ones that come to my mind right off the

13   top of my head.

14           THE COURT:  If the Court rejects your arguments and

15   holds that to the extent that PA 436 authorizes the

16   appointment of an emergency manager that is unconstitutional,

17   is there enough left of PA 436 for this bankruptcy to

18   continue or not?

19           MS. NELSON:  At this point, I don't believe there

20   would be, your Honor, because the mechanisms or the way that

21   the statute is designed right now, the emergency manager is

22   acting on behalf of the city, and he is the one who made the

23   recommendation, and he is the one that's specifically been

24   approved.  If you conclude --

25           THE COURT:  Approved?

```
 1            MS. NELSON:  I'm sorry.

 2            THE COURT:  Approved for what?

 3            MS. NELSON:  Approved to file.  The authorization

 4    was given to him to file, and he was doing it in the place

 5    and stead of the elected officials.  So if the determination

 6    is that 436 is unconstitutional and his appointment,

 7    therefore, is void --

 8            THE COURT:  That was not exactly my hypo.

 9            MS. NELSON:  Okay.

10            THE COURT:  My hypo was that holding that his

11    appointment was unconstitutional or that so much of PA 436

12    that allowed the governor to appoint him was

13    unconstitutional.

14            MS. NELSON:  Well, first of all --

15            THE COURT:  I mean I guess it's partially a

16    severability question.

17            MS. NELSON:  That's correct.  There's a severability

18    provision within 436 itself, and there's also a general

19    severability question.  And the first issue or the first

20    question that would have to be decided is whatever you

21    conclude -- whatever provisions you conclude to be

22    unconstitutional, when they are severed, does that leave a

23    substantial or significant amount of the Act in place so that

24    it can be reasonably carried out.  I would submit that if you

25    conclude the appointment of the emergency manager is
```

1   unconstitutional, that goes right to the heart of the

2   authority to proceed or the authorization to proceed in

3   bankruptcy because he was acting on behalf of the city.  If

4   the appointment is deemed unconstitutional, then that would

5   restore the local elected officials, the mayor and the

6   council, as the representatives of the city, and they would

7   have to then take the action to continue this bankruptcy.

8           THE COURT:  I think your colleague represented the

9   last time she was here in court -- and forgive me for not

10  remembering her name.  Who was it?

11          MS. NELSON:  In what context?  Michelle Brya?

12          THE COURT:  A couple weeks back.

13          MS. NELSON:  Is that who you might be thinking of?

14          THE COURT:  Anyway, she --

15          MS. NELSON:  Nicole Grimm.

16          THE COURT:  -- referred to the statute, and there's

17  a provision that authorizes the emergency manager to conduct

18  the case.

19          MS. NELSON:  Correct.  That's Subsection 2.  That's

20  18 -- Section 18, Subsection 2, which specifically

21  authorizes -- once he receives the authorization from the

22  governor, it specifically authorizes the emergency -- we're

23  using "authorization" a lot or I am anyway --

24          THE COURT:  Right.

25          MS. NELSON:  -- but it specifically authorizes the

1  emergency manager to file the bankruptcy petition, so that's

2  Subsection 2, so -- Section 18, Sub 2.

3       THE COURT:  But it wasn't just file.  It was file

4  and conduct the case.

5       MS. NELSON:  And conduct it.  That's correct.  And

6  so if, in fact, he is removed from office by virtue of a

7  ruling that his appointment was unconstitutional, that would

8  necessarily terminate the case because it would revert back

9  to the local officials, and they would then have to either

10  reinitiate the process or somehow decide to continue the case

11  without having -- if they could without reinitiating.

12       THE COURT:  There's nothing else besides PA 436 that

13  provides the necessary basis for authorization or consent for

14  a municipality to be in bankruptcy?

15       MS. NELSON:  Correct.  Does the Court have any other

16  questions?

17       THE COURT:  No.

18       MS. NELSON:  Thank you.

19       THE COURT:  Thank you.  Who's up next?

20       MR. BENNETT:  I think our side.  We relinquish our

21  remaining time.

22       THE COURT:  I did have a few questions for Mr. Troy.

23  Stand by one second.

24       MR. TROY:  Good morning, your Honor.  Matthew Troy,

25  Department of Justice, Civil Division, on behalf of the

1   United States.  Your Honor, I want to clarify that we're on

2   the same page with respect to the question that you had

3   yesterday, which was, I think, how does the government

4   respond to the objectors' reply regarding the ripeness issue.

5   I went back last night and looked at what was filed on Friday

6   by the various objectors.  I think I found it, but I want to

7   make sure we're talking about the same thing.  I saw it in

8   AFSCME's amended objection filed Friday wherein they talk

9   about the harm that their members are suffering right now.

10          THE COURT:  Right now, precisely.

11          MR. TROY:  Okay.  From the potential --

12          THE COURT:  Ms. Ceccotti mentioned that in her

13   argument yesterday as well.

14          MR. TROY:  Okay.  And, in fact, I mean I guess if I

15   could read what I understood that Governor Snyder's

16   authorization has itself unconstitutionally caused an

17   immediate concrete injury to Council 25's members by creating

18   a contingent liability that their inviolable rights will be

19   disregarded causing them to reorder their financial affairs.

20   It's articulated in different ways elsewhere in the brief,

21   but I think that kind of encapsulates it.

22          THE COURT:  Yes.

23          MR. TROY:  I'll answer your Honor's question, but I

24   do want to clarify one point before doing so.  That

25   contention, your Honor, is made in the context or in response

 1   to the debtor's reply regarding the argument of whether or

 2   not there was proper authorization under 109(c)(2).  That's

 3   not an argument made in the context of their constitutional

 4   challenge to Chapter 9, but I can see where it also falls

 5   over into that analysis.

 6            THE COURT:  Okay.

 7            MR. TROY:  But I want to make clear that on the

 8   109(c)(2) issue the United States government is not taking a

 9   position on that issue.

10            THE COURT:  Right.

11            MR. TROY:  Okay.  And that's where that argument

12   arose, but I can see where your Honor thinks that has

13   applicability to the constitutional challenge as well, and

14   that's why I'll address that.

15            THE COURT:  Well, I think we have to consider it and

16   deal with it.

17            MR. TROY:  Right.  Your Honor, that articulation or

18   that argument goes to whether or not they have standing.  Is

19   there a concrete actual injury?  And when I read that

20   description of the harm, the injury that they're suffering,

21   to me, as a bankruptcy lawyer, that strikes me as a dynamic

22   that occurs, frankly, every day in bankruptcy.  A small

23   business owner is faced with a debtor who wishes to assume

24   and assign its lease or executory contract and says, "Consent

25   or I'll reject it," or a nondebtor party that is faced with

 1   the threat of a turnover action by a debtor in possession or

 2   trustee, and the nondebtor party says, "No, it's not property

 3   of the estate.  It's held in a validly state law created

 4   trust or escrow account."  Going back to my prior

 5   hypothetical, I left out that point as well saying the

 6   nondebtor party, small business owner, to the executory

 7   contract or lease says, "Wait a minute.  I've got state law

 8   nonassignability rights.  You can't do that."  And the debtor

 9   says, "Yes, I can.  Bankruptcy Code says I can."

10   Preferential actions, your Honor, where seemingly innocent

11   defendants are faced with a trustee or debtor in possession

12   saying, "Pay or else I'm filing the action," particularly

13   perhaps pointing at our seemingly innocent investors in what

14   turns out to be a Ponzi scheme facing clawback suits.  Some

15   are less sympathetic than others, but there are some that are

16   very sympathetic.  They face the same dynamic that AFSCME

17   poses here, and, unfortunately, that's just a dynamic that

18   exists in bankruptcy.

19         THE COURT:  Well, but to carry those hypos to the

20   next step that may make it analogous here, couldn't any of

21   those parties who you have identified file something in court

22   asking for a court ruling sustaining their position, whatever

23   it is, there was no preference, there was no fraudulent

24   transfer, whatever their position is on the executory

25   contract?

1          MR. TROY:  That is true, your Honor, but that's

2     an -- that's either an affirmative defense or an argument

3     that the debtor or trustee has failed to satisfy one of the

4     elements of even bringing the claim.  That's not what's being

5     posed here.  What's being posed here is that the whole

6     statute is unconstitutional, and for a party to come in and

7     say that and to assert that, they have to meet a high hurdle,

8     and that hurdle is in part -- some of the hurdles they have

9     to meet -- and the two that are relevant here are standing

10    and ripeness.  And that hurdle, I would submit, is not met

11    here with the argument that they have posed as being their

12    injury in fact.  It's a commonplace dynamic in bankruptcy.

13    It's unfortunate -- and I'll take the objectors at their

14    word, and it might very well have tragic consequences, but

15    that's, unfortunately, what can happen in bankruptcy given

16    the powers afforded a debtor.

17          THE COURT:  Well, but I can hear the response now.

18    The response is we retirees don't know what to do about our

19    financial futures because of the uncertainty that this

20    bankruptcy has created for us about the security of our

21    retirement pensions.  That uncertainty will be resolved or

22    would be resolved if the Court were to take head on right now

23    in the eligibility context the issue of whether this

24    bankruptcy can impair pensions.

25          MR. TROY:  And my response, your Honor, is that that

1  asserted injury in fact is not sufficient to vest them with

2  standing to ask you to make that reach at this stage of the

3  case.

4         THE COURT:  Okay.  So why not?

5         MR. TROY:  Because it is -- what they're asking for

6  is a significant remedy, which is the invalidation of the

7  entire statute, at this stage of the case.

8         THE COURT:  Right.

9         MR. TROY:  To do that, they have to meet a much

10  higher standard for their injury in fact.

11         THE COURT:  So what's the -- what's, in your view,

12  the most pertinent Supreme Court case that says that this

13  kind of contingent concern, just to put a legal label on it,

14  is insufficient?

15         MR. TROY:  I don't have one to say that it is

16  insufficient.  I can explain to you why I think the one that

17  they cite as evidencing it is inapplicable here.

18         THE COURT:  Okay.

19         MR. TROY:  I think they're principally relying on

20  Clinton v. United States to say that this contingent

21  liability is sufficient to constitute an injury in fact

22  imbuing them with standing.  My response, your Honor, is that

23  that case is significantly different and distinguishable from

24  this.  In that case, your Honor, HHS went to the State of New

25  York and its various municipalities, I guess, subsidiaries,

 1   that administered Medicaid and said, "Look, you receive
 2   federal subsidies from us.  You have to pay some of those
 3   back if you tax the healthcare providers providing those
 4   healthcare services."  And so HHS issued a notice and demand
 5   to New York and said, "Pay.  You've been imposing these taxes
 6   in the past.  Those have to be reimbursed to us as basically
 7   a recoupment of the federal subsidies you've been receiving."
 8   They issued a demand saying pay.

 9          THE COURT:  Um-hmm.

10          MR. TROY:  Well, some members in Congress,
11   presumably from -- representing New York, said, "We don't
12   like that so much, so we're going to put a section in the
13   federal -- in the Balanced Budget Act of 1997 that says that
14   liability is zapped out of existence."  So New York and
15   others then went and filed suit and said, "No, they can't do
16   that."  Ultimately the Court said, "No, you don't have
17   standing.  It hasn't happened yet."  Then President Clinton
18   actually exercised his line item veto power and excised that
19   provision that said that liability is now zapped out of
20   existence.  The only reason it was contingent is because
21   after the State of New York got the notice saying pay, they
22   exercised apparently a valid right to request HHS to waive
23   it, and HHS hadn't acted on it yet, but there was an explicit
24   demand to pay from the federal government to the State of New
25   York.  It's not quite as contingent as what we're dealing

1    with here, your Honor, is my basic submission.  There was an

2    explicit demand to pay, and the ripeness -- or the standing,

3    rather, was cured when President Clinton excised that

4    specific section that had eliminated the liability.  The

5    liability rearose, and it was very real.  The only thing that

6    the City of New York, I guess, as the appellee in that case,

7    had left was, well, we have a waiver request pending with HHS

8    that hasn't been acted on, but HHS had already made the clear

9    demand and said pay.  That's why I think it's a different

10   case than this, your Honor.

11        THE COURT:  All right.  One final question for you,

12   and it goes to the issue of the constitutionality of Chapter

13   9, and it addresses some language in one of the commandeering

14   cases, the New York case.  There's some broad language in

15   here that I think we have to deal with somehow, and so I'm

16   asking for your help in how you think it should be dealt

17   with.  In that case, the Supreme Court said -- and I want to

18   quote it to you.  It's at 182.  "The constitutional authority

19   of Congress cannot be expanded by the 'consent' of the

20   governmental unit whose domain is thereby narrowed, whether

21   that unit is the Executive Branch or the States."  How do we

22   reconcile that language with the constitutionality of Chapter

23   9?

24        MR. TROY:  Because I don't -- I would submit that,

25   as set forth in our brief, I think, that Chapter 9 does not

1   so narrowly proscribe the powers of the state, if I am

2   recalling the quote correctly, your Honor.   Chapter 9 --

3        THE COURT:  Constitutional authority of Congress

4   cannot be expanded by the consent of the governmental unit

5   whose domain is thereby narrowed.

6        MR. TROY:  I would submit, your Honor, that Chapter

7   9 does not -- it gives the states the consent to decide

8   whether or not its municipalities can file Chapter 9 and

9   under what terms and conditions, but I would submit also

10  that, having done so -- having given states that right to

11  consent, Chapter 9 does not then narrow impermissibly and

12  unconstitutionally the state's sovereign powers to control

13  and regulate its municipalities.

14       THE COURT:  Well, but the objectors argue that it

15  does because it imposes federal priorities on creditors that

16  may be different from the priorities the state has.

17       MR. TROY:  Right.  And this all goes back, your

18  Honor --

19       THE COURT:  So its sovereign powers says we want

20  priority scheme A, and, you know, the federal government has

21  got its priority scheme B, so by filing bankruptcy, there's

22  this narrowing of the state's sovereignty and this expansion

23  of the federal government's sovereignty.

24       MR. TROY:  Right.  And, your Honor, I think this all

25  goes back to the --

1        THE COURT:  And New York says that can't be done by

2   consent.

3        MR. TROY:  Right.  And I think all that is hinged

4   upon and was subject to a lengthy colloquy between you and

5   Mr. Bennett about Bekins or Bekins, take your pick, and

6   Asbury Park.  It's all -- that whole hypothetical that you're

7   posing, your Honor, is -- again, it's dependent upon what did

8   Asbury Park do and what did it imbue the states with.

9        THE COURT:  Well, but what do I do with this

10  language?

11       MR. TROY:  Well, again, your Honor, that language --

12  I think when you then take that language and say, "Well, what

13  about this hypothetical?" that hypothetical to me that you

14  just posed raises the issue of why can't states then just

15  impose their own municipal debt adjustment schemes because

16  Asbury Park says we can, and --

17       THE COURT:  Is the answer nothing more than if the

18  state doesn't want to use the federal priority scheme, it

19  just doesn't authorize bankruptcies?

20       MR. TROY:  I think that might be --

21       THE COURT:  Is that the answer to this?

22       MR. TROY:  I think that might be the answer, yes,

23  and that's the ultimate control that the state has.  And that

24  goes back to the language that Mr. Bennett was quoting from,

25  I believe, Bekins and somewhat in a parallel sense in the

1    dissent from <u>Ashton</u>.  It's the state's decision.  It's the

2    state's control.  And as your Honor has pointed out in

3    subsequent more recent cases involving Chapter 9, that's how

4    the courts have viewed the issue.  Once in, you're in.

5          THE COURT:  All right.  Thank you, sir.

6          MR. TROY:  If I may, your Honor, if I just address

7    one point --

8          THE COURT:  Yes.

9          MR. TROY:  There's standing, and there's ripeness.

10    They're distinct, and they're different.  Admittedly, if you

11    look at the requirements for each, they arguably bleed into

12    one another, but there is an element of ripeness here, your

13    Honor, that I think is important for you to consider in

14    determining whether or not to take up the objectors on their

15    challenge to the constitutionality of Chapter 9, and it's

16    principally judicial discretion, your Honor.  Do you really

17    have to do this now?  Should you make this reach in declaring

18    the statute that effectively has been upheld for 75 years and

19    say it's unconstitutional right now at this stage of the

20    proceeding?  As articulated in our brief, we don't think you

21    have to.

22          THE COURT:  Well, since you raise standing, it was

23    pointed out by one of the attorneys that under the Bankruptcy

24    Code, creditors have standing to raise any issue that affects

25    them in the bankruptcy.  Does that provision in the

1  Bankruptcy Code answer the standing question?  If not, why

2  not?

3          MR. TROY:  Because it's different than

4  constitutional standing, which is what we're talking about

5  here.  We're talking about a constitutional standing to

6  invalidate an entire statute.

7          THE COURT:  Are the considerations on constitutional

8  standing any different than the constitutional considerations

9  on ripeness in any substantial way or significant way?  Can

10  you have one without the other?

11          MR. TROY:  Can you have standing without --

12          THE COURT:  Do they walk hand in hand down the same

13  path?

14          MR. TROY:  I'm sorry, your Honor.  Are you referring

15  to standing and ripeness?

16          THE COURT:  That's what I meant, standing and

17  ripeness.

18          MR. TROY:  As I understand the doctrines, your

19  Honor -- again, principally I'm a bankruptcy lawyer, not a

20  constitutional lawyer, but as I understand the doctrines,

21  your Honor, I would submit you could have one without the

22  other.  They are -- while similar, they are distinct.  You

23  could have standing but not have ripeness.

24          THE COURT:  You argue neither here.

25          MR. TROY:  Correct.

1          THE COURT:  All right.  I sense a certain eagerness

2     on Mr. Bennett's part, so let's yield the lectern to him.

3          MR. TROY:  Thank you, your Honor.

4          MR. BENNETT:  Your Honor, I want to return to your

5     question about whether or not the constitutional authority of

6     Congress is being expanded here at all.  From the very, very

7     beginning of my argument we talked about why the Chapter 9 or

8     the Chapter 9 -- whoops -- or the Chapter 9 equivalent from

9     back in the '30s, what did not run afoul of the Tenth

10    Amendment.  And remember there was -- the first part of it

11    was because there are -- uniform laws on the subject of

12    bankruptcies are the domain of Congress, and the Supreme

13    Court has told us that uniform laws on the subject of

14    bankruptcies, as they apply to -- does apply to municipal

15    credits.

16         THE COURT:  Yeah.  I get all that, and in the New

17    York case the Congress was legislating within its commerce

18    powers; right?

19         MR. BENNETT:  But the problem with New York was it

20    chose means; i.e., the only part that it didn't like was

21    directing the states to buy or to take possession of nuclear

22    waste.  That was it.  It was that part.  It was the state's

23    direction.

24         THE COURT:  Well, okay.  So do we read this language

25    simply to say that the state cannot consent to a

 1  Congressional enactment that goes beyond its commerce powers?

 2          MR. BENNETT:  I think --

 3          THE COURT:  If that's what they mean, that's sort --

 4          MR. BENNETT:  I think that the --

 5          THE COURT:  -- of like, "Well, duh."

 6          MR. BENNETT:  Well, that they can't consent to

 7  the -- also to the commandeering aspect of it.  They can't

 8  consent to the direction to the states to do something the

 9  states can't be directed to do.

10          THE COURT:  Okay.  Pause there.  If that

11  commandeering in the statute were directed to a private

12  party, would that have been within Congress' commerce power?

13          MR. BENNETT:  It actually would have been because

14  they talk about --

15          THE COURT:  Okay.

16          MR. BENNETT:  -- nuclear waste.  And I also want to

17  come back to the point, though, that --

18          THE COURT:  But, okay, if that's true -- I have to

19  pin this down with you.

20          MR. BENNETT:  That's okay.

21          THE COURT:  If that's true, what is the Court

22  talking about in this language in New York when it says the

23  constitutional authority of Congress cannot be expanded?

24          MR. BENNETT:  That New York, by having participated

25  in negotiations and been part of the group that pulled

1   together the statute at issue, can't have consented -- can't

2   consent to the part that requires the state to buy nuclear

3   waste, the part that was unconstitutional in the New York

4   case.

5           THE COURT:  Okay.  But what authority -- what

6   constitutional authority of Congress is being expanded by

7   that?

8           MR. BENNETT:  The Congress doesn't have the

9   authority to direct the states to do things that it -- to buy

10  things.  It doesn't have that authority.  That's the part

11  that was the problem.

12          THE COURT:  That's the Tenth Amendment --

13          MR. BENNETT:  Correct.

14          THE COURT:  -- limitation on the commerce power.

15          MR. BENNETT:  Correct.  But here I want to come back

16  and say in the bankruptcy realm, because the Congress has the

17  power to pass uniform laws on the subject of bankruptcies,

18  because the subject of bankruptcies include municipal debt

19  adjustment, of all the things that are clearly within

20  Congress' power and is not an expansion, it's priorities when

21  there's not enough to go around.

22          THE COURT:  So your argument is that in order for

23  this comment by the Supreme Court in New York to impact this

24  case, the Court would have to find that the bankruptcy power

25  of Congress does not include the power to include municipal

1 | bankruptcies?

2 |         MR. BENNETT: Yes, your Honor.

3 |         THE COURT: Okay.

4 |         MR. BENNETT: Or that the subject of municipal --

5 | the subject of bankruptcies does not include priorities.

6 |         THE COURT: Okay.

7 |         MR. BENNETT: And I would -- just to round out the

8 | answer to the rest of the points, there was also a

9 | recognition that Chapter 9 might creep up to the edges.

10 | That's where we have the 903 and 904 focus on governmental

11 | and political powers, and there there was a recognition that

12 | consent might not be enough. That's why we have 903 and 904

13 | that people aren't requiring consent to too much.

14 |         MS. NELSON: Your Honor, may I just quickly make a

15 | brief statement to the Court?

16 |         THE COURT: Sure.

17 |         MS. NELSON: Margaret Nelson again on behalf of the

18 | state. I just wanted to let the Court know you requested

19 | yesterday that we file all of the Webster documents, and I

20 | just wanted to let you know that that likely will happen this

21 | afternoon or tomorrow morning --

22 |         THE COURT: Okay.

23 |         MS. NELSON: -- including all of the transcripts. I

24 | know I didn't discuss it during my oral, and I just wanted to

25 | ask the Court if it had any questions specific to the

1 | collateral estoppel argument for the state.

2 | THE COURT: No.

3 | MS. NELSON: All right. Thank you.

4 | THE COURT: All right. Mr. Gordon, may I have your

5 | attention, please? I had promised you and your colleagues on

6 | the objecting side here an opportunity before your rebuttal

7 | to organize. Would you like that opportunity now, or are you

8 | and your group prepared to proceed?

9 | MR. GORDON: Your Honor, in that regard, a couple of

10 | things. One, in discussing these matters last night with the

11 | group on the objectors' side, it is the sort of universal

12 | view that there were issues that were raised and arguments

13 | that were made by Mr. Bennett yesterday that, frankly,

14 | weren't in the city's papers prior to yesterday. And in

15 | light of the importance of these issues, we would

16 | respectfully ask that there be perhaps an adjournment of the

17 | rebuttal argument and an opportunity to brief this with the

18 | idea that we would strive to coordinate so as to minimize the

19 | burden on the Court in terms of the amount of paper that gets

20 | filed and so forth, but it is our request in the first

21 | instance, your Honor, that there be essentially an

22 | adjournment of the rebuttal.

23 | Also, as you can imagine, just trying to coordinate

24 | who would address what in rebuttal is something that was

25 | difficult to do at the end of a very long day yesterday, and

1   so there are some logistical issues, but, again, from a

2   substantive standpoint, we were desirous of asking the Court

3   if we could have two weeks to submit briefs on these issues

4   and have rebuttal argument in the course of the --

5           THE COURT:  Okay.

6           MR. GORDON:  -- the Court's conducting of the

7   evidentiary hearing at some point.

8           THE COURT:  I fully intended to offer you the

9   opportunity to file supplemental briefs, and that was just a

10  question of how much time you needed, so for me that's not an

11  issue.  Much more problematic is the issue of adjourning the

12  rebuttal arguments.  Mr. Bennett, do you have a position on

13  this?

14          MR. GORDON:  And by the way, just for the record, I

15  did at least reach out to Mr. Bennett last --

16          THE COURT:  Um-hmm.  Okay.

17          MR. GORDON:  -- night about this, and he has his

18  opinions, of course.

19          THE COURT:  That was very civil and courteous of

20  you.

21          MR. GORDON:  Thank you.  I try.

22          THE COURT:  Yes, you do.

23          MR. BENNETT:  Yes.  That's true.  I did receive

24  this -- the notice of the possibility that this request would

25  be made.  First of all, we did not cite any new cases.  We

1  certainly read cases that they had cited perhaps more closely
2  than they did, and that was all within the fair game of the
3  party who speaks not having filed the last set of papers.
4  The last set of papers were, of course, filed by the
5  objectors, so there's been no impropriety, nothing unfair,
6  nothing unusual.  And the fact that they had overnight to
7  prepare is a courtesy that, quite frankly, I don't always get
8  when I have to deal with an oral argument after full sets of
9  papers.

10        Adjourning the hearing will create another time
11  burden and expense.  We're getting enough complaints in the
12  press about how much this case is costing.  I'm prepared and
13  the city has invested in that preparation, and we're ready to
14  go.  If we put this off, we're going to get to do that all
15  over again.  The request for two weeks, quite frankly, may
16  well be okay depending upon the length of the trial, but we
17  would need an opportunity to respond, and that would push the
18  response beyond the trial.  And we have business we need to
19  conduct.  We have a DIP financing that we're going to need to
20  get approved, and that won't fund until there's a
21  determination on eligibility.  So there's all kinds of
22  calendar difficulties if your Honor chooses to adjourn, and,
23  frankly, there's calendar difficulties if we have to do
24  another set of briefs.  The ultimate objective is to give
25  your Honor the help you need to decide, and so with the

1  understanding that there will be incremental additional

2  expense if there's an adjournment -- and we're ready to go

3  today -- I believe there's nothing unfair about that -- it's

4  ultimately what works for you, and we'll accommodate whatever

5  your Honor decides.  I have no problem with a short break if

6  people want to get organized.  That's perfectly okay

7  obviously.

8           THE COURT:  All right.  Stand by one moment, please.

9  All right.  Mr. Gordon, may I have your attention again,

10 please?  In the circumstances, I can't justify putting off

11 rebuttal for any substantial period of time.  I can offer you

12 the choice of proceeding after lunch at one o'clock today or

13 proceeding this Friday.  We do have another motion hearing on

14 an unrelated matter at ten, and we could go in this matter at

15 11 on Friday.

16          MR. BENNETT:  Your Honor, I'm not available.  I'm

17 not available on Friday.  It's mid-semester break for one of

18 my sons, and I'm planning to be away this weekend, including

19 Friday.

20          THE COURT:  Well, hold on one more second.

21          MR. GORDON:  Your Honor, I can perhaps short-circuit

22 the issue.  I think, from what I'm hearing, we're comfortable

23 then under the circumstances with coming back at one o'clock

24 today and presenting our rebuttal.

25          THE COURT:  Your other choice would be to do this on

1  Monday either before or after or as part of the pretrial

2  conference that's scheduled for that date.  Do you have any

3  objection to that?

4          MR. BENNETT:  I'll have to take a red-eye unless it

5  starts really late like at about -- I can make a 3:30, I

6  think.

7          THE COURT:  I can't do that myself.

8          MR. BENNETT:  Look, I'll take a red-eye.

9          THE COURT:  I have to be done by three.

10          MR. BENNETT:  I'll take a red-eye, and someone will

11  nudge me if I fall asleep.  As long as it's in the afternoon,

12  it's okay.

13          THE COURT:  Well, hopefully their arguments will not

14  have that impact on you.

15          MR. BENNETT:  Okay.  If it's in the afternoon, it'll

16  work.  It'll be okay.

17          THE COURT:  Okay.  If I understand our time

18  constraints correctly, there's an hour on each side left,

19  right, for rebuttals?  So if we start at one, then I can

20  leave by three, which is what I need to do.  Does that help

21  you?

22          MR. BENNETT:  I'll make it work.

23          THE COURT:  So you were not going to be at the

24  pretrial conference at ten.

25          MR. BENNETT:  That's correct.

1          THE COURT:  Somebody else was covering that for you.

2   That's fine with me, one o'clock Monday for the rebuttal

3   arguments.  Did you want to say something?  Go ahead.

4          MS. CECCOTTI:  Yes.  One o'clock is fine actually.

5   That's helpful to me.  I wonder, though, in terms of the

6   pretrial, I was actually going to ask as a housekeeping

7   matter, again, just due to flights and so forth, it may not

8   be one of my team, but if we had some -- a UAW designee,

9   would that be sufficient, a lawyer for our side here?

10  Otherwise --

11         THE COURT:  That's up to you.

12         MS. CECCOTTI:  Okay.  You don't --

13         THE COURT:  No.

14         MS. CECCOTTI:  I just wondered if the Court had

15  any --

16         THE COURT:  I mean generally speaking, we want at

17  the final pretrial conference whoever is going to conduct the

18  trial.

19         MS. CECCOTTI:  Yeah.

20         THE COURT:  Is that -- is there that disconnect for

21  you?

22         MS. CECCOTTI:  There is.  There are four lawyers on

23  my side and all handling different aspects --

24         THE COURT:  Um-hmm.

25         MS. CECCOTTI:  -- so -- and they're all busy.

1          THE COURT:  Well, all right.  So long as the person

2     is familiar enough, you know, to conduct the sort of

3     administrative stuff we do at a final pretrial conference,

4     including dealing with exhibits, that's fine.

5          MS. CECCOTTI:  I see.  Okay.  All right.  That's

6     helpful, your Honor.  We'll be --

7          THE COURT:  All right.

8          MS. CECCOTTI:  -- guided accordingly.

9          THE COURT:  All right.  So -- all right.  I guess

10    the point is we're adjourning for today to reconvene in this

11    matter at one o'clock on Monday for the final two hours.

12         MR. TROY:  Apologies, your Honor.  Matthew Troy

13    again.  I'm not sure if my presence here was helpful or not,

14    but I will not be here on Monday --

15         THE COURT:  That's fine.

16         MR. TROY:  -- unless you request it or ask of it,

17    and then --

18         THE COURT:  But please accept my assurance that your

19    appearance here today and your argument was helpful.

20         MR. TROY:  Thank you, your Honor.  If your Honor

21    wants me here for that hearing, I can start making inquiries.

22         THE COURT:  You know, if that arises, we do have the

23    option of a telephonic appearance as well.

24         MR. TROY:  Okay.

25         THE COURT:  In fact, you have that option regardless

1  to listen in, so, you know, in terms of whether you, on

2  behalf of your client, feel the need to make any further oral

3  argument, I leave that to your discretion.  And if you want

4  to, we'll do it by telephone.

5          MR. TROY:  Thank you, your Honor.

6          THE COURT:  Just let us know in advance.

7          MR. TROY:  Yes, sir.

8          THE COURT:  All right.  Anything further for today,

9  anyone?  No.  All right.  That's it then.

10          THE CLERK:  All rise.  Court is adjourned.

11      (Proceedings concluded at 4:21 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                 October 20, 2013
_____        _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
          MICHIGAN,           .
                              .      Detroit, Michigan
                              .      October 21, 2013
                  Debtor.     .      1:00 p.m.
. . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9
PETITION (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  GEOFFREY S. IRWIN
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       State of Michigan
Michigan:              Michigan Department of Attorney General
                       By:  MATTHEW SCHNEIDER
                       P.O. Box 30754
                       Lansing, MI  48909
                       (517) 241-8403

APPEARANCES (continued):

```
For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City     65 Livingston Avenue
of Detroit           Roseland, NJ  07068
Retirees:            (973) 597-2374

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  ROBERT D. GORDON
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5882
Retirement System
of the City of
Detroit:

For the Detroit      Erman, Teicher, Miller, Zucker &
Fire Fighters          Freedman, P.C.
Association, the     By:  BARBARA A. PATEK
Detroit Police       400 Galleria Officentre, Suite 444
Officers Associa-    Southfield, MI  48034
tion and the         (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For the Inter-       Cohen, Weiss & Simon, LLP
national Union,      By:  BABETTE A. CECCOTTI
UAW:                      PETER D. DECHIARA
                     330 West 42nd Street, 25th Floor
                     New York, NY  10036-6976
                     (212) 356-0227

For Detroit          Silverman & Morris, PLLC
Retired City         By:  THOMAS R. MORRIS
Employees            30500 Northwestern Highway, Suite 200
Association,         Farmington Hills, MI  48334
Retired Detroit      (248) 539-1330
Police and Fire
Fighters Associa-    Lippitt O'Keefe, PLLC
tion, Shirley V.     By:  RYAN C. PLECHA
Lightsey, and        370 East Maple Road, Fl. 3
Donald Taylor:       Birmingham, MI  48009
                     (248) 646-8292
```

APPEARANCES (continued):

```
For the Official      Dentons
Committee of          By:  CLAUDE D. MONTGOMERY
Retirees:                  ANTHONY B. ULLMAN
                      1121 Avenue of the Americas
                      New York, NY  10020-1089
                      (212) 632-8390

                      Brooks, Wilkins, Sharkey & Turco, PLLC
                      By:  MATTHEW E. WILKINS
                      401 South Old Woodward, Suite 400
                      Birmingham, MI  48009
                      (248) 971-1711

For Retired           Strobl & Sharp, PC
Detroit Police        By:  LYNN M. BRIMER
Members               300 East Long Lake Road, Suite 200
Association:          Bloomfield Hills, MI  48304-2376
                      (248) 540-2300

For the Flowers       Law Offices of William A. Wertheimer
Plaintiffs:           By:  WILLIAM WERTHEIMER
                      30515 Timberbrook Lane
                      Bingham Farms, MI  48025
                      (248) 644-9200

For Ambac             Schafer and Weiner, PLLC
Assurance Corp.:      By:  DANIEL J. WEINER
                      40950 Woodward Avenue, Suite 100
                      Bloomfield Hills, MI  48304
                      (248) 540-3340


Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Recalling Case Number 13-53846, City of Detroit,

3  Michigan.

4      THE COURT:  And you may proceed.

5      MR. GORDON:  Thank you, your Honor.  Good afternoon.

6  For the record, Robert Gordon of Clark Hill on behalf of the

7  Detroit Retirement Systems.  Your Honor, we did not submit a

8  proposed line-up to the Court as we did for the October 15th

9  hearing; however, the objectors have all conferred with one

10  another over the weekend and have come up with an informal

11  line-up, if you will, and have discussed amongst themselves

12  sort of loosely how much time each party would need.  And so

13  rather than inform the Court of the time slots, we'll just

14  sort of try to self-police ourselves and inform the Court if

15  that's okay.

16      THE COURT:  Okay.

17      MR. GORDON:  Again, as with the October 15th

18  hearing, each party will try its best to identify before it

19  starts its rebuttal argument -- apprise the Court of what

20  issues it plans to touch upon.  Unlike the October 15th

21  hearing, of course, because time is short, various parties

22  will be trying to touch upon discrete issues and not overlap

23  with one another, so while each party may support the

24  arguments that are being made, for the record, I just need to

25  state that each party obviously reserves its right to make

1 similar arguments or diverge from those arguments in its

2 supplemental briefing. Thank you.

3 With that, your Honor, just so the Court has an

4 understanding of the order in which we are proposing the

5 objectors rise, first would be Ms. Levine on behalf of

6 AFSCME, then Ms. Brimer on behalf of the Retired Detroit

7 Police Members Association, then myself on behalf of the

8 Retirement Systems, then Mr. Morris on behalf of the Retiree

9 Associations, then Ms. Patek on behalf of the Public Safety

10 Unions, then Ms. Crittendon as an interested party, and then

11 Mr. Montgomery on behalf of the Retiree Committee.

12 THE COURT: All right.

13 MR. GORDON: Oh, my goodness. I'm sorry. After --

14 I'm sorry. After Mr. Morris, Ms. Ceccotti would be next on

15 behalf of the UAW.

16 THE COURT: Thank you. It's fine with me not to

17 keep track of your time individually if that's your request,

18 but I do have to cut off all rebuttal argument in one hour.

19 MR. GORDON: Very well, your Honor. Thank you.

20 THE COURT: And one more thing. You will notice

21 that on your tables we now have three microphones instead of

22 one. I have been asked to advise you that this makes it much

23 more likely that our record will pick up your private

24 conversations, and you should be concerned about that because

25 we do post the audio unedited on our website every night.

1    And I should say if there is a private conversation that you

2    want to have at any point today or during the trial and

3    you're concerned about it getting on the microphone, just

4    request a brief pause from the recording. We'll turn the

5    recording off. You can have your conversation, and we'll

6    continue.

7          MS. LEVINE: Good afternoon, your Honor. Sharon

8    Levine, Lowenstein Sandler, for AFSCME. Your Honor, I've

9    been given ten or twelve minutes and will address, per the

10   Court's suggestion, home rule and then perhaps if there's

11   time a sentence on Chapter 9 again.

12         THE COURT: Okay.

13         MS. LEVINE: Thank you, your Honor. Your Honor,

14   similar to the arguments or the statements in the

15   conversation we had with the Court with regard to Chapter 9

16   and the interplay between the federal Constitution and the

17   state municipal governments under the Tenth Amendment, we

18   would respectfully submit that under the Cooley Doctrine and

19   the cases that have been decided here in Michigan that the

20   Michigan Constitution in Chapter 7 also reflects a very

21   strong view towards home rule, and what we mean by home rule,

22   your Honor, is that the local governments -- in this case,

23   Detroit -- are given a lot of respect by the state government

24   in order to manage and run their own local governments. And

25   we would respectfully submit that the way that either 439 is

1    written or as applied in this case, that the grant of power
2    given the emergency manager here in Detroit violates the
3    state Constitution.

4         So, first, your Honor, we would note that the
5    emergency manager has been appointed by the state.  He was
6    not elected by the local electorate.  He was not elected the
7    way, for example, the mayor and the City Council were
8    elected.  He has supplanted them, and he was -- and he didn't
9    supplant them by a vote of the citizens, and he didn't even
10   supplant them with the consent of the locally elected
11   officials.  So first point is that we believe that the
12   emergency manager and 436 is inappropriate here because he's
13   not an elected official.

14        Two, your Honor, we would note that the breadth of
15   the powers granted the emergency manager even if the
16   appointment of the emergency manager were appropriate is
17   inappropriate here both as a matter of constitutional law and
18   as applied in this particular case because the governor
19   failed to appoint the emergency manager with any appropriate
20   contingencies in the letter of appointment, and that's
21   because of the scope of the power that the emergency manager
22   wields is well in excess of that which the Constitution --
23   the Michigan Constitution would permit.  So, for example,
24   even if the scope of the powers were not subject to -- sorry.
25   Let me say it differently.  Even if the Michigan Constitution

1 does allow, for example, taxation or even debt adjustment, it

2 doesn't allow the wholesale taking over of the local

3 government by the emergency manager.  So, for example, not

4 allowing there to be replacements to the City Council, day-

5 to-day negotiation of vendor contracts, labor contracts,

6 grievances, de minimis asset sales, these are the types of

7 things that are not necessarily --

8             THE COURT:  Well, but let me ask you to -- let me

9 ask you to pause there with this question.  Is the

10 constitution -- or would the constitutionality of PA 436, as

11 it pertains to those kinds of issues, be before this Court?

12 Are they necessary to decide in the context of eligibility?

13             MS. LEVINE:  They are, your Honor, because the way

14 this appointment has taken place, all of those individual

15 acts that the emergency manager has been allowed to engage in

16 ahead of a plan of adjustment which might deal with just the

17 debt makes the very decision that the emergency manager made

18 with regard to filing the Chapter 9 petition itself

19 unconstitutional or unconstitutional as applied to the facts

20 of this case because there was no limitation on what the

21 scope of his authority was just dealing with that one issue.

22 And that scope -- the unfettered scope, your Honor, is not

23 just related to the day-to-day business operations, and we've

24 seen that play out in the deposition of Mayor Bing and in

25 others who talk about the fact that they're bottlenecked with

1    regard to decision-making and that ordinary types of
2    decision-making is now deferred to the emergency manager or
3    his counsel, but we've seen that, your Honor, in the
4    unfettered scope that provides for no judicial review of
5    those decisions as well.  So, for example, if, in fact,
6    there's a dispute under a Chapter 11 or a Chapter 7 where you
7    have a debtor in possession or a trustee, a debtor in
8    possession, for example, a corporate debtor, has fiduciary
9    obligations under the direct language of the Bankruptcy Code
10   and has fiduciary obligations under state law.  A Chapter 7
11   or a Chapter 11 trustee similarly has fiduciary obligations,
12   and they are not allowed to take actions either outside the
13   ordinary course of business or under the course of a Chapter
14   7 without coming to this Court for approval, sales,
15   settlements, ultimate plans of reorganization.  Under Chapter
16   9, because we're dealing with the fact -- and we believe it's
17   the unconstitutional fact -- that there's a tension between
18   what the state can do and what the federal government can do,
19   we don't have that same access to judicial review, so under
20   904, 362, and even Stern's there are a lot of decisions that
21   get made on the day-to-day basis.  And I'm not dealing with
22   the global jurisdictional issues, just the day-to-day basis
23   of tort claims, of contract disputes, of settlements with
24   individual creditors that don't ever see the light of day in
25   this court, and to the extent that there was a grievance or a

1  dispute about that under 362 in this Court's stay extension

2  orders, there's no other court where those disputes can be

3  taken.

4       So we have an unelected emergency manager who's in

5  place now because he's a contractor with the state

6  government, and we have unfettered rights where basically our

7  view is it's tantamount to all of the rights that were

8  granted to the city under Chapter -- under Article VII of the

9  Constitution are now within the power of the EM in this

10  particular case.  And we'd respectfully submit that that is

11  just not what the Cooley Doctrine or the state Constitution

12  envisioned even if it did envision in appropriate

13  circumstances debt restructuring.

14       Nine minutes.  With that, your Honor, I would just

15  close briefly on Chapter 9.  We would respectfully submit

16  that similar -- well, I'll --

17       THE COURT:  I'm not sure you've quite addressed the

18  central home rule question that at least I see.  The city and

19  the state argue that to whatever extent home rule powers

20  apply to the City of Detroit under the Michigan statutes,

21  they are effectively modified by PA 436 and that that

22  modification is not inconsistent with whatever the Michigan

23  Constitution says about home rule.  How do you deal with

24  that?

25       MS. LEVINE:  Your Honor, we understand the statement

1    has been made along those lines.  We don't see those
2    modifications in PA 436.  In other words, either in the
3    statute itself or in the authorization as granted under the
4    statute here, there is no limitation that we can see, and, in
5    fact, we've seen the opposite through the emergency manager's
6    orders and the emergency manager's right to run unfettered
7    the City of Detroit.  And in addition to that, one of the
8    issues that they talk about in terms of limiting his ability
9    is that his term is only 18 months, but that also is not
10   supported if you take a look at the statute and you take a
11   look at the statute in practice without any limitation in the
12   authorization because at the end of 18 months, the state has
13   the absolute right to continue the term.  The City Council
14   can only stop that by a two-thirds vote, but since the EM has
15   effectively taken over the City Council, we don't even have
16   the checks and balances that appear facially on the statute,
17   so we're saying two things.  We're saying they can say that
18   it's a limitation, but as far as we can tell, PA 436
19   virtually gives away to the emergency manager everything that
20   was referred to the states under Chapter 7 of the
21   Constitution, and not only that, there is no redress for
22   addressing violations of that unfettered right or stopping
23   the time line pursuant to which the EM can stay in office.
24   Thank you.
25            MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

1  Brimer appearing on behalf of the Retired Detroit Police

2  Members Association.  Your Honor, to begin with, I have

3  approximately ten to twelve minutes of the allotted time for

4  the objectors.  I am going to discuss, your Honor, the narrow

5  issue of whether or not PA 436 is constitutional under the

6  referendum provision of the Michigan Constitution.  As your

7  Honor will recall, Article II, Section 9, of the Michigan

8  Constitution specifically reserves to the people of Michigan

9  the right of referendum with respect to any law other than

10  those that contain a spending or appropriation provision.

11        When we were here on Tuesday, your Honor, last week,

12  I advised the Court that at that time the city and the state

13  neither had responded to the arguments that had been raised

14  by the RDPMA in its opening objection and, moreover, that at

15  that point in time we had not been able to find a case that

16  was factually similar to this case.  Today, we do have the

17  oral arguments that were presented by Ms. Nelson in response

18  to this argument during the state's opening arguments.  The

19  city has still not responded to this discussion, and we

20  still, your Honor, do not have a case that is even closely

21  factually similar to this case.

22        As the Court may recall, Ms. Nelson cited the case

23  of Reynolds v. Martin for the proposition that the governor

24  and the state legislature can completely disregard the will

25  of the people and thwart the people's constitutional right to

1    a referendum by placing an insignificant spending provision

2    at the tail end of an act that had previously been defeated

3    on referendum, pass such act during a lame duck session, and

4    consider it to be constitutional. Reynolds v. Martin is so

5    factually distinguishable, your Honor, as to be of little or

6    no actual application to this case, and ultimately we would

7    conclude that its holding, in fact, supports the argument of

8    the RDPMA. And I think it's very important to very briefly

9    discuss that case. In Reynolds in 1994 the legislature

10    passed an act amending the state's Bingo Act. That act was

11    referred for referendum. However, before it was placed on

12    the 1994 ballot, certain of its signatures were questioned.

13    Therefore, it did not make the 1994 ballot. The general

14    election was held in November of '94. A new legislation --

15    legislators were elected. They were seated in 1995. In 1995

16    with the new legislation in -- legislative body in place, a

17    new act was passed. Subsequently, in 1996 the 1994 act was

18    certified for the referendum, and it was, in fact, voted down

19    in the referendum.

20        A party challenged the denial of a license under the

21    1995 act on the grounds that it could not have been passed in

22    contravention of the referral of the 1994 act to the

23    referendum process under Article II, Section 9. However,

24    your Honor -- and ultimately the 1995 act was upheld as

25    constitutional.

1          The state would argue that that case is factually

2    applicable and the holding consistent with their position

3    that PA 436 is constitutional.  However, there are two

4    significant distinctions between the holding and the facts in

5    Reynolds and the matter before this Court with respect to

6    436.  One, there was a general election after the matter had

7    been referred to referendum.  A new legislative body was in

8    place, and it was the new legislative body that had been, in

9    fact -- that passed the new act.  But more significantly,

10   your Honor, the 1995 act did not contain a spending

11   provision, and it was not, therefore, removed from the

12   referendum provisions of the Michigan Constitution.  In fact,

13   in Reynolds the appellate court relied on the Michigan

14   Supreme Court holding in Michigan Farm Bureau versus

15   Secretary of State at 379 Mich. 387, 1997, and noted that

16   should the legislators not be responsive to the will of the

17   people expressed at the referendum vote, the second

18   legislation itself is subject to the same right of referendum

19   as the original act.  That is simply not what we have with

20   respect to 436.

21          The question, your Honor, is why wasn't 436 subject

22   to the referendum vote?  It was not subject to the referendum

23   vote because the governor, the Michigan Department of

24   Treasury, and their consultants devised a scheme in the event

25   that PA 4 was defeated on referendum, that would remove a new

1  law from the referendum.  And how do we know that there was a

2  scheme that was devised?  We have communications that have

3  been produced during discovery that confirm that the spending

4  provisions in Section 34 and 35 were included in order to

5  avoid the referendum vote.  For example, as early as March

6  2nd, 2012, in communications between Mr. Ellman at Jones Day

7  and Ms. Ball at Jones Day, Mr. Ellman was discussing the

8  possibility that PA 4 would be defeated on referendum and

9  what the options would be in the event it was rejected by the

10  people.  He states in discussing the options, your Honor,

11  "The cleanest way to do all of this probably is new

12  legislation that establishes the board and its powers and" --

13  with the "and" in capital letters, your Honor -- "includes an

14  appropriation for the state institution.  If an appropriation

15  is attached to, parenthetical, included in the statute to

16  fund a state institution, parenthetical, which is broadly

17  defined, then the statute is not subject to repeal by the

18  referendum process."

19       In fact, Mr. Orr himself has acknowledged this

20  concern with respect to PA 436.  On January 31st, 2013, he e-

21  mailed Ms. Ball stating the following:  "Michigan's new EM

22  law is a clear end-around the prior initiative that was

23  rejected by the voters in November."  He then discusses some

24  of the provisions of PA 436 and concludes with the following

25  statement:  "So although the new law provides the thin veneer

1    of a revision, it is essentially a redo of the prior rejected

2    law."  Your Honor --

3             THE COURT:  What was the date of that?

4             MS. BRIMER:  That, your Honor, was January 31st,

5    2013.  So, your Honor, despite Ms. Nelson's contention that

6    the spending provisions were not added in an effort to avoid

7    the referendum vote, we would suggest that the evidence and

8    the discovery proves otherwise.

9             Ms. Nelson also argued that the $5,780,000 spending

10   provisions were meaning provisions not designed to avoid the

11   referendum.  First, I would suggest quite to the contrary,

12   your Honor.  A review of the state's financial statements for

13   the fiscal year ending 9-30, 2012, suggests that $5,780,000

14   represents approximately .011 percent of the state's

15   expenditures for the prior fiscal year.  With respect to the

16   pensioners that are before this Court making an average of

17   $18,000 in their pension, that would represent $1.98.  I

18   would suggest that's hardly a meaningful spending provision.

19            But second and more significant is that we have the

20   words of the debtor's attorney in the e-mails that I read to

21   you that the spending provisions were added with the intent

22   of avoiding the referendum.  We also have testimony from the

23   state's 30(b)(6) witness, Howard Ryan, the legislative

24   liaison for the Department of Treasury during the period for

25   the drafting of 436, in which he testified in his deposition

1   on October 14th that the spending provisions were added to
2   avoid the referendum.
3           "Question:  Based on your conversations with the
4           people at the time, was it your understanding that
5           one or more of the reasons to put the appropriation
6           language in there was to make sure it could not --
7           that the new act could not be defeated by
8           referendum?
9           Answer:  Yes.
10          Question:  Where did you get that knowledge
11          from?
12          Answer:  Well, having watched the entire process
13          unfold over the past two years.
14          Question:  The governor's office knew that that
15          was the point of it?
16          Answer:  Yes."
17          Your Honor, we would suggest that those spending
18  provisions were, one, de minimis, and, two, added solely for
19  the purpose of removing this act from the constitutional
20  right of the people to a referendum vote.
21          I'm uncomfortable with the amount of time I have
22  left here, your Honor.  Two more points.  Ms. Nelson argued
23  that PA 436 has substantially changed PA 4.  We prepared a
24  comparative analysis, your Honor, of the relevant provisions,
25  those with respect to the appointment of an emergency manager

1    and those with respect to the authorization for the filing of

2    a Chapter 9.  Those provisions are virtually identical.  Our

3    comparative analysis has been attached and submitted to the

4    Court as Exhibit B to our pretrial brief.  Those provisions

5    were, in fact, your Honor, subject to the provision in the

6    Constitution which provides that no law as to which the power

7    of referendum properly has been invoked shall be effective

8    thereafter unless approved by a majority of the electors

9    voting thereon in the next general election.

10            Your Honor, the Michigan Supreme Court, which should

11    be our controlling court here, has, in fact, suggested that

12    the right of referendum is so important to this state and so

13    important to our constitutional rights that in <u>Kuhn</u> -- I'm

14    trying so hard to get through my time -- that in the matter

15    of <u>Kuhn</u> v. <u>Department of Treasury</u> the Court said that this is

16    a reserved right to the people which must be liberally

17    construed.  This Court must liberally construe the right of

18    the people to the referendum, find that the Michigan Supreme

19    Court would, in fact, determine that PA 436 violates Article

20    II, Section 9, of the Michigan Constitution, and, therefore,

21    cannot have been a proper basis for authorization of the

22    filing of this Chapter 9 under Section 109(c) of the

23    Bankruptcy Code.

24            THE COURT:  Thank you.

25            MR. GORDON:  Again, for the record, Robert Gordon of

1  Clark Hill. Your Honor, I want to touch upon, if I may, an

2  issue that was raised on the 15th regarding who is

3  essentially the impairer of contracts in a Chapter 9 process

4  and then touch upon one other small matter that came up in

5  colloquy on that day.

6       Your Honor, during the oral argument, city's counsel

7  argued that in a Chapter 9 case, the law views the federal

8  government as the sole relevant actor impairing contracts of

9  the debtor municipality and that, therefore, the prohibition

10  in the pensions clause against the state and its subdivisions

11  impairing accrued pension benefits is of no moment in this

12  matter because it will be the federal government and not the

13  state or the city that is doing the impairing.

14       In making the argument, the city's counsel relies on

15  the language of a dissenting opinion of Justice Cardozo in

16  the Ashton case and then suggests that the viewpoint

17  expressed therein is adopted by the Bekins court, which

18  overruled Ashton. We submit that the analysis is incorrect.

19  First, it is not entirely clear that the expansive

20  interpretation of Justice Cardozo's opinion suggested by the

21  city comports with his intended meaning. However, even if

22  that interpretation is accurate, there is no indication that

23  his views were adopted in Bekins, a decision in which Justice

24  Cardozo did not even participate.

25       Contrary to the city's argument, as we've pointed

out in our papers, it is the municipality alone that can file

a plan and propose the impairment of claims, and it is the

municipality alone that can solicit votes and ask the Court

to approve such a plan.  Indeed, your Honor, the reality of

the active role played by the debtor is reflected clearly in

Section 109 itself.  109(c)(5) provides, and I quote, "(a) An

entity may" -- excuse me.  It provides under 109(c), I quote,

"An entity may be a debtor under Chapter 9 of this title if

and only if such entity," and then under (5)(A) it says, "has

obtained the agreement of creditors holding at least a

majority in amount of the claims of each class that such

entity intends to impair under a plan in a case under such

chapter," and there's similar language under 109(c)(5)(B).

Both of those provisions talk about the municipal debtor

being the one who intends to impair under the plan.  It

doesn't say that the municipal entity intends to ask the

Court to impair.  So 109(c)(5) reflects the reality that we

just discussed.

          Moreover, contrary to the city's argument, your

Honor, Chapter 9 jurisdiction turns on the basic concept that

the state can consent to subjecting a political subdivision

to federal bankruptcy law.  Having thus consented, federal

law will then apply, but it is still the state and its local

governmental unit that is actively availing itself of the

Bankruptcy Code in the Bankruptcy Court.  The city has not

1  and we submit cannot cite to any case law that describes a

2  Chapter 9 debtor as standing mute and passive in the

3  Bankruptcy Court during the plan process and simply accepting

4  whatever impairment of contracts the Court may mete out.

5  It's an unsupportable and unsupported proposition, we submit.

6          Since the state and its political subdivision is

7  clearly the impairer of contracts in the Chapter 9, then

8  absent the relief that's been requested by the Retirement

9  Systems and other objectors, the state or the city in this

10  case would be directly breaching the pensions clause, which

11  it cannot do.  To the extent it is asking the federal court

12  to assist, it cannot do so since the state government and its

13  subdivisions are bound by the pensions clause and cannot

14  delegate to another entity authority that they do not have to

15  abrogate Michigan's Constitution.  And we've cited several

16  cases in our reply brief at page 15 for the axiom that the

17  state and its various branches cannot do indirectly what they

18  cannot do directly.

19          Since the state and the city cannot violate the

20  Michigan Constitution and specifically the pensions clause

21  outside of the Chapter 9 process, they can no more do so in

22  Chapter 9, and the requirement that the Retirement Systems

23  and other objectors have advocated for -- i.e., an explicit

24  conditioning of the bankruptcy upon the protection of the

25  pensions clause -- is absolutely proper and mandated by

1   Section 109(c)(2)'s respect for state law.  Any other

2   conclusion we submit eviscerates 109(c)(2) and its

3   requirement to uphold the Tenth Amendment and the sovereignty

4   of state law.  Moreover, your Honor, there was --

5          THE COURT:  So is the end result of that argument

6   that no municipality in Michigan can file a Chapter 9?

7          MR. GORDON:  The end result would be that they

8   cannot file a Chapter 9 without the explicit understanding

9   that they will not impair accrued pension benefits in

10  violation of the pension clause.

11         THE COURT:  Well, but that violates the Bankruptcy

12  Code.

13         MR. GORDON:  How so, your Honor?

14         THE COURT:  Well, it gives a priority to one

15  unsecured creditor over all the others, or one group of

16  unsecured creditor over all the others.

17         MR. GORDON:  We disagree, but the priority issue I'm

18  going to defer to Mr. Morris on.  He was going to speak about

19  that issue, but we disagree that it can be characterized as a

20  priority issue, your Honor.  I just don't want to steal his

21  portion.

22         THE COURT:  Okay.

23         MR. GORDON:  But it is not a priority --

24         THE COURT:  No pressure, Mr. Morris.

25         MR. GORDON:  It is not a priority issue, your Honor.

1  Moreover, your Honor, the city's counsel had suggested, I

2  believe, on October 15th that Section 943(b) may not contain

3  any bar to adjusting debts but only technical restrictions on

4  how debt adjustment may be implemented. If he is correct --

5  and we think not -- then all the more reason why the

6  protection of pension benefits under the pensions clause must

7  be addressed at the eligibility stage.

8          The only other thing, your Honor, I wanted to touch

9  upon was at, I think, page 103 of the written transcript of

10  the hearing on the 15th we had a discussion in which I

11  likened the accrued pension benefits to a nondischargeable

12  debt, and the Court questioned whether that concept was truly

13  applicable in a Chapter 9. I wish to simply note to the

14  Court that while Section 523 of the Bankruptcy Code was not

15  incorporated into Chapter 9, Section 944(c) provides that the

16  debtor is not discharged under Subsection (b) of this section

17  from any debt excepted from discharge by the plan or order

18  confirming the plan. So, indeed, concepts of

19  nondischargeable debt do exist under Chapter 9 of the

20  Bankruptcy Code, and because it is not governed by Section

21  523 of the Bankruptcy Code, it must be assumed -- because

22  there's no other basis identified in the Bankruptcy Code

23  itself, it must assumed that the bases for

24  nondischargeability would arise under state law such as the

25  absolute and impermeable protection of accrued pension

1    benefits under the state's Constitution.

2              THE COURT:  Why isn't it safer to assume that that

3    provision is in there to facilitate parties' negotiations

4    regarding how to treat debts?

5              MR. GORDON:  I don't know that it's mutually

6    exclusive.  It could be nondischargeability.  It could be as

7    a matter of law --

8              THE COURT:  Okay.

9              MR. GORDON:  -- or by negotiation, your Honor.

10             THE COURT:  Okay.

11             MR. GORDON:  We would simply submit that with

12   respect to a state constitutional protection, it can't be the

13   subject of negotiation.  Thank you, your Honor.

14             THE COURT:  Okay.

15             MR. MORRIS:  Good afternoon, your Honor.  Thomas

16   Morris on behalf of the Retiree Association parties.  There

17   was discussion last week and, in fact, this morning, today,

18   this afternoon, regarding the manner in which the pensions

19   clause operates.  Specifically, there were comments by Mr.

20   Bennett which characterize the pensions clause as

21   establishing a payment priority.  Mr. Bennett would have the

22   Court view the pensions clause as the equivalent of a state

23   law which designates a public pension obligation as a

24   priority claim in bankruptcy.  This is an incorrect

25   characterization of the pensions clause.

1        The pensions clause is a state law which controls

2   the city in the exercise of its political or governmental

3   power.  The pensions clause establishes a constitutional and,

4   therefore, fundamental rule addressing the authority of a

5   municipality to reduce or impair its pension obligations.  It

6   is an essential definition of the state -- of the duties of

7   the state and its subdivisions.  The pensions clause simply

8   doesn't provide for a priority payment.  The usual way for a

9   state to provide for a priority is to specify that the debt

10  is entitled to priority.  An example is found in the Worker's

11  Compensation Disability Act, MCL 418.821, which provides that

12  liability of an employer for Worker's Compensation claims or

13  Worker's Compensation payments shall be paramount to other

14  claims except for wages and taxes.  Another way to ensure a

15  priority is to provide for a statutory lien, so we've got

16  lien -- a lien under Section 211.40 of the Michigan Compiled

17  Laws for property taxes that are secured by a first lien,

18  prior, superior, and paramount.  And MCL 324.3115 provides

19  that certain fines for environmental liabilities constitute a

20  lien on all property of any kind or nature owned by the

21  defendant.  And a construction lien is entitled to priority

22  under state law.

23        In Orange County -- in the case if Orange County

24  found at 151 B.R., there's a quote on page 1017.  In Orange

25  County there was a statute at issue, a California statute

1    that was found by the Orange County court to be preempted by
2    the Bankruptcy Code.  Now, that statute provided that --
3    provided for certain funds to be treated as trust funds, and
4    that statute, as interpreted by the Court, apparently or was
5    argued to provide for there to be no tracing requirement, so
6    the Court in that case found that statute to effectively
7    establish a priority in bankruptcy and found it to be
8    preempted.  That case is distinguishable.  The Michigan
9    pensions clause provides for no priority of payment.  It
10   simply provides an ongoing indestructible duty of the
11   municipality or the state to not impair and not reduce
12   pensions.

13          Now, the priorities provided for in Section 507 are
14   applicable in Chapter 7 cases, for example, because Chapter 7
15   is a process of liquidation, liquidation of assets and the
16   distribution of those assets, so you need to determine who's
17   going to get the assets.  Who gets paid first?  That's the
18   priority.  Those priorities are also applicable in Chapter 11
19   because in every Chapter 11 case, liquidation is an
20   alternative.  Liquidation is the implied alternative, and
21   it's a standard by which a plan of reorganization in a
22   Chapter 11 case is measured.  Liquidation is not provided for
23   in Chapter 9.  Therefore, priorities are not provided for in
24   Chapter 9 with one exception.  That one exception is
25   507(a)(2), which provides for administrative expense

1   priorities.  That's a --

2        THE COURT:  But doesn't the best interest test of

3   943(b)(7) implicate the priorities of the Bankruptcy Code?

4        MR. MORRIS:  It doesn't.  It doesn't implicate the

5   priorities of a liquidation as an alterative unlike in

6   Chapter 11.  That's what's done -- in a Chapter 11 you look

7   at the unsecured creditors.  What would they get in

8   liquidation?

9        THE COURT:  Your position is that there's nothing in

10  a municipal bankruptcy case that would prohibit one group of

11  unsecured creditors from insisting on payment before or in

12  full while other unsecured creditors are paid later or not in

13  full.

14       MR. MORRIS:  Well, in confirmation of a case where

15  the pensions are unimpaired, you have a possible

16  discrimination claim by other creditors.  The bondholders

17  might claim that it's unfair discrimination, and I think the

18  response would be any bondholders who purchased their bonds

19  prior to 1963 when the Michigan Constitution was adopted,

20  you've got a different argument, but those bondholders who

21  purchased their bonds after 1963, which is all of them, don't

22  have an argument.  They're aware of the political climate.

23  They're aware of the Constitution.  They're aware that the

24  municipality cannot --

25       THE COURT:  Right, but the city's response to that

1    is the people who lobbied for and got the pensions clause in

2    the Constitution were aware of the Chapter 9 possibility.

3    How do I deal with that, or how do you deal with that?

4            MR. MORRIS:  Mr. Gordon dealt with that.

5            THE COURT:  Okay.  I will look at what he said.

6            MR. MORRIS:  But I don't want to -- I don't want to

7    repeat it, but the city is not permitted to restrict or

8    impair the pensions.  They are an inviolate obligation that

9    the city will live with even if it reorganizes under Chapter

10   9.  That's just a fact.  If the City of Detroit were to cease

11   to exist, if there were to be some horrendous natural

12   catastrophe that wiped the city off the state -- wiped the

13   city off the map, then we believe the city would still owe

14   that obligation, and it might cause a constitutional crisis.

15   Maybe the state would have to -- let's say the city remained

16   with only one resident, and that one resident couldn't

17   possibly pay the taxes to pay this.  It would cause a

18   constitutional crisis.  There'd have to be a resolution.

19   Maybe the state would step in.  I don't know.  That's beyond

20   conjecture.

21           THE COURT:  The city says we're there now.  I'm

22   sensing from Ms. Ceccotti having risen that your time may be

23   up.

24           MR. MORRIS:  Yes, it is.  Thank you.

25           MS. CECCOTTI:  Your Honor, I actually rose because I

1  was planning to address the question that you just asked --

2          THE COURT:  Okay.

3          MS. CECCOTTI:  -- about -- and I was going to

4  actually spend less time on it, but I think I'll just

5  dispense with -- I was going to -- first of all, for the

6  record, Babette Ceccotti, Cohen, Weiss & Simon, LLP, for the

7  UAW, and good afternoon again.

8          I was going to spend some time on talking about the

9  pension clause, the language of the pension clause, and how

10  the courts in Michigan address constitutional provisions when

11  called upon to review them and the principles that they

12  apply, but I'm going to move actually right to your Honor's

13  question because I do think that a lot of -- some of the

14  questions that your Honor has asked, particularly this

15  afternoon, really do go to what I think is going to be the

16  crux of this.

17          First of all, on the city's point that the pension

18  clause doesn't seem to make any -- doesn't, in fact, make any

19  reference to the possibility of municipal bankruptcy, I think

20  we have to go and ask ourselves a couple of questions.

21  First, what did municipal bankruptcy mean at the time, and

22  what did pension rights mean at the time?  And so we have to,

23  you know, sort of bring ourselves back in the legal regime --

24  in two legal regimes to 1963.  First, the city's brief cites

25  to a law that was on the books in Michigan, PA 72, dating

1    from 1939, and the law refers to the 1898 Bankruptcy Act and

2    basically says that any taxing agency or instrumentality as

3    defined in the bankruptcy law may proceed to do something

4    called secure a composition of its debts, and the law then

5    goes on to describe rules about who can file the petition and

6    who can agree to the plan of composition and what kinds of

7    things can be in the plan of composition and also provides

8    that the composition is binding on the instrumentality.

9            In 1963 -- okay.  So that's the law that's on the

10   books.  In 1963 as well the municipal bankruptcy law that is

11   being referenced looks a lot more like the '37 law than it

12   does the law that we have today.  On the sort of time line of

13   Chapter 9 changes starting with the law that was declared

14   constitutional by the Supreme Court in '37, while there are

15   some changes that take effect in 1946, you really don't get a

16   major overhaul until 1976 and the events surrounding the New

17   York City fiscal crisis, so from that point forward -- from

18   that amendment forward, Chapter 9 looks a lot closer to the

19   Chapter 9 that we're dealing with today, but in 1963 it

20   really didn't look like that.  And, frankly, the notion

21   that -- and this is where we get to the pension regime part

22   of my answer.  The notion that the pension clause coming in

23   as it did to take a situation where employees working for the

24   state had, in effect, no vested right to deferred

25   compensation they had earned with services that they provided

 1   to the state, that was -- that's the gratuity and the gift --
 2   that changes with the pension clause, which then provides the
 3   protection for accrued financial benefits.  This is a new
 4   thing under the state Constitution.  So it's not -- to me
 5   it's not surprising at all that you wouldn't find a reference
 6   to the plan of composition or municipal bankruptcy because we
 7   have really these arcane terms that it is very unlikely
 8   anyone would have applied to vested pension rights.  It's not
 9   until 11 years later that ERISA is enacted in the federal
10   regime.  ERISA, of course, has language -- sets forth a
11   comprehensive scheme to protect pensions and uses words like
12   "nonforfeitable benefits" and "vested pensions" and "accrued
13   pensions" and the like.  And as we talked about last week,
14   that regime includes the pension termination system, and you
15   get then developing in the private sector bankruptcy world,
16   the Chapter 11 world, the Chapter 7 world, where the
17   priorities do function, what is the status of a pension
18   contribution given the fact that it is based on services that
19   were rendered to the debtor pre-petition?  All of that law
20   comes up after 1963.  There just simply wouldn't be a way to
21   think about a pension benefit in the context of a debt
22   composition, or at least that is -- that seems very likely to
23   me because you just don't get this law -- all of this law
24   coming up until you get to ERISA and the concept of plan
25   termination and the priorities that apply in Chapter 11 and

1   Chapter 7 years and years later.  And now, you know, to my
2   way of thinking about it, unfortunately, we have seen a lot
3   of pension terminations, and so there's a lot of law on that
4   subject now, but it didn't exist in 1963, and it couldn't
5   possibly have been fairly contemplated.  So I think that
6   we're then left with a section, which is the pension clause,
7   Article -- of the pension clause of the Michigan Constitution
8   that is very much standing on its own without reference to
9   any exception, and we can see why, I think, no -- in
10  particular no reference to the concept of municipal
11  bankruptcy working very much, in effect, each word being
12  given effect by the courts of Michigan who have construed it
13  a number of times to protect accrued pensions.  And it's
14  standing on its own effectively against impairment or
15  diminishment by, as we spoke about last week, the state, the
16  state officials, or governance -- government and political
17  subdivisions to which it applies, so I think the --
18          THE COURT:  I have to interrupt you and ask this
19  question about bankruptcy.  Is there anywhere else in the
20  Bankruptcy Code where a party's nonbankruptcy law right to
21  payment is given an absolute status in the bankruptcy?
22          MS. CECCOTTI:  Well, your Honor, I think that there
23  are a number of places in the Bankruptcy Code where state law
24  is referenced, and we had a reference to the effect given to
25  certain types of liens, which are given effect, but I think

1  the --

2          THE COURT:  Well, but even there there are many

3  circumstances in which security interests are not given

4  absolute effect in bankruptcy.

5          MS. CECCOTTI:  Your Honor, here's --

6          THE COURT:  Cramdown, of course, is a perfect

7  example of that.

8          MS. CECCOTTI:  Here's where I think the crux of this

9  is.  We have a regime in Chapter 9 that must operate by

10  maintaining the state's sovereign control over the political

11  and governmental affairs, including the expenditures

12  therewith under 903.  Chapter 9 is not Chapter 11, and so,

13  therefore, the question to start with is what is the -- what

14  limited things can be done in Chapter 9, not necessarily

15  let's look at the whole of the Bankruptcy Code and try to

16  sort of plug in examples that are going to cross between a

17  Chapter 9 debtor and a Chapter 11 debtor.

18          THE COURT:  I understand that argument, but isn't

19  the end result of that argument that a state like Michigan

20  that has this clause, if it is to be given absolute impact,

21  cannot authorize its municipalities to file bankruptcy?

22          MS. CECCOTTI:  Cannot authorize its municipalities

23  to file for bankruptcy if a purpose is to diminish or impair

24  accrued pensions.  That's correct, and that is --

25          THE COURT:  But what you're not saying there is that

```
 1    if there is the intent not to diminish pensions, they can
 2    file municipal bankruptcy?
 3           MS. CECCOTTI:  In this case, your Honor, the intent
 4    was made abundantly clear going in.  If they had hidden the
 5    intent, we might --
 6           THE COURT:  No.  I understand that.  I'm trying
 7    to --
 8           MS. CECCOTTI:  -- we might not be standing here
 9    today.
10           THE COURT:  I'm trying to figure out where your
11    argument goes because there are two possible outcomes here.
12    One is when a municipality is subject to the state
13    constitutional provision, it can file bankruptcy and still
14    impair, or it can file bankruptcy without the intent to
15    impair, or I suppose there's a third alternative, which is
16    the one I'm asking about, which is they can't file bankruptcy
17    because bankruptcy doesn't permit that kind of
18    discrimination.
19           MS. CECCOTTI:  I think -- your Honor, I think it's a
20    false choice, frankly.  I really do.  And we've seen some --
21    we've seen enough instances, I guess, of the more modern use
22    of Chapter 9, particularly the cases out in California,
23    where -- and this is -- and CalPERS has been just on the
24    forefront of this, as I'm sure you know -- where they're not
25    touched.  I just -- I don't see what is so accepted or that
```

1  it's a black and white choice between filing for bankruptcy
2  and not filing for bankruptcy simply based on the pension
3  question.  I mean this is a -- this is a very -- this is a
4  large, large municipality to be seeking Chapter 9 relief.
5  There is a lot going on.  This very much reminds me, Judge,
6  of going from the very small Chapter 11's at the beginning of
7  the '78 Code and then all of a sudden finding companies like
8  LTV Steel filing for bankruptcy and suddenly declaring that
9  retiree health was a general unsecured claim, someone no one
10  had thought of before.  This very much feels to me like that
11  type of a moment where the size of this city and the
12  magnitude of what it's trying to accomplish simply cannot be
13  easily fit within the rules that might otherwise apply in a
14  smaller -- in a smaller context or with less going on or with
15  less money available for fewer options.  It's very much a
16  moment, I think, where -- it's one of those moments that I
17  think we will look back on and say this is where Chapter 9
18  changed.  And we are very much hoping it does not change in
19  the direction of violating what we believe are legitimate --
20  a legitimate basis for a municipality to say, "I need to
21  adjust my debt, but I am going to adhere to a state law, a
22  state constitutional provision like the pension clause, and I
23  can accomplish both."  I very much think that those things
24  are possible, and if we don't have a bankruptcy system that
25  allows for that duality -- the dual sovereignty to have play

1  like that, then we are simply wiping aside centuries of
2  constitutional law.  And I'm really -- my colleagues are
3  going to be very upset with me.
4           THE COURT:  Eleven minutes left.
5           MS. CECCOTTI:  I'm sorry.
6           MS. PATEK:  Your Honor, given the time
7  limitations -- again, Barbara Patek on behalf of the Detroit
8  Public Safety Unions -- I want to address for the moment the
9  Court's question about whether there's anywhere else in the
10  Code, and I don't -- I believe the answer to that question is
11  no, but I think also the Tenth Amendment answers that
12  question.  And I think even if you assume for the sake of
13  argument that there are -- that what the -- what is being
14  said here, that this is just a priority issue, that this
15  constitutional promise that was made to these public servants
16  is to be treated like general unsecured debt as if it were
17  credit card debt, I think a careful look at the Code answers
18  that question to the contrary, and I think you can start with
19  the Orange County versus Merrill Lynch case, which talks
20  about 507 and the reason for the exclusion of (a)(1) and
21  (a)(3) through (9) from the Code.  And in a footnote it talks
22  about what were then (a)(3) and (a)(4) being excluded because
23  they had to do with employment rights and collective
24  bargaining agreement rights potentially of employees which
25  could affect the ability of the municipality to continue its

1  operation.  I suggest it's no accident that those two

2  sections were excluded.  I suggest that it's no accident --

3  we heard a lot about electoral will or political will last

4  week -- that this provision is tucked away in the Michigan

5  Constitution so it's difficult to change.  This is a promise

6  that's made to people as part of the sovereignty of the State

7  of Michigan to the people who are necessary in this case,

8  talking about my clients, the Public -- the members of the

9  Public Safety Unions, and I would suggest that it would be a

10  violation of the Tenth Amendment to read the Code otherwise.

11  Thank you, your Honor.

12       MR. MONTGOMERY:  Your Honor, Claude Montgomery for

13  the Retiree Committee.  I had four things that I was going to

14  try to address today in my seven minutes.  One was ripeness.

15  One was whether or not there is an issue, despite the Cardozo

16  dissent, and, three, I'd like to answer the question of

17  whether or not intent matters for the governor and the

18  emergency manager, a question raised by the state, and,

19  finally, if I have any time left, that Studier does not

20  undercut Seitz v. Probate Judges System.

21       But I'd also like to take the opportunity to answer

22  the last question or at least offer a thought -- whether or

23  not it's considered useful or not, I will, of course, leave

24  to the Court -- and that Bekins itself tells us what the best

25  interest question was, and it wasn't relative treatment of

creditors.  It was whether or not bondholders could get tax
people to actually levy on property that was either worthless
among the municipalities or couldn't be sold for the amount
or tax levy marshals and whatnot were running away from
creditors.  So the best interest of creditors that _Bekins_ saw
being made possible by the plan of adjustment was better than
zero, not a relative priority vis-a-vis other creditors but
an ability to get paid where the state was actively, through
its minor officials, resisting paying anything.  And so I
think that is the best interest of creditors that 943(7) is
looking to, and I have further statutory construction for
that.  At least I offer it.  One is that neither 1129(a)(7)
nor 1129(a)(11) are actually adopted by Chapter 9, and so
the -- what is the best interest of creditors as in feasible
is not necessarily identical to those statutory -- those two
statutory provisions to which no reference is made.

So now I'd like, if you will, turn my attention to
the Cardozo dissent, which I must say I thought Mr. Bennett
made a very interesting offer to the Court as a foundation
for _Bekins_, but I would like to suggest and only suggest,
your Honor, that there is a key -- two key parts to the
Cardozo consent that the Court may wish to pay attention to.
One is that the Court action on which Mr. Bennett relies was
the discharge of the debt.  It wasn't what happened inside
the plan process.  It was the actual discharge, which

1  couldn't be accomplished without court intervention.  The
2  second thing that was critical to Justice Cardozo's thinking
3  and, according to Mr. Bennett, ultimately adopted by the
4  Bekins court, which was this concept of consent.  Well,
5  Justice Cardozo characterized it as a waiver of a privilege,
6  right, but here what controls how the state exercises the
7  waiver of the privilege?  Well, obviously that has to be a
8  question of state law.  It can't be transformed into a
9  question of federal law.  And what is the state law that
10  controls the exercise of the waiver of the privilege?  Well,
11  it's this Michigan state Constitution.  So if the Michigan
12  state Constitution is the bedrock on which the waiver takes
13  place and the Michigan Constitution says, according to the
14  Seitz case and according to the Musselman case, no act can be
15  taken that results in a diminishment of pensions, not affects
16  the value of those pensions but actually diminishes the
17  amount of those pensions, then the state actors cannot do
18  anything in that regard.  And I would further answer the
19  question your Honor asked earlier, was if the Michigan
20  Constitution is a proscription on the behavior designed to
21  undercut the Constitution, does that mean that no city can
22  file a Chapter 9?  Well, obviously ones that don't have
23  pension issues don't even have to ask the question, so 436
24  and the Michigan Constitution are clearly not a bar where
25  there's no desire to impair pensions because they don't have

1  pensions, but if they do have pensions --

2         THE COURT:  Well, I'm not sure that's so.

3         MR. MONTGOMERY:  Well, as your Honor -- forgive me.

4         THE COURT:  I mean my question would be in that

5  case -- I mean you can construct a hypothetical in which the

6  city proposes to impair bonds and the bondholders are saying,

7  "Wait a minute.  There's this other asset over here, the

8  pension assets, you know.  We have to impair everybody, not

9  just us."

10        MR. MONTGOMERY:  I presume your Honor meant pension

11 obligations.

12        THE COURT:  Pension, yeah.  Thank you.

13        MR. MONTGOMERY:  The one difference between the

14 state constitutional provision on impairment of contracts and

15 Article IX, Section 24, is that Article I, Section 8, of the

16 Michigan Constitution speaks of legislation whereas Article

17 IX, Section 24 --

18        THE COURT:  And I don't mean to frame this in terms

19 of a constitutional protection for bonds because that's not

20 the point of it.  The point of it is that the bondholders

21 could argue that under the Bankruptcy Code, pension holders

22 do have to be impaired, even if the municipality doesn't want

23 to, to achieve fairness in treatment.

24        MR. MONTGOMERY:  Well, first, they would have to, of

25 course, start on a class basis because obviously --

1       THE COURT:  Right.

2       MR. MONTGOMERY:  -- the unfair discrimination starts

3  there, but, secondly, the key issue here for whether or not

4  there is an unfair discrimination is whether or not there are

5  differences in the protections afforded each claim.  It is

6  well-established that you can make distinctions between

7  creditors based on the nature of the obligation and that you

8  can make differences in treatment based on the nature of the

9  obligation, so the only question is whether or not it's

10  unfair, and how could it be unfair to let the pension rights

11  of the City of Detroit retirees pass through a Chapter 9 case

12  if the Michigan Constitution says it's unconstitutional to

13  try to impair them?

14       THE COURT:  The bondholders say protected by

15  Constitution or not, in bankruptcy they are unsecured claims.

16       MR. MONTGOMERY:  Right.  And so if, your Honor, the

17  only possibility of dealing with a pension obligation is that

18  it has to be done in a Chapter 9 and it is unconstitutional

19  for the actor, the state actors to ask for Chapter 9, I think

20  you're blocked.  You can't ask for the Chapter 9 position.

21  And we find nothing inconsistent with that roadblock because

22  the people of Michigan retain the right and the ability to

23  change the law if they wish to give their municipalities

24  greater access to Chapter 9.  If, in fact, Article IX,

25  Section 24, is a roadblock -- and we assert it is a

1  roadblock -- the people of Michigan, not the federal
2  government, but the people of Michigan retain the right to
3  make that change.
4         THE COURT:  One more minute.
5         MR. MONTGOMERY:  Yes, sir.
6         THE COURT:  Ripeness.  I would simply commend your
7  attention to U.S. Postal Service v. National Association of
8  Letter Carriers, which your Honor no doubt has read and which
9  ripeness focuses on the timing of the action rather than the
10 party that brings the action, and the key question there for
11 the Court was whether or not there was a reasonable threat of
12 liability if compliance with the arbitration order violated
13 the CSRA, which was the relevant statute, and we say the
14 analogy to that is whether or not there's a reasonable threat
15 of harm to the pensioners as a result of the city's action.
16        THE COURT:  Um-hmm.
17        MR. MONTGOMERY:  And I think that's -- at least we
18 would offer to your Court that is a difficult thing to
19 dispute.  And I think that exhausts my ten minutes, your
20 Honor.
21        THE COURT:  Thank you.
22        MR. SCHNEIDER:  Your Honor, Matthew Schneider, chief
23 legal counsel, Michigan Department of Attorney General, on
24 behalf of the state.  Your Honor, I'd only like to discuss
25 two topics here.  One is home rule and then, secondly, the

1    referendum issues regarding PA 436.

2         So if we start with the home rule argument, if we

3    look at Article VII, Section 22, just setting aside the text,

4    we have to look at the text and ask what does this do.  What

5    does this provision of the Constitution do?  It gives local

6    citizens the power to adopt their own governing structure and

7    ordinances.  And what it allows citizens to do is gives them

8    a City Council.  The City Council can adopt ordinances and

9    resolutions.  And the citizens have a right to that power.

10        In this case, what did the citizens do with that

11   power?  Look at Detroit City Charter, Section 1-102.  They

12   enacted as part of that charter a provision that reads,

13   quote, "The City has the comprehensive home rule power

14   conferred upon it by the Michigan Constitution, subject only

15   to the limitations on the exercise of that power contained in

16   the Constitution or this Charter or imposed by statute."  So

17   the charter itself states that the home rule power is limited

18   to what is imposed by statute.

19        But even if it didn't say that, if the charter

20   didn't say that, we know that when the citizens of Detroit go

21   to the ballot box and they elect their City Council members,

22   those same members, those same citizens, have an opportunity

23   to vote for their state senator and their state

24   representative and their governor, and those representatives

25   in Lansing, who the city has an ability to vote for, pass

1   laws that govern those city residents as well.  Those

2   representatives passed PA 436.

3           This cannot possibly violate the home rule concept.

4   Let's look at what those representatives did.  They passed

5   the Home Rule City's Act, MCL 117.36.  Quote, "No provision

6   of any city charter shall conflict with or contravene the

7   provisions of any general law of the state," unquote.

8           And we have to look at this through another third

9   and final prism.  In 1963 the residents of this city had an

10  opportunity to vote another time, and they voted to ratify

11  the state Constitution.  Article VII, Section 22, contains a

12  very important line that now binds those city residents.  A

13  city, quote, "shall have the power to adopt resolutions and

14  ordinances related to its municipal concerns, property and

15  government, subject to the Constitution and law," unquote.

16  The law is passed by the legislature.  In other words, you

17  can only pass local laws that are subject to the Constitution

18  and the laws passed by the legislature, and this is all about

19  representative government.  This is how it works in our

20  constitutional republic.  The city residents still govern

21  themselves.  They voted for the people enacting the city

22  charter.  The city residents voted for a legislature that

23  enacted PA 436, and the city residents had a hand in the

24  Michigan Constitution as well.

25          If you look at the legal priority here, we know, as

1   I've stated, that the acts of the legislature can take
2   priority over local acts.  The Michigan Supreme Court in <u>Mack</u>
3   v. <u>City of Detroit</u>, 467 Mich. 186, a 2002 case, explained
4   this.  There was a Detroit city charter provision that
5   created a private cause of action for discrimination.  A city
6   police officer brought a discrimination suit under the
7   charter, but in this case the legislature had already passed
8   a governmental immunity statute that prevented these actions
9   against the city.  And the Michigan Supreme Court held that
10  the charter provision conflicted with the law as passed by
11  the legislature, and so the legislation took priority over
12  the charter.
13          PA 436 is not a local act.  It can be applied to any
14  other city, and we can see in the newspapers today about the
15  issue of PA 436 being raised in other cities or
16  municipalities.  So there's a much larger point here, your
17  Honor.  The objectors, I think, are incorrect in the overall
18  approach to the home rule argument.  They're arguing that PA
19  436 trumps home rule and ignores the will of the voters and
20  that the legislature somehow just wanted to overrule the
21  citizens of Detroit, but we have to look at PA 436 and know
22  that there were incredibly compelling reasons for PA 436.
23  The point of that, as spelled out in the Act, was to help
24  distressed cities and school districts.  The evidence showed
25  that this was a problem that was not going away.  It was true

1   before PA 4, after PA 4, before PA 436, and after it.  And

2   the language of PA 436 shows that the legislature wanted to

3   fix it, but it also responded to the voters' rejection of PA

4   436.  If we look at the governor's testimony in his

5   deposition, he indicates as such.

6           THE COURT:  Well, but the fact that there may have

7   been compelling reasons for 436 wouldn't justify it if it's

8   otherwise unconstitutional, would it?

9           MR. SCHNEIDER:  No, but there's no -- it's not

10  unconstitutional.  That's my point.

11          THE COURT:  I'm just wondering why you're arguing

12  that it was compelling.  What's the point?

13          MR. SCHNEIDER:  It's a point because -- just to say,

14  your Honor, there's a much larger point here, and the point

15  is is this wasn't done arbitrarily.  This was done for a very

16  specific purpose.

17          Secondly, your Honor, I want to respond to the issue

18  regarding the right to referendum.  I believe Assistant

19  Attorney General Margaret Nelson explained this quite

20  adequately yesterday, but I do want to address the fact that,

21  you know, there's been argument raised here that there were

22  documents produced in discovery that lawyers at Jones Day

23  discussed how PA 436 would be, you know, going around the

24  referendum power.  Well, neither of these people were members

25  of the legislature.  If we look at the governor's position

1    itself, the state has produced discovery in this case

2    explaining the governor's position, and it was not to go

3    around the legislature.  The governor had directed -- I

4    believe it was Dick Posthumus, the former lieutenant

5    governor, and his legislative director, how are we going to

6    craft -- how would PA 436 be crafted?  It would be crafted

7    not to ignore the will of the voters.  It would be crafted in

8    order to make sure that different changes were made to make

9    it better.  And, you know, as to --

10        THE COURT:  But how does anyone know whether the

11   changes that 436 incorporated over the rejected law, PA 4,

12   responded to the will of the voters or not?  How does anyone

13   know that?

14        MR. SCHNEIDER:  Well --

15        THE COURT:  I mean all we know is PA 436 was

16   repeal -- PA 4 was repealed.

17        MR. SCHNEIDER:  Folks aren't blind, I think, to the

18   media coverage as well.  When an act is --

19        THE COURT:  Rely on media coverage?

20        MR. SCHNEIDER:  Well, they have constituents.  Laws

21   are passed only through the regular process of legislators

22   responding to their constituents, and that is the will of the

23   voters.  And when the governor wants a new structure, PA 436,

24   or the members of the legislature want that, their

25   constituents will go to the media as well or will speak

1  directly to them, so it was in direct response to fixing the

2  problems that the will of the voters pointed out.

3          If you have any other questions on these topics, I'd

4  be happy to answer them or I could defer to Mr. Bennett on

5  the other issues.

6          THE COURT:  Thank you, sir.

7          MR. SCHNEIDER:  Thank you.

8          MR. BENNETT:  Good afternoon, your Honor.  Bruce

9  Bennett of Jones Day on behalf of the city.  I got a little

10  bit of an organizational challenge here.  One comment with

11  respect to the last point concerning the right of referendum,

12  if the defect in 436 is that there was a right -- there

13  should have been a right to referendum anyway,

14  notwithstanding what the statute says, well, I suppose the

15  remedy is for someone to try to mount a referendum, not to

16  wait till you come to a Bankruptcy Court and ask the

17  Bankruptcy Court to decide there should have been a

18  referendum.  If there had been a referendum, it would have

19  been rejected, and, therefore, we're going to hold it

20  unconstitutional.  It seems that there's a whole -- there's a

21  few steps that are being skipped in the relief that's been

22  requested of you here.

23          There's a number of topics, and I can only refer to

24  the other Mr. Bennett to cover all the different questions,

25  so I'm going to try to organize it, but if it falls apart a

1    little bit, I apologize.

2         First, there was an appeal to the other California

3    cases, which has to refer to <u>Vallejo</u>, where, of course,

4    pension claims were not impaired, debt claims were impaired,

5    in what was a largely consensual plan.  I think I said in

6    another appearance before this Court that today <u>Vallejo</u> may

7    well be in trouble again and perhaps because it did not get

8    enough relief from its debt generally, but that's not the

9    reason I refer to it this time because I think you can't

10   refer to <u>Vallejo</u> without referring to <u>Central Falls</u> in Rhode

11   Island.  And in <u>Central Falls</u> in Rhode Island, what happened

12   was was that the pension claims, pension and benefit claims,

13   took haircuts and the debt did not, again, a consensual

14   outcome.

15        If the economics were a little different, perhaps we

16   could have a consensual outcome one way or another in

17   Detroit's case, but I'm pretty sure that the bondholders, who

18   I think are listening on the phone and not here today, would

19   say that they are not in a position and would not consent to

20   allowing pension claims in this case to be unimpaired, and

21   I've certainly heard the various representatives of those

22   holding pension and other retiree benefit claims here and

23   indicating that they're not in a position or willing to let

24   bondholders leave unimpaired.  And it may well be that this

25   is the first case where irrespective of consent from one side

1   or another, we could not achieve that result, so I think

2   the -- that a consensual outcome could come out differently

3   and could come out with only part of a capital structure

4   being impaired unfortunately says nothing about the

5   controversy we have today.

6           The second point I want to cover is the point about

7   the discharge language in Bankruptcy Code Section 944.  It's,

8   of course, important whenever reading a provision in a

9   statute to figure out where it is in the statute, and the

10  provision relating to discharge is in the effect of a

11  confirmation order.  And the line is that the discharge

12  applies -- excuse me -- the debtor is not discharged --

13  there's a broader discharge provision that comes ahead --

14  from any debt exempted from discharge by the plan or order

15  confirming the plan.  This is not a claim that has some

16  inherent nondischargeability.  This is a reference to a plan

17  exempting from the provision before it, and I suppose that

18  what this is intended to do is to say that obligations as

19  modified will continue if the plan or the order confirming

20  the plan says so.  Otherwise, if you go up and look at the

21  discharge, it covers all claims, period, and so I think this

22  is a provision that makes a plan that partially and does not

23  fully discharge claims work, and I think that's all it is.

24  It's not a recognition --

25           THE COURT:  Well, but what Mr. Gordon argues, if I

1    understand it correctly, is that this provision of the Code

2    allows a municipal debtor to waive the discharge of the

3    claims of a class, and, therefore, this city can pursue a

4    Chapter 9 case that addresses all of the debt other than the

5    pension debt which can't be pursued or at least impaired

6    because of the Michigan Constitution.

7         MR. BENNETT: Well, once again, this provision is

8    one section in a Bankruptcy Code that contains lots of other

9    sections, and a couple of them were touched upon by your

10   Honor and other people addressing you just a few minutes ago.

11        First, there was a discussion about whether it

12   creates a priority or not. I don't think that's terribly

13   relevant. The issue that the Bankruptcy Code sets up is that

14   it has a distribution scheme imbedded in it. The

15   distribution scheme in some places is given effect through a

16   combination of a declaration that a particular claim has

17   priority and then a treatment requirement that you would find

18   in 1129. In others there's no explicit priority, but there's

19   a treatment -- there's a treatment requirement in 1129, and

20   that treatment requirement works two ways, and I think this

21   came out in the discussion. One, there's the ranking, which

22   is basically what 1129(b) does between secured claims,

23   unsecured claims, subordinated claims, and not in Chapter 9

24   equity. But it also has the nondiscrimination provisions,

25   and I actually think that counsel for the retiree committee

 1   slightly misspoke when he said, well, nondiscrimination,
 2   that's an issue between classes, and it is, but within
 3   classes there's actually a stronger nondiscrimination
 4   provision.  The treatment within a class has to be the same.
 5   Between classes the rule is unreasonable discrimination.  And
 6   so the discharge -- the provision in 944, the ability to have
 7   an exception in the confirmation order from discharging all
 8   claims that existed on the petition date and leaving some
 9   around to some extent, I don't think is a license to confirm
10   a plan that doesn't meet with the requirements of 1129, both
11   the priority -- what I called priority, but the
12   distributional entitlement requirements and the creditor
13   justice requirements, whether they are unlawful
14   discrimination or same treatment within a class.  And so you
15   get to the point where your Honor was, I think, which is that
16   these claims are --
17           THE COURT:  Well, but Mr. Morris pointed out
18   astutely that Chapter 9 itself prohibits -- or I should say
19   requires that a plan be fair and equitable.  Yes?
20           MR. BENNETT:  It has a different meaning than the
21   provision in the Chapter 11 --
22           THE COURT:  Right.
23           MR. BENNETT:  -- for -- yes.
24           THE COURT:  Right.
25           MR. BENNETT:  But he referred to best interest, but,

1   yes, it has a fair and equitable provision.

2           THE COURT:  So he argues how can a provision that

3   impairs pensions be fair and equitable in the face of the

4   constitutional protection of them?

5           MR. BENNETT:  I think you go back to the -- again,

6   what came up when we were last here, which is that you can

7   say as a constitutional matter these cannot be impaired for

8   one -- by the municipality, but the reality is at the end of

9   the day there isn't enough money.  And when the reality is

10  there isn't enough money to pay them, then if you went

11  through all and exhausted all of the nonbankruptcy procedures

12  for enforcing a debt, where would you be?  That is the --

13  that is essentially the best interest benchmark.  And we've

14  got a lot of law on this.  Bekins, which was referenced, is

15  one of them.  The fact pattern that you see in cases

16  involving very distressed municipalities in the cases, which

17  a lot of them are from the depression era, of course, is

18  situations where the municipality, notwithstanding an

19  obligation to raise taxes, just can't collect any more money

20  no matter what it does.  Sadly, that fact situation, albeit

21  with more modern features, presents itself in Detroit.  And I

22  think it would be what the city will have to prove, open

23  paren, one, in the event it does not achieve a consensual

24  plan, which it still hopes to and that the -- that it is

25  object -- the plan is objected to by relevant constituents

1   representing retirees, the city will ultimately have to prove
2   that the distributions on account of underfunding claims
3   offered by the plan are better than the contributions that
4   could be achieved if there wasn't a Chapter 9 case and if the
5   creditors were free to pursue their remedies, all creditors
6   were free to pursue their remedies, and if the residents
7   reacted as we can predict residents would react because they
8   have been doing so for the past several decades.  And if the
9   city -- if the retiree -- committees represented by the
10  retiree groups are able to prove that the environment for
11  them outside of Chapter 9 is better than the results we are
12  able to achieve in this Chapter 9 case, they may get a chance
13  to prove to themselves whether they were right or wrong
14  because that's where we'll be.  We'll be in a dismissed case.
15  There will be lots of unsatisfied bond debt.  There will be
16  lots of unsatisfied pension debt.  There will be lots of
17  unsatisfied OPEB debt, and we'll see how it turns out.  I
18  think that will not be a good outcome.
19          So this kind of brings me back to how the system
20  works, and I think, frankly, why don't I start with really
21  Justice Cardozo's reasoning?  And first I wanted to spend a
22  minute to take away some of the mystery that seems to be
23  surrounding who was where in 1936 and 1938.  It was mentioned
24  that Judge Cardozo for some reason didn't participate in the
25  decision in Bekins.  Unfortunately, that's because Justice

1   Cardozo had a heart attack at the end of 1937, a stroke at
2   the beginning of 1938, and he died in early July 1938, about
3   ten weeks after the decision in Bekins.  The reality was is
4   Justice Cardozo was too sick to participate.  His opinion was
5   joined by, quote, the chief justice, Justices Brandeis and
6   Justice Stone -- excuse me -- Justices Brandeis and Stone.  I
7   actually didn't know when we were here last for certain that
8   the chief justice at the time of the dissent was the same
9   Chief Justice Hughes who wrote the opinion in Bekins.  It
10  turns out he was.  I was able to verify that during the
11  break.  And I think I offer what Justice Cardozo had to say
12  because its logic is irrefutable.  By the way, its reasoning
13  wasn't assailed by any of the retiree representatives.  It's
14  joined by a very distinguished group of justices, and all of
15  them except for Cardozo participated in the ultimate reversal
16  of Ashton in Bekins.  The opinion, of course, was written by
17  Hughes, who joined the dissent, and I think, therefore, it's
18  an excellent aid to interpretation.
19          I admitted last time that Bekins is a little hard to
20  interpret because it's dealing actually with three specific
21  constitutional challenges.  It spends most of its column
22  inches on the Article X problem.  It spends exactly one
23  column inch on the Fifth Amendment problem and really only
24  talks about the commerce clause problem because the
25  legislative history that it quotes for the changes made

 1  between _Ashton_ and _Bekins_ touches on the commerce clause

 2  issue, and the Court basically is agreeing with the treatment

 3  that accompanied it -- accompanied the statute in the

 4  legislative history.

 5       It turns out that Cardozo didn't write on a clean

 6  slate.  He cited a case, _Imperial Irrigation District_, 10

 7  Fed. Supp. 832, which is probably where he borrowed the

 8  concept, and I quote from that case, "The impairment of

 9  contracts is brought about by the national law, and not by

10  the state measure, and local consent similar in effect to

11  that sanctioned by the California statute."  The judge in

12  that case -- so it's obviously a district judge -- it's not

13  even an appellate judge -- is dealing with the same problem

14  that you would have if you tried to ground the

15  constitutionality of the Bankruptcy Court -- Bankruptcy Code

16  as against the contracts clause on anything other than the

17  reality that it is the federal power that is impairing

18  contracts.  You wind up with a situation that you have

19  basically destroyed Chapter 9 and maybe parts of Chapter 11

20  as an avenue for impairing contracts in many circumstances,

21  not just pensions.

22       In short, you've proven too much.  You've proven

23  that contracts clauses in every state -- and I said last time

24  I think there's a contracts clause in every state

25  Constitution, but I could be off by one or two -- that would

prevent the impairment of bonds.  That would prevent the
impairment of trade claims.  In fact, you would have
effectively preempted all impairments, and Chapter 9 would be
completely a dead letter.  And so we have to look for other
interpretations or we should be looking very hard for other
interpretations, and we don't have to look very far.  And as
I said before, I think while Bekins says -- crunches it into
a couple of sentences, Justice Cardozo's reasoning joined by
Hughes, Stone, and Brandeis explains to us why,
notwithstanding the federal contracts clause, notwithstanding
state contracts -- state Constitution contracts clauses, and
notwithstanding the pension clause, we still have an
effective bankruptcy power to implement debt restructurings
and debt impairments in cases where there are necessary --
where they are necessary.  Nothing about eligibility is
dealing with the question that your Honor sensibly asked,
which is, "Don't you have to show that a plan is in the best
interest of creditors?"  Clearly we do.  Is there anybody
going to use Chapter 9 as a method for impairing contracts if
they're not in financial extremis?  No, they should not, and,
no, they will not.  It is in those circumstances where the
federal government comes to the aid of states and
municipalities that can't on their own restructure their
financial affairs.

            And by the way, a nice corollary of looking at it

1    this way is that it dovetails precisely with one of your

2    Honor's observations, which is the last word -- I think it's

3    the last word of the relevant sentence of the pensions

4    clause, the words "thereby," which relate back to the state,

5    relate back to the municipality, but don't say that they

6    can't be impaired by anybody, just says the pension --

7    accrued pension benefits cannot be diminished or impaired

8    thereby, "thereby" being the state and the municipality.  So

9    adopting the language and approach in the California case

10   just cited, in the Cardozo dissent joined by the other

11   justices, and in Bekins itself, albeit not quite as

12   precisely, you wind up with federal law that happens to fit

13   nicely with the actual language of the state law with a

14   bankruptcy system that does still work and has not been

15   crippled and made unable to deal with every financial --

16   every municipality in financial distress and a Bankruptcy

17   Code that is constitutional, as Bekins said it was.

18         I don't think I have many more points.  First, I

19   wanted to make clear -- someone mentioned that the city had

20   not in oral argument taken positions on certain points

21   relating to PA 436.  We've been relying and join in the

22   arguments of the attorney general.  I think I dealt with

23   that.  Oh, there was an assertion that the 1963 bankruptcy

24   law was somehow different than the fact that throughout --

25   beginning in the '30s but all the way through '61, '63, all

1   the way up until the Bankruptcy Code made specific

2   authorization unnecessary for awhile, Michigan authorized all

3   of its municipalities to resort to the composition law.  This

4   1963 law still had impairment of contracts as one of its

5   central elements.  In fact, if you look at Bekins, which

6   stands, of course, for many things, Bekins is a case where

7   it's a 60-percent -- it's a 60-cent distribution on account

8   of debt, and it was a mercifully simple case.  There was one

9   class, so we didn't have to deal with discrimination and all

10  those other things.  But Bekins is a debt impairment case.

11  It turned out to be that 86 percent of the creditors by

12  amount approved it, and it's the 14 percent who are

13  complaining.  And so it really isn't fair to say that the

14  bankruptcy laws as they apply to municipalities were vastly

15  different than the laws that -- the laws that are here now.

16  They're probably a little bit more advanced in certain

17  respects, informed by the New York experience, but the idea

18  that contracts between a municipality or obligations of a

19  municipality because very often they're not just in the form

20  of contracts, they're in the form of ordinances, and its

21  creditors can be -- could be -- could have been in 1963 and

22  in 1961 impaired as a matter of federal bankruptcy law.  It's

23  the absence of any mention at all of this issue or problem

24  anywhere in -- specifically in the pensions clause itself,

25  but also in the convention history leads to the conclusion

1    that people weren't thinking or it's hard to find any
2    evidence that anyone was thinking that anything that happened
3    in the structuring of the pensions clause was intended to
4    take Chapter 9 relief away from a municipality, period, in
5    any circumstances.  And we think, again, that even if it did
6    or tried to -- and I think this is important -- even if it
7    did or tried to, the Justice Cardozo, Hughes, Stone, and
8    Brandeis reasoning would say it doesn't matter, that at the
9    end of the day, the -- unless there's an explicit direction
10   not to file Chapter 9, the state can only protect pension
11   claims so much.  They can't protect them ultimately from
12   federal power.
13          I think those are all the points I need to cover.
14   If your Honor has any questions that I could answer --
15          THE COURT:  No.  Thank you.
16          MR. BENNETT:  Thank you.
17          THE COURT:  All right.  Ladies and gentlemen, I
18   promised you one deliverable at the conclusion of these
19   arguments, which was a decision on whether or not there are
20   any genuine issues of material fact that should be addressed
21   at the upcoming trial relating to these issues which I had
22   preliminarily determined were strictly legal issues.  I'm
23   going to take ten more minutes to just think about that.  I
24   think there might actually be one.  So we'll reconvene at
25   2:45.  In the meantime, I want to remind you, please, that

1  when you are in the hallway, you must remain absolutely

2  silent, no talking in the halls.  If you want to talk, you

3  can talk in here or down on the first floor.

4         One other housekeeping matter, which, again, I want

5  to bring up just in case I forget later.  It was requested of

6  the Court permission to have in the courtroom a transcriber

7  to provide -- I guess it's called realtime transcripts, and

8  that's fine with the Court so long as we all understand that

9  that transcript is not the official transcript of the court

10  and may not be used in lieu of what would otherwise be

11  required to be used, the official transcript.  So 2:45 we'll

12  reconvene.

13         THE CLERK:  All rise.  Court is in recess.

14     (Recess at 2:34 p.m., until 2:46 p.m.)

15         THE CLERK:  Court is in session.  Please be seated.

16  Recalling Case Number 13-53846, City of Detroit, Michigan.

17         THE COURT:  Counsel are present.  I want to

18  emphasize again what I think I stated the other day, that the

19  Court certainly will take into account in deciding these

20  issues which I have preliminarily determined are legal issues

21  any facts that come out in the trial that bear upon them.

22  Having said that, though, there is one issue of fact that

23  needs to be identified because the parties do disagree about

24  it, and it might have a bearing on one of these legal issues,

25  and that specific factual issue is what was the purpose of

1  adding the spending provision to PA 436.

2          Anything further for today?  All right.  We will

3  begin our trial at nine o'clock Wednesday morning in this

4  room.  Oh, I urge you to get here early because the security

5  lines are longer at that hour in the morning than they are at

6  the times we've been starting.

7          THE CLERK:  All rise.  Court is adjourned.

8      (Proceedings concluded at 2:48 p.m.)

INDEX

<u>WITNESSES:</u>

        None

<u>EXHIBITS:</u>

        None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    October 23, 2013
_____        _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,         .         Docket No. 13-53846
        MICHIGAN,                .
                                 .         Detroit, Michigan
                                 .         October 23, 2013
                     Debtor.     .         9:00 a.m.
. . . . . . . . . . . . . . .


HEARING RE. ELIGIBILITY TRIAL
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>       JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>       JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| | Clark Hill, PLC<br>By:  RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI  48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Associa-tion and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker & Freedman, P.C.<br>By:  BARBARA A. PATEK<br>       JULIE BETH TEICHER<br>       DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the Inter-national Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>       PETER D. DECHIARA<br>       THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>     ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>     MEREDITH E. TAUNT<br>     MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Court is in session.  Please be seated.

2   Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.  Excuse me.  We have an

4   attorney to admit to the Bar of the Court, Miguel Eaton.

5          MR. EATON:  Good morning, your Honor.

6          THE COURT:  Are you Mr. Eaton?

7          MR. EATON:  Yes, sir.

8          THE COURT:  Okay.  Are you prepared to take the oath

9   of admission to the Bar of the Court?

10         MR. EATON:  Yes, your Honor.

11         THE COURT:  Please raise your right hand.  Do you

12  affirm that you will conduct yourself as an attorney and

13  counselor of the Court with integrity and respect for the

14  law; that you have read and will abide by the civility

15  principles approved by the Court; and that you will support

16  and defend the Constitution and laws of the United States?

17         MR. EATON:  I will.

18         THE COURT:  Welcome, sir.

19         MR. EATON:  Thank you, your Honor.

20         THE COURT:  We will take care of your paperwork for

21  you.  And we should go ahead and have appearances entered,

22  please.

23         MR. IRWIN:  Good morning, your Honor.  Geoff Irwin

24  from Jones Day on behalf of the city.

25         MR. STEWART:  Geoffrey Stewart, Jones Day, also on

```
 1   behalf of the city, your Honor.
 2            MS. LEVINE:  Good morning, your Honor.  Sharon
 3   Levine, and if I could introduce to the Court my partner,
 4   Jack Sherwood, Lowenstein Sandler, for AFSCME.  Thank you.
 5            THE COURT:  Welcome, sir.
 6            MR. MONTGOMERY:  Good morning, your Honor.  Claude
 7   Montgomery, Dentons US, for the retiree committee, and with
 8   me in the courtroom today with possible speaking roles are
 9   Anthony Ullman, partner in Dentons, and Arthur Ruegger back
10   there.  Thank you, your Honor.
11            MR. SCHNEIDER:  Good morning, your Honor.  Matthew
12   Schneider, chief legal counsel, Michigan Department of
13   Attorney General, on behalf of the State of Michigan, and
14   with me is Steven Howell, special assistant attorney general.
15            MS. CECCOTTI:  Good morning, your Honor.  Babette
16   Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  I would
17   also like to introduce my partners, Tom Ciantra sitting here
18   at counsel table, Peter DeChiara over in the corner, both of
19   whom you will see predominantly at the trial.
20            THE COURT:  Thank you.
21            MR. WERTHEIMER:  William Wertheimer, your Honor, on
22   behalf of the Flowers plaintiffs.
23            MS. GREEN:  Good morning.  Jennifer Green on behalf
24   of the General and Police and Fire Retirement Systems, and I
25   have with me my colleagues Ron King and Bob Gordon.
```

1          THE COURT:  I'm sorry.

2          MS. GREEN:  Ronald King and Bob Gordon.

3          THE COURT:  Mr. King.  Okay.

4          MR. MORRIS:  Good morning, your Honor.  Thomas

5    Morris of Silverman & Morris on behalf of the Retiree

6    Association parties.  Also here representing those parties is

7    Ryan Plecha of Lippitt O'Keefe.

8          MS. PATEK:  Good morning, your Honor.  Barbara Patek

9    of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

10   Detroit Public Safety Unions, and with me this morning are

11   Julie Teicher and David Eisenberg.

12         MS. BRIMER:  Good morning, your Honor.  Lynn M.

13   Brimer appearing on behalf of the Retired Detroit Police

14   Officers Association.  Also with me this morning as trial

15   counsel are Meredith Taunt and Mallory Field from the firm

16   Strobl & Sharp, PC.

17         THE COURT:  Thank you.

18         MR. BENNETT:  Bruce Bennett of Jones Day on behalf

19   of the city, your Honor.

20         THE COURT:  Okay.  Then in terms of our order of

21   proceeding this morning, I'd first like to deal with the

22   motion in limine and then the three remaining discovery

23   motions, then the joint final pretrial order, and then we'll

24   begin the trial.  Is that order of proceeding okay with

25   everyone?  Okay.

1       Actually, first, dealing with the motion in limine,

2  I'm going to waive further oral argument on that and rely on

3  your papers and conclude, as I suggested I might the other

4  day, the Court must conclude that it is challenging, if not

5  difficult, if not impossible, to resolve this motion before

6  trial and before Mr. Moore is actually testifying.  Before

7  the Court can determine the admissibility of his proffered

8  testimony, the Court must have before it the questions that

9  the proponent of the witness asks of him, so in the

10 circumstances, I will deny the motion but without prejudice,

11 of course, to the right of any party to object to any of Mr.

12 Moore's testimony on any appropriate ground.

13      So let's turn our attention then to the three

14 discovery motions.  Who will argue those?

15      MR. CIANTRA:  I will start off, your Honor.  Thomas

16 Ciantra, Cohen, Weiss & Simon, for the UAW.

17      THE COURT:  Go ahead, sir.

18      MR. CIANTRA:  Your Honor, first I want to thank the

19 Court for its indulgence.  Obviously we have been under a lot

20 of strain and effort to complete discovery in this matter so

21 that the trial can take place on an expedited basis, and we

22 appreciate the Court's hearing these issues on an expedited

23 basis.  I'm not going to go over the papers extensively.  The

24 Court has seen the issues and I'm sure has read the papers,

25 but I will make a presentation, and it's going to be divided

1  basically chronologically.

2      The first part I want to discuss are the documents

3  and testimony concerning matters which antedate the retention

4  of Jones Day or the emergency manager's retention, and then

5  the second part of the argument deals with matters that come

6  after that point in time and that are really taken up with

7  our request that the Court revisit the issues that it ruled

8  upon back in September.

9      So let me begin then with the first part, the

10  matters that antedate Jones Day's retention, and the issue

11  has been crystallized by the position that counsel for the

12  city took in the October 15th e-mail that is attached as

13  Exhibit 6(d) to the UAW's motion papers with respect to the

14  city.  And what it involves are a series of memoranda that

15  Jones Day prepared in 2012, approximately at least a year

16  before the firm was retained to represent the city in this

17  matter, and these e-mails -- these memoranda are referenced

18  in an e-mail that discusses a meeting between partner Jones

19  Day that had been scheduled with Governor Snyder for June

20  5th, I believe, of 2012, and they're very specific e-mails,

21  your Honor.  They are identified there, and they go to

22  obviously issues that are at the heart of UAW and other

23  objectors' issues that they would raise here, the

24  constitutional protection of the retirees' pensions being the

25  most salient.  And obviously we are seeking production of

1   those documents as well as anything else that may be being

2   withheld that antedates the retention of Jones Day.

3         Now, the city has sort of taken a selective approach

4   with respect to these types of materials.  Obviously Jones

5   Day spent a lot of time and a lot of effort to get itself in

6   a position to impress the state and get hired to represent

7   the city in connection with this case.  There's a very

8   detailed pitch book that we have marked as an exhibit that

9   will be discussed throughout this proceeding.  They have

10  produced that.  They have withheld these e-mails -- these

11  memoranda that are attached to the e-mail.  And the principal

12  basis for that decision at this point is the work product

13  doctrine.  They have withdrawn attorney-client privilege.

14  They weren't retained by the state at any point.  And now

15  they are focusing on work product.

16        And, of course, going back to first principles, the

17  work product doctrine, as it developed, intended to preserve

18  a party's lawyer's work on developing the theories and facts

19  of a case.  I mean this is Hickman v. Taylor, the classic

20  example of an attorney who was interviewing witnesses to an

21  accident to assist his client's defense of that case.  That's

22  not what's involved here, of course.  Jones Day wasn't

23  retained by the state at any point, and they weren't retained

24  by the city in 2012.

25        THE COURT:  What do you contend was the relevance or

 1  would be the relevance of these memoranda in this eligibility

 2  trial?

 3          MR. CIANTRA:  I think, your Honor, it gets to the

 4  central question of what were the motivations and intent of

 5  the decision-makers here.  We know from discovery -- and it's

 6  going to be crystal clear -- that the governor and the state

 7  were well-aware of the constitutional protections that apply

 8  to retiree pensions.  They knew that.  They were well-aware

 9  of what the position was with respect to the creditor

10  proposal that the emergency manager made in June.  The filing

11  was authorized without any conditions.  We all know that.

12  These memos we believe will get beyond that, get into the

13  question of the specifics of knowledge, the specifics of the

14  intent of the parties to do that, and that's why we're

15  looking to get them.

16          THE COURT:  Okay.  Doesn't that statement of

17  relevance prove more conclusively perhaps than the city could

18  even on its own that these memoranda are prepared in

19  anticipation of litigation?

20          MR. CIANTRA:  They weren't, your Honor.  They were

21  prepared more than a year in advance of any litigation and by

22  a firm that was not representing anyone.  These were like the

23  pitch book.  They were prepared to market, to develop

24  theories and to market services.  All right.  There's no case

25  law that they cite that would support the assertion of work

1    product privilege for documents that are prepared in this

2    context.  They have selectively produced the pitch book.

3    It's the same type of material.  So for them at this point to

4    demand work product protection with respect to this we think

5    is just baseless.  I mean this is not a case where maybe a

6    memo is prepared, the client comes in to meet with the

7    attorney and reveals confidences, and those are protected.

8    We all know that.  That's basic attorney-client privilege

9    law, but this is not that situation.  This is their marketing

10   effort to the state to be retained, and we think it is not

11   entitled to --

12           THE COURT:  To be retained for what?

13           MR. CIANTRA:  To apparently be retained at some

14   point.  Who knows?  At that point there was no emergency

15   manager.  There obviously was no Chapter 9 case.  This is

16   devoid of a litigation context where you could claim work

17   product.  They're not representing a party at this point.

18   They're pitching.

19           THE COURT:  Well, I'm just struggling with what the

20   relevance of the fact that Jones Day was pitching the

21   governor a year before would be to this eligibility trial if

22   that's all you assert it was.

23           MR. CIANTRA:  Well, we know that.  We know that they

24   were pitching that.  That's clear.  They've admitted that.

25   What's relevant is --

1          THE COURT:  My question is relevance.

2          MR. CIANTRA:  Well, what's relevant is potentially

3     the content of the documents, which, of course, we haven't

4     seen.  That we think --

5          THE COURT:  To prove what, though?

6          MR. CIANTRA:  To prove what these people knew and

7     what they were intending to do.

8          THE COURT:  Regarding what, though?

9          MR. CIANTRA:  We think it would be relevant to

10    assess the conduct that we know occurred in 2013.

11         THE COURT:  Which was to file this Chapter 9 case?

12         MR. CIANTRA:  Which was to authorize the filing in

13    the face of the constitutional protections for the pension

14    benefits.

15         THE COURT:  Okay.  But doesn't that establish that

16    these memoranda were in anticipation of litigation?

17         MR. CIANTRA:  It can't, your Honor, because of the

18    simple distance in time.  They have not provided any

19    indication that the memoranda were demanded by the state;

20    that there was any retention that existed at that point in

21    time.  It's an effort like the pitch book, which is a very

22    detailed document, to get work.  They spent a thousand hours

23    to get work.  That's what law firms do, and that's what's

24    involved here.

25         Now, obviously we haven't been able -- we don't have

1  the memos.  I have the titles of the memos that are revealed

2  in the e-mail.  We don't have them.  I can't argue the

3  specific relevance of the content.  I would suggest at this

4  point --

5          THE COURT:  Do you have any case law that

6  specifically says that pre-retention work by a lawyer cannot

7  be the subject of the work product privilege?

8          MR. CIANTRA:  Well, your Honor, to be honest with

9  you, I have -- we have done the research.  I haven't been

10  able to find a case that has recognized work product in this

11  instance.  The text of the rule talks about --

12          THE COURT:  But you haven't found any that

13  specifically denies it either, huh?

14          MR. CIANTRA:  No, but the --

15          THE COURT:  Okay.

16          MR. CIANTRA:  But the purpose of work product and

17  the wording of Rule 26 contemplates a representation.  It

18  contemplates that the lawyer is working for a client

19  developing facts, developing theories.  It does not

20  contemplate a relationship between parties who never

21  consummated an attorney-client relationship.  Remember, of

22  course, Jones Day is not working for the State of Michigan

23  here.  That's who these discussions were with.  It wasn't

24  with the City of Detroit.  It was with the State of Michigan.

25  But as I said, your Honor, you know, we haven't had access to

1   the memos.  I would suggest --

2           THE COURT:  We know, don't we, that as a matter of

3   law the attorney-client privilege can extend to pre-retention

4   discussions; isn't that right?

5           MR. CIANTRA:  Well, of course.  It can extend if the

6   client -- if the prospective client reveals confidences, but

7   that's not what's involved here.  They're not claiming to

8   shield the confidences of the State of Michigan.

9           THE COURT:  No.  My question went to the next

10  question.  If the attorney-client privilege can extend pre-

11  retention, why not the work product doctrine, too, if it

12  would -- if it's otherwise in anticipation of litigation?

13          MR. CIANTRA:  Well, I think if there were notes of a

14  meeting that took place where client confidences would be

15  revealed, that would be -- that would be privileged, but I

16  don't believe --

17          THE COURT:  That's not what we're talking about.

18          MR. CIANTRA:  That's not what we're talking about,

19  at least -- I mean I haven't seen the memos, so I --

20          THE COURT:  Let's boil it down to a simple hypo.

21  Okay.  Client calls up attorney and says, "I'm thinking of

22  retaining you to pursue this claim I have against a potential

23  defendant.  When I interview you, I want to know what your

24  strategy will be."  They have a further conversation about

25  the facts.  The attorney prepares a memo.  They have their

1   meeting.  Client decides to retain that attorney.

2           MR. CIANTRA:  Right.

3           THE COURT:  Is that memo protected by work product

4   or not?

5           MR. CIANTRA:  I don't believe it's protected by work

6   product.  I believe parts of it would be protected by

7   attorney-client in terms of the --

8           THE COURT:  Okay.  But I'm talking about work

9   product.  You're talking about work product here.

10          MR. CIANTRA:  I am talking about work --

11          THE COURT:  Not protected by work product.  So the

12  defendant in that case could subpoena that memorandum from

13  that attorney?

14          MR. CIANTRA:  Subject to the client confidences that

15  were revealed in it cannot be -- would be attorney-client.

16  We're not challenging --

17          THE COURT:  Okay.  But otherwise it's disclosable.

18          MR. CIANTRA:  Otherwise I think it is.

19          THE COURT:  Discoverable.

20          MR. CIANTRA:  Yeah.  Otherwise I think it is until

21  there's a retention, especially if there's never been a

22  retention, which is the case here.  This is something that

23  happened a year before between parties that never had an

24  attorney-client relationship.

25          THE COURT:  Um-hmm.  Um-hmm.

1          MR. CIANTRA:  As I said, your Honor, we haven't

2    looked at the memos.  I don't know what's in them.  I would

3    suggest and we would request that the Court consider in

4    camera review of the documents and then make a ruling.

5          THE COURT:  Is it just these -- I think you said six

6    memoranda that are the subject of this dispute?

7          MR. CIANTRA:  At this point, that's what it's boiled

8    down to, your Honor, but we feel that we're entitled to a

9    decision with respect to this that if there's anything else

10   out there that we're not aware of -- and, frankly, your

11   Honor, there's been a lot of documents that have been

12   produced in a very exigent period of time -- we would like

13   the city to produce those.

14         THE COURT:  All right.  Well, we'll inquire -- we'll

15   inquire about that.

16         MR. CIANTRA:  Okay.  Now, let me turn to the

17   second -- let me turn to the second point, and this concerns

18   the issue that was litigated back in September, September

19   19th, on the joint --

20         THE COURT:  Well, on that one I need you to begin

21   with a response to the city's assertion that this motion is

22   late --

23         MR. CIANTRA:  It is --

24         THE COURT:  -- untimely.

25         MR. CIANTRA:  It is late, your Honor.  It is late.

1          THE COURT:  So why should it be considered?

2          MR. CIANTRA:  Well, I think it should be considered

3    because of the particular facts and circumstances that are

4    involved here.  Back in September as this issue was framed

5    and as the Court ruled, it was rather narrowly focused with

6    respect to the question of authorization.  That was the

7    hypothetical that the Court developed to support its

8    reasoning.

9          THE COURT:  Right.  I recall that.

10          MR. CIANTRA:  And what has happened since then --

11    and this, I think, is most clearly brought out in the

12    excerpts from Governor Snyder's deposition that are attached

13    to both of the motions that UAW filed -- is that that common

14    interest has moved and morphed well beyond the issue of

15    authorization that was presented in September to basically

16    every element of -- every material element with respect to

17    the case, the development of the creditors' proposal, the

18    discussion of Article IX, Section 24, and its protections

19    here, consideration to be provided to creditors under the

20    proposed plan, consideration to be provided to the pensioners

21    under the proposed plan.  It has just morphed into

22    essentially a cloak with respect to -- and excuse me; it's

23    very dry -- with respect to all of the deliberations

24    involving the emergency manager and the state, and while, you

25    know, we concede the city is correct, there is an attorney-

1   client privilege that they have, the -- it should be
2   construed narrowly in light of the public interest that's
3   involved here.  The emergency manager by law is the governing
4   body of the City of Detroit.  He has executive and
5   legislative authority rolled into one.  His actions obviously
6   affect the 700,000 residents of the city, and people have a
7   right, we submit, to know what his deliberations are, how
8   policy is being formulated, and it shouldn't be cloaked under
9   a very broad and we would submit legally unsupported
10  construction of the attorney-client privilege.  Discovery has
11  been curtailed, and it has put us in a position where now we
12  are facing trial, and we have not been able to -- because of
13  the extensive theory of privilege that the state and the city
14  have adhered to, to develop facts fully in deposition and
15  otherwise.

16          We would submit that the assertion of the privilege
17  that the governor has made, as revealed in the deposition
18  transcripts that has been taken throughout the discovery, is
19  extensive beyond what was considered in the Court's September
20  19th ruling, and we would ask the Court to -- respectfully to
21  reconsider it because otherwise we have secrecy.  We have
22  public actors here, your Honor.  The public has to be able to
23  hold political representatives accountable for their actions.
24  They have to know what policy decisions are being made, and
25  right now this privilege ruling has cloaked that in secrecy.

1    I don't have anything else, your Honor, to state.

2    THE COURT:  Thank you.

3    MR. CIANTRA:  I don't know if Mr. Wertheimer, who

4  has joined the motions for the Flowers plaintiffs, has

5  anything he would like to add.

6    THE COURT:  Okay.

7    MR. CIANTRA:  Thank you for your consideration.

8    MR. WERTHEIMER:  William Wertheimer, your Honor.

9  First, I would like to join in the UAW's motion vis-v-vis the

10  city.  I did formally join on the papers the motion vis-a-vis

11  the state.

12    I just have two points in addition to what Mr.

13  Ciantra just argued.  One relates to the Snyder deposition,

14  which I participated in, and kind of what it revealed about

15  the scope of the privilege arguments now being made and how

16  far we are from the day in court where you made it a point of

17  indicating to the state that transparency was necessary here.

18  At the governor's deposition essentially privilege was

19  invoked as to the entire content of weekly meetings that the

20  governor had with the emergency manager for months as to the

21  entire scope of those meetings making it virtually impossible

22  to examine the governor as to any of that.  That's point

23  number one.

24    And just one other point, and that is that in the

25  normal case -- well, let me back up.  Per the agreement the

parties made and given the position of the governor, we

agreed to limit our discovery deposition to three hours.  In

the normal case where privileges are alleged on privilege

logs like what we have here, you have an opportunity to go

beyond the privilege log and the cursory explanation for why

the privilege is being invoked by at deposition asking

witnesses questions, detailed questions about the particular

meeting at which they're claiming a privilege, you know, what

the other subjects were, how long the meeting took, did the

lawyer do anything at the meeting, et cetera, as to key

documents.  We have not had that opportunity here just given

the time, and I'm not -- no one is at fault for that.  It's

going too fast.  We had three hours with the governor.  We

did appropriate examinations.  But I think in this

circumstance that it would make sense for this Court to

examine certain of the documents in camera in order to assure

that the Court's desire and everybody's desire for

transparency is met.  I think this is a special case.  I

don't think --

THE COURT:  Are you referring to documents other

than these six memoranda attached to the e-mail?

MR. WERTHEIMER:  I am, your Honor.  I'm referring

specifically to documents that are in dispute that are in the

state's possession.

THE COURT:  Can you identify them any more

1    particularly for me or the record?

2         MR. WERTHEIMER:  We've attempted to identify them to

3    the state by indicating in logs documents that covered a

4    particular -- what we believe to be a key time period was.

5    We've also attempted to limit the request in terms of those

6    in which Mr. Orr and Mr. Snyder were directly involved, but I

7    must admit to the Court it still involves, at least at this

8    point, in terms of our back and forth, a fairly large number

9    of documents that I would respectfully suggest that the best

10   way to proceed -- given the fact that the governor is going

11   to be testifying on Monday at trial, the best way to proceed

12   may be for the Court to get involved in terms of in camera

13   review.

14        THE COURT:  And these are documents which you claim

15   were improperly withheld pursuant to the common interest

16   exception?

17        MR. WERTHEIMER:  Not just common interest, your

18   Honor, also just documents where they claimed attorney-

19   client.  And we're not claiming -- we don't know whether

20   they're improperly withheld I guess is what I'm trying to

21   say.  We're claiming that they may be --

22        THE COURT:  You're concerned.  Okay.

23        MR. WERTHEIMER:  -- and that we should not have to

24   rely upon the cursory description of counsel given --

25        THE COURT:  Well, but in order for me to accede to

1 │ your request to look at documents, we have to have identified

2 │ what documents you want me to look at and what documents you

3 │ want the city or the governor or the state -- excuse me -- to

4 │ produce to me.

5 │      MR. WERTHEIMER:  What I'm -- I agree, your Honor,

6 │ and what I'm suggesting is we did make such an effort on a

7 │ preliminary basis with the state in trying to resolve it, but

8 │ I'm acknowledging that that effort would still -- if we stop

9 │ there, would still leave your Honor with a large number of

10 │ documents.  We could continue that effort.  I agree that that

11 │ would be necessary, but I still think that it calls for in

12 │ camera review of relevant documents or potentially relevant

13 │ documents.  And we're happy to work with the state to try and

14 │ limit what that -- what the documents would be.

15 │      THE COURT:  Well, when are you going to do that

16 │ given that we're in trial all day today, tomorrow, and

17 │ Friday?

18 │      MR. WERTHEIMER:  Well, if we can't, we can't, and

19 │ then I would suggest to the Court that the limitation which

20 │ we did communicate to the state should be the one the state

21 │ should use -- or that we should use.  And as I recall, there

22 │ were at least two attempts to limit the documents.  One

23 │ related to time; that is, we said we think that the judge

24 │ should be able to take an in camera look at documents between

25 │ key players from date A to date B, and I don't have in front

1  of me exactly what those dates were.  And, second, we

2  indicated that the documents directly between the governor

3  and the emergency manager over a broader period of time

4  should be subject to in camera review.  If there's no time to

5  do anything else, our position would be that the Court should

6  examine those documents in camera.

7       THE COURT:  All right.  Thank you, sir.

8       MR. WERTHEIMER:  Yes, your Honor.

9       THE COURT:  While you're sitting down, I would

10  suggest you try to figure out what those dates are.  That

11  would be helpful.

12       MR. SCHNEIDER:  Your Honor, Matthew Schneider on

13  behalf of the state.  Mr. Wertheimer has raised some issues

14  that relate to this and also to the other motion, so in

15  expediency here I can kind of respond to both.

16       THE COURT:  Please.

17       MR. SCHNEIDER:  The first issue here that Mr.

18  Wertheimer's -- or the UAW and Flowers objectors raised

19  relates to a March 12 e-mail, and the objection was that it

20  should have been produced without redactions.  Now, the state

21  disagrees, but we want to resolve this dispute, and we have

22  produced that anyway, so we're not waiving the attorney-

23  client privilege or altering the common interest agreement or

24  anything by doing that, but I wanted to let you know at least

25  one issue has been resolved.  Secondly --

```
 1            THE COURT:  When you say "has been resolved," you
 2    say you have or are willing to turn over the memos?
 3            MR. SCHNEIDER:  We have.  This is related to the
 4    March 12 e-mail.
 5            THE COURT:  March 12 --
 6            MR. SCHNEIDER:  It's an e-mail from Richard Baird to
 7    Kevyn Orr, and this was at issue.
 8            THE COURT:  -- 2012?
 9            MR. SCHNEIDER:  2013.
10            THE COURT:  Okay.
11            MR. SCHNEIDER:  Okay.  Secondly, there's another
12    argument that the state hasn't been specific on its privilege
13    log, and I think that's why this is kind of bleeding
14    together.  Again, the state disagrees.  We think the logs are
15    sufficient, but we've revised these anyway, and we've -- you
16    know, we're giving them to Mr. Wertheimer.  So, again, we're
17    not waiving anything, but we want to let the Court know that
18    we are working with them and are happy to do so.  But,
19    finally, third --
20            THE COURT:  It was a little frustrating that your
21    log didn't provide any identifying information regarding the
22    people involved other than their names.
23            MR. SCHNEIDER:  Well, we've corrected that.
24            THE COURT:  Where?  How?
25            MR. SCHNEIDER:  Well, Mr. Wertheimer asked for
```

1  additional information that's more specific on the privilege

2  log, and I believe we've done that, and --

3      THE COURT:  In the log itself because we looked at

4  the revised log -- at least I did, and all I saw were names?

5  Now, it's possible that I missed a page where the names were

6  identified, whether they're attorneys or officers of the

7  state or associated with the emergency manager.  I couldn't

8  tell who was who.

9      MR. SCHNEIDER:  My understanding is there's more

10  description about what actually is in there, but I will --

11  you know, I will continue to work with Mr. Wertheimer on this

12  so as to not -- not to delay.

13      The third issue here is relating to the common

14  interest agreement, and I think that's where the Flowers and

15  the UAW objectors are really going here.  The state's

16  position ultimately at the end of the day -- the state's

17  position is is that your order, your Honor, that you entered

18  on September 19 was correct, and we believe that it was

19  correct then and it's correct today.  And the new position

20  that the objectors are raising is essentially that there's no

21  common interest privilege before the filing.  This is -- as

22  the Court is aware, this has been brought to your attention

23  literally -- literally -- on the eve of trial.  There was a

24  deposition in which the Court invited the parties to contact

25  the Court in case there were concerns.  They never did that.

1   They never raised a written objection after the deposition.

2   It's beyond the 14-day rule, and there's no defect or no

3   error shown, so I think there's a waiver here, and,

4   therefore, it should be denied on that ground.

5        In addition, the common interest agreement here as

6   to the argument that the objectors are trying to find

7   information that antedate the appointment of the emergency

8   manager, if you look at the common interest agreement itself,

9   it states that this isn't just about the appointment of the

10   emergency manager.  It states that the parties have a common

11   interest in relation to the city's financial emergency and

12   the bankruptcy case and the emergency manager, so this goes

13   to a lot more than just the Chapter 9 filing.  It goes to the

14   financial emergency and things in connection with the policy

15   issues and the legal discussions related to that.  Thank you.

16        THE COURT:  Thank you.

17        MR. IRWIN:  Thank you, your Honor.  I will address

18   the motion to compel the Jones Day materials first and then

19   the motion for reconsideration.  The request that has been

20   made as it relates to core Jones Day internal research

21   memoranda it seems to us is antithetical to the work product

22   privilege, and we think the Court's analogy is exactly right.

23   If a client prepares a legal -- if a lawyer prepares a legal

24   memoranda to assist him or her or a team of lawyers in order

25   to deliver legal advice to a potential client -- a client or

1  a potential client, even before there is an attorney-client

2  relationship, that is wholly protected by work product if it

3  reflects the attorney's mental impressions and it puts him or

4  her in a position where they can deliver appropriate legal

5  advice.  And it shouldn't matter if that attorney-client

6  relationship is ultimately consummated or not.  It is an

7  inviolable attorney work product that is -- belongs to the

8  lawyer who prepared it and puts them in a position where they

9  can effectually do their jobs and deliver legal advice.

10         Now, what happened in this particular situation,

11  just to put a finer point on it, is I think not the subject

12  of any real debate.  Everyone knew that Detroit was in

13  trouble in late 2011 and that there were people working this

14  problem, and that included people from the state.  It

15  included people from the city.  It included numerous advisors

16  and consultants.  It involved numerous law firms, and there

17  were lots of people who wanted to get involved.  And Jones

18  Day had the opportunity to do just that, and we --

19         THE COURT:  So why doesn't it matter that the work

20  product was for the state, for the governor or state

21  officials, and the ultimate client wound up being none of

22  those but the city?

23         MR. IRWIN:  Well, I think it was all part of the

24  same problem.  I think that the entity that had the problem

25  here was the city, and I think the law firms like Jones

1   Day -- and I think that the papers that we submit support
2   that -- were hoping and expecting to be retained and engaged
3   by the city.  And it's not -- it shouldn't surprise anyone
4   that Jones Day would have been doing legal research in order
5   to put itself in a position to assist the city in that
6   regard, and so it really didn't matter which of the entities
7   was -- not engaging in the sense of an attorney-client
8   representation, but was discussing these matters with Jones
9   Day.  Jones Day had to put itself in a position where it was
10  able to represent the city effectively, and in order to do
11  that, it had to investigate this entire situation.  There was
12  a legal analysis that you would expect to have been done on a
13  number of levels, and we have, you know, memoranda that came
14  about as a result.  And if the Court would be --
15          THE COURT:  Well, okay, but what's the foundational
16  basis for the work product privilege that shields otherwise
17  relevant facts from discovery and suggests that that basis
18  should apply to memoranda such as you claim privilege for
19  here?
20          MR. IRWIN:  Well, it's if they're prepared in
21  anticipation of litigation, and as we've indicated in the
22  papers, that's a broad standard.  You don't have to
23  anticipate a specific piece of litigation.  You can
24  anticipate litigation broadly.  You can anticipate that this
25  is a city in financial crisis and that they are going to need

 1   assistance moving forward.  It might take the path of a
 2   Chapter 9.  It might not.  It might take the form of numerous
 3   private lawsuits against individual stakeholders in all of
 4   this.  And a law firm has to be able to explore those various
 5   options to put itself in a position where it can ably
 6   represent the ultimate client here, which turned out to be
 7   the city.
 8          We also -- your Honor, the -- we're having a hard
 9   time understanding the relevance here of the memoranda as
10   well.  We are happy to provide them to the Court in camera.
11   If the Court would like to see the memoranda, we have the
12   memoranda.  We can easily provide them, and the Court could
13   determine for itself if, in fact, it finds these memoranda
14   either surprising or relevant in some way.  And what we have
15   done here, your Honor, is we've proposed a structure or a
16   framework that I would submit is reasonably conservative
17   under the circumstances in terms of the number of privileges
18   and the nature of privileges that we could assert.  What we
19   have done here is we have, in fact, already released the --
20   many of the e-mails that reflect the conversations between
21   Jones Day lawyers and the folks in 2012 who were working on
22   this problem.  This, again, is before there's any attorney-
23   client relationship with anyone.  We've released those, and
24   we're not claiming those back.  We are seeking an order from
25   the Court is to protect our wholly internal memoranda or

1   internal deliberations, which conversations are not --

2           THE COURT:  Now, when you say "wholly internal" --

3           MR. IRWIN:  Yes.

4           THE COURT:  -- do you mean that these memoranda were

5   not shared even with the state officials?

6           MR. IRWIN:  We will make that determination, but we

7   believe there are memoranda at issue here that were not

8   shared with anyone from the state, so our -- we are asking to

9   be able to withhold our internal research memoranda even

10  though work product would protect that.  The work product,

11  because there's no waiver of work product, unlike attorney-

12  client, as long as you share it with someone who is in a

13  nonadversarial -- you share it in a nonadversarial way.  It's

14  not like attorney work -- it's not like attorney-client in

15  that regard.  We believe that we would still have work

16  product protection over those materials, and so we are asking

17  for the Jones Day research materials and the Jones Day

18  internal conversations about how to proceed here and how to

19  deliver advice should be protected.

20          Now, there comes a point in time later in 2012 when

21  a specific client opportunity presents itself in the form of

22  being hired by the city, in the form of this RFP process, and

23  the public document that is the pitch material that is in the

24  record already and that we not seeking to disclose, but

25  insofar as documents relating --

1          THE COURT:  You mean not seeking not to disclose?

2          MR. IRWIN:  I'm sorry, your Honor.  Yes.  It's in

3    the record right now.  We are not seeking to clawback or

4    anything like that.  That's not an issue here.  But we are --

5    we do believe that -- as the Court referenced, because pre-

6    engagement conversations between a lawyer and a potential

7    client are still protected by the attorney-client privilege,

8    we are seeking -- we are seeking protection for those

9    communications, communications -- outbound communications

10   from Jones Day in the retention period where we are receiving

11   confidential information and acting upon it.  We do think at

12   that period of time, attorney-client protection would attach

13   as well as attorney work product.  But in the 2012 time

14   period, which is what the UAW's motion is directed towards,

15   we are simply asserting work product for the Jones Day legal

16   research that was conducted to put ourselves in a position to

17   ultimately be hired in to assist the city.

18          THE COURT:  So are you telling the Court that you

19   don't have any objection to disclosing and don't claim work

20   product privilege as to any memoranda that was shared with

21   one or more state officials?

22          MR. IRWIN:  That's right.

23          THE COURT:  And have you already turned over all

24   such memoranda and communications that were given to state

25   officials?

1    MR. IRWIN:  No.  The answer is no, but we are

2    prepared to do that.  We are not standing on that.

3        THE COURT:  Okay.  Thank you, sir.

4        MR. IRWIN:  Yeah.  Does the Court wish to hear on

5    the motion for reconsideration?

6        THE COURT:  Yes.  Yes, I do.

7        MR. IRWIN:  Yes.

8        THE COURT:  If you'd like to address that, I'd like

9    to hear from you, of course.

10       MR. IRWIN:  I would, your Honor.  As we indicated,

11   we think this is late.  This is -- there is no -- there's

12   nothing in the papers that have been submitted that indicate

13   a good reason for reopening this.  There is no palpable

14   defect in the ruling, and there is nothing new.  There's no

15   new evidence.  There's no -- despite the fact that they occur

16   in the same motion, there's no linking of these two issues,

17   and so there's, therefore, no good reason -- and I haven't

18   heard one offered -- as to why this matter should be

19   reopened.  And the parties have, in fact, been relying on

20   this ruling in connection with all of the discovery

21   proceedings that have taken place since then.  We think the

22   ruling was sound.  The objectors have not indicated why there

23   is any reason to disturb the Court's analogy of a board of

24   directors and corporation counsel and the fact that they

25   should be permitted and need to talk to each other in order

 1   to reach a sound conclusion as to whether to do something
 2   like file for bankruptcy.  We think that's analogous here.
 3   The governor and his legal team and the emergency manager and
 4   his legal team need to be able to talk.  They need to be able
 5   to talk in confidence with regard to the common interest,
 6   which, again, this is counsel to what -- contrary to what we
 7   heard, broader than simply a Chapter 9 filing.  The common
 8   interest related to the city's financial -- the city's
 9   financial crisis more broadly and the right legal path
10   forward.  And insofar as the communications related to a
11   legal path forward, that privilege was properly invoked.  And
12   I do recall that the Court -- I read -- I was not here, but I
13   understand that the Court made itself available to the
14   parties if, in fact, there were specific questions because
15   it's very difficult to know exactly what form these questions
16   will take in making a ruling, and I believe the Court offered
17   its services to the parties if, in fact, there was any
18   impasse at the depositions, and I don't believe any objectors
19   took advantage of that, and so we believe that under the
20   circumstances, given that the ruling was fundamentally
21   correct, that there was no attempt at the time to seek
22   further court intervention and that we've been relying on
23   these rulings going forward, that there is no reason to
24   overturn them at this time.
25           THE COURT:  Thank you, sir.

1          MR. IRWIN:  Yeah.

2          THE COURT:  Brief rebuttal.

3          MR. CIANTRA:  Just very briefly, your Honor.  I just

4    want to draw the Court's attention to a couple of matters.

5    First, with respect to the Jones Day memos, to the extent the

6    Court determines to review the memoranda in camera, we'd

7    request that the Court also review the cover e-mail that

8    enclosed the memoranda.  And I'm not --

9          THE COURT:  This was an e-mail from who to whom?

10         MR. CIANTRA:  This was an e-mail from Heather Lennox

11   of Jones Day to certain of her partners at Jones Day that

12   references the meeting with the governor, and I'm not going

13   to read the e-mail because they've claimed in the October

14   15th correspondence to myself that it's privileged, but it

15   goes to the -- I think goes to the issue that the Court was

16   addressing with respect to --

17         THE COURT:  So these memoranda are internal in the

18   sense that they were not shared with any officials of the

19   state or the city?

20         MR. CIANTRA:  It is unclear to me that that can be

21   said with any degree of assurance, and it seems entirely --

22         THE COURT:  Well, but Mr. Irwin states it here on

23   the record.  Do we doubt it?

24         MR. CIANTRA:  I did not hear that.  I did not hear

25   him say definitively that those memos were not shared with

1  anyone at the state, and from the --

2          THE COURT:  Well, let's just ask to be sure.  Mr.

3  Irwin.

4          MR. IRWIN:  We will -- I will absolutely

5  investigate.  That's part of what we're saying.  We will

6  investigate that, and we'll have a clear answer.

7          THE COURT:  Oh, all right.

8          MR. CIANTRA:  So we don't have --

9          THE COURT:  So there you go.

10          MR. CIANTRA:  So we don't have a clear answer, but I

11  would suggest that if you -- if the Court reviews the e-mail

12  that they are claiming privilege with respect to, the

13  conclusion can be drawn that the substance of those memos was

14  surely shared in that meeting, and it would seem, at a

15  minimum, that would arguably constitute a waiver along with

16  the production of the pitch materials, which go into

17  considerable detail with respect to the legal theories that

18  were involved here.

19          THE COURT:  All right.

20          MR. CIANTRA:  The second issue I just wanted to just

21  very -- just brief clarification with respect to the

22  privilege logs.  We filed -- we requested that the state

23  supplement the privilege logs, and that is in the

24  correspondence that is attached to the motion that we filed

25  with respect to the state because there was no specification

1  in certain cases of who was involved in the communications,

2  who authored them, who received them, or the subject matter

3  of many of the -- of all of the communications, so we had no

4  way to assess the assertion of privilege based on the logs.

5  In response to that correspondence, they revised the logs, so

6  this is what the Court referred to, but we only received

7  those within the past day or two --

8            THE COURT:  Right.  I know.

9            MR. CIANTRA:  -- so we haven't had the opportunity

10 to, you know, line that --

11           THE COURT:  Right.

12           MR. CIANTRA:  -- up, but I just wanted the record to

13 be clear with respect to that.

14           THE COURT:  No.  I appreciate that very much.

15           MR. CIANTRA:  Yeah, yeah.  Obviously with respect to

16 the -- having not filed this within 14 days, your Honor,

17 obviously the discovery here was enfolding well past the

18 deadline for the production, and we have not -- we've done

19 the best we could.  This was not an intentional delay on our

20 part.  As these issues developed, it became clear to us that

21 the scope of what was being withheld we felt was inconsistent

22 with what the Court had permitted.

23           THE COURT:  All right.  I'm going to take this under

24 advisement until ten o'clock, and I'll give you a decision

25 then.

```
 1          THE CLERK:  All rise.  Court is in recess.

 2      (Recess at 9:49 a.m., until 10:00 a.m.)

 3          THE CLERK:  All rise.  Court is in session.  Please

 4  be seated.  Recalling Case Number 13-53846, City of Detroit,

 5  Michigan.

 6          THE COURT:  All counsel are present.  Ma'am.

 7          MS. GREEN:  Good morning, your Honor.  I apologize.

 8  I think our motion got lost in the shuffle.  The Retirement

 9  Systems filed a similar motion to the UAW's.  I just have a

10  few --

11          THE COURT:  I was actually going to hear it after,

12  but if you'd like to be heard now, that's fine.

13          MR. GREEN:  Oh, you know, I just -- it dovetailed

14  with what they were arguing, so I just had a few points --

15          THE COURT:  Okay.  Go ahead.

16          MS. GREEN:  -- to raise.  The first thing I wanted

17  to add is that at the time we drafted our motion, we thought

18  that the June 5th, 2012, e-mail was being reasserted as

19  privileged.  Mr. Irwin in his argument this morning has said

20  that they are not waiving privilege -- or they are now

21  waiving privilege to that.  It is back in the record.  So to

22  clarify, the e-mail does say that the memos were shared with

23  the treasurer.  It says they were memos that we did for Andy.

24  I presume that means they were shared with him.  I don't know

25  if that's actually true or not, but the memo does seem to
```

1    indicate that they were shared with a third party.

2         As far as the work product analysis, in our brief we

3    went through the relevant standard in the Sixth Circuit, your

4    Honor, and I don't believe that we talked about that yet

5    today.  There's a two-part test.  The first part of that test

6    is whether the document was prepared, quote, "because of the

7    party's subjective anticipation of litigation, as contrasted

8    with ordinary business purpose, and (2) whether that

9    subjective anticipation was objectively reasonable."  And,

10   furthermore, the driving force behind the preparation of the

11   document is what is key, and we assert that the "because of"

12   part fails.  They did it because of the fact that they were

13   trying to prepare themselves for the prospect of being hired,

14   not because of the fact that there was actually anticipated

15   litigation.  And, moreover, it's very attenuated that in 2011

16   they had some kind of crystal ball that they knew two years

17   from now they were going to be in this courtroom arguing

18   about eligibility under Chapter 9.  And we did cite case law

19   in our brief.  You had asked counsel this morning if there

20   was any case law regarding some kind of temporal factor, and

21   we cited two cases.  One states, "the mere fact that

22   litigation does eventually ensue does not, by itself, cloak

23   materials with work product immunity," so between that and

24   the next case that we cited, "The abstract possibility that

25   an event might be the subject of future litigation will not

1  support the claim of privilege," I think those are

2  dispositive. This was two years before any of this even

3  arose.

4         Furthermore, I think that goes to whether or not the

5  anticipation of litigation could be objectively reasonable.

6  I don't know how two years prior to the litigation it could

7  be objectively reasonable that, number one, PA 4 still had to

8  get past the referendum. Number two, it was ten months

9  before the EM was hired even if you assume that these were

10  prepared in June of 2012 when the memo -- memos were shared

11  with the governor or with Andy Dillon. They may have been

12  prepared prior to that. We don't know. Moreover, the EM had

13  to be appointed. PA 436 had to become effective. All of

14  these things had to happen before we could be here today, and

15  Jones Day had to be retained. So there are like at least

16  five or six major contingencies that had to occur before the

17  actual litigation would ensue.

18         Furthermore, even if they can establish the work

19  product, which we don't think they can, they still have to

20  overcome the waiver issue, and I don't -- I think that today

21  is a further example that they have selectively waived. They

22  waived the memo itself but not the attachments. Today the

23  state stood up and said, you know, "We have an e-mail from

24  March 3rd, 2013, between Kevyn Orr. There are two attorneys

25  on it from the State of Michigan. But to be cooperative, we

1   will give you that e-mail." Well, if they're saying it's

2   privileged but they're giving it to us, to me, again, that's

3   a selective waiver. They just give us what they want when

4   they want it, but they keep what they want as well, and I

5   don't see how they get past that.

6           In addition, my last point would be it's still not

7   clear who the client is that Jones Day is claiming they've

8   been representing. No city official, to my knowledge,

9   through any of my review of these documents or the e-mails --

10   there is not a single city official that is ever cc'd, bcc'd,

11   you know, sent the memos. It's purely between Jones Day

12   attorneys, Miller Buckfire, Huron Consulting, all of these

13   advisors that, again, when I think it comes to waiver,

14   clearly these are third parties and not the potential client.

15           The last point I will make because I want to be

16   brief -- I know you are ready to rule, I think -- is that I

17   think the wrong standard was stated earlier by the city. He

18   said that there's a different standard for waiver of the

19   attorney-client privilege versus work product, and that is

20   not true in the Sixth Circuit. We cited two cases in our

21   brief. The first one is New Phoenix Sunrise, and it says,

22   "Both the attorney-client privilege and work product

23   protection are waived by voluntary disclosure of private

24   communications to third parties." We also cited the In re.

25   Columbia case also --

1          THE COURT:  I'm sorry.  Are waived by what?  I just
2     didn't hear what you said.
3          MS. GREEN:  Disclosure of private communications to
4     third parties.  And he had said that some sort of different
5     standard applied when it was work product versus attorney-
6     client, and we also cited the In re. Columbia case that said
7     the same thing.  There's no compelling reason for
8     differentiating waiver of work product from waiver of the
9     attorney-client privilege, so to me it's a distinction
10    without a difference to say, "Well, we gave it to," and I
11    think the quote he said a minute ago was, "numerous
12    consultants and advisors as well as the state."  And to me
13    that is disclosing it to third parties; therefore, it was
14    waived when it was created a year or two ago, not to mention
15    the fact that as part of this litigation, they have
16    selectively waived certain e-mails that somewhat have to do
17    with this subject matter in that they relate to, for
18    instance, reviewing the consent agreement or reviewing and
19    commenting on PA 4 and the analysis related to PA 4.  And we
20    cited case law in our brief stating that if you waive the
21    privilege on selected pieces, you, therefore, waive it as to
22    the entire subject matter, and, therefore, you can't
23    selectively say, "Well, you can have the e-mail, but you
24    can't have the attachments," or, "You can have this e-mail,
25    but you can't have this e-mail."  So we would say that the

1  entire privilege has been waived by selectively waiving it as

2  to a few e-mails here and there.  Those are my comments.

3           THE COURT:  Thank you.

4           MS. GREEN:  Thank you.

5           MR. IRWIN:  I'll simply respond to those few points

6  that counsel made.  The first, in connection with whether the

7  timing of all of this should make a difference, I would

8  submit that that is arbitrary.  There are lots of things that

9  could have happened in the middle of 2012 that would have

10  been litigation events.  Maybe they didn't, but that doesn't

11  mean that at the time that all of this was being considered,

12  when legal advice -- or when Jones Day was considering some

13  of these issues, they weren't anticipating litigation.  It is

14  fortuitous that this happened two years later, actually, a

15  year and a half later or one year later, but that doesn't

16  mean that either potential clients or Jones Day were not

17  working in anticipation of litigation, which, as we indicated

18  in our brief, does not need to be a specific litigation

19  event.  You can anticipate litigation broadly.  You never

20  know what form it will take.  You know there are going to be

21  fights.  You know there will be disputes.  You don't know if

22  it'll be a private -- private lawsuits.  You don't know if

23  it'll be a Chapter 9 filing, but you can anticipate the need

24  for legal advice in an adversarial proceeding in some form

25  and meet the standard.

1    In terms of select -- whether there's been selective
2  waiver or subject matter waiver, as counsel suggests, this is
3  I think fundamentally incorrect.  The standard for subject
4  matter waiver is whether documents have been disclosed.  It's
5  the shield and sword problem.  It's if documents have been
6  disclosed and counsel intends to rely on them affirmatively
7  and yet withholds the balance of the documents that, in
8  fairness, should be considered, and I think this is codified
9  pretty clearly in the advisory committee notes to Federal
10  Rule 502 where they say, "Thus, subject matter waiver is
11  limited to situations in which a party intentionally puts
12  protected information into the litigation in a selective,
13  misleading and unfair manner.  Under both Rules, a party that
14  makes a selective, misleading presentation that is unfair to
15  the adversary opens itself to a more complete and accurate
16  presentation."  We are not -- we, the city, are not using any
17  of these materials affirmatively.  They are not on our
18  exhibit lists.  We are not introducing them through
19  witnesses.  We are not using them to our advantage that
20  should open us to some sort of claim of subject matter waiver
21  or selective disclosure under the rules.

22    And then lastly, I think fundamentally there is --
23  and I believe this is black letter law -- there are different
24  standards for whether there is waiver by disclosure under
25  attorney work product as opposed to attorney client.  If you

1  disclose attorney-client communications to a third party, you

2  are much more likely to be deemed to have waived that

3  privilege, but with attorney work product, you can make

4  disclosures.  And as long as they are disclosures to parties

5  who are nonadversarial, then you can still enjoy that

6  protection.  And that is a fundamental difference between the

7  two privileges.  It is not something where they are -- where

8  disclosures to folks who are within the potential group of

9  clients or advisors who are working these problems operates

10 to waive the privilege.  And I think we've demonstrated that,

11 your Honor.

12        THE COURT:  I want to -- I want to be sure the

13 record accurately reflects your position regarding what's to

14 be disclosed and what isn't.  Is it correct that to the

15 extent any of these memoranda that were attached to this June

16 2012 e-mail from Ms. Lennox were disclosed to state

17 officials, you are willing to make them available to counsel

18 here?

19        MR. IRWIN:  Yes, your Honor, but the e-mail itself

20 suggests -- if memoranda was prepared to prepare a Jones Day

21 lawyer for a meeting with counsel, that would not be.  It's

22 not my understanding of what we're talking about.

23        THE COURT:  Okay.  But you don't know which of the

24 several memoranda were shared and which weren't?

25        MR. IRWIN:  We'll do that.

1          THE COURT:  How will you determine that or --

2          MR. IRWIN:  Because we have the -- the Jones Day

3    lawyers are accessible, and we can figure that out.

4          THE COURT:  All right.  Thank you.

5          MS. GREEN:  I have a brief rebuttal.

6          THE COURT:  Yes, of course.

7          MS. GREEN:  I think the hypo that you stated earlier

8    compared to what he just said -- you know, these were memos

9    preparing a Jones Day lawyer to go seek work -- is different

10   than the hypo that you stated earlier, which was you meet

11   with a client who wants to meet with you for the purpose of

12   retaining you, and you may make notes.  That's different to

13   me than, "I did memos to prepare myself to go pitch a

14   client."  To me those are two different scenarios, and

15   there's a distinction, I think, between did the state ask for

16   this work, or was Jones Day just doing it internally, again,

17   to prepare.  I think those are two distinct scenarios.

18          One other thing that occurred yesterday, you made a

19   note on the record about PA 4 and that perhaps the intent

20   behind the appropriation -- the inclusion of the

21   appropriation was a factual issue for this trial, and I think

22   that some of the e-mail correspondence may go to that issue,

23   quite frankly, because the PA 4 appropriation was extensively

24   discussed in all these e-mails, and for that reason I think

25   there is a possibility that it would become relevant to a

 1   separate issue than what Mr. Ciantra stated this morning,

 2   which was the good faith and the bad faith issues and things

 3   like that.

 4          The last thing I would offer is our Exhibits 31

 5   through 65 have a lot of the e-mail correspondence that has

 6   been produced by the city, and there is a lot of, I guess,

 7   internal -- what they would consider their internal work

 8   product in those e-mails.  I don't concede it's work product,

 9   but according to what they are defining as work product, it's

10   in those e-mails, and it's already been produced, and it's

11   been waived.  So if you'd like to look at those e-mails to

12   sort of familiarize yourself with what we're talking about,

13   I've produced a copy of our binder for your clerk this

14   morning if you'd like to look at those.  Thank you, your

15   Honor.

16          THE COURT:  All right.

17          MS. BRIMER:  Your Honor, I'll be very brief.

18          THE COURT:  Why should I hear you?  You're not a

19   party to these motions.

20          MS. BRIMER:  I understand that, your Honor.  I want

21   to clarify one matter on the record that Ms. Green made,

22   and --

23          THE COURT:  I will let you clarify a statement on

24   the record, but I can't let you argue on one side or the

25   other of these motions.

1       MS. BRIMER:  That's fine, your Honor.  And Ms. Green

2  raised the issue of your ruling on Monday with respect to the

3  intent of the appropriation in PA 4, and I want to be sure

4  the record is very clear that it's the appropriation in PA

5  436 that your Honor ruled may be a factual issue that prior

6  to that was not considered a factual issue.  I want to be

7  sure the record is very clear on that, which law we are

8  addressing, your Honor.  It may have an impact on the memos.

9  Thank you.

10      THE COURT:  Thank you, I guess.  All right.  On the

11  issue -- on the first issue, which is the motion for

12  reconsideration of the Court's previous ruling on the common

13  interest doctrine, the Court concludes that the record does

14  not establish cause to consider that motion out of time, and,

15  accordingly, for that reason alone, the motion is denied.

16      But having said that, I want the record to be clear

17  and the parties to understand that to the extent a question

18  is asked of a witness and either a witness or counsel on the

19  witness' behalf claims attorney-client privilege and asserts

20  the common interest doctrine or any other privilege, for that

21  matter, the Court will take a fresh look at that and consider

22  counsel's arguments relating to that.

23      On the motions to compel, the Court appreciates the

24  city's willingness to disclose to counsel for the objecting

25  parties whatever memoranda it shared -- the city's counsel,

1  Jones Day, shared with state officials and would request that

2  that disclosure be accomplished as promptly as possible.

3      To the extent, however, that the moving parties seek

4  a ruling from the Court that the mere fact that memoranda or

5  other documents that would otherwise be protected by the work

6  product doctrine were prepared pre-retention means that they

7  are not protected by that doctrine, the Court must reject and

8  overrule that position.

9      Accordingly, to the extent that the city is

10  maintaining this privilege as to any of these memoranda that

11  were attached to Ms. Lennox's e-mail or any other memoranda,

12  for that matter, the Court will look at them in camera and

13  ask the city to produce them for that purpose, again, as

14  promptly as possible.

15      As to the documents that Mr. Wertheimer suggests

16  were improperly withheld in discovery, this presents a more

17  challenging request if only because the documents that are

18  the subject of Mr. Wertheimer's request are not identified,

19  and so, Mr. Wertheimer, all I can do in that regard is ask

20  you to identify, again, as promptly as possible, what

21  documents or range of documents you seek the city to be

22  compelled to disclose, review that with the city, and to the

23  extent you can't work it out, we will take a break from our

24  trial whenever you are ready and work our way through it.

25      MR. WERTHEIMER:  Yes, your Honor.  I believe you

1  meant the state.

2          THE COURT:  The state.  I did.

3          MR. WERTHEIMER:  Yes.

4          THE COURT:  Thank you.

5          MR. WERTHEIMER:  Thank you, your Honor.

6          THE COURT:  All right.  So are there any other

7  issues still open before we begin our opening statements?

8          MR. SCHNEIDER:  Your Honor, there is one, and that

9  is because there has been discussion about the trial

10  subpoenas that were issued to the governor, the treasurer,

11  Mr. Baird, and Mr. Ryan.  The last time I appeared before

12  you, I argued -- I opposed that.  I want the Court to know I

13  am not going to file a motion to quash.  The governor, in the

14  spirit of cooperation and because he wants to move this

15  proceeding along, is willing to testify, and we have made --

16  we will make all of those state witnesses available.  And we

17  believe that Monday between 1 p.m. and 3 p.m. the governor

18  would be available, and we think the other witnesses -- well,

19  the other witnesses will be available on Monday or Tuesday.

20          THE COURT:  Thank you.

21          MR. DECHIARA:  Good morning, your Honor.  Peter

22  DeChiara from the law firm of Cohen, Weiss & Simon for the

23  UAW.  The UAW and the <u>Flowers</u> plaintiffs appreciate the

24  state's decision to change its position and to produce the

25  state witnesses.  We just want to be careful to note for the

1  record that there's been no agreement that there should be

2  any set time for the testimony of the state witnesses,

3  including the governor.  While we realize the governor has a

4  busy schedule, it is also our view that the governor, perhaps

5  with the exception of Mr. Orr, is maybe the most important

6  witness in this case, and given the significance of his

7  testimony and given the significance of the fact that there

8  may be documents we may have to examine him on which we have

9  not yet seen, we would just want to note for the record that

10  there's been no agreement that his testimony would be limited

11  to two hours.  Thank you.

12        THE COURT:  Thank you.  Mr. Schneider.

13        MR. SCHNEIDER:  As of this point, your Honor, I fail

14  to see the reason for the objector's argument that the

15  governor would require to testify for a lengthy period of

16  time.  This Court is well aware of the governor's situation

17  and who he is in the state.  He is willing to do this, but I

18  think we will have to work with the objectors as to timing.

19        THE COURT:  Well, I would certainly encourage that,

20  but it's not for a witness who appears in any court to

21  condition his appearance on a specific time limit.

22        MR. SCHNEIDER:  He's certainly not doing that.

23  That's certainly not the case.

24        THE COURT:  The UAW certainly interpreted it that

25  way, and, frankly, I did, too.

1          MR. SCHNEIDER:  Well, I'm sorry about that, your

2     Honor, but I can tell you, as I indicated before, the

3     governor wants to be cooperative --

4          THE COURT:  All right.

5          MR. SCHNEIDER:  -- as possible.

6          THE COURT:  Good.  Thank you.  All right.  We do

7     have to get to the issue of the amended joint final pretrial

8     order.  If I read it correctly, one or more of the objecting

9     parties decided after our final pretrial conference to object

10    to a certain small number of exhibits, and the state was --

11    or excuse me -- the city was not willing to allow for a

12    statement of such a late asserted objection.  Is that what

13    this is about?

14         MR. ULLMAN:  Not really, your Honor.

15         THE COURT:  Not really?

16         MR. ULLMAN:  Not really, not in our view.

17         THE COURT:  Oh, so you're withdrawing your

18    objections?

19         MR. ULLMAN:  No.  Should I -- may I speak?

20         THE COURT:  Please.

21         MR. ULLMAN:  No.  The issue is not that we're trying

22    to add new objections.  This whole --

23         THE COURT:  So you're not trying to add new

24    objections --

25         MR. ULLMAN:  We are maintaining the same --

1           THE COURT:  -- so to the extent there are new
2   objections, we can strike them.
3           MR. ULLMAN:  No, your Honor.  Let me try to explain.
4   We had always told the state -- the city that for this subset
5   of documents -- I believe there are six of them -- that we
6   were not opposing admissibility in general, but we believe
7   that they were admissible for limited purposes only to show
8   that these documents were said, that they were, you know,
9   created, that they were given to people.  We weren't
10  contesting that they're authentic documents, but we spoke
11  with Mr. Irwin and told him but at the same time -- that's
12  why we're not contesting admissibility in general -- we do
13  not agree that they're admissible for the truth of what they
14  say.  Some of these documents have forward-looking
15  projections that we don't think there's been an adequate
16  foundation for, and in our discussions with Mr. Irwin, he
17  said, "Yeah, we understand that.  We're not asking you to
18  concede to the truth of what's in there."  And we said,
19  "Fine.  On that basis" --
20          THE COURT:  Well, but hang on.  The admission of a
21  document into evidence or the agreement of the admission of a
22  document into evidence is not a stipulation to the truth or
23  credibility of the document.  It just means that it meets the
24  criteria for admissibility under the rules.
25          MR. ULLMAN:  And that may be all that's going on

1 here. The reason this came up is because I had heard -- I
2 was not here at the legal argument yesterday, but I had been
3 told that your Honor had indicated that if a document did not
4 have a note on it saying there was some sort of objection, it
5 would be admitted for any and all purposes, at which point I
6 said to Mr. Irwin, "Wait a minute. There's a couple of
7 documents here that we know from our discussions" -- you
8 know, they're limited for -- we agree they're admissible for
9 limited purposes only, and we have the right --
10 THE COURT: Well, but what -- for what purpose do
11 you assert these six documents are not admissible for?
12 MR. ULLMAN: Just for the truth of what's in them,
13 the hearsay, expert opinion, and then lack of foundation.
14 Some of these have forward-looking numbers or values in them
15 as to the amount of the unfunded pension liability, and for
16 those we're saying we don't disagree that you gave these
17 documents out, but we're not agreeing that the numbers that
18 are in there are necessarily true numbers. That's all we're
19 saying. That was understood from day one with discussions
20 with Mr. Irwin, and we just wanted to make sure that your
21 Honor -- that if the document came in, that your Honor would
22 not assume that everything that was in it on these -- on
23 these six documents was true. That's all that we cared
24 about. We don't deny that they were either created, that
25 they were given to people, and for that purpose we have no

1    problem with admission.  And it may have been that we

2    misinterpreted what your Honor said.

3            THE COURT:  I'm having a hard time comprehending

4    what you're saying, frankly.  If a piece of evidence has

5    hearsay within hearsay --

6            MR. ULLMAN:  Um-hmm.

7            THE COURT:  -- which I think is what you're talking

8    about here; right?  The document itself is hearsay.

9            MR. ULLMAN:  Okay.

10           THE COURT:  And it contains hearsay statements.

11           MR. ULLMAN:  Yes.

12           THE COURT:  Okay.  If the document is admitted,

13   opposing parties waive -- if they agree to the admission,

14   they waive both hearsay objections.  That does not mean that

15   that party is stipulating to the truth of any of that

16   hearsay.  It just doesn't mean that.  All it means is it's

17   evidence.

18           MR. ULLMAN:  Okay.  And if, you know, I had been

19   given a misinterpretation or a misapplication of what your

20   Honor indicated the other day, then you're right.  This is a

21   moot issue, and there is no problem based on what your Honor

22   said.  I think that's true.

23           THE COURT:  Okay.  All right.  Then in that event,

24   the Court will enter the amended final pretrial order, and

25   based on the list of documents that are shown as having no

1    objections, the Court will prepare an order admitting all of

2    those documents into evidence.  Okay.  Opening statements.

3           MR. BENNETT:  One second, your Honor.  Good morning,

4    your Honor.  I'm assuming that you want to hear from us

5    first, notwithstanding that the order was different in the

6    other -- in the legal issues proceedings, but, in any

7    event --

8           THE COURT:  Well, you have the burden of proof;

9    right?

10          MR. BENNETT:  Correct.

11                       OPENING STATEMENT

12          MR. BENNETT:  First of all, I want to make crystal

13   clear -- many people have in different environments -- that

14   I'm not going to speak about any arguments that came up in

15   the context of the legal argument part of the proceedings.

16          THE COURT:  Thank you.

17          MR. BENNETT:  I appreciate that part, too.  And I'm

18   going to confine myself to the issues -- or the parts of the

19   eligibility standard and the part of 521(c) that have some

20   factual disputes that have been identified in connection with

21   them.  And toward the end I do want to spend a minute on the

22   materiality of facts relating to legislators' or governors'

23   intent relating to statutes because I think it was not

24   something that we did cover when we were here before.

25          So, first of all, I'm going to start with the issue

1   of insolvency, and what I'm going to say about that because I

2   could stand here for hours describing the evidence that is

3   going to come in on that subject, but I'm not going to do

4   that -- I'm going to say simply that the witnesses that we

5   will present on the subject are going to present a mountain

6   of evidence showing insolvency of the city.  Sadly, that

7   evidence will show that the city is insolvent on every

8   relevant standard.  And, your Honor, there's been at least

9   intimated in a lot of the papers about the significance that

10  no expert report has been submitted.  Quite frankly, that is

11  because no expert report is required.  This is one of those

12  cases where the data speaks very clearly and persuasively on

13  its own -- it needs no gloss -- and that only AFSCME is

14  objecting on the insolvency point, at least as I read the

15  papers, itself speaks volumes.

16          I want to say that from the near term perspective,

17  the city did not run out of cash because -- only because

18  actions were taken to prevent that from happening.  The

19  evidence will show that if the city just kept on paying debts

20  as and when they were becoming due, cash would have run out.

21  The fact that the city stopped doing that is the only reason

22  why there are positive cash balances.  As I said before,

23  there's no question that if the actions were not taken, cash

24  would have run out.

25          I will also say that the steps that the city took

1  during past years to pay many of its debts as they become due

2  didn't turn out particularly well.  One of the consequences

3  you'll see in the evidence and, in fact, a good document to

4  keep around at all times is the proposal for creditors dated

5  June 14th.  There's a section there that deals with this.  It

6  shows that there were numerous secured borrowings made to

7  create liquidity in the city in past years when there were

8  similar cash flow problems.  Each and every one of those

9  borrowings were done on a secured basis, and so the

10  consequence that we face today is that those borrowings

11  consume a very significant amount of cash otherwise available

12  for creditors generally, so that was -- so avoiding a

13  liquidity problem in the prior periods didn't exactly work

14  out well from the perspective of many other creditors.

15       Also, as will come into evidence, pension

16  contributions were deferred during at least the past two

17  fiscal years with the effect that the underfunding under

18  anyone's measure -- we don't have to worry about the fight

19  between the different measures of pension underfunding.  It's

20  greater than it might otherwise have been.

21       Finally, on the insolvency point, you are going to

22  hear from several witnesses, but most importantly perhaps

23  Chief Craig, about the fact that the city is failing to

24  provide basic services to its residents.  We don't think

25  about that as another one of the creditor claims or

1   obligations, but the reality is it's as important as anything

2   else.  As we've indicated before and as the witnesses will

3   indicate, without solving that problem, there may not be a

4   city to reorganize.

5          Now, AFSCME makes a few points that are worth

6   discussing how the evidence will deal with them.  First, much

7   is made over the dispute about the underfunding amount, and

8   it is asserted that because there's a dispute of the

9   underfunding amount, the city can't demonstrate it's

10  insolvent.  Well, as your Honor knows, the insolvency test

11  focuses on cash flow.  It focuses on near term and longer

12  term cash flow type measures, and in that connection, there

13  are cash flows that will be put into evidence.  There's also

14  a convenient place to find them in the proposal for

15  creditors.  There's different versions with different levels

16  of updates and different assumptions that are baked into

17  them, but the line items that talk about pension

18  contributions your Honor is going to learn don't change very

19  much whether you use the city's assumptions as to

20  underfunding amount or the city's calculation of underfunding

21  amount or the Gabriel, Roeder calculation of underfunding

22  amount, Gabriel, Roeder, of course, being the actuaries

23  retained by the pension funds, the pension fund management

24  themselves, to give them advice.  And so your Honor will be

25  taken through the numbers, and you will find that the

1  contribution amounts, which are the relevant numbers in the

2  insolvency calculation, don't move around very much

3  notwithstanding the very different calculations of

4  underfunding amounts, and the reason for that will be

5  explained.  Mr. Moore of Conway MacKenzie will be the witness

6  that will cover that area.

7       There's also a little bit of numerical confusion

8  concerning the percentage of the city's contribution to the

9  GRS Pension Fund that is attributable to DWSD employees.  You

10  will see in the papers a number bandied around, 62 percent.

11  Well, actually, the number is the reverse of that.  It's 38

12  to 39 percent.  Mr. Orr got that wrong in his deposition.  He

13  corrected it at the end, but, of course, the correction

14  wasn't cited in the papers.  There will be evidence on the

15  point so there won't be confusion on the point as we go

16  forward with the numbers.

17       Then AFSCME says that the city deferred sales of

18  assets, and they talk about two examples.  We will

19  demonstrate, of course, that that is not true.  First of all,

20  the Belle Isle deal, Belle Isle leased to the state in

21  exchange for the state taking over the maintenance and CAPX

22  requirements with respect to Belle Isle, never involved the

23  generation of incremental spendable cash.  It did and always

24  has involved a reduction of the cost on the city to maintain

25  Belle Isle.  And what the evidence will show is that those

1  anticipated savings were included in the projections that
2  were the basis for insolvency calculations, and they are in
3  the projections.  They're the basis for the proposal for
4  creditors or at least the lead-up to the proposal for
5  creditors in the June 14th presentation.

6          It's also very hard for us to understand how anyone
7  can say that art sales were deferred.  It is common
8  knowledge -- and I suspect we'll figure out a way to get this
9  into evidence as well -- that there's an attorney general
10 opinion out there that basically says that the art can't be
11 sold for creditors.  We, unfortunately -- in the absence of
12 some form of an agreement, there are no sales possible
13 without a significant change in current management of the
14 museum or litigation and -- maybe and/or litigation relating
15 to some of the points made in the attorney general's opinion.
16 There were no pre-filing opportunities to liquidate art.

17         Next, AFSCME talks about the swap deal, which, of
18 course, your Honor is familiar with because it's before you
19 in still another adversary setting in this case.  The swap
20 deal itself, you will hear, does not provide adequate cash
21 relief, but the transaction hasn't been approved yet.  And
22 there is, unfortunately, no assurance as we stand here today
23 and certainly as we stood here several months ago, that it
24 will be done.  It turns out that some of the objectors in
25 this proceeding are also objectors in that one, and so I'm

1  | not sure how we're supposed to even count the anticipated

2  | cash flow relief attributable to the swap transaction as

3  | something that could have even affected the city's insolvency

4  | calculations.

5  | And lastly, there is the assertion -- and I'm

6  | anxious to hear what the evidence will be to support this

7  | one -- that the appointment of the emergency manager

8  | prevented the city from taking actions designed to raise

9  | revenue and avoid insolvency. Of course, in the briefs that

10 | have been filed, there is no suggestion about exactly what

11 | steps those are that the City Council or the mayor or whoever

12 | else has been displaced in the view of AFSCME have been

13 | planning and anxious to implement that would solve the city's

14 | financial problem. No such actions have ever been specified.

15 | We have no idea where that evidence is coming from. It will

16 | be quite a surprise if there is any.

17 | It was for these reasons, the insolvency and the

18 | fact that there really weren't anything left, that the city

19 | or the state could think of to do to address the problems

20 | that the June 14th presentation was put together, and it

21 | proposes a plan that includes significant reductions in the

22 | city's obligations, including bonds, including other post-

23 | employment benefits, including other unsecured claims, and

24 | including pension underfunding claims. Whatever the law

25 | turns out to be concerning protections to be afforded to

1  various claims, there is no law prohibiting the city from

2  trying to commence negotiations to resolve its financial

3  problems, and that's what we were trying to do.

4          Now, while we're near this subject, there is an

5  issue that ripples through actually several of the standards,

6  which is whether or not the proposal that's included in the

7  proposal to creditors -- and I'm referring to the materials

8  that are, I think, between pages 101 and 109 or thereabouts

9  of that document -- whether that proposal was a -- was close

10 enough to a confirmable plan of adjustment to qualify for the

11 purposes of, open paren, one, demonstrating that the city

12 desires to implement a plan; open paren, two, that the city

13 was in good faith as part of the good faith negotiations

14 because they had to be talking about a certain kind of plan

15 that is asserted; and, three, whether the city was acting in

16 good faith generally.  And I think the proposal for

17 creditors, that June 14th document, has been admitted into

18 evidence, again, for all purposes, but very clearly for the

19 purpose of showing this is what the proposal was that the

20 city presented as its initial presentation to creditors, and

21 so it speaks for itself.  We can look at it.  We don't need

22 testimony.  It's reasonably detailed.  In fact, I would

23 argue your Honor sees disclosure statements, summaries of

24 plans all the time, and you will see this measures up quite

25 nicely to the standard that's applicable even in disclosure

1    statements to what a plan should look like. It is -- it has

2    a classification scheme. It defines treatment for all

3    classes. It includes a very extensive term sheet for notes

4    that are proposed to be distributed to creditors, and it is a

5    plan, your Honor, that for that reason is a plan that could

6    be confirmable.

7         Now, there is clearly disputes over what law should

8    be applied by this Court in determining whether or not it

9    would confirm that plan if it was fleshed out, put into plan

10    form, and presented to your Honor. I told your Honor in

11    prior hearings that I doubt that's the way this case is going

12    to come out, but that's the relevant standard for today.

13         And the reality is is that on the city's very

14    reasonable view of the law, there is no question that it

15    could be confirmed. I understand that with respect to the

16    retiree constituents' views of the law, they say it can't be,

17    but that doesn't render the proposal inappropriate for

18    purposes of a Chapter 9 case. We are dealing with issues

19    that your Honor has heard argument about, is going to

20    ultimately decide, but the plan hangs together as an

21    appropriate expression of the kind of debt relief the city

22    should be able to get based upon one very reasonable view of

23    the law. We think it's absolutely the right view.

24         The other assertion as to why the plan isn't an

25    appropriate plan is that it doesn't adequately liquidate

1    claims, and here again they're talking about the pension

2    underfunding amount.  But I think we know both from the

3    structure of the Bankruptcy Code itself and from many, many,

4    many other cases that the liquidation of claims is not a

5    prerequisite to confirmation of a plan.  Plans are confirmed

6    all the time with the treatment specified as the treatment is

7    specified in the plan in the proposal for creditors that is

8    not claim size dependent.  It's by plan.  It makes

9    distributions based upon pro rata interests in the overall

10   claims pool.  It was designed that way because there is, in

11   fact, uncertainty concerning the aggregate amount of certain

12   claims.  Frankly, the city believes there's more questions

13   relating to the size of the OPEB, or other post-employment

14   benefit, claim pool than there is with respect to the pension

15   claim pool, but there's uncertainty on these issues.  It is

16   acknowledged there is uncertainty of issues.  Those are not

17   confirmation problems.  At least they're not confirmation

18   problems with some plan structures, and they're certainly not

19   confirmation problems with the plan structure that was

20   offered by the city.

21          So for these reasons, that is a plan that is

22   sufficiently detailed, more detailed than it has been in many

23   other of the other reported Chapter 9 cases, and it is

24   appropriate for all purposes as a starting point for good

25   faith negotiations, demonstration of the city's intent to

1    implement a plan in Chapter 9, and demonstration of the
2    city's overall good faith in commencing its Chapter 9 case.
3    And so I think we've dispensed of that component of the
4    different standards.
5              We now turn to impracticability.  Can I have a
6    second for a glass of water?  Thank you, your Honor.  Moving
7    to impracticability, the record shows in numerous places that
8    the city has many, many issues of bonds outstanding, and
9    another reason to keep the proposal for creditors nearby is
10   that toward the back of it -- and I think it's between pages
11   like 115 and 130, thereabouts -- there is an extensive list
12   in a type size not so good for people who wear bifocals.  I
13   think you will hear in the evidence, if it's not already
14   clear from the record, that most of the individual bond
15   issues do not have indenture trustees as we think of them in
16   the commercial context or any other equivalent holder
17   representative.  In fact, holders reserve more rights in most
18   muni structures or assign them to their insurers, to bond
19   insurers if insurers are involved.  And so what you have here
20   is that in order to compromise principal or interest as well
21   as many other terms of debt that have to be addressed in
22   connection with resolving the city's financial problems
23   either under the proposed plan that was in the proposal for
24   creditors or in any other plan, there is going to have to be
25   extensive solicitation, efforts to find relevant bondholders

 1  to get the right consents.  The bankruptcy process is going

 2  to make it a little bit easier because, of course, it will be

 3  majorities of those who vote, and the solicitation rules are

 4  clearer.  Outside of a proceeding you might have to get

 5  everybody in order to implement changes.  In fact, you do

 6  have to get everybody with respect to most of the issues.

 7  There are a couple where there might be an exception if the

 8  insurer exercises certain extensive levels of control.  The

 9  bottom line is it is an awful mess.  There is many, many,

10  many, many issues, many, many, many holders, and this, of

11  course, is the definition of impracticability in a lot of

12  ways in the Bankruptcy Code because the whole reason we have

13  impracticability was because of New York's case back in the

14  '70s.  New York back then -- the numbers were different;

15  times have changed -- didn't have materially more and may

16  have had less bond issues and bondholders than Detroit has

17  today.  And the purpose of the impracticability standard was

18  to recognize the fact that with that kind of a debt

19  structure, having good faith negotiations with creditors in

20  advance of a proceeding in an effort to have an out-of-court

21  workout were, frankly, pointless or would have been

22  pointless.

23         And, frankly, for the most part, the objectors don't

24  disagree with anything I've just said.  It's hard to.  What

25  they say instead is that whether -- however negotiations

1  might have been practicable with bondholders, negotiations
2  were practicable with them, with the -- in some senses, self-
3  appointed or appointed representatives of particular labor
4  groups or retirees, and we're going to talk about that in
5  detail in a second, but we have a point first, which is if
6  you have a situation where it's admitted or almost
7  admitted -- and the Court may have to decide -- that
8  negotiations are impracticable with a huge universe of
9  creditors but they might be practicable with respect to
10  another universe of creditors, what do you do?  And the
11  Retiree Committee actually is good about admitting there's
12  law on this in one of their footnotes, and the law is that if
13  you've got an impracticability problem, you have an
14  impracticability problem; that negotiating with the groups
15  you can groups with are kind of pointless.  I think that if
16  we think about it a little bit, that has to be right because,
17  of course, if -- let's take a hypothetical that you've got,
18  you know, a group over here not organized, and then you've
19  got one bank debt piece, which is clearly organized and you
20  can clearly negotiate it.  Well, you try to do everything you
21  can with the bank, but at some point the bank is going to say
22  what's going to happen with them, all those people that you
23  can negotiate with, because no one ever makes a deal in a
24  vacuum.  And even if you could get all the way to conclusion
25  with a bank and you still have to file a Chapter 9 case,

 1  doesn't that make you start -- effectively start all over
 2  again with the one that was easy to negotiate with?  And even
 3  if it doesn't, even if it's possible to negotiate a deal with
 4  both the bank and the city decides this is it, we're going to
 5  make this deal no matter what happens in the Chapter 9 case
 6  that you need for everybody else, you still have to go
 7  through the Chapter 9 case.  And waiting to file a Chapter 9
 8  case while you work with the bank and finally reach the deal
 9  that you're going to have with the bank that's going to be
10  permanent, you've wasted a lot of time because you have to
11  start a Chapter 11 case and go through that process anyway.
12  So I submit that the couple of cases that have focused on
13  this that we cite in our papers and that the Retiree
14  Committee cites in a footnote have got it exactly right.  If
15  you have an impracticability with respect to a material part
16  of your capital structure, you have an impracticability
17  problem, period, so I think by looking at this -- and by the
18  way, before we go off, I want to say there's one paragraph of
19  the AFSCME brief that I think is just terribly important on
20  this.  They argue this point a lot, but then they have
21  paragraph 102 at page 46, and it's only two sentences, so I'm
22  going to -- three sentences, so I'm going to read the whole
23  thing.  "AFSCME is not suggesting that pre-petition
24  negotiations could have bound everyone" -- hold that
25  thought -- "or must have involved all of the city's thousands

1    of creditors."  I don't under -- I think that sentence means
2    we're done because if the pre-petition negotiations couldn't
3    have bound everyone, how would you get a plan done?  And if
4    it didn't involve all the city's thousands of creditors, how
5    would you get a plan done?  So I think they're conceding that
6    our situation has to be regarded as impracticable, but they
7    go on.  They say, "Some level of negotiation with principal
8    creditors could have led the city to a nonbankruptcy
9    solution."  I think that's a non sequitur.  If you're not
10   talking to everyone, you can't possibly have a solution.  But
11   then they go on further, "By way of analogy, Section
12   109(c)(5)(B) of the Bankruptcy Code contemplates pre-
13   bankruptcy negotiations with creditors that the
14   municipality" -- there's a "the" missing -- "intends to
15   impair, not all creditors."  Well, one of the complaints of
16   AFSCME is that the city intends to impair substantially all
17   of its material creditors.  It has no other choice.  So I
18   suppose there's a circumstance if the city was arguing that
19   we have a huge group of creditors as to which negotiations
20   are impracticable, but we're not going to impair them, and we
21   have another group of creditors that we really can talk to,
22   and we're going to impair them, if the city said no
23   discussions, that would be a rather extreme and silly
24   position.  It's just not our case.  We need impairment pretty
25   much across the board.  We have proposed impairment pretty

1    much across the board.  And in that circumstance, the fact

2    that huge chunks of the relevant constituencies are not

3    organized, can't be organized, can't be found, that is to me

4    the end of the impracticability discussion.

5         But maybe we should go on.  Maybe we should try to

6    figure out whether it was really impracticable to negotiate

7    with the unions themselves.  And, your Honor, I think the

8    answer to whether or not it was impracticable to negotiate

9    with the unions themselves -- and I include here the unions

10   and the other retiree groups -- is, frankly, what happened

11   when we asked the unions whether or not they could represent

12   retirees and the other groups or they could represent

13   retirees, and we have a demonstrative that we'll come back to

14   and put into evidence later on, but I think it's useful to

15   pause on, and I think it can go up on -- oh, you have a --

16   oh, okay.  Okay.  We have a big one there, and I have a few

17   that I can hand out to people, so with the Court's

18   permission --

19        THE COURT:  Yes, sir.

20        MR. BENNETT:  I think it's also in the -- I think

21   it's also in the binders.  Now, there's a lot of information

22   on this chart, and I'm not going to try to take us all the

23   way through it, but I want to zero in on the fourth line of

24   data, which is the -- which is -- well, first of all, the

25   third line of data, which says, "Was a letter sent to a

1 creditor?" What that is is a letter that basically asked,
2 "Are you in a position to represent retirees and which ones?"
3 You'll see it. It'll be in evidence. And then the next line
4 is, "Respondent is able to represent retirees," and I'll give
5 you the key. "X" means they said no, the green check means
6 they said yes, and the question mark is there was no response
7 or it's not clear, and your Honor is going to hear some
8 evidence on that. And so look across the line. I have a
9 number of your most vigorous objectors who said, "No, we
10 can't represent retirees," so I'm going to come back to this
11 in the context of good faith, but let's -- we can start
12 thinking about it now. What is -- what do you expect of the
13 city having made a proposal heavily supported, certainly,
14 again, as standards go in this -- in similar circumstances,
15 had lots of meetings to explain, answered every question,
16 every question that was asked at the meetings -- there will
17 be evidence on that, too -- and your negotiating partner says
18 to you, in many instances in writing, "We actually can't
19 represent the people who are impaired by your proposal"? To
20 say that anything that happened afterwards is not in good
21 faith, you've got to have a good answer as to what do you do.
22 What's the next sentence in the dialogue? You're getting
23 feedback from someone who doesn't have authority to give
24 feedback if they give you any feedback. By the way, the
25 bottom line is feedback. "X" means no. There's no other

1    term we need to define.  If they say -- if they said --

2    responded otherwise constructively, which was either "No, but

3    I might do this," or "Yes, if you make the following

4    changes," that's okay, but that just came from somebody who

5    said they don't represent the person who's going to be

6    affected.  What is the next step in a negotiation where the

7    person who said they're here to negotiate says to you, "We

8    really don't represent the person who's affected by the plan

9    we're discussing"?  None of the objectors say how that

10   question is supposed to be answered.

11           The reality is is the city said, "Tell us your

12   suggestions anyway."  And if we got suggestions, feedback, we

13   would have had to then figure out what to do with it in that

14   very unusual circumstance that I, frankly, haven't confronted

15   very often in my career, but we weren't even put to that hard

16   question because what the other part says is is that -- and

17   this is more toward the good faith negotiation part than this

18   one, but as long as I've got the chart up, as the bottom line

19   indicates, the evidence will show that from this creditor

20   constituency, not from others -- I'll get to that in a

21   second -- we received no concrete proposal or comprehensive

22   feedback.  We got a lot of "no," but I'll come to that later.

23           With respect to this part, again, impracticability,

24   AFSCME cites results of past collective bargaining as an

25   example of negotiations with unions that have succeeded.

1  That doesn't surprise me in the slightest, but there's also

2  no evidence and I don't think there will be any that those

3  past discussions began with unions disclaiming power to

4  bargain on behalf of the relevant constituency.  As the

5  evidence will demonstrate, that's how these discussions did.

6          So the bottom line, again, with respect to this

7  part, is even if -- and it's not -- the standard for

8  impracticability of negotiations is impracticability with

9  every major constituency, I think the fourth line of this

10  chart demonstrates that negotiations were impracticable with

11  the retiree side, and they were impracticable with the

12  bondholder side.

13          Good faith negotiations.  Again, this is a question

14  I don't think we have to reach because I think we've

15  demonstrated that those kinds of negotiations were

16  impracticable, but we tried really hard anyway.  The evidence

17  will show that we presented the June 14th plan.  Mr. Buckfire

18  of Miller Buckfire, who was integral to all the negotiations,

19  but others, Mr. Moore, Mr. Malhotra, people

20    you will hear from, they also extensively participated

21  and will testify about what happened in the rooms.  The city

22  told the creditors essentially the following.  The city would

23  have discussions with all parties willing to speak for the

24  city for about a month after the June 14th presentation so

25  that the city could listen to people and figure out if there

 1  was an out-of-court solution possible for this enormously
 2  complex and dire circumstance.  The city representatives
 3  asked for feedback, including proposals that the creditors
 4  would accept if they weren't going to accept the city's
 5  proposal.  And the city said in writing and separate -- and
 6  verbally that it would evaluate what it heard during the
 7  following month, during the week beginning July 15th, 2013,
 8  and decide what came next.  It's conceivable -- I think
 9  people would say they doubted it would happen -- that one of
10  the things that would have come next were consensual
11  negotiations on the effort to build some kind of plan.  That
12  could have commenced.
13          THE COURT:  You said July.  Did you mean June?
14          MR. BENNETT:  No.  July 15th was the evaluation
15  week.
16          THE COURT:  Oh, okay.
17          MR. BENNETT:  The June 14th proposal and July 15th
18  evaluation week, meetings in the middle.  I'll have a
19  timeline at some point, and you'll see how this fits
20  together.
21          THE COURT:  Okay.
22          MR. BENNETT:  So one of the things that might have
23  happened next would have been negotiations on a consensual
24  plan, but if the -- after the month of discussions and after
25  the evaluation week the city could not see a path to an out-

1 of-court restructuring that could be implemented outside of
2 court, a Chapter 9 case was absolutely a possibility. No one
3 was shy about that. And, frankly, it should not be
4 surprising to anyone that the evidence shows that work on
5 both contingencies was proceeding throughout this entire
6 period. Much is made of the fact that there's contingency
7 planning going on for a Chapter 9 case. Absolutely there
8 was. It would have been irresponsible not to. By the way,
9 nothing in the Jones Day pitch is inconsistent with this way
10 of organizing a case. And there's a lot of complaints about,
11 well, people thought they had to keep a record, make a
12 record. Absolutely they have to keep a record and make a
13 record. Making a record of out-of-court steps taken in a
14 Chapter 9 negotiating process is just sensible when everybody
15 knows, based upon the play book executed in the last six or
16 seven major cases have involved vigorous objections to
17 eligibility by bondholders and labor unions, depending upon
18 the case which, sometimes both, and in every single one of
19 those cases, the judge has to go through pages and pages and
20 pages about what happened during the out-of-court phase to
21 determine whether people were in good faith. So courts
22 through their opinions have sent a message to people who are
23 serious about Chapter 9 restructurings. Keep records, and we
24 did.

25          There is a lot of criticism in the papers that there

1  were instances where the city said these are not negotiations
2  or particular meetings were not negotiations.  I confess that
3  this implicates an area of law that I'm not tremendously
4  familiar with.  It has to do with collective bargaining.  As
5  the evidence will show, the collective bargaining was
6  suspended as a result of a statute passed, and there was a
7  clear concern by the city that they were not going to waive
8  the -- or reverse the suspension of collective bargaining and
9  all of the baggage that came with that.  However, we don't
10  really have to deter ourselves much over that incident
11  because it's admitted by the objectors that the city sought
12  feedback.  The evidence will show that.  It's admitted that
13  there were, quote, discussions, close quote, and by the way,
14  the leading case that people cite as the -- I think it's
15  Endicott Schools case that is cited for the proposition of,
16  you know, what is a nonnegotiated process or absence of
17  negotiations.  That case talks about absence of discussions.
18  That's the actual quote if you go back to the case itself.
19          So, in any event, there is no dispute that dialogue
20  was something that was encouraged and not discouraged.
21  Nobody said we don't care what you think.  Never happens;
22  evidence will show never happens.
23          Now, again, assuming for a second that what the city
24  did in the negotiations has any relevance at all given the
25  clear impracticability in this case, what is required of the

1   city in good faith negotiations -- and I intimated that when
2   we started talking about the chart -- is informed what
3   creditors -- by what creditors said and did.  Okay.  Mr.
4   Buckfire will testify about some of that being especially
5   careful not to talk about proposals that other people made
6   because they were made with an intent that they be kept
7   confidential, but we got permission at least in one instance
8   to talk about the fact that a proposal was made.  And what
9   Mr. Buckfire is going to tell the Court is that the proposals
10  that the city got back were proposals that basically said,
11  "Our position is better than everybody else.  We should do
12  better than everybody else," and they were, frankly,
13  completely insensitive to the overall problems that the city
14  faced.  Again, the fact that we did get proposals from people
15  other than the labor negotiators is going to be --
16  Mr. Buckfire will testify to it, but there's a letter in
17  evidence, and I don't have the number.  I forgot to put it on
18  this morning.  There's a letter in evidence -- a cover letter
19  to a proposal that came from three major insurers in the pre-
20  filing period.  And, your Honor, that demonstrates that a
21  party that's represented by qualified professionals, as a
22  number of the labor/retiree constituents were, knew exactly
23  what you're supposed to do when you receive a proposal and
24  you don't like it.  The way you -- the way you respond to a
25  proposal and you don't like it is you send back something

 1   that you do like, and that's how a negotiation gets started.

 2   Whether it would have worked or not is a different question.

 3   The point is is that it wasn't a mystery to anybody how to

 4   start a negotiation if someone really wanted to start one.

 5          What did labor do besides respond maybe we're not

 6   the right person to talk to, which is a problem in and of

 7   itself?  Well, here the UAW's papers are particularly

 8   instructive, and in many places in their papers, particularly

 9   their supplemental objection -- I think it's also in the

10   pretrial brief; I'm just not remembering that as clearly

11   today -- the UAW says, "Well, of course we weren't going to

12   say yes to any modifications of retiree benefits or pension

13   benefits in the pre-filing scenario because we had a

14   constitutional guarantee.  Any proposal that doesn't pay

15   these in full and does not impair retiree benefits is a

16   proposal we cannot accept," or, "we will not accept."  I

17   think it says both those things in different places.

18          So, again, I think we have to ask the most crucial

19   question in evaluating the city's good faith.  When you get

20   back a response that says, "We're never going to agree to

21   anything but nonimpairment," what exactly is the city

22   supposed to do next?  What's the next step in that

23   negotiations?  "Gee, we were just kidding.  We found the

24   money in a mattress.  We'll do that"?  I don't think that's

25   the right response.  I don't think there is a right response.

1    I think at that point you can determine that negotiations

2    have failed and they're not going to succeed.

3          The Retiree Committee goes even further in their

4    papers, their pretrial brief.  They say that negotiations

5    were not in good faith because they included an impairment,

6    meaning the city wasn't in good faith because we didn't agree

7    with them from day one.  Okay.  Again, I ask the question,

8    what exactly -- if anyone is going to contend that the city

9    was in bad faith negotiations and got that response, what

10   exactly were they supposed to do next in the negotiations

11   that would have helped matters?

12         And as I said before, many retiree groups said,

13   "We'd love to talk to you, but we don't represent the

14   relevant people."

15         Clearly, your Honor, we received many requests for

16   additional information.  You will see some interesting charts

17   that show what was in the data room, at least in terms of

18   volumes, how the data room is populated.  The evidence will

19   show that the city did its best to comply with information

20   requests.  I'm absolutely certain that no one was completely

21   satisfied with what the city gave them.  In some instances,

22   that's because the city doesn't always have everything that

23   people want.  In some instances, I suspect it's -- we will

24   find that -- to the end of this case we will not find -- we

25   will find certain people who will never agree that they've

1  gotten everything that they want or they're satisfied with
2  the information they received.  It's a hard problem, but the
3  evidence will show that the city created a database, worked
4  really hard to populate it, populated it with enormous
5  amounts of information, and did not withhold information as a
6  basis to obtain a negotiating advantage.
7       Final point with respect to this section.  In almost
8  all the papers -- and I want to -- it could be all -- there
9  is a statement quoted by Kevyn Orr concerning the financial
10 and operating plan at a meeting to discuss the financial and
11 operating plan, which is not the proposal for creditors.  The
12 financial and operating plan is a document required by
13 statute to be filed 40 days -- 45 days after his appointment.
14 It's about facts, and he's reporting facts.  And someone
15 asked him about negotiating the financial and operating plan,
16 and he said, "This is not something to negotiate.  This isn't
17 a plebiscite.  This is a report.  I'm supposed to file it."
18 So that quote, which I think the objectors would have you
19 think applied to the restructuring plan, and it does not, did
20 not, and it applies to something completely different, and I
21 think the evidence will show that.
22      For the foregoing reasons, I think the city did act
23 in good faith in all of the negotiations that it conducted.
24 Those negotiations were unsuccessful and, thus, that
25 prerequisite for filing a Chapter 9 case and being eligible

1    for relief has been met.

2              I'm now going to turn to good faith generally, spend

3    a little time on it, 921(c).  Here again, I want to borrow

4    AFSCME's papers because they're just very instructive and

5    really help us with this.  Paragraph 109 on page 48, "The

6    relevant considerations regarding good faith under Chapter 9

7    include," and they point to five points out of the Stockton

8    case.  I'll accept them.  Number one, whether the city's

9    financial problems are of a nature contemplated by Chapter 9.

10   The evidence will show that if Detroit's financial problems

11   are not the financial problems of the nature contemplated by

12   Chapter 9, I don't know what city's is, so we think we will

13   satisfy that one very easily.  Number two, whether the

14   reasons for filing are consistent with Chapter 9.  I think

15   the form and substance of the plan that was proposed and,

16   frankly, everything that the city has been saying about it

17   are indicative that the city is trying very hard to use the

18   powers subject to the limitations included in Chapter 9 to

19   effectuate a financial restructuring for the city.  I don't

20   think we'll have any difficulty demonstrating that with the

21   evidence.  Number three, the extent of the city's pre-

22   petition efforts to address the issues.  Here I want to pause

23   and put on a timeline, and there's -- it's really long, so

24   there's two pieces, but for this purpose it's the first piece

25   that's the most relevant.

 1          THE COURT:  Let me ask you to pause for just a
 2   second.  We should have the record reflect what exhibit
 3   number that chart is.
 4          UNIDENTIFIED SPEAKER:  It's Exhibit Number 36.
 5          MR. BENNETT:  I have better.  They'll try and put it
 6   up, but I also have some copies of it.  Here's what I'm going
 7   to do.  I'm going to distribute the first piece now, with the
 8   Court's permission, and the second piece in a minute, so --
 9   after I get through this, so here's the first piece.  Again,
10   I think everyone has seen this already.  If you don't have
11   it, it's okay.  Everyone else is going to have it in a
12   second.  Obviously in a bunch of ways this chart summarizes
13   lots and lots of evidence that is going to go into the
14   record, but what is going to be seen in the record was that
15   it wasn't a bunch of people up at night on June 13th working
16   on a presentation of a plan for June 14th.  The efforts to
17   address the -- the pre-petition efforts to address the issues
18   stretch probably before December 21, '11, but I think at
19   least, as I understand the history and as the evidence will
20   certainly show, no later -- excuse me -- no later than
21   December 21, 2011, December 2011, a number of people within
22   state government and city government started focusing on the
23   fact that the Detroit financial situation was very serious
24   and had to be addressed.  And there were a number of efforts
25   that were attempted all through 2012 to try to grapple this

1    problem -- with this problem short of requiring concessions

2    from creditors, short of Chapter 9.  Kind of everything else

3    you might think of doing was done by a large number of really

4    devoted and qualified people.  Regrettably, it all failed,

5    and -- but the part about -- you know, this first chart,

6    which covers almost a year and a half on one page -- it was a

7    lot of time and a lot of effort in a search for alternative

8    solutions.  So forgetting the near-in -- what happened in the

9    June and July time frame, which we'll get to in a second,

10   the -- it is clear that there was a tremendous amount of time

11   and effort considering the issues.

12        Next is the fourth item in the AFSCME list, the

13   Stockton list, the extent that alternatives to Chapter 9 were

14   considered.  I think alternatives broadly construed include

15   all of this, but then we'll turn to the time frame -- and all

16   of a sudden -- we just got this one up -- the time frame of

17   June and July, which we've blown up because so much happened,

18   onto its own separate chart, so let me pass this one out.

19        THE COURT:  So, ma'am, what's the number of that one

20   that you're just now taking down?

21        UNIDENTIFIED SPEAKER:  They're both Exhibit 104.

22        THE COURT:  Oh, both 104.  Okay.

23        MR. BENNETT:  And because so much more happened, at

24   least in terms of dates and places, in the June and July time

25   frame, we've blown that one up so that the last two months

 1  are their separate page.  And June was devoted to heavily

 2  trying to figure out whether the last round of possible

 3  alternatives, any conceivable kinds of out-of-court

 4  restructuring, could work, and what the evidence will show is

 5  that on this page, which shows all kinds of meetings and all

 6  kinds of different interactions with creditors, a concerted

 7  decision was made to exclude meetings with individual

 8  creditors or individual creditor representatives because it

 9  wouldn't be readable anymore, so this is just organized

10  meetings with different groups for different specific

11  purposes.  The other key to interpretation is when it says

12  "nonunion," it means the bonds, so the union -- for

13  purposes --

14          THE COURT:  Means what, sir?  Pardon?  It means

15  what?

16          MR. BENNETT:  The bonds.  "Nonunion" means --

17          THE COURT:  Bonds.

18          MR. BENNETT:  -- the bonds and other borrowed money

19  because there is a collection of notes involved in that side

20  of the case as well.  Where it says "union," it's really the

21  retiree representatives, which at the time were predominantly

22  union.  And so what this demonstrates -- again, it may be

23  part of the good faith piece, too, but for purposes of the

24  fourth prong of the Stockton test, I would say both of these

25  are relevant, both the long-term assessment of alternatives

1    that were short of debt restructuring, then the close-in

2    effort to figure out whether there was any conceivable way to

3    get something accomplished out of court.  It is perfectly

4    clear that there was an extensive effort to evaluate every

5    conceivable alternative that anyone could think of.

6            And then the last factor, factor five, whether the

7    city residents would be prejudiced by Chapter 9 relief.  As

8    we said in argument last week -- and the Court will hear

9    through extensive evidence -- and it's a really important

10   part of the case both for purposes of eligibility and for

11   everything that will follow -- the residents are dramatically

12   prejudiced by denying Chapter 9 relief.  Many of the problems

13   the city confronts in providing services to its residents is

14   because so many of its tax dollars are devoted to dealing

15   with bonds and other legacy liabilities.  That's the problem.

16   The taxpayer in Detroit puts up a dollar and gets back --

17   right now the number is something -- right now the number is

18   something like 58 cents, and the projections show it could be

19   some day 35 cents.  That's an unstable situation.  It's not

20   working now, it's not going to work in the future, and it has

21   to be changed.

22           The other side of the coin.  Very often the first

23   reaction in cases like this is raise taxes.  The evidence

24   will show -- it's summarized, by the way, in the June 14th

25   proposal -- that the taxes in Detroit are already the highest

1    in any municipality in Michigan; that we're already having

2    enforcement problems.  The city is already having enforcement

3    problems with respect to property taxes; that the property

4    tax assessments may be too high, not too low, indicating that

5    that revenue source is stressed as well.  There's nothing

6    left to do here.  There is no revenue solution.  So we have

7    come to a case, which is not necessarily like other Chapter 9

8    cases, where we have a very finite revenue pool, and it just

9    isn't enough to provide services and to pay debt, and, thus,

10   Chapter 9 is more needed here than in any other scenario you

11   can possibly think of.  The evidence will show that.

12       Last topic, and this gets a lot more technical, but

13   this is responsive to your Honor's suggestion that we had to

14   deal with a disputed issue of fact, and that was the

15   motivation for the inclusion of appropriations provisions in

16   PA 436.  Your Honor, I think the following is intended to

17   really indicate that that question isn't material, but I

18   think it's also -- when we did the research, we found that

19   it's also not a legitimate question for judicial review, so

20   I'm going to give you some citations, and I'm going to read a

21   very few quotes, and your Honor is clearly going to find more

22   when you look at this question.

23       In the State of Michigan, frankly, I think in other

24   places, et al. -- other places as well, the judiciary is not

25   supposed to engage in guessing about the legislature's

 1    intent.  The leading case about this turns out to be a

 2    referendum case in Michigan.  It's called Michigan United

 3    Conservation Clubs versus Secretary of State.  It's found at

 4    630 N.W. 2d 297.  Michigan United involved a review of a

 5    Court of Appeals decision -- I think it's called the Court of

 6    Appeals here -- a Court of Appeals decision that held, in

 7    fact, that the -- that an appropriations provision in gun

 8    control legislation was not going to prevent that legislation

 9    from being subject to a referendum, and the Supreme Court

10    reverses and says that that -- that the inclusion of that

11    provision is going to insulate that statute from the

12    referendum process.  And along the way, the Court was not

13    fractured in result but was fractured a little bit in

14    reasoning.  There's a collection of -- I think it's three

15    concurring opinions.  There's one judge who writes a

16    dissenting opinion.  I think it's just one, but I'm not a

17    hundred percent positive about that.  And so the lead -- the

18    first concurring opinion has this to say.  "This court has

19    repeatedly held that courts must not be concerned with the

20    alleged motives of a legislative body in enacting a law, but

21    only with the end result - the actual language of the

22    legislation."  And then there's a whole series of cases that

23    are cited to support that proposition that I won't read the

24    citations in the record unless your Honor wants them.

25         The next concurring opinion, Judge Corrigan's,

1    quotes from Justice Cooley's constitutional law thesis or

2    textbook.  It looks like it may be a textbook.  And the

3    quote, I think, is also instructive.  It's a little bit

4    longer.  It says the following:  "to make legislation depend

5    upon motives would render all statute law uncertain, and the

6    rule which should allow it could not logically stop short of

7    permitting a similar inquiry into the motives of those who

8    passed judgment.  Therefore, the courts do not permit a

9    question of improper legislative motives to be raised, but

10   they will in every instance assume that the motives were

11   public and benefitting (sic) the station.  They will also

12   assume that the legislature had before it any evidence

13   necessary to enable it to take the action it did take."

14        Then, your Honor, the next case you would find if

15   you looked at this is Houston versus Governor, which is a

16   2012 case.  There's a longer -- 491 Michigan 876, 810 N.W. 2d

17   255.  And right near the front of the opinion there's a

18   paragraph.  I'm only going to read two parts of the paragraph

19   to save time.  "There is nothing that is relevant in this

20   regard" -- that's in terms of interpreting a statute -- "that

21   can be drawn from the political or partisan motivations of

22   the parties."  I'm going to skip a sentence.  "Moreover, this

23   court possesses no special capacity and there are no legal

24   standards by which to assess the political propriety of

25   actions undertaken by the legislative branch."

 1          Now, of course, much of this makes sense because one
 2    of the problems we scratched our heads about when we got back
 3    to think about how we would address your Honor's question is
 4    there are a whole bunch of legislators in two Houses that
 5    conceivably had all kinds of different reasons for supporting
 6    the appropriations.  It could well be that most of them put
 7    the appropriations there because they really thought they
 8    needed the money even if some thought they were putting it
 9    there because it was a problem relating to the referendum
10    process.  I will tell you a very, very persuasive example of
11    the hazards of trying to figure out the intent of statutes
12    was impressed upon me by a law school, an example I learned
13    in law school, which was about the age 55 -- or the 55-mile-
14    per-hour speed limit, and it -- research turns out to show
15    that the purpose of that speed limit was to save fuel, and
16    the reason that it wasn't increased for a long time is
17    because it saved lives.  And so also the purpose of
18    legislation actually can change over time or the reason why
19    it stays there, so I think it's a hazardous inquiry.  I don't
20    think we know where to start.  I don't think we can drag all
21    the legislators in here and ask them all, and I think the
22    only other evidence you're going to see about this is,
23    frankly, inadmissible hearsay.
24          Maybe more importantly than this, I think I
25    indicated to your Honor in argument last week that I didn't

 1  think there was any consequence to a determination by this
 2  Court that the appropriation provisions might prevent a
 3  referendum.  I said that the statute wouldn't be
 4  unconstitutional.  It just would be subject to referendum.
 5  Well, it turns out in the Michigan United case, one of the
 6  concurrences goes back and gives everybody the history of
 7  what happened in that case, and so how did that case wind up
 8  in court to begin with?  And it wound up in court because the
 9  persons, the group that wanted to have a referendum went out
10  and got the required number of signatures, went to the
11  appropriate office where the election is going to be held,
12  and the first response was no referendum because of the
13  provisions, and then they went to court to test it.  So I
14  think we're in a situation where, frankly, the only
15  circumstance where this issue of whether or not the
16  appropriate -- whether or not the appropriation provisions
17  are in there for an appropriate purpose would conceivably
18  come up is when a person or organization desiring a
19  referendum within the time specified by the statute -- and it
20  could conceivably have run; I couldn't figure that out --
21  actually collects the signatures, goes down to the
22  appropriate place and tries.  That never happened.
23          It also appears that even if a group or person
24  doesn't do that, there is an initiative process, which is
25  different from a referendum process, which they could have

1  triggered, and that process is not dependent in any way on

2  whether or not there's an appropriation provision in the

3  relevant statute.

4       And, finally, I think it was pointed out when we

5  were together last that the PA 436 contains a severability

6  clause, so what's left to have happen at this point is if

7  that provision is somehow inappropriate and has to be

8  stricken for some legally cognizable reason, the rest of the

9  statute is still there.  So I would say, again, summarizing

10 from where I started, there's two points here.  One is is

11 that I think your Honor has asked for an inquiry that is not

12 only impractical, it's not one for courts, but, in any event,

13 it's not material to anything because it doesn't lead us

14 anywhere that would change the result that we have PA 436 or

15 at least every single one of its provisions with or without

16 the appropriation provision to apply, and it's not upset by

17 reason of the possibility that a referendum could have been

18 attempted in some circumstances where one never apparently

19 has been attempted.

20      With that, if you have no more questions, I think

21 I'm done.

22      THE COURT:  Thank you.

23      MR. BENNETT:  Thank you.  I've been asked to offer

24 104 for demonstrable purposes only because it would not be on

25 the relevant lists.

 1          THE COURT:  Is there any objection to 104 for

 2    demonstrative purposes only?  All right.  The Court will

 3    admit it for that purpose.

 4          (Debtor's Exhibit 104 received at 11:25 a.m.)

 5          MS. LEVINE:  Good morning, your Honor.  Sharon

 6    Levine, Lowenstein Sandler.

 7          THE COURT:  Let's just have the record clearly state

 8    this.  Does the State of Michigan wish to make an opening

 9    statement on the issue of the city's eligibility?

10          MR. SCHNEIDER:  No, your Honor.  However, we may

11    wish to make a closing statement.

12          THE COURT:  Thank you.  You may proceed.

13          MS. LEVINE:  Thank you, your Honor.  Sharon Levine,

14    Lowenstein Sandler, for AFSCME.  I'm actually here in the

15    role of emcee.  As with the oral arguments, we have agreed to

16    work together to try and not duplicate efforts and to make a

17    cohesive presentation, so just to give your Honor a little

18    bit of an understanding, the Retirement System is going to,

19    in essence, go first, spend about 20 minutes going through

20    the timeline as we see it.  Following that, the Retired

21    Detroit Police Members Association will react to the city's

22    final portion of their statement and also to their particular

23    issues as reflected in the timeline and apply it to the

24    facts.  The UAW, the Public Safety Unions, the Retired

25    Association Parties, and AFSCME will each spend just a few

 1    minutes indicating how we see any additional facts or how the

 2    facts apply to our particular situations, and then the

 3    Retiree Committee probably for 20 or 30 minutes will give a

 4    global overview of applying the facts that came out in the

 5    timeline to the law.  Thank you.

 6              THE COURT:  Okay.  Well, do you think it's okay with

 7    your group if at a convenient break around noon we take our

 8    lunch break?

 9              MS. LEVINE:  That would be great.

10              THE COURT:  Okay.

11              MS. GREEN:  Your Honor, can I move the -- oh, I'm

12    sorry.

13              THE COURT:  Yes.  Can we arrange to move that easel,

14    please?  You can try.

15              MS. GREEN:  Your Honor, Jennifer Green on behalf of

16    the Retirement Systems.

17              THE COURT:  Be sure you speak right into the

18    microphone even though you've angled the lectern there.

19                           OPENING STATEMENT

20              MS. GREEN:  As Sharon mentioned, we have put

21    together a slideshow presentation of the timeline.  We

22    believe that these facts will later be used to support

23    certain legal arguments that we will be raising throughout

24    trial regarding the fact that Chapter 9 was a foregone

25    conclusion well before any creditor negotiations occurred;

1  that Chapter 9 was filed in bad faith to circumvent the

2  pension clause, and we submit, respectfully, we disagree with

3  the city's assertion a moment ago that Chapter 9 was a mere

4  contingency, and our assertion is that it really was a

5  foregone conclusion before any of the creditor negotiations

6  ever occurred, and with that I will begin.

7        You may ask why we're going back this far to 2011,

8  but at his deposition, your Honor, Governor Snyder testified

9  that this has been a highly structured process for close to

10 three years, so we begin in January 2011 when Richard Snyder

11 takes office as the governor of the State of Michigan.

12       Shortly thereafter, just three months later, the

13 governor signs into law what we now refer to as PA 4.  The

14 legislation makes its way through both Houses within just 34

15 days.  February 2012, Stand Up for Democracy files with the

16 Secretary of State a petition to invoke a referendum on PA 4.

17 Just days later, within -- actually, within three days of

18 Stand Up for Democracy's petition, discussions begin

19 regarding ways to insulate PA 436 -- or what will become PA

20 436 eventually from referendum.  There are notations that

21 discussions were had with Andy Dillon, the treasurer of the

22 State of Michigan's office, and there are notes about Miller

23 Buckfire are going to follow up with Andy directly about the

24 process for getting this to the governor and a notation that

25 the cleanest way to do all of this is new legislation that

1    establishes a board and includes an appropriation for a state

2    institution.  If an appropriation is attached, it concludes,

3    then the statute is not subject to repeal by the referendum

4    process.

5            In April of 2012, the city enters into the consent

6    agreement with the State of Michigan.  Shortly thereafter,

7    Heather Lennox of Jones Day and Ken Buckfire of Miller

8    Buckfire purportedly meet with Governor Snyder on June 6th,

9    2012, to discuss the Detroit -- the City of Detroit's

10   financial crisis and issues related to potential 9 Chapter --

11   or Chapter 9 bankruptcy.

12           Prior to the meeting, in the e-mail that we

13   discussed earlier and that I quoted for you earlier during

14   oral arguments, there is a notation that Mr. Buckfire

15   suggested that all the memos be put together, the ones that

16   were done for Andy.  A list of those memos were compiled, and

17   three of those we think are pertinent to some of the issues

18   at trial in this case.  One of the memos was regarding a

19   summary and comparison of PA 4 and Chapter 9.  One was a

20   memoranda on constitutional protections for pension and OPEB

21   liabilities, and a third memo was analysis of filing

22   requirements of Section 109(c)(5) of the Bankruptcy Code, in

23   particular, negotiation being impracticable and negotiating

24   in good faith.

25           Two weeks after the meeting with Governor Snyder,

1   Miller Buckfire is engaged by the State of Michigan to
2   perform an analysis and review of the city's financial
3   condition.  Shortly thereafter, Ken Buckfire testified that
4   after he got this engagement, he started receiving phone
5   calls from law firms seeing if he would be interested in
6   helping them get inserted in --
7           THE COURT:  I need to interrupt you for a second.
8           MS. GREEN:  Am I going too fast?
9           THE COURT:  Yes.
10          MS. GREEN:  I was trying to get done by noon.  I was
11  trying to get done by noon because you said you wanted to
12  break at noon.
13          THE COURT:  I really want to follow what you say,
14  so --
15          MS. GREEN:  I will slow down.
16          THE COURT:  -- I need you to slow down.
17          MS. GREEN:  I knew I only had 30 minutes, so I was
18  trying hard.
19          THE COURT:  Well, we don't have to stop right at
20  noon.
21          MS. GREEN:  Okay.  I will slow down.
22          THE COURT:  But slow down for me by about 50
23  percent.
24          MS. GREEN:  Wonderful.  I get this a lot, so I know
25  I'm a fast talker.  The discussion continues.  Mr. Buckfire

1   testified that Corrine Ball had wanted him to meet one of her

2   partners, who was successful in a Chapter 9 case.  This is in

3   2012.  In October of 2012, PA -- before PA 4 is even rejected

4   by the voters, the Treasury Department and the Governor's

5   Office begin discussing creation of a new emergency manager

6   statute just in case the referendum is passed.  Howard Ryan,

7   who is the 30(b)(6) witness for the State of Michigan, will

8   testify to that.  Shortly thereafter, November 6th of 2012,

9   the Michigan electorate rejected PA 4.

10          In December Senate Bill 865, which would eventually

11  become PA 436, was introduced in the Michigan legislature.

12  The final version is adopted by both Houses just 14 days

13  later on December 15th, and around that same time the

14  treasurer commences a preliminary review of the city's

15  finances under PA 72 and determines that a serious financial

16  problem exists in the City of Detroit.

17          At the end of December, the governor of Michigan

18  signs PA 436 into law, submits it to the Secretary of State.

19  The entire process for PA 436 took only 26 days, and it is

20  insulated from public referendum because it contains what the

21  objecting parties submit is a minor appropriation of $5.8

22  million, which is less than .009 of the state budget, and

23  below we have the citation from the exhibit that sets forth

24  the amount of the state budget.

25          In connection with the PA 436 appropriation, the

 1    state 30(b)(6) witness testified at his deposition that he

 2    was aware that the appropriation was included for the purpose

 3    of insulating it from referendum.  He was asked the question,

 4              "Do you recall when that provision of the

 5              legislation was added to the draft bill?"

 6              Pretty early on, I believe.  It was quite early,

 7              maybe from the inception."

 8         He was then asked,  "Based on your conversations

 9    with the people at the time, was it your understanding that

10    one or more of the reasons to put the appropriation language

11    in there was to make sure it could not -- the new act could

12    not be defended by a referendum?"  He answered, "Yes."

13              "Where did you get that knowledge from?

14              Well, having watched the entire process unfold

15              over the two -- past two years.

16              The governor's office knew that was the point of

17              it?

18              Yes.

19              That your department" -- his is the treasury --

20              "knew that was the point of it?

21              Yes."

22         In January of 2013, Miller Buckfire was reengaged,

23    this time by the City of Detroit, to continue its evaluation

24    of the city's financial condition.  Mr. Buckfire was then

25    asked by Treasurer Dillon to make arrangements for the city

 1   and state officials to meet and interview Jones Day and seven

 2   other law firms that were interested in serving as

 3   restructuring counsel.

 4         The day before the pitch presentation with the City

 5   of Detroit, Kevyn Orr, who attends the pitch, receives an e-

 6   mail recounting conversations with Mr. Buckfire -- Mr.

 7   Buckfire will be testifying live during this trial -- and

 8   listed are the questions that will be asked the following day

 9   at the pitch.  They all relate to Chapter 9.  "Given the

10   issues that Detroit faces, how can they address them outside

11   of Chapter 9?" is the first, but all the rest are, "Under

12   what circumstances should Chapter 9 be used?"  "How would one

13   execute a low-cost fast Chapter 9?"  "Given Chapter 9

14   experience, what went wrong with JeffCo and Orange County?"

15   And at the bottom, "If Miller Buckfire finds a way to

16   monetize assets and create liquidity, how would that impact

17   eligibility?"

18         The next day on January 29th, Jones Day presents its

19   restructuring strategy to the city and state officials, and

20   it explains that while out-of-court solutions are preferred,

21   they conclude they are extremely difficult to achieve in

22   practice.  They note that Chapter 9 can create negotiating

23   leverage negotiating with the backdrop of bankruptcy, which

24   we submit is not good faith.

25         They further conclude in their strategy that an out-

1   of-court plan should contemplate the possibility of Chapter 9

2   because it creates leverage, you can negotiate in the shadow

3   of Chapter 9, and it helps bolster your eligibility and your

4   success in a Chapter 9 by establishing a record of seeking

5   creditor consensus.

6       There are notes on the slide that state, "A good

7   faith effort to pursue an out-of-court restructuring plan

8   will establish that clear record and will deflect any

9   eligibility complaints based on alleged failure to negotiate

10  or bad faith.  If needed, though, Chapter 9 could be used as

11  a means to further cut back or compromise, quote, 'accrued

12  financial benefits otherwise protected under the Michigan

13  Constitution.'"

14      The next day Richard Baird, who's Governor Snyder's

15  consultant, reaches out to Jones Day to inquire about hiring

16  Kevyn Orr as the emergency manager.  The following day,

17  Mr. Orr calls PA 436 a clear end-run around the prior

18  initiative that was rejected by the voters in November and

19  also comments, "So although the new law, PA 436, provides the

20  thin veneer of a revision, it is essentially a redo of the

21  prior rejected law and appears to merely adopt the conditions

22  necessary for a Chapter 9 filing."

23      THE COURT:  What do those statements appear in?

24      MS. GREEN:  It's Orr Exhibit 4, JDRD0000295.  It's

25  an e-mail.

1          THE COURT:  Right, but what is that?

2          MS. GREEN:  An exhibit.  It's an e-mail.

3          THE COURT:  An e-mail.  Thank you.

4          MS. GREEN:  E-mail.  I'm sorry.  In February of

5    2013, Mayor Bing was approached by Mr. Baird regarding Kevyn

6    Orr as the candidate for the emergency manager position, and

7    Mayor Bing recalls that the only salient qualifications he

8    was offered about Mr. Orr was his bankruptcy experience.  Mr.

9    Baird told him about Kevyn Orr's experience in part of the

10   Chrysler bankruptcy team, and Mr. Orr -- Mayor Bing was

11   asked, "Did you ask Mr. Baird anything else about Mr. Orr's

12   qualifications to serve as emergency financial manager?"  And

13   then he answers, "He -- yes, I did, and he felt that not only

14   was he a lawyer that dealt with bankruptcy for over 30 years,

15   but he also had some qualification as it related to

16   restructuring."  "And did Mr. Baird indicate that Orr had

17   qualifications concerning restructuring outside the context

18   of bankruptcy?"  "That would be no" was his response.

19          In March the governor declared that a local

20   government financial emergency existed in the City of

21   Detroit.  At the end of March, Kevyn Orr was appointed

22   emergency manager of the City of Detroit.  On March 28th PA

23   436 becomes effective, and in April of 2013 Jones Day is

24   engaged as legal counsel for the City of Detroit.

25          After being appointed emergency manager, Kevyn Orr

1  is quoted on May 12th, 2013 -- we've all heard this quote,

2  but I'll say it again -- that the public can comment on the

3  city's financial and operating plan, but we are not, like,

4  negotiating the terms of the plan.

5      The day before presenting its proposal to the

6  creditors, Mr. Orr gives an interview with the <u>Detroit Free</u>

7  <u>Press</u> and expresses his intent to evade the pensions clause

8  through a federal Chapter 9 bankruptcy proceeding, and we

9  have quoted for you the portion of that interview and

10  highlighted it in yellow.  He states, "If you think your

11  state-vested pension rights, either as an employee or

12  retiree -- that's not going to protect you.  If we don't

13  reach an agreement one way or the other, we feel fairly

14  confident that the state federal law, federalism, will trump

15  state law."

16      On June 14th, the emergency manager held a meeting

17  at the Detroit Metropolitan Airport and presented the city's

18  proposal for the creditors.  The evidence will show that the

19  city proposed to fully -- fully intended to impair or

20  diminish accrued financial benefits.  This is an excerpt from

21  the proposal for creditors, and it clearly states that with

22  respect to unfunded pension liabilities, quote, "such

23  contributions will not be made under the plan."  And it

24  further states there must be, quote, "significant cuts in

25  accrued vested pension amounts for both active and currently

1  retired persons."

2       On June 20th, the emergency manager undertook a

3  presentation regarding the city's finances and plan

4  restructuring to both uniform and nonuniformed retirees.

5  Numerous witnesses who attended this meeting, several of

6  which will be testifying at trial, will testify that they did

7  not observe or participate in any negotiations regarding the

8  city's financials and that these meetings were purely

9  informational.

10      On June 27th following this presentation that I just

11  spoke of, the city sends a letter to the UAW thanking them

12  for their time in participating in the meeting, and in that

13  letter even the city acknowledged that the unions would need

14  more information moving forward.  The letter here is quoted,

15  "The city recognizes that representatives of active and

16  retired employees will need access to additional information

17  to analyze the restructuring proposals outlined in the June

18  20 meetings.  Information relevant to these proposals will be

19  made available in the on line data room," but at this time on

20  June 27th, that information, as they were saying, was not yet

21  available.

22      Five days later on July 23rd Gracie Webster and

23  Veronica Thomas commenced lawsuits against the State of

24  Michigan, the governor, and the treasurer seeking a

25  declaratory judgment that PA 436 violated the pensions

1  clause, and they also sought an injunction.

2          In July when several of the creditor meetings took

3  place, the evidence will show that the city had no intention

4  of actually negotiating with its creditors.  By July 8th you

5  will see an e-mail with an attachment of a timeline and a

6  communications roll-out demonstrating that the city had

7  already determined that its Chapter 9 petition was going to

8  be filed on July 19th.  There's a timeline crafted by the

9  State of Michigan that identifies July 19th as a filing date

10  despite the fact that the creditor meetings had not yet

11  occurred.  Therefore, the objecting parties submit that

12  Chapter 9 was already a foregone conclusion before the city

13  met with its creditors on July 10th and 11th.  In fact, here

14  is a copy of that Chapter 9 roll-out, communications roll-out

15  that I spoke of.  In an e-mail from Kevyn Orr's press

16  secretary, Bill Nowling, to certain state officials, he lays

17  out the communications plan.  And if you go down to the

18  yellow portion, it starts with, "We negotiated in good faith

19  with all of Detroit's creditors."  Mind you, several of the

20  meetings had not yet even occurred.  "We presented a

21  comprehensive restructuring plan to creditors in June.  At

22  this point, it would be impractical to continue discussions

23  out of court because it is clear that we will be able to

24  reach agreement with some creditors only through a court-

25  supervised process, and the State of Michigan has authorized

1 the emergency manager to take this step." This is on July

2 8th.

3 The timeline attached to that communications roll-

4 out on Thursday, July 18th, states that, "Last minute

5 revisions will be made to all the key documents," and on

6 Friday, July 19th, which is in bold and capital letters

7 called "The Filing Day," at nine o'clock the Governor's

8 Office is supposed to transmit the authorization letter to

9 the emergency manager, and at ten o'clock on the 19th the

10 necessary paperwork is supposed to be filed with the court

11 system, and then a series of press conferences are to be

12 held.

13 The following day, on July 9th, an e-mail from

14 Treasurer Dillon to the governor of the State of Michigan

15 states that, "We are still in the informational mode." This

16 e-mail is interesting for several reasons. First, it states

17 that Kevyn will meet the Detroit pensions the following day,

18 on July 10th. It says there will be no exchange of documents

19 and that he will not translate that -- the information that

20 he gives into an impact on retiree or employees' vested

21 rights. Treasurer Dillon continues and says that there are a

22 lot of creative options that we can explore to address how

23 they will be treated in restructuring with respect to the

24 pensions, but at his deposition when he was -- when he was

25 asked whether these creative options were ever explored

1  directly with the Retirement Systems, Dillon said no.  And

2  it's not up there, but he also was asked if they were ever --

3  these creative options were put into written reports or

4  formal proposals, and he also said, no, they were not.

5       Further in the e-mail he says to the governor,

6  "Tomorrow's meeting could lead to questions directed to you

7  about your view on this topic.  In my view, it's too early in

8  the process to respond to hypothetical questions.  We remain

9  in many ways in the -- at the informational stage."  This was

10 just one week before the filing.  And Mr. Dillon admitted at

11 his deposition that nothing changed between July 9th and the

12 filing date of July 18th that would take them out of this

13 informational stage, as he called it.

14       On July 10th and 11th, there were a series of

15 creditor negotiations -- alleged creditor negotiations that

16 took place.  The emergency manager himself did not even

17 attend, but witnesses who did attend the meeting will testify

18 that they did not observe or participate in any negotiations

19 regarding the city's finances and that, again, these meetings

20 were purely informational.  And this is consistent with the

21 state treasurer's report to the governor that as of July 8th,

22 we are still in the informational mode.  It's also consistent

23 with Mr. Orr's admission at his deposition when he was

24 questioned, "There were no actual negotiations at the June

25 14th meeting, were they?"  And he answers, "No, not as it's

1  generally understood."

2         Lastly, the fact that there were no negotiations on

3  July 10th and 11th is consistent with the city's and the

4  state's communications roll-out, which already adopted the

5  excuse that negotiations were going to be impractical.

6         On July 12th, following those meetings, the Detroit

7  Fire Fighters Association sends a letter to the emergency

8  manager asking for more information and stating, "It would be

9  productive if the city could provide us with its specific

10 proposals on pension benefit restructuring as soon as

11 possible.  We have two meetings with the city where pension

12 benefits were addressed and still have only the city's

13 general observation that pension benefits must be reduced."

14 At trial Mark Diaz, the president of the Detroit Police

15 Officers Association, and Dan McNamara, president of the

16 Detroit Fire Fighters Association, will testify that no

17 specific proposals were ever given by the city after this

18 letter, and instead the city filed bankruptcy just six days

19 later.

20        On July 15th the Webster defendants filed a response

21 brief and a motion for summary disposition.  In that court

22 paper, the state asserted that a bankruptcy filing by the

23 City of Detroit is, quote, "only a possibility that

24 plaintiff's claims were, quote, 'unripe, premature, and based

25 on a speculative threat of future injury.'"  And mind you,

1  this position is taken in open court, which conflicts with
2  the timeline that had already been circulated within the
3  Governor's Office that slated the filing date as just four
4  days later.

5      On July 16th Mr. Orr submitted the bankruptcy
6  recommendation letter to Governor Snyder and Treasurer
7  Dillon.  In that letter he stated that dramatic but necessary
8  benefit modifications must be made.  The governor
9  acknowledged that he read that letter before authorizing the
10 filing and that he knew that the city's request for
11 authorization that dramatic cuts be given would be part of
12 any Chapter 9 process.  He also testified that he knew,
13 quote, "based on the facts going into it, there was a
14 likelihood accrued pension benefits would be reduced in the
15 Chapter 9 case."

16      The next day, the Detroit Public Safety Unions
17 received correspondence from the city thanking them on behalf
18 of the emergency manager for their, quote, "strong
19 cooperation regarding the City of Detroit pension
20 restructuring."  Later that same day, the Retirement Systems
21 filed their lawsuit against the governor and the emergency
22 manager in Ingham County Circuit Court seeking declaratory
23 relief.  That same night at 6:23 p.m. the governor's press
24 secretary, Sara Wurfel, circulates an updated timeline that
25 still shows the bankruptcy filing date of Friday, July 19th.

1    This is July 17th at 6:23 p.m.  The following day, the
2    Retirement Systems filed a motion for a TRO seeking an
3    injunction.  At 3:05 p.m. that afternoon, Margaret Nelson of
4    the Attorney General's Office received a telephone call
5    informing her that Retirement Systems were in court seeking a
6    TRO.  At 3:47 the governor e-mailed his authorization letter
7    to Orr and to Treasurer Dillon, and at 4:06 Orr changes the
8    date on the filing papers from July 18th, crosses out the 19
9    because it was supposed to be filed the 19th, handwrites in
10   an 18 and files the petition one hour and one minute after
11   finding out that the Retirement Systems were in court seeking
12   a TRO, which is inconsistent with the timeline sent at 6:30
13   the night before saying it was going to be on Friday.

14          And at 4:10 p.m. the attorney general appears for
15   the TRO hearing in Ingham County.  This is reflected in the
16   papers filed by the state, the docket history and the hearing
17   transcripts.  Orr later admitted that he was being counseled
18   that it would be, quote, irresponsible not to file the
19   petition sooner rather than later given all the lawsuits that
20   were popping up.

21          On July 19th, the following day, the declaratory
22   judgment was entered against the governor, the treasurer, and
23   the State of Michigan and that declaratory judgment states PA
24   436 is unconstitutional and in violation of Article IX,
25   Section 24, of the Michigan Constitution, and it further

1 states the governor is prohibited from authorizing an

2 emergency manager to proceed under Chapter 9, yet the city

3 filed its Chapter 9 petition despite the fact that each of

4 its advisors uniformly testified at their depositions that

5 the city's financial information was still incomplete as of

6 the filing, and, in fact, today it is still incomplete.

7       Charles Moore, senior managing director at Conway

8 MacKenzie, testified that quote, when he was asked, "Has

9 there been a specification of those level of cuts that the

10 city contends must occur?" He says, "I mean have you put a

11 dollar amount on it?" He answers, "No. Our analysis of this

12 continues. Right now we still don't know what assets could

13 be available to put toward the pensions. We still have not

14 had the type of dialogue that we would like to have related

15 to the calculation of the unfunded amount, so because of

16 those two uncertainties, among others, we don't know what

17 cuts, if any, there may need to be."

18       The state treasurer also agreed that as of July 8th,

19 just a week before the filing, "I thought that the situation

20 was not understood enough for the governor to go on record

21 yet because I couldn't even tell him with any degree of

22 confidence what level of funding the pension funds had, so

23 why should he get in the middle of a debate about this?"

24       In addition, as of the petition date -- and I

25 believe the city's witnesses will testify consistent with

1  their depositions -- that to date the city still -- the city

2  still does not know the value of two of its primary assets,

3  including the Water and Sewage Department and the city-owned

4  artwork at the Detroit Institute of Arts.  Because the city

5  still does not know what assets are available to satisfy

6  liabilities, does not know the scope of the liabilities, it

7  is the objecting parties' position that the Chapter 9 filing

8  was premature and not made in good faith.  Thank you.  I

9  believe Mr. Ullman may be following me.

10          THE COURT:  Okay.

11          MS. GREEN:  I apologize.  It's Lynn Brimer.

12          THE COURT:  Okay.  Perhaps we should move that

13  lectern back to center, huh?

14          MS. BRIMER:  I can do that.

15          THE COURT:  Okay.  Thank you.

16          MS. BRIMER:  Is this good, your Honor?

17          THE COURT:  That's great.  Let me just ask will

18  there be other uses of the projector during openings?

19          ATTORNEY:  Yes, your Honor.

20          THE COURT:  Okay.

21                  OPENING STATEMENT

22          MS. BRIMER:  Good morning, your Honor.  And, your

23  Honor, I thank Mr. Bennett for raising the legal issues with

24  respect to the spending provision because it at least makes

25  me more comfortable as to why I thought it's so important we

1   clarify the record on the discovery matters with respect to

2   which law had a spending provision added onto it.

3            THE COURT:  Okay.

4            MS. BRIMER:  So rather than address my opening issue

5   to begin with, would the Court like me to address the legal

6   issues raised by Mr. Bennett, or would you like the legal

7   issue -- I am prepared to briefly discuss those.  I don't

8   have a written preparation, but I do think it's important for

9   the Court to understand I did look at the case that

10  Mr. Bennett cited.  I didn't disregard any case law when

11  coming to this Court and believing that there was a factual

12  issue.

13           With respect to the Michigan United case, I think

14  it's factually distinguishable again.  That case did not

15  involve an original law that did not have a spending

16  provision that was overturned on referendum and then a new

17  law presented.  In that case, your Honor, the issue was

18  whether or not the spending provision itself added in the

19  original law such that it was not subject to referendum was,

20  in fact, an appropriate provision taking it out of the

21  referendum provision.  You know, under -- your Honor, that is

22  not the facts that we have before us today.

23           In addition, your Honor, I have reviewed Justice

24  Corrigan's opinion, which, by the way, was a concurring

25  opinion, not the Court's majority opinion, but she addressed

1    the issue of intent and that, generally speaking, we do not

2    look to the motive or intent of the legislature --

3    legislative body when passing a law, but she said this is

4    because -- and she notes this in a footnote -- this is

5    because, generally speaking, we do not have any testimonial

6    record regarding motive or intent.  That would be, your

7    Honor, in her concurring opinion.  There is no testimonial

8    record in the -- in this original action regarding the motive

9    or intent.  Well, your Honor, that is simply not the case in

10   this matter.  As Ms. Green read to you and as I quoted from

11   the state's own 30(b)(6) witness, we have evidence regarding

12   the motive of the inclusion of the spending provisions on an

13   act that had previously been rejected on referendum.  We

14   believe that factual issue is important to this Court in

15   determining that whether or not some or all of PA 436 should

16   have been subject to the second provision that everyone seems

17   to gloss over in Article II, Section 9, of the Constitution,

18   which states specifically that no law that has properly been

19   submitted to referendum can then -- and rejected can then be

20   passed without a referral back to the general electorate.

21         Your Honor, the cases cited by the state, Ms.

22   Nelson, of Reynolds v. Martin and the case cited this morning

23   just simply are not factually similar enough to PA 436 to be

24   controlling, and we do -- and, you know, my closing -- my

25   opening can be as simple as, your Honor, the evidence will

1   show that the motive of including the spending provisions was

2   to, in fact, take an act that had previously been overturned

3   on referendum and disregard the will of the people, and it's

4   very clear.  The state's attorney argued yesterday that we

5   knew what the people's will was because we have the media.

6   Well, we know what the people's will was.  The people's will

7   was that we not have an emergency manager who would supplant

8   the democratically elected officials in the City of Detroit,

9   and that was very clear, and yet we now have PA 436, which

10  disregarded that, which added a spending provision to it, and

11  the facts will demonstrate that we can establish what the

12  motive was in adding those spending provisions.  And,

13  moreover, we can establish that the emergency manager,

14  Mr. Orr, was fully aware of that at the time he accepted his

15  appointment as the emergency manager.  I'll conclude --

16        THE COURT:  Well, how do you -- how do you deal with

17  Mr. Bennett's argument that if the issue is ever appropriate

18  for court review, it is not appropriate until petition

19  signatures are collected on the bill that has the spending

20  provision in it and the petitions are rejected because it's

21  not the kind of a law that can be subject to a referendum?

22        MS. BRIMER:  Well, certainly I don't think there's

23  any case law that would suggest that the people be required

24  to take an act which on its face would be rejected.  I'm not

25  sure I'm aware of any case law that would suggest that the

1   people had to refer that case -- the law to a referendum and

2   have it denied because of the failure -- or the inclusion of

3   the spending provision.  At issue here, your Honor, is

4   whether or not the act is sufficiently similar enough, not

5   that it had to go back to referendum, but whether it's

6   sufficiently similar enough that the second provision would

7   require that it be deemed to be unconstitutional because it

8   was not presented to the people again.

9           THE COURT:  Okay.  All right.  Let's take our lunch

10  break now.  Before we do, I want to remind everyone that we

11  are guests here in this building, and we need to maintain

12  decorum and silence while we are in the hallways.  Please

13  don't linger in the halls.  You can have your conversations

14  here in the courtroom over lunch if you'd like to do that, or

15  in the elevator or on the 1st floor, but please maintain

16  silence in the hall.  Let's see.  It's noon.  We'll reconvene

17  at 1:30, please, and that's it.

18          THE CLERK:  All rise.  Court is in recess.

19      (Recess at 11:59 a.m., until 1:30 p.m.)

20          THE CLERK:  Court is in session.  Please be seated.

21          THE COURT:  Counsel are present.  We have a couple

22  of housekeeping matters that we need to address before we

23  continue with our opening statements, please.  The first is

24  that in the amended final pretrial order that was submitted

25  through our order processing program, on Attachment G, which

1  is the attachment from the Retirement Systems, the exhibit

2  numbers were omitted.  I'm sure that was inadvertent, so

3  please fix that and resubmit it as soon as possible so that

4  we can get it entered.  Okay?

5          ATTORNEY:  Of course, your Honor.

6          THE COURT:  And then a second brief housekeeping

7  matter is -- is Ms. Green still here?

8          ATTORNEY:  She's not here yet, your Honor.

9          THE COURT:  Okay.  Mr. Gordon, just to keep the

10  record a hundred percent clean, we need to put an exhibit

11  number on a paper version of the slide presentation so that

12  for the record that is identified, whatever exhibit number

13  you want to put on it.

14          MR. GORDON:  All right.  Very well, your Honor.

15          THE COURT:  Okay.

16          MR. IRWIN:  Your Honor, will counsel be provided a

17  copy of that when it's done in that way?

18          THE COURT:  Can you do that?

19          MR. GORDON:  Yes, absolutely.

20          THE COURT:  Okay.  All right.  We are ready to

21  proceed.

22                      OPENING STATEMENT

23          MR. WERTHEIMER:  William Wertheimer, your Honor, on

24  behalf of the Flowers plaintiffs.  I'll be very brief, and I

25  just want to add a couple of points relevant to the timeline

1  that Ms. Green was showing you.  I do not have a clicker, but

2  I'll just state them.

3           THE COURT:  Okay.

4           MR. WERTHEIMER:  That is, first, on July 3rd the

5  Flowers lawsuit was actually filed before the Webster

6  lawsuit.  They were both filed on July 3rd, so they were both

7  filed that day.  Second, on the same day, both Flowers and

8  Webster cases, Judge Aquilina signed orders to show cause

9  setting a hearing for the preliminary injunction that we were

10  seeking for July 22nd so that -- and those were served on the

11  governor and the treasurer on July 3rd so that at the point

12  in time on the timeline a few days later when they're setting

13  the putative bankruptcy for July 19th, Friday, they know that

14  the state court preliminary injunction hearing is being

15  scheduled for July 22nd, the following Monday.  That's it.

16  Thank you.

17           THE COURT:  Okay.

18                    OPENING STATEMENT

19           MS. CECCOTTI:  Good afternoon, your Honor.  Babette

20  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  Ms.

21  Green's timeline was very complete and detailed.  I do want

22  to just -- because I don't think this particular slide was up

23  there, so I would like to mention the pitch book again.  Ms.

24  Green had a slide from the Jones Day pitch book from January

25  20, 2013, and one thing that -- when your Honor goes through

1  the pitch book you'll notice that there are, you know, a

2  few -- quite a few, I would say, or certainly more than one

3  or two references to the use of Chapter 9 either itself or

4  the shadow of Chapter 9 as leverage vis-a-vis creditors, vis-

5  a-vis specific proposals and claims related to labor costs,

6  and I think Ms. Green showed the slide with the quote on

7  there about using Chapter 9 to reduce accrued financial

8  benefits.

9        The other thing that I'd like to mention about the

10  pitch book, which really does become something of a

11  blueprint, I think, for what follows, is at page 57 there's a

12  slide that reads, "Any Chapter 9 process should be

13  comprehensive," and it starts with the bullet, "plans of

14  adjustment address narrow range of economic compromises."

15  And then it talks -- and then there are other bullets that

16  follow, "other fundamental changes must occur outside the

17  plan context," "any Chapter 9 process should pursue as many

18  revitalization initiatives as possible," "negotiating in

19  Chapter 9 or its shadow is a powerful tool for

20  revitalization," and, finally, "the city should take

21  advantage of its opportunity for long-term comprehensive

22  solutions."

23        So that's actually a good segue to June 14th

24  proposal because, as we've talked about before in the other

25  arguments that we've had, this is really a massive

comprehensive revitalization proposal that really has
elements of more or less what that slide that I just read you
is talking about.  It's got -- the plans include a $1.25
billion spending program going out over ten years.  There are
many detailed wide-ranging initiatives that have to do with
improvement of services, upgrades, reinvestment, and the
like, and there is also a restructuring proposal.  There's a
section called "restructuring proposal."  I don't have to
take you through that because we've been through it a number
of times.  You know what the pension proposal -- what the
pension proposal is, but the point being that the -- just the
four corners of the proposal itself, what that reflects in
terms of what it is that the city is trying to pursue through
Chapter 9.

      In terms of the events following the launch of that
proposal on June 14th, I think that we see a number of
things, and the evidence will show this.  As we saw actually
from Mr. Bennett's slide, the number of meetings that
actually occur on this proposal -- regarding this proposal
are relatively few.  It's a limited number of sessions.
Regardless of how we're characterizing them, there's at least
one document that refers to one of the meetings as
informational, in fact.

      We have the data room issue.  Ms. Green read the
letter or showed the letter to the UAW regarding the fact

1  that the data room wasn't quite up and running yet, but what

2  is also true about the data room, as your Honor knows from

3  the early days of this case, is that in order to access the

4  data room, one had to sign a confidentiality agreement and an

5  additional release to get the Milliman pension materials, and

6  my client, at least, took issue with that prior to the

7  bankruptcy, and others may -- other groups may have as well,

8  so you had this quite massive proposal, a series of really a

9  handful of meetings being held with the data that the city

10 was loading into the data room about the proposal not readily

11 available.

12      In addition, as I mentioned, these were not -- there

13 were just a few of these meetings, and I think the evidence

14 will show that they wouldn't really constitute labor

15 negotiations.  The unions, you know, have various ways that

16 they talk about that in the evidence.  They are fairly

17 well -- I guess I'll just use the word "highly organized" or

18 the phrase "high organized" by the city, including one

19 meeting where -- at least one meeting where if there were

20 questions about the proposal, those in attendance were

21 required to submit them on cards, and the cards would be read

22 as opposed to any sort of free flowing give and take that one

23 might associate with a meeting with stakeholders that we

24 might think about in terms of going over a restructuring

25 proposal or even a labor proposal.

1        So now I'd like to get to Mr. Bennett's comments

2   about the UAW because I think this really does -- that this

3   is really a very important point.  Yes, it is true that, as

4   we know, the proposal included the cessation of funding to

5   the Retirement System and the statement about -- the

6   statement that significant cuts to accrued vested pension

7   benefits would be necessary, so, yes, on its -- the UAW's

8   position is, yes, on its face, looking at that on page 109,

9   if that's the right page, that is a proposal that violates

10  the Michigan state Constitution, and the immediate questions

11  that arises on its face just looking at it like that is how

12  could it be accepted.  How could it be accepted by a labor

13  union?  How could it be accepted by anyone purporting to

14  speak for or represent actives or retirees?  So, yes, on its

15  face the proposal was not acceptable, and we believe that

16  that has legal consequences as distinct from fact

17  consequences, so I do want to make that point about the --

18  about our objection -- our amended objection in that regard.

19  We very much believe that that has legal consequences.

20       As a factual matter, however, and notwithstanding

21  the fact that the proposal on its face could not be accepted,

22  you couldn't simply hand it to the union with a signature

23  line and say, "Here, sign," the UAW, through its general

24  counsel, contacted Jones Day on July 9th, and we'll have a

25  witness to this effect, and we have an exhibit on it as well,

1   to raise a couple of points, one regarding the data room and

2   the confidentiality issue that I mentioned already.  Then in

3   response to the letter that Mr. Bennett's chart showed trying

4   to ask the labor organizations and the retiree groups if they

5   would be representing their retirees, the e-mail to Jones Day

6   reads as follows:  "Further to its reservation of rights, the

7   UAW continues to seek an answer from Mr. Orr and your firm as

8   to the following:  Please cite the basis for any claim that

9   the UAW has the authority to compromise the vested benefits

10  of active and/or retired UAW or former UAW members employed

11  or formerly employed by the City of Detroit and its

12  affiliates.  As I presume you know, Article IX, Section 24,

13  of the Michigan Constitution provides in pertinent part that,

14  quote, 'the accrued financial benefits of each pension plan

15  and Retirement System of the state and its political

16  subdivisions shall be a contractual obligation thereof which

17  shall not be diminished or impaired thereby,' unquote.

18  Please tell me what authority your firm and/or Mr. Orr

19  believe gives the UAW the right to compromise vested pension

20  benefits despite the contrary provisions of Article IX,

21  Section 24.  Please tell us -- please also tell us whether

22  Mr. Orr and/or your firm take the position that Article IX,

23  Section 24, of the Michigan Constitution is not or may not be

24  binding on the City of Detroit, the State of Michigan,

25  Governor Snyder, Mr. Orr, or the UAW and state, if that is

1   the case, under what circumstances you believe that Article

2   IX, Section 24, would not bind some or all of these persons

3   or entities.  We also seek the answer to the same question

4   with regard to vested post-retirement insurance benefits,"

5   and then there's a reference to the Supreme Court's decision

6   in the Pittsburgh Plate Glass case.  And the letter makes it

7   clear that, again, from the UAW's perspective, "We do not

8   understand the July 10 and 11 multiple stakeholder meetings

9   to which we have been invited to be a forum for negotiations

10  of your proposed pension and retiree healthcare changes but

11  are willing to attend and obtain for our union whatever

12  information may be provided at those meetings," and then --

13  and, finally, "Your full answers to the questions posed in

14  the foregoing paragraphs of this message will help the UAW

15  determine the scope of any such negotiations and the UAW's

16  decisions regarding its representative capacity in them about

17  which your firm has inquired."  So we very much have a

18  factual case as well as a legal case regarding the

19  implications of the proposal, and I did want to make that

20  clear for the record, the point being that what is in this e-

21  mail represents some fairly fundamental questions about the

22  ground rules upon which discussions or negotiations with the

23  city regarding its proposal can proceed.

24          I should note that -- and we'll have testimony to

25  this effect -- that no answer was forthcoming from the city

1　and, as far as I know, has not been forthcoming regarding the

2　questions posed other than obviously when we got into

3　bankruptcy, your Honor solved the problem of the data room.

4　　　　Time frame. Putting aside the lawsuits and all of

5　the activity surrounding all of that, it does appear that the

6　city set out a timeline for itself that only had about a 30-

7　day period for this launch notwithstanding everything that's

8　in that proposal and everything that was expected apparently

9　to be accomplished by it. I think I heard Mr. Bennett refer

10　to something like evaluation week, which was supposed to

11　occur on or which probably did occur -- I gather it did occur

12　on July 15th. That's really a month later. So one -- now,

13　Mr. Bennett's timeline, of course, goes way back -- I think

14　it was to 2011 and the various initiatives to deal with

15　Detroit's problems, and we are certainly not denying any of

16　those or -- and I'm sure everyone is fully cognizant of --

17　particularly those who live here are fully cognizant of all

18　of those efforts, but we think, as a legal matter, that those

19　efforts really don't legally count. They obviously count to

20　the citizens of Detroit, but for purposes of eligibility, the

21　relevant time frame, from our perspective, is the proposal is

22　launched on June 14th and then apparently evaluated -- the

23　response or reaction apparently evaluated merely -- a mere

24　four weeks later.

25　　　　So during this time, again, the evidence, we

1  believe, will show that during the same sort of compressed

2  time period, we know that the governor and the emergency

3  manager are meeting on a fairly regular basis.  We know that

4  the governor had seen the June 14th proposal.  He had a draft

5  of it before it was launched.  He knew about the pension

6  proposal.  He knew that there was an issue -- a legal issue

7  with respect to Article IX, Section 24, of the Michigan

8  Constitution and the effect, if any, of the Bankruptcy Code

9  and federal law on the continued enforcement of that section.

10  He knew it was a serious issue.

11        We know, again, since we've discussed it most

12  recently last week at the argument that we then march through

13  the timeline to get to Mr. Orr's July 16th request and the

14  governor's July 18th response.  We know that the governor

15  obviously from the dates signed it only two days later

16  apparently with a review of all of the material that was

17  contained in Mr. Orr's letter, I think could probably best be

18  characterized as limited.  It does not appear that there was

19  an independent evaluation that the governor conducted

20  regarding many of the sort of predicate items that Mr. Orr

21  laid out in his letter.  The governor was also aware, as we

22  know from the slides that Ms. Green showed, that the pension

23  numbers were very much still up in the air and in question.

24  Nevertheless, both the July 16th and the July 8th -- the July

25  16th letter from Mr. Orr and the July 18th approval letter

1   from the governor lay out the -- what I will characterize as

2   the shift in spending priorities.  This is the part of the

3   proposal that relates to revitalization, and we know that the

4   governor in his letter approves of the manner in which

5   Mr. Orr has proposed to proceed in that regard, and so he

6   signs the letter, and, of course, the bankruptcy petition is

7   filed on the 18th.

8           So what all of this adds up to we think at the end

9   of the day in terms of the legal cases -- in terms of our

10  legal objections is a fairly deliberate plan to use Chapter

11  9.  We think that really knitting -- connecting all of the

12  dots here, that the plan was to use Chapter 9.  We've saved

13  for another day all of the legal issues associated with that,

14  the state's authorization.  There's really -- well, we won't

15  get into those because we'll have closing, and we've had --

16  and we'll have other briefs on all of that, but the sort of

17  deliberate plan, which starts whenever you'd like to start it

18  on the timeline but certainly from the governor's appointment

19  of Mr. Orr leaving his -- leaving the Jones Day firm, the

20  Jones Day retention by the city, this really several month

21  timeline leading from the end of March to the middle of July,

22  we believe the evidence establishes this as a deliberate plan

23  to use Chapter 9 to, in effect, find a way to undermine the

24  Michigan state Constitution through the use of bankruptcy.

25  We believe that that is evidence of a lack of bad faith under

1 | 921(c), a lack of bad faith in connection with --

2 |       THE COURT: You mean a lack of good faith?

3 |       MS. CECCOTTI: I'm sorry. A lack of -- yes.

4 | Apologies, your Honor. Not enough sleep, once again, I'm

5 | afraid.

6 |       THE COURT: Okay.

7 |       MS. CECCOTTI: Now I'm afraid to open my mouth. No

8 | good faith --

9 |       THE COURT: I'll help you.

10 |       MS. CECCOTTI: Yes. All right.

11 |       THE COURT: I'll help you.

12 |       MS. CECCOTTI: No good faith, a lack of good faith

13 | negotiations under 109(c)(5), and not a valid plan of

14 | adjustment for Chapter 9 purposes. Thank you.

15 |                  OPENING STATEMENT

16 |       MS. PATEK: Good afternoon, your Honor. Barbara

17 | Patek again on behalf of the Detroit Fire Fighters

18 | Association, the Detroit Police Officers Association, the

19 | Detroit Police Lieutenants & Sergeants Association, and the

20 | Detroit Police Command Officers Association, who have been

21 | collectively referred to in these proceedings as the Detroit

22 | Public Safety Unions or the Public Safety Unions.

23 |       As the evidence in this case will show, the public

24 | safety unions are the recognized collective bargaining

25 | representatives of the nearly 3,200 men and women employed by

1   the Detroit Fire Department and the Detroit Police

2   Department.  I'm sure we'll hear from Chief Craig either

3   today, tomorrow, or sometime this week about the very

4   daunting and difficult conditions in which they work to

5   provide -- excuse me -- police and fire services to -- that

6   are so essential to the survival and the revival of the City

7   of Detroit.

8           The public safety unions piece of this in terms of

9   the evidence is a small but important part of the timeline

10  that was gone over this morning by Ms. Green and also by

11  Mr. Bennett.  First, I think I want to say at the outset that

12  the public safety unions have never in these proceedings

13  disputed that the city was in severe financial distress

14  beginning in the time period where I believe both Mr. Bennett

15  and Ms. Green's timelines began.  The public safety unions do

16  not, however, believe that the city can meet its burden of

17  showing that it is eligible for these Chapter 9 proceedings

18  because of the issue of the good faith negotiations, what we

19  believe was a -- as Ms. Ceccotti referred to, a deliberate

20  effort to sort of create a record of impracticality where

21  they set themselves up for failure, and we also believe that

22  the evidence will show, based upon the same set of facts,

23  that the petition was not filed in good faith as required by

24  Section 921(c).

25          While we acknowledge the legal nature of the

1    constitutional questions that this Court must wrestle with,

2    we also believe that the evidence that this Court will hear

3    in this eligibility trial may help inform those decisions by

4    providing the Court with a practical and very real platform

5    in which those questions can be applied.

6              Because the public safety unions will rely on and

7    adopt certain proofs submitted by the other objectors, I'm

8    going to try to avoid repeating what was said this morning,

9    but I do want to briefly address where our proofs will fit in

10   the chronology the Retirement Systems put up this morning.

11   And for ease of the Court's reference -- and I apologize in

12   advance.  This will also have to be marked, and we'll get a

13   paper copy, and I believe --

14             THE COURT:  Okay.

15             MS. PATEK:  -- it'll be Exhibit 720.  Our facts --

16             THE COURT:  And I'll have to ask you to understand

17   that I'm going to be looking at what's there on this little

18   screen here just because it's easier for me.  It's not that

19   I'm not paying attention to you.  I'm looking at it here.

20             MS. PATEK:  That's okay.  That's okay.  The public

21   safety unions' piece of it are in red, and the portions in

22   black are portions from Ms. Green's timeline, and we did that

23   so the Court could see where they fit in.  And we start in

24   December of 2011 and January of 2012, but before we start

25   talking about that time period, I do want to take a moment

1   because I think it's important to this negotiations issue,
2   and I think it's also important to some of the state labor
3   law issues that inform how we ended up in Chapter 9 to take
4   the Court back about 44 years ago.  In the fall of 1969,
5   again, not long after the city had been through some very,
6   very trying times, then Governor Milliken, a Republican
7   governor, signed into law an act found beginning at MCL
8   423.231 that has become -- come to be known as Act 312.  Act
9   312 is, as the Court may be aware, the platform on which
10  public safety unions negotiate their labor agreements under
11  the auspices of the Michigan Employment Relations Commission.
12  Before the emergency manager, terms and conditions of
13  employment were negotiated pursuant to this process.  That
14  process, which will be described by one of our witnesses, the
15  Detroit Police Command Officers' labor attorney, Mary Ellen
16  Gurewitz, is designed to provide for a period of mediation
17  followed by, if the mediation fails, compulsory arbitration,
18  including the opportunity to send the parties back to
19  mediation, and it's designed to be expeditious and to keep
20  labor peace and, if might say, might be a tool that if it
21  could be applied to everybody in this proceedings, some of
22  the mediators working so hard to try to resolve our
23  differences might find useful.  Ms. Gurewitz will explain
24  much better than I can the mechanics of the Act 312 process
25  and also her experience in negotiating with the city and the

1  DPCOA in the relevant time period.

2      We start with 2011 and two thousand -- December 2011

3  and January of 2012, and I believe that was also on

4  Mr. Bennett's initial timeline.  Interestingly, at that time,

5  there were negotiations between the city, recognizing the

6  financial difficulties that were present, and each of the

7  Detroit public safety unions of concessionary agreements or

8  tentative agreements.  These agreements were never adopted,

9  but our purpose in offering them is to show that where

10  there's a will, it could be done.  Our intention is not to

11  suggest in this setting that such negotiations would be easy,

12  and that's precisely taking up on Ms. Ceccotti's point why

13  that 30-day period that the city gave itself was doomed to

14  fail.

15      During the same time period as the various acts were

16  being repealed and reenacted and shortly after the governor

17  signed PA 436 into effect, Mark Diaz, the president of the

18  Detroit Police Officers Association, will tell the Court that

19  pursuant to Act 312 proceeding, there was an award that

20  became the contract for the Police Officers Association

21  through June of 2014.  This is important because, as I'm

22  going to talk about continuing along this timeline to the

23  period after the appointment of the emergency manager, which

24  takes us to our second slide, there were acts that the city

25  took to specifically remove this tool from the tool kit of

1 the city and its labor unions, and I'm not suggesting that

2 that removal was not perhaps authorized, although the unions

3 dispute that as a matter of labor law under Public Act 436,

4 but I think that it's important to suggest that in light of

5 the concept that there was a plan and design going back a

6 long way, it was no accident that, you know, the city filed

7 an emergency motion on April 18th of 2013, and on June 14th,

8 2013, the very same day it rolled out its proposal, it

9 obtained an opinion from MERC blocking the Police Lieutenants

10 & Sergeants Association, the Police Command Officers

11 Association, and the fire fighters from resorting to Act 312

12 arbitration finding that Public Act 436 had divested MERC of

13 jurisdiction to address those disputes.  And that becomes

14 important because if you consider that there's a plan on June

15 30th, 2013, the collective bargaining agreements between the

16 city, the DFFA, and the DPLSA all expired just two and a half

17 weeks before the Chapter 9 petition was filed.

18         The president of the Fire Fighters Association, Dan

19 McNamara, the president of the Lieutenants & Sergeants, Mark

20 Young, and the president of the DPOA, Mr. Diaz, as previously

21 referred to, will each tell the Court that very quickly after

22 the emergency manager's appointment on March 28th, they were

23 each informed by the city that it was exercising its right

24 under Public Act 436 not to bargain.  I know we've heard

25 through some of the testimony that that was done to somehow

 1    not waive their rights not to bargain, but the Court will

 2    have to consider whether it accepts that as a credible

 3    explanation for what happened next.

 4            Following the June 14th presentation, again, as

 5    Ms. Ceccotti referred to, things moved very quickly.  There

 6    was a presentation by the city the week of July 10th, and on

 7    July 12th -- and it was up on the screen earlier today in Ms.

 8    Green's presentation, and I believe it is in the record as

 9    Exhibit -- give you the right number here -- I'm not seeing

10    it, but it's a letter from each of the presidents of each of

11    the Detroit public safety unions addressed to Jones Day

12    indicating in response that they were, in fact, interested in

13    making a counter-proposal.  They were seeking more

14    information and a concrete proposal from the city in that

15    regard.  Four days later, on June -- or July 16th, the

16    governor -- or I'm sorry -- Mr. Orr sent his letter to the

17    governor seeking authorization.  The following day Jones Day

18    sent correspondence back to the four public safety unions

19    thanking them on behalf of the emergency manager for their

20    strong cooperation in the City of Detroit's pension

21    restructuring efforts.  The next day the petition was filed.

22            Your Honor, we believe that when the Court has heard

23    all the evidence, that it will be difficult for the Court not

24    to conclude that in this case that there was, in fact, a

25    calculated effort by the city going back over an extended

1    period of time to use Chapter 9 to both, in Mr. Orr's words,

2    trump that constitutional provision but also, as suggested in

3    some of the arguments last week, to obtain the political

4    cover that would be provided by this Court to do so.  That's

5    all I have to say.

6              THE COURT:  Thank you.

7              MS. PATEK:  Thank you very much.

8                   OPENING STATEMENT

9              MR. MORRIS:  Good afternoon, your Honor.  Thomas

10   Morris of Silverman & Morris on behalf of the Retiree

11   Association parties.  Your Honor, the Court heard a

12   comprehensive opening statement from the Retirement Systems

13   and opening statements from other opponents of the city's

14   eligibility.  Those statements chronicle the voluminous

15   evidence weighing against eligibility.  In our pretrial

16   brief, we focused on the evidence which we will offer through

17   Shirley Lightsey, president of the DRCEA -- that's the

18   Detroit Retired City Employees Association -- and Donald

19   Taylor, the president of the RDPFFA.  That's the Retired

20   Detroit Police & Fire Fighters Association.  My opening

21   statement will, likewise, address that evidence.

22             Mr. Taylor and Ms. Lightsey will testify that their

23   associations have a long and active history.  They're not

24   organizations which came into being just to respond to the

25   present situation, but they are and were prepared to deal

1   with it.  The police and fire fighters have had a retiree

2   association since 1946.  The DRCEA was formed in 1960.  The

3   elected leadership of these associations includes persons

4   who, had they been working for the city, would be the ones

5   responsible for helping resolve the city's problems.  Members

6   and management of the associations include a past chief of

7   police, a deputy chief, city budget director, personnel

8   managers, a Retirement Systems trustee, and city financial

9   and legal staff.  These are people who were leaders during

10  their active service for the city, and they continue to be

11  leaders for the retirees.

12          More than 12,000 retired nonuniform city employees

13  are members of the DRCEA, and more than 8,000 retired Detroit

14  police officers and fire fighters are members of their

15  organization.  Both of these organizations serve city

16  retirees in a number of ways, but they have particular

17  expertise in the pension and benefits areas.  Although the

18  associations do not have the power of a governmental body to

19  enter into agreements that bind their members, the elected

20  leadership is responsible to the membership and responsive to

21  the membership.  They communicate with the retirees.  The

22  associations go beyond service to their members.  Together

23  they represent the class of retired Detroit employees, all

24  Detroit retirees, not just the members who send in their

25  dues.  The associations have appeared before City Council.

1    They have lobbied the state legislature.  They have been

2    party to the lawsuits involving pension and benefit issues.

3    The evidence will show that the associations are the natural

4    representatives of the retirees capable of negotiating on

5    their behalf.

6            Upon the emergency manager's appointment, each of

7    the associations contacted the emergency manager in writing,

8    sent him a letter.  Mr. Orr did not respond to the letters,

9    but he did invite the association -- associations to

10   informational sessions which they conducted, the city

11   conducted, in April, June, and July.  Both Ms. Lightsey and

12   Mr. Taylor attended those meetings.

13           The evidence will show that the city in its meetings

14   never got beyond the first step of presenting information.

15   The city never offered to meet with the retirees to discuss

16   the city's proposal or to negotiate.  The retiree

17   representatives were relegated to being members of the large

18   audience.  The associations had their attorney contact the

19   city's attorneys, Jones Day, to request the opportunity to

20   specifically address retiree issues, but nothing came of

21   that.  Instead, on July 18, in a tactical rush, the city

22   filed its petition.

23           The evidence will show that negotiations with the

24   retirees was possible.  The membership of the associations is

25   more than a majority of the retirees.  Overall it's

1    considerably more than two-thirds.  By working with the

2    membership, the city had the opportunity to make an agreement

3    with a majority of the retirees and thereby satisfy Section

4    109(c)(5)(A) either by not impairing the class or by reaching

5    an agreement.

6         The evidence will show that negotiation was not

7    impracticable, certainly not with the retirees who, prior to

8    the appointment of the emergency manager, had already elected

9    their leaders.  The retirees had built and maintained through

10   the work of generations of dedicated volunteers organizations

11   which were prepared to work on behalf of the retirees for the

12   best outcome of Detroit -- for Detroit.  The evidence will

13   show that the emergency manager and his advisors rejected the

14   opportunity to attempt to resolve matters as to the retirees.

15   The city, therefore, does not satisfy the eligibility

16   requirements of Section 109(c)(5).  Thank you.

17             THE COURT:  Thank you.

18                      OPENING STATEMENT

19             MS. LEVINE:  Good afternoon, your Honor.  Sharon

20   Levine, Lowenstein Sandler, for AFSCME.  Very briefly and not

21   to be repetitive, with regard to solvency, the city addressed

22   AFSCME's brief with regard to our request that there should

23   actually be expert testimony in order to meet the burden of

24   proof with regard to this issue, and the city's response is

25   basically what we've seen in some smaller debtor cases, which

is the debtor can testify to its own numbers. And we're not necessarily disputing that line of cases. What we're saying here, Judge, is that this is not the debtor that's testifying to its own numbers. We don't have anybody from the budget department. We don't have any of the elected officials. What we have are hired experts who are being offered as fact witnesses, so we're bringing in experts like Ernst & Young, Conway MacKenzie, Miller Buckfire, being paid millions of dollars, who routinely appear as expert witnesses and, for reasons that we submit are not appropriate here, are just simply being offered without having to give their expert testimony with regard to solvency.

With regard to impracticality and the issue of good faith, we would respectfully submit that the argument that there are simply too many classes of bondholders doesn't make a lot of sense. The June 14 date that the proposal was presented and the filing date of July 18th was only one month and three days. Even if we went by the city's own originally projected timeline, the filing date was projected to be July 19th. That's only one month and four days. It takes more months than that to negotiate out-of-court workouts in simple small single level of debt Chapter 11 cases. We respectfully submit that the timeline that the city set for itself was a timeline that was designed not to allow an out-of-court negotiation to fully take place.

1    The city also looks to the fact that there are too
2    many bondholders and, therefore, it was impractical to
3    negotiate with bondholders, and they cited to a New York
4    case.  The only New York case we were able to find that
5    addressed the issue was the Off-Track Betting case, which
6    dealt with a six-month period before that case, which wasn't
7    even an entire city, said that there wasn't enough -- there
8    wasn't an ability to get it done out of court, and they had
9    run out of time.

10    The other issue there is too many bondholders means
11   that you've met the impracticality standard means that what
12   you're doing is you're writing the need to respond to labor
13   out of the Code.  If you have too many bondholders, it's
14   impractical, and, therefore, you don't even have to go
15   further.  We would respectfully submit that that would be a
16   sad day for Detroit if we're actually writing the need to
17   negotiate with labor out of the Code.

18    The June 14 meeting is the meeting where the
19   proposal was presented.  We've heard the city say that at
20   that meeting, they invited questions.  Okay.  So we have a
21   meeting that lasts a couple of hours.  We have a proposal
22   that's in excess of 110 pages.  The amount of time it takes
23   to even read the slides takes up the lion's share of that
24   meeting, and in addition to that, the questions which were
25   permitted were in a very controlled environment and under the

1  guise that the city was, quote, unquote, begging for
2  feedback.  All right.  The city announced at that meeting
3  that these are not negotiations.  Now, whether that
4  announcement was made to preserve a technical reservation of
5  rights under PA 436, they invited a room full of labor
6  negotiators, and they held a meeting that was basically a
7  classroom type instruction meeting, and then they announced
8  after a brief Q&A period these are not negotiations.  And
9  somehow or other this room full of labor negotiators was
10 supposed to understand that, well, while they're not
11 technically legally negotiations per PA 436, we really are
12 asking for negotiations to meet the good faith requirement
13 under the Bankruptcy Code.  That's not a -- that's not a
14 realistic or fair interpretation of the facts here coupled
15 with the fact that we have sophisticated bankruptcy counsel
16 and all of these sophisticated outside consultants who
17 apparently, when receiving a letter from these same labor
18 negotiators that assert in response to the June 14 proposal,
19 well, we have factual and legal reasons why we think we can't
20 negotiate with you, that causes them to immediately think
21 negotiations are impossible.  That's not an -- that's not a
22 fair reaction either.  I've never walked into a labor
23 negotiation where the company said to the union, "Here's your
24 1113 proposal.  What do you think?" and the union has said,
25 "Oh, good idea."  It takes a little bit more than that, your

1  Honor.  In addition to that --

2          THE COURT:  Well, you raise an interesting point

3  here that has been on my mind, and that is the extent to

4  which the standard of good faith negotiation in 1113 is

5  related to or overlaps with the standard of good faith

6  negotiation in Section 109 or even, for that matter, the

7  extent to which it overlaps with whatever the law of good

8  faith negotiation is in labor law outside of bankruptcy.  I

9  think it would help me if anyone would be interested in

10 briefing that subject.  I'm not surprised.  And there are

11 really two distinct questions there.  The one is is there

12 this overlap, should there be this overlap, and, second, how

13 might the law in those other circumstances, 1113 and labor

14 law more generally, help to resolve the issue here of whether

15 there was good faith negotiation.

16         MS. CECCOTTI:  Your Honor, may we join with that

17 effort as well?

18         THE COURT:  Yes.  The invitation is an open

19 invitation.

20         MS. LEVINE:  Thank you, your Honor.  We accept the

21 invitation, and if your Honor sets a deadline by which you'd

22 like that brief, we will --

23         THE COURT:  Oh, a deadline.  I don't know.  What's

24 convenient for you all?

25         MS. CECCOTTI:  After the 30th.

1          MS. LEVINE:  Busy this week.

2          THE COURT:  Got that.

3          MS. LEVINE:  Two weeks?  Is that sufficient, or is

4    that too long?

5          THE COURT:  Two weeks is fine with me.

6          MS. LEVINE:  Thank you, your Honor.

7          THE COURT:  All right.  Two weeks from today then.

8    I'll enter an order just so the record has it there.

9          MS. LEVINE:  Your Honor, but moving past that, okay,

10   so we have the -- we have the city saying that these are not

11   negotiations and labor negotiators are supposed to glean that

12   they are negotiations, and then we have labor negotiators

13   taking a hard line at the initial proposal and the city

14   accepting that then there can't be any negotiation and

15   somehow or other this proves that the city acted in good

16   faith or that the negotiations were impractical.  We

17   respectfully submit that's false.  And not only is it false,

18   but for the reasons that you've heard from some of the other

19   folks already, we, too, sent requests to the city for

20   additional information to understand what the ask was, what

21   the savings -- what the proposed savings were, and for better

22   information to understand, while it was a long slideshow, a

23   little bit more about what the assumptions behind the

24   proposal or the alleged proposal were so that we could, in

25   fact, like in an 1113 context, truly engage in a meaningful

1 negotiation. And AFSCME itself, your Honor, just a mere 18

2 months prior to the bankruptcy filing, on behalf of itself

3 and with a coalition of 30 unions, did agree to a tentative

4 agreement which resulted in substantial savings for active

5 and retirees' benefits, and those were ratified by all of

6 those respective unions but not implemented by the city. So

7 I'd respectfully submit that not only was there an ability to

8 negotiate in good faith over a period of just a couple of

9 months, but there's a proven track record that on this side

10 of the table, we have been able to actually do those

11 negotiations and accomplish results, so if --

12        THE COURT: Why not implemented?

13        MS. LEVINE: You'd have to ask the city and the

14 state, your Honor.

15        THE COURT: Okay.

16        MS. LEVINE: It does remain a mystery to us because

17 it also included, for example, changes to the pension

18 benefits on a go-forward basis, and to the extent that there

19 are other or different issues that they needed to address

20 now, those, too, should have been addressed through

21 negotiations. What we seem to be hearing and what is also a

22 very important point for the City of Detroit and for Chapter

23 9 on a go-forward basis is that if you have legacy

24 liabilities and you have to deal with retiree benefits, then

25 you automatically get to say it's impractical, and I don't

 1   have to show good faith at all.  And we would respectfully

 2   submit that that would be a very sad place for the City of

 3   Detroit to take Chapter 9 and all cases on a go-forward

 4   basis.

 5           We respectfully submit, your Honor, that the city

 6   can't meet its burden of proof and that it's not eligible in

 7   this case at this time to be a Chapter 9 debtor.  Thank you.

 8           THE COURT:  Thank you.

 9                       OPENING STATEMENT

10           MR. ULLMAN:  Good afternoon, your Honor.  Anthony

11   Ullman from Dentons.  I'll be speaking for the Retiree

12   Committee.  But first Ms. Patek asked me to tell you that

13   Exhibit 704 was the number of the joint public union --

14   safety union's letter that she couldn't find previously --

15           THE COURT:  Okay.

16           MR. ULLMAN:  -- so I've done that.  Your Honor, of

17   course, we're here today on what the Court has identified as

18   factual issues which arise in the context of eligibility,

19   which the city has the burden of proof on.  And you've heard

20   an overview of a lot of the evidence that the objectors

21   expect to bring to the hearing, much of it in chronological

22   order.  And what I'm going to try to do is put that in the

23   framework of the legal issues that relate to eligibility and

24   try to explain how the evidence that we expect to come out at

25   the hearing fits in with those legal issues.  I'm going to be

1    focusing, of course, on the issues that the Retiree Committee

2    is advancing, which I think are common to most, if not all,

3    of the objectors.

4         Now, it's the committee -- it's the committee's

5    contention and the contention of the objectors in general

6    that the city has failed to meet its burden of proof on a

7    number of specific elements that it has to meet to be

8    eligible for Chapter 9 and that it also has failed to meet

9    its burden of showing that its filing has been made in good

10   faith, and so what I'd like to do is kind of go through those

11   elements serially and put into context our view of how the

12   evidence falls into that and how the evidence should shape

13   your view of the law and application of the law, and

14   basically our points are as follows.

15        The committee itself, of course, doesn't contest

16   that Detroit is a municipality, and the committee is not

17   contesting insolvency, although AFSCME, of course, is, but we

18   do contest that other necessary elements have been met.  I

19   mean specifically it's our contention that the city can't

20   show that the emergency manager, first of all, was

21   specifically authorized to make this Chapter 9 filing.  We

22   also contend that the city has failed to meet the eligibility

23   criteria that are set out in 109(c)(5), and there are, of

24   course, two prongs of that.  We say the city has not shown

25   that it negotiated in good faith, which was required under

1   Subprong (c)(5)(B).  And we say the city can't show that the

2   good faith negotiations were impracticable, which is a prong

3   under Sub (c)(5)(C), and, finally, the committee says that

4   the city cannot show that it filed its petition in good

5   faith, which is required under 921(c).

6         So taking that from the top, this is, first of all,

7   what Section 109(c)(2) requires, and it requires specifically

8   that the city be specifically authorized or the person acting

9   for the city be specifically authorized to be a debtor under

10  state law, and we don't think the city can show this as a

11  factual matter because in filing the Chapter 9 petition, the

12  emergency manager did so with the specific intent of taking

13  actions and achieving results that are prohibited by the

14  Michigan state Constitution, namely the pension clause,

15  Article IX, Section 24.  And we believe that that renders the

16  filing ultra vires, ineffective, and void, and this point

17  also obviously ties in with the view that in filing the

18  Chapter 9 petition, the emergency manager didn't act in good

19  faith under Section 921(c), so what I'm going to do is review

20  the evidence on the intent in filing, particularly relative

21  to the pension clause, for both purposes of the specific

22  authorization and good faith under 921(c) together.

23         Now, as the Court may recall, there's also another

24  aspect that we've raised with respect to Section 921(c) and

25  good faith, and that is what we contend are the misleading

1    statements and omissions that were made in connection with

2    the Chapter 9 filing, and I'll deal with those later in the

3    presentation.

4         So turning now to the emergency manager's intentions

5    as regards the pension clause, we think that the evidence is

6    very clear, and I'll summarize some of the key points.  First

7    of all, we know that Mr. Orr was made the emergency manager

8    under PA 436, and that, of course, as you've heard, was the

9    replacement law for PA 4, the prior emergency manager law

10   which had given the emergency manager very broad powers and

11   then was repealed by voter referendum, and PA 436 was passed

12   in its place.  And as we know, it was passed with a minor

13   appropriation provision, and we believe that the evidence

14   will show that that was intended to immunize the law from

15   Michigan voter review and, in fact, was a strategy that had

16   been devised and suggested by the Jones Day law firm itself.

17        Now, PA 436 was enacted in November 2002 with an

18   effective date of March 2013, and it was against this

19   background that the emergency manager, Mr. Orr, was selected

20   for his post.  Now, Kevyn Orr we know is a bankruptcy lawyer

21   by trade.  That, of course, in and of itself, doesn't prove

22   anything, but the evidence will show that before becoming the

23   emergency manager, he was a bankruptcy lawyer at Jones Day,

24   and, as I believe the Court has heard, he participated in the

25   pitch that Jones Day made to the city and to the state to get

1    its current assignment as restructuring counsel.

2         Now, we've already seen from Ms. Green's

3    presentation that prior to the pitch that Jones Day made,

4    which was in late January 2013, Mr. Orr was specifically

5    asked about the availability and use of Chapter 9

6    specifically relative to the City of Detroit, and the

7    evidence will show that in connection with that pitch, the

8    Jones Day team was not only focused on Chapter 9 but was also

9    specifically aware of the Michigan state pension clause and

10   had already thought of using Chapter 9 as a means to try to

11   get around it.

12        Now, this is the cover of the Jones Day pitch book,

13   and here's a slide from it which we're blowing up, and what

14   it says specifically is that if needed, Chapter 9 could be

15   used as a means to further cut back or compromise, quote,

16   "accrued financial benefits," close quote, otherwise

17   protected under the Michigan Constitution.  And that

18   quotation, "accrued financial benefits," I believe, are words

19   that are lifted right out of the pension clause itself.  So

20   this is from the pitch book that Jones Day prepared, and, as

21   we've said, Mr. Orr himself was a major player and part of

22   the pitch book -- the Jones Day pitch team.

23        And the evidence further is that from his own review

24   of the circumstances of PA 436 and PA 4, Mr. Orr concluded

25   that the new law, PA 436, in reality, was nothing more than a

1  thin veneer -- those are Mr. Orr's words -- a thin veneer of

2  a revision that's essentially a redo of the prior PA 4 that

3  the voters had rejected and an end-run around the voter

4  rejection.  This is from an e-mail that Mr. Orr wrote, and I

5  believe -- it's a little hard to read because we didn't blow

6  that top part up, but I believe it's January 31 of 2013.  And

7  this is from one of the exhibits that was gone over with

8  Mr. Orr in his deposition.

9        Now, central to the issue of bad faith and

10  authorization is the Michigan Constitution's pension clause.

11  I'll just put a copy of that up on the screen.  And as we

12  see, the same word, the financial -- accrued financial

13  benefits, the same words that appeared in the Jones Day pitch

14  book, are right there in the Constitution.

15        Now, the evidence will show that Mr. Orr was

16  personally aware of the pension clause, and the evidence will

17  also show that when he became the emergency manager, Mr. Orr

18  took an oath requiring him to uphold the pension clause --

19  the state Constitution, of which the pension clause is part.

20  And this is from Mr. Orr's testimony where he acknowledged

21  that, yes, he took the oath of office, and he solemnly swore

22  to support the Constitution of the United States and the

23  Constitution of this state; that is, of the State of

24  Michigan.  But the evidence will show that instead of

25  adhering to the strictures of the pension clause, Mr. Orr

1  decided, contrary to his sworn oath, to engage in a course of

2  action that was deliberately designed to thwart it through

3  the vehicle of a Chapter 9 filing, and what I'm going to go

4  through now are some highlights of what I think the evidence

5  will show, some of which you've seen before, some of which

6  you may not have.

7      Now, the evidence will show that as early as May

8  2013, which was less than two months after he became the

9  emergency manager, Mr. Orr made the decision to cut pension

10 benefits that were owed to -- excuse me -- to retirees, and

11 it will show that he understood that he was unable to

12 identify any viable way to achieve that end just under state

13 law.  And the evidence will show that the emergency manager,

14 therefore, decided to try to accomplish that end through the

15 means of a Chapter 9 filing.  And even more specifically, the

16 evidence will show that the emergency manager decided to try

17 to use Chapter 9, the Chapter 9 filing, as a vehicle

18 specifically to, quote, "trump" the pension clause of the

19 Michigan Constitution.

20     Now, this all came together in the proposal to

21 creditors that the emergency manager made on June 14th of

22 2013, and in his proposal the emergency manager made no

23 pretense that he was intending to protect accrued financial

24 benefits as is required and provided for in the Michigan

25 Constitution.  For example, here's an excerpt from page 109

1    where he specifically says that under this proposal, there

2    must be significant cuts in accrued vested pension amounts

3    for both active and currently retired persons.

4         And under this June 14th proposal, the emergency

5    manager, in fact, said that the city would not make any

6    further pension contributions on account of retirees.  For

7    retirees the defined pension benefits were to be cut entirely

8    from the forecast of the city's expenses going forward as

9    were the retiree healthcare benefits.  And for active

10   employees, they were being shown as switched from a defined

11   benefit plan to a defined contribution plan with the level of

12   the city's funding of the contributions slashed dramatically

13   from the present levels.  Now, for the actives, this is a new

14   plan, and the contributions are being made only on a going-

15   forward basis, so for the active employees' vested pensions

16   under this proposal, no further contributions would be made

17   for those either.

18        Now, the June 14 proposal, although it was very

19   lengthy, well over a hundred pages, didn't mention anywhere

20   in it the prospect or even the potentiality of a Chapter 9

21   filing, but the evidence will show very clearly that the

22   emergency manager understood that his proposal could not be

23   implemented outside of the context of Chapter 9 specifically

24   because of the pension clause and that he, therefore,

25   intended to use Chapter 9 as a vehicle to, again, in his

1    words, trump that very clause, the Constitution's pension

2    clause. And he's freely admitted that it's the state

3    Constitution -- the pension clause and no other provision of

4    the Michigan Constitution that the emergency manager was

5    trying to trump. This is an excerpt from his deposition. I

6    think you may have seen parts of this before, but he says --

7    he goes on to say that -- he answers, "We don't believe

8    there's an obligation under the state Constitution to pay

9    pensions." He says, "Yes, that's right." He says, "No.

10    I've made that statement many times." And then we go on to

11    ask him, "And the state law that you were referring to as

12    being trumped was Article IX, Section 24; isn't that right?"

13    He says, "Yes. That's right." We asked, "Is there any other

14    state law that you viewed as relevant to the pension -- to

15    the pension issue that you were trying to trump?" He says,

16    "No," there's no other state law that he's trying to trump.

17    It's specific, the pension clause. This Chapter 9 filing was

18    done specifically to try to get around the pension clause of

19    the Constitution, and there's no other way to read the

20    evidence on that. And these admissions also confirm the

21    city's recognition that the pension clause, in fact, applies

22    directly to what the city is trying to do through this

23    Chapter 9 proceeding and that the pension clause is in direct

24    conflict with what the emergency manager is trying to do here

25    as regards pensions. There's no question about it. They are

 1 trying to do something that they acknowledge is in conflict

 2 with the pension clause.  If that weren't the case, there'd

 3 be no context in which the federal law could trump anything.

 4 There would be nothing to trump.  There's a direct --

 5          THE COURT:  I don't mean to cut you off, but haven't

 6 we been through this?

 7          MR. ULLMAN:  To some extent, your Honor, and I'm

 8 trying not to repeat exactly --

 9          THE COURT:  Any extent to which we haven't?

10          MR. ULLMAN:  Yes, I believe there is, your Honor.

11 I'm trying to -- I'm trying to bring additional evidence to

12 make the -- largely the same points but in a more summary

13 fashion and then move on to the eligibility issues.

14          Now, the emergency manager did all this in

15 circumstances where he himself has admitted that he was not

16 aware of any court decision that allowed the use of a federal

17 bankruptcy proceeding to trump a provision of the state law

18 Constitution.  And the emergency manager did this in

19 circumstances where the Jones Day law firm itself had

20 previously advised that the emergency manager's ability to

21 cut pensions through Chapter 9 was, at best, uncertain.  That

22 comes from the Jones Day pitch book itself.  They said it was

23 uncertain.  And he did this in circumstances where the

24 emergency manager had been advised by the state attorney

25 general that the pensions were protected under Michigan state

1  law and that what the emergency manager was doing in terms of

2  trying to cut them was contrary to the Michigan Constitution.

3         And, finally, on this point, we think that the

4  timing of the filing itself is very significant.  You've seen

5  already that there were -- there was state court litigation

6  that was pending, and you've heard that there was a TRO

7  hearing that was scheduled and that the hearing on the TRO

8  was scheduled to take place on the 18th.  And what the

9  evidence shows -- I'm sorry.  Yeah.  It was on the 18th, and

10  the evidence shows, as you've seen already, that the

11  bankruptcy filing had been originally scheduled for the 19th

12  and then had been moved up to go -- to coincide on the 18th

13  immediately prior to when the TRO hearing was supposed to

14  take place, and the evidence on that is as follows, and I'll

15  just skip to this particular slide.

16         Mr. Orr was asked specifically about the timing of

17  the filing of the bankruptcy petition and, in particular,

18  about the timing relative to the TRO proceeding, he was

19  asked, "Is there a particular reason why the filing was made

20  when it was, at the time it was, other than to try to get a

21  jump on the state court decision?"  And the emergency manager

22  answered that, to the best of his knowledge, there was no

23  such reason.

24         So to sum up on all this, we think that it boils

25  down to the simple proposition that a state actor who takes

 1  actions that are intentionally designed to achieve results
 2  that are in plain violation and in direct odds with the state
 3  Constitution is not acting within the scope of his authority
 4  and is not acting in good faith, and we believe the evidence
 5  will show that that's the situation here.
 6          I'm going to turn now to the issues of eligibility,
 7  and there are -- as we've said, there are two prongs here.
 8  The city can prove by -- the good faith negotiation or the
 9  impracticability issue either by showing that it engaged in
10  good faith negotiations or by showing that those were
11  impracticable.
12          Now, on the good faith negotiation prong, we believe
13  the evidence is going to show two things.  First of all, the
14  emergency manager has argued that the presentations and
15  discussions that followed his June 14th proposal to creditors
16  constituted attempts at good faith negotiations.  However,
17  the evidence will show that at the time of the presentations
18  and meetings, the emergency manager did not have what he
19  believed was a plan of adjustment and specifically that the
20  emergency manager himself viewed the June 14th proposal only
21  as a proposal and not as a plan of adjustment.  Now, we've
22  heard this morning from Mr. Bennett that the city is
23  apparently trying to backtrack on this now, but when Mr. Orr
24  was questioned at his deposition, he not only acknowledged
25  but was adamant that what he presented on June 14th, which

1    was the subject of the following discussions and meetings,

2    was not a plan but merely a proposal that he had put out to

3    seek the general creditor feedback.  He said this very

4    specifically.  "We never called this a plan.  We never called

5    it a deal.  We always called it a proposal."  So it was never

6    considered -- whatever the city is saying now, at the time

7    that the proposal was made, which, of course, was well before

8    we filed our pretrial brief, which is at the same period when

9    Mr. Orr testified prior to the filing of our pre-trial brief,

10   Mr. Orr was quite clear that what they put on the table on

11   June 14th was not a plan of adjustment, was not intended as a

12   plan of adjustment.  It was just intended as a proposal,

13   something to be discussed.  And we believe this is important

14   because under the clear -- what we believe is the clear

15   weight of the law, in order for the negotiations that are

16   referred to in Subpart (c)(5)(B) --

17           THE COURT:  One second.  I have been asked to ask

18   you to move back from the mike just a bit.

19           MR. ULLMAN:  Okay.  Is that better?

20           THE COURT:  Maybe a little bit more.

21           MR. ULLMAN:  Little bit more?

22           THE COURT:  There you go.

23           MR. ULLMAN:  Okay.  The reason this is important is

24   because under Subpart 109(c)(5)(B), the negotiations that are

25   referred to in that subpart have to be negotiations over what

1  is a plan of adjustment as that term is used in the

2  Bankruptcy Code.  The legal analysis on that, the authorities

3  we cite are all in our brief, and I'm not going to repeat

4  that here, but the point is that for the good faith

5  negotiation prong to be met, the negotiations that have to

6  be -- at issue have to take place over a plan of adjustment,

7  and the evidence shows that per the emergency manager's own

8  testimony in this case, no plan of adjustment was ever

9  presented to the creditors, and so a fortiori the

10  negotiations required under Subprong (c)(5)(B) never took

11  place.

12          And so there's no confusion on this, I want to be

13  clear that the question of whether the city presented the

14  creditors with a plan of adjustment is a very different

15  question from whether the city intended to impair or diminish

16  protected pension payments.  On the one hand, as I've gone

17  through, the evidence will show that the city never presented

18  creditors with anything that they considered a plan of

19  adjustment, and on the other hand, as I've gone through and

20  Ms. Green has summarized, the evidence will show that the

21  emergency manager did intend to impair the protected pension

22  benefits.  In fact, this latter point is not even subject to

23  question.  The city has actually admitted in an RFA in this

24  proceeding that's binding on it that it, in fact, intends to

25  impair the pension rights as part of this proceeding, and

1    that's from the city's answer to the RFA that was served on

2    it, Number 12, where they admit that the city intends to seek

3    to diminish or impair accrued financial benefits.  That,

4    again, is the term that's used in the pension clause of the

5    Constitution.  So that's what the evidence will show on the

6    existence of a plan of adjustment.

7            Now, we also believe and you've heard before that

8    even if there were a plan of adjustment, even if there had

9    been one presented, there were no good faith negotiations.

10   For example, there was no way to know from the evidence --

11   or, rather, from the information that was provided at the

12   June 14 meeting how in actual monetary terms the individuals

13   that the city sought to affect under the June 14 proposal

14   would be impacted, and specifically in terms of both the

15   proposed pension cuts and the OPEB where the city was saying

16   that the retirees would instead get some share of notes,

17   there was no way for the retirees to know what the cash value

18   was of what the city was proposing.  And, in fact, the

19   evidence will show that for -- at least for retirees at the

20   time of the discussions over the June 14 proposal, the time

21   those discussions were proceeding, the city itself did not

22   even know what the real size of the unfunded pension

23   liability was.  In other words, there was no way to know what

24   the parties were even negotiating over.  And here's some of

25   the evidence quickly on the negotiations.  First of all, the

1   emergency manager has admitted -- this is a question asked as

2   regards to the June 14 meeting.  We asked him, "Were there

3   negotiations there?"  His answer, "No.  There were not

4   negotiations.  I'm going to be careful how I use the word,

5   but no.  As we generally use the word, there were none."

6            There were other meetings that then took place.  The

7   next meeting, as I recall, took place on June 20, and this is

8   from a letter that Jones Day wrote, and it called them

9   informational meetings and acknowledged that actives and

10  retired employees will need access to additional information

11  to analyze the proposals that are being -- that are proposed

12  in the June 14th document.  And here's another letter from

13  Jones Day.  This is dated, I believe, July 17th, and what it

14  says is, "We think it first makes sense to try to reach

15  common ground with the unions and associations on actuarial

16  assumptions and methods and the amount of the underfunding."

17  First we got to figure out what the amount of the

18  underfunding is and then tackle the contributions and

19  attendant benefit changes.  You have to know what the size of

20  the underfunding is before discussions can even take place,

21  so, again, there wasn't even anything concrete to negotiate

22  over.

23           And, finally, on this point, we believe the evidence

24  will show the city never really intended to engage in good

25  faith negotiations.  I'm going to put this document up

1  briefly. I think we've gone through this before. This is a
2  document from Bill Nowling of the emergency manager's office,
3  and what he's basically saying -- this is as of July 8th --
4  that they've already concluded what their key filing messages
5  would be. July 8th they're saying it's impracticable. This
6  is before the meetings that took -- that were scheduled for
7  July 10th and 11 even took place. So what we can see is that
8  even as the city was telling the world that it wanted to have
9  more meetings, it had already internally and secretly decided
10 that it would claim impracticability. So the meetings that
11 were followed were really nothing more than an effort to
12 create a record that would allow the city to claim good faith
13 negotiations when, in truth, there were no real negotiations
14 and the city wasn't negotiating, we believe, in good faith.
15        With respect to the impracticability prong, we
16 believe the situation is similar. At the outset, as we've
17 explained in our pretrial brief, the committee believes that
18 the requirement that there be a plan of adjustment applies
19 equally to the impracticability test, and this only makes
20 sense because without an actual plan identifying who the city
21 intends to impair and how, there's no way to assess whether
22 negotiations would be practicable. And specifically, as
23 we've said, the only document that was on the table was the
24 June 14 proposal, and that was a proposal, not a plan.
25        And further, as we've set out, we believe and the

1   law is that to show impracticability, the city has to show

2   impracticability with respect to each class of creditors.  It

3   has to try to negotiate with those with whom negotiations are

4   possible, and, as you've heard, the evidence will show that

5   we believe there were certainly a number of classes of

6   creditors with whom that was possible.  And as we saw from

7   the last slide, the evidence indicates that the city really

8   never intended to try to negotiate but really just tried to

9   use impracticability as a tool to get out of it.  So from a

10  factual viewpoint, we believe the impracticability prong will

11  not be met either.

12          Now, finally, I want to talk briefly about Section

13  921(c), which is the good faith requirement.  I've already

14  addressed one aspect of the good faith, the emergency

15  manager's pursuit of a course of action that's contrary to

16  the pension clause of the Constitution, but there's also

17  another aspect to it, and that is this, that we believe that

18  in connection with his filing of the petition, the emergency

19  manager made a number of misrepresentation -- or of

20  representations that we believe the evidence will show were

21  at minimum misleading and incomplete, and I'll give you some

22  examples.

23          First of all, in his declaration -- this is the

24  declaration that the emergency manager filed with the

25  petition -- he stated that the city has over 18 billion in

1    accrued liabilities and including specifically over 6.4

2    billion in bonds that are backed by enterprise revenues or

3    otherwise secured.  Now, that, of course, sounds like a huge

4    liability for the struggling City of Detroit to bear, but the

5    evidence will show that what's not stated in this is that the

6    vast majority of these bonds that we see referred to here,

7    the 6.4 billion, are bonds that are issued by the Detroit

8    Water and Sewerage Department, which is operated as a

9    separate authority and is fully responsible for the payment

10   of those bonds.  And the evidence will show that the

11   Department of Water and Sewers itself has the financial

12   wherewithal to make those payments.  We put this question to

13   the emergency manager in his deposition.  He said, yes, the

14   Department of Water and Sewers, it generates its own

15   revenues, and it pays its debts as they come due.  So right

16   off the bat, the total liabilities that, according to the

17   emergency manager, he has to struggle to meet are effectively

18   reduced by at least a third.

19        Now, also in his declaration the emergency manager

20   stated that in terms of the unfunded pension liability, that

21   the unfunded pension liability is $3.5 billion, and this is

22   stated here as a fact, not subject to qualification, and as

23   we all know, the unfunded pension liability -- how big it is

24   and what, if anything, will be done about it, those are

25   central issues that will have to be addressed if this action

 1   proceeds, but for present purposes, the evidence will show
 2   that this $3.5 billion number that Mr. Orr stated in his
 3   declaration is not a fact.  We think the evidence will show
 4   that the fact is that at the time the petition was filed, the
 5   city did not know the actual size of the unfunded pension
 6   liability as its analysis on that was ongoing and hadn't been
 7   completed and, indeed, still hasn't been completed today.
 8   And this, for example, is from the deposition testimony of
 9   Charles Moore, who is the city's -- from Conway MacKenzie,
10   which is the city's operational restructuring advisor.  Mr.
11   Moore also put in a declaration addressing unfunded pension
12   liabilities, and at his deposition Mr. Moore candidly
13   admitted that, in fact, the city didn't know what the actual
14   amount of the unfunded liability was and that work was going
15   on to try to make that determination.  He says specifically,
16   most importantly, the city's actuary has not completed its
17   analysis on the unfunded position, and until that work is
18   done, no one really knows what the unfunded liability is.
19   And, indeed, we believe the evidence will show that the last
20   full actuarial evaluation of the unfunded liability was done
21   around June of 2011, and the unfunded amount that was shown
22   in that evaluation was about 643, 644 million.  And the
23   evidence is also going to show that of that total amount, the
24   644 or so, only about 250 million is allocable to the general
25   fund, which is the fund that the city is most concerned

1  about, which it pays most of its bills.  That is not a charge

2  on the general fund.  The evidence will show that a very

3  large chunk of that is, in fact, allocable to other

4  departments such as the Department of Water and Sewerage,

5  which, again, is responsible for that and pays its own bills.

6        Now, during the -- Mr. Bennett's arguments, he

7  suggested that we had somehow misstated what Mr. Orr said at

8  his deposition, failed to cite all the appropriate parts.

9  That's not accurate.  At his deposition Mr. Orr was put

10  through the numbers, and there was an initial error.  He then

11  corrected that arithmetic error.  At the end of the

12  deposition, Mr. Orr said that it appeared to his knowledge at

13  that time the portion of the unfunded pension liability that

14  was allocable to the Department of Water and Sewerage was

15  about 68 percent.  Mr. Bennett is suggesting that maybe 68

16  percent isn't the right number, and the right number should

17  be 38 percent.  Be that as it may, 38 percent is still in

18  this context a huge chunk of the unfunded pension liability,

19  which is something that's borne by Department of Water and

20  Sewerage and payable from those funds without any strain on

21  the general fund.  And the evidence will show that the

22  emergency manager has acknowledged that even if the unfunded

23  pension liability were ultimately found to be greater than

24  the $644 million number, even if it were found to be --

25  excuse me -- as high as the $3.5 billion number that you've

1  heard, that same principle would hold true, that there's a

2  significant portion of it that is not allocable to the

3  general fund but is borne entirely and payable by and fully

4  funded by the Department of Water and Sewers.  And as I said,

5  the evidence will show that that department is solvent and

6  capable of meeting its obligations, and, indeed, the Water

7  and Sewerage pension payments even have priority over secured

8  claims in that they're included in net operating expenses.

9       So we believe the evidence will show that the amount

10  of the underfunding on the pension liability is not nearly as

11  severe as -- still substantial -- we're not denying that, but

12  not nearly as severe as was portrayed in the emergency

13  manager's declaration.

14       And finally, related to all this, the evidence will

15  show that the city does, we believe, have substantial assets

16  that can be monetized.  Chiefly but not alone among them is

17  the art that's owned by the city that's maintained at the

18  Detroit Institute of Arts, and we're talking about art that's

19  owned outright by the city, not art that's subject to any

20  charitable trust.  And the evidence will show that there's

21  that asset, and also the Department of Waters and Sewers is a

22  valuable asset that could be monetized.  The city may well be

23  in a position to obtain substantial cash inflows from these

24  assets and we understand is actively pursuing these

25  opportunities.  Those assets, those cash flows could

 1 | obviously be used to fund other obligations as well, yet none
 2 | of that was factored in any way into the Orr declaration even
 3 | though that could dramatically change the mix of what happens
 4 | in terms of paying not only pension obligations but other
 5 | obligations as well.

 6 | So that, your Honor, is what we believe the evidence
 7 | will show.  Based on that, we believe the city cannot meet
 8 | its burdens of proving eligibility or good faith, and we look
 9 | forward to proceeding.  Thank you, your Honor.

10 | THE COURT:  Thank you.

11 | MR. ULLMAN:  Oh, and I do -- we will have a bound
12 | copy of the slides that I used for you marked.  Thank you.

13 | THE COURT:  All right.  Thank you.

14 | MS. LEVINE:  Your Honor, I apologize, but I got a
15 | flurry of e-mails after I stepped away from the podium saying
16 | two weeks, what are you, crazy?

17 | THE COURT:  What was your answer to that question?

18 | MS. LEVINE:  I have to ask the judge if I'm crazy or
19 | not.  I guess --

20 | THE COURT:  I take it you're asking for more time.

21 | MS. LEVINE:  If we could have another week, your
22 | Honor, that would be --

23 | THE COURT:  Sure.  Three weeks.  Absolutely.  Okay.
24 | So does that conclude your opening statements?  All right.
25 | We'll take a recess now until ten after three, and we'll

1  begin with the evidence at that time.

2         THE CLERK:  All rise.  Court is in recess.

3      (Recess at 2:51 p.m. until 3:10 p.m.)

4         THE CLERK:  Court is in session.  Please be seated.

5         THE COURT:  Okay.  It appears everyone is here.  You

6  may proceed.

7         MR. STEWART:  Thank you, your Honor.  Geoffrey

8  Stewart, Jones Day, for the city.  Our first witness will be

9  Gaurav Malhotra, but before we call him, I wanted to put on

10 the record a stipulation that the parties have reached with

11 regard to the sequestration of witnesses.  We've agreed that

12 witnesses should be sequestered with the exception of those

13 who, by definition, are representatives of a party.

14        THE COURT:  That's fine.  I ask counsel, please, to

15 supervise this sequestration because you know who your

16 witnesses are.

17        ATTORNEY:  Thank you, your Honor.  We will.

18        THE COURT:  Okay.

19        MR. STEWART:  May we call Mr. Malhotra to the stand?

20        THE COURT:  Yes, yes, of course.  Step forward,

21 please, sir.  Before you sit down, please raise your right

22 hand.

23         GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN

24        THE COURT:  Please sit down.  You may proceed, sir.

25                    DIRECT EXAMINATION

1  BY MR. STEWART:

2  Q   Good afternoon.  Mr. Malhotra, could you please, for the

3  record, give us your full name and your home address?

4  A   Gaurav Malhotra, and I live in Chicago, Illinois.

5  Q   And are you presently employed?

6  A   Yes.

7  Q   Who are you employed by?

8  A   Ernst & Young.

9  Q   And what is Ernst & Young?

10  A   Ernst & Young is a Big Four accounting firm.

11  Q   And how long have you worked for Ernst & Young?

12  A   For close to four years since I recently joined.

13  Q   In what part of Ernst & Young's practice do you work?

14  A   Restructuring specifically.

15  Q   And just for the record, tell us what that means when you

16  say "restructuring"?

17  A   Our practice predominantly represents corporations and

18  public sector clients in order to assist with business plan

19  assessments, liquidity analyses, as well as developing

20  restructuring proposals.

21  Q   Tell us, if you could, about your college education and

22  any post-graduate education that you had.

23  A   I went to college in New Delhi, India, and I did my MBA

24  in Finance and Business Policy from Case Western, and I'm

25  also a CFA.

1  Q   Certified financial analyst?

2  A   That is correct.

3  Q   After you left Case Western, what was the first job that

4  you had?

5  A   I joined Ernst & Young.

6  Q   And how long were you at EY at that point?

7  A   At EY, I joined in May of 2000, and EY's restructuring

8  practice was, I believe, in 2004, sold to Giuliani Capital

9  Advisors.  I transitioned with that team.  That team was

10  subsequently sold to Macquarie, an Australian investment

11  bank, and I transitioned with that team and came full circle

12  back to EY about four years ago.

13  Q   And what is your title at EY now?

14  A   I'm a principal.

15  Q   And what does that mean?

16  A   It's a non-CPA partner of the firm.

17  Q   So you're an equity partner of EY?

18  A   I am an equity partner of EY.

19  Q   Could you tell us some of the clients you have worked for

20  as part of your work in restructuring?

21  A   I worked for Delta Airlines.  I did work for Detroit

22  Public Schools, doing work for Liberty Medical right now,

23  worked at Collins & Aikman, and those are some of the clients

24  that I've worked with in addition to others.

25  Q   Did there come a time when EY was retained by the City of

1   Detroit to perform work for the city?

2   A   Yes.  We started our work in about the May, June of 2011

3   time frame.

4   Q   So over two years ago?

5   A   That's right.

6   Q   At the time the city approached you or at any time since,

7   was EI -- EY -- sorry -- retained to serve as an expert for

8   the city in any litigation, including Chapter 9 litigation?

9   A   No.  In fact, it's very clear in our letter that we will

10  not serve as an expert.

11  Q   What were you hired to do in May of 2011?

12  A   Generally, it was to get a handle on the city's liquidity

13  position and try and get our arms around in terms of the

14  city's short-term liquidity forecast over the next 12 months

15  or so.

16  Q   And this was back in 2011.  That was what you were asked

17  to do?

18  A   That is correct.

19  Q   Did there come a time earlier this year when the scope of

20  work the city asked of EY was expanded?

21  A   Yes.  In the front end of this calendar year, our role

22  was expanded to look at a ten-year forecast for the city,

23  predominantly on the general fund, and to ascertain what the

24  deficit as well as cash projections would be over a longer

25  time frame versus a shorter time frame.

1  Q   Now, you just used the term "general fund."

2  A   Yes.

3  Q   What is the general fund?

4  A   The general fund is basically where the day-to-day

5  activities for a municipality are recorded. i.e., collection

6  of taxes, payment of operating expenses and administrative

7  expenses as well as debt service that is not related to an

8  enterprise fund.

9  Q   Why is the general fund a logical place to look when

10 you're analyzing the city's financial position?

11 A   Because that's where the tax revenues or the fees are

12 recorded, so the enterprise funds specifically charge their

13 own fees for that specific service, but the general fund is

14 where the core operating deficit of a city is recorded in

15 municipal accounting across the country.

16 Q   Now, you've used the term a couple of times "enterprise

17 funds."  For the record, what are the enterprise funds?  What

18 are examples of the enterprise funds?

19 A   Enterprise funds generally are -- have a specific fees

20 that is charged for the services that are provided by that

21 fund.  It's generally break-even.  For example, the Water and

22 Sewer department is an enterprise fund of the city.  The

23 Detroit Department of Transportation is an enterprise fund of

24 the city, although the Department of Transportation requires

25 a subsidy from general fund, so it's not break-even.

1  Q   Now, in your analysis of the city's financial position

2  and of the general fund, did you take into account the

3  enterprise funds?

4  A   We looked at some of the cash activity of the enterprise

5  funds back in 2011 but focused majority of our efforts on the

6  general fund and those enterprise funds that require a

7  subsidy from the general fund like DDOT, which is the

8  Department of Transportation.

9  Q   Now, in the course of your work, what materials or

10  information from the city did you rely upon?

11  A   We looked at a CAFR.

12  Q   I'm going to stop you right there.

13          MR. STEWART:  Can we put up Exhibit 6?  And I

14  believe, your Honor, the CAFR, which is Exhibit 6, has been

15  stipulated into evidence.

16  BY MR. STEWART:

17  Q   Is this the CAFR?

18  A   Yes.  That's the CAFR for 2012.  It's the Comprehensive

19  Annual Financial Report, which is the city's audited

20  financial statements.

21  Q   Those were audited?

22  A   Yes.

23  Q   By Ernst & Young?

24  A   No.

25  Q   And what does the CAFR tell you?

1  A   It gives you a detailed snapshot of revenues and expenses

2  as well as the deficit position of the general fund as well

3  as some activity of the enterprise funds.

4  Q   Is this a public document?

5  A   Yes, it is.

6  Q   What else did you look at in the course of your work to

7  learn about the details of the finances of the city?

8  A   We looked at the city's budgets.  We looked at internal

9  financial reports that we had access to from the city.

10  Q   What kind of financial reports?

11  A   They were generally department-specific revenues and

12  expenses as we had available.  We also looked at receipts and

13  disbursements activity for different bank accounts to try and

14  get our arms around the financial position of the city.

15  Q   Now, were these materials you looked at records -- the

16  financial records that the city had kept in the ordinary

17  course of its business?

18  A   Yes.

19  Q   And in your experience, is it in the ordinary course of

20  an enterprise or city's business to keep records such as the

21  ones you were looking at?

22  A   Yes.

23  Q   And did the records appear to you to be accurate?

24  A   Generally, yes.  I mean there were always questions about

25  assumptions like specifically on budgets, but we did not find

1  any material discrepancies at least in the information that

2  we were trying to get our arms around specifically like the

3  CAFR.

4  Q   Well, what did you do to check the reliability of the

5  information the city gave you?

6  A   What we did is we looked at the information that was made

7  available.  We spoke to various members of the city's

8  management team, the finance department at the city, various

9  department heads.  We looked at the receipts and

10 disbursements activity as generally cash was a telling

11 barometer in terms of the quality of information we were

12 receiving, so we went through and tried to scrub the data to

13 the best of our ability.

14 Q   You just used the term "we."  I should have asked you

15 earlier how many people from EY worked with you on this

16 project?

17 A   On the front end of this engagement, we had a team of

18 about four or five, and that team is larger now.

19 Q   What deliverables were expected of E&Y as a result of its

20 work?

21 A   It was generally cash flow updates, whether they be short

22 term or medium term, generally going out on a monthly basis,

23 variance reports in terms of how the city was performing in

24 context of those cash flows.  As time progressed, our work

25 expanded to helping develop the long-term projections in

1   conjunction with other members of the city, so we also helped

2   in terms of updating the financial advisory board on a

3   monthly basis in terms of where some of the cash position of

4   the city was.

5   Q   And in terms of organizing and presenting your data, what

6   methods did you use?

7   A   It was generally Excel spreadsheets or PowerPoint

8   presentations.

9   Q   Okay.  And an Excel spreadsheet is what?

10  A   It's a software that allows you to compile, organize, or

11  make calculations in terms of the data that we have

12  available.

13  Q   And the calculations are arithmetical calculations?

14  A   Yes.

15  Q   Now, let me ask you this.  Did there come a time when you

16  learned that an emergency manager had been appointed for the

17  City of Detroit?

18  A   Yes.

19  Q   And do you remember when you learned of it?

20  A   Right around March.

21  Q   And when did you meet Kevyn Orr for the first time?

22  A   The first time I met Kevyn Orr was during the interview

23  process of various law firms where Jones Day was one of the

24  firms that was presenting its credentials to represent the

25  city.

1  Q   And after Mr. Orr was appointed as emergency manager, how

2  often did you meet with him?

3  A   Generally weekly.

4  Q   And has that continued to this day?

5  A   Yes, either meetings or phone conversations.

6  Q   Okay.  Are you aware of something called a 45-day report?

7  A   Yes.

8  Q   What is a 45-day report?

9  A   It's a report that an emergency manager has to present 45

10  days after his or her appointment to provide a snapshot of

11  the financial and operating condition of the city.

12  Q   Now, we put up on the monitor before you Exhibit -- I

13  think it's 75 for identification.  Is that the 45-day report?

14  A   Yes, it is.

15  Q   And you've seen this before?

16  A   I have.

17  Q   And do you understand why it was Mr. Orr was required to

18  submit a 45-day report?

19  A   I believe it's per statute under PA 436.

20  Q   Did you yourself contribute any part of the content of

21  the 45-day report?

22  A   We did.  We helped work on the financial section of the

23  document as well as some short-term liquidity projections

24  that were available as of that point in time.

25  Q   Let me ask if we could go to page 40 of the --

 1          MR. STEWART:  And if we blow it up for the monitor,

 2   please, Lauren, so we can see it better --

 3   BY MR. STEWART:

 4   Q   Mr. Malhotra, do you have that before you, page 40 of the

 5   report?

 6   A   Yes, I do.

 7   Q   And what is that?

 8   A   That is a snapshot of the monthly receipts and

 9   disbursements activity of the general fund and the cash

10   balance available for the general fund along with any

11   deferrals that we were able to identify as of that --

12   Q   And is this a spreadsheet that you or someone at E&Y

13   working at your direction prepared?

14   A   Yes.

15   Q   Without going --

16          MR. SHERWOOD:  Your Honor, I'd just like to

17   interpose an objection at this time.

18          THE COURT:  Would you identify yourself, sir?

19          MR. SHERWOOD:  I'm sorry, your Honor.  I was

20   introduced this morning.  I'm Jack Sherwood from Lowenstein,

21   counsel for AFSCME.  I'm Ms. Levine's partner.

22          THE COURT:  Okay.  Go ahead, sir.

23          MR. SHERWOOD:  I believe that this testimony in

24   terms of forecasts of future performance by the city is

25   improper lay opinion testimony and should be disallowed.  We

1  submit that this testimony is in the nature of financial

2  projections, requires special expertise, training, and so

3  forth and under Federal Rule of Evidence 701(c) should be

4  excluded.  Thank you.

5          MR. STEWART:  Well, your Honor, two responses.

6          THE COURT:  Excuse me one second.

7          MR. STEWART:  Yes.  I'm sorry.

8          THE COURT:  Is it the exhibit you object to or the

9  testimony about it?

10          MR. SHERWOOD:  Both, your Honor.

11          THE COURT:  The exhibit is already in evidence;

12  right?

13          MR. SHERWOOD:  Well, then the testimony about it.  I

14  think it has been stipulated into evidence.  I think this

15  document is in evidence, but I do believe that any testimony

16  about these projections is expert testimony and should be

17  disregarded.

18          THE COURT:  Sir.

19          MR. STEWART:  Well, first of all, I don't believe

20  the witness is going to be asked any opinion about this, and

21  he has testified earlier he has not been hired as an expert.

22  More fundamentally, I think the rule is clear that to the

23  extent a witness, even one who has expertise, is simply

24  performing arithmetic or similar calculations on voluminous

25  data, it is not expert testimony, and I think the leading

1   Sixth Circuit case on that, your Honor, is -- I think it's

2   the Madison case, 226 Federal Appendix 535, which is a 2007

3   case, and it cites at length an Eleventh Circuit case that

4   says that in greater detail and on the different facts, and

5   so that is why I asked the questions I asked a few minutes

6   ago about the source of the data, were they business records,

7   what did he do with them.  They went into a spreadsheet.

8   What does a spreadsheet do?  And at this stage I'm still

9   trying to explain how he went about compiling his

10  spreadsheets, but counsel is correct.  I'm going to ask him

11  at some point what were the results or the calculations.  I'm

12  not going to ask him his opinion on what anything ought to

13  be.  It is simply going to be, "After you compiled the

14  information, as you testified, what did the number turn out

15  to be?"

16          MR. SHERWOOD:  Just briefly, your Honor.  Anything

17  that projects future revenues or forecasts is opinion.  It's

18  not fact.  It's not adding numbers that exist.  I understand

19  that a fact witness can testify what our expenses and

20  payments were on a given month or even that are due this

21  month, but this is forecasting into the future in terms of

22  not only expenses but also receipts, things like property

23  taxes, utility taxes, various types of revenues going out

24  through the end of this year, and I think that by definition

25  that requires some type of expertise, specialized training,

1   certainly not something that anyone can do, is properly the

2   subject of expert testimony and shouldn't be allowed.

3        MR. STEWART:  And I think what the Sixth Circuit

4   wrote, your Honor, was that there are many things that

5   require expertise.  For example, it requires expertise to

6   read the records and know what part of the city's records are

7   important.  But where the calculations themself do not

8   require expertise beyond simple mathematics, it's not expert

9   testimony.  They distinguish being an expert and expert

10  testimony.

11       THE COURT:  What was the specific last question that

12  you asked?

13       MR. STEWART:  I believe it was how he went about

14  preparing -- or his staff went about preparing the

15  spreadsheet we see before us on the screen.

16       THE COURT:  I'll permit that question.

17  BY MR. STEWART:

18  Q   You may answer.

19  A   The way we helped pull this spreadsheet together or any

20  of the spreadsheets on the cash flows were we looked at the

21  information that was available in the different budgets.  We

22  were able to look at the different receipts and disbursements

23  on an actual basis in terms of what was actually coming into

24  the city and break that down into the different categories

25  and then, based on the assumptions that we had collectively

 1   in conjunction with the city, forecast what the monthly

 2   receipts and disbursements could be over this forecast

 3   period.

 4   Q   And you populated the spreadsheet with those numbers?

 5   A   That is correct.

 6   Q   And you performed addition and subtraction on them to

 7   reach the conclusions that are shown here; is that correct?

 8   A   Yes.

 9   Q   And now may I ask you just as to this, what did you

10   conclude the short-term cash flow forecast would yield to in

11   terms of the city's available cash as of the end of calendar

12   year 2013?

13           MR. SHERWOOD:  I'd renew the same objection, your

14   Honor.

15           THE COURT:  That objection is sustained.

16           MR. STEWART:  Okay.

17   BY MR. STEWART:

18   Q   Mr. Malhotra, let me also ask you to look at -- actually,

19   I'll come back to that in just one minute.  Okay.  Did there

20   come a time, Mr. Malhotra, that you learned that the

21   emergency manager had scheduled a meeting with creditors of

22   the city for June 14 of this year?

23   A   Yes.

24   Q   And when did you learn of the meeting?

25   A   It was right around, I think, in that June time frame.

1   Q   And did you attend the meeting?

2   A   I did.

3   Q   Where was it held?

4   A   At the Westin at the airport.

5   Q   And how many people attended?

6   A   I would say about a couple of hundred.

7   Q   How long did it last?

8   A   Four, five hours.

9   Q   Did you speak or present anything at the meeting?

10  A   I did.

11  Q   Let me -- and were materials passed out at the June 14

12  meeting?

13  A   Yes.

14  Q   Let me first put up on the screen Exhibit 43.  You see

15  Exhibit 43?

16  A   I do.

17  Q   Is that a document entitled "Proposal for Creditors" that

18  was distributed on June 14?

19  A   It was.

20  Q   And let's put up Exhibit 44.  Is that an executive

21  summary of the proposal that was also distributed that day?

22  A   That is correct.

23  Q   Now, at that meeting -- this is entitled "Proposal for

24  Creditors."

25  A   Yes.

1   Q   That's the title of it.  What's being proposed?

2   A   What the city was proposing was a framework for

3   restructuring of its long-term liabilities showing that the

4   city was going to be unable to meet its obligations as they

5   came due.

6   Q   Now, I think you testified that you prepared certain

7   parts of this document?

8   A   That is correct.

9   Q   Okay.  And let me direct your attention, if I could, to

10  page 8 of the document.

11          MR. STEWART:  Can that be blown up, Lauren?

12  BY MR. STEWART:

13  Q   Is this a spreadsheet that you or others at E&Y prepared?

14  A   Yes, it was.

15  Q   And what does it purport to show?

16  A   The first column on that spreadsheet --

17  Q   Well, first of all, what's the title of the spreadsheet?

18  A   It says "Fiscal Year 2013 Forecasted Cash Flow to Year-

19  End."

20  Q   Now, it uses the term "fiscal year '13."  What is the

21  fiscal year of the City of Detroit?

22  A   July 1 to June 30th.

23  Q   So at the time of this meeting, the fiscal year '13 had

24  about 16 days to go?

25  A   Yes.  June -- the month of June 2013 was still a

1    forecast.

2    Q   So let's -- before we go further, let's look at our

3    spreadsheet here.  How many months of this spreadsheet are

4    actual numbers?

5    A   The first column has 12 months of fiscal year 2012, and

6    subsequent to that 11 of the 12 months are actuals, and

7    there's a month of forecast.

8    Q   And that information you obtained from where?

9    A   It was compiled from the information that was given to us

10   by the city.

11   Q   Okay.  And what I'd like to do because we're going to be

12   dealing with some of these issues later is to go over some of

13   the elements of operating receipts and operating

14   disbursements that we see here on the spreadsheet.

15            MR. STEWART:  And I don't know if that can be blown

16   up to be even larger or not, Lauren.  I don't know if

17   everyone can see them.  Let's just blow up operating receipts

18   if we could.  There.

19   BY MR. STEWART:

20   Q   I've asked the technical assistant here to blow these up

21   so we can all see them better, and let me ask you about some

22   of the operating receipts.  Property taxes and income and

23   utility taxes are just what they say they are?

24   A   That's right.  That's what they contain.

25   Q   And gaming taxes, what are gaming taxes?

1    A    Those are the taxes the city receives from the three

2    casinos.

3    Q    Next is municipal service fee to casinos.

4    A    Those are generally additional fees that the city

5    collects from the casinos for additional services that are

6    provided.

7    Q    And then our next line is state revenue sharing?

8    A    That's state aid that the city receives every other

9    month.

10   Q    And below that we have other receipts.  Could you tell us

11   what the other receipts are?

12   A    Sure.  Those are a combination of fees from the different

13   departments.  It has grant revenue in there as well as any

14   other one-time items that are also captured in there.

15   Q    And the final item is called refinancing proceeds?

16   A    Yes.  Those generally reflect the monies that the city

17   was borrowing from the escrow account that was set up with

18   the state, so it was essentially additional debt borrowings.

19   Q    Okay.

20        MR. STEWART:  Let's go back if we could, Lauren, to

21   the -- if you could just then expand for us the part of our

22   chart that says "Operating Receipts."  "Operating Receipts."

23   That would still be the top part, I think.  Now, "Operating

24   Receipts," that would be the rows there entitled "Operating

25   Receipts."  Okay?

1  BY MR. STEWART:

2  Q    Now, your spreadsheet purported to tabulate what the

3  operating receipts were.  I think the first column is actual

4  for fiscal year '12.  What did you determine the city's

5  operating receipts had been for that fiscal year?

6  A    For the general fund predominantly the operating -- total

7  operating receipts were 1.765 billion of which 50 million was

8  related to so-called proceeds from debt issuance or

9  borrowings from the escrow fund.

10  Q    And then for fiscal year 2013, you had 11 months actual

11  and 1 month forecast; is that right?

12  A    That is correct.

13  Q    Okay.  And can you tell me what your forecast was with

14  those 11 actual and 1 forecasted month for --

15          MR. SHERWOOD:  Object.  I'm sorry.

16  BY MR. STEWART:

17  Q    -- the operating receipts for fiscal year '13?

18          MR. SHERWOOD:  Your Honor, I object to testimony

19  based on forecasts.

20          MR. STEWART:  Your Honor, what we have -- he spoke

21  not only about the actual -- the city's actual receipts.  He

22  also spoke about the city's budgets not as a forecast he made

23  but as a budget the city had, which was itself a factual

24  document.  To the extent he's talking about what the city has

25  budgeted, especially when he tests it against actual

1   experience for reliability, I believe he can talk about what

2   the forecast result is to look like. I would add that this

3   is one where 11/12ths of the data is actuals that had, in

4   fact, already come to pass.

5         THE COURT: Sir, is the number for the column

6   forecast June 13 of 125 your number or the city's number?

7         THE WITNESS: It was generally a collaborative

8   effort in which we used the numbers that were, your Honor,

9   developed by the city originally. We scrubbed them along

10   with the city.

11         THE COURT: What does "scrub" mean?

12         THE WITNESS: So we looked at, your Honor, the

13   historical actuals in terms of how the amount of collections

14   that were received in that particular month in conjunction

15   and comparison with the overall tax row, so it was -- you

16   know, actually, you are looking through the historical

17   information that we had available as well as the best

18   forecast information we had available to demonstrate what the

19   one month of forecast would have looked like.

20         THE COURT: Well, all right. I'll permit the

21   testimony as to the full year for actual and forecast but

22   subject to credible admissible evidence regarding June '13.

23         MR. STEWART: Your Honor, we will provide that.

24   BY MR. STEWART:

25   Q   And then, Mr. Malhotra, as to the full year operating

1  receipts for 2012, what did you calculate?

2  A    For the full year of fiscal year 2013, the total

3  operating receipts were -- with 11 months of actual and 1

4  month of forecast were 1.582 billion, which included roughly

5  $30 million of borrowings from the escrow account as shown in

6  the line item up above.

7  Q    Okay.  And so the line you're referring to is the line

8  that says "refinancing proceeds"?

9  A    That is correct.

10  Q    And you better tell us what the escrow account is.

11  A    It's an account -- escrow account that's set up that's

12  subject to an escrow agreement between the city and the state

13  where there are roughly about $70 million of cash that is

14  sitting in that escrow account today.  It was projected that

15  $20 million of that 70 would have been collected, your Honor,

16  in June of 2013, but that has not happened.  We are

17  anticipating to collect that $20 million from the escrow

18  account in the subsequent months going forward, but it is

19  subject to -- the amount in there is subject to an escrow

20  agreement between the city and the state.

21  Q    Okay.  Thank you.  Lets, if we could, now --

22          THE COURT:  Excuse me one second.  So the 20 billion

23  you're talking about is the 20 that's shown in forecast June

24  '13?

25          THE WITNESS:  Yes, your Honor.  That's the 20

1  million.

2          THE COURT:  That didn't happen.

3          THE WITNESS:  That did not happen.  That is correct,

4  your Honor.

5  BY MR. STEWART:

6  Q   At the time you wrote it, you expected that it would

7  happen?

8  A   That is correct.

9          MR. STEWART:  Could we now expand the segment of the

10  chart that talks about operating disbursements, just the

11  title so we can see them all?  No.  That's fine.

12  BY MR. STEWART:

13  Q   Now, we've now expanded on the screen, Mr. Malhotra, the

14  segment of the spreadsheet that speaks of operating

15  disbursements.  Let me ask you if we could go through this.

16  The first line is payroll taxes and deductions, and I assume

17  that's self-explanatory.  That's what it says.

18  A   Yes.

19  Q   Next is benefits.  What are benefits?

20  A   Those are generally health benefits.

21  Q   Okay.  Below that is something called pension

22  contributions?

23  A   That is correct.

24  Q   And those are pension contributions to who?

25  A   To either the police Retirement System or the General

1  Retirement System.

2  Q    And those are both defined benefit plans?

3  A    Those are defined benefit plans, yes.

4  Q    Now, I understand that some portion of the benefits from

5  the General Retirement System goes to city employees who work

6  for the Department of Water and Sewer?

7  A    That is correct.

8  Q    And how do you account for that in this spreadsheet?

9  A    Those are not accounted for here because this shows the

10  activity predominantly of the general fund.  The

11  contributions that the Water and Sewer Department makes for

12  pension go directly to the Retirement System and --

13         THE COURT:  Excuse me, sir.  You need to lean back

14  away from the microphone a little bit because when you get

15  too close, it cuts out.

16         THE WITNESS:  All right.

17         THE COURT:  And while we have a break here, I think

18  your tech person needs to redo that chart because her effort

19  to line up the headings isn't working very well separately.

20         MR. STEWART:  Okay.  Thank you.

21         THE COURT:  That's better.

22         MR. STEWART:  That's better.  A little to the left,

23  yes.

24         THE COURT:  Thank you.

25  BY MR. STEWART:

1    Q    We were talking, I guess, about pension contributions.

2    Next we have -- and for actual year 2012, those had amounted

3    to how much?

4    A    For actual fiscal year '12, there were pension

5    contributions of 103.9 million made by the general fund.

6    Q    And for fiscal year 2013, what is the number?

7    A    That reflects 11 months of actuals and 1 month of

8    forecast, but about $30.8 million of pension contributions

9    that were made.

10   Q    Why is that so much lower than the pension contributions

11   that had been made in 2012?

12   A    Because the city was trying its best to preserve

13   liquidity during this time frame where liquidity was

14   extremely tight and was deferring pension contributions.

15   Q    Now, let's -- let me ask you about this.  When you say

16   "deferring pension contributions," what do you mean?

17   A    It's essentially not making the scheduled payments as

18   they came due and as were laid out by the city's other

19   systems actuaries, so I would say it was more or less

20   borrowing money from the pension system to fund ongoing

21   operations.

22   Q    So just to be clear, the money was owed to the pension

23   systems; correct?

24   A    That is correct.

25   Q    But the city did not pay the pension systems the money it

1  owed them?

2  A    That is correct.

3  Q    And that is called deferral?

4  A    Yes.  That's what we are calling deferral.

5  Q    And do you know looking at this what the amount of

6  deferrals were for fiscal year 2013?

7  A    For fiscal year 2013, I would say compared to the

8  beginning of fiscal year 2012 there was probably another 70-

9  odd million dollars that was deferred compared to the

10 beginning of fiscal year 2012, an additional 70 million.

11 Q    Okay.

12         THE COURT:  And may I interrupt for one moment?

13 Just so the record is clear and everyone understands, would

14 you describe in more plain English what you mean by the

15 concept of "liquidity was tight"?

16         THE WITNESS:  Sure, your Honor.  The city was during

17 this time frame paying very close attention to its cash

18 position, and in order to ensure that the city did not have a

19 payless payday or run out of complete cash in its bank

20 account, the amount of cash available for the city's general

21 fund to continue to operate was dwindling.  And in order to

22 make sure that the cash position did not get to an

23 unsustainable level where the core operations of the city

24 were put at peril, that's what, your Honor, I meant by

25 liquidity being extremely tight.  It's the cash that was

1  available to run the operations of the general fund.

2         MR. STEWART:  If we can go back to the full chart

3  for just a minute, please.

4  BY MR. STEWART:

5  Q   And before we go further, just on this same point, this

6  chart is a projection of cash flow for the city for the past

7  year and for fiscal year 2013; correct?

8  A   It's actuals for --

9  Q   Actuals and then -- okay.  Now, you just talked about

10 deferrals as something the city did to preserve cash.  Is

11 there something called pooled funds?

12         THE COURT:  I'm sorry.  Something called what?

13         MR. STEWART:  Pooled funds.  And I'm going to ask

14 him what they are.

15 BY MR. STEWART:

16 Q   Can you tell us what pooled funds are?

17 A   The pooled funds are cash that has been available in

18 other accounts for specific purposes such as the solid waste

19 fund or the street fund or the risk management fund that has

20 been pooled with the general fund cash so that the general

21 fund cash is higher because of the result of the pooling of

22 cash from these other accounts.

23 Q   Now, these other accounts are not -- well, first of all,

24 you better tell us what these other accounts are.

25 A   As highlighted in the city's CAFR, the city had roughly

1    $92 million of pooled cash from the solid waste fund, the

2    street fund, and the risk management fund, cash that was

3    combined with the general fund, that is currently reflected

4    in the cash balances reported for the general fund.

5    Q    And so that I understand, so because of the liquidity

6    problems the city faced, it took the $90 million out of the

7    street fund, the solid waste fund, and the public safety or

8    emergency fund and commingled it with money in the general

9    fund?

10   A    I don't know when it was done, but that would generally

11   be yes.  The commingling has probably happened some time ago,

12   but the answer would be yes.  It would be to further

13   supplement the cash available for the general fund.

14   Q    And if the city had not done that, what would have been

15   the effect on its liquidity position?

16   A    Well, at the end of fiscal year '12 where the cash net of

17   distributions was shown as 1.9 million, if the city had to go

18   ahead and segregate or unpool almost $92 million, that cash

19   net of distributions or cash available to the general fund

20   would have been significantly lower dollar for dollar.

21   Q    It would have been $92 million lower?

22   A    Yes.  That is my understanding.

23   Q    Let's go back now to our operating disbursements that we

24   were talking about.  All right.  The next item there is

25   something called subsidy payments.  What are subsidy

1  payments?

2  A    Subsidy payments are the cash payments that the general

3  fund fund makes to DDOT, which is the Department of

4  Transportation, because the Department of Transportation

5  requires an annual subsidy every year from the general fund.

6  Q    And below that we have distributions, and there are three

7  different lines.  There's distributions, tax authorities,

8  then distributions, UTGO, and then distributions, DDA.

9  Please tell us what those items are.

10  A    Those are distributions to other taxing authorities.  In

11  the first line when we saw property tax collections, the city

12  collects property taxes not only for itself but also on

13  behalf of other taxing authorities like Detroit Public

14  Schools, Wayne County, and what the city does then is once

15  the gross property taxes are collected, it distributes to

16  these other entities on behalf of whom the cash has come in.

17  Q    So, in other words, it's cash the city has but that it

18  has to turn over to someone else?

19  A    Yes.  That is correct.

20  Q    And below that we have income tax refunds, account

21  payables, and other disbursements and professional fees.

22        MR. STEWART:  Now let's go back to the full chart if

23  we could, and for purposes of simplicity, why don't we simply

24  expand actual fiscal year '12 along with the descriptions of

25  items that would help us walk through them?  All the way to

1    the bottom.  Thank you.  Okay.

2    BY MR. STEWART:

3    Q    Now, our next line has total disbursements.  Do you see

4    that?

5    A    Yes.

6    Q    And that's just the sum of all the operating

7    disbursements?

8    A    That is correct.

9    Q    And below that there's something called net cash flow.

10   What is net cash flow?

11   A    That's the total operating receipts less the total

12   disbursements.

13   Q    And what was it for fiscal year 2012?

14   A    It was negative $65.5 million after including $50 of

15   proceeds from the escrow fund.

16   Q    And why were those excluded?

17   A    Those were already a part of the negative 65.5.  Had they

18   been excluded, the net cash flow would have been negative

19   115.5.

20   Q    I see.  And then the next line is beginning cash balance,

21   and what is that?

22   A    That would be reflective of the cash balance the city's

23   general fund had in its account including the pooled cash.

24   Q    And you subtract from that the net cash flow that we just

25   talked about; correct?

1    A    Yes.

2    Q    And we end up with cash before required distributions of

3    $29.8 million?

4    A    That is correct.

5    Q    And then there's something subtracted from that, and what

6    is subtracted?

7    A    Those are the accumulated property tax distributions, so

8    when the city collects its property taxes, makes the

9    distributions to the different taxing authorities -- excuse

10   me -- there still is a holdback in terms of amounts that are

11   being reconciled where the city and the different taxing

12   authorities are going back and forth in terms of what the

13   final amount is that is due to those authorities.  That is

14   the estimate that the city has available at that point of

15   time in terms of additional monies that were due to these

16   other taxing authorities but had not been paid yet, so we

17   reserved for that cash that it will eventually be paid out.

18   Q    Okay.  What's an example of one of these other

19   authorities that is owed to which the money has to be paid

20   out by the city?

21   A    It would include the Detroit Public Schools.  It would

22   include Wayne County.  It would include the library.  Those

23   would be some of those examples.

24   Q    And so our last line here says cash net of distributions,

25   and that's $1.9 million?

1   A    That is correct.

2   Q    And what does that represent?

3   A    That would be the net cash available for the general

4   fund, including pooled cash, that was available for the

5   general fund's operations at that point of time.

6   Q    At the end of --

7   A    Fiscal year 2012.

8   Q    -- 2012, which would be June 30th, 2012; correct?

9   A    Yes.

10  Q    And below you have something that says "memo," and the

11  first line is accumulated deferrals?

12  A    Yes.

13  Q    Is that what you told us about earlier which were pension

14  contributions the city owed but had not paid?

15  A    That is correct, about 64.4 million.

16  Q    And below that refunding bond proceeds in escrow, what

17  are those?

18  A    Those are the escrow account's amounts that were still in

19  escrow and had not been drawn upon that were still subject to

20  this escrow agreement with the state.

21  Q    From the refunding financing that you told us about

22  earlier?

23  A    Yes.

24  Q    And finally reimbursements owed to other funds, what is

25  that?

1   A    That is where we've highlighted the amounts -- or we

2   haven't put an amount in off the funds that would subject --

3   be subject to the unpooling of the cash that is shown in the

4   general fund, but the city did not have a specific view in

5   terms of when and how the unpooling of some of that cash

6   would take place.

7          MR. STEWART:  Now, if we could now highlight the far

8   right column, which is the fiscal year 2013, it says 11(a)

9   plus 1(f), and let's look at that.  And then, Lauren, if you

10  could put the categories next to it so he could --

11  BY MR. STEWART:

12  Q    I'm going to ask you the same questions, but I'm going to

13  be quicker when it comes to the fiscal year 2013.  You

14  already told us, I think, that the operating receipts were

15  thought to be 1.52 -- 582.2 billion.  What were the total

16  disbursements expected to be?

17  A    1.5 --

18         MR. SHERWOOD:  Objection.

19         MR. STEWART:  This is the same point I think we

20  argued earlier.

21         THE COURT:  What is the objection, please?

22         MR. SHERWOOD:  The objection --

23         THE COURT:  Excuse me one second.  And I've been

24  asked to ask you to pull that microphone closer to you when

25  you speak.  Closer, closer, closer.

1    MR. SHERWOOD:  I object --

2    THE COURT:  Closer yet, please, sir.  There you go.

3    MR. SHERWOOD:  Okay.  I object based on the fact

4    that the disbursements include projections for June of 2013,

5    and that requires expert testimony.  That's improper lay

6    opinion testimony.

7    THE COURT:  All right.  Subject to the same

8    condition I indicated earlier, the Court will permit this.

9    Go ahead.

10   BY MR. STEWART:

11   Q    And to repeat the question then, the total disbursements

12   for fiscal year 2013 are shown to be what here?

13   A    1.578.2 billion.

14   Q    And so the net cash flow for the city in fiscal 2013 was

15   how much?

16   A    $4 million positive.

17   Q    And then we had cash before required distributions of how

18   much?

19   A    Before required distributions, $33.8 million.

20   Q    And then cash net of those distributions for fiscal year

21   2013 came to what?

22   A    $14.1 million.

23   Q    And by then, what was the accumulated -- was the amount

24   of accumulated deferrals, and what was owed to the pension

25   funds?

1  A   By then the amount of accumulated deferrals predominantly

2  due to the pension funds had increased from roughly $65

3  million at the end of fiscal year 2012 all the way to $118.7

4  million at the end of fiscal year 2013.

5  Q   And where did the number come from in terms of what was

6  owed to the pension funds?

7  A   The amount of funding that would have been scheduled for

8  the General Retirement System and the Police and Fire

9  Retirement System would have come from the payments that the

10  actuaries of the systems had suggested to be made but had not

11  been made over the course of this time frame.  That was

12  predominantly what -- where those numbers came from.

13  Q   So the numbers came from the pension plans themselves or

14  their actuaries.

15  A   The schedule came --

16         MR. SHERWOOD:  Objection.  Hearsay.  Move to strike.

17         MR. STEWART:  He can know this.

18         THE COURT:  The objection is overruled.  It was,

19  however, a leading question.

20         MR. STEWART:  It was, your Honor.  I was trying to

21  clarify, but let me ask it again.

22  BY MR. STEWART:

23  Q   Where, if anywhere, did these numbers come from?

24  A   The accumulated deferral number, which predominantly is

25  made up of the pension deferrals, would have been a sum of

1  the pension payments that were not made during the course of

2  fiscal year 2013 and it would have been in the amount of the

3  scheduled payments the systems actuaries had suggested that

4  should have been made on a monthly basis but were not.

5  Q   So who is it who tells the city how much the pension

6  payments ought to be?

7  A   It's the system's actuaries.

8  Q   The system being the General Retirement System and the

9  Police and Fire Retirement System; correct?

10  A   That is correct.

11  Q   Did there come a time when you spoke with Mr. Orr about

12  what you had found in the course of this analysis?

13  A   We showed Kevyn Orr in terms of what the actual activity

14  was and the magnitude of the deferrals that were taking place

15  to sustain the city's cash position on a monthly basis.

16  Q   Do you remember what you said to him and what he said to

17  you?

18  A   Not specifically, but it was generally showing as to what

19  the magnitude of the -- what the magnitude of the dire

20  liquidity position of the city.

21          THE COURT:  I'm sorry.  What?  The magnitude what?

22          THE WITNESS:  How dire the --

23          THE COURT:  I didn't hear what you said.  What did

24  you say?

25          THE WITNESS:  Your Honor, I said the dire liquidity

1  situation of the city.

2  BY MR. STEWART:

3  Q   Let me -- let's now go to page 9 of this same exhibit,

4  and the control number on this, if that makes it easier, ends

5  with 7289.  And could you just tell us what this is?

6  A   This is the fiscal year 2014 forecasted cash flow to

7  year-end on a monthly basis.

8  Q   And is this a document you or others at Ernst & Young

9  prepared?

10  A   Yes, it is.

11  Q   Did you show it to Mr. Orr?

12  A   Yes, we did.

13  Q   Did you discuss it with Mr. Orr?

14  A   Yes.  We discussed the receipts and disbursements

15  activity, yes.

16  Q   As shown in this document?

17  A   That is correct.

18  Q   And do you remember what you said to him and he said to

19  you?

20        MR. SHERWOOD:  Your Honor, object to the extent that

21  the question calls for testimony about these forecasts.  This

22  document -- this particular page relates to 2014, which is

23  all projections.

24        MR. STEWART:  And that's why I'm asking the

25  questions I'm asking, only was this shown to Mr. Orr and did

1  he discuss it with him, and I won't go any deeper into it

2  right now.

3          MR. SHERWOOD:  I didn't object to those questions.

4          THE COURT:  No.  I believe the witness can testify

5  as to what he said to Mr. Orr about these documents.  It goes

6  to what Mr. Orr knew or at least what he was advised of at

7  the time, so just tell us what you said to him about these

8  documents or this document.

9          THE WITNESS:  Your Honor, my recollection what I

10  would have said on this particular document would have been

11  that the fiscal year two thousand --

12          THE COURT:  Well, hold on.  Are you reconstructing

13  what you would have said, or are you remembering what you did

14  say?

15          THE WITNESS:  Your Honor, I am trying to recall what

16  I would have said.  I do not remember specifically what I

17  would have said.

18          THE COURT:  All right.  If you don't know the answer

19  to a question, just say that.  Don't guess or try to

20  reconstruct.

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Okay.

23  BY MR. STEWART:

24  Q    Did you provide this document to Mr. Orr?

25  A    I did.

1    Q   Did there come a time that he raised it with you?

2            THE COURT:  I'm sorry.  Was there what?

3    BY MR. STEWART:

4    Q   Did there come a time when Mr. Orr raised this document

5    with you?  Did he call you up or ask to have a conversation

6    with you about it that you can remember?

7    A   We had several discussions about this particular document

8    and the overall contents of the numbers, yes.

9    Q   And my only question to you is going to be, if you

10   remember, what did you say to him, and what did he say to

11   you, just that?

12   A   What I would have said on this particular document --

13   Q   Not would have said, what you did say if you remember,

14   and if you don't remember, just tell me you don't remember.

15           THE COURT:  If you don't remember, just say that.

16           THE WITNESS:  I don't remember specifically what I

17   would have said to Mr. Orr on this particular page in a

18   specific conversation around that, but --

19   BY MR. STEWART:

20   Q   Then let me ask the question a different way.  In the

21   time frame around June 14, did you have discussions with

22   Kevyn Orr about the liquidity situation of the city?

23   A   I did.

24   Q   And do you remember what you said to him about the

25   liquidity situation of the city?

1    A    I do.

2    Q    And will you tell us what you told him?

3    A    The point -- what I said is that the fiscal year '14 cash

4    receipts could fall short of cash disbursements to the tune

5    of $185 million.

6    Q    What did he say to you?

7    A    I do not remember specifically about what he said to me

8    directly.

9    Q    Let's go, if we could, now to another page of this, page

10   47, which has control number 227327.  Could you just tell us

11   the -- what this document is?  What's the title of this

12   document?

13   A    "Ten Year Projections for the General Fund Only on the

14   Steady State."

15   Q    And what is a steady state?

16   A    The steady state would have reflected no restructuring of

17   the city's long-term obligations or legacy liabilities.

18   Q    I'm not going to ask you about the content of this, but

19   I'm going to ask you to tell us how you prepared it.

20   A    The way we prepared this is through different line items

21   in terms of the revenue assumptions.  We looked into

22   specifically the overall State of Michigan forecast.  We

23   looked at the historical information with respect to the City

24   of Detroit.  We also went ahead and looked at analyses in

25   terms of what the property taxes recently were for the city

1  and what the -- where the City of Detroit was faring in

2  conjunction with the State of Michigan to come up with a

3  forecast in terms of what the assumptions were for the

4  revenue and property tax and income tax assumptions over the

5  next ten years.  We did it in conjunction with the management

6  team of the city.  We went through income taxes in a great

7  level of detail between residents and nonresidents,

8  corporations, to build up assumptions from the standpoint of

9  what the revenues would look like over the next ten years.

10 We looked at the casino taxes with respect to all three

11 casinos, what their growth had been historically, where they

12 were projected to be in the future, state aid.  We got those

13 numbers directly from the budget department of the State of

14 Michigan in terms of where they saw the overall sales taxes

15 that were due to the city were projected to be over the next

16 ten years.  That's generally how we came up with the revenue

17 forecast, and I can highlight how we went through the

18 expenses as well.

19 Q   Well, yes, if you could, the expense and, finally, the

20 legacy cost without getting into what the numbers actually

21 are, just what your methodology was.

22 A   With respect to the salaries, wages, and overtime, we

23 started with what the current wage levels and the headcount

24 was.  It was built up by department to try and ascertain what

25 the exact headcount was by department.  From there on we had

 1   fairly simplistic assumptions with respect to wage level
 2   increases of two percent on a year-over-year basis over the
 3   forecast period.  For the health benefits for the active
 4   employees, we used assumptions that the city's health
 5   actuaries have developed on a per head basis, which is what
 6   we used based on a per headcount basis to extrapolate over
 7   the next ten years.  On the other operating expenses, it was
 8   developed by individual department to look at every single
 9   department, their budgets, to help ascertain what were the
10   ongoing operating expenses of each one of those departments
11   on a ongoing basis.
12           MR. DECHIARA:  Objection, your Honor.  Peter
13   DeChiara of Cohen, Weiss & Simon for the UAW.  We object to
14   this.
15           THE COURT:  Are you pulling your microphone nice and
16   close for me, please?
17           MR. DECHIARA:  Objection based on relevance.  The
18   only relevance it would have to how this witness performed
19   these numbers would be if the numbers were coming in for the
20   truth of the matter.  Otherwise it has no relevance.
21           THE COURT:  I'm concerned about that, Mr. Stewart.
22   First of all, just so the record is clear, what exhibit
23   number is this page 47 of?
24           MR. STEWART:  It is Exhibit 44.
25           THE COURT:  All right.  So the --

1      MR. STEWART:  44 is in evidence.

2      THE COURT:  Right.  So the question is what weight

3  is page 47 of this exhibit entitled to --

4      MR. STEWART:  Correct.  It goes to weight.

5      THE COURT:  -- if the witness has not been qualified

6  as an expert?

7      MR. STEWART:  Well, Judge, what I was going to do

8  was lay a greater foundation for how it was put together, and

9  then I was going to simply ask the witness this question,

10  which I will ask him now.

11  BY MR. STEWART:

12  Q   Where in here, Mr. Malhotra, did you insert your own

13  personal assumptions?

14  A   All of the assumptions were done in collaboration with

15  the city.

16  Q   Well, where did the numbers come from?

17  A   The numbers came from either the actuaries that we were

18  working with with the city or the city's debt documents with

19  respect to the long-term liabilities of the city or, in terms

20  of the revenues, it was assumptions that we worked on in

21  conjunction with the city.

22      MR. DECHIARA:  Your Honor --

23      MR. STEWART:  And so, your Honor, my point on this

24  is the following.  The fact something is a future projection

25  does not make it an opinion in the sense of being an expert

1    opinion.  If one is relying on numbers from another source --

2    in this case, all the sources Mr. Malhotra told us about --

3    it is their numbers, not his numbers but their numbers, and

4    what he is doing is tabulating them and calculating them.

5           THE COURT:  I heard him say that at least some

6    portion of this, which he didn't specify, was done in

7    collaboration.

8           MR. STEWART:  Well, let me -- but that's why I asked

9    him this other question about which of these --

10   collaboration, and I will ask him this --

11          MR. DECHIARA:  Your Honor, may I be heard?

12          THE COURT:  One second.

13          MR. STEWART:  It sounded from his testimony he met

14   with him and worked with him to learn the numbers.  When I

15   asked him which assumptions were his assumptions, not the

16   assumptions of the people who gave him the numbers, the

17   answer were they're not his assumptions.

18          THE COURT:  His answer was, "We collaborated."

19          MR. STEWART:  Well, I thought -- maybe I heard

20   him -- I must have heard him differently than your Honor

21   heard him.  I thought the answer -- well, should we ask him

22   again?

23   BY MR. STEWART:

24   Q   Mr. Malhotra, of these numbers, which ones are your

25   assumptions?

1  A    EY has made no assumptions that these are EY's numbers.

2  I want to make that -- that's what I'm making clear.

3  Q    So these numbers came to you from who?

4  A    The numbers with respect to -- there are a lot of numbers

5  on this page.  The numbers with respect to all of the debt

6  service would have been picked up from the city's CAFR.  The

7  numbers on the health benefits or pension retiree

8  contributions would have come from the city's actuaries.  The

9  numbers for the actual headcount for all of the departments

10 and the associated costs would have come from the city and

11 its departments.  The numbers with respect to the health

12 costs for the active employees on a per head basis would have

13 come from the city's actuaries.  The numbers with respect to

14 state revenue sharing would have come from the state

15 directly.  The numbers for property taxes, income taxes, and

16 wagering taxes, those numbers, in terms of the assumptions,

17 were validated, collaborated, between our team and the city

18 in terms of the assumptions behind the revenue assumptions.

19 Q    When you say "assumptions," you mean --

20         THE COURT:  One second.

21 BY MR. STEWART:

22 Q    -- the number that's there?

23         THE COURT:  I need to hear from counsel at this

24 point.

25         MR. STEWART:  Okay.  Go ahead.

1          MR. DECHIARA:  Your Honor, to the extent the

2     information in this exhibit comes from actuaries who are not

3     on the witness stand, those numbers are hearsay and should

4     not come in.

5          THE COURT:  Well, but the document is already in

6     evidence.

7          MR. DECHIARA:  Your Honor, and also I would say,

8     too, the witness is testifying about a process that took a

9     high degree of expertise.  I don't think I or most of the

10    people in this room, let alone the man on the street, would

11    be able to take these raw data and convert them into ten-year

12    projections.  It took the sophisticated work of an Ernst &

13    Young team to put it together.  This is in the nature -- this

14    is the very essence of expert testimony.

15         THE COURT:  I agree.  I do.

16         MR. STEWART:  All right.  Your Honor, what we may

17    ask leave to do is to submit perhaps a memoranda raising this

18    with your Honor later on so we can move on now.

19         THE COURT:  You may, of course.

20         MR. STEWART:  Yeah.  Okay.  Your Honor, since --

21         UNIDENTIFIED SPEAKER:  May I ask you --

22         MR. STEWART:  Yes.  Your Honor, one other thing.

23    Since it's in evidence, I assume I am allowed to at least ask

24    the witness what it says, and objections go to weight.

25         THE COURT:  Well, it's duplicative to do that, but I

1  suppose to make a point you could ask briefly for the witness

2  to review what it says.

3          MR. STEWART:  Well, I'm going to just ask him to

4  look at the far right column, and then I'm going to -- pardon

5  me, your Honor.  I'll move on to my next question.

6          MR. RUEGGER:  Excuse me.  Objection.  Arthur Ruegger

7  from Dentons on behalf --

8          THE COURT:  I need you to move that microphone

9  closer, sir.

10          MR. RUEGGER:  I'll try, Judge.  Is this better?

11          THE COURT:  Hold the base closer.

12          MR. RUEGGER:  Don't spill the water.

13          THE COURT:  There you go.  Much better.  Much

14  better.  Thank you.

15          MR. RUEGGER:  Your Honor, we submit the document

16  speaks for itself.  Any further narrative from this witness

17  is in the nature of asking for his expertise on that.

18          THE COURT:  Well, it doesn't take an expert to read

19  it, so I'll permit it.

20          MR. RUEGGER:  Very well, your Honor.

21          MR. STEWART:  Could we simply blow up the far right

22  column?

23  BY MR. STEWART:

24  Q   As a result of your calculations, Mr. Malhotra, what did

25  your spreadsheet conclude was the ten-year adjusted deficit

1  the city was facing?

2  A    The spreadsheet would have said that revenues would be

3  10.4 billion, operating expenditures would be 7.4 billion,

4  and legacy expenditures would be 7 billion over this ten-year

5  time frame for a surplus/deficit of almost $4 billion, a

6  negative $3.93 billion.

7  Q    All right.  So did there come a time when you sat down

8  with the emergency manager to talk about these projections?

9  A    Yes.

10  Q    Now, in preparing the projections, what did you do to

11  make them as accurate as you knew how to make them accurate?

12          MR. SHERWOOD:  Objection.  Calls for analysis of

13  projections that have been --

14          THE COURT:  I'm sorry, sir.  I can't hear you.

15          MR. SHERWOOD:  Objection.  Calls for improper

16  opinion testimony.  These are -- he's being asked to testify

17  about projections that are properly the subject of expert

18  testimony.

19          MR. STEWART:  I think I asked him what he did to try

20  to be accurate.

21          THE COURT:  No.  The objection is sustained.

22          MR. STEWART:  Okay.

23  BY MR. STEWART:

24  Q    In your conversations with Mr. Orr, what did you say to

25  him about your ten-year projections?

1          MR. SHERWOOD:  Same objection.

2          THE COURT:  That objection is overruled.  Please

3    answer.

4          THE WITNESS:  What we said is that if you look at

5    simply the operating --

6          THE COURT:  You said --

7          THE WITNESS:  I said.

8          THE COURT:  You said, "we said."

9          THE WITNESS:  What I said is if you look at the

10   total operating revenues and the total operating

11   expenditures, the city still has a surplus of roughly $3

12   billion.  However, when you layer in the legacy costs of

13   roughly $7 billion over the next ten years, the city has a

14   deficit of almost $4 billion over that ten-year time frame.

15   BY MR. STEWART:

16   Q    And what did he say to you?

17   A    I don't remember specifically about what he said back to

18   me.

19   Q    Now, June 14 was the date of a meeting we've been -- I've

20   been asking you about, I believe.  This document was a

21   document passed out that day; correct?

22   A    Yes.

23   Q    Before moving on from the meeting, let me ask you this.

24   Were questions asked by anyone at that meeting on June 14?

25   A    Yes.  There were questions asked.

1   Q   Do you remember any of the questions that were asked or

2   who asked them?

3   A   I don't know who asked them, but there were questions

4   about the assumptions and the liquidity position of the city.

5   Q   And am I correct in understanding that when you addressed

6   the people attending that meeting that day, you were speaking

7   about the spreadsheets I've asked you about this afternoon?

8   A   That is correct.

9   Q   And were questions asked of you then about those

10  spreadsheets?

11  A   There were -- yes, there were questions about it.

12  Q   Okay.  Let me move to another subject.  You're aware of a

13  security called the certificates of participation --

14  A   Yes.

15  Q   -- or sometimes called pension obligation certificates?

16  A   Yes, I am aware.

17  Q   For the record, can you tell us what those are?

18  A   Those are -- certificates of pension are the funds that

19  the city borrowed back in about 2005 to help fund the

20  underfunding on the two pension systems.

21  Q   And did the city have obligations to service the interest

22  or principal of those securities?

23  A   Yes.

24  Q   And do you know what the city's obligation was?

25  A   As of June of 2013, the city had a $40 million payment

1    that was due to those -- on behalf of those POC's.

2  Q   And what did the city do with respect to that payment?

3  A   The city did not make that payment.

4  Q   The city defaulted on it?

5  A   Yes.  That is correct.

6  Q   What effect did that default have upon the city's cash

7  position?

8  A   It improved the cash position by $40 million at the end

9  of -- June 30, 2012.

10  Q   What conversations, if any, did you have with the

11  emergency manager or his advisors on the subject of the

12  decision to default on the COPs?

13  A   I do not recall of a specific discussion with Kevyn Orr

14  on defaulting on the swaps.

15  Q   Let's move on to another set of meetings.  Did you attend

16  meetings held on June 20th, 2013, with representatives of the

17  pension plans?

18  A   I do.

19  Q   And am I correct in remembering there were two meetings

20  that day?

21  A   That is correct.

22  Q   The morning meeting was with the nonuniformed pension

23  plan, the GRS?

24  A   Yes.

25  Q   And the afternoon meeting was with who?

1    A    With police and fire.

2    Q    Okay.  And we have put up the first exhibit -- I believe

3    this is in evidence -- Exhibit 48.  Can you tell me what

4    Exhibit 48 is?

5    A    It's the presentation that was used for the meeting with

6    the nonuniform retirees on June 20th.

7    Q    And let's go back.  Just ask you a question.  Towards the

8    back of this, are there projections that were included in

9    here that you or Ernst & Young had prepared?  Let's look at

10   page 4 and page 5.  Are these projections you prepared?

11   A    Page 4 was a summary of the legacy expenditures,

12   historical, actual, and forecast.  That would have been

13   information on the pension and health benefits we received

14   from the city's actuaries.

15   Q    Okay.  And the next page?

16   A    Page 5 was the ten-year projections for the general fund

17   only under a restructuring scenario that highlighted claims

18   or amounts that were available to service unsecured claims.

19   Q    Now let's go back to the meeting itself.  How long did

20   the morning meeting last?

21   A    Probably about three hours.

22   Q    And who was there?

23   A    It was the city's advisors along with the members from

24   the -- some retirees and some of the members from the

25   Retirement System.

1    Q    Were questions asked?

2    A    There were some questions asked.

3    Q    Do you remember the questions?

4    A    They were questions about the cash position of the city.

5    They were questions about the city's ability to make any

6    changes to specific legacy liabilities.

7    Q    Do you remember any questions being directed to you?

8    A    They were -- yes.  I remember questions that came up with

9    respect to the cash flows of the city.

10   Q    And do you recall who in particular asked you those

11   questions --

12   A    No, I don't.

13   Q    -- or what you said in response to them?

14   A    No, I don't.

15   Q    Was Mr. Orr there that day?

16   A    He was not.

17   Q    Let's go to the next exhibit, if we could, which is

18   Exhibit 49.  Is this the handout that was given in the

19   afternoon meeting?

20   A    Yes, it was.

21   Q    And tell me about the afternoon meeting.  First of all, I

22   should have asked where these meetings were held.

23   A    These meetings were held at City Hall.

24   Q    And how long did the afternoon meeting last?

25   A    About two or three hours.

1  Q   Who attended?

2  A   It was the city's advisors along with some

3  representatives from the Retirement Systems as well as I

4  thought some active employees.

5  Q   And, once again, if you look towards the back, are there

6  portions of this document that was prepared by you or someone

7  else at E&Y?

8  A   Yes.  We helped pull together pages 4 and 5 for this

9  particular presentation.

10 Q   Okay.  Now, page 4, which we have, has legacy

11 liabilities, some for fiscal years that have already ended --

12 A   That is correct.

13 Q   -- and others that are projected?

14 A   Yes.

15 Q   And where did your numbers come from for these?

16 A   The debt service numbers, the scheduled debt service, as

17 the amortization tables exist today, the POC principal and

18 interest payments were, again, based on the current

19 amortization schedules.  The POC swaps payments were based on

20 the existing swap schedule.  The pension contributions and

21 the health benefits for retirees would have come based on the

22 assumptions that were provided to us by the city's actuaries.

23 Q   Now, let me ask you about the substance of the meeting.

24 Did you make any part of the presentation that afternoon?

25 A   I did.

1   Q    What parts of the presentation did you make?

2   A    I would have focused on pages 4 and 5 in terms of laying

3   out what the financial position of the city was.

4   Q    Were questions asked of you that day, that afternoon?

5   A    I don't remember specific questions that afternoon.

6   Q    Where were matters left at the end of the morning

7   meeting?

8   A    They were generally left to have an open dialogue and

9   communication flow between the city's advisors and the

10  participants in the meeting.

11  Q    And at the end of the afternoon meeting?

12  A    It was the same.

13  Q    Let's look at the next exhibit, Exhibit 51.  Can you tell

14  us what Exhibit 51 is?

15  A    Exhibit 51 is the ten-year plan in terms of the forecast

16  that was available at that point of time as of June 21st.

17  Q    Did you attend a meeting on June 25th with

18  representatives of the bondholders?

19  A    I did.

20  Q    And where was that meeting held?

21  A    That meeting was held in New York.

22  Q    Who attended?

23  A    It was bondholders and bond insurers and their financial

24  advisors.

25  Q    Was Exhibit 51 a document given to them that day?

1  A    Yes.  That was the document that we went through on that

2  particular day.

3  Q    Do you remember which bond insurers you met with or

4  bondholders you met with on the 25th?

5  A    Yes.  Ambac was there.  I think Assured was there.

6  National, advisors from FGIC, advisors from Syncora.  Those

7  are actually some of the ones that I remember specifically.

8  It was a pretty big meeting.

9  Q    And I apologize if I asked you this.  How long did you

10  meet with them?

11  A    We met with them for at least four to five hours.

12  Q    What was the purpose of that meeting?

13  A    The purpose of the meeting was to have a subsequent

14  discussion and Q&A on the assumptions behind the information

15  that was shared as of June 20th.

16  Q    Do you remember any questions you were asked?

17  A    There were a lot of questions with respect to the

18  assumptions underlying the ten-year projections and the

19  details in terms of how those numbers were built up.

20  Q    And once again, where were matters left at the end of the

21  June 25th meeting?

22  A    They were left to have follow-up meetings on an

23  individual basis with certain bondholders or the insurers to

24  have more specific discussions around the business plan.

25  Q    Let me direct your attention to July 9.  Were there

1  meetings that day with bondholders or insurers for

2  bondholders?

3  A   Yes.

4  Q   And where were those meetings?

5  A   Those meetings were held in Detroit.

6  Q   And did you attend them?

7  A   Yes.

8  Q   How long did they last?

9  A   The morning meeting lasted about four or five hours.

10 Q   And then I assume there was an afternoon meeting as well?

11 A   Yeah.  There was an afternoon meeting.  My recollection

12 is with the pension systems, I believe.  There were a lot of

13 meetings during this time frame.

14 Q   How long was your meeting with the pension systems?

15 A   I think we had a meeting for about two or three hours.

16 Q   What was the purpose of the morning meeting?

17 A   The morning meeting was generally to have additional

18 dialogue and discussions around the assumptions of the

19 business plan.

20 Q   Do you remember who you met with in particular that

21 morning?

22 A   I remember it was the financial advisors for National.

23 It was the financial advisors for FGIC, Assured were the some

24 of the names that at least come to mind.

25 Q   In this period, did the city, to your knowledge, make any

1  proposals to the bondholders to resolve their claims?

2  A    The city made a proposal or a framework for a proposal in

3  its June 14th presentation.

4  Q    Did the bondholders at any point or any subgroup of

5  bondholders make a proposal to the city at some point?

6  A    My understanding is yes.  I have not reviewed a proposal

7  from the bondholders in detail.

8  Q    Do you remember when that proposal was made?

9  A    My recollection is it was prior to the city filing.

10  Q    Okay.  Now, in the afternoon meeting, what was the reason

11  for meeting with the two pensions on the afternoon of July 9?

12  A    It was to have additional discussions around the

13  assumptions that the city's actuaries were using with respect

14  to not only the size of the claim but also to ascertain the

15  contribution levels required over the next ten years for the

16  pension systems.

17  Q    And I apologize if I've asked you this before.  At the

18  end of that afternoon meeting with the pensions, what was

19  supposed to happen next, if anything?

20  A    There was supposed to be a process to try and understand

21  the assumptions, the actuarial assumptions, and thereby

22  derive -- have an understanding of the amount of the claim

23  and then have subsequent discussions around the amount of

24  funding that the city may or may not able to afford over the

25  long term.

1   Q   Okay.  Now, let's now go to July 18.

2           THE COURT:  Excuse me, Mr. Stewart.

3           MR. STEWART:  Yes.

4           THE COURT:  I'm sorry to be such a nuisance about

5   this, but please try not to wander so far from the

6   microphone.

7           MR. STEWART:  Oh, sorry, Judge.

8           THE COURT:  Part of our issue here is that we have

9   overflow courtrooms where people are trying to hear what we

10  say, so it's not just a question of the recording, which is

11  important, but other people are listening in as well.

12          MR. STEWART:  I'll do better, your Honor.  Sorry.

13  BY MR. STEWART:

14  Q   Let me direct your attention, if I could, now to July 18.

15  Were you asked on or about July 18 to execute a declaration

16  in connection with Detroit's bankruptcy filing?

17  A   Yes, I was.

18  Q   How many days before July 18 did you start working on

19  your declaration?

20  A   I don't recall the specific number of days.  It was

21  sometime in June.  Late June is I think where we started it.

22  Q   And do you -- how much of your declaration did you write,

23  and how much of it was written by others for you?

24  A   A majority of it -- of the declaration was written by me

25  in conjunction with counsel.

1  Q   Now, your declaration has a number of attachments to it,

2  and I'm going to put them up before I question you about

3  them.  And let's start with Exhibit -- Attachment A, which is

4  Exhibit 9.  And is that one of the exhibits to your

5  declaration?

6  A   It is.

7  Q   And is this a document you or someone else at E&Y

8  prepared?

9  A   Yes.

10 Q   And what is it?

11          MR. RUEGGER:  Your Honor, objection.  We objected to

12 this document.  It is forecasts, which we think would require

13 expert testimony.  We believe any testimony related to it

14 should be excluded on that grounds.

15          THE COURT:  The document is in evidence?

16          MR. RUEGGER:  No, your Honor.

17          THE COURT:  It's not?

18          MR. STEWART:  It's not, Judge.  I'm going to ask him

19 now about his dealings with Mr. Orr on the document; however,

20 we also designated this document and the next two as

21 summaries under Federal Rule of Evidence 1006 since they

22 accumulate voluminous evidence which we made available to the

23 objectors.

24          THE COURT:  What does this document purport to do or

25 to be without telling me what its contents are?

1  THE WITNESS:  It was meant to be to show the two

2  years of actual cash activity for the general fund and what

3  the city's cash position was at the end of fiscal year 2013

4  and fiscal year 2012, the magnitude of the deferrals over

5  that time frame, your Honor, and then the two-year forecast

6  beyond that time frame.

7  THE COURT:  And so how was the document compiled?

8  THE WITNESS:  Your Honor, the actuals for the first

9  two years were compiled based on the receipts and

10  disbursements activity that we were able to ascertain for the

11  bank accounts.  Your Honor, for the next two years, with

12  respect to the different line items, I can walk through the

13  assumptions, but --

14  THE COURT:  By "the next two years," you mean fiscal

15  year '14 and '15?

16  THE WITNESS:  That is right, your Honor.

17  THE COURT:  No need.  I'll admit the document as to

18  actual and preliminary for 2012 and 2013, but the objection

19  is sustained as to the forecasts.

20  MR. STEWART:  Thank you, your Honor.

21  (Debtor's Exhibit 9 received at 4:33 p.m.)

22  BY MR. STEWART:

23  Q    Is this a document you discussed with the emergency

24  manager or his advisors, Mr. Malhotra, on or before the date

25  you executed your declaration?

1    A    Yes.

2    Q    And why did you discuss it with them?

3    A    Because it showed the status of the city's liquidity

4    position right around that time frame and in the subsequent

5    few months.

6    Q    And what did you say to the emergency manager or his

7    advisors about the city's liquidity position at that time or

8    in the coming periods?

9    A    What I said is that the city's liquidity position at the

10   end of fiscal year 2013 had improved by roughly $40 million

11   because the city did not make the POC payment that was due in

12   June -- on June 15, 2013.  And what I said is that over the

13   next two years the city was going to have a significant cash

14   burn for each particular year based on the disbursements

15   significantly exceeding receipts.

16   Q    What did you tell Mr. Orr --

17             THE COURT:  Excuse me one second.  Again, we have to

18   clarify your language.  You used the phrase P-O-C.  What does

19   that mean?

20             THE WITNESS:  Your Honor, I was referring to the

21   pension obligation certificate --

22             THE COURT:  Okay.

23             THE WITNESS:  -- and the payment that was due on

24   June 15th.

25             THE COURT:  And then you used the phrase "cash

1  burn."  What does that refer to?

2        THE WITNESS:  Your Honor, that refers to the city's

3  operating disbursements exceeding its receipts or its --

4  city's total disbursements exceeding its receipts thereby

5  reducing the cash over a specified time frame.

6  BY MR. STEWART:

7  Q   And so you've told us what you said to Mr. Orr.  Did you

8  tell him what the cash position was going to be at this rate

9  in the coming years?

10 A   Yes, I did.

11 Q   And what did you tell him?

12 A   I would have -- what I said is that the city's cash

13 position net of deferrals could be approximately $143 million

14 negative at the end of fiscal year 2014 not making -- while

15 not repaying any of the deferrals that had already been made

16 as of that point of time or without unpooling any of the cash

17 that the city had -- has currently pooled.

18 Q   And if the city had unpooled the cash or paid up the

19 deferrals, what did you tell him the cash position was going

20 to be?

21 A   What I said is that the city's cash position for -- would

22 have been almost $150 million worse off if the pension

23 contributions that had been deferred till that time frame

24 were made as well as if the deferred POC payment had been

25 made.  If the pooled cash had to be unpooled, that amount

1  would be roughly an additional $90 million based on what was

2  in the CAFR.

3  Q   For a total cash shortfall of how much?

4  A   Before the --

5          MR. DECHIARA:  Objection.

6          THE WITNESS:  -- unpooling of cash, it would --

7          MR. DECHIARA:  Objection.  Your Honor, I just am

8  objecting to the extent that this -- what the witness is

9  recounting he's saying to Mr. Orr, I just want to make clear

10  that that's not coming into the record as the truth of the

11  matter -- of the statements he's making to Mr. Orr.  If

12  that's clear, I have no objection, but the line is getting

13  pretty blurred, and I think it's getting pretty close to the

14  line.

15          THE COURT:  I'm concerned about that.  I share your

16  concern.  You used a phrase again that needs clarification,

17  "unpool."

18          MR. STEWART:  We were talking about the pooled

19  funds, your Honor.  Those were the --

20          THE COURT:  I'm asking the witness.

21          MR. STEWART:  Thanks.

22          THE COURT:  What does "unpool the cash" mean?

23          THE WITNESS:  Your Honor, what I was -- what I meant

24  to say is if the pooled cash had to be restricted or

25  segregated out of the general fund, that's what I was

1    referring to the unpooling of cash.

2            THE COURT:  Okay.

3    BY MR. STEWART:

4    Q   What did Mr. Orr say to you?

5    A   On this particular document, the discussions with Mr. Orr

6    or specifically also the other advisors was the magnitude --

7            MR. RUEGGER:  Your Honor, I'm sorry to interrupt the

8    witness, but I thought the question was what did Mr. -- what

9    was the conversation with Mr. Orr.

10           MR. STEWART:  Or his advisors.

11           MR. RUEGGER:  And I thought the witness was just

12   describing a conversation that might not have been with

13   Mr. Orr but might have been with the advisors.  If I

14   misheard, then I apologize.

15           MR. STEWART:  I thought I said Mr. Orr or his

16   advisors, but if not I'll reask the question.

17           MR. RUEGGER:  Thank you.

18           THE COURT:  Okay.

19   BY MR. STEWART:

20   Q   What did Mr. Orr or his advisors say to you?

21   A   The specific discussions on this particular page were

22   around the magnitude of the city's cash disbursements

23   exceeding its cash receipts in terms of how dire the

24   situation was with respect to the general fund's cash

25   position.

1   Q   Page 2 of our exhibit is -- let's put it up there, and

2   let me ask you just what this is.

3           MR. RUEGGER:  Your Honor, objection.  It's a

4   forecast.  I'd rather not have any testimony on this.

5           THE COURT:  I'm sorry.  Did you say you'd rather not

6   have any testimony about it?

7           MR. RUEGGER:  And I'll rephrase my objection with

8   all due respect, your Honor.  Objection.  It's a forecast,

9   your Honor.

10          MR. STEWART:  My question is what is this document?

11          THE COURT:  Yeah.  I think we can get at least that

12  much in.

13          MR. STEWART:  Yeah.

14  BY MR. STEWART:

15  Q   What is this document?

16  A   It's the monthly cash flow forecast for fiscal year 2014

17  under base case.

18          THE COURT:  I'm sorry.  Under what?

19          THE WITNESS:  Under base case.

20          THE COURT:  Base case, which means --

21          THE WITNESS:  So, your Honor, on this it means the

22  city continuing to make its payments for both all unsecured

23  claims per schedule and no restructuring initiatives such as

24  any benefits from the bankruptcy protection may avail.  It

25  was the city paying its payments as they came due based on

1　the information that we had, including information from the

2　actuaries.

3　　　　　THE COURT:  Like steady state before?

4　　　　　THE WITNESS:  That is correct, your Honor.

5　BY MR. STEWART:

6　Q   And did you discuss your conclusions with Mr. Orr or his

7　advisors?

8　A   Yes.

9　Q   Let's put up the next exhibit, 10, for identification.

10　Mr. Malhotra, I think we have Exhibit 10 for identification,

11　which is Exhibit B to your declaration.  Is this a ten-year

12　financial projection?

13　A   Yes, it is.

14　Q   Did you discuss this with Mr. Orr or his advisors?

15　A   Yes, I did.

16　Q   And what did you say to him, and what did he say to you

17　or his advisors say to you about the ten-year projections?

18　A   What the --

19　　　　　MR. RUEGGER:  Objection.  Your Honor, this is the

20　same issue that Mr. DeChiara raised.  A discussion of

21　forecasts is essentially I think a back door around your

22　ruling, so we'd object to the question and the answer.

23　　　　　THE COURT:  Well, I'll permit the witness to answer

24　this question with the understanding that the document is not

25　in evidence and the witness' testimony about what the

1  document says is only for the purpose of the truth of what he

2  told Mr. Orr, not for the truth of the statements themselves.

3          MR. RUEGGER:  Thank you, your Honor.

4  BY MR. STEWART:

5  Q   And what did you say to Mr. Orr about the conclusions you

6  had reached in the document?

7  A   What I said is that the city's revenues over the ten

8  years, approximately $10-1/2 billion, and the city's

9  operating expenditures over these next ten years,

10 approximately $7-1/2 billion, for roughly a $3 billion

11 operating surplus.  What I said specifically around the

12 legacy liabilities was based on the current amortization

13 schedule and the information that we have received from the

14 actuaries, the legacy costs could be in excess $7 billion

15 over the ten years, which would result in a potential

16 operating -- a potential deficit to the tune of $4 billion

17 over the next ten years.

18         MR. STEWART:  Let's put up Exhibit 11 if we could.

19 BY MR. STEWART:

20 Q   Can you tell us what Exhibit 11 is?

21 A   Exhibit 11 is the five years of actual legacy

22 expenditures and five years of a forecast on the scheduled

23 debt service as it exists today or the pension and health --

24 retiree healthcare information we received from the

25 actuaries.

1      MR. STEWART:  Let's blow up, if we could, the part

2  that deals with the fiscal years ended between 2008 and 2012.

3  BY MR. STEWART:

4  Q   Are those numbers numbers relating to years that had

5  already -- where the books had already been closed?

6  A   That is correct.

7  Q   Where did your numbers come from?

8  A   The numbers would have come from -- for the debt service,

9  the POC's, would have come from the city.  The pension

10 contributions and the health benefits, the retirees -- for

11 the retirees would have also come from the city in

12 conjunction with the city's actuaries on the allocation of

13 what was for public safety versus nonpublic safety or DDOT.

14      MR. STEWART:  Your Honor, I would move this portion

15 of the document into evidence since it reflects only

16 historical data.

17      THE COURT:  Any objections?  All right.  The Court

18 will admit this document.  What was the exhibit number again

19 just so we're clear?

20      MR. STEWART:  11, I believe, Judge.

21      THE COURT:  All right.  Admitted Exhibit 11, 2008

22 through '12 only.

23      (Debtor's Exhibit 11 received at 4:45 p.m.)

24 BY MR. STEWART:

25 Q   And then go back to the full document if you could, and

1  as to the overall document, Mr. Malhotra, did you have

2  discussions with the emergency manager or his advisors about

3  it?

4  A   Yes, I did.

5  Q   And why did you discuss it with them?

6  A   We discussed it in the context of the legacy expenditures

7  continuing to have an increasing percentage of the overall

8  general fund revenues compared to where the city was five

9  years ago, compared to where the city was headed by 2017,

10 that the weight of the legacy expenditures was almost going

11 to close to double based on the projections that we had been

12 given.

13 Q   And what did the -- Mr. Orr or his advisors say to you in

14 response to the points that you made?

15 A   Specifically, they were surprised in terms of the

16 magnitude of the increase in pension and retiree healthcare

17 costs over the next five years.

18         MR. DECHIARA:  Objection.  Lack of foundation.

19 Testifying to the state of mind of the --

20         THE COURT:  It actually wasn't the question.  The

21 question was what did they say.

22         THE WITNESS:  They basically said that the costs

23 going up from where they were five years ago to where they

24 were ten years ago -- I specifically remember that it was

25 almost going to double -- was the response that I got back on

1    this particular page.

2             THE COURT:  Okay.  Can you try to specify for us

3    when these conversations were that Mr. Stewart has been

4    asking you about?

5             THE WITNESS:  Sure.  On this particular document we

6    would have had -- which was also as a part of the June 14th

7    proposal, your Honor, so we would have had meetings with

8    Mr. Orr and the other advisors all through the June time

9    frame and even in some of the May time frame, so there were a

10   series of meetings that we had.

11            THE COURT:  At which these documents were discussed?

12            THE WITNESS:  Yes.  The June 14th proposal, your

13   Honor, was pulled together over a period of time, so there

14   were specific documents that were discussed in those

15   meetings.

16            MR. STEWART:  Your Honor, I have a demonstrative

17   exhibit I would like to use, but before putting it up on the

18   screen, since there have been objections, it's Exhibit 38.

19   Why don't we put it up on the screen?  Judge, this is a

20   graphic representation of what the witness already has

21   testified to that he told Mr. Orr was the city's cash

22   position as the witness had seen it, and what I would like to

23   ask the witness is does this represent what you told Mr. Orr

24   or his advisors about what you believe the city's cash

25   position was going to look like in the coming year?

 1          MR. RUEGGER:  Objection.  Leading, and it's also a

 2   forecast.

 3          MR. STEWART:  I can ask it in a nonleading way,

 4   Judge, but --

 5          MR. RUEGGER:  Then just forecast.

 6          THE COURT:  Yeah.  You can fix the question.  No.

 7   The objection is sustained.

 8          MR. STEWART:  Okay.  Now, your Honor, as to these

 9   last three exhibits and actually also this chart, I'd like to

10   move them into evidence on another ground.  And as I

11   mentioned, we identified these to the objectors as documents

12   that qualified as summaries over Federal -- under Federal

13   Rule of Evidence 1006.  In other words, they compiled and

14   pulled together voluminous records that could not

15   conveniently or easily otherwise be made into proofs.  That

16   was done with proper notice.  As the rule requires, we

17   notified the objectors of this.  We told them we have the

18   underlying records available for your examination.  If you

19   wish to see them, please come and do so.  One person did call

20   to say they'd like to see them but never, in fact, came.  I

21   would submit that we have actually satisfied the requirements

22   of Rule 1006 by doing this and that as simple summaries of

23   voluminous information they qualify for admission.

24          MR. RUEGGER:  Your Honor, I think Mr. Stewart

25   misunderstands our objection.  It's not that there's a lot of

 1    data underlying any of these documents.  That might very well

 2    be, but they are forecasts, which require, in our view,

 3    expert testimony, which is not in the courtroom, so we're not

 4    objecting due to the volume of the underlying data.  It's

 5    because they are forecasts.

 6            THE COURT:  I do agree with that.  The motion is

 7    denied.

 8            MR. STEWART:  Well, your Honor, could I be heard

 9    just one more --

10            THE COURT:  All right.

11            MR. STEWART:  -- one more moment on this?  The fact

12    they are forecasts doesn't, per se, change anything.  They

13    would have to be opinions before they're excludable.  It's

14    been testified he --

15            THE COURT:  But why isn't the forecast an opinion

16    about what's being forecast?

17            MR. STEWART:  Well, it's possible to have forecasts

18    that are factual, that are extrapolations, that are not

19    really opinions, and there are forecasts rendered many times

20    that don't involve experts.  In fact, the two decisions I

21    cited earlier involved financial analysts much like

22    Mr. Malhotra who pulled together documents from which then

23    conclusions could be reached about the probability of

24    something happening or not happening.  The fact --

25            THE COURT:  They involve forecasts?

1          MR. STEWART:  These did not.

2          THE COURT:  Financial forecasts?

3          MR. STEWART:  These involved complicated personal

4    financial records, but they did involve an ultimate issue

5    such as could this person have possibly afforded this item

6    based on his or her income or --

7          THE COURT:  In the past.

8          MR. STEWART:  Well, it's past, but if a forecast is

9    based on information that is either historical or is made

10   available as information about a forecast --

11         THE COURT:  I have to say I'm not persuaded, but if

12   you can find me a case which says that a forecast does not

13   involve expertise, I'll certainly consider it.

14         MR. STEWART:  Okay, your Honor.  We will do that.

15         THE COURT:  We'll leave it open to that extent.

16         MR. STEWART:  Thank you.  That's all I have of this

17   witness, your Honor.

18         THE COURT:  All right.  Well, we won't press on with

19   cross-examination now.  We will break for the day and

20   reconvene at nine o'clock tomorrow morning.  Before we go --

21   ah, Ms. Patek has something, and then I have something.

22         MS. PATEK:  Your Honor, this is just a brief

23   housekeeping matter about a matter of a summary exhibit that

24   came in at the beginning of the day, and this was something

25   Mr. Irwin and I had talked about, and there was an error on

1  it.  It was to be corrected, and it didn't get corrected, but

2  it's going to be corrected on the --

3          THE COURT:  All right.  Let me ask the two of you to

4  consult about that and get back to me first thing in the

5  morning.  I have been asked to remind you that although this

6  courtroom will be locked overnight, there may and probably

7  will be people in here doing what they regularly do, the IT

8  staff, court staff, cleaning staff, so you are free to leave

9  your equipment and property here with that understanding or,

10  of course, you can take it with you.  And I remind you once

11  again please be quiet, perfectly quiet in the hallways.  And

12  we'll reconvene at nine o'clock tomorrow morning.

13          THE CLERK:  All rise.  Court is adjourned.

14      (Proceedings concluded at 4:53 p.m.)

INDEX

|                                      | Page |
|--------------------------------------|------|
| Opening Statement by Mr. Bennett     | 56   |
| Opening Statement by Ms. Green       | 94   |
| Opening Statement by Ms. Brimer      | 112  |
| Opening Statement by Mr. Wertheimer  | 117  |
| Opening Statement by Ms. Ceccotti    | 118  |
| Opening Statement by Ms. Patek       | 128  |
| Opening Statement by Mr. Morris      | 135  |
| Opening Statement by Ms. Levine      | 138  |
| Opening Statement by Mr. Ullman      | 145  |

| WITNESSES:      | Direct | Cross | Redirect | Recross |
|-----------------|--------|-------|----------|---------|
| Gaurav Malhotra | 168    |       |          |         |

| EXHIBITS:             | Received |
|-----------------------|----------|
| Debtor's Exhibit 9    | 228      |
| Debtor's Exhibit 11   | 236      |
| Debtor's Exhibit 104  | 93       |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    October 27, 2013
_____       _____
Lois Garrett

```
 1                UNITED STATES BANKRUPTCY COURT
                  EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3  IN THE MATTER OF,           Case No. 13-53846
                                Detroit, Michigan
 4  CITY OF DETROIT, MI         October 24, 2013
    _____/  9:05 a.m.
 5
                    IN RE:  ELIGIBILITY TRIAL
 6           BEFORE THE HONORABLE STEVEN W. RHODES
              TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                 GEOFFREY STEWART, ESQ.
                                   THOMAS CULLEN, JR., ESQ.
10                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
11                                 Washington, D.C. 20001-2113
                                   202-879-3939
12
                                   BRUCE BENNETT, ESQ.
13                                 Jones, Day
                                   555 South Flower Street
14                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
15                                 213-243-2382

16                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   Pepper, Hamilton
17                                 4000 Town Center
                                   Suite 1800
18                                 Southfield, MI 48075-1505
                                   248-359-7333
19
    For State of Michigan:         MATTHEW SCHNEIDER, ESQ.
20                                 (P62190)
                                   Chief Legal Counsel
21                                 Attorney for State of Michigan
                                   Michigan Department of
22                                 Attorney General
                                   P.O. Box 30754
23                                 Lansing, MI 48909
                                   517-373-0126
24

25
```

```
 1                              STEVEN HOWELL, ESQ. (P28982)
                                Special Assistant Attorney
 2                              General
                                Dickinson, Wright
 3                              500 Woodward Avenue
                                Suite 4000
 4                              Detroit, MI  48226-3425
                                313-223-3033
 5
     For Michigan Council 25 of   SHARON L. LEVINE, ESQ.
 6   the American Federation of   JOHN SHERWOOD, ESQ.
     State, County and Municipal  Lowenstein, Sandler, LLP
 7   Employees (AFSCME), AFL-CIO  65 Livingston Avenue
     and Sub-Chapter 98, City of  Roseland, NJ 07068
 8   Detroit Retirees:            973-597-2500

 9   For Detroit Retirement       ROBERT D. GORDON, ESQ. (P48627)
     Systems - General Retirement JENNIFER GREEN, ESQ.
10   System of Detroit, Police and Clark, Hill, PLC
     Fire Retirement System of    151 S. Old Woodward Avenue
11   the City of Detroit:         Suite 200
                                  Birmingham, MI 48009
12                                248-988-5882

13                                RONALD KING, ESQ. (P45088)
                                  Clark, Hill
14                                212 East Grand River Avenue
                                  Lansing, MI 48906
15                                517-318-3015

16   For the Detroit Fire Fighters BARBARA PATEK, ESQ. (P34666)
     Association, the Detroit      JULIE BETH TEICHER, ESQ.
17   Police Officers Association   (P34300)
     and the Detroit Police        DAVID EISENBERG, ESQ. (P68678)
18   Lieutenants and Sergeants     Erman, Teicher, Miller, Zucker
     Association:                  & Freedman
19                                 400 Galleria Officentre
                                   Suite 444
20                                 Southfield, MI 48034

21   For International Union, UAW:  BABETTE A. CECCOTTI, ESQ.
                                    PETER D. DECHIARA, ESQ.
22                                  THOMAS CIANTRA, ESQ.
                                    Cohen, Weiss, and Simon, LLP
23                                  330 West 42nd Street
                                    New York, NY 10036-6976
24                                  212-356-0227
25
```

```
 1  For the Detroit Retired        THOMAS MORRIS, ESQ. (P39141)
    City Employees Association,     Silverman & Morris
 2  Retired Detroit Police and     30500 Northwestern Highway
    Fire Fighters Association,      Suite 200
 3  Shirley V. Lightsey, and       Farmington Hills, MI 48334
    Donald Taylor (Retiree         248-539-1330
 4  Association Parties):
                                   RYAN PLECHA, ESQ. (P71957)
 5                                 Lippitt, O'Keefe
                                   370 East Maple Road
 6                                 3rd Floor
                                   Birmingham, MI 48009
 7                                 248-646-8292

 8  For the Official Committee of  MATTHEW E. WILKINS, ESQ.
    Retirees:                      (P56697)
 9                                 Brooks, Wilkins, Sharkey &
                                   Turco, PLLC
10                                 401 S. Old Woodward Avenue
                                   Suite 400
11                                 Birmingham, MI 48009
                                   248-971-1711
12
                                   CLAUDE D. MONTGOMERY, ESQ.
13                                 ANTHONY ULLMAN, ESQ.
                                   ARTHUR RUEGGER, ESQ.
14                                 Dentons
                                   1221 Avenue of the Americas
15                                 New York, NY 10020-1089
                                   212-768-6700
16
    For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
17  Police Members Association:    MEREDITH TAUNT, ESQ. (P69698)
                                   MALLORY FIELD, ESQ. (P75289)
18                                 Strobl & Sharp, P.C.
                                   300 East Long Lake Road
19                                 Suite 200
                                   Bloomfield Hills, MI 48304-2376
20                                 248-540-2300

21  For the Flowers Plaintiffs -   WILLIAM A. WERTHEIMER, ESQ.
    Robert Flowers, Michael Wells, (P26275)
22  Janet Whitson, Mary Washington 30515 Timberbrook Lane
    and Bruce Goldman:             Bingham Farms, MI 48025
23                                 248-644-9200

24

25
```

```
 1  For Ambac Assurance          DANIEL WEINER, ESQ. (P32010)
    Corporation:                 Schafer & Weiner
 2                               40950 Woodward Avenue
                                 Suite 100
 3                               Bloomfield Hills, MI 48304
                                 248-540-3340
 4
    Court Recorder:              Letrice Calloway
 5
    Transcriber:                 Deborah L. Kremlick
 6

 7

 8

 9  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2  WITNESSES FOR          Direct        Cross         Redirect
   THE CITY:
3
   GAURAV MALHOTRA                  8,56,67,82         85
4  CHARLES MOORE            90     128,143,148,151
   KENNETH BUCKFIRE        154
5
   EXHIBITS:                                           ID   ADM
6
   CX69    Draft Actuarial Evaluation Report          119  123
7  CX70    Actuarial Evaluation Report                126  127
   CX75    Financial Operating Plan                   182  184

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Court in Session)

2         THE CLERK:  All rise.  Court is in session.  Please

3    be seated.  Case number 13-53846, City of Detroit, Michigan.

4         THE COURT:  Is anybody not here?  All right.  Well,

5    then let's assume everyone's here and we don't have to repeat

6    appearances.

7         A couple of housekeeping matters.  Mr. Stewart, I

8    received and actually read the memorandum that was filed a few

9    minutes ago on this issue of allowing the witness to testify

10   about projections.  Thank you to whoever on your staff stayed

11   up all night doing that.

12        MR. STEWART:  Unfortunately Mr. DiPompeo did, Your

13   Honor.

14        THE COURT:  Well, thanks to him.  As a matter of

15   process, however, before we have any further argument on it,

16   it is appropriate to -- to take some time not only for us, but

17   for the objecting parties to study it and look at the cases

18   that have been cited and prepare.

19        So I think we'll proceed with his cross examination.  And

20   perhaps reconsider the issue after lunch.

21        The second housekeeping item is in regard to the

22   Governor's testimony.  Is Mr. Schneider here?  Mr. Howell is

23   here.  Is it -- is it --

24        MR. HOWELL:  Dickinson, Wright.  Special Assistant

25   Attorney General appearing on behalf of the state.

1        THE COURT:  Thank you, sir.  Is it the parties'

2   agreement and the Governor's intention to appear at 1:00 on

3   Monday?

4        MR. HOWELL:  I don't know if that -- I believe

5   that's the plan without the limitations suggested.

6        THE COURT:  Okay.  I --

7        MR. DECHIARA:  I'm sorry, Your Honor, I was

8   distracted for a moment.

9        MR. HOWELL:  If I may, Your Honor, I -- I believe

10  the -- there is ongoing discussions between Matthew.  He's

11  meeting today with the Governor to work those details out.

12  But I thought the offer was 1:00 on Monday.

13       MR. DECHIARA:  Yes.  The state offered to produce

14  the Governor at 1:00 on Monday and there's no agreement as to

15  any limitation on the time of his testimony.

16       MR. HOWELL:  Okay.  That is correct, Your Honor.

17       THE COURT:  Okay.  Then in -- in that circumstance,

18  the Court will change its plans and we will run Court until

19  5:00 instead of our previously scheduled time of 3:00 because

20  I don't want to have to require the Governor to come back a

21  second day on account of my schedule.  So we'll plan on going

22  until at least 5:00 on Monday to try to get all of his

23  testimony in in one -- one day.

24       MR. DECHIARA:  Thank you, Your Honor.  We appreciate

25  it.

1      MR. HOWELL:  Thank you, Your Honor.  We appreciate

2  the accommodation.

3      THE COURT:  Okay.

4      MR. HOWELL:  Thank you very much.

5      THE COURT:  All right.  Let's proceed with the

6  testimony then.

7      MR. RUEGGER:  Your Honor, excuse me.  Art Ruegger

8  for Dentons on behalf of the Retiree Committee.

9      We respectfully request a little more time to read the

10  memo from Jones, Day and -- and respond.

11      THE COURT:  Do what you can over lunch and then

12  we'll see if we need any more time.

13      MR. RUEGGER:  Very well, Your Honor.

14      THE COURT:  Sir, would you resume the witness stand?

15  And you're still under oath so you may just have a seat and

16  we'll continue with the examination.

17      (WITNESS GAURAV MALHOTRA WAS PREVIOUSLY SWORN)

18      MR. SHERWOOD:  Good morning, Your Honor.  Jack

19  Sherwood, Lowenstein, Sandler for the record for AFSCME.

20                      CROSS EXAMINATION

21  BY MR. SHERWOOD:

22  Q    Mr. Malhotra, good morning.

23  A    Good morning.

24  Q    You were engaged by the City of Detroit in May of 2011,

25  isn't that right?

1  A    That's correct.

2  Q    So as of now you've been on the job for the city for over

3  two years, is that fair to say?

4  A    That is correct.

5  Q    And when you were initially engaged in May of 2011

6  through the appointment of Mr. Orr as the emergency manager,

7  you reported to officials, city officials, is that right?

8  A    That is correct.

9  Q    And some of those city officials include Kirk Lewis,

10 correct?

11 A    Yes.

12 Q    And who is Kirk Lewis?

13 A    Kirk Lewis was the former Chief of Staff for Mayor Bing.

14 Q    And Chris Brown, do you know that name?

15 A    I do.

16 Q    And who was Chris Brown?

17 A    He was the former Chief Operating Officer for the city.

18 Q    And when you say -- when you say former or -- or Mr.

19 Lewis and/or Mr. Brown, are they still employed by the City of

20 Detroit?

21 A    No, they are not.

22 Q    And -- and when were they -- when were they terminated by

23 the city?

24 A    I don't know if they were terminated and I don't know the

25 exact date they left.

1  Q    Okay.  But you know that as of now they're -- they're not

2  -- they're not working for the city, correct?

3  A    That's what I said earlier, yes.

4  Q    And -- and -- and you're not -- you're not reporting to

5  them any -- you're not reporting to any city officials at this

6  point in time, is that fair to say?

7  A    We report to Kevyn Orr.  We have been reporting to Gary

8  Brown.  We have been reporting to Jim Bonsall, was a former

9  Chief Financial Officer.  And those were the folks we were at

10  least reporting our day to day activities on.

11  Q    I just want to get this straight in terms of time, okay?

12  The -- I'm talking about since March of this year, are you

13  reporting to the Mayor or the Mayor's office since March of

14  this year when Mr. Orr was appointed?

15  A    No.  Our general updates are with Mr. Orr.

16  Q    And since March of this year, you're not reporting to the

17  city council of the City of Detroit, isn't that right, since

18  March of this year when Mr. Orr was appointed?

19  A    Not -- not specifically, no.

20  Q    Now Mr. Orr was -- was appointed in -- in March of this

21  year so at the time of his appointment you have been on the

22  job with Ernst and Young for about a year and ten months,

23  correct?

24  A    Sounds about right.

25  Q    And in -- in -- yesterday you testified on direct about

1  various conversations, things that you told Mr. Orr and the

2  other professionals for the city, correct?  Do you remember

3  that testimony from yesterday?

4  A    Yes.

5  Q    So I assume that when you were updating Mr. Orr and the

6  rest of the city's professionals, you drew on your year and

7  ten months worth of experience that you had working for the

8  city up to that point?

9  A    For certain aspects of those updates, yes.

10 Q    Do you recall in the course of your services for the

11 city, before the appointment of the emergency manager in March

12 2013, providing services in connection with the response of

13 the city to the report of the financial review team?

14 A    You -- can you shorten the question so -- and which

15 financial relating --

16 Q    Do -- do you recall in -- in late 2012, early 2013,

17 working with people from the city concerning the financial

18 review team's report?

19 A    We were working during that time frame on the specific

20 improving -- mechanisms for improving the cash flows of the

21 city, yes.

22 Q    Okay.  And -- and as you just testified one of the -- one

23 of the topics that you were working on during that period was

24 improving cash flows, correct?

25 A    That's right.  We were looking at different alternatives

1  how the city could improve its cash flow position.

2  Q    And -- and you were doing that work for the city and its

3  officials, correct?  Before Mr. Orr got involved.

4  A    That is correct.

5  Q    Did you attend meetings in December of 2012 where the

6  issue of the city's cash flows was discussed?

7  A    Meetings with who?

8  Q    Members of the city's -- members of the city council,

9  members of the Mayor's staff?

10 A    Yes.

11 Q    All right.  I'd like to refer you to a document it's

12 AFSCME 551, document 551.

13        MR. SHERWOOD:  And, Your Honor, I believe there

14 are --

15 Q    Are you okay with the -- with the screen or -- because I

16 think there might be some hard copies there too.

17 A    I'm okay.

18 Q    Okay.

19 A    Thank you.

20 Q    Now this letter is -- is dated February 22nd, 2013,

21 correct?

22 A    That is correct.

23 Q    And I'd like you to scroll down to the bottom of the

24 letter, the -- the paragraph marked cash crisis.  Do you see

25 that?

1  A     Yes.

2  Q     And there is a reference to Ernst and Young in that

3  paragraph.  And the administration, council President Pugh,

4  council President Brown, council member Cockrel, fiscal staff,

5  Ernst and Young consultant, along with Miller, Canfield met

6  over the December holiday break to come up with a cash plan

7  with counter measures to get the city through June 30th, 2013.

8  Do you recall participating in those meetings?

9  A     Yes, I do.

10 Q     And you see that in this letter the -- the authors

11 conclude on the first sentence that a satisfactory plan exists

12 to resolve the city's cash crisis.  Do you see that?

13 A     I see it.  I didn't write this, but I see it.

14 Q     You do see it?  And but that -- this was written after

15 your -- your lengthy meetings over the holiday break, correct?

16 A     I -- this was written on February 22nd.  We met during the

17 December time frame to come up with different ideas how the

18 city could preserve cash which included a significant amount

19 of deferrals, yes.

20 Q     Okay.  But -- and as -- as a result of those meetings --

21        THE COURT:  One second, counsel.  Have you seen this

22 letter before?

23 A     Your Honor, this letter was handed to me --

24        THE COURT:  That would be a yes or a no.

25 A     No.

1          THE COURT:  You've never seen this letter before?

2    A    It -- I have seen it, I have not read it is my answer.  I

3    was given it during my deposition.

4          THE COURT:  Is this letter in evidence?

5          MR. SHERWOOD:  I believe it is not, Your Honor.  I

6    was just asking him -- using it to refresh his recollection in

7    terms of things that happened.

8          THE COURT:  Well, it's proper to refresh a witness'

9    recollection when he says he doesn't have a recollection.  I

10   haven't heard that yet.

11         MR. SHERWOOD:  Okay.

12   Q    Did you believe in February of -- February 22nd, 2013,

13   that a satisfactory plan existed to address the city's cash

14   crisis?

15   A    What a satisfactory plan means is -- is subjective.  What

16   I can say is, during the December time frame we had a lot of

17   meetings with the city officials to see how the city could

18   preserve cash to -- to increase the cash position over the

19   next few months.

20        And that predominantly resulted in the city coming up

21   with a plan that said most of these would have to come through

22   deferrals because what the city could actually impact in terms

23   of permanent cost reductions, those options were very limited.

24   So the -- the majority of any savings that would come or any

25   cash increase would come, would come through the deferral of

1  either pension related costs or additional health care related

2  costs.  That -- that's at least the -- what -- what I view as

3  what the plan was at that point in time.

4  Q    Did you ever criticize the city or the council with

5  respect to their plans to address cash flow issues during the

6  February 2013 time period?

7  A    Criticize -- indirectly criticize in terms of what the

8  satisfactory plan was?

9  Q    Did you ever go to the city council or -- or the city

10 professionals and say, I disagree with your cash management,

11 cash flow plan, do something else?

12 A    During this time frame I made very clear that the --

13 based on the experience that I had over the past 18 months

14 working with the city, that the options that the city was

15 undertaking to preserve cash were predominantly based on

16 deferrals and not actual structural cost savings.  That's what

17 I -- I clearly highlighted.

18 Q    Let me ask you about additional revenue collection during

19 the period of early 2013.  Do you recall whether the city was

20 concerned about revenue collection from the 36th District Court

21 citations which the city -- where the city's share would be

22 $199,000,000?

23 A    No, I do not.

24 Q    You don't recall -- do you recall that that was an issue?

25 A    No, I do not.

1  Q    Do you recall being asked to look into the level of

2  collections from the 36th District Court in the amount of

3  $199,000,000?

4  A    No, I do not.

5  Q    Do you know what -- do you know whether the 36th District

6  Court is a source of revenue for the City of Detroit?

7  A    I think there are some collections, yes, that come

8  through the 36th District Court.  I am not exactly sure of the

9  amount off the 36th District Court collections.

10 Q    You don't -- you can't even estimate what the amount of

11 the collections are from the 36th District Court for 2013?

12 A    No, I cannot off the top of my head.

13 Q    So Ernst and Young didn't look into those collections or

14 whether they were slower than they should be, is that fair to

15 say?

16 A    That is fair.  Ernst and Young did not go into any

17 specific analysis on 36th District Court on their collections.

18 Q    Now you discussed a little bit yesterday about the -- the

19 general fund and the -- is all of the city's debt attributable

20 to the general fund?

21 A    No.

22 Q    Is -- does -- does the -- the total amount of debt that

23 the city has, does the number 14.9 billion, does that sound in

24 -- in the ballpark?

25 A    The amount of debt of 14,000,000,000 sounds a little high

1  because in my mind I remember the $18,000,000,000 of long term

2  liabilities as a total number of which.  And so that sounds a

3  little high to me.  If you could break it down for me, it will

4  -- it will refresh my recollection.

5  Q    Let me -- let me -- can we put the letter up again and

6  turn to Page 3?  Under long term liabilities there --

7           MR. STEWART:  Your Honor, I object.  We've been over

8  this.  He's not testifying to a lack of recollection.  He

9  hasn't seen the letter.  Unless there's a better --

10          THE COURT:  Well, no.  The -- the witness did

11 indicate some uncertainty about this question, so if this

12 refreshes his recollection, I'll permit it.  Does this refresh

13 your recollection about the debt of the city?

14 A    Yes, Your Honor, it's the long term liabilities of the

15 city which as noted here it's 14.9 billion dollars.  So, yes.

16          THE COURT:  Well, but the question for you is not

17 what this letter says because the letter is not in evidence.

18 The question is what do you remember after having seen this

19 letter?

20 A    Your Honor, I can at least frame up what was being asked

21 of me in terms of the total indebtedness.  Because when I look

22 at debt I consider this pure debt versus other long term

23 liabilities.  Yes, it does at least give me a frame of

24 reference to what the question was.

25          THE COURT:  Okay.

1  Q    And does this document -- do you agree with the statement

2  in this document that only 15% or 7.36 billion is attributable

3  to the general fund?  Does that -- does that sound right to

4  you?

5  A    That -- that could be an approximation based on the

6  existing assumptions with respect to unfunded liabilities from

7  a pension and -- and OPEB standpoint.

8  Q    And -- and the -- the city has other business type

9  activity funds, Department of Water and Sewage, Department of

10 Transportation and Municipal Parking.  And those funds are --

11 are not part of the general fund, correct?

12 A    That is correct.  They're -- they're enterprise funds.

13 Q    And do you know whether -- whether the -- the total

14 pension -- pension obligation of the city, is that all

15 attributable to the general fund, or is some of that

16 attributable to the enterprise funds?

17 A    The -- the pension liability is due to the two systems,

18 the general retirement system and the police and fire system.

19 The general retirement system is comprised of the general fund

20 employees, as well as water and sewer employees, as well as

21 Department of Transportation employees.

22 Q    So is it fair to say that some of the pension obligation

23 is -- is the responsibility of -- of water and sewer?

24 A    The -- yes, that would be -- that would be -- that would

25 be a fair assumption in terms of what they have been doing.

1  Q    Now in -- in again early 2013, are you aware that the

2  City of Detroit was in the process and had been in the process

3  of trying to achieve certain cost saving initiatives?

4  A    I don't recall of specific initiatives in of early 2013.

5  But the city has been in a constant effort to reduce costs and

6  looking for cost savings initiatives.

7  Q    And would you agree that by March of 2013, $150,000,000

8  of cost saving initiatives have been achieved by the City of

9  Detroit?

10 A    Compared to what time frame?

11 Q    Simply do you agree that $150,000,000 of cost savings

12 have been achieved prior to March 2013?

13 A    It's -- it's difficult for me to answer a question on

14 cost savings achieved by a particular date unless you can

15 frame for me over what course of time your question is related

16 to.

17          MR. SHERWOOD:  Can you -- can you put up Exhibit

18 419, please?  Your Honor, I think this is in evidence.

19          THE COURT:  Thank you.

20          MR. STEWART:  It is.

21 Q    Have you seen this report dated March of 2013, Mr.

22 Malhotra?

23 A    I -- I think so.  I -- I would have to see the contents,

24 Your Honor, to make sure that I understand what's in the

25 report or what the contents were.

1          THE COURT:  Is it on the table over there?  Is it on

2    the table over there?

3          MR. SHERWOOD:  Yes, it's 419.  May I approach and

4    help him, or -- or --

5          THE COURT:  He can do it.

6          MR. SHERWOOD:  Okay.

7          THE COURT:  And while he's doing that, Mr. Stewart,

8    I have to ask you as I did the objecting attorneys yesterday,

9    to pull the microphone closer to you so that when you do speak

10   or object, the -- the microphone will pick it up.

11         MR. STEWART:  Thank you, Your Honor.  Will do.

12   A    I'm sorry, did you say 419?

13         MR. SHERWOOD:  419, yeah.

14   A    I don't see a 419.

15         THE COURT:  Which binder is that in?  Are they

16   labeled?

17         MR. SHERWOOD:  I -- I think that would be in the

18   Retiree Committee's binder.

19         THE COURT:  So you couldn't find it, sir?

20   A    Your Honor, I could not see it in this particular binder

21   or these three binders.  There is no number 419.

22         THE COURT:  Okay.  Can someone produce a copy for

23   the witness, please?

24         MR. SHERWOOD:  Your Honor, I'm sure we have it in

25   our binder which is up there, I've just got to get the right

1 | number.

2 |          THE COURT:  Okay.  All right.

3 | Q    Can you try 522, Mr. Malhotra?  It's in the -- I think

4 | it's one of the black ones, probably to your right there.

5 |          THE COURT:  It's not there -- not there either?

6 | A    No.

7 |          MR. SHERWOOD:  Can I hand the witness a copy, Your

8 | Honor?

9 |          THE COURT:  Yes, please.

10 |          MR. SHERWOOD:  May I approach?

11 |          THE COURT:  Yes.

12 | Q    Have you -- you don't have to read the whole thing, but

13 | are you generally familiar with -- with this document?

14 | A    Very briefly.  I don't think we had any major part of

15 | putting this document together.

16 | Q    And this is called the -- the City of Detroit

17 | restructuring plan.  It's -- it's dated March of 2013.  And by

18 | this time Ernst and Young had, you know, been on the job for a

19 | year and ten months.  Are you saying you had no input into the

20 | Mayor's restructuring plan?

21 | A    We had a lot of things put into the Mayor's restructuring

22 | plan.  What you're referring to is this particular report on

23 | March 2013.  And what I'm saying is we did not have a

24 | significant amount of input that was put into this particular

25 | report.

```
 1  Q    Okay.  Can you turn to Page 5 of the report?  Getting

 2  back to the cost saving initiatives.  And if you look at the

 3  -- the title of that page and -- and the first part there, it

 4  says many revenue and cost saving initiatives have been

 5  implemented and others have been identified to address the

 6  $150,000,000 annual structural deficit.

 7       And then if you look at sub paragraph (b) below that, it

 8  says achieved cost saving initiatives approximately

 9  $150,000,000.  Do you see that?

10  A    That's what's written on this page, yes.

11  Q    Okay.  And do you have any reason to -- to agree with --

12  with that conclusion -- or disagree with -- with that

13  conclusion in this document?

14  A    Your Honor, it's tough for me to make a -- I -- I cannot

15  make an agreement or disagreement until I understand the

16  context of the time frame where a statement is being referred

17  to.  Achieve cost savings of 150,000,000, but it's over three

18  years, two years, one year, it's -- it's -- I can't put any

19  sort of reference to it.

20  Q    Okay.  Let me try it this way.  You started in May 2011,

21  right?

22  A    That is correct.

23  Q    And this document was done around March of 2013.  During

24  that period, did you see achieved cost savings of

25  $150,000,000?
```

1  A    We -- we saw a lot of cost savings.  I do not know if

2  they aggregated to 150,000,000 or not.  I -- I would have to

3  go back and check.

4  Q    Okay.  Now what about -- what about reduction in debt

5  obligations of the general fund?  Would you agree that the

6  debt obligations of the general fund in March of 2013 were

7  $400,000,000 lower than five years prior to that?

8  A    You're referring to the outstanding debt obligations, I

9  assume.  I do not know what the outstanding debt balance was

10  five years ago to be able to draw inference to a five -- or a

11  $400,000,000 number.

12  Q    And I think we've -- we've covered this already.  But --

13  but if you look at -- would you agree that as of -- of March

14  2013, approximately $6,000,000,000 of city debt was owed by

15  the Water and Sewer Department and does not have an impact on

16  the general fund?

17  A    I -- I agree with the first part of that statement that

18  there's roughly about $6,000,000,000 of revenue bonds

19  outstanding for the Water and Sewer Department, yes.

20  Q    Now, again in March 2013, you had no idea that the

21  emergency manager was -- was going to be appointed, isn't that

22  right?

23  A    That is correct.

24  Q    Okay.  And certainly in March 2013, the -- the recovery

25  plan for the City of Detroit was not finished, correct?

1  A     Sorry, what recovery plan are you referring to?

2  Q    Well, were there other -- were there other cost saving

3  initiatives that the city and its advisors including yourself,

4  had planned?

5  A     Going back to December of 2012.

6  Q    Not --

7  A     I'll just finish the answer.

8  Q    Go ahead, I'm sorry, I'm sorry.

9  A     And I'll answer your question.  As I testified earlier,

10  in December of 2012, the city with -- along with us and some

11  of the other advisors, went through a detailed process to

12  figure out how to improve the city's cash position as I

13  testified earlier.  Majority of those were related to

14  predominantly deferrals off bills that the city had due, not

15  paying them on time.

16          MR. SHERWOOD:  Your Honor, I'm sorry to interrupt.

17  I -- I asked a specific question.  The specific question was,

18  in March of 2013, were there future initiatives that the city

19  had planned.

20     I -- and with -- with due respect, I -- I thought the

21  answer was non-responsive.  I think he was going back to 2012.

22  So I -- I'd you just to answer that question.

23  A    I do not recall of specific initiatives.  As of March

24  2013 from a cost savings standpoint, that were either not in

25  progress, or had not been achieved that were of significance

1  -- that were of significance in my mind that stand out, that

2  were of significance as of March of 2013.

3  Q    Okay.  Thank you.  As of March 2013, and again this is

4  before the appointment of Mr. Orr, the city had not only

5  retained you, but it also had retained the Miller, Buckfire

6  firm and it had retained Conway, MacKenzie, isn't that right?

7  A    Yes, that's correct.

8  Q    So they were on the scene in March 2013 before the

9  emergency manager was appointed, correct?

10 A    Yes.

11 Q    And it was -- it was yourself and Mr. Moore and Mr.

12 Buckfire, it's basically the same team of professionals were

13 advising the city in their restructuring effort before Mr. Orr

14 was appointed, and those same restructuring advisors are

15 advising Mr. Orr now, true?

16 A    We were all collectively advising the city from a

17 restructuring standpoint, yes.

18 Q    Okay.  So those advisors and yourself had been retained.

19 And if you look at -- at the document, Page 5 again going down

20 to Paragraph C.

21     Again we talked about future cost saving initiatives.

22 You said you didn't recall anything specific, but scrolling

23 through those items in C, would you agree that those had been

24 identified by the city and its professionals as potential

25 future cost saving initiatives that were in process?

1  A    Yes.

2  Q    Now the last one there is asset monetization strategies.

3  Do you see that?

4  A    I do.

5  Q    Who was the person that was involved from the

6  professional side in the asset monetization strategy?

7  A    It would have been Miller, Buckfire.

8  Q    And what is your -- asset monetization strategies, that

9  means taking city's assets and either financing them, or

10  selling them to raise cash to pay liabilities.  Would you --

11  can we agree with that?  Agree on that?

12  A    Or any other -- I would say any other monetization

13  strategy to create cash for the city.  That's the way I would

14  frame it.

15  Q    And to the extent that assets were monetized in -- in

16  2013, those -- those monetized assets would -- would enhance

17  the cash profile, the actual cash collections during that

18  period for the general fund, let me just add that.

19  A    If you sell something you would intuitively have more

20  cash.  However, to answer the second part of your question,

21  which is to improve the cash profile, my personal experience

22  is, selling assets to improve cash versus -- and not

23  addressing the operational structural imbalance that exists.

24  I don't know if that improves -- improves the cash profile as

25  you put it, but if you sell assets that -- that generate cash,

1  you will have more cash, yes.

2  Q    And you can use that cash to satisfy your liabilities,

3  correct?

4  A    Cash is cash.  So if you have more cash, you have more

5  cash.

6  Q    Now, let's stay in the period of time before the

7  appointment of Mr. Orr.  Were there discussions among the

8  professionals and the -- the city concerning asset

9  monetization strategies?

10  A    Not that I was specifically a part of, so I do not know.

11  Q    And do you recall any conversations with Miller, Buckfire

12  concerning asset monetization strategies?

13  A    Yes.

14  Q    Was Miller, Buckfire concerned that asset monetization in

15  March 2013 or thereabouts, would have a negative impact on the

16  City of Detroit's ability to prove that it was eligible for

17  Chapter 9 bankruptcy?

18  A    That's a long question.  It's -- and you asked if Miller,

19  Buckfire was concerned?

20  Q    Right.

21  A    I can't answer the question if Miller, Buckfire was

22  concerned or not.  You would have to ask Miller, Buckfire.

23  Q    Did Miller, Buckfire say anything to you?  And I'm -- you

24  know, Mr. Buckfire or any of his colleagues, did he say

25  anything to you or in your presence where he or they suggested

1  that they were concerned that if the City of Detroit monetized

2  assets in 2013, early 2013, March, February, January, that

3  that would have a negative impact on the City of Detroit's

4  ability to prove that it was eligible for Chapter 9

5  bankruptcy?

6  A    I do not recall of a conversation like that.

7  Q    Did Miller, Buckfire express any opposition in your

8  presence to strategies that would call for short term

9  monetization of assets in early 2013?

10  A    I do not recall.

11  Q    You were at the Jones, Day meeting at the airport on

12  January 29th -- I'm sorry, not the Jones, Day meeting, that's

13  not fair.

14      The -- the council interview meeting on January 29th, 2013

15  at the airport, yes?

16  A    Yes.  I was at that meeting.

17  Q    And -- and were you there when Jones, Day gave the

18  presentation?

19  A    I was.

20  Q    And is it safe to assume that when Jones, Day or any

21  other attorneys that were giving their presentation, were

22  presenting, you were particularly interested in statements

23  that they had to make about liquidity, and cash flow, and

24  such, yes?

25  A    Yes, absolutely.

1  Q    Can -- can you put up 418, please?   This is a pretty

2  lengthy document.

3       If -- if you need a hard copy we can get it for you, but

4  let's -- let's try it without because the -- the statements

5  are -- I'm not going to go through the whole thing.

6            MR. SHERWOOD:  Is that okay, Your Honor?  It is in

7  evidence.

8            THE COURT:  Sure, try it.

9  Q    Was -- was this presentation handed out during the -- the

10 meeting at the airport?

11 A    Yes.

12 Q    And just to be clear, this presentation was given not

13 only by Jones, Day, but Mr. Orr was also giving this

14 presentation to the group?

15 A    He was part of the team that presented, yes.

16 Q    Can we turn to -- let's start with Page 30 of the

17 presentation.

18            THE COURT:  Excuse me, sir.  Has the Court been

19 given copies of these exhibits?

20            MR. SHERWOOD:  Yes, Your Honor.  I -- I think we

21 gave two to the law clerks and --

22            THE COURT:  Are there up here somewhere?

23            MR. SHERWOOD:  I believe so.  This is marked in the

24 -- in the -- the Retiree Committee's exhibits as Exhibit 418.

25 It might also be an AFSCME exhibit.  I think everybody offered

1 | this one.

2 | THE COURT: Okay. So the tabs in the binder don't

3 | correspond to the numbers of the exhibits.

4 | MR. SHERWOOD: I think, Your Honor, that's because

5 | we didn't decide on the prefix. I think --

6 | THE COURT: Okay. And we're -- and we're looking at

7 | what exhibit number now?

8 | MR. SHERWOOD: It's 418, Your Honor.

9 | THE COURT: I have it. We're all set. Thank you.

10 | MR. SHERWOOD: You're welcome. A lot of documents.

11 | Q    Turning to Page 30, Mr. Malhotra, and if you look at the

12 | third line down it says asset sales pose challenges to

13 | generating substantial revenue. Do you see that?

14 | A    I see that line, yes.

15 | Q    And do you recall whether this slide was presented at the

16 | meeting?

17 | A    I don't recall.

18 | Q    You don't recall?

19 | A    No, I do not.

20 | Q    Do you recall any discussion about the next line, sale of

21 | assets to pay creditors may not promote revitalization. Do

22 | you recall that being presented by Mr. Orr or anyone else at

23 | Jones, Day?

24 | A    Not specifically.

25 | Q    Okay. Now if you turn to the next page, Page 31. And

 1  these are -- these are the speaker notes for the slide.  And

 2  if you go right to the middle, there's a thing called --

 3  there's a line called note.  And it says asset monetization

 4  outside of bankruptcy may implicate eligibility requirement

 5  that the city be insolvent, e.g. measured by short term cash.

 6       During the presentation, did anyone from Jones, Day

 7  suggest to the group that it was not a good idea to engage in

 8  asset monetization outside of bankruptcy because it could hurt

 9  the city's case on insolvency?

10  A    I do not recall that.  We had five presentations as for

11  every presenting group.

12  Q    Let's look at Page 62 and 63 of this presentation.  I

13  know it's a long presentation, but Mr. Malhotra, did you

14  recall any discussion by Mr. Orr or the rest of the team at

15  Jones, Day about evaluating the impact of any asset sale on

16  Chapter 9 eligibility?  Do you recall -- recall anything about

17  that -- that day?  Does this -- this slide refresh your

18  recollection at all?

19  A    It does not.  No, I do not recall.

20  Q    And let me -- let me just -- let me just ask one more

21  question about -- on this topic.  If you turn to the next

22  page.  Maybe this will help you.

23       If you look at the speaker notes at the top under asset

24  sales, again we talk -- it says concerns regarding eligibility

25  for Chapter 9 may be implicated.  Any transactions should be

1  reviewed and restructured to address any eligibility issues,

2  e.g. earmarking of funds.

3      Do you recall any discussions by Jones, Day during this

4  presentation where they suggested that funds that come from

5  asset monetization be earmarked so that they don't end up in

6  the general fund and thereby jeopardize the Chapter 9

7  eligibility?

8  A    No.  I do not recall.

9  Q    Do you recall any discussions during that or with -- with

10 Mr. Buckfire where the idea was to the extent that we monetize

11 any assets, let's make sure they don't -- that the proceeds

12 don't end up in the general fund.  Anything like that?

13 A    I do not remember of any specific conversation of

14 earmarking or -- or highlighting assets like this.  I mean

15 during our general discussions were always -- asset sales were

16 one time sources and -- but we needed to continue to work to

17 fix the ongoing operating deficit debt and the cash deficit

18 that's been existing at the city for a long time.

19 Q    Let me ask you one more question about that meeting.  And

20 do you recall any suggestions by Mr. Orr or Jones, Day during

21 that presentation that the city's policy should be to defend

22 against approaches that focus on monetization of assets to pay

23 creditors?

24 A    No.

25 Q    Can you turn to Page 26?  Does that refresh your

1 | recollection?  Fourth bullet point down, defend against calls

2 | for expenses and monetizing assets to pay creditors?

3 | A    No, I do not recall of a specific conversation like that.

4 | Q    Now just -- just to -- just so I understand your

5 | testimony from yesterday when you talked about the revenues

6 | that you knew about through May of 2013.  To the extent that

7 | there was any type of asset monetization before May of 2013,

8 | the proceeds of asset monetization would -- could have

9 | enhanced the general fund, is that fair to say?

10 | A    Yes.  If you sell assets that generate cash you have --

11 | you get more cash.

12 | Q    All right.  I'd like -- let me switch topics real quick.

13 | And can we -- 408.

14 |       MR. SHERWOOD:  Your Honor, 408 and Mr. Malhotra, is

15 | the proposal for creditors.

16 | Q    I think you talked about this yesterday on direct and

17 | again we'll give you a copy if you need it, but we'll try to

18 | make do with -- with the screen.

19 | A    Okay.

20 | Q    Okay.  If you look at Pages 54 and 55 of 408.  I'm

21 | looking for 54 and -- well, hold on.  Let's try 83 and 84.

22 |       MR. SHERWOOD:  I'm -- I'm sorry, Your Honor.

23 | There's kind of two sets of numbers on this one.  Let's do 83

24 | and 84.  There we go.  That's 83.  Eighty-three or 135

25 | depending on which number you're looking at, or 134.

1  Q    You testified that -- that we talked about realization

2  value of asset -- assets and I'm not going to spend a lot of

3  time on this, but -- but some of the -- there's a reference to

4  the Detroit Water and Sewer Department.  And if you scroll

5  down a few -- in the following pages, there's a Coleman Young

6  Airport, Detroit Windsor Tunnel, Belle Isle Park, Detroit

7  Institute of Arts, city owned land, parking operations, Joe

8  Louis Arena.

9        And I guess the question is, were -- when -- at this

10 presentation, were these assets that are described on these

11 pages, assets that -- that could be monetized in order to help

12 the city's cash flow situation?

13 A    I think these were generally all the assets that were

14 listed.  This is -- Miller, Buckfire is the investment bank

15 for the city in connection with asset monetization.  And so I

16 can't answer questions specifically on asset monetizations

17 because it includes eight or ten different assets, all of

18 which may have different reactions to each one.

19 Q    Let's talk -- let's talk about taxes for a minute.  And

20 -- and if we could stay with the same exhibit, I think there

21 is a discussion about taxes.

22       Do you know what the outstanding tax obligations of the

23 City of Detroit were in in or about say June of this year?

24 A    I do not recall, no.

25 Q    Well, I think that the presentation, if you turn to Page

1  87.  Let me make sure I'm using the right numbers here.

2  That's not 87.  Page -- Page 79, please.  Actually Page 80,

3  I'm sorry.

4      Do you recognize this page of the presentation?  It talks

5  about taxes.

6  A    It does talk about taxes.

7  Q    And if you look at about the fourth bullet point down, it

8  says Compuware has identified historical non-filers with

9  outstanding tax obligations totaling approximately

10  $250,000,000, correct?

11  A    That's what the sentence says.

12  Q    And have you -- have you heard numbers substantially in

13  excess of 250,000,000 in terms of the outstanding obligations

14  of taxpayers to the City of Detroit?

15  A    I have heard numbers like this and I've been hearing

16  numbers like this for the last two years despite which the

17  city's property taxes and income taxes keep going down every

18  year.

19  Q    But there are a lot of outstanding taxes and they're in

20  the hundreds of millions of dollars, fair?

21  A    I cannot -- I cannot say that.

22  Q    Okay.  And you can't say that because you didn't look

23  into the issue of -- of outstanding taxes in -- in your two

24  years plus, is that --

25  A    That is correct.  We were not going out looking for

1 delinquent taxes especially of numbers that were highlighted

2 of this magnitude, that's correct.

3 Q    Do you know who from the city or on behalf of -- well,

4 let's start with the city.  Who from the city was in charge of

5 improving tax collection efforts?

6 A    Yeah.  It was Cheryl Johnson who is the city's Treasurer

7 was working, I believe, with Compuware to try and get their

8 arms around what taxes were outstanding.  I believe that

9 project has been going on for a long time.  That's -- that's

10 what I know about it.

11 Q    And you'd agree that if -- if the -- the tax collection

12 efforts of the city in late -- in fiscal year 2013 which ends

13 June of 2013, correct?  If -- if those tax collection efforts

14 were better, that would have enhanced the general fund, is

15 that fair to say?

16 A    And the city has already implemented if -- if not two, at

17 least one amnesty program for sure.  And I think that yielded

18 probably single digit millions of dollars in the 3,000,000,

19 $5,000,000 range in terms of its amnesty program.

20     So the city has repeatedly done a efforts in order to

21 maximize the collections on taxes that they could at least

22 identified from their records.

23 Q    And who -- who from the city is involved in that -- in

24 that effort?

25 A    Specifically on the amnesty it was, I'm sure the -- the

1  tax department that has been involved, I think with respect to

2  any past due of these outstanding obligations.  I would say

3  that you would have to talk to Cheryl Johnson who is the

4  Treasurer in the context of this Compuware discussion.

5  Q    But -- but you -- you were not charged at Ernst and Young

6  in doing an analysis of the effectiveness of the city's

7  efforts prior to May, June of 2013 to collect taxes from

8  taxpayers, is that fair to say?

9  A    Yes, that is.

10 Q    What about abatements?  Do you know anything about

11 abatements?

12 A    No, I do not.

13 Q    Do you know that the city has a program for industrial

14 tax abatements?

15 A    I do not.

16 Q    Do you know anything about renaissance zone abatements

17 here in the city in terms of property taxes?

18 A    Not specifically.  I know it is a component of the

19 property tax for tax build up, but not specifically on

20 renaissance zone and the abatements.

21 Q    Do you know if -- if the city has taken any effort to

22 review the existing tax abatements that are enjoyed by certain

23 of the property owners here in the City of Detroit to make

24 sure that they are fair and up to speed and -- and current?

25 A    I do not know of a specific effort on reviewing the

1  abatements.

2  Q    Do you know -- do you know who the -- who -- who the tax

3  assessor is for the City of Detroit?

4  A    It used to be Linda Bade.  She has recently retired.  I'm

5  blacking out on the name of the new assessor.  I think it's

6  Alvin.

7  Q    I'm sorry.  Do you know has -- has Ernst and Young been

8  charged with trying to figure out how the assessment, the tax

9  assessment process works here in the -- in the City of

10  Detroit?

11  A    No, Ernst and Young has not been.  But what I do know is

12  that there are several reviews that are happening to assess --

13  ascertain better the assessed values are too high.  Currently

14  a lot in terms of the city's property taxes.

15  Q    What about too low?

16  A    From what I understand the general view is that the

17  assessments are too high.

18  Q    But are there -- so there's not a single property in the

19  City of Detroit that where -- where the assessment is -- is

20  too low?

21  A    I cannot answer that question.  I do not know.

22  Q    And you haven't been asked to audit that or anything like

23  that?

24  A    That is correct.

25  Q    Let me turn -- I just have one or two more topics.  But

1  let me turn to negotiations before the filing.  I think you

2  said yesterday that you were at the -- the meeting -- I'm

3  sorry, was it June 13th?  I'm trying to remember off the top --

4  A    June 14th.

5  Q    June 14th, thank you.  You were at that meeting?

6  A    Yes, I was.

7  Q    That June -- June 14th meeting.  And I think you said you

8  were at meetings between June 14th and July 11th as well,

9  correct?

10  A    That is correct.

11  Q    And how many -- there was a June 14th meeting, a June 20th

12  meeting, July 10th, July 11th.  Have I got them all?

13  A    I don't know.  There were -- there were several meetings

14  we had during those weeks and those are the ones I can

15  remember.  So there were several meetings that we had during

16  that time frame with -- with all of the creditors in some

17  fashion or the other.

18  Q    But June 14th was the first.  And -- and during that June

19  14th meeting, this -- the proposal was handed out and

20  presented, right?

21  A    That is correct.

22  Q    During all the meetings from June 14th to July 11th,

23  whatever.  After all of those meetings, are you aware of a

24  single change to the June 14th proposal by the city?

25  A    Not specific -- not specifically that I recall whether we

1  were making changes or not to the June 14th proposal.

2  Q    You can't cite to a single specific change to the

3  proposal that was made on -- on June 14th, correct?

4  A    Not that I can recall off the top of my head, yes.

5  Q    Now, were any of those meetings with union

6  representatives or retiree representatives?

7  A    I think both were present on June 14th.

8  Q    And you were at that meeting?

9  A    I was.

10 Q    And let me ask you this.  In terms of dealing with the

11 employee issues, when Mr. Orr was appointed, did you tell him

12 about your personal experience with dealing with the city's

13 unions?

14 A    Yes.

15 Q    And you -- and you had been involved on behalf of the

16 city before the arrival of Mr. Orr in some pretty substantial

17 negotiations between the city and many many of its unions,

18 true?

19 A    I -- I was -- but I was involved in those meetings from

20 the standpoint of helping ascertain the financial

21 implications, yes.

22 Q    Okay.  And in February of 2012, and I know this -- we're

23 going -- we're going way back now.  So if you started May --

24 May 2011, you're only on the job about seven months at this

25 time.  There were negotiations between the city and a number

1 | of unions.  And those negotiations were successful, correct?

2 | A    I don't understand the meaning of successful or not.

3 | There were negotiations that -- that were held.

4 | Q    And they -- but they led to an agreement between the city

5 | and the unions, correct?

6 | A    They led to tentative agreements.

7 | Q    Okay.  Let's -- let's look at Exhibit 505, please, 505.

8 | Actually before I ask any questions about this.  You said they

9 | led -- well, let me ask you about 505.  Is this a copy of the

10 | -- the tentative agreement between the city and the coalition

11 | of unions of the City of Detroit?

12 | A    Yes.

13 | Q    And if you -- if we turn to the --

14 |       MR. STEWART:  Well, Your Honor, may I interpose a

15 | foundation objection.  This has been objected to.  If counsel

16 | is laying a foundation for admissibility, I have no objection

17 | if that's all you're doing.  But if he's going to question the

18 | witness about it, I would have an objection.

19 |       MR. SHERWOOD:  I'm going to try to lay a foundation,

20 | Your Honor, with this and maybe other witnesses.

21 |       THE COURT:  Okay.  Go ahead.

22 |       MR. SHERWOOD:  But I'd like to get his understanding

23 | of this document, and some testimony -- what he knows about

24 | this document on the record so that when we move it into

25 | evidence later, you have the benefit of that.

1          THE COURT:  I'll permit that subject to its ultimate

2  admission.

3  Q    Page 17, please of -- of the agreement.  City of Detroit,

4  do you recognize that as Chris Brown's signature by any

5  chance?

6  A    I do think that is Chris Brown's signature.

7  Q    And that's dated February 1st, 2012.  CO -- and he was the

8  chief -- Chief Operating Officer for the City of Detroit,

9  correct?

10 A    That is correct.

11 Q    And just if you can take -- take that down.  Let's look

12 at the signatures on the right.  Now I don't -- I don't -- I'm

13 not going to ask you identify those signatures.

14      But the -- the parties to the right, you know, you see

15 IOU, SAA, are -- are these -- do you understand this to be

16 like various union representatives that signed on to this

17 agreement?

18 A    Yes.

19 Q    And it was the union coalition, right?

20 A    That is correct.

21 Q    Now did you -- did you participate with any of the

22 members of the union during the negotiation of this tentative

23 agreement?

24 A    I was present in those negotiations from -- to ascertain

25 the financial impact as I said earlier

1  Q    And -- and you were working for the city at that point,

2  correct?

3  A    That is correct.

4  Q    And -- and Chris Brown from the city signed this

5  agreement and agreed to it, correct?

6  A    Yes.

7  Q    During those negotiations, did you -- did you talk about

8  any wage concessions by the employees of the city?

9  A    I think there were discussions around wage concessions,

10 yes.

11 Q    And in fact there were wage concessions.  Do you recall

12 that?

13 A    Are you referring specifically to this tentative

14 agreement, or are you referring to --

15 Q    Yes.

16 A    -- broadly?

17 Q    This tentative agreement in February of 2012.

18 A    I would have to go back and look because whether it was

19 new wage concessions or it was a continuance of the wage

20 concessions that had already been provided in the past.

21 Q    Was -- was there a discussion about giving back some of

22 the wage concessions to the extent that the -- there was --

23 there was net surplus for 2012, 2013, and 2014?

24 A    Yes, there were discussions around how to give back wage

25 concessions that the active employees were giving.  If the --

1  the city can get back on its footing from a financial

2  standpoint, yes.

3  Q    And in -- in the -- and you were involved in that part of

4  the discussion, correct?

5  A    I was involved in at least trying to ascertain how to

6  insure either asset sales or refinancings were not considered

7  as an operational fix.  So not one time --

8  Q    Well, I just asked -- I just asked if you were involved

9  in that part of the discussions.

10  A    And I was giving you a context of how I was involved,

11  yes.

12  Q    And -- and -- but during those -- during those

13  discussions, weren't you saying to the union members that

14  based on the work of you and other people in the city that the

15  city was going to get back into the black in -- in 2013 and

16  2014?  Was that -- was that part of your pitch with respect to

17  this?

18  A    The -- the discussions that the city was having with its

19  unions was to try and come up with cash to try and deal with

20  the cash shortfall issues that were forthcoming, especially

21  after fiscal year '12 where the city continued to borrow and

22  defer.

23        And the city was -- and after discussions with its active

24  employees, how to try and address some of the oncoming fiscal

25  year '13 cash issues, yes.

1   Q    No, the -- the question was obviously you've got labor

2   representatives sitting on the other side of the table.  And

3   one of -- one of the terms was these -- these give backs,

4   right?  Give backs of -- of wage concessions, right?

5        Certainly the -- the labor people that were talking to

6   you wanted to know what's the likelihood of my people getting

7   these give backs, right?

8             MR. STEWART:  Objection.

9   Q    Did that happen?

10            MR. STEWART:  Sorry, I object.  He's asking for

11  speculation unless the last part of his sentence was asking

12  what they said to him.  I think his question --

13            THE COURT:  I agree, rephrase the question, please.

14  Q    During those -- the negotiations, was it your perception

15  based on things said to you by the labor representatives that

16  they were -- they were concerned about -- or they wanted to

17  know what the likelihood was that they would get their give

18  backs in terms of salary -- wage concessions.

19  A    Sorry, can you rephrase that question?  It's too long a

20  question.

21  Q    During the negotiations concerning the tentative

22  agreement, did anyone on the labor side ask you to tell them

23  if the wage concessions would happen?  Or -- or the give backs

24  on the wage concessions would happen, yes or no?

25  A    I don't recall specifically.

1  Q    Let me ask you this about those discussions.  There were

2  -- there were negotiations that surrounded health care,

3  correct?

4  A    Yes.

5  Q    And one of the objectives in the health care part of the

6  negotiation was to attain $60,000,000 in health care savings,

7  is that right?

8  A    That sounds right.

9  Q    Okay.  And those health care savings were going to come

10  from not only the existing employees of the City of Detroit,

11  but also the retired employees, isn't that right?

12  A    I'm not sure about that.  I think the majority of those

13  savings were coming from the active employees.  I don't recall

14  of a specific amount from the retirees.

15  Q    Well, you said the majority.  So some of the savings were

16  coming from the retired employees, isn't that right?

17  A    I do not recall that.

18          MR. SHERWOOD:  Your Honor, I'd like to mark a -- a

19  document that has not been marked before to try to refresh the

20  witness' recollection.

21          MR. STEWART:  Your Honor, in view of the fact this

22  wasn't identified to us, wasn't subject to the objection

23  process, before he uses it, I'd like to frame very carefully

24  exactly what the failure of recollection this is intended to

25  address.

1          MR. SHERWOOD: Yes. This is a document that talks

2     about cost savings in fiscal year 2012. And there is a line

3     that talks about --

4          THE COURT: Well, let's not say what the document

5     says because it's not in evidence. But the document can be

6     used to refresh the witness' recollection if it -- if it has

7     that effect.

8          MR. STEWART: May I also ask the parties where it

9     comes from. Because I mean I understand it for pure purpose

10    of refreshing recollection, Your Honor, what -- what is

11    allowed. On the other hand is this part of a larger document.

12    What is this?

13         MR. SHERWOOD: I believe it was part of a

14    presentation that was made during the course of the

15    negotiations in 2012 with respect to the tentative agreement.

16         MR. STEWART: Okay. We have an objection to its use

17    generally, but --

18         THE COURT: All right. To the extent there's an

19    objection to the use of the document to refresh the witness'

20    recollection, it is overruled. You may present it to the

21    witness.

22         MR. STEWART: Once again could we -- what frame

23    exactly which failure of recollection this is intended --

24         THE COURT: I think the record is clear enough on

25    that point. Let's proceed.

1          MR. SHERWOOD:  May I approach the witness and hand

2    him the document, Your Honor?

3          THE COURT:  Please.

4          MR. SHERWOOD:  And for the record can I -- can we

5    mark this as 505A?

6          THE COURT:  Sure.  Whatever is convenient for you is

7    fine.

8          MR. SHERWOOD:  Your Honor, may I hand a copy to the

9    Court?

10          THE COURT:  Not if it's use is for refreshing

11    recollection.

12          MR. SHERWOOD:  Fair -- okay.

13    Q    So Mr. Malhotra, I've showed you what I will mark as

14    505A.  And -- and if you would look at the box to the left

15    relating -- that's -- that's called retirees.  And then the

16    data to the right of that.  Does that reflect your -- you

17    testified that the majority of the savings related to current

18    employees and you didn't know about whether -- whether any of

19    these savings also impacted retirees.  Do you remember that

20    testimony?

21    A    I testified that the tentative agreements as reached, if

22    they had any impact on retiree medical or not.  That's what I

23    testified to, yes.

24    Q    Okay.  And having reviewed this document, does this

25    refresh your recollection that in fact there were certain

1  savings projected to be achieved from retirees for fiscal year

2  2012 and 2013?

3          THE COURT:  All right.  Now here I want to caution

4  you, this does not ask you what that document says.  In fact

5  turn it over.  Do you have a recollection now having reviewed

6  that document of what the answer to counsel's question is?

7  A    Okay.  Your Honor, my answer is the same as it was

8  earlier.

9  Q    Do you recognize 505A?  Have you ever seen it before?

10          MR. SHERWOOD:  Can he look at it for that purpose?

11          THE COURT:  Yes, yes.

12  A    Yes, I recall seeing this in that 2012 time frame, yes.

13  Q    And can you describe what it is?

14  A    It is trying to describe the projected or ask of the --

15  the targeted savings the city was looking to get for fiscal

16  year '13.

17  Q    So this was prepared by the city and -- and these were

18  part of the requests by the city to the labor representatives

19  in -- in 2012, correct?

20  A    This could have framed some of those discussions, yes.

21  Q    And were you present when this document was discussed

22  with representatives of the unions in -- in 2012?

23  A    I do not recall the specific meeting, but I would have

24  generally been having some of the discussions in terms of the

25  qualification of some of these numbers.

1 Q    Let's go back to 505.  Now this agreement, this tentative

2 agreement, although it was -- was executed by the city and --

3 and various union representatives, was it implemented for the

4 City of Detroit?

5 A    I do not think this exact tentative agreement was

6 implemented.

7 Q    Do you know why this tentative agreement was not

8 implemented for the City of Detroit?

9 A    I think the city employment terms were implemented

10 instead.

11 Q    Isn't it true that the state refused to authorize the

12 city to implement this agreement?

13 A    I was not a part of those discussions with the state.

14 Q    And this agreement -- well, scratch that.  Let me just

15 ask a few more -- more random questions and then I'll be done.

16       This is the first Chapter 9 bankruptcy case that you've

17 ever worked on, correct?

18 A    That is correct.

19 Q    And neither you nor Ernst and Young have ever prepared a

20 balance sheet for the City of Detroit, correct?

21 A    That is correct.

22 Q    You began to prepare the schedules for the filing of this

23 bankruptcy case in May of 2013, isn't that right?

24 A    It was May, June time frame.  I do not remember the

25 specific date.

1  Q    But it could have been May -- May 2013?  May, June time

2  frame?

3  A    Like I said, May, June time frame, yes, that is right.

4  Q    Okay.  Now, in early July, your opinion was not solicited

5  by anyone before the bankruptcy filing about the decision to

6  file bankruptcy, isn't that right?

7  A    That is correct.

8  Q    So you and Ernst and Young, you didn't have any input

9  whatsoever on whether or not Chapter 9 was the only

10 alternative for the City of Detroit, isn't that right?

11 A    That is correct.

12         MR. SHERWOOD:  Your Honor, can I have a two minute

13 -- a 30 second break just to consult with a colleague a

14 minute?

15         THE COURT:  Yes.  We'll sit here while you do that.

16         MR. SHERWOOD:  Your Honor, I'd like to mark another

17 document to -- which addresses the issue of impact on retiree

18 benefits.  And just see if the witness recognizes -- not to

19 refresh recollection, just to see if he recognize it and can

20 authenticate it.

21         MR. STEWART:  This is a new exhibit?

22         MR. SHERWOOD:  I believe it is.

23         MR. STEWART:  We would object to it, Your Honor, for

24 any use other than refreshing recollection.  It was not

25 identified.

1          THE COURT:  Well, let's -- let's get it marked and

2     when it's offered into evidence I'll hear your objection.

3     What number would you propose?

4          MR. SHERWOOD:  505B.

5          THE COURT:  Are we out of numbers?

6          MR. SHERWOOD:  I just think we're in the five's and

7     I don't know what we're up to.

8          THE COURT:  Okay.  Well, let me see if I can help

9     you.

10         MR. SHERWOOD:  505B, I think.

11         THE COURT:  Hold -- hold on one second.  Ah, we have

12    used every number from 500 to 599.  All right, fine, 505B it

13    is.

14         MR. SHERWOOD:  May I approach, Your Honor?

15         THE COURT:  Yes.  Are you asking the witness if he

16    recognizes this?

17         MR. SHERWOOD:  Yes.

18         THE COURT:  Do you recognize that document, sir?

19    A    Yes, Your Honor, I do.

20    Q    And can you describe it for us?

21    A    It's a discussion document dated July 16th, 2012.

22    Q    And did you -- were you involved in the preparation of

23    this document?

24    A    Yes, we were.

25    Q    And was this document presented to -- who was this

1  document presented to?

2  A    I don't recall.

3  Q    For what purpose was this document prepared?

4  A    It would have been to –- for –- trying to ascertain the

5  tentative agreements and the savings that would have come from

6  some of the tentative agreements.

7  Q    And does this document refresh your recollection as to

8  the savings that could be achieved from retiree health care?

9  A    I would have to go to that specific section.

10  Q    Yes, please do.

11         THE COURT:  Well, hold on.  It's not proper to ask

12  the witness a question about the contents of the document

13  until it's admitted into evidence.

14         MR. SHERWOOD:  Well, I move it into evidence, Your

15  Honor.

16         MR. STEWART:  We object, Your Honor.  For the –-

17  well, first of all, I'm not sure what its relevance is, but

18  more to the point it wasn't identified as part of the

19  pre-trial process we engaged in to identify, have timely

20  objections, and have an opportunity to review documents.

21         MR. SHERWOOD:  I –- I agree that it wasn't

22  identified pre-trial, Your Honor.  We did identify the –- the

23  tentative agreement, however.  We have maintained in this case

24  that on the impracticability issue, that indeed it was and is

25  possible to negotiate with a large number of unions for the

1  city and to negotiate with respect to the rights of retirees

2  in the context of those negotiations.

3      Our -- I was at the deposition of -- of one of our

4  clients in Washington where this issue was raised and -- and

5  probed.  We were -- we believed that this witness having been

6  involved in those negotiations would testify that indeed some

7  of the give backs in this tentative agreement impacted

8  retirees.

9      And he hasn't clearly done that.  So I'm using this to

10 refresh recollection.  Your Honor, there are a lot of

11 documents in this case.  This is a fast track case with a lot

12 of document review and production that has been done.  This is

13 a City of Detroit document that certainly this witness, and I

14 assume the other professionals, are -- are intimately familiar

15 with.

16     And I do not think that the failure to put it on our

17 exhibit list in this case and on this track should prevent the

18 admission into evidence.  It's otherwise relevant for the

19 reasons that I've set forth.  And I don't see any prejudice

20 whatsoever to the city.

21         MR. STEWART:  Your Honor, I think it is prejudicial.

22 We see this for the first time while the witness is on the

23 stand.  In fact so fresh is it we don't even know how to

24 number it as an exhibit.

25         And to the point that he didn't get the answer from the

1 | witness he wanted.  If he fails in trying to refresh

2 | recollection, the answer is for him to call his own witness,

3 | not to bring in documents outside of the normal structure that

4 | we had all agreed upon.

5 |          THE COURT:  I agree that this record does not

6 | establish cause to add an exhibit to the established witness

7 | list.  Accordingly, the objection is sustained.  The document

8 | may be used to refresh recollection.

9 |          MR. SHERWOOD:  Excuse me one second, Your Honor.

10 | Q    I'm going to try to use this to refresh your

11 | recollection.  Can you turn to Page 7, please?  Now again

12 | we're on the topic of whether this negotiation involved

13 | savings on benefits that impacted retirees.  If you look at

14 | the -- the second block down on the left, have you read that

15 | block?

16 | A    Yes.

17 | Q    And have you -- and does that block and the -- the

18 | numbers to the right of it, refresh your recollection as to

19 | whether or not in the context of these negotiations, the city

20 | was -- or -- or the union reps were negotiating with respect

21 | to rights of retirees?

22 | A    No.  In fact on my --

23 |          THE COURT:  The only question is, does that document

24 | refresh your recollection on that question.

25 | A    Sorry, Your Honor.  No.

1  Q    And it -- and just -- just to be clear on this point,

2  it's your -- you don't recall during these negotiations

3  whether the city and the representatives of the union

4  negotiated and reached an agreement that impacted the rights

5  of the city's retirees, is that your testimony?

6  A    That is my testimony, yes.

7  Q    But you don't recall?

8  A    That's what I just said.

9        MR. SHERWOOD:  Okay.  Thank you, Your Honor.  Thank

10 you, Mr. Malhotra.  I have nothing further.

11       THE COURT:  All right.  At this time we'll take our

12 morning 15 minute recess.

13       (WITNESS GAURAV MALHOTRA WAS TEMPORARILY EXCUSED AT 10:37

14 A.M.)

15       THE CLERK:  All rise.  Court is in recess.

16     (Court in Recess at 10:37 a.m.; Resume at 10:59 a.m.)

17       THE CLERK:  Court is in session.  Please be seated.

18       MR. DECHIARA:  Good morning, Your Honor.  Peter

19 Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

20 the UAW International Union.

21     (WITNESS GAURAV MALHOTRA RESUMED THE STAND AT 10:59 A.M.)

22                     CROSS EXAMINATION

23 BY MR. DECHIARA:

24 Q    Good morning, Mr. Malhotra.

25 A    Good morning.

1 Q    One preliminary question, Mr. Malhotra.  Between the time

2 that you completed your direct testimony at the end of the day

3 yesterday and when you began your cross examination today, did

4 you consult with counsel about the subject of your testimony?

5 A    No, I did not.

6 Q    You're not and never have been an officer of the City of

7 Detroit, correct?

8 A    That is correct.

9 Q    Okay.  And you've never -- and you don't currently and

10 you never have held any elected or appointed position with the

11 city, correct?

12 A    That is right.

13 Q    And you don't -- you're not involved in the direct

14 running of the city, the direct operation of the city,

15 correct?

16 A    Yes.

17 Q    Yes, I'm correct?

18 A    Yes, you're correct.

19 Q    Let me ask you about the June 14th, 2013 meeting at which

20 the emergency manager made his presentation of the creditor

21 proposal.  Do you remember your testimony about that meeting

22 yesterday?

23 A    Yes.

24 Q    And I believe you testified on direct that there were

25 questions that were asked by the people who were in attendance

1  at that meeting, correct?

2  A    Yes.

3  Q    Okay.  Am I correct that the procedure at that meeting

4  was that if an attendee wanted to ask a question or make a

5  comment, they had to write it down on a card which would then

6  be passed up to the front and then it would be read out by

7  someone in the front of the room?  Wasn't that the procedure?

8  A    As I recall I think, yes.

9  Q    And let me now draw your attention to the June 20th

10  meeting.  Do you recall your testimony about the June 20th

11  meeting?

12  A    Yes.

13  Q    And the emergency manager was not present, correct?

14  A    That is correct.

15  Q    And the people who were presenting at the meeting were

16  city advisors, including yourself, correct?

17  A    Yes.

18  Q    Did anyone from the city tell you that you had authority

19  to negotiate for the city at that meeting?

20  A    I was presenting at that meeting.

21  Q    Is the answer to my question no?

22  A    That is correct.

23  Q    Okay.  And it was not your understanding, was it, that

24  you had authority to negotiate on -- for the city at that

25  meeting, am I correct?

1  A    I was not negotiating for the city at that meeting, that

2  is correct.

3  Q    Okay.  And is it -- do you have any knowledge that any of

4  the other advisors who were attending that meeting on behalf

5  of the city had authority to negotiate for the city?

6  A    I can't say what the authority was of the other advisors,

7  you would have to ask them.

8  Q    So you have no knowledge -- you have no affirmative

9  knowledge that the -- any of the other advisors were

10  authorized to negotiate on behalf of the city, is that

11  correct?

12  A    I have no knowledge one way or the other, that is

13  correct.

14  Q    Okay.  Were there any other meetings besides the June 14th

15  and June 20th meeting that you -- that you attended where there

16  were presentations made to labor or retiree groups?

17  A    I don't recall specifically.

18  Q    As you sit here today you don't recall any others?

19  A    I do not recall any others, no.

20  Q    Okay.  You testified I believe on direct about a July 9th

21  meeting.  Do you recall that testimony?

22  A    Yes.

23  Q    And who -- who were the -- what category of attendees

24  attended the July 9th meeting?

25  A    My recollection is that it was the city's advisors and

1  members of the retirement systems or advisors for the

2  retirement systems and other retirees.

3  Q    So the -- the -- so I'm going to distinguish between the

4  presenters and the attendees.  The attendees were advisors to

5  the retirees and the retirees?

6  A    That's my recollection, yes.

7  Q    Okay.  And were there -- were there negotiations -- did

8  you engage in negotiations on behalf of the city at that

9  meeting?

10  A   We had discussions about the city's financial profile as

11  well as discussions around pensions as I recall.

12  Q    And I believe your direct testimony was that the purpose

13  of that meeting was to discuss actuarial assumptions, is that

14  correct?

15  A    No.  What I said on my testimony is that at the end of

16  the meeting there was a discussion or dialogue about trying to

17  get the retirement system and the city's advisors on the same

18  page with respect to the actuarial assumptions.

19  Q    And -- and the reason -- and you were involved in that

20  effort, is that correct?

21  A    Not really.  I -- I was not directly involved with the

22  actuarial assumptions at all.

23  Q    Okay.  Did you have an understanding about what -- did --

24  did the city advisors want to achieve an understanding with

25  the retiree system advisors as to actuarial assumptions?

1   A    Yes.

2   Q    And did -- did you have an understanding about why the

3   city advisors wanted to obtain that understanding?

4   A    I do.  It was generally to try and ascertain the amount

5   of the under funding in the -- in the two pension systems,

6   yes.

7   Q    Okay.  Would it be fair to say that as a predicate for

8   meaningful negotiations, it's often helpful to have shared

9   assumptions between the -- the parties?

10  A    Yes.

11  Q    Did anyone tell you that -- from the city -- did -- did

12  anyone from the city tell you that you were -- you were

13  authorized at the July 19th -- I'm sorry, the July 9th meeting

14  to negotiate on behalf of the city?

15  A    No.

16  Q    You testified about certain meetings you had with the

17  emergency manager Mr. Orr at which you orally presented to him

18  certain findings or analysis that you had prepared.  Do you

19  recall that testimony on direct?

20  A    Yes.

21  Q    Okay.  And how many of those meetings were there?

22  A    I cannot count the number of meetings or conference calls

23  that we had, there were numerous.

24  Q    Okay.  So there were numerous face to face meetings and

25  also numerous conference calls?

1  A    Can you clarify what time frame is your question related

2  to?

3  Q    Well, you tell me.  I'm just asking about the -- the

4  meetings that you had -- well, okay.  I -- I can do this.

5  From the time the emergency manager became the emergency

6  manager until the bankruptcy filing, let's say that's the time

7  frame.  How many face to face meetings did you have with the

8  emergency manager at which you presented conclusions, or

9  findings, or analysis?

10  A    I can't recall the specific number, but there were

11  several.

12  Q    Okay.  And were these one on one meetings that you had

13  with the emergency manager?

14  A    We may have had -- yes, there were a couple of one on one

15  meetings I thought and as I recall and there were meetings

16  with -- in a broader group setting with the city's other

17  advisors.

18  Q    Okay.  And the ones that took place in a broader group

19  setting with the city's other advisors, those were

20  pre-scheduled meetings?

21  A    Generally yes.

22  Q    Okay.  And who -- who were the other city advisors who

23  attended those meetings?

24  A    It would have been representatives from Jones, Day, from

25  Miller, Buckfire, Conway, MacKenzie, our team.  But there were

1  several meetings and there wasn't a set schedule that

2  everybody was at a particular meeting.

3  Q    Okay.  But --

4  A    Is my recollection.

5  Q    Okay.  But some of the meetings where there were other

6  advisors were present, were you presented conclusions, or

7  findings, or analysis to the emergency manager were meetings

8  where Jones, Day attorneys were present, correct?

9  A    Yes.

10        MR. DECHIARA:  Okay.  Your Honor, I -- I don't have

11  anything further on that line of questioning.  I would note

12  for the record that the city has on the direct of Mr.

13  Malhotra, had Mr. Malhotra testified on direct about meetings

14  he had with Mr. Orr in the presence of counsel.

15  Q    You -- you testified about a meeting that you attended in

16  New York, I believe with the bond holders and the insurers of

17  the bond holders, is that correct?

18  A    Yes.

19  Q    Okay.  And when was that meeting?

20  A    I think it was June 25th maybe is my recollection.

21  Q    I'd like now to direct your attention to the proposal to

22  creditors which is Exhibit 43.  Do you have the exhibit book

23  or could somebody call up Exhibit 43, please?

24  A    I'm happy to get it if you just tell me what folder it is

25  though.

1  Q    Okay.  Yeah, you can get it.  Excuse me?

2  A    What folder, 43?

3  Q    I don't know what folder it is, but it's -- oh, I'm

4  sorry.  I -- no -- no, I'm correct.  It's -- it's City Exhibit

5  43.

6          THE COURT:  Can you help the witness find it,

7  please?

8          MR. DECHIARA:  Absolutely.

9  Q    Do you have it?

10 A    I got it.  Thank you.

11 Q    Okay.  Mr. Malhotra, if I could ask you to turn to Page

12 114 of Exhibit 43.  Are you on Page 114?

13 A    Yes.

14 Q    Okay.  Let me direct your attention to the last column on

15 the right.  It says insurer.  Do you see that?

16 A    I do.

17 Q    And do you see there's a list of insurers there?

18 A    Yes.

19 Q    And those are the insurers for the bond holders?

20 A    Yes.

21 Q    And were representatives of those insurers present at the

22 June 25th meeting?

23 A    I can't recall if all of them were there, but there were

24 representatives from the bond insurers at that meeting, yes.

25 Q    Okay.  Do you remember specifically which ones were there

1  and which ones were not?

2  A    No, I do not.

3  Q    Can you testify whether they were all there, or they were

4  not all there?

5  A    No, I cannot.

6  Q    Okay.  So they -- they may all have been there, is that

7  correct?

8  A    It could be, yes.

9  Q    Okay.  Let me turn your attention to Page 120.  It's

10 Appendix E.  There's a similar column, the right column it

11 says insurers and let me ask -- just ask you the same

12 question.

13     Were representatives from those insurers at that -- at

14 the June 25th meeting?

15 A    I cannot recall specifically if all of them were there.

16 On my -- I think most of them were there, or their advisors.

17 But I do not recall specifically if each and every one of

18 these were there or not.

19 Q    Okay.  Do you have a understanding of what percentage of

20 the bond holders of the city -- of the unsecured bond holders

21 of the City of Detroit are -- were insured by the -- by the

22 insurers that were listed in Appendix A through E of Exhibit

23 43?

24 A    No, I do not.

25 Q    It's the majority, isn't it?

1  A    I would assume, but I'm not sure.  I haven't done the

2  percentage of all of the unsecured notes what percentage are

3  insured versus not.  I haven't done that calculation.

4  Q    Okay.  Am I correct if -- if we wanted to, or someone

5  wanted to determine that, one could add up the -- the numbers

6  on the appendices under the balance column and -- and

7  determine the percentage that are insured?

8  A    Presumably if the -- if they're still in short at that

9  particular time frame or not.  Presumably yes.

10  Q    Okay.  Thank you.  And just so I understand correctly,

11  when a bond holder is insured that means that if -- if the

12  municipality defaults on the bond, the bond holder has

13  recourse against the insurer?

14  A    That is my understanding, yes.

15          MR. DECHIARA:  No further questions.

16          THE COURT:  Anyone else have any cross examination

17  questions for the witness?

18          MR. RUEGGER:  Yes, Your Honor.

19          MR. DECHIARA:  Your Honor, I would just ask to

20  reserve the right to -- to ask additional cross examination

21  question if the Court decides to reverse its prior ruling.

22          THE COURT:  Yes, yes.  That -- that right is

23  reserved for everyone.

24      On that point, and just so I don't forget later, I have

25  reconsidered my suggestion that we revisit this after lunch

1  and to give both you all and us time to review the memorandum

2  and the issue, we'll take it up again tomorrow morning.

3          MR. RUEGGER:  Thank you, Your Honor.

4          THE COURT:  You're welcome.

5          MR. RUEGGER:  May I -- may I proceed?

6          THE COURT:  Yes.

7          MR. RUEGGER:  Thank you.

8                     CROSS EXAMINATION

9  BY MR. RUEGGER:

10  Q    Good morning, Mr. Malhotra.  My name is Arthur Ruegger

11  from the Dentons firm.  We haven't met before.  I represent

12  the retirees committee here.

13        And I don't have a lot to ask you.  But I -- I do want to

14  talk to you a little bit about a document that Mr. Stewart

15  raised yesterday.  It was City Exhibit 44.  It's -- it's, I

16  believe, the executive version of the June 14th proposal.  Is

17  it on your screen?

18  A    It is, yes.

19  Q    Okay.  And specifically if we could look at Page 8.  And

20  I'm going to ask you some questions about the fiscal year 2012

21  figures that are on that page.  So if Kathy, you could expand

22  that, it would probably make it easier for us to see.  Great.

23        First, Mr. Malhotra, when were the -- these figures, and

24  specifically the fiscal year 2012 figure, when were they

25  finalized?

1  A    This is cash activity so it's -- it would have been right

2  around the end of fiscal year 2012.  So July 2012.  This is

3  cash activity.

4  Q    And how large was the E & Y team at that time?

5  A    At what time?

6  Q    When these figures were finalized.

7  A    Probably four or five.

8  Q    And did they have specialized roles?

9  A    Yes.  Our team was -- was focused, very focused on

10 looking at all of the cash activity, yes.

11 Q    Okay.  So can you tell us what the individuals roles were

12 on your team?

13 A    They were to ascertain what receipts were timing versus

14 permanent, any variances.  Looking at all of the property

15 taxes, looking at the income taxes.

16      The city generally receives a lot of its collections in

17 certain lock boxes.  We had to try and ascertain what part of

18 those collections were related to property taxes versus not.

19 It was to track the monthly gaming taxes.  It was to look at

20 the activity and the other receipts.  It was to highlight any

21 sort of one time bond related or escrow related proceeds that

22 were coming in that were further augmenting the general fund's

23 cash.

24 Q    And did you assign any of your team members any of those

25 particular matters to be their responsibility?

1  A    No, they were generally a team effort.

2  Q    Can you tell us beyond what you've just answered, in

3  general what was the process of compiling those figures?

4  A    Our team tracks the pretty much daily cash activity of

5  the city to ascertain what receipts are coming in, what

6  disbursements are going out to at least help be able to

7  quantify where that activity is going on a day in day out

8  basis.  And because we had wanted to try our best to insure

9  that the city did not run out of cash.

10     And that's the reason we had our team working

11  specifically on the receipts and disbursements activity,

12  looking at the bank accounts, looking at bank statements to

13  insure that we -- we could forecast where the movement was so

14  that the city would not run out of cash as it had to rely on

15  refinancing proceeds to keep going.

16  Q    Did you do any of that tracking personally, or was that

17  your team's responsibility?

18  A    It was a combination.  I was intimately involved.

19  Q    Okay.  Tell me what part you were intimately involved and

20  what part your team did.

21  A    I don't think there's -- there's a specific delineation

22  of what part I did versus what my team did.  It was a team

23  effort and I was intimately involved with the team.

24  Q    All right.  If you could look at that part of Exhibit 44.

25  I think you testified yesterday that your team, or someone

1  from your team, contacted the city individual responsible for

2  the property taxes is that -- is that correct?

3  A    I don't recall that specific part of my testimony.

4  Q    Okay.  All right.  Forgive me.  I don't mean to misstate

5  your testimony.

6       How -- did your team attempt to verify for example the

7  property tax figure that's on -- on that document for fiscal

8  year 2012?

9  A    This would have represented to verify, I don't know if

10  you mean audits.  I just want to make sure --

11  Q    Don't mean audit.

12  A    We, in terms of all the cash that comes in, in gross tax

13  collections, our team is to try our best ability to segregate

14  what collections were for property taxes, and what taxes were

15  due to the city, and versus what property taxes were related

16  to distributions that the city had to make to other taxing

17  authorities.

18  Q    All right.  With all respect, sir, I'm not sure that was

19  responsive.  I'm trying to determine to what extent anyone on

20  your team verified the figures and specifically the property

21  tax figure there.

22  A    This would have been the number that we had for the -- to

23  the best of our ability.

24  Q    And you had it from what source, sir?

25  A    It would have been from a -- for fiscal year 2012 from a

1  combination of the bank accounts, or the city's internal

2  reports.

3  Q    The -- I'm sorry, I didn't hear you.  The city's what

4  reports?

5  A    Internal reports.

6  Q    Internal reports.

7  A    Yes.

8  Q    Did you consider the -- the CAFR for this analysis at

9  all?

10  A    This is fiscal year 2012 cash activity.  The CAFR, the

11  CAFR doesn't come out for months after that.

12  Q    I thought yesterday you testified, and correct me if I'm

13  wrong, that someone from your team contacted the city to -- to

14  check the property tax figures, is that not correct?

15  A    You can go back to my testimony.  I don't remember that

16  specific piece.  We looked at the cash activity of city in --

17  in a considerable amount of detail.

18  Q    Dropping down to the next item, income -- income and

19  utility taxes.  How were -- how was that figure derived?

20  A    That figure was derived from the information we had from

21  the bank accounts as well as the city's internal reports.

22  Q    And when you say city's internal reports, what kind of

23  reports were those?

24  A    They are various internal reports that the city tries its

25  best ability to track this cash activity.

1  Q    Did -- did anyone on your team ever try to get behind any

2  of those figures?

3  A    In order to --

4  Q    To check their accuracy.

5  A    Cash is generally cash.  If you are trying to ask the

6  classification of those receipts, there is -- there is always

7  classification issues, but cash is generally cash.  I don't

8  know what verification you do of cash.  This is not audited

9  statements.

10  Q    Your team didn't have the cash, right?

11  A    We tracked cash.

12  Q    Your team was not counting the cash?  It was looking at

13  reports from the city, correct?

14  A    That is accurate.  We were not counting dollar bills if

15  that is your question.

16  Q    No, that was true for both the bank reports and the

17  internal city reports?

18  A    We were tracking cash to the best of our ability.

19  Q    Based on the city's reports?

20  A    Based on our review of the city's reports and our review

21  of the bank statements.

22  Q    Sure.  And I don't mean to belabor the issue, but you

23  didn't check the city's reports, did you?  You reviewed them

24  and accepted them.

25  A    We subtract cash compared to the bank activity.  So we

1  used to check them.  We used to review them.  We used to ask

2  questions.  But generally tracking cash was not going to

3  approves or anything that.  It was -- it was tracking cash.

4  Q    All right.  So back to my question about the income and

5  utility taxes.  How did you derive that figure?

6  A    This will be a combination as I already testified based

7  on the city's internal reports and their bank accounts.  And

8  even out of discussions we may have had with the city

9  personnel.

10  Q    Did you have any personal conversations with city

11  personnel related to that item?

12  A    I may have, I don't recall specifically.  This is going

13  back to fiscal year 2012.

14  Q    Do you recall having any personal conversations with

15  anyone at the city related to the property tax item?

16  A    I don't remember a specific conversation.  We used to

17  track these daily, or actually on the fiscal year 2012 at

18  least weekly to -- to get our arms around the cash activity.

19  Q    You and your team?

20  A    That is correct.

21  Q    What about the gaming taxes?  Do you recall where that

22  figure came from?

23  A    I think it comes from the city's bank activity.

24  Q    The city's bank activity?

25  A    Its bank statements.

1  Q    Bank statements.  And how often did you receive the

2  city's bank statements?

3  A    It has varied from time to time, but we are receiving

4  statements right now on a weekly basis if not on a daily

5  basis --

6  Q    And in back --

7  A    That's --

8  Q    I'm sorry.  I didn't mean to speak over you.  And back in

9  2012, do you recall how often you were receiving those

10 statements?

11 A    I do not recall, but we -- we started getting the bank

12 statements on a regular basis as soon as we -- we got engaged

13 because that was the best proxy to track cash.

14 Q    And that would have been 2011, correct?

15 A    Calendar year 2011, that's right.

16 Q    Okay.  But I'm asking now about 2012.  Do you recall how

17 often you got statements related to gaming taxes?

18 A    Talking about fiscal year 2012.  I just want to make

19 clear that includes a part of 2011.  We would have received

20 activity on a regular basis that's what I would say.

21 Q    And you can't recall now whether that was weekly, or

22 twice a month, or monthly?

23 A    That is correct, I can't recall.

24 Q    How about the municipal service fee to casinos?

25 A    Consistent with how we received the gaming taxes

1  information.

2  Q    Reports from the city?

3  A    Reports, bank activity, discussions with -- with -- with

4  -- from the city's management team.

5  Q    I'm sorry?  Reports -- discussions with who at the city?

6  A    The city's management team.

7  Q    Okay.  Do you recall having any personal conversations

8  with the city's management team related to that line item?

9  A    No, I do not.

10  Q    So any -- any conversations would have been between your

11  team and -- and the people at the city?

12  A    No, that's not right.

13  Q    Okay.  What would -- who would be -- who was part of

14  those conversations to your knowledge?

15  A    Like I said earlier, I was intimately involved with the

16  tracking of cash activity of the city given how precarious the

17  cash position was.  I had several discussions with members of

18  the city's management team with respect to cash.

19       Your question was if I had a specific conversation on

20  this particular line item, I do not recall.  I had specific

21  conversations on the cash activity with various members of the

22  city's management team.

23  Q    Over what period of time?

24  A    Since the time we got engaged.

25  Q    And how frequently?

1  A    I cannot recall, it was very frequent.

2  Q    Just so we're clear, you don't recall having any

3  conversations specifically related to the municipal service

4  fee to casinos, is that correct?

5  A    I do not recall of a specific conversation, you're

6  correct.

7  Q    How about the state revenue sharing?  I think you talked

8  about that yesterday.  Did you have any personal involvement

9  in any conversations with the state relating to the revenue

10 sharing figure that's reflected in this exhibit?

11 A    It's -- no, it's -- the cash that's received every second

12 month pretty regular.

13 Q    I thought you testified yesterday, and I don't want to

14 put words in your mouth, that -- that there was a conversation

15 with the state related to what -- the revenues that came from

16 the state to the city.  Is that wrong?

17 A    No, you're correct.  But my testimony was related to the

18 forecast specifically and I'm happy to talk about it, and also

19 the ten year forecast in terms of the assumptions behind it.

20 Q    I understand you might be happy about that.  But let's

21 talk -- let's talk to these figures now.

22 A    I was just clarifying your -- your question and my

23 testimony.  This is for fiscal year 2012.

24 Q    Correct.

25 A    I did not have specific discussions with the state.  We

1  subtract this cash activity through a combination of the

2  city's reports, the bank activity, and discussions with the

3  management team on a regular basis.

4  Q    How about the last item there?  It's a fairly large one,

5  other receipts.  What -- what goes into that?

6  A    That includes grant receipts, it includes any sort of

7  fines that are collected, it includes any sort of fees that

8  are charged by the different departments.  It also includes

9  some of the utility charges that come through.  So it's --

10  it's a variety of items that makes up that line item.

11  Q    And did your team -- what was the source for your team's

12  collection of that data?

13  A    It was the same as I highlighted before.

14  Q    Reports from the city?

15  A    Bank statements, reports from the city, and discussions

16  with the management team.

17  Q    Do the bank statements that come in, do they break out

18  these line items as set forth in Exhibit 44 on this page?

19  A    Some of those items are -- are broken out, I believe.

20  But that -- that was part of the process in which we used to

21  look at that activity and try and ascertain where those

22  dollars belong so that we could be updating our forecast based

23  on the run rates more accurately based on the information we

24  received.

25  Q    For 2012, the figure on the -- on this exhibit is -- is

1  that $1,765,000,000, is that correct?

2  A    That is correct, including 50,000,000 of refinancing.

3  Q    Any -- and is it correct that that's simply cash, that's

4  not something that -- that it could be the subject of -- of

5  discussion or adjustment?

6  A    That's correct, it's -- it's cash.

7  Q    Did you have any conversations or did your team to your

8  knowledge have any conversations with anybody from Conway,

9  MacKenzie relating to the fiscal year 2012 figures?

10  A    We had discussions around the fiscal year 2012 figures

11  with all of the advisors in terms of what the cash activity

12  for fiscal year 2012 was.

13  Q    So in essence your team or you just relayed to Conway,

14  MacKenzie what the cash figures were?

15  A    We related to the cash activity of fiscal year 2012 as

16  shown on this page was discussed with Conway, MacKenzie and

17  all of the other advisors.

18  Q    Now these -- this is the general fund figure, is that

19  correct?

20  A    Predominantly, yes.  It does not include the activity for

21  Water and Sewer Department, all the receipts for DDOT.

22  Q    Or receipts for --

23  A    I'm sorry.  The Department of Transportation.

24  Q    It -- it -- it does not, or it does include Department of

25  Transportation?

1  A    It does not include the receipts of the Department of

2  Transportation.  The subsidy that's given to the Department of

3  Transportation from the general fund is shown on other

4  disbursement section.

5  Q    And -- and tell -- tell us why those enterprise funds

6  receipts are not included in -- in these figures.

7  A    The -- the Department of Transportation receipts are not

8  included because it's the net subsidy that the general fund

9  sends to the Department of Transportation after they go

10  through their own receipts and disbursements activity.  The

11  net subsidy that the general fund sends to the Department of

12  Transportation are included here.  With respect to the Water

13  and Sewer Department, they are receipts saying disbursements

14  activity are not included in here.

15  Q    And you said, I think earlier, that the department of --

16  Departments of Water and Sewer are self sustaining or break

17  even, correct?

18  A    That's generally correct.

19  Q    So that they can generally handle their own debts and

20  take care of their own business?

21  A    Yes.

22  Q    I would like to ask the help to put up Exhibit 6 which is

23  also in evidence.  And on this instance I believe it's the

24  CAFR for 2012.

25        And if you could turn to Page 20 of that -- that exhibit.

 1  If you could highlight, please, just the 2012 total receipts.

 2  And -- and compare it with, if you could, Exhibit 44 which we

 3  were just looking at.

 4      Okay.  I believe on the top we have an -- an excerpt from

 5  Exhibit 6 which is the 2012 CAFR.  You're familiar with that

 6  document, Mr. Malhotra?

 7  A    Yes, I am.

 8  Q    And at the bottom is the year -- well, we were actually

 9  looking on the left hand column, but that's the figure from

10  Exhibit 44, am I correct?

11  A    That is correct.

12  Q    You will note there is a discrepancy between the -- the

13  total operating receipts figure which we were talking about in

14  the bottom and total revenues figure that's recorded in the

15  top.  Can you explain for us, please, what the differences are

16  between those two figures?

17  A    Sure.  I'll focus on your top table which is for

18  governmental activities of total revenues of 1,537,000,000

19  compared to the total operating receipts of 1,765,000,000.

20  Q    Right.

21  A    The 1,765,000,000 includes cash receipts that the city

22  collects in its property taxes line for distribution to other

23  taxing authorities.  If you go back to the cash flows you will

24  see there's a DDOT off a significant amount of disbursements

25  going to other taxing authorities for collections that have

1  come.

2      So again, I just want to clarify, you're tracking cash.

3  The city receives the gross tax collections then distributes

4  the taxes it has collected on behalf of other entities for a

5  net tax number.  Generally that net tax number is what's

6  reported in the coffer as property tax revenue.

7  Q    So the one five figure reflects a net figure for the

8  taxes that you just described, is that correct?

9  A    That is correct.

10 Q    Okay.  And -- and that's reflected below the revenue

11 line, or it should be above -- oh, forgive me.  It's -- it's

12 reflected in the tax figure itself.

13 A    You are correct.

14 Q    And if you could drop the Exhibit 44 and just stay with

15 -- yes, that page.  Just so I'm sure I understand it.  The --

16 the figures on the top, again this is from CAFR not your

17 document, show that the -- the governmental activities column,

18 the 1.5 is really just a -- it's far short of the -- no, you

19 don't need to do that.  The total operational receipts for the

20 City of Detroit, correct?

21 A    For the reasons that I described, yes.

22 Q    That's the business type activities, those are -- that's

23 water, sewer, transportation?

24 A    I believe so.  I -- I have not focused on the business

25 type activity, I believe so.  I'm not sure.

1  Q    Isn't it true that when you -- your engagement began in

2  2011, the business type activities were part of the financial

3  review that your team undertook, correct?

4  A    We were looking at the -- the receipts and disbursements

5  activity of some of the enterprise funds, that is correct.

6           MR. RUEGGER:  No further questions, Your Honor.

7           THE COURT:  Thank you, sir.

8           MR. RUEGGER:  Thank you, Mr. Malhotra.

9           THE COURT:  Any other questions for the witness?

10                     CROSS EXAMINATION

11  BY MS. PATEK:

12  Q    Good morning, Mr. Malhotra, Barbara Patek.  I represent

13  the Detroit Fire Fighters, the Detroit Police Officers

14  Association, and the Detroit Police Command Officers

15  Association, and the Detroit Police Lieutenant and Sergeants

16  Association.  I have just a few questions for you this

17  morning.

18       Mr. Stewart asked you some questions about negotiations

19  with various city unions in late 2011 and 2012.  Were you

20  involved in similar negotiations with the Detroit Fire

21  Fighters Association during that same time period?

22  A    Yes.  Me or my team members were involved, yes.

23  Q    Okay.  And was Chris Brown a member of that team?

24  A    Chris Brown was representing the city.

25  Q    And do you recall whether or not, let's start with the

1 Detroit Fire Fighters.  Whether or not you were able to --

2 your team negotiate an agreement with the fire fighters that

3 resulted in some cost savings?

4 A    Yes.  We did not negotiate it.  We helped ascertain the

5 financial impact, but I believe there was a tentative

6 agreement that was reached with Detroit Fire Fighters

7 Association and the city.

8 Q    Can I have 714, please?  Mr. Malhotra, can -- do you

9 recognize Exhibit 714?

10 A    It's the tentative agreement to --

11 Q    And -- and can you tell the Court going down to the first

12 -- the first full paragraph in the -- the agreement with whom

13 that appears to be?

14        MR. STEWART:  Your Honor, we've objected to this.

15 It is not in evidence.  If she's laying a foundation, no

16 objection.  But if she's going to question the witness about

17 the substance, we do object.

18        MS. PATEK:  I am just laying a foundation, Your

19 Honor.

20        THE COURT:  Well, the question you asked was not

21 exactly a question to establish foundation.

22        MS. PATEK:  Let me --

23 Q    Can you tell us what Exhibit 714 is?

24 A    It's the tentative -- tentative agreement entered the 23rd

25 of March between the City of Detroit and the Detroit Fire

1 Fighters Association.

2 Q    And can we flip to Page 6 of that agreement, please?  Oh,

3 I'm sorry, 7.  Do you recognize in the upper left hand corner

4 of that the -- the signature that appears?

5 A    I think that is the signature of Chris Brown.

6 Q    And Chris Brown was at that time the Chief Operating

7 Officer of the City of Detroit?

8 A    That is correct.

9 Q    Can we bring up 717?  Did you have similar discussions

10 with the Detroit Police Command Officers Association during

11 the same time period, 2011 and 2012?

12 A    We have ascertained some of the financial impact of those

13 discussions.

14 Q    And you participated and were there in those

15 negotiations?

16 A    I was participating from a financial standpoint, yes.

17 Q    Do you recall whether or not the agreement negotiated

18 with the Detroit Police Command -- well, strike that.  If we

19 can jump ahead to the signature page which I believe on this

20 one is Page 5.

21      And same question here.  If you look on the left hand

22 side of the page about a little better than halfway down on

23 Exhibit 717.  Do you recognize that signature?

24 A    I think that is the signature of Chris Brown.

25 Q    And again he was the Chief Operating Officer of the City

1  of Detroit at that time?

2  A    Yes.

3  Q    Do you recall whether or not as a result of the

4  negotiation of the tentative agreement, the agreement that

5  resulted provided for some cost savings to the City of

6  Detroit?

7  A    It was a combination of cost savings and deferrals, yes.

8            MS. PATEK:  I have nothing further at this time.

9            THE COURT:  Any other questions for the witness?

10 Any redirect?

11           MR. STEWART:  Not very much, Your Honor.

12                   REDIRECT EXAMINATION

13 BY MR. STEWART:

14 Q    Mr. Malhotra, and when you were questioned you mentioned

15 something called structural cash flow problems?

16 A    Yes.

17 Q    What are structural cash flow problems?

18 A    As shown on the city's cash flow activity for fiscal year

19 '12 and 2013, the disbursements continue to exceed receipts

20 for both of those years which in my mind are structural cash

21 flow issues especially given the fact that the city had

22 already made -- or had gotten a lot of concessions from some

23 of the active employees that -- but yet other than borrowing

24 new cash, or pooling new -- pooling accounts, or deferrals,

25 the core structural problems were -- or cash flow problems

1  where that the disbursements continued to exceed the receipts.

2  Q    Now when you used that term, it was in connection with

3  the questions you were asked about the monetization of city

4  assets.  What effect if any would the monetization of city

5  assets have upon the city's structural cash flow problems?

6  A    None.

7  Q    Why not?

8  A    Because in -- in my view those are one time proceeds from

9  asset sales that do not address the issues with respect to the

10 ongoing operating disbursements and the legacy cost

11 disbursements, the combination of which continue to exceed the

12 receipts that the city generates from its operations.

13 Q    Now you also were asked at various times about cost

14 savings that had been negotiated or realized or what have you

15 in previous years.  To the extent cost savings had been

16 achieved by the city, what if anything did you do in your

17 financial analyses with respect to those savings?

18 A    Those savings were clearly reflected in the cash activity

19 on a monthly basis all through fiscal year 2013.  So the

20 fiscal year 2013 would already reflect those cash savings that

21 had occurred during that time frame.

22     We also adjusted for additional cost savings from a

23 forecast basis over the forecast time frame which were already

24 incorporated in the cash flow assumptions.

25         MR. STEWART:  Thank you.  I have no further

1  questions.

2       THE COURT:  All right.  Sir, you may step down.

3  Thank you very much.  I will ask you to be here again tomorrow

4  morning in case we have more questions for you.

5  A    Yes, Your Honor.

6       (WITNESS GAURAV MALHOTRA WAS EXCUSED AT 11:43 A.M.)

7       THE COURT:  All right.  Your next witness, sir.

8       MR. STEWART:  Charles Moore.  Your Honor, before Mr.

9  Moore comes into the courtroom, as a foreseeable evidentiary

10 point, I think it might be best just to raise outside of the

11 presence of the witness.

12      THE COURT:  Okay.

13      MR. STEWART:  And here is what it is.  Yesterday in

14 the opening, I believe it was Mr. Oldman and if I'm wrong, I

15 apologize to Mr. Oldman who in the course of his opening about

16 the alleged bad faith of the emergency manager said, and we

17 have the imperfect transcript here with us, that Mr. Orr did

18 not have a factual basis to state in his declaration that the

19 pension claims were about 3.5 million dollars.

20    Because he opened on it, that is squarely now an issue in

21 our case.  And I intend to ask Mr. Moore about that.  And in

22 particular where that number came from.  I'm going to ask him

23 did he give that number to Mr. -- Mr. Orr and where did he get

24 it from and what made him believe that was a reliable number.

25      His answer is going to be that it was based upon reports

1    given to him by the pension plans actuaries.  And he has those

2    reports with him.  There have been -- they're exhibits here in

3    our case.  So I intend to ask him about that.

4        I'm not certain there will be an objection to it, but if

5    there is, I thought it would be more orderly to deal with it

6    now instead of while he was testifying.

7            THE COURT:  Any objections?

8            MR. RUEGGER:  On behalf of the committee yes, Your

9    Honor.  I believe that that's just an effort to introduce

10   opinion testimony, expert testimony through a witness who is

11   supposed to be a lay witness.  And I don't believe Mr.

12   Oldman's opening relating to that figure opened any doors to

13   allow that kind of expert testimony.  I would take it on a

14   question by -- I'm sorry, Your Honor.

15           MR. MONTGOMERY:  I didn't mean to interrupt you.

16           THE COURT:  I actually meant for him to remain quiet

17   so you could finish.  All right.

18           MR. RUEGGER:  I'm sorry, Your Honor.  I wasn't sure

19   who was where.

20           MR. MONTGOMERY:  We would simply object, Your Honor,

21   for the -- for the reasons that I think we've -- we've raised

22   with you in the past.

23           THE COURT:  Okay.  And please recall to speak right

24   into the microphone.  Any other objections before I get back

25   to Mr. Stewart?  Sir?

1      MR. SHERWOOD:  Yeah, on behalf of AFSCME, Jack

2  Sherwood.  We would join in the objection.  We would submit

3  that any testimony by Mr. Moore about pension under funding is

4  clearly, I don't think there's any dispute that that type of

5  testimony involves extremely specialized knowledge, training,

6  and is way beyond the understanding of the average person.

7      It is without a doubt the subject of what should be

8  expert testimony.  And for the city to try to use that

9  testimony in this proceeding by a witness who has not been

10  qualified as an expert, who has not rendered an expert report,

11  is improper.

12      And only experts can rely on -- on hearsay.  And that is

13  what this witness would be doing.  So on behalf of AFSCME, we

14  would also oppose any testimony by ths witness concerning the

15  -- the value of the -- the pension under funding.  Thank you,

16  Your Honor.

17      MR. CIANTRA:  Thomas Ciantra for the UAW, Your

18  Honor.  We would join in those objections and note that Mr.

19  Moore is not an actuary and has not been proffered, we

20  understand, as a -- as an expert qualified to provide

21  actuarial testimony.

22      THE COURT:  All right.  Thank you.  The -- go ahead,

23  I didn't mean to cut you off.

24      MR. STEWART:  I think there may be some confusion.

25  We're not offering it for the truth, we're offering it for the

1  good faith basis of Mr. Orr who has been accused of bad faith.

2  So that -- that is the nature of the proffer and there is a

3  hearsay exception for that.

4          THE COURT:  Yes.  The Court will admit the evidence

5  but for the limited purpose of addressing the challenge to Mr.

6  Orr's credibility and good faith.

7          MR. STEWART:  Mr. Moore is being brought to the

8  courtroom from the hall because of the sequestration --

9          THE COURT:  Yes.

10          MR. STEWART:  -- agreement, Your Honor.

11          THE COURT:  Step forward please, sir.  And before

12  you sit down, please raise your right hand.

13      (WITNESS CHARLES MOORE WAS SWORN)

14          THE COURT:  All right.  Please sit down.

15                      DIRECT EXAMINATION

16  BY MR. STEWART:

17  Q    Good morning, Mr. Moore.

18  A    Good morning.

19  Q    Could you please give the Court your full name and your

20  home address?

21  A    Charles Moore, M-o-o-r-e.  And I am out of Birmingham,

22  Michigan.

23  Q    And are you employed, Mr. Moore?

24  A    Yes, sir.

25  Q    And where do you work?

1  A    Conway, MacKenzie, Inc.

2  Q    And tell us if you could what Conway, MacKenzie, Inc. is.

3  A    We are primarily a turnaround and restructuring firm.

4  Q    How long have you worked for Conway, MacKenzie?

5  A    For approximately 12 years.

6  Q    Tell us if you could about your education, college and

7  after college if you have post graduate work.

8  A    I have a Bachelor's Degree in Accounting from Michigan

9  State University.  I have a Master's of Business

10  Administration from Michigan State University in Professional

11  Accounting.  And I have various certifications as well.

12  Q    Well, first of all, if you could give me the dates of

13  your degrees from Michigan State.

14  A    Sure.  I completed both degrees in 1994.  It was a

15  combined degree program and both degrees are granted at the

16  same time.

17  Q    And then you mentioned your professional certifications.

18  Could you tell us what those are?

19  A    Yes, sir.  I am a Certified Public Accountant, a

20  Certified Turnaround Professional, and I'm certified in

21  Financial Forensics.

22  Q    And who does the certifications for those qualifications?

23  A    The American Institute of Certified Public Accountants is

24  the CPA body.  The Turnaround Management Association is the

25  body for the Certified Turnaround Professional designation

1  And then the AICPA, the American Institute of Certified Public

2  Accountants, also does the financial forensics certification.

3  Q    Tell us if you could about your employment since your

4  graduation from Michigan State.

5  A    My first job was with Deloitte and Touche.  I was

6  employed there for approximately five and a half years.  After

7  that I was at a company by the name of Horizon Technology

8  where I was Chief Financial Officer and then I joined Conway,

9  MacKenzie.

10 Q    And you told us you've been there 12 years.

11 A    Yes, sir.

12 Q    Where is Conway, MacKenzie headquartered?

13 A    We are headquartered in Birmingham, Michigan.

14 Q    And what Conway, MacKenzie office do you work out of?

15 A    I work out of the Birmingham, Michigan office.

16 Q    What title do you hold at Conway, MacKenzie?

17 A    I'm Senior Managing Director and shareholder.

18 Q    Okay.  And tell us if you could what kind of practice you

19 have at the firm.

20 A    My work primarily involves turnaround and restructuring

21 services.  I also perform services in other areas of our firm

22 such as investment banking and litigation support.

23 Q    Could you -- to the extent they're probably discloseable,

24 could you tell us some of the clients you have worked for

25 while at Conway, MacKenzie?

1  A     Certainly.  As you mentioned, there are client

2  confidentiality restrictions, but publicly known clients

3  recently would include the City of Detroit, Detroit Public

4  Schools, the Commonwealth of Puerto Rico, Jefferson County,

5  Alabama, Greektown Casino and Hotel.

6  Q     Have your clients included unions?

7  A     Yes, sir.

8  Q     Which unions?

9  A     I have done work on behalf of AFSCME and UAW.

10  Q     And what project was that on if you can tell us?

11  A     Yes.  I was engaged jointly by AFSCME and the UAW related

12  to the Commonwealth of Puerto Rico.

13  Q     Now in 2007, did you sit on a commission appointed by the

14  Michigan government?

15  A     Yes, sir.

16  Q     Please tell us what that work involved.

17  A     The commission was the legislative commission on

18  government efficiency.  It was a nine person panel appointed

19  by legislators from the State of Michigan.

20  Q     And how long did you work with that commission?

21  A     It was approximately a two year assignment.

22  Q     And what did you do in those two years?

23  A     The primary objective of the commission was to find

24  operational efficiencies for the state government.

25  Q     Did there come a time in 2012 you began working for the

1  City of Detroit?

2  A    Yes.

3  Q    And tell us about that work.

4  A    In late 2012, Conway, MacKenzie did some pro bono work

5  for the City of Detroit.

6  Q    And what was -- what work -- what work -- sorry, what

7  work did you do?

8  A    Conway, MacKenzie was asked to perform analysis on

9  certain areas related to cashiering operations for the city.

10  Q    And you'd better tell us what a cashiering operation is.

11  A    Cashiering generally means areas where cash is coming

12  into the city.

13  Q    Okay.  And then what areas did you look into?

14  A    There were, as I mentioned, about five areas.  Some were

15  more of a focus than others.  Municipal parking was a primary

16  area of focus.  We also looked at fire operations including

17  the fire marshal where fees are generated.  We also looked at

18  aspects of building safety and engineering.

19  Q    Did there come a time earlier this year when Conway,

20  MacKenzie was hired by the City of Detroit to -- on a non-pro

21  bono basis to do work for the city?

22  A    Yes, sir.

23  Q    And how did that come about?

24  A    The City of Detroit issued an RFP, a request for proposal

25  in November of 2012 for restructuring services.  Conway,

1  MacKenzie was one of the firms that responded to that RFP and

2  was eventually engaged in January of 2013.

3  Q    And by restructuring services, what are you referring to?

4  A    Restructuring services is not really a defined term, but

5  because of the financial distress that the city was

6  experiencing, there was a desire to bring in outside expertise

7  to help the city deal with that financial distress.

8  Q    And so Conway, MacKenzie became a operational

9  restructuring advisor to the city?

10  A    Yes, sir.

11  Q    What areas did you look at?

12  A    We've looked at pretty much every area of the city's

13  operations.

14  Q    Okay.  Let me ask about some in particular.  What if

15  anything were you asked to do in terms of looking at the

16  city's operations in the area of public safety?

17  A    Public safety involves multiple areas.  It includes

18  police, fire, EMS, and Department of Homeland Security.  We

19  spent quite a bit of time understanding how those departments

20  function currently, what are the major impediments to

21  improving their performance, and working with individuals in

22  those departments to develop a plan for improving performance.

23  Q    Tell me if you could how did you go about doing this

24  work?

25  A    The city has had multiple consultants performing work

1  over the last several years.  And so one of the items that

2  Conway, MacKenzie did was to first understand work that has

3  been done in the past by outsider organizations so that we

4  could leverage that work.

5      In addition to that we worked very closely with the

6  people within the departments as well as outside organizations

7  to not only gather facts in terms of how the department is

8  performing currently, but also to benchmark as to how the

9  department stacks up compared to other areas that would be

10 relevant.

11 Q     Did there come a time when you made recommendations to

12 the city relating to public safety?

13 A     Yes, sir.

14 Q     And what did you recommend?

15 A     In the June time period of this year there was a document

16 that was put together.  A creditor proposal which incorporated

17 our work and specifically had initiatives related to public

18 safety in both restructuring expenses as well as capital

19 expenditures.

20 Q     And if we could, let's put up exhibit -- if we could,

21 let's put up Exhibit 43.  Mr. Moore, is this the creditor

22 proposal that you -- you referred to a few minutes ago?

23 A     This appears to be the title so, yes.

24 Q     And could you direct us to the portion of this that

25 contains the recommendations and analysis you told us about

1  just a few minutes ago?

2  A    If I recall correctly, this document is about 130 pages.

3  There are multiple areas where recommendations related to

4  public safety would exist.  If -- if we're able to scroll

5  through it, I could get you those pages.

6       I can tell you at the very end of the document that has a

7  summary listing of capital expenditures which you would be

8  able to look at from the standpoint of public safety.

9  Q    We will -- and we will do that once we've covered all

10  these areas.  And then what did you do if anything with regard

11  to the Water and Sewer Department?

12  A    Conway, MacKenzie was asked to prepare a long term, long

13  term being defined as ten year business plan for both the

14  water and sewer funds.

15  Q    And what do you mean when you say business plan?

16  A    A business plan essentially involves how the department

17  will operate over a period of time.  Anticipated revenues,

18  expenses, as well as other cash needs such as capital

19  improvements.

20  Q    And did there come a time when you made a recommendation

21  to the city or to the emergency manager based on the work that

22  you had done?

23  A    Yes.

24  Q    And when did you make that recommendation?

25  A    At the end of September of 2013 we delivered that ten

1  year business plan for the water and sewer funds.

2  Q    Now have you also been asked to look into the

3  monetization of the Water and Sewer Department?

4  A    Yes, sir.

5  Q    When did you begin your work looking into the

6  monetization of that department?

7  A    The business plan which our work began in July of 2013,

8  the development of the business plan for the water and sewer

9  funds was to be used as a basis for evaluating strategic

10  alternatives for the water and sewer funds.  And among those

11  strategic alternatives was the potential creation of a

12  regional water authority.  And that was one area that this

13  business plan is currently being used.

14  Q    And how, if you can disclose to us, how would the

15  creation of a regional water and sewer authority lead to its

16  monetization?

17  A    What is currently being discussed, and -- and this is a

18  publicly available aspect.  And I -- and I have to be careful

19  because the negotiations are ongoing and they are

20  confidential.

21      But what has been publicly discussed is the formation of

22  a regional authority would potentially involve the City of

23  Detroit leasing the water and sewer assets to a regional

24  authority and then receiving a payment in return.

25  Q    So the monetization would take the form of lease

1  payments?

2  A     Yes, sir.

3  Q     And did I hear you correctly this is under discussion as

4  we speak?

5  A     Yes, sir.

6  Q     Let me direct your attention to the Detroit -- Detroit

7  Department of Transportation.  What if anything was Conway,

8  MacKenzie asked to do with regard to DDOT?

9  A     DDOT as you mentioned, the Department of Transportation

10 is another department that we looked at and there are both

11 short term as well as longer term items that we evaluated

12 there.

13      In the short term, we looked at ways of potentially

14 improving the operation perhaps through as an example fare

15 increases to try to get more revenue into the department.

16 Identify ways that the -- that the department could operate

17 more efficiently.

18      As an example getting more buses on the road, maintenance

19 tends to be an issue in that department.  And also the

20 management of the department.  The longer term is still a

21 question and that could involve eventually merging into more a

22 regional transportation authority.

23 Q     And that merger would be done for what reason?

24 A     If the authority, if a regional authority could provide

25 better service to residents and it could also save the city

1  money, then that certainly is something that we would look at.

2  Q    Were you also asked to look at the Detroit Lighting

3  Authority?

4  A    Yes.

5  Q    What if anything did you do with regard to the Detroit

6  Lighting Authority?

7  A    Mr. Stewart, I'll just clarify.  You're referring to the

8  Public Lighting Authority.

9  Q    Public Lighting.

10  A    Yes.

11  Q    I'm sorry.  Thank you.

12  A    The -- the Public Lighting Authority was an authority

13  established within the past year and the primary purpose of

14  that lighting authority is to improve the lighting within the

15  city.  That needs to be funded.  And then the efforts to

16  replace lights will occur.

17      And so we worked with the city and the state as it

18  relates to the initial financing for the Public Lighting

19  Authority which is ongoing right now.  As well as we were

20  involved with a request for proposal related to the management

21  of the Public Lighting Department.

22  Q    What were you asked to do if anything with regard to tax

23  and revenue collection operations for the city?

24  A    The city takes in a variety of taxes.  The primary items

25  for taxes are property taxes, income taxes, and utility taxes

1   among others.

2        And we looked at those operations as to how they could be

3   made more efficient as well as potentially increase the amount

4   of revenue that was coming in.

5   Q    What did you find in the course of your investigation

6   into the operations of the city's tax and revenue functions?

7   A    As it relates to property taxes, there have been efforts

8   that were underway for the last few years where the city had

9   been using some outside assistance to try to improve that

10  area.

11       The city, its ability to operate in the property tax

12  area, was very broken.  Simple things such as getting bills

13  out on time and to the right addresses, as well as having the

14  right number of resources available to accept payment were

15  both significant deficiencies.

16  Q    Were -- were measures implemented to correct those

17  deficiencies?

18  A    Yes, sir.

19  Q    Tell us if you could what those measures were or are?

20  A    There are a number of things as it relates to property

21  tax collections that are underway.  First of all, the property

22  tax billing process has been improved significantly and so the

23  bills have gone out on time.

24       In addition to that, a number of additional resources

25  were brought in in July and August of this year in order to be

 1  able to process the receipts, the -- the payments that

 2  residents and others would make.

 3      We also changed some of the bank information so that

 4  payments would be received quicker as well as larger amounts

 5  for property tax payments could actually be received.

 6  Q    And do I understand correctly you're continuing to work

 7  in the area?

 8  A    Yes, sir.

 9  Q    What did you do with regard to investigating the problem

10  of housing blight here in the City of Detroit?

11  A    Blight which is the term that most people use for

12  structures as well as non-structural areas that are -- could

13  be abandoned, burned out buildings, overgrowth of brush,

14  certainly was an area that we kept running into in a number of

15  the departments that would drive department activity.

16      As an example within the fire department, approximately

17  60% of the fire department's runs relate to abandoned

18  buildings.  We also noticed on the property tax side that

19  areas where there was significant amounts of blight, both

20  structural and non-structural, that property taxes -- or

21  property tax values would deteriorate very quickly.

22      And so there was an initiative identified as part of the

23  plan that was put together to eliminate the residential blight

24  within the City of Detroit.

25              THE COURT:  Excuse me.  You used the phrase

1  non-structural blight?

2  A     Yes, Your Honor.

3          THE COURT:  What is that?

4  A     If you think of a lot, a residential lot, some of these

5  lots don't have a structure on them anymore, however, there is

6  tremendous overgrowth.  And so it hides what activity may be

7  going on in that lot.  And that also can be a -- an area that

8  breeds crime.

9  Q     Now, have you heard the terms restructuring and

10  reinvestment as used with respect to the work of the emergency

11  manager?

12  A     Yes, sir.

13  Q     In fact was that not something also discussed in the June

14  14 presentation?

15  A     Yes, sir.

16  Q     Could you tell us please, what is meant by those terms?

17  And let's start with restructuring.

18  A     Restructuring refers to how the departments operate.  And

19  when Conway, MacKenzie first began its efforts with the

20  departments, very often we find that there are areas where

21  costs can be reduced and so that is a big focus in the

22  turnaround industry in general is reducing expenses.

23      What we found within the departments is that a number of

24  the -- the departments were severely broken.  The -- as a

25  result of a number of cost cuts that have happened over the

1  years, many departments couldn't perform the most basic

2  functions I referred to earlier, just the inability to get

3  property tax bills out.

4      And so when we use the word restructuring we're talking

5  about changing how the department operates.  And in many

6  instances what that actually revolved around was adding

7  expenses so that departments could function and services could

8  be performed.

9  Q    Were you able to determine whether the benefit from

10 adding these employees would outweigh the expense of hiring

11 them?

12 A    In addition to the expenses that we identified, we also

13 identified a number of revenue initiatives as well.

14 Q    If you could, just explain to us what the revenue

15 initiatives were?  Actually I should first ask what were the

16 amount of the expenses?

17 A    The amount of expenses, added expenses over the ten year

18 period which is the period that we developed for the

19 restructuring and reinvestment plan, was approximately

20 $250,000,000.

21 Q    And what did you calculate the benefits would be

22 financially from the restructuring?

23 A    We had other revenue initiatives where revenue

24 initiatives would revolve around areas where the city could

25 receive additional cash in flows revenue of approximately

1  $280,000,000.  There were some offsets to that as well as we

2  looked at changing some departments it would result in some

3  lower revenue as well.  And so as a result there was net

4  revenue improvements of about $250,000,000 as well.

5  Q    Now then the term was used reinvestment.

6  A    Yes, sir.

7  Q    Tell me -- or tell the Court what you mean -- or meant

8  when you used the term reinvestment.

9  A    Reinvestment is referred to as the category of planned

10  expenditures that would relate to the infrastructure of the

11  city.  As an example whether that is facility improvements,

12  vehicle fleet, information technology, or even in the case of

13  blight, spending on blight elimination.

14  Q    And why is reinvestment -- this was something you

15  recommended?

16  A    Yes, sir.

17  Q    Why did you recommend it?

18  A    What became very clear is that over the years as the

19  city's finances suffered and deteriorated that there was not

20  the necessary reinvestment made in the structural assets.  As

21  an example, there are parking garages where large portions of

22  the parking garages are actually blocked off because the

23  structures themselves are in disrepair.  And that's a source

24  of revenue for the city.

25       And that unless those items are fixed, the city will have

1   continued issues with just performing functions.  And so what

2   became very clear to Conway, MacKenzie and formed the basis of

3   our recommendations, is that without spending money on the

4   infrastructure, the ability to perform services and actually

5   have hard assets where those services are performed, would

6   continue to be challenged.

7   Q    Now is the removal of blighted structures part of

8   reinvestment?

9   A    Yes, sir.

10  Q    Okay.  And why as a matter of economics, is removal of

11  blighted properties -- well, you did recommend removal of

12  blighted properties, correct?

13  A    Blighted residential properties, yes.

14  Q    Why is that economically sensible to do?

15  A    As I mentioned before, blight seems to touch on a number

16  of the areas that we've looked at whether it is public safety,

17  property taxes, or even appearance.  And so by spending money

18  on eliminating that, you change the dynamics of where people's

19  time gets spent as well as the basis for how the city receives

20  revenue.

21  Q    Did you have an estimate of what it would cost to remove

22  the blighted residential properties?

23  A    Yes, sir.

24  Q    And what was your estimate?

25  A    Five hundred million dollars during this time period.

 1  Q    And the time period for removal was how many years?

 2  A    We forecasted $500,000,000 over six years.

 3  Q    And where did the number 500,000,000 come from?

 4  A    This was an estimate based on discussions with people

 5  that have been involved with blight removal in the past within

 6  the city.  The city has been undertaking blight removal

 7  efforts for some time as well as outside parties that have

 8  been involved with blight removal as well.

 9  Q    Now --

10          MR. RUEGGER:  I'm sorry, Mr. Stewart.

11          MR. STEWART:  Sure.

12          MR. RUEGGER:  I would object to the last testimony

13  as -- as hearsay, Your Honor.

14          THE COURT:  Would you speak into the microphone,

15  please?

16          MR. RUEGGER:  Objection to the last question and

17  answer as it called for hearsay and his answer was hearsay.  I

18  also want to object.  I believe this is bordering into expert

19  testimony and the witness is supposed to be a lay witness.

20          MR. STEWART:  Your Honor, he made recommendations

21  that resulted in a number for restructuring the reinvestment

22  during the openings yesterday.  That number too is challenged.

23  In particular I remember one of the openings saying how could

24  the city in good faith budget for this when it is not going to

25  be able to pay others.

1  So as a matter of dealing with the good faith issue and

2  the reliability of the data, I wanted to adduce testimony of

3  where these numbers came from.

4          THE COURT:  Is that the sole purpose that you're

5  offering this for?

6          MR. STEWART:  At this point, yes.

7          THE COURT:  All right.  With that limited purpose,

8  the Court will overrule the objection.

9  Q    I have one further question in this area which is

10 including the $500,000,000 for blight removal, what was the

11 total number you developed for reinvestment and restructuring

12 for the city?

13 A    It was approximately $1,000,000,000.

14 Q    Over ten years?

15 A    Over ten years, yes.  Excuse me, Mr. Stewart.  In your

16 question, did you ask restructuring and reinvestment?

17 Q    I did.

18 A    Okay.  The total with both of those would be

19 approximately 1.25 billion dollars.  A billion on the

20 reinvestment.

21 Q    Let me move to another area.  As part of your work for

22 the city or the emergency manager, were you asked to do

23 something called tax benchmarking?

24 A    Yes, sir.

25 Q    Could you tell us what tax benchmarking is?

1  A    As part of the -- our initial efforts when we were

2  looking at potential sources of cash, we looked at the current

3  level of taxation for residents and businesses within the City

4  of Detroit to understand whether that -- whether those could

5  be increased as a potential source of cash.  And so we looked

6  at the City of Detroit's taxation and we compared that to a

7  few of the surrounding communities.

8  Q    And what did you conclude?

9  A    That the City of Detroit residents were taxed far more

10  than surrounding communities.  And in fact had the highest

11  taxation within the State of Michigan.

12         MR. STEWART:  Your Honor, this is a good breaking

13  point for me, but I'm prepared to continue if the Court --

14         THE COURT:  No.  No, let's -- let's stop now for

15  lunch and reconvene at 1:45, please.

16     (WITNESS CHARLES MOORE WAS TEMPORARILY EXCUSED AT 12:15

17  P.M.)

18         THE CLERK:  All rise.  Court is in recess.

19     (Court in Recess at 12:15 p.m.; Resume at 1:45 p.m.)

20         THE CLERK:  Court is in session.  Please be seated.

21  Recalling case number 13-53846, City of Detroit, Michigan.

22         MR. IRWIN:  Good afternoon, Your Honor.  Geoff Irwin

23  from Jones, Day.  Might we return to a brief housekeeping

24  matter from yesterday morning just to update the Court?

25         THE COURT:  Sure, go ahead.

1          MR. IRWIN:  In regard to the -- the UAW motion to

2    compel, and I've -- I've conferred with Mr. Ciantra on this.

3    That you may recall that there were some Jones, Day research

4    memoranda that were the subject of the motion to compel.

5          And I indicated that we would do our very best to

6    investigate whether these memoranda were in fact shared with

7    the state.  And that if they were we would in fact disclose

8    them to -- to objectors here.

9          We have done our very best and it is proving too

10   difficult to know.  People just don't recall as they look at

11   individual memoranda whether they did or didn't.

12         So I -- I have conferred with Mr. Ciantra.  I am

13   perfectly prepared to share them with the Court.  I think the

14   Court invited for us to submit them in camera for the Court to

15   consider before deciding what -- what to do and I'm prepared

16   to do that.

17              THE COURT:  Okay.  I will accept that and give you a

18   decision tomorrow morning.

19              MR. CIANTRA:  Thank you, Your Honor.  In -- in

20   connection with that, I would just ask that the Court focus

21   with respect to the cover email that was -- that described --

22              THE COURT:  Is that there too, or is that in

23   evidence?

24              MR. CIANTRA:  I believe -- I believe it is -- is it

25   there?

 1          MR. IRWIN:  It's not in -- it's not in here.

 2          MR. CIANTRA:  But it was -- it was read into the

 3 record yesterday by Ms. Green.

 4          THE COURT:  Okay.  So I think I have -- so it's in

 5 here?  Objecting parties opening statement, RSC867?

 6          MR. CIANTRA:  I don't -- Your Honor, I don't believe

 7 -- I don't believe it is in there.  I believe Ms. Green read

 8 -- read it into the record in connection with her argument on

 9 -- on the retirement systems motion.

10          THE COURT:  Oh, oh, okay, all right.  So we'll have

11 to get it from -- from the transcript.

12          MR. CIANTRA:  If -- I don't have it right --

13          THE COURT:  Ms. Green, can you help us?

14          MS. GREEN:  The date of the email is listed in the

15 PowerPoint presentation.  And it's June 5th, 2012.  The whole

16 email I don't believe is in it.  I think it's maybe a piece of

17 it perhaps, but --

18          THE COURT:  Well, let me just ask.  Does anyone have

19 the email?

20          MS. GREEN:  I do.  It is in our exhibit binders that

21 we gave to the Court.

22          THE COURT:  Can you -- can you give me a number?

23          MS. GREEN:  I will give you the number in one

24 second.  I will look it up.  I have my binder back here.

25          MR. CIANTRA:  Thank you for the Court's patience

1   with this, Your Honor.

2           THE COURT:  Well, Ms. Green, why don't you take your

3   time and look for that, or do you have it right at hand there?

4           MS. GREEN:  I have it, yeah.

5           THE COURT:  Oh, all right.

6           MS. GREEN:  I believe it is 844 -- it's 844 in the

7   retirement systems binder.

8           THE COURT:  Okay.  We are all set.  Thank you.  And

9   we got the envelope so we're all set.  May we proceed?  You

10  may proceed, sir.

11          MR. STEWART:  Thank you, Your Honor.

12      (WITNESS CHARLES MOORE RESUMED THE STAND AT 1:49 P.M.)

13  BY MR. STEWART:

14  Q   Mr. Moore, let me direct your attention to June 14, 2013.

15  Did -- did you have occasion that day to attend a meeting

16  given by the emergency manager?

17  A   Yes, sir.

18  Q   What was the purpose of that meeting?

19  A   The purpose of that meeting was to present what is

20  referred to as the proposal to creditors, to various creditors

21  of the City of Detroit.

22  Q   Can we put up Exhibit 43, please?  And do you see on the

23  monitor in front of you, Mr. Moore, a document Exhibit 43?

24  A   Yes.

25  Q   What is that?

1   A    This appears to be the title of that presentation.

2   Q    And that was a presentation made that day?

3   A    Yes, sir.

4   Q    What role if any did you have in making the presentation?

5   A    I spoke to a couple of parts in that presentation.

6   Q    How long was your part of the meeting?

7   A    I would estimate about 15 minutes or so.

8   Q    And what was the general reason for the meeting if you

9   know?

10  A    The general reason for the meeting as I indicated was to

11  present the current situation that the city found itself in.

12  And the plan that the city wanted to pursue regarding

13  restructuring and reinvestment.  As well as to lay out a

14  proposal as to how various classes of creditors would be

15  treated.

16  Q    Were particular questions asked of you that day?

17  A    Not that I recall.

18  Q    Let me ask you if you could, to go to -- and let's also

19  ask the -- Ms. Lori, to go to Page 98 of the document which

20  you can see on your monitor.  And is this -- actually let's go

21  one page earlier, just so the witness has his attention

22  focused on it.

23       Just one -- one -- one page before.  Do you see the page

24  that's before you?

25  A    Yes.

1 Q    Then go -- then go back to the page we just had.  And

2 this page as well?

3 A    Yes.

4 Q    Do you understand what these pages depict?

5 A    Yes.

6 Q    And what do they depict?

7 A    This is a ten year financial forecast indicating the

8 approximate amount of cash that was anticipated to be

9 available for unsecured claims.

10 Q    And that was --

11          MR. SHERWOOD:  Your Honor, I -- I object to this

12 testimony.

13          THE COURT:  All right.  First of all, pull the mike

14 closer.  Second of all, please talk louder.

15          MR. SHERWOOD:  I object on the grounds that this is

16 improper opinion testimony from a non-expert.

17          THE COURT:  Well, the last question certainly didn't

18 ask him an opinion, so to that extent it's overruled.  When

19 you think there is an opinion being given I invite your

20 objection at that time.

21          MR. SHERWOOD:  Thank you, Your Honor.

22 Q    And now, Lori, could be blow up the box?  There.  Do you

23 see the part of that page which has now been expanded to fill

24 the monitor screen?

25 A    Yes.

1  Q    What -- what is this?

2  A    This is a listing of the estimated unsecured claims as of

3  June 14ᵗʰ, 2013.

4  Q    And when you use the phrase unsecured claims, what are

5  you referring to?

6  A    This is based on claims for which there did not appear to

7  be a specific security interest.

8  Q    Claims by who?

9  A    Creditors of the City of Detroit.

10  Q    And claims against who?

11  A    Against the City of Detroit.

12  Q    Let me ask you to direct your attention to the line that

13  says unsecured pension and OPOB.  Do you see that?

14  A    Yes.

15  Q    And then do you see the area that has now just been

16  highlighted for you?

17  A    Yes.

18  Q    And what is that?

19  A    These are the estimated unfunded amounts related to the

20  two pension systems of the City of Detroit.

21  Q    Unfunded in what sense?

22  A    The liability for the pension system in excess of the

23  plan assets of the pension system.

24  Q    And those two numbers add up to about 3.474 billion

25  dollars?

 1   A    Yes, sir.

 2   Q    Do you know where that number came from?

 3   A    Yes.

 4   Q    Where did it come from?

 5   A    From me.

 6   Q    And why did -- who did you give it to?

 7   A    I gave it to Mr. Malhotra.

 8   Q    And anyone else?

 9   A    I gave it to the other restructuring advisors that would

10   have put it into the document.

11   Q    And did you also share it with Mr. Orr?

12   A    Yes, sir.

13   Q    And where did you get it from?

14   A    I got it from Milliman.

15   Q    And for the record who is Milliman?

16   A    Milliman is the actuary engaged by the City of Detroit.

17   Q    Do you know how Milliman derived those numbers?

18   A    Yes.

19   Q    And could you tell us briefly how they did it and then

20   I'm going to show you some -- some exhibits.

21         MR. RUEGGER:  With respect, Mr. Stewart, objection.

22   I believe --

23         THE COURT:  And into the microphone, please.

24         MR. RUEGGER:  This is getting into expert opinion

25   testimony, Your Honor.

1              THE COURT:  The objection is overruled.

2  A    Would you please restate the question?

3  Q    Could you tell us how you -- how Milliman to your

4  knowledge came up with these numbers?

5  A    Yes.  The restructuring team has a task force

6  specifically --

7              THE COURT:  Excuse me one second.  How do you know

8  how Milliman came up with these numbers?

9  A    Your Honor, I lead a task force for the City of Detroit

10  on pensions and I specifically received this information from

11  Milliman.

12              THE COURT:  Okay.  You may answer the question.

13  A    The task force that I indicated that is specifically

14  focused on pensions asked Milliman to run a variety of

15  scenarios.

16  Q    Now let me -- and do you understand how Milliman in these

17  scenarios came up with its numbers?

18  A    Yes, sir.

19  Q    And how did they come up with their numbers?

20  A    Milliman used the Gabrielle Roeder actuarial evaluation.

21  Q    Stop you there.  Who is Gabrielle Roeder?

22  A    Gabrielle Roeder is the actuary that is used by each

23  pension system.

24  Q    Okay.  Sorry to have interrupted your answer.

25              MR. SHERWOOD:  Your Honor, I'm going to pose a

1  hearsay objection to this.  I think this is just -- he is

2  testifying to out of Court statements by -- presumably by

3  actuaries at Milliman as to how they derived numbers.  It's --

4  it's rank hearsay.

5          THE COURT:  And who was Milliman retained by?

6          MR. SHERWOOD:  Milliman was retained by the City of

7  Detroit.

8          MR. STEWART:  No, I think it was retained by the

9  pension --

10          THE COURT:  Who was Milliman retained by?

11  A    The City of Detroit.

12          MR. STEWART:  And, Your Honor --

13          THE COURT:  And you --

14          MR. STEWART:  Yes.  It's being offered for state of

15  mind.  As we -- as I -- before he took the stand I raised this

16  saying, we're not offering these for the truth, we're offering

17  these numbers to rebut the argument that has been made that

18  Mr. Orr did not have a good faith basis in this document and

19  other documents for representing that the pension claims would

20  be 3.5 million dollars.

21          THE COURT:  Did you tell Milliman -- I'm sorry, did

22  you tell Mr. Orr how Milliman came up with these numbers?

23  A    Yes, sir.

24          THE COURT:  All right.  Tell us what you told Mr.

25  Orr.

1  A    I told Mr. Orr that Milliman had taken the Gabrielle

2  Roeder actuarial evaluation and modified a couple of

3  assumptions based on that actuarial valuation.

4       THE COURT:  All right.  The Court will receive that

5  testimony again only for purposes of -- of demonstrating what

6  Mr. Orr was told, not for the truth of it.

7  Q    And did you have reason to believe that Milliman's

8  conclusions were reliable?

9       MR. CIANTRA:  I would object.  I'm going to again

10 object to this.  He's not an actuary.  He's not being

11 proffered for actuarial expertise.  I don't know what the

12 basis of him offering that opinion would be.

13      MR. STEWART:  Foundational question, Your Honor, but

14 also once again, since what we're talking about is good faith

15 reliance an element of reliance is reliance --

16      THE COURT:  All right.  Well, here's a better

17 question.  Did you express to Mr. Orr any doubt about the

18 reliability of the information that you had given him?

19 A    No, Your Honor.

20 Q    Let me put up, let's put up Page 1 of Exhibit 69, please.

21 Can you tell me what Exhibit 69 is?

22 A    This is the draft actuarial evaluation report from

23 Gabrielle Roeder for the general retirement system of the City

24 of Detroit as of June 30th, 2012.

25      (City's Exhibit 69 was identified)

1  Q    And the general retirement system is the system

2  representing non-uniformed employees of the City of Detroit?

3  A    Yes, sir.

4  Q    Do you know what percentage of those non-uniformed

5  employees work for the Department of Water and Sewer?

6  A    Approximately 40% of the contributions that typically are

7  made relate to water and sewer employees.

8  Q    Now let me ask if we could please put up Page 3 of this

9  document.

10        THE COURT:  Is this in evidence?

11        MR. STEWART:  It is in evidence.  Yes, Your Honor.

12 It has not been objected to.

13 Q    And in particular could I ask the Court technician to

14 expand the box at the bottom?  First of all, have you seen

15 this document before, Mr. Moore?

16 A    Yes.

17 Q    And tell us what it is.

18 A    This is the actuarial evaluation as of June 30th of 2012

19 in draft.  And this indicates what the estimated unfunded

20 actuarial accrued liability is as of that date and the

21 previous year.

22 Q    And how does one get from the information you see here

23 for the -- for the GRS, in other words the general retirement

24 system, to the amount of the unsecured claim the GRS would

25 have?

1  A    Focusing on the column on the left which is as of June

2  30th of 2012, the eight hundred, approximately $830,000,000 --

3  Q    Go back, the same box we need to keep that up.  There we

4  go.

5          THE COURT:  Okay.

6  A    The approximately $830,000,000 in the column on the left

7  is the UAAL, unfunded actuarial accrued liabilities.

8  Q    And may I stop you there and ask you to explain to us

9  what a UAAL is?

10  A    A UAAL is based on an actuarial calculation for

11  liabilities and assets.  So the first item in terms of the

12  unsecured claim amount was to look at the market value of the

13  assets rather than the actuarial value of the assets.

14      The actuarial value of the assets at that date was

15  approximately 2.8 million dollars.  The actual market value so

16  the -- the value of the assets at that point in time was

17  actually approximately $650,000,000 lower than what was showed

18  for actuarial purposes.

19      In addition to that, the top line, the actuarial accrued

20  liabilities is based on a discount rate and the discount rate

21  that is used here is 7.9% and in the claim, unsecured claim

22  calculation, a discount rate of 7% was used.

23  Q    And so how using those numbers do you come up with the

24  amount of the claim, the unsecured claim of this pension plan

25  against the city?

1  A    Yes, sir.

2  Q    So tell me how you then take those numbers and turn it

3  into a figure.

4  A    The accrued asset number, 2.8 million.

5          MR. RUEGGER:  Your Honor, I apologize for the

6  tardiness on this, but I believe Mr. Stewart was misinformed.

7  Sixty-nine was objected to on hearsay and expert opinion and

8  foundation grounds.

9          MR. STEWART:  I stand corrected.  I had been told it

10  had not been objected to.

11          MR. RUEGGER:  We would press those objections, Your

12  Honor.

13          MR. STEWART:  That's confirmed, it was indeed

14  objected to.  Your Honor, I believe the witness has laid a

15  foundation for it as a document he has seen, has worked with.

16  Let me ask two more questions, then I'm going to move it into

17  evidence so then it can be --

18          MR. RUEGGER:  Well, I object to the testimony.  Is

19  it foundation testimony?

20          THE COURT:  I'll let the witness testify or be asked

21  about foundational questions to see if it's admissible and

22  then we'll move on from there.

23  Q    So let's put up the cover page of the document again.

24  This is a document you've seen before, Mr. Moore?

25  A    Yes, sir

1  Q    How did it come to you?

2  A    I received this as part of my role on the pension task

3  force.

4  Q    And you received it from who?

5  A    We received these -- this report from the retirement

6  system itself.

7  Q    And Gabrielle Roeder is employed by the retirement

8  system?

9  A    Yes, sir.

10  Q    And what use did you make of the document?

11  A    I reviewed this document for actuarial information

12  related to the general retirement system.

13         MR. STEWART:  I'd move it into evidence, Your Honor,

14  on the grounds it is, if nothing else, an admission of a party

15  opponent since the GRS is an objector here and this is an

16  agent of an objector.

17         MR. RUEGGER:  It's hearsay and it's expert opinion

18  and it's coming in through a lay witness, Your Honor.  We

19  press the objection.

20         THE COURT:  The objection is overruled.  The

21  document 69 is admitted in evidence.

22      (City's Exhibit 69 was admitted)

23  Q    Now let's please go back to Page 3.  So Mr. Moore, let's

24  go back to our calculation.  We have at the bottom unfunded

25  actuarial accrued liabilities and then two numbers above it.

1   From the numbers you have described -- described to us --

2           THE COURT:  I want to be -- I want to be sure what

3   we're doing here again.

4           MR. STEWART:  Yes.

5           THE COURT:  This evidence is solely in relation to

6   the representation that Mr. Orr made to the Court regarding

7   the unfunded pension liability.

8           MR. STEWART:  Yes.

9           THE COURT:  Well, in that regard again, I'm much

10  more interested in what the witness told Mr. Orr than how he

11  did his calculations or really anything else.  Because

12  otherwise it sounds too much like him testifying as an expert.

13          MR. STEWART:  Let's take the document down.  I think

14  Your Honor already asked that question of the witness, but --

15          THE COURT:  Well, let's just be sure.

16          MR. STEWART:  Yes.

17          THE COURT:  Did you tell Mr. Orr anything about how

18  you made the adjustments that you made?

19  A    Yes, sir.

20          THE COURT:  What did you tell him?

21  A    I told Mr. Orr that two variables were adjusted based on

22  the Gabrielle Roeder actuarial evaluation.  And that included

23  the -- using the market value of the assets as well as using a

24  different discount rate.

25          THE COURT:  Uh-huh.  And did you disclose anything

1 | more specific about those two adjustments than just that much?

2 | A     No, sir.

3 |           THE COURT:  All right.  That's it.

4 |           MR. STEWART:  Let me then wrap up very quickly with

5 | this witness, Your Honor.

6 | Q     Did you attend other meetings with -- held on behalf of

7 | the emergency manager with creditors of the city?

8 | A     During what time period?

9 | Q     After June 14th?

10 | A     Yes, sir.

11 | Q     Okay.  And let me direct your attention in particular to

12 | a meeting held on June 20th.  Do you remember two meetings held

13 | that day?

14 | A     Yes, sir.

15 | Q     One in the morning and one in the afternoon?

16 | A     Yes.

17 | Q     Let me ask you about the afternoon meeting.  Was that a

18 | meeting with representatives of the non-uniformed employees of

19 | the city?

20 | A     I can't recall.  I -- I think that the non-uniform was

21 | the first meeting and then uniform was the second meeting.

22 | Q     And what was the purpose of those meetings?

23 | A     The purpose of those meetings was to lay out information

24 | more information from the June 14th presentation regarding the

25 | financial situation that the city was in.  And then specific

1  information related to health care and pension obligations.

2  Q    Do you remember any questions being asked at either of

3  those two meetings?

4  A    Yes.

5  Q    And what do you remember?

6  A    I recall one question from an attorney representing the

7  UAW questioning how we -- we being the City of Detroit would

8  be able to accomplish some of what was in the proposal outside

9  of bankruptcy.

10  Q    And do you remember what answer was given to that person?

11  A    I believe that the answer that was given by counsel to

12  the city was we want to move forward with these discussions

13  and determine whether or not something could actually occur

14  with all the parties outside of Court.

15  Q    Thank you.  Could we put Exhibit 70 on the screen,

16  please?  Mr. Moore, Exhibit 70 has been -- for identification

17  has been placed on the screen before you.  Have you seen this

18  document before?

19  A    Yes, sir.

20  Q    What is it?

21  A    This is the actuarial evaluation report as of June 30th of

22  2012 for the police and fire retirement system.

23       (City's Exhibit 70 was identified)

24  Q    And who was it prepared by?

25  A    By Gabrielle Roeder

1  Q     How did it come to you?

2  A     Through my role on the task force, pension task force.

3  Q     And what use did you make of the document?

4  A     I used this document to obtain actuarial and other

5  information on the pension system.

6        MR. STEWART:  Your Honor, I would move Exhibit 70

7  into evidence on the same grounds as recited in moving Exhibit

8  69 into evidence.

9        MR. RUEGGER:  Your Honor, I object based on the

10  statements Your Honor just explained on the limited use of

11  this -- these documents and this testimony.  I don't see how

12  this document moves it along.

13     It's -- it's hearsay and expert opinion just as 69 is.

14  But as Your Honor said, if -- if the issue is really what Mr.

15  Moore said to Mr. Orr, I'm not sure how this document adds to

16  the -- the evidence.  So we object on that ground.

17        THE COURT:  All right.  The objection is overruled.

18  Exhibit 70 is admitted into evidence for all purposes.

19     (City's Exhibit 70 was admitted)

20        MR. STEWART:  Thank you.  No further questions, Your

21  Honor.

22        MR. CIANTRA:  The first thing I want to do is make

23  sure that this microphone is positioned correctly.

24        THE COURT:  It sounds good, yes.

25        MR. CIANTRA:  Before I even say my name for the

1  record, I want to make sure.

2         THE COURT:  I appreciate that very much, sir.

3                    CROSS EXAMINATION

4  BY MR. CIANTRA:

5  Q    Good afternoon, Mr. Moore.  I'm Thomas Ciantra as you

6  know.  I'm the lawyer for the UAW.

7  A    Yes, sir.

8  Q    Now you had mentioned in your direct examination that you

9  formed part of a pension task force, is that correct?

10 A    Yes, sir.

11 Q    And that task force was created when?

12 A    In February or March of this year.

13 Q    So around the time the emergency manager was -- was

14 appointed, would that be correct?

15 A    Prior to the emergency manager being appointed.

16 Q    All right.  Let's focus on from the time the emergency

17 manager was appointed.  You remained on the task force

18 obviously?

19 A    Yes, sir.

20 Q    There were also individuals from the Milliman actuarial

21 consulting firm who were on the task force?

22 A    Yes, sir.

23 Q    And there were lawyers from the Jones, Day law firm that

24 were on the task force?

25 A    Yes.

1  Q    All right.  And that task force met on a regular basis?

2  A    Met or had calls, yes.

3  Q    Okay.  And on -- on some of those occasions was Mr. Orr

4  included in -- in those task force meetings?

5  A    Not that I recall.

6  Q    Now you testified that there was a meeting with Mr. Orr

7  where you reviewed with him the approximately 3 -- 3.5 billion

8  dollar number with respect to the pension plan under funding,

9  is that correct?

10  A    Yes, sir.

11  Q    There was -- there was one meeting, or was that multiple

12  meetings?

13  A    There were multiple meetings where we discussed this

14  number in combination with other numbers.

15  Q    Okay.  And at the meeting where you discussed how the --

16  how the number -- how the known -- let me step back.  The

17  number was actually -- you didn't actually do those

18  calculations, the Milliman Actuarial Firm did those

19  calculations, correct?

20  A    Correct.

21  Q    So you were relaying to Mr. Orr what the results of the

22  work of the Milliman firm had been?

23  A    Yes.

24  Q    And you did that at a -- an in person meeting?

25  A    There were both in person meetings and calls with Mr.

1  Orr.

2  Q    Okay.  Let's focus on the in person meetings.  Were the

3  other members of the task force present at that in person

4  meeting?

5  A    Well, there were multiple in person meetings.  I can't

6  recall if anyone else from the task force was in the in person

7  meetings or not.

8  Q    Okay.  Were -- were lawyers from Jones, Day in those

9  meetings with Mr. Orr?

10  A    Yes.

11       MR. CIANTRA:  I'm going to move, Your Honor, that --

12  that his testimony with respect to those meetings be struck

13  because it -- it is in effect a selective waiver of

14  attorney/client privilege that they are engaging in here.  We

15  have had multiple deposition questions cut off on the grounds

16  of attorney/client privilege with respect to the workings of

17  this task force in other areas and they are obviously now

18  making selective use of this to get in those figures.

19       He has just testified that counsel for Jones, Day was

20  present in the meeting.  He testified about it in direct.  We

21  would request that it be struck.

22       THE COURT:  Can you give me an example of such an

23  assertion?

24       MR. CIANTRA:  From prior testimony?

25       THE COURT:  You said that attorney/client privilege

1 had been asserted in relation to that meeting.  I'm asking you

2 for an example.

3          MR. CIANTRA:  Well, in relation to the workings of

4 the pension task force, that had --

5          THE COURT:   That's circled.

6          MR. CIANTRA:  I -- I questioned Mr. Moore in his

7 deposition with respect to deliberations of that pension task

8 force concerning the provisions of the Michigan Constitution

9 that protect pension obligations and the inquiry was stopped

10 on the grounds of attorney/client privilege.

11          THE COURT:  Have you got it?  Can you show me?

12          MR. CIANTRA:  If this had an index it would be

13 easier.  If you could give me a moment, Your Honor.

14          THE COURT:  Sure.  Well, let me ask you to pause

15 from that and ask you a slightly different question, or a very

16 question, sir.

17      Why wouldn't the remedy here be based on the testimony

18 that was given that privilege is waived as of now?  And that

19 -- and that -- and that therefore you can ask any questions

20 without fear of privilege being asserted, or at least a

21 privilege claim sustained.

22          MR. CIANTRA:  Well, Your Honor, the -- the problem

23 with that is that there's been weeks of discovery and

24 deposition testimony that's been taken where we have had

25 questions cut off on the grounds of privilege.  So I don't --

1  I can't do a redo of that at this point.

2         THE COURT:  He's right here.  Redo all you like.

3         MR. CIANTRA:  Well, though not -- with respect to

4  this question I can, but not with respect to questions or

5  documents that weren't produced during the course of this

6  litigation, I can't.

7         THE COURT:  Can you identify a document that wasn't

8  produced that related to this pension task force?

9         MR. CIANTRA:  There are multiple documents that --

10        THE COURT:  Can you identify one?

11        MR. CIANTRA:  Well, I can find the -- the log of

12  their production.  There are multiple documents that were

13  withheld.  I don't have it right with me.

14        THE COURT:  It doesn't sound to me like you're quite

15  ready to deal with the questions relating to your request

16  here, so let's move on and I will consider your request to

17  strike the testimony when you are ready to argue it.

18        MR. CIANTRA:  Thank you, Your Honor.

19  Q    I want to ask you some questions, Mr. Moore, with respect

20  to the city proposal for its creditors, the June 14th proposal.

21  Now with -- with respect to that proposal, I understand an

22  important component of it is reinvestment in the

23  infrastructure and operations of the City of Detroit.

24  A    Yes, sir.

25  Q    And we're projecting approximately a $1,000,000,000 price

1 tag for that -- for that program over the next ten years?

2 A    One billion on the reinvestment, if you will, the capital

3 expenditures, yes.

4 Q    And then there's an additional quarter of a billion

5 dollars with respect to other restructuring initiatives?

6 A    There are -- there is -- yes, that's correct, about a

7 quarter of a billion dollars for expenses.  There are also

8 about a quarter of a billion in revenue initiatives.

9 Q    Okay.  And you also indicated that the emergency manager

10 is of the view that there is no possibility for material

11 increases in the -- the tax revenues that are coming into the

12 city, is that correct?

13 A    I testified that we looked into that and that was our

14 conclusion, yes.

15 Q    You -- you can't raise taxes to -- to pay for that?

16 A    Yes.

17 Q    And it's also correct, isn't it, that -- well, over the

18 past ten years there's been a substantial reduction in the

19 amount of revenue sharing that's come to the City of Detroit

20 from the State of Michigan?

21 A    That's correct.  The revenue sharing has decreased, yes.

22 Q    And that is discussed in the proposal for creditors,

23 correct?

24 A    Yes.

25 Q    And let's just for the record do you have it?  It's

1  Exhibit 43, City Exhibit 43.  Do you have it there?

2  A    Nothing is up yet.

3          THE COURT:  Is it on the table there?

4  A    Yes, sir, I have it.

5  Q    If we turn to Page 4 of the document, the bullet point at

6  the top of that page is state revenue sharing.  Do you see

7  that?

8  A    Yes.

9  Q    And so that quantifies that you've seen approximately a

10  48% reduction in -- the city has seen approximately 48%

11  reduction in the amount of revenue sharing it's received from

12  the State of Michigan since fiscal year 2002?

13  A    Yes.

14  Q    And you're off -- they're approximately 30.6% since 2008?

15  A    There's been a reduction of 30.6% since 2008, yes, that's

16  correct.

17  Q    And would you agree those amounts are material?

18  A    They certainly have been -- had a significant impact on

19  the city's revenue, yes.

20  Q    And part of the projection that is included in the

21  proposal for creditors to the exhibit, Exhibit 43, are

22  projections with respect to the amount of the revenue sharing

23  going forward, is that -- is that correct?

24  A    Yes.

25  Q    And that is -- if you would turn to Page 90 of that

1  document.

2  A    Yes, sir.

3  Q    Towards the top of the page you list the preliminary

4  forecast revenues.  And the revenue sharing is the -- I guess

5  the second item there, correct?

6  A    Yes.

7  Q    So would I be correct that -- that year over year you're

8  projecting an increase in that of it looks like a little over

9  1%?

10  A    That's about right, yes.

11  Q    Is that a number that you calculated as a part of your

12  contribution to this report?

13  A    No, sir, I did not calculate that.

14  Q    But that's -- that was the assumption that the -- the

15  increase in the revenue sharing would be approximately 1% year

16  over year?

17  A    I can't speak to the assumption, but the number looks

18  like about 1% per year.

19  Q    Yeah, it's the arithemetic.

20  A    Yes.

21  Q    And the revenues of the city are -- other revenues of the

22  city are also projected there, correct?

23  A    Yes, sir.

24  Q    And you have there on the first line the municipal income

25  tax?

1  A    Yes.

2  Q    Right.  And the income tax in the City of Detroit now is

3  the highest in the State of Michigan?

4  A    Yes, for individuals the income tax rate for residents is

5  the highest in the State of Michigan.

6  Q    Okay.  So you're seeing -- I'm looking there at increases

7  in the order of a couple of percent per year?

8  A    Yes, sir.

9  Q    So that's -- those two items are staying -- well, one

10  would agree that probably not exceeding the rate of inflation,

11  correct?

12  A    I'm not sure because I did not put together an assumption

13  regarding inflation.

14  Q    Okay.  But 1 or 2% increases year over year?

15  A    That's what appears to be the math, yes.

16  Q    So sort of putting it together, it would be correct,

17  isn't it, that the -- the source of the funding for the -- the

18  reinvestment and restructuring that the city would like to

19  undertake here, is -- is basically going to come from a

20  reduction in the legacy costs, the bond debt and the -- the

21  accrued pension and other post retirement benefits?

22  A    I don't think that's the case.

23  Q    Where is the money coming from if the revenues are

24  staying the same and you're coming up with an extra billion

25  dollars, where is the revenue -- where is the money coming

1  from other than from cutting in those areas?

2  A    The -- the projections show approximately $250,000,000 in

3  additional revenue that I indicated as well as $350,000,000 in

4  also other categories of additional revenue which total about

5  $600,000,000 in new revenue during this ten year period.

6  Q    Okay.  So you got 600,000,000 new, and you've got the

7  rest of that 1.25.  And that's coming from reductions in the

8  legacy costs?

9  A    Could you define legacy costs?

10 Q    Sure.  The -- the -- the pensions that are owed to the

11 people I represent, their post retirement benefits, and the

12 bond holders, the debt on the existing bonds.

13 A    Yes.  Those three categories that is what the proposal

14 indicates is an adjustment to those categories.

15 Q    Now let me go back to Exhibit 43 just for a moment and

16 ask you to turn to Page 109 of that document.  And there's a

17 bullet point on that page, a little more than halfway down

18 claims for unfunded pension liabilities.

19 A    Yes, sir.

20 Q    And in the first bullet point it indicates that because

21 of the preliminary analysis with respect to the under funding,

22 that the city will not be making future contributions to the

23 retirement plans for its employees, is that correct?

24 A    Yes, sir.

25 Q    And that on account of that, in the third bullet point it

1   says there must be significant cuts in accrued vested pension

2   amounts for both active and currently retired persons.  Do you

3   see that?

4   A     Yes.

5   Q     And you were at the -- the June 14th meeting where this

6   was presented to -- well, among others, labor unions and other

7   organizations representing retirees, correct?

8   A     Yes.

9   Q     And I am correct that there was no number that was put on

10  the level of cuts that were -- that the -- the city believed

11  were necessary under this plan, correct?

12  A     Correct.

13  Q     And in fact as you sit here today, there has been no

14  number that has been put on that, correct?

15  A     Correct.

16        MR. CIANTRA:  I have no further questions.  Thank

17  you.

18        THE COURT:  Thank you, sir.

19        MR. CIANTRA:  Your Honor, if I could just address

20  that privilege issue.  And this is at Mr. Moore's deposition

21  that was taken on the 18th of September.  And I can read from

22  the transcript if Your Honor would --

23        THE COURT:  Go ahead.

24        MR. STEWART:  What page, please?

25        MR. CIANTRA:  Oh, certainly.  This begins -- I'm

1 looking at the minuscript of the transcript, Page 154,

2 beginning the bottom of -- of the page.

3          THE COURT:  Is there a line number?

4          MR. CIANTRA:  Yeah, I'm looking just let me see

5 where to start here.

6          THE COURT:  Ah, here we have it on the screen.

7          MR. CIANTRA:  We're beginning on Page 153.  We'll

8 see at page -- Line 14.  Actually I'm asking the questions.

9      You indicated earlier that you were part of a pension

10 task force that has been considering pension issues since I

11 guess the spring of this year.  My question is, during those

12 -- during the discussion, the meetings of that task force have

13 you -- has that provision of the Michigan State Constitution,

14 and that obviously is Article 9, Section 24, been a subject of

15 discussion?  The witness answers, yes.

16      And he goes on and then continuing on to Page 155 at the

17 top, Line 1.  And was there more than one such discussion or

18 did that come up on just one occasion?  It probably came up

19 more than -- I seem to recall more than one occasion where a

20 discussion about whether the city would have to file for

21 Chapter 9 took place and the pension element was discussed.

22      And what was the -- was the consensus that was developed

23 with respect to that issue?  And Mr. Miller, counsel for the

24 city responds.  I'm going to object and ask the witness before

25 he answers that question, whether in connection with any

1  discussion that might have led to a consensus, that discussion

2  included lawyers and counsel.

3      Mr. Ciantra, I'm not asking him -- and counsel that was

4  provided by those lawyers.  I'm not asking about discussion

5  with counsel, I'm asking whether this task force that was

6  looking at the pension issues reached a consensus.  And it

7  continues.

8      But the task force included counsel, he's testified to

9  that.  And then he goes -- then I interject, I'm interested in

10 whether there was a discussion not necessarily what your

11 counsel might have advised.  But to the extent that the

12 consensus was reached and that consensus was based on legal

13 advice, that consensus would be in my judgment privileged.

14     So that's why I asked him.  And he goes on and then at

15 the end, and so I would instruct you, Mr. Moore, not to

16 expound.

17     So our inquiry with respect to the consensus that was

18 developed by this pension task force was cut off by

19 attorney/client privilege assertions.  If the witness has

20 testified with respect to conversations in the -- in the

21 presence of lawyers for the city with respect to where these

22 -- these actuarial numbers came from, it -- it seems to be

23 just a -- a selective use of the privilege, depending on

24 circumstance, and it's put -- it's put us in a difficult

25 position, Your Honor, because I -- you know, as I said before,

1  I can't turn back the time -- the hands of time and, you know,

2  re-take Mr. Moore's deposition.  Go back and look at the, you

3  know, re -- review the tens of thousands of documents that

4  have been produced to deal with it.

5          THE COURT:  All right.  Thank you.

6          MR. CIANTRA:  It just seems unfair.

7          THE COURT:  Mr. Stewart.

8          MR. STEWART:  Perhaps, Your Honor, I'm -- I'm just

9  confused.  But -- and let's put that transcript back up on the

10 screen.

11     Mr. Ciantra paraphrased parts of it, but the fact of the

12 matter is, there was no instruction and his question got

13 answered.  And if we could blow up the bottom quadrant of our

14 document there.

15     And there's this colloquy between Mr. Miller and Mr.

16 Ciantra.  And Mr. Miller makes an objection.  Are you asking

17 -- and Mr. Ciantra, I am not asking him that.  And if so, I

18 would ask you not to expound.

19     So let me ask the question again.  Let's make the record

20 straight.  Question, did the task force you were a part of

21 reach a consensus on the question of what effect the provision

22 of the Michigan State Constitution that protects accrued

23 pension benefits would have on a Chapter 9 filing?  He

24 answered it, no.

25     Question, there was no consensus?  No.

1       And if we went to the following page with a follow up

2   question, there is none of those instructions either.

3            THE COURT:  Let's do that.  Can we go to the next

4   page, please?

5            MR. STEWART:  And you'll have to blow those up so we

6   can all see them, please.

7            THE COURT:  Yeah.

8            MR. STEWART:  So are we on the same page?

9            THE COURT:  Is this -- is this the next page that we

10  have now?

11           MR. STEWART:  Okay.  So I can keep reading, Judge,

12  but as I go down this, I don't see an instruction not to

13  answer the question.  I don't see what was withheld.

14       And then I could go further.  I have other reasons too,

15  but this to me seems to be the most important one.  And

16  perhaps I just misunderstood it, and we're on the wrong page.

17  And why don't I sit down and Mr. Ciantra can -- can stand up

18  and guide us to where maybe I should have looked.

19           THE COURT:  Mr. Ciantra, this is -- this is an

20  important motion that you have made to strike.

21           MR. CIANTRA:  Yes.

22           THE COURT:  So I don't want to press you for a

23  response to my question.  So let's take our time and -- and

24  you can research this properly and -- and -- and present your

25  best case to the Court as to maybe even more than one example

1  of situations in which you assert that the privilege claim was

2  selectively advanced.  So there's no need to rush through

3  this.

4          MR. CIANTRA:  Thank you, Your Honor.  I appreciate

5  it.

6          THE COURT:  All right.

7          MR. CIANTRA:  I will -- I will review the transcript

8  and I will respond.

9          THE COURT:  Okay.  All right.  Does anyone else have

10  any questions for Mr. Moore?  Yes, sir.

11          MR. SHERWOOD:  Your Honor, just -- on the last

12  point.  Before -- before I -- this privilege was also asserted

13  at the deposition of Mr. Bowen from Milliman.

14          THE COURT:  Okay.  Well, let's -- let's add that one

15  to the -- the group that you'll put together together and

16  we'll -- we'll deal with it in -- in due course.

17                     CROSS EXAMINATION

18  BY MR. SHERWOOD:

19  Q    Good afternoon, Mr. Moore.  Jack Sherwood on behalf of

20  AFSCME.

21  A    Good afternoon, Mr. Sherwood.

22  Q    Let me ask you about some of your conversations with Mr.

23  Orr about the under funding of the position of -- of the

24  pensions.  Do you recall that testimony?

25  A    Yes, sir.

1  Q    Okay.  And during those conversations between you and Mr.

2  Orr, did you advise him that the analysis of the unfunded

3  position had not yet been completed?

4  A    Could you be more clear on which conversations?

5  Q    In any of -- any conversations that you had with Mr. Orr

6  before the bankruptcy was filed, did you advise him that the

7  city's analysis with respect to the unfunded position on the

8  pension had not been completed?

9  A    I spoke with Mr. Orr regularly as to the status of all

10 analyses and what the sources of where numbers were coming

11 from.

12 Q    Okay.  But I'm just asking specifically if you remember

13 telling Mr. Orr that the city's analysis of -- and its

14 actuaries' analysis of the unfunded position had not been

15 completed.  Do you recall that?

16 A    I recall specifically telling him the source that we were

17 using for numbers as well as additional activities that the

18 pension task force would undertake or other analyses.

19 Q    So that means that additional analysis was in process, is

20 that fair to say?

21 A    Yes.  And to this day additional analysis is in process.

22 Q    Do you recall telling Mr. Orr that the city was trying to

23 undertake a process to develop a more concrete valuation model

24 to analyze the amount of the unfunded position?

25 A    I did tell Mr. Orr that the analyses that we were giving

1  him were based on Gabrielle Roeder's valuation and that

2  Milliman would be developing its own valuation model as well.

3  Q    And did you also tell Mr. Orr that -- that because the

4  analysis of the unfunded position was still in process, that

5  it was hard to negotiate with respect to that number because

6  there wasn't a common assumption with respect to what the

7  number should be?

8  A    No, I never told Mr. Orr that it was hard to negotiate.

9  Q    Did you tell him that it was difficult to negotiate with

10 respect to a pension under funding amount when that amount was

11 still in process of being developed?

12 A    No, I never told him that.

13 Q    Was that your belief in September of this year?

14 A    My belief in September of this year certainly was not

15 that it was difficult to have a discussion or a negotiation

16 over these numbers.

17 Q    Did you say it was premature -- would you say it was

18 premature to negotiate over the pension under funding if the

19 -- if the number was not known?

20 A    No.

21 Q    So it's your view that you -- you can negotiate --

22 negotiate with respect to a pension under funding amount even

23 though you don't know exactly what that amount is?

24 A    Any pension under funding amount is an estimate.  And we

25 have an estimate.  There are other estimates out there and

1  certainly you can engage in discussions around those

2  estimates.

3  Q     You testified earlier that the City of Detroit's

4  individual taxes are -- are the highest in Michigan, right?

5  A     Yes, sir.

6  Q     What about taxes on -- on people or entities other than

7  individuals?

8  A     There is a corporate tax rate as well, corporate income

9  tax rate.

10  Q     Are they the highest in the -- in the State of Michigan?

11  A     I believe that's the case, yes.

12  Q     Have -- have you investigated the operations of the tax

13  people in Michigan -- or the tax department?

14  A     Could you define tax people?

15  Q     The tax department.

16  A     The tax department of the State of Michigan?

17  Q     No, of the City of Detroit.

18  A     Which tax are you referring to?

19  Q     Any.

20  A     Yes, sir.

21  Q     And have you analyzed -- have you -- have you looked into

22  rebates, tax rebates for corporations in the State of

23  Michigan?  I'm sorry, in the City of Detroit?

24  A     Corporate taxes are only approximately $6,000,000 per

25  year, so we have not spent a whole lot of time on corporate

1  income taxes.

2  Q    And what about tax rebates?  Have you spent a lot of time

3  on that?

4  A    No, sir.

5  Q    At the -- at the meeting on June 14th, you were present,

6  correct?

7  A    Yes, sir.

8  Q    And then you testified about a meeting on June 20th also,

9  correct?

10 A    Yes.

11 Q    Were you present at -- were you present at that meeting?

12 A    There were two meetings on the 20th and yes, I was present

13 for both.

14 Q    Was Mr. Orr at either of those meetings?

15 A    No.

16 Q    And at either of those meetings did you have authority to

17 negotiate with the parties at that meeting -- at those

18 meetings?  Did you have authority to negotiate with the

19 parties at those meetings on behalf of the city?

20 A    Could you define what you mean by authority?

21 Q    Just the general understanding of authority that you --

22 you would have.  You don't understand what authority means?

23 A    Mr. Sherwood, I certainly was authorized to go to those

24 meetings, to present information, and to receive information

25 back.  So yes, I was authorized.

1  Q    You were authorized to go to the meeting, to present

2  information, and to receive information back, correct?

3  A    Yes, sir.

4  Q    And -- and is it your testimony that that constitutes

5  grounds to negotiate?

6  A    If you're talking --

7  Q    A party to negotiate, I'm sorry.

8  A    Yes, sir.  My understanding not in the context of the

9  collective bargaining agreements, but in the context of

10  negotiations where there's give and take, yes.

11  Q    Were you consulted by Mr. Orr in connection with the

12  decision of the city to file Chapter 9?

13  A    No, I was not.

14        MR. SHERWOOD:  I have nothing further.  Thank you.

15        THE COURT:  Any other questions?  Sir.

16        MR. KING:  Good afternoon, Your Honor.  Ron King

17  with Clark, Hill.  I'm a colleague of Ms. Green and Mr.

18  Gordon's.  Pleasure to be in front of you today.

19                    CROSS EXAMINATION

20  BY MR. KING:

21  Q    Mr. Moore, I just have a handful of questions and I'll

22  try -- I'm going to jump around a little bit just because I

23  don't want to be cumulative.

24  A    Okay, Mr. King.

25  Q    As we sit here today, is it true that the city and its

1  actuaries have not completed their analysis on the unfunded

2  pension liabilities?

3  A    The city has completed its analysis from the standpoint

4  of coming up with the 3.5 billion.  The city desires to

5  undertake additional analysis.

6  Q    So it's not completed the -- the analysis yet?

7  A    The city would like to continue to refine that avenue.

8  Q    So there's additional work that needs to be done before

9  they'll complete their analysis?

10  A    Not that needs to be done, but that we would like to do.

11  Q    And so I understand your earlier testimony, to date the

12  city hasn't proposed any specific restructuring of the pension

13  plans or a cut in pension benefits to any retiree, is that

14  correct?

15  A    The city has proposed a process, a couple of times with

16  which to undertake, but there have not been specifics as to

17  any cuts if you will in a pension.

18  Q    Now let me refer you back to Exhibit 43 if we could have

19  that put back on the screen, please.  And specifically Page

20  101, please.  And this is -- yeah, can we go -- next page,

21  please.  Now I'm -- I'm looking for the page relating to the

22  pension plan.  109, I'm sorry.  Thank you.

23      And referring you to a provision that you testified on

24  previously related to the claims for the unfunded pension

25  liabilities.  Do you see that section?

1  A     Yes, sir.

2  Q     Outside of this presentation, have there been any other

3  presentations or proposals presented to any of the objectors

4  with respect to the treatment of the unfunded pension

5  liabilities?

6  A     Yes, sir.

7  Q     And which ones are those?

8  A     The two meetings on June 20th.  There were documents that

9  were handed out that had specifics as it relates to pension in

10  those documents.

11  Q     What specifically?

12  A     There were some specific thoughts as to ideas for

13  modifying benefits of the pensions.

14  Q     But again no specific numbers in terms of no specific

15  numbers that reflect a cut to a pension benefit?

16  A     There were a lot of numbers in the June 20th document

17  regarding the pensions, yes.

18  Q     But my question is pretty simple.  There wasn't any

19  specific proposal that would say that the pension benefit of a

20  particular retiree is going to be cut by X percent?

21  A     Correct.

22  Q     And was there ever an effort undertaken by you or the

23  city to develop a plan or a proposal that didn't contemplate

24  an impairment or of accrued pension benefits?

25  A     Yes.

1  Q    And was that plan presented to any of the objectors?

2  A    Similar to what I indicated before.  I don't believe that

3  there is anything specifically that has been presented in

4  terms of pension benefits.

5  Q    So you're saying -- and I should be clear.  Pre-petition,

6  so prior to July 18th, was there ever a plan presented to any

7  of the objectors that contemplated not impairing or

8  diminishing pension benefits?

9  A    Yes, sir.  The June 14th presentation, the financial

10  projections, the base line show what we anticipate the

11  contributions would be without any cuts to pension plans.

12  Q    But that same June 14 proposal specifically states that

13  there will be significant cuts in accrued vested pension

14  amounts, correct?

15  A    It indicates that, yes.

16          MR. KING:  I don't have any further questions.

17          THE COURT:  Thank you, sir.  Other questions for the

18  witness?

19          MR. RUEGGER:  I do, Your Honor.

20                      CROSS EXAMINATION

21  BY MR. RUEGGER:

22  Q    Good afternoon, Mr. Moore.

23  A    Good afternoon.

24  Q    We met -- we met a month ago.

25  A    Yes, sir.

1  Q    I just have a couple of questions.  The first relates to

2  the June 20 meeting.  You testified about that on direct, do

3  you remember?

4  A    Yes, sir.

5  Q    At that meeting did you have authority to accept any

6  counter proposals from any of the participants?

7  A    Except from the standpoint I'd receive and then bring it

8  back to city officials?  Yes.

9  Q    Okay.  So you could have -- you could have informed Mr.

10 Orr and the other city officials, but you couldn't have agreed

11 to anything at that meeting that had been countered, is that

12 correct?

13 A    I think it would be highly unlikely that anything like

14 that would happen at that meeting.

15 Q    Okay.  Just answer my question though.  You couldn't have

16 agreed to anything that might have been proposed by any of the

17 participants, correct?

18 A    No, sir.

19 Q    Only a couple of questions.  Switching subjects.  On your

20 conversations with Mr. Orr relating to the alleged under

21 funding figure, did any of those occur prior to the June 14th

22 proposal that was just mentioned?

23 A    Yes, sir.

24 Q    Approximately how many?

25 A    This is a guess, but perhaps five to seven meetings or

1  conversations.

2  Q    On that -- on that issue before that meeting?

3  A    Yes, sir.

4  Q    Okay.  And approximately how many conversations with Mr.

5  Orr on that figure occurred between the June 14th proposal and

6  the July 18th petition filing?

7  A    I would guess maybe two.

8  Q    Did your information relating to that figure change at

9  all between the June 14th proposal and the July 18th filing?

10 A    No, sir.

11          MR. RUEGGER:  Thank you.  No further questions.

12 Thank you, Your Honor.

13          THE COURT:  Thank you.  Any redirect?

14          MR. STEWART:  No, Your Honor.

15          THE COURT:  You may step down.  Thank you very much

16 for coming today.

17 A    Thank you, Your Honor.

18          THE COURT:  I will have to really maintain your

19 status as a witness here until we resolve the earlier issue

20 that was raised about the privilege.  So your sequestration

21 still applies.  Okay, sir?

22 A    Understood.  Thank you, Your Honor.

23          THE COURT:  All right.

24     (WITNESS CHARLES MOORE WAS EXCUSED AT 2:48 P.M.)

25          MR. CULLEN:  Good afternoon, Your Honor.  My name is

1  Thomas Cullen of Jones, Day and I'm going to be presenting the

2  next witness, Ken Buckfire.

3          THE COURT:  All right.  What is your last name, sir?

4          MR. CULLEN:  Cullen, C-u-l-l-e-n.  We're going into

5  the hall to get him.  Sorry, Your Honor.  He's in the men's

6  room.

7          THE COURT:  While we're waiting, Ms. Patek, may I

8  have your attention, please?  Do you have one or two extra

9  copies of your exhibits or your exhibit book that we can have

10  for my law clerk or law clerks.

11      We'll start with your offer of one.  If we can have yet

12  one more at a -- at a later time, that would be great.  Okay?

13  Can you get through there?  Thank you so much.

14      Raise your right hand, please.

15      (WITNESS KENNETH BUCKFIRE WAS SWORN)

16          THE COURT:  Please sit down.

17                      DIRECT EXAMINATION

18  BY MR. CULLEN:

19  Q    Good afternoon, Mr. Buckfire.  Could you state your full

20  name and address for the record, please?

21  A    Kenneth Buckfire.  I reside at 1175 Park Avenue, New

22  York, New York.

23  Q    And where are you from originally?

24  A    Detroit, Michigan.

25  Q    Born and raised?

1  A    Born and raised in Detroit and its suburbs.  Then went to

2  the University of Michigan where I graduated in 1980.  And

3  then I went to New York.

4  Q    Can you tell me something -- you're employed now?

5  A    I am.

6  Q    And where are you employed?

7  A    I am the co-founder and co-President of Miller, Buckfire

8  and Company.  An investment banking firm based in New York

9  City.

10  Q    And prior to that, what was your employment experience?

11  A    Prior to that I began my career as a restructuring banker

12  in 1987 with Dillon, Reed and Company.  After several years

13  with that firm, I joined Lehman Brothers where I was a senior

14  restructuring banker.  In 1996, I joined Wasserstein, Perella

15  to help them found their financial restructuring practice

16  which my partner Henry Miller and I then bought in 2002 to

17  form Miller, Buckfire.

18  Q    And what does it mean -- what -- explain exactly what

19  Miller, Buckfire does.

20  A    Miller, Buckfire is an investment bank specializing in

21  restructuring advisory services to governments and companies.

22  Our mission is to work with those entities when they have

23  financial difficulties either paying their debts when due, or

24  need specific skills in negotiating with their creditors and

25  other stakeholders.

1  Q    Unpack that for me a little bit if you would, Mr.

2  Buckfire.  Restructuring advisory services.  What does -- what

3  does that mean?

4  A    Our typical engagement is with a company or government

5  which is experiencing financial difficulty and does not quite

6  know what to do about it.  So our first mission would be to

7  help them with a diagnosis, to identify the causes of their

8  financial pressures, to identify what can be done about those

9  in terms of the diagnostic, and then to make recommendations

10  on how to solve the problem which normally means for a company

11  making sure they have adequate liquidity to operate in the

12  ordinary course and maximize the value for their stakeholders.

13       In the case of the government, making sure they have

14  adequate access to capital markets and the ability to provide

15  an adequate level of public services.

16  Q    And in these engagements, what is your personal role?

17  A    My personal role is to manage our team of bankers in

18  working with our clients to do our diagnosis.  And then once

19  instructed by the client as to what they wish us to do, help

20  them formulate strategy and the next -- whatever transactions

21  are required, to implement that strategy.  My job is general

22  financial strategy and oversight.

23  Q    And could you give the Court some idea of specific

24  engagements you've worked on which are public?

25  A    Well, over the years we've worked on many well known and

1   complex restructurings.  Some of the more notable ones would

2   include Niagara Mohawk Power Company, Calpine Corporation,

3   General Growth Properties, K-Mart Corporation, Lehr, Dana.

4       We've also been involved in several well known municipal

5   restructurings including Stockton, California.  And we are

6   currently advising a -- a large sovereign country with its

7   financial issues.

8   Q    How did you first become familiar with Detroit's

9   financial and operational issues?

10  A    Well, being from here, I have always paid close attention

11  to what's been going on in Detroit.  Certainly in 2009 in

12  financial crisis when it became well known that Detroit had

13  lost access to the capital markets due to its downgrade, I

14  started paying more attention to the problems here trying to

15  figure out if there's some way that my firm could be helpful.

16  And obviously given my personal connection to the area, it was

17  of personal interest to me to try to find a way to contribute

18  to the revitalization of the city.

19  Q    And so what did you do?

20  A    We paid close attention to it.  We tried to figure out

21  where there was a way to form some relationships locally that

22  might eventually introduce us to Mayor Bing and to other

23  people in the administration who might find our particular

24  expertise of help.  And that just began a general program of

25  building those relationships.

1  Q    How did you first become engaged by the city?

2  A    We had done a very brief financial review of the city on

3  behalf of the state in March or April of 2012.  It was a 60

4  day process of just looking at the public information and

5  trying to identify what the financial --

6  Q    If you could just slow down and speak up, just a little.

7  A    All right.  We first were engaged by the state in March

8  or April of 2012 for a 60 day review.

9      They wanted us to review the public information of the

10 city to try to ascertain what their financial challenges were

11 and to put that in a format that could be useful for decision

12 makers to understand the situation more accurately.

13     That put us in contact with members of the Mayor's

14 administration, Jack Martin and Chris Andrews in particular.

15 So I began a relationship with them.

16 Q    Did there come a time in the fall of 2012 when the city

17 issued a request for proposal for certain financial services?

18 A    Yes.

19 Q    Could you describe that for me, please?

20 A    Well, the city had entered into a consent decree with the

21 state in March of 2012 pursuant to which the state promised to

22 provide financing to the city and support their restructuring

23 efforts as long as the city was meeting certain milestones

24 that were incorporated in that agreement.

25     I wasn't paying that much attention at the time.  But

1  then in the fall Jack Martin called me and said, you know,

2  we're probably going to have to put out a request for a

3  financial advisor because we're about to enter into a new

4  agreement with the state and they're going to require us to

5  hire advisors to help implement the restructuring program that

6  we first had described in the March 2012 consent agreement.

7  So we were invited to submit our qualifications to the city at

8  that time.

9  Q    Now, did you become familiar in the course of your work

10  with the consent agreement?

11  A    Yes, I did.

12  Q    And does the term milestone agreement mean anything to

13  you?

14  A    Yes.

15  Q    Let me show you Exhibit 23.  In the book beside you,

16  there's a book Exhibit 6 through 50.  And we'll throw it up on

17  the screen as well.  And it will be on the screen in front of

18  you.  Do you see it, sir?

19  A    I do.

20  Q    Is that the consent agreement to which you referred?

21  A    Yes.

22  Q    What understanding did you derive of the concept and

23  purpose of this consent agreement?

24  A    Well, the consent agreement as I reviewed it, describes a

25  transaction really between the state and the city in which the

1  state agreed to help the city raise funding to support its

2  liquidity while it began a reform program which was very

3  clearly delineated in -- in Section 2.4 and more fully

4  described in Annex B of this agreement.

5  Q    Could I direct your attention to I believe it's section

6  -- well, let's look at 2.4 and 2.5.  Do you see that, sir?

7  A    I do.

8  Q    Is that the reform program and the quid pro quo if you

9  will for the -- by the treasury?

10 A    Yes.

11 Q    And why did the state want the reform agreement in your

12 understanding?

13 A    Well, the city as I understood it had asked for financial

14 assistance from the state.  The city was under liquidity

15 stress.  They didn't have sufficient cash.  They needed to

16 find cash somewhere and the state agreed to facilitate the

17 city's sale of -- of bonds, a portion of which would be given

18 to the city and any consideration for that assistance, my

19 understanding is, the city agreed to implement the reform

20 program.

21         THE COURT:  Excuse me one second.  It turns out you

22 are now too close to the microphone and as a result our

23 overflow rooms are getting static.  So move it just a bit

24 further away.

25         MR. CULLEN:  Is that better, Your Honor?

1          THE COURT:  Yes.

2          MR. CULLEN:  Okay.  Thank you.  You should have a

3    training program, Your Honor.

4          THE COURT:  No.

5          MR. CULLEN:  Or -- or a ruler, either way.

6          THE COURT:  Yeah.  Or a better audio system.

7    Q    In terms of the division of responsibility between the

8    state and the city reflected in this agreement, did you have

9    an understanding of that?

10   A    I did.

11   Q    Could you tell me what that understanding was?

12   A    Well, my understanding was that the responsibility for

13   designing and the implementing the reform program was really

14   entirely the city's.  The state agreed to provide the funding

15   the city required to sustain its operations while doing the

16   formulation of the plan and executing it.  And that the state

17   also asked for a reasonable amount of oversight to make sure

18   the city in fact did what they said they were going to do.

19   Q    Was the state -- would it be fair to say therefore that

20   the state aid was conditional on progress on that reform

21   program?

22   A    Yes.

23   Q    If I could direct your attention to Exhibit B of Exhibit

24   23 -- Annex B, I'm sorry.  What's this, sir?

25   A    Well, this was the reform program goals and subjects that

1  had been agreed to by the city with the state.

2  Q    Just looking up at the top there, first is something

3  prioritization and timing to be mutually agreed upon by Mayor

4  and council and approved by financial advisory board as

5  provided in the agreement.  What was your understanding of

6  what the financial advisory board was and what its role was?

7  A    Well, the financial advisory board my understanding was

8  created to make sure that the city had appropriate level of

9  oversight in terms of developing accurate financial

10 information, reporting it to the stakeholders, and then making

11 sure that the -- once the operation of the program had been

12 designed, that it would be approved by the financial advisory

13 board as consistent with the goals of the agreement.

14 Q    Did this strike you as a fairly comprehensive set of

15 reform initiatives?

16 A    Yes.

17 Q    If I could direct your attention to Exhibit 7.  Is this

18 the agreement we've referred to as the milestone agreement?

19 A    Yes.

20 Q    What was your understanding of the concept and purpose of

21 this agreement?

22 A    Well, my understanding was that by November of last year,

23 the city had not been able to achieve many -- many of the

24 milestones or requirements of the original consent agreement.

25 And this was entered into between the state and city as a

1  condition of further disbursements of funds from the escrow

2  account that had been established by the state on behalf of

3  the city in March of 2012.

4  Q    And if you look at the bottom of the first page, and

5  going on to the top of the next.  Where it says joint

6  restructuring expenses and restructuring assistance.  And

7  because I'm closer, I'll read it.

8      The city will as expeditiously as possible, select and

9  retain a restructuring firm or teams to advise the city's

10  program management office upon and implement the city's reform

11  program, including but not limited to -- the next page as

12  well.  Could you blow that up, the top of that?

13      And was -- was it your under -- let me ask it in an open

14  ended way.  What impact did this milestone agreement have on

15  your hiring?

16  A    Well, this is what led to our retention.  We had stayed

17  in touch with Chris Andrews who was the corporate managing

18  director and Jack Martin, the CFO all during this period even

19  though we had no role.  And they had called me in November

20  after this was signed and said, we decided we really need

21  expert outside help to implement our reform program and look

22  forward to getting an RFP.

23  Q    Now, was there any borrowing in connection with the

24  milestone agreement?

25  A    Well, the original consent agreement had contemplated a

1  financing, I believe it was $130,000,000 of which I believe it

2  was 50,000,000 or 60,000,000 was released to the city upon

3  that funding and the rest was retained in an escrow account

4  which was still in effect as of the date of this agreement.

5  Q    And so was there some relation between progress on the

6  agreement and draws from the escrow account?

7  A    Yes.  The state was requiring the city to execute its

8  milestones in order for further cash to be released to it

9  pursuant to this agreement.

10  Q    At -- at what point were you actually hired by the city

11  in '12?

12  A    Well, as I recall, we submitted to the RFP process in --

13  it might have been late November.  We were told we had won in

14  December and we signed our agreement with the city, I believe,

15  on January the 5th of 2013.

16  Q    When you first came into your responsibilities as the

17  restructuring firm for the city, did you undertake an

18  assessment of the city's finances and operations?

19  A    Yes, we did.  And we already were familiar with that

20  because of the review we had done seven months before for the

21  state.

22  Q    Now in terms of the -- this consent agreement and the

23  milestone agreement, did you come to an understanding of the

24  degree to which those agreements had been a success in

25  promoting or helping the city to -- to achieve the identified

1  reforms?

2  A     Yes.

3  Q     What was that view?

4  A     That it had been a very mixed outcome.  The city had been

5  successful in delivering really for the first time good

6  financial information on a monthly basis to the FAB which had

7  been a responsibility required of it as part of the original

8  consent agreement.

9       But they had had very limited success in implementing any

10 other objectives of that March agreement.  And that's why this

11 milestone agreement goes into such specificity about what is

12 now required of the city to do in order for the state to

13 continue to release money from the escrow account.

14 Q     But -- but let's -- let me be clear.  Or let me allow you

15 to be clear.  Did the division of responsibility or authority

16 for these reforms remain the same under the milestone

17 agreement, or was it changed?

18 A     No, it was still with the city.

19 Q     And ultimately as of the date that the emergency

20 financial manager was named, had the city made substantial

21 progress on this reform program?

22 A     No.

23 Q     And why do you say that?

24 A     Because they hadn't.  I mean they -- they simply had

25 failed to address any of the major items first identified in

1  March of 2012, in particular on blight removal, restoration of

2  public safety.  There had been no initiatives made, no money

3  spent.  Simply nothing had happened.

4  Q    Let me direct your attention to Exhibit 7 at II VIII C.

5  It says, any future draws to be negotiated between the

6  administration of the estate are contingent on the following

7  provided that the escrow account will maintain a minimum

8  balance of $50,000,000 at all times.  First, what was the

9  escrow account?

10 A    Well, the escrow account had been created with some of

11 the proceeds from the $130,000,000 bond offering that had been

12 done in the late -- early spring of 2012.

13 Q    Speak up again, please.

14 A    I'm sorry.  Of the $130,000,000 bond offering that had

15 been done a year prior, that was the money that had been put

16 into escrow by the state on behalf of the city.

17 Q    And what was the significance -- did you attain an

18 understanding of the significance of the minimum balance of

19 $50,000,000 and its importance?

20 A    Well, the city has in aggregate $1,000,000,000 plus

21 budget.  It has nearly 10,000 employees and $50,000,000

22 represents approximately three weeks of expenditure on the

23 part of the city.

24     And that's relevant because the city's revenues come in

25 in a fairly lumpy way from a variety of different sources,

 1  So to make sure they have adequate liquidity to meet their

 2  obligations, particularly payroll, the state felt it

 3  appropriate to make sure there was always $50,000,000 in

 4  reserve if it turned out that the city had misestimated its

 5  cash reserves, the state could step in and help.

 6  Q    Pardon me, but what was --

 7  A    The state could step in and release this money in an

 8  emergency.

 9  Q    You say that revenues came in in a lumpy way.  What does

10  that mean?

11  A    Well, the city -- well, the city relies on four primary

12  streams of revenue.  Gaming tax revenue, state revenue share,

13  property tax, and income tax.

14       Property tax income in particular comes in on a round

15  about quarterly basis because that's when assessments are

16  made.  Income taxes come in likewise in a fairly irregular

17  fashion.  The only revenue that is predictable and coherent is

18  gaming revenue.  Because it is being collected by the casinos

19  on behalf of the city and remitted to the city pursuant to a

20  fairly complex set of accounts on a monthly basis.

21  Q    And so there will be times when the city is more flush

22  than others?

23  A    Correct.

24  Q    Or more importantly less flush?

25            MR. MONTGOMERY:  Objection, leading.  I believe

1  that's a leading question that is necessary.

2          THE COURT:  The objection is sustained.

3  Q    What were the terms of your engagement for the city at

4  that time?  What were you asked to do, what did you set out to

5  do?

6  A    We agreed to provide general financial advisory services.

7  There were no transactions contemplated or built into our

8  engagement.  We were providing corporate financial advice only

9  for $150,000 a month.

10 Q    When you say that -- when you distinguish between general

11 financial service and no transactional fees built in, what

12 difference does that make to an engagement for a firm such as

13 yours?

14 A    Well, when we begin an engagement for a government or a

15 company and we don't know what we might have to do, we

16 normally agree to provide general financial advice, just

17 diagnosis, a set of recommendations with no presumption that

18 we are going be hired to do any transactions as a result of

19 that because not only does it protect the client from knowing

20 that our advice is in any way biased, it protects our firm.

21 Because we don't want to agree to provide a transaction

22 service unless we really believe A, we can execute it, and B,

23 it's actually needed.

24 Q    So upon your appointment, what did you first do to get

25 your arms around the problem?

1  A    Well, the first thing we did was refresh our

2  understanding of the city's financial condition and having

3  worked with Jack and Chris nine months earlier, we had a very

4  strong understanding of their condition.  We wanted to revisit

5  that which we did.

6      We then sat down with the other advisors to the city at

7  that time, Ernst and Young and Conway, MacKenzie, and reviewed

8  together the city's reform program and quickly agreed on a

9  number of different projects that had to be done collectively

10 so we could form a coherent understanding of the city's short

11 term and long term financial condition.

12 Q    From that point forward, what was the working

13 relationship between you and the other advisors, Ernst and

14 Young and Conway, MacKenzie?

15 A    Very collaborative and close.  We were on the phone with

16 them probably on a daily basis, either myself or my team.

17 Because it's a very integrated advisory challenge.

18     We as the financial strategists can't do our job unless

19 we have good information from the city which has to focus on

20 two primary areas.  One, the short term liquidity position of

21 the city.  We have to make sure that at all times the city can

22 operate in the ordinary course because it is pointless to try

23 to address the long term issues unless you have the cash to

24 give you the time to do so.  That was a primary responsibility

25 of Ernst and Young.

1        Secondly, and also related again to the March 2012

2   agreement, we needed to understand exactly the costs and

3   timing of implementing the reform program.  There had been no

4   budget created by the city during that period of time to

5   address any of the issues in Annex B.

6        And therefore in order to form a long term financial

7   strategy for the city, we needed to know how much capital we

8   would need to raise from whatever source for the city to

9   implement that program.  And that was Conway, MacKenzie's

10  primary responsibility.

11  Q    Were you the -- were you personally the leader of this

12  integrated team of restructuring professionals?

13  A    Yes.

14  Q    And you said before that this is a complex task and you

15  need specialized help.  Did you come to a conclusion in their

16  respective fields as to whether you had the right help, in

17  E & Y, and Conway, MacKenzie?

18  A    From a financial perspective, I thought we had an

19  excellent team that could adequately address all the financial

20  and operational issues of the city.

21  Q    And as you went forward to make judgments and to give

22  strategic advice to the city, were you relying on the advice

23  and the work of Conway, MacKenzie and E & Y?

24  A    Yes.

25  Q    In terms of analyzing the finances of the city at that

1 time, what preliminary conclusions did you draw?

2 A    Well, we were very concerned about the city's ability to

3 operate in the ordinary course for a number of reasons.  The

4 first one which I was aware of because of my earlier work for

5 the city, was the default to the swap counter parties.

6      The city in 2009 had entered into a agreement with the

7 swap providers that were giving interest rate swap protection

8 to the certificate of participation bonds that had gone

9 against the city.  That is the present value of those swap

10 contracts was a significant cost to the city, not a benefit.

11      In 2009, because of a default at that time, the city

12 settled that default by granting a collateral interest in the

13 gaming revenues to UBS and Bank of America, and Merrill Lynch.

14 However, because of another credit downgrade in March of 2012,

15 the city was again in default to those banks.  I was very --

16          MS. GREEN:  To the extent that he is testifying to

17 the legal conclusion of what was a benefit --

18          THE COURT:  Speak into the mike.

19          MS. GREEN:  I object to -- to the extent that he's

20 testifying to a legal conclusion of what constitutes an event

21 of default under the swap contracts.

22          THE COURT:  Okay.  I don't understand him to be

23 testifying to that, so the objection is overruled.

24          MS. GREEN:  Thank you, Your Honor.

25          THE COURT:  You may continue, sir.

1  A    Thank you.  I was very concerned about this uncured

2  default and the threat that at any moment the swap counter

3  parties could exercise their remedies and block the city's

4  access to its gaming revenues which was and still is the

5  highest quality source of revenue the city has.  Approximately

6  $180,000,000 a year which represents close to 20% of its

7  annual budget.

8       And that was an immediate issue that we addressed and we

9  had to deal with in order to preserve the city's ability to

10  operate while we were trying to figure out what the long term

11  strategy should be.

12  Q    Now, did you go about -- did you do anything to evaluate

13  the assets of the city?

14  A    We did.  Together with the city and again we had a lot of

15  familiarity with the city because of our earlier work.

16  Q    I'm just talking about this -- in this initial phase.

17  A    Oh, yeah.

18  Q    When you were first getting yourself oriented.

19  A    We had begun to do what we always do is to address the

20  city's assets and liabilities to understand what value did we

21  have to work with to settle with the city's creditors and

22  perhaps monetized to create incremental liquidity for the city

23  to operate.

24       So we began to examine all of the city's assets to

25  determine whether any of them were in our words non-core, not

1   essential for city operations, and could be available for

2   sale.  And if they were available for sale, how much could be

3   realized.

4   Q    Okay.  Did you at that point evaluate the time necessary

5   to effectuate a sale and turn an asset into cash?

6   A    Yes.

7   Q    Now at the time you came into your responsibilities as

8   head of this restructuring effort for the City of Detroit, was

9   there talk about the possibility of Chapter 9?

10  A    Yes.

11  Q    Could you describe that for me?

12  A    Well, when a company or government is in default the

13  threat of bankruptcy is always real.  The lack of cash is

14  normally what would push a company into a Chapter 11.  In the

15  case of a government it's more complex.

16       But clearly we had to be concerned about that being a --

17  a necessary way of protecting the city given this uncured

18  default of the swap banks.  And in January of this year that

19  was our primary concern.

20  Q    What was your primary concern?

21  A    That the swap banks could take unilateral action to

22  deprive of us of access to the gaming revenues and that would

23  cause the city incredible damage because it would immediately

24  have to make massive cut backs to services.  And we weren't

25  sure what we would do about it.  So we had to consider Chapter

1  9 as an alterative to protect the city.

2  Q    As a result of your initial review of the city's

3  position, what was your first set of advice to the city about

4  what more they should do or what more you should do?

5  A    Well, in addition to accelerating our analysis of the

6  city's financial condition, which we obviously had undertaken

7  to do, we recommended that the city consider bringing in a law

8  firm with the multi-disciplinary skills and experience to help

9  the city with contingency planning for whatever might occur.

10  Q    And did you give specific instructions to either E & Y or

11  Conway, MacKenzie in terms of what they should try to

12  accomplish in the short term?

13  A    I did.

14  Q    Let's start with E & Y.

15  A    With E & Y, I suggested to them even though their RFP had

16  only required them to do a five year forecast, that really we

17  should extend that to ten years.  For a city or a government

18  to look at a long term financial picture, the longer you can

19  look out the safer you are in terms of understanding what you

20  need to do.  Five years is simply too short a period for any

21  realistic appraisal of its performance.

22       And they agreed to extend out their analysis to ten years

23  even though that did impose a significantly higher burden on

24  them.  And we also recommended to both Conway and E & Y that

25  we collectively try to form our conclusions about the

1    financial condition of the city as soon as possible given its

2    continued financial stress and the uncured nature of this

3    default.  We needed to move as fast as we could to figure out

4    what the true picture of Detroit's condition was.

5    Q    And to get a ten year picture of Detroit's condition,

6    what options were available to you at that time in terms of

7    resources in addition to or besides E & Y?

8    A    Well, we had access to the city of course and they were

9    very cooperative in giving us information about their cost

10   structure in particular.  But there really were no good

11   projections of revenues.

12        We had to go and do the best we could with information

13   that was available to us.  In particular and it turned our

14   fortuitously Ernst and Young has a group in Washington which

15   is probably the country's leading experts in revenue, policy,

16   and tax analysis for municipalities and states.

17        So we were able to avail ourselves of that resource as

18   well in terms of developing a revenue forecast for the city,

19   particularly with respect to property and income tax

20   collections.

21   Q    And did you feel that you had a competent team in E & Y

22   to do this?

23   A    Yes.

24   Q    Did you tell them what you were going to use it for?

25   A    Yes.

1  Q    Did you intend to rely on it?

2  A    I did.

3  Q    And did you rely on it?

4  A    I did.

5  Q    And do you, as you sit here now, feel justified in your

6  reliance upon it?

7  A    Yes.

8  Q    Did there come a time when Detroit turned its attention

9  to hiring legal counsel?

10 A    Yes.

11 Q    What was your involvement in that process?

12 A    Well, about a week after we had been officially retained,

13 I met with the city and we concluded that at a minimum the

14 city needed to focus on strategies, particularly legal

15 strategies to protect itself from the swap banks in terms of

16 any actions they might take to take the gaming revenues away.

17      It was their conclusion that bringing in another law

18 firm, at least considering bringing another law firm in to

19 supplement other attorneys already working for the city was a

20 sensible thing to consider.  They asked me to recommend firms

21 that might meet the qualifications required.

22      So we basically gave them a list of law firms that we

23 felt had all the qualifications to provide the full range of

24 services the city might require under any scenario.

25 Q    And how many law firms were there?

1  A    Well, I think we ended up with about 14 or 15 law firms.

2  Many of them were well known to the city having done work for

3  them before.  The rest were so-called national law firms that

4  had had very little exposure to the city but did have the

5  experience in complex reorganizations, has had some experience

6  with Chapter 9's, had a lot of experience with out of Court

7  restructurings.

8       In addition to that had sufficient familiarity with

9  health care regulation and pension reform to deal with those

10 issues as well.

11 Q    Was there a meeting at which these law firms presented

12 themselves?

13 A    Yes.

14 Q    Were you at that meeting?

15 A    I was.

16 Q    Who else was at that meeting?

17 A    Well, we had a large group from both the state and the

18 city represented there for the purpose of interviewing the law

19 firms they did not know.

20      As I testified earlier, the city already knew quite a few

21 law firms, especially in Detroit that it was quite comfortable

22 with.  They did not feel they needed to interview those firms

23 again.  So they interviewed the firms they did not know.

24      And I was present at that meeting with Andrew Dillon,

25 State Treasurer, Tom Saxton, who I believe his title is Senior

1  Deputy Treasurer, Braum Stibitz, which is S-t-i-b-i-t-z who

2  was a Senior Advisor to the Treasurer.  And Richard Baird who

3  my understanding at the time was he was the Governor's aid for

4  Human Resources and things like that.

5       And from the city we had Chris Andrews, Program Managing

6  Director, Jack Martin, CFO, and I believe we had somebody from

7  the legal department, but I can't recall their name.  Oh, I

8  apologize, we had two members also from the financial advisory

9  board, Sandy Pierce and Ken Whipple.

10 Q    In your understanding, who was to make the decision?

11 A    The city.

12 Q    And what was your input into this decision?

13 A    After the interviews were over, the city asked us to put

14 together a comparison sheet laying out the qualifications of

15 all the law firms that have interviewed, and giving them for

16 lack of a better word, a qualitative assessment of their

17 relatives strengths and weaknesses which we did provide.

18 Q    And was there another meeting after that at which the

19 actual selection was made?

20 A    The initial presentations were on a Friday.  I believe it

21 was January 29th.  And then the selection meeting was the

22 following Friday.

23 Q    Were you at that meeting?

24 A    No.  My plane was stuck on the ground at LaGuardia and

25 even though I had been invited, I didn't attend.

1  Q    And do you know who -- do you know who was at that

2  meeting?

3  A    I believe it was largely the same group that had done the

4  interviews.

5  Q    And were you informed of the result?

6  A    I was told that the city had selected Jones, Day.

7  Q    Did you have any role in selecting or suggesting the

8  emergency manager?

9  A    No.

10        THE COURT:  All right, sir.  Let's pause now for our

11  afternoon recess.  It's 3:30, we'll resume at 3:45 please.

12        (WITNESS KENNETH BUCKFIRE WAS TEMPORARILY EXCUSED AT 3:28

13  P.M.)

14        THE CLERK:  All rise.  Court is in recess.

15        (Court in Recess at 3:29 p.m.; Resume at 3:45 p.m.)

16        THE CLERK:  Court is in session.  Please be seated.

17        MR. CULLEN:  Mr. Buckfire.

18        THE COURT:  One second, please.

19        MR. CULLEN:  I'm sorry.

20        THE COURT:  It appears everyone's present.  You may

21  proceed.

22        MR. CULLEN:  Thank you.

23        (WITNESS KENNETH BUCKFIRE RESUMED THE STAND AT 3:45 P.M.)

24  BY MR. CULLEN:

25  Q    Mr. Buckfire, as Ernst and Young worked on these cash

1  projections, did they keep you informed of their progress?

2  A    Yes, they did.

3  Q    Was there any particular one of these projections that

4  stands out in your mind as having significance to this matter?

5  A    Yes.  In early May of this year they showed me a draft 12

6  month cash flow forecast.

7  Q    And what did that cash flow forecast indicate to you?

8  A    Well, it indicated to me that the city's cash position

9  was far worse than I had ever feared.  That the city would

10 effectively be operating with no cash by the end of that

11 period of time even on the current projections which

12 incorporated certain deferrals of expenses that in the

13 ordinary course they should not be making.

14     And I was very alarmed about this because I was acutely

15 aware of the fact we still had no solution to the default

16 under the swap agreements.  And that at any moment the city's

17 ability to provide services could be eliminated.

18 Q    How -- how would you describe the city's cash situation

19 at that time as presented in those projections?

20 A    The city had minimal cash.  They had a few tens of

21 millions of dollars.  It was erratic.  They had no real

22 ability to project because as I testified earlier cash would

23 come in in a somewhat lumpy and unpredictable manner.  And so

24 at any given time the city could find itself with no cash.

25 Q    Were those cash flow projections memorialized in a -- any

1  of the documents in this case?

2  A    Yes.

3  Q    If I could show you Exhibit 75 at Page 40.  If you could

4  blow up the numbers there, please.  And you could put the

5  thing below too.  Are these the numbers that you just

6  testified to?

7  A    Yes, they are.

8  Q    Could you tell us what your understanding was at the time

9  based upon these numbers?

10        MR. SHERWOOD:  Your Honor, I -- I object to this

11  witness' testifying about forecasted receipts for the period

12  set forth there.  That is the -- the proper subject for expert

13  testimony and this is a lay witness.

14        MR. CULLEN:  May I lay some foundational questions,

15  Your Honor?

16        THE COURT:  Okay.

17  Q    In your work as a restructuring analyst, do you normally

18  commission cash flow forecasts?

19  A    Routinely.

20  Q    Is it one of the ordinary tools of your trade?

21  A    Yes.

22  Q    Do you make decisions based on those cash flow forecasts?

23  A    I make recommendations based on these forecasts, yes.

24  Q    And when you make those forecasts, what kind of people do

25  you use to do them?

1  A    We use -- well, we rely upon outside professionals such

2  as Ernst and Young and Conway, MacKenzie as well as the

3  finance staff of our client.

4  Q    In this situation, did you think that a cash flow

5  forecast of this type was necessary for the city to have?

6  A    Yes.

7  Q    Was it necessary for you to make informed

8  recommendations?

9  A    Yes.

10 Q    And based upon these forecasts, did you indeed make

11 recommendations to the city about its strategy in the

12 restructuring?

13 A    I did.

14 Q    And did you have any other -- any better options

15 available to you at that time to make this kind of a cash flow

16 forecast which you said was necessary to your job on behalf of

17 the city?

18 A    No.

19       MR. CULLEN:  I'd -- I'd move the admission of this

20 cash flow forecast, Your Honor.

21       THE COURT:  What's the exhibit number?

22       MR. CULLEN:  The exhibit number is 75, Page 40.

23 It's the financial operating plan, Page 40 of -- of same.

24       (City's Exhibit 75 was identified)

25       MR. SHERWOOD:  Your Honor, Rule 702 of evidence is

1  specifically designed so that when a party offers testimony

2  requiring expertise, knowledge, tools of the trade, the trade

3  of this witness is not a simple trade.  It requires expertise,

4  experience and so forth.

5      And just because he relied on these and he does, it does

6  not take this outside of the scope of -- of Rule 702 and --

7  and frankly I just think this is sort of an end run around the

8  Court's decision to deny the -- the testimony or not give

9  weight to the testimony with respect to the projections of

10  Ernst and Young.

11      MR. MONTGOMERY:  Your Honor, could I join for a

12  moment if I might?  May I join in the objection?

13      THE COURT:  Of course you may.  I'm not sure why you

14  think you need to do that, but okay.

15      MR. MONTGOMERY:  I just wanted to point out one --

16  one foundation that was --

17      THE COURT:  Oh, there's an additional argument you

18  want to make, okay.

19      MR. MONTGOMERY:  -- missing, Your Honor.  Very

20  simply that to the extent that the city was going to try to

21  rely on an officer, director, or owner type exception,

22  obviously this witness does not fall within that category.

23      THE COURT:  Yeah, I don't -- I don't hear that quite

24  at issue here, but thank you.  And just so the record is clear

25  and I'm clear too, this was prepared by Ernst and Young?

1  A    That's correct.

2          MR. CULLEN:  Your Honor, if -- if I might.

3          THE COURT:  And it's not otherwise in evidence at

4  this point?

5          MR. CULLEN:  It is otherwise in evidence.  The

6  Exhibit 75 as a whole is in evidence subject to the fight

7  about these parts of the exhibit and what they're in for and

8  what they're not in for.

9          THE COURT:  All right.  I -- I will admit the

10 document but for the limited purpose of establishing what this

11 witness relied upon for his work and not for purposes of

12 establishing the truth of anything in it.

13         (City's Exhibit 75 was admitted)

14         MR. CULLEN:  I -- I take it, Your Honor, just to be

15 -- to be clear, that when we close up this matter depending on

16 how you rule on the motions tomorrow, that it is some

17 evidence, weight or not, of the state of the city that Mr.

18 Buckfire will testify that he believed this was the state of

19 the city.  Mr. Orr will testify that he believed this was the

20 state of the city.  And that they had a reasonable basis so to

21 believe.  The reasonableness of their reliance on these

22 numbers is a separate issue from their -- their --

23         THE COURT:  Well, it might -- it might go to good

24 faith, but on the substance of the issue for example of these

25 projections, it's not evidence of that

1        MR. CULLEN:  All right, Your Honor.

2        THE COURT:  I don't know how more clear to be.

3   Q    What -- what conclusions did you --

4        THE COURT:  I will comment I have refrained from

5   making this comment till now, but I will make it now that

6   you've asked the question.  It's actually hard for me to

7   comprehend why you didn't offer the Ernst and Young witnesses

8   who prepared these projections as experts.  You may proceed.

9        MR. CULLEN:  Thank you, Your Honor.

10  Q    What impact did these numbers have upon your forward

11  planning and advise with respect to the Detroit restructuring?

12  A    Well, we were extremely alarmed by these numbers.

13  Remember, we received these numbers in early May.  We knew how

14  unpredictable the city's ability to collect property income

15  taxes were.

16       We immediately realized that in June of 2013, which was

17  only a month away from this forecast date, that the city was

18  operating on a razor's edge.  If it were to make the

19  $40,000,000 bond payment on June 15th to the TOC bond holders,

20  that would only make sense if it indeed collected all of its

21  anticipated tax revenues on schedule in the amounts stipulated

22  here.

23       A $7,000,000 cushion on a budget of this magnitude is

24  almost effectively nothing.  That also alarmed me because I

25  knew we still had a continuing problem with the swap banks,

1  Bank of America and UBS.

2      We knew we would have to negotiate some kind of agreement

3  with them to retain our access to the gaming revenues which

4  you'll see here for this short period of time is $105,000,000.

5  You'll notice how regularly it's projected to come in.  And

6  that is a matter of historical record and is quite accurate.

7      The city has always been able to rely on those revenues

8  in the absence of anything else because they're collected by

9  the gaming casinos themselves.  We realized that if it turned

10 out that our recommendation to the city in order to reserve --

11 to preserve cash was to not make the $40,000,000 bond payment,

12 that would be another default to the swap counter parties.

13     At that point we already had two defaults to them.  The

14 original ratings downgrade of March of 2012 which had not been

15 cured, and indeed the appointment of Kevyn Orr as emergency

16 manager also in and of itself constituted an event of default.

17     The swap banks which were continuing to get paid, had not

18 shown any indication that they might change their minds.

19 Nonetheless it was a significant risk to the city.  So we

20 immediately turned our attention in early May to deciding what

21 should we do about this in order to make sure the city

22 continued to have adequate cash to operate and provide

23 services.

24 Q    Was there a -- were there any payments in the near future

25 that you had to decide whether to make or not?

1  A    Yes.  If you look at the schedule you'll notice under

2  June of '13 column -- second column to the left, there's a

3  line in the middle of the page called POC and debt related

4  payments.  There's approximately a $40,000,000 payment due by

5  the city on June 15th.

6  Q    And was there a decision to be made with respect to that

7  payment?

8  A    There was.  Given how tight the city's cash position was,

9  they only had even on the projections, 70,000,000 of cash if

10  they made that payment.  We had to consider the necessity of

11  not making it in order to preserve liquidity.

12  Q    Were there any other ways that you haven't discussed to

13  preserve or enhance the city's cash position in May of 2013?

14  A    Well, as I testified earlier, we had looked at all of the

15  city's assets to find out if any of them could be marshaled to

16  create significant cash for the city.  And that began in

17  January.

18      We revisited that in early May.  We unfortunately came to

19  the same conclusion we came to in January that really there

20  was nothing that was readily convertible into cash.  The city

21  effectively had mortgaged all of its real assets years before.

22      The city did have potentially $60,000,000 left in the

23  escrow account established with the state in 2012.  I called

24  Senior Deputy Treasurer Saxton to ask whether that might be

25  available to the state if we really found ourselves in an

1 | emergency.  And he said that it would really depend on our

2 | overall recommendation in dealing with the city's long term

3 | financial problems.

4 | Q    Did you and the advisors ever come to a conclusion, a

5 | consensus at any point as to whether or not the city was

6 | insolvent?

7 | A    Yes.

8 |         MR. SHERWOOD:  Objection.  I -- I object to any

9 | testimony about insolvency.  This is not an expert witness and

10 | it calls for a legal conclusion.

11 | Q    In the course of your work do you -- are you always or

12 | often called upon to address that question and advise on that

13 | issue?

14 | A    Yes.

15 | Q    What is your understanding of insolvency?

16 |         MR. SHERWOOD:  Your Honor, I -- I renew the

17 | objection.  I assume that when this witness is called upon to

18 | testify in other matters concerning insolvency, he's qualified

19 | as an expert witness.

20 |         THE COURT:  Hold on one second.

21 |         MR. CULLEN:  Pardon me?

22 |         THE COURT:  Hold on one second for me, please.

23 |         MR. CULLEN:  Sure.

24 |         THE COURT:  I do think it is appropriate to ask the

25 | witness about the -- the facts that constitute insolvency

1  under 10132(c) of the Bankruptcy Code.

2  Q    Did you come to the conclusion that the city was unable

3  to pay its debts as they came due?

4  A    Yes.

5  Q    What was the basis for that conclusion?

6  A    Well, there were two sets of facts that we relied upon.

7  One was this schedule which was very short term in nature and

8  therefore we felt had to be relied upon because it wasn't very

9  long dated.  And it clearly showed that the city was operating

10  on a razor's edge of liquidity.

11     Secondly, we knew because we were in constant

12  communication with the city's finance staff, that they were

13  routinely stretching out payables in an attempt to conserve

14  cash.  They were not paying their trade creditors when due,

15  even at the date of the May 13 report.

16  Q    In your view as of -- as of May of 19, '13, was the city

17  able to pay its debts as they came due?

18  A    No.  In fact they were continuing to stretch out and

19  defer payments wherever possible to conserve cash.

20  Q    Was there any probability in your view of the city's

21  operations and cash flow of its remedying either of those

22  situations without aid in the foreseeable future?

23  A    We didn't see a possibility of that.  The city had

24  lost --

25          MR. SHERWOOD:  Sorry to interrupt again, Your Honor.

1  I object, calls for a lay opinion.  Again, talking about that

2  what --

3          THE COURT:  The objection is overruled.  Go ahead,

4  sir.

5  A    Well, as a banker the first thing we always evaluate is

6  whether a company or a government can borrow to cover a short

7  term financing requirement.  And in the case of Detroit, its

8  access to the capital markets had been cut off long before.

9  The most recent downgrade made it impossible for the city to

10  borrow in the ordinary course on the markets.

11      And it in fact had nothing left to pledge to gain access

12  to capital markets.  So that source of financing was closed.

13  And that's why indeed the prior year the state had to step in

14  and assist the city in raising even the 130,000,000 it did

15  raise because without that it would never have been able to do

16  it.

17      We then looked again at all of the so-called non-core

18  assets of the city and determined again whether any of those

19  could be readily converted to cash.  We again came to the

20  conclusion that there was nothing of any significance that

21  could be converted to cash in the time frame required to avert

22  a cash crisis in June or July to this year.

23  Q    Turning your attention now to the June 14th proposal to

24  creditors, did you have input into the strategy and concept of

25  that document?

1  A     I did.

2  Q     Could you tell me what your understanding of what that

3  proposal was meant to achieve was?

4  A     Well, going back to the --

5  Q     If it's an understandable sentence.

6          THE COURT:  It's close enough.

7  A     Well, going back to the consent decree of 2012 between

8  the city and the state, Annex B clearly -- the state expected

9  the city and the city agreed to review comprehensively all of

10  its operations and its long term financial stability in order

11  to come up with a strategy that would if implemented, result

12  in the rebirth and rejuvenation of the city as well as paying

13  its creditors what they were owed.

14      We were specifically tasked with working on that list of

15  activities, especially with regard to the long term

16  obligations.  And when we got re-hired by the city in January

17  this year to assist with that project, we explained to the

18  city that the only way in which we could establish a proper

19  foundation to negotiate with our stakeholders, whenever that

20  deemed necessary to take advantage of, would require us to

21  give our stakeholders as much information about the city's

22  financial condition as we could.

23      And until they had as much information as we could

24  reasonably develop about the short term forecast as well as

25  the long term condition of the city, they could not be in a

1  position to properly evaluate whatever restructuring proposal

2  we ultimately made to them in consideration of their claims.

3        So in January when we first sat down with Ernst and Young

4  and Conway, MacKenzie, we all agreed that that would be the

5  goal toward which we would work.  Would be to develop a set of

6  information that all policy makers and our stakeholders could

7  rely upon to evaluate whatever we deemed our strategy to be.

8  And that was our goal and that was our objective from January

9  until May of this year.

10 Q    In terms of putting out all of the proposal and informing

11 the stakeholders of the state of the city, can you tell me

12 what your input was into the structure of the offer itself,

13 the structure of the plan?

14 A    Well, the structure of the -- the restructuring proposal

15 being made in the June 14th document that was publicly made

16 available on that date, really relied upon the ten year

17 forecast that Ernst and Young had put together to show what a

18 realistic view of the city's revenues would be and that would

19 be assuming the impact of the reinvestment plan of over

20 $1,000,000,000 over the next ten years would allow the city to

21 stop its decline and set a foundation for renewal.

22       Based on the financial implications of that program, we

23 then were able to calculate what was available to give to our

24 stakeholders in consideration of their claims which in and of

25 itself was a very complicated analytical challenge because

1  until Ernst and Conway had really examined the off balance

2  sheet liabilities of the city, we really didn't know what the

3  real liabilities of the city were.

4      In our original review of 2012 we relied on publicly

5  available information which was accurate insofar as the funded

6  debt went, but we really did not know whether the projections

7  and liabilities associated with other liabilities, particular

8  health care and pension were accurate or could be relied upon.

9      And that was a very important focus of our analytical

10  work this year until the release of the June 14th plan.  So our

11  role was after we received the information was to then review

12  with counsel the appropriate way to construct a offer to all

13  of our stakeholders which recognized what the city's true debt

14  capacity was and then decide what would be an appropriate way

15  of allocating that across our stakeholders.

16  Q    Now, you talked about a level of services consistent with

17  sustaining the population and the tax flow revenues of the

18  city, did you not?

19  A    I did.

20  Q    How did you go about identifying that level of services?

21  A    Well, again, going back to March of 2012, the city itself

22  had identified a long list of areas in which it felt it needed

23  to restore or invest services.  Blight removal, police, fire,

24  lighting, there's a whole list of things.

25      But there was no budget against them.  We didn't know

1  what it would cost, nor did we know how long it would take to

2  implement any of those potential program areas.

3      And that was the primary focus of Conway, MacKenzie's

4  work together with the city's own staff was to identify

5  precisely how much it might cost to implement all of those

6  objectives.

7  Q    And in terms of your previous discussions of time and

8  cash, how do they play into this June 14th proposal?

9  A    Well, we had discussed with the city back in January of

10  this year what we would do once we came to a conclusion about

11  what the city really could afford in terms of its obligations

12  while reinvesting in rehabilitation.  Then we explained to the

13  city that as long as we had cash, as long as we had liquidity,

14  we would be able to construct an out of Court negotiating

15  strategy that would with enough time, allow us to negotiate

16  with all of our creditors and not have to result in

17  immediately a Chapter 9 filing, although that would always

18  have to be considered if for no other reason that when

19  negotiating with creditors, if you don't let them know that

20  that's a possibility, it's hard to get them to take you

21  seriously in a negotiation to keep a country, or a city, or a

22  company out of Bankruptcy Court.

23  Q    So could you make that concrete for me?  How much cash

24  equals how much time?

25  A    Well, normally you'd want to have enough cash to operate

 1  without interruption from the negotiations for at least six

 2  months to a year.

 3  Q    All right.  And how much money would that be in this

 4  case?

 5  A    Several hundred million dollars.

 6  Q    Did the city have that?

 7  A    No.

 8  Q    If I could direct your attention to Page 41 of the --

 9  A    May I correct one thing?  I apologize.  The city did not

10  have the money, and the only way it could get the cash would

11  be not paying its unsecured obligations such as the POC bonds.

12       But that would have created another level of defaults

13  which would have brought us right back to the problem I had

14  with the swap counter parties which is they had the right

15  through their remedies to block our access to gaming revenues,

16  so if we did try to solve our liquidity problem by not paying

17  our unsecured creditors, we might immediately lose it because

18  we'd lose the gaming revenues.

19  Q    Forty-one of this exhibit, Exhibit 43, Page 41.

20  A    Sorry, I've lost you.  What tab -- what exhibit are you

21  on?

22  Q    I haven't -- I haven't asked a question yet.

23  A    Oh.

24  Q    All right.

25              THE COURT:  It's on your screen there.

1  Q    It's on your screen.

2  A    Oh, yes.

3  Q    Does this accurately reflect what it purports to reflect,

4  the key objectives for the financial rehabilitation and

5  restructuring?

6  A    Yes.  These are the objectives set out to us by the city.

7  Q    Were these objectives new in this report?

8  A    No.  These were all reflected in the consent agreement of

9  March of 2012.

10  Q    Had substantial progress been made on any of these?

11  A    No.

12  Q    In terms of the discussions internally within the -- the

13  brain trust of the city, as I might call it that.  The Mayor

14  and his advisors.  What was the -- was there an intention to

15  make this proposal a take it or leave it proposition?

16  A    No.

17  Q    What was the intention?

18  A    Well, the intention was to provide our stakeholders with

19  the best possible information about the city's true condition

20  that we could develop and we'd been working around the clock

21  on this for months.

22       We also wanted to make sure that when we did begin

23  discussing with stakeholders they would see what we thought

24  made sense for all of our stakeholders at the same time so

25  there would be no doubt the city was approaching this in the

1 most even handed and fair way possible.

2 Q    And when you say even handed and fair, what aspect of the

3 proposal can you point to that reflects that determination or

4 that principle?

5 A    Well, just to pick out one example.  We felt it important

6 to start out by delineating our creditors into whether they

7 were secured or unsecured.  And we proposed that our secured

8 creditors would receive 100 cent recoveries, our unsecured

9 creditors would share pro rata in what we believed was the

10 value available to them pursuant to our restructuring plan

11 which is $2,000,000,000 in notes.

12          THE COURT:  Which was what?

13 A    Two billion dollars of notes.  That was all we calculated

14 the city could afford post this restructuring in terms of debt

15 capacity.

16 Q    And have -- have you used the words in the past, pari

17 passu to explain that?

18 A    Yes.

19 Q    Model as well.  Now, there's been a lot of discussion in

20 the case about asset sales.  And you've discussed it some

21 today.  But I would like to direct your attention to Pages 83

22 to 89 of Exhibit 43.

23          And take you through this list of assets so that you can

24 talk about, and I apologize for the nature of this question,

25 but I think it will move things along.  So you can talk about

1  the nature of the consideration and effort given to each

2  asset, the values available, and the -- and the hurdles to be

3  overcome or -- or to be avoided in getting -- turning the

4  asset into money.

5          MR. CULLEN:  If I can proceed that way, Your Honor,

6  with respect to each of the assets.

7          THE COURT:  Yes, go ahead.

8  Q    Detroit water and sewage.

9  A    Well, Detroit -- the Detroit Water and Sewer Department

10  is a very complicated situation, had been operating under

11  Federal Court order for a very long time.

12          At the time of our engagement in January, it was still

13  operating under the supervision of the so-called Root Cause

14  Committee which was really effectively the governance body,

15  although the assets were owned by the city and are still owned

16  by the city.  The city has never received any cash flow from

17  it's ownership stake.

18          The department has operated on the basis of zero profit.

19  It is allowed to recover its operating, maintenance, and debt

20  service costs from rate payers and that's all.  So it's never

21  been a source of cash flow to the city.

22          And furthermore, in addition to that, we had no ability

23  to raise rates to generate cash.  That would not be allowed

24  under the utilities laws of the State of Michigan.

25          And we also had no ability to pick up and sell it

1  overnight because as I mentioned before it was under a Court

2  order until March of this year.  So we began to evaluate after

3  that Court order was, I guess, dismissed is the correct

4  phrase, whether or not we could in fact realize cash from the

5  system, but because of its public nature we recognized it

6  would be extremely complicated to do.

7      And that the only ways to do it really would be to either

8  sell it to its customers in exchange for a lease payment or a

9  pilot payment, or consider some version of a privatization.

10  We've been contacted by a number of private equity firms which

11  have expressed an interest in buying it if they could, but

12  only if they could charge higher rates to recover their own

13  costs as capital.

14      So we recognize even though this would be potentially a

15  source of great value to the city, it would be a long and

16  complex process with a low probability of success.

17  Q    The Coleman Young Airport, next page.  Keep going.

18  Coleman Young Airport.

19  A    The airport is currently not being used for commercial

20  services.  It's being used for so-called general aviation

21  only.  It's a very small airport.  Its runways are too -- too

22  short to allow regular commercial service by major carriers.

23      The airport itself is dilapidated and would require

24  reinvestment to bring it up to commercial standard.  It's

25  effectively worth nothing.  And likely not be worth anything

1   unless these reinvestments are made.

2       And we did explore it actively with one of my partners

3   who is an airlines expert.  We came to the conclusion that,

4   you know, we'd have to pay someone to take it.

5   Q    Move on to the Belle Isle Park if you would, please.  Oh,

6   I'm sorry, Detroit Windsor Tunnel.

7   A    Well, the city owns half the tunnel, Windsor owns the

8   other half.  Under a prior administration, Detroit leased its

9   portion of the tunnel in exchange for a rent to equal 20% of

10  the annual revenues.

11      Last year, I believe, it collected $750,000.  The city

12  has no ability to vacate the lease which runs through 2020.

13  There is no ready buyer for it.  Given the lease which

14  encumbers the asset, there was no value to be realized there.

15  Indeed we recommended instead that the city audit the

16  operations of the operator to find out whether we'd be getting

17  a fair allocation of revenue.  And that audit is still

18  ongoing.

19  Q    Belle Isle Park.

20  A    Belle Isle Park is a major park of the city.  And we did

21  not believe that it would have any material value as any other

22  -- in any other application.

23      First of all, it would require re-zoning.  Re-zonings

24  typically are long and complex undertakings.  It is an

25  important social asset of the city.

1    Converting it into any kind of private use would again be

2    a long and contentious process.  We did not believe it could

3    be converted into any form of cash at any time soon.

4    Q    Next page, please.  The Detroit Institute of the Arts.

5    The number of words understates the interest in the problem.

6    Could you tell us what investigations and efforts have been

7    done with respect to the Detroit Institute of Arts?

8    A    Well, back in January when we first began our engagement,

9    we discovered, we had not known this before, that the City of

10   Detroit actually does own the building and the art collection

11   of the Detroit Institute of Arts which is operated on the

12   city's behalf by the DIA Corp. which is the founder society as

13   a contractor to the city.

14       We obviously were concerned about this and had to decide

15   whether or not this might be a source of value for the city.

16   I did meet with trustees and managers of the DIA in May and

17   explained to them that they should be concerned about the fact

18   that in the worst scenario the collection and the art might

19   need to be dealt with as part of a restructuring.  And it

20   would be in their interest as trustees of the operator to try

21   to secure funding from whatever source they could to give to

22   the city in exchange for a protective covenant.

23       I thought that would be a clever way of realizing short

24   term cash for the city which would not necessarily require the

25   arduous process of trying to take the art and selling it on a

1  fire sale basis.

2  Q    And what was the response?

3  A    They told me that would be impossible, that no money was

4  available from anybody that they knew, and that it was not

5  something they would consider.

6  Q    And subsequently did any office of the state weigh in on

7  this issue?

8  A    Yes.  The Attorney General issued an opinion that the art

9  was in a public trust and could not be used for any other

10  purpose despite the fact that a significant part of the

11  collection had been paid for by tax revenues of the City of

12  Detroit.

13  Q    Has that progressed any further?

14  A    Somewhat.

15  Q    Has there been an attempt to value it?

16  A    In our recommendation to the emergency manager,

17  Christie's, which is an internationally known auction house

18  with expertise in these matters, has been engaged in a

19  appraisal of that portion of the collection paid for by the

20  city.  I expect to get a preliminary estimate from them in a

21  matter of weeks.

22  Q    City owned land.

23  A    Well, we originally hoped that this land could be quite

24  valuable.  It's not everyday that 22 square miles within a

25  massive urban area becomes available for re-development.  We

1  thought that should be of interest to some set of developers.

2      But again the land is in disparate parcels.  It's held in

3  disparate hands.  There are at last count five different

4  government entities that control different parts of the

5  property represented by this 22 square miles.

6      There is no coherent strategy for disposal, marshaling,

7  or re-development of this property.  In addition, much of the

8  land is still encumbered with blight.  It would require

9  significant investment to remove that blight.

10     And lastly, a lot of the land is subject to liens which

11  has not has been cleared.  And the cost of clearing those

12  liens, it would not be insubstantial here.  Again even though

13  individual parcels might be available for cash, there is no

14  substantial value to be realized from this today.

15  Q    Parking operations.

16  A    Again the city owns nine garages, many of which are being

17  operated by others.  We actually are in the process of putting

18  together an auction to sell the rights to use those parking

19  garages to others.

20     I would note that many of the garages are in such a

21  dilapidated condition they are unsafe.  Ironically enough the

22  garage supporting the DIA has been condemned.  It has not been

23  used for any commercial purpose for a number of years because

24  it's in such bad condition.  I'm not sure that anyone would

25  pay us for that.

1  Q    Next one.  The Joe Louis Arena.

2  A    Again, you know, it's an old facility, currently

3  obsolete.  We're entertaining alternatives for it, but we

4  haven't received any.

5  Q    And with respect to all of these assets sale

6  possibilities, or asset monetization possibilities, had they

7  all to your knowledge been the subject of discussion before

8  they appeared in this report?

9  A    Well, prior to our involvement, I can't testify to that.

10 But as we were engaged we immediately began to systemically

11 look at all these assets to find out whether any of them could

12 be turned into cash.  And it was the subject of intensive

13 analysis by my firm beginning in January of this year.

14 Q    All right.  And --

15      MR. CULLEN:  Pardon me, Your Honor.

16 Q    In the -- in the proposal itself, was there any

17 discussion of what would happen to further unsecured payments

18 of debt going forward?

19 A    Well, on June 14th we told the creditors, we had over 100

20 people show up at that meeting, that we had taken the decision

21 because of the city's dire cash position to not make the

22 $40,000,000 bond payment due on June 15th and that we would be

23 suspending all other unsecured debt payments for the

24 forseeable future in order to conserve cash.

25 Q    And did you view that as necessary in light of the

1  circumstances of the city?

2  A    We did, but we also felt we could take that step because

3  we were able to negotiate an agreement in principal just prior

4  to that date with the swap banks which we felt would allow us

5  to continue to have access to our gaming revenues which is an

6  essential condition to allowing the city sufficient time to

7  negotiate with the stakeholders.

8  Q    So again what was the relationship between the settlement

9  with the swap banks and the ability to negotiate?

10 A    Well, the swap banks already had one uncured default, the

11 ratings downgrade, the appointment of Kevyn Orr was in and of

12 itself a default.  And we knew that once we took the decision

13 to not make the bond payment, that would be another default.

14      At some point especially after the swap banks saw the

15 financial condition of the city, they might feel they had no

16 option but to be defensive in protecting their own position,

17 even if they didn't want to and block our access to gaming

18 revenues.  So having an agreement with them in place prior to

19 taking a decision to not make that bond payment was crucial.

20 Q    After the June 14th proposal in the public meeting at

21 which it was presented, did you make further efforts -- did

22 you make any efforts to generate counter proposals,

23 discussions, other -- other -- other interests?

24 A    Yes.

25 Q    What were -- could you describe generally those efforts?

1  First, let me put up a -- on the screen Exhibit 44, the full

2  version of the creditor's proposal.  Well, Pages 61 and 62.

3  Yeah, 61 and 62.

4      And is this the calendar that you set forth for your

5  efforts in the proposal?

6  A    Yes.

7  Q    Now what -- what did you personally do to try to talk to

8  contact various stakeholders?

9  A    Well, we were fortunate in one respect.  We had had a

10  very robust response to our invitation to the meeting on June

11  14.  We had been able to identify all of the bond trustees and

12  all of the bond insurers that insured much of the city's debt.

13      They effectively could be relied upon to speak for if not

14  actually vote the interests of their underlying bond holders.

15  And so we were very happy that they all agreed to come and

16  hear our proposal because we knew we could begin our

17  discussions with them.  They already were organized.

18      We also knew who could speak for the pension trusts and

19  they were invited.  And we also invited union representatives

20  who we hoped could speak for both the active and retired

21  employees of the city.  So they were all present on the 14th of

22  June.

23  Q    And was it -- was it your desire to promote discussions

24  and counter proposals?

25  A    That was the whole intent of the meeting.  We had spent

1  months developing the financial information.  We felt our

2  stakeholders deserved to be able to evaluate not only their

3  current conditions relative to the city, but evaluate the

4  proposal that we made to them at that meeting.

5      We wanted them to have exactly the same information that

6  we did.  We wanted to make sure they could rely upon it to be

7  accurate.  We wanted them to also understand that despite all

8  the promises had been made to both bond holders and others,

9  the city did not have the resources and likely would never

10  have the resources to honor those promises.

11      We felt they had to have information in order to

12  understand what we were asking them to do in terms of

13  compromising their claims to allow fair treatment for

14  everybody.

15  Q    In the discussions you had with any of the stakeholders,

16  did you encounter any resistance to the idea of compromising

17  their claims at less than 100%?

18  A    Nobody was willing to consider any proposal in which they

19  compromised their claims.

20  Q    And you're saying nobody, who do you mean?

21  A    Well, I was primary responsible for discussions with the

22  bond holders and other funded debt holders of the city.  And I

23  would further break that down between the Detroit water and

24  sewer revenue bond holders and the general obligation and comp

25  the bond holders of the city.

1    Given our expertise as investment bankers and the fact we

2  had relationships with most of these people, that made sense.

3  So I took primary responsibility for those discussions.

4    The discussions with our other claim holders, primarily

5  the pension funds, and retirees, and active employees were led

6  by Conway, MacKenzie and Jones, Day as well as some of my

7  partners at Miller, Buckfire.

8  Q    And what kind of a response did you get in those

9  discussions?

10  A    Well, in speaking with the bond holders, and again I'm

11  using that between both the secured bond holders and the

12  unsecured bond holders, nobody was willing to consider any

13  compromise of their claims whatsoever.

14    In fact even the secured bond holders, that is those bond

15  holders who held debt of the Water and Sewer Department were

16  very unhappy because our plan contemplated that if we were to

17  create a new authority controlled by the customers of it, that

18  we would want to take advantage of the fact that that

19  authority could borrow at a much higher credit rating than

20  Detroit could, and even though we were going to give them 100

21  cent recovery, it would not be in the form of new bonds that

22  would have the same old interest rates.

23    In other words they wanted to have the benefit of a

24  strong investment grade rating, but retain bonds that were

25  giving them interest at double B costs.   So even they didn't

1    like the proposal.  I was not surprised by that, but I hoped

2    that they would at least counter with something else which

3    they did not do.

4         THE COURT:  What -- what does the phrase double B

5    cost mean?

6    A    It refers, Your Honor, to a credit rating.  Cities as do

7    companies, borrow in the markets at a spread over the

8    so-called risk free rate, although some could argue to say,

9    I'm not sure what that is, but let's assume for the moment

10   that that's the treasury yield curve.

11        The double B cost would be perhaps a spread of 400 or 500

12   basis points over the treasury cost, whereas a single A cost

13   to borrowing might be only 100 basis points over.  So the

14   difference would be obviously reflecting the risk of a lower

15   rate of credit.

16   Q    Did -- did you receive any indications in your

17   discussions with any of these bond holders, that some of the

18   considerations in their negotiations or non-negotiations with

19   you, had to do with considerations that extended beyond the

20   City of Detroit?

21   A    Yes.  In discussions with the bond insurers who insured

22   the water and sewer debt, about five and a half billion

23   dollars of that, several of them also insured GO debt, general

24   obligation bonds of the city.

25        And they made it very clear to me that they were not

1   willing to consider any impairment of the GO bonds because

2   they believed that the GO pledge was so much more valuable in

3   every other jurisdiction of which they insured bonds, that

4   creating a precedent of impairment here would damage their

5   businesses elsewhere.

6   Q    And when you say GO bonds, explain to the Court what you

7   mean.

8   A    The city up until recent times, had been able to issue

9   unsecured debt that is not secured by a specific revenue

10  pledge, but secured instead by the full faith and credit

11  obligation to raise taxes sufficient to pay that debt when

12  due.

13      And there are two different kinds.  Unlimited tax and

14  limited tax general obligation bonds, both of which have been

15  considered for many years to be of higher credit and less risk

16  than revenue bonds because a revenue bond is specifically

17  secured only by the revenues of a project or an authority or a

18  utility.  Whereas bonds secured by taxing authority are

19  considered to be much safer because the city is required to

20  raise taxes in the ordinary course until that bond can be

21  repaid.

22      Now in the case of Detroit, of course, that's -- they've

23  come to the end of the road because on the property tax side

24  for a moment, we know that the property tax mileage that the

25  city is already assessing is already at the state maximum.  So

1  the city would have no ability to raise taxes or tax rates to

2  pay this debt.

3      That was anathema to the bond insurers because they had

4  operated, as does the municipal bond market, on the theory

5  that general obligation debts are higher -- higher credit and

6  less risky than revenue bonds.

7      We, on the other hand, when we did the math, recognized

8  the city could never begin to satisfy its unsecured

9  obligations which would include the general obligation bonds

10 and we had classified those bonds pari passu with the other

11 unsecured obligations of the city, in this case are under

12 funded pension claims and health care claims.

13 Q   If I could have you take a look at Exhibit 37.  Could you

14 blow that up a little bit, please?  This is a set of meetings

15 that I won't go through completely.  But if you'll just look

16 down the -- the left hand side and -- and across the top.

17     Can you tell me did you or representatives of Miller,

18 Buckfire participate in virtually all of these meetings?

19 A   Yes.

20 Q   Did the city ever receive a proposal from anybody?

21 A   We did.

22 Q   How many?

23 A   We received I would say one and a half.  One that was

24 actually written out and then to be responsive, the second was

25 really just a letter saying they'd like to come talk to us

1    again about something, but only if we would stipulate they'd

2    get 100 cent recovery.

3    Q    And was that the one or the one and a half proposal that

4    was attractive enough to follow up on?

5    A    No.  Because they were linking any willingness to

6    negotiate on water and sewer debt to our treatment of the GO

7    bonds that they also insured.

8    Q    What in your view is the alternative for the city if the

9    plan set forth in the June 14th proposal is not achieved?

10   A    Well, first, the city will not be able to execute is

11   reinvestment program.  It would simply not have the money.

12   That would mean the city would continue to be liquidated for

13   the benefit of its stakeholders.  Revenues are likely to

14   continue to decline.  Services will continue to deteriorate.

15   That would be the condition of the city in -- in the absence

16   of this plan.

17   Q    Is that a long term sustainable future for Detroit?

18   A    From a financial perspective, no.  Because I don't

19   believe if you want to measure sustainable future as having

20   access to the capital markets, that under that scenario

21   Detroit would ever have access to capital markets.  They would

22   have no credit.

23          MR. CULLEN:  That's all I have, Your Honor.

24          MR. MONTGOMERY:  If I may at this point.  I would

25   like to strike from the testimony the -- all of the opinion

1  testimony given by the witness for the last several questions

2  starting with how the capital markets are reacting, not

3  through conversations with the witness, but in general.

4      And I think this witness has given classic, wonderfully

5  prepared, rather wonderfully delivered, expert witness

6  testimony relying on hearsay, relying on specialized

7  knowledge, relying on years of accumulated talent and

8  education that this gentleman clearly has, but none of which

9  was offered prior to the pre-trial, or offered to Your Honor

10 as expert witness testimony.  I believe it should be stricken.

11          MR. CIANTRA:  UAW would join in that motion.

12          THE COURT:  I wish you had objected at the time.

13          MR. CULLEN:  Your Honor, part of our job here is to

14 set forth before the Court the story of the decisions that

15 were made and the reasons that they were made on behalf of the

16 City of Detroit.

17     This witness has done that.  He was an operative figure

18 in real time.  He has testified candidly as to the bases on

19 which his decisions were made, the things he looked at, the

20 advice he gave to the city as it faced these difficult

21 decisions.

22     The story cannot be -- this is a factual story.  It may

23 need a man of rare experience to tell it, but it is

24 nonetheless a factual story about things that were done in

25 real time, not about a piece of paper that was given to an

1   independent person to look at and -- a set of assumptions from

2   which to draw opinions.

3       This is the actor.  This is the actor at the heart of the

4   story and he is telling his story.  And as such, it has to be

5   admissible, if that as nothing else.

6       He is the man who made the recommendations.  He is the

7   man who presided over the analyses.  He has told that story

8   and told of the basis for making these.  Because it's -- it's

9   somewhat upside down, a -- an expert witness is qualified by

10  his expertise and nothing else.  That's why we let expert

11  witnesses testify only rarely and under certain circumstances,

12  but we let percipient witnesses testify all the time, all the

13  time to their experience, to what they saw and did, decided.

14      This man tells the story.  And that story is a factual

15  story by a percipient witness of rare gifts, but a percipient

16  witness.

17          THE COURT:  What -- what you say is good as far as

18  it goes, but it doesn't really meet the objection.  Because

19  the objection is that beyond explaining what the witness did

20  and why he did it, is the question of whether that constitutes

21  proof of the truth of the facts on which he relied to -- to

22  make the decisions that he made.

23          MR. CULLEN:  And -- and I would submit, Your Honor,

24  that the judgment of a sophisticated person in real time is

25  some proof of the truth of what they relied on.  I think that

1  that happens in -- in virtually every -- every case.

2          THE COURT:  Well, it strikes me that --

3          MR. CULLEN:  Some level.

4          THE COURT:  That this issue overlaps largely, if not

5  entirely, with the issue that you and your firm briefed here

6  this morning and that we're going to argue tomorrow morning.

7  So I would suggest that we hold the resolution of this until

8  then.  Do you have any further questions of the witness?

9          MR. CULLEN:  I -- I do not, Your Honor, at this

10 point.

11         THE COURT:  All right.  Counsel, do you want to

12 press ahead with cross examination at this time, or would you

13 prefer to break now and -- and resume in the morning?

14         MR. MONTGOMERY:  Your Honor, my colleagues had

15 suggested that we should break until tomorrow.

16         MR. RUEGGER:  Shocker.

17         THE COURT:  Yeah.  Apparently -- apparently there

18 was no vote for you in that, was there?

19 A    I didn't want to suggest that.

20         THE COURT:  Okay.  Well, we will -- we will break

21 for now.  It's fine.  We're close enough to 5:00 and so we'll

22 reconvene at 9:00 tomorrow morning.

23     Regarding our argument tomorrow morning on the issues

24 raised here just now and by the -- the memorandum that was

25 filed this morning, I certainly do not request that you take

1  your time to file a brief.  If you want to, obviously I can't

2  prevent it.  The sooner you file it, the more likely it is

3  we'll be able to read it and actually comprehend it.

4      So I would ask that if you do file something you do not

5  file it at ten minutes till 9:00 tomorrow morning, please.

6  But if there are authorities you want me to consider, feel

7  free to just bring them to Court tomorrow and we will deal as

8  best we can given the expedited nature of this.

9          MR. STEWART:  Thank you, Your Honor.

10          THE COURT:  All right.  So we'll be in recess.

11          MR. SHERWOOD:  Thank you, Your Honor.

12          MR. CULLEN:  Thank you, Your Honor.

13          THE CLERK:  All rise.  Court is adjourned.

14      (Court Adjourned at 4:42 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-1-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                             .      Detroit, Michigan
                             .      October 25, 2013
                Debtor.      .      9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>        JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |

For Detroit              Clark Hill, PLC
Retirement Systems-  By:  ROBERT D. GORDON
General Retirement          JENNIFER K. GREEN
System of Detroit,   151 South Old Woodward, Suite 200
Police and Fire      Birmingham, MI   48009
Retirement System    (248) 988-5882
of the City of
Detroit:             Clark Hill, PLC
                     By:  RONALD A. KING
                     212 East Grand River Avenue
                     Lansing, MI   48096
                     (517) 318-3015

For the Detroit      Erman, Teicher, Miller, Zucker &
Fire Fighters           Freedman, P.C.
Association, the     By:  BARBARA A. PATEK
Detroit Police            JULIE BETH TEICHER
Officers Associa-          DAVID EISENBERG
tion and the         400 Galleria Officentre, Suite 444
Detroit Police       Southfield, MI   48034
Lieutenants &        (248) 827-4100
Sergeants
Association:

For the Inter-       Cohen, Weiss & Simon, LLP
national Union,      By:  BABETTE A. CECCOTTI
UAW:                      PETER D. DECHIARA
                          THOMAS N. CIANTRA
                     330 West 42nd Street, 25th Floor
                     New York, NY  10036-6976
                     (212) 356-0227

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Associa- tion, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>     ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>     MEREDITH E. TAUNT<br>     MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning, everybody.

4          ATTORNEYS:  Good morning, your Honor.

5          THE COURT:  I understand that the security lines

6    were long.  Does anyone know of anyone we need to wait for

7    here this morning, or can we get underway?

8          MS. BRIMER:  Your Honor, Ms. Patek is not here this

9    morning.  I don't know if anyone --

10          THE COURT:  Okay.  She probably is intending to be

11    here.  Let's see.  She's not directly involved in this

12    evidentiary issue we were going to start with here this

13    morning, so maybe we can proceed with that.  Okay.  So let's

14    do that.

15          The first thing I want to place on the record is

16    that the Court did review, as necessary, the Jones Day

17    memoranda that were submitted to it in camera.  The Court's

18    review of that material establishes really quite conclusively

19    that the material is attorney work product and that,

20    therefore, is not required to be disclosed by the city or its

21    counsel, and so the Court will so order.

22          In this regard, the Court will state for the record

23    that its review of that material was only cursory.  That was

24    really all that was necessary, and certainly the Court will

25    not take into account anything it saw in those memoranda in

1   deciding the issue of eligibility.  So, for the record, we

2   are going to return those materials to you, Mr. Stewart,

3   right now.  Will you come forward and accept them from us?

4            MR. STEWART:  Thank you.

5            THE COURT:  Thank you.  So the next order of

6   business will be for the Court to hear from counsel for the

7   objecting parties on the issue of lay versus expert testimony

8   here.  And, once again, before I forget, I want to again

9   request, counsel, that -- to remind counsel really that the

10  so-called rough transcript that you all have arranged for is

11  not the official transcript.  It is under no circumstances to

12  be cited in any pleading before the Court.  You may cite the

13  official transcript when and if it's produced, but the rough

14  transcript is for your purposes only and is not to be cited.

15  And as a result, I'm going to ask each of you to file amended

16  memoranda that strike your references to the rough

17  transcript.

18           MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

19  on behalf of the Retiree Association parties from Lippitt

20  O'Keefe.  I just wanted to make clear on the record that

21  those objecting parties that are not making live objections

22  on the record or filing papers are relying on the evidentiary

23  objections made by those parties making those live

24  objections, and I just wanted to clarify that on the record.

25           THE COURT:  Absolutely.

1    MR. PLECHA:  Thank you, your Honor.

2    THE COURT:  And for the record, Ms. Patek has

3    arrived, so we can proceed.  Who would like to proceed?

4    MR. MONTGOMERY:  Good morning.  Claude Montgomery

5    for the Retiree Committee.  I am rising first, your Honor,

6    because I believe today's motions -- two part.  The city has

7    asked to reconsider your Honor's ruling with respect to the

8    exclusion of forecast testimony with respect to Mr. Malhotra,

9    and we have moved to strike the testimony of Mr. Buckfire as

10   having been unqualified expert testimony.  And so if I may,

11   first, I would like to point out to the Court I think you

12   will -- you may remember that the -- Mr. Malhotra testified

13   that he both examined and relied on a team of people to

14   examine both bank records and relied upon departments of the

15   city within which he was not employed in order to determine

16   what cash levels were.  Two, your Honor may recall that he

17   testified that he was not an officer or director,

18   shareholder, or owner of the city.  Of course, he couldn't a

19   shareholder.  Second -- third, your Honor may recall that

20   Mr. Buckfire, I believe, testified yesterday that they had

21   recourse to expert revenue and tax policy individuals that

22   were part of the forecasting team and that they -- I think

23   Mr. Buckfire testified yesterday that he was fortunate to

24   have had access to such people and that those individuals

25   participated in the generating of the forecasts.  Fourth,

1  your Honor, I think intuitively, at least intuitively for me,

2  the mere notion that using an Excel spreadsheet somehow

3  transforms the compilation of thousands of lines and

4  different kinds of formulas from being simple arithmetic into

5  something that a layperson can do by looking at their own

6  checkbook or bank accounts, quite the contrary.  I am not an

7  expert in using Excel.  It took me some training to be able

8  to do it, and I know from multiple efforts with my

9  secretaries that it is not something that the ordinary

10  layperson can do with a high school education.  And I, by the

11  way, think my secretaries are quite good.  And so, your

12  Honor, I think this falls squarely within the Sixth Circuit's

13  JGR Industries decision and which the debtor, the city,

14  acknowledges holds against them, excludes testimony, and does

15  so because there was no basis absent the -- in effect, the

16  owner being a part of the business exception and absent

17  individual effort at verification and absent simple

18  mathematics to allow the testimony to go forward.  And

19  perhaps, most importantly of all, there are cases where

20  historical records are allowed to be testified about.  I

21  believe the Sixth Circuit has a decision along those same

22  lines, your Honor, but this is a forecast.  This is

23  projecting into the future.  This is using assumptions,

24  assumptions that had to be created and referenced to some

25  specialized knowledge or understanding of not only how the

1    cash got into the city but how it will get into the city in
2    the future and what would be a reasonable basis to make an
3    assumption for a going-forward prospect, so we think under
4    those circumstances the cases, in particular, that the city
5    seems to rely on just don't help it, and I think both Sixth
6    Circuit cases are either squarely against it -- that is, the
7    JGR case -- or clearly distinguishable on the ownership
8    basis, which is the Lativafter Liquidating Trust, and that we
9    suggest to you is the controlling authority.
10          We would note that the recitation by the city of
11   United States versus Madison, another Sixth Circuit case,
12   again, did not offer or involve a future forecast.  The
13   analysis that was allowed in that case was retrospective
14   only.  And, secondly, it was -- there were no complex
15   formulas and no assumptions, no assumptions applied in using
16   the work.  It was purely, if you will, large scale
17   ministerial effort, and I think the Court allowed it in.  And
18   interestingly I find and perhaps your Honor might that that
19   particular case also cites the DIJO versus Hilton Hotels case
20   and JGR as authority to support its holding where in the DIJO
21   case it was complex formulas that -- appraising economic
22   values of a lost contract that were excluded, so the Sixth
23   Circuit in the Madison case cites the boundaries of what
24   should be excluded, finds that it's retrospective only, it's
25   ministerial in its efforts and, therefore, says it's not an

1 abuse of discretion. It's permitted in. And I think here,

2 your Honor, this is clearly being addressed to your

3 discretion. It is well within the bounds and even the

4 directions under 701 to exclude such testimony, and,

5 therefore, we would ask you to adhere to your Honor's earlier

6 ruling and not permit the forecast testimony of Mr. Malhotra.

7 Now, if I may turn to Mr. Buckfire, yesterday at the

8 conclusion or near the conclusion --

9 THE COURT: One second.

10 MR. STEWART: Your Honor, I don't wish to interrupt

11 Mr. Montgomery; however, this motion on Mr. Buckfire is brand

12 new. It came to us this morning. I got it at 6:52 this

13 morning. I would suggest, no, that was not part of the

14 original motion. The original motion was made only by AFSCME

15 with respect to Mr. Malhotra. The Buckfire motion is new.

16 We would ask leave to just put in a paper on it lest we be

17 pulled into something we've not had time to prepare on.

18 THE COURT: There was a motion to strike at the

19 conclusion of the proceedings yesterday, and I --

20 MR. STEWART: A motion was --

21 THE COURT: -- and I deliberately deferred it to

22 this morning.

23 MR. STEWART: Right. I withdraw my --

24 THE COURT: All right.

25 MR. STEWART: Then I'll sit down.

1          THE COURT:  Go ahead, sir.

2          MR. MONTGOMERY:  Successfully thrown off my --

3          MR. STEWART:  I'm sorry.  I apologize.  I apologize.

4          MR. MONTGOMERY:  -- my game, your Honor.

5          THE COURT:  I'm sure that was not the intent, but

6     you were about to talk about Mr. Buckfire.

7          MR. MONTGOMERY:  I was.  Now, although we do not

8     have a transcript on which we can rely, I would ask your

9     Honor to look at the -- your Honor's memory of the questions

10    beginning with an explanation of the GO bonds, the general

11    obligation bonds.  You may recall that Mr. Buckfire then

12    launched into a fairly intriguing explanation of GO bonds and

13    matters that he tied to the marketplace and the nature of

14    risk and the nature of interest rate costs associated with

15    risk and the differences between interest rates for taxing

16    authorities and nontaxing authorities and how that all played

17    a role.  And he concluded at the end of his testimony, if I

18    remember correctly, that -- with an opinion on long-term

19    sustainability for the future of New York, again, pure expert

20    testimony regarding access to capital markets, a subject in

21    which he was clearly an expert, clearly had gained knowledge

22    over time, and it was -- it is something that is quite often

23    the subject of admissible expert testimony.  I think we

24    pointed out, your Honor, orally yesterday that this

25    individual was not identified as an expert in the pretrial.

1  In fact -- and I think the city made a quite conscious choice

2  that they weren't going to use experts at all in this case

3  and Mr. Buckfire just being the last and final manifestation

4  of that strategic or tactical decision, and we think that in

5  the case of Mr. Buckfire, while he put in a lot of factual

6  and historical information, those last questions that were

7  asked and answered beginning with the discussion of the GO

8  bonds are pure opinion, rely entirely on expert

9  understanding, rely entirely on information gathered that

10 would have been or is hearsay insofar as this Court is

11 concerned, and under 702, since he was not a qualified

12 expert, was not identified as an expert to be -- to testify,

13 that his testimony should be stricken.

14          THE COURT:  Thank you.

15          MR. DECHIARA:  Good morning, your Honor.  Peter

16 DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

17 the UAW International Union.  I'll begin with the Malhotra

18 piece of this issue.  We agree entirely with the city's

19 reliance on the key case of JGR, a Sixth Circuit 2004 case.

20 And that case, we agree with the city, is squarely on point,

21 and it's squarely on point in our favor.  The holding of that

22 case was remarkably similar to the facts here.  In that case,

23 the Court held that the admission of lay opinion by an

24 accountant about the company's lost profits was not

25 admissible, not admissible, when two things:  the accountant

1   was not the owner, officer, or director of the business, and,

2   two, relied for information principally on the business

3   itself.  Here what do we have?  We have Mr. Malhotra, who, as

4   I asked him at the very outset of my cross-examination

5   yesterday, I asked him whether he was an officer or whether

6   he had any elected or appointed position with the city, and

7   he indicated he was not, but then I went further, your Honor,

8   and I asked him was he directly involved in running the

9   business of the city, and Mr. Malhotra clearly indicated that

10  he was not directly involved in running the business of the

11  city.

12          Then the question becomes where did he get the

13  information he relied on.  Well, let's look at Mr. Malhotra's

14  declaration.  It's Exhibit 8 in the record, paragraph 14.

15  I'm going to start reading from the second sentence.  His

16  declaration says, quote, "EY used the city's publicly

17  available historical financial data," and then I'll skip over

18  the piece of it that just refers to the 2012 CFR, and then

19  the sentence continues, "and other information provided by

20  the city and its other advisors.  EY did not audit the city's

21  historical financial data.  Rather, EY relied upon the raw

22  data provided by the city, including the underlying data that

23  the city used to prepare 2012 CAFR and previous financial

24  reports."  So this case, the case of Malhotra, on this issue

25  is squarely on point with the binding decision and the

1   holding of the Sixth Circuit in the JGR case, and we think,

2   your Honor, that that is dispositive on the issue that

3   Mr. Malhotra's forecasts are inadmissible lay testimony.

4          There were a couple other points.  I think they were

5   sort of tangential points that the city made in its brief,

6   and I'd just like to address those.  In paragraph 7 of the

7   city's brief, it says that -- the city's brief says, "In any

8   event, even if the Court does not permit Mr. Malhotra to

9   provide lay testimony on the cash flow forecast he prepared

10  for the city, the economic projections offered in

11  Mr. Malhotra's testimony will still be probative of the

12  city's financial condition."  Well, that's -- what the city

13  is arguing there is that his -- Mr. Malhotra's forecasts

14  should come in for the truth of the matter as to what the

15  city's financial condition is.  That's exactly what it should

16  not be allowed to come in for.  And I think your Honor made

17  that clear in your prior rulings, and we think that should be

18  upheld.

19         And then one last point on Mr. Malhotra.  In

20  paragraph 8 of its brief the city argues that Mr. Malhotra's

21  forecasts were not prepared in anticipation of litigation.

22  Well, whether that's true or not is irrelevant.  The guiding

23  Sixth Circuit precedent, the JGR case, doesn't incorporate

24  that as an issue or a deciding factor, but -- and I think

25  this is interesting, your Honor.  It was interesting that in

1  arguing that Jones Day's memos were work product, the city
2  argued that going back months and months and months before
3  the bankruptcy filing that Jones Day was preparing these
4  memos because they knew something was going to happen.  The
5  financial condition of Detroit meant there was going to be
6  some legal proceedings or lawsuits.  So why is it consistent
7  for the city to argue that what Jones Day was doing was
8  somehow in anticipation of something related to litigation,
9  but Mr. Malhotra's forecasts, which were prepared in this
10 exact same time frame, why are those not in anticipation of
11 some legal proceedings?  But be that as it may, whether or
12 not it's prepared for litigation is irrelevant.  The key
13 points are he was -- it was inadmissible lay testimony by
14 someone who was not an officer or owner of the entity and who
15 relied on information obtained from the entity itself.

16        Let me now move to Mr. Buckfire.  Mr. Buckfire was
17 asked questions such as -- and I'm relying on my notes.  He
18 was asked during his direct whether it was economically
19 sensible, economically sensible, for the city to remove
20 blight.  He was asked what, in his view, was the alternative
21 for the city if the June 14th creditors' proposal was not
22 accepted, what was the long-term sustainable -- whether the
23 city's current finances were sustainable in the long term.
24 Now, your Honor, those are all expert questions, and the
25 thing is it seemed natural to all of us when we were

1   listening to Mr. Buckfire answer those questions -- it seemed
2   natural to hear his opinion because the truth of the matter
3   is -- the real fact is he is an expert.  He's an expert
4   investment banker who has a lot of experience in this area,
5   but for some unfathomable reason, the city has made a
6   decision not to use him and not to qualify him as an expert,
7   so for purposes of this proceeding, Mr. Buckfire's testimony
8   in response to those questions was no more deemed worthy of
9   credit than if we had taken a random person off the street.
10  If instead of putting on Mr. Buckfire the city had put on the
11  taxi driver who drove Mr. Buckfire here from the airport and
12  asked the taxi driver what is the -- is the city's finances
13  sustainable in the long term, does it make economic sense
14  to -- the Court would not have allowed the taxi driver to
15  answer those questions.  For purposes of this proceeding,
16  because the city made that strategic decision, Mr. Buckfire
17  is no more qualified to answer those questions than the taxi
18  driver.  Thank you.
19          MS. LEVINE:  Good morning, your Honor.  Sharon
20  Levine, Lowenstein Sandler, for AFSCME.  Trying not to
21  duplicate but making similar arguments, with regard to both
22  E&Y and Miller Buckfire, these are expert witnesses.  They're
23  relying on financial assumptions.  They're scrubbing numbers.
24  They're getting in hearsay evidence that would not otherwise
25  be admissible before this Court in the form of publicly

1   available financial information prepared by the city to

2   audited financial statements prepared by other experts not

3   called upon to testify before your Honor.  We would

4   respectfully suggest that it would be telling just to go back

5   to the statute itself.  If you take a look at Rule 401, if a

6   witness is not testifying as an expert, testimony in the form

7   of an opinion is limited to one that is rationally based on

8   the witness' perception, helpful to clearly understand the

9   witness' testimony or determining facts in issue, and not

10  based on scientific, technical, or other specialized

11  knowledge within the scope of Rule 2002.

12          So then we turn to Rule 2002.  A witness who is

13  qualified as an expert by knowledge, skill, experience,

14  training, education may testify to opinion.  That's exactly

15  what we have here, your Honor.  If you take a look at the

16  paragraph --

17          THE COURT:  I think you're referring to Rules 701

18  and --

19          MS. LEVINE:  702.

20          THE COURT:  -- 702.

21          MS. LEVINE:  Right.  To further assist in projecting

22  future economic trends -- and this is paragraph 16 of the E&Y

23  declaration; it's Docket Number 12 -- E&Y sought the advice

24  and input of its own internal team members with experience in

25  economic forecasts impacting the likely future property and

1  income tax revenues.  The testimony on the stand, your Honor,

2  similarly relies on input from Milliman, input from audited

3  financial statements.  In addition to that and with regard to

4  Ken Buckfire, same -- and I won't go through the examples.

5  Your Honor already has them.  But it is not simply putting

6  somebody on the stand with a factual understanding of the

7  city's financial issues and giving testimony that any other

8  layperson could give.  And more than that, your Honor,

9  neither of these are elected officials or city employees,

10  which means not only is it not a business owner exception,

11  but it's not a hearsay exception.  In other words, there's

12  nobody who looks at these.  Neither E&Y nor Miller Buckfire

13  review the City of Detroit's books and records in the

14  ordinary course of business.  The way they come into every

15  single situation where they're an expert witness -- they're

16  brought in as an expert witness for that very purposes.

17  They're allowed to rely on the books and records of their

18  client, but this is not a business record exception.  It's

19  not a business owner exception.  It's not a hearsay

20  exception.  What it is, your Honor, is disguised expert

21  testimony.  If it's truly simple math, why do we have to hire

22  E&Y, Conway MacKenzie, and Miller Buckfire to do it for us?

23  Thank you.

24        THE COURT:  Anyone else?

25        MR. STEWART:  Thank you, your Honor.  It's going to

 1  take me a minute to get organized.  So I submit that actually
 2  this is a fairly easy question, not easy to resolve but easy
 3  to analyze, and let me do so this way.  We're talking about
 4  what does Rule 701 mean and how is it to be applied.  We
 5  don't need to guess because the people that wrote it told us,
 6  so let's put up the advisory committee -- while that's being
 7  put up, I just want to deal with one issue in passing as to
 8  Mr. Buckfire and also Mr. Malhotra.  The suggestion was made
 9  that because they have all this expertise, they could only
10  testify as expert witnesses.  The paragraph -- keep that up,
11  if you'd like, Lauren.  The advisory committee actually
12  answered that, too.  This is not what's up on the screen.
13  It's the advisory committee comments to the 2000 amendments,
14  and I know these books come out every year, but mine is on
15  page 460.  And the committee wrote, "The amendment does not
16  distinguish between expert and lay witnesses but, rather,
17  expert and lay testimony.  Certainly it is possible for the
18  same witness to provide both lay and expert testimony in a
19  single case."  And I said I'm just really dealing with that
20  in passing because I want to put to one side the proposition
21  that the fact that these witnesses have expertise means that
22  they were precluded from giving lay testimony, but the reason
23  now I put this up is this is what the advisory committee that
24  wrote the rule said.  Although many cases have interpreted
25  it, what is useful about this is they told us what they

1　meant, and it says, "For example, most courts have permitted

2　the owner or officer of a business to testify to the value or

3　projected profits of the business, without the necessity of

4　qualifying the witness as an accountant, appraiser, or other

5　similar expert," and they cite a case called Lightning Lube,

6　Inc., which was from the Third Circuit.  So what I think we

7　ought to do is go to Lightning Lube since the authors of this

8　looked at that case and obviously were -- thought it was what

9　they wished to implement here.  Now, Lightning Lube -- and I

10　think I have copies of all -- of many of these, Judge, and if

11　you'd like I may pass them up.  I have a copy also for

12　counsel.  However --

13　　　　　　THE COURT:  It's not necessary, sir.

14　　　　　　MR. STEWART:  Okay.  Thank you, your Honor.

15　　　　　　THE COURT:  If others would like them, that's fine,

16　but it's not necessary for me.

17　　　　　　MR. STEWART:  So what happened in Lightning Lube?

18　Lightning Lube involved a man named Venuto, and he was

19　starting a chain of -- I don't know what you call them --

20　centers like a Jiffy Lube.  And he had a deal with one of the

21　lubricant oil companies, and the deal fell apart, and it

22　ended up in a large business failure case.  And one of the

23　interesting facts about the Third Circuit opinion is just

24　the -- all the lawyers that appeared in it, but the Court

25　said Mr. Venuto could testify about the projected profits

from his business. It didn't say no forecast. It didn't say
you can't have projections. It said he was allowed to. And
by the way, not only was he allowed to testify about the
projected profits from his business, the Court also said it
was not a problem in affirming the admissibility of this
evidence that he had relied on -- in part on a report that
came from a third party, so it's not required that it be only
his knowledge. And, similarly, let me dispense with another
point. The advisory committee made a distinction in this
rule and carved out what other courts have sometimes called
the owner-officer exception to the rule, and so there's a
sub-body of a case law on this. There are other cases
involving criminal law and so on, but there's a line of cases
on owner-officers. Few things are clearer than the fact that
is a label, not a requirement, and any number of the cases
allow people who are not owners or officers to testify as lay
experts under Rule -- I mean lay -- give lay opinion under
Rule 701. The Sixth Circuit not long ago in a case I have
trouble pronouncing, but it seems to be something like
Lativafter, allowed an outside investor to do so, so I don't
think we should be confused by the name of the exception
since we know what it means.

        So let's go back to Mr. Venuto, and Mr. Venuto --
this is -- I'm going to paraphrase or I could read from what
the Third Circuit said in Lightning Lube. It says Mr. Venuto

1  calculated future profits, so we're not talking about

2  historical; we're talking about future profits -- in two

3  ways.  First, he calculated the profits he would have earned

4  on the 117 franchise contracts that he actually sold.  Venuto

5  predicted that after four years in business, each center

6  would have been generating $28,000 in royalty fees.  Given

7  this calculation plus the money the franchisees would have

8  earned in the first four years, Venuto predicted that he

9  would have earned $27,729,000 in future profits from the 117

10  existing contracts through 1996.

11       Next, Venuto calculated the lost profits on

12  franchises he expected to have sold based on projections he

13  developed with an accounting firm when he planned to take the

14  company public.  Venuto predicted that he would have sold 370

15  more franchises over the ten-year period; that all of them

16  would have opened, parens, 37 each year, close parens, and

17  that he would have earned $43,821,000 from these franchises

18  using the formula discussed above.

19       Now, if this were simply one of the various cases

20  that go back and forth on the subject, we'd say, well, that's

21  an interesting case, let's look at the others, and we will

22  look at others, but to make the obvious point, this is the

23  case the advisory committee cited, and it is the only case

24  the advisory committee cited.

25       So now let's go to the cases that have been cited by

the objectors, and let's start with the one that they began

with, JGR, a Sixth Circuit opinion from 2004. In JGR there

was a lay witness who was put on the stand. His name was, I

think, Gornik. And his lay testimony was going to be about

the value of the business. He was excluded. The reason he

was excluded was not that a lay witness can't talk about

future events at a company. He was excluded because he

didn't know about it from firsthand knowledge. He didn't

happen to be an officer or employee of the company, but more

to the point, his information was cobbled together at the

last minute, and he failed the leg of this that he had to

prove, that he had particularized knowledge of it. And as is

so often the case, the footnotes tell us a lot about this,

and this is what the Court wrote in footnote three. It said,

"The district court's apparent assumption that Gornik was a

'factual witness'" -- that was in quotes -- "who, quote,

'does JGR's books,' unquote, is false. In fact, Gornik was

never an accountant for JGR and never did its books. His

first experience with JGR was in March 1999 when he was

contacted by JGR's trial counsel for the purpose of, quote,

'putting down on paper what the financial statements of

Gerald's Furniture would have looked like had Thomasville

support to the business continued and had the owners been

able to carry through on how they planned to operate the

business.'" So JGR does not stand for any broader principle

1   than this, and I would suggest, your Honor, that there are

2   two steps to our analysis.  Step number one, does the witness

3   have personal particularized knowledge of the facts in

4   question?  Two, is he using that personal particularized

5   knowledge to give his testimony?

6           Now, I'm going to come back to that, but I also want

7   to deal with the DIJO case -- D-I-J-O, and I'm pronouncing it

8   as DIJO, and I think various lawyers mentioned it.  DIJO was

9   a hotel case of some sort, and there was -- this is a Fifth

10  Circuit case, but it's cited in the other cases.  And there

11  there were two witnesses.  There was a man named Skinner, and

12  Skinner didn't really work for the company, didn't know very

13  much.  They were offering him, once again, to testify about

14  projections, and they said he doesn't have the particularized

15  knowledge that's necessary, so they didn't let him testify.

16  Stuck in the back of the opinion, though, is something else.

17  It turns out in DIJO there were two witnesses.  There was a

18  man named Turner.  Quoting from the Fifth Circuit opinion,

19  "The Defendants also contend that the District Court erred

20  when it permitted Turner to testify about DIJO's lost

21  profits.  Turner testified that the proposed hotel would have

22  generated a net income of $633,000 a year.  Based on that

23  projection, he offered his opinion that the business would

24  have been worth 5.45 million if sold in its fifth year.

25  Turner was one of DIJO's two principals, and his estimates

1   were based on his own involvement in developing the Project.

2   In light of the foregoing discussion of the boundaries of

3   Rule 701, we cannot conclude that the district court abused

4   its discretion in admitting Turner's lost profit testimony."

5           So these cases do not stand for a hard-and-fast rule

6   about ownership.  They stand instead for the two steps that I

7   mentioned earlier.

8           Now, as to step one, did Mr. Malhotra have personal

9   and particularized knowledge of the city's finances and the

10  numbers that came out of the city's books and records?  I

11  think his testimony establishes that.  I had actually

12  excerpted all of it, but I did so from the transcript we are

13  not using, so I'm not going to go further in terms of

14  citations, but I think it was quite clear what his knowledge

15  was.  He was hired in May of 2011, about 30 months ago if my

16  counting is right.  He wasn't hired because of lawsuits nor

17  of impending bankruptcy.  His retention preceded, I think,

18  even the financial stability board.  It appears he was hired

19  because the city had laid off so many of its workers it

20  couldn't do this job itself, and so for the past two and a

21  half years Mr. Malhotra has accumulated information, he has

22  analyzed it, and that's where his work comes from.  I think

23  it's apparent -- and I don't think anyone is challenging

24  seriously that he has the level of personal and

25  particularized knowledge that's required by Rule 701.

1          So then the question becomes the second leg of it,
2     and that is is he using that particularized knowledge in
3     giving his opinion.  There was a case, for example, in the
4     Bankruptcy Court in New York, and it's cited, I believe, in
5     the objector's brief, called MarketXT.  Like all these cases,
6     they all -- since they're fact-based, are all illuminating no
7     matter where they come out.  And in MarketXT, there was a
8     witness -- and I don't remember his name, but I have the case
9     here, but it's not important -- who is a principal of -- I
10    guess it must have been the debtor.  And he was there to
11    testify about the things we talked -- projections, future
12    profits, current value, all of the things that we see in this
13    line of cases.  What they did, though, with this expert --
14    and I actually should dig it out because it's such an
15    interesting case -- they said, "You can't testify about that.
16    This model you've got has discounted cash flow values.  It's
17    got all kinds of theoretical economic elements to it.  And
18    that's not who you are, Mr. Witness, you are just the fellow
19    who worked for the company.  So they said, "We're not going
20    to let you talk about it," but then the Court gratuitously
21    said, "You know, if they'd offered him as a 701 witness, we
22    would have received his testimony," because then he would
23    have been talking about what he knew and he could have used
24    the standard types of approaches that the other 701 cases
25    have talked about.

1     So when you look at where these cases fall out --
2  and I think in the end it becomes something like a question
3  of fact -- what you find, I think, is this.  There's no hard-
4  and-fast rule that you have to be an owner or officer.   There
5  are cases where that's not the case.  There's no prohibition
6  on relying from information that comes from other people, and
7  there are any number of cases that certainly permit that to
8  be done.  LTV is one.  This case, Lativafter is one.
9  Lightning Lube itself was one.  There's no prohibition on a
10  lay witness having specialized technical information provided
11  that's not what he's using or that's not what he's talking
12  about.  He's not giving an expert opinion in that sense.
13  Instead, it is how does it relate to what he knows?  And in
14  cases like the one I just mentioned, MarketXT -- there's
15  another one, I think, called Lifewise where a 701 witness was
16  asked to testify about a complicated econometric model, and
17  the Court didn't accept it for that reason.  Where that's the
18  case, although the witness meets leg one, he or she doesn't
19  meet leg two.  However, one thing is quite clear.  Where the
20  witness is working from and has the particularized personal
21  knowledge and is using that to provide projections,
22  forecasts, and similar, the courts do allow it.
23     Now, I think one of the main objections we run into
24  here is, yes, that's true, but this is just a heck of a lot
25  of information, and it is a lot of information.  I think when

1   we're dealing with an enterprise the size of Detroit, there's

2   no getting around that.  The courts, though, never say this

3   rule only applies in narrow circumstances and when you're

4   dealing with a narrow data set.  The rule is instead do you

5   have the knowledge, and is that what you're using.  The fact

6   assumptions are used makes no difference.  Every single one

7   of the cases I recited and the rest, the witness uses

8   assumptions.  He or she has to.  They're forecasting future

9   profits, and every one of these cases is a case about future

10   profits or future value or future this or future that, so

11   that is not a disability.

12          What it comes down to then is how then did he use

13   his particularized knowledge to prepare his analysis, so

14   let's start with what the particularized knowledge was.  What

15   his particularized knowledge was -- hang on; I wrote it down

16   for myself so I wouldn't forget it -- the historical data

17   about the city, which he said in his declaration came from

18   the CAFR and many other publicly available sources; the

19   city's bank records; internal reports that he got from the

20   city; factual matters.  And by the way, this is not hearsay.

21   I established a business record exception for that when I

22   asked him at the beginning of his testimony, "Were these

23   materials that the city prepared in the ordinary course of

24   its business?  In your experience, do cities and other

25   enterprises prepare materials like these in the ordinary

course of their business?"  And he said, "Yes," and that was
never challenged, and so he's not being used to get in
hearsay on that basis.  These are business records, and I
don't think anyone ever contended otherwise.

What else did he add?  He added known changes coming
in the future, the city's budgets, which are predictions;
cost of living clauses in contracts; information he did
receive from actuaries about changes in pensions.  However,
the actuary in question was their actuary, Gabriel, Roeder.
Information about state revenue sharing, changes in tax
rates.  What about assumptions given to him by others or that
he made, rate of growth or rate of decay in tax -- property
tax receipts, rate of growth or rate of decay in income tax
receipts, assumed rates of inflation, changes in population
of the city.  Now, those are assumptions, but they are no
different qualitatively than what Mr. Venuto did when he
predicted how many franchises he thought he would be selling
in the next four years and how those franchises would do in
the next ten years.  And the Court not only thought that it
was fine, so, too, did the advisory committee.  What about
other things that went in?  And let's, if we could, put up
Exhibit 9 I think it is, page 2.  This is one of the
exhibits, your Honor, obviously we spent a lot of time on,
but it's illustrative.  That tells you what is his
particularized knowledge, and there is a list of it on the

1  left-hand side, and we spent a lot of time going over what is

2  each of these things, but he has knowledge about things like

3  lumpiness of revenue receipts.  They don't come in a smooth

4  way.  Remember the testimony is you get a bunch and then

5  nothing happens for awhile.  When is it that the city

6  receives -- it's every other month -- its revenue sharing so

7  he could put in the spreadsheet when that arrives?  What is

8  the expected availability of the escrowed funds that came

9  from the state-sponsored financing that the city floated?

10 And perhaps also which of the numbers he gets from the city

11 are the most reliable?  Maybe it's a personal judgment which

12 ones he finds most materially useful to him.  So these are

13 all things that he gets as a result of his work.

14      Now, I think it was Mr. Montgomery raised the point

15 about using an Excel spreadsheet, so let me spend a minute on

16 that.  I think if you're above a certain age, maybe it's

17 not -- I think you're younger than me -- it may be more of a

18 challenge.  It comes preinstalled on every computer in this

19 courtroom.  It is the way business is now run.  It is the

20 standard method used not by experts but by everybody to

21 organize financial information.  There's nothing suspect

22 about taking the city's information and putting it into a

23 spreadsheet.

24      Now, what does a spreadsheet do and the real

25 question, does using a spreadsheet convert Mr. Malhotra's

1   approach into one that used scientific or other technical or
2   specialized knowledge, which was the test under 702, and 702
3   gets imported into 701 by dint of 701(c), which is the very
4   thing -- added in 2000, which is the very thing the advisory
5   committee was talking about in the text we had on the screen.
6   So what does he bring into it?  He brings in labels, which
7   tells us what information he's talking about.  He brings in
8   dates, what period he is forecasting.  He puts in the numbers
9   that he has, and they repeat either verbatim or they repeat
10  based on knowledge he has such as when does the revenue
11  sharing money come in, or they repeat because he's using some
12  kind of a metric to increase or decrease them over time.

13      Now, what he's doing here is addition and
14  subtraction, maybe division, probably multiplication.  There
15  was no evidence and no one asked him this, that behind this
16  stood some kind of complicated econometric model of the sort
17  that other courts have rejected.  He was there to be
18  examined.  No one asked him that.  In fact, I asked him how
19  he calculated, and he said it was arithmetic.

20      Now, there is in the tone of the papers -- and I'm
21  not criticizing counsel at all -- the suggestion that this
22  was some sort of stealth means of springing a surprise on the
23  objectors.  The fact of the matter is that document was in
24  Mr. Malhotra's declaration, which the objectors have read
25  from this morning and has been in the public domain since

1    July 18.  Ernst & Young, who we don't control, wrote a letter

2    to the objectors saying, "If you wish our back-up papers,

3    you'll have to subpoena them, but serve a subpoena on us, and

4    we will produce them."  No subpoena was ever served.  We

5    identified this document as a back-up for hearsay purposes as

6    a compilation under Federal Rule of Evidence 1006, and we

7    sent a letter to the objectors saying, "If you want to see

8    the back-up materials, they're available for examination.

9    Please call Ernst & Young."  One objector called.  No one

10   ever came.

11        Mr. Malhotra was deposed not once but twice.  I was

12   there both times.  The first time especially he was examined

13   at no small length about his spreadsheets.  It went on for a

14   long time.  He answered every single question put of him.  If

15   after that first deposition there had been uncertainty, there

16   was a second deposition coming and an opportunity in the

17   meantime to go get any documents they might need if they

18   wanted to dig deeper with Mr. Malhotra.  That did not happen.

19   So this is not a case where there was surprise.  It's not a

20   case where this was concealment.  It is, instead, I think, a

21   fairly classic case of everything was available.

22        Is this complex?  Yes, it is.  I don't deny it.

23   Does that mean that it can only be addressed by an expert

24   witness under Rule 702?  The cases do not say that.  Now, the

25   advisory committee rule and the cases that speak about it are

1  quite clear. A lay witness who has personal particularized

2  knowledge about facts may offer his opinion -- his opinion --

3  the rule says "opinion." He can offer his opinion about

4  future profits, forecasted value, and those other things that

5  go off into the future, and it is admissible. The issue

6  here, I think, is one only of magnitude when it comes to

7  Mr. Malhotra, but that was something we've all known from day

8  one. It was disclosed on day one. He's been deposed two

9  times. There's been opportunity for other discovery, and he

10 was here and cross-examined. I thank you, your Honor, for

11 your patience.

12         THE COURT: You want to turn your attention to the

13 Buckfire issue?

14         MR. STEWART: I will, your Honor. I think a lot of

15 that is the -- it's the same basic analysis, so I -- with the

16 rule, and so I won't repeat any of that. Mr. Buckfire

17 testified -- by the way, one other minor point here. Cases

18 also say just because someone has scientific, technical, or

19 other specialized knowledge and that makes it easier -- we

20 can keep that up if you'd like because I was going to point

21 to that in a moment -- and that makes it easier for them to

22 do things like pull all this together, it doesn't convert

23 them into a 702 witness. And they spoke at one -- it was one

24 of the cases, and I'm not sure I know it off the top of my

25 head, which spoke about a witness' computer knowledge making

1  it easier for that witness to put his or her projections

2  together, and there were others as well.  So the fact

3  somebody has a lot of expertise doesn't disqualify them or

4  change things.

5       Now, with Mr. Buckfire, one thing was apparent.

6  He's a highly skilled, very experienced, highly intelligent

7  investment banker who's been in the business a long time and

8  has done restructurings a long time and knows an immense

9  amount about it.  No question about that.  And he -- that

10  came out in his background and otherwise.  It's also clear

11  that when he was hired by the city, he began working very

12  hard to learn everything he could about the city, and he

13  relied, among other things, on Mr. Malhotra's work.

14       His subsequent testimony was about what that -- what

15  those -- how those projections fit into his other work and

16  what it was he did or felt he had to do based on the state of

17  the facts that he found when he came to this job.  And as I

18  understand the particular objections that we're facing to his

19  testimony, one had to do with his statement about GO bonds

20  and the accessibility of the credit market to the city.  I

21  think that somebody with his level of knowledge of the city

22  can say, "I'm looking at what their numbers are, and these

23  numbers will not allow you to borrow money on the bond market

24  because the numbers are negative."  And there were other

25  parts of the testimony as well, your Honor, but I think, as

1    Mr. Cullen said, at the end of Mr. Buckfire's testimony, much

2    of what he was talking about and asked about and testified

3    was about his own conduct and that his conduct and

4    conclusions were in and of themselves operative facts in the

5    lead-up to the city's decision to file for bankruptcy, and

6    they were certainly probative of good faith, but I assume

7    that's not what we're here to talk about.  And as a result,

8    Buckfire's testimony on the subject is also qualified lay

9    testimony because he was taking the facts that he had, which

10   were particularized and personal, and he was -- pardon me --

11   applying those looking forward as a projection as how this

12   affected the city's ability to borrow money, which is no

13   different than projecting an enterprise's ability to earn a

14   profit, and the city's ability to do other things.

15        One last point that troubled us on this -- and

16   actually on both, but I'll focus on Mr. Buckfire -- that

17   objection also came in a little late at the very end of his

18   testimony, and had it been made in a timely way, perhaps the

19   questioning could have taken a different course to avoid

20   this.  I'm not trying to impugn motives of anyone, but, as a

21   practical matter, it did change how the examination of

22   Mr. Buckfire went and I think may have led to some of the

23   very issues that they now raise, and it would have been

24   easier for us all perhaps had the objection been made at the

25   time.  And if the Court has no questions --

1    THE COURT:  No.  Thank you.  Excuse me.  Any brief

2    rebuttals, please?

3         MR. DECHIARA:  Your Honor, I find it interesting

4    that the city begins its legal analysis by reliance on the

5    advisory committee notes to the rule as if the advisory

6    committee notes to the rule were somehow in opposition to the

7    JGR case, the governing Sixth Circuit case.  Well, JGR quotes

8    from and discusses the advisory committee notes before it

9    reaches the holding that it does, so there's nothing

10   inconsistent between the advisory committee notes and the

11   Sixth Circuit's holding in the JGR case.  It's the JGR case

12   which is -- which governs here.

13        It's also curious counsel cited in his oral argument

14   just now the JGR case, and I think he said it's something

15   that we cited, we, the objectors, but that is the lead case

16   in the city's papers.  It's block quoted in paragraph 2 and

17   then cited throughout, so there's -- I don't think there's

18   any dispute between the parties here that JGR is the case

19   that's relevant here and that governs.  We're not -- there

20   was lengthy discussion by counsel about a Third Circuit case,

21   and if this courtroom were in New Jersey or Pennsylvania,

22   that would probably be more interesting, but this is a

23   courtroom in Michigan in the Sixth Circuit, and we're bound

24   by Sixth Circuit law, the JGR case.

25        Then, having cited it as its lead case, the city now

1   tries to run away and distinguish the case, and how does it
2   try to distinguish the case?  By citing facts in the
3   footnotes.  Well, there's a reason a court puts facts in the
4   footnotes, and it's because they're marginal.  The key facts,
5   the holding, is in the body of the decision, and let me just
6   read it.  It says very simply -- and this is 370 F.3d 256,
7   quote, "Gornik has never been an owner, officer or director
8   of JGR.  Additionally, the information upon which he relied
9   in making his calculations of lost profits and lost business
10  value came primarily from Yasowitz," who was someone -- a
11  principal of the company, "and Gornik admitted he did not
12  independently verify much of that information.  Therefore --
13  therefore, Gornik has no basis upon which to offer lay
14  opinion testimony about JGR's lost profits or lost business
15  value, and the district court abused its discretion in
16  admitting that testimony."  That's the holding of the case.
17  Counsel for the city comes up with his own formulation based
18  on his reading of a lot of case law, and he calors his own
19  standard.  We don't need to do that here.  We have the Sixth
20  Circuit telling us what the standard is and what the holding
21  is.  It's the JGR case, and it's squarely on point.
22          MS. LEVINE:  Your Honor, counsel spent some time
23  discussing the MarketX Holdings Corp. case.  Respectfully,
24  that case specifically cites to Rule 701 as -- and to the
25  advisory committee note with regard to 701 and specifically

points out that Rule 701 allows the admission of nonexpert
opinion testimony from a witness within limitations designed
to prevent the simple expedient of proffering an expert in
lay witness clothing and then goes on from there to conclude
an analysis based on specialized knowledge is excludable
where the witness has not been qualified as an expert and
then goes on to cite the exception when somebody is actually
a business owner, won't rehash that, but specifically
provides that even if a person is a business owner, if you
still go outside what that business owner's area of expertise
could be, then you exclude that as well.  Thank you.

MR. MONTGOMERY:  Your Honor, just a couple of final
points, not on the law because I think there's no possibility
in my mind that your Honor has any doubt as to the law and
the scope of this Court's discretion, so instead I'd like to
simply remind -- ask the Court to remember that Mr. Buckfire
testified that the forecasts were prepared by a team of
experts in revenue and tax policy.  Those are the same
forecasts that Mr. Malhotra said "we" many times.  I remember
the Court even asked Mr. Malhotra to say please speak in the
personal, not in the collective, but Mr. Malhotra repeatedly
discussed collective, and I think the reason is
straightforward.  We learned from Mr. Buckfire that, in fact,
a team was involved.  The second -- the notion raised by
counsel that Mr. Malhotra could testify on the -- or use

 1    reasonable assumptions on city population growth when he

 2    wasn't an economist, he was not a population forecaster, he

 3    had no -- didn't say anything about having skills in that

 4    particular environment, sort of cuts back from the notion

 5    that all he's doing is math, taking specific numbers, putting

 6    them in cells on a spreadsheet and simply putting auto sum

 7    for each column of the numbers.

 8            And last but not least, in his own detailed work, he

 9    repeatedly said he both looked at bank accounts and he looked

10    at documents prepared by others, which were the city

11    department budgets, in trying to assess whether identified

12    cash belonged in one column or another.  Your Honor, that is

13    not ordinary math.  It's not lay testimony.  Thank you.

14            THE COURT:  Thank you all.  The Court will take this

15    under advisement until 10:15 and return with a decision at

16    that time.

17            THE CLERK:  All rise.  Court is in recess.

18        (Recess at 10:00 a.m. until 10:15 a.m.)

19            THE CLERK:  Court is in session.  Please be seated.

20            THE COURT:  The matter is before the Court on the

21    city's request for reconsideration of the Court's previous

22    exclusion of so much of its exhibits and its witnesses'

23    testimony, especially from Mr. Malhotra, that dealt with the

24    cash flow projections which have been excluded from evidence

25    and also the motion to strike so much of Mr. Buckfire's

1    testimony as appeared to present opinion testimony based on

2    his expertise.

3         The Court concludes that the motion for

4    reconsideration should be granted and that the motion to

5    strike Mr. Buckfire's testimony should be denied.  These

6    decisions are controlled, as the parties suggest, by Rule 701

7    of the Federal Rules of Evidence, which provides that a lay

8    witness -- that is, one who is not testifying as an expert --

9    may only testify to, quote, "opinions or inferences which are

10   (a) rationally based on the perception of the witness; (b)

11   helpful to a clear understanding of the witness' testimony or

12   the determination of a fact in issue; and (c) not based on

13   scientific, technical, or other specialized knowledge within

14   the scope of Rule 7002 (sic)," close quote.

15        As has been noted here, Subsection (c) of Rule 701

16   was added to the rule in the year 2000 to eliminate the risk

17   that the reliability requirement set forth in Rule 702 would

18   be evaded through the simple expedient of proffering an

19   expert in lay witness clothing.  The advisory committee note

20   suggests a second reason as well, which was to prevent

21   litigants from evading the mandatory prediscovery disclosure

22   requirements for expert testimony as set out in Rule 26 of

23   the Federal Rules of Civil Procedure.

24        However, most significantly, the advisory committee

25   note for the 2000 amendment does further explain, quote,

1  "Most courts have permitted the owner or officer of a

2  business to testify to the value or projected profits of the

3  business, without the necessity of qualifying the witness as

4  an accountant, appraiser, or similar expert."  And here the

5  note cites Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153,

6  Third Circuit, 1993, and the Court notes parenthetically that

7  that case held that there was no abuse of discretion in

8  permitting the plaintiff's owner to give lay opinion

9  testimony as to damages as it was based on his knowledge and

10  participation in the day-to-day affairs of the business.  The

11  advisory committee note goes on to state, quote, "Such

12  opinion testimony is admitted not because of the experience,

13  training, or specialized knowledge within the realm of an

14  expert, but because of the particularized knowledge that the

15  witness has by virtue of his or her position in the business.

16  The amendment does not purport to change this analysis,"

17  close quote.

18       There are obviously a wide range of circumstances in

19  which the issue of whether lay opinion testimony will be

20  admitted arises, and it is certainly an appropriate

21  observation that ultimately the Court's decision on whether

22  to permit such testimony is highly fact-specific.  The

23  parties here largely have argued this issue in the context of

24  lay opinion testimony on lost profits or projected profits,

25  and the Court agrees that those are the most pertinent cases.

1    Accordingly, the Court will review some of those.

2         Perhaps the most controlling case is that which the

3    parties have argued here, JGR, Inc. v. Thomasville Furniture

4    Industries, Inc., 370 F.3d 519, Sixth Circuit, 2004.  In that

5    case, the Court stated, quote, "The primary issue in this

6    case concerns the admissibility of testimony by JGR witness

7    James Gornik, a certified public accountant and lawyer who

8    testified about the amount of lost profits and lost business

9    value that JGR allegedly suffered as a result of

10   Thomasville's breach of contract."

11        In the course -- close quote.  In the course of the

12   opinion, the Sixth Circuit relied heavily on a prior decision

13   by the Fifth Circuit in DIJO, Inc. v. Hilton Hotels Corp.,

14   351 F.3d 679, Fifth Circuit, 2003.  The JGR court held that

15   was a strikingly similar case to the one before it, and the

16   Sixth Circuit stated in regard to DIJO, quote, "In DIJO, the

17   Fifth Circuit held that the district court abused its

18   discretion in permitting a, quote, 'financial consultant,'

19   close quote, to testify as a lay witness regarding the

20   company's lost profits.  Although the witness was the

21   plaintiff's primary contact at a commercial lending facility

22   with which the plaintiff had a business relationship, he had

23   not served as an owner or officer of the plaintiff company.

24   Additionally, the witness's opinion was based primarily" --

25   excuse me -- preliminary -- "was based on preliminary income

1  figures and other information that he had received from the

2  plaintiff's founder, and his appraisal was not based upon his

3  own independent knowledge or observations."

4      And the Court further quoted from DIJO, "It is

5  telling that DIJO responds, not with evidence of the

6  witness's involvement with the plaintiff or the Project, but

7  only emphasizing his substantial business experience.  Such

8  generic industry experience does not pass Rule 701 scrutiny.

9  The plaintiff never attempted to qualify the witness as an

10  expert, and a lay witness who was never employed by or

11  directly involved in a business is unlikely to have the type

12  of first-hand knowledge necessary to provide reliable

13  forecasts of future profits.  The further removed a layman is

14  from a company's day-to-day operations, the less likely it is

15  that his opinion testimony will be admissible under Rule

16  701."  And that's the Sixth Circuit's quote from DIJO, 351

17  F.3d at 686.

18      So the Sixth Circuit noted that in light of the

19  witness' lack of the requisite firsthand personal knowledge

20  of the company about which he testified, the Fifth Circuit

21  held that the District Court abused its discretion in

22  permitting the witness to give lay witness -- lay opinion

23  testimony under Rule 701.

24      In the JGR case, the Court of Appeals noted that the

25  District Court's apparent assumption that Gornik was a

1  factual witness who does JGR's books was false.  The Court

2  noted that, in fact, Gornik was never an accountant of JGR

3  and never did its books.  His first experience with JGR was

4  in March of 1999 when he was contacted by JGR's trial counsel

5  for the purpose of putting down on paper what the financial

6  statements of Gerald's Furniture would have looked like had

7  Thomasville -- had the Thomasville support to the business

8  continued and had the owners been able to carry through on

9  how they planned to operate the business.

10      Now, it is true, as has been pointed out here, that

11  this observation by the Court of Appeals is in a footnote.

12  Nevertheless, the Court cannot conclude that it is,

13  therefore, a marginal fact.  It plainly formed a substantial

14  basis for the Court's ultimate disposition in the case.

15      And since the Sixth Circuit in JGR relied so heavily

16  on DIGO (sic) from the Fifth Circuit, the Court concludes

17  that it's appropriate to look further into what the Fifth

18  Circuit said in that case, so, for example, at 351 F.3d at

19  686 the Fifth Circuit stated -- the Fifth Circuit discussed

20  two other cases, these two from the Third Circuit, In re.

21  Merritt Logan, Inc., 901 F.2d 349, Third Circuit, 1990, as

22  well as Teen-Ed, Inc., v. Kimball International, Inc., 620

23  F.2d 399, F.3d, 1980.  And so in regard to these two cases,

24  the Fifth Circuit stated, quote, "In In re. Merritt Logan,

25  Inc. the plaintiff's company -- the plaintiff company's

1   principal shareholder, Logan, was permitted to testify about

2   the company's lost profits.  The facts recited in that

3   opinion demonstrate that Logan was not a passive outside

4   shareholder.  He was intimately involved with the investments

5   and management of the business.  Thus, the Third Circuit

6   correctly concluded that Logan could provide lay opinion

7   testimony given his personal knowledge of the enterprise.

8   Likewise, in Teen-Ed, Inc. v. Kimball International, the

9   Third Circuit decided that the appellant, Teen-Ed's, licensed

10  public accountant, Zeitz or Zeitz, could provide lost profits

11  opinion testimony.  Zeitz's testimony was based on the

12  personal knowledge of Teen-Ed's balance sheets, which Zeitz

13  had acquired firsthand as Teen-Ed's accountant and

14  bookkeeper.  Thus, the Court concluded -- this, the Court

15  concluded, qualified Zeitz as a witness eligible under Rule

16  701 to testify to his opinion of how lost profits could be

17  calculated and to inferences he could draw from his

18  perception of Teen-Ed's books.

19          Further supporting the Court's decisions on these

20  two matters is the Sixth Circuit's decision in Lativafter

21  Liquidating Trust v. Clear Channel Communications, Inc., 345

22  Federal Appendix 46, Sixth Circuit, 2009.  In that case, the

23  Court stated, quote, "Grady Vanderhoofven is a venture

24  capitalist, the Executive Vice-President of Southern

25  Appalachian Fund, which invested in Eon, and was a member of

1  Eon's board.  Vanderhoofven testified that Eon's value would

2  have been $57 million with the Clear Channel contract,

3  instead of the $17 million it sold for in 2006.  As an

4  investor in Eon, Vanderhoofven in 2005 investigated Eon's

5  financials, retaining a market research firm to verify Eon's

6  market potential.  When he became a member of Eon's board in

7  March 2005, he received Eon's monthly financial reports,

8  including income statements, balance sheets, and cash flow

9  statements.  Vanderhoofven testified that between June 2004

10  and June 2005, the number of stations Eon was streaming

11  increased by over 500 percent.  After June 2005, however, the

12  revenue from Clear Channel began to dwindle, and

13  Vanderhoofven determined that Clear Channel was moving its

14  streaming business to another company.  Vanderhoofven based

15  his $57 million valuation on the revenue Clear Channel had

16  been generating for Eon prior to the discontinuation of their

17  business, and the projection for the 12-month period prior to

18  Eon's sale.  As an investor who researched Eon's financial

19  condition, and later as a member of Eon's board,

20  Vanderhoofven had personal, particularized knowledge of Eon's

21  value.  The district court did not abuse its discretion in

22  permitting him to testify about Eon's projected value if it

23  had retained Clear Channel's business.  Moreover, contrary to

24  Clear Channel's assertions, Vanderhoofven's testimony rested

25  on a sufficient foundation - his personal research into Eon's

1  financial reports."

2          The Court's decision today is also consistent with

3  and supported by a Third Circuit decision in Donlin v.

4  Philips Lighting North American Corp., 581 F.3d 73, Third

5  Circuit, 2009.  In that case, the Court stated that Rule 7001

6  (sic), quote, "does not mean that an expert is always

7  necessary whenever the testimony is of a specialized or

8  technical nature.  When a lay witness has particularized

9  knowledge by virtue of her experience, she may testify - even

10  if the subject matter is specialized or technical - because

11  the testimony is based on the layperson's personal knowledge

12  rather than on specialized knowledge within the scope of Rule

13  702.  At the same time, we have consistently required that

14  lay testimony requiring future projections of business or

15  operation come from someone who has intimate and thorough

16  knowledge of the business gathered from either a lengthy

17  tenure or a position of authority," close quote.

18          Most tellingly, the Court in Donlin stated, quote,

19  "A trial judge must rigorously examine the reliability of a

20  layperson's opinion by ensuring that the witness possesses

21  sufficient specialized knowledge or experience which is

22  germane to the opinion offered," close quote.

23          And, finally, just to cite some other opinions or

24  decisions that support this, Van der Ruhr v. Immtech

25  International, 570 F.3d 858, Seventh Circuit, 2009;

1    Securitron Magnalock Corp. versus Schnabolk, 65 F.3d 256,

2    Second Circuit, 1995; United States versus Valencia, 600 F.3d

3    389, Fifth Circuit, 2010; and MCI Telecommunications Corp. v.

4    Wanzer, 897 F.2d 703, Fourth Circuit, 1990.

5         Ultimately, it is for the Court to determine whether

6    the proffered testimony carries with it sufficient indicia of

7    reliability arising from the witness' personal relationship

8    with the proponent of the evidence.  Accordingly, it is

9    certainly true that, as argued here, a taxicab driver would

10   not be permitted to testify to these matters, but that does

11   not mean that neither Mr. Malhotra nor Mr. Buckfire can

12   testify -- can't testify to the matters that they testified

13   to because of their personal knowledge of the city's

14   financial affairs, and in this regard, the Court will find

15   that both Mr. Malhotra and Mr. Buckfire had extensive

16   personal knowledge of the city's affairs that they acquired

17   during their -- the course of their consulting work with the

18   city and that formed the basis of their opinions and

19   conclusions.

20        Perhaps more fundamentally than any of this is this

21   key consideration in the Court's ultimate resolution of these

22   matters.  What both Mr. Malhotra did and what Mr. Buckfire

23   did are a substantial part of the facts and circumstances

24   that led to the filing of this case and that are, therefore,

25   highly relevant to the issues of eligibility that are before

1   the Court at this time.  Accordingly, not only what they did

2   but why they did what they did, as explained through the

3   documents and in the testimony that they have proffered, is,

4   in the Court's view, entirely admissible.  Accordingly, the

5   motion to reconsider is granted.  The documents that the

6   Court had previously admitted on a limited basis are now

7   admitted for all purposes, and the motion to strike is

8   denied.

9             We were about to begin the cross-examination of

10  Mr. Buckfire, I believe, so let's do that.

11            MR. STEWART:  Yes.

12            THE COURT:  Step forward, please, sir, and resume

13  the witness stand.  And, sir, you understand you are still

14  under oath.

15            MR. BUCKFIRE:  I do.

16            THE COURT:  You may proceed.

17     KENNETH A. BUCKFIRE, DEBTOR'S WITNESS, PREVIOUSLY SWORN

18                      CROSS-EXAMINATION

19  BY MR. MONTGOMERY:

20  Q   Good morning, Mr. Buckfire.

21  A   Good morning.

22  Q   My name is Claude Montgomery.  I believe we've met before

23  in connection with your deposition in this matter --

24  A   Yes.

25  Q   -- is that correct?

1  A    That's right.

2  Q    Good morning.  Now, Mr. Buckfire, if for any reason I

3  speak too quickly or you do not understand my question, I

4  would ask that you let me know.

5  A    Thank you.

6  Q    Now, do you recall the date of your deposition that I

7  took of you in connection with this matter?

8  A    Not specifically, no.

9  Q    It was September 20 of this year, was it not?

10  A    Okay.

11  Q    Okay.  Do you recall where the deposition took place?

12  A    New York City.

13  Q    Okay.  Do you recall what time it started?

14  A    I believe it was in the morning.

15  Q    Would 8:30 be right?

16         THE COURT:  You believe it was what, sir?

17         THE WITNESS:  In the morning.

18  BY MR. MONTGOMERY:

19  Q    Now, I believe you testified to the Court yesterday that

20  you're from this area or a native I think is the word you

21  used.

22  A    Yes.

23  Q    Okay.  And what did you mean by "native," sir?

24  A    I was born in Detroit.  My family lived here until 1965.

25  They moved to Southfield, Michigan.  Then I attended

1  Southfield-Lathrup Senior High School.  My family still lives

2  in the area as does my wife's.  Attended the University of

3  Michigan, and I come back here frequently.

4  Q   You're quite connected to the Detroit area; is that

5  correct?

6  A   Yes, I am.

7  Q   Okay.  Do you know Andy Dillon personally?

8  A   Not personally, no.

9  Q   Have you ever met him?

10  A   Yes.

11  Q   And when did you first meet him?

12  A   I met him for the first time in January or February of

13  2010.

14  Q   And in what connection?

15  A   I had been introduced to him by a gentleman from the

16  Business Leaders for Michigan.  I'd asked him to introduce me

17  to Treasurer Dillon in the ordinary course of my duties

18  trying to make sure he knew about our firm and that that

19  might be helpful sometime with respect to Detroit.

20  Q   I believe you told the Court yesterday that starting in

21  about 2009 you engaged in an effort to make sure that your

22  firm's resources were known to potential players in the City

23  of Detroit drama; is that correct?

24  A   No.  We simply started paying attention to Detroit after

25  it was downgraded.

1  Q   Okay.  And was your introduction to Mr. Dillon part of

2  that paying attention to the City of Detroit after it was

3  downgraded?

4  A   Yes.

5  Q   Okay.  Now, by any chance do you know the current

6  governor, Rick Snyder?

7  A   I met him a few times.

8  Q   Okay.  And in what connection, sir?

9  A   During the course of our discussions with the state and

10 the financial advisory board in 2012, I met with him once or

11 twice to present really on an educational basis, you know, a

12 description of what restructuring was and how it might be

13 employed in a corporate and governmental setting.

14 Q   Okay.  And do you recall when that was, sir?

15 A   It might have been in the spring.

16 Q   Of which year?

17 A   April 2012.

18 Q   And can you be more specific in what information you gave

19 to Governor Snyder at that time?

20 A   We had put together a very brief presentation really

21 describing the techniques of restructuring, how we go about

22 analyzing the problems of a company or a government, and

23 describing the various techniques that could be employed to

24 deal with those issues in the course of creating a

25 comprehensive long-term financial strategy.

1    Q    And among the information that you gave to the governor

2    at that time, did it specifically relate to municipal

3    restructurings as well as corporate restructuring?

4    A    Yes.

5    Q    Okay.  And did it include in any -- a discussion of

6    Chapter 9 as a vehicle for a municipal restructuring?

7    A    Only as one of many alternative techniques.

8    Q    And what other alternative techniques did you tell the

9    governor existed in the spring of 2012?

10   A    I told him the same thing I tell all of my clients, that

11   bankruptcy is to be avoided at all costs, but it's always

12   required to be studied as a last resort.

13   Q    Okay.  You are the city's financial strategist, are you

14   not?

15   A    Yes.

16   Q    Okay.  Are you its chief financial strategist?

17   A    I don't understand that question.

18   Q    Okay.  But you are its financial strategist?

19   A    Miller Buckfire is the city's investment bank, and part

20   of our responsibilities is to formulate and develop and

21   execute financial strategy.

22   Q    All right.  And for Miller Buckfire, you are managing

23   this engagement?

24   A    I am.

25   Q    Okay.  Now, is the June 14 proposal a public

1  manifestation of the city's financial strategies developed by

2  you, sir?

3  A    Yes, it is.

4  Q    Okay.  Now, is the June 14 proposal something you were --

5  in which you had input into the strategy and concept of that

6  document?

7  A    Yes.

8  Q    I believe you told that to Mr. Cullen in response to a

9  question yesterday; is that correct?

10  A    Yes.

11  Q    Okay.  In fact, the Court should expect you to have input

12  in strategy if you are the chief strategist; is that correct?

13  A    Yes.

14  Q    Okay.  Why did you tell me you had no involvement in the

15  production of the June 14 proposal when I asked you that

16  question at the deposition?

17  A    You asked me whether we had worked on or drafted or

18  formulated any part of that document, and I told you we had

19  not except for the portion that related specifically to the

20  restructuring plan and the development of the limited

21  recourse participation notes, so we did not develop that as a

22  work product of Miller Buckfire.  It was a manifestation of

23  the overall strategy that we had formulated in conjunction

24  with the city's other advisors beginning in January of this

25  year.

1   Q   But am I not correct, sir, that with respect to the June

2   14th proposal itself you told me that you did not participate

3   in its preparation?

4   A   I just answered that question.

5           MR. STEWART:  Objection, your Honor.  If he wants to

6   read a question and answer, that would be the appropriate way

7   to proceed.

8           THE COURT:  The objection is sustained.

9   BY MR. MONTGOMERY:

10  Q   Mr. Buckfire, I'm going to ask you if on the 20th of

11  September of this year during your deposition I asked you a

12  question which began at page 37, line 22,  "Mr. Buckfire,

13  I've handed you what has been marked as Buckfire Exhibit

14  Number 2.  Have you seen this before?"  Do you recall me

15  asking you that question?

16  A   No.

17  Q   Okay.  Do you recall that at line 25 you said, "Yes"?

18  A   No.

19  Q   All right.  That Mr. Buckfire said -- "Question:  What is

20  it, sir?"  Your answer at line 3 was, "It is the June 14

21  report and proposal to creditors."  My question to you at

22  line 5 was, "Did you participate in its preparation?"  And

23  your answer at line 7 was, "No."  Do you remember giving that

24  answer, sir?

25  A   No.

1  Q   Is it true that you had no involvement in the

2  preparation?

3  A   Neither myself or my firm drafted this presentation.  The

4  entire effort to restructure Detroit has been since January a

5  multi-disciplinary, multi-firm effort.  The financial

6  strategy incorporated in the June 14th plan was one that we

7  had helped to formulate.  We didn't draft the June 14th

8  document except to participate in the drafting of the

9  description of the plan for the creditors and the description

10  of the limited recourse participation notes.

11  Q   So your input into the June 14 proposal is the limited

12  participation notes?

13  A   I didn't say that.

14  Q   Okay.  Tell me again, sir.

15  A   It's a very lengthy document reflecting the work of five

16  months by many firms.  It does, of course, rely upon and is

17  meant to address the financial strategy that we helped the

18  city formulate beginning in January from an informational

19  perspective.  My firm did participate, as I testified

20  earlier, in the creation of the restructuring plan itself;

21  that is, the portion of the document reflecting proposed

22  treatment for the claims of the creditors of the City of

23  Detroit, and, in particular, the formulation of the terms of

24  the $2 billion of notes that we have identified as being

25  available for resolution of those claims.

1  Q   So it's your testimony today that the treatment of

2  creditors was essentially your idea?

3  A   As I said, it was a collaborative effort by multiple

4  firms.  We participated actively in that portion of the plan.

5            THE COURT:  Excuse me one second.  Again, we're

6  having a slight difficulty with our audio, so pull your

7  microphone two inches closer but no more.

8            THE WITNESS:  Yesterday it was too far.

9            THE COURT:  Go ahead.  Pull it closer.  There.

10           THE WITNESS:  Thank you, your Honor.

11           THE COURT:  Try that.

12 BY MR. MONTGOMERY:

13 Q   So, Mr. Buckfire, I take it you share all of the

14 recommendations that appear in the June 14 proposal.

15 A   I don't understand that question.

16 Q   I think you just told me it was a collaborative effort,

17 not necessarily your idea.

18 A   That's correct.

19 Q   Okay.  And so I'm asking you, as you are sitting here

20 today advising the Court, do you share all of the

21 recommendations that -- in the treatment of creditors that

22 appears in the June 14 proposal?

23 A   You're referring specifically to the proposed treatment

24 of creditors?

25 Q   Yes, sir.

1  A   Yes, I do.

2  Q   Okay.  Now, does that include the recommendation that

3  retiree pension and healthcare benefits must be significantly

4  reduced?

5  A   I do.

6  Q   Okay.  And did you ever personally make that

7  recommendation to the emergency manager?

8  A   No.

9  Q   Since this was a collaborative effort, who made that

10  recommendation to the emergency manager?

11  A   Well, it was a function of the city's insolvency and lack

12  of cash.  There was no way for the city to satisfy its

13  unsecured creditors to the extent that their claims indicated

14  because the claims of the pension fund and healthcare

15  retirees are unsecured claims, therefore, pari passu with

16  those of the general obligation and COP bondholders, clearly

17  there wasn't enough value to satisfy them all, and they would

18  have to be reduced.

19  Q   Mr. Buckfire, I believe the question I asked required

20  identification of a person.  Who made the recommendation

21  since you didn't make it?

22  A   Well, it was a function of the mathematics.  I'm not sure

23  that there was any particular recommendation made.  The math

24  and the financial condition of the city simply didn't support

25  continued satisfaction of all of its unsecured obligations as

1   previously promised.

2   Q   Are you suggesting it was so self-evident no one had to

3   say it?

4   A   Yes.

5   Q   So, in fact, you didn't say it?

6   A   I didn't have to.  The mathematics indicates that was the

7   unfortunate result.

8   Q   Did Conway MacKenzie say it?

9   A   I don't know.

10  Q   Did Ernst say it?

11  A   I don't know.

12  Q   Did Jones Day say it?

13  A   I don't know.

14  Q   So let's turn to the topic of how this no one had to say

15  it aspect of the proposal came to be pursued.  When, sir, is

16  the first time you recall you and Mr. Orr discussing the

17  reduction of pension benefits and healthcare benefits if

18  ever?

19  A   I don't recall.

20  Q   Okay.  It never happened?

21  A   I said I don't recall.

22  Q   Did it ever happen?

23  A   I don't recall.

24  Q   Okay.  Change the topic.  You were involved in the

25  negotiations -- strike that.  What role, if any, did you have

1  in discussions or presentations to creditors following the

2  June 14 proposal?

3  A   I was delegated by Mr. Orr with the responsibility of

4  negotiating and discussing with the funded debt creditors of

5  the city the June 14th proposal.

6  Q   Did you, sir, personally have any involvement with any

7  current or former employee groupings of creditors?

8  A   I was present at at least one or two meetings here in

9  Detroit with representatives of retirees, but I was not

10  taking a lead role in those discussions.

11  Q   When you say "present," were you talking about the June

12  14th meeting itself?

13  A   No, afterwards.

14  Q   Afterwards.  Are you talking about the June 20th meeting

15  that may have occurred?

16  A   It may have been that week, but I know I was present at

17  at least one or two.

18  Q   Okay.  Are there any others other than that one that may

19  have occurred on June 20?

20  A   Well, it was a very, very busy time for me.  I was trying

21  to get the forbearance agreement done with the swap

22  counterparties, so after that initial set of meetings I

23  didn't directly participate.  Other members of my firm, I

24  believe, did.

25  Q   So you were not involved in a June 25 meeting; correct?

1   A   I may have been.  I just don't recall the dates.

2   Q   Okay.  And you were not involved in a July 10 meeting; is

3  that correct?

4   A   I just don't recall.

5   Q   And, again, same question with respect to July 11?

6   A   I don't recall.

7   Q   And July 12?

8   A   I don't recall.

9   Q   Okay.  But do you recall participating in meetings with

10  funded debt creditors?

11   A   Yes, I do.

12   Q   Okay.  And which days do you remember for that?

13   A   I can't put specific dates to it.  After the June 14th

14  presentation in which I participated, we gave all of the

15  city's creditors a week to study the plan and supporting

16  information, which obviously made sense because it was a

17  bombshell for them, and we immediately began discussions with

18  as many creditors as was willing to meet with us the week

19  after that, so that would be, I guess, the 20th or 21st.  And

20  we began meeting with groups of the creditors primarily in

21  New York City all that week, and that extended into the week

22  following.  At the same time, I was meeting or having

23  discussions almost every day with the swap counterparties.

24   Q   Should I understand that you had a determination,

25  Mr. Buckfire, that it was more important for you to meet with

1    the funded debt creditors than with the retiree and employee

2    creditors?

3    A    No.  It was just a division of labor.  The bondholders

4    and the bond insurers were organized.  They told us that they

5    could rely upon them to represent the interests of the

6    underlying creditors, so because of the fact that we're an

7    investment bank and have long experience in managing creditor

8    relationships of that kind, it was determined that we should

9    take the lead in those discussions while the lead in

10   discussions with the retirees and other claim holders would

11   be taken by others.

12   Q    And you participated in making that decision as the chief

13   financial strategist for the city; is that correct?

14   A    Well, you keep saying I'm the chief financial strategist.

15   I am a financial strategist, and the city asked my opinion,

16   and that was my recommendation.

17   Q    Okay.  Thank you.  Now, do you recall yesterday in

18   response to a question by Mr. Cullen indicating that you

19   regarded the June 14 proposal as even-handed and fair?

20   A    Yes.

21   Q    Okay.  And as you sit here today, do you still think it

22   is even-handed and fair?

23   A    Yes.

24   Q    Now, I'm correct, am I not, that the June 14 proposal

25   provides for no cash payments to the Retirement Systems on

1  account of the city's promised pensions; is that correct?

2  A   I'm not sure I understand what you're saying.

3  Q   Are -- it's a simple question.  Retiree creditors for

4  pensions, are there any cash payments at confirmation or

5  shortly thereafter that the June 14 proposal plans to be made

6  to the Retirement Systems?

7  A   Yes.

8  Q   Okay.  And what are those, sir?

9  A   They would receive their share on a pro rata basis with

10 the other unsecured creditors of the proposed $2 billion of

11 notes that would be provided upon exit from bankruptcy.

12 Q   All right.  But those are notes in which there is no

13 mandatory payment of principal required; is that correct?

14 A   There's a mandatory payment of interest, and there's an

15 optional payment of principal if the city can afford it.

16 Q   But my question was no mandatory requirement.

17 A   That's correct.

18 Q   Okay.  And with respect to interest, it's one and a half

19 percent; is that correct?

20 A   That's all the city can afford.  That's correct.

21 Q   But that's what it proposes, one and half percent?

22 A   That's correct.

23 Q   Okay.  So no cash at confirmation, one and a half percent

24 interest over time, and no mandatory principal repayments; is

25 that correct?

1   A    That's correct.

2   Q    Now, the same is true for the healthcare creditors; is

3   that correct?

4   A    No.  The plan did propose a continued payment of

5   healthcare benefits to actives and retirees.  I don't have

6   the plan in front of me, but I think you'll see a line item

7   in the financials that do assume continued payment of

8   healthcare premiums.

9   Q    That's for actives, is it not?

10  A    I don't recall exactly the distinction, but it's in the

11  plan.

12  Q    In fact, the plan proposes for active employees defined

13  contribution payments for future pension accruals; is that

14  correct?

15  A    Are you talking about healthcare or pension now?

16  Q    Right now I switched back to pension because you

17  mentioned both.

18  A    Okay.

19  Q    It is correct that insofar as past pension entitlements

20  are concerned, the only recovery proposed under the plan is a

21  share of a note; is that correct?

22  A    Yes.

23  Q    Okay.  And but for what the city may or may not be doing

24  right now, the only proposal for retiree -- existing retiree

25  healthcare is whatever funding is provided by the note; is

1  that correct?

2  A    Well, the healthcare benefits for retirees would be

3  provided to an insurance exchange, and some of that would be

4  supplemented by payments made by the city.

5  Q    The insurance -- okay.  Insurance exchanges is not the

6  city, though, is it?

7  A    No.

8  Q    Okay.  And there is no vehicle proposed in the plan for

9  delivering cash to retirees to participate in the exchange,

10  is there?

11  A    Not to my knowledge, no.

12  Q    All right.  Now, are you familiar with the term "Dutch

13  auction"?

14  A    Yes.

15  Q    Would you tell the Court what a Dutch auction is?

16  A    A Dutch auction is a technique used in the financial

17  markets to ensure that a company or a government when issuing

18  securities will always get the most favorable price for

19  itself.  In other words, you don't want to have a situation

20  where you sell a bond or a note or a share of stock and it

21  turns out that after you've done so, the price has doubled

22  because you mispriced the security because you misjudged the

23  demand for that security, so a Dutch auction is intended to

24  allow interested buyers of securities to, in effect, make an

25  offer to sell into the tender securities at whatever price

1  they deem fair, and then the city or the government in that
2  case would look at the total tally of bids or offers and
3  decide what is the lowest price that will clear the entire
4  market.  So anybody who made the mistake of offering to sell
5  a security for too high a price would not have its offer
6  accepted.
7  Q   So, sir, it's basically creditors fight to see who can
8  make the lowest bid in order to get the greatest amount of
9  whatever distribution or security is being offered; is that
10 correct?
11 A   Yes.
12 Q   Okay.  So in this particular context, your plan proposes
13 that pension creditors and healthcare creditors should
14 compete for the lowest possible price in order to be entitled
15 to a distribution under your notes; is that correct?
16 A   It's an option.  They don't have to take it if they don't
17 want to.
18 Q   But if they don't take it, if any creditor offers to sell
19 their note for a distribution, that creditor will get it, and
20 the retiree creditors will get nothing; is that correct?
21 A   It sets up a very interesting situation.  If a creditor
22 offers to sell his note back to the city at too low a price,
23 then a rational other buyer -- for example, a well-advised
24 pension fund in this case -- would probably decide not to
25 sell.  They would retain their notes.  And as the pool of

1    other noteholders shrinks, having sold at too low a price,

2    they would benefit by a higher price later.

3    Q    But in the context of this plan, if you needed cash

4    sooner rather than later, you'd have to bid rather than wait;

5    is that correct?

6    A    No.  You would have the option of selling your note into

7    the open market to presumably people who understand this

8    mechanic, who understand the city's credit, and they would be

9    offering you what they would deem is a fair market determined

10   price.

11   Q    But the bottom line, sir, is basically creditors under

12   your proposal have to compete for the lowest price --

13   A    No.  They don't have to --

14   Q    -- offered to the city?

15   A    They don't have to sell.  They can keep it and sell into

16   the market as an alternative to selling into a sinking fund

17   process run by the city.  No mandatory requirement to do so

18   and no coercion.

19   Q    But you can't get cash without participating in the bid?

20   A    Or selling in the open market.

21   Q    Can't get cash from the city, sir, without participating

22   in the bid?

23   A    That's true.

24   Q    And that's even-handed and fair insofar as retirees are

25   concerned?

1  A    They are being treated no worse or no better than any

2  other unsecured creditor of the city.

3  Q    Now, the note is -- that the June 14 proposal puts

4  forward is a $2 billion nominal value note; is that correct?

5  A    Correct.

6  Q    Okay.  And it is proposed to be distributed among

7  unsecured creditors on a pro rata basis; is that correct?

8  A    Yes.

9  Q    So that if a creditor had a billion dollar note and there

10 were $11 billion of unsecured claims, that billion dollar

11 note would be 1/11th; is that correct?

12 A    That's right.

13 Q    Okay.  Now --

14       MR. STEWART:  Your Honor, if I may, I think we are

15 straying a little bit into plan as opposed to eligibility

16 issues.

17       THE COURT:  I think the objection is relevance.

18       MR. MONTGOMERY:  Your Honor, in order for the

19 debtor's proposal to have been made in good faith, it must be

20 one that manifests both subjective and objective standards

21 with respect to good faith, and how creditors are proposed to

22 be treated I think is quite relevant to whether or not, "A,"

23 a plan has been proposed, and, "B," whether or not it's in

24 good faith.

25       THE COURT:  I agree.  The objection is overruled.

```
 1   BY MR. MONTGOMERY:
 2   Q   If a creditor -- if the city -- strike that.  Under the
 3   note proposal, asset sales by the city play a role in the
 4   funding of that note; is that correct?
 5   A   Yes.
 6   Q   And it's on a formula basis; is that correct?
 7   A   Yes.
 8   Q   And with respect to asset dispositions, it's 75 percent
 9   goes into the note pool, and 25 percent goes to the city?
10   A   Yes.
11   Q   But it's capped at an aggregate distribution of $2
12   billion; is that correct?
13   A   That's correct.
14   Q   So that if the city were to sell $2-1/2 billion worth of
15   assets, you would completely defease the $2 billion note and
16   the city would get a half a billion dollars; is that correct?
17   A   That's correct.
18   Q   If the city were to sell $5 billion of assets, the
19   creditors would get $2 billion and the city would get 3; is
20   that correct?
21   A   After the bankruptcy, that's correct.
22   Q   Is that fair and even-handed, sir?
23   A   It was an opening offer.  There are obvious things we
24   expected our creditors to come back and object to or ask to
25   negotiate.
```

1  Q    Okay.

2  A    But to answer your question, it was fair because it

3  treated our unsecured creditors exactly the same.

4  Q    And for you that's the key indicia in fairness?

5  A    Starting out a process like this, it's complicated, and

6  one must be very sensitive to the competing interests of all

7  of our creditors.  Other cites that have tried to do

8  consensual out-of-court restructurings have tended to favor

9  one group of creditors over the other.  That has not proven

10  to be a very successful strategy.  We elected to treat

11  everyone exactly the same, and we obviously expected there to

12  be vigorous negotiation among all of our unsecured creditors

13  because clearly everybody wanted to be treated more specially

14  than everybody else.  We decided because we didn't know where

15  this would go that the city should be viewed as being

16  impartial in how it would treat it's unsecured creditors.

17  Q    And treating -- in your mind, sir, treating the pension

18  obligations of the city for accrued financial benefits or --

19  strike that -- for pension benefits, in your mind, it's fair

20  to treat those exactly the same as general unsecured

21  creditors, trade creditors?

22  A    They're unsecured claims.

23  Q    Okay.  Isn't the city actually paying trade creditors

24  now, sir?

25  A    They are.

1  Q   The June 14 proposal that you made, there's some missing

2  information from it, is there not, if -- strike that.  Let me

3  rephrase the question.  Assume I'm a creditor, a hypothetical

4  creditor, and I want to make a decision on whether or not to

5  vote for your plan or not.  If I was just looking at the June

6  14 proposal, there would be some missing information;

7  correct?

8  A   I don't know what you're referring to.

9  Q   Are there any asset values listed in the June 14

10  proposal?

11  A   No.

12  Q   There's absolutely no balance sheet information of any

13  kind anywhere in that document; is that correct?

14  A   That's correct.

15  Q   Is there any information regarding major disputes that

16  the city has that might yield future cash or assets?

17  A   I don't understand your question.

18  Q   Is there any information regarding disputes over

19  collection of past due contract debts?

20  A   I believe we did make some references to that.

21  Q   And do you recall what those references were?

22  A   Well, the city has historically had a very difficult time

23  collecting delinquent property tax revenues.  I believe the

24  past due on that particular line item is several hundred

25  million dollars.  The city, from an administrative

1  perspective, has never been very good at collecting taxes,

2  and that's a potentially significant asset, but, again, the

3  ability of the city to collect on that has always been very,

4  very doubtful.

5  Q   But the June 14 proposal doesn't actually say anything

6  like several hundred million dollars, does it?

7  A   No.  I think there's a reference to it -- I don't have it

8  in front of me -- to the past due income taxes the city has

9  not been able to collect, but I'd have to have it in front of

10  me to find the reference to it.

11  Q   Understood.  Now, as part of your information provision

12  strategies for creditors, you created a data room; is that

13  correct?

14  A   My firm did organize one, yes.

15  Q   Okay.  And basically all creditor information is supposed

16  to show up there?

17  A   Yes.

18  Q   Okay.  Is there any information in that data room

19  regarding the value of art?

20  A   Not that I'm aware of.

21  Q   Is there any information in that data room regarding the

22  value of the Department of Water and Sewer?

23  A   Not that I'm aware of.

24  Q   Okay.  And there's no information on the value of either

25  of those two in the actual June 14 proposal, is there?

1  A    It was not available at the time.

2  Q    Okay.  Is it available today?

3  A    Well, they're both ongoing asset evaluations that the

4  city is managing.  I've already testified that the city did

5  retain Christie's to do an evaluation of city-owned art, and

6  the results of that hopefully will be available soon.

7  Q    Could you pause there for a second, sir?  Have there been

8  any preliminary reports by Christie's?

9  A    No.

10  Q    Nothing of any kind?

11  A    No.

12  Q    Are you in the information trail between Christie and the

13  city, sir, meaning are -- strike that.  What role, if any,

14  did you have in the selection of Christie's?

15  A    I recommended that the city interview them for the role

16  of appraising the city-owned art.

17  Q    And when did you make that recommendation?

18  A    I believe it was in late May, early June of this year.

19  Q    Would it have been before or after May 7?

20  A    Oh, after.

21  Q    Going back to information that's in the data room or in

22  the June 14 proposal itself, I asked you if there was any

23  information regarding the Department of Water and Sewer

24  there, and you said no.

25  A    No.  I didn't say -- I said I don't know.

1  Q   Oh, you don't know?

2  A   I don't have a record of every scrap of information

3  that's in the data room in my head.

4  Q   Okay.

5  A   I apologize.

6  Q   But is there any in the June 14 proposal itself?

7  A   We made reference to it as we've already testified to the

8  fact that we were working on it as potential source of value

9  to the city, but as is well-known, it is operated on a

10  nonprofit basis.  The city has never received any cash from

11  the Water and Sewer Department through which it provides

12  services to the customers all through southeastern Michigan,

13  and there has been no business plan up until the time we

14  commissioned one on that department in order to determine

15  what the value could be.

16  Q   Two follow-up questions perhaps.  One, it's true, isn't

17  it, that the Department of Water and Sewer makes

18  contributions to the Retirement System -- the General

19  Retirement System on behalf of its employees and retirees; is

20  that correct?

21  A   Yes.

22  Q   And that's actually a substantial number, isn't it?

23  A   I believe so.

24  Q   Now, it's also true that the Department of Water and

25  Sewer pays retiree healthcare benefits for its former

1    employees; is that correct?

2    A    With respect to its former employees?

3    Q    Well, retirees.

4    A    I don't know.

5    Q    And those payments -- strike.  Let me rephrase that.

6    You're familiar with the bonds that are secured by the

7    revenues of the Department of Water and Sewer, are you not?

8    A    I am.

9    Q    All right.  That's actually part of your firm's special

10   charge here is to understand those values; is that correct?

11   A    Yes.

12   Q    Okay.  And you understand that -- are you familiar with

13   the concept of a waterfall?

14   A    Lower case or upper case?  Yes.

15   Q    Okay.  In the context of a secured creditor's entitlement

16   to money, could you tell the Court what a waterfall is?

17   A    In our technical vocabulary, a waterfall describes the

18   application of cash flows in terms of priority of creditor

19   claims, so if a creditor has a lien against revenues, that

20   lien is supposed to be satisfied before any money may be paid

21   to any other creditor who has an interest subordinate to that

22   lien.

23   Q    So in the waterfall for the bonds secured by the

24   Department -- the assets belonging to the Department of Water

25   and Sewer, net operating expenses are paid first before the

1  bonds, are they not?  Is that not correct?

2  A    You know, it's a good question.  The way the rate

3  agreement works in that context, it's not clear that it's a

4  strict waterfall in the context used in creditor documents.

5  It is -- we are allowed to seek reimbursement for operating,

6  maintenance, and debt service costs from our rate payers, but

7  I don't know whether it specifically says those costs are

8  senior to the payments made to the secured creditors.

9  Q    Sir, isn't it true that the bondholders are entitled to

10  the revenues after payment of net operating expenses?

11  A    Again, I'd have to read the agreement.

12  Q    Sir, you understand this asset perhaps better than

13  anybody in this room.  Are you telling me you don't know the

14  answer to the question?

15  A    I'm saying I'd have to read specific language to give you

16  an accurate answer.

17  Q    But as you're sitting here today, you don't know the

18  answer?

19  A    I'd have to read the language to give you an accurate

20  answer.

21  Q    Does that mean as you're sitting here today, you do not

22  know the answer without reading the document?

23  A    It's a very technical provision, and I would want to make

24  completely sure I gave you an accurate answer by rereading

25  that language.

1  Q   Okay.  Are you familiar with the size of the operating

2  revenues that either the sewer fund or the water fund

3  receive?

4  A   Yes.

5  Q   Okay.  And, sir, is it -- am I correct that the sewage

6  disposal fund had revenues in excess of $430 million a year?

7  A   In fiscal 2012, that seems correct.

8  Q   Okay.  And same question with respect to the water fund,

9  in excess of $350 million a year?

10  A   That sounds right.

11  Q   Would you regard those numbers as being material?

12  A   Yes.

13  Q   Okay.  But they are not mentioned in the June 14

14  proposal?

15  A   No.

16  Q   When thinking about asset values for purposes of being a

17  hypothetical creditor, is an understanding of the future

18  value of -- strike that.  Is the understanding of a fair

19  market value of that asset something that a creditor would

20  like to know?

21  A   Yes.

22  Q   Is there any fair market value information anywhere in

23  the June 14 proposal?

24  A   No.

25  Q   Okay.  Another way of understanding value for a creditor

1   is to understand historical costs; is that true?

2   A   Yes.

3   Q   Is there any historical cost information in the June 14

4   proposal?

5   A   No.

6   Q   And, lastly, another way is third-party appraisals.  As

7   of June 14th, are there any third-party appraisals in the --

8   mentioned or described in the June 14 proposal?

9   A   No.

10  Q   As the city's financial strategist, has the city

11  commissioned any appraisals other than Christie's?

12  A   Well, let's see.  I testified yesterday we have requested

13  an audit be done of the Detroit-Windsor Tunnel.

14  Q   I think I said appraisals, sir.

15  A   No.

16  Q   We'll get to audits.  Appraisals.

17  A   No.

18  Q   No.  Okay.  So let's turn to audits.  Is there any

19  information in the June 14 proposal with respect to audits of

20  any of the assets?

21  A   Not as of that time.

22  Q   And if I could for the purpose of this question consider

23  valuations, appraisals, and historical cost being asset value

24  information -- can I just use that as asset value

25  information?

1   A    If you wish.

2   Q    Okay.  So there's no asset value information regarding

3   the City Airport in the June 14 proposal, is there?

4   A    No outside appraisal?  No.

5   Q    No.  The three buckets, appraisals, valuation, or

6   historical cost.  I'm calling it asset value information.

7   A    No.

8   Q    Okay.  Is there any on noncore real estate?

9   A    No.

10  Q    Is there any on the municipal parking system?

11  A    No.

12  Q    And I think you already testified there was nothing on

13  the Detroit-Windsor Tunnel; correct?

14  A    Correct.

15  Q    And you've also told me that there was no information on

16  potentially past due tax receivables; correct?

17  A    Well, we identified, I believe, how large a number it

18  was.  That's a matter of accounting entry.

19  Q    But nothing else?

20  A    That's right.

21  Q    Okay.  Has a business plan been developed by you or

22  somebody working with you for the Department of Water and

23  Sewer?

24  A    Yes.

25  Q    Okay.  And what role, if any, did Miller Buckfire play in

1    the development of that business plan?

2    A    None.

3    Q    You did not give any assumptions or make any

4    recommendations with respect to how that business plan should

5    be developed?

6    A    No.

7    Q    Okay.  So it's entirely the work of Conway MacKenzie?

8    A    And other consultants who were brought in to review the

9    Water and Sewer Department's capital improvement plan.

10   Q    Okay.  And who were those consultants, sir?

11   A    There was five or six firms involved.  I don't have all

12   their names.

13   Q    Are you speaking of engineering firms?

14   A    Yes.

15   Q    Oh, okay.  Now, have you read the business plan?

16   A    Yes.

17   Q    Have you made it part of a proposal that you have made to

18   anyone?

19   A    I don't understand.

20   Q    Have you made any proposals since the presentation to you

21   of the Conway MacKenzie business plan for the Department of

22   Water and Sewer to any third parties?

23   A    No.

24   Q    Have you made a -- have you made a proposal to the

25   emergency manager?

1  A   I don't understand what you mean by "proposal."

2  Q   Let's try again.  Have you been involved in any

3  negotiations regarding Department of Water and Sewer with

4  anybody not employed by the city or the emergency manager

5  since the Conway MacKenzie business plan was produced?

6  A   Yes.

7  Q   Okay.  And can you tell me what you have done in that

8  regard?

9       MR. STEWART:  I beg your pardon.  Could I hear the

10 question again?

11 BY MR. MONTGOMERY:

12 Q   The question was what have you done in that regard?  Do

13 you understand the question, sir?

14 A   Well --

15 Q   Obviously not.  Your eyes are wrinkling, and you can't

16 understand, so let me -- may I rephrase?

17 A   Of course.

18 Q   Thank you.  You were in charge of monetization of the

19 Department of Water and Sewer as an asset of the city, were

20 you not?

21 A   Yes.

22 Q   Okay.  And you've actually taken steps since the

23 production of the business plan to achieve that goal; is that

24 correct?

25 A   Yes.

1    Q   Okay.  And that has involved formulating a proposal to

2    third parties; is that correct?

3    A   Well, it's a very --

4    Q   Is that a "yes" or a "no" you're about to give me and

5    then answer?

6    A   Can you rephrase -- can you repeat the question?

7    Q   Sure.  I asked you if you had made a proposal to third

8    parties.

9           THE COURT:  And I would only ask you to specify,

10   counsel, a time period.

11          MR. MONTGOMERY:  Since the production of the Conway

12   MacKenzie business plan.

13          THE COURT:  To today?

14          MR. MONTGOMERY:  To today.

15          THE WITNESS:  No.

16   BY MR. MONTGOMERY:

17   Q   You've had no meetings with the regional water customers

18   of the city making a proposal to them?

19   A   I have not made a proposal on behalf of the city yet.

20   Q   Okay.  Did you have a meeting with the regional water

21   customers for the Department of Water and Sewer after

22   production of the Conway MacKenzie business plan?

23   A   We had a presentation of that plan after we met with our

24   creditors and presented the same information.

25   Q   Okay.  So you presented --

1        THE COURT:  I have to ask for a pause here.  I'm

2   concerned about the relevance of any of this information as

3   it may apply to work the witness has done since the case was

4   filed.

5        MR. MONTGOMERY:  Your Honor, if I may, this is a

6   line of inquiry that's actually designed to show that there

7   was potentially disclosable value in the June 14 proposal

8   that simply was not.

9        THE COURT:  Okay.  You can certainly ask about that,

10  but I don't think it's appropriate to ask the witness about

11  specific activities that he has undertaken to monetize

12  property since the case was filed.  The issue is was the --

13       MR. MONTGOMERY:  I understand, your Honor.

14       THE COURT:  -- city eligible on the date it filed.

15       MR. MONTGOMERY:  Okay.  Thank you, your Honor.

16  BY MR. MONTGOMERY:

17  Q   Mr. Buckfire, a central part of the June 14 proposal is

18  to free the Department of Water and Sewer from the legacy

19  pension and healthcare costs.  Is that not correct?

20  A   No.

21  Q   It's not correct, so --

22  A   It's not correct.

23  Q   Under the June 14 proposal, the city contemplates the

24  Department of Water and Sewer continuing to pay past pension

25  and healthcare obligations?

1   A    That wasn't what you asked me.  You asked me if we

2   contemplated freeing the department from legacy pension

3   liabilities.  That was not contemplated.  What was

4   contemplated was attempting to create a transaction that

5   might create value for the city but only if there was a buyer

6   on the other side willing to pay value for it.

7   Q    So two questions.  Does the June 14 proposal contemplate

8   that the retirees of the Department of Water and Sewer will

9   continue to have payments made by the city for either

10  pensions or healthcare?

11  A    Well, there are two scenarios.  In one case, the city

12  would continue to own the Department of Water and Sewer,

13  which is currently the most likely situation the city has,

14  and in that case the retirees would be treated exactly as we

15  identified in the plan with respect to their unsecured

16  claims --

17  Q    No.

18  A    -- in that scenario.  In the scenario in which we are

19  successful in selling Water and Sewer to its customers, which

20  would only be done if it created value back to the city, then

21  the use of that value would be up to the plan.

22  Q    When you say the use would be up to the plan, you mean

23  would be resolved as part of the plan of adjustment?

24  A    It would be a very fortunate outcome if we, in fact, are

25  able to get our customers to pay something for the use of

1  these assets.  What we do with that stream of value would

2  obviously be the subject of negotiation with our creditors

3  for whom benefit this is being done.

4  Q  Okay.  And am I not correct that the Conway MacKenzie

5  business plan identifies fairly significant streams of value

6  that are capable of being discussed?

7  A  In theory, yes.

8       MR. STEWART:  Objection, your Honor.  The plan was

9  provided and its detail was provided in the -- under the

10  confidentiality order in connection with the mediation

11  ordered by the Court.  I would object to any questioning

12  based upon that plan.

13       THE COURT:  Was that the question?

14       MR. MONTGOMERY:  No.  That was not actually the

15  question, but --

16       THE COURT:  All right.  Let's rephrase the question,

17  and we'll see if there's still an objection.

18  BY MR. MONTGOMERY:

19  Q  I think I asked you whether or not the Conway MacKenzie

20  business plan identified material streams of value.

21       MR. STEWART:  Same objection, your Honor.

22       THE COURT:  Was this Conway MacKenzie business plan

23  proffered to creditors or attorneys for creditors as part of

24  the mediation process?

25       MR. MONTGOMERY:  I believe we and others received

1  it.  That's why I was asking the question earlier whether or

2  not the witness had met with third parties.

3       THE COURT:  It was proffered as -- and you've seen

4  it as part of the mediation process?

5       MR. MONTGOMERY:  I have not asked -- yes.

6       THE COURT:  Is that right?

7       MR. MONTGOMERY:  Yes.

8       THE COURT:  Then the objection is sustained.

9       MR. MONTGOMERY:  Thank you.

10 BY MR. MONTGOMERY:

11 Q   Change of topic, sir.  You've been engaged twice in

12 connection with the City of Detroit; is that correct?

13 A   Yes.

14 Q   Okay.  And the first time was in 2012?

15 A   Yes.

16 Q   I believe you told Mr. Cullen yesterday that your first

17 engagement started around March; is that correct?

18 A   That's my recollection.

19 Q   That's March of 2012.  Do you recall telling me that your

20 first engagement was in July of 2012?

21 A   Yes.  I think I was wrong.

22 Q   So the July -- what you referred to in your deposition

23 transcript as July you now mean as March?

24 A   That's right.

25 Q   Thank you.  Were you involved with matters relating to

1 the city prior to March of 2012?

2 A    Only in a very limited sense.  We had tried to build a

3 relationship with the city and with the state obviously, as I

4 testified earlier, for about a year.  In the context of that,

5 at some point in early 2012 -- I can't recall when -- I was

6 contacted by Treasurer Dillon, who asked me if there was any

7 relevant experience that he could look at that might guide

8 him in constructing a agreement with the city to provide

9 future funding, so we did a little research, and I sent him

10 some documents related to the creation of the New York City

11 Financial Control Board and Municipal Assistance Corporation,

12 both of which were done in the 1970s, and answered a few of

13 his questions about that.

14 Q    Did you transmit to him any form of consent agreement?

15 A    No.

16 Q    Did you discuss these matters with Jones Day?

17 A    I recall asking someone at Jones Day what they thought

18 about this example as a structure that could be used by the

19 State of Michigan and the City of Detroit.

20 Q    And was that before or around March of 2012?

21 A    It was sometime in early 2012.  I can't recall the date.

22 Q    Okay.  Do you recall creating a model for use by

23 Treasurer Dillon?

24 A    A financial model?

25 Q    A model for a consent agreement?

1    A    I might have given him a model in the strict sense of an

2    outline, but that's all.

3    Q    Okay.  And did you share that outline with anybody else?

4    A    I don't recall.

5    Q    Did you share it with Jones Day?

6    A    I might have.

7    Q    Specifically Corrine Ball?

8    A    I might have.

9    Q    You communicate a lot with Corrine Ball, do you not?

10   A    I communicate with many attorneys.

11   Q    Did you not tell me in your deposition that you have had

12   almost daily contact with her as a result of a totally

13   different case?

14   A    That's true.

15   Q    Okay.  And were you having extensive contact with her in

16   March of 2012?

17   A    On another matter, that's correct.

18   Q    Okay.  But you also did talk with her or communicate with

19   her regarding this matter, did you not?

20   A    I did.

21   Q    Okay.  Do you recall communicating with Treasurer Dillon

22   about the possibility of repeal of PA 4?

23   A    No.

24   Q    No.  Do you recall communicating with Jones Day about the

25   possibility that the voters in the State of Michigan might

1   repeal PA 4?

2   A    No.

3   Q    Sir, do you remember telling me that -- in 2013 that the

4   city's information was not reliable?

5   A    That's correct.

6   Q    Do you recall participating in a meeting with E&Y and the

7   emergency manager on or about May 7?

8   A    Yes.

9   Q    Okay.  Do you recall telling me that that is the moment

10  in time in which you concluded the city was not solvent?

11           MR. STEWART:  Your Honor, if I may, if he could

12  answer the question -- ask the question directly, and then if

13  he doesn't recall, he can refresh his recollection or impeach

14  him with the deposition.  Asking whether he recalls the

15  deposition without the deposition in front of him is just an

16  improper way to proceed.

17           THE COURT:  The objection is sustained.  Just ask

18  the question.

19  BY MR. MONTGOMERY:

20  Q    When did you decide that the city was insolvent?

21  A    I didn't decide the city was insolvent.

22  Q    When did you conclude in your own mind that the city was

23  insolvent?

24  A    Well, if you use the definition of insolvency as the

25  inability to continue to pay debts when due, which I think is

1   relevant here, that's when it became, I think, factually

2   pretty evident to me that that would be a serious problem for

3   the city.  The city could not, therefore, make the

4   representation that it could pay its debts when due in the

5   short term, and, therefore, if you want to call that

6   insolvency, I would agree with you.

7           THE COURT:  The question was when did you come to

8   that conclusion?

9           THE WITNESS:  Around May 7th when I first saw the

10  projection from Ernst & Young.

11  BY MR. MONTGOMERY:

12  Q   That was the projection from Ernst & Young that --

13  A   The short-term cash flow forecast, yes.

14  Q   Okay.  Sir, I'm going to change topics, if you don't

15  mind.  I'd like to draw you back to a meeting that took place

16  at the City Airport, the law firm retention meetings, which I

17  believe you were in attendance at; is that correct?

18  A   I think you mean Metropolitan Airport.

19  Q   Metropolitan.  Did I say City Airport?

20  A   You did.  No one would have a meeting there if they could

21  avoid it.

22  Q   My apologies.  My apologies.  Even I know the difference

23  between the City Airport and the Metro Airport.  At the Metro

24  Airport?

25  A   Yes.

1  Q   Okay.  And were you in the room when Jones Day made its

2  presentation?

3  A   I was in the room for all the presentations, including

4  Jones Day's.

5  Q   Okay.  Do you recall anyone at Jones Day during that

6  presentation making a statement to the effect that asset

7  monetization outside of a bankruptcy may implicate

8  eligibility requirement that city be insolvent?

9  A   No.

10  Q   Sir, do you recall anybody at Jones Day making a

11  statement that statutes, codes, case law may require that

12  funds received from disposition be allocated?

13  A   No.

14  Q   Do you recall anyone at Jones Day making a statement that

15  any transaction should be reviewed and structured to address

16  any eligibility issues by earmarking of funds?

17  A   No.

18  Q   Was there any conversation during that meeting regarding

19  asset dispositions?

20  A   As I recall, the topic was addressed by all the law firms

21  that made presentations.  I can't recall what specifically

22  any one law firm said about it.

23  Q   In your experience as a financial strategist, leading up

24  to a Chapter 9, is asset monetization an issue that needs to

25  be watched closely for eligibility purposes?

1    A    I think you're asking me for a legal conclusion.  My

2    focus is purely and simply on cash, and we looked at all the

3    assets of the city with the objective of determining whether

4    any of the assets of the city could be converted into cash on

5    a fast basis because we needed the cash.  I really wasn't

6    worried about eligibility implications of that.

7    Q    Do you recall having any conversations with Emergency

8    Manager Moore (sic) regarding the timing of asset

9    monetizations prior to June 14, 2014 (sic)?

10   A    Yes.

11   Q    And when did that conversation -- first, was it one

12   conversation or more than one conversation?

13   A    That was multiple conversation over many months.

14   Q    Okay.  And so when was the first time you discussed the

15   impact of asset monetization?

16   A    Well, after he was appointed emergency manager -- I

17   believe it was close to the end of March.  We had already

18   been engaged for several months before that.  We briefed him

19   on our preliminary assessment of the situation, including

20   whether or not any assets were available for rapid conversion

21   to cash.  I believe it was that time we went through our list

22   of what I would call non-core assets and helped him

23   understand what any of them might be worth in a sale

24   transaction.

25   Q    But your conclusion was that nothing could be done in the

1  short term?

2  A   Correct.

3  Q   Okay.  And did the emergency manager charge you to begin

4  the long-term effort as a result of those conversations?

5  A   We continued to evaluate all of the city's assets after

6  that conversation as we have continued to do so to try to

7  maximize value for the city.

8  Q   So did the emergency manager change your work plan with

9  respect to asset monetization in any way?

10  A   No.

11          MR. MONTGOMERY:  Your Honor, subject to conferring

12  with my colleagues, I believe I'm done with this witness.

13          THE COURT:  All right.  I'll give you a moment to do

14  that.

15          MR. MONTGOMERY:  Your Honor, the Retiree Committee

16  has finished with Mr. Buckfire.  Thank you.

17          THE COURT:  All right.  Thank you.

18          MR. MONTGOMERY:  It'll take a moment to move my

19  papers from underneath the podium.

20                          CROSS-EXAMINATION

21  BY MR. CIANTRA:

22  Q   Good afternoon, Mr. Buckfire.  Thomas Ciantra, Cohen,

23  Weiss & Simon.  We're counsel for the UAW.  I don't have a

24  lot, but I do want do -- did want to ask you about one of the

25  topics that you testified about in your direct examination,

1  and that was, as I understand it, you were tasked to

2  negotiate with the city's bondholders and specifically the

3  bond insurers.  Is that correct?

4  A   That we took the lead role in those negotiations, yes.

5  Q   Okay.  And just by way of -- just by way of background,

6  would it be correct that some of the city's debt, both the

7  secured debt and the unsecured debt, is insured by municipal

8  bond insurers?

9  A   Substantially all of it is.

10 Q   Substantially all of it, so can you put a percentage on

11 that?

12 A   Well, there is approximately $6 billion of water and

13 sewer debt, and of that total about 5-1/2 billion, I believe,

14 is insured.

15 Q   Okay.

16 A   And of the city's general obligation debt, which includes

17 the certificate of pension payment debt, substantially all of

18 that is insured as well.

19 Q   Okay.  So how the insurance works -- would it be correct

20 that the insurers for the cost of the premium take on an

21 obligation to pay both interest payments when due and

22 repayment of principal in the event of a default?

23 A   Yes.

24 Q   So the bondholder, by purchasing the insurance,

25 essentially is reducing the credit risk of the underlying

1  bond?

2  A    That's the theory, yes.

3  Q    Right.  And the theory would be the way the market would

4  function is the issuer then is able to charge a lower

5  interest rate for the underlying bond obligation because of

6  the insurance?

7  A    The issuer, if it's done correctly, is supposed to be

8  able to borrow at a lower cost.

9  Q    Got it.  So in the proposal for creditors, there are

10 appendices that specify the various bond issues that are

11 outstanding?

12 A    Yes.

13 Q    And they identify the -- with respect to each bond issue,

14 the identity of the relevant insurer?

15 A    I believe that information is in the document, yes.

16 Q    Okay.  And would I be correct that there are -- it looks

17 to me as though there are six bond insurers that are

18 identified?

19 A    Yes.

20 Q    MBIA, Assured Guaranty, FGIC -- looks like Berkshire

21 Hathaway might be involved with some of the FGIC issues --

22 Syncora and something called Ambac?

23 A    That's correct.

24 Q    Did I miss any?

25 A    No.

1   Q   So in terms of the city's negotiation with respect to the

2   bond debt, those negotiations could really effectively be

3   done by those six bond insurers?

4   A   Well, it's not clear what would have ultimately happened

5   and what will happen in this case.  Certainly we began with

6   them, but we did not expect to end with them.

7   Q   Okay.  But it would be correct that from your perspective

8   in terms of handling the negotiation, the bond debt was --

9   debt holders were organized through the insurers; correct?

10  A   We could start there, yes.

11  Q   Right.  And the insurers could be effectively relied upon

12  to speak for the bondholders?

13  A   Well, again, we were opening what we expected to be a

14  long series of negotiations.  The bond insurers represented

15  themselves as holding the economic risk of these bonds

16  because of their insurance.  Therefore, we began our

17  discussions with them.

18  Q   Okay.  And as we said, that's six entities --

19  A   Correct.

20  Q   -- that cover the substantial majority of the city's

21  outstanding secured and unsecured debt; correct?

22  A   That's right.

23  Q   Do you know whether the city's unsecured pension

24  liabilities are insured?

25  A   I don't know.

1  Q   Okay.  So if I'm a bondholder -- let's say I'm a little

2  old lady in Pasadena who's relying on insured municipal bonds

3  from the City of Detroit for my retirement income.  I would

4  have recourse with respect to that income to the bond

5  insurer; correct?

6  A   Only if the bond insurer itself is solvent.

7  Q   Okay.  Assuming that they're solvent, is that --

8  A   Can't make that assumption here because some of them

9  aren't.

10 Q   I understand that some of them are having financial

11 difficulties, but at least it's possible.  It was possible

12 for the bondholder to purchase an insured product; correct?

13 A   In theory.

14        MR. CIANTRA:  No further questions.

15        THE COURT:  You may proceed, sir.

16        MR. SHERWOOD:  Hello, your Honor.

17                    CROSS-EXAMINATION

18 BY MR. SHERWOOD:

19 Q   Mr. Buckfire, Jack Sherwood, Lowenstein Sandler.  I'd

20 like to ask the technician to put up City Exhibit 7, which I

21 think you discussed yesterday on your direct.  Do you

22 remember discussing this agreement yesterday, Mr. Buckfire?

23 A   I do.

24 Q   And this agreement was executed before you were retained.

25 Is that fair to say?

1    A    Yes.

2    Q    And one of the parties to this agreement is the

3    Department of Treasury of the State of Michigan; correct?

4    A    Yes.

5    Q    And the other is the City of Detroit.  And I'd like to

6    ask you to clarify some of your testimony yesterday for me

7    about this agreement.  I thought I heard you say that it was

8    pursuant to this agreement that -- or that there was

9    something about this agreement that led to your engagement.

10   Is that accurate?

11   A    Yes, paragraph 1.

12   Q    Paragraph 1.  Is that the paragraph that talks about

13   restructuring assistance; correct?

14   A    Correct.

15   Q    And would you call yourself part of that restructuring

16   assistance that was agreed to for the city pursuant to this

17   agreement?

18   A    Well, my firm was selected pursuant to this paragraph 1

19   requirement.

20   Q    Okay.  And is it your understanding that, in addition to

21   your firm, Ernst & Young and Conway were also selected

22   pursuant to this paragraph 1 to provide restructuring

23   assistance?

24   A    No.  Ernst & Young had already been working for the city

25   pursuant to the March 2012 consent agreement.  I believe

 1   paragraph 2 of this memorandum is the entry point for Conway

 2   MacKenzie being awarded the contract to provide operational

 3   assistance.

 4   Q   Okay.  So you were engaged pursuant to paragraph 1,

 5   Conway MacKenzie pursuant to paragraph 2, and Ernst & Young

 6   was already on the scene; correct?

 7   A   Correct.

 8   Q   And did you -- so when was the exact date that you

 9   actually got selected pursuant to this agreement?  It was

10   January of 2013; right?

11   A   Well, we signed our contract with the city on January the

12   5th, but we had been told we had won the award, as it were,

13   in December.

14   Q   Okay.  So you started work in earnest pursuant to this

15   agreement in January of 2013; is that right?

16   A   Yes.

17   Q   And same for Conway?

18   A   I don't know when they began, but it was -- certainly the

19   first time I met with them was in January.

20   Q   Okay.  And do you know whether Conway began their

21   services in January?  Maybe you just answered the question.

22   I'm sorry for asking it again.  Just to be clear, you don't

23   know whether Conway actually began their work in January of

24   2013?

25   A   I don't.  That's just when I first met them.

1  Q   Okay.  But you met them in the context of you're both

2  working on your engagement for the City of Detroit; isn't

3  that right?

4  A   Yes, because we both reported to the same city officers.

5  Q   Now, if you turn to paragraph 8 of this agreement -- I

6  think it's on page 5.  Can you -- it talks about milestones

7  for draws, and I think you testified a little bit yesterday

8  about -- and there has been some testimony over this money

9  that was loaned by the state and held in escrow.  Do you

10 recall that testimony?  Is that accurate?

11 A   No, it's not accurate.  I testified that the city had

12 been assisted by the state in raising $130 million on the

13 capital markets.  I think it was in March or April of 2012.

14 Q   Okay.  And you understood that to be the case when you

15 came on board in January of 2013?

16 A   Yes.  I knew there was still some money in escrow from

17 that bond financing.

18 Q   Okay.  And do you know what the amount in escrow was

19 in -- I just heard yesterday numbers like 30 million, 80

20 million, 50 million.  Do you know how -- let's see if we can

21 go date by date.  Do you know how much was in escrow in

22 November of 2012, the date of this agreement?

23 A   Well, paragraph 8 says there was $80 million, so I assume

24 it --

25 Q   Okay.

1  A    -- was $80 million.

2  Q    And do you know how much was in escrow on the date that

3  the bankruptcy petition was filed?

4  A    I believe it was around 60 million.

5  Q    Okay.  And do you know -- so at least 20 million was

6  distributed from that escrow between the period of November

7  2012 and July 2013; right?

8  A    Yes.

9  Q    And is this -- was it sort of like an advance and then a

10  repayment, or do you know how that worked?

11  A    Well, it was meant to be a release from the escrow.  I

12  don't really recall what the mechanism was.  I don't recall

13  there being any requirement for the city to put it back

14  because the city would not have the ability to do that once

15  the money was spent.

16  Q    Okay.  So you don't know whether it was 80 and then it

17  was below 60 and then -- you don't know whether the city ever

18  paid any of that money back?

19  A    I don't.

20  Q    Okay.  Do you know whether the city pays interest on that

21  money?

22  A    I don't.

23  Q    And is it true that that escrow money is releasable to

24  the city in the discretion of the state treasurer?

25  A    That's my understanding.

1  Q   So if the state treasurer wanted to release that money to
2  the City of Detroit, it could in the exercise of its
3  discretion?
4  A   I assume so.
5  Q   Now, the release of this -- would you agree that your
6  engagement and the engagement of Conway pursuant to this
7  agreement was sort of a condition of the city having access
8  to this escrow money?
9  A   Well, that was part of the paragraph 1 and 2 requirements
10 of this agreement.
11 Q   Right.  So if the city didn't retain -- and I'm not
12 saying you personally, but a financial advisor and a business
13 advisor, then they couldn't get access to this money.  Is
14 that your understanding?
15 A   Yes.
16 Q   Now, when this -- the date of this agreement was November
17 2012.  That was the same time that PA 4 was repealed by the
18 voters of the State of Michigan; isn't that right?
19 A   I don't know.
20 Q   And in your conversations with the state concerning this
21 agreement, do you know whether there was any connection
22 between this agreement and the referendum with respect to PA
23 4?
24 A   No.
25 Q   Now, after you were engaged in January of this year along

1  with Miller Buckfire, your understanding is you were working

2  for the City of Detroit; isn't that right?

3  A   That's who our contract is with.  That's correct.

4  Q   Okay.  But you reported to a board which include

5  representatives from the state, for the State of Michigan?

6  A   No.  We reported to Kriss Andrews and Jack Martin.

7  Q   Just the city?

8  A   That's correct.

9  Q   Okay.  And I assume you tried to fulfill your duties as a

10  professional, and I'm sure, based on your observations, the

11  folks at Conway MacKenzie were doing what they could to

12  provide financial advice and restructuring advice and to

13  implement initiatives for the City of Detroit from January

14  2013 through the appointment of the emergency manager;

15  correct?

16  A   As directed by the city.  That's correct.

17  Q   Let me just jump to your discussion earlier about your

18  communications with Jones Day.  You talked about March 2012

19  being your engagement date.  You made a mistake at your

20  deposition, so it was March 2012.  So your initial engagement

21  by the city ended, because I think it was a 60-day

22  engagement, so did it end in May of 2012?

23  A   I can't remember.  It was only 60 days, and it was a very

24  limited scope, so it was around that time.

25  Q   So just running the math -- and we don't have to be exact

1  here, but, generally speaking, you were really not -- you

2  were kind of on the sidelines during the period from, say,

3  May of 2012 through the end of the year when you were engaged

4  pursuant to this new deal; right?

5  A    That's right.  We had developed a relationship with the

6  city which we maintained during that period.

7  Q    Now, during that period of time, you continued to

8  maintain contact with Jones Day and continued to exchange

9  information with Jones Day about the City of Detroit and

10  their financial issues; isn't that right?

11  A    And other law firms.  That's correct.

12  Q    Let me stay on this topic because I want to try to do

13  this in some type of logical order.  Let me jump now to the

14  meeting of the law firms at the airport on January 29th.

15  Isn't it true that you had a telephone conversation with the

16  Jones Day law firm on the day before that meeting?

17  A    I did, along with all the other law firms.

18  Q    You had a telephone conversation with all of the 14 or 15

19  law firms on the day before that meeting?

20  A    Many of them called looking for last-minute advice and

21  guidance on how to conduct themselves in the presentation.

22  Q    Okay.  Do you recall in your conversation with Jones Day

23  in particular advising Jones Day to address the issue if

24  Miller Buckfire finds a way to monetize assets, how will that

25  affect eligibility?

1  A   No.

2  Q   You don't recall that, any discussions with Jones Day

3  about that particular topic?

4  A   No.

5  Q   Do you recall what you said to Jones Day in advance of

6  the meeting to help them prepare to give their pitch?

7  A   I recall telling them the same thing I told all the other

8  law firms.  In general, make sure that they presented as

9  thoughtful a range of alternatives to the city and the state

10 as they could; to emphasize, to the extent they could, their

11 deep connections to the City of Detroit and the State of

12 Michigan; if they could speak to it, their midwestern roots

13 and any other things that would indicate that they cared

14 about this assignment.

15 Q   And just to be clear for the record, your testimony is

16 that you don't recall any discussions with Jones Day on

17 January 28th, 2013, asking them to address asset monetization

18 and the impact of that on eligibility under Chapter 9?  Is

19 that your testimony here today?

20 A   We might have talked about how we would handle an asset

21 monetization, but I don't recall any other implications of

22 that.  Asset monetizations always have to be considered in

23 any restructuring process as a source of cash and recovery

24 for creditors.

25 Q   Do you know discussing with them the impact of asset

1  monetization on eligibility for Chapter 9?

2  A   No.

3          MR. SHERWOOD:  Can I have one second, your Honor?

4          THE COURT:  Yes, sir.

5          MR. SHERWOOD:  Can we have Exhibit 860, please?

6  Your Honor, I don't think that this exhibit is in evidence.

7  I'm trying to use it to refresh the witness' recollection.

8          THE COURT:  Well, if that's so, I would ask you to

9  take it off the screen and just hand him a paper copy.

10          MR. SHERWOOD:  I'm sorry, your Honor.  I don't have

11  a paper copy.

12          MS. GREEN:  It's in the binder.

13          THE COURT:  Did you say 860?

14          MR. SHERWOOD:  Yes, sir.

15          THE COURT:  My order says that it is admitted into

16  evidence.

17          MR. SHERWOOD:  Then we can put it on the screen,

18  your Honor.

19          MR. STEWART:  No.  I think the -- don't we have the

20  objection on attorney privilege and on attorney work product

21  on that?

22          ATTORNEY:  We had one, yes.

23          MR. STEWART:  Did we recede from it?

24          ATTORNEY:  Yes, we did.

25          MR. STEWART:  Okay.  I'm sorry.  We receded from our

1  objection.

2          MR. SHERWOOD:  All right.  So can I put it back up,

3  your Honor?

4          THE COURT:  Okay.

5          MR. SHERWOOD:  I'm sorry.  Nw, if you can -- can I

6  ask that we go down to the text and sort of the line that

7  starts "Miller Buckfire" and blow that part up, please?

8  BY MR. SHERWOOD:

9  Q    Bottom sentence in the block that says, "If MB finds a

10  way to monetize assets to create liquidity, how would that

11  impact eligibility?"  And just for the -- just so we're

12  clear, Mr. Buckfire, you're not on this e-mail.  This is an

13  e-mail in evidence, and it -- and take your time reading the

14  whole thing, but basically it describes, I think, a

15  conversation at Jones Day describing their conversation with

16  you, and, you know, the last question is, "If MB" -- I assume

17  that means Miller Buckfire -- "finds a way to monetize

18  assets, how would that impact eligibility?"  Does that

19  refresh your recollection as to the content of your

20  conversation with Jones Day that day?

21  A    This is not an e-mail that I'm part of.

22  Q    Fair.

23  A    May I read the whole thing?  You're showing me one little

24  paragraph.

25  Q    Yeah.

1  A    This is an internal e-mail from Jones Day?

2  Q    Yes, it is, sir.

3  A    Yeah.  I'm sorry.  It's -- okay.  Can you blow this up?

4  I can't even read it.  Thank you.

5  Q    Is that better?

6  A    Thank you.  Okay.

7  Q    Does that refresh your recollection as to whether -- when

8  you had your conversation with Ms. Ball from Jones Day on the

9  28th, whether you told her to address the issue at the

10 meeting the next day if Miller Buckfire finds a way to

11 monetize assets, how would that impact eligibility?

12 A    I simply pointed out to her, as I did to everybody else,

13 that we were looking at ways of creating value, and we needed

14 to consider whether that could be done inside or outside of a

15 bankruptcy.  Obviously in the course of a normal bankruptcy,

16 Chapter 11 in particular, selling an asset prior to a

17 bankruptcy proceeding may often be challenged in hindsight by

18 creditors.  If we did find a source of value, we'd want to

19 make sure it didn't happen that way.

20 Q    So are you saying now that you recall the -- you

21 specifically --

22 A    No.

23 Q    -- recall the conversation, or are you just speculating

24 as to what you might have --

25 A    I'm speculating as to what this means and what she

1  thought she was writing about.

2  Q   All right.  We can take that down now.

3        MR. STEWART:  I'd move to strike the testimony, your

4  Honor.

5        THE COURT:  I'm sorry.  On what grounds, sir?

6        MR. STEWART:  Speculation.

7        MR. SHERWOOD:  I don't mind.

8        THE COURT:  All right.  It is so ordered.

9  BY MR. SHERWOOD:

10  Q   Now, in your previous cross -- I don't want to take too

11  much time with this because you've been up there a long time

12  and everybody is (inaudible) to lunch, but -- and just so the

13  record is clear, you were asked about whether Jones Day at --

14  whether you recall at the meeting on the 28th whether Jones

15  Day actually made part of their pitch with Mr. Orr a

16  statement about the impacts of asset monetization and

17  eligibility, and just so we're clear, you don't recall any

18  such statements being made by Jones Day during the course of

19  their presentation, or do you?

20  A   I don't.

21  Q   Let me try to pick up on the whole even-handed and fair

22  discussion.  I think you testified -- I'm sorry.  Is it your

23  understanding that at $12 billion of total liabilities the

24  projected recovery for unsecured claims under the proposal

25  was 16 cents on the dollar?

1  A   That's correct.

2  Q   And in concluding that the plan, as presented, is even-

3  handed and fair, did you consider the argument that the

4  vested pension claims are protected by the Constitution of

5  the State of Michigan?

6  A   I am aware of that argument.

7  Q   Did you incorporate that argument into the proposal?

8  A   No.

9  Q   And do you consider that argument -- you don't give that

10 argument much value, do you, when you conclude that the

11 proposal made on June 14th is even-handed and fair; isn't

12 that right?

13 A   We didn't give any weight to the obligation -- the

14 statement of the general obligation bondholders that their

15 tax pledge was important either.  We regarded them both as

16 covenants that the city could not honor.

17 Q   I'm sorry.  I just asked you about the vested pension

18 benefits and their mention in the Constitution.

19 A   They don't have --

20 Q   I asked you -- I asked you whether you give the

21 constitutional protection any value in either the proposal --

22 A   Um-hmm.

23 Q   -- or your statement that the proposal was even-handed

24 and fair.

25 A   They don't have a security interest, and, therefore, we

1   did give it weight, but we did not regard it as relevant to

2   our claims classification.

3   Q   They didn't have a security interest, but -- so, in your

4   view, a security interest is more valuable than

5   constitutional protection?

6   A   If a creditor has a security interest in an asset or

7   revenue stream, that gives them a claim on that revenue

8   stream or asset.  What is a covenant?

9   Q   Let me -- staying with the proposal, do you remember

10  looking at a page of the proposal that had a -- sort of a

11  timeline?  Would you like to see that again?

12  A   Yes, to make sure I understand which page --

13  Q   Yeah.  Can we pull up --

14  A   Which exhibit is that?

15  Q   It's 408, among others.  We're going to pull it up.

16  A   Are you referring to Exhibit 43?

17  Q   Yeah.  That's your number, yeah.  The city's number is

18  403.  That works.

19  A   Okay.

20  Q   Now, if you turn to page 113 of that -- and I believe

21  that is the page 113 that was on the original document.  Yes.

22  That's it.  Now, when this proposal -- I think you testified

23  yesterday that this was not a take it or leave it proposal;

24  correct?

25  A   Correct.

1  Q   And you and counsel referred to this calendar of contacts

2  and this page.  Was this calendar and contacts information --

3  was that highlighted at the end of the meeting on June 14th?

4  A   Yes, it was.

5  Q   Okay.  So there was a period for requests for additional

6  information June 17th to June 24th, and then initial round of

7  discussions.  The initial round of discussions ends on July

8  2nd; correct?

9           ATTORNEY:  July 12th?

10          THE WITNESS:  July 2nd?

11          MR. SHERWOOD:  July 12th.  Thank you.

12          THE WITNESS:  That was the plan, yes.

13  BY MR. SHERWOOD:

14  Q   Right.  And that was just to be the initial round of

15  discussions; correct?

16  A   We had to start someplace.

17  Q   Correct.  And then there's an evaluation period July 15th

18  through July 19th.  Do you see that?

19  A   I do.

20  Q   And the city filed bankruptcy on July 18th; isn't that

21  right?

22  A   I believe that's right.

23  Q   On this calendar and contacts, it doesn't say anything

24  like if we don't reach an agreement we're going to file on

25  July 18th, 2013; isn't that right?

1    A    It doesn't say that.

2    Q    And that wasn't said at the meeting, July 18th we're

3    going to file.  Nobody said that?

4    A    We hoped we didn't have to.

5    Q    One of the big concerns from your perspective in the --

6    in regard to the swaps counterparties -- we can put that down

7    there.  I think it was your testimony that you were really

8    concerned about these negotiations with the swaps.  You were

9    involved in that.

10   A    That's right.

11   Q    And your big concern was that absent a deal with these

12   guys, the city could lose the casino revenue, and that's a

13   big part of the city's revenue; right?

14   A    And then it got worse.  That's correct.

15   Q    Okay.  Isn't it true that -- though, that on July 17th a

16   forbearance agreement was executed with the swap

17   counterparties?

18   A    That's true.

19        MR. SHERWOOD:  Can we put up Exhibit 558, please?

20   It's AFSCME 558.  I'll move on to something else and see if I

21   can get back to that, your Honor.

22        THE COURT:  I'm feeling like this is a good time to

23   break for lunch.

24        MR. SHERWOOD:  Your Honor, I was hoping to get done

25   before lunch, which is -- I'm sorry about that, but --

1          THE COURT:  I'd like to actually conduct a

2   referendum among counsel here.  One hour, one hour and 15

3   minutes, or one hour and 30 minutes for lunch?  How many vote

4   for one hour?  Nobody.  How many vote for an hour and 15

5   minutes?  A couple people.  How many an hour and 30?

6   Everybody else.  All right.  Fine.  An hour and 30 it is.

7   We'll reconvene at 1:45.

8          MR. SHERWOOD:  Your Honor, just --

9          THE COURT:  Sir.

10          MR. SHERWOOD:  -- for everybody's benefit, I'm 15

11   minutes from --

12          THE COURT:  Okay.

13          MR. SHERWOOD:  Just so everybody can plan.

14          THE COURT:  We'll pick it up then.

15          MR. STEWART:  Another question now?

16          THE COURT:  Sir.

17          MR. STEWART:  I would like to ask the Court's

18   guidance.  We have Mr. Malhotra here, and I assume that for

19   fairness sake, since those exhibits are now in for the truth,

20   that there will be additional cross-examination of

21   Mr. Malhotra and probably brief additional direct.

22          THE COURT:  Well, let's take this up at 1:45.

23          MR. STEWART:  Okay.

24          THE COURT:  Counsel, I want you to think about the

25   question whether you need further examination of Mr. Malhotra

1    or whether he can be excused as a witness.

2         THE CLERK:  All rise.  Court is in recess.

3       (Recess at 12:15 p.m. until 1:45 p.m.)

4         THE CLERK:  Court is back in session.  Please be

5    seated.  Recalling Case Number 13-53846, City of Detroit,

6    Michigan.

7         THE COURT:  Looks like everyone is here.  You may

8    proceed, sir.

9    BY MR. SHERWOOD:

10   Q   Mr. Buckfire, before lunch I was trying to get ahold of

11   this exhibit that we've marked as 588.  Can you see it on the

12   screen, or would you like a hard copy?

13   A   If you could blow up the one I have here, that would be

14   helpful.  Yes, I see it.  There's only half the document.  Do

15   you have a hard copy just if you don't mind?

16        MR. SHERWOOD:  May I approach, your Honor?

17        THE COURT:  Yes.

18        MR. SHERWOOD:  Would the Court like a hard copy,

19   too?

20        THE COURT:  No.  That's all right.

21        THE WITNESS:  Thank you.

22        THE COURT:  Do you have a question for the witness?

23        MR. SHERWOOD:  Oh, I'm sorry.

24   BY MR. SHERWOOD:

25   Q   Have you reviewed the document?  Do you recognize it?

1  A   I do.

2  Q   And did you write this e-mail to the governor, Treasurer

3  Dillon, and others on July 17th, 2013?

4  A   I did.

5  Q   And does it accurately describe the state of affairs with

6  respect to negotiations -- the negotiation of a forbearance

7  agreement with the swap counterparties?

8  A   Yes.

9  Q   Okay.

10       MR. SHERWOOD:  Your Honor, I would move this

11  evidence into evidence.  I don't think it's been stipulated

12  in.  I think we've laid a proper foundation.

13       MR. STEWART:  No objection, your Honor.

14       THE COURT:  All right.  The exhibit was 588, did you

15  say?

16       MR. SHERWOOD:  Yes, sir.

17       THE COURT:  Exhibit 588 is admitted.

18    (Exhibit 588 received at 1:47 p.m.)

19  BY MR. SHERWOOD:

20  Q   Mr. Buckfire, just before lunch, just to follow up on

21  something I asked you, you indicated that one of the people

22  at the city that you reported to before the appointment of

23  the EM was a person by the name Jack Martin.  Do you remember

24  that?

25  A   Yes.

1    Q   And isn't it true that Mr. Martin was hired pursuant to a

2    consent decree and appointed by Governor Snyder?

3    A   Well, I know he was hired as chief financial officer

4    after the consent agreement was signed in March of 2012,

5    chief financial officer of the City of Detroit.  I don't

6    recall him being appointed by the governor.

7    Q   Isn't it true that he's now the EM for the Detroit Public

8    Schools?

9    A   Yes.

10   Q   And in that post, was he appointed by the governor?  Do

11   you know?

12   A   I don't know.

13   Q   Let me ask you just about the artwork and the Christie's

14   appraisal.  I think you said that you engaged them in either

15   May or June.  Do you remember that?

16   A   May.

17   Q   Was it May?

18   A   May 15th or so.

19   Q   May 15th.  Okay.  So they've had all of June, July,

20   August, and September, and I mean it's been like five months

21   since their engagement.

22   A   No.  I didn't say that.  I said I met with the DIA May

23   15th --

24   Q   When were they --

25   A   -- and I recommended to the emergency manager that an

1   appraisal be conducted sometime in June, and I contacted

2   Christie's on behalf of the city to find out if they had an

3   interest in taking on this assignment.  As I recall, the

4   emergency manager did not sign their agreement until sometime

5   in August.

6   Q   August.  Okay.  So they've only had August, September,

7   October to do their appraisal work.  Is that what you're

8   saying?

9   A   I believe they actually started in early September.

10  Q   Okay.  And in that time they haven't even produced a

11  preliminary report on valuation?

12  A   No.

13  Q   You testified yesterday about -- in connection with the

14  Coleman Young Airport.  I think you said something about

15  consulting with one of your colleagues at Miller Buckfire who

16  had expertise in matters concerning to airports and financing

17  and so forth.  Do you recall that?

18  A   I do.

19  Q   And what was the name of that individual?

20  A   John McKenna.  He's a managing director at Miller

21  Buckfire, a lot of experience with airlines.  Among other

22  things, he had been a director of U.S. Airways at one point.

23          THE COURT:  The question simply was who was that.

24          THE WITNESS:  John McKenna.

25  BY MR. SHERWOOD:

1  Q   And at Miller Buckfire, you guys have over 30

2  professionals.  Do the professionals within your firm -- do

3  they specialize in specific industries?

4  A   They don't set out to do so, but after you've worked with

5  one company and one industry, you tend to do others, so they

6  do acquire industry expertise.

7  Q   And what other types of industry expertise would you say

8  that Miller Buckfire has as a strong part of their practice?

9  A   Sovereign restructuring.  We have one large country,

10  which has been a client of ours now for several years.  We've

11  done other work for other municipalities in the United

12  States.  In terms of private sector work, airlines, electric

13  utilities, merchant power companies, retailers, steel

14  companies, telecommunications companies, yeah.  I could go

15  on, but those are the primary ones.

16  Q   And in connection with your firm's work, do you testify

17  in court on behalf of your clients?

18  A   Yes.

19  Q   And in your experience testifying in court, have you been

20  qualified as an expert before?

21  A   Yes.

22  Q   Was it your decision to be a nonexpert witness in this

23  case?

24  A   No.

25  Q   Do you know whose it was?

1  A   No.

2          MR. SHERWOOD:  Thank you, Mr. Buckfire.  Thank you,

3  your Honor.  I have no further questions.

4          THE COURT:  Anyone else have questions for the

5  witness?

6          THE WITNESS:  You want this exhibit?

7          THE COURT:  I guess just set it down there.

8                      CROSS-EXAMINATION

9  BY MS. GREEN:

10 Q   Good afternoon, Mr. Buckfire.  My name is Jennifer Green.

11 I represent the General and Police and Fire Retirement

12 Systems for the City of Detroit.  We've actually met before.

13 I was at your deposition.  I just wanted to get the timeline

14 straight that you just testified about.  You were initially

15 engaged by the State of Michigan in 2012; correct?

16 A   Correct.

17 Q   And at that time, your engagement was limited to the time

18 frame of March to April?

19 A   It was 60 days.

20 Q   And at that time, it was your job to identify assets of

21 the City of Detroit; correct?

22 A   No.  I didn't testify to that.  I testified we were asked

23 to do a general financial review of the city's financial

24 condition based on public information.

25 Q   Okay.  And then in 2013 when you were reengaged, you

1  discovered that the artwork could be a potential asset?

2  A    Among other things, yes.

3  Q    And you did not know that during your engagement in 2012;

4  correct?

5  A    No.

6  Q    You met with Christie's in May of 2013?

7  A    I first called them late May, and I believe I met with

8  them either late May or early June to ascertain whether they

9  might have an interest in appraising the art at the DIA.

10 Q    And were you told by Christie's at that time how long it

11 would take to perform the valuation?

12 A    They told me it would take several months.

13 Q    You knew even if you started in May that it would not be

14 done until the end of summer; correct?

15 A    Correct.

16 Q    The meeting with the DIA, what date in May was that?

17 A    May 15th.

18 Q    Was that the only meeting you had with the DIA?

19 A    No. It was the first meeting I had with the DIA.

20 Q    What other meetings did you have with the DIA?

21 A    Well, I met with representatives of the DIA and the

22 chairman of the trustees several times after that meeting to

23 again reiterate the city's position that the city owned the

24 art and the building and that it would be useful to everybody

25 to arrive at a consensual resolution that would create value

1    for the city.  Those discussions did not prove fruitful.

2    Q    And who is the chairman that you just mentioned?

3    A    Gene Gargaro.

4    Q    And who is Richard Manoogian?  Is he also involved with

5    the DIA?

6    A    I don't know.  I assume he -- I've heard the name, but I

7    never met him.

8    Q    And David Meador, how is he involved with the DIA?

9    A    He's a trustee.

10   Q    And did you meet with him as well in May or June?

11   A    I did.  I met him when DTE was working with the city on

12   the formation of the public lighting authority.

13   Q    And when you met with Mr. Meador, did you discuss the

14   potential of a Chapter 9 filing on behalf of the City of

15   Detroit?

16   A    I told him that it was certainly a risk given the city's

17   financial position.

18   Q    Did you identify a particular date that the city may file

19   Chapter 9?

20   A    No.

21   Q    Did you share with any of the other trustees of the DIA

22   that there was a particular date or month that a Chapter 9

23   might be filed on behalf of the city?

24   A    No.

25   Q    Mr. Buckfire, do you remember receiving an e-mail from

1 | David Meador, the Mr. Meador that we just spoke about, on

2 | July 11th of 2013?

3 | A   I recall getting numerous e-mails from him.  That sounds

4 | like I might have gotten one on that date.

5 | Q   We'll pull up a copy of it for you to look at.  Do you

6 | recognize this as being the e-mail that you received from Mr.

7 | Meador in July of 2013?

8 | A   Yes.

9 | Q   I'd like to direct your attention to the top of the e-

10 | mail where it says "Ken, here's the outline that I provided

11 | Gene."  Is that Gene Gargaro, who we just spoke of?

12 | A   Yes.

13 | Q   "As a pre-read to our call, I don't think any action is

14 | needed on your part.  I just wanted you to be aware of what I

15 | had shared with him."

16 | A   I see that.

17 | Q   Okay.  The e-mail below has a date of, if you look down,

18 | June 22nd.  And if you scroll to the last page of the e-mail,

19 | there's a bullet point list of topics that were discussed.

20 | Bullet point number --

21 |         MR. CULLEN:  Before we get into the topics, unless

22 | we're going to refresh his recollection, I would like to have

23 | a proper foundation for the rest of the e-mail or for his

24 | ability to discuss the substance of this.

25 |         MS. GREEN:  Your Honor, it's actually going to be

1  impeachment because he just said that he didn't tell them
2  something, and that's all I'm using it for.
3          THE COURT:  Well, let's just get the record
4  straight.  Is this e-mail an exhibit?
5          MS. GREEN:  It is not yet an exhibit, your Honor.
6          THE COURT:  Okay.  Well, for identification
7  purposes, let's just put a number on it, and you'll tell me
8  what that number is.
9          MS. GREEN:  It would be Exhibit 868.
10         THE COURT:  868.  Okay.  We'll put that number on
11  it.
12      (Exhibit 868 marked at 1:57 p.m.)
13         THE COURT:  Is this an e-mail that the witness
14  received in the ordinary course?
15         MS. GREEN:  I believe he just testified that he
16  generally recalls receiving an e-mail from Mr. Meador
17  following their meeting.
18         THE COURT:  Did you receive this e-mail?
19         THE WITNESS:  I did.
20         THE COURT:  All right.  You may proceed.
21  BY MS. GREEN:
22  Q   Bullet point number five states the EFM has to have a
23  plan in place by mid-July.
24  A   Um-hmm.
25  Q   The second line states, "A bankruptcy filing will likely

1    be in July.  The team would like to include a conceptual

2    framework for the DIA assets in that filing.  A formal plan

3    will be submitted in the fall, November or earlier, and a

4    hearing next May."  And as you recall, an e-mail that you

5    received stated, "I just wanted you to be aware of what I had

6    shared with him."  Had you shared this information with a

7    board member of the DIA?

8    A    Well, this is his e-mail to Gene Gargaro.  It's not from

9    me to him.

10   Q    I understand that.  I'm asking if it's -- if it is your

11   testimony that you did not share at your meeting that a

12   bankruptcy filing will likely be in July.

13   A    I never shared with anybody at DIA that a bankruptcy

14   filing was likely in mid-July, but at this point -- and this

15   is dated -- when was this dated again?  When was it sent?

16   Q    June 22nd.

17   A    Okay.  We had already had our meeting with creditors on

18   June 14th.  All right.  We were already in the middle of

19   discussions with them.  He had called me to find out where

20   this left DIA, and I explained to him that, you know, given

21   where we were with the cash position of the city -- and this

22   is an important point -- we still didn't have a forbearance

23   agreement in place -- that that raised the risks of a

24   bankruptcy to a high level, and, therefore, it would be nice

25   to have something in place as soon as possible.

1  Q   Did you respond to his e-mail and deny that you ever told
2  him a bankruptcy filing would be coming in July?
3  A   I never said it was coming in July.
4  Q   His e-mail --
5  A   This is his e-mail.
6  Q   I understand that.  His e-mail says that a bankruptcy
7  filing will likely be in July, and you had just met with him.
8  And the e-mail to you said, "I wanted you to be aware of what
9  I had shared with him."  Did you respond and say, "I didn't
10 share any information of this nature with you"?
11 A   I'm confused.  This is what he wrote to his colleagues
12 about what he believed would be the state of play.
13 Q   Can we go back to the initial e-mail to Mr. Buckfire,
14 please?
15 A   Can you hand me a hard copy because it's actually hard to
16 follow this from the screen?
17 Q   Mine has writing, so --
18 A   What?
19 Q   Mine has writing.
20          MR. CULLEN:  Don't you have a --
21          THE COURT:  Do you have a clean copy?
22          MR. CULLEN:  You don't have a clean copy?
23          MS. GREEN:  Don't have a clean copy.
24          MR. CULLEN:  Well, it's more important that he have
25 it than I do, your Honor.

1          THE COURT:  Okay.  Thank you, sir.

2    BY MS. GREEN:

3    Q   I just wanted to direct your attention again to the

4    sentence that says -- it's an e-mail from Mr. Meador to you

5    saying, "I wanted you to be aware of what I had shared with

6    him."

7    A   Um-hmm.

8    Q   Had you shared that information?

9    A   Well, he's referring to what he had shared with Gene, not

10   what I had shared with him.  That's what it says.

11   Q   My question to you was are you denying that you were the

12   one that told them that a bankruptcy filing would be coming

13   in July?

14   A   I never told him that.  I did, however, tell them that

15   the city was at great risk of action because we didn't have a

16   forbearance agreement.  We just had our meeting with

17   creditors.  I didn't know what was going to happen, and,

18   therefore, they should be concerned about doing something

19   about DIA as soon as possible.

20   Q   Did the emergency manager himself have a meeting with Mr.

21   Meador or Gene Gargaro?

22   A   Not to my knowledge.

23   Q   Who all was in the meeting in May of 2013 with you and

24   Mr. Meador?

25   A   Let's see.  It was Mr. Gargaro, Richard Levin from

1   Cravath, Alan Schwartz from Honigman Miller, Bruce Bennett

2   from Jones Day, and myself.

3   Q   Do you think it's possible that one of the other people

4   at that meeting shared with the representatives from the DIA

5   that a bankruptcy filing would be coming in July?

6   A   Well, all the people at that meeting were from the DIA

7   except for Mr. Bennett and myself.

8   Q   That's what I'm asking you.  Did someone else at the

9   meeting, perhaps Mr. Bennett, share with the DIA

10  representatives that the emergency -- or I'm sorry -- that a

11  bankruptcy filing would be coming in July?

12  A   I have no idea.

13  Q   Do you recall any discussion about a formal plan that

14  would be submitted in November as the e-mail states?  Do you

15  recall any discussions of that nature in your meeting?

16  A   Yes.  I explained to Mr. Meador that in the ordinary

17  course, if we were successful in crafting a plan with our

18  creditors, we would move this along as rapidly as we could,

19  and the earliest we could potentially file a plan would be

20  end of this year with a goal of having an exit from

21  bankruptcy, if necessary, by the end of next year.

22  Q   And the portions regarding having a plan in place by July

23  or bankruptcy filing in July never came up?

24  A   No.  We were referring to having a plan with our

25  creditors.

1   Q   And you never corrected this what you now say is an

2   inaccurate recollection or an inaccurate summary of your

3   meeting?

4   A   This is not my meeting, and it's not my e-mail, so I

5   don't know what you're talking about.

6   Q   You didn't correct his understanding that there was not

7   to be a bankruptcy filing in July?

8   A   I didn't feel it necessary to respond to every e-mail I

9   receive because he's not an employee or officer --

10         THE COURT:  "Yes" or "no," sir?

11         THE WITNESS:  No.

12  BY MS. GREEN:

13  Q   Thank you.  I believe you testified earlier when Mr.

14  Montgomery was questioning you whether you had any

15  communications with Jones Day regarding the possibility of a

16  repeal of PA 4, and you answered, "No."

17  A   Okay.

18  Q   Do you consider e-mails a form of communication?

19  A   Yes.

20  Q   I'd like to direct your attention to Exhibit 842.  Do you

21  recognize this document?

22  A   No.

23  Q   Do you recognize your e-mail address at the top of it?

24  A   I do.  It was sent to me.  That's correct.

25  Q   Correct.  So you -- do you recall receiving it generally?

1  A    No.

2  Q    When it says at the top, "FYI ahead of your meeting,"

3  what meeting is that relating to in June of 2012?

4  A    I can't recall which meeting that might be referring to.

5  Q    Did you meet with the governor of the State of Michigan

6  in June of 2012?

7  A    I may have, yes.

8  Q    Who all was at the meeting with the governor in June of

9  2012?

10  A    It was a meeting where we briefed him about restructuring

11  alternatives in general.  I believe it was attended by

12  Treasurer Dillon, one of his aides, Brom Stibitz.  Dennis

13  Muchmore, chief of staff, was there.

14  Q    What was the substance of the conversations during this

15  meeting on June -- I think it would be June 6th?  If it's the

16  following day, it would be June 6th.

17  A    Yeah.  Well, as I testified, they were interested in the

18  application of restructuring technique to the problems of the

19  City of Detroit, how these issues could be resolved, and they

20  asked me to come up and brief them about those things, which

21  I did.

22  Q    Were any representatives of Jones Day at the meeting on

23  June 6th?

24  A    I don't recall.

25  Q    I'd like to draw your attention to another exhibit.  It

1  is an e-mail dated June 5th, 2012.  I believe it's 845, 844.

2  A    This is dated March 24th?

3  Q    Yeah.  I think it's off one.  It should be 844.  Okay.

4  The next page of that e-mail -- I'll direct your attention to

5  the top line, and it says, "Guys, I'm going with Ken Buckfire

6  to talk to the governor in Michigan tomorrow," and it's an e-

7  mail from Heather Lennox.  Does that refresh your

8  recollection at all about whether someone from Jones Day

9  joined you at the meeting?

10  A    Yes.

11  Q    Was Heather Lennox, indeed, there?

12  A    She was.

13  Q    Were there any other representatives of Jones Day at the

14  meeting?

15  A    Not that I recall.

16  Q    Do you recall if there were any discussions relating to a

17  Chapter 9 filing at that meeting?

18  A    I'm sure we talked about it.  It's something you have to

19  consider when you have a high level of insolvency.

20  Q    Did you discuss Chapter 9 filing specifically in

21  connection with any particular sorts of liabilities such as

22  the pension liabilities of the City of Detroit?

23  A    I don't recall that either.

24  Q    Do you remember if there were any memos or reports

25  relating to constitutional protections of the pension

1  liabilities discussed at this meeting?

2  A  No.

3  Q  Do you recall if any -- do you recall being given at any

4  time memos from Jones Day relating to Chapter 9 filing issues

5  vis-a-vis the City of Detroit?

6  A  In general, yes, but not specifically with respect to

7  Detroit.

8  Q  I couldn't -- I didn't hear the last --

9  A  Not specifically with respect to Detroit but in general,

10 yes.

11 Q  Do you remember any discussion at the meeting with the

12 governor relating to the bankruptcy filing requirements under

13 109(c)(5) and negotiations and the good faith requirements --

14 A  No.

15 Q  -- listed thereunder?  No?  Do you remember any

16 memorandums being shared with the governor on that topic?

17 A  No.

18 Q  Do you remember, as stated in the e-mail, suggesting that

19 Jones Day put together all the memos that they had done for

20 Andy?

21 A  I don't recall any of those memos.

22 Q  No.  Do you recall suggesting to them that they compile

23 the memos in advance of the meeting?

24 A  Yes.

25 Q  And what prompted you to do that?

1  A   I thought that the state would find it helpful to see

2  their research.

3  Q   And when it says "the memos we did for Andy," is that for

4  Andy Dillon?

5  A   Yes.

6  Q   And do you remember specifically what types of memos had

7  been requested by Mr. Dillon prior to this meeting?

8  A   He didn't request any specific memo.  He just wanted to

9  get an education on the issues.

10  Q   So they prepared the memos on their own volition?

11  A   Yes.

12  Q   I'd like to go back to what I believe is Exhibit 843.  We

13  talked a little while ago about your denial of any

14  communications relating to the repeal of PA 4.  Do you

15  recognize this e-mail?

16  A   No.

17  Q   Do you see your name at the top as a recipient?

18  A   I see my name as a recipient, but I don't recall reading

19  it.

20  Q   So you just ignored the e-mail or you just --

21  A   I guess.

22  Q   -- generally don't recall getting it?

23  A   I get a lot of e-mails.  I don't recall reading this one

24  at the time.

25  Q   Okay.  Well, let's look at the context, and maybe that

1    will remind you whether or not you read it.  The first bullet

2    point talks about the appeals court should soon rule on the

3    repeal efforts related to Public Act 4.  Does that ring a

4    bell to you?

5    A    Yes.

6    Q    And the second paragraph talks about a separate challenge

7    to the state unrelated to the efforts to repeal PA 4.

8    A    Yes.

9    Q    Do you now remember getting the e-mail and having

10   communications about the repeal of PA 4?

11   A    No.

12   Q    What about Exhibit Number 846?  Oh, these are all off

13   one.  You know, it must be 8 -- I think it's 845.

14            MR. CULLEN:  Is it copied on 846, counsel?

15            MS. GREEN:  No.  It's 845.  They're all off by one

16   for some strange reason.  There we go.

17   BY MS. GREEN:

18   Q    Do you see this e-mail, and do you recognize it?

19   A    I see the e-mail.  I don't recall it, but I'm sure I

20   received it.

21   Q    And you see your name at the top of the e-mail?

22   A    I do.

23   Q    And you see a discussion in paragraph 1 about the state

24   and city were concerned that PA 4 may not survive the

25   petition challenge?

1  A    I do.

2  Q    I direct your attention to the second page of this e-mail

3  where it states, "The state was likely looking at declaring

4  at emergency and appointing and EFM with a likely subsequent

5  step of a Chapter 9."

6  A    Sorry.  You lost me.  Where are you reading from?  Oh,

7  okay.  Okay.

8  Q    And then the following paragraph where it talks about if

9  PA 4 is pulled back at the end of April, is this another

10  example of communications relating to the repeal of PA 4?

11  A    It seems to be.

12  Q    I have several more, but I would -- I don't need to go

13  over them.  Do you have a reason why you said before you had

14  no communications relating to the PA 4 repeal?

15  A    I didn't send this e-mail.

16  Q    You didn't what?

17  A    I didn't send this e-mail.

18  Q    But you received it.

19  A    I don't remember it.

20  Q    As part of your position with the team of E&Y, Conway

21  MacKenzie, and Miller Buckfire Advisors, were you privy to

22  any timelines or communication rollout plans prepared by

23  Kevyn Orr's staff?

24  A    Are you referring to a public communication strategy?

25  Q    I'm referring to any kind of timeline or communications

1    rollout plan that would have been shared with you in your

2    role as the lead advisor for the financial team.

3    A    I might have received a document from his communications

4    director at some point this year laying out a proposed time

5    schedule for public communications, but I can't recall

6    specifically.

7    Q    Do you recall when that would have been?

8    A    No.

9    Q    And his press secretary is Mr. Nowling?

10   A    Yes.

11   Q    Do you recall the substance of that timeline and what the

12   date was for the bankruptcy filing?

13   A    No.

14   Q    Did you not review the e-mail from Mr. Nowling for its

15   substance?

16   A    I just don't remember it.

17   Q    You were the lead advisor of the financial team, and you

18   don't remember an e-mail with the date for the bankruptcy

19   filing?

20   A    No.

21   Q    Do you think that would have been an important thing for

22   you to know as the lead negotiator on the swap transaction

23   and negotiating with the creditors?

24   A    I had advised Mr. Orr that if he were to decide to seek

25   protection, he shouldn't do it until we had a forbearance

1  agreement executed.

2  Q   And at the time leading up to the negotiation of the

3  forbearance agreement, you and Mr. Orr were in daily contact;

4  correct?

5  A   Yes, up until the time we got the forbearance agreement

6  executed.

7  Q   And that was executed on July 15th; correct?

8  A   I think it was the 16th.

9  Q   July 16th?

10  A   July 16th.  That's right.

11  Q   Is it your testimony that as of July 16th, you didn't

12  know what the filing date, if any, would be for the City of

13  Detroit?

14  A   That's correct.

15  Q   How far in advance did you know that the bankruptcy was

16  going to be filed?

17  A   Well, I knew after the forbearance agreement was executed

18  that the decision to seek a filing was being discussed

19  between Mr. Orr and the state.  I was not part of any of

20  those discussions.

21  Q   So as of the date of the forbearance agreement, you had

22  no idea that the bankruptcy petition would be filed two days

23  later?

24  A   No.

25  Q   Were you shared any -- I'm sorry.  Were any timelines or

1   communications rollouts shared with you that were prepared by
2   the governor's staff?
3   A   Not that I recall.
4   Q   Was the one that was shared with you by Mr. Nowling by
5   any chance dated July 8th of 2013?
6   A   I don't know.
7   Q   Why don't we pull it up, and we'll see if you recognize
8   it?  It would be Exhibit 831.  And if you scroll to the next
9   page, there's a communications rollout plan.  Can you tell me
10  if it looks like the one that you think you saw?  There's a
11  document checklist, and the next --
12  A   It looks familiar.
13          MR. CULLEN:  Do you have a hard copy for the
14  witness, counsel?
15          MS. GREEN:  There's a binder up there if you want me
16  to --
17          MR. CULLEN:  Allow me.
18          MS. GREEN:  I can give him the binder.
19          MR. CULLEN:  May I, your Honor?
20          THE COURT:  What are you doing?
21          MR. CULLEN:  Giving him the exhibit, the hard copy
22  of the exhibit.
23          THE COURT:  Okay.
24  BY MS. GREEN:
25  Q   Have you reviewed it?  Does that look like the one that

1  was shared with you?

2  A   Yes.  This was the contingency planning documents I knew

3  they were working on.

4  Q   I think you have to speak into the microphone.

5  A   I'm sorry.  This is the contingency planning document

6  that they'd been working on.  That's correct.

7  Q   Okay.  And on the next page, if you scroll through to the

8  timeline itself, the end, all the way to the end -- there we

9  go.  There are various dates and there are various milestones

10  that are listed there.

11  A   Okay.

12  Q   And as of on the Friday, July 19th, date -- is that what

13  you're looking at?

14  A   I'm sorry.  You're at July 19th?

15  Q   Yes.

16  A   Yes, yes.

17  Q   Okay.  And do you see where it says "filing day" in big

18  capital letters?

19  A   Yes.

20  Q   And this is the document that you think you saw on July

21  8th?

22  A   Yes.  It's a contingency plan.

23  Q   On the 18th, it talks about document preparation.

24          MS. GREEN:  Your Honor, I'd ask to strike that last

25  part.  I had no question pending when he offered that last --

1          THE COURT:  The motion is granted.

2     BY MS. GREEN:

3     Q    And it says, "make last-minute revisions to all key

4     documents."  I don't see the words "contingency."  Do you see

5     the words "contingency"?

6     A    The whole thing is a contingency plan.

7     Q    And the date -- the following date on the 19th says

8     "filing date, July 19th."  Does it say "contingency"?

9     A    No, but this document is dated July the 8th.

10    Q    Are the words "contingency" anywhere on the document?

11    A    No, but it says "draft document."

12    Q    As of July 8th?

13    A    Right.

14    Q    Do you recall seeing an updated timeline shared with you

15    after that?

16    A    No.

17    Q    Were you ever told that the filing date of July 19th was

18    going to be changed?

19    A    No.

20    Q    When the filing came on the 18th, did it surprise you?

21    A    Yes.

22    Q    Do you know if the members of the Conway MacKenzie team

23    were also shared the timeline?

24    A    I don't know.

25    Q    What about the members of the Ernst & Young team?

1    A    I don't know.

2    Q    Do you know? I believe you testified at your deposition

3    that in May of 2013 you received a Milliman report?

4    A    No. It was in April.

5    Q    April. And at that time, you discovered that according

6    to Milliman, at least, the underfunding level was $3.5

7    billion?

8    A    That's right.

9    Q    And I believe you testified that you did not investigate

10    the Milliman report for accuracy or ask anyone else to verify

11    those numbers; correct?

12    A    Correct.

13    Q    And you testified that you just assumed they were true

14    based on Milliman's expertise.

15    A    That was their job. I relied on their work.

16    Q    What about all the caveats listed on the face of the

17    Milliman report? Did you read those?

18    A    I believe I did.

19    Q    Do you recall being cautioned that a more robust

20    projection model could vary the results?

21    A    Yes.

22    Q    You testified at your deposition that you thought before

23    the Milliman report came out that the underfunding might be

24    at a modest enough level where we could deal with it in a

25    different way. What other different options did you have in

1   mind prior to the Milliman report?

2   A    Well, we thought if we had sufficient time to monetize

3   some of the city's assets, in particular, the Water and Sewer

4   Department, maybe we could use that as a funding source to

5   fully fund the pension underfunding.

6   Q    Were any of these different options explored with the

7   Retirement Systems or any of the unions or retirees?

8   A    At that time?

9   Q    At any time.

10  A    Well, they were well-aware of the fact that we were

11  exploring monetization of Water and Sewer as of the June 14th

12  report, but we hadn't been able to make any progress on it at

13  that point.

14  Q    That wasn't my question.  I asked you if you shared with

15  them your different options.

16  A    Not on June 14th, no.

17  Q    The data room that you put together, I believe you said

18  that you had been developing it for about five months prior

19  to its launch in June?

20  A    I didn't say that.

21  Q    How many months did it take you to put the data together?

22  A    Well, the data began to be assembled by Ernst & Young,

23  Conway, and ourselves probably in early February because that

24  was part of our engagement.  I can't recall exactly when we

25  set up the data room specifically, but I do know all the data

1  that went into it had been created by either our respective

2  firms or by the city itself.

3  Q   My question was how long did it take?

4  A   To do what?

5  Q   To put the data together for the data room.

6  A   Months.

7  Q   Months.  Can you give me a rough estimate of how many

8  months?

9  A   Well, we began working in January.  It took until June.

10 Q   So six months?

11 A   That's correct.

12 Q   A little longer?

13 A   Yes.

14 Q   Because it was up on June 20th; correct?

15 A   That sounds right.

16 Q   And when it was initially launched, it was not fully

17 populated with all of the data; correct?

18 A   I don't recall what was not in there at the time.  I know

19 our intent was to put everything in there we could.

20 Q   And the proposal for creditors was laid out on June 14th.

21 A   Correct.

22 Q   And then in June you were tasked with assisting in the

23 negotiation process; correct?

24 A   That's right.

25 Q   And you did not attempt to form a subgroup of any

1    retirees that you could negotiate with directly at that time,

2    did you?

3    A    Well, no.  We did meet with all of the representatives

4    that we could find, including the unions, pension trustees,

5    and the bond and note trustees and bond insurers.

6    Q    My question was you did not attempt to form a subgroup of

7    retirees that you could negotiate with directly; correct?

8    A    No.

9    Q    And do you recall testifying that it was discussed but it

10   was reported back to you that it was impractical to do so?

11   A    Yes.

12   Q    And who was it that reported back to you that it would be

13   impractical to attempt to directly negotiate with smaller

14   groups of people?

15   A    Jones Day.

16   Q    So after being told that it would be impractical to

17   divide the constituencies into smaller subgroups, you did not

18   attempt do so; correct?

19   A    I personally did not, no.

20   Q    During these negotiations, you didn't even have authority

21   to actually bind the city; correct?

22   A    Well, as the lead negotiator for the city, my

23   responsibility was to negotiate with our creditors.  I don't

24   have any decision-making authority.  I'm not an executive of

25   the city.  I would take back whatever came to the city and

1   make a recommendation.

2   Q    So your answer is, yes, you did not have authority to

3   bind the city?

4   A    I wasn't given that authority, but I was authorized to

5   negotiate on behalf of the city.

6           THE COURT:  All right.  One second.  Mr. Buckfire,

7   with all due respect, probably less than half the questions

8   that have been asked of you have you given a straight answer

9   that doesn't volunteer all kinds of information that wasn't

10  asked.  In order for us to get through this, I'm going to ask

11  you from now on just to answer the questions and not

12  volunteer any information.  Okay?

13          THE WITNESS:  Thank you, your Honor.

14          MS. GREEN:  I was actually done, but I appreciate --

15          THE COURT:  Well, okay, but --

16          MS. GREEN:  I appreciate the --

17          THE COURT:  That's great, but are there going to be

18  any more?

19          MS. GREEN:  Yes.

20          THE COURT:  Who else?  Three more?  Three more?  Can

21  I give you ten minutes each?

22          MR. WERTHEIMER:  Fine.

23          THE COURT:  Ten minutes.  Start the clock.

24          MR. WERTHEIMER:  Okay.

25                          CROSS-EXAMINATION

1  BY MR. WERTHEIMER:

2  Q   Mr. Buckfire, my name is Bill Wertheimer.  I represent

3  what's been called the Flowers plaintiffs.  Those are five

4  retirees or employees who filed a lawsuit against the state

5  before the bankruptcy was filed, and I've got a few

6  questions.  You had mentioned, I believe, that in June of

7  2012 you were involved in some discussions with state

8  officials having to do with the possibility of restructuring

9  the city or the city's finances; is that correct?

10 A   Yes.

11 Q   Did the governor participate in those discussions?

12 A   Yes.

13 Q   You indicated that in at least one of those discussions

14 you thought the possibility of a Chapter 9 filing came up; is

15 that correct?

16 A   Yes.

17 Q   Do you recall the governor being present at that

18 discussion?

19 A   Yes.

20 Q   And what, if anything, did he say about that?

21 A   I don't recall him saying anything.

22 Q   Do you recall who brought it up?

23 A   I believe it was Treasurer Dillon.

24 Q   I'm sorry.

25 A   I believe it was Treasurer Dillon.

1   Q   And what do you remember him saying, as best you recall?

2   A   What does Chapter 9 mean?

3   Q   Simple as that?

4   A   Yes.

5   Q   And someone explained what Chapter 9 meant?

6   A   That's correct.

7   Q   Okay.  Was it -- that was about it?

8   A   Yes.

9   Q   Okay.  You indicated that you had seen a document which

10  showed a rollout which was going to -- at least at one point

11  in the rollout there was going to be a bankruptcy filing

12  scheduled for the 19th.  Do you recall?

13  A   Yes.

14  Q   And then we know, in fact, that the bankruptcy was filed

15  on the 18th; correct?

16  A   Yes.

17  Q   And you indicated in your testimony that you were

18  surprised by that change.

19  A   Yes.

20  Q   Would I be correct in understanding that the reason for

21  your surprise was that normally when you have a rollout as

22  detailed as this, you stick with it, particularly such a key

23  event as the filing itself?

24  A   Yes.

25  Q   Would that be fair?

1   A    That's fair.

2   Q    And did you talk to anyone after the filing to learn --

3   to try to learn why it was that the date had been changed

4   from the 19th to the 18th?

5   A    No.

6   Q    So you were surprised on the 18th; correct?

7   A    Yes.

8   Q    You never talked to Mr. Orr about why it was switched?

9   A    No.

10  Q    Never talked to anybody?

11  A    I did later, but it just wasn't very important.

12  Q    All right.  Well, to you.  Who did you talk to later?

13  A    Counsel at Jones Day and my own colleagues.

14  Q    And what did you learn?

15          MR. CULLEN:  Objection, your Honor, to the extent it

16  calls for legal work of Jones Day.

17          MR. WERTHEIMER:  Your Honor, that's hardly legal

18  advice after the fact if he's learning why something was

19  done.  I don't think the privilege covers that.

20          THE COURT:  Well, first, who did you speak to about

21  this question?

22          THE WITNESS:  Mr. Heiman.

23          THE COURT:  Anyone else?

24          THE WITNESS:  Ms. Ball and Ms. Lennox.

25          THE COURT:  Anyone who's not an attorney with Jones

1    Day?

2            THE WITNESS:  I spoke with Mr. Orr at some point a

3    week later about this.

4            THE COURT:  What did Mr. Orr tell you about that?

5            THE WITNESS:  All he told me was that the decision

6    had been made to expedite the filing because they were

7    concerned about losing control of the process, and that's

8    what he told me.

9            THE COURT:  In the circumstances, I will hold that

10   the witness' conversations with attorneys from Jones Day on

11   the subject are protected conversations.

12   BY MR. WERTHEIMER:

13   Q    The conversation you had with Mr. Orr when he talked

14   about losing -- the possibility of losing control of the

15   process, did he identify part of the reason for that

16   possibility of losing control being the fact that there were

17   lawsuits out there in state court dealing with the bankruptcy

18   issue?

19   A    Yes.

20   Q    Did he identify them as the lawsuits in front of Judge

21   Aquilina in Lansing or in any way pinpoint the lawsuits he

22   was talking about?

23   A    If that judge is in Ingham County, then the answer is

24   yes.

25   Q    She is in Ingham County.

1   A    Then that's correct.

2   Q    Okay.  So Orr told you that one of the reasons for moving

3   up the filing was because of the litigation that was pending

4   in Ingham County?

5   A    Yes.

6   Q    Did he indicate that that litigation was in part an

7   effort to assure that if, in fact, the city filed bankruptcy,

8   that it would be done in a way that would protect the pension

9   rights under the state Constitution even generally?  In other

10  words, I understand he wouldn't have necessarily used those

11  words.

12          MR. CULLEN:  I'll object to the form of the

13  question.

14          THE COURT:  Please rephrase.

15          MR. WERTHEIMER:  Okay.

16  BY MR. WERTHEIMER:

17  Q    When you talked to Mr. -- well, just tell us.  What

18  did -- how did Mr. Orr characterize those Ingham County

19  lawsuits?

20  A    I don't recall he did.  He simply said there were

21  lawsuits pending that might have made it very difficult for

22  us to move forward, and they had to expedite the filing.

23  Q    In Ingham County?  In other words, he at least gave you

24  that?

25  A    Well, I knew they were in Ingham County, but that's --

1  Q   Okay.

2  A   But it was only because of the impact on the timetable.

3  Q   What did you know about those lawsuits?

4  A   Very little.

5  Q   Did you know at least generally that they were efforts to

6  in some way protect the pensions of city employees based on

7  state law?

8  A   I knew they had something to do with it, yes.

9  Q   Okay.  I believe you indicated it was on July 8 that you

10  saw the rollout or maybe that's the date of the rollout

11  document.

12  A   Yes.

13  Q   Okay.  And the rollout anticipated a bankruptcy filing on

14  the 19th; correct?

15  A   That's right.

16  Q   Which was a Friday; correct?

17  A   That's right.

18  Q   I'll state to you that these Ingham County lawsuits were

19  filed on July 3rd.  Do you recall on July 8 knowing about the

20  existence of those lawsuits at that time?

21  A   No.

22  Q   Do you recall knowing on July 8 that the Ingham County

23  judge had hearings already scheduled for July 22nd -- that

24  is, the Monday after the 19th -- in order to determine

25  whether she should issue injunctive relief?

1   A    No.

2   Q    Did you know anything about that as of July 8?

3   A    No.

4         MR. WERTHEIMER:  That's all I have, Mr. Buckfire.

5   Thank you.

6         THE COURT:  Mr. Wertheimer, will you yield the

7   balance of your time to Ms. Brimer, who seems to think she

8   needs more than ten minutes?

9         MR. WERTHEIMER:  I will.

10        THE COURT:  All right.

11                    CROSS-EXAMINATION

12  BY MS. PATEK:

13  Q    Good afternoon, Mr. Buckfire.  Barbara Patek.  I

14  represent the Detroit Police Officers Association, the

15  Detroit Police Lieutenants & Sergeants Association, the

16  Detroit Police Command Officers Association, and the Detroit

17  Fire Fighters Association.  You and I have not met before; is

18  that right?

19  A    That's correct.

20  Q    You told us in your testimony that becoming involved in

21  this case was somewhat personal for you; isn't that right?

22  A    Yes.

23  Q    And that was because you're from here, being Detroit, and

24  you care about the city?

25  A    That's right.

1  Q   And you have, in the course of your successful

2  professional career, been an expert in many bankruptcy

3  situations; is that right?

4  A   Yes.

5  Q   Most of those were probably Chapter 11 proceedings?

6  A   Yes.

7  Q   And some of them were Chapter 9; correct?

8  A   Never in Chapter 9.

9  Q   Never in Chapter 9.  Have you -- you served as a

10 consultant in Stockton in Chapter -- in that Chapter 9

11 proceeding?

12 A   Yes.

13 Q   And as a restructuring expert, you certainly understand

14 that there are different rules that govern Chapter 9 and

15 Chapter 11 proceedings; isn't that right?

16 A   Yes.

17 Q   And one of the differences, you would agree with me,

18 between Chapter 11 and Chapter 9 is that there can't be a

19 liquidation in a Chapter 9; that is, that the City of Detroit

20 in these proceedings must continue to provide its core and

21 essential services; isn't that right?

22 A   Yes.

23 Q   You also told us -- and I'm going to condense, so you can

24 tell me if anything about my statement is inaccurate -- that

25 what drove the city's July 18th, 2013, filing was the need --

1  or the concern that it would run out of cash it needed to pay

2  for its core and essential services.  Is that an accurate

3  summary?

4  A    Yes.

5  Q    And among those core and essential services you would

6  agree with me are police and fire protection?

7  A    Yes.

8  Q    And you would agree with me that the work of providing

9  police and fire protection in the City of Detroit is a

10  difficult and dangerous job?

11  A    Yes, I would.

12  Q    And, in fact, probably much more difficult and dangerous

13  than what you do or what I do for a living?

14  A    Certainly.

15  Q    And you told us -- well, strike that.  In terms of the

16  June 14th proposal, that proposal lumped together in terms of

17  how it was going to treat the accrued vested constitutionally

18  protected pension benefits of Detroit workers and retirees;

19  isn't that right?

20  A    Yes.

21  Q    And that would include those active police and fire

22  fighters?

23  A    That's correct.

24  Q    And it's your testimony here today that it is fair to

25  treat the city's unsecured obligation, including the accrued

1  vested pension benefits of those active police and fire

2  fighters, the same as it is the other unsecured creditors,

3  including the bondholders?

4  A  Yes.

5        MS. PATEK:  That's all I have, your Honor.

6        THE COURT:  Nineteen.

7        MS. PATEK:  Thank you, your Honor.  I will be as

8  quick as I can.

9                    CROSS-EXAMINATION

10 BY MS. BRIMER:

11 Q  Good afternoon, Mr. Buckfire.  My name is Lynn Brimer.  I

12 represent the Retired Detroit Police Members Association.

13 You and I have never met before; is that correct?

14 A  That's correct.

15 Q  And I did not attend either of your depositions; is that

16 correct?

17 A  That's correct.

18 Q  So with my limited time, I would like to step back a bit

19 and go back to some of the history of your relationship with

20 the City of Detroit and the State of Michigan in connection

21 with the City of Detroit.  Now, sometime in -- you testified

22 earlier that sometime in the spring of 2012 you had some

23 discussions with the treasurer, Dillon, regarding the

24 financial condition of the City of Detroit; is that correct?

25 A  Yes.

1  Q   Okay.  Was that before or after your engagement by the

2  city to perform a financial review?

3  A   It was around the same time.

4  Q   So your engagement in connection with the financial

5  review that you performed, was that pursuant to an RFP that

6  was issued by the state?

7  A   Yes, it was.

8  Q   Okay.  And was it by a particular department of the

9  state?  Was it Treasury or the Governor's Office, if you

10 recall?

11 A   I believe it was Treasury.

12 Q   Okay.  And you testified that the scope of your work in

13 connection with the financial -- 60-day financial review was

14 limited.  Can you identify or describe what the scope of your

15 work was?

16 A   We had been asked actually together with another firm,

17 Huron Consulting, which was part of the same RFP, to review

18 the city's financial results and come up with a coherent

19 evaluation of the balance sheet and the city's ability to

20 sustain its obligations, which we did, based on public

21 information.

22 Q   So in connection with that, you reviewed historical

23 public information of the city's financial records; correct?

24 A   Correct.

25 Q   Was there a particular time frame of records that you

1  reviewed?

2  A   We went back and looked at the last five years as well as

3  the city's current budget, which was made available to us by

4  the city.

5  Q   So you reviewed the records from approximately 2007

6  through 20 --

7  A   '11.

8  Q   -- 11?

9  A   And then the current fiscal year budget.

10 Q   Okay.  And did you issue a written report in connection

11 with that review?

12 A   We did.

13 Q   Did you draw any conclusions in that report?

14 A   Well, I'd have to go back and read it again.  I think we

15 pointed out that the city continued to spend more than it was

16 taking in from revenues; that it had limited ability to raise

17 capital in the capital markets; and that without a long-term

18 financial forecast it would be hard to understand that the

19 city had the ability to continue to pay its obligations.

20 Q   So at that point in time, you had already concluded that

21 the city could not pay its obligations on an ongoing basis;

22 is that correct?

23 A   No, no.  I didn't say that.

24 Q   What was your conclusion?

25 A   It was concluded that we didn't have enough information

1  to make that evaluation, but certainly it was a risk.

2  Q   What additional information would you have needed in

3  order to reach that conclusion?

4  A   Well, we would have needed a five- or ten-year financial

5  forecast that would accurately reflect the city's potential

6  revenues, and we'd also have to have an accurate

7  understanding of the city's long-term claims and requirements

8  to pay on those claims.

9  Q   So at that point in time, you did not have an

10  understanding of the city's long-term obligations?

11  A   We had an understanding of those obligations as publicly

12  reported.

13  Q   Okay.  And you performed that review with the -- with

14  Huron Consulting?

15  A   Correct.

16  Q   Were there any other consultants or advisors that were

17  engaged in connection with that review?

18  A   No.

19  Q   At any time was the scope of your engagement expanded?

20  A   No.

21  Q   Was your engagement ever expanded to include a review of

22  the consent agreement with the City of Detroit?

23  A   No.

24  Q   Did you have any role in connection with the drafting of

25  the consent agreement that was entered into with the City of

1   Detroit?

2   A    I was asked for some comments on it, yes.

3   Q    Who asked for comments?

4   A    Brom Stibitz.

5   Q    And who's that?

6   A    A senior advisor to Treasurer Dillon.

7   Q    Now, during the time frame that you were drafting the

8   financial report, do you know whether or not Jones Day had

9   been retained by the State of Michigan in any -- in

10  connection with any of the City of Detroit's financial

11  issues?

12  A    They had not been retained, to my knowledge.

13  Q    So did you work with anyone at Jones Day in connection

14  with the drafting of the consent agreement that was executed

15  by the City of Detroit?

16  A    No.

17          MS. BRIMER:  Your Honor, I'd like to show the

18  witness an exhibit that has not been entered into evidence.

19  If he has our binder, I could identify -- direct him to where

20  it is in the binder or, given the time frame, I could hand

21  him a copy.

22          THE COURT:  Yeah.  Why don't you just hand it to

23  him?  What exhibit is it?

24          MS. BRIMER:  I believe it's 202, your Honor.

25          THE COURT:  Okay.

1  BY MS. BRIMER:

2  Q   Do you see on that exhibit, Mr. Buckfire, your e-mail as

3  a carbon copy recipient of the e-mail?  Do you see that?

4  A   I do.

5  Q   And have you had an opportunity to review the e-mail?

6  A   Just now, yes.

7  Q   Does it refresh your recollection with respect to whether

8  or not you had any involvement with the Jones Day law firm in

9  the drafting of the consent agreement that was provided to

10  the City of Detroit?

11  A   They'd asked me for some comments.  I knew they were

12  talking to the state and trying to find a role for

13  themselves.  I apologize for going on about this, but, you

14  know, they had given them some comments, and I'd reviewed

15  them.

16  Q   So that would be a "yes."  You were --

17  A   That's a "yes."

18  Q   You had provided some comments to Jones Day in connection

19  with the consent agreement that was provided to the City of

20  Detroit?

21  A   Yes.

22  Q   And then you were aware that that consent agreement was

23  then provided to Treasurer Dillon for presentation to the

24  City of Detroit; correct?

25  A   No.

1   Q   Do you recall receiving this e-mail?

2   A   Not specifically.

3   Q   Have you reviewed the consent agreement that was

4   ultimately executed by the City of Detroit?

5   A   Yes.

6   Q   Is it the consent agreement that you had commented on

7   with the Jones Day law firm?

8   A   No.

9   Q   How is it different from the --

10   A   I recall the one that I was shown by Jones Day as being

11   materially different from the one the state ultimately signed

12   with the city.

13   Q   Can you identify some of the terms that were materially

14   different?

15   A   I'd have to go back and look at it.  I don't recall, but

16   I know it wasn't the same one.

17   Q   But sitting here today, you can identify that it wasn't

18   the agreement you had worked with Jones Day on, and yet you

19   can't recall any of the specifics on why it was not the same

20   agreement?

21   A   It wasn't the same agreement.

22   Q   Okay.  Just yes.  You are sitting here today.  You know

23   it was not, but you cannot recall any of the specifics?

24   A   That's correct.

25   Q   Okay.  Now, you've also indicated that at some point in

1  time you became aware that the State of Michigan and Jones

2  Day -- and maybe -- I don't want to put words in your mouth,

3  but at some point in time you became aware that the State of

4  Michigan and the City of Detroit -- Jones Day had addressed

5  issues in connection with the filing of a Chapter 9 by the

6  City of Detroit; is that correct?

7  A   I'm sorry.  I don't understand the question.

8  Q   Okay.  So when did you first learn that the State of

9  Michigan was considering a Chapter 9 bankruptcy filing for

10  the City of Detroit?

11  A   Well, it was on the table at all times really after June

12  14th.  I don't know when specifically they began to discuss

13  it.  It was always an option.

14  Q   Was it on the table in 2012?

15  A   Not that I recall.

16       MS. BRIMER:  Your Honor, I think this exhibit is in

17  evidence.  I believe it's 845.

18  BY MS. BRIMER:

19  Q   Do you recall discussing this exhibit with Ms. Green just

20  a few minutes ago?

21  A   Yes.

22  Q   I'd like to direct your attention to the second page

23  perhaps midway down, the paragraph that begins, "The state

24  believes."  And you were a recipient of this e-mail; correct?

25  A   Yes.

1  Q   And that paragraph reads, "The state believes it needs PA

2  4 or worst case PA 72 to file a Chapter 9 case based on law.

3  As such, state legal counsel and Jones Day provided guidance

4  on whether a Chapter 9 filing in April could be upheld if PA

5  4 is pulled back at the end of April."  Is that what that

6  says?

7  A   Yes, it does.

8  Q   You were a recipient of this e-mail; correct?

9  A   I am.

10  Q   So is it fair to say that at least as early as March of

11  2012, the state and Jones Day were discussing a Chapter 9

12  filing for the City of Detroit?

13  A   Yes.

14        THE COURT:  What exhibit number did you say that

15  was?

16        MS. BRIMER:  846, your Honor.

17        ATTORNEYS:  845.

18        MS. BRIMER:  Oh, 845.

19  BY MS. BRIMER:

20  Q   So, now, later in 2012, in November of 2012 an RFP was

21  issued by the City of Detroit in connection with the consent

22  agreement; is that correct?

23  A   Yes.

24  Q   And you completed that RFP?

25  A   We did.

1  Q   And then you were ultimately engaged by the city in
2  December; correct?
3  A   January of 2013.
4  Q   But in December you were aware that you would --
5  A   We'd been chosen, yes.
6  Q   -- receive the contract?
7  A   Right.
8  Q   Do you recall the questions that were asked on that
9  request for production -- request for an offer?
10 A   No.
11 Q   Do you recall whether or not specifically you disclosed
12 to either Mayor Bing or the City Council that you were aware
13 that at least as early as March of 2012 the state and Jones
14 Day had been contemplating a bankruptcy filing on behalf of
15 the city?
16 A   I don't understand that question.
17 Q   Well, we just went over -- you were aware that at least
18 as early as March of 2012 --
19 A   Um-hmm.
20 Q   -- the State of Michigan and the law firm, Jones Day, had
21 been discussing a Chapter 9 filing on behalf of the city;
22 correct?  We just went over that.  Your answer was, "Yes."
23 A   Yes.
24 Q   So I'm asking you at the time you completed your RFP or
25 prior to executing a contract, did you ever disclose to the

1   City Council or Mayor Bing that you were aware that at least

2   as early as March 2012 the State of Michigan along with Jones

3   Day had discussed and were contemplating a Chapter 9 filing

4   on behalf of the city?  It's a "yes" or "no" question.

5   A    No.

6   Q    Now, you were also involved in the interview process

7   sometime in January for the law firms that were selected by

8   the city; correct?

9   A    Yes.

10  Q    And it was the City Council and the mayor at that point

11  in time that were in place; is that correct?

12  A    That's correct.

13  Q    So Mr. Orr had not yet been selected at that point in

14  time; correct?

15  A    Correct.

16  Q    And one of those law firms was Jones Day; is that

17  correct?

18  A    Correct.

19  Q    At any point in time during the interview process for the

20  law firms, did you disclose to the mayor or the City Council

21  that you were aware that at least one of the law firms they

22  were interviewing had been discussing with the state and

23  providing guidance on the filing of a Chapter 9 by the City

24  of Detroit?

25  A    No.

1  Q   So now I want to go over a few issues in connection with

2  the fair and even-handed treatment of the bondholders vis-a-

3  vis the pension beneficiaries.  And it's been your testimony

4  all along, if I understand correctly, that you think it is

5  fair and even-handed treatment to treat the bondholders, who

6  have insurance, in the same class or category as the pension

7  beneficiaries on the grounds that they're all unsecured

8  creditors; is that correct?

9  A   Yes.

10  Q   So isn't it true that when bondholders determine that

11  they will issue a bond or extend credit to the City of

12  Detroit, when they made that determination they had the

13  opportunity to review the financial data of the city and

14  evaluate the risk?  Is that accurate?

15  A   I hope so.

16  Q   To the best of your knowledge, if you have any, do you

17  believe any of the pension beneficiaries have had an

18  opportunity prior to accepting employment to review the

19  financial data of the City of Detroit and evaluate the risk

20  of whether or not their pensions would be honored?

21  A   Is that calling for a "yes" or "no"?

22          THE COURT:  Yes.

23          THE WITNESS:  No, I don't know.

24  BY MS. BRIMER:

25  Q   Do you believe they would have been provided that

1  opportunity?

2  A    I don't know.

3  Q    Now, I believe you testified earlier that in connection

4  with the June 14th proposal the obligations owed to

5  pensioners that were employees of the Department of Water and

6  Sewage, their obligations were included in the $3.5 billion

7  underfunding and that their -- they were included in the

8  restructuring proposal for the underfunded pensions; is that

9  correct?

10 A    Yes.

11 Q    You also testified, though, that the revenue stream

12 generated by Department of Water and Sewage was not included

13 in the revenue that was reflected in the July -- the June 14

14 proposal; is that correct?

15 A    It's a nomenclature issue.  The Water and Sewer

16 Department collects revenues, but there is no net cash flow

17 to the city from those revenues.

18 Q    But isn't it true that those revenues represent

19 contributions on behalf of their employees into the pension

20 fund?  They use their own revenues.  The Department of Water

21 and Sewage pays -- makes contributions to the pension fund on

22 behalf of its employees; correct?

23 A    Yes.

24 Q    And it uses the revenues it generates to make those

25 contributions; correct?

1  A   Yes.

2  Q   Now, you also talked about, I believe --

3          THE COURT:  Your time is up.  You're looking at me

4  like you want more time.

5          MS. BRIMER:  Perhaps just a few questions, your

6  Honor.  I have two brief areas I want to ask, and I'll be

7  brief.

8          THE COURT:  Does that mean two questions?  It's just

9  a question.

10          MS. BRIMER:  Just a handful, your Honor.  It may

11  depend on how he answers.

12          THE COURT:  Five questions.  Go ahead.

13          MS. BRIMER:  Okay.  All right.  Let me think then.

14  BY MS. BRIMER:

15  Q   So you testified yesterday that -- in connection with

16  reviewing Water and Sewage again, that one avenue of

17  generating additional revenue could not be increasing water

18  rates because -- well, let me stop there.  Is that correct?

19  Do you recall?  You testified that the city could not

20  increase water and sewage rates because of utility laws, that

21  it's a regulated industry, and so it just could not

22  arbitrarily increase rates; correct?

23  A   Correct.

24  Q   Okay.  So at the time the June 14th proposal was put

25  together, did you take into consideration the fact that the

1   city did not have any authority under the Michigan

2   Constitution to impair the pension benefits?

3   A   I don't understand the question.

4   Q   So on the one hand, you certainly took into consideration

5   the legal -- the authority of the city to raise the utility

6   rates in connection with Water and Sewage; correct?

7   A   Correct, not a source of cash.

8   Q   But you did not take into consideration any constraints

9   on the city's ability to impair the pension rights?

10   A   That's correct.

11   Q   One other brief area.  You also discussed that you did

12   not consider it a viable option, for example, to look at

13   avenues for increasing collection on the taxes as generating

14   a significant amount of -- or any amount of additional

15   revenue; is that correct?

16   A   That's not what I testified to.

17   Q   So what did you testify to in connection with the unpaid

18   tax obligation?

19   A   That the city had been very ineffective in collecting its

20   unpaid taxes, and we didn't believe they would change anytime

21   soon and collect those taxes.

22   Q   Was that in connection with both income taxes as well as

23   property taxes?

24   A   Primarily property taxes.

25   Q   Do you know or have -- can you estimate what the unpaid

1 income taxes are that are due to the city?

2 A    No.

3         MS. BRIMER:  I have nothing further, your Honor.

4         THE COURT:  All right.  We'll take our afternoon

5 break at this time.  Well, let me just ask first will there

6 be any redirect?

7         MR. CULLEN:  Three or four questions.

8         THE COURT:  All right.

9         MR. CULLEN:  Do you want to do it now, or do you

10 want to --

11         THE COURT:  No.  We'll take our recess now and

12 reconvene at 3:15.

13         THE CLERK:  All rise.  Court is in recess.

14      (Recess at 3:01 p.m. until 3:16 p.m.)

15         THE CLERK:  All rise.  Court is in session.  Please

16 be seated.

17         THE COURT:  It appears that everyone is here.  You

18 may proceed, sir.

19         MR. CULLEN:  Good afternoon, your Honor.

20                     REDIRECT EXAMINATION

21 BY MR. CULLEN:

22 Q   Very briefly, Mr. Buckfire, you talked about beginning

23 with the bond insurers, and you mentioned it was the

24 beginning and not the end.  What would the end be?

25 A    The end would have been an active negotiation with all

1    the bondholders and all the other unsecured creditors of the

2    city.

3    Q   And what would have been the steps between the beginning

4    and the end?

5    A   Well I would have expected after making our initial offer

6    we would have received responses that would have formed

7    effectively the counter-bid.

8    Q   And when you said you'd have to go to all of the

9    individual bondholders, what does that mean?

10   A   We would have to frame an offer supported by the bond

11   insurers that they would hopefully recommend to the bond

12   insurers and get their support for.

13   Q   The bondholders, you mean?

14   A   The bondholders themselves, yes.

15   Q   Did the bond insurers have authority to either bind

16   the -- did the bond insurers have the authority to either

17   bind the bondholders or to change the terms of the bond?

18   A   No.

19            MR. CULLEN:  That's all I have, your Honor.

20            THE COURT:  All right, sir.  You may step down.

21            THE WITNESS:  Thank you.

22            THE COURT:  Thank you.

23        (Witness excused at 3:17 p.m.)

24            THE COURT:  Sir.

25            MR. SCHNEIDER:  Your Honor, Matthew Schneider on

1  behalf of the State of Michigan.  When we earlier discussed

2  this in the last few days, we had planned on the governor

3  coming at 1 p.m. on Monday, and because of the pace of the

4  proceedings here, I want to just confirm with the Court that

5  that is still the case no matter what stage we're at.

6          THE COURT:  A good question.  Anyone object if the

7  governor appears at one o'clock on Monday regardless of where

8  we are otherwise in the case?

9          MR. WERTHEIMER:  No, your Honor.

10          THE COURT:  Hearing no objection, you may count on

11  it.

12          MR. SCHNEIDER:  Thank you.

13          THE COURT:  Sir.

14          MR. STEWART:  Your Honor, Geoffrey Stewart, Jones

15  Day, for the city.  Two matters.  One is we would at this

16  stage ordinarily call Mr. Malhotra back in connection with

17  the matters that were resolved by your ruling; however, I was

18  only going to call him for the purpose of getting four

19  documents into evidence.  Counsel for the objectors and I

20  have agreed that they'll stipulate to the admissibility of

21  those while retaining any objections they may have to your

22  ruling, but rather than me put words in their mouth, let me

23  have them put that on the record themselves.

24          THE COURT:  What are the numbers of those four?

25          MR. STEWART:  Number 9, 10, 11, and 38.

1          THE COURT:  All right.  Sir.

2          MR. RUEGGER:  Arthur Ruegger from Dentons on behalf

3  of the Retiree Committee.  Yes, your Honor, that is correct.

4  We've consulted with the other counsel for the objectors, and

5  we believe that those four exhibits fall within your Honor's

6  ruling.  We want to preserve for the sake of the record our

7  objection and rights related to that ruling, but we --

8          THE COURT:  Yes.

9          MR. RUEGGER:  -- feel that is a fair interpretation,

10  and on that basis we have no objection to that admission.

11          THE COURT:  All right.  Thank you.  The admission of

12  those four into evidence is granted.

13      (Debtor's Exhibits 9, 10, 11, and 38 received at 3:19

14      p.m.)

15          MR. STEWART:  That being the case, your Honor,

16  unless there are questions the Court has or anyone else has,

17  I would suggest we excuse Mr. Malhotra as a witness.

18          THE COURT:  Anyone have any questions for the

19  witness, or may we excuse him?

20          ATTORNEY:  No questions for the witness, your Honor.

21          THE COURT:  All right.  He is excused.

22      (Mr. Malhotra excused at 3:19 p.m.)

23          MR. STEWART:  A second housekeeping matter is Mr.

24  Ciantra had mentioned the other day that he would have a

25  motion to strike or similar vis-a-vis Mr. Moore.  That motion

1     has not yet been made. Mr. Moore then has been kept on the

2     status of an active witness. We have been physically

3     sequestering witnesses --

4           THE COURT: Yes.

5           MR. STEWART: -- while they're on the stand. I

6     spoke earlier with counsel. He said he's still studying his

7     motion. I don't mean to put words in his mouth, but he has

8     no objection to us unsequestering Mr. Moore. However, we

9     will instruct Mr. Moore to not discuss his testimony with

10    anyone pending the filing and adjudication of Mr. Ciantra's

11    motion.

12          MR. CIANTRA: Yes, your Honor. I would intend to

13    bring that issue to the Court Monday morning --

14          THE COURT: Okay.

15          MR. CIANTRA: -- if that's acceptable.

16          THE COURT: Absolutely.

17          MR. CIANTRA: And I would have no objection to

18    releasing --

19          THE COURT: All right.

20          MR. CIANTRA: -- Mr. Moore.

21          MR. STEWART: Thank you, your Honor.

22          THE COURT: We'll unlock the doors to Mr. Moore's

23    confinement. I have one more housekeeping matter. Hold on

24    there. Based on some confusion that has been stated here on

25    the record about exhibits and exhibit numbers, I am concerned

1　about whether everyone's versions of the exhibit books

2　correspond with the exhibits and exhibit numbers in the

3　attachments to the joint final pretrial order, so I would

4　like to task someone with the responsibility of checking all

5　of the exhibit books and all of the lists and numbers of

6　exhibits that are attached to the joint final pretrial order.

7　Any volunteers?

8　　　　　MR. MONTGOMERY:  Dentons will do so for the Retiree

9　Committee for the objectors, your Honor.

10　　　　　THE COURT:  For all the objectors?

11　　　　　MR. MONTGOMERY:  For all the objectors.

12　　　　　MR. IRWIN:  Geoff Irwin, your Honor.  We have the --

13　the city had the pleasure of putting together the 130- or 40-

14　page pretrial order, and we worked with the Dentons firm.  I

15　would be happy to do that personally.

16　　　　　THE COURT:  All right.  So I'd like a report from

17　you Monday that this has been accomplished, please.

18　　　　　MR. MONTGOMERY:  Yes, sir.

19　　　　　MR. IRWIN:  Yes, your Honor.

20　　　　　THE COURT:  And this task includes checking our

21　exhibits book up -- exhibit books up here as well, please.

22　　　　　MR. IRWIN:  Of course.

23　　　　　MS. PATEK:  While we're on housekeeping, Barbara

24　Patek for the Public Safety Unions.  The Court asked and we

25　did provide the additional books, and in those additional

1  books is a marked version of the display, the demonstrative.

2  I've given copies to Jones Day, and we'll --

3         THE COURT:  Good.

4         MS. PATEK:  -- send them, so I just wanted to make

5  that clear for the record.

6         THE COURT:  Thank you.  Okay.  Next witness.

7         MR. HERTZBERG:  Yes, your Honor.  Robert Hertzberg,

8  Pepper Hamilton.  I'm going to call Chief Craig to the stand.

9         THE COURT:  Okay.

10        MR. HERTZBERG:  May I turn the podium a little bit?

11        THE COURT:  If you'd like.

12        MR. HERTZBERG:  Thank you.

13        THE COURT:  Step forward, please, sir.

14        MR. CRAIG:  Thank you.

15        THE COURT:  And before you sit down, would you

16  please raise your right hand?

17           JAMES CRAIG, DEBTOR'S WITNESS, SWORN

18        THE COURT:  Please sit down.  And you may proceed.

19                    DIRECT EXAMINATION

20  BY MR. HERTZBERG:

21  Q    Could you state your name for the record, please?

22  A    James Craig.  Last name is spelled C-r-a-i-g.

23  Q    And where do you reside currently?

24  A    City of Detroit.

25  Q    And are you employed by the City of Detroit?

1   A    I am.

2   Q    In what position are you employed?

3   A    Police chief for the Detroit Police Department.

4   Q    And when did you first commence your position as police

5   chief?

6   A    July 1st, 2013.

7         THE COURT:  Excuse me one second.  Could you do me a

8   favor?  If you're going to sit back like that, that's fine.

9   Just pull the microphone a little bit closer.

10         THE WITNESS:  Okay.

11         THE COURT:  That's good right there.

12         THE WITNESS:  Okay.

13         THE COURT:  Not too close, but that's good right

14   there.  That's good.

15  BY MR. HERTZBERG:

16  Q    Chief Craig, did you grow up in Detroit?

17  A    I did.

18  Q    Were you born in the city?

19  A    I was.

20  Q    And how long did you stay in the city?

21  A    Twenty-four years.

22  Q    Did you go to school at Cass Tech High School?

23  A    I did.

24  Q    Do you have any parents or siblings that live in the

25  city?

1   A    I do.

2   Q    And how many?

3   A    Five siblings and both parents still alive.

4   Q    Okay.  Let's spend a minute and go over your educational

5   background.  Where did you go to college?

6   A    West Coast University in Los Angeles, but prior to that

7   Lawrence Institute of Technology here in -- I think it's

8   Dearborn.  Also attended University -- well, Mercy College,

9   which is now U of D Mercy, while employed as a Detroit -- as

10  a Detroit police officer.  Then later, after attending West

11  Coast University in Los Angeles, I attended the University of

12  Phoenix.

13  Q    Before we get to that, when did you graduate from West

14  Coast University?

15  A    I'm not absolutely certain on the date.  I'd have to --

16  Q    Approximately the year.

17  A    Probably in the late '90s.

18  Q    And did you receive a degree?

19  A    I did.

20  Q    And what type of degree?

21  A    Business management.

22  Q    And did you go to the FBI National Academy at Quantico?

23  A    I did.

24  Q    And when did you do that?

25  A    At the rank of lieutenant, once again, probably late

1  '90s, early 2000s.

2  Q   And you graduated from there?

3  A   I did.

4  Q   Have you ever received a master's degree?

5  A   I did.

6  Q   From where?

7  A   University of Phoenix.

8  Q   And when did you receive that degree?

9  A   Possibly -- oh, 2010.

10  Q   Have you ever studied for a doctoral degree?

11  A   I did.

12  Q   And what's the status of that?

13  A   It's on hold right now.  When I accepted the job with the

14  Detroit Police Department, that is when I placed the work on

15  hold.

16  Q   How far along were you?

17  A   I immediately entered after my -- obtaining my master's,

18  so a couple years, three years.

19  Q   Was your first job as a police officer with the City of

20  Detroit?

21  A   It was not my first job.

22  Q   What was your first job?

23  A   Delivering papers in high school.

24  Q   No, but as a police officer, was that your first --

25  A   Oh, my first police job was, yes, 1977 in the City of

1  Detroit.

2  Q   And how long did you work for the City of Detroit?

3  A   Roughly two and a half years until I was laid off in

4  1980.

5  Q   And what position did you hold with the City of Detroit?

6  A   Police officer.

7  Q   After you were laid off by the City of Detroit, where did

8  you next seek employment?

9  A   City of Los Angeles.

10  Q   And were you employed there?

11  A   Yes, as a police officer.

12  Q   For what period of time did you work as a police officer

13  in Los Angeles?

14  A   For 28 years starting in 1981 until the date I retired in

15  2009 after being selected as a police chief for Portland,

16  Maine.

17  Q   I assume you held numerous positions while you were with

18  the police department in Los Angeles?

19  A   I did.

20  Q   Could you describe some of those positions that you held?

21  A   Ranged from both administration, field.  I, as a police

22  officer, worked in community relations, worked in a gang

23  unit, promoted to sergeant, worked as an internal affairs

24  investigator, also as an advocate, a grievance investigator

25  and advocate for the police chief, promoted to lieutenant,

1    ran a defense rep unit with the unit -- with the union.  From
2    that I became an adjutant to the chief of police and after
3    that promoted into captain.  I worked several positions as a
4    command level officer from juvenile division, specialized
5    division, then the Wilshire area, also southwest area twice
6    as a captain, later as the area commanding officer, and then
7    at that time I retired.  Well, for one month prior to
8    retirement I was a commanding officer of West Los Angeles
9    area.
10   Q    And you said you retired from Los Angeles when?
11   A    In 2009.
12   Q    And did you take a job after that?
13   A    I did.
14   Q    And where did you take a job?
15   A    Portland, Maine, as the police chief.
16   Q    And what were your duties as police chief of Portland,
17   Maine?
18   A    Overall management, leadership of the police department.
19   Q    And how big of a staff was that?
20   A    Sworn and civilian staff of about 215.
21   Q    And how long did you act as police chief of Portland,
22   Maine?
23   A    Roughly two years.
24   Q    And after that, did you take another job?
25   A    I did.

1  Q   And where was that?

2  A   Cincinnati, Ohio, police chief.

3  Q   And what was your start date, approximately, for that

4  job?

5  A   2010, August, I think.  Stayed there two years.

6  Q   August of 2010?

7  A   Right, if my memory serves me correct.

8  Q   And what was the general description of your duties as

9  police chief of Cincinnati?

10 A   Basically the same, overall management, leadership of the

11 Cincinnati Police Department.

12 Q   How big of a police force was Cincinnati?

13 A   Sworn and civilian, roughly 1,700 employees.

14 Q   What was the residential size, the people in City of

15 Cincinnati?

16 A   The actual residential population was about 300,000, but

17 what makes unique -- a unique characteristic of Cincinnati is

18 it had a metropolitan statistical area of 2.2 million, which

19 is the largest in the State of Ohio.

20 Q   When you talk about the metropolitan statistical area, do

21 you consider that part of your jurisdiction as the police

22 chief of Cincinnati?

23 A   Yes, because of the people that will work, attend school

24 that live in the city represent that population.

25 Q   How did you become the police chief of the City of

1  Detroit?

2  A    A recruiter contacted me.

3  Q    And when was that?

4  A    Probably February, March, roughly, early part of the

5  year, of this year.

6  Q    2013?

7  A    Yes.

8  Q    And what did you do once you were contacted by the

9  recruiter?  Did you meet with anyone at the City of Detroit?

10  A    I did.

11  Q    And who did you meet with?

12  A    I met with a number of people through a series of

13  interviews.  I met with the recruiter, of course, initially,

14  and from that I met with city officials, the mayor, the

15  emergency manager.

16  Q    Being Kevyn Orr?

17  A    Kevyn Orr.

18  Q    Met with the monitor, federal monitor, at some point

19  during the process, Mr. Baird out -- who works for the

20  Governor's Office, State of Michigan, and that was it.

21  A    At some point you were offered a job as the police chief

22  of Detroit?

23  Q    I was.

24  Q    And when was that?

25  A    Started in July, possibly June.

1  Q   And when did you actually -- when was your first day of

2  work?

3  A   June -- I mean July 1st.

4  Q   Why were you interested in taking the job as police chief

5  of Detroit when you were already police chief in Cincinnati?

6  A   It was a great opportunity.  I knew that the city was

7  facing a myriad of challenges.  This was home, certainly the

8  place I started my policing career, so certainly when I look

9  across at -- this now is my third job as a police chief -- to

10  come back here was very significant to my career.

11  Q   When you started as the new police chief of the City of

12  Detroit, what steps did you take to familiarize yourself with

13  the police department?

14  A   As I do in the past in other departments that I held the

15  chief's position, I certainly tried to meet as many people as

16  I could, both internal and external to the police department.

17  As it relates to inside, certainly I met with a cross-section

18  of rank and file prior to starting, had a chance to attend a

19  union meeting, so I got to meet the union president from the

20  DPOA, met some of the members at that meeting.  From that,

21  after I actually started, I continued to meet with the union

22  president, and I began to make my rounds, if you will, and

23  talking to a cross-section of people inside the department.

24  Q   And what was that -- what did the cross-section consist

25  of, the people you met with inside of the department?

1  A   I met with the executive management team.  I met with

2  rank and file.  I physically visited some of the stations,

3  some of the work locations where the specialized units were

4  housed.

5  Q   When you said you met with the executive management team,

6  who consists or who was part of the executive management team

7  at the time you took the job?

8  A   The deputy chiefs, assistant chiefs, commanders, then

9  inspectors.  I've also met with the civilian counterparts,

10  the civilian deputy chiefs that held several positions in the

11  police department.

12  Q   How many meetings do you figure you had when you first

13  took the job as police chief?

14  A   Virtually met every day, still meet every day, many

15  meetings.  I would be making a guess at how many meetings,

16  but depends on what time period.

17  Q   Did you --

18  A   From the beginning until now -- that's a difficult one --

19  in excess of 50 meetings.

20  Q   Okay.  Did you meet with any city officials after you

21  took the position as police chief?

22  A   I have.

23  Q   And who did you meet with?

24  A   I have had a meeting or two with the mayor, certainly --

25  Q   Mayor Bing?

1  A   Mayor Bing.  Certainly met and have been continuing to

2  meet with the emergency manager, Kevyn Orr, on a number of

3  occasions.  I've met with several on the council, in

4  particular, the council president, Saunteel Jenkins.  I have

5  met with the now president and former president of the police

6  commission.

7  Q   Did you meet with any community business leaders before

8  or after you took the position as police chief?

9  A   I did.

10  Q   And what did you do to meet with the community business

11  leaders?

12  A   There were several meet-and-greets, met business leaders.

13  There was a meet-and-greet at Comerica Park early during my

14  arrival, maybe within the first month, so I had a chance to

15  meet a variety of business leaders as well as community

16  stakeholders, Wayne County prosecutor, which I left out, had

17  a chance to meet with her.  And then there's been several

18  other smaller meet-and-greets, one at Detroit Athletic Club

19  where, once again, I met with local business leaders.

20  Q   Who's the Bratton Group?

21  A   The Bratton Group is a consultant firm.  Bratton is a

22  former police chief of Los Angeles, also former commissioner

23  of New York, Boston, and Boston Transit.

24  Q   Were they providing -- when you started as police chief,

25  were they providing consulting services to the Detroit Police

1    Department?

2    A    Yes, they were.

3    Q    And what kind of services did you understand that they

4    were providing?

5    A    Looking at the organizational structure, for the most

6    part, there were actually several consulting firms working

7    with the Detroit Police Department, but I actually had a

8    conversation with Bill Bratton prior to being selected.

9    Q    Is he the CEO of the Bratton Group?

10          MS. LEVINE:  Your Honor, objection.  We don't have a

11   certification or a declaration from the police chief.  I was

12   just wondering if we could get some understanding as to how

13   this is relevant to eligibility.

14          MR. HERTZBERG:  Sure, your Honor.  First, your

15   Honor, I'm laying a foundation for the witness, but, second,

16   one of the aspects, as cited in the brief that the city

17   filed, is one of the tests is service delivery insolvency.

18   And the chief is here to testify as to the public safety and

19   whether the services are being provided to the community,

20   being the --

21          THE COURT:  Is this foundation for that?

22          MR. HERTZBERG:  Yes.  This is foundation.

23          THE COURT:  All right.  I'll permit it.  Go ahead.

24          MR. HERTZBERG:  Thank you.

25   BY MR. HERTZBERG:

1   Q   So you met with the Bratton Group; correct?

2   A   I did.

3   Q   And what did they tell you about the state of the Detroit

4   Police Department?

5   A   That -- if I just might summarize it in a very short way,

6   that everything is broken, deplorable conditions, crime is

7   extremely high, morale is low, the absence of leadership.

8   Q   And after you took the job as police chief, did you meet

9   with anyone from Conway MacKenzie?

10   A   I did.

11   Q   And who did you meet with?

12   A   Chris Gannon, one of the consultants.

13   Q   What did you talk to -- or what subject did you cover

14   with him?

15   A   Essentially the same as I did with the Bratton Group, the

16   staff, low morale, working conditions.

17   Q   Did you review any reports that have been prepared or any

18   information when you joined the force as police chief?

19   A   I had reviewed different reports, some in more detail

20   than others. I don't recall which. There was a lot written,

21   but there were no real reports from the consultants as it

22   related to the state of the department.

23   Q   After you became police chief, did you -- you said you

24   went and saw some of the police stations. Did you go out at

25   crime scenes? Did you go out and meet officers in the field,

1 anything of that nature?

2 A    I have, and I did.

3 Q    Can you describe that please?

4 A    I've had a chance to go by all of the precincts, and

5 certainly in most, if not all, the conditions of the stations

6 were in some instances deplorable.  One comes to mind.

7 During a visit I had with one of our leased facilities where

8 our crime lab technicians work out of, a location where I'm

9 told by the staff the heat sometimes works, it's dirty,

10 deplorable working conditions, not a lot of space.  Certainly

11 as I made my rounds, that was consistent.  In fact, even as

12 recently as yesterday at a community meeting, community

13 members brought up the deplorable state of the police

14 stations and asked what I plan to do about that.

15 Q    Let's talk about crime in the City of Detroit at the time

16 you took over as police chief and what we call clearance

17 rates.  What is clearance rates on crime?

18 A    Solving the crime basically.  I knew coming in that the

19 homicide clearance rate for Detroit was roughly 11 percent.

20 Q    Before we go there, let me ask you a few additional

21 questions.  Do police departments ordinarily maintain

22 statistics on crime?

23 A    Yes.

24 Q    And where are those reported to?

25 A    Reported to the FBI.

1  Q   And does Detroit maintain these type of reports and

2  statistics?

3  A   They do now.

4  Q   When you started as police chief, did you consider

5  Detroit -- after you met with your commanders, met with

6  people, citizens, and moved around and looked at the

7  different police stations, met with people on your staff, did

8  you consider Detroit a violent city?

9  A   I did.

10  Q   How violent?

11  A   Extremely violent.  In comparison to cities I've worked,

12  primarily Los Angeles and Cincinnati, it was the most violent

13  city I've ever worked, so I knew that I would be facing a

14  significant challenge in focusing on reducing crime, violent

15  crime in particular.

16  Q   You started to talk about the homicides in Detroit.  How

17  many homicides were there in the city from the beginning of

18  the year until the time you took your job in June?

19  A   I'm not certain what the exact number was at that time.

20  Q   Were you aware of what it was in 2012?

21  A   I was aware that it was, I think, 384.  It was ranked,

22  according to a recent report by the FBI, as the second most

23  violent city in America only exceeded by Flint, so I was

24  aware of the homicide rate.

25  Q   You started to talk about clearance rate, solving of

1 crimes.  What was the clearance rate on the homicides in

2 Detroit?

3 A    The information that I received was around 11 percent.

4 Q    Is that a good clearance rate?

5 A    It's deplorable.

6 Q    What did you see as the clearance rate when you were

7 working in Los Angeles?

8 A    Sixty-five to seventy percent.  Cincinnati, 70 percent.

9 Q    Seventy-percent clearance rate on homicides?

10 A    Kind of fluctuates between 60 and 70.

11 Q    Was the clearance rate similar on other violent crimes in

12 the City of Detroit?

13 A    As low or lower.  In fact, if my memory serves me, I

14 think like for using the crime of robbery, I think the crime

15 of robbery, the clearance rate was about eight percent.

16 Q    Is that low?

17 A    Extremely low.

18 Q    What was the clearance rate, approximately, in Los

19 Angeles when were you employed there?

20 A    As I recall, just looking at the one station, it would go

21 between 25-, 35-percent clearance rate.

22 Q    In Cincinnati when you were chief?

23 A    About the same.  Robbery clearances tend not to be as

24 high.  There are more reported crimes, but roughly about the

25 same, 25 to 35 percent.

1    Q   You said -- you testified earlier that the police

2    department was having extreme problems.  Was there problems

3    of accountability with police officers?

4    A   Accountability was for the most part, in my judgment,

5    absent.  The one thing that I acknowledge the department did

6    well in terms of -- and when I talk about accountability, I'm

7    talking about at the executive and management levels.  I'm

8    not referring to the rank and file police officer.  There was

9    an absence of accountability, but the department certainly

10   could be lauded for its success just recently two years ago

11   where the consent judgment -- they were at about 24-percent

12   compliant, and they rose to about 91, 92 percent over a two-

13   year period.  But when you look at the other areas of the

14   department, it didn't seem to be that certainly the executive

15   and managers were being held accountable.

16   Q   Was there an urgency, in your mind, to drive down violent

17   crime?

18   A   Both violent crime and raise morale of the police

19   officers.

20   Q   What was the morale like for the everyday police officer

21   in the City of Detroit when you took over as chief?

22   A   In my judgment, it was the lowest I have seen of any

23   police department I've ever worked, including when I worked

24   here in the '70s.

25   Q   Do you have any idea what caused that?

1    A    A number of factors.  Certainly the fact that they had

2    lost ten percent pay; that they were forced into a 12-hour

3    work schedule.  They had no real voice in the department, no

4    real decision-making, and as I met with officers through my

5    visits to different operational entities, the thing I heard

6    most was they just wanted to be police officers again, and

7    they felt that they didn't have leadership that would allow

8    them to do that.

9    Q    Were police officers, in your mind, when you took over as

10    police chief being deployed in the correct way?

11    A    They were not.

12    Q    Can you explain that, please?

13    A    It appeared and later found out that Detroit police

14    management had taken what I call a cookie cutter approach to

15    staffing or deployment, and there was no real science behind

16    how police officers were deployed.  And specifically what I'm

17    talking about is looking at issues of calls for service,

18    crime, and population.  And so it was after my staff started

19    to take a good look at -- we made some adjustments in

20    staffing because one indicator was the fact that not only was

21    the response time a big issue, but when officers came to

22    start their 12-hour work schedule, there were anywhere

23    between 40 and 60 calls being held to be answered.

24    Q    Let's talk about response time.  What is the average

25    response time on a call to a police station right at the time

1    you took over as police chief, approximately?

2    A    What was reported out to me was roughly 50 minutes to an

3    emergency call.

4    Q    And when you were in L.A. as a captain, what was the

5    normal response time you saw there?

6    A    It was an average response time of seven minutes.

7    Q    How about when you were chief in Portland, Maine?

8    A    Three to four minutes.

9    Q    And when you were chief in Cincinnati?

10   A    Five to six minutes.

11   Q    Do you think this 50-minute response time put residents

12   at risk of their safety?

13   A    I did.

14   Q    Why is that?

15   A    Because if a community member is calling for police

16   services in an emergency situation, certainly the expectation

17   that police will get there as soon as possible, so what I

18   heard coming in from community members, what I heard before I

19   got here, is the fact that there were times when Detroit

20   police officers were called, and no one would ever show up.

21   In fact, we have two dispatchers now facing criminal charges

22   based on the allegation of not sending police officers to a

23   call for service, one where the allegations involving a woman

24   who died as a result of a domestic situation, and the other

25   one I think was a stabbing.

1 Q And the dispatchers never dispatched police officers to

2 the --

3 A It's a pending matter, but that's the allegation, yes.

4 Q Okay. Let's talk about where police officers were

5 working when you took over as police chief. Were some of

6 them working in non -- or jobs that were not on the street

7 policing crimes and stuff?

8 A It was very odd to me when I came in. First, I took a

9 look at my office, and, for example, one officer -- a full

10 duty officer was -- sole assignment was to gas and wash my

11 car.

12 Q And this was a police officer?

13 A A police officer. Then there were several other police

14 officers in my office that were performing clerical duties,

15 and so those individuals -- I took action to move them out,

16 and then we started to look at the rest of the department.

17 Q Well, before you go there, when you say "move them out,"

18 do you mean place them on the street patrolling?

19 A In a more -- in an operational assignment, which doesn't

20 necessarily mean they went back to a uniform patrol, but in

21 another operational, something where a police officer would

22 be assigned.

23 Q Let's talk about the mayor's personal protection force.

24 When you took over as the police chief in the City of

25 Detroit, was protection provided by the Detroit Police

1  Department to Mayor Bing?

2  A   Yes, it was.

3  Q   And how many police officers were used for that

4  protection?

5  A   Twenty-three.

6          MS. LEVINE:  Your Honor, objection, again, with

7  regard to relevance.  I'm just not sure where this fits into

8  109.

9          MR. HERTZBERG:  It's, as I said, service insolvency.

10 We're going to show that there were police officers not being

11 used correctly on the street, which jeopardized the safety of

12 the residents, and when he took over as chief the residents

13 were at risk because of this, and we were showing service

14 insolvency.

15         THE COURT:  The relevance is arguable, so I'll

16 permit it.

17         MR. HERTZBERG:  Thank you.

18         MS. LEVINE:  Your Honor, just for the record --

19         THE COURT:  Yes.

20         MS. LEVINE:  -- our understanding is that solvency

21 we've determined here is whether or not the city can pay its

22 debts as they come due, and that's a financial mathematical

23 problem.  So while this is sympathetic testimony, we would

24 respectfully submit it doesn't go to the issue of whether or

25 not this debtor is eligible.

1          MR. HERTZBERG:  As I indicated to the Court, and

2     I'll just repeat --

3          THE COURT:  You may proceed, Mr. Hertzberg.

4          MR. HERTZBERG:  Okay.  Thank you, your Honor.

5     BY MR. HERTZBERG:

6     Q    You were telling us about the personal protection staff

7     on Mayor Bing.  How many officers was it?

8     A    Twenty-three officers.

9     Q    And how many now are being used?

10    A    Six.

11    Q    And are you the one who reduced the staff?

12    A    I was.

13    Q    And where are those officers deployed now?

14    A    They went back to operational assignments.  Six remain

15    working for the mayor in executive protection, one was de-

16    appointed, and the remaining were sent out to a variety of

17    assignments.

18    Q    How many police officers were there when you took over as

19    police chief?

20    A    Roughly 2,400.

21    Q    In order for the city, in your mind, to be safe, how many

22    police officers do you need?

23    A    In my estimation, if we had 3,000 police officers today,

24    that would help tremendously, but before I could put a hard

25    number to it, I need to make an evaluation on how we are

1   deploying current officers, and so when you talk about moving

2   staff from the mayor's executive protection detail, there's

3   also a move to civilianize some of the positions now held by

4   police officers, and one key example is our dispatch.

5   Dispatchers in the Detroit Police Department are sworn police

6   officers, and so I wanted to make sure that we were

7   effectively deploying sworn officers the best that we could

8   so I would have an idea of how many officers we actually

9   need.

10   Q   Okay.  Let's turn to the equipment.  Do the officers get

11   as part of their -- or as police officers, are they given

12   bullet-proof vests?

13   A   They are.

14   Q   And what's the state of the bullet-proof vests when you

15   took over as police chief?

16   A   Deplorable.  There were roughly 350-plus vests, and I

17   think it's up now to roughly 400 -- it might even be higher;

18   I think it's 500 when we include our narcotics unit -- that

19   are expired.  Even the police chief does not have a vest

20   except the one I brought with me from Cincinnati.

21   Q   When you say "expired," bullet-proof vests have

22   expiration dates on them?

23   A   Yes.  Five years.

24   Q   And after that they're not safe to wear?

25   A   That's correct.

1  Q   Let's talk about the vehicle, police vehicles.  What
2  condition were the police vehicles in when you took over?
3  A   I saw vehicles with obvious damage.  I saw vehicles that
4  appeared to be unsafe.  In fact, when I stopped one officer,
5  there was one vehicle that had -- the right front brake
6  wasn't working properly, so I directed him to turn the
7  vehicle in.  Paint peeling off the vehicle.  In fact, in the
8  field on one call where it was an officer needs help, a back-
9  up car that I responded to in the eastern district where they
10 were looking for a wanted suspect, which we ultimately
11 identified and arrested, as the officers were preparing to
12 leave, one of the police vehicles would not start up.  The
13 officer proceeded to climb underneath the vehicle and jump-
14 started the vehicle to get it running.  When I asked the
15 question, "Is this the norm?" several of the officers said
16 for the most case it is the norm, and either they jump it
17 that way or they push the car to get it started, not all
18 vehicles but some.
19 Q   And what was the mileage on the vehicles?  Was it normal
20 mileage for the year of the vehicle?
21 A   I'm not certain on the mileage, but I am told that 66-
22 percent of our fleet has excessive wear, is well beyond the
23 normal -- I guess it's three years that police cars are
24 deployed.
25 Q   The condition of the police cars, does this put citizens

1  at risk?

2  A    It does.

3  Q    Does it put visitors to the city at risk?

4  A    It does.

5  Q    And does it put the safety of people who work in the city

6  at risk?

7  A    It does, including the police officers.

8  Q    You received some new police cruisers once you took over

9  as police chief; is that correct?

10  A    That's correct.

11  Q    And where did you receive those from?

12  A    Penske Corporation and a group of other local businesses

13  that were part of this effort to bring a hundred new police

14  cruisers.

15  Q    So you received -- have you taken possession of the

16  hundred new police cruisers?

17  A    We have.

18  Q    Are all of them operating on the street right now?

19  A    No, they're not.

20  Q    How many are actually operating on the street?

21  A    Roughly 20 or so.  I'm not actually certain.  I check

22  weekly.  Some of them are still being outfitted by the

23  outfitter, and they're being pushed out, but we do have

24  possession of the 100 police vehicles.

25  Q    Let's spend a minute and talk about the fire department

1    and EMS.  You don't oversee those departments, do you?

2    A    I do not.

3    Q    Have you had an opportunity to observe as police chief

4    those departments and how they're operating?

5    A    I have.

6    Q    And what have you seen?

7    A    The thing I've seen -- two things that would have been

8    most notable is the fact that Detroit police officers on a

9    routine basis I'm told transport injured victims to the

10   hospital and in all cases children.

11   Q    Is this a normal function for the police department?

12   A    Not anyplace I've worked.

13   Q    And why is the police department in Detroit doing that?

14   A    I'm told because EMS did not have vehicles or staff that

15   could respond in a timely manner, and so the decision was to

16   transport.  And when I asked how long this has been going on,

17   it's certainly been more acute in the last five years, but

18   one of my staff as recent as this morning said that they've

19   been doing it since the '80s.  Now, to what degree I am not

20   certain, but it is routine that Detroit police officers

21   transport injured youth victims of crimes or that have been

22   injured.

23   Q    And do you work closely with the fire department?

24   A    Work in the same building.  We have communication.  We

25   talk about a variety of issues.

1  Q   Have you seen any issues that have caught your attention

2  with the fire department?

3  A   Yes, one notable issue.

4  Q   And what's that?

5  A   The fact that there have been since I've been here two

6  occasions but this year four occasions where fire fighters

7  have responded to a fire and put out the fire, left the

8  location, and a deceased person was found in the location

9  later.

10 Q   By the police department?

11 A   By the police -- well, someone would call us and say

12 there was a dead body in the location.  Police department

13 would respond out and start its investigation only to find

14 out that the fire department had been at the location and put

15 out the fire.

16 Q   One more area I want to cover with you, blight.  What is

17 blight in the city?

18 A   Abandoned homes, streetlights out, traffic signals not

19 working, overgrown shrubbery.

20 Q   Is that a safety issue?

21 A   It is.

22 Q   In which way?

23 A   It affords someone who wants to engage in criminal

24 behavior to do it under the cloak of darkness.  Certainly

25 abandoned homes are a key location where violent crimes take

1    place.  And using the broken windows concept, certainly when

2    an area is deplorable or broken, it tends to attract criminal

3    behavior.  So if an area is clean, it's well-lit, people take

4    pride in the neighborhood, crime seems to be lower.

5    Q    Did you -- when you took over as police chief, did you

6    notice blight in the City of Detroit?

7    A    I have.

8    Q    And how bad was it, in your mind?

9    A    Significant.

10   Q    When you say "significant," could you describe it?

11   A    Well, just blocks where it may be only one home, home

12   could be partially burned, certainly streetlights that were

13   not working, which certainly contribute to a safety issue

14   both for pedestrians and certainly a place where crime takes

15   place, traffic signals not working, which certainly puts

16   motorists at harm as they travel through the City of Detroit.

17   Q    When you arrived as police chief and took over, do you

18   think that the residents, visitors, people who worked in the

19   city were at risk of violent crime?

20   A    I did and do.

21          MR. HERTZBERG:  I have no further questions, your

22   Honor.

23          THE COURT:  Any questions for the witness?

24                      CROSS-EXAMINATION

25   BY MS. PATEK:

1  Q    Good afternoon, Chief Craig.  Welcome back to Detroit --

2  A    Thank you so much.

3  Q    -- right in the eye of the storm.  In spite of all the

4  challenges you've described, we can agree for those of us who

5  grew up here and have families here that this is a place with

6  some rich history and some wonderful things to offer; isn't

7  that right?

8  A    Absolutely.  I agree with that.

9  Q    I want to start with your comments about the DFFA.  I

10 take it you have no firsthand knowledge as to whether or not

11 the DFFA faces some of the same undermanning or morale

12 problems that are present in the Detroit Police Department?

13 A    Only what I've heard from police officers and -- but I

14 have not firsthand, not like I have in the police department.

15 Q    Is it your understanding that they're in a similar

16 situation as the Detroit Police --

17 A    Yes.

18 Q    -- Department?  And in that respect, I heard you say, I

19 think, that the Detroit Police Department is currently

20 undermanned; correct?

21 A    I would say so, yes.

22 Q    And the individual officers are in many cases underpaid?

23 A    Yes.

24 Q    And the working conditions, as you described them,

25 were -- are deplorable?

1  A    Yes.

2  Q    And they -- as a consequence, when you came here in July,

3  you found a department in very low morale?

4  A    Yes.

5  Q    And I don't know how much research or how much you were

6  paying attention, but is it your understanding that there was

7  a series of chiefs before you that stepped down in a variety

8  of less than -- let's say less than auspicious circumstances?

9  A    Yes.  I'm aware.

10  Q    And is it your understanding that that was, in large

11  part, what left the department leaderless?

12  A    Yes.  That certainly was a significant contributing

13  factor.

14  Q    And as I understand it, since you've been here, you've

15  brought on new deputy and assistant chiefs?

16  A    A new executive and management team with maybe one or two

17  exceptions.

18  Q    Okay.  And some of that executive management team has

19  been pulled directly from the command staff; that is, people

20  who are members of the Detroit Police Command Officers

21  Association?

22  A    That's correct.

23  Q    Because when you came here, in spite of the difficulty of

24  the situation, you found that there were dedicated

25  professional men and women there who you wanted to elevate to

1    be part of your new leadership team?

2    A    Yes.

3    Q    And with respect to the lieutenants and sergeants, some

4    of those who had actually been acting as inspectors have now

5    been formally appointed as inspectors?

6    A    Yes, now called captains, yes.

7    Q    And you also mentioned meeting with on a number of

8    occasions the president of the Detroit Police Officers

9    Association, Mark Diaz?

10   A    Yes.

11   Q    And in your meetings -- and I don't know if he's still

12   here.  He was here earlier in the courtroom today.  In your

13   meetings with Mr. Diaz, have you found him to be interested

14   in the restructuring and revitalization of the Detroit Police

15   Department?

16   A    I have, yes.

17   Q    And willing to be flexible with you in terms of trying to

18   try new things to better deployment, better strategy in terms

19   of getting more officers out on the street?

20   A    Yes, in every instance.

21   Q    And obviously I think it goes without saying from what

22   you described the work these officers do every day out on the

23   street is very dangerous work?

24   A    Yes, it is.

25   Q    And they're literally putting their lives at risk?

1  A   Yes, they are.

2  Q   And would it be fair to say that that would go for

3  probably the police and the fire fighters as well?

4  A   Yes, it would.

5  Q   And do you -- and if you don't know, it's a fair answer.

6  Do you know anything about the restructuring proposal that

7  has been made by the City of Detroit with respect to what is

8  to occur with the accrued vested pension benefits of the

9  active and retired Detroit police and fire fighters?

10  A   I've heard.  I don't have intimate understanding of it.

11  Q   And would it be -- do you believe sitting there and even

12  understanding the financial challenges that it would be fair,

13  given what these officers face every day, to impair those

14  accrued vested and previously earned pension benefits?

15  A   I do support the public service workers having their

16  pension, but I also understand the necessity to take some

17  very bold action as it relates to addressing this fiscal

18  crisis in the City of Detroit.  I'm certainly not the expert

19  on what should happen or what the balancing would be to that,

20  but I am certainly concerned about pensions.  I have the good

21  fortune of having served 28 years with the Los Angeles Police

22  Department, and I have my pension, so that certainly does

23  concern me.

24  Q   And when you went to work for the Los Angeles Police

25  Department and you did the very hard work that you did for 28

1  years, you understood that you were earning that pension?

2  A   That's correct.

3  Q   And you had an expectation that at the end of the day it

4  would be paid to you?

5  A   That's correct.

6         MR. HERTZBERG:  Objection, your Honor.  This is --

7         MS. PATEK:  I have nothing further.

8         MR. HERTZBERG:  Okay.  I'll withdraw the objection

9  then.  Let her testify.

10                    CROSS-EXAMINATION

11  BY MS. LEVINE:

12  Q   Good afternoon.

13  A   Good afternoon.

14  Q   Sharon Levine, Lowenstein Sandler, for AFSCME.

15  A   Yes.

16  Q   You mentioned there was a morale issue with regard to

17  lost pay, increased schedule, and a lack of leadership, I

18  believe; correct?

19  A   All kind of combined in one.

20  Q   Combined?

21  A   All played varying roles in morale.

22  Q   Isn't it true that reducing pensions and reducing health

23  benefits would also contribute to further morale loss?

24  A   I am certain.

25  Q   The city actually produced a lot of documents for us in

1  discovery in connection with this case.  I don't recall --
2  and I may have just missed it -- a proposed budget with
3  regard to fixing the Detroit Police Department.  Have you
4  provided that kind of a budget to the city?
5  A   I have not.
6  Q   Would you be -- would you be supportive of using existing
7  vested pension benefits to fund that kind of a budget?
8          MR. HERTZBERG:  Objection, your Honor.  Way beyond
9  the scope of direct examination.
10          THE COURT:  Overruled.  Please answer the question,
11  sir.
12          THE WITNESS:  I would have to take a look at the
13  full picture.  I mean there have been some steps I've taken
14  to reduce the fiscal liability.  One such action I took was
15  dramatically reducing the command and executive team, thereby
16  resulting in a $1 million annual savings in salaries, so we
17  are in budget discussions talk right now, so I'm not prepared
18  to answer the question to the level of detail you're asking.
19  BY MS. LEVINE:
20  Q   You mentioned using civilians for certain job functions,
21  including, for example, dispatchers.  Just so I understand,
22  is that outsourcing those jobs?  Is that what you're talking
23  about?
24  A   Not outsource -- not outsourcing but redeploying sworn
25  officers that hold those jobs back into traditional policing

1 functions. Most police agencies across America use civilians

2 as dispatchers, and Detroit has used sworn dispatchers from

3 the time I was here now over 36 years ago, and so this was an

4 effort to more equitably deploy police officers back into the

5 field.

6 Q   So it would either be hiring the citizens of Detroit at

7 probably a lower pay scale and/or outsourcing those jobs?  Is

8 that -- do I --

9 A   That's probably a strategy that could be used, but it

10 would definitely be hiring people from the city.

11 Q   And from your time with the Los Angeles Police

12 Department, in addition to a pension, do you enjoy health

13 benefits?

14         MR. HERTZBERG:  Objection, your Honor.  It's

15 irrelevant.

16         THE COURT:  No.  I'll permit it.  Go ahead, sir.

17         THE WITNESS:  I do.

18         MS. LEVINE:  Thank you.

19         THE COURT:  Other questions for the witness?

20         MR. KING:  Please, your Honor.  Ron King on behalf

21 of the Pension Systems.  I just didn't want to displace Ms.

22 Green.  Sorry.

23                     CROSS-EXAMINATION

24 BY MR. KING:

25 Q   Thank you for your service.

1  A    Thank you.

2  Q    Chief Craig, are you aware that there are approximately

3  400 active duty officers that have less than ten years of

4  service in the department?

5  A    I didn't know it was that few.

6  Q    Are you concerned at all that if their pension benefits

7  are not vested, that you will have a difficult time retaining

8  those people?

9  A    I am concerned about retention and hiring.

10 Q    Do you think that impairing or diminishing pension

11 benefits will have an impact on your ability to recruit and

12 retain police officers?

13 A    It could.

14          MR. KING:  I don't have anything further.

15          THE COURT:  Thank you.

16                    CROSS-EXAMINATION

17 BY MS. BRIMER:

18 Q    Good afternoon.  My name is Lynn Brimer.  I represent the

19 Retired Detroit Police Members Association.  It's an

20 association of approximately 350 retired Detroit police

21 personnel, officers through chiefs.  Now, I'm going to try

22 not to repeat anything that's already been put in the record,

23 but you did indicate you do receive a pension, and you do

24 receive healthcare benefits; is that correct?

25 A    I do.

1  Q   And when you accepted your position as a police officer

2  in Los Angeles, you considered those benefits, both the

3  pension and your healthcare benefits, to be part of your

4  compensation package; is that correct?

5  A   That's correct.

6  Q   Now, you indicated that there were a number of what

7  appear to be management problems with the police department

8  when you took over.  For example, you indicated that the

9  mayor's personal protection at the time you took over

10  consisted of 23 officers; is that correct?

11  A   That's correct.

12  Q   And you've reduced that to six?

13  A   Yes.

14        THE COURT:  All right.  Ms. Brimer, I am going to

15  ask you not --

16        MS. BRIMER:  Okay.

17        THE COURT:  -- to ask any more duplicative

18  questions.

19        MS. BRIMER:  Okay.

20  BY MS. BRIMER:

21  Q   Do you know --

22        THE COURT:  Any question that begins with "you

23  testified that" --

24        MS. BRIMER:  Okay.

25        THE COURT:  -- is going to be a duplicative

1   question.

2   BY MS. BRIMER:

3   Q   Do you know whether or not the decision to put -- well,

4   let me think of how I want to ask this.  So the decision to

5   put 23 officers on the mayor's protection order was a

6   management decision, not a financial decision.  Would you

7   agree with that?  It was driven by management rather than the

8   amount of resources available to the department?

9   A   It's both.

10   Q   Okay.  Why is it a financial decision?

11   A   Police officers cost money.  It's a financial resource.

12   So if you decide to put 23 officers on an executive

13   protection detail, that's the equivalent to a shift in a

14   Detroit police station, the precinct.  So it's like me saying

15   I'm going to close the Tenth Precinct on the midnights.

16   That's why it's important.

17   Q   So now you've freed up 18 to go back to shifts at a

18   precinct; correct?

19   A   Not all went back to a precinct.  Some did.

20   Q   Okay.

21       MS. BRIMER:  And I think, your Honor, I -- I will

22   say that everything else I was going to ask has been asked.

23   Thank you.

24                CROSS-EXAMINATION

25   BY MR. MONTGOMERY:

1  Q   I'm Claude Montgomery from the law firm of Dentons.  We

2  are representing the Official Committee of Retirees in this

3  case, so I have just a couple of quick questions.  I think I

4  heard you say that you believe that bold action is required

5  on many levels?

6  A   I may have said that, and I do agree that bold action has

7  to happen.

8  Q   And you have a huge job in front of you to try to protect

9  700,000 people from what you found to be an incredibly

10  violent situation; is that correct?

11  A   Absolutely.

12  Q   All right.  Do you think the governor should be playing a

13  role in that, in helping you tackle that job?

14  A   I think that I don't see a problem or an issue with that.

15  Q   Okay.  Do you think that there should be any assets that

16  the City of Detroit has that should be blocked off from your

17  access to help the citizens of the City of Detroit?

18  A   I'm not understanding your question.

19  Q   Do you think there are any -- if the City of Detroit has

20  an asset that can be sold to help you, do you think it should

21  be sold to help you?

22  A   It depends on the asset.

23  Q   So there are some assets you think are less available to

24  you than others?

25           MR. HERTZBERG:  Your Honor, I'm going to object.

1   This is beyond the scope of direct examination and far

2   afield.  Asking the chief of --

3           THE COURT:  It is that, but in the Court's

4   discretion, the Court will permit it, nonetheless.  Go ahead,

5   sir.

6           THE WITNESS:  Again, as I indicated, possibly some

7   assets could be sold to support, say, public safety.

8   BY MR. MONTGOMERY:

9   Q   Thank you.  And anything in that regard from your vantage

10  point has to be directed towards helping you keep people

11  alive inside the City of Detroit?

12  A   Public safety is critical.

13  Q   Okay.  And, again, I think you said earlier that having a

14  police force of men and women that are dedicated and have

15  high morale is part of that?

16  A   Absolutely.

17  Q   Okay.  And part of that is how their promise -- the

18  promises made to them are kept; is that correct?

19  A   Promises are important, but also how they're treated is

20  important.

21  Q   It's got to be fair?

22  A   Fairness is important.  Transparency is important.

23          MR. MONTGOMERY:  No further questions.

24          THE COURT:  Any others?

25                          CROSS-EXAMINATION

1  BY MR. PLECHA:

2  Q   Good afternoon, Chief Craig.  I represent the Retiree

3  Association parties, which includes the Retired Detroit

4  Police and Fire Fighters Association.

5         THE COURT:  Could you back off of the mike a bit,

6  please?

7         MR. PLECHA:  Oh, I'm sorry.

8  BY MR. PLECHA:

9  Q   I will be very brief.  Would you support any plan or

10 initiative that could potentially increase blight?

11 A   An initiative to increase blight?  I wouldn't support an

12 initiative to increase blight.  Did you say decrease blight?

13 Q   No.  I said increase blight.

14 A   No.  I wouldn't be supportive of it.  I can't -- I don't

15 understand an initiative that would do that.

16 Q   So if retirees were financially forced to leave their

17 home, vacating those homes, increasing blight, you would not

18 be in favor of that?

19 A   I would not like to see retirees leave their homes.  I

20 don't -- it's not my call, but I don't like the question.

21 Q   Well, I appreciate that, but thank you.  Would you agree

22 that the retiree community is a stable part of the Detroit

23 community?

24 A   I would say that there are many retirees that offer

25 stability to the Detroit community.  My dad is one.

 1          MR. PLECHA:  Thank you very much.  No further

 2    questions.

 3          THE COURT:  All right.  Anything further for the

 4    chief?  Redirect?

 5          MR. HERTZBERG:  None, your Honor.

 6          THE COURT:  All right.  Thank you very much for

 7    coming today, sir, and also thank you for your service.

 8          THE WITNESS:  Thank you very much.

 9       (Witness excused at 4:18 p.m.)

10          MR. IRWIN:  Move this, your Honor?

11          THE COURT:  Yes, sir.

12          MR. IRWIN:  Your Honor, our next witness is Mr. Orr.

13    He is in the building.  We would need to locate him, but

14    given the hour, we just didn't know how the Court wished to

15    proceed.  We can --

16          THE COURT:  I wish to proceed.

17          MR. IRWIN:  That's fine.  We will get him.

18          THE COURT:  We'll wait here for him.

19          MR. IRWIN:  He'll be here as soon as we can get him.

20          THE COURT:  All right.  Would everyone take their

21    seats as promptly as possible, please?  One second, please.

22    Everyone sit down, please.  Mr. Orr, would you raise your

23    right hand?

24              KEVYN ORR, DEBTOR'S WITNESS, SWORN

25          THE COURT:  Please sit down.

1          THE WITNESS:  Thank you.

2          MR. SHUMAKER:  Good afternoon, your Honor.  Greg

3   Shumaker of Jones Day for the City of Detroit.

4                         DIRECT EXAMINATION

5   BY MR. SHUMAKER:

6   Q   Good afternoon.

7   A   Good afternoon, Mr. Shumaker.

8   Q   Would you state your full name for the record?

9   A   Kevyn Duane Orr.

10  Q   Mr. Orr, what is your current occupation?

11  A   My current occupation is the emergency manager for the

12  City of Detroit.

13  Q   Where did you go to college, sir?

14  A   The University of Michigan, Ann Arbor.

15  Q   When did you graduate from there?

16  A   December 1979.

17  Q   And after college, did you proceed to employment or to

18  another post-graduate school?

19  A   I took a little time off and went out west to do some

20  skiing but eventually went to graduate school.

21  Q   And where did you go to graduate school?

22  A   The University of Michigan Law School, Ann Arbor.

23  Q   And when did you graduate from there?

24  A   I graduated from law school in May 1983.

25  Q   And for the Court, where did you grow up?

1   A    I was born and grew upon Fort Lauderdale, Florida,

2   Broward County.

3   Q    Your parents are from Florida?

4   A    Yes.

5   Q    Have any -- do they have any involvement with the State

6   of Michigan?

7   A    My mother went to the University of Michigan graduate

8   school in education.

9   Q    Could you give us a brief summary of your professional

10  background?

11  A    Sure.  After graduation from law school, I went back to

12  Florida in private practice with the law firm of Arky Fried,

13  which eventually became Stearns, Weaver, Miller, Weissler,

14  Alhadeff & Sitterson, where I specialized in litigation,

15  eventually became a bankruptcy trial practitioner with who is

16  now Chief Judge Robert Mark at that law firm.  After five

17  years, I was voted into the partnership of that law firm in

18  1988.

19          I eventually took what I thought was going to be a

20  two-year leave of absence from that law firm in 1991 to go

21  into federal government first in the FDIC, Federal Deposit

22  Insurance Corporation, then into the Resolution Trust

23  Corporation in 1992.  While at the RTC, I had a specialty

24  first as a line attorney, as a counsel, then a senior

25  counsel, in litigation and bankruptcy-related matters.  I was

1  eventually promoted to assistant general counsel of complex

2  litigation and bankruptcy under then Deputy General Counsel

3  Jerry Patchan.  I stayed there from '92 to '95.

4  Q   Can I just stop you one second?  You said you started at

5  the FDIC; is that correct?

6  A   Yes.

7  Q   What was your position there at the FDIC?

8  A   At the FDIC I was counsel in the legal division.

9  Q   Okay.  And then you went to the Resolution Trust

10 Corporation?

11 A   Yes.  The Resolution Trust Corporation was originally

12 staffed by attorneys at FDIC, and then it got its own

13 independent hiring authority, and we were assigned there

14 permanently.

15 Q   Did you have any particular responsibilities at the RTC?

16 A   Yes.

17 Q   What were they?

18 A   While at the RTC, I not only had line responsibilities

19 for litigation and litigation-related matters, I also had

20 responsibilities as a liaison from the legal division with

21 the agencies, Office of Minority and Women Owned Business and

22 Women Owned Law Firms called MWOLF's and MWOB's.  I was also,

23 during the course of that, assigned as the chief

24 restructuring officer of a bank holding company in New

25 Orleans for a period of time and eventually became

 1   responsible for the agency's supervision and management of

 2   all cases implicating federal preemption and the primacy of

 3   the Financial Institutions Reform, Recovery and Enforcement

 4   Act of 1989 over various state laws.

 5   Q   I'm sorry.  You went on from the RTC to where?

 6   A   After the RTC, I was going to return to private practice

 7   to my old firm in Miami.  The supervisor that I had at the

 8   RTC had moved on to become director of the Executive Office

 9   for United States Trustees at the Department of Justice, a

10   retired bankruptcy judge by the name of Jerry Patchan.  He

11   asked me to come over for what was then going to be a year or

12   two as his deputy, and I ended up staying there for

13   approximately six years.

14   Q   And what did you do, if you could tell us, at the United

15   States Trustee program?

16   A   I was initially the deputy director of the U.S. Trustee's

17   program where I was responsible as the -- more or less the

18   chief operating officer for the agency at the director of

19   the -- at the direction of the director.  The EOUST and the

20   U.S. Trustee's program is one of 36 ranking components within

21   the United States Department of Justice.  It is responsible

22   for the administration and oversight regarding the integrity

23   of the bankruptcy practice in all 50 states with the

24   exception of North Carolina and Alabama.

25   Q   Were there any specific duties that you had in that

1   position that you think translates into your role as the

2   emergency manager of the City of Detroit?

3   A    Yes.  I mean we had over 1,100 employees throughout the

4   United States, 93 offices throughout the United States.  I

5   think our budget at that time was somewhere in the

6   neighborhood of over a hundred million dollars, which we

7   administered.  In that capacity, we also had reporting

8   requirements for the -- to the Department of Justice through

9   the associate attorney general to the then Attorney General

10  Reno for most of the time that we were there.  We also had

11  supervisory, administrative, and operational responsibility

12  for the 21 United States Trustees Offices.  I was also

13  responsible for both preparing and giving oversight testimony

14  to the various oversight committees in Congress both on the

15  House side and the Senate side and coordinating budget

16  reviews on a regular basis during the regular budget season

17  but oftentimes one-offs as well with House Majority, House

18  Minority, and the U.S. House, Senate Majority, Senate

19  Minority, budgeting with the White House as well as budgeting

20  issues with respect to the Department of Justice's overall

21  annual budget.

22  Q    During your time in the federal government from your

23  position at the FDIC, the RTC, and the United States Trustee

24  program, did you have any restructuring experiences?

25  A    Yes.

1  Q   And what were those?

2  A   Well, because I'd had some experience as a bankruptcy

3  practitioner in South Florida, then in the Southern District

4  of Florida, principally in front of Judge Cristol but others,

5  I was initially selected to participate as the chief legal

6  officer with the Savings & Loan because a subsidiary down in

7  Atlanta was -- down in New Orleans was a -- had a large

8  holding company called the Landmark Land Company.  At that

9  time, the Landmark Land Company held a series of golf courses

10 and country clubs, five of which were some of the most well-

11 regarded country clubs, highly rated ones in the nation at

12 the time, such as Kiowa, Mission Hills, PGA West, Oak Tree --

13 trying to think of the other ones -- Palm Beach Polo and

14 Country Club, places I typically couldn't have gone to, but

15 very significant clubs at that time, high-end properties, and

16 I initially became responsible for supervision of the

17 restructuring of the holding company, but I also ended up

18 becoming responsible for asset disposition during that

19 process.

20 Q   After you left the federal government, where did you go?

21 A   In 2000 I was selected by the Attorney General to

22 become -- go from being the deputy director to becoming the

23 director, and that went from being a career position to a

24 political appointee after White House vetting and approval

25 during President Clinton's administration.  As a political

1　appointee -- most of the agency heads are -- it is typical

2　for the President of the United States, upon a new

3　election -- that was Bush v. Gore first election -- to put in

4　his own people, and I think the President gets, on average,

5　somewhere in the neighborhood of 60,000 appointments, U.S.

6　Attorneys, others, ambassadors, so on and so forth.  So it

7　became clear that I was at the end of my tenure as a

8　political appointment in an agency, and I was going back to

9　my old law firm in Miami.  I was approached by Jones, Day,

10　Reavis & Pogue to consider an overture to join them, and I

11　pursued that overture, and, much to my surprise, I ended up

12　staying with Jones Day in Washington, D.C., office.

13　Q    Why did you select Jones Day?

14　A    Jones Day had been an opponent when I was at the

15　Trustee's Office on the other side.  We had met with a number

16　of different law firms in that capacity, as you might

17　imagine.  In federal government you handle a number of

18　different matters, a number of law firms.  We had always been

19　pretty strong adversaries but never enemies.  They conducted

20　themselves in a very professional and honorable manner.  I

21　could not have said the same for some of the firms that we

22　interfaced with.  I felt that even though we had been

23　adversaries, we had a very professional relationship, and I

24　admired the way they conducted business.  I felt that I could

25　do business with them on a handshake in any particular

1  litigation.  They would keep their word.  And, frankly, I was

2  somewhat surprised by the approach because I'd already hired

3  movers to go back to Miami, but after spending some time with

4  them, my initial impressions of the firm were borne out after

5  meeting with some of their leadership.

6  Q   And you joined Jones Day in what year?

7  A   I joined Jones Day May 2001.

8  Q   And you said you had your bags packed for Miami, but you

9  didn't get to Miami?

10  A   No, no.  I had already gone back to my old firm and had

11  hired movers, and I was ready to go, but I changed my plans

12  and joined the firm, joined Jones Day.

13  Q   Okay.  And which office were you in?

14  A   I was in the Washington, D.C., office.

15  Q   And what practice area?

16  A   I initially joined in the litigation practice of the firm

17  and within a year or two was assigned to the restructuring

18  practice.

19  Q   And what kind of restructuring practice does Jones Day

20  have or did it have when you joined?

21  A   Jones Day had and still has principally a fairly well-

22  regarded restructuring practice.  The firm has usually been

23  rated in the top tier, if not the top, one, two, three, or

24  four of restructuring practices as well as the firm overall

25  consistently.  Its practice focused largely on large

 1  corporate matters, oftentimes precedent-setting, and

 2  typically debtor side representations as opposed to creditor

 3  representations.

 4  Q   Could you share with the Court some of the more

 5  significant representations that you worked on?

 6  A   Sure.  At the firm, the Laidlaw bankruptcy at that time

 7  concerned one of the largest transportation companies, both

 8  ambulances, busses.  I think they owned both Trailways and

 9  Greyhound.  The Dana case.  Renaissance Cruise Lines

10  concerned a series of seven cruise ships in Tahiti concerning

11  a cash security agreement which was negotiated in Paris,

12  France, as an economic development process with the EU, and

13  we had to negotiate the almost $7 billion in debt for that

14  one.  I've handled very obviously the Chrysler case, which I

15  think everybody is fairly familiar with.  I was the team

16  leader on the dealer team having to reject dealer franchise

17  state agreements as well as dealing with throughput and

18  rationalizing the dealer network and a number of other fairly

19  large cases.

20  Q   You talked a little bit about the dealer network.  What

21  did you do with regard to the dealer network in Chrysler?

22  A   The company had been considering rationalizing -- that

23  is, downsizing its dealer network -- for the better part of a

24  decade.  And with the advent of the financial crisis come to

25  bear full-borne in 2008, the company had to begin -- had

1  begun considering how it was going to rationalize the dealer

2  network so it could increase what was then called throughput;

3  that is, the ability to sell more vehicles through its dealer

4  network and increase profitability while at the same time

5  downsizing its dealer network so that it did not create

6  inefficiencies because of a very wide footprint, which is

7  very hard to maintain.  The company took that project, and we

8  originally were in the company September 2008 discussing

9  alternative solutions, both out-of-court and in-court

10  solutions, with the company, including how we would

11  rationalize the dealer network in a very analytical and

12  scientific process.  As you might recall, two of the auto

13  companies, GM and Chrysler, were both considering this

14  process.  GM had a little bit more of a blanket process.  I

15  think they established a certain line of profitability, and

16  all dealers below that line were cut.  Chrysler examined a

17  fairly complex formula, almost a logarithm, to make that

18  determination as to which dealers would be candidates for

19  rejection.

20  Q   Did you have to review financial records, statements, in

21  connection with that role on the Chrysler team?

22  A   Yes.  The Chrysler analysis was quite complex.  They had

23  a spreadsheet, dealer spreadsheet, which was over three dozen

24  factors, a dealer location footprint; whether the dealer was

25  dueled, which is with other dealers; multi-dealer with other

 1  brands and makes; the dealers' seasonal, annual, daily sales;

 2  the dealers' longevity; notes a number of a different

 3  factors.  They knew their network quite well.  And also for

 4  each of those dealers, they had the financial information

 5  both in regard to retail financing, wholesale financing,

 6  operational costs, parts and servicing requirements, warranty

 7  service under the dealer, everything you would think that

 8  would go into a dealer, fleet sales, the percentage of sales

 9  compared to their other dealers within their region,

10  everything that you would think would go into a fairly

11  complex and sophisticated analysis of a business vis-a-vis

12  its ability to put more vehicles out into the public and

13  increase profitability both for the dealer but as well as for

14  the manufacturer, which was the company.

15  Q    At Jones Day, did you have any nonlegal, say,

16  administrative roles?

17  A    Yes.

18  Q    And what were they?

19  A    I initially came into the firm not knowing anyone from

20  Adam's off ox but was eventually admitted to the partnership,

21  I believe, within two and a half, three years later.  I was

22  asked to become initially the administrative partner for the

23  Washington, D.C., office, which is sort of chief operational

24  function for the entire office, which at that time had 200 --

25  approximately 220, 230 attorneys and 500 or so support

1  personnel.  I then went on and was asked to become the

2  firmwide diversity partner for all of the firms.  I think

3  there are 2,500 attorneys in 37 offices, and I performed that

4  firm -- that function for a number of years, and eventually I

5  was elected to be the firmwide hiring and diversity partner

6  responsible for all recruiting, hiring for the firm

7  throughout the firm's system both here and internationally.

8  Q    And I'd like to ask you a few questions about how you

9  became the emergency manager of Detroit.

10  A    Yes.

11  Q    What indication did you have that you were being

12  considered as the emergency manager?

13  A    We originally came out to pitch the restructuring --

14  legal restructuring work for the city in late January.  I

15  believe it was January the 29th.  And I think either later

16  that day or the next day I was informed by the firm's

17  managing partner, Steve Brogan, that he had received a call

18  from one of the review team members at the pitch who wanted

19  to talk to me about potentially pursuing the position of

20  emergency manager.

21  Q    And what was your reaction to Mr. Brogan's call?

22  A    I was surprised, flattered, but was very firmly resistant

23  and against taking the position.

24  Q    Why was that?

25  A    I was involved in several significant matters with the

1  firm, in the midst, as a matter of fact, of a very large case

2  that we were mediating with one of the largest private

3  investment banks in the world at the time.  It appeared that

4  we were going to resolve that case quite successfully for the

5  firm.  I was also very concerned about walking away from

6  other clients.  I had been selected earlier that year to be

7  the new partner in charge -- to be the partner in charge of

8  the firm's new Miami, Florida, office, which was an

9  opportunity to go home, and we were in the midst of lease

10 negotiations and operation negotiations with several

11 landlords in Miami.  There were also some fairly significant

12 personal hardships.  My wife is a professional.  She's a

13 surgeon, perinatology, high-risk obstetrics, at Johns

14 Hopkins.  She has a very active practice and takes call at

15 night.  We have two young children, seven and six, who are

16 the apples of my eye.  I very much enjoy spending time with

17 my family, and the thought of being away from them for

18 extended periods of time was not attractive to me.  And,

19 frankly, I was at a very good place both personally and with

20 my career, and I'd done secondments, if you will, or long-

21 term assignments away.  They're quite trying, and they would

22 take me away from both family and my existing position for a

23 long period of time, which wasn't something I was either

24 asking for or expecting.

25 Q    What made you change your mind?

1  A     There was an initial overture that I -- when Steve

2  brought me into his office, said Mr. Baird has called, Rich

3  Baird, who had been one of the team members.  There were six

4  of us during the pitch.  There was me, Steve Brogan -- we

5  were the only firm to bring our managing partner -- Corrine

6  Ball, who is a fairly well-known bankruptcy practitioner.

7  Heather Lennox was in that group; Aaron Agenbroad, partner in

8  charge of the San Francisco office; and Bruce Bennett.  And

9  we had given a fairly robust presentation of what we thought

10 were our credentials for the firm, and Steve called me in the

11 office and said, "We think we did a nice presentation, but

12 they want to talk to you about being the EM -- EFM" at that

13 time, emergency financial manager.  And I said, "Steve, as

14 you know, I'm very excited about what we're doing in Miami,"

15 and, you know, I was also -- had just come back from Sao

16 Paulo.  We were opening the Sao Paulo office, and we'd gone

17 to Rio.  We had also -- I was also a member of the Jones Day

18 Foundation.  It's a charitable foundation that does good

19 works throughout the world, and we had come back from Haiti,

20 both Cite du Soleil and Port-au-Prince.  In Cite du Soleil,

21 which is one of the most poverty ridden areas certainly on

22 the face of the world if not the western hemisphere, the firm

23 was sponsoring two schools and a hospital, health facility

24 there, and I wanted to see that through.  And so I told Steve

25 I'm not interested in becoming -- leaving the firm, becoming

1  emergency financial manager.  I will talk to Rich and try to

2  explain to him that I'm very flattered, but I'm very dug in

3  here, would certainly be more than willing to work side by

4  side with anyone they wanted selected as the firm's -- as the

5  city's attorneys, but that I would respectfully decline.

6  Q    So is Rich -- you may have identified him, but --

7  A    Yes.

8  Q    -- who is Rich?

9  A    Rich Baird was the governor's -- I think his title was

10  transformation manager, and he was one of the members on the

11  review team on the 29th at the Detroit Westin Hotel at the

12  airport that was reviewing -- I think there were 12 to almost

13  20 law firms presenting their credentials that day.

14  Q    And so you said that you would help Detroit find a

15  emergency financial manager?

16  A    No, not so much help them find it, but that I would work

17  with whoever they -- I assumed they had a number of different

18  candidates they were looking at, and I would work with

19  whoever that person would -- in a legal capacity, but because

20  I had these other issues, family, professionally,

21  administratively, and commitments I had made, I was quite

22  happy in my position and had expected a different course for

23  this year.

24  Q    So it sounds like you still haven't changed your mind.

25  What made you change your mind?

1   A    After the initial entry, Mr. Baird said he understood.

2   Rich said, "Look, you know, we looked at your credentials,

3   your background and what you've done.  Would you at least

4   talk to us?  We have other candidates that we're looking at,

5   but we'd like to have the ability to speak with you."  And I

6   said, "Well, let me give it some thought.  I have to go talk

7   to my boss lady, my wife, and sort of get some feedback

8   there, and let me talk with my partners, and maybe we'll talk

9   again."  I think I said in a day or two.

10  Q    And I take it you did --

11  A    Yes.

12  Q    -- talk to Detroit?

13  A    Yes.  As part of this process, we've been through some e-

14  mails that show me having conversations I think on the 30th

15  and in early February about that process and that I was going

16  to take it under consideration.

17  Q    And so you took it under consideration.  What time frame

18  is that?

19  A    That's January 30th into early February.

20  Q    Okay.  So what did you do next in the progression to

21  becoming the emergency financial manager?

22  A    I went on and talked to my wife and said, "Hey, honey,

23  I've been approached about this crazy idea about me working

24  full-time, leaving the firm and working full-time in

25  Detroit," and I thought she would shut it down fairly

1  quickly.

2  Q   She did not?

3  A   She did not.

4  Q   What did she say to you?

5  A   Well, somewhat to my surprise, she said, "Honey, we

6  were" -- our first year of marriage she was doing a

7  fellowship in New Haven, and I was in D.C., so we spent our

8  first year of marriage actually apart.  And she said, "Look,

9  this is a career opportunity for you.  If you want to do

10  it -- you've done public service before."  I left my law firm

11  in Miami for what I thought was going to be two years, and

12  that turned into ten years.  And she said, "You know, you sit

13  around here Sunday morning like I suspect a lot of husbands

14  browsing about the Sunday morning talk shows and why doesn't

15  somebody do something about things," and she said this was a

16  call to action; that I had to look inside my own soul and

17  make a decision as far as if you're called to do something

18  and you turn it down, how are you going to feel later.  And

19  she said we would be able to work it out, and she would find

20  a way to make the family obligations get met no matter what I

21  did.

22  Q   So what was your next step then?

23  A   I then came back and talked to Steve, Steve Brogan, the

24  managing partner, and said, "You know, I talked to my wife,

25  and, you know, she more or less has given me the green light

1  for me to make a decision."

2  Q   And did you get back in touch with Mr. Baird?

3  A   Yes.  After talking to Steve, who essentially said

4  something very similar, that, "Kevyn, this is a call to

5  action.  Yes, you'll have to step out of, you know, what

6  we're doing in the firm, but, you know, sometimes you have to

7  ask yourself and the question you have to answer is not how

8  you feel right now but in a year, five, ten years from now

9  when you're asked again what's going to be your response,

10  that you didn't step up," and that whatever happened he would

11  support me in whatever decision I decided to do, decided to

12  make, so I called Mr. Baird back.

13  Q   And what did Mr. Baird ask you to do?

14  A   You know, just generally summarizing, Mr. Baird said

15  great, why don't we have further talks.  I think in -- he

16  started sending me some information.  I started doing some

17  research on the emergency manager process and the history

18  behind the crisis that was going on in Detroit.  I'd

19  obviously been aware of it, some of the criminal

20  investigations and what not, as well as the city's slide for

21  a period of time.  I have a great deal of affinity having

22  gone -- gotten both degrees here, and I think I've come back

23  to the state or the city every year since I graduated in 1983

24  either recruiting for my law firm, a visit while I was in

25  federal government, or recruiting for my new law firm at

 1  Jones Day, so I'd been coming to the city for the better part

 2  of 33 years.  And I told him, "Well, let's start talking

 3  about what the job entails."

 4  Q   And did you do that over the phone?  Did you visit

 5  Detroit?  What steps did you take?

 6  A   We initially had an e-mail exchange, and then he said,

 7  "Well, I think the next step is for you to come and visit

 8  with some of the executive members of the state, including

 9  Andy Dillon; Brom Stibitz; Tom Saxton, who's deputy

10  treasurer; as well as the governor and Rich Baird and the

11  governor's chief of staff and his deputy chief of staff.

12  Q   And did you do that?

13  A   Yes, we did that in mid-February.

14  Q   In those meetings, did you talk about Chapter 9?

15  A   No.

16  Q   At what point in time did you decide "I would be okay

17  with being a candidate"?

18  A   I think at some point either just before or after those

19  meetings, I decided that I'd throw my hat into the ring, and

20  I think I sent out an e-mail to the firm and the rest of the

21  team recusing myself from the firm's consideration process as

22  a law -- I think I sent out two e-mails.  I sent out an e-

23  mail to the immediate core team that was doing the pitch and

24  working on the analysis of the city, and then an associate

25  inadvertently sent me some more information, and I sent an e-

1   mail back to him just saying, "You may not have heard, but

2   I've recused myself from any involvement in the firm's pitch

3   and potential retention by the city because I'm being

4   considered for emergency financial manager."

5   Q   Okay.  And when was that about?

6   A   Mid-February.

7   Q   When did you learn that you were a finalist?

8   A   I think there was a series of e-mail exchange with Rich,

9   and after the meeting with the governor I think the governor

10  would send me attaboy e-mails, "Hey, glad to meet you.  Hope

11  you take this seriously.  We're still looking at some other

12  candidates, but it seems like you're the odds-on favorite."

13  I think that was towards the end of February, maybe early

14  March.

15  Q   When were you, in fact, appointed emergency manager or

16  emergency financial manager?

17  A   I was appointed emergency financial manager effective

18  March 25th, 2013.

19  Q   Was there any connection between your being considered as

20  emergency financial manager and Jones Day being retained as

21  Detroit's restructuring counsel?

22  A   No.

23          ATTORNEY:  Your Honor -- sorry.  I was going to

24  object.  That calls for speculation.  Lack of foundation.

25          THE COURT:  You understand that this question asks

1    you of your own knowledge and not speculation.

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  So to your own knowledge, was there any

4    such connection as counsel described?

5              THE WITNESS:  No, your Honor.  In fact, I think I

6    made it fairly clear.  I think even in e-mails I said now

7    that I'm a candidate, I don't want this -- my candidacy to

8    either hurt or help the firm.  In fact, if it would -- if it

9    would have hurt the firm, then I probably wouldn't consider,

10   but the firm will stand on its own.

11   BY MR. SHUMAKER:

12   Q    Who did you tell that to?

13   A    I think I told that to Mr. Dillon.  I think I told that

14   to Rich Baird.  I may have said that in my meeting with the

15   governor.

16   Q    Did you accept the appointment of emergency financial

17   manager for the money?

18   A    No.  It's a -- no, no.

19   Q    Was there ever any understanding between you and the

20   governor or any member of his staff that you met or anyone

21   that you ever came across that you would file for Chapter 9

22   on the city's behalf if you were named emergency manager?

23   A    Not at all.

24   Q    What was the first thing you did upon being appointed

25   emergency financial manager?

1   A   Well, there were several things.  One of the first things

2   I did -- the week before I was appointed, there was what

3   people called a rollout, which was a series of press events

4   and stakeholder meetings throughout that week.  I think the

5   week prior to me actually taking office on the 25th I engaged

6   in somewhere in excess of five dozen meetings and pressers,

7   as I've come to know them, but immediately upon coming into

8   the office on the 25th, I went to City Hall, and I started

9   asking the various consultants and experts who had been hired

10   before I got there -- a number of them had been hired as a

11   result of a consent agreement that was entered into in March

12   2012 and then a memorandum of understanding that was entered

13   into with the city in November 2012, so they were already on

14   the ground.  In fact, I think Ernst & Young had been on the

15   ground for a year prior to that.  And so I began meeting with

16   them to try to get a sense of the city's financial condition

17   and operational --

18   Q   Did you -- I'm sorry.  Did you meet with anyone other

19   than the advisors, Ernst & Young and --

20   A   Oh, yeah.  Prior to taking office, I had met with Mayor

21   Bing a couple of times in D.C., and I met with stakeholders

22   throughout the city and with members of -- I believe I met

23   with members of Treasury during that first week, too.

24   Q   Did you meet with any union members?

25   A   Yes.  I set up a series of stakeholder meetings in that

1  first week. I met with each councilperson individually. I

2  met with members of the various uniform unions, some

3  nonuniform, while I was there. And I think the first thing I

4  did was to issue an order under the statute 72, which was due

5  to be overtaken by statute 436, Public Act 436 -- the

6  compensation and benefits of the City Council and the mayor

7  were going to be extinguished, so I think the first order I

8  did was restore their compensation and benefits by EM Order

9  1.

10  Q   Did you meet with any of the city's pension boards?

11  A   I think -- not that first week, but I think I met with

12  both pension boards at some point later that month.

13  Q   Did you meet with any citizens?

14  A   Oh, God -- oh, yes. Oh, good, yes, met with lots of

15  citizens, numerous stakeholders, civic leaders, faith

16  community ministers, business leaders, CEO's, many of the

17  pedagogical institutes, the presidents of some of the

18  universities, a lot of stakeholder meetings.

19  Q   Now, you mentioned that you reviewed a couple of

20  agreements. Did you -- were there generally financial

21  records that you took a look at?

22  A   There were financial and restructuring agreements. After

23  my initial approach in January, I went and reviewed several

24  press reports that had made various statements about the

25  upcoming law, but then after I decided to throw my hat in the

1  ring and become a serious candidate, I started pulling down

2  the actual public documents, and there are a lot of them.

3  The city had been in some form of financial review or

4  financial crisis from at least 2009.  It had taken out $250

5  million in addition to the 1.4 billion in 2005 and 2006.  In

6  2009 it had taken out another -- 2010 it had taken out

7  another 250 million.  In 2011 there was a Detroit review team

8  that was commissioned in December that issued a report the

9  following -- I believe the following January.  The governor

10  issued another report, a lot of correspondence with Treasury.

11  I believe they entered into an escrow agreement in March of

12  2012, and then in -- later in April of 2012 they entered into

13  the financial stability agreement, also called the consent

14  agreement.  There was a lot of correspondence going back and

15  forth since then.  Subsequently, in November 2012, there was

16  a memorandum of understanding regarding the Detroit Reform

17  Program that was contained in the consent agreement.  After

18  that in December 2012 another Detroit review team was

19  commissioned.  They issued their report in 2013, I believe

20  February, and the governor issued his findings of fact in

21  March declaring a financial emergency.  I hadn't looked at

22  all those -- the March document prior to taking the job, but

23  I looked at it -- I think maybe immediately prior to taking

24  the job, but my due diligence regarding the other documents

25  occurred between the January through early March time frame.

1  Q   It sounds like you looked at a lot.

2  A   I looked at a lot of documents.  I found in each of those

3  documents there were two -- at least two review teams, and

4  each of them concluded that the review team process was a

5  precursor to the appointment of an emergency manager.

6  Q   I'd like to ask you a few questions about those documents

7  in a little bit, but --

8  A   Sure.

9  Q   -- first I wanted to ask you, did you -- when you took

10  over the position, did you go out and visit the city when you

11  got here?

12  A   Oh, yeah.  I still do.  I mean we -- there is quite a

13  robust outreach effort under the state's aegis and the MEDC

14  or others, Cadillac.  Harvey Hollins in Urban Affairs helps

15  run that, and I would have meetings, sometimes two or three a

16  week, with various community groups and stakeholders.

17  Q   And you went out and saw parts of the city?

18  A   Yeah.  Usually after work I'd ask to be driven around the

19  city.  I sort of -- when I studied, the city had over 184

20  neighborhoods, in some of my briefing materials, and some of

21  the neighborhoods are very notable, Boston-Edison, East

22  Indian Village, Marina District, Milwaukee Junction.  But the

23  city has a spoke system that goes out, Michigan, Grand River,

24  Woodward, Gratiot, and others, and I would sort of -- I've

25  done this when I've gone to other cities.  I would sort of

1    methodically try to go through each neighborhood to get a
2    sense for the difference of the various neighborhoods and
3    their relationship to the city overall.
4    Q   Based on those visits and the records that you were
5    looking at and your due diligence generally, what did you
6    come to learn about the services that the city was providing
7    to its residents?
8    A   I had read that the services were substandard.  As part
9    of my due diligence, if you'll call it, I had -- having been
10   an ex-federal government official, I went immediately to the
11   federal government resources, Bureau of Justice Statistics,
12   Department of Labor Statistics, Department of Commerce, the
13   census stats, some of which -- Michigan CRC or the State
14   Research Council, and it sort of compiled in my mind
15   academically a composite of the city and statistics about the
16   quality of service in addition to meeting with various
17   members, and the services reflected quite broadly in looking
18   at them what I had heard.  They were substandard.  Lights
19   were off in the city.  I since came to know that almost half,
20   38,000 of 78,000 or so are off.  Twenty percent of the city's
21   housing stock is in some form of blight, 78,000 dwellings out
22   of 390 roughly; that between the year 2000 and 2010 the city
23   lost 238,000 residents.  That's the equivalent of a city the
24   size of Romulus, Allen Park, or Wyandotte leaving the city
25   every year.  That was driving down tax revenue.  That the

1  infrastructure not only appeared broken, but actually I'd
2  gone back and looked at some of the -- some of the press
3  reports about how the lights would go out, some during the
4  election in 2005, but other things along those lines.
5  Q   I'm sorry.  I didn't mean to interrupt, Mr. Orr, but what
6  did you -- what did you learn about the police department?
7  A   Well, I'd known that the police department, like many,
8  New Orleans, L.A., and others, was under a consent decree --
9  actually, two, I think -- with the Department of Justice that
10  had spanned 12 years by the time I got here.  I knew that
11  their fleet, roughly 1,300 vehicles, the majority of which
12  were quite old -- I had looked at BJ -- Bureau of Justice
13  Statistics stats, and typically a service vehicle runs three
14  years, 90,000 miles.  Typically most police forces -- not
15  most but some lease those vehicles.  Our fleet in some cases
16  had over 200,000 miles on them.  Bumpers were literally
17  falling off.  Paint was delaminating.  They didn't have the
18  high tech that modern vehicles have.  Our call rates -- our
19  response rates were low for a city that had been rated by
20  BJS, Bureau of Justice Statistics, as well as such sites like
21  Quizzle, which is an Internet neighborhood site, as being a
22  highly dangerous city subject to carjacking, violent crime in
23  the city and a highly armed populous.  Basically everything
24  that I had read was substantiated in very stark relief once
25  you get out into the city.  The call rates -- our officers

1    were on 12-hour shifts.  When I met with the officers, DPLSA,

2    DPOA union, they explained to me how, you know, if you want

3    people to have court time to get at some of the perpetrators

4    and you keep them on a 12-hour shift, 24-hour day, they

5    barely have time to get home, take a shower, go to court, see

6    their families, and they're back on shift and that, as a

7    consequence, sometimes they miss shifts and that the

8    perpetrators, in addition to laughing at them as they drive

9    down the street, know that more than likely they're not going

10   to get the testimony they need and they're going to get off,

11   and they'll end up actually suing the city for false arrest

12   and recovering because the city settles many of its claims.

13   We don't have a very robust defense process in the city.

14   Q    And how about the -- how about the fire department?  Can

15   you give us some examples of what you learned there?

16   A    Sure.  I knew academically that the fire department had

17   an old fleet, but I've learned at 88 departments the

18   foundations were very poor.  Our firemen were oftentimes

19   flowing the fires with inadequate equipment, equipment that

20   was broken, pumps on pumper trucks that didn't work, leaky

21   tanks in pumper trucks.  Our ladders hadn't been certified

22   for a number of years because we didn't have the money to do

23   it.  Since I was here, the mayor managed to get -- I think it

24   was State Farm to give us a donation to get our ladders

25   certified because otherwise you can't go to high-rise fires.

1    Many of our firemen had not been trained on the equipment, so
2    they were injuring themselves, such as standing on the ladder
3    as it went up and you cut your foot.  Many of our firemen
4    were very frustrated both by lack of equipment and inadequate
5    training.  In addition, they, too, were quite fatigued
6    because of the number of fire calls.  I think it was 18,000
7    or so.  Sixty percent are unnecessary.  They're either to
8    abandon structures or blight or arson, so our firemen -- the
9    majority of our calls for our fire department are actually
10   false calls, but they're real because the buildings are
11   either on fire either through abandoned structure or through
12   intentional arson.
13   Q    How about the --
14        THE COURT:  Mr. Shumaker, we do have to stop now.
15   We're going to take a recess in a minute.  I'm going to ask
16   everyone to remain seated while Mr. Orr leaves the courtroom,
17   so let's just sit here while he takes his leave, and we'll
18   see you Monday morning, sir.  Stand by another moment,
19   please.
20        All right.  So I'm going to take my leave now.  Good
21   weekend, everyone.  We'll see you Monday morning, 9 a.m.
22   until 5.  I'm going to ask you to stay until our CSO's do
23   excuse you.  I'm going to let you all go first, and my staff
24   and I will remain in chambers while you take your leave.
25        THE CLERK:  All rise.

1          MR. SHUMAKER:  Thank you, your Honor.

2          THE CLERK:  Court is adjourned.

3       (Proceedings concluded at 5:03 p.m.)

4                         * * *


                         INDEX


WITNESSES:              Direct  Cross  Redirect  Recross

Kenneth A. Buckfire             49/93/97   170
                                120/145
                                152/155

James Craig             176  203/208
                             210/211
                             213/215

Kevyn Orr               218

EXHIBITS:                        Marked       Received

Debtor's Exhibits 9, 10, 11, 38                173

Exhibit 588                                    116
Exhibit 868                       124


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.



/s/ Lois Garrett                November 2, 2013
_____       _____
Lois Garrett

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
          MICHIGAN,             .
                                .        Detroit, Michigan
                                .        October 28, 2013
                   Debtor.      .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:     Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

                    Jones Day
                    By:  GEOFFREY S. IRWIN
                         GEOFFREY S. STEWART
                         GREGORY SHUMAKER
                         THOMAS CULLEN, JR.
                         MIGUEL F. EATON
                    51 Louisiana Avenue, N.W.
                    Washington, D.C.  20001-2113
                    (202) 879-3768

                    Pepper Hamilton, LLP
                    By:  ROBERT S. HERTZBERG
                    4000 Town Center, Suite 1800
                    Southfield, MI  48075-1505
                    (248) 359-7333

For the State of    State of Michigan
Michigan:           Michigan Department of Attorney General
                    By:  MATTHEW SCHNEIDER
                    P.O. Box 30754
                    Lansing, MI  48909
                    (517) 241-8403

                    Dickinson Wright, PLLC
                    By:  STEVEN G. HOWELL
                    500 Woodward Avenue, Suite 4000
                    Detroit, MI  48226-3425
                    (313) 223-3033

APPEARANCES (continued):

```
For AFSCME,           Lowenstein Sandler, LLP
AFL-CIO, and Sub-     By:  SHARON L. LEVINE
Chapter 98, City           JOHN K. SHERWOOD
of Detroit            65 Livingston Avenue
Retirees:             Roseland, NJ  07068
                      (973) 597-2374


For Detroit           Clark Hill, PLC
Retirement Systems-   By:  ROBERT D. GORDON
General Retirement         JENNIFER K. GREEN
System of Detroit,    151 South Old Woodward, Suite 200
Police and Fire       Birmingham, MI  48009
Retirement System     (248) 988-5882
of the City of
Detroit:              Clark Hill, PLC
                      By:  RONALD A. KING
                      212 East Grand River Avenue
                      Lansing, MI  48096
                      (517) 318-3015


For the Detroit       Erman, Teicher, Miller, Zucker &
Fire Fighters            Freedman, P.C.
Association, the      By:  BARBARA A. PATEK
Detroit Police             JULIE BETH TEICHER
Officers Associa-          DAVID EISENBERG
tion and the          400 Galleria Officentre, Suite 444
Detroit Police        Southfield, MI  48034
Lieutenants &         (248) 827-4100
Sergeants
Association:


For the Inter-        Cohen, Weiss & Simon, LLP
national Union,       By:  BABETTE A. CECCOTTI
UAW:                       PETER D. DECHIARA
                           THOMAS N. CIANTRA
                      330 West 42nd Street, 25th Floor
                      New York, NY  10036-6976
                      (212) 356-0227
```

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>      ANTHONY B. ULLMAN<br>      ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>      MEREDITH E. TAUNT<br>      MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2     be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Looks like everybody is here.  Sir.

4          MR. CIANTRA:  Good morning, your Honor.  Thomas

5     Ciantra, Cohen, Weiss & Simon, LLP, for the UAW.  Before

6     bringing the evidentiary motion that I would like to present,

7     I just have one or two housekeeping matters.  We will be

8     providing the Court with binders with the separate UAW

9     exhibits tomorrow morning, with the Court's indulgence.  We

10    haven't been able to get that pulled together as of yet.

11         THE COURT:  Okay.

12         MR. CIANTRA:  And I would also indicate that I guess

13    there are one or two additional exhibits that will be

14    included, short documents, in the binder from what the Court

15    has presently in the stack.  So with the Court's indulgence

16    then, I would like to discuss the motion that I presented

17    during Mr. Moore's testimony and provide some additional

18    argument and record citation with respect to that.

19         THE COURT:  I wonder if, in light of our schedule

20    today, it would be okay with you if we considered this

21    tomorrow morning.

22         MR. CIANTRA:  That would be fine, your Honor.

23         THE COURT:  Thank you very much.  I just need an

24    assurance from someone that the work that I requested

25    regarding the exhibits has all been taken care of and we're

```
 1   all -- we all have the same exhibit books with reconciled
 2   exhibits and exhibit numbers.
 3            MR. IRWIN:  Good morning, your Honor.  Ms. Ramirez
 4   and I were in the courtroom yesterday, and we did our best to
 5   reconcile exhibits with the materials we had, and my
 6   understanding is that other objectors have brought new books
 7   this morning.  I won't speak for them, but as of yesterday I
 8   thought that we had moved this along as best we could.
 9            THE COURT:  Okay.  Sir.
10            MR. ULLMAN:  Yes, your Honor.  For the Retiree
11   Committee, our understanding is that everything has been
12   done.  Either we did it on behalf of other objectors or some
13   of them have come in themselves and done it with the
14   exception of the UAW, which Mr. Ciantra explained.
15            THE COURT:  Okay.  Good.  Okay.  You may proceed
16   with the direct examination of Mr. Orr.
17            MR. ORR:  Good morning, your Honor.
18            THE COURT:  Good morning.
19            MR. SHUMAKER:  Good morning, your Honor.  Greg
20   Shumaker of Jones Day for the City of Detroit.
21            KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN
22                  DIRECT EXAMINATION (CONTINUING)
23   BY MR. SHUMAKER:
24   Q    Good morning, Mr. Orr.
25   A    Good morning, Mr. Shumaker.
```

1  Q    Mr. Orr, on Friday afternoon when we last were here, I
2  believe you were sharing with the Court what you had
3  experienced regarding the city's provision of services upon
4  your arrival as the emergency manager.  Do you recall that?
5  A    Yes.
6  Q    I believe I interrupted you, and you were sharing what
7  you had experienced in the area of emergency medical
8  services.
9  A    Yes.  I believe I was talking about an event at City Hall
10 where the president of one of the unions was late to a
11 meeting because since all of our ambulances were out
12 typically by 7:30, a citizen woman had a seizure in the 1st
13 floor, and he was the only one available to administer her.
14 That's anecdotal, but, more importantly, I think it's been
15 fairly well-reported that the EMS services have substandard
16 equipment.  They are typically on a significant number of
17 calls every day.  The policy of the unit is that if they're
18 called to an event, they are to transport the patient to a
19 medical facility.  Oftentimes patients will call for things
20 such as, "I fell asleep, and my wrist is" -- "I feel asleep
21 on the couch, and my wrist is asleep," or, "I slipped, and I
22 hurt my ankle," to more serious injuries that are fairly
23 widely reported such as shootings and stabbings.
24 Q    Thank you.  What was the -- what did you learn about the
25 city's streetlight situation?

1  A   Here again, as has been widely reported, as in our June
2  14th presentation, roughly 40 percent plus of our lights are
3  out, 38,000 over some 78,000 roughly.  Large sloughs of the
4  city are unlighted.  More importantly, it's not just that the
5  lights are out.  The city infrastructure is somewhat
6  destroying it, I've been informed.  There are lights that are
7  either above ground -- there are switches that are below
8  ground.  To replace the switches sometimes below ground
9  requires excavation and a plan.  It is significant.  A lot of
10 our deferred maintenance has caused us to be, shall we say,
11 very much behind the technology curve in terms of the quality
12 of our lightings, whether they're still 1970s vintage
13 gaslights as opposed to LED, which provide more lights and
14 last for up to 15 years, for instance, therefore, reduce your
15 replacement cost.  Our grid and our lighting is so old that
16 typically PLD is very -- Public Lighting Department is very
17 overworked, and, in fact, many private contractors' insurance
18 companies and policies won't allow them to work in our
19 lighting grid.
20 Q   And how does that compare to other municipalities?
21 A   We've done some analysis to other municipalities.  I
22 don't think there's any other municipality considered a large
23 city, generally over 500,000 or so, that has as -- is as
24 unlit as we are citywide.
25 Q   What were your observations about blight in the city?

1  A   Blight is endemic.  It's apparent.  If you drive in on

2  94, take out the Lodge or go to any street in the city, it's

3  very clear, commercial and residential.  We have 78,000

4  buildings.  That's roughly 20 percent.  390,000 I think is

5  our total housing stock.  That's roughly 20 percent of our

6  housing stock.  No other city has that footprint.  Our lots

7  are about 66,000, which are quite significant, and it's not

8  just the fact that there's blight.  It's that the blight has

9  been here -- working its way here for 60 years but more

10  acutely in the past 15 to 20 years.  There are trees growing

11  out, growing on top of roofs, growing out of roofs.  They are

12  an attractive nuisance in the old language.  Crime, rapes,

13  dead bodies, and not to mention the impact it has on our

14  residents and particularly our children.  The Skillman

15  Foundation did a study of our schoolchildren and asked them

16  how they felt.  Fifty percent responded they were afraid.

17  And when it asked them what they're afraid of, they said

18  everything.  When they asked them how they coped with it,

19  they said they usually picked up a stick or a rod on their

20  way to school and on the way back because that's the way they

21  could protect themselves given what they had to walk through

22  to public school busses to get to school.

23          MR. DECHIARA:  Objection.  Hearsay.

24          THE COURT:  Overruled.  Go ahead, sir.

25          THE WITNESS:  That's what they had to walk through

1    to get to the bus stop for school.  It's been widely

2    reported.

3    BY MR. SHUMAKER:

4    Q    Your impression of any of the other city services that

5    made an impact on you?

6    A    Well, virtually all city services are generally

7    considered not where they should be.  Our city workers work

8    very hard for the most part to try to work through the

9    substandard level of services, whether it's in tax

10   collection, assessments, blight remediation, lighting.  Our

11   power grid -- we have a power grid that costs the city about

12   $30 million a year.  There are 115 customers on that grid.

13   Only five of those customers are residential, so we subsidize

14   power for about a hundred commercial and institutional uses.

15   Our grid -- in fact, the grid in City Hall is so old that

16   most providers, such as DTE, will not allow their workers --

17   because of various pernicious effluent that's down there,

18   asbestos and the like, will not allow them to go down into

19   the grid because it's too dangerous.  We have 38 stations and

20   one power factory, Mistersky, which is obsolete.  Our

21   stations are sorely in need of repair.  Our grid is a

22   patchwork of repairs that we tried even earlier this year --

23   the grid went out for a period of time, which was not

24   necessarily the grid.  It was that we were running a test,

25   and the test tripped the grid because it is so sensitive that

1   it turned off the lights for two and a half days.

2   Q    During this time, as you were becoming familiar with the

3   city's services, did anyone ever come up to you and say that

4   the services were adequate?

5   A    No one has ever said that the services are adequate for

6   the City of Detroit.

7   Q    Have you done anything to address the problems you've

8   described?

9   A    Yes.

10  Q    What are they?  What are they?

11  A    When we came in, we did an assessment in the first 30

12  days to try to get to the real meaning of things.  I sat

13  down, as I said before, with a number of stakeholders,

14  including all the City Council people.  I tried to restore a

15  sense of normalcy in the city by restoring compensation to

16  the mayor and the City Council and then delegating authority

17  to them to do most of the business of the city in the

18  ordinary course, and then we began our assessment of the city

19  operations.  Many of the contractors -- in fact, all of them

20  with the exception of Jones Day, the principal restructuring

21  contractors -- Milliman, Ernst & Young, Conway MacKenzie, and

22  Miller Buckfire were hired before 2013 to start assessing the

23  city's needs and restructuring, and they were already well

24  along their way of preparing reports.  I started reviewing

25  those reports and discussions, and I found out that much of

1   the city's structure needed to be reinvented, so we started

2   out looking at lighting.  We have since authorized the Public

3   Lighting Authority.  We found some money after the June 14th

4   default on the COPs payment.  We have created a $12 million

5   fund to get the Lighting Authority stood up with cash.  We

6   also found $1.8 million for them to have an operational

7   budget so they could run -- they are due to have two

8   demonstration projects up and running in terms of relighting

9   the city by the end of this year.  We are going through the

10  process of a bond issuance to get them additional tranches of

11  money to provide a lighting plan for the entire city.  We

12  stood up a Detroit Land Bank Authority and in conjunction

13  with MSHDA, the Michigan State Housing & Development

14  Authority, created a fast-track authority so that we could

15  deal with blight.  One of the things we found was that on the

16  City Code for the better part of 30 years there was the

17  ability to declare a blight emergency in addition to the

18  powers that I have under 436, so under that existing

19  authority we put those two together, and we abolished for a

20  time, being through the rest of this year, the requirement

21  for Class B licenses -- that is, the demolition of structures

22  35 feet or lower -- so that we could get at residential

23  blight in an expedited basis, expedited process, and allow

24  other contractors who are licensed by the state, although not

25  licensed by the city, to come into the city to help us with

1    blight remediation as quickly as possible.

2         We also began looking at the same process for Class

3    A licenses -- that is usually commercial or higher

4    structures, 35 feet or higher -- so that we could fast-track

5    the blight.  And most recently we appointed a chief land

6    officer in conjunction with the federal government to try to

7    use some of the hardest hit funds, which are funds designated

8    directly for blight, to get to blight.

9         We began looking at city services, and particularly

10   the revenue drivers, for tax collection.  For instance,

11   cities like Albion, Michigan, have a memorandum of

12   understanding with the Department of Treasury whereby they

13   will assist the city to collect some of its taxes.  That's

14   been in existence since 1997.  One of the things in the

15   financial stability agreement and the MOU that the city

16   agreed to was that they would look at that.  We've assigned a

17   taskforce to find ways to enter a similar situation so that

18   we can have enhanced tax collection.

19        We hired a new police chief, went through a fairly

20   long and competitive process to get him here.  He has opened

21   up -- he may have testified -- I'm not sure, but I suspect he

22   testified that he's opened up eight precincts that were

23   closed.  We had these virtual precincts where citizens after

24   dark would have to go to a blue phone in order to get

25   service.  If there was an incident on the east side, for

 1    instance, they may have to go as far as ten miles to file a

 2    report in the dead of night, oftentimes a victim being chased

 3    by a perpetrator or alleged perpetrator.  We've opened up

 4    those.  We flowed new money to the police force in addition

 5    to the hundred cars that the philanthropic and civic

 6    community donated on March 25th, the day I started.  We have

 7    since purchased another 50 cars and have another 50 on order

 8    for a total of a hundred, so we get new vehicles going to the

 9    street.  We recently restructured the police department so

10    that you have more line authority pushed down as opposed to a

11    third of the department being involved in clerical work.

12    We're getting more officers on the street.

13         We've looked at a number of remediation plans also

14    for city-owned property, city-owned land, parking lots.  We

15    also issued a number of orders focused on dealing with

16    efficiency within the city and have a number of different

17    things in the works as we speak.

18    Q    What level of services are you trying to get to with

19    these efforts?

20    A    We're under no illusion that given the long term that

21    it's taken the city to get here and the fact that the

22    specifics of what's required by the city have been discussed

23    in detail since 2010, that we're going to get to an A+ or

24    honors level of services.  We're trying to get to an average

25    level of services, one that's acceptable, a C, C+.

1   Q   Okay.  On Friday you shared with the Court your efforts

2   to get on top of the financial condition of the city and --

3   A   Yes.

4   Q   -- review of certain financial records.  I want to ask

5   you is it fair to say that part of your job responsibilities

6   as the emergency manager is to understand the city's

7   financial condition?

8   A   Yes.

9   Q   And have you become familiar with the city's records --

10  A   Yes.

11  Q   -- financial records?

12  A   Yes.

13  Q   You understand how they operate?

14  A   Yes.

15  Q   You're in charge of implementing them?

16  A   Yes.

17  Q   One of the agreements that you referred to was something

18  called the consent agreement.  Do you recall that?

19  A   Yes.

20  Q   I'd like to show you what is the consent agreement, which

21  is Exhibit 23, and it has been admitted into evidence.  It

22  should appear on your screen there.

23  A   Yeah.  It's quite small.

24  Q   Allow you to get your glasses on.  Is that what you're

25  trying --

1   A    Yeah.  Okay.

2   Q    And is that -- that document is entitled the "Financial

3   Stability Agreement"; correct?

4   A    Yes.

5   Q    And is that the agreement you understand as the consent

6   agreement that you've testified about?

7   A    I'm assuming this is the May 4th, 2012, financial

8   stability agreement.

9   Q    We can get you a copy.

10  A    No.  If that's the document, yes.

11  Q    You recognize it?

12  A    Yes, I do.

13  Q    What was your understanding of the consent agreement?

14  A    The city, starting with the 2009 collateral pledge

15  agreement, June 15th, 2009, had experienced a number of

16  financial upheavals, if you will, consistently throughout

17  2009 and 2010.  The city again borrowed almost a quarter of a

18  billion dollars to try to stem those upheavals in addition to

19  the $1.4 billion that was borrowed in 2005 and 2006 and the

20  $250 million that was borrowed in 2006 in addition to the

21  1.4.  And this document was a result of a financial review

22  team examination of the city that was begun in December 2011

23  and I believe in January or February 2012 found that the city

24  was in financial distress.  That finding by the financial

25  review team also found that -- I think that finding or the

1   governor's recommendation in 2011 found that that finding was

2   a precursor to the appointment of an emergency manager.  This

3   document grew out of the requirement that the city, as a

4   result of the finding by the financial review team, engage in

5   certain specified things to correct the endemic and

6   widespread problems -- financial problems of the city --

7   would be required to agree to certain metrics to correct

8   those on a very short time frame as embodied in this

9   document, and I think it has five appendices as well.

10  Q    Let me ask you about that, but who signed this agreement?

11  A    This agreement was signed by four parties.  It was signed

12  by Deputy Mayor Kirk Lewis; the mayor, Dave Bing.  It was

13  signed by the governor and the treasurer.

14  Q    And do you have -- and when was this?  When was that

15  signed?

16  A    This was April 2012, April 5th, 2012, I believe.  I think

17  it's on the document somewhere.

18  Q    And what did you understand the state's obligations to be

19  under the consent agreement?

20  A    In one of the appendices, it spells out -- I think the

21  last one maybe, the fifth one, DRE -- it spells out certain

22  specified obligations that the state is going to do in

23  consideration for the city meeting certain metrics, fairly

24  widespread, regarding both finances, revenue projections,

25  estimation and metrics, operations, and long-term

1 liabilities.

2 Q   And what were the city's obligations under that

3 agreement?

4 A   The city, in a series of appendices to the document,

5 undertook about 40 obligations.  Oftentimes when this

6 document is referred to, people refer to the 21 obligations

7 in Appendix B, but that's incomplete.  The city, in Appendix

8 C and D as well, I believe, undertook certain specified

9 obligations in detail.  In Appendix B, for instance, for the

10 operational reforms, there were 21 specific requirements,

11 some having to do with payroll, having to do with collective

12 bargaining agreements, having to do with revenue estimation,

13 having to do with the Water Department, and then in the other

14 appendices there were obligations having to do with finance

15 and metrics and so on and so forth.

16 Q   What was your understanding of whether the city complied

17 with those obligations specified in the appendices you

18 referred to?

19 A   When I got here, the city had undertaken one of them.  I

20 believe in November 2012 they entered into a four-year, $32

21 million, ADP contract.  And I think there were one or two

22 more in Appendix B that were ongoing.

23 Q   And those are the only ones that were complied with?

24 A   Essentially, those were the only ones in any demonstrable

25 form that were ongoing, yes.

1    MR. SHUMAKER:  Can you put up -- Laurie, can you put

2  up Annex B at the back of that exhibit?

3  BY MR. SHUMAKER:

4  Q   Are these the obligations of the city that you were

5  referring to, Mr. Orr?

6  A   Yes, they are.

7  Q   And you indicated that the city had made progress on one

8  or two of these?

9  A   Yes.  I believe there were demonstrable ones.  There was

10  a demolition effort.  There was health and wellness

11  department changes.  I believe a privatization effort was

12  ongoing.  There was -- I believe I also said payroll was

13  involved.  Those were the ones that were ongoing at the time.

14  Q   Now, you -- and then you also were referred to Annex D.

15  Can you put that up?

16  A   Yes.  I would also say on Annex B there was an effort to

17  procure technical assistance from the federal Department of

18  Housing & Urban Development regarding grants management.

19  Q   Here's Annex D.

20  A   Yes.

21  Q   These are some of the additional obligations of the city?

22  A   Yes.  Those are the ones I referred to about collective

23  bargaining agreements.

24  Q   Now, you also testified on Friday about another

25  agreement.  I believe you referred to it as the milestone

1    agreement.

2    A    Yeah.   That agreement is called the milestone agreement

3    or the memorandum of understanding regarding the Detroit

4    Reform Program.

5    Q    And how did the milestone agreement and the consent

6    agreement relate?

7    A    The consent agreement, which was entered into in April

8    2012, also had two phases for Detroit Reform and certain

9    specified metrics that the city was to undertake.   Phase one

10   of Detroit Reform was specified in some of the appendices to

11   that agreement.   Throughout that year apparently -- I wasn't

12   here, but as I understood through reading through the

13   documents and talking to people, the city had failed to meet

14   some of those requirements within six or seven months of

15   entering into the consent agreement, so the memorandum of

16   understanding was negotiated and designed as a consideration

17   for the city to get access to another $137 million in

18   financial stabilization bonds later that year, and that's

19   commonly referred -- I believe that was in November 2012, and

20   that's commonly referred to as the memorandum of

21   understanding.

22   Q    I'd like to show you another document that's in evidence,

23   which is Exhibit 7, and ask you if you recognize -- that's

24   the cover page.

25   A    Yes.

1  Q   Do you recognize that document?

2  A   Yeah.  November 13th, 2012.

3  Q   Is that the milestone agreement you referred to?

4  A   Memorandum of understanding or milestone agreement.

5  Q   And who signed the milestone agreement?

6  A   Well, the milestone agreement had the signatures of the

7  treasurer, Andy Dillon; and then the finance director for the

8  city, Cheryl Johnson; the program director at that time for

9  Detroit Reform, Kriss Andrews; and the chief financial

10  officer, Jack Martin.

11  Q   Did the Detroit City Council have anything to do with

12  this document?

13  A   Yes.  The Detroit City Council approved aspects of this

14  agreement in two resolutions, one by a vote of 6-0, and one

15  says by a vote of 9-0, but I noticed that there's no check --

16  I thought there was no check for the president pro tem.

17  Q   And what was your understanding as to whether the city

18  had met its obligations under the milestone agreement?

19  A   When I came on board on March 25th it had not.  The city,

20  however -- all the understandings -- as a component for this

21  agreement, my understanding that is from 2010, 2011, and then

22  in stark relief starting in December 2011, it became apparent

23  that the city was in severe financial distress.  This

24  agreement, I believe, was a result of the city failing to

25  comply with some of its obligations in the appendices to the

1   MOU.  At this time, the city needed additional cash for
2   operations, so the state used some of its authority to
3   support the city in a bond issuance for 137 million.  I
4   believe from time to time it's referred to as a net of 129
5   million or so less fees and costs.  In order for the city to
6   have access to that cash, that cash was supposed to both fund
7   operations but also assist the city in going forward with
8   some of the reform that was specified in the MOU -- not MOU,
9   in the consent agreement.  This agreement also had certain
10  specified obligations of the city to change some of its
11  procurement obligations but also to retain financial
12  professionals to assist the city and to use the proceeds of
13  that bond issuance in part, after the retention of those
14  professionals, as a condition to using the money.
15  Q   And the city was unable to comply with the conditions of
16  this agreement?
17  A   The city was able to comply with the conditions of the
18  agreement for the retention of an actuary, Milliman; for
19  Ernst & Young, who had already been doing work as a city --
20  as its accountant but also for a restructuring effort; for
21  Conway MacKenzie for operational restructuring; and, although
22  not specified by name, I believe by December of this year the
23  return of the Miller Buckfire firm.  And it also retained
24  local counsel in the guise of Miller Canfield to assist with
25  the restructuring.

1  Q   How about with regard to the rest of the agreement?  How

2  is the city's compliance?

3  A   The city had not complied with more or less the

4  balance -- as I understood it from reading the documents, the

5  balance of the rest of the agreement.

6  Q   Did this lead to any consequences for the city?

7  A   Yes.  Less than approximately a month later, another

8  Detroit review team two was commissioned after finding the

9  city was in financial -- I think it went from financial

10  distress to severe financial crisis.  That review team spent

11  the holiday season, I believe, December and January,

12  reviewing the city's restructuring efforts, and in February

13  2013 I think it issued a report to the governor finding that

14  the city was in a financial emergency.

15  Q   And is it that financial emergency that led to your

16  appointment as emergency manager?

17  A   Well, that February 2013 Detroit review team report,

18  again, as in the prior Detroit review team, report number

19  one, in 2012, specifies that the finding of that emergency is

20  a precursor to the appointment of an emergency manager.

21  Q   Is that financial emergency still in effect?

22  A   Yes.

23  Q   I want to ask you about a couple of other things about

24  the city's finances aside from the consent agreement and the

25  milestone agreement. upon your arrival as emergency manager.

1    What did you learn about the city's cash situation when you

2    got here?  When did you arrive?  Let's start there.

3    A    As I said, I took office March 25th under Public Act 72

4    as the emergency financial manager, and then effective March

5    28th I became the emergency manager under Public Act 436.

6    Q    And on March 25th, March 28th, that time period, what did

7    you learn about the city's cash situation?

8    A    The cash situation was dire.  The city was on a billion

9    dollar budget roughly.  The city was by, I believe, the

10   middle of June -- it gets a little bump in the year from cash

11   collections that it holds onto, but by the middle of June,

12   the city was going to have on hand somewhere in the

13   neighborhood of only $7 million.

14   Q    How about the revenue situation upon your arrival?

15   A    Revenue situation was, likewise, trying.  The city's

16   revenues had seen a period of decline in the past ten years.

17   That's well-documented.  I think it's in my June 14th report.

18   And, likewise, the revenue collections were still

19   challenging, and so there was no hope that the revenues were

20   going to in some fashion make up for the shortfall in terms

21   of the cash flow.

22   Q    How about the city's liabilities at that time?

23   A    The city's liabilities were significant.  I had read as

24   part of my due diligence before taking the job that the

25   various statements of liability began in 2011 as all-in

1  liability, meaning both legacy costs and bond debt.  At 12

2  billion in 2012, that grew to 14 billion.  Between my

3  appointment and within a few weeks after that, it became that

4  the liability was approximately $4 billion larger than that,

5  about $18.5 billion total.  That's the long-term capital

6  liabilities, but also the city's operational liabilities were

7  quite significant, and we were not taking in enough cash to

8  meet operational obligations.

9  Q   Do you recall your general reaction upon learning all

10 this about the cash and the liabilities and the revenue?

11 A   Yeah.  I knew things were bad.  It was somewhat shocking

12 just how dire it was.  In fact, I think within a few weeks of

13 coming on board or just prior to the June 14th presentation,

14 I was informed that several of our employees had their checks

15 bounce.  They negotiated them later that day, but our cash

16 flow on any given day was so tight that it was unclear we'd

17 have sufficient cash on hand to meet payroll; that some of

18 our obligations with regard to our contractors as well as our

19 other suppliers were routinely pushed out beyond what should

20 be an average 30-day or 45-day net period between the

21 invoicing to the payment, oftentimes 180 days or greater;

22 that there was no plan in place to remediate the situation

23 and that the city was bumping along in the ordinary course in

24 a very dire set of circumstances.

25 Q   During this initial time frame, did the emergency manager

1  statute require anything of you?

2  A   Yes.  The emergency manager statute imposes upon me

3  certain obligations with regard to reporting.  I think the

4  first report I had due was the 45-day report, and then I was

5  obligated to have a public meeting within 30 days of issuing

6  that report.

7  Q   Let me show you an exhibit, which is Exhibit 75.  It's in

8  evidence.

9  A   Yes.

10 Q   And you see that document, sir?

11 A   Yes.

12 Q   And is that the 45-day plan that you just referred to?

13 A   Here again, assuming -- without reviewing the entire

14 document, yes, that's the May 12, 2013, financial and

15 operating plan.

16 Q   Okay.  Did you have anyone help you in putting together

17 that plan?

18 A   Yes, absolutely.

19 Q   And who was that?

20 A   My entire team, restructuring team, as well as members of

21 the city staff working with them, so that would be the

22 accountants, the operational consultants, the investment

23 bankers, the attorneys, as well as people in the finance

24 department and operational departments of the city.

25 Q   And this is a public document; correct?

1   A   Yes, it is.

2   Q   And obviously the document speaks for itself, but could

3   you summarize generally what you concluded in this initial

4   45-day plan?

5   A   Generally, we gave a snapshot of what we thought was the

6   city's true financial condition.  We both spoke to it in

7   terms of spreadsheets but also a series of charts as far as

8   demographic changes, crime rate, financial collections,

9   expenditures, a number of debt issuances over and above the

10  operational revenue collection in the document, and some of

11  the key operational issues such as public health, safety, and

12  welfare dealing with police, fire, EMS, and city operations.

13  Q   And do you recall this plan containing cash flow

14  projections?

15  A   Yes.

16  Q   Who put those together for you?

17  A   Those would have been put together by a combination of

18  the finance team and restructuring team, Ernst & Young,

19  probably Miller Buckfire to a degree, attorneys probably

20  lesser.

21  Q   Okay.  And were those put together at your direction?

22  A   Yes.

23  Q   Okay.  I'd like to show you page 40 of this exhibit.

24          MR. SHUMAKER:  If you could blow up the chart,

25  Laurie.

1    THE WITNESS:  Thank you.

2  BY MR. SHUMAKER:

3  Q   Mr. Orr, could you tell the Court what this is?

4  A   Yes.  This is a document that shows monthly cash flow as

5  a forecast -- that is, not actual numbers -- based upon

6  anticipated revenue collections and projections, property

7  tax, income tax, gaming revenue, municipal service fees from

8  casinos, state revenue share, other receipts and refinancing

9  proceeds.  It also shows disbursements, which include

10  payroll, benefit costs, other distributions, summarizes total

11  disbursements.  It shows what our net cash flow -- that is,

12  disbursements over revenue -- and then it shows what our cash

13  balances are going forward.

14  Q   And that line near the bottom, cash net of distributions,

15  what is that?

16  A   That line shows what cash we would have after all the

17  distributions were made.  And as a forecast issue, it shows

18  what cash we would have at the end of the year, December

19  2013.

20  Q   And your reaction upon receiving these cash flow

21  projections?

22  A   A high degree of concern.  Essentially, this document in

23  our analysis showed that we would have $900,000 at the end of

24  the year, which is below a margin of error for a billion

25  dollar budget, so it essentially showed that we either would

1   have no money or would be negative in terms of cash flow.

2   Q   And this plan, again, was issued on May 12th; is that

3   right?

4   A   On May 12th.  It's my financial and operating plan on May

5   12th.

6   Q   I'd ask you to turn -- I want to show you page 2 of that

7   plan.  There's a paragraph right at the bottom that carries

8   over to page 3.

9   A   Yes.

10          MR. SHUMAKER:  And I'd ask if you'd put that up,

11  too, Laurie.  If you could blow up that paragraph, please.

12          THE WITNESS:  Thank you.

13  BY MR. SHUMAKER:

14  Q   Mr. Orr, I'd like you to read that --

15  A   Yes.

16  Q   -- for the Court.  This was your conclusion, correct, one

17  of --

18  A   Yes.

19  Q   -- your observations?

20  A   Yes.  As of --

21  Q   What was that?

22  A   Well, it says as of April 20 -- would you like me to

23  summarize it or --

24  Q   Please do.

25  A   -- actually read it?

1  Q    You can read it.

2  A    Okay.  Okay.  As of April 26, 2013, the city had actual

3  cash on hand of 64 million but had current obligations of 226

4  million to other funds and entities in the form of loans,

5  property tax distributions, and deferred pension

6  contributions and other payments.  Therefore, the city's net

7  cash position was a negative $162 million as of April 26,

8  2013.  The city has been deferring and will need to continue

9  to defer payments of its current obligations in order to

10  avoid running out of cash.

11  Q    Is that an accurate summary of the city's cash flow

12  situation at that time?

13  A    Yes.

14           MR. SHUMAKER:  Let me ask you, Laurie, to put up

15  page 26, and that paragraph, if you could blow it up for

16  Mr. Orr, please.

17  BY MR. SHUMAKER:

18  Q    Mr. Orr, do you recall this entry into the -- in the

19  plan?

20  A    Yes.

21  Q    Would you read that for the Court?

22  A    The City of Detroit continues to incur expenditures in

23  excess of revenue despite cost reductions and proceeds from

24  long-term debt issuances.  In other words, Detroit spends

25  more than it takes in.  It is clearly insolvent on a cash

1  flow basis.

2  Q   Was this your view as of May 12th of the city's cash

3  situation?

4  A   Yes, it was.

5  Q   And you indicated that this document was publicly

6  released.  Did anyone after you released it come up to you in

7  any forum at any time and dispute whether the city was

8  insolvent?

9  A   No one on a serious basis has ever disputed to me that

10  the city was insolvent.

11  Q   Mr. Orr, do you recall giving an interview at or about

12  the time that this plan was released?

13  A   I gave several interviews.

14  Q   There was an interview by WWJ News Radio.  Do you recall

15  talking to them?

16  A   Yes.

17  Q   I'm going to read you a quote that -- you were asked a

18  question, and you were quoted as saying, quote, "The public

19  can comment, but it is under the statute.  It is my plan and

20  it is within my discretion and obligation to do it.  This

21  isn't a plebiscite.  We are not, like, negotiating the terms

22  of the plan.  It's what I'm obligated to do," unquote.  Do

23  you recall giving that quote?

24  A   On May 12th?

25  Q   On May 12th.

1  A   Yes.

2  Q   What plan were you referring to when you were saying that

3  it was a plebiscite?

4  A   There's only been one plan.  It's the financial and

5  operating plan.

6  Q   The plan you issued on May 12th?

7  A   Yes, the May 12th financial and operating plan.  That's

8  the only document I've referred to as a plan.

9  Q   And what did you mean when you said that?

10 A   That it was my statutory obligation to issue the

11 financial and operating plan and that this wasn't a document

12 to be negotiated.  It was supposed to be a true summary and

13 public disclosure of the city's true state of affairs.

14 Q   You indicated that after releasing the 45-day plan that

15 the emergency manager statute obligated you to have a public

16 informational meeting; is that correct?

17 A   Yes.

18 Q   And how soon after the plan came out were you supposed to

19 do that?

20 A   I was obligated to have that meeting within 30 days of

21 the publication of the financial and operating plan.

22 Q   Did you conduct such a meeting?

23 A   Yes.

24 Q   When did you have that meeting?

25 A   June 10th, 2013.

1  Q   Where was it held?

2  A   Wayne State University auditorium.

3  Q   Who was in -- I'm sorry.

4  A   The exact name of the auditorium escapes me, but it was a

5  large auditorium at Wayne State.

6  Q   Who was invited?

7  A   The public was invited.

8  Q   And how many people attended?

9  A   I believe it was perhaps 200.  I know there was an

10 overflow crowd, and some people couldn't get in, but the

11 auditorium was full.

12 Q   What was the thrust of your message at that meeting?

13 A   The thrust of my message -- I think I took some of the

14 slides from the May 12th financial and operating plan and

15 used them as a slide deck in a presentation of the meeting to

16 take the community through the financial and operating plan

17 on a graphic basis as opposed to having to slough through the

18 narrative and the spreadsheets.  But it was basically a

19 graphic depiction of the information we had contained in the

20 financial summary of the information we had contained in the

21 financial and operating plan.  I also said that we would have

22 to be making some very difficult decisions within the next 30

23 to 60 days.  I think I mentioned that there were some

24 powerful tools at my disposal, both the Public Act 436 as

25 well as Chapter 9, but I would prefer not to use Chapter 9;

1  that I was certainly making an overture -- I think I even

2  said an open hand -- for proposals from interested parties,

3  but that time was moving quite quickly, and I was going to

4  have to make some decisions because the city had been going

5  through this process in one form or another for the prior

6  almost two years.

7  Q   You mentioned you showed some slides at that meeting; is

8  that correct?

9  A   Yes.

10 Q   Okay.  I'd like to show you a document that is not in

11 evidence yet, so I don't want it to be shown on the screen,

12 but I would refer you to the book of the city's exhibits,

13 Exhibit 41.

14 A   One marked "City"?

15 Q   Yes, sir.

16 A   Okay.

17 Q   Again, that's 41.

18 A   Okay.  Yes, sir.

19 Q   You have it?

20 A   Yes, I do.

21 Q   If you'd take a look at it, are you familiar with that

22 document?

23 A   Yes.

24 Q   Did you prepare it?

25 A   Yes, with my team, yes.

1 Q   Is that the one you showed at the meeting?

2 A   Yes.

3          MR. SHUMAKER:  Your Honor, we would move to

4 introduce Exhibit 41 into evidence.

5          THE COURT:  Any objections?

6          MR. ULLMAN:  Your Honor, to the extent that it

7 contains the projections, we have the same objections as

8 previously.  I don't believe they were prepared by Mr. Orr

9 personally.

10          THE COURT:  Right.  I wonder, counsel, if you would

11 have any objection to me giving the objecting parties a

12 continuing objection on that issue so that they don't have to

13 rise and restate that every time.

14          MR. SHUMAKER:  Certainly.

15          THE COURT:  Is that all right with you, sir?

16          MR. ULLMAN:  Thank you, your Honor.

17          THE COURT:  All right.  That objection is overruled.

18 This document is admitted into evidence.

19      (Debtor's Exhibit 41 received at 9:40 a.m.)

20          THE COURT:  You may proceed.

21          MR. SHUMAKER:  Thank you.  Laurie, if you could put

22 41 up -- you've done that.  Thank you.

23 BY MR. SHUMAKER:

24 Q   Mr. Orr, what is the -- are there any differences between

25 this slide presentation and the 45-day plan that you were

1   just discussing?

2   A   No.  These graphs were generally contained in the 45-day

3   financial and operating plan with the exception of the graph

4   contained at page 8, which is a graphic depiction of the cash

5   flow projections we went over in the financial and operating

6   plan.

7          MR. SHUMAKER:  Laurie, could you put up page 8,

8   please?

9   BY MR. SHUMAKER:

10  Q   And could you tell the Court what this is, Mr. Orr?

11  A   Yes.  This is a graphic depiction of the short-term cash

12  flow projections from January 13 through December 13.

13  Actually, by the time this document was prepared, the ones

14  through approximately April, May, were actual numbers, and

15  the projections went forward as they did on the spreadsheet

16  on the financial and operating plan.  The dark blue line

17  shows the cash balance with deferrals -- that is, the

18  payments we weren't making for either long-term liabilities

19  or pension contributions -- and the light blue line shows

20  what it would have been like -- the city's financial

21  condition would have been like if we had not made those

22  deferrals.

23  Q   Okay.  And when you say "deferrals," what do you mean?

24  A   We weren't paying the money.  When we say "deferral,"

25  it's just another way of saying we weren't making the

1   payments.

2   Q   And what weren't you paying?

3   A   We weren't paying a hundred million dollars of pension

4   payments that year.  I think there were some deferrals with

5   regard to some reimbursable accounts that we weren't paying.

6   There are a number of different things that we weren't paying

7   at that time.

8           MR. SHUMAKER:  Laurie, could you put up page 1,

9   please?

10  BY MR. SHUMAKER:

11  Q   Mr. Orr, could I ask you to take a look at -- this is

12  page 1.

13  A   Yes, um-hmm.

14  Q   Could you read that slide for the Court?

15  A   Yes.  Detroit spends more than it takes in.  It is

16  insolvent.  It has borrowed hundreds of millions of dollars

17  and has deferred just as much in obligations in order to

18  support city operations.  This path is not sustainable.

19  Q   Do you believe that statement was true and accurate when

20  made?

21  A   Yeah.  I think actually this was one of the slides that I

22  personally worked on, yes.

23  Q   Okay.

24          MR. SHUMAKER:  Can we go to page 13 of that, Laurie?

25  BY MR. SHUMAKER:

1    Q    Do you recognize this page, Mr. Orr?

2    A    Yes.

3    Q    Could you tell us what that is --

4    A    Well --

5    Q    -- what you were intending to convey with that?

6    A    What we were -- we were trying to say that we are

7 currently evaluating options to adjust -- in other words, to

8 either not pay or adjust our funded debt obligations to

9 better fit our cash flow projections, which include a number

10 of arrangements, such as rescheduling principal amortization

11 without reduction in principal; that is, how you would pay

12 the obligations that you owe without actually reducing the

13 total amount, permanently reducing the principal amount of

14 debt outstanding. That means giving someone a haircut.

15 We're not going to pay. If we owe you a dollar, we're not

16 paying a dollar. Reducing interest rates. If we owe you a

17 dollar at credit card interest rates of 23 percent, we're not

18 going to pay that to achieve cost savings or compensate for

19 loss, extended principal, and issuing debt to provide for

20 certain cash recoveries to other creditors; that is,

21 refinancing high-cost debt with lower-cost debt to reduce our

22 obligations.

23    Q    And you presented each of these slides at the meeting?

24    A    Yes, yes.

25    Q    Was there an opportunity at the end of that meeting on

1  June 10th for the audience members to ask questions?

2  A    Yes.

3  Q    Did you answer them?

4  A    Yes.

5  Q    Did anyone at that time or any subsequent time come up to

6  you after the meeting or at the meeting and say that the city

7  wasn't insolvent?

8  A    No.  Most of the people who came up to me after the

9  meeting expressed a level of shock.  They hadn't -- some of

10  them hadn't seen this before, and some actually expressed

11  some gratitude for finally disclosing the true state of

12  affairs.  I think some of those comments I saw on video feeds

13  either in newspapers or on You Tube.

14  Q    You had another meeting a few days later; correct?

15  A    Yes.

16  Q    June 14th?

17  A    Friday, June -- yes.  This meeting was Monday, June 10th,

18  and then we had the June 14th meeting for creditors.

19  Q    Okay.  I'd like to refer you to two documents in

20  evidence.  One is Exhibit 43, and if you could refer to that

21  in your binder.

22  A    Yes.

23  Q    And then also 44, so one is entitled "City of Detroit

24  Proposal for Creditors," and the other one is entitled "City

25  of Detroit Proposal for Creditors Executive Summary."

1  A    Yes.

2  Q    Could you share with the Court what the difference is

3  between those documents?

4  A    The substance of the documents is essentially the same.

5  44, the executive summary, is basically a shortened or

6  truncated version of Exhibit 43.  We'd refer to them as the

7  small slide deck and the large slide deck, but they're both

8  the proposal for creditors that was presented to creditors on

9  Friday, June 14th.  I believe we gave the executive summary

10 out either at or during the meeting and then gave the larger

11 deck out at the conclusion of the meeting.

12 Q    Okay.  And so during the meeting, the executive summary

13 slides is what was shown to the audience?

14 A    Yes, I believe so.

15 Q    Okay.

16 A    Yes.  I'm trying to think.  Did we show the slides?  I

17 think so.

18 Q    Okay.  What were the differences between the 45-day

19 report issued in May and the June 14th proposal to creditors?

20 A    Yeah.  What we were trying to do with the 45-day report

21 was to give a true report on the condition of the city

22 without any cant or any gloss.  What we were trying to do

23 with the June 14th report, which is essentially a month

24 later, was to try to say, well, based upon this document, the

25 true state of the city, this is what we can offer you in the

1    nature of a proposal.  This was not a plan.  It's what we

2    were saying to creditors we would propose to deal with all

3    these obligations that we reported in the May 12th report.

4    Q    Was there any update on cash flows?

5    A    I believe so, yes.

6    Q    Okay.  Who was invited to the June 14th meeting?

7    A    We tried to invite all record debt holders of the city,

8    according to their documents.  We tried to invite all of the

9    labor partners for the city or representatives of the labor

10   partners.  Occasionally there were parties who would call in

11   who also wanted to be invited or wanted their

12   representatives, either attorneys or financial advisors, to

13   attend the meeting, and we tried to accommodate them as well.

14   Q    Okay.  Do you know how they were invited?

15   A    We invited them through a number of ways.  We followed

16   the notice provisions of the actual debt instruments and

17   documents.  I think we did e-mails.  I think we did mail as

18   well, as well as phone calls.

19   Q    I'm sorry.  How many showed up?

20   A    Oh, there were several hundred in the room.

21   Q    Did this represent the entire universe of the city's

22   creditors?

23   A    No.

24   Q    Why do you say that?

25   A    Well, there are individual bondholders in terms of the

1  city creditors as well as trade creditors as well as labor

2  unions as well as individual employees, both current active

3  employees and retirees.  The potential creditor core of the

4  city probably numbers into the thousands, if not tens of

5  thousands.

6  Q    Who presented at the meeting?

7  A    Me and my team.  There was a panel on a DS.  I believe it

8  was David Heiman, who was a lead attorney, bankruptcy

9  attorney, at Jones Day; Ken Buckfire, our investment banker

10  at Miller Buckfire; Gaurav Malhotra at Ernst & Young.  I

11  believe Chuck Moore for Conway MacKenzie was there, and I

12  also believe Bruce Bennett from the Jones Day law firm was

13  there.

14  Q    And they all contributed to the presentation?

15  A    Yes.

16  Q    What were the highlights of the presentation to the

17  audience, as you recall?

18  A    Well, generally, the presentation was designed to sort of

19  take all the parties through a summary of the city's

20  financial and operational condition, operational both health,

21  safety, and welfare, police, fire, EMS, operations,

22  obligations.  Then we went through an analysis of more or

23  less the city's various buckets of assets, the bridge, the

24  tunnel, city-owned parking, city-owned land, DWSD, DIA,

25  whatever.  I think there were approximately 12 to 15 buckets

1  of assets that we discussed.  And then we went through an

2  explanation of how we were going to classify the various

3  creditor cores.  Generally the way you do in any

4  restructuring is secured parties are treated in a different

5  way than unsecured parties are.  That's just like your -- the

6  mortgage on your house has a different value to a lender as

7  opposed to your credit card as a secured party.  And then we

8  concluded by both putting forward a proposal in exchange for

9  downsizing or not paying the unsecured portion of the debt

10  that we would create a note that all the parties in that pool

11  of unsecured, whether it was a creditor or labor or a GO

12  bond, whatever it was, would share in the note.  And I think

13  on the last page of the document we set out a timetable for

14  both negotiations, evaluations, and decision-making.

15  Q    Did you indicate anything about the city's payment plans

16  with regard to various creditors?

17  A    Yes.

18  Q    What were they?

19  A    Well, we announced that going forward that we would

20  continue to pay our secured debt, the $6 billion or so, at

21  DWSD, but that we were not going to be paying our unsecured

22  debt, and some of the deferrals that had already been made on

23  the year, we would continue with those.  And, in fact, that

24  day we were defaulting on our certificate of participation

25  payment.

1  Q    And why were you doing that?

2  A    We needed the money.

3  Q    Now, the title of this document is a proposal for

4  creditors.  Why did you call it a proposal?

5  A    As we said at the meeting, and we tried to be quite clear

6  both on June 10th and June 14th, we had some difficult

7  decisions that we were going to have to make in a very short

8  time frame; that we wanted to see responses from creditors

9  quickly; that as we spelled out at the back of the document,

10  we were going to be making some decisions based upon those

11  responses.  I think I said on June 10th and again on June

12  14th that if we saw proposals coming forward in the nature of

13  term sheets or agreements in principle or something

14  substantive and the like, we might extend our evaluation time

15  frame a little longer beyond the July 15th, July 19th time

16  frame, but if we did not, we were going to be making some

17  very difficult decisions.

18  Q    Did you tell the audience that the proposal was not

19  negotiable?

20  A    No.

21  Q    Now, did you say anything about a reinvestment plan in

22  this document?

23  A    Yes.  We mentioned the fact that one of the reasons we

24  needed to go through this process quickly was to prepare for

25  a reinvestments plan into the city to deal with the critical

1    issues we had discussed in the proposal, blight remediation,

2    lighting, public safety, health and welfare, so on and so

3    forth, along those lines.

4    Q    How much was that reinvestment plan going to cost the

5    city?

6    A    Over the ten-year projection -- and the reason we indexed

7    at the ten years is under 436 I'm obligated upon exit to

8    provide a two-year budget and then a ten-year projection, so

9    we indexed it to that period of time.  And all-in on average

10   over the ten years, it's $1.25 billion.

11   Q    And how much of that was going to be spent on remediating

12   blight?

13   A    Almost $500 million in the first five and a half years.

14   I think 50, 2014; 50, 2015; and then a hundred million

15   dollars or so for the next four years.

16   Q    How did you, as emergency manager, come to decide on what

17   reinvestments were needed for the city?

18   A    Well, it's been apparent for a long period of time, and

19   it's been memorialized in the consent agreement that all

20   parties on behalf of the city and the state agree to and the

21   memorandum of understanding that these priorities were key

22   priorities for the city.  It's just that the city had not

23   gotten at them in a meaningful way during that time, but we

24   tracked what had already been agreed to by the city and the

25   state.

1   Q    Did any of your advisors focus on that area?

2   A    On blight?

3   Q    No.  On the reinvestments for the city.

4   A    Oh, sure.  Oh, yeah, absolutely, yeah.

5   Q    And who was that?

6   A    Oh, all of our advisors in some capacity.  I mean Conway

7   MacKenzie had been hired at the end of 2012 to examine the

8   city's operations.  They had been doing that before I came on

9   board.  Ernst & Young I think had been on board prior in

10  2012.  Milliman was doing its analysis based upon information

11  obtained from the pension fund's regular actuary, Gabriel,

12  Roeder, so they were examining obligations in that regard,

13  and Miller Buckfire, which I believe was retained in 2012,

14  began work almost -- I think they had been working informally

15  prior, but they began work in earnest around that time, so

16  all of them participated in some fashion on what we needed to

17  do.

18  Q    Do you recall what Conway MacKenzie did with regard to

19  investigating reinvestment needs?

20  A    Yes.  There's another component in the financial

21  stability agreement is that the financial stability agreement

22  created what's called the FAB, Financial Advisory Board, and

23  they were supervising Conway's insertion of itself in all

24  operations of the city to examine ways to increase the

25  efficiency of the city, which they had been doing.

1    Q    Why do you believe this reinvestment is necessary?

2    A    Well, I think some of it is apparent.  As I said before,

3    if you drive around the city -- this is not the way any major

4    city or any city in America, for that matter, should operate

5    or should look.  The blight, while it has been tolerated for

6    a long time, is unacceptable.  Our police response rates by

7    any objective measure, whether it's Bureau of Labor

8    Statistics, Department of Justice, BJS, Bureau of Justice

9    Statistics, or whether it's Quizzle on the Internet, show a

10   low level of services.  Our violence is apparent.  I don't

11   think any serious person -- I've heard no one say that this

12   is the way the city should operate or that the city is not in

13   need in some form of remediation.

14   Q    Was the audience allowed to ask questions at this

15   meeting?

16   A    Yes.

17   Q    Did they?

18   A    Yes.

19   Q    Did you answer their questions?

20   A    Yes.

21   Q    All of them?

22   A    Yes.

23   Q    When you made that quote about the plan being a

24   plebiscite, were you talking about this one, the June 14th

25   proposal?

1  A    Absolutely not.  Anybody who says that is taking the

2  quote out of context.

3  Q    Did you tell the audience that you would not negotiate

4  the proposal?

5  A    Absolutely not.  We said it was a proposal.  We were

6  looking forward to having a series of meetings the next week.

7  We were looking forward to counterproposals or suggestions.

8  Quite frankly, given the fact that the city had been working

9  through two Detroit review teams, three findings of financial

10  distress, financial crisis, until March 1st, 2013, a full-

11  blown financial emergency, all interested parties certainly

12  had opportunity to all of those documents for over two years,

13  to all of the metrics and timetables contained in both the

14  MOU and the consent decree, and what was required in all

15  aspects, both debt and labor.  We anticipated that certainly

16  very sophisticated and interested parties that were in that

17  room had already had over two years to consider the condition

18  of the city and would be coming forward to us with proposals.

19         MR. SHUMAKER:  Laurie, could you put up page 61 of

20  the summary?  Could you blow that up, please?

21  BY MR. SHUMAKER:

22  Q    Mr. Orr, do you recognize this slide?

23  A    Yes.

24  Q    What is it?

25  A    This is the page 61, Section 9, of the proposal, whether

1    it's the full deck or the executive summary, and it sets out

2    a timetable, as I said before, for how we're going to handle

3    requests for additional information; that we wanted to have

4    discussions with stakeholders throughout this time,

5    essentially a month; and that we were going to evaluate those

6    discussions following mid-July or so.

7    Q    How much time did you say you had?

8    A    I said I didn't have any time; that I felt at that point

9    that I was running out of time both under Public Act 436;

10   that my term and the powers that come with the emergency

11   manager expire in September 2014; that some of the work we

12   needed to get at, given that it had been discussed in detail

13   on a number of different documents with specificity -- and I

14   can only guess that it had been published throughout that

15   time quite apparently throughout the city; that anyone paying

16   attention knew that we had been working our way here

17   certainly throughout 2012 and 2011 and that the time had come

18   to make some very difficult decisions, to not delay, and that

19   the regular order of things, whether it was delay, whether it

20   was collective bargaining, whatever it was, that the regular

21   order of things was suspended, and we were in a financial

22   emergency and were going to have to move very quickly.

23   Q    At this time, on June 14th, 2013, did you think that the

24   city had to file for Chapter 9?

25   A    No.

```
1   Q    Why not?

2   A    No.  I thought that given the state of affairs in the

3   city, given the amount of publicity surrounding the Financial

4   Advisory Board, the agreements we discussed, the apparent

5   condition of the city -- you know, if you live in a city

6   where the bumpers on your police cars are falling off and

7   every neighborhood, even the good ones, have some level of

8   blight, you cannot possibly reasonably think that something

9   doesn't need to be done, so I thought parties were going to

10  be coming in with a discussion.  In addition, we were already

11  in discussions with other parties and had reached an

12  agreement in principle on the swap agreement with Bank of

13  America, Merrill Lynch.

14  Q    I want to return to this time frame, but around this

15  time, which is mid-June, you were involved in the city's

16  budgeting process; is that correct?

17  A    Yes.  The budget is due June 30th.  Yes.

18  Q    Okay.  And this is for the fiscal year budget; correct?

19  A    Yes.  July 1 through June 30 of each fiscal year.

20  Q    Okay.  Could you describe for the Court what the process

21  was in coming up with the city's budget?

22  A    Sure.  There's a budget estimation process.  There's a

23  review of all the costs done by -- the city has 44

24  departments.  Cost is done by departments, what the revenue

25  is.  The budget director and finance director get to go --
```

1    get together and discuss it, look at possible collections.

2    The City Council then undertakes the mayor's budget.  As he

3    puts that together, that's sent to the council.  The council

4    makes recommendations and adjustment.  The mayor gets to

5    review it.  And ultimately under 436 I have to approve or

6    disapprove the budget.

7    Q   Okay.  So PA 436 requires you to look at the budget after

8    the City Council passes it; is that correct?

9    A   Yeah.  I don't think -- I don't know if I have to look at

10   it afterwards.  I mean I could take it up, but I had

11   delegated to the mayor and the council the authority to

12   operate generally the city in the ordinary course, and that

13   was part of the process.

14   Q   Okay.  I'd like to show you an exhibit that's in

15   evidence.  It's Exhibit 74.  Take a look at that first page.

16   And that's your signature, Mr. Orr?

17   A   Yes, it is.

18   Q   Okay.  And what is this document?

19   A   This document is the quarterly report that's necessary

20   under 436 to the Treasury.

21   Q   And does it include the city's fiscal year 2014 budget?

22   A   I believe so, yes, a summary of it, not the entire budget

23   but a summary --

24   Q   Right.

25   A   -- of the budget, yes.

1   Q   Right.  I'd like to show you Appendix D of this report.

2           MR. SHUMAKER:  Laurie, if you could blow up the

3   first three sentences maybe up at the top?

4   BY MR. SHUMAKER:

5   Q   And is this what you were describing, Mr. Orr, about the

6   process?

7   A   Yes, more or less.  I mean we summarized it here, but I

8   have an obligation to approve the budget.  The budget is

9   apprised -- comprised of input from the City Council as well

10  as their review of the mayor's cut and that to reconcile

11  those figures with new ten-year projections under our

12  projections and that this is the budget we're going to adopt.

13  Q   Okay.  If I could direct your attention to the middle of

14  that page with the revenues.  Obviously we know what the

15  revenues are, but what were the total revenues at that point

16  in time?

17  A   Well, the total revenues, if you look at the general fund

18  amount, are 988 million.  If you include other funds, the

19  total goes down in the bottom right-hand corner about 2.4

20  billion.

21  Q   How about below that, the expenditures?  Could you

22  summarize that for us?

23  A   Yes, yeah.  Under the general fund it shows there are

24  expenditures of about $380 million above revenues in the

25  general fund.

1  Q   Below there on the line under -- well, it says "total

2  expenditures before concessions."

3  A   Yes.

4  Q   What -- and then concessions below that of 379; is that

5  correct?

6  A   Yes.

7  Q   What are concessions?

8  A   Well, concessions can mean both agreed to or unilaterally

9  imposed adjustments to obligations, things you're supposed to

10  pay.

11  Q   And when you made the reference to concessions, what did

12  that -- what did that mean?

13  A   That meant both payments perhaps to -- for deferred

14  obligations -- we knew we weren't paying a hundred million

15  that year to the pension funds -- payments to creditors that

16  we may not make, generally concessions we needed in that

17  amount in order to balance the budget, the 988 over and above

18  the 1.367.

19  Q   Those are the payments that the city wouldn't be able to

20  make in fiscal year 2014?

21  A   Those are payments that the city would not be able to

22  make as well as borrowings that the city was not going to

23  engage in again.

24  Q   Are you aware of any payments that the city has not been

25  able to make in fiscal year 2014?

1    A    Yes.

2    Q    What are those?

3    A    Oh, they're payments to trade creditors.  We are still

4    behind on our payments, for instance, to parts supplies that

5    we have not made in several millions of dollars.  There are

6    creditors that we have not paid in connection with supply

7    contracts, some of them in connection with the new police

8    station, for instance.  There are a number of different

9    payments we have not made this year.

10   Q    Let me return to --

11        MR. SHUMAKER:  You can take that down, Laurie.

12   BY MR. SHUMAKER:

13   Q    Let me return to the time frame after -- immediately

14   after the June 14th creditors' meeting, if you will.

15   A    Yes.

16   Q    At that meeting, I believe you indicated that one of the

17   topics discussed was the city's cash situation; correct?

18   A    Yes.

19   Q    Is one of the sources of the city's revenues or cash

20   referred to as the casino revenues?

21   A    Yes.  Casino and developer fees, casino revenue and

22   developer fees.

23   Q    Now, what are the casino revenues as you understand them

24   to be?

25   A    There are three casinos in the city, and in consideration

1  for some time ago passing legislation for the casinos, they

2  remit to us a portion of a tax that comes into the city in

3  the sum of approximately $180 million a year total.  A

4  portion of that is used to pay certain creditors, and then a

5  portion of that comes back to the city.

6  Q   Is that an important revenue source for the city?

7  A   That is probably -- yes, and it's probably the most

8  stable source of revenue for the city.

9  Q   Now, are those casino revenues freely available to the

10 city?  Are there any restrictions on the casino revenues?

11 A   In 2009 the city entered into a collateral pledge because

12 it was in default under the swap agreement.  That collateral

13 pledge gave a security interest to the swap counterparties.

14 Under that collateral pledge, those counterparties, upon an

15 event of default, had the option to execute on the totality

16 of those payments, so they were not freely available to the

17 city until we entered into the Bank of America, Merrill Lynch

18 forbearance and optional termination agreement, which I

19 believe we announced in principle on June 14th.

20 Q   Okay.  Let me ask you, you referred to swap

21 counterparties.

22 A   Yes.

23 Q   Who were the swap counterparties?

24 A   Bank of America, Merrill Lynch, and then U.S. Bank as

25 trustee generally.

1  Q   So there was some restriction in the ability of the city

2  to get those revenues directly from the casinos?

3  A   Yes.  There was a mechanism by which the revenue was

4  paid.  I think the revenue is paid on a daily basis, about

5  $500 million, into a holdback account.  Then there's another

6  distribution account when it reaches a certain level that

7  that money is then -- about 4.2 million a month is then taken

8  away and put into another account for the counterparties, and

9  then every quarter that money, roughly a million or so, is

10  then paid over to the counterparties.

11  Q   I think you said 500 million a day.

12  A   500,000 a day, roughly --

13  Q   Okay.

14  A   -- somewhere in that --

15  Q   I wish it would be 500 million.

16  A   I wish it were 500 million a day.

17  Q   So -- and this arrangement, does it have a name, a

18  commonly referred to name?

19  A   You mean the holdback account --

20  Q   Yeah, the holdback account.

21  A   -- or the swap?  It's generally called a swap.

22  Q   Have you heard of the phrase "lockbox arrangement"?

23  A   Sure, yeah.  That's a common term in financing, holdback

24  account, lockbox, and the like.

25  Q   After the June 14th meeting, did anything happen with

1  regard to the casino revenues?

2  A   Yes.

3  Q   What was that?

4  A   On the following Monday, one of the parties that was a

5  monoline insurer -- that is, insurer for some of these

6  obligations -- called Syncora claimed that they had an

7  interest in the swap agreement, which we very strongly

8  disputed, and sent a letter to counterparties alleging that

9  their interest prohibited them from performing on the

10 agreement in principle that we had announced on Friday, the

11 14th.

12 Q   So they sent a letter to UBS and Bank of America, Merrill

13 Lynch?

14 A   I think it was U.S. Bank --

15 Q   Okay.

16 A   -- and Bank of America, Merrill Lynch.

17 Q   Okay.  U.S. Bank, was U.S. Bank a swap counterparty, or

18 were they something else?

19 A   They were like a trustee.

20 Q   A trustee.  Okay.

21 A   Yeah.  They were a trustee for the counterparties.

22 Q   So you had the swap counterparties, which are UBS and --

23 A   And Merrill Lynch.

24 Q   -- Merrill Lynch?

25 A   Then you have U.S. Bank, which is a trustee.

1   Q   Okay.

2   A   Um-hmm.

3   Q   And why would they send a letter to U.S. Bank?

4   A   Well, we didn't know.  We interpreted them -- our

5   understanding was they had made a payment based upon our

6   default under the certificate of participation as an insurer

7   for the COPs, which is a separate structure.  Under the

8   swaps, which they did not have an agreement in the collateral

9   pledge agreement, it appeared to us that they were trying to

10   assert some interest under the swaps to bolster their

11   position under the COPs.  We thought that was inappropriate

12   and unfounded.

13   Q   What did U.S. Bank do in response to the letter it

14   received from Syncora?

15   A   Understandably, as a trustee, U.S. Bank more or less

16   froze, and they froze the account.

17   Q   What did that freezing of the account mean for the city?

18   A   Well, it actually meant the city was in worse condition

19   than it was on June 14th because not only were we getting

20   that -- not getting that portion of the revenue,

21   approximately $132 million that should come to us in the

22   course of a year, but we weren't getting the benefits of the

23   swap agreement that we had reached with them just that

24   Friday.

25   Q   Had you been counting on the money, the casino revenues?

1   A   Yes, absolutely.

2   Q   What did you do in response to Syncora's actions?

3   A   I think I instructed our legal team to reach out to them.

4   There was a letter.  I think I wrote -- there was a series of

5   letter exchanges over the next couple of weeks.  I think I

6   wrote back saying your position is unfounded to a -- to one

7   of the principals, I think a Mr. LeBlanc at Syncora.  I think

8   he then wrote back to me, and this went on for about two

9   weeks, and then I wrote another letter or two back to him,

10  but there were a series of what we used to call nastygrams

11  going back and forth about the parties' respective interest

12  and how we felt they were unfounded and how they felt that

13  they had a right to assert them.

14  Q   Were you asking Syncora to change its position?

15  A   Yes.  We were very -- we were telling Syncora they did

16  not have a position, that they were causing damage to the

17  city, and they needed to cease and desist immediately.

18  Q   Did your letters or meetings with Syncora work?

19  A   No.

20  Q   What was the next step that you took --

21  A   Well --

22  Q   -- with regard to the casino revenues?

23  A   Well, we were relying on the casino revenue strongly to

24  relieve the cash flow pressures that we were under from March

25  to June because we -- mid-June we were going flow pretty

1    skinny cash flow negative.  They refused apparently to reach

2    some sort of accommodation.  We told them if they didn't, we

3    would have to pursue our legal remedies, and I think in this

4    time frame we were also going through the discussion with the

5    counterparties, certainly in the next week -- we spent that

6    following week, the 17th through the 22nd -- 17th, 18th,

7    19th, 20th, 21st, 22nd -- yeah -- 17th through the 22nd

8    having plenary meetings with a number of interested parties.

9    We were writing these letters to Syncora.  After several

10   weeks of this, we eventually decided that we were going to

11   have to sue them to stop, get a preliminary injunction -- or

12   TRO, temporary restraining order.

13   Q    Was what Syncora was doing affecting your negotiations

14   with the swap counterparties --

15   A    Yes.

16   Q    -- the agreement you were talking about?

17   A    Yes.  It interfered with those negotiations quite

18   severely.

19   Q    So you decided to pursue legal action?

20   A    Yes.

21   Q    And when you say "legal action," what do you -- what do

22   you mean?

23   A    Well, after discussion with our team, we decided to sue

24   Syncora.

25   Q    Okay.  And how did you go about doing that?

1  A   We filed a complaint for a temporary restraining order in

2  early July, July 5th, I believe.

3  Q   Were you successful in obtaining the TRO?

4  A   Yes, we were.

5  Q   And what did that mean for the city?

6  A   Well, that mean that Syncora had to cease and desist from

7  interfering with the settlement agreement we had reached with

8  Bank of America and Merrill Lynch and UBS; that the casino

9  revenue begin to flow again so we had some relief from the

10  financial pressures that we were feeling in terms of cash

11  flow and that we could refocus quite clearly with that relief

12  on trying to reach some agreements with other parties.

13  Q   If the city hadn't gotten that TRO, what would it have

14  meant to the city?

15  A   It would have been pretty catastrophic.  Without the

16  casino revenue, even our projections for cash flow would not

17  have flowed.  We would have been short, in addition to the

18  money we saw -- we lost on that blue graph that we discussed

19  on the June 10th presentation, we have lost another $132

20  million a year, which would have put the city in dire

21  straits.  You could not cut enough city services to make up

22  for that difference.  We couldn't go back to the financial

23  markets because we had exposed the true state of the city

24  affairs, and any lending at that time perceivably without

25  this revenue stream would have been very high.  It would have

1    been very dire.

2    Q    And you got this TRO on July 5th, you said?

3    A    I believe it was July 5th.

4    Q    Do you know how long a TRO typically lasts?

5    A    In federal court it can last for a period of time, but I

6    think this was in state court, and it had a 14-day life, I

7    believe.

8    Q    Mr. Orr, while you were dealing with the Syncora

9    situation after the June 14th meeting, were there subsequent

10   meetings between representatives of the city and its

11   creditors?

12   A    Yes, throughout that week, the following week.

13   Q    I'd like to show you Exhibit 104, which has been admitted

14   for demonstrative purposes.  Do you see that, Mr. Orr?

15   A    Yes.

16   Q    And you see June 14th over on the left side of that

17   document?

18   A    Yes.

19   Q    Could you walk us through any meetings that you

20   participated in during this time period?

21   A    Yes.  I was at the June 10th meeting on the bottom, June

22   14th meeting, June 20th meeting.  I believe -- I think at one

23   other meeting or one other one-off meeting at some point the

24   week after that, which would have been July 25th or so,

25   thereabouts.

1  Q   Or June 25th?

2  A   Yeah.  June.  I'm sorry.  June 25th.

3  Q   Now, at these meetings, Mr. Orr, what did you tell those

4  who came to them?

5  A   I think at the June 20th meeting it was the afternoon

6  session that I attended.  I told them that we were -- same

7  thing I said at June 14th essentially.  We were working hard

8  to try to get some concessions; that we were fighting very

9  hard from a concession that we had obtained from Bank of

10  America, Merrill Lynch; that we were looking -- we thought

11  that that settlement as well as our willingness to default on

12  the COPs payment would have told all interested parties that

13  we were serious about trying to get some negotiations done

14  fairly quickly; that we were working on a very tight time

15  frame; and that we meant what we said in our June 14th

16  proposal for creditors; that that was the time frame we were

17  going to stick to.

18  Q   Let me focus your attention on the meeting on June 20th

19  with the nonuniformed union and retiree representatives.

20  A   Um-hmm.

21  Q   At that meeting, did you tell them that you would not

22  negotiate with them?

23  A   No.  What I said was that we would not waive our rights

24  under 436; that collective bargaining was suspended for five

25  years under the statute, but that as long as everybody

1  understood we weren't engaging in collective bargaining, we'd

2  be willing to have discussions and other negotiations short

3  of calling it collective bargaining.

4  Q   Did you tell the meeting participants in the afternoon

5  session with the uniformed union and retiree representatives

6  the same thing?

7  A   Yes.

8  Q   How about the meeting on June 25th with the nonunion

9  creditors and representatives from the Retirement System?

10 A   You know, I don't -- I'm trying to see if I meant at that

11 meeting or if I had a separate one-off, but I think either

12 way I was trying to tell everyone that we were meeting with

13 the same message.  We want to have discussions.  We want to

14 have proposals.  We want to have negotiations, but we are not

15 waiving our rights under the statute.

16 Q   Did you tell the meeting participants that you -- the

17 city would not accept proposals or counterproposals to what

18 you had exhibited at the June 14th meeting?

19 A   No.  If anything, we kept telling people that we would

20 accept counterproposals and we were looking for them.

21 Q   Now, you didn't go to all the meetings; correct?

22 A   No, I did not.

23 Q   How did you stay informed as to what was happening at

24 those meetings?

25 A   My team kept me regularly informed.  Typically either

1    during or after -- immediately after those meetings, they

2    would stop by my office.  We would have daily telephone

3    calls.  We have a number of standing calls called work in

4    progress calls beginning of the week.  At the end of the week

5    we have team calls.  During the middle of the week we have

6    various operational calls and other calls with all the

7    consultants.  We have regular meetings and calls on a daily

8    basis.  In addition, lead counsel, David Heiman, as well as

9    our investment banker, Ken Buckfire, speak to me essentially

10   almost daily, maybe Ken not as much daily, but David

11   certainly does on a regular basis.  And any particular

12   taskforce like the pension taskforce with Evan Miller, Jones

13   Day, or Conway MacKenzie through Chuck Moore or Ernst & Young

14   or any of their other partners would meet with me daily.

15   Q    Do you think that any important developments at those

16   meetings would have been reported to you?

17   A    Without a doubt.

18   Q    What was -- who was your team of -- who was the team that

19   you had that went to the meetings you did not attend?

20   A    Well, we had various teams for different obligations.

21   For instance, on labor, we had a team headed up by Jones Day

22   attorneys on pension and benefits.  We had a team with Jones

23   Day's attorneys, Conway MacKenzie, Ernst & Young on debt.  We

24   had a team with various attorneys as well as our investment

25   bankers.  Each sort of group between debt, labor, benefits,

1  employees would have members assigned to it who would attend

2  those meetings, have follow-up calls, exchange e-mails, come

3  back and forth with proposals.  There were a number of

4  letters that were exchanged which would routinely be shared

5  with me.

6  Q   Did you tell any of the members of your team not to

7  negotiate with those who came to the meetings?

8  A   Absolutely not.  What I said is if there any serious

9  proposals, I'm a phone call away.  Typically what would

10  happen, they would relay those proposals to me, and we'd make

11  a consensual decision about how to respond or whether or not

12  they were proposals that we thought were moving us forward,

13  but, no, I was involved at every stage of that process.

14  Q   Did you participate in these meetings in good faith?

15  A   Yes, absolutely.

16  Q   Do you believe your team did?

17  A   Yes, I do.

18  Q   Aside from the meetings that are set forth on Exhibit

19  104, were there other contacts with the city's creditors --

20  A   Yes.

21  Q   -- that you had?

22  A   Yes.

23  Q   What kinds of contacts?

24  A   Various parties would routinely stop by my office, ask

25  for meetings, either drop by when they were in other meetings

1   or we'd have set-up meetings.  To this day, I routinely meet

2   with various interested groups on behalf of the city.  I

3   don't think there's a point at which I have turned down a

4   request for a meeting.  Maybe if I'm busy, not immediately at

5   that moment, but I generally will try to make myself

6   available for any reasonable request for a meeting.

7   Q   You believe you were available during this time?

8   A   Yes.

9   Q   Did any creditors submit proposals or counterproposals to

10  you after the June 14th meeting and before July 18th?

11  A   Yes.

12  Q   Who did?

13  A   I think a group of creditors led by Ambac, I believe,

14  submitted a proposal, and then there was another sort of

15  proposal, a single-page letter that was admitted --

16  submitted.

17  Q   Let me show you Exhibit 102 and ask you, if you could, to

18  identify it for the Court.

19  A   I believe this was a letter that was submitted by Ambac

20  and NPF, National Public Finance Guarantee Corporation.

21  Q   And it was a proposal made to you after the June 14th

22  meeting?

23  A   Yes.  I believe it was made roughly on the day that's

24  referenced, July 15th, Monday, July 15th.

25  Q   Okay.  Aside from this proposal and the other one that

1   you referenced, did you receive any proposals between June

2   14th and July 18th from the unions?

3   A   Nothing I would call a proposal.  I think there was

4   reference to -- may have been reference to a letter that

5   requested collective bargaining but not a proposal.

6   Q   How about the bondholders?

7   A   No.

8   Q   The retirees?

9   A   No.

10  Q   Pension funds?

11  A   No.

12  Q   Any other stakeholders?

13  A   No.

14  Q   At some point after the June 14th meeting, did you

15  authorize your team to start preparing for a Chapter 9

16  filing?

17  A   Yes.

18  Q   When did you do that?

19      (Phone interruption at 10:24 a.m.)

20          THE COURT:  I guess we have to pause our proceedings

21  for a second to address this.  Okay.  Hold on one second.

22  Letrice -- we're going to just pause in place here for a

23  moment while we get the phone working again.

24          MR. SHUMAKER:  Your Honor, this is somewhat of a

25  breaking point if you would like to, or --

1    THE COURT:  Ah, let's talk about that.  Okay.  Just

2  let me know when you're ready again, Letrice.  Okay.  On the

3  issue of a break, because of our commitment to hear the

4  governor's testimony beginning at one, it was my intent to

5  call for lunch at 11:30 since the vote was to have an hour-

6  and-a-half lunch, so in light of that, it was my intent to

7  just plow ahead until 11:30.

8    MR. SHUMAKER:  Fine.  That's wonderful.

9    THE COURT:  Okay.  And you may proceed.

10    MR. SHUMAKER:  Thank you, your Honor.

11  BY MR. SHUMAKER:

12  Q    Mr. Orr, I forget the question.

13  A    Okay.

14  Q    You indicated that at some point after the June 14th

15  meeting you authorized your team to start preparing a

16  potential Chapter 9 filing.  I believe I'd asked you when you

17  thought that occurred.

18  A    I think approximately late June, early July.

19  Q    Okay.

20  A    Maybe -- yeah, yeah.

21  Q    Well, why did you need to start planning for a Chapter 9

22  filing at that point at the same time you were negotiating?

23  A    It's basically contingency plan filing.  I mean, you

24  know, pray for peace, prepare for war.  Any prudent person

25  always prepares for the contingency that what you hope for

1  doesn't occur.  To do so -- not do so would be irresponsible.

2  Q    Do you believe these preparations for a possible Chapter

3  9 filing affected your ability to negotiate in good faith?

4  A    Absolutely not.

5  Q    How about your team?

6  A    Absolutely not.  We were willing to accept any agreement

7  that came over the transom.

8  Q    About this time -- I'm talking now July -- July 5th was

9  the TRO.

10  A    Yes.

11  Q    And the negotiations that were on Exhibit 104 were -- the

12  meetings that were taking place were going on.  Did you

13  become aware of any lawsuits filed around that time regarding

14  the emergency manager statute?

15  A    Yeah.  There had been filed prior to this whole time

16  frame lawsuits seeking to invalidate the statute.  We were in

17  a running gun battle with Syncora with the exchange of

18  correspondence.  We were trying to negotiate with a number of

19  parties, I think 48 or so, 49 bargaining units, 44 or so bond

20  issuers, 9 bond insurers.  And also I believe that week, the

21  first week of July, just before the July 4th holiday -- I

22  think it was July 3rd -- two lawsuits -- two or three were

23  filed against us, not against me personally at that time.  I

24  think they were filed against the state, the governor, and

25  the treasurer, the Flowers and Webster's lawsuits, and then

1    we went to court.  July 4th, I think, was a Thursday, and

2    then we went to court to enjoin Syncora on the 5th, which I

3    believe was a Friday.

4    Q    Okay.  So you believe that the Flowers and the Webster

5    lawsuits were filed on July 3rd?

6    A    Yes, I believe so.

7    Q    Okay.  What was your understanding of what these suits

8    were alleging?

9    A    There had been a lot of discussion prior to filing the

10   suits as to whether or not the constitutional requirements of

11   the Michigan state Constitution prohibited the adjustment of

12   vested pension rights, and I thought these lawsuits were

13   seeking to prohibit a Chapter 9 filing if it would include

14   adjusting vested pension rights.

15   Q    How did the filing of these lawsuits affect you in your

16   role as emergency manager?

17   A    They initially didn't really concern me.  I assumed that

18   parties were pursuing their legal rights.  We were trying to

19   negotiate.  Frankly, I ignored them when they were initially

20   filed and continued to try to reach some sort of negotiated

21   solution with our interested parties and labor partners.

22   Q    Did they tell you anything about the negotiations?

23   A    Well, they suggested to me that parties were pursuing a

24   litigation role or option as opposed to a sincere good faith

25   negotiation option when we had already said that time was

1   running out.  We were coming to the end of our 30 days; that

2   they thought for whatever reason it was in their best

3   interest to pursue litigation as opposed to coming --

4   proposing some sort of agreement.

5   Q    Did this concern you?

6   A    Yes.  It wasn't -- it certainly wasn't showing of a

7   willingness to enter into some sort of concessions or

8   agreements.  It said they wanted to sue.

9   Q    Now, there was another lawsuit filed after the Flowers

10  and Webster lawsuits; correct?

11  A    Yes.

12  Q    And when was that?

13  A    I think that was the following week.

14  Q    How did these lawsuits affect your negotiating posture?

15  A    Well, from our perspective, we continued to say that we

16  would negotiate even in the sort of litigious -- what I mean,

17  we had been in a situation of opposition and some level of

18  conflict from the beginning.  We expected that, and that

19  wasn't going to change our willingness to try to reach some

20  sort of agreement.  In fact, even in the face of litigation

21  and some very contentious negotiations and statements, we

22  continued to try to move forward.

23  Q    Now, you indicated that in the Flowers and Webster

24  lawsuits the governor and the treasurer were named as

25  defendants.

1   A   Yes.

2   Q   In the pension fund lawsuit that you referenced --

3   A   Yes.

4   Q   -- on July 15th --

5   A   Yes.

6   Q   -- were those the same defendants?

7   A   No.  In the pension lawsuit, GRS, I believe, sued me

8   along with some other parties, and they named me and the

9   governor, I believe.

10  Q   Did you continue to meet with the pension funds after

11  they sued you?

12  A   Yeah.  We continue to meet with them now.  We'll continue

13  to meet with them, yes.

14  Q   Did these lawsuits affect your decision to seek the

15  governor's authorization to file for Chapter 9 bankruptcy?

16  A   Yes, to some degree.  It appeared --

17  Q   How so?

18  A   Well, between the Syncora litigation, that injunction was

19  only going to last for two weeks, I believe, through the 19th

20  or so, Friday, the 19th, I think it was -- the Webster and

21  Flowers litigation suggested to me that an agreement was not

22  going to be forthcoming.  There was a lot of publicity

23  regarding those lawsuits and what I viewed to be chest

24  thumping, people saying what they were going to do and they

25  weren't going to make any movement until we agreed as a

 1  condition -- it appeared to be as a condition to going
 2  forward that we had to observe these sort of philosophical
 3  differences, these sort of philosophical positions that you
 4  couldn't touch vested pension rights.  There was a lot of
 5  discussion in the general obligation bond community that
 6  unless we agreed to observe the implied full faith and credit
 7  of the city beyond our GO bond debt, that they weren't going
 8  to make any concessions.  We had tried to tell them we could
 9  not comply with the $12 billion of unfunded -- unsecured
10  liability, and the situation seemed to be growing more and
11  more precarious and somewhat out of control.
12  Q   Let me show you Exhibit 28, which is in evidence.
13  Mr. Orr, do you recognize this document?
14  A   Yes, I do.
15  Q   And what is it?
16  A   This is my recommendation to the governor, copying the
17  treasurer, that I be given authority to file Chapter 9.
18  Q   And it's dated as of July 16th; is that correct?
19  A   Yes, it is.  I believe that was a Tuesday.
20  Q   Why did you send the governor this letter on that date?
21  A   Well, as I said, I believe at that time there was a
22  mounting level of conflict.  There were a number of pieces of
23  litigation going on.  There were a number of what appeared to
24  be conditions all parties were setting before we'd have
25  discussions that we'd have to agree to.  I was running out of

1    time.  I meant what I said on June 14th that we were going to

2    have to go through an evaluation period, and that was coming

3    to a close.  We hadn't received any real counterproposals

4    from any parties.  The only one actually we received in

5    writing was from Ambac Assured and National Public Finance.

6    We hadn't received any from the other parties, and time was

7    running out that we said we'd have to do an evaluation, and I

8    wanted to get the authority in hand to file Chapter 9 if we

9    weren't receiving any proposals.

10   Q    And is that what you told the governor in this letter?

11   A    Yes.  I told him about the condition of the city, the

12   budget deficits, the growing liabilities, the ongoing

13   financial emergency that he had declared now back in March, I

14   believe March 1, 2013.  We discussed our meeting with

15   creditors and why there were certain barriers to reaching

16   agreement and that it was time to make a decision.

17   Q    Why did you recommend Chapter 9 bankruptcy for the city

18   at this time?

19   A    Well, it seemed to me that after going through a series

20   of negotiations in the time frame that we said we would,

21   after standing by and suffering a number of different

22   lawsuits aimed at denuding us of the authority to make

23   decisions under 436, after parties taking strong

24   philosophical positions about what they would or wouldn't do

25   based upon our position; that I had made a pledge of the time

1    I was going to keep open; that nobody was coming forward --

2    and I said it was approximate within that time frame -- and

3    that I was running out of time.  We had said for some of the

4    things that we needed to accomplish we had to make some

5    decisions, and, furthermore, given the amount of litigation,

6    it was clear to me that there was going to be no other way to

7    pursue a comprehensive and orderly resolution of the city's

8    problems in an expeditious way.

9    Q    On July 16th when you sent this letter, were you aware of

10   any hearings in the Flowers or Webster or pension fund

11   lawsuits that were upcoming?

12   A    There were hearings that were scheduled at that time for

13   the 22nd, I believe, the following week.

14   Q    Were you aware of any other hearings on July 16th?

15   A    Not on July 16th.

16   Q    How long between concluding that bankruptcy was

17   appropriate and sending this letter to Governor Snyder?

18   A    Well, I think I reached the final conclusion the prior

19   week, so drafts of the letter were probably prepared over the

20   weekend and that Monday, and when I sent it, I was prepared

21   to file.

22   Q    Prior to sending this letter to the governor, did you

23   have any agreement with the governor regarding what his

24   response might be?

25   A    No.

1  Q   Did the governor respond to this letter?

2  A   Yes.

3  Q   I show you Exhibit 29, please.  Do you recognize this

4  document, Mr. Orr?

5  A   Yes, I do.

6  Q   It's in evidence.  Could you give an overview of what the

7  governor told you in this letter?

8  A   The governor said that he had reviewed my recommendation;

9  that he looked at the obligation of the city first and

10 foremost to provide basic needs, basic obligations to its

11 citizens, which were not being met; that it could not meet

12 its basic obligations to creditors; that its failure to meet

13 these obligations prohibited it from providing basic needs to

14 the citizens and to its creditors; and that the only

15 reasonable path to resolving this would be the filing of a

16 bankruptcy.

17 Q   And did he authorize you to file for a Chapter 9 --

18 A   Yes.

19 Q   -- bankruptcy?

20 A   Yes, he did.

21 Q   When on July 18th -- that's the date you received this

22 letter; correct?

23 A   Yes, it is.

24 Q   When on July 18th did you receive this letter?

25 A   I believe I received this letter late morning, maybe

1    early afternoon.

2    Q    How did you receive it?

3    A    I think someone on my staff brought it to me at first.

4    Q    Hard copy?

5    A    Yeah.  I think it was either e-mail or fax, yeah.

6    Q    What did you do upon receiving this letter?

7    A    I called the attorneys and instructed them to prepare to

8    file the bankruptcy case.

9    Q    Why do you believe this Chapter 9 filing was in the best

10   interest of the citizens of Detroit?

11   A    I believe that the city had been dealing with the issues,

12   as I said before, both on the creditors' side and some of its

13   city operations and work rules for a long time.  I believe

14   that they had been agreed -- the city and the state and then

15   the city officers and the state had agreed over a long period

16   of time to resolve some of these issues.  They had spelled

17   them out in detail; that for whatever reason they were not

18   being addressed in a timely fashion; that there are a number

19   of efforts and safeguards that the parties had agreed to to

20   redouble those efforts in specificity in the financial

21   stability agreement, Detroit Reform 1 and Detroit Reform 2;

22   that they failed to meet those obligations, so they started

23   to put milestones in place to try to achieve those

24   obligations.  Those were not met; that the city had gone

25   through between 2012 and 2013 essentially three different

1  reviews that had all gone from financial distress to

2  financial crisis to financial emergency; that upon my

3  appointment we were trying to look at some of those very same

4  issues.  We had specified to people that given this length of

5  time that those issues had been discussed, that after our

6  June 14th presentation we were going to take a certain period

7  of time to do evaluation for counterproposals, which we

8  thought were forthcoming; that they were not forthcoming;

9  that we were running out of time both in terms of what was

10 required in the statute and any reasonable period of time to

11 get through a bankruptcy filing; that I had to make a

12 difficult decision to try to resolve these issues once and

13 for all in a comprehensive and orderly way under the guise of

14 federal law so that they could be all resolved finally and

15 the city could move forward to deal with some of the

16 amazingly necessary reforms that have been agreed to by

17 everyone in the city for two years.

18 Q   Do you still believe that this bankruptcy filing is in

19 the best interest of the citizens of Detroit?

20 A   Yes.

21 Q   If the city isn't eligible for Chapter 9, what's next?

22 A   If the city isn't eligible for Chapter 9, there's either

23 free-fall crisis -- I mean this city -- and I'm certainly --

24 the people that live here have seen this.  This city for ten

25 years, from 2000 to 2010, lost a city the size of Romulus or

1  Wyandotte every year, 24,000 people on average.  That is
2  free-fall flight out of the city.  The services have degraded
3  to a point that they are severely substandard, and they are
4  apparent.  To put the city either back in the status quo,
5  which is clearly unacceptable -- and nobody of any serious
6  note disagrees with that.  No one says that we should go back
7  to the way it is.  No one says that our ability to meet our
8  creditors should continue to be deferred or we should borrow
9  more debt upon debt that for ten years averaged over a
10  hundred million dollars deficit; that we have $1.4 billion
11  that was supposed to resolve our pension obligations in 2005
12  and 2006.  No one says that's an adequate way to proceed.  If
13  we do not go through Chapter 9, this city --
14          MR. DECHIARA:  Objection, your Honor.
15          THE WITNESS:  -- will continue to fail.
16          MR. DECHIARA:  I would just object.
17          THE COURT:  What is your objection, sir?
18          MR. DECHIARA:  Speculation.  He's speculating about
19  events that are counterfactual and about the future.
20          THE COURT:  The objection is overruled.
21          MR. SHUMAKER:  Thank you, Mr. Orr.  That's all I
22  have.
23          THE WITNESS:  Yes, sir.
24          THE COURT:  All right.  Cross-examination.  Okay.
25          MR. ULLMAN:  Your Honor, may I tilt the lectern so

1    I'm more facing the witness?

2                            CROSS-EXAMINATION

3    BY MR. ULLMAN:

4    Q   Good morning, Mr. Orr.

5    A   Good morning, Mr. Ullman.

6    Q   Now, we've met before, haven't we?

7    A   Yes.  Yes, we have, several times.

8    Q   Twice, I think.  I'm going to -- just preliminarily let

9    me ask you a few questions.  Now, apart from a college

10   degree, do you have any degree other than a law degree?

11   A   No.

12   Q   You're not a CPA?

13   A   No.

14   Q   You're not an actuary?

15   A   No.

16   Q   Okay.  I believe you testified that you've been with

17   Jones Day since 2001; is that right?

18   A   2001 until March 15th, 2013.

19   Q   Okay.  So you were --

20              THE COURT:  Excuse me.  Would you point the

21   microphone more towards you?

22              MR. ULLMAN:  Is this better?

23              THE COURT:  Yes.

24              MR. ULLMAN:  Sorry.

25              THE COURT:  Thank you, sir.

1          MR. ULLMAN:  Okay.

2    BY MR. ULLMAN:

3    Q   So you were a practicing attorney at Jones Day for about

4    12 years prior to becoming the emergency manager; is that

5    right?

6    A   Yes.

7    Q   And I think you indicated you were primarily in the

8    bankruptcy and restructuring group?

9    A   Yes, litigation at first and then bankruptcy and

10   restructuring.

11   Q   Right.  Now, you also mentioned that you'd been at the

12   U.S. Trustee's Office; is that right?

13   A   Yes.

14   Q   And that was from around 1995 through 2001, if I recall?

15   A   Yes.

16   Q   Okay.  And while you were there, did you ever serve as an

17   actual trustee in a bankruptcy case?

18   A   No.

19   Q   And prior to the U.S. Trustee's Office, I believe you

20   indicated you were at the RTC?

21   A   Yes.

22   Q   Okay.  And that would have been from about '92 to '95 if

23   I got the dateline right?

24   A   Yeah.  We originally came in as attorneys at FDIC.  We

25   were then assigned to RTC.  RTC then got authority to hire

1  its own attorneys, and I became an attorney at the RTC

2  proper.

3  Q   Okay.  So that's the general time frame, '92 to '95, that

4  you were there?

5  A   Yes.  '91 through '95.

6  Q   Okay.  And I believe you mentioned that while you were at

7  the RTC you served as the chief legal officer for a savings

8  and loan company that had a sub-subsidiary or holding company

9  called Landmark Land?

10 A   Yes.

11 Q   And you indicated that you ended up being responsible for

12 the disposition of the assets of that company?

13 A   Yes.

14 Q   Okay.  And those, I think you said, were golf courses and

15 country clubs?

16 A   There were a number -- golf courses, country clubs,

17 vacant land, financial assets, yes, number of assets.

18 Q   Okay.  And the golf courses and country clubs, of course,

19 are relatively high-value assets or --

20 A   Yeah.  They were at the time.

21 Q   And that was all around 18 years ago; is that right?

22 A   Whatever the math works out to, Mr. Ullman.

23 Q   Okay.  I think that's it.

24 A   Um-hmm.

25 Q   And is it correct that prior to becoming the emergency

1  manager, you never ran a city?

2  A    No.  Most governors haven't --

3  Q    Okay.

4  A    -- nor mayors.

5  Q    Okay.  And prior to becoming emergency manager, you never

6  had responsibility for budgeting all of the various

7  departments that are involved in running a city or a state;

8  is that right?

9  A    That is correct.

10  Q    And you've never been employed by a corporation, have

11  you, putting aside governmental like the RTC, in a private

12  company?

13  A    Well, there were times in college jobs that I was

14  employed by corporations, but do you mean --

15  Q    Well, after.

16  A    -- during my professional career?

17  Q    Yeah, in your professional career.

18  A    I've been an attorney, then in government, and then an

19  attorney again, yes.

20  Q    Okay.  And is it fair to say that other than being a

21  bankruptcy and restructuring attorney, you have no particular

22  expertise in finance?

23  A    Well, I've been either a litigator or a regulator, a

24  banking regulator, at FDIC, RTC, or an investigator when I

25  handled the Whitewater investigation on behalf of the RTC for

1   six years.  Whatever that amounts to is what it amounts to.

2   Q   Okay.

3   A   But are you saying do I have any particularized degrees

4   or certifications?

5   Q   I'm asking if you could answer my question, Mr. Orr,

6   because --

7   A   Sure.

8   Q   -- I really don't believe you did, and it was -- the

9   question was simply whether it's fair to say that other than

10  being a bankruptcy and restructuring attorney, you have no

11  particular expertise in finance?

12  A   That's a broad question, but I'll grant you this.  That's

13  what I've been throughout the balance of my career.

14          THE COURT:  Excuse me one second.  I need you to

15  move back from the microphone just a bit.

16          MR. ULLMAN:  Okay.

17          THE COURT:  Maybe not that much.

18          MR. ULLMAN:  Okay.

19          THE COURT:  Go ahead.

20  BY MR. ULLMAN:

21  Q   Okay.  So is the simple answer to my question "yes," that

22  what I said is true?  That would be a fair statement?

23  A   If that's your characterization -- and I don't mean to

24  joust with you, Mr. Ullman, but I think that accomplishes a

25  number of things, but to move forward, I'll say your question

1   a fair representation.

2   Q    Thank you.  Let's go back to your time at Jones Day.

3   Now, you indicated you were there as of 2012.  Yes?

4   A    Yes.

5   Q    Okay.  And Jones Day, of course, is the restructuring and

6   bankruptcy counsel to the city, of course; right?

7   A    Yes.

8   Q    And we know that Jones Day got that work following a

9   pitch that it made to various representatives of the city and

10  the State of Michigan in January 2013; is that right?

11  A    That is correct.

12  Q    And you were part of the Jones Day pitch team at that

13  time?

14  A    Yes, I was.

15  Q    And is it correct that one of the things that Jones Day

16  was pitching at that meeting, at that presentation was its

17  expertise and experience in municipal bankruptcy work?

18  A    I think that's a fair statement.

19  Q    And Jones Day prepared a pitch book, did it not?

20  A    Yes, we did.

21          MR. ULLMAN:  Can we put Exhibit 418 on the screen,

22  which is the common exhibit 418?

23  BY MR. ULLMAN:

24  Q    And what we have here is the cover of that pitch book;

25  correct?

1   A    I believe so.

2   Q    And you were engaged in -- or you participated and took

3   part in the preparation of this pitch book; right?

4   A    Yes, to some degree.

5   Q    And among other things, this pitch book laid out Jones

6   Day's thoughts and insights on subjects, including municipal

7   bankruptcy; is that right?

8   A    Yes, I believe so.

9   Q    Okay.  And it also addressed issues relating to the

10  appointment of an emergency manager; is that true?

11  A    Yes, I believe it did.

12  Q    Okay.  And is it correct that the thoughts and insights

13  prepared by the Jones Day pitch team and addressed in this

14  pitch book included the possibility of a Chapter 9 bankruptcy

15  filing made by the emergency manager?

16  A    Yes, I believe it did.

17  Q    Okay.  And is it also the case that the Jones Day

18  thoughts and insights specifically included using the

19  backdrop of a bankruptcy filing, a Chapter 9 filing, as a

20  tool for gaining leverage with creditors?

21  A    I think it certainly contained -- if you're talking about

22  the presentation, it certainly contained the potential pros

23  and cons of Chapter 9, yes.

24  Q    Okay.

25          MR. ULLMAN:  And could we put up page 15?

1   BY MR. ULLMAN:

2   Q   Okay.  And so there's no question that it talked about

3   that specifically.  This is page 15.  The heading you see is

4   "Impact of Possible Emergency Manager Appointment."  Do you

5   see that?

6   A   Yes.  Thank you for putting up the page.  If that's what

7   you're talking about, that's what it says.

8   Q   And the third bullet talks about the ability to commence

9   a Chapter 9 filing quickly if warranted?

10  A   If warranted, yes.

11  Q   And the next bullet point talks about how that can create

12  negotiating leverage, as they phrased it here, negotiating

13  with the backdrop of bankruptcy; is that right?

14  A   Yes.

15  Q   Okay.  And that's one of the points that the Jones Day

16  team was making to the city and the state at this January

17  presentation; correct?

18  A   Yes.  That's a point I echoed during my June 10th

19  presentation.

20  Q   Okay.  And the Jones Day team also referred to this as,

21  quote, "negotiating in the shadow of Chapter 9."  Is that

22  another phrase that you recall being used?

23  A   It may have been used.  This says "negotiating with the

24  backdrop of bankruptcy," but "shadow," "backdrop,"

25  essentially the same.

1  Q   Okay.  And if we turn to page 17 of this presentation, we

2  see right down there in the arrows that are following the

3  third bullet, "negotiating in the shadow of Chapter 9";

4  right?

5  A   Yes.  It's essentially the same.

6  Q   That's spelled out expressly, isn't it?

7  A   Yes.  Shadow, backdrop.

8  Q   And is it fair to say that Jones Day was recommending the

9  use of Chapter 9 as a threat in dealing with creditors?

10  A   Your question implicates a threat.  We will stand by --

11  or, rather, we were trying to say here that this was an

12  alternative, as I said at June 10th.

13  Q   Okay.  So you'd rather stand by what's said in the pitch

14  book; is that right?

15  A   Sure.

16  Q   Okay.  Well, let's go to page 18 of the pitch book.

17  Okay.  And I'd like you to focus on the third paragraph, if

18  we can highlight, and it says, "Creditors understand that a

19  troubled municipality has greater leverage in a Chapter 9

20  case.  Accordingly, developing an out-of-court restructuring

21  plan that can later be implemented in Chapter 9, if

22  necessary, can create leverage in favor of a negotiated

23  deal."  It goes on and then says, "This is particularly the

24  case if an emergency manager is appointed because the threat

25  of a Chapter 9 filing -- threat of a Chapter 9 filing,

1    including potential moratorium on payments, will be more

2    tangible and possibly even more imminent."  Did I read that

3    correctly?

4    A    Yes, you did.

5    Q    Okay.  And didn't Jones Day, in fact, say that having a

6    viable threat of Chapter 9 was critical to Detroit's being

7    able to restructure its debt?

8    A    If that's in the document, yes, that's what we said.

9    Q    Okay.  And just so we can confirm whether it is or not,

10   let's look at page 46.  And if we look at the first bullet

11   point right on the top, that's exactly what it says, isn't

12   it?

13   A    Yes.

14   Q    So there's no question this is what Jones Day was telling

15   the city and state in January of 2013?

16   A    Yes.  It's in the document.

17   Q    And is it correct that Jones Day was also specifically

18   recommending Chapter 9 as a way for Detroit to avoid payment

19   of vested pension benefits?

20   A    I believe we were recommending possibly filing a Chapter

21   9 as a way to avoid a number of things, included pension

22   rights.

23   Q    Okay.  And isn't it correct that the Jones Day team

24   specifically told the city that, in their view, Chapter 9

25   could, in fact, be potentially used to get out of accrued

1    financial benefits that were otherwise protected under the

2    Michigan Constitution?

3    A    You mean in the document?

4    Q    The document.

5    A    Yeah, I believe so.

6    Q    And just so we can see whether that's right or not, can

7    we look at page 41?  And, in fact, that language appears

8    there in what I've just highlighted; isn't that right?

9    A    Yes.  I said so.

10   Q    Okay.  Now, is it correct that the reference that we've

11   just seen here that's still on the screen where it says

12   cutting back or compromising the phrase "accrued financial

13   benefits otherwise protected under the Michigan

14   Constitution," that that's referring to accrued financial

15   benefits that are protected under what's known as the pension

16   clause of the Michigan Constitution?

17   A    I believe so.

18   Q    Okay.  And were you aware of the -- and just for clarity,

19   the pension clause is Article IX, Section 24, of the Michigan

20   Constitution?

21   A    I believe that's the appropriate section.

22   Q    Okay.  And were you aware of the pension clause prior to

23   becoming the emergency manager?

24   A    Yes.

25   Q    Okay.  And on becoming emergency manager, you took an

1  oath, didn't you?

2  A   Yes, I did.

3  Q   Okay.  And I'm going to read you something.  I'd like you

4  to tell me whether it's correct that this is the oath you

5  gave.  Quote, "I do solemnly swear that I will support the

6  Constitution of the United States and the Constitution of

7  this state and that I will faithfully discharge the duties of

8  the Office of Emergency Financial Manager, City of Detroit,

9  according to the best of my ability."

10  A   I believe that's the oath I took, yes.

11  Q   And were you speaking truthfully when you gave that oath?

12  A   Yes.

13  Q   And I believe you've previously indicated that you

14  understood that that same oath applied to your conduct as

15  emergency manager as well; is that right?

16  A   I believe so.

17  Q   And I believe you've testified that upon becoming the

18  emergency manager, you set about formulating a restructuring

19  plan -- let me withdraw that.  I guess on becoming emergency

20  manager, you first put together a plan that showed the

21  financial situation of Detroit and also made some

22  observations or recommendations as to what you believe needed

23  to be done; is that right?

24  A   Yes.

25  Q   Okay.  And that's the May 12th document that we looked at

1  earlier.

2  A    The May 12th financial and operating plan.

3  Q    Right.

4         MR. ULLMAN:  And let's put the first page of that on

5  the screen.

6  BY MR. ULLMAN:

7  Q   Okay.  I'm just going to ask you a few questions about

8  this.  If we can go to page 21 -- and just to give the

9  context, I think you've already testified this morning that a

10  lot of this document was spent detailing what you perceived

11  to be the financial situation of Detroit as it stood after

12  you assumed your post as emergency manager; right?

13  A   Yes.  I believe that's correct.

14  Q   Okay.  And is it correct that as part of the initial

15  review that you did, which was -- which culminated in the

16  document that we have on the screen, which is Exhibit 407,

17  that you made a determination that, in your view, accrued

18  rights to pensions -- to pension benefits had to be cut?

19  A   I think it's fair to say that we came to that conclusion,

20  yes.

21  Q   Okay.  And you had come to that as of May 12th, 2013, the

22  date of this operating plan and proposal; is that right?

23  A   I think as of May 12th we made a representation that all

24  stakeholders would have to be adjusted, yes.

25  Q   Okay.  So that we're clear, that at this point in time

1   you had made the determination that, in your view, vested

2   pension benefits of Detroit's retirees had to be cut back; is

3   that right?

4   A    I think that's a fair characterization of what we're

5   saying.

6   Q    Okay.  And at the time that you made that determination,

7   you said you were aware of the pension clause in the Michigan

8   Constitution?

9   A    I think I said -- yes.

10   Q    Okay.  So you were aware at the same time that you made

11   that determination that the pension clause specifically

12   provided against the diminution or impairment of accrued

13   financial benefits?

14   A    Well, that's a conclusion.  I think you'll remember, Mr.

15   Ullman, during my deposition I said that, you know, we might

16   either have concessions or we might have to go Chapter 9, but

17   I think your characterization is fair one way or the other.

18   Q    Let's turn now to the proposal that you made to

19   creditors.  That's the June 14 proposal.

20          MR. ULLMAN:  Let's put the first page on the screen.

21   BY MR. ULLMAN:

22   Q    And this is -- what we have here is common Exhibit 408.

23   It's just a different -- I think you were shown this earlier

24   today.  I think the city used its exhibit number.  We have

25   the same document, just a different exhibit number --

1    Q    Yeah.

2    A    -- but it's the same.

3    A    If you tell me it's the same thing, that's fine.

4    Q    It's the same.  Okay.  Now, this, of course, is the

5    proposal that you made to creditors in June -- on June 14,

6    2013.

7    A    Yes.

8    Q    And I believe it states expressly in here that, in your

9    view, there have to be significant cuts to vested pensions;

10   is that right?

11   A    I believe so.

12   Q    Okay.  And just so we can see that, if we look at page

13   109 -- right -- we see the phrase that there must be

14   significant cuts in accrued vested pension amounts for both

15   active and currently retired persons; correct?

16   A    Yes.

17   Q    Okay.  And is it correct that under this proposal, it

18   shows current employees being switched to a defined

19   contribution plan?

20   A    That was our suggestion, yes.

21   Q    Okay.  And that would be a totally new plan from the one

22   that had been in effect up to this point in time; is that

23   right?

24   A    We would be going from a defined benefit plan to a new

25   defined contribution plan, yes.

1  Q   And is it correct that under the June 14 proposal there
2  would be some ongoing pension contributions for active
3  employees under the new defined contribution plan but no
4  pension contributions for active employees on account of
5  pension benefits that were already vested?
6  A   I think so.  In other words, you're talking about closing
7  the plan --
8  Q   Yeah.
9  A   -- the current plan?  Yes.
10 Q   Okay.  So for the vested pension benefits, the
11 contributions for those would be cut entirely for actives; is
12 that right?
13 A   I think the plan would be closed.  I don't know if they'd
14 be cut in the entirety, but what you mean -- there would be
15 benefits under the existing plan that would continue to be
16 paid out in some portion.
17 Q   Well, what I meant is that under this proposal, it shows
18 the city not making any more pension contributions for active
19 employees for vested pension rights; is that true?
20 A   Yeah.  I think we switched to a different plan and would
21 make contributions for a defined contribution plan as opposed
22 to defined benefit plan.
23 Q   All right.  And under the defined benefit plan, the
24 vested benefits, no more contributions being made by the
25 city?

1  A   It would be a different plan.  That is correct.

2  Q   And is it correct that under the June 14 proposal the

3  pension contributions for retirees would be cut in their

4  entirety?

5  A   You know, Mr. Ullman, you keep saying "cut in their

6  entirety."  I don't want to give the wrong impression that

7  somehow there'd be no pensions under the prior plan.  When

8  you say "cut in the entirety" --

9  Q   Let me --

10  A   -- if you mean -- let me finish my thought -- if you say

11  "cut in their entirety," you mean that that plan would no

12  longer continue, then your statement is accurate.

13  Q   Well, I think what I was asking about was the pension

14  contributions which are made by the city.  The city would

15  stop making pension contributions for retirees; correct?

16  A   For retirees?

17  Q   For retirees.

18  A   Yes.

19  Q   I've turned -- I'm asking about retirees now.

20  A   Yes.

21  Q   So what I said is true, that the pension contributions

22  that had previously been made by the city on account of

23  retirees are shown under this proposal as being cut in their

24  entirety; right?

25  A   The city would no longer make contributions.  Here again,

1  for purposes of public concession, I don't want to say there

2  are not going to be pensions for retirees.  That's the only

3  difference.

4  Q   Okay.  So we're clear, I am not saying that there would

5  not be some ongoing pension amounts paid because of funds

6  that were already there.  I'm talking about contributions for

7  vested pensions being made by the city.  Under this proposal,

8  those are over; right?

9  A   With that clarification, yes.

10  Q   Okay.  And is it also correct that this proposal is

11  showing health benefits for retirees being cut entirely; in

12  other words, under the financials that are shown in this

13  proposal, there's no more line item showing that the city is

14  going to be paying out health benefits for retirees?

15  A   Well, it shows that the current benefit plan will be cut.

16  There will be payments made to some retirees with a stipend,

17  either 120 or $125 a month, but that plan will be cut, yes.

18  Q   Okay.  I was asking specifically about this document.  Is

19  there anything in this document that shows anything other

20  than the health benefit payments to retirees being cut?

21  A   No, but I want to be clear on the record and also clear

22  for the public.  The fact that it's not in this document

23  doesn't mean that that hasn't evolved, so let's not give a

24  bad impression.

25  Q   Mr. Orr --

1   A   The reality -- let me finish my thought.  The reality is

2   your statement is correct under this plan, but that has

3   evolved, and you know that.

4   Q   Mr. Orr, I would request that you confine your answer to

5   asking -- your answer to responding directly to my

6   question --

7   A   Um-hmm.

8   Q   -- as opposed to volunteering information or providing

9   extraneous information.

10          MR. ULLMAN:  Your Honor, if you could ask the

11  witness simply to respond, things would go more quickly.

12          THE COURT:  Please just respond to the question.

13          THE WITNESS:  Yes, your Honor.

14          MR. ULLMAN:  Thank you, your Honor.

15  BY MR. ULLMAN:

16  Q   So my question was that what's shown in this June 14

17  proposal shows healthcare payments that otherwise or in the

18  past had been made by the city to retirees being cut

19  completely; true?

20  A   Yes.  We would close a defined plan and change to a

21  different plan, yes.

22  Q   We're talking about healthcare.

23  A   Yeah, I understand.

24  Q   Okay.

25  A   I'm just saying -- I'm using those terms, yes.

1  Q   And so we're really clear, does this -- this specific

2  document, this June 14 proposal, actually show the city in

3  the future making any payments to retirees on account of

4  healthcare?

5  A   I don't believe it's contained in this document.

6  Q   Thank you.  And is it correct that under this proposal,

7  the June 14 proposal, that all the retirees would get is some

8  share of the notes that the -- the $2 billion or so in notes

9  that the City of Detroit would be issuing?

10  A   Yes.   That was the proposal.

11  Q   And is it correct that under the June 14 proposal,

12  there's no way to tell how much in cash value any retiree

13  would actually get if this proposal were accepted or

14  otherwise went through?

15  A   No.  The proposal was a proposal, and we asked for

16  responses, so, no --

17  Q   Again --

18  A   -- in the proposal there's no way to tell.

19  Q   Yeah.  If you could just answer the question, Mr. Orr,

20  I'd appreciate it.

21  A   I was doing that.  Under the proposal the answer is yes.

22  Q   Okay.  "Yes" in the sense that there is no way that

23  anyone would know -- there's no way to tell how much the

24  retirees would get in cash value; is that correct?

25  A   I think that's fair.

1  Q   Okay.  Now, this is June of 2013 that we're talking,

2  right, this proposal?

3  A   Yes, June 14th, 2013.

4  Q   And at this point in time, did you have any ability as

5  the emergency manager to actually impose the cuts on pension

6  benefits that we've shown are reflected in this proposal if

7  the retirees did not agree to it?

8  A   Unilaterally?

9  Q   Yes.

10  A   I want to be responsive.  I think it's fair to say --

11        THE COURT:  If you can't answer the question "yes"

12  or "no," just say that.

13        THE WITNESS:  Okay.  Please repeat your question.

14  BY MR. ULLMAN:

15  Q   As of this point in time -- and we're talking June 14,

16  June 2013 -- did you have any ability as the emergency

17  manager to actually impose the cuts on pension benefits that

18  are reflected in this proposal that we've discussed if the

19  retirees did not agree to it?

20        THE WITNESS:  Your Honor, that may call for a legal

21  conclusion, and I don't want to be evasive.

22        MR. ULLMAN:  I'm not --

23        THE WITNESS:  Pardon me.

24        MR. ULLMAN:  I'm not asking for his legal

25  conclusion.  I asked him what he believed, what he understood

1   his authority to be as emergency manager.

2           THE WITNESS:  Let me say this, Mr. Ullman.  I

3   believe that my authority under 436 by itself would not give

4   me that authority.

5   BY MR. ULLMAN:

6   Q   Is the answer to my question then "no"?  It's not that

7   tough.

8   A   No, it's not, but it implicates other things, but I'll

9   give a "no" --

10          THE COURT:  Well, I would say it's an extremely

11  tough question.

12          THE WITNESS:  Yeah.  I mean it --

13          MR. ULLMAN:  I never argue with the Court, your

14  Honor.

15          THE COURT:  I've got mountains of briefs to prove

16  it.

17          THE WITNESS:  Yeah.

18  BY MR. ULLMAN:

19  Q   But, again, Mr. Orr, we're just talking as of June 2013.

20  A   I understand the time frame we're talking, Mr. Ullman,

21  but the reason I'm -- I'm not trying to joust with you here.

22  The reason I'm trying to not follow your question with a

23  simple "yes" or "no" answer is because that's a large debate

24  as to what's required under 436, whether or not the

25  provisions of 436 somehow can be trumped or implicated by the

1  Constitution, and whether or not there's a federal law

2  overlay, so I want to be very careful.  I understand what

3  you're trying to ask me --

4  Q    Let me --

5  A    -- but -- let me finish my thought, please.  I understand

6  what you're trying to ask me, but I'm trying to relay to you

7  that it's a much more complex question.

8  Q    Okay.  And I'm specifically asking as of the June 2013

9  time frame because at this point in time the Chapter 9

10  petition had not been filed.

11  A    Yes.

12  Q    Okay.  So at this point in time, when the Chapter 9

13  petition had not yet been filed, did you have the ability, as

14  you understood it, as emergency manager, to actually impose

15  the cuts on the pension benefits that are reflected in this

16  proposal if the retirees did not agree to it?

17  A    I don't know.

18         MR. SHUMAKER:  I'm going to object.  Calls for a

19  legal conclusion.

20         THE COURT:  That objection is overruled.

21         THE WITNESS:  Yeah.  I don't know.

22  BY MR. ULLMAN:

23  Q    And did you address that question?  Did you analyze it?

24  A    Yes.

25  Q    Okay.  And did you take into account in your analysis the

1  pension clause?

2  A   Yes.

3  Q   Okay.  And isn't it correct that you understood that as

4  of June '13, again, prior to the Chapter 9 filing, that you,

5  as emergency manager, during that time frame, did not have

6  the ability to actually impose the cuts on pension benefits

7  if the retirees didn't agree?

8  A   I don't know.

9  Q   Okay.  Did you obtain legal advice on that from Jones

10 Day?

11 A   Yes, from a number of different sources, yes.

12 Q   Okay.  And what did Jones Day tell you?

13      MR. SHUMAKER:  Objection, your Honor.  Calls for

14 attorney-client communications.

15      MR. ULLMAN:  Fair enough.

16      THE COURT:  All right.  The objection is sustained.

17 BY MR. ULLMAN:

18 Q   Isn't it correct, Mr. Orr, that absent a consensual

19 resolution, the only way that the proposal set out in the

20 June 14 document could be implemented, if at all, was in the

21 context of a Chapter 9 filing?

22 A   No.  I don't know if that's correct.

23 Q   Okay.  And what other avenues did you think were

24 available to you, if any, again, putting aside a consensual

25 resolution or a Chapter 9 filing?

1   A   A court might conclude that under 436 I would have the

2   authority to achieve those results.

3   Q   Okay.  So was it your contention that under PA 436 you

4   were authorized without a Chapter 9 filing to take actions

5   that were in contravention of the pension clause of the

6   Michigan state Constitution?

7   A   Mr. Ullman, you're trying to get at this a different way.

8   Here again, there are a number of different potential legal

9   outcomes, and I want to be very careful.  Let me help you, if

10  I can, to try to move along.  Okay.  A bland reading of the

11  statute might get to your conclusion, but that ignores a

12  number of different factors that have to be analyzed and

13  concluded possibly by a court.

14  Q   I'm just asking your position, Mr. Orr.  Was it your

15  position, again, in the June 2013 time frame, that you had

16  some -- that the authorization that you had, the powers you

17  had under PA 436 enabled you to take actions that were in

18  contravention of the pension clause of the Michigan state

19  Constitution?

20  A   It's my position that 436 might have given me that

21  authority.

22  Q   Okay.  And is it -- was it your position that the state

23  legislature could amend the state Constitution simply by

24  enacting legislature -- or legislation that authorized state

25  actors to do things in contravention of the pension clause?

1   A    I don't know the answer to that question, Mr. Ullman.

2   That's a legal issue.

3   Q    Okay.  Now, nothing in -- but it was, nonetheless, your

4   position that you thought you could do things that were

5   specifically prohibited by the pension clause of the Michigan

6   Constitution; is that right?

7   A    That's a conclusion that you're making.  What I'm trying

8   to say to you is those were a number of legal issues that

9   were being analyzed, and sitting here today, I don't know

10  what the exact answer is.

11  Q    Okay.  Now, nothing in this document, this June 14

12  proposal, acknowledges -- well, let me ask you this question.

13  In the course of your analysis on that issue, did you

14  identify any case law that indicated to you that the

15  emergency manager had powers under PA 436 to take actions

16  that were prohibited by the Michigan Constitution?

17  A    Mr. Ullman, I'm not acting as an attorney in this job,

18  so, no, I did not identify any case law.

19  Q    Okay.  Is there any other authority that you can identify

20  that you recall having looked at?

21  A    Without getting into the content of the discussions,

22  there are discussions that I had with attorneys, but I would

23  not have done that research.

24  Q    Okay.  So I take it then at this point in time, the

25  implications and the restrictions of the pension clause in

1  the Michigan Constitution were something that you were

2  specifically focused on; is that right?

3  A   I was aware of it, yes.

4  Q   And you were aware that that was something that,

5  depending on how things ultimately turned out, could be

6  interpreted to prohibit your taking action that diminished or

7  impaired accrued financial benefits that were due to

8  retirees?

9  A   Yes.  I think that's a fair statement.

10 Q   Now, there's nothing -- going back to the June 14

11 proposal, is there -- we've talked about the effect that the

12 restructuring that's shown in here would have on the

13 pensions.  Is there anything in this June 14 proposal that

14 acknowledges that accrued pension benefits are protected

15 under the Michigan state Constitution?

16 A   I don't think so.

17 Q   Okay.  Now, I think you made some reference in your

18 testimony to how potentially there could be, you know,

19 thousands of individual retirees that might be affected by

20 this?

21 A   I think there are thousands of individual retirees.

22 Q   And you said that in theory -- at least in theory they

23 could come and make proposals or talk to you about this June

24 14 proposal; is that right?

25 A   Well, what we said was any party could come and make a

1   proposal, but we asked the unions early on would they

2   represent retirees.  They declined to do so, and so we said

3   we needed a Retiree Committee.

4   Q   Mr. Orr, you're really going well beyond what I asked

5   you, so I would just appreciate if you'd focus on my question

6   and answer it.  If you think my question is confusing, let me

7   know, and I'll be glad to rephrase it.

8   A   No.  I'm just trying to give you a complete answer.

9   Q   Okay.  And I just -- I would appreciate if you'd give me

10  an answer to the direct question.

11  A   I will.

12  Q   So, now, with respect to the retirees, you understood

13  that this was a document the retirees themselves,

14  individuals, might well have access to and look at?

15  A   We put it on the website, yes.

16  Q   Okay.  And you understand that retirees -- individual

17  retirees are not necessarily fully aware of all of the legal

18  provisions that exist in the State of Michigan?

19  A   Some may be; some may not be.

20  Q   Okay.  And given that you envisioned that this document

21  might be read by individual retirees, you still didn't see

22  fit anywhere in here to mention that one of the things this

23  proposal was doing, if it went through, is taking away

24  pension rights that were protected under the Michigan

25  Constitution?

1  A   I think we made a proposal and were offering solutions.

2  The proposal is what it is.

3  Q   Um-hmm.

4  A   I think the issue of retiree benefits had been fairly

5  widely discussed in a number of different forums.

6  Q   Um-hmm.

7  A   I think anybody could have come in with a

8  counterproposal.

9  Q   Okay.  And so in the interest of complete disclosure and

10  putting all the things on the table, you still didn't feel it

11  either necessary or appropriate to mention anywhere in

12  this -- is it a hundred-some-odd-page document that one of

13  the things that the proposal was proposing to take away were

14  pension rights that were specifically protected under the

15  Michigan Constitution?

16  A   I think we said that in the highlighted portion.

17  Q   That the pension rights were protected under the Michigan

18  Constitution?

19  A   No.  I think there must be significant cuts in accrued

20  vested pension rights.

21  Q   That wasn't my question.

22  A   If you're trying to get to the point as whether or not we

23  should have -- we should have said Michigan Constitution, I

24  think that was discussed quite broadly throughout this time

25  period.

1　Q　You're really still not answering my question, Mr. Orr.

2　Given the fact that in this document, this some -- hundred-

3　some-odd-page document that you said could be, you know, seen

4　and reviewed by retirees, and given that this document -- the

5　proposal, if it went through, would be taking away protected

6　pension benefits, you didn't see fit anywhere in here to

7　mention at all, even in passing, that the pension rights that

8　this proposal shows as being cut in their entirety were

9　specifically protected under the Michigan Constitution?

10　A　The protections of the Michigan Constitution are not

11　contained in this document.

12　Q　And you didn't think that's something that ought to be

13　mentioned, did you?

14　A　I think everybody knew that, Mr. Ullman.

15　Q　Okay.　So you didn't believe that that was something you

16　thought you needed or felt appropriate to mention in this

17　document; correct?

18　A　Mr. Ullman, it was quite public at that time that the

19　attorney general had taken a position on that point.　I think

20　everybody was aware of it.

21　Q　Okay.　And in light of that, is that the only reason you

22　didn't see fit to mention it?

23　A　No.　I think we mentioned what our proposal was, and

24　whether or not the intent to include the Constitution was a

25　decision that we made.

1    Q   Now, Chapter 9 isn't mentioned anywhere in this June 14

2    proposal either, is it?

3    A   I don't believe so.

4    Q   And isn't it correct that this proposal was made against

5    the context that if an agreement on the proposal wasn't

6    reached, the city would, in fact, be filing for Chapter 9?

7    A   I think I said on June 10th that I had a powerful

8    statute; that we have another powerful tool called Chapter 9,

9    but I don't want to use it, but we're going to have to make

10   some difficult decisions.

11   Q   So to go back to my question, is it correct that this

12   proposal was made against the context that if agreement on

13   the proposal wasn't reached, the city would file for Chapter

14   9?

15   A   No.

16   Q   Okay.

17   A   What we said was that the proposal was a proposal, and we

18   were looking for counteroffers and that we were going to have

19   to make some evaluations within the next 30 days; if we had

20   received agreements in principle and the like, we perhaps

21   might extend that, but the proposal does not say that if we

22   don't receive those agreements, we're going to file Chapter

23   9.

24   Q   Well, hadn't you publicly stated around this time that

25   the June 14 proposal -- around the time the June 14 proposal

1  was made that you intended to try to use Chapter 9 to try to

2  trump the state Constitution?

3  A   I think what I said at that time was that we had powerful

4  tools, as I said before on June 10th.  Chapter 9 was one of

5  them, but I didn't want to use it.

6  Q   Okay.  And didn't you state that one of the -- that the

7  state Constitution provision that you were trying to trump

8  was the pension clause?

9  A   I think I may have said at some point, either that time

10  or before, that I felt federal law would trump state law.

11  Q   Yeah.  Do you remember at your deposition I asked you

12  some questions about an interview you gave on June 14?

13  A   Yes, I believe you did.

14  Q   Okay.

15  A   I don't remember exact -- if you want to refresh my

16  recollection.

17  Q   Were you testifying truthfully when you gave your

18  testimony?

19  A   Yes.

20  Q   Okay.  And do you recall giving the following testimony

21  when I deposed you about one of the -- some of the things you

22  said on June 14?

23         MR. ULLMAN:  Do we have the clip?  It's around lines

24  113.

25         (Videotape of deposition at 11:19 a.m. as follows:)

1    BY MR. ULLMAN:

2              "You gave an interview that I'm sure you're

3         familiar with with the _Detroit Free Press_ on or

4         around June 14th.  Do you remember?  I'll just tell

5         you what I believe you said, and you can tell me --

6         I'm sure you remember this one, and you can tell

7         me -- if not, I have the quote.

8         Yeah.  You can give me the quote.  There's so

9         many interviews, but I'll trust your quote.

10        Okay.  This is the quotation.

11        'Question:  You said in this report, referring

12        to the June 14th proposal, that you don't believe

13        there is an obligation under our state Constitution

14        to pay pensions if the city can't afford it.

15        Answer:  The reason we said it that way is to

16        quantify the bankruptcy question.  We think federal

17        supremacy trumps state law.'

18        Yes.

19        Okay.  You don't deny making that statement?

20        No.  I think I've said that several times.

21        Okay.  And the state law you were referring to

22        that you referred to as being trumped was Article

23        IX, Section 24, of the state Constitution; is that

24        right?

25        I believe so."

1     (Videotape concluded at 11:20 a.m.)

2  Q   Do you recall that testimony, Mr. Orr?

3  A   Yes, I do.

4  Q   Now, we're talking here -- this is June 14, the date of

5  your proposal.  Now, can you tell me -- refresh my

6  recollection.  I think you mentioned, but when exactly was it

7  that you had given your oath to uphold the Michigan

8  Constitution?

9  A   I think it was March 25th.

10  Q   Okay.  So that was within 90 days of June 14th; is that

11  right?

12  A   Yes.

13  Q   Now, prior to the June 14 proposal, did you make any

14  inquiries as to the size of the unfunded pension liability?

15  A   Yeah, I believe we did.

16  Q   Okay.  And who did you ask?

17  A   I believe I asked our consultants, principally Conway,

18  Ernst & Young, the entire crowd.

19  Q   Okay.  And who from Conway?

20  A   There are a number of people from Conway.  That team is

21  led by Chuck Moore, but I may have talked with Chris Gannon

22  and others.  We had regular conversations.

23  Q   Okay.  And the amount of the -- the size of the unfunded

24  pension liability isn't something that you have any personal

25  knowledge of, is it?

1  A   No.  Those calculations are made both by Gabriel, Roeder

2  and Milliman's review of Gabriel, Roeder's information, and

3  since Milliman has made an independent calculation.

4  Q   Okay.  Mr. Orr -- and I believe my question really called

5  for a "yes" or "no."  I simply asked whether the unfunded

6  pension liability was something you had personal knowledge

7  of.

8  A   Okay.

9       MR. SHUMAKER:  Again, your Honor, if he --

10       THE WITNESS:  Well --

11       MR. SHUMAKER:  -- could just say "yes" or "no" where

12  appropriate.

13       THE WITNESS:  But to the extent I've read the

14  reports, I have personal knowledge.

15       THE COURT:  Hold on.  I've been --

16       THE WITNESS:  Oh, I'm sorry.

17       THE COURT:  I've been asked to do something here.

18  The question is ambiguous, and I'm going to ask you to

19  rephrase it.

20       MR. ULLMAN:  Okay.

21  BY MR. ULLMAN:

22  Q   Did you have personal knowledge, based on work that you

23  yourself had done, analysis you yourself had done, as to the

24  size of the unfunded pension liability?

25  A   No.

1  Q   And, now, you indicated that you made inquiries as to the

2  size of the unfunded pension liability prior to making the

3  June 14 proposal; right?

4  A   Yes, I believe so.

5  Q   Okay.  And was there any further work on the actuarial

6  analysis that you recall being brought to your attention

7  between June 14th and the date of the Chapter 9 filing?

8  A   Yes.

9  Q   And what was the subsequent work that you recall being

10  done?

11  A   I don't remember the exact dates, but the basic

12  chronology was that Gabriel, Roeder, as part of the 2012

13  report, had done an analysis; that Milliman had done an

14  analysis of Gabriel, Roeder's work, and that Milliman either

15  was in the process of doing its own independent analysis or

16  had completed that.

17  Q   Okay.  Do you recall -- do you recall hearing a figure

18  for the unfunded pension liability of 3.5 billion at any

19  point in time?

20  A   Yes.

21  Q   When do you recall first hearing that?

22  A   I don't recall the exact date that I first heard that,

23  but I remember we had discussions in May, I believe.

24  Q   I'm sorry.

25  A   In May.

1  Q    In May.  Okay.  And was that prior to the filing of the

2  May 12th report that we looked at previously?

3  A    Yes, I believe so.

4  Q    Okay.  And as of May then -- that May report, based on

5  what you were told, did you believe that the 3.5 billion was

6  an accurate figure for the unfunded pension liability?

7  A    Yes.

8  Q    And did anything change on that between May and June 14?

9  A    No, I don't think so.

10 Q    Okay.  And did you -- did what you wrote in the May 12th

11 report accurately reflect the state of your knowledge as of

12 that date regarding the size of the unfunded pension

13 liability?

14 A    Yes.

15 Q    Okay.  So if we can turn back to Exhibit 407 -- okay.

16 Now, do you recall at the time that this proposal -- or this

17 report was written, do you recall whether this 3.5 billion

18 figure was being reported to you as something that was

19 preliminary in nature and not yet final or something that was

20 hard-fast and accurate?

21 A    I think we felt at this time that that was an accurate

22 analysis of the amount of the unfunded pension liability, but

23 we certainly had said throughout that time that there were

24 factors that went into that calculation that would be subject

25 to discussion.

1  Q    Um-hmm.  So at this point in time, was it your

2  understanding that as a fact the liability -- the unfunded

3  liability was $3.5 billion and has been determined to be that

4  figure by the Milliman actuarial firm?

5  A    Yes.  Based upon reasonable calculations, yes.

6  Q    Okay.  So if we look at page 3 of this document -- okay.

7  In the first full paragraph I'd like you to focus on the last

8  sentence.

9  A    Yes.

10 Q    Okay.  It goes on.  It says, "In addition, the city's

11 pensions are underfunded by at least 0.6 billion and perhaps

12 significantly more once appropriate actuarial assumptions and

13 current data are considered."

14 A    Yes.

15 Q    Was that an accurate reflection of the state of how you

16 understood things to be regarding the unfunded pension

17 liability as of the date this document was written?

18 A    Yes.  I think at that time we thought it was at least 600

19 million but probably more once you consider certain factors.

20 Q    Okay.  And, in fact, this one says "perhaps significantly

21 more"; correct?

22 A    Yes.  As I said, I don't remember the exact dates that we

23 were getting the calculations in, but we were looking over

24 the reports that had been made by Gabriel, Roeder and doing

25 our own analysis.

1  Q   Um-hmm.  And if we look at page 37 -- okay.  And if we

2  look at the top paragraph, there's a sentence that begins,

3  "As of June 30."  Do you see that?  We can pull that out,

4  just the "As of June 30" sentence.

5  A   Yes.

6  Q   All right.  And what that says is, "As of June, 30, 2011,

7  the most recent actuarial reports provided to the city by the

8  pension funds showed the pension UAAL" -- that's unfunded

9  actuarially accrued liabilities; right?

10  A   Yes.  And to be accurate, I think you have to read the

11  sentence right after that as well.

12  Q   I haven't -- I'm planning to.

13  A   Good.

14  Q   I just wanted to clarify what UAAL meant.

15  A   Yes.  That's what it means.

16  Q   Okay.  So it says the -- it showed the pension UAAL at

17  646 million.  Then it continues -- and please highlight the

18  next sentence as well -- "Using more current data and/or more

19  conservative assumptions could cause that deficiency to rise

20  into the billions of dollars."  You see that?

21  A   Yes.

22  Q   And does that also accurately reflect the state of your

23  knowledge as of the date that Exhibit 407 was prepared, which

24  is May 2003 (sic)?

25  A   Yes.  As I said before, I don't understand -- I don't

1    remember the specific dates that we were receiving data from

2    Milliman based upon Gabriel, Roeder or Milliman by itself,

3    but I think this is a fair characterization because that work

4    was ongoing.

5  Q    Okay.  And did -- what is --

6              MR. ULLMAN:  By the way, I would like to move to

7    strike everything in his last answer after the word "yes,"

8    your Honor, because I think --

9              THE COURT:  Any objections?

10             MR. SHUMAKER:  Your Honor, I think he was clarifying

11   his answer.

12             THE COURT:  The motion is granted.  If you are

13   unable, Mr. Orr, to answer a question "yes" or "no," please

14   say that.

15             THE WITNESS:  Okay.

16             THE COURT:  Otherwise, if it's a yes/no question,

17   just answer "yes" or "no" or "I don't know."

18             THE WITNESS:  Yes, your Honor.

19             THE COURT:  All right.  We're going to take our

20   break now for lunch, but before we do, please, I have to ask

21   you a question about your line of questioning of the witness

22   regarding the Michigan Constitution.  Is it your position

23   that the Michigan Constitution prohibits a city from even

24   asking its retirees to negotiate its retirement benefits in

25   such a way that might work an impairment?

1          MR. ULLMAN:  Subject to what my co-counsel says, no.

2    I don't --

3          THE COURT:  The answer to that question is no?

4          MR. ULLMAN:  No.  If they can ask?

5          THE COURT:  All right.

6          MR. ULLMAN:  No.

7          THE COURT:  We will break for lunch now.  We are

8    going to remain in place for a few moments so that Mr. Orr

9    can make his exit, and then we'll all go, so we'll be in

10   recess now, and you may go, sir.

11         THE WITNESS:  Thank you, your Honor.

12         THE CLERK:  All rise.  Court is in recess.

13      (Recess at 11:30 a.m. until 1:00 p.m.)

14         THE CLERK:  All rise.  Court is in session.  Please

15   be seated.  Case Number 13-53846, City of Detroit, Michigan.

16         THE COURT:  All right.  It appears that everyone is

17   here.  Sir, would you please stand and raise your right hand?

18            GOVERNOR RICK SNYDER, WITNESS, SWORN

19         THE COURT:  Please sit down.  And just so the record

20   is clear, we are interrupting the city's case to allow the

21   objecting parties to call this witness.

22         MR. WERTHEIMER:  Yes, your Honor.

23         THE COURT:  And you may proceed, sir.

24         MR. WERTHEIMER:  Thank you.  William Wertheimer,

25   your Honor, appearing on behalf of the Flowers plaintiffs.

1   Your Honor, before I begin questioning the governor, I would
2   request permission of the Court to examine him under Federal
3   Rule of Evidence 611(c)(2) -- that is, to ask leading
4   questions -- as I believe he is clearly a party -- a
5   witness -- excuse me -- a witness identified with an adverse
6   party.
7               THE COURT:  Any objections?
8               MR. SCHNEIDER:  No objections.
9               MR. SHUMAKER:  No objections, your Honor.
10              THE COURT:  All right.  Your motion is granted, sir.
11                      DIRECT EXAMINATION
12  BY MR. WERTHEIMER:
13  Q   Good afternoon, Governor.
14  A   Good afternoon.
15  Q   Thank you for appearing here this afternoon.  You are
16  appearing here pursuant to a subpoena that was issued by the
17  UAW, are you not?
18  A   I believe so.
19  Q   When were you elected governor?
20  A   January 1st, 2011.
21  Q   And when were you sworn in as governor?
22  A   Oh, I'm sorry.  I was sworn in January 1st, 2011.
23  Q   Okay.
24  A   I was actually elected in November of 2010.
25  Q   Okay.  And I've got in front of me the oath that I think

1  you swore.  I'm going to read it to you and ask you if you

2  recall swearing to that oath.  "I do solemnly swear that I

3  will support the constitution of the United States and the

4  constitution of this state, and that I will faithfully

5  discharge the duties of the office of governor according to

6  the best of my ability."  Do you recall that as being the

7  oath you swore to?

8  A   Yes.

9  Q   Did you know anything about Article IX, Section 24, of

10  the Constitution, the one that we've now all heard so much

11  about, relating to pension benefits of municipal employees at

12  the time you were sworn in as governor?

13  A   Yes.

14  Q   Do you have an understanding, Governor, as to how a

15  constitutional provision like that could be amended just

16  generally?  It's not a civics lesson, but -- and I'm --

17  A   Yes.

18  Q   Just generally.  Would you tell us?

19  A   Yeah.  It could go to a vote of the people.  It could be

20  an item that would be proposed as an amendment to the

21  Constitution and changed that way.  It could be put on the

22  ballot either by petition or by vote of the legislature.

23  Q   But you would agree with me that you do not have the

24  power to amend the state Constitution?

25  A   That's correct.

1  Q   Would it be fair to say, Governor, that at your

2  deposition and actually for some time before then, you have

3  taken the position publicly and at your deposition that while

4  you've been supportive of -- you've been supportive of

5  improved services for the citizens of the City of Detroit,

6  you have not been supportive of the notion of the repayment

7  of debts of the city, including any debt created by the

8  pension; is that correct?

9  A   Yes.

10  Q   And have you taken that position throughout your time as

11  governor?

12  A   Yes.

13  Q   And you've done so publicly?

14  A   Yes.

15  Q   Have you told Mr. Orr that that's your position in one

16  way, shape, or form?  In other words, does he know that

17  that's your position?

18  A   I couldn't speak to him -- I couldn't speak to his

19  presumption, but I had publicly made those statements.

20  Q   Did you ever make them in the presence of Mr. Orr?

21  A   I don't recall.

22  Q   How many times have you met with Mr. Orr since he became

23  emergency manager either one on one or in groups?

24  A   I would have to speculate.  It would be a reasonably

25  significant number.

1    Q   Well, let's try it this way.  How often -- from the time

2    he became emergency manager, how often would you regularly

3    see him?  Every week or two, every month?  Can you

4    characterize it like that?

5    A   Yeah.  Typically weekly.

6    Q   Weekly.

7    A   In terms of not necessarily in person but on the phone or

8    in person.

9    Q   Either on the phone or in person weekly?

10   A   Yes.

11   Q   Okay.  In any of those conversations, did the subject

12   come up of your position being that you did not want the

13   state to be obligated to pay any of the pension benefits at

14   issue in this case?

15   A   That would be a different question than my other

16   statements in the sense that I view that as a legal matter in

17   terms of if the court was deciding that we had a

18   constitutional obligation, then we would pay it.

19   Q   My question, Governor, was whether you had ever

20   communicated that to Mr. Orr in any of these meetings that

21   you've had with him weekly since he became emergency manager.

22   A   Those meetings would have had our legal counsel present,

23   where I was asking for their advice on topics such as that.

24   Q   So do I take that to mean that you're asserting the

25   attorney-client privilege as to that question?

1          MR. SCHNEIDER:  And I'm objecting on the grounds

2     that this question might implicate the attorney-client

3     privilege.

4          MR. SHUMAKER:  The city joins the objection.

5          THE COURT:  Well, no.  I think the witness can

6     testify to what he told Mr. Orr on this question.  Did you

7     ever tell Mr. Orr what your position was on whether the State

8     of Michigan has an obligation to pay the city's pension

9     obligations?

10          THE WITNESS:  What I told him was is I viewed that

11     as a legal question that I thought best left to the courts to

12     decide because anything else on my part would have been

13     speculative in the fact if I had an opinion, it would get

14     reviewed anyway, and I would rather have the most competent

15     people make that decision to start with.

16     BY MR. WERTHEIMER:

17     Q    Fair enough.  While we're on the issue of your

18     conversations with Mr. Orr during the period that he was

19     emergency manager, these weekly or so conversations, at your

20     deposition you refused to answer any questions related to

21     whether you discussed the specifics of Article IX, Section

22     24, of the Constitution in those meetings.  Does that remain

23     your position?

24     A    I think I made mention that it was an attorney-client

25     issue.

1    Q   Again, Governor -- I'm getting confused, Judge,

2    Governor -- I just need to know whether you can -- I don't

3    want to go through all those questions if that remains your

4    position.

5    A   It does, so the answer, yes.

6    Q   All right.  I believe you also asserted the attorney-

7    client privilege or your attorneys did at your deposition as

8    to those weekly meetings as it related to any discussions

9    between you and Mr. Orr relating to the potential filing of a

10   Chapter 9 proceeding; is that correct?

11   A   Yes.

12   Q   And that remains your position; that is, that because

13   attorneys were present either on the phone or in the room at

14   each of those meetings, as you recall, you are asserting the

15   attorney-client privilege?

16   A   Yes.

17   Q   Thank you.  I'd like to ask you a couple of questions

18   about other -- well, let me start with your involvement.  I

19   think we all know you have been involved since you became

20   governor with the financial problems that relate to the City

21   of Detroit.  You inherited that as an issue.  Would that be

22   fair?

23   A   Yes.

24   Q   And it was a big issue?

25   A   I'd describe it as the largest issue in our country.

1  Q   From day -- well, leaving aside the largest in our

2  country, it's been a big issue for you from day one.

3  A   This has been a large issue for 60 years.

4  Q   Okay.  When did -- and I think we all know that then

5  Treasurer Dillon has been involved in assisting you on that

6  issue; is that correct?

7  A   Yes.

8  Q   When did his involvement begin --

9  A   It would have --

10  Q   -- approximately?

11  A   It would have began when he became treasurer.

12  Q   Which was?

13  A   It would have been about the same time I took office or

14  shortly thereafter.

15  Q   Early 2011?

16  A   Yes.

17  Q   Would that be fair?  Okay.  We also heard some testimony

18  here that a Mr. Buckfire, an investment person, has been

19  involved in this issue on your behalf; is that -- or on the

20  state's behalf; is that correct?

21  A   I don't -- I wouldn't characterize it as on the state's

22  behalf.  Mr. Buckfire came several times and presented

23  information, and in some of those cases I didn't ask for him

24  to come, and I'm not sure of all the grounds, whether it was

25  with the treasurer or not, that they made the decision to

1   come.

2   Q   Who was he being compensated for for the work he was

3   doing at this early point, as far as you understood?

4   A   My understanding is he wasn't necessarily getting

5   compensated.

6   Q   He was just doing it?

7   A   There were a number of parties that during the course of

8   this -- that first year, in particular, that offered

9   unsolicited advice on Detroit.

10  Q   Okay.  Without going further with that, would it be fair

11  to say that Mr. Buckfire and the people who work for his

12  company were offering advice to the state?

13  A   They were presenting information to the state, yes.

14  Q   Not to the city.  As far as you knew, they were trying to

15  get your ear and Treasurer Dillon's ear.  Would that be fair?

16  A   I couldn't speak to that.  I also know -- I also believe

17  they were potentially talking to the city also.

18  Q   Well, but didn't you understand that they were talking to

19  the city as part of their efforts to help you out for the

20  state as opposed to being an independent actor for the city?

21  A   The way I would perceive it at that point in time, I

22  perceived it as they were more presenting information to

23  potentially get themselves hired for an engagement most

24  likely --

25  Q   Well, that's what I was getting to.

1    A   -- but not necessarily by the state or by the city.  I'm

2    not going to speculate on who.

3    Q   Okay.  Fair enough.  The Jones Day law firm, when did

4    they first get involved in assisting the state in dealing

5    with the problems relating to Detroit?

6    A   Again, you're making the statement in the same fashion

7    you did before.  I believe they were presenting information

8    to the state.  I don't believe -- they were not hired by the

9    state --

10   Q   Well --

11   A   -- to my knowledge.

12   Q   So you would assume that they were looking for business

13   also?

14   A   Yes.

15   Q   Okay.  And don't you think, as sophisticated as they

16   were, that they recognized, given all that was going on, that

17   it would be you or people at your end who would be calling

18   the shots relative to how the city's financial restructuring

19   ultimately took place?

20           MR. SCHNEIDER:  Objection.  Calls for speculation.

21           MR. WERTHEIMER:  I don't think it does.  It seems --

22           THE COURT:  If you can answer that question from

23   your personal knowledge, I'll permit it.

24           THE WITNESS:  I didn't believe that to be the case

25   because, in fact, the city ended up hiring Jones Day without

1  me making a statement.

2  BY MR. WERTHEIMER:

3  Q   You met with Jones Day and with Ken Buckfire in June of

4  2002 (sic), did you not?

5  A   I don't recall the specific meeting.

6         MR. WERTHEIMER:  Could you put up -- it's Retirement

7  Systems' Exhibit 844, the second page.

8  BY MR. WERTHEIMER:

9  Q   You should see this on your screen if it works, you know.

10  That's a letter that's in evidence in this case from Heather

11  Lennox at Jones Day to someone at her end where she's saying

12  that she's going with Ken Buckfire to talk to the governor in

13  Michigan tomorrow, and it's an e-mail dated June 5, 2012.  Do

14  you recall meeting with Heather Lennox and Ken Buckfire in

15  June of 2012?

16  A   I recall meeting with Mr. Buckfire.  I apologize to Ms.

17  Lennox, but I literally do thousands of meetings, so I don't

18  recall the specific meeting.

19  Q   Okay.  I won't get into identifications.  It's not that

20  kind of case.  Do you recall there being one or more Jones

21  Day lawyers there with Mr. Buckfire?

22  A   Yes.

23  Q   And they were together talking to you about ways that the

24  state could deal with the problem that you, as the governor,

25  faced vis-a-vis the City of Detroit.  Would that be fair?

1   A   Yes.

2   Q   If you look at that same document on the bottom where it

3   lists the attachments, there's an attachment -- a listing of

4   an attachment.  I'll skip the numbers, but it says, "City of

5   Detroit - Memo on Michigan Constitutional Pension Plan

6   Protections.DOC."  Do you see that?

7   A   Yes.

8   Q   Do you recall the Jones Day people or Buckfire at that

9   meeting talking to you about that issue?

10  A   No.

11  Q   That is, the constitutional pension plan protection?

12  A   No.

13  Q   You're not saying it didn't happen.  You're saying you

14  don't recall one way or the other whether it did?

15  A   Yeah.  I believe that's how you stated your question.

16  Q   It is.  It is.  It is.  Do you recall whether or not the

17  Jones Day attorneys provided you or any of your -- let me

18  back up.  Do you recall who was at this meeting?

19  A   I don't recall all the participants.  Generally the

20  treasurer, I believe --

21  Q   Okay.

22  A   -- and Ken Buckfire.

23  Q   Okay.  So Treasurer Dillon.  Would any of -- either of

24  your aides have attended in the normal course?

25  A   It would have been likely.

1  Q   Likely.  Okay.  Do you recall whether the Jones Day

2  lawyers -- excuse me -- provided either you or any of your

3  people there with any legal documents?  Did they share any

4  legal documents with you?

5  A   I don't recall legal documents.  I recall a PowerPoint

6  kind of presentation.

7  Q   Made by Jones Day?

8  A   No.  More Ken Buckfire.

9  Q   Okay.  Do you recall whether in the PowerPoint

10  presentation Mr. Buckfire referenced the constitutional --

11  the state constitutional provision relating to pensions in

12  any way, shape, or form?

13  A   Don't recall.

14  Q   Okay.  Again, you don't recall one way or the other?

15  A   That's correct.

16  Q   Sometimes my questions aren't as clean as they should be,

17  and I'm just trying to make sure that --

18  A   Okay.

19  Q   You were involved in the selection of Mr. Orr as

20  emergency manager, were you not?

21  A   Yes.

22  Q   Can you approximate when the process began that ended up

23  with the hiring of Mr. Orr?

24  A   The process generally would have started late '12, early

25  '13 in terms of looking for potential emergency manager

1    candidates as a contingency plan.

2    Q    Did you interview Mr. Orr?

3    A    Yes.

4    Q    Did you interview him more than once?

5    A    I believe so.

6    Q    How many times?

7    A    I recall a couple.

8    Q    Okay.  Did you interview anybody else?

9    A    Yes.

10   Q    How many people?

11   A    At least one.

12   Q    Okay.  During the interview process with Mr. Orr -- when

13   I mean process, I mean not just the interviews but any

14   communications you had with him up to the point he became

15   emergency manager -- did you discuss whether vested pension

16   benefits could be reduced or modified in a Chapter 9

17   proceeding?

18   A    I don't --

19   Q    Did you discuss that issue?

20   A    I don't recall.

21   Q    Do you recall discussing -- or do you recall discussing

22   with Mr. Orr in any of these preliminary discussions before

23   he became emergency manager anything regarding vested pension

24   benefits?

25   A    No.

1   Q   No, or "I don't recall"?

2   A   Again, I thought you --

3   Q   Well, again, I'm trying to fine-tune my question, and now

4   I confused you.  I'm sorry.

5   A   Well, I thought you started, as I recall --

6   Q   You don't recall any such conversations?

7   A   I was trying to get better and just do "yes" or "no" --

8   Q   Me, too.

9   A   -- to show I was a good listener.

10  Q   No.  You were.  Me, too, but we missed each other, you

11  know.

12  A   Okay.

13  Q   I switched, and you switched to say --

14  A   "I don't recall" would be the summary answer.

15  Q   Okay.  Thank you.  As part of the hiring of Mr. Orr, it's

16  true, is it not, that parts of his expenses are being

17  reimbursed by the NERD Fund, N-E-R-D Fund?

18  A   Yes.

19  Q   And what parts of his expenses?

20          MR. SCHNEIDER:  Objection as to relevance.

21          THE COURT:  What is the relevance?

22          MR. WERTHEIMER:  I think it goes to the potential

23  conflict issue; that is, I think that Mr. Orr is in a

24  position where he has the state paying expenses for him and

25  at the same time he has to make decisions relative to the

1   position he should take as to whether or not the state should

2   be obligated to do something relative to the city's pension

3   problems under Article IX, Section 24, of the Constitution.

4           THE COURT:  Is this fund a state fund?

5           THE WITNESS:  No.  It's a separate nonprofit that

6   was organized to help offset the cost of government.

7           THE COURT:  The objection is sustained.

8   BY MR. WERTHEIMER:

9   Q   I'm going to direct your attention now, Governor, to June

10  of 2013, the point in time when Mr. Orr was -- specifically

11  June 14th when he made a proposal.  You're familiar with the

12  June 14th proposal?

13  A   Yes.

14  Q   And I know you were asked about it at your deposition, so

15  you know what I'm talking about.

16  A   Yes.

17  Q   Okay.  Did you participate in the development of that

18  proposal?

19  A   I reviewed drafts of it.

20  Q   And suggested -- either you or one of your people

21  suggested changes in it, I would assume?

22  A   I don't recall.

23  Q   Okay.  But you do recall reviewing drafts of it?

24  A   At least one draft.

25  Q   And do you recall that that proposal included -- I'll

1  read from it -- apologize, Governor -- "Because the amounts

2  realized on the unfunding claims will be substantially less

3  than the underfunding amount, there must be significant cuts

4  in accrued vested pension amounts for both active and current

5  retired persons"?  Do you recall that as being part of his

6  June 14th proposal?

7  A   Yes.

8  Q   And in your review, did you suggest any changes in that?

9  A   No, because it was to be a mutual negotiation.  It was a

10  preliminary proposal.

11         MR. WERTHEIMER:  Your Honor, I would ask the witness

12  to simply respond to the question.

13         THE COURT:  You may.

14         MR. WERTHEIMER:  I didn't ask why.  I don't mean to

15  make a big deal, but I think it would go smoother.

16         THE COURT:  You may ask the witness that.

17         MR. WERTHEIMER:  Thank you.

18  BY MR. WERTHEIMER:

19  Q   Do you understand -- did you understand, Governor, that

20  at the time this proposal was being made, that the

21  retirees -- the proposal was that the retirees would get

22  treated as the other unsecured creditors in the language --

23  in the legal language would, including bondholders?  They'd

24  be treated the same way.  Would that be fair?

25  A   Yes.

1  Q   Did you understand at the time you looked at -- or

2  reviewed this proposal that the guarantees of pension

3  benefits that there are in this country relate to private

4  employees only under the Pension Benefit Guarantee

5  Corporation?  Did you understand that at the time?

6  A   Yes.

7  Q   In other words, you knew these people weren't being

8  protected by any federal program --

9  A   Yes.

10  Q   -- "these people" being the retirees and those with

11  vested benefits?

12  A   Yes.

13  Q   Did you also understand that the bondholders at least had

14  insurance, at least many of them did?  They were insured

15  bonds?

16  A   I was not clear on who had insurance and who did not.

17  Q   Well, you were clear on the fact that the individual

18  retirees didn't have insurance, weren't you?

19  A   Yes.

20  Q   Did you have any sense as to the impact these cuts might

21  have on individual retirees at the time you reviewed the

22  proposal?

23        MR. SCHNEIDER:  Objection.  Calls for speculation.

24  It's also not relevant.

25        MR. WERTHEIMER:  I'm just asking if he did or not,

1    your Honor.

2              THE COURT:  Again, if you can speak from personal

3    knowledge, I will accept your answer.

4              THE WITNESS:  I viewed that as speculation at that

5    point in time, in particular, that my understanding is the

6    funded part of the pension plan would not be involved, but

7    the unfunded was the part at issue.

8    BY MR. WERTHEIMER:

9    Q    Okay.

10   A    And that was a matter still to be determined.

11   Q    Did you understand what the range of the pensions were of

12   City of Detroit retirees; that is, how much money they would

13   receive if they were getting a full pension?

14   A    Not specifically.

15   Q    How did you understand it?  How generally, if you could

16   just identify it in any way that is consistent with what you

17   understood?

18   A    Well, they would get a monthly payment of so much per

19   month.

20   Q    Did you have a sense as to whether there were many of

21   them who were getting monthly payments of $10,000 or anything

22   like that amount?

23   A    That would be at the very high end.

24   Q    Okay.  Fair enough.  I'll drop it.  Did you know at

25   around this time -- I think it was before it, but I don't

1    have the time line in front of me.  You recall Mr. Orr making

2    a statement to the Detroit Free Press that got publicized

3    pretty widely that federal law would trump Article IX,

4    Section 24, of the Constitution.  Do you recall that being in

5    the papers?

6    A    I recall that from the questions that you and your

7    colleagues asked me from the deposition.

8    Q    Do you recall knowing that Orr had made a statement like

9    that at the point you were reviewing his -- what became his

10   June 14th proposal?

11   A    I accepted the fact you were making a truthful assertion

12   when you told me that.

13   Q    No, but did you know at the time?

14   A    I don't recall.

15   Q    You know, as you sit here, I suspect, that the Attorney

16   General has weighed in on this issue of the relationship

17   between the state constitutional provision and the bankruptcy

18   proceedings?

19   A    Yes.

20   Q    And you know that he has taken the position that in

21   bankruptcy Mr. Orr is obligated to honor Article IX, Section

22   24, in proposing a plan of adjustment, do you not?

23   A    Yes.

24   Q    And you know that Mr. Orr in no way, shape, or form has

25   indicated that he would be proposing any such plan of

1  adjustment, do you not?

2  A   Well, no plan of adjustment has been presented, so that

3  would be just speculative.

4  Q   Has Mr. Orr ever said anything either in your

5  conversations with him or that you've heard about secondhand

6  that would indicate that he has any intent to honor the state

7  constitutional provision when he proposes a plan?

8          MR. SCHNEIDER:  I would object to the extent that

9  this calls for secondhand conversation.  The governor would

10  not have firsthand knowledge of that.

11          THE COURT:  The objection is overruled.  What is

12  your answer, sir?

13          THE WITNESS:  Could we repeat the question?

14          MR. WERTHEIMER:  Can you repeat the question,

15  whoever is --

16          THE COURT:  We don't have that ability.

17          MR. WERTHEIMER:  Oh, I'm sorry.  I'll ask it another

18  way.

19  BY MR. WERTHEIMER:

20  Q   Has Mr. Orr ever communicated anything to you either

21  directly or indirectly that would indicate to you that at the

22  point he is going to propose a plan, that he is going to

23  propose a plan which would not adversely impact the retirees?

24  A   I have not discussed a specific plan with Mr. Orr in any

25  regard.

1  Q   Let me ask it another way.  Has Mr. Orr ever said

2  anything to you inconsistent with what he said to the <u>Detroit</u>

3  <u>Free Press</u> to the effect that he was going to use the federal

4  bankruptcy law to trump Article IX, Section 24, of the state

5  Constitution?

6  A   The question is those discussions would have been with

7  counsel present.

8  Q   So you're asserting the attorney-client privilege?

9  A   The way you stated that, yes.

10  Q   Okay.

11       MR. SCHNEIDER:  I'm objecting on privilege grounds

12  as well.

13       MR. SHUMAKER:  The city joins the objection.

14  BY MR. WERTHEIMER:

15  Q   When did you first learn that the attorney general was

16  going to take the position that he did?

17  A   On a phone call a couple days --

18  Q   And what --

19  A   -- a day or so ahead.

20  Q   A day or so ahead of his --

21  A   Filing.

22  Q   -- filing?  Okay.  And by "filing," to make sure we're

23  talking about the same thing, the filing he made in federal

24  court relative to his position at least on this issue?

25  A   Yes.

1  Q    Did you consult with the attorney general on this issue

2  of the interrelationship of Article IX, Section 24, of the

3  Constitution and bankruptcy anytime before this phone call?

4  A    I did not personally.

5  Q    Did you ask anybody on your behalf to do that?

6  A    No.

7  Q    Would it be fair to say that the call that he made to you

8  a day or two before was a courtesy call?

9  A    Yes.

10  Q    He was letting you know one politician to another that

11  I'm taking this position that may be adverse to you?

12  A    I wouldn't describe it as one politician to the other.  I

13  would describe it as the chief --

14  Q    I knew you wouldn't, and I apologize for framing it that

15  way.

16         THE COURT:  All right.  So restate your question,

17  sir.

18  BY MR. WERTHEIMER:

19  Q    Why don't just tell us what was said between you and

20  Attorney General Schuette --

21  A    Yeah.  The chief legal officer of the state called the

22  chief executive of the state to --

23  Q    Okay.

24  A    -- let me know he was --

25  Q    I accept your amendment.

1 A   -- he was going to file a brief or a position on this

2 issue, and I appreciated that, that he had his constitutional

3 responsibilities, as did I, and we respect other and are good

4 working colleagues.

5 Q   I'd like to move you now to a different subject, and that

6 is the Flowers and Webster lawsuits.  Do you recall being

7 asked about that at your deposition?

8 A   Yes.

9 Q   I'm going to ask you hopefully fewer questions than at

10 your deposition about that.

11 A   Thank you.

12 Q   You're welcome.  You learned of those lawsuits within a

13 day or so after they would -- let me back up.  I'll state for

14 the record that they were filed on July 3rd.  You learned

15 about their filings within a day or two, did you not?

16 A   I would assume so.  I know it was relative -- yes.

17 Q   Okay.  And you also learned at the same time or shortly

18 thereafter that the court had scheduled a hearing on

19 preliminary injunction requests in both of those two cases

20 for Monday, July 22nd, did you not?

21 A   I didn't recognize it as simply about preliminary

22 injunctions.  I believed it was simply a hearing on the

23 lawsuits, which could include preliminary injunctions.

24 Q   Let me read to you a question and answer from your

25 deposition and see if it's accurate, and I'm at page 125,

1    line 21. "You did know" -- and I'm asking the question.

2    "You did know, did you not, shortly after those suits were

3    filed -- it was all over the papers -- that Judge Aquilina

4    was going to hold a hearing on whether to issue an injunction

5    Monday, July 22nd, did you not?" Your answer was, "Yes."

6    A    No.  I was simply stating I believed it included that.  I

7    wasn't sure what else might have been in that hearing.

8    Q    Okay.  Fair enough.  And I believe your counsel -- do you

9    recall at your deposition we asked for the transmission --

10   the e-mail transmission of your authorization to Mr. Orr, and

11   there were a bunch of questions because the only transmission

12   that we had at the time was late in the evening or like seven

13   something p.m.?  Do you recall that?

14   A    Yes.

15   Q    And then later your counsel found the correct e-mail and

16   provided it to us.  Do you recall that --

17   A    I actually found it.

18   Q    -- learning that?  Oh, I'm sorry.  You found it?

19   A    Yes.

20   Q    Okay.  And at the end of the deposition, you said you

21   would, correct, that you would find it?

22   A    Yes.

23   Q    And you did?

24   A    Took me about 30 seconds once I got on my computer.

25   Q    Okay.  And your counsel sent them to us or you instructed

1   your counsel, I assume, to do that?

2   A   Yes.

3   Q   And do you recall that that transmission occurred at 3:47

4   p.m.?

5   A   Yes.

6   Q   So it was not until 3:47 p.m. that Mr. Orr got written

7   authorization from you to file the bankruptcy; correct?

8   A   Yes.

9   Q   Okay.  When did you first learn that Mr. Orr was

10  seriously considering filing Chapter 9?  When I say

11  "seriously," I mean to the point of preparing papers as

12  opposed to just generally having it out there as a

13  possibility.

14  A   It probably would have been about a week, in the time

15  frame of two or three to seven days or so before he sent his

16  letter to me.

17  Q   And he sent his letter to you on the 16th, so sometime

18  maybe between July 6 and the 16th, somewhere in there?

19  A   I couldn't speak to what specific day, but it was --

20  Q   I understand.

21  A   -- generally that time frame.

22  Q   Okay.  To your knowledge, did the state play any role in

23  drafting the request that Mr. Orr made?

24  A   Not to my knowledge.

25  Q   Do you know one way or another whether Mr. Orr sent a

1   draft of his request to somebody on your team to take a look
2   at and for input?
3   A    That would have been at meetings that would have had
4   counsel present.
5   Q    So you're asserting attorney-client privilege?
6   A    Yes.
7           MR. SCHNEIDER:  Objection based on attorney-client
8   privilege.
9           MR. SHUMAKER:  The city joins the objection.
10          MR. WERTHEIMER:  Your Honor, for the record, I
11  believe the privilege has been waived as to that based on a
12  document that the state voluntarily produced and waived the
13  privilege as to, but it is not a document to or from the
14  governor, so I'll delay examination relative to it.
15          THE COURT:  Okay.
16          MR. SCHNEIDER:  Of course, we object that there's
17  been no waiver.
18          MR. WERTHEIMER:  Understood.
19  BY MR. WERTHEIMER:
20  Q    And I think we know from your deposition that as late as
21  July 7th -- and let me back up.  I apologize.  If we're in
22  this week that ends up the 19th, let's say earlier that week,
23  if I can put you back there -- 15th is Monday, if I'm doing
24  it right.  You know that Judge Aquilina is going to hold a
25  hearing on an injunction request the following Monday, the

1    22nd; correct?

2    A    Yes.

3    Q    And you know -- without getting into all the legalese,

4    you know that the requests to Judge Aquilina are that she in

5    one way or another make sure that if you authorize a

6    bankruptcy, it will only be with a contingency that Article

7    IX, Section 24, be honored.  Would that be fair as to your

8    knowledge?

9    A    No, because I wouldn't speculate on what a judge is going

10   to do in doing the order or not doing the order or what they

11   might say in the order.

12   Q    Well, you had been -- you were served on July 3rd with

13   the complaint, the motion for preliminary injunction, the

14   brief in support, and the order to show cause, were you not?

15   A    I didn't personally receive all those documents.

16   Q    Fair enough, but your office was served on that day.  You

17   don't dispute that.

18   A    Again, I can't confirm nor dispute.  You have better

19   information on that than I do.

20   Q    Okay.  I mean for the record, we have documents showing

21   that that's the day, and we didn't serve you personally.  It

22   was served at --

23   A    My office.

24   Q    -- the Romney Building at your office where you kindly

25   always accept service.  Let me ask you this.  Did you at

1    least look at the complaint or talk to somebody about the

2    contents of these complaints generally to get an idea what

3    they were about?

4    A    That would have been subject to attorney-client

5    privilege.

6    Q    Okay.  Back to the beginning of the week.  We're at

7    Monday, the 15th.  If we move to Wednesday, the 17th, there's

8    a communications rollout document that we showed you at your

9    deposition.  Do you recall that?

10   A    Yes.

11   Q    Three- or four-page document showing a rollout of the

12   bankruptcy filing that went into a lot of events that would

13   occur before the filing; correct?

14   A    Yes.

15   Q    A bunch of events that would occur after it; correct?

16   A    Correct.

17   Q    Down to, you know, who you were interviewing with the

18   following Monday and stuff like that.  Am I -- is that

19   correct?

20   A    Yes.

21   Q    Okay.  And that document that we showed you that was

22   dated -- was dated the 17th, do you recall that?

23   A    Yes.

24   Q    So that's Wednesday, and on Wednesday the rollout listed

25   that the filing would occur on the 19th; is that correct?

1    A    Yes.

2    Q    And it didn't occur on the 19th, did it?

3    A    No.

4    Q    And we know, do we not, that the filing -- the actual

5    physical paper filing the bankruptcy had a typed in nine that

6    Mr. Orr at his deposition indicated he switched to an eight.

7    A    That's what you explained to me in the deposition.

8    Q    And you have no reason to dispute it, but you don't know

9    it of your own knowledge?

10   A    Yes.

11   Q    Would it be fair to say that the fact that you, Mr. Orr,

12   and others knew that a state court judge would be considering

13   whether she should be imposing conditions on you authorizing

14   a bankruptcy played a role in when you transmitted your okay

15   to Mr. Orr at 3:47 on the 18th?

16   A    I believe I explained this in my deposition that it was

17   more the filing of the lawsuits and the fact that bankruptcy

18   is a very last resort and that these actions showed that

19   there wasn't a meeting of the minds; that there was not going

20   to be a mutual understanding here to resolve this short of

21   bankruptcy.  And that was part of my decision-making process

22   to say when I was comfortable to sign a letter authorizing

23   bankruptcy, which was a tremendously difficult decision to

24   make but the right one given the circumstances.

25   Q    Fair enough.  Just one other question, I think, related

1  to that.  When you said "lawsuits" in that answer, would you

2  have been referring to the Flowers lawsuit, the Webster

3  lawsuit, and by that time the third lawsuit filed by the

4  Retirement System?

5  A   Yes, and an expectation that there could be many other

6  lawsuits from debt holders and many other parties.

7  Q   Okay.  Fair enough.  But no other specific lawsuits other

8  than the three I identified?

9  A   Correct.

10  Q   I'm going to have you identify some documents, and then

11  I've got some questions as to one, and then we're done,

12  Governor.

13        MR. WERTHEIMER:  Could you put UAW 616 up?

14  BY MR. WERTHEIMER:

15  Q   Governor, can you confirm that this is an e-mail that you

16  received from Andy Dillon?

17  A   Yes.

18  Q   And that you read it on or around July 8?

19  A   Yes.

20  Q   And that it's part of the communications that went on

21  between you and your people relative to this issue of the

22  bankruptcy filing?

23  A   I'm not sure.  That last question, me and my people --

24  Q   Well, I'm sorry.  I apologize.  It's an e-mail that

25  involves Mr. Dillon's role in helping you with the Detroit

1  problem.

2  A   Yes.

3          MR. WERTHEIMER:  Move for its admission.  I believe

4  that was not admitted.

5          MR. SHUMAKER:  Your Honor, the city objects on

6  hearsay grounds.

7          MR. WERTHEIMER:  It goes to the state of mind of the

8  state officers, the back and forth.  It's not being offered

9  for its truth as to any of the statements.  It's being

10  offered as to their state of mind.  Good faith is an issue.

11          MR. SHUMAKER:  Your Honor, state of mind is not at

12  issue.  This is for hearsay purposes.

13          THE COURT:  Well, technically what's it --

14          MR. WERTHEIMER:  I have one other point, your Honor,

15  and that is it's an admission.  We have a common interest

16  privilege asserted when they want to keep documents from us,

17  but they are not agents of each other for purposes of the

18  hearsay rule, so it's -- not only is it offered as state of

19  mind, not for its truth, but even were it offered for its

20  truth, it should come in as an admission.

21          THE COURT:  Well, what's at issue here in the

22  eligibility trial is the good faith of the city in filing the

23  case, so I would question how the good faith of the governor

24  is an issue at all.

25          MR. WERTHEIMER:  Your Honor, we will present

1 | through --

2 | THE COURT: Could you do me a favor and pull that

3 | microphone back closer to you? I think it got knocked

4 | somewhere in the meantime.

5 | MR. WERTHEIMER: Yeah. I'm sorry. We'll be

6 | providing evidence indicating -- establishing that the state

7 | helped Mr. Orr draft the July 16th request, so the idea that

8 | we're going to in any way separate out state of minds here I

9 | think just is counterfactual.

10 | THE COURT: Well, but how does this memo bear upon

11 | the city's good faith at all? That's the question.

12 | MR. WERTHEIMER: Well, I think that the city, with

13 | all due respect to Mr. Orr, was acting at the behest of the

14 | state. I think that there is all kinds of evidence of that,

15 | and there will be further evidence of it. And given that, we

16 | think that if -- pulling the strings may be a little strong,

17 | but if the state is involved in that decision-making, the

18 | state of mind of the two principal state actors, by the

19 | way -- we're not offering, you know, someone at Department of

20 | Treasury whose name we've got to look up. This is Dillon to

21 | Snyder.

22 | THE COURT: All right. This is arguable. I'll

23 | permit it.

24 | MR. WERTHEIMER: Thank you.

25 | MR. SCHNEIDER: Your Honor, I have an objection,

1 however. If this is to go to state of mind, this can't

2 possibly go to the governor's state of mind because this is

3 not a message sent from the governor. This is sent from the

4 treasurer. Not only that, but no one from the city is --

5        THE COURT: Well, but who received it?

6        MR. SCHNEIDER: The governor. He received --

7        THE COURT: Yeah. That objection is overruled.

8        MR. WERTHEIMER: Thank you.

9        THE COURT: The document is admitted. What's the

10 number again? 616?

11        MR. WERTHEIMER: 616, UAW 616.

12        THE COURT: 616 is admitted.

13    (Exhibit 616 received at 1:46 p.m.)

14        MR. WERTHEIMER: Would you now show 615?

15        MR. SCHNEIDER: Same objection, your Honor, on

16 hearsay grounds.

17        THE COURT: You're objecting to 615?

18        MR. SCHNEIDER: 615.

19        THE COURT: Okay. Hold that until it's actually

20 offered.

21        MR. SCHNEIDER: I'm sorry, your Honor.

22        MR. WERTHEIMER: Can you blow up that a little bit

23 at the top? Yeah, just there. That's great. Thank you.

24 BY MR. WERTHEIMER:

25 Q  Is that on your screen now, governor, the July 9 e-mail?

1   A    Yes.

2   Q    Okay.  And this is Andy Dillon to you, a response to

3   the -- or a follow-up to the e-mail of the day before?

4   A    Yes.

5        MR. WERTHEIMER:  Move for its admission again for

6   the same reason, your Honor.

7        MR. SHUMAKER:  Objection, your Honor.  Hearsay.  I'd

8   also like to ask if counsel is going to attempt to introduce

9   documents not in evidence already that they not be displayed

10  to you prior to you making a ruling as to their introduction.

11       THE COURT:  Well, that's interesting because

12  sometimes I actually need to see the document to see if it's

13  relevant, so I will not ask him to make that request.  And

14  you have your same objection, counsel?

15       MR. SCHNEIDER:  Yes, your Honor.

16       THE COURT:  All right.  Both objections are

17  overruled, and this document -- 615, did you say --

18       MR. WERTHEIMER:  Yes, your Honor.

19       THE COURT:  -- is admitted.

20       MR. WERTHEIMER:  Thanks.

21     (Exhibit 615 received at 1:47 p.m.)

22  BY MR. WERTHEIMER:

23  Q    I have just one other document to ask you about, and it's

24  not in evidence yet, so I'm going to -- we're going to do it

25  the old way.  I'm going to show you a hard copy, and then

1    I'll come back here and ask you some questions about it.  Do

2    you have that document in front of you, Governor?

3    A    Yes, 625.

4    Q    And who's Dennis Muchmore?

5    A    He's my chief of staff.

6    Q    And was he your chief of staff in July?

7    A    Yes.

8    Q    Okay.  And who is Mike Gadola?

9    A    He's the legal counsel to the governor.

10   Q    And who is John Roberts?

11   A    Deputy chief of staff.

12   Q    And Greg Tedder?

13   A    He's the state liaison to Kevyn Orr.

14   Q    And do I read this document right that this is an e-mail

15   that Mr. Gadola sent to Mr. Muchmore and Roberts and that

16   Muchmore then sent on to you?

17   A    Yes.

18   Q    And you received it on July 12th?

19   A    Yes.

20   Q    And you read it?

21   A    Yes.

22   Q    Both Mr. Muchmore's message and the underlying message

23   from Mr. Gadola?

24   A    Yes.

25   Q    And it does relate to your decision-making relative to

1    the decision to authorize?

2    A    I'm not sure I understand your question.

3    Q    Well, I'll stop at this point.

4              MR. WERTHEIMER:  I'd move for its admission at this

5    point, your Honor.

6              MR. SHUMAKER:  Objection.  Hearsay, your Honor.

7              THE COURT:  And that's number what?

8              MR. WERTHEIMER:  625.  And, again, I think we've got

9    the same arguments we had before, identical; that is --

10             MR. SCHNEIDER:  Same objection.

11             MR. WERTHEIMER:  Well, I won't repeat them, your

12   Honor, and I'd like to -- I mean obviously I'll be examining

13   the governor as to their content, but I thought it made sense

14   to move for their admission first.  I'm happy to answer --

15   ask any follow-up questions the Court thinks it needs.  And I

16   would also indicate for the record, your Honor, that --

17             THE COURT:  One second.

18             MR. WERTHEIMER:  I'm sorry.

19             THE COURT:  So, Governor, have you seen this e-mail

20   before?

21             THE WITNESS:  I've seen it before.  I'd like time to

22   read it again --

23             THE COURT:  Go ahead.

24             THE WITNESS:  -- if possible.

25             THE COURT:  Sure.  Go ahead.

1          THE WITNESS:  Thank you.

2          MR. WERTHEIMER:  Your Honor, while he's doing that,

3    if I could inform the Court this was a document that was

4    withheld based on attorney-client privilege.  It was

5    privilege log Number 6 of the state's log.  It was produced

6    as part of the agreement that the state and I ended up making

7    relative to those privilege logs that we argued in front of

8    this Court a couple days ago, and in producing it, they

9    specifically waived in writing the attorney-client privilege.

10          THE COURT:  Thank you, sir.

11          MR. WERTHEIMER:  Yes.

12          THE COURT:  Did you receive this e-mail?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.  The objections are

15    overruled, and Exhibit 625 is admitted into evidence.

16       (Exhibit 625 received at 1:52 p.m.)

17          THE COURT:  Can we get a couple more copies of this,

18    please?  Do you have --

19          MR. WERTHEIMER:  Yes.

20          THE COURT:  -- extras to provide?

21          MR. WERTHEIMER:  Yes, you can.  I've got a couple

22    here that are not marked 625.

23          THE COURT:  All right.  We'll take care of the

24    marking.  Don't worry about that.

25          MR. DECHIARA:  Your Honor, we're going to -- UAW is

1    going to submit binders tomorrow that will have multiple

2    copies of that exhibit.

3              THE COURT:  Okay.  That'll work, too.  Thank you,

4    sir.

5    BY MR. WERTHEIMER:

6    Q   All right, Governor.  My last round of questions is I'd

7    like to go through the contents of this e-mail, specifically

8    that part of it from Mr. Gadola ultimately to you, but

9    indirectly to you.

10   A   Um-hmm.

11   Q   Okay.  On the third line he indicates, Mr. Gadola does,

12   that he spoke to Rich this morning.  In context, would I be

13   right in suspecting that that would be Rich Baird?

14   A   I would assume so.

15   Q   Okay.  And Andy would be Andy Dillon?

16   A   Yes.

17   Q   And LG would be the lieutenant governor?

18   A   Yes.

19   Q   And who is the lieutenant governor, for the record?

20   A   Brian Calley.

21   Q   And one of the things that Mr. Gadola is communicating to

22   you is that Baird is now in favor of a more deliberative

23   approach at your end; correct?

24   A   He's stating what Rich Baird's view is.

25   Q   Yes.

1  A   Yes.

2  Q   Fair enough.  By the way, would it be correct -- if I

3  could move you off the document for just a minute, would I be

4  correct in recalling from your deposition that the only

5  investigation you did of the -- Orr's request on the 16th

6  related to assessing the lawsuits and taking his word for

7  some of the content of that letter; is that right?

8          MR. SCHNEIDER:  Objection, your Honor.  That's not a

9  correct statement, I believe, of what was taken at the

10  deposition.

11          MR. WERTHEIMER:  Well, it may not be, your Honor.

12  If I can go back, I'll get the correct statement.  I don't

13  want to -- I have no intention of misrepresenting.

14  BY MR. WERTHEIMER:

15  Q   I think I'm going to have to read a couple of questions

16  and answers to get this in context, if you'll bear with me,

17  because I want to make sure I'm accurate.  There was a

18  question, and this is on page 77, line 20.  "And did you

19  undertake any independent investigation or cause to be

20  undertaken any independent investigation to determine

21  whether, in fact, Mr. Orr's representation to you that there

22  had been" --

23          MR. SCHNEIDER:  Your Honor, I object.  There's no

24  foundation for this.  If he wants to ask the governor a

25  question, that's fine, but that's not what's going on here.

 1          THE COURT:  The objection is sustained.  Just ask

 2     the governor a question.

 3          MR. WERTHEIMER:  All right.

 4     BY MR. WERTHEIMER:

 5     Q    Tell me what investigation you took between July 16th

 6     when you received the Orr request and July 18 when you sent

 7     the authorization back?

 8     A    I actually asked and built in additional time to think

 9     about it because of the consequence of this in terms of

10     decision-making process, so I had them expand the calendar

11     originally through that process to give me an extra night or

12     so to sleep on something like this and to go through my

13     process.  And I went back -- and I know you didn't care for

14     this last time, but literally I went back to since the time I

15     became governor walking through the entire process with Mayor

16     Bing about the prior review cycle at the end of 2011, 2012,

17     about the consent agreement.  I reviewed the other financial

18     review team reports.  I reviewed his 45-day report.  I

19     reviewed his proposal to creditors.  So I didn't go out and

20     find independent parties to do this, but I reviewed the file

21     and went back through the decision-making process to

22     recognize this was two and a half years of effort, and

23     basically then I made a decision.

24     Q    Fair enough.  And in fairness to you, I think I broadened

25     in my question what you were asked.

1  A    Yeah.

2  Q    And let me go down to the next question and answer, and I

3  think that --

4  A    Um-hmm.

5  Q    -- where we're only talking about -- or the question only

6  relates to the good faith negotiations, and I apologize for

7  being broader than I should have been.  At page 78, line 14,

8  this is --

9        MR. SCHNEIDER:  Same objection, your Honor.  He's

10  just reading the transcript.

11        THE COURT:  If you're trying to impeach the witness,

12  that's fine, but otherwise just ask a question.

13        MR. WERTHEIMER:  Okay.  Fair enough.

14  BY MR. WERTHEIMER:

15  Q    Would it be true, Governor, that the only thing you did

16  to check out the assertion that there had been -- there had

17  been good faith negotiations was to take a look at the

18  lawsuits or that issue and accept what Mr. Orr had in his

19  July 16th letter?  Did you do anything else relative to the

20  assertion that there had been good faith negotiations?

21  A    Well, I'd gone through multiple meetings where attorneys

22  were present where I would get updates on how meetings had

23  gone, and it wasn't just Mr. Orr.  Mr. Dillon was present and

24  those -- and other people that were monitoring this process.

25        MR. WERTHEIMER:  Well, your Honor, then I would

1  offer two questions and answers to impeach, and this is page

2  78, line 14, through 78, line 21.

3  BY MR. WERTHEIMER:

4  Q   "Question:  So just so I understand your answer, your

5  acceptance of the truth of the assertion that there had been

6  good faith negotiations were based on what you read in the

7  July 16th letter" -- "Uh-huh" -- that was the answer --

8  "Question:  -- and also the fact that certain lawsuits had

9  been filed?"  "Answer:  Yes."  "Question:  Was there anything

10  else that you relied on to conclude that there had been good

11  faith negotiations?"  "Answer:  No."  Were those answers

12  truthful?

13  A   Well, I don't see the difference because in the letter --

14  Q   I'm not suggesting there is.

15  A   Okay.

16  Q   I'm just asking the question whether those answers were

17  truthful, Governor.

18  A   Yeah, in the context of he cited meeting dates that were

19  during the process where we had other meetings going on, and

20  I got updates.

21  Q   Fair enough.  Let's go back to 625.  The next sentence,

22  "Am I right in understanding that it's not just Baird, but

23  it's now Dillon and the lieutenant governor who are on board

24  with a more deliberative approach?"

25  A   That's what this e-mail says.

1  Q   And then what they suggest is you writing a letter back

2  to Mr. Orr and then the process continuing from there; is

3  that correct?

4  A   That's, again, what this e-mail says.

5  Q   Let's go to the next paragraph of the letter -- or I'm

6  sorry -- of the e-mail.  Mr. Gadola then says, "I favor this

7  approach for a number of reasons, but primarily because I

8  think we should exercise the governor's ability under PA 436

9  to include conditions upon his authorization for a bankruptcy

10 filing."  Do you recall receiving that opinion from your

11 attorney, Mr. Gadola, through this e-mail?

12 A   I saw it through this e-mail, and I had other

13 confirmation of that.

14 Q   In fact, it was your office that was instrumental in

15 getting the contingency language put into 436; isn't that

16 true?  That is, the Governor's Office.  I'm jumping around,

17 and I apologize.  We took a -- we took a deposition of the

18 state official from Treasury, who was authorized to speak for

19 the state about the issue of who was doing what relative to

20 the passage of 436.

21         THE COURT:  Counsel, it's not appropriate to advise

22 one witness of what another witness has said --

23         MR. WERTHEIMER:  I'm just trying --

24         THE COURT:  -- when they are sequestered.

25         MR. WERTHEIMER:  I understand, your Honor.  I'll

1    drop it.

2    BY MR. WERTHEIMER:

3    Q    Mr. Gadola specifically mentions vested pension benefits,

4    does he not?

5    A    Yes.

6    Q    And it's in the context of talking or recommending to you

7    that you put contingencies on a bankruptcy filing; correct?

8    A    I'm not sure what sentence you're looking at.  The one

9    I'm looking at said "could also include."

10   Q    Yes.

11   A    So it doesn't imply he's saying it has to but could

12   include.

13   Q    That's right, could include, but what -- the overall --

14   A    And it talks --

15   Q    -- subject of this paragraph is the contingency issue;

16   isn't that right?

17   A    It talks about vested pension benefits, GO debt,

18   disposition of assets, and assets greater than a certain

19   amount.

20   Q    Fair enough.  I didn't ask about those, but it does say

21   other things; correct?

22   A    Yes.

23   Q    Okay.

24        MR. WERTHEIMER:  I have nothing further subject to

25   checking with my co-counsel.  I have no further questions,

1  Governor.  Again, thank you for your time.

2         MR. DECHIARA:  Good afternoon, your Honor.  Peter

3  DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

4  the UAW International Union.

5                       DIRECT EXAMINATION

6  BY MR. DECHIARA:

7  Q    Good afternoon, Governor.

8  A    Good afternoon.

9  Q    Governor, did Mr. Orr send a draft of his July 16th

10  letter to you before he sent the actual letter on July 16th?

11  A    I don't recall that.

12  Q    Do you know whether he sent a draft of the letter to your

13  staff?

14  A    I don't recall.

15  Q    Do you know whether he sent a draft of the letter to Mr.

16  Dillon?

17  A    I don't recall.

18  Q    Do you know if he sent a draft of the letter to Mr.

19  Dillon's staff?

20  A    I don't recall.

21  Q    Okay.  Now, it's true that you were sent a draft of the

22  June 14th proposal to creditors; correct?

23  A    Yes.

24  Q    And you reviewed it?

25  A    Yes.

1   Q   And you gave feedback on it; correct?

2   A   I don't recall much feedback on it.

3   Q   Well, do you recall giving feedback?

4   A   No.  I don't recall specific feedback.

5   Q   I'm not asking you whether you recall specific feedback.

6   Do you recall giving any feedback?

7   A   I recall letting him know I read through it.

8   Q   But no feedback?

9   A   No.

10   Q   Do you recall giving a deposition on October 9th, 2013,

11   in this proceeding?

12   A   Yes.

13   Q   And did you testify truthfully at that deposition?

14   A   Yes.

15   Q   I'd like to refer you to page 61 of the deposition, line

16   1.

17           "Question:  Okay.  Did you comment on the draft?

18           Answer:  I generally reviewed it and just gave

19       general feedback."

20       Does that refresh your recollection about whether

21   you gave feedback on the draft?

22   A   Yeah.

23   Q   Did you give feedback on the draft?

24   A   Well, again, just general comments, thanks for sending me

25   the draft.

1  Q   And you saw in the proposal, did you not, that there was

2  language that said that there must be significant cuts to

3  accrued pension liabilities?

4  A   Yes.

5  Q   Okay.  Did you raise any -- did you comment on that

6  language?

7  A   No.

8  Q   Okay.  So by that answer, I assume you did not say to

9  Mr. Orr or to his staff that you opposed that position;

10  correct?

11  A   In their presentation in the draft in the way they

12  described it to me, this was just the opening to describe the

13  factual situation to start a dialogue with creditors.

14  Q   That's not my question.  Let me ask this question.  Did

15  you say to Mr. Orr or his staff that you opposed the position

16  that was laid out in the proposal that said that there must

17  be significant cuts to accrued pension liabilities?

18          MR. SCHNEIDER:  I object to any question that might

19  be leading us into the area of attorney-client privilege,

20  which I believe this may be.

21          MR. DECHIARA:  Your Honor, there's been absolutely

22  no testimony that there are any lawyers involved, and even if

23  there were, the governor commenting on the proposal --

24  there's already been testimony on it.  And in any event, it's

25  not -- doesn't go to attorney-client privilege.

1     THE COURT:  The objection is overruled, but having

2  said that, counsel, I would ask you and caution you not to

3  ask the very same questions that Mr. Wertheimer asked.

4     MR. DECHIARA:  Your Honor, I'll try my best.  I

5  really will.

6     THE COURT:  I must insist on it.

7     MR. DECHIARA:  I will try my best.  Let me ask the

8  same question.

9     THE COURT:  Okay.  I'm going to assume you didn't

10  mean that.

11     MR. DECHIARA:  Oh, your Honor, I don't believe there

12  was any -- this was asked on the prior examination, and I

13  think this is -- I don't recall --

14     THE COURT:  Okay.  I'll give you --

15     MR. DECHIARA:  -- this being asked on the prior

16  examination.

17     THE COURT:  I'll give you one more shot.  Go ahead.

18     MR. DECHIARA:  Okay.  Thank you.

19  BY MR. DECHIARA:

20  Q   Governor, did you say anything to Mr. Orr after you

21  reviewed the June 14th creditors' proposal that you objected

22  to the position that was set out there, namely that there

23  must be significant cuts to accrued pension liabilities?

24  A   Again, there would have been attorneys present, but I'm

25  confused enough now where --

1          THE COURT:  Well, if you are claiming the privilege,
2    we will deal with that.  Is that your claim, sir?
3          MR. DECHIARA:  Your Honor, I believe you overruled
4    counsel's attorney-client objection, so is -- are you
5    sustaining the governor's objection?
6          MR. SCHNEIDER:  Renewing my objection, your Honor.
7          MR. DECHIARA:  You're withdrawing it?
8          THE COURT:  Okay.
9          MR. SCHNEIDER:  I'll renew it.
10          THE COURT:  Hang on.  Hang on.  All right.  So I
11    already permitted testimony on this, and, if so, why are we
12    asking the question again?
13          MR. DECHIARA:  The question has not been answered.
14    My recollection of the sequence of events was I asked the
15    question, counsel objected, you overruled the objection.  I
16    asked the question again.  The witness objected.  So I think
17    that's where we are.
18          THE COURT:  No, but when Mr. Wertheimer was
19    questioning, wasn't this exact question asked?  In fact,
20    after the attorney-client privilege was overruled, I asked
21    the question.  Let's move on here.
22          MR. DECHIARA:  Should I not ask the question, your
23    Honor?
24          THE COURT:  Let's move on.
25          MR. DECHIARA:  Okay.

1    BY MR. DECHIARA:

2    Q    Governor, do you support -- at the time you read that

3    language in the proposal, did you support -- do you agree

4    with that position that there must be significant cuts in

5    accrued pension liabilities?

6    A    No.

7    Q    You do not agree with that position?

8    A    Again, I think it's speculation at this point in time.

9    Q    I'm asking you at the time that you read the proposal,

10   did you agree with what was set out in the document?

11   A    It used the word "must," and it was to go through a

12   negotiation process, so good faith parties could come up with

13   any arrangement they wanted to.  Again, the numbers could be

14   difficult to get there, but to say it's impossible, I

15   couldn't say that.

16   Q    Let me try to simplify it.  Do you agree with the

17   position that there must be -- as you sit here today, do you

18   agree with the position that there must be significant cuts

19   to accrued pension liabilities?

20   A    Again, that's one of the issues in Chapter 9.  I view

21   this as not a matter of speculation.  It depends on the plan

22   and the judge's approval.

23   Q    I'm not asking for any speculation.  I'm asking if you

24   agree with that position.

25   A    Well, again, there's no plan been submitted yet.

1  Q   I'm asking if you agree with that position, Governor.

2  A   I don't necessarily know there have to be, and, again,

3  it's not my decision to make that call.

4  Q   Did you believe -- when you received the July 16th

5  request by Mr. Orr for permission to file for bankruptcy,

6  there was reference to the June 14th creditors' proposal in

7  it, was there not?

8  A   Yes.

9  Q   Okay.  And you approved the request to file for

10  bankruptcy; correct?

11  A   Yes.

12  Q   Okay.  Did you undertake any investigation before you

13  approved the filing for bankruptcy of what impact that

14  proposal would have on the retirees of the City of Detroit?

15  A   Yes.

16  Q   What investigation did you undertake?

17  A   Well, not investigation, but understanding from the

18  creditors' proposal it would have a dramatic impact, but also

19  the points in Mr. Orr's letter -- he pointed out why the

20  creditors' proposal didn't appear to be feasible.

21  Q   Did you know the -- when you approved the bankruptcy

22  filing, did you know the extent of the cuts to pension

23  liabilities that were being proposed by Mr. Orr?

24  A   Again, they were contingent, so it could have been any

25  amount of numbers, and it was subject to negotiation.

1  Q   So you didn't know how much Mr. Orr -- when Mr. Orr said

2  there must be significant cuts, you didn't know what he had

3  in mind in terms of the extent of the cuts, if he had

4  anything in mind.  Is that a fair statement?

5  A   Yes.

6  Q   Did you ask Mr. Orr before you approved the bankruptcy

7  filing how much he intended to cut people's -- retirees'

8  pensions?

9  A   Those would have been in meetings subject to attorney-

10  client privilege.

11  Q   So are you refusing to answer the question on attorney-

12  client privilege?

13         MR. SCHNEIDER:  Objection based on attorney-client

14  privilege.

15         MR. DECHIARA:  Your Honor, are you sustaining the

16  objection?

17         THE COURT:  Would you like to be heard on whether

18  it's an appropriate claim of privilege?

19         MR. DECHIARA:  Yes.  I don't think just the fact

20  that there were attorneys present makes the communication

21  between the governor and the emergency manager privileged.

22  It doesn't deal with a legal issue.  It's just a question

23  about whether he inquired of Mr. Orr.  It goes directly to

24  the question of authorization.

25         THE COURT:  Well, I assume it's relevant, but that

1    doesn't make it any less protected by the attorney-client

2    privilege.  If there were attorneys there, I will sustain the

3    claim of privilege.

4    BY MR. DECHIARA:

5    Q    Before you approved the bankruptcy filing, apart from

6    the --

7              THE COURT:  By the way, as a matter of procedure,

8    counsel, when the witness claims privilege, there's no need

9    to object on the grounds of privilege.  If counsel wishes the

10   witness to be compelled to answer in the face of the claim of

11   privilege, he will make such a motion, and then you'll be

12   heard.

13             MR. SCHNEIDER:  That's fine, your Honor.  Thank you.

14   BY MR. DECHIARA:

15   Q    Did you understand that the proposal provided that in

16   exchange for the cuts in accrued pension liabilities the

17   retirees would get certain notes?

18   A    Yes.

19   Q    Okay.  And did you know what the value of those notes

20   would be that the retirees would get?

21   A    I knew the principal amount of the notes.

22   Q    But did you know how much the value of the notes would be

23   that the retirees would get?

24   A    Not to a specific number.

25   Q    Okay.  Did you have any idea?

1   A    It would be a significant discount for the unfunded part

2   of the obligation.

3   Q    Was it your understanding that the notes would be

4   interest only; in other words, that the retirees would not

5   have an entitlement to receive principal on the notes?

6   A    I don't recall.

7   Q    You didn't know that?

8   A    That's different than "I don't recall."

9   Q    Okay.  So let me clarify the question.  Did you know at

10  the time that you approved the bankruptcy filing whether or

11  not the notes would be interest only?

12  A    Again, that's where I don't recall.

13  Q    You don't recall whether you knew or not?  Is that your

14  answer?

15  A    I don't recall what the notes said specifically in terms

16  of their terms other than understanding there was a

17  contingent note.

18  Q    Did you, before you approve the bankruptcy filing,

19  undertake -- apart from anything you said to Mr. Orr,

20  undertake any investigation or have any investigation

21  undertaken for you to assess how much the cuts in pension

22  liabilities would impact the retirees?

23          THE COURT:  Asked and answered, your Honor, and I

24  believe Mr. Wertheimer also went into this area.

25          MR. DECHIARA:  I'll strike that question.

1  BY MR. DECHIARA:

2  Q    Did you investigate how much an average retiree of the

3  City of Detroit receives annually in retirement benefits?

4         MR. SCHNEIDER:  Again, your Honor, asked and

5  answered.  We're covering the same ground.

6         MR. DECHIARA:  I don't believe it was, your Honor.

7         THE COURT:  I'll permit this one.  Go ahead, sir.

8  Please answer.  Did you do such an investigation?

9         THE WITNESS:  I had seen accounts in the press of

10  what pension benefits were for a number of the retirees.

11  BY MR. DECHIARA:

12  Q    And did you rely on those accounts in the press?

13  A    Some of them, yes.

14  Q    Okay.  Did you undertake any investigation -- given the

15  powers of your office and the resources at your disposal, did

16  you undertake or have an investigation undertaken to

17  determine the annual average pension benefits received by

18  retirees?

19  A    No.

20  Q    You just -- whatever -- you just read about it in the

21  newspaper.  Is that your testimony?

22  A    Again, there would have been meetings subject to

23  attorney-client privilege.

24  Q    I'm not asking anything about meetings or attorney-client

25  privilege.  I'm asking you did you rely on what you read in

1  the newspaper?

2  A   I had other information that would have been in meetings

3  provided to me where attorneys were present.

4  Q   And what was your understanding of the average annual

5  pension benefit received by a retiree?

6  A   Again, it would have been in the thousand to $2,000-a-

7  month range.

8  Q   Okay.  So about 12,000 to 24,000 annually; is that -- am

9  I doing the math right?

10  A   Sounds like it.

11  Q   Okay.  Did you do any investigation or cause any

12  investigation to be undertaken whether a retiree whose

13  pension is between 12 and $24,000 a year, if significant

14  amounts of that income was cut, whether the retirees would be

15  able to pay their mortgages or pay their rent necessary to

16  stay in their homes?

17          MR. SCHNEIDER:  Objection.  Relevance.

18          MR. DECHIARA:  Your Honor, the governor approved the

19  bankruptcy filing based on -- he said he read the proposal --

20  based on the proposal.  I'm trying to inquire into the state

21  of the governor's knowledge when he approved the bankruptcy

22  filing.  I think to say -- let me just say this.  To say

23  that -- these questions all go to the impact that these cuts

24  that Mr. Orr has proposed and that the governor knew about

25  and that the governor approved -- to say that the impact of

1    these cuts are going to have on the retirees and whether

2    they're going to be able to put food on the table and pay

3    their rent --

4         MR. SCHNEIDER:  Objection, your Honor, to --

5         MR. DECHIARA:  To say that's irrelevant to this

6    proceeding --

7         MR. SCHNEIDER:  -- not only --

8         THE COURT:  I need to hear the response to your

9    objection, sir.

10        MR. SCHNEIDER:  I believe he's testified --

11        MR. DECHIARA:  To say that's irrelevant to this

12   proceeding I think is incorrect.

13        THE COURT:  Well, but your objection to eligibility

14   is that this bankruptcy will impair the pensions regardless

15   of their impact; right?

16        MR. DECHIARA:  I'm sorry, your Honor.

17        THE COURT:  Your objection to eligibility here is

18   that pensions will be impaired regardless of their impact.

19   Yes?  Yes?

20        MR. DECHIARA:  We object to any impairment of

21   accrued pension liabilities.  That's correct.

22        THE COURT:  All right.  So it's not on the grounds

23   of impact.  Its on the grounds of the Constitution.  Yes?

24        MR. DECHIARA:  Correct, but that's not our only --

25        THE COURT:  All right.  So the objection is

1  sustained.

2  BY MR. DECHIARA:

3  Q   You testified earlier that since Mr. Orr has been

4  emergency manager, you've had regular meetings with him;

5  correct?

6  A   Yes.

7  Q   And those are both meetings in formal settings without

8  other advisors present, other staff and advisors present, and

9  also one-on-one meetings; correct?

10  A   Yes.

11  Q   In Mr. Orr's July 16th letter to you requesting

12  permission to file bankruptcy, he asserted, did he not, that

13  there were $3.5 billion in accrued pension liabilities that

14  the city had?

15  A   Yes.

16  Q   Okay.  And you accepted that number as true?

17  A   I --

18  Q   It's a "yes" or "no" question.

19  A   I took that as a number that he was presenting in his

20  letter.  There's a variety of numbers out there.

21  Q   My question is did you take that number that he presented

22  as true?

23  A   I believed he was presenting a number he believed was a

24  true estimate.

25  Q   And did you agree that it was true?

1 A   I believe that there could be some reasonable range on

2 that, but it was within the reasonable range.

3 Q   And when you received the July 16th letter, you knew that

4 the emergency manager had not completed an analysis of what

5 assets of the city could monetized; correct?

6 A   Correct.

7 Q   And when you approved the bankruptcy filing, you were

8 aware or were -- let me ask you.  When you approved the

9 bankruptcy filing in your July 18th letter, were you aware

10 that a significant portion of the underfunded pension

11 liability of the City of Detroit was allocable to the Water

12 and Sewer Department?

13 A   I didn't know what percentage, but there would be some

14 portion --

15 Q   Did you know --

16 A   -- to Water and Sewer.

17 Q   Did you know that there was some percentage that was

18 allocatable?

19 A   Yes.

20 Q   Okay.  Let me refer you back to your deposition.  I'm

21 referring to page 59, line 2.

22           "Question:  Do you know whether a significant

23           portion of Detroit's unfunded pension liability is

24           allocable to the city's Water and Sewer Department?

25               Answer:  I'm not aware of that relationship."

1        Was that true at your deposition when you said you

2   were not aware of that relationship?

3   A    At that time.

4   Q    At the time of the deposition?

5   A    Yeah.

6   Q    And so since you -- so since then you've learned.  Okay.

7   My question was not that.  My question was at the time -- on

8   July 18th before your deposition, going back to July 18th --

9   A    I'm sorry.  I missed --

10  Q    Okay.  Okay.

11  A    That would be correct.

12  Q    We're not on the same page.

13  A    Yes.

14  Q    I think we are now.  At the time of the July 18th letter

15  that you issued approving the bankruptcy filing, were you

16  aware then that a significant portion of the city's pension

17  liability was allocable to the Water and Sewer Department?

18  A    Not at that time.

19  Q    You were aware, were you not, that under law you could

20  have, had you chosen, put a contingency on your approval and

21  made the bankruptcy filing contingent on Mr. Orr not seeking

22  to impair accrued pension liabilities?  Are you aware that

23  you had that power?

24  A    Yes.

25  Q    Okay.  And you chose not to exercise it?

1  A   Yes.

2  Q   Did you speak to Mr. Orr at any time about using Chapter

3  9 to get -- to eliminate pension liabilities of the city?

4  A   Those discussions would have been with attorneys.

5  Q   Okay.  So are you refusing to answer the question?

6  A   Yes.

7  Q   Okay.  Did you speak to Mr. Orr at any time about the

8  timing of the bankruptcy filing?

9  A   Those discussions would have been with attorneys present.

10  Q   And you're refusing to answer that question?

11  A   Yes.

12         MR. DECHIARA:  Your Honor, I'm sorry if I'm taking

13  some time.  I'm trying to eliminate so --

14         THE COURT:  Okay.

15         MR. DECHIARA:  -- I don't duplicate.

16         THE COURT:  Take your time.  Actually, while you're

17  doing that, I'm going to consult with my court security

18  officer here, so give me just a minute, please.  You may

19  proceed whenever you are ready, sir.

20         MR. DECHIARA:  Thank you, your Honor.

21  BY MR. DECHIARA:

22  Q   Are you aware, Governor, that revenue sharing by the

23  state with the city -- in other words, monies given by the

24  state to the city -- have been reduced substantially over --

25  in recent years?

1      MR. SCHNEIDER:  Objection to relevance.

2      THE COURT:  No.  That objection is overruled.

3  Please answer the question.

4      THE WITNESS:  Yes.

5  BY MR. DECHIARA:

6  Q   And is -- that's true, that it has been reduced

7  substantially over recent years?

8  A   It has been reduced, yes.

9  Q   Okay.  Is it true, in your view, that if that state

10  revenue sharing had not been reduced, there might have been

11  monies to maintain the pensions of the Detroit retirees?

12  A   That would be speculative.

13  Q   Well, if the city had more money from the state, wouldn't

14  that -- wouldn't it not have more money available to pay for

15  pensions?

16  A   Again, that's speculative because there are approximately

17  somewhere between 15 and $18 billion worth of debt and needs

18  in the services for better services -- excuse me -- the

19  citizens having better services within the city.

20  Q   Did Mr. Orr at some point ask you whether his decision

21  whether or not to become emergency manager would impact the

22  decision on whether or not Jones Day would be hired as

23  restructuring counsel for the city?

24  A   Would you repeat that again?

25  Q   Sure.  It was a little complicated.  Did you -- excuse

1   me.  Did Mr. Orr at any point when he was a candidate for

2   emergency manager -- did he ever have a conversation with you

3   where he said something to the effect of, "I don't want my

4   decision as to whether or not I accept the job to impact

5   Jones Day's chances of being hired as restructuring counsel

6   for the city"?  Did Mr. Orr ever say anything to you --

7   A   I don't recall.

8   Q   -- along those lines?

9   A   I don't recall that.

10  Q   Did Mr. Orr ever come to you at any point since he's been

11  emergency manager asking whether or not the state would share

12  in the financial burden of some or all of Detroit's pension

13  liabilities?

14  A   That would have been in meetings with attorneys present.

15  Q   I'm just asking whether that conversation occurred.

16  A   That particular question I don't recall being ever

17  brought up.

18  Q   You don't recall whether it was ever brought up, but if

19  it did, it was -- it happened before attorneys?  Is that your

20  testimony?

21  A   Well, again, we had discussions on pensions, but

22  attorneys were present in those meetings.

23  Q   Right, but this is a specific question.  Did Mr. Orr ever

24  have discussions with you about the state sharing in the

25  financial burden in whole or in part of Detroit's financial

1  liabilities?

2  A  I don't recall.

3      MR. DECHIARA:  Nothing further, your Honor.

4      THE COURT:  All right.  Hang on.  We're going to

5  take our afternoon break at this time for 15 minutes.  Well,

6  actually until 2:45.  I will, however, ask everyone to remain

7  seated until the governor can make his exit, and so give us a

8  couple minutes for that, and then we'll reconvene at 2:45.  I

9  think the court security officer or one of them will show you

10 to the judges' conference room down the hall.

11     THE WITNESS:  Okay.  Just trying to show the right

12 etiquette, Judge.

13     THE COURT:  I'm sorry, sir.

14     THE WITNESS:  That you were leaving first.

15     THE COURT:  No, no, no.  I'm going to sit here with

16 everyone else, and then when you're all settled, we will go.

17 Okay.  All right.  We're going to be in recess.

18     THE CLERK:  All rise.  Court is in recess.

19    (Recess at 2:27 p.m. until 2:45 p.m.)

20     THE COURT:  You may proceed.

21     MS. LEVINE:  Good afternoon, your Honor.  Sharon

22 Levine, Lowenstein Sandler, for AFSCME.  Just to clarify the

23 record, AFSCME also served a trial subpoena and appreciated

24 the acceptance of service by the state.  Thank you.

25                    DIRECT EXAMINATION

1  BY MS. LEVINE:

2  Q   Good afternoon, Governor.

3  A   Good afternoon.

4  Q   Briefly, do you recall a coalition of unions negotiating

5  a tentative agreement with the City of Detroit back in -- in

6  or around February of 2012?

7  A   I don't recall.

8  Q   If I could try just to refresh your recollection for a

9  moment, there were about 30 unions that negotiated a

10  tentative agreement that was a concessionary agreement that

11  resulted in savings for the city.  The unions ratified that

12  agreement and then were advised by the city that the state

13  asked them not to implement it.  Are you familiar with that?

14  A   I recall the general topic but no specifics.

15  Q   Do you know why the state asked the city not to implement

16  the terms of the concessionary agreement, which would have

17  provided for savings to the city?

18          MR. SCHNEIDER:  Objection to relevance.

19          THE COURT:  Overruled.  Please answer.

20          THE WITNESS:  I don't recall.

21  BY MS. LEVINE:

22  Q   Governor, it's true, is it not, that in a nonmunicipal

23  bankruptcy case, the Pension Benefit Guarantee Corp. or the

24  PBGC provides insurance coverage for retirees if their

25  pensions are terminated; correct?

1  A   For private entities, I believe that's true.

2  Q   For private entities with, for example, single employer

3  defined benefit plans; correct?

4  A   Yes.

5  Q   And the current level of protection provided by the PBGC

6  is $57,500; is that correct?

7  A   I wouldn't be aware of that number.

8  Q   Well, isn't it true that -- our understanding is that the

9  average pension in Detroit is approximately $18,000 a year,

10  but even using your figure of between one or $2,000 a month,

11  which is slightly higher, isn't it true that all of the

12  retirees in Detroit would fall within the limits of the PBGC

13  protections?

14  A   Again, I'm relying on your statements.

15  Q   So it's true, though, that all of the retirees would fall

16  within the limits of about $57,000, in fact, substantially

17  under $57,000 a year?

18  A   Again, I don't know to a fact that every retiree is under

19  that number.

20  Q   Okay.  We'll try this a different way.  You reviewed the

21  June 14th proposal prior to the time of the June 14

22  presentation; correct?

23  A   Yes.

24  Q   Were you present at the June 14 presentation?

25  A   No.

1  Q   Kevyn Orr was present at the June 14 presentation?  Yes?

2  A   Yes.

3  Q   But he had discussions with you prior to that time?

4  A   Yes.

5  Q   And you reviewed the presentation before it was made;

6  correct?

7  A   Yes.

8  Q   And on page 109 of the presentation, which was Exhibit

9  43, and on page 59 of the executive summary of the

10 presentation, which is Exhibit 44, there is a comment with

11 regard to underfunded pension, and I'm just going to read it

12 so we don't have to find the document right now.  "Because

13 the amounts realized on the underfunding claims will be

14 substantially less than the underfunding amount, there must

15 be significant cuts in accrued vested pension amounts for

16 both active and currently retired persons."  Do you recall

17 that?

18 A   Yes.

19 Q   Did you read that before June 14?

20 A   Yes.

21 Q   Now, with regard to the amount of the underfunding, I

22 believe you previously testified today that you don't know

23 what it is, is that correct, as we sit here today?

24 A   Yes.

25 Q   And it would be speculative to guess what it would be as

1  you sit here today; correct?

2  A    Yes.  There could be a wide range on that.

3  Q    So there is nothing in this so-called proposal to

4  creditors, for example, that would say to a retiree that if

5  they earn currently $18,000 a year, that after the proposal

6  was implemented, if it's implemented, their annual benefit

7  will drop to nine, five, four, or zero; correct?

8  A    Well, that was a proposal subject to mutual negotiations,

9  so it didn't --

10  Q    No, no, but under the proposal, regardless of what the

11  mutual negotiation is, if I'm a retiree -- Sharon Levine is

12  86 years old.  I live in Detroit.  I look at this proposal,

13  and I say to myself, okay, I currently get $18,000 a year.

14  After the proposal, my vested accrued pension benefit payment

15  will now drop to nine, five, seven, whatever the number is.

16  You can't tell that from this proposal; correct?

17  A    I believe that would be difficult.

18  Q    And in addition to that, it talks about a $2 billion note

19  for all of the unsecured creditors to share; correct?

20  A    Yes.

21  Q    And we don't know what the total universe of all

22  unsecured claims are, do we?

23  A    I believe -- well, there's an estimate in the proposal to

24  creditors.

25  Q    Right, but as we sit here today, exactly what that number

1  is going to be, we don't know what it is, do we?

2  A   Correct.

3  Q   And so any individual creditor doesn't really know, as we

4  sit here today, what their share of the $2 billion note will

5  be over the term of that note; correct?

6  A   Well, you said "will be."  You're assuming that will be

7  the case.  That's past tense now that --

8  Q   Let's go back.

9  A   -- we're in bankruptcy.

10 Q   Let's go back to June 14 again.  I'll try it again.

11 Okay.  On June 14 the city made a proposal that you read

12 before it was made.

13 A   Yes.

14 Q   Okay.  And a retiree reading that proposal doesn't know

15 what their post-proposal, if it's implemented, retiree annual

16 benefit is going to be post-proposal.  We just had that

17 conversation.  We don't know if 18 is dropping to 9 or 4 or 7

18 or whatever the number is going to be; correct?

19 A   I'm not trying to be difficult, but you're speaking in

20 the future tense.

21 Q   No.  I'm speaking in the past.  In other words, one of

22 the things we're looking at --

23 A   You said what it will be --

24 Q   Okay.  I'll rephrase it.

25 A   -- or what it would have been.

1   Q   I'll rephrase.

2   A   Yeah.

3   Q   I'll rephrase.

4   A   I'm sorry.  I'm just trying to make sure I'm answering --

5   Q   I'll rephrase.  Going back to June 14, we're making a

6   proposal; right?  We have a proposal.  It's the so-called

7   proposal to creditors.  A retiree is a creditor; correct?

8   A   Yes.

9   Q   Okay.  An individual retiree picks up the proposal or

10   takes it off the website or comes to one of the public

11   meetings.  They currently get $18,000 a year.  They take a

12   look at this proposal.  There is nowhere in that proposal

13   that tells them what they're going to get if the proposal is

14   implemented on that -- what they now know to be their $18,000

15   a year; correct?

16   A   Yes.

17   Q   Okay.  And in addition to that, whatever that

18   underfunding is would -- if I understood your testimony

19   correctly, would be part of what gets paid under the $2

20   billion note; correct?

21   A   Yes.

22   Q   Okay.  Now, there's nothing in that proposal, though,

23   that would tell an individual creditor or an individual

24   retiree exactly what their proportionate share of the $2

25   billion note would be; correct?

1    A    I thought you already asked that, but yes.

2    Q    Well, but we were -- okay.  So that's good.  So we don't

3    know what we're getting on our annual pension benefit

4    anymore, and we don't know what our claim is going to be

5    worth as we read the June 14 proposal for creditors; correct?

6    A    Yes.

7    Q    Okay.  In addition to that, as we sit here today, is it

8    your understanding that the individual retiree asserts a

9    claim for the underfunding portion, or is it, as the city

10   contends, only the Retirement System that asserts that claim?

11   A    That would be a legal question that I'd leave to the --

12   Q    So a retired person who is coming to the June 14 meeting

13   doesn't know what their annual pension benefit is going to be

14   reduced to, doesn't know what their pro rata share of this $2

15   billion note is going to be, and doesn't even know if they're

16   going to be allowed to assert a claim to share in the $2

17   billion note; is that correct?

18   A    If you're speaking in the present tense, I believe one of

19   the first things that was requested by the city during the

20   bankruptcy process was to have someone represent the

21   creditors so they would have a voice at the table, so I view

22   that as one of the constructive issues that I looked at that

23   retirees weren't having the kind of representation I thought

24   they deserved until we got into this process.

25   Q    Okay.  But I'm going to ask my question again.  On June

1   14, if you're a retiree and you're reading this proposal --

2   okay -- you cannot tell -- it's correct that you can't tell

3   what your -- and I'm using a hypothetical -- $18,000 a year

4   is going to be reduced to, you can't tell what your pro rata

5   share of the $2 billion note is going to be in real

6   quantifiable dollars, and you don't know even if you're going

7   to be allowed to assert that claim or whether that claim only

8   gets asserted by the pensions themselves; isn't that correct?

9   A   The first two statements I would say yes.  The third one

10  is a legal question that I don't know the answer to.

11  Q   But, Governor, if you don't understand it, how does the

12  86-year-old retiree understand it?

13  A   Again, that's --

14          MR. SCHNEIDER:  Objection.  Speculation.

15          THE COURT:  Overruled.  Can you answer the question?

16          THE WITNESS:  That would have been the part of the

17  negotiate process because I believe Mr. Orr was trying to

18  have meetings with various union and other representatives to

19  potentially represent the retirees.  My understanding is in

20  many cases they would not take up that interest in

21  representing the retirees.

22  BY MS. LEVINE:

23  Q   Governor, are you aware that AFSCME wrote several letters

24  to Jones Day and Miller Buckfire requesting meetings prior to

25  the filing of the bankruptcy case on July 17 requesting

1    meetings with regard to negotiations?

2    A    No.

3    Q    Were you aware that those requests were declined?

4    A    No.

5    Q    In response to earlier questioning, you said if the Court

6    ordered you -- sorry.  In response to prior questioning with

7    regard to not diminishing or impairing vested pension

8    benefits, I believe you testified, and I quote, here today,

9    if the court ordered you had to pay them, you would pay them.

10   Is that a true statement?

11   A    I will follow a lawful order of a court every time.

12   Q    So if this Court finds --

13   A    That's my goals as governor.

14   Q    So if this Court finds that it's unconstitutional or

15   unconstitutional as applied to impair or diminish vested

16   pension benefits, are you, as the governor of the State of

17   Michigan, saying that the state will pay those pension

18   benefits?

19   A    I think you're asking a broader question in that context

20   because the case is with the City of Detroit, not the State

21   of Michigan.

22   Q    Your comment was if the court ordered you had to pay

23   them, you would pay them.

24   A    If the court through this process -- if I have a valid

25   judicial order that's been reviewed and gone through the

1  judicial system ordering me to take an action, I'm going to

2  follow the action of the court.

3  Q   As we sit here today, have you or has anyone on behalf of

4  the state offered to Detroit or Kevyn Orr state funding to

5  avoid impairing or diminishing pension benefits?

6  A   Those discussions would have been with attorneys present.

7  Q   I'm not asking you what the discussions were.  I'm not

8  asking what you said or what they said.  I'm asking as we sit

9  here today, have you or has anyone on your behalf or on

10  behalf of the state offered Detroit or Kevyn Orr state

11  funding to avoid impairing or diminishing vested pension

12  benefits?

13        THE COURT:  I'm going to ask you to answer that

14  question but with one further limitation, which is I don't

15  want you to disclose any conversations that you have had or

16  that you are aware has been had in the context of the

17  District Court's mediation here.

18        MS. LEVINE:  And we weren't looking for that, your

19  Honor.

20        THE COURT:  So with that limitation, would you

21  answer the question?

22        THE WITNESS:  Could you walk through that one more

23  time for me?  Sorry.

24  BY MS. LEVINE:

25  Q   As we sit here today --

1          THE COURT:  That's all right.  That's all right.

2    BY MS. LEVINE:

3    Q   -- have you or has anyone on your behalf or on behalf of

4    the state offered Detroit or Kevyn Orr state funding to avoid

5    impairing or diminishing vested pension benefits?

6    A   No.

7          MS. LEVINE:  No further questions, your Honor.

8                        DIRECT EXAMINATION

9    BY MR. KING:

10   Q   Good afternoon, Governor.

11   A   Good afternoon.

12   Q   My name is Ron King, and I represent the two Detroit

13   Retirement Systems.  If I understood your testimony

14   correctly, leading up to the June 18th authorization, you'd

15   indicated that this was a two-and-a-half-year-in-the-making

16   process.  Is that accurate?

17   A   I had been involved with serious discussions on Detroit's

18   financial condition over the last two and a half years, yes.

19   Q   And as part of those discussions, is it safe to assume

20   that there was substantial review of financial information,

21   compilation of multiple reports, in-depth analysis of cash

22   flow, and other factors that would go into evaluating the

23   financial condition of the city?

24   A   Yes.

25   Q   And, additionally, even dating back to 2012, the city had

1  professionals on board, consultants on board, that were

2  engaged in the process of conducting and compiling this

3  information and performing those types of reviews, to your

4  knowledge; correct?

5  A   Yes.

6  Q   So this has been a very lengthy ongoing process leading

7  up to your authorization on July 18th.  Is that accurate?

8  A   Yes.

9  Q   And you indicated that you were familiar with the June

10 14th proposal to creditors; correct?

11 A   Yes.

12 Q   And I believe you agreed that that June 14 proposal

13 actually used the language that there would be significant

14 cuts to pension benefits.  Is that accurate?

15 A   Yes.

16 Q   And I think you also stated just a moment ago -- and I

17 know you also did in your deposition -- that one of your

18 concerns understandably was that retirees would have a voice

19 in this process.  Is that accurate?

20 A   Yes.

21 Q   If the city were to put forth a proposal that didn't

22 contemplate an impairment or diminishment of pension

23 benefits, then there wouldn't be a need for the retirees to

24 have a voice, would there be?

25         MR. SCHNEIDER:  Objection.  Calls for speculation.

1    THE COURT:  Sustained.

2  BY MR. KING:

3  Q    Do you know if the city has set forth any other proposals

4  to creditors other than the June 14 proposal?

5  A    I wasn't present for the follow-up negotiations, the

6  meetings that would have taken place in terms of I wasn't

7  present in those meetings with all those various creditors.

8  Q    And do you know whether or not the city contemplated a

9  proposal that would not impair or diminish pension benefits?

10  A    I don't recall.

11  Q    Have you and Mr. Orr had any discussions that would

12  contemplate a proposal that would not include the impairment

13  or diminishment of pension benefits, and that's subject to

14  Judge Rhodes' caveat that obviously you can't include

15  anything that was done in the context of the mediation?

16  A    I'm trying to recall.

17  Q    And I can -- let me -- you want me to repeat the question

18  for you?  Have you or Mr. Orr had any discussions prior to

19  your June 18 -- your July 18th authorization about putting

20  forth a proposal to creditors that does not contemplate the

21  diminishment or impairment of pension benefits?

22    MR. SCHNEIDER:  Objection if the question is calling

23  for attorney-client privileged information.

24    MR. SHUMAKER:  Same objection.

25    THE COURT:  You can answer that question if it does

1  not involve communication with counsel.

2          THE WITNESS:  It did involve counsel.

3          THE COURT:  All right.

4  BY MR. KING:

5  Q    Thank you, Governor.

6          MR. KING:  Can we see Exhibit 615, please?

7  BY MR. KING:

8  Q    And, Governor Snyder, if I could just focus your

9  attention to the last sentence of the first paragraph, and

10 this is the e-mail from then Treasurer Dillon to you, and

11 that sentence says, "Because pensions have such a long life,

12 there are a lot of creative options we can explore."  Have

13 you explored any of these creative options that Treasurer

14 Dillon set forth in this e-mail to you?

15 A    In terms of this particular e-mail, what would have

16 happened is -- what happened is I believe there was a phone

17 conversation that he called me that evening and had a general

18 discussion on that.  I listened to what he had to say.  I

19 appreciated what he had to say.  And then I passed it on to

20 discussions with Kevyn Orr and the city in meetings that

21 attorneys were present at and giving advice on.

22 Q    Did any of these creative options contemplate a scenario

23 where pension benefits were not diminished or impaired?

24 A    I don't recall that specifically.

25 Q    And let me -- if we could put up -- oh, one more question

1   on this.

2           MR. KING:  Could we go back to the full text of the

3   e-mail, please?

4   BY MR. KING:

5   Q   In this e-mail, there's also a reference to at least

6   Governor -- or excuse me -- Treasurer Dillon's statement that

7   it's early in the process, and this is still in the

8   informational stage.  As of July 9th of 2013, did you believe

9   that statement to be true?

10  A   Which part?  I'm sorry.

11  Q   The part that's now --

12          THE COURT:  Would you just rephrase the question?

13          MR. KING:  Sure.

14  BY MR. KING:

15  Q   In this e-mail Treasurer Dillon says, "In my view, it's

16  too early in the process to respond to hypothetical

17  questions.  We remain in many ways at the information stage,"

18  and my question was as of July 9th, do you agree with that

19  statement?

20  A   That's what he shared with me, so I took that as

21  accurate.

22  Q   Do you agree that that's the case even today, as we sit

23  here today?

24  A   There's more work that's been done on the subject matter,

25  and I believe people are still analyzing data on this

1    question.

2    Q    Thank you.

3           MR. KING:  Can you put up UAW 625, please?  And can

4    you scroll down to the second full paragraph where it starts

5    "I favor"?  Thank you.

6    BY MR. KING:

7    Q    Now, this was an e-mail from your counsel to you, and --

8    A    Actually, it was not to me.  This e-mail wasn't -- you're

9    quoting the part from Mike Gadola to a number of people that

10   Mike Gadola -- that Dennis Muchmore then forwarded to me.

11   Q    Fair enough.  Did you see this statement here?

12   A    Yes.

13   Q    And did Mr. Gadola ever share with you his opinion that

14   you should exercise your ability under PA 436 to put

15   contingencies on the bankruptcy filing?

16   A    Yeah.  I don't want to be difficult here.  I just need

17   some help --

18   Q    Sure.

19   A    -- in the sense that it's in this document that's now an

20   exhibit, but Mike Gadola is my counsel, so he shared

21   information on this topic, but that's where I just need help

22   to know is that subject to privilege or because it's here

23   it's not anymore?

24          MR. KING:  Your Honor, I'm not familiar with the

25   agreement that Mr. Wertheimer entered into with the city, but

1  it's my understanding that there was a waiver of privilege at

2  least with respect to this document.

3       MR. SCHNEIDER:  Your Honor, the waiver is only as to

4  this document, nothing else.

5       MR. WERTHEIMER:  The waiver is as to this and other

6  documents but nothing beyond the documents.

7       MR. KING:  Let me move on, your Honor.

8       THE COURT:  All right.

9  BY MR. KING:

10 Q   At some point, you elected not to include any

11 contingencies with the authorization that you sent to Mr. Orr

12 on July 18th; correct?

13 A   Correct.

14 Q   And at the time that you sent that authorization to

15 Mr. Orr, you were aware of his public position and, of

16 course, the position set forth in the June 14 proposal that

17 he believed pension benefits needed to be significantly

18 reduced; is that correct?

19 A   Again, I didn't take the June 14th proposal as

20 conclusive.  Again, that was part of the mutual negotiation

21 process to avoid the bankruptcy.  Now that we're in

22 bankruptcy, it's really contingent on waiting for a plan on

23 bankruptcy to be presented to the judge.

24 Q   But at your deposition you indicated that you were aware

25 at the time that you executed the July 18th letter that it

1   was Mr. Orr's position that there had to be significant cuts

2   in accrued pension benefits?

3   A   It was what he presented in the proposal to creditors.

4   Q   And why is it that you chose not to put a contingency in

5   the July 18th authorization related to accrued pension

6   benefits?

7   A   I made a decision not to put a contingency with respect

8   to any conditions because my concern was is this is an

9   extremely difficult process; that we're in a crisis mode; and

10  that we have serious issues here.  And I felt it could be an

11  issue causing more delays, concern, complexity to a very

12  complex case to begin with; that I have confidence in the

13  judicial process, and that's why I actually asked that

14  additional statement to be added in that paragraph that any

15  plan that comes out of this has to be a legal plan.  I

16  thought it was a good opportunity to get people that are the

17  appropriate people to make decisions that then I can help

18  support the city in the implementation.

19  Q   But ultimately you decided that the July 18th

20  authorization should not have any contingencies?

21  A   Yes.  I made that decision.

22  Q   And I'm going to finish up, I think, where you started,

23  which was -- I think you testified very, very early on that

24  you believe that the issue affecting the Detroit bankruptcy

25  is one of I think national importance.

1  A    Not national importance.  It could be viewed that way.

2  My concern is with the citizens of Michigan and the City of

3  Detroit, including the retirees.  To the degree it affects

4  things nationally, that's a national issue.  What I was

5  putting in is if you look at difficult problems around our

6  country, this is a problem that's been accumulating for 60

7  years and had not been solved before, and there are not many

8  problems of this magnitude in our country.

9  Q    So you certainly would agree that the situation in

10  Detroit impacts the citizens of the State of Michigan?

11  A    Yes.

12  Q    And do you agree with me that until such time that the

13  people of the State of Michigan, through a lawful amendment

14  to the Constitution, choose to modify Article IX, Section 24,

15  that the state should otherwise honor that obligation?

16  A    I believe I'm following Michigan's Constitution and the

17  Constitution of the United States, and the article says

18  accrued financial benefits shall be treated as a contractual

19  obligation.

20          MR. KING:  Thank you, Governor.  Appreciate your

21  time.

22                    DIRECT EXAMINATION

23  BY MS. PATEK:

24  Q    Good afternoon, Governor.  Barbara Patek.  I represent

25  the four public safety unions that represent the police and

1   fire fighters of the City of Detroit, and I have just a

2   handful of questions for you.  I want to start with Public

3   Act 436.  Obviously you're the chief executive of our state,

4   and you're not a legislature, but Public Act 436 was an act

5   that you favored; is that right?

6   A    Yes.

7   Q    And you favored it because it provided a number of tools

8   that could be used in circumstances like that facing the City

9   of Detroit; correct?

10  A    That was very general.  I'd be happy to give you more

11  specific reasons.

12  Q    And I'm going to ask you about --

13  A    Okay.

14  Q    -- some of the -- I mean I'm not suggesting that there

15  aren't reasons --

16  A    Okay.

17  Q    -- but I'm going to ask you about some of those reasons.

18  Among those tools, it did allow, upon a finding of a

19  financial emergency, for the appointment of an emergency

20  manager like Mr. Orr; right?

21  A    Public Act 436 actually gives options to communities

22  about one of four courses to follow, which --

23  Q    Correct.

24  A    -- was an improvement on Public Act 4.

25  Q    I think you and I are talking about the same thing, but

1  I'm just asking about specific --

2  A    Okay.

3  Q    -- aspects of that.  So among those options is, under the

4  appropriate circumstances, an emergency manager like Mr. Orr

5  can be appointed.

6  A    A city may select that.

7  Q    And that occurred in this particular case; correct?

8  A    What happened in this particular case is Kevyn Orr

9  came -- originally this process was under Public Act 72; that

10  then he transitioned to Public Act 436.

11  Q    But at the time Kevyn Orr became first the emergency

12  financial manager under Public Act 72 or former Public Act

13  72, everyone knew that a few days hence that he would become

14  the emergency manager under Public Act 436; isn't that right?

15  A    He became -- it was under Public Act 72 that he would be

16  transitioning to 436, yes.

17  Q    And when that happened, you knew and the others involved

18  with the City of Detroit knew that within a few days after

19  that appointment because Public Act 436 would become

20  effective on March 28th of this year, that he would then --

21  Kevyn Orr would then become the emergency manager under

22  Public Act 436.

23  A    He would transition from one act to the other.

24  Q    And one of the -- one of the things that Public Act 436

25  also does is it allows an emergency manager to seek your

1  authorization to file for Chapter 9; correct?

2  A   Correct.

3  Q   And as we know, that, indeed, occurred in this case?

4  A   Correct.

5  Q   And we've talked a lot about -- well, strike that.

6  Another thing that Public Act 436 does is it is designed to

7  in a financial emergency situation reduce or eliminate under

8  certain circumstances the collective bargaining rights of

9  public employees.

10  A   It allows contracts to be changed in some fashion, yes.

11  Q   Including collective bargaining agreements, and it has --

12  A   There is a process, though, that has to be followed.

13  It's not simply a decision of the manager.

14  Q   And if that process is followed, those -- the right to

15  bargain collectively can be suspended?

16  A   Yes.

17  Q   And we talked about the June 14th proposal, and as I'm

18  hearing your testimony sitting here this afternoon, one of

19  the things that I hear you saying is it was the expectation

20  that there would be some kind of more robust give-and-take

21  negotiating process once that proposal was made that would

22  potentially result in a solution to one or more of the

23  problems facing the City of Detroit?

24  A   I'm not sure I follow you.  Could you --

25  Q   The June 14th proposal, I think you've indicated a number

1    of times you expect -- you expected that proposal to trigger

2    negotiations between the various interested parties.

3    A    Yes.

4    Q    And was it your expectation that that negotiating process

5    would take some time?

6    A    Given that it's an environment of crisis, it would -- it

7    could take some time, but hopefully it would be done promptly

8    and thoughtfully given the urgency.

9    Q    And one of the difficulties, as Ms. Levine went over with

10   you a few moments ago, with respect to the impairment of the

11   accrued vested pension benefits was the fact that there were

12   a lot of numbers missing from the equation; that is, exactly

13   what that impairment meant wasn't quite clear as of the time

14   of the June 14th proposal.  You would agree with that?

15   A    In the proposal itself there were open issues, but that

16   was the point of it being a proposal that needed further

17   negotiation.

18   Q    And I think you also told us when you made the decision

19   in response to Mr. Orr's July 16th letter to authorize the

20   Chapter 9 filing, you really went back over your term as

21   governor and reviewed for yourself the process of -- you

22   know, everything sort of that the City of Detroit had gone

23   through and the milestones that perhaps had not been met

24   and -- before you granted the authorization.

25   A    Yes.

1    Q    You are familiar, as the governor of the state, with Act
2    312?
3    A    Yes.
4    Q    And you know that that provides a mechanism that includes
5    mediation and arbitration of disputes between public safety
6    employees like police and fire with their various
7    municipalities?
8            MR. SCHNEIDER:  Objection as to the relevance.
9            THE COURT:  Overruled.  Go ahead.
10           THE WITNESS:  Yes.
11           MS. PATEK:  Can we have 720?  Hopefully this will
12   work.  You can go to the second page, please.
13   BY MS. PATEK:
14   Q    Were you monitoring or following closely the activities
15   in terms of what was going on with the financial emergency in
16   the City of Detroit after Mr. Orr's appointment on March
17   28th?
18   A    Well, I'm not sure how you define "following closely."  I
19   followed it.
20   Q    Were you aware that there were a number of collective
21   bargaining agreements among the public safety unions that
22   were due to expire as of June 30th of 2013?
23   A    I believe there were some.
24   Q    And would you agree with me -- well, strike that.  Are
25   you aware or did you play any role in the city's decision to

1  block the Act 312 proceedings associated with those efforts

2  to negotiate and extend those collective bargaining

3  agreements?

4  A   No.

5  Q   Would you agree with me that if the city were, in fact,

6  looking to negotiate and address the problem of the accrued

7  vested pension benefits, that, first of all, as a general

8  matter, there was at least some question as to whether

9  outside of bankruptcy those benefits could be impaired

10 because of the state Constitution?  Would you agree with

11 that?

12 A   I don't think I have enough knowledge to answer that

13 question.

14 Q   Would you agree that in the context of a negotiation and

15 perhaps as a quid pro quo for an extension of the term of the

16 contract, that that might be a place for the city to begin to

17 address on a relatively expeditious basis the accrued vested

18 benefits, at least of the active public safety employees

19 involved in those negotiations?

20         MR. SCHNEIDER:  Objection.  Calls for speculation.

21         THE COURT:  Overruled.  Excuse me.  Overruled.

22 Please answer.

23         THE WITNESS:  Again, I don't have enough knowledge

24 of the specifics of the situation that I would just be

25 speculating.

1          THE COURT:  Okay.

2   BY MS. PATEK:

3   Q   Do you know whether or not pursuant to Public Act 436 in

4   this case the collective bargaining rights of the public

5   safety employees were at least in some cases suspended by the

6   emergency manager?

7   A   I believe they had been suspended for some time under the

8   prior emergency manager laws.

9   Q   And that allowed the state to impose terms?

10  A   Again, it's not the state.  It would be the City of

11  Detroit.

12  Q   I'm sorry.  That allowed the city to impose terms.

13  A   Yes.

14  Q   Well, by the time the emergency manager took his role

15  under Public Act 436, if we focus on March 28th, 2013,

16  whether -- without getting into the specifics, would it be

17  fair to say that the legacy costs facing the City of Detroit

18  were in issue?

19  A   They had been an issue for some time.

20  Q   And having the opportunity to have a negotiation with the

21  public safety unions could provide a venue in which that

22  issue could be addressed?

23  A   That would be possible.

24  Q   Now, in terms of the proposed significant impairments to

25  pension benefits that we've been talking about, do you

1  understand that included in those accrued vested pension

2  benefits are the benefits belonging to the active public

3  safety -- that is, police and fire fighters -- who are

4  working today for the City of Detroit?

5  A   Yes.

6  Q   And do you understand that in addition to -- well, strike

7  that.  Are you aware that the police and fire fighters in the

8  City of Detroit do not have the benefit of Social Security?

9  A   Yes.

10  Q   And am I correct that in order for the City of Detroit to

11  be exempted from paying Social Security on behalf of those

12  fire fighters and police officers, it has to have a Section

13  218 agreement with the federal agreement?

14  A   I'm not aware of that.

15  Q   Are you aware that there has to be some sort of agreement

16  with the federal government under which the federal

17  government has to be satisfied that there is a qualified

18  pension plan to provide pension and disability benefits to

19  the affected employees?

20  A   No.  I'm not familiar with those federal statutes.

21  Q   And if I were to ask you whether or not you were aware of

22  the requirement that such a pension plan provide any minimum

23  level of benefits, I take it you're unaware of that?

24  A   With regard to federal law.

25  Q   And would it be fair to say that you were unaware of that

1  at the time you authorized the bankruptcy filing on July

2  18th, 2013?

3  A    Yes.

4           MS. PATEK:  I think that's all I have.

5           THE COURT:  Any other questions for the witnesses?

6           MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

7  Brimer.

8                    DIRECT EXAMINATION

9  BY MS. BRIMER:

10  Q   Good afternoon, Governor.  My name is Lynn Brimer.  We've

11  not met.  I represent an association, the Retired Detroit

12  Police Members Association, in this matter.  Your Honor,

13  my -- Governor, my line of questioning will probably be a bit

14  different, and if you don't mind to indulge me, I'd like to

15  ask just a few questions to get a little bit of the lay of

16  the land.  Treasurer Dillon is an appointee that you

17  appointed; correct?

18  A    Yes.

19  Q   And Treasurer Dillon and his staff ultimately would be

20  responsible for reporting to you in connection with their

21  activities on behalf of the State of Michigan.  Is that a

22  fair assumption?

23  A    Yes.

24  Q   Now, Richard Baird, do you mind explaining to me who

25  Richard Baird is?

1  A    Yeah.  He works as part of the executive office in terms

2  of his title is transformation manager with his primary

3  responsibilities involving human relations, HR functions, in

4  terms of sourcing people, finding people, counseling people.

5  Q    And does he report directly to you, or does he report to

6  some other representative in the executive office?

7  A    No.  He reports to me.

8  Q    Now, at some point in 2011, Public Act 4 was referred --

9  a petition was circulated, and the matter was referred for

10  being placed on the 2011 ballot for a referendum; is that

11  correct?

12  A    I believe it was the 2012 ballot.

13  Q    You know, your Honor -- Judge -- Governor, yes, you are

14  right.  It was in early 2012.

15  A    It was suspended and then went on the ballot in November

16  of two thousand --

17  Q    Do you recall when PA 4 was suspended?

18  A    I don't recall the specific date, but it would have been

19  in the earlier part of 2012.

20  Q    And do you have an understanding of what the implications

21  were of PA 4 being suspended?

22  A    It meant that PA 72 came back, and that somewhat changed

23  the rules.  PA 72 has been around since 1990.  It provided

24  for emergency managers.

25  Q    So once it was suspended, you were no longer authorized

1   to appoint an emergency manager under PA 4; is that correct?

2   A   That's correct.

3   Q   And when PA 4 was placed on the ballot for referendum, it

4   became a concern to the state that it may be rejected; is

5   that correct?

6   A   It became a concern that I think it had some value.  I

7   wouldn't say to the state necessarily.  People had different

8   opinions of it.

9   Q   Did it become a concern to you personally that PA 4 may

10  ultimately be rejected?

11  A   Yes.

12  Q   So at some point in time, the state began drafting a new

13  law to replace PA 4.  Do you recall when that took place?

14  A   It was after PA 4 was eliminated.

15  Q   Are you aware of any discussions prior to the repeal of

16  PA 4 regarding the drafting of a law to replace PA 4 in the

17  event it was rejected?

18  A   There were many discussions about alternatives and issues

19  relating to PA 4's potential replacement because there were

20  actually issues with PA 4 in terms of approvement, so as soon

21  as PA 4 was passed, through that entire process, there was

22  issues talking about how PA 4 could be improved, and they

23  were talking about different options and ideas should PA 4 be

24  eliminated.

25  Q   Now, some --

1  A   But the actual process, the main process didn't take

2  place until after it was eliminated, as I recall.

3  Q   Sometime in approximately March of 2012, Miller Buckfire

4  was retained by the State of Michigan to perform a financial

5  review of the City of Detroit.  Are you familiar with that

6  engagement?

7  A   No.  I don't recall them being hired by the state.

8  Q   You are familiar that during the early months of 2012,

9  Miller Buckfire was, in fact, involved with a review of the

10 City of Detroit?

11 A   They could have been.  That could have been hired by the

12 city or -- again, they were doing work on the project

13 relating to the city.

14 Q   Are you aware of the law firm of Jones Day being retained

15 by the State of Michigan at any point in time in connection

16 with the City of Detroit?

17 A   No.

18 Q   Are you aware that representatives of Miller Buckfire and

19 Jones Day were involved with the Department of Treasury and

20 Mr. Dillon specifically in connection with negotiating the

21 consent agreement that was -- or drafting the consent

22 agreement, rather, that was presented to the City of Detroit?

23 A   Yeah.  I don't recall that.

24 Q   So if those activities were taking place, Miller Buckfire

25 was hired by the State of Michigan to perform a financial

1  review and Miller Buckfire and Jones Day were engaged in

2  drafting or working with Andy Dillon in connection with

3  drafting a consent agreement, you were not apprised of that?

4  A   Again, I would have been working with the treasurer on

5  the consent agreement.  They have lots of consultants that

6  they work with on a multitude of projects.

7  Q   So were you involved in the drafting of the law that was

8  ultimately passed and became PA 436?

9  A   Yeah.  Switching subject -- yes.

10  Q   And what was your involvement?

11  A   Well, as governor of the state, I am involved in the

12  legislative process, so I was involved in helping define some

13  of the key parts of Public Act 436 that I viewed as

14  improvements over Public Act 4 listening to what our citizens

15  said, and then ultimately I signed the bill into law.

16  Q   So one of those key provisions would have been, I think

17  you testified a few moments ago, that cities have the

18  opportunity to request that an emergency manager be

19  appointed; is that correct?

20  A   That would have been one of the improvements.

21  Q   In the case of the appointment of Mr. Orr, he had

22  actually, though, been appointed under PA 72; correct?

23  A   Correct.

24  Q   And he automatically became the emergency manager when PA

25  436 was effective; is that correct?

1  A   Correct.

2  Q   So the City of Detroit did not have the opportunity to

3  exercise any of the options that were presented in PA 436; is

4  that correct?

5  A   Yes.  PA 436 didn't apply.  They had opportunities to

6  speak and comment under --

7  Q   But, yes --

8  A   -- the PA 72 process.

9  Q   Governor, I just -- that was a "yes" or "no" question.

10  The City of Detroit did not have the opportunity to exercise

11  any of the options that were presented in PA 436, and you --

12  A   Correct.

13  Q   Correct.  Okay.  So PA 436 contains a spending provision.

14  Are you familiar with that?

15  A   Yes.

16  Q   Are you familiar with Article II, Section 9, of the

17  Michigan Constitution?

18  A   Yes.

19  Q   And is it true that Article II, Section 9, of the

20  Constitution reserves to the people the right of referendum;

21  is that correct?

22  A   Yes.

23  Q   Other than those provisions, Governor, that contain a

24  spending provision; is that correct?

25  A   Correct.

1  Q   Are you familiar with the provision of Article II,

2  Section 9, which provides that -- and I'll read it to you.

3  "No law as to which the power of referendum properly has been

4  evoked shall be effective thereafter unless approved by a

5  majority of the electors thereon at the next general

6  election."  Are you familiar with that provision?

7  A   Yes.

8  Q   And did you discuss that provision -- I'm just asking if

9  you discussed, not the content -- that provision with your

10  counsel prior to passing PA 436?

11  A   PA 436 was a different act.

12  Q   I just asked -- Governor --

13  A   Yes.

14  Q   -- "yes" or "no"?  Did you discuss this provision with

15  your counsel prior to passing PA 436, this provision?

16  A   This provision?

17  Q   Yeah.

18  A   Yes.

19  Q   Now, PA 4 was rejected on appeal on November 6, 2012;

20  correct?

21  A   I believe that's the date.

22  Q   Do you know the date that the law that was ultimately

23  signed as PA 436 was presented to Congress, the State of

24  Michigan's legislators, and ultimately passed by both Houses?

25  A   I believe it would have been in December.

1    Q    Do you know what date in December?

2    A    No, not without looking.

3    Q    You ultimately signed it on December 26th; is that

4    correct?

5    A    I believe so.

6    Q    Okay.  So less than 60 days a new law was drafted,

7    presented.  I believe there was even a bill that was the

8    combined bill of the two Houses, made its way through both

9    Houses, and you signed it; is that correct?

10   A    We work much more efficiently than Congress.

11   Q    Now, the spending provisions, those are Sections 34 and

12   35 of the bill.  Section 34 provides for $780,000 to cover

13   the salaries of the emergency managers and their staff.  Do

14   you know whether or not anyone -- let me step back.  Did you

15   analyze whether or not $780,000 was a sufficient

16   appropriation for the then appointed emergency managers or

17   those emergency managers that you anticipated appointing

18   under PA 436?

19   A    I relied on the Treasury Department to make those

20   calculations.

21   Q    Are you aware of whether or not Treasury made those

22   calculations?

23   A    I believe so.

24   Q    Did you review those calculations?

25   A    No.

1   Q   There were, though -- there were at the time a number of
2   emergency managers in place in the State of Michigan; is that
3   correct?
4   A   I believe it was approximately seven or eight in both
5   cities and school districts.
6   Q   And the $780,000 was to cover their salaries.  Do you
7   know what the salary for the emergency manager that was
8   appointed to the Detroit Public School system was?
9   A   I would just be speculating.
10  Q   Then there's a second provision for $5 million for the
11  financial consultants.
12  A   Yes.
13  Q   Okay.  Do you know whether or not any financial analysis
14  had been performed, I assume, then again, by Treasury, in
15  order to determine whether or not that was a sufficient
16  spending provision?
17  A   Treasury did make some analysis of that.
18  Q   Did you review that analysis?
19  A   No.
20  Q   Was the analysis presented to you?
21  A   No.
22  Q   Did you ever discuss the analysis with the treasurer?
23  A   I don't recall.
24  Q   Would it be common for you to review the analysis of a
25  spending provision in a law that you are signing?

1  A    Quite often I do.

2  Q    In which instances do you determine that it's not

3  necessary for you -- I understand your background -- for you

4  to review the financial analysis of a spending provision?

5  A    The State of Michigan's budget is approximately $40

6  billion, so it's quite significant.  So in terms of going

7  through every line item, that's the point of having a

8  treasurer and a budget office that are very good at what they

9  do, so in many respects I count on the work of Treasury.

10  Quite often they're checked by DTMB, the Department of

11  Technology, Management & Budget.

12  Q    So in light of an approximate $40 billion budget,

13  $5,780,000 as a spending provision is not significant, is it,

14  Governor?

15  A    It is significant.  Every taxpayer dollar is significant.

16  In terms of the numbers, the $5 million, we had quite a bit

17  of experience, having been through emergency managers going

18  back to my predecessor, in understanding the cost from 2011

19  and 2012.  The number -- the 700,000-and-some thousand

20  dollars for emergency managers, you may wonder why it's that

21  number.  If you look at -- it's probably a half-year number

22  because -- or less than a full-year number because it's

23  during the middle of a year, and for us to follow through to

24  implement the legislation, we needed legislative

25  authorization to have the dollars to pay them, which was one

1    of the improvements of 436 over 4.

2    Q    So the prior laws didn't require a spending provision,

3    did they?

4    A    The prior laws -- we were expending money on consultants

5    and resources to help cities because we really do care about

6    these cities and their citizens, so we thought it appropriate

7    to provide additional resources so we could carry some of

8    those opportunities and burdens through state resources.

9    With the emergency manager, that was specifically done in

10   response to concerns that were raised through the ballot

11   initiative on PA 4.  Previously emergency managers were paid

12   by the city.  In looking at it in retrospect, that wasn't

13   appropriate, so we thought we should pay for them through the

14   state.

15   Q    Okay.  You were aware, though, that by adding a spending

16   provision, PA 436 would not be subject to the referendum;

17   isn't that true?

18   A    Yes.  That would be one of the consequences with my

19   reasoning being we needed the dollars to pay the consulting

20   and the --

21   Q    I just asked.  You were fully aware that by adding a

22   spending provision, PA 436, which is replacing a law that had

23   just within weeks been repealed or rejected by the citizens

24   of the State of Michigan, would not be subject to referendum?

25   A    Yes.

1  Q   Are you aware of any discussions between Mr. Dillon and

2  the Jones Day attorneys in early 2012 with respect to the

3  inclusion of a spending provision on a revised law in the

4  event PA 4 was rejected?

5  A   No.

6  Q   So if he had such discussions, he kept -- he did not

7  share them with you?

8  A   Not that I recall.

9  Q   Now, I'd just like to -- if I could look at 44,

10  Retirement Systems 44, you looked at this exhibit with

11  Mr. Wertheimer in connection with the second page.  Do you

12  recall that?  And he pointed out a memo in connection with

13  the constitutionality of the pension provisions.

14  A   Yes.

15  Q   Okay.  But if you'll see on the very top line of the

16  attachments, "Memo Re. Public Act 4 and Chapter 9" -- do you

17  see that?

18  A   Yes.

19  Q   So if Mr. Dillon received a copy of a memo regarding

20  Public Act 4 from the Jones Day attorneys, he did not share

21  that with you?

22  A   I don't recall.

23  Q   And this e-mail, if you can go up just a bit in the

24  paragraph, it's dated June 5th, 2012.  Do you see that?

25  A   Yes.

1  Q   So is it fair to conclude that Mr. Dillon, at a minimum,

2  on behalf of the state, is addressing issues with respect to

3  the repeal of PA 4 at least in June of 2012?

4          MR. SCHNEIDER:  Objection, your Honor.  Calls for

5  speculation.

6          THE COURT:  Any response?

7          MS. PATEK:  I'll withdraw the question.

8          THE COURT:  Okay.

9  BY MS. PATEK:

10 Q   Do you have regular meetings with Mr. Dillon?

11 A   Yes.

12 Q   And during 2012, did you have regular meetings with Mr.

13 Dillon?

14 A   Yes.

15 Q   In your experience, does Mr. Dillon conduct business on

16 behalf of the State of Michigan without informing you as his

17 executive, chief executive?

18 A   He has to make decisions as to what he thinks is most

19 important to bring to my attention.

20 Q   Now, Mr. Orr sits at your pleasure; correct?  You could

21 terminate him with or without cause?

22 A   Yes.

23 Q   Now, Mr. Baird -- you testified a few moments ago he

24 reports directly to you.  Are you aware of that?  That was

25 your testimony; correct?

1 A    Yes.

2 Q    Are you aware that in early January 2013 that Mr. Baird

3 was conducting a review of the law firms that were

4 presenting -- making presentations to the City of Detroit?

5 A    I believe the city had asked him to help them in that

6 process.

7 Q    Are you aware that one of his concerns was the bankruptcy

8 background of those law firms?

9 A    I don't recall.

10 Q    When do you recall the state first discussing the filing

11 of a Chapter 9 by the City of Detroit?

12 A    There was a lot of people that brought information to us

13 about Chapter 9.  In terms of discussions, in terms of the

14 serious part, we had that discussion earlier.  It literally

15 was the week before because we were working through it as a

16 last resort to the fact that the negotiations were not being

17 successful.  There were contingency plans put in place going

18 back some time to say in the event things don't work, you

19 needed to be thoughtful about it, but the serious discussion

20 of getting the recommendation was really in that week before.

21 Q    So if Mr. Dillon was having discussions with the

22 attorneys at Jones Day regarding a filing of a Chapter 9 on

23 behalf of the city in April of 2012, you were not a party or

24 aware of those discussions?

25 A    Again, I don't recall.

1  Q   Were you at all involved or did you have any discussions
2  with Mayor Bing regarding his selection of Miller Buckfire as
3  financial consultants to the City of Detroit?
4  A   I don't recall any specific discussions.
5  Q   Did you have general discussions with the mayor regarding
6  the selection of a financial consultant in late December of
7  2012 or early January?
8  A   Again, I don't recall.
9  Q   Did you have any discussions with the mayor regarding the
10  selection of counsel, specifically ultimately Jones Day, and
11  the selection process?  Did you have --
12  A   I don't recall.  Those were city decisions.
13  Q   Did you ever advise the mayor that the State of Michigan
14  had retained Miller Buckfire to perform a 60-day financial
15  review of the City of Detroit in March of 2012?
16  A   I did not.
17  Q   Did you ever advise the mayor or the City Council that
18  Jones Day had been discussing the repeal of PA 4 with the
19  Department of Treasury and its implication?
20  A   I did not.
21  Q   Did you ever discuss with the mayor or the City Council
22  the fact that the Jones Day attorneys had been discussing
23  with the treasurer the potential of filing a Chapter 9 on
24  behalf of the city as early as April of 2012?
25  A   No.

1          MS. BRIMER:  May I have one moment, your Honor?

2          THE COURT:  Yes.

3          MS. BRIMER:  Thank you, your Honor.  Thank you,

4    Governor.

5          THE COURT:  Any other questions for the governor?

6          MR. MONTGOMERY:  None from the Retiree Committee,

7    your Honor.

8          MR. WERTHEIMER:  Your Honor, I know I'm out of turn,

9    but I have one follow-up to Ms. Brimer's question.  I

10   promise, two minutes.

11         THE COURT:  Well, let me see if there's any

12   examination of the governor by either the state or the city,

13   and then we'll get back to redirect.

14         MR. SCHNEIDER:  Yes, your Honor.  Could we have just

15   one moment?

16         THE COURT:  Yes.

17                    CROSS-EXAMINATION

18   BY MR. SCHNEIDER:

19   Q   Good afternoon, Governor.  Governor, what did you do

20   prior to becoming governor?

21   A   I was a venture capitalist and entrepreneur.  Prior to

22   that, I was an executive at a computer company running that,

23   and prior to that, I was in public accounting as a CPA.

24   Q   So is it safe to say that your background involves the

25   review of financial statements, financial documents; is that

1  correct?

2  A    I have extensive experience in those matters.

3  Q    And do you have extensive experience in reading and

4  understanding balance sheets as well?

5  A    Yes.

6  Q    How long in your career have you been working in issues

7  of finance of accounting?

8  A    Since 1982.

9  Q    Does your educational background also involve finance and

10  accounting?

11  A    It does.  I have an MBA from the University of Michigan

12  and basically a number of accounting classes in my

13  undergraduate plus a law degree.

14  Q    You're also a CPA; is that correct?

15  A    That's correct.  That's where the nerd thing came from.

16  Q    Your Honor -- or, Governor -- a reoccurring problem in

17  this courtroom apparently.  After you --

18          THE COURT:  I'm wondering if there's some interest

19  in a judicial position that you haven't disclosed to us.

20          THE WITNESS:  I'm not that qualified, your Honor.

21  BY MR. SCHNEIDER:

22  Q    Your Honor, you -- Governor, you testified -- you

23  testified regarding your review of financial reports after

24  you became governor related to the City of Detroit.  Do you

25  remember that testimony?

1  A   Yes.

2  Q   Did you review reports regarding cash flow for the city?

3  A   Yes.

4  Q   And through this process, were you able to determine

5  whether or not there was a cash flow problem with the City of

6  Detroit?

7  A   There's a serious cash flow problem.

8  Q   And is it safe to say that the longer you stayed in

9  office as governor, the cash flow problems worsened; is that

10  correct?

11  A   Yes.  The most nonaccounting description I would use is

12  the word hemorrhaging.

13  Q   Okay.  In fact, you received some reports from the

14  financial review teams calling it a cash crisis; is that

15  correct?

16  A   Yes, including statements by the mayor going back to, I

17  believe, 2011 talking about the city even at that point

18  potentially running out of cash.

19  Q   Okay.  So the dialogue of -- and the discussion of

20  running out of cash had been continual; correct?

21  A   Yes.

22  Q   And things were getting worse and not better.  Is that

23  accurate?

24          MR. DECHIARA:  Objection.

25          THE WITNESS:  Yes.

1          MR. DECHIARA:  That was leading.

2          THE COURT:  Yes.  Please don't ask leading

3    questions.  The objection is sustained.

4    BY MR. SCHNEIDER:

5    Q   Ultimately, however, Mr. Orr was appointed as emergency

6    manager; correct?

7    A   Yes.

8          THE COURT:  Yes, that was another leading question.

9          MR. SCHNEIDER:  I'm sorry, your Honor.

10   BY MR. SCHNEIDER:

11   Q   Governor, there's been a lot of talk here about Chapter 9

12   filing, and I want to ask you during this process about cash

13   flow discussions and your review of the reports, where was

14   Chapter 9 in your mind?

15   A   It was a last resort.  When you looked at the entire

16   process, I tried to be very diligent about this in a very

17   difficult situation.  If you go back to the time I took

18   office, first it involved working with the mayor.  I actually

19   attended the State of the City address to show support for

20   the mayor in a public fashion to help work in a collaborative

21   fashion through that process.  Then it became clear -- he

22   made the statement, for example, that they were going to run

23   out of cash, and there were other issues, so we started

24   the -- the Treasury began a preliminary review of the city's

25   finances, I believe, in late 2011.  That's an objective

1  process.  That's not a subjective process.  They came out

2  with their findings that then led to a financial review team

3  that did an objective process again under Public Act 4

4  finding there's severe financial distress.  There was a

5  series of options given to me at that point in time that

6  include there's no distress, there's a consent agreement, or

7  there's a need for an emergency manager.  We worked very hard

8  and very diligently to do a consent agreement, and we finally

9  got a consent agreement done that included an appendix that

10 had 20-some items, I believe 23 different items to follow

11 through on, again, to avoid more serious consequences, so

12 there was a lot of work done through the summer on the

13 consent agreement.  Unfortunately, by fall it appeared that

14 most of the items in that consent agreement were not being

15 implemented.  Again, people worked hard on doing those

16 things, but they didn't happen.  So another review took place

17 along with continuing cash crises, so another review cycle

18 was begun under Public Act 72 because this is a crisis.  It

19 still is a crisis today.  And so we went through that

20 exercise, and then they found that the consent agreement was

21 not going to end up in a satisfactory plan that led to the

22 emergency manager situation, and so, again, we went through a

23 hearing process there.  I appointed an emergency manager.

24 The emergency manager went through a process of negotiation

25 proposing something to creditors to work out.  He came to me

1   then and said that was not successful.  I authorized

2   bankruptcy, and now that's where we're at.  One of the things

3   that doesn't come across very often is an overriding concern

4   for the citizens of Detroit.  That is, while all this is

5   taking place, all we've seen is more blight, more lights

6   going out, challenges on the police force.  These things have

7   to get resolved.  It's an unacceptable situation.

8   Q   So is it correct to say that you -- when you were

9   reviewing these reports, you did not do so with the intention

10  to authorize or seek a filing?

11  A   I worked very diligently to avoid this process in good

12  faith and to go through this process to say what are all the

13  other steps possible and, again, avoid subjectivity and do it

14  as objectively understanding that the subjective piece is

15  people are suffering, the 700,000 citizens of Detroit.

16  Q   Let me ask you some questions regarding PA 436.  You

17  testified that it gives options to communities.  Can you

18  explain just a little bit about what you meant by that?

19  A   Yeah.  One of the issues with Public Act 4 is it really

20  had those three choices that I mentioned.  What now happens

21  is there's an opportunity for four different choices that the

22  community has.  They can do a consent agreement.  There's an

23  option for an emergency manager.  There's an option for

24  looking at a negotiated settlement to try to go to creditors

25  to work things out, and then there's potentially bankruptcy.

1  Q   Let me ask you more specifically about PA 436.  You were

2  asked regarding the appropriations provisions.  For you what

3  was the point of those appropriations, the purpose?

4  A   Yeah.  We were in the course of the middle of a fiscal

5  year, and under Michigan's Constitution, I can't -- we cannot

6  expend funds without an appropriation.  Part of Public Act

7  436 is saying we were going to relieve the cities of the

8  burden of paying for the emergency manager because that is a

9  burden on them, so we needed an appropriation to do that, and

10  it was the simplest best way to do it, in my view, along with

11  the fact significant dollars were being spent on consultants

12  in some capacity, whether it be the city or the state, and

13  for us to continue to do consulting work to help cities out

14  across our state is by having that additional appropriation

15  we'd have those resources available.  That was done to get us

16  through that budget year with a view that I would include

17  similar numbers for the following budget year, which was

18  proposed in February, and that took effect this October 1.

19  Q   Well, you signed the bill, so was your purpose to make it

20  referendum-proof?

21  A   No.  It was to deal with this issue of paying for

22  emergency managers and having financial resources in a crisis

23  available.

24  Q   Can the state make an expenditure without an

25  appropriation?

1   A   No.

2   Q   So in order to pay for these salaries, an appropriation

3   was required; is that correct?

4   A   Yes.

5   Q   And was the most efficient or best way to do this by

6   putting the appropriation in the bill?

7           MR. WERTHEIMER:  Object.  I think we're back to the

8   leading.

9           THE COURT:  Yes.  That was a leading question.

10          MR. SCHNEIDER:  Okay.

11          THE COURT:  The objection is sustained.

12  BY MR. SCHNEIDER:

13  Q   Did either PA 4 or PA 72 require the state to pay for

14  emergency managers' salaries?

15  A   No.

16  Q   So after the bill took effect, after PA 436 takes effect,

17  was there ever a later appropriation in a budget bill to

18  handle this type of issue?

19  A   For ongoing expenses, I proposed it in the February

20  budget message that I put forward.  That would have been

21  included in the budget adopted in the June time frame that

22  began this October 1.

23  Q   What was the purpose of that?

24  A   Again, for ongoing, to help pay for the ongoing costs of

25  emergency managers and consultants.

1          MR. SCHNEIDER:  Thank you, your Honor.

2          THE COURT:  Questions from the city?

3          MR. SHUMAKER:  Your Honor, the city has no questions

4    for the governor.

5          THE COURT:  All right.  Mr. Wertheimer, do you have

6    questions?

7          MR. WERTHEIMER:  Yes, I do.

8          MS. LEVINE:  Your Honor, a point of process, so that

9    there's time for all the objectors who want to redirect, can

10   we talk about perhaps time limits?

11         MR. WERTHEIMER:  I'll be two, three minutes.

12         THE COURT:  Well, of course, your redirect of the

13   governor should be limited to what was covered on his cross-

14   examination, which wasn't much.

15         MS. LEVINE:  Yeah.  No, no.  I'm going to be brief,

16   your Honor, but I --

17         THE COURT:  I don't mean to minimize his testimony,

18   but it didn't take very long.

19         MS. LEVINE:  Plan to be brief, your Honor, but I am

20   third in the queue, so I just want to make sure third doesn't

21   show up at five.

22         THE COURT:  All right.  Let me just see a show of

23   hands.  How many of you propose to ask redirect examination

24   at this point?  Just the three of you?  All right.  I think

25   we'll be all right then.

1  REDIRECT EXAMINATION

2  BY MR. WERTHEIMER:

3  Q  Governor, would you agree with me that the fact that

4  these problems that Detroit has that we all recognize, that

5  they have to be resolved and have to be resolved

6  expeditiously, does not mean that they have to be resolved on

7  the backs of retirees making one or $2,000 a month?

8          MR. SCHNEIDER:  Objection.  Relevance.

9          MR. WERTHEIMER:  Your Honor, the governor made a

10 long statement in response to a question that implied that

11 all he was doing was dealing with the problem expeditiously,

12 and I'm simply attempting to make the point that I'm

13 attempting to make that seems obvious to me.

14         THE COURT:  I'll permit it.  Go ahead, sir.  Can you

15 answer the question?

16         THE WITNESS:  Again, I have concerns about the

17 retirees also.  I'm concerned about the 700,000 citizens of

18 Detroit, the citizens of Michigan, which include these

19 retirees.

20 BY MR. WERTHEIMER:

21 Q  Governor, I did not ask you whether you had concerns.

22 Again, I'll ask you the same question again, and try to just

23 answer that, please.  Would you agree with me that the fact

24 that the problems that you've identified that have to be

25 resolved and have to be resolved quickly, that that does not

1  mean that they have to be resolved on the backs of the city

2  retirees?

3  A    I think you're asking me to speculate because we're still

4  in this process where there isn't even a plan on the table to

5  say how to resolve this issue.

6  Q    All right.  I'll let it go.  Ms. Brimer asked you a

7  question about you having the ability to fire Mr. Orr.  Do

8  you recall that?

9  A    Yes.

10  Q    You were also the person who recommended that he be

11  hired, were you not?

12  A    Yes.

13          MR. WERTHEIMER:  That's all I have.  Thank you.

14                    REDIRECT EXAMINATION

15  BY MS. LEVINE:

16  Q    Good afternoon again, Governor.  Sharon Levine,

17  Lowenstein Sandler, for AFSCME.  In response to your

18  counsel's questions, you went through your education, your

19  CPA, your law degree, and some other financial experience

20  that you've had; correct?

21  A    Yes.

22  Q    And that you also discussed the fact that going back to

23  even 2011 you were having discussions with the mayor of

24  Detroit about the fact that the mayor of Detroit was running

25  out of cash; correct?

1  A    It was a public statement.  I was quoting a public

2  statement the mayor made back, I believe, in November of 2011

3  where he publicly came out and said there was a concern about

4  running out of cash.

5  Q    So you were aware -- you were watching Detroit and its

6  cash position going back as far as 2011; correct?

7  A    Yes.

8  Q    Okay.  Does that refresh your recollection with regard to

9  why the state stopped the implementation of the tentative

10  agreement in February of 2012, which was ratified by a

11  coalition of 30 unions and provided for substantial cash

12  savings for the City of Detroit?

13  A    No.

14  Q    You also testified that Chapter 9 was a last resort and

15  that you were looking to try to resolve it some other way in

16  good faith; is that correct?

17  A    Yes.

18  Q    So then I'm going to go back to the June 14 proposal to

19  creditors, and with your CPA and all of your financial

20  background, if you didn't understand exactly what was being

21  offered in dollars and cents to the retirees, how is it good

22  faith if the retirees couldn't understand that either?

23  A    What I would say is is if you looked at that package, it

24  was described as preliminary, that there are many pieces

25  needed to be fleshed out, including there's a section in

1 there about there had been no real evaluation of the assets

2 of the city, so it was an open question as to where it would

3 go.  And the way I viewed it is in a situation like this, you

4 had to start the discussion at some starting point, and this

5 was something to get out on the table to say now people can

6 have informed discussions, have dialogue, have questions,

7 have answers, and then hopefully move towards a conclusion.

8 In the case of retirees, in particular, though, in

9 retrospect, I think there was a real challenge to say who was

10 going to step up to represent them.  And I felt that was one

11 of the problems in that whole process that I thought could

12 get resolved by authorizing the bankruptcy; that then

13 somebody could be appointed to represent them.

14 Q   So this is not a proposal for creditors or an offer for

15 creditors.  All it is is an invitation to start a process?

16 A   No.  I hope -- I believe it was a good faith negotiation,

17 put something on the table based on the facts that were

18 available.  Again, you know, I --

19 Q   I'm just trying to clarify.  Is it a -- is it an

20 invitation to negotiate, or is it an actual proposal to

21 creditors?

22 A   I believe it was a proposal, but then you start a

23 dialogue because, again, it needed to be mutually agreed to.

24 Q   Okay.  So as a proposal --

25 A   I don't think those two comments are mutually exclusive.

1  Q   As a proposal to creditors, is it your testimony that it

2  actually clarified how those creditors were going to be

3  treated, including specifically how the retirees were going

4  to be treated?

5  A   I think it helped clearly clarify the financial situation

6  of Detroit saying here are the resources available, here's

7  where dollars need to go, and have a discussion as to what's

8  possible.

9           MS. LEVINE:  Thank you, Governor.

10                      REDIRECT EXAMINATION

11  BY MS. BRIMER:

12  Q   Just a very brief follow-up, Governor.

13           MS. BRIMER:  And I'd like to ask him if he's ever

14  seen this e-mail.  It's Retirement Systems Number 46.  No.  I

15  want to ask if he's ever seen it first.  If he's not seen it,

16  then I have no questions on it.  I'd like to ask the governor

17  if he's seen an e-mail that has been presented as an exhibit.

18  He's not a part of it, but I may have questions if he's seen

19  it.  May I approach?

20           THE COURT:  You may.  What exhibit is it?

21           MS. BRIMER:  It is the Retirement Systems Number

22  846.

23           THE COURT:  You may ask the witness if he has seen

24  it.

25  BY MS. BRIMER:

1  Q   Have you --

2          MR. SCHNEIDER:  Your Honor, before we go any

3  further, I object because this is outside the scope of my

4  examination.

5          MR. SHUMAKER:  The city joins the objection.

6          MS. BRIMER:  I believe -- I believe I will be able

7  to tie it to his examination, your Honor.

8          THE COURT:  All right.  Have you seen this before,

9  sir?

10          THE WITNESS:  I don't recall.

11          MS. BRIMER:  And if he's not recall -- does not

12  recall seeing it, your Honor, I'll take it back from him, ask

13  him a few questions --

14          THE COURT:  Okay.

15          MS. BRIMER:  -- not on it, but --

16  BY MS. BRIMER:

17  Q   Governor, do you recall who suggested that the

18  appropriation provisions in PA 436 should be included in the

19  act?

20  A   I don't recall.

21  Q   Were you the one who suggested if -- that they should be

22  included?

23  A   Again, I said I don't recall --

24  Q   Okay.

25  A   -- because, again, that's an interactive process on

1  legislation, and clearly I do several hundred bills a year.

2          MS. BRIMER:  I have nothing else, your Honor.

3          THE COURT:  All right.

4          MR. KING:  Your Honor, I just have a few questions.

5                      REDIRECT EXAMINATION

6  BY MR. KING:

7  Q    Governor, you indicated that you had reviewed a host of

8  financial information and other documentation in the course

9  of your review of Detroit's financial situation.  I think

10 that was what you just testified to with Mr. Schneider.  Did

11 you ever have an opportunity to review any information

12 regarding funding levels of other Retirement Systems in the

13 state relative to the two pension systems in Detroit?

14 A    No.

15 Q    So you wouldn't know one way or the other whether or not

16 the Detroit systems, for example, are significantly better

17 funded than either the Michigan State Employees Retirement

18 System or the Michigan Public School Employees Retirement

19 System?  You wouldn't know one way or the other whether the

20 Detroit systems are better funded than either -- better

21 funded than either of those two state systems?

22 A    Correct.

23         MR. KING:  Thank you.

24         THE COURT:  All right.  We have concluded the

25 witness' testimony.  Sir, you are excused.  Thank you very

1   much for coming today.  Appreciate it.

2        (Witness excused at 4:08 p.m.)

3            THE COURT:  We will remain in place while the

4   governor takes his leave.  Mr. Ciantra, I had indicated we

5   would take up your issue tomorrow morning, but since we have

6   time yet today, is it okay with you if we take up your issue

7   today?  All right.

8            MR. SHUMAKER:  Your Honor, the attorneys that have

9   been dealing with that issue are not present for the city.

10           THE COURT:  Oh.

11           MR. SHUMAKER:  I'm sorry about that.

12           THE COURT:  Okay.  Well, that's a problem.  Remind

13  me who that -- remind me who that was.

14           MR. SHUMAKER:  It was Mr. Stewart.

15           THE COURT:  Of course; of course.  All right.  Well,

16  we'll deal with it first thing tomorrow morning then.  Is

17  there anything else we can do today?  All right.  We'll be in

18  recess till tomorrow morning.

19           MR. SHUMAKER:  Thank you, your Honor.

20           THE CLERK:  All rise.  Court is adjourned.

21       (Proceedings concluded at 4:09 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | 6 | 81 | | |
| Governor Rick Snyder | 122/166 185/196 204/213 | 228 | 236/238 241/243 | |

| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 41 | 35 |
| Exhibit 615 | 155 |
| Exhibit 616 | 154 |
| Exhibit 625 | 158 |

      I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    November 3, 2013
_____            _____
Lois Garrett

```
 1                UNITED STATES BANKRUPTCY COURT
                  EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION

 3  IN THE MATTER OF,            Case No. 13-53846
                                 Detroit, Michigan
 4  CITY OF DETROIT, MI          October 29, 2013
    _____/    9:00 a.m.
 5
                     IN RE:  ELIGIBILITY TRIAL
 6           BEFORE THE HONORABLE STEVEN W. RHODES
             TRANSCRIPT ORDERED BY: PAUL HAGE, ESQ.
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                 GEOFFREY STEWART, ESQ.
                                   GREGORY SHUMAKER, ESQ.
10                                 THOMAS CULLEN, JR., ESQ.
                                   MIGUEL EATON, ESQ.
11                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
12                                 Washington, D.C. 20001-2113
                                   202-879-3939
13
                                   BRUCE BENNETT, ESQ.
14                                 Jones, Day
                                   555 South Flower Street
15                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
16                                 213-243-2382

17                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   Pepper, Hamilton
18                                 4000 Town Center
                                   Suite 1800
19                                 Southfield, MI 48075-1505
                                   248-359-7333
20
    For State of Michigan:        MATTHEW SCHNEIDER, ESQ.
21                                 (P62190)
                                   Chief Legal Counsel
22                                 Attorney for State of Michigan
                                   Michigan Department of
23                                 Attorney General
                                   P.O. Box 30754
24                                 Lansing, MI 48909
                                   517-373-0126
25
```

```
 1                              STEVEN HOWELL, ESQ. (P28982)
                               Special Assistant Attorney
 2                              General
                               Dickinson, Wright
 3                              500 Woodward Avenue
                               Suite 4000
 4                              Detroit, MI  48226-3425
                               313-223-3033
 5
    For Michigan Council 25 of  SHARON L. LEVINE, ESQ.
 6  the American Federation of  JOHN SHERWOOD, ESQ.
    State, County and Municipal Lowenstein, Sandler, LLP
 7  Employees (AFSCME), AFL-CIO 65 Livingston Avenue
    and Sub-Chapter 98, City of Roseland, NJ 07068
 8  Detroit Retirees:          973-597-2500

 9  For Detroit Retirement     ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement JENNIFER GREEN, ESQ.
10  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of  151 S. Old Woodward Avenue
11  the City of Detroit:       Suite 200
                               Birmingham, MI 48009
12                             248-988-5882

13                             RONALD KING, ESQ. (P45088)
                               Clark, Hill
14                             212 East Grand River Avenue
                               Lansing, MI 48906
15                             517-318-3015

16  For the Detroit Fire Fighters BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit   JULIE BETH TEICHER, ESQ.
17  Police Officers Association (P34300)
    and the Detroit Police     DAVID EISENBERG, ESQ. (P68678)
18  Lieutenants and Sergeants  Erman, Teicher, Miller, Zucker
    Association:               & Freedman
19                             400 Galleria Officentre
                               Suite 444
20                             Southfield, MI 48034

21  For International Union, UAW: BABETTE A. CECCOTTI, ESQ.
                               PETER D. DECHIARA, ESQ.
22                             THOMAS CIANTRA, ESQ.
                               Cohen, Weiss, and Simon, LLP
23                             330 West 42nd Street
                               New York, NY 10036-6976
24                             212-356-0227

25
```

| | | |
|---|---|---|
| 1 | For the Detroit Retired | THOMAS MORRIS, ESQ. (P39141) |
| | City Employees Association, | Silverman & Morris |
| 2 | Retired Detroit Police and | 30500 Northwestern Highway |
| | Fire Fighters Association, | Suite 200 |
| 3 | Shirley V. Lightsey, and | Farmington Hills, MI 48334 |
| | Donald Taylor (Retiree | 248-539-1330 |
| 4 | Association Parties): | |
| | | RYAN PLECHA, ESQ. (P71957) |
| 5 | | Lippitt, O'Keefe |
| | | 370 East Maple Road |
| 6 | | 3rd Floor |
| | | Birmingham, MI 48009 |
| 7 | | 248-646-8292 |
| 8 | For the Official Committee of | MATTHEW E. WILKINS, ESQ. |
| | Retirees: | (P56697) |
| 9 | | Brooks, Wilkins, Sharkey & |
| | | Turco, PLLC |
| 10 | | 401 S. Old Woodward Avenue |
| | | Suite 400 |
| 11 | | Birmingham, MI 48009 |
| | | 248-971-1711 |
| 12 | | |
| | | CLAUDE D. MONTGOMERY, ESQ. |
| 13 | | ANTHONY ULLMAN, ESQ. |
| | | ARTHUR RUEGGER, ESQ. |
| 14 | | Dentons |
| | | 1221 Avenue of the Americas |
| 15 | | New York, NY 10020-1089 |
| | | 212-768-6700 |
| 16 | | |
| | For the Retired Detroit | LYNN M. BRIMER, ESQ. (P43291) |
| 17 | Police Members Association: | MEREDITH TAUNT, ESQ. (P69698) |
| | | MALLORY FIELD, ESQ. (P75289) |
| 18 | | Strobl & Sharp, P.C. |
| | | 300 East Long Lake Road |
| 19 | | Suite 200 |
| | | Bloomfield Hills, MI 48304-2376 |
| 20 | | 248-540-2300 |
| 21 | For the Flowers Plaintiffs – | WILLIAM A. WERTHEIMER, ESQ. |
| | Robert Flowers, Michael Wells, | (P26275) |
| 22 | Janet Whitson, Mary Washington | 30515 Timberbrook Lane |
| | and Bruce Goldman: | Bingham Farms, MI 48025 |
| 23 | | 248-644-9200 |
| 24 | | |
| 25 | | |

```
 1  For Ambac Assurance          DANIEL WEINER, ESQ. (P32010)
    Corporation:                 Schafer & Weiner
 2                               40950 Woodward Avenue
                                 Suite 100
 3                               Bloomfield Hills, MI 48304
                                 248-540-3340
 4
    Court Recorder:              Letrice Calloway
 5
    Transcriber:                 Deborah L. Kremlick
 6

 7

 8

 9  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2   WITNESSES FOR        Cross
     THE CITY:
 3
     KEVYN ORR          22,69,115,
 4                       131,166,171

 5   EXHIBITS:                                     ID   ADM

 6   UAWEX619 Chain of Emails                      77    78
     UAWEX620 Email                                81    81
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
        (Court in Session)

2
                THE CLERK:  All rise.  Court is in session.  Please

3
be seated.  Case number 13-53846, City of Detroit, Michigan.

4
                THE COURT:  Good morning.  Everyone appears to be

5
here.  Sir.

6
                MR. CIANTRA:  Good morning, Your Honor.  If I may

7
proceed.

8
                THE COURT:  Yes.

9
                MR. CIANTRA:  Thank you.  Thomas Ciantra, Cohen,

10
Weiss, and Simon, LLP for the UAW.

11
        And I rise with respect to the motion I made during the

12
examination of Mr. Moore to exclude one part of his testimony.

13
And that is the portion of his testimony where he related a

14
conversation in the presence of counsel with respect to the

15
calculation of the unfunded liability of the Detroit City

16
Retirement Plans.

17
        And I'm going to make a -- a brief argument with respect

18
to that.  Cited a couple of cases.  And relied on some

19
deposition excerpts that I'll read to the Court that I've

20
shared with counsel for the city earlier this morning.

21
        We start with some of the basics.  Obviously under the

22
federal rules, discovery should be open and robust.  It's

23
intended to get at both the facts, to develop a factual

24
record, to present to the Trier of Fact.  And as well to

25

1  enable the parties to learn and understand the positions and

2  contentions of the other side.  That's -- that's what

3  discovery is supposed to get at.

4      And the case law as it is developed, is clear, at least

5  with respect to one thing which is that if a party asserts a

6  privilege, whether it be attorney/client, the Fifth Amendment,

7  spousal or something else, it cannot be both used as a shield

8  against disclosure to the adversary.  And then effectively as

9  a sword through selective later disclosure.

10     And that is -- is really a matter of fundamental --

11 fundamental fairness in the -- in the adversarial process.

12 And the case law as I said has applied this principal in --

13 with respect to the attorney/client privilege.  It's applied

14 it with respect to the Fifth Amendment privilege against self

15 incrimination which obviously carries with it other

16 constitutional values that aren't -- aren't present with

17 respect to the attorney/client privilege.

18     But -- and the basic principle that I think that

19 developed in that case law is that if a party is -- is going

20 to assert privilege with respect to a particular subject

21 matter, it has to be prepared to accept the consequence that

22 the -- the universe of proof that may -- it may introduce with

23 respect to that is going to be -- is going to be limited by

24 the -- by the extent to which is has asserted the privilege.

25     And in this district, the Eastern District of Michigan,

1  that case law has developed most clearly in cases involving

2  the Fifth Amendment privilege and I would point the Court to

3  -- to -- two District Court decisions. One by Judge Gadola,

4  it's a forfeiture case, U.S. v $60,000. That is reported at

5  763 F Supp 909. And a franchise case, a decision by Judge

6  Rosen, Dunkin Doughnuts v Taseski. That's 47 F Supp 2d 867.

7      And in both of those cases we had parties who asserted

8  privilege in discovery to limit inquiry and then were

9  precluded once discovery had closed and summary judgment and

10 trial from then selectively waiving privilege to -- to either

11 try to defeat summary judgment or -- or defeat the claims of

12 -- of the -- their adversary.

13     In the -- in the Dunkin Doughnuts case it was evidence

14 with respect to sales levels under a franchise agreement and

15 the -- the franchisee took the Fifth Amendment apparently

16 because of the fraud allegations. In the -- the forfeiture

17 case, it was someone whose property was seized at the airport

18 after a, you know, dog identified it as positive for drugs.

19     In both of those cases discovery had closed. And -- and

20 the Court precluded the party that had asserted privilege from

21 then asserting by way of affidavit or other discovery

22 material, evidence to try to defeat summary judgment on the

23 principle that once the privilege had been asserted and

24 discovery had closed, the -- the adversary was precluded from

25 effectively from -- from rebutting it and the -- the party

1 that had asserted privilege had to accept the -- the

2 consequences of that assertion.

3     Now here, the city largely shielded almost entirely from

4 disclosure, the deliberations of the pension task force that

5 there's been testimony about.  That task force worked with

6 actuaries at the Milliman firm that the -- the city had

7 retained and it had the -- those actuaries undertake various

8 analyses with respect to the -- the funded status of the plan

9 and various alternatives and issues related to the plans that

10 the -- that the city was investigating.

11     And Mr. Moore's testimony with respect to that concerned

12 some of the work of that task force with respect to its -- the

13 -- the actuary's calculation based on the -- the retirement

14 system's actuary's work of what the unfunded liability of the

15 plan was.

16     But the -- the city did not in discovery permit the

17 objecting parties to take -- permit inquiry with respect to

18 the deliberations of the task force.  And in addition to the

19 excerpt that -- from Mr. Moore's deposition that we recited on

20 Thursday, which I will concede was not the crispest assertion

21 of privilege.

22     That issue -- that tactic was clearly pursued in the

23 deposition of the -- the actuary himself, Mr. Bowen.  And I

24 would point to two instances during my deposition of Mr. Bowen

25 and there was as well a follow up inquiry by counsel for the

1 retiree committee.

2      Let's talk about the -- the first one.  There is an

3 issue, Your Honor, with respect to remedies that the emergency

4 manager has under Public Act 436.  In the event that there is

5 a certain level of under funding in the pension system, the

6 emergency manager can take certain remedies with respect to

7 the governance of the system.

8      And the actuaries were asked -- tasked to compute the

9 under funding of the system lining up the provisions of this

10 statute.  The one question that became obvious was if the

11 actuaries and the emergency manager believed that the under

12 funding of the system permitted them to take remedies with

13 respect to the governance of the system, essentially replacing

14 the trustees, why had they not done so.  And what does that

15 tell us with respect to their confidence in the -- in the

16 calculation of the under funding.

17      So with respect to that issue, I questioned the actuary

18 with respect to the discussions of the task force where that

19 assignment was discussed, the assignment to calculate the --

20 the liabilities of the -- unfunded liabilities of the pension

21 plans in light of the -- the statutory provisions.

22      And this appears beginning at Page 53 of Mr. Bowen's

23 deposition.  And I'm -- I'm using the minuscript version of

24 the transcript.  And it continues a bit further.  And I'll --

25 let me read from that -- from that transcript.

1    This is my question.  The pension task force conference

2  call that you -- that you discussed where this assignment was

3  given to you, who participated in that?  Was there an attorney

4  on the line that participated in that call?  Answer, yes,

5  there was.

6    Okay, who was that?  That would have been Evan Miller

7  from Jones, Day.

8    All right.  Did Mr. Miller give you the instruction with

9  respect to this particular assignment?  I don't recall which

10  particular party on the pension task force asked the direct

11  question to do this now.

12    Next question.  Okay.  Was there a reason given for why

13  you were being asked to do this?  An objection is raised at

14  that point.  Mr. Miller, and again, to the extent that any

15  discussion that you had with members of the task force

16  relating to this assignment involved counsel for the city, I

17  would instruct you not to respond on the grounds of

18  attorney/client privilege.

19    And then I -- then I questioned.  So you can respond to

20  that question consistent with your counsel's direction or the

21  city -- the city counsel -- city's counsel's direction.

22  Answer -- or the witness, I have no response.

23    Question, yes.  But for Mr. Miller's instruction would

24  you answer the question?  Answer, I'm not going to disobey the

25  attorney for my client.

1    Continue.  So I assume the answer to that is yes, other

2   than his instruction you would answer the question.  The

3   witness, answer, yes.  That's -- that's a very difficult

4   hypothetical because that instruction exists and I plan to

5   follow the advice -- the instruction of my client's attorney.

6   And then I respond, I think that's clear.

7    So at that point our inquiry with respect to the reasons

8   for that calculation and that subject matter were clearly --

9   were clearly cut off.  Similarly, we sought to question the

10  witness with respect to the -- their analysis of the costs of

11  a defined contribution plan that they were proposing to

12  implement as a follow on to the -- the defined benefit plan

13  that the city contends it will no longer fund.

14    And there again at Page 77 of the transcript, I sought to

15  question them with respect to where that 10% number -- how

16  that 10% number was derived.  And I asked beginning at Lines

17  19 on Page 77.

18    And where -- how was that 10% number arrived at?  Answer,

19  it was provided to us by the pension task force.

20    Was there or were there discussions of using different --

21  a different percentage of pay?  Mr. Miller, wait.  To the

22  extent that those discussions if any involved counsel for the

23  City of Detroit, I would instruct the witness not to answer

24  those on the grounds of attorney/client privilege.

25    By Mr. Ciantra, so you can answer that question?  The

1 | witness, no answer.  Because of the direction of the city

2 | counsel -- the city's counsel?  Answer, that's correct.

3 | So at that point, Your Honor, it was pretty clear at

4 | least to me, that there was -- the city was not going to

5 | permit the actuary to testify with respect to any of the

6 | deliberations of the task force with respect to the

7 | calculations that he had made.

8 | And as a result, those areas were effectively blocked off

9 | from our inquiry, both by deposition and -- and as well with

10 | respect to -- to documents.  So at this point the city of

11 | course has not -- did not call the actuary to testify.  They

12 | didn't put in an -- an expert report with respect to these

13 | calculations.

14 | And the -- the evidence with respect to the Milliman

15 | actuary's calculations has come in through the report of Mr.

16 | Moore.  That was privileged.  It was made in the presence of

17 | an attorney as to which we would submit that subject was not

18 | permitted on account of their assertion of privilege, our

19 | ability to take discovery with respect to that.

20 | So we would ask that just that question and answer,

21 | that's the only remedy that we are asking, be stricken from

22 | the record because it's -- it is selective use of the

23 | privilege that is simply inconsistent with notions of

24 | fundamental fairness.

25 | THE COURT:  Do you have the official transcript from

1  Mr. Moore's testimony and can you identify the pages and lines

2  that you want stricken?

3          MR. CIANTRA:  I do not at this point have the

4  official transcript.  You know, I have the unofficial daily,

5  but certainly I could provide that, Your Honor.  Once -- well,

6  I don't believe that it -- I don't believe that's been made

7  available to us as of yet.

8          THE COURT:  Okay.  So what was the precise question

9  and answer that you want stricken?

10          MR. CIANTRA:  The precise question and answer that I

11  would -- would ask that the Court strike, is the question

12  where he report -- he was asked to report on the -- the

13  calculation by the actuary of the -- the under funding of the

14  city's retirement system.  And he testified that the actuary

15  had taken the calculations of the systems actuaries, revised a

16  earnings assumption --

17          THE COURT:  Right.

18          MR. CIANTRA:  -- and instead of using the actuarial

19  value of the assets, had used a market value and that that

20  sort of in total gave the --

21          THE COURT:  He adjusted the discount rate.

22          MR. CIANTRA:  He adjusted -- well, there are two

23  things.  He adjusted the discount rate and then he used a

24  market valuation of the assets --

25          THE COURT:  Right.

1        MR. CIANTRA:  -- as of the date and time rather than

2   the actuarial value.

3        THE COURT:  All right.  Thank you, sir.

4        MR. STEWART:  Geoffrey -- Geoffrey Stewart of Jones,

5   Day for the city, Your Honor.

6      A couple of things.  First of all, just to put things in

7   perspective, the testimony we're talking about Mr. Ciantra

8   just described, and let me make a couple of points.

9      First of all, in his deposition Mr. Moore answered every

10  single question he was asked but one.  And the one was, what

11  did you discuss with your lawyer in preparing for your

12  deposition.  So there was no instruction to Mr. Moore to not

13  answer any substantive question.

14     Moreover, he was asked about and he did testify about at

15  no short length, this 3.5 billion dollar number.  And I guess

16  -- I think it was by Mr. Ciantra himself -- no, it was by Mr.

17  Ruegger.  And it's -- that questioning starts on Page 62 of

18  his deposition and runs for at least five more pages.

19     So this is a matter that he was not instructed on.  He

20  was asked -- he was asked about and he did testify about.  So

21  this is not a matter where any inquiry was blocked.  And I

22  think I said the pages but if not, I'll repeat myself.  It's

23  62 through 67 of Mr. Moore's deposition.

24     So there is no sword/shield issue going on with respect

25  to Mr. Moore if only because of the simple expedient that only

1  one question was he instructed to not answer and it was one

2  that no one I think would challenge.  It's certainly an

3  instruction objectors have given when their depositions were

4  taken.  And as I just said, he was allowed to answer questions

5  on this very subject.

6      Mr. Ciantra then goes to a different witness, one who has

7  not been called to testify here today, Mr. Bowen who is an

8  actuary.  And he did -- Mr. Ciantra kindly gave me the

9  deposition cites in the hall this morning so I did have a

10  chance to look at them.

11      There were two different topics and I agree, and I think

12  he -- Mr. Ciantra has accurately described them of what Mr.

13  Bowen was asked about that drew instructions.  The first had

14  do with a possibility under PA436 that if pension assets fell

15  below 80%, the emergency manager might have the right to

16  replace the pension plan trustees with trustees of his own

17  choosing.

18      The question there wasn't -- and that question, that

19  topic was certainly raised.  The instruction had to do with

20  how the subject came up in a meeting.

21      There was no instructions against and there were -- there

22  was, I ought to say, fairly significant testimony by Mr. Bowen

23  about Milliman, that's his firm.  Of Milliman's calculations

24  of whether or not the plan was under funded at the 80%

25  threshold.

1    Now let me grab the pages on his deposition and we can

2  provide that as well to the Court.  That -- after the

3  instruction, counsel then asked the question, well, sir, what

4  did you do?  And there were no instructions.  That starts on

5  Page 55 and goes at least to Page 62 of Bowen's deposition.

6    So once again I'd submit two things.  One is this is not

7  even the same subject as the testimony they would like to

8  strike.  It's not the same witness.  And the witness they did

9  question did answer all of their questions about the threshold

10  funding and what he did among other things is to say actually

11  if I look at your own actuary, you're so far below 80%, it's

12  -- it's not even a real issue.  And in the event by the way as

13  we all know, the emergency manager has not replaced any

14  trustees of the pension plan.

15    So the second one is -- is this.  Milliman was asked to

16  prepare a series of scenarios of what numbers would look like

17  if the plans were changed to define contribution from defined

18  benefit.  And then there were various assumptions.

19    That under this assumption the numbers came out this way,

20  and under that assumption, they came out a different way.  Mr.

21  Bowen was -- and once again obviously this is not the subject

22  Mr. Moore testified about, this is a different subject.

23    Mr. Bowen was asked about one of these scenarios called

24  scenario 2 where one of the assumptions came from, namely an

25  assumption of 10% of pay as the defined contribution.  And

1 counsel said, to the extent those discussions involve counsel

2 for the city, I'd instruct you not to answer.

3      And as Mr. Ciantra quoted, the witness did not answer.

4 However, when they went to what the scenarios were, how things

5 were calculated, and what was done, the witness testified

6 quite fully.  His testimony started on Page 79 and continued

7 for several pages thereafter where he described how the

8 scenarios were run, how he used the numbers, and what results

9 they came up with.

10      It is not the case that at that point anyone thought that

11 there was going to be total blocking of testimony about the

12 pension task force.  And in fact Mr. Ciantra on Page 83 asked

13 a question.  Other than these, the several letters that we've

14 gone through has Milliman analyzed any other scenarios on

15 behalf of the pension task force?  And there was an answer to

16 that.

17      So, just to be clear, our position is there were no --

18 there has not been a sword or shield issue.  The instructions

19 given are two in the Bowen deposition, none in the Moore

20 deposition.

21      They do not involve the subject of Mr. Moore's testimony

22 on the 3.5 billion dollars.  And in fact he was questioned

23 about that at his deposition and he did answer those

24 questions.

25      As to Mr. Bowen, there was no wholesale blocking of

1  inquiry into the pension task force.  Two instances and only

2  two, was there an instruction.  And in that case, in both

3  cases, counsel then proceeded with his questioning and got

4  answers to the substantive questions and in fact went on for a

5  number of pages in asking questions and getting answers.

6      And finally as I've said, these subjects do not relate to

7  the 3.5 million.  Anyway, they're extraneous.  And so I don't

8  think there has been any sword or shield used at all, Your

9  Honor.  Thank you.

10      THE COURT:  All right.  May I have the Moore and

11 Bowen deposition transcripts, please?

12      MR. STEWART:  Your Honor, I could pass you my copy

13 now or have a clean copy delivered later today.

14      MR. CIANTRA:  I have clean --

15      THE COURT:  Do you have them?

16      MR. CIANTRA:  I have clean copies, Your Honor.

17      THE COURT:  All right.  May I -- may I have your

18 copies then?  Thank you.

19      MR. CIANTRA:  Yes, the whole transcript.  I'll just

20 double check to make sure, I didn't write on it.  May I

21 approach, Your Honor?

22      THE COURT:  Please.

23      MR. CIANTRA:  Thank you.

24      THE COURT:  Now can you direct me to the page number

25 of the Bowen transcript where -- or page numbers where the

1 | privileges are asserted?

2 |      MR. CIANTRA: Yes, Your Honor. Page 53, beginning

3 | on Line 12. And then continuing to Page 55, Line 8.

4 |      THE COURT: Thank you. Stand by, please.

5 |      MR. CIANTRA: Oh, I'm sorry. And then Page 77, Line

6 | 19, through Page 78, Line 14. Those are the excerpts that I

7 | read to the Court.

8 |      THE COURT: Okay.

9 |      MR. CIANTRA: Thank you, Your Honor.

10 |      THE COURT: One second. All right. Anything

11 | further, counsel?

12 |      MR. STEWART: I do have one thing. All right. Your

13 | Honor, I had not known until Mr. Ciantra raised it that the

14 | relevance he was urging for this was that this point about

15 | PA436 and the assumption of power over the pension systems.

16 |    Leafing through this, I see that Mr. Moore was also asked

17 | about this. Pardon me. Pages 132 and following of his

18 | deposition and he answered all of those questions and there

19 | were no instructions to not answer.

20 |      MR. CIANTRA: I have nothing further, to add, Your

21 | Honor.

22 |      THE COURT: Well, before I resolve this, I want to

23 | have a conversation with Mr. Miller. Is there a Mr. Miller

24 | here?

25 |      MR. STEWART: He is not here. Pardon me, Your

1  Honor, he has been in Court, but he's not here today.  He's a

2  Jones, Day partner in the pension area.

3           THE COURT:  All right.  Well, communicate to him on

4  my behalf then, please.

5           MR. STEWART:  Yes, I will do so.

6           THE COURT:  In the few pages of these transcripts

7  that I have read, especially the transcript of Mr. Moore, it

8  appears that Mr. Miller objects to virtually every question

9  stating, "object to form".  Tell him that from now on he has a

10 standing objection on the grounds of form and he is not to

11 interrupt the flow of depositions with that objection.

12          MR. STEWART:  Pardon me.  Of course, Your Honor.

13          THE COURT:  All right.  After reviewing these --

14 these transcripts and reviewing the testimony that is sought

15 to be stricken here, the Court concludes that there is no

16 unfairness in permitting this testimony to be offered here, or

17 received here despite the earlier claim of attorney/client

18 privilege.

19     The Court so concludes because there was nothing about

20 the isolated and specific claims of privilege that were

21 asserted in the Bowen deposition that precluded a full

22 opportunity for discovery on all factual matters that directly

23 related to the subject of Mr. Moore's testimony now sought to

24 be stricken.  So the motion to strike is denied and I will

25 return the transcripts to counsel.

1           MR. CIANTRA:  Thank you, Your Honor.

2           THE COURT:  Okay.  Anything further before we resume

3    with Mr. Orr?  All right.  Can we arrange for him to be

4    brought back into the courtroom, please?

5        Mr. Orr, you may be seated.  You understand that you are

6    still under oath.

7           THE WITNESS:  Yes, Your Honor.

8       (WITNESS KEVYN ORR WAS PREVIOUSLY SWORN)

9           THE COURT:  Thank you.  And you may proceed, sir.

10          MR. ULLMAN:  Good morning, Your Honor.  Anthony

11   Ullman for the retiree committee.

12                      CROSS EXAMINATION

13   BY MR. ULLMAN:

14   Q    Good morning, Mr. Orr.

15   A    Good morning, Mr. Ullman.

16   Q    And you may recall when we broke yesterday, I had been

17   asking you about the -- your knowledge as to the size of the

18   unfunded pension liability.  And I think we had just finished

19   discussing the May 2013 plan that was Exhibit 407.  Do you

20   recall that in general?

21   A    Yes, I do.

22   Q    Okay.  Now the size of the unfunded pension liability was

23   also mentioned in the June 14 proposal which is number --

24   Exhibit 408, is that right?  Do you want to just put the cover

25   on the screen?

1  A    Yes.  It was mentioned in the June 14th presentation.

2  Q    And does what's written in Exhibit 408, the June 14

3  proposal, accurately reflect your knowledge about the size of

4  the unfunded pension liability as you understood it as of June

5  14th, 2013?

6  A    Yes.  It accurately reflects the size of the unfunded

7  pension liability to the extent -- to the best of our

8  knowledge, yes.

9  Q    Okay.  So if we look at Page 23 of this document, and

10  what we see there's a -- a bullet point there.  Yeah, thank

11  you.  We can pull out.  And it says, that further analysis by

12  the city using more realistic assumptions (including by

13  reducing the discount rate by one percentage point) suggests

14  that the pension UAAL will be approximately 3.5 billion as of

15  June 30, 2013.  Do you see that?

16  A    Yes.

17  Q    Okay.  And that reflects the state of things as you

18  understood it as of June 13, 2013?  I'm sorry, June 14, 2013?

19  A    Yes, I believe so.

20  Q    Okay.  And at that point in time it was characterized as

21  a suggestion, correct?

22  A    It was characterized as a proposal based upon our best

23  analysis at that time.

24  Q    I'm focusing on the bullet point that we have

25  highlighted.  This is -- this is what the analysis regarding

1  the unfunded pension liability suggests.  Did I read that

2  correctly?

3  A    Yes.  The document speaks for itself, that's what it

4  says.

5  Q    Okay.  And is it fair to say that what you knew about the

6  size of the unfunded pension liability in June 2013 was

7  fresher in your mind in June 2013 than it is today?

8  A    I think I've been aware of the unfunded -- the amount of

9  the unfunded pension liability from then until now.  I think

10 it's been fairly consistent.

11      MR. ULLMAN:  Okay.  I'll move to strike as

12 non-responsive, Your Honor.

13      THE COURT:  Motion denied.

14      MR. ULLMAN:  Okay.  Thank you.

15 Q    My question, Mr. Orr, was actually a different -- well,

16 let me rephrase the question.  Would you agree that the

17 information that you had about the size of the unfunded

18 pension liability as of June 14, 2013 was fresher in your mind

19 in June of 2013 than it is today?

20 A    No.

21 Q    And Mr. Orr, I previously asked you about the retiree

22 health benefits and how those were to be treated under the

23 June 14th proposal.  Do you remember that?

24 A    Yes

25 Q    Okay.  And just for clarity, the health benefits that we

1  were talking about are what is referred to in the June 14

2  proposal as OPEB, is that right?

3  A    Yes.  Other employee benefits.

4  Q    Okay.  And is it correct that according to -- in the

5  analysis that you had as of June 14, 2013, the unfunded OPEB

6  liabilities were reported as 5.7 billion dollars?

7  A    Yes.  I believe that's correct.

8  Q    Okay.  And that's set out in your June 14 proposal, isn't

9  it?

10 A    Yes, I believe so.

11 Q    Okay.  Now staying in the June 2013 time frame, and

12 putting aside the possibility of a consensual resolution,

13 okay.  Have you come up with what you considered a viable

14 course of action that allowed the city to cut pension benefits

15 that did not involve a Chapter 9 filing?

16 A    I'm just trying to -- that's a long question, so I'm

17 making sure that I understand it.  Putting aside a potential

18 consensual resolution, had we come up with a viable option to

19 cut pension benefits without filing Chapter 9.

20 Q    That's the question, sir.

21 A    Okay.  There were other options.  I don't know if they

22 were viable or not.  I think between June 14 and until a few

23 months later, it became clear that there were no other viable

24 options.

25 Q    Okay.  Thank you.  Now you in fact did file the Chapter 9

1 | petition obviously, right?

2 | A    I instructed my attorneys to file the Chapter 9 petition

3 | after receiving authority from the Governor.

4 | Q    Okay.  And in fact it is the City of Detroit that is the

5 | debtor, not the emergency manager as such, right?

6 | A    Yes.  Under 436 I act for the city.

7 | Q    All right.  Okay.  And to be clear at the time the city

8 | filed for bankruptcy, is it correct that it was your position

9 | that there had to be significant cuts in accrued pension

10 | rights for both active employees and retirees?

11 | A    Well, I don't know if active employees receive pensions,

12 | but I think the gist of your question is, would there have to

13 | be cuts in the accrued actuarial liability and the answer is

14 | yes.

15 | Q    Okay.  I was asking specifically about cuts in accrued

16 | pension benefits for both actives and retired persons.

17 | A    Well, they're vested pension benefits that active

18 | employees if they vest, have them.  And then there's accrued

19 | actuarial liabilities.  Let's just assume that we're talking

20 | about both in your question, is that fair?

21 | Q    Yes.

22 | A    Okay.  Then yes, there would have to be cuts.

23 | Q    Okay.  And is it correct that as part of the proceedings

24 | in this -- in this action after the Chapter 9 filing was made,

25 | that the city has in fact agreed and admitted that -- that it

1  in fact intends to cut vested pension benefits for actives and

2  retired persons?

3  A    I think you're referring to a request for admissions.

4  Q    Yes.

5  A    Yes, I believe so.

6  Q    Thank you.  Now I understand it's your position that the

7  Chapter 9 filing was done under the authority of PA436, is

8  that right?

9  A    Yes.

10  Q    Okay.  And of course you're generally familiar with that

11  law?

12  A    Yes.

13  Q    Okay.  And you're also generally familiar with PA4, the

14  predecessor statute?

15  A    Not quite as familiar.  Yes.

16  Q    Are you aware of it?

17  A    I'm aware of it.

18  Q    And you were aware that it was repealed by a referendum?

19  A    Yes.

20  Q    Okay.  And then PA436 was enacted with an appropriationed

21  measure that was tacked on that avoided the possibility of

22  another referendum for PA436, correct?

23  A    I'm aware that an appropriation measure was tacked on.  I

24  have read that that was to resolve the possibility of another

25  referendum, yes.

1  Q    Okay.  And I believe that prior to your appointment as

2  emergency manager, you yourself looked at the history of PA4

3  and PA436 at least to some degree, is that right?

4  A    If you're talking about the first day between January 30th

5  to 31st, I looked at it initially then.  And then I looked at

6  it in more depth later.

7  Q    Okay.  So let's put on the screen Exhibit 403.  Okay.

8  This is an email that you wrote from January 13, 2003 (sic).

9  Is this what you were referring to?

10  A    Yeah, I think that's the email we discussed during my

11  deposition.

12  Q    Okay.  And if we focus on the -- it talks about a number

13  of things.  What it does as you said, go over some of your

14  understanding of the legislative history.  And if we look at

15  the first paragraph, it's talking about the new EM law which

16  is PA436, correct?

17  A    Yes.

18  Q    And if you focus in particularly on the second to last

19  sentence it says, by contrast Michigan's new EM law is a clear

20  end run around the prior initiative that was rejected by the

21  voters in November, correct?

22  A    What day is this dated?

23  Q    I'm sorry?

24  A    Is this dated the 31st?

25  Q    January -- I think I may have said the 13th, but thank

1  you, it is the 31st.

2  A    Okay.  Thank you.  Yes, I see that.

3  Q    Okay.  And that was what you wrote in this email of

4  January 31st?

5  A    Yes.  That's what I wrote one day after being approached

6  about becoming the EM.

7  Q    And then if we skip two paragraphs down, there is --

8  right.  In the last paragraph we see the -- the phrase you

9  wrote.  It says, so although the new law provides the thin

10  veneer of a revision, it is essentially a redo of the prior

11  rejected law and appears to merely adopt the conditions

12  necessary for a Chapter 9 filing.  Do you see that?

13  A    Yes, I see it.

14  Q    Okay.  And that's what you wrote and concluded when you

15  created this email in January of 2013?

16  A    Yes.

17  Q    And subsequent to then, to that time, have you done any

18  further investigation as to how PA436 came about and the --

19  the origin of the appropriations measure?  It's really a yes

20  or no question.

21  A    Well, no, I want to be complete in my answer so it's not

22  misinterpreted either by people in the courtroom or the

23  public.  But have I done further investigation --

24  Q    I'm sorry, Mr. Orr, but the question is simply whether

25  you did investigation, sir.

 1          THE COURT:  And as I've indicated to you before, if

 2   you can't answer a question with a yes or a no answer, just

 3   say that.

 4   A    Okay.  I can't answer that question with a yes or no

 5   answer.

 6   Q    You cannot tell me yes or no whether you did any further

 7   investigation subsequent to January of 2013?

 8   A    It would be misleading for you to give just -- for me to

 9   give you just a yes or no answer.

10   Q    Okay.  Did you ask any of your colleagues at Jones, Day

11   whether they had any information about the circumstances

12   surrounding the repeal of PA4 or the creation and enactment of

13   PA436?

14   A    I don't think I asked anyone at Jones, Day.  I think I

15   did my own analysis.

16   Q    Well, were you aware that Jones, Day was in discussions

17   with the State of Michigan in March of 2012 concerning the

18   challenge to PA4?

19   A    No.

20   Q    Okay.  Well, let's put 845 on the screen.  This is

21   Exhibit 845.  This is a March 24th, 2012 email.  Do you -- do

22   you need -- I think we have a hard copy in the binders there

23   if it's easier for you to look --

24   A    No, that's okay with my reading glasses, I can -- I can

25   keep up.

1  Q    Okay.  And why don't you take a moment to read it because

2  I don't want to just, you know, spring the paragraph on you.

3  A    All I have on the screen is the two's.

4  Q    Okay.  Can you just put the -- the document on the screen

5  so Mr. Orr can read it?

6  A    Well, I can't read that.  You want me to read the whole

7  email or just --

8  Q    You can look at the second page too and then I'll ask you

9  a few questions.

10  A    Okay.

11  Q    And then we'll move on.  Have you had a chance to look

12  through that, Mr. Orr?

13  A    I haven't read it all, but I -- I get the gist of the

14  email.

15  Q    Okay.  And this is as I said it's a May -- it's a March

16  24, 2012 email.  You are not on it.  I'm not suggest that you

17  are.

18  A    No.

19  Q    It's talking about a meeting that took place with Braum

20  Stibitz.  That's a person from the -- of the Treasury

21  Department of the state, is that right?

22  A    Yes.

23  Q    And if you look at the paragraph numbered 1 with the

24  Arabic number 1, giving the context it says the state and the

25  city were concerned that PA4 may not survive the petition

1  challenge.  Do you see that?

2  A    Yeah, that's what it -- that's what it says, yes.

3  Q    Yeah, okay.  And then if you go on to the next page, you

4  go through some more discussion.  It goes to the next page and

5  there is a -- a paragraph that says based on that conclusion,

6  it said the state quickly began evaluating the alternatives.

7  And go through one, could a consent agreement be achieved to

8  an artful solution such as the DEP was intended.

9      And then it goes to number three, thus, the state was

10 looking at declaring an emergency and appointing an EFM with a

11 likely subsequent step of a Chapter 9.  Do you see that?

12 A    Yes, I see that.

13 Q    Then in the next paragraph it goes on to say, the state

14 believes it needs PA4 or worse case PA72 to file a Chapter 9

15 case based on law.  And as such state legal counsel and Jones,

16 Day provided guidance on whether a Chapter 9 filing in April

17 could be upheld if PA 4 is pulled back at the end of April.

18 And does that refresh your recollection, Mr. Orr, as to

19 whether Jones, Day was involved in discussions in -- in -- or

20 in the spring of 2012 with the state concerning PA4 and

21 potential challenges to it?

22 A    No.  I have no -- I have -- did not have then and I just

23 learned now that Jones, Day had involvement in March 2012.

24 Q    Okay.  Well, were you aware, or are you aware I should

25 say, that Jones, Day itself was involved in suggesting the

1  addition of an appropriation measure to PA436?

2         MR. STEWART:  Objection, Your Honor, foundation.

3         THE COURT:  I'll permit it.  Go ahead, sir.

4  A    No.

5  Q    You've never heard that?  You don't recall ever hearing

6  that from anyone at Jones, Day?

7  A    I just heard it from you.

8  Q    That wasn't my question.  You don't recall ever hearing

9  that from anyone at --

10 A    I never heard it from anyone at Jones, Day, no.

11 Q    Okay.  I'm going to show you a document and see if this

12 refreshes your recollection.  The document I'm going to show

13 the witness is not in evidence, so I will not put it on the

14 screen.  With permission, I'll just direct --

15        THE COURT:  Well, the -- the witness did not

16 indicate a lack of recollection.  He said -- the answer was

17 no.  He was not aware of that.

18        MR. ULLMAN:  Well, he said he -- I thought I asked

19 him whether he recalled ever hearing it and he said no.

20        THE COURT:  That he wasn't aware of it.  Is that

21 right, sir?

22 A    Yes, Your Honor.

23        MR. ULLMAN:  Well, Your Honor, if -- if he saw

24 something that refreshed his recollection that he had heard

25 of then he would have been aware.  It's a little --

1          THE COURT:  But that's a question of impeachment,

2   not refreshing recollection.

3          MR. ULLMAN:  Okay, Your Honor.

4   Q    Mr. Orr, prior to the Chapter 9 filing, were you aware of

5   any legal precedent specifically allowing a city or an

6   emergency manager to use Chapter 9 as a means to trump a

7   provision of the State Constitution that protects vested

8   pension rights?

9   A    I cannot answer that in a yes or no fashion.  I'll give

10  you an explanation.

11        I -- as I had said before in my background, I handle

12  cases for federal preemption over state law in a number of

13  different roles.  And so I generally was aware and -- and as

14  you've said before with my oath, that federal law takes over

15  state law.

16        Was I aware of any specific cases regarding an emergency

17  manager authorizing a Chapter 9 to trump state filings.  I

18  don't think there were any specific cases of State

19  Constitution regarding vested pension rights.  I don't think

20  there were any specific cases that I was aware of in that

21  regard, but I was aware of federal preemption, yes.

22  Q    Okay.  And were you at the time that you filed, were you

23  aware of any legal precedent allowing a city or an emergency

24  manager to use Chapter 9 as a means to trump a state

25  constitutional provision in general, even apart from -- from

1  vested pension rights?

2  A    Here again broadly, federal supremacy takes over state

3  constitutional law.  I don't recall any specific cases in that

4  regard.

5  Q    Okay.  No specific cases regarding federal law trumping

6  the State Constitution, is that correct?

7  A    No.  I think I am aware of specific cases of federal law

8  trumping state constitutional law.  What I was saying to you,

9  I was not aware of specific cases of federal law trumping

10  state constitutional law regarding vested pension rights.

11  Q    Okay.  Do you recall being deposed before right around

12  September 16th?

13  A    Yes, I was deposed.

14  Q    And I think you indicated that you were testifying

15  truthfully when you --

16  A    I was testifying truthfully.

17  Q    Okay.  Let's show the -- the clip beginning at Page 192,

18  Line 2.  I'd like to know, Mr. Orr, whether this was testimony

19  that you gave during that deposition?

20        MR. STEWART:  Objection, Your Honor.  I don't think

21  that this is a proper use of -- of deposition testimony.  And

22  I would -- if Mr. Ullman has a question.

23        THE COURT:  What -- what do you assert is improper

24  about it?

25        MR. STEWART:  Well, there has been no statement

1 inconsistent with the deposition.

2          THE COURT:  Well, then the impeachment will be

3 ineffective.  But I'll permit counsel to -- to try.

4 Q    Okay.  The question is, do you recall giving this

5 testimony that we're about to play and you can answer yes or

6 no once you get --

7 A    Yes, I recall September 16 deposition.

8 Q    Okay.  Why don't I just play the testimony?

9          (Video Being Playing at 9:56 a.m.; Concluded at 9:56

10 a.m.)

11 Q    Now, Mr. Orr, is it correct that you've been told by the

12 State Attorney General that in his view the Michigan

13 Constitution protects the pensions that you're seeking to cut?

14 A    Yes.

15 Q    Is it correct that prior to the Chapter 9 filing there

16 were State Court proceedings that had been filed alleging

17 among other things that PA436 was unconstitutional inasmuch as

18 it purported to allow you to file for Chapter 9 without

19 insuring that the vested pension payments were protected?

20 A    Yes.

21 Q    Okay.  And those were pending as of July 2013, correct?

22 A    I believe they began July 3rd and there was another one

23 the following week and then one on July 15th, but yes.

24 Q    Okay.  And that litigation was pending in Ingham County

25 before Judge Aquiline?

1  A    Yes.  There was one case prior to the July cases

2  challenging the constitutionality of 436.  But the cases

3  you're talking about Flowers, Webster, and GRS, I think were

4  all pending in Ingham County.

5  Q    Yeah, in Ingham County.  And is it correct that at -- at

6  least at some point in July the date for the bankruptcy filing

7  had been planned for July 19?

8  A    No.  I think I said before that I wanted to file as soon

9  as I got the authority.  There wasn't a planning date.  But I

10  was going to file as soon as I asked for the authority to do

11  so.

12  Q    Okay.  Isn't it correct that there was a plan that had

13  been -- a written plan that had been put in place and that had

14  been created at least that showed the filing date of July 19?

15  A    I don't know if there was, I'm trying to recall.  I don't

16  know if there was a plan.  I think we had had discussions

17  about timing, yes.

18  Q    Okay.  And why don't we put on the screen Exhibit 831,

19  please.  Or, yeah, I'm sorry, or we can use 452, I think

20  that's easier.

21       Okay.  And what I'm putting before you is an email with

22  various attachments that comes from a Bill Nowling dated July

23  8th, 2013.

24  A    Yes.

25  Q    And it indicates at the bottom that Mr. Nowling works for

1  the office of the emergency manager, you?

2  A    Yes, he's my communications director.

3  Q    Okay.  And this is a document that was created by Mr.

4  Nowling, is that right?

5  A    I assume it was.  I haven't seen this document before.

6  Q    Okay.

7  A    But I assume it was.

8  Q    Okay.  And as you look at the attachments, it says

9  Chapter 9, COMS, which I assume is communications document,

10  Chapter 9 messages, Chapter 9 communications roll out from

11  July 4, 2013.  Do you see that?

12  A    Yes, that's what it says.

13  Q    Okay.  And Mr. Nowling in his ordinary course of duties

14  communicates with other people as to the state of things and

15  what the current schedule looks like, is that right?

16  A    Yes.  Mr. Nowling is the communications director and he

17  does a number of different things.

18  Q    Okay.  And if we turn to Page 7 of this document.  Okay.

19  This is what we see, it looks like the roll out schedule which

20  was referred to in the attachment.

21      And if we look at the first entry, under the middle

22  column, event.  It says Friday, July 19th, 2013 FILING DAY in

23  capital letters.  Do you see that?

24  A    Yes.

25  Q    And then if you look at the second box below there is an

1  item for 10:00 a.m., file necessary paperwork with Court

2  system?

3  A    Yes, that's what it says.

4  Q    Okay.  And this is all referring to the Chapter 9 filing,

5  isn't it?

6  A    I believe so.

7  Q    Okay.  Now do you recall, and I think you indicated

8  previously that in -- in early to mid-July you were aware that

9  there was -- there had been a hearing in the State Court

10 litigation for a TRO that had been scheduled for July 22nd, is

11 that right?

12 A    Yes.

13 Q    Okay.  And is it correct that the TRO hearing was then

14 moved up to July 18 in the late afternoon?

15 A    I believe so.

16 Q    Okay.  And is it correct that the bankruptcy filing was

17 in fact done on July 18, not on the 19th?

18 A    Yes.

19 Q    And is it correct that it was around 4:06 in the

20 afternoon of the 18th that it was filed shortly before the

21 State Court TRO hearing was scheduled to start?

22 A    If -- if that's the time it shows on the documents then

23 yeah, that's correct.

24 Q    Okay.  Now why don't we put up the -- do we have the

25 petition here?  And this is just from the Court files.  This

1  is a copy from the petition.

2      And if we look at the bottom, we see the filing date and

3  we see the filing time which is 4:06 in the afternoon.  And if

4  you look at the date, there was a date that was handwritten to

5  July 18th.  And I believe you've indicated previously that you

6  hand wrote the date to change it from July 19 to July 18, is

7  that right?

8  A    Yes, I did that.

9  Q    Okay.  Now, you of course know Kenneth Buckfire, is that

10 right?

11 A    Yes, I know Ken Buckfire.

12 Q    Okay.  And do you recall telling Mr. Buckfire that one of

13 the reasons that the bankruptcy filing was moved from the 19th

14 to the 18th, was to avoid the impact of a decision in the State

15 Court litigation that might have prevented you from filing the

16 bankruptcy petition?

17 A    I don't recall specifically saying that, but I may have

18 said it.

19 Q    Okay.  So if Mr. Buckfire testified to that, would you

20 have any reason to challenge that testimony?

21 A    Like I said, I don't specifically recall it, but I have

22 no reason -- I have no reason to say I did not say it.

23 Q    Okay.  And are you aware of any particular reason why the

24 Chapter 9 filing was filed when it was other than to get a

25 jump on a decision by the State Court?

1  A    Yeah.  I think I said before that once I sent the letter

2  to the Governor, I was prepared to file the case immediately.

3  I had said before that we were going to give it a month to try

4  to reach some sort of consensual resolution through the

5  process that we had outlined on June 14th and that wasn't

6  forthcoming.

7     I had said before that things were beginning to spiral

8  out of control.  We had sat by for the better part of three

9  weeks being sued on a regular basis.  We had the Syncora

10 litigation.  And the -- TRO, temporary restraining order that

11 was due to expire at the end of that week.  There were a

12 number of reasons besides the implication of your question

13 which was to try to get a jump.  That we were concerned about

14 filing as soon as we could.

15 Q    Okay.  Mr. Orr, again, you remember testifying on

16 September --

17 A    Yes.

18 Q    Of September?

19 A    Uh-huh.

20 Q    I'm sorry, September of -- of this year.

21 A    Yeah.

22 Q    And again you indicated you were testifying truthfully?

23 A    Yes, I was testifying truthfully.

24 Q    Okay.  And can you tell me did you give the following

25 testimony that we're about to play?

1  A     Sure.

2       (Video Being Played at 10:03 a.m.; Concluded at 10:04

3  a.m.)

4  Q     Okay.  That was your testimony, Mr. Orr?

5  A     Yes.

6  Q     Okay.  Now isn't it the case that subsequently the State

7  Court ruled that PA436 was unconstitutional to the extent that

8  it allowed a filing for Chapter 9 without protecting vested

9  pensions?

10 A     I'm aware that there was a State Court ruling.  I'm not

11 aware of the details.  But I think I -- I think I have heard

12 that.  I didn't -- I may have read the ruling, but I don't --

13 I think that's the gist of the ruling, yes.

14 Q     You're aware of that in substance?

15 A     I'm aware of that in substance.

16 Q     Okay.  And you didn't withdraw the bankruptcy petition in

17 response to the State Court ruling, did you?

18 A     No.  You asked me that on September 16th.  No.

19 Q     Now in connection with the bankruptcy filing, you filed

20 -- you yourself submitted a declaration, is that right?

21 A     Yes.

22 Q     Okay.  And in it among other things you gave figures as

23 to the city's liability in cash flow?

24 A     Yes.

25 Q     Okay.  And on the liability side, I believe you said that

 1  the total liabilities are over $18,000,000,000, is that right?

 2  A    Yes.

 3  Q    Okay.  And I think you also broke that $18,000,000,000

 4  figure down in a couple of ways.  And we can -- I can show

 5  you.  Okay.  So why don't we put -- let's put Exhibit 414 on

 6  the screen.  This is your declaration that you filed, isn't

 7  it?

 8  A    Yes.

 9  Q    Okay.  And if we can go to Paragraph 9 which is on --

10  starts on Page 5 and then continues.  So okay, I guess we have

11  it all pieced together here.  So we see here that you wrote in

12  Paragraph 9 that the city has over 18,000,000,000 in accrued

13  obligations, right?

14  A    Yes.

15  Q    And then you go on further to say, that there is over

16  6,000,000,000 -- a little further down, over 6,000,000,000 in

17  obligations backed by enterprise revenue -- enterprise

18  revenues or that are otherwise secured?

19  A    Yes.

20  Q    Okay.  And then you elaborate that a little more in

21  Footnote 4.  Will you put Footnote 4 on the screen?  Okay.

22  And there is a phrase in there exactly where you say -- you're

23  elaborating on what that 6.4 billion dollar figure is.  And

24  among other things you say that that consists of 5.85 billion

25  in enterprise fund debt.  Do you see that?

1    A    Yes.

2    Q    Okay.  And is it correct that that is basically referring

3    to bonds that are issued by the Detroit Water and Sewer

4    Department and state loans that are also made to the

5    Department of Water and Sewer?

6    A    Yes.  That's generally -- yeah, 6,000,000,000 of it

7    belongs to DWSD, yes.

8    Q    And the DWSD, that's department of -- that's the Detroit

9    Water and Sewer Department?

10   A    Detroit Water and Sewer Department.

11   Q    Okay.

12   A    We call it DWSD.

13   Q    And the DWSD is operated as a separate authority in

14   Detroit, is that right?

15   A    It's a department of the City of Detroit, but it is

16   operated as a -- not as -- necessarily as an authority.  It's

17   operated with some autonomy, both operationally and as a

18   result of Judge Cox's ruling in the Clean Water Act case.

19   Q    Okay.  And it keeps its own books and records?

20   A    Yes.

21   Q    And the DWSD is responsible for the payment of these

22   bonds, isn't it?

23   A    Yeah.  There's a mechanism but generally, yes.

24   Q    Okay.  So the payment of these bonds, this about

25   6,000,000 is not allocable to the -- to the Detroit general

1  fund, is it?

2  A     Six billion.

3  Q     Six billion.  Did I say million?

4  A     Yeah, you did.

5  Q     Thank you.

6  A     Okay.  Six billion.

7  Q     And that's -- the payment -- the responsibility for the

8  6,000,000,000 in the DWSD related bonds and -- and loans is

9  not allocable to the general fund, is it?

10 A     No.  No, it's not part of the general fund debt, but it

11 is an obligation of the city.

12 Q     Okay.  And the DWSD has the financial wherewithal to make

13 the payments on its bonds as they come due, doesn't it?

14 A     Yes.  And it is doing so.

15 Q     Okay.  Now if we look a little further in your

16 declaration, staying with Paragraph 9.  You talk about where

17 is the 11. -- no, it's the top part.  11.9 billion in

18 unsecured obligations to lenders and retirees.

19 A     Yes.

20 Q     And we go back down this time to Footnote 3.  And we see

21 in -- in little letter (a), we see the 5.7 billion -- billion

22 dollar figure in the OPEB liabilities, right?

23 A     Yes.

24 Q     And then in little (b) we see that number again, 3.5

25 billion in under funding pension liabilities, correct?

1  A    Yes.

2  Q    Okay.  And that's a reference to the state of things as

3  you believe them to exist or saying they existed as of June

4  14, 2013, correct?

5  A    Well, I -- I think my affidavit also includes a state of

6  play that we believe them to exist at the time of filing.

7  Q    Well, I'm looking right now at Footnote 3 which says on

8  June 14, it says we met and these were the obligations.  And

9  it says see proposal for creditors as of June 14, correct?

10  A    Yeah.  I'm not taking issue with what is said in there,

11  I'm just saying that I didn't see any change in those numbers,

12  yes.

13  Q    Okay.

14  A    But the answer to your question is yes.

15  Q    Okay.  Now is it correct that as of June 14 -- and you

16  had not been aware of any -- was there any substantial

17  revision to the work that had been done regarding the size of

18  the unfunded pension liability as you recall between June 14

19  and the time of the bankruptcy filing?

20  A    There -- there -- there is ongoing work on these issues

21  through from June 14th until the bankruptcy filing.  But there

22  were no, to the best of my knowledge, there were no

23  substantial changes in the amount of the debt represented by

24  these figures.

25  Q    Okay.  And is it correct then that as of June 14, the

1 | work that had been done by Milliman was in fact preliminary

2 | work?

3 | A    I don't remember the exact date, but I believe June 14th

4 | is correct and that Milliman's first work was done off of

5 | Gabrielle Roeder, yes.

6 | Q    Okay.  So the June 14 preliminary.

7 | A    Yeah.

8 | Q    Was it still preliminary as you understood it as of the

9 | date of the bankruptcy filing, July 18?

10 | A    I don't know if it's -- if it's -- it's preliminary until

11 | we reach agreement as to what the numbers are.  So the work is

12 | consistently estimates.  When you say preliminary, I assume

13 | you mean that we haven't reached a final conclusion as to the

14 | amount.  But this represents our best analysis of what those

15 | numbers are.

16 | Q    Yes.  Preliminary in the sense that the Milliman firm had

17 | not reached a final conclusion as to what the right number was

18 | for the pension liability.

19 | A    I -- I think that's fair.

20 | Q    Okay.  And I think you testified earlier that during this

21 | time frame, Milliman was doing an analysis of the Gabrielle

22 | Roeder work, correct?

23 | A    The --

24 | Q    Well, I'm not saying that's all, I'm just taking this

25 | piecemeal.

1  A    Yeah.  Well, so I don't -- without -- without looking at

2  the actual documents, I want to be sure I'm not misleading.

3  Milliman -- the sequence was Milliman was doing analysis of

4  Gabrielle Roeder.  Milliman then began doing its own analysis.

5  I don't remember the exact dates, so I don't want to say June

6  14th and it turns out it was June 15th.  But generally that's

7  the sequence and that's the approximate time.

8  Q    Okay.  So there are two aspects to what -- so we're

9  clear, what Milliman was doing one, was doing an analysis

10 based on the Gabrielle Roeder work, right?

11 A    Yes.

12 Q    And so we're clear Gabrielle Roeder is the actuary

13 retained by the retirement systems, correct?

14 A    Yes.

15 Q    Okay.  And it was also, I think you had said earlier, in

16 the process of creating its own valuation?

17 A    Yes.

18 Q    Okay.  And is it correct that as late as September 18,

19 2013, Milliman had not in fact yet completed its work and the

20 city was not in a position to know the actual size of the

21 pension under funding?

22 A    I think it's correct that as of the 18th, Milliman may

23 have not -- here again I'm trying not to be specific with

24 dates if they're different and are proven to be different,

25 that's fine.  But that's approximately the time.  I don't know

1  if it's fair to say that the actual valuations hadn't been

2  concluded.  Our valuations have been fairly consistent based

3  upon the assumptions used.

4  Q    Okay.  And you know Charles Moore, correct?

5  A    Yes.

6  Q    Okay.  And he is on the pension task force?

7  A    Yes.

8  Q    Okay.  And he was tied in with the Milliman work and the

9  status of it at various points in time?

10 A    Yes.

11 Q    Okay.  Why don't we put on the screen some deposition

12 transcript excerpts.  Do you know what I'm -- okay.

13      This is from the deposition of Mr. Moore on September 18th

14 of this year.

15           MR. STEWART:  Objection, Your Honor.

16           MR. ULLMAN:  I'm not sure what the objection is,

17 Your Honor.  I want to ask him some questions about some

18 specific things, made -- statements made by Mr. Moore.  This

19 document has not been objected to, or rather this -- this

20 deposition testimony has not been objected to.

21           THE COURT:  It's really not appropriate to ask one

22 witness about the testimony of another witness, or to confront

23 one witness with the testimony of another witness.  The

24 objection is sustained.

25 Q    Okay.  Is it correct, Mr. Orr, that so far as you were

1  aware that as late as September 18th, 2013, the city and its

2  actuary Milliman, had not completed the analysis on the

3  unfunded pension liability?

4  A    As I said, I think that's the approximate date.  I don't

5  recall independent the exact date.  But I think it's around

6  that time.

7  Q    What are you saying, it's around that time that they

8  complete -- I'm not sure when you say -- what's around that

9  time?

10 A    No, at some point Milliman completed its analysis.  I

11 don't remember the exact date that that was done.

12 Q    Okay.  But at -- you would agree that at least as of

13 September 18th, 2013, that Milliman had not completed its

14 analysis, correct?

15 A    I'll agree that it was around that date.  I don't want to

16 say yes and then it turns out that they had and I was wrong

17 because I just don't recall the date.

18 Q    Okay.  So that your best knowledge is around that date,

19 around September 18th.

20 A    Sometime in September.

21 Q    Okay.  And is it correct that as recently as September

22 18, Milliman and the city were still in the process of trying

23 to create their own valuation model?

24 A    That -- here again, it may be around that time.  I mean

25 we continually do work on -- on valuations and analysis, but

1  that may have been the approximate time.

2  Q   Okay.  And to the extent that they were still working on

3  it as of around the July -- I'm sorry, the September 18 time

4  frame, do you have any personal knowledge as to when if ever

5  the Milliman valuation work was completed?

6  A   Do I have personal knowledge of -- of when?  I believe it

7  was completed.  I don't know the exact time it was.

8  Q   In any event it -- to the extent it was, it would have

9  been sometime on or after September 18th, is that true?

10 A   Yeah, if your supposition is correct, that September 18th

11 it was still a work in progress, then it would have flowed

12 that it would follow sometime after that.

13 Q   Now I think you also made reference in your June 14

14 proposal to the investment rate of return that had been used

15 by the retirement systems actuary, do you recall that?  A 7.9

16 figure?

17 A   Yes.

18 Q   Okay.  And do you want me to show that to you, or do you

19 agree that you made some reference to that as being what you

20 considered an inappropriate assumption?

21 A   To move along, I will agree that we made a reference to

22 in our anticipated rate of return.  And if you say it was 7.9,

23 I have no reason to -- to disagree with you.

24 Q   Okay.  And as it correct that as -- as late as September

25 24, 2013, the Milliman firm had not given any opinion as to

1  whether the investment rate of return that was used by the

2  retirement systems actuary was inconsistent with actuarial

3  standards of practice?

4  A    Here again I'm -- I'm going to defer to the documents and

5  -- and the actual timing of when those reports were produced.

6  But I think there was one report that had a range of

7  assumptions as far as what was reasonably anticipated to be

8  the expected rate of return.

9  Q    My question is a little -- is really quite specific.  Are

10  you aware -- they called actuarial standards of practice?

11  A    Yes.

12  Q    Okay.  And is it correct that at least as late as

13  September 24, 2013, the Milliman firm had not opined, had not

14  given an opinion --

15  A    Right.

16  Q    -- that the investment rate of return used by the

17  retirement systems actuaries was inconsistent with actuarial

18  standards of practice?

19  A    Yeah, without seeing the report, I don't recall if

20  Milliman ever opined.  They may have, I just don't recall it.

21  If you say that there was some time after September 24th is

22  what you said, without getting caught up in the dates because

23  I don't have the document, and that document speaks for

24  itself, I have no reason to disagree with it.

25  Q    Okay.

1          THE COURT:  What's the relevance of all of this to

2   whether the city was eligible to file two months earlier?

3          MR. ULLMAN:  This has to go to what the city knew

4   and what it's the city, not Mr. Orr necessarily personally,

5   but the city and its state of mind in making the

6   representation that the number for the unfunded pension

7   liability was indeed 3.5 billion when we believe the evidence

8   will show and shows that no one had come to that conclusion

9   yet and in fact work was still ongoing.

10          THE COURT:  All right.  I'll permit some brief

11  further inquiry into this and then ask you to move on.

12          MR. ULLMAN:  Thank you, Your Honor.

13  Q    Is it correct that as of September -- at least September

14  24, 2003 (sic), the work done by Milliman, the city's actuary,

15  had not in fact progressed to the point where it was even able

16  to replicate the valuation model that had been used by the

17  retirement systems actuaries?

18  A    Mr. Ullman here again, I don't know what your dates are.

19  And I don't recall at what point --

20          THE COURT:  All right.  Mr. Orr --

21  A    I don't know.

22          THE COURT:  If you don't know, just say --

23  A    I don't know.

24          THE COURT:  -- I don't know.

25  A    I don't know.  I'm sorry, Your Honor.  I don't know.

1  Q    Is it correct, Mr. Orr, that the last actuarial valuation

2  for the pension liability as a whole was done as of June 2011,

3  that's for both systems, the GRS and the police and fire?

4  A    I don't know if that's the date.

5  Q    Okay.  Well, you recall that there was an actuarial

6  evaluation for June 2011 that showed a total unfunded

7  liability of about 643.8 million dollars?

8  A    I don't recall if that was the date.  I recall during a

9  deposition us discussing that number.  I think that number was

10  based off the Gabrielle Roeder report as part of their annual

11  valuation.

12  Q    Yeah.  And that number, the 643.8 million is referenced

13  in the June 14 proposal, isn't it?

14  A    I think it is, yeah.

15  Q    Okay.  And that would be for June 11, 2000 -- I'm sorry,

16  June 2011, right?

17  A    I -- I -- I think that's when the report dates back to.

18  Q    Okay.

19  A    The end of the calendar -- I mean fiscal year.

20  Q    Now for that -- didn't mean to interrupt you.  Now,

21  taking that number, the total liability number for the

22  unfunded pension liability of the reported figure of 643.8

23  million, not all of that is allocable to the general fund, is

24  it?

25  A    No.  I think we discussed this on September 16th.  There's

1  a mechanism for some allocation to DWSD, but Gabrielle Roeder

2  doesn't break that out between general fund and DWSD.

3  Q    Okay.  And the fact is that a substantial portion of the

4  unfunded pension liability, the reported one, the 643.8

5  million, was allocable to DWSD, correct?

6  A    Well, I think you and I discussed on September 16th that

7  the math, and I thought I said let's be careful.  The math

8  works out to about 38%.  I -- I think that figure does not --

9  I think that figure focuses on what was actually paid as

10 focusing on what was obligated.  That 38% might go down if you

11 include the deferrals that we made.  But generally somewhere

12 between a third to 40% is DWSD.

13 Q    Of the unfunded pension liability --

14 A    Of the unfunded --

15 Q    -- is allocable -- I'm sorry, I didn't mean to --

16 A    I didn't mean to interrupt you, I'm sorry.

17 Q    Okay.  To be clear though about you said 38 to 40% of the

18 unfunded pension liability is allocable to DWSD.

19 A    What I -- what I said was, depending upon if you're

20 looking at just what was paid for that year, or what was paid

21 and deferred that that percentage probably ranges, because

22 Gabrielle Roeder doesn't break out the difference between the

23 general fund and DWSD obligations.  Probably ranges between 30

24 to 38%.  I think that 38% is what we discussed during my

25 September 16th deposition

1  Q    Okay.  Just so I'm clear, the 38% that we discussed was

2  -- was allocable to the -- that we're talking about the

3  unfunded pension liability.  And you're getting a little

4  confused is your answer?

5  A    Yeah.  Let me -- yeah.  I'm going to try to clarify as

6  best I can because I want to be responsive.

7      If you calculated in the total amount the city had due

8  for instance in 2013 of about $130,000,000, then DWSD's

9  responsibility would be about 30% of that number.  If you

10 calculated in just the amount that was actually paid and other

11 deferrals in other years, then the DWSD component would

12 probably be about 38% of that number because it's -- it's a

13 larger component of what was actually paid as opposed to what

14 was obligated but a portion of which was deferred.

15 Q    Okay.

16 A    So the range depending upon whether it's -- it's all that

17 should be paid but was deferred, or whether it's just what was

18 actually paid, is somewhere between 30 to 38%.

19 Q    Isn't it correct that the unfunded pension, just the

20 unfunded amount allocable to DWSD is about 39 to 40%, that

21 range?

22 A    That's the figure we discussed on September 16th.  And --

23 and that -- that is correct for the amount that's actually

24 paid.  That percentage goes down if you include the deferral

25 amount.  But yes, that's correct.

1  Q    Okay.  Just so we're real clear, can we put up the City's

2  Exhibit 68?  Look at Page 1 first.  Okay.  This is the

3  Gabrielle Roeder.  It's a -- a report from July 2012.  Do you

4  see that?

5  A    Yes.

6  Q    And if we go to Page B3.  Okay.  If we can blow that up.

7  Do you see here Gabrielle Roeder actually breaks down the --

8  the actuarial accrued liability as of June 30, 2011?

9  A    Yes.

10  Q    And at the very bottom there's unfunded actuarial accrued

11  liabilities?

12  A    Yes.

13  Q    Okay.  You see there's a -- a total column at the far

14  right?

15  A    Yes.

16  Q    Okay.  And in the middle it's Department of Water and

17  Sewage -- or Sewage?

18  A    Yes, the middle column.

19  Q    The two forty-seven --

20  A    Yes.

21  Q    And I believe if you do the math, if you divide the two

22  forty-seven six two four figure into the total unfunded

23  accrued liabilities, it comes out to just about 38.6%.  Do you

24  see that?

25  A    Yeah, that's the discussion we had on September 16th.

1  Q    Okay.  And this is -- so this is talking about the

2  unfunded liabilities only, correct?

3  A    Yes.

4  Q    Okay.  And in the -- going back now to our discussion

5  September 16th, do you remember that there was some -- there

6  was some confusion over how to do the math to get the right

7  number?

8  A    Yes, I do.

9  Q    And remember we first did it the wrong way and we ended

10  up with 38%.  And then we went back and tried it again and you

11  ended up saying yes, the right number is 61 -- it was

12  something like 61%.

13  A    Well, I said if you -- I think what I said was, and I'm

14  sorry because we were both going back and forth on the math.

15  I think what I said is, the math is the math, but be very

16  careful with the numbers because you'd actually have to do

17  down.  So just -- just to clarify that whole discussion --

18  Q    I -- I agree.

19  A    We're -- we're talking about 38%.

20  Q    Right.  And at the deposition I think we ended up with

21  61, but we see now that the right number is more at -- at

22  38.6?

23  A    Yes, that's right.  Attorneys doing math.

24  Q    Thank you.  Okay.  And now with respect to the unfunded

25  pension liability that is allocable to DWSD, that is -- DWSD

1  bears financial responsibility for that, doesn't it?

2  A    Yes.

3  Q    Okay.  And so again that's not allocable to the general

4  fund, is it?

5  A    No.  It's accounted for in DWSD, but the general fund

6  makes the payment.  So whether or not, I don't want to get

7  confused with a legal conclusion as to whether or not there's

8  an obligation by the city to fund that, but DWSD makes a

9  contribution for that amount.

10 Q    So ultimately it's borne that the unfund -- the pension

11 amounts including the unfunded would ultimately be borne by

12 DWSD, correct?

13 A    Ultimately the -- the portion of that obligation due for

14 employees at DWSD is borne by DWSD, but is still a city

15 obligation because they're a department of the city.

16 Q    Okay.  But ultimately not an obligation that's payable at

17 the end out of the general fund?

18 A    It's not taken out of the general fund.

19 Q    Okay.  Now, is it correct -- what we've been talking

20 about now is the 643,000,000 or so liability as of June 2011.

21 And then we saw that there's an amount about 38 -- it was 38

22 to 39% that's allocable to DWSD.  Is it correct that with

23 respect to the unfunded pension liability, that if it were

24 concluded subsequently that the correct amount of the unfunded

25 pension liability is higher than 643.8 million, even as high

1 as 3.5 billion, that a substantial portion of that would still

2 remain allocable to DWSD?

3 A    I -- I think I cautioned on September 16th with being

4 careful about doing a straight line analysis.  And I think I

5 said then that you'd have to go back and do analysis of

6 deferrals and payments and so on and so forth.  So I'm going

7 to say that again today.  But if you're relying on the math, a

8 portion of that obligation is due from DWSD.

9 Q    And I was not suggesting that it was necessarily a

10 straight line relationship, but simply that there would be a

11 substantial portion of the unfunded liability that would

12 remain allocable to DWSD, correct?

13 A    Yeah.  I'm just going to -- I'm going to caution a little

14 bit about substantial.  There will be a portion substantial if

15 we go back and do an analysis that of the deferrals, different

16 proportion than other things.  Let's just be a little careful.

17 But generally speaking, there are obligations due from DWSD.

18 Q    Yeah.  And as you sit here now you don't know what that

19 portion that's allocable to DWSD would be, do you?

20 A    No.  We'd have to do an analysis.

21 Q    Is it correct that the City of Detroit owns certain

22 pieces of art that are maintained at the Detroit Institute of

23 Arts?

24 A    Yes.

25 Q    Okay.  And this is art that the -- we're talking about

1  art that the city owns itself, right, not art that's subject

2  to any kind of public trust?

3  A    Yes.

4  Q    Okay.  And that art is very valuable, is it not?

5  A    We're currently going through a valuation, but I believe

6  it's very valuable, yes.

7  Q    Okay.  And Christie's has been retained, correct?

8  A    Christie's has been retained, correct.

9  Q    And they were retained in August, is that right?

10 A    I believe -- well, let's -- let's get by the sequence.  I

11 believe they were initially requested to come out.  I told

12 them go away.  We were taken actually --

13        THE COURT:  Mr. Orr, please, just answer the

14 question.  Were they retained in August?

15 A    I don't recall a specific date.  I think it was August.

16 Q    Okay.  So you were appointed the emergency manager at the

17 end of March and Christie's was not retained until August.

18 Was that in the beginning or the end of August, do you recall?

19 A    I don't know.

20 Q    Okay.  Now the art is a potential source of cash for the

21 city, is it not?

22 A    I don't know.

23 Q    Okay.  Well, isn't it potentially a very large source of

24 cash for the city?

25 A    It is valuable.  I don't know if it's a large source of

1  cash for the city.

2  Q    Okay.  Have you received any estimates or preliminary

3  views of its total value from Christie's?

4  A    No.

5  Q    You're aware of course of reports in the press that the

6  art that's own by the city could be worth billions?

7  A    Yes, I'm aware of press reports, yes.

8  Q    Okay.  And billions in cash flow would certainly help the

9  city's financial position, would it not?

10 A    I think it would.

11 Q    And in fact an influx of cash of that magnitude would

12 provide funds to at least pay pension contributions for the

13 next several years, isn't that right?

14 A    It might.

15 Q    And is there -- there -- let me ask it this way.  There's

16 nothing in the June 14 proposal that recognizes the potential

17 cash influx from the sale of art as a means to pay vested

18 pensions, is there?

19 A    June 14th proposal speaks to DIA, but we did not speak to

20 any sale of art.

21 Q    Okay.  We've also talked about the Department of Water

22 and Sewer.  That's another potential cash source for the city,

23 isn't it?

24 A    Yes.

25 Q    Okay.  And I think you've indicated previously that

1  you've been looking at ways to monetize that?

2  A    Well, yes.

3  Q    And at this point do you have any understanding as to

4  the, at least a preliminary valuation of what the -- the

5  amount of cash the Department of Water and Sewer might be able

6  to generate for the city?

7  A    No.

8  Q    And I take it nothing in the June 14 proposal shows any

9  funds generated by DW -- excuse me, DWSD being used to pay

10  retirees pension benefits, does it?

11  A    Well, to the extent the June 14th report speaks to trying

12  to monetize some value out of DWSD and that monetization would

13  go into in some form the $2,000,000,000 note, to the extent

14  pensions are unsecured, they would receive a benefit from that

15  process.

16  Q    Okay.  So the answer to my question is, I was correct,

17  wasn't I, that nothing in the June 14 proposal shows any funds

18  that might be received through DWSD is going to pay vested

19  pension benefits?

20  A    No, I don't think that's correct.  I think the June 14th

21  proposal speaks about a -- a process by which we would provide

22  benefits through the monetization of certain city assets to

23  the unsecured creditor class, so consequently they would

24  benefit.

25  Q    You're saying that if -- that under the June 14 proposal,

1  the pension holders would be treated as any other unsecured

2  creditor and the value of their bonds might go up a little,

3  correct?

4  A    Yes.

5  Q    But there's nothing in the June 14 proposal that says if

6  we're able to get cash out DWSD, we'll use that cash to

7  preserve pension benefits and not have to cut them or not have

8  to cut them so significantly, is there?

9  A    There is nothing that treats pension benefits differently

10 than any other unsecured creditor.

11 Q    Okay.  Going back now -- just a few more questions.

12 A    Okay.

13 Q    To the June 14 meeting.  Do you recall being there?

14 A    Yes.

15 Q    Okay.  There were no negotiations that took place at the

16 June 14 meeting, were there?

17 A    No.  I wouldn't call those negotiations.

18 Q    Okay.  Now subsequent to the June 14 proposal and the

19 meeting on June 14, there -- there were series of

20 presentations and discussions concerning the terms of the

21 proposal with respect to various persons and entities that

22 would be affected under it, correct?

23 A    Yes.

24 Q    Okay.  And is it correct that you yourself did not attend

25 all of the presentations and discussions that took place

1  concerning that subsequent to June 14?

2  A    Yes, that's correct.

3  Q    Okay.  And you didn't attend the June 20 meetings, did

4  you?

5  A    No.  I think I did attend the June 20th meeting.

6  Q    Okay.  Well, I'd just like to, if we can pull up Exhibit

7  414.  This is your declaration, Mr. Orr?

8  A    Yes.

9  Q    I just want to ask you if you can -- if we can turn to

10 Paragraphs 91 and 92.  Well, I'll just do it.  Do you see in

11 Paragraph 91 and 92 it's both talking about the June 20

12 meeting?

13 A    Yes.

14 Q    Okay.  And we can also show you the preceding paragraph

15 where it's talking about advisors.

16 A    Right.

17 Q    But if we focus on 91 and 92, it says on June 20, 2013,

18 certain of these advisors met in Detroit with representatives

19 of the city's unions and retiree associations.  And then in

20 Paragraph 92, it again in the first sentence talks about the

21 city's advisors answering as many questions as were asked.  Do

22 you see that?

23 A    Uh-huh.

24 Q    Okay.  And there's no reference to you personally being

25 there at the June 20 meetings, is there?

1  A    No, but I remember attending because I bought lunch.

2  Q    Okay.

3  A    Out of my pocket.

4  Q    Okay.  So if Mr. Malhotra testified that you were not

5  present at either of the June 20 meetings, would you have any

6  particular basis to disagree with him?

7  A    No.  But Mr. -- the way the meetings were designed, I

8  think there was a session in the morning, there was a session

9  in the afternoon.  And I may have been at one session that he

10 was not at.  But I remember being at the meeting.

11 Q    Okay.  And there were also meetings on July 10th and 11th,

12 correct?

13 A    I believe so.

14 Q    Okay.  And you -- I think you indicated previously that

15 you have no recollection of being present at those meetings,

16 is that correct?

17 A    No, I wasn't at those meetings.

18 Q    Okay.  Now on July 16th, you sent a letter to the

19 Governor, is that right?

20 A    Yes.

21 Q    Okay.  And why don't we put the July 16th letter, that's

22 Exhibit 409 on the screen?  Okay.  And this is a letter on

23 which you asked authorization to file the Chapter 9 filing, is

24 that right?

25 A    Yes.

1  Q    Okay.  And in this letter you went through a variety of

2  things reviewing what you represented to be the facts for the

3  Governor in which the Governor was to base his decision, is

4  that right?

5  A    Yes.

6  Q    And among other things you discussed the substance of

7  what happened at the various creditor meetings that took place

8  after June 14th, is that right?

9  A    Yes.

10 Q    Okay.  And if we look at page -- look at Pages 8 to 9 of

11 this document, we see there is a heading entitled individual

12 follow up meetings?

13 A    Yes.

14 Q    And that goes on to the next page?

15 A    Yes.

16 Q    Okay.  So just going through this briefly, the first one

17 talks about June 20.  And it says again, the city's advisors

18 conducted meetings with unions and retiree associations.  Do

19 you see that?

20 A    Uh-huh, yes.

21 Q    Okay.  On the 25th it says the advisors met with various

22 persons and among them is the GRS and PFRS?  Do you see that?

23 A    Yes, that's what the document says.

24 Q    And that that's -- the GRS and PFRS, that's the

25 retirement systems, right?

1  A    General retirement system, police and fire retirement

2  system, yes.

3  Q    Okay.  Then the next bullet on the next page talks about

4  July 9th and 10th and it talks about due diligence with persons

5  including GRS, PFRS.  Do you see that?

6  A    Yes.

7  Q    Okay.  And then on July 10th, it talks about follow up

8  diligence sessions again GRS and PFRS were mentioned and the

9  unions?

10  A    Yes, I see what it says.

11  Q    Okay.  And then on July 11th, it again talks about

12  sessions with business people and advisors for the unions,

13  right?

14  A    Yes.

15  Q    And then finally on the last bullet it talks about

16  negotiations with counter parties to the pension related swap

17  contracts?

18  A    Yes.

19  Q    Okay.  And on the -- the counter parties to the swap

20  contracts though, they don't have anything to do, they're not

21  the unions or retiree association or the retirement system,

22  are they?

23  A    No.

24  Q    Okay.  Now in this final bullet paragraph, you say the

25  city's negotiations.  Do you see that?  You refer to the

1  city's negotiations?

2  A    Yes.

3  Q    Okay.  In any of the preceding bullet paragraphs that we

4  have talked about, did you use the word negotiations in

5  describing what took place?

6  A    The document speaks for itself, but I -- I don't see the

7  word negotiations, no.

8            MR. ULLMAN:  I have nothing further.

9            THE COURT:  All right.  We'll take out break now and

10  resume at 10:55, please.

11       (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 10:38 A.M.)

12            THE CLERK:  All rise.  Court is in recess.

13       (Court in Recess at 10:38 a.m.; Resume at 10:55 a.m.)

14            THE CLERK:  Court is in session.  Please be seated.

15            MR. DECHIARA:  Good morning, Your Honor.  Peter

16  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

17  the UAW International Union.

18                      CROSS EXAMINATION

19  BY MR. DECHIARA:

20  Q    Good morning, Mr. Orr.

21  A    Good morning, Mr. Dechiara.

22            THE COURT:  You may proceed, but please no redundant

23  questioning.

24            MR. DECHIARA:  I will try my best, Your Honor, to

25  avoid redundant questions.

1  Q    Mr. Orr, you testified at the beginning of your direct

2  fairly extensively about your background.  I just want to ask

3  you a few questions about that.

4  A    Sure.

5  Q    You testified you were born and raised in the State of

6  Florida, is that correct?

7  A    Yes.

8  Q    Okay.  Prior to --

9          THE COURT:  Excuse me, the first question you asked

10  was a redundant question.

11          MR. DECHIARA:  I was just saying the framework for

12  my next question, Your Honor.  I apologize.  I'll try my best

13  to keep it focused.

14  Q    Before you became emergency manager, had you ever lived

15  in the City of Detroit?

16  A    No.

17  Q    Do you currently maintain a permanent residence in the

18  Washington, D.C. area?

19  A    Yes.

20  Q    And I believe you -- and does your wife -- do your wife

21  and kids live in the Washington, D.C. area?

22          MR. STEWART:  Objection, relevance, Your Honor.

23          MR. DECHIARA:  Your Honor --

24          THE COURT:  The objection is sustained.

25  Q    Okay.  Since becoming emergency manager, do you commute

 1  back and forth between Detroit and Washington, D.C.?

 2  A    Yes.

 3  Q    And you don't maintain a permanent residence in Detroit,

 4  is that correct?

 5  A    No.

 6  Q    And since you've been emergency manager you've been --

 7            THE COURT:  Fine.  Counsel said, is that correct and

 8  you said no.  So you do or you don't maintain a permanent

 9  residence here?

10  A    I do not maintain a permanent residence here.

11  Q    Since you've become emergency manager you -- while in

12  Detroit you've been living out of a hotel, is that correct?

13  A    Yes.

14  Q    You testified -- you were asked on -- on direct whether

15  you took the emergency manager job for the money.  Do you

16  recall that question?

17  A    Yes.

18  Q    And your answer on direct was no, correct?

19  A    I did not take the job for the money.

20  Q    Okay.  How much money do you earn as emergency manager?

21  A    As stated by -- stated in my contract $275,000 a year.

22  Q    Okay.  And do I take it from your answer that you didn't

23  take the job for the money to mean that when you were a

24  partner at Jones, Day you were earning much much more than

25  that?

1  A    Yes.

2  Q    And apart from your $275,000 a year salary, do you

3  receive any other compensation for your services as emergency

4  manager?

5  A    I do not receive directly any other compensation.  If

6  you're -- if you're trying to talk about the expenses of the

7  hotel, I've since understood that those are paid from a fund.

8  Q    What fund?

9  A    I believe it was the NERD fund.

10  Q    Okay.  And do you know who contributes to that fund?

11  A    I know nothing about that fund.  I know nothing about how

12  it's paid.  I've never seen my lease.

13  Q    Do you know that -- that fund, the NERD fund is the

14  Governor's fund?

15  A    I know that.  I know it's related to the Governor.  I

16  don't know what you mean by the Governor's fund, but yes, I

17  know that.

18  Q    Okay.  You know Richard Baird, do you not?

19  A    Yes, I do.

20  Q    Okay.  And he is a consultant to the Governor?

21  A    He is now a state employee.

22  Q    As of the time that -- as of January and February of

23  2013, was he a consultant to the Governor?

24  A    Yes.

25  Q    And in that period of time he worked closely with the

1  Governor?

2  A    I don't know about his -- I assume he did.  He -- I think

3  his title was transformation manager to the Governor.

4  Q    Okay.  To the best of your knowledge based on your

5  dealings with him, was it your understanding that he worked

6  closely with the Governor?

7  A    To the best of my knowledge based on my dealings with

8  him, yes.

9  Q    The meeting, and there's been a lot of testimony about

10  this, the meeting at which Jones, Day made a pitch to become

11  restructuring counsel for the City of Detroit was on January

12  29th, 2013, correct?

13  A    Yes.

14  Q    Okay.  And the very next day Mr. Baird called up the

15  managing partner of Jones, Day, Steven Brogan to inquire about

16  whether he could speak to you about becoming a candidate for

17  emergency manager, is that correct?

18  A    I believe that's correct.

19  Q    And then the very next day after that you spoke to Mr.

20  Baird, correct?

21  A    I may have spoken to him that day, or the day after that,

22  but it was closely after that, yes.

23  Q    Okay.  So it was either January 30th or January 31st that

24  you spoke to Mr. Baird?

25  A    I believe so.

1  Q     Okay.  Just to make the record clear, if I could ask you

2  to turn your attention to Exhibit 401.  Can -- can you blow

3  that up a bit?  Do you have that on your screen, Mr. Orr?

4  A     Yes, I do.

5  Q     Okay.  And is that an email from -- from you to others

6  dated January 31st, 2013?

7  A     Yes.

8  Q     And it says in the first sentence, I had a good

9  conversation with -- with Rich Baird this morning?  Do you see

10  that?

11  A     Yes, I do.

12  Q     Does that refresh your recollection about whether it was

13  on the 30th or the 31st that you spoke to Mr. Baird?

14  A     I -- I may have spoken with him both on the afternoon of

15  the 30th and again on the 31st.  But this says I clearly spoke

16  with him on the 31st, so I certainly spoke with him on the 31st.

17  Q     You interviewed with the Governor to become emergency

18  manager, correct?

19  A     Yes.

20  Q     And you interviewed with Mr. Dillon?

21  A     Yes.

22  Q     And you interviewed with Mr. Baird?

23  A     Mr. Baird was at the meeting that I had with the

24  Governor.

25  Q     Okay.  Now I believe you testified on direct that you

1  didn't want your decision about whether or not to become --

2  whether or not you wanted to become emergency manager to have

3  any impact on whether or not Jones, Day would be chosen as

4  restructuring counsel for the city, is that -- am I getting

5  that right?

6  A    Yes.  I think I testified that whether or not I was

7  interested in becoming the emergency manager, I did not want

8  it to either help or hurt Jones, Day.

9  Q    Okay.  And in fact on direct you testified that you told

10 the Governor, and the Treasurer, and Mr. Baird that you did

11 not want your decision about whether to become emergency

12 manager to have any impact on whether or not Jones, Day was

13 chosen as restructuring counsel for the city.  Am I -- am I

14 correct that that's what you testified on direct?

15 A    Yes.  I think I told both the Governor, and Mr. Baird,

16 and Treasurer Dillon as well.

17 Q    Okay.  And the reason you told the Governor that, and the

18 reason you told Mr. Dillon that, was because you understood

19 that they would be in a position to have influence or impact

20 on whether or not Jones, Day was chosen for -- as

21 restructuring counsel, correct?

22 A    I told Mr. Dillon and Mr. Baird that because they were on

23 the review team that we pitched to.  I think I told the

24 Governor that just to reinforce what I told Mr. Baird and Mr.

25 Dillon.

1    I assumed that Mr. Baird and Mr. Dillon would have some

2  influence on the selection process since they were on the

3  team.  I don't think I said that just because I assumed the

4  Governor would have that influence.

5  Q    Did the Governor say anything to you in response when you

6  said that to him?

7  A    I think the Governor agreed that it went one way or the

8  other.

9  Q    Okay.  I'd like to show you a document that's UAW 619.

10 It's --

11       MR. DECHIARA:  Your Honor, it's not yet admitted

12 into evidence.  I would just ask the witness to -- it's in the

13 UAW binders which were provided to the Court and the witness

14 and -- and city counsel this morning.

15 Q    Mr. Baird, if I could ask you to turn to -- behind Tab

16 619.

17 A    Mr. Orr?

18 Q    I'm sorry, whatever I said, excuse me.  Mr. Orr.  Are you

19 at -- do you see this exhibit?

20 A    Yes.

21 Q    Okay.  Am I correct that this is -- these -- this

22 exhibit, and I'm just referring to the first page, the first

23 page of this exhibit is a chain of emails.  The first one --

24 or the middle one is from Mr. Baird to you dated February 20th,

25 2013?

1   A      Yes.

2          (UAW Exhibit 619 was identified)

3   Q      Okay.  Did you receive that email?

4   A      Yes.

5   Q      And do you recall what the -- let me just read it.  It

6   says, FYI --

7              THE COURT:  Not in evidence yet.

8              MR. DECHIARA:  Okay.  Your Honor, I -- I would move

9   this document at this point into evidence.

10             MR. STEWART:  The objection is relevance, Your

11  Honor.

12             MR. DECHIARA:  Your Honor, a major theme of -- of

13  our case, and I believe some of the other objectors' cases, is

14  that the state was working hand and glove with the firm of

15  Jones, Day to implement this effort, this scheme, this

16  strategy to end run the Michigan Constitution in order to cut

17  the pensions of Detroit retirees.

18         And this is one data point, if I -- if I could, that

19  shows the intimate relationship between the state and Jones,

20  Day.  This is an email from the Governor's right hand man, Mr.

21  Baird before Mr. Orr was emergency manager, but while he was a

22  partner at Jones, Day saying what it says in this email which

23  if I may refer to it --

24             THE COURT:  No, that's all right I'm satisfied that

25  the document is relevant and that objection is overruled.

1  What -- what number was it again, sir?

2          MR. DECHIARA:  Six nineteen.

3          THE COURT:  Okay.

4      (UAW Exhibit 619 was admitted)

5  Q    Could you blow up the -- okay.  Do you recall Mr. Orr,

6  what this email was about?  What the general subject matter of

7  this exchange was?

8  A    Yes.

9  Q    What was it?

10  A    This was discussion of a proposed partnership agreement

11  between the Mayor and myself if I were to become emergency

12  manager.

13  Q    Okay.  I'd like to refer you to second sentence.  It's --

14  Mr. Baird writes, told him that there were certain things I

15  would not think we could agree to without your review,

16  assessment, and determination.  And then the sentence goes on

17  and you can read it, but I'll stop reading out loud there.  Do

18  you know who -- I know you didn't write the sentence, but did

19  you have an understanding of who the we was, that last word on

20  the -- on the second line on the -- on the right?

21  A    Yes.  I think he was talking about the Mayor.

22          MR. WERTHEIMER:  Pardon me.  I can't hear him and I

23  apologize.

24          THE COURT:  Would you repeat your answer, please?

25  A    Yes, Your Honor.  Yes, I think he was talking about the

1  Mayor.

2  Q    Okay.  Mr. Baird was talking about himself and the Mayor?

3  A    You know, I don't -- I don't know.

4  Q    Okay.  I don't want you to guess if you don't know.

5  A    I don't know.

6  Q    Okay.  All right.  But nonetheless, Mr. Baird was saying

7  to you that he did not think that we, whoever we were, could

8  agree to something without your review, assessment, and

9  determination.

10 A    Mr. Dechiara, let me clarify my answer.  I think this

11 email is Mr. Baird talking about an outline that he gave the

12 Mayor.  And I think the we is referring to me and Mr. Baird.

13 Q    Okay.  Did Mr. Baird ever explain to you apart from

14 what's written in this email, why your agreement -- your

15 review assessment and determination were necessary at this

16 point in time?

17 A    You know, as I read this email, Mr. Dechiara, let me

18 further clarify.

19        THE COURT:  I think I just need you to answer that

20 question, please.

21 A    Oh, I'm sorry, Your Honor.  Please --

22 Q    Did -- did Mr. Baird apart from what's written in this

23 email, ever explain to you why in his view your review,

24 assessment, and determination were necessary?

25 A    I don't recall.

1  Q    Okay.  But just to be clear, you were a partner at Jones,

2  Day at the time of this email, correct?

3  A    Yes.

4         THE COURT:  Excuse me one second.  Now, witness, you

5  say there's some testimony you'd like to clarify?

6  A    Yes, Your Honor.

7         THE COURT:  You can do that.

8  A    I think the we that's circled here at the end of the

9  second line is referring to both the -- the -- to Mr. Baird,

10 to myself, and the Mayor, the royal we if you will.

11 Q    And did Mr. Baird ever explain to you apart from what's

12 written here what -- what the we was, or are you just --

13 A    I don't recall.  I'm just reading the context of the

14 email.

15 Q    Okay, okay.  Let me refer you now to UAW Exhibit 620.

16 It's the next tab in the book.  And do you have it in front of

17 you, Mr. Orr?

18 A    Yes, I do.

19 Q    Okay.  Let me refer you to the -- the middle email, the

20 one that is from Richard -- which appears to be from Richard

21 Baird to you dated February 22nd, 2013.  Do you see that?

22 A    Yes, I do.

23 Q    And is that in fact an email that Richard Baird sent to

24 you on February 22nd, 2013?

25 A    Yes, I believe so.

1    (UAW Exhibit 620 was identified)

2         MR. DECHIARA:  Move the admission of UAW 620, Your

3    Honor.

4         MR. STEWART:  Same objection, Your Honor.

5         MR. DECHIARA:  Same argument, Your Honor.  It's --

6    it's just part of the same -- and it's not like I have a lot

7    of these.  This is the only other one on this line.

8         THE COURT:  All right.  It is admitted.  The

9    objection on relevance grounds is overruled.

10    (UAW Exhibit 620 was admitted)

11   Q    Let me if -- thank you.  Let me refer to the email from

12   Richard Baird it says, Kevyn, about to be in a car for several

13   hours so thought I would send this to you prior to hearing

14   back from the G a final time.  Did -- did you have an

15   understanding of who the G was?  That was the Governor, wasn't

16   it?

17   A    I -- I think it's referring to the Governor, yes.

18   Q    And then the -- and then the email goes on, if you agree

19   with what I have done to the doc, based on everyone's input

20   and agree that you should be the one to provide it to the

21   Mayor as fully endorsed by the Governor, and the Treasurer,

22   and you, then I think that clearly established that you are

23   already behaving as an agent of the state committed to getting

24   Detroit back on track.

25   Did you agree with Mr. Baird's statement there that if

1  you agree to the things that he refers to in that sentence

2  that you were already behaving as an agent of the state?

3  A    No.

4  Q    Did you disabuse Mr. Baird of that notion and -- and --

5  and tell him that he was wrong about that?

6  A    I don't recall.

7  Q    You did respond to the email, didn't you in the -- in the

8  email that is at the top of the exhibit?

9  A    Yes.

10  Q    If -- if you could blow that up.  And am I correct that

11  nowhere in that response do you say anything to Mr. Baird that

12  his statement in his email was incorrect, am I reading that

13  email accurately?

14  A    I think the email speaks for itself, yes.

15  Q    Okay.  Thank you.  Is it your understanding that you

16  serve at the pleasure of the Governor?

17  A    Yes, provided I'm acting under 436.  I think the Governor

18  has certain authority to remove me as well as the city council

19  and the Mayor at the end of 18 months.

20  Q    Are you aware of any limits on -- are you -- can the

21  Governor remove you at will?

22  A    I think that may be a legal conclusion under the statute.

23  Q    I'm not asking for your legal conclusion.  I'm asking for

24  your understanding.

25  A    I don't know.

1  Q    Okay.  Since you've become emergency manager, you've met

2  frequently -- frequently with the Governor, have you not?

3  A    Yes.

4  Q    Both in formal group settings with staff and -- and

5  advisors present as well as one on one?

6  A    I meet with the Governor --

7  Q    It's a yes or no question.

8  A    No.

9  Q    You have not met with the Governor both in formal

10 settings with others present as well as one on one since

11 you've become emergency manager?

12 A    Yes.  I have met with the Governor in formal settings and

13 with one on one.  The difference in my answer was your use of

14 frequently.  I meet with the Governor less frequently in the

15 one on one sessions.

16 Q    Okay.  But the totality of your meetings with the

17 Governor, are frequent, correct?

18 A    Yes.

19 Q    Okay.  And in your meetings with the Governor, have you

20 discussed the -- prior to the bankruptcy filing, did you

21 discuss plans for the filing of Detroit's bankruptcy petition?

22 A    Outside of implicating any privilege discussions?

23 Q    I'm just asking you the question.

24          MR. STEWART:  I would state an objection to the

25 extent that it's going to call the witness to reveal

1  attorney/client information.

2  A    We had discussions.

3  Q    And what were your -- what was discussed?  But let me --

4  let me -- let me -- let me ask you, on how many occasions did

5  you have those discussions?

6  A    The Governor and I and the Detroit --

7  Q    But do you have a number?

8  A    Weekly.

9         THE COURT:  That's not a number, but okay.

10 A    I don't -- I don't know the number, Your Honor.

11 Q    Okay.  Just so I understand -- understand your testimony,

12 testimony, Mr. Orr, you discussed with the Governor on a

13 weekly basis plans for the filing of the -- the bankruptcy

14 petition?

15 A    No.

16 Q    Okay.  So my question is, how often did you meet with the

17 Governor or speak to the Governor if it was by phone, about

18 plans for Detroit's bankruptcy filing?

19 A    Somewhere between two and four or five, maybe.

20 Q    And do you have a recollection of what was said in those

21 discussions between you and the Governor?

22         MR. STEWART:  Same objection, Your Honor, to the

23 extent it's calling for the witness to reveal privileged

24 attorney/client communications.  I would ask that he not

25 answer.  But if there were such discussions without counsel

 1 | present.

 2 |         MR. DECHIARA:  I think the objection is premature,

 3 | Your Honor.  I simply asked whether he recalls what was said.

 4 | I didn't ask I didn't yet ask him to reveal it.

 5 | Q    Do you recall what was said in those meetings?

 6 | A    I recall some of what was said, yes.

 7 | Q    Okay.  Now I would ask you to -- to testify as to what

 8 | was said.

 9 |         MR. STEWART:  Same objection.

10 | A    Those meetings were held with attorneys acting as

11 | attorneys, Your Honor, and I'm remembering the admonition from

12 | the Court about my follow on deposition.  So I -- I'd like to

13 | say that the Governor has a J.D., and I believe the Treasurer

14 | has a J.D., so I'm not talking about them.  I'm talking about

15 | attorneys acting as attorneys.

16 |         THE COURT:  So is it your testimony to the Court

17 | that none of the meetings at which the filing of this case was

18 | discussed, was held outside of the presence of lawyers?

19 | A    To the best of my recollection, none were held outside

20 | the presence of lawyers acting as lawyers.

21 | Q    What lawyers?

22 | A    I believe it was -- there were -- there were a lot of

23 | meetings with lawyers.  The Governor's staff lawyers --

24 |         THE COURT:  Fine, Mr. Orr.  The question was, what

25 | lawyers attended the meetings where the filing of this case

 1  was discussed.

 2  A    Yes, Your Honor.

 3          THE COURT:  The two to five that you said.  Was it

 4  five?

 5          MR. DECHIARA:  He said -- I think he said two to

 6  four or five.

 7  A    Two to four or five.

 8          THE COURT:  Two to four or five.

 9  A    Two to four or five.

10          THE COURT:  Those meetings.  What lawyers?

11  A    There were lawyers on the Governor's staff, Valerie

12  Brader and Mike Gadola.  There were lawyers from Jones, Day at

13  some of those meetings sometimes on the phone.  There would be

14  lawyers perhaps on the city's staff.  From Jones, Day it could

15  include David Heiman, could include Heather Lennox.  I'm

16  trying to think of other lawyers.  But generally lawyers both

17  on the Governor's staff and lawyers at the city's counsel,

18  Jones, Day.

19          MR. DECHIARA:  Your Honor, it's the UAW's position

20  that the -- the attorney/client privilege should not apply

21  here.  That these attorneys either for the state or Jones, Day

22  were being -- were working for the city or the state, public

23  entities of this -- of this state, paid for by the city or the

24  state.  And their presence at these meetings should not shield

25  from disclosure what was said at these critical meetings.

1          THE COURT:  Well, how do I reconcile that with your

2    relevance offer just a little while ago where you talked about

3    the common, I think the word you used was scheme.

4          MR. DECHIARA:  I don't see any tension between the

5    two, Your Honor.

6          THE COURT:  All right.  Response, please.

7          MR. STEWART:  Your Honor, there's no -- the

8    attorney/client privilege maintained applies to government --

9    government officials just like it will apply to private

10   parties and because of the fact that the lawyers were there in

11   connection with the rendition of legal advice and in

12   conjunction with the common interest agreement, we would

13   submit that they're privileged.

14         THE COURT:  Is there any reason for a different

15   ruling on the common interest issue here than there was

16   earlier?

17         MR. DECHIARA:  Your Honor, it's -- the UA -- UAW

18   took issue with Your Honor's ruling on that.  We moved for

19   reconsideration.  Your Honor, we're obviously not going to --

20   we're obviously going to comply with whatever ruling you make

21   on this issue.  I've stated our argument.

22         THE COURT:  And I appreciate that.  I appreciate

23   that, but my -- my question to you was in this specific

24   context, is there -- is there a reason to have a different

25   ruling --

1          MR. DECHIARA:  No, I think -- I think this specific

2    context --

3          THE COURT:  Is there a distinction to be made here?

4          MR. DECHIARA:  Yeah, this specific context is not

5    unique, it's part of a larger effort by the city and the state

6    to cloak under the attorney/client privilege these critical

7    discussions that bear -- that have such importance to the

8    people of this city and state.

9          THE COURT:  All right.  The Court will sustain the

10   claim of privilege and to the extent there was a motion to

11   compel, the Court will deny that.  But I do want to clarify

12   there was no one on one conversation between you and the

13   Governor with no one else present where the filing of this

14   case by the city was discussed, is that your testimony to this

15   Court?

16   A    Not that I recall, Your Honor.  The Governor and I have

17   one on ones.  Okay.

18         MR. DECHIARA:  Your Honor, if I may.  Your Honor --

19         THE COURT:  One second.  You need to be near a

20   microphone, sir.

21         MR. DECHIARA:  Your Honor, I don't want to burden

22   the record or take the Court's time necessarily.  I did -- I

23   was planning on asking the witness a series of questions about

24   what discussions he may have had with the Governor on issues

25   central to this case, including the timing of the bankruptcy

1  filing, the reasons for the bankruptcy filing.

2      If the Court's ruling is going to be if there were state

3  and city attorneys present, that the attorney/client privilege

4  applies, I would just like to note for the record that the UAW

5  would take exception to that ruling and preserve our position

6  for any possible subsequent proceedings.

7          THE COURT:  Well, I -- I appreciate your interest in

8  -- in saving time, but let's just clarify that the subjects

9  you were going to ask the witness about included matters

10  relating to the filing of the case, yes?

11          MR. DECHIARA:  Yes.

12          THE COURT:  Okay.  And your testimony, Mr. Orr, is

13  that every time you discuss matters relating to the filing of

14  the case with the Governor there were counsel -- counsel and

15  attorneys present.

16  A    Yes, Your Honor.

17          THE COURT:  All right.  You may have that objection.

18          MR. DECHIARA:  Thank you, Your Honor.  I will yield

19  to Mr. Wertheimer.  I believe he had something to say.

20          MS. LEVINE:  Your Honor, can all of the objectors

21  join in that reservation of rights so we don't have to do it

22  again?

23          THE COURT:  Yes, absolutely.

24          MS. LEVINE:  Thanks.

25          THE COURT:  Absolutely.

1      MR. WERTHEIMER:  William Wertheimer, Your Honor, on

2  behalf of the Flowers plaintiffs.  I just wanted to do a

3  couple of things.  First, join in that objection so that I

4  didn't have --

5      THE COURT:  Okay.  I appreciate that.

6      MR. WERTHEIMER:  -- to do it.  But second, Your

7  Honor, I would also add to the point made by counsel for the

8  UAW, that my objection is also based on the fact that the

9  Court consistent with its rulings yesterday relative to the

10  Governor, has acknowledged the attorney/client privilege and

11  says that it should apply with no more evidence than that an

12  attorney was present at a discussion.

13     And I just want the record to reflect that it's -- our

14  argument -- or the Flowers plaintiffs' argument is not just

15  that these are government attorneys, but that more of a

16  showing needs to be made for the privilege to apply, than that

17  an attorney was present.

18      THE COURT:  Well, since you've challenged that, sir,

19  I will state for the record that my ruling is based on more

20  than the fact that -- more than merely the fact that an

21  attorney was present.  When you're talking about as we are

22  here, the filing of a bankruptcy case, those conversations

23  relating to the filing of a bankruptcy case are in relation to

24  a legal matter and not what would otherwise be an unprivileged

25  matter.

1          MR. WERTHEIMER:  I did not mean to imply that the

2    Court was not making that ruling in that context.

3          THE COURT:  All right.

4          MR. WERTHEIMER:  I would add just one other point.

5    And that is I think consistent with your rulings yesterday

6    that the privilege would also be asserted were any questions

7    to be asked relative to communications between the Governor

8    and Mr. Orr relating to Section 924 of the State Constitution,

9    the constitutional pension provision, and what its impact

10   could be on the bankruptcy.  I would assume the privilege

11   would be asserted as to that and that the Court's ruling would

12   be the same.

13       Again for purposes of the record, I think that was the

14   position taken by the Governor yesterday.  I think it's

15   consistent with the Court's ruling yesterday.  But I want to

16   make sure that it's included as to this testimony also.

17         THE COURT:  All I can say as to that is, it sounds

18   like it would, but if in the context of a specific area of

19   inquiry you think that this ruling should be different because

20   of particular facts or circumstances, I certainly invite you

21   to draw my attention to any distinction that you think should

22   require a different result.

23         MR. WERTHEIMER:  I -- I understand that, Your Honor.

24   I -- my last point was just to make clear that it's my

25   understanding that the city is asserting the privilege also as

1  to conversations between --

2          THE COURT:  All right.  I think we've gone as far as

3  we can with this.  So I'm going to ask that we resume with our

4  cross examination at this time.

5          MR. WERTHEIMER:  Thank you, Your Honor.

6  Q    Mr. Orr, did you send a draft of your June 14th proposal

7  to creditors, to the Governor to review?  And when I say you,

8  I mean you or your staff?

9  A    I'm -- I'm trying to -- I don't recall.

10 Q    Do you recall whether you received feedback from the

11 Governor or comments of any sort on a draft of the June 14th

12 proposal to creditors?  And when I say you, I mean you or

13 people in your office.  And when I say the Governor, I mean

14 the Governor or his staff.

15 A    I don't think we received feedback.

16 Q    Did you receive any comments from the Governor or his

17 office on the proposal before it was made public?

18 A    No, I'm not aware of any comments.

19 Q    If the Governor had made comments or been given feedback,

20 is that something you would have been made aware of?

21 A    I might have been.  It might have been done at a

22 different level, at the drafting level.

23 Q    But if the Governor of the state had comments about the

24 June 14th proposal of the -- the key document in this case,

25 it's your testimony that you would not have been aware of his

1  comments?

2  A    One of the key documents.  And it's my testimony that

3  those comments could have been communicated through attorneys

4  or through a staff level that would not have gotten to me

5  during the drafting stage.

6  Q    Would they have gotten to you at some point before the

7  document was made public?

8          THE COURT:  Okay.  So counsel on this question, when

9  you say Governor, you don't mean the Governor or his staff,

10  you mean the Governor personally?

11         MR. DECHIARA:  No, I mean the Governor and his

12  staff.  Well, let me break it down to be clear.  Thank you,

13  Your Honor.  I appreciate the clarification.

14  Q    So let me start with the Governor.  Is it your testimony

15  that the Governor and the state had comments on the June 14th

16  creditors' proposal, you before the document became public,

17  would not have known about those comments?

18  A    It is my testimony that I don't recall the Governor

19  providing any comments and that if he had, they may not have

20  made their way to me.

21  Q    You -- you are aware, are you not, that part of your June

22  14th proposal, where that stated that there must be significant

23  cuts to accrued pension liabilities?

24  A    Yes.  I think we said that in the June 14th proposal.

25  Q    And was the June 14th proposal negotiable?  Were you

1  prepared to negotiate on it?

2  A    Yes.  That's why we called it a proposal.

3  Q    And were you prepared to negotiate on every -- every

4  element of it?

5  A    Yes.  I think we said that.

6  Q    And were you prepared to negotiate a -- an agreement that

7  would not have had any cuts to accrued pension liabilities?

8  A    I'm not sure that's accurate.  I think the amount of

9  unaccrued pension liabilities was so significant that we may

10  not --

11        THE COURT:  All right.  Mr. Orr, again, I have to

12  ask you please, just answer the question.  We're going to be

13  here a really long time if you insist on going on and on.

14  A    And -- and I don't want that, Your Honor.  I'll try to

15  answer just the question.  Please, Mr. Dechiara.

16  Q    I'll -- I'll repeat the question.

17  A    Uh-huh.

18  Q    Were you prepared in response to your proposal, your June

19  14th proposal, to accept any counter proposal that had as part

20  of the counter proposal, an element that would have spared,

21  that would have not had -- would not have impaired at all

22  accrued pension liabilities?

23  A    We were prepared to accept any counter proposal.

24  Q    Including a counter proposal that would have had no cuts

25  at all in accrued pension liabilities, is that your testimony?

1  A    Yes.

2  Q    Okay.  And are you prepared to do that today?

3  A    If there's a counter proposal, yes.  When you say accept,

4  Mr. Dechaira, we'll accept counter proposals, that's not

5  agreed to.

6  Q    Okay.  Thank you for that clarification.  That's what I'm

7  getting at.  Okay.  So let me -- let me try it again because I

8  think that's an important point.  At the time you made the

9  June --

10        THE COURT:  While we're clarifying here, I'm going

11 to strike the last question and answer about what he's willing

12 to do today.

13        MR. DECHIARA:  Thank you, Your Honor.  I -- I -- I

14 will not go there.

15 Q    At the time you made the June 14th proposal, until the

16 time you filed for bankruptcy, were you prepared to agree to

17 an agreement with the stakeholders that would have spared the

18 pension -- accrued pension liabilities from any cuts?

19 A    Probably not.

20 Q    Is it -- am I correct that the procedure at the June 14th

21 meeting was that for an attendee, in other words someone who

22 was invited to attend, for an attendee to make a comment or

23 ask -- ask a question, they had to fill out a card and have

24 that card brought up to the front of the room and read -- read

25 by someone else?

1  A     Yes, I believe so.

2  Q     You -- is your testimony here today on direct -- I mean,

3  not on direct, but on cross by -- by the retiree committee

4  that you did attend the June 20th meeting?

5  A     Yes.

6  Q     Okay.  Do you recall giving a deposition in this

7  proceeding on September 16th?

8  A     Yes.

9  Q     Okay.  And did you testify truthfully in that deposition?

10  A     Yes.

11  Q     I'd like to read for you, from Page 261 of your

12  deposition.  I'm at Line 16.

13        Question, okay.  So do you recall whether you attended

14  June 20th?  Answer, I think I did, but I don't recall.

15  A     Yes.

16  Q     Is it true that as of June 16th you could not recall with

17  certainty whether you had attended the June 20th meeting?

18  A     As of September 16th?

19        THE COURT:  You mean September 16th?

20        MR. DECHIARA:  Yes, I'm sorry.

21  A     Okay.

22  Q     Thank you.  As of September 16th?

23  A     I -- I think my answer was, I think I did, but I didn't

24  recall with specificity.  I now recall that I did.

25  Q     Was there something that happened between September 16th

1  and today that caused your recollection to improve on that

2  point?

3  A     Yes.

4  Q     What happened?

5  A     I went over my old American Express bills.

6  Q     Fair enough.  Was the same procedure that you -- that you

7  -- I asked you about -- about using the cards, did that apply

8  to the June 20th meeting as well?

9  A     I don't recall.

10 Q     I'd like to show you what's been admitted into evidence,

11 it's in your UAW binder as Exhibit 623.  Do you -- do you

12 recognize this -- is this -- it's a two page document.  If you

13 can look at both pages.  Putting aside this particular

14 document, is this the form of the question cards that were

15 used at these meetings?

16 A     I don't recall.

17 Q     Okay.  Do you recall this particular document?

18 A     I do not.

19 Q     Do you agree that the June 20th meeting was an

20 informational meeting?

21 A     Yes.  I would agree in part it was informational.

22 Q     Are you familiar with the term OPEB, other post

23 employment benefits?

24 A     Yes.

25 Q     Okay.  Did anyone at Jones, Day ever communicate to you

1  that the UAW was interested in setting up a process for

2  negotiating over OPEB benefits?

3  A    I don't recall.

4  Q    Let me now refer you to your July 16th letter requesting

5  permission from -- requesting authorization to file for

6  bankruptcy.  Do you recall that letter?

7  A    Yes, I do.

8  Q    Did you or your staff show a draft of that letter to the

9  Governor or his staff at any time before July 16th?

10 A    No, I don't think so.

11 Q    Did you or your staff show a draft of the July 16th letter

12 to the Treasurer or his staff at any time before July 16th?

13 A    No, I don't think so.

14 Q    I'd like to show you -- well, first, I'd like to call

15 your attention to the July 16th letter which is Exhibit 409.

16 Could you please call up Exhibit 409?  Mr. Orr, could you

17 please turn to Exhibit 626 in the UAW binder?

18 A    Yes, I have it.

19 Q    And this appears to be a July 10th email from Andy Dillon

20 to certain individuals, none of whom appear to be you?  Do you

21 see that?

22 A    Yes.

23 Q    Okay.  Did you -- have you ever seen this document

24 before?

25 A    I have not

1    Q    Okay.  Let me refer you, and I'm not going to read it

2    because it's not in evidence.  But let me just refer you to

3    the -- do you see the numbered paragraphs on the bottom of

4    page -- the first page?

5    A    Yes.

6    Q    Okay.  Let me refer you to the first one.  If you could

7    just read that to yourself.

8    A    Yes.

9    Q    Okay.

10              THE COURT:  What's the purpose of this, counsel?

11              MR. DECHIARA:  Your Honor, the purpose of this is to

12    show, to clearly show, we believe, that the Treasurer, not

13    only was shown a draft of the July 16th letter in contradiction

14    to the witness' testimony, but that the -- the Treasurer's

15    comments on the draft were incorporated into the final letter.

16              THE COURT:  Is the document in evidence?

17              MR. DECHIARA:  No, it's not, Your Honor, but --

18              THE COURT:  Okay.  So, you can't confront him with

19    it until it is.

20              MR. DECHIARA:  I'm trying to refresh -- Your Honor,

21    we -- we do intend to put it into -- into evidence, but I'm

22    trying to establish to essentially impeach this witness'

23    testimony that a draft was not provided to the Treasurer by

24    pointing out to him what I just said.

25              THE COURT:  Well, why don't you just point it out to

1  me after the document is in evidence.

2          MR. DECHIARA:  I will, Your Honor.

3  Q    Let me ask if Exhibit 44 can be called to the screen.

4  And while that's being done, Mr. Orr, let me ask you, when did

5  you begin to -- you didn't write the July 16th letter on July

6  16th, correct?  The preparation for that letter became -- began

7  earlier?

8  A    Yes.  There were drafts of that letter being made earlier

9  than July 16th.

10 Q    Okay.  Can we turn to Page 61 of Exhibit 44?  And if you

11 could blow that up, please.  And by the way, Mr. Orr, Exhibit

12 44 is the executive summary of the June 14th proposal, correct?

13 A    Yes.

14 Q    Okay.  And that was presented at the June 14th meeting?

15 A    Yes.

16 Q    And on Page 61, third bullet point, it says that there

17 would be -- it says as part of the calendar, there would be an

18 evaluation period from July 15th to July 19th, 2013.  Do you see

19 that?

20 A    Yes.

21 Q    Okay.  And you told the attendees at the June 14th

22 meeting, and I think I'm quoting you accurately from your

23 direct, but tell me if I'm not, "that that was a schedule that

24 you were sticking to".

25 A    Yes.

1   Q    Did you say that?

2   A    Yes.

3   Q    Okay.  And in fact you did not stick to that schedule,

4   isn't that a fact?

5   A    We substantially stuck to it, yes, but no, not exactly on

6   the 19th.

7   Q    Well, in fact you filed for bankruptcy on the 18th,

8   correct?

9   A    Yes.

10  Q    And in fact before July 15th, you were already writing

11  your July -- what became your July 16th letter, correct?

12  A    I or members --

13  Q    Just answer the question.

14  A    I wasn't writing it.

15  Q    It was -- the letter was being prepared, is that correct?

16  A    Yes.

17  Q    Did you tell -- did you contact the stakeholders or the

18  creditors who were at the June 14th meeting and tell them that

19  you were not going to be sticking to the schedule the way you

20  had told them you would?  Did you do that?

21  A    No.

22  Q    You testified, I believe on direct, that as a result of

23  the Flowers, Webster and -- lawsuits and the lawsuit by the

24  pension funds, that the situation, and I think I'm quoting you

25  correctly on direct, but -- but tell me if I'm not.  Was

1  becoming out of control?  Was -- was that your direct

2  testimony?

3  A    I think that's -- yes.  I think that's substantially my

4  testimony.

5  Q    Okay.  Is it fair to say that the plaintiffs in the -- in

6  those three lawsuits were exercising their lawful right to go

7  to the state judiciary to obtain a determination on a

8  important issue of law?

9  A    I think the plaintiffs were doing whatever they thought

10 was in their best interest.

11 Q    That may be, but that doesn't answer my question.

12 A    But your question were they exercising their judicial

13 rights.  I -- I don't know what they were doing.  I know that

14 they were not keeping with the schedule and not coming forward

15 with counter proposals, that's what I know.

16 Q    Well, they were filing lawsuits with the state judiciary,

17 correct?

18 A    Yes.

19 Q    And you consider that to be behavior that was out of

20 control?

21 A    No.  I consider that to be behavior that was calculated

22 to undermine my ability to discharge my obligations under the

23 statute.

24 Q    It was calculated to prevent you from filing for

25 bankruptcy, wasn't that what it was about?

1  A    No.  I -- I didn't say that.

2  Q    Could it -- could you not have waited a few days to see

3  how the Courts would have -- the State Courts would have

4  resolved important issues involving the statute and the

5  Constitution?

6  A    Mr. Dechaira, we'd waited almost a month.

7  Q    Okay.  Have you ever spoken to the Governor about having

8  the state assume some or all of the city's pension

9  liabilities?

10 A    I don't recall.

11 Q    You don't recall ever having done that?

12 A    No, I don't.

13 Q    Okay.  So you -- you may have done it, and you just don't

14 recall?

15 A    Yes.

16 Q    Did you ever undertake or cause to --

17       THE COURT:  One second.  I want to make sure I

18 understand that answer.

19 A    Yes.

20       THE COURT:  You do not remember asking the Governor

21 to write a check for 3.5 billion dollars?

22 A    This is the problem with a yes or no.  The number may not

23 have been 3.5 billion.  The -- the question may have come in

24 in terms of some assistance.  But I don't recall asking it in

25 that context, Your Honor.  There are things I can testify to,

1    it's just that question I don't recall.

2    Q    Just so the record is clear, let me ask it again.  Do you

3    recall ever making a request to the Governor in any context

4    seeking assistance, financial assistance from the state for

5    some or all, any -- any amount of the state's pension

6    liabilities -- of the city's pension liabilities?

7    A    I don't recall asking for assistance in that form.

8    Q    Do you recall asking in any form?

9    A    I recall having discussions about whether the state would

10   be in a position to make any assistance to the city to deal

11   with its problems and I think I said this publicly before.

12   And that it was made clear that the city's obligated to

13   resolve its own problems.

14   Q    When -- when did you make that request?

15   A    I don't recall.

16   Q    Was it before you filed for bankruptcy?

17   A    Probably.

18   Q    You don't remember when?

19   A    I do not remember when.

20   Q    Was it a request in writing?

21   A    I don't think so.

22   Q    Was it -- was it a request face to face with the

23   Governor?

24   A    Yes.

25   Q    Was -- do you recall where the meeting took place?

1   A     No, our meetings either take place in Lansing or here in

2   -- in -- in Cadillac Place, but I don't recall which -- which

3   location.

4   Q    Do you recall who was present other than you and the

5   Governor?

6   A     There were -- it was -- it would have been in the Detroit

7   team meeting.

8   Q    What does that mean?  Who -- who would have been present

9   at the meeting?

10  A     In -- in those meetings, sometimes it's me and the

11  Governor, Treasurer Dillon, Tom Saxon on behalf of the state,

12  Braum Stibitz occasionally, Rich Baird, Valerie Brader, Mike

13  Gadola.  There may be attorneys on the line, my state liaison

14  Greg Tedder.  There may be other attendees at those meetings.

15  Q    What to the best of your recollection was said at that

16  meeting on the subject that I've just asked you about?

17          MR. SCHNEIDER:  Objection, Your Honor, on behalf of

18  the state.  I object to any conversation--

19          THE COURT:  Go ahead and approach the podium and --

20  and -- and speak, sir.

21          MR. SCHNEIDER:  Objection to the -- on behalf of the

22  state to any content of this that might implicate the

23  attorney/client privilege.

24          THE COURT:  How is the state providing help to the

25  City of Detroit for assistance on its fiscal problems

1   protected by attorney/client privilege?

2           MR. SCHNEIDER:  The reason why I'm stating this is

3   because I believe the witness --

4           THE COURT:  I just need an answer to my question.

5           MR. SCHNEIDER:  Could you state it again, please?

6           THE COURT:  How is a conversation between Mr. Orr

7   and the Governor about whether the state can or is willing to

8   help the city with its fiscal problems, protected by

9   attorney/client privilege?

10          MR. SCHNEIDER:  Well, to the extent that attorneys

11  were present and attorney discussion was relevant -- relevant

12  to that, and that these conversations did take place if that

13  is what happened with attorneys advising and being there for

14  the purpose of that, I believe that that would be

15  attorney/client privilege information.

16          THE COURT:  Well, but how is -- how is it a

17  discussion about a legal matter?

18          MR. SCHNEIDER:  I don't know what the witness is

19  going to testify to.  The reason why I objected is because the

20  statement was made that attorneys were present.  And that's --

21  that's the --

22          THE COURT:  Well, but you certainly agree with the

23  proposition that just because attorneys were present doesn't

24  make every conversation protected by the attorney/client

25  privilege, don't you?

1          MR. SCHNEIDER:  I believe in this situation --

2          THE COURT:  Don't you, sir?

3          MR. SCHNEIDER:  I think when the attorneys are

4   present, Your Honor, my position is, is that they are there

5   for the purposes of providing legal advice.

6          THE COURT:  So there's like a presumption.  Any law

7   in support of that?

8          MR. SCHNEIDER:  Well, Your Honor, I'm willing to

9   yield back to the city.  I just wanted my objection noted to

10  the extent that attorney/client privilege is --

11         THE COURT:  Well, counsel, we don't make objections

12  for the sake of making objections for the record.  We make

13  objections because you don't want the testimony to come in and

14  you have to be prepared to argue that.

15         MR. SCHNEIDER:  That's true.  And I don't know what

16  the testimony is and that's why I was objecting.

17         THE COURT:  All right.  I'm going to hold that --

18  that this question does not relate to a legal matter and

19  therefore is not protected by the attorney/client privilege

20  even though there may have been attorneys who were either

21  listening in to the conversation, or participating in it.  So,

22  please answer the question.

23  Q    Okay.  What was said at that meeting on the subject I

24  asked you about?

25  A    I don't recall the specifics, but the subject was

1  generally discussed that there was no ability for the state to

2  provide direct financial assistance to the city and that we

3  had to find a way to resolve our problems based upon what we

4  could work with.

5  Q    The words that you just said, were you saying those

6  words, or was -- was the Governor saying those words?

7  A    It -- it was an exchange.  I don't recall verbatim what

8  was said during the exchange.

9  Q    Did the Governor in any forum deny the request that you

10  were making?

11  A    I guess you could call that -- I don't know one, if it

12  was a request, or one if you call it denial.  I know there was

13  a dialogue and it became clear that there would be no

14  assistance coming from the state.

15  Q    Were you in that meeting seeking assistance from the

16  state?

17  A    I don't know if we were just seeking assistance for the

18  state, Mr. Dechaira.  As I said, it was part of a dialogue and

19  -- over a number of different things.

20  Q    Well, Mr. Orr, I wasn't at the meeting.  I'm asking you,

21  do you -- do you know what you were doing in that meeting on

22  this subject?

23  A    As I've said, we have weekly meetings.  We discussed a

24  number of things.  In those meetings there was an exchange in

25  dialogue about the state's ability to potentially help the

1  city.

2      It became clear as a part of that discussion that the

3  state would not be forthcoming with any assistance from the

4  city.  The exact exchange and the exact dialogue, I do not

5  recall, but that is the gist of the discussion.

6  Q    Okay.  And I'm not going to ask you to recollect

7  verbatim, I wouldn't expect that what was said.  But I want to

8  just get some basic information.

9  A    Uh-huh.

10 Q    Were you in what you said seeking in one form or another,

11 aid from the state for this -- to pay for -- to help pay for

12 the city's pension liabilities?

13 A    I don't recall.

14 Q    Okay.  And do you recall whether the Governor responded

15 in any way to what was said on that subject, other than what

16 you've already said?

17 A    I don't recall.

18 Q    Have you ever undertaken or caused to be undertaken any

19 analysis of whether it would be possible to craft a legal

20 claim by the city against the state to try to hold the state

21 responsible for some or all of the city's pension liabilities?

22 Have you ever caused any analysis to be undertaken on that

23 point?

24 A    No, not that I'm aware of.

25 Q    Have you ever looked into the issue of whether or not

1  there might be a conflict of interest between the existence of

2  such a claim and your position being paid by the state and

3  being housed by the Governor's NERD fund?  Have you ever

4  looked -- done any analysis to look into whether or not there

5  might be a conflict of interest?

6  A    No.

7  Q    Are you familiar with the concept of deferred

8  compensation?

9  A    Yes, I'm familiar with it.

10 Q    And is it your understanding that when an employee works

11 in exchange for his or her labor, the employee receives

12 current wages but also in certain circumstances part of that

13 compensation for the worker's labor is deferred until

14 retirement.  Is that your understanding of what deferred

15 compensation is?

16 A    It can mean that, yes.

17 Q    Okay.  And in that context if you have deferred

18 compensation such as a pension, is it your understanding that

19 that pension even though it's collected in retirement, has

20 already been earned through years of labor by the employee?

21 A    Mr. Dechiara, I believe that implicates a legal

22 conclusion.  It might be true.

23 Q    Well, I'm not asking a legal conclusion, unless you have

24 one.  But I'm -- I'm looking for your understanding apart from

25 any legal conclusion.

1  A    My understanding of your concept that pensions are a form

2  of deferred compensation, I'm aware of that.  My understanding

3  in this situation as to whether or not the pension fund is

4  adequately protected, that responsibility is a different

5  understanding.

6  Q    My question is, has the pension already been earned

7  through the employee's years of labor for the City of Detroit?

8  That's my question.  Do you have an understanding of that --

9  that, one way or another?

10  A    Yes.

11  Q    And what's your understanding?

12  A    My understanding is that the concept you're trying to

13  discuss is one where the employee's pension is earned through

14  the labor.

15  Q    Okay.  Is -- would you agree with me in your position as

16  emergency manager that to revitalize the City of Detroit

17  requires capable and committed employees working for the city?

18  A    Yes.

19  Q    Have you done any analysis as to whether proposing -- or

20  strike that.  Have you done any analysis as to whether cutting

21  accrued retiree benefits for active employees would negatively

22  impact their morale?

23  A    No.

24  Q    Have you done any analysis such as speaking to a labor

25  economist as to whether or not cutting accrued retiree

1  benefits for active employees of the city would diminish the

2  city's ability to attract and retain committed and capable

3  employees?  Have you ever undertaken any analysis on that

4  point?

5  A    I'm thinking it through because we recently held a job

6  fair and we received over 1,700 applications, so it doesn't

7  appear that the current situation is impairing our ability to

8  attract workers.

9  Q    That was not my question, Mr. Orr.

10  A    That's -- have I done analysis?  Yes.

11  Q    I'm sorry?

12  A    Yes.

13  Q    You have done analysis?

14  A    In my mind that's an analysis.

15  Q    You -- so you have done your own analysis, is that what

16  you're testifying?

17  A    Yes.  Unless you want to define some other term, yes.

18  Q    So, tell me what your analysis is?

19  A    My analysis is that during the course of the job fair,

20  we've seen another employees come in.  My analysis is that

21  we've spoken with several uniform unions who have said that

22  their morale is increasing even under the current

23  circumstances.

24        My analysis is, that I've spoken with city employees that

25  say despite the current circumstances, they continue to work

1 | hard at their jobs and they're committed to assist this city

2 | going forward.

3 | Q    You testified on direct, I believe, that your June 14th

4 | proposal was in the best interests of the citizens of Detroit.

5 | Do you recall that?

6 | A    Yes.

7 | Q    And -- and when you say the best interests of the

8 | citizens of Detroit, are you including the retirees of the

9 | City of Detroit?

10 | A    Not all the retirees are citizens of Detroit, Mr.

11 | Dechiara.

12 | Q    The ones that are, are you including among the citizens

13 | of Detroit for whom you think your proposal would be in the

14 | best interest?

15 | A    I'm including the -- I'm sorry.

16 | Q    Are you including retirees?

17 | A    I'm including all of the 700,000 residents of the citizen

18 | of Detroit and if that includes retirees, yes, I'm including

19 | them.

20 | Q    Do you have any doubt that some of the retirees of the

21 | City of Detroit live in the City of Detroit?

22 | A    No, I do not.

23 | Q    Okay.  Have you done any analysis in coming to the

24 | conclusion that your proposal is in the best interests of the

25 | city -- of the citizens of the City of Detroit including the

1  retirees?  Have you done any analysis of the amount that

2  Detroit retirees receive on average annually in pension?

3  A    Have I done?

4  Q    Yes.

5  A    No.

6  Q    Have you taken any steps to inform yourself as to that

7  question, what's the average annual pension of a Detroit

8  retiree?

9  A    Yes.

10  Q    Have you?  Okay.  And did you come -- did you learn the

11  answer?

12  A    I've seen ranges, but yes.

13  Q    Okay.  And what's the range?

14  A    The ranges have gone from 19,000, approximately 24,000,

15  to 35,000 or more.

16  Q    And do you know whether there's any federal or other

17  insurance that would cover retirees to which -- strike that.

18  Are you aware of whether there's any federal or other

19  insurance that would provide benefits to retirees in the event

20  that their accrued pension liabilities were impaired?

21  A    Yes.

22  Q    What -- there -- is it your belief there is insurance?

23  A    No, you asked me if I were aware.

24  Q    Okay.  And is there such insurance?

25  A    No.

1  Q    Okay.  Have you done any analysis to determine whether if

2  retirees, whether they're earning $18,000 a year in

3  retirement, or $24,000 a year, have you done any analysis

4  whether under your proposal to significantly cut their

5  pensions, have you done any analysis to determine whether

6  those retirees would be able to make ends meet in terms of

7  paying their mortgage, paying their rent, putting food on the

8  table, buying their medications, et cetera?  Have you done any

9  analysis?

10            MR. STEWART:  Objection.  Objection, Your Honor,

11  relevance.

12            MR. DECHIARA:  We think it --

13            THE COURT:  Objection is -- the objection is

14  sustained.

15            MR. DECHIARA:  I have nothing further, Your Honor.

16                      CROSS EXAMINATION

17  BY MS. LEVINE:

18  Q    For two more minutes.  Good morning, Mr. Orr.

19  A    Good morning, Ms. Levine.

20            MS. LEVINE:  Your Honor, Sharon Levine, Lowenstein,

21  Sandler for AFSCME.

22  Q    Mr. Orr, do you receive -- do you recall receiving a

23  request from Ed McNeil on behalf of AFSCME's Council 25 on --

24  actually let me go back.  You were -- your -- you first day of

25  work if you will as the emergency manager, was March 25?

1  A    Yes.

2  Q    Do you recall receiving a request from Ed McNeil on

3  behalf of AFSCME Council 25 on March 25 to meet with you on

4  behalf of not only himself, but -- but a coalition of 30 city

5  unions who had previously worked together with regard to

6  concessionary bargaining and wanted to work together with you?

7  A    Are you talking about proposed two year collective

8  bargaining agreement that was presented to me on the --

9  Q    No, no.  I guess I've already -- a question.  Did you get

10  a request?

11  A    That was presented to me on the 26th.

12  Q    Did you get a request?  Do you recall getting a request

13  from Ed McNeil on March -- on your first day of work, on March

14  25th asking you and inviting you to meet with him and the

15  coalition of unions to work together with regard to the -- to

16  solving Detroit's problems?

17  A    Are you talking about the request of Mr. McNeil said he

18  taped to the door?

19  Q    That's the one.

20  A    The one.  I recall that that was sent to someone on my

21  staff.  I recall the next day I also got another request.

22  Q    And did your respond by offering to set up a meeting?

23  A    I think I said I was willing to meet with anyone going

24  forward.

25  Q    No, no.  But they specifically asked you to schedule a

1  meeting with them and it's -- actually let me rephrase it.

2  Isn't it true that you actually never met with the coalition

3  of unions separate -- separate and apart from the meetings

4  that we've been -- or the presentations that we've previously

5  been discussing that occurred on the 4th, the big 4th, what

6  we'll call the big 4th?

7  A     Me personally?

8  Q     Yes.

9  A     Yeah, I believe that's true.

10 Q     All right.  Is it your position that you directed

11 somebody on your behalf to meet with the coalition separate

12 and apart from the June 14, June 20, July 10, and July 11

13 meetings with the coalition of unions?

14 A     Are we still talking about the request?

15 Q     The -- the question is, did you direct somebody on your

16 behalf to meet with the coalition of unions separate and apart

17 from the June 14, June 20, July 10, and July 11 presentations

18 prior to the filing of the bankruptcy petition on July 18th?

19 A     There were meetings with other CDA's.  I don't know

20 specifically the coalition.  The request that you're talking

21 about was a request to enter into collective bargaining which

22 has been suspended by 436.

23 Q     I'm going to try again.

24          THE COURT:  No.  We're going to take our lunch break

25 now.  And Mr. Shumaker, I have obviously been ineffective at

1   having the witness answer questions.  So I'm going to instruct

2   you to counsel with your client over this lunch break about

3   the absolute criticality of just answering the question.  Will

4   you do that, please?

5           MR. SHUMAKER:  I will do that, Your Honor.

6   A    I apologize, Your Honor.

7           THE COURT:  Mr. Orr, I will accept your apology, if

8   you accept my advice and your attorney's advice.

9   A    Yes, Your Honor.

10          THE COURT:  All right.  1:30.

11      (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 12:00 P.M.)

12          THE CLERK:  All rise.  Court is in recess.

13      (Court in Recess at 12:00 p.m.; Resume at 1:30 p.m.)

14          THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Recalling case number 13-53846, the City of

16  Detroit, Michigan.

17          THE COURT:  It appears everyone's here.  You may

18  proceed.

19  BY MS. LEVINE:

20  Q    Good afternoon, Your Honor.  Mr. Orr.

21  A    Good afternoon, Ms. Levine.

22  Q    Going back to where we were right before we broke for

23  lunch.  So on March 25, 2013, you received a request from Ed

24  McNeil from AFSCME Michigan Council 25 to meet, correct?

25  A    Yes.

1  Q    And that request was on behalf of not only himself, but a

2  coalition of approximately 30 unions, correct?

3  A    I believe so.

4  Q    And in that request he indicated that the coalition of

5  unions had met previously including with Ernst and Young and

6  were -- had agreed to concessions that hadn't been imposed,

7  but they -- they wanted to continue that dialogue with you,

8  correct?

9  A    I don't recall the specifics of the request.

10 Q    Well, you received a copy of a letter which I believe you

11 described as being taped to your door?

12 A    Yes.

13 Q    And you gave that letter to somebody who worked for you

14 in order to respond, is that correct?

15 A    Yes.  I or a member of my staff.

16 Q    Okay.  And do you recall who you gave the letter to?

17 A    I do not.

18 Q    Did you meet with that coalition of unions?

19 A    Not to the best of my knowledge.

20 Q    Did anybody -- did you direct anybody to meet with that

21 coalition of unions prior to the time that you filed the

22 bankruptcy?

23 A    I don't recall.

24 Q    Well, isn't it true that there was no meeting between

25 anybody on behalf of the emergency manager and that coalition

1  of unions prior to the filing of the bankruptcy case?

2  A    I don't know.

3  Q    If you personally attended a meeting with the coalition

4  of unions, is that something you believe you would recall?

5  A    I might.

6  Q    Okay.  Besides the June 14 proposal, presentation,

7  between March 25 and June 18 -- I'm sorry, and June 13, you

8  were never personally in a room with anybody from AFSCME where

9  the topic of concessions, labor, pension, or health benefits

10  was discussed, correct?

11  A    I don't think so.

12  Q    And between March 25 and June 13th you had no telephone

13  calls with anybody from AFSCME where the topic of concessions,

14  labor, pension, or health benefits was discussed, correct?

15  A    I don't recall.

16  Q    Do you recall having those types of conversations by

17  telephone?

18  A    I don't recall.

19  Q    Between June 14 and July 18, other than attending the

20  presentation on June -- on June 14, you were never in the same

21  room with anybody from AFSCME where the proposal for creditors

22  was discussed, correct?

23  A    I don't recall.

24  Q    Between June 14 and July 18th, you did not participate in

25  any telephone calls with anybody from AFSCME where the

1  proposal for creditors was discussed, correct?

2  A    Not to the best of my recollection.

3  Q    At the June 14 presentation of the so-called proposal to

4  creditors, your team perhaps through counsel announced that

5  these were not negotiations, correct?

6  A    I believe so.

7  Q    Is it true that -- that your team also announced that

8  these were not negotiations at the June 20, July 9, and July

9  10 presentations?

10  A    I don't know.

11  Q    Okay.  So going back to when you were still at Jones, Day

12  and even before your -- your practice was primarily

13  bankruptcy, is that correct?

14  A    Yes, I think that's fair.

15  Q    So you're generally -- generally familiar with the

16  process for achieving labor concessions under 1113 of the

17  Bankruptcy Code?

18  A    Generally, yes.

19  Q    And it's your understanding that under 1113 there are

20  certain protections that are afforded unions that don't exist

21  for example, under Bankruptcy Code Section 365, is that

22  correct?

23  A    Generally, yes.

24  Q    And are you generally familiar with the process for

25  achieving concessions to retiree health benefits under

1  Bankruptcy Code Section 1114?

2  A    I'm -- I'm familiar with Section 1113 generally, yes.

3            THE COURT:  The last question was about Section

4  1114.

5  A    1114, yes, I am.

6  Q    And are you generally familiar with the process for

7  seeking a distressed termination of a single employer defined

8  benefit pension plan in the corporate context under Chapter

9  11?

10  A    Generally, yes.

11  Q    So generally under Bankruptcy Code, Section 1113 and

12  1114, in order to modify or get concessions with regard to

13  CVA's or retiree health, there are certain elements that the

14  case law deciphering 1113 has come up with, correct?

15  A    I believe so.

16  Q    And that would include presenting a proposal explaining

17  the concessions that are being requested, correct?

18  A    I believe there's a process under 1113.  I don't know if

19  it's that specific but generally, yes.

20  Q    And does that process also include having the proposal be

21  based on complete reliable information?

22            MR. STEWART:  Objection, Your Honor, it calls for a

23  legal conclusion.

24  Q    Is it your understanding that under 1113 and 1114 the

25  process for seeking concessions under -- under collective

1  bargaining agreements and retiree health requires that the

2  proposal be based on complete and reliable information?

3  A    I think the statute speaks for itself.

4  Q    I'm asking your understanding, Mr. Orr.

5  A    I don't know.

6  Q    Is it your understanding that under 1113 and 1114 the

7  proposal needs to be fair and equitable?

8  A    Yes.

9  Q    And is it your understanding that under 1114 and 1113

10 there have to be good faith negotiations?

11 A    Yes.

12 Q    Are you aware that AFSCME made information requests both

13 through Ed McMahon (sic) and Steve Kreisberg requesting

14 additional information following the June 14 proposal?

15 A    No.

16 Q    Do you know whether or not all of the information

17 requests made from various constituencies were responded to in

18 the ordinary course between June 14, but prior to the filing

19 of the bankruptcy case?

20 A    No.

21 Q    Okay.  During the time that you were at Jones, Day,

22 Jones, Day was debtor's counsel in Chrysler, correct?

23 A    Yes.

24 Q    And isn't it true in Chrysler that vested pension

25 benefits survived even though creditors were adjusted?

1  A     Yes.

2  Q     And isn't it true that Jones, Day represent -- was

3  conflicts counsel in AbitiBowater and vested -- vested pension

4  benefits survived even though creditor claims were -- were

5  compromised?

6  A     I don't know.

7  Q     And isn't it true that in AES Eastern Energy, Jones, Day

8  represented a committee of certificate holders where the

9  pension, vested pension benefits survived, but the claims of

10 creditors were adjusted?

11 A     I don't know.

12 Q     And isn't it true that Jones, Day represented the debtor

13 in Dana where the pension, vested pension benefits survived

14 and the claims of creditors were adjusted?

15        MR. STEWART:  Objection, relevance.

16        MS. LEVINE:  Your Honor, it goes to good faith

17 negotiations with regard to whether or not we can actually

18 have a situation where vested pension benefits survive and you

19 can adjust the claims of creditors to successfully go through

20 a bankruptcy process.

21        THE COURT:  Well, the problem is that not only is

22 every case different, but of course Chapter 11 is different

23 from Chapter 9.  So the objection is sustained.

24 Q     Well, Mr. Orr, unlike Chapter 11, in all of those cases

25 where if the pensions had been terminated the retirees would

1  have had the benefit of a PBGC.  Isn't it true that under

2  Chapter 9 there is no similar insurance protection?

3  A    It is true that under Chapter 9 there's no protection by

4  PBGC.

5  Q    And isn't it true that the current protection provided by

6  the PBGC now is over $57,000 a year?

7  A    I don't know.

8  Q    Well, assuming for the moment that it is over $57,000 a

9  year.  Isn't it true that all of the retirees who received

10  pension benefits in -- from Detroit would fall within the PBGC

11  protections if that protection existed in municipal

12  situations?

13          MR. STEWART:  Objection, calls for speculation.

14          THE COURT:  That objection is overruled.  Please

15  answer if you can.

16  A    I don't know.

17  Q    Mr. Orr, is it your understanding that to the extent

18  pension benefits are cut, the individual retirees will become

19  unsecured creditors?

20  A    Yes.

21  Q    So then is it your understanding that to the extent

22  retiree pension benefits are cut, the individual retirees

23  would share in the $2,000,000,000 note that's -- that exists

24  under the currently existing proposal for creditors?

25  A    Yes.

1  Q    So is it your understanding then that the individual

2  retirees would have to file proofs of claim in order to assert

3  their claims in this bankruptcy case?

4  A    I don't know.

5  Q    Well, how would they -- how would you know the dollar

6  amount of the claims of the individual retirees in order to

7  determine what their pro rata share is under the

8  $2,000,000,000 note?

9  A    I don't know how to answer your question.

10 Q    Prior to the time that Detroit filed for bankruptcy, did

11 the retirement system discontinue paying pension benefits?

12 A    Prior to the time?

13 Q    Uh-huh.

14 A    No, I don't think so.

15 Q    And in fact as we sit here today, they continue to make

16 the pension benefits payments, correct?

17 A    Yes.

18 Q    Anywhere in the proposal for creditors, Exhibit 43 or

19 Exhibit 44, is there a chart or explanation that an individual

20 retiree can look at to know exactly what their benefit would

21 be if in fact the proposal for creditors were implemented?

22 A    No, I don't think so.

23 Q    Mr. Orr, there was some press coverage that seemed to

24 imply that you were considering or would consider a

25 restructuring or a plan of adjustment that would include

1  freezing pension benefits.  Is that under consideration by

2  you?

3          THE COURT:  Excuse me, are you talking about now?

4          MS. LEVINE:  I'm talking about now.

5          MR. STEWART:  Objection, relevance, Your Honor.

6          MS. LEVINE:  Well, then I'm going to ask the next

7  question.

8          THE COURT:  I'm sorry then what?

9          MS. LEVINE:  Then I'm going to ask him whether he

10  considered it before July 19th, Your Honor.

11          THE COURT:  You may ask that question.

12  Q    Are -- are you considering it now?

13          THE COURT:  Well, I'm sorry, my ruling was you can

14  ask about his intent as of July, but --

15          MS. LEVINE:  Your Honor --

16          THE COURT:  But what's the relevance of that now?

17          MS. LEVINE:  Your Honor, it goes in part to the --

18  to the discussion that we've been having or the arguments that

19  we've been making with regard to good faith.  We had a month

20  and three days in order to negotiate prior to the bankruptcy.

21  If all we had were no real negotiations just presentations,

22  and no opportunity to have a dialogue with regard to some of

23  these issues and they are in fact being considered now, then

24  why weren't they considered then.

25          THE COURT:  No.  I'm going to sustain the objection.

1  Q    Mr. Orr, did you consider freezing the pensions prior to

2  July 19th?

3  A    Yes.

4  Q    And in connection with that consideration, did you talk

5  at all to the -- with the Governor about the state providing

6  support to the extent it was necessary in order to fund any

7  shortfall to effectuate a freezing?

8  A    I don't recall.

9  Q    In the Governor's testimony before this Court, with

10  regard to being questioned on vested pension benefits, he

11  responded, if the Court ordered you had to pay them, you would

12  pay them.

13      So in other words it appeared that the Governor was

14  saying that if in fact the Court directed that he pay whatever

15  was necessary in order to keep the vested pension benefits

16  from being impaired or diminished he would pay that.  Have you

17  had conversations with the Governor prior to July 19th in that

18  regard?

19  A    No.

20  Q    From January 2012, but prior to being retained by the

21  city, did your firm -- did your prior firm provide services to

22  the Governor?

23  A    I don't know.

24  Q    Did they provide services to the state?

25  A    I don't know.

1  Q    Did they provide services to anybody affiliated with the

2  Governor or the state?

3  A    I don't know.

4  Q    Did you run a conflict search before you took the

5  position as emergency manager?

6  A    No, I resigned from my firm.

7  Q    And do you know whether or not your firm ran a conflict

8  search before being retained as counsel to the city in these

9  proceedings?

10  A    I recused myself from the retention process, I don't

11  know.

12  Q    Prior to July 19, did you or did anybody on your behalf

13  if you didn't do it personally, or on behalf of the City of

14  Detroit, ask the Governor or anybody associated with the

15  Governor, for funding to avoid impairing or diminishing vested

16  pension benefits?

17          MR. STEWART:  Objection, foundation.

18          THE COURT:  What foundation is missing?

19          MR. STEWART:  Well, she asked for whether Mr. Orr,

20  any of his staff, or anyone else asked the Governor.  This

21  witness can only testify as to what he knew.

22          MS. LEVINE:  I'll -- I'll rephrase, Your Honor.

23  There was a on his behalf in there, but it may have gotten

24  lost for the record.

25  Q    As we sit here today, have you or has anybody on your

1  behalf, or anybody on behalf of the City of Detroit who -- who

2  responds to you, ask the Governor, or anybody affiliated with

3  the state, for funding to avoid impairing or diminishing

4  vested pension benefits, outside of any request that may have

5  been made through mediation?

6  A    I don't know.

7  Q    Well, we've heard the Governor testify and we've seen in

8  the press that the Governor's view seems to be that Detroit

9  has to handle Detroit's own problems.  Are you familiar with

10  that press?

11  A    Yes.

12  Q    Is that consistent with your conversations with the

13  Governor?

14  A    Yes.

15  Q    And we've heard both you and the Governor speak about the

16  fact that you serve at the pleasure of the Governor, correct?

17  A    Yes.

18  Q    At any time between July 15th and -- or July 14th and July

19  18th, did you ever feel that your job was in jeopardy?

20  A    Not at all.

21          MS. LEVINE:  No further questions.  Thank you.

22  A    Thank you.

23          THE COURT:  Who is next?

24                      CROSS EXAMINATION

25  BY MS. GREEN:

1 Q    Good afternoon, Mr. Orr.  Jennifer Green on behalf of the

2 retirement systems for the City of Detroit.

3 A    Good afternoon, Ms. Green.

4 Q    We've met on a few occasions at your prior deposition.

5 A    Yes, we have.

6 Q    I want to follow up on a question, something you stated a

7 second ago.  Why did you tell Christie's to go away in May of

8 2013?

9 A    We were immediately trying to assess a number of

10 different things and I felt that that wasn't as high a

11 priority as getting a real view of the financial condition of

12 the city.  And I didn't think it was ready to be assessed yet.

13 Q    And you changed your mind as of August 5th when I believe

14 they were retained, correct?

15 A    Approximately around that time.

16 Q    I'd like to draw your attention to Exhibit 865 if I may.

17 Do you have the appropriate witness binder or would you like

18 to see it on the screen?

19 A    I'll find it.

20       MR. STEWART:  State exhibit, retirees?  The exhibit

21 retiree committee.

22 Q    If you're okay with the screen, we can do the screen as

23 you have been.  I just wanted to verify.

24 A    I'll do the screen.

25 Q    Okay.  Do you recognize that email, Mr. Orr?

1  A    Yes.

2  Q    And it's dated February 11th, 2013?

3  A    Yes.

4  Q    And you were still a Jones, Day partner at this time?

5  A    Yes.

6  Q    When exactly did you resign from Jones, Day?

7  A    I resigned effective Friday, March 15th.

8  Q    If I may draw your attention to the first paragraph.  It

9  -- it talks about preparation -- well, I assume that's what

10  the abbreviation prep stands for, correct?

11  A    Uh-huh.

12  Q    Prep for EM appointment is important.  Ideally we would

13  like to plan for orderly transition to EM, whoever it is, not

14  a splash landing.  Does that -- do you remember getting this

15  email?

16  A    Yes.

17  Q    And the second paragraph talks about I am not sure the

18  state, Dillon, Baird, Governor, are really thinking on an

19  operational and practical level.  Do you see that part?

20  A    Yes.

21  Q    Further down there's a paragraph that states, it would be

22  a better process if the firm is on the ground working,

23  preparing and coming up with a well thought out game plan

24  before EM is appointed.  Do you see that portion?

25  A    Yes.

1  Q    At this time you were not yet appointed emergency

2  manager, correct?

3  A    Correct.

4  Q    At the bottom of the page, there is discussion about J.B.

5  should be there to make sure EM and process works.  Question,

6  maybe how does state get city and us six to eight weeks before

7  appointment if possible.  So my question for you is, was

8  Jones, Day already working on this case before your official

9  appointment six weeks later?

10  A    Not to the best of my knowledge.

11  Q    As of your appointment in March your public contract

12  states that your salary is $275,000, correct?

13  A    Yes.

14  Q    Are there any supplements or bonus payments associated

15  with that contract?

16  A    No.

17  Q    I'd like to direct your attention to Exhibit 807.  Do you

18  recognize this email, Mr. Orr?

19  A    Yes.

20  Q    Bullet point 2 talks about your contract period not to

21  exceed 18 months with incentives if job is completed sooner

22  based on mutually agreed milestones.  The next bullet point

23  talks about an intent to raise private funding for performance

24  measure outcome bonus.  And this is before -- this is a month

25  before you were appointed?

1  A    Yes.

2  Q    Was there ever an incentive bonus included in your

3  compensation package?

4  A    No.

5  Q    After you were appointed, was there any change to your

6  contract?

7  A    No.

8  Q    Was there ever a request made from a state fund to have a

9  performance bonus included with your contract?

10 A    No.  This is the only time it was mentioned, I let it

11 drop.

12 Q    You were never sent a letter in April of 2013 relating to

13 a -- a performance bonus?

14 A    I don't recall.

15 Q    You are familiar with the NERD fund, I think we've talked

16 about it a few times?

17 A    I have heard what I read in the paper.

18 Q    This is not in our witness binder.  I will give you a

19 copy.

20         THE COURT:  Not in the exhibit binder.

21         MS. GREEN:  It is not in the exhibit binder, Your

22 Honor.  We received it on Friday afternoon with the latest

23 production from the city and the state.  So I apologize it's

24 not in our binder.

25         THE COURT:  Yes, is there an exhibit number on it?

1          MS. GREEN:  It will be 869.

2          THE COURT:  Okay.

3   Q    Do you recognize the letter dated April 12th, 2013?

4   A    No.

5   Q    You were never sent a letter discussing an early out

6   provision incentive payment in addition to your regular

7   compensation?

8   A    No.

9   Q    And there has been no discussion or contract -- contract

10  executed where you would get an early payment bonus if you

11  completed your emergency manager goals before the 18 months is

12  completed?

13  A    No.

14  Q    I'd like to draw your attention now to Exhibit 853.  For

15  starters Mr. Orr, do you -- do you recognize this email dated

16  January 28th, 2013?

17  A    I don't recall specifically but I see that I was one of

18  the addressees.

19  Q    For starters, what is Detroit News?

20  A    I think that's a -- I don't know.

21  Q    Have you ever heard the phrase project Detroit used

22  internally at Jones, Day?

23  A    Yes.

24  Q    Is it -- is it perhaps a play on the French pronunciation

25  of Detroit?

1  A    It might well be, I don't know for sure.

2  Q    So this email is relating to the City of Detroit.  At the

3  bottom I'd like to draw your attention to Paragraph 4.  June

4  -- I'm sorry, January 28th was the day before you pitched your

5  services to the State of Michigan and the City of Detroit,

6  correct?

7  A    Yes.

8  Q    At the bottom there, the discussion about avoiding

9  pitfalls of alienating the state, e.g. if something happens to

10  city's pension, state will probably step up to deal with, but

11  thus far has failed to concede this point at all.  Do you

12  recall any discussion about trying to side step this issue in

13  your pitch to the state and city officials?

14  A    No.

15  Q    In your pitch to the state and to the city, was this

16  issue of seeking contributions from the State of Michigan ever

17  raised?

18  A    Not that I recall.

19  Q    And when was the first time that after you became

20  emergency manager the issue of potentially seeking

21  contributions from the State of Michigan was -- was raised?

22  A    I don't recall.

23  Q    Yesterday you were asked to answer whether under PA436

24  you believed you had the authority to impair pensions.  Do you

25  recall that question?

1  A    Yes.

2  Q    I believe your response was, that you felt it called for

3  a legal conclusion?

4  A    Yes.

5  Q    Do you recall being asked the same question following

6  your June 14th meeting where you laid out the proposal for

7  creditors?

8  A    Generally, yes.

9  Q    Do you recall what your response was?

10 A    No, I don't.

11 Q    Can you pull up the part number 1?  I'm going to ask you

12 if you've -- if this refreshes your recollection.

13 A    Uh-huh.

14 Q    To what your response was at the time.

15      (Video Being Played at 1:57 p.m.; Concluded at 1:58 p.m.)

16 Q    Do you recall answering the question in that manner on

17 June 14th?

18 A    That was a press event after the meeting.  I might well

19 have said that, I don't recall specifically.

20 Q    Assuming that's what you said --

21 A    Uh-huh.

22 Q    By legislative relief, did you mean a constitutional

23 amendment?

24 A    I don't recall.

25 Q    Did you mean legislative relief in the form of

1  contributions from the State of Michigan?

2  A    No, I don't recall.

3  Q    You don't recall one way or the other what you meant?

4  A    I -- I don't recall one way or the other.

5  Q    You would agree with me though that this response is

6  different than the response you gave yesterday?

7  A    No.

8  Q    How so?

9  A    Well, I think this response I was saying that you can

10  negotiate which is what I think I said yesterday.  Read it

11  back.  I think this one said legislation.  I think yesterday I

12  also said that discussion was in the context of federal

13  supremacy.  And I'll stand by those statements.

14  Q    Was there any discussion following this statement as to

15  whether you should continue to make such statements regarding

16  the need for legislative relief in the face of the pensions

17  clause?

18  A    No.

19  Q    Were you ever advised that you should not state in the

20  future that legislative relief would be necessary if there was

21  not a consensual agreement?

22  A    No.

23  Q    Mr. Orr, did you have any involvement in the creation of

24  the pension task force?

25  A    Yes.

1  Q    How so?

2  A    Everything that's done under the aegis of 436 and the

3  efforts that we're making in the city is done under my

4  authority, so I suppose I had some involvement.

5  Q    And am I understanding it correctly that the pension task

6  force consists of attorneys from Miller, Canfield, attorneys

7  from Jones, Day, and then certain other financial advisors,

8  correct?

9  A    Financial and operational advisors, yes.

10  Q    Okay.  And when was it created?

11  A    I don't know.

12  Q    Was it in place before you became emergency manager?

13  A    Not to the best of my knowledge.

14  Q    Okay.  And -- and who created it specifically?  Was it

15  you under PA436?

16  A    I don't recall.

17  Q    Who else, if I may ask, would have the authority to

18  create a pension task force if it wasn't you?

19  A    As part of the financial stability agreement and the

20  memorandum of understanding, both of which were entered into

21  in 2012, there were certain tasks that were to be undertaken

22  at that point.  The task force itself as you're referencing

23  may have begun at that process.

24      Since Jones, Day got involved further in 2013, there may

25  have been other attorneys added to that task force, but the

1  MOU of November 2012 speaks to certain tasks that Milliman,

2  Miller -- Miller, Canfield, Conway, MacKenzie, E & Y, are

3  supposed to undertake.

4  Q    And what was the purpose of the pension task force?

5  A    I don't know.

6  Q    Well, who does it report to?

7  A    Well, it now reports to me.

8  Q    But you don't know the purpose of it?

9  A    Well, the purpose as spelled out in the MOU was to

10  examine certain pension issues.  But you asked me what was the

11  purpose of the task force as far as I understand it.  It's

12  what it does for me now.

13  Q    Okay.  So what does it do for you now?

14  A    It -- it analyzes and reports to me different issues

15  regarding the city's pension obligations.

16  Q    Have there been any findings, written reports,

17  memorandums, anything like that --

18  A    Yes.

19  Q    -- created by the pension task force?

20  A    The task force or members of the task force.

21  Q    Have those documents been produced in this litigation?

22  A    I don't know.

23  Q    And no one from either of the two retirement systems was

24  asked to participate in the pension task force, correct?

25  A    I don't know.

1  Q    Well, did you personally ask anyone from any of the

2  retirement systems to participate in the task force?

3  A    No.

4  Q    And no one from any of the retiree associations or active

5  employee associations were asked to join this pension task

6  force, correct?

7  A    I don't know.

8  Q    And no one from the unions were asked to join the pension

9  task force?

10 A    I don't know.

11 Q    But you don't know, or you did not do it?

12 A    I did not ask them.

13 Q    Okay.  Would anyone else have authority to be asking

14 people to join the pension task force?

15 A    Yes.

16 Q    Who would that be?

17 A    The people that were tasked, I think, under the MOU in

18 2012 and members of my staff whether they joined it or asked

19 them to participate would be authorized to solicit information

20 from other parties.

21 Q    But to your knowledge none of those people reached out to

22 any of the people I just listed, the retirement systems active

23 employees, retirees, or unions to join the pension task force,

24 correct?

25 A    I don't know.

1  Q    And this task force was not -- the existence of the task

2  force was not made public until the bankruptcy filing,

3  correct?

4  A    I don't know if that's true.

5  Q    Did the pension task force ever approach the retirement

6  systems to discuss any creative options relating to the design

7  of the pension plans or any cash flow changes that could be

8  made to resolve under funding problems?

9  A    I don't know.

10 Q    Yesterday I believe you stated that with respect to your

11 -- or I'm going to call them commercial creditors.  You said

12 that you followed all the notice provisions in the loan

13 documents and you sent notices of the June 14th meeting,

14 correct?

15 A    Yeah.  I said that we followed -- followed notice

16 provisions, sent notices to all record holders or their

17 agents, and also received telephone calls and other requests.

18 Q    Did you do the same thing with any active employees or

19 retirees?

20 A    I believe we reached out to -- I -- I don't know for

21 sure.

22 Q    Okay.  Let's talk about what attempts if any you made to

23 mobilize the actives or the retirees.

24 A    Uh-huh.

25 Q    Did you or anyone on your team make phone calls to each

1  individual?

2  A    To each individual active employee?

3  Q    Or retiree.

4  A    No, not that I know of.

5  Q    Did you reach out by mail, write letters, things of that

6  nature?

7  A    To the actives I believe we reached out.  There certainly

8  -- there are actives on my staff so they would have been

9  aware.  There are actives that are working with the

10  consultants, so they would have been aware.  To the retirees,

11  we asked certain bargaining units, unions to represent them

12  and they declined.

13  Q    My question was, did you reach out directly to any of the

14  retirees before the June 10th or June 14th meetings?

15  A    I don't know.  I don't recall.

16  Q    Did you post any public notices in newspapers or

17  advertise on television that there were these meetings coming

18  up?

19  A    I don't recall.

20  Q    Did you set up a web site where you could communicate

21  directly with any of the retirees or actives?

22  A    We have a web site in the city.  Whether or not that's of

23  the type you're talking about to communicate directly, you

24  have to examine the web site.

25  Q    I have.

1  A    Okay.

2  Q    I did not see anything.  It's your web site.  Do you have

3  anything on that web site that you believe enabled you to

4  directly communicate with actives or retirees?

5  A    Yes, I think I do, yeah.

6  Q    Okay.  Did you use anything on your web site before the

7  June 14th and June 10th meetings to reach out directly to any of

8  the actives or retirees?

9  A    Not that I recall.

10 Q    Okay.  Did you mail a copy of your proposal for creditors

11 to all of the -- or any of the actives or the retirees?

12 A    I don't know.

13 Q    You -- you do have a list of all those names though,

14 don't you?

15 A    We believe we have a list of all active employees.  I

16 would think that we would have a list of all retirees.  I know

17 we asked for some help in compiling that list, but they're our

18 list.

19 Q    And if you needed those identities there were places you

20 could look and people you could ask for that information,

21 correct?

22 A    We did ask.

23 Q    And you -- you never attempted to develop sub groups of

24 these retirees so that you could negotiate with them directly,

25 correct before the bankruptcy?

1   A    I don't know.

2   Q    Are you familiar with anyone else on your staff being

3   tasked with breaking up the group of retirees into smaller

4   groups to be able to negotiate with smaller groups directly?

5   A    Yes.

6   Q    Okay.  Who on your staff was responsible for that?

7   A    There are members both on the legal team and on the

8   actuarial as well as the -- well, principally that would have

9   been -- probably members on the legal team.

10  Q    And who would those individuals be that were tasked with

11  breaking the retiree groups into smaller sub sections?

12  A    That would have been led by the -- probably Evan Miller

13  at Jones, Day.

14  Q    And when did these smaller sub group negotiations, or

15  alleged negotiations take place?

16  A    I don't know.

17  Q    Are there any documents that actually reflect that

18  smaller sub groups were created for the purpose of

19  negotiating?

20  A    I -- I don't know.

21  Q    Have any documents been -- been produced in this case

22  that show that actual sub groups had been developed?

23  A    A lot of documents have been produced.  There may well

24  have been.  I don't know for sure.

25  Q    Are you familiar with any such documents?

1  A    I wasn't involved in the document production, no.

2  Q    Are you familiar with testimony on Friday that there was

3  no attempt made to create smaller sub groups of retirees?

4  A    No, I'm not familiar with that testimony.

5  Q    If it was from Mr. Buckfire who was your lead negotiator

6  for your financial advisory team, would it surprise you to

7  hear him saying that there had been no group, smaller sub

8  group developed?

9  A    No.  Mr. Buckfire may have not have been involved in all

10 aspects of it.

11 Q    Okay.  So it's your testimony the Jones, Day lawyer was

12 tasked with breaking out smaller sub sections and negotiating

13 directly?

14 A    It's my testimony that they could have been.  I don't

15 recall specifically the timing or the sub groups as you're

16 characterizing it.

17 Q    Okay.  So if we ask the retirees that are testifying next

18 week if anyone contacted them for the purpose of breaking into

19 smaller sections so that they could be negotiated with

20 directly, we're going to expect to hear that yes, Evan Miller

21 contacted me to negotiate?

22        MR. STEWART:  Objection, Your Honor, calls for

23 speculation.

24        THE COURT:  Sustained.

25 Q    What specific strategies other than this apparent sub

1  group that you've formulated, did you come up with to overcome

2  what was the perceived impractical nature of directly dealing

3  with large groups of people?

4  A    Can you impact that question a little bit?

5  Q    What specific strategies did you come up with to try to

6  overcome any perceived difficulty with negotiating with large

7  numbers of people, list them?

8  A    Related to retirees?

9  Q    Yes.

10  A    Okay.  Because your question said, as you did, we asked

11  for a retiree committee in bankruptcy.  You're talking about

12  before?

13  Q    Before bankruptcy.

14  A    Before bankruptcy.  We had made requests from certain of

15  the bargaining units to represent retirees.  I have certainly

16  met with I believe the Police and Fire Retiree Association.

17  Q    Okay.  Would that be the sum total of what you did?

18  A    It may not be.  Many of my consultants meet with

19  different groups all the time.  And sometimes I'm not aware of

20  all meetings.

21  Q    We talked a little bit about the pension task force.  Was

22  there a negotiations task force that was put together by your

23  team?

24  A    By my team?

25  Q    Yes.

1  A    I would think the entire effort was a negotiations task

2  force.

3  Q    But there was no specific committee on your team dealing

4  with how to tackle the problem of the retirees that needed to

5  be negotiated with, correct?

6  A    My team and consultants worked together collaboratively.

7  Whether or not that's called a task force as a proper noun, is

8  a different question.

9  Q    Well you had names for your teams.  I'm asking was there

10 an official team dedicated to negotiating with retirees?  Yes

11 or no?

12 A    Not -- I don't know.  Not that I'm aware of.

13 Q    The June 10th, June 14th, and June 20th presentations, I

14 believe we're all in agreement now were purely informational.

15 I believe that's what you've said between yesterday and today,

16 correct?

17 A    Generally, yes.

18 Q    In the June 10th time frame, you held the -- the public

19 meeting at Wayne State, correct?

20 A    Yes.

21 Q    And that was as I believe you testified kind of the

22 ground work and you were laying the foundation for the

23 negotiations that you expected to occur in the following

24 weeks?

25 A    No.  I think what I testified to was that the June 10th

1  meeting was required as a public meeting within 30 days of my

2  May 12th report.

3  Q    You may have said that.  At some point you agree with me

4  that that was your first public meeting and you were trying to

5  set the foundation for what was to occur?  Maybe I'm

6  mischaracterizing slightly, but it's the gist of what I got

7  from what you said yesterday.

8  A    Well, I -- I can't be responsible for the gist of what

9  you got.  What I said was, the June 10th meeting was required

10  by 436 within 30 days of the May 12th report.  There were many

11  things that were done at that meeting, but what I was trying

12  to relay yesterday was I was meeting my statutory obligations

13  under 436.

14  Q    Okay.  Do you remember at that June 10th meeting that it

15  was video taped?

16  A    Yes.

17  Q    And in fact you've posted these videos on your emergency

18  manager web site, correct?

19  A    Yes.

20  Q    Do you recall being asked a question by a retiree at the

21  June 10th meeting about what to expect to happen to their

22  pension funds?

23  A    I don't recall a specific question, but you're welcome to

24  show it to me.

25  Q    I will do that.

1      (Video Being Played at 2:12 p.m.; Concluded at 2:14 p.m.)

2  Q    So on June 10th when asked by a retiree what was to happen

3  to their pension benefits, you said they were sacrosanct and

4  they could not be touched, correct?

5  A    I think there was more to that clip.

6  Q    I'm only asking about that part.  I -- we can keep

7  playing it.  You say except OPEB's are different.  Is that --

8  did that refresh your recollection of what you followed

9  that --

10 A    No.  I mean the entire clip.  I think there were multiple

11 questions, but that clip speaks for itself, yes.

12 Q    Okay.  So on June 10th you told retirees at the June 10th

13 meeting that their pensions were sacrosanct and they couldn't

14 be touched.  And four days later you held the proposal for

15 creditors meeting.

16      And at that time you produced a 135 page proposal and I

17 believe we've shown it up on the screen a few times Page 109

18 where you say significant cuts will have to be taken.  Did you

19 invite all the same retirees to the second meeting and then

20 explain to them that what they may have heard at the June 10th

21 meeting was now being changed?

22 A    I don't know.

23 Q    Well, did you correct any misunderstanding out there

24 where retirees thought their pension obligations were indeed

25 sacrosanct and safe?

1  A    I may well have.

2  Q    So you told them no cuts.  Four days later you said cuts.

3  And that was on June 14th.  And the time line that you laid out

4  on your proposal for creditors slated June 17th through July

5  12th as the initial discussion round, correct?

6  A    It is whatever it is in the document, yes.

7  Q    We've looked at it a few times.  I won't bother pulling

8  it up again.  So on the 14th you -- you did state there had to

9  be cuts.  And three days later the negotiations were to

10  commence, correct?

11  A    Yes, generally.

12  Q    Okay.  And the data room wasn't live until June 20th,

13  right?

14  A    I don't know.

15  Q    If other people have testified June 20th, does that sound

16  about correct?

17  A    That -- that would not surprise me.  I don't know the

18  exact date.

19  Q    And as of the 20th the data room was not fully populated

20  with the -- with the data, right?

21  A    I don't know.  I wasn't populating the data room.

22  Q    And if other people testified that it was not fully

23  populated would that --

24  A    That would not surprise me.

25  Q    Okay.  So three days into the initial round of

1  discussions with all the stakeholders, the documents were

2  still not up?  You gave a proposal for creditors that changed

3  information that you had said at the public meeting on the

4  10th.  And you did not give a copy of this proposal for

5  creditors to all of the retirees, correct?

6  A    Not necessarily, Ms. Green.

7  Q    Okay.  When was the first time that you realized Chapter

8  9 was going to be necessary to cut the pension benefits?

9  A    I don't know if I realized Chapter 9 was going to be

10  necessary just to cut the pension benefits.

11  Q    Did you know it before you said on the 10th that pension

12  benefits could not be touched?

13  A    I think you're taking that quote out of context, but let

14  me respond this way.  The 10th and 14th, we were negotiating

15  with Bammel.  We thought that was going to spur other

16  settlements and other negotiations.  I had made no conclusion

17  regarding Chapter 9 at that point.

18  Q    Well, isn't it true you were being advised by your

19  financial advisors that Chapter 9 was necessary?

20  A    Chapter 9 had been discussed since 2005, Ms. Green.

21  Q    Can we look at Exhibit 870, please?  You were in contact

22  with your financial advisors continuously throughout this

23  period, correct, Mr. Orr?

24  A    Yes.

25  Q    And Chuck Moore is one of your financial advisors?

1    A    Yes.

2    Q    And he's on the pension task force?

3    A    Yes.

4          MR. STEWART:  Counsel, could I get a copy of that

5    document?  I don't think we have it.

6          MS. GREEN:  Oh, this was just -- I'm sorry, Your

7    Honor.  This was produced on Friday as well.  And we do have

8    extra copies for the Court today.

9    Q    Do you recognize this email?

10   A    Is it in here?

11   Q    It should be on the screen.

12   A    Okay.  Okay.  Thank you.

13   Q    Do you recognize this email dated June 7th, 2013?

14         THE COURT:  Do you have a number for this?

15         MS. GREEN:  It's 870, Your Honor.

16         THE COURT:  Thank you.

17   A    Yes.

18   Q    And at the bottom of that email it's -- it's a whole

19   string and there's an email from Chuck Moore at Conway,

20   MacKenzie dated 6-5-2013?

21   A    Yes.

22   Q    And it's an email to you, correct?

23   A    Yes.

24   Q    Discussing a lengthy call with Milliman this afternoon?

25   A    Yes.

1  Q    And you received this -- this email, right?

2  A    Yes, I believe so.

3  Q    On the second page there are numbered paragraphs.  I'd

4  like to call your attention to Paragraph 3.  Just above it

5  it's talking about under funding liability.

6       And it states, we anticipate a significant reduction and

7  already accrued benefits will be required in order to get

8  required contributions to the level of available cash to

9  service the UAAL.  It appears this may only be possible in a

10 Chapter 9 proceeding.

11 A    Yes.

12 Q    Do you -- do you recall receiving that portion of the

13 email?

14 A    Yes.

15 Q    And this was on June 5th?

16 A    It's dated June 5th, so I assume I received it around

17 then, yes.

18 Q    But on the meeting of June 10th you responded to questions

19 regarding the pension benefits and you stated that they could

20 not be touched?

21 A    In the clip that you showed, yes.

22 Q    So did you knowingly give misinformation to the retirees

23 that were asking questions on the 10th?

24 A    No.

25 Q    I believe that you testified earlier that Ernst and

1    Young, Miller, Buckfire, and Conway, MacKenzie had all been

2    engaged by the city prior to your arrival, correct?

3    A    Yes.

4    Q    And they were working since 2012 putting all the

5    financial data together, correct?

6    A    I believe Ernst and Young was engaged in 2012.  The

7    others may have begun work either at the end of December 2012,

8    or the beginning of 2013.

9    Q    And all of their work culminated with this proposal for

10   creditors that you laid out in the middle of June?

11   A    Yes.

12   Q    So that took your team of three financial advisor firms,

13   yourself, and whomever else you had working on it, several

14   months, five, six months all together, maybe longer?

15   A    I believe they met in 2013 and began to come up with

16   concepts and it culminated in this document.  But if that's

17   your supposition, yes.

18   Q    Okay.  And yet the time frame that you laid out for the

19   initial rounds of discussions with the relevant stakeholders

20   lasted from June 17th to July 12th, right, just a three week

21   period?

22   A    July 19th, but yes.

23   Q    And the evaluation period that you set forth in your

24   proposal for creditors was July 15th through the 19th, right?

25   A    Yes.

1  Q    I think you stated earlier that the pre-petition lawsuits

2  helped force the bankruptcy filing, correct?

3  A    I think I said either on September 16th, or yesterday, or

4  the day before, that we were getting ready to lose control,

5  that those lawsuits were creating concerns, yes.

6  Q    Okay.  And I believe you said that at first you ignored

7  the -- the lawsuits that were filed?

8  A    Yes.

9  Q    How long did you ignore them for?

10  A    Almost three weeks.

11  Q    Okay.  You were asked yesterday if you were aware of any

12  hearings that were scheduled in State Court lawsuits as of the

13  time that you sent your letter on the 16th?

14  A    Yes.

15  Q    And you stated that at time you were unaware of any

16  hearings in the State Court litigation?  The 16th.

17  A    I don't -- yeah.  I don't know if as of the 16th.  I don't

18  -- I don't recall when I became aware.  There were hearings

19  scheduled for the following week.  I may not have known as of

20  the 16th.

21  Q    What about the 18th when you filed the petition?

22  A    I think by the 18th, I knew there were hearings scheduled

23  for the following week.

24  Q    You said earlier that you were concerned that one of

25  these lawsuits could impact your ability or would undermine

1  your authority under PA436 to get your job done, something to

2  that effect.  Do you recall that from this morning?

3  A    Yes.

4  Q    What authority under PA -- PA436 did you think was going

5  to be undermined?

6  A    All of my authority.

7  Q    And in fact you expected these lawsuits, didn't you?

8  Let's call up Exhibit 403.  Do you recognize this email from

9  January of 2013?

10  A    Yes.

11  Q    And isn't it true that at that time you were observing

12  that there were already reports that "opponents of the prior

13  law are already lining up to challenge this law"?

14  A    Yes.

15  Q    So as of January before you even were appointed emergency

16  manager, you expected a legal battle forthcoming, correct?

17  A    Not of the nature you're talking about, but yes, I

18  expected that there were challenges because that's what I

19  read.

20  Q    Well, and to be clear the State Court lawsuits were

21  challenges to PA436 and your authority thereunder, correct?

22  A    Yes.  But I don't want to mislead you.  This is talking

23  about lawsuits to PA436.  I wasn't expecting injunctions, I

24  was expecting more lawsuits in the nature of declaratory

25  judgments and the like.

1       So the specifics of the lawsuit, I wasn't talking about

2   in here.  But I was expecting challenges because that's what

3   was being talked about in the news reports.

4   Q    Well, and there were in fact declaratory judgments sought

5   in those pre-petition lawsuits, weren't there?

6   A    I believe so.

7   Q    Okay.  And the retirement systems didn't file their

8   lawsuit until July 16th, correct?

9   A    Yes.  I believe GRS filed July 15th.

10  Q    Well, either way it was -- it was after the week, after

11  in your own time line, it was after the period where you had

12  set aside for discussions to take place with your

13  stakeholders?

14  A    Yes.

15  Q    Okay.  So there were no -- there wasn't a lawsuit

16  vis-a-vis the retirement systems during the week that you were

17  meeting with the retirement systems, correct?

18  A    I don't think so.

19  Q    And I believe you said yesterday the TRO from the Syncora

20  litigation was set to expire within 14 days?

21  A    Yes.

22  Q    And that would take you to July 19th?

23  A    I believe so.

24  Q    But the July 19th date was set forth on your proposal for

25  creditors as the end date unrelated to the Syncora litigation,

1  correct?

2  A    I think it was set forth related to everything.

3  Q    Yesterday you talked a lot about the swap transactions

4  and that negotiation.  At your deposition you testified that

5  they were extraordinarily complex.  I presume that your

6  testimony would be the same today?

7  A    The swap transactions.

8  Q    Yes.

9  A    Yes.

10  Q    And those negotiations started in earnest on June 4th,

11  right?

12  A    I don't recall the exact date, but that sounds about

13  right.

14  Q    Okay.  And the general terms of that negotiation were

15  agreed upon around June 11th?

16  A    Generally, yes.  Generally about those days, yeah.

17  Q    And then between June 11th, and July 15th through the 17th,

18  the paperwork was drafted and the forbearance agreement was

19  executed, correct?

20  A    Yes, forbearance and optional termination agreement, yes.

21  Q    Okay.  So even though the transactions were extremely

22  complex, and I believe you testified that the negotiations

23  were -- there was a lot of back and forth?

24  A    Uh-huh, yes.

25  Q    Even with all of that, the whole thing was wrapped up in

1  about four weeks, right?

2  A     Yes, I believe so.

3  Q     And that freed up the casino revenue?

4  A     Yes.

5  Q     That you thought was critical to the city's liquidity?

6  A     Yes.

7  Q     And yet having successfully negotiated that complex deal,

8  you didn't continue down the path of negotiating.  Two days

9  after you executed the forbearance agreement you actually

10 filed your bankruptcy petition, correct?

11 A     That's correct.  Forbearance agreement is dated July 15th

12 and we filed on July 18th.

13 Q     In three days?

14 A     Whatever that is, yeah.

15 Q     Okay.  We talked a lot about negotiations.  Isn't it true

16 though that if negotiations do not -- if there's -- I'm sorry,

17 let me restate that.  It was a terribly started question.

18 A     I understand.

19 Q     We talked about negotiations, but isn't it true that if a

20 consensual deal is not worked out, the city will use the cram

21 down provisions of the Bankruptcy Code to force a resolution?

22 A     The city would propose a resolution, but the cram down

23 provisions are available in Bankruptcy Code.

24 Q     So the answer is yes?

25 A     We hope to reach a negotiated solution even now.

1  Q    But if you don't, the answer is yes, correct?

2  A    If I don't we will address that situation then, but

3  certainly cram down is an opportunity available to us.

4  Q    And the $2,000,000,000 note that was proposed, there's no

5  recourse if the city fails to pay that note back, correct?

6  A    It is a non-recourse note.

7  Q    And in fact as of June 14th the proposal for creditors

8  does not actually identify anywhere in that document the

9  amount that an individual -- an individual's benefits would be

10  impacted, correct?

11         MR. STEWART:  Objection, asked and answered before,

12  Your Honor.

13         THE COURT:  Sustained.

14  Q    If an individual retiree was looking to find how much

15  their individual pension benefits would be impacted prior to

16  the bankruptcy filing, where would they look?

17         MR. STEWART:  Same objection, Your Honor.

18         MS. GREEN:  A different question.

19         THE COURT:  Well, it's slightly different.  What's

20  the answer, please?

21  A    I don't know, Your Honor.

22  Q    Mr. Orr, earlier we looked at Exhibit 831.  If we could

23  see that again, please.  This is the time line from July 8th.

24  Bill Nowling or Nowling is your press secretary?

25  A    He's my communications director, yes.

1  Q    Okay.  I would draw your attention to about three pages

2  in.  There is a list of bullet points relating to a

3  communications plan.  There we have it.  And as of July 8th

4  your communications plan was that you believe the Court

5  supervised restructuring is the best and most efficient way to

6  secure a viable strong future for Detroit, correct?

7  A    Yes.

8  Q    And further down on the page, there is a bullet point

9  that states, we negotiated in good faith with all of Detroit's

10  creditors and we will continue to work cooperatively with them

11  in the Federal Bankruptcy Court process, correct?

12  A    Yes.

13  Q    And it states that at this point it would be impractical

14  to continue discussions out of Court, correct?

15  A    Yes, it says that.

16  Q    And it states that the State of Michigan has authorized

17  the emergency manager to take this step?

18  A    Yes.

19  Q    As of July 8th, you had not yet even conducted several of

20  the meetings with the relevant stakeholders, correct?

21  A    July 8th?

22  Q    Right.

23  A    I think we had meetings beginning on June 17th, so we had

24  conducted a number of meetings.

25  Q    What about the ones on the 10th and the 11th?  Those had

1  not even taken place, correct?

2  A    Of July.

3  Q    Right.

4  A    Yes.  No, they hadn't taken place.

5  Q    And I think we established earlier that all the

6  presentations on the 10th, 14th, and 20th were merely

7  informational and presentational, correct?

8  A    Of July?

9  Q    Of June.

10  A    Of June, yes.

11  Q    Okay.  And this same document has the filing date of the

12  19th, right?

13  A    Yes.

14  Q    Okay.  Was there another document that set forth some

15  sort of contingency plan if negotiations actually were

16  fruitful?

17  A    It looks like this is one of them.

18  Q    Where on here does it say what your steps are if the

19  negotiations, the meetings that took place July 10th and 11th

20  where --

21  A    Did you say that they were fruitful, or unfruitful?

22  Q    If they were fruitful.

23  A    Oh, they were fruitful.

24  Q    Where is your plan for if the negotiations on the 10th and

25  11th worked out?

1  A     Rephrase your question because I'm not sure I'm

2  understanding it.

3  Q     This document lays out a time line as of July 8th.

4  A     Contingency plan, yes.

5  Q     Okay.  Where on the document does this say it's a

6  contingency plan?

7  A     No.  I'm just saying that you do contingency planning.

8  It doesn't have to be called a contingency plan.  You plan for

9  contingencies before the last minute, Ms. Green, I'm sure

10 you're aware of that.

11 Q     Okay.  So where is the contingency plan for if

12 negotiations were fruitful?

13 A     I don't know.

14 Q     In the 200,000 pages of documents the city has produced,

15 is there a single contingency plan relating to negotiations

16 with creditors?

17        MR. STEWART:  Objection, Your Honor, foundation.

18        THE COURT:  Overruled.  Answer the question if you

19 know.

20 A     I don't know.

21        MS. GREEN:  Your Honor, I'm sorry.  I'm just going

22 through my notes.  I want to make sure I got everything.

23 Q     I have one more question.  At the June 10th proposal, or

24 I'm sorry, public meeting.

25 A     Uh-huh.

 1 | Q    Do you recall talking about your authority under PA436?

 2 | A    Yes.

 3 | Q    Do you recall making a statement about how powerful your

 4 | authority was under PA436?

 5 | A    Yes, I do remember that.

 6 | Q    Do you remember saying, and I don't want to misquote you,

 7 | so I'm going to have to play the clip, but do remember saying

 8 | that the statute itself was powerful, but you had a much more

 9 | powerful Chapter 9?

10 | A    Yes.  I remember saying that I have a very powerful

11 | statute, 436 is even a more powerful statute, Chapter 9, but I

12 | don't want to use it.

13 | Q    And didn't you end with but -- let's just play the clip

14 | from what you actually said before --

15 |          MR. STEWART:  Your Honor, objection.  The -- the

16 | witness has stated his memory.  There's no reason to -- to

17 | show a -- a clip.

18 |          THE COURT:  I'll permit it, go ahead.  Go ahead.

19 |          MS. GREEN:  The clip says something different.

20 |          THE COURT:  Go ahead.

21 |     (Video Being Played at 2:35 p.m.; Concluded at 2:35 p.m.)

22 | Q    Do you also recall just prior to that June 10th meeting

23 | the -- the email we looked at earlier from Chuck Moore stating

24 | that Chapter 9 would be necessary to deal with the pension

25 | obligations?

1  A    I recall receiving that email.

2  Q    When you were discussing to the public this issue with

3  respect to Chapter 9, were you aware of the fact that your

4  financial advisors had already set on a course for Chapter 9

5  proceedings?

6  A    I'm not sure we'd set on a course for Chapter 9

7  proceedings.  We were trying very hard to get some consensual

8  resolutions and had one in hand.

9  Q    Last question.  Do you remember being asked by a precinct

10  delegate for the Democratic party after you made that

11  statement about Chapter 9.  Do you remember a woman standing

12  up and asking you -- stating that she felt as though she was

13  threatened by your Chapter 9 comments?

14  A    No, I don't remember.  Somebody may have said that, I

15  don't remember.

16  Q    Do you believe that when you stated that you had a very

17  powerful Chapter 9, that you were trying to set the tone for

18  the negotiations that were to take place over the following

19  weeks?

20  A    No, not necessarily.  I was just speaking.

21        MS. GREEN:  I have nothing further, Your Honor.

22                    CROSS EXAMINATION

23  BY MR. WERTHEIMER:

24  Q    Good afternoon, Mr. Orr.  My name is Bill Wertheimer and

25  I represent the Flowers plaintiffs, the plaintiffs in that

1   lawsuit --

2   A    Good afternoon, Mr. Wertheimer.

3   Q    We have not met, have we?

4   A    No, we have not.

5   Q    I'd like to clear up, if I can, the timing related to

6   these hearings in the State Court.  You testified that the

7   suits were filed on July 3rd, correct?  The Flowers and the

8   Webster suits were filed on July 3rd, correct?

9   A    Yes, I believe so.

10        THE COURT:  Counsel, I have to caution you not to

11  ask any redundant questions.

12        MR. WERTHEIMER:  That was -- I will not further.

13  Q    Did you also learn at the same time you learned about the

14  lawsuits that along with the lawsuits the same day the

15  lawsuits were filed, the Judge in that case entered an order

16  to show cause scheduling a hearing for preliminary injunctions

17  on the Websters and Flowers case for July 22nd?

18  A    No.

19  Q    When in time did you learn that hearings were scheduled

20  for July 22nd in front of Judge Aquiline?

21  A    I'm not aware if I ever knew in front of which Judge.  I

22  think I learned that a few days or weeks later.

23  Q    Okay.  Have you ever in your meetings or communications

24  with the Governor, or any of his staff people in any way

25  communicated to him that it was your intention as the

1  representative of the people of the City of Detroit to make a

2  legal claim against the state, that the state would be

3  obligated to pay any pension monies that the city could not

4  pay because of Article 9, Section 24 of the Constitution?

5  A    No, I don't think so.

6  Q    In any of your conversations with the Governor, beginning

7  at the time you became emergency manager in March, did you

8  ever communicate to the Governor what you communicated to that

9  retiree at a public meeting, that is that because of the state

10 law in Michigan pensions are sacrosanct?

11 A    I don't recall.

12 Q    You don't recall?  Are you testifying under an oath you

13 -- oath you don't recall one way or another whether you used

14 the term sacrosanct in your discussions with the Governor

15 relative to this issue?

16       MR. STEWART:  Objection, asked and answered.

17       THE COURT:  The objection is sustained.

18 Q    In your -- these conversations with the Governor, any of

19 them from the time you became emergency manager, have you had

20 discussions with the Governor about your claim that federal

21 law trumps state law on this pension issue?

22       MR. STEWART:  Objection, Your Honor.  To the extent

23 that the question calls for the witness to reveal privileged

24 attorney/client communications.  If there were lawyers in the

25 room and it was in connection with the rendition of legal

1  advice, I would object.

2          MR. WERTHEIMER:  Can I follow up a question?

3          THE COURT:  Uh-huh, sure.

4  Q    First of all, have you had any discussions with the

5  Governor where the issue of the impact of the filing of a

6  federal bankruptcy would have on this state constitutional

7  right outside the presence of attorneys?

8  A    No.

9  Q    How many meetings have you had with the Governor either

10 personally or over the telephone since you became emergency

11 manager approximately?

12         MR. STEWART:  Objection, asked and answered.

13         THE COURT:  Sustained.

14 Q    It was two to four or five, right?

15 A    No, I have weekly meetings but two to four or five with

16 the Governor.

17 Q    Okay.  Thank you.

18 A    Uh-huh.

19 Q    And in your meetings were there ever occasions where

20 attorneys were present and in your view of things you were not

21 seeking legal advice, they just happened to be either on the

22 line or in the meeting?

23 A    With the Governor?

24 Q    Yes.

25 A    Yes.

1  Q    In those meetings, were there occasions where you and the

2  Governor discussed the issue of federal law trumping or in

3  some way allowing you to adversely impact pension benefits?

4          MR. STEWART:  Renew my earlier objection, Your

5  Honor.

6          THE COURT:  Which objection, sir?

7          MR. STEWART:  The -- the -- to the extent that the

8  -- the question asks for the witness to reveal attorney/client

9  communications, we'd object.

10          MR. WERTHEIMER:  I'm only now asking about meetings

11  where he's acknowledged the attorneys were not there giving

12  legal advice.  He says there were such meetings.

13          MR. STEWART:  The question of -- I'm sorry.  The

14  question of whether federal law trumps, or trumps the Michigan

15  Constitution is clearly a request for legal advice.

16          MR. WERTHEIMER:  He's now testifying.  That's not

17  what Mr. Orr said.  Mr. Orr said --

18          THE COURT:  The problem is your question was

19  misleading, sir.  Because you asked --

20          MR. WERTHEIMER:  With all due respect, Your Honor, I

21  don't believe it was.

22          THE COURT:  Excuse me, you -- you asked were there

23  such meetings and there may have been.  But that doesn't mean

24  that every subject that was covered in such meeting was --

25  were subjects that did not involve legal advice.

1        MR. WERTHEIMER:  Well, then may I ask the question?

2   Q    At these -- these one or more meetings where there were

3   attorneys present, either on the telephone or in person, but

4   where you're not talking about legal advice or seeking legal

5   advice from those attorneys, in any of those contexts, did you

6   and the Governor talk about what the impact of your filing a

7   Chapter 9 proceeding might be on the pension rights of

8   citizens of the State of Michigan?

9        MR. STEWART:  Same objection, Your Honor.  That

10  issue is by definition one of a legal character.

11       THE COURT:  It seems to me, but I'll permit the

12  witness to answer.

13  A    No.

14       MR. WERTHEIMER:  Thank you.

15       THE COURT:  Any other questions for the witness?

16  Any redirect?  Oh, this I assume had all been worked out.  I'm

17  sorry.

18       MS. BRIMER:  I'm standing, Your Honor.  I'll --

19       THE COURT:  How many more?

20       MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

21  Brimer appearing on behalf of the Retired Detroit Police

22  Officers Association.

23                    CROSS EXAMINATION

24  BY MS. BRIMER:

25  Q    Mr. Orr, my name is Lynn Brimer.

1  A    Good afternoon, Ms. Brimer.

2  Q    We have never met before?

3  A    No, we have not.

4  Q    Mr. Orr, I'd like to go back to some discussion prior to

5  your appointment as the -- as the emergency manager.  Do you

6  recall when you first learned that Jones, Day would be

7  involved in preparing or presenting a pitch to the City of

8  Detroit for engagement?

9  A    Yes.

10  Q    And when was that?

11  A    Two weeks or so prior to the pitch.

12  Q    So about --

13  A    Mid-January.

14  Q    About mid-January?

15  A    Yes.

16  Q    And at that point in time did the topic of a Chapter 9

17  filing come up in your discussions?

18  A    No, not initially, no.

19  Q    Could we have Exhibit 866, please?  Do you -- do you see

20  that Exhibit 866?

21  A    Yes.

22  Q    All right.  Now that's an email from Ms. Ball and you're

23  listed on there at the end of the carbon copies, is that

24  correct?

25  A    Yes.

1  Q    What is Ms. Ball's role in connection with the City of

2  Detroit project at Jones, Day?

3  A    Ms. Ball is one of the attorneys at Jones, Day in the

4  restructuring practice that was at the pitch -- pitch

5  presentation.

6  Q    Okay.  So if you'd go down midway through the page you'll

7  see there is a paragraph that says Kevyn.

8  A    Uh-huh.

9  Q    I assume that's you, Mr. Orr?

10 A    Uh-huh.

11 Q    There are diversity related issues.  You have to be the

12 star on this stuff and be able to discuss what we can provide.

13 (We do submit reports to the Bar Association).  Also, can you

14 check with Dan Moss where he is on updating our Chapter 9

15 paper with new decisions like the ones in California, PA, and

16 Alabama among others.

17 A    Yes.

18 Q    All right.  Who is Mr. Moss?

19 A    Mr. Dan Moss is an attorney at Jones, Day seated at

20 counsel's table.

21 Q    And he was involved in the project to pitch to the City

22 of Detroit, correct?

23 A    Yes.

24 Q    All right.  Now already at least as early as January 15,

25 2013, the issue of a Chapter 9 was being addressed by the

1  Jones, Day attorneys, is that correct?

2  A    Yes, it appears to be so.

3  Q    So now you spent the -- the pitch was actually made on

4  January 29th, is that correct?

5  A    Yes.

6  Q    And who attended that pitch?

7        MR. STEWART:  Objection, Your Honor, asked and

8  answered.

9        THE COURT:  Sustained.

10 Q    There were attorneys from various offices of Jones, Day

11 at that pitch, is that correct?

12 A    Yes.

13 Q    And in that two week period were there discussions among

14 the attorneys of the role each would play in the pitch with

15 the city?

16 A    Yes.

17 Q    And during any of those discussions, did Ms. Ball ever

18 discuss any prior involvement with the State of Michigan?

19 A    Not with me.

20 Q    Was Ms. Lennox also involved in the pitch?

21 A    Yes.

22 Q    And did Ms. Lennox ever discuss in any of the meetings or

23 conversations preparing for the pitch, her role or Jones,

24 Day's role in connection with prior advice rendered to the

25 State of Michigan?

1  A    Not that I recall.

2  Q    Now shortly after the pitch you were approached in

3  connection with becoming the emergency manager?

4  A    Yes.

5  Q    And there were discussions internally with respect to

6  what Jones, Day may be able to do to generate funding for the

7  project and to nationalize the project, is that correct?

8  A    I think there was an email, yes.

9          MS. BRIMER:  Could we have 605?  It's 805, I

10  apologize.  And, Your Honor, I'm using exhibits that have been

11  admitted.

12          THE COURT:  Thank you.

13  Q    This is an email chain between you and Mr. Moore -- Moss,

14  is that correct?

15  A    Yes.

16  Q    Do you see that?  Okay.  Now if you go down to the second

17  page, it begins with an email to you from Ms. Ball, the last

18  sentence -- well, actually we'll go all the way down to the

19  first food for thought.  For your conversation with Baird and

20  us, I understand Bloomberg Foundation has a keen interest in

21  this area.  Do you know what area she is referring to?

22  A    I do not.

23  Q    Well, and the subject is D.  Do you know what that D is

24  referring to?

25  A    I think it's referring to Detroit.

1  Q    Okay.  I was thinking about whether we should talk to

2  Baird about financial support for this project and in

3  particular the EM.  So the issue is discussions with respect

4  to whether or not you can generate additional funding for it,

5  is that correct?

6  A    I believe so.

7  Q    The last sentence is, I can ask Harry, I believe that's

8  Harry Wilson from the auto task force, for contact

9  information.  This kind of support and weighs -- nationalizes

10  the issue and the project.  What project is that she's

11  referring to, do you know?

12  A    I assume she's referring to something related to Detroit.

13  Q    So she related to the -- does the project relate to the

14  representation of the City of Detroit by the Jones, Day

15  attorneys?

16  A    I don't know.

17  Q    All right.  So then if you go up from that, there is an

18  email from Mr. Moss to you that begins, making this a national

19  issue is not a bad idea.  It provides political cover for the

20  state politicians.  Indeed this gives them an even greater

21  incentive to do this right because if it succeeds, there will

22  be more than enough patronage to allow either Bing or Snyder

23  to look for higher callings whether cabinet, Senate, or

24  corporate.  Further, this would give you, I assume you means

25  you, Mr. Orr.

1  A     Uh-huh.

2  Q     Would give you cover and options on the back end, I

3  assume that's when you're finished with your appointment as

4  the EM, to make up for lost time here.

5  A     Yeah.

6  Q     Is the perception at Jones, Day that your appointment as

7  the emergency manager for the City of Detroit is lost time?

8  A     No.

9  Q     Then why would Mr. Moss have included that sentence in an

10  email, if you know?

11  A     I don't know.

12  Q     Was it important to move forward with this project in a

13  fashion that provided political cover for those who are

14  involved?

15  A     No.  I think I say that in one of the following emails.

16  Q     Now when did you first learn that the Mayor -- I mean

17  that the Governor would be supporting your candidacy as the

18  emergency manager?

19  A     Sometime after we met in mid-February.

20  Q     Could we have 807?  So 807 is an email chain between

21  yourself and Mr. Baird, is that correct?

22  A     Yes.

23  Q     The Re line is tribute to my dad, Reverend Dr. Allen E.

24  Orr.

25  A     Senior.

1 Q    If we could go to the email midway down from Mr. Baird to

2 you dated February 12, 2013.  Do you recall receiving this

3 email?

4 A    Yes.

5 Q    And I think we've discussed part of this email with Ms.

6 Green.  But the paragraph that begins a little further down,

7 Kevyn, I know you have work -- you have to work logistics on

8 your end, but I do want you to know our folks are already

9 behaving if you have -- as if you accepted the job.  I guess

10 that's human nature since the chemistry envisioned was so

11 aligned with our own.

12      The last sentence in that paragraph reads, anyway, I need

13 to clue -- I need you to clue me in.  Are you feeling

14 differently because the boss and his team are already

15 arranging for the church and pastor and I need to talk them

16 off the ledge if you tell me we are misreading the

17 relationship.

18      So already by February 12th you understood that the

19 Governor was seriously supporting your candidacy, is that

20 correct?

21 A    Yes.

22 Q    Did you at that point in time do anything to advise the

23 Governor that you would not be taking the position?

24 A    No.  I think I still was taking it under consideration.

25 Q    Let's see here.  All right.  I'd like to -- I do have an

 1  exhibit here --

 2          THE COURT:  Actually, Ms. Brimer, I'm -- I'm going

 3  to conclude Court now.  We do have some housekeeping matters

 4  that I need to review with everyone.  How much longer will

 5  your cross examination be?

 6          MS. BRIMER:  Probably only about 15 minutes, Your

 7  Honor.

 8          THE COURT:  And the other cross examination, sir?

 9          MR. WILKINS:  About 10 to 15 minutes.

10          THE COURT:  Ms. Patek?

11          MS. PATEK:  It will be less than that, Your Honor.

12          THE COURT:  All right.  So we'll reconvene next

13  Monday morning at 9:00 a.m.

14      Now I have been advised regarding exhibits and your other

15  property that your choices are a little more constrained at

16  this point.  You can either leave them in the jury room where

17  they will be locked, or you can take them with you.  But we

18  can't leave them in place between now and Monday.  I think

19  Judge Cook will be using this courtroom for other purposes.

20  Who else is the city intending to call, please?

21          MR. STEWART:  This is our last witness, Your Honor.

22          THE COURT:  All right.  Monday morning when we meet,

23  I would like some good faith estimate from the objecting

24  parties as to how long your case will take.  We need that

25  because if it's going to go beyond Thursday of that week, we

1  need to arrange for -- for courtrooms after that.

2      All right.  Any other further housekeeping matters?  Yes,

3  Ma'am.

4          MS. LEVINE:  Your Honor, just a question.  Assuming

5  the witnesses conclude maybe even Monday or Tuesday, can

6  closings be after we submit our briefs on 11-13 on Wednesday,

7  or are you going to want closings to be --

8          THE COURT:  No, I want closings immediately after

9  the conclusion of the proofs.

10          MS. LEVINE:  Thank you.

11          MR. DECHIARA:  One question in that regard, Your

12  Honor.  Is it your expectation that if we are not finished for

13  whatever reason Tuesday afternoon that we will go Wednesday

14  despite the current mediation order that's in place?

15          THE COURT:  I had not taken that into account.  Is

16  this something you need to know now, or can I get back to you

17  on Monday on that?

18          MR. DECHIARA:  No, you can get back to us on Monday,

19  Your Honor.

20          THE COURT:  All right.  If -- if -- if I don't,

21  please remind me of this question.  Anything further, anyone?

22  All right.  We'll stand in place while Mr. Orr takes his exit.

23  And my apologies to you for blasting out of here at lunch

24  without giving you that opportunity, sir.

25  A    Thank you.  Thank you.

1        THE COURT:  But go ahead and we'll just wait here.

2    (WITNESS KEVYN ORR WAS EXCUSED AT 2:59 P.M.)

3        THE COURT:  Jim, you'll let us know when we can go.

4 Ready?

5        THE CLERK:  All rise.

6        THE COURT:  All right.

7        THE CLERK:  Court is adjourned.

8    (Court Adjourned at 2:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-4-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                              .        Detroit, Michigan
                              .        November 4, 2013
                Debtor.       .        9:01 a.m.
. . . . . . . . . . . . . . .

           HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
            BEFORE THE HONORABLE STEVEN W. RHODES
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>        JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>        JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882<br><br>Clark Hill, PLC<br>By:  RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI  48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &<br>   Freedman, P.C.<br>By:  BARBARA A. PATEK<br>        JULIE BETH TEICHER<br>        DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>        PETER D. DECHIARA<br>        THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>      ANTHONY B. ULLMAN<br>      ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>      MEREDITH E. TAUNT<br>      MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning.

4    MR. MONTGOMERY:  Good morning.

5    THE COURT:  It appears that everyone is here.

6  Before we continue with the trial, Mr. Montgomery, may I have

7  your attention for a moment, please?

8    MR. MONTGOMERY:  Yes, sir.

9    THE COURT:  As you know, the city has filed a motion

10  to adjourn the preliminary injunction hearing that we had

11  tentatively set for Friday.  Is it okay with you if we have a

12  hearing on that motion to adjourn tomorrow morning before the

13  trial?

14    MR. MONTGOMERY:  I think that would be fine, your

15  Honor.  I think the debtor had proposed that we file

16  objection papers today, and so I believe that is our

17  intention to file --

18    THE COURT:  If you feel the need to do that, that's

19  fine.  Otherwise we can just have a conversation about it

20  tomorrow morning.

21    MR. MONTGOMERY:  In any case, we will be here

22  tomorrow morning, your Honor.

23    THE COURT:  All right.

24    MR. MONTGOMERY:  Thank you.

25    THE COURT:  We'll notice that for hearing then.  All

1   right.  We will continue with Mr. Orr's testimony.

2           MS. BRIMER:  Good morning, your Honor.  Lynn M.

3   Brimer appearing on behalf of the Retired Detroit Police

4   Members Association.

5           KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

6                   CROSS-EXAMINATION

7   BY MS. BRIMER:

8   Q   Good morning, Mr. Orr.

9   A   Good morning, Ms. Brimer.

10  Q   Mr. Orr, I'd like to just go back over without

11  duplicating any of the testimony a couple of items just to be

12  sure I have everything clear.  When you were present at the

13  January 29 presentation by the Jones Day attorneys, were

14  you -- did you leave the room at any time during the Jones

15  Day presentation?

16  A   No.

17  Q   During the presentation, did you hear any of the members

18  of the Jones Day team advise the city, the mayor, or the City

19  Council that they had been involved with Treasurer Dillon and

20  other members of the state in connection with the drafting of

21  the consent agreement?

22  A   The mayor and the City Council weren't there, no.

23  Q   Did they advise anyone on behalf of the city that they

24  had been involved in drafting the consent agreement?

25  A   Not that I recall.

1    Q    To your knowledge, did they advise anyone on behalf of

2    the city that they had been involved in the redrafting or the

3    drafting of Public Act 436?

4              MR. SHUMAKER:  Objection, your Honor.  It states --

5    misstates facts not in evidence.

6              THE COURT:  Overruled.  Please answer the question.

7              THE WITNESS:  Not that I recall.

8    BY MS. BRIMER:

9    Q    When did you first learn that members of Jones Day had,

10   in fact, been involved with the drafting of the consent

11   agreement, if at all?

12   A    I don't know that.

13   Q    Okay.  You are aware that members of the Jones Day team

14   gave advice to Treasurer Dillon in connection with drafting a

15   law to replace PA 4 in the event PA 4 was repealed; correct?

16   A    No.

17   Q    I'd like to direct your attention to Exhibit 866.  In

18   January of 2013, you were with the bankruptcy department at

19   Jones Day; correct?

20   A    Yes.

21   Q    And you were in the Washington office?

22   A    Yes.

23   Q    What office was Mr. Moss in in January of 2013?

24   A    Washington.

25   Q    We've already talked about this exhibit, and that is you,

1  Kevyn, that is referred to a few paragraphs into the e-mail;

2  correct?

3  A   Yes.

4  Q   And I believe this e-mail is in evidence.  I did not ask

5  you -- it refers to, "Check with Mr. Moss regarding updating

6  our Chapter 9 paper."  What Chapter 9 paper, if you know, is

7  Ms. Ball referring to in that paragraph?

8  A   I don't recall.

9  Q   Are you familiar with a paper that was drafted by members

10  of Jones Day in connection with Chapter 9 and the treatment

11  of pensions?

12  A   At this time?

13  Q   At any time.

14  A   Yes.

15  Q   Do you recall the name of that article?

16  A   No.

17          MS. BRIMER:  Your Honor, may I, just to refresh his

18  memory?

19          THE COURT:  Yes.  So the question is whether what

20  Ms. Brimer just handed you refreshes your recollection on the

21  name of that article.

22          THE WITNESS:  No.

23  BY MS. BRIMER:

24  Q   Have you ever seen the article before, Mr. Orr?

25  A   I don't think so.

1    Q    What office was Mr. Ellman in in January of 2013?

2    A    Atlanta.

3    Q    Was Mr. Ellman a member of the bankruptcy department at

4    Jones Day?

5    A    Business restructuring and reorganization group.

6    Q    Is that different than the bankruptcy department, or is

7    that the department you were in as well?

8    A    It's the same one I was in.  It just has a broader

9    connotation.

10   Q    All right.  Now, I'd like to refer your attention to

11   Exhibit 860.  This is an e-mail from Ms. Ball, and as you'll

12   see, you'll note that you're one of the -- you are a

13   recipient of this.  Do you see that?

14   A    Yes.

15   Q    It's dated 1-28.  That's the day before the presentation

16   by Jones Day; is that correct?

17   A    Yes, I believe so.

18   Q    And do you recall reviewing this e-mail?

19   A    I suspect I did.

20   Q    You have no reason to believe you didn't review it at the

21   time?

22   A    That's correct.

23   Q    You'll notice the first sentence, "Just heard from

24   Buckfire."  Do you believe that is Ken Buckfire from Miller

25   Buckfire?

1   A   Yes.  Well, strike that.  I'm not sure.

2   Q   But it would be a representative of Miller Buckfire?

3   A   It could be, yes.

4   Q   Could it be anyone else?

5   A   I think it would be somebody affiliated with Miller

6   Buckfire.

7   Q   And you'll see a little bit further down "questions that

8   Miller Buckfire has drafted for interview."  See that?

9   A   Yes.

10   Q   So the Jones Day team had the interview questions prior

11   to the interview.  Is that what we can interpret from this?

12   A   I don't know that.  You could interpret that.

13   Q   Okay.  And then you'll see much further down how can the

14   costs, especially legal costs, be controlled, strong advice,

15   not to mention a thousand hours except to say we don't have

16   major learning curve.  Do you know what that thousand hours

17   is referring to?

18   A   No.

19   Q   Is that thousand hours referring perhaps to the thousand

20   hours that members of the Jones Day team already has in this

21   project?

22   A   I don't know.

23   Q   Did you ever discuss with any of the members of Jones Day

24   what they had done in order to prepare for the presentation?

25   A   Yes.

1   Q   And what were you advised by the other members of the

2   presentation team regarding the Jones Day preparation for the

3   project?

4   A   I get the gist of your question. Nothing regarding

5   anything related to prior orders -- hours. Anything we

6   discussed concerned putting on the presentation.

7   Q   Were any other members of the team that made the

8   presentation also in the Washington, D.C., office of Jones

9   Day?

10   A   Yes.

11   Q   And who was that?

12   A   Steve Brogan.

13   Q   That's the managing partner?

14   A   Yes.

15   Q   So your managing partner never discussed with you any of

16   the prior involvement that Jones Day had with the State of

17   Michigan relative to the City of Detroit's finances?

18   A   No, not that I recall.

19   Q   You indicated you had recused yourself from the Jones Day

20   RFP. Do you recall when you did that?

21   A   I believe it was sometime in February.

22   Q   Was it early February, late February?

23   A   I don't recall a specific date.

24   Q   Was it before you submitted your application -- at some

25   point you submitted an application on line for the EM

1  position; is that correct?

2  A   Oh, yes.  It was before that.

3  Q   So do you recall when you submitted that application?

4  A   That would have been late February or March.

5  Q   Could it have been as early as February 15th?

6  A   It might.

7       MS. BRIMER:  I'd like to show him something else,

8  your Honor, to refresh his recollection.  The date is

9  important to my cross-examination.

10      THE COURT:  Refresh his recollection regarding the

11 date?

12      MS. BRIMER:  Regarding the date.

13      THE COURT:  Yes, you may.

14 BY MS. BRIMER:

15 Q   I don't believe that this is in evidence.  I'd just like

16 you to take a look at the paragraph in the middle of that

17 first page.  Does that refresh your recollection with respect

18 to the date that you submitted your application?

19 A   Yes.

20 Q   And so what date was that?

21 A   That says February --

22      THE COURT:  Well, the question is not what the

23 document says.  The question is what do you remember after

24 having reviewed the document.

25      THE WITNESS:  I thought it was later than this.  The

1   document has a date up here, but I'm not sure it's affiliated

2   with this e-mail.  It might well be.

3   BY MS. BRIMER:

4   Q   So was it about mid-February that you submitted your

5   application on line?

6   A   This appears to say so.

7   Q   I'd like to direct your attention to Exhibit 865, and

8   this exhibit is in evidence as well.  This is an e-mail from

9   Ms. Ball directly to you.  Do you see that?

10  A   Yes.

11  Q   It's dated February 11th --

12  A   Yes.

13  Q   -- correct?

14  A   Yes.

15  Q   Do you recall reviewing this e-mail?

16  A   I have no independent recollection, but I have no reason

17  to believe that I did not review it.

18  Q   So if we could move down -- the third paragraph from the

19  bottom, do you see that paragraph?  "Given an alternative, I

20  am not sure that an immediate Chapter 9 is superior.  If we

21  can get time, it would be better.  The city is not ready for

22  a Chapter 9, hyphen, at least not the one we would like.  It

23  would be better to negotiate with creditors and assess city

24  management, et cetera."  Do you know who Ms. Ball is

25  referring to when she says "not the one we would like"?

1  A  No.

2  Q  If you look back up at the parties that this e-mail has

3  been addressed to, is there anyone other than Jones Day --

4  A  No.

5  Q  -- attorneys on that?

6  A  No.

7  Q  So other than Jones Day attorneys, you believe that the

8  "we" could have been referring to anyone other than the Jones

9  Day personnel?

10  A  It could have been; it could not have been.

11  Q  So at least as early as February 11th, the Jones Day

12  attorneys were contemplating and believed a Chapter 9 was

13  appropriate for the City of Detroit; is that correct?

14  A  No.

15  Q  What do you interpret from this paragraph that Ms. Ball

16  has sent out to the Jones Day attorneys?

17  A  It says it might be appropriate, it might be appropriate

18  to negotiate with creditors and assess city management.

19  Q  So other than the fact that an immediate -- "I'm not sure

20  an immediate Chapter 9 is superior, at a minimum, not the one

21  we would like," must be referring to Jones Day personnel, is

22  it -- does it not, because there's no one else on the e-mail?

23          MR. SHUMAKER:  Objection.  Asked and answered.

24          MS. BRIMER:  I'll withdraw it.

25          THE COURT:  All right.  The question is withdrawn.

1  BY MS. BRIMER:

2  Q   And we can also interpret this that at least in January

3  11th you're still involved with the Jones Day process;

4  correct?  I mean February 11th you're still involved with the

5  Jones Day application for appointment as counsel for the

6  city; correct?

7  A   I might have been.  I don't recall independently.

8  Q   Well, it is directed -- we'll go back up to who this is

9  directed to.  It's only directed to you, and the other

10  parties on it are carbon copies, not direct recipients;

11  correct?

12  A   Yes.

13  Q   So I'd like to direct your attention to Exhibit 8 -- 808.

14  This is a series of e-mails between yourself and the governor

15  and Mr. Baird; correct?

16  A   The one in the middle?

17  Q   Well, it starts -- if you go to page 2, it starts with an

18  e-mail from --

19        THE COURT:  Would you like the paper copy, sir?

20        THE WITNESS:  It would be helpful if counselor would

21  like me to read the whole e-mail.

22        MS. BRIMER:  I can hand him a paper copy, your

23  Honor.

24  BY MS. BRIMER:

25  Q   So it begins with an e-mail from Governor Snyder to you;

1    correct?

2    A    Yes.

3    Q    And then it continues with some other e-mails between

4    yourself and other representatives of the state, correct,

5    Richard Baird?

6    A    Yes.  There's e-mails copied to Mr. Baird.

7    Q    And the date of the -- then the final e-mail is dated

8    February 15.

9    A    Yes.

10   Q    It's an e-mail from you to Ms. Ball and other members of

11   the Jones Day team; correct?

12   A    Yes.

13   Q    So on February 15 at about the time you were applying --

14   submitting your application, you're still keeping the Jones

15   Day team -- in fact, it says, "They're pretty good at keeping

16   me in the loop," so you're still keeping your Jones Day team

17   in the loop on what's going on between yourself and the

18   representatives of the state; is that correct?

19   A    Yes.  That's what this e-mail says.

20   Q    This e-mail was three days after -- if you will recall,

21   three days after the governor had indicated that you were the

22   candidate he intended on supporting; is that correct?

23   A    I don't recall that.

24   Q    All right.  Well, then we can go back to an e-mail we

25   discussed, which is 807.  We discussed this e-mail, and I'm

1  trying not to duplicate testimony we've already had, but at a

2  minimum, on February 12th, if you'll scroll down, you'll see

3  that Mr. Baird has indicated to you -- and we discussed this

4  on Friday -- that you were the candidate that the governor

5  intended on supporting.  In fact, they were arranging for the

6  church and pastor is the language that Mr. Baird used,

7  correct, on the -- if you --

8           MS. BRIMER:  And I'll hand him a hard copy, your

9  Honor.

10          THE COURT:  Okay.

11          THE WITNESS:  Okay.  Thank you.  Okay.

12  BY MS. BRIMER:

13  Q   So at what point would you have thought it appropriate to

14  withdraw yourself from the Jones Day team that was

15  negotiating and dealing with the city and the state for its

16  engagement after you were already aware that the governor was

17  supporting your application for the appointment as --

18  A   I recused --

19  Q   -- emergency manager?  Okay.  Go ahead.

20  A   I recused myself at some point during the process.  I

21  believe there are two e-mails speaking to that recusal.  If

22  you have them to refresh my recollection, that would be

23  helpful.  I don't recall the specific date.

24  Q   So at what point did you become aware that the Jones Day

25  personnel were interested in filing a Chapter 9 for the City

1  of Detroit?

2  A   The documents speak to it and the presentation, but the

3  implication is that they were interested in filing it, and I

4  don't know if that's true.  The document you showed me said

5  that we should first negotiate.

6  Q   How about if we take a look at Exhibit 853?  This is an

7  e-mail the day prior to the Jones Day presentation dated 1-

8  28, 2013.  Do you see that?

9  A   Yes.

10 Q   And it is from Mr. Ellman to various members of the Jones

11 Day team.  You're included in that.

12 A   Yes.

13 Q   You recall reviewing this e-mail, Mr. Orr?

14 A   I have no independent recollection, but there's no reason

15 for me to believe I would not have reviewed it.

16 Q   So the first paragraph from Mr. Ellman, "The RFP process

17 will inevitably lead to some internal issues about the

18 various certifications and commitments that the city may

19 require and that Jones Day may not want to give," do you know

20 what certifications and commitments Mr. Ellman is referring

21 to?

22 A   No.

23 Q   Did you ever inquire with Mr. Ellman of the

24 certifications and commitments that he was referring to?

25 A   Not that I recall.

1    Q    You didn't think it was important prior to giving a

2    presentation for this engagement to understand what

3    commitments and commitments -- what certifications and

4    commitments may cause a problem for Jones Day?

5    A    Not prior to the presentation, no.

6    Q    Then if you'll look a little further down, there's an e-

7    mail from an Amy Ferber also at Jones Day.  It's to various

8    members of Jones Day, including yourself.  Do you see that?

9    A    Yes.

10   Q    I believe Debtwa News we've established is the Detroit

11   bankruptcy -- the Detroit engagement; correct?

12   A    I believe so.

13   Q    So just in paragraph 1, the last sentence, this is

14   discussing the other -- some of the other firms that would be

15   interviewing, one of them being Foley & Lardner, and they

16   would be taking Ken Klee with them.  Mr. Klee this indicates

17   is involved in the Jefferson County bankruptcy, and you'll

18   see the last paragraph.  "It should also prove interesting

19   that MB" -- MB must be Miller Buckfire -- "has said that no

20   one wants this bankruptcy to go the way of Jeff County,"

21   Jefferson County, which, of course, Ken is running, so no one

22   wants this bankruptcy.  It's already predetermined from this

23   e-mail, isn't it, Mr. Orr, that there will be a bankruptcy

24   for the City of Detroit?

25   A    No.

1    Q    Then I'll direct your attention down to paragraph 4.  "We

2    are to be as detailed as possible in our discussions of

3    specific issues facing the city, OPEB, but avoid pitfalls of

4    alienating the state.  If something happens to the city's

5    pensions, state will probably step up to deal with this but

6    thus far has failed to concede this point," so at least as

7    early as January 28th, you were aware and the Jones Day team

8    was aware that covering the unpaid pensions was a possibility

9    from the state; correct?

10   A    Was a possibility?

11   Q    Yes.

12   A    Anything is possible, yes.

13   Q    Have you requested that the state cover any shortfall for

14   the pensions as of today?

15   A    Not directly, no.

16   Q    So based on this e-mail, it's a foregone conclusion as of

17   January 28th that Detroit will be filing a bankruptcy, isn't

18   it?

19   A    No.

20           MS. BRIMER:  Your Honor, I'd like to move for the

21   admission of this exhibit.  It was not one of the stipulated

22   exhibits.

23           THE COURT:  What number is that?

24           MS. BRIMER:  853, your Honor.

25           THE COURT:  Any objections to 853?

 1              MR. SHUMAKER:  I believe it's already in evidence,

 2   your Honor.

 3              THE COURT:  Ah, let's just check.  It wasn't on the

 4   original list.  Kelli, do we show it in the meantime?  All

 5   right.  Well, if it hasn't been admitted, we'll admit it now.

 6         (Exhibit 853 received at 9:29 a.m.)

 7              MS. BRIMER:  Thank you, your Honor.

 8   BY MS. BRIMER:

 9   Q   Were you at all involved in the preparation of the RFP by

10   Jones Day?

11   A   Yes.

12   Q   And what was your involvement?

13   A   Generally speaking, reviewing drafts, perhaps preparing

14   comments, things along those lines.

15   Q   Do you know when that process took place?

16   A   I believe it took place sometime in mid to late January.

17   That was my involvement.

18   Q   809.  Well, again, this isn't the e-mail that I had

19   marked as 809.

20              MS. BRIMER:  Your Honor, if I may approach the

21   witness.  I don't even need this in.  I was going to refresh

22   his memory.

23              THE COURT:  Okay.

24   BY MS. BRIMER:

25   Q   So from that e-mail it's clear that the RFP was not even

1    issued to the firms until February 27th; is that correct?

2    A    This e-mail?

3    Q    Well, see, that's an e-mail to you.

4    A    I think we are talking about different documents.

5    Q    A different RFP?

6          MR. SHUMAKER:  Objection, your Honor.  The issue is

7    whether it refreshed the witness' recollection, I believe.

8          THE WITNESS:  Yeah.  I have no knowledge of --

9          THE COURT:  Don't testify about the content of the

10   document.  The only issue is what you remember after having

11   read it.

12         THE WITNESS:  Nothing related to this document, your

13   Honor.

14   BY MS. BRIMER:

15   Q    Were you involved with the Jones Day RFP that was

16   submitted in early March?

17   A    No.

18   Q    So to this day you're still unaware that the members of

19   the Jones Day team have been involved with the City of

20   Detroit since March of -- at least March of 2012?

21   A    No.  I became aware of it as part of this process.

22   Q    And when was that?

23   A    At some point last week or week before.

24   Q    Do you know when Jones Day's engagement agreement with

25   the city was executed?

```
 1   A   No.
 2   Q   Do you know if it was after you were appointed as the
 3   emergency manager?
 4   A   It might have been.
 5           MS. BRIMER:  I have nothing further, your Honor.
 6           MR. PLECHA:  Good morning, your Honor.  Ryan Plecha
 7   on behalf of the Retiree Association parties.
 8                      CROSS-EXAMINATION
 9   BY MR. PLECHA:
10   Q   Good morning, Mr. Orr.
11   A   Good morning, Mr. Plecha.
12   Q   I just have a couple of quick questions for you.  Prior
13   to the June 14th proposal for creditors, had you at that
14   point advised retirees that the city intended to cut accrued
15   vested pension rights?
16   A   I don't think so.
17           THE COURT:  Excuse me, sir.  Could you point that
18   microphone more at you?  Just turn it.  There you go.  Thank
19   you.
20           MR. PLECHA:  Thank you.
21   BY MR. PLECHA:
22   Q   Then isn't it also correct that the retirees would not
23   have had two years to prepare for those cuts?
24   A   No.
25   Q   It's not true?
```

1  A   No.

2  Q   How would the retirees have known that cuts were coming?

3  A   Issues regarding pensions and potential reductions were

4  discussed in this city for a number of years prior to my

5  appointment.

6  Q   Okay.  When do you know or when was the first time you

7  were aware of that?

8  A   When I was doing --

9       THE COURT:  Excuse me.  Is the question when did he

10 become aware of it, or when does he understand they were --

11 that these issues were first discussed?

12      MR. PLECHA:  When does he believe they were first

13 discussed?  Thank you, your Honor.

14      THE WITNESS:  I don't know a specific date, but I

15 know that in doing some research for the position, I recall

16 discussions in late 2011 and 2012 regarding OPEB and

17 pensions.

18 BY MR. PLECHA:

19 Q   And did that involve cutting vested pension rights?

20 A   I don't recall.

21 Q   Okay.  You or someone on your staff has requested answers

22 from the union on whether they would represent retirees;

23 correct?

24 A   Yes.

25 Q   Did anyone on your staff contact the Detroit Retired City

1   Employees Association to ask if they would represent
2   retirees?
3   A    I don't know.
4   Q    Did you ask anyone on the DRCEA?
5   A    Not personally, no.
6   Q    Okay.  Did you ask the Retired Detroit Police and Fire
7   Fighters Association if they would represent retirees?
8   A    Personally?
9   Q    Correct.
10  A    I don't think so.
11  Q    Did anyone on your staff?
12  A    I don't know.
13  Q    Upon taking office, did you have conversations with City
14  Council members?
15  A    Yes.
16  Q    Did you ask them if there were any retiree
17  representatives you should speak with?
18  A    I don't recall.
19  Q    Isn't it true that retiree representatives are entitled
20  under the city charter to attend budget hearings and
21  legislative proceedings of the city?
22  A    I believe citizens -- yeah.  I believe citizens are
23  entitled to attend those meetings, yes.
24  Q    Isn't it true that the DRCEA has been formally invited
25  and participated in budget hearings before City Council?

1  A    They may well have.

2  Q    Isn't it true that the RDPFFA has been formally invited

3  and participated in budget hearings before the council?

4  A    They, too, may well have.

5  Q    But you're not aware?

6  A    Not with specificity, counsel.

7  Q    To your knowledge, is the RDPFFA a plaintiff or co-

8  plaintiff in any of the July 2013 litigation?

9  A    I don't recall.

10  Q    Do you know if the DRCEA was a plaintiff or co-plaintiff

11  in any of the July 2013 litigation?

12  A    I don't recall.

13  Q    Did you ask either of those groups if they were going to

14  file a lawsuit?

15  A    Not that I recall.

16  Q    Then isn't it true that the RDPFFA and the DRCEA were not

17  being litigious?

18  A    If they weren't filing suits?

19  Q    "Yes" or "no" is okay.

20  A    I don't know.

21  Q    So how would they be litigious if they weren't filing

22  lawsuits?

23  A    They may have been.  Sitting here today, I don't know if

24  they joined suits or were involved or if they were working

25  together behind the scenes.  I don't know.

1  Q   Did you ever ask them?

2  A   No, I don't think I have.

3  Q   Did anyone on your staff ask them?

4  A   I don't know.

5  Q   Mr. Orr, you testified that you never turned down a

6  request for a meeting; is that correct?

7  A   Me or my staff, yes.

8  Q   Okay.  Do you recall receiving a letter from Ms. Shirley

9  Lightsey on May 4th requesting a meeting?

10  A   No.

11         MR. PLECHA:  If we could please show Exhibit 309,

12  which has been admitted into evidence.

13  BY MR. PLECHA:

14  Q   Do you recall receiving this letter?

15  A   No.

16  Q   Do you see that it clearly requests a meeting?

17  A   Yes.

18  Q   And that meeting never happened?

19  A   Not that I recall with me.

20  Q   Did you or anyone on your staff schedule a meeting

21  specifically with the DRCEA?

22  A   I don't recall.

23  Q   And do you see that it says that the DRCEA has been the

24  eyes and ears of the GRS system retirees, now nearly 12,000,

25  since 1960?

1   A    I see what it says on the document.

2   Q    At any of the meetings you attended relating to

3   restructuring, you testified that you answered all questions;

4   correct?

5   A    Yes.

6   Q    Did you ask the individuals asking those questions if

7   you, in fact, answered their questions?

8   A    I don't recall.

9   Q    So it's possible that you responded without actually

10  answering the heart of the question?

11  A    I don't know.

12  Q    Is it possible?

13  A    Anything is possible.

14  Q    But you didn't ask them if their answer -- if their

15  questions were answered; correct?

16  A    I just said I don't --

17  Q    Did you ask them --

18  A    I just said I don't recall.

19  Q    Okay.  Okay.  Do you have any agreement with Jones Day to

20  rejoin the firm after your EM term expires?

21  A    No.

22  Q    Did you have any discussions with Jones Day about

23  rejoining the firm?

24  A    No.

25        MR. PLECHA:  No further questions.

1          MS. PATEK:  Good morning, your Honor.  Barbara Patek

2    on behalf of the Detroit public safety unions.

3                          CROSS-EXAMINATION

4    BY MS. PATEK:

5    Q    Good morning, Mr. Orr.

6    A    Good morning, Ms. Patek.

7    Q    Mr. Orr, I want to start with the idea of metrics and

8    milestones, which you talked about in your testimony last

9    week.  When you became the emergency manager, did you seek

10   out or ask the state, the treasurer, the governor, any

11   representative of the state about establishing milestones or

12   metrics with regard to your going forward as the emergency

13   manager?

14   A    In what respect?

15   Q    In terms of -- well, you told us last week that, for

16   example, there were certain milestones or metrics that were

17   set forth in past consent agreements with the city that the

18   city did not meet.

19   A    Yes.

20   Q    Did you make any effort when you became the emergency

21   manager to attempt to negotiate with the state additional

22   milestones and metrics that might have facilitated your

23   performance?

24   A    Not that I recall.

25   Q    And you were asked by Ms. Brimer with regard to whether

1    you had sought any additional support from the state since

2    becoming appointed emergency manager, and you said not

3    directly.  Have you indirectly sought such support from the

4    state?  And I want to focus my question on from the time

5    period that you were appointed the emergency manager until

6    the date of the filing of the bankruptcy petition.

7    A    Yes.

8    Q    And can you tell us what support you've sought and how?

9    A    The Belle Isle lease relieves the city of tens if not

10   hundreds of millions of dollars in liability over 30 years.

11   MMSA assisting the city with rolling out the benefit plan

12   relieves the city of several million dollars of obligation.

13   For instance, also having the state assist us with tax

14   collection provides the city with enhanced revenue collection

15   and milestones, things of those nature -- things of that

16   nature, which are operational.

17   Q    Have you indirectly or otherwise asked the state for any

18   assistance with the anticipated unfunded pension liability?

19   A    You mean cash assistance?

20   Q    Yes.

21   A    Not directly.

22   Q    And what about indirectly?

23   A    Not that I recall.

24   Q    At the time you took the job as emergency manager for the

25   City of Detroit, you were a very experienced bankruptcy and

1    restructuring professional.  Is that fair?

2    A    I had practiced in the area of bankruptcy and

3    restructuring for a long period of time, yes.

4    Q    And you had extensive experience in Chapter 11 with

5    corporate or business reorganizations?

6    A    Yes.

7    Q    Did you also have experience with municipal

8    reorganizations either inside or outside of court?

9    A    Municipal reorganizations?

10   Q    Yes.  Municipal restructuring.

11   A    Not in the sense that you mean, no.

12   Q    You had not before participated as counsel in a Chapter

13   9?

14   A    That is correct.

15   Q    And you had not, I take it from your testimony,

16   participated in -- on behalf of a municipality in a

17   restructuring or reorganization in an effort to address

18   municipal debt?

19   A    I think in my days in Florida I did land use and other

20   types of practices, but I don't think it's the nature of what

21   you're inquiring about.

22   Q    And had you ever been involved in a restructuring or

23   insolvency proceeding where public safety was an issue in the

24   case?  And so I'm clear, I'm talking about municipal

25   provision of public safety.

1   A   Do you mean like police, fire, and EMS --

2   Q   Yes.

3   A   -- as opposed to public safety at large?

4   Q   Yes.

5   A   I get the gist of your question.  There are cases I'm

6   involved with that certainly had public safety implications,

7   but the nature of your question is of this character, and I

8   think it's fair to say not in the sense that you mean.

9   Q   And you have an impressive resume, but I take it you,

10   before your appointment as an emergency manager, never worked

11   as a police officer or a fire fighter?

12   A   I never worked as a police officer or fire fighter.

13   Q   And I take it upon undertaking your responsibilities as

14   emergency manager, you undertook to educate yourself about

15   the jobs that the police and fire do in the City of Detroit?

16   A   Yeah.  I'd like to think I had done some of that before

17   becoming emergency manager, but, yes, specifically with

18   regard to police and fire in the City of Detroit.

19   Q   And you would agree with me that the ability of the City

20   of Detroit to provide effective public safety services is at

21   the core of what's essential to Detroit's survival?

22   A   Yes.

23   Q   And would you agree with me that at the time you assumed

24   the role of emergency manager, that the working conditions

25   for fire and police in the City of Detroit were, in fact,

1    deplorable?

2    A    The working conditions were substandard.

3    Q    Would you agree that at the time you assumed the position

4    of emergency manager, that the police department was, in

5    terms of its ability to provide effective public safety,

6    undermanned?

7    A    The reason I'm hesitating, I've seen studies that address

8    deployment, so on and so forth, and whether it's a manpower

9    issue and the number of people that are doing clerical jobs

10   as opposed to the 30 percent that should be on the street, so

11   I don't know how to answer your question.  I don't know.

12   Q    You don't know the answer to that?

13   A    I don't know the answer, no.

14   Q    With respect to its ability to provide adequate fire

15   protection for the citizens, businesses, and visitors to the

16   City of Detroit, would you agree that the Detroit Fire

17   Department was, at the time you assumed the position of

18   emergency manager, undermanned?

19   A    I would agree that it was substandard, yes.

20   Q    And would you agree that one of your most important

21   obligations in the course of this city's restructuring is to

22   ensure that at the end of the day that the City of Detroit

23   has enough qualified, committed, well-trained, and well-

24   equipped police and fire fighters to provide effective public

25   safety for its residents, businesses, and visitors?

1    A    Yes.

2    Q    At the time you were involved in the Jones Day pitch

3    proposal to the City of Detroit in late January and perhaps

4    into early February of this year, did you have any

5    understanding with regard to whether or not, as a general

6    matter, public safety officers -- that is, police and fire --

7    were participants in the federal Social Security program?

8    A    As of the pitch?

9    Q    Yes.

10    A    I don't recall.

11    Q    At the time you assumed the position of emergency manager

12    in March of 2013, did you have an understanding as to whether

13    or not police and fire in the City of Detroit were

14    participants in the federal Social Security program?

15    A    I don't recall.

16    Q    Do you know whether or not by the time you issued your

17    financial operating plan for the City of Detroit in May of

18    2013 whether you were aware at that time that police and fire

19    fighters for the City of Detroit were not participants in

20    Social Security?

21    A    Yes.

22    Q    And I take it then certainly at the time of the June 14th

23    proposal you were also aware that they were not participants

24    in Social Security?

25    A    Yes.

1  Q   And did you also have an understanding that for police or

2  fire fighters hired before March 31st of 1986 those

3  individuals also were not participants or did not have

4  access, at least through their employment with the City of

5  Detroit, to the Medicare program?

6  A   No.

7  Q   Do you understand that sitting here today?

8  A   Yes.

9  Q   At the time you took the position of the emergency

10 manager, you indicated that you went back and you looked back

11 at the relationship between the various unions, including

12 public safety unions, and the City of Detroit.  Is that fair?

13 A   I think I did some of that prior to me becoming emergency

14 manager, but I think your statement is fair.

15 Q   So you had reviewed at least what would have been the

16 existing collective bargaining agreements at the time you

17 became the emergency manager?

18 A   I don't recall.

19 Q   Was it your impression that the city, as of the time that

20 you became the emergency manager, had made great strides

21 under the consent agreement in reducing costs imposed by the

22 active and expired collective bargaining agreements that

23 affected the city's relationship with the various unions?

24 A   No.

25 Q   Was it your impression that some of the cost savings that

1  the city had achieved prior to your assuming the role of

2  emergency manager had actually been achieved through interest

3  arbitration awards under Act 312?

4  A   I think it's fair to say there were cost savings achieved

5  associated with police and fire, but there were also

6  arbitration awards that restored some of those savings.

7  Q   You would agree that some of the cost savings, however,

8  that had been achieved had been achieved through the --

9  through Act 312 interest arbitration awards?

10 A   Yes, some.

11 Q   At the time -- well, strike that.  Did you ever review

12 any of the concessionary agreements that had been negotiated

13 between the city and some of the public safety unions prior

14 to your assuming the role of emergency manager?

15 A   I don't recall.

16 Q   Are you aware sitting here today that such agreements, in

17 fact, existed?

18 A   Yes.

19 Q   And is it your understanding that those agreements were

20 never, in fact, implemented by the City of Detroit?

21 A   To be fair, there are aspects that may have been

22 implemented through CET's and through give-backs of costs,

23 but the agreements in toto I'm unaware of.

24 Q   So stated another way, there were, in fact, negotiated

25 agreements that included cost savings that were not made

1  effective or were not implemented in toto; correct?

2  A    Yes.

3  Q    And instead what happened was the city implemented the

4  aspects of those agreement that the city liked and imposed

5  them on the various unions?

6  A    I don't know the city liked or not.  I know that the city

7  implemented certain aspects of those agreements.

8  Q    And would it be fair to say that those -- they would --

9  well, strike that.  You were appointed -- or you assumed the

10  role of emergency financial manager on March 25th, 2013;

11  correct?

12  A    Yes.

13  Q    And that was three days before Public Act 436 became

14  effective?

15  A    Yes.

16  Q    And is it true that by virtue of your appointment on

17  March 25th, the city -- well, strike that.  Let me withdraw

18  that.  Were you or did you become aware of an Act 312 award

19  issued on or about March 25th, 2013, that involved the city

20  and the Detroit Police Officers Association?

21  A    Talking about the arbitrator, Mr. Roumell, DPOA award?

22  Q    Yes, I am.

23  A    Yes.  I think I became aware of that on or about the

24  25th.

25  Q    And did you review that award?

1   A   I don't recall, but I think I did.

2   Q   And do you recall -- did you play any role as the

3   emergency manager in any decision to appeal any portion of

4   the -- I'm going to call it the Roumell arbitration award?

5   A   I believe I was consulted and advised as to the reasons

6   why, so to that extent, yes.

7   Q   Okay.  And was it your understanding that the only

8   portion of the Roumell award that was appealed by the City of

9   Detroit was the portion of the award that would have given

10  back to the DPOA's members part of the ten-percent pay cut

11  that had been imposed on them?

12  A   Yeah.  If you're talking about the five-percent give-

13  back, that's -- there may have been other provisions, but I

14  recall that.

15  Q   And is it your understanding that the terms of that Act

16  312 award form now the basis of the contractual relationship

17  between the city and the Detroit Police Officers Association?

18  A   Without straying into a legal conclusion, I'm aware that

19  there's an Act 312 award.  I'm aware that there's an appeal

20  of the award.  I'm aware that it gave back five percent.

21  Q   And are you -- do you have an understanding here today as

22  to whether or not that Act 312 award, leaving aside the

23  appeal of the five-percent give-back, governs the

24  relationship between the City of Detroit and the Detroit

25  Police Officers Association and its members as we sit here

1  today?

2          MR. SHUMAKER:  Objection, your Honor.  Relevance.

3          MS. PATEK:  Your Honor, I think it's absolutely

4  relevant.  I think the -- I think to date the city has not

5  directly acknowledged that there is a contract between the

6  Detroit Police Officers Association and the city, and it's

7  our position that there is.

8          THE COURT:  How is that relevant to eligibility?

9          MS. PATEK:  I think it's relevant to eligibility

10  from the standpoint of the city's obligations with respect to

11  negotiating.  It's a city's ability to impose terms in that

12  regard.

13          THE COURT:  All right.  It's arguable.  I'll permit

14  it.

15          THE WITNESS:  I don't know if it forms a contractual

16  relationship.

17          MS. PATEK:  Can I have City's Exhibit 75?  And I'm

18  looking at page 13.

19  BY MS. PATEK:

20  Q    Mr. Orr, I'm going to ask you to take a look at City

21  Exhibit 75 and look at the first few lines of -- under

22  "Bargaining Unit Overview."  And I'm going to ask you if

23  the -- reading that -- well, strike that.  This is a document

24  that you authored; correct?

25  A    Can we just verify which document you're talking about?

1  This is the report?

2  Q   Yes.  This is City Exhibit 75 --

3  A   The May 12th report.

4  Q   -- the financial May -- yes.

5  A   Okay.  That's the financial and operating plan.  Okay.

6  Q   And you authored this document?

7  A   I and my team authored this document.  I didn't write it

8  out longhand.

9  Q   And this is the document that you told us was not a

10  plebescite.  This is just the fact of the way it is for the

11  City of Detroit as of May 12th, 2013.

12  A   Yes.  This is the document caught up in that interview

13  and all that statement.

14  Q   And --

15  A   Can we go back?

16  Q   Looking at the first sentence under "Labor Initiatives,

17  Bargaining Unit Overview, and Collective Bargaining Agreement

18  Consolidation," does that refresh your recollection as to

19  whether, in fact, the city had made great strides under the

20  consent agreement in reducing costs imposed by its numerous

21  active and expired collective bargaining agreements?

22  A   Yes, for all 48 CBA's.

23  Q   And some of those cost savings, as we've already

24  established, included the cost savings received by -- through

25  interest arbitration awards?

1  A   Yes.  I think we just talked about that.

2         MS. PATEK:  Can I have 720?  And if we can go to the

3  second page --

4  BY MS. PATEK:

5  Q   One of the things that Public Act 436 did was to allow

6  you, at your option, to suspend collective bargaining with

7  the various unions who had collective bargaining

8  relationships with the city; is that right?

9  A   Well, here again, without straying into legal

10  conclusions, I think the act does that by itself, but, yes,

11  it suspends collective bargaining for five years.

12  Q   You were not -- you could have at your option chose to

13  bargain collectively with the various unions.  Is that fair?

14  A   I'm not sure.

15  Q   Well, and, in fact, you did choose to do so with respect

16  to some of the transportation unions; isn't that right?

17  A   No.

18  Q   You did not continue to bargain collectively with the --

19  any of the transportation unions?

20  A   No.  I think I've instructed my team to make it very

21  clear that any discussions or negotiations we are engaged in

22  are not collective bargaining or waiving that provision under

23  the statute.

24         MS. PATEK:  I'm going to ask you to flip back to 75

25  for a moment, and I'd like page 14.

1  BY MS. PATEK:

2  Q   And if you look at the first sentence, Mr. Orr, when you

3  issued your March 12, 2013, report, was it accurate that the

4  city was currently bargaining with transportation employees

5  covered under Section 13(c) of the Federal Mass Transit Act?

6  A   Yes, but they have an exemption from other provisions,

7  which I think we validated at some point prior to this.

8  Q   So, in fact, the city was bargaining with the

9  transportation employees?

10  A   Transportation is separate under 13(c) of the Federal

11  Transportation Act.  They have an exemption which supersedes

12  the state provision of 436.

13  Q   Was it your understanding that you could not, even if you

14  wanted or chose to do so, bargain collectively with any of

15  the public safety unions after March 28th, 2013?

16  A   I'm not sure.  That may draw for -- call for a legal

17  conclusion.

18  Q   You don't know one way or the other?

19  A   Yeah.  I think that's correct.  I'd consult counsel.

20         MS. PATEK:  We can go back to page 2 of the

21  timeline.

22  BY MS. PATEK:

23  Q   Did you at some point in time shortly after your

24  appointment as emergency manager authorize city

25  representatives to file a motion in an effort to block Act

1  312 proceedings that had been filed by, among others, the

2  Detroit Police Command Officers Association and Detroit

3  Police Lieutenants and Sergeants Association?

4         MR. SHUMAKER:  Objection, your Honor.  Relevance.

5         MS. PATEK:  Again, your Honor, this goes to

6  negotiating in good faith.  I mean if --

7         THE COURT:  I'll permit it.  Go ahead.

8         THE WITNESS:  Yes, I believe so.

9  BY MS. PATEK:

10 Q   And do you know if you were aware at the time you

11 authorized the filing of that motion that the Detroit Police

12 Command Officers Association did not have a collective

13 bargaining agreement with the city?

14 A   DPCOA?

15 Q   Yes.

16 A   I don't recall.

17 Q   Were you aware that there were a number of collective

18 bargaining agreements, including the Detroit Police

19 Lieutenants and Sergeants Association's, which was scheduled

20 to expire on June 30th of 2013 at the time you authorized

21 that motion?

22 A   I believe a number of CBA's were due to expire on the

23 30th.  I don't recall with specificity if DPLSA's was one of

24 them.  I have no reason to believe that it was not.

25 Q   And are you aware that ultimately there was an order that

1   came out of the Michigan Employee Relations Commission, in

2   fact, on June 14th which blocked those Act 312 proceedings

3   from going forward?

4   A   I don't recall the date, but I remember an order.

5   Q   You knew before you assumed the role of emergency manager

6   that one of the issues you would have to find a way to

7   address was -- were the pension issues and the legacy costs

8   that faced the City of Detroit?

9   A   Yes, I believe so.

10   Q   And you certainly knew that that might entail having to

11   address the accrued vested pension rights of Detroit public

12   safety employees?

13   A   Yes, I believe so.

14   Q   And in terms of your ability to address those issues, you

15   had the benefit of multiple advisors, including Ernst &

16   Young, Conway MacKenzie, Miller Buckfire, Jones Day, Miller

17   Canfield, and the city legal department to help you get your

18   arms around what needed to be done to address those issues?

19   A   Yes.

20   Q   And all of those various advisors, I take it, assisted

21   you in preparing the first financial operating report that

22   was issued on -- or operating plan that was issued on May 12,

23   2013?

24   A   Yes.

25   Q   And Public Act 436, in fact, I think you testified

1   earlier, gave you 45 days to put together that financial

2   operating plan; correct?

3   A    Yes.

4   Q    And with the assistance of those advisors, you needed

5   every bit of those 45 days to do so?

6   A    We used 45 days, but there are analyses that were already

7   in the works.

8   Q    And we can agree that the financial operating plan was

9   not rolled out early, but it was rolled out in a timely

10  fashion?

11  A    Yes.  It was rolled out on time.

12  Q    And then you had -- I think we've talked about earlier on

13  June 10th you had your first public meeting at Wayne State

14  University to discuss that financial and operating plan?

15  A    Yes.

16  Q    And your first proposal with respect to what would happen

17  with the accrued vested pension benefits was rolled out four

18  days later on June 14th of 2013, about 75 days or two and a

19  half months after you took office?

20          MR. SHUMAKER:  Objection, your Honor.  Asked and

21  answered.

22          THE COURT:  Sustained.

23  BY MS. PATEK:

24  Q    And I don't want to go back over the time line of the

25  various meetings.  I want to jump ahead.  You know, we've

1    talked about the June 14th meetings, and I believe you

2    testified to some meetings June 20th, July 10th and 11th held

3    with the various unions, including the public safety unions.

4                 MS. PATEK:  I'd like to bring up -- I think it's

5    704, and this is in evidence.

6    BY MS. PATEK:

7    Q   Mr. Orr, have you seen this letter before?  It's a letter

8    on Detroit Fire Fighters Association letterhead dated July

9    12th, 2013.

10   A   I believe so.

11   Q   And wasn't one of your goals in terms of when you rolled

12   out the proposal on June 14th to -- in addition to addressing

13   the legacy costs, to establish some uniformity among the

14   contracts between the city and its various unions?

15   A   I think that's fair, yes.

16   Q   And this June 12th letter went to Mr. Miller and Mr.

17   Heiman, who were two of the contact people to whom people

18   were directed at the June 14th meeting and at the later

19   benefits meeting?

20   A   Yes.

21   Q   And if we scroll down to the bottom, this letter came

22   from the presidents of each of the four public safety unions;

23   that is, the fire fighters, the Detroit Police Command

24   Officers Association, the Detroit Police Lieutenants and

25   Sergeants Association, and the Detroit Police Officers

1　Association?

2　A　Yes.  I see their initials behind their signatures, but I

3　assume there was authority for them to sign it, so the answer

4　is yes.

5　Q　And would you agree with me that at this point in time

6　that it may have been beneficial for the city in terms of its

7　effort to get uniform contracts to be able to negotiate with

8　these four public safety unions as a coalition?

9　A　It may or may not have been either as a coalition or

10　either individually.

11　Q　You don't have an opinion one way or the other?

12　A　No.

13　Q　Do you know whether or not historically these unions had

14　negotiated individually as opposed to as a coalition with the

15　City of Detroit?

16　A　I don't recall.

17　Q　And during this letter, the individuals who sent the

18　letter were requesting specific restructuring proposals from

19　the city.  Do you see that in the third full paragraph?

20　A　Yes.  I see what it says.

21　Q　And we've covered this earlier.  You can agree that while

22　there was a statement that accrued vested pension benefits

23　would have to be significantly impaired, there was no

24　specific proposal as to by how much?

25　A　On June 14?

1    Q    Yes.

2    A    Yes.

3    Q    And I take it that would also have been true as of the

4    date of this letter as of July 12th?

5    A    I don't recall.

6    Q    Do you have any information sitting here today that there

7    was a more specific proposal provided to any of the Detroit

8    Fire Fighters Association, the Detroit Police Command

9    Officers Association, the Detroit Police Lieutenants and

10   Sergeants Association, or the Detroit Police Officers

11   Association as of July 12th, 2013?

12   A    Do I have any specific information that more detailed

13   information was provided?  Is that your question?

14   Q    That specific proposal --

15   A    Oh, okay.

16   Q    -- a more specific proposal was provided.

17   A    I don't recall.

18   Q    Do you know whether or not you received a copy of this

19   letter from anyone at or around July 12th, 2013?

20   A    I received it at some point.  I don't recall if it was at

21   or around the 13th, but somewhere in that time frame.

22   Q    Do you know whether or not you, as the emergency manager,

23   played any role in directing the city's response to this

24   communication from the four public safety unions?

25   A    There were a lot of discussions about reaching out to the

1    public safety unions, and that may have included this time or

2    later more information, so I don't recall with specificity if

3    it was at or around this time.

4    Q    And I want to skip down to the next paragraph in that

5    letter and actually the next two paragraphs.  The letter

6    states that the four public safety unions were reviewing and

7    will provide the city with specific proposals, but it would

8    be productive if the city could provide us with its specific

9    proposals on pension benefit restructuring as soon as

10   possible.  Do you see that?

11   A    Yes.

12   Q    This was six days before the city filed its bankruptcy

13   petition; correct?

14   A    I believe so.

15   Q    Do you know whether or not anybody either from Jones Day

16   or from your office made any effort to contact any of these

17   four individuals with regard to providing them with

18   counterproposals?

19   A    I know there were a lot of discussions with certain

20   groups here.  I don't know if they were provided with

21   specific proposals.

22   Q    I want to jump ahead to Exhibit 705.  And we know in

23   terms of our timeline that on July 16th you had already

24   written the governor to ask for authorization to file for

25   Chapter 9 protection; correct?

1   A    Yes.

2   Q    And have you seen this letter before, that being Exhibit

3   705, which is a July 17th, 2013, letter on Jones Day

4   stationery?

5   A    Yes.

6   Q    And the letter is addressed to the four presidents of the

7   four Detroit public safety unions, is it not?

8   A    Yes.

9   Q    And the letter itself does not indicate whether it was

10  transmitted by e-mail, regular mail, or some other means?

11  A    That's correct.  I don't see it.

12  Q    The letter starts out, "Thank you for your letter of July

13  12th, and thank you for further continuing to discuss in good

14  faith the difficult issue of pension restructuring.  The

15  office of the emergency manager appreciates your strong

16  cooperation."  Do you know if you directly authorized the

17  sending of this letter?

18  A    I instructed my team to continue cooperating and reaching

19  out to the various stakeholders.  I don't recall if I

20  directly authorized this particular letter.

21  Q    Was it your impression and understanding that as of July

22  17th, 2003 (sic), that the four public safety unions were

23  cooperating and, in fact, providing strong cooperation in

24  terms of being willing to discuss and negotiate and address

25  the difficult legacy cost issues that were facing the city?

1    A    It was my understanding that there were ongoing

2    discussions without characterizing the level of cooperation.

3    Q    You certainly would not have authorized the lawyers at

4    Jones Day to put something that was not true in a letter

5    going out to the public safety officers?

6    A    I certainly would hope not.

7    Q    Is it your position prior to the filing of the

8    bankruptcy -- well, strike that.  As a bankruptcy

9    practitioner, you've been involved in, I take it, many

10   difficult negotiations.

11   A    Yes.  I think that's fair.

12   Q    And we can all agree that -- even those of us who are

13   litigators, that a consensual solution is generally

14   preferable to a litigated solution?

15   A    Yes.  We can agree with that.

16   Q    Because it gives both parties input into and control --

17   at least some control over the outcome?

18   A    There are a number of reasons, but those are part of

19   them, yes.

20   Q    And it also gives the participating parties some

21   ownership of whatever that decision turns out to be?

22   A    There are a number of reasons.  Among them may be those

23   reasons as well.

24   Q    You are certainly aware of the give and take that's

25   necessary in such negotiations for them to be successful?

1  A   Yes.

2  Q   And you're also aware that sometimes, especially when the

3  issues are complicated and long-standing, that they can take

4  an extended period of time?

5  A   Sometimes they can; sometimes they can't.

6  Q   Did you ever consider upon assuming the role of emergency

7  manager at any time prior to the filing of the bankruptcy

8  petition using the opportunity to potentially extend the

9  contracts of the four Detroit public safety unions as a

10  bargaining tool to address the difficult legacy and pension

11  issues facing the city?  And that's a "yes" or --

12  A   I may have.  I don't recall with specificity.

13  Q   You elected not to do so, however?

14  A   We may have with regard to some of the bargaining units.

15  I just don't recall.

16  Q   Did you consider, based upon your prior experience as a

17  bankruptcy practitioner, whether it might chill your ability

18  to negotiate these difficult pension restructuring issues

19  with the public safety employees to tell the unions that you

20  were exercising your right not to bargain collectively with

21  them?

22  A   No.

23  Q   With respect to -- well, strike that.  The June 14th

24  proposal that was put out at the airport, did that proposal

25  contain terms that could be accepted or rejected within the

1    time frame between June 14th and July 18th?

2    A   It might have.

3    Q   You can't say one way or the other?

4    A   No.  I'm saying people may have been willing to accept

5    terms in the proposal.  It might have.

6    Q   Well, there was no -- I think we've already established

7    there was no specific proposal with respect to how the

8    accrued vested pension benefits were going to be impaired by

9    that proposal.

10   A   I think that's correct.

11   Q   And so even if the public safety unions or one of the

12   other unions had been willing to accept, there really was not

13   a proposal with enough -- let's call it meat on it for them

14   to accept at that time?

15   A    I don't know what they would have required to accept, so

16   there might have been.

17   Q   Was it your -- well, in terms of the active employees,

18   you certainly understood by the time of the June 14th

19   proposal that for the police and -- active police and fire

20   employees that if their pension benefits were significantly

21   impaired by the restructuring, that they would not have

22   through their employment at the City of Detroit the benefit

23   of falling back on Social Security?

24   A   I think that's fair.

25   Q   And you also understood -- strike that.  Did you have an

1 understanding in terms of the pension restructuring as to how

2 that restructuring would affect their ability to receive duty

3 disability; that is, for police and fire fighters who were

4 disabled as a result of on-the-job injuries, whether and how

5 they would be impacted by the restructuring proposal?

6 A    Did I have an understanding when?

7 Q    As of June 14th when you made -- when you put the

8 restructuring proposal out at the airport --

9 A    Right.

10 Q    -- did you have an understanding as to how significant

11 impairments of accrued vested pension benefits would affect

12 disabled police and fire fighters?

13 A    I think sometime around this time, I had a general

14 understanding, including disability and physical therapy.  I

15 don't recall if it was with the level of specificity you seem

16 to be implying.

17 Q    Can you tell me generally what your understanding was?

18 A    Well, my understanding was that there would have been

19 impacts to some of their coverage, and we were discussing

20 perhaps ways of addressing that.

21 Q    As rolled out, the June 14th proposal did not address

22 those issues, though; correct?

23 A    I don't think the proposal itself did.

24          MS. PATEK:  I think that's all I have, Mr. Orr.

25          THE WITNESS:  Thank you.

```
 1          THE COURT:  Any other questions for the witness?
 2   All right, sir.  You are excused.
 3          MR. SHUMAKER:  Your Honor, I do have a few redirect
 4   if I could.
 5          THE COURT:  Oh, you do?
 6          MR. SHUMAKER:  Yes, if I may.
 7          THE COURT:  I didn't hear you reply.
 8          MR. SHUMAKER:  I'm sorry.  I thought you were asking
 9   the objectors.
10          THE COURT:  Go for it.
11          MR. SHUMAKER:  Sorry about that, your Honor.  For
12   the record, Gregory Shumaker of Jones Day for the city.
13                    REDIRECT EXAMINATION
14   BY MR. SHUMAKER:
15   Q   Good morning, Mr. Orr.
16   A   Good morning, Mr. Shumaker.
17   Q   I'm going to jump around here a little bit, but I'd like
18   to ask you a few questions about some of the questions you've
19   been asked over the last three days of cross-examination.
20   I'd like to show you Exhibit 418, and I believe Mr. Ullman,
21   if you can recall back that far, asked you a few questions
22   about this document, and this is the Jones Day pitch book;
23   correct?
24   A   Yes.
25   Q   Mr. Ullman showed you a page where Jones Day discussed
```

1  filing a Chapter 9 case if one was warranted.  Do you recall

2  that?

3  A   Yes.

4  Q   I want to show you a page that Mr. Ullman did not show

5  you.

6       MR. SHUMAKER:  Go to page 13.  Thank you.  And could

7  you blow up the top there, Laurie?

8  BY MR. SHUMAKER:

9  Q   Mr. Orr, you just testified in response to some of Ms.

10 Patek's questions that out-of-court solutions are preferred.

11 Was this -- first of all, was this slide shown to the

12 participants of the January 29th --

13 A   Yes.

14 Q   -- meeting?  And did you agree with this slide when it

15 was shown?

16 A   Yes.

17 Q   Why would out-of-court solutions be preferred?

18 A   For a number of reasons listed here but also because, as

19 I think I testified during my cross with Mr. Ullman, the

20 issues that are being discussed in this deck had been

21 examined by the city over a number of years.

22 Q   And the benefits listed are the ones that you're

23 referring to down below?

24 A   Yes.

25 Q   When you became emergency manager, did you agree that an

1  out-of-court solution was preferable?

2  A   Yes.

3  Q   Is that what you were aiming for in the months from March

4  25th through July 18th?

5  A   Yes.

6        MR. MONTGOMERY:  Objection.  Leading, your Honor.

7        THE COURT:  No.  That question is not leading.  I'll

8  permit it.  Go ahead.

9        THE WITNESS:  Yes, your Honor.

10  BY MR. SHUMAKER:

11  Q   Mr. Orr, at the bottom of that slide, there's a point

12  that says "extremely difficult to achieve in practice."  Do

13  you see that?

14  A   Yes.

15  Q   Do you have any understanding as to why Jones Day would

16  share that message with the city?

17  A   Yes.

18  Q   And why is that?

19  A   Typically out-of-court solutions require parties to agree

20  to significant concessions in some cases to deal with legacy

21  issues that have been under discussion and under review for a

22  long period of time.  Oftentime parties are unwilling for a

23  number of reasons to do that.

24  Q   Is there anything in your subsequent experience as

25  emergency manager that has made you believe in any way that

1    Jones Day was wrong in that assessment?

2    A    No.

3    Q    Mr. DeChiara showed you Exhibit 44.

4         MR. SHUMAKER:  If we could put that up, please.

5    BY MR. SHUMAKER:

6    Q    And he showed you page 61 of that document.

7         MR. SHUMAKER:  If you could blow that up, please.

8    BY MR. SHUMAKER:

9    Q    Mr. DeChiara asked you a number of questions and

10   suggested that you had not stuck to the schedule because you

11   had filed on July 18th instead of July 19th.  Do you recall

12   that?

13   A    Yes.

14   Q    He also indicated that someone had started drafting your

15   letter requesting authorization to file a Chapter 9 filing

16   earlier that week or later in the prior week.  Do you recall

17   that testimony?

18   A    Yes.

19   Q    Did you believe that having someone start drafting up

20   your request for authorization was inconsistent with what you

21   had told the June 14 meeting participants?

22   A    No, not at all.

23   Q    Why was that?

24   A    We had said at the meeting that we had to make some very

25   difficult decisions.  If we were getting proposals in in the

1  nature of term sheets or agreement in principles, we might

2  extend it for another 30 days, but if we were not within that

3  time frame, that we were going to have to make a hard call.

4  I think I said the same thing at the June 10th meeting for --

5  public meeting and that, in fact, we were not getting

6  progress along those lines within this time frame.

7  Q   So you mentioned the fact of possibly having to file a

8  Chapter 9 at both the June 10th and the June 14th meetings?

9  A   Yes.

10  Q   Were you keeping that fact, that there might have to be a

11  Chapter 9 filing, from those meeting attendees?

12  A   No.

13  Q   Mr. DeChiara also showed you another document.  It was

14  Exhibit 620.

15        MR. SHUMAKER:  If you could put that up, please.

16  BY MR. SHUMAKER:

17  Q   I'm looking -- he was asking you about the second e-mail

18  down.  It starts out "Kevyn."

19        MR. SHUMAKER:  Yes.  Thank you.

20  BY MR. SHUMAKER:

21  Q   And Mr. DeChiara focused your attention on, I believe,

22  the last sentence there.  Do you see that?  It starts with

23  "if you agree."

24  A   Yes.

25  Q   Okay.  My question is -- and he referred you, if you

1  recall, to the last clause of that sentence that talked

2  about, "Then I think that clearly establishes that you are

3  already behaving as an agent of the state committed to

4  getting Detroit back on track."  Do you recall that?

5  A    Yes.

6  Q    And this e-mail was dated February 22nd, 2013; correct?

7  A    Yes.  That's what it says.

8  Q    On that date, did you believe you were acting as an agent

9  of the state?

10  A    No.  I believe Mr. Baird was just salesmanship and

11  puffing, no legal conclusion.

12  Q    Had you been offered the job of emergency manager at that

13  time?

14  A    I don't think so.

15  Q    Had you accepted the job of emergency manager at that

16  time?

17  A    No.

18  Q    Ms. Levine asked you a number of questions.  If you

19  recall, she asked you about a note that Ed McNeil had taped

20  to your door.  Do you recall that?

21  A    Yes.

22  Q    And she asked you a series of questions about whether you

23  had any meetings or phone calls with anybody from AFSCME

24  between March 25th and June 13th.  Do you recall that?

25  A    Yes.

1   Q    She even asked you if you'd ever been in the same room

2   with AFSCME officials?

3   A    Yes.

4   Q    And you couldn't recall; correct?

5   A    What are the dates?

6   Q    March 25th through June 13th.

7   A    Yes.

8   Q    You couldn't recall?

9   A    I couldn't recall.

10  Q    And Ms. Patek just asked you some questions about --

11  related questions about this, but was there anyone on your

12  team responsible for contacting the unions?

13  A    Yes.

14  Q    Including AFSCME?

15  A    Yes.

16  Q    Who were those team members?

17  A    We had a number.  Brian Easley of Jones Day would be

18  involved with the unions as well as Evan Miller.  Lamont

19  Satchel had contacts with the unions.  In fact, in the second

20  day, I believe AFSCME submitted a new two-year CBA, I think,

21  on the 27th, on the eve of the 28th.  There would have been

22  other members of the legal team involved whose names escape

23  me right now.

24  Q    I'm sorry.  Did you say Mr. Miller?

25  A    Yeah, Evan Miller, Brian Easley.  Another is Lamont

1    Satchel, who is the city's labor negotiator, and others.

2    Q   Do you know whether they ever made any contact with the

3    unions --

4    A   I believe so.

5    Q   -- during this time frame from March 25th through June

6    13th?

7    A   Yes.

8    Q   How about with AFSCME?

9    A   I believe so.

10   Q   Do you know whether they ever met with those officials?

11   A   I believe they did, but I don't know with which

12   officials.

13   Q   Do you know whether they sent them letters?

14   A   Yes.

15   Q   Did you instruct the team to contact the unions?

16   A   Yes.

17   Q   Including AFSCME?

18   A   Yes.

19   Q   Are you aware of communications between this team that

20   you just described and the unions?

21   A   Yes.

22   Q   I'd like to refer you to a document that is not in

23   evidence.

24           MR. SHUMAKER:  I do not know -- this document is

25   Exhibit 32, your Honor.  It's a composite exhibit, and it's a

1    lengthy one.  It's about 148 pages.  It is the -- provides

2    the underpinnings of Exhibit 32, which has been admitted into

3    evidence.  32 is the big chart.

4            THE COURT:  You mentioned 32 twice now.

5            MR. SHUMAKER:  Oh, I'm sorry.  Did I?  36.  I think

6    it's 36.

7            THE COURT:  36 is the one you're talking about?

8            MR. SHUMAKER:  Yes, your Honor.  Can you put up 36

9    now, please?

10           THE COURT:  36 is admitted.

11           MR. SHUMAKER:  Yes, your Honor.  And the question --

12   this document is not in evidence now.  We'd like to move into

13   evidence.  This is not 36.  I'm referring to --

14           THE COURT:  Which is the one you're moving now?

15           MR. SHUMAKER:  Exhibit 32.

16           THE COURT:  All right.  So you're making that motion

17   now?

18           MR. SHUMAKER:  Yes, your Honor.

19           THE COURT:  Is there any objection to the admission

20   into evidence of Exhibit 32?  All right.  It is admitted.

21      (Debtor's Exhibit 32 received at 10:33 a.m.)

22           MR. SHUMAKER:  Okay.  If you could put up City

23   Exhibit 32.

24   BY MR. SHUMAKER:

25   Q   Mr. Orr, do you have the -- could I refer you to the

1   binder of the exhibits that should be right in front of you?

2   A    Yes.

3   Q    There's a number of pages there, I know.  I'd like to

4   direct your attention first, if you will, to the following

5   Bates number.  For the record, it's DTM100084885.  And for

6   convenience, Mr. Orr, if I could, I'll just refer to the last

7   three numbers of the Bates number from now on if that's okay

8   with you.

9   A    Yes.  That's fine.

10  Q    Mr. Orr, do you see on the next page that you're cc'd on

11  this letter?

12  A    Yes.

13  Q    Will you take a look at that letter?  Do you recognize

14  this letter?

15  A    Yes.

16  Q    And was it sent at your direction?

17  A    Yes.  I instructed my team generally to correspond and

18  reach out to all interested parties.

19  Q    And who was this letter sent to?

20  A    Mr. Garrett, who's president of AFSCME Council 25.

21  Q    Now, I'd like you to take a look --

22          MR. SHUMAKER:  If you could blow that up, Laurie,

23  just the -- no, just the address.

24  BY MR. SHUMAKER:

25  Q    I'm sorry.  When you say president of a local, what do

1  you mean by that?

2  A   I think he's president of the council for the state,

3  AFSCME's Council 25, which includes the local here in

4  Detroit.

5  Q   So this letter was sent to AFSCME on May 20th, 2013?

6  A   Yes.  That's what it says.

7  Q   I ask you to take a look at the next several pages behind

8  this one, specifically to pages 889 through 924.  And I know

9  that's a number of pages, but if you could take a look at

10 that, and if you will, I'd like to direct your particular

11 attention to the addressees of those letters.

12 A   Yes.

13 Q   First of all, could you count the number of letters that

14 I've referred you to, including the one to Mr. Garrett?

15 A   One, two, three, four, five, six, seven, eight, nine,

16 ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen,

17 seventeen, eighteen, twenty -- I believe it comes in at

18 twenty.

19 Q   And the addressees of those letters, who are they to?

20 A   I believe the one to Mr. Garrett, as I said, is the

21 president of the council, and I believe the others are to the

22 presidents of the locals in various units.

23 Q   So is it fair to say that your team that was dealing with

24 the unions sent out 20 letters to the presidents of AFSCME

25 locals?

1    A    Yes.  Well, 19 to the locals and 1 to the council

2    president.

3    Q    Now, I'd like to -- do you know whether the unions ever

4    responded to these letters?

5    A    I never received a response.  I don't know if they

6    responded to someone else.

7    Q    Did any of your team members ever share with you that

8    some of those letters had been responded to?

9    A    No.

10   Q    I'm going to refer you to page 811 through 812.

11   A    Yes.

12   Q    Are you there, Mr. Orr?  Okay.  And what's the date of

13   this letter?

14   A    May 24th.

15   Q    I'd ask you who signed this letter.

16   A    Mr. Edward McNeil.

17   Q    Is Mr. McNeil the person who taped the message on your

18   door?

19   A    Yes, at least to the best of my knowledge.  I didn't see

20   him do it.

21   Q    I'd like to direct your attention to the first paragraph,

22   if you will.  Would you take a look at the second sentence of

23   that paragraph, please, sir?

24   A    Yes.

25   Q    It says, "Please be advised that in accordance with

1  Michigan law we have no authority in which to renegotiate the

2  pension or medical benefits that members of our union

3  currently receive."  Do you see that?

4  A   Yes.

5  Q   Is this -- was this sentiment shared by Mr. Easley and

6  others on your team that was dealing with the unions to you

7  during this time frame?

8  A   Yes.  I'd asked them to reach out and see if they would

9  represent retirees as well, and it came back to me that they

10  declined to do so.

11  Q   Do you know whether other unions responded in this

12  fashion?

13  A   As far as I knew, that was the general response, that no

14  one wanted to represent the retirees at this time.

15  Q   Let me direct you to page 790, if you would.

16  A   Yes.

17  Q   And what is that, Mr. Orr?

18  A   This appears to be a May 22nd, 2013, letter to Mr. Brian

19  Easley from John Cunningham, the international representative

20  of UAW Region Number 1.

21           MR. SHUMAKER:  I'd ask if you could blow up the

22  first paragraph, please, Laurie.

23  BY MR. SHUMAKER:

24  Q   Mr. Orr, could you read the third sentence there?

25  A   "These locals do not, however, represent current retirees

1  and have no authority to negotiate on their behalf."

2  Q   Is this consistent with the feedback you were receiving

3  from your team dealing with the unions regarding other unions

4  as well?

5  A   Yes.

6  Q   Your team kept you apprised of its dealings with the

7  unions during this time; is that correct?

8  A   Yes, they did.

9  Q   Did that include between June 14th and July 18th?

10 A   Yes.

11 Q   Was the position that's set forth in the UAW letter

12 consistent with what you were hearing from that team during

13 that time?

14 A   Yes.  I was informed that no one wanted to represent the

15 retirees.

16 Q   Did the positions of the unions ever change during that

17 time?

18 A   Not that I'm aware of.

19 Q   Mr. Orr, Ms. Green asked you a few questions, and she

20 asked you a number of questions regarding your efforts to

21 negotiate with the swap counterparties.  Do you recall that?

22 A   Yes.

23 Q   She referred to the swap transactions as extraordinarily

24 complex.  Do you recall that testimony?

25 A   Yes, I believe so.

1  Q    That was Ms. Green's words.

2  A    Yes, I remember.

3  Q    My question is why during this time frame -- and I'm

4  focusing now on the June, July time frame -- why were you

5  able to negotiate with the swap counterparties?

6  A    Well, I think we were able to negotiate with the swap

7  counterparties because we had laid out sort of the broad

8  sketch of what we needed and the urgency with which we needed

9  it and that the concessions were essential for the city to

10 receive the cash flow that it needed to operate, and also the

11 city was in somewhat of a crisis because starting in mid-June

12 the city would have, at best, on a billion dollar budget

13 about four to $7 million of free cash and was at some risk of

14 going below the line.

15 Q    You were able to reach an agreement with the swap

16 counterparties; correct?

17 A    Yes.

18 Q    How long did it take you to reach an agreement regarding

19 this extraordinarily complex transaction?

20 A    I think it took from the end of May until it was

21 announced on June 14th.  I believe we actually reached an

22 agreement in principle on June 12th or 13th.

23 Q    Based upon what you were hearing from the team dealing

24 with the unions, did you think you were able to achieve

25 similar results in negotiations with them?

1  A    Yes.  I thought their issues had been talked about both

2  in the 2012 MOU and the 2012 consent agreement.

3  Q    And you negotiated with those unions in the same way that

4  you negotiated with the swap counterparties?

5  A    Yes.  I thought the issues that we were going to be

6  discussing had been discussed for many years.

7  Q    I just have a couple more questions, Mr. Orr.

8  A    Um-hmm.

9  Q    One is Ms. Green showed you a couple of video clips from

10  the June 10th, 2013, meeting.  Do you recall those?

11  A    Yes.

12  Q    And one of those clips you were quoted as saying

13  something about vested pension rights being sacrosanct, that

14  they couldn't be touched.

15  A    Yes.

16  Q    Do you recall that?

17  A    Yes, I do.

18  Q    When you made that statement to the June 10th meeting,

19  what were you attempting to convey with your words?

20  A    Despite the implication, I wasn't attempting to mislead

21  anyone.  I was simply trying to say we understood that there

22  were these issues regarding pensions.  I believe at that time

23  they had been discussed before, but they were going to have

24  to be addressed, and we were going to address them coming on

25  in the following part of the week.

1  Q   Were you attempting to mislead that gentleman who asked

2  the question?

3  A   No, not at all.

4  Q   Were you trying to give him misinformation?

5  A   No.

6  Q   Ms. Green showed you another video snippet.

7           THE COURT:  Excuse me one second.  What would you

8  say to that retiree now?

9           THE WITNESS:  About what, your Honor?

10          THE COURT:  Okay.  What would you say to him --

11          THE WITNESS:  You know, I mean what I said then

12  or --

13          THE COURT:  What would you say to that retiree now

14  about his rights?

15          THE WITNESS:  I would say that his rights are in

16  bankruptcy now.  I would say that his rights are subject to

17  the supremacy clause of the U.S. Constitution.

18          THE COURT:  That's a bit different than sacrosanct,

19  isn't it?

20          THE WITNESS:  No.  What I was trying to convey, your

21  Honor, without being misleading, is to say that I understood

22  there were these issues, but I also think I said during that

23  meeting that they would have to be resolved by a federal

24  court.  I believe I also said at June 14th -- June 14th and

25  June 10th that I had been involved in other cases.  I think I

1  said it June 14th, as a matter of fact, and June 10th that I

2  had been involved in other cases where the supremacy clause

3  had been employed in other contexts.

4  BY MR. SHUMAKER:

5  Q   Ms. Green showed you another snippet from the June 10th

6  meeting.  Do you recall that?

7  A   Yes.

8  Q   And the one that I'd like to refer you to is that you --

9  she showed the part where you were talking about there being

10 a caveat regarding PA 436 and Chapter 9 being powerful

11 statutes.  Do you recall?  You said that there was a caveat,

12 and 436 and Chapter 9 were powerful statutes?  Do you recall

13 that?

14 A   Yeah.  I think I said we have a powerful tool in 436,

15 even more powerful one in Chapter 9.

16 Q   What I want to show you is what she didn't show you was

17 the lead-up to that statement, if I could --

18 A   Um-hmm.

19 Q   -- show you that quickly.

20     (Videotape played at 10:46 a.m. as follows:)

21         "MR. ORR:  But I need your help because the way I'm

22 trying to do this collaboratively, cooperatively is the way I

23 think is appropriate because, quite frankly, I think the city

24 has suffered through enough errors of strife and pain and

25 anguish and finger pointing and vitriol and bile.  To what

1    end?  Where's it got us?  What have we achieved?  What's the

2    end result?  More of the same.  Now, I'll say that with this

3    caveat."

4        (Videotape concluded at 10:47 a.m.)

5    BY MR. SHUMAKER:

6    Q   Was that an important part of the message you were giving

7    to the meeting on June 10th, Mr. Orr?

8    A   Yes.  I was trying to say it's time for us to put beyond

9    conflict and continued strife and let's try to reach a

10   consensual resolution.

11           MR. SHUMAKER:  That's all I have, your Honor.  Thank

12   you, Mr. Orr.

13           THE COURT:  Any other questions for the witness?

14           MS. LEVINE:  Short redirect, your Honor.

15                    RECROSS-EXAMINATION

16   BY MS. LEVINE:

17   Q   Good morning, Mr. Orr.  Sharon Levine, Lowenstein

18   Sandler, for AFSCME.

19   A   Good morning, Ms. Levine.

20   Q   Very briefly, so Ed McNeil on behalf of the coalition of

21   unions requests a meeting of you on the day you're appointed,

22   which is March 25; correct?

23   A   As far as I know, yes.

24   Q   And you wait until May 20 to send a response basically

25   asking for meetings which were the exact meetings that Mr.

1    McNeil asked you for on March 25; is that correct?

2    A   I don't know if that's correct, Ms. Levine.

3    Q   And then on March 24, your counsel just pointed out to

4    you a letter that said that the unions were taking the

5    position that they couldn't negotiate retiree benefits; is

6    that correct?

7    A   Yes.

8    Q   And you're saying that based upon that letter, you

9    assumed that there was no ability to negotiate with the

10    unions over retiree benefits; is that correct?

11    A   No.   I don't think it was just on the basis of that

12    letter.

13    Q   Well, after that letter, you invited AFSCME along with

14    the other unions to the June 14, June 20, July 10, and July

15    11 meetings; correct?

16    A   Yes.   I think there were representatives at the June 10th

17    meeting, yes.

18    Q   I'm asking if you invited them.

19    A   I know we did at the 14th, and I know we did at the other

20    ones.   I'm not as sure about the June 10th meeting, but I

21    believe we did.

22    Q   Well, you invited them -- would it refresh your

23    recollection as to whether or not you invited them to know

24    that they actually came to those meetings?

25    A   Yeah.   The only reason -- Ms. Levine, I get your measure,

1  but the only reason I say the June 10th, because it was a

2  public meeting, and we -- it may not have been as formal as

3  the 14th and the other --

4  Q    Did you invite them to the June 11 meeting?

5  A    Well, I'm finishing.  It was a public meeting, and it may

6  not have been as formal as the other ones, but they were

7  generally invited.

8  Q    Did you invite them to the June 11 meeting -- sorry --

9  the July 11 meeting?

10  A    Okay.  I believe so.  I don't recall with --

11  Q    And that meeting was specifically to discuss pension

12  issues; correct?

13  A    I believe so.

14  Q    And they attended all four of those meetings; correct?

15  A    To the best of my knowledge.

16  Q    And they made information requests with regard to the

17  cost savings you were requesting, the benefit changes you

18  were requesting, and the pension changes you were requesting;

19  correct?

20  A    I think the information requests were going both ways,

21  but I think information requests were made.

22  Q    I'm just asking what AFSCME requested of you, and they

23  requested information of you either through Jones Day or

24  through Miller Buckfire or to you directly with regard to

25  cost savings, benefits, and pensions; correct?

1   A   I don't recall if they made any to me directly.  I do

2   think they made them to my representatives.

3   Q   And they also signed the confidentiality agreement you

4   requested; correct?

5   A   The nondisclosure agreement, yes.

6   Q   And they were in the data room; correct?

7   A   I believe they were in the data room.

8   Q   And you provided some information in response to those

9   information requests that were populated into the data room;

10  correct?

11  A   Yes, I believe we did.

12  Q   But not all of the information that was requested was

13  provided prior to July 18, 2013; correct?

14  A   I don't know that.

15  Q   I believe you testified that the team to talk to AFSCME

16  were two lawyers from Jones Day and Lamont Satchel; correct?

17  A   No.  I believe that I recall with specificity Brian

18  Easley, Evan Miller, and Lamont Satchel, and there might have

19  been others.

20  Q   Did any of those three or others at any time meet with

21  anybody from AFSCME --

22  A   I don't recall.

23  Q   -- between March 25 and June 13?

24  A   I don't recall.

25  Q   Do you recall running into -- do you recall you

1   personally running into Ed McNeil at events in the city at

2   any time between March 25 and July 18?

3   A    You asked me about a meeting.  Now you're just asking

4   about run-ins?

5   Q    You can -- we can do it both ways.  First I'm asking if

6   you ran into him at other events, and, second of all, I'll

7   ask you if you ran into him -- if you actually had a meeting

8   with him.

9   A    I believe I've run into him in other events from time to

10  time.

11  Q    And isn't it true that every time he's seen you during

12  that period of time he asked you to schedule a meeting with

13  AFSCME to discuss these issues?

14  A    No.  I don't think that's true.

15  Q    Did you -- you were starting to talk about the fact that

16  you had a meeting with Ed McNeil.  Did you meet one on one

17  with Ed McNeil at any point in time between March 25 and July

18  18?

19  A    I don't think so.

20  Q    Did you have a meeting with him with others between March

21  25 and July 18th?

22  A    I may have, but I don't recall.

23  Q    Do you recall whether or not you discussed with him

24  specifically the proposal other than just the presentations

25  made at the four meetings that were public presentation

1  meetings?

2  A   I don't think I personally discussed it with him, no.

3            MS. LEVINE:  No further questions, your Honor.

4            MR. MONTGOMERY:  Your Honor -- excuse me.

5                         RECROSS-EXAMINATION

6  BY MR. MONTGOMERY:

7  Q   Mr. Orr, Mr. Ullman is not here today, so I have the

8  honor of talking to you.  One quick clarification.  I believe

9  you just testified in response to a question by Mr. Shumaker

10 that your negotiations with the swap counterparties started

11 in May of 2013; is that correct?

12 A   They may have started towards the end of May 2013 or

13 June.  I believe I said it could have been May through June,

14 but it was in that time frame.

15 Q   Now, isn't it true, sir, that those negotiations began in

16 2012?

17 A   Not to my knowledge.

18 Q   Isn't that what you told the governor in your letter of

19 recommendation, sir?

20 A   Those specific negotiations regarding the swap deal, to

21 my knowledge, the specific ones we're talking about, began in

22 May and June.

23            MR. MONTGOMERY:  Could I have Exhibit 409 shown on

24 the screen, specifically page 8?  Could you go to the fourth

25 bullet and amplify that for the witness, please?

1  BY MR. MONTGOMERY:

2  Q   Now, sir, isn't it true that you told the governor that

3  negotiation with the pension-related swap contracts had been

4  going on since 2012?

5  A   Yes, Mr. Montgomery.  This document speaks for itself,

6  but the question I was asked was the specific ones regarding

7  the counterparty agreement that's since been reached.

8  Q   Now, your Honor -- sir, negotiations had been going on

9  since 2012, not May of 2013; is that not correct?

10  A   As I said, the specific ones regarding the deal we

11  eventually reached began sometime in late May and went on

12  until June 12th or 13th.  This letter speaks about ongoing

13  negotiations which may have occurred.  I was speaking about

14  the specific ones that yielded the agreement we now have.

15  Q   And the negotiations which yielded the agreement which

16  you now have, your words, actually commenced in 2012; is that

17  not correct?

18           MR. SHUMAKER:  Objection, your Honor.  Asked and

19  answered.

20           MR. MONTGOMERY:  He did not, in fact, answer the

21  question.

22           THE COURT:  No.  Overruled.  Please answer the

23  question.

24           THE WITNESS:  To the best of my knowledge, the

25  negotiations regarding the swap, as this statement has said,

1   have been ongoing since 2012, but --

2            MR. MONTGOMERY:  Thank you.

3            THE WITNESS:  -- the specific ones related to the

4   agreement were in May to June just like labor negotiations.

5            MR. MONTGOMERY:  No further questions, your Honor.

6            MR. PLECHA:  Ryan Plecha for the Retiree Association

7   parties.

8                    RECROSS-EXAMINATION

9   BY MR. PLECHA:

10  Q   Mr. Orr, did Mr. Easley or Mr. Miller send letters to the

11  DRCEA or the RDPFFA to request whether they would represent

12  retirees?

13  A   I don't recall with specificity.  If you have a document

14  to refresh my recollection, I'm happy to look at it.

15  Q   All right.  The answer is fine.  Did you instruct Mr.

16  Miller or Mr. Easley to contact anyone that was not a union

17  to see if they would represent retirees?

18  A   Generally we instructed them to reach out to anyone who

19  was willing to represent unions who appeared to have the

20  authority to do so.

21  Q   And in your answer I believe I heard you use the word

22  "union."  Anyone besides unions?

23  A   You got to reach out to all parties, interested parties,

24  is what I said --

25  Q   Okay.

1  A  -- not just in my testimony, but that's what I said then.

2  Q  Okay.  Is it not true that the DRCEA informed the city

3  that it was willing to represent general retirees?

4  A  I don't recall.

5        MR. PLECHA:  Could I have Exhibit 309, please?  Just

6  blow up the middle paragraph, please.

7  BY MR. PLECHA:

8  Q  Did you receive this letter, Mr. Orr?

9  A  I believe so.

10  Q  And did you instruct Mr. Easley or Mr. Miller to send a

11  letter to the DRCEA to see if they would represent retirees?

12  A  I don't recall.

13  Q  Isn't it true that you received -- or that the city was

14  informed that the RDPFFA informed the city that it was

15  willing to represent uniformed retirees?

16  A  I don't recall that.

17  Q  Isn't it true that neither of the retiree association

18  denied the request to represent retirees?

19  A  I don't know.  I don't recall receiving a letter.  If you

20  have something to refresh my recollection, I'd be happy to

21  see it.

22  Q  In all of those letters that Mr. Shumaker had you review

23  the addressees on, did any of those letters come from either

24  retiree association party saying that they did not want to

25  represent retirees?

1  A    None of the ones I reviewed today.

2  Q    And to your knowledge, are those all of the letters?

3  A    I don't know.  There are a lot of letters.

4         MR. PLECHA:  No further questions.

5                        RECROSS-EXAMINATION

6  BY MR. WERTHEIMER:

7  Q    Good morning, Mr. Orr.

8  A    Good morning.

9  Q    I just have a follow-up on a question that Lynn Brimer

10  asked you.

11         MR. WERTHEIMER:  Could you put 866 up, please?

12         MR. SHUMAKER:  Your Honor, I'm going to object to

13  the extent that this is outside the scope of the redirect.

14         MR. WERTHEIMER:  It is, your Honor, and I'd request

15  permission.  There was a -- seemed to me an obvious follow-up

16  to a question Ms. Brimer asked.

17         THE COURT:  All right.  One question I'll permit.

18         MR. WERTHEIMER:  Thanks.  Could you highlight the

19  paragraph that begins "Kevyn"?

20  BY MR. WERTHEIMER:

21  Q    Mr. Orr, did you check in with Dan Moss regarding the

22  Chapter 9 paper that Jones Day was putting together as

23  Corrine Ball suggested you should?

24  A    I don't recall, but I have no reason to believe that I

25  did not.

1    Q    Is that another way of saying you probably did?

2    A    I just don't recall.

3              MR. WERTHEIMER:  Okay.  Fair enough.  Thank you.

4                         RECROSS-EXAMINATION

5    BY MS. PATEK:

6    Q    Two quick things, Mr. Orr.  Barbara Patek again on behalf

7    of the Detroit public safety unions.  I believe you told Mr.

8    Shumaker that you negotiated with the unions in the same way

9    that you negotiated with the swap counterparts on his

10   redirect.  Is that your testimony?

11   A    Generally, that's the gist of it, yes.

12   Q    But, in fact, that's not accurate, is it?

13   A    Why not?

14   Q    Well, in fact, didn't you rely under Public Act 436 on

15   the -- what you talked about as the suspension of your duty

16   to bargain to not engage in the kind of robust hard give-and-

17   take negotiations that presumably occurred with the swap

18   counterparties?

19   A    No.  I wouldn't agree with that as a characterization of

20   what I said.

21   Q    You would not agree with that, that that's -- well,

22   strike that.  Are you testifying now that you did engage in

23   give-and-take hard negotiations with the public safety

24   unions?

25   A    Ms. Patek, you're using your characterization.  When I

1   said that I engaged with the unions in the same way we did

2   with the creditors, it was to mean that we reached out to

3   them.  We expected responses, and we would have responded in

4   kind.

5   Q   But it was not to suggest that you were engaging in the

6   kind of hard give-and-take negotiations with the unions that

7   you engaged in with the swap counterparts?

8   A   I don't know how to answer your characterization.

9   Q   I want to talk just for a minute about the supremacy

10  clause because I think you told us that that's -- you told

11  the Court that that was what made -- you know, took

12  sacrosanct sort of out of play once we got into bankruptcy.

13          THE COURT:  I think we've had enough testimony

14  regarding the supremacy clause, and besides it's not really

15  within the scope of this trial.

16          MS. PATEK:  Okay.  Thank you, your Honor.

17          THE COURT:  Any other questions?  You are excused

18  this time, sir.

19          THE WITNESS:  Thank you, your Honor.  The young

20  woman --

21          MS. BRIMER:  I'll take the compliment.

22          THE WITNESS:  Thank you, your Honor.

23      (Witness excused at 11:02 a.m.)

24          THE COURT:  And we will take a recess until 11:20,

25  please.

1          THE CLERK:  All rise.  Court is in recess.

2      (Recess at 11:02 a.m. until 11:20 a.m.)

3          THE CLERK:  Court is in session.  Please be seated.

4          THE COURT:  It appears that everyone is here.  Sir.

5          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

6      Jones Day, on behalf of the city.  I wanted to advise the

7      Court that that concludes the city's case in chief.  We don't

8      intend to call additional witnesses as part of our case in

9      chief.  We do reserve the right, of course, to introduce new

10     evidence and call witnesses as part of our rebuttal case, but

11     we'll have that determination after we see the objectors'

12     proofs.

13          I also wanted to advise the Court and come back to

14     something that we had talked about in connection with or at

15     the pretrial conference.  The only other exception to the

16     city's case in chief relates to deposition designations.  We

17     have been working with objectors pretty cooperatively on

18     this, and we're trying to put something together that would

19     be the easiest for the Court to deal with in that regard.  We

20     are designating and counter-designating and talking about a

21     system whereby we would have a single transcript if the Court

22     would like, and it would be color-coded with objections and

23     keyed with testimony from each side.  There are also some

24     videotape depositions that I think the objectors would like

25     the Court to consider, and we are, again, working with them

1   to submit those all together.  I think we would be in a

2   position to do that shortly, but I just wanted to advise the

3   Court that we are continuing to work on that, and that is

4   part of the city's affirmative case.

5         THE COURT:  Thank you.  The city rests.  Who'd like

6   to call a witness?

7         MR. IRWIN:  I'm sorry.  I thought Mr. Ruegger was

8   going to address that as well.  I have one other --

9         THE COURT:  Oh, I'm sorry.

10        MR. IRWIN:  -- administrative issue to --

11        MR. RUEGGER:  Good morning, your Honor.  Arthur

12  Ruegger from Dentons on behalf of the Retiree Committee.

13  Yes.  I'd just like to agree with Mr. Irwin's comments.  We

14  do have some videotape depositions that we'd like your Honor

15  to review.  We can present them in two different formats,

16  though.  One is a PowerPoint, which your Honor could review

17  on a computer.  Another would be a DVD that obviously you

18  could read on a DVD player.  The latter format would take us

19  some hours to prepare, but whatever your Honor --

20        THE COURT:  Whatever is easiest for you is fine with

21  me.

22        MR. RUEGGER:  Very well, your Honor.  We should have

23  the videotapes and the hard copies at least for the

24  depositions that I've discussed with Mr. Irwin ready no later

25  than tomorrow for your Honor.

1          THE COURT:  All right.

2          MR. RUEGGER:  Thank you.

3          MR. IRWIN:  Just one other administrative matter,

4    your Honor.  We have been coordinating with objectors in

5    terms of trying to get a preview of their witness lists and

6    estimates, nonbinding, but estimates on their direct

7    examinations and trying to budget accordingly.  We are all, I

8    think, looking forward and looking ahead to closing

9    arguments.  We don't know entirely when that will happen, but

10   we're all starting to prepare for those.  The city -- and

11   we've reached out to objectors yesterday.  We were wondering

12   if the Court had direction to the parties in terms of any

13   time limits or allocations of time between and among the

14   parties along the lines of what the Court did at the legal

15   argument stage of the eligibility proceeding, and we would

16   obviously take our direction from the Court in that regard.

17         THE COURT:  Frankly, I had decided, in light of the

18   importance of these issues, not to set any specific time

19   limits.  Having said that, I will assume counsel will be

20   responsible about this latitude that I am allowing to them,

21   and so that's my conclusion on it.  Is it your -- are you

22   trying to tell me that you think there should be time limits?

23   I didn't quite hear that.

24         MR. IRWIN:  I'm not -- I am not suggesting that

25   there need be time limits.  I'm looking -- we were wondering

```
 1   if the Court was expecting something from us either
 2   because --
 3             THE COURT:  No.
 4             MR. IRWIN:  -- we should work something out between
 5   us or the Court had some expectation that we needed to know
 6   about.
 7             THE COURT:  No, no.
 8             MR. IRWIN:  All right.  Thank you, your Honor.
 9             THE COURT:  All right.  Are we ready to begin the
10   objectors' case now?
11             MR. PLECHA:  Good morning, your Honor.  Ryan Plecha
12   on behalf of the Retiree Association parties.  I would like
13   to call Shirley Lightsey.
14             SHIRLEY LIGHTSEY, OBJECTOR'S WITNESS, SWORN
15             THE COURT:  Please sit down.
16                       DIRECT EXAMINATION
17   BY MR. PLECHA:
18   Q   Good morning, Ms. Lightsey.
19   A   Good morning.
20   Q   Could you please state your full name for the record?
21   A   Shirley Virginia Lightsey.
22   Q   And are you retired from employment with the City of
23   Detroit?
24   A   Yes.
25   Q   Do you currently receive a pension from the City of
```

1    Detroit?

2    A    Yes.

3    Q    Do you currently receive healthcare benefits from the

4    City of Detroit?

5    A    Yes.

6    Q    Would you be negatively impacted if pension benefits were

7    reduced?

8    A    Yes.

9    Q    Would you be negatively impacted if healthcare benefits

10   were reduced?

11   A    Yes.

12   Q    Have you already taken financial planning measures to

13   prepare for potential cuts to pension and benefits?

14   A    Yes.

15   Q    Before you began your work with the city, could you

16   please explain your education after high school?

17   A    I went to Wayne State University and eventually graduated

18   from Wayne State University.

19   Q    And did you obtain a degree?

20   A    Pardon?

21   Q    Did you obtain a degree?

22   A    Yes.

23   Q    And what was that?

24   A    Bachelor of Arts in Sociology.

25   Q    What was your final position with the City of Detroit?

1   A   Was personnel manager, which would now be equated to

2   human resources manager two.

3           THE COURT:  Excuse me one second.  Would you just

4   push the microphone a bit away from you or sit back a bit

5   from it?  That's better.  Thank you.

6   BY MR. PLECHA:

7   Q   Ms. Lightsey, how long did you work for the city?

8   A   Thirty years.

9   Q   And what were your job duties as the personnel manager?

10  A   I was responsible for the budget of that department,

11  which included several support functions, which would be

12  safety, labor relations, security, payroll, personnel

13  activities, training, and I also had an administrative

14  section that took care of EEOC and Workers' Comp cases.

15  Q   And could you briefly describe that budget for me for the

16  Water and Sewerage Department?

17  A   Question again?

18  Q   What size, approximately, was the budget for the Water

19  and Sewerage Department?

20  A   I'm not sure of the total budget for the Water and

21  Sewerage Department.  I know we had 3,000 employees, but my

22  budget was a little over three million.

23  Q   Okay.  While you worked with the city, did you have any

24  positions with any labor organizations?

25  A   Yes.

1    Q    Okay.  What position was that?

2    A    I was a steward.

3    Q    Okay.  Are you familiar with an organization known as the

4    DRCEA?

5    A    Yes.

6    Q    What does the DRCEA stand for?

7    A    Detroit Retired Employees -- DR -- Detroit Retired City

8    Employees Association.

9    Q    Okay.  Thank you.  What is the DRCEA?

10   A    It's an organization established in 1960 to -- in my

11   words, we are the eyes and ears of the general systems

12   retirees.

13   Q    Okay.  And are you a member of the DRCEA?

14   A    Yes.

15   Q    How long have you been a member?

16   A    Approximately 27 years.

17   Q    And do you hold a position with the DRCEA?

18   A    Yes.

19   Q    What position is that?

20   A    President.

21   Q    How did you obtain that position?

22   A    I was elected into the position.

23   Q    And how long have you held that position?

24   A    Fourteen out of sixteen years.

25   Q    Okay.  Can you please summarize briefly for the Court

1   your duties as president of the DRCEA?

2   A    I'm sorry.  I didn't hear the question.

3   Q    Could you please summarize your duties as DRCEA

4   president?

5   A    I conduct the meetings.  I appoint committees every year.

6   I recommend our nominating committee to the full board.  I

7   keep the board and the members informed of anything that they

8   may be involved -- that may involve retirees, and I'm sure

9   there's some other duties I just can't remember right now.

10  Q    Okay.  Ms. Lightsey, is the DRCEA incorporated?

11  A    Yes.

12          MR. PLECHA:  If I could please have Exhibit 305

13  displayed.  This has been admitted into evidence.

14  BY MR. PLECHA:

15  Q    Are you familiar with this document, Ms. Lightsey?

16  A    Yes.

17          MR. PLECHA:  And I believe there is a hard copy of

18  exhibits, if we could also provide that to Ms. Lightsey so

19  she doesn't have to read it off the screen.

20          THE COURT:  You can do that, counsel.

21          MR. PLECHA:  Thank you.

22  BY MR. PLECHA:

23  Q    Ms. Lightsey, could you please read Article 2 for me,

24  please?

25  A    I'm sorry.  The exhibit number?

1    Q    Oh, it's Exhibit 305. I'm sorry.

2    A    Yes.

3    Q    Could you please read Article 2 for me, please?

4    A    "To take appropriate action to promote the pension rights

5    of the retired employees of the City of Detroit and generally

6    to engage in such lawful activities as are determined by the

7    board of directors to promote the best interest of the

8    retired employees of the City of Detroit."

9    Q    And is that statement consistent with the DRCEA's current

10    purpose?

11    A    Yes.

12    Q    Has the association been in continuous existence since

13    its formation?

14    A    Pardon?

15    Q    Has the DRCEA been in continuous existence since its

16    formation?

17    A    Yes.

18    Q    Does the DRCEA have by-laws?

19    A    Yes.

20        MR. PLECHA: If I could please have Exhibit 303.

21    BY MR. PLECHA:

22    Q    Do you recognize this document, Ms. Lightsey?

23    A    Yes.

24    Q    Are these the current by-laws for the DRCEA?

25    A    Yes.

1          MR. PLECHA:  If I could please display page 2.

2          THE WITNESS:  Page 3?

3          MR. PLECHA:  Two.

4          THE WITNESS:  Two?

5    BY MR. PLECHA:

6    Q    Could you read Article 2 for me, please?

7    A    "The Detroit Retired City Employees Association is a

8    service organization existing for the purpose of representing

9    and protecting the interests of the civilian City of Detroit

10   retirees, the spouses or deceased retirees and other

11   beneficiaries of deceased retirees."

12   Q    Does this currently state the -- does this accurately

13   state the purpose of the association?

14   A    Yes.

15   Q    Okay.  Is the DRCEA governed by a board of directors?

16   A    Yes.

17   Q    How often are board meetings conducted?

18   A    Once a month.

19   Q    How many individuals serve on the board of directors?

20   A    Five officers, seventeen board members, and one pension

21   representative.

22   Q    Okay.  And does the DRCEA board have committees?

23   A    Yes.

24   Q    Do any of those committees deal with pension or other

25   retiree benefits?

1  A    Yes.

2  Q    What committee would that be?

3  A    For retiree benefits we have the pension.  Then we have

4  the medical benefits board -- committee.  I'm sorry.

5  Q    Okay.  And are you aware of any board of directors

6  individuals who have professional experience with the

7  finances of the City of Detroit?

8  A    Yes.

9  Q    Who would that be?

10  A    Gerald Fischer, Tom Sheehan, Pam Scales -- Pamela Scales.

11  I think that's all.

12  Q    And could you just very briefly give me a description of

13  what those individuals did for the city?

14  A    Well, Gerald Fischer had many positions.  He was an

15  appointee.  I know he was the assistant director of the

16  Water -- Detroit Water and Sewerage Department.  He was also

17  an appointee to the finance or budget departments, and that's

18  about all I can really state.  I don't know what his

19  positions or titles were.

20  Q    What about Mr. Sheehan?

21  A    Mr. Sheehan worked for the finance department and --

22  total of years, but I don't really remember what his title

23  was.

24  Q    Okay.  What about Ms. Scales?

25  A    Ms. Scales worked until the last year or two, and she was

1  the budget director.

2  Q    Is that the budget director for the entire city?

3  A    Yes.

4  Q    Is there any member on the board of directors that has

5  professional experience with the city as it relates to labor

6  relations?

7  A    Yes.

8  Q    Who would that be?

9  A    Barbara Wise Johnson.

10  Q    What did Ms. Johnson do?

11  A    She was director of labor relations, which included

12  benefits.

13  Q    Is there any member on the board of directors who has

14  professional experience with the city as it relates to

15  pensions?

16  A    Yes.

17  Q    Who would that be?

18  A    That would be Tom Sheehan.  He was a trustee as an active

19  employee, and he is now a trustee of the retirees.

20  Q    Okay.  Is there any member on the board of directors who

21  has professional experience with the city as it relates to

22  legal matters?

23  A    Yes.

24  Q    Who would that be?

25  A    Kay Schloff, who was an attorney, and Marian Harper, who

1    was an attorney.

2    Q    What did Ms. Schloff do at the city?

3    A    She codified the charter.

4    Q    Can you please tell me what the DRCEA does for general

5    city retirees?

6    A    I don't understand the question.

7    Q    Okay.  Can you please tell me what the association does

8    for its general city retiree members?

9    A    We maintain a watch over benefits and pension issues.

10   Q    Do you provide information to general retirees?

11   A    Yes.

12   Q    Do you advocate for general city retirees?

13   A    Yes.

14   Q    Do you organize general city retirees?

15   A    Organize?

16   Q    Hold meetings with them --

17   A    Yes.

18   Q    -- luncheons?

19   A    Yes.

20   Q    Do you communicate with general city retirees?

21   A    Yes.

22   Q    Do you represent general city retirees?

23   A    Yes.

24   Q    Does the association provide all services to members and

25   nonmember general city retirees?

1  A    Yes.

2  Q    Okay.  Has the DRCEA ever had the occasion to appear

3  before the City Council in budget-related matters?

4  A    Yes.

5        MR. PLECHA:  If I could, your Honor, I would like to

6  have the Court judicially notice Section 9-601 of the city

7  charter that's entitled "Retirees Representation," which

8  states, "Retired general city employees are entitled to be

9  represented in the city legislative and budgetary proceedings

10  on issues affecting their interest by persons elected by

11  them."

12        THE COURT:  Thank you.  Any objections?

13        MR. IRWIN:  I have no notice of this.  If it's being

14  read accurately, I have no objection, your Honor.

15        THE COURT:  All right.  Well, have a look at it, and

16  at some point when you're ready let me know if you have any

17  objection to this.

18        MR. IRWIN:  Thank you, your Honor.

19  BY MR. PLECHA:

20  Q    Ms. Lightsey, has the DRCEA been formally invited to

21  those budgetary meetings?

22  A    Yes.

23  Q    Did the DRCEA, in fact, participate in those meetings?

24  A    Yes.

25  Q    To your knowledge, did any other group appear at those

1   meetings on behalf of general city retirees?

2   A    No.

3   Q    At any time, did the DRCEA have an open invitation to

4   appear before City Council?

5   A    Yes.

6   Q    Did the DRCEA serve on the charter revision commission

7   for the City of Detroit?

8   A    Yes.

9   Q    Has the DRCEA ever filed a lawsuit against the City of

10  Detroit?

11  A    No.

12  Q    What about any that it joined with the City Council?

13  A    Yes.  We did join back in the '90s when council was

14  challenged on their legal rights to do what they were doing.

15  Q    Did you file any lawsuits in July 2013?

16  A    No.

17  Q    Approximately how many members does the DRCEA currently

18  have?

19  A    Members?  Approximately 70 -- between 76 and 7,800.  I

20  don't have the exact number.

21  Q    And that's out of approximately how many general --

22  A    12,000.

23  Q    Okay.  And do your members pay dues?

24  A    Yes.

25  Q    Is it a voluntary association?

1   A    Yes.

2   Q    Do the officers and board members serve as volunteers?

3   A    Yes.

4   Q    Has the DRCEA ever had pamphlets that it would provide to

5   your members and nonmembers to provide information about the

6   DRCEA?

7   A    Yes.

8         MR. PLECHA:  If I could please have Exhibit 315

9   displayed.

10  BY MR. PLECHA:

11  Q    Do you recognize this document, Ms. Lightsey?

12  A    Yes.

13  Q    If I could have you page -- turn to page 7 -- I'm

14  sorry -- page 5.  Could you read the bottom paragraph in the

15  lower right-hand corner?  It's on the screen if that's easier

16  for you, Ms. Lightsey.

17  A    Pardon?

18  Q    It's on the screen if that's easier for you.

19  A    "The watchdog for city retirees.  DRCEA maintains a year-

20  round watch on the city administration, mayor, City Council,

21  and the General Retirement System board of trustees

22  continually monitoring actions that may affect your pension

23  or retirement benefits."

24  Q    Is that statement accurate today for the DRCEA?

25  A    Yes.

1  Q    Does the DRCEA conduct regular membership meetings?

2  A    Yes.

3  Q    How often are those meetings held?

4  A    We have one annual meeting and schedule any others when

5  needed.

6  Q    Does the DRCEA hold special meetings?

7  A    Yes.

8  Q    Who's invited to those special meetings?

9  A    All general retirees.

10  Q    And are there regular communications to general retirees?

11  A    Yes.

12  Q    What type of communications?

13  A    We have a newsletter that goes out every three, sometimes

14  four times a year.  We have a website.  We have e-mails for

15  some of our members.

16  Q    What type of information is posted on your website,

17  Ms. Lightsey?

18  A    News articles.  Every now and then I write a letter to

19  them, coming events, and anything we deem informational for

20  our retirees.

21  Q    Is the contact information listed on the website?

22  A    Yes.

23  Q    Are there benefit resources on the website?

24  A    Yes.

25  Q    Pension resources?

1   A   Pension resources, I'm not sure.

2   Q   Links to places that --

3   A   Links.  We have links, right, to -- yeah.

4   Q   Has the DRCEA ever sent out correspondence to all general

5   retirees that requested a return mailing --

6   A   Yes.

7   Q   -- or a response?

8   A   Um-hmm.

9   Q   Okay.  Could you tell me about that?

10   A   Well, recently, the most recent one, we sent out the

11   consent form.  We had recommended eight of our members for

12   the -- to the trustees -- to the Justice Department trustees

13   for the Retiree Committee.

14   Q   Okay.  And did you receive feedback from those

15   communications?  Did you receive responses back?

16   A   Yes.

17   Q   Do you know approximately how many?

18   A   There were thousands.  I don't know because I wasn't -- I

19   haven't been brought up to date on that.

20   Q   Okay.  And do you know approximately how long it took to

21   get these thousands of responses back?

22   A   I would say the first couple of thousand came in within

23   seven days.  After that, I'm -- they came in in batches.

24   Q   Okay.  How did the general retirees generally communicate

25   to the DRCEA?

1   A    I'm sorry.  Repeat that.

2   Q    How did the general retirees generally communicate to the

3   DRCEA?

4   A    By notes, by comments on the cards that we send for

5   renewals, by e-mail, by voicemail, and socially anywhere they

6   can find a DRCEA member to ask questions.

7   Q    So they recognize you and stop you in public?

8   A    Pardon?

9   Q    They recognize you and stop you in public to ask you

10  questions?

11  A    I didn't understand that question.

12  Q    Do members recognize you and ask you questions as it

13  relates to retiree matters in public?

14  A    Our members, yes.

15  Q    Does anyone on behalf of the association read those

16  letters that are sent in?

17  A    Yes.

18  Q    Does the board generally respond to those letters?

19  A    We respond to some.  Others are just information that

20  they're giving us or comments that they're making that don't

21  require a response.

22  Q    Have you received expressions of concern from general

23  retirees regarding their pensions and benefits?

24  A    Recently, yes.

25  Q    Have any of your members told you that they've already

1   made financial planning changes based on the potential cuts

2   to their pensions?

3   A   Yes.

4           MR. IRWIN:  Your Honor, I object to the relevance of

5   this line of questioning.  I also find the questions fairly

6   leading.

7           MR. PLECHA:  I believe they're relevant as ripeness

8   has been contested in this matter, and it goes to the present

9   impact of the proposed cuts that they're already taking

10  measures directly related to those proposed cuts.

11          THE COURT:  This is arguable.  I'll permit it.  Go

12  ahead, sir.

13  BY MR. PLECHA:

14  Q   Ms. Lightsey, has any of the members let you know that

15  they've made financial planning changes based on the proposed

16  cuts to pensions?

17  A   Yes.

18  Q   Okay.  I'm going to switch topics a little bit.  Did you

19  become aware that Mr. Orr was appointed as the emergency

20  manager for the city?

21  A   Yes.

22  Q   Have you ever met Mr. Orr?

23  A   Yes.

24  Q   When did you first meet Mr. Orr?

25  A   I attend pension board meetings throughout the year, and

1 Mr. Orr was at a meet-and-greet pension board meeting the end

2 of April.  I think it was the last Wednesday in April.  I'm

3 not sure.  I think that's when it was.

4 Q   Do you recall how you were introduced to Mr. Orr?

5 A   I was introduced to Mr. Orr as the president of the GRS

6 retirees.

7 Q   After meeting Mr. Orr, did you ever contact him?

8 A   Only by letter.

9        MR. PLECHA:  If I could have Exhibit 309 displayed,

10 please.

11 BY MR. PLECHA:

12 Q   Do you recognize this document?

13 A   Yes.

14 Q   Is this the letter you, in fact, sent to Mr. Orr?

15 A   Yes.

16 Q   And why did you send this letter to Mr. Orr?

17 A   To have a meeting to understand what it was that the

18 retirees were expected to discuss or --

19 Q   Did you ever receive a response to this letter?

20 A   No.

21 Q   Did you ever receive a meeting response for this letter?

22 A   No.

23 Q   Did you ever receive a letter from the city or its

24 professionals requesting information about who the DRCEA

25 represents?

1  A   Yes.

2  Q   Did you respond to that letter?

3  A   Yes.

4  Q   Did you inform them that you were willing to represent

5  retirees?

6  A   If that was what was on the letter.  I don't remember the

7  questions, but I'd have to see my response.  I responded to

8  whatever the questions were.

9       MR. IRWIN:  I have a best evidence objection to the

10  witness testifying as to the contents of a letter that is not

11  in evidence and that I'm not aware of.

12       THE COURT:  The objection is sustained.

13  BY MR. PLECHA:

14  Q   Did you happen to attend a meeting on June 14, 2013?

15  A   No.

16  Q   Why not?

17  A   I wasn't invited.

18  Q   Did you ever learn that other retiree associations

19  attended this meeting?

20  A   Yes.

21  Q   When did you learn this?

22  A   I really don't remember.  I just remember that I didn't

23  receive an invitation --

24  Q   How did you learn this?

25  A   -- for the DRCEA.  Pardon?

1   Q   How did you learn this?

2   A   How did I what?

3   Q   How did you learn that other associations attended?

4   A   Through conversation, and I really don't remember.  It

5   wasn't anything official.  It was probably through a member

6   or it may have been the news.  I don't know.  I don't

7   remember.

8   Q   Did you attend a meeting on June 20th, 2013?

9   A   Yes, I did.

10   Q   Was your invitation limited in any way?

11   A   It was limited to two people.

12   Q   And who attended on behalf of the DRCEA?

13   A   Myself and Marian Harper.

14   Q   And was this meeting only for retirees?

15   A   I'm not sure.

16   Q   Was there any attendees on behalf of AFSCME?

17   A   Yes.

18   Q   The UAW?

19   A   Yes.

20   Q   The public safety unions?

21   A   Not that I recall.

22   Q   Who was there on behalf of the city?

23   A   Ms. Lennox, Mr. Heiman.  I can't think of the other

24   gentleman's name, but there were about five or six that were

25   there that day.

1    Q   Was Mr. Orr there?

2    A   No.

3    Q   Did anyone ask you to present the DRCEA's position at

4   this meeting?

5    A   No.

6    Q   Were you permitted to submit questions at this meeting?

7    A   Yes.

8    Q   Did you ask any questions?

9    A   No.

10   Q   Why not?

11   A   Others had asked questions.  I didn't see any need to

12  repeat the same questions.

13   Q   Were you comfortable with asking retiree-specific

14  questions in this meeting setting?

15   A   I'm sorry.  I don't understand that.

16   Q   Were you comfortable asking retiree-specific questions in

17  this meeting setting?

18   A   Not really.

19   Q   Was there an opportunity at this meeting to break out in

20  smaller groups to discuss retiree-specific issues?

21   A   No.

22   Q   Following the June 20th meeting, did you take any actions

23  or communicate with the city?

24   A   Yes.

25   Q   And who did you communicate with?

1   A   Pardon?

2   Q   Who did you communicate with?

3   A   Mr. Easley.

4   Q   Do you recall why you sent a letter to Mr. Easley?

5   A   In response to what was, I guess, discussed at the

6  meeting.

7   Q   Did you ask him how the DRCEA should proceed?

8   A   Yes.

9   Q   Did anyone from the city ever respond to your letter?

10  A   No.

11  Q   Anyone from Jones Day?

12  A   No.

13  Q   Okay.  Did you attend a meeting on July 10th?

14  A   Yes.

15  Q   Were you invited to this meeting?

16  A   Yes.

17  Q   Was your invitation limited in any way?

18  A   Two people.

19  Q   Did anyone ask you to present the DRCEA's position at

20  this meeting?

21  A   No.

22  Q   Was there an opportunity for you to break out and discuss

23  retiree-specific issues?

24  A   No.

25  Q   Did you attend a meeting on July 11th?

1   A    Yes.

2   Q    Were you invited to that meeting?

3   A    Yes.

4   Q    Was your invitation limited?

5   A    Two people.

6   Q    Did you ask any questions at this meeting?

7   A    Yes.

8   Q    What questions did you ask?

9   A    I asked if the city proposed to offer vision and dental

10  to retirees in 2014.

11  Q    And was your question answered?

12  A    Yes.

13  Q    Did that answer cause you to do anything following the

14  meeting?

15  A    Yes.

16  Q    What did it cause you to do?

17  A    Inform our board and immediately start to look for vision

18  and eye care possibilities for our members.

19  Q    So you started to look for alternatives?

20  A    Yes.

21  Q    Did you have enough time between July 11th and July 18th

22  to prepare counterproposals as it relates to dental and eye

23  care?

24  A    No.

25  Q    During the July 11th meeting, did you have the

1    opportunity to break out into smaller groups to discuss

2    retiree-specific issues?

3    A    No.

4    Q    Following the June 20th meeting, did you take any action

5    as it relates to communicating with Jones Day?

6    A    20th.  That was -- yes.

7    Q    What did you do?

8    A    Four days later on the 24th, I think it was, I sent a

9    request for information.

10   Q    Was that ever responded to?

11   A    No.

12   Q    Did you ever request your attorney send a letter to Jones

13   Day to request a meeting with the DRCEA?

14   A    Yes.

15   Q    Did the city ever respond?

16   A    No.

17   Q    In any of your meetings with the city, were there

18   breakout sessions for retirees?

19   A    No.

20   Q    Did anyone at these meetings ever tell you that they were

21   going to have breakout sessions specific for retirees?

22   A    No.

23   Q    Did anyone tell you that they intended to create breakout

24   meetings for retirees?

25   A    No.

1   Q   Prior to July 18, 2013, did the city provide you with a

2   copy of the June 14th proposal to creditors?

3   A   No.

4   Q   Prior to filing the bankruptcy by the city, did you ever

5   consider general retirees as creditors of the city?

6   A   What was the date that you said?

7   Q   July 18th before they filed for bankruptcy.

8   A   I had heard it enough that we were now looked at as

9   creditors, so that would have been prior to July 18th through

10  the media and other areas.

11  Q   Did anyone on behalf of the city at any of these meetings

12  specifically request counterproposals from the DRCEA?

13  A   I didn't receive it that way, no.

14  Q   Did anyone on behalf of the city say that if

15  counterproposals were not received by July 19th, a Chapter 9

16  case would be filed?

17  A   I don't remember hearing that.

18  Q   Prior to July 18th, did you have enough information to

19  make counterproposals?

20  A   No.

21  Q   Has the DRCEA ever advocated for benefit enhancements to

22  retirees that was applied to all general city retirees?

23  A   Yes.

24  Q   How did the DRCEA do that?

25  A   Through the budget process.

1  Q    Is that with City Council?

2  A    That would be through the mayor first and then the City

3  Council, yes.

4  Q    That applied to all general retirees regardless of

5  membership?

6  A    Yes.

7  Q    In this current bankruptcy case, has the DRCEA ever

8  claimed to be able to legally bind its members?

9  A    No.

10  Q    Is the DRCEA a collective bargaining unit?

11  A    No.

12  Q    Following each of the meetings you had with the city, did

13  you discuss those meetings with your board of directors?

14  A    Yes.

15  Q    Did the city ever provide you with a proposal to take

16  back to the board of the DRCEA as it relates to retiree

17  issues?

18  A    No.

19  Q    Would the board have been able to accept and consider a

20  proposal?

21  A    Yes.

22  Q    Could the board have then communicated that information

23  to the general city retirees?

24  A    Yes.

25  Q    Was negotiation with the DRCEA as it relates to retiree

1   issues possible?

2   A   Yes.

3         MR. PLECHA:  No further questions.

4         THE COURT:  Any cross-examination?

5         MR. IRWIN:  Yes, your Honor.

6                 CROSS-EXAMINATION

7   BY MR. IRWIN:

8   Q   Good morning, Ms. Lightsey.

9   A   Good morning.

10   Q   I believe I heard you testify that your organization has

11   been around for more than 50 years; is that right?

12   A   Yes.

13   Q   And you consider yourself and the organization to be

14   advocates of retirees; is that right?

15   A   Yes.

16   Q   And I think we heard some examples in that regard.  I

17   think you talked about how you advocated for enhancements

18   before the City Council.  Do you recall that?

19   A   Yes.

20   Q   And I heard you testify in connection with the articles

21   of incorporation of your organization that your mission is to

22   promote rights of retirees; is that right?

23   A   Correct.

24   Q   And you've also described the mission of the organization

25   to be a conduit for information.  You have the ability to

1    pass along information to your members; is that right?

2    A    Yes.

3    Q    And you have, in fact, lobbied on behalf of your

4    organization; is that right?

5    A    Yes.

6    Q    And you've been granted legal standing in courts on

7    behalf of your organization; is that right?

8    A    Repeat that again.

9    Q    You've been granted legal -- you've been involved in

10   lawsuits, is that right, the organization?

11   A    Yes.

12   Q    Okay.  One of the things that I don't believe you've

13   mentioned yet is whether your organization -- or you haven't

14   mentioned an instance in which the DRCEA has with binding

15   effect negotiated health or pension reductions on behalf of

16   your membership; is that right?

17   A    We cannot do binding.

18   Q    That's right.  The organization doesn't have the

19   authority or the power to enter into any binding agreements

20   with regard to health or pension benefits on behalf of its

21   members; is that right?

22   A    Correct.

23   Q    Okay.  And that was true at all points in time leading up

24   through the bankruptcy filing in this case on July 18th; is

25   that right?

1  A    Well, that depends on how far you go back as all time.

2  Q    Are you --

3  A    Are you going back to 1960, or are you going back to last

4  year?

5  Q    I'll go back to information that's within your personal

6  knowledge, so as long as you've been involved with the

7  organization, the organization has not entered into binding

8  agreements to reduce pension or health benefits on behalf of

9  the membership?

10  A    No.  I can't make that statement because I've been on the

11  board for 27 years, but I can't make that statement.  I was

12  not always the president, so I don't remember.

13  Q    But you're not -- is it fair to say that you're not aware

14  of a situation in which the organization has entered into a

15  binding agreement to reduce pension or healthcare benefits

16  for its membership?

17  A    I'm not aware.

18  Q    All right.  Let's turn -- Ms. Lightsey, do you recall a

19  point in time in this proceeding when the DRCEA was in

20  receipt of written questions or interrogatories, and it was

21  incumbent upon the organization to respond to those?

22  A    I don't remember.

23  Q    Okay.  Maybe I'll -- we can take a look at them, and it

24  may refresh your recollection.

25           MR. IRWIN:  Can we put up Exhibit -- can we put up

1   Exhibit -- city 83, please?

2   BY MR. IRWIN:

3   Q   Ms. Lightsey, there's an exhibit on your screen in front

4   of you.  Do you see that?

5   A   Yes, yes.

6   Q   Does this exhibit refresh your recollection at all in

7   terms of questions that were put to the organization that

8   needed to be answered?

9   A   Yes.

10  Q   Okay.  And you personally participated in this exercise;

11  is that right?

12  A   I turned this document over to my attorneys.

13  Q   Yes, but you also provided and verified the responses

14  that were given to the city; isn't that right?

15  A   I would have to see the responses.

16  Q   Okay.

17          MR. IRWIN:  Well, let's turn to the -- I think it's

18  page 16 of the document, please, and if we could blow up the

19  signature block in the lower right corner.

20  BY MR. IRWIN:

21  Q   Ms. Lightsey, is that, in fact, your signature on this

22  document?

23  A   Yes, it is.

24  Q   Okay.  Does that refresh your recollection that you

25  participated in the responses that were delivered in

 1    connection with these questions?

 2    A    Yes.  Now I understand your question.

 3    Q    Okay.  And did you review these answers before you signed

 4    your name to the end of this document?

 5    A    I reviewed -- I'm pretty sure I reviewed most of them,

 6    yes.

 7    Q    And that's a fair point.  There are questions that relate

 8    to a different organization, and there are questions that

 9    relate to the DRCEA.  It's a combined set of questions and

10    answers; is that right?

11    A    Right.

12    Q    And you responded on behalf of the DRCEA; is that right?

13    A    I would imagine so.  I'm not sure.  I'd have to look at

14    them again, but I'm pretty sure I did.

15    Q    Okay.  Well, let's look at some of the specific questions

16    if we could.  If you could please turn to --

17    A    I'm not reading this well on this screen, so --

18    Q    And we're going to -- we're going to publish the pages

19    for you so that you can --

20    A    Okay.

21    Q    -- follow along.  We're going to look at page 8 of the

22    document, which is Interrogatory Number 6.  Do you see that,

23    Ms. Lightsey?

24    A    Yes.

25    Q    We're going to -- we're going to read it, so you can --

1  we can read along together, but the interrogatory to the

2  DRCEA reads as follows, "Identify any person or persons who

3  have knowledge of any agreement entered into by the DRCEA and

4  the City of Detroit in which the DRCEA agreed to reduce,

5  limit, or abridge the health benefits provided by the City of

6  Detroit to existing DRCEA member retirees."  Did I read that

7  right?

8  A   Yes.  Is that --

9  Q   This is Number 6, ma'am.

10  A   Oh, Number 6.  Yes.

11  Q   And did you understood -- and this is one of the

12  interrogatories that's directed to the DRCEA, so am I correct

13  in assuming that this was a question and response that you

14  participated in drafting the answer to?

15  A   Yes.

16  Q   Okay.  And the question asks for -- the question asks for

17  the DRCEA to identify anyone who has knowledge of a prior

18  agreement between the DRCEA and the city where health

19  benefits were reduced.  You understood that?

20  A   Yes.

21  Q   Okay.  And let's look at the response.  The answer

22  below -- there are some objections that are posed in the

23  first couple lines, but if you look about halfway down, the

24  answer reads, "However, without waiving said objections and

25  in the spirit of cooperation, the DRCEA states that it is not

1  aware of any individual with knowledge responsive to this
2  interrogatory."  Do you see that?
3  A   Yes, I see it.
4  Q   All right.  And it continues, and it says, "By way of
5  further statement, the purpose of the DRCEA has always been
6  and remains to protect and preserve benefits of retirees, not
7  to reduce such benefits."  Do you see that?
8  A   Yes.
9  Q   And so am I correct in interpreting this response that
10 there has never been, to the best of your knowledge, any
11 agreement between the DRCEA and the city where the DRCEA has
12 agreed to reduce health benefits?
13 A   I would imagine not.
14 Q   And that has --
15 A   Not that I can recall, no.
16 Q   And that has never happened?
17 A   I can't say that it's never happened.  I don't know.
18 Q   Best of your knowledge, it has never happened?
19         MR. PLECHA:  Objection.  Asked and answered.
20         THE COURT:  Objection sustained.
21 BY MR. IRWIN:
22 Q   And, Ms. Lightsey, let's look at the very next question
23 because it's a little bit different.  Do you see Number 7?
24 A   Yes.
25 Q   Okay.  I'm going to read Number 7.  "Identify any person

1   or persons who have knowledge of any attempt prior to July

2   19th, 2013, by the DRCEA to obtain any form of legal

3   authority from its members to appoint DRCEA their

4   representative in connection with negotiations" --

5          MR. PLECHA:  Objection, your Honor.  I think this

6   exceeds the scope of direct.

7          THE COURT:  The objection is overruled.  Go ahead,

8   sir.

9   BY MR. IRWIN:

10  Q   Any form of legal authority from its members to appoint

11  DRCEA their representative in connection with negotiations to

12  reduce, limit, or abridge health benefits provided by the

13  City of Detroit to retirees.  Do you see that?

14  A   Yes, I see it.

15  Q   So it's a similar question, but it's asking if there's

16  ever even been an attempt to get authority from the

17  membership to negotiate to reduce health benefits; is that

18  right?

19  A   Right.

20  Q   Yes.  And let's look at the answer, which is on the next

21  page.

22          MR. IRWIN:  I'd like to pull the answer up, please.

23  BY MR. IRWIN:

24  Q   And the answer -- I'm skipping to the middle paragraph

25  again, but it's the same answer.  However, without waiving

1  said objections and in the spirit of cooperation, the DRCEA

2  states that it is not aware of any individual with knowledge

3  responsive to this interrogatory.  Do you see that?

4  A   Yes.

5  Q   It further states that the purpose of the DRCEA has

6  always been and remains to protect and preserve benefits of

7  retirees, not to reduce such benefits.  Do you see that?

8  A   Yes.

9  Q   So, to your knowledge, never in the history of the DRCEA

10  has it ever sought approval from its membership to reach an

11  agreement to reduce health benefits; is that right?

12  A   In the history of the DRCEA?

13  Q   Yes, according to this response.

14  A   I didn't construe it as meaning the full history of the

15  DRCEA back --

16  Q   Well, how about to the history of the --

17  A   -- to 1960.

18  Q   How about to the history of the DRCEA to your knowledge?

19  A   DRCEA, to my knowledge, I could -- I could agree, I

20  guess, on that.

21  Q   All right.  Now, let's look at one more, which is the

22  next interrogatory.  It's Number 8.  It's the very next one.

23  Now, we're shifting gears a little bit because this question

24  relates to pension benefits.  The two that we were talking

25  about before were health benefits.

1  A    Um-hmm.

2  Q    So here's Number 8.  "Identify any person or persons who

3  have knowledge of any attempt prior to July 19th, 2013, by

4  the DRCEA to obtain any form of legal authority from its

5  members to appoint DRCEA as their representative in

6  connection with DRCEA negotiations to reduce, limit, or

7  abridge pension benefits on a prospective basis only provided

8  by the GRS."  Do you see that?

9         MS. LEVINE:  Your Honor, objection.  Isn't the

10 purpose of the interrogatory to refresh recollection after

11 the witness answers?  There hasn't been any --

12        THE COURT:  It's not limited to that purpose.  The

13 objection, if there was one, is overruled.

14        THE WITNESS:  Now, question again.

15 BY MR. IRWIN:

16 Q    Did I read that correctly?

17 A    You're reading it correctly.

18 Q    Okay.  And did you understand it to -- did you understand

19 the question to be asking for if, to your knowledge, the

20 organization had ever sought authority from its membership to

21 negotiate to reduce pension benefits?

22 A    Not to my knowledge.

23 Q    I understand that.  You understood -- you understand

24 that's what the question is asking for.

25 A    Right.

1    Q    Right.  Okay.  Let's look at the answer.  Again, about

2    halfway through the answer -- and this is an answer -- this

3    is a document which you have affixed your signature -- the

4    DRCEA states that it is not aware of any individual with

5    knowledge responsive to this interrogatory.  Do you see that?

6    A    Yes.

7    Q    And so it is your understanding and your testimony that

8    the DRCEA has never even attempted to get authority from its

9    members to reduce pension benefits?

10   A    Not that I can recall.

11   Q    Right.  And, in fact, there's a new -- there's a new

12   sentence here at the end of this response which I would like

13   to direct your attention to, and it says the DRCEA would not

14   take any action to obtain or solicit authority from its

15   members to do something prohibited by the Michigan

16   Constitution.  Do you see that?

17   A    Yes, I see that.

18   Q    Okay.  You understand that your attorneys have filed

19   papers in this case, and you understand the position that

20   you've taken in this case is that pension benefits are

21   protected by the Michigan Constitution, do you not?

22   A    Yes.

23   Q    Okay.  And is this sentence in this interrogatory

24   response when it says "something prohibited by the Michigan

25   Constitution," you are referring to the pension protection in

1  the Constitution; right?

2  A   Yes.

3  Q   Okay.  And so what you're saying here is that the DRCEA

4  would not take any action to solicit authority from its

5  membership to reduce pension benefits because they're

6  protected by the Michigan Constitution; is that right?

7  A   Yes.

8  Q   Okay.  And did you make that plain to anyone from the

9  city in connection with any of the meetings you attended?

10 A   No.

11 Q   You did attend meetings; right?

12 A   Yes.

13 Q   Yes.  I think we heard about some of those on direct.

14 And you did not make any counterproposals to the city either

15 at or after any of the meetings you attended; is that right?

16 A   No.

17 Q   And that is because you did not have the authority from

18 your membership to make those counterproposals; is that

19 right?

20 A   No.

21 Q   No, you did not have that authority; right?

22 A   No.  That's not true.

23 Q   Okay.  Did you have authority from your members to make a

24 counterproposal to the city at or after any of these meetings

25 to reduce healthcare or pension benefits?

1   A    I never understood any of those meetings as being

2   meetings that they were presenting proposals for me to even

3   do what you just asked.

4   Q    Okay.  But I'm asking a slightly different question.  I'm

5   asking whether you had authority from your membership to make

6   a binding counterproposal to either reduce healthcare or

7   pension benefits at the meetings?

8   A    I've never had the authority to make a binding, and I've

9   never asked for that from the membership.

10          MR. IRWIN:  Okay.  Thank you.  That's all I have,

11  your Honor.

12          THE COURT:  Any more questions for the witness?

13          MR. PLECHA:  I have some redirect, your Honor.

14          THE COURT:  Yes, sir.

15                  REDIRECT EXAMINATION

16  BY MR. PLECHA:

17  Q    Ms. Lightsey, has the City of Detroit ever filed Chapter

18  9 bankruptcy before?

19  A    No, not that I --

20          THE COURT:  Seriously?

21          MR. PLECHA:  I think that goes directly to --

22          THE COURT:  Ask your next question.

23          MR. PLECHA:  Okay.

24  BY MR. PLECHA:

25  Q    To your knowledge, Ms. Lightsey, has the city ever

1    requested a reduction in benefits from the DRCEA?

2    A    I'm not sure.  I can't answer that "yes" or "no."

3    Q    So you don't recall if they ever asked the DRCEA to

4    negotiate reductions?

5    A    Not that I can recall.

6    Q    In all of the meetings you attended before City Council,

7    were you advocating for enhancements to benefits?

8    A    Yes.

9    Q    So there would be no need to seek authority to reduce

10   benefits in that situation?

11   A    No.

12   Q    And Mr. Shumaker asked you some questions from the

13   requests for interrogatories, one of which related to the

14   answer addressing the Michigan Constitution or the

15   protections of pensions; correct?

16   A    Correct.

17   Q    And that was asking for any attempt prior to July 19th;

18   correct?

19   A    Correct.

20   Q    And that was prior to the filing of the bankruptcy?

21   A    Correct.

22         MR. PLECHA:  No further questions.

23         THE COURT:  Any more questions for the witness?  You

24   are excused, ma'am.  Thank you very much for your testimony

25   today.

1      THE WITNESS:  All right.

2      (Witness excused at 12:16 p.m.)

3      THE COURT:  Let's take our lunch break now and

4  reconvene at 1:45, please.

5      THE CLERK:  All rise.  Court is in recess.

6      (Recess at 12:16 p.m. until 1:45 p.m.)

7      THE CLERK:  All rise.  Court is in session.  Please

8  be seated.  Recalling Case Number 13-53846, City of Detroit,

9  Michigan.

10     THE COURT:  Sir.

11     MR. MORRIS:  Good afternoon, your Honor.  Thomas

12 Morris on behalf of the Retiree Association parties.  I

13 believe it's our turn to call the next witness, and the

14 Retiree Association parties call Donald Taylor.

15         DONALD TAYLOR, OBJECTOR'S WITNESS, SWORN

16     THE COURT:  All right.  You may sit down.

17                 DIRECT EXAMINATION

18 BY MR. MORRIS:

19 Q   Good afternoon, Mr. Taylor.  Would you please state your

20 full name for the record?

21 A   Donald Taylor.

22 Q   Mr. Taylor, you're a retired Detroit police officer; is

23 that correct?

24 A   Yes.

25 Q   And do you receive a pension from the city?

1  A    Yes, I do.

2  Q    And post-employment benefits as well; is that correct?

3  A    Yes.

4  Q    How long did you work for the city?

5  A    Twenty-six years.

6  Q    And during your employment with the city, did you ever

7  hold a position with any labor organization?

8  A    Yes, I did.

9  Q    And what position was that?

10  A    It was a union steward, chief steward, and executive

11  board member with the Detroit Police Officers Association.

12  Q    Are you familiar with an organization known as the

13  RDPFFA?

14  A    Yes.

15  Q    And what do those initials stand for?

16  A    Retired Detroit Police and Fire Fighters Association.

17  Q    And what position do you hold with that organization?

18  A    President.

19  Q    And how long have you been president?

20  A    Seven years.

21  Q    Were you elected to that position?

22  A    Yes.

23  Q    And how long have you been a member of the RDPFFA?

24  A    Fifteen years.

25  Q    Did you hold any prior elected position prior to being

1 president?

2 A   Vice president.

3 Q   Do you hold any positions with any other organizations at

4 this time?

5 A   By virtue of my position as president of the Retired

6 Detroit Police and Fire Fighters Association, I'm also a

7 member of the board of trustees of the C.O.P.S. Trust.

8 That's Coalition of Public Safety.  It's an organization that

9 provides healthcare benefits to public safety officers.

10 Q   Is that a statewide organization?

11 A   Yes.

12 Q   Would you please summarize for the Court your duties as

13 president of the association?

14 A   Day-to-day operation.  We have a full-time office open

15 five days a week, and I manage the day-to-day operations,

16 also conduct the meetings, chair the meetings at our board

17 meetings, general membership meetings.  I'm also the

18 representative for the association in hearings with the state

19 or city level and whatever else is necessary in signing,

20 counter-signing checks, things of that nature.

21 Q   Is the association governed by a board of directors?

22 A   Yes, it is.

23 Q   How often are board meetings conducted?

24 A   Once a month.

25 Q   And how many persons serve on the board?

1   A   Right now there's ten.

2   Q   Can you tell me, please, when the association was formed?

3   A   It was originally formed, I believe, back in the 1950s.

4   At that time, it was an organization of just retired police

5   officers, and in the '70s it merged with fire and became

6   known as the name that it operates under now.

7   Q   Would you please take a look at the document that's been

8   labeled as Exhibit 304?  I'm sorry.  Is there an exhibit book

9   up there for you?

10  A   No.

11          THE COURT:  On the table there to your right.

12          THE WITNESS:  That could be it.

13          MR. MORRIS:  Yes, please.  Can you display 304,

14  please?

15          THE WITNESS:  Okay.

16  BY MR. MORRIS:

17  Q   Can you tell me, please, if you can identify this

18  document?

19  A   It's the restated by-laws for the association.

20  Q   And would you take a look, please, at page 6, page 6 by

21  paper?  It's the numbered page 1.

22  A   Okay.

23  Q   And look at Article II, Section 1, and can you tell me,

24  please -- tell the Court what that states?

25  A   It's to provide the members with information concerning

1   the status of pensions, hospitalization, and insurances and

2   to keep the members informed on all matters relative to the

3   best interest of the association and its members.

4   Q   And is this stated in the by-laws as the purpose of the

5   organization?

6   A   Yes, sir.

7   Q   And is that an accurate statement of the association's

8   objectives and purpose, as far as you understand it?

9   A   Yes.

10  Q   And does the association, in fact, provide its members

11  with information concerning the status of pensions,

12  hospitalization, and insurances?

13  A   Yes, it does.

14  Q   How does it provide that information?

15  A   A number of different ways.  Like I mentioned earlier, we

16  have a full-time office where the members have access to the

17  office.  We have a website which the information is posted on

18  our website.  We regularly send out e-mails.  We have 3,000

19  of our members on e-mail.  We have regular general monthly

20  membership meetings, and we inform the members at those

21  meetings also.

22  Q   Does the association also provide information to

23  nonmember retirees?

24  A   Yes.

25  Q   And how does it do that?

1  A   It's available on our website.  Our website is not

2  password protected, and all of our information is displayed

3  on that website.  Also, on an annual basis we send out a copy

4  of our monthly Unity magazine to all members, nonmembers and

5  the like, and whenever it's necessary when very important

6  issues come up, we notify by mail all retired police officers

7  and fire fighters, and we've done that on a number of

8  occasions.

9  Q   Do you have the capacity to communicate by e-mail as

10  well?

11  A   Yes.  Like I said, we have about 3,000 members on e-mail.

12  Q   And are regular membership meetings conducted?

13  A   Yes, once a month.

14  Q   Is there information on the website relating to the

15  bankruptcy case?

16  A   Yes, there is.

17  Q   Do police and fire retirees communicate with the

18  association?

19  A   Yes.

20  Q   And how do they communicate with the association?

21  A   By phone, by e-mail, at the general membership meeting,

22  by letters.

23  Q   Have you noticed an increase in the number of letters

24  since the bankruptcy has been filed?

25  A   Yes.  I think we received around 900 letters in the last

1  couple months from the members.

2  Q   And how many members does the association have?

3  A   Right around 6,500.

4  Q   How many total police and fire retirees are there?

5  A   I believe it's right around 8,000.

6  Q   Do the members pay dues?

7  A   Yes.

8  Q   Is membership in the association automatic when you

9  retire from police or fire service?

10  A   No.  It used to be automatic for the fire fighters

11  because the Fireman's Fund used to provide the first year's

12  membership, but they don't do that.  They quit this year.

13  Q   Has the association in the past been a party to any

14  lawsuit regarding benefit for police and fire -- benefits for

15  police and fire retirees?

16  A   A number of lawsuits.

17  Q   Has the association ever been a party to any compromise

18  regarding healthcare benefits?

19  A   Yes, they have.

20  Q   And can you please tell me about that?

21  A   Yeah.  The latest would be referred to as the Weiler

22  settlement agreement.  I think that was reached in 2009; had

23  to do with reductions in healthcare benefits to retired

24  police officers and fire fighters.

25  Q   And did the association participate in that settlement --

1    A    Yes, they did.

2    Q    -- or that reduction, I should say?

3    A    Yes, they did.

4    Q    How did that occur?

5    A    Once the benefits were changed, we initiated a lawsuit

6    against the City of Detroit, and during the hearings on that,

7    there were some negotiations started to take place with our

8    attorneys and with Judge Torres, and we were able to come up

9    with what we felt was a compromise.  And we addressed that to

10   our memberships in advance, and we told the -- advised our

11   attorney to go ahead with the settlement agreement.

12   Q    And was that settlement, in fact, implemented?

13   A    Yes, it was.

14   Q    Has the association ever lobbied the state legislature on

15   behalf of police and fire retirees?

16   A    Yeah, on a number of occasions.

17   Q    Can you tell me about one of those occasions --

18   A    Well, we --

19   Q    -- for example?

20   A    We had three different pieces of legislation that we

21   assisted in drafting, had to do with the composition of the

22   police and fire pension board in the City of Detroit.

23   Q    As president of the association, have you ever been

24   consulted by elected officials to discuss proposed

25   legislation at the state level?

1  A   At the state, yes, I have.

2  Q   Can you give me an example of that?

3  A   Andy Dillon has contacted me as the president of the

4  association to discuss legislation up there, and also the

5  mayor of the City of Detroit contacted me to discuss

6  legislation on the city.

7  Q   Have you ever served on a committee regarding benefits

8  legislation?

9  A   Yes, I have.  When Andy Dillon -- when he was the Speaker

10  of the House -- I think it was about four years ago -- he

11  proposed legislation that would establish a statewide

12  healthcare program for public employees within a committee

13  that he chaired, and there was a breakout committee for

14  retirees, and I was asked to serve on that breakout committee

15  representing retirees.

16  Q   Mr. Taylor, are you registered as a lobbying agent?

17  A   As a lobbying agent for the retired Detroit Police and

18  Fire Fighters Association.

19  Q   Has the association ever expressed a position before the

20  City Council on behalf of retirees?

21  A   A number of occasions.

22  Q   Was the association involved with the Detroit City

23  Charter Revision Committee --

24  A   Yes, it was.

25  Q   -- or Commission, I should say?

1   A   Commission.

2   Q   Was it the Detroit --

3   A   Yeah, to revise.

4   Q   -- City Charter Revision Commission?

5   A   Revise the charter, yes.

6   Q   And when was the Charter Revision Commission active?

7   A   I believe the election was in 2011, so 2010, 2011.

8   Q   What was the purpose of your association participating in

9  the commission?

10  A   As the president of the association, I was invited to

11  participate in the portion of the charter revision that

12  referred to the pensions, and I was -- took part in the

13  board, questions from the public and from the board.

14  Q   Have you met with state officials on behalf of the

15  association?

16  A   Yes, a number of them.

17  Q   Did you meet this spring with State Treasurer Dillon?

18  A   Yes, I did.

19  Q   And did you request that meeting?

20  A   Yes, I did.

21  Q   Why did you want to meet with Mr. Dillon?

22  A   It was shortly after the new emergency manager

23  legislation had been passed, and I notified him that I wanted

24  to meet with him to discuss any possible effect that it could

25  have on retired police officers and fire fighters.

1  Q   Did you advise Mr. Dillon of any concern for payment of

2  pensions and benefits?

3  A   At that meeting?

4  Q   Yes.

5  A   Yes.  We discussed a number of issues at the meeting.

6  Q   Did you ask Mr. Dillon about the effect the legislation

7  might have on police and fire retirees?

8  A   Yes.  During the discussion, I brought up what proposals

9  or what possible changes that he could see on a number of

10 issues.  One of those included the composition of the police

11 and fire retirement board, and he indicated that there may be

12 some changes on that board, but it would not affect retirees'

13 positions.  I then asked him if there was anything that he

14 would see as possible changes on the pensions or anything of

15 that nature, and he informed me that there would be no

16 changes because the current retirees' pensions were

17 guaranteed by the state Constitution, but they were looking

18 at possible changes for future retirees on the way in which

19 their pensions may be calculated in the future.  And I also

20 asked him about our healthcare settlement, the Weiler

21 settlement agreement, if he's seen any possibility that that

22 would be affected during these hearings, and --

23 Q   Did you receive a response to that question?

24 A   Yes.  He informed me it was the State of Michigan's

25 intention to attempt to set aside that agreement or overturn

1  that agreement.

2          MR. IRWIN:  Your Honor, I have an objection to the

3  testimony as hearsay.

4          THE COURT:  This was -- these were statements that

5  Mr. Dillon made to you?

6          THE WITNESS:  Directly to me, yes, sir.

7          THE COURT:  The objection is overruled.  You may

8  proceed.

9  BY MR. MORRIS:

10 Q   Mr. Taylor, did you become aware this spring of the

11 appointment of Mr. Orr as emergency manager for the City of

12 Detroit?

13 A   Yes, I did.

14 Q   And following his appointment, did you contact Mr. Orr?

15 A   Yes.  I sent a letter and requested a meeting.

16 Q   Did you receive any response?

17 A   Yes, I did.  His office contacted me by phone and set up

18 a date for a meeting.

19 Q   And did you eventually meet with Mr. Orr?

20 A   Yes, I did.

21 Q   And do you recall when that meeting occurred?

22 A   It was towards the end of April.  I think it was April

23 18th.

24 Q   And who was at that meeting?

25 A   It was the secretary treasurer of our association, Allan

1  Grant; the vice president of our association, Greg Trozack;

2  Mr. Orr; and myself.

3  Q   And what was discussed at the meeting?

4  A   There was a number of issues.  We had a 45-minute

5  meeting, and, first of all, I introduced who we were and what

6  our organization does, and I asked him some of the same

7  questions I had spoke with with Mr. Dillon.  I asked him if

8  he seen changes in the composition of the pension board, and

9  he said he hadn't made any decisions on that yet.  I asked

10  him if he was -- about the pensions of retirees.  He said

11  that he was fully aware that the pensions were protected by

12  the state Constitution, and he had no intention of trying to

13  modify or set aside it or change the state Constitution, and

14  I went on.  I asked him if he was familiar with the Weiler

15  settlement agreement.  He indicated that he was, and he

16  indicated to me that he was -- assured me that under the

17  Emergency Manager Act, he had no authority to set aside that

18  agreement or modify that agreement.  After he made that

19  statement, I told him that I'd had a meeting with Andy

20  Dillon, and Andy Dillon had indicated that the state's

21  intention was to attempt to overturn that settlement

22  agreement.  He indicated that he doesn't speak for the state,

23  but that was not his intention, and he had no intention of

24  trying to set aside that agreement.

25  Q   Was there any discussion at that meeting about the

1  possibility of having future meetings with Mr. Orr?

2  A   Yeah.  Following the meeting, Mr. Orr indicated to me as

3  he was just starting to proceed and there was more

4  information that he was gathering, and as the process moved

5  along, he would contact our association for further meetings.

6  Q   After this meeting, did you communicate the results to

7  the board of directors of the association?

8  A   Yes, I did, and also to the membership.  I sent out an e-

9  mail regarding our meeting.

10 Q   Was an e-mail sent to the membership?

11 A   Yes.

12 Q   To the e-mail list?

13 A   Yes.

14 Q   After your meeting with Mr. Orr, did you receive a

15 communication from the city asking who the association

16 represents?

17 A   Yes, I did.

18 Q   And did you respond to that?

19 A   Yes, I did, that we represent all police and fire

20 retirees.

21 Q   After meeting with Mr. Orr, did you hear again from Mr.

22 Dillon's office?

23 A   Yes.  I received an e-mail from Mr. Dillon's office -- I

24 think it would be towards the end of May, maybe the first

25 part of June -- advising me that I should contact

1    Mr. Buckfire's -- Ken Buckfire and one other member of his

2    team regarding things that may affect police and fire in the

3    bankruptcy proceedings.

4    Q    Did you contact Mr. Buckfire?

5    A    Yeah.  I sent e-mails to Mr. Buckfire, and I don't recall

6    the other representative's name.  And I also called

7    Mr. Buckfire by phone and left a message with his secretary.

8    Q    Did you receive --

9    A    I assume it was his secretary.

10   Q    Did you receive a response?

11   A    Yes, I did, in both occasions, by e-mail and by phone.

12   Q    And what was the response?

13   A    Mr. Buckfire indicated to me by phone that they would be

14   in touch and they would be setting up meetings and would get

15   back with me at a later time, and that was pretty much --

16   both e-mails came back from both representatives saying

17   basically the same thing, that they would be in touch and

18   meetings would be set up in the future.

19   Q    And were further meetings set up?

20   A    Not with our organization.

21   Q    But did you attend a meeting on June 14th at the Metro

22   Airport?

23   A    Yes, I did.

24   Q    And were you invited to attend that meeting?

25   A    Yes, I was.

1  Q   Who invited the association to attend the meeting?

2  A   It was done by e-mail.  It was from representatives from

3  Jones Day.  I don't recall the name.

4  Q   Who attended on behalf of the association?

5  A   We were limited to two, and it was the secretary-

6  treasurer, Allan Grant, and myself.

7  Q   Do you recall how many persons were in the audience at

8  that meeting?

9  A   It was maybe at least a couple hundred.

10  Q   Do you know what groups were represented at that meeting?

11  A   There was -- pretty much every group was represented

12  there, the active associations, the pension board, the

13  bondholders, every --

14  Q   Was the proposal for creditors document that's been

15  referred to circulated at that meeting?

16  A   Yes, it was.

17  Q   Did you receive a copy?

18  A   Yes.

19  Q   Did you furnish a copy to the association's attorneys?

20  A   Yes, I did.

21  Q   At that meeting, were you or other representatives of the

22  association given an opportunity to discuss your position?

23  A   No, not to discuss the position.

24  Q   Was there an opportunity to submit questions?

25  A   You could submit written questions.

1    Q    Did you submit a question?

2    A    No.

3    Q    And was there a reason why you didn't submit a question?

4    A    At that point, I had met with the state treasurer and

5    Mr. Orr, and I was under the impression that the members of

6    the Retired Police Officers and Fire Fighters benefits were

7    not at that great a risk at that point, and I was informed

8    that Mr. Orr would notify me and would set up future meetings

9    with our association if it became necessary.

10   Q    And following that meeting, did you report back to the

11   board of directors?

12   A    Yes.

13   Q    Did you attend another meeting on June 20?

14   A    Yes.

15   Q    And do you recall where that meeting occurred, where that

16   was held?

17   A    I think that was the one in the auditorium at City County

18   Building.

19   Q    And was there someone that invited you to attend?

20   A    Yes, same way, by e-mail.

21   Q    And who attended on behalf of the association?

22   A    Once again, it was restricted to -- I was -- myself and

23   our attorney, Brian O'Keefe.

24   Q    And this -- you said it was restricted.  What do you mean

25   by --

1   A    We had two positions, yes.

2   Q    You were allowed to have two people attend?

3   A    Yeah.

4   Q    Do you recall how many persons were in the audience?

5   A    I'm going to guess 50, 60.

6   Q    And what groups were represented?

7   A    All the active labor organizations were there, and I

8   think there was probably representatives from the pension

9   board and some that I'm not familiar with who they were, but

10  there was a number of people there.

11  Q    Did the city at this meeting tell you what it intended to

12  do with police and fire pensions?

13  A    No, they didn't.

14  Q    Were you asked your position?

15  A    No.

16  Q    Did you submit any questions at this meeting?

17  A    No.

18  Q    And why not?

19  A    Once again, I had no reason to submit.  I was still under

20  the impression -- I wasn't sure what they were referring to

21  and --

22  Q    How many different retiree groups were represented at

23  that meeting?

24  A    One.

25  Q    Basically two people there on behalf of your association?

1  A   Yeah.  I was the only retiree and an attorney, as far as

2  I know.  There may have been some individual retirees with

3  him, but there was no retiree association.

4  Q   Now, did you attend another meeting with the city?

5  A   Yes.

6  Q   In July?

7  A   Yeah.

8  Q   Do you recall the date of that meeting?

9  A   There was two in a row.  I think they were the 10th and

10 11th.

11 Q   And were you invited to attend that meeting?

12 A   Not initially, no.

13 Q   Did you hear about it somewhere?

14 A   Yeah.  One of our board members is -- he also is a member

15 of the Police Officers Association of Michigan, and he was

16 invited as a representative for the EMS.  And once he was

17 invited, he sent me a copy of his e-mail, and once I received

18 his e-mail that these meetings were set up, I contacted the

19 phone number at the bottom of his and asked if we would be

20 allowed to attend to represent the interest of retirees, and

21 I don't recall the name of the person, but they was from

22 Jones Day, and they indicated that they would run it up the

23 chain and get back with me.

24 Q   And did you receive a response?  Did you receive a --

25 A   No.  I also forwarded that e-mail to our attorney, and he

1  indicated he also called and requested a meeting, and a few

2  hours later that day he notified me that they were going to

3  give us one position.

4  Q   Now, are EMS part of the police and fire?

5  A   No.

6  Q   Was there also a limit on the number of persons permitted

7  to attend this meeting on behalf of the --

8  A   Yeah.  Initially it was just going to be one, and then

9  the attorney indicated to me that he called them back, and

10  they were allowed -- I was allowed to bring an attorney.

11          THE COURT:  Allowed to bring what, sir?

12          THE WITNESS:  The attorney.

13  BY MR. MORRIS:

14  Q   And who was in attendance at this meeting?  Who was in

15  the audience?

16  A   Once again, it was all the public safety unions and

17  different labor organizations and I think probably the

18  pension board and pension trustees, the actuaries, and

19  depends on what you --

20  Q   Did the city make a proposal at that meeting with respect

21  to police and fire retirees?

22  A   No.  Well, which meeting are you referring to?

23  Q   July --

24  A   I assume the pension meeting was first, right, the

25  pension -- that was the 10th?

1   Q   July 10 I'm referring --

2   A   Yeah.

3   Q   -- to, the first of the two meetings.

4   A   Yeah.

5   Q   Was there a discussion at this meeting regarding active

6   employees?

7   A   Yes.  There was a lot of discussion because it was pretty

8   much all active members there with the exception of myself,

9   and there was some discussion over modifications on how their

10  pensions were going to be altered or administered in the

11  future, so most of the meeting geared around the active

12  members.

13  Q   Are those issues that concern your association?

14  A   No.

15  Q   Was there discussion regarding retiree issues?

16  A   Not that I recall.

17  Q   At this meeting, were you asked your position on any

18  issues?

19  A   No.

20  Q   Did you have any questions at this meeting?

21  A   No.

22  Q   Did the city at this meeting state that it intended to

23  reduce or impair police and fire pensions for current

24  retirees?

25  A   Not for current retirees.

1  Q   Now, you also said there was another meeting --

2  A   The next day.

3  Q   -- the next day?

4  A   Yes.

5  Q   And was that -- did that meeting regard --

6  A   Healthcare.

7  Q   -- healthcare?

8  A   Yeah.

9  Q   And were you invited to this meeting?

10 A   In the same method as the previous one.  It was done at

11 the same time.

12 Q   Two meetings go together.

13 A   Yeah.  They were published at the same -- together as

14 joint meetings.

15 Q   And was the audience similar to the July 10 meeting?

16 A   Yes.  There may have been a little -- I'm not sure at the

17 second meeting if the actuaries from the pension board was

18 there or not.

19 Q   Did the city at this meeting make a proposal regarding

20 police and fire retirement benefits?

21 A   They passed out a -- I guess you could call it a

22 proposal.  It was a four-line -- just one paragraph that had

23 four options for healthcare benefits for retirees.

24 Q   Like the names of healthcare plans?

25 A   There was two options from Blue Cross and two options

1   from HAP.

2   Q   Did you ask any questions at this meeting?

3   A   Yes.  I asked one question regarding whether their

4   intention was to modify or to include those that were covered

5   by the Weiler settlement agreement in this healthcare

6   proposal.

7   Q   Did you receive an answer to your question?

8   A   Not a direct -- at that point, once I asked that

9   question, the attorney who represented us in the -- Mr.

10  Legghio, Mr. Chris Legghio, was present, and he kind of took

11  over once I brought up the question, and then there was an

12  exchange of legal back and forward between that attorney and

13  the Jones Day attorneys.  And they indicated that there was

14  some legal questions regarding whether they would be able to

15  enforce that, and that was still being looked into by the

16  attorneys.

17  Q   The attorney you referred to, Mr. Legghio, had he been

18  involved in the Weiler litigation?

19  A   Yeah.  He was the -- he was the attorney that handled the

20  class action.

21  Q   Following this meeting, did you have the opportunity to

22  ask for a separate meeting with the emergency manager's

23  representatives?

24  A   Yeah.  I don't recall the exact procedure.  It was either

25  after that meeting or the previous one.  As I was leaving the

1  meeting with our attorney, Brian O'Keefe ran into one of the

2  Jones Day senior attorneys. Once again, I'm not good with

3  names, you know, but we -- they had a brief discussion in the

4  hallway. At that time, I indicated to him that we would like

5  to have a meeting on our own, a breakout meeting just

6  affecting retired Detroit police and fire fighters.

7  Q   Did that meeting ever occur?

8  A   No. He indicated to our attorney that -- asked that the

9  attorney, you know, put that in writing, forward it to him,

10  and forward the request to him.

11  Q   Following this meeting or these meetings on July 10 and

12  July 11, did you meet with any of the other persons in the

13  audience to discuss issues?

14  A   Following the meeting? After the second meeting, the

15  active unions, we all met out in the hallway for a short

16  time, you know, right outside the meeting, and then we

17  decided to all go over to the office of the Detroit Police

18  Officers Association and discuss what had just transpired.

19  Q   And did you attend that meeting at the --

20  A   Yes, I did --

21  Q   -- DPOA headquarters?

22  A   -- along with our attorney. We all went to the offices

23  of the Detroit Police Officers Association.

24  Q   Did you hear testimony previously regarding a letter sent

25  by the public safety unions to the city manager?

1   A   Yes.

2   Q   Do you recall that letter that was being discussed?

3   A   Not at that particular -- what we discussed at that

4   meeting when we all got in, we decided that as a group we

5   would select like a lead organization to represent us as a

6   group and request further meetings, and at that meeting we

7   decided that the lead would be the Detroit Police Officer --

8   the president of the Detroit Police Officers Association, and

9   he asked that we all submit questions to him so that he could

10  forward this information or request on to the city's

11  representatives.

12  Q   So is it fair to state that you participated in

13  discussions that led up to a letter being sent?

14  A   Yeah.  I was involved in a meeting with the Detroit

15  Police Officers Association.

16  Q   Did the association -- after the bankruptcy was filed,

17  did the association send out a mailing to police and fire

18  retirees?

19  A   Yeah.  That's what we considered -- referred to as a

20  consent agreement where we sent letters out to all the

21  retired police officers and fire fighters asking if they

22  wanted to -- us to represent them in the bankruptcy

23  proceedings.

24  Q   Was this sent immediately after the bankruptcy was filed?

25  A   Yes.

1   Q   And who was this sent to?

2   A   All retired police officers and fire fighters.

3   Q   And what responses were received?

4   A   We got back at this point I think a little over 5,300.

5   Q   Did you receive any responses from nonmembers?

6   A   Yes.

7   Q   Did you receive any responses that indicate that the

8   association should not represent the retirees?

9   A   Yes, we did.

10   Q   How many of those did you receive?

11   A   One.

12   Q   Did you receive any responses that indicated that the

13   retirees wanted the association to represent the retirees?

14   A   Yes, as I said, 5,300, over 5,300.

15   Q   Did you receive feedback from police and fire retirees

16   regarding the city's bankruptcy petition?

17   A   You're going to have to repeat that.

18   Q   Did you receive feedback?  Did the association receive

19   feedback from police and fire retirees regarding the city's

20   bankruptcy petition?

21   A   Oh, yeah.  As I said, we have a full-time office, and the

22   phones have -- basically, like I say, ringing off the hook.

23   We were constantly receiving phone calls, e-mails, and

24   letters asking what's going to happen, are they going to --

25   many times before the first of the month we got calls to ask

1    if they're going to get their pension check, is our pension

2    check still coming, what's going to happen on January 1st.

3    We -- it's hundreds of inquiries.

4    Q    Was the board of directors of the association in a

5    position to receive a proposal from the city regarding police

6    and fire retirees?

7    A    Yes.

8    Q    Was it in a position to consider such a proposal?

9    A    Yes.

10   Q    Was the board in a position to transmit any such proposal

11   or other information to the membership?

12   A    Yes.

13   Q    Was the board in a position to transmit that information

14   to the retirees, the police and fire retirees who were not

15   members?

16   A    Yes.

17          MR. IRWIN:  Objection.  This is very leading, your

18   Honor.

19          THE COURT:  No.  I'll permit this.  Go ahead, sir.

20   BY MR. MORRIS:

21   Q    Did the city ever make a proposal specifically to police

22   and fire retirees?

23   A    No, not that I'm aware of, not to our organization.

24   Q    Did you ever inform Mr. Orr that the RDPFFA did not want

25   to represent police and fire retirees?

1   A   No.

2   Q   Did negotiations occur with the RDPFFA?

3   A   No.

4   Q   Was it possible for the city to negotiate with the

5   RDPFFA?

6   A   Yes.

7   Q   Has the uncertainty regarding future pensions -- pension

8   and benefit payments affected your members?

9   A   Yes.

10  Q   Has it affected you personally?

11  A   Yes.  Everything affects everybody.  You're not sure

12  what's going to happen, whether on January 1st -- my personal

13  thing, my daughter has asked me to loan her money for a down-

14  payment on a house, and I told her we're going to have to

15  wait a few months, see what happens.  My car currently has

16  250,000 miles on it.  It's still running, but it's got 250,

17  so I'm holding off any big expenditures until I get a better

18  picture of what's going to -- the future is going to hold.

19           MR. MORRIS:  Thank you, Mr. Taylor.  I have no

20  further questions.

21                      CROSS-EXAMINATION

22  BY MR. IRWIN:

23  Q   Good afternoon, Mr. Taylor.

24  A   Good afternoon.

25  Q   I just want to revisit briefly something that you

1    described in connection with your background and the

2    background of the organization, the --

3    A    Okay.

4    Q    -- RDPFFA.  We saw earlier in connection with the by-laws

5    of the organization that there are actually two missions, if

6    you will, for the organization.  One was to provide

7    information.  Do you recall that?

8    A    Yes.

9    Q    And the other was to promote goodwill among the

10   membership; is that right?

11   A    Yes.

12   Q    And did the organization start or did it have roots as a

13   social organization of some sort?

14   A    Oh, yes.  Yes.

15   Q    And it was formed over 50 years ago?

16   A    Yes.

17   Q    And you consider the organization to be advocates for the

18   membership; is that right?

19   A    Yeah, advocates for all retired police officers and fire

20   fighters.

21   Q    Correct.  And I believe that you have indicated that the

22   organization has been involved in lawsuits before; is that

23   right?

24   A    Yes.

25   Q    And is it a true statement that the only time that the

1  organization has been able to bind the members in connection

2  with a reduction in benefits has been by court order or by

3  consent of all the retirees; is that right?

4  A   Yeah.  It was either by court order or consent.  There

5  was a time when we used consent on the 13th check agreement.

6  Q   And in connection with the settlement agreement that you

7  were talking about, that was done with the consent of the

8  members; is that right?

9  A   Yes.

10  Q   And -- well, I'll return to that in just a moment.  The

11  Weiler settlement agreement that you were talking about

12  previously, do you recall that --

13  A   Yes.

14  Q   -- testimony?  And that was a topic that had actually

15  come up at a number of the meetings that you had with the

16  city; is that right?

17  A   Yes, with the city and the state.

18  Q   And I think you mentioned that at your first meeting with

19  Mr. Orr -- I think you said that was late April; is that

20  right?

21  A   Yes.  April 18th I think was the date.

22  Q   And you said that that was -- that particular consent

23  decree was important enough to you that you wanted to make

24  sure that there was some discussion about that at the

25  meeting; is that right?

1    A    Yes.

2    Q    Okay.  Did you at that meeting indicate to Mr. Orr that

3    you had any authority from the membership of the organization

4    to renegotiate the Weiler consent decree?

5    A    No.  I wouldn't seek that in advance.  Why would I seek

6    that in advance?

7    Q    Did you ever -- did you ever in the -- did you ever,

8    prior to the time that the bankruptcy was filed, seek

9    authority from the membership of your organization to reduce

10   the benefits that were memorialized in the Weiler consent

11   decree?

12   A    No.  I don't see that as part of the negotiating process.

13   I was a member of the Detroit Police Officers Association

14   from 20 years as an executive there, and we never sought in

15   advance permission from the members to reduce benefits then

16   either.  That's not something -- I don't see that as part of

17   the bargaining process.

18   Q    Is that a "no"?  Is it a fair statement to say that you

19   did not, in fact, get authorization from the membership at

20   any time prior to the bankruptcy filing to renegotiate the

21   Weiler consent decree?

22   A    I didn't feel it was necessary at that point.

23   Q    Okay.  And did you ever indicate -- I assume then you

24   never indicated to Mr. Orr or any city officials at your

25   meetings that you were prepared to renegotiate the Weiler

1 | consent decree?

2 | A    No.   Mr. Orr --

3 | MR. MORRIS:  Objection.  Asked and answered.

4 | THE COURT:  It's a slightly different question.  You

5 | may answer it, sir.

6 | THE WITNESS:  Mr. Orr never indicated to me at our

7 | meeting -- I think I said that -- that he intended to reduce

8 | our benefits, so I wasn't going to suggest that he reduce our

9 | benefits.

10 | BY MR. IRWIN:

11 | Q    Did you ever indicate -- or the discussion that you

12 | described at one of the meetings -- I think it was the -- one

13 | of the July meetings, and you said there was an attorney

14 | there for the class in the Weiler consent decree.  He was

15 | present at the meeting.

16 | A    Yeah.  Chris Legghio.

17 | Q    And do you recall observing the communications or the

18 | dialogue back and forth between Mr. Legghio and the Jones Day

19 | attorneys?

20 | A    Yes.

21 | Q    Okay.  Did you observe -- in what you saw and heard, did

22 | you observe Mr. Legghio at any time make an offer to

23 | renegotiate the terms of Weiler?

24 | A    No.

25 | Q    And did anyone at that meeting indicate to anyone at the

1    city that they had authority from the members of your

2    organization to renegotiate Weiler?

3    A   Once again, I think you're putting things ahead of time.

4    Why would we negotiate something before anything is offered?

5            THE COURT:  Is the answer "no"?

6            THE WITNESS:  No.  The answer is "no."

7    BY MR. IRWIN:

8    Q   Did you believe that the city had the right to

9    renegotiate the terms of Weiler at that meeting?

10   A   Through consent, yes.

11   Q   And have you at any point in time, even after the

12   bankruptcy filing, approached your membership and asked for

13   consent or authorization to renegotiate Weiler?

14   A   Once again, I repeat the same thing.  I don't have -- it

15   would be premature.

16   Q   Is that a "no"?

17   A   That's a "no."

18   Q   Okay.  And is it also true, Mr. Taylor, that your

19   organization, the RDPFFA, has not negotiated in a binding way

20   a reduction in healthcare costs -- or sorry -- healthcare

21   benefits for its membership?

22   A   No, that's not true.  We did do -- we did negotiate a

23   reduction in healthcare benefits.

24   Q   Are you talking about the Weiler --

25   A   Yes.

1    Q    -- consent decree?  Setting Weiler aside, which was a

2    class action lawsuit --

3    A    Yeah.

4    Q    -- has there ever been any other instance where the

5    organization has had the authority and has negotiated with

6    binding effect to reduce healthcare benefits to the members?

7    A    No.  It was never necessary.

8    Q    Okay.  And has there ever been any other attempt by the

9    organization to get authority from its members to reduce

10   healthcare benefits in a binding way?

11   A    No.  It was never necessary.

12   Q    So the way the process would need to work then, if I

13   understand it, is that the organization would, if invited,

14   participate in negotiations with the city; is that right?

15   A    Yes.

16   Q    Okay.  And then what would happen -- if the city were to

17   make a proposal to the RDPFFA, that is a proposal that the

18   RDPPFFA (sic) could consider; is that right?

19   A    That's right.

20   Q    And it could negotiate -- it could pass along that

21   information to the members; is that right?

22   A    Yes.

23   Q    And it could even perhaps recommend that the membership

24   accept that proposal; is that right?

25   A    That's what we've done in the past, yes.

1  Q    But ultimately is it not true that it would be up to the

2  individual members of the association to decide if they would

3  accept or reject that offer?

4  A    Yes.

5  Q    Okay.  And so it could be the case certainly that the

6  city could negotiate with your organization and make a

7  proposal and, in fact, reach an agreement in principle only

8  to find that the vast majority if not all of the members

9  rejected it?

10  A    And that would be true with the actives the same.  They

11  vote on their contracts.

12  Q    And in that case, the city would have to negotiate with

13  the individual members themselves if they wanted to reach an

14  agreement to reduce benefits?

15  A    No.  I believe we could follow the same procedure that we

16  followed with the Weiler.  We'd bring in the assistance of

17  attorneys and a court.

18  Q    But in terms of a straightforward negotiation, though,

19  the city would have to negotiate with members individually in

20  that case; is that right?

21  A    Not necessarily.  I just said we did it with the Weiler

22  through a class action.  I believe they could follow the same

23  proceeding.

24  Q    Outside of a class action setting where the members are

25  suing the city, if we're just talking about a negotiation

1 where the city is attempting to reduce healthcare benefits,

2 if the city made a proposal, it would ultimately have to

3 negotiate with the individual members; is that right?

4 A   Yeah.  I believe they could put it out --

5            MR. MORRIS:  Objection, your Honor.

6            THE WITNESS:  -- for a vote, and the members --

7            MR. MORRIS:  Calls -- I'm sorry.

8            THE COURT:  What is your objection, sir?

9            MR. MORRIS:  Calls for a legal conclusion.

10            THE COURT:  Well, the witness can give us his

11 understanding if he feels comfortable doing that.

12            THE WITNESS:  Yes, sir.  I'll give an answer.  I

13 believe that the city could propose that to the retired

14 police officers and fire fighters, and they could vote on the

15 proposal.

16 BY MR. IRWIN:

17 Q   They would decide for themselves if they wanted to accept

18 the proposal; is that right?

19 A   Yes, they would.

20 Q   All right.  We've been talking about healthcare benefits;

21 right?  We've been talking about the Weiler settlement and --

22 A   Yes.

23 Q   -- healthcare benefits.  Let's talk about pension issues

24 for a moment, if we could.

25 A   Okay.

1  Q   It is your position, is it not, Mr. Taylor, that the

2  organization -- your organization is not empowered to enter

3  into binding agreements with the city in order to reduce

4  pension benefits?  Is that a true statement?

5  A   Not on our own, and it would have to be done in the same

6  method, and it would have to -- obviously that one would have

7  to be a consent, and that is a more legal question than I

8  could answer.

9           MR. IRWIN:  Well, let's put -- why don't we put

10  up -- let's put up Exhibit 302, if we could.

11  BY MR. IRWIN:

12  Q   Do you see Exhibit 302 in front of you, Mr. Taylor?

13  A   Yes, I do.

14  Q   Do you recall -- do you recall providing a declaration in

15  connection with the legal proceedings in this case?

16  A   Yes.

17  Q   And is this a true and accurate copy, to the best you can

18  tell, of that declaration?

19  A   Yes.

20  Q   And did you sign it on or around August 19th of this

21  year?

22  A   If that's the date, yeah.  It would be around then.

23  Q   We can confirm it.

24  A   Yeah.

25  Q   It's on the last page of the document.

1   A    Okay.  Yeah.

2   Q    Is that your signature on the last page?

3   A    Yes, sir.

4   Q    Okay.  If I could direct your attention, please, to

5   paragraph 6 of that document -- it's on the second page at

6   the bottom.

7   A    Okay.

8   Q    Have you had a chance just to read that paragraph?

9   A    Yes.

10   Q    I'd like to direct your attention to the second line

11   where you state, "The RDPFFA is not empowered to enter into a

12   binding agreement with the city regarding pension benefits."

13   A    Yes.

14   Q    Do you see that?

15   A    I stated that, not without outside assistance.

16   Q    Not without outside assistance.  You mean the consent of

17   the members?

18   A    Yes, or through the legal process through a court.

19   Q    Right.  So the organization does not have the authority

20   absent the consent --

21   A    Consent, yes.

22   Q    -- of the members who you would purport to bind --

23   A    Right.

24   Q    -- in order to reduce pension benefits?

25   A    Right, yeah.

1    Q    Which means that if the city were to wish to negotiate a

2    reduction in pension benefits, ultimately it would need to

3    negotiate with the individual members; correct?

4    A    Not the individual members.  They could put a proposal

5    and present it for their vote, yes.

6              MR. IRWIN:  And if we could -- while we're on the

7    subject of pension benefits, if we could also put up --

8    Laurie, if you could put up Exhibit 83.

9    BY MR. IRWIN:

10   Q    Do you see Exhibit 83 in front of you, Mr. Taylor?

11   A    Yes.

12   Q    Do you recall participating in responding to written

13   questions that were posed to your organization in connection

14   with this proceeding?

15   A    Yes.

16             MR. IRWIN:  And could we go to the last page of

17   document, Laurie, the signature page?  If you could blow up

18   that bottom left section --

19             THE WITNESS:  Yeah.  I can see it.

20   BY MR. IRWIN:

21   Q    Can you see it okay?

22   A    Yeah.

23   Q    Okay.  Is that your signature, Mr. Taylor?

24   A    Yes.

25   Q    Does that indicate that you personally participated in

1    the preparation of the responses to these questions?

2    A    Yes.  I reviewed them, yeah.

3    Q    To the extent they applied to your organization.

4    A    Yeah.

5    Q    This was a composite set of questions and answers, some

6    of which applied to your organization and some to another; is

7    that right?

8    A    That's right.

9    Q    And to the extent that there are questions and answers

10   that relate to your organization, may I presume that you were

11   the person who provided the substantive responses and

12   verified them; is that right?

13   A    Yes.

14   Q    Okay.  And you signed this believing that these answers

15   were truthful and accurate?

16   A    Yes.

17   Q    Okay.

18          MR. IRWIN:  Could we then turn to -- let's look at

19   response Number 3 -- sorry -- response Number 5 is the one I

20   wanted to focus on, the question and answer Number 5.  I

21   think it's one more page.  There we go.  Could you blow that

22   up?

23   BY MR. IRWIN:

24   Q    All right.  This is a question, and I'll read it -- and

25   I'd like you to make sure I've read it right -- where we

1  ask -- the city asks to identify any person or persons who

2  have knowledge of any attempt prior to July 19th, 2013, by

3  the RDPFFA to obtain any form of legal authority from its

4  members to appoint RDPFFA as their representative in

5  connection with negotiations to reduce, limit, or abridge

6  pension rights or benefits on a prospective basis only

7  provided by the PFRS.  Do you see that?

8  A   Yes.

9  Q   And did you understand the question at the time you were

10 responding to it?

11 A   Yes.

12 Q   And is it a fair summary to say that the question is

13 asking for individuals with knowledge of any prior attempt to

14 get authority to negotiate a reduction in pension benefits on

15 behalf of the membership?

16 A   Yes.

17 Q   Okay.

18 A   Like I said, it would be premature.

19 Q   Yes.  But you answered this question, did you not?

20 A   Yes, I did.

21 Q   Okay.  And let's look at your answer.  It actually

22 extends onto the next page of the document.  There are

23 several lines where there are some objections that are

24 stated, and then there's a response that begins on the next

25 page.  Do you see that?

1  A    Yes.

2  Q    Okay.  And the answer provides -- there's a sentence that

3  begins, "However," and it says, "without waiving said

4  objections and in the spirit of cooperation, the RDPFFA

5  states that it is not aware of any individual with knowledge

6  responsive to this interrogatory."  Do you see that?

7  A    Yes.

8  Q    And may I interpret that to mean that there is no --

9            THE COURT:  Excuse me.  What answer were you reading

10  from?

11           MR. IRWIN:  The response to Number 5.  Maybe we

12  didn't have it pulled up the right away.

13           THE COURT:  Yeah.  Let's get this --

14           MR. IRWIN:  Yeah.

15           THE COURT:  -- set up properly here.

16           MR. IRWIN:  Yeah.  I think it was just a problem

17  with the screen.  I was reading from Number 5, and I'll do it

18  again.

19           THE COURT:  Here we go, yes.  It was the second page

20  on the screen that wasn't the correct second page, so --

21           MR. IRWIN:  Yeah.

22           THE COURT:  -- let's just hold on.

23           MR. IRWIN:  We'll blow it up.

24           THE COURT:  Hold on.

25           MR. IRWIN:  Yeah.

1   THE COURT: Yeah. Hold on one second.

2   MR. IRWIN: Right.

3   THE COURT: Okay. Now you may proceed.

4 BY MR. IRWIN:

5 Q   I apologize, Mr. Taylor. I think we've got this right

6 now.

7 A   All right. I was confused anyway.

8 Q   Sorry? We have it. Okay. I think we've got it right

9 now.

10 A   Okay.

11 Q   Okay. And I'll read it. I'll read from the answer.

12 A   Yeah.

13 Q   It says, "However, without waiving said objections and in

14 the spirit of cooperation, the RDPFFA states that it is not

15 aware of any individual with knowledge responsive to this

16 interrogatory." Do you see that?

17 A   Yes.

18 Q   And do I correctly interpret that to mean that you are

19 not aware of any prior instance where the organization has

20 asked for authority from the membership to negotiate a

21 reduction in pension benefits?

22 A   In advance, no, we haven't.

23 Q   We have not. And it is true that you did not ask for

24 permission in advance in this case here to negotiate with --

25 A   No.

1   Q    -- the city.

2   A    No.

3   Q    "No," that's correct?

4   A    Yes, that's correct.

5   Q    Okay.  Then I want to skip down to the end of the answer.

6   There's a sentence here that reads, "The RDPFFA would not

7   take any action to obtain or solicit authority from its

8   members to do something prohibited by the Michigan

9   Constitution."  Do you see that?

10  A    Yes.

11  Q    And you're aware that your organization has advanced a

12  claim in this case that pension benefits are protected by the

13  Michigan Constitution?

14  A    Yes.

15  Q    And is that the reference that you're making in this

16  answer?

17  A    Yes.

18  Q    Yes.  And the answer states that the organization would,

19  in fact, not ever seek authority from its members to reduce

20  those pension benefits because they're protected by the

21  Constitution?

22  A    Yes.

23  Q    Am I reading that right?

24  A    Yes, not without their consent.

25  Q    And did you make that plain to officials from the city at

1  any of the meetings that you attended?

2  A   No.

3  Q   Okay.  But it was your belief at the time that you would

4  not seek authority to negotiate a reduction in pension

5  benefits?

6  A   At the meetings I was at, it wasn't only my belief, it

7  was that of Mr. Orr and Mr. Dillon, so, once again, I'm not

8  sure why I would make such a statement.

9  Q   And at no point prior to the filing of the bankruptcy did

10  you make it plain to anyone at the city that you would not be

11  willing to negotiate pension benefits?

12  A   No.  What --

13        MR. MORRIS:  Objection.  Asked and answered.

14        THE COURT:  Well, I'll permit it.  I'll permit it

15  one more time.  Go ahead.

16        THE WITNESS:  Rephrase it again.

17  BY MR. IRWIN:

18  Q   Sure.  At any point in time prior to the filing of the

19  bankruptcy, did you come to understand that pension benefits

20  might, in fact, need to be renegotiated?

21  A   No, not the filing, not as it related to police and fire

22  pensions.

23  Q   And so, therefore, you did not indicate that you were

24  unwilling to negotiate reductions in pension benefits to

25  anyone at the city?

1    A    No, because I was told all along this process that the

2    pensions for police and fire were protected by the state

3    Constitution by Mr. Orr and by Mr. Dillon.

4    Q    And in connection with the meetings that you did attend,

5    you were provided -- you received either presentation

6    materials or you saw things that were presented to you; is

7    that right?

8    A    Yes.

9    Q    And did you at any point in time -- did you at any point

10   in time seek guidance from any advisors outside of counsel in

11   terms of how to interpret those presentations?

12   A    No, because I was -- at that point, I was still waiting

13   for a call back from Mr. Orr, and he had notified me when I

14   met with him if it came to the point where we were affected,

15   he would notify me, and we would be invited back to meet with

16   him, and that, I assumed, would be the time we would discuss

17   things that affected police and fire retirees.

18   Q    And if Mr. Orr at one such meeting had indicated to you

19   that he, in fact, did intend to impair pension benefits, it

20   was your belief at the time that that could not be done under

21   the Constitution?

22   A    He didn't indicate that to me.

23   Q    I understand that.

24   A    Yeah.

25   Q    But it was your belief that that could not be done?

1   A    Yes.

2   Q    Okay.

3              MR. IRWIN:  That's all I have, your Honor.

4              MR. MORRIS:  Could I have -- I'm sorry.  Go ahead.

5              MS. PATEK:  Good afternoon, Mr. Taylor.  Barbara

6   Patek, your Honor, again, on behalf of the Detroit public

7   safety unions.

8                        CROSS-EXAMINATION

9   BY MS. PATEK:

10  Q    In your testimony talking about the July 11th meeting,

11  you mentioned an attorney by the name of Chris Legghio, who

12  represented you in the Weiler litigation.

13  A    Yes, ma'am.

14  Q    To your knowledge, do you know whether or not Mr. Legghio

15  also represents the Detroit Fire Fighters from time to time

16  in their labor relations with the City of Detroit?

17  A    Yeah.  I believe that's why he was at that meeting as

18  their representative.

19  Q    And you also mentioned going over to the Detroit Police

20  Officers Association offices after that meeting on the 11th?

21  A    Yes.

22  Q    And there was some discussion that the president of the

23  DPOA would be sort of taking the lead on moving this process

24  forward?

25  A    Yes.

1 Q   Can you tell us who that individual was?

2 A   Mark Diaz.

3        MS. PATEK:  That's all I have.

4        THE COURT:  Redirect.

5        MR. MORRIS:  Could I have Exhibit 302 on the screen,

6 please, specifically paragraph 6 we were looking at before?

7                    REDIRECT EXAMINATION

8 BY MR. MORRIS:

9 Q   Mr. Taylor, do you have that there?  I'm looking at

10 paragraph 6 of Exhibit 302.

11 A   Page 2?

12 Q   Yes, it is, page 2.

13 A   Yes.

14 Q   Page 2 to page 3, yes.  Mr. Taylor, would you please read

15 that paragraph?  Now, on cross-examination you were asked to

16 read a part of this.  Would you please read the complete

17 paragraph 6 for the Court?

18 A   Although like a committee of retirees to like the --

19 although like a committee of retirees to -- appointed by the

20 United States Trustee in this case, the RDPFFA is not

21 empowered to enter into binding agreement with the city

22 regarding pension benefits.  The RDPFA (sic) is a

23 representative of the interest of its members and other

24 police and fire retirees and was at all times relevant to

25 this matter in a position to negotiate on their behalf, to

1    communicate and comment upon proposals made by the city and
2    to recommend to its members and to all police and fire
3    retirees an acceptable proposal.  The RDPFFA retained counsel
4    to assist in the discussions with the city.
5    Q    Thank you.  Mr. Taylor, is that an accurate statement?
6    A    Yes.
7              MR. MORRIS:  No further questions.
8              THE COURT:  All right, sir.  You may step down.
9    Thank you very much for your testimony today.  You're
10   excused.
11       (Witness excused at 2:37 p.m.)
12             MS. LEVINE:  Your Honor, we just have to find
13   Mr. Kreisberg.  He's been sequestered.
14             THE COURT:  Okay.  Thank you.
15             STEVEN KREISBERG, OBJECTOR'S WITNESS, SWORN
16             THE COURT:  Please sit down.
17                         DIRECT EXAMINATION
18   BY MS. LEVINE:
19   Q    Good afternoon, Mr. Kreisberg.
20   A    Good afternoon.
21   Q    Can you state your name and spell your last name for the
22   record, please?
23   A    My name is Steven with the "V."  Last name is
24   K-r-e-i-s-b-e-r-g.
25   Q    And by whom are you employed?

1  A    The American Federation of State, County and Municipal

2  Employees, AFSCME.

3  Q    Is that the International?

4  A    Yes, it is.

5  Q    And what's your title?

6  A    I'm the director of collective bargaining and healthcare

7  policy.

8  Q    And how long have you held that position?

9  A    In different titles about 17 years.

10 Q    In your role as director of collective bargaining and

11 healthcare policy, do you provide assistance to AFSCME locals

12 such as AFSCME Michigan Council 25 in their collective

13 bargaining efforts?

14 A    I do.

15 Q    Do you or does your department in the ordinary course

16 retain copies of the various collective bargaining agreements

17 negotiated and ratified by the various AFSCME locals?

18 A    Yes.

19         THE COURT:  Ms. Levine, could you slow down a little

20 bit for me, please?

21         MS. LEVINE:  This is slow.

22         THE COURT:  Slow?  Well --

23         MS. LEVINE:  Yes, your Honor.

24         THE COURT:  -- okay.  Slow down a little bit more

25 then.

1  BY MS. LEVINE:

2  Q   About how many collective bargaining agreements do you

3  have access to in your capacity as the AFSCME director of

4  collective bargaining and healthcare policy?

5  A   Approximately 8,000.

6  Q   Does the AFSCME constitution require that the AFSCME

7  locals share a copy of all of their negotiated agreements

8  with the AFSCME International?

9  A   Yes.

10  Q   As part of the -- as part of the CBA negotiation process,

11  does AFSCME and its locals negotiate CBA's that provide

12  health plan and pension benefits?

13  A   Yes.

14  Q   As part of the CBA negotiation process, does AFSCME and

15  its locals negotiate CBA provisions requiring employee

16  contributions to health plan and pension benefits?

17  A   Employee and employer contributions.

18  Q   Prior to July 18 -- and I'm not suggesting anything

19  changed after July 18.  It just happens to be the date that

20  the city filed its bankruptcy petition.  Prior to July 18th,

21  in Detroit before the consent decree and before the CET's,

22  the city employment terms, on retirement, did a retired

23  AFSCME employee continue to receive health plan and pension

24  benefits on the terms that were in effect under their

25  collective bargaining agreement on their retirement?

1   A    Yes.

2   Q    And prior to July 18, in Detroit after the consent decree

3   and after the CET's, on retirement, did a retired AFSCME

4   employee continue to receive health and pension benefits on

5   the same terms as those in effect under the CET's on their

6   retirement?

7   A    Yes.

8            MS. LEVINE:  Can we have AFSCME Exhibit 505, please?

9   BY MS. LEVINE:

10  Q    Mr. Kreisberg, I'm going to show you what's been marked

11  as Exhibit 505.  It's a -- it's what we've been referring to

12  as the February 1, 2012, tentative agreement.  Do you see

13  that document?

14  A    Yes, I do.

15  Q    Is this one of the 8,000 CBA documents you have access to

16  in your role as the director of collective bargaining and

17  healthcare policy for AFSCME?

18  A    Yes.

19  Q    Can you identify this tentative agreement from your own

20  personal knowledge or from your review of the records kept in

21  AFSCME's ordinary course of business?

22  A    Yes.

23           MS. LEVINE:  Your Honor, we'd like to move this

24  document into evidence, please.

25           THE COURT:  Any objections?

 1          MR. STEWART:  Yes, your Honor.  What's the relevance

 2     of it?

 3          THE COURT:  The Court overrules the relevance

 4     objection.  The document is admitted into evidence.

 5       (Exhibit 505 received at 2:42 p.m.)

 6          MS. LEVINE:  Thank you, your Honor.

 7     BY MS. LEVINE:

 8     Q    Did this agreement cover certain AFSCME locals here in

 9     Detroit?

10     A    It did.

11     Q    Did the agreement also cover certain other local unions

12     representing various other Detroit city employees?

13     A    Yes.

14     Q    Was this agreement negotiated by a coalition of local

15     Detroit unions working together?

16     A    Yes.

17     Q    Is this a concessionary agreement?

18     A    Yes.

19     Q    And by "concessionary agreement," does that mean that

20     this agreement reflects reductions in the terms and

21     conditions of employment that were previously in effect?

22     A    Yes, specifically compensation levels.

23     Q    Was this agreement ratified or approved by the unions who

24     were parties to this agreement?

25     A    It was.

1    Q    Does that mean that the city represented employees

2    actually voted "yes"?

3    A    Yes, it does.

4    Q    Was this agreement ever put in effect?

5    A    No, it was not.

6    Q    What's your understanding as to why it wasn't put in

7    effect?

8    A    The City Council had never voted to approve the agreement

9    based on instructions it had received from state officials.

10   Q    Under this agreement, would retiree benefits have been

11   affected?

12   A    Yes.

13   Q    And it was a concessionary agreement, so there would have

14   been -- there would have been concessions to those retiree

15   benefits; correct?

16   A    That is correct.

17   Q    And would that have affected active as well as retired

18   employees?

19   A    Yes.

20   Q    Okay.  Turning now to --

21        THE COURT:  Excuse me one second, please.  What

22   state officials did you understand directed the City Council

23   not to approve Exhibit 505?

24        THE WITNESS:  My understanding that it was Treasurer

25   Dillon and perhaps Mr. Baird.

1          MS. LEVINE:  That was for tomorrow, your Honor.

2          THE COURT:  Oh, I jumped the gun.  My apologies.

3          MS. LEVINE:  No.  That's fine.  I just -- I wasn't

4    sure he had personal knowledge.

5    BY MS. LEVINE:

6    Q    Turning now to the good faith negotiations or the lack of

7    good faith negotiations, did you attend the June 14

8    presentation with the city with regard to the so-called

9    proposal to creditors?

10   A    Yes.

11   Q    About how long did the presentation last?

12   A    The entire meeting lasted a little less than two hours.

13   Q    Did the city present certain slides at that meeting?

14   A    They did.

15   Q    What was the title?

16   A    "Proposal to Creditors, City of Detroit."

17   Q    Do you recall about how many slides were presented?

18   A    The slide presentation was approximately 50 slides out of

19   a fuller deck that was made available to us at the end of the

20   meeting.

21   Q    The fuller deck was the full -- there was an executive

22   summary that was presented at the meeting.  Is that your

23   understanding?

24   A    Yeah, a shortened version of the full proposal.

25   Q    Were questions permitted during the slide presentation?

1   A   No.

2   Q   Were questions permitted after the slide presentation?

3   A   Yes, in written form.

4   Q   Were you told one way or the other at that meeting

5   whether or not it was a negotiation?

6   A   We were told it was not a negotiation.

7   Q   Who made that comment?

8   A   The leaders of the meeting.

9   Q   Was that --

10  A   City officials and their attorneys.

11  Q   Was Mr. Orr present at that meeting?

12  A   He was.

13  Q   As the director of collective bargaining and healthcare

14  policy for AFSCME, have you participated with AFSCME locals

15  in collective bargaining sessions?

16  A   Yes.

17  Q   About how many CBA negotiations have you attended?

18  A   Hundreds, thousand, I mean if you're talking about

19  individual discrete sessions.

20  Q   In your experience, was the June 14 presentation a

21  negotiation?

22  A   No.

23  Q   Did you attend the June 20 presentation with the city?

24  A   Yes.

25  Q   And did you also attend the July 10 and the July 11

1    presentations?

2    A    I did, yes.

3    Q    To try and shortcut them, I'm going to sort of ask these

4    questions together.  Did the city make presentations at all

5    three of those meetings as well?

6    A    Yes, they did.

7    Q    Was Mr. Orr present at any of those meetings?

8    A    No, he was not.

9    Q    Did they permit questioning during the presentations?

10   A    Not during the June 20th meeting.  Again, it was written

11   questions at the end of the presentation.

12   Q    And what about during the July 10 and July 11 meeting?

13   A    July 10 and 11 meetings, questions were permitted in a

14   less formal and structured manner.

15   Q    How long did the June 20 meeting last?

16   A    Approximately two hours, maybe a bit less.

17   Q    And what about the July 10 presentation?

18   A    The same.

19   Q    And what about the July 11 presentation?

20   A    The same as well.

21   Q    What was the topic of the June 20 presentation?

22   A    Legacy costs.

23   Q    And what about the July 10?

24   A    July 10th meeting pertained to pensions.

25   Q    And what about the July 11 meeting?

1   A   Retiree healthcare.

2   Q   Were you told whether or not any of these meetings were

3   negotiations?

4   A   We were expressly told they were not negotiations.

5   Q   At each meeting that announcement was made?

6   A   Yes.

7   Q   In your mind, were these negotiations?

8   A   No, they were not.

9   Q   Was Mayor Bing at any of these meetings?

10  A   No, he was not.

11  Q   Between June 14 and July 18, were you or AFSCME invited

12  to any other presentations by the city?

13  A   No.

14  Q   Between June 14 and July 18th, was AFSCME invited to any

15  meeting you would consider a negotiation or where there was a

16  discussion, a give-and-take about the June 14 proposal?

17  A   Other than the ones we described, no.

18  Q   Did you request any financial or other information from

19  the city between June 14 and July 18 to better understand the

20  information provided at those meetings?

21  A   Yes, we did.

22  Q   Did you request information about the city's financial

23  condition?

24  A   Yes.

25  Q   Did you request information to better understand the

1  health benefits?

2  A   Not directly.  Understand the retiree healthcare?

3  Q   All right.  Did you request information to better

4  understand retiree health benefits?

5        MR. STEWART:  Objection, your Honor.  We've had a

6  series of leading questions.  Could we perhaps not have so

7  many leading questions?

8        THE COURT:  No.  The Court does not consider these

9  leading, so you may continue.

10        MS. LEVINE:  Thank you, your Honor.

11  BY MS. LEVINE:

12  Q   Did you request information to better understand the

13  pension portion of the June 14 proposal and the discussions

14  that were had on June 20, July 10, and July 11?

15  A   Yes.  I requested information regarding the funding

16  levels of the pension.

17  Q   Did you personally sign a NDA or confidentiality

18  agreement to access the city's data room?

19  A   I did.

20  Q   Did you access the city's data room?

21  A   Yes, I did.

22  Q   Was certain information in response to your request

23  posted to the data room?

24  A   Yes, it was.

25  Q   Was all of the information you requested posted to the

1  data room?

2  A   No.

3  Q   Did you consider any of the information you requested

4  inconsistent with the type of information you would normally

5  request in the context of a CBA negotiation?

6  A   No, I did not.

7  Q   Prior to the July -- prior to July 18, did the city ever

8  ask you to agree to or to sign a document waiving the right

9  to assert that the city had waived any of its rights under PA

10  436 to facilitate discussions or a give-and-take with regard

11  to the city's proposal?

12  A   The city never sought such a waiver from me.

13  Q   Prior to July 18th, was the June 14th proposal ever

14  modified or revised with regard to the retiree health or

15  pension benefits?

16  A   No.

17  Q   The average AFSCME retiree has what level -- collects

18  what level of pension benefit?

19  A   In the City of Detroit, it's approximately 18 to $19,000

20  a year.

21  Q   In your position as director of collective bargaining and

22  healthcare policy, do you have an opportunity to review from

23  time to time what the poverty level is?

24  A   I do.

25  Q   What is the poverty level for a family of three?

1  A    Family of three, approximately $19,500 annually.

2  Q    And what's the poverty level for an individual?

3  A    Approximately $11,500.

4  Q    Based upon the proposal to creditors provided here, can

5  you tell whether or not AFSCME retirees will be reduced below

6  the poverty level as a result of this proposal as it

7  currently sits?

8  A    It's hard to say.  The proposal was not to pay into the

9  pensions,  and it was -- the representatives of the city

10  declared that there would be no funding of the pensions in

11  terms of the unfunded obligations.  It has been not described

12  to this date that I'm aware of what impact would be and what

13  the effect would be on particular benefits, and, of course,

14  the benefits for individuals vary based on their years of

15  service and their salary levels at the time of retirement.

16  Q    There was a letter that was written by Ed McNeil in May

17  where he indicates that he's not negotiating on -- or is not

18  going to negotiate pensions or retiree benefits.  Are you

19  familiar with that letter?

20  A    I am.

21  Q    And so the questioning seems to indicate that the city is

22  concluding that as a result of that letter, AFSCME was either

23  refusing to negotiate on behalf of its retirees or couldn't

24  negotiate on behalf of its retirees.

25          MR. STEWART:  Objection, your Honor.

1   Characterization of another witness' testimony and also

2   hearsay since she's speaking about the substance of a

3   document that's not before the witness or in front of us but

4   I should add asking the witness to speculate about the

5   contents of that document.

6           THE COURT:  I need you to just ask a question.

7   BY MS. LEVINE:

8   Q   Is it your understanding that AFSCME has from time to

9   time taken the position that it can't negotiate retiree

10  health or pension benefits?

11  A   Yes, we have.

12  Q   But in the February tentative agreement that we were

13  discussing earlier, February 2012, did that agreement affect

14  retiree health benefits?

15  A   It did affect retiree health benefits.

16  Q   And are there other recent examples where AFSCME has

17  worked around the issue of both protecting its members' right

18  to retiree health and pension benefits but also come up with

19  a work-around to effectively negotiate a businesslike

20  solution to an economic problem like this one?

21          MR. STEWART:  Objection to form.

22          THE COURT:  Overruled.  Please answer, sir.

23          THE WITNESS:  Well, across the nation, you know --

24  it's a diverse country, as we all know, and we've -- we enter

25  into all sorts of agreements.

1          THE COURT:  Well, let me interrupt you.

2          MS. LEVINE:  Well, let me -- actually, let me try --

3          THE COURT:  You're talking about --

4          MS. LEVINE:  Let me do -- let me go narrower, your

5     Honor.

6          THE COURT:  -- here in the city?

7          MS. LEVINE:  Actually, I have a specific --

8     BY MS. LEVINE:

9     Q    What are you guys doing right now in Illinois?

10    A    Okay.

11         THE COURT:  By "you guys," you mean AFSCME?

12         MS. LEVINE:  AFSCME.

13         THE WITNESS:  Yeah, the union.  The State of

14    Illinois passed legislation in the recent past which would

15    impair our retiree healthcare benefits.  Traditionally, state

16    employees, upon retirement, would enjoy health benefits

17    without being assessed any premium charge for the healthcare.

18    The state enacted a statute requiring that retirees now pay

19    for some cost of their retiree healthcare but did not specify

20    a rate, and instead the legislation required that the state

21    negotiate the rate that would be charged to the retirees with

22    the active employees' union, which is an AFSCME affiliate,

23    Council 31, so at the collective bargaining table over their

24    most recent state agreement, those negotiations took place.

25    However, our position -- the union's position is that that

 1  particular statute is unconstitutional under Illinois'

 2  Constitution, which also has a nonimpairment very similar to

 3  the one here in Michigan.  And based on that, the

 4  understanding we've reached with the state was we are not

 5  waiving our rights to challenge the statute and the

 6  requirement for payment, so by entering into that agreement,

 7  it was very clear that we were not prejudicing our rights.

 8  We were not waiving our rights to eventually -- and we are

 9  right now in court challenging the legality of imposing the

10  premium payments on the retirees.

11  BY MS. LEVINE:

12  Q   So you both negotiated a good faith solution on the

13  assumption that you would -- you might lose in court, and you

14  continued to preserve your rights with regard to your -- what

15  you believe to be your constitutional rights in court;

16  correct?

17  A   Correct.  We thought that was -- yeah.

18          MS. LEVINE:  Your Honor, I have no further questions

19  for Mr. Kreisberg.

20          THE COURT:  I do need to stop at three.  Do you want

21  to start now, or do you want to just pick it up in the

22  morning?

23          MR. STEWART:  May be better in the morning.  I'll

24  have to break it up otherwise, your Honor.

25          THE COURT:  All right.  In the meantime, is someone

1  willing to volunteer me from the -- volunteer for me on the
2  objectors' side how long the case might take for our planning
3  purposes?

4       MR. MONTGOMERY:  Your Honor, we have shared with the
5  city estimated times for witnesses.  I would say it's fair
6  that the sum of direct and cross for the two witnesses have
7  started -- has gone beyond the time estimates.  I would say
8  on current projections we would finish sometime Thursday
9  morning, so in theory Thursday afternoon is available for the
10 start of closing.  Again, if all changes are simply additive
11 and not plowed earth.

12      THE COURT:  Right.  Okay.  So our closings would
13 then be on Thursday, perhaps into Friday.

14      MR. MONTGOMERY:  Yes, sir.

15      THE COURT:  All right.  And I've been asked to
16 remind you that we are back in this room tomorrow.  We are
17 not going to Room 100.  We're back in this room.  And I think
18 that's it for today, so we'll be in recess.

19      THE CLERK:  All rise.  Court is adjourned.

20      (Proceedings concluded at 2:56 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | | 6/23/29 | 55 | 73/78/80 82/83 |
| Shirley Lightsey | 88 | 114 | 126 | |
| Donald Taylor | 128 | 155/174 | 175 | |
| Steven Kreisberg | 176 | | | |

| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 32 | 63 |
| Exhibit 505 | 180 |
| Exhibit 853 | 21 |

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.

/s/ Lois Garrett                     November 8, 2012
_____        _____
Lois Garrett

<pre>
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION

 3  IN THE MATTER OF,           Case No. 13-53846
                                Detroit, Michigan
 4  CITY OF DETROIT, MI         November 5, 2013
    _____/  9:17 a.m.
 5
                    IN RE:  ELIGIBILITY TRIAL
 6          BEFORE THE HONORABLE STEVEN W. RHODES
            TRANSCRIPT ORDERED BY: PAUL HAGE, ESQ.
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                 GEOFFREY STEWART, ESQ.
                                   GREGORY SHUMAKER, ESQ.
10                                 THOMAS CULLEN, JR., ESQ.
                                   MIGUEL EATON, ESQ.
11                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
12                                 Washington, D.C. 20001-2113
                                   202-879-3939
13
                                   BRUCE BENNETT, ESQ.
14                                 Jones, Day
                                   555 South Flower Street
15                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
16                                 213-243-2382

17                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   DEBORAH KOVSKY-APAP, ESQ.
18                                 (P68258)
                                   Pepper, Hamilton
19                                 4000 Town Center
                                   Suite 1800
20                                 Southfield, MI 48075-1505
                                   248-359-7333
21

22

23

24

25
</pre>

```
 1  For State of Michigan:        MATTHEW SCHNEIDER, ESQ.
                                  (P62190)
 2                                Chief Legal Counsel
                                  Attorney for State of Michigan
 3                                Michigan Department of
                                  Attorney General
 4                                P.O. Box 30754
                                  Lansing, MI 48909
 5                                517-373-0126

 6                                MARGARET NELSON, ESQ. (P30342)
                                  Assistant Attorney General
 7                                Michigan Department of
                                  Attorney General
 8                                525 W. Ottawa Street
                                  Floor 7
 9                                P.O. Box 30212
                                  Lansing, MI 48933
10                                517-373-1124

11                                STEVEN HOWELL, ESQ. (P28982)
                                  Special Assistant Attorney
12                                General
                                  Dickinson, Wright
13                                500 Woodward Avenue
                                  Suite 4000
14                                Detroit, MI  48226-3425
                                  313-223-3033
15
    For Michigan Council 25 of    SHARON L. LEVINE, ESQ.
16  the American Federation of    JOHN SHERWOOD, ESQ.
    State, County and Municipal   Lowenstein, Sandler, LLP
17  Employees (AFSCME), AFL-CIO   65 Livingston Avenue
    and Sub-Chapter 98, City of   Roseland, NJ 07068
18  Detroit Retirees:             973-597-2500

19  For Detroit Retirement        ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement  JENNIFER GREEN, ESQ.
20  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of     151 S. Old Woodward Avenue
21  the City of Detroit:          Suite 200
                                  Birmingham, MI 48009
22                                248-988-5882

23                                RONALD KING, ESQ. (P45088)
                                  Clark, Hill
24                                212 East Grand River Avenue
                                  Lansing, MI 48906
25                                517-318-3015
```

```
 1   For the Detroit Fire Fighters    BARBARA PATEK, ESQ. (P34666)
     Association, the Detroit         JULIE BETH TEICHER, ESQ.
 2   Police Officers Association      (P34300)
     and the Detroit Police          DAVID EISENBERG, ESQ. (P68678)
 3   Lieutenants and Sergeants        Erman, Teicher, Miller, Zucker
     Association:                     & Freedman
 4                                    400 Galleria Officentre
                                      Suite 444
 5                                    Southfield, MI 48034
                                      248-827-4100
 6
     For International Union, UAW:    BABETTE A. CECCOTTI, ESQ.
 7                                    PETER D. DECHIARA, ESQ.
                                      THOMAS CIANTRA, ESQ.
 8                                    Cohen, Weiss, and Simon, LLP
                                      330 West 42nd Street
 9                                    New York, NY 10036-6976
                                      212-356-0227
10
     For the Detroit Retired         THOMAS MORRIS, ESQ. (P39141)
11   City Employees Association,     Silverman & Morris
     Retired Detroit Police and      30500 Northwestern Highway
12   Fire Fighters Association,       Suite 200
     Shirley V. Lightsey, and        Farmington Hills, MI 48334
13   Donald Taylor (Retiree          248-539-1330
     Association Parties):
14                                    RYAN PLECHA, ESQ. (P71957)
                                      Lippitt, O'Keefe
15                                    370 East Maple Road
                                      3rd Floor
16                                    Birmingham, MI 48009
                                      248-646-8292
17
     For the Official Committee of   MATTHEW E. WILKINS, ESQ.
18   Retirees:                       (P56697)
                                      Brooks, Wilkins, Sharkey &
19                                    Turco, PLLC
                                      401 S. Old Woodward Avenue
20                                    Suite 400
                                      Birmingham, MI 48009
21                                    248-971-1711

22                                    CLAUDE D. MONTGOMERY, ESQ.
                                      ANTHONY ULLMAN, ESQ.
23                                    ARTHUR RUEGGER, ESQ.
                                      Dentons
24                                    1221 Avenue of the Americas
                                      New York, NY 10020-1089
25                                    212-768-6700
```

```
 1                                   SAM ALBERTS, ESQ.
                                     DAN BARNOWSKI, ESQ.
 2                                   Dentons US LLP
                                     1301 K Street, N.W.
 3                                   Suite 600 East Tower
                                     Washington, D.C. 20005-3364
 4                                   202-408-7004

 5   For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
     Police Members Association:     MEREDITH TAUNT, ESQ. (P69698)
 6                                   MALLORY FIELD, ESQ. (P75289)
                                     Strobl & Sharp, P.C.
 7                                   300 East Long Lake Road
                                     Suite 200
 8                                   Bloomfield Hills, MI 48304-2376
                                     248-540-2300
 9
     For the Flowers Plaintiffs -   WILLIAM A. WERTHEIMER, ESQ.
10   Robert Flowers, Michael Wells,  (P26275)
     Janet Whitson, Mary Washington 30515 Timberbrook Lane
11   and Bruce Goldman:             Bingham Farms, MI 48025
                                    248-644-9200
12
     For Ambac Assurance           DANIEL WEINER, ESQ. (P32010)
13   Corporation:                  Schafer & Weiner
                                    40950 Woodward Avenue
14                                  Suite 100
                                    Bloomfield Hills, MI 48304
15                                  248-540-3340

16   Court Recorder:               Letrice Calloway

17   Transcriber:                  Deborah L. Kremlick

18

19

20
     Proceedings recorded by electronic sound recording, transcript
21   produced by transcription service.

22

23

24

25
```

1                               INDEX

2    WITNESS FOR          Direct      Cross     Redirect      Recross
     THE AFSCME:
3
     STEVEN KREISBERG                    7          20           24
4
     WITNESSES FOR
5    THE UAW:

6    MICHAEL NICHOLSON      26          75

7    WITNESS FOR
     THE FLOWERS:
8
     JANET WHITSON          85          94
9    ANDY DILLON       101,134,154

10   EXHIBITS:                                              ID   ADM

11   CityX 105   Typed Notes                              75    75
     UAWX624     Affidavit                                52    52
12   UAWX626     Email                                   122   122
     RSX870      Email                                   159   162
13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Court in Session)

2          THE CLERK:  Case number 13-53846, City of Detroit,

3   Michigan.

4          MR. ALBERTS:  Your Honor, may we be excused?

5          THE COURT:  Yes.

6          MR. ALBERTS:  Thank you.

7          MR. SCHNEIDER:  Your Honor, Matthew Schneider on

8   behalf of the State of Michigan.  Before we begin, because

9   we're discussing witnesses here and the order of witnesses,

10  Ms. Brimer and I have been talking about one of the witnesses

11  that the objectors wish to have, Howard Ryan.

12       And Ms. Brimer and I are in agreement that instead of

13  having to have him called, that his 30(b)(6) deposition tape

14  could be a part of the record instead.  And Ms. Brimer and I

15  wanted to make sure that you were okay with that.

16         THE COURT:  Uh-huh, absolutely.  If that works for

17  you, it works for me.

18         MR. SCHNEIDER:  We also wanted to make sure that

19  nobody else objects to that.

20         THE COURT:  Any other objections to using the video

21  tape?

22         MR. SHUMAKER:  The city is in agreement with that,

23  Your Honor.

24         MS. BRIMER:  Thank you, Your Honor.

25         MR. SCHNEIDER:  Thank you, Your Honor.

1          THE COURT:  Are you ready, sir?

2                   CROSS EXAMINATION

3    BY MR. STEWART:

4    Q    Geoffrey Stewart for Jones, Day.  Good morning, Mr.

5    Kreisberg.  I don't think we've met.

6    A    No.

7    Q    My name is Geoffrey Stewart.  I'm a lawyer for Jones, Day

8    representing the city.  Let me collect my papers for a minute.

9         You, I think, testified that you attended the June 14

10   meeting?

11   A    Yes.

12   Q    Okay.  Can we put up Exhibit 43, Page 109?  While that's

13   being done, Mr. Kreisberg, that was the big meeting if you --

14   are you looking for your glasses as I look for mine all the

15   time?

16   A    Yeah, well -- I wasn't sure.

17   Q    I have a spare pair if you need them.

18   A    I'll be able to see.  If I have trouble, I'll --

19   Q    Okay.  I do -- I actually do have a spare pair.

20   A    Thank you.

21   Q    Okay.  And you remember that day attending a meeting for

22   I think you said that lasted a little less than two and a half

23   hours?

24   A    Yes, yes.

25   Q    And various slides were shown at the meeting.  I think you

1  testified?

2  A    That's correct.

3  Q    Do you remember this slide and we're on Page 109 of

4  Exhibit 43.  Do you remember this slide being shown -- shown

5  that day?

6  A    It's -- it's possible the content was shown.  I don't

7  think it would have been slide 109 because the slide deck that

8  was shown had less slides than 100 slides.

9  Q    Okay.  I think we may have had slide deck inflation here.

10  Let me just put it this way.  Do you remember the subject

11  coming up at the meeting about what the city's intentions were

12  when it came to claims for unfunded OPEB liabilities?

13  A    Yes.

14  Q    And just for the record OPEB is short for other post

15  employment benefits?

16  A    That's right.

17  Q    And usually that's retiree benefits for health or

18  something else?

19  A    Correct.

20  Q    Okay.  I'm going to use OPEB unless that is going to be

21  confusing for you if I do.

22  A    It's fine with me.

23  Q    Okay.  Do you remember what the city said on June 14

24  about its intentions with respect to OPEB benefits?

25  A    I do.

1  Q    And what do you remember the city telling you?

2  A    Essentially that they would cease providing the current

3  benefit offerings and in lieu therefore they would provide

4  distinct benefits for pre-Medicare retirees and post-Medicare

5  retirees that would cost in -- in a pay range of approximately

6  100.00 to $130.00 per month for each of those categories with

7  a -- a separate category for retirees who may not be eligible

8  for Medicare.

9  Q    How extensive did you consider that proposal in a way of

10 changes to what the retirees currently enjoyed?

11 A    Well, the proposal lacked detail.  But the structure that

12 was described was very extensive.

13 Q    Okay.  And then the next bullet point on this slide has

14 to do with claims for unfunded pension liabilities.  Now, I

15 understand you may not remember this slide.  So if it helps

16 you, fine, but if not, you don't need to look at it.

17     Do you remember what it was the city said that day about

18 its intentions when it came to unfunded pension liabilities?

19 A    The city essentially said it would -- it would not be

20 paying into the fund for those unfunded liabilities other than

21 some of the contingency note that they talked about which

22 frankly at the time I didn't quite fully understand.

23 Q    Did you consider -- let's put it this way.  How extensive

24 or major did you consider the city's planned changes to its

25 pension liabilities?

1  A    Again the -- the city's proposal lacked any detail.  But

2  the structural changes described were very extensive.

3  Q    Okay.  Now is it not the case that your union AFSCME,

4  represents about half of all the city employees?

5  A    That's correct.

6  Q    Okay.  And is it also not the case that your union lacked

7  the authority to negotiate with respect to either pension

8  liabilities or OPEB with respect to retirees?

9  A    That's not the case.

10  Q    Okay.  Well, let me go to your deposition then.  Can we

11  put up Page 29, starting with Line 17.  And while we're doing

12  that, you remember giving a deposition in this case, do you

13  not, Mr. Kreisberg?

14  A    I do, I remember.

15  Q    That was just a few weeks ago.  And you were examined for

16  a couple of hours?

17  A    It seems like more than a couple of hours.

18  Q    Okay.  Let me start, I'm just going to read a part to

19  you.  And I'm going to read these questions and answers.  And

20  again I'm going to ask you whether this is -- these are the

21  questions you were asked and these were the answers you gave.

22      Question, by Mr. Miller, let me ask a clarifying

23  question.  Is it your understanding that under Michigan law

24  unions would be able to waive the rights of existing retirees

25  to their existing health benefits?  And then Mr. Sherman

1  interposes an objection.  And I'm jumping down to your answer.

2  The witness, again, that is a matter of law that I haven't

3  fully researched.

4      Question, so you would have no opinion about that?  Then

5  Mr. Sherwood interposes an objection.  And Mr. Miller says,

6  you can answer.  And you say, I may have opinions, but I have

7  no legal conclusion.

8      Question, what is your personal opinion?  My opinion

9  would be that the union can engage in such bargaining and

10 could possibly extensively or not extensively, you know, make

11 reasonable adjustments to retiree health care benefits.

12     Question, without the retirees' approval?  Answer,

13 without the retirees' approval.

14     Question, what about extensive changes to retirees health

15 benefits?  Could they make that without the retirees'

16 approval?  There's an objection.  You answer, I do not think

17 so.

18     Question, so the ability of the union to make changes to

19 the retirees benefits without the retirees' approval hinges on

20 the nature of the change?  Answer, yes.

21     And the more extensive the change at some point the union

22 does not have the ability to bind the retirees?  Answer, that

23 would be my opinion.

24     Were you asked those questions and did you give those

25 answers in your deposition?

1    A    Yes, sir.

2    Q    And were your answers truthful?

3    A    Yes.

4    Q    Now you were asked yesterday -- take that down and put up

5    Exhibit 505.  You were asked yesterday about the tentative

6    agreement.  Do you remember questions you were asked and this

7    Exhibit 505 was put up on the screen for you back then?

8    A    Yes.

9    Q    Okay.  It was the case, was it not -- first of all, that

10   was negotiated by a coalition of city unions, correct?

11   A    Correct.

12   Q    That did not include the uniform unions, right?

13   A    That is correct.

14   Q    It also did not include the water and sewer employees?

15   A    Again correct.

16   Q    Now is it also not the case that in those negotiations

17   the coalition did not represent retirees?

18   A    That's correct.

19   Q    Instead what the coalition did was agree that if the city

20   after this happened cut retiree benefits, the unions would not

21   help those retired employees in any grievance they might file

22   against the city?

23   A    I disagree with that characterization.

24   Q    Let's go to the last page of the exhibit then.  I think

25   that's -- there it is.  There's one more.  Should be another

1  page back there.  And you want to go to Page 21 or what would

2  be 21 if it were numbered.  There.  Do you have that page

3  before you?

4  A     I do.

5  Q     And can you tell us what it is?

6  A     If you make that piece larger like we did the others.

7  Q     Go ahead, can you make the text larger for the witness,

8  please?

9          MS. LEVINE:  Reading glasses, is that what you're

10  using?

11          MR. STEWART:  You can have mine.  I actually do have

12  a second pair.  May -- may I approach the witness, Judge?

13          THE COURT:  Do you want to borrow some reading

14  glasses, sir?

15  A     I think we're going to be fine.

16          THE COURT:  Okay.  All right.  He's going to be

17  fine.

18          MR. STEWART:  I buy them by the box literally at

19  this age.  I have very -- very poor eyesight.

20  A     Where do you get them?  I could use them.

21          MR. STEWART:  Actually I get them on line and I will

22  after the break I will give you the web address.

23          THE COURT:  All right.  Let's proceed.

24          MR. STEWART:  I'm sorry, Your Honor.  Anyhow --

25          THE COURT:  Okay.

1   Q     Do you have this before you?

2   A     I do, yes.  Thank you.

3   Q     Okay.  And it says -- and first of all, who signed all of

4   this just in general?

5   A     These are the coalition union representatives.

6   Q     Okay.  Is your signature here by the way?

7   A     No, it is not.

8   Q     Okay.  And it says it is hereby agreed between the

9   parties that the coalition of unions waive their rights to

10  grieve and arbitrate, participate as a party, or sponsor legal

11  action brought by retirees concerning the changes in their

12  health care which may arise in 2012.  Is that -- did I read

13  that correctly?

14  A     Yes.

15  Q     And that was the coalition agreeing that if a retiree was

16  aggrieved by changes to health care benefits, the unions would

17  not support that grievance, right?

18  A     That's correct.

19  Q     Okay.  Now -- you can take that down.  There were a

20  series of meetings that counsel asked you about and I'll go

21  through them very quickly.

22        We talked about the one on the 14th already.  Then there

23  are meetings on June 20th, correct?

24  A     Correct.

25  Q     And you attended those?

1  A    Yes.

2  Q    And July 10?

3  A    I attended that meeting.

4  Q    And July 11th?

5  A    I attended that meeting.

6  Q    And there was a data room which was available to you and

7  you or people working with you accessed the data room?

8  A    Yes.

9  Q    Okay.  And during that period of time am I correct that

10 the city said to you that they were willing to talk with you

11 and share information with you and wanted to have discussions

12 with you?

13 A    The city had indicated it would share data.

14 Q    Uh-huh.  And they did?

15 A    Through the data room.

16 Q    Okay.  Well, they -- they also gave you data, did they

17 not, during various meetings that you attended with them?

18 A    The data consisted of the proposal for creditors which

19 was provided both in the shortened version and made available

20 in the longer version at the conclusion of the meeting on June

21 14th.

22 Q    Uh-huh.

23 A    And then approximately 20 or 25 page slide deck.

24 Q    Right.

25 A    On legacy costs on June 20th.

1   Q     Uh-huh.

2   A     And then a single page describing the bare outlines of

3   the OPEB proposal on July 11th.

4   Q     Uh-huh.

5   A     Most of those I would not characterize as data other than

6   the June 14th.  I would consider that a presentation which

7   included some data.  But it was not completely responsive to

8   all the data.

9   Q     I see.

10  A     That we would need.

11  Q     That all having been said, did the city not ask your

12  union more than once to make a counter proposal to them?

13  A     That was not a term that was used.

14  Q     And what term did you use?

15  A     They -- they were fond of the term feedback.

16  Q     I see.  But did the day come when your union actually did

17  prepare a counter proposal?

18  A     We never provided a counter proposal to the city.

19  Q     That wasn't my question.  My question was whether you

20  prepared one.

21  A     I did not prepare a proposal.

22  Q     Did your union prepare a proposal?

23  A     If I could -- could I ask a clarifying question of you?

24  Is that permitted?

25  Q     I'm sorry?

1  A    Is it permitted for me to ask a clarifying question?

2  Q    You can ask me whatever you want.

3  A    On what subject?

4  Q    Health care benefit, retiree health.

5  A    No.

6  Q    Did you prepare a counter proposal on anything?

7  A    We had on a post-petition -- post-petition we prepared a

8  counter proposal on active employee health care.

9  Q    Uh-huh.  Let's go to your deposition Page 82, Line 16.

10        MS. LEVINE:  Your Honor, I apologize.  Before we ask

11  a question, I just want to caution the witness to stay before

12  July 18th and not to discuss anything going on in the

13  mediations.

14        THE COURT:  That's good advice, sir.

15  Q    Page 82, Line 16.  And once again, Mr. Kreisberg, I'm

16  going to read the questions and answers and at the end I'm

17  going to ask you whether this was your testimony.  All right?

18        Question, did AFSCME make any formal counter proposal

19  subsequent to the June 20th meeting respecting retiree health?

20  Answer, we had proposed that we negotiate and suggested a date

21  for negotiations.

22        Question, but a labeled proposal to negotiate is not

23  itself a counter proposal, correct?  Answer, the counter

24  proposal would have been provided at the negotiating session.

25        Question, so you were prepared at a negotiating session

1  in July to provide a counter proposal?  Answer, we had

2  suggested having a meeting on July 10 to do such.

3      Question, but you just testified that you were prepared

4  if there were to be a negotiating session in July to make a

5  counter proposal, correct?  Answer, yes.

6      Question, okay.  Did you make any counter proposals at

7  the meetings in July 10 or July 11?  Answer, no.

8      Question, did you have at that time the counter proposal

9  to make?  Answer, can I consult with counsel?  Question, no,

10  it's a pending question.  I would like you to answer it first.

11  Mr. Sherwood says, I would just -- if it involves privileged

12  communications.  Witness, that is the point.  I discussed such

13  a proposal with counsel.  Question, I'm sorry, it involved

14  discussions with counsel.  And you go on.

15      And now let's go to Page 84, 19.

16  A    Excuse me?

17  Q    Were you asked those questions and did you give those

18  answers?

19  A    Yes.

20  Q    Okay.  Now go to Page 84, Line 19.  Question, did you

21  have a counter proposal to make?  Answer, yes.

22      Question, but you did not make the counter proposal,

23  correct?  Answer, correct.

24      Were you asked those questions and did you give those

25  answers?

```
 1  A    Yes.

 2  Q    Now, let me -- you can take that down.  I believe you

 3  were asked by counsel about the provisions of the Michigan

 4  Constitution which at sometimes has been called the pension

 5  clause.  Do you -- do you know of something called a pension

 6  clause?

 7  A    Yes.

 8  Q    Okay.  And it's -- I think it's Article -- Article 9,

 9  Section 24 if I recall correctly.  Is it the position of

10  AFSCME that the accrued pensions, investment pensions of city

11  retirees can never be cut back?

12          MS. LEVINE:  Objection, Your Honor.  Calls for a

13  legal conclusion.

14          THE COURT:  Overruled.  Please answer.

15  Q    Is that the union's position?

16  A    I'm not a lawyer but that's our position, yes.

17  Q    Okay.  And that's something you believed back in June?

18  A    It is.

19  Q    And in July?

20  A    Yes.

21  Q    And today?

22  A    Yes.

23  Q    Have you advised any of your employees to waive their

24  constitutional rights?

25  A    I have not
```

1  Q    Is the union prepared to advise people to waive -- waive

2  their constitutional rights?

3           THE COURT:  Don't answer that question.

4           MR. STEWART:  I'm sorry?  Okay.  You said not to

5  answer the question.

6           THE COURT:  Yeah, I -- I don't want the witness to

7  answer that question.  You can ask him that question as it

8  pertained to pre-petition.

9           MR. STEWART:  Yes.

10           THE COURT:  But not Monday.

11  Q    Limiting us to all days before and -- and including July

12  18 of this year, was -- excuse me, was your union prepared to

13  advise its members to waive their constitutional rights?

14  A    No.

15           MR. STEWART:  Thank you.  That's all I have.

16           MS. LEVINE:  Your Honor, brief redirect.

17           THE COURT:  Uh-huh.

18                     REDIRECT EXAMINATION

19  BY MS. LEVINE:

20  Q    Just a couple of questions, Mr. Kreisberg.  With regard

21  to the deposition testimony that you were just read with

22  regard to retiree health.  It -- it sounded like you actually

23  had a written proposal sitting in your desk drawer that you

24  just didn't give to anybody.  Did you have thoughts about a

25  proposal, or did you actually have a physical written fully

1  blown proposal?

2  A    I had thoughts about a proposal that I discussed with

3  counsel.

4  Q    And did you want to have those discussions with the city

5  to see whether or not some of your thoughts would make sense

6  in a counter proposal?

7  A    Yes.

8  Q    Same question with regard to the pension issues.  Did you

9  have some thoughts about the pension proposal that was made by

10  the city that you wanted to discuss with the city to see if it

11  made sense?

12  A    Yes.

13  Q    And in addition to that did you also require additional

14  information to make those thoughts more formal into what might

15  be deemed to be an actual written formal counter proposal?

16  A    Yes.

17  Q    You were asked by counsel if -- if AFSCME was willing to

18  advise its members to waive its constitutional rights.  Do you

19  recall that testimony?

20  A    I do.

21  Q    Under the -- under the February 12th collective bargaining

22  agreement on a go forward basis, were there changes to pension

23  benefits?

24  A    Yes.  The TA reduced post effectively the pension

25  accruals of active employees.

1  Q    And did it also permit for certain pensions for new hires

2  to get a defined contribution plan?

3  A    It gave the -- the city the authority to establish a

4  defined contribution plan.

5  Q    And did you think that making those changes violated the

6  pension clause?

7  A    I did not.

8  Q    In addition to that, in -- in the example we were

9  discussing yesterday in Illinois, where the -- there was a

10  concern that the proposed changes violated a constitutional

11  right.  Do you recall that discussion?

12  A    I do.

13  Q    Did you along with the AFSCME locals involved there

14  negotiate revisions to retiree benefits consistent with the

15  current form of the statute?

16  A    Yes.

17  Q    And were those changes implemented?

18  A    Yes.

19  Q    And -- and was there also a reservation of right that

20  allowed the local there to continue to preserve its

21  constitutional rights?  Continue to litigate over the issue of

22  whether or not their constitutional rights were abridged?

23  A    Yes.  The agreement was without prejudice to a right to

24  continue the litigation challenging the constitutionality of

25  the law.

1   Q    You were showed a page in the tentative agreement where

2   the unions agreed not to support the retirees in connection

3   with any grievance or other claims.  Do you recall that?

4   A    I do.

5   Q    In Illinois, isn't it true that the named plaintiff there

6   is an individual retiree?

7   A    I believe so, yes.

8   Q    And who is paying for the cost of that litigation?

9   A    The union is, the AFSCME and as well as other unions are

10  challenging it as well.

11  Q    One more follow up question.  How long did the

12  negotiations take for the tentative agreement, recognizing

13  that it was Thanksgiving and Christmas and we weren't in a

14  pre-bankruptcy filing regime.  But actual days of negotiation,

15  about how long did it take to negotiate that coalition

16  agreement?

17  A    Yeah, I really don't know the number of days the parties

18  met.  But it -- it occurred over a period of a few months, the

19  negotiations.  But there's -- in those negotiations like many

20  others there's a period of intense activity which is probably

21  about 60 to 90 days.

22          MS. LEVINE:  Thank you.  No further questions, Your

23  Honor.

24          MR. STEWART:  If I might, Judge, just a few raised

25  by the questions.

 1              THE COURT:  Yes, sir.

 2                      RECROSS EXAMINATION

 3  BY MR. STEWART:

 4  Q    How long did the negotiations in Illinois take?

 5  A    The negotiations in Illinois over the retiree health

 6  care?

 7  Q    What you just talked about.

 8  A    They were part of a master agreement involving many many

 9  issues.

10  Q    And how long did they take?

11  A    I believe they lasted over a year.

12  Q    Okay.  And you were asked about the tentative agreement.

13  Were vested pension rights reduced under the tentative

14  agreement?

15  A    Not at all.

16  Q    Were vested pension rights reduced under the tentative

17  agreement?

18  A    Maybe I didn't understand the last question.  Did you

19  just repeat the question twice?

20  Q    And maybe I just repeated myself.  Were any vested rights

21  to be reduced under the tentative agreement?

22  A    Not that I'm aware of, no.

23  Q    And is that why in your opinion there is no violation of

24  the pension clause?

25  A    Yes.

1          MR. STEWART:  Thanks.  That's all I have.

2          THE COURT:  In one of your answers, or maybe more

3   than one, you used the phrase TA.  Is that tentative

4   agreement?

5   A    Yes, sir.

6          THE COURT:  All right.  Any more questions for the

7   witness?  You may step down, sir, and you are excused.

8   A    Thank you.

9       (WITNESS STEVEN KREISBERG WAS EXCUSED AT 9:40 A.M.)

10         THE COURT:  Thank you for your testimony.

11         MR. DECHIARA:  Good morning, Your Honor.  Peter

12  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

13  the United Auto Workers International Union.  The UAW for its

14  first witness calls Michael Nicholson who is out in the hall

15  and I will go get him.

16         THE COURT:  Thank you.

17         THE WITNESS:  Good morning, Your Honor.

18         THE COURT:  Step forward, please.  Raise your right

19  hand.

20      (WITNESS MICHAEL NICHOLSON WAS SWORN)

21         THE COURT:  Please sit down.

22         MR. DECHIARA:  Your Honor, before we begin, I'm

23  going to be referring with the witness to a couple of exhibits

24  in the UAW exhibit book.  If I could ask the witness to please

25  locate the UAW exhibit book that's on the table there.  And if

 1 | I may, I'll --

 2 |            THE COURT:  Yes, please.

 3 |                        DIRECT EXAMINATION

 4 | BY MR. DECHIARA:

 5 | Q    Good morning.

 6 | A    Good morning.

 7 | Q    Would you please state your full name for the record?

 8 | A    Michael Brendan Nicholson.

 9 | Q    By whom are you employed?

10 | A    International Union, UAW.

11 | Q    And in what position?

12 | A    General counsel.

13 | Q    Does the UAW have any members who may be affected by this

14 | proceeding?

15 | A    Yes.  We have members who are not employees of the City

16 | of Detroit, but are employees and retirees of the Detroit

17 | Public Library which is a separate municipal corporation but

18 | whose employees and retirees participate in the Detroit

19 | general retirement system.

20 |      In addition, we have employees and retiree -- employee --

21 | employee and retiree members who work for the City of Detroit

22 | Law Department as lawyers, some Detroit Water and Sewer

23 | Department employees, some civilian police investigators, some

24 | paralegals, and I may be missing something, but I think that's

25 | about the -- the size of the list.

1  Q    So about?

2  A    You know, less than 200 employees.  Less than 200

3  retirees.  I don't have an exact count, but to give you an

4  idea of the magnitude, Your Honor.

5         THE COURT:  Okay.  Can you point that microphone

6  more right at you?  You can adjust the --

7  A    Like this?

8         THE COURT:  Yes.  That's better.

9  A    Okay.

10        THE COURT:  Don't -- don't speak too close to it,

11 but it needs to be pointed right at you.

12 A    All right.  I'll look for your reaction to see if I'm

13 talking too loud.

14        THE COURT:  Okay.

15 Q    Where and when did you go to law school?

16 A    I attended the University of Michigan Law School and I

17 graduated with an honors J.D. degree in 1977.

18 Q    And can you recount for us briefly your professional

19 career since law school?

20 A    Having left law school, I -- my first job was with the

21 appellate court branch of the National Labor Relations Board

22 at their headquarters in Washington, D.C.  I argued cases in

23 the various United States Courts of Appeals around the

24 country.

25        I also, while I was there, took up an interest in

1 | bankruptcy law.  They were looking for people in a branch

2 | called the -- the special litigation branch to help on

3 | bankruptcy matters.  And so I did that.  That was actually my

4 | first involvement with bankruptcy as a lawyer for the labor

5 | board.  I worked for the labor board until March 1980.

6 | Q    And what did you do next?

7 | A    I was hired as a lawyer by International Union, UAW.  I

8 | had clerked there during law school.

9 | Q    And how long did you stay at the UAW?

10 | A    That time I stayed from 1980 until 2000, I believe.  2000

11 | or 2001.  And --

12 | Q    And during that period what -- what kind of work did you

13 | do at the UAW?

14 | A    The first -- continuing my theme of -- I did a lot of

15 | different kinds of work, but one of the first things I

16 | remember when I went there was I got in on the tail end of the

17 | Chrysler, I won't call it a bankruptcy because it wasn't in

18 | Bankruptcy Court, but it was a restructuring through Congress.

19 | Learned about retiree insurance issues there for the

20 | first time before there was an OPEB, before that term existed.

21 | I worked on that.  We went into a severe financial crisis in

22 | the auto industry almost with my starting.

23 | The UAW when I hired in had a million and a half members

24 | and that started a decline, mostly in the parts industry, but

25 | also otherwise in a lot of business failures, a lot of

1  bankruptcies.  And I dealt with those issues and the impacts

2  on employees and retirees.

3  Q    Were you involved in any legislative activities while you

4  were at the UAW in that period?

5  A    I was.  I was basically -- because I was the lead

6  bankruptcy lawyer in the eighties for the UAW, I was involved

7  in a number of high profile cases, one of which was LTV.  Your

8  Honor may remember that.  It wasn't in this Court, it was in

9  the Southern District of New York.

10     And the case began by the debtor which was a conglomerate

11 and had steel mills where the steel workers were the union,

12 but also had an aerospace division in Texas where we were the

13 union.  The debtor stopped paying retiree health care

14 immediately upon filing and there was immediate reaction in

15 Congress.  An emergency piece of legislation was passed

16 reversing that decision essentially.

17     And then longer term legislation was considered and

18 enacted.  I was at work directly with Senator Metzenbaum's

19 staff who was the sponsor of the bill that included among

20 other things Section 1114 of the Act and I actually drafted

21 significant portions of 1114 as well as the Senate report that

22 accompanied it.

23 Q    What did you do after 2000?

24 A    I retired from the UAW.  I went to work for the office of

25 the election administrator of -- for the International

1   Brotherhood of Teamsters.  That takes a little bit of

2   explanation, but not much.

3        So the Justice Department had sued the Teamsters under

4   the Racketeering and Corrupt Organizations Act back in the

5   late eighties I think.  And to -- in an effort to remove the

6   influence of organized crime in the Teamsters union.

7        And that was settled with a consent decree that was

8   administered and still is administered.  It's still alive

9   today by the Justice Department.  And one of the pieces of the

10  consent decree was that Justice Department and Court approved

11  monitors would monitor the International officer elections of

12  the Teamsters and issue decisions.

13       So I ran with Mr. Wertheimer who was the election

14  administrator appointed directly by Justice.  I was the

15  general counsel of that.  I ran a team of lawyers and

16  investigators around the country dealing with issues from as

17  mundane as, you know, whether an election was run properly, a

18  local union delegate election to issues of alleged -- alleged

19  corruption.  And I investigated, I deposed, and I ran a team

20  of about 30 or 40 people all around the U.S.  Who were mostly

21  lawyers, but some Justice -- or some labor department

22  investigator types as well.

23  Q    And how long did that job last?

24  A    About -- I did that until -- I think I must have started

25  there, I must have started there in 2001, so it was about

1 | three years. So I ended that in 2004. The election was held,

2 | we certified the results, finished our forensic accounting and

3 | all -- all the work that went with this, a lot of work. And

4 | the UAW asked me to come back and I did. I returned to the

5 | UAW.

6 | Q     And how long did you remain at the UAW?

7 | A     Not long. I was there about 19 months as I recall and

8 | then I was offered a tenured professorship at Indiana

9 | University which I accepted.

10 | Q     And while you were at -- while you were at Indiana

11 | University did you also perform legal work?

12 | A     I was allowed to do some work on the side under my

13 | contract and I started out in a full time position. I worked

14 | also part time for a while when I got involved in some very

15 | interesting legal work and they allowed me to work part time

16 | in addition to teaching the courses that I taught.

17 | Q     What is the -- the legal work that you did?

18 | A     The legal work I did was pretty much the same kinds of

19 | things that I had specialized in. So I -- I was there until

20 | 2010. So it's about a six year period part full time, part

21 | part time. And I worked on retiree insurance litigation. I

22 | worked on the Dana Chapter 11 which worked on with people at

23 | Jones, Day. I know a couple of the people sitting in the

24 | courtroom from that. And we had a successful resolution of

25 | that Chapter 11.

1       We recovered -- we recovered $723,000,000 that went into

2   a VEBA fund for retiree health care.  And that VEBA actually

3   was in some ways, if you looked at it at that point in time at

4   the onset, better funded than the VEBA's that were eventually

5   -- came out of the General Motors, and Chrysler, and Ford

6   situations.  I was very proud of that.

7   Q    And then when did you return to the UAW again?

8   A    I returned to the UAW in 2010.  I finished up my -- my

9   courses and I was offered a job by the newly elected President

10  of the UAW, Bob King to come and be his general counsel.

11      One of the -- I had gotten to know Bob from working on

12  the Rouge Steel bankruptcy which is local.  But it was filed

13  in Bloomington, Delaware and also a successful, very

14  successful result.  That steel mill is still operating and the

15  retirees are still getting their retiree insurance.

16      And Bob got to know me through working on that and asked

17  me to come back and be his general counsel and I accepted.

18  Gave up my tenure and left Indiana University.

19  Q    Over the years that you've been at the UAW, have you

20  engaged in any types of negotiations?

21  A    Yes.

22  Q    Can you tell us what types of negotiations you've been

23  involved in?

24  A    Many kinds.  First of all, collective bargaining

25  negotiations by which I mean negotiations for collective

1  bargaining agreements which typically run in cycles.  They

2  could be three years, they could be four, they could be five.

3  The law doesn't set a -- a fixed term.

4      So that's the most typical kind of collective bargaining.

5  A person in my position did not do collective bargaining of

6  that type except for major companies.  And my predominant

7  assignment for that kind of collective bargaining over the

8  years, really over the 20 year span I was there was for Ford

9  Motor Company.  I worked with the UAW's lawyer at the Ford

10 Motor Company negotiations.

11 Q   Were you involved in any other types of negotiations in

12 your years at the UAW?

13 A   Many.  We had plant closing negotiations which are a type

14 of collective bargaining under the National Labor Relations

15 Act dealing with plants that are closing or relocating.  There

16 may be benefits issues.  There's all kinds of issues that have

17 come up, transfer rights.  I did that kind of negotiations.

18     Also there's a whole another branch of negotiations that

19 aren't collective bargaining negotiations per say but are

20 negotiations in relationship to litigation.  I did much of

21 that.  Much -- I'd say more of that than collective bargaining

22 negotiations.

23     And then bankruptcy itself is a sort of a sub -- a subset

24 of that.  Bankruptcy is a kind of litigation in a way.  And

25 the lead up to bankruptcy is kind of in some ways like the

1  lead up to regular litigation.  There's differences too, but

2  bankruptcy insolvent -- let's -- let's use the term insolvency

3  negotiations.  I did a lot of insolvency negotiations over the

4  years.  That was my predominant area of expertise over the

5  years.

6  Q    Have you been involved on behalf of the UAW in

7  negotiations regarding employee benefits?

8  A    Yes, I have.

9  Q    Can you give us any examples?

10  A    I -- two come to mind.  One reminds in -- me in some ways

11  of this case.  It was one of my first ones.  That was the

12  first case in which I was a co-chair of a creditors'

13  committee.  I'd served on -- served on a number of creditors'

14  committees over the years.

15      I was co-chair of the -- the UAW was co-chair, I was the

16  person sitting.  It was an institutional appointment on that

17  committee.  And it was a -- a heavy -- heavy earth moving

18  equipment division of General Motors.  It was spun off.

19      And a few years after it was spun off, with the

20  management in place that was there under General Motors went

21  bankrupt, filed -- filed for bankruptcy.  And the UAW and the

22  other creditors, none of them labor, we were the only labor --

23  labor creditor, determined through our experts and our lawyers

24  and our own knowledge of the business, that the business was

25  under capitalized by General Motors.  That the current

1  management had a conflict of interest and they were reluctant

2  or would refuse to sue -- the debtor, would refuse to sue

3  General Motors.

4      And so the creditors' committee authorized and our

5  lawyers filed a lawsuit, an equitable subordination lawsuit

6  attacking the -- the setting up of this company as an under

7  capitalized company.  We -- that resulted in a recovery, a

8  settlement, and a recovery that funded a plan that treated

9  creditors very well.

10      And we -- had we not acted, because the debtor refused to

11 act against somebody who was jointly responsible, the debtors

12 would have -- or the creditors would have received virtually

13 nothing.

14      And the other case is -- and also bears some similarities

15 to this.  It's important.  It's actually -- I'm very proud of

16 this too.  This is the first VEBA that I know of that was ever

17 set up.

18      Allis Chalmers.  Allis Chalmers was a company that at one

19 point had tens of thousands of workers and minimal number of

20 retirees.  And over time the balance shifted, the company

21 shrank, they sold off one product line after another.

22      And at the time I got involved they had 12,000 retirees

23 and less than 1,000 workers, the bulk of which on the hourly

24 side were UAW.  They hired Joe Califano who was LBJ's

25 secretary of HEW to come in and talk to us, a good Democrat

1  so a friend of ours.

2      And told us -- they told us they couldn't afford retiree

3  health care on a cash flow basis, it was going to kill them.

4  And we talked about it and it was my advice that we asked them

5  to pay for an investment banker.  We at that point, really had

6  no dealings with investment bankers because I had thought that

7  the best deal for our members active and retired, would be if

8  the company was sold as a going concern.

9      What was left was a viable company.  And that the

10  proceeds would be used at that point to fund retiree health

11  care, pay out the creditors a premium as well.  And we

12  accomplished that and funded a VEBA for those retirees.  Most

13  of them have died off now, but there's still some left and the

14  VEBA is still alive and paying retiree health care.  That was

15  in -- around 1985, '86 that that started.

16      So that -- that is a case that in the Chapter 11 side, is

17  -- is instructive and in fact was a paradigm in many ways for

18  subsequent events.  Many VEBA's have been negotiated.  OPEB

19  still wasn't a term of art at that time.

20      It became a term of art when the Financial Accounting

21  Standards Board passed FAS 106 which required companies to

22  book unfunded retiree health care liability and then the flood

23  gates were open in terms of this becoming a live issue in the

24  private sector side, not on the public side.

25      We don't have a lot of public members, we have some.

1  Obviously Detroit and State of Michigan and some others around

2  the country.  But that in -- in many ways that case was a -- a

3  paradigm for what was to come in the following decades.

4  Q    Has the UAW to your knowledge ever been involved in

5  settling retiree benefit disputes outside of bankruptcy?

6  A    Yes, we have.

7  Q    And can you explain how that works?

8  A    Yes.  So we often, very often in ongoing bargaining

9  relationships with companies, are met with bargaining demands

10 to -- in collective bargaining negotiations, to reduce retiree

11 health care benefits for retirees who are already retired.

12      And we have -- our union has historically taken the

13 position based on a very to us, where this shows how much

14 inside base of all this is, I guess, but a very significant

15 and important footnote in, whose number I remember Footnote

16 20, in Allied Chemical Workers v Pittsburgh Plate Glass.  I

17 think it's in Volume 414 of the U.S. Report.

18      And that footnote says that it's about whether retiree

19 benefits for those already retired or what are called

20 mandatory bargaining subjects under the National Labor

21 Relations Act.  And it says they are not.

22      And in this Footnote 20 even more significant in some

23 ways to us, is a statement that with respect to already vested

24 benefits as a matter of law, federal labor law, retirees have

25 to individually consent to have their vested benefits reduced.

1  Unions or anybody else, their neighbor, the retiree

2  association, nobody has the right to do it for them unless

3  they give them that right.  They have to agree themselves.

4      So we have taken the position historically when employers

5  address us, come to us with this, at the onset especially in

6  collective bargaining negotiations, that those are things that

7  we can't bargain about.  The Supreme Court says they're

8  protected.

9      However, we live in a real world.  And if we are -- if we

10 are convinced, and I know this from countless cases that I've

11 been involved in, if we are convinced that there are risks

12 inherent in the situation, and that those risks require a

13 consideration of making a deal, some sort of compromise that

14 would put our retirees in a better position long run -- in the

15 long run, then we are open to negotiations.  But always with

16 the caveat that the results because of <u>Pittsburgh Plate Glass</u>

17 have to be accomplished through a class action approval

18 process always.

19     And all the settlements that we've reached in -- in that

20 kind of litigation, and even sometimes pre-litigation talks

21 are -- are couched in that -- with that condition, very

22 important condition to us.  You'll note as an analog, Judge,

23 1114 has a provision in it, I remember at the table being the

24 scribe of this sentence that says in 1114 unions are the

25 authorized representative and can negotiation, this is not a

1  quote, but can -- they can negotiation the reductions.

2      It was our idea to put that in there so that 1114 as a

3  process, Chapter 11 as a process could, you know, it's kind of

4  a quick moving -- can be quick moving process, especially 1113

5  and 1114.  And they're comparative to each other in some ways.

6      And we wanted to -- we -- we thought it should be clear

7  and we convinced our friends on capitol hill and I think the

8  lobbyists for the other side as well that that was a good

9  idea.

10      But outside of Chapter 11, you have to have this class

11  action process.  And what we do is, so you can understand our

12  thinking, we look at the types of risks that are involved.

13  And there are two basic kinds of risks.

14      There's insolvency risk and there's litigation risk.

15  Litigation risk is the risk that the employer either has sued

16  or will sue and sue the retirees, sue the union, and ask for a

17  reduction in benefits because the benefits aren't vested.  Ask

18  the Court to say the benefits aren't vested.  That's a

19  litigation risk.

20      Insolvency risk is a risk of collection.  That's what we

21  were facing in Allis Charmers by the way.  It was insolvency

22  risk.  They never even -- they admitted they owed them

23  lifetime retiree health care benefits that they couldn't

24  change.

25      But we were faced with insolvency risk and we either

1  could deal them now or face a company that was going to, we

2  thought, increasingly shrink in terms of its asset value.  And

3  at the end of the day the cash would run out and we wouldn't

4  be able to pay.

5       So we –– we were the ones who initiated that process.  We

6  suggested Chapter 11 to them and they ultimately agreed.  And

7  –– and so those are the kinds of –– that's the kind of

8  thinking that –– and I'm sorry about running on, but that's ––

9  it's a complex area.  That's the kind of thinking we engage in

10  in deciding whether to negotiate about retiree health care.

11       But you got to understand what negotiation means.  It ––

12  it –– the caveat about class action approval is critical and

13  it's driven in our view by the requirement of Footnote 20 in

14  Pittsburgh Plate Glass.

15       No one has ever really quarreled with us on the –– in the

16  settlement fund on that.  That's how when we settle we always

17  do it on a class action basis.

18  Q    You've testified about various negotiations regarding

19  insolvency that the UAW has been engaged in.  Do you know

20  whether the Jones, Day law firm has ever been on the other

21  side of those negotiations?

22  A    Yes, yes.  They weren't, you know, a lot of –– there's a

23  lot of law firms that do this.  Jones, Day does it.  And with

24  us there were two cases that I can think of, Dana first of

25  all.

1    They were the lead counsel, Corrine Ball was the -- the

2   lead counsel of the lead counsel firm, Jones, Day.  Andy

3   Cramer was the sort of co-lead counsel.  He's a person we at

4   the UAW greatly respect.  He's unfortunately passed away a

5   little bit ago.  He's a deal maker par excellence and we miss

6   him.

7    And the other -- and that resulted as I said in a -- in a

8   very well funded VEBA.  Also all the plants really kept open.

9   We have a good collective bargaining relationship with this

10  company, Dana.  It's a -- it's a real positive.  So that's

11  one.

12    And then on the tail end of the General Motors, I was

13  gone -- I was not at the UAW for the GM and Chrysler 11's.

14  But there has been some spallo on litigation in -- from

15  General Motors that some of it in the Bankruptcy Court, some

16  of it is now pending in this Court.  And although Jones, Day

17  was not the lead counsel, was not counsel according to the

18  appearance sheet that I looked at it in the out of Court VEBA

19  -- sorry I'm confusing two things.

20    Let me start over.  There -- General Motors filed Chapter

21  11 as everyone in this city knows.  A deal was reached.  The

22  company survived under new ownership.

23    Following on from that, there was a dispute between the

24  UAW and General Motors about whether 450,000,000 additional

25  dollars was owed to the GM VEBA.  Litigation was had.

1  commenced in both the Bankruptcy Court here in the Eastern

2  District of Michigan.  The Bankruptcy Court ruled that the

3  litigation should proceed here, it's pending in front of Judge

4  Cohn.  To this day we're waiting -- pending on dispositive

5  motions.

6       And Jones, Day was involved, but our primary -- my

7  primary dealing with Jones, Day on that was -- was trying to

8  see if a settlement could be negotiated and talk to the other

9  side, and talk to Mr. Cramer and we determined we were too far

10  apart.  And so -- and we haven't really pursued that.

11      So Dana and General Motors but not really the -- the

12  heart of the bankruptcy, but a follow -- follow on piece of

13  litigation.  That's -- that's my knowledge about Jones, Day.

14      There are other Jones, Day matters that I have been

15  personally involved in.  Continental Tire and some other ones

16  I'm probably missing, but that is -- we do have some dealings

17  with Jones, Day, yes.

18      And we were -- and I'll say this.  When -- when the --

19  because of our positive relationship with Mr. Cramer,

20  particularly we didn't know for sure when this process started

21  at Detroit before the filing, the sort of lead up to the

22  process until the filing.  We -- we wondered whether that, you

23  know, positive relationship would -- would continue or not.

24  Q    Did you attend the June 14th, 2013 meeting where Mr. Orr

25  presented his document called proposal to creditors?

1  A    I did.

2  Q    What's your recollection of that meeting?

3  A    Well, there was a book that was passed.  My guess is,

4  it's in evidence.  And they walked through the book and

5  described the various pages and the explanation passed back

6  and forth between various people.

7       Up on a dais, it was held in a room out at the airport.

8  There was a dais and -- and a number of representatives from

9  Jones, Day and some of the other professional firms that are

10 in the case today, where they were talking and they made a

11 presentation.  People listened.  And then at the end of the

12 listening they -- there were cards that were passed out if

13 people wanted to ask questions and people filled in cards.

14 Q    Were --

15 A    And they were read out, not by the questioners, but by

16 the people on the dais and -- and answered.

17 Q    Were the people who were invited to attend the meeting

18 allowed to speak freely during the meeting?

19 A    They weren't allowed to speak at all.

20 Q    In any of your prior experiences in negotiations, had you

21 ever attended or participated in negotiations where one side

22 wasn't allowed to speak freely?

23 A    With respect to all the various kinds of negotiations, I

24 have testified to just now, and if there's any others I've

25 missed, any negotiations of any type, I have never ever been

1  in negotiations where only one side speaks.

2  Q    At the June 14th meeting, was Mr. Orr asked about Article

3  9, Section 24, of the Michigan Constitution?

4  A    He was.

5  Q    Do you recall whether he gave a response and if so what

6  it was?

7  A    It -- it was something to the effect that -- that, you

8  know, the question was something like does that -- how does

9  that affect what you want to do.  Because the book they passed

10  out said they wanted to cut pension benefits.

11      And he said well, it might take legislative action or

12  agreement.  And that was the extent of it, it was a very short

13  answer.

14  Q    After the June 14th meeting, did you report back to the

15  UAW leadership about Mr. Orr's proposal?

16  A    I did.

17  Q    And what was -- can you describe that interaction that

18  you had with the UAW leadership?

19  A    Yes.  I talked to our President Bob King directly one on

20  one.  I reported what happened.  He asked me to be --

21  personally lead our effort despite the small number of

22  retirees we had because we care deeply about what happens to

23  the City of Detroit, and its citizens, and its retirees, and

24  its employees.  And it's our home.  And he said, let's do

25  everything we can to protect the retirees and let's try to

1 play a constructive role in trying to bring a resolution of

2 this.

3 Q     Did you attend a June 20th meeting regarding the proposal

4 that the emergency manager had made?

5 A     I did.

6 Q     And was the same procedure that you testified about

7 concerning the June 14th meeting in place at the June 20th

8 meeting, i.e. that attendees were not allowed to speak freely,

9 but had to submit cards?  Was that same procedure in place?

10 A     It was.  The dynamics of the meeting were just a little

11 different.  I just thought of this sitting here now.  In the

12 airport meeting the -- the city professionals were up -- up on

13 the dais overlooking us.  And this meeting happened to be in

14 an amphitheater in the 13th floor of the city county building

15 and everybody was looking down on them like an operating room

16 where the surgeons all look -- the surgeon students look down

17 at the operating table.  So it was a little different.

18     But the card thing was exactly the same.  If you had a

19 question -- Mr. Orr wasn't there.  So it was led by Heather

20 Lennox and some other Jones, Day and other professional

21 people.  But the same process was there, they passed out

22 cards.

23 Q     And did you submit any question cards at that meeting on

24 June 20th?

25 A     I -- I submitted two question cards.

1  Q    Okay.  I'd like to draw your attention to Exhibit 623.

2  It's -- it should be in the book behind you.  And if we can

3  have it on the screen as well.

4  A    This.

5  Q    The image on the screen is in black and white and it's

6  hard to read.

7  A    That's kind of blacked out in the corner, so --

8  Q    Right.  But the book, the hard copy book has it in color.

9         MR. DECHIARA:  And, Your Honor, I -- the -- the

10  Court has been submitted copies in color that are legible.

11  A    Are you ready, Your Honor?  You've got it?

12  Q    Since -- Mr. Nicholson, since legibility of the -- of the

13  image on the screen is -- is limited and since -- since it's

14  in handwriting, I would just ask you to -- to read into the

15  record the -- the question that you submitted and Exhibit 23

16  is a two page document.

17       So let me first ask you to read the -- the first one.

18  It's -- it's stamped at the bottom UAW 0302.  Can you read

19  what your question was on that page?

20  A    That's actually two questions on that one card.  And the

21  first -- and as you can see, there's a little cut off at the

22  bottom, but I can help piece that together.

23       So question one is, how does the emergency manager

24  propose to compromise the rights to pension payments which are

25  protected by the Michigan Constitution?

1    Question number two was, how could Governor Snyder

2  authorize a Chapter 9 filing by the city without violating

3  Article 9, Section 24 of the Michigan Constitution given the

4  announced intention and then I believe the words are of the EM

5  to impair and diminish pension benefits.

6    You can see the ish and the D in front of -- in front of

7  pension.  That's diminish and you can see the R and the

8  capital I and so on on impair before the -- it's not a

9  preposition, whatever the word is sorry, but -- but that --

10  that's basically what it says.

11  Q    Do you recall whether you received a response to those

12  questions that you posed at that meeting?

13  A    Heather Lennox responded to that.

14  Q    Do you recall what she said?

15  A    Yeah.  I -- I will tell you.  And I'm going to take it

16  one question at a time here.

17    Basically the response on the first one was kind of a

18  non-response.  I didn't really understand --

19          THE COURT:  Just tell us what she said, sir.

20  A    Okay, I will.  I will.  Let me think.

21  Q    Well, let me ask you, do you have a verbatim recollection

22  of what she said?

23  A    I don't have a verbatim recollection.

24  Q    What's your best recollection of what she said?

25  A    My best recollection is she said something like, well

1  we're just -- that's something we're just going to have to

2  deal with.  Something like that.  And that is not verbatim.

3      And then on the second question, I had a more specific

4  recollection about Governor's Snyder's authorization.  And

5  with respect to that, Ms. Lennox said, it's a two -- and again

6  this is not verbatim, but it's very close.

7      It's really a two part process.  The Governor authorized

8  this bankruptcy and then what happens to the pensions just --

9  is just something that happens in the Chapter 9 proceeding.

10 So they don't happen together, it's a two part process.  I

11 remember that phrase.  And I -- I heard that.

12 Q    Let me now turn you to the second question card, the one

13 that's stamped at the bottom UAW 0303.  Can you read into the

14 record what the questions are on that card?

15 A    Yes.  This is a -- sorry about the complexity of this,

16 but there is a -- three questions with a sub part in the first

17 one.  So we'll take it in terms of reading one sentence at a

18 time.

19     The first sentence is, does the emergency manager law

20 under which Mr. Orr was appointed, grant my union, and it's

21 the UAW, the authority to A, negotiate over, and B, compromise

22 either X, OPEB for present retirees or Y, pension benefits

23 already accrued by present and/or future retirees.

24     The second sentence says, please explain and cite me to

25 the basis for any such authority.

1    And the third sentence says, if the answer to either of

2  the above is no, who does Mr. Orr propose to negotiate with.

3  Q    And do you recall whether there was a response given to

4  those questions?

5  A    The response was, in -- in so many words, that they

6  didn't have any doubt about the -- the ability of the -- Mr.

7  Orr to negotiate.  It was up to the other side to figure out

8  what to do.  It was our problem in other words.

9    And that's not what I was asking.  I wasn't asking

10  whether it was our problem.  I was asking legally what --

11    THE COURT:  You've answered the question, sir.

12  A    Okay.  Thank you.

13    MR. DECHIARA:  Your Honor, Exhibit 623 is already in

14  evidence, I won't move it into evidence.

15  Q    Mr. Nicholson, was the UAW willing to negotiate with the

16  emergency manager over reduction in accrued pension benefits

17  for its members?

18  A    No.

19  Q    Why not?

20  A    At the meeting that we just -- the June 20th meeting, I

21  spoke after -- and I said -- I said our position on this.  So

22  you didn't ask me that, but I'll tell the Court.

23    THE COURT:  No, the simple question was, why not?

24  Please answer that question.

25  A    Okay, I will.  The Michigan Constitution, Article 9,

1  Section 24 which we believe is binding on the UAW and binding

2  on all citizens of Michigan including the Governor, precludes

3  impairment or diminishment of pension benefits.

4      And in our view it would be a violation of law for us to

5  do that.  And I also believe that only the citizens of the

6  State of Michigan through the amendment process with respect

7  to their Constitution, have the authority to change that legal

8  fact.  And that has not happened.  And the Governor can't

9  amend the Constitution, nor can Mr. Orr.  They're not

10  authorized to do so under our law, our basic law in this

11  state.

12  Q    You testified earlier about OPEB, other post employment

13  benefits.  Do you recall using that phrase?

14  A    Yes.

15  Q    Was the UAW willing to participate in the resolution of

16  OPEB issues with the emergency manager?

17  A    Yes.

18  Q    What was the UAW prepared to do?

19  A    While the pre-bankruptcy -- let's talk about the

20  pre-bankruptcy period.  I think -- and -- and limit it to

21  that.  And if you want --

22  Q    Right.  That's all I'm asking about, pre -- pre-July 18.

23  A    Right.  I previously told you, Your Honor, about this

24  process that we go through in figuring out whether we have an

25  employer who is --

1           THE COURT:  The question was, what are you -- what

2   were you willing to do?

3   A    Okay.  Well, we went through this process that I

4   described and evaluated the city.  And we -- and we looked at

5   the -- the -- we didn't have access to the data room.  And I

6   think you'll remember that.

7           THE COURT:  Again sir, you're going beyond the

8   question.

9   A    Okay.  We --

10          THE COURT:  What were you willing to do?

11  A    Based on our analysis of the situation, I told lawyers

12  for Jones, Day at a meeting on July 11th that the UAW was

13  willing to engage in a class action process to deal with and

14  try to resolve the OPEB issue and take leadership in that role

15  since we, more than any other union in the country, have dealt

16  -- had to -- had to deal with that issue.  And I asked Mr.

17  Miller, Evan Miller, I -- I said you know, there's a process

18  Evan, to deal with this --

19  Q    Who is Evan Miller?

20          THE COURT:  And again -- again you're going beyond

21  the question.

22  A    All right.  I'll let my counsel fill in.  Trying to move

23  -- move this along, Your Honor.

24          MR. DECHIARA:  Your Honor, I'm going to refer the

25  witness next to Exhibit 624 which is currently not in

1  evidence.  I've spoken to counsel for the city.  I understand

2  they have no objection, so I would now move Exhibit 624 into

3  evidence.

4          THE COURT:  Any objections?

5          MR. STEWART:  Hold on a minute.  Oh, no, no

6  objection.

7          THE COURT:  It is admitted.

8          (UAW Exhibit 624 was admitted)

9  Q    Mr. Nicholson, can you either look on the screen or turn

10  in your book to Exhibit 624?  And I would first ask you, it's

11  a three -- it's a three page document.  Can you identify what

12  each of the pages are?

13  A    It's actually a four page document.

14  Q    Thank you.

15  A    And it's -- it's an affidavit that I swore to on July

16  18th, 2013 with two exhibits that are identified in the text of

17  the affidavit.

18          (UAW Exhibit 624 was identified)

19  Q    Okay.  Can you identify the third page?  The page that

20  says Exhibit A on it.

21  A    Yes.  That's an email from David Birnbaum of Jones, Day

22  to me dated June 28th, 2013.

23  Q    Okay.  And now I'd like you to turn the page to the last

24  page of the exhibit and ask you to identify what that document

25  is.  The one that says Exhibit B on it.

1  A    That's an email I sent to Mr. Merrett and Mr. Birnbaum at

2  Jones, Day on July 9, 2013 in advance of the meetings that

3  were scheduled and that we were planning to attend with

4  representatives of the city on July 10 and 11, 2013.

5  Q    Okay.  I'd like to direct your attention to the first

6  paragraph of that email that's marked as Exhibit B.  It

7  states, UAW has requested access to the City of Detroit data

8  room maintained by your firm.  You have responded by

9  proffering a proposed non-disclosure agreement and release and

10 have made UAW's execution of such documents a condition of our

11 access to the data room.  Do you see that language that I just

12 read, Mr. Nicholson?

13 A    I do.

14 Q    And what was the UAW's position in regard to the

15 requested non-disclosure agreement?

16 A    Well, we had -- to that point not agreed to sign it.  Our

17 counsel, Cohen, Weiss, and Simon, had thought we should.  But

18 I said no, this is a public -- said to them, no, this is a

19 public proceeding involving a public entity and it should be

20 transparent and open and there should not be some secret data

21 room.  I can accept that in a Chapter 11 proceeding with a

22 private entity, but not with a public entity.

23      So but the second paragraph asked them -- you asked our

24 position at this time, but we asked them to explain the basis

25 for that condition of signing confidentiality.

1   Q      Right.  And let me --

2   A      We asked them to explain.

3   Q      Let me just direct your attention to the last sentence of

4   the second paragraph.  It says, "I would like to understand

5   the basis for withholding data room information with respect

6   to the City of Detroit based on claims of confidentiality".

7   Do you see -- do you see that sentence there, I just read, Mr.

8   Nicholson?

9   A      I do.

10  Q      Did you get a response to that statement?

11  A      Never.

12  Q      Was the UAW allowed access to the data room prior to the

13  bankruptcy filing?

14  A      Unless we refused -- unless we agree to sign the

15  confidentiality agreement and release, we were not allowed

16  access and we did not sign the confidentiality agreement and

17  release.  And this Court, as Your Honor knows, subsequently --

18  it was subsequently removed as a condition for access.

19  Q      Okay.  And just to be clear on your answer, before the

20  bankruptcy filing, did the UAW -- was the UAW given access to

21  the data room?

22  A      No.

23  Q      In your experience, how important is it in negotiations

24  over retiree benefits to have access to relevant information?

25  A      It is absolutely essential.

1  Q     Let me now refer --

2  A     Good faith negotiations cannot occur without access to

3  information.  As a matter of fact, under the National Labor

4  Relations Act that's a basic tenant of the national labor law.

5  And -- and especially when an employer is claiming inability

6  to pay.  That's a condition precedent to any good faith

7  negotiations.  And we were denied access here.

8              THE COURT:  Okay.  I think you've answered the

9  question, sir.

10 A     Thank you, Your Honor.

11 Q     Let me now refer you to Paragraph 4 of Exhibit 624.  If I

12 -- if I could have that exhibit on the screen.  It's the big

13 paragraph in the middle.

14 A     Yes.

15 Q     Do you see that paragraph, Mr. Nicholson?

16 A     I do.

17 Q     Okay.  I'm going to refer you to the sixth line that on

18 the right side of the line there's a sentence that begins,

19 please tell me what.  Do you see that?

20 A     Are you going to highlight it?  I see it.  Give me a

21 second.

22 Q     Sure.

23 A     It actually helps a lot if you highlight it because it's

24 kind of squeezed.

25 Q     Okay, yeah.  If the -- the rest of the paragraph could be

1  highlighted.

2  A    Well, you want to ask me about the first sentence that

3  you've highlighted?

4  Q    Yes.

5  A    Please tell me what authority your firm and/or Mr. Orr

6  gives the UAW the right to compromise vested benefits --

7  benefits, sorry, despite the contrary provisions of Article 9,

8  Section 24.  It's very similar to the question I asked at the

9  June 20 meeting.

10 Q    And I'm not going to read them out loud into the record.

11 It's in print, and it's highlighted on the screen.  And -- and

12 Mr. Nicholson you could read those questions yourself.

13      And my -- my question is, did you ever receive a response

14 from Jones, Day or the emergency manager to the questions that

15 are set forth in that paragraph?

16 A    Never.

17 Q    Let me now refer to the last paragraph of the -- the

18 exhibit and the last sentence of the last paragraph.  It says,

19 your full answers to the questions posed in the foregoing

20 paragraphs of this message will help the UAW determine the

21 scope of any such negotiations and the UAW's decision

22 regarding it's representative capacity in them about which

23 your firm has inquired.  Do you see that sentence?

24 A    I see it.

25 Q    What did you mean when you wrote that?

1  A    I wrote it and I meant that.  We were trying to

2  understand their point of view with respect to the ability to

3  conduct negotiations and our ability to compromise.

4     And we were trying to make decisions, we were -- I -- I

5  was the lead person here for the UAW.  And I personally was

6  trying to make decisions about whether we had a bargaining

7  partner here or not.

8     And this was part of my inquiry and thought process which

9  continued -- which I intended to continue put it that way.  At

10 that point at the July 10th and 11th meetings, key to

11 understanding the -- my motivation in asking that question and

12 saying what you've got highlighted there, your full questions,

13 et cetera, that sentence, is the fact that this was the day

14 before the July 10th and the 11th meetings.  We were going to

15 talk about pensions on the 10th and OPEB on the 11th.

16    So I sought that inquiry.  I -- I posed that inquiry but

17 never really got a response.  Never got a response at all to

18 anything in this email.  It went unresponded to.  My sworn

19 affidavit that was filed in the State of Michigan, Circuit

20 Court for the County of Ingham was un -- un -- unopposed.

21 Nobody said it was untrue.  It is true.  So, the next thing

22 that happened was, we showed up for the meeting on July 10th.

23 Q    Okay.  You anticipated my next question.  You attended

24 the July 10th meeting?

25 A    I went to the city -- I went to the City of Detroit city

1  county building to attend it and was in the room for a brief

2  period of time, also talked to Mr. Miller for a short period

3  of time out in the hall before.

4  Q    Who is Mr. Miller?

5  A    Mr. Miller is a partner at Jones, Day who is an ERISA

6  partner.

7  Q    And what happened at the July 10th meeting during the time

8  you were there.

9  A    Well, out in the hall -- out in the hall before the

10  meeting, this will not take long because I basically had to

11  leave the meeting.  Out in the hall before the meeting Mr.

12  Miller asked me if I -- if he could engage in an off the

13  record discussion with me and I said, Evan, I don't think this

14  is the time for that.

15      We have to do what we have to do here.  And so I don't

16  think this is the time, but I appreciate that.  Then we walked

17  into the meeting.

18      I saw Ed Hammond, a partner at Clark, Hill.  They're, I

19  presume, representing the retirement systems.  Ed and I know

20  each other.  We were -- worked together very closely to

21  resolve the Rouge Steel bankruptcy.  And especially on pension

22  issues and retiree health care issues.

23      And I exchanged pleasantries with Ed and he said to me,

24  you know, Mike, you should check out the legislative history

25  of ERISA which I know a fair amount -- amount about.  And --

1 but I wasn't aware of this piece.

2      And he said, Congress made clear in that legislative

3 history that the reason it didn't extend the pension guarantee

4 system to state and city employees was because it believed

5 that states and cities would stand behind their pension

6 promises.  And I said thank -- thank you for that.  I

7 appreciate that.  Then we sat down.

8           THE COURT:  Excuse me one second.  Is there

9 something you want to say, sir?

10           MR. STEWART:  Your Honor, I think -- I think maybe a

11 question and answer approach might work better here.  So I

12 would actually move to strike Mr. Nicholson's last testimony

13 and maybe we can move things along more quickly if we did it

14 that way.

15 A    I'll try to stick with question and answer, Your Honor.

16           THE COURT:  A good idea.  The Court will strike the

17 last answer, it was hearsay.

18           MR. DECHIARA:  Well, Your Honor, the witness was

19 just recounting what the conversation was he had with this

20 individual.  I don't believe that -- we're not submitting it

21 for the truth of what the other individual --

22           THE COURT:  What's the relevance of it then?  The

23 evidence is stricken.

24           MR. DECHIARA:  It's --

25           THE COURT:  Please proceed in question and answer

1  format.

2  Q    What else do you recollect from that meeting?

3  A    The meeting began -- the meeting was conducted by well,

4  such as it was.  I was there for a short period of time.

5  David Heiman, a partner at Jones, Day began the meeting by

6  saying, if you're -- and this is not verbatim, but this is --

7  this is the nub of it.

8       If you want to attend this meeting you have to agree that

9  this is a Rule 408 meeting, protected by Rule 408 of the

10 Federal Rules of Evidence.

11 Q    And what was your understanding of what that meant?

12 A    He meant that what happened in the meeting could not go

13 here, or perhaps elsewhere in terms of evidence or perhaps

14 other things, I don't know.  I responded and told him that the

15 UAW was not willing to accept that condition as a condition of

16 participation in the meeting because we believed again that

17 this should be an open process.  We're dealing with public

18 employees and we have to be able to tell our members what

19 we're doing.  We don't want to have secret meetings.

20      And we want -- and we also thought it was relevant for

21 what might happen down the road.  So I -- it was all very

22 polite, but I said I'm sorry, I can't accept those conditions

23 and I left.

24 Q    Did you attend the July 11th meeting the next day?

25 A    I did.

1    Q    Do you recall what the subject of that meeting was?

2    A    It was announced to be a meeting about retiree health

3    care OPEB.

4    Q    Okay.  Was Mr. Orr present at the July 11th meeting?

5    A    He was not present at the July 10 or 11 meetings when I

6    was in the room.  And I was in the room for all of the July 11

7    meeting.

8    Q    Do you recall a presentation by the Jones, Day attorneys

9    at the July 11th meeting?

10   A    Yes.

11   Q    And what's your recollection of the substance of that

12   presentation?

13   A    Evan Miller walked through their proposal on OPEB

14   benefits.  On -- and on health care benefits.

15   Q    Did you speak at the meeting?

16   A    I did.

17   Q    And do you recall what you said?

18   A    I spoke several times.  I asked some questions.  But at

19   the beginning before we got into the substance of OPEB in

20   response to Mr. -- Mr. Heiman said we're not going to impose a

21   408 condition on participation in the meeting.  And I said

22   that's good because I thought of a -- another reason why it

23   would be inappropriate because if this was evidence -- if --

24   it would be evidence -- it would important to look at what

25   happened because of Bildisco.  I said that

1 Q    But --

2 A    And then I spoke later in the meeting as well.

3 Q    What -- what are you referring to, by the word Bildisco?

4 A    Bildisco is a Supreme Court decision about rejection of

5 agreements pre 1113 of the Bankruptcy Code and it talks about

6 how a Court should look at what happened in dealings between

7 the parties in negotiations so to speak.

8 Q    I'm sorry, I interrupted you.  You were -- you were

9 recounting what you said at the July 11th meeting.

10 A    I spoke again after we were well into the discussion of

11 retiree health care benefits and health benefits in general.

12 Q    And --

13 A    Do you want me to say what I said or --

14 Q    Yes, recount what you said.

15 A    I'm trying to stick to the Q and A, so -- I -- several

16 questions.  And my first question as I recall was to Mr.

17 Miller because he was really the presenter.  Was could the

18 city having if this -- if this were to be, this program that

19 they were proposing were imposed in any way by agreement or

20 otherwise, would the city be free in the city's eyes to

21 eliminate the reduced benefits at any time and he said yes, it

22 would.  That was -- and then I spoke again shortly thereafter.

23 Q    What did you say then?

24 A    Okay.  I said, what recovery would there be for lost

25 benefits.  In other words the difference between a reduced

1  benefit level and the benefits that were in place at the time

2  the chapter –– at the time –– we weren't in Chapter 9.  We

3  were trying to avoid Chapter 9.

4       But under a deal what would –– what would happen to that

5  differential between the benefits as they were and the

6  benefits at the reduced level.  Would there be a recovery for

7  workers.  And Mr. Miller said, no.

8  Q    Do you recall having any other interchanges ––

9  A    I said, and I responded, that's very unusual.  That's

10  certainly not the way it works in 1114 which I know a little

11  bit about.

12  Q    Did you have any other interchanges with Jones, Day

13  attorneys on July 11th?

14  A    Yes.

15  Q    Can you tell us what those were?

16  A    At the –– near the conclusion of the meeting, I spoke up.

17  I started to talk about this earlier, but near the conclusion

18  of the meeting, I having thought about this issue going into

19  the meeting, looked at Mr. Miller and said, Evan, I want you

20  to go back and tell Mr. Orr that the UAW –– well, let me stop.

21       I –– I said Evan, there's a way to deal with this despite

22  the fact that we have this issue of being able to bargain or

23  not bargain for retirees.  You know what it is.  And he said

24  yes, class action.

25       And I said, that's right.  And I said, you should go back

1  and tell Mr. Orr that the UAW which has a lot of experience in

2  doing that, is willing to engage and lead in that process with

3  you in order to avoid a bankruptcy proceeding.  And please go

4  back and present that to Mr. Orr and get back to me because we

5  are serious about that.

6  Q    And between July 11 when you made that statement to Mr.

7  Miller, and July 18th when the bankruptcy was filed, did you

8  receive any response from the emergency manager or from Jones,

9  Day regarding the UAW's proposal to have a class action

10  process put in place?

11  A    Never.

12  Q    To what extent were there what you would consider, given

13  your experience, to -- to what extent were there what you

14  would consider negotiations over pension benefits at the June

15  14th, the June 20th, and the July 11th meetings?

16  A    There were two significant deficits that precluded

17  negotiations but each of which could have been taken out of

18  the way.  The first was access to information unimpeded by

19  secrecy.  That was not taken away.

20      The second was a process because --

21          THE COURT:  I think your lawyer wants to say

22  something to you.

23          MR. DECHIARA:  Thank you, Your Honor.

24  A    I'm sorry, I apologize.

25  Q    Specifically in my question I'm talking about to what

1  extent do you believe there were negotiations over accrued

2  pension benefits?

3  A    Did I -- if I misunderstood you about pension, I'm sorry.

4  I -- I must not have heard --

5  Q    That's fine.  But now that I've clarified the question,

6  can you answer it?

7  A    The question is, were there discussions about pension

8  benefits.

9          THE COURT:  No, that's not the question.

10  Q    The question is, to what extent in your experience, given

11  your experience --

12  A    Yes.

13  Q    Were there what you would consider to have been

14  negotiations over accrued pension benefits at the meetings

15  that you attended?

16  A    As far as the UAW was concerned, no.  And in our view

17  there could not have been because it would have been contrary

18  to Michigan's basic law, the Constitution.

19  Q    And now let me ask you the same question, but instead of

20  limiting it or instead of referring to accrued pension

21  benefits, let me ask you to what extent do you believe there

22  were negotiations over OPEB?

23  A    And this is what I started to answer before and I

24  apologize to the Court for mishearing the question.  We tried

25  to start negotiations.  There could have been -- there were

1  impediments.

2          THE COURT:  That's not the question.

3  A    Were there negotiations?

4          THE COURT:  To what extent were there negotiations.

5  A    We asked to be involved in negotiations.  We invited the

6  city to --

7          THE COURT:  And this is not a question about your

8  attitude or your intent.

9  A    But it's about --

10          THE COURT:  The question is to what extent were

11  there negotiations?

12  A    The first step in negotiations --

13          THE COURT:  I want to tell you, sir --

14  A    Okay.

15          THE COURT:  This question and the last question are

16  probably the most important questions you are asked here this

17  morning.

18  A    I understand.

19          THE COURT:  To what extent were there negotiations.

20  A    There were.  And in our view the first step --

21          THE COURT:  Were what?

22  A    There were negotiations that we tried to initiate with

23  the city over OPEB.  We invited them to negotiate through a

24  class action process.  The first step in negotiations is to

25  ask the other side to participate in the process, process that

1  will lead to a resolution.

2      We asked.  We asked that be taken back to Mr. Orr and Mr.

3  Orr never responded to us, nor did his lawyers ever.  That's

4  my answer.

5  Q    And given the lack of response by Mr. Orr, was what

6  occurred -- what actually occurred, were those negotiations?

7  A    In my view the first step in negotiations is to ask, but

8  following --

9           THE COURT:  Again you're not answering -- you're not

10 answering the questions.

11 A    Okay.  All right.

12           THE COURT:  Given your --

13 A    They never took us up on it, put it that way.

14           THE COURT:  Given your perception of what actually

15 happened, and your understanding of what negotiation means,

16 that phrase, that term means, to what extent was what happened

17 negotiation in your opinion?

18 A    I have to explain what I mean by negotiations to answer

19 that, Your Honor.

20           THE COURT:  No, you don't.  You just have to tell me

21 the extent to which it was negotiation.

22 A    The first step in negotiations --

23           THE COURT:  Okay.  This -- this answer you've

24 already given me.  If that's your answer, we'll move on.

25 Q    Mr. Nicholson, are you familiar with the Flowers

 1  litigation?

 2  A     One second.

 3          THE COURT:  What's the matter, sir, do you need a

 4  minute?

 5  A     I do.

 6          THE COURT:  All right.  We'll take a recess until

 7  10:55.

 8      (WITNESS MICHAEL NICHOLSON WAS TEMPORARILY EXCUSED AT

 9  10:55 A.M.)

10          THE CLERK:  All rise.  Court is in recess.

11      (Court in Recess at 10:39 a.m.; Resume at 10:56 a.m.)

12          THE CLERK:  All rise.  Court is in session.  Please

13  be seated.

14      (WITNESS MICHAEL NICHOLSON RESUMED THE STAND AT 10:56

15  A.M.)

16          THE WITNESS:  Your Honor --

17          THE COURT:  One second.  It looks like everyone is

18  here.  Sir.

19          THE WITNESS:  There's two things I need to tell you

20  about my testimony if you'll give me permission.

21          THE COURT:  Any objection?

22          MR. STEWART:  No.  No objection, Your Honor.

23          THE WITNESS:  First of all, Your Honor, I just -- I

24  want to make the Court aware that my -- I'm trying to stay

25  focused on this, but I just learned this morning -- this

1  morning that my brother is in the hospital with end stage

2  liver cancer.  And I want to be with him.  So I'm trying to

3  stay on task here, okay?

4          THE COURT:  Okay.

5          THE WITNESS:  And -- but I think you should know

6  that because you have to judge my credibility and my frame of

7  mind.

8          THE COURT:  Right.

9          THE WITNESS:  The -- the second thing I want you to

10 know if there's something -- an additional thing I remembered

11 about I should have responded to it about the July 11th

12 meeting.  And with your permission, I'll tell you so you have

13 a complete story, but it's up to you.

14          THE COURT:  Go ahead.

15          THE WITNESS:  So, after I asked Mr. Miller to go

16 back to Mr. Orr and tell him the UAW was willing to engage in

17 a class action type process, something would culminate that to

18 resolve retiree health care out of bankruptcy.

19      Mr. Heiman -- Heiman, I'm sorry, said there isn't time

20 for that.  And I said, there is time, we got this resolved

21 very quickly in a number of cases including Ford, and GM, and

22 Chrysler.

23      That was the last discussion we had.  So the negotiations

24 such as they were, there was nothing beyond that point.  There

25 was an ask, an invitation, but no acceptance.

1  BY MR. DECHIARA:

2  Q    The last topic, Mr. Nicholson.  I'm going to ask you

3  about July 18th.  But let me first ask you some questions to

4  set the stage.  Are you familiar with the Flowers litigation?

5  A    Yes.

6  Q    And what was -- what was or is the UAW's role in the

7  Flowers litigation?

8  A    First of all, I conceived of the idea of the basic

9  premise and theory behind the litigation.  That's the first

10 part of the role.

11     Second, the UAW funds the attorney for the Flowers

12 plaintiffs.

13     Third, the UAW cooperates and lends assistance to those

14 attorneys.  However, those attorneys make their own mind up

15 with respect to representing their clients.  So that's the

16 answer.

17 Q    And do you know Bill Wertheimer, counsel to the Flowers

18 plaintiffs?

19 A    I've known Bill for decades.

20 Q    Okay.  Are you aware that the Flower plaintiffs moved for

21 a preliminary injunction?

22 A    Yes, I am aware of that.

23 Q    And are you aware of the date that the preliminary

24 injunction was scheduled to be held?

25 A    Yes.  It was scheduled by the Ingham County Circuit Court

1  to be heard on July 22nd.

2  Q    Okay.  And do you recall working with Mr. Wertheimer on

3  reply papers for that preliminary injunction motion?

4  A    Yes.  Bill came to my office at UAW solidarity house on

5  July 18th and we worked on finalizing a reply brief and I also

6  signed the affidavit which is -- which was notarized and is in

7  the record as Exhibit 624 that day.

8  Q    Now on that day, did you become aware that the retiree

9  system in its -- its lawsuit had filed papers for an ex parte

10 TRO?

11 A    We received a call.  Bill and I were in my office along

12 with our law clerk, great law clerk at the time, Kristin

13 White, working busily away on the reply brief which had to be

14 filed that day, July 18th.  So that was why we were there,

15 because it had to be driven up to Lansing as I understand it.

16      And we had a call during that day to that effect, that

17 they were going to Court and seek an ex parte restraining

18 order restraining the city from filing a Chapter 9 petition

19 because they had heard --

20          THE COURT:  All right.  Sir, you've answered the

21 question.

22 A    I'm sorry.

23 Q    Did you and Mr. Wertheimer that afternoon have a

24 discussion about the retiree systems seeking a ex parte TRO?

25 A    Yes.

1 Q    And can you recount the conversation that you and Mr.

2 Wertheimer had on that subject?

3 A    Yes.

4          MR. STEWART:  I just -- it's a proper question,

5 however, there's going to be a waiver here.

6          MR. DECHIARA:  Your Honor, first of all, Mr.

7 Wertheimer is counsel for the Flowers plaintiffs, Mr.

8 Nicholson is counsel for the UAW.  But I'm not asking for any

9 -- any discussion of any legal issues, just a discussion of

10 this event in a -- in a separate lawsuit.  And -- and it's

11 foundational, Your Honor.  It's -- it's -- it's --

12          THE COURT:  Then proceed.

13          MR. DECHIARA:  Thank you.

14 A    The question, can you repeat it?

15 Q    Can you recount your conversation with Mr. Wertheimer on

16 the subject of the retiree systems seeking the ex parte TRO

17 that you had been informed of?

18 A    We were told they were going to Court that afternoon in

19 front of Judge Aquiline.  Bill and I decided that since we had

20 to go to Lansing anyway and since that Court hearing was

21 probably going to be pretty important, that we ought to finish

22 the reply brief in the car and drive it up -- drive up there

23 right now so we got there in time for the hearing and that's

24 what we did.

25 Q    And did you have any discussion with Mr. Wertheimer about

1  whether the state should be notified of the ex parte TRO?

2  A    Yes.

3  Q    What -- can you recount that discussion?

4  A    We finished the brief on the -- I was sitting in the back

5  seat typing away on my laptop.  We finished the brief.

6  Q    This is in the car to Lansing?

7  A    The car on the way to Lansing.  And Bill asked me Mike,

8  do you think we should notify the state.  And I took it as an

9  ethical question, a practical -- what I would call in my

10 terms, practical ethics.  What's the right thing to do.

11      And I said yeah, Bill, I think we have to, it's not in

12 our interest, but I think we have to do that, that's the right

13 thing to do and he agreed.  And he proceeded to call the state

14 Attorney General's office and tell them that we were going to

15 be there even though it wasn't our motion and that there was

16 an ex parte motion being brought.

17      We didn't know ahead of time what was going to happen in

18 Court.  Bill ended up asking for relief because we had just

19 filed the reply brief and it was now a fully briefed

20 preliminary injunction motion.

21 Q    How do you know -- how do you know Mr. Wertheimer called

22 the state attorneys?

23 A    I heard him talking to them while I was in the car.  And

24 then -- and he actually had two calls with them and we

25 discussed it in the interim.  I also know because I talked to

1  the state Attorney General, the lawyer for the state, not Mr.

2  Schuette, but the lawyer for the state Attorney General, Mr.

3  Canzano.  And he told me Bill called and I told him and he

4  told me how much he appreciated Bill's ethical behavior.

5       And I said well, I was part of that and I was part of

6  that decision too.  And he said well, I appreciate you doing

7  that as well.

8  Q    Do you know what time on July 18th Mr. Wertheimer called

9  the state to notify them of the TRO hearing?

10 A    I can put it within about a ten minute window because I

11 know --

12 Q    What time?

13 A    Around 3:35.

14 Q    P.M.?

15 A    Yes.

16 Q    And how can you put it in such a tight window?

17 A    Because I remember a sequence of events, one of which is

18 -- is an email I sent that nails down the time.  It was

19 between the first and the second conversation Mr. Wertheimer

20 had with the Attorney General's office.

21      I've also seen Mr. Wertheimer's cell phone records that

22 confirm that.  But that -- but I have my own memory of it as

23 well.  And I also know from talking to Mr. Canzano because he

24 is of the same view as to the time.

25           MR. DECHIARA:   No further --

1  A     I talked to Mr. Canzano about that this morning.

2           MR. DECHIARA:  No further questions on direct.

3                       CROSS EXAMINATION

4  BY MR. STEWART:

5  Q     Good morning, Mr. Nicholson.

6  A     Good morning.

7  Q     Could we first put up Exhibit 105?  Mr. Nicholson, are

8  these notes that you took at the July 11 meeting?

9  A     They're notes I typed, yes.

10         (City Exhibit 105 was identified)

11 Q     You typed them at the time?

12 A     During the meeting.

13 Q     And why did you prepare them?

14 A     I prepared them because I was -- it turns out -- I

15 thought I wasn't -- didn't take notes at that meeting.  When I

16 found this document, I recalled that I did.  And I prepared

17 them to record some of what happened.  It's very much

18 shorthand about what happened.

19         MR. STEWART:  I'd move -- I move the admission of

20 Exhibit 105.

21         THE COURT:  Any objections?

22         MR. DECHIARA:  No objection.

23         THE COURT:  105 is admitted.

24         (City Exhibit 105 was admitted)

25 Q     Mr. Nicholson, just a couple of things.  First of all,

1  just the chronology so that I understand it.  You attended the

2  June 14 meeting, correct?

3  A    Yes.

4  Q    And the June 20th meeting, correct?

5  A    Yes.

6  Q    Your union funded and you said you were a participant in

7  the thinking about the Flowers litigation?

8  A    Yes.

9  Q    That was brought July 3rd?

10 A    I believe that's right.

11 Q    And you began thinking of that before July 3rd, correct?

12 A    Yes.

13 Q    Probably about a week before July 3rd?

14 A    I -- what led me to start thinking about it --

15 Q    Well, just when -- when did you --

16       THE COURT:  The question was when did you start

17 thinking it?

18 A    I -- when I -- I can't think of the exact date, but I

19 know the event.

20       THE COURT:  Approximately.

21 A    I'll have it just a minute, I'm just lining up a

22 sequence.

23       THE COURT:  While he's thinking, can we have a copy

24 of Exhibit 105 which was just admitted?

25       MR. STEWART:  Yes, Your Honor.

1           THE COURT:  If not at this moment, then at some

2    point, please.

3           MR. STEWART:  I believe we have extras, Your Honor.

4    Let me get it from our -- may I approach, Your Honor?

5           THE COURT:  Yes.  Do you have an answer, sir?

6    A    Yes.  Within a few days after the June 14th meeting is

7    about the best I can put it -- put it to, Your Honor.

8    Q    Okay.  So let me go back.  You were at the June 14

9    meeting.

10   A    Yes.

11   Q    Within a few days you began thinking of a lawsuit,

12   correct?

13   A    Yes.

14   Q    You went to the June 20th meeting?

15   A    Yes.

16   Q    Lawsuit was filed July 3rd?

17   A    I think that's the date it was filed, yes.

18   Q    You were involved in the thinking behind and the work of

19   the lawsuit?

20   A    Yes.

21   Q    The UAW paid the lawyers for the lawsuit?

22   A    Yes.

23   Q    Mr. Flowers was a UAW member?

24   A    A proud UAW member.

25   Q    And didn't -- you did not at any point tell the city its

1  lawyers that the UAW was behind this lawsuit, did you, until

2  your deposition when I asked you that question?

3  A    I don't think I was asked, but no, I think that's right.

4  The first time I told them was when you asked me the question

5  in the deposition, I said yes.

6  Q    And then on -- on July 10 there were two meetings.  One

7  in the morning, one in the afternoon.

8  A    I was not invited to a meeting in the afternoon.  I heard

9  there was one for police and fire workers.

10  Q    And at the beginning of the July 10 meeting Mr. Heiman of

11  Jones, Day invoked Rule 408 of the Federal Rules of Evidence,

12  correct?

13  A    Uh-huh.

14  Q    And you understand that that rule is a rule designed to

15  insure the privilege that attend to settlement negotiations,

16  correct?

17  A    Yes.

18  Q    You would not agree to that, so you did not attend the

19  meeting, right?

20  A    I would not agree to accepting that as a condition of

21  attending and therefore I excused myself because they were

22  free to impose whatever conditions they want, I suppose.

23  Q    So you decided to not accept the conditions and not

24  attend the meeting?

25  A    That's right.

1  Q     Okay.  And by the way you mentioned the data room.  There

2  was a non-disclosure agreement that had to be executed before

3  the filing of the petition in this case, before one could

4  access the data room.  Do you remember your testimony about

5  that?

6  A     Yes.

7  Q     And you decided not to sign that non-disclosure

8  agreement, correct?

9  A     That's right.

10 Q     And as a result you did not have access to the data room,

11 correct?

12 A     Correct.

13 Q     Other unions did sign the non-disclosure agreement.

14 A     I don't know that for a fact.

15 Q     You don't know --

16 A     I would not be surprised if they did, but I don't know

17 that for a fact.

18 Q     Don't speculate.  If you don't know, just tell me.

19 A     I don't know that for a fact, I know what we did.

20 Q     On the -- on the morning of July 10 did other unions

21 proceed to attend that meeting?

22 A     When I left the room, there was Mr. Kreisberg for AFSCME.

23 He may have had somebody with him.  And at that point I wasn't

24 sure who on the police and, you know, July 10th.  I was in that

25 for such a short period of time, actually the only -- the only

1  parties other than the debtor's representatives that I --

2  sorry, the city's representatives that I remember being there

3  were Clark, Hill people and Mr. Kreisberg.  I'm sure -- I know

4  there were others in the room, but I -- I didn't know a lot of

5  these people at that point in time.

6  Q    Okay.  All right.  And then you mentioned a meeting on

7  July 11, correct?

8  A    That's correct.

9  Q    You attended and those are your notes, right?

10  A    That's correct.

11  Q    Okay.  Now so our chronology from the time of that first

12  meeting from June 14th to July 11th is what, four weeks?

13  A    Whatever the calendar says.  It's about 28 days maybe.

14  Q    Uh-huh.  Now you mentioned various discussions you had

15  with lawyers for the city and in particular lawyers from

16  Jones, Day.  Do you remember your testimony on that?

17  A    I think I remember what I testified to this morning, yes.

18  Q    Okay.  That was Mr. Heiman?

19  A    I remember saying what Mr. Heiman said at the July 11th

20  meeting.  I think I just said that part of it when I just --

21  we just came back from break and -- and a little bit before

22  about David saying at the beginning of the meeting that he

23  wasn't imposing a Rule 408 condition for attendance.

24  Q    Well, you also -- and Mr. Miller.  You testified you

25  talked to Mr. Miller?

1  A    Well --

2  Q    Yes, sir, yes or no, did you --

3  A    On the 11th?

4  Q    At any time before the filing -- between the 14th and the

5  filing of the petition, did you or did you not talk to Mr.

6  Miller?

7  A    Yes.

8  Q    Okay.  And he -- did at any time did Mr. Miller tell you

9  he was not willing to talk with you some more?

10  A    He didn't utter those words.

11  Q    Did Mr. Heiman utter those words?

12  A    No.

13  Q    Now you testified about -- put up 38, please.  You

14  testified about something called a VEBA?

15  A    That is correct.

16  Q    That is a Voluntary Employee Beneficiary Association?

17  A    That's what the acronym stands for.

18  Q    And those are -- that's the class action mechanism that

19  you proposed?

20  A    A VEBA is --

21  Q    Sir, yes or no?

22  A    No, it is not per say limited to class actions, it's

23  often the result of a class action retiree insurance

24  settlement.

25  Q    Okay.  And when you --

1  A    It can also result from a bankruptcy resolution through

2  1114.

3  Q    Uh-huh.

4  A    In Chapter 11's.

5  Q    Uh-huh.  And at the time you'd had these discussions, was

6  the city in bankruptcy?

7  A    The city filed bankruptcy --

8  Q    Sir, yes or no.  At the time of your discussions before

9  July 18, was the city in bankruptcy, or was the city not in

10  bankruptcy?

11  A    The city was not in bankruptcy until --

12  Q    Thank you.

13  A    -- 4:06 p.m. on July -- on July 18th, 2013.

14  Q    Now, these class action resolutions that you told us

15  about.  You mentioned the one in Dana.

16  A    That's right.  That was not a class action resolution,

17  that was a Chapter 11 resolution reached through 1114.

18  Q    And how long --

19  A    Dana was a Chapter 11.  Your firm worked on it with us.

20  Q    Uh-huh.  And it took about a year?

21        THE COURT:  Excuse me one second.  Again, Mr.

22  Nicholson, I have to ask you please just answer the question.

23  A    Well, he said Dana was a -- a class action and it's not

24  right.  So I want to make sure you understand what the facts

25  are, Your Honor.  That's why I'm answering the way I am.

1       THE COURT:  I appreciate that very much, but your

2   job is just to answer the question.

3   A    All right.

4       MR. DECHIARA:  Your Honor, I think what the witness

5   is trying to say is, the question assumed a fact that was

6   contrary to fact.  So he was trying to explain.

7       THE COURT:  And I -- and I appreciate that.  But his

8   job is just to answer the question.  If he can't answer the

9   question, he should say that.  All right.  So let's try to

10  proceed on that basis.

11  A    I know it's not my job to object to the form of the

12  question, Your Honor.  But -- and I hear what you're saying

13  and I will comply.

14      THE COURT:  Go ahead, sir.

15  Q    Dana took about one year to resolve?

16  A    It depends on when you start counting.

17  Q    Uh-huh.  From the time negotiations began until the time

18  you were done in Dana was about one year, isn't that true?

19  A    That is not my recollection sitting here today, but I

20  don't -- I did not refresh myself on that particular question.

21  Q    Now you mentioned the VEBA that was done in General

22  Motors?  That took over one year, did it not?

23  A    There were three VEBA settlements in General Motors, Your

24  Honor, which one?

25      THE COURT:  Please answer the question

1  A    I -- you have to tell me which VEBA settlement you mean.

2  Q    The one that this Court approved on March 2006.  That was

3  after a one year negotiation process, wasn't it?

4  A    This Court never approved a VEBA settlement in 2006.

5  Q    The Eastern District of Michigan did not?

6  A    This is a -- the Bankruptcy Court, not the District

7  Court.

8  Q    All right.

9           THE COURT:  Apart from that distinction --

10 A    Yes.

11          THE COURT:  Perfectly valid.  Did it take a year, or

12 over a year?

13 A    I was not involved in that case.

14          THE COURT:  You don't know?  Just say I don't know.

15 A    No, I don't know.

16 Q    And you're aware of the VEBA in Goodyear.  Do you know

17 about that?

18 A    I heard -- read about it in the newspapers, that's all.

19 Q    Do you know that took 22 months?

20 A    I don't know.

21 Q    So I have up on the screen Exhibit 38.  And that I'd

22 represent to you is a chart showing the cash forecast the city

23 had through the end of its 2014 fiscal year.  Starting in July

24 of 2013, what is the city's cash -- cash -- cash position

25 after one year?

1          MR. DECHIARA:  Objection, Your Honor, it's beyond

2   the scope of direct.  There's no foundation that this witness

3   can testify about the city's cash flow position.

4          THE COURT:  The objection is sustained.  You can

5   represent to the witness what the exhibit says if you want to.

6          MR. STEWART:  Well, I think I made my point.  I'm

7   going to sit down.  Thank you, Mr. Nicholson.  That's all I

8   have.

9          THE COURT:  Any more questions for the witness?

10          MR. DECHIARA:  No redirect.

11          THE COURT:  All right.  Sir, you're excused.  Thank

12   you very much for your testimony.

13   A    Thank you.

14      (WITNESS MICHAEL NICHOLSON WAS EXCUSED AT 11:16 A.M.)

15          MR. WERTHEIMER:  Your Honor, I have to go get our

16   next witness.  It will take me just a few minutes.

17          THE COURT:  Okay.  Please raise your right hand.

18      (WITNESS JANET WHITSON WAS SWORN)

19          THE COURT:  Please sit down.

20                      DIRECT EXAMINATION

21   BY MR. WERTHEIMER:

22   Q    Would you state your name and address, please?

23   A    Janet Whitson, 25260 East Deborah, Redford, Michigan.

24   Q    You are one of the plaintiffs in what we've been calling

25   the Flowers litigation?

1  A    I am.

2  Q    How old are you, Ms. Whitson?

3  A    Sixty-six.

4  Q    And are you retired?

5  A    Yes.

6  Q    Where are you retired from?

7  A    The Detroit Public Library.

8  Q    And when did you retire?

9  A    2002.

10  Q    How old are you now?

11  A    Sixty-six.

12  Q    Could you briefly tell the Court how you came to be a

13  plaintiff in the Flowers litigation?

14  A    On the Local 2200 list serve there was a query, asking if

15  someone would be interested in volunteering to be on the part

16  of the lawsuit and I volunteered.

17  Q    And Local 2200 is the UAW local that represents the

18  active librarians?

19  A    Yes.

20  Q    When did you begin working at the public library?

21  A    May of 1969.

22  Q    At that point what education did you have beyond high

23  school?

24  A    I had a Bachelor's Degree in history from the University

25  of Detroit.

1  Q    And when did you obtain that Bachelor's Degree?

2  A    May 3rd of 1969.

3  Q    So you started right in at the library right out of

4  college?

5  A    Yes.

6  Q    What did you hire in as?

7  A    A pre-professional librarian.

8  Q    When you hired in as a pre-professional librarian, did

9  you make any kind of commitment to the library as to education

10  you would have to undergo?

11  A    Yes.

12  Q    And what was that commitment?

13  A    That I would complete my library degree in six years.

14  Q    And did you do that?

15  A    Yes, I did.

16  Q    What degree did you obtain?

17  A    A Master's in library science.

18  Q    And where did you obtain it from?

19  A    At the University of Michigan.

20  Q    And when did you obtain your Master's?

21  A    In 1972.

22  Q    And you're working all this time at the library?

23  A    Yes, I was.

24  Q    Did you receive any other education beyond that during

25  your years at the library?  That is beyond the Master's?

1  A    Yes, I did.

2  Q    Briefly tell us what that is.

3  A    I have a post-Master's specialist in archival

4  administration from Wayne State University.

5  Q    And when did you obtain that?

6  A    In 1987, I believe.

7  Q    Now I'd like to ask you just a couple of questions about

8  your work at the library.  When you first started work in

9  1969, did you work in one or -- one of the branches?

10  A    Yes, I did.

11  Q    And for how long a period did you work in the branches?

12  A    Initially from 1969 to 1980.

13  Q    And how many different branches did you work in in that

14  11 year period?  Just approximately.

15  A    Five.

16  Q    What did you do at that point?  Or where did you work

17  from that point forward, from 1980?

18  A    I was at the main library.

19  Q    And what were you doing -- let -- let me back up.  Just

20  generally tell us what you did at the branches, what kind of

21  library work?

22  A    I initially was a young adult librarian.  I specialized

23  and worked with teenagers, but I did reference work and book

24  selection.  And really that's it, book selection, reference

25  work.  We did the collections, worked with the public, that

1   type of work.

2   Q    Okay.  When you went down to the main library in 1980,

3   and that's the library on Woodward?

4   A    Yes.

5   Q    How long did you remain at the main library the first

6   time you were working there?

7   A    Five years.

8   Q    And just briefly tell us what you did there.

9   A    I again was -- there I was an adult librarian.  Worked in

10  with -- those were special collections.  So working with the

11  subject matter and those collections.  General information was

12  sports, cooking, gardening, and biography.  And the Burton

13  historical collection was local history and genealogy.

14  Q    What was your position relative to the Burton historical

15  collection?

16  A    At that point I was a librarian too in that department.

17  Q    Did you then go back out into the branches for a few

18  years?

19  A    Yes.  I was promoted and went out to the branches.  I

20  went out to Franklin branch.

21  Q    And how long did you stay out in Franklin or in another

22  branch?

23  A    Three years.

24  Q    Did you then come back to the main library?

25  A    I was promoted to manager of the rare books collection.

1  Q    Would you tell the Court what that -- what that means or

2  what that entails?

3  A    Well, I had received that special collections training,

4  so I went to the Burton historical collection -- I went to the

5  rare books collection as manager and that was really the

6  greatest job in the State of Michigan.  And I had --

7  Q    For a librarian?

8  A    For a librarian.  I handled rare materials.  George

9  Washington's diary incunabula.  Books from the first 50 years

10 of printing, illuminated manuscripts, papyrus fragments,

11 Babylonian clay tablets.

12 Q    Okay.

13 A    It was extraordinary.  It was great, great materials to

14 handle.

15 Q    And then you retired in 2002?

16 A    Yes.

17 Q    About how old were you at the time you retired?

18 A    Fifty-five.

19 Q    Did you have any physical problems that led to your

20 retirement?

21 A    I went out on a medical disability.

22 Q    And just briefly tell us what that physical problem was.

23 A    Two failed back surgeries.

24 Q    You have, I take it, remained retired since -- since '02?

25 A    Disabled since '02

1   Q    Do you receive a pension from the library?

2   A    Yes.

3   Q    Approximately how much do you receive a month?

4   A    Twenty-five hundred dollars.

5   Q    Do you also receive Social Security?

6   A    Yes, I do.

7   Q    Approximately how much do you receive Social Security?

8   A    Just about 2,000.

9   Q    Do you have any other sources of income?

10  A    No, I don't.

11  Q    Do you have an IRA?

12  A    No.

13  Q    Do you have any substantial monies in the bank?

14  A    No.

15  Q    Do you have any equity in your home?  Let me ask you, do

16  you own your home?

17  A    Yes.  It has a mortgage, but --

18  Q    Do you have any equity in your home such that you could

19  do a reverse mortgage or get money out of it?

20  A    No.

21  Q    What is your marital status?

22  A    I'm divorced.

23  Q    Do you have children?

24  A    Two sons.

25  Q    Are they grown?

 1  A    Yes.

 2  Q    Do they have their own families?

 3  A    Yes.

 4  Q    Do they provide you with any financial support?

 5  A    No, they don't.

 6  Q    Are you able to go back out into the work force now?

 7  A    No.

 8  Q    Why not?

 9  A    I have a difficult time walking and standing.

10  Q    Do you have health insurance now?

11  A    Yes.

12  Q    Do you have Medicare?

13  A    Yes.

14  Q    Do you pay for Part B of Medicare?

15  A    Yes.

16  Q    Okay.  And that's about $100.00 a month?

17  A    Yes.

18  Q    Do you currently have health care through the city?

19  A    Yes.

20  Q    And are there co-pays for that?  That is do you pay

21  something for that?

22  A    Yes.

23  Q    Approximately how much do you pay?

24  A    Right now it's $85.00 a month out of my check.

25          MS. KOVSKY-APAP:  Your Honor, we object to the

1  relevance of this line of questioning.  It doesn't seem to

2  have anything to do with the city's eligibility.

3          MR. WERTHEIMER:  Your Honor, I'm done with this line

4  of questioning.  The -- the relevance is, I think that we are

5  entitled to put a face on the retirees who were litigious thus

6  forcing the emergency manager to file bankruptcy.

7          THE COURT:  I'll permit it to stand.  Go ahead.

8          MR. WERTHEIMER:  Thank you.

9  Q    During the time you worked at the library, did you hold

10 any office with the -- the local union?

11 A    Yes.

12 Q    What offices did you hold and approximately when?

13 A    In the early eighties, I was unit secretary for the --

14 what we refer to as the POOL unit, but is the professional

15 organization of librarians.  And I was Vice President of the

16 amalgamated Local 2200 and then I was President for nine

17 years.

18 Q    What were the approximate nine years that you were

19 President?

20 A    1993 to 2002.

21 Q    And finally I asked you how you came to be a plaintiff in

22 the Flowers litigation.  Why did you agree to become a

23 plaintiff in the Flowers litigation?

24 A    Well, I had always understood that my pension was

25 protected by the -- just always understood it was protected by

1  state law.  And suddenly it seemed to be in jeopardy when I

2  was reading the paper over the summer.  So I felt I better get

3  involved.

4  Q    Are you a litigious person?

5  A    No, not really.

6  Q    Have you ever sued anyone?

7  A    I had to in my divorce.

8         MS. KOVSKY-APAP:  Objection, relevance.

9         THE COURT:  The objection is sustained.

10        MR. WERTHEIMER:  I have nothing further.  Thank you,

11  Your Honor.  Thank you, Ms. Whitson.

12  A    Uh-huh.

13                    CROSS EXAMINATION

14  BY MS. KOVSKY-APAP:

15  Q    Ms. Whitson, my name is Deb Kovsky-Apap.  I'm one of the

16  lawyers for the city.

17        THE COURT:  I'm sorry, would you repeat your name,

18  please?

19        MS. KOVSKY-APAP:  Sorry, Deborah Kovsky-Apap.

20  Q    Ms. Whitson, you testified that you were a librarian with

21  the Detroit Public Library for approximately 32 years, is that

22  correct?

23  A    Yes.

24  Q    And it's your understanding that the Detroit Public

25  Library is a separate municipal corporation from the city, is

1  that right?

2  A     Yes.

3  Q     But employees of the Detroit Public Library are eligible

4  for pensions under the city's general retirement system,

5  correct?

6  A     Yes.

7  Q     And you said that when you were actively employed you

8  were a member of UAW Local number 2200?

9  A     Yes.

10  Q     And that's a collective bargaining unit?

11  A     Yes.

12          THE COURT:  Could you speak more into the mike for

13  me?  There you go.

14  Q     Can you tell me who does Local 2200 represent?

15  A     Right now?

16  Q     Or at the time that you were a member?

17  A     The time that I was a member, it -- it changes.  It's an

18  amalgamated local.  But at the time that I was a member, it

19  had the librarians 1, 2, and 3 in a unit that was called the

20  Professional Organization of Librarians.  It had the librarian

21  managers and coordinators in a unit that was called the

22  Association of Professional Librarians.  It had the skilled

23  trades at the -- at the Detroit Public Library.  It had a

24  health and safety unit sometimes that was called SEMCOSH.  And

25  it represented some of the doctors from the City of Detroit

1  Q    Local 2200 represented only active employees, correct?

2  A    Correct.

3  Q    To your understanding, as a former President of Local

4  2200, was the union authorized to enter into agreements to

5  bind retirees without their consent?

6  A    I didn't hear all of your question.

7  Q    To your understanding, was Local 2200 authorized to enter

8  into agreements to bind retirees without their consent?

9  A    No.

10        MR. WERTHEIMER:  Your Honor, I think this is asking

11 her for a legal opinion, or at a minimum an -- an opinion that

12 may be outside any area she dealt with at the local.  There's

13 no evidence that she ever had to deal with this issue during

14 the time that she was --

15        THE COURT:  Well, she -- she was President.

16        MR. WERTHEIMER:  Yes.

17        THE COURT:  If she doesn't know, she can say so.

18        MR. WERTHEIMER:  That's fine.

19        THE COURT:  Please answer the question.

20 A    I don't know.

21 Q    You mentioned that when you were at the Detroit Public

22 Library you served as the manager of the rare books

23 collection.  Do you recall that?

24 A    Yes.

25 Q    And that's part of the Burton historical collection?

1  A    Yes.

2  Q    That's an important resource for scholars and

3  researchers, isn't it?

4  A    It is.

5  Q    And since your retirement, you continue to be involved in

6  organizations related to books and libraries, correct?

7  A    Yes.

8  Q    You're the immediate past President and librarian of the

9  Irish Genealogical Society of Michigan?

10  A    That's true.

11  Q    And that's an organization that focuses on research,

12  genealogical research?

13  A    Yes.

14  Q    And the Detroit Public Library is one of the resources

15  that may be used by organizations such the Irish Genealogical

16  Society?

17  A    Yes.

18  Q    You were also the Vice President of the Book Club of

19  Detroit, is that correct?

20  A    Yes.

21  Q    And is it fair to say that the Book Club of Detroit is a

22  non-profit association of Detroit area biblio files who

23  assembly periodically for the purpose of stimulating a mutual

24  interest in books, manuscripts, and prints?

25  A    Yes.

1    Q    And the book club frequently co-sponsors events with

2    libraries and collections such as the Burton historical

3    collection, is that right?

4    A    Yes.

5    Q    And you said that's part of the Detroit Public Library,

6    correct?

7    A    Wait a minute.  Go back and ask me that question again.

8    Q    Sure.  The book club frequently co-sponsors events with

9    libraries and collections such as the Burton historical

10   collection?

11   A    Yes, it does.

12   Q    And you said that the Burton historical collection is

13   part of the Detroit Public Library, correct?

14   A    Yes.

15   Q    So it's fair to say that you are currently a user of

16   Detroit Public Library services, is that right?

17   A    Yes.

18   Q    And you believe in the importance of libraries to a

19   community, correct?

20   A    I do.

21   Q    As a librarian in Detroit, were you aware that for some

22   Detroiters the public library is their only source of books

23   and internet access?

24   A    Yes.

25   Q    As a former employee and current user of the Detroit

1  Public Library, are you aware that -- of how the Detroit

2  Public Library is funded?

3  A     How it's currently funded?

4  Q     Or how it has been funded in the past.

5  A     I'm generally aware of how it's been funded in the past.

6  Q     Are you aware that the Detroit -- is it -- is it your

7  understanding that the Detroit Public Library has been funded

8  through property taxes?

9  A     That's one of its sources of funding, yes.

10 Q     Are you -- I'm sorry, I didn't mean to cut you off.

11 A     I'm aware that property taxes are one of its sources of

12 funding.

13 Q     Are you aware that the property taxes funding the library

14 have decreased significantly in recent years?

15 A     I think that's possible.  I'm not aware of to what extent

16 that's true.

17 Q     Did you become aware around March 2011 that the Detroit

18 Public Library laid off approximately 20% of its staff?

19 A     I'm not aware on the figure of 20%.

20 Q     Were you aware of any lay offs around that time period?

21 A     Only what I might have heard from fellow retirees.  I

22 have been retired since 2002.

23 Q     As a current user of Detroit Public Library services, did

24 you become aware in late 2011 that four branches of the

25 Detroit Public Library were closed due to a budget shortfall?

1  A    No.

2  Q    As a user of Detroit Public Library services are you

3  aware that certain branches of the Detroit Public -- Public

4  Library are currently operating on reduced hours?

5  A    Not aware of the extent of the reduced hours at four

6  particular branches, no.

7  Q    Is it your understanding that the City of Detroit's

8  financial problems have affected its ability to deliver

9  library services to the residents of Detroit and other users

10 of the Detroit Public Library?

11 A    The library runs on a mileage.  And I'm not sure how much

12 the -- the city's finances have influenced the library so no,

13 I'm not aware of that.

14 Q    No one has yet made a proposal to you regarding a

15 specific amount by which any retiree pension or other benefits

16 would be reduced, have they?

17 A    No.

18       MS. KOVSKY-APAP:  Thank you.  I have no further

19 questions.

20       MR. WERTHEIMER:  Nothing further, Your Honor.

21       THE COURT:  You are excused, Ma'am.  Thank you very

22 much for your testimony.

23 A    Thank you.

24       (WITNESS JANET WHITSON WAS EXCUSED AT 11:38 A.M.)

25       THE COURT:  Who is your next witness, sir?

1              MR. WERTHEIMER:  I call Andy Dillon.

2              THE COURT:  Please raise your right hand, sir.

3         (WITNESS ANDY DILLON WAS SWORN)

4              THE COURT:  Please sit down behind you.

5              MR. WERTHEIMER:  Your Honor, William Wertheimer on

6    behalf of the Flowers plaintiffs and also the UAW as to

7    examining this witness.

8         Before I begin, I would request permission from the Court

9    to examine Mr. Dillon pursuant to Federal Rule of Evidence

10   611(c)(2).

11             THE COURT:  Any objections?

12             MS. NELSON:  No objections, Your Honor.

13             THE COURT:  For the city?

14             MR. SHUMAKER:  We have no objection, Your Honor.

15             THE COURT:  All right.  Your motion is granted.

16             MR. WERTHEIMER:  Thank you.

17                        DIRECT EXAMINATION

18   BY MR. WERTHEIMER:

19   Q    Good morning, Mr. Dillon.

20   A    Good morning.

21   Q    You are appearing here pursuant to subpoena, are you not?

22   A    Yes.

23   Q    And you have been the state Treasurer of the State of

24   Michigan for a period of time?

25   A    Yes.

1  Q    When did you become state Treasurer?

2  A    I believe January 1 of 2011.

3  Q    And what was your last day as state Treasurer?

4  A    October 31 of '13.

5  Q    So just last week?

6  A    Right.

7  Q    Okay.  Would it be fair to say that you have been -- that

8  as state Treasurer, you were involved in the problems of the

9  state dealing with the city's financial situation from your --

10 the beginning of your -- of being state Treasurer?

11 A    Yes.

12 Q    Okay.  Could you generally characterize for us what that

13 involvement has been from the beginning?

14 A    The city was in emergency.  We inherited some that were

15 in emergency, our school district.  We worked closely with the

16 manager in those instances.  For those that were finding

17 themselves getting in financial trouble, we tried to work with

18 them to keep them out of financial trouble.  So it would vary

19 depending on the condition that you found in the various

20 school district or city.

21 Q    All right.  Did you stay involved in -- in issues

22 relating to the City of Detroit from the beginning of your

23 tenure as state Treasurer until your end last week?

24 A    Yes.

25 Q    Okay.  I want to direct your attention to a few discreet

1  periods of time and ask you some questions about that.  And

2  the first period is around March of 2012.  Do you recall

3  generally what was going on at that point in time?

4  A    I believe we had completed a review and were working on

5  negotiating a consent agreement with the City of Detroit.

6  Q    Okay.  And what were the results of those negotiations?

7  A    We ultimately reached agreement on something called a

8  financial stability agreement.

9  Q    When was that?

10  A    I believe the final day was around April 4 of 2012.

11  Q    So the negotiations would have been ongoing in March of

12  2012?

13  A    I believe so, yes.

14  Q    And your part of the negotiating team for the state,

15  negotiating with the city?

16  A    Correct.

17  Q    And it was an arm's length negotiations that is

18  adversarial not in the bad sense of the word?  They had their

19  position, you had yours?

20  A    That's right.

21  Q    Would that be fair?

22  A    Yeah.

23  Q    Okay.  And you were using the Jones, Day law firm to

24  represent the state at that point in time, were you not?

25  A    I actually don't think so, although they were involved

1  We had a relationship with Miller, Buckfire.  And I believe

2  that Miller, Buckfire reached out to Jones, Day for legal

3  advice.  So there was a role, but they were not, to my memory

4  -- I -- I don't recall a contractual relationship between the

5  state and Jones, Day.

6  Q    When you say you don't recall a contractual relationship,

7  is that another way of saying you weren't paying them?

8  A    I believe that's correct.

9  Q    Okay.  But they were providing work for you on a pro bono

10 or some other kind of basis, were they not?

11 A    I believe that to be true.

12 Q    They were putting together drafts of the consent

13 agreement, were they not?  That is Jones, Day.

14 A    Yeah.  But we did have counsel, Michigan based counsel

15 that was in the room negotiating the document.  But we were

16 getting input and advice from Jones, Day, yes.

17 Q    Did that advice include actual drafts of the consent

18 agreement from Jones, Day as opposed to your in house people

19 in March of 2012?

20 A    I believe so.

21 Q    And you indicated Buckfire.  They were also assisting the

22 state in those negotiations with the city, correct?

23 A    Correct.

24 Q    Did you ever talk or did you have any understanding as to

25 why Jones, Day was doing what they were doing?  That is

1  providing legal services for you and not billing you whatever

2  their hourly rate was at the time?

3  A    We were working with Ken Buckfire at the time to make a

4  consent agreement that would work and function for the city.

5  And he had a relationship with Jones, Day and -- and would

6  seek their advice.

7  Q    Didn't you understand that let's start with Mr. Buckfire.

8  That Mr. Buckfire, was he being paid by the state?

9  A    I think there's a brief window of time where he had a --

10  a short term contract.

11  Q    Did you assume that Mr. Buckfire and his -- on behalf of

12  his firm when he was helping you out in March of 2012, was

13  looking for more work in the future relative to the City of

14  Detroit?

15  A    I think he was very interested in having a role with

16  Detroit going forward, yes.

17  Q    And didn't you assume the same with Jones, Day?

18  A    Yes.

19  Q    Did you have discussions in March of 2012 about the

20  possibility of a Chapter 9 filing at that time?

21  A    I don't recall and -- I don't recall.

22  Q    Can you put up 852?  And can you go to the second --

23  well, let's start.

24        MR. SHUMAKER:  Objection, Your Honor.  We have a

25  hearsay objection.

1          THE COURT:  We don't have -- we don't quite have a

2    question yet, so let's get a question and then I'll take your

3    objection.

4    Q    Let me -- let me do it a different way based on the

5    objection and -- and what I'm saying here.  I'm going to show

6    you -- forget what's on the screen, Mr. Dillon, if you would.

7    I'm going to show you what's been marked for identification

8    purposes --

9          THE COURT:  I need you to be by the microphone.

10         MR. WERTHEIMER:  I'm sorry.

11   Q    I'm going to show you what's been marked for

12   identification purposes as Exhibit 852.  And ask you to take a

13   look at the second page of it in the middle.  And -- and read

14   it to yourself.  And my question is going to be whether that

15   refreshes your memory as to whether there might not have been

16   discussions involving Jones, Day people and others about the

17   possibility of filing Chapter 9 in March of 2012?

18         MS. NELSON:  May I see it, please before it's handed

19   to the witness?

20         THE COURT:  You can see it after it's handed to the

21   witness.

22   Q    Take a look at whatever you need to put it in context.

23         THE COURT:  Mr. Wertheimer, I have to insist that

24   anything you say to the witness be from the lectern so that

25   it's on the record.

1        MR. WERTHEIMER:  Sorry.

2  Q    I was just telling you, Mr. Dillon, take a look at any of

3  it that you need to put it in context.  But the part I'm

4  asking you to take a look at to see if it refreshes your

5  recollection as to what was going on then is in the middle of

6  the second page of the document.

7        THE COURT:  And did you represent that that is

8  exhibit what, I'm sorry?

9        MR. WERTHEIMER:  852.

10       THE COURT:  Do you have that exhibit, Ma'am?

11       MS. NELSON:  Oh, yes, I do, Your Honor.  I didn't

12 realize that's what he was referring to.

13       THE COURT:  All right, then we're all set.

14 A    This refreshes my memory.  I didn't read Page 2.  Do you

15 want me to?

16 Q    Yeah.  Yeah, go ahead and read Page 2.

17 A    Okay.

18 Q    Mr. Dillon, does having read the proposed Exhibit 852

19 refresh your memory on the issue that I was asking about?

20 A    It does.

21 Q    Okay.  And what is your memory now as to Chapter 9 filing

22 -- a Chapter 9 filing being discussed by you, other people for

23 the state, and lawyers from Jones, Day in March of 2012?

24 A    I mean it was a topic of conversation, but the -- you

25 know, even the thought at that time was that we did want to

1  get to a consent agreement.  We didn't want to declare an

2  emergency.  And Chapter 9 was always out there as an issue but

3  it wasn't front and center.

4  Q    And Jones, Day was involved in those discussions?

5  A    I don't recall if they were physically present, but I

6  believe that yes, in the background they were looking at

7  versions of agreements that were being drafted and obviously

8  from reading that they were looking at the options for a

9  Chapter 9.

10  Q    Okay.  Let me -- can you put up 851, please?  And I

11  believe it has been admitted.  Mr. Dillon, this is a -- the

12  first page is an email from Corrine Ball to L. Marcero at

13  Huron Consulting.  Can you tell us, first of all, who Corrine

14  Ball is?

15  A    She's an attorney at Jones, Day.

16  Q    And who is L. Marcero?

17  A    She works for Huron Consulting.  She's a -- she lives in

18  the Detroit area and was advising us on working through these

19  issues with the City of Detroit.

20  Q    And -- and Huron Consulting is a separate entity from

21  Miller, Buckfire?

22  A    Yes.

23  Q    Any relationship between the two as far as you know?

24  A    Not as far as I know.

25  Q    Okay.  If you could put up the second page of 851.  If

1  you look at the top, Mr. Dillon, this is a email from Corrine

2  Ball at Jones, Day to L. Marcero.  Am I pronouncing it right?

3  A    I think it's Laura Marcero.

4  Q    Laura Marcero.  And in the email Laura is saying to

5  Corrine, if at all possible, can you call me.  I need to link

6  you into a Chapter 9 conversation with Andy very quickly.  Do

7  you recall ever being linked in to such a conversation?

8  A    I don't have a specific memory of that.

9  Q    Do you have a general memory of it?

10  A    No.  I mean to me I think from reading that memo and

11  refreshing my memory a little bit, it was about whether or not

12  the city would be eligible if in fact a Chapter 9 became

13  something that had to happen in the view of -- of the folks at

14  the table.

15  Q    Okay.

16  A    But it wasn't our priority, it was always a last resort

17  option for us.

18  Q    I want to direct your attention now to December 2012 and

19  January 2013.  In other words nine months later or so.  Were

20  you involved in the hiring of Kevyn Orr as emergency manager?

21  A    Yes.

22  Q    And Kevyn Orr up to then had been a partner at Jones,

23  Day, had he not?

24  A    To my knowledge.

25  Q    And would you tell the Court generally what your

1  involvement was?

2  A    The first time I believe I ever met Kevyn Orr was around

3  the January 29th date where we interviewed, I believe, five or

4  six different law firms as potential restructuring firms for

5  the City of Detroit.  He was one of the members on the team

6  from Jones, Day.

7      We did all of those interviews in one day, so I think

8  give or take each interview with each firm lasted around an

9  hour, it could have been a little more for each firm.  That

10  was the first time I met him.

11  Q    Okay.  Did you recommend that he be hired?

12  A    I got a phone call from Richard Baird who asked me what I

13  thought about Kevyn.  I thought he was impressive in the

14  meeting and should be someone that we considered.

15  Q    Were you concerned at the time that he was with Jones,

16  Day and that Jones, Day had been advising the state for up to

17  a year on this issue of how the state was going to deal with

18  the Detroit financial situation?

19          MS. NELSON:  Objection, assumes facts not in

20  evidence.  There's no indication that Jones, Day had been

21  providing advice to the state for up to a year.

22          THE COURT:  Well, the objection is overruled.

23  Please answer the question if you can.

24  A    Not terribly.  There was a -- a review team that was

25  involved in interviewing all the firms.  It wasn't just my

1  decision to make, so I thought they would have to stand on

2  their own as the -- as the law firm of choice.

3  Q    Well, does -- does the beginning of your answer being not

4  terribly mean that there was some concern?

5  A    It could have an appearance of impropriety which I

6  recognized and -- and gave consideration to.  And in fact

7  because when ultimately they were hired, I believe there were

8  six to eight people on the panel.  I actually held my vote

9  back to let the group move on their own because I was one of

10  two people that even knew that they were being considered.

11  Q    Okay.

12  A    Or that Kevyn was being considered.

13  Q    What -- did you recognize the same or even more extreme

14  propriety issues when in March or April of 2013 with Kevyn Orr

15  in place, there was a consideration as to hiring the Jones,

16  Day law firm now as counsel for the city through the emergency

17  manager as opposed to being counsel for the state as it had

18  been in the past?

19  A    I thought the sequence was that Jones, Day was hired

20  before Kevyn was announced is my memory.

21  Q    Whatever the sequence was, did you have the same concerns

22  with propriety relative to the hiring of Jones, Day as you did

23  as to the potential hiring of Kevyn Orr?

24  A    No.  Because there was -- there was quite a few people

25  that were on the hiring team.  And -- and I didn't cast -- it

1  was unanimous vote for Jones, Day and I withheld my vote and I

2  was careful not to kind of push any particular firm that day

3  because I knew that Kevyn was a possible EM candidate.  And I

4  -- I was also informed that Kevyn withdrew from pushing Jones,

5  Day to get the contract in Detroit.

6  Q    So that it was -- it was done without the help of Kevyn

7  Orr as far as you knew?

8  A    I was advised that the firm was hired that -- or was

9  advised by Rich Baird that the hiring of Kevyn Orr would

10 neither help or hinder their efforts to become the

11 restructuring counsel for the City of Detroit.

12 Q    Who is Braum Stibitz?

13 A    He works for me in treasury.

14 Q    Or past tense?

15 A    Yes.

16 Q    Worked.  Sorry.  What was his position in April of 2013?

17 A    And I forget the exact title, but he was my right hand

18 guy.  He didn't have the title of Chief of Staff, but he

19 functioned that way.

20 Q    Okay.  And what about Terry Stanton?

21 A    Terry is a public information officer for the Department

22 of Treasury.

23 Q    Were you aware that in April of 2013, Terry Stanton

24 authored an email to Braum Stibitz that took issue with Jones,

25 Day being hired as the attorneys for the city?

1  A    I don't recall that.

2  Q    Let me put --

3           THE COURT:  Excuse me, Mr. Wertheimer.  How much

4  longer will you be on your direct examination of the witness?

5           MR. WERTHEIMER:  Half hour.

6           THE COURT:  All right.  In that event, we'll take

7  our lunch break now and reconvene at 1:30.  Everyone please

8  stand by for me for one second while I consult.

9       All right.  Everyone please stand by while Mr. Dillon

10 makes his exit.

11      (WITNESS ANDY DILLON WAS TEMPORARILY EXCUSED AT 12:02

12 P.M.)

13          THE COURT:  And we'll be in recess until 1:30.

14          THE CLERK:  All rise.  Court is in recess.

15     (Court in Recess at 12:02 p.m.; Resume at 1:30 p.m.)

16          THE CLERK:  All rise.  Court is in session.  Please

17 be seated.  Recalling case number 13-53846, City of Detroit,

18 Michigan.

19          THE COURT:  It appears that everyone is here.  Sir,

20 you may proceed.

21          MR. WERTHEIMER:  Thank you, Your Honor.

22      (WITNESS ANDY DILLON RESUMED THE STAND AT 1:30 P.M.)

23 BY MR. WERTHEIMER:

24 Q    Can you put 835 on the screen?  Mr. Dillon, as I recall

25 it when we left I was asking you some questions about who

1  Braum Stibitz was and Terry Stanton.  And you had answered

2  those questions.  Do you recall that?

3  A    Yes.

4  Q    Would you take a look at what's on your screen and on the

5  big screen?  It's an email from Braum Stibitz who I think you

6  identified -- or I'm sorry, to him from Terry Stanton from

7  April of 2013.

8            MR. STEWART:  Objection, Your Honor, hearsay.

9            MS. NELSON:  Same objection, Your Honor.

10           THE COURT:  Again let's -- let's wait until we have

11 an actual question and then I'll take your objection.

12 Q    Have you seen that document before, Mr. Dillon?

13 A    I don't believe I have.

14 Q    Do you recall -- would you -- well, let me ask it this

15 way.  Do you recall Terry Stanton or anyone else at treasury

16 raising the issue of the appearance of impropriety in the city

17 hiring Jones, Day to be its lawyer at around this time, March

18 or April of 2013?

19 A    I don't recall that.

20 Q    You don't recall any internal discussions relative to it?

21 A    No.

22 Q    Mr. --

23           THE COURT:  Can we take this document down, please?

24           MR. WERTHEIMER:  Yes, we can take it down.

25 Q    Mr. Stibitz never raised it with you?

1  A    I don't recall that.

2  Q    Again, I want to make sure we're on the same wave length.

3  Leaving aside the email, do you recall ever Mr. Stibitz

4  raising with you generally the issue of the appearances of

5  Jones, Day being hired as the city's attorney in the spring of

6  2013?

7  A    I don't specifically recall that, no.

8  Q    Do you generally recall it?

9  A    No.

10  Q    Do you recall being concerned about that issue yourself

11  at that point in time?

12  A    It was an issue that I gave some consideration to, yes.

13  Q    And did -- I was unclear on your testimony from -- from

14  this morning, did -- was that the reason that you abstained

15  from a particular vote?

16  A    I just held my vote back and it ended up being a

17  unanimous vote.  But yeah, I intentionally tried not to lead

18  the outcome of that vote, so I held my opinion back.

19  Q    And this was a vote on Jones, Day being selected as the

20  city's attorneys?

21  A    Right.

22  Q    It would have occurred sometime in the spring of 2013?

23  A    Right.

24  Q    Did you have any discussions with your staff before you

25  decided to do that about that issue?  That is the issue of

1  abstaining or in some way not voting as a -- for -- for the

2  reason you stated?

3  A    I did not.  I kept that to myself.

4  Q    Okay.  Would you put 858 up, please?  Mr. Dillon, this is

5  an email that you sent to the Governor, July 8, 2013.  Do you

6  recall you were questioned about this at your deposition?

7  A    Yes.

8  Q    And I'm not going to go over the entire email, but I just

9  have a question or two on it.  Would I be correct in recalling

10 that you testified that the recent suits against you and me in

11 that last sentence in the first paragraph would have been a

12 reference to the Flowers and Webster lawsuits?

13 A    It was logical to conclude that based on reading it and

14 putting it in the time frame, yes.

15 Q    All right.  And part of the logic being you did know

16 about those lawsuits at that time, correct?

17 A    I believe so.

18 Q    And you also knew that a hearing was scheduled for a

19 preliminary injunction in those cases, did you not?

20 A    At that time I can't say that I did.

21 Q    All right.  By a couple of days thereafter you did?

22 A    I don't have specific memory of that.  But I knew at some

23 point there was a hearing scheduled.

24 Q    Okay.  Before the date of the hearing?

25 A    Yes.

1  Q    In other words you knew that there was a hearing

2  scheduled in the future?

3  A    Right.

4  Q    In the Flowers and Webster cases, correct?

5  A    Correct.

6  Q    If you'd take a look -- now if you would put up 834,

7  please.  Let me -- I -- I apologize, Mr. Dillon.  Let me just

8  go back a second.

9       Would it also be correct that by July 15th you knew that

10 there was a schedule in place and per that schedule the

11 bankruptcy would be filed on July 19th, is that correct?

12 A    I don't have a specific memory of the date of the filing,

13 but I do remember prior to that filing date that was in the

14 schedule that we were presented with, a pretty detailed

15 schedule about what a Chapter 9 would look like and all the

16 events that would have to transpire.

17 Q    All right.  And do you recall that whatever the details

18 of that schedule that you don't recall, do you recall that in

19 fact the bankruptcy was filed a day before the dates in that

20 document?

21 A    I believe that to be true, yes.

22 Q    Okay.  Now if you'll take a look.  This is an email that

23 you sent the next day, that is after the July 8 email to the

24 Governor, is it not?

25 A    I believe so, yes.

1   Q    And by the way just for the record, that the email from

2   the 8th is an email from you to the Governor?

3   A    Correct.

4   Q    Okay.  In this email on the 9th, you indicate -- I'm --

5   I'm looking at the last paragraph.  The second of the three

6   sentences.  You say to the Governor on July 9, we remain in

7   many ways at the informational stage.  That was a true

8   statement when you made it, was it not?

9   A    I believe so, yes.

10   Q    Did anything happen that you knew of between July 9th and

11   July 18th to take it out of the informational stage?

12   A    We were getting more information and the numbers kept

13   getting worse for the funding level of the pension fund.  As

14   we learned new facts, the -- the health of the pension funds

15   seemed to be getting worse.

16   Q    Are you suggesting that you learned these facts after

17   July 9?

18   A    I don't have specific memories, but in reading these

19   emails they refresh my memory that information was flowing in

20   as I was sending them to him.

21   Q    Well, how about you didn't get that information in the

22   next day, did you, by the 10th?

23   A    I -- I'd want to go back and read the one from the 8th.  I

24   think you're --

25   Q    I'm sorry, go ahead.  Will you put up that one which is

1   -- I'm sorry, 858.  Go ahead.  You say you wanted to read that

2   one?

3   A    The day I sent this I believed I was going to learn more

4   information.  I don't recall now if it actually happened on

5   that date or not.

6   Q    Okay.  Do you recall communicating to the Governor's

7   office just before July 12th that a more deliberative approach

8   should be taken at the Governor's end relative to authorizing

9   a bankruptcy?

10  A    I don't have a specific memory of that, no.

11  Q    Would you put up 625, please?  Mr. Dillon, I'm going to

12  -- this has been introduced as Exhibit 625.  I'm going to

13  direct your attention to the -- the second email there, not

14  the top one, but the second one that goes on for three

15  paragraphs.

16       To the first paragraph about halfway down.  And by the

17  way, this is July 12.  And this is from Mike Gadola.  And he's

18  saying, I spoke to Rich this morning and he informed me that

19  last night he had a discussion with Andy and the LG about the

20  exchange of letters.  Rich now favors as I do, a more

21  deliberative approach at the Governor's end.  He indicates

22  Andy and the LG are on board with that approach.  Does that

23  refresh your memory on that issue?

24  A    I have a vague recollection of this email.

25  Q    All right.

1  A    Or that --

2  Q    But my question is as to the broader issue.  Do you

3  recall communicating in one way, shape, or form, whether

4  through Baird much more directly with Snyder -- excuse me,

5  with Governor Snyder, do you recall communicating to the

6  Governor's office at around this time your view as the state

7  Treasurer that a more deliberative approach at the Governor's

8  end was in order as of July 12?

9  A    From reading this, it's -- I don't have a clear

10  recollection of this conversation, but I have no reason to

11  believe that this is not an accurate description of a call I

12  had with Rich Baird and the LG.

13  Q    Okay.  Fair enough.  If you look down in the next

14  paragraph, and again this is from Mike Gadola to Mr. Muchmore

15  and John Roberts.

16      He supplies some additional reasons for this approach

17  including, I'm about halfway down, the conditions could also

18  include such items as pre-approval for anything having to do

19  with vested pension benefits.  Do you recall Mr. Gadola taking

20  that position at around this time?

21  A    I believe I had conversations with Mike Gadola in this

22  time frame that I believe is subject to the lawyer client

23  privilege, attorney/client.

24  Q    Well, I -- I will indicate to you, Mr. Dillon, that this

25  document has been produced and that the attorney/client

 1  privilege has been waived as to this document.

 2  A    I don't know if I was copied on it.

 3            MS. NELSON:  If I may respond.  If I may respond,

 4  Your Honor.  This is not a communication from the attorney to

 5  Mr. Dillon.  This was to Mr. Muchmore and then to Baird.  So,

 6  Mr. Dillon is testifying about separate conversations in

 7  response to Mr. Wertheimer's question that were separately

 8  attorney/client privilege.

 9            MR. WERTHEIMER:  I think that's correct actually.

10            THE COURT:  Okay.

11  Q    Do you recall having discussions with -- may I back up?

12            MR. WERTHEIMER:  For the record, I would take an

13  exception based on the arguments we've previously made as to

14  the applicability of the attorney/client privilege to

15  communications involving public officials, et cetera.

16  Q    Do you recall having discussions at around this time with

17  the Jones, Day law firm relative to contingencies being placed

18  on the bankruptcy?

19  A    Yes.

20            MS. NELSON:  Same objection, Your Honor,

21  attorney/client privilege as to their content.

22            MR. SHUMAKER:  The city joins in the objection.

23            MR. WERTHEIMER:  I'm not going to go any further

24  than -- than his yes response.

25            THE COURT:  All right.

1  Q    I'm going to show you a document, Mr. Dillon that has

2  been marked for identification purposes as UAW 626.  And ask

3  you if you can identify it as an email that you sent to Braum

4  Stibitz who you've already identified and others on July 10,

5  2013?

6  A    Yes, I recall this.

7       (UAW Exhibit 626 was identified)

8            MR. WERTHEIMER:  Move for its admission.

9            THE COURT:  What was the number again, sir?

10            MR. WERTHEIMER:  626.

11            THE COURT:  Any objections?

12            MS. NELSON:  No objections.

13            MR. SHUMAKER:  No objection, Your Honor.

14            THE COURT:  It is admitted.

15       (UAW Exhibit 626 was admitted)

16  Q    Put it up.  I want to direct your attention -- I'm -- I'm

17  going to go through it to some extent with you, Mr. Dillon.

18  It begins -- or you begin by saying, I would like to get a

19  response to the proposed Orr letter out tomorrow about noon.

20  Would I be correct in understanding that the proposed Orr

21  letter is his letter seeking authorization to file bankruptcy

22  to you and the Governor?

23  A    Yes.

24  Q    And this is dated July 10, correct?

25  A    Yes.

1  Q    Do you recall when you received the draft of the proposed

2  Orr letter that you would have been working from when you

3  created 626?

4  A    Not specifically, no.

5  Q    That day, a day before?  I mean was it a tight --

6  A    Yes.

7  Q    Fairly tight time frame?

8  A    Yes.

9  Q    How did you come to receive it?

10 A    I believe it came in via email.

11 Q    From whom?

12 A    I don't recall.

13 Q    From someone at the emergency manager's end, or was it

14 already being distributed at the state if you recall?

15 A    I don't recall.

16 Q    Do you recall the context at all of how you received it?

17 A    No.  I -- I had been briefed on the schedule.  I was

18 aware things were going to be in motion.

19 Q    To your knowledge, were other people at the state end

20 being provided with a copy of the draft authorization?

21 A    Not to my knowledge.

22 Q    As far as you knew it was only you?

23 A    Well, treasury.

24 Q    Did you think there was anything untoward with Orr asking

25 for your input into his request to you for something that you

1  and the Governor would need to act on?

2  A    No.  I thought it was a courtesy.

3  Q    You thought it was a courtesy, is that right?

4  A    Yes.

5  Q    You felt free, did you not, to suggest changes both

6  typographical if you will, and substantive, did you not?

7  A    Apparently, yes.

8  Q    Okay.  Fair enough.  And in fact Mr. Orr if you -- I

9  don't know if we can get two on the screen at once, but if we

10  take a look at Mr. Orr's authorization of July 16 which is

11  Exhibit 28 for example.  Your point number one back to 626 is

12  that you think initiates should be initiatives.  That is that

13  it was just a mistake in the word choice, correct?

14  A    Yes.

15  Q    And if you look at Exhibit 28, he agreed and changed the

16  word to initiatives near the end of the second full paragraph

17  on Page 2, did he --

18           MS. NELSON:  Your Honor, I'm going to object.  First

19  of all, it calls for hearsay.  There's no foundation that this

20  was even communicated to Mr. Orr ultimately or even back to

21  anyone who prepared Exhibit 28 for what Mr. Orr accepted or

22  didn't accept.

23           THE COURT:  The objection is overruled.  You may

24  proceed.

25           MR. WERTHEIMER:  Thank you.

1  Q    Let me ask you, however, you did communicate your changes

2  to Stibitz.  We know who he is, correct?

3  A    Correct.

4  Q    Who is Saxton, Tom Saxton?

5  A    He works for treasury as well.

6  Q    And what does he do there?

7  A    He's the Deputy Treasurer.

8  Q    And Mr. Headen?  Who is Mr. Headen?

9  A    He's the lawyer that works within Treasury Department.

10  Q    Okay.  Did you in one way or another assume that your

11  people would have got your input back to Mr. Orr?  In other

12  words you weren't doing some academic exercise, were you?

13  A    At this point I thought that this would be transformed

14  into a letter written by Fred Headen which never transpired.

15  Q    Okay.  And so you thought at this point Headen was going

16  to write a letter back to Orr?

17  A    I thought we would send a letter back to whoever sent

18  this to us.

19  Q    And which you would point out the things that you thought

20  should be changed?

21  A    I shared with them my views and expected that they might

22  have some of their own thoughts as well.

23  Q    Okay.  What did happen to the changes that you were

24  suggesting?  Did -- tell -- tell us what your knowledge is as

25  to how if at all these suggestions were communicated back to

1  Mr. Orr?

2  A    There was a phone call, but not to Mr. Orr.  Excuse me.

3  Q    Who -- who called who?

4  A    There was a conference call with a few people from my

5  staff as well as the Jones, Day lawyers.

6  Q    So you get on to a conference call with you, your staff

7  people, and Jones, Day lawyers and during that conference

8  call, you communicate the contents of this email which is now

9  626 back to Orr through the Jones, Day lawyers, do I

10 understand that correctly?

11        MS. NELSON:  Objection, attorney/client privilege.

12        MR. SHUMAKER:  Same objection, Your Honor.

13        MR. WERTHEIMER:  Your Honor, the privilege has been

14 waged -- waived as to this document.

15        THE COURT:  The question merely summarized what the

16 witness previously said, so I'll permit it.  Please answer the

17 question, sir.

18 A    I spoke to some lawyers over the phone with Jones, Day.

19 What they communicated to Kevyn, I don't know.

20 Q    Fair enough.  But what you -- you had -- I assume you had

21 in front of you the contents of your email?

22 A    I believe I did.

23 Q    And you communicated those contents to the Jones, Day

24 lawyers?

25 A    I did.

1  Q    And you communicated them for the purpose of getting back

2  to Orr your comments relative to his request for an

3  authorization?

4  A    I don't know that I made that leap but, sure.  They were

5  obviously involved in this issue for Mr. Orr.

6  Q    All right.

7  A    And how they communicated with him, I have no personal

8  knowledge.

9  Q    All right.  They're competent counsel and you assumed

10  that they would have communicated back to the client what the

11  treasury secretary was suggesting.  Would that be fair?

12  A    That would be fair.

13  Q    Okay.  Thank you.  And if you look at 626, your third

14  point is no mention of GRS.  And then your question is why.

15  Am I reading that right?

16  A    Yes.

17  Q    What is GRS?

18  A    General employee retirement system.

19  Q    Okay and that got put into the authorization request, did

20  it not?

21  A    I believe it did.

22  Q    And it's just to be clear for the record, if you -- if we

23  look at the authorization letter, Page 4, the third full

24  paragraph, there's now a paragraph relating to GRS and other

25  things, correct?

1  A    I didn't read it right now, but that's my memory.

2  Q    Okay.  And that was not in your memory, I would -- is

3  your memory that that was not in the draft that you were

4  looking at?

5  A    Yes.  That's my memory.

6  Q    Okay.  Now I won't match up all the other things, but --

7  but let me just ask kind of a summary question that I think

8  will -- we can then figure it out from the record.

9       Would it be fair to say that all the suggestions you made

10 in your July 10 -- or that are recorded in your July 10 email,

11 are things that were not in the version that you were looking

12 at?  In other words you're suggesting additions or changes to

13 what was in the Orr draft at the time you were looking at it,

14 would that be fair?

15 A    I think it's an overly broad description.  I read a

16 document, here's my thoughts.

17 Q    Okay.

18 A    Sometimes it was an omission, sometimes it was a failure

19 to hit on a theme.

20 Q    All right, fair enough.  I want to direct your attention

21 now to the second page of your Exhibit 626, number 10.  You

22 say here I, Andy Dillon, don't think we are making the case

23 why we are giving up so soon to reach an out of Court

24 settlement.  That was a true statement of yours at the time

25 you made it, was it not?

1  A    That's what I believed at the time.

2  Q    And you then said, looks premeditated, did you not?

3  A    Yes.

4  Q    Period, a two word sentence.  You believed that to be

5  true when you wrote it -- when you typed it down on to your

6  computer on the 10th, did you not?

7  A    Yes.

8  Q    Then you go on to say, I think we need to say facts got

9  worse as we dug into the numbers.  And I believe there is a

10 State Court option to get retirees into a class (we don't

11 acknowledge that) and why is that impractical?  That was a

12 correct statement of your thinking at the time, was it not?

13 A    Yes.

14 Q    You believed that there was a State Court option to get

15 retirees into a class and that it was not impractical?

16 A    That's what I believed at the time.  I was never apprised

17 to know if that was ultimately the case.

18 Q    All right.  Then you say, we don't even say they rejected

19 the city's proposal.  That was true as far as you knew it at

20 the time.  That is that was not being said in Orr's

21 authorization request, correct?

22 A    Correct.

23 Q    Then you say, I think we may want to take it or -- I'm

24 sorry.  I think we may want a take it or leave it demand

25 before we pull this trigger.  First of all, is the trigger the

1  Chapter 9 filing?

2  A    Yes.

3  Q    And did you mean by take it or leave it demand that the

4  -- that Orr or somebody on his behalf should make such a

5  demand before the Chapter 9 was filed?

6  A    I thought that might have been beneficial.

7  Q    Then you say, I agree with the recommendation.  Are you

8  referring now to the recommendation to proceed to bankruptcy?

9  A    Yes.

10  Q    But I don't think we make the case.  Was that true on

11  July 10?  You did not think that Orr had made the case?

12  A    In the document that I read.

13  Q    Now and I -- would I be correct in assuming that the

14  information that's included here under your number 10 on Page

15  2 of 626, that you communicated that in this conference call

16  you had with Jones, Day shortly either on July 10, or shortly

17  thereafter?

18  A    I believe that's true.

19  Q    You didn't leave any of it out?

20  A    I don't know if I went into as much detail here, but I

21  think I would have made the point.

22  Q    Then finally down at the bottom, you say after this

23  letter is revised, let's work on Governor's response.  By

24  Governor's response you meant the response that the Governor

25  would make either authorizing or not, or conditioning or not,

1   to Mr. Orr's letter, did you not?

2   A    That's what I meant, yes.

3   Q    So you were of the view at that point -- let me -- sorry.

4   And you then indicated at end just for completion, that these

5   were just your initial thoughts, correct?

6   A    Correct.

7   Q    Did you have any further input into the Orr authorization

8   request beyond what's on this document between July 10 and

9   July 16 when he submitted it to the Governor?

10  A    I don't believe so.

11  Q    Now back to the Governor's response.  You're saying we're

12  going to revise this letter and then we're going to work on a

13  response to it, correct?

14  A    Correct.

15  Q    And as I understand it based on what you say you talked

16  to Mr. Gadola about, the response -- well, you tell me.  What

17  was the response going to be at that point?

18  A    I wanted to finish this before we got to that.

19  Q    One step at a time?

20  A    That's right.

21  Q    All right.  But one step at a time.  But you're on both

22  sides of each of the steps, would that be fair?

23  A    Actually not.

24  Q    Well, you're helping to create the authorization request,

25  correct?

1  A    I shared comments about it.

2  Q    And you're -- oh, okay.  You're hoping to be involved in

3  what the Governor's response will be, correct?

4  A    I don't know if I agree with the word hoping or thought.

5  It may fall on to my duty list.

6  Q    Fair enough.  All right.  But do I take your answer to

7  mean, or can I conclude from it that in fact you were not

8  involved in what became the Governor's response, the July 18

9  document?

10  A    That's correct, I was not.

11  Q    Is that correct?  You were not?  You were out of the loop

12  on that?

13  A    Yes.

14         MR. WERTHEIMER:  Okay.  Can I have just one minute,

15  Your Honor?

16         THE COURT:  Yes, sir.

17  Q    Back with just one clean up question, Mr. Dillon.  Back

18  to questions and your answers relative to your not

19  participating in the vote where Jones, Day was hired.  Do you

20  recall that?

21  A    Yes.

22  Q    Did you -- first of all, what board was this that was

23  deciding that ostensibly at least deciding that issue?

24  A    I don't remember all the attendees, but there were people

25  from the City of Detroit there, there was people from treasury

1  there.  There might have even been some members of the

2  financial advisory board there.

3  Q    Was that what it was?  Was that the body voting,

4  financial advisory board?

5  A    It was not a formal entity.  It was --

6  Q    Oh, okay.  It was just an informal group of people?

7  A    Right.

8  Q    At the point that you decided not to vote, did you

9  communicate to the other people who were voting that Jones,

10  Day had been actively involved in providing legal assistance

11  to the state in March of 2012 or any other time?  In other

12  words that they had previously done work on this case for a

13  client different than the City of Detroit and a rather big

14  client?

15  A    Well, this case I don't understand that.  Can you explain

16  that?

17  Q    I'm sorry.  I kind of loaded it up.  I apologize.  Did

18  you communicate to the other members of the board at the time

19  that you were deciding not to vote, based at least in part on

20  your concern about the appearance of things, did you

21  communicate to the other members of -- of the people voting,

22  that Jones, Day had been actively representing the state in

23  March of 2012?

24             MS. NELSON:  I'm going to object again, Your Honor.

25  That assumes facts not in evidence.  That was not the

1  Treasurer's testimony.

2          MR. WERTHEIMER:  It certainly was and it's all over

3  the --

4          THE COURT:  Objection is overruled.

5          MR. WERTHEIMER:  Sorry.

6  A    I didn't reference that they played a role in the

7  negotiation of the consent agreement.

8  Q    You just abstained?  Silently, you didn't --

9  A    Yeah.

10          MR. WERTHEIMER:  Yeah, okay.  That's all I have, Mr.

11  Dillon.  Thank you very much.

12                      DIRECT EXAMINATION

13  BY MS. LEVINE:

14  Q    Good afternoon, Mr. Dillon.  Sharon Levine, Lowenstein,

15  Sandler for AFSCME.  Just a couple of questions.

16          During the period of time that you were Treasurer, did

17  you report to the Governor?

18  A    Yes.

19  Q    And did there come a point in time, actually either

20  before or after you became Treasurer that you began to think

21  that Detroit was insolvent or to avoid the need for a legal

22  conclusion financially distressed?

23  A    Yes.

24  Q    And when was that?

25  A    Well, pretty much from day one, but it continued to get

1 | worse over the two year window.

2 | Q    And what were some of the indicators that caused you to

3 | think that Detroit was financially in distress?  Did it

4 | include the blight?

5 | A    Sure.

6 | Q    Conditions with regard to the police and fire services?

7 | A    Yes.

8 | Q    Did you -- did you review any financial documentation in

9 | that regard?

10 | A    In what regard?

11 | Q    Numbers relating to Detroit's cash flow?

12 | A    Yes.

13 | Q    What did you review?

14 | A    Cash flow forecast that we requested to be developed.

15 | Q    By whom?

16 | A    By the city.

17 | Q    By whom for the city?

18 | A    Well, we had invited Ernst and Young to participate and

19 | help the city develop its cash flow forecast.

20 | Q    When did you retain -- when was Ernst and Young retained?

21 | A    I don't recall specifically.

22 | Q    Were they retained by the city, or by the state, or by

23 | somebody else?

24 | A    I'd have to guess, but I believe the city.

25 | Q    Did there come a point in time also when Miller, Buckfire

1  was retained?

2  A    By the city?

3  Q    Well, by anybody in connection with the Detroit

4  situation.

5  A    Yes.

6  Q    And when was that?

7  A    There was a short period of time, I don't know when it

8  began, but in the early part of 2012 they were hired for a

9  specific project.  And then --

10 Q    By the -- by the state?

11 A    I believe by the state, yes.

12 Q    And at the conclusion of that project, were they then

13 retained at some point in time by the city?

14 A    About a year after.

15 Q    But in 2012, E & Y, or Ernst and Young was just retained

16 by the state and continued to be retained by the -- I'm sorry,

17 just retained by the city and continued to be retained by the

18 city, correct?

19 A    I believe that's right.

20 Q    Did there come a point in time when Conway, MacKenzie was

21 retained?

22 A    Yes.

23 Q    And when was that?

24 A    I don't recall the specific date.  It would have been

25 early 2013, I believe.

1   Q    And by whom were they retained?

2   A    The city.

3   Q    Did any of these professionals, E & Y, Miller, Buckfire

4   or Conway, MacKenzie during 2012, and I guess it wouldn't be

5   Conway, MacKenzie because they hadn't been retained yet, do

6   what's known as a bottom's up analysis?

7   A    I don't recall that term of art.

8   Q    Do you have an understanding of what a bottom's up

9   analysis is as opposed to a top down analysis?

10  A    Why don't you describe it to me, that would be safer.

11  Q    Did any of these professionals actually instead of

12  relying on numbers provided to them by city officials or

13  others, actually go in and stress test the numbers?

14  A    I believe so.

15  Q    And who was that?

16  A    I think it would have been a combination of E & Y and

17  Conway.

18  Q    And when did Ernst and Young prepare this bottom's up

19  analysis?

20  A    We didn't use that term, so their engagement grew over

21  time as the situation got worse and -- and as they were there

22  longer they started to get better -- better numbers and

23  understand the environment better.  And then let's say from

24  January of '13, you know, through May or June, there was a lot

25  of effort to put together a ten year forecast for the city

1  that was based on a lot of effort to dig under and understand

2  the numbers.

3  Q    And that took place starting in January of 2013, but not

4  earlier?

5  A    I believe earlier.  I think as E & Y was there, the

6  longer they were there, the better comfort they got.  So we --

7  we always relied and looked at the cash flow forecast and some

8  understanding of the city's profit and loss statement.  So I

9  mean it was -- started from day one really.  But the numbers

10  got more refined as we learned more.

11  Q    Did anybody look behind -- did anybody look behind the

12  numbers in terms of finding other sources of revenue for the

13  city?  For example we've heard a lot of talk about uncollected

14  taxes.  Did E & Y or any of the professionals actually go in

15  and dig into those numbers directly?

16  A    Conway -- I mean everyone in treasury did.  And we had --

17  we were working on a partnership with the city where the state

18  would help them collect their taxes.  We did go look at their

19  outstanding receivables to see if there's monies that could be

20  collected there.

21      That probably was 2011, maybe 2012 when that happened.

22  Conway, MacKenzie did a study of all the cash collection

23  operations.  I don't recall when that project happened.  And

24  then E & I was -- E & Y was on the ground for pretty much the

25  entire time.  And I wasn't on the ground with them, so I don't

 1  know all the areas that they paid attention to.

 2  Q    But you were concerned about the revenue stream from the

 3  City of Detroit going back all the way to the time you took

 4  office in 2011?

 5  A    Yes.

 6  Q    State shared revenue.  For every year that you were in

 7  office, did the state share revenue provided to Detroit

 8  diminish?

 9  A    I believe it actually grew.

10  Q    The state shared revenue?

11  A    Maybe the first year.  The first year might have been a

12  cut and then after that I think it grew every year from that.

13  Q    Do you recall what the number was the first year?

14  A    I do not.

15  Q    Do you recall what the number was that -- the second or

16  third year?

17  A    No.

18  Q    What makes you think it grew?

19  A    I just remember the state's economy began turning around

20  and -- and the initial cuts from the first year the Snyder

21  administration was kind of the bottom.  And the revenues with

22  the state started to increase from that point forward.

23  Q    But isn't the state shared revenue also tied to the city

24  population and wasn't Detroit losing population?

25  A    I'm not totally familiar with the state shared statutory

1  formulation.  But I do believe it's tied to revenue.  And when

2  Detroit fell below a million, that was a relevant number for

3  the city.  I don't know in that sense this number took place

4  and when the new numbers were relied upon.

5  Q    So would it be fair to say then that you're not really

6  sure whether or not the state shared revenue to Detroit grew,

7  or shrank, or stayed the same?

8  A    I would rather see the numbers, yes.

9  Q    Were you involved in the selection of E & Y on behalf of

10  the city back in 2012?

11  A    Well, I think they were brought in before '12.

12  Q    Were you involved in the selection of Miller, Buckfire on

13  behalf of the state in 2012?

14  A    Yes.

15  Q    And were you involved in the selection of Miller,

16  Buckfire on behalf of the city about a year later?

17  A    Yes.

18  Q    And were you involved in the selection of Conway,

19  MacKenzie for the city in 2013?

20  A    Yes.

21  Q    How long did the interview process last with Miller,

22  Buckfire before they were actually retained by the city?

23  A    I don't recall.

24  Q    Do you recall how long the interview process took with

25  Conway, MacKenzie before they were actually retained by the

1  city?

2  A    Not specifically, but it was hours.

3  Q    You met them and hired them on the spot?

4  A    No, no.  It was hours and it took several meetings.

5  Q    Over what time frame, do you know?

6  A    The process -- I don't recall specifically, but it was

7  not a matter of days.  It was several -- it was a competitive

8  process and there was a lot of meetings.  And a lot of time

9  was spent on that.

10  Q    Same thing with choosing Miller, Buckfire, several

11  meetings, competitive process, a lot of days?

12  A    Not quite the same with Miller, Buckfire.

13  Q    How many -- how many investment bankers were interviewed

14  during the process that resulted in Miller, Buckfire being

15  retained by the city?

16  A    I don't recall.

17  Q    More than two?

18  A    I don't recall a formal interview process like we had

19  with the law firms, or the accounting firms, or the

20  restructuring firms.

21  Q    So it's possible it was just Miller, Buckfire that was

22  considered and ultimately retained?

23  A    I don't recall if no one else was considered, but it's

24  possible.

25  Q    Now were you involved in the selection of Jones, Day?

1  A    Yes.

2  Q    And there were several law firms that were considered

3  along with Jones, Day?

4  A    Correct.

5  Q    And the interview took place on January 29?

6          MS. NELSON:  Your Honor, asked and answered.

7          THE COURT:  Many times.

8          MS. LEVINE:  I'll move on.

9  Q    When did you personally become first aware of Jones,

10 Day's interest in serving as counsel for the city?

11 A    For what purpose?

12 Q    For any purpose.

13 A    Well, they had some role during the efforts to negotiate

14 a consent agreement.  So that suggested to me that they had an

15 interest in this case.

16 Q    Back in 2012?

17 A    Right.

18 Q    Was it earlier than 2012?

19 A    Could have been December even, but I don't recall

20 specifically when it started.

21 Q    Now I don't want to go through again the entire interview

22 process with -- with Kevyn Orr, but Kevyn Orr first became

23 considered on 1-29-13, is that correct?

24 A    By me it would have been later.  It would have been after

25 Rich Baird called to ask me if I thought he could be a

1  candidate.

2  Q    But the state was considering him effective as of the

3  interview date with Jones, Day, correct?

4  A    After the -- that date.  I don't recall the day I got a

5  phone call.

6  Q    And he was formally retained on March 25?

7  A    That sounds right.

8  Q    And there was an interview process and negotiation back

9  and forth between January 29 and March 25, correct?

10 A    Correct.

11 Q    There was some discussion earlier with regard to Jones,

12 Day working on the consent decree and some other Miller,

13 Buckfire working perhaps for the state and then for the city.

14 Did the state or any entity affiliated with the state or any

15 of its officers fund any of the professionals currently

16 involved in this case, Jones, Day, Conway, MacKenzie, Miller,

17 Buckfire, or E & Y?

18 A    Could you restate the question?

19 Q    Did the state or any entity affiliated with the state, or

20 its officers, at any time fund any of the professionals

21 retained by the city in this case, Jones, Day, Conway,

22 MacKenzie, Miller, Buckfire, E & Y?

23 A    Yes.  For those units we contributed to the city's cost

24 of retaining them.

25 Q    So the state itself?

1  A    Yes.

2  Q    Anybody on behalf of the state or affiliated with the

3  state or any of its officers?

4  A    I don't know if I understand the question, but treasury

5  was -- appropriated some money from the legislature for me to

6  assist local units of government retain professionals that can

7  help them navigate financial difficulties.

8  Q    Well, there -- there was some testimony earlier that the

9  NERD fund for example, contributed to defray some of Kevyn

10  Orr's expenses.  Were there any other entities affiliated with

11  the state or any officer of the state that helped defray the

12  costs of the professionals retained by the city in this case?

13  A    I'm not aware of any other funds.

14  Q    Okay.  Are you familiar with the June 14 proposal to

15  creditors made by the EM in this -- the emergency manager in

16  this case?

17  A    Yes.

18  Q    Did you -- and by EM I mean emergency manager as we have

19  a shorthand.  Did you review that proposal for creditors

20  before it was made on June 14?

21  A    I don't believe so.

22  Q    When was the first time that you saw it?

23  A    I believe when I attended it.

24  Q    When you attended the June 14 meeting?

25  A    Right.

1  Q    Did you see that there was a time line at the back of

2  that proposal that concluded on July 19?

3  A    I don't recall that.

4  Q    Does a -- does a time line running from the June 14

5  meeting through July 19 ring a bell?

6  A    I believe I recall a time line that was scheduled for the

7  process and that sounds about right.

8  Q    And was it your understanding that there were to be

9  negotiations with various stakeholders between June 14 and

10 July 19 as a precursor to the Chapter 9 filing?

11 A    Yes.

12 Q    And what's your understanding of the total debt in

13 Detroit?

14 A    About 18,000,000,000.

15 Q    Did you think it was reasonable to schedule negotiations

16 with the various stakeholders of $18,000,000,000 of debt for

17 one month and three or four days?

18 A    I don't think I passed judgment on that.  I knew it was

19 an aggressive schedule.

20 Q    Okay.  You've previously testified that you were

21 concerned about Detroit's finances virtually from the time you

22 took office back in 2011, correct?

23 A    Correct.

24 Q    And that there were various restructuring professionals

25 in and around the Detroit situation.  Some dating back to even

1  as far as December 2011, but coming through straightforward

2  till the filing of the bankruptcy in -- in July of 2013,

3  correct?

4  A    Correct.

5  Q    And in response to some questions by Mr. Wertheimer, you

6  testified to the fact that Chapter 9, while not necessarily

7  being considered, was in the background at least since April

8  of 2012, correct?

9  A    I believe I testified to that, sure.

10 Q    So knowing what one of the precursors to a Chapter 9 is

11 to try and negotiate with your various stakeholders prior to a

12 filing, why didn't negotiations start with these various

13 stakeholders back in April of 2012?

14 A    Of '12?

15 Q    Uh-huh.

16 A    Our hope was to avoid emergency and to get to a consent

17 agreement back in '12.

18 Q    Were you negotiating with municipal bond holders and

19 others with regard to -- the consent decree didn't solve the

20 debt problem?

21 A    No.

22 Q    Were you negotiating with the stakeholders back in 2012?

23 A    No.  We were negotiating with the city to see if we could

24 reach an agreement that would give them a chance to

25 restructure the city.

1  Q    Did you encourage the city during the period of time that

2  you were negotiating with the city to be also negotiating with

3  their stakeholders?

4  A    I don't have a specific memory about that.

5  Q    There were negotiations in late 2011, early 2012 with a

6  coalition of unions for Detroit with regard to a concessionary

7  agreement.  Are you familiar with that?

8  A    Yes.

9  Q    And there were about 30 unions that participated in those

10 concessionary negotiations, is that your understanding?

11 A    I'm aware that the city was negotiating something that I

12 think were described as TSA's.  Who was involved, I don't

13 remember each name of each union.

14 Q    But it was a coalition of unions?

15 A    Yes.

16 Q    It wasn't just one union.  And on the other side of the

17 table was city, correct?

18 A    Correct.

19 Q    And involved in that on behalf of the city was E & Y,

20 correct?

21 A    Yes, they were there.

22 Q    Do you recall who the person was at E & Y who was

23 involved in that?

24 A    I believe Gaurav Malhotra.

25 Q    And as a result of those negotiations, there was a

1  consensual agreement that was actually reached, isn't that

2  correct?

3  A    Between the city and the unions, yes.

4  Q    And the unions ratified the agreement so approximately

5  4,000 plus city employees voted in favor of the agreement, is

6  that correct?

7  A    I don't believe every union ratified.

8  Q    To your knowledge did most of the unions ratify?

9  A    I don't recall.

10 Q    Would you be surprised if I told you that the unions

11 actually ratified?

12 A    Yeah, because my memory was that not all of them

13 ratified.

14 Q    Was the -- was the agreement brought before the city

15 council for ratification?

16 A    I don't remember.

17 Q    Well, did you tell the city, you personally tell the city

18 not to ratify this agreement and not to agree to the terms and

19 conditions of this collective bargaining agreement?

20 A    I didn't think that those agreements would work for the

21 city, so I was not supportive of them.

22 Q    Why is that?

23 A    Because I didn't think -- well, I sought expert advice on

24 and had them reviewed.  And there was several issues that

25 surfaced and the advice I received was that these agreements

1  won't work for the city.

2  Q    And was one of the pieces of that advice that it would be

3  bad for the city to enter into a three year collective

4  bargaining agreement if it wanted to file Chapter 9 to

5  jettison the pensions?

6  A    No.  I mean --

7  Q    Who did you seek advice from?

8  A    Huron was involved looking at them.  I believe they had

9  some --

10 Q    But so Huron, a financial consulting firm, took a look at

11 these and said they were bad while E & Y, a consulting firm

12 that you were also involved with took a look at these and said

13 that they were good, is that what was happening?

14 A    I can't tell you what E & Y's professional opinion was on

15 those agreements.  The mere fact that he was there with the

16 city doesn't mean that E & Y was putting their seal of

17 approval on those TSA's.

18 Q    What were they advising the city in the room, if not how

19 to get to a consensual agreement that made sense for the city?

20 A    I -- I don't -- I wasn't a part of the relationship

21 between the Mayor, and the COO, and E & Y.  Maybe they were

22 there just to provide numbers, or -- I wasn't there, I can't

23 tell you.

24 Q    When did it first come to your attention -- or when did

25 you first -- well, let me ask the question a different way.

1  Are you of the belief right now that the pensions are under

2  funded?

3  A    I believe they are.

4  Q    And do you believe that's part of the reason why you

5  would view Detroit as insolvent?

6  A    It's a contributing factor.

7  Q    And when did you first reach the conclusions that the

8  pensions were under funded and that was a contributing factor?

9  A    It would have been the spring probably of '13.

10 Q    At no time prior to the spring of '13 did you have a

11 concern about the vested pension benefits and the cost of

12 maintaining the vested pension benefits?

13 A    I don't recall when that first became an issue for me.

14 From day one, it was the unfunded health care liability that

15 to me was really the big challenge for the city.

16 Q    And --

17 A    And the level of the pensions, the numbers seemed to move

18 quite a bit, but the funds themselves were advertising

19 themselves at over 90 and over 80% funded.  If that was true,

20 that would not have been alarming to me.  It's not perfect,

21 but not bad.  There's a lot of pension funds worse funded than

22 that.

23 Q    When did you first reach the conclusion that the health

24 benefits were under funded?

25 A    Early on.  We knew it was a big number from --

1  Q    2011?

2  A    -- the first day I started, yeah.

3  Q    Did you start talking to the city about negotiating with

4  the unions or others with regard to solving that problem back

5  in 2011?

6  A    We had discussions dating from the very beginning about

7  that issue, yes.

8  Q    Did you have discussions with anybody besides the city?

9  In other words with the actual stakeholders with regard to

10  that issue?

11  A    With lawyers and some of the consultants working with the

12  city, we had those discussions.  But that's --

13  Q    Did you talk to the unions?  Did you talk to any

14  retirees?  Did you talk to anybody who was actually receiving

15  health benefits with regard to those issues?

16  A    I did.  I met with various union officials throughout

17  this two and a half year window.

18  Q    Did you participate in the negotiations that led to the

19  concessionary agreement in February of 2012?

20  A    No.

21  Q    Why not?

22  A    I don't recall being invited.

23  Q    If the issue was health care, did you pick up the phone

24  and call anybody about that and suggest that maybe you should

25  be involved in that?

1  A     I didn't ask to be at the table.

2  Q     After the proposal for creditors disseminated, there was

3  a time frame from June 13th, 14th, to July 19th to negotiate

4  with all of these stakeholders.  Do you recall that?

5  A     I do.

6  Q     Do you believe it was practical to believe that there

7  could be resolutions reached with all of these stakeholders

8  during that short period of time?

9  A     Can you rephrase it?  Or just repeat it.  Just --

10  Q     Do you believe it was possible to reach an agreement with

11  all of the city's stakeholders between June 14th, and July 19th?

12  A     Possible, yes.

13  Q     Okay.  As you -- as the deadline approached and there was

14  a lot of testimony that you gave earlier with regard to back

15  and forth over the authorization letter to Kevyn Orr to file

16  Chapter 9 and it looked more likely that a Chapter 9 was going

17  to be filed.  Was there any thought given to the city funding

18  a period of time for Detroit to engage in more meaningful,

19  more productive negotiations for another 60, 30, 90 days in

20  order to allow the stakeholders a real opportunity to engage

21  in a back and forth negotiation to try and solve these

22  problems before rushing into Chapter 9?

23  A     I'll tell you the thing that troubled me the most was

24  when they put together the ten year plan that talked about

25  investing in the city which is important for it to turn around

1    eventually.  That the recovery for the unsecured creditors was

2    so low I didn't know how anyone practically could cut a deal

3    and walk out of the settlement room accepting something based

4    on those numbers.  I became very skeptical that an out of

5    Court solution could happen.

6    Q    Did you ever suggest that perhaps there should be some

7    funding to provide a limited further longer period of time to

8    better develop a proposal that could actually form the basis

9    of a successful out of Court plan of adjustment?

10   A    I was not optimistic that you could reach it out of Court

11   after the numbers kept getting worse and when you saw the

12   potential recovery, I just don't know practically how the

13   unsecured creditors could accept that practically.  And that's

14   probably the biggest influence on me.

15   Q    So then at no point from 2011 through the filing of the

16   Chapter 9 did you actually sit down and participate in and

17   engage in negotiations with the stakeholders of the City of

18   Detroit, personally?

19   A    It's overly broad.  I mean I had various meetings with

20   some union -- union representatives during those windows of

21   time where we discussed various matters.  I think I'd need a

22   little more definition to the question.

23   Q    Well, there was a proposal for creditors that came out on

24   June 14th.  What you're saying was a proposal that nobody could

25   possibly agree to, so you viewed it as impractical.  But

1  Detroit's financial condition had been deteriorating for the

2  whole time that you'd been in office if I'm understanding your

3  testimony correctly.  So at any point in time did you suggest

4  to anybody now is the time for us to get in front of this

5  situation, make a proposal, and start negotiating?

6  A    I don't believe so.

7         MS. LEVINE:  Thank you.  No further questions.

8         THE COURT:  Other questions for Mr. Dillon?

9                DIRECT EXAMINATION

10 BY MS. GREEN:

11 Q    Good afternoon, Mr. Dillon.  Jennifer Green on behalf of

12 the general and the police and fire retirement systems.

13      I'd like to follow up on some questions that Ms. Levine

14 just asked.  Can we pull up UAW Exhibit 626?  The second page.

15 Paragraph 10 -- no, 11, Paragraph 11.  At the bottom these are

16 your comments, correct, to the authorization letter -- or I'm

17 sorry, the recommendation letter by Kevyn Orr?

18 A    Yes.

19 Q    And you note here you think it should say there's a

20 fundamental reality that after fully estimating the city's

21 liabilities, the pennies on the dollar outcome for unsecured

22 creditors make it practically impossible for them to accept

23 KO's offer.  Is that the sentiment that you were referring to

24 just a moment ago when you said that you thought that

25 basically the recovery was so low that it would be impossible

1  for anyone to accept it?

2  A    Yes.

3  Q    Do you know if anyone else in -- in the state or city

4  shared your view that a pennies on the dollar offer was really

5  a non-starter?

6  A    I don't have a specific memory on that.

7  Q    The paragraph just prior to this, Paragraph 10, you had

8  made a statement, I believe there's a State Court option to

9  get retirees into a class.  We don't acknowledge that and why

10 is that impractical?

11     I believe your testimony was that you were never

12 ultimately briefed on why that was the case.  But did you ever

13 ask about this particular option on the conference call that

14 you had just later on July 10th?

15 A    I don't recall.

16 Q    So you never got an explanation to your question as to

17 why that State Court class action option was impractical?

18 A    I don't recall having that conversation in that call.

19 Q    Do you know if anyone else shared your view with the

20 State Court option that no one had fully explained why that

21 was not a practical option?  Anyone at the state or city?

22 A    I don't recall any discussions on it.

23 Q    At the bottom of the letter, it says after this letter is

24 revised, let's work on the Governor's response.  And you knew

25 as of July 10th then as the date of this email that the Chapter

1  9 filing was going to be filed on July 19th, correct?

2  A    I don't think I acknowledged that the exact date, but I

3  remember seeing a time schedule that that date was likely in

4  that schedule.

5  Q    And the time line that you're referring to, do you -- do

6  you recall who you got that from?

7  A    Who was that?  Whenever our weekly Monday meetings, I

8  believe, with the Governor and Kevyn and miscellaneous people

9  from the Governor's office and treasury.  And possibly some of

10 the consultants.

11 Q    Do you recall if the time line was given to you from

12 someone by the city, or someone from the state?

13 A    From the city.

14 Q    Do you recall if it was a time line prepared by Bill

15 Nowling?  Does that name ring a bell?

16 A    It does.  I don't believe it came from him.

17 Q    I'm sorry, what?

18 A    I don't recall it coming from Bill.

19 Q    Do you know if it came from Sarah Wurfel, the Governor's

20 press secretary?

21 A    It -- I don't recall that it came from her.

22 Q    Okay.  If I showed you a copy of the time line would you

23 recognize the time line or --

24 A    Yeah, I mean there's some press and media coverage tied

25 to this -- the time line.  But the relevant time line to me

1   was the actual if there's going to be a filing, a filing and

2   all the steps that follow a filing.  I do recall the

3   conversations about doing media issues, but that wasn't

4   relevant to me.

5   Q    You stated though after this, after let's get to work on

6   the Governor's response, that you were then left out of the

7   loop.  Why was that?

8   A    I never had a discussion, but I think the Governor

9   decided he was going to do it himself.

10  Q    Was there ever a version of Kevyn Orr's recommendation

11  letter with a contingency placed in it?

12  A    I don't know.  I don't recall it in the version that I

13  read.

14  Q    In -- in any subsequent version?

15  A    I'm sorry?

16  Q    Was there a subsequent version that may have contained

17  the contingency?

18  A    I don't recall that.

19  Q    Do you ever recall seeing a version of the Governor's

20  letter that had a contingency placed in it?

21  A    No.

22  Q    In the July 8th email to the Governor, you mentioned that

23  there was financial information forthcoming from certain

24  financial consultants regarding the pension under funding.

25  Who were the consultants that you were referring to?

1  A    Milliman and probably Conway, MacKenzie.

2  Q    And that would be Chuck Moore from Conway, MacKenzie?

3  A    Right.

4  Q    Were you at all involved in the pension task force with

5  Chuck Moore?

6  A    No.

7  Q    Were you aware of that group?

8  A    I don't recall.

9  Q    Do you know if anyone from the state had anything to do

10  with the formation of the pension task force?

11  A    I don't recall.

12  Q    Did they -- did that task force in any way report to

13  anyone at the State of Michigan?

14  A    I don't believe so.

15  Q    When was the first time that you recall a financial

16  advisor telling you that the pensions would have to be cut

17  significantly?

18  A    I don't recall specifically.

19  Q    Do you recall who that would have been?

20  A    I believe it would have been in the spring and we would

21  have Friday meetings before Kevyn was on board with Chris

22  Andrews and Jack Martin and the various consultants.  It was

23  probably the first time it came up that the pension fund

24  numbers were not what they thought they were.

25  Q    Can you put a finer point at all?  Would it have been

1  May, April?

2  A    I'd be guessing.

3  Q    Do you know if it was before Kevyn Orr came on board as

4  emergency manager?

5  A    I don't recall.

6  Q    Do you remember in June of 2013 receiving advice that the

7  pensions would have to be reduced and that the only way to do

8  that would be in a Chapter 9 proceeding?

9  A    I received advice on that date?

10 Q    Do you recall receiving advice in June of 2013 that the

11 pensions would have to be cut significantly and that a way to

12 do that would be a Chapter 9 filing?

13 A    I'm sorry, I don't mean to be difficult, but did I

14 receive advice or information --

15 Q    Do you recall receiving that advice?

16 A    No, not specifically.

17 Q    Can we pull up Exhibit 870, please?  I'd like to draw

18 your attention to the middle of the page.  There's an email

19 that says from Kevyn Orr to Andy Dillon on June 7th, 2013.  Do

20 you recollect getting this email?

21       (Retirement Systems' Exhibit 870 was identified)

22 A    It might be helpful if I could read more of it.

23 Q    Yup, no problem.  The next page contains the substance of

24 the email.

25 A    Can I see a hard copy?  It might be easier

1          MS. GREEN:  Your Honor, can I approach?

2          THE COURT:  Yes.

3    A    Okay.  Can we restate the question?

4    Q    Do you recall getting an email on June 7th from Kevyn Orr?

5    A    I don't have specific memory of this email.

6    Q    On the second page of the email there is a bullet point 3

7    under GRS.  And it says based on this, we anticipate a -- a

8    significant reduction in already accrued benefits will be

9    required in order to get required contributions to the level

10   of available cash to service the UAAL.  It appears that this

11   may only be possible in a Chapter 9 proceeding.

12        Do you recall receiving at least this portion of the

13   email in June of 2013?

14   A    I don't recall seeing this language, no.  And it's

15   possible I did, I just don't have a specific memory of it.

16   Q    But suffice it to say that by July you were -- you had

17   advised the Governor that you -- some financial consultant had

18   told you that there would have to be significant cuts to the

19   pensions, correct?

20   A    The numbers for the pension funds were very volatile.  I

21   remember just not having a lot of confidence in -- in really

22   what was the number.  And so I was worried about them, but I

23   never felt like we had a number that we could rely upon.

24        MS. GREEN:  And, Your Honor, just a matter of

25   housekeeping, 870 has been used, but I don't know that it has

1  been formally moved for admission, so I'd seek to move for its

2  admission.

3        THE COURT:  Any objections to 870?

4        MS. LEVINE:  Well, Your Honor, I don't believe an

5  appropriate foundation has been laid through this witness.  He

6  doesn't recall this email at all.  And I don't believe it

7  would be appropriate to admit it through his testimony.

8        MS. GREEN:  Can I respond?  He did say he recalled

9  receiving it.  I don't -- he didn't recall the exact sentence

10  that was -- that I drew his attention to.  And Kevyn Orr

11  testified that he recalled receiving it and we had established

12  foundation through that way.

13        THE COURT:  Do you recall receiving this email, sir?

14  A    Well, I see my name on here.  I don't have a specific

15  memory of this document.

16        THE COURT:  Is there some doubt about it's

17  authenticity, Ma'am?

18        MS. LEVINE:  I have nothing -- no, Your Honor, at

19  this point.

20        MR. SHUMAKER:  It is hearsay, Your Honor.

21        MS. GREEN:  Your Honor, if I may respond to that.

22  At least a portion of the email, it is an email directly from

23  Kevyn Orr and we've already established through other emails

24  that that is a party admission, so I'm not exactly sure what

25  the hearsay argument is based on.

1          THE COURT:  May I see it, please?  I don't want the

2   one with all your markings on it.  Is there a -- is there a

3   clean one?

4          MS. GREEN:  There is a clean one.

5          THE COURT:  What number is it again?

6          MS. LEVINE:  Take Mr. Dillon's.

7          THE COURT:  Oh, yes, let me just have Mr. Dillon's,

8   that will work.

9          MS. GREEN:  And, Your Honor, if I may add one more

10  thing.  We've argued in other situations including the city

11  that statements by the financial advisors are being considered

12  party admissions and this is an email from Chuck Moore of

13  Conway, MacKenzie, clearly a party admission.

14         THE COURT:  The Court will admit 870 into evidence.

15  Hold on one second, please.  Can we keep this one?  We don't

16  appear to have it.  Okay.  Can you put the number on there so

17  it will have a number?  Okay.

18     (Retirement Systems' Exhibit 870 was admitted)

19  Q    And if we may pull up Exhibit 834.  You were already

20  questioned a little bit about this email.  I believe that you

21  testified at your deposition the reason you were telling the

22  Governor that you were still in the informational stage was

23  because as you explained the building block is what the funded

24  status was and that issue was fluid, correct?

25        And I believe you further explained that if you're going

1  to reach a settlement with your creditors, it's important to

2  understand what's the funding level.  From there you can start

3  to figure out how do you solve the equation going forward.  Do

4  you recall that?

5  A    Yes.

6  Q    And yet you admit that at this time in July 9th there was

7  no clear understanding of what that level of under funding

8  was, correct?

9  A    For me personally.

10  Q    Do you know anyone else that had a clear understanding at

11  the city or state?

12  A    Well, I believe Chuck Moore was working closely with

13  Milliman and I think he had a pretty clear understanding of

14  where he thought the funding was.  I think he and Kevyn

15  were --

16  Q    But you personally were not convinced?

17  A    I hadn't seen what I thought were final numbers that gave

18  me a good sense of really what was the funding status of the

19  pension plans.

20  Q    And at this time on the email it says that the -- the

21  actual number was not going to be shared as far as the amount

22  and how that would impact the creditors, is that right?  I'm

23  not reading it verbatim.  It doesn't say that, I'm

24  summarizing.

25  A    My understanding that if Kevyn were to meet with them is

1  really just get to what was the funded level.  What's --

2  what's the status.  And from there you can start to translate

3  what may or may not need to happen to get the pension fund to

4  be solvent going forward.

5  Q    But you're -- what you were saying in this email was he

6  was not going to be translating that into an impact on

7  retirees or employees vested rights, correct?

8  A    I thought it best that they come to an agreement.

9  There's a lot of different ways to measure the funding status,

10  the number of years that you're smooth, and what's your

11  amortization rate, and I thought it best to at least see if

12  there's common ground on what the funding level is based on

13  some agreed upon criteria.  But from there then you -- the

14  math kind of falls in place.

15  Q    But at this time there was no number agreed upon as to

16  what the impact would be on the individual retirees, correct?

17  A    Not that I was aware.

18  Q    And that number was thus not going to be shared with

19  anyone at the meeting the following day, correct?

20  A    That was my understanding.

21  Q    You also note at the bottom of the -- the last sentence

22  of the first paragraph.  Because pensions have such a long

23  life, there are lots of creative options we can explore to

24  address how they will be treated on restructuring.  Did you

25  ever explore any of these creative options with the retirement

1  systems?

2  A     No.

3  Q     Did you ever explore any of these creative options with

4  any of the unions or the retirees?

5  A     No.

6  Q     Did you ever prepare a proposal with any of these

7  creative options and then share that proposal with the

8  retirement systems or the unions?

9  A     No.

10  Q     Now this email also says that you expect to get better

11  financials on Thursday which I believe is the middle

12  paragraph.  Who were you expecting to receive better

13  financials from on Thursday?

14  A     I don't specifically recall from the city.

15  Q     You were also asked just a moment ago about whether or

16  not you thought anything changed between the date of this

17  email on July 9th and the filing on the 18th.  Because in this

18  email you stated you thought were in the informational stage.

19  Do you recall that testimony?

20  A     Let's rephrase the question if we can.

21  Q     You were asked by Mister, I think it was Mr. Wertheimer

22  asked you what changed between July 9th and July 18th to take

23  you out of the informational stage.  Do you recall that

24  question?

25  A     I do.

1  Q    And -- and I believe you said something different today

2  than you said in your deposition.  Today you -- do you recall

3  what you said exactly?

4  A    I think it had something to do with that the pensions to

5  me weren't the major driver in the decision whether or not to

6  file.  That, you know, out of 18,000,000,000 this was

7  somewhere, depending on what the union's position was versus

8  the city's, that number was relevant but not a driving factor

9  for whether or not 9 was necessary.

10  Q    So it sounds like your answer has less to do with what my

11  question was.  My question was, do you admit that nothing

12  changed between July 9th and the 18th to take out -- take you

13  out of what you were referring to as the informational stage.

14  A    As it related to the pension?

15  Q    Yes.

16  A    Yes, nothing -- I don't recall having new numbers that

17  came in that made me want to call the Governor and say hey,

18  things are better or things are worse.

19  Q    So nothing changed and you were still in the

20  informational stage the following week, right?

21  A    I believe so.

22  Q    You've testified before that you believed there was a

23  "general understanding" that there was a constitutional

24  protection of pensions that was understood by folks from day

25  one.  And this was the premise of all discussions that we had,

1  correct?

2  A    Correct.

3  Q    And you also testified that the Governor and Kevyn Orr

4  both understood that this constitutional protection existed,

5  correct?

6  A    Yes.

7  Q    And I think you even explained that this presumption was

8  discussed early on and it was understood by people that there

9  was this provision that you had to grapple with, correct?

10 A    The conversation that I had dealt with that the state

11 wasn't liable for pension liabilities of a particular city.

12 That was discussed.  There was also the general understanding

13 that this provision existed in the Constitution.

14 Q    Okay.  I'll get to both.  The first question is, when was

15 the first time that you recall learning of this constitutional

16 protection?

17 A    I don't recall.

18 Q    Do you know if it was during your time as Treasurer, or

19 would it have been something that you knew from your

20 background when you were in the legislature?

21 A    I think it predated my time at the treasury.

22 Q    Okay.  And in fact do you recall citing this

23 constitutional protection to any of the unions or retirees

24 that you met with prior to the bankruptcy filing?

25 A    I don't recall that

1  Q    And then you also just said that there was a component of

2  your discussions related to whether the state had to provide

3  funding, correct?

4  A    That was a concern early on and because we have other

5  cities and units that are beyond just Detroit.  So it was a

6  concern did the state have any credit exposure to failed

7  pensions at the local level.

8  Q    And in any of these meetings or conversations, do you

9  recall Kevyn Orr ever asking the state to contribute money

10 toward the pension under funding for the City of Detroit?

11 A    I don't recall that.

12 Q    Do you recall if anyone else from his team asked the

13 state if it would contribute funding for the City of Detroit's

14 pension under funding?

15 A    I believe the question was asked.

16 Q    And who asked the question?

17 A    I don't recall.

18 Q    Do you recall what the answer was?

19 A    I think -- well, I recall saying that I don't think A,

20 the state can't lend credit to local units of government.  So

21 constitutionally we're prohibited from doing that.  And then

22 my comment was, I don't ever see the situation where the state

23 legislature would appropriate money to shore up liabilities of

24 the city.

25 Q    So you're constitutionally prohibited from what?

1  A    Lending credit from the state to local units.

2  Q    And that was a constitutional prohibition that you

3  thought was appropriate to enforce even in the case of the

4  Chapter 9 proceeding?

5  A    I was responding to a question from someone that said

6  will the state contribute money.  And I gave them two reasons

7  why I didn't think that would ever happen.

8  Q    Did you think that the state's constitutional prohibition

9  against lending credit was more important than the state

10  constitutional prohibition against impairing or diminishing

11  pension benefits?

12  A    I don't think it's appropriate to compare them in terms

13  of importance.  I think the Courts will ultimately decide what

14  they want as it relates to pensions meanings and what their

15  rights are.  But I was pretty clear as Treasurer that I

16  couldn't lend credit to local units of government, that I was

17  prohibited from doing that.

18  Q    But the Courts could have decided if you did lend credit

19  perhaps the Court could also decide that issue, correct?

20  A    I swear an oath to uphold the Michigan Constitution when

21  I took this position and I intend to follow that rule, or I

22  did.

23  Q    So if there was a prohibition in the Michigan

24  Constitution that you think directly constrained your actions,

25  you would find that to be a violation of your oath of office?

1  A    If I lend -- as Treasurer lend credit to local government

2  when the Michigan Constitution says that I can't do that, then

3  I would feel that yes, I violated my constitutional

4  obligations.

5  Q    But you don't feel the same way about Article 9, Section

6  24 of the Michigan Constitution?

7           MS. LEVINE:  Objection, Your Honor, argumentative

8  and vague.

9           THE COURT:  I'll permit it.  What's your answer,

10  sir?

11  A    I don't know that that provision influenced any way

12  whether the Governor was -- I don't think it blocks him or

13  prevent him from authorizing a Chapter 9.  We had it in

14  Article 72.  We had it in Public Act 4.  We had it in Public

15  Act 436.  That's always been out there.

16  Q    You mean the power to permit a Chapter 9?

17  A    Yes.

18  Q    And there's also the power to place a contingency on a

19  Chapter 9, correct?

20  A    I believe that's in 436.

21  Q    And we looked at an email earlier where it was discussed

22  whether or not such a condition should be placed on this

23  filing, correct?

24  A    I believe that.

25  Q    It was an email dated July 12th.  Do you know ultimately

1  why no contingencies were placed on the Chapter 9 filing?

2  A    Just from what I read in the Governor's letter.

3  Q    You were never briefed afterward?

4  A    No.

5  Q    As for the bankruptcy timing, the July 19th date that was

6  picked, it was your understanding that that date was picked

7  because in part the Governor had a desire that if you're going

8  to do a Chapter 9, he wanted it to be fast and efficient,

9  correct?

10 A    Uh-huh.

11 Q    So was that the primary driver of the July 19th date and

12 why it was ultimately decided upon?

13 A    Well, I -- I can't speak to why that specific date was

14 picked.  I -- I was aware that it was being considered, the

15 filing was being considered.  And I do know that there was a

16 sequence of events, dates that followed months after the

17 actual filing.  And there was a briefing to the Governor if --

18 you know, all these events have to transpire the filing and

19 how that landed on that particular date, I don't -- I was

20 never briefed specifically on why that date.

21 Q    But your understanding was in general it was supposed to

22 be fast and efficient?

23 A    That's what the Governor wanted.

24 Q    Was that in part driven by trying to get it done within

25 the 18 months of the emergency manager's appointment?

1  A    You'd have to ask the Governor that, but it would make

2  sense to me.

3  Q    Were you ever privy to any conversations where that time

4  line was discussed for that reason?

5  A    I don't recall that.

6  Q    The time line that we've discussed, you said that you had

7  meetings and you were briefed on the time line?

8  A    Yes.

9  Q    Was there ever a back up time line that you saw a copy

10  of?

11  A    There was an understanding that these dates could slip or

12  move.

13  Q    And it did, right?

14  A    But I didn't see an alternative schedule.  This was the

15  one that was mapped out.

16  Q    Okay.  But it did move by one day?  The bankruptcy filing

17  was delayed by one day.

18  A    I don't dispute that.  I don't have specific memory of

19  the date that it was supposed to be filed and the original

20  time line.  But I have a vague memory that -- that might have

21  been pulled up.

22  Q    Okay.  Did you attend a meeting in June of 2012 with the

23  Governor and Ken Buckfire of Miller, Buckfire and any

24  attorneys from Jones, Day?

25  A    In June of '13?

1  Q    2012.

2  A    '12.  June of 2012, Miller, Buckfire, Jones, Day, the

3  Governor and I?

4  Q    Yes.

5  A    I don't recall.

6       THE COURT:  All right.  We have to stop now.  How

7  much longer will you be?

8       MS. GREEN:  I actually had just like one more

9  question.  If you want, I can finish it or I can go --

10      THE COURT:  Okay.  One more question.

11 Q    With respect to the meeting that we just discussed, do

12 you recall receiving memos from Jones, Day relating to the

13 pension obligations back in 2012?

14 A    I don't have a specific memory of it.

15 Q    Do you recall --

16 A    And actually let's be clear.  What pension obligation

17 certificates, or what?

18 Q    The constitutional protections of pension obligations in

19 Michigan.

20 A    I don't recall.

21 Q    Do you recall receiving any memos relating to Chapter 9

22 filings for the City of Detroit?  Memos on that topic?

23 A    Not specifically.

24      THE COURT:  All right.  We have to stop now.  We do

25 not have Court tomorrow.  We'll reconvene Thursday morning at

1  9:00.  At that time if I could get a representation from the

2  objectors group as to how long you think your closing

3  arguments will be, that will help me a lot.  We are still

4  researching the issue of courtrooms for next week, so I hope

5  to have some further information for you about that.  And

6  we'll be in recess.

7       (WITNESS ANDY DILLON WAS EXCUSED AT 3:00 P.M.)

8            THE CLERK:  All rise.  Court is adjourned.

9       (Court Adjourned at 3:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-8-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,          .          Docket No. 13-53846
      MICHIGAN,                 .
                         .          Detroit, Michigan
                         .          November 7, 2013
             Debtor.          .          9:02 a.m.
.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

                    Jones Day
                    By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                    51 Louisiana Avenue, N.W.
                    Washington, D.C.  20001-2113
                    (202) 879-3768

                    Pepper Hamilton, LLP
                    By:  ROBERT S. HERTZBERG
                          DEBORAH KOVSKY-APAP
                    4000 Town Center, Suite 1800
                    Southfield, MI  48075-1505
                    (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                    By:  MATTHEW SCHNEIDER
                        MARGARET NELSON
                    P.O. Box 30754
                    Lansing, MI  48909
                    (517) 241-8403

APPEARANCES (continued):

```
                        Dickinson Wright, PLLC
                        By:  STEVEN G. HOWELL
                        500 Woodward Avenue, Suite 4000
                        Detroit, MI  48226-3425
                        (313) 223-3033

                        Dickinson Wright, PLLC
                        By:  PETER H. ELLSWORTH
                        215 South Washington Square, Suite 200
                        Lansing, MI  48933-1816
                        (517) 371-1730

For AFSCME,             Lowenstein Sandler, LLP
AFL-CIO, and Sub-       By:  SHARON L. LEVINE
Chapter 98, City             JOHN K. SHERWOOD
of Detroit              65 Livingston Avenue
Retirees:               Roseland, NJ  07068
                        (973) 597-2374

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  ROBERT D. GORDON
General Retirement           JENNIFER K. GREEN
System of Detroit,      151 South Old Woodward, Suite 200
Police and Fire         Birmingham, MI  48009
Retirement System       (248) 988-5882
of the City of
Detroit:                Clark Hill, PLC
                        By:  RONALD A. KING
                        212 East Grand River Avenue
                        Lansing, MI  48096
                        (517) 318-3015

For the Detroit         Erman, Teicher, Miller, Zucker &
Fire Fighters              Freedman, P.C.
Association, the        By:  BARBARA A. PATEK
Detroit Police               JULIE BETH TEICHER
Officers Associa-            DAVID EISENBERG
tion and the           400 Galleria Officentre, Suite 444
Detroit Police         Southfield, MI  48034
Lieutenants &          (248) 827-4100
Sergeants
Association:
```

APPEARANCES (continued):

```
For the Inter-        Cohen, Weiss & Simon, LLP
national Union,       By:  BABETTE A. CECCOTTI
UAW:                       PETER D. DECHIARA
                           THOMAS N. CIANTRA
                      330 West 42nd Street, 25th Floor
                      New York, NY  10036-6976
                      (212) 356-0227


For Detroit           Silverman & Morris, PLLC
Retired City          By:  THOMAS R. MORRIS
Employees             30500 Northwestern Highway, Suite 200
Association,          Farmington Hills, MI  48334
Retired Detroit       (248) 539-1330
Police and Fire
Fighters Associa-     Lippitt O'Keefe, PLLC
tion, Shirley V.      By:  RYAN C. PLECHA
Lightsey, and         370 East Maple Road, Fl. 3
Donald Taylor:        Birmingham, MI  48009
                      (248) 646-8292

For the Official      Dentons
Committee of          By:  CLAUDE D. MONTGOMERY
Retirees:                  ANTHONY B. ULLMAN
                           ARTHUR H. RUEGGER
                      1121 Avenue of the Americas
                      New York, NY  10020-1089
                      (212) 632-8390

                      Dentons US, LLP
                      By:  SAM J. ALBERTS
                           DAN BARNOWSKI
                      1301 K Street, NW
                      Suite 600 East Tower
                      Washington, DC  20005-3364
                      (202) 408-7004

                      Brooks, Wilkins, Sharkey & Turco, PLLC
                      By:  MATTHEW E. WILKINS
                      401 South Old Woodward, Suite 400
                      Birmingham, MI  48009
                      (248) 971-1711

For Retired           Strobl & Sharp, PC
Detroit Police        By:  LYNN M. BRIMER
Members                    MEREDITH E. TAUNT
Association:               MALLORY A. FIELD
                      300 East Long Lake Road, Suite 200
                      Bloomfield Hills, MI  48304-2376
                      (248) 540-2300
```

APPEARANCES (continued):

| | |
|---|---|
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please
2   be seated.  Case Number 13-53846, City of Detroit, Michigan.
3          THE COURT:  Is everyone here?  Well, first, good
4   morning.
5          ATTORNEYS:  Good morning (collectively).
6          THE COURT:  Is everyone here, or are there people we
7   need to wait for?  All right.  No response, so I'll assume we
8   are all here.  Ms. Green.
9                    ANDY DILLON, WITNESS, SWORN
10                   DIRECT EXAMINATION (CONTINUING)
11  BY MS. GREEN:
12  Q   Good morning, Mr. Dillon.
13  A   Good morning.
14  Q   Jennifer Green on behalf of the Retirement Systems for
15  the City of Detroit.  I just have a few more small lines of
16  questioning.
17  A   Who is Brom Stibitz, and what is his position within the
18  Treasury Department?
19          MS. NELSON:  Asked and answered, your Honor.
20          MS. GREEN:  Maybe it's foundational.  I just really
21  don't recall what his position was.
22          THE COURT:  I'll ask it.  I'll permit it.  Go ahead.
23          THE WITNESS:  He works for the Department of
24  Treasury.  He serves without the same title but basically as
25  my chief of staff.

1   BY MS. GREEN:

2   Q    And Tom Saxton?

3   A    Tom is a chief deputy.

4   Q    And Terry Stanton?

5   A    Terry Stanton is the public information officer.

6   Q    Okay.  And so they all reported directly to you?

7   A    Yes.

8   Q    Do you recall questions in late June of 2013 from

9   reporters in the media regarding how general obligation bonds

10  would be handled with the City of Detroit?

11  A    With the Bond Buyer?

12  Q    Yes.

13  A    From the last deposition, I think I saw a story on that

14  interview --

15  Q    Okay.

16  A    -- if that's the one we're referring to.

17  Q    It is.  Who is R.W. Baird, and how is that company

18  involved with the Detroit matter?

19  A    R.W. Baird is a financial consultant.  They advise the

20  state.  They may have been involved with helping Detroit

21  issue some debt as well.

22  Q    And is Wayne Workman a financial advisor at R.W. Baird?

23  A    He was at the time.

24  Q    Okay.  And did he report to you in any way?

25  A    He worked directly with Tom Saxton.

1   Q   Okay.  And did you communicate with Mr. Workman about the

2   City of Detroit's financial condition?

3   A   When?

4   Q   In that time period, June of 2013.

5   A   I don't recall that.

6   Q   Do you recall when you would have communicated with him

7   about the situation?

8   A   We worked with him during my entire tenure on various

9   bond matters.  I don't recall having a specific discussion

10   with him about Detroit.  We did a bond deal in 2012 for the

11   city.  They may or may not have been engaged.  I suspect they

12   might have been.

13   Q   So would he have been privy to any of the timelines or

14   any of the dates that were planned for the bankruptcy filing?

15   A   I doubt it.

16   Q   Pardon me?

17   A   I doubt that he would have been.

18   Q   If there was e-mail correspondence between Brom Stibitz,

19   Tom Saxton, and Wayne Workman, would you have been aware of

20   those communications?

21   A   Not necessarily.

22   Q   Do you recall at any point Brom Stibitz, Mr. Stanton, or

23   Mr. Saxton asking you about the inquiry from Bond Buyer

24   magazine regarding the general obligation bonds?

25   A   I remember an incident.  I don't know if it was the one

1  you're referring to.

2          MS. GREEN:  Can we bring up Exhibit 848, please?

3  BY MS. GREEN:

4  Q   Does this document look familiar to you?  Is this the

5  incident that you were referring to?

6  A   I don't recall seeing this specific e-mail.

7  Q   Do you recall questions within the Treasury Department

8  about how to handle this issue?

9          THE COURT:  Excuse me one second, please.  Who's

10 ever in charge of getting this monitor going, I need help

11 because it's not running.  Feel free to come right on up here

12 and work your magic.  Excellent.  Thank you, sir.

13         MS. NELSON:  Your Honor, I don't believe this e-mail

14 is in evidence, and I think it's inappropriate to display it

15 until it is.

16         MS. GREEN:  I was ask -- he mentioned an incident

17 with this exact situation.  I thought that he would be able

18 to testify or I was asking if he could testify is this the

19 incident that he was referring to a moment ago.  If you would

20 prefer, I can refresh his recollection with it instead if --

21         THE COURT:  I didn't quite hear the witness say that

22 there was something he didn't recall.

23         MS. GREEN:  He said there was an incident with Bond

24 Buyer magazine.  I believe this is the incident he was

25 referring to, so I had asked him if he recognized the

1    document, if this was the incident.

2            THE COURT:  Well, you can certainly ask the witness

3    if he has seen the e-mail before.  Otherwise, it's not

4    appropriate to show it to him.

5            MS. GREEN:  That was the -- I believe my question to

6    him was, "Do you recognize the document?  Is this the

7    incident you referred to?"

8            MS. NELSON:  And his answer was he did not recall

9    seeing it, so it's been asked and answered.

10           THE COURT:  Is that right, sir?  You don't recall

11   that specific e-mail?

12           THE WITNESS:  I do not.

13           THE COURT:  All right.  The objection is sustained.

14   BY MS. GREEN:

15   Q   Do you know why Mr. Workman would have been privy to

16   discussions relating to the court option with respect to the

17   City of Detroit?

18   A   The court option?

19   Q   Court option versus out-of-court option.

20   A   He was a consultant to Treasury.  He handles a lot of our

21   debt issuances.  I'm certain Mr. Saxton relies on his advice

22   regularly.

23   Q   Do you know if Mr. Saxton would have shared with him some

24   of the planning that was going on with respect to the City of

25   Detroit bankruptcy?

1  A    I can't answer that.

2  Q    Do you know if Mr. Stibitz or Mr. Saxton or Mr. Stanton

3  would have been involved with R.W. Baird relating to the

4  timing of the City of Detroit bankruptcy filing?

5  A    Can you rephrase that or restate it?

6  Q    Would any three of the individuals that worked at

7  Treasury that we just spoke of, Terry Stanton, Thomas Saxton,

8  or Brom Stibitz, have been in contact with R.W. Baird and Mr.

9  Workman relating to the City of Detroit bankruptcy filing?

10 A    I would highly doubt that Stibitz or Stanton would.  I

11 can't speak to what Mr. Saxton spoke to him about.

12 Q    If Mr. Workman was of the understanding that court seemed

13 like a foregone conclusion, would you have any reason to

14 believe that it was based on conversations with people from

15 the Treasury Department?

16        MS. NELSON:  Objection, your Honor.  Inappropriate

17 hypothetical.  Assumes facts not in evidence.  Lacks

18 foundation.

19        THE COURT:  The objection is sustained.

20 BY MS. GREEN:

21 Q    In March of 2013, do you recall planning for the

22 emergency manager's appointment and the topics that you

23 wanted him to handle when he was appointed?

24 A    I don't recall.  We had a lunch.  We met with him.  Tom

25 Saxton, Brom Stibitz, and I met for lunch with Kevyn and just

1 gave him our experience of working with emergency managers

2 and what the experience would be like. It was a lunch. It

3 was fairly informal. I don't recall much more than that.

4 Q   And do you recall compiling a list of key items that you

5 wanted him to focus on as soon as he was appointed?

6 A   We may have done that. I don't have a specific memory of

7 it.

8           MS. GREEN: Can we pull up Exhibit 836, please?

9           MR. SHUMAKER: Your Honor, this exhibit is not in

10 evidence either. I don't think it's appropriate to display.

11           MS. GREEN: Your Honor, I can ask him if he

12 recognizes it and then move for its admission if he does.

13           THE COURT: You can do that. You can put it back on

14 the screen for that purpose.

15 BY MS. GREEN:

16 Q   Mr. Dillon, do you recognize this e-mail? Do you

17 recognize your name in the "To" --

18 A   Yes.

19 Q   -- column? Do you recall receiving this e-mail in March

20 of 2013?

21 A   Can I read it?

22 Q   Sure.

23           UNIDENTIFIED SPEAKER: I'm sorry. Could you tell us

24 what number this is, please?

25           MS. GREEN: 836.

1          UNIDENTIFIED SPEAKER:  836.

2          THE WITNESS:  I'm sure I saw it at the time.  I

3    don't have a specific memory today of it.

4    BY MS. GREEN:

5    Q    In the middle -- well, almost to the end paragraph, it

6    begins with March 28th.  It states, "There may be a narrow

7    window for taking action before lawsuits are filed."  What

8    type of lawsuits were you expecting?

9    A    We get sued all the time, and in our experience with

10   working with other cities where there were emergency

11   managers, there's all kinds of litigation that follows.

12   Q    So would it be safe to assume that you were relating

13   to -- or you were referring to PA 436 lawsuits?

14   A    Most likely, yes.

15   Q    Okay.  Do you recall if there were topics relating to --

16   or I'm sorry -- discussions relating to lawsuits relating to

17   Article IX, Section 24, of the Michigan Constitution?

18   A    I'm sorry.  Could you restate that?

19   Q    Would there have been discussions relating to lawsuits

20   involving Article IX, Section 24, of the Michigan

21   Constitution?

22   A    I don't have any memory of that.

23   Q    So would this be limited to the PA 436 lawsuits you were

24   expecting?

25   A    We got sued on open meetings acts.  All kinds of theories

1   were surfacing, and I literally believe there's over a
2   hundred lawsuits.  I mean there's a substantial number, so
3   every theory I don't recall.
4   Q    So they were certainly expected and somewhat planned for?
5   A    Apparently.
6   Q    The next paragraph just below that says "status and
7   timing of the ongoing 312 arbitration."  Do you recall what
8   that's referring to?
9   A    I know there was an arbitration between the city and
10  maybe DPD.  There might have been some other uniform
11  arbitrations that were ongoing, and I believe, yes, there was
12  an ongoing arbitration at the time.
13  Q    And so when you say "timing of the ongoing arbitration,"
14  what specifically were you referring to?
15          MS. NELSON:  Well, I'm going to object, your Honor.
16  That mischaracterizes.  This is an e-mail to Mr. Dillon.
17  This is not Mr. Dillon's e-mail.
18          MS. GREEN:  He said they had a meeting where they
19  were discussing the topics.  I'll rephrase the question to
20  make it more clear.
21  BY MS. GREEN:
22  Q    Was this one of the topics that you discussed at your
23  meeting when you said that you were talking about the items
24  that you wanted Kevyn Orr to focus on when he took over as
25  emergency manager?

1    A    I described the meeting as a lunch where we just shared

2    with him generally what an experience of being an EM is.

3    That topic I highly doubt came up at that lunch.

4    Q    Okay.  Did this topic come up at any other time in your

5    discussions relating to the emergency manager?

6    A    Me personally?  I don't recall it.

7              MS. GREEN:  Your Honor, I'd move for the admission

8    of Exhibit 836.

9              THE COURT:  Any objections?

10             MS. NELSON:  No objection.

11             MR. SHUMAKER:  Hearsay, your Honor.

12             MS. GREEN:  Your Honor, it's an e-mail to him.  He's

13   the recipient of it.  It's a business record under 803(6),

14   and he spoke about the communications and was able to respond

15   to the substance of what was referred to in the e-mail.

16             THE COURT:  Well, do you remember receiving this e-

17   mail or not?

18             THE WITNESS:  I don't have a specific memory of it,

19   no.

20             THE COURT:  All right.  The objection is sustained.

21             MS. GREEN:  Your Honor, if I may, there have been

22   several e-mails that were -- where people did not have a

23   specific recollection of that we have all permitted to be --

24             THE COURT:  If there's an objection as opposed to by

25   stipulation, I have to deal with it.  If the witness can't

1    authenticate it, then it's not admissible.

2    BY MS. GREEN:

3    Q    When we last spoke, Mr. Dillon, you referred to a section

4    of the Michigan Constitution that you thought prohibited the

5    state from reimbursing the City of Detroit for the pension

6    underfunding.  Do you recall that?

7    A    I don't recall the topic, but I think you've

8    mischaracterized my testimony.

9    Q    Do you recall saying that you thought that you were

10   prohibited from lending credit --

11   A    Yes.

12   Q    -- to the City of Detroit?  What provision of the

13   Constitution were you referring to?

14   A    I don't know.  It's just the general understanding I had

15   serving in the role as treasurer.

16   Q    Were you referring to a prohibition against the state

17   guaranteeing obligations of the city?

18   A    It's my understanding that the interpretation of that

19   lending of credit is fairly broadly construed, so my

20   understanding would be a guarantee would be contrary to

21   what's permissible under the Constitution.

22   Q    But if there was legislation enacted that gave an

23   appropriation to a particular municipality, that would not be

24   prohibited; correct?

25   A    That's my understanding, yes.

1    MS. GREEN:  I have nothing further, your Honor.

2    THE COURT:  Any further questions for the witness?

3    MS. BRIMER:  Good morning, your Honor.  Lynn M.

4  Brimer appearing on behalf of the Retired Detroit Police

5  Members Association.

6                    DIRECT EXAMINATION

7  BY MS. BRIMER:

8  Q   Good morning, Mr. Dillon.  My name is Lynn Brimer.

9  A   Good morning.

10  Q   I represent an association of retired police personnel.

11  We've not met before, have we?

12  A   I don't believe so.

13  Q   One thing that no one has asked you yet is regarding your

14  background.  You hold a law degree, do you not?

15  A   I do.

16  Q   And when did you obtain your law degree?

17  A   1988.

18  Q   All right.  And you are admitted to practice law?

19  A   I am.

20  Q   And is that in the State of Michigan?

21  A   Yes.

22  Q   And when were you admitted to practice?

23  A   I believe '89.

24  Q   All right.  And you have continuously been admitted to

25  the Michigan State Bar since 1989, approximately?

1    A    Yes.

2    Q    All right.  Now, I'm going to go back to early 2012, and

3    without hopefully duplicating any of the answers you've

4    already given or questions you've already asked, I'd like to

5    go over some of the early dealings between the state and the

6    consultants, so in early 2012 Miller Buckfire and Huron

7    Consulting were hired to perform a 60-day review of the City

8    of Detroit; is that correct?

9    A    I believe so.

10   Q    And were you involved in the retention of either Huron

11   Consulting or Miller Buckfire?

12              MS. NELSON:  Objection --

13              THE WITNESS:  Yes.

14              MS. NELSON:  -- your Honor.  This line has already

15   been asked and answered.

16              THE COURT:  It has.

17              MS. BRIMER:  Your Honor, I believe I will ask some

18   questions that have not been asked of Mr. Dillon, and I will

19   try very hard not to be duplicative.  I understand the Court

20   and counsel's concern.

21   BY MS. BRIMER:

22   Q    So at the end of that 60-day review, was a report

23   produced by Miller Buckfire or Huron Consulting?

24   A    I don't specifically recall.

25   Q    All right.  So you don't specifically recall reviewing a

1  report then either?

2  A    I assume we got some financial data from Miller Buckfire.

3  I know we got some information on other matters from Huron,

4  but specifically I don't have a memory of reading a binder or

5  document that was put together that summarized everything.

6  Q    Now, at some point you testified that Miller Buckfire

7  brought in Jones Day in connection with the consent

8  agreement.  Do you recall when that happened?

9  A    Not specifically.

10 Q    Are you aware that in 2011 Jones Day had submitted a

11 response to an RFP in connection with the appointment of

12 emergency managers by the State of Michigan?

13 A    I didn't recall that recently.  That happens under my

14 department.  I don't -- I'm not involved in the specifics of

15 those, so I wasn't part of the decision group to put them on

16 the list, but I knew we did an RFP to assist with troubled

17 units.

18 Q    So you were aware that at least as early as March 2nd of

19 2011, multiple attorneys from Jones Day were working with

20 Miller Buckfire and Huron Consulting on the consent agreement

21 with Department of Treasury; correct?

22 A    Yes.

23 Q    Were you aware of the number of attorneys from Jones Day

24 that were working with Miller Buckfire?

25 A    No.

1          MS. BRIMER:  Exhibit 202, please.

2          UNIDENTIFIED SPEAKER:  I don't have 202.

3          MS. BRIMER:  Oh, I'll give you --

4          MS. NELSON:  Oh, wait.  There it is.

5          MS. BRIMER:  Oh, there you go.

6  BY MS. BRIMER:

7  Q   That's an e-mail dated March 3rd, 2012; is that correct?

8          MS. NELSON:  Your Honor, I don't believe this has --

9  objection.  This hasn't been admitted, and it would be

10  inappropriate to ask questions on the substance.  If she's

11  laying foundation, I don't have an objection, but to question

12  on the substance of the e-mail would be inappropriate at this

13  point.

14          MS. BRIMER:  Well, preliminarily, your Honor, last

15  evening the city and the RDPMA agreed to the admission of

16  this exhibit.

17          THE COURT:  Any objections to its admission?

18          MR. SHUMAKER:  No, your Honor.

19          THE COURT:  All right.  So that's 202, did you say?

20          MS. BRIMER:  Yes.  For the record, your Honor, we've

21  also stipulated to the admission of Exhibit 201.

22          THE COURT:  Is that right?

23          MR. SHUMAKER:  That's correct, your Honor.

24          THE COURT:  All right.  Exhibits 201 and 202 are

25  admitted.

1    (Exhibits 201 and 202 received at 9:25 a.m.)

2        THE COURT:  You may proceed.

3        MS. BRIMER:  Thank you, your Honor.

4  BY MS. BRIMER:

5  Q   So that's an e-mail dated March 3rd, 2012, from Ms.

6  Lennox; correct?

7  A   Correct.

8  Q   And it's addressed to you; correct?

9  A   Correct.

10  Q   Do you recall reviewing that e-mail?

11  A   I recall during my deposition having my memory refreshed

12  about it.

13  Q   So as you'll note -- I'd actually like to go back up to

14  the caption -- it's from Ms. Lennox, who's an attorney at

15  Jones Day, and in the carbon copy there's Ms. Ball, Jeffrey

16  Ellman, David Kates and Thomas Wilson, so we have five

17  attorneys from Jones Day involved in the Detroit consent

18  agreement; correct?

19        MS. NELSON:  I'm going to object.  I don't believe

20  there's a foundation for those attorneys' specific

21  involvement with the consent decree.

22        THE COURT:  It's a question, so the objection is

23  overruled.  If you can answer, sir.

24        THE WITNESS:  What's the question again?

25  BY MS. BRIMER:

1　Q　Well, there's five attorneys from Jones Day that are

2　being copied in connection with the involvement of Jones Day

3　on the drafting of the consent agreement for the City of

4　Detroit; correct?

5　A　I only know what this document shows me.

6　Q　And it shows us five attorneys involved or at least

7　copied on this e-mail; correct?

8　A　Yes.

9　Q　And then there's a number of consultants both from Huron

10　Consulting and Miller Buckfire; correct?

11　A　Yes.

12　Q　All right.　Now, if we go down to the body of the e-mail,

13　it's an e-mail addressed directly to you from Ms. Lennox;

14　correct?

15　A　Yes.

16　Q　So you were dealing directly with Ms. Lennox in drafting

17　the consent agreement for the city; correct?

18　A　A very limited basis.

19　Q　And it indicates that, "Attached for your consideration

20　is a consent agreement reviewed by Miller Buckfire and

21　Huron," meaning Huron Consulting; correct?

22　A　Correct.

23　Q　All right.　So you're aware that these three consulting

24　firms, which at this point in time you've testified were not

25　hired by the city in connection with the consent agreement,

1  were working on the consent agreement; correct?

2  A    They were providing advice, but we had -- the state had

3  its own counsel in negotiations of the consent agreement.

4  Q    And who was that?

5  A    There's probably an AG and Steve Liedel from Dykema

6  Gossett.

7  Q    So was Dykema Gossett aware that Jones Day was working

8  with you on drafting a consent agreement?

9  A    They were providing input that I'm certain certain items

10  were shared with them.  They may have reviewed the documents.

11  I don't recall.

12  Q    Would they have reviewed the documents directly from

13  Jones Day, or would they have been provided to Dykema from

14  someone at Treasury?

15  A    I can't answer that.

16  Q    And at this time, none of these consulting or lawyers are

17  charging Department of Treasury for the services they're

18  providing in connection with the consent agreement; correct?

19  A    Not correct.  I think we testified that we did retain

20  Miller Buckfire for a brief period of time.

21  Q    In connection with the 60-day review -- financial review

22  of the city?

23  A    That's right.

24  Q    And were their duties expanded to include the consent

25  agreement?

1  A   We engaged them as we were going through the review and

2  in preparation of the consent agreement.  We were working

3  closely with Huron Consulting as well as Miller Buckfire.

4  Q   Okay.

5  A   Those firms reached out to lawyers and provided advice we

6  didn't -- generally we asked for, but they, I think, were

7  supplementing their efforts to help us out.

8  Q   And the drafting of the consent agreement took a fairly

9  lengthy period of time, at least 30 days; correct?

10  A   Yes.

11  Q   And Jones Day, Miller Buckfire, and Huron Consulting were

12  involved during that entire 30-day process; correct?

13  A   There's a negotiation.  We met probably five or more

14  times with the City of Detroit and their lawyers.  It was an

15  arm's length bargain negotiated aggressively, and I don't

16  recall any of them being in the room during those

17  negotiations.

18  Q   But they did continue to review the consent agreement and

19  its multiple revisions; correct?

20  A   I don't specifically recall when their input ended or

21  necessarily even began, but --

22          MS. BRIMER:  Can we see Exhibit 841, please?

23  BY MS. BRIMER:

24  Q   You'll notice about midway down there is an e-mail that

25  is addressed to you; correct?

1  A   Can we grow the font size here?  Okay.  I'm sorry.  Could

2  you restate the question?

3  Q   So that's an e-mail to you.  That's from someone at

4  Miller Canfield, also a law firm the city works with;

5  correct?

6  A   Correct.

7  Q   And it's regarding the --

8        MS. NELSON:  Objection, your Honor.  This has not

9  been admitted into evidence.  It would be inappropriate to

10  ask substantive questions regarding this e-mail.

11  BY MS. BRIMER:

12  Q   So the e-mail is addressed to you; correct?

13  A   I see my name there, yes.

14  Q   Do you recall reviewing this e-mail?

15  A   I bet we turned that document six to ten times, so I

16  remember these incidents where we would get versions from the

17  city, and they would get them from us, so generally I

18  remember these types of e-mails.

19  Q   Do you have any reason to believe that you did not review

20  this e-mail from Mr. McGee dated March 29th addressed to you?

21  A   No.  I would think I seen it, yeah.

22        MS. BRIMER:  Your Honor, I'd move for the admission

23  of this Exhibit 841.

24        THE COURT:  I'm sorry.  Was your answer you have

25  seen this or --

1          THE WITNESS:  I believe I saw it at the time, yes.

2          THE COURT:  You do.  All right.  Any objections?

3          MR. SHUMAKER:  Yes, your Honor.  It's hearsay.

4          THE COURT:  Hold on one second.  Well, are you

5   offering the -- I'm sorry --

6          MS. BRIMER:  Thanks.

7          THE COURT:  -- offering the entire document or just

8   the e-mail that Mr. Dillon received?

9          MS. BRIMER:  Well, I'd actually like to offer the

10  entire document, your Honor, because I think it establishes

11  what Treasury has done with it.

12         THE COURT:  The issue isn't relevance.  The issue is

13  hearsay.

14         MS. BRIMER:  But it is forwarded, your Honor, by a

15  member of the State of Michigan who works -- and Mr. Dillon

16  indicated that Mr. Stibitz works directly for him, so that

17  would become an exception as a party --

18         THE COURT:  May I see the paper copy of this,

19  please?

20         MS. BRIMER:  If I may, your Honor, it has only

21  highlighting similar --

22         THE COURT:  Okay.  All right.  I will return this to

23  you.  The Court will admit so much of the document as begins

24  from McGee, comma, Michael P., but not the part above it.

25         (Exhibit 841 excerpt received at 9:34 a.m.)

1          MS. BRIMER:  Thank you, your Honor.

2          THE COURT:  And that was Exhibit -- what number

3   again?

4          MS. BRIMER:  841, your Honor.

5   BY MS. BRIMER:

6   Q   So, Mr. Dillon, do you know when the consent agreement

7   was executed by the city?

8   A   I think on or around April 4.  That might have been the

9   date City Council voted on it.  I'm not sure.

10  Q   So is it in the ordinary course for the Department of

11  Treasury to receive that type of consulting from outside law

12  firms that have not yet been retained by the Department of

13  Treasury or any other agency for the state?

14  A   I can't say that it hasn't happened in another unit of

15  government.  On occasion some will provide some pro bono

16  services if we have an urgent need.  I know that happened

17  with DPS and a little bit with Flint, a little bit with

18  Highland Park, so it's not unusual.

19  Q   Were Jones Day providing any other consulting services in

20  connection with any other matters before the Department of

21  Treasury?

22  A   Not to my memory.

23  Q   So at some point in time Jones Day became involved with

24  the -- with Public Act 4 and a concern with respect to

25  whether or not that might be repealed; is that -- or rejected

1  on the referendum; is that correct?

2          MS. NELSON:  Objection.  Lacks foundation and is

3  vague.

4          THE COURT:  Overruled.  You may answer the question.

5          THE WITNESS:  Could you restate that?

6  BY MS. BRIMER:

7  Q   At some point Jones Day also became involved with the

8  Department of Treasury and concerns regarding the rejection

9  of PA 4 on referendum; correct?

10  A   I wouldn't characterize it that way.  What we were

11  working on was a consent agreement that we wanted to survive

12  even if PA 4 was repealed, so there's other provisions of

13  state law that would allow for the consent agreement to have

14  legal standing and substance, so I believe they looked at

15  those other provisions of the law to make certain the

16  agreement we worked so hard to develop would survive a repeal

17  of PA 4.

18  Q   Did anyone at Jones Day give either you or anyone at the

19  Department of Treasury any advice in connection with how to

20  react or an approach to take in the event PA 4 was, in fact,

21  repealed?

22  A   Only what would be in that document, but it wasn't -- you

23  know, Steve Liedel is an expert on this at Dykema.  Actually,

24  I think we relied on him more than Jones Day on that issue.

25          MS. BRIMER:  So I'd like Exhibit 201, please.  No.

1  I think that's 202.  201.

2          THE COURT:  It says 201.

3          MS. BRIMER:  Oh, it's possible this is the second

4  page.  Is there a first page?  Okay.  It's also marked as an

5  Exhibit 8 -- 846, so 846 would be, your Honor, admitted since

6  it's the same document as 8 -- as 201, which the city has

7  stipulated to.

8          THE COURT:  Is that all right?

9          MR. SHUMAKER:  That's correct, your Honor.

10          THE COURT:  All right.  Thank you.

11  BY MS. BRIMER:

12  Q   So this is an e-mail dated March 2nd, 2013.  Do you see

13  that?

14  A   Yes.

15  Q   And it's just addressed from Mr. Ellman to other

16  attorneys at Jones Day.

17          MS. NELSON:  I would just like to correct the

18  record.  I think Ms. Brimer indicated this was dated March 2,

19  2013, and it's 2012.

20          MS. BRIMER:  Oh, '12, 2012.

21          MS. NELSON:  Thank you.

22          THE COURT:  Thank you.

23  BY MS. BRIMER:

24  Q   You're not copied on that e-mail; correct?

25  A   I don't see my name.

1  Q   Have you ever seen this e-mail before?

2  A   I believe in preparation for deposition and this

3  testimony, I may have seen it.

4  Q   All right.  So it indicates in the first paragraph that,

5  "We spoke to a person from Andy's office."  That Andy, that

6  would be you?

7  A   I suspect that.

8  Q   So when you prepared for your deposition, did you read

9  this e-mail all the way through?

10  A   I glanced through it.

11  Q   Okay.  It further indicates, "I thought MB was also going

12  to try to follow up with Andy directly about the process for

13  getting this to the governor."  Do you recall anyone from

14  Miller Buckfire discussing with you, if you've read this, the

15  content of this e-mail?

16  A   I'd like to read the whole document before I answer.  I

17  don't --

18  Q   Take your time.

19  A   Okay.  Could you restate the question?

20  Q   Do you recall at about this time someone from Miller

21  Buckfire discussing the content of this e-mail with you

22  directly?

23  A   We were having daily conversations at this time.  I'm

24  certain we discussed items in this e-mail.

25  Q   So you'll see about midway down if PA 4 is repealed or

1    suspended, there may be an argument that some or all of this

2    does not work, so there was a concern by Treasury, Miller

3    Buckfire, Jones Day that what was being put in place in

4    connection with the consent agreement might be in jeopardy in

5    the event PA 4 was repealed; correct?

6    A    That's what it says, yes.

7    Q    Then if you go a little further down, "The cleanest way

8    to do all of this is probably new legislation that

9    establishes the board" -- I assume that's the Financial

10   Review Board -- "and its powers and" -- and the "and" is in

11   capital letters -- "includes an appropriation for a state

12   institution.  If an appropriation is attached to and included

13   in the statute to fund a state institution, which is broadly

14   defined, then the statute is not subject to repeal by the

15   referendum process."  Do you see that?

16   A    I do.

17   Q    So is it -- it's correct that by March of 2012 the

18   consultants that were working with Treasury and Treasury are

19   already contemplating new legislation that would include a

20   spending provision in order to avoid a referendum in the

21   event PA 4 was rejected?

22   A    I think you're overstating the case here.

23   Q    Okay.

24   A    Even if PA 4 stayed in law, the advice and recommendation

25   we were getting was to have something like -- the model we

1   were following is the MAC that was put into existence in the

2   late '70s in New York City.  The advice we were getting is

3   that the state should have some statute that defines what the

4   role -- in this case it became the FAB, the Financial

5   Advisory Board -- what its powers and duties may be, so this

6   is, I guess, related in some way to PA 4 or PA 72, but their

7   advice was and remains today that the state should have some

8   statutory construction around what is the role of a Financial

9   Advisory Board.

10  Q   And so at least as early as March of 2012, that advice is

11  coming to Department of Treasury from the Jones Day

12  attorneys; correct?

13  A   The person lobbying me or recommending and pushing me to

14  do this even before this date was Miller Buckfire.

15  Q   And it was Miller Buckfire that brought in Jones Day?

16  A   Yes.

17  Q   So the concern was just how much control the state would

18  have over a city that was subject to the appointment of a

19  financial emergency manager; correct?

20  A   Can you restate that question?

21  Q   The concern that you just indicated that was being raised

22  was the level of control that the state would have over a

23  city in the event an emergency manager was appointed?

24  A   There's other provisions in state law that give us the

25  ability to negotiate a consent agreement, so we examined what

1  those other ones were in case PA 4 was resolved.  And you go

2  through all this effort of creating the consent agreement,

3  and if PA 4 was repealed and it didn't rely on those other

4  provisions of state law, then there would have been an issue,

5  and a lot of that work and effort to have a viable working

6  consent agreement would have been lost.

7          MS. BRIMER:  So if we could see Exhibit 840.

8  BY MS. BRIMER:

9  Q   You'll see about a third of the way down an e-mail from

10  Laura Marcero -- Marcero -- and it's addressed to you;

11  correct?

12  A   Correct.

13  Q   It's dated March 25th, 2012; correct?

14  A   Correct.

15  Q   Do you recall seeing this e-mail?

16  A   Yeah.  I have a memory of this.

17  Q   You have a memory of this?

18          MS. BRIMER:  Just to be clear, your Honor, I'd like

19  to move for the admission of the e-mail -- the portion of

20  this exhibit that is an e-mail addressed to Mr. Dillon.

21          THE COURT:  And what number again is that?

22          MS. BRIMER:  840, your Honor.

23          THE COURT:  Any objections?

24          MR. SHUMAKER:  Yes, your Honor.  It's hearsay.

25          THE COURT:  All right.  That objection is overruled.

1      MS. BRIMER:  Thank you, your Honor.

2      THE COURT:  The document is admitted or this much of

3  the document is admitted.

4      (Exhibit 840 excerpt received at 9:48 a.m.)

5  BY MS. BRIMER:

6  Q   And if you'll go down to paragraph 4, the first sentence,

7  this e-mail is regarding concerns, you would agree, over a

8  draft of the consent agreement that the city had sent back to

9  Treasury; correct?

10  A   I'm sorry.  I was reading it when you were asking -- let

11  me -- can I read it --

12  Q   Go right ahead.

13  A   -- over again?  Okay.

14  Q   So the content of the e-mail regards a revised draft of

15  the consent agreement that had been forwarded to Treasury

16  from the city; correct?

17  A   Correct.

18  Q   Okay.  And you'll see paragraph 4, the first sentence,

19  "The ability to call defaults on projects and diminish the

20  mayor's authority seems to have limitations now," so the

21  concern was drafting an agreement that would allow the state

22  to take control and authority from the mayor; correct?

23  A   I believe that this was in conjunction with the financing

24  we did, and money was in escrow.  And there were certain

25  milestones the city had to meet to achieve a consent

1   agreement, which we wanted to achieve as well.  We didn't

2   want to go to emergency status, so when we negotiate a

3   consent agreement, whether it be with Detroit or any other

4   unit, there's certain expectations that we have, and these

5   units have to hit certain milestones or benchmarks to stay in

6   a consent agreement relationship where they have their

7   authority, so, yeah, there's certain requirements that we

8   had, and with Detroit being such a significant operation, we

9   had expectations that they would meet during the consent

10   agreement so that they could stay in it.

11   Q    So was the milestone agreement executed before the

12   consent agreement?

13   A    It became part of it.

14   Q    Was it executed before, though, or after?

15   A    Actually, the milestones were pretty much universally

16   agreed between the city and the state.  By that I mean there

17   wasn't a lot of dispute about what should be in there.

18   Q    So even after the consent agreement was drafted, Miller

19   Buckfire, Huron Consulting, and Jones Day continued to advise

20   Treasury and you yourself individually in connection with the

21   situation in the City of Detroit; correct?

22   A    I don't believe so.

23        MS. BRIMER:  Your Honor, I'd like to show an exhibit

24   that I believe has not yet been admitted.  842 has not been

25   admitted, has it?  I'll show Ms. Nelson.  If I may approach,

 1    your Honor --

 2              THE COURT:  I'm sorry.  I can't permit you to have a

 3    private conversation with the witness.  If there's something

 4    you'd like to say to him, you can feel free to say it at --

 5              MS. BRIMER:  I directed him to look, your Honor --

 6              THE COURT:  I'm sorry.  You can feel free to say it

 7    at the microphone so that it is on the record.

 8              MS. BRIMER:  For the record, your Honor, I directed

 9    him to the paragraph that I identified for Ms. Nelson that I

10    believe may refresh his recollection.

11              THE WITNESS:  Okay.  Could you restate the question?

12    BY MS. BRIMER:

13    Q   Does that refresh your recollection with respect to the

14    continued advice and consulting that Treasury and you

15    individually were receiving from Jones Day, Miller Buckfire,

16    and Huron Consulting even after the consent agreement was

17    finalized?

18    A   Yeah.  After the -- before the consent agreement was

19    finalized, there was very, very frequent, if not daily,

20    conversations with Hugh Sawyer and Laura and Miller Buckfire

21    to maybe a lesser extent, very little dialogue with us and

22    Jones Day other than for a few of these e-mails and some of

23    their comments on the drafts.  After the consent agreement

24    was in place, we stayed in touch but on a much less frequent

25    basis.

1    Q   And after the consent agreement, what matters did you

2    remain in touch with the -- Jones Day and other -- Miller

3    Buckfire and Huron Consulting individuals in connection with?

4    A   I don't recall any contacts with Jones Day after it until

5    2013 let's say, and then -- I mean throughout -- there could

6    be various issues that came up, and we may pick up the phone

7    and ask for advice from Hugh or Laura, and I think there was

8    similar infrequent contact with Miller Buckfire.

9    Q   So I believe Ms. Green asked you whether or not you were

10   aware of a meeting in June between Ms. Lennox, Mr. Buckfire,

11   and the governor, and I don't recall your answer to that.

12   A   I think I said I didn't remember.

13   Q   So it's possible that the governor's office continued to

14   remain in contact with the Jones Day attorneys without your

15   being aware of that?

16         MS. NELSON:  I'm going to object.  Inappropriate

17   hypothetical and lacks foundation.

18         THE COURT:  The objection is sustained.

19   BY MS. BRIMER:

20   Q   Now, at some point Public Act 4 was, in fact, repealed;

21   correct?

22   A   Correct.

23   Q   And a new law was enacted, what we've referred to as

24   Public Act 436; correct?

25   A   Correct.

1    Q    Who was responsible for drafting PA 436?

2    A    Right after the election, there was -- I probably

3    attended two or three meetings with the governor and Brom

4    Stibitz from my staff and maybe a few folks from the

5    Governor's Office to discuss, you know, what about PA 4 could

6    be improved.  There were some items that we just learned by

7    working with PA 4 that we wanted in a new law, and then some

8    of the criticisms of PA 4 we genuinely sought to address,

9    giving locals more control, different options than just going

10   into emergency, so I attended -- I don't know -- two to four

11   maybe meetings during mid- to late November through early

12   December.  The governor drew up -- kind of put a little chart

13   together that showed what the new law could look like.  From

14   that point forward, it was folks on my staff and the

15   Governor's Office that moved the legislation through the

16   legislature.

17   Q    Now, to be clear, the appointment of Kevyn Orr was under

18   PA 72; correct?

19   A    I believe so, for three days.

20   Q    And he automatically became the emergency manager under

21   PA 436; correct?

22   A    That's my understanding, yes.

23   Q    So the city did not have any of the other options that

24   were added into PA 436 to avoid the appointment of an

25   emergency manager; correct?

1  A    Correct.

2  Q    Okay.  Now, one of the things PA 436 included were some

3  spending provisions.  Do you recall those?

4  A    Yes.

5  Q    Who drafted those provisions?  Do you know?

6  A    I don't.

7  Q    Have you reviewed those spending provisions?

8  A    Yeah.  I know that my office did the calculation of how

9  much money -- one of the new requirements of 436 was that

10 Treasury would have to pay emergency managers.  That was one

11 of the criticisms of PA 4, that you put someone in place and

12 then you make them pay for them, so I know my office did the

13 calculations to identify how much we would need to pay the

14 salaries of the EM's that were in place throughout the state,

15 and I believe that number was about 780,000.

16 Q    So when you performed your calculation, did you only

17 address those emergency managers that were in place at the

18 time, or did you address the potential emergency managers

19 that the state was aware it intended on or hoped to put in

20 place?

21 A    Someone on my staff did that calculation.  I can't speak

22 to what the components of it were.

23 Q    Did you ever review the financial analysis that was

24 performed by your staff?

25 A    No.  I think they just shared the number with me, that

1    that's what we would need to get through the fiscal year.

2    Q    And there was then a second spending provision; correct?

3    A    Yes.

4    Q    And that provided for funds to cover consultants;

5    correct?

6    A    Correct.

7    Q    And that was approximately $5 million?

8    A    Right.

9    Q    Do you believe those spending provisions were adequate to

10   cover both the salaries for the emergency managers and the

11   professionals that emergency managers may retain?

12   A    I'm pretty certain they were -- the emergency manager

13   number was probably quite close because it was very

14   predictable.  The consultant costs, you know, those

15   consultants, you never can trust them.  They get really

16   expensive.

17   Q    Well, let's just talk about the consultants for a moment.

18   As time went on, was that, in fact, sufficient to cover the

19   fees of the consultants in connection, for example, with the

20   City of Detroit?

21   A    Well, so far we haven't had to go back to the legislature

22   to ask for additional money, so I -- so far it's been

23   adequate.

24   Q    So the $5 million has covered the Jones Day attorneys'

25   fees, the Miller Buckfire, the Conway MacKenzie, and the

1  Ernst & Young fees in connection with the City of Detroit
2  from -- I believe it would have just been from the effective
3  date, March 28th, through September?
4  A   You'd have to ask -- I go to Brom Stibitz when I want to
5  know how we're doing on resources to hire consultants, and he
6  just tells me we're fine or we're not fine.  I can't speak to
7  the specifics.
8  Q   Well, at some point you did become concerned, did you
9  not?
10 A   I worry about a lot of things.
11        MS. BRIMER:  Your Honor, I'd like to show the
12 witness an exhibit, an e-mail that is, in fact, from him.  I
13 shared it with Ms. Nelson.
14        THE COURT:  What are you showing him?  Is it an
15 exhibit number?
16        MS. BRIMER:  Well, we can mark it as Exhibit 206,
17 your Honor.
18        THE COURT:  Okay.
19     (Exhibit 206 marked at 10:02 a.m.)
20        MR. SHUMAKER:  Your Honor, we would state an
21 objection.  This is not -- this document was not a mystery
22 and wasn't placed on their exhibit list at the beginning of
23 trial.
24        THE COURT:  Well, let's see if it's offered into
25 evidence, and then I'll hear your objection.  Are you asking

1  the witness to have a look at it?

2  BY MS. BRIMER:

3  Q   Have you had a chance to review that?

4  A   Yes.

5  Q   That's an e-mail from you --

6  A   Yes.

7  Q   -- dated June 11, 2013?

8  A   Yes.

9  Q   Do you recall sending this e-mail?

10  A   Very much so.

11        MS. BRIMER:  Your Honor, it was not offered at the

12  time the pretrial was prepared.  I believe this runs directly

13  to the issue of whether or not the spending provision was, in

14  fact, ever properly evaluated.

15        THE COURT:  Isn't relevance.  It's why wasn't it on

16  the original exhibit list.

17        MS. BRIMER:  I think I can explain, your Honor.

18  Your Honor only on the day -- the day before the pretrial was

19  finalized suggested that your Honor would take evidence

20  regarding the intent on the referendum, and this exhibit,

21  your Honor, was produced by the city.  It was used in Mr.

22  Dillon's deposition.  It is certainly not a shock and

23  surprise to the parties.

24        THE COURT:  It certainly would not have surprised

25  you that I would be willing to take evidence on that point

1  since you advocated that.  You didn't think you were going to

2  lose, did you?

3            MS. BRIMER:  No, your Honor, but your Honor had

4  suggested that it was a legal issue.  I think I can ask the

5  witness a few questions then if -- I believe it's relevant.

6  I believe it should be admitted.

7            THE COURT:  The issue is not relevance.

8            MS. BRIMER:  I understand that, your Honor.

9            THE COURT:  In light of the failure to list it and

10  the lack of cause for that, the Court sustains the objection.

11  BY MS. BRIMER:

12  Q   So isn't it true, Mr. Dillon, that by June 11 of 2013,

13  the state was already running out of money in connection with

14  the fees of the consultants?

15  A   What I was referring to here was a forecast of what --

16            THE COURT:  Mr. Dillon, the document has not been

17  admitted into evidence, so don't tell us what's in it.  Just

18  answer the question.

19            THE WITNESS:  All right.  Going forward, sure, the

20  money would not have been adequate.

21  BY MS. BRIMER:

22  Q   Now, you testified to Ms. Levine -- when she asked you

23  why Jones Day was involved with the state in March of 2012,

24  you indicated that you knew that they were always interested

25  in this case, so you knew as early as March of 2012 that

1    Jones Day was interested in a Chapter 9 for the City of

2    Detroit; correct?

3            MR. SHUMAKER:  Objection.  Asked and answered.

4            MS. NELSON:  Same objection, your Honor.

5            THE COURT:  Sustained.

6    BY MS. BRIMER:

7    Q    So then you were involved in the March -- excuse me --

8    the interview process for the preliminary interview in

9    January of 20 -- January 29th, 2013, for the attorneys;

10   correct?

11   A    Correct.

12           MS. NELSON:  Objection.  Asked and answered.

13   BY MS. BRIMER:

14   Q    And that initial interview on January 29th was merely to

15   narrow down the firms that would then be invited to submit a

16   response to the RFP that would later be issued; correct?

17           MS. NELSON:  Objection, your Honor.  This whole line

18   has been asked and answered on Tuesday.

19           MS. BRIMER:  I have two or three questions that have

20   not been asked.  That question was not asked.

21           THE COURT:  I don't think that specific one was, so

22   you may answer that, sir.

23           THE WITNESS:  There's very specific procurement

24   rules, so I hesitate to say "yes," but I did participate in a

25   day of meetings at the airport where several law firms were

1  interviewed.  Now, legally, what follows from that to

2  actually make them eligible to be hired, I won't -- I'm not

3  an expert on the procurement practices of the city or the

4  state.

5  BY MS. BRIMER:

6  Q   Were you aware that Miller Buckfire had provided the

7  interview questions to the Jones Day attorneys prior to the

8  interview?

9  A   I don't think I ever saw the questions myself, so I don't

10  know that, no.

11  Q   Okay.  So after the interview process, who drafted the

12  RFP?  Do you know?

13  A   I do not.

14  Q   Could it have been Miller Buckfire?

15  A   Is it possible that they did?  I mean is that the

16  question?

17  Q   Yes.

18         MS. NELSON:  I'm going to object.  Calls for

19  speculation.  He's already indicated he doesn't know.

20  BY MS. BRIMER:

21  Q   Was it someone on the staff of Treasury that drafted the

22  RFP?

23         MS. NELSON:  Same objection, your Honor.  That's

24  been asked and answered.  He indicated he doesn't know.  This

25  would call for speculation.

1          THE COURT:  Do you know the answer to that question?

2          THE WITNESS:  I don't know who drafted it.

3    BY MS. BRIMER:

4    Q    Do you recall asking Brom Stibitz to put together a

5    stable of bankruptcy attorneys for future Chapter 9's?

6    A    It doesn't sound unlikely.  I knew that we would probably

7    need some in case these things --

8          THE COURT:  The question is do you remember doing

9    that?

10         THE WITNESS:  Generally, yes.

11   BY MS. BRIMER:

12   Q    And did Mr. Stibitz provide you with a list of potential

13   bankruptcy attorneys?

14   A    I think we did an RFP.  We've done two RFP's, I believe,

15   at Treasury to get people on a list that we can tap if we

16   need.

17   Q    And was Jones Day one of the firms that responded to

18   either of those RFP's?

19   A    I don't have a memory, but apparently they did because I

20   think I've seen something during this process where their

21   name is on the state list as well.

22   Q    Okay.  Did you ever disclose to anyone with the City of

23   Detroit that Miller Buckfire had performed a 60-day review

24   for the city -- for the state of the city's finances in early

25   2012?

1    A    I think they were very familiar that they were doing

2    that, yes, because they worked with the city.  They were

3    present in City Hall.

4    Q    Did you advise the city that -- prior to the engagement

5    of Jones Day that Jones Day had been working with the state

6    on the consent agreement?

7    A    I don't believe I did.

8    Q    Did Jones Day have any involvement in the drafting of PA

9    436?

10   A    Not to my knowledge.

11   Q    Do you know whether or not anyone on your staff provided

12   Jones Day with copies of drafts of PA 436?

13   A    I don't recall that.

14   Q    Have you ever heard of the hundred day plan?

15   A    Yes.

16   Q    And what was that?

17   A    It can be a term of art, but generally when you come in,

18   you -- if you're in a turnaround situation, you have a goal

19   to accomplish certain things within a hundred days.

20   Q    And in the event those goals aren't accomplished, a

21   bankruptcy would then be filed?  Is that --

22   A    Not necessarily, no.

23   Q    Did the state institute a 100-day plan in connection with

24   the City of Detroit?

25   A    I believe we had one during the -- for the consent

1  agreement, and then I believe -- under 436 there's certain

2  reports that have to come in with a certain number of days,

3  and I don't think any of those reports line up to a hundred

4  days.  I think there's 45 days and six months, what's in the

5  law.

6  Q   And isn't it true that at least as early as March of 2012

7  Treasury personnel who worked directly for you were

8  discussing a Chapter 9 on behalf of the city with the Jones

9  Day attorneys?

10 A   I don't know what you mean by "discussing."  Chapter 9

11 was always an option, but it was the last resort.  We

12 obviously were fighting to get to a consent agreement with

13 the city and wanted to avoid even emergency, so if we were

14 thinking of Chapter 9, then we would not have gone consent

15 agreement because you couldn't get into 9 that way.

16 Q   But under the then existing law, the consent agreement

17 was the way to proceed; correct?

18 A   No.  Under a consent agreement, you can't enter Chapter

19 9.

20 Q   Okay.

21         MS. BRIMER:  I have nothing else, your Honor.

22         THE COURT:  Thank you.  Any other questions for the

23 witness?

24         MS. PATEK:  Your Honor, Barbara Patek on behalf of

25 the Detroit public safety unions.

1     DIRECT EXAMINATION

2    BY MS. PATEK:

3    Q   Mr. Dillon, I represent the Detroit public safety unions.

4    Good morning.  I have a handful of questions for you.  At or

5    about the time of Mr. Orr's appointment -- well, strike that.

6    Going back to your involvement with the situation in the City

7    of Detroit even from the time you became state treasurer,

8    were you aware that the police and fire fighters for the City

9    of Detroit were not eligible through their employment at the

10   City of Detroit for Social Security?

11   A   It was a -- we were aware that that was very likely the

12   case.  I never saw a report that said who was and who wasn't,

13   but we knew that was a real issue.

14   Q   And was that an important issue to you?

15   A   Yes.

16   Q   And at any time before Mr. Orr's appointment, did you

17   take it upon yourself to confirm whether or not, in fact, the

18   City of Detroit fire fighters and police were eligible for

19   Social Security?

20   A   We asked quite often -- my memory is that there may be

21   some that were eligible at some point, but I couldn't tell

22   you what percentage are eligible versus not.

23   Q   Do you know whether or not police officers and fire

24   fighters hired before March 31st, 1986, are eligible for

25   Medicare?

1          MS. NELSON:  I'm going to object to this line of

2    questioning, your Honor, as irrelevant.  I don't know how

3    this has any relevance to the eligibility issues or Mr.

4    Dillon's testimony.

5          THE COURT:  No.  I see the relevance.  I'll permit

6    it.  Go ahead.

7          THE WITNESS:  I was aware of the issue.  It was

8    important to me, but the specific dates and numbers I

9    didn't -- I wasn't familiar with.

10   BY MS. PATEK:

11   Q   Did you ever determine whether or not for those officers

12   not covered by Social Security they had to, as a matter of

13   federal law, be provided a certain minimum level of

14   retirement benefits by the state?

15   A   I'm not familiar with that.

16   Q   And you're not aware of that sitting here today?

17   A   No.

18   Q   You would agree with me in these Chapter 9 proceedings

19   that one of the things that cannot happen is that the City of

20   Detroit cannot be liquidated?

21   A   I don't know if it's a legal impossibility, but it's not

22   something that we ever envisioned.  I think the City of

23   Detroit will need to carry on and move forward.

24   Q   And among the City of Detroit's obligations in carrying

25   on and moving forward is providing effective police and fire

1   services.  Would you agree with that?

2   A   Very much so.

3   Q   And that would be absolutely essential to any

4   restructuring?

5   A   Yes.

6   Q   Do you believe that -- well, strike that.  I want to -- I

7   want to go back to an issue that came up earlier with Ms.

8   Green.  You were asked some questions about an Act 312

9   arbitration.  Do you know what Act 312 is?

10  A   I do.

11  Q   And that's a procedure or a statute that provides for a

12  mechanism, including mediation and arbitration, by which the

13  public safety unions resolve their employment disputes with

14  the particular municipality; is that right?

15  A   That's right.

16  Q   And isn't it true that at or near the time Mr. Orr was

17  about to be appointed as the emergency manager of the City of

18  Detroit, that there was a pending Act 312 arbitration

19  proceeding involving the Detroit Police Officers Association

20  and the City of Detroit?

21  A   Yes.

22  Q   Was there a concern on the part of Treasury that if --

23  well, strike that.  Do you understand that when an Act 312

24  award is issued following the conclusion of those

25  proceedings, that the results of that award become part of

1 the collective bargaining agreement between the union and the
2 municipality?

3 A   That's my general understanding.

4 Q   And did you have an understanding that if, in fact, an
5 Act 312 award were to issue in connection with the ongoing
6 proceedings between the city and the Detroit Police Officers
7 Association, that that would potentially extend the length of
8 the collective bargaining agreement between the Detroit
9 Police Officers Association and the City of Detroit?

10 A   I assume it could do a lot of things.

11 Q   And would that be one of them, to extend the length of
12 the agreement?

13 A   I'm not an expert on 312.  I can't say that it was not
14 one of the things that could have happened, but I do recall
15 that he had -- I don't recall extending the CBA is an item,
16 but it very may well have been.

17 Q   Were you concerned about the Act 312 award providing
18 certain terms to the Detroit police officers that would be
19 contrary to what the state was thinking would be an
20 appropriate restructuring plan?

21 A   I had concerns about an award that could -- that the city
22 couldn't afford, that it was a possibility.

23 Q   Were you looking for a mechanism to prevent those Act 312
24 proceedings involving the city and the Detroit Police
25 Officers Association from coming to a conclusion?

1   A   Mechanisms to prevent?  I can tell you I was concerned

2   about whipsawing the police and fire and having something

3   come out that wasn't sustainable and may have to be adjusted

4   in an emergency status, so I had concerns, yes.

5   Q   You didn't want them, for example, to get some wage cuts

6   reinstated only to have those reimposed again by an emergency

7   manager?

8   A   It was a concern of mine.

9   Q   Do you believe -- or did you believe as state treasurer

10  that the morale of the Detroit public safety unions,

11  including the Detroit Police Officers Association, was

12  important to their ability to provide the public safety

13  services required by the City of Detroit?

14  A   Yes.  And I also believe that they, unfortunately, are

15  underpaid.  If you look at them compared to comparable

16  cities, they're not overpaid, and it's just unfortunate the

17  city didn't have the resources to pay more.

18  Q   And would you also agree that as a general matter, based

19  upon your knowledge as state treasurer at the time, that they

20  were undermanned; this is, that there were not enough of them

21  out there to really provide effective public safety?

22  A   That's a tougher question because a lot of the

23  information we had is that two-thirds of the police, for

24  example, worked behind desks rather than on the street, so I

25  don't know if it was a lack of personnel or just they could

1  be better utilized.  As it relates to the fire, I don't have

2  that similar information.

3  Q   And with respect to the police, let me reframe the

4  question.  With respect to police officers on the street, was

5  your understanding that there was an inadequate number of

6  those?

7  A   I believe there may have been.

8  Q   Was there -- well, strike that.  Was it part of the

9  restructuring plan, at least as it was envisioned by the

10  state, to have all of the collective bargaining agreements

11  for the public safety unions expire sometime in the summer of

12  2013?

13  A   I don't know if I understand the question.

14  Q   Was there -- was part of the goal of the restructuring to

15  put the -- either the state, through an emergency manager, or

16  the city in a position to impose terms without having to

17  bargain or negotiate with its public safety employees?

18  A   In what time frame?

19  Q   In the time frame leading up to and after the appointment

20  of Mr. Orr as the emergency manager.

21  A   In 2013, I think that was less of a consideration because

22  the emergency manager has that power if he needs to do it.

23  Q   Are you aware whether or not the Act 312 -- an Act 312

24  award ever issued in the arbitration between the City of

25  Detroit and the Detroit Police Officers Association?

1  A   My memory is that one did.

2  Q   And is it your understanding in that regard that that

3  agreement then became part or that award then became part of

4  the collective bargaining agreement between the city and the

5  Detroit Police Officers Association?

6  A   That's my memory.

7  Q   You told me earlier that the issue of whether or not

8  police and fire received Social Security benefits was an

9  important issue to you, and let me step back from that as a

10  moment -- your understanding is if they don't -- if the city

11  doesn't contribute and they don't participate in Social

12  Security, they are also not eligible through their city

13  employment for Social Security Disability benefits; is that

14  right?

15  A   I don't think my understanding related to disability.

16  Q   You didn't have any understanding one way or the other as

17  to whether or not these fire fighters and police officers

18  would be eligible for Social Security Disability whether or

19  not the city participated in the Social Security program?

20  A   Yeah.  I don't recall the aspect of Social Security as it

21  relates to disability being discussed in any of the meetings

22  I attended.

23  Q   Do you think disability is a significant issue for police

24  and fire fighters?

25  A   I understand it may well be.

1    Q    Do you think it would be an important part of the

2    equation in terms of the city's ability to provide the

3    essential services of public safety?

4    A    Yes.

5    Q    And is that why the Social Security issue was, in part,

6    important to you?

7    A    I'm not -- I viewed it more in terms of retirement.  I'm

8    not certain -- and I'm not a benefits experts -- about if

9    you're an active employee and you are injured on the job

10   site, is it your employment insurance or Social Security

11   Disability?  I'm not an expert to have an opinion on that.

12   Q    Would it trouble you to know that police officers

13   currently who do not have from some other source access to

14   Social Security are not entitled to Social Security

15   Disability given what has been proposed by the emergency

16   manager in terms of impairing their pension benefits?

17            MS. NELSON:  Objection.  Relevance.

18            THE COURT:  Sustained.

19   BY MS. PATEK:

20   Q    You told us, based upon your experience as treasurer,

21   that you did not see any scenario where the Michigan

22   legislature would be willing to help the City of Detroit with

23   its pension funding problem; is that correct?

24   A    I was asked the question about would the funds come from

25   the state, and I answered it with, I think, I thought it

1   might be difficult to get the Michigan legislature to

2   appropriate funds for that.

3   Q   Would it be fair to say that it's your impression that

4   the Michigan legislature lacks the political will to provide

5   such assistance?

6           MS. NELSON:  Objection.  Relevance and speculation.

7           MS. PATEK:  Your Honor, I think this is entirely

8   relevant to the issue of bad faith and eligibility in terms

9   of the purpose for which these Chapter 9 proceedings are

10  being used.

11          MS. NELSON:  If I may address that, your Honor,

12  she's clearly asking a political question, which is outside

13  the scope of not only the Court's jurisdiction but the

14  eligibility factors that are to be considered for purposes of

15  this case.

16          MS. PATEK:  If I may respond, your Honor, I would

17  think that if these Chapter 9 proceedings were, in fact,

18  being used for a political purpose, which I think is not

19  unfathomable given the record --

20          THE COURT:  My only problem with the question is the

21  phrase "political will."  I'm not sure what that means.  You

22  can ask him why he has this belief, but --

23          MS. PATEK:  I think --

24          THE COURT:  -- I think a more direct question there

25  would be appropriate.

1  BY MS. PATEK:

2  Q   I'll take the Court's question, Mr. Dillon.  Why do you

3  have the belief that there would be no set of circumstances

4  that you can envision in which the Michigan legislature would

5  provide support to the City of Detroit for its pension

6  problem?

7  A   I don't know if I described the situation that way, but

8  having served in the legislature for six years and

9  understanding a lot of the mentality of people that don't

10  come from the Detroit area, I think it would be very

11  difficult to get them to subsidize or fund or support Detroit

12  with an appropriation.

13          THE COURT:  Excuse me one second.  Would you just

14  slide back a little bit from the microphone?  Thank you.

15  BY MS. PATEK:

16  Q   You're saying it would be difficult to get the Michigan

17  legislature to support Detroit with an appropriation for any

18  purpose?

19  A   I didn't say that, but I think if it was funding

20  something about a historical liability, I think that would be

21  much more difficult.

22  Q   In terms of revitalizing the city, providing blight

23  relief, is that something that you believe they might fund?

24  A   I think it would have a much better chance.

25  Q   You were asked a couple questions about -- or by Ms.

1  Green and then later Ms. Brimer about the timing of the

2  appointment of Mr. Orr as the emergency manager, and it's

3  true, is it not, that by appointing Mr. Orr on March 25th

4  three days before the effective date of Public Act 436, that

5  that removed from the City of Detroit the right to choose

6  some of the new options available under Public Act 436?

7          MS. NELSON:  Asked and answered, your Honor.

8          MS. PATEK:  This is foundational, and I can go to

9  my --

10          THE COURT:  Please.

11  BY MS. PATEK:

12  Q   One of those options was a negotiated -- or a period of

13  negotiations to attempt to do an out-of-court workout; is

14  that right?

15  A   Can you start from the beginning?

16  Q   Yeah, yeah.  Are you generally familiar with Public Act

17  436 and those four options it gave to a municipality?

18  A   Yes.

19  Q   And among those options were a consent agreement, which

20  the City of Detroit had already done; correct?

21  A   Yes.

22  Q   And the consent agreement itself, did that provide if the

23  City of Detroit didn't make its metrics that an emergency

24  manager would be put into place?

25  A   You can have a default of a consent agreement that then

1   leads to a different option.

2   Q   I'm asking you, though, in this particular case, the

3   April 4th, 2012, consent agreement, that did not have as a

4   default option the appointment of an emergency manager, did

5   it?

6   A   I'd have to review the document.

7   Q   With respect to Public Act 436 --

8          MS. PATEK:  Can you put up -- I think it's 721.

9   This is just actually the act itself, and I want Section 25.

10          MR. SHUMAKER:  Your Honor, 721 is not on the exhibit

11  list.

12          MS. PATEK:  And I'm just going to ask the -- I'm

13  just putting up the text of Public Act 436 --

14          THE COURT:  I'll permit that.

15          MS. PATEK:  -- which is --

16  BY MS. PATEK:

17  Q   Mr. Dillon, you see the text of Section 25 of Public Act

18  436 in front of you there?

19  A   Yes.

20  Q   And one of the options given to a community or a

21  municipality under Public Act 436 was a neutral evaluation

22  process; isn't that right?

23  A   Right.

24  Q   And that neutral evaluation process provided by Public

25  Act 436 is not unlike the mediation process now ongoing in

 1   these Chapter 9 proceedings; isn't that right?

 2         MS. NELSON:  Objection.  Calls for a legal

 3   conclusion and speculation.  He's not participating in that

 4   process.

 5         MS. PATEK:  Well, I believe the state has been

 6   ordered into the process.

 7         THE COURT:  You can ask the witness his

 8   understanding.

 9   BY MS. PATEK:

10   Q   Are you aware that there is in these Chapter 9

11   proceedings confidential mediation proceedings supervised by

12   the Court?

13   A   I'm aware that they're ongoing.

14   Q   And is the neutral evaluation process provided by Public

15   Act 436 similar to the mediation process in these

16   proceedings, to your knowledge and understanding?

17   A   We've never had one in Michigan, so -- and I'm not part

18   of these here, so I can't answer that.

19   Q   We can agree, however, by appointing Mr. Orr three days

20   before the effective day of Public Act 436 this neutral

21   evaluation option was taken away from the City of Detroit?

22   A   I don't recall what triggered the emergency, whether

23   if -- I don't recall the date the governor decided that he

24   was going to declare an emergency in Detroit.

25   Q   So you can't answer -- you don't know the answer to that

1   question?

2   A   I don't know if it's triggered by the date Kevyn Orr

3   started or by the governor's declaration of emergency.  I

4   don't recall the -- what the statute says on that point, but

5   I would guess it's the date the governor declares the

6   emergency is what would answer your question, not the date

7   that the manager is hired.

8   Q   Well, isn't it accurate that one of the things that

9   Public Act 436 did was to make sure that actions that had

10   been taken under former Public Act 4 or former Public Act 72

11   would be sustained and continue on?

12   A   Right.

13   Q   And that included an appointment, for example, of an

14   emergency manager under Public Act 72?

15   A   Right.

16         MS. PATEK:  That's all I have.

17                 DIRECT EXAMINATION

18   BY MR. MONTGOMERY:

19   Q   Good morning, Mr. Dillon.

20   A   Good morning.

21   Q   Claude Montgomery.  Real simple line of inquiry regarding

22   one topic.  You were very much involved in trying to

23   understand the pension questions for the state, were you not,

24   for the City of Detroit?

25   A   I wouldn't say very much involved.

1  Q   You would not say you were very much involved?

2  A   Well, there was -- the consultants on the ground were

3  very focused on it, and a professional firm was hired to do

4  evaluation, so I was aware that those were going on, but I

5  was not in day-to-day work groups working through those

6  numbers.

7  Q   But you were trying to follow the issue as best you could

8  as treasurer, were you not?

9  A   Yes.

10 Q   And from time to time you would inform the governor of

11 your views with respect to pension issues, did you not?

12 A   I did, yeah.

13 Q   And focusing on the time period on or about July 9, 2013,

14 do you remember having formed the conclusion that from your

15 perspective you were still in the informational stage with

16 respect to pensions?

17 A   Yes.

18 Q   And do you recall telling the governor that on or about

19 July 9?

20 A   Yes.

21 Q   And did you do so by e-mail?

22 A   Yes.

23          MR. MONTGOMERY:  Could you put on the screen,

24 please, common Exhibit 438?  If you could expand the "to" and

25 "from" line, please, first.

1  BY MR. MONTGOMERY:

2  Q   Did you, in fact, send this e-mail on or about July 9,

3  2013?

4        MS. NELSON:  Your Honor, this has been asked and

5  answered and was admitted as an exhibit on Tuesday through

6  the treasurer's testimony, and he testified about this e-mail

7  and specifically the "to" and the "from."

8        MR. MONTGOMERY:  Well, that's interesting because my

9  notes still had objected to hearsay, so I was going to move

10  its admission to make sure it was part of the record.

11        THE COURT:  What number is it?

12        MR. MONTGOMERY:  438.

13        MR. SHUMAKER:  The city does object because it's

14  hearsay, your Honor.

15        MR. MONTGOMERY:  There we go.

16        THE COURT:  Kelli, do we show it admitted?  Can you

17  open up the exhibit for me to see the whole thing?  Thank

18  you.  And do you recognize this exhibit, sir?

19        MR. MONTGOMERY:  Yes.

20        THE COURT:  It's admitted.

21     (Exhibit 438 received at 10:35 a.m.)

22        MR. MONTGOMERY:  Thank you.

23  BY MR. MONTGOMERY:

24  Q   And so just to conclude, sir, on or about July 9, you

25  shared with the governor your opinion that you were still in

1  the informational stage with respect to pensions, did you
2  not?
3  A   Yes.
4  Q   Okay.  And --
5            THE COURT:  Sir, I'm advised that you need to be
6  closer to the microphone or have it pointed more at you
7  because the other room is having trouble hearing you.
8            MR. MONTGOMERY:  Is that better, your Honor?
9  Better?
10           THE COURT:  There you go.
11           MR. MONTGOMERY:  Okay.
12           THE COURT:  Try that.
13 BY MR. MONTGOMERY:
14 Q   So, again, I believe my question was on or about July 9,
15 you informed the governor of your opinion that with respect
16 to pensions you were still very much in the informational
17 stage?
18 A   Yes.
19           MR. MONTGOMERY:  All right.  Thank you.  No further
20 questions, your Honor.
21           THE COURT:  Any other questions from counsel on
22 this?  Cross-examination.
23           MS. NELSON:  No questions, your Honor.
24           MR. SHUMAKER:  The city has no questions, your
25 Honor.

 1          THE COURT:  All right.  Mr. Dillon, thank you very

 2   much for your testimony.  You're excused.

 3          THE WITNESS:  Thank you, Judge.

 4     (Witness excused at 10:36 a.m.)

 5          THE COURT:  And let's take our morning break now and

 6   reconvene in 15 minutes at 10:50, please.

 7          THE CLERK:  All rise.  Court is in recess.

 8     (Recess at 10:36 a.m. until 10:50 a.m.)

 9          THE CLERK:  All rise.  Court is in session.  Please

10   be seated.

11          MR. WERTHEIMER:  William Wertheimer, your Honor, on

12   behalf of the Flowers plaintiffs and the UAW for this

13   witness, and we will call Richard Baird.  I would indicate

14   that -- or request that the Court give permission to allow

15   the examination pursuant to Rule 611(c).

16          THE COURT:  Thank you.  Any objections to that?

17          MR. SHUMAKER:  No objection, your Honor.

18          THE COURT:  You may.

19          MR. ELLSWORTH:  Your Honor, I'm Peter Ellsworth on

20   behalf of the state.

21          THE COURT:  Welcome, sir.  Step forward, please,

22   sir.  Just step over here, and then I will administer the

23   oath to you.

24               RICHARD BAIRD, WITNESS, SWORN

25          THE COURT:  Please sit down.

1      DIRECT EXAMINATION

2  BY MR. WERTHEIMER:

3  Q   Would you state your name for the record, please?

4  A   Richard L. Baird.

5  Q   Mr. Baird, you are appearing here pursuant to subpoena;

6  is that correct?

7  A   Yes.

8  Q   And are you currently a state employee?

9  A   Yes.

10  Q   When did you become a state employee?

11  A   October 16th.

12  Q   Of this year?

13  A   Yes.

14  Q   You were involved with working indirectly for the

15  governor from the time he took office, were you not?

16  A   Yes.

17  Q   I'd like to ask you just a couple of questions about what

18  your relationship was at that -- at the time from your

19  beginning with the governor up until you became a state

20  employee a couple of weeks ago.  Okay?

21  A   Sure.

22  Q   Are you familiar with an organization called MI Partners,

23  LLC?

24  A   Yes.

25  Q   And what is it?

1    A    It is a limited liability corporation incorporated in the

2    State of Michigan, and it does organization development and

3    consulting.

4    Q    And are you an employee -- or were you an employee during

5    that time period -- that is, from 2011 up until a couple of

6    weeks ago -- of MI Partners, LLC?

7    A    I was the founder and the only employee.

8    Q    And you're the owner of it?

9    A    Yes.

10   Q    No other owners?

11   A    No.

12   Q    And what business does it -- is it in or was it in during

13   the time period we're talking?

14   A    Predominantly organizational consulting, team

15   development, talent selection.

16   Q    And how --

17        THE COURT:  One second, please.  Can you either pull

18   the microphone a few inches closer to you or sit closer to

19   it?

20        THE WITNESS:  Is this better?

21        THE COURT:  Yes, but not too close.  Thank you, sir.

22   BY MR. WERTHEIMER:

23   Q    During the period from the beginning of 2011 up until a

24   couple of weeks ago, how many clients did this entity have?

25   A    One client.

1   Q   And who was that client?

2   A   It was the New Energy to Reinvent and Diversify Fund.

3   Q   And tell us what that fund was.

4   A   That fund was a 501(c)(4) that was formed to further good

5   government at nontaxpayer expense.

6   Q   And has it sometimes in the public gone by an acronym

7   NERD?

8   A   Yes.

9   Q   Would you generally describe for the Court what role you

10  played vis-a-vis the state and particularly the governor from

11  the time the governor came in in January of 2011?

12  A   I was involved in helping source and select members of

13  the governor's team and also critical positions for other

14  departments or for state oversight operations such as failing

15  school districts or municipalities.

16  Q   Did you play any particular role relative to the issues

17  that were in place from when the governor first came in

18  relative to the financial problems of the City of Detroit?

19  A   I'm sorry.  Did I play a role relative to --

20  Q   The work the Governor's Office was doing on that problem.

21  A   Yes.

22  Q   And what role did you play?

23  A   My role was predominantly focused on assessing talent for

24  potential positions that may come as a result of a failing

25  school district or municipality.

1    Q    Did you play a particular role relative to the ultimate

2    hiring of an emergency manager for the City of Detroit?

3    A    I played a role in the identification, sourcing, and

4    recommendation to the governor, who then made recommendations

5    to the Emergency Loan Board, which made the selection of the

6    emergency manager.

7    Q    Okay.  Would it be fair to say that you worked intimately

8    with the governor on this issue?

9    A    I worked intimately with the governor on the planning for

10   contingency, but my degree of interaction with him didn't

11   become what I would call intimate until I had live candidates

12   for his consideration.

13   Q    All right.  And were you the person who made the at least

14   tentative decision to move forward relative to Kevyn Orr

15   becoming emergency manager?

16   A    I was the person that made a recommendation to both the

17   governor and the treasurer that Kevyn Orr had the

18   qualifications and capabilities that led me to believe he

19   should be a candidate for consideration should a

20   recommendation to the ELB be made.

21   Q    And were you -- did you attend the pitch meeting in late

22   January of this year?

23   A    Yes.

24   Q    And was it the day after that meeting that you made an

25   initial outreach to the Jones Day law firm to talk to someone

1    there about the possibility of Kevyn Orr being considered for

2    that position?

3    A    Yes.

4    Q    And who is the person that you made that outreach to at

5    Jones Day?

6    A    I called Steve Brogan, a managing partner.

7    Q    By the way, at this point, did you have any knowledge

8    that Jones Day had been working for the state on the problems

9    it was having with the city, in fact, was helping it in the

10   negotiations over a consent agreement in March of 2012; that

11   is, about nine or ten months before the initial consideration

12   of Mr. Orr?

13   A    I don't believe so.

14   Q    And in your conversation with Mr. Brogan -- this initial

15   conversation would have been on January 30th?

16   A    Yes.  That's correct.

17   Q    The pitch meeting having been on the 29th?

18   A    You call it a pitch meeting.

19   Q    I'm sorry.  Go ahead.

20   A    I did not view the 29th meeting as a pitch meeting.  It

21   was bringing in several highly competent restructuring

22   oriented legal advisors to help the city in the preparation

23   for its RFP.

24   Q    When you talked to Mr. Brogan on the 30th, did you make

25   it a point to tell him at that point in this initial contact

1   that Jones Day would be neither hurt nor helped if you went

2   further relative to recruiting Mr. Orr for the emergency

3   manager position?

4   A   I'll tell you what I recall that I said in that

5   conversation.

6   Q   Can you answer my question?

7   A   Those exact words, no.

8   Q   Go ahead.  Tell me what you recall.

9   A   I said -- I asked for the managing partner's permission

10   to speak with Kevyn Orr.  I said if it was -- whether it was

11   granted or not and further discussions took place, that

12   should not help or hurt Jones Day in any potential bid for

13   work with the city or the state.

14   Q   And you were speaking as a representative of the state to

15   the Jones Day managing partner at that time, were you not?

16   A   No.  I was never a representative of the state.

17   Q   Who did you hold yourself out as in your discussions with

18   Mr. Brogan?

19   A   An independent consultant to the governor and his team

20   involved in talent sourcing.

21   Q   But you were working for the governor.  He would have

22   understood that.

23   A   Well, I was working with the governor.

24   Q   You weren't working for the City of Detroit, were you?

25   A   No.

1  Q   If you were working for anybody, it would have been the

2  governor?

3  A   I was working for the NERD Fund.

4  Q   Okay.  Which is the -- which is a fund that -- set up

5  either directly or indirectly by the government -- or the

6  governor.  You understood that, did you not?

7  A   No, I don't understand that.

8  Q   Okay.  Had you talked to anyone -- had you talked to

9  anyone with the state to get the approval for the

10  representation you made to Mr. Brogan; that is, that Jones

11  Day would neither be hurt nor helped if you went forward

12  relative to Orr?

13  A   No, and I've testified in my deposition that upon

14  recollection of that, I did not have the right to make that

15  assertion.

16  Q   You never withdrew that assertion from Mr. Brogan or

17  anyone else at Jones Day, did you not?

18  A   Not that I recall.

19  Q   And you always acted consistent with it, did you not?

20  A   I believe I did.

21  Q   In fact, you pushed for Jones Day to be hired by the

22  city, did you not?

23  A   Define "push," sir.

24  Q   You spoke in their favor, talked to people, suggested

25  that Jones Day would be a good choice, something like that?

1  A    I said any of those five firms that presented that day

2  would be a good choice.

3  Q    Did you tell Kevyn Orr on January 31st that you were --

4  at the time you were soliciting him, that you were also going

5  to be pulling for Jones Day?

6  A    I believe I did.

7  Q    And you told him that because, in fact, you were going to

8  be pulling for Jones Day; correct?

9  A    I hoped that they would be successful, yes, sir.

10  Q    What did you mean by the term "pulling" when you used it

11  in your conversations with Mr. Orr?

12  A    That I hoped they would be successful.

13  Q    It's like a wish?

14  A    It's a hope.

15  Q    "Pulling" implies a little bit more than a hope, does it

16  not?

17  A    Not in my view, sir.

18  Q    You're the governor's right-hand man at the time, are you

19  not?

20  A    There's nothing in my job description or my contractual

21  agreement that puts that label on me, sir.

22  Q    Is there anybody you know of who was closer to the

23  governor in terms of this operation relative to who's going

24  to be hired as emergency manager and who's going to do the

25  legal work than you?

1   A   My job was to source talent.

2   Q   Anybody that you knew from your involvement in the

3   process had any more in a role of it than you?

4   A   I don't have a perspective to tell you.  My job was to

5   source talent.  There were a lot of people involved in the

6   City of Detroit issues.

7   Q   But you were the one that was involved to source talent;

8   correct?

9   A   Correct.

10   Q   And part of sourcing talent was your determination that

11   Orr would be good talent for the emergency manager's job;

12   correct?

13   A   My job was to assess his experience and qualifications

14   for that job, yes.

15   Q   Okay.  And part of your role in assessing talent would be

16   to assess that the Jones Day law firm would also be a good

17   choice for the City of Detroit, would it not?

18   A   No, sir.  That was not my role.

19   Q   I thought you said your role was in talent

20   identification.

21   A   Well, there's a difference between talent identification

22   for an emergency manager possibility and recommending a law

23   firm to a city that has to make its own decision.

24   Q   What did Kevyn Orr say to you when you told him on

25   January 31st that you'd be pulling for Jones Day?

1  A    I don't recall what he said at that time.

2  Q    Do you recall a conversation a couple weeks later with

3  Kevyn Orr where you talked both about his retention and the

4  retention of Jones Day?

5  A    I'm sorry.  Ask the question again.

6  Q    Do you recall having a conversation with Kevyn Orr around

7  the middle of February of this year in which you talked to

8  Mr. Orr both about the possibility of his being retained and

9  in that same conversation him bringing up the possibility of

10  Jones Day being retained?

11  A    I don't recall explicitly, but I would have said probably

12  the same thing to Kevyn Orr that I said to Steve Brogan,

13  which is in my -- which I've already testified I probably had

14  no right to say, but my issue was I wanted permission to talk

15  to Kevyn Orr about the prospects for this opportunity, and I

16  did not want it to have a positive or a negative impact on

17  anything occurring between Kevyn Orr's firm and the City of

18  Detroit.

19  Q    Mr. Baird, isn't pulling for Jones Day a little bit

20  stronger than not having it hurt Jones Day?  Don't you

21  recognize a difference between those two phrases?

22  A    No, sir, I don't.  I know it's --

23  Q    You've answered my question.  Thank you.

24            MR. WERTHEIMER:  Would you put 807 up, please?

25  BY MR. WERTHEIMER:

1   Q   I'm going to ask you, Mr. Baird, if this refreshes your

2   memory as to the specifics between you and Mr. Orr around

3   February 13th.  This is an e-mail he's sending to you

4   February 13th, and I'm directing your attention down to he's

5   saying to you, "In the interim" -- you with me --

6   A   Yes.

7   Q   -- "when you have time, I'd like to speak with you about

8   the timing and process for both the retention of the EM" --

9   i.e., him -- "and legal counsel" -- i.e., Jones Day.  Do you

10  recall Mr. Orr e-mailing you asking you if you could have --

11  he could have that conversation with you?

12  A   Well, I recall this e-mail, but I didn't specifically

13  recall this part about the request and process for timing of

14  the EM and legal counsel.

15  Q   Do you recall it now?

16  A   Well, I see it's here, so -- and I read the rest of the

17  e-mail, so I now agree that it's part of the same e-mail.

18  Q   Okay.  And you agree that Kevyn Orr wants to communicate

19  that information to you; correct?

20  A   Well, I mean I agree that he says, "In the interim, when

21  you have time, I'd like to speak with you about the timing

22  and process for both the retention of the EM and legal

23  counsel."  That's what this memo says.

24  Q   And didn't you understand when you received it that what

25  Orr was doing was continuing the pitch, this time both for

1    himself and for Jones Day, to make sure that both things

2    would be accomplished?

3    A    No, sir.

4    Q    No?  Do you recall talking to Mr. Orr after receiving

5    this e-mail about this per his request?

6    A    I spoke with Mr. Orr several times over this period of

7    time, and I don't recall talking about this request.

8             MR. WERTHEIMER:  That's all I have, Mr. Baird.

9    Thank you.

10                    DIRECT EXAMINATION

11   BY MS. LEVINE:

12   Q    Good morning, Mr. Baird.

13   A    Good morning.

14   Q    Sharon Levine, Lowenstein Sandler, for AFSCME.  Just a

15   couple of questions if you would.  You testified that when

16   you were with your consulting firm before you were retained

17   by the state, your client was the NERD Fund; correct?

18   A    Correct.

19   Q    And in that capacity, the NERD Fund paid you, but you

20   provided services benefitting the state; correct?

21   A    Yes.

22   Q    Do you know if the NERD Fund paid for any other

23   consultants that provided services benefitting the state or

24   the City of Detroit?

25   A    I don't know.

1  Q   Do you know if there are any other funds or affiliations

2  that paid for the services of consultants that provided

3  services to the city in connection with Detroit?

4  A   No.

5  Q   No, there aren't any, or, no, you don't know?

6  A   I don't know.

7  Q   I apologize.  It was my -- it was my question that was

8  off.  Okay.  So when did you start providing services to the

9  governor, again?

10  A   In January of 2011.

11  Q   And at the point in time that you started providing those

12  services, was it your understanding that the governor's view

13  was that Detroit was already financially distressed?

14  A   It was my understanding that the governor was concerned

15  about Detroit's financial condition, yes.

16  Q   In addition to the assistance you provided the governor

17  in connection with the selection of Jones Day and the

18  emergency manager, did you have any involvement in the

19  selection or retention of Ernst & Young, Miller Buckfire, or

20  Conway MacKenzie?

21  A   Not in the selection or retention, no.

22  Q   During the course of the time that you provided services

23  for the governor, did you interact with Ernst & Young?

24  A   Yes.

25  Q   Did you interact with them in 2002?

1    A    I'm sorry.  Two thousand --

2    Q    Two.  I'm sorry.  2012.  Sorry.  I'm tired.

3    A    I would have to check that.

4              THE COURT:  Ms. Levine, could you pull the

5    microphone a little closer to you, please?

6              MS. LEVINE:  Yes, your Honor.  I'm sorry.

7              THE COURT:  Thank you.

8    BY MS. LEVINE:

9    Q    Were you involved at all with the -- providing services

10   to the governor -- actually, let me start a different way.

11   Are you aware that in late 2011, early 2012, there were

12   negotiations with a coalition of unions and the City of

13   Detroit with regard to some concessionary bargaining?

14   A    I believe I was, yes.

15   Q    And that Ernst & Young was involved in those or attended

16   those negotiations as a consultant for the city?

17   A    I don't know that or at least I don't recall that.

18   Q    How did you become aware of those negotiations?

19   A    I believe through the newspapers.

20   Q    Did you have any involvement or discussions about those

21   negotiations other than through learning about them through

22   the press?

23   A    Not that I recall, no.

24   Q    Did you have any discussions with the governor about

25   those negotiations?

1   A   No.

2   Q   Did you have any discussions with Mr. Dillon about those

3   negotiations?

4   A   Not that I recall.

5           MS. LEVINE:  I have no further questions.  Thank

6   you.

7                   DIRECT EXAMINATION

8   BY MS. GREEN:

9   Q   Good morning, Mr. Baird.  Jennifer Green on behalf of the

10  General Retirement System and the Police and Fire Retirement

11  Systems for the City of Detroit.

12  A   Good morning.

13  Q   Who is Dennis Muchmore?

14  A   He's the governor's chief of staff.

15  Q   And do you interface with him on a regular basis?

16  A   Yes.

17  Q   Do you recall discussing the issue of the governor's

18  authorization letter for the Chapter 9 filing in or about

19  July of 2013 with Mr. Muchmore?

20  A   Not the authorization letter, no.

21  Q   How about the request letter from Kevyn Orr?

22  A   No.

23  Q   Do you remember a meeting in or around July 12th relating

24  to the governor's authorization of the Chapter 9 filing?

25  A   I'm sorry.  A meeting -- say that again.

1  Q    Do you recall a meeting in or around July -- on or around

2  July 12th relating to the governor's authorization for the

3  Chapter 9 filing?

4  A    There were several meetings, and they were subject to

5  attorney-client privilege.  And I was in some of them and not

6  in others, but I don't recall the specific one that you're

7  asking about.

8  Q    When you say the "attorney-client privilege," which

9  attorney do you recall being at the meeting?

10  A    Well, it wasn't always the same one, but it would be

11  usually Mike Gadola or someone in Mike Gadola's shop.

12           MS. GREEN:  Your Honor, I believe that the privilege

13  has been waived with respect to that meeting.  There's a

14  document that was admitted into evidence.  It's UAW Exhibit

15  625, and I believe that all privilege assertions have been

16  waived with respect to that meeting.  We discussed this

17  meeting yesterday.

18           THE COURT:  Well, I suggest you ask your questions,

19  and we'll see what objections, if any, we get on this ground,

20  and we'll deal with it on a question-by-question basis.

21           MS. GREEN:  I will certainly do so.  I was trying to

22  head off an objection that I felt was coming, so --

23  BY MS. GREEN:

24  Q    You do recall a meeting with Mike Gadola the week of July

25  12th?

1   A    Counselor, we have a lot of meetings, and so I'd have to

2   go back and check that specific one and look for triggers to

3   help my recollection.

4   Q    Sounds like an invitation for me.

5              MS. GREEN:  Can we pull up Exhibit 625, please?

6   BY MS. GREEN:

7   Q    The top part of that e-mail discusses a Monday meeting

8   the week of July 12th, which actually it would have placed

9   the meeting earlier in the week.  Does that refresh your

10  recollection as to whether you had a meeting with certain

11  state officials relating to the governor's authorization?

12  A    Well, I don't recall a specific meeting, but it says here

13  that Mr. Gadola spoke to me, Rich, this morning, and so I

14  would have no reason to think that's not accurate.

15  Q    Do you recall discussing and taking the position that the

16  governor should take a more deliberative approach to his

17  authorization of the Chapter 9 filing?

18             MR. ELLSWORTH:  Your Honor, I object.  The privilege

19  has been waived with respect to the document but not the

20  discussions.

21             THE COURT:  The objection is overruled.  Please

22  answer the question.

23             THE WITNESS:  Would you repeat the question?

24  BY MS. GREEN:

25  Q    Can I repeat the question?  I don't remember the exact

1  wording, but my question was do you recall discussing the

2  issue of the governor's authorization and whether or not a

3  more deliberative approach should be taken with respect to

4  that authorization?

5  A   I don't recall "more deliberative" ever being part of a

6  conversation between Mike and I.  I do recall perhaps what

7  he's referring to.

8  Q   Okay.  Can you explain what that would be?

9  A   We had had conversations about whether it might be

10  advisable to have contingencies around this process, and I

11  had provided the opinion that I thought a contingency would

12  be appropriate, and that contingency would be in the form of

13  a control that the governor would have to approve certain

14  areas of concern.

15  Q   And what were these certain areas of concern?

16  A   I don't recall specifically, but it would have covered

17  any of the entire spectrum of liabilities or claims by

18  creditors.

19  Q   Was one of those areas of concern the pension benefits?

20  A   Well, certainly the pension liabilities were a

21  significant component.

22  Q   So you agreed with other state officials that a more

23  deliberative approach should be taken due to this contingency

24  issue?

25  A   I'm not sure I would have termed it as "a more

1    deliberative approach."  What my particular opinion was --

2    and I come from a long time with a large public accounting

3    firm -- that I thought it would be advisable to have an

4    internal control or a check and balance relative to the

5    governor's approval of certain things that might go into a

6    plan of adjustment.

7    Q    And others shared your view; correct?

8    A    I didn't have conversations with anyone other than Mike

9    Gadola on this.

10   Q    Did you have a discussion with Treasurer -- you did not

11   have a discussion with Treasurer Dillon then?

12   A    I don't believe so.

13   Q    Do you recall a discussion with Lieutenant Governor Brian

14   Calley on this issue?

15   A    I don't recall talking to either of those individuals.

16   From this memorandum, it would appear that Mike Gadola did,

17   though.

18   Q    Do you know ultimately why such a contingency was not

19   included with the authorization of the Chapter 9 filing?

20   A    I would have to speculate.  I mean I know that the

21   governor did not agree, but I'd have to speculate as to what

22   the reason might be.

23   Q    Outside of Lieutenant Governor Calley, Attorney General

24   Mike Gadola, Treasurer Dillon, and yourself, were there

25   others that also shared the belief that a contingency was

1 | appropriate?

2 | A   I don't know that.

3 | Q   Do you know if there were people within the city that

4 | believed that a contingency was appropriate?

5 | A   I don't know that.

6 | Q   Do you recall communicating with Dennis Muchmore via e-

7 | mail the week of July 12th relating to this issue separate

8 | and apart from this e-mail?

9 | A   No, I don't.  I don't believe I did, but I don't recall

10 | if I did.

11 |         MS. GREEN:  Your Honor, I have a new e-mail that was

12 | produced by the state after the pretrial order was already

13 | entered, so it is not on the pretrial list, but I believe

14 | because it was produced on the 25th of October it is

15 | appropriate to be able to use the document, and I have copies

16 | for counsel.

17 |         THE COURT:  Okay.  One second.  Do you have a number

18 | for it?

19 |         MS. GREEN:  It's 872.

20 |         THE COURT:  872.

21 |         MS. GREEN:  May I approach?

22 |         THE COURT:  Are you going to ask the witness to

23 | identify it?  Is that your plan?  Okay.  And I guess we'll

24 | need copies, too, at some point.  Thank you, sir.

25 | BY MS. GREEN:

1  Q   Do you recognize the document that I just handed to you,

2  sir?

3  A   I'd like to read it, please.

4  Q   Absolutely.

5  A   Yes.  I recall this.

6  Q   Okay.  And do you agree that the vast majority of the e-

7  mail is the same as Exhibit 625 that I just showed you with

8  the exception of a slight modification to the top of the

9  document, which is a new portion of an e-mail?

10  A   I'm not sure I follow your question, but I believe that

11  it was -- that I was not copied on any of this e-mail until

12  Dennis Muchmore sent me what you've just provided me.

13  Q   My question was just that the -- 75 percent of this e-

14  mail is the exact same e-mail chain that we just discussed.

15  That was Exhibit 625.  Do you recognize that they are the

16  same document largely?

17  A   I'm still confused.

18  Q   We can move on.  I was just asking if you recall that we

19  just discussed the same e-mail, which is a slightly

20  different --

21  A   May I add to my testimony because this has jogged my

22  recollection?

23  Q   Okay.

24  A   I did not recall a specific meeting with lieutenant

25  governor and Treasurer Dillon, and the reason I didn't recall

1   it is because we had dinner together as part of a -- of

2   something another staff person who lectures at University of

3   Michigan had arranged for some of his students, and so we did

4   have a few moments before that dinner began, and I remember

5   we did talk about contingencies.

6   Q   Okay.

7   A   So I'd like to amend my testimony.  I recall that.

8   Q   Is there anything else that you recall relating to that

9   conversation regarding contingencies specifically?

10  A   No.

11  Q   Okay.  The top of the e-mail to you, you wrote "left a

12  voicemail for you," and that is a voicemail to Dennis

13  Muchmore, correct, the chief of staff?

14  A   Correct.

15  Q   He wrote back to you --

16          MS. GREEN:  And if we could pull up Exhibit 872.

17  It's a July 12th, 2013, e-mail.

18  BY MS. GREEN:

19  Q   "Thanks.  This La Costa" --

20          THE COURT:  You have not offered this yet.

21          MS. GREEN:  Oh, I'm sorry.  I actually wanted to

22  make sure that he recognized the top part before I offered

23  it.  I was going to ask him --

24          THE COURT:  Well, you can just ask that question.

25          MS. GREEN:  Okay.

1          THE COURT:  Sure.

2    BY MS. GREEN:

3    Q   Mr. Baird, do you recognize the top half of the e-mail?

4    That's the new portion.

5    A   I now know what he's referring to, but I don't recognize

6    the e-mail.  I'm not even sure I read it.

7    Q   So you know what he's referring to, but you don't know if

8    you read the e-mail?

9    A   Well, what I'm saying is he refers to this "La Costa is

10   not all it's cracked up to be," and I recall --

11         THE COURT:  Don't tell us what's in it until we

12   admit it into evidence.

13         THE WITNESS:  I'm sorry, your Honor.

14         THE COURT:  The only question before you now is do

15   you recognize the top portion of the e-mail?  Have you seen

16   it before?

17         THE WITNESS:  I don't recall having seen this e-mail

18   before.

19         THE COURT:  All right.

20   BY MS. GREEN:

21   Q   Do you deny that you would have received the e-mail?  You

22   just don't specifically remember it?

23         MR. SHUMAKER:  Objection.  Asked and answered.

24         MS. GREEN:  Well, I think the -- I thought it was a

25   different question.  I mean --

1          THE COURT:  It is a different question, but it's not

2     a particularly relevant question.

3          MS. GREEN:  Okay.

4     BY MS. GREEN:

5     Q    What was the reference to -- that you remembered?

6          THE COURT:  I'm sorry.  What?  Could you rephrase

7     that?

8          MS. GREEN:  He said that he had -- it referred him

9     to something, and he remembered.  I'm asking --

10         THE WITNESS:  The Judge just admonished me.  I don't

11     care to be admonished again.

12         MS. GREEN:  Your Honor, I guess I'm asking can I

13     refresh his recollection with it?  Is that okay?  Can I

14     refresh his recollection as to what his reference was?  I

15     believe even if it's not admitted I can refresh his

16     recollection as to what he was -- what this meant.

17         THE COURT:  It sounds like you're asking him what's

18     in the document, and I can't permit that.  If you have a

19     different question, we can try it.

20         MS. GREEN:  Okay.

21     BY MS. GREEN:

22     Q    Do you recall having conversations with Dennis Muchmore

23     the week of July 12th regarding the process related to

24     Chapter 9?

25     A    No.

1  Q   Do you recall communicating with Dennis Muchmore via e-

2  mail relating to the process of Chapter 9?

3  A   I do not recall, no, while he was away.

4  Q   If there is a -- was there a shared understanding that

5  the process was becoming long?

6  A   I don't know that.

7  Q   Would there have been some sort of shared sentiment that

8  the process was becoming worn or lengthy?

9  A   I don't know that.  I mean --

10      MS. GREEN:  Your Honor, if I might try it this way,

11  I believe that this document is a party admission.  We've

12  been admitting e-mails from state officials throughout the

13  proceeding as an admission of a party, and this is another e-

14  mail nearly identical to Exhibit 625 that was admitted as a

15  party admission.

16      THE COURT:  Any objection?

17      MR. ELLSWORTH:  Well, I object.  He says that he

18  doesn't recognize the document.  He can't identify it, so it

19  shouldn't be admitted.

20      THE COURT:  It can only be a party admission if it's

21  authenticated, and the witness can't authenticate it.

22      MS. GREEN:  I believe there's a difference between

23  not specifically remember reading an e-mail and being able to

24  authenticate it.  Yes, this is to me.  I recognize the date.

25  I recognize the people on it.  I recognize this is an e-mail

1   that I would have received but for perhaps I don't

2   specifically recall reading e-mails from several months ago.

3   I think the authentication bar is much lower than being able

4   to substantively testify to it.

5           THE COURT: As low as it is, still the witness has

6   to be able to testify that he has seen it before, and he does

7   not remember seeing it before. Am I right about that, sir?

8           THE WITNESS: That's correct.

9           THE COURT: All right. So the objection is

10   sustained.

11           MS. GREEN: My last attempt is it was produced via

12   subpoena by the State of Michigan specifically by a request

13   from the parties on October 25th. I believe the

14   authentication bar is very low in the fact that they produced

15   it and that --

16           THE COURT: Did the state produce this e-mail, sir?

17           MR. ELLSWORTH: Yes.

18           THE COURT: Doesn't that establish its

19   authentication?

20           MR. ELLSWORTH: Well, I don't think that establishes

21   the authentication. You can't admit a --

22           THE COURT: Why wouldn't it? The state wouldn't --

23           MR. ELLSWORTH: Because this witness --

24           THE COURT: The state wouldn't produce an

25   inauthentic e-mail, would it?

1          MR. ELLSWORTH:  No, your Honor, but this witness

2     doesn't recognize the document and doesn't recall receiving

3     it.

4          THE COURT:  Right, but you just admitted the

5     document is authentic.

6          MR. ELLSWORTH:  The state produced the document,

7     yes, your Honor.

8          THE COURT:  All right.  And what is the document

9     offered for?  And we're talking about the top part of it,

10    right --

11         MS. GREEN:  Yes.  He had a --

12         THE COURT:  -- because the rest of it was already

13    admitted?

14         MS. GREEN:  It sparked his recollection about he

15    knew what this reference was to, and he -- when I showed him

16    the e-mail he remembered, and he said he had testimony he

17    knew what this meant, so the question is what is this

18    reference to and what does it mean to you and --

19         THE COURT:  All right.  The Court will reverse its

20    prior ruling and admit the document into evidence.  What

21    number was it again?

22         MS. GREEN:  Exhibit 872.

23         THE COURT:  All right.

24       (Exhibit 872 received at 11:30 a.m.)

25    BY MS. GREEN:

1  Q   Mr. Baird, you've read the e-mail now.  At the top of the

2  e-mail you stated earlier that this sparked your recollection

3  of either a conversation or an incident or something of that

4  nature.  Can you explain that, please?

5  A   I recollect that members of the governor's team had

6  discussed contingencies as a recommendation to the governor

7  and that the chief of staff said it's time to take this to

8  the governor and get a decision.

9  Q   What did you understand to be meant by the "kind of worn"

10 phrase?

11 A   He's talking about the resort where that particular

12 conference was being held.

13 Q   Oh, okay.

14 A   That's what sparked my recollection.

15 Q   Recollection of -- okay.

16      MS. GREEN:  Your Honor, I don't have any further

17 questions.  However, Exhibit 836 was also produced by the

18 state.  I don't know if that would mean that the -- your

19 ruling that it's authentic because it was produced by the

20 state would also apply equally to that.  It was an Andy

21 Dillon e-mail produced by the State of Michigan.

22      MR. SHUMAKER:  Your Honor, that was a hearsay

23 objection.  It was not an authentication objection.

24      THE COURT:  Let's just pause for just a second.  Can

25 you produce that for me again?

1           MS. GREEN:  836?

2           THE COURT:  Please.

3           MS. GREEN:  Yes.

4           THE COURT:  I remember seeing it, but I need to see

5    it again.  Okay.  Ms. Green, we have it here, so we're all

6    set.  Thank you, Kelli.  So stand by one second, please.

7    Counsel, did the state produce Exhibit 836 in discovery?

8           MR. ELLSWORTH:  Yes, your Honor.

9           THE COURT:  All right.  Then the Court will reverse

10   its earlier denial of the admission of this document and

11   admit it into evidence.

12      (Exhibit 836 received at 11:33 a.m.)

13          MS. GREEN:  Thank you, your Honor.  I have nothing

14   further for Mr. Baird.

15          MR. RUEGGER:  Good morning, your Honor.

16                     DIRECT EXAMINATION

17   BY MR. RUEGGER:

18   Q   Good morning, Mr. Baird.

19   A   Good morning.

20   Q   You probably don't remember me.  I appeared at your

21   deposition but didn't ask you any questions.  My name is

22   Arthur Ruegger from the Dentons firm.  We represent the

23   Retirees' Committee.  I have a couple of issues I'd like to

24   talk to you about this morning.  Shouldn't be too long,

25   though.  The first is the date when Mr. Orr accepted your

1  invitation or the state's invitation to become emergency

2  manager. Do you remember the specific date he said yes?

3  A   No.

4  Q   You'll recall Mr. Wertheimer showed you an exhibit. It

5  was 807. I think it was an e-mail dated February 13th, and

6  that, if I read it correctly, seems to indicate he had not

7  yet made his mind up. Is that consistent with your

8  recollection?

9  A   Yes.

10 Q   I'm going to ask to show you a document that may refresh

11 your recollection about the timing of his acceptance. I have

12 a document marked for identification RC Exhibit 460.

13         MR. RUEGGER: With your Honor's permission, I'll

14 present it to the witness.

15         THE COURT: Yes, sir.

16         MR. RUEGGER: It's not on the list, gentlemen. It's

17 just marked for identification. I haven't offered it yet.

18         THE WITNESS: All right. I've completed my review.

19 BY MR. RUEGGER:

20 Q   Does that refresh your recollection, sir, about the date

21 that Mr. Orr accepted the position as emergency manager?

22 A   No, sir.

23 Q   Do you recognize that document?

24 A   I believe I have seen this document, yes.

25 Q   Can you tell us what it is?

1    A    It is a --

2            MR. SHUMAKER:  Your Honor, we would object before

3    the witness gets into the exhibit that this exhibit was not

4    on the pretrial exhibit list.

5            MR. RUEGGER:  It was only recently produced, and I

6    only found it within the last day or so, so I don't believe

7    it was produced before the date of the pretrial order.

8            MR. SHUMAKER:  This is a document produced in the

9    Davis litigation.

10           MR. RUEGGER:  I don't have any basis to question

11   your --

12           THE COURT:  Counsel, I have to ask you to address

13   your comments to the Court, not to each other.

14           MR. RUEGGER:  Sorry, your Honor.

15           THE COURT:  So the question is when was this

16   document produced or how?

17           MR. SHUMAKER:  Your Honor, again, this was not on

18   the pretrial exhibit list, and the indications are that it

19   was a document produced in the Robert Davis litigation, which

20   predated the deadline of the pretrial order.

21           THE COURT:  And just so we're clear, what number

22   exhibit are we talking about?

23           MR. RUEGGER:  It's Exhibit Number 460, your Honor.

24           THE COURT:  Okay.

25           MR. RUEGGER:  We've only marked it today.  It's not

 1   on the pretrial list.  Mr. Shumaker is correct about that.

 2   And I believe there's an objection to my question as to

 3   whether the witness can identify the document.

 4            MR. SHUMAKER:  You were asking him questions about

 5   the document's contents.  That's why I objected.

 6            MR. RUEGGER:  Well, I believe my question was

 7   whether he could identify the document.

 8            THE COURT:  No.  He said he could recall it.  Then

 9   you asked him --

10            MR. SHUMAKER:  What is it?

11            THE COURT:  -- what is it?

12            MR. SHUMAKER:  Another objection --

13            THE COURT:  I'll allow it to be identified for the

14   record, but if you offer it in evidence, we're going to have

15   to deal with this issue of it not being on the list.  Can you

16   just tell us generally what the document is without telling

17   us the contents?

18            THE WITNESS:  The document is a -- is the forwarding

19   of a prospective timetable of communications and

20   announcements predicated upon Kevyn final decision, which at

21   the time of this document had not been made.

22   BY MR. RUEGGER:

23   Q   So is it your testimony, sir, that as of the date of this

24   document, Mr. Orr had not made any final decision?

25   A   Yes.

1   Q   But I believe your testimony was that you were forwarding

2   to him a proposed timetable on the contingency that he would

3   make a final decision?

4   A   I can't answer your question without the judge's

5   permission because there's a key part of this that I believe

6   you're ignoring.

7   Q   Apart from the document, sir, did you forward to Mr. Orr

8   a proposed timetable related to his potential acceptance of

9   the emergency manager position and the events that would

10  follow from that acceptance?

11  A   Pursuant to his decision, yes.

12  Q   And which decision was that?

13  A   The decision of whether he would accept this nomination

14  if recommended.

15  Q   And you forwarded that timetable before he gave you his

16  decision?

17  A   Yes.

18  Q   Do you recall how far in advance of his decision you

19  forwarded that timetable?

20  A   I don't remember his exact date.

21  Q   So even before his decision, the state had a proposed

22  timetable for events that were to follow from receipt of his

23  decision?

24  A   It was a -- it was a tentative plan, yes.

25  Q   Okay.  And can you tell us what dates or events were part

1 of that timetable?

2 A   Well, that would be giving the content of the memorandum.

3 Q   Without -- sorry, your Honor.  Without basing your

4 testimony on the document in front of you, from your

5 recollection, can you recall those events?

6 A   No, I cannot.

7        MR. RUEGGER:  Okay.  I would offer Exhibit 460 in

8 evidence.

9        MR. SHUMAKER:  Same objection, your Honor, and

10 hearsay.

11        THE COURT:  Well, what do you have to suggest that

12 you only recently got this document, for example, after the

13 final pretrial?

14        MR. RUEGGER:  Your Honor, the Retirees' Committee

15 was not part of the Davis litigation.  We did not serve a

16 subpoena on Jones Day in any litigation.  We've learned about

17 some of these productions in the course of the depositions

18 leading up to this trial, but we were behind the eight ball,

19 if you will, in terms of learning about this.  We tried to

20 follow up when we could.  It was a hectic schedule.  We only

21 got these documents in the last 48 hours, to the best of my

22 knowledge.

23        MR. SHUMAKER:  Your Honor, the Retiree Committee has

24 multiple documents that are based -- are documents produced

25 in the Davis litigation, specifically Exhibits 400, 401, 402,

1  403, so clearly Retirees' Committee had time in advance of

2  the joint pretrial order to submit this document.

3          THE COURT:  May I see a copy, please?

4          MR. SHUMAKER:  May I approach?

5          MR. RUEGGER:  Your Honor --

6          THE COURT:  The Court concludes -- I'm sorry.

7          MR. RUEGGER:  I'm sorry, your Honor.  In response to

8  Mr. Shumaker's objection that we had documents from the Davis

9  litigation, we attended the Orr deposition.  Someone

10  marked -- was it -- I don't know if it was ours -- some

11  documents from certain of these litigations, but, to the best

12  of my knowledge, we were behind the eight ball trying to get

13  these documents.  I don't have a personal knowledge as to

14  exactly when we did get these.

15          THE COURT:  The Court concludes that the record does

16  establish cause for the late addition of this document to the

17  exhibit list.  The other objection is overruled.  Exhibit 460

18  is admitted.

19      (Exhibit 460 received at 11:43 a.m.)

20          MR. RUEGGER:  Thank you, your Honor.  May I proceed?

21          THE COURT:  Yes.  Did we give you your document

22  back?

23          MR. RUEGGER:  Do you want an extra copy?  You're

24  okay.

25          THE COURT:  Oh, yes.  I need a copy.  So that's our

1  copy that we have?  Okay.

2  BY MR. RUEGGER:

3  Q   Mr. Baird, can you tell us now what Exhibit 460 is?

4  A   Exhibit 460 is my forwarding a tentative communications

5  timetable that was given to me by the governor's press

6  secretary to Kevyn Orr on February 21st, 2013.

7  Q   And that timetable contemplates a date where the governor

8  would announce his recommendation of Mr. Orr as emergency

9  financial manager; correct?

10          THE WITNESS:  May I read from the document, your

11  Honor?

12          THE COURT:  Yes.

13          THE WITNESS:  "A Thursday, March 14th, date for

14  governor to confirm the emergency post-hearing as required

15  legally and recommend ELB candidate and for the ELB to

16  confirm and make the emergency financial manager

17  appointment."

18  BY MR. RUEGGER:

19  Q   And if you turn to the last page of that document, the

20  timetable also contemplated that Mr. Orr would start in his

21  official capacity as of March 25th; correct?

22  A   That was the working timetable, yes, sir.

23  Q   And would this timetable have slipped at all if Mr. Orr

24  had not accepted the position on or about the date you sent

25  this timetable?

1   A   For Mr. Orr, yes.

2   Q   So there were other candidates that the governor might

3  have recommended to comply with this timetable?

4   A   I'm sorry.  Say that again.

5   Q   If I understood your testimony correctly, you said that

6  if Mr. Orr had not accepted promptly on or about the date you

7  sent the timetable, the timetable would have slipped for

8  Mr. Orr.

9   A   Mr. Orr had not made his decision at the time of this,

10  and it was predicated on something needing to happen that had

11  not yet happened, and so this was all very tentative.

12   Q   You state in the first paragraph on the first page that,

13  "We would like you here physically for announcement,

14  stakeholder meetings, and media on March 15 and as much of

15  the following week as you could manage before the start date

16  of March 25th."

17          THE COURT:  What is your question?

18  BY MR. RUEGGER:

19   Q   My question is did Mr. Orr say he could be physically

20  available on those dates?

21   A   I don't recall him saying because it was contingent upon

22  something else happening.

23   Q   Do you recall approximately -- or specifically when after

24  you sent this e-mail Mr. Orr accepted the position?

25   A   Well, Mr. Orr never accepted the position.  He only

1  accepted the nomination of the governor to the Emergency Loan

2  Board, so there was no acceptance of position until that

3  action had occurred.

4  Q   I stand corrected.  When did Mr. Orr indicate to you he

5  accepted whatever positions or contingencies you were

6  offering?

7  A   I don't remember the exact date, but I know it was after

8  this memo.

9  Q   Thank you, sir.  I'd like to switch time and subject

10 slightly to July of this year.  Do you recall whether you had

11 any role in the structuring of the city's advisors' fees in

12 the upcoming Chapter 9 proceeding?

13 A   I'm sorry.  Say that again, please.

14 Q   In July of this year, as everyone in this courtroom

15 knows, there was a petition for Chapter 9 relief on behalf of

16 the city.  Leading up to that petition, did you have any role

17 in the structuring of the fees for the city's various

18 advisors in that Chapter 9 proceeding?

19 A   Not structuring of the fees, no, sir.

20 Q   What role, if any, did you have?

21 A   I was requested by the emergency manager to go back to

22 members of the restructuring team and discuss putting a finer

23 point on their fees, which the original estimates were higher

24 than what the emergency manager believed were affordable.

25 Q   Do you recall compiling proposed fees for each of the

1   advisors to the city in that connection?

2   A    Compiling fees?

3   Q    Did you determine any approximate fees for those advisors

4   going forward?

5   A    I had conversations with the principals of those entities

6   about reducing the estimates that they had previously

7   provided.

8   Q    So if I understand you correctly, the advisors had given

9   estimates for their fees in the Chapter 9 proceeding, and you

10  were tasked with engaging with them about whether those fees

11  could be reduced?

12  A    Yes.

13  Q    Do you recall communications with Mr. Saxton and Mr.

14  Dillon at Treasury on this subject?

15  A    Yes, I do.

16  Q    What did you tell them?

17  A    When?

18  Q    On or about July 16th, 2013.

19  A    I don't recall the exact -- can you tell me is that

20  before or after I had the conversations with the

21  restructuring team principals?

22  Q    Well, I'm not allowed to tell you that, sir, but if I

23  can --

24  A    Then I don't recall.

25          MR. RUEGGER:  Can I approach the witness with an

1  exhibit that I believe will help refresh his recollection?

2          THE COURT:  You may.

3          THE WITNESS:  Yes.  This is consistent with my prior

4  testimony and does help me recollect.

5          THE COURT:  Excuse me, sir.  The only question was

6  does that document refresh your recollection on this point.

7          THE WITNESS:  Yes, it does.

8  BY MR. RUEGGER:

9  Q   Thank you.  Do you recall on or about that date giving

10  Mr. Saxton and Mr. Dillon estimated fees for the advisors to

11  the city in Chapter 9?

12  A   Well, estimated reductions, which netted to estimated

13  fees, yes, sir.

14  Q   Okay.  Can you tell us without discussing the content

15  what the document that's been marked as 458 is?

16  A   Well, yes.  It's hard to -- the content is all numbers,

17  so -- but effectively it is -- as I said before, it is a

18  communication to Tom Saxton from -- to Tom Saxton and Andy

19  Dillon from me that deals with conversations that I had had

20  with Ernst & Young, Miller Buckfire, Jones Day, and Conway

21  MacKenzie dealing with a reduction in fee estimates.

22          MR. RUEGGER:  Your Honor, we offer 458 in evidence.

23          MR. SHUMAKER:  Objection, your Honor.  It's another

24  brand new one.  Also, it's hearsay.

25          MR. RUEGGER:  Your Honor, it was produced by the

1 State of Michigan. Again, as with the earlier document, we

2 were behind the eight ball in terms of receipt of these

3 documents. We did not subpoena them ourselves. The other

4 parties did, but I only received this document in the last 24

5 hours.

6 THE COURT: All right. For the same reason, the

7 Court will overrule the objection and admit it into evidence.

8 (Exhibit 458 received at 11:52 a.m.)

9 MR. RUEGGER: Thank you, your Honor.

10 BY MR. RUEGGER:

11 Q So, Mr. Baird --

12 THE COURT: Before we proceed, however, I will ask

13 you over the lunch break, which we will take here shortly, to

14 advise counsel for the city and the state if there are any

15 other exhibits that you intend to offer into evidence on the

16 same grounds. All right? Will you do that?

17 MR. RUEGGER: I can certainly do it. I can state

18 now that are no such documents related to this witness, your

19 Honor, but I will ask my colleagues related to any other

20 witnesses.

21 THE COURT: And we need a copy of Exhibit 458. Can

22 you provide that for us, please? Thank you, sir.

23 BY MR. RUEGGER:

24 Q Mr. Baird, in the e-mail that's at the middle of the page

25 going to the bottom, which is, I believe, addressed from you

1    to Messrs. Saxton and Dillon, are those, as you testified

2    earlier, your determination of the fee reductions you believe

3    are achievable in the Chapter 9 case?

4    A    I would testify that these are an accurate summary of my

5    conversations with each of those parties.

6    Q    And you believe that the total fees from the four

7    advisory firms were approximately $75.2 million; is that

8    correct?

9    A    Well, that's the mathematical exercise, yes.  That's what

10   the memo says.

11   Q    So what's the -- can you explain the difference between

12   the breakout of the four sets of fees that's in the beginning

13   of that e-mail and then the four sets of fees that's at the

14   bottom of that e-mail?

15            THE COURT:  Excuse me, sir.  I'm going to interrupt

16   your answer to that question.  What's the relevance of all of

17   this?

18            MR. RUEGGER:  Your Honor, there's several pieces of

19   relevance, one of which is whether the advisors had an

20   incentive to rush to Chapter 9 vis-a-vis the cap that might

21   have been on their fees before the Chapter 9, and that's one.

22   Another is the reasonableness of the $5 million advisory cap

23   that is stated in the appropriations part of PA 436.  I'm not

24   going to spend a lot of time on this, Judge.

25            THE COURT:  Yeah.  I don't think any of those --

1  either of those is reasonably arguable, so I'm going to ask

2  you to move on.

3          MR. RUEGGER:  Very well.  I have no further

4  questions of this witness.  Thank you.  Thank you, Mr. Baird.

5                    DIRECT EXAMINATION

6  BY MS. BRIMER:

7  Q   Good morning, Mr. Baird.  My name is Lynn Brimer.  I

8  represent the Retired Detroit Police Members Association.  I

9  only have a handful of questions for you.  You indicated you

10 participated in the January 29 interview process for the law

11 firms.  Were you aware that Miller Buckfire had shared the

12 interview questions with the Jones Day team?

13 A   No.

14 Q   Would you have considered it appropriate to have shared

15 the interview questions with the teams in advance of the

16 meeting?

17 A   Well, you've characterized this as an interview.  It was

18 not an interview.

19 Q   So if it wasn't an interview, what was the meeting -- the

20 January 29 meeting intended to be?

21 A   It was bringing together credentialed firms to address

22 various considerations to assist the city in creating a

23 request for proposal which would have had to go out

24 subsequent to that time.

25 Q   You're aware that Jones Day put together what they

1  considered to be a pitch book for that meeting; correct?

2  A   I'm aware that all of those firms invited would have

3  hoped to have been candidates for any future successful RFP.

4  Q   Were you aware that Miller Buckfire had presented or

5  brought in Jones Day in the -- to Treasury in the process of

6  drafting the consent agreement?

7  A   I don't believe so I was.

8  Q   Okay.  Were you aware that Miller Buckfire -- I mean that

9  Jones Day had provided advice in connection with revising

10  Public Act 4 to members of Treasury?

11  A   No.

12  Q   Do you know who drafted the RFP that was ultimately

13  issued in connection with the retention of counsel?

14  A   I don't know who specifically drafted it.

15  Q   Do you know whether or not Miller Buckfire participated

16  in the drafting of the RFP?

17  A   I do not.

18  Q   Now, you indicated you were not aware of when Mr. Orr

19  actually accepted his nomination by the governor.  Do you

20  know when it was that the governor had finally -- or had

21  determined that Mr. Orr would be the candidate he nominated?

22  A   I was asked about the exact date, and I did not recall

23  the exact date.  And I would say that I don't recall the

24  exact date where the governor was involved in saying this is

25  my person either.

1          MS. BRIMER:  Could we see Exhibit 807?

2    BY MS. BRIMER:

3    Q    And I believe, Mr. Baird, this exhibit has already been

4    admitted into evidence.  You'll see midway down there's an e-

5    mail from you to Mr. Orr.  Do you see that?

6    A    Yes.

7    Q    That's dated February 12th; correct?

8    A    February 12th, yes.

9    Q    All right.  And if you look at the second page or

10   perhaps -- yeah.  We'll look at the second page.  There's a

11   sentence in that very top paragraph, "Anyway, I need you to

12   clue me in" -- "to clue me in you are" -- if -- I believe

13   you're missing the word "if" -- "if you are feeling

14   differently because the boss" -- does the boss refer to the

15   governor --

16   A    In this context, I think it did.

17   Q    -- all right -- "and his team are already arranging for

18   the church and pastor, and I need to talk them off the ledge

19   if you tell me we are misreading the relationship."  So was

20   it by at least -- was it by February 12th that the governor

21   had determined -- can you interpret from this that the

22   governor had determined that Mr. Orr would be the candidate

23   he nominated?

24   A    I think the governor had determined by this point that

25   subject to further due diligence and research that he would

1  be very comfortable with this individual as his nomination.

2  Q   Were you aware that after February 12 Mr. Orr continued

3  to share the e-mails that you and the governor had shared

4  with him with members of his team at Jones Day?

5  A   Not at the time.

6  Q   Have you since learned that?

7  A   I believe I've seen some e-mails since then, yes.

8  Q   Was Mr. Orr the only candidate that the governor

9  nominated in connection with this -- the EM position?

10  A   Nominated to the ELB?

11  Q   Yes.

12  A   Yes.

13          MS. BRIMER:  I have nothing further, your Honor.

14          THE COURT:  Thank you.  We'll stop for lunch now and

15  reconvene at 1:30, please.

16          THE CLERK:  All rise.  Court is in recess.

17      (Recess at 12:01 p.m. until 1:30 p.m.)

18          THE CLERK:  All rise.  Court is in session.  Please

19  be seated.  Recalling Case Number 13-53846, City of Detroit,

20  Michigan.

21          THE COURT:  It appears everyone is here.  You may

22  proceed.

23          MS. PATEK:  Good afternoon, your Honor.  Barbara

24  Patek on behalf of the Detroit public safety unions.

25                      DIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Good afternoon, Mr. Baird.

3  A   Good afternoon.

4  Q   Just a couple questions for you.  You indicated in your

5  testimony this morning that you had advised the governor to

6  perhaps have some internal controls about what could go into

7  the plan.  Can you tell me what those internal controls that

8  you advised were?

9  A   There was really only one that was on my mind.

10 Q   And what was that?

11 A   That the governor reserved the right to approve decisions

12 taken of a particular magnitude before they were executed.

13 Q   When you say "decisions of a particular magnitude," can

14 you explain what you mean by that?

15 A   Proposed plan of adjustment kind of conditions of a

16 material nature.

17 Q   Are you talking about diminishment or impairment of

18 certain obligations of the city?

19 A   It could have been diminishment or impairment, but

20 specifically I didn't have monetary notion in mind.  I had an

21 internal control of a secondary approval in mind.  I can't

22 speak for the others relative to their notion of

23 contingencies.

24 Q   So I take it those internal controls or contingencies

25 were not directly related to the pension issues in the case?

1  A    Not in my mind, no.

2  Q    Last series of questions.  You indicated also that at

3  some point -- I think it was in June of 2003 (sic) -- the

4  emergency manager had raised some concerns about the fees of

5  the various professionals, and he consulted with you in that

6  regard.

7  A    I don't recall if it was -- if it was the emergency

8  manager and the treasurer or just the emergency manager, but

9  I do recall the conversation with the emergency manager was

10 that he had not had an opportunity to talk with the members

11 of the restructuring team, the external lenders, the

12 professional firms, about their fee estimates, and that was

13 something that really needed to be done prior to any

14 potential filing.

15 Q    And you said you put together some figures for him?

16 A    I did.  I put together some -- I put together an approach

17 that suggested here are two different approaches that we

18 might take in conversations with those individuals.

19 Q    And who -- and for whom were you working at the time you

20 put those figures together?

21 A    Well, I was doing this at the request of Emergency

22 Manager Kevyn Orr.

23 Q    And did you see yourself as working at that point on

24 behalf of the state or on behalf of the city?

25 A    I actually saw that I continued to work on behalf of my

1  own company, but I'd been asked to take on a task, and I

2  agreed to do that.

3  Q   Okay.  And did you see any conflict in that regard?

4  A   No.

5         MS. PATEK:  That's all I have.  Thank you.

6         THE COURT:  Anybody next?  Questions from the state

7  or the city?

8         MR. ELLSWORTH:  No, your Honor.

9         MR. SHUMAKER:  The city has no questions, your

10  Honor.

11         THE COURT:  Mr. Baird, you are excused.  Thank you

12  very much for your testimony today.

13         THE WITNESS:  Thank you, your Honor.

14     (Witness excused at 1:33 p.m.)

15         MR. KING:  Good afternoon, your Honor.  Ron King

16  with Clark Hill on behalf of the Retirement Systems.  The

17  next witness we're going to call is Brad Robins.

18         THE COURT:  Step forward, please, sir, and before

19  you sit down, please raise your right hand.

20               BRADLEY ROBINS, WITNESS, SWORN

21         THE COURT:  Please sit down.

22                     DIRECT EXAMINATION

23  BY MR. KING:

24  Q   Good afternoon, Mr. Robins.

25  A   Good afternoon.

1  Q   For the record, will you please state your name and
2  business address, please?
3  A   Yes.  My name is Bradley A. Robins.  I'm a managing
4  director at Greenhill & Company, 300 Park Avenue, New York,
5  New York.
6  Q   And, Mr. Robins, could you briefly describe for the Court
7  your educational background?
8  A   Sure.  I have a BA in economics from Middlebury College
9  in Middlebury, Vermont.  I have a law degree from the
10 University of Pennsylvania.
11 Q   And where did you graduate from Middlebury College?
12 A   1986.
13 Q   And when did you attend law school?
14 A   University of Pennsylvania.
15 Q   And when did you graduate from law school?
16 A   1990.
17 Q   And for the benefit of the Court, we'd like to just go
18 through your professional background and experience.  After
19 you graduated from law school, were you employed?
20 A   Yes.  My first job was as a law clerk to Judge Walter
21 Stapleton on the Court of Appeals for the Third Circuit, U.S.
22 Court of Appeals for the Third Circuit, and after --
23 Q   And how long were you clerking?
24 A   That was a one-year job.  After that I was an attorney at
25 Wachtell, Lipton, Rosen & Katz in New York in the creditors'

1  rights department.

2  Q    How long were you employed at Wachtell?

3  A    I was employed there about six or so years, little more

4  than six years.

5  Q    And what types of work did you do as an attorney at

6  Wachtell?

7  A    As an attorney at Wachtell, I did restructurings,

8  bankruptcies, and financings along with leveraged buyouts.

9  Q    When did you leave Wachtell?

10  A    I left Wachtell in late 1998 or sometime in 1998,

11  thereabouts.

12  Q    And did you take another position at that point?

13  A    I did.  I went to the investment banking firm of

14  Houlihan, Lokey, Howard & Zukin, and I joined the financial

15  restructuring group there.

16  Q    And what type of work did you do at Houlihan Lokey?

17  A    There again it was on the banking side rather than legal,

18  but I did restructurings, distressed M&A transactions,

19  assignments like that.

20  Q    Can you give us some examples of the types of assignments

21  that you performed?

22  A    We advised United Artists, the movie theater chain, when

23  they went through bankruptcy, worked with some oil and gas

24  companies doing out-of-court restructurings as well as

25  bankruptcies.

1  Q    And what type of work were you specifically doing?

2  A    Well, I was a vice president -- a senior vice president,

3  so I was kind of leading the execution team and overseeing

4  the associates and analysts on the assignments.

5  Q    When you say "execution team," for my benefit, what does

6  that mean exactly?

7  A    It means doing the day-to-day work on the assignments.

8  Q    And how long were you at Houlihan Lokey?

9  A    About two years, a little over two years.

10 Q    And after you left Houlihan Lokey, where were you

11 employed?

12 A    At Greenhill & Company.

13 Q    And that is your present employer?

14 A    Yes, it is.

15 Q    And what year did you start with Greenhill?

16 A    I began in late 2000 or the beginning of 2001.

17 Q    And generally what types of work were you performing at

18 Greenhill?

19 A    Very similar to Houlihan Lokey, so advising companies,

20 investors, stakeholders in companies that were distressed, in

21 and outside of court restructurings or companies looking to

22 invest in distressed companies.

23 Q    And can you give us a little more specific understanding

24 of the types of work or the types of engagements that you're

25 undertaking?

1   A    Sure.  A lot of the clients are companies, so advising

2   companies who are recognizing or thinking about needing to

3   restructure.  Those have included Loral, for example, AT&T

4   Canada, Refco, which was a commodities broker.  We also

5   worked with creditors.  And another significant client over

6   the years has been the Pension Benefit Guaranty Corporation,

7   which is the sort of quasi governmental entity that

8   guarantees -- insures private company pensions, and for them

9   I advise them in connection with a number of big

10  bankruptcies, American Airlines most recently, also --

11  Q    Let me --

12  A    Sorry.

13  Q    Well, let me stop you there.

14  A    Yep.

15  Q    About how many engagements do you believe you've

16  undertaken for the PBGC?

17  A    The PBGC, maybe six, six or so.

18  Q    And for my benefit, can you explain exactly what the PBGC

19  does?

20  A    Sure.  I mean their role is to insure corporate pensions.

21  In bankruptcy cases, if a company terminates the pension

22  plan, the PBGC has to take on that -- take on the plan, so

23  the role for the PBGC in a bankruptcy is to really --

24  particularly in cases where companies are thinking about

25  terminating the plans, work to due diligence, negotiate

1  pushbacks so they keep the plans if possible and, if they

2  don't, figure out whether they can at least keep some, and

3  then negotiate the treatment they would receive in the

4  bankruptcy case if a plan is terminated.

5  Q   Can you give us a specific example of where you were

6  performing those types of services?

7  A   Yeah.  I mean the most recent is American Airlines, and

8  American Airlines filed for bankruptcy a couple years ago,

9  you know.  And when they did, they announced pretty quickly

10  they intended to terminate all the pension plans, so that was

11  a pretty good example of working with PBGC both as a member

12  of the creditors' committee but also to really diligence and

13  negotiate over that, the treatment of the pensions in the

14  plans.

15  Q   Well, let me stop you there.  Describe what you mean by

16  "diligence and negotiate" with respect to the pension

17  benefits.

18  A   Okay.  Well, you know, the question when American

19  Airlines -- American said they couldn't afford the pensions

20  anymore.  They weren't affordable.  One of the things that

21  happens early on in a restructuring discussion usually is a

22  company puts out a proposed business plan, so a big part of

23  the early work is reviewing that business plan, diligencing

24  that business plan, spending time with the leaders at the

25  airline who run the different parts of the business that

1  generate those revenues, understand it, really ask questions

2  and probe.  Usually what ends up happening is changes are

3  made to a company's business plan during that process, so,

4  you know, that was the initial stage at American Airlines.

5  Also negotiating and talking to other creditors about what

6  the effect would be if the company did successfully terminate

7  the plans and together make the case that they couldn't

8  successfully do it if they tried and they --

9  Q  I'm sorry.  They could not successfully do it if they

10  tried?

11  A  Yes.

12  Q  And why was that?

13  A  Because we were working to make the case and show that

14  they did have sufficient cash flows to afford the pension

15  plans in that case.

16  Q  And what was the ultimate outcome in the American

17  Airlines matter?

18  A  Ultimately, the plan that was confirmed keeps all the

19  pensions.  It hasn't consummated yet because they're awaiting

20  the anti-trust trial with U.S. Airways, but the plan that's

21  been confirmed has all the pension plans still in place.

22  Q  And what was your specific role in that engagement?

23  A  I led the Greenhill team that advised PBGC.  We, you

24  know, engaged in the negotiations on behalf of the business

25  folks at PBGC and deeply involved in the financial diligence

1 of American's business plan.

2 Q   Is it possible for you to quantify the number of

3 restructurings that you'd been involved in in let's say the

4 last five years?

5 A   Not specifically, but it would be dozens I would say.

6 Q   It would be enough so that if I asked you if you could

7 define what your understanding of a proposal is that you

8 could do it; is that right?

9 A   Yes.

10 Q   And how would you define a proposal in the context of the

11 restructuring work that you performed?

12 A   Well, a proposal would be a company or a debtor coming

13 forward with some pretty specific changes it wanted to make

14 to either debt or other obligations and laying out both the

15 specific changes it wants and the reasons for that.

16 Q   Along those same lines, in your experience, how would you

17 define negotiations in the context of the restructuring work

18 you performed?

19        MR. CULLEN:  Objection, your Honor.  Is there a

20 point to having a lay witness define a common term?

21        MR. KING:  This is his understanding of these terms,

22 your Honor, in the context of his experience and his work in

23 this industry.

24        THE COURT:  I agree.  I'll permit it.

25        THE WITNESS:  Can you repeat the question?

 1   BY MR. KING:

 2   Q    Sure.  In your experience in the context of the

 3   restructuring work you've done, what's your definition or how

 4   would you define negotiations?

 5   A    Typically it would involve the initial proposal from the

 6   party in a restructuring who wants to make changes to the

 7   debt or other obligations it has, and then the creditors and

 8   other stakeholders reviewing that proposal, coming back with

 9   alternatives saying yes, no, or providing some other

10   alternative, and then there's a back and forth.  It's based

11   on a combination of, you know, information that's available

12   and business leverage and negotiations.

13   Q    In your professional experience, have you developed

14   proposals -- excuse me -- developed proposals addressing the

15   affordability of pension benefits?

16   A    Yes.

17   Q    And so that would be similar to the work that you did for

18   American, for example?

19   A    Yes.

20   Q    And in that same context, have you personally been

21   involved in negotiations regarding the treatment of pension

22   benefits?

23   A    In a Chapter 11, yes.

24   Q    So that's a good point.  Have you ever had an engagement

25   involving a Chapter 9 proceeding?

1  A    I have not.

2  Q    Your experience is limited to Chapter 11?

3  A    Yes.

4  Q    Now, by virtue of the fact that you're sitting here

5  today, at some point you have been engaged in some capacity

6  to participate in the bankruptcy proceeding or the Detroit

7  restructuring matter?

8  A    Correct.

9  Q    Can you explain for the Court how you became involved in

10  this matter?

11  A    Yes.  I was contacted this spring by an attorney, Bob

12  Gordon, one of your partners, to ask if we'd be interested in

13  pitching for the role of financial advisor to the Retirement

14  Systems in contemplation of a potential restructuring of

15  Detroit.

16  Q    And when you were initially contacted, what was your

17  understanding of the scope of that engagement?

18  A    Well, my understanding -- it was certainly from the press

19  clear there were issues financially in Detroit.  I was also

20  aware that they hadn't made some of the recent pension

21  payments that they were obligated to make, so, you know, it

22  was unclear exactly what the scope would be, but we expected

23  it would involve a fair amount of diligence on the city's

24  financial situation, and we expected there'd be negotiations

25  with the city over the treatment at least of the payments

 1   that hadn't been made and maybe other items and also maybe

 2   just advising the pensions' interest in the context of an

 3   overall restructuring, including potentially a Chapter 9.

 4   Q    But initially it was really to assist in what -- if I

 5   understand it correctly, was it to assist in what the

 6   Retirement Systems believed would be a restructuring

 7   negotiation on a going forward basis?

 8   A    Yes.

 9   Q    And you're aware that at least conceptually a Chapter 9

10   had been discussed either in the media or elsewhere?

11   A    Yes.

12   Q    Was it your understanding that you -- that Greenhill was

13   retained specifically to advise the Retirement Systems with

14   respect to a Chapter 9 filing?

15   A    No.

16   Q    And what is your understanding of the scope of the

17   testimony that you've been asked to provide today?

18   A    My understanding is that I'm being asked to testify about

19   whether there were negotiations that took place between the

20   city and the Retirement Systems in advance of the Chapter 9

21   filing.

22   Q    And in your judgment, had any negotiation -- did any

23   negotiations take place between the city and the Retirement

24   Systems prior to the Chapter 9 filing?

25   A    No.

1  Q   You're familiar with the June 14, 2013, proposal for

2  creditors?

3  A   Yes.

4  Q   And you're aware that there was a meeting that was

5  conducted at the Detroit airport with respect to that

6  proposal?

7  A   Yes.

8  Q   And did you attend that meeting?

9  A   I did not.

10 Q   Have you subsequently come to an understanding of what

11 occurred at that meeting?

12 A   Yes.

13 Q   And what's your understanding?

14 A   My understanding is that Kevyn Orr and others took the

15 people who were there through a 120-page deck, and I'm not

16 sure exactly in what detail, but really starting to make the

17 case that the city was in serious financial issues and would

18 want to engage in restructuring discussions with the

19 creditors who were there.

20 Q   And the deck you're referring to is the document that's

21 titled "Proposal for Creditors"?

22 A   Correct.

23 Q   And have you personally reviewed that document?

24 A   I have.

25 Q   And have members of your team reviewed that document?

1    A    Yes.

2    Q    Is it possible to characterize how many hours you or your

3    team may have spent analyzing the materials that were

4    presented in that deck, as you described it?

5    A    I mean the deck itself I'm sure we've each spent at least

6    a few hours on it and then more diligence to the items behind

7    it.

8            MR. KING:  Can we look at Exhibit 43, page 109,

9    please?

10   BY MR. KING:

11   Q    And if I can turn your attention to the paragraph almost

12   at the bottom referring to claims for unfunded pension

13   liabilities.

14   A    Yes.

15   Q    See where I'm referring?

16   A    Yes.

17   Q    And you're familiar with that paragraph; correct?

18   A    I am.

19   Q    And would you consider this to be a proposal with respect

20   to the unfunded pension liabilities?

21   A    It may be a proposal for the unfunded liabilities, but I

22   didn't consider it a proposal in terms of how to treat the

23   pension plans overall.

24   Q    There's a note in there that discusses underfunding of

25   approximately $3.5 billion.

1    A    Yes.

2    Q    Do you know what -- do you know what that is referring

3    to?

4    A    Yes.  That's referring to the city's estimate of the

5    underfunded actuarial accrued liability for -- combined for

6    the two pension funds.

7    Q    And do you know how that number was derived?

8    A    I believe it was derived by Milliman running the math

9    based on assumptions that representatives of the city gave

10   it.

11   Q    And do you have an understanding of how the pension

12   liability is proposed to be treated as set forth in this

13   proposal or in this document?

14   A    Yes.

15   Q    And what's that understanding?

16   A    The understanding is that in this document it proposes

17   that underfunding would be treated ratably with the other

18   unsecured creditors, although, again, I think that's what it

19   says.  It's not entirely clear.  The other groups on that

20   page you see there's a bullet treatment, and it says what the

21   treatment is.  It doesn't say that here.  But I think this is

22   probably what it's trying to do.  And it would propose that

23   those groups share ratably in this note that is laid out in

24   the proposal here.

25   Q    Let me refer you back to the reference to the treatment

1  under the other bullet points.  Your testimony is that there

2  isn't, you know, a, quote, unquote, bullet point for

3  treatment under the unfunded pension liabilities; correct?

4  A   Correct.

5  Q   And I'm sorry.  What did you -- you thought there might

6  be some significance with respect to that omission?

7  A   No.  I just note that although this may be a proposal for

8  how to treat the underfunding, you know, it's not a hundred

9  percent clear, and I'm just noting that, for example, it

10  identifies treatment for all the other classes.  It doesn't

11  do so for the unfunded pension liabilities.

12  Q   And your testimony was that the unfunded pension

13  liability would be treated ratably.  Can you explain what

14  that means?

15  A   Yeah.  What it looks like, each line lists -- each

16  category on this page 109 lists out an aggregate estimated

17  claim amount for these different groups, and I believe this

18  proposal suggests that those claims would each get their pro

19  rata share of the new $2 billion note that is proposed in

20  this deck.

21  Q   And what's your understanding of the $2 billion note?

22  A   You know, I guess it's sort of the city's opening shot.

23  I mean I viewed it more as just a shot across the bow that

24  they're looking to negotiate, which is why there's a hundred

25  pages of information leading up to this.  The note itself I

1 thought was not really a serious proposal but may be a
2 placeholder.
3 Q   Why didn't you think it was serious?
4 A   You know, essentially, although it says it's a $2 billion
5 note, there's no maturity.  It's really promising to pay $30
6 million a year for 20 years, but they're calling it a $2
7 billion note, and I just -- I didn't view that as a serious
8 proposal.
9 Q   When you say there's no maturity, there's no obligation
10 for the city to pay?
11 A   Correct.
12 Q   And is there any income stream or security that would
13 guarantee payment of the note?
14 A   No.  It does provide for annual interest at one and a
15 half percent, and it has provisions for the note to collect
16 on extra revenue that gets collected from asset sales or fund
17 for blight removal, but there's no obligation for the city to
18 pursue any of that or, you know, any incentive for the city
19 to pursue any of that to pay the note.
20 Q   Did you take that as a serious proposal for the
21 creditors?
22 A   No.  I took it as the city sending -- putting the
23 creditors on notice that it wanted to begin the process of
24 having a discussion about a restructuring.
25 Q   And did you attend a June 20th, 2014 (sic), meeting with

1  the city and its financial advisors?

2  A   I did.

3  Q   And who -- I'm sorry.  Where was that meeting?

4  A   It was in the Coleman Young Building.

5  Q   And who attended that meeting?

6  A   There were two meetings that I attended that day, one in

7  the morning and one in the afternoon.  One of the meetings

8  was -- and the city was the host of both.  Representatives of

9  the city presented to the uniformed retirees in one and the

10 nonuniformed retirees in the other meeting, and it was meant

11 to, I believe, provide that group specifically more

12 information on the healthcare proposal that had been made and

13 to start to address, you know, their concerns the city had

14 about the pension funds as they currently existed.

15 Q   Did you attend both meetings?

16 A   I did.

17 Q   And were there any materials handed out at that meeting?

18 A   There were.

19      MR. KING:  Can we look at Exhibit 49, please?  And

20 we'll refer to page 21.

21 BY MR. KING:

22 Q   Mr. Robins, do you recall seeing page 21 of the materials

23 that were passed out at the June 20th meeting?

24 A   Yes.

25 Q   And what's your understanding of what's set forth in this

1  page?

2  A    What is set forth -- this page followed a number of pages

3  where the city kind of summarized some financial information

4  to explain -- start to really explain its view that it needed

5  to change the pension plans as they currently exist, and then

6  what it stated is it concluded -- or near concluded with this

7  saying that these are its objectives for restructuring in

8  this case of the PFRS pension fund.

9  Q    Would you characterize these objectives as a proposal?

10 A    No.

11 Q    And did you ever provide any feedback to the city or any

12 of its professionals with respect to these objectives?

13 A    The feedback really was, you know, when will the data

14 room be open so we can start to do the work and do the

15 information gathering we need to engage in a negotiation with

16 you.

17 Q    At the June 20th meeting, were there any negotiations

18 between the Retirement Systems and the city or its

19 professionals?

20 A    No.

21 Q    And there's been some prior testimony with respect to the

22 data room, but can you explain to the Court your

23 understanding of the data room and its function in the

24 capacity of the Detroit restructuring?

25 A    Sure.  It's an electronic data room where the city has

1    loaded onto, you know, a virtual data room, as they call it,

2    financial legal information about the city, its assets, its

3    historical finances, you know, the business plan going

4    forward and the back-up and build-up to that business plan.

5    Q    Is the use of a data room a fairly common practice in the

6    context of the restructuring engagements that you've been

7    involved in?

8    A    Yes.

9    Q    And what's the benefit or the value of populating a data

10   room with financial information?

11   A    Well, it lets a debtor or in this case the city provide

12   information to all of its creditors or the creditors it wants

13   to -- needs to negotiate with in a pretty efficient manner

14   and makes sure all the creditors are getting the same

15   information at the same time.

16   Q    Did you or anyone on your team -- let me back up.  When

17   did the Greenhill term first obtain access to the data room?

18   A    I believe it was June 21st.  I think it was just after

19   these meetings.

20   Q    And in the context of gaining access, Greenhill had to

21   execute certain nondisclosure agreements and confidentiality

22   agreements.  Is that accurate?

23   A    That is true.

24   Q    And have you or members of your team accessed the

25   information that's contained in the data room?

1    A    Yes.

2    Q    And when you accessed that information, did you come to

3    an understanding of whether or not the information that was

4    in the data room as of June 21st was complete?

5    A    Yes, I did.

6    Q    And what was that understanding?

7    A    It was not complete.

8    Q    And what did you find to be lacking?

9    A    Lots of information on values of assets, different

10   projections and build-ups, and it really is typical.  A data

11   room is loaded.  People start looking.  They ask questions.

12   That leads to more requests for additional information, and

13   that's a typical -- it's an iterative process, which is

14   typical, and that's what's happened here and is ongoing.

15   Q    In the data room, were there any proposals with respect

16   to pension benefits?

17   A    No.

18   Q    You described an iterative process that would involve

19   asking questions.  Did you or anyone on your team at

20   Greenhill subsequently ask the city or its professionals for

21   additional information following your review of the

22   information in the data room?

23   A    Yes.

24   Q    And which professionals particularly have you had contact

25   with?

1   A   At Greenhill or at --

2   Q   At the city.

3   A   At the city?  The diligence questions mostly go through

4   Miller Buckfire, the formal questions.  The request is that

5   formal lists be made and sent around.  A lot of the

6   conversations, though, also take place with Conway MacKenzie

7   and, in addition, professionals from Ernst & Young.

8   Q   Since June 21st, how often would you say that Greenhill

9   has requested information from the city or its professionals?

10  A   I would say formerly -- formerly -- sorry -- formally in

11  writing maybe a half dozen times, but there's a lot of, you

12  know, conversation that goes on pretty regularly as we try to

13  work through that.

14  Q   And by a conversation, I'm assuming that's your team

15  picks up the phone and contacts someone from, say, Miller

16  Buckfire, for example?

17  A   Correct; correct.

18  Q   And is that happening on a regular basis?

19  A   Yes.

20  Q   And for the most part, have the professionals of the city

21  been responsive to your requests?

22  A   They've been responsive.  I think they had struggled at

23  times to get information that we have asked them for, but

24  they have been responsive in acknowledging the receipts

25  and -- the receipt of our requests and trying to track it

1   down, I believe.

2   Q   When you say that they've been frustrated, what do you

3   mean by that?

4   A   I think some of the information that's been requested --

5         MR. CULLEN:  Objection, your Honor.  He's

6   characterizing somebody else's state of mind.

7         MR. KING:  I'm just asking the witness whether --

8   what his understanding was of the discussions that he's

9   having with the professionals from the city, your Honor.

10         THE COURT:  He can testify to what they said.

11         MR. KING:  That's fair.

12   BY MR. KING:

13   Q   What did they say, Mr. Robins?

14   A   They have at times expressed -- I won't say frustration,

15   but that they are having difficulty getting the information

16   that we've asked them for.

17   Q   Do you believe that prior to July 18th Greenhill was

18   furnished complete information to fully evaluate what was

19   laid out in the June 14 proposal to creditors?

20   A   No.

21   Q   Can you give a couple of examples of the type of

22   information that you requested but did not receive prior to

23   July 18th?

24   A   I mean a major category is the value of assets.  I mean,

25   you know, there's two main sources of recovery for creditors

1   here.  One is from cash flows, and one is from assets.  And

2   there's been very little information available on the value

3   of assets, for example.

4   Q    And did you attend diligence meetings on July 9th?

5   A    I did.

6   Q    And what were the nature of those meetings?

7   A    Those meetings were conducted primarily by Conway

8   MacKenzie and Ernst & Young, and it was to provide an

9   opportunity for creditors and creditors' advisors -- you

10  know, the audience was primarily the financial advisors for

11  some of the different creditor groups -- opportunity for them

12  to ask questions and engage in some discussion about how the

13  ten-year projections were constructed and put together.

14  Q    Where was that meeting conducted?

15  A    That was held -- I believe it's called Cadillac Plaza in

16  midtown here in Detroit.

17  Q    And were there any proposals set forth at that meeting?

18  A    No.

19  Q    Were there any negotiations that occurred at that

20  meeting?

21  A    No.

22  Q    Did you attend a meeting on July 10th with the city and

23  its advisors?

24  A    Yeah, several.  The diligence meeting of July 9th carried

25  over to July 10th, so that -- I was there till about one

1  o'clock, and then in the afternoon certain city advisors met

2  with I guess the representatives of the retirees again, one

3  meeting with the uniform, one nonuniform, but a smaller

4  group.

5  Q   And who was there on behalf of the city?

6  A   At which meeting?

7  Q   The smaller meetings that you're describing that occurred

8  on the afternoon of July 10th.

9  A   It was David Heiman and Evan Miller from Jones Day, Chuck

10 Moore from Conway MacKenzie, and I think Gaurav Malhotra from

11 E&Y was there as well.

12 Q   At any of the meetings that you attended on July 10th,

13 were there any proposals presented to you or your team?

14 A   There were no proposals for treatment of the pensions.

15 There was discussion about setting up a structure really to

16 diligence -- I thought of it as to continue the diligence on

17 pension issues.

18 Q   Were there any negotiations at any of those meetings?

19 A   No.

20 Q   Do you think that prior to July 18th that the city had

21 thought it presented a proposal to you to consider?

22 A   No.

23 Q   Why is that?

24 A   There were at least two occasions, meetings I was at,

25 where there was discussion specifically of OPEB and the

1  treatment of healthcare, and financial advisors to other
2  creditors asked the city advisors, "Have you made a proposal
3  as to pensions?" and the answer was no.
4  Q  Just a couple more questions.  Prior to July 18th, did
5  the city or any of its professionals ever present to you or
6  your team any scenario which did not contemplate the
7  impairment or diminishment of pension benefits?
8  A  No.
9  Q  Could they have done so?
10      MR. CULLEN:  Objection.  Foundation, your Honor.
11      THE COURT:  I'm not sure what the question means,
12  could they have done so.
13  BY MR. KING:
14  Q  Was there sufficient data prior to July 18th to come up
15  with a proposal that didn't contemplate impairment or
16  diminishment of pension benefits, in your judgment?
17  A  I hadn't seen it.  I don't know if they had it or not.
18  Q  In your experience, do you believe that the 35 days
19  between the June 14th meeting and the July 18th bankruptcy
20  filing was a reasonable period of time for your team to
21  evaluate data, perform the analysis that you deemed
22  appropriate, and come up with solutions or proposals for the
23  city's consideration?
24  A  No.
25  Q  And I assume the same answer is true for the 28-day

1   period that elapsed between the time Greenhill was provided

2   access to the data room on June 21st and the filing of the

3   bankruptcy on June 18th -- July 18th?  Excuse me.

4   A   That is correct.

5   Q   So last question and important question.  Throughout your

6   entire experience in the process of working with the city and

7   its advisors, were there ever any negotiations with respect

8   to pension benefits?

9   A   Ever or pre-petition?

10  Q   Pre-petition.

11  A   Pre-petition, no.

12         MR. KING:  Thank you.

13         THE COURT:  Thank you.  Other questions for the

14  witness?

15         MR. CULLEN:  If I may, your Honor --

16         THE COURT:  One second.  We have Ms. Levine who

17  wants to ask some questions.

18         MR. CULLEN:  Oh, I'm sorry.

19                  DIRECT EXAMINATION

20  BY MS. LEVINE:

21  Q   Sharon Levine, Lowenstein Sandler, for AFSCME.  Good

22  afternoon.

23  A   Hello.

24  Q   You just testified that you didn't think the month and

25  three or four days was sufficient time to negotiate a

1  proposal and come up with a consensual resolution; correct?

2  A    Correct.

3  Q    Do you believe it was -- one of the things the city seems

4  to be contending is that it was impractical and it couldn't

5  have been done no matter how much time you had.  Do you

6  believe, given a reasonable period of time, you could have

7  come up with a proposal or a solution or a consensual

8  arrangement with the city?

9  A    Yes.

10         MS. LEVINE:  Thank you.

11         MR. CULLEN:  Good afternoon, your Honor.

12                      CROSS-EXAMINATION

13  BY MR. CULLEN:

14  Q    Good afternoon, Mr. Robins.  I'm Thomas Cullen of Jones

15  Day representing the city.

16  A    Good afternoon.

17  Q    I believe we met briefly in one of those big rooms a

18  couple weeks ago.

19  A    I believe that's right.

20  Q    All right.  A few questions for you.

21         MR. CULLEN:  If I could have Exhibit 48, which is

22  one of the document -- which is the other document from the

23  June 20th meeting, the presentation with regard to the

24  nonuniform retirees.

25  BY MR. CULLEN:

1  Q   Do you see that, sir?  Do you see it in front of you?

2  A   I do, yeah.

3  Q   Remember this document?

4  A   Yes, I do.

5  Q   Okay.  And I'm going to direct you to -- my basic

6  question is going to be with respect to this document, was

7  the city presenting ideas for the restructuring that it

8  wanted a response from you on in this document?

9  A   Unclear.  I mean this document clearly presents a

10  proposal on healthcare.  When it comes to pensions, it talks

11  about objectives, and I think is this one possible ideas, so,

12  you know, again, I viewed this, I think I said before, as

13  part of the city wanting to kick off discussions, you know.

14  Our reaction was when is the data room open because we need

15  to start digging and understanding your position.

16  Q   So let's flip through it just quickly.

17  A   Sure.

18  Q   Let's look at page 8.  Eight.  Here we go.  That's what

19  you talked about in terms of objectives for retiree

20  healthcare restructuring; is that right?

21  A   No.

22  Q   That wasn't in the document?

23  A   That's not what I was referring to.

24  Q   Okay.  But it is part of the document that was presented

25  to you on this date; right?

1   A    It is, yes.

2   Q    Okay.  And it set forth some objectives for the city for

3   this process of restructuring, did it not?

4   A    It does.

5   Q    All right.  And did you discuss those objectives?

6   A    I did not.

7   Q    Okay.  And did you offer any ideas for different ways to

8   address those objectives?

9   A    No.

10  Q    Okay.  Let's look at the next page, page 9, for Medicare

11  eligible retirees, proposed design solution.  Do you see

12  that, sir?

13  A    I do.

14  Q    And was that discussed at this meeting?

15  A    It was discussed at the meeting, yes.

16  Q    And what was your part of that discussion?  What did you

17  say?

18  A    I listened.

19  Q    You didn't say anything?

20  A    I said nothing.

21  Q    Okay.  Did you understand the page?

22  A    Yes.

23  Q    Let's look at page 10 where it presents the rationale for

24  that structure.  Did you discuss with the city the rationale

25  for that structure as presented in that meeting?

1  A   I did not.

2  Q   Okay.  Let's look at page 11 where it says "proposed

3  design solution."  Was that presented at the meeting?

4  A   It was.

5  Q   Okay.  And what was your response -- did you discuss it?

6  A   No.

7  Q   You just listened?

8  A   Yes, I did.

9  Q   Okay.  And on page 12 where we talk about the rationale,

10 did you discuss the rationale or take issue on the rationale?

11 A   I did not.

12 Q   Did you understood -- you understood what was being

13 presented in those --

14 A   I did.  I understood a healthcare restructuring proposal

15 was being made.

16 Q   Okay.  All right.  So when we look at page 14 and --

17 well, it's 13 and 14 for both.  You understood that there was

18 a proposed design solution being suggested for healthcare.

19 A   Yes.

20 Q   And you understood that in the course of this meeting as

21 a whole, the city was conveying to you the message that it

22 wanted to work cooperatively with the creditors on these

23 issues; correct?

24 A   Yes.

25 Q   All right.  And by "work cooperatively on those issues,"

1   it wanted you to engage in discussion of these ideas so that

2   progress could be made; correct?

3   A    I don't know.  I'd be speculating.

4   Q    Was that your understanding?

5   A    Yes.

6   Q    Okay.  And as a matter of fact, on page 15 under the

7   heading "Key Message," that's exactly what the city was

8   telling you; correct?

9   A    Correct.

10  Q    Now, let's move on through the document to page 20, if we

11  could, please.  Twenty.  Once had a trial where in the middle

12  the whole system went down.  The woman running it nearly had

13  a heart attack, and there was mad copying going on in the

14  halls.  She nearly had to be sedated.  You see this, plan

15  freeze contributions, GRS --

16  A    I do.

17  Q    -- right?

18  A    Yes.

19  Q    And this was proposal of an idea with respect to -- and

20  the impact of an idea or scenario on pension benefits;

21  correct?

22  A    I'm not sure if it was a proposal of an idea or an

23  illustration of a scenario, but --

24  Q    It was one or the other?

25  A    I viewed it as an illustration of a scenario as they're

1  laying out their case.

2  Q   And, again, this is something you just listened, you had

3  nothing to say about.

4  A   Correct.

5  Q   All right.  And if you look on the next page where it

6  gets to possible GSR restructuring ideas -- no, no.  Let's go

7  to 22.  Possible GRS restructuring ideas.  You see that?

8  A   I do.

9  Q   Is that right?

10  A   Yep.

11  Q   And these were ideas that the city was putting forward --

12  A   That is right.

13  Q   -- restructuring the plan?

14  A   Correct.

15  Q   And we can agree that they're ideas and they're

16  discussable ideas?

17  A   Yes, we can.

18  Q   And from your field, you understand these ideas and how

19  you could discuss them; correct?

20  A   Correct.

21  Q   Because you had already had some exposure to the data

22  here because you had full access to the systems actuary,

23  Gabriel, Roeder; correct?

24  A   Correct.

25  Q   And so in order to get information about how the system

1   was actually being run and the actual liabilities of the

2   system, you had firsthand knowledge of that; correct?

3   A   Correct.

4   Q   And there were no restrictions placed upon your access to

5   Gabriel, Roeder?

6   A   No.

7   Q   Now, but again with respect to -- going back to 21 now

8   for just a second, in terms of the objectives for the GRS

9   restructuring, was there any discussion of those objectives?

10  A   I don't recall specifically.  I mean we were in a very

11  large conference room.  Questions were only accepted in

12  writing on note cards.  So I think, you know, it was really a

13  presentation by the city, so it was not a small back-and-

14  forth discussion.

15  Q   And, again, you just listened?

16  A   I did.

17  Q   And after the meeting, with respect to all of these

18  things that you just listened to --

19  A   Yes.

20  Q   -- at the meeting, with respect to the scenarios and the

21  ideas of the structures and the rationale --

22  A   Yep.

23  Q   -- presented at this meeting --

24  A   Yep.

25  Q   -- did you pick up the phone and say, "Explain this to me

1  better"?

2  A   I did not say that.  I said, "When will the data room be

3  open?" is what I said.

4  Q   Okay.  And even after the data room was open, as you

5  indicated, this would be an iterative process --

6  A   Absolutely.

7  Q   -- by which you mean that more production yields more

8  questions --

9  A   Yes.

10  Q   -- and so on and so on; correct?

11  A   Yes.

12  Q   All right.  And, again, page 23 here, work cooperatively

13  to equitably restructure GRS pensions consistent with the

14  city's severe financial limitations, do you see that?

15  A   Yes.

16  Q   Did you understand again here consistent with your

17  understanding of what was being attempted by the city on June

18  14th that the city was trying to coax a response or ideas out

19  of you; correct?

20  A   Not clear to me at all really since, again, the data room

21  wasn't even open.  I viewed this as an opening salvo where we

22  don't want to work with you, but the first step of that is

23  getting the data room open, so --

24  Q   Do you have your deposition there available?  Do you have

25  your deposition available?

```
 1   A    No.

 2   Q    Please.

 3            MR. CULLEN:  May I approach, your Honor?

 4            THE COURT:  Yes.

 5   BY MR. CULLEN:

 6   Q    And if you look at page 46, items -- lines 2 through 6,

 7   where you were asked, "What did you understand the city's

 8   request for cooperation to mean?" and the answer was, "Well,

 9   I understood that they were looking to have negotiations at

10   some point over the OPEB and the pension obligations."

11            MR. KING:  Your Honor, objection.  To the extent --

12   to the best of my knowledge, all we have is a rough draft,

13   uncertified copy of the deposition transcript today.  As long

14   as the witness doesn't mind answering or can answer the

15   questions, I don't have a problem with proceeding.  I just

16   want to, you know, bring that to the Court's attention

17   because I know the Court is sensitive to having the official

18   record available.

19            THE COURT:  Thank you, sir.

20            MR. CULLEN:  Is it all right if I proceed, your

21   Honor?

22            THE COURT:  Yes.

23            MR. CULLEN:  All right.

24   BY MR. CULLEN:

25   Q    Would you agree that the Jones Day's generally --
```

1    attorneys in this meeting generally took an approach that,

2    look, we think there is this problem, here's some possible

3    ideas that we thought of, but we're going to want to get you

4    to see or work cooperatively to equitably restructure these

5    pensions consistent with the city's severe financial

6    limitations?  Do you agree with that, sir?

7    A    I'm sorry.  Were you just reading from the --

8    Q    If you take a look at 46, 7 through 17.

9    A    46, 7 -- yeah.  You're reading my answer there?

10   Q    Yes.

11   A    Yeah, I do agree with that.

12   Q    Okay.  All right.  Now, as of this time and at no time in

13   terms of the ideas that the city was coming up with and

14   bouncing off you in this meeting, did you ever have any

15   substantive response to any of these ideas?

16   A    No, other than we really need to dig in to do the work on

17   the diligence.

18   Q    Okay.  All right.  Now, let's -- in terms of your

19   relationship with your client throughout this period, did you

20   ever have authority to negotiate any diminution or impairment

21   of vested pension rights?

22   A    No.  I mean there was no specific proposal that I took

23   back to them, so there's no reason they would have given me

24   that.

25   Q    Did you take these ideas back to them, the ideas we've

1   talked about in the January 20th proposal?

2   A   Yes.  We told them about the meeting, and some of the

3   trustees were there, so they were aware of those ideas.

4   Q   And did you ask for authority to discuss any of these

5   ideas?

6   A   No.

7   Q   Did they ever give you authority to discuss any of these

8   ideas?

9   A   No.

10  Q   These, I take it, are all ideas in which you have

11  competence, training, and the expertise to address and

12  discuss; correct?

13  A   With sufficient information, yes.

14  Q   Okay.  And it's true, is it not, that with respect to

15  vested pension benefits, it was your understanding that there

16  would be no retreat or compromise beyond a hundred cents on

17  the dollar unless and until there was no alternative

18  whatsoever?  Is that true, sir?

19  A   I know it would be our starting point that the vested

20  benefits should be unaffected for sure.

21  Q   Did you ever indicate any willingness to move beyond that

22  starting point?

23  A   Probably not.

24  Q   And did you, in fact, indicate affirmatively that you had

25  no authority nor any intention of moving beyond that starting

1  point?

2  A   I don't believe so.

3  Q   Okay.  Did members of your client in meetings before the

4  date of filing indicate that position either to you or to

5  representatives of the city?

6  A   I don't know.

7  Q   If I'll take you forward to the meeting on -- the small

8  group meeting on July the 10th, I believe it was --

9  A   Yes.

10  Q   -- with representatives of Jones Day --

11  A   Yes.

12  Q   -- and I believe at that meeting the Jones Day lawyers

13  were trying to set up a process to deal with your diligence

14  problem, correct, among other things?

15  A   Yes.

16  Q   And they were trying to set up a four-step process;

17  correct?

18  A   Yes.

19  Q   Do you remember the four steps?

20  A   I believe so.

21  Q   Do you?

22  A   I believe I do, yes.

23  Q   Could you tell us?

24  A   I will try.

25  Q   Okay.

1  A   The proposed four steps were to first have the actuaries

2  spend time together to see if they could agree on what the

3  underfunded liability is.  The second step was to have the

4  financial advisors spend time working with each other to see

5  if they could agree on how much cash was available to fund

6  pension funds.  The third step would be, in light of the

7  results of the diligence on those first two, to see if

8  parties could agree on whether or not any changes needed to

9  be made to the pensions.  And the last step would be if

10  changes were required, what mechanisms could be put in place

11  to restore benefits if things turned out better later on.  I

12  believe that is what they proposed.

13  Q   And at that meeting, there was at least discussion in

14  which you participated of the merits of that four-step

15  process; correct?

16  A   Correct.

17  Q   And you took the viewpoint that deciding what was

18  available in terms of assets or funding should precede

19  looking at the amount of the underfunding; correct?

20  A   Correct.

21  Q   And you and representatives of the city argued the merits

22  of the two different positions; correct?

23  A   Correct.

24  Q   And you didn't come to a conclusion at that meeting?

25  A   That is correct.

1  Q   Okay.  Was it in your view that whether step one came

2  first or step two came first, was that a deal breaker for you

3  or your client?

4  A   No.

5  Q   All right.  But, nonetheless, you had to go back to your

6  client to get authority even for that; correct?

7  A   Correct.

8  Q   And the authority you were going to get from your client

9  was in a meeting some eight days later?

10 A   About --

11 Q   Was to be --

12 A   Yes.

13 Q   -- in a meeting some eight days later?

14 A   Yes.

15 Q   Okay.  And sometime during that eight-day period, were

16 you feeling any sense of urgency about these negotiations at

17 this time?

18 A   No.

19 Q   Okay.  And during this eight-day period, your client

20 decided to file a suit against the city, the state, the

21 governor, and the financial manager; correct?

22 A   I believe that's right, but --

23 Q   Yeah.  When did you know that they were going to file a

24 suit with the stated objective in the suit filed July 17th

25 that neither the governor nor the emergency manager either

1    inside or outside bankruptcy had any authority to impair any

2    vested pension rights?  That was the point of the suit, as

3    you recall it; right?

4    A    I believe that's correct, yeah.

5    Q    All right.  When did you know that they were preparing

6    that suit?

7    A    I don't know.

8    Q    Was it before or after July the 10th?

9    A    I believe it was after, but I'm not sure of that.

10   Q    All right.  Were you working out of the same offices as

11   Clark Hill at some times during this engagement?

12   A    At some times, yes.

13   Q    Yeah.  Did you ever become aware that they were preparing

14   for this litigation while you were in their offices?

15   A    No.

16   Q    Did you ever discuss it with the lawyers for Clark Hill?

17   A    After it was filed I think I did.

18   Q    All right.  So with respect to this lawsuit, was it your

19   understanding that by virtue of either negotiations or to the

20   law -- or through the lawsuit, that the -- that your client,

21   the Retirement Systems, would exhaust every legal remedy

22   before they would negotiate any diminution in vested pension

23   rights?  Was that your understanding?

24   A    No.

25   Q    All right.  Tell me what you have that's inconsistent

1   with that understanding.  What authority did you have pre-
2   petition to address those issues, even to address ideas?
3   A   Again, I don't know that I had any specific authorities.
4   I didn't request it.  The advice to my client was we need a
5   lot more information before we're ready to engage on this.
6   Q   Well, let's just take a for instance.  This is a defined
7   benefit -- the current plan is a defined benefit plan, is it
8   not?
9   A   It is.
10  Q   And the city was proposing a defined contribution plan,
11  was it not?
12  A   Correct.
13  Q   Were you ever asked to your -- by your client or did you
14  suggest to your client that you could address a hybrid plan
15  which maintained elements of both?  Does that make sense to
16  you as a concept, sir?
17  A   It does, yes.
18  Q   Okay.  Within the range of your gifts and expertise to
19  put together such a plan; correct?
20  A   With some help from the actuaries, yes.
21  Q   All right.  And it was also within the range of your
22  expertise to address the fourth point on the four-point
23  program, which would be how to get back some of the lost
24  pension funding that might have been lost in the early years
25  of the reinvestment; correct?

1  A   Correct.

2  Q   All right.  And prior to the petition date, did you ever

3  address that in detail?  Did you ever propose anything?

4  A   Look, as I told you, where I wanted to start is

5  affordability.  All right.  So the primary issue for us was

6  getting together with the city, understanding the business

7  plan, and seeing whether we agreed with their view they could

8  afford it or not.  We were nowhere on that, so the rest of

9  this you're just -- you're getting ahead of yourselves.

10  Q   Okay.  Ms. Levine asked you how long you thought a proper

11  negotiation process would take for this set of obligations

12  for the city.  Do you remember that question?

13  A   I don't think that's what she asked, but --

14  Q   Well, I'll ask you.  How long do you think it would take?

15  A   It's really a function of a lot of things, including

16  information availability, so I don't know.  I don't know.

17  Q   Did you ever make a representation to the city that if I

18  get "X" information, that I can -- we can clear this up in

19  some finite amount of time?

20  A   No.

21  Q   So you at no point offered the city any finite

22  negotiation path; correct?

23  A   That's correct.

24  Q   All right.

25         MR. CULLEN:  That's all I have, your Honor.

1    THE COURT:  Any other questions for the witness?

2    MR. KING:  Just a couple, your Honor.

3    THE COURT:  Go ahead, sir.

4                    REDIRECT EXAMINATION

5  BY MR. KING:

6  Q   Mr. Robins, in your engagement with the Retirement

7  Systems, have you been asked to take a direct role in

8  evaluating healthcare benefits for retirees?

9  A   No.

10    MR. CULLEN:  I was just going to direct him to pre-

11  petition, so -- but if it's no, it's no.

12    THE WITNESS:  No.

13  BY MR. KING:

14  Q   You're not -- you haven't been asked to evaluate OPEB at

15  all with respect to retiree benefits?

16  A   Correct.

17    THE COURT:  The questions were focusing on pre-

18  petition, please.

19    MR. KING:  Pre-petition.

20    THE WITNESS:  Understand.

21  BY MR. KING:

22  Q   And your testimony was that you believe Greenhill first

23  had access to the data room on June 21st?

24  A   Correct.

25  Q   And at any time prior to the filing of the petition, did

1  you feel you had sufficient information to make any

2  meaningful proposal to your client?

3  A    No.

4  Q    And on the July 10th meeting you just testified regarding

5  the four-step process, do you recall that testimony?

6  A    Yes.

7  Q    As of July 10th, did you believe that you had sufficient

8  data or information to meaningfully respond to that four-step

9  process?

10  A    Well, I viewed the process -- and I think the question

11  from Jones Day characterized it this way, I agree -- as a

12  process really to address the diligence issues around -- the

13  diligence issues around pension issues.

14  Q    At that July 10th meeting, did you have or gain an

15  understanding of what the city's position was relative to the

16  treatment of pension benefits going forward?

17  A    Not specifically, no.

18  Q    Did you understand their position to be that in all

19  circumstances there had to be an impairment or diminishment

20  of those pension benefits, at least as presented as of July

21  10th?

22  A    Well, I think they made it clear that they needed some

23  sorts of changes, and, you know, consistent with the

24  materials from June 20th, they had some different ideas they

25  had in mind, but they didn't have a specific proposal.

1  Q   Can you engage in meaningful negotiations in a

2  restructuring setting without an overall asset picture of the

3  restructuring entity, the City of Detroit in this case?

4  A   Not very effectively, no.

5  Q   At any time prior to the pension systems filing its

6  lawsuit on July 17th, did anyone from the pension systems

7  ever tell Greenhill to cease and desist discussions, phone

8  calls, e-mails, with the city or any of the city's

9  representatives?

10  A   No.

11          MR. KING:  Nothing further, your Honor.

12          THE COURT:  Any further questions?

13          MR. CULLEN:  No redirect, your Honor.

14          THE COURT:  Thank you, sir.  You may step down, and

15  you are excused.

16          THE WITNESS:  Thank you.

17          MS. LEVINE:  Your Honor, sorry.

18          THE COURT:  I'm sorry.

19          MS. LEVINE:  Just a couple.

20          THE COURT:  Oh, I'm sorry.  Yes.  You're not

21  excused.

22                      REDIRECT EXAMINATION

23  BY MS. LEVINE:

24  Q   Just going back to the colloquy with regard to what was a

25  reasonable period of time --

1    A    Yes.

2    Q    -- in the American Airlines case, for example, that was a

3    complex pension issue; correct?

4    A    Yes.

5    Q    And at the time that the company filed, the debtor's

6    position was that the pensions were going to be terminated;

7    correct?

8    A    Correct.

9    Q    And within the time period -- it took, in fact, less than

10   the time period it took for that company to run through its

11   1113 process, you had -- the PBGC already negotiated and

12   resolved and entered into a settlement agreement to resolve

13   the pension issues; is that correct?

14   A    I believe that is correct, yep.

15   Q    Okay.  Going back to United Airlines, Greenhill was also

16   a financial advisor in that case as well; correct?

17   A    Correct.

18   Q    And the pension issues were resolved also within a

19   relatively -- one-, two-, maybe three-month period of time;

20   correct?

21   A    I honestly don't recall the timing on that, Sharon.

22   Sorry.

23   Q    All right.  Thank you.

24   A    Okay.

25            THE COURT:  All right, sir.  You are excused.  Thank

1  you.

2         THE WITNESS:  Thank you.

3      (Witness excused at 2:34 p.m.)

4         MS. PATEK:  Good afternoon, your Honor.  Barbara

5  Patek on behalf of the public safety unions, and at this time

6  the public safety unions call Mary Ellen Gurewitz.  And can I

7  just check to make sure our exhibit book is up here?

8         THE COURT:  Yes.

9             MARY ELLEN GUREWITZ, WITNESS, SWORN

10        THE COURT:  Please sit down over there.

11        MS. PATEK:  Your Honor, if I might approach again,

12  it doesn't look like the book --

13        THE COURT:  Yes.

14                    DIRECT EXAMINATION

15  BY MS. PATEK:

16  Q   Good afternoon.  Can you state your name, please?

17  A   Mary Ellen Gurewitz.

18  Q   And can you briefly tell the Court what it is you do for

19  a living?

20  A   I'm sorry.  What?

21  Q   What it is you do for a living.

22  A   Oh, I'm an attorney with Sachs Waldman.

23  Q   And what kind of law do you practice?

24  A   Union side labor law and political and election law.

25  Q   And how long have you been an attorney?

1  A   Since 1974.

2  Q   Can you give us a very brief overview of your education

3  and professional background?

4  A   I graduated from the University of Michigan in 1965 and

5  from Wayne Law School in 1974.  I then clerked for Judge

6  James Churchill in the Eastern District of Michigan, and then

7  from 1975 through 1979 I was an attorney with the National

8  Labor Relations Board.  And then I joined the law firm that

9  I'm with now.

10  Q   And in that capacity, do you represent the Detroit Police

11  Command Officers Association?

12  A   Yes, I do.

13  Q   And what is the Detroit Police Command Officers

14  Association?

15  A   It's a bargaining unit consisting of the commanders and

16  captains in the Detroit Police Department.

17  Q   And for how long have you represented the Detroit Police

18  Command Officers --

19  A   My office has represented them since about 1995, and I

20  have been their principal attorney since, I believe, 2003.

21  Q   And what kind of matters do you handle for the DPCOA?

22  A   The whole gamut of representation of a labor union, and

23  that has included grievance arbitration, negotiation.  I did

24  an Act 312 for the DPCOA, so whatever arises where they need

25  representation.

1    Q    I want to talk for a moment about Act 312.  What are Act

2    312 proceedings?

3    A    Act 312 is the statute called compulsory arbitration for

4    police and fire disputes, compulsory labor arbitration, so it

5    is a supplement to the Public Employment Relations Act.  And

6    when parties are unable to resolve their contract to reach

7    agreement on a collective bargaining agreement, they can

8    submit the dispute for compulsory arbitration.  It is

9    available only to police and fire.

10    Q    And to your understanding, is there a reason for that?

11    A    Because of the importance of public safety and because

12    they have no right to strike, it is a way to resolve their

13    disputes.

14    Q    And how are Act 312 proceedings triggered?

15    A    They are triggered when either the employer or the union

16    files a request for Act 312 with the Michigan Employment

17    Relations Commission.

18    Q    And is there a state agency that oversees Act 312

19    proceedings?

20    A    Right.  It is the Michigan Employment Relations

21    Commission.  We call it MERC.

22    Q    Ms. Gurewitz, I'd like you to take a look at in the

23    exhibit book that I handed you at the start of your testimony

24    Exhibit 718 and 719.  We'll start with 718.

25    A    All right.

1  Q   Okay.  Can you identify for the record what 718 is,

2  please?

3  A   Yeah.  718 is a MERC decision which issued in June of

4  this year.  Do you want to know the substance of it?

5  Q   Not yet.  Are MERC opinions such as Exhibit 718 public

6  records?

7  A   Yes, they are.

8  Q   And are they matters on which the Michigan Employment

9  Relations Commission has a legal duty to report?

10 A   Yes.

11 Q   And as far as you know, are they maintained as public

12 records by the State of Michigan and by the Michigan

13 Employment Relations Commission?

14 A   Yes, they are.

15 Q   And are they available to anyone who wants to access them

16 on the state website?

17 A   Yes, they are.

18        MS. PATEK:  Your Honor, at this time I would move

19 for the admission of Exhibit 718.

20        MS. KOVSKY-APAP:  Your Honor, we object on the

21 grounds of relevance and hearsay.

22        THE COURT:  The objections are overruled.  The

23 document is admitted.  What was the number again, please?

24        MS. PATEK:  718.

25     (Exhibit 718 received at 2:40 p.m.)

1    BY MS. PATEK:

2    Q    And, Ms. Gurewitz, if you could take a look at Exhibit

3    719.

4    A    Yes.

5    Q    Is that also a MERC opinion?

6    A    Yes, it is.

7    Q    And if I were to ask you the same series of questions

8    about its status as a public record, would your answers be

9    the same?

10   A    Yes.

11          MS. PATEK:  Your Honor, at this time we'd move for

12   the admission of Exhibit 719.

13          MS. KOVSKY-APAP:  Your Honor, the same objections.

14          THE COURT:  All right.  The objections are

15   overruled.  Exhibit 719 is admitted.

16        (Exhibit 719 received at 2:41 p.m.)

17   BY MS. PATEK:

18   Q    I want to ask you some general questions regarding your

19   knowledge and understanding with respect to issues related to

20   the DPCOA that they've had during the time you've been

21   representing them.  First of all, have you represented the

22   DPCOA with regard to negotiations related to pension and

23   healthcare?

24   A    Pension and healthcare are always subjects for collective

25   bargaining, so in negotiations we have certainly addressed

1    those issues.

2    Q    And as a result of your representation of the DPCOA in

3    that capacity, do you know whether or not through their

4    employment with the city DPCOA members are entitled to Social

5    Security?

6    A    They are not.

7    Q    And do you know whether or not they are entitled to

8    Medicare?

9    A    People became entitled to Medicare or it became mandatory

10   for contributions to be made for Medicare in 1986, so anyone

11   hired before 1986 is not Medicare eligible.

12   Q    And what impact does that have on DPCOA members upon

13   their retirement?

14   A    Well, they are -- assuming that they were hired before

15   1986, they are not eligible at the time they retire and they

16   will never be eligible for Medicare, and Social Security is

17   also unavailable to them, so their entire retirement income

18   comes from the pension system.

19   Q    And in the event that a DPCOA member suffers a either

20   duty- or nonduty-related disability, can you tell the Court

21   whether or not such individuals are eligible for Social

22   Security Disability?

23   A    They are not.

24   Q    And do you have an understanding as to the basis on

25   which -- well, strike that.  Do you know whether or not the

1  same rules with regard to Social Security and Medicare apply

2  to the other Detroit public safety unions; that is, the fire

3  fighters, the Police Officers Association, and the Police

4  Lieutenants and Sergeants Association?

5  A    Yes.  Exclusion from Social Security is for police and

6  fire employees.

7  Q    Do you have an understanding as to the rationale for

8  excluding police and fire from Social Security?

9  A    I think early on Social Security did not -- was not

10 available or did not cover employees of state and municipal

11 governments at all, and then gradually there were amendments

12 to the statute so that more people were brought under its

13 coverage.  It is -- there are certainly statements in the

14 legislative history and in the legislation itself that says

15 that the exclusion from Social Security is based upon the

16 fact -- or occurs only -- can only occur when the employees

17 are covered by a public retirement system which meets certain

18 standards established by the IRS.

19         MS. KOVSKY-APAP:  Your Honor, we object to this

20 testimony.  The witness is giving legal opinions.  She was

21 not called as an expert witness, and to the extent she's able

22 to give facts testimony, this isn't within her personal

23 knowledge.  She's reciting the law.

24         THE COURT:  No.  The Court will permit it, but, Ms.

25 Kovsky, I caution you that if you object to testimony, it's

1  better to do it before.

2  BY MS. PATEK:

3  Q   Moving on, Ms. Gurewitz, do you recall the last Act 312

4  proceeding in which you were involved on behalf of the DPCOA?

5  A   Yes.  We had hearings in 2009, and we got an Act 312

6  award in January 2010.

7  Q   And can you tell the Court when the last collective

8  bargaining agreement with the City of Detroit applicable to

9  the DPCOA expired?

10  A   It actually expired in June 2009 so that the Act 312

11  award that we got had already expired by the time that we got

12  it, so it was for a period from 2005 through 2009.

13       MS. PATEK:  Your Honor, at this time, I'd like to

14  bring up Exhibit 717, which previously was identified by Mr.

15  Malhotra has an agreement that was negotiated between the

16  city and the DPCOA back in 2011, 2012.  He identified the

17  city's signature on the agreement.  And I'd like to move for

18  its admission.

19       MS. KOVSKY-APAP:  Your Honor, we object on hearsay

20  and relevance.

21       THE COURT:  One second, please.  Oh, can you put it

22  back on the screen for me, sir?  Thank you.   The objection

23  is overruled.  The document 717 is admitted.

24     (Exhibit 717 received at 2:46 p.m.)

25  BY MS. PATEK:

1    Q   Ms. Gurewitz, are you familiar with Exhibit 717?

2            THE COURT:  Give me one second before you proceed.

3    Ms. Gurewitz, could you do us a favor and sit back a couple

4    of inches from the microphone?  There you go.  Thank you.

5    Now you may proceed.

6    BY MS. PATEK:

7    Q   Ms. Gurewitz, do you recognize Exhibit 717?

8    A   Yes, I do.

9    Q   And what is that?

10   A   It is a tentative agreement that was reached between the

11   DPCOA and the City of Detroit in about -- well, it's signed

12   February 2012.

13   Q   Do you know whether Exhibit 717 included -- was a

14   concessionary agreement?

15   A   Yes, it was.

16   Q   And do you know whether those concessions included

17   changes to pension?

18   A   You know, quite frankly, I'm not sure.

19   Q   Do you know whether Exhibit 717, while ratified by both

20   parties, was ever implemented?

21   A   It was not.

22   Q   And why is that?

23   A   It was rejected, as I understood it, by the State of

24   Michigan.

25   Q   And in that regard, between the negotiation of this

1   concessionary agreement and the appointment of the emergency

2   manager on March 25th, 2013, did the DPCOA make any further

3   effort to engage the city in collective bargaining?

4   A    We did.  After the rejection of the tentative agreement,

5   we periodically sought to further negotiate an agreement

6   because we had not had one for such a long time.  In July

7   2012 the city imposed new terms and conditions of employment.

8   It was called the CET.

9   Q    The city employment terms?

10  A    Yes.

11  Q    And as part of those city employment terms, was the

12  DPCOA -- was one of the things that was eliminated was their

13  right to just cause on termination?

14  A    That's correct.

15  Q    And that was under Public Act 4, is that correct, former

16  Public Act 4 that the CET --

17  A    Public Act 4 was in effect, and the CET was imposed.  The

18  city had no -- took the position that it had no obligation to

19  bargain and that it could impose terms without negotiation.

20  Q    And did there come a time when Public Act 4 was

21  subsequently suspended?

22  A    It was suspended in August of 2012.

23  Q    And at the time of its suspension, did you or the DPCOA

24  make any further effort to engage the city in negotiations

25  with regard to terms and conditions of employment for the

1    DPCOA members?

2    A    We did.  The city, prior to the imposition of the CET,

3    had actually itself initiated 312 proceedings, so when PA 4

4    was suspended, we tried to resuscitate those proceedings.

5    The city withdrew its request, and we then filed our own

6    request for Act 312.

7    Q    And did the process for Act 312 begin at that point in

8    time?

9    A    It did, and MERC appointed an arbitrator.

10    Q    And can you tell us just very briefly what happened in

11    those proceedings?

12    A    We had a number of hearing days scheduled in March of

13    2013, and prior to those hearings, the city approached us to

14    negotiate.  It was really the first time that they had

15    negotiated with us in several years.  And we had some fairly

16    productive negotiations in March of 2013, and, in fact, we

17    did postpone the hearings that had been scheduled.  We were

18    not able to reach an agreement, a complete agreement, and

19    then the emergency manager was appointed.

20    Q    And what happened once the emergency manager was

21    appointed?

22    A    Then our negotiations ceased.

23    Q    And did the city take any action in regard to ensure that

24    there were no further negotiations?

25    A    Yeah.  The city filed a motion to dismiss the Act 312

1  proceedings that the DPOA had -- excuse me -- the DPCOA had

2  pending, and there were also -- there were motions that were

3  heard by MERC to dismiss both the DPCOA Act 312, an Act 312

4  that was pending for the Detroit Police Lieutenants and

5  Sergeants Association, and an Act 312 that was pending for

6  the Police Officers Association of Michigan, which

7  represented the emergency services.

8  Q   And was the result of that motion by the city the opinion

9  that we previously identified as Exhibit 718?

10  A   Yes, it is.

11  Q   And that opinion was issued on June 14th, 2013?

12  A   Yes, it did.

13  Q   You were not involved in the meetings between the DPCOA

14  and the city that began with the meeting of creditors at the

15  airport on June 14th, 2013; is that correct?

16  A   I was not.

17  Q   And were you involved in any of the subsequent meetings

18  with the city that took place on -- the record has

19  established June 20th, July 11th, and July 10th of 2013?

20  A   No, not prior to the bankruptcy.

21  Q   Did you become involved at some point prior to the

22  bankruptcy in advising the DPCOA with regard to the issues

23  that were facing it as to the City of Detroit?

24  A   Right.  I recommended to the DCPOA and helped organize a

25  coalition of the Detroit public safety unions -- that would

1   be the lieutenant and sergeants and the commanders and the

2   DPOA and the fire fighters -- to retain bankruptcy counsel.

3           MS. PATEK:  I don't have anything further, your

4   Honor.

5           THE COURT:  Thank you.

6           MS. KOVSKY-APAP:  Deborah Kovsky-Apap on behalf of

7   the city.

8                       CROSS-EXAMINATION

9   BY MS. KOVSKY-APAP:

10  Q   Ms. Gurewitz, it's nice to see you again.  We met at your

11  deposition.  The DPCOA does not represent current retirees;

12  is that correct?

13  A   That's correct.

14  Q   So the DPCOA would not be empowered to negotiate on

15  behalf of current retirees; correct?

16  A   That is correct.

17  Q   And the DPCOA would not be authorized to enter into

18  binding agreements on behalf of current retirees; correct?

19  A   Correct.

20          MS. KOVSKY-APAP:  Thank you.  I have no further

21  questions.

22          THE COURT:  Any further questions of the witness?

23          MS. PATEK:  One question.

24          THE COURT:  Yes.

25                      REDIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Why is it that the DPCOA cannot bargain on behalf of

3  current retirees?

4  A   The statute provides that a union is authorized to

5  represent employees for purposes of negotiating over wages,

6  hours, and terms and conditions of employment, and retirees

7  are not employees.

8          MS. PATEK:  Thank you.

9          THE COURT:  All right.  You may step down.  You're

10  excused.  Thank you very much.

11     (Witness excused at 2:53 p.m.)

12          MS. PATEK:  Your Honor, at this time, the Detroit

13  public safety unions call Mark Diaz.

14                  MARK DIAZ, WITNESS, SWORN

15          THE COURT:  All right.  Please sit down.  Before we

16  proceed with questioning the witness, may I ask how many more

17  witnesses?

18          MS. PATEK:  I think this is it, your Honor.  I don't

19  want to speak out of turn, but I'm pretty --

20          THE COURT:  Anyone else have any other witnesses?

21  Any rebuttals for the city that you foresee?

22          MR. SHUMAKER:  No, your Honor.

23          THE COURT:  Or the state for that matter?  All

24  right.

25                  DIRECT EXAMINATION

1   BY MS. PATEK:

2   Q   Sir, can you state your name for the record?

3   A   Mark Diaz.

4   Q   By whom are you employed?

5   A   The Detroit Police Department.

6   Q   And are you employed by anybody else?

7   A   Yes, I am.

8   Q   And who is that?

9   A   I am employed by the Detroit Police Officers Association

10  as well as the Township of Holly.

11  Q   And with respect to the Township of Holly, what do you do

12  there?

13  A   I'm a planning commissioner.

14  Q   And with respect to -- well, first of all, what is the

15  Detroit Police Officers Association?

16  A   It's the collective bargaining unit that represents the

17  police officers of the Detroit Police Department.

18  Q   How long have you been employed by the DPOA?

19  A   I've been employed by the DPOA since January 1st of 2013.

20  Q   And how was it that you became employed by the DPOA on

21  January 1st of 2013?

22  A   I was elected by the members of the Detroit Police

23  Officers Association.

24  Q   To what office?

25  A   To the position as president.

1 Q   And how long have you been employed by the Detroit Police

2 Department?

3 A   Just under 20 years, since March 21st of 1994.

4 Q   Can you tell me a little bit just briefly about your work

5 historically with the Detroit Police Department?

6 A   As a new police officer, I worked various positions,

7 including patrol.  I worked undercover operations.  I worked

8 in community relations.  I worked in special operations,

9 which essentially is the booster crew going after -- my main

10 role was to investigate part one crimes and -- which is

11 essentially major felonies, as well as apprehending suspects

12 associated with those crimes.  I've also been an instructor

13 at the Detroit Police Academy for -- since -- well, for seven

14 years.

15 Q   And what do you teach, or what have you taught at the

16 Detroit Police Academy?

17 A   As an instructor at the Academy, I have taught the state

18 computer systems.  I was an administrator for that.  I taught

19 first-aid, CPR, AED.  I taught officers to operate and use

20 the department motorcycles as well as I taught cultural

21 diversity and advanced police ethics.

22 Q   And tell us a little bit about your educational

23 background.

24 A   Well, out of high school I began attending Schoolcraft

25 College until I was hired by the Detroit Police Department

1  shortly thereafter.  Since then I've attended Oakland

2  Community College, Wayne County Community College, and I've

3  been enrolled studying accounting with the University of

4  Phoenix for the last two years.

5  Q   And in addition to that course -- well, first, let me ask

6  you this.  Do you have any affiliation besides the fact that

7  you're a beneficiary with the Police and Fire Retirement

8  System of the City of Detroit?

9  A   Yes.  I'm an elected trustee on the Police and Fire

10  Retirement System board.

11  Q   And how long have you held that position?

12  A   Since July 1st of 2011.

13  Q   And have you taken any kind of continuing education in

14  that capacity?

15  A   Yes, I have.

16  Q   And can you tell us what that was?

17  A   It ranges but specifically executive portfolio

18  management.  I've taken that course at the Wharton University

19  twice.

20  Q   And what is executive portfolio management?

21  A   Essentially, it gives the -- it's a very rigorous course

22  that gives a trustee a basic foundation of the fundamentals

23  of running a pension system and the -- again, a basic

24  foundation for the various investments.

25  Q   You are not a finance expert, are you?

1  A   By no stretch, no, I'm not.

2  Q   And you are also not an actuary?

3  A   No, I'm not.

4  Q   As a member of the Detroit -- well, as a member of the

5  Detroit Police Department, does the city contribute to Social

6  Security on your behalf?

7  A   No.

8  Q   If you become disabled, are you entitled to receive

9  Social Security Disability?

10  A   No.

11  Q   And is -- do you have an understanding as to whether or

12  not your members are entitled to receive Social Security

13  Disability?

14  A   Not through the Detroit Police Department they are not.

15  Q   And can you tell the Court how the issue of disability is

16  addressed for DPOA members?

17  A   With respect to officers who are injured in the line of

18  duty?

19  Q   Yes.

20  A   Well, officers who are injured in the line of duty

21  ultimately are -- at this point in time, they are carried in

22  a disabled status and -- well, in essence, they receive a

23  portion of their base pay, and, again, at this time they are

24  also receiving medical benefits as well.

25  Q   And how is that funded, to your knowledge and

1  understanding?

2  A    Through the pension system.

3  Q    I want to focus your attention on the time period

4  beginning in late 2012, early 2013, and ask you this

5  question.  When was the election held that resulted in your

6  being elected the president of the DPOA?

7  A    As I recall, that was in September.  It was either

8  September or November of 2012.

9  Q    And at the time of your election, were there ongoing Act

10  312 proceedings relative to the DPOA?

11  A    Yes.

12  Q    And were those -- you became the president on January

13  1st, 2013?

14  A    That's correct.

15  Q    Upon your election, did you do anything to familiarize

16  yourselves with the ongoing Act 312 proceedings?

17  A    As president elect, I began attending the 312

18  proceedings.

19  Q    And did you continue when you became the president in

20  January of 2013 to attend and participate in those

21  proceedings?

22  A    Yes.

23  Q    And what was the result of those proceedings?

24  A    Ultimately the result was an arbitration award for the

25  Detroit Police Officers Association.

1    Q   And do you recall approximately when that award was

2    issued?

3    A   I believe it was March 25th or 26th of 2013.

4    Q   Okay.  I'm going to ask you -- there's a notebook of

5    exhibits there, and if you look at -- I believe it is 706,

6    707, and 708.

7              MS. PATEK:  May I approach the witness for just a

8    moment?

9              THE COURT:  Yes.

10   BY MS. PATEK:

11   Q   We'll start with Exhibit 706, and I know that's a rather

12   voluminous exhibit, but if you can turn towards the back,

13   you'll see on the last several pages -- come to the signature

14   pages --

15   A   Okay.

16   Q   Okay.  Can you identify -- well, strike that.  First of

17   all, is Exhibit 706 part of the arbitration award that was

18   issued by the arbitrator in the DPOA's Act 312 proceedings?

19   A   It appears to be, yes.

20   Q   And with respect to the signature pages, do you recognize

21   the signatures on those pages?

22   A   If I'm looking at the correct pages here, there are

23   several.

24   Q   Okay.

25   A   And the --

1  Q   Is one of them the signature of the arbitrator, George

2  Roumell?

3  A   Yes, it is.

4  Q   And is one of them the signature of the city's

5  representative?  I believe it was a Mr. Schafer.

6  A   Craig Schwartz.

7  Q   Schwartz?  And is one of them the DPOA's representative?

8  A   Yes.

9  Q   And that would be Mr. Iorio, I-o-r-i-o?

10  A   Yes.

11  Q   And if you could move forward to 707 and 708, and I'd ask

12  you to take a look at those signature pages as well.  And if

13  you don't mind doing them both together, we can try for a

14  twofer here.

15  A   Okay.  For 707 I see the same three signatures for Mr.

16  Roumell, Mr. Schwartz, as well as Mr. Iorio.  However, on 708

17  I only see the signature for Mr. Roumell.

18  Q   Okay.

19       MS. PATEK:  Your Honor, at this time we would move

20  for the admission of 706 and 707, which are the arbitration

21  awards issued to the DPOA.

22       MR. STEWART:  Your Honor, no objection other than

23  we -- I assume if we ask the witness he would establish

24  there's a public record foundation for these to deal with

25  hearsay objections as you did with the previous witness, or

1   if you can represent that to the Court, that'll be fine.

2   BY MS. PATEK:

3   Q    Is this record, Mr. Diaz, publicly available on the DPOA

4   website?

5            MR. STEWART:  Well, I think the actual issue is is

6   it issued by a government agency pursuant to its charter.

7            MS. PATEK:  I'm not sure it's --

8            MR. STEWART:  That's the exception in the rule of

9   evidence for it, not whether it's publicly available.  Is it

10  issued by a public body?

11           THE COURT:  Okay.  Counsel, again, I have to ask you

12  to address the Court rather than each other.

13           MR. STEWART:  All right.

14           MS. PATEK:  Your Honor, this is signed by a private

15  arbitrator.  It is overseen and administered by MERC, as Ms.

16  Gurewitz previously testified, and I believe it is a public

17  record available to anybody, but I will --

18           THE COURT:  Well, but it wasn't issued by a public

19  body.

20           MS. PATEK:  Well, it also, however, is part of a

21  proceeding in which the City of Detroit, in fact,

22  participated, had a representative sign off on and, as we

23  heard Mr. Dillon testify earlier today, to his understanding,

24  becomes part of the collective bargaining agreement between

25  the City of Detroit and the DPOA, and I think that's an

1    additional basis on which it ought to be admitted.

2            MR. STEWART:  Perhaps, your Honor, we'd have no

3    dispute if we agree it's being introduced only for what it

4    purports to say as opposed for any internal hearsay that it

5    might contain.

6            MS. PATEK:  I have no problem with that, your Honor.

7            MR. STEWART:  In other words, its rulings --

8            THE COURT:  All right.

9            MR. STEWART:  -- holdings, or award.  If that's

10   acceptable, then we would not object to it.

11           THE COURT:  With that limitation, 706 and 707 are

12   admitted.

13       (Exhibits 706 and 707 received at 3:06 p.m.)

14   BY MS. PATEK:

15   Q    To your knowledge, Mr. Diaz, did the city take any action

16   with regard to the Act 312 award that we've been talking

17   about?

18   A    Yes.

19   Q    Did it appeal a portion of the award?

20   A    Yes.

21   Q    And can you tell us about that?

22   A    The city appealed a portion of the 312 award that spoke

23   to a five-percent restoration for DPOA members which was to

24   take effect January 1st of 2014.

25   Q    And does that appeal remain pending?

1  A    Yes.

2  Q    And is it your understanding it's stayed by these

3  bankruptcy proceedings?

4  A    Yes.

5  Q    I want to focus on the time period now after Mr. Orr's

6  appointment as emergency manager.  First of all, at or around

7  that time, did you become aware that the City of Detroit was

8  searching for a new police chief?

9  A    Yes.

10  Q    And can you tell the Court what, if anything, you did and

11  in what time frame on behalf of the DPOA with regard to that

12  search?

13  A    In around March or April of 2013, I had learned of

14  several individuals who had applied or shown interest in

15  becoming the chief of police for the City of Detroit.  One of

16  the individuals I was not familiar with, I learned that he

17  was the chief of police in Cincinnati.  I then began, I

18  guess, sporadically or no real method to the madness but

19  contacting different police officers in Cincinnati and asking

20  them questions about their chief.

21  Q    Was that Chief Craig?

22  A    Yes.

23  Q    And what did you find out as a result?

24         MR. STEWART:  Objection.  Asks for hearsay.

25  BY MS. PATEK:

1  Q   Well, let me ask you this.  Did there come a point in

2  time when you actually reached out to Chief Craig?

3  A   Yes.

4  Q   And did that happen prior to him assuming the job as

5  chief of the City of Detroit Police Department?

6  A   Yes.

7  Q   And since he has become the chief of the City of Detroit

8  Police Department, have you and your members reached out to

9  him?

10 A   Yes.

11 Q   And to your knowledge, have the members of the other

12 police unions done the same?

13 A   Yes.

14 Q   And in terms of -- I'm not talking about collective

15 bargaining issues, but I'm talking about issues related to

16 the management and restructuring of the Detroit Police

17 Department.  Have you participated actively in those efforts?

18 A   Yes.

19 Q   And do you consider that there has been a give and take

20 and a sharing of ideas and exchanging of proposals in that

21 regard?

22 A   Yes.

23 Q   Do you think that you are making progress in that regard?

24 A   I do.

25 Q   With regard -- and the next series of questions I'm going

1    to ask you are going to be going only up through the date the

2    bankruptcy petition was filed on July 18th.  With respect to

3    that time frame and since the Act 312 arbitration award was

4    issued by the city, has the city engaged the DPOA in any

5    further negotiations with regard to terms of employment,

6    healthcare benefits, anything of the like?

7    A    You're referring to the time pre-petition?

8    Q    Yes.

9    A    No.

10   Q    Did you -- we've heard a lot in this courtroom, and I

11   know you, as the DPOA's representative, have sat through this

12   part of -- part of the trial, but let me ask you this, first

13   of all.  With regard to your membership, are you -- since

14   assuming the job of president -- and let's just take up

15   through the date of the filing of the bankruptcy petition,

16   have you been generally in touch with them on a day-to-day

17   basis?

18   A    Yes.

19   Q    Do you have regular communications?

20   A    Yes.

21   Q    Do you have a sense as to -- as their president as to

22   their morale?

23   A    Yes.

24   Q    Do you have a sense of the issues that are of concern to

25   them?

1   A   Yes.

2   Q   And is the issue of pension and disability an issue of

3   significant concern?

4   A   Yes, it is.

5   Q   Now, with regard to those issues, did you attend a

6   meeting at the airport on June 14th, 2013, regarding the

7   city's unveiling of a proposal for creditors?

8   A   Yes, I did.

9            MS. PATEK:  And if you could -- could I have Exhibit

10   43, page 109?

11   BY MS. PATEK:

12   Q   First of all, Mr. Diaz, with regard to the June 14th

13   meeting for creditors, was there any statement by the city or

14   its representatives as to whether or not that meeting was a

15   negotiation?

16   A   No.

17   Q   And in terms of -- in terms of your particular interests,

18   looking at page 109, I take it of particular significance is

19   the claim for unfunded pension liabilities that we see on

20   109?

21   A   Yes.

22   Q   And when you were at that meeting, first of all, were

23   people allowed to ask questions verbally; that is, was there

24   any back-and-forth discussion?

25   A   No, not that I recall.

1  Q   Do you recall at that particular meeting submitting any

2  questions?

3  A   I did not.

4  Q   Did you review this document; that is, the proposal for

5  creditors, and, in particular, page 109?

6  A   Yes, I did.

7  Q   Did you view what you saw on page 109 as a proposal to

8  the DPOA?

9  A   I did not.

10  Q   And did you -- well, strike that.  Did you attend

11  subsequent meetings on June 20th, July 10th, and July 11th on

12  behalf of the DPOA?

13  A   I believe those were the dates, yes.

14  Q   And were any of the -- at any of those meetings was there

15  any statement by the city with regard to whether or not

16  negotiations would take place at those meetings?

17  A   I'm not entirely sure I can answer that question with a

18  "yes" or "no."

19  Q   Okay.  Why not?

20  A   With respect to whether at any of those meetings --

21  excuse me -- it was portrayed to me as a union representative

22  that these meetings were negotiations, at one of the meetings

23  it was definitely portrayed to me that it was -- these were

24  not negotiations.

25  Q   And tell me how you came to understand that.

1  A   I asked a question if, in fact, these meeting -- this

2  meeting was a negotiation, and I was informed that it was

3  not.

4  Q   Subsequent -- or, well, as these meetings were

5  proceeding, were you taking any action with regard to the

6  restructuring issues facing the City of Detroit as the

7  president of the DPOA?

8  A   Yes.

9  Q   Did there come a point in time when you began

10  communicating with members of the other public safety unions

11  and their executive boards?

12  A   Yes.

13  Q   And can you tell the Court approximately when that was?

14  A   It was shortly after -- as memory serves, shortly after

15  the June 14th meeting.

16  Q   And did there come a point in time when you and the

17  presidents of the other three public safety unions -- that

18  is, the Detroit Fire Fighters, the Police Lieutenants and

19  Sergeants Association, and the Detroit Police Command

20  Officers Association -- decided as a group to reach out to

21  the city?

22  A   Yes.

23        MS. PATEK:  And if I could have -- I believe it is

24  704, and this is in evidence.

25  BY MS. PATEK:

1   Q   Mr. Diaz, do you recognize Exhibit 704?

2   A   I do.

3   Q   And before we talk about this, I wanted -- I'm sorry to

4   do this to you, but I want to step back to one point I just

5   forgot to cover. In approximately May of 2013 and before the

6   meeting of creditors, do you recall receiving correspondence

7   from an attorney at Jones Day regarding pension issues?

8   A   As I recall, yes.

9   Q   And did that -- was it an inquiry to ask if you would

10   represent the retirees who were former DPOA members?

11   A   That's exactly what I remember, and I --

12   Q   Did you respond promptly to that request?

13   A   I did, yes.

14   Q   And can you tell the Court what your response was?

15   A   That I do not represent retirees. I represent active

16   DPOA members and their future retirement benefits.

17   Q   And is there anything unique with regard to your active

18   employees with regard to some of them actually receiving, at

19   least in an escrow account, retirement benefits while they're

20   still active?

21   A   Yes. There is a -- I don't want to use the word

22   "hybrid," but there is an element of active employees who

23   are, in fact, having a portion of their retirement set aside

24   in an escrow account, and for all intents and purposes, in

25   the view of the pension system, they are, in fact, receiving

1    a pension benefit under a form of a retirement status which

2    is referred to as the deferred retirement option plan.

3    Q    And as I understand it, that means that once they elect

4    to DROP, D-R-O-P --

5    A    Correct.

6    Q    -- their retirement benefit is frozen at that level?

7    A    That is correct.

8    Q    And they cannot access it until they actually retire?

9    A    Correct.

10   Q    Going back to this letter on July 12th, this was sent to

11   Jones Day on behalf of the four public safety unions; is that

12   correct?

13   A    Yes.

14   Q    And you were indicating -- well, strike -- what was the

15   purpose of this letter?

16   A    Well, as pointed out in the first paragraph, the purpose

17   was -- is a follow-up to the July 10th meeting with the city

18   to discuss pension restructuring proposals.

19   Q    And were the four public safety union presidents willing

20   to attempt to engage the city in some kind of counterproposal

21   or proposal with regard to pension benefits?

22   A    I'm sorry.  You're asking if we were prepared to do so?

23   Q    I'm asking not whether you were prepared to do so but

24   whether you were willing to do so at that time.

25   A    Yes.

1  Q   And you made a request to the city in that regard for

2  some additional information?

3  A   Yes.

4  Q   And do you recall receiving a response from the city?

5  A   I have not, no.

6         MS. PATEK:  If we could put up 705.

7  BY MS. PATEK:

8  Q   Mr. Diaz, does this -- looking at 705, does that refresh

9  your recollection as to whether or not you ever received a

10  response?

11  A   I do not personally recall receiving this response.

12  Q   That response is, however, from Jones Day?

13  A   Yes, it is.

14  Q   Thanking you for your strong cooperation?

15  A   Yes.

16  Q   Dated the day before the bankruptcy petition was filed?

17  A   That's correct.

18  Q   During the time period from -- you sent your letter on

19  July 12th until July 18th, the date the bankruptcy petition

20  was filed, did anyone from either the emergency manager's

21  office or Jones Day reach out to you with regard to providing

22  further information or talking more about restructuring

23  proposals?

24  A   For the sake of clarity, I personally did not send the

25  letter to Jones Day on July 12th, but to follow up with the

1   remainder of that question, the answer is no.

2   Q   Mr. Diaz, do you consider the services your members

3   provide essential to the City of Detroit?

4   A   They are.

5   Q   Are you and your members committed to the City of

6   Detroit's restructuring?

7   A   Yes, we are.

8   Q   And do you want to be a positive force in that process?

9   A   Yes.

10  Q   With respect to the Act 312 arbitration award -- well,

11  strike that.

12          MS. PATEK:  That's all I have.

13          THE COURT:  All right.  We'll take our afternoon

14  recess now until 3:40, please.  Before we do that, can I get

15  an estimate on the length of closing arguments, please, on

16  each side?

17          MR. BENNETT:  Your Honor, I'm planning my opening

18  statement to be about an hour and a half, and I don't know

19  how much I will need on the back end.  It will depend partly

20  on how much time the objectors do so.

21          MR. SCHNEIDER:  Probably 20 to 30 minutes for me.

22          THE COURT:  Thank you, sir.

23          MR. MONTGOMERY:  Your Honor, we've undertaken to

24  sort of collect the estimates, and I think we're running

25  about three hours for the objectors as a whole.

1    THE COURT:  All right.  In light of those estimates,
2  it would be my intent to conclude court after the balance of
3  the examination of this witness and start with our closing
4  arguments tomorrow morning.  And what did I say?  3:40,
5  please.
6    MR. STEWART:  Your Honor, my cross-examination is
7  going to be extremely brief with this witness if you wanted
8  me to just get it out of the way before the break and perhaps
9  dispense with the need for a break and then return as the
10  Court wishes.
11    THE COURT:  Okay.  Go for it.
12    CROSS-EXAMINATION
13  BY MR. STEWART:
14  Q   Good afternoon, Mr. Diaz.  I'm Geoffrey Stewart of Jones
15  Day.
16  A   Good afternoon.
17  Q   Just a few questions for you.  You testified that with
18  the exception of those active employees who had the -- I
19  guess you called it the DROP or DROP's escrow arrangement for
20  their pensions, your union does not represent retirees?
21  A   That's correct.
22  Q   You don't negotiate on their behalf?
23  A   No.
24  Q   You cannot bind them either?
25  A   No.

1    Q    Okay.  Then one other thing.

2              MR. STEWART:  Can you put up Exhibit 60, please?

3    BY MR. STEWART:

4    Q    You, I think, were asked about various meetings that you

5    attended.  Do you remember a meeting that you attended on

6    July 11 on the subject of healthcare?

7    A    To narrow that down, there were two meetings we had on

8    healthcare.  There was one at the Coleman A. Young Municipal

9    Building.  Well, actually, they were both there.

10   Q    Right.

11   A    One was in the auditorium.  One was in a smaller room.

12   Could you narrow it down as to which room we're talking

13   about?

14   Q    You know, I can't.

15   A    Okay.

16   Q    Do you remember attending a meeting on the 11th where

17   specific healthcare proposals were made to you?

18   A    Yeah.  With the specific date, I can't.  I do not -- I

19   can't give you that answer.

20   Q    Could you look at Exhibit 60 and tell me if you've seen

21   it before?

22   A    I believe I have, yes.

23   Q    Does it refresh your recollection as to the date of a

24   meeting and what happened at the meeting?

25   A    This document in and of itself does not refresh my

1    recollection as to which meeting we're referring to.

2    Q   Do you remember a meeting, though, at which these

3    healthcare options were presented to you as proposals by the

4    city?

5    A   As I recall, yes.

6            MR. STEWART:  Thank you very much.  That's all I

7    have.

8            THE COURT:  Any other questions for the witness?

9            MR. KING:  I'm sorry, your Honor.  This will take

10   two minutes.

11                   CROSS-EXAMINATION

12   BY MR. KING:

13   Q   Ron King on behalf of the Retirement Systems.  Good

14   afternoon, Mr. Diaz.

15   A   Good afternoon.

16   Q   You testified that you also serve as a trustee of the

17   Police and Fire Retirement System?

18   A   Correct.

19   Q   And in your capacity as a trustee, are you familiar with

20   the operations generally of the Retirement Systems staff and

21   the systems themselves?

22   A   Vaguely, yes.

23   Q   And do you have interaction with the staff members at the

24   Retirement System?

25   A   I do.

1    Q    Are you aware of whether the Retirement System keeps a

2    database of all the retirees of the City of Detroit?

3    A    Yes.

4    Q    And does the Retirement System maintain a website?

5    A    Yes.

6    Q    Does the Retirement System have the capabilities of

7    reaching out to the Retirement Systems either through its

8    database or by way of its website?

9    A    Very easily, yes, it does.

10   Q    Are you aware of any effort on the part of the city to

11   ask the Retirement Systems to use its resources to contact

12   retirees in the context of restructuring proposals?

13   A    Not at all.

14           MR. KING:  Thank you.  Nothing further.

15           MR. STEWART:  Just one question unless -- other

16   questions?

17                     RECROSS-EXAMINATION

18   BY MR. STEWART:

19   Q    Did the city impede your ability to reach out to those

20   retirees?

21   A    For the purpose of --

22   Q    Anything at all.

23   A    Not to my knowledge, no.

24           MR. STEWART:  Thank you.

25           THE COURT:  Is that it then?  All right.  Sir, you

1  may step down.  You are excused.  Thank you for your

2  testimony.

3      (Witness excused at 3:26 p.m.)

4          THE COURT:  And we'll be in recess for the day, and

5  we'll reconvene for our closing arguments tomorrow morning at

6  nine o'clock.

7          THE CLERK:  All rise.  Court is adjourned.

8      (Proceedings concluded at 3:26 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Andy Dillon | 5/16<br>48/61 | | | |
| Richard Baird | 66/77<br>80/94<br>108/111 | | | |
| Bradley Robins | 114/139 | 140 | 157/159 | |
| Mary Ellen Gurewitz | 161 | 173 | 173 | |
| Mark Diaz | 174 | 194/196 | | 197 |

| EXHIBITS: | Marked | Received |
|---|---|---|
| Exhibit 201 | | 20 |
| Exhibit 202 | | 20 |
| Exhibit 206 | 40 | |
| Exhibit 438 | | 63 |
| Exhibit 458 | | 106 |
| Exhibit 460 | | 100 |
| Exhibit 706 | | 183 |
| Exhibit 707 | | 183 |
| Exhibit 717 | | 168 |
| Exhibit 718 | | 164 |
| Exhibit 719 | | 165 |
| Exhibit 836 | | 94 |
| Exhibit 840 (excerpt) | | 33 |
| Exhibit 841 (excerpt) | | 25 |
| Exhibit 872 | | 92 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    November 12, 2013

_____            _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
2                     SOUTHERN DIVISION

3   IN THE MATTER OF,              Case No. 13-53846
                                   Detroit, Michigan
4   CITY OF DETROIT, MI           November 8, 2013
    _____/  9:00 a.m.
5
            IN RE:  ELIGIBILITY TRIAL CLOSING ARGUMENTS
6           BEFORE THE HONORABLE STEVEN W. RHODES
            TRANSCRIPT ORDERED BY: SHANNON DEEBY, ESQ.
7
    APPEARANCES:
8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
9                                 GEOFFREY STEWART, ESQ.
                                  GREGORY SHUMAKER, ESQ.
10                                THOMAS CULLEN, JR., ESQ.
                                  MIGUEL EATON, ESQ.
11                                Jones, Day
                                  51 Louisiana Avenue, N.W.
12                                Washington, D.C. 20001-2113
                                  202-879-3939
13
                                  BRUCE BENNETT, ESQ.
14                                Jones, Day
                                  555 South Flower Street
15                                Fiftieth Floor
                                  Los Angeles, CA 90071-2452
16                                213-243-2382

17                                ROBERT HERTZBERG, ESQ. (P30261)
                                  DEBORAH KOVSKY-APAP, ESQ.
18                                (P68258)
                                  Pepper, Hamilton
19                                4000 Town Center
                                  Suite 1800
20                                Southfield, MI 48075-1505
                                  248-359-7333
21
                                  PETER ELLSWORTH, ESQ. (P23657)
22                                Dickinson, Wright
                                  215 S. Washington Square
23                                Suite 200
                                  Lansing, MI 48933-1816
24                                517-371-1730

```
 1 | For State of Michigan:      MATTHEW SCHNEIDER, ESQ.
   |                             (P62190)
 2 |                             Chief Legal Counsel
   |                             Attorney for State of Michigan
 3 |                             Michigan Department of
   |                             Attorney General
 4 |                             P.O. Box 30754
   |                             Lansing, MI 48909
 5 |                             517-373-0126
   |
 6 |                             STEVEN HOWELL, ESQ. (P28982)
   |                             Special Assistant Attorney
 7 |                             General
   |                             Dickinson, Wright
 8 |                             500 Woodward Avenue
   |                             Suite 4000
 9 |                             Detroit, MI  48226-3425
   |                             313-223-3033
10 |
   | For Michigan Council 25 of   SHARON L. LEVINE, ESQ.
11 | the American Federation of   JOHN SHERWOOD, ESQ.
   | State, County and Municipal  Lowenstein, Sandler, LLP
12 | Employees (AFSCME), AFL-CIO  65 Livingston Avenue
   | and Sub-Chapter 98, City of  Roseland, NJ 07068
13 | Detroit Retirees:            973-597-2500
   |
14 | For Detroit Retirement       ROBERT D. GORDON, ESQ. (P48627)
   | Systems - General Retirement JENNIFER GREEN, ESQ.
15 | System of Detroit, Police and Clark, Hill, PLC
   | Fire Retirement System of    151 S. Old Woodward Avenue
16 | the City of Detroit:         Suite 200
   |                             Birmingham, MI 48009
17 |                             248-988-5882
   |
18 |                             RONALD KING, ESQ. (P45088)
   |                             Clark, Hill
19 |                             212 East Grand River Avenue
   |                             Lansing, MI 48906
20 |                             517-318-3015
   |
21 |
   |
22 |
   |
23 |
   |
24 |
   |
25 |
```

| | | |
|---|---|---|
| 1 | For the Detroit Fire Fighters | BARBARA PATEK, ESQ. (P34666) |
| | Association, the Detroit | JULIE BETH TEICHER, ESQ. |
| 2 | Police Officers Association | (P34300) |
| | and the Detroit Police | DAVID EISENBERG, ESQ. (P68678) |
| 3 | Lieutenants and Sergeants | Erman, Teicher, Miller, Zucker |
| | Association: | & Freedman |
| 4 | | 400 Galleria Officentre |
| | | Suite 444 |
| 5 | | Southfield, MI 48034 |
| | | 248-827-4100 |
| 6 | | |
| | For International Union, UAW: | BABETTE A. CECCOTTI, ESQ. |
| 7 | | PETER D. DECHIARA, ESQ. |
| | | THOMAS CIANTRA, ESQ. |
| 8 | | Cohen, Weiss, and Simon, LLP |
| | | 330 West 42nd Street |
| 9 | | New York, NY 10036-6976 |
| | | 212-356-0227 |
| 10 | | |
| | For the Detroit Retired | THOMAS MORRIS, ESQ. (P39141) |
| 11 | City Employees Association, | Silverman & Morris |
| | Retired Detroit Police and | 30500 Northwestern Highway |
| 12 | Fire Fighters Association, | Suite 200 |
| | Shirley V. Lightsey, and | Farmington Hills, MI 48334 |
| 13 | Donald Taylor (Retiree | 248-539-1330 |
| | Association Parties): | |
| 14 | | RYAN PLECHA, ESQ. (P71957) |
| | | Lippitt, O'Keefe |
| 15 | | 370 East Maple Road |
| | | 3rd Floor |
| 16 | | Birmingham, MI 48009 |
| | | 248-646-8292 |
| 17 | | |
| | For the Official Committee of | MATTHEW E. WILKINS, ESQ. |
| 18 | Retirees: | (P56697) |
| | | Brooks, Wilkins, Sharkey & |
| 19 | | Turco, PLLC |
| | | 401 S. Old Woodward Avenue |
| 20 | | Suite 400 |
| | | Birmingham, MI 48009 |
| 21 | | 248-971-1711 |
| 22 | | CLAUDE D. MONTGOMERY, ESQ. |
| | | ANTHONY ULLMAN, ESQ. |
| 23 | | ARTHUR RUEGGER, ESQ. |
| | | Dentons |
| 24 | | 1221 Avenue of the Americas |
| | | New York, NY 10020-1089 |
| 25 | | 212-768-6700 |

```
 1                                    SAM ALBERTS, ESQ.
                                      DAN BARNOWSKI, ESQ.
 2                                    Dentons US LLP
                                      1301 K Street, N.W.
 3                                    Suite 600 East Tower
                                      Washington, D.C. 20005-3364
 4                                    202-408-7004

 5   For the Retired Detroit         LYNN M. BRIMER, ESQ. (P43291)
     Police Members Association:      MEREDITH TAUNT, ESQ. (P69698)
 6                                    MALLORY FIELD, ESQ. (P75289)
                                      Strobl & Sharp, P.C.
 7                                    300 East Long Lake Road
                                      Suite 200
 8                                    Bloomfield Hills, MI 48304-2376
                                      248-540-2300
 9
     For the Flowers Plaintiffs -    WILLIAM A. WERTHEIMER, ESQ.
10   Robert Flowers, Michael Wells,   (P26275)
     Janet Whitson, Mary Washington  30515 Timberbrook Lane
11   and Bruce Goldman:              Bingham Farms, MI 48025
                                      248-644-9200
12
     For Ambac Assurance            DANIEL WEINER, ESQ. (P32010)
13   Corporation:                    Schafer & Weiner
                                      40950 Woodward Avenue
14                                    Suite 100
                                      Bloomfield Hills, MI 48304
15                                    248-540-3340

16   Court Recorder:                Letrice Calloway

17   Transcriber:                   Deborah L. Kremlick

18

19   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
20

21

22

23

24

25
```

1      (Court in Session)

2          THE CLERK: All rise. Court is in session. Please

3  be seated. Case number 13-53846, City of Detroit, Michigan.

4          MR. IRWIN: Good morning, Your Honor. For the

5  record, Geoff Irwin, Jones, Day on behalf of the city.

6      Just one housekeeping matter. I think we've -- we've

7  talked about this a couple of times. Both objectors and the

8  city have deposition designations that we wish to submit in

9  hard copy and I think in a few instances, by video as well.

10 So I have them here if you'd like me to hand them up.

11         THE COURT: Okay, please.

12         MR. IRWIN: And we will be submitting a revised

13 pre-trial order which will conform to dep designations in a

14 pre-trial order too while we are handing up.

15         THE COURT: Okay.

16         MR. RUEGGER: Your Honor, for the record Arthur

17 Ruegger from Dentons on behalf of the retirees committee. We

18 have four copies of the Moore deposition which is marked as

19 Exhibit 456 with everyone's designations, and cross

20 designations, and the Bowen deposition marked as 455 equally

21 with cross designations.

22     We also have, Your Honor, the video deposition of Mr. Orr

23 on September 16th and October 4th marked as Exhibit 446. And

24 the Bing deposition marked as 447. There are only two copies

25 of these disks right now, Judge, but with your permission

1  we'll hand up two more later on.

2       THE COURT:  Okay.  Thank you.

3       MR. RUEGGER:  One -- one final issue, Your Honor.

4  And we don't need a ruling on this yet.

5     The pre-trial order that Mr. Irwin submitted contains

6  only the exhibits that were a part of the original pre-trial

7  order.  As everyone here knows, a number of exhibits have been

8  offered and some accepted since that list went in.  We'd like

9  to help the Court as best we can with a list of those

10  supplemental exhibits which have been discussed, whether

11  they've been accepted or -- or rejected during the course of

12  the trial if that will help the Court.  And we would -- could

13  submit that next week.  But if Your Honor has any other

14  procedure we're happy to oblige.

15       THE COURT:  We've maintained a list of the admitted

16  exhibits that were not admitted pre-trial that were admitted

17  during the course of the trial.  And so at lunch time I would

18  propose to just give you that list and ask you if we have it

19  right.

20     Are there exhibits on the list that shouldn't be on the

21  list, or are there exhibits that aren't on the list that

22  should be.  And ask you all to review that over the lunch

23  hour, compare it to your own notes regarding admitted

24  exhibits, and then we'll discuss that further this afternoon.

25       MR. RUEGGER:  Very well.

 1          THE COURT:  That's -- that's the help I need.  And

 2   then of course what we'll do, is go through our copies of the

 3   exhibit books that we have here and just remove the exhibits

 4   that are in there that were not admitted into evidence and --

 5   and not consider them.

 6          MR. RUEGGER:  Thank you, Your Honor.

 7          THE COURT:  Okay.  Are we ready to proceed with the

 8   closing arguments now?  Okay, let's do that.

 9          MR. SCHNEIDER:  Good morning, Your Honor.  Matthew

10   Schneider on behalf of the State of Michigan.

11      May it please the Court.  Years ago the people of

12   Michigan and the citizens of this city started to learn that a

13   tremendous and terrible storm was headed toward the City of

14   Detroit.  And this was no secret.

15      The people of Michigan, the citizens of Detroit, and the

16   city could see what was headed their way.  And throughout this

17   trial we've heard the evidence that this storm was coming.

18          Exhibit 21, please.  In the City of Detroit's preliminary

19   review findings, it indicates that since 2006, the city has

20   been experiencing significant financial problems caused by the

21   loss of residence, the financial challenges of the automobile

22   industry, the destructions in the financial markets, and the

23   overall economic issues faced by the country.  You can take

24   that down.

25          So with that in mind in January of 2011, Governor Snyder

1 takes office. And he begins to read these weather reports.

2 The weather reports in this case are cash flow reports. And

3 they are forecasting the storm.

4 And the Governor realizes as he testifies that there is a

5 serious cash flow problem. And the Treasury Department is

6 also reviewing these weather reports. And in December 2011

7 they conduct a preliminary review of the city's finances. And

8 the conclusion is, significant cash flow shortages, long term

9 debt liabilities, $12,000,000,000 not including almost

10 5,000,000,000 in interest owed.

11 The long term bond rating, the city is in junk status.

12 And the city has no adequate plan to fix the deficit. There

13 is probable financial stress and there is need of a financial

14 review team.

15 Exhibit 21, second page. And the preliminary review

16 indicates that the inability of the city to avoid fund

17 deficits, recurrent accumulated deficit spending, severe

18 projected cash flow shortages resulting in an improper

19 reliance on inter fund and external borrowing, the lack of

20 funding of the city's other post-retirement benefits, and

21 increasing debt of the city calls for a financial review team.

22 You can take that down.

23 So in December 2011, the Governor appoints a financial

24 review team. And this review team produces another weather

25 report. In March of 2012, the weather report indicates that

1 the City of Detroit is in a condition of severe financial

2 distress.

3     The conclusions are that the general fund deficit is

4 increasing.  Moody's is downgrading approximately two five --

5 2.5 billion of the city's debt.  Some of it five to six levels

6 below investment grade.  The city is facing a significant

7 depletion of its cash and the forecast is a negative cash

8 balance.

9     Exhibit 22.  Because this conclusion is that the City of

10 Detroit is in a condition of severe financial stress, the next

11 step is that a consent agreement between the city and the

12 state is attempted.  You can take it down.

13     The Governor testified that he worked very hard to get

14 this done but by the fall the city was not living up to -- to

15 its part of the obligations.  And so, Your Honor, the

16 impending storm here is not getting better, it is getting

17 worse.  And in February of 2013, another financial review is

18 done.  And what does this weather report show us, Exhibit 25?

19 There is a cash crisis.

20     The city continues to experience a significant depletion

21 of its cash.  Projections have estimated accumulative cash

22 deficit in excess of $100,000,000 by June 30, 2013 absent

23 implementation of financial counter measures which aren't on

24 the horizon.

25     Over $14,000,000,000 in liabilities are facing the city

1 and the city has no workable plan.  And what does the Governor

2 call this?  He says that the city is hemorrhaging cash.

3     What else is going on with the city at this time?  The

4 evidence in this case shows a lot else is going on.  The

5 streetlights aren't working.  Forty percent of them are out in

6 the first quarter of 2013.

7     Ambulances aren't responding in time.  Detroiters are

8 waiting 58 minutes for police to respond to calls.  There is

9 78,000 abandoned buildings.  The evidence shows that the

10 health, safety, and the welfare of the citizens of Detroit are

11 at risk.

12     And this is what caused the appointment of the emergency

13 manager.  Throughout this whole process, the state and the

14 city are working together.  They are working together in a

15 partnership to survive this storm.

16     And also throughout this whole process, the state and

17 city are receiving financial advice.  And some of this is

18 unsolicited.  Miller, Buckfire is offering advice, Jones, Day,

19 Miller, Canfield, Dykema, Huron Consulting, Ernst and Young,

20 Conway, MacKenzie.  Some of this is unsolicited advice, pro

21 bono, for free.

22     Mr. Dillon testified, this is not unusual.  Ultimately

23 the storm arrives and the Governor says, this is the last

24 resort.  Because people are suffering.  The 700,000 citizens

25 of Detroit are suffering and his overriding concern is for the

1 citizens. And because of that, he authorized -- authorizes to

2 file for Chapter 9 protection.

3     So what is the objectors' theory of this case? Their

4 theory appears to be don't go speaking with weather experts

5 too early or consultants because that must mean you want the

6 storm to come. Their theory is apparently that the state or

7 the city shouldn't consider the last resort and don't be

8 prepared. Don't even ask whether you need a raincoat.

9 Because if you buy a raincoat, or you ask someone whether you

10 need a raincoat, then you want the storm to come.

11     This makes no logical sense. Doesn't it make sense that

12 when you have a storm of this magnitude coming toward you, you

13 want all the help you can get? So was the state working with

14 the city? Were consultants involved? Of course they were for

15 the benefit of the citizens of Detroit.

16     If you saw this storm coming toward you, isn't this what

17 you'd expect out of your government? You would expect

18 planning, you'd expect cooperation, you'd expect your

19 government leaders to prepare and plan and be ready for

20 anything. And that is just responsible government. Like any

21 good government, it would be foolish to go alone. It would be

22 irresponsible to fail to prepare.

23     The evidence in this case shows that the city and the

24 state prepared for the worst, but they hoped for the best.

25 And as Mr. Orr testified, we pray for peace, but prepare for

1 war.

2     The objectors apparently want to punish the Governor or

3 the Treasurer for contingency planning, for doing their jobs

4 to protect the people of Detroit.  But working together was

5 the right thing to do.

6     The evidence in this case shows that this was never about

7 pre-determining a Chapter 9 filing.  This was only about

8 careful consideration.

9     So then it begs the question, what is this trial about?

10 It's about eligibility.  It's about whether the City of

11 Detroit is eligible for bankruptcy, that's it.  It is not

12 about when Jones, Day and Miller, Buckfire became involved to

13 give advice on how to weather this storm.  It is not about

14 whether Kevyn Orr has a background as a bankruptcy lawyer.  It

15 is not about whether a Judge in Ingham County had set a

16 hearing.  It's not about whether the Governor decided to

17 authorize a filing a day before than his communications staff

18 had planned.  And it's definitely not about all the other

19 confirmation arguments that the objectors have raised.

20     It is about eligibility and the facts and the evidence

21 show that the city is eligible for bankruptcy protection.  So

22 let's look at the law.

23     To be eligible for bankruptcy, we have to look at Section

24 109(c)(2) of the Bankruptcy Code which states that an entity

25 may be a debtor if such entity is specifically authorized to

1  be a debtor by a governmental officer empowered by state law

2  to authorize a filing.  That process is governed by state law.

3      So determine -- to determine who is the governmental

4  officer empowered by state law, we have to look at the state

5  law PA436.  And Section 18(1) describes this process.  It

6  effectively states that the process is that the emergency

7  manager recommends a filing to the Governor and the Treasurer.

8      Second, if the Governor approves, he informs the

9  emergency manager and Treasurer in writing.

10      Third, the Governor may place contingencies on the filing

11  but he does not have to.

12      And fourth, upon receipt of the written approval, the

13  emergency manager may file.

14      Well, Your Honor, that's what happened in this case.

15  There is really no serious dispute that that happened.

16  Exhibit 28, which is Mr. Orr's letter and Exhibit 29, which is

17  the Governor's letter, comply with PA436.

18      The statutory process was followed in this case to the

19  letter.  And the objectors cannot refute that.  They can't

20  argue that the authorization process failed to follow that

21  statute.  And they can't seriously refute that the city is out

22  of cash.  So they have to refute everything else, even things

23  that have nothing to do with eligibility.  And that is truly

24  the theory of their case.

25      I want to object -- address some of the objectors'

1 | arguments.  And I'd like to go through five separate issues.

2 | Number one, the objectors say that the purpose of the

3 | appropriation provision in PA436 was to make it referendum

4 | proof.  And therefore that violates the referendum clause.

5 | Well, first of all, as been -- as it has been argued in

6 | this Court, it is improper to speculate on the motives of the

7 | legislature.  And the <u>MUCC v Secretary of State</u> case tells us

8 | that.

9 | Now Howard Ryan did indicate that one of the motives was

10 | for proofing it.  Okay.  But who did the objectors really cite

11 | to for the motive to make this referendum proof?  They present

12 | emails from March 2 and 3.  They're talking about Jones, Day

13 | lawyers talking about this.

14 | Well, that's all very interesting, but those Jones, Day

15 | lawyers are not legislators.  And they are not the Governor.

16 | The Governor signed the bill and he testified no, that was not

17 | his purpose.

18 | The Governor testified that the purpose was to pay the

19 | emergency managers.  And the Treasurer indicated as much as

20 | well.  To pay for emergency managers -- managers not just for

21 | Detroit.  Because there were seven or eight emergency

22 | managers.  This is a statewide problem, not just a situation

23 | in this city.  And it's to pay consultants to get through the

24 | fiscal year.

25 | And -- and, Your Honor, you can look at the language of

1  the statute to find out exactly what those appropriation

2  provisions said.  But the testimony from the Governor and the

3  Treasurer was that the purpose really was to respond to the

4  criticism from cities because you had put an EM in place and

5  then you would make the city pay for it.  And the improvement

6  in this was, that's not appropriate.  Let's have the state pay

7  for the EM so that we don't put that burden on the city, or

8  the school district.

9      But most significantly as the Governor testified, after

10  PA436 was done, he later signed another appropriations bill.

11  And in that appropriations bill, he funded emergency managers.

12  So the appropriation was put back in later.

13      So if the purpose of the appropriation was to proof it

14  from referendum, why would they put in an appropriation again

15  in a later bill?  That's why this doesn't -- their theory

16  makes no logical sense.

17      The second point I'd like to make is that the objectors

18  argue that the Governor acted with bad faith effectively by

19  rushing this filing.  But the facts and the evidence just

20  don't support that.

21      We look at the evidence, we look at what the Treasurer

22  said, and we look at what the Governor said.  He testified

23  that he went back literally since the time he became Governor,

24  he reviewed the financial review team reports.  He reviewed

25  the 45 day report.  He reviewed other items.  And he worked

1    diligently to go through this process in good faith and that

2    is what he said.

3        He said that he reviewed this file himself.  The evidence

4    shows that the Governor took careful, and thoughtful, and

5    deliberate consideration about this.

6        Point number three, the objectors argue that the

7    Governor's failure to place a contingency in his authorization

8    excluding pensions was either sinister, or unconstitutional,

9    or both.  Well, we know why the Governor did this.  The

10   evidence is what he said.

11       He testified, we're in a crisis mode.  We have serious

12   issues here.  And contingencies could cause more delays, more

13   concern, more complexities to an already complex case.  The

14   Governor said that he has confidence in the judicial process

15   and he himself asked that the statement be added that any plan

16   has to be a legal plan.

17       To get into the legal system so the appropriate people

18   can decide.  And that is what he said.  It doesn't matter

19   whether the Governor's legal counsel, Mr. Gadola, thought

20   contingency should be included because the statute provides

21   that the Governor makes that decision.  The Governor, himself,

22   after careful thought, chose not to place contingencies.  And

23   this was allowed and appropriate under the law.

24       Point number four.  The objectors argue that the state

25   had some sort of scheme to end a run -- end run around the

 1 | Constitution, the pension clause, in order to cut the pensions

 2 | of retirees.

 3 | Well, again, let's look at the facts. The facts are both

 4 | the Governor and the Treasurer explained, even if you take out

 5 | this 3.5 billion dollars in pension fund liability, the city

 6 | is still 14,000,000,000 or $15,000,000,000 in debt. It is

 7 | inconceivable that the purpose of seeking a Chapter 9 filing

 8 | is to get the pensions.

 9 | Even Mr. Dillon testified that the problem that the

10 | pensions was underfunded, the health care liability was in an

11 | even bigger problem. So the pensions can't be the target.

12 | Point number five. The objectors want this Court to

13 | believe that there was some sort of alliance between the

14 | consultants, and the state, and the city to drive the city

15 | into Chapter 9.

16 | And we've seen these emails from the consultants and the

17 | lawyers talking about a Chapter 9 filing. You know, these

18 | consultants and the lawyers, they can talk all they want and

19 | if we had a nickel for every time a lawyer gave free advice,

20 | we'd all be wealthy.

21 | But ultimately it's not those consultants' decision to

22 | authorize the filing, it is the Governor's decision. So the

23 | best evidence is the Governor's testimony. He said that lots

24 | of people were talking about Chapter 9. There were

25 | contingency plans going back quite some time. So why do we

1  have contingency plans?  It's because it's a contingency.

2  It's not our goal.

3      The Governor said, you needed to be thoughtful about

4  this.  And he said that the serious discussion of Chapter 9

5  was the week before the authorization.  The Treasurer also

6  presented evidence why this argument is meritless.

7      In Ms. Brimer's last question, her last few questions of

8  Mr. Dillon really spelled this out.  And this goes to the

9  heart of what the objectors' theory is.  The question was,

10  about as early as March 2012 were people at the state and

11  consultants speaking about the filing for Chapter 9?  Well,

12  let's remember what the Treasurer said.  He said, it was

13  always a last resort.

14      If we were thinking of Chapter 9, we wouldn't have gone

15  into a consent agreement.  Because you can't get into Chapter

16  9 through the consent agreement route.  And that's what the

17  statute says.

18      So to agree with this conspiracy theory, then you must

19  conclude that the entire consent agreement process was just a

20  charade.  The problem for the objectors is there is no

21  evidence of that.  In fact the evidence proves otherwise.

22      The evidence proves that the state didn't want to rush

23  into Chapter 9.  The state even wanted to avoid a declaration

24  of financial emergency because the state wanted the locals to

25  work it out.  That's what the testimony in this case was.

1   That was the purpose of the consent agreement.  And both the

2   Governor and the Treasurer explained that.

3       The objectors argue much more.  And the city will address

4   those points and Mr. Bennett will be up here in just a moment

5   to do so.

6       So let me conclude by saying this, Your Honor.  This

7   world is full of critics.  The objectors can criticize the

8   Governor, and the state, and the Treasurer, and the emergency

9   manager because they don't like where they think this case is

10  heading.

11      But this eligibility case isn't about their critiques.

12  The witness testimony shows that it's about leadership.  By

13  authorizing a Chapter 9 filing, the Governor took on an

14  enormous task.  He saw that the problem was getting worse and

15  no one was solving it.

16      He showed leadership by making the hard decision to

17  authorize the filing.  That's not a showing of bad faith,

18  that's good faith.  It's good faith to step up and do what

19  needed to be done to protect the health and the safety of the

20  citizens of Detroit.

21      The evidence in this case shows that Chapter 9 was always

22  a last resort.  Unfortunately the deplorable financial facts

23  of this case required that it come to that.  This city is

24  eligible for bankruptcy.

25              THE COURT:  Thank you, sir.

1          MR. BENNETT:  Good morning, Your Honor.  I think --

2     while I will be using the screen, I will be talking a lot

3     about Exhibit 43, so if the -- if you want to get that handy,

4     it might --

5          THE COURT:  Okay.

6          MR. BENNETT:  It might make some sense.

7          THE COURT:  One second, please.

8          MR. BENNETT:  Okay.

9          THE COURT:  Okay.

10         MR. BENNETT:  All right.  First of all, I'm going to

11    try really hard not to repeat any --

12         THE COURT:  Would you point the mike right at you?

13         MR. BENNETT:  I'm going to try really hard not to

14    repeat any of the things that we've just heard or cover any of

15    the same subjects.  Frankly the city is in exactly the same

16    place as the state in those points.

17        I will add one comment which is that in the careful

18    exegesis of all of the emails about what was going on around

19    the Governor at various points in time, it's been pointed out

20    that there have been lots of different opinions expressed by

21    different actors.  And I frankly take that as comforting.

22    Internal debate, free internal debate is a good thing.

23        I would be much more concerned and frankly with this

24    administration, surprised if everybody wouldn't say a thing

25    until the Governor said what he wanted to do and then they

1 said okay.  So, I think we have in the -- in all of the

2 internal debate where people are talking about suggestions

3 that may or may not have been adopted along the way, we're

4 seeing an additional sign of a healthy process and an

5 additional reflection of good faith.

6      I want to begin by finding our way through the math

7 because while the testimony has been quite wide ranging and

8 some of the points are a little bit open ended, there is a

9 certain amount of business that we have to do.  And that

10 business is to work our way through 109(c) and determine

11 whether the City of Detroit is authorized to be a debtor under

12 Chapter 9.  I think just to check the box, I don't think

13 there's any dispute with respect to (c)(1) that it is a

14 municipality.  The city is a municipality.

15      Number two, second requirement, we've heard about

16 specific authorization from the state this morning.  It was

17 also of course a subject touched on extensively during the

18 arguments concerning legal issues.  I am not going to repeat

19 any of those arguments today.  I don't think Your Honor wants

20 me to.  Of course I'd be happy to answer any questions you may

21 have.

22      We then reach 109(c)(3) which is whether or not the city

23 was insolvent.  I'm going to have some very brief comments on

24 that question.  But I do want to point out that only one

25 objector actually put the issue -- put insolvency in issue

1  They -- this was AFSCME.

2      They made certain promises about what they would prove in

3  the context of their trial brief and opening statement.  And I

4  didn't see them prove anything.  But it is our burden, we will

5  cover -- we will demonstrate that we have met our burden, but

6  it may be that we can do this in a relatively condensed way

7  because I'm not sure there's a dispute anymore.  And -- and --

8  and perhaps we'll get some help about that when the AFSCME

9  representative reaches the podium.

10      The fourth issue is whether or not the city desires to

11  effect a plan to adjust its debts.

12      And then the fifth issue is the disjunctive tests

13  concerning practicability of negotiations and good faith.

14      Those are the specific things we need to do to move from

15  here to the next phase of the case.  Now woven through some of

16  the objections was an argument that Section 921, good faith

17  was also an issue which of course opened up a few additional

18  doors for testimony.

19      I'm going to try to cover 921 good faith in the context

20  of the discussions relating to 109(c)(5)(B) because I think

21  the overlap is so great that to try to do it separately would

22  just take too much time.

23      So let's begin with the issue of whether or not Detroit

24  is insolvent.  At the opening I promised that our witnesses

25  would present a mountain of evidence showing that the City of

1 Detroit was insolvent and it wasn't pretty, but it turns out

2 that we did in fact do that. I will take through very -- take

3 us through a little bit of it in a minute.

4 As I said before, this evidence was not rebutted by any

5 evidence introduced by anybody else. So let's just cover a

6 few of the very very key points that are suggested by the

7 statute and we'll cover a little more later.

8 First of all, Mr. Buckfire testified that when he took a

9 hard look at -- at -- at liquidity in May, he found that the

10 city's position was on a razor's edge. And that was at a time

11 when vendors were not being paid on schedule. That there was

12 involuntary deferral of vendor payments.

13 Then Mr. Malhotra got a lot more technical but just to

14 get one glimpse of his testimony, Exhibit 38, please. I'm

15 sure everybody remembers this chart, the two different lines,

16 the light blue line which is if you were paying all of your

17 debts how much cash you would have left. And of course that's

18 below the break even line at every point on the chart.

19 And then there's the darker line which shows the cash

20 flow situation given the cash conservation steps that the city

21 took. And by those cash conservation steps, they weren't

22 saving money so that you had more money to pay creditors, it

23 was testified that the cash conservation steps were not paying

24 debts as they become due. And -- and most prominent of course

25 is the decision by the city not to make the June -- I think it

1  was due on the weekend, June 15th payment on the -- of

2  principal on the COPs.

3      But at the same point -- point in time, as not only Mr.

4  Buckfire, but I think Mr. Malhotra testified there was also

5  deferrals in the trade payment area.  And there is now other

6  problems that may well occupy some time later in the case that

7  the city's cash position was -- was calculated based upon a

8  past commingling of certain other -- money from certain other

9  accounts.  So there was roughly 103,000,000, the number sticks

10  in my head, could be off by a little bit of cash that was

11  really from other funds that could be called back at -- or

12  could conceivably be called back at any point in time.

13      But it's not technically right to say that that money

14  should be regarded as part of the city's cash balance.  That's

15  another form of borrowing.  And so to make it, to -- to

16  actually not hit the wall, the city was not paying its debts

17  as they become due.

18      Now, let's not be content with this horrifying snapshot.

19  Let's take a look at Mr. Orr's budget for fiscal '14 to see

20  what the situation looked going out from the vantage point of

21  June of this year.

22      This exhibit was displayed during Mr. Orr's testimony.

23  Again, in the interest of time, I'm just going to zero in on

24  the numbers at the bottom, but you can blow them off as fine.

25  And note the -- the surplus (deficit) before concessions.

1  That's the kind of general fund deficit, the $379,000,000

2  number that the city was facing if nothing changed for the --

3  the 2014 fiscal year.

4      That's a big number.  It's not -- you're not going to get

5  there by the way with contract changes that the unions may be

6  proud of that they negotiated pre-petition and weren't

7  implemented.  The highest savings number, multi year savings

8  number, I ever heard attached to those was a little over

9  $100,000,000.  And that was over the entire term of the

10 contract.

11     So this is a number that -- that there was no non-debt

12 adjustment mechanism to address.  And no evidence was adduced

13 concerning any conceivable non-debt adjustment approach to

14 creating some form of balance on a cash flow basis to the

15 city's financial affairs in '14.

16     But the sterile numbers only understate the problem.  We

17 also proved what this means, what this -- what the reality is

18 faced by citizens because of the fact the city's budget is so

19 stressed.  And some of that was covered in the state's

20 opening, not going to repeat it.  I'm of course referring to

21 Chief Craig's testimony and I'm going to skip over the

22 different points and just say the cases actually look at the

23 things that -- that Chief Craig talked about as reflective of

24 something called service insolvency.

25     Why do the cases talk about service insolvency and say

1 it's relevant? Well, that's kind of for the cases where the

2 -- the municipality is somehow managing to pay its debts and

3 maybe not having deferrals, but is not providing adequate

4 services. So it means that the money it should be spending

5 would render it insolvent.

6     In our case, it tells us that even the numbers that get

7 to the three seventy-nine negative are not generating an

8 adequate result for citizens. So the inference is, is that

9 the $379,000,000 number actually understates the extent of the

10 problem.

11     Detroit is one of those situations where the insolvency

12 tests are made without regard to the fact that the services

13 being provided are not adequate by any measure. And when you

14 consider that making them adequate will cost more money, it

15 only means the situation is far worse.

16     My first reference to the proposal for creditors is a

17 chart -- is a chart on Page 34. This is the chart that

18 quantifies what Chief Craig is talking about, or says the same

19 thing from a different perspective. And I want to just zero

20 in on the bottom line.

21     And -- and one thing I'm going to say over and over

22 again, Your Honor's going to be tired of hearing it by the

23 time I'm done, but it's important for emphasis. This chart's

24 in evidence. No one said a word, no evidence was adduced that

25 there's anything inaccurate, incomplete, or misleading about

1 | this chart.

2 | And the bottom line shows the percentage of revenues in

3 | the general fund that are devoted to paying legacy liabilities

4 | in the general fund.  And what it means in the 2013 fiscal

5 | year just ended, is that when the city walks up to a taxpayer

6 | and collects a dollar of taxes, there is only 57 1/2 cents

7 | that's going to be spent on services for that resident.  That

8 | that residence is going to get today.

9 | And I'm going to use Chapter 11 analogies a lot during

10 | this case, but if we had a situation where -- where we had a

11 | store that was in bankruptcy and the -- the reality was was

12 | that -- that the dollar in that store was only going to give

13 | the customer 57 1/2 cents worth of goods, and there's a store

14 | down the street where the customer is going to get 84 or 85

15 | cents, just turns out to be about what the average is for well

16 | managed cities, out of the dollar they spend in the store, we

17 | have a reorganization problem in our store that needs to be

18 | fixed.

19 | That's bad enough.  But because of increases in pension

20 | contributions that would be required if things aren't fixed,

21 | and escalation of other numbers over time like OPEB's, this

22 | problem gets worse, and worse, and worse, and worse in future

23 | years.  This has to be addressed.  This cannot be ignored.

24 | Finally, there's one more dimension to this -- to the

25 | city's insolvency that we have to talk about.  And it's the

1  close in problems that the city was confronting in and around

2  June.

3      We already talked about the fact that the city had its

4  first payment default on borrowed money indebtedness by

5  foregoing the principal payment with respect to the COPs.  The

6  full repercussions of that were not yet known, but they were

7  dealing with that and the clock was ticking on it.

8      It was known that that was an additional default that

9  might give additional rights to the swap counter parties.  And

10 as Your Honor knows, there was testimony that there was a

11 series of negotiations started, actually a little before the

12 June 14th presentation.  This is the 60 days of negotiations

13 that Mr. Orr was testifying about and other people criticized

14 him for not including prior negotiations that were actually

15 triggered by something different.

16     And a settlement was reached with the swap counter

17 parties right about the, you know, kind of in and around the

18 same time.  But Syncora was initiating a campaign initially

19 letter writing, ultimately in litigation to seize the casino

20 revenues, notwithstanding the swap counter parties' agreement

21 to leave them available to the city.

22     And of course that -- Syncora's campaign wasn't actually

23 stopped until this Court decided that the automatic stay

24 applied.  So that campaign actually lasted even into the

25 Chapter 9 case to a degree and of course there's still an

1  appeal.

2      So when we evaluate as we're going to have to in a few

3  minutes, the reasonableness of the city's position concerning

4  what a negotiation period should be and what we should try to

5  accomplish out of Court.  There are three things that were

6  clearly on the city's mind and have to be on the mind of

7  anyone evaluating that.

8      One is, the 15th, June 15th was the first payment default

9  on public debt.  Second is, that created additional covenant

10  defaults under the swap.  Third is, that Syncora, at least,

11  even though a deal was getting done with respect to the swap

12  banks, Syncora was seeking to cut off the casino cash.

13      I'm going to stop here because again only AFSCME

14  contended that the city was not insolvent.  And neither it nor

15  the others who have joined it on some questioning on this

16  question -- on this issues, has adduced any evidence that

17  counters anything that the city introduced.

18      And so if I have to review -- cover -- cover this topic

19  more, I'll cover it on reply.  Suffice it to say we don't --

20  we don't think there is fair ground to dispute that the city

21  is insolvent within the meanings -- within the relevant

22  definition of the statute.

23      The next place, staying in order, is whether the city

24  desires to affect a plan to adjust its debts.  Again, proposal

25  for creditors, Exhibit 43 is in evidence.  At the opening I

1  said that the plan proposal speaks for itself.  I said it was

2  reasonably detailed.  I said it contained the classification

3  scheme.  I said it included a term sheet for notes to be

4  distributed to creditors, and I said it defines treatment for

5  all classes.

6      And the objectors seem to disagree with that.  They

7  contend that there isn't a specific proposal on reduction of

8  pension benefits.  And sometimes this argument or this

9  statement is accompanied by just a citation of half of one

10  sentence that's in the document.  But other times the -- even

11  looking at the entire paragraph that seems to be the

12  contention.

13      So let's do a little work ourselves and see if we can

14  figure out what the treatment that is proposed in the plan is.

15  Because I think we can do it with Exhibit 43 in a couple of

16  minutes.  So if I could have Exhibit 43, Page 109, please.

17  And if you would do me a favor and leave it open for now.  But

18  -- but later we're going to block just a part on pension,

19  unfunded pension liabilities.

20      One of the points Mr. Robbins made, and his testimony on

21  this was a little bit -- it moved around a little bit during

22  the testimony.  Was he said well, other -- treatments of other

23  classes, there's a specific treatment provision, but there

24  isn't in the section of claims for unfunded pension

25  liabilities.

1    So let's try to figure out if we can figure out what he's

2   talking about.  So going up to the top, claims under unsecured

3   general obligation bonds and notes, the treatment says and I

4   quote, "exchange for a pro rata (relative to all unsecured

5   claims) principal amount of new notes".

6    All right.  Let's go to the next paragraph.  Another

7   class of unsecured creditors.  This is claims of service

8   corporations.

9    And by the way, note here that we don't say this is the

10  treatment of the COPs.  Now why don't we do that?  Well,

11  because the COPs are obligations of trusts.  Trusts in turn

12  are beneficiaries of contracts between the city and service

13  corporations.  So from the perspective of the city, these

14  technical details have a tendency to matter, from the

15  perspective of the city, the counter party is the service

16  corporations, the relevant -- relevant obligation is the

17  city's obligation to the service corporations.

18    So we focus on that and we say treatment.  Exchange for a

19  pro rata (relative to all unsecured claims) principal amount

20  of new notes.

21    By the way the next paragraph says the same thing, we'll

22  skip it just for time purposes.  Now could we blow up the

23  section, claims for unfunded pension liabilities?  And

24  skipping to the middle paragraph it says, claims for the

25  underfunding will be exchanged for, this will sound a little

1 familiar, for a pro rata relative to all unsecured claims

2 principal amount of new notes.

3     So first of all, if Mr. Robbins found the other

4 discussions sufficiently informative and in a specification --

5 specification of treatment, I am having a hard time

6 understanding how he did not find the specification of

7 treatment with respect to unfunded pension liabilities hard to

8 understand.

9     Well, let's stay here because I think we can learn a

10 little more if we read words and take a look at other parts of

11 the document.  First of all, very much like the situation with

12 service corporations, when we reach unfunded pension

13 liabilities, we have to pause and think about what exactly is

14 the city's remaining liability with respect to pensions.

15 Because the pension funds are not funded at zero.  There is

16 funding in both pension funds.

17     I thought there was going to be a big dispute over it,

18 how much the underfunding was.  Of course that dispute didn't

19 show up in this courtroom.

20     So let's look at the first paragraph, or excuse me, the

21 first bullet point, it's not quite a paragraph.  The first

22 sentence says as set forth above and is material earlier in

23 the presentation that we won't bother visiting, preliminary

24 analysis indicates that the underfunding in GRS and PFRS is

25 approximately 3.5 billion.  I'll show you the number in a

1  minute.

2      At this level of underfunding, the city would have to

3  contribute approximately 200,000,000 to 350,000,000 annually

4  to fully fund current accrued vested benefits.  Again, more

5  information about how the city views its obligation relative

6  to pension.  That's what we're focusing on, the city's

7  obligation.

8      And then the statement which was hard for everyone to

9  make but is driven by math, we'll come to that soon.  Such

10  contributions will not be made under the plan.  Okay.  So the

11  city has obligations to make contributions.  Note, that's what

12  we're talking about.

13      We're not talking about the individual pension benefits

14  yet because to the city that's not the problem.  The city's

15  problem is, obligations to make contributions on account of

16  underfunding.

17      So next sentence.  Claims for the underfunding will be

18  exchanged for a pro rata relative to all unsecured claims

19  principal amount of new notes.

20      Okay.  First of all, this sentence talks about claims for

21  underfunding.  Those familiar with the pension system, and Mr.

22  Robbins surely must be assumed to be familiar with the pension

23  system knows, this is part of the formula.  There is existing

24  funding which is another part of the formula.

25      Now, let's pause for a second.  Is this sentence really

1  mysterious about what we're talking about when we say a pro

2  rata relative to all unsecured claims, principal amount of the

3  new notes. Well, we know that the principal amount of the new

4  notes is capped at 2,000,000,000. That's something that's

5  also in the exhibit.

6      But let's just take a quick look at Page 98. Because the

7  fact of the matter is, no one expected the creditors to guess

8  what we were talking about when we said pro rata portion of

9  unsecured claims. And there's a box at the lower left corner

10  of the page. And all in one place is the estimated claim

11  amounts for every single class of unsecured claims.

12      In a way some of these numbers have a little bit of a

13  false precision because with respect to OPEB liability as

14  disclosed in other parts, it's an estimate. With respect to

15  pension unfunded liability, it's an estimate. Under the

16  pension unfunded liability, it's an estimate.

17      But Mr. Robbins is a bankruptcy professional. And this

18  Court is a bankruptcy professional. And we've seen plans that

19  say we think claims in all of the different categories are

20  these. And creditors and the debtor are going to have to deal

21  with some uncertainty about what's in each of the categories.

22  But it's normal to spell out the different categories so

23  people have some visibility as to what's in a broad pool. And

24  then it's just as normal to specify here is what is going to

25  be distributed to that pool of creditors.

1    So what have we shown?  We demonstrated that we've

2  specified what's going to be given to the pool of creditors.

3  They don't like it, we'll come to that in a second.  And we

4  specified what the pool of creditors look like, its goal

5  there.

6    So to the extent that one of the objections is there was

7  no proposal, therefore that the county doesn't intend to

8  affect a plan of a judge -- a plan to adjust its debts, I

9  submit that the Exhibit 43 in fact contains a proposal and

10  it's quite precise with respect to the city's obligation to

11  provide funding in respect to pensions.

12    Now, let's return to Page 109 because we have one more

13  sentence we have to deal with.  It's everyone's favorite

14  sentence, or half of it's everyone's favorite sentence.  But

15  it turns out it's not the sentence about treatment.

16    This sentence is about consequences.  This sentence says

17  again, it should be completely obvious to Mr. Robbins, it's

18  completely obvious to me, I think it's completely obvious to

19  the Court, but we weren't only talking to Mr. Robbins, we were

20  talking to other people that might have a lower degree of

21  sophistication.

22    And so we explained because the amounts realized on the

23  underfunding claims, part of the equation, not the whole

24  equation, will be substantially less than the underfunding

25  amount, there must be significant cuts in accrued vested

1  pension amounts for both active and currently retired persons.

2      So what are we saying there?  We're saying a consequence

3  of the fact that the city's distribution on account of this

4  claim is going to be less than the amount that the pension

5  funds were expecting to receive by the city, something has to

6  give.  And that is pension amounts.

7      We didn't say which and when.  And there's two reasons

8  why one might expect that you wouldn't.  One, it's

9  presumptuous.  This is an issue as to which in a lot of ways

10 the city's indifferent.  Legally indifferent, not necessarily

11 emotionally indifferent, but legally indifferent.

12     And there's all kinds of reasons why the pension

13 adjustments, and in fact it's kind of traditional, why the

14 pension adjustments wouldn't meet standards like uniform

15 treatment for all persons in a class.  Because there might be

16 very legitimate social reasons for inflicting relatively less

17 impairment on older people and more impairment on younger

18 people.  And in fact that pattern is -- persists all the time,

19 but it might or might not be legal.

20     Viewing the world this way, which is correct as a matter

21 of law, also creates flexibility for the parties to deal with

22 the consequences of the distribution on the claims asserted

23 against the city in ways that might make more sense than those

24 that could be required by law if you looked at it a different

25 way and quite frankly not the way technically correctly as far

1  as I'm concerned.  And I actually think that the funding --

2  pension funds' counsel agrees with this analysis, but maybe

3  we'll hear.

4     Okay.  So the summary with respect to this point, the

5  pension claims themselves will have to be adjusted, but the

6  city saw no reason to unilaterally decide that.  The city's

7  issue is not about that.  The city's issue is about much it

8  will have to pay and the distribution, proposed distribution

9  on account of the pension underfunding claim is very

10  specifically laid out.

11     Last couple of points on the issue of the city's desire

12  to adjust its debts or to effect a plan to adjust its debts.

13  There -- I think there is the assertion, it's covered in our

14  briefs very briefly here, that the -- that there's a -- a --

15  that the plan as proposed can't be confirmed, so it's a plan

16  that doesn't count.

17     And I think I covered this in oral argument, the plan

18  clearly, we believe, can be confirmed.  We understand there

19  are legal disputes.  We -- we understand that there is an

20  assertion that the pensions clause of the Michigan

21  Constitution precludes impairment.  Your Honor knows our

22  position on that.  The subject of bankruptcies includes

23  clearly priorities of claims, rights to distributions,

24  consequences -- bless you, consequences of when there's not

25  enough to go around and discharges.

1    This is at the core of things that are the subject of

2  bankruptcies.  A declaration that a claim is not impaired is

3  inconsistent with that.  That is a part of federal law that is

4  not limited by -- by powers reserved to the states.

5    It was also asserted in papers, again no testimony, that

6  because there was a dispute as to the amount of the pension

7  claim, pension underfunding claim, and if that wasn't settled,

8  the plan could not be confirmed.  Of course that's not the

9  case.  The Bankruptcy Code is specifically structured to allow

10 subsequent determination of claims even after a plan is

11 confirmed.  But that was all premised on the idea that Your

12 Honor was going to hear some proof that the city's estimate

13 was wrong.

14    You heard no such proof.  So for purposes of today, there

15 actually isn't a dispute of the amount of the underfunding

16 claim.  And I think it's worth pointing out that when the city

17 says the underfunding claim is 3.5 billion dollars and it's

18 making a distribution based upon 3.5 billion dollars, it's

19 strange for the pension funds to be saying it's really less.

20 Because the consequences are that you would get a lower

21 distribution if the underfunding amount was less than the

22 estimate that the city believes is right.

23    But nevertheless we found ourselves clearly as a

24 historical matter in that strange place.  I'm not sure based

25 upon the evidence introduced that we are in that strange place

1  anymore.

2      So with respect to this part, the city's demonstrated the

3  desires to effect the plan.  The plan is a -- is an outline --

4  that's all that's required, but it's actually more fleshed out

5  than that.  An outline of a plan that can be confirmed.  We do

6  think it's confirmable.  I've also said before, that it will

7  change, that's -- that's also clear.

8      And -- and I'm not going to come back to this point, but

9  there's a -- there's -- there's an argument actually supported

10 by the cases that when considering the requirements for good

11 faith negotiations under -- under Bankruptcy Code Section

12 109(c)(5), that you also have to demonstrate that the plan you

13 started with is a plan of adjustment that could conceivably be

14 confirmed under Chapter 9.  I think I've dealt with that

15 issue, I'm not going to return to it in the interest of time.

16     But this brings us to an important aside.  And -- and I'm

17 not again going to repeat, but I endorse the state's argument

18 that from the very beginning of this case, or from the very

19 beginning of the -- of the Governor's administration when they

20 focused on the situation in Detroit, that it was prudent as a

21 matter of common sense, sensible planning, and because

22 everyone else in the world was talking about it, to look at

23 Chapter 9 as -- as something that might some day, if

24 circumstances didn't get better, have to be considered for the

25 City of Detroit.

1        The aside is to -- to basically inform the Court that

2   actually the law that we just talked about, the law pressed by

3   the opposition that the plan, that the -- that the city has to

4   start with, is a plan that is a plan of adjustment, or an

5   outline of a plan of adjustment that could be confirmed.

6   That's actually a legal command that when you're confronting a

7   municipality that has financial difficulties you have to start

8   with Chapter 9.

9        Because if you don't understand what the rights, and

10  powers, and obligations of a municipality are under Chapter 9,

11  and what a plan adjustment would have to look like in the case

12  of a Chapter 9 case, you can't start.  So in addition to all

13  of the, you know, very practical observations, and the fact

14  that it's very sensible to pay attention to the same law that

15  frankly your creditors are paying attention to when they're

16  thinking about what they might have to do in an out of Court

17  scenario, in this one circumstance the law actually commands

18  an early look at the statute.  So I think that if the law

19  commands an early look at the statute, an early look at the

20  statute cannot constitute evidence of a lack of good faith by

21  anybody.

22        THE COURT:  Before you go on, this question.  So is

23  it the city's position that with regard to the pension

24  liability underfunding, the creditors -- the only creditors

25  were the two plans and not the retirees themselves?

1          MR. BENNETT:  Your Honor, I think that's -- at the

2    end of the day, I think that's probably right.  We expect it

3    to be disputed, we understand it will be disputed.  I think

4    you will find that the -- the -- the -- I think you should ask

5    them when they reach the podium.

6         We think that's right.  That by the way, is the reason

7    that the first people we asked about whether they could

8    represent retirees in discussions that would ultimately affect

9    their pensions was them.  And they basically told us that we

10   can fight to preserve our claims, but we can't compromise

11   them.

12         THE COURT:  Well, all right.  I will -- I will look

13   forward to your discussion of how this impacts your argument

14   regarding impracticality.

15         MR. BENNETT:  We'll get there.  Okay.  Well, we're

16   there.  Impracticality.

17        You know, back to the -- coming back to the opening

18   argument, we started with, and we'd start with again, the

19   number of bond issues that the city has.  The fact that bond

20   holders have the right, each individually, to consent to any

21   impairment of their principal amount or of their interest.

22        And the -- the -- the one -- one place where you can

23   find, I said this at opening also, a list of all the different

24   issues, and demonstrate how numerous they are, are in the

25   appendix to the proposal for creditors.  There's a complete

1 list.

2      There's also -- it also reveals that many are insured,

3 but some are not which is an additional complication.  Mr.

4 Buckfire testified that although talking to the insurers was a

5 place to start, his -- his view was, because it's also the

6 law, that they could just make recommendations and there were

7 some issues as to which, according to this book, it's true,

8 there were no -- there -- there are no insurers.

9      And so ultimately if an insurer is going to recommend

10 something and you're going to send it out to a vote, you're

11 going to get some yes votes and that's great but there's

12 nothing you can do with respect to the no votes under

13 applicable non-bankruptcy law.

14      And so with respect to the bond holders, while there was

15 someone to talk to to get started, there was no way to get all

16 the way home.  And no one has suggested that there was a way

17 to go all the way home.

18      So -- but the -- and the second part we said at opening,

19 and again I'm -- I'm not going to repeat it here, is that

20 frankly that's the end of the inquiry.  Because

21 impracticability with any one class means that out of Court

22 negotiations are impracticable.

23      There are cases that say this, they're cited in our

24 papers.  I also spent some time thinking with the Court about

25 the problem about, you know, how you would go about it if you

1  thought that you still had to conduct good faith negotiations

2  with a group you could negotiate with, but you have another

3  group that you couldn't negotiate with and where it leads you

4  is delay for no purpose.

5      Ultimately you wind up having to be in a Chapter 9 case

6  anyway.  And whenever we talk about delay as -- as a -- as an

7  answer, let's go back to the undisputed fact that we had a

8  very severe insolvent situation that was also unstable.  The

9  instability being the recent default, the Syncora activities,

10  and the other things that -- and the delayed trade payments.

11     So the -- so delay isn't an answer for anything.  In the

12  context where there is actual near term prechter, there --

13  there is a serious problem that has to be addressed.

14     So the next step is were negotiations -- excuse me, there

15  should be no next step, but the next step in the event that

16  the Court decides, and I think this would be wrong, and

17  against the cases, that impracticability of one class is not

18  determinative.  That it -- that it has to be impractical with

19  every class which would mean that you have to conduct good

20  faith negotiations with classes where it is practicable.  We

21  then deal with the assertion by the -- the different retiree

22  groups that somehow negotiations in this case were practicable.

23     And I think there's -- there's a -- a -- three different

24  reasons why negotiations with the -- with the different

25  employee groups are impracticable.  And the first, which will

1  also apply to the retiree the -- excuse me, the two funds, is

2  the -- is the testimony of Mr. Taylor.  I think best

3  represented by the testimony of Mr. Taylor, but represented by

4  the testimony of other witnesses.

5      He said a couple of things that are relevant to the

6  subject of impracticability, we'll cover more of them.  But

7  right now I want to zero in on -- on what he said after he

8  acknowledged that he did not have the authority to bind any

9  retirees.

10     He said, he was nevertheless willing to conduct

11 negotiations.  Let's put aside for a second what negotiations

12 really mean with someone who's not authorized to bind anyone.

13 But he's ready to conduct negotiations and if he actually got

14 to the point with the city that there was a proposal for

15 modification of benefits that he -- that he was okay with, he

16 would recommend it to retirees.

17     And -- and -- and I don't remember if he was asked or he

18 volunteered, that what would have -- have to happen next, he

19 said there'd be a vote.  So what does a vote mean in this

20 context?  Again, out of Court.

21     It means that those who vote yes, I suppose, supposed to

22 be some form of solicitation materials, would be bound.  And

23 that would be a partial solution to the problem.  That would

24 be progress.  But everyone who voted no wouldn't be bound.

25 Well, what happens then?

1        THE COURT:  Well, but -- but this assumes that your

2   negotiation is with the retirees because they're creditors.

3        MR. BENNETT:  I -- I -- I understand.

4        THE COURT:  A point you weren't willing to --

5        MR. BENNETT:  I'm going to get to that.

6        THE COURT:  -- a moment ago.

7        MR. BENNETT:  Okay.  I'm not going to forget the

8   issue.  I'm talking about the people who stepped forward and

9   said, you should have talked to us.  Okay.

10      And Your Honor, this is exactly the situation we faced

11  with the bond holders.  That if -- if this is -- if -- if we

12  ultimately at the end of the day have to negotiate with

13  retirees and there is ultimately a retiree vote on some basis,

14  the fact that you could have a vote at some point out of Court

15  doesn't solve your problem.  You need to get the centers as

16  well.

17      Let's get to the retiree funds.  They said, they told us,

18  I think -- can we skip to the chart?  And I need a blow up the

19  top so I can find them.  Oh, there they are.

20      The police and fire retiree systems.  They're all --

21  they're all the way --

22        THE COURT:  I see it, sir.

23        MR. BENNETT:  Okay.  And --

24        THE COURT:  And I see the other one too.

25        MR. BENNETT:  Okay.  All right.

1          THE COURT:  The General Retirement Systems is the

2    other one you were looking for?

3          MR. BENNETT:  Right.

4          THE COURT:  Okay.

5          MR. BENNETT:  Okay.  I can't -- I'm -- the fire is

6    covered.  They either didn't respond or said no.  They

7    verbally responded.  You can ask them what their response was,

8    that they don't have the power to bind retirees.

9      Okay.  We'll talk about, by the way, what they did

10   because that may be important too.  Okay.  So with respect to

11   the first point, that every -- that even the people who -- who

12   stood up here and said, you should talk to me even though I

13   don't have authority.  At the end of the day, they led to a

14   place that did not give you retiree votes.

15     Again, we could stop here.  This is impracticability, the

16   same kind of impracticability as the bonds demonstrated also

17   with respect to the holders of retiree claims if we have to

18   talk to them.  And -- and if our -- if the objectors say we

19   don't have to talk to them, we'll get to that in a second.

20     Second, I was going to talk about this chart, so we can

21   leave it up.  The responses that -- that the city actually

22   received to the basic inquiry concerning whether the unions or

23   pension funds were actually in a position to represent

24   retirees, also demonstrates impracticability.  That alone.

25     So even if they say, and they -- but they didn't, I mean

1  they didn't say if -- we can talk and recommend.  That's not

2  actually what they said.  What they actually said, and you

3  have a big exhibit of the letters is, not us, we don't

4  represent them.  That's what they said to the city when they

5  were asked the question.

6      They didn't say to the city, we can't represent them as a

7  formal matter, but we have found ways to get around that which

8  I think was the testimony of some of the witnesses.  What they

9  said was, no, we don't represent them.  What you heard

10  testimony from -- from one of the -- the next to the last

11  witness yesterday, was that maybe as a matter of law they

12  couldn't have even represented retirees.

13      But I -- I submit that the actual letters which are in

14  evidence demonstrate that confronted with a broad statement,

15  we do not represent retirees or cannot represent retirees, is

16  another indication of impracticability, again, assuming for

17  the moment that retirees are even needed which they say they

18  are.  But --

19      And then finally, the third reason why I think in this

20  case you can find impracticability by the unions are the

21  numerous statements kind of throughout the record, starting

22  with the -- the briefs filed by the UAW, which I pointed out

23  at opening argument.  The briefs filed by the retiree

24  committee, the brief retiree committee proclaims that it's bad

25  faith even to ask for a impairment of the underfunding claims.

1    The UAW said in their briefs they would never agree to an

2  impairment of the underfunding claims because of the

3  non-impairment provision with respect to contracts.  And then

4  others at the trial, Ms. Lightsey, Mr. Taylor, Mr. Nicholson,

5  these are persons who said they would have represented

6  retirees but would have never agreed to a plan that modified

7  vested pension benefits.

8    And, Your Honor, in some instances, they actually said

9  that from the witness stand.  In other instances, it's found

10  in the interrogatory responses that they filed in discovery.

11  Some of them were projected here and this is a good time to

12  come -- to start coming back to the retiree funds because we

13  have their interrogatory responses that I think covers Your

14  Honor's question.

15    This is -- this is -- Exhibit 79.  Okay.  And I want to

16  go to Page 10.  Is that the first page?  Yes, Page 10 is the

17  first page.  Okay.  Paragraph 3, if you could blow it up.

18    Please describe any authority delegated to or otherwise

19  possessed by the trustees of GRS.  And -- and, Your Honor,

20  I'll take you through the GRS section.  There's an exactly

21  parallel set of questions for the uniformed pension fund the

22  PFRS.  So I'll do it once as opposed to twice to save time.

23    To eliminate or reduce on a prospective basis only, the

24  benefits, rights, and features of the pensions provided to GRS

25  participants who were already retired or terminated from the

1   City of Detroit.

2       And their response.  If you'd go -- I think we have to

3   read most of it.  Because first of all, GRS doesn't think this

4   is a direct enough question and so they object.  Because it's

5   incomprehensible.  Because the phrase is they don't understand

6   what any authority delegated to, otherwise possessed,

7   eliminated or reduced.  They don't know what any of those

8   words mean.  That's the first response.  So if we're going to

9   gauge constructive, you know, negotiations, this is part of

10  what we were dealing with.

11      Due to this imprecision, it is difficult to ascertain

12  what information is sought by the interrogatory.  And the GRS

13  is effectively asked to speculate as to its meaning which may

14  or may not include requests for legal conclusions.  The GRS

15  objects to this inquiry.  Okay, skip the rest of this.

16      Now let's move over to when they finally say the answer

17  is on the top of Page 11.  Well, let's go up to the last

18  objection to it, I'm sorry.  The last objection to the

19  interrogatory, GRS also objects to this interrogatory because

20  it assumes the existence of authority to act in contravention

21  of Article 9, Section 24 of the Michigan Constitution of 1963,

22  the pension clause that prevents any impairment or

23  diminishment of accrued financial benefits which authority

24  does not exist.

25      Okay.  Let's go to the next paragraph.  Now by the way, I

1  -- I -- I hope Your Honor is keeping track.  The -- the

2  interrogatory started on Page 10.  And we got to the answer

3  kind of in the middle of Page 11.

4      Subject to and without waiving the foregoing objections,

5  GRS states at no time from 2004 to the present have the

6  trustees of GRS had or been delegated authority to eliminate

7  or reduce on a prospective basis, the basis the benefits,

8  rights, and features including but not limited to the elements

9  of the pension formula of the pensions provided to GRS

10  participants who are already retired or terminated from the

11  city because the pension clause prohibits the elimination or

12  reduction of approved financial benefits of GRS participants

13  who are already retired, terminated from employment with the

14  city.

15      So what we have from the retiree committee, Your Honor,

16  is an admission that they aren't going to do anything that

17  they interpret as impairing or modifying pensions.  And so I

18  think frankly the third reason why Your Honor can find that

19  negotiations were impracticable as to retiree groups if that's

20  the question, and we don't even think you reach that question,

21  is that all of the different places you would think to go if

22  you think it's the funds, and frankly initially we did, you

23  would say to the funds, try to talk about something.  I think

24  we know they won't talk.

25      If you -- if you -- if you think it's the retirees, we

1  have explained that number one, we got a whole bunch of

2  letters that said we're not the right persons to talk to you.

3  And secondly, we got a -- even those people who said

4  notwithstanding our lack of authority, we would still like to

5  talk to you, they have all said we are working to a

6  recommendation.  The next step would be a vote.  And that

7  still would not give the -- the city any means to deal with

8  persons who choose to vote no, or actually more importantly,

9  persons who don't vote at all.

10     Now there's one exception to this, I guess.  And -- and

11  that is, it was asserted that there is a class action

12  mechanism that would conceivably have resolved the problems

13  with respect to the unions.  I actually want to hear exactly

14  what that mechanism is that was proposed.  And so while I am

15  prepared to discuss why a class action mechanism was not

16  practicable at all, particularly in light of the fact -- the

17  financial pressures that the city was confronting, I think

18  it's best if I hear exactly what the objectors had in mind

19  before responding.

20     Take a sip of water before turning to good faith.  It's

21  warmer in here than it was yesterday.  Okay.

22          THE COURT:  Excuse me one second.  Is that someone's

23  electronic device?  Is it off now?  Yes?  Okay.

24          MR. BENNETT:  Okay.  As I said before, and I think

25  it's important, at least as far as eligibility is concerned,

1  perhaps not with respect to 921, Your Honor's opinion can stop

2  here because the -- as Your Honor knows, the requirements in

3  109(c)(5) are disjunctive if negotiations are impracticable,

4  whether or not negotiations proceeded or whether negotiations

5  were in good faith are just not issues for the Court to be

6  concerned with.

7      And of course the legislative history of -- of the

8  impracticability prong is that it was designed for big cities.

9  New York was actually the pragmatic example that everyone was

10  concerned about at the time.  Where it was just understood

11  that when dealing with a situation as large as this one, as

12  large as New York which by the way was smaller than, at least

13  in nominal terms, than this is now, is a -- is a -- is enough

14  of a reason to recognize that in a lot of large city cases,

15  the negotiation prong is not going to be terribly relevant

16  because impracticability is the reality as it is here for all

17  the reasons we've described.

18      But nevertheless -- well, I should start with there's two

19  clauses actually to 109(c)(5)(B).  The first is, it deals with

20  negotiations in good faith.  And the second is, creditors

21  holding at least the majority in amount of the claims of each

22  class that such entity intends to impair under a plan in a

23  case under such chapter, well, I think it's stipulated that we

24  didn't get a majority in any class.  And we certainly didn't

25  get the retiree funds, or the retirees to agree to a plan.  So

1 we met the second half, and -- and I think there's no dispute

2 about that.

3     The -- the -- now we have to talk about whether the city

4 has negotiated in good faith with creditors.  And I think Your

5 Honor, the city's good faith in the negotiations and in this

6 whole process is demonstrated by what it did.

7     And I'm actually going to start with the process of

8 generating the proposal for creditors.

9         THE COURT:  Again, I have to ask you to pause here.

10 It -- it strikes me as factually impossible for it to be

11 impracticable for that party to negotiate with other parties

12 in any circumstance, and to negotiate with them in good faith.

13         MR. BENNETT:  You know, I -- I think the -- I -- I

14 disagree.  I think that the -- the -- the -- the view of the

15 professionals, and can we put up for just a second, Exhibit

16 413, Page 13.

17         THE COURT:  I'm sorry, page what?

18         MR. BENNETT:  Exhibit 413 -- 418, Page 13.  I'm --

19 I'm more using this to kind of organize the topic than -- than

20 for the evidentiary value which will come later.  But I think

21 anyone who looked at the situation back at the beginning

22 thought this, that's on this chart.

23     They -- everyone understands that if you can have an out

24 of Court solution, it's a great thing for all the reasons

25 listed on this chart.  And it's really, really, really hard to

1  say to yourself or to anybody else given all of the potential

2  advantages of an out of Court solution of saying, it's

3  impossible.

4      So look at the next part.  The -- you know, it's also a

5  recognition like -- I guess I want to say it this way.  The

6  first part benefits of well planned out of Court restructuring

7  in that list, that's all the stuff you know in your heart.

8      The next section, consensus or near consensus is

9  necessary for a successful out of Court restructuring.  And

10 then the thing in Italics is really an understatement.  It's

11 extremely difficult to achieve and practice.

12     In your head you know it's nearly impossible.  But you

13 hate to say it's impossible.  And so even in circumstances

14 where this is how you evaluate the situation, and I believe

15 that -- that -- that -- that Page 13 of Exhibit 418 is how

16 every really qualified insolvency professional who knows

17 anything about Chapter 9 would look at this situation.  You

18 get to the end and you say okay, I'm going to try anyway.

19     But you could -- you could have given the circumstances

20 of this city, you could easily have written this page that

21 said out of Court situations are preferred and unfortunately

22 it will not be possible here.  And that would have been true

23 too.

24     So I think the -- the -- the -- what the city did was

25 they said, this is extremely difficult to achieve, but we're

1  going to try anyway.  So I think you absolutely can believe in

2  your head that this is never going to work, but try anyway.

3  And that's what I think the situation is in this case.

4      So let's talk about what the city did.  And let's see

5  whether it's reflective of a good faith attempt,

6  notwithstanding what may well have been insurmountable odds.

7      What you heard testimony about from multiple witnesses

8  from Mr. Moore, from Mr. Malhotra, from -- from -- from Mr.

9  Buckfire, and a little bit from the outside looking in from

10  Mr. Dillon, was that there was a lot of effort, probably

11  beginning a long time ago, but really intensifying at the

12  beginning of '13 by professionals as they were hired to study

13  the situation carefully and get up to speed.

14      And one of the things that you also heard several times

15  in testimony of several witnesses, that many of the people

16  involved at one point or another, were surprised at what they

17  found.  And none of the surprises were positive.  You heard

18  that with Mr. Buckfire when he got the liquidity numbers in

19  May, you heard Mr. Dillon talk about the numbers kept getting

20  worse.  You talked about -- Mr. Malhotra said it in a number

21  of different ways.

22      And -- and that is a theme that I think Your Honor has to

23  also keep coming back to which is this situation, the economic

24  situation.  Whatever people thought it was going to be it

25  ultimately looked worse than everyone's initial impressions,

1    So they determined what they thought the situation was,

2   and then they developed the June 14th proposal.  Now, the June

3   14th proposal is really important because number one, it's in

4   evidence.  And number two, when we go through not every page,

5   but I'm going to go through the sections and explain their

6   significance.

7    It's important to remember that with one exception that

8   I'll get to and discuss having to deal with the section on

9   assets, throughout all of the testimony of all of the

10   witnesses that came here, no one objected to any of the

11   findings, conclusions, and data that is contained in this

12   report.  And as importantly, no one objected to the math.

13    And so I think this proposal stands frankly as a monument

14   to the city's good faith in this process.  And I'm going to

15   show you why.

16    The book is divided into sections and frankly the

17   sections are a progression.  The first 40 pages is about the

18   current financial condition of the city with some emphasis on

19   the services that are being provided to the residents.  It

20   covers the economic service -- the economic circumstances, the

21   tax base, legacy liabilities, deficiencies of service

22   delivery.

23    As I said before, no one adduced any evidence that

24   anything contained in these pages is incorrect in any respect,

25   and it's a horrifying story.  I'm sure Your Honor has looked

1 | at it.

2 | But now let's look at Page 41. Page 41 is a statement of

3 | key objectives. It's what the city is trying to accomplish.

4 | Nobody even mentioned it. But it's really important when

5 | assessing the good faith of the city. Let's look at what it

6 | says. If we can blow it up a little bit.

7 | It starts with to the fullest extent possible under all

8 | the circumstances. All the circumstances recognizing that

9 | things aren't so good.

10 | The first item, provide incentives and eliminate

11 | disincentives for businesses and residents to locate and/or

12 | remain in the city. The city cannot stabilize or pay

13 | creditors meaningful recoveries if it continues to shrink.

14 | Achieving this goal requires improvements in city services,

15 | particularly the area of public policies. Public safety and

16 | tax reform to reduce the cost of living in the city and to

17 | more closely approximate costs of living in nearby areas.

18 | No one took issue with this. That a fundamental problem

19 | for the city is fixing delivery of services and -- and

20 | actually reforming taxes. Neither one of these things are

21 | good for creditors because both of them cost money.

22 | And going back, I said I was going to use a Chapter 11

23 | analog. We know that there are some cases that come to Court

24 | and they advertise the business is just fine, we just have a

25 | debt problem. I'm not sure I've ever really seen a case where

1 that's been true, but there are cases that are portrayed that

2 way.

3      This is not one of them.  This is a case that requires a

4 rehabilitation and a debt restructuring at the same time.  And

5 we're saying it right there and we're saying it's going to

6 cost money.  No one walked into this Court and said that's

7 wrong.

8      Next point.  Maximize recoveries for creditors.  But

9 there's a recognition.  Since the city will not generate

10 sufficient cash to pay all liabilities, alternatives have to

11 be considered.  No one walked into this Court and said that

12 was wrong.

13      Go to the next section.  We recognized that it's

14 important to provide affordable pension and health insurance

15 benefits, affordable, what the city can afford in restructured

16 governance of pension arrangements.  It didn't come up here,

17 but it's in the book.  There's been some problems there.

18      Next, eliminate blight to assist in stabilizing and

19 revitalizing neighborhoods and communities within the city.

20 No one objected.  No one says this is wrong.

21      Next, reform city government operations to improve

22 efficiency and reduce costs.  In many areas longer term

23 benefits will require immediate increases in capital

24 investments.  No one said this is wrong.

25      Maximize collection of taxes and fees that are levied and

1 imposed. We've heard complaints that there's insufficient

2 attention to this, but no one noted it's in the key objectives

3 that it is part of the plan.

4 And lastly, generate value from city assets where it's

5 appropriate to do so. And we're going to talk more about

6 that. We've been up front about that from day one.

7 So, with all of the contentions that the city is acting

8 in bad faith, there hasn't been and there can't be a

9 contention that the city understands what the objectives of

10 this exercise is, and has identified the correct ones because

11 there is no evidence to the contrary.

12 Pages 43 to 50, we're not going to look at them because

13 we've talked about the city, but it's a review of the city

14 budget for the past several years. Again, less important with

15 this -- this section, but there's no evidence in the record

16 that anything contained in these pages is wrong in any

17 respects.

18 But now let's do pause and take a look at Page 51.

19 Fifty-one is one of those pages that I'm sure, although I

20 don't know, the Governor's office looked at and was horrified.

21 What this page does is it looks at -- at five years of fiscal

22 actuals and we can blow it up for Your Honor if you don't have

23 it in front of you. But I wasn't planning to.

24 And then -- then forecast going forward for the next five

25 years based on nothing changing. No debt restructuring. Keep

1  things the way they are.  And you have progressively building

2  budgets -- budget deficits in every single year.  No one

3  introduced any evidence that there's anything inaccurate about

4  this page.

5       Pages 53 to 60 then go and say well, what has it already

6  done to address these problems?  And there's a discussion

7  about the consent agreement, the appointment of the emergency

8  manager, and many things.  There's another part to pages -- in

9  Pages 53 and 60 that are worth dwelling on because they're

10  partly relevant to what's going on here.

11       Which is there's a summary of things that emergency

12  managers have been trying to do in other jurisdictions that

13  were precipitated litigation, some of which have the effect of

14  imposing limitations on emergency managers' powers and

15  affecting their ability to accomplish things that would have

16  to be accomplished in the City of Detroit.  Suggesting, of

17  course, that there were true limitations to what could be

18  accomplished out of Court as we've discussed in the context of

19  the impracticability section.  No evidence introduced that

20  anything contained in that section is inaccurate in any way.

21       Pages 61 to 78 talk about what has to be done to address

22  the rehabilitation part of the program.  And again in a

23  Chapter 11 example, everybody recognizes that you have to keep

24  the business going and keep the customers coming in the door

25  and to continue to keep your customers happy.

1      It's not any different in a city, particularly one that

2  has confronted declining population for as long as everyone

3  can remember.  Pages 61 to 78 is a proposal for addressing

4  those things.  And no evidence was adduced at this hearing

5  that anything contained in Pages 61 to 78 is incorrect,

6  unreasonable, imprudent, unnecessary, in any way.

7      Pages 79 to 82 only bear a short mention because this is

8  one area where there is no specific proposal.  There is the

9  general recognition that taxes have to go down rather than up.

10  And of course the only thing -- there's -- there's no specific

11  proposal with respect to that.  They will have to be some day,

12  but the point here is, is that in many cases it is asserted

13  that a debtor is not eligible because it can go solve its

14  problems by raising taxes.

15      And of course not a single witness has presented himself

16  or herself to Your Honor and suggested that that is a solution

17  to the problems of the City of Detroit for reasons described

18  elsewhere in the report, it is not.

19      And finally -- well, not finally, but we've now reached

20  the section where there's been some controversy which is the

21  -- which is realization of value of assets on Pages 83 to 89.

22  And first, I want to talk about complaints that weren't made.

23      There was no complaint that an asset is missing.  The --

24  the -- the report covers the -- the assets that people at the

25  very beginning of the case were thinking about as places where

1  value might be extracted to help out with the creditor

2  situation.  And no one testified that one was missing or

3  hidden.

4      There's also no testimony by anyone that the information

5  presented with respect to the various assets is inaccurate or

6  incomplete in any way.  The specific complaint from Mr.

7  Robbins, and frankly it was -- we'll come to this in more

8  detail later, but Mr. Robbins had lots of complaints about

9  there wasn't enough information, or at least the -- the -- the

10  testimony was elicited from him that he needed more

11  information.

12      Then he qualified that by saying, well, we needed more

13  information because any time you look at information more

14  questions come up and we have to ask for more.  And then he

15  was asked well, what additional information did you really

16  need.  And the only specific category he could think of was

17  values of assets -- values of the assets.

18      So I want to cover this in two different ways.  First of

19  all, it's worth asking would creditors have credited a city

20  value on any of those assets if they had offered one at that

21  stage in the case.

22      I have been doing this for a really long time.  I am

23  waiting to see a case where a debtor puts a value on assets

24  and the creditors immediately respond, gee, those are great,

25  we'll use them and not dispute them.  I'm pretty sure Your

1  Honor hasn't seen that case yet either.

2      But in any event, the -- the -- Mr. Buckfire's testimony

3  demonstrated that there were really only two of the listed

4  assets that can contribute material value to resolving

5  creditor -- creditor problems in this case or the city's

6  problems in this case.  And the reality is, is that both of

7  those involve publicly known circumstances is the best way I

8  can put it, the cloud value.

9      So even if you create theoretical valuations, or

10 appraisals, or -- or -- or try to, you know, kind of come to

11 values of assets that turn out to be very difficult to value

12 to begin with, there are what I'll call other issues.

13     First, with respect to DWSD as is explained in the

14 proposal for creditors, realizing value from DWSD for the

15 benefit of creditors involves a very complex transaction with

16 -- with surrounding governmental units.  A topic by the way

17 that I think has been a subject of discussion for more than

18 five years.  And it involves a lot of competing concerns of

19 the other municipalities and desires to pay less when the city

20 would want more.

21     And secondly, as we pointed out in oral argument, the

22 second category is the art, the Detroit Institute of Art and

23 the collection contained therein.  And as I pointed out there,

24 we are currently operating under an Attorney General opinion

25 that says the city can't realize any value from it.  And that

1  is probably not the only, but it's a significant issue with

2  respect to the asset, but it's probably not the only issue

3  that is relevant for consideration.

4      So the reality is with these assets as with so many more

5  in so many other cases that we've all been a part of, there

6  are tremendous uncertainties as to what the true value

7  realization potential is.  It's in a really big range.

8      And it may well be and in fact we can -- we should in a

9  second, cross reference to another part of the presentation,

10  recognize that these things might not be resolved in -- during

11  the pendency of any Chapter 9 case, and there might have to be

12  an agreement that deals with allocations of values as if and

13  when realized on a sensible basis.  Not exactly an unheard of

14  plan term.

15      In our own way, maybe not artfully enough, we signaled

16  that.  And so if Your Honor goes to the book, and I didn't

17  prepare the pages to be presented, but I'll just give people

18  references so that they can go to the right place if they need

19  to.  In a description of the note that is -- was intended to

20  be distributed pro rata to unsecured creditors, there are a

21  couple of terms that deal with these uncertainties.

22      In particular there are two kinds of participation

23  payments that are prescribed by the note.  One deals with

24  revenues, and one deals with designated assets which weren't

25  defined, but that was something that people could talk about.

1    And the idea was that if as and when monies were

2  received, 70% would be devoted to creditor recoveries and 30%

3  would be retained by the city.  Which also by the way answers

4  one of Mr. Robbins' complaints about there wasn't an incentive

5  for the city actually to realize value.  Thirty percent was

6  part of that.

7    But another part of that, of course, is the possibility

8  that exists in many cases for post effective date supervision

9  by Courts.  It will surprise some people, but believe it or

10  not, the Orange County Chapter 9 case was open for about a

11  decade after the plan was confirmed and it was reopened last

12  year because some loose end developed that had to be closed.

13    So in any event, we -- in its own way the proposal

14  anticipates the reality that many had to have recognized that

15  asset values at this point in time were really hard to

16  deliver, would not be precise, and in any event would not

17  necessarily represent a number that would effectively result

18  in a distribution.  That that information might come much much

19  later.

20         THE COURT:  What page was that on?

21         MR. BENNETT:  It's asset distribution proceeds, Page

22  108, about one-third from the top.

23         THE COURT:  Thank you.

24         MR. BENNETT:  And the -- and the provision relating

25  to sharing of -- of improvement in gross revenues is -- is on

1 the prior page.  It's 107 on the bottom.

2      Okay.  So after the description of assets we come to the

3 ten year projections.  And here again no evidence at all was

4 introduced that says anything about the assumptions on which

5 the projections were based, or the number crunching and the

6 math that actually generates the results are wrong in any way.

7 And -- and really in this section the assumptions are

8 summarized and then math takes over.

9      We should -- let's take a look at Page 98, just very very

10 briefly once again.  Page 98 where there is the -- the box of

11 estimated claim amounts, is also the place where we show

12 available cash under the first ten years that is generated by

13 the model and the assumptions that are listed in that section.

14      And if you'll -- if you could blow -- blow up the box

15 above the box we saw last time.  So the one that goes all the

16 way across the page.  Okay.

17      So the first line is funds available for unsecured

18 creditors based upon city operations and city tax collections.

19 Further demonstrating that nobody was hiding the ball about

20 the importance of asset sales as -- or asset monetization as a

21 potential source of recovery in the case, there's a line that

22 shows that there -- there may or may not be something.  TBD of

23 course means to be determined.

24      And then the bottom line, funds that we know are

25 available for unsecured claims.  And then notice the last two

1  words, with opportunities, recognizing that it's hoped that

2  things will be better.  That's why there's the revenue sharing

3  provision in the other sections.

4      But as I said before, at this point the math has taken

5  over.  And it is these numbers, the numbers we know we're

6  going to have that drive the next section which is treatment.

7  We've already discussed the plan.  I don't think there's any

8  more reason to discuss it.  As I said before, it's driven by

9  the numbers, it is complete, covers all the contingencies

10  people are concerned about.  It may not cover them the way

11  they want, and we'll come to that in a second, but no one is

12  hiding the ball.  Every issue that anyone has ever talked

13  about in this Court that has to be dealt with in this case, is

14  highlighted here, a reflection of good faith, not bad faith.

15      On -- there's another section on post -- post plan

16  governance recognizing that that's another subject that has to

17  be addressed, it got no attention here.  So the proposal

18  itself shows that the city's professionals did a lot of work.

19  It shows that the results were driven by math that no one

20  challenges, and at this point, and I can skip it now because

21  we went there already, I wanted to make the point that

22  everyone involved understood that the negotiations were likely

23  to fail because it was impracticable to expect that you could

24  achieve a negotiated solution in this case.

25      And by the way, Mr. Dillon said something that I think --

1  but of course the evidence doesn't show directly, that

2  everybody else also understood, which is as the numbers got

3  worse, everyone testified in varying ways that the numbers got

4  worse and the negative surprises.  The chances that a deal

5  could be worked out out of Court actually decreased because

6  it's harder to get a deal done when there's low recoveries

7  than a deal done when there's relatively higher recoveries.

8      And I don't think at any time people thought the

9  recoveries could be great.  But I think that when you look at

10  the recoveries that are -- are projected and the plan

11  provisions that are included in the June 14th proposal, what

12  you're seeing is the lowest situation, or the worst situation

13  anyone envisioned at any point in the process.

14      So to the extent that back on January 29th, there is

15  optimism in the Jones, Day report that, you know, all these

16  great things can happen if you can get something done out of

17  Court, and it's very difficult, because the numbers went down

18  from there, I think people felt even worse about the

19  prospects.  But as I said before, they tried anyway and they

20  tried hard.

21      Okay.  Well, notwithstanding the reservations that this

22  was going to be very hard if not impossible, a meeting was

23  scheduled, presentation was finalized, a meeting was

24  scheduled.  Many many people were invited to that meeting.  I

25  think the testimony is uniform on that.

1    Some people managed not to get an invitation.  I frankly

2  think that the -- that the broad array of people who weren't

3  invited was a reflection of good faith as opposed to bad faith

4  and the fact that a few -- we missed a few, I don't think

5  reflects any -- any lack of good faith.

6    There was a big room at the first meeting, very clearly

7  no negotiations were intended there.  And so all the testimony

8  about how there were no negotiations at the first meeting, I

9  stipulate to that.

10    I will point out that everyone testified that all

11  questions were answered.  Some people testified they didn't

12  ask questions.  Some people testified that there was a card

13  system used because of -- frankly because of the size of the

14  room, it was a pretty reasonable thing to do.

15    But the fact that some people were discouraged from

16  asking questions frankly is not evidence of the city's bad

17  faith.  That certain professionals might have decided not to

18  ask questions for whatever reasons, certainly is not a

19  reflection of the city's bad faith, but that obviously could

20  have impeded progress to a degree.

21    At the end of the initial presentation the city discussed

22  what it was going to do next.  And if we can have Exhibit 44,

23  Page 61.  Your Honor's seen it before, I'm not going to read

24  it.

25    I'm going to only point to the words initial round of

1  discussions with stakeholders.  No one ever said we're going

2  to negotiate a plan in four weeks or else.  But what is said

3  is, we're going to have an initial round of discussions with

4  stakeholders.  And then we're going to evaluate where we are.

5      So now you've got a city that said, I've got a really bad

6  situation, the numbers clearly show that.  No one denies that.

7  We're going to make a shot because in -- because in our hearts

8  we would love to have an out of Court deal even if in our

9  heads we think it's impossible.

10     So let's see what the initial reactions are to what we

11 are proposing.  And we are proposing something by the way

12 backed with a huge amount of information and backed with a

13 progression that explains exactly how we got to the place

14 where we got.

15     I'm going to ignore for the time being and hold for

16 reply, the whole potential confusion over the subject of

17 whether there were negotiations or not at different stages.

18 But I think the testimony showed that everyone understood, or

19 that many, not everyone, many understood -- actually the most

20 important people understood that the city representatives were

21 looking for feedback.  No one denies that.

22     And in fact a list of some of the witnesses.  Nicholson

23 acknowledges this, Kreisberg acknowledged this.  By the way,

24 they were actually the most professional negotiators involved

25 back at that point in time along with Mr. Robbins.  We'll get

1  to in a second.

2      And -- and Kreisberg is a person who understood that a

3  counter proposal was kind of the right next step.  Because

4  Kreisberg testified that he actually had worked out a counter

5  proposal of some sort, he just decided not to present it.  I

6  don't know if he would have presented it, it would have

7  changed anything, but it would have been more information for

8  the evaluation that the city said was going to follow.

9      Robbins testified that the proposal itself with all of

10  the flaws that he asserted are in it, signaled that the city

11  wanted to negotiate and have discussions.  He used both of

12  those words, although I don't have the official transcript, it

13  was just yesterday.

14      But he also volunteered that he didn't think the city's

15  proposal was serious.  And he said -- and the reasons when he

16  asked about that he said well, there was no incentive to

17  actually realize monetization with respect to assets.  Your

18  Honor can create your own judgment on that.  And that there

19  was no requirement in the -- in the notes to pay on maturity

20  if asset sales and if the distributions didn't happen.

21      Well, again, that's a function of the math.  There are

22  projections that shows how much cash is available.  It's

23  already being used for interest on the note.  There's a

24  separate provision saying some of it's going to be used for

25  purposes of supplementing OPEB benefits.  It wasn't a lot of

1 money.  But again, those were thoughts he kept to himself.  He

2 didn't ask questions or discuss.

3      As I said before, at this evaluation period what was

4 going to happen.  Well, a lot of things could have happened.

5 It might have been unlikely, but one thing could have happened

6 is, the germ of an idea, or the possibility of agreement might

7 have emerged and it would have been pursued.

8      The other thing that could have happened is, is that

9 there was no prospect of an agreement and the objective

10 judgment that things were -- were impracticable would be

11 confirmed.  But one thing should not be surprising, is that

12 work on both contingencies proceeded at all times.  Because

13 remember, the backdrop was an insolvent city with a number of

14 recent events that created instability.  And no one could

15 ignore that.

16      And Mr. Nowling's schedule is part of normal

17 pre-bankruptcy planning, nothing more, nothing less.  And

18 pre-bankruptcy planning is not a reflection of a lack of good

19 faith, it's a reflection of sensibly managing your affairs in

20 circumstances where you're under extreme financial pressure

21 and you know that the only proposal that you can afford isn't

22 so great.

23      There was testimony about other large group meetings.

24 There was testimony about in the hall meetings.  There was a

25 lot of -- there was at least some testimony about all of the

1 meetings that were happening on the bond holder side. And

2 there too, there was big meetings and small meetings, and

3 individual meetings. There were lots and lots and lots of

4 meetings during the four week period of time.

5    Again, whether or not negotiations occurred, discussions

6 did occur. And multiple requests for feedback were made,

7 they're in the record.

8    Robbins actually says the same thing a little bit

9 differently. You know, he -- he -- he doesn't say that

10 feedback was attracted, I think I mentioned before he said it

11 was implicit in the proposal.

12    But what I think for these purposes, I want to go back to

13 that testimony that -- that these three experienced

14 negotiators at a minimum two on the labor side, one an

15 investment banker representing labor side, they knew that a

16 negotiation that the city was trying to start negotiation.

17 And they just didn't accept the invitation.

18    So I -- I think again we ask ourselves two questions.

19 One, how does a dialogue get started. And two, what is the --

20 the city supposed to do, what is a good faith city supposed to

21 do when the dialogue doesn't get started? Well, I think it's

22 incredibly obvious that the way a dialogue has to -- has to

23 get started, is that when -- when you get a proposal from

24 someone and you don't like it, but you want to or need to make

25 a deal with that person, you make a counter proposal.

1    I -- I -- very short digression, we're in Motor City.  So

2   let's talk about how people go about buying cars which should

3   be familiar to everyone in this room except a couple of New

4   Yorkers who may never have owned one.

5    You go to a dealer.  There's a sticker on the car.  And

6   let's say you like the car.  You don't want to pay the sticker

7   price ever.  What do you have to do to find out what the real

8   price of the car is going to be and if you're going to be able

9   to buy it.

10    The dealer, the sales person, or the manager says, how

11   much are you willing to pay for the car.  And you have to tell

12   them, you have to make an offer, otherwise you're not going to

13   buy the car.  That's how a dialogue gets started.

14    No one ever answered the question which Robbins

15   understood was on the table, which Kreisberg understood was on

16   the table, which Nicholson understood was on the table, and

17   many other people may have understood on the table as well.

18   Which is okay, in light of all this data, the progression, the

19   argument, the presentation about what the problems are, which

20   is not contested at all in this hearing.  It had five months

21   to decide that there was something wrong with this.

22    Propose something else that you like better that works.

23   That never happened.  And actually what did happen, the

24   evidence shows, the interrogatory responses told, is that to

25   the questions with respect to pension retirees, whether the

1  response is from the -- the -- the two funds, any one of the

2  retiree representatives who say we should have negotiated with

3  them, the response was, I'll pay zero because their statement

4  was, no impairment at all.

5      I don't think this is that hard.  Other city creditors

6  knew how to respond.  From Mr. Orr we have the testimony about

7  the negotiations with the swap banks and the 60 days, the

8  roughly 60 day period beginning from the time when everyone

9  started to understand there was going to be a default on the

10  COPs.

11      Buckfire testified, and it's in the record, that some of

12  the GO insurers actually did submit a written out offer, a

13  competing framework.  It wasn't acceptable but they submitted

14  something.

15      He also testified that someone else had half a proposal.

16  I think he called it half a proposal.  It was -- it was -- it

17  was verbal.  But other professionals who Mr. Robbins would say

18  he is as qualified as, or in the same league with, knew what

19  to do if there was any hope at all of starting a dialogue.

20      So now we get to the next -- the next part of the

21  question.  What is a good faith city supposed to do when

22  confronted with counter parties that said to the city, you

23  have miscalculated the pension underfunding claim, said it's

24  too high as opposed to too low.  But no impairment will be

25  acceptable.  As I said in the vernacular of the car buyer

1  zero.

2     And some of them they say they don't -- they don't even

3  really represent the employees as reflected by the

4  interrogatory responses which are admissions.  This is really

5  important.  There is no answer to that question in the

6  evidence, none.

7     The answer that well, spend more time.  There's two

8  responses to spend more time.  One is the city didn't have

9  more time.  There were other pressures.  This wasn't just

10  about a negotiation however long it could be.  It was a

11  constant tension between spending more time in negotiations

12  and incurring more financial instability risk.

13     But the second part is, what would more time have led to.

14  There was no evidence of any overt indication that the city

15  could have looked at and said, there's a path to a deal.

16     With respect to UAW, there's an additional complication

17  we now know, didn't know then, that the UAW was secretly

18  financing a lawsuit, the Flowers case.  By the way, the UAW is

19  the one that in their brief, their trial brief for this

20  proceeding says, they were never going to make a deal because

21  they would never ever ever compromise on pension claims.

22  Three times in their trial briefs they say that.  There is no

23  answer to the question as to what a good faith city is

24  supposed to do in response to that position.  That works, that

25  makes things better.

1       And then we have Mr. Robbins and his client the funds.

2  Now remember how those discussions ended.  Robbins has a

3  meeting with city representatives and they are talking about a

4  process for trying to reach agreement.  What steps are we

5  going to take?  What things are we going to try to talk about?

6  Really due diligence points.  They actually weren't even

7  talking about an agreement.

8       I'm going to call those things the shape of the table.

9  So Mr. Robbins says -- is trying to talk about the shape of

10  the table.  And he says back, I need eight days to discuss

11  with my client my authority and my recommendations concerning

12  the shape of the table.

13      Mr. Robbins knows the city has already defaulted on some

14  of its debt.  Mr. Robbins may or may not know, or maybe didn't

15  ask about what was going on with Syncora.  I don't know.  But

16  Mr. Robbins knows that there's an emergency and Mr. Robbins

17  knows a valuation is starting soon.  But he says, I'll get

18  back to you in eight days.

19      And what happens during those eight days?  Well, with or

20  without Mr. Robbins' knowledge, don't know what was going on

21  inside the funds as to what they were really talking to each

22  other, his client initiates litigation against the city.  I

23  don't understand why Mr. Robbins was surprised by the timing

24  of the filing.  In fact I don't know how anyone could have

25  been under all the circumstances.

1     On some -- some other points that I'm going to do a

2  little anticipating now, but only a little.  About the kinds

3  of objections that we expect to see to the good faith of the

4  city.  But I don't think I have a vivid enough imagination to

5  figure out all of them.

6     One is, not enough information was provided.  We talked

7  about that already in a number of places we've talked about

8  it.  Robbins is so far as I can tell, the only specific

9  testimony about information that was missing.  There is no

10  doubt that more can always be provided, more is always

11  provided, and another thing I've never had happen to me yet in

12  my professional career, is where an adverse party has said,

13  enough, I have enough information.  Just never happened to me

14  yet.  I don't expect it to happen for the rest of the case.

15     But the fact that there is more information that is

16  always available does not mean negotiations aren't supposed to

17  start.  Enough information will never be available.

18     By the way, the only person who was really asked about

19  the operation of the data room was Mr. Robbins and he

20  testified that Miller, Buckfire had been responsive and he was

21  generally satisfied with the way it was working, although

22  admittedly he said, and it's true, the city was having

23  problems coming up with some of the information he was

24  requesting.

25     Filing on July 18th instead of July 19th.  The Ingham

1  County -- it's one thing about the Ingham County forum that I

2  think everyone would have to stipulate to.  There is nothing

3  about what was going on in the Ingham County forum that was

4  going to solve the city's problems.  It was only going to make

5  the situation worse.

6      To me that's the -- an example of the beginning of

7  uncoordinated creditor action that bankruptcy laws are

8  designed to supplant.  And bankruptcy laws do supplant.  And

9  so by filing this case here, when the city was already facing

10 time pressure, already had been through the period of time it

11 told everyone it was going to have discussions based on which

12 it would conduct an evaluation, and where everything that it

13 heard confirmed the fears that -- that things were as

14 impractical as their heads told them, it was not only in good

15 faith, but it was sensible to engage a forum that not only had

16 exclusive jurisdiction to decide all the questions that

17 someone was trying to raise in Ingham County, but could

18 actually and did actually have the power to solve -- help

19 solve the city's problems.  That can't possibly be in bad

20 faith.

21     I expect to hear that the city did not negotiate in good

22 faith because it took at face value the retiree

23 representatives' disclaimer of authority to negotiate.

24 Because what you've heard here, is that while they can't

25 change their interrogatory responses and the letters that they

1  sent which said we can't negotiate, don't have authority, have

2  never sought authority.

3      They appear to contend that the city should have figured

4  out that they didn't mean it.  I think you've heard testimony

5  that we thought they did mean it.  But let's assume that there

6  was a misunderstanding.

7      If there was a misunderstanding, it was a

8  misunderstanding created by the written letters which don't

9  admit an exception to the statements that were made, or don't

10  admit to the existence of a work around to the statements that

11  are made.  I don't think it was a misunderstanding, but if

12  there was a misunderstanding, that does not reflect bad faith.

13      Another point that I -- I think we will hear was that the

14  proposal that was made was not acceptable.  You've already

15  heard the retiree committee, any proposal that involves any

16  impairment to pension benefits was not going to be acceptable.

17      To Mr. Montgomery's cross examination of Mr. Buckfire and

18  he wasn't here of course at the very beginning, but drawing

19  inferences from his cross examination, it sounds like the

20  retiree representatives didn't like the interest rate.  It

21  sounds like the retirement on the note.  It sounds like the

22  retiree representatives didn't like that the principal amount

23  was 2,000,000,000 as opposed to a different number.  It sounds

24  like the retiree representatives didn't like the Dutch auction

25  mechanism.

PAGE ___81___

1      Those things are good to hear.  They would have been

2  better to hear if there was any chance of -- of having a

3  consensual solution back at the time when the proposal was

4  made and a discussion -- period for discussion with creditors

5  was going on.  There is no evidence that any creditor stood up

6  and made any of the points that Mr. Montgomery made in his --

7  or tried to make in his cross examination of -- of Mr.

8  Buckfire at any time during the negotiation period.

9      Again, perhaps they were under no obligation.  Your

10  Honor, once observed to me that the good faith requirement

11  points to the city and it does.  But the question is, in the

12  absence of the kind of feedback that I guess the retiree

13  committee is now effectively admitting, is the kind of things

14  people talk about when they receive a proposal, speaks volumes

15  to the question of what a good faith city is supposed to do

16  when it doesn't get that feedback.

17      City representatives at meetings were not "authorized to

18  negotiate".  And -- and I think the testimony from the

19  witnesses was a little clear when that question was sprung --

20  unclear when the question was sprung at them.  Some said, you

21  know, well, I work for Mr. Orr, he wasn't there.  But the

22  reality is, is that the representatives of the city were there

23  to collect feedback and figure out what to do about it.

24      And they have the ability to make a recommendation to a

25  single person who yea or nay and sometimes with government

1 approval depending upon the amounts of money at stake, could

2 actually instantly or very promptly respond. That Mr. Orr was

3 not in the room is -- does not make a difference. He sent

4 people to collect feedback to figure out what the next step

5 should be. That should be sufficient.

6 No one proved, Your Honor, and -- and I'm going to be

7 slightly going over matters that the state covered, so I'll be

8 very brief. No one proved that the filing of the Chapter 9

9 case was preordained, or planned, or implemented without

10 considering approvals.

11 I said before the fact that state -- the state, the

12 professionals who ultimately represent the city looked at

13 Chapter 9, realized that the city might be headed there, and

14 thought about that, doesn't show a lack of good faith, it

15 shows two things. It shows a lack of prudent and practical

16 planning, and as I pointed out, it may also show due regard

17 for the law.

18 I think this is a -- I think -- while there will be, I'm

19 sure, other assertions of indicia of lack of good faith that

20 arose at different points in the process, I think I will save

21 that for reply, because I think I'm also a little bit

22 overstaying the time I reserved for myself.

23 For a very short summary. First of all, I want to harken

24 back to where I started. That there's a list of five things.

25 109(c)(1), (2), (3), (4), (5) that Your Honor has to make

1 decisions on to demonstrate to find that the city is eligible.

2 I think the evidence overwhelmingly demonstrates that the

3 city is eligible, that there's been no effective rebutting of

4 the -- of the city's prima facie case on any of the points.

5 And this Court could clearly find in the alternative that it

6 was impracticable and the city tried anyway. And everything

7 they did in that process was in good faith and did not exhibit

8 any lack of good faith. And I think for the same reason,

9 there is no basis for dismissing the case under 921.

10 I think it is important in -- in listening to the

11 argument you're about to hear, whether any of the complaints

12 about the process are followed with, and if this particular

13 thing was done differently, the city's problems would be

14 solved as follows.

15 The second half has never been a part of the dialogue.

16 If you scour through all of the pre-trial briefs that were

17 filed, AFSCME recognizes that it's something they have to say,

18 or a topic they have to address. And then they address it by

19 saying well, there were lots of ways that the city could have

20 avoided bankruptcy if they just talked some more.

21 Well, lots of unspecified ways don't cut it anymore. If

22 there is a assertion that there was a fork at the road where

23 the city acted in any way lacking complete good faith, and

24 could have acted differently, they should specify what the

25 city should have done differently, and what consequence of

1  that act would have made this proceeding unnecessary and

2  redundant.

3      That question has never been answered.  And that's the

4  most important question before you.  I think the facts are

5  overwhelming, the city should -- the Court should determine

6  the city is eligible and the case should not be dismissed

7  under 921.  I'm happy to answer any questions Your Honor might

8  have.

9          THE COURT:  Thank you, sir.  And who is going first

10  on the objectors side?

11          MS. LEVINE:  We are, Your Honor.

12          THE COURT:  So I'll ask you your preference.  Would

13  you like to take an hour and a half now for what would be an

14  early lunch break, or do you want to plow ahead after a 20

15  minute recess?

16          MR. MONTGOMERY:  Your Honor, if I may make an

17  inquiry of the Court.  Which is initially when would you

18  otherwise plan to take the lunch break for today?

19          THE COURT:  Probably after the first of the

20  arguments.  That's why I was leaving it up to Ms. Levine.

21          MR. MONTGOMERY:  Your Honor, whatever Ms. Levine

22  wants to do, we'll follow.  If she wants to take a break now.

23          THE COURT:  I agree, it's all on you.

24          MS. LEVINE:  Okay.  We'll start.

25          THE COURT:  Okay.  Well, I would like to take a 20

1  minute break at this point.  Is that okay?

2          MS. LEVINE:  If we -- if we take lunch then does

3  that obviate the 20 minute break and maybe gets out a little a

4  bit earlier on Friday?

5          THE COURT:  It would.

6          MS. LEVINE:  Then we will eat lunch.

7          THE COURT:  All right.  It's 11:15.  We'll reconvene

8  at 12:45, please.

9          MS. LEVINE:  Thank you.

10          THE CLERK:  All rise.  Court is in recess.

11      (Court in Recess at 11:14 a.m.; Resume at 12:48 p.m.)

12          THE CLERK:  All rise.  Court is in session.  Please

13  be seated.  Recalling case number 13-53846, City of Detroit,

14  Michigan.

15          MS. LEVINE:  Good afternoon, Your Honor.  Sharon

16  Levine, Lowenstein, Sandler for AFSCME.

17          THE COURT:  You may proceed.

18          MS. LEVINE:  Thank you, Your Honor.  Your Honor,

19  based on these facts, Detroit is not eligible to be a debtor

20  under Chapter 9 of the Bankruptcy Code.

21      Under the Bankruptcy Code, in Chapter 11, it works

22  because of transparency and because there's value creation for

23  all of the constituents.  There's an exchange for the

24  automatic stay.  There is a fish bowl.

25      The private sector company defaults, creditors understand

1  how bankruptcy works.  The bonds get equity or get

2  restructured debt, vendors get equity and they get to keep a

3  customer.  And even if you're part of the cadre of -- of costs

4  that have to get kicked to the curb, like -- like the

5  pensioners or the retirees, there's safety nets in the private

6  sector that -- that protect against that.

7      There's the Pension Benefit Guaranty Corp which provides

8  federal insurance.  The is multi employer pension plans.

9  There are VEBA's.  There's COBRA.  It's not as if you're --

10  you're left there with no pension and no Social Security.

11      Here, Your Honor, in Detroit, there is no such safety

12  net.  And while we heard you ask Mr. Orr whether or not he had

13  asked the Governor for that help and we certainly heard the

14  Governor say that he doesn't have to provide that help because

15  the bankruptcy process will take care of it.  As we sit here

16  today, there is no -- there is no visibility on that issue.

17      We'd respectfully submit that operating outside of a fish

18  bowl but under a cloak of secrecy, leaves folks with a limited

19  understanding of what's happening, why it's happening, and why

20  it's happening now.  And particularly troubling here, Your

21  Honor, is -- and we've heard the testimony and then we just

22  heard the state and the city acknowledged in their closings,

23  when the Governor took office, when the Treasurer took office

24  in 2011, they were -- they already had their eye on Detroit,

25  they already believed it to be financially distressed.

1      There was a slow decline that the state believed was

2  occurring, that the Governor believed was occurring at that

3  time which didn't result in an emergency or a crisis on June

4  14 when the proposal for creditors was made and an emergency

5  that necessitated a July 19 or a July 18 filing.  There was a

6  multi year decline where the Governor chose to do nothing and

7  Detroit suffered the consequences.  That is not -- that's not

8  impractical and that's not good faith.

9      Turning first, Your Honor, to insolvency.  You know,

10  there's a little bit of tongue in cheek when we talk about the

11  fact that the city needs to prove insolvency because we're not

12  -- you know, we're not immune to the fact that there clearly

13  is blight and no lights.  And we'd like to see more from the

14  police and from the fire.  And we'd like to help them be able

15  to do more to -- to make the -- to make this city safer.

16      But under Bankruptcy Code Section 109, only one type of

17  debtor has to prove insolvency at the beginning of the case

18  and that's a municipality.  And we would respectfully submit

19  that that makes sense because of how unusual this is and how

20  scary this is for its citizens.

21      So for the city to say, sort of tongue in cheek that of

22  course we wouldn't expect them to offer evidence of value at

23  the start of the case, you need to negotiate those values and

24  do that at the end of the case.  That works.  We've done that,

25  that works in a Chapter 11.

1      But that doesn't work in the Chapter 9 context, Your

2   Honor.  So if I owe a dollar and I choose not to pay it, even

3   if I have it, that doesn't make me insolvent.  If I have an

4   asset and I choose not to pay that dollar because the Governor

5   through the Attorney General has told me not to sell or

6   dollarize that asset, that doesn't make me insolvent.

7      And if the police chief gets on the stand and despite the

8   fact that the testimony is compelling, and it is compelling,

9   how much he wants to improve the city.  Or even frankly I

10  found particularly compelling, Your Honor, the retired

11  librarian who -- who loved the library and who -- and who was

12  very compelling in the sadness that she felt that some of the

13  libraries were being closed.  That's not proof of insolvency,

14  that's anecdotal.

15     And what -- and what -- and if you listen to what Captain

16  Craig said on cross examination, he has not given the city a

17  budget.  We don't know what the hole is.  We don't know what

18  the path is to fix it and we don't know how much it's going to

19  cost.

20     We know they're going to take from the retirees.  We know

21  they're going to take from the active employees.  We know

22  they're going to take, but we don't know what -- whether or

23  not it's going to fix anything, and how it's going to be used,

24  and what that taking is going to mean.

25     Your Honor, we've also heard anecdotal evidence about the

1  fact that we can't collect taxes.  And that therefore we -- we

2  don't know what our revenue stream.

3      My co-counsel Richard Macks lives in the city and he pays

4  his taxes.  And we went through this thing, this 109 pages

5  together.  We don't understand who is not paying, and why

6  they're not paying, and whether or not that's valid.

7      Now it may be, Your Honor, that, you know, we see the

8  blight and we see the problems.  And we're not saying that

9  those aren't real issues.  And we're not saying that -- that

10  Detroit doesn't have, you know, issues with tax collection.

11  But what we are saying is, a municipality for a very important

12  and compelling reason has the burden of proof and they haven't

13  proved it here.

14      We don't see valuations.  We don't see appraisals.  We

15  don't see actuarial reports.  We don't see any expert reports

16  with regard to the shortfall -- alleged shortfall in the

17  vested pension benefits or otherwise.  And we have heard that

18  that's for strategic reasons.

19      But let's assume -- but -- but even if that is, Your

20  Honor, we still have a Chapter 9 municipality and a Chapter 9

21  municipality to be eligible must -- must prove solvency.  And

22  even if Your Honor disagrees with us that we need expert

23  testimony on that which we believe you do, then we need to

24  take a look at what factual evidence they've given us.  Okay.

25  They've put up slides that say these are the numbers and

1  they say we haven't refuted them, but that's not true, Judge.

2  We absolutely have.  They've -- they've offered the testimony

3  particularly of Ernst and Young, of E & Y.  And those -- and

4  E & Y has been involved with the city according to Mr. Dillon

5  in 2012 and maybe even as early as 2011 because E & Y

6  participated in the concessionary bargaining negotiations with

7  labor.  Okay.

8      So E & Y is the guy that everybody is telling us has

9  really gotten underneath the numbers.  We didn't agree that

10  the terminology was a bottoms up terminology, but we did agree

11  that E & Y was the guy that got underneath the numbers.

12      So why when E & Y took the stand, are they relying on

13  audited financial statements from non-testifying CPA's?  Or

14  even more confusing, if the theory is that we need an

15  emergency manager because the -- because the city is being

16  mismanaged by itself, why is E & Y relying on untestifying,

17  untested city employees to provide the information that

18  they're relying on.

19      Either -- either they're a fact witness and they're doing

20  their own fact checking, bottoms up, true digging in and

21  understanding the numbers, or they're an expert and they're

22  really offering expert testimony.  We have neither.  We have

23  neither, Your Honor.  They haven't demonstrated insolvency.

24  Okay.

25      So we have a flock of financial consultants who have been

1  involved in this process for at least since the middle of

2  2012.  And it's frankly baffling to the stakeholders that they

3  want to cut claims, that they want to cut jobs, that they want

4  to cut retiree health, that they want to cut pensions, but

5  they don't have an indication for us yet as to what is that

6  hole that they need to fill.

7      And frankly, Your Honor, unlike some cities that find

8  themselves distressed, Detroit is in a solvent state.  So if

9  we have a Governor who is starving the city and then delaying

10  taking action with regard to the stakeholders, that is not, we

11  would respectfully submit, proof of insolvency.

12      We were -- we heard colloquy on the stand actually, Your

13  Honor, and I think Your Honor actually questioned Mr. Orr with

14  regard to why he didn't ask the Governor specifically for the

15  3.5 -- or why he didn't remember whether or not he asked the

16  Governor for the 3.6 billion to fill the pension hole.  Your

17  Honor, I have kids, they know when not to ask.

18      Your Honor, with regard to good faith and with regard to

19  the negotiations.  AFSCME and others sought to meet with the

20  emergency manager on the day, the very day he was appointed.

21  Ed McNeil went to his office and when he couldn't get into the

22  office, he posted a letter to the door requesting a meeting

23  with the coalition of unions that wanted to meet with him.

24      AFSCME and others, including Mr. Kreisberg went to all

25  four of the presentations that were offered.  AFSCME and

1  others signed a confidentiality agreement to access the data

2  room to get access to information.  AFSCME sent information

3  requests requesting reasonable financial, cost, health

4  benefit, retiree health, pension information.

5      Mr. Kreisberg testified that despite the fact that there

6  was some colloquy during his deposition that may have

7  indicated otherwise, he did want to meet and he was trying to

8  get information from the city with regard to what might

9  constitute the underpinnings of a successful proposal, or a

10  successful counter proposal.  And that was not forthcoming.

11      There were no meetings.  There were no responses to those

12  inquiries.  And in addition to that, there was not sufficient

13  information in the data room as of the filing date to make a

14  reasonable counter proposal.

15      In fact we're not sure, Your Honor, and we would

16  respectfully submit that Your Honor find, that this proposal

17  isn't a proposal.  We saw some of the pages that the city

18  pointed us to during their opening, but if you look at this

19  proposal, and you're a retiree counting on health benefits,

20  you don't know what your new benefits are going to be.  You

21  don't know what benefits are going to be cut.  And you don't

22  know how much the city is saving because they're making those

23  changes.  So you can't really counter or offer something

24  different or potentially less devastating to you.

25      Same with regard to the pension, including vested pension

1 benefits.  You don't know what's going to be cut, you don't

2 know what your pension benefit is going to be.  And you don't

3 know what the savings are as a result of those cuts.  In fact

4 with regard to the pensioners, you don't even know if you're

5 considered a creditor.

6      With regard to jobs, Your Honor, you don't know if you're

7 going to have one.  And you don't know what they're going to

8 save by outsourcing your job or by eliminating it.  How can

9 you make a counter proposal without these very basic simple

10 facts?

11      And equally telling, equally telling is that we've seen a

12 plethora of information and evidence with regard to the fact

13 that people were reviewing and looking at whether or not you

14 could terminate the pensions through the use of Chapter 9 way

15 back into 2012.

16      Not one shred of evidence, Your Honor, not one shred of

17 evidence on how you conduct the good faith negotiations you

18 need to conduct to be a Chapter 9 debtor consistently with

19 whatever rights you want to reserve under PA436.  Not one

20 shred of evidence on how they could actually facilitate those

21 discussions.

22      We would respectfully submit that the arguments with

23 regard to impractical also go to bad faith and a -- and a lack

24 of -- and a lack of authority.  They've admitted financial

25 distress at least as of the time the Governor took office in

1  2011, yet the state created a situation where there was only

2  one month and four days that we could do these negotiations.

3  They did not, the Governor did not before June 14th, encourage

4  negotiations with stakeholders.

5      We heard testimony from the bevy of consultants that

6  there were no discussions with the bonds before the -- before

7  the -- before the EM was appointed.  There were no discussions

8  with vendors.  There were no discussions on the pensions.

9  There were no discussions with the retirees.

10      And when there were discussions, with a coalition of

11  unions led by Ed McNeil and others that resulted in a

12  concessionary agreement where the city sat in the room and

13  worked hard for several months and frankly it could have been

14  done shorter, if it needed to be done shorter as a precursor

15  to Chapter 9 and where E & Y, the one -- the one consultant

16  that the -- the state has testified is the guy that knows the

17  numbers, sat in the room and participated in those

18  discussions.  When that negotiation concluded, the state said

19  no.

20      And not only were there no negotiations with retirees,

21  Your Honor, but you heard testimony from at least two of the

22  -- two of the witnesses that you can do settlements with

23  retirees.  You can do settlements through class actions, you

24  can do settlements as Mr. Kreisberg testified actually

25  occurred here in Detroit by -- by having the unions as part of

1  the concessionary bargain, which by the way dealt with retiree

2  health and dealt with pensions.  Also have the unions agree

3  not to fund retiree litigation.

4      There's no retiree with 18,000 or $19,000 in pensions

5  undertaking a Supreme Court challenge to -- to litigation.

6  And for the city to say they're surprised to learn that in

7  like -- like with AFSCME in Illinois, or with the Flowers

8  litigation that that wasn't being funded by the retiree, is --

9  is just -- is frankly disingenuous.  Not only -- not only do

10  they know it, Your Honor, they participated in the settlement

11  negotiations that resulted in how to stop it.

12      Your Honor, as you approach Chapter 9, one of the

13  criteria under Chapter 9 is that you enter into an agreement

14  that is approved by a majority of your creditors.  That is

15  completely consistent with the concept of a pre-packaged

16  bankruptcy in a Chapter 11 context.  And it's a good thing to

17  do because it vests people like the labor negotiation vested

18  people in the making better of the problem.

19      They're owning, they're owning the resurgence of Detroit

20  as opposed to being discarded by the Governor's view of what

21  that resurgence should look like.  But instead of that, Your

22  Honor, we're doing things where we're kicking people off to

23  the side and disenfranchising them.  And that's not the proper

24  way to be using Chapter 9.

25      Outside of bankruptcy if you say the bond holders can't

1 | consent because the indentures or the loan documents require

2 | 100% consent, then you get to one-half in number and

3 | two-thirds in dollar amount.  You don't even have to do that

4 | in Chapter 9.  In Chapter 9, you only need a majority.

5 | If you say that the insurance carriers, that the bond

6 | insurers aren't getting to consent, same thing, Your Honor.

7 | You only need a majority.  You don't even need the high bar

8 | that you have in Chapter 11 for a pre-package.  In a Chapter 9

9 | it's only a majority of the creditors.

10 | They didn't get to a majority of the creditors because

11 | they didn't spend sufficient time with those creditors to do

12 | those negotiations.  And by sufficient time we don't mean two

13 | years, we just mean more than a month and five days.  They

14 | took more time, Your Honor, the Governor took more time to

15 | interview the consultants that were hired to help the city

16 | with its restructuring than they took to negotiation the

17 | restructuring itself.  That's absurd.

18 | Your Honor, you're being asked today here to set a very,

19 | very dangerous precedent, not only for Detroit, but if the

20 | Governor is allowed to create a self -- a slow decline with no

21 | real emergency and just wait until we're at the precipice and

22 | then say oh, we have to do something, and now with that self

23 | created emergency, be able to use Chapter 9 to further what

24 | might be because we're under this -- this cloak of -- of lack

25 | of transparency, an agenda that is not truly a financial

1  agenda, but a political agenda, a bi-partisan agenda, a

2  socioeconomic agenda, a racial agenda, Your Honor, you're

3  going to be put in a situation where this will allow the

4  Governor to do this to any city in -- in Michigan and it will

5  be a road map for Governors across the country to use Chapter

6  9 by creating a self created emergency to deal with issues

7  that are unrelated to really truly solving the financial woes

8  of particular cities.

9       And the facts in Detroit are particularly egregious.

10  Because in addition to not doing anything, trying to negotiate

11  with the stakeholders all during 2012, they actually stopped

12  the one stakeholder that begged the city to negotiate with

13  them which was labor.  We had concessionary agreements by 30

14  unions that were approved with the city with E & Y in the room

15  and the state said no.  And then they went one step further.

16  They negotiated a consent decree.

17       And the only substantive right other than technical

18  assistance that they're giving to themselves in that consent

19  decree, is the right to veto labor agreements.  And the only

20  reference to the Constitution in that consent decree, Your

21  Honor, is not to the pension clause, it's to the fact that the

22  Constitution limits funding.  We can't help the city

23  financially, it's silent on the pension clause.

24       And what happens after the consent decree?  The -- the --

25  the Governor enacts 436.  What's the only thing that 436 does

1  here?  Is it stops negotiations.  So now we have the

2  consultants in a pretzel trying to figure out how they can

3  conduct good faith negotiations as required as a precursor to

4  Chapter 9 while simultaneously not waiving rights under PA436.

5      Now I would respectfully submit that had they spent one

6  scintilla of time working on the problem the way they did on

7  getting rid of the pensions, they could have come up with a

8  creative solution.  But that road block was put there by the

9  state and blocks the ability of Detroit to reasonably be here.

10     We understand, Your Honor, that this is a hard situation.

11  We --

12         THE COURT:  What -- what was the Governor's

13  motivation in your view?

14         MS. LEVINE:  Your Honor, I don't -- I'm not -- I'm

15  speculating.  I've heard -- I've heard from our constituents.

16         THE COURT:  The evidence to suggest what his

17  motivation was other than to help the city, is there?

18         MS. LEVINE:  Your Honor, the -- the -- actually we

19  think the evidence is to the contrary.  We think that there's

20  accumulation of evidence that says that starting back in 2011

21  he was aware of this financial condition and has not done

22  anything other than create this emergency here.  And what was

23  in his mind?

24         THE COURT:  For what purpose though?

25         MS. LEVINE:  I'd be speculating.  But I -- but I'd

1 be speculating also to say it was just out of altruism with

2 regard to the financial situation of Detroit.

3     And, Your Honor, I would also respectfully submit that

4 regardless of that motivation, if this really is all you have

5 to do to prove impractical -- to prove it's impractical, just

6 to wait for the time period to pass till you get to a

7 precipice, it couldn't possibly be surprising to all of these

8 financial consultants that we were reaching the point in time

9 when the bond holders were going to call a default, or where

10 the bond insurers were going to call a default.  That just

11 makes no sense.  Okay.

12     And while it might -- the EM might not have been

13 appointed until March, all these consultants were involved

14 since 2012.  If what we're saying here, Your Honor, is that we

15 can use Chapter 9, potentially just to get rid of the pensions

16 and the retirees, who aren't like -- who are not going to

17 share in the upside, or potentially get rid of some of the

18 bond debt or other debt who aren't going to share in the

19 upside, that's an -- that's an improper use under this factual

20 setting.

21     It's unconstitutional to use -- to apply Chapter 9 in

22 this way, Your Honor.  It's unconstitutional under the state

23 constitution to get rid of the pensions in this way.  It's

24 unconstitutional to apply Chapter 9 as a work around for

25 PA436.

1    We would respectfully submit it's an unconstitutional

2  application to use Chapter 9 to jettison legacy liabilities

3  without any safety net for those recipients.  And we would

4  respectfully submit, Your Honor, it's a terrifying use of

5  Chapter 9.  Thank you.

6        MR. GORDON:  Good afternoon, Your Honor.  Robert

7  Gordon of Clark, Hill on behalf of the Detroit Retirement

8  Systems.

9    Your Honor, similar to when we had oral argument back on

10 October 15th, if I may, I just want to give a little bit of a

11 road map if I may as to the sequencing of -- of closing

12 arguments following Ms. Levine at this point.

13    Consistent with the opening arguments, Your Honor, will

14 recall, Ms. Green from our office was sort of cast by all of

15 the objectors on behalf of all of the objectors because of her

16 singular facility with all of the volume of -- of evidence,

17 and facts, and documents, to construct and -- and present to

18 the Court a timeline of the evidence that was intended to be

19 introduced and that had been adduced in discovery.

20    Consistent with that, she has been essentially asked to

21 again provide to the Court an enhanced form of her timeline to

22 review with the Court succinctly to review what evidence has

23 indeed been introduced in this trial with highlighting, and

24 this is the enhanced part of it, highlighting the specific

25 facts, pertinent facts that have been developed during the

1  trial that weren't in the original timeline.

2      So with that, Your Honor, the -- the suggestion is that

3  Ms. Green would provide the enhanced timeline on behalf of all

4  of the objectors.  I would then provide some limited comments,

5  legal arguments on behalf of the retirement systems, and then

6  it would be followed by a -- a number of the other objectors

7  including in a particular order.  If the Court wants to know,

8  I can give you that as well.

9            THE COURT:  That's fine.

10           MR. GORDON:  Okay.  As I understand it --

11           THE COURT:  On one condition.

12           MR. GORDON:  Yes, Your Honor.

13           THE COURT:  Ms. Green, succinct doesn't mean talk

14 fast.

15           MS. GREEN:  I have the word slow written on the

16 cover.

17           THE COURT:  Because I want to -- I want to

18 comprehend what you're saying.

19           MS. GREEN:  I can't talk as fast as Ms. Levine

20 either, so I won't.

21           THE COURT:  Okay, fair enough.

22           MR. GORDON:  Duly noted for everyone.  If I misstate

23 the -- the order of objectors, I will apologize.  But for the

24 Court's assistance, my understanding is that after the

25 retirement systems, then the retired Detroit Police Members

1   Association would be next, and then the UAW, then the Flowers

2   plaintiffs, then the public safety unions, then uniform and

3   non-uniform retiree associations, including Ms. Lightsey and

4   Mr. Taylor, and then the retiree committee.  If I got that

5   correct.  Thank you, Your Honor.

6           THE COURT:  That's fine.  Thank you.  Thank you for

7   your work in organizing that.

8           MS. GREEN:  Good afternoon, Your Honor.  Jennifer

9   Green on behalf of the retirement systems.

10      The objecting parties began trial on the 23rd of October

11  by showing a similar timeline of what we believed the evidence

12  would show at trial.  And we believed that evidence would show

13  that there was never an intent to actually negotiate prior to

14  the bankruptcy filing and that it was a foregone conclusion

15  before any of those negotiations or alleged negotiations took

16  place that the end game would be Chapter 9.

17      And we believe that timeline that now includes more

18  evidence that was adduced at trial, in addition to new

19  documents that were produced during trial, will indeed show

20  that.  And I will look quickly through some portions that I'm

21  sure are undisputed by this point, but they are included for

22  your reference.

23      At trial the Governor testified that this process has

24  been a two and a half year effort which was consistent with

25  his previous accurate characterization.  In March of 2011,

PA4

1  was signed into law.  In February of 2012, as Ms. Levine just

2  stated, the coalition of 30 unions ratified a concessionary

3  agreement that was later blocked by the state.  And in

4  February of 2012, Stand Up for Democracy filed a petition to

5  invoke a referendum on PA4.  Within just days of that, Stand

6  Up for Democracy's petition, there were already discussions

7  about how to insulate PA -- what became PA436 later from

8  referendums.

9      At about the same time, Jones, Day and the State of

10  Michigan began to work together on issues relating to the

11  possible repeal of PA4 and the consent agreement.  And we have

12  exhibit number 849 here that discusses that.

13      On March 23rd, Treasurer Dillon admitted at trial that a

14  possible Chapter 9 for the city was discussed as far back as

15  the spring of 2012.  And at that time Huron Consulting,

16  Miller, Buckfire, and Jones, Day lawyers were also discussing

17  a potential Chapter 9.

18          THE COURT:  Something you'd like to say, sir?

19          MR. IRWIN:  Your Honor, I -- I am extremely

20  reluctant to interrupt during summation, but I don't believe

21  that Exhibit 852 is in evidence.

22          THE COURT:  Oh.

23          MR. IRWIN:  It is not on the Court's list of

24  documents provided to us during the break.  We have tracked

25  these things quite carefully and we don't believe this is in

1  the record.  We believe it was discussed with a witness but

2  never offered.  And we have an objection to it in the

3  pre-trial order.

4          MS. GREEN:  I believe --

5          MR. MONTGOMERY:  I believe, Your Honor, on our list

6  has 852 which is also Bowen deposition exhibit number 14 as

7  having been admitted --

8          MS. GREEN:  Uh-huh.

9          MR. MONTGOMERY:  -- in the trial.  That's on our

10  master list.

11          MS. GREEN:  I will say, Your Honor, when putting

12  this together we double checked every exhibit we included in

13  closing as having been admitted.

14          THE COURT:  Do you have a date for the admission?

15          MR. MONTGOMERY:  Yellow highlight means what?

16          MS. GREEN:  Either day six or day seven.

17          THE COURT:  Six or seven was the response?  Well, I

18  think rather than take the time to try to dig into the record

19  to see if it was admitted or not, we'll let Ms. Green continue

20  with the understanding that any references to it will be

21  stricken if it was not admitted into evidence.

22          MR. IRWIN:  Your Honor, if there are additional

23  documents with this issue, I -- I would feel the need to in

24  fact raise the same objection.

25          THE COURT:  Absolutely you should, absolutely.

1          MS. GREEN:  I believe this was admitted into

2     evidence during Treasurer Dillon's testimony.

3          THE COURT:  Okay, that helps.

4          MS. GREEN:  That date, I think is the right day.

5     Later that same day Huron Consulting emailed Jones, Day

6     discussing a Chapter 9, stating I need to link you into a

7     Chapter 9 conversation with Andy very quickly, referring to

8     Andy Dillon.

9          On April 4th, 2012, the city entered into the consent

10    agreement which Jones, Day had helped craft with the State of

11    Michigan.

12         In June of 2006 -- or 2012, Heather Lennox of Jones, Day

13    and Ken Buckfire met with Governor Snyder and they pulled

14    together some memos that they had prepared for Andy Dillon,

15    including some of the topics that are relevant to these

16    proceedings, including a comparison of PA4 in Chapter 9, a

17    memorandum on constitutional protections and pension, and an

18    analysis of filing requirements of Section 109(c)(5) of the

19    Bankruptcy Code regarding impracticability and negotiating in

20    good faith.

21         And we raise these, Your Honor, not to -- this isn't a

22    Jones, Day led conspiracy argument.  The fact of the matter

23    is, that we think things like this relate to whether or not it

24    was good faith to wait until 34 days before filing when these

25    issues were clearly on the horizon back in 2012 as Ms. Levine

1  just argued as well.

2      In July of 2012, Miller, Buckfire was hired by the state

3  to perform a 60 day review of the city's financial condition.

4  And at that time Miller, Buckfire, Ken Buckfire from Miller,

5  Buckfire testified that he was approached by Jones, Day and

6  that one of the partners had wanted to meet -- or that she

7  wanted to introduce one of her partners who was the lead

8  bankruptcy partner for Orange County which was a successful

9  Chapter 9.

10      In October 2012, before PA4 was rejected by the voters,

11  the Treasury Department and the Governor's office began

12  discussing creation of a new emergency manager statute in case

13  the referendum passed.  This testimony comes from the

14  deposition of Howard Ryan that has been submitted to Your

15  Honor.  He did not testify live.

16      In 2012 December, PA436 was introduced in the Michigan

17  legislature and passed shortly thereafter.  PA436 was

18  insulated from a public referendum because it had an

19  appropriation in the amount of 5,000,000 -- just over

20  $5,000,000.  And as you heard Treasurer Dillon testify, that

21  covered a small portion of the budget for only the City of

22  Detroit's consultants.  This was not enough money to even

23  cover other emergency manager situations across the State of

24  Michigan.

25      Howard Ryan, a state 30(b)(6) witness, testified very

1 candidly that the reason that the appropriation language was

2 put in there was so that it would not be defeated by a

3 referendum.

4     In January of 2013, Miller, Buckfire was re-engaged and

5 at this time Miller, Buckfire discovered that the DIA art

6 collection was a potential asset capable of monetization.

7 However, there were no actions taken on the DIA artwork until

8 August 5th.  At the same time Miller, Buckfire was asked by

9 Treasurer Dillon to make arrangements for the city and state

10 officials to interview Jones, Day and seven other law firms

11 that were interested in serving as restructuring counsel.

12     At the end of the month an internal email at Jones, Day

13 shows as though they were acting like a Chapter 9 was already

14 the plan.  There is an email from that date that states, it

15 should also prove interesting that Miller, Buckfire has said

16 no one wants this bankruptcy to go the way of JEFFCO.  And

17 there's also a caution at the bottom, that when they do their

18 pitch to avoid alienating the state and not to mention that if

19 something were to happen with the city's pensions, that the

20 state would probably step up to deal with but thus far has

21 failed to concede this point.

22     At the pitch, and we've all seen the presentation, so I

23 will skip through these very quickly.  The strategy was laid

24 out.  Negotiating in the shadow of a Chapter 9 and attempting

25 to bolster eligibility for and success in a Chapter 9

1   proceeding by establishing a good faith record of seeking

2   creditor consensus, was one thing that was laid out.

3       And these are the speaker notes from the pitch

4   presentation and it states, this will deflect any eligibility

5   complaints based on alleged failure to negotiate or bad faith.

6   Further it blatantly says, if needed Chapter 9 could be used

7   as a means to further cut back or compromise accrued financial

8   benefits otherwise protected by the Michigan Constitution.

9       Shortly thereafter, Richard Baird reaches out to Jones,

10  Day to inquire about hiring Kevyn Orr as the emergency

11  manager.  On January 31st, Orr calls PA436 a clear end run

12  around the prior initiative that was rejected by the voters.

13  And although the new law provides a thin veneer of a revision,

14  it is essentially a redo of the prior rejected law.

15      That same day Jones, Day opines that it seems the ideal

16  scenario would be that Snyder and Bing both agree that the

17  best option is simply to go through an orderly Chapter 9.  In

18  February, Mayor Bing was -- Mayor Bing was approached by

19  Richard Baird regarding Kevyn Orr as a candidate for the EM

20  position.  And Mayor Bing recalls that the only qualification

21  -- qualification he was offered about Orr was his bankruptcy

22  experience.

23      In March, the Governor declared a local emergency, a

24  local financial emergency.  Kevyn Orr was appointed emergency

25  manager, and in April, Jones, Day was engaged as legal counsel

1  for the city.

2     On April 18th, Don Taylor has a face to face meeting with

3  Kevyn Orr and several other members of the Retired Detroit

4  Police Officers and Fire Fighters Association.  And Kevyn Orr

5  told Mr. Taylor at that time that pension benefits are

6  protected under the Michigan Constitution.

7     Mr. Taylor testified at trial, I asked him about the

8  pensions of retirees.  He said that he was fully aware that

9  the pensions were protected by the state constitution and he

10  had no intention of trying to modify, or set aside, or change

11  the state constitution.

12     A month later the emergency manager was quoted as saying,

13  the public can comment on the city's financial and operating

14  plan, but this isn't -- we all heard this in Court a thousand

15  times, but this isn't a plebocite, we are not like negotiating

16  the terms of the plan.

17     In May, the city met with Christie's, but Kevyn Orr

18  testified that he told them to go away.  Buckfire met with

19  Christie's in May and again failed to retain them until after

20  the bankruptcy filing.  He retained them on August 5th.

21     At trial Buckfire denied telling the DIA board members

22  about an imminent bankruptcy filing, although Buckfire was

23  later impeached on that point with an email recounting a

24  meeting between himself and board member David Meador.

25     On June 5th, Chuck Morris sent an email to Kevyn Orr

1  stating that the pension underfunding is so large that Chapter

2  9 is the only way to deal with it.  Thus, the city knew at

3  least as of June 5th that "a significant reduction was

4  necessary".  And two days after this email, Kevyn Orr

5  forwarded that email to Treasurer Dillon alerting him of the

6  situation.

7      On June 10th, Kevyn Orr held his first public meeting

8  pursuant to his statutory duties under PA436.  And when asked

9  a question from an audience member regarding pension benefits,

10  Orr told the public that the benefits are sacrosanct and

11  cannot be touched.

12      (Video Being Played at 1:24 p.m.; Concluded at 1:25 p.m.)

13      On June 10th, Orr's assertion that accrued benefits are

14  sacrosanct is consistent with what he told Don Taylor, the

15  President of the RDPFFA in their meeting in April.  But it is

16  inconsistent with what Orr proposes at the proposal for

17  creditors meeting that occurs just four days later.

18      Orr admitted on the stand that he never corrected this

19  misinformation.  So at best the city mistakenly gave

20  misinformation to the very class of creditors it was supposed

21  to be negotiating with, or at worse, the city outrightness led

22  the retirees into thinking that their pensions were safe.

23      Three days after telling the retirees at the public

24  meeting that their pensions could not be touched, Mr. Orr gave

25  an interview with the *Detroit Free Press* and expresses his

1  intention to evade the pension clause through a federal

2  Chapter 9 bankruptcy proceeding.

3      The following day the emergency manager held the meeting

4  at the Detroit Metropolitan Airport and presented the proposal

5  for creditors.  Attendees at this meeting all testified that

6  it was announced that this was not a negotiation.  And I

7  believe Mr. Orr also admitted during trial that indeed the

8  meetings on the 10th, and the 14th, and the 20th were not

9  negotiations, they were merely presentational.

10     And this is when the city admitted for the first time

11 that it fully intended to impair and diminish accrued

12 financial benefits.  However, this was buried 109 pages into

13 the proposal.

14     At the end of the proposal the city laid out a timeline.

15 It gave 34 days for the informational stage as well as the

16 negotiations to take place.  It is the objecting parties'

17 position that a four week time frame was inadequate.  Buckfire

18 testified they'd been working around the clock for months on

19 the proposal for creditors, but the state quotas were given

20 just three weeks to review the data and then negotiation

21 within that compressed time frame.

22     As Ms. Levine mentioned earlier, the city could have been

23 negotiating since 2012.  Chapter 9 had been contemplated since

24 2012.

25     And the state raised an issue this morning about

1  preparing for the storm and -- and buying a raincoat and

2  umbrella and all of that.  But it's as though they knew the

3  storm was coming for two years, but then only gave 34 days for

4  people to get ready which we think was unfair because to argue

5  that it was impracticable when they knew all along that they

6  had this time, was not good faith.

7       In June 17th the initial rounds of stakeholder

8  negotiations were set to start.  And somehow the pension

9  people that were involved were supposed to know that the city

10 was expecting them to negotiate even though Orr had told Don

11 Taylor of the RDPFFA that pensions would not be cut.  And he

12 later asserted on June 10th again, that pensions would not be

13 touched.

14      The vast majority of the retirees were not even aware of

15 the creditor proposal because the city admitted, Mr. Orr

16 admitted, that it did not mail them each a copy of it.  The

17 city had also informed people that attended the meeting on the

18 14th that it was not a negotiation and the city and state

19 witnesses all admitted that the proposal did not identify the

20 amount to which the pensions would be reduced.  And in fact to

21 date the city has never put an exact dollar amount on the

22 level of intended cuts.

23      On June 20th, the data room was opened, but as witnesses

24 testified, it was not fully populated.  Brad Robbins testified

25 it was missing key information such as data regarding the

1  city's assets.  And he also testified that the first step in

2  any restructuring negotiation is investigating the

3  affordability issue and reviewing the relevant data.

4      He referenced the <u>American Airlines</u> case where the debtor

5  had claimed the pensions could not be afforded, but he and his

6  team were able to restructure the pensions and keep the

7  benefits intact.  This morning I believe Mr. Bennett said that

8  was the only example, the asset information, but Mr. Robbins

9  did testify several times that financial data relating to

10  whether or not the pensions were indeed incapable of moving

11  forward, is the information he was looking for.

12      On June 27th the city sent a letter to the UAW thanking

13  them for their time.  And in that letter even the city

14  acknowledged that the unions would need more information.  Mr.

15  Bennett said this morning that no one except Mr. Robbins had

16  asked for more information and that is not true as the city

17  admits in this letter that the UAW had asked for more

18  information.  And the date is interesting because it's June

19  27th which is already outside of the one week time period the

20  city had given for an informational swap.

21      In June of 2013, Orr testified that he had authorized his

22  team to start preparing a potential Chapter 9 filing, in late

23  June or early July.  Malhotra admitted at trial that his

24  declaration was being drafted by late -- by late June.  On

25  July 3rd, Robbie Flowers, Gracie Webster, and Veronica Thomas

1  commenced their lawsuits.

2     And while Orr testified at trial that these lawsuits made

3  clear to him that the parties are not interested in

4  negotiating, this testimony is undermined by the fact that

5  several witness testified that the city was expecting lawsuits

6  and expecting challenges to PA436.  Exhibit 403 noted that

7  opponents were lining up to challenge PA436.  Dillon testified

8  that they not only expected these lawsuits, they had planned

9  for them in advance.

10     Further, Orr admitted that he ignored these lawsuits for

11  three weeks.  In other words he ignored them during the time

12  period that the city had given for the alleged negotiations.

13  Therefore I don't know how these lawsuits could have impacted

14  the negotiations.  Further, there were only a handful of

15  plaintiffs at issue and there were plenty of other parties the

16  city could still be negotiating with.

17     And lastly, the retirement systems lawsuit was filed

18  after the time period the city dedicated to negotiations, so

19  their lawsuit also could not have impacted any of the

20  so-called negotiations.

21     Therefore, we believe the evidence adduced at trial

22  showed that the city had no intention of ever negotiating with

23  creditors.  You saw a timeline dated July 8, 2013, where the

24  city had already determined its Chapter 9 petition would be

25  filed on July 19th.  The timeline created had a filing date

1 despite the fact that creditor meetings had not even yet

2 occurred. Therefore, we believe that shows that it was a

3 foregone conclusion before the creditor meetings ever took

4 place that the end game was a Chapter 9 filing on the 19th.

5     This is a copy of the communications roll out that was

6 admitted into evidence. And as of July 8, the city's position

7 is, that we negotiated in good faith, we presented a

8 comprehensive restructuring plan, but at this point it would

9 be impractical to continue discussions out of Court because it

10 is clear that we will be able to reach -- we'll be able to

11 reach agreement with some of our creditors only through a

12 Court supervised process. However, the creditor negotiations

13 had -- the meetings had not even taken place and this was

14 already their position. And further as of July 8th, July 19th

15 was clearly the date already set forth as the filing date.

16          THE COURT: Well, how do you deal with the city's

17 argument that this timeline was merely a contingency?

18          MS. GREEN: The slide.

19          THE COURT: Okay.

20          MS. GREEN: Orr and Buckfire both characterize this

21 timeline as a contingency, however, on cross exam they were

22 forced to admit that nowhere on the face of the timeline does

23 it say contingency plan. Further, there were no other

24 contingency plans produced or admitted that he knew of no

25 other alternative timeline out of the hundreds of pages of

1  documents that were produced by the city.

2      And when asked about the timeline, Treasurer Dillon said,

3  I didn't see an alternative schedule.  This was the one that

4  was mapped out.

5      On July 8th, as set forth in Exhibit 452, they had already

6  mapped out the communications message that it would be

7  impractical to continue discussions.  But the only meetings

8  that had taken place at that time were the June 10th, 14th, and

9  20th meetings which Mr. Orr testified were merely informational

10 and presentational.  That is direct evidence that there was no

11 intention of actually negotiating at the upcoming stakeholder

12 meetings being held on July 9th, 10th, and 11th because the

13 decision to file had been made regardless.

14     The key filing messages also took the position that

15 before any creditor meetings, the negotiations would be

16 impracticable.  But this ignores these facts.

17     The city carries the burden of proof.  It actually has to

18 prove that it was impracticable to negotiate which it cannot

19 do because the city did nothing to reach out to active or

20 retired employees.  Orr admitted the city did not mail

21 letters, did not mail informational materials to retirees or

22 active employees.

23     He admitted the city did not create a special web site to

24 communicate with these stakeholders.  He admitted they didn't

25 reach out over the telephone.  They didn't post public

1  notices, they didn't use the media to communicate with these

2  stakeholders.

3     The city also did not break the retirees into smaller sub

4  groups that could be negotiated with directly.  Mr. Orr

5  testified that he thought perhaps Ed Miller at his firm had

6  done so, however, none of the witnesses at trial confirmed

7  this.  And Ken Buckfire testified that while this idea was

8  raised, he was told by David Heiman and Heather Lennox at

9  Jones, Day that this would be impracticable to do and so no

10 one bothered to try.

11    The city has repeatedly said that negotiations were

12 impracticable because no one would represent retirees.  But

13 the city had several viable options that they could have taken

14 advantage of.  Namely, the DRCEA, the RDPFFA, the retirement

15 systems, and the pension task force.

16    Shirley Lightsey testified on behalf of the DRCEA.  She

17 told the Court that she introduced herself to Kevyn Orr as the

18 President of the DRCEA at a meet and greet in April.  That

19 organization represents between 7,600 and 7,800 of the 12,000

20 retired general employees, roughly 63 to 65%.

21    She testified that her organization has the power to

22 appoint committees and call special meetings.  It has a web

23 site, its members can be communicated with via telephone,

24 email, and in writing.  She also testified that her

25 organization provides information to even non-member retirees.

1  Thus the DRCEA could have been utilized to mobilize the

2  general retirees.  And while the DRCEA could not itself bond

3  the members, its infrastructure could have been used to

4  communicate with those people and then the members themselves

5  could vote.

6      But the city never utilized the DRCEA.  And in fact

7  Shirley Lightsey was not even invited to the June 14th proposal

8  for creditors meeting as she testified.

9      The RDFPPA, it should be RDPFFA, represents 6,500 out of

10 the 8,000 retired police and fire fighters which is over 80%

11 of the retired police and fire fighters.  That organization

12 has a web site, holds monthly meetings, circulates a monthly

13 magazine, and has lines of communication to all of its

14 members.

15     Mr. Taylor, the President, testified that his group has

16 negotiated reductions in benefits in the past.  And he

17 explained in detail a prior situation where his group came up

18 with a compromise, the members voted, and a settlement was

19 reached.  But this organization was also not utilized by the

20 city and in fact its President was misinformed by both Andy

21 Dillon the state Treasurer, and the emergency manager that

22 their pensions would not be touched.

23     Mr. Taylor testified that he passed this information on

24 to his membership who were then lulled into inaction.  You may

25 recall there was an exchange where Mr. Taylor was asked why he

1  didn't ask questions at the meeting.  And he said because I

2  was told that our pensions were not going to be touched.

3      The city also could have used the pension task force

4  which is currently comprised of representatives from Milliman,

5  the actuarial firm, Conway, MacKenzie, and Jones, Day.  There

6  are no representatives from the retirement systems, Gabriel

7  Roeder, Greenhill, the unions, or any of the retiree groups

8  that I just mentioned.  They were never asked to join the task

9  force.  And if they were, if the city was serious about

10  restructuring efforts, or implementing new cash flow

11  strategies to avoid having to impair, these different groups

12  of people could have been reached out to as a way to

13  negotiate.

14      Treasurer Dillon himself admitted there are lots of

15  creative options given the long life of a pension fund.  But

16  he also admitted that none of these creative options were ever

17  raised with the unions, the retirees, or with the retirement

18  systems themselves.

19      In addition Mark Diaz, a trustee of the retirement

20  systems testified yesterday that the systems themselves could

21  have been used as a partner to communicate to the retirees.

22  The systems have a data base of all the retirees, they have a

23  web site, and they can "very easily communicate with all of

24  the individual people".  But when Mr. Diaz was asked if the

25  city ever requested that the systems infrastructure be used in

1  this manner he said no, not at all.

2      And lastly with respect to the bond holders, Mr. Buckfire

3  admitted that with respect to those negotiations, he knew all

4  of the bond trustees and their insurers, those parties were

5  "organized" and that they could be relied on to speak for, if

6  not actually vote the interest of the underlying bond holders.

7      Similar to what Ms. Levine just argued, the position is,

8  that the city should not be permitted to have created an

9  environment of impracticability and then use that

10 impracticability as its excuse for refusing to negotiate.  And

11 the point is, if they knew back in 2012 that Chapter 9 was

12 being contemplated, then why did we wait till 34 days before

13 the filing to begin.

14     And if that is the way that 109(c)(5) works, then in

15 essence good faith negotiations and impracticability

16 provisions may as well be read out of the Code if all we have

17 to do is make a conclusory statement that negotiations are

18 impracticable without actually proving that those negotiations

19 were in fact an impracticability.

20     On July 9th, Treasurer Dillon wrote to the Governor of the

21 State of Michigan and as you know it's used a lot at trial.

22 But it highlights that as of July 9th, the Treasurer believed

23 that we were still in the informational mode, not in the

24 decision making mode.  And yet when he was asked what changed

25 between July 9th and July 18th, he said that nothing changed to

1 | take them out of the mere informational stage.  It obviously

2 | -- key decisions were being made just a week later because the

3 | filing was on July 18th.

4 |    On July 9th, as Mr. Dillon said, they were in the

5 | informational mode.  The level of underfunding in the pension

6 | systems was still being debated and Mr. Dillon testified to

7 | that.  And how much the actual reduction would be for the

8 | retirees was still unknown.  Dillon and Orr both admitted that

9 | it would be impossible to negotiate when these numbers were

10 | not known.

11 |    Mr. Dillon admitted if you're going to reach a settlement

12 | with your creditors, it's important to understand what's the

13 | level, what's the funding level.  He also admitted that they

14 | did not know these numbers during the week of the alleged

15 | creditor negotiations which took place on July 10th and 11th.

16 | And to date they still don't know the exact numbers he

17 | admitted.

18 |    On July 10th, the same day that the creditor negotiations

19 | were allegedly taking place, the recommendation letter by

20 | Kevyn Orr is already being authored by Treasurer Dillon and

21 | others.  Dillon admitted that the July 19th filing date had

22 | already been decided as of this date on July 10th when they

23 | were writing the recommendation letter.  And he testified

24 | about a detailed timeline and schedule that had been

25 | circulated.

1    However, that same week Dillon was very skeptical about

2   whether the city had adequately made the case for a Chapter 9

3   and he raised his concerns with Kevyn Orr's team on a

4   conference call and he laid them out in an email.  He stated,

5   I don't think we are making the case.  Why are we giving --

6   why we are giving up so soon to reach an out of Court

7   settlement.  Looks premeditated.

8    He also says, I believe there is a State Court option to

9   get retirees into a class.  We don't acknowledge that and why

10   is that unpractical.

11    That I believe is the State Court class action option

12   that was testified to by Michael Nicholson of the UAW.  And

13   Treasurer Dillon said that no one ever explained to him why

14   that option was not practical.  He also states, I think we may

15   want a take it or leave it demand before we pull this trigger.

16   I agree with the recommendation, but I still don't think we

17   make the case.

18    And at the end he said, the pennies on the dollar outcome

19   for unsecured creditors make it practically impossible for

20   them to accept KO, Kevyn Orr's offer.  And Treasurer Dillon

21   also testified that the recoveries were so low that it seemed

22   to be that negotiations were expected to be unfruitful.

23    On July 10th and 11th, the creditor meetings took place.

24   The retirement systems met with attorneys from Jones, Day

25   regarding the city's finances.  The EM did not attend.  Brad

1  Robbins did attend and he testified yesterday that he did not

2  observe or participate in any negotiations regarding the

3  city's financing and that the meetings were purely

4  informational.

5      And this is consistent with Treasurer Dillon's report to

6  the Governor that as of this time frame, he considered

7  themselves to be still in the informational mode.  It is also

8  consistent with the city and state's communications roll out

9  which had already adopted the excuse that negotiations were

10 going to be impractical.

11     On July 12th the Governor's legal counsel, Mike Gadola of

12 the Attorney General's office, Treasurer Dillon, Lieutenant

13 Governor Brian Calley, and Richard Baird were all urging that

14 a more deliberative approach be taken with respect to the

15 Chapter 9 filing.  They specifically urged that a condition be

16 placed on the bankruptcy filing.  And they even more

17 specifically urged that a condition be placed on the

18 bankruptcy filing with respect to the vested pension benefits.

19     On July 12th, the Detroit Firefighters Association sent a

20 letter to the emergency manager asking for more specific

21 information on pension benefit restructuring as soon as

22 possible.  They noted that they have had two meetings with the

23 city where pension benefits were addressed and still have only

24 a general observation that pension benefits must be reduced.

25 Mark Diaz testified that no specific proposals were ever --

1  ever given.

2       On July 15th, just a few days before the bankruptcy

3  petition was filed, the Webster defendants filed a response

4  brief in the State Court action.  There was a hearing

5  scheduled for -- it should be July 22nd which was the following

6  Monday.  The State Court -- or the state asserted in its

7  response that a bankruptcy filing was still only a

8  possibility, that the plaintiffs' claims were unripe, and

9  premature, and based on a speculative threat of future injury.

10 However, as we all know, there was already a recommendation

11 letter and an authorization letter being worked on and the

12 decision had actually been made to allow the filing.

13      On July 16th, Mr. Orr submitted the bankruptcy

14 recommendation letter to Governor Snyder and Treasurer Dillon.

15 And it stated in that letter that dramatic but necessary

16 benefit modifications would be needed.

17      Governor Snyder acknowledged when he testified that he

18 read the letter before authorizing the filing.  And he

19 admitted that he knew that the city's request for an

20 authorization included that dramatic cuts to accrued benefits

21 would be part of any Chapter 9.

22      On July 17th, the day before the bankruptcy filing, the

23 DPSU received correspondence from the city thanking them on

24 behalf of the emergency manager for their strong cooperation

25 and their good faith negotiations regarding the difficult

1  issue of pension restructuring.

2      On July 17th the retirement systems filed their lawsuit

3  against the Governor and the emergency manager.  The complaint

4  was served on the Governor's office and the EM's office in

5  Detroit.  And that night the exhibit that you saw was the

6  Sarah Wurfel timeline circulated throughout the state without

7  -- throughout the state officials.  And at 6:23 on July 17th,

8  the plan was still to file on Friday, July 19th.

9      However, the following day, as you heard Mr. Nicholson

10  from the UAW testify, the retirement systems went to Ingham

11  County Court seeking a TRO.  The AG's office received a phone

12  call stating that the retirement systems were in the State

13  Court seeking a TRO, 3:47 the Governor emailed the

14  authorization letter, and at 4:06, Orr changed the date on the

15  filing papers, hand wrote in an 18, and filed the petition.

16  And at 4:10 the Attorney General appeared at the TRO hearing.

17  Orr admitted that he had been counsel, it would be

18  irresponsible not to file sooner rather than later given all

19  of the lawsuits.

20      In authorizing the bankruptcy with no conditions.  The

21  Governor ignored the advice of his own counsel at the AG's

22  office to further probe the conclusions in Orr's letter,

23  undertake due -- due diligence to confirm the eligibility

24  requirements had been met, and to place a condition on the

25  bankruptcy filing with respect to pension benefits.  That's

1 | Exhibit 625 that we just looked at.

2 |     But the Governor testified he chose not to impose any of

3 | these conditions because he did not want to create more

4 | delays.  As Treasurer Dillon testified, the reason the July

5 | 19th filing date was originally chosen was because the Governor

6 | wanted the process to be "fast and efficient".  However, due

7 | to the desire for the Chapter 9 case to be fast and efficient,

8 | adequate time was not given for the negotiation process to be

9 | undertaken.

10 |     The Chapter 9 case was filed despite the fact that as

11 | Chuck Moore testified, the actuarial numbers were still being

12 | refined.  Mr. Buckfire cautioned that the Milliman reports,

13 | which the city relied upon to state the 3.5 billion dollar

14 | underfunding number, cautioned on their face that a "more

15 | robust projection model could vary the results".  And

16 | Treasurer Dillon stated that he also was not confident in the

17 | pension underfunding numbers and that they were a moving

18 | target.

19 |     In addition to the primary assets were still an unknown,

20 | the Water and Sewage Department, and the city owned artwork at

21 | the DIA which the objecting parties would submit is in large

22 | part due to the fact that knowing the process was going to

23 | take several months, the city waited until after the petition

24 | date to even begin that process.

25 |     And in conclusion, because the city did not negotiate in

1  good faith, did not prove that the negotiations were in fact

2  impracticable, and instead filed this bankruptcy in bad faith

3  to evade the pensions clause, this case must be dismissed, or

4  the city must be forced to cure its bad faith by seeking new

5  authorization with a proper contingency under PA436 for the

6  pension benefits.  Thank you.

7       THE COURT:  I want to get back to that Exhibit 852

8  issue.  Is it possible that that exhibit was the same document

9  as an exhibit with a different number that was admitted?

10       MS. GREEN:  It could be 202, 2, 0 -- that is very

11  possible.  We had several that were --

12       THE COURT:  Can you check that out and let us know?

13       MS. GREEN:  Yes, I will.

14       MR. IRWIN:  Can I briefly be heard on that, Your

15  Honor?  We -- we -- it's hard to do this on the fly, so I have

16  a little bit more information at this time.

17     It is true 852 was used by Mr. Wertheimer.  It was used

18  during the Dillon examination.  It was an attempt to refresh

19  his recollection.

20       THE COURT:  Right.

21       MR. IRWIN:  It was not refreshed, and it was not

22  offered, and it was not admitted.  That is on November 5th and

23  the lines are Page 126, Line 25, to Page 129, Line 5.  It was

24  not offered, it was not accepted.

25       THE COURT:  All right.  Well, check to see if it was

1  another -- if it -- if the document itself is another exhibit

2  that was admitted and let us know.  202 is in, but the

3  question is, is it the same as 852.

4      Okay.  And -- and before we go to the next argument, are

5  there any other exhibit discrepancies?

6          MR. IRWIN:  There is one, Your Honor.  Exhibit

7  number 452.

8          THE COURT:  Yes.

9          MR. IRWIN:  This was the email from Mr. Nowling that

10  attached the timeline.  And -- and Ms. Green referred to it.

11  There was examination on that exhibit during the hearing,

12  however, again, and this was a -- a pattern to some degree,

13  was discussed, there was an objection to it in the pre-trial

14  order, and it was moved on before that objection -- before the

15  exhibit was offered, so that the objection could be ruled on.

16  And it is therefore not in the record.  It is not on the

17  Court's for that reason, we believe, indication of the

18  exhibits that are in evidence.

19          THE COURT:  Uh-huh.  Was 452 one of the exhibits in

20  Ms. Green's --

21          MR. IRWIN:  It was.

22          THE COURT:  -- slide show?

23          MR. IRWIN:  Those were the only two that I saw, Your

24  Honor, 852 and 452.

25          MS. GREEN:  That one also may have been a duplicate.

1  It's also the same as 831 which -- it's just hard because

2  other people have different numbers for the same exhibit.

3           THE COURT:  Right.

4           MS. GREEN:  But I believe it's the same as 831 which

5  is in evidence.

6           MR. IRWIN:  831, I have not in evidence, Your Honor,

7  according to your list for the same reasons.

8           THE COURT:  And it's not in the pre-trial order?

9           MR. IRWIN:  It is not.  It is in the pre-trial order

10  with an objection.

11           THE COURT:  Okay.

12           MR. WERTHEIMER:  Your Honor, for the record --

13           THE COURT:  In order for you to be on the record,

14  you need to be near a microphone.

15           MR. WERTHEIMER:  For the record William Wertheimer

16  for the Flowers plaintiffs.  Your Honor, my memory is

17  consistent in part with counsel's relative to 852.

18           THE COURT:  Well, memory doesn't matter.  What

19  matters is what's on the record.  Have you checked --

20           MR. WERTHEIMER:  I understand and it --

21           THE COURT:  Have you checked the record?

22           MR. WERTHEIMER:  I have not checked the record.  But

23  I believe the representation that his memory was not refreshed

24  is incomplete.  My memory is, he admitted the facts that Ms.

25  Green pointed to on the exhibit.

1          THE COURT:  All right.  Well, let me just ask, are

2     there any other exhibits that are not on the list that we had

3     passed around at lunch that anyone thinks was admitted into

4     evidence?

5          MR. RUEGGER:  Good afternoon, Your Honor.  Arthur

6     Ruegger from Dentons on behalf of the retiree committee.

7      I have been provided a list of several exhibits that the

8     notes of our team that they indicate that they were admitted.

9     I'd like to verify that before I bother the Court with it.

10    I'd also like to --

11         THE COURT:  How will you verify it?

12         MR. RUEGGER:  I'd like to check what transcript,

13    informal transcript references we have, Judge.

14         THE COURT:  Okay, fair enough.

15         MR. RUEGGER:  Thank you.

16         THE COURT:  Any others?  Okay.  Are there any

17    exhibits on -- that were on our list that you don't think were

18    admitted into evidence anyone?

19         MR. IRWIN:  Not from the city, Your Honor.  The --

20    the Court's list virtually tracks ours verbatim.

21         MR. RUEGGER:  We have no problem with the exhibits

22    on your list, Your Honor.

23         MR. IRWIN:  All right.

24         THE COURT:  All right.  Who's next?  Mr. Gordon,

25    yes, of course.  Go ahead.

1          MR. GORDON:  Thank you, Your Honor.  Robert Gordon

2    on behalf of the Detroit Retirement Systems.  I will do my

3    very best to not repeat any of what Ms. Green has provided.

4          THE COURT:  Oh, before -- on that subject before you

5    actually launch here, we need to have a hard copy of that

6    slide presentation marked as an exhibit, not for purposes of

7    admission, but just for purposes of identification so that it

8    can be included in the record of the case for -- for

9    completeness purposes.  So what -- do you have an exhibit

10   number that you would use for that?

11         MS. GREEN:  I believe it would be 873.

12         THE COURT:  Okay.  Go ahead, sir.

13         MR. GORDON:  Thank you, Your Honor.  I know that

14   others will want to make a number of -- of comments about the

15   -- the evidence.  I'm going to try to keep my comments fairly

16   limited as a result to allow others to express their -- their

17   points of view as well.

18       As a sort of I guess a housekeeping matter, if I may,

19   Your Honor, to begin with, I thought I had heard in the

20   presentation by counsel for the city, essentially a suggestion

21   that there has been no objection made to the asserted

22   underfunding liability in a particular document of -- prepared

23   at one time by Milliman.

24       I would like to make clear for the record that it is not

25   our impression that this is an evidentiary hearing about what

1   the underfunding level is, or was at the time of the petition,

2   or is or was today.  That document was not introduced for that

3   purpose.  There has been no expert testimony on that point and

4   we reserve all rights as to that.

5      Indeed, it is impossible we would submit to determine

6   what the underfunding level is unless you know what treatment

7   is going to be made of the pension systems, whether they're

8   going to be frozen and closed, or whether the defined benefit

9   plans are going to be continued, and that has yet to be

10  determined.  So we reserve all rights on that, Your Honor.

11     In fact, the document that was submitted from Milliman,

12  had a caveat in it by Milliman that if they had more robust

13  data to work with their calculations may vary.  So in -- in

14  itself it -- it indicates that it's not a very reliable

15  document.  But again for all the other reasons I just stated,

16  we submit that there has not been any -- that there shouldn't

17  be any interpretation that -- that any of the parties here,

18  and particularly the retirement systems, agree to the

19  underfunding level asserted in that one document, Your Honor.

20     Your Honor, we don't dispute that prior to the city

21  filing its bankruptcy petition the city was experiencing

22  financial distress.  And whether or not that financial

23  distress constitutes insolvency for purposes of Section

24  109(c)(3) of Bankruptcy Code, is -- is only one issue.  And I

25  will not opine on whether the city met its burden of proof on

1  that issue, since we did not specifically raise the insolvency

2  issue.

3       But there is another issue here under 109(c)(5) which is

4  how did the state and the city proceed to address the

5  situation.  And this is very important because the Bankruptcy

6  Code does require specifically that a municipality proceed in

7  a specific fashion before it takes the extraordinary step of

8  filing for bankruptcy.  And these are important requirements,

9  they are not merely pro forma.

10      And this is where we submit that the city's argument

11  really breaks down.  Because if you pull back from the -- the

12  -- the -- the huge amount of evidence that's been introduced

13  here, as Ms. Green has -- has shown through her slides, the

14  fact of the matter is, that the city and the state over many

15  many months analyzed the financial and operational situation

16  of the City of Detroit, a very complex undertaking when you're

17  talking about a city of 700,000 residents.  It devoted

18  significant resources in analyzing those issues.

19      And then they made a proposal on June 14th and within 34

20  days it filed a bankruptcy.  If you just pull back and look at

21  those simple facts, there simply was not time for good faith

22  negotiations.

23      Now, there was testimony by the retirement systems

24  through Mr. Robbins about the inability to have good faith

25  negotiations during that 34 day period.  And there was some

1 reference to that this morning by the city's counsel.  And I

2 want to make sure that the characterization of the testimony

3 is accurate.

4      There was some suggestion that financial advisors are

5 never satisfied with the amount of information that they have

6 and things of that nature.  Mr. Robbins did not testify that

7 he had adequate information but not optimal amounts of

8 information.  Mr. Robbins testified clearly and unequivocally

9 that he did not have adequate information with which to begin

10 negotiations.  And that the proposal such as it was on June

11 14th, and I say such as it was because it did not even include

12 a proposal for how the pension systems, the pension plans

13 would be treated on a go forward basis, was not really a -- a

14 serious proposal and that information was needed.

15      Now counsel for the city has also suggested that no one

16 disputed the facts in the proposal and no one asked any

17 questions.  That simply isn't true.  Now, maybe at the airport

18 on June 14th in a room of 200 people, when people were provided

19 for the first time with 120 page document, not a lot of

20 questions were asked.

21      But the evidence is clear, there were due diligence

22 sessions on June 25th, and on July 9th, and July 10th with

23 financial advisors.  And I am sure lots of questions were

24 being asked.  I was in those rooms as well.  There were lots

25 of questions being asked about the financials.

1      Mr. Robbins testified among other things that there was

2  not information in the proposal or in the data room regarding

3  significant assets.  One of those assets is the cash flows

4  from the Detroit Water and Sewage Department.

5      Counsel for the city indicates that seeking information

6  regarding the cash flows from a potential transaction from the

7  water authority is really not a fair ask because that's

8  something that's been discussed for many years and it may or

9  may not come to fruition.  We want to be clear here.  That's

10  not the information that was missing from the June 14th

11  forecasts.

12      What was missing from those forecasts were the actual

13  existing cash flows from the DWSD to the city that exist as of

14  today.  Very substantial cash flows.  They're not in the

15  projections.  That was also testified to by Mr. Buckfire

16  himself.  Mr. Buckfire also testified that there were no fair

17  market value analyses of any of the assets.

18          THE COURT:  I thought the evidence was that the

19  DWSP provided -- or DWSD provided no net cash flow to the

20  city.  Am I wrong about that?

21          MR. GORDON:  That's not correct, Your Honor.  It

22  depends on how you look at the cash flows.  There -- there is,

23  if I understand it correctly, and I may get this number wrong,

24  but I think there's approximately $80,000,000 that flows from

25  DWSD just to support the -- the employee and -- and legacy

1  obligations.  And there may be additional amounts that come to

2  the city but I'm not exactly sure how much that is.  But there

3  definitely are cash flows from DWSD to the city and/or the

4  pension systems that are not in the cash flows at all.

5        THE COURT:  So what you're referring to is what the

6  city paid -- excuse me, what the department pays to the city

7  for retirement funding.

8        MR. GORDON:  That's correct, Your Honor.  The

9  proposal does not propose those cash flows to continue --

10        THE COURT:  I do recall that.

11        MR. GORDON:  -- to the pension systems, nor do they

12  come to the general fund in the cash flow forecasts.

13        THE COURT:  But I don't recall any evidence that the

14  water department provided funding to the city for any other

15  purpose.  Have I missed something?

16        MR. GORDON:  I'm not -- I'm not certain whether the

17  evidence did provide that, Your Honor.

18        THE COURT:  All right.

19        MR. GORDON:  I can't comment on that.  But there --

20        THE COURT:  All right.

21        MR. GORDON:  As I said, there is a -- is a

22  substantial amount that comes to the pension systems that in

23  the proposal from June 14th there is no discussion of those

24  amounts coming to the pensions any further, nor do they come

25  into the -- the forecasts in any way, shape, or form.

1    Your Honor, if I may, I just want to comment on a couple

2   of other items that I think particularly pertain to the

3   retirement systems.  Mr. Dillon, who as we know was the state

4   Treasurer at all times relevant to this matter, indicated in

5   an email dated July 9, 2013, I think it's marked as Exhibit

6   834, that and I quote, "because pensions have such a long

7   life, there are a lot of creative options we can explore to

8   address how they will be treated in a restructuring".

9    And in that same email he further indicates a desire to

10   explore ways to avoid negatively impacting pensions.  In

11   counter point to Mr. Dillon's views, we have the pension task

12   force.  And the pension task force as we understand it

13   consists of two personnel from the Milliman firm, Mr. Moore

14   from Conway, MacKenzie, and several other non-actuarial

15   professionals.

16    Now, there is a document Exhibit 870 that is in evidence

17   that reflects some of the activities of the pension task

18   force.  And it indicates that scenarios were run by Milliman

19   based on assumptions provided to them by Conway, MacKenzie

20   and/or others on behalf of the city.

21    The exhibit shows that an assumption is being

22   unilaterally made by the pension task force that the General

23   Retirement System Plan ought to be frozen, which by the way,

24   would drive up the underfunding level of that plan

25   exponentially.  And a conclusion is then drawn that a

1 significant reduction in accrued pension benefits is required

2 and that I quote, "it appears this may only be possible in a

3 Chapter 9 proceeding".

4          THE COURT:  And what are those two exhibits again?

5          MR. GORDON:  That would be Exhibit 870, Your Honor.

6          THE COURT:  That's the task force document?

7          MR. GORDON:  That's correct.  And the quote from Mr.

8 Dillon is Exhibit 834.

9      What is remarkable about this, Your Honor, I would

10 submit, is that the pension task force simply assumed that

11 accrued benefits must be impaired without ever asking the

12 people who would know.  The retirement systems and their

13 actuaries Gabriel Roeder.  They never asked the retirement

14 systems and Gabriel Roeder about this.  They never came to the

15 retirement systems and Gabriel Roeder with a business plan and

16 said, here's our proposal, here are the needs of the city in

17 terms of diverting cash flows to reinvesting in the city and

18 so forth and is there a way that we can do this and perhaps

19 restructure or reschedule employer contributions in a way that

20 will not impair or diminish the -- the -- the pension

21 benefits, but will accommodate our business plan.

22      That discussion was never had.  Nor was there any such

23 discussion in conjunction with Greenhill and Mr. Robbins whose

24 experience in preserving pensions in American Airlines and

25 other bankruptcy cases, might have been of some assistance

1  here.

2      Counsel for the city suggests this morning that there's

3  no evidence in the record that having such discussions would

4  have led to a solution.  And the problem is we'll never know.

5  They never tried.  The suggestion is that impracticability is

6  a completely subjective determination to be made by the

7  municipality alone.  We suggest that that's inappropriate.

8      Now based on the city's purely internal conclusion that

9  the city -- purely internal conclusion that -- that accrued

10  benefits must be impaired, the city further concludes that

11  negotiation with the retirement systems is impracticable

12  because the retirement systems are constrained by the pensions

13  clause of the state constitution to not negotiate any

14  impairment or diminishment of the accrued benefits.

15      As I just indicated, there were other discussions that

16  could have been had about how to perhaps modify employer

17  contribution schedules, or do something that didn't

18  necessarily involve impairing and diminishing the -- the

19  benefits over the long term, but there was no such discussion.

20      So the city uses an untested internally created premise

21  that benefits must be impaired to then make a further, I would

22  submit, infirm conclusion that negotiations with the

23  retirement systems are futile and impracticable.  While this

24  exercise is convenient for the city, it does not stand up to

25  scrutiny from a legal perspective and does not meet the test

1  of Section 109(c)(5)(C) of the Bankruptcy Code.

2      Your Honor, what is also particularly remarkable in this

3  regard we would submit is that the evidence shows that the

4  state and the city were aware of the pensions clause, but

5  instead of trying to determine if they could accommodate the

6  pensions clause in their restructuring plan, they essentially

7  just assumed that they could not without speaking to the

8  retirement systems and their professionals and instead decided

9  to just take their chances on being able to run roughshod over

10  the pensions clause and the state constitution in this Chapter

11  9 case.

12      Now this argument ends up being rooted very much in the

13  arguments that we made on October 15 that in order to have

14  valid state authorization for the bankruptcy, that there must

15  be a condition that -- that respects and upholds the pensions

16  clause.

17          THE COURT:  We need not repeat here which -- but I

18  do want to ask you this question.  What inference do I draw

19  here in -- in the context of this trial from the fact that

20  your client submitted no evidence that there was a viable way

21  for the city to propose a restructuring of its retirement

22  program?

23          MR. GORDON:  Well, Your Honor, I think that that's

24  -- if I may say so, sort of putting the shoe on the wrong

25  foot.  If the city had come to us and asked to have that

1  conversation we would have been happy to have that

2  conversation with them.

3      There never was an opportunity to.  As we said, there was

4  34 days from the date that a proposal was put on the table at

5  the airport to the day that the bankruptcy was filed.  In

6  fact, I -- I hesitate to mention this because this is an

7  evidentiary hearing, but I -- the general counsel for the

8  General Retirement Systems actually reached out to the

9  emergency manager earlier than that to try to have a meeting

10  and was rebuffed because it didn't fit the timeline that the

11  emergency manager was on or his schedule.  So there really

12  wasn't an opportunity for us to -- to ever have that

13  discussion.

14      THE COURT:  Well, but whether there was an

15  opportunity to have the discussion or not, my question wasn't

16  that so much as what do I do with the fact that there is no

17  evidence that there was a viable alternative plan?

18      I don't know whether there is or not.  All I know is

19  what's here in the evidence.  And you didn't submit any

20  evidence that there was a viable alternative plan.  What

21  inference do I draw from that, that's the question.

22      MR. GORDON:  Excuse me.  I think what you -- what

23  the testimony was of Mr. Robbins was that -- and this -- and

24  this highlights the problem which is not a problem that we

25  have created.  The problem is that we don't have enough

1  information.

2      And -- and I'm not casting aspersions on the city or its

3  professionals in that regard.  It's a difficult process.  It's

4  a complicated process.  But the process needed to play out and

5  it didn't.

6          THE COURT:  Uh-huh.

7          MR. GORDON:  So there was never enough information

8  there.  But what Mr. Robbins, I believe indicated, was that

9  based upon the information that he had and has, it is not

10  clear that there needs to be an impairment and diminishment of

11  the pension -- accrued pension benefits in order to

12  restructure here.

13      But beyond that, we can't go further than that yet

14  because we don't have all of the information, Your Honor.  I

15  don't know if I'm answering the question.

16          THE COURT:  No, but isn't -- isn't -- yeah.  No,

17  that -- that's good.  But isn't it -- isn't -- isn't the

18  underfunding, underfunded liability here according to the

19  retirement systems own experts at least a billion and

20  something?

21          MR. GORDON:  That's a difficult question.  You know,

22  it depends again on whether the pension systems, the defined

23  benefit plans are kept open or are frozen and closed.  I think

24  it is --

25          THE COURT:  Uh-huh.

1          MR. GORDON:  I wouldn't want to -- I wouldn't want

2   to speculate on that.  But let's assume that it's -- it's over

3   a $1,000,000,000.  Okay.  It's a, as -- as Mr. Dillon himself

4   said, it's a long term issue.

5          THE COURT:  Uh-huh.

6          MR. GORDON:  The liabilities can rise and fall.  The

7   performance of the investments can rise and fall.  There are

8   -- and again, I think because it's a long term issue there can

9   be flexibility in the way it's approached.  And it -- and a

10  $1,000,000,000 sounds like a lot money, but it's --

11         THE COURT:  All fair enough, but what -- what

12  prevented your client from making a proposal based on its view

13  of what the reasonable assumptions were as necessary to create

14  a proposal, given that there is some level of underfunding

15  that its own experts have found.

16         MR. GORDON:  Right.  But if you don't know what the

17  true cash flows are, and you don't know what the opportunities

18  for monetization of assets are --

19         THE COURT:  Uh-huh.

20         MR. GORDON:  -- to try to negotiate against yourself

21  as to how much you should be deferring, what you should be

22  getting paid, is really negotiating against yourself.  It's

23  impossible to do.  You need to have the full picture or at

24  least a reasonably full picture.

25         I understand Mr. Bennett's concern that, you know,

1 | financial advisors never have enough information.  This is not

2 | that situation.  The -- there were major pieces of information

3 | that were missing here that made it impossible quite frankly,

4 | to have that discussion at this stage.

5 |         THE COURT:  All right.

6 |         MR. GORDON:  Your Honor, I -- I don't want to -- and

7 | I'm sure you don't want me to repeat arguments relative to

8 | 109(c)(2) that really are the same types of arguments that

9 | support in our opinion a finding that the petition was filed

10 | in bad faith under 921(c) because it seeks to impermissibly

11 | abrogate the protections of the pensions clause.  So with

12 | that, Your Honor, I have no further comments.

13 |         THE COURT:  All right.

14 |         MR. GORDON:  Thank you.

15 |         THE COURT:  Who is next?

16 |         MR. GORDON:  Your Honor, if I may, I just wanted to

17 | make one more comment.

18 |         THE COURT:  Oh, okay.

19 |         MR. GORDON:  Mr. King apprised me that I should make

20 | this point and I agree.  I just want to make the record clear

21 | that prior to June 14th, before we saw that proposal, there was

22 | no information or indication from the city or the state to the

23 | retirement systems that there would be a -- a seeking of an

24 | impairment or diminishment of the accrued pension benefits of

25 | the pension plans.  Thank you.

1          MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

2    Brimer appearing on behalf of the Retired Detroit Police

3    Members Association.

4          Your Honor, I'd like to address three points with the

5    Court this afternoon.  The first, the spending provision that

6    was added to PA436, the evidence has established was in fact

7    meaningless and was adopted in order to disregard the will of

8    the electorate with the intent of avoiding the people's right

9    of referendum.

10          The second, even if the spending provision is deemed by

11    this Court to have been appropriate, PA436 nonetheless

12    violates Article 2, Section 9 of the Michigan Constitution as

13    a re-enactment of a law previously properly referred to the

14    referendum process and defeated by the -- on referendum that

15    was then not re-subjected to the people.

16          THE COURT:  Okay.  Ms. Brimer, you've already argued

17    that one, right?

18          MS. BRIMER:  There is though one piece of evidence

19    that has not been -- that has not been objected to, that has

20    not been presented to the Court that I would like to review

21    with the Court very briefly, Your Honor.

22          THE COURT:  Okay.

23          MS. BRIMER:  Okay.

24          THE COURT:  I'll let you argue the evidence, but I

25    don't want to re-argue the point of law.

1          MS. BRIMER:  I -- I understand that, Your Honor.

2          THE COURT:  Okay.

3          MS. BRIMER:  And then finally, that the evidence

4    does in fact establish a lack of good faith and a

5    pre-determination by the EM's advisors that a Chapter 9 was in

6    fact inevitable.

7          Your Honor, this morning we heard from Mr. Schneider that

8    there was an impending storm heading for the City of Detroit.

9    And that a review of the weather reports indicated that the

10   city's cash flow was in despair.  In fact I would probably

11   argue that those of us in the courtroom who live in and near

12   the City of Detroit would probably not disagree that the

13   weather reports for the City of Detroit sadly have in fact

14   deteriorated over the past few years.

15         However, an impending storm and poor weather reports are

16   simply not a basis for the state, the Governor, and the

17   Treasurer to disregard the constitutional rights of the

18   citizens of the State of Michigan.

19         Despite the fact that Mr. Schneider discussed some case

20   law, I will, Your Honor, disregard it, because we have, I

21   believe, all briefed and properly briefed all of those issues.

22         With respect to the spending provision, Your Honor, we do

23   have a few critical facts that are worth reviewing with the

24   Court.  First we know that on February 29, 2012, PA4 was

25   referred for a referendum vote.  We also know, and this Court

1  has reviewed numerous times, so I will not bring up again,

2  that within three days of that referral, the attorneys at

3  Jones, Day were counseling Treasury and the State of Michigan

4  with respect to the passage of new legislation with a tacked

5  on spending provision in order to render the new law

6  referendum proof.

7      Eventually on November 6, 2012, PA4 was in fact rejected

8  by the people of the State of Michigan.  Within 39 days, the

9  new bill was approved by the Senate and within 50 days of

10  rejection, the new law PA436 was signed by the Governor.

11      Now we've discussed that that new law contains two

12  spending provisions.  One for $5,000,000 to cover the

13  consultants and one for $780,000 to cover the salaries of the

14  EM's.

15      We also know from Mr. Buckfire who testified that a

16  $7,000,000 cushion was almost nothing for the City of

17  Detroit's budget.  The Governor testified that the state's

18  budget is $40,000,000 rendering this appropriation .014% of

19  the state's budget.

20      We also know that both the Governor and the Treasurer

21  testified that they did nothing to review any of the financial

22  analysis associated with these spending provisions.  In fact

23  they were more interested, Your Honor, in pushing this piece

24  of legislation through than insuring that the appropriation

25  was sufficient to cover the spending provisions

1     Mr. Schneider this morning in fact indicated and told us

2   that the state was in fact forced to seek additional

3   appropriations for the fiscal year 9-30-13 in connection with

4   PA436.

5     Mr. Dillon testified that by June 11, he was seeking

6   re-negotiation of the professionals' contract in connection

7   with the consultants and their $5,000,000 appropriation.

8     And Mr. Baird testified in Exhibit 458 which has been

9   admitted into evidence, demonstrates that he determined that

10   the professionals would need approximately 75.2 million

11   dollars for this case.  A far cry, Your Honor, from the

12   $5,000,000 spending provision that was tacked on to PA436.

13     In fact, on cross examination by Mr. Ullman, Mr. Orr in

14   fact testified that he understood that the spending provisions

15   were added to PA436 to resolve the possibility of another

16   referendum.

17     Finally, Your Honor, Mr. Howard Ryan, the state's own

18   30(b)(6) witness, the witness they selected to appear at

19   deposition and testify on behalf of the state, testified at

20   Page 46 of his deposition which has in fact been admitted into

21   evidence, that the spending provision was added to PA436

22   specifically to avoid a new referendum.

23     There's no evidence and Mr. Dillon testified that even

24   the provision relative to the salaries of the EM's was only

25   for those EM's that were then appointed.  No projections, no

1  analysis of whether or not it would cover the EM's and at that

2  point in time they knew they were going to be hiring certainly

3  an emergency manager for the City of Detroit.

4      This simply was a spending provision that in the short

5  period of time that the state had to get this law passed, that

6  they put into play in order to avoid a referendum.

7          THE COURT:  One second, please.  Does someone have

8  Mr. Ryan's deposition I can look at?  Apparently ours has

9  already gone back to our office.

10         MS. BRIMER:  I do, Your Honor, and I have pulled out

11  the relevant page.  But I can put this back in and give the

12  Court my entire copy.

13         THE COURT:  Okay.  I'll give it right back to you.

14  I just want to see it.

15         MS. BRIMER:  Would you just like Page 436, Your

16  Honor -- 46?

17         THE COURT:  Page 46, yes, please.

18         MS. BRIMER:  Yes, if I may.

19         THE COURT:  Stand by.  Thank you.  I will return

20  this to you now.

21         MS. BRIMER:  Your Honor, given the speed with which

22  the new law was passed, the lack of any financial analysis by

23  either the Governor or the Treasurer, it's clear that those

24  spending provisions were added on simply to insure that the

25  state would have a law by which they could appoint an

1 emergency manager who would have the authority to file this

2 Chapter 9.

3　Even assuming, Your Honor, that those spending provisions

4 are deemed by the Court to be appropriate, the law is

5 nonetheless unconstitutional under the second paragraph of

6 Article 2, Section 9 which provides that no law that has been

7 properly referred on the referendum can be then enacted

8 without being referred to the people.

9　And if I may refer the Court to Exhibit 205.  There are

10 two reasons why, Your Honor, we believe that even if the

11 spending provisions are appropriate, it's still nonetheless --

12 if -- if we could go to Page 20.

13　　MR. SCHNEIDER:  Your Honor, if I could.  I -- I -- I

14 don't recall that this was entered into evidence.

15　　MS. BRIMER:  This was not objected to, Your Honor,

16 at pre-trial and I understood the exhibits not objected to

17 were accepted into evidence.

18　　MR. SCHNEIDER:  I'm sorry, Mr. Irwin indicates that

19 it may be.

20　　MS. BRIMER:  Page --

21　　MR. SCHNEIDER:  Yeah.

22　　THE COURT:  Hold on.  I'll check.

23　　MR. IRWIN:  There was no objection pre-trial, Your

24 Honor, to 205.

25　　THE COURT:  It has been admitted.

1          MS. BRIMER:  Thank you, Your Honor.

2          THE COURT:  So go ahead.

3          MS. BRIMER:  Section 23, Page 19, I think it is.  So

4  the relevant provision in this instance, Your Honor, are the

5  provisions relative to the filing of a bankruptcy and this is

6  a red line version of PA4 and a comparison with PA436.  And it

7  may well just be -- we're taking that down.

8       And you'll notice, Your Honor, it's two sections.  And

9  put the other page next to it.  Well, no, just the next page.

10  There's only one change and it's a meaningless change in the

11  Chapter 9 filing provisions from PA4 to PA436.  That's the

12  entire provision.

13       There's one change.  And it provides that the Governor

14  may place contingencies on a local government in order to

15  proceed under Chapter 9.  And the reason I would express to

16  the Court that I believe this is a meaningless addition and

17  does not do any more than reenact the prior law, because

18  there's no prohibition in PA4 from placing contingencies.  So

19  this is just a redo with a minor change with an attempt to

20  remove this from the people's right of referendum or their

21  right to review a law that has been referred to referendum.

22       We did hear some testimony, Your Honor, from the Governor

23  that there were changes, new options in PA436 for the cities.

24  However, as applied in this case, Your Honor, the state took

25  specific steps to insure that those options would not be

1    available to the city and the citizens of Detroit.

2        PA436 became effective on March 29th.  The state announced

3    the selection of Mr. Orr as the emergency manager who would be

4    appointed over the city.  He entered a contract on March 25th,

5    a Friday.  In order to insure that he was enacted as an

6    emergency manager under PA72 which did not afford these

7    options to the city, and would automatically become the

8    emergency manager with this broad authority to file a Chapter

9    9 under PA436 without affording the city any opportunity to

10   take advantage of the purported changes and options in the new

11   enacted law, a clear attempt, Your Honor, to disregard the

12   will of the people.

13       If all it takes, Your Honor, is the inclusion of a minor

14   change or the tacking on of a spending provision, then we have

15   simply read the second paragraph of Article 2, Section 9 out

16   of the Michigan Constitution.

17       Now with respect to the history of this filing, and the

18   fact that I would assert that there has been bad faith on the

19   part of the emergency manager's consultants, and a

20   pre-determination that a Chapter 9 would be filed, I think the

21   record is replete with that evidence.

22       We have numerous emails dating back at least until March

23   of 2012 where Jones, Day and Miller, Buckfire are gratuitously

24   offering their services to the state, advising the state on

25   how to pass a new piece of legislation that would insure that

1   a Chapter 9 would be -- that the city would be able to file a

2   Chapter 9 without any push back from the citizens.  We know

3   that Jones, Day invested at least 1,000 hours on this project.

4       And we do have Mr. Dillon telling us that from time to

5   time other counsel and consultants may have provided pro bono

6   services and I can understand that.  However, what we don't

7   have, Your Honor, despite the numerous emails from the Jones,

8   Day attorneys, the law firm that the emergency manager was a

9   partner at, the law firm that the emergency manager continued

10  to provide communications between Mr. Baird, the Governor, and

11  himself, with his partners even after he was aware that he was

12  the preferred candidate, we have no email in the record from

13  any other consultants recommending a Chapter 9.

14      Mr. Dillon advised us that at this very same period in

15  time he was working with Steve Liedel from Dykema.  And we

16  also know that Miller, Canfield was advising the city.  We

17  have no emails, no information to suggest that any other

18  consultants were recommending that the city drive -- that the

19  state drive the city into this Chapter 9.

20      We know from Mr. Dillon that Mr. Buckfire is the

21  individual or the party that brought Jones, Day to the state.

22  We know from the email communications that Mr. Buckfire

23  provided Jones, Day with the interview questions, drafted the

24  RFP that Jones, Day would be responding to, and was hired

25  prior to Jones, Day's involvement so he had some influence

1 | over the process.

2 | We can conclude, Your Honor, that from day one of the

3 | involvement of the -- the consultants, they have been

4 | advocating for the filing of a Chapter 9.  It became a

5 | foredrawn conclusion from the day they were retained as the

6 | city's restructuring counsel and the Court should also take

7 | into consideration that Mr. Buckfire and Mr. Dillon both

8 | testified that at no point in time did anyone advise the city,

9 | and it was the city who initially engaged Jones, Day, that

10 | Jones, Day had been working with Miller, Buckfire and/or the

11 | state in drafting the consent resolution.

12 | So in conclusion, Your Honor, not only do we have an

13 | authorization from the Governor based on an unconstitutional

14 | law, we have no evidence that the emergency manager and his

15 | consultants have met the burden of demonstrating that they

16 | have been engaged in good faith negotiations intending -- and

17 | that they were intending anything other than the filing of

18 | this Chapter 9.

19 | The Chapter 9, Your Honor, that the Jones, Day attorneys

20 | communicated with the emergency manager was the Chapter 9 that

21 | we, the Jones, Day personnel would like to see.  Thank you.

22 | THE COURT:  Thank you.  We'll take a recess now

23 | until 2:55, please.

24 | THE CLERK:  All rise.  Court is in recess.

25 | (Court in Recess at 2:37 p.m.; Resume at 2:55 p.m.)

1          THE CLERK:  Court is in session.  Please be seated.

2          THE COURT:  One second, please.  We have -- we have

3  determined that Exhibit 452 was not admitted into evidence

4  even under another number.  So in the circumstances, I will

5  strike from the slide show which has been marked for

6  identification purposes as Exhibit 873, the one slide that

7  does refer to 452.  Ms. Green, can you arrange for that,

8  please?

9          MS. GREEN:  Yes, Your Honor.

10          THE COURT:  All right.  Now let me ask counsel for

11  the city, with that slide stricken, do you have any objection

12  to the Court using during its deliberations, Ms. Green's slide

13  show?

14          MR. IRWIN:  No, Your Honor.

15          THE COURT:  All right.  Will you make that available

16  to the Court, please with that change.

17          MR. IRWIN:  There was 852 as well.  Would that --

18  would the same investigation be conducted with regard to that

19  exhibit?

20          THE COURT:  We have determined that that was not

21  admitted either.

22          MR. IRWIN:  Right.  So with -- could -- both of

23  those two slides then the city has no objection.

24          THE COURT:  That's right.  There was a slide on that

25  one too.

1           MS. GREEN:  If I may respond, Your Honor.  852 is a

2    duplicate of 845.  We just pulled some of the transcripts.

3    There is a reference to Exhibit 845, Ms. Brimer used it, Your

4    Honor.  I think this exhibit is in evidence.  I believe it's

5    845.  That was --

6           THE COURT:  You think 845 was admitted?

7           MS. GREEN:  I thought so.  It says it was already in

8    evidence as of the date of her line of questioning.  And

9    that's a duplicate --

10          THE COURT:  Is that on -- is that on the Court's

11   list?

12          MR. IRWIN:  It's not, Your Honor.  Just because Ms.

13   Brimer says and represents that it's in evidence does not mean

14   it's in evidence.  And 845 on our list again is consistent

15   with what counsel is saying, was in fact used, but it was

16   never offered and our objection was never heard.

17          MS. GREEN:  If I could continue.  The Judge -- or

18   Your Honor had asked that the retiree committee and the city

19   get together one weekend to come up with -- there were some

20   issues with all the different exhibits.

21       And my understanding was that there was a meeting over

22   the weekend in the courthouse and I was given a list of

23   exhibits marked at trial after that meeting.  My understanding

24   was that this was the agreed upon list of exhibits.

25       I spoke with Mr. Irwin over the break and he said that

1  that was not his understanding, however, many objecting

2  parties all believed that this was the list of exhibits marked

3  at trial. And I checked every slide against what I believed

4  to be was the agreed upon --

5         THE COURT: Well, but -- but the fact that there was

6  an agreement on what exhibits were marked with what numbers

7  doesn't mean that there was an agreement on their admission

8  into evidence.

9         MS. GREEN: My understanding was that this was the

10  list agreed upon as used at trial, admitted into evidence.

11  But Mr. Irwin said that that is not the case.

12     There were several of us that were of that understanding,

13  that that's what the agreed upon list was supposed to be. And

14  I also thought, and I have not looked yet through the record,

15  that the Bill Nowling timeline was used and admitted as a

16  party admission because it was Kevyn Orr's press secretary. I

17  have not yet looked through the transcript, I just received

18  some of the transcripts.

19         THE COURT: What exhibit is that?

20         MS. GREEN: Well, it's a duplicate. It's 452 and

21  there's also 831. And it may be others. It may be a UAW

22  exhibit as well because we all had a lot of the same exhibits.

23         THE COURT: Well, if you can show me that any of

24  those was admitted, we're all set. Otherwise we look for what

25  we look for. As to what your understanding was, unless it's

1  on the record as an agreement, I -- I can't really give it

2  much weight.  So, I'll ask you to submit the slide show of

3  your closing argument without the two slides that address

4  these -- these two exhibits which were not admitted into

5  evidence.

6          MS. GREEN:  Okay.  Thank you, Your Honor.

7          MR. IRWIN:  Your Honor, may I briefly be -- be heard

8  on that?  We -- we were in fact in Court, or one of the

9  lawyers from the Dentons firm was here that weekend.  And we

10 were stuffing exhibit binders, updating the Court's collection

11 of exhibits to make sure those binders were accurate.

12     We have never exchanged a list of exhibits where there

13 was some agreement in terms of what is in evidence or not.

14 And I am not impugning Ms. Green's intent.  Whether she relied

15 on that document that objectors have been circulating is not

16 my issue.  I am simply making the observation that it is not

17 in evidence.

18          THE COURT:  All right.

19          MR. IRWIN:  And may I make a -- a related point,

20 Your Honor?  And I'm not asking the Court to -- to rule on

21 this.  I just want to correct something.

22     I understood Ms. Brimer to make the point with respect to

23 the -- the Howard Ryan deposition testimony.  I think she said

24 it's in evidence and that is right.  It is one of the

25 transcripts that we submitted.  I think it was an agreement

1  between the state and Ms. Brimer to avoid the need for Mr.

2  Ryan to testify live.

3      We did make very limited objections to the testimony that

4  she has referred to and those have not been waived.  Again I'm

5  not asking the Court to rule on them, I just don't want there

6  to be any mistake in terms of what has been stipulated into

7  the record or not.

8          THE COURT:  Where do I find those objections?

9          MR. IRWIN:  They were in the pre-trial order.

10         THE COURT:  In the pre-trial order.

11         MR. IRWIN:  Yes.

12         THE COURT:  All right.  Thank you, I'll consider

13 that.  Okay, sir.

14         MR. CIANTRA:  Thank you and good afternoon, Your

15 Honor.  Thomas Ciantra, Cohen, Weiss, and Simon, LLP for the

16 International Union UAW.

17     Let me start, Your Honor, by thanking the Court for its

18 consideration and courtesy during the past few weeks of this

19 trial.  It has been most appreciated.

20     Begin, Your Honor, by noting the interest and role of the

21 UAW in these proceedings as Mr. Nicholson, the union's general

22 counsel testified.  The UAW represents a relatively small

23 number of employees of the City of Detroit.  It has obviously

24 taken an outside interest in these proceedings.

25     And as Mr. Nicholson testified, the union's President has

1 directed that -- that the union's resources and its expertise

2 in the restructuring area in particular, be brought to bear to

3 assist in and provide a catalyst for hopefully a consensual

4 resolution of a number of the issues that have been raised in

5 these proceedings and have been the subject of discussion and

6 concern up -- up to and -- up to the date of the filing and to

7 the present day.

8     And there are a couple of reasons for that, Your Honor.

9 The first is of course the obvious reason that Detroit is home

10 for the UAW and it has an obvious interest in the

11 revitalization and rebirth of -- of -- of the city.

12     The second interest is -- is also, I think, obvious.  And

13 that is in the protection of the rights of Detroit's active

14 and retired employees in their post-retirement benefits, in

15 their medical benefits that are obviously critical, and in

16 their pension benefits that are constitutionally protected

17 here in Michigan under Article 9, Section 24 of the

18 Constitution.

19     And it is those rights that the UAW is most vigorous in

20 seeking to have vindicated here.  Because they are at threat.

21 And with respect to that, and in response to observations by

22 the city, the city's apparent surprise that the UAW is

23 supporting the Flowers litigation to assert and protect the

24 rights of those -- of those retirees, we do not shy from and

25 indeed we rise to the challenge of defending the interests of

1  those retirees and employees in these -- in this extremely

2  critical area.

3      The record, we would submit of this trial, has

4  demonstrated that the approach of the present state

5  administration towards Detroit's fiscal crisis is based upon

6  it seems three elements.  One, is taking the position that

7  there will be no financial support by the state for the city's

8  reorganization.

9      The second is of course the use of the extraordinary

10 powers provided by PA436 to displace local elected leadership.

11     And the third component is through the working of the

12 emergency manager selected by the Governor under that law to

13 use Chapter 9 to vitiate the constitutional protection of

14 pension benefits so that in effect the financially vulnerable

15 retirees and employees of the city may be made to finance a

16 rather extensive restructuring plan that the emergency manager

17 has promulgated.  No one, I think, can deny that there is a

18 fiscal problem here.  No one can deny that there is a need for

19 reinvestment.  The question is, who is going to pay for that.

20     And as we have submitted, Your Honor, the option of

21 forcing the retirees to pay for that through a decision to

22 cease funding their pension benefits, is -- is a null set.  It

23 is inconsistent with the protections provided by the state

24 constitution and as we have argued is a legal matter.  The

25 Chapter 9 authorization is invalid for that reason alone.

1    The -- the trial evidence has made it clear obviously

2  that the Governor was well aware of the intent of the

3  emergency manager.  In the filing he was provided with a copy

4  of the June 14 creditors' proposal and was familiar with its

5  terms beforehand.

6    In short, we submit that the Governor and the state

7  cannot use bankruptcy to take away the pension benefits.  He

8  -- the state -- the state's executive leadership and its

9  legislature cannot change the Constitution.  Only the people

10  of the State of Michigan can do that.

11    The strategy that the city has -- the city acting through

12  the emergency manager has taken in this respect, was

13  foreshadowed quite extensively in the January 29th -- what's

14  been referred to the pitch book that the Jones, Day law firm

15  made in support of its candidacy to be hired as restructuring

16  counsel.

17    And if I could have Exhibit 600 which is I guess the --

18  the UAW's admission of that.  And if we could go to Page 57 of

19  that.  And there we see that the -- a discussion of the -- the

20  Chapter 9 process and the intent here.

21    Counsel notes, plans of adjustment address narrow range

22  of economic compromises.  That's what a plan of adjustment is.

23  It's an effort to compromise outstanding debt obligations.

24  And then it goes on to note that other fundamental changes

25  must occur outside of the plan context.

1      The -- the -- the -- the presentation goes on to note,

2    final bullet point, the city should take advantage of its

3    opportunity for long term comprehensive solutions.  And it

4    should do so by using the force of Chapter 9 to negotiate with

5    creditors.  It should use the tools of Chapter 9 to develop

6    and fund a large scale revitalization program.

7           THE COURT:  What does the language negotiating in

8    Chapter 9 or its shadow mean?

9           MR. CIANTRA:  It means that either you negotiate in

10   Chapter 9, or with the threat of it to try to extract

11   concessions from creditors that can -- that can fund something

12   that a large scale revitalization plan that goes beyond a

13   narrow adjustment of creditor relations.  That's what the city

14   is looking at.  That's what the city proposed --

15          THE COURT:  So are you being critical of the city

16   for its plan, or critical of Jones, Day for suggesting to the

17   city a plan to threaten Chapter 9 to negotiate retirement

18   benefit concessions?

19          MR. CIANTRA:  Yes, Your Honor.  Because the -- the

20   -- the pension benefits are protected by the Constitution,

21   they cannot be reduced.  That -- that should have been a third

22   rail in this -- in this process.

23       What they have done is used the Chapter 9 process, used

24   the threat of Chapter 9, to -- to put the pension benefits at

25   play --

1          THE COURT:  So it would have been impracticable for

2    the city to negotiate with retirees regarding pension

3    benefits?

4          MR. CIANTRA:  It -- it may have -- it may have been

5    difficult, Your Honor, and as -- as I -- I will go on to point

6    out, obviously with respect to the unions, the unions are not

7    in a position as a matter of law to negotiate for retirees.

8    That is clear.  That was clear to Jones, Day at the outset of

9    that process.

10          THE COURT:  Well, but apart from that, what I'm

11   hearing you say, is that it would not have been good faith for

12   the city to even attempt to negotiate with retirees directly

13   on -- on impairing their benefits.

14          MR. CIANTRA:  Yes, Your Honor, from the outset.

15   That was bad faith.  They should not have been looking to

16   reduce those accrued pension liabilities.  They should not

17   have been looking to use Chapter 9 as leverage for that.

18          THE COURT:  Or even the shadow of Chapter 9.

19          MR. CIANTRA:  Yes.  Or even the shadow of Chapter 9.

20   That's -- those were -- those are inviolate.

21          THE COURT:  And that's true even -- and that's true

22   even though Chapter 9 requires as a condition of eligibility,

23   good faith negotiations or its impracticability --

24   impracticability.

25          MR. CIANTRA:  And it requires that -- that the --

1 the filing be specifically authorized.  And we have maintained

2 as a matter of law --

3          THE COURT:  Well, but that -- that -- that's not my

4 question.

5          MR. CIANTRA:  That cannot happen --

6          THE COURT:  My question was, in order to file they

7 have to -- they have to either negotiate in good faith, or

8 show that that would have been impracticable.

9          MR. CIANTRA:  And what would have been --

10          THE COURT:  You say they could do neither one in

11 regard to this specific obligation because of the Michigan

12 Constitution.

13          MR. CIANTRA:  Correct, correct.  They could have

14 negotiated about a lot of things and -- and so we'll go on, I

15 think there -- there were openings for negotiations about for

16 example other post-employment benefits that were not taken up.

17 But the pensions -- the pensions were the third rail.

18          THE COURT:  So they could have negotiated regarding

19 health -- health benefits?

20          MR. CIANTRA:  Yes.  And -- and --

21          THE COURT:  Okay.

22          MR. CIANTRA:  Yes.  So as -- as the process

23 developed obviously the emergency manager was selected by the

24 emergency loan -- the emergency loan board which is comprised

25 of an appointee of the Governor, the Treasurer, and two of his

1  deputies.

2      The emergency manager's vision and chemistry according to

3  Mr. Baird, and this is from Exhibit 807 were obviously seen as

4  aligned with those of the state administration.  Obviously

5  during this process the Governor and Mr. Orr conferred very

6  frequently, both in formal meetings and in one on one

7  discussions.  And they had obviously multiple discussions

8  ahead of time with respect to the Detroit bankruptcy filing.

9      Throughout this process, however, the city and the state

10  have pretty consistently sought to limit access, limit public

11  access to those deliberations and to relevant information.

12  The city sought to limit access to its data room on the

13  execution of a -- a non-disclosure agreement.  The state

14  initially stated an aggressive position with respect to

15  executive privilege concerning its role in this process.

16  There is of course the common interest agreement that has been

17  the subject of litigation and repeated assertions of the

18  attorney/client privilege during these proceedings to shield

19  from -- from public scrutiny questions of the state support or

20  its willingness to support the restructuring as well as

21  discussions of the protection of the pension benefits.

22      The -- the -- as -- as I mentioned, the -- the -- the

23  Governor was well aware in advance of Mr. Orr's demand that

24  accrued pension benefits be cut in the proposal to creditors.

25  He was provided with drafts of that proposal to review.  And

1    in fact as shown in Exhibit 814, Treasurer Dillon had played a

2    fairly extensive role with respect to editing and revising the

3    very request for authorization for the filing that Mr. Orr

4    subsequently made.

5        So, the -- the -- the creditors' plan that was submitted,

6    this extensive and -- proposal, a hundred and some odd page

7    proposal, was not as I said, focused on a narrow range of

8    economic compromises with -- with creditors.  But it is

9    instead a -- a ten year comprehensive restructuring plan for

10   the city.

11       And it is as discussed on that -- in that pitch book.

12   And -- and -- and an effort to take advantage of the

13   opportunity for long term comprehensive solutions that is

14   presented by the finance -- by this financial crisis and by

15   this Chapter 9 filing.

16       Now the -- the -- the plan's details of course as we --

17   we heard, involved the spending of over one and a quarter

18   billion dollars over ten years in various reinvestment and

19   renewal projects.  And where is the money coming from for

20   that?  Well, that was -- came out pretty clearly in the

21   testimony of Mr. Moore.

22       The city has taken the position that it cannot

23   effectively raise taxes, that the share of revenue that is

24   received from the state is declining, and that as a

25   consequence, a substantial amount of that funding is going to

1   come from impairing the -- the city's existing debt, its bond

2   debt, and the -- its obligation to fund pension benefits and

3   other post-employment benefits.

4       The Governor has made clear and in fact I think that is

5   reflected in the -- the creditor proposal, that the city must

6   solve its own problems.  And that -- that state aid would not

7   be forthcoming with respect to the city's legacy obligations.

8           THE COURT:  And -- and what's the UAW's position on

9   where any pension underfunding liability should be paid from?

10          MR. CIANTRA:  Well, it -- it -- it remains to be

11  seen, Your Honor, frankly whether the -- whether the city has

12  claims against the state with respect to those obligations.

13          THE COURT:  Uh-huh.

14          MR. CIANTRA:  I think that is something that has to

15  be pursued.  It has to be investigated, it has to be

16  discussed.

17      So under the proposal, contributions to the retirement

18  plan would cease and as a result there would have to be cuts

19  unspecified in the proposal.

20          THE COURT:  Of course there's nothing about a

21  finding of eligibility that would preclude the city from that

22  investigation and/or litigation if appropriate, is there?

23          MR. CIANTRA:  That -- I suppose strictly speaking as

24  a matter of law, not.  But under the circumstances of how the

25  -- the city is -- is being run by an emergency manager --

1             THE COURT:  Uh-huh.

2             MR. CIANTRA:  I think there's -- there's a question

3    there.

4             THE COURT:  Uh-huh.

5             MR. CIANTRA:  A question of -- of interests of whose

6    interests are being served by that.

7             THE COURT:  Conflict of interest?

8             MR. CIANTRA:  Yeah.  So what --

9             THE COURT:  And any other source other than a claim

10   against the estate?

11            MR. CIANTRA:  I'm sorry, Your Honor, did not hear

12   that.

13            THE COURT:  Yeah, any other source for funding the

14   underfunded liability, pension liability, than a potential

15   claim against the State of Michigan?

16            MR. CIANTRA:  Well, presumably as has been

17   discussed, there are various assets that the city has that

18   could be monetized that -- that could be used to pay its

19   obligations.  But certainly a potential claim against the

20   state has to be something that has to be considered.

21            THE COURT:  Okay, thank you.

22            MR. CIANTRA:  Now with respect to the particular

23   proposal that was being made to creditors, the -- we would

24   submit that the position of retirees or employees with respect

25   to that is quite a bit different than the perspective or

1  position of bond holders or their insurers.

2      For the -- for the bond holders or the insurers, their

3  insurers, it's a cents on the dollar question.  It's how much

4  -- how much of that note is going to be theirs and how much of

5  their debt is that note going to cover.  That is what their

6  issue is, it is dollars and cents.  It's a -- it's a bean

7  cutting exercise for them.

8      For the employees it's quite a bit different.  For the

9  employees, it's a matter of unpacking a proposal that

10  discusses underfunding of the pensions, but does not in -- in

11  fact at the time could not translate into any meaningful

12  numbers in terms of what that would mean on a day to day basis

13  in terms of reduction of benefits.

14      It is as -- as -- as we submit, in effect a -- a -- a

15  plan to use in part the pension underfunding claims, to not

16  pay them, and to use those funds to -- to fund the

17  revitalization of the city under this plan.  And so what --

18  what are these pensions that are at issue?

19      As the Governor testified, he estimated --

20          THE COURT:  Let me -- let me ask you to pause there

21  and answer the city's assertion that its revitalization is

22  necessary for it to get back into a position where it doesn't

23  continue to underfund pension liabilities?

24          MR. CIANTRA:  Well, as I said at the outset, Your

25  Honor, you know, there is obviously a hole here.  It's a --

1   it's a bankruptcy that's -- it's like doughnut there's always

2   a hole, right.  It has to be filled.

3           THE COURT:  True.

4           MR. CIANTRA:  Okay.  The question is, where is it

5   going to be filled?  Who is going to be paying for it and

6   where is it going to come from, all right.

7      And it's our position that the -- the pensions are a

8   third rail, that's -- that's a piggy bank that they cannot

9   touch.  There are other sources that they have both with

10   respect to their existing creditors and elsewhere that they

11   can use.

12           THE COURT:  For -- for revitalization --

13           MR. CIANTRA:  Yes.

14           THE COURT:  In addition to plugging this doughnut

15   hole?

16           MR. CIANTRA:  Right.

17           THE COURT:  Okay.

18           MR. CIANTRA:  The -- the position and -- and there

19   was some testimony I think from -- from Mr. Buckfire with

20   respect to this.  That the -- the pensioners find themselves

21   -- that the -- that the city is -- is -- is treating everyone

22   the same.  We're treating all unsecured creditors the same.

23      It -- frankly it ignores social reality.  Obviously the

24   bond -- bond holders are relatively sophisticated financial

25   investors.  They are paid for taking on risk.  And that I

1  think is pretty well reflected in the interest rates that

2  you'll see at the back of the creditor proposal with respect

3  to the bond rates.  It's a market.

4      As the city's bond rating has fallen as Mr. Bennett

5  outlined in his -- in his opening, the rates that the city has

6  had to pay have -- have risen.  And investors have taken on

7  that risk knowingly.

8          THE COURT:  Well, but isn't this kind of equitable

9  argument, one that's more appropriately focused at plan

10  confirmation when and if cram down becomes necessary and the

11  issue is whether the plan is fair and equitable?

12          MR. CIANTRA:  I -- it certainly -- it certainly is

13  relevant there, Your Honor.  I also, however, think it's

14  relevant here in terms of the good faith of proposing a

15  proposal that treats these folks the same.

16          THE COURT:  Okay.

17          MR. CIANTRA:  Because as a practical matter, Ms.

18  Whitson who testified, or Mr. Taylor who testified, were not

19  in the same position as some bond holder who could diversify

20  these investments.  They're stuck.  And they don't have a

21  backstop.

22      This is not like a -- the airline case that Mr. Robbins

23  testified to where the Federal Government has provided an

24  insurance safety net for single employer defined benefit

25  pension plans.  There is no safety net to those benefits here.

1    And unlike -- unlike the bond holders.  As Mr. Buckfire

2   testified, a substantial number of those bond issues are

3   insured.  They are the -- they are the economic party that's

4   at risk.  Those insurers.  That's why he was negotiating with

5   them.

6    It's not a matter of having as a practical matter, to

7   negotiate with thousands of -- of little old ladies in

8   Pasadena, or thousands of mutual funds.  It's a matter of

9   dealing with the insurers who are taking on the economic risk

10   of default.

11    Let me turn to the -- the question of good faith in the

12   negotiations.  The city and the state we submit, created

13   conditions under which a consensual resolution became all but

14   impossible.  And we think the evidence supports the conclusion

15   that the reason for that is that the emergency manager had

16   determined that he wanted to obtain the tools that were

17   provided by Chapter 9 to -- to -- to push through the -- the

18   -- the plan of restructuring that is set out in the creditor

19   proposal.

20    You can't simply create circumstances that make a

21   consensual resolution impossible and then complain that you

22   didn't have a consensual resolution.  All right.  As Mr.

23   Buckfire testified, the June 14th creditor proposal was a

24   bombshell.  That's his word, not mine.

25    Indeed just days before the emergency manager had told --

1  spoken in a public meeting here and stated in response to a

2  retiree's direct question, that pension benefits were

3  sacrosanct.  Yet on the 14th obviously the proposal was quite a

4  bit different.

5      And there was a -- a -- an extensive, a -- a very

6  abbreviated rather, schedule for discussions that was set out

7  in that proposal.  And it's been discussed by -- by many and

8  I'm not going to go -- go through the details.  But the

9  obvious fact is that the -- the emergency manager set a

10  abbreviated period, a little over a month for discussions with

11  stakeholders to take place before an -- before his evaluation

12  period and then a -- an expected conclusion of this process on

13  the -- the 19th of July.

14      So despite the fact that obviously as the testimony was,

15  that months of work went into the production of the financial

16  reports and the creditor proposal, the discussion period was

17  very short indeed.  And there were very few meetings that were

18  held to -- where that proposal could be discussed and

19  digested, much less actually negotiated.

20      That has been the subject of much discussion previously

21  in Ms. Green's timeline with respect to those meetings and the

22  conditions under which they were taken -- had taken place.  I

23  think they are well known to the Court and I'm not going to --

24  to dwell on them here.

25      But the fact that the emergency manager did not attend

1 | all the meetings and did not send anyone who could actually

2 | negotiate an agreement is, I think, telling.  Now the city

3 | contends well, it wasn't any big deal, someone could have gone

4 | back to the emergency manager and relayed whatever proposal

5 | might have been made and -- and there could have been further

6 | discussions and progress could have been made.

7 | But the fact of the matter is that of course the city was

8 | -- and the emergency manager were insisting on a highly

9 | abbreviated time schedule.  So if you want work to get done on

10 | that type of a schedule, it's important to send people to

11 | meetings who can actually get work done rather than just carry

12 | information back to home base as it were.

13 | There were -- the -- the -- the process of discussion

14 | limited by information issues as was previously noted and as

15 | seen on Exhibit 814, the city even acknowledged to my client,

16 | the UAW, that it needed time and information to review the

17 | proposal.  That was on June 27th.  That's already almost two

18 | weeks into this process.  As noted the city conditioned access

19 | to the data room on -- on the execution of a non-disclosure

20 | agreement which we believe it improper given the -- the public

21 | nature of what's at issue here.  And even the Treasurer, Mr.

22 | Dillon, in his email of July 9th, that's Exhibit 834, noted

23 | that in many ways we were still in the "informational" stage.

24 | So there are a lot of obstacles that existed to getting a

25 | consensual agreement done here.  The time frame, and the

1  information issues being two notable -- two notable issues.

2      The city also in this connection did not address the

3  legitimate concerns that the unions raised with respect to

4  their ability to negotiate at least with respect to the

5  pension obligations.  The basis of that concern really was

6  obvious as Mr. Nicholson and Ms. Gurewitz testified.  Just as

7  a matter of pretty simply labor law, unions collective

8  bargaining responsibilities extend to units of active

9  employees.  The city was well aware of that.

10     And -- and the UAW demanded that the city provide the

11 basis for its contention that the union could lawfully

12 negotiate over those benefits, especially given their

13 constitutional protection.  That -- that's in Exhibit 624, the

14 affidavit that Mr. Nicholson presented in the Flowers case in

15 Exhibit B.

16     Yet the city provided no response.  It provided no -- no

17 explanation of its contention that it could legitimately seek

18 to have the unions negotiate over those benefits.  And of

19 course it -- it never modified its proposal.  Indeed Mr. Orr

20 testified that he probably -- "probably would not have

21 accepted a counter proposal that left pension benefits intact

22 in any event".

23     When Mr. Dillon testified the other day, he noted that in

24 his view the OPEB liability was more of a concern.  That it

25 was at least as I have his testimony, the big challenge.  Why?

1  Because it was not funded at all.

2      And if we recall the -- the chart that counsel for the

3  city showed of the outstanding unsecured claims, obviously

4  that OPEB number is -- is bigger even than the pension

5  underfunding number that the -- that the city had claimed. All

6  right.

7      Mr. Nicholson testified that on the 11th of July, the

8  meeting attended by city representatives, that he spoke with

9  Evan Miller of Jones, Day.  Mr. Miller is one of the leading

10  bankruptcy practitioners in the United States, a benefits

11  practitioners in the United States.  A person of substantial

12  knowledge in this area.

13      And as Mr. Nicholson testified, he told Mr. Miller,

14  there's a way, you know, that we can get at solving the OPEB

15  issue.  And as Mr. Nicholson testified, Mr. Miller answered --

16  finished his sentence, yeah.  He said the class action method.

17      As Mr. Nicholson testified, that was the way or has been

18  the -- the tool that has been used by UAW and another -- a

19  number of other unions to reach comprises over retiree health

20  obligations in different circumstances.  And it provided

21  frankly a framework for negotiation of that issue that could

22  work to a conclusion, that could get you to a conclusion.

23      As Mr. Nicholson testified, the first step in any

24  negotiation is to invite the -- the other side to participate

25  in a process that can be expected to lead to a resolution

1  That's what he was doing with Mr. Miller.

2      The city didn't take him up on that.  And in fact the

3  Treasurer, Mr. Dillon, in Exhibit 626, just -- just a couple

4  days before Mr. Nicholson's meeting with Mr. Miller, he

5  acknowledges that that structure coming up with a class action

6  as a way to deal with retiree benefit obligations, is an -- an

7  option.  And it appears at point ten, I think it's the next

8  page if you -- if you would of that exhibit.

9      All right.  I knew that was too fancy for me, Your Honor.

10 Let me -- I can just talk about the exhibit the old fashioned

11 way.  He acknowledged --

12             THE COURT:  Mr. Wertheimer seems to have it for you,

13 sir.

14             MR. CIANTRA:  Well, I -- no, I have the document.

15             MR. WERTHEIMER:  Okay.

16             THE COURT:  What does it say?

17             MR. CIANTRA:  He says well, I'll just read it.  It's

18 point -- it's point ten and he's talking about the -- the

19 draft letter to -- that Mr. Orr has circulated requesting

20 authorization.

21             THE COURT:  Uh-huh.

22             MR. CIANTRA:  He says, I don't think we are making

23 the case why we are giving up so soon to reach an out of Court

24 settlement.  Looks premeditated.

25      I think we need to -- need to say facts got worse as we

1 dug into the numbers and I believe there is a State Court

2 option to get retirees into a class.  We don't acknowledge

3 that.  And why is that impractical?  Then he goes on, we don't

4 say they even rejected the --

5          THE COURT:  Uh-huh.

6          MR. CIANTRA:  -- city's proposal, et cetera.

7      Mr. Dillon was aware of that option.  Jones, Day lawyers

8 were certainly aware of that option.  Mr. Miller finished Mr.

9 Nicholson's sentence.  That was a structure that would have

10 provided a way to get to an agreement on that issue.  And an

11 issue that obviously was a -- a $5,000,000,000 issue, at least

12 as reflected in the -- the city's proposal.

13      As Mr. Nicholson said, you need to create as a first step

14 in a negotiation, an understanding, the other side, as to what

15 the process is that's going to be followed and an agreement

16 that that process is something that's going to lead to a

17 resolution.

18      Contrast this in fact with the process that the city

19 asked parties to undertake with respect to negotiation of the

20 pension issue, all right.  The city through the cross

21 examination of Mr. Robbins just the other day, indicated

22 essentially that it was following that same approach.  It

23 wanted to get Mr. Robbins to agree to a process for

24 discussion.

25      And its -- and its proposed construct was well, we start

1  by getting the actuaries for both sides, for all these parties

2  to agree on what the underfunding number actually is.  Then we

3  get financial advisors to agree on how much the city can pay

4  and then we go from there.  We figure out what can we pay for,

5  what can be afforded, what cannot.

6      And there was discussion between Mr. Robbins and -- and

7  counsel for the city because Mr. Robbins thought gee, step two

8  should be what -- what we focus on first rather than getting

9  the actuaries involved.  But the same idea.  Here's a process,

10  here's how you begin to constructively deal with that issue.

11      But here with respect to the pension issue, all right,

12  the city was at no point in this process able to get to step

13  one because its actuaries had not finished the work.  So there

14  -- there was no way to undertake that process here, all right.

15      You know, as Mr. Dillon said in -- in the email that I

16  quoted from before, Exhibit 434, we remain in many ways at the

17  informational stage with respect to the pensions.  And as the

18  deposition excerpts from Mr. Moore, I think made quite clear,

19  this is at really page -- Pages 149 through 151.  The city's

20  actuaries hadn't completed their work.

21      They didn't know what the underfunding number was.  And

22  so again, how -- how even under the city's construct for --

23  for these negotiations to take place, could you have had it

24  meaningfully take place.

25      We'd submit that for those reasons there was no -- there

1  was no good faith negotiation here.  It was impossible.  The

2  city created the impossibility that it's complaining of.

3      Now were they impractical?  Well, I don't -- I don't

4  believe so.  The Detroit financial crisis was well known for a

5  period of years.  There is no reason why these issues could

6  not have been addressed beforehand to have permitted the type

7  of -- these type of processes that Mr. Nicholson talked about

8  and that Mr. Robbins talked about to -- to take place.

9      And indeed here the -- the unions had -- had a history of

10  coalition bargaining over concessions.  There was a lot of

11  testimony with respect to the 2011, late 2011 early 2012

12  concessionary agreement that was negotiated by a coalition of

13  30 -- 30 labor organizations including the UAW Locals.  There

14  is the possibility as I mentioned of a potential class action

15  resolution with respect to the OPEB issues.  And as we

16  discussed, obviously the -- the city could have -- could well

17  have undertaken negotiation with the bond holders who -- who

18  hold the fundamental economic interest here as -- as Mr.

19  Buckfire testified substantially all of the bond -- bond

20  holders were insured by -- by one of six insurance companies

21  that are identified in the -- in the June 14th proposal.

22      They obviously hold the economic interest.  They

23  obviously were the parties, the discreet parties to negotiate

24  with.

25      The -- the Governor as we said, knew that the emergency

1  manager intended to impair pensions as part of any Chapter 9

2  filing.  And he also knew that under PA436 he could have

3  conditioned his approval of that on protection of those

4  constitutionally protected benefits.  And in fact his counsel

5  advised him to place conditions on the filing.  And

6  specifically identified potential conditions with respect to

7  anything having to do with vested pension benefits.  That's in

8  Exhibit 625.

9       But the Governor rejected that advice and he in effect

10 turned that issue over to this Court.  He did not consider the

11 requirements of state law in authorizing the filing.  And he

12 left it to the Federal Bankruptcy Court to sort out whether

13 those accrued pension obligations could be reduced.

14      And we submit, Your Honor, that that is not appropriate

15 authorization under the statute.  The Governor's statement in

16 his July 18th letter that the plan of adjustment must be

17 legally executable under Section 943(b)(4), was insufficient

18 because of course the Governor knew that the emergency manager

19 was pursuing the pension proposal as part of the -- of the

20 filing.

21      And 943(b)(4) which applies to confirmation of the plan

22 of adjustment does not provide the requisite gatekeeping

23 authorization that is required, we submit, under 109(c)(2).

24 Effectively an evasion of responsibility with respect to the

25 obligation to support the Michigan State Constitution.

1    Finally, Your Honor, I just want to reiterate where I

2    started.  And that is that the UAW is committed to playing a

3    constructive role here, no matter what the result is in this

4    -- on this issue.  And it is fully prepared to bring to bear

5    the restructuring expertise that it has developed in the

6    assistance of this Court and to hopefully serve as a catalyst

7    for consensual resolution.  Thank you.

8         THE COURT:  Thank you, sir.  Before we continue,

9    let's do a -- a head count of how many more final closing

10   arguments we have.  One, two, three, four.  We're running over

11   time here, so I'm going to ask you to keep them as concise as

12   possible because we also have rebuttal arguments.

13        MR. WERTHEIMER:  William Wertheimer, Your Honor, on

14   behalf of the Flowers plaintiffs and I will keep it brief.

15   And particularly not -- try not to repeat anything that

16   counsel for the UAW just said, either directly or indirectly.

17        But -- but one point I think does need to be made and

18   that is from the beginning the position of the Flowers

19   plaintiffs has been that the Governor and the Treasurer were

20   attempting to use Chapter 9 to avoid the requirements of

21   Article 9, Section 24.

22        And that that legally constituted a tort.  And that that

23   made their -- that -- that impacted on the eligibility issue

24   under 109(c)(2).  Simply put, and consistent with what counsel

25   for the UAW said, and in contra distinction to what was said

1  by the Attorney General, the tort claim is that the Governor

2  has allowed his political position to influence his legal

3  position.  And has done that from the beginning.  And that

4  that constitutes a tort.

5      We're not saying that the Governor did anything evil,

6  we're not saying that the Governor conspired with Treasurer

7  Dillon.  What we are saying is, that from the beginning, the

8  Governor has taken the position that his political position

9  has been no financial support from the state.  And that has

10 driven everything that has happened here.

11     I'll just go over briefly the points that the state made

12 this morning relative to those -- that claim.  The state made

13 five points.  The first had to do with referendum and Ms.

14 Brimer dealt with that, I won't speak to it at all.

15     The second had to do with the allegation that there was a

16 bad faith rush to file.  I won't repeat anything that's been

17 put up on the board.  I think we all kind of know what

18 happened when.  I would just add two things relative to that

19 rush to file.

20     One, not only is it clear that the move from the 19th to

21 the 18th was because we were in Court on the 18th, it's also

22 clear that scheduling the bankruptcy for the 19th was done

23 because we filed on the 3rd and had a hearing scheduled for the

24 following Monday.  There is all kinds of evidence to support

25 that.

1          Second point, there is no --

2                THE COURT:  Let me ask you to pause there.

3                MR. WERTHEIMER:  Yes.

4                THE COURT:  I think in my experience it's fair to

5    say that many many bankruptcy filings, maybe even most

6    bankruptcy filings are precipitated by creditor action.  And

7    so even if this one was, why is that evidence of bad faith?

8                MR. WERTHEIMER:  Because this is different, Your

9    Honor.  I made that point before and I recognize it as being

10   true.

11        This is a Governor who is taking action when he's taking

12   action in order to avoid a State Court Judge coming out with a

13   decision which will require him to do something that he

14   doesn't want to do.  We now know --

15               THE COURT:  Well, why is that different than every

16   other bankruptcy?  I mean people file Chapter 13 to --

17               MR. WERTHEIMER:  Because the Governor took an

18   oath --

19               THE COURT:  Because they don't want their --

20               MR. WERTHEIMER:  I'm sorry.

21               THE COURT:  -- homes foreclosed, or they don't want

22   their cars repossessed, or -- or they file Chapter 7 because

23   they're tired of the phone calls, all of which are perfectly

24   legal actions by those creditors to be taking regarding debts

25   that -- that debtors promised to repay.

1          MR. WERTHEIMER:  We think it is different when it is

2   a Governor rushing to Court in order to avoid a State Court

3   decision that he believes will be politically damaging to him

4   and will make it more difficult for him to maintain his

5   political position that -- that there should be no financial

6   support from the state and that this bankruptcy should go

7   forward without condition.

8          THE COURT:  Okay.

9          MR. WERTHEIMER:  We think it's qualitatively

10  different.

11      Let me move on to the third point that the state made.

12  And that had to do with our claim that -- that the Governor at

13  a minimum had an obligation to put contingencies on.  What do

14  we know now we didn't know at the start of this case relative

15  to that?

16      We know that all of the Governor's advisors agreed with

17  us.  Because we now have the document that was being withheld

18  based on the attorney/client privilege.

19      The fourth point they made, or the AG made this morning,

20  was to characterize what we're claiming is -- is some kind of

21  a -- essentially they're saying, we're claiming that this is

22  some kind of scheme to end run 924 to save three and a half

23  billion dollars when there's $18,000,000,000 at stake, that

24  doesn't make any sense.  That's not what we're claiming.

25      We're not suggesting that the Governor started the whole

1  process.  We're not suggesting that the Governor is not in

2  good faith generally in attempting to deal with the Detroit

3  problem.  We've never claimed that.  That's just a false

4  issue.

5      All we have claimed is that as to 924 and that pension

6  obligation, the Governor -- Governor from day one has acted in

7  his own interests and not in the interests of the citizens of

8  the State of Michigan, pure and simple.

9      The fifth point they make is that they try to

10 characterize what we're claiming as some sort of crazy

11 conspiracy among Jones, Day, Miller, Buckfire, the state, the

12 city.  No.  It's very simple.  And it goes back to what we

13 claim the Governor has been doing from the beginning.

14     And if we take a look just at a couple of documents which

15 haven't been referenced at different points in time, if you go

16 to June of 2012, document 844, you have Heather Lennox of

17 Jones, Day saying I'm going with Ken Buckfire, Miller,

18 Buckfire, to talk to the Governor Richard Snyder in Michigan

19 tomorrow.

20     And what's the attachment that she's bringing with her

21 per somebody's request?  Among others, a memo on Michigan

22 constitutional pension plan protections.  Everybody in this

23 courtroom knows what that memo said.

24     That's June of 2012, Jones, Day is providing pro bono,

25 it's too late in the day for me to make a joke about that, but

1  pro bono work to the -- to the State of Michigan at this point

2  and that's what they're doing in June of 2012.

3       Now move forward to February of 2013, this year.  Richard

4  Baird, Exhibit 810.  He's communicating with Kevyn Orr.  And

5  he says, that clearly establishes that you are already

6  behaving as an agent of the state.

7       That's not a slip of the tongue.  That's part of the

8  whole game plan.  Orr is from Jones, Day, Jones, Day has been

9  on board from the beginning.  Even little pieces, and I'll

10  stop with this, Judge, in terms of these other exhibits.  Even

11  little pieces, in the opening briefs I think both AFSCME and

12  the UAW talked about a Jones, Day partner's article that was

13  circulating in the bankruptcy world that I knew nothing about

14  at that point relative to how municipalities and states could

15  get out from under pension obligations.

16       And the claim was made by the UAW, by AFSCME, by others

17  ah, ha.  Well, there's an exhibit in evidence in which Kevyn

18  Orr is provided with a copy of that as part of this whole

19  process.  It all fits.  It is what happened.  This totally

20  innocent explanation is not consistent with reality.

21       And then finally let me bring you to just about two or

22  three weeks ago.  We're all in Court and the Court asked Mr.

23  Bennett a question relative to -- and I don't want to

24  characterize it because I'm not sure exactly what it was, but

25  something that brought at issue whether the city was going to

1  be making a claim against the state.  Something similar to

2  what counsel for the UAW was talking about just a few minutes

3  ago.

4      If you will recall, Mr. Bennett did not answer the

5  Court's question as to his client, the city.  He said, he gave

6  you Jones, Day's opinion.  And guess what?  Jones, Day's

7  opinion is, the state isn't liable.  There's a serious

8  conflict related to that, an obvious conflict.

9      The AG concluded by saying that the Governor had

10  expressed leadership and made a hard decision.  He has done

11  exactly the opposite.

12      He has made no decision.  He hasn't even made a decision

13  under state law.  He hasn't said -- at least the Attorney

14  General, Mr. Schuette or Attorney General Schuette has taken a

15  legal position -- taken a position, not Governor Snyder.

16      Why?  Because it's not in his political interest to do

17  so.  And therefore he says, I have no position, I defer to Mr.

18  Orr, and I know what he's going to do.  He's going to take it

19  to Bankruptcy Court and it's going to be trumped and guess

20  what?  You then can make the decision instead of the Governor

21  of the State of Michigan.  That's not right.  Thank you.

22          THE COURT:  Thank you, sir.

23          MS. PATEK:  Good afternoon, Your Honor.  Barbara

24  Patek on behalf of the Detroit Public Safety Unions.

25      I want to start with one brief housekeeping matter given

1  this issue that's come up about the exhibits.  I'm not going

2  to put any exhibits up, but I do have my timeline and I have

3  in that I moved for the admission of both 714 and 717

4  yesterday based upon Mr. Malhotra's identification of the

5  city's.  And I thought they were both admitted.  They're not

6  on the -- on the list, only 717 is.

7       So I'm going to proceed as if it's only 717, the point if

8  there's one concessionary agreement.  And the record will bear

9  out, you know, as to whether they're both in.

10      With that, may I ask if you can put up -- and we will

11 mark this as -- as 723 and provide the Court with a -- with a

12 hard copy as well.

13          THE COURT:  Is this different from the timeline you

14 used in your opening?

15          MS. PATEK:  It is very similar.  We've just filled

16 in some of the --

17          THE COURT:  Okay.

18          MS. PATEK:  -- evidence.  And there's a couple

19 additional facts.  And -- and for the Court's convenience,

20 what's in blue is what's added.  So that you can easily see

21 what's --

22          THE COURT:  Oh, okay.  Thank you.  723 you say?

23          MS. PATEK:  Yes.  As the Court is aware, you know,

24 at the time of the first day hearings, the Detroit Public

25 Safety Unions did come into the Court supporting the city's

1 request for the benefit of the automatic and the extension of

2 the automatic stay.  In fact attempting as they have tried to

3 be for the last several years, a willing partner in the city's

4 effort to restructure itself.

5      However, at that time we reserved our rights on

6 eligibility and -- and we're here today to address that issue.

7 And I want to start with the debtor that the Court raised with

8 -- I'm trying to remember who it was now, but you asked a

9 question about why would the Governor have done that, what

10 would have been his purpose in sort of delaying and let the

11 city continue to deteriorate.

12      And I'm going to try to propose an answer to that

13 question.  And -- and --

14           THE COURT:  I put Ms. Levine on -- Levine on the

15 spot.

16           MS. PATEK:  -- so I don't know if this bails her out

17 or not, but I'm going to take -- take a stab at it.  First of

18 all, it goes without saying that we're in Chapter 9 so

19 inherently people get here one way or the other through

20 politicians.

21      Second, I think that there is a -- a very human instinct

22 to try to control the process and whether it's Governor

23 Snyder, or Treasurer Dillon, or the emergency manager, or

24 Mayor Bing, when you are in a position of having public

25 responsibility, the instinct is always to control the process

1 so that it comes out consistent with your view of what the

2 public interest is.

3 Which brings me to my first point which is, first of all,

4 I think the constitutional issues hovering above us here

5 today, again it shows the -- the wisdom of the checks and

6 balances built into our federal system and the states' rights

7 and the -- and the Federal Government's rights.

8 But the second, it also shows the wisdom and perhaps the

9 constitutional necessity of Section 109 and in particular

10 109(c) which provides a number of transparent and consensual

11 ways for people to attempt to work out their -- the adjustment

12 issues outside of Chapter 9.

13 I -- I have a couple of points to make and I will try to

14 be quick and -- and go through my timeline here. And they are

15 as follows.

16 First, the active members of the Detroit Public Safety

17 Unions are both the providers as we've heard many times and

18 from many witnesses in this Court, of the indispensable

19 essential fire and police services that are necessary for the

20 city to continue on. And they are also holders of a

21 potentially significant portion of what the city claims is a

22 3.5 billion dollar underfunded pension liability.

23 We believe that the 35 day window that the city gave is

24 inadequate. I will also show based on our timeline, that it's

25 undisputed that not only did the city choose not to negotiate

1  with this important stakeholder as its condition was

2  deteriorating, but it used every tool in its legal and

3  political tool kit to in fact prevent such negotiations.

4      Treasurer Dillon told us yesterday that there were a lot

5  of creative ways that these problems could be solved and I

6  will talk about those in a few moments.  But I will say that

7  we believe that in order to solve this problem, and knowing

8  what it knew, and obviously doing the careful planning that it

9  was doing, that the city had an obligation to begin

10 negotiations much much sooner.

11     Why didn't they?  I'm not certain.  Part of it may be

12 that this -- that this is a political process.  Part of it is

13 perhaps there was a perceived mistrust in the case of labor

14 with their negotiating partner.

15     But I'm going to suggest to the Court that they passed up

16 an opportunity to begin to solve a significant portion of the

17 -- this process in the very way that I suggested to the Court

18 when we came here on the first day of the trial, that made it

19 inevitable that they would be able to come before the Court

20 and tell it that it was impractical for -- for this problem to

21 be solved outside of bankruptcy.

22     When on June 14th the city at that first meeting of

23 creditors outside of bankruptcy dropped the claimed 3.5

24 billion dollar elephant on the active employees, the retirees,

25 and the pension systems, and -- and gave it 35 days to sort of

1  swallow it whole or else, I think they -- they set any

2  possible negotiations up for failure.

3      And with respect to the active public safety unions, I

4  want to go back on my timeline to the negotiation of the

5  concessionary agreements in December of 2011 and January of

6  2012 when by which time it was clear that there were serious

7  financial issues in the City of Detroit.  Those exhibits were

8  negotiated.  Mr. Malhotra indicates he was there when they

9  were negotiated.  Ms. Gurewitz talked about the negotiation of

10 the agreements in advising her clients.

11     And the state elected not to have those agreements become

12 effective.  And the -- and the reasons were several fold, but

13 I -- I believe one of the suggestions was that they wanted to

14 maintain flexibility.  That is if they extended the length of

15 the -- the collective bargaining agreements it would somehow

16 restrict their ability to restructure.

17     I'm going to suggest to the Court given what Public Act 4

18 said, given what Public Act 436 says, and given Section 365

19 and the tools available in Chapter 9, if that became an

20 inevitability that that is a false construct.  There were

21 tools that allowed them to modify and/or reject those

22 agreements and for them to suggest and leave savings on the

23 table so that they could proceed in a certain way, I -- I -- I

24 think is some early evidence of a potential lack of good faith

25 negotiations in this case.

1       I then want to fast forward into the time period before

2   the emergency manager took --

3               THE COURT:  Before you change slides --

4               MS. PATEK:  Yes.

5               THE COURT:  If you were about to, our notes do show

6   that Exhibit 714 was not admitted.

7               MS. PATEK:  Correct.  That's the one I mentioned

8   when we first started as the housekeeping matter.  So I --

9   I --

10              THE COURT:  But I just want to --

11              MS. PATEK:  -- it's perfectly possible that I

12  misspoke and my notes are incorrect and I'm -- I'm not going

13  to put it up.

14              THE COURT:  I want to confirm that for you.  So I

15  will have to ask you to change that slide before you submit it

16  to the Court.

17              MS. PATEK:  We -- we will.  With respect to March

18  25th, that's the date, and Mr. Diaz testified about this, Mr.

19  Dillon testified about his efforts to prevent any Act 312

20  awards from being issued.  The award itself is in evidence

21  pursuant to the agreement reached with Jones, Day that we're

22  looking at the contractual terms, not any comments made by the

23  arbitrator unrelated to that.

24      That agreement was reached on March 25th.  And that's also

25  the day that Kevyn Orr assumed the role of the emergency

1  financial manager under former Act -- Public Act 72.

2      As Mr. Dillon conceded when he was on the witness stand

3  yesterday, that timing eliminated the city's right to elect

4  the neutral evaluation process, or the negotiated solution

5  that is provided for under Public Act 436 by instead

6  triggering the provision that would make Mr. Orr automatically

7  the emergency manager of the City of Detroit when Public Act

8  436 became effective a few days later.

9      I would suggest given the careful planning that -- that

10  has been demonstrated through the evidence that the Court has

11  seen, that -- that that timing was not an accident.

12      I want to go now to the next slide.  And the next date we

13  have is that effective date of Public Act 436, March 28th.

14  Both Mr. Diaz, the President of the Detroit Police Officers

15  Association, and Ms. Gurewitz told the Court that as of that

16  date all negotiations with the Public Safety Unions ceased.

17      And in fact Ms. Gurewitz testified that her clients, the

18  Command Officers Association in fact had Act 312 hearings

19  scheduled but put them off because the city was negotiating in

20  what she believed were productive negotiations.  I will leave

21  it to the Court to decide whether or not that was again

22  perhaps some lack of good faith in terms of trying to get to a

23  certain time period where they could suspend their obligation

24  to negotiate.

25      Very shortly thereafter the -- in fact about two and a

1    half weeks later, the city filed its emergency motion seeking

2    to dismiss the pending Act 312 proceedings for two of the

3    public safety unions, the Command Officers Association, and

4    the Police Lieutenants and Sergeants Association.  That the

5    opinion upholding that dismissal and the dissenting opinion

6    are Exhibit 718, which is in evidence.  Ms. Gurewitz testified

7    about that.  And that opinion came down on June 14th, the very

8    same day that the meeting of creditors took place at the

9    airport.

10       I don't want to go over what happened at the individual

11   creditor's meetings, but instead I want to focus on the Public

12   Safety Unions, so if we can go ahead to the next slide.

13       My June 25th date in fact by virtue of some agreements, we

14   don't have that evidence, but I think that June 30th covers it.

15   We had reached some stipulations with the city to shorten our

16   proofs.  That the existing -- is collective bargaining

17   agreements between the city and the DFFA and the city and the

18   Lieutenants and Sergeants expired.  As Ms. Gurewitz testified

19   the command officers have not had a collective bargaining

20   agreement since 2010 and were in fact essentially at will

21   employees at that time.

22       The very next day Chief Craig assumed his job as Detroit

23   Police Chief.  And I think on the issue of whether or not the

24   Detroit Public Safety Unions, and we don't have specific

25   evidence on the -- the fire fighters here, but I think that --

1  that the evidence on the police unions is -- is sufficient to

2  cover the waterfront here.

3      Every witness who was asked testified that the Detroit

4  Police Officers Association, the various bargaining units,

5  first of all, that -- that the membership were under paid.

6  That their working conditions were deplorable.  And

7  nevertheless Chief Craig testified that the Detroit Police

8  Officers Association and the other bargaining units had in

9  fact reached out to him and that there were negotiations.  And

10 there was a lot of flexibility demonstrated.

11     And in fact in terms of issues on the restructuring that

12 did not involve dollars going into the pockets of these

13 Detroit Public Safety Union members, they were working

14 diligently in the restructuring and as we heard from Mr. Diaz

15 yesterday, even before Chief Craig came on board, the Detroit

16 Police Officers Association was reaching out to him to try to

17 find out what they -- they could do.

18     So to suggest that the city did not have a willing

19 partner here, I think, and to suggest that it did not have an

20 opportunity, particularly with, and I believe it was Mr.

21 Buckfire who -- who I -- I questioned about this, where they

22 had these collective bargaining agreements that were expiring,

23 to try to obtain some concessions.

24     There are creative ways perhaps without impairing

25 existing vested pension benefits, to try to begin to solve

1  this puzzle so that people wouldn't on June 14th be faced with

2  having to swallow the elephant whole.  And in that regard as I

3  think the Court has heard, the active Detroit Public Safety

4  Unions have the folks who are out there working in the street

5  who have accruing, but not vested and therefore not

6  constitutionally protected pension benefits.  They have

7  members who have vested and constitutionally protected accrued

8  pension benefits.  And there are those who have dropped.  That

9  is who are actually receiving what amounts to a pension

10  payment into a separate account that they'll -- they can't

11  touch until they get to retirement.

12      For -- for whatever reason the city elected not to engage

13  these folks, and if we can go now to the next slide.  We have,

14  and I don't want to belabor this because I know this has been

15  up a number of times.  But there was the letter that was sent

16  on July 12th and I think we can all agree by now that -- that

17  -- that July 12th was likely too late given what the rest of

18  the evidence shows.

19      But the four public safety unions got together and the

20  Court heard Ms. Gurewitz testify yesterday that she was part

21  of advising them in terms of obtaining bankruptcy counsel, in

22  terms of trying to form a coalition.  And sent a letter

23  together to -- to the city asking and indicating a desire to

24  make a counter proposal, to -- asking for some more concrete

25  information.

1      And the response by the city was a letter dated July 17th,

2  after Mr. Orr had sought his authorization to file, and only a

3  day before the bankruptcy petition was filed, thanking them

4  for their strong cooperation in the city's restructuring

5  efforts.

6      I would suggest to the Court on the issues of -- of good

7  faith and impracticability that here the city for whatever

8  reason passed up an opportunity to begin to address this

9  problem in a constructive way, more than a year before the --

10  the June 14th meeting of creditors.  Actively refused to engage

11  one of its most important partners in the restructuring.  And

12  instead rather than treating them as I think somebody in my

13  office suggested, you know, we're like the landlord.  They

14  really need us and -- and -- and should be engaging us.

15      They -- they were treated like general unsecured debt and

16  were repeatedly told, we don't have to negotiate with you and

17  we don't have to bargain with you.  And I think that -- that

18  timeline and that series of events together with the other

19  legal questions that have to be resolved, should help inform

20  this Court's decision as to whether or not the city in fact

21  engaged in good faith negotiations or has successfully shown

22  impracticability when they had opportunity when it was clearly

23  not impractical to engage certainly one of -- certainly the

24  Public Safety Unions and probably the other unions based upon

25  what we've heard as well in bargaining that could have begun

1  to solve the -- the problem that we're now all facing in the

2  Court today.  Thank you.

3          THE COURT:  Thank you.

4          MR. IRWIN:  Your Honor, briefly.  The city would

5  simply request a copy of -- of the timeline with -- with the

6  removal of the reference to Exhibit 714.  The city has no

7  objection.

8      There's one other correction that the city would request,

9  however, on the -- on the second page of the timeline there

10  was a reference to an Exhibit 869.  I think it's just an

11  administrative problem.  869 is not in the record.  It's an

12  email and I believe it was -- it was in reference to a -- a

13  Kevin Orr video clip that just needs to be fixed.

14          MS. PATEK:  Okay.

15          MR. IRWIN:  So it's just a question of fixing the

16  reference to 869.

17          THE COURT:  I'll ask the two of you to work on that

18  and -- and then provide a copy to city's counsel and the

19  Court, please.

20          MR. IRWIN:  Thank you, Your Honor.

21          THE COURT:  Sir.

22          MR. PLECHA:  Good afternoon, Your Honor.  Ryan

23  Plecha on behalf of the retiree association parties.

24      Your Honor, with my time today, I would like to spend it

25  discussing and highlighting the evidence as it relates to the

1 retirees.  No one in this case has disputed the city's

2 pre-petition intent to impair the class of retirees under a

3 plan of adjustment.

4      Therefore under Section 109, it is clear that the city

5 must either obtain agreement from a majority of the retirees,

6 negotiate with the retirees in good faith, or prove that

7 negotiations with retirees was impracticable.  The city cannot

8 prove or meet any of these burdens.

9      It is clear that the city in fact did not reach an

10 agreement with the majority of retirees.  The city did not,

11 nor does it claim that it negotiated in good faith with

12 retirees.  And finally, the city has failed to satisfy its

13 burden of proving that negotiations were in fact

14 impracticable.

15      Your Honor, the testimony presented throughout the trial

16 is clear that the city did not negotiate with retirees.  Ms.

17 Lightsey and Mr. Taylor unequivocally testified that the city

18 did not negotiate with the DRCEA or the RDPFFA.  The city did

19 not respond to the DRCEA's request for retiree specific

20 meetings.  It did not even invite the DRCEA to the June 14th

21 meeting and in fact has never provided a copy of the June 14th

22 proposal to creditors directly to the DRCEA.

23      As others have said today, Mr. Taylor did request and in

24 fact had a meeting with Mr. Orr regarding retiree issues.  In

25 this meeting Mr. Orr told Don Taylor, representative of the

1 RDPFFA, that the retirees on the police and fire side's

2 benefits and health care were not at risk.  He essentially

3 told the police and fire retirees that they had protection

4 from the oncoming financial storm or had protection from the

5 upcoming war and need not worry.

6     After making this inaccurate statement to Mr. Taylor, the

7 city ignored multiple requests from the retirees belonging to

8 the RDPFFA for specific meetings.

9         THE COURT:  Can you remind the Court when that

10 meeting was with Mr. Taylor?

11         MR. PLECHA:  I believe it was April 18th.

12         THE COURT:  Thank you, sir.

13         MR. PLECHA:  You're welcome, Your Honor.  Therefore

14 the only individual meeting that was held specifically with

15 retirees was based solely on this information.  This in no way

16 can constitute negotiations, let alone good faith

17 negotiations.

18     Therefore, Your Honor, the city did not introduce any

19 evidence to support a claim that the city actually negotiated

20 with retirees or their representatives.  Your Honor,

21 negotiations with the retirees was practicable through the

22 DRCEA and the RDPFFA.  However, Your Honor, instead of

23 attempting to negotiate with retirees in good faith, the city

24 instead attempted to create a paper case of impracticability.

25     This tactical scheme was predicated on the city's red

1  herring argument that because there was no negotiating partner

2  that could unilaterally -- unilaterally bind the retirees,

3  negotiations were impracticable.  This is not the appropriate

4  legal standard for determining whether negotiations were

5  impracticable.

6      The city documented this alleged impracticability by

7  requesting various union representatives represent retirees,

8  all the while knowing they were not the appropriate parties to

9  do so.  The city's purpose of this campaign was to add to the

10  paper record in case of impracticability.

11      The city has presented to Your Honor multiple times, a

12  chart alleging impracticability on these grounds representing

13  whether various groups would represent retirees with checks,

14  X's, and dashes.  Further, the city beat the drum of

15  impracticability through repetitive testimony of Mr. Orr that

16  no unions would represent the retirees.

17      Well, Your Honor, the city was asking the wrong person.

18  It may be true that they knocked on many doors.  Not only did

19  they not knock on the correct door, representatives from the

20  DRCEA and the RDPFFA in fact requested to be that party that

21  they were looking for to represent and negotiate on behalf of

22  the retirees.

23      Both Ms. Lightsey and Mr. Taylor testified that they

24  responded to the very same letters that the city sent to the

25  unions and in fact requested to represent retirees in

1 negotiations with the city.  Both associations requests for

2 those meetings were denied or never followed through on.

3        THE COURT:  Okay.  But legally speaking, why are

4 those organizations in a better position to negotiate as

5 partners with the city than any other potential partner that

6 the city did seek out?

7        MR. PLECHA:  Your Honor, these associations each

8 have been in existence for over 50 years.  They have lines of

9 communication open to provide information to their members,

10 get information back from their members.  They have a

11 mechanism in place to get the appropriate votes and

12 information necessary to provide that to the Court to show

13 that there is an agreement or there is not an agreement.

14        Under 109 the requirement is that a majority of a class

15 agrees to it.  That's solely for the purpose of eligibility,

16 that's not for plan confirmation.  We could have sent out

17 through the associations these requests for votes on a plan

18 that was negotiated by the associations, they could be sent

19 back to the Court or the associations to show whether there

20 was in fact an agreement possible.

21        The city's plan to create its own impracticability fails

22 because of the association's presence, history, and desire to

23 represent retirees.  As been shown through the evidence and

24 testimony, and I just said, the retirees associations, the

25 DRCEA has been in existence for over 50 years.  They have

1    served as the watchdogs and sole voice of general retirees.

2    They have obtained the benefit enhancements applicable to all

3    general city retirees through the city council budget

4    proceedings which it was formally invited to and participated

5    in.

6         That attendance was set forth in the city charter.  The

7    DRCEA has over 7,600 members and represents all general city

8    retirees regardless of membership.

9         The evidence is very similar as it relates to the RDPFFA.

10   They as well have been in existence for over 50 years.  They

11   have served as the united voice of police and fire retirees.

12        The RDPFFA in fact has engaged in concessionary

13   negotiations which were implemented and impacted all police

14   and fire retirees within a particular class.  The RDPFFA has

15   also bound retirees in an agreement through consent of the

16   police and fire retirees.

17        They as well have the similar invitation to, and in fact

18   participated in city council proceedings.  They also have

19   frequent communications with their retirees.

20        Despite all this, Mr. Orr and his team at the city chose

21   not to inform themselves of the associations or take any steps

22   to acknowledge the existence of any group that could foil its

23   impracticability scheme.  This impracticability scheme was

24   coupled with an extraordinarily aggressive timetable that has

25   been discussed by other objectors which I will not get into.

1      Therefore, the city cannot now claim impracticability

2  based on its own self imposed timeline.  It's also important

3  to note that Ms. Lightsey's letter to Mr. Orr still remains

4  unanswered as to the time of filing.

5      Each of the associations were capable of negotiations.

6  As testified to by Ms. Lightsey, the DRCEA's board includes a

7  former city budget director, a former city personnel manager,

8  a former director of labor relations who is also in charge of

9  benefits, and a former trustee of the pension funds.  These

10  are the people that would be negotiating on behalf of the city

11  had there not been an emergency manager and had those

12  individuals not retired from the city.

13      The associations in fact are the eyes and ears of

14  retirees.  The associations are trusted by their members who

15  have turned to them for decades to receive benefit assistance,

16  and information.  The majority of all retirees of either the

17  DRCEA or the RDPFFA are members of the representative

18  associations.  And two-thirds of all retirees are a member of

19  one association or the other.

20      As I said previously, Your Honor, 109 does not envision

21  unanimous consent.  109(c)(5)(A) would be satisfied with only

22  agreement of a majority of retirees.  Given that the

23  associations together represent two-thirds of all retirees,

24  they were in fact in a position to solicit and obtain

25  agreement of a majority of the retirees.

1 | That would have not been impracticable if the city had

2 | negotiated in good faith.  Therefore, Your Honor, the evidence

3 | does show that negotiation with retirees through the

4 | associations was practicable.

5 | Your Honor, the requirements of 109(c)(5) cannot be met

6 | by clearly just the city acknowledging that it was difficult

7 | in deciding not to engage or attempt to engage in any

8 | negotiations.  109 was intended by Congress to require that a

9 | municipality seeking to reorganize under Chapter 9 exhaust the

10 | possibility of a negotiated resolution with each class of

11 | creditors.

12 | As for retirees who merit recognition as a class due to

13 | the constitutional protections of their pensions, the evidence

14 | has showed that the timeline, the avoidance of the city, of

15 | the retiree associations, was not in good faith and that

16 | negotiations were practicable.

17 | Further, Your Honor, the discovery responses cited to by

18 | the city were in fact post-petition.  Mr. Taylor testified

19 | that he never provided his position to the city as did Ms.

20 | Lightsey.  So the city at the time of filing its petition had

21 | no knowledge of these alleged positions.  They may be true,

22 | but the city did not know.  The city did not ask.  Quite

23 | frankly the city did not care because it did not comply with

24 | its plan.  Thank you, Your Honor.

25 | THE COURT:  Thank you.  At this time I think it's in

1  everyone's best interest to take a brief break, ten minutes

2  and we'll reconvene at 4:35 please.

3          THE CLERK:  All rise.  Court is in recess.

4      (Court in Recess at 4:34 p.m.; Resume at 4:35 p.m.)

5          THE CLERK:  Court is in session.  Please be seated.

6          THE COURT:  It looks like there are some people who

7  aren't here.  Should we wait, or should we plow on ahead?

8          MR. MONTGOMERY:  Your Honor, I think it may be a

9  function of my simply being the last man standing.

10         THE COURT:  All right.  All right.  You may proceed,

11  sir.

12         MR. MONTGOMERY:  Thank you, Your Honor.  I'm going

13  to try in my time this afternoon to try to tie the evidence

14  that came through in seven days of testimony to our specific

15  theories of the case, not in the -- necessarily in the -- in

16  the broadest sense, but with -- to the specific points we are

17  trying to make, mentioned first in our opening and then that

18  we think are important here.

19     Now we know of course that the backdrop for point one in

20  this whole discussion is the authorization question.  Now the

21  legal question on whether or not --

22         THE COURT:  Can I ask you not to repeat the

23  arguments of your --

24         MR. MONTGOMERY:  Yes, exactly.  We're not going

25  there, we're not going there.

1            THE COURT:  Okay.

2            MR. MONTGOMERY:  This is just nothing but context

3    and there's no dispute as to the existence of authorization

4    letters.

5        There is a dispute as to whether or not that

6    authorization violates that, that's argued legally, but we

7    also argue specifically that there was an -- an intent to

8    violate the pending clause, Your Honor.  And so the question

9    is, is there proof of intent, all right.

10        Now, the first step --

11            THE COURT:  The theory being that would go to good

12    faith?

13            MR. MONTGOMERY:  Yes, Your Honor.  And it would go

14    to whether or not -- if there was an -- an intention to

15    violate a state law, specifically the Constitution, does that

16    somehow affect or infect the actual grant of authorization

17    itself.  Meaning that if there were no intent to violate a

18    law, it's a pure legal issue.

19        If there is an intent to violate -- violate the law, does

20    that render the act void ab initio.  That's something we've

21    argued.  We think you need to know the facts before you can

22    actually apply that issue.

23            THE COURT:  So there's a different consequence if

24    there's intent versus no intent?

25            MR. MONTGOMERY:  We believe there is, Your Honor.

1  Because --

2          THE COURT:  Okay.

3          MR. MONTGOMERY:  -- the question.  We do.

4          THE COURT:  Go for it.

5          MR. MONTGOMERY:  And so whether we're right or we're

6  wrong, we need to have the facts in front of you.

7          THE COURT:  Uh-huh.

8          MR. MONTGOMERY:  All right.  Now where do we start?

9  Of course the city admitted to you in oral argument and it

10  admitted in its admissions that it intended to diminish or

11  impair accrued financial benefits of the participants and

12  the --

13          MR. GORDON:  Retirement system objection, please.

14  If you're going to make that statement at least read it

15  correctly.

16          MR. MONTGOMERY:  Fair enough, sir.  The admission of

17  the city was that --

18          THE COURT:  Hold on.  Sir, is that your electronic

19  device?

20          A VOICE:  Yes, I apologize, Your Honor.

21          THE COURT:  Please turn it off.  Is everyone's

22  electronic device off?  All right.  I'll assume from silence

23  that the answer is yes.  You may proceed.

24          MR. MONTGOMERY:  What did the city admit?  Admit

25  that the city intends to seek to diminish or impair the

1  accrued financial benefits of the participants in the

2  retirement systems through this Chapter 9 case, response

3  admitted.

4      Now, that is the beginning of the process.  The city

5  knows it's trying to do something that on its face appears to

6  violate the constitutional provision.  Now we think intent can

7  be shown not just by the statement that they intend to do so

8  here, but that they had intended to do so for time.  And it

9  was part of the planning process leading up to the Chapter 9.

10     Now we also have to show you various other topics which

11 we -- I will touch on.  There's a rightness question that Your

12 Honor needed to hear from us on.  We think the evidence on

13 rightness is in and we'll explain how.

14     Second, is we have an alternative explanation for the

15 specific timeline that has appeared.  We think that the

16 financial information, and we will show you how, that is in

17 evidence shows that July or early August at the latest, was

18 the right time for the city to file a Chapter 9 if it was

19 going to.  And we think the evidence will support the debtor

20 understand that.  And it -- and it must have understood it

21 long ago.

22     The next thing we have to show you, and we think we do,

23 is that there is in fact no plan of adjustment.  You may

24 recall that Mr. Bennett said he was going to prove that there

25 was a plan of adjustment in his opening.  We said we were

1  going to prove there was no plan of adjustment in our opening.

2  We think the evidence supports our view of it.  We're going to

3  try to show you how today.

4      We're also going to try to show you that related to that

5  question that there were insufficient disclosures.  We're

6  going to show you that what -- some disclosures were

7  misleading.  We're going to show you that there was a general

8  desire to avoid asset sales.  That is both intentional and

9  accidental.  We believe the evidence will support that.

10     We're going to show you that the proposal was not fair

11  and even handed.  We think that is part of the good faith

12  standard.

13     We're going to show you that part of this whole drama is

14  that the person who was chosen to lead this march towards

15  Chapter 9 really could only do that.  The qualifications of

16  this very talented individual, Mr. Orr, related to nothing

17  other than leading a march to Chapter 9.

18     We'll also try to show you some credibility challenges

19  which we think relates to the question of whether or not the

20  debtor has been exercising good faith, not just vis-a-vis the

21  creditors in general, but with respect to retirees

22  specifically.  And then we will conclude.

23     Now, Mr. Orr again, a well educated, legal degree

24  individual, made a statement on June 10 in response to a

25  question that the state constitution and state case law says

1  that vested pension rights are sacrosanct, they can't be

2  touched.  Now why do I think that's of interest to the Court

3  with respect to the question of intent?

4      First, it is a statement of importance.  The use of the

5  word sacrosanct suggests it cannot be touched.  It's too

6  important or too respected.  One might turn to a dictionary,

7  Webster's on line dictionary or something like that, and find

8  a definition like too important and respected to be changed or

9  criticized.  That's from Webster's on line.

10     You will also see that he purports to have an

11 understanding of law, perfectly logical for a lawyer to have

12 an understanding of law.  So he knows what the law is, he

13 knows what the Constitution is.  And he knows that vested

14 pension rights are part of that constitutional protection and

15 he knows that it's so important that he uses the word

16 sacrosanct.  And then he adds the practical statement that in

17 the environment he found himself in on June 10, they couldn't

18 be touched.

19     However, the proposal he made in fact on June 14th, has as

20 is demonstrated in Exhibit 408, Page 109 which is the June 14

21 proposal, with respect to pensions is the clause that has been

22 cited to Your Honor before, but it simply says of importance,

23 because the amounts realized on the underfunding claims will

24 be substantially less than the underfunding amount, there must

25 be significant cuts in accrued vested pension amounts for both

1  active and currently retired employees.  The people that my

2  committee represents.

3       Now, this proposal, June 14 is four days after Mr. Orr

4  made the video tape statement.  It's impossible for me, and I

5  suggest for the Court to infer, that Mr. Orr changed his mind

6  between June 10 and --

7            THE COURT:  Just a question about the record.  Is

8  the video tape of June 10th in the record or a transcript of

9  it?

10           MR. MONTGOMERY:  I believe it is, Your Honor.

11           THE COURT:  Do you have a number, or does anyone

12  have a number?

13           MR. MONTGOMERY:  Hang on.  The --

14           MS. GREEN:  It is in the record a transcription and

15  a video.  I believe it is 871.  I have copies of the CD with

16  me today to update it in the binder so you have a video clip

17  and the transcription if you --

18           THE COURT:  I'm sorry, the video clip is what?

19           MS. GREEN:  871.

20           THE COURT:  It's part of 871?

21           MS. GREEN:  The video clips are all on a CD with --

22           THE COURT:  Or, they're on a CD.

23           MS. GREEN:  Yes.

24           THE COURT:  Is that one of the ones that was given

25  to me today, or where is -- where is the CD?

1            MS. GREEN:  I have the CD's.  The transcriptions

2    were already in the binder.  But I have the CD's themselves

3    today.

4            THE COURT:  Okay.

5            MS. GREEN:  To update the binder.

6            THE COURT:  So are we going to get those?

7            MS. GREEN:  I have them with me today to give to the

8    Court.

9            THE COURT:  Okay.  Good, thank you.  You may

10   proceed, sir.

11           MR. MONTGOMERY:  Thank you.

12           THE COURT:  Something you wanted to say, sir?

13           MR. IRWIN:  Well, there were -- there were

14   completeness designations from the city as well.  I believe

15   they were in the transcript, I just wanted to confirm that

16   they were on the video as well.

17           THE COURT:  Is that right, Ms. Green?

18           MR. IRWIN:  The city's completeness designations

19   that were on the transcript on the -- on the video too.

20           MS. GREEN:  Yes.  There was a counter designation by

21   the --

22           MR. IRWIN:  Yeah, they're all there.

23           THE COURT:  So they are on the CD or the DVD also?

24           MS. GREEN:  Yes.

25           THE COURT:  Okay.

1          MR. MONTGOMERY:  Thank you, Your Honor.  The

2    inference I was suggesting the Court might draw from the

3    timing of this statement and the timing of the June 14th

4    proposal, is that Mr. Orr already knew that the June 14th

5    proposal was going to have either language like this, or the

6    intention expressed by this document which is of course the

7    June 14th proposal.

8          Now, we further suggest that it was the June 10 statement

9    that meant little to Mr. Orr despite the fact that he was

10   talking about the Constitution as someone who had a legal

11   education, despite the fact that as the emergency manager he

12   had taken an oath to uphold that Constitution, and despite the

13   fact that he was trying to answer a question posed by an

14   ordinary human being.  What are you doing to me?  Pensions

15   aren't going to be touched is effectively what he said.  A

16   lie, he knew better.  I think that that's only one example of

17   the lack of good faith in the process of dealing with

18   creditors associated with the city of Michigan.

19         Now we also believe that in the process of the request

20   for authorization, you will find the key to the prior intent

21   to violate the state constitution with respect to pensions.

22   You will notice that the very first sentence on Page 6 of

23   Exhibit 28, and we use this two page because we'll come back

24   to it and there is no point in repeating it, it says as a

25   first step in this process, I worked with the city advisors to

1  develop a financial and operating plan for the city, the

2  financial and operating plan, which placed the city's

3  challenges in context and defined a series of key

4  restructuring goals and initiatives.  All right.

5       Now, this is Exhibit 28 at Page 6.  Now the same document

6  may appear as Exhibit 407.  Now, 407, Page 21 is the same as

7  the operating and financial plan.

8       This plan put forward on May 12, 2013, recognizes, and

9  here I've highlighted language of interest to me, although the

10 entire sentences are there, recognizes that legacy liabilities

11 must be evaluated as part of the city's comprehensive

12 restructuring.  Significant and fundamental debt relief must

13 be obtained to allow the city's revitalization to continue and

14 succeed.

15      Okay.  So what.  Well, the -- first, this is the same

16 plan that was not a plebocite.  This is the same plan that was

17 not negotiable.  And we say to you that this is the same plan

18 that thinks that the pension number is only $646,000,000.

19      A statement from Exhibit 407, Page 37 says, as of June

20 30, 2011, the most recent actuarial reports provided to the

21 city by the pension funds showed the pension UAAL, unfunded

22 actuarial accrued liability, at $646,000,000.  But the

23 emergency manager then speculated that with utilizing more

24 current assumptions -- excuse me, more current data and/or

25 more current assumptions could cause that deficiency to rise

1  into the billions of dollars.

2      So he's thinking about this at the time of the May 12th,

3  again before June 10, and certainly before June 14.  And he's

4  thinking this problem is temporarily defined as a $646,000,000

5  problem, but it could rise to $1,000,000,000 or more problem.

6      And so he says to all of us, or to those who were given

7  access, annual payment on accounts of these legacy liabilities

8  are expected to increase in the future if no action is taken

9  to modify them.  If no action is taken to modify them, he

10  thinks the problem gets worse.

11      Now, in his cross with Mr. Ullman on October 28 --

12          MR. BENNETT:  Excuse me, Your Honor.  If you're

13  reading, I don't need to object, but he misread this sentence

14  again.  But if you're reading, I won't object.

15          THE COURT:  I am it says mitigate.  Go ahead.

16          MR. MONTGOMERY:  Thank you, Your Honor.  The -- the

17  testimony by Mr. Orr in response to cross examination, is that

18  pensions and pension benefits had to be cut back and that he

19  had made that conclusion on or before May 12.  Why do I say

20  that?

21      So this is cross by Mr. Ullman.  At trial we don't have

22  the formal, so we think this is what your transcript will show

23  when you get it, that on -- on October 28th.  So he was asked

24  the following question by Mr. Ullman.

25      Okay.  So that we're clear at this point in time, and

1  that's referring to May 12th, you had made the determination

2  that in your view vested pension benefits of Detroit's

3  retirees had to be cut back, is that right?  Answer by Mr.

4  Orr, I think that's a fair characterization of what we --

5  we're saying -- we are saying.

6      Now, Your Honor, now we have Mr. Orr saying on June 14th

7  they must be cut.  We having had concluded on May 12th that

8  they must be cut, but on June 10th he told somebody who was

9  relying on the state appointed official to tell him the truth

10  about what was happening in the world, they were sacrosanct,

11  couldn't be touched.

12      Now in addition to this particular -- let me just skip

13  right back.  In addition to which we've already done this,

14  that all makes sense now from -- from May 12, June 14, Mr. Orr

15  had made the decision, his counsel admitted it for him in the

16  admissions.  So that part of the -- the record is clear, they

17  intended to do something to the Constitution, violate it.

18      Now, the same information was sent to the Governor,

19  meaning Mr. Dillon said that he told the Governor on July 8th

20  by email that the view of the consultants is that current

21  pensions have to be cut significantly.  I believe that the

22  only logical inference there is that he was talking about the

23  consultants for the City of Detroit.

24      So that the Governor understood that this is where the

25  city's advisors were going.  That intention is reflected in

1  the June 14 proposal.  And therefore when the Governor issues

2  his recommendation in response to -- issues his authorization

3  in response to the recommendation that references the May 12

4  plan, that there is no doubt that cutting pensions benefits is

5  part of the scenario.

6      Now, everybody understood this and in fact Mr. -- some of

7  the advisors for the Governor are suggesting they place

8  conditions because they know this is coming.  Specifically

9  conditions could also include such items as preapproval for

10  anything having to do with vested pension benefits.

11      Well, the only reason to even contemplate doing that is

12  because it might be a politically sensitive issue, I suggest

13  to the Court, or it might be unconstitutional for the -- for

14  the Governor to support such an effort.  And so his advisors

15  are saying, give yourself a way out, put conditions on it,

16  make sure the emergency manager doesn't do anything that

17  you're uncomfortable with.

18      But he doesn't do that.  He gives an unconditional

19  authorization knowing that the emergency manager of the

20  biggest municipal bankruptcy in the history of the country and

21  certainly the largest in the State of Michigan, wanted to

22  violate the state's constitution and he said okay.

23      Now, this notion that the Governor understood and that it

24  -- from at least May 12 it was fixed, is merely reflective, we

25  think the evidence will suggest to you, of a longer running

1 thought process by those who are talking directly to, or

2 indirectly to the Governor. Of course I start my reference in

3 that regard with -- with respect to the Jones, Day pitch book.

4     Now, the significance of the pitch book is not that

5 Jones, Day had reached the conclusion as appears on Page 418

6 -- Page 41, Exhibit 418 if needed Chapter 9 could be used as a

7 means to further cut back, compromise accrued financial

8 benefits otherwise protected by the Michigan Constitution.

9 The fact that they reached that legal conclusion is not what I

10 say to you is important.

11     It's the fact that that view was shared with all of the

12 other actors in the drama. This was available and part of the

13 process at the interview. Mr. Orr himself was part of this

14 process. He knew this was the going in game plan.

15     We know from other -- other testimony and the timeline

16 that Miller, Buckfire was aware of this kind of information.

17 In fact Miller, Buckfire had even told them what kinds of

18 questions to answer if I recall the timeline correctly.

19     Now, so we have advisors saying that if you really want

20 to cut pension benefits you can only do that in Chapter 9

21 because of the Michigan Constitution. We've got an emergency

22 manager who understands that both legally, because he's a

23 lawyer, and practically because he says he needs to do it.

24     When are you going to take this on? What -- what makes a

25 logical time to do this? Well, let's look at the City of

1  Detroit as if it was an ordinary debtor.  What do you do with

2  an ordinary debtor?  You say well, gee, what -- what are its

3  cash flows, what are its assets, what might make a sense of

4  good timing.

5      Well, Mr. Buckfire on direct told us that the city relies

6  on four primary streams of revenue, gaming tax revenue, state

7  revenue share, property tax, and income tax.  He then told us

8  property tax income in particular comes in on a quarterly

9  basis because that's when assessments are made and income

10 taxes come in likewise in a fairly irregular fashion.

11     So that to me says that a bankruptcy plan is going to try

12 to figure out well, when does cash peak and when does it

13 trough.  When are liabilities high, when are they trough.

14 Well, we think, Your Honor, that the answer is, July and

15 August is when cash rises.

16     So all of a sudden it dawned on me as it probably did the

17 Jones, Day advisors when they were thinking about this whole

18 process, as I'm sure instinctively it's true for you as an

19 observer of the bankruptcy process, Your Honor, that June --

20 July or August was the logical time for a Chapter 9 filing to

21 occur.  And that whoever was looking at the cash flows of the

22 city would know that.

23     And E & Y had been looking at the cash flows of the city

24 for over a year prior to the appointment of Mr. Orr as

25 emergency manager.  Miller, Buckfire had been there twice

before the appointment of the emergency manager.  The

financial people all understood the cash flow timing question.

They may not have liked the curve, but they knew the bumps.

And so if you're going to file at the right time you do it

when cash is king.

So when is cash king?  Well, according to Exhibit 75,

which was the short term cash flow associated with the May 12

report, you will see that July cash is $142,000,000 of

operating receipts.  And August there's $254,000,000 of

operating receipts.  And then it drops back down

significantly.

Well, what does that tell me?  Well, that sometime

between July and August all things being equal, that's when

you want to file because that's when the greatest amount of

cash is going to come in.

So this notion that a July filing appeared out of thin

air in late June, early July of 2013 is wrong.  Whoever was

looking at these issues knew that this was the only logical

time if you were going to do it in the 12 months of 2013 to do

it.  And I suggest to Your Honor that's exactly what you will

see when you look at the evidence, the inference you will make

that July or August is the logical time.  Come back to that in

a moment.

Let me just quickly get out of the way the rightness

issue.  You have testimony from Ms. Lightsey, and Mr. Taylor,

1    and Ms. Whitson about their reliance -- or excuse me, their

2    participation in the pension systems, their receiving health

3    care benefits and that each of them has had some measurable or

4    demonstrable impact already.

5        Now, the other thing I want to suggest to you with

6    respect to rightness is that the city's testimony is

7    unequivocal that but for water and sewer, the city had made no

8    pension contribution since 2011.  So it's already violating

9    the second clause of the pension constitution when Mr. Orr

10   takes office and that doesn't change.

11       Now, I want to skip that.  I'm going to ignore that last

12   one.  Here we go.

13       On the question of whether or not the Jones, Day and Andy

14   Dillon discussion is theoretical with respect to Chapter 9,

15   I'd point the Court's attention to Exhibit 851 which is a

16   March 23 email from Corrine Ball to Laura Marcero of Huron

17   Consulting.  One of the people that was helping the Treasurer

18   in this time frame.  And this is a full year before the

19   appointment of Mr. Orr, a full year.

20       In which they say in response to a question, "however, we

21   point out that you will need executives in place in the -- in

22   the Chapter 9 case.  You need a practical as well as legal

23   response.  We think having the CRO structure with CFO, COO in

24   place from the first day of a Chapter 9 would enhance the

25   position of continuing the case".

1    All right.  So a year in advance of any possible filing

2 they're telling the consultants to make sure you have people

3 in place who can actually run a filing.  Well, why would you

4 say that if it was in response to a purely theoretical

5 question.  I submit that they're actually thinking about a

6 Detroit bankruptcy.  It doesn't happen for well over another

7 year, but they're already thinking about it for real.

8    Now, Mr. Orr is clearly part of this process because

9 before -- let's roll forward nine months.  His -- his people

10 are talking about Chapter 9 and talking about it perhaps

11 theoretically, perhaps practically.  There is no in fact

12 filing happening.

13    But Mr. Orr is asked where is he up -- on updating our

14 Chapter 9 paper with new decisions.  That tells us, we ask the

15 Court to infer, that one, Mr. Orr was personally familiar with

16 the Chapter 9 studies that Jones, Day was doing, and that in

17 fact he was part of the process because he was being asked by

18 one of his partners where are they on updating it.  And how

19 could he possibly know that if he wasn't involved directly.

20    So now what's happening?  So we know that Jones, Day is

21 -- and Mr. Orr are discussing Chapter 9 before their pitch.

22 We know it's going to -- we've seen the pitch book.  It's been

23 referenced by other people, so I don't need to repeat that.

24    So then they go and tell again a consultant with respect

25 to 870, roll forward another six months, the same conclusion.

1  Based on this we anticipate a significant reduction and

2  already accrued benefits will be required in order to get

3  contributions to the level of available cash to service the

4  UAAL.  It appears this may only be possible in a Chapter 9

5  proceeding.

6      Now this is June 5.  This is again before the June 10

7  statement, it's before the June 14 proposal, but it's after

8  the May 12 financial and operating plan.

9      I'll turn back to the request for authorization, Your

10  Honor.  The last bullet which was -- which appears there, it

11  says the city's negotiations with the counter parties to its

12  pension related swap contracts which have been ongoing since

13  2012, intensified in recent weeks and included, and then he

14  goes on to describe what actually happens.

15      But for our purposes, Your Honor, the importance is that

16  they are talking with serious creditors owed a lot of money by

17  the City of Detroit back in 2012 and the discussions are now

18  accelerating.  They're accelerating because they want this

19  issue out of the way when they file.  They know they're going

20  to file.

21      Now, you -- you may recall I just suggested that July or

22  August was the only logical time frame.  That people had been

23  making the decisions on how to get there, managing the

24  process, and that when they put out the executive summary of

25  the June 14 proposal unknowingly I think to most people, I was

1  not here at the time, they're telling us that July 19 is the

2  deadline.  They give themselves three weeks to honor requests

3  -- excuse me, seven days to honor requests for additional

4  information.  They give themselves a month more or less to

5  engage in negotiations.

6     Again one of the parties they've been negotiating with

7  since 2012 by the time this was coming up.  And they say

8  evaluate July 19.  July 19 happens to correspond with

9  testimony that that was the roll out date.  All right.

10     So the only thing that really happens to knock this plan

11  schedule off of a July or August filing, we submit that if

12  it's July, is the fact that the Flowers and retirement system

13  filed litigation.  And what did that -- what impact did that

14  have?  It moved it up by a day.

15     So all this great tamise about oh, the world came to an

16  end when we got sued, no.  It had one 24 hour day's impact on

17  what the city had already been planning, the Chapter 9.

18     Now, switching topics.  Is there a plan of adjustment?

19  We know that -- oh, sorry, Your Honor.  Let me back up for

20  half a second.  I forgot that the acceleration was due only to

21  the TRO litigation and that Mr. Orr conceded that in his

22  deposition which is part of the record and it says in response

23  to Mr. Ullman again asking questions.

24     Is there a particular reason that the bankruptcy filing

25  was made at 4:06 in the afternoon of the same day a TRO was

1  being heard in the State Court other than to get a jump on the

2  State Court ruling?  Mr. Shumaker objected as to form.  Mr.

3  Orr however answered, not to the best of my knowledge.  And he

4  would know better than anyone else because he was the man in

5  charge.

6      Now Mr. Bennett told us that we had to look at, you know,

7  what boxes did we need to check off -- check off.  And one of

8  them is, we believe, is there a plan of adjustment.  And the

9  reason there needs to be a plan of adjustment is of course

10 109(c)(4) mentions it.  But 109(c)(5)(A) says, impair under a

11 plan.  We submit that's a plan of adjustment.

12     109(c)(5)(B) says, intends to impair under a plan.  We

13 submit that's a plan of adjustment.  And then impracticality

14 or fraudulent transfer.  There's no issue with respect to

15 somebody gaining a fraudulent transfer.  That's come up in the

16 evidence, but all the others have been disputed.

17     Now, Mr. Orr in his deposition testimony again designated

18 for the record says, and this is a summary but precise quote

19 from the deposition, "we never called this a plan.  We never

20 called this a deal.  We always called it a proposal because we

21 were open for discussion".

22     Well, that doesn't sound like a plan of adjustment, but

23 maybe we can turn it into one if we do enough of the other

24 things.  The Governor, who authorized the filing, said on

25 cross examination by Mr. Wertheimer on October 28th, again we

1 think that is what the transcript is going to say.  This is

2 our understanding of what it will show.

3     Well, no plan of adjustment has been presented so that

4 would be speculative.  No plan of adjustment.  So the most

5 important officer in the State of Michigan said there's not a

6 plan adjustment in connection with approving the filing of a

7 Chapter 9 proceeding by the City of Detroit.

8     Now, maybe that's a so what because with the right amount

9 of negotiations you can turn it into something.  Well,

10 Treasurer Dillon testified on November 5 in response to

11 questions by Ms. Levine, again this is what we think the --

12 the final transcript will say.  This -- I'll tell you the

13 thing that troubled me the most was when they put together the

14 ten year plan to talk about investing in the city which is

15 important for it to turn around eventually.  That the recovery

16 for unsecured creditors was so low I didn't know how anyone

17 practically could cut a deal and walk out of the settlement

18 room accepting something based on those numbers.  DOA is

19 another way of saying it.

20     It wasn't supposed to be acceptable.  It couldn't be

21 acceptable.  It -- in fact the Treasurer again, a man deeply

22 emeshed in financial issues for the State of Michigan,

23 absolutely understanding how to negotiate, financial number

24 says, he doesn't know how anybody could do it.

25     We suggest to you that that is not only irrelevant to the

1  plan side of the question, it's irrelevant to the good faith

2  negotiation side.  If you put something on the table that

3  nobody can accept, where is the good faith in the -- in the

4  offer?  Where is the good faith in the proposal?  Where is the

5  fair disclosures that make it possible or reasonable for the

6  person to accept it?

7      Now in order to sort of get into this posture they needed

8  to have numbers bigger than the $15,000,000,000 that shows up

9  in the May 12 report.  Well, what grew between May 12 and June

10  14?  Well, the pension number grew between May 12 and June 14.

11      You may recall, I showed you slide earlier, there was

12  $646,000,000 on May 12.  It's three and a half billion dollars

13  by the time Mr. Orr files his declaration on July 18th.

14      This is Footnote 3 to Mr. Orr's declaration in which he

15  identifies his proposal and says that he has identified

16  obligations consisting of and he points out 3.5 billion in

17  underfunding pension liabilities.  That's 3,000,000,000 higher

18  than appeared in the May 12 proposal.  That's how he gets to

19  $18,000,000,000.

20      Now is that a hard number?  No, it's a preliminary

21  number.  How do we know it's a preliminary number?  Because

22  the June 14 proposal tells us it's a preliminary number.

23  Claims for unfunded pension liabilities appearing at 109, as

24  set forth above, preliminary analyses indicates that the

25  underfunding in the GRS and the PFRS is approximately 3.5

1  billion dollars.

2      The rest of the sentence everybody has quoted many times.

3  That is, at this level of underfunding, the city would have to

4  contribute approximately 200,000,000 to 350,000,000 annually

5  to fund currently accrued vested benefits.  Such contributions

6  will not be made under this plan.  Just in case there was any

7  doubt they -- they aren't doing anything to contribute to the

8  historically accrued vested pension benefits, nothing in the

9  plan other than a share of a note ends up dealing with that

10  issue.

11      Now, Mr. Moore confirmed in his deposition on September

12  18, again this is designated in the record, that the city, I'm

13  going to paraphrase before I quote, city's actuaries had not

14  completed their work.

15      He actually said, "the city and most importantly its

16  actuary has not completed its analysis on the unfunded pension

17  -- unfunded position".  All right.

18      Now, so that's preliminary.  So for some reason it was

19  important to make that number bigger on June 14th than it had

20  been on May 12, even though no completed analyses have doing.

21  Well, why?  Because it's part of the process of making the

22  problem look as bad as it can.  It may be that bad, Your

23  Honor.  I don't know the answer to that question.

24      But why did they have to jump?  The reason they had to

25  jump is they had to justify the position that they were going

1  to cut vested pension benefits.

2       Again Mr. Bowen from Milliman confirms that they hadn't

3  done their work.  He says on 9-24 in response to a question

4  that was, has Milliman done yet a -- a plan valuation of the

5  assets and liabilities of the -- either the police and fire

6  fund or the general pension fund?  He starts to answer, the

7  actual -- Mr. Miller objects to form.  And the witness says

8  yeah, the actuary typically doesn't value the assets, we are

9  provided information from the system and we report the assets

10 in conjunction with liabilities.  As I said, we are in process

11 of doing a replication of each of the two systems.  You can't

12 reach a conclusion until you know what your starting point is

13 and the actuary hadn't finished his work on what the starting

14 point was.

15      Now, the -- there's a second question that sort of comes

16 up in the question of whether or not the information in the

17 June 14 proposal is misleading in any way with respect to

18 pensions.  Now, Exhibit 419 which is the legacy proposal if I

19 am not mistaken, which is put out after the June 14 proposal

20 is put forward, if I've got my timing right.  It says

21 approximately 650,000,000 of unfunded liability as of fiscal

22 year 2012 of which only 250,000,000 relates to the general

23 fund.

24      Well, what's the significance of that?  Well, this is

25 referring to DWSD.  DWSD has a significant share of the UAAL,

1  $250,000,000 divided by the $650,000,000 is the 38.5% that

2  Your Honor may remember was bandied about with respect to Mr.

3  Moore's testimony -- Mr. Orr's testimony, I'm sorry.

4      Just in case Your Honor has a question as to where this

5  number might have come from, well, if you look at the

6  actuarial liabilities as of June 11 which is Exhibit 68

7  admitted by the city at Page B3, you'll see that unfunded

8  accrued -- actuarially accrued liabilities for the water and

9  sewage are $247,000,624.  And the total for the GRS of the

10  liabilities, unfunded actuarial accrued liabilities is

11  $639,871,000.  And it just so happens that if you do the math

12  you again end up with a 38 plus percent number.

13      So Mr. Bing in his document, the actuaries all sort of

14  agree that 38% is the right share on a smaller number.  And

15  you may recall that Mr. Orr said it would slide.  He -- there

16  was some confusion as to whether it was six fifty, or 60%.

17  But the bottom line was, it moves with the size of the number

18  and 38% is what both Mr. Bing thought as in his proposal, and

19  what the actuaries thought when they made their assessment in

20  2011.  Those are consistent.  So whether they're right or

21  they're wrong, they had a consistent world view.

22      It's misleading to suggest that DWSD contributions -- or

23  excuse me, that the GRS participants who worked for, or worked

24  now, or worked in the past for Detroit Water and Sewer

25  Department were being funded by tax dollars from the general

1  fund.  They were in fact coming from the DWSD itself.  And

2  DWSD itself was making money.  So we say that is a misleading

3  observation.

4      Again, the suggestion here is that tax dollars are what's

5  servicing the legacy debt.  The city has over 18,000,000,000

6  in accrued obligations.  We've shown that the number rose from

7  fifteen to eighteen.  They said over 6.4 billion in

8  obligations are backed by enterprise revenues, but that

9  doesn't count the legacy obligations, so again the implication

10 is that -- is that those obligations come to the city through

11 the general fund and that tax dollars are paying for it.

12     Now, one of the things that is missing throughout all of

13 this again, we say adversely affecting whether or not this is

14 a plan of adjustment, whether or not it's submitted in good

15 faith, is there was a hole that Mr. Buckfire confirmed during

16 his cross examination with respect to the absence of

17 appraisals, the absence of valuations, the absence of

18 historical cost information in the June 14 proposal, and that

19 it wasn't provided in the data room.

20     And so what does this mean?  Because you know the book

21 had a listing of assets that were non-core, I believe was the

22 answer, but no valuations were given.  So the Detroit Water

23 and Sewer Department, no values of potentially realizable

24 nature or otherwise are actually described in the June 14

25 proposal.

1    The Coleman A. Young airport, again no values associated

2  with that described.  The same with the Detroit Windsor

3  tunnel.  The same for Belle Isle park.  Same for the Detroit

4  Institute of Arts.  No numbers given with respect to what

5  might be -- might be the largest single asset owned by the

6  City of Detroit.

7    City owned land, again no values.  Parking operations, no

8  values.  The Joe Louis Arena, no values.  And, you know, I

9  don't know all the assets of the city, so I said have -- is

10  there anything they might have missed.  I don't know.

11    Well, no values.  Not even the Detroit Zoo, again, I

12  don't even know what it's worth.  I don't know if it's worth a

13  dime, or a lot.  But there was no effort by the city to be

14  exhaustive with respect to assets that might form a basis of

15  recovery.

16    Now you may recall that Mr. Bennett said he was going to

17  show that a trust owned the art.  There was no testimony that

18  came in reflecting a trust owning the art.  In fact Mr. Orr on

19  cross said in response to the following question, is correct,

20  the word it is missing, is correct that the City of Detroit

21  owns certain pieces of art that are maintained at the Detroit

22  Institute of Arts?  Mr. Orr's answer, yes.

23    Question, and this is art talking about the art that the

24  city owns itself, right?  Not art that is subject to any kind

25  of public trust?  Yes, was Mr. Orr's answer.  So again one of

1  the things that Mr. Bennett said he was going to show simply

2  disappeared.

3      Now art again might be a huge issue.  In response -- on

4  direct Mr. Buckfire says, that before his engagement in

5  January he had no knowledge despite his prior visits to the

6  City of Detroit about art.

7      He says well, back in January when we first began our

8  engagement, we discovered and we had not known this before,

9  that the City of Detroit actually does own the building and

10  the art collection of the Detroit Institute of Arts which is

11  operated on the city's behalf by the DIA corp which is the

12  founder society as a contractor to the city.

13      So two witnesses established that this is city owned art.

14  Efforts to appraise, value, get a handle on.  Mr. Orr says in

15  response to questioning he says, yes, he ultimately retained,

16  I'm not reading now, he retained Christie's in August.  So how

17  did he answer that question?

18      Question, and Christie's has been retained, correct?

19  Answer, Christie's has been retained, correct.  And they were

20  retained in August, is that right?  Answer, I believe -- well,

21  let's get the sequence.  I believe they were initially

22  requested to come out and I told them to go away.  We retained

23  them.

24      The Court, Mr. Orr, please just answer the question.

25  Were they retained in August?  I don't recall a specific date.

1   I think it was August.

2       So two things we think the Court should infer from this.

3   One, that August is in fact the date they were hired, and two,

4   Mr. Orr consciously told a potential appraiser of value to go

5   away.  Why would you do that?

6           THE COURT:  I have to interrupt you here and ask you

7   how much longer you'll be.

8           MR. MONTGOMERY:  I have a few more minutes, Your

9   Honor.

10          THE COURT:  A few, sure.

11          MR. MONTGOMERY:  But actually, Your Honor, just tell

12  me how much time you want me to take and I will take that

13  amount of time.

14          THE COURT:  Well, I want to be fair to Mr. Bennett's

15  rebuttal and --

16          MR. MONTGOMERY:  Okay.  So let me rocket through to

17  my last couple of slides.

18          THE COURT:  All right.

19          MR. MONTGOMERY:  All right.  The reason for asking

20  the question about why would you delay is because again the

21  advisors had said that is Jones, Day, and Exhibit 418, Page 31

22  in their speaking notes, make sure that the listeners learn

23  that asset monetization outside of a bankruptcy may implicate

24  eligibility requirement that the city be insolvent, e.g.

25  measured by short term cash.

1    How could that be?  Well, if you sell assets you have

2  cash.  You can pay your debts when they come due, you're not

3  insolvent.  I guess you don't want to sell valuable assets.

4    Again, with respect to the negotiating point.  It's

5  important, highlighted by others, that the word negotiations

6  applies only to the swap counter parties, it doesn't apply to

7  GRS, PFRS and debt insurers.  It doesn't apply to GRS, PFRS,

8  and unions.  And it doesn't apply to business people and

9  unions in general on those three dates July 10, July -- three

10  sets of meetings on July 10 and July 11.

11    Seen that before.  Again, the city has wanted to design

12  and restructure.  They sometimes use different words for cuts.

13  They twice in the discussions talk about restructure and

14  redesign of benefits to a level the city can afford.  Again,

15  what did that mean in the context of the June 14 proposal?

16  How do you deal with the underfunding?

17    Well, they said they had $803,000,000 available.  Total

18  estimated unsecured claims 11,000,000,000, so there's a

19  fraction there.  You would multiply that fraction times the

20  pensions and come up with an assessment.

21    Well, what's the math on that?  All right.  Eight hundred

22  and three million divided by 11,000,000,000 is 7.2% -- 7.02%.

23  Divide -- times it -- times the unsecured creditor side of

24  that world that relates to pensions and OPEB, you come up with

25  $645,000,000 total based on the -- the cash flows -- as rather

1 obligations.

2     What is the total for pensions against 7%, two hundred

3 and forty-three.  Two hundred and forty-three is obviously

4 less than three and a half billion.  Hard not to have an

5 impairment.

6     Okay.  I'm going to skip the further math.  I want to

7 just point out with respect to negotiations that with respect

8 to the bond holder question on the water and sewer side that

9 it was impractical to negotiate with them.  There were four

10 insurers of the sewage disposal system.  There were three

11 insurers of the water system.  Combined they had five insurers

12 total for 6.4 billion dollars of debt.  Doesn't sound like an

13 impossible group to have a conversation with.

14     The note we said was not fair.  We identified on cross

15 and we'd point out to Your Honor here that how could it be

16 fair that percent and a half, there's no support for it as a

17 market rate.  No obligation to pay any amounts other than

18 revenue participation payments, no obligation to go sell any

19 assets.

20     A division if as and -- if as and when there were

21 proceeds.  And here's the one that bothers me the most about

22 the proposal worse than the interest rate, worse than the

23 note.  This concept that the retirees should fight each other

24 for the cash which is what the Dutch auction means.  It's a

25 well tried and trued phenomenon where you have people bidding

1   in their debt in order to receive a pile of cash.

2       Well, a guy or the person who bids the lowest -- the

3   highest amount of debt for the lowest amount of cash, he gets

4   the cash without getting the retirees that are 80% of the

5   obligations to fight among themselves for cash proceeds.  How

6   is that fair and even handed as a starting point?

7       Talked about Mr. Dillon.  Now here's an important point.

8   And I suggested to you earlier that this was all about a

9   bankruptcy case from the beginning.  Mr. Orr, a very talented

10  and well educated man, was supposed to fit in the requirements

11  of 436, Section 9.  Shall have a minimum of five years

12  experience and demonstrable expertise in business, financial

13  from local or state budgetary matters.

14      This is his qualifications we say the evidence suggests

15  that he was litigation and a bankruptcy restructuring lawyer

16  practicing with Jones, Day.  He never worked for a

17  corporation.  He once oversaw the sale of a -- a country club.

18  Worked for the office of the U.S. Trustee.

19      With respect to financial matters, he's not a CPA, an

20  MBA, or an investment banker.  And we suggest to you that

21  other than being a bankruptcy and restructuring lawyer, no

22  particular expertise in finance.  And with respect to local or

23  state budgetary matters, never ran a city or had budgeting

24  responsibility for either state or city.

25      But he was a very good bankruptcy lawyer, Your Honor, and

1   he knew how to take the case into bankruptcy with a very

2   skilled and excellent team to go with him.  And he was from

3   the beginning committed to working with the Governor's office

4   in lock step, point to Exhibit 401.

5       On the 22nd, he acknowledged that he was being looked at,

6   he was being looked at, who knows what he thought, but he was

7   being looked at as an agent of the state.  They weren't going

8   o do things without his consent, Exhibit 619 suggests that.

9   And by the way they wanted to hide it because they were going

10  to we'll broker a meeting via note between you and the Mayor's

11  personal assistant who was not foiable, F-o-i-a, ble, foiable

12  meaning not subject to discovery.

13      Same man thought it was an indirect -- the -- the prior

14  initiative was an end around of an initiative that was

15  rejected by the voters in November.  That the new law was a

16  thin veneer.  This is all going to what this man's

17  understandings are.

18      During his deposition he recalled telling the Governor

19  and his staff in general that one of the purposes, I'm not

20  saying the only purpose, one of the purposes or intentions of

21  Chapter 9 filing would be to allow you to cut back pension

22  benefits.  We probably had that discussion.  I don't recall

23  anything specific, be probably did.  That appears.

24      And we know he said trump.  This is one of the places

25  where he used the word trump, his deposition testimony.  He

1  said, question, you said this -- in this report, referring to

2  the June 14 proposal that you don't believe there is an

3  obligation under our state constitution to pay pensions if the

4  city can't afford it.

5     That's not what he said on June 10.  Answer, the reason

6  we said it that way is to quantify the bankruptcy question.

7  We think federal supremacy trumps state law.  Answer, yes.

8  You don't deny making that statement?  No.  I think I've said

9  it several times.

10          THE COURT:  All right.  Let me ask you to wrap up,

11  please.

12          MR. MONTGOMERY:  Okay.  This is the same man, of

13  course, who said on June 10 that it couldn't be trumped.  We

14  -- we think that -- that was an accident, that last one.  The

15  -- we think that the conclusion that Your Honor -- we think

16  the logical inferences to be drawn by the Court are that the

17  players, in particular the emergency manager lacks the

18  requisite intent to be a good faith actor in this drama, and

19  that therefore you must find that the city is not eligible.

20  Thank you.

21          THE COURT:  Rebuttal.

22          MR. SCHNEIDER:  Your Honor, both the city and the

23  state have rebuttal.

24          MR. BENNETT:  About how much time are you

25  contemplating, Your Honor?

1        THE COURT:  As little as you think is necessary for

2    your rebuttal purposes.

3        MR. BENNETT:  Well, I'm going to look around and

4    make an estimate.  I think it's under an hour, but I'm sure

5    it's more than a half an hour.  And I will say that that last

6    presentation was rather spectacular and I ordinarily wouldn't

7    spend much time on it, but inasmuch as it accuses the

8    Governor, the Treasurer, and Mr. Baird, and Mr. Orr even more

9    explicitly of lying in this courtroom, I think I should go

10   through it with some care.

11       So I think what I would propose at this point, unless you

12   really want to do it tonight, it's a close call for you, I'll

13   come back.  But if you want me to go forward, I'll go forward.

14       THE COURT:  Mr. Schneider, how long are you going to

15   be?

16       MR. SCHNEIDER:  I would probably add 10 to 15

17   minutes on top of that.

18       THE COURT:  What do the attorneys on the objecting

19   side prefer on this issue?  Stay or come back on Tuesday?

20       MR. MONTGOMERY:  Your Honor, the objectors have all

21   suggested that notwithstanding the fact that I will miss the

22   last flight back out of the city, we'd rather finish.

23       THE COURT:  Okay.  That -- that's my preference as

24   well.  It's now 5:35, I want to give the two of you a hard

25   deadline arbitrarily of 6:30.

1              MR. BENNETT:  Okay.  I'll figure out the best way to

2    do this.

3         Your Honor, will forgive me if this is not quite as

4    organized as I was -- would ordinarily like to be.  Let's

5    start with the last presentation first.

6         I want to start with the premise.  I think the purpose

7    was it was said to prove that there was an intent to impair

8    pensions.  And if there was an intent -- excuse me, intent to

9    seek to impair pensions.  That's an important difference.

10         And if there was an intent to seek to impair pensions,

11    that that somehow was different than if a Chapter 9 case was

12    commenced and then it had to impair pensions.  I'm not sure

13    that makes any sense at all.  And I think the premise has to

14    be wrong.

15         In any event, I apologize that we are going back to the

16    constitutional argument, but it's necessary to do so.  As Your

17    Honor will remember, it is the city's position and it is

18    correct that the pensions clause is the same in all functional

19    respects to the contracts clause.  And so all contracts,

20    pension contracts and -- and other contracts are protected by

21    state constitutions and in fact by the federal constitution

22    from amendment and -- and from -- from impairment, excuse me,

23    by the state.

24         When an entity resorts to Chapter 9 following Justice

25    Cardozo's reasoning, following the ultimate holding in

1    <u>Deacons</u>, and following the practice in Chapter 9 cases for as

2    long as there have been Chapter 9 cases, the Bankruptcy Court

3    acts to impair contracts.  That's how it impairs bonds.

4         The ascending antecedent as I think Justice Cardozo put

5    it, or all of the prefatory steps are not relevant.  When

6    you're in trouble you can ask for help.  So if as we have

7    demonstrated, the numbers showed that the City of Detroit

8    could not pay its debts as they become due and going forward

9    could not pay its debts as it's become due on the pension and

10   OPEB side even if it didn't have any bond indebtedness it was

11   in a position where it needs help.

12        That the state authorizes Detroit to get help from the

13   Federal Government.  So that the Federal Government can assist

14   with the problem or address the knot in the words of Cardozo.

15   Whether they intend to do it, or don't intend to do it,

16   doesn't matter.

17        The relevant actor if in fact pensions are to be impaired

18   in this case, if in fact the underfunded amount is not to be

19   paid in full in this Chapter 9 case, and we've said both are

20   very likely results and were within the contemplation of the

21   people who put together the June 14th presentation and the

22   filing, it makes no difference at all.

23        Neither Mr. Orr, Governor Snyder, nor I, nor David

24   Heiman, my partner, are going to be impairing pensions.

25   Unfortunately if it's going to happen that's your job and the

1  reviewing Courts that are going to come later.

2     So the entire -- the entire --

3        THE COURT:  I have to stop you there.  What do I do

4  about the representation that Mr. Orr made at the June 10th

5  meeting to the retiree in response to his question that

6  pensions are sacrosanct and not to be touched.  And his

7  further representation that there was a 50/50 chance of filing

8  bankruptcy?

9        MR. BENNETT:  Okay.

10        THE COURT:  Were those statements misleading?

11        MR. BENNETT:  Can you please put up the actual

12  statement that Mr. Orr made that was utilized in the

13  presentation just now?  Your Honor, that statement -- no, I

14  want the quote, not the clip.

15     Your Honor, that statement may well have been

16  inappropriately timed.  I don't have the words around it, it

17  would be one of the things I would do before Tuesday --

18  Tuesday morning.

19     Technically inelegant but also true.  He says the state

20  constitution and state law, case law says that vested pension

21  rights are sacrosanct, they can't be touched.  That is what

22  the state constitution and state case law says in a very

23  non-technical and actually slightly imprecise sense.

24     He doesn't talk about the Constitution.  Now, would I --

25  so would I have liked him to say --

1          THE COURT:  Well, but the -- but the retiree wanted

2  to know what was going to happen to his pension benefits,

3  right?

4          MR. BENNETT:  Your Honor, I -- I am absolutely --

5  Mr. Orr, during the many many past months has probably been

6  one of the most carefully monitored actors in this entire

7  case.  I am sure there are quotes of endless, endless, endless

8  things that he has said.

9      This may not be the moment where he used the best words.

10  I don't remember enough of the context on both ends.  I know

11  that if there was a -- if Your Honor believes that this

12  statement without more was misleading, it was corrected three

13  days later by their own exhibits.  And it was certainly

14  corrected four -- four days later when the proposal for

15  creditors dated on the 14th, the moment the meeting was over

16  was put on the worldwide web.  So I -- I --

17          THE COURT:  I'm sorry, what happened the moment the

18  meeting was closed?

19          MR. BENNETT:  The entire proposal was put on the

20  web.

21          THE COURT:  Not after this meeting, after the next

22  meeting.

23          MR. BENNETT:  After -- on the 14th.

24          THE COURT:  But not on the 10th.

25          MR. BENNETT:  Not on the 10th.  So there is a --

1  there is a, at maximum, a three or four day period where there

2  was misinformation or frankly a accurate but potentially not

3  complete statement was in the -- was in the record.

4      And that meeting had 200 people in it.  So it's bad but

5  there are 685,000 residents of the City of Detroit.  There are

6  23,000 retirees.  Mistakes happen, I can't do anything about

7  this one.  I don't --

8          THE COURT:  What about the comment that there was a

9  50/50 chance of filing bankruptcy?

10          MR. BENNETT:  I think that -- I don't know if Mr.

11  Orr was questioned about that comment.  I think that was a

12  very optimistic view of the situation, but he is absolutely

13  entitled to be optimistic.

14          THE COURT:  Well, but doesn't it raise a question

15  about whether that's what he really thought?

16          MR. BENNETT:  Does what raise a question as to

17  whether that's what he really --

18          THE COURT:  That statement.

19          MR. BENNETT:  He was -- he was hoping that the

20  negotiations would succeed.

21          THE COURT:  Well, but the question is that on June

22  10th, did he really believe there was a 50% chance that they

23  would succeed?

24          MR. BENNETT:  Your Honor, I'm the wrong person to

25  ask that question.  You would have to ask him.  This was --

1          THE COURT:  You're his lawyer.

2          MR. BENNETT:  At this point in time, it is -- it is

3   before --

4          THE COURT:  You're his lawyer.

5          MR. BENNETT:  Yeah, but this is -- but this is a

6   judgment everybody gets to make based upon really what they

7   think about the people that they know and don't know.  And

8   this is before the presentation is made and before there's

9   been any feedback by anybody.

10      So I -- I -- and certainly it's inappropriate for me to

11  add to the record as to whether or not the 50/50 statement was

12  anything but his belief --

13         THE COURT:  No, I understand that.  And perhaps my

14  question is a little imprecise and inelegant.  But the -- what

15  I'm really asking is, what evidence is there in the record

16  that that is what he genuinely believed as opposed to

17  knowingly misled --

18         MR. BENNETT:  I -- I'm not aware that there's --

19         THE COURT:  -- a crowd.

20         MR. BENNETT:  I'm not aware that there's any

21  evidence either way about that.

22         THE COURT:  All right.

23         MR. BENNETT:  But given that the assertion is that

24  that was bad faith, I would think that's not our problem,

25  that's the objectors' problem, that there's no evidence in the

1  record on that point.

2      THE COURT:  Well, all right.  Let me just ask the --

3  the next question.  Which is, assuming that both of those

4  questions were misleading, what impact does that have, or

5  should that have on the Court's analysis of good faith here?

6  Because that's ultimately the point, the -- the element.

7      MR. BENNETT:  Your Honor, it should have no impact

8  at all.  The -- you have seen a mountain of evidence of a

9  careful deliberative process to pull together the very best

10  reorganization proposal for the City of Detroit that anyone

11  could put together.  You saw it, it was presented to a wide

12  variety of -- of representatives of retirees.  By the way,

13  acting in capacities with respect to the OPEB's and acting in

14  capacities with respect to the pensions.

15      And you have found that notwithstanding after there was

16  no confusion about what the plan was all about and

17  notwithstanding prior statements, you will have found that

18  everybody responded either, I cannot represent retirees, or I

19  cannot represent retirees, and I would never represent them to

20  impair pension benefits because they are -- they are not to be

21  impaired.

22      So, against that factual background, was there anything

23  that the city did in negotiations that means it did not

24  negotiate in good faith.  Is there anything about a statement

25  four days before any discussions ever started that reflects on

1  to the subsequent negotiations?

2      How could it?  Because any conceivable misunderstanding

3  was completely and totally vitiated either three days later or

4  four days later, depending upon which set of statements you

5  want to pick.  And in all events, everything else happened

6  afterwards.

7      I just can't get there from here.  I think that the --

8  that -- that number one, mistakes happen.  They happened all

9  over the place.  And more will.

10      But in this instance nothing that happened before the

11  negotiations even started can inform whether or not the city

12  conducted negotiations in good faith.  And nothing about those

13  statements affected the course of the negotiations.  And

14  there's no evidence at all that suggested that they did.  It

15  was a good effort to try to -- to try to impeach or impair Mr.

16  Orr, but it was not -- did not address anything about the

17  negotiations that followed.

18      I think the other points with respect to the presentation

19  you just saw is that there is massive amounts of testimony in

20  the record that go directly contrary to all of the -- to all

21  of the inferences you were asked to accept.  This is going to

22  be an incomplete list.

23      But as to the timing of the filing and the motivations

24  from the filing from a financial perspective you have the

25  testimony of Malhotra, the testimony of Buckfire.  It is also

1  supported to some extent by testimony of Dillon and testimony

2  of Orr.

3      With respect to the absence of -- of a scheme to march

4  toward a Chapter 9 filing with specific intent to impair

5  pensions from 2012, you have the testimony of the Governor,

6  the testimony of Dillon, the testimony of Baird, the testimony

7  of Orr, the testimony of Buckfire.  And in addition, probably

8  the most compelling piece of -- piece of evidence because it

9  exists from way back when, and no one can change it, is the

10 entry into the consent agreement itself.

11     As was pointed out by Mr. Dillon in -- in his testimony,

12 but also appears from the face of the consent agreement if you

13 read it, under the consent agreement, there is no conceivable

14 way that the city could file a Chapter 9 case.  The consent

15 agreement is -- and it represents directions or agreed

16 directions toward an alternative path.

17     As the testimony revealed there were a long list of

18 things the city had to accomplish which the authors of the

19 consent agreement thought would solve the city's financial

20 problems.  Unfortunately nearly none and maybe none of those

21 things were actually accomplished.

22     But when the state entered into that agreement they were

23 clearly hoping that it were -- was.  And if anything the entry

24 of a consent agreement was a huge delay of addressing a

25 potential Chapter 9, and was viewed -- I know the testimony

1  said it was viewed as a reason for avoiding a Chapter 9.

2      Swap negotiations since 2002.  I think there's testimony

3  in the record that the --

4          THE COURT:  2012?

5          MR. BENNETT:  I'm sorry, 2012.  That there was a

6  downgrade that triggered the early negotiations with the swap

7  counter parties at the beginning of 2012.  Because the -- the

8  restructuring in twenty -- in 2009 included a default under

9  the swaps in the event that there was a downgrade in the

10  city's credit rating.

11      That downgrade happened in -- in 2012.  I do not remember

12  the month.  I don't know if it's in the record.  So the

13  reference in the -- in the -- to negotiations since 2012, had

14  nothing to do with an anticipated filing and nothing to do

15  with the additional COPs payment default that was resulting in

16  another covenant default.  It is not an advanced negotiation

17  with respect to a potential Chapter 9 case.

18      As was testified by Mr. Buckfire, actually both on cross

19  and on redirect, insurers do not control consent of the debt

20  instruments and if you look a little more closely at the

21  charts, not all debt issues are insured.  The insurers are

22  sitting exactly in the same place as I will get to in the case

23  of the -- some of the other presentations, they're in exactly

24  the same place as the retiree associations.  They're in a

25  position to communicate.  They may be in a condition to make a

1   recommendation.  They don't vote.  They can't deliver votes.

2   They can't do anything about non-consenting voters.

3       Eligibility in asset sales.  I actually thought that the

4   record fleshed out quite clearly where that whole thing came

5   about.  It was a question by Miller, Buckfire I think to all

6   of the people presenting to address whether assets sales have

7   anything to do with eligibility.

8       I think Mr. Malhotra gave the best testimony on this.  I

9   will tell you, Your Honor, what I -- my response would have

10  been which is only in a courtroom with a Judge who doesn't

11  understand economics.  And so I wouldn't be worried about it

12  for a minute.

13      But we know that the question was a question that wanted

14  to be addressed.  The -- the showing of speaker notes without

15  a witness ever having said that the speaker said the things

16  that were in the speaker notes, I think goes beyond the

17  record.  The speaker notes were not passed out.  The

18  presentation was passed out.  There was no reference to this

19  issue at all.

20      I am told by my colleague Mr. Schneider that the Detroit

21  Zoo isn't in Detroit.  The other point with respect to that

22  because it was kind of funny at the time, there was some

23  discussion -- I think in a newspaper or something someone

24  talked about the Detroit Zoo.  I remember someone making a

25  joke that -- that whoever thought Detroit -- the Detroit Zoo

1 was an asset didn't recognize that animals eat.  And

2 accordingly it was a liability, not an asset which I suspect

3 is -- so if that's the asset that we -- that -- that we missed

4 on the list of assets, even if it is in Detroit, I'm pretty

5 sure it belongs on the liability side and not in the asset

6 side.

7      You know, whether it's a plan or not a plan, I think

8 there's been lots of comments that I think each and every one

9 was taken out of context about whether the plan was not a

10 plan.  Again, if I had the time, I'd go find the context for

11 all those comments.  I think -- I think frankly Your Honor is

12 perfectly well suited to figure out whether -- and by the way

13 the cases require an outline of a plan of adjustment that can

14 be confirmed.

15      They're actually pretty clear by that like -- in that

16 way.  They don't require a fully fleshed out plan of

17 adjustment.  That argument has been made before and rejected

18 before by every single Court that considered the question.

19      Your Honor, has seen enough plans.  Your Honor has seen

20 enough plans and the summaries and disclosure statements.

21 Your Honor will be able to tell whether or not the proposal

22 that was made on June 14th is a sufficiently detailed outline

23 of a plan of -- of adjustment that is appropriate under

24 Chapter 9 and frankly I think that's an issue for you, not for

25 anybody else.

1    I'm going to move to some of the comments that were made

2  by Mr. Ciantra.  And first of all, the -- there was a -- there

3  was a criticism that he made about the fact that in the

4  pre-filing negotiation environment a non-disclosure agreement

5  was required as condition to access for the data room.

6    Whether or not it was appropriate to continue to require

7  that after the filing of the Chapter 9 case as the proposal to

8  creditors appendix reveals, there were -- I want to do the

9  math, including water and sewer because I think it would be

10  appropriate to include it for these purposes, a little less

11  than $10,000,000,000 of publicly traded debt securities out

12  there in the universe.

13    If you're going to -- to make a data room available to

14  anyone without publishing the whole thing on the internet, I

15  think it's appropriate to have confidentiality agreements in

16  place.  Yes, it turns out some of the bonds are held by widows

17  and orphans too.

18    The social reality as a method of classification and

19  treatment.  That was fascinating.  You know, we're going to

20  have to read the bankruptcy -- bankruptcy law very carefully

21  for purposes of determining who is entitled to what as

22  distribution in this case.

23    And it's going to turn out that there are going to be

24  lots of arguments that -- that debts other than pension claims

25  are also entitled to priority that the June 14th proposal does

1  not accord them.

2      While we were here today, I read an email report that a

3  declaratory judgment action has been filed on behalf of the

4  UTGO, the unsecured UTGO's that we classified as unsecured,

5  claiming since they almost have a security interest they

6  should be regarded as secured and their distributions should

7  come off the top.  That will -- if that lawsuit succeeds, the

8  $830,000,000 number that was misused in the distribution

9  example, I'll come back to that in a second, will be reduced

10 by a number that's roughly $500,000,000.

11     And so there are going to be collisions everywhere over

12 this.  I have not yet seen a basis for distinguishing

13 classification claims based on social reality.  I mention that

14 as a reason why the city perhaps does not want to be in the

15 business of unilaterally dealing with the consequences of a

16 reduction of the -- excuse me, of the change in unfunded

17 amount based upon the distribution contemplated under the

18 plan.  If I missed it in the Bankruptcy Code, someone should

19 give me the reference.

20     Dillon's remarks concerning that he was still in the

21 information gathering stage, on several occasions in Mr.

22 Dillon's testimony he recognized that that was a description

23 as to him.  He fully understood others closer to the situation

24 knew more.

25     The issue -- and -- and -- and -- and all of the

1  discussions from the -- from the United Auto Workers were very

2  interesting.  Because Exhibit 32 includes the United Auto

3  Workers letter which states, and just let me grab it a second.

4  I have -- I have it here.

5      The union does, however, represent current retirees and

6  has no authority to negotiate on their behalf.  Not bind, not

7  -- just we have no authority to negotiate on behalf.

8      So it's first of all, extraordinarily interesting that a

9  person who writes that letter with no qualification, it's part

10  of Exhibit 32, how they can complain about anything that

11  happened in negotiations.  One of the things they complain

12  about many other people do, is the -- is the fact that the

13  so-called concessionary bargain back at the beginning of -- of

14  2012 was not put into effect.

15      For some reason the unions believe that that entire

16  episode represents a great success.  I think we know in

17  retrospect that that entire episode was a great failure.  Huge

18  amounts of time and effort was devoted in an attempt to have a

19  concessionary bargain with a wide variety of unions and at the

20  end of the day the economic results were a drop in the bucket,

21  certainly by comparison to the extent of Detroit's problems

22  however you choose to measure them.

23      That is not a success.  That the -- that the Governor's

24  office had not analyzed it and that others analyzed it and

25  said look, I -- it may have been the best you can do, this

1 just doesn't work for the City of Detroit.  It is not a bad

2 thing, it is probably a good thing.

3     The other assertion that was made that I have to spend

4 just a little bit of time on, is the class action device.  The

5 class action device has been proposed as the perfect way to

6 resolve the problem with retirees.

7     Now by the way, again this is asserted as -- as a counter

8 to the argument on the issue of -- of impracticality and --

9 and Your Honor, actually missed additional points, the ones

10 that I said this morning were probably enough relating to your

11 question of you know, what are the consequences if it turns

12 out that the -- that the pension funds or the two people you

13 have to deal with in the pension context.

14     Well, first of all, no one stood up and said you were

15 right.  Everyone still talked about themselves as being

16 relevant actors.  And that's because that's consistent with

17 the pre-filing atmosphere.

18     But the second part is, is the retirees still become

19 relevant with respect to OPEB's and with respect to OPEB's

20 there is no intervening structure.  And as we've revealed many

21 times before, and it's not our favorite fact, those are

22 essentially completely unfunded.

23     So -- so when they talk about a class action approval

24 also they're only talking about the -- the OPEB side of the

25 question, I think, because these same people have also refused

1  to ever be part of an out of Court deal that -- that impairs

2  pension claims.  But maybe it applies to both.

3      The fact of the matter is, if you page through the cases

4  and we can give -- send you a list of citations if you want

5  them.  If you don't, it's okay.

6      It turns out that these things take a year to 22 months

7  for the examples that we were able to find when we looked in

8  the cases and we were able to use the dates in the cases to

9  figure out how long it is -- it takes to get a class action

10  settlement approved in these contexts where it's a mandatory

11  non-opt out class.

12      I was given a list of the things that have to happen in

13  order to get from here to there, or from an agreement to

14  there.  First of all, the union, in this case I guess, more

15  unions and the city negotiate to reach a tentative agreement.

16  We have no idea how long that would happen, no one has ever

17  put on any evidence to say that we were two or three weeks

18  away back then in -- in July.

19      I think the evidence seems to suggest we were at best

20  months away.  And I say at best because I don't think we were

21  anywhere.

22      Second, you need an independent counsel for the retirees

23  because the people who actually negotiate the deal, their view

24  isn't enough.  The retirees' independent counsel has to

25  investigate the settlement.

1          THE COURT:  I think I have to cut you off here

2     because there was really no evidence on either side of any of

3     this.

4          MR. BENNETT:  This is actually law.  This is just

5     what the -- the -- the legal requirements in order to get a

6     settlement done.  I don't -- I think that Your Honor, if I had

7     -- if I had -- if I was going to brief it, I'd just take it

8     right out of cases.  I would not call a fact witness for any

9     of this.  But if you want me to stop, I'll stop.  This is --

10    this is not -- these are not -- this is just right out of

11    cases.

12         THE COURT:  All right.  I will accept it from you on

13    that premise.

14         MR. BENNETT:  Okay.

15         THE COURT:  But with the understanding that we have

16    no evidence on the specifics of what's required or how long it

17    would take.

18         MR. BENNETT:  Okay.

19         THE COURT:  Any of these steps.

20         MR. BENNETT:  I'm happy to just -- just not go

21    further and -- and submit a list of cases with no commentary

22    if that would make you more comfortable.

23         THE COURT:  I don't want any post-hearing briefing.

24    Because that will add a month to our process here.

25         MR. BENNETT:  Then let me just -- let me just run

1 down -- let me just run the list of the procedures that have

2 to be followed. These are just procedures that have to be

3 followed.

4     At -- at that point you can bing a non-opt out class

5 action lawsuit against the city in order to get this created.

6 This -- the -- that's the next thing you file in Court after

7 you've got independent counsel and you're at that stage.

8     Then you have a class certification proceeding. Then you

9 have preliminary approval of the agreement. Then you have a

10 notice process.

11     MR. CIANTRA: Your Honor, I'm going to object at

12 this point. You know, this is -- really should have been a

13 rebuttal case. If they wanted to put on someone that had --

14 had knowledge as to how these proceed -- proceeds, this should

15 have been done on rebuttal.

16     THE COURT: Well, I'm not sure I can sustain that

17 because none of this was put in evidence as part of the

18 objectors' case.

19     MR. CIANTRA: Mr. Nicholson testified that he

20 offered this opportunity, this structure, to Mr. Bennett's

21 partner, Mr. Miller. That it was discussed. It was a -- a

22 way that he testified they had settled these issues in the

23 past. If they wanted to make an argument that this was

24 impractical, they should have called rebuttal testimony.

25     THE COURT: Well, that's good as far as it goes.

1 | except that Mr. Nicholson did not testify as to what the

2 | various steps were and how they would work in this context.

3 |         MR. CIANTRA:  They could have asked him.

4 |         THE COURT:  Well, but so could you.  It was -- it

5 | was part of your defense to this case.

6 |         MR. CIANTRA:  Well, I -- I made a -- we -- we

7 | presented evidence that this proposal was presented to the

8 | city, but they did not respond to it.  They did not take us up

9 | on that.

10 |         THE COURT:  I'll permit this with the understanding

11 | that we're just talking about how this would work legally.

12 |         MR. BENNETT:  Okay.  I think all the following by

13 | the way is in the Federal Rule of Civil Procedure that governs

14 | class actions.  But one of my partners will give us the rule

15 | citation and -- and I will demonstrate that I'm not testifying

16 | from the lectern.

17 |         THE COURT:  You mean Rule 23?

18 |         MR. BENNETT:  No.  Your Honor, I think that what I

19 | will do is just say, peruse Rule 23 and then we'll move on.

20 | All of -- all of these things are in there.  All the rest of

21 | them are.  The others are from the cases.

22 |     Okay.  I'm now going to turn to the -- to Mr. Gordon's

23 | argument.  I think that -- that may make the most sense.

24 |     Okay.  First of all, again the -- the -- I think we

25 | indicated that both funds -- we -- we demonstrated that those

1  funds from their interrogatory responses said that they could

2  not negotiate impairment and would not negotiate impairment.

3      I think that Mr. Gordon misstated the position that I

4  think I very -- very clearly stated this morning.  We fully

5  understand that there are many people who may object to the

6  3.5 billion dollar number.  My point was, was there was no

7  evidence in the record suggesting any other number this

8  morning -- excuse me, during the trial.  And that remains

9  true.

10      So for purposes of this hearing, the only number in

11  evidence is the 3.5 billion dollar number split in the two

12  ways as -- split in two as described in the June 14th

13  presentation.  And that's the number we're working with.

14      We -- we also indicated it is in the record that the

15  retirees committee have a different and lower number as of the

16  end of the school year of 2012.

17          MR. MONTGOMERY:  Objection, Your Honor.  I'm sorry,

18  you are definitely -- we never offered a different number in

19  any evidence or any written submission to this Court.  This

20  goes right to the thing you told me not to ask Mr. Buckfire

21  about.

22          MR. BENNETT:  It was in the slides that he

23  projected.

24          THE COURT:  All right.  The record will reflect what

25  it does.  Let's move on.

1          MR. BENNETT:  Okay.  And again the point with

2    respect to the -- to -- to the exhibit, Exhibit 43.  Was that

3    if -- if there was anybody in the objectors' group who thought

4    that the premises of the proposal were false, misleading, or

5    wrong, the -- the -- the -- we expected evidence suggesting

6    the same.  That of course didn't happen.

7          And finally, I don't remember if was on -- on this point,

8    I don't remember whether it was Mr. Gordon, but Your Honor

9    engaged one of the objectors on the whole subject of well, if

10   you didn't think that the city's premises that were behind its

11   plan were correct, why didn't you propose a plan, or I think

12   you actually said what inference am I to draw from the fact

13   that you didn't produce an alternative scenario.

14         And the answer, it's not a matter of inference, it's

15   decisive.  The fact that they didn't means there isn't another

16   alternative that Your Honor can lawfully consider.

17         By the way, it should not be surprising that a way to --

18   to object to eligibility when you think that the city's plan

19   isn't a good plan, or isn't an accurate plan, is to actually

20   generate a different one.  In the early ages of -- the early

21   stages of the Stockton proceedings, one of the objectors

22   actually did object to the Stockton business plan, or -- or

23   projections and they generated their own.

24         Valeo was all about alternative projections based upon,

25   you know, correcting erroneous business decisions, or

1  erroneous municipal decisions made two years in the past.  So

2  if you go read the cases and -- and watch how other people

3  have successfully or unsuccessfully objected to eligibility,

4  if the reason you're objecting is because the premises were

5  wrong, you should bring different premises to the Court and

6  prove them.

7        As to Mr. Robbins, we were very careful.  Mr. Robbins

8  certainly did say he didn't have enough information.  But when

9  he was pressed on the point, he said only -- he identified

10  only one specific area where he didn't have adequate

11  information and that was asset sales.

12        All of the rest of the testimony was about generalized

13  complaints of lack of information.  And frankly that testimony

14  was significantly blunted by Mr. Robbins' own admissions that

15  as if and when they asked for more data, Miller, Buckfire was

16  pretty receptive in getting it to them and that a lot of the

17  additional things that were requested were things that -- that

18  came about because as you read information, additional

19  questions are raised and there's nothing about that that is

20  unusual.

21        You know, the -- the -- the -- also the assertion by the

22  retiree committee that we didn't negotiate with them with

23  enough.  Mr. Robbins was their agent.  He --

24              MR. MONTGOMERY:  Excuse me, Mr. Bennett.  I think

25  you meant retirement system, not retiree committee.

1        MR. BENNETT:  I'm sorry, I apologize.  The

2   retirement systems.  Mr. Robbins was their agent, okay.  He

3   knows what the -- what the projections mean.  He testified

4   that we -- that the city was pretty clearly starting to --

5   trying to start negotiations.

6        And his response was, I need eight days to figure out

7   what my authority is to negotiate what we're going to be

8   talking about.  What I called the shape of the table.  So at

9   this point in time given that we -- we have not only with

10  respect to the -- the two retirement funds, we have actual

11  evidence that number one, they weren't confused about whether

12  negotiations were sought.  Number two, talks about certain

13  things actually started.  Number three, at the end what had

14  happened was there was a discussion about what we're going to

15  talk about next and the actor says, I need eight days to find

16  out what my client is going to authorize me to do and in that

17  period there was a lawsuit.

18       So of all of the places to be standing up here and

19  saying, there were no negotiations, the city discovers

20  negotiations.  The last that should be heard from is the

21  retiree -- is the retiree funds -- excuse me, the retirement

22  funds.

23       They had perhaps one of the most qualified advisors who

24  admitted that he understood exactly what's going on.  We

25  understand exactly what he did.  And then we come to the

1   question which I foreshadowed this morning should be answered

2   with evidence and isn't.  Which is exactly what is it that a

3   good faith city has to do more than what it did in response to

4   the fact pattern it was presented with with the retirement

5   funds.

6        This is in the negotiations.  This isn't before the

7   negotiations.  This is at a time where everybody knows the

8   city's looking for feedback over a four week period and then

9   figuring out what it's going to do during a time the

10  undisputed evidence demonstrates the city was under financial

11  distress.

12       It was the retiree funds that said -- that you asked what

13  inference should be drawn.  Okay.  Given -- given the -- the

14  -- given that Mr. Robbins of all people was about the most

15  qualified actor from the financial side on -- on the retiree

16  side of the equation, that -- and that he's not only had the

17  negotiation period, but till now to decide whether or not

18  there was anything wrong with the -- with the June 14th

19  presentation and that the financial data should be looked at

20  differently.  The fact that nothing was presented by him or

21  anybody else is decisive, not just the basis of an inference.

22       A couple more things.  It was more than four hours, Your

23  Honor.  I -- I -- I have to spend some time because you're

24  going to take them away with you, with -- with what is going

25  to be new Exhibit 873.  And that is the -- the slides that

1 were shown on -- that were -- that were shown by -- by Ms.

2 Green.  And if they're still available -- are those slides

3 still available?  The slides that -- that you -- that Ms.

4 Green put up?

5             THE COURT:  You mean -- you mean to be projected?

6             MR. BENNETT:  Yeah, to be projected.

7             THE COURT:  Are they available to be projected?

8             MS. GREEN:  Yes.

9             THE COURT:  Apparently so.

10             MR. BENNETT:  Well, I'm just going to skip to a --

11 to -- to -- to a -- to a few.  I'm going to skip the

12 evidentiary issue because that's been dealt with.  Okay.  I

13 would like to go to 13.

14             THE COURT:  Slide number 13?

15             MR. BENNETT:  Slide -- page number -- it has -- they

16 have page numbers at the bottom.

17             THE COURT:  Page number 13?

18             MR. BENNETT:  Slide number 13, at page number 13.

19 Why don't I start and I hope he catches up with me.

20      The slide number 13 is the -- is the testimony of Howard

21 Ryan which Your Honor asked about and -- and putting the

22 objections aside for the second -- for a second, this

23 testimony is completely irrelevant.

24      Because in the -- in the unlikely event that we actually

25 are -- are interested notwithstanding the Michigan cases, and

1  the intent of the legislature in adding the appropriation

2  provisions, the -- the -- the way you find out is asking the

3  legislators who voted for it.  And so it's a huge evidentiary

4  problem but frankly it's the objectors' evidentiary problem.

5      And I can't imagine that you could make the decision as

6  to what the intent of the legislature was in adding the

7  appropriation provisions until you elicited testimony from at

8  least a majority of the majority of each house that voted for

9  it.

10     There may be an argument, you've got to talk to all of

11  them.  But the bottom line is, is that the -- that someone

12  from outside the process, an advisor, I have no idea how he

13  knows, but it seems to me that it's the worst kind of hearsay

14  or speculation as to what -- why the legislature passed a law

15  with -- with certain provisions as opposed to didn't -- passed

16  it with others.

17          THE COURT:  Well, but how do I deal with the fact

18  that this witness, Mr. Ryan --

19          MR. BENNETT:   Yes.

20          THE COURT:  -- was the state's 30(b)(6) witness?  He

21  was the representative of the state to answer these questions.

22          MR. BENNETT:  Your Honor, I think he's --

23          THE COURT:  I mean he could have said, I don't know,

24  but he didn't.

25          MR. BENNETT:  Well, he's at best the executive's

1    30(b)(6) witness.  I don't think and I -- and I think this is

2    something that Mr. Snyder should deal with.  I don't think --

3            THE COURT:  Oh, all right, that's fine.

4            MR. BENNETT:  And -- and the executive of course

5    testified himself as to what -- that's -- that's the Governor.

6    But the law doesn't become law until the legislature passes it

7    both houses and the Governor signs it.  So there's a lot of

8    empty boxes in terms of intent that we have no idea what their

9    intent was.  And you're being asked to presume that the intent

10   was to do something unconstitutional which we pointed out it

11   isn't even really a constitutional question.

12       As to -- as opposed to do something absolutely legitimate

13   which is to allocate funds to the municipalities who are

14   subjected to it at the jurisdiction of an emergency manager

15   don't have to pay for it by themselves.

16       The next slide I'd like you go to is 15.  That's 16.

17   That's still 16.  The one that's -- that one.

18       This was the slide that -- that -- that Ms. Green said

19   demonstrated that it was part of the drive, the -- the -- the

20   preordained drive to Chapter 9.  But she forgot to read the --

21   the -- the first three line highlighted block.

22       Questions that Miller, Buckfire has drafted for review.

23   First one, given the issues that Detroit faces, how can they

24   address them outside of Chapter 9?  I don't think I have to

25   say more.

1          Slide 22, please.  Moved a little quicker when Ms. Green

2     was asking.  May 12, the May 12, we are not like negotiating

3     the terms of the plan.  Once again, it was not anchored to the

4     place where the testimony has anchored it which is this is not

5     referring to the June 14th plan.  The testimony is perfectly

6     clear and actually the statement in context was perfectly

7     clear.  It was -- it was relating to the 45 day report under

8     the law.

9          Next page, Page 23, please.  I'm not sure I'm pronouncing

10    his name right, David Meador.  The record actually doesn't say

11    and the email certainly doesn't say where David Meador came up

12    with the idea that there might be a filing coming in July.

13         As I indicated to -- to -- to Your Honor before, there

14    was rampant speculation everywhere where this was headed.

15              THE COURT:  This is 23, were you looking for 22?

16              MR. BENNETT:  This is 23, this is the one I'm -- I'm

17    sorry, this is 21.

18              THE COURT:  Twenty-three, okay.

19              MR. BENNETT:  I'm sorry.  This is the -- the email.

20    I'm sorry, this is the right one.

21              THE COURT:  Okay.

22              MR. BENNETT:  Okay.  So there is -- the evidence

23    does not actually say that -- that Mr. Meador got this from

24    Mr. Buckfire.  We actually don't know where he got it.

25         Next slide, number 26.  Your Honor raised this issue.  My

1  only point here is that whatever -- whatever

2  misrepresentations or inadequate disclosures Mr. Orr gave on

3  June 10th, it was corrected three or four days later.

4      Moving on to 29, please.  This is about the last point

5  the city could have been negotiating since 2012 when it knew

6  there was a financial crisis.  Your Honor, this is the Valeo

7  decision, or another version of the Valeo decision.

8      If Your Honor will recall, the objecting parties in Valeo

9  said that -- that if Valeo had done things differently two

10  years before their budgeting process they really wouldn't be

11  in trouble.  And the Valeo Judge ultimately decides what I

12  think Your Honor knows, which is there not a bankruptcy case

13  in the world that doesn't start with some mistakes at some

14  period of time.

15      And they decide that no, you do not disqualify yourself

16  for Chapter 9 relief forever if you make a -- if you budget

17  too much or spend too much in a particular year.  I think

18  frankly Judge Klein in Stockton is even stronger on this

19  point.

20      The idea that in 2012 the -- the state should have

21  commenced negotiations that had to be fashioned on a Chapter 9

22  plan because that's the law according to your objectors,

23  instead signed the consent agreement which gave the city the

24  ability to work out its problems away from a courthouse cannot

25  possibly be a basis for the city losing its ability to file

1  Chapter 9 when the consent agreement process failed.  We've

2  got at least two cases that say that, there are probably more.

3      Page 30.  I don't know how to -- how to reconcile items

4  1, and 2, and 3.  One and 2 of this chart with the idea that

5  Your Honor's been presented that the right thing by the

6  objectors that the right thing for the city to do was talk to

7  the unions and talk to the retiree groups.

8      They -- the -- the -- I'm sorry, the introductory

9  language.  The initial rounds of stakeholders negotiations are

10  set to start.  Somehow the pensioners were supposed to know

11  the city was expecting them to negotiate over the pensions

12  even though, and then number two, the vast majority of

13  retirees were not aware of the proposal as the city admitted

14  it did not mail each of them a copy.

15      Well, they've got to decide which way it is.  If the

16  reality is that the retirees themselves were the actual

17  players who had to be involved and had to be informed, then

18  they've admitted impracticability.  And if it's not the

19  retirees who have to be involved and someone else, they have

20  to own up to their letters that said it's not us.  We don't

21  have authority, we're not going to negotiate.

22      And this constant straddling between the two is another

23  demonstration that we are dealing with an impracticability

24  situation.  In any event as I said earlier, the proposal went

25  on a web site accessible to everyone the moment the meeting

1  was over.

2         THE COURT:  Mr. Schneider is concerned that you're

3  eating now into his time.

4         MR. SCHNEIDER:  I probably am.

5         MR. BENNETT:  Would you give me five minutes?

6         THE COURT:  He wants five minutes.

7         MR. BENNETT:  Your Honor, I ask that you be

8  exceptionally careful in reading the -- these slides.  Because

9  they themselves reveal more information if they're read

10  carefully and they -- and if you look at the record in many

11  cases, inferences drawn from them are misleading in light of

12  the overall record.  If Your Honor has any questions, I'll be

13  happy to deal with, otherwise I'm not done, but I guess I've

14  got to be.

15        THE COURT:  All right.  Thank you.

16        MR. SCHNEIDER:  Your Honor, most revealing about

17  what the objectors have said in their closing arguments, in

18  order to rebut their arguments I think is what they didn't

19  say.  Because the objectors argued in their closing that the

20  pensions have been impaired.

21     So tell us which witness actually testified in this case

22  that his or her pension was actually impaired.  None, because

23  that witness does not exist.  Impairment means actual

24  impairment and not a single pension has been impaired.

25     The objectors also didn't cite a single case or testimony

1  saying that the good faith of the Governor, or the Treasurer,

2  or any state actor is even relevant.  Good faith is about the

3  good faith of the debtor.  And even if it is about the

4  Governor, there's plenty of evidence in the record to support

5  his good faith.

6      The objectors also didn't explain what Mr. Dillon really

7  said.  Can we have 626 up on -- on the projector?  In

8  Paragraph 10 of 626, this is -- go to the next page.  Bring up

9  Paragraph 10.

10     First of all, this isn't a communication from Dillon to

11 Orr, okay.  It's -- it's Mr. Dillon's suggestions basically

12 through his legal counsel.  He says, looks premeditated.  That

13 doesn't mean that it is.  Looks premeditated.  In fact the

14 evidence in this case shows that the opposite is true, it's

15 not premeditated.  So don't make it look that way.

16     But look at this last sentence.  I want to -- if you can

17 highlight that last sentence.  This is the -- the sentence

18 that Ms. Green in her testimony didn't highlight.  I agree

19 with the recommendation, but I don't think we make the case.

20     Translation, this case has been made.  The city is

21 eligible, so say so.  Okay.  I agree.  Now just -- would you

22 just say so because it's been made.

23     And this is also shown in Mr. Dillon's testimony.  Mr.

24 Wertheimer asked Mr. Dillon, was it true on July 10 you didn't

25 think that Orr had made the case?  And what is his response?

1  In the document that I read.

2      So Dillon is just -- Mr. Dillon is just saying yeah, in

3  this particular document, the case wasn't made.  But that's

4  not to say that the case wasn't made.

5      Next, Mr. Bennett talked a little bit about the

6  appropriations provisions.  If the objectors here are arguing

7  that it's a bad faith filing due to some alleged improper

8  motive, there is no evidence that these appropriations were

9  added to allow the Governor to authorize this particular

10 bankruptcy.  So this particular filing couldn't have been done

11 in good faith.

12     Now as to Howard Ryan, well, he is the legislative

13 liaison for the Department of Treasury.  And 30(b)(6) is

14 really a discovery tool.  That's -- but this trial depends on

15 witnesses, not a 30(b)(6) discovery tool.

16     And you -- you can effectively override that testimony,

17 or basically you'd be using it to impeach him, with the

18 Governor's testimony.  Now, Howard Ryan, legislative liaison,

19 never a member of the House, never a member of the Senate and

20 definitely didn't sign this bill.  And the Governor did sign

21 the bill and he would know.

22     And he testifies, and his motives are clear, it was done

23 through the appropriation to pay for the emergency managers

24 because cities were upset that they were stuck with these

25 bills.  Now Ms. Brimer calls this appropriation the 5.7

1  million dollar appropriation meaningless.  What does the

2  Governor testify to?  And that's what we have to look at in

3  this case.  The testimony, the evidence.

4      He says, of course that appropriation provision is

5  significant.  Every taxpayer dollar is significant.  And what

6  Mr. Dillon and the Governor said, is we needed that money in

7  this -- we're halfway through the fiscal year, so we needed to

8  appropriate that money.  Do you have any questions about that,

9  Your Honor?

10      THE COURT:  Yes.  How -- how do I reconcile just

11  from a credibility perspective, Mr. Ryan's testimony and the

12  Governor's testimony?

13      MR. SCHNEIDER:  Well, the live witness here, the

14  Governor, was asked under oath, in front of you and explained

15  his provisions.  They're his -- his viewpoint.

16      If you're trying to reconcile this who had -- who would

17  really know better.  Who has the most experience in signing

18  the bill?  Who made the appropriation happen?  And also who

19  signed the later bill to have another appropriation so that we

20  could pay for these emergency managers?  That was the

21  Governor.  And he's the one who did that.

22      THE COURT:  Well, but doesn't that later bill raise

23  or even amplify the question about why it was necessary to put

24  an appropriation in the first bill?

25      MR. SCHNEIDER:  It was necessary because they were

1  halfway through the fiscal year and they had to pay for these

2  emergency managers.  That was the --

3           THE COURT:  But why not have a separate

4  appropriations bill so that the people's right to a referendum

5  could be preserved?  Why not do that?

6           MR. SCHNEIDER:  Because the legislative process in

7  Lansing, it's not -- the Governor testified this is the most

8  efficient way to go on to this, to do it.  And I can -- you

9  know, it's not in the record --

10           THE COURT:  Efficiency trumping the people's right

11  to referendum, is that -- is that your answer?

12           MR. SCHNEIDER:  No, Your Honor.  It's not --

13           THE COURT:  You just said --

14           MR. SCHNEIDER:  What's the most efficient way to get

15  a bill made into law?  Get the appropriation put in the bill

16  and pass it.

17           THE COURT:  No, I understand the efficiency of it.

18  But -- but what I'm hearing you say, is that the efficiency of

19  it was more important than allowing the people their right to

20  referendum, especially considering that just a month before

21  they had expressed a will on this subject.

22           MR. SCHNEIDER:  Well, and that's not what I'm

23  saying.  They did express a will on that subject and that's

24  why there were different changes put into the bill to fix it.

25  There were plenty of other -- as the Governor explained, there

1 | were plenty of other fixes in that bill.

2 |      THE COURT:  Granted, but -- but my question is a

3 | different one.  What -- why as a matter of law does the need

4 | for efficiency, which is what you assert is the grounds for

5 | including the appropriation in -- in PA436.  What -- what

6 | justifies that in trumping the people's right to a referendum,

7 | especially given that they had just expressed a will on the

8 | subject.  There were differences, but they had just expressed

9 | a will on the subject.

10 |      MR. SCHNEIDER:  The basis of that question assumes

11 | that if you don't have a separate bill, then that's a

12 | trumping.  But that's not the case.  You -- you don't trump

13 | the people's will --

14 |      THE COURT:  Am I missing something?  Doesn't the

15 | Constitution say that there's the right of referendum unless

16 | there's an appropriation in the bill?

17 |      MR. SCHNEIDER:  Yes.

18 |      THE COURT:  So putting an appropriation in the bill

19 | has the effect of denying the right of what would otherwise be

20 | a right of referendum, right?

21 |      MR. SCHNEIDER:  But plenty of bills have

22 | appropriations.

23 |      THE COURT:  Do they?

24 |      MR. SCHNEIDER:  Yes.

25 |      THE COURT:  There's no evidence of that, is there?

1          MR. SCHNEIDER:  Well, I think the Court can take

2     judicial notice of that.

3          THE COURT:  Well, all right.  Let's assume that's

4     true.  Does that prove anything more than the legislature

5     often violates the right of referendum?

6          MR. SCHNEIDER:  You do not violate the right of

7     referendum by putting an appropriation in a bill.  <u>MUCC v</u>

8     <u>Secretary of State</u> indicates as such.  It's -- if you put --

9     Your Honor, if you violated the Constitution every time you

10    put an appropriation in a bill, we'd never have any money to

11    run this government.  Because then --

12         THE COURT:  But you could have appropriations bills

13    which you actually did here.

14         MR. SCHNEIDER:  That's true.  And we could spend --

15    the legislature in Lansing could spend all its time passing

16    appropriations bills and not passing other bills.  So let's

17    not put appropriations in here, we have to wait and put it in

18    a different appropriations bill.

19        This bill, the evidence is, was at the middle of the

20    fiscal year.  So if they didn't put this appropriation --

21         THE COURT:  Well, but so was the later one.

22         MR. SCHNEIDER:  If they didn't put this

23    appropriation bill in this bill then --

24         THE COURT:  Uh-huh.

25         MR. SCHNEIDER:  Then the fiscal year would have run

1  out.  They wouldn't have been able to get through to this.

2          THE COURT:  But that assumes the wouldn't pass PA437

3  which had an appropriation for PA436.

4          MR. SCHNEIDER:  What I'm saying is --

5          THE COURT:  Why not do that given the will that the

6  people of this state had just expressed a month earlier?  Why

7  not?

8          MR. SCHNEIDER:  Because it's not unconstitutional or

9  improper to put -- let me explain.  It's not improper to put

10 an appropriation in a bill.

11         THE COURT:  Apart from misuse of propriety and

12 constitutionality, why not do that?

13         MR. SCHNEIDER:  Why not do what, Your Honor?  Put it

14 in a separate bill and --

15         THE COURT:  Put it in PA437 and bump the -- the

16 other ones down the line one number.

17         MR. SCHNEIDER:  Because I think the evidence is, is

18 by that time that would -- the legislature wouldn't have been

19 able to do that until the spring time.  And whether the --

20         THE COURT:  I didn't hear that.

21         MR. SCHNEIDER:  Whether that's in the record or

22 not --

23         THE COURT:  Can't the legislature pass an

24 appropriations bill mid term any time it likes?  It did that.

25         MR. SCHNEIDER:  Not when they're in recess.

1          THE COURT:  Well, but -- but the next vote after it

2     took the vote on PA436 could be on PA437 appropriating money

3     for PA436.  Why not?

4          MR. SCHNEIDER:  I think you're --

5          THE COURT:  The people had just spoken a month

6     before.

7          MR. SCHNEIDER:  And yes, they had spoken.  And

8     that's why there were changes put into this bill.

9          THE COURT:  All right.  I think we're going in

10    circles at this point.  Anything further?

11         MR. SCHNEIDER:  Yes, hold on.  There was some

12    testimony about why the Treasurer stopped the tentative

13    agreement in February 2012.  Mr. Dillon testified to that.  He

14    explained that he received expert advice on the agreements.

15    There were several issues raised.  He didn't think the

16    agreements would work for the city, so he wasn't supportive.

17    And it's really as simple as that.

18         Finally, this whole issue about as Mr. Dechiara explained

19    in his theory in his cross of Mr. Orr about kind of this --

20    this theory of the state conspiring with the city in bad faith

21    and kind of to drive in the city into Chapter 9.

22         I think, Judge Rhodes, you asked the correct question.

23    To what end?  I mean why?  What does the Governor or the

24    Treasurer gain by this?  By kind of engineering a bankruptcy.

25    I mean what purpose does that serve?  The objectors never

1    explained that.  And this is my last point.

2       Mr. Wertheimer says, it's a political motive.  What

3    political juice does the Governor get out of doing this?  I

4    mean that makes no logical sense.  He testified -- testified

5    about his motive.

6            THE COURT:  And I really do have to ask for silence

7    from those who are watching these proceedings.  Thank you.

8            MR. SCHNEIDER:  I think that's an indication, Your

9    Honor, if somebody mentions -- or rumblings in the courtroom

10   that it's not a popular move.  In other words, why would this

11   be like a politically popular thing to do?  That's not why it

12   was done.

13      The Governor testified about his motive, to help the

14   citizens of Detroit.  And that's the evidence in this record.

15   Now the political theories and arguments of the counsel,

16   they're not evidence.  And no witness testified otherwise.

17      So although Mr. Montgomery urges you to make inferences

18   of what should be about bad faith.  Mr. Wertheimer does the

19   same.  I don't want you to do that, Your Honor.  You don't

20   have to make those inferences, just look at the evidence and

21   the testimony and the Governor's testimony refutes that.  I

22   think I've run out of time.

23           THE COURT:  Yes.  And -- and more.  Okay.  So we'll

24   be in recess.  I'm going to take this matter under advisement.

25   Is there anything else I need from you?  You're going to give

1  me the documents that have been marked with numbers that are

2  the slide shows from this afternoon.  When -- when can we

3  expect those?

4          MS. GREEN:  You wanted an updated slide deck and I

5  presume the Court is closed on Monday?

6          THE COURT:  We are -- we are closed on Monday.

7          MS. GREEN:  Okay.

8          THE COURT:  Okay.  All right.  Please try to get

9  them to me as promptly as possible.

10          MR. MONTGOMERY:  Your Honor, does that include

11  non-commonly placed slides --

12          THE COURT:  Yeah, I want all -- all of the ones

13  marked for identification purposes and submitted to me.  But

14  to the extent they need to be corrected because of the

15  inaccuracies we've pointed out, or -- or to the extent they

16  mention exhibits not in evidence, they need to be corrected.

17      And just for the record, technically the matter isn't

18  under advisement until the time for you to submit the briefs

19  that I earlier allowed has expired which I think is Wednesday,

20  right?

21          MS. PATEK:  Your Honor, Mr. Irwin and I have already

22  taken care of -- mine are corrected.  I -- we will have a hard

23  copy here on Tuesday and we can also email them if that's

24  better.

25          THE COURT:  We -- we prefer not to use email for

1  this purpose, so a hard copy, please.  Anything further from

2  anyone?  We're in recess.  Thank you all very much.

3          THE CLERK:  All rise.  Court is adjourned.

4      (Court Adjourned at 6:35 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7    We certify that the foregoing is a correct transcript from the

8    electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11   /s/Deborah L. Kremlick, CER-4872          Dated: 11-14-13
     Letrice Calloway
12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,     .     Docket No. 13-53846
         MICHIGAN,            .
                              .     Detroit, Michigan
                              .     December 3, 2013
                 Debtor.      .     10:00 a.m.
. . . . . . . . . . . . . . .


            HEARING RE. BENCH OPINION RE. ELIGIBILITY
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  DAVID G. HEIMAN
                       North Point
                       901 Lakeside Avenue
                       Cleveland, OH  44144-1190
                       (216) 586-7175

                       Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                            DEBORAH KOVSKY-APAP
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       Dickinson Wright, PLLC
Michigan:              By:  STEVEN G. HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE MONTGOMERY<br>        CAROLE NEVILLE<br>1221 Avenue of the Americas<br>New York, NY  10020-1089<br>(312) 632-8390 |

Dentons US, LLP
By:  SAM J. ALBERTS
1301 K Street, NW
Suite 600, East Tower
Washington, DC  20005-3364
(202) 408-7004

Brooks, Wilkins, Sharkey & Turco, PLLC
By:  MATTHEW E. WILKINS
401 South Old Woodward, Suite 400
Birmingham, MI  48009
(248) 971-1711

For Detroit Retired       Lippitt O'Keefe, PLLC
City Employees            By:  RYAN C. PLECHA
Association,              370 East Maple Road, 3rd Floor
Retired Detroit          Birmingham, MI  48009
Police and Fire          (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For AFSCME,               Lowenstein Sandler, LLP
AFL-CIO, and Sub-         By:  SHARON L. LEVINE
Chapter 98, City         65 Livingston Avenue
of Detroit               Roseland, NJ  07068
Retirees:                (973) 597-2374

For Detroit               Clark Hill, PLC
Retirement Systems-      By:  ROBERT GORDON
General Retirement       151 South Old Woodward, Suite 200
System of Detroit,       Birmingham, MI  48009
Police and Fire          (248) 988-5882
Retirement System
of the City of
Detroit:

APPEARANCES (continued):

| | |
|---|---|
| For the Detroit Fire Fighters Association, the Detroit Police Officers Associa-tion and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker & Freedman, P.C.<br>By: BARBARA A. PATEK<br>      CRAIG E. ZUCKER<br>      EARLE I. ERMAN<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By: LYNN M. BRIMER<br>      MEREDITH E. TAUNT<br>      MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

 1          THE CLERK:  All rise.  Court is in session.  Please

 2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

 3          THE COURT:  Counsel, would you like to put your

 4   appearances on the record, please?

 5          MR. HEIMAN:  David Heiman, Jones Day, on behalf of

 6   debtors, and with me today are Bruce Bennett and Heather

 7   Lennox and Bob Hertzberg as well.

 8          MR. HOWELL:  Good morning, your Honor.  Steven G.

 9   Howell, Dickinson Wright, special assistant attorney general,

10   appearing on behalf of the State of Michigan.

11          MR. MONTGOMERY:  Good morning, your Honor.  Claude

12   Montgomery of Dentons, and with me are Carole Neville and Sam

13   Alberts from Dentons and Matt Wilkins as local counsel.

14          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

15   from Lippitt O'Keefe on behalf of the retiree association

16   parties.

17          MS. LEVINE:  Good morning, your Honor.  Sharon

18   Levine, Lowenstein Sandler, for AFSCME.

19          MR. GORDON:  Good morning, your Honor.  Robert

20   Gordon of Clark Hill on behalf of the Detroit Retirement

21   Systems.

22          MS. PATEK:  Good morning, your Honor.  Barbara Patek

23   of Erman, Teicher, Miller, Zucker & Freedman, and with me are

24   Craig Zucker and Earle Erman on behalf of Detroit public

25   safety unions.

1    MS. BRIMER:  Good morning, your Honor.  Lynn M.

2    Brimer appearing on behalf of the Retired Detroit Police

3    Members Association.  With me this morning are Meredith Taunt

4    and Mallory Field.

5    THE COURT:  The Court decided to provide this

6    summary of its written opinion, which it will issue shortly,

7    because it is important to give the people of the City of

8    Detroit the best opportunity to understand what the Court is

9    ruling and why.  I would not call this a brief summary.  It's

10   a bit extended, so settle in, please.  The written opinion

11   will be over 140 pages, and it will address in more detail

12   and with more legal and factual support all of the arguments

13   that have been made regarding eligibility.  I thought this

14   summary would be more accessible.  It is critical to the

15   process, indeed, to any judicial process, that those who are

16   impacted by the Court's ruling have confidence that they were

17   heard and that their arguments and concerns were fully and

18   fairly considered.

19   The matter is before the Court on the parties'

20   objections to the eligibility of the city to be a debtor in

21   this Chapter 9 case under Section 109(c) of the Bankruptcy

22   Code.  The City of Detroit was once a hard-working, diverse,

23   vital city, the home of the automobile industry, proud of its

24   nickname, The Motor City.  It was rightfully known as the

25   birthplace of the American automobile industry.  In 1952, at

1  the height of its prosperity and prestige, it had a

2  population of 1,850,000 residents.  It was building half of

3  the world's cars.

4       The evidence establishes, however, that for decades

5  the City of Detroit has experienced dwindling population,

6  employment, and revenues.  This has led to decaying

7  infrastructure, excessive borrowing, mounting crime rates,

8  spreading blight, and a deteriorating quality of life.  The

9  city no longer has the resources to provide its residents

10  with basic police, fire, and emergency medical services that

11  its residents need for their basic health and safety.  To

12  reverse this decline in basic services and to attract new

13  residents and businesses and to revitalize and reinvigorate

14  itself, the city needs help.

15       The city estimates that its debt is $18 billion.

16  This consists of 11.9 billion in unsecured debt and 6.4

17  billion in secured debt.  It has more than 100,000 creditors.

18  According to the city, this unsecured debt includes $5.7

19  billion for other post-employment benefits through June of

20  2011, which is the most recent actuarial data available; 3.5

21  billion in unfunded pension obligations; $650 million in

22  general bond obligations; $1.43 billion for certificates of

23  participation related to the pensions; $346.6 million for

24  swap contracts, liabilities related to the certificates of

25  participation; and $300 million of other liabilities.  Except

1  for the unfunded pension liability, the parties -- the

2  objecting parties do not seriously challenge the city's

3  estimates of this debt.  The pension plans and others have

4  suggested a much lower pension underfunding amount, perhaps

5  even below $1 billion.  However, the Court concludes that it

6  is not necessary to resolve this issue at this time.

7  Otherwise, the Court is satisfied that the city's estimates

8  of its other liabilities are accurate enough for purposes of

9  determining eligibility, and the Court so finds.

10         For the five years ending with fiscal year 2012,

11  pension payments exceeded contributions and investment income

12  by approximately $1.7 billion for the General Retirement

13  Systems and $1.6 billion for the Police and Fire Retirement

14  Systems.  This, of course, resulted in the liquidation of

15  pension trust principal.

16         Using current actuarial assumptions, the city's

17  required pension contributions as a percentage of eligible

18  payroll expenses are projected to grow from 25 percent for

19  the GRS and 30 percent for the PFRS in 2012 to 30 percent for

20  the GRS and 60 percent for the PFRS by 2017.  Changes in

21  actuarial assumptions would further increase the city's

22  required pension contributions.  During 2012, 39 percent of

23  the city's revenue was used to service legacy liabilities.

24  The forecasts for subsequent years, assuming no

25  restructuring, are 43 percent for 2013 going up to 65 percent

1  for 2017.

2       The Court will now address the transactions referred

3  to as the certificates of participation, often called the

4  COP's, and the swaps associated with them.  These

5  transactions are complex and confusing, and so is the

6  resulting litigation.  The Court will provide only the

7  briefest summary of them at this time.

8       In 2005 and 2006, the city decided to raise $1.4

9  billion for its underfunded pension funds.  A substantial

10  part of this funding was at an interest rate that would float

11  with the market.  If the market interest rate went up, so did

12  the rate on the COP's and vice versa.  As part of the

13  transaction, therefore, the city decided to try to protect

14  itself against interest rates going up, so it entered into a

15  wager.  The more common name for this is a swap, but it's

16  nothing more than a common bet.  If the rate went up, someone

17  would pay the city to help cover the increased interest

18  expense.  If the rate went down, the city would have to pay.

19  In 2008 interest rates dropped dramatically.  As a result,

20  the city lost on the swaps bet.  Actually, it lost

21  catastrophically on the swaps bet.  The city estimates that

22  the damage will be approximately $45 million per year for the

23  next ten years.  The result has been complex and expensive

24  litigation.  In any event, the city estimates that as of June

25  30, 2013, it may owe $480 million from the 2005 COP's and

1   $949 million on the 2006 COP's.  It also has a potential

2   liability in excess of $300 million on the swaps, although

3   the city has serious and substantial challenges to those

4   amounts.

5          Debt service from the city's general fund related to

6   limited tax and unlimited general obligation debt and the

7   COP's was $225 million for fiscal year 2012 and is projected

8   to exceed $247 million in 2013.  The city estimates that 38

9   percent of tax revenues go to debt service rather than city

10  services.  It further estimates that without changes, this

11  will increase to 65 percent within five years.  At the same

12  time, however, tax revenues are going down.  State revenue

13  sharing is also going down.  It has decreased by $161

14  million, 48 percent, since 2002 and by $67 million, 31

15  percent, since 2008.

16         The city has experienced large operating deficits

17  for each of the past seven years.  Through 2013, it has an

18  accumulated general fund deficit of $237 million.  However,

19  this includes the effect of recent debt issuances.  The city

20  borrowed $75 million in 2008, $250 million in 2010, and $129

21  million in 2013.  If the city had not borrowed these amounts,

22  the city's accumulated general fund deficit would have been

23  $700 million through 2013.  In 2012, the city had a negative

24  cash flow of $115 million excluding the proceeds from

25  borrowings.  In March of 2012, to avoid running out of cash,

1   the city borrowed $80 million.  In 2013, the city deferred

2   payments on certain of its obligations totaling $120 million

3   for current and prior year pension contributions and other

4   payments.

5           Absent restructuring, the city projects it will have

6   negative cash flows of $190 million for 2014 increasing to

7   $346 million for 2017.  The city further estimates that by

8   2017 its accumulated deficit will grow to approximately $1.3

9   billion.  The city is not making its pension contributions as

10  they become due.  As of May 2013, the city had deferred

11  approximately $54 million in pension contributions and

12  approximately $50 million on June 30th, 2013, for current

13  year pension contributions.

14          Also, the city did not make the scheduled $39.7

15  million payment on its COP's that were due on June 14, 2013.

16  If the city had not deferred these payments, it would have

17  run out of cash by June 30th, 2013.  Let me repeat that.  If

18  the city had not deferred these payments, it would have run

19  out of cash by June 30th, 2013.  It filed for bankruptcy 18

20  days later.

21          The city will -- the Court will now review the

22  causes and consequences of this.  These are discussed

23  together because it can be hard to tell which is a cause and

24  which is a consequence.  Detroit's population declined to

25  684,800 in December of 2012.  This is a 63-percent decline in

population from its peak in 1950.  In June 2000, Detroit's
unemployment rate was 6.3 percent.  In June 2010, it was 23.4
percent.  In June 2012, it was 18.3 percent.  The number of
employed Detroit residents fell from approximately 353,000 in
2000 to 280,000 in 2012.

The city's credit ratings are below investment
grade.  In calendar year 2012, 136,00 crimes were reported in
the city.  Of these, 15,200 were violent crimes.  The city's
case clearance rate for violent crimes is 18.6 percent.  The
clearance rate for all crimes is 8.7 percent.  These rates
are substantially below those of comparable municipalities
nationally and surrounding local communities.

As of April 2013, about 40 percent of the city's
88,000 streetlights were not working.  There are
approximately 78,000 abandoned and blighted structures in the
city.  Of these, 38,000 are considered dangerous buildings.
The city experiences 11 to 12,000 fires each year for the
past decade.  Approximately 60 percent of these were in
blighted or unoccupied buildings.  In 2012 the average
priority one response time for the police department was 30
minutes.  In 2013 it was 58 minutes.  The national average is
11 minutes.  The police department staffing has been reduced
by approximately 40 percent over the last ten years.  It has
not invested in or maintained its facility infrastructure for
many years and has closed or consolidated many precincts.  It

1  operates with a fleet of 1,291 vehicles, most of which have

2  reached the replacement age of three years and lack modern

3  information technology.  The average age of the city's 35

4  fire stations is 80 years.  The fire department's fleet has

5  many mechanical issues, contains no reserve vehicles, and

6  lacks equipment ordinarily considered standard.  During the

7  first quarter of 2013, frequently only ten to fourteen of the

8  city's 36 ambulances were in service.  The city's information

9  technology infrastructure and software is obsolete and is not

10  integrated between departments or even within departments.

11  The city has reduced the number of its employees by about

12  2,700 since 2011.  As of May 31st, 2013, it has approximately

13  9,560 employees.

14          The city's union employees are represented by 47 or

15  48 discrete bargaining units.  The collective bargaining

16  agreements covering all of these bargaining units expired

17  before the case was filed.  The city has implemented revised

18  employment terms called City Employment Terms for

19  nonunionized employees and for unionized employees under

20  expired collective bargaining agreements.

21          It has also increased revenues and reduced expenses

22  in other ways.  It estimates that these measures have

23  resulted in annual savings of $200 million.  The city cannot

24  legally increase its tax revenues nor can it reduce its

25  employee expenses without further endangering public health

1    and safety.

2           Before reviewing the events leading to the filing of

3    this case, a brief review of the winding history of the

4    Michigan statutes on point is necessary.  In 1990 the

5    Michigan legislature enacted Public Act 72 of 1990, the Local

6    Government Fiscal Responsibility Act.  This act empowered the

7    state to intervene with respect to municipalities that faced

8    financial crisis through the appointment of an emergency

9    financial manager, who would assume many of the powers

10   ordinarily held by local public officials.  Effective March

11   16, 2011, PA 72 was repealed and replaced with Public Act 4

12   of 2011, the Local Government and School District Fiscal

13   Accountability Act.  On November 5th, 2012, however, the

14   Michigan voters rejected PA 4 by referendum.  In Davis v.

15   Roberts, the Michigan Court of Appeals held that this

16   rejection revived Public Act 72.  Public Act 72 remained in

17   effect until March 28, 2013, when Public Act 436, the Local

18   Financial Stability and Choice Act, became effective.  The

19   legislature had enacted that law on December 13, 2012, and

20   the governor had signed it on December 26, 2012.

21          On February 19, 2013, a financial review team

22   appointed by the governor submitted its report regarding the

23   city.  That report concluded that a local government

24   financial emergency exists within the City of Detroit because

25   no satisfactory plan exists to resolve a serious financial

1  problem.  On March 1st, 2013, after receiving that report,

2  the governor announced his determination that a financial

3  emergency existed within the city.  On March 12, 2013,

4  Governor Snyder conducted a public hearing to consider the

5  City Council's appeal of his determination.  On March 14,

6  2013, the governor confirmed his determination of a financial

7  emergency within the city and requested that the Local

8  Emergency Financial Assistance Loan Board appoint an

9  emergency financial manager under PA 72.  On March 15, 2013,

10 the Loan Board appointed Kevyn Orr as the emergency financial

11 manager for the City of Detroit.  On March 15, Mr. Orr took

12 office formally.  On March 18, which was the effective date

13 of PA 436, PA 72 was repealed, and Mr. Orr became the

14 emergency manager of the city under PA 436.

15        Under law, the emergency manager acts for and in the

16 place and stead of the governing body and the office of the

17 chief administrator -- administrative officer of the local

18 government.  He has broad powers in receivership to rectify

19 the financial emergency and to assure the fiscal

20 accountability of the local government and the local

21 government's capacity to provide or cause to be provided

22 necessary government services essential to the public health,

23 safety, and welfare.

24        On June 14, 2013, Mr. Orr organized a meeting with

25 approximately 150 representatives of the city's creditors.

1    Mr. Orr presented the June 14 creditor proposal, Exhibit 43,

2    and answered questions.  At the conclusion of the meeting,

3    Mr. Orr invited creditor representatives to provide feedback

4    to the city regarding the proposal.  This proposal described

5    the economic circumstances that resulted in Detroit's

6    financial condition.  It also offered a restructuring of the

7    city's operations, financing, and capital structure.  It also

8    offered recoveries for each creditor group.

9         Regarding creditor recoveries, the city proposed,

10   (a) treatment of secured debt adequate to the value of the

11   collateral; (b) the pro rata distribution of $2 billion in

12   principal amount of interest only limited recourse

13   participation notes to holders of unsecured claims -- that

14   is, the unsecured bondholders, the COP's, the pension

15   systems, retirees, and other unsecured claims -- and (c) a

16   Dutch auction process for the city to purchase or pay the

17   notes.

18        Following the June 14, 2013, meeting at which the

19   proposal to creditors was presented, Mr. Orr and his staff

20   had several other meetings.  On June 3, 2013, two lawsuits

21   were filed against the governor and the treasurer in state

22   court.  These suits sought a declaratory judgment that PA 436

23   violated the Michigan Constitution to the extent that the law

24   purported to authorize bankruptcy proceedings in which vested

25   pension benefits might be impaired.  The suits also sought an

injunction preventing the governor from authorizing a
bankruptcy proceeding for the City of Detroit in which
pension -- vested pension benefits might be impaired.  The
two cases were _Flowers_ v. _Snyder_ and _Webster_ v. _Snyder_.  On
July 17, 2013, the GRS commenced a similar lawsuit, _General_
_Retirement System of the City of Detroit_ v. _Orr_.  On the day
before, July 16, 2013, Mr. Orr had recommended to the
governor and the treasurer that the city file for Chapter 9
relief.  On July 18, Governor Snyder authorized the City of
Detroit to file a Chapter 9 bankruptcy case.  At 4:06 p.m. on
July 18, 2013, the City of Detroit filed this Chapter 9
bankruptcy case.

      Before turning to the filed objections in this case,
it is necessary to point out that the city bears the burden
to establish by a preponderance of the evidence each of the
elements of eligibility under Section 109(c).  As the Court
commented at the conclusion of the hearing on September 19,
2013, the individuals' presentations on that day were moving,
passionate, thoughtful, compelling, and well-articulated.
These presentations demonstrated an extraordinary depth of
concern for the City of Detroit, for the adequate level of
services that their city government provides, and for the
personal hardships that that creates, and most clearly for
the pensions of the city retirees and employees.  These
individuals expressed another deeply held concern and even

1  anger that became a major theme of the hearing, the concern

2  and anger that the state's appointment of an emergency

3  manager over the City of Detroit violated their fundamental

4  democratic right to self-governance.

5        The Court's role here is to evaluate how these

6  concerns might impact the city's eligibility for bankruptcy.

7  In making that evaluation, of course, the Court can only

8  consider the specific requirements of applicable law.  The

9  popularity of the decision to appoint an emergency manager is

10  not a matter of eligibility under the federal bankruptcy

11  laws.  The Court has carefully considered the concerns of the

12  individuals that filed eligibility objections, including

13  those that addressed the Court on September 19 of this year.

14  Those concerns are addressed throughout the Court's opinion

15  but are primarily addressed in the context of whether this

16  case was filed in good faith.

17        The Court will now begin its findings and

18  conclusions.  The City of Detroit is a municipality as

19  defined in the Bankruptcy Code.  The parties agree to that.

20  Several objecting parties challenge the constitutionality of

21  Chapter 9 of the Bankruptcy Code under the United States

22  Constitution.  Citing the United States Supreme Court's

23  decision in Stern versus Marshall, these parties also assert

24  that this Court does not have the authority to determine the

25  constitutionality of Chapter 9.  Several objecting parties

1   also challenge the constitutionality of Public Act 436 under

2   the Michigan Constitution.  Some of these parties also assert

3   that this Court does not have the authority to determine the

4   constitutionality of PA 436.

5           The Official Committee of Retirees previously filed

6   a motion to withdraw the reference to the District Court on

7   the grounds that this Court does not have the authority to

8   determine the constitutionality of either Chapter 9 or PA

9   436.  It also filed a motion for stay of the eligibility

10  proceedings pending the District Court's resolution of that

11  motion.  In this Court's denial of the stay motion, it

12  concluded that the committee was unlikely to succeed on its

13  arguments regarding this Court's lack of authority under

14  Stern.  For the reasons stated in that opinion, the Court

15  concludes that it has the authority to determine the

16  constitutionality of Chapter 9 and PA 436.

17          The objecting parties argue that Chapter 9 of the

18  Bankruptcy Code violates several provisions of the United

19  States Constitution both on its face and as applied in this

20  bankruptcy case.  Article I, Section 8, of the United States

21  Constitution provides the Congress shall have the power to

22  establish uniform laws on the subject of bankruptcies

23  throughout the United States.  The objecting parties assert

24  that Chapter 9 violates the uniformity requirement of the

25  United States Constitution because Chapter 9 cedes to each

1    state the ability to define its own qualifications for a

2    municipality to declare bankruptcy, and, therefore, Chapter 9

3    permits the promulgation of nonuniform bankruptcies within

4    the states.  The Supreme Court has addressed the uniformity

5    requirement in several cases.  Most notably, in Hanover

6    National Bank v. Moyses in 1902 the Supreme Court held that

7    the incorporation into the bankruptcy law of state laws that

8    relate to exemptions did not violate the uniformity

9    requirement of the Constitution.  The Court stated, "The

10   general operation of the law is uniform although it may

11   result in certain peculiars differently in different

12   States" -- I'm sorry -- "certain particulars differently in

13   different States."

14        The Court concludes that Chapter 9 does exactly what

15   the Supreme Court cases require to meet the uniformity

16   requirement.  The defined class of debtors to which Chapter 9

17   applies is the class of entities that meet the eligibility

18   requirements.  One such class qualification is that the

19   entity is specifically authorized to be a debtor under

20   Chapter 9 by state law.  As Moyses held, it is of no

21   consequence in the uniformity analysis that this requirement

22   of state authorization to file a Chapter 9 case may lead to

23   different results in different states.  Accordingly, the

24   Court concludes that Chapter 9 satisfies the uniformity

25   requirement of the bankruptcy clause of the United States

1  Constitution.

2        The contracts clause of the United States

3  Constitution provides, quote, "No State shall pass any law

4  impairing the Obligation of Contracts," close quote.  It is

5  argued that Chapter 9 violates the contracts clause.  This

6  argument is rejected.  Chapter 9 is a federal law, not a

7  state law.  Article I, Section 10, does not prohibit Congress

8  from enacting a law impairing the obligation of contracts.

9        The Tenth Amendment challenge to Chapter 9 is the

10  most strenuously argued here.  That amendment provides,

11  quote, "The powers not delegated to the United States by the

12  Constitution, nor prohibited by it to the States are reserved

13  to the States respectively, or to the people," close quote.

14  The objecting parties argue that Chapter 9 of the Bankruptcy

15  Code violates the principles of federalism that are reflected

16  in this amendment.  The argument is that through Chapter 9,

17  Congress has established rules that control state fiscal

18  self-management, which is an area of exclusive state

19  sovereignty.  This argument is a facial challenge to the

20  constitutionality of Chapter 9.  The as applied challenge is

21  that if the State of Michigan can properly authorize the City

22  of Detroit to file for Chapter 9 relief without the explicit

23  protection of pension rights for retired city employees, then

24  Chapter 9 is unconstitutional because that would violate

25  Michigan's sovereignty.

1    Before addressing the merits of these arguments,

2  however, the Court must first address two preliminary issues

3  that the United States raised, standing and ripeness.  First,

4  the Court concludes that the objecting parties do have

5  standing.  Section 1109(b) of the Bankruptcy Code provides,

6  quote, "A party in interest, including a creditor, may raise

7  and appear and be heard on any issue in a case under this

8  chapter," close quote.  Section 901(a) makes this provision

9  applicable in a Chapter 9 case.  Accordingly, the objecting

10  parties who are creditors with pension claims against the

11  city have standing to assert their constitutional challenges

12  as part of their objections to this bankruptcy case.

13    The United States further argues that the issue of

14  whether Chapter 9 is constitutional as applied in this case

15  is not ripe for determination at this time.  The city joins

16  in this argument.  Early on in this case, the Court expressed

17  its own doubts about this thinking that the issue of whether

18  pension rights can be impaired in bankruptcy applied more to

19  confirmation than to eligibility.  The Court finds now that

20  these issues are ripe for decision.  At the request of the

21  objecting parties, the Court, therefore -- excuse me --

22  reconsidered that position and now agrees that the issue is

23  ripe at this point.

24    The premise of the argument that the United States

25  makes is that the filing of the case did not result in the

1   impairment of any pensions, thus the United States argues

2   that this issue will be ripe only when the city proposes a

3   plan that would impair pensions if it were confirmed.  Until

4   then, it argues their injury is speculative.  Although the

5   argument of the United States has some appeal, as the Court

6   itself initially concluded, the Court must now reject it.

7          The ultimate issue before the Court at this time is

8   whether the city is eligible to be a debtor in Chapter 9.

9   This dispute arises in the concrete factual context of the

10  City of Detroit's filing this bankruptcy case under Chapter 9

11  of the Bankruptcy Code and the objecting parties challenging

12  the constitutionality of that very law.  This dispute is not

13  an abstract disagreement that is ungrounded in the here and

14  now.  It is here, and it is now.  The Court further concludes

15  that as a matter of judicial prudence resolving this issue

16  now will likely expedite the resolution of this bankruptcy

17  case.  The parties have fully briefed and argued the merits.

18  Further, if the Tenth Amendment challenge to Chapter 9 is

19  resolved now, the parties and the Court can then focus on

20  whether the Court -- whether the city's plan will meet the

21  confirmation requirements of the Bankruptcy Code.

22  Accordingly, the Court concludes that the objecting parties'

23  challenge to Chapter 9 of the Bankruptcy Code as applied in

24  this case is ripe for determination at this time.

25          The Court concludes that the United States Supreme

1  Court has already decided the question of whether a federal

2  municipal bankruptcy act can be administered consistent with

3  the principles of federalism reflected in the Tenth

4  Amendment.  In United States versus Bekins, the Supreme Court

5  specifically upheld the Municipal Corporation Bankruptcy Act

6  of 1937 over the objections that the statute violated the

7  Tenth Amendment.  It is well-settled that this Court is bound

8  by the decisions of the United States Supreme Court.

9       Nevertheless, the objecting parties assert that

10  Bekins is no longer good law because of amendments to the

11  municipal bankruptcy statute after Bekins was decided and

12  because of two more recent Supreme Court decisions regarding

13  the Tenth Amendment.  However, the Court concludes first that

14  changes to the municipal bankruptcy law since 1937 have been

15  minor and do not undermine the continuing validity of Bekins.

16  Second, changes to the Supreme Court's Tenth Amendment law do

17  not undermine the continuing validity of Bekins.  In its

18  recent cases deciding issues under the Tenth Amendment, New

19  York versus United States and Printz versus United States,

20  the Supreme Court has upheld laws that encourage states to

21  regulate according to federal policies so long as the states

22  consent.  On the other hand, laws that compel or commandeer

23  state resources do violate the Tenth Amendment.  The key is

24  state consent.  Chapter 9 simply does not raise a consent

25  issue.  As the Supreme Court emphasized in Bekins, Chapter 9

1   is limited to voluntary proceedings.  The federal government
2   cannot and does not compel states to authorize municipalities
3   to file for Chapter 9 relief, and municipalities are not
4   permitted to seek Chapter 9 relief without specific state
5   authorization.  There is simply no commandeering or
6   compulsion involved.  Therefore, the Court concludes that
7   Chapter 9 is not facially unconstitutional under the Tenth
8   Amendment of the United States Constitution.

9           Several of the objecting parties also raise as
10  applied challenges to the constitutionality of Chapter 9
11  under the Tenth Amendment.  The primary point of these
12  arguments is that if Chapter 9 permits the State of Michigan
13  to authorize a city to file a petition for Chapter 9 relief
14  without explicitly providing for protection of
15  constitutionally protected pension rights, then the Tenth
16  Amendment is violated.  The State of Michigan itself cannot
17  legally provide for the adjustment of pension debts or any
18  debts of the City of Detroit.  That is so because the United
19  States Constitution and the Michigan Constitution both
20  prohibit the State of Michigan from impairing contracts.  It
21  is also because the Michigan Constitution prohibits the
22  impairing of the -- of accrued pension benefits.  These
23  prohibitions, however, do not apply in the federal Bankruptcy
24  Court.  As the Bankruptcy Court in the City of Stockton
25  Chapter 9 case said, the bankruptcy clause of the United

1    States Constitution necessarily authorizes Congress to make
2    laws that would impair contracts, so it has long been
3    understood that bankruptcy law entails impairment of
4    contracts.  For purposes of the Tenth Amendment and state
5    sovereignty, nothing distinguishes pension debt in a
6    municipal bankruptcy case from any other debt.  If the Tenth
7    Amendment prohibits the impairment of pension benefits in
8    this case, then it would also prohibit the adjustment of any
9    other debt in the case like bond debt.  Bekins makes it
10   clear, however, that with state consent the adjustment of
11   municipal debts does not impermissibly intrude on state
12   sovereignty.  This Court is bound to follow that Supreme
13   Court holding.

14          The plans and other objecting parties counter that
15   result by asserting that under the Michigan Constitution
16   pension debt has greater protection than ordinary contract
17   debt.  The argument is premised on the slim read that in the
18   Michigan Constitution the pension clause provides that
19   pension rights may not be, quote, "impaired or diminished"
20   whereas the contracts clause in the Michigan Constitution
21   only prohibits impairing contract rights.  There are several
22   reasons why the slight difference between the language that
23   protects contracts, no impairment, and the language that
24   protects pensions, no impairment or diminishment, does not
25   demonstrate that pensions are entitled to any extraordinary

1  protection.  At common law, before the adoption of the

2  Michigan Constitution in 1963, public pensions in Michigan

3  were viewed as gratuitous allowances that could be revoked at

4  will because a retiree lacked any vested right in their

5  continuation.  In 1963, this new provision enhancing the

6  protection for pensions was included, quote, "The accrued

7  financial benefits of each pension plan and retirement system

8  of the state and its political subdivisions shall be a

9  contractual obligation thereof which shall not be diminished

10 or impaired thereby," close quote.  That's Article IX,

11 Section 24, of the Michigan Constitution of 1963.

12      So here are the reasons why pension rights are

13 contract rights under the Michigan Constitution.  First, as

14 noted, the language of Article IX, Section 24, gives pension

15 benefits the status of a, quote, "contractual obligation,"

16 close quote.  That's the language that it uses.

17      Second, if the Michigan Constitution were meant to

18 give the kind of higher or even absolute protection for which

19 the plans argue here, that language simply would not have

20 referred to pension benefits as a, quote, "contractual

21 obligation," close quote.

22      Third, linguistically there is no functional

23 difference in meaning between "impair" and "impair or

24 diminish."  Now, there certainly is a preference, if not a

25 mandate, to give every -- to give meaning to every word in

1  written law.  At the same time, however, we give undefined

2  statutory terms their plain and ordinary meanings.  If this

3  Court gives these terms, "diminish" and "impair," their plain

4  and ordinary meanings, those meanings would not be

5  substantially different from each other.  The terms are not

6  synonyms, but they cannot honestly be given meanings so

7  different as to compel the result that the plans now seek,

8  the protection of pension rights in bankruptcy.  "Diminish"

9  adds nothing material to "impair."  All diminishment is

10  impairment, and "impair" includes "diminish."

11       Fourth, the argument for a greater protection is

12  inconsistent with the Michigan Supreme Court's interpretation

13  of this constitutional language in two cases, Kosa versus

14  Treasury -- Treasurer of the State of Michigan and In re.

15  Constitutionality of 2011 PA 38.  In Kosa in 1980 the

16  Michigan Supreme Court quoted the history from the

17  Constitutional Convention regarding Article IX, Section 24.

18  Several times that history refers to pension rights as

19  contractual rights.  The Court in Kosa also itself used

20  contractual language when referring to pension rights.  More

21  recently in In re. Constitutionality of 2011 PA 38 in 2011,

22  the Michigan Supreme Court stated, quote, "The obvious intent

23  of Section 24, however, was to ensure that public pensions be

24  treated as contractual obligations that, once earned, could

25  not be diminished," close quote.

1    Fifth, an even greater narrative must be considered

2 here focusing on 1963. At that time, Michigan law allowed

3 municipalities to file a bankruptcy, and <u>Bekins</u> had long

4 since held that that was constitutional, so when the new

5 Michigan Constitution was negotiated and proposed and

6 ratified in 1963, it explicitly gave accrued pension benefits

7 only the status of contractual obligations. That new

8 Constitution could have given pensions protection from

9 impairment in bankruptcy in several ways, but it did not. It

10 could have simply prohibited Michigan municipalities from

11 filing bankruptcy. It could have somehow created a property

12 interest that bankruptcy would be required to respect, or it

13 could have established some sort of a secured interest in the

14 municipality's property. It could have even required the

15 state to guarantee pension benefits, but it did none of

16 those. Instead, both the history from the Constitutional

17 Convention and the very language of the pension provision

18 itself, it is made clear municipal pension rights are

19 contract rights. Because under the Michigan Constitution

20 pension rights are contractual rights, they are subject to

21 impairment in a federal bankruptcy proceeding. Moreover,

22 where, as here, the state consents, that impairment does not

23 violate the Tenth Amendment. Therefore, as applied in this

24 case, Chapter 9 is Constitutional.

25    Nevertheless, the Court is compelled to comment. No

1   one should interpret this holding that pension rights are

2   contract rights and subject to impairment in this bankruptcy

3   case to mean that this Court necessarily will confirm any

4   plan of adjustment that impairs pensions.  The Court

5   emphasizes that it will not lightly or casually exercise the

6   power under federal bankruptcy law to impair pensions.

7   Before the Court confirms any plan that the city submits, the

8   Court must find that the plan fully meets the requirements of

9   Section 943(b) of the Bankruptcy Code and the other

10  applicable provisions of the Bankruptcy Code.  Together these

11  provisions of law demand this Court's judicious, legal, and

12  equitable consideration of the interests of the city and the

13  interests of all of its creditors, including retirees, as

14  well as the laws of the State of Michigan.

15          Section 109(c)(2) of the Bankruptcy Code requires

16  that a municipality be specifically authorized to be a debtor

17  under such chapter.  The evidence establishes that the city

18  was authorized to file this case.  The issue is whether that

19  authorization was proper under the Michigan Constitution.

20  Several objectors argue that the authorization is not valid

21  because Public Act 436, the statute establishing the

22  underlying procedure for a municipality to obtain

23  authorization, is unconstitutional.  The validity of Public

24  Act 436 under the Michigan Constitution is a question of

25  state law.  The Michigan Supreme Court has not ruled on the

1    validity of Public Act 436.  As a result, this Court must
2    attempt to ascertain how that Court would rule if it were
3    faced with this issue.

4            As discussed earlier, on March 16th, 2011, the
5    governor signed Public Act 4 into law, but Public Act 4 was
6    repealed by Public Act 72.  However, the voters rejected
7    Public Act 4 by referendum in the November 6, 2012, election.
8    Shortly after that election on December 26th, 2012, the
9    governor signed PA 436 into law, and it took effect on March
10   28th, 2013.  It is argued here that Public Act 436 is
11   unconstitutional because it is essentially a reenactment of
12   the rejected Public Act 4 in violation of the people's
13   referendum rights.  The city and the State of Michigan assert
14   that there are several differences between Public Act 436 and
15   Public Act 4 such that they are not the same law.  In
16   Reynolds versus Bureau of State Lottery in 2000, the Michigan
17   Court of Appeals held that nothing in the Michigan
18   Constitution suggests that a referendum has any broader
19   effect than the nullification of the rejected act.  This
20   Michigan Court of Appeals decision strongly suggests that the
21   referendum rejection of Public Act 4 did not prohibit the
22   Michigan legislature from enacting Public Act 436 even though
23   Public Act 436 addressed the same subject matter as Public
24   Act 4 and did contain very few changes.  Accordingly, the
25   challenge on this ground must be rejected.

1        It is also contended that Public Act 436 is

2 unconstitutional because the Michigan legislature included

3 appropriations provisions in Public Act 436 for the sole

4 purpose of shielding the act from referendum.  There

5 certainly was some credible evidence in support of the

6 assertion that the appropriations provision in Public Act 436

7 were intended to immunize it from referendum.  For example,

8 Howard Ryan, the legislative assistant in the Michigan

9 Department of Treasury, so testified in his deposition.  The

10 Court must conclude, however, that if faced with this issue,

11 the Michigan Supreme Court would not hold Public Act 436

12 unconstitutional on this grounds.  In Michigan United

13 Conservation Clubs versus Secretary of State in 2001, the

14 Court concisely held that a public act with an appropriations

15 provision is not subject to referendum regardless of the

16 motive of the appropriation.  To the same effect was Houston

17 v. Governor decided by the Michigan Supreme Court in 2012.

18 Accordingly, the Court concludes that PA 436 is not

19 unconstitutional on the grounds that the appropriations

20 provisions of it improperly shielded it from the people's

21 right of referendum.

22        Certain objectors also argue that Public Act 436

23 violates the home rule provision of the Michigan

24 Constitution, which recognizes the right of the electors to

25 adopt and amend the city charter and the city's right to

1   adopt ordinances.  The argument is that the appointment of an
2   emergency manager for a municipality under PA 436 is
3   inconsistent with those rights.  This argument fails for the
4   simple reason that this authority that the Michigan
5   Constitution grants to municipalities is subject to state
6   laws enacted by the legislature.  The constitutional
7   provision specifically says so.  It states, quote, "Each city
8   and village shall have the power to adopt resolutions and
9   ordinances relating to its municipal concerns, property and
10  government, subject to the constitution and law," close
11  quote.  Indeed, Section 1-102 of the city -- excuse me -- of
12  the charter of the City of Detroit states, quote, "The City
13  has the comprehensive home rule power conferred upon it by
14  the Michigan Constitution, subject only to the limitations on
15  the exercise of that power contained in the Constitution or
16  this Charter or imposed by statute," close quote.
17  Accordingly, the Court finds that PA 436 does not violate the
18  home rule provisions of the Michigan Constitution.

19          Many objectors argue that the bankruptcy
20  authorization section of PA 436 itself does not comply with
21  the heightened requirements for protecting pensions in the
22  Michigan Constitution and, therefore, that PA 436 is
23  unconstitutional.  Accordingly, the objectors argue that PA
24  436 cannot provide a valid basis for authorization to file a
25  bankruptcy.  The Court has already explained that pension

1  benefits are a contractual obligation of the municipality and

2  not entitled to any heightened protection in bankruptcy.  It

3  follows that if a state consents to a municipal bankruptcy,

4  no state law can protect pension rights that are merely

5  contractual rights from impairment in bankruptcy just as no

6  law could protect any other type of contract rights like

7  bonds.  Accordingly, the failure of PA 436 to protect pension

8  rights in a municipal bankruptcy does not make that law

9  inconsistent with the pension clause of the Michigan

10  Constitution any more than the failure of PA 436 to protect,

11  for example, bond debt in bankruptcy is inconsistent with the

12  contracts clause of Michigan Constitution.  For this purpose,

13  the parallel is perfect.  For these reasons, the Court

14  concludes that PA 436 does not violate the pension clause of

15  the Michigan Constitution.

16         PA 436 permits the governor to place contingencies

17  on a local government in order to proceed under Chapter 9.

18  The governor chose not to impose a contingency requiring the

19  City of Detroit to protect pensions in bankruptcy.  Several

20  objectors argue that the pension clause of the Michigan

21  Constitution obligated the governor to include such a

22  condition in his authorization.  The Court concluded earlier

23  that any such condition in PA 436 itself would be ineffective

24  and potentially invalid under federal law.  For the same

25  reason, any such contingency in the governor's authorization

 1   letter would have been invalid and may have rendered the

 2   authorization itself invalid under Section 109(c).

 3   Accordingly, this objection is overruled.  The Court

 4   concludes that the governor's authorization to file this

 5   bankruptcy case under PA 436 was valid under the Michigan

 6   Constitution.

 7          On July 3, 2013, Gracie Webster and Veronica Thomas

 8   filed a complaint against the State of Michigan, Governor

 9   Snyder, and Treasurer Dillon in the Ingham County Circuit

10   Court.  They sought a declaratory judgment that PA 436 is

11   unconstitutional because it permits accrued pension benefits

12   to be diminished or impaired in violation of Article IX,

13   Section 24, of the Michigan Constitution.  The complaint also

14   sought a preliminary and permanent injunction enjoining the

15   governor and the treasurer from authorizing the Detroit

16   emergency manager to commence proceedings under Chapter 9 of

17   the Bankruptcy Code.

18          On Thursday, July 18th, 2013, just minutes after the

19   city filed its bankruptcy petition, the state court held a

20   hearing.  During that hearing, the state court confirmed that

21   the bankruptcy case had been filed.  Nevertheless, the state

22   court granted the relief enjoining the governor and the

23   emergency manager -- excuse me -- enjoining the governor from

24   taking any further action in the bankruptcy proceeding.

25          A further hearing was held the next day on the

1    plaintiff's request to amend the order of the previous

2    afternoon.  At the conclusion of that hearing, the judge then

3    stated her decision to grant the declaratory relief that the

4    plaintiffs had requested.  Later that day on July 19th, 2013,

5    the court entered a declaratory -- an order of declaratory

6    relief.  It states that PA 436 is unconstitutional and in

7    violation of Article IX, Section 24, of the Michigan

8    Constitution.  It also states that PA 436 is to that extent

9    of no force and effect.  In their objections in this case,

10   several of the objectors assert that this judgment precludes

11   or prevents the city from asserting that PA 436 is

12   constitutional or that the governor properly authorized this

13   bankruptcy filing.

14          There are, however, two main reasons why this Court

15   is not required to honor the Webster judgment in this

16   bankruptcy case.  First, upon the city's bankruptcy filing,

17   federal law gave this Court exclusive jurisdiction to

18   determine all issues relating to the city's eligibility to be

19   a Chapter 9 debtor.  At that moment, the state court no

20   longer had jurisdiction.  Accordingly, the state court's

21   order of declaratory judgment on which the objectors rely is

22   void and of no effect.  It does not preclude the city from

23   asserting its eligibility to file bankruptcy in this case.

24          Second, bankruptcy law provides that when a

25   bankruptcy petition is filed, it operates as a stay of any

1  act to exercise control over property of the estate.  The

2  main objectives of the plaintiff's case in Webster v.

3  Michigan was to protect the plaintiff's pension rights by

4  prohibiting a bankruptcy case which might allow the city to

5  use its property in a way that might impair pensions.  It

6  does not matter that neither the city nor its officers were

7  defendants.  The suit was clearly an act to exercise control

8  over the city's property.  Accordingly, it was stayed under

9  the bankruptcy law.  The state court's order of declaratory

10  relief was entered in violation of the stay.  For those two

11  reasons, the Court concludes that the judgment in Webster is

12  void, and this objection to the city's eligibility is

13  rejected.

14         To be eligible for relief under Chapter 9, the city

15  must establish that it is insolvent.  A few objectors contest

16  this requirement of eligibility under Section 109(c)(3).  For

17  a municipality, the Bankruptcy Code defines insolvent as,

18  quote, "a financial condition such that the municipality is:

19  (i) generally not paying its debts as they become due unless

20  such debts are the subject of a bona fide dispute; or (ii) is

21  unable to pay its debts as they become due."  The Court finds

22  that the City of Detroit was and is insolvent under both

23  definitions.  The Court has already detailed the enormous

24  financial distress that the city faced as of July 18th, 2013,

25  and will not repeat it here.  The Court finds that the city

1  was generally not paying its debts as they became due.

2         In May 2013 the city deferred payments on $54
3  million in pension contributions.  On July 30th it deferred
4  an additional $5 million fiscal year-end payment.  The city
5  also did not make a scheduled $39.7 million payment on its
6  COP's on June 14th.  It was also spending more money than it
7  was receiving and only making up the difference through
8  expensive and even catastrophic borrowings.  These facts
9  establish that the city was generally not paying its debts as
10 they became due as of the time of filing.

11        The evidence also overwhelmingly establishes that
12 the city is unable to pay its debts as they become due.  The
13 evidence established that as a result of the city's financial
14 state, there are many, many services in the city which do not
15 function properly.  The facts found earlier firmly support
16 this conclusion.

17        Most powerfully, however, the testimony of Chief
18 Craig established that the city is in a state of service
19 delivery insolvency as of July 18th and will continue to be
20 for the foreseeable future.  He testified that the conditions
21 in the local precincts were deplorable.  He said, quote, "if
22 I just might summarize it in a very short way, that
23 everything is broken, deplorable conditions, crime is high --
24 extremely high, morale is low, the absence of leadership,"
25 close quote.  He described the city as, quote, "extremely

1    violent," close quote, based on the high rate of violent

2    crime and the low rate of clearance of violent crimes.  He

3    stated that their facilities, equipment, and vehicles were in

4    various states of disrepair and obsolescence.  Service

5    delivery insolvency focuses on the municipality's inability

6    to pay for all costs of providing services at the level and

7    quality that are required for the health, safety, and welfare

8    of the community.

9         The objecting parties assert that the city could

10   have and should have monetized a number of its assets in

11   order to make up for its severe cash flow insolvency.  Most

12   directly, this objection targets the city's valuable art

13   collection.  However, the city's witnesses credibly

14   established that sales of city assets would not address the

15   long-term operational structural financial imbalance facing

16   the city, and this makes sense.  When the expenses of an

17   enterprise exceed its revenue, a one-time infusion of cash,

18   whether from an asset sale or from a borrowing, only delays

19   the inevitable financial failure unless, in the meantime, the

20   enterprise sufficiently reduces its expenses or enhances its

21   income.  The City of Detroit itself has proven the reality of

22   this many, many times.  In any event, when considering

23   selling an asset, the enterprise must take extreme care that

24   the asset is truly unnecessary in pursuing its mission and

25   unnecessary in enhancing its operational revenue.  For these

1    reasons, the Court finds that the city has established that

2    it is insolvent.

3         The city must also establish that it desires to

4    effect a plan to adjust its debts under Section 109(c)(4).

5    In the City of Stockton case, the Bankruptcy Court explained

6    the cases equate desire with intent and make clear that this

7    element is highly subjective.  At the first level, the

8    question is whether the Chapter 9 case was filed for some

9    ulterior motive such as to buy time or to evade creditors

10   rather than to restructure the city's finances.  Several

11   objectors assert that the city does not desire to effect a

12   plan to adjust its debts.  The Court concludes that the

13   evidence overwhelmingly establishes that the city does desire

14   to effect a plan in this case.  Mr. Orr so testified.  More

15   importantly, before filing this case, Mr. Orr did submit to

16   creditors a plan to adjust the city's debts.  Plainly, that

17   plan was not acceptable to any of the city's creditors.  It

18   may not have even been confirmable under the Bankruptcy Code,

19   although that is not necessary to resolve at this time.

20   Still, it was evidence of the city's desire and intent to

21   effectuate a plan.  There is simply no evidence that the city

22   has an ulterior motive in pursuing Chapter 9 such as to buy

23   time or to evade creditors.  Indeed, the objecting creditors

24   do not really contend that there was any such ulterior

25   motive.  Rather, their argument is that the plan that the

emergency manager has stated he intends to propose in this
case is not a confirmable plan.  It is not confirmable, they
argue, because it will impair pensions in violation of the
Michigan Constitution.  Certainly the evidence does
establish -- certainly the evidence does establish that the
emergency manager intends to propose a plan that impairs
pensions.  The Court has already so found.  Nevertheless, the
objectors' argument must be rejected.  As established
earlier, a Chapter 9 plan may impair pension rights.  The
emergency manager's stated intent to propose a plan that
impairs pensions is, therefore, not inconsistent with a
desire to effect a plan.  Accordingly, the Court finds that
the city does desire to effect a plan.

        The fifth element for eligibility is found in
Section 109(c)(5).  Under that section an entity may be a
debtor under Chapter 9 if such entity has either negotiated
in good faith with creditors or is unable to negotiate with
creditors because such negotiation is impracticable.  In the
present case, the City of Detroit argues that the June 14,
2013, proposal to creditors along with its follow-up meetings
was a good faith effort to begin negotiations to which
creditors refused to respond.  The Court concludes, however,
that the June 14 proposal to creditors and the follow-up
meetings were not sufficient to satisfy the requirements of
good faith negotiations under law.  The proposal to creditors

 1   did not provide creditors with sufficient information to make
 2   meaningful counterproposals, especially in the very short
 3   amount of time that the city allowed for the, quote,
 4   "discussion," close quote, period.  Charitably stated, the
 5   proposal is very summary in nature.  There was simply not
 6   enough information for creditors to start meaningful
 7   negotiations.  For example, Brad Robins of Greenhill &
 8   Company, the financial advisor for the Retirement Systems,
 9   testified, quote, "The note itself I thought was not really a
10   serious proposal but may be a placeholder, no maturity, no
11   obligation for the city to pay," close quote.  The city
12   asserts that it provided supporting data in an electronic
13   data room.  However, several witnesses testified that the
14   data room did not contain the necessary data to make a
15   meaningful evaluation of the proposal to creditors.
16   Moreover, the city conditioned access to the data room on the
17   signing of a confidentiality and release agreement.  This
18   created an unnecessary hurdle for creditors.  The creditors
19   simply cannot be faulted for failing to offer
20   counterproposals when they did not have the necessary
21   information to evaluate the city's vague initial proposal.
22   The proposal for creditors provided a calendar.  It allotted
23   one week, June 17 to 24, for requests for additional
24   information.  The initial rounds of discussions were
25   scheduled for July 17 -- sorry -- June 17 to July 12, and the

1    evaluation period was scheduled to be July 15 to July 19.

2    This calendar was very tight and did not request

3    counterproposals or even provide a deadline for submitting

4    them.  The total time available under this schedule for

5    creditor negotiations was approximately 30 days.  Given the

6    extraordinary complexities of the case and the 100,000

7    creditors, that amount of time is simply far too short to

8    conclude that such a vague proposal to creditors rises to the

9    level required to shift the burden to objectors to make

10   counterproposals.

11         In addition, the city affirmatively stated that the

12   meetings were not negotiations.  The city asserts that this

13   was to clarify that the city was not waiving the suspension

14   of collective bargaining under Public Act 436, but the city

15   cannot announce to creditors that the meetings were not

16   negotiations and then assert to this Court that those same

17   meetings amounted to good faith negotiations.

18         Finally, the format of the meetings were primarily

19   presentational, informational, to different groups of

20   creditors with different issues and gave little opportunity

21   for creditor input or substantive discussion.

22         Accordingly, the Court concludes that the city has

23   not established by a preponderance of the evidence that it

24   has satisfied the requirements for good faith negotiations.

25         Congress adopted Section 109(c)(5)(C) specifically

1　to cover situations in which a very large body of creditors

2　would render pre-filing negotiations impracticable.  Several

3　cases suggest that the impracticability requirement must be

4　satisfied based -- or excuse me -- may be satisfied based on

5　the sheer number of creditors involved.  The list of

6　creditors of the City of Detroit is over 3,500 pages.  It

7　lists over 100,000 creditors.  The city estimates over 20,000

8　individual retirees are owed pension funds.  The Court is

9　satisfied that when Congress enacted the impracticability

10　section, it foresaw precisely a situation like that which

11　faces the City of Detroit.  The sheer size of the debt and

12　the number of individual creditors made pre-bankruptcy

13　negotiation impracticable, impossible really.

14　　　　There are, however, several other circumstances that

15　also support a finding of impracticability.  First, although

16　several unions have now come forward that they are the

17　natural representatives of the retirees, these same unions

18　asserted in response to the city's pre-filing inquiries that

19　they could not and did not represent retirees.  These

20　responses sent a clear message to the city that the unions

21　would not negotiate on behalf of retirees.

22　　　　Several voluntary associations of retirees also

23　assert that they are the natural representatives of retirees.

24　However, none assert that they can bind individual retirees

25　absent some sort of cumbersome class action litigation.  As

1   Donald Taylor testified, ultimately it would be up to the

2   individual members of the association to decide if they would

3   accept or reject an offer.

4          Further, several witnesses who testified on behalf

5   of the retiree associations made their positions clear that

6   they would not have negotiated a reduction in accrued pension

7   benefits because they consider them to be fully protected by

8   state law.  It is impracticable to negotiate with a group

9   that asserts that their position is immutable.  As the Court

10  stated in Stockton, "It is impracticable to negotiate with a

11  stone wall."

12         Finally, the city has demonstrated that time was

13  quickly running out on its liquidity.  Accordingly, the Court

14  finds that pre-filing negotiations were impracticable.

15         The last requirement for eligibility is set forth in

16  Bankruptcy Code Section 921(c).  That section provides,

17  quote, "After any objection to the petition, the court, after

18  notice and a hearing, may dismiss the petition if the debtor

19  did not file the petition in bad faith -- excuse me -- in

20  good faith," close quote.  The city's alleged bad faith in

21  filing its Chapter 9 petition was a central issue in the

22  eligibility trial.  Indeed, in one form or another all of the

23  objecting parties have taken the position that the city did

24  not file its Chapter 9 petition in good faith and that this

25  Court should exercise its discretion to dismiss this case.

1 As will be explained, the Court finds that the totality of
2 circumstances coupled with the presumption of good faith
3 which arises because the city has proven each of the elements
4 of eligibility under Section 109(c) establishes that the city
5 filed its petition in good faith under 921(c).

6          In a moment, the Court will review the factors upon
7 which it relies in finding that the city filed this case in
8 bad -- in good faith.  First, however, the Court considers it
9 crucial to this process to give voice to what it understands
10 is the narrative supporting the objecting parties' argument
11 that the City of Detroit did not file this case in good
12 faith.  The Court will then explain why there is some support
13 in the record for this narrative.  After that, the Court will
14 then explain why it still finds that the city filed this
15 petition in good faith.  It must be recognized that the
16 narrative that the Court describes here is a composite of the
17 objecting parties' presentation on this issue.  No single
18 objecting party neatly laid out this precise version with all
19 of its features described here.  Moreover, it includes the
20 perceptions of not only several of the objecting parties
21 whose objections were filed by attorneys, but also many of
22 the individual objecting parties.  This description does not
23 contain the Court's findings.  It is only the Court's
24 perception of a compositive narrative -- excuse me --
25 composite narrative that appears to ground the objectors'

1  various bad faith arguments.

2       According to this composite narrative of the lead-up

3  to the bankruptcy filing on July 18, 2013, the City of

4  Detroit's bankruptcy was the intended consequence of a long-

5  term strategic plan.  The goal of this bankruptcy, according

6  to this narrative, was the impairment of pension rights

7  through a bankruptcy filing by the city.  Its genesis, the

8  narrative goes, was hatched in a Law Review article that two

9  Jones Day attorneys wrote.  This is significant because Jones

10  Day later became not only the city's attorneys in the case

11  but the law firm from which the city's emergency manager was

12  hired.  The article laid out in detail the legal road map for

13  using bankruptcy to impair municipal pensions.  The objectors

14  believe that the plan was executed by the top officials of

15  the State of Michigan and the state's legal and financial

16  consultants.  The goals of the plan included also lining the

17  professionals' pockets while extending the power of the state

18  government at the expense of the people of the City of

19  Detroit.  In this narrative, there may even be a racial

20  element to the plan.  The plan participants foresaw the

21  rejection of PA 4, according to this narrative, coming in the

22  November 2012 election, and so work began on PA 436 even

23  before that.  As a result, it only took 14 days to enact PA

24  436 after it was introduced in the legislature's post-

25  election lame duck session.  PA 436 was also enacted contrary

1  to the will of the people of the State of Michigan, as just

2  expressed in their rejection of PA 4.  The plan included

3  inserting into PA 436 two very minor appropriations

4  provisions so that the law would not be subject to the

5  people's right of referendum and would not risk the same fate

6  as PA 4 had just experienced.  The plan also saw the value in

7  enticing a bankruptcy attorney to become the emergency

8  manager even though he did not have the qualifications

9  required by PA 436.  Another important part of the plan,

10  according to this narrative, was for the state government to

11  starve the city of cash by reducing its revenue sharing, by

12  refusing to pay the city millions of promised dollars, and by

13  imposing on the city a heavy financial burden of expensive

14  professionals.  It also included suppressing information

15  about the value of the city's assets.  The narrative

16  continues that this plan also required active concealment and

17  even deception.  One purpose was to deny creditors,

18  especially those whose retirement benefits would be at risk

19  from such a filing, from effectively acting to protect those

20  interests.  This concealment and deception were accomplished,

21  the narrative goes, through a public relations campaign that

22  deliberately misstated the ultimate objective of PA 436,

23  downplayed the likelihood of bankruptcy, asserted an unfunded

24  pension liability amount that was based on misleading and

25  incomplete data and analysis, understated the city's ability

1   to meet that liability, and obscured the vulnerability of
2   pensions in bankruptcy.  It also included imposing an
3   improper requirement to sign a confidentiality and release
4   agreement as a condition of accessing financial information
5   in the data room.  As the bankruptcy filing approached, the
6   narrative states that a necessary part of the plan became to
7   engage with creditors only the minimum necessary so that the
8   Court could later assert in -- so that the city could later
9   assert in Bankruptcy Court that it attempted to negotiate in
10  good faith.  The plan, however, was not to engage in
11  meaningful pre-petition negotiations with the creditors
12  because successful negotiation might thwart the plan to file
13  a bankruptcy.  "Check a box" was the phrase that some
14  objecting parties used for this.
15          The penultimate moment that represented the
16  successful culmination of the plan was the bankruptcy filing
17  itself.  In this narrative, this was accomplished in secrecy
18  and a day before the planned date in order to prevent the
19  retirees who were at that moment in state court pursuing
20  their available state law remedies to protect their
21  constitutional pension rights.  "In the dark of the night"
22  was the phrase used to describe the actual timing of the
23  filing.  The phrase refers to the secrecy surrounding the
24  filing and captures in shorthand the assertion that the
25  petition was filed to avoid an imminent adverse ruling in the

1   Webster case in state court.

2          The oft repeated phrase that was important to the

3   objectors' theory of the city's bad faith was "foregone

4   conclusion."  This was used in the assertion that Detroit's

5   bankruptcy case was a foregone conclusion perhaps as early as

6   January 2013, perhaps even earlier.

7          Finally, post-petition the plan also necessitated

8   the assertion of the common interest privilege to protect it

9   and its participants from disclosure.  The Court must

10  emphasize again now that what the Court just summarized is

11  what it believes is the viewpoint of the objecting parties.

12  Those were not the Court's findings.

13         The Court will now, however, turn to its evaluation

14  of this viewpoint of bad faith on the city's part in filing

15  this case.  The Court acknowledges that many people in

16  Detroit hold to this narrative or at least to substantial

17  parts of it.  The Court further recognizes, on the other

18  hand, that state and city officials vehemently deny any such

19  improper motives or tactics as this theory attributes to

20  them.  They contend that this case was filed for the proper

21  desire and necessary purpose of restructuring the city's

22  debts, including its pension debt, through a plan of

23  adjustment.  Indeed, the Court has already found that the

24  city does desire to effect a plan of adjustment.  The Court

25  finds, however, that in some particulars the record does

1   support the objectors' view of the reality that led to this
2   bankruptcy filing.  It is, however, not nearly supported
3   enough -- in enough particulars for this Court to find that
4   the filing was in bad faith.  For example, Howard Ryan
5   testified that the appropriations provision of PA 436 was
6   added to evade a referendum.  An e-mail from Kevyn Orr was to
7   the same effect.  The Jones Day pitch book from January 2013
8   laid out the scenario for this bankruptcy case, and Mr. Orr
9   was, after all, a bankruptcy lawyer, and his associates at
10  Jones Day did write the legal road map for this back in 2011.
11  And at the June 10 public meeting, Mr. Orr did mislead the
12  public about the status of pensions in bankruptcy as well as
13  about the chances of filing bankruptcy.  The issue that such
14  evidence presents, however, is how to evaluate it in the
15  context of the good faith issue.  One important question
16  raised, for example, is during the lead-up, was the City of
17  Detroit's bankruptcy filing a foregone conclusion as the
18  objecting parties assert.  The answer is, yes, of course it
19  was, for a long time.  Even if it was a foregone conclusion,
20  experience with both individuals and businesses in financial
21  distress establish that they often wait longer to file a
22  bankruptcy than is in their interests.  Detroit was no
23  exception.  Its financial crisis had been worsening for
24  decades, and it could have and should have filed bankruptcy
25  long before it did, perhaps even years before.  Certainly the

1  Court must conclude that the bankruptcy -- that the

2  bankruptcy filing by the City of Detroit was a foregone

3  conclusion during all of 2013, but waiting too long does not

4  suggest bad faith.

5       Perhaps it would have been more consistent with our

6  democratic ideals and with the economic and social needs of

7  the city if its officials and state officials had openly and

8  forthrightly recognized the need for filing bankruptcy when

9  that need first arose.  It is, after all, not bad faith to

10  file bankruptcy when it is needed, and city officials could

11  also avoided the appearances of pretext negotiations and the

12  resulting mistrust by simply announcing honestly that the

13  city is insolvent, that it needs to file bankruptcy, and that

14  negotiations would not even be attempted because it would be

15  impracticable.  The law clearly permits that and for good

16  reason.  It avoids the very delay and worse the very

17  suspicion and bad feeling that resulted here.  The Court must

18  acknowledge some truth in the factual basis of the objectors'

19  claim that this case was not filed in good faith.

20  Nevertheless, for strong reasons that the Court will state

21  next, it finds that this case was filed in good faith and

22  should not be dismissed.

23       Number one, the Court finds that the city's

24  financial problems are of a type contemplated for Chapter 9

25  relief.  The Court's finding here is based on its finding

1    that the city is insolvent and that the city was unable to

2    negotiate with creditors because that negotiation was

3    impracticable.

4          Number two, the city's filings are consistent with

5    the remedial purpose of Chapter 9.  The Court's analysis on

6    this factor is based on its finding that the city desires to

7    effect a plan to adjust its debts.  To show bad faith on this

8    factor, the evidence must establish that the purpose of the

9    filing of the Chapter 9 was not simply to buy time or --

10   excuse me -- to show good faith on this factor, the evidence

11   must establish that the purpose of the filing was not simply

12   to buy time or evade creditors.  Notably, this argument was

13   not raised by the objectors in any pleadings or at trial, and

14   there's no evidence.  The objectors do assert that the city

15   filed this petition to avoid a bad state court ruling in the

16   <u>Webster</u> litigation.  They argue this is indicative of bad

17   faith.  This argument is also rejected.  It is quite common

18   for creditor lawsuits to precipitate bankruptcy filings.

19   That the lawsuits were in vindication of an important right

20   under the state Constitution does not change this result.

21   They were still suits to enforce creditors' claims against a

22   debtor that could not pay those claims.  The objectors also

23   argue that the city filed the petition so that its pension

24   obligations could be impaired, and this is inconsistent with

25   the remedial purpose of bankruptcy.  Again, discharging debt

1   is what motivates every debtor that files bankruptcy, and

2   that motivation does not suggest bad faith.

3           Three, the city made efforts to improve the state of

4   its finances prior to filing to no avail.  Although the Court

5   finds that the city did not engage in good faith negotiations

6   with its creditors, the Court does find that the city did

7   make some efforts to improve its financial condition before

8   filing its Chapter 9 petition, which resulted in some

9   savings, as stated earlier.  No objecting parties have

10  suggested any other measure that the city could have taken to

11  relieve its financial stress other than selling assets, but,

12  as stated earlier, that would not have solved any long-term

13  financial problems.  The fact that the city did not consider

14  any alternatives to Chapter 9 in the period leading up to the

15  filing does not indicate bad faith either.  By that time, all

16  of the measures that the city had attempted had largely

17  failed to resolve the problem of the city's cash flow

18  insolvency.

19          Four, the residents of the City of Detroit will be

20  severely prejudiced if this case is dismissed.  The Court

21  concludes that this factor is of paramount importance in this

22  case.  The city's debt and cash flow insolvency is causing

23  its nearly 700,000 residents to suffer hardship.  As already

24  discussed at length, the city is service delivery insolvent.

25  Without the protection of Chapter 9, the city will be forced

1  to continue on the path that it was on until it filed this

2  case.  In order to free up cash for day-to-day operations,

3  the city would have to continue to borrow money, defer

4  capital investments, and shrink its workforce.  This solution

5  has proven unworkable.  It is also dangerous for its

6  residents.  This factor weighs heavily in favor of finding

7  good faith.

8         Accordingly, the Court concludes that the city's

9  petition was filed in good faith and the petition is not

10 subject to dismissal under Section 921(c).  The Court

11 accordingly concludes that under Section 109(c) the City of

12 Detroit may be a debtor under Chapter 9 of the Bankruptcy

13 Code.  The Court will enter an order for relief forthwith as

14 required by Section 921(d).  The Court reminds all interested

15 parties that this eligibility determination is merely a

16 preliminary matter in this bankruptcy case.  The city's

17 ultimate objective is the confirmation of a plan of

18 adjustment.  It has stated on the record its intent to

19 achieve that objective with all deliberate speed and to file

20 a plan shortly.  Accordingly, the Court strongly encourages

21 the parties to begin to negotiate or, if they have already

22 begun, to continue to negotiate with a view toward a

23 consensual plan.

24        The Court recognizes and understands, to the extent

25 it can, the widespread anguish and distress that this

1  decision to permit the city's bankruptcy to proceed may cause

2  to the city's employees and retirees as well as their

3  families.  The Court, therefore, implores with all urgency

4  those who administer our social safety net, our governor who

5  authorized this case, our state government leaders, our civic

6  and business leaders, our religious and charitable

7  organizations, to focus yet greater attention on the real

8  human needs that will arise because of the city's bankruptcy.

9  The message of this bankruptcy is that the city does

10  not have enough money to properly care for its residents let

11  alone to pay its debts, and, unfortunately, that economic

12  fact would be true even if pensions did have the legal

13  protection that the city's employees and retirees seek here,

14  and that's the very wisdom of the bankruptcy law.  It

15  recognizes that people, businesses, and even municipalities

16  can't print money, and it tries to provide an equitable and

17  hopeful solution.

18  It is, indeed, a momentous day.  We have here a

19  judicial finding that this once proud and prosperous city

20  can't pay its debts.  It's insolvent.  It's eligible for

21  bankruptcy.  At the same time, it also has an opportunity for

22  a fresh start.  I hope that everyone associated with the city

23  will embrace that opportunity.

24  Under Section 921(e) of the Bankruptcy Code, there

25  is no stay of this finding.  The Court understands that one

1  or more parties may seek an appeal of this directly to the

2  Court of Appeals.  The Court would ask that any such request

3  be made promptly by motion.

4       Is it still the city's intent to file a plan by

5  year-end?

6       MR. HEIMAN:  Your Honor, we're not quite certain.

7  I'm sorry.  David Heiman for the city.  We're still working

8  on our timeline but obviously mindful of your prior request

9  that we file before March 1, so we hope to be well within

10 that request.

11      THE COURT:  All right.  Thank you, sir.

12      MR. HEIMAN:  Thank you.

13      THE COURT:  Is there anything else that anyone would

14 like to raise at this time?  No.  We'll be in recess.

15      THE CLERK:  All rise.  Court is in recess.

16     (Proceedings concluded at 11:33 a.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.

/s/ Lois Garrett             December 5, 2013
_____      _____
Lois Garrett