# SUPPLEMENTAL EXHIBIT
## Part 5

**Order for Relief dated December 5, 2013 [Docket No. 1946]**

**Opinion Regarding Eligibility dated December 5, 2013 [Docket No. 1945]**

Accordingly, for the reasons stated in that Part, AFSCME's argument on this point is rejected. The Court concludes that the emergency manager's authorization to file this bankruptcy case under P.A. 436 was valid under the Michigan Constitution, even though he was not an elected official.

### XI. The Governor's Authorization to File This Bankruptcy Case Was Valid Under the Michigan Constitution Even Though the Authorization Did Not Prohibit the City from Impairing Pension Rights.

P.A. 436 permits the governor to "place contingencies on a local government in order to proceed under chapter 9." M.C.L. § 141.1558(1). The governor did not place any contingencies on the bankruptcy filing in this case. Ex. 29 at 4. The governor's letter did, however, state "Federal law already contains the most important contingency – a requirement that the plan be legally executable." Ex. 29 at 4.

Several of the objectors argue that the pension clause of the Michigan Constitution, article IX, section 24, obligated the governor to include a condition in his authorization that would prohibit the City from impairing pension benefits in this bankruptcy case.

In Part IX E, above, the Court concluded that any such contingency in the law itself would be ineffective and potentially invalid. For the same reason, any such contingency in the governor's authorization letter would have been invalid, and may have rendered the authorization itself invalid under 11 U.S.C. § 109(c).

Accordingly, this objection is overruled. The Court concludes that the governor's authorization to file this bankruptcy case under P.A. 436 was valid under the Michigan Constitution.

### XII. The Judgment in *Webster v. Michigan* Does Not Preclude the City from Asserting That the Governor's Authorization to File This Bankruptcy Case Was Valid.

#### A. The Circumstances Leading to the Judgment

On July 3, 2013, Gracie Webster and Veronica Thomas filed a complaint against the State of Michigan, Governor Snyder and Treasurer Dillon in the Ingham County Circuit Court. They sought a declaratory judgment that P.A. 436 is unconstitutional because it permits accrued pension benefits to be diminished or impaired in violation of article IX, section 24 of the Michigan Constitution. (Dkt. #1219) The complaint also sought a preliminary and permanent injunction enjoining Governor Snyder and State Treasurer Dillon from authorizing the Detroit emergency manager to commence proceedings under chapter 9 of the bankruptcy code.

On Thursday, July 18, 2013, the state court held a hearing, apparently jointly on a similar complaint filed by the General Retirement System of the City of Detroit. According to the transcript of the hearing, it began at 4:15 p.m. Case No.13-734-CZ, Hrg Tr. 4:2, July 18, 2013. (Dkt. #1219-9) Almost immediately, counsel for the plaintiffs advised the court that the City had already filed its bankruptcy case. Hrg Tr. 6:2-9. (It was filed at 4:06 p.m. on that day.) As a result, counsel asked for an expedited process. Hrg Tr. 7:8-18. The court responded, "I plan on making a ruling Monday. I could make a ruling tomorrow, if push came to shove, but Monday probably would be soon enough. I am confident that the bankruptcy court won't act as quickly as I will." Hrg Tr. 7:23-8:2.

The plaintiff's attorneys then asked that the hearing on their request for a preliminary injunction be advanced from the following Monday, which is when it had been set. Hrg Tr. 8:13-22. Counsel observed that it had been briefed by both sides. Hrg Tr. 9:1-10. After the Court confirmed through its law clerk that in fact the bankruptcy case had been filed, Hrg Tr.10:9-10, counsel asked to amend its requested relief so that the governor and the emergency

manager would be enjoined from taking any further action in the bankruptcy proceeding. Hrg Tr. 10:11-17. The court responded, "Granted, as to all your requests. How soon are you going to present me with an order?" Case No.13-734-CZ, Hrg Tr. 11:1-4, July 18, 2013. (Dkt. #1219-9).

At this point, it must be observed that the judge granted this extraordinary relief with no findings and without giving the state's representative any opportunity to be heard.

In any event, the plaintiffs' counsel then used a previously prepared proposed order in the case that the General Retirement System filed and modified it extensively in handwriting, most of which was legible, to change the parties, the case number, and the ordering provisions. Case No.13-734-CZ, Hrg Tr.15:7-15, July 18, 2013. (Dkt. #1219-9) It states that it was signed at 4:25 p.m., which was 10 minutes after the hearing began. Case No.13-734-CZ, Hrg Tr. 17:4-5, July 18, 2013. (Dkt. #1219-9)

