# SUPPLEMENTAL EXHIBIT
## Part 6

**Order for Relief dated December 5, 2013 [Docket No. 1946]**

**Opinion Regarding Eligibility dated December 5, 2013 [Docket No. 1945]**

Moreover, the City conditioned access to the data room on the signing of a confidentiality and release agreement. This created an unnecessary hurdle for creditors.

The creditors simply cannot be faulted for failing to offer counter-proposals when they did not have the necessary information to evaluate the City's vague initial proposal.

The proposal for creditors provided a calendar on page 113. Ex. 43. It allotted one week, June 17, 2013 through June 24, 2013, for requests for additional information. Initial rounds of discussions with stakeholders were scheduled for June 17, 2013 through July 12, 2013. The evaluation period was scheduled to be July 15, 2013 through July 19, 2013. This calendar was very tight and it did not request counter-proposals or provide a deadline for submitting them.

The City filed its bankruptcy on July 18, 2013, the day before the end of the evaluation period. Although the objecting creditors argue that in hindsight the bankruptcy filing was a forgone conclusion, they argue that the initial proposal did not make clear the City's intention to file. Regardless, the time available for creditor negotiations was approximately thirty days. Given the extraordinary complexities of the case, that amount of time is simply far too short to conclude that such a vague proposal to creditors rises to the level required to shift the burden to objectors to make counter-proposals.

In addition to the lack of detail in the initial proposal and the short response time, the Court notes that two additional factors support its conclusion.

First, the City affirmatively stated that the meetings were not negotiations. Eligibility Trial Tr. 188:22-24, 189:1-3, Nov. 7, 2013; (Dkt. #1681) Orr Dep. Tr. 129:14-18, 262:1-25, Sept. 16, 2013. The City asserts this was to clarify that the City was not waiving the suspension of collective bargaining under P.A. 436. Orr Dep. Tr. 264:23-265:7, Sept. 16, 2013 (Dkt. #1159-B); Orr Dep. Tr. 63:21-64.20, Oct. 28, 2013. (Dkt. # 1502) This explanation is inadequate,

bordering on disingenuous. The City simply cannot announce to creditors that meetings are not negotiations and then assert to the Court that those same meetings amounted to good faith negotiations.

Second, the format of the meetings was primarily presentational, to different groups of creditors with different issues, and gave little opportunity for creditor input or substantive discussion. Eligibility Trial Tr. 145:7-146:3, Nov. 4, 2013. (Dkt. #1683) For example, at the end of the June 14, 2013 meeting, creditors were permitted to submit questions via notecard. Shirley Lightsey attended the June 20, 2013, July 10, 2013 and July 11, 2013 meetings and testified that there was no opportunity to meet in smaller groups to discuss retiree-specific issues. Eligibility Trial Tr.108:19-20, 109:22-23, 111:1-3, Nov. 4, 2013. (Dkt. #1683) Mark Diaz, President of the Detroit Police Officers Association, testified there was no back and forth discussion. Eligibility Trial Tr. 187:22-25, 189:1-3, Nov. 7, 2013. (Dkt. #1681)

The City argues that these meetings were intended to start negotiations and that they expected counter-proposals from the creditors. Even as a first step, these meetings failed to reach a level that would justify a finding that negotiations had occurred, let alone good faith negotiations. Moreover, the Court finds that the lack of negotiations were not due to creditor recalcitrance. Accordingly, the Court concludes that the City has not established by a preponderance of the evidence that it has satisfied the requirement of 11 U.S.C. § 109(c)(5)(B).

### XVI. The City Was Unable to Negotiate with Creditors Because Such Negotiation Was Impracticable.

#### A. The Applicable Law

Nevertheless, the Court finds that negotiations were in fact, impracticable, even if the City had attempted good faith negotiations. "[I]mpracticability of negotiations is a fact-sensitive inquiry that 'depends upon the circumstances of the case.'" *In re New York City Off-Track*

*Betting Corp.*, 427 B.R. 256, 276-77 (Bankr. S.D.N.Y. 2010) (quoting *In re City of Vallejo*, 408 B.R. at 298); *In re Valley Health Sys.*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008) ("There is nothing in the language of section 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case."). *See also In re Hos. Auth. Pierce County*, 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009) ("Whether negotiations with creditors is impracticable depends on the circumstances of the case.").

> "Impracticable" means "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." Webster's New International Dictionary 1136 (3d ed. 2002). In the legal context, "impracticability" is defined as "a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty." Black's Law Dictionary 772 (8th ed. 2004).

*In re Valley Health Sys.*, 383 B.R. at 163.

Congress adopted § 109(c)(5)(C) specifically "to cover situations in which a very large body of creditors would render prefiling negotiations impracticable." *In re Cnty. of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995) (*quoting In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 79 n. 55.) *See also In re New York City Off-Track Betting Corp.*, 427 B.R. at 276-77; 2 Collier on Bankruptcy ¶ 109.04[3][e][iii]. "The impracticality requirement may be satisfied based on the sheer number of creditors involved." *Cnty. of Orange*, 183 B.R. at 607. *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ("It certainly was impracticable for [debtor] to have included several hundred Series D Bondholders in these conceptual discussions."); *Valley Health Sys.*, 383 B.R. at 165 (finding that the requirement of § 109(c)(5)(C) was met where the debtor's petition disclosed not more than 5,000

creditors holding claims in excess of $100,000,000); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (over 7,000 creditors and parties in interest were set forth on the mailing matrix).