A further hearing was held the next day, beginning at 11:25 a.m., on the plaintiffs' request to amend the order of the previous afternoon. Case No.13-734-CZ, Hrg Tr. 4:2, July 19, 2013. (Dkt. #1219-10) The plaintiffs' counsel had also filed a motion that morning for a declaratory judgment and asked the court to consider it. Hrg Tr.8:2-13 The state's attorney then agreed to allow the court to consider it. Hrg Tr. 8:24-25. The judge then addressed the parties. This portion of the transcript is quoted at length here because it is necessary to demonstrate an important point in section B, below, concerning Congress' purpose in granting exclusive jurisdiction to the bankruptcy court over all issues that concern the validity of a bankruptcy filing:

> You know what we're doing? We are under siege here. Well, we aren't; I'm not. Technically I am through paper, but all of you are. Detroit is. The State is. So I'm not going to go through the usual court rules and the time and all of that. You are all going to

spend your weekend doing what lawyers do, and that's a lot of homework because we're going to have that hearing Monday unless you're asking me to do it now.

I'm going to hear everything because we're not going to piecemeal this. You all know the case. I know the case: I've done the homework. I don't think myself or my staff got any sleep last night. We've been doing research. I bet if I called all of your wives and asked if you got any sleep, they'd be saying, "No. When is my husband going to get some sleep," right? So we're going to have a hearing, and I don't care if it's today or Monday. I'll come here Saturday, if you would like. I don't care. Let's get some answers, let's get a bottom line, and let's get this moving to the Court of Appeals because that's where you all are headed. I don't care what side you're on. Someone is going up, right? So I have answers for you. Tell me your story. I've got the solution. You might not like it.

Can we move on?

Case No.13-734-CZ, Hrg Tr. 11:7-12:5, July 19, 2013. (Dkt. #1219-10)

The attorneys then agreed and argued the merits. The judge then stated her decision to grant the declaratory relief that the plaintiffs requested. Case No.13-734-CZ, Hrg Tr.33:18-35:19, July 19, 2013. (Dkt. #1219-10)

Later that day, the court entered an "Order of Declaratory Relief." This is the judgment on which the objecting parties rely in asserting their preclusion argument. The judgment is quoted at length here to demonstrate both its scope and its intended impact on this bankruptcy case:

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager

under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

A copy of this Order shall be transmitted to President Obama.[26]

Order of Declaratory Judgment, *Webster v. State of Michigan*, No. 13-734-CZ (July 19, 2013).

(Dkt. #1219-8)

In their eligibility objections in this case, several of the objectors assert that this judgment is binding upon the City under the principles of *res judicata* or collateral estoppel. Specifically, they contend that this judgment precludes the City from asserting that P.A. 436 is constitutional and that the governor properly authorized this bankruptcy filing. In the alternative, these parties

---

[26] The order had been prepared by plaintiffs' counsel before the hearing and was provided to the judge at its conclusion. However, this last sentence of the judgment was handwritten, apparently by the judge herself.

assert that the judgment is at least a persuasive indication of what the Michigan Supreme Court would hold on the issue of the constitutionality of P.A. 436.

The Court concludes that it is neither.

### B. The Judgment Is Void Because It Was Entered After the City Filed Its Petition.

There is a fundamental reason to deny the declaratory judgment any preclusive effect in this bankruptcy case.

Upon the City's bankruptcy filing, federal law - specifically, 28 U.S.C. § 1334(a) - gave this Court exclusive jurisdiction to determine all issues relating to the City's eligibility to be a chapter 9 debtor. That provision states, "[T]he district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). The Sixth Circuit has explained:

> Several factors highlight the exclusively federal nature of bankruptcy proceedings. The Constitution grants Congress the authority to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8. Congress has wielded this power by creating comprehensive regulations on the subject and by vesting exclusive jurisdiction over bankruptcy matters in the federal district courts.

*Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000). The court went on to quote this from *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir.1996):

> [A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 et seq., demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike.

*Pertuso*, 233 F.3d at 417.

The wisdom of this grant of exclusive jurisdiction lies in the absolute necessity that any bankruptcy petition be filed, considered, and adjudicated in one court. Foreclosing the

opportunity for parties to litigate a bankruptcy petition in multiple courts eliminates the likely consequence of a confused and chaotic race to judgment, and of the associated multiplication of expenses. It also eliminates the potential for inconsistent outcomes.

Indeed, the necessity to prohibit such collateral attacks on a bankruptcy petition is grounded in the uniformity requirement of Article 1, Section 8 of the United States Constitution, as the Ninth Circuit has observed:

> Filings of bankruptcy petitions are a matter of exclusive federal jurisdiction. State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one. Such an exercise of authority would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating. . . . *The ability collaterally to attack bankruptcy petitions in the state courts would also threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution.*

*Gonzales v. Parks*, 830 F.2d 1033, 1035 (9th Cir. 1987) (emphasis added). The Ninth Circuit continued, "A Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant." *Id.* at 1036. "A state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *Id.*

The Court recognizes that Congress has granted to other courts concurrent jurisdiction over certain proceedings related to the bankruptcy case. 28 U.S.C. § 1334(b) provides, "[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." However, it is not argued that this subsection applies here, and for good reason. It does not. Referring to 28 U.S.C. § 1334(b), the Ninth Circuit stated in *Gruntz v. Cnty. of Los Angeles (In re Gruntz)* 202 F.3d 1074, 1083 (9th

Cir. 2000) (en banc), "[N]othing in that section vests the states with any jurisdiction over a core bankruptcy proceeding[.]"