**B. Discussion**

The list of creditors for the City of Detroit is over 3500 pages. Ex. 64 (Dkt. #1059) It lists over 100,000 creditors. It is divided into fifteen schedules including the following classifications: Long-Term Debt; Trade Debt; Employee Benefits; Pension Obligations, Non-Pension Retiree Obligations; Active Employee Obligations; Workers' Compensation; Litigation and Similar Claims; Real Estate Lease Obligations; Deposits; Grants; Pass-Through Obligations, Obligations to Component Units of the City; Property Tax-Related Obligations; Income Tax-Related Obligations. Ex. 64 at 2-3. (Dkt. #1059) The summary of schedules provided with the list estimates the amount of claims and percent total for each schedule where sufficient information is available to determine those amounts. (Dkt. #1059-1) Some schedules such as Workers' Compensation and Litigation and Similar Claims do not have amounts listed because they are unliquidated, contingent and often disputed claims.

Long term debt, including bonds, notes and loans, capital lease, and obligations arising under the COPs and swaps, is listed at over $8,700,000,000 or approximately 48.52% of the City's total debt. Within this category are several series of bonds where individual bondholders are not identified. Many of these bondholders are not represented by any organization. Ex. 28 at 10.

As noted above, pension obligations are estimated at almost $3,500,000,000 or 19.33% of the City's total debt. The City estimates over 20,000 individual retirees are owed pension funds.

Ex. 28 at 9. OPEB amounts are estimated at approximately $5,700,000,000 or 31.81% of the City's total debt.

The Court is satisfied that when Congress enacted the impracticability section, it foresaw precisely the situation facing the City of Detroit. It has been widely reported that Detroit is the largest municipality ever to file bankruptcy. Indeed, one of the objectors stated that it is "by far the largest and most economically significant city ever to file for chapter 9 bankruptcy." AFSCME's Supplemental Br. on Good Faith Negotiations at 7. (Dkt. #1695) The sheer size of the debt and number of individual creditors made pre-bankruptcy negotiation impracticable – impossible, really.

There are, however, several other circumstances that also support a finding of impracticability.

First, although several unions have now come forward to argue that they are the "natural representatives of the retirees," those same unions asserted in response to the City's pre-filing inquires that they did not represent retirees. Ex. 32. For example, in a May 22, 2013 letter, Robyn Brooks, the President of UAW Local 2211, stated, "This union does not, however, represent current retirees and has no authority to negotiate on their behalf." John Cunningham sent the same response on behalf of UAW Locals 412 and 212. In a May 27, 2013 letter, Delia Enright, President of AFSCME Local 1023, stated, "Please be advised that in accordance with Michigan law, I have no authority in which to renegotiate the Pension or Medical Benefits that retired members of our union currently receive." Several other union representatives sent similar responses.

These responses sent a clear message to the City that the unions would not negotiate on behalf of the retirees. *See Stockton*, 493 B.R. at 794 ("it is impracticable to negotiate with 2,400 retirees for whom there is no natural representative capable of bargaining on their behalf.").

Several voluntary associations, including the RDPMA, the Detroit Retired City Employees ("DRCEA"), and the Retired Detroit Police and Fire Fighters Association ("RDPFFA"), assert that they are the natural representatives of retirees. However, none assert that they can bind individual retirees absent some sort of complex class action litigation. Ex. 301 at ¶ 6; (Dkt. # 497-2) Eligibility Trial Tr. 115:15-22, Nov. 4, 2013; (Dkt. #1683) Ex. 302 at ¶6; (Dkt. #497-3) Eligibility Trial Tr.164:1-8, Nov. 4, 2013. (Dkt. #1683) Ultimately "it would be up to the individual members of the association to decide if they would accept or reject" an offer. Eligibility Trial Tr. 157:1-4, Nov. 4, 2013. (Dkt. #1683)

Further, several witnesses who testified on behalf of the retiree associations made it clear that they would not have negotiated a reduction in accrued pension benefits because they consider them to be fully protected by state law. As Shirley Lightsey testified, "The DRCEA would not take any action to solicit authority from its membership to reduce pension benefits because they're protected by the Michigan Constitution." Eligibility Trial Tr. 125:3-7, Nov. 4, 2013. (Dkt. #1683)

The answers to interrogatories from both organizations reveal a similar inflexibility. "[T]he purpose of the RDPFFA has always been and remains to protect and preserve benefits of retirees, not to reduce such benefits." Ex. 83, Answers to Interrogatories No. 4. See also Answer to Interrogatories No. 6 for similar statement by DRCEA.

Indeed, as noted above, within two weeks of the June 14, 2013 meeting, some retirees had filed lawsuits attempting to block this bankruptcy based on their state law position. (*Flowers v. Synder*, No. 13-729-CZ July 3, 2013; *Webster v. Synder* No. 13-734-CZ July 3, 2013)

It is impracticable to negotiate with a group that asserts that their position is immutable. *See Stockton*, 493 B.R. at 794 (Bankr. E.D. Cal. 2013) ("it is impracticable to negotiate with a stone wall.").

The Court concludes that the position of the several retiree associations that they would never negotiate a reduction in accrued pension benefits made negotiations with them impracticable.

Finally, the City has sufficiently demonstrated that time was quickly running out on its liquidity. Ex. 9. (Dkt. #12) The Court therefore rejects the objectors' assertions that the City manufactured any time constraints in an attempt to create impracticability. Throughout the pertinent time periods, the City was in a financial emergency.