Indeed, 28 U.S.C. § 1334(b) only demonstrates that Congress knew precisely how to draw the line between those matters that should be within the exclusive jurisdiction of the federal bankruptcy court and those matters over which the jurisdiction could be shared. By denying effect to the Ingham County Circuit Court judgment in this case, this Court is enforcing that line.

The Court therefore concludes that upon the filing of this case at 4:06 p.m. on July 18, 2013, the Ingham County Circuit Court lost the jurisdiction to enter any order or to determine any issue pertaining to the City's eligibility to be a chapter 9 debtor.

The Sixth Circuit has held that a state court judgment entered without jurisdiction is void *ab initio*. *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.")

Accordingly, the state court's "Order of Declaratory Judgment" on which the objectors rely here is therefore void and of no effect, and does not preclude the City from asserting its eligibility in this Court in this case.

## C. The Judgment Is Also Void Because It Violated the Automatic Stay.

11 U.S.C. § 362(a)(3) provides that "a petition filed under section 301 . . . operates as a stay, applicable to all entities, of . . . any act . . . to exercise control over property of the estate[.]" 11 U.S.C. § 902(1) states, "In this chapter 'property of the estate', when used in a section that is made applicable in a case under this chapter by section 103(e) or 901 of this title, means property of the debtor[.]"

The Sixth Circuit has held, "[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision." *Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.)*, 423 F.3d 567, 578 (6th Cir. 2005) (quoting *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997). *See also Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993).

The thrust of the plaintiffs' case in *Webster v. Michigan* was to protect the plaintiffs' pension rights by prohibiting a bankruptcy case which might allow the City to use its property in a way that might impair pensions. It does not matter that neither the City nor its officers were defendants. The suit was clearly an act to exercise control over the City's property. Accordingly, it was stayed under 11 U.S.C. § 362(a)(3) and the state court's "Order of Declaratory Relief" was entered in violation of the stay.[27]

In *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993), the court stated, "In summary, we hold that actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances."

---

[27] The Retirement Systems argue that there was no bankruptcy stay applicable to the state court litigation until July 25, 2013 when this Court entered an order extending the automatic stay to certain state officers. That order specifically included these state court cases as examples of cases that were included in the extended stay. Retirement Systems Br. at 51. (Dkt. #519)

That order, however, did not preclude the City from arguing later that the stay of 11 U.S.C. § 362(a)(3) applied as of the bankruptcy filing. Indeed, at the hearing on the motions that resulted in these orders, the Court expressly stated: "The Court is not ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay." Hrg. Tr. 84:10-16, July 24, 2013. (Dkt. #188)

That issue is now squarely before the Court. For the reasons stated in the text, the Court concludes that the automatic stay of § 362(a)(3) was applicable to the Flowers, Webster and General Retirement Systems state court cases from the moment the City filed its bankruptcy petition.

In this case, no equitable circumstances suggest any reason to find that the state court's order should not be voided. Instead, equitable circumstances suggest that it should be voided. When the plaintiffs' counsel appeared in the state court on July 18 and 19, 2013, they knew that the City had filed its bankruptcy petition, as did the judge. The record of those proceedings establishes beyond doubt that the proceedings were rushed in order to achieve a prompt dismissal of the bankruptcy case. The protection that the stay of 11 U.S.C. § 362(a) affords is for the benefit of both the debtor and all creditors. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 541 (5th Cir. 2009); *Johnson v. Smith (In re Johnson)*, 575 F.3d 1079, 1083 (10th Cir. 2009). Condoning the actions that the plaintiffs took in this case would open the floodgates to similar actions by creditors in other bankruptcy cases and thereby vitiate that important protection.

Accordingly, the Court concludes that the judgment in *Webster* is void because its entry violated the automatic stay of 11 U.S.C. § 362(a)(3) and no equitable circumstances suggest that it should not be voided. For this additional reason, that judgment does not preclude the City from asserting its eligibility in this Court in this case.

### D. Other Issues

The City disputes the application of *res judicata* and collateral estoppel on several other grounds. Specifically, it contends that the two hearings that resulted in the *Webster* judgment were confused and hurried. It also disputes whether the State was given a full and fair opportunity to be heard, and whether the judgment is binding on it, as it was not a party to the suit.