> Courts also frequently find that negotiations are impracticable where pausing to negotiate before filing for chapter 9 protection would put the debtor's assets at risk. *See, e.g., In re Valley Health Sys.*, 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets."); 2 Collier on Bankruptcy ¶ 109.04[3][e][iii] ("[W]here it is necessary to file a chapter 9 case to preserve the assets of a municipality, delaying the filing to negotiate with creditors and risking, in the process, the assets of the municipality makes such negotiations impracticable.").

*In re New York City Off-Track Betting Corp.*, 427 B.R. at 276-77.

The majority of the City's debt is bond debt and legacy debt. Neither the pension debt nor the bond debt are adjustable except through consent or bankruptcy. Negotiations with retirees and bondholders were impracticable due to the sheer number of creditors, and because many of the retirees and bondholders have no formal representatives who could bind them, or

even truly negotiate on their behalf. Additionally, the Court finds that the City's fiscal crisis was not self-imposed and also made negotiations impracticable.

Accordingly, the Court finds that prefiling negotiations were impracticable. The City has established by a preponderance of the evidence that it meets the requirements of 11 U.S.C. § 109(c)(5)(C).

## XVII. The City Filed Its Bankruptcy Petition in Good Faith.

The last requirement for eligibility is set forth in 11 U.S.C. § 921(c), which provides, "After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

Unlike the eligibility requirements in § 109(c), "the court's power to dismiss a petition under § 921(c) is permissive, not mandatory." *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (citing 6 Collier on Bankruptcy ¶ 921.04[4], at 921-7); *In re Cnty. of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) (citing *In re Sullivan Cnty. Reg. Refuse Disposal Dist.*, 165 B.R. 60, 79 (Bankr. D.N.H. 1994)) ("the court has discretion to dismiss a petition if it finds that the petition was not filed in good faith").

The City's alleged bad faith in filing its chapter 9 petition was a central issue in the eligibility trial. Indeed, in one form or another, all of the objecting parties have taken the position that the City did not file its chapter 9 petition in good faith and that this Court should exercise its discretion under 11 U.S.C. § 921(c) to dismiss the case.

## A. The Applicable Law

"Good faith in the chapter 9 context is not defined in the Code and the legislative history of [section] 921(c) sheds no light on Congress' intent behind the requirement." *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 278-79 (Bankr. S.D.N.Y. 2010) (quoting *In re Cnty. of Orange*, 183 B.R. at 608) (quotation marks omitted).

In *Stockton*, the Court found:

> Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's prepetition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief.

*Stockton*, 493 B.R. at 794.

Similarly, the court in *New York City Off-Track Betting Corp.*, 427 B.R. at 279 (quoting 6 Collier on Bankruptcy ¶ 921.04[2]), stated:

> The leading treatise lists six different factors that the courts may examine when determining whether a petition under chapter 9 was filed in good faith: (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems.

The essence of this good faith requirement is to prevent abuse of the bankruptcy process. *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. at 81.

In conducting its good faith analysis, the Court must consider the broad remedial purpose of the bankruptcy code. *See, e.g., Stockton*, 493 B.R. at 794; *see also In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 32 (Bankr. D. Colo. 1999) ("The purpose of reorganization under

Chapter 9 is to allow municipalities created by state law to adjust their debts through a plan voted on by creditors and approved by the bankruptcy court.").

Indeed, "if all of the eligibility criteria set forth in § 109(c) as described above are satisfied, it follows that there should be a strong presumption in favor of chapter 9 relief." *Stockton*, 493 B.R. at 794. This Court agrees with the analysis set forth in the *Stockton* case on the issue of good faith under § 921(c):

> The quantum of evidence that must be produced to rebut the § 921(c) good faith presumption is appropriately evaluated in light of, first, the policy favoring the remedial purpose of chapter 9 for those entities that meet the eligibility requirements of § 109(c) and, second, the risk that City residents will be prejudiced if relief nevertheless is denied.

*Stockton*, 493 B.R. at 795.

## B. Discussion

As explained below, the Court finds that the totality of the circumstances, coupled with the presumption of good faith that arises because the City has proven each of the elements of eligibility under § 109(c)(3), establishes that the City filed its petition in good faith under § 921(c).

### 1. The Objectors' Theory of Bad Faith

In section 3, below, the Court will review the factors upon which it relies in finding that the City filed this case in good faith. First, however, it is crucial to this process for the Court to give voice to what it understands is the narrative giving rise to the objecting parties' argument that the City of Detroit did not file this case in good faith. The Court will then, in section 2, explain that there is some support in the record for that narrative.

It must be recognized that the narrative that the Court describes here is a composite of the objecting parties' positions and presentations on this issue. No single objecting party neatly laid out this precise version with all of the features described here. Moreover, it includes the perceptions of the objecting parties whose objections were filed by attorneys, as well as the many objecting parties who filed their objections without counsel. Naturally, these views on this subject were numerous, diverse, and at times inconsistent.