The Court concludes that in light of its conclusions that the state court lacked jurisdiction and that its judgment is void, it is unnecessary to decide these issues.

Nevertheless, the Court does comment that the transcripts of the two post-petition state court hearings on July 18 and 19, 2013 reflect a very chaotic and disorderly "race to judgment." (Dkt. #1219-9; Dkt. #1219-10)  Those proceedings are perfect examples of the very kind of litigation the Congressional grant of exclusive jurisdiction in bankruptcy to one court was designed to control and eliminate.  Moreover, respect for the extraordinary gravity of the issues presented, as well as for the defendants in the case, would certainly have mandated a much more considered and deliberative judicial process.  Actually, so does respect for the plaintiffs, and for the City's other 100,000 creditors.

Finally, for the reasons stated in Part IX, above, the reasoning in the *Webster* declaratory judgment is neither persuasive nor at all indicative of how the Michigan Supreme Court would rule.

This objection to the City's eligibility is rejected.

### XIII. The City Was "Insolvent."

To be eligible for relief under chapter 9, the City must establish that it is "insolvent."  11 U.SC. § 109(c)(3).  Several individual objectors and AFSCME challenge the City's assertion that it is insolvent.

### A. The Applicable Law

For a municipality, the bankruptcy code defines "insolvent" as a "financial condition such that the municipality is-- (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) is unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C).

The test under the first prong "looks to current, general non-payment." The test under the second prong "is an equitable, prospective test looking to future inability to pay." *Hamilton*

*Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384 (10th Cir. 1998); *see also In re City of Stockton*, 493 B.R. 772, 788 (Bankr. E.D. Cal. 2013) ("Statutory construction rules likewise point to a temporal aspect as the § 101(32)(C)(ii) phrase 'as they become due' must mean something different than its § 101(32)(C)(i) partner 'generally not paying its debts.'").

A payment is "due" under the first prong if it is "presently, unconditionally owing and presently enforceable." *Hamilton Creek*, 143 F.3d at 1385. When a municipality is unable to meet its presently enforceable debts, it is said to be "cash insolvent." *See Stockton*, 493 B.R. at 789.

When considering the second prong, courts take into account broader concerns, such as longer term budget imbalances and whether the City has sufficient resources to maintain services for the health, safety, and welfare of the community. *Id.*; *see also In re Boise Cnty.*, 465 B.R. 156, 172 (Bankr. D. Idaho 2011) ("The test under § 101(32)(C)(ii) is a prospective one, which requires the petitioner to prove as of the petition date an inability to pay its debts as they become due in its current fiscal year, or, based on an adopted budget, in its next fiscal year.")

Although each test focuses on the City's ability to meet its financial obligations at different points in time, both are to be applied as of the time of the chapter 9 filing. *Hamilton Creek*, 143 F.3d at 1384-85 (citing *In re Town of Westlake*, 211 B.R. 860, 866 (Bank. N.D. Tex. 1997)).

Finally, the Court notes that "the theme underlying the two alternative definitions of municipal insolvency in § 101(32)(C) is that a municipality must be in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts." *Stockton*, 493 B.R. at 788.

## B. Discussion

The Court finds that the City of Detroit was, and is, insolvent under both definitions in 11 U.S.C. § 101(32)(C). The Court has already detailed the enormous financial distress that the City faced as of July 18, 2013 and will not repeat that here. See Part III A, above.

### 1. The City Was "Generally Not Paying Its Debts As They Become Due."

Specifically, in May 2013, the City deferred payment on approximately $54,000,000 in pension contributions. On June 30, 2013, it deferred an additional $5,000,000 fiscal year-end payment. Ex. 43 at 8. The City also did not make a scheduled $39,700,000 payment on its COPs on June 14, 2013. Ex. 43 at 8. It was also spending much more money than it was receiving, and only making up the difference through expensive and even catastrophic borrowings. See Part III A 5, 8 and 9, above.

These facts establish that the City was "generally not paying its debts as they become due," as of the time of the filing. 11 U.S.C. § 101(32)(C)(i).

AFSCME asserts that this was "[t]he purposeful refusal to make a few payments comprising a relatively small part of the City's budget." AFSCME Pre-Trial Br. at 51. (Dkt. #1227)

The Court must reject this assertion. The evidence established that the nearly $40,000,000 pension-related COPs default was particularly serious because it put in jeopardy the City's access to its casino tax revenue, which was one of the City's few reliable sources of income. Eligibility Trial Tr. 185:16-186:23, Oct. 24, 2013. (Dkt. #1490)

Moreover, the City was operating on a "razor's edge" for several months prior to June 2013. Eligibility Trial Tr. 189:9-10, Oct. 24, 2013. (Dkt. #1490)

As of May 2013, the City stopped paying its trade creditors to avoid running out of cash. Eligibility Trial Tr. 189:14-15, Oct. 24, 2013. (Dkt. #1490) But for these and other deferments, the City would have completely run out of cash by the end of 2013. Ex. 75 at 2.