The Court will use an italics font for its description of this narrative, not to give it emphasis, but as a reminder that these are **not** the Court's findings. As noted, this is only the Court's perception of a composite narrative that appears to ground the objectors' various bad faith arguments:

> *According to this composite narrative of the lead-up to the City of Detroit's bankruptcy filing on July 18, 2013, the bankruptcy was the intended consequence of a years-long, strategic plan.*
>
> *The goal of this plan was the impairment of pension rights through a bankruptcy filing by the City.*
>
> *Its genesis was hatched in a law review article that two Jones Day attorneys wrote. This is significant because Jones Day later became not only the City's attorneys in the case, but is also the law firm from which the City's emergency manager was hired. The article is Jeffrey B. Ellman; Daniel J. Merrett, Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?, 27 EMORY BANKR. DEV. J. 365 (2011). It laid out in detail the legal roadmap for using bankruptcy to impair municipal pensions.*
>
> *The plan was executed by the top officials of the State of Michigan, including Governor Snyder and others in his administration, assisted by the state's legal and financial consultants - the Jones Day law firm and the Miller Buckfire investment banking firm. The goals of the plan also included lining the professionals' pockets while extending the power of state government at the expense of the people of Detroit.*
>
> *Always conscious of the hard-fought and continuing struggle to obtain equal voting rights in this country and an equal opportunity to partake of the country's abundance, some who hold to this narrative also suspect a racial element to the plan.*

The plan foresaw the rejection of P.A. 4 coming in the November 2102 election, and so work began on P.A. 436 beforehand. As a result, it only took 14 days to enact it after it was introduced in the legislature's post-election, lame-duck session.

It was also enacted in derogation of the will of the people of Michigan as just expressed in their rejection of P.A. 4.

The plan also included inserting into P.A. 436 two very minor appropriations provisions so that the law would not be subject to the people's right of referendum and would not risk the same fate as P.A. 4 had just experienced.

The plan also called for P.A. 436 to be drafted so that the Detroit emergency manager would be in office under the revived P.A. 72 on the effective date of P.A. 436. This was done so that he would continue in office under P.A. 436, M.C.L. § 141.1572, and no consideration could be given to the other options that P.A. 436 appeared to offer for resolving municipal financial crises. See M.C.L. § 141.1549(10) ("An emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72, and serving immediately prior to the effective date of this act, shall be considered an emergency manager under this act and shall continue under this act to fulfill his or her powers and duties."); see also id. § 141.1547 (titled, "Local government options . . .").

The plan also saw the value in enticing a bankruptcy attorney to become the emergency manager, even though he did not have the qualifications required by P.A. 436. M.C.L. § 141.1549(3)(a).

Another important part of the plan was for the state government to starve the City of cash by reducing its revenue sharing, by refusing to pay the City millions of promised dollars, and by imposing on the City the heavy financial burden of expensive professionals.

The plan also included suppressing information about the value of the City's assets and refusing to investigate the value of its assets - the art at the Detroit Institute of the Arts; Belle Isle; City Airport; the Detroit Zoo; the Department of Water and Sewerage; the Detroit Windsor Tunnel; parking operations; Joe Louis Arena, and City-owned land.

The narrative continues that this plan also required active concealment and even deception, despite both the great public importance of resolving the City's problems and the democratic mandate of transparency and honesty in government. The purposes of this concealment and deception were to provide political cover for the governor and his administration when the City would ultimately file for bankruptcy and to advance their further political aspirations. Another purpose was to deny creditors, especially those whose retirement benefits would be at risk from such a filing, from effectively acting to protect those interests.

*This concealment and deception were accomplished through a public relations campaign that deliberately misstated the ultimate objective of P.A. 436 – the filing of this case. It also downplayed the likelihood of bankruptcy, asserted an unfunded pension liability amount that was based on misleading and incomplete data and analysis, understated the City's ability to meet that liability, and obscured the vulnerability of pensions in bankruptcy. It also included imposing an improper requirement to sign a confidentiality and release agreement as a condition of accessing the City's financial information in the "data room."*

*As the bankruptcy filing approached, a necessary part of the plan became to engage with the creditors only the minimum necessary so that the City could later assert in bankruptcy court that it attempted to negotiate in good faith. The plan, however, was not to engage in meaningful pre-petition negotiations with the creditors because successful negotiations might thwart the plan to file bankruptcy. "Check-a-box" was the phrase that some objecting parties used for this.*

*The penultimate moment that represented the successful culmination of the plan was the bankruptcy filing. It was accomplished in secrecy and a day before the planned date, in order to thwart the creditors who were, at that very moment, in a state court pursuing their available state law remedies to protect their constitutional pension rights. "In the dark of the night" was the phrase used to describe the actual timing of the filing. The phrase refers to the secrecy surrounding the filing and is also intended to capture in shorthand the assertion that the petition was filed to avoid an imminent adverse ruling in state court.*

*Another oft-repeated phrase that was important to the objectors' theory of the City's bad faith was "foregone conclusion." This was used in the assertion that Detroit's bankruptcy case was a "foregone conclusion," as early as January 2013, perhaps even earlier.*

*Finally, post-petition, the plan also necessitated the assertion of the common interest privilege to protect it and its participants from disclosure.*

The Court will now turn to its evaluation of this narrative of bad faith on the City's part in filing this case.

## 2. The Court's Conclusions Regarding the Objectors' Theory of Bad Faith

The Court acknowledges that many people in Detroit hold to this narrative, or at least to substantial parts of it.

The Court further recognizes, on the other hand, that State and City officials vehemently deny any such improper motives or tactics as this theory attributed to them. They contend that the case was filed for the proper desired and necessary purpose of restructuring the City's debt, including its pension debt, through a plan of adjustment. Indeed, in Part XIV, above, the Court has already found that the City does desire to effect a plan of adjustment.