### 2. The City Is Also "Unable to Pay Its Debts As They Become Due."

The evidence was overwhelming that the City is unable to pay its debts as they become due.

The evidence established that there are many, many services in the City which do not function properly as a result of the City's financial state. The facts found in Parts III B 6-12, above, further firmly support this conclusion.

Most powerfully, however, the testimony of Chief Craig established that the City was in a state of "service delivery insolvency" as of July 18, 2013, and will continue to be for the foreseeable future. He testified that the conditions in the local precincts were "deplorable." Eligibility Trial Tr. 189:4-6, Oct. 25, 2013. (Dkt. #1501) "If I just might summarize it in a very short way, that everything is broken, deplorable conditions, crime is extremely high, morale is low, the absence of leadership." Tr. 188:5-7 He described the City as "extremely violent," based on the high rate of violent crime and the low rate of "clearance" of violent crimes. Tr. 190:11-191:25. He stated that the officers' low morale is due, at least in part, to "the fact that they had lost ten percent pay; that they were forced into a 12-hour work schedule," and because there was an inadequate number of patrolling officers, and their facilities, equipment and vehicles were in various states of disrepair and obsolescence. Eligibility Trial Tr. 192:20-193:3, 197:21-23, 198:10-199:18, Oct. 25, 2013. (Dkt. #1501)

In *Stockton*, the Court observed:

> While cash insolvency—the opposite of paying debts as they
> become due—is the controlling chapter 9 criterion under
> § 101(32)(C), longer-term budget imbalances [budget insolvency]
> and the degree of inability to fund essential government services
> [service delivery insolvency] also inform the trier of fact's
> assessment of the relative degree and likely duration of cash
> insolvency.

478 B.R. at 789.

Service delivery insolvency "focuses on the municipality's ability to pay for all costs of

providing services at the level and quality that are required for the health, safety, and welfare of

the community." *Id. at* 789. Indeed, while the City's tumbling credit rating, its utter lack of

liquidity, and the disastrous COPs and swaps deal might more neatly establish the City's

"insolvency" under 11 U.S.C. § 101(32)(C), it is the City's service delivery insolvency that the

Court finds most strikingly disturbing in this case.

### 3. The City's "Lay" Witnesses

The objecting parties argue the City failed to establish its insolvency because it failed to

present expert proof on this issue. *See* AFSCME Pre-Trial Br. at 52. (Dkt. # 1227) ("Courts in

the non-chapter 9 context note that 'it is generally accepted that whenever possible, a

determination of insolvency should be based on . . . expert testimony . . .'" (citing *Brandt v.*

*Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.),* No. 03B12184, 2005 WL 3021173,

at *6 (Bankr. N.D. Ill. July 14, 2005)). This argument arises from the fact that the City

mysteriously declined to qualify its financial analysts as expert witnesses.

At trial, upon the request of the City, the Court determined that under Rule 701, F.R.E.,

these witnesses - Charles Moore, Ken Buckfire and Gaurav Malhotra - could testify as lay

witnesses regarding the City's finances and their projections of the City's finances in the future.

Eligibility Trial Tr. 39:20-49:8, Oct. 25, 2013. (Dkt. #1501) The Court also admitted extensive

documentary evidence of the analysts' observations and projections. Tr. 49:5-8. These determinations were based upon the Court's finding that the financial consultants "had extensive personal knowledge of the City's affairs that they acquired during ... the course of their consulting work with the city." Eligibility Trial Tr. 48:14-19, Oct. 25, 2013. (Dkt. #1501); *see, e.g., JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 525-26 (6th Cir. 2004); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685-87 (5th Cir. 2003) (discussing *In re Merritt Logan, Inc.*, 901 F.2d 349 (3rd Cir. 1990) and *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399 (3rd Cir. 1980)). While the Court questions the City's strategy here, it is clear from these cases that there is nothing improper about the City's decision not to qualify these witnesses as experts, even though it likely could have.

The witnesses testified reliably and credibly regarding their personal knowledge of the City's finances and the basis for their knowledge. In these circumstances, the Court must reject AFSCME's argument that expert testimony is essential for a finding of insolvency under 11 U.S.C. §§ 109(c)(3) and 101(32)(C).

### 4. The City's Failure to Monetize Assets

Finally, the objecting parties assert that the City could have, and should have, monetized a number of its assets in order to make up for its severe cash flow insolvency. *See e.g.,* AFSCME Pre-Trial Br. at 53. (Dkt. #1227)

However, Malhotra credibly established that sales of City assets would not address the operational, structural financial imbalance facing the City. Eligibility Trial Tr. 85:2-86:12, Oct. 25, 2013. (Dkt. #1501) Buckfire also testified similarly. Tr. 197:19-204:14. The undisputed evidence establishes that the "City's expenditures have exceeded its revenues from fiscal year 2008 to fiscal year 2012 by an average of $100 million annually." Ex. 75 at 2.