The Court finds, however, that in some particulars, the record does support the objectors' view of the reality that led to this bankruptcy filing. It is, however, not nearly supported in enough particulars for the Court to find that the filing was in bad faith.

The evidence in support of the objectors' theory is as follows:

- The testimony of Howard Ryan, the legislative assistant for the Michigan Department of Treasury who shepherded P.A. 436 through the legislative process. He testified that the appropriations provisions in P.A. 436 were inserted to eliminate the possibility of a referendum vote on the law, and everyone knew that. Ryan Dep. Tr. 46:1-23, Oct. 14, 2013. To the same effect is Exhibit 403, a January 31, 2013 email from Mr. Orr to fellow Jones Day attorneys, stating, "By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. . . . The news reports state that opponents of the prior law are already lining up to challenge this law. Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks." Ex. 403.

- Email exchanges between other attorneys at the Jones Day law firm during the time period leading up Mr. Orr's appointment as Emergency Manager and the retention of the Jones Day law firm to represent the City. For example, Exhibit 402 contains an email dated January 31, 2013 from Corinne Ball of Jones Day to Mr. Orr, which states:

> Food for thought for your conversation with Baird and us -
> I understand that the Bloomberg Foundation has a keen
> interest in this area. I was thinking about whether we
> should talk to Baird about financial support for this project
> and in particular the EM. Harry Wilson-from the auto task
> force-told me about the foundation and its interest. I can
> ask Harry for contact info-this kind of support in ways
> 'nationalizes' the issue and the project.

Ex. 402 at 2. Exhibit 402 also contains an email dated January 31, 2013, from Dan T. Moss at Jones Day to Mr. Orr, which states:

Making this a national issue is not a bad idea. It provides political cover for the state politicians. Indeed, this gives them an even greater incentive to do this right because, if it succeeds, there will be more than enough patronage to allow either Bing or Snyder to look for higher callings-whether Cabinet, Senate, or corporate. Further, this would give you cover and options on the back end.

Ex. 402 at 2.

- Exhibit 403, containing an email dated February 20, 2013, from Richard Baird, a consultant to the governor to Mr. Orr, stating: "Told [Mayor Bing] there were certain things I would not think we could agree to without your review, assessment and determination (such as keeping the executive team in its entirety). *Will broker a meeting via note between you and the Mayor's personal assistant who is not FOIA ble.*" Ex. 403 (emphasis added). The Court finds that "FOIA" is a reference to the Freedom of Information Act. Generally, FOIA provides citizens with access to documents controlled by state or local governments. *See* M.C.L. § 15.231.

- The Jones Day Pitch Book. As part of its "Pitch Presentation," the Jones Day law firm presented, in part, the following playbook for the City's road to chapter 9:

  (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations, Ex. 833 at 13; 16-18; 22-23; 28;

  (ii) the EM could be used as "political cover" for difficult decisions such as an ultimate chapter 9 filing, Ex. 833 at 16;

  (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City against raising money in order to will itself into insolvency, Ex. 833 at 17; and

  (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan Constitution, Ex. 833 at 39; 41.

- The State's selection of a distinguished bankruptcy lawyer to be the emergency manager for Detroit. Orr Dep. Tr. 18:12-21:20, Sept. 16, 2013 (discussing how Mr. Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors"); Baird Dep.Tr. 13:11-15:10, Oct. 10, 2013. During that pitch, Mr. Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney." Orr Dep. Tr. 21:3-6, Sept. 16, 2013; *see also* Bing Dep.Tr. 12:7-13:7, Oct. 14, 2013 (indicating that Baird explained to Mayor Bing that Baird was "impressed with him [Mr. Orr], that he had been part of the bankruptcy team representing

132

Chrysler" and that Mr. Orr primarily had restructuring experience in the context of bankruptcy).

- Jones Day provided 1,000 hours of service without charge to the City or the State to position itself for this retention. Ex. 860 at 1 (Email dated January 28, 2013, from Corinne Ball to Jeffrey Ellman, both of Jones Day, stating: "Just heard from Buckfire. . . . Strong advice not to mention 1000 hours except to say we don't have major learning curve"). *See also* Eligibility Trial Tr. 103:23-109:17, November 5, 2013; (Dkt. #1584) Ex. 844.

Exhibit 844 provides a list of memos that attorneys at Jones Day prepared prior to June 2012, "in connection with the Detroit matter." Heather Lennox of Jones Day requested copies of these memos for a June 6, 2012, meeting with Ken Buckfire, of Miller Buckfire, and Governor Snyder. Some of the memos include:

(1) "Summary and Comparison of Public Act 4 and Chapter 9"
(2) "Memoranda on Constitutional Protections for Pension and OPEB Liabilities"
(3) "The ability of a city or state to force the decertification of a public union"
(4) "The sources of, and the ability of the State to withdraw, the City's municipal budgetary authority."
(5) "Analysis of filing requirements of section 109(c)(5) of the Bankruptcy Code ("Negotiation is Impracticable" and "Negotiated in Good Faith")

- Exhibit 846, an email dated March 2, 2012, from Jeffrey Ellman to Corinne Ball, both of Jones Day, with two other Jones Day attorneys copied. The subject line is, "Consent Agreement," and the body of the email states:

> We spoke to a person from Andy's office and a lawyer to get their thoughts on some of the issues. I though MB was also going to try to follow up with Andy directly about the process for getting this to the Governor, but I am not sure if that happened.
>
> . . . .
>
> The cleanest way to do all of this probably is new legislation that establishes the board and its powers, AND includes an appropriation for a state institution. If an appropriation is attached to (included in) the statute to fund a state institution (which is broadly defined), then the statute is not subject to repeal by the referendum process.
>
> Tom is revisiting the document and should have a new version shortly, with the idea of getting this to at least M[iller]B[uckfire]/Huron [Consulting] by lunchtime.