When the expenses of an enterprise exceed its revenue, a one-time infusion of cash, whether from an asset sale or a borrowing, only delays the inevitable failure, unless in the meantime the enterprise sufficiently reduces its expenses and enhances its income. The City of Detroit has proven this reality many times.

In any event, when considering selling an asset, the enterprise must take extreme care that the asset is truly unnecessary in enhancing its operational revenue.

For these reasons, the Court finds that the City has established that it is insolvent as 11 U.S.C. § 109(c)(3) requires and as 11 U.S.C. § 101(32)(C) defines that term.

## XIV. The City Desires to Effect a Plan to Adjust Its Debts.

To establish its eligibility for relief under chapter 9, the City must establish that it desires to effect a plan to adjust its debts. 11 U.S.C. § 109(c)(4).

### A. The Applicable Law

In *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (B.A.P. 9th Cir. 2009), the Bankruptcy Appellate Panel surveyed the case law under § 109(c)(4):

> Few published cases address the requirement that a chapter 9 petitioner "desires to effect" a plan of adjustment. Those cases that have considered the issue demonstrate that no bright-line test exists for determining whether a debtor desires to effect a plan because of the highly subjective nature of the inquiry under § 109(c)(4). *Compare In re County of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995) (proposal of a comprehensive settlement agreement among other steps taken demonstrated efforts to resolve claims which satisfied § 109(c)(4)) *with In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 76 (Bankr. D.N.H. 1994) (post-petition submission of a draft plan of adjustment met § 109(c)(4)).

Petitioners may satisfy the subjective requirement with direct and circumstantial evidence. They may prove their desire by attempting to resolve claims as in *County of Orange*; by submitting a draft plan of adjustment as in *Sullivan County*; or by other evidence customarily submitted to show intent. *See Slatkin*, 525 F.3d at 812. The evidence needs to show that the "purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors." *See Collier* ¶ 109.04[3][d], at 109–32.

*Local 1186*, 408 B.R. at 295.

In *Stockton*, the court expanded:

> The cases equate "desire" with "intent" and make clear that this element is highly subjective. *E.g., In re City of Vallejo*, 408 B.R. 280, 295 (9th Cir. BAP 2009).

> At the first level, the question is whether the chapter 9 case was filed for some ulterior motive, such as to buy time or evade creditors, rather than to restructure the City's finances. *Vallejo*, 408 B.R. at 295; 2 Collier on Bankruptcy ¶ 109.04[3][d], at p. 109–32 (Henry J. Sommer & Alan N. Resnick eds. 16th ed. 2011) (hereafter "Collier").

> Evidence probative of intent includes attempts to resolve claims, submitting a draft plan, and other circumstantial evidence. *Vallejo*, 408 B.R. at 295.

493 B.R. at 791. *See also City of San Bernardino, Cal.*, 2013 WL 5645560, at *8-12 (Bankr. C.D. Cal. 2013); *In re Boise County*, 465 B.R. 156, 168 (Bankr. D. Idaho 2011); *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 272 (Bankr. S.D.N.Y. 2010).

"Since that 'plan' is to be effected by an entity seeking relief under Chapter 9, it is logical to conclude that the 'plan' referred to in section 109(c)(4) is a 'plan for adjustment of the debtor's debts' within the meaning of section 941 of the Bankruptcy Code." *In re Cottonwood Water and Sanitation Dist., Douglas County, Colo.*, 138 B.R. 973, 975 (Bankr. D. Colo. 1992).

**B. Discussion**

Several objectors asserted that the City does not desire to effect a plan to adjust its debts.

The Court concludes that the evidence overwhelmingly established that the City does desire to effectuate a plan in this case. Mr. Orr so testified. Eligibility Trial Tr. 43:1-47:13, October 28, 2013. (Dkt. #1502) More importantly, before filing this case, Mr. Orr did submit to creditors a plan to adjust the City's debts. Ex. 43. Plainly, that plan was not acceptable to any of the City's creditors. It may not have been confirmable under 11 U.S.C. § 943, although it is not necessary to resolve that question at this time. Still, it was evidence of the City's desire and intent to effect a plan. There is simply no evidence that the City has an ulterior motive in pursuing chapter 9, such as to buy time or to evade creditors.

Indeed, the objecting creditors do not contend that there was any such ulterior motive. They assert no desire on the part of the City or its emergency manager to buy time or evade creditors. Rather, their argument is that the plan that the emergency manager has stated he intends to propose in this case is not a confirmable plan. It is not confirmable, they argue, because it will impair pensions in violation of the Michigan Constitution.