- Exhibits 201 & 202, showing that Jones Day and Miller Buckfire consulted with state officials on the drafting of the failed consent agreement with the City. They

continued to work on a "proposed new statute to replace Public Act 4" thereafter. Ex. 847, Ex. 851. *See also* Ex. 846.

- The testimony of Donald Taylor, President of the Retired Detroit Police and Fire Fighters Association. He testified about a meeting that he had with Mr. Orr on April 18, 2013: "I asked him if he was - - about the pensions of retirees. He said that he was fully aware that the pensions were protected by the state Constitution, and he had no intention of trying to modify or set aside . . . or change the state Constitution." Eligibility Trial Tr. 140:9-13, November 4, 2013. (Dkt. #1605)

- At the June 10, 2013 community meeting, Mr. Orr was asked a direct question - what is going to happen to the City employee's pensions? Mr. Orr responded that pension rights are "sacrosanct" under the state constitution and state case law, misleadingly not stating that upon the City's bankruptcy filing, his position would be quite the opposite. In response to another question about whether Mr. Orr had a "ball park estimation" of the City's chances of avoiding bankruptcy, Mr. Orr responded that, as of June 10, there was a "50/50" chance that the City could avoid bankruptcy, knowing that in fact there was no chance of that.

- State Treasurer Andy Dillon expressed concern that giving up too soon on negotiations made the filing "look[] premeditated" Ex. 626 at 2.

- The City allotted only thirty four days to negotiate with creditors after the June 14 Proposal to Creditors. Ex. 43 at 113.

The issue that this evidence presents is how to evaluate it in the context of the good faith requirement. For example, during the orchestrated lead-up to the filing, was the City of Detroit's bankruptcy filing a "foregone conclusion" as the objecting parties assert? Of course it was, and for a long time.

Even if it was a foregone conclusion, however, experience with both individuals and businesses in financial distress establishes that they often wait longer to file bankruptcy than is in their interests. Detroit was no exception. Its financial crisis has been worsening for decades and it could have, and probably should have, filed for bankruptcy relief long before it did, perhaps even years before. At what point in Detroit's financial slide did it lose the ability, without bankruptcy help, to restructure its debt in a way that would firmly ground its economic and

social revitalization? Was it after the disastrous COPs and swaps deal in 2005? Or even sometime before?

The record here does not permit an answer to that question. Whatever the answer, however, the Court must conclude that Detroit's bankruptcy filing was certainly a "foregone conclusion" during all of 2013.

For purposes of determining the City's good faith, however, it hardly matters. As noted, many in financial difficulty, Detroit included, wait too long to file bankruptcy.

Then the issue becomes what impact does it have on the good faith analysis that Detroit probably waited too long. Perhaps it would have been more consistent with our democratic ideals and with the economic and social needs of the City if its officials and State officials had openly and forthrightly recognized the need for filing bankruptcy when that need first arose. It is, after all, not bad faith to file bankruptcy when it is needed.

City officials also could have avoided the appearance of pretext negotiations, and the resulting mistrust, by simply announcing honestly that because negotiating with so many diverse creditors was impracticable, negotiations would not even be attempted. The law clearly permits that, and for good reason. It avoids the very delay, and, worse, the very suspicion that resulted here.

The Court must acknowledge some substantial truth in the factual basis for the objectors' claim that this case was not filed in good faith. Nevertheless, for the strong reasons stated in the next section, the Court finds that this case was filed in good faith and should not be dismissed.

### 3. The City Filed This Bankruptcy Case in Good Faith.

Based on *Stockton* and *New York City Off-Track Betting Corp.*, reviewed above, the Court concludes that the following factors are most relevant in establishing the City's good faith:

a. The City's financial problems are of a type contemplated for chapter 9 relief.

b. The reasons for filing are consistent with the remedial purpose of chapter 9,

c. The City made efforts to improve the state of its finances prior to filing, to no avail.

d. The City's residents will be severely prejudiced if the case is dismissed.

### a. The City's Financial Problems Are of a Type Contemplated for Chapter 9 Relief.

The Court's analysis of this factor is based on its findings that the City is "insolvent" in Part XIII, above, and that the City was "unable to negotiate with creditors because such negotiation [was] impracticable" in Part XVI, above. 11 U.S.C. §§ 109(c)(3) and 109(c)(5)(C).

The City has over $18,000,000,000 in debt and it is increasing. In the months before the filing, it was consistently at risk of running out of cash. It has over 100,000 creditors.

"Profound" is the best way to describe the City's insolvency, and it simply could not negotiate with its numerous and varied creditors. *See In re Town of Westlake, Tex.*, 211 B.R. 860, 868 (Bankr. N.D. Tex. 1997) (finding the debtor filed in good faith because it faced "frozen funds, multiple litigation, and the disannexation of a substantial portion of its tax base").

It is true that the City does not have a clear picture of its assets, income, cash flow, and liabilities, likely because its bookkeeping and accounting systems are obsolete. But this only suggests the need for relief. It does not suggest bad faith. Moreover, as the City's financial analysts' subsequent months of work have sharpened the focus on the City's finances, the resulting picture has only become worse. Eligibility Trial Tr. 118:4-119:5, Nov. 5, 2013. (Dkt. #1584)

The Court finds that this factor weighs in favor of finding good faith.