Certainly the evidence does establish that the emergency manager intends to propose a plan that impairs pensions. The Court has already so found. See Part VIII C 1, above. Nevertheless, the objectors' argument must be rejected. As established in Part VIII C 5, above, a chapter 9 plan may impair pension rights. The emergency manager's stated intent to propose a plan that impairs pensions is therefore not inconsistent with a desire to effect a plan.

Accordingly, the Court finds that the City does desire to effect a plan, as 11 U.S.C. § 109(c)(4) requires.

### XV. The City Did Not Negotiate with
### Its Creditors in Good Faith.

#### A. The Applicable Law

The fifth requirement for eligibility is found in § 109(c)(5).

An entity may be a debtor under chapter 9 of this title if and only if such entity—

   . . .

   (5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

   (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

   (C) is unable to negotiate with creditors because such negotiation is impracticable; or

   (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5).

This section was enacted because Congress recognized that municipal bankruptcy is a drastic step and should only be taken as a last resort. *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994); 5 Norton Bankr. L. & Prac. 3d § 90:25 ("It is the policy of the Bankruptcy Code that a Chapter 9 filing should be considered only as a last resort, after an out-of-court attempt to avoid bankruptcy has failed.") Therefore, it added a requirement for pre-bankruptcy negotiation to attempt to resolve disputes.

Because § 109(c)(5) is written in the disjunctive, a debtor has four options to satisfy the requirement for negotiation: "[1] it may obtain the agreement of creditors holding a majority in amount of claims in each class [; (2)] it may show that it has negotiated with its creditors in good faith but has failed to obtain their agreement [; (3)] it may show that it is unable to negotiate with creditors because negotiation is impracticable [; or (4)] it may demonstrate that it reasonably believe[s] that a creditor may attempt to obtain a preferential transfer." *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 265–66 (Bankr. D. Colo.1992).

*In re Valley Health Sys.*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008).

The City of Detroit asserts that it has met the requirements of § 109(c)(5)(B) or, in the alternative, § 109(c)(5)(C). City's Reply to Objections at 45-49; (Dkt. #765) City's Pre-trial Br. at 49-67. (Dkt. #1240)

The Court finds the recent case, *In re Mendocino Coast Recreation & Park Dist.*, 12-CV-02591-JST, 2013 WL 5423788 (N.D. Cal. Sept. 27, 2013), persuasive on this issue. In that case, the district court for the Northern District of California noted:

> [T]he Bankruptcy Court identified two lines of authority about 109(c)(5)(B)'s requirements. The less restrictive view, adopted by the editors of Collier, is that the debtor need not attempt to negotiate any specific plan of adjustment. *Id.* (citing 2–109 Collier on Bankruptcy ("Collier "), ¶ 109.04[3][e][ii] (16th ed.)). As the Bankruptcy Court saw the more restrictive view, adopted by *In re Cottonwood Water and Sanitation Dist.* ("Cottonwood"), 138 B.R. 973, 975 (Bankr. D. Colo.1992) and by dicta in *Vallejo*, 408 B.R. at 297, the debtor must negotiate over "the possible terms of a plan," "at least in concept."

*Mendocino Coast*, 2013 WL 5423788 at *2. After a thorough analysis of the legislative history of § 109(c)(5)(B), the court was "persuaded by the *Cottonwood* view that Section 109(c)(5)(B) requires municipalities not just to negotiate generally in good faith with their creditors, but also to negotiate in good faith with creditors over a proposed plan, at least in concept, for bankruptcy under Chapter 9." *Mendocino Coast*, 2013 WL 5423788 at *5. This Court is also persuaded by that analysis.

*Mendocino Coast* also considered how the § 109(c)(5)(B) process compares to analogous provisions in other chapters of the bankruptcy code. The court looked to 11 U.S.C. §§ 1113(b) & (c) and 1114(f)(1), which require debtors to negotiate regarding the post-petition rejection of collective bargaining agreements and pension plans in chapter 11 proceedings. The court stated:

> [T]he appropriate standard to apply [under Section 109(c)(5) ] is one that is "at least as stringent as those under §§ 1113 and 1114." 1 Norton Bankr. L. & Prac. 3d § 17:8, n.19. Those statutes require courts to, inter alia, determine whether the parties "[met] to confer in good faith in attempting to reach mutually satisfactory modifications," determine whether unions have rejected proposals "without good cause," and "balance . . . the equities." 11 U.S.C. § 1113(b)(2) & (c). In doing so, courts commonly assess both parties' conduct in negotiations.