### b. The City's Reasons for Filing Are Consistent with the Remedial Purpose of Chapter 9.

One of the purposes of chapter 9 is to give the debtor a "breathing spell" so that it may establish a plan of adjustment. *In re Cnty. of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995).

The Court's analysis on this factor is based on its finding that the City "desires to effect a plan to adjust such debts." 11 U.S.C. § 109(c)(4). To show good faith on this factor, "the evidence must demonstrate that 'the purpose of the filing of the chapter 9 petition [was] not simply . . . to buy time or evade creditors.'" *In re New York City Off-Track Betting Corp.*, 427 B.R. at 272 (quoting *In re City of Vallejo*, 408 B.R. at 295). Notably, this argument was not raised by the objectors in any pleadings or at trial, nor was any evidence presented to support it.

The objectors do assert that the City filed the petition to avoid "a bad state court ruling" in the *Webster* litigation. They argue this is indicative of bad faith. *See, e.g.*, Second Amended Final Pre-Trial Order, ¶ 107 at 30. (Dkt. #1647) This argument is rejected. Creditor lawsuits commonly precipitate bankruptcy filings. That the suits were in vindication of an important right under the state constitution does not change this result. They were suits to enforce creditors' monetary claims against a debtor that could not pay those claims.

The objectors also argue that the City filed the petition so that its pension obligations could be impaired and that this is inconsistent with the remedial purpose of bankruptcy. *See, e.g.*, Second Amended Final Pre-Trial Order, ¶ 86 at 24. (Dkt. #1647) Again, discharging debt is the primary motive behind the filing of most bankruptcy petitions. That motivation does not suggest any bad faith. That the City "chose to avail itself of a legal remedy afforded it by federal law is not proof of bad faith." *In re Chilhowee R-IV School Dist.*, 145 B.R. 981, 983 (Bankr.

W.D. Mo. 1992). This is especially true here. The evidence demonstrated that attempting to negotiate a voluntary impairment of pensions would have been futile.

Accordingly, the Court finds that this factor also weighs in favor of finding good faith.

### c. The City Made Efforts to Improve the State of Its Finances Prior to Filing, to No Avail.

Although the Court finds that the City did not engage in good faith negotiations with its creditors, Part XV, above, the Court does find the City did make some efforts to improve its financial condition before filing its chapter 9 petition. See Part III C, above.

The City's efforts are detailed in Mr. Orr's declaration filed in support of the petition. Ex. 414 at 36-49. (Dkt. #11) Those efforts include reducing the number of City employees, reducing labor costs through implementation of the City Employment Terms, increasing the City's corporate tax rate, working to improve the City's ability to collect taxes, increasing lighting rates, deferring capital expenditures, reducing vendor costs, and reducing subsidies to the Detroit Department of Transportation. Ex. 414 at 36-49. (Dkt. #11); Eligibility Trial Tr. 231:15-233:7, October 28, 2013. (Dkt. #1502) Despite those efforts, the City remains insolvent.

The fact that the City did not seriously consider any alternatives to chapter 9 in the period leading up to the filing of the petition does not indicate bad faith. By this time, all of the measures described in Mr. Orr's declaration had largely failed to resolve the problem of the City's cash flow insolvency. Ex. 414 at 36-49. (Dkt. #11); Eligibility Trial Tr. 231:15-233:7, October 28, 2013. (Dkt. #1502). In *In re City of San Bernardino, Cal.*, 499 B.R. 776, 791 (Bankr. C.D. Cal. 2013), the Court observed:

> Was there an alternative available to the City when it was faced with a $45.9 million cash deficit in the upcoming fiscal year and inevitably was going to default on its obligations as they came due? The Court answers this question 'no.' To deny the opportunity to reorganize in chapter 9 based on lack of good faith

would be to ignore fiscal reality and the general purposes of the Bankruptcy Code.

The Court finds this factor also weighs in favor of finding good faith.

### d. The Residents of Detroit Will Be Severely Prejudiced If This Case Is Dismissed.

The Court concludes that this factor is of paramount importance in this case. The City's debt and cash flow insolvency is causing its nearly 700,000 residents to suffer hardship. As already discussed at length in this opinion, the City is "service delivery insolvent." See Parts III B 6-11 and XIII B, above. Its services do not function properly due to inadequate funding. The City has an extraordinarily high crime rate; too many street lights do not function; EMS does not timely respond; the City's parks are neglected and disappearing; and the equipment for police, EMS and fire services are outdated and inadequate.

Over 38% of the City's revenues were consumed by servicing debt in 2012, and that figure is projected to increase to nearly 65% of the budget by 2017 if the debt is not restructured. Ex. 414 at 39 (Dkt. #11) Without revitalization, revenues will continue to plummet as residents leave Detroit for municipalities with lower tax rates and acceptable services.

Without the protection of chapter 9, the City will be forced to continue on the path that it was on until it filed this case. In order to free up cash for day-to-day operations, the City would continue to borrow money, defer capital investments, and shrink its workforce. This solution has proven unworkable. It is also dangerous for its residents.

If the City were to continue to default on its financial obligations, as it would outside of bankruptcy, creditor lawsuits would further deplete the City's resources. On the other hand, in seeking chapter 9 relief, the City not only reorganizes its debt and enhances City services, but it

also creates an opportunity for investments in its revitalization efforts for the good of the residents of Detroit. Ex. 43 at 61.

This factor weighs heavily in favor of finding good faith.

## C. Conclusion Regarding
## the City's Good Faith

While acknowledging some merit to the objectors' serious concerns about how City and State officials managed the lead-up to this filing, the Court finds that the factors relevant to the good faith issue weigh strongly in favor of finding good faith. Accordingly, the Court concludes the City's petition was filed in good faith and that the petition is not subject to dismissal under 11 U.S.C. § 921(c).

## XVIII. Other Miscellaneous Arguments

The objections addressed here were asserted in briefs after the deadline to object had passed. Accordingly, these objections are untimely and denied on that ground. In the interest of justice, however, the Court will briefly address their merits.

### A. *Midlantic* Does Not Apply in This Case

In its supplemental brief filed October 30, 2013, AFSCME asserts, "The rights created by the Pensions Clause should survive bankruptcy because the Pensions Clause is an exercise of the right to enact 'state or local laws designed to protect public health or safety' which cannot be disregarded by the debtor." AFSCME's Supplemental Br. at 3-4. (Dkt. #1467) In support of this argument, AFSCME relies on the United States Supreme Court decision in *Midlantic Nat'l Bank v. New Jersey Dep't of Env. Protection*, 474 U.S. 494, 106 S. Ct. 755 (1986).

In *Midlantic*, the Supreme Court held that "a trustee in bankruptcy does not have the power to authorize an abandonment without formulating conditions that will adequately protect

the public's health and safety." 474 U.S. at 507, 106 S. Ct at 762. At issue in that case was whether a trustee in bankruptcy could abandon real property pursuant to 11 U.S.C. § 544(a), when the property was contaminated with 400,000 gallons of oil containing PCB, "a highly toxic carcinogen." *Id.* at 497, 106 S. Ct. at 757.

The case is simply not applicable on AFSCME's point. The City has not "abandoned" its property. Moreover, AFSCME has failed to identify how the pensions clause is a "state or local law designed to protect public health or safety." *Id.* at 502, 106 S. Ct. at 760.

Accordingly, this objection is overruled.

### B. There Was No Gap in Mr. Orr's Service as Emergency Manager

In an objection filed on October 17, 2013 (Dkt. # 1222), Krystal Crittendon asserted that Mr. Orr was not validly appointed because the rejection of P.A. 4 did not revive P.A. 72. This argument is rejected for the reasons stated in Part III D, above.

In this objection, Crittendon also contended that Mr. Orr was not validly appointed because his initial emergency manager contract expired before P.A. 436 took effect.

P.A. 436 contains a grandfathering provision which states:

> An emergency manager or emergency financial manager appointed and serving under state law immediately prior to the effective date of this act shall continue under this act as an emergency manager for the local government.

M.C.L. § 141.1571.

Mr. Orr's initial emergency manager contract under P.A. 72 stated that it "shall terminate at midnight on Wednesday, March 27, 2013." Crittendon contends that therefore the contract terminated the morning of Wednesday, March 27, and that therefore he was not in office on that day. She asserts that because Mr. Orr's current emergency manager contract became effective

on Thursday, March 28, 2013, there was no emergency manager serving immediately prior to the March 28 effective date of P.A. 436, and the grandfathering clause does not apply.

The City contends that the parties intended for Mr. Orr's initial contract to expire at the end of the day on March 27th and that there was no gap in his service.

In *Hallock v. Income Guar. Co.*, 270 Mich. 448, 452, 259 N.W. 133, 134 (1935), the court assumed "midnight" meant the end of the day. Courts in other jurisdictions, however, have found that the term is ambiguous. *See Amer. Transit Ins. Co. v. Wilfred*, 745 N.Y.S.2d 171, 172, 296 A.D.2d 360, 361 (N.Y. 2002); *Mumuni v. Eagle Ins. Co.*, 668 N.Y.S.2d 464, 247 A.D.2d 315 (N.Y.A.D. 1998).

In *Klapp v. United Insurance Group Agency, Inc.*, 468 Mich. 459, 663 N.W.2d 447 (2003), the Michigan Supreme Court noted, "'The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation.'" *Id.* at 470, 663 N.W.2d at 454 (quoting *Penzien v. Dielectric Prod. Engineering Co., Inc.*, 374 Mich. 444, 449, 132 N.W.2d 130, 132 (1965)).

The Court finds that the parties to the contracts clearly intended that there would be no gap in Mr. Orr's contracts or in his appointment. Accordingly, Mr. Orr was validly appointed under M.C.L. § 141.1572. The objection is rejected.

### XIX. Conclusion:
### The City is Eligible and the Court
### Will Enter an Order for Relief.

The Court concludes that under 11 U.S.C. § 109(c), the City of Detroit may be a debtor under chapter 9 of the bankruptcy code. The Court will enter an order for relief forthwith, as required by 11 U.S.C. § 921(d).

142

The Court reminds all interested parties that this eligibility determination is merely a preliminary matter in this bankruptcy case. The City's ultimate objective is confirmation of a plan of adjustment. It has stated on the record its intent to achieve that objective with all deliberate speed and to file its plan shortly. Accordingly, the Court strongly encourages the parties to begin to negotiate, or if they have already begun, to continue to negotiate, with a view toward a consensual plan.

For publication

**Signed on December 05, 2013**

_____/s/ Steven Rhodes_____
**Steven Rhodes**
**United States Bankruptcy Judge**