*Mendocino Coast*, 2013 WL 5423788 at *7. The Court reached two conclusions regarding § 109(c)(5)(B):

> First, courts may consider, based on the unique circumstances of each case and applying their best judgment, whether a debtor has satisfied an obligation to have "negotiated in good faith." Second, while the Bankruptcy Code places the overwhelming weight of its burdens on petitioners, the provisions that call for negotiation contemplate that at least some very minimal burden of reciprocity be placed on parties with whom a debtor must negotiate.

*Mendocino Coast*, 2013 WL 5423788 at *7.

*Mendocino Coast* recognized that its case did not present the issue "of what must occur in a negotiation that satisfies 109(c)(5)(B). It presents the issue of what information, if missing from the debtor's first attempt to negotiate, bars a municipality from filing Chapter 9 even if a creditor rejects the overture and declines to negotiate." *Id.* at *8.

This Court faces the same question, and therefore finds *Mendocino Coast*'s analysis very useful, although on the facts of this case the Court ultimately reaches the opposite conclusion.

While recognizing that a determination of what qualifies as a good-faith effort to begin negotiation can depend on several factors, *Mendocino Coast* was able to make its determination upon consideration of three factors.

> First, the greater the disclosure about the proposed bankruptcy plan, the stronger the debtor's claim to have attempted to negotiate in good faith. A creditor might be justified in rejecting the overture of a debtor proposing a frivolous or unclearly described adjustment plan, but a creditor is less justified in ignoring a substantive proposal.
>
> . . .
>
> Second, the municipality's need to immediately disclose classes of creditors and their treatment in the first communication will depend upon how material that information would be to the creditor's decision about whether to negotiate.
>
> . . .
>
> Third, the creditor's response, and the amount of time the creditor has had to respond, may also be factors. If a creditor has had a relatively short time to respond to the municipality's offer to

negotiate, a lack of detail in the opening communication might weigh against a municipality rushing to file. On the other hand, where a creditor has been apprised of the possibility of a debt adjustment and declined to respond after a reasonable period of time, or where the creditor has explicitly responded with a refusal to negotiate, its position as an objector is significantly weakened.

*Mendocino Coast*, 2013 WL 5423788 at \*8-9.

### B. Discussion

In the present case, the City of Detroit argues that the June 14, 2013 proposal to creditors, along with its follow up meetings, was a good-faith effort to begin negotiations, and that the creditors refused to respond. It asserts, therefore, it has satisfied 11 U.S.C. § 109(c)(5)(B). City's Reply to Objections at 54-58. (Dkt. # 765)

The Court concludes, however, that the June 14 Proposal to Creditors and the follow up meetings were not sufficient to satisfy the requirements of 11 U.S.C. § 109(c)(5)(B). The first and third factors cited by *Mendocino Coast* weigh heavily against finding that the City's initial efforts satisfied the requirement of good faith negotiation. The Proposal to Creditors did not provide creditors with sufficient information to make meaningful counter-proposals, especially in the very short amount of time that the City allowed for the "discussion" period.

The City's proposal to creditors is a 128 page document. Ex. 43. The City invited many creditors or "stakeholders" to the meeting on June 14, 2013, when it presented the proposal. Its presentation was a 120 deck powerpoint presentation, providing information regarding the financial condition of the City and proposing across the board reductions in creditor obligations.

The restructuring proposal began on page 101. Addressed on page 109 are the proposed treatment of the unsecured general obligation bonds, the claims of service corporations on account of the COPs, the claims for unfunded OPEB liabilities, the claims for unfunded pension

116

liabilities and the claims on account of other liabilities. Ex. 43. Charitably stated, the proposal is very summary in nature.

For example, the proposed treatment for underfunded pension liabilities is three bullet points in length. The first bullet point states that the underfunding is approximately $3.5B. The second bullet point states, "Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes." The third bullet point states, "Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." Ex. 43 at 109.

This is simply not enough information for creditors to start meaningful negotiations. Brad Robins, of Greenhill & Co. LLC, financial advisor to the Retirement Systems, testified, "The note, itself, I thought was not really a serious proposal but maybe a place holder, [because it had] no maturity, no obligation for the City to pay." Eligibility Trial Tr. 129:1-11, Nov. 7, 2013. (Dkt. #1681)

The City asserts that it provided supporting data in an "electronic data room." However, several witnesses testified that the data room did not contain all the necessary data to make a meaningful evaluation of the proposal to creditors. Brad Robins testified that the data room was missing "lots of information: value of assets, different projections and build-ups." Eligibility Trial Tr. 133:7-10, Nov. 7, 2013. (Dkt. #1681) He felt that prior to the filing date, Greenhill was not given complete information to fully evaluate what was laid out in the June 14, 2013 proposal. Eligibility Trial Tr. 135:17-20, Nov. 7, 2013. (Dkt. #1681) Mark Diaz testified that he made a request to the City for additional information and did not receive a response. Eligibility Trial Tr. 192:1-5, Nov. 7, 2013. (Dkt. #1681)