UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF, Case No. 13-53846
Detroit, Michigan
CITY OF DETROIT, MICHIGAN December 18, 2013
_______________________________/ 9:01 a.m.

IN RE: MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 USC SECTIONS 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, AND 922(I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III) MODIFYING AUTOMATIC STAY (DKT #1520)
MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (1) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT #17)
CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, and (III) GRANTING RELATED RELIEF (Dkt #157)
BEFORE THE HONORABLE STEVEN W. RHODES
TRANSCRIPT ORDERED BY: STEPHEN GROW, ESQ.

APPEARANCES:

For the City of Detroit, MI:

CORINNE BALL, ESQ.
Jones, Day
222 East 41st Street
New York, NY 10017-6702
212-326-3939

JEFFREY ELLMAN, ESQ.
Jones, Day
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309-3053
404-521-3939

ROBERT HAMILTON, ESQ.
Jones, Day
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43216-5017
614-469-3939

GEOFFREY IRWIN, ESQ.
GEOFFREY STEWART, ESQ.
GREGORY SHUMAKER, ESQ.
THOMAS CULLEN, JR., ESQ.
Jones, Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
202-879-3939

BRAD ERENS, ESQ.
Jones, Day
77 West Wacker
Chicago, IL 60601-1692
312-782-3939

For State of Michigan:

STEVEN HOWELL, ESQ. (P28982)
Special Assistant Attorney General
Dickinson, Wright
500 Woodward Avenue
Suite 4000
Detroit, MI 48226-3425
313-223-3033

For Bank of America and Merrill Lynch Capital Services:

MARK ELLENBERG, ESQ.
Cadwalader, Wickersham & Taft
700 Sixth Street, N.W.
Washington, D.C. 20001
202-862-2200

HOWARD HAWKINS, ESQ.
Cadwalader, Wickersham & Taft
One World Financial Center
New York, NY 10281
212-564-6000

For UBS AG:

JARED CLARK, ESQ.
EDWIN SMITH, ESQ.
Bingham, McCutchen
399 Park Avenue
New York, NY 10022-4689
212-705-7000

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | STEPHEN HACKNEY, ESQ.<br>WILLIAM ARNAULT, ESQ.<br>RYAN BLAINE BENNETT, ESQ.<br>Kirkland & Ellis<br>300 North LaSalle<br>Chicago, IL 60654<br>312-862-2000 |
| For the Ad Hoc COPS Holders: | DEBORAH FISH, ESQ. (P36580)<br>Allard & Fish<br>2600 Buhl Building<br>535 Griswold<br>Detroit, MI 48226<br>313-961-6141 |
| | THOMAS MOERS MAYER, ESQ.<br>Kramer, Levin, Naftalis & Frankel<br>1177 Avenue of The Americas<br>New York, NY 10036<br>212-715-9100 |
| For General and Police and Fire Retirement Systems: | JENNIFER GREEN, ESQ. (P69019)<br>Clark, Hill, PLC<br>500 S. Woodward Avenue<br>Suite 3500<br>Detroit, MI 48226<br>313-965-8300 |
| For Erste Europaische Pfandbrief and Kommunalkreditbank Aktiengesellschaft in Luxemborg, S.A.: | VINCENT MARRIOTT, III, ESQ.<br>Ballard, Spahr<br>1735 Market Street<br>Philadelphia, PA 19103<br>215-665-8500 |
| For Interested Party David Sole: | JEROME GOLDBERG, ESQ. (P61678)<br>Jerome Goldberg, PLLC<br>2921 East Jefferson<br>Suite 205<br>Detroit, MI 48207<br>313-393-6001 |
| For Financial Guaranty Insurance Company: | ALFREDO PEREZ, ESQ.<br>Weil, Gotshal & Manges, LLP<br>700 Louisiana Street<br>Suite 1600<br>Houston, TX 77002<br>214-746-7700 |

| | |
|---|---|
| For Ambac Assurance Corporation: | CAROLINE TURNER, ENGLISH, ESQ.<br>Arent, Fox, LLP<br>1717 K Street, N.W.<br>Washington, D.C. 20036-5342<br>202-857-6000 |
| For U.S. Bank as Trustee For Water and Sewer Bonds: | DAVID LEMKE, ESQ.<br>Waller, Lansden, Dortch & Davis<br>Nashville City Center<br>511 Union Street<br>Suite 2700<br>Nashville, TN 37219<br>615-244-6380 |
| For FMS Wertmanagement: | RICK FRIMMER, ESQ.<br>Schiff, Hardin, LLP<br>233 South Wacker Drive<br>Suite 6699<br>Chicago, IL 60606-6473<br>312-258-5500 |
| For the Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor (Retiree Association Parties): | RYAN PLECHA, ESQ. (P71957)<br>Lippitt, O'Keefe<br>370 East Maple Road<br>3rd Floor<br>Birmingham, MI 48009<br>248-646-8292 |
| Court Recorder: | Letrice Calloway |
| Transcriber: | Deborah L. Kremlick |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

INDEX


| WITNESSES FOR THE DEBTOR: | Direct | Cross |
|---|---|---|
| JAMES DOAK | 11 | 36,46,51 |
| KEVYN ORR | 76 | |

| EXHIBITS: | | ID | ADM |
|---|---|---|---|
| CX90 | Presentation | 21 | 22 |
| CX91 | Briefing Materials | 31 | 32 |
| CX94 | Commitment Letter | 26 | 28 |
| CX96 | Letter | 24 | 24 |
| CX97 | Response from Treasurer Dillon | 26 | 26 |
| RSX1003 | Email | 64 | 68 |
| RSX1005 | Email | 65 | 68 |

(Court in Session)

THE CLERK: All rise. Court is in session. Please be seated. Case number 13-53846, City of Detroit, Michigan.

THE COURT: Good morning. One moment, please. Sir.

MR. ERENS: Good morning, Your Honor. Again Brad Erens on behalf of the City of Detroit.

If it please the Court, we thought before we went on the clock this morning we'd give the emergency loan board report Your Honor asked for yesterday afternoon.

THE COURT: Yes.

MR. ERENS: Mr. Steve Howell of Dickinson, Wright is here on behalf of the state and I'm going to have him give the report.

THE COURT: Okay.

MR. ERENS: Thank you.

MR. HOWELL: Good morning, Your Honor. Steven G. Howell, Dickinson, Wright appearing as Special Assistant Attorney General on behalf of the state.

Your Honor, I understand there were questions that came up yesterday and I'd like to address a couple of them that I understand were raised. One is in terms of the members of the board, emergency loan board, they are Kevin Clinton, State Treasurer, John Nixon, Director of the Department of Technology Management and Budget, and Steve Arwood, Director of Licensing and Regulatory Affairs.

Your Honor, there is underway an effort to get a meeting scheduled. There is 18 hours notice required under the Open Meetings Act. We hope to have that meeting scheduled by the -- either on Friday afternoon, or Monday. And that is the soonest we can have it set up, Your Honor.

THE COURT: What is the nature of the loan board's review?

MR. HOWELL: It's not real clear. The -- the requirement -- the review is under the Home Rule Cities Act, not under PA436. And it is simply a requirement that it comply with the procedures and requirements of -- of the -- let me just read it for you if I could.

THE COURT: Okay, sure.

MR. HOWELL: And it's the Home Rule City Act 279, Section 36(a)(2). Any financial recovery bonds issued under this section are subject to the terms and conditions approved by the local emergency financial assistant loan board created under the Emergency Municipal Loan Act.

And that is the extent of the guidance in the statute. It will be presented to them. They will ask whatever questions they have and make their decision at that time.

THE COURT: Why wasn't this done before this hearing?

MR. HOWELL: I think at the time I think their thinking was that it would be presented after any revisions

that may come up in the course of this proceeding, in the course of any negotiations, the Judge's ruling, that what we would present to the emergency loan board would be that which was final and concluded. Whether that was a correct judgment with the benefit of hindsight, is another question. But that was the thinking at the time that we would simply present what was the final outcome as opposed to having to possibly go back later if there were changes between what was approved earlier and what ultimately --

THE COURT: Someone actually made the decision to potentially risk wasting the Court's time and all of the attorney fees in this case?

MR. HOWELL: That was -- that was certainly not --

THE COURT: Should the loan board decide not to approve whatever loan this Court approves?

MR. HOWELL: That was not the intention, Your Honor. The intention was not to show any disrespect to this Court.

THE COURT: Well, it's not -- of course it wasn't your intention, but that's the risk, right?

MR. HOWELL: That is -- that is the risk. We are hopeful that will not happen, but that -- that is a risk that exists, Your Honor, I can't change that.

THE COURT: Well, let me just put it to you directly. Is there any reasonable likelihood that the loan board would not approve the loan after this Court approves it?

MR. HOWELL: Well, the question will be presented and needs to be made. That decision needs to be made in -- in the meeting that is scheduled under the Open Meetings Act. But I do not expect there -- we do not expect there to be an issue, but that is -- that -- that decision has to be made at that meeting at that time under the Open Meetings Act, Your Honor.

THE COURT: Well, but -- okay. So suppose one or more of the objecting parties here wish to address the loan board with the same or perhaps even different issues on why the loan board shouldn't accept it. Will -- will -- will that be permitted?

MR. HOWELL: I suppose they -- I don't know the procedure for presenting evidence at that hearing. I don't know that there is a procedure for presenting evidence. But if it is, I would -- I would expect that that board would be before this Court.

THE COURT: I wasn't asking about evidence, I was just -- that's another question. I was just asking about whether parties are permitted to be heard on the issue of whether the loan should be approved at that administrative level.

MR. HOWELL: It is an open -- it is an open meeting under the Open Meetings Act. So I suppose someone could come in. I -- I do not expect the members as constituted of that

board to disregard the Court's view of this when -- when the ruling is completed. And we are confident it will be -- be approved, but we cannot say that or give any real guidance prior to that meeting occurring.

THE COURT: Is it your recommendation that the Court proceed?

MR. HOWELL: It is, Your Honor.

THE COURT: Thank you, sir.

MR. HOWELL: Thank you, Your Honor.

THE COURT: One more moment, please. At the beginning of this case, I resolved to myself that I would never have an off the record conversation with counsel because the case is too public for that.

A circumstance, however, has arisen that has forced me to reconsider that and so I want to see Ms. Ball and Ms. (sic) Hackney at the side of the bench here right now.

(At Side Bar Off the Record at 9:09 a.m.; Resume at 9:10 a.m.)

THE COURT: All right. Let's proceed.

MR. HAMILTON: Good morning, Your Honor. Robert Hamilton of Jones, Day on behalf of the City. We're going to continue with the direct examination of -- of James Doak.

THE COURT: Sir, you are still under oath. You may be seated.

THE WITNESS: Thank you.

(WITNESS JAMES DOAK WAS PREVIOUSLY SWORN)

DIRECT EXAMINATION

BY MR. HAMILTON:

Q Good morning, Mr. Doak.

A Good morning.

Q When we broke yesterday afternoon, evening we were on City's Exhibit 88 which is the September 26th, 2013 financing discussion dec that you testified you provided to Mr. Orr, the City's CFO, and to then State Treasurer Andy Dillon. And we were on the second page of the dec which is up there on the screen.

And I wanted to ask you, the first two columns after all the names of the alternative lenders has a column that CA sent and CA signed. What does the CA refer to?

A That refers to confidentiality agreement. So the first column is parties that received the confidentiality agreement and then parties that returned it executed.

Q And then the next column is 9-6 check in. What is that?

A For parties that received the introductory packet at the -- at the commencement of the process. We had asked them to get back to us on the 6th of September to indicate whether they were anticipating preparing a -- a term sheet or indication of interest.

Q Okay. And then the next column has the label data room. What is that?

A We anticipated at the outset of the process that some of the parties may ask for access to a data room and we -- this column was intended to track those that -- that were admitted into the data room.

Q And if you go down to the -- the very bottom on that column under the grand total which as I understand it combines both the lenders on this page and the previous page, the traditional lenders. It has a total of eight out of 50 with access to the data room, is that right?

A That's correct.

Q Why such a small number?

A Of -- in the -- in the time frame of getting to the term sheets, a number of the parties did -- did not request access to the data room. In -- they felt that they could produce the term sheet without access to the data room and as a result only -- only eight subsequently entered the -- the data room.

Q Did they have discussions with you in -- in lieu of going to the data room on other topics?

A Yes, they did. Most of our discussions with the parties in advance of deliveries of the term sheet concerned structuring of the -- structuring of the loan and the provisions in the indicative term sheet. Parties were less concerned with the financial and operational data that was in the data room that the City operated.

Q Well, during those discussions with the lenders, both

before the 26th and after the 26th, what was the most important areas of concerns that were expressed by the lenders to you?

A The most -- the areas that were most frequently addressed by the lenders were the state of the Chapter 9 filing and the protections including collateral that the lenders would receive in the -- in making the loan and how those protections and collateral would be affected by various litigative outcomes including the appeal of the Chapter 9 and a -- an overturning of the -- the -- the Chapter -- Chapter 9 as well as other issues associated with 436.

Q And when you say the appeal of Chapter 9, do you mean the appeal of the eligibility ruling for Chapter 9?

A Yes. The lenders were concerned that the Court's decision on the eligibility of the city would be overturned in the appellate process and at that point they would have a -- a loan agreement that would potentially have state -- state components and federal components, but the federal components could be viewed as being inactive or not part of their loan any longer.

Q So how did the concern regarding loan structure and collateral relate -- relate to the concern about the possibility that the Chapter 9 eligibility ruling would be reversed and this case would be dismissed? How did those two relate?

A None -- none of the lenders felt comfortable in

proceeding forward. None of them indicated to us that they were -- were willing to proceed forward without -- and being provided collateral and collateral that could be provided to them under state law as well as -- as federal law.

MR. ARNAULT: Objection, Your Honor. That's hearsay.

THE COURT: Overruled.

Q The last column on Page 2 of this dec is title -- not the last column, second to last one is -- is term sheet. What does that refer to?

A That refers to potential lenders who got back to us with written indications of interest to participate in the financing.

Q Now in the -- if you look at the very bottom on that column, the grand total is 15 out of 50. Yet in the City's motion and your declaration and -- and in some other testimony we have indicated that we got a total of 16 term sheets, not 15. Why does that say 15 but elsewhere we say 16?

A Subsequent to the date of this document, CSG Investments which also goes by the name Beal Bank in our process submitted an indication of interest.

Q And they're the one that's close to the middle of the page there on the alternative lender's side, right?

A That's correct.

Q Okay. All right. So if we then go to the next page of

this exhibit, what does this page represent?

A This page represents the comparative economics of solely the -- the swap termination portion of the post-petition financing amongst the various parties.

Q And then the next page of the exhibit shows what?

A The next page shows the same mathematics for the quality of life component of the facility.

Q And then Page 5 of the next page shows what?

A Page 5 shows the comparative economics of the proposal -- proposals that we received for the entire financing and for the total facility.

Q Okay. Now there's a -- there's a black bar down the middle of this chart. There's three potential lenders on the left side of that -- of that black bar and there's five on the right side. What's the significance of that black bar?

A At the time these were the three potential lenders that we were recommending that we proceed forward with to definitive commitment letters.

Q The three to the left of the bar?

A That's correct.

Q And why -- why were you recommending proceeding with those three and not with the other five?

A We were recommending those three because of the -- their -- all in terms of their -- their indicative term sheet, including the -- the cost and other provisions as well as the

strength of the institutions.

Q And if you'll look on the -- the -- under the Barclays column, the second lender there to the left of the bar. If you go down to the -- the bottom totals on the difference from lowest all in rate and difference from lowest all in expense, dashes there for Barclays. Why is that?

A Because this -- this row showed sort of distance off the lead. And at this point Barclays was the lead and that they were the lowest all in rate provider of financing.

Q All right. Now does this all in cost analysis reflect the market flex provision that ultimately ended up in the Barclays facility?

A No. No, it does not.

Q Why not?

A Because at -- at this time the indicative term sheet that they provided us did not have a market flex provision.

Q All right. After you recommended to the -- I assume you made your recommendation to Mr. Orr, the emergency manager. I'm assuming the three to the left of the bar, is that right?

A Yes, we did.

Q All right. After you made that recommendation, what did you do?

A We -- we indicated to those three institutions that we would like to see from them definitive executable commitment letters on -- on the lines of their indicative term sheets.

Q And did you go after anybody else other than those three?
A Subsequently we incorporated the syndicate of lenders led by Carval which is the next -- the next column over.
Q Why did you decide to do that?
A Because we were not confident we would get to acceptable commitment letters from all three of the -- the lenders. We had issues with -- individual issues with all of them, but -- but significant issues with Bank of America and with -- and with Goldman.
Q And so what were you -- what was your concern then as to why -- why you needed to get someone else in -- in -- in the room?
A Our -- our concern was we were headed towards a one horse race and that would give us very limited flexibility in case for some reason we were not able to arrive at acceptable terms with Barclays and recognizing that Carval was a close fourth. We incorporated them back into the process.
Q Let me ask you now about City Exhibit 89.
MR. HAMILTON: And this too, Your Honor, is already in evidence because it was not objected to.
Q What is this document, Mr. Doak?
A This was the briefing materials that we provided to the emergency manager and -- and others providing the real time status update on negotiating commitment letters and -- and the form of the definitive commitment letters that we got back

from the four lead potential lenders.

Q Did you also give this to then State Treasurer Andy Dillon?

A Yes. The -- the working group was -- was the same set of individuals.

Q As the previous dec?

A As the previous dec. The Director of Michigan Finance Authority, the Treasurer, CFO, other members of the EM staff.

Q All right. So if we go to the next page of this exhibit which is Page 1 of the dec.

A This is a comparison of the principal economic terms of Barclays and Carval which were at that time developing into our two lead potential commitment letters.

Q And then on Pages 3 and 4 you got the same discussion with respect of Bamil and Goldman Sachs, is that right?

A That's correct.

Q All right. Go back to Page 1. Under the Barclays columns, halfway down there's a thing for market flex. We now have information there on the market flex. Why is that?

A In their definitive commitment letters, Barclays incorporated in market flex terms into what they -- into their overall commitment.

Q Okay. If we load to Page 5 of this exhibit, the one that's labeled 5, what is this?

A This is a -- this is a comparison of all in cost analysis

of the state of the four proposals. And for Barclays and for Goldman Sachs. Both of those institutions anticipated syndicating a portion of the loan subsequently. So both of them incorporated in market flex provisions to their -- their commitment. So we ran those proposals both at their, you know, starting no flex point and also at their max flex point.

Q All right. If you go down to the very bottom, there's a total annual expense row. What's that?

A Total annual expense was our mathematics for taking the all in rate and incorporating in all of the fees associated with the transaction as well as the interest rate and calculating over a two year period what the raw dollar cost would be of each one of these commitment proposals.

Q All right. And so if you look for under the max -- max flex column for Barclays you get a total annual expense calculation of 26.3, I assume that's million, is that right?

A Yes.

Q All right. And that's lower than all the other figures to the right, is that correct?

A That's correct.

Q So even if you get the max max max market flex for Barclays it's still less expense to the City than the others?

A That's correct, yes. That was our conclusion.

Q All right. This is dated -- this -- this dec is dated October 3rd, 2013 at 8:00 a.m. What day of the week was that?

Is that Thursday?

A That was Thursday morning.

Q What happened on Friday and over the weekend?

A Friday and over the weekend, we negotiated with Barclays and their representatives to come to a final form of commitment letter. We also engaged in dialogue -- you know, dialogue with Carval in regards to furthering on their -- their commitment as well.

Q All right. And did Barclays send you its commitment letter, signed by the Barclays representative on Sunday the 6th?

A Yes. At each stage of the process we asked Barclays to -- to bring down their commitment letter and provide us with a executed copy. This is our way making sure in our process that what we had from them was what they were willing to sign.

Q Now did Mr. Orr sign the document on Sunday evening the 6th when you got the signed ones, the signed letter from Barclays?

A No, he did not.

Q All right. What did you do on Monday the 7th?

A On Monday the 7th, I met -- I start -- I met with members of city council on a one on one basis to brief them on the post-petition financing process and the fact that we would be coming to them shortly with a financing proposal.

Q All right. And did you meet with each individual member

of the city council on Monday and Tuesday of that week?

A Yes, I met with each member of city council on -- on Monday and Tuesday, most on Monday.

Q Was that just one meeting or was it individual meetings with each one?

A It was individual meetings with each one of the city council members, all six.

Q And in those individual meetings with each individual member of the city council, did you provide them with any written materials to explain the process in the terms of the commitments that you had received?

A Yes, we did. Or yes, I did.

Q All right. I'd like to ask you about City Exhibit 90, Mr. Doak. What is this document?

A The -- this is the presentation, the physical briefing materials that I provided to each member of the city council in the one on one meetings that I held with them on October 7th and October 8th.

(City's Exhibit 90 was identified)

Q And did you discuss the contents of this document with each member of the city council?

A Yes, I did.

Q During those meetings?

A Yes, I did.

MR. HAMILTON: Your Honor, I would -- the City would

move Exhibit 90 into evidence.

THE COURT: Any objections? It is admitted.

(City's Exhibit 90 was admitted)

Q If you'll look at what's numbered Page 4 on this dec, which makes it the fifth page in, next page. There you go. If you look at the bullet that starts with this confidential process. Do you see that, Mr. Doak?

A Yes.

Q Could you read that, please?

A This confidential process resulted in a competitive financing commitment on the most favorable terms available in the market.

Q What were you referring to with the phrase, a competitive financing commitment in this bullet?

A I was referring to the -- the -- the deal that we -- we had in hand from Barclays.

Q If we turn to the next page of the exhibit, what does this page show?

A This page shows the savings, the opportunity to the City from -- from moving forward with the -- with the termination of the swaps and putting in place the post-petition financing.

Q All right. And in the middle column it says annual cost of -- of swap termination load. And then in Italics it says, indicative all in interest rates. Do you see that?

A Yes.

Q What -- what did you tell the city council members was meant by indicative all in interest rates?
A I -- we told them that indicative all in interest rates was meant to represent both the interest rate components which could be a base rate plus a -- plus a -- plus a lift. As well as the fees associated with the deal. So it's consistent with the all in economics concept.
Q So it includes both the potential interest rates and the fees involved with the loans, is that correct?
A That's correct.
Q All right. How did you -- why did you choose the ranges that are in here 5 to 9% to discuss with the members of city council?
A I chose the -- the ranges here because I knew that the financing proposal that we had was well within the bounds of this range and I could represent to council members that the financing proposal that we had was within this range without disclosing the specific economics.
Q All right. So earlier you said it was the interest rate plus a lift is the term you used. Did you tell each individual council member that there was a market flex provision in the commitment?
A I -- I -- I don't recall whether I discussed market flex with them at -- at this time.
Q But you did tell them that the potential interest rate

all in would be somewhere in the range of 5 to 9%, is that right?

A Yes. I told -- I told them that this range was a -- was an appropriate range and the financing was going to be well within this -- the range that was presented to them.

Q All right. I'd like now to ask you, Mr. Doak, about City Exhibit 96. Are you familiar with this document, Mr. Doak?

A Yes.

Q What is it?

A This is the letter from Kevyn Orr to then Treasurer Andy Dillon requesting his approval as is required under 436 for Kevyn to execute the commitment letter, the Barclays commitment letter to proceed forward with the financing.

(City's Exhibit 96 was identified)

Q And was this document actually sent to Treasurer Dillon?

A Yes, it was.

MR. HAMILTON: Okay. Your Honor, the City would move Exhibit 96 into evidence.

THE COURT: Any objections? It is admitted.

(City's Exhibit 96 was admitted)

Q Did you have -- and if we look -- if you'll look at the third page of this exhibit. And this is an attachment to what the letter that was sent to Mr. Dillon, is that right?

A Yes.

Q And what is this document?

A This is the -- this is the fee letter which is one component of the documentation that we were required to execute at that time to proceed forward.

Q If you'd go to Page 5 of that fee letter. You'll see -- go back one, please. There -- this -- this fee letter is signed by Barclays, is that right?

A Yes, it is.

Q By Gerbino?

A Yes.

Q And it's not signed yet by -- by Mr. Orr on behalf of the City of Detroit, is that right?

A That's correct.

Q And then the next document that's attached is what is that? The next -- there we go. What is that?

A This is the commitment letter for the financing.

Q And if you go to the last page of that document which is Page 10, the signature page, you'll see that one is signed also by Barclays?

A Yes.

Q But not yet signed by Mr. Orr, is that correct?

A That's correct.

Q And this is on Tuesday the 8th when it was sent to Mr. Dillon?

A That's -- yes.

Q All right. Did you have a discussion with Mr. Dillon

about this document, this package on Thursday evening the -- the 10th?

A Yes, we did.

Q And I'd now ask you to look at City Exhibit 97. What is this document, Mr. Doak?

A This is the response that we received from Treasurer Dillon coming out of the prior night's conference call when we asked for his approval for Kevyn Orr to execute the commitment documentation for the Barclays loan and --

(City's Exhibit 97 was identified)

Q Is this document Mr. Dillon's approval of the loan and the -- and authorization for the City to enter into the commitment?

A Yes.

MR. HAMILTON: Your Honor, the city would move City Exhibit 97 into evidence.

THE COURT: Any objections? It is admitted.

(City's Exhibit 97 was admitted)

Q And again this exhibit is dated October 11th, that's Friday, right?

A Yes.

Q All right. So let's look at City Exhibit 94 then. This is a copy of the commitment letter from Barclays, right?

A Yes.

(City's Exhibit 94 was identified)

Q And if you look at the signature -- signature page which is ten pages in, I believe, right there. We see that it's executed by Kevyn Orr on behalf of the City of Detroit, is that right?
A Yes.
Q When did Mr. Orr sign this document?
A He signed it on the 11th.
Q After you received the approval from Mr. Dillon?
A Yes.

MR. HAMILTON: And, Your Honor, Exhibit 94 is already into evidence, it wasn't objected to.

THE COURT: Thank you.

Q Mr. Doak, could you explain to the Court why the City agreed -- why it entered into the commitment letter and agreed to pay the commitment fee to Barclays before it obtained approval from the Bankruptcy Court of this transaction?
A We -- we moved forward with executing the commitment letter because it was an integral part of the overall Barclays financing. And it was -- which was the lowest overall cost to the city. And we were -- would not have the ability to proceed forward with negotiating definitive documentation with Barclays unless we executed the commitment letter.
Q Why did the city --

MR. HAMILTON: Your Honor, I -- I misspoke. There was an objection to Exhibit 94 which was the signed commitment

letter. The objection was that it's duplicative. We couldn't find it elsewhere, so we don't think it's duplicative. But I misrepresented it, it has not been entered into evidence yet. So we would move it into evidence.

THE COURT: Thank you. Any objections? Let's just restate for the record what Exhibit 94 is.

MR. HAMILTON: Is -- Exhibit 94, Your Honor, is the commitment fee letter that is executed by both Barclays and by Mr. Orr on behalf of the City of Detroit.

THE COURT: Thank you. Any objections?

MR. MARRIOTT: I want to just clarify the commitment fee letter, or the commitment letter?

MR. HAMILTON: It's titled commitment letter. The fee letter is a separate document.

MR. MARRIOTT: Right. Okay, I just wanted to clarify. No objection.

THE COURT: It is admitted.

(City's Exhibit 94 was admitted)

Q Mr. Doak, can you explain to the Court why the city ultimately decided to select Barclays over all the other potential lenders? What's -- what's advantageous about the Barclays financing facility?

A The -- the Barclays facility was advantageous over the others because it presented the city with the best overall economics and it was a -- and it was a fully underwritten

commitment by a major financial institution that we felt confident would be able to complete the transaction.

In addition the other terms that Barclays negotiated for in our process were ones that we felt we were capable of performing -- performing on in the time allotted. That includes the collateral provisions that they -- that they requested.

Q What was particularly attractive about the collateral provisions in the Barclays financing proposal that you ultimately were able to negotiate?

A The -- the Barclays proposal worked with the indicative term sheet that we provided and was -- and they were willing to move forward with the -- the limited collateral interest that we suggested that the lenders would receive on gaming revenue and income tax revenue.

The other proposals that we received most -- all the other proposals were -- were much more complex in regards to what collateral interest parties were looking for.

Q And under the Barclays proposal that you were able to negotiate, what happens with respect to the collateral if the city is unable to get exit financing and the city ends up defaulting at the end of the term of this loan?

A The -- Barclays has limited rights under the documents to -- to utilize up to $4,000,000 a month of gaming tax revenues and $4,000,000 a month of income tax revenues to pay default

interest and amortize their position down. They -- they don't have -- they don't have more expansive rights to the tax streams of the city.

Q So they can't -- can Barclays if -- if the city defaults, can Barclays demand immediate payment of the entire outstanding balance in full and collect the collateral to do that?

A No, that's -- that's not within their rights under the documents.

Q All right. And is the city confident that in the event it defaults, can't obtain exit financing, it will be able to afford the amortized pay down of the loan in a default status going forward?

A It will require some very difficult choices, but the -- but the city is -- is confident that it can -- it can still operate and perform under those terms.

Q If I could ask you, sir, now to look at City Exhibit 98.

MR. HAMILTON: And again, Your Honor, this is a document that is -- that is already in evidence because it was not objected to.

Q Mr. -- Mr. Doak, can you tell us what this document is?

A This is the submission of the post-petition financing to -- to the city council.

Q Was this document in fact -- and its attachments provided to the city council?

A Yes, it was.

Q Okay. And then if I could ask you, sir, what happened after you submitted the -- the package that included the -- the financing proposal and the related letters? What happened with respect to the city council after you submitted them?

A The city council requested a -- a briefing on the -- on the post-petition financing, so we -- and we provided them with a closed meeting briefing in the subsequent week.

Q And did you attend that meeting?

A Yes, I did.

Q And did you physically provide them with the dec that they requested?

A Yes. We -- we provided them with briefing materials in the context of that meeting.

Q All right. If I can ask you, sir, to look at City Exhibit 91. What is this document?

A These are the briefing materials that we provided to city council in their closed session on the afternoon of October 17th.

(City's Exhibit 91 was identified)

MR. HAMILTON: Okay. Your Honor, the -- the city would move Exhibit 91 into evidence.

THE COURT: Any objections?

MR. MARRIOTT: Your Honor, no objection to admission of this exhibit for purposes of indicating what was provided

to city council. There are projections on the back that we lodged objections to yesterday as to their relevance and whether they should be admitted for the truth of the material information contained therein. But as to -- to the extent the city, and I assume this is true, was using this exhibit for purposes of showing what was provided to city council, no objection.

THE COURT: Is that the purpose of the exhibit, sir?

MR. HAMILTON: That is correct, Your Honor.

THE COURT: All right. For that limited purpose, Exhibit 91 is admitted.

(City's Exhibit 91 was admitted)

Q Mr. Doak, if you'll look at Page 6 of this dec. Under the -- in the row that's got the heading of pricing, second from the bottom. The second bullet refers to the market flex provision, or market flex provisions. Do you see that?

A Yes.

Q What was -- what was discussed with council in the closed session on the 17th regarding this -- this provision?

A We informed them that there was a -- there was a market flex provision in the -- in the Barclays commitment that gave Barclays the -- the flexibility within specific limits to modify the -- the interest rate component of the -- the financing in order to syndicate out a -- a given portion of the overall loan.

Q During that closed session, did you expressly state what the maximum cap was on the market flex?

A No, we did not.

Q Why not?

A Because that's the -- because it was important to not convey the market flex including what the max is in a -- in a forum that could eventually be public because that would defeat the -- the purpose of having the -- the -- the market flex provision. Financing would likely move to the -- to the all in rate.

Q Now had you already discussed with each of the individual city council members what the interest -- potential interest rate range would be as a result of the market flex?

A In -- in the one on one sessions with the council members, for those who -- who asked about the pricing, we -- we had conveyed that the -- that the commitment was -- was well within the range that we had provided which was the 5% to the -- to the 9%.

Q Okay. Did you also discuss at the closed session with city council, the commitment fee that the city had agreed to pay to -- to Barclays?

A Yes, we did.

Q Did you disclose the amount of that fee during your discussions?

A Yes, we did.

Q What happened after the closed session with city council? What did city council do?
A City council provided us with a -- the staff provided us with a list of questions that we had to respond to over the weekend.
Q And after you responded to those questions what did the council do?
A The council subsequently did not approve the -- the post-petition financing.
Q Is city council approving -- is city council approval of the facility a condition, a closing condition to the facility?
A No.
Q Do you have an understanding as to why it's not a condition to closing?
A The state public law 436 provides for how the City of Detroit operates in the -- in the installation of emergency manager. And subsequent to a disapproval by city council there is an opportunity for them to provide an alternative and then from there there is a -- there is an emergency loan board decision that can be made to determine what goes forward.
Q Mr. Doak, do you have an opinion as to whether based on the process that you -- you employed and directed, whether or not the post-petition financing facility that the city has agreed to with Barclays, has been substantially and adequately tested by the market?

A Yes, I do.

Q What is your opinion?

A My opinion is that the Barclays financing is the best available to the city under present circumstances and it has been adequately and appropriately tested by a robust competitive and market based solicitation process.

Q And is it your opinion it's the best facility available to the city even if the maximum market flex provision is --

THE COURT: Would you not ask a leading question on this point?

MR. HAMILTON: Sure.

Q Do you have an opinion as to whether or not this facility is the best available to the city even if the market flex provision is fully implemented?

A Yes.

Q What is your opinion?

A My opinion is that even if the market flex provision is fully executed, this is the -- this is the best available financing to the city right now given the circumstances and we have the benefit of knowing from a very competitive process of soliciting a -- from a wide range of financing providers what other economics and associated terms was available. And I'm confident that even with market flex, no party was -- was willing to provide comparative overall and better terms.

Q And Mr. Doak, do you have an opinion as to whether

unsecured financing is available to the city in this Chapter 9 case?

A Yes, I do.

Q What's your opinion?

A My opinion is that unsecured financing is not available to the City of Detroit at this time given its current circumstances.

MR. HAMILTON: I have no further questions, Your Honor.

CROSS EXAMINATION

BY MR. ARNAULT:

Q Good morning, Mr. Doak. How are you?

A Good morning.

Q Again, my name is Bill Arnault and I represent Syncora. I'd like to begin by discussing the initial proposal that you sent out to prospective lenders regarding the DIP financing. So the initial proposal that you sent out contemplated that the DIP financing would be secured, correct?

A Yes.

Q And the collateral that the city included in its initial proposal was income tax revenue, asset proceeds, and the casino revenues, correct?

A Yes.

Q And you would agree with me -- agree with me that it would be unlikely that a potential lender would remove

protections that went out with the city's initial proposal, right?

A I would agree.

Q And as part of this solicitation process, you did not send out a solicitation document that asked parties to return bids for unsecured financing, right?

A No, we did not.

Q And you did not personally ask any prospective lender if it would make the DIP loan on an unsecured basis, right?

A I did not ask that particular question.

Q Now yesterday on direct you testified that you had some discussions with potential lenders before you filed for bankruptcy. Do you remember that testimony?

A Yes.

Q And you testified that you had conversations with Deutsche Bank, Wells Fargo, Citibank, and JP Morgan, right?

A That's correct.

Q And as we learned yesterday as part of these discussions, you identified four distinct revenue streams that could be used as security to secure any potential lending facility, right?

A Yes.

Q I'd now like to move to your discussions with the city council regarding the Barclays DIP. As you testified earlier, the Barclays DIP is subject to market flex, right?

A Yes.
Q And as part of this market flex provision, the libor floor can flex up from 1% to 2%, right?
A That's correct.
Q And the spread over libor can flex up from 2.5% to 4.5%, right?
A Yes.
Q So the minimum interest rate on the DIP loan could go as high as 6.5%, right?
A Yes.
Q And as part of the fee letter, Barclays has what is defined as a successful syndication target, isn't that right?
A That's correct.
Q And the terms in the market flex provision allow them to reset the interest rate on the entire loan within the market flex parameters, right?
A Yes, under particular conditions.
Q So for example if Barclays discovers that the only interested takers of the loan are willing to loan -- or willing to take it at 5%, the portion of the loan that is also retained by Barclays also resets to 5%, right?
A If they retained that portion of the loan, yes.
Q Okay. And the Barclays DIP also contains a commitment fee, isn't that right?
A Yes.

Q And the commitment fee is due regardless of whether or not this deal ever closes, right?
A Yes.
Q And you've already paid half of this commitment fee, correct?
A No, we've paid all of it.
Q Okay. Okay. And the terms of the market flex provision and the commitment fee are set forth in the fee letter, correct?
A Yes.
Q And of course the market flex and the commitment fees impact the ultimate cost of the Barclays DIP, right?
A Yes.
Q And when you were evaluating the various proposals, one of the items that you evaluated was the interest rate, right?
A Yes.
Q So interest rate is a factor in evaluating the attractiveness of a particular loan, correct?
A Yes.
Q And you would agree with me that pricing was an important factor when you were evaluating the various proposals, right?
A Yes, it was.
Q In fact you would not have been in a position to recommend the transaction to Mr. Orr if you were not aware of the specifics of the market flex provision, right?

A I think that's correct, yes.
Q Now as you've testified, you said that you eventually submitted the Barclays proposal to city council, right?
A Yes.
Q And under PA 436, if the city council disapproved the Barclays DIP, it then had seven days to submit an alternative proposal that would yield substantially the same financial result or even a better one, right?
A I -- I don't think that's how 436 is written. They have seven days to submit an alternative proposal.
Q That would yield substantially the same financial result?
A That's not how 436 is written. They have seven days to submit an alternative proposal.
Q And after you submitted the proposal you had several discussions with the city council members, correct?
A I have -- I'm a little lost on the chronology. Could -- could you provide some --
Q Sure, sure, sure. So after you submitted the proposal to the city council, you had several discussions with city council members, correct?
A No.
Q You didn't have any discussions with city council members after you submitted the proposal to the city council?
A After we submitted the executed commitment letter to council we had a closed door session with the city council in

full.

Q And this is a closed door session, correct?

A Yes.

Q So it was not subject to the Open Meetings Act, correct?

A Well, I -- I'm not familiar with every aspect of the Open Meetings Act, but my understanding was that because this was associated with litigation on a number of levels, the city council and their legal advisors determined that a closed meeting was appropriate.

Q Okay. And at this closed meeting, the substance of the market flex provision was not provided to the city council, right?

A No, it was not.

Q I'm sorry. It was not provided, correct?

A That's correct.

Q Okay. But isn't it true that after you had this closed door meeting that the city council had additional questions about the key terms of the Barclays DIP?

A The staff provided us with a list of questions that they asked Jones, Day and Miller, Buckfire to answer.

Q Okay. And if we could turn to Syncora Exhibit 233.

MR. ARNAULT: I believe this has already been admitted into evidence. Can we bring it up, please?

Q Now Syncora Exhibit 233 is an October 20th, 2013 email attaching responses to questions for the city council,

correct?

A Yes.

Q And you are a recipient of this email, right?

A Yes.

Q And this document contains responses to the city council's inquiries regarding the post-petition financing, correct?

A Yes.

Q If we could turn to Page 7 of this document, please. Sorry, next page, please. Yeah. And if we look at question 13, you'll see that the city council asked whether there are any other key terms that the city council should be aware of. Do you see that?

A Yes.

Q And in response the city notes that the primary terms of the financing are in the term sheets, correct?

A Yes.

Q And the city notes the existence of market flex but does not actually disclose the specific terms of the market flex, correct?

A Yes.

Q Now, Mr. Doak, on redirect -- or on direct, you were asked why you did not disclose the terms of the market flex to the city council. And you stated that you did not want the terms to get out into the market, correct?

A That's correct.

Q But I think as we established, this was actually a closed door meeting, correct?

A That's correct.

Q Can we bring up Exhibit 94, please? I believe this has also been admitted into evidence. City Exhibit 94 please. This is the commitment letter with Barclays, correct?

A Yes.

Q And this document actually sets forth the conditions under which you may disclose the fee letter, right?

A Yes.

Q And if we could turn to Page 6, please. And if you'll look at Section 8, that actually set forth the conditions under which you may share the commitment letter and the fee letter, correct?

A Yes.

Q And little (I) there, states that the commitment and fee letters may be disclosed to the City of Detroit's agents, representatives, officers, directors, and advisors on a need to know basis to the extent you notify such persons of this obligation to keep those documents confidential, correct?

A Yes.

Q And the section also states that the fee letter may be disclosed to the extent required pursuant to applicable law, including any disclosures required to be made to the city

council, correct?

A It doesn't say that. What --

Q I think we go to the next page, please. Yeah, right at the top there.

And we see notwithstanding any of the foregoing with respect to any disclosures regarding the commitment letter or the fee letter to the city council or any local emergency financial assistance loan board as may be required under Michigan PA 436, or Section 36(a) of the Michigan Home Rule Act, correct?

A Okay.

Q Okay. And you would agree with me that the city council are duly elected representatives of the City of Detroit, correct?

A They are -- they are -- yes. They're -- well, I can't tell you exactly how they fit into the architecture of governance under 436 at this point, but they're certainly elected individuals into the city council provisions.

Q Sure. Okay. Moving along, have you ever used the -- the forward libor curve to take the swaps all the way out to completion?

A I think you're asking have I looked at the libor curve and understand what the implications are and in regards to the size of payments throughout the entire remaining life, technical life of the swap.

Q Yes.

A So I have an understanding of that.

Q Okay. And have you -- have you -- have you done that?

A I -- I -- I have not performed the -- the mathematics. We have others on our team that have.

Q But you have an understanding of what that shows?

A Yes.

Q Similarly with respect to the -- the DIP financing, have you done the same thing? Have you used the forward libor curve to take -- to take that all the way out?

A Yes.

Q Okay. And have you compared the two results, the swaps versus the DIP financing to see what that shows?

A No.

Q No. So you don't know whether the net present cost of the swaps is actually lower than the net present cost of the DIP financing?

A No, I'm -- I think there's a couple problems with your question. Because as it stands the swaps are in default right now. So I would -- I would challenge the assumption that you should be looking at the swaps as if they will exist in their current position in place over the next 20 to -- 20 to 30 years. And we -- but we do know that the mark to market liability, the net present value of those -- that swap obligation, you know, comes to the tune of 280,000,000 to

$290,000,000 in -- in recent times looking at the libor curve.

The economic cost of the swap termination portion of the loan is significantly lower because the principal balance of the loan will be 25 to 18% less and in addition the -- the near term cost on a month to month basis is lower.

Q Okay. So it sounds like you haven't actually compared -- I mean it sounds like you haven't actually compared whether the net present cost of the swaps is lower over time than the net present cost of the DIP financing, is that right?

A Based on --

Q Assuming that the swaps are not terminated.

A Well, the swaps are in default so one would -- one would have to -- one would have to question how -- whether that would be an appropriate analysis to perform.

Q But it's not an analysis that you performed, correct?

A We -- it's -- that is not a particular analysis that -- that I had performed. We do know what the overall economic cost is of the swaps to the end of the life. Effectively that's the mark to market liability.

MR. ARNAULT: Okay. No further questions, Your Honor.

CROSS EXAMINATION

BY MR. MARRIOTT:

Q Good morning, Mr. Doak.

A Good morning.

Q Vince Marriott of Ballard, Spahr representing EEPK and affiliates. I have just a few questions for you. You indicated in your response to previous questions that you did not personally call any potential post-petition lender to ask if they would provide to the city unsecured credit, correct?

A Yes.

Q Yes, that's correct?

A Yes, that -- that's correct. That would not --

Q I just want to make sure the answer doesn't come in ambiguously.

A Okay.

Q My understanding is that you led the efforts of the city to find post-petition financing, correct?

A Yes, I executed most of the activities and -- and led the process.

Q Okay. Did you direct anybody else to contact a prospective lender or lenders to ask if they would provide to the city unsecured credit?

A No, I did not.

Q Did anybody do that anyway and report to you the answer?

A Not to my knowledge, no.

Q If we could bring up briefly City 90.

THE COURT: I'm sorry, sir, what number?

MR. MARRIOTT: I'm sorry, City 90.

Q And if we could turn to the -- well, the sixth page

including the cover page. Thank you. Now if I understood your previous testimony, Mr. Doak, Exhibit 90 was a presentation that you provided to the members of city council, correct?

A Yes.

Q And these were the briefing materials from which you spoke when you met with each of the city council members individually?

A Yes.

Q And your testimony was that in the context of those discussions, you did not indicate to members of city council at least what the substance of any market flex provision would be, but you did provide them with a range of interest rates that could apply to the post-petition financing, is that correct?

A That's correct.

Q And -- and that's what this page reflects, that range of interest rates that you provided to them?

A Yes. This reflects a range of all end costs for the facility.

Q Okay. And -- and it could run according to this chart from a low of 5% up to 9%, correct?

A Yes.

Q So the range that you provided to them was one at the low -- the high end was almost twice what the low end was,

correct?

A Yes.

Q Now if we could turn to City Exhibit 89. And -- and first let me just -- well, I understood your earlier testimony, this presentation was provided to among others, emergency manager Orr, correct?

A Yes.

Q And is it fair to say that this presentation was provided to emergency manager Orr to assist him in evaluating the relative merits of the four commitment letters that the city received?

A Yes.

Q Okay. And if you would flip to the last page of this exhibit. This is the all end cost analysis whereby the -- the various potential costs of the facilities contemplated by those four commitment letters, was provided to Mr. Orr, correct?

A Yes.

Q With the contemplation that he would use this information to assist him in deciding which if any of these commitment letters to -- or the -- which of any of these commitments to proceed with, correct?

A Yes. We -- we were not asking him to make a definitive decision at that particular meeting. But this was to advise him as to the comparative economics of the proposals at that

time.

Q Okay. Now in providing information to Mr. Orr, you didn't provide a range of potential interest rates from 5 to 9%. You provided the actual potential interest rates, market flex, and all under each of the commitments that the city had in hand at that time, correct?

A Yes.

Q Would you have considered yourself adequately advising him on the potential costs of these facilities if instead of giving him the actual interest rates you just gave him a range?

A No.

Q And I believe you also testified on direct that you gave -- you gave two, unless I missed one, two principal reasons for ultimately recommending the Barclays loan to Mr. Orr. The first you gave was the best economics, correct?

A Yes.

Q Okay. And this last page of City 89, is a summary depiction of the economics, correct?

A Yes, it is.

Q The second reason you gave if I heard you correctly was that Barclays number one was undertaking to fully underwrite the facility and they were an institution that could -- you felt could close, correct?

A Yes.

Q Okay. And -- and there was a third and I have trouble reading my own notes, you found the collateral provisions of the Barclays facility to be the most favorable of the commitments you received?

A We -- we did, yeah. We -- the Barclays facility was the best overall financing that the city had available given all the elements of the commitment. The economics, the collateral terms, the other lender protections, where they were willing, where we resolved issues and associated with legal opinions, it -- it was the best overall proposal that the city had available.

MR. MARRIOTT: Nothing further.

CROSS EXAMINATION

BY MS. GREEN:

Q Good morning, Mr. Doak. I'm Jennifer Green on behalf of the Retirement Systems for the City of Detroit.

A Good morning.

Q As you understand it the funds related to the quality of life note will be deposited in one lump sum, correct?

A Yes.

Q And those funds will be deposited into the city's general fund account, not into a special re-investment account, correct?

A My current understanding is that it will be deposited into a -- an account that would be appropriately accounted for

as a general fund account, however, it most likely will be deposited into a specific segregated bank account.

Q And the funds from the quality of life note are not earmarked for a particular purpose though, correct?

A They are not earmarked for a particular purpose.

Q And you can't answer why the city will not commit to using those proceeds for a particular purpose, correct?

A I -- I don't -- sorry, can you ask that question again?

Q You cannot answer why the city will not commit to using the proceeds for a particular purpose, correct?

A I -- I can provide you an answer.

Q What's that?

A I think the -- the -- the number of different projects and revitalization needs that the city has right now are -- are extensive and I believe that there is some flexibility that's desired by the -- by the leadership team to deploy the capital in the most efficacious purposes. And those determinations will most likely be made on a real time basis.

Q Mr. Doak, do you remember being -- being deposed on December 5th of 2013?

A Yes.

MR. HAMILTON: Your Honor, I'm going to object to the relevance of this whole line of inquiry. I believe you ruled on Friday this isn't relevant.

MS. GREEN: His answer, Your Honor, was actually not

what I was looking for, that's why I'm bringing up his deposition. He answered differently at his deposition. That's -- that's why. I'm not going into the --

THE COURT: So you want to impeach him on an irrelevant point?

MS. GREEN: No. I -- I -- I didn't think he was going to answer with the purpose. He said something different about where the funds were going to be deposited in general. I didn't expect him to say anything about the re-investment structure.

THE COURT: Why do we care where the funds will be deposited?

MS. GREEN: Pardon me?

THE COURT: I'm sorry. Where do we care about where the funds will deposited?

MS. GREEN: He testified previously that they would be deposited into the general fund and that they would not be earmarked for any particular re-investment purpose.

THE COURT: Right. Why do we care about that?

MS. GREEN: It's not related to what I take his objection to be. Under the city's proposed order, they are asking for certain findings of fact and conclusions of law relating to the validity of the collateral with respect to the quality of life note.

The collateral is the casino revenue and as you are aware

several parties have objected to the legality of that collateral. In order to find -- for this Court to find that that collateral is a valid pledge, I believe that the use of the proceeds for proceeds approved under the gaming act is still a relevant issue, setting aside what the objection is. And I think I understand his is to be more limited than the purpose I'm seeking it for.

MR. HAMILTON: I withdraw the objection, Your Honor, if that's the purpose.

THE COURT: Well, but I -- I would suggest to you that you get to that rather than worry about what specific bank account it happens to land in.

MS. GREEN: But I didn't expect the answer. I expected something different, Your Honor.

THE COURT: All right.

Q Mr. Doak, do you remember being deposed on December 5th?

A Yes.

Q Can you pull up Exhibit 236, please? Page 187. It actually starts on Page 186 at the bottom. At Line 22, Mr. Doak, if the post-petition financing is approved, is my understanding correct that the city will receive the proceeds as a part of one lump sum? Yes, that's correct. Do you recall that testimony?

A Yes.

Q And further down the page on 187, Line 10. Okay. What

is your understanding of what will happen to the remainder of those funds? The aspect that is the quality of life note, what will happen to that lump sum? That will be deposited in the city's general fund. Do you recall that testimony?

A Yes.

Q And on Page 188. So as part of the general fund, is it fair to say that those quality of life proceeds are not earmarked for any particular purpose? Object to form. You stated they will -- the proceeds will not be placed to the best of my knowledge in a segregated account and that the spending will occur as I understand it, is not going to be from a segregated account. Do you recall that testimony?

A Yes.

Q Okay. And the concept of calling it a quality of life note, was the idea --

A Would you like to know why the answer is changed?

Q Sure, why is your answer different today than it was a week ago?

A We've -- we've had subsequent negotiations with one of the objectors, NPFG and we've also had discussions with the city in regards to how the city is going to be administrating the quality of use funds. There is now in the latest version of the order, some understanding as to how the city will be attempting to track how the proceeds are used and report back to key stakeholders on a monthly basis.

I'm also aware of dialogues between Conway, MacKenzie and other city officials in regards to how they want to think about using the funds and they have indicated it's administratively easier for them to potentially track it in a separate account.

Q For clarification purposes, let's pull up the latest order so you can clarify which portion of the order you are referring to.

A I -- I'm not -- sure.

Q Okay. Can I direct your attention to the first page. Do you recognize this order as being the one that has recently been amended? The date is at the bottom.

A So this -- this looks like it's the 16th at 6:10. And I don't know whether the negotiation with NPFG was completed by that. In fact I'm -- I'm pretty sure it may not have entered into this particular version of the order.

Q So subsequent to this order, you have re-negotiated a term relating to the use of the proceeds?

A No. Just how we are going to provide some information and reporting on what we're -- on -- on how we're going to be tracking the -- tracking the spending.

Q Can I direct your attention to Page 7? (ii), use of the proceeds of the post-petition facility. Is that paragraph consistent with the negotiation and the amendment that you just referenced?

A Yes.

Q Okay. So this is the negotiation that you just referenced with NPFG?

A No.

Q No. So I'm just trying to clarify. This order does or does not contain the subsequent negotiations and the resulting amendment that you are referencing?

A Given the -- given the time stamp on it, I -- I don't know if it does. I don't believe it does. And once again that is -- this is related to a -- a reporting or information -- subsequent information providing requirement to the -- to stakeholders.

I -- I don't know if the order itself is going to include a particular provision in regards to what bank accounts are used. That's my -- my information there is based on dialogue that I've had with city officials and advisors.

MS. GREEN: I'll move on, Your Honor, except that we've all been tailoring our cross examinations based on the details in the proposed order. This one was filed just two days ago, so we've all been using that as our template.

And if there is a purpose of the quality of life note that's been injected back into the case, we may have further questions. I'm just not sure at this time.

THE COURT: Well, let's just inquire. Is there a later version of the proposed order than this one?

MR. HAMILTON: I believe -- I think this is the current one, Your Honor. I think it's Paragraph 18 is what she meant to be looking at.

THE COURT: Eighteen?

MR. HAMILTON: Eighteen.

MS. GREEN: So there, just to clarify, there is not another order that will be filed after this.

MR. HAMILTON: There was a -- a typo that we found that we need to correct, but substantively this is the current state of the -- of the order.

MS. GREEN: Thank you.

Q And back to the quality of life note. The concept for calling it a quality of life note was an idea by a -- an attorney for the City of Detroit, correct?

A That the name first appeared in a document -- in a document that was drafted by Jones, Day.

Q Okay. And this phrase, quality of life, originated in mid to late August of this year, correct?

A Yes.

Q And it was after the objections to the forbearance agreement and the assumption motion were filed in mid-August?

A I -- I don't know the timing of the objections, but that would --

Q After August 16th?

A Yes.

Q Okay. And this terminology was used in response to concerns related to the Michigan Gaming Revenue Control Act, correct?

A This terminology was used because it appropriately reflected the -- how the funds would be deployed.

Q Well, you had discussions about the Gaming Control Act while you were developing the term sheet, correct?

A Yes.

Q And you incorporated ideas from those discussions when you were formulating the purpose for which the quality of life proceeds could be used, correct?

A Could you state that again?

Q You incorporated certain ideas from these discussions when you were formulating the purpose for which the quality of life proceeds would be used, correct?

A I -- I -- I believe that's accurate, but I -- I'm not quite sure about the concept of formulating the purpose. But, okay. I -- I didn't formulate a -- a purpose. I formulated a construction of the -- the term sheet.

Q And you decided to call the loan that was not going to be used to pay off the swaps, the quality of life loan in August as we established. But your first awareness of the Michigan Gaming Act was actually back in June, correct, during negotiations by the swap counter parties?

A Yes.

Q So you're generally familiar, or were familiar with the notion that there are limitations on the use of casino revenue under Michigan law?

A Yes.

Q And as you were drafting the term sheet you purposely structured it so that different collateral would secure the quality of life note versus the way that the swap note would be collateralized, correct?

A Yes.

Q And you only offered the casino revenue for the quality of life note collateral because you thought that it would be less controversial given that the marketplace was aware of the arguments that had been made in connection with the assumption motion that had been filed, correct?

A Yes.

Q And in fact even with this collateral structure that you came up with, some potential lenders still had concerns regarding the casino revenue being used as collateral, correct?

A Yes.

Q And I think that you just testified they were concerned about the collateral with respect to both federal and state law, correct?

A Lenders were concerned about how their collateral interest would be structured and formalized, both in the

context of state law and in the context of federal law.

Q Okay. And city council also had concerns with using the casino revenue as collateral due to the gaming act, correct?

A I don't know whether I could affirm that statement. City council, various city council members voiced their concern in regards to the use of gaming tax revenues in the first place in regards to some of the transactions in -- in 2009.

Q Do you remember meeting with someone named Irv Corley, the executive policy manager of the city council's policy division?

A Yes.

Q Do you remember this concern about the collateral and the casino revenue being raised by Mr. Corley during that meeting?

A It most likely was.

Q Okay. Can you pull up Exhibit 233? And you recognize these. You asked about these earlier. These are the questions that were sent to you from city council? Well, this is the cover email, but attached to this are the questions?

A Yes. This is the Q and A that was provided back to the city council.

Q Okay. And this -- this casino revenue collateral issue was also raised by the city council in their written questions to you?

A It -- it most likely -- likely was.

Q Okay.

A This was a set of questions prepared by city council staff.

Q Okay.

A So I -- I can't tell you whether it was actually the city council that raised this.

Q Fair enough. Can I direct your attention to Page 6, Question 9? Question 9 states, under MCL 432.212, do you understand that that's the Michigan Gaming Act, a reference to that?

A Okay.

Q It lists the restrictions on the use of wagering taxes. Which category allows the use of wagering taxes to secure the swaps or the proposed financing? The response was, with respect to the swaps, the swap counter parties have made certain legal arguments in support of the pledge of wagering taxes which speak for themselves.

In connection with the proposed post-petition financing, the city intends to rely on the Federal Bankruptcy Code to authorize the pledge of collateral including the wagering taxes. Did you -- did you work on this response to this particular question?

A I did not work on this response.

Q But you understand that the city council's question was what purpose under Michigan law and under which category of the gaming act the casino revenue would be used for, correct?

MR. HAMILTON: Your Honor, at this point I think we're beyond the competence of the -- of the witness to answer. He didn't work on this portion of this unit.

THE COURT: The objection is sustained.

Q Do you know who did prepare the responses to the questions raised by city council?

A Yes.

Q And who prepared these responses?

A Two attorneys from Jones, Day.

Q Okay. You would agree with me that based on the plain language of the answer since I will not be cross examining an attorney from Jones, Day, that there is no use listed in the response under Michigan law specifically referencing the gaming act?

MR. HAMILTON: Object, Your Honor. It's calling for --

THE COURT: The objection is sustained. You -- you can argue that, but --

MS. GREEN: I'll move on.

Q The city council, I believe we already established they were not given a copy of the fee letter?

A That's correct.

Q And you admit that fees are important to you in analyzing the transaction, correct?

A Yes.

Q I believe you were already asked this question about the market flex provision, but I don't know that anyone asked this with respect to the fees. If you didn't know the amount of the fees associated with the loan, do you agree with me that you would not be in a position to recommend the $350,000,000 financing to the city?

A I -- I would agree with you.

Q Okay. Can we pull up Exhibit 1003? Mr. Doak, do you recognize this email dated August 29th, 2013? Or it might be August 30th, there's two.

(Retirement Systems Exhibit 1003 was identified)

A I -- I --

Q Can you pull up the -- the paragraph below it? The body of the email.

A It -- it looks that -- that looks like the letters that -- email and correspondence we were sending to many of the potential lenders.

Q Okay. And the to and from portion of the email states that it's an email from you to Bruce Mendelson at Goldman Sachs?

A Yes.

Q And Goldman Sachs was a potential lender with respect to the post-petition financing, correct?

A Yes.

Q And Mr. Mendelson was inquiring, if we go to the next

paragraph of the email. It says Jim, thank you for sending the information over. We've begun our work and are far along in clearing our internal conflict system. Is there a data room that you were planning on making available or should we provide a list of diligent questions. Do you remember this email?

A Not -- not this particular email, but I -- that looks completely consistent with what he might have written to me.

Q And with the work that you were doing to prepare the information that the lenders would need, correct?

A Yes.

Q And your response to him, if we could go to the email directly above that. Hold off on the due diligence, we have a data room and there's a liquidity piece under development. You did not call the liquidity piece a quality of life improvement piece to Mr. Mendelson, did you?

A No. That reference, a liquidity piece under development is a reference to the -- the monthly cash flow liquidity forecast that we subsequently provided to all of the potential lenders that signed the NDA.

Q Okay. Can we also look at email Exhibit 1005? At the bottom portion dated August 29th, it's an email from you. Do you recognize that email?

(Retirement Systems Exhibit 1005 was identified)

A Yes.

Q And is this another solicitation email to a prospective lender?

A Yes. In a -- yes, it is.

Q And Mr. Gavin is an investment banker at RW Baird, correct?

A Yes, he is.

Q And you were reaching out to him as a potential source for the post-petition financing?

A Yes. We -- we -- we were reaching out to RW Baird to see whether they wanted to look at the financing opportunity.

Q And the email states exactly that, we're working on sourcing 350,000,000 post-petition financing for the city, use of proceeds is to financing the swap termination and provide general fund liquidity through the Chapter 9 case. Do you see that portion?

A Yes.

Q And that's not relating to the liquidity forecast, correct? That's the actual purpose of -- of the use of the proceeds?

A Yes. This was sent to him to get a quick understanding as to whether RW Baird wanted to be incorporated into the process and receive the formal invitation.

Q And you also had a conversation with Mr. Gavin relating to the potential post-petition financing shortly after this email, correct?

A Yes.

Q And in this conversation he told you -- let's go to the next portion of the email, please. The top of the email it says when we spoke I said the counter parties didn't get a bankruptcy opinion. Is he referring to the phone conversation that you had?

A Yes, he is.

Q Okay. Further down in the second paragraph as I said on the phone, the counter parties' attorneys did not believe that the pledge survived, but they did what they could get from Oreck. And attached to this email was a legal opinion from Oreck, correct?

MR. HAMILTON: Your Honor, at this point I think we're talking about double hearsay about what somebody who's not in Court said, somebody else who is not in Court said. I would object on that ground on this portion of the email.

THE COURT: Well, excuse me again. Is this exhibit in evidence?

MS. GREEN: Not yet. I was going to move for its admission after we established certain things relating --

THE COURT: Okay. Again, it's not proper to ask a witness about the content of a document until it is in evidence. So on that ground the objection is sustained.

MS. GREEN: Your Honor, I would move for the admission of Exhibit 1005.

MR. HAMILTON: And, Your Honor, we would object to the portion of the exhibit that contains the double hearsay, the portion that's actually currently highlighted on the screen. We don't object to the statements that this man made to Mr. Doak in response to Mr. Doak's inquiries. But when this man is -- if they're introducing what this man is saying about what somebody else said that is -- has no relation to the financing that's being sought, that's double hearsay and should not come in.

MS. GREEN: May I respond? I will be using this particular sentence for its affect on Mr. Doak and what he did afterward, not to establish the truth of the email itself. And so therefore I do not believe I'm using it for the truth of the matter asserted and it's not hearsay.

THE COURT: For that very limited purpose, the Court will overrule the objection and admit into evidence Exhibit 1005.

(Retirement Systems Exhibit 1005 was admitted)

MS. GREEN: And, Your Honor, I believe that my Exhibit 1003 is already in evidence, the one that I asked him about previously.

THE COURT: Would you like me to check for you?

MR. HAMILTON: No objection, Your Honor. We don't object to it being admitted into evidence. It's not into evidence yet, but we don't object.

THE COURT: 1003 is --

MS. GREEN: Right, Your Honor.

THE COURT: 1003, all right. 1003 is admitted.

(Retirement Systems Exhibit 1003 was admitted)

Q If we could pull the portion up that we had up a moment ago. And attached to this email was a legal opinion from Oreck, correct?

A Most likely.

Q And I think we established when we -- when you testified at your deposition you didn't read the legal opinion, but you knew that it was attached?

A Yes.

Q Okay. And that Oreck opinion, do you understand that that's the same opinion that was attached to the collateral agreement?

A I don't -- all I know is the Oreck opinion related to the 2009 swap amendment.

Q Fair enough. The portion that we read earlier, as I said on the phone the counter parties' attorneys did not believe that the pledge survived, but they did what they -- did get what they could from Oreck. And to your knowledge this information was gained through Mr. Gavin's role as a financial advisor to the city in 2009, correct?

MR. HAMILTON: Again, I'm going to object now on relevance grounds. This has nothing to do with the financing,

the post-petition financing facility. It's not within the scope of his direct. I -- I don't see how this relates to the post-petition financing facility.

MS. GREEN: Your Honor, I believe that it does relate to the ability of the city to have potentially gotten a better deal. Yesterday we heard evidence relating to the city's poor bargaining position in relation to the forbearance agreement. We heard that they had no leverage. The cards were stacked against them.

I think that certain evidence tends to show that after they entered into the agreement they learned information that could have strengthened our case and I want to explore whether this information was used to reconsider their position, to investigate further, things of that nature.

THE COURT: This is arguable. I'll permit it. Go ahead.

A Could you ask the question again, please?

Q Sure. Your understanding was that this knowledge was gained by Mr. Gavin through his role as a financial advisor to the city in 2009, correct?

A I have -- I have no knowledge and do not recall having knowledge at the time as to whether Tom Gavin was or RW Baird was an advisor to the city for the purposes of that transaction.

Q Well, you did -- you do understand that he was a former

financial advisor or consultant for the City of Detroit, correct?

A His -- yes. His engagement as I understand it has been a standing one related to the water fund and the sewer fund and the debt of DWSD. I don't know what RW Baird's role was or if they had a role with regards to the 2009 deal.

Q Okay. Rather than taking this down and pulling your deposition up, I will read it so that we don't have to switch. You recall being deposed on December 5th, correct?

A Yes.

Q Do you recall being asked a question about Mr. Baird and your conversations and your knowledge of his involvement with the City of Detroit?

MR. HAMILTON: Your Honor, could we at least have a page reference so I can --

MS. GREEN: 215.

Q Do you recall testifying about that?

A I don't recall that particular -- I don't recall that particular question, but I'm sure you asked it.

Q Do you recall testifying, "he had a recollection, meaning Mr. Gavin, or at least a narrative in regards to the negotiations that occurred amongst the parties in 2009 and he was informing me of a dialogue that he indicated had occurred in the negotiations between the city and its advisors, and the swap counter parties and their advisors, in regard to

structuring the collateral agreement and the amendment to the swaps"?

A Yes.

Q Does that change your answer as to whether or not you're -- the context of your conversation was that he was a former financial advisor during the 2009 negotiations?

A Absolutely not. I didn't know if that was firsthand, secondhand, thirdhand, fourth hand, at the bar (Inaudible). I -- I didn't know where he came up with this.

Q Okay. After you spoke to Mr. Gavin and you received this email from him, you then forwarded this information to the city's legal advisors, correct?

A Yes.

Q And why do you share it with -- why did you share it with them?

A I shared it with them --

MR. HAMILTON: At this point I think we're getting into privilege, Your Honor.

MS. GREEN: Perhaps, then I -- with that caveat, if there's a non-privileged answer, I'll take it.

THE COURT: I don't know that we can rely on the witness to know the difference.

Q Without disclosing any potentially attorney/client privileged information, did you have a reason for forwarding this email? If you can't answer it without disclosing that's

fine, sorry. Just --

A It seemed to be a pertinent conversation to make sure that I was not the only person who was aware of this act that my conversation had occurred.

Q Okay. And did you share it with the swap counter parties as well?

A No.

Q Do you know if anyone from the city's team shared it with the swap counter parties?

A No.

Q Did you do any further investigation as to whether Mr. Gavin's statements were true?

A No.

Q Did you ask Mr. Gavin for the names of the individuals that allegedly said these statements?

A No.

Q Did you look for any documents where the swap counter parties may have made this admission -- admission in writing?

A No.

Q Did this information cause you in any way to reconsider the deal that had previously been struck?

A In -- my focus at that particular point was on moving forward with the post-petition financing and my area of focus was not on the executed forbearance agreement and where it would go from there.

Q Good point. Do you know if anyone else on the emergency manager's team or perhaps your colleague Mr. Buckfire used this information as leverage with the swap counter parties?

A I -- I don't know.

Q Do you know after you forwarded this information on to others, do you know if anything was ever done with this information in regards to due diligence that could be performed to look into the story that you were told?

A I don't know.

Q Is it fair to say that this information didn't cause you to re-think the strategy of seeking post-petition financing versus litigating the underlying swap transactions?

A I -- I -- could you ask the question again? Because I'm --

Q You just testified --

A Is it the whole city or -- or like we -- we had an executed forbearance agreement that provided advantages to the city and, you know, -- and -- and had, you know, various obligations. And I was working on the -- the financing.

If there was to be a reverse of course on the direction we were going on the forbearance optional termination agreement, it would not have come from me.

Q Okay. There were continued negotiations though related to the forbearance agreement after its initial execution date, correct? Five amendments?

A Yes. There has been subsequent amendments.
Q And there's a sixth one in the works, right?
A Yes.
Q And some of those are related to the fact that the city missed the first discount milestone date?
A Sure, yes.
Q And the current size of the discount is a 25% discount until January 1st, I believe?
A Well, the -- without an execution of the Sixth Amendment, we -- we are in the 82 price zone.
Q Okay. And did you use any of this information as leverage to negotiate yourself back into the 75% price zone?
A This is -- once again I'm focused on the post-petition financing. And I have not taken a laboring or on the dialogue with the swap counter parties.

MS. GREEN: Understood. Thank you. I have no further questions, Your Honor.

THE COURT: All right. Stand by one second, please. All right. We'll take our morning recess now and reconvene at 10 after 11:00, please.

(WITNESS JAMES DOAK WAS TEMPORARILY EXCUSED AT 10:46 A.M.)

THE CLERK: All rise. Court is in recess.

(Court in Recess at 10:46 a.m.; Resume at 11:13 a.m.)

THE CLERK: All rise. Court is in session. Please

be seated.

(WITNESS JAMES DOAK RESUMED THE STAND AT 11:13 A.M.)

THE COURT: It appears everyone is present, let's proceed. Everyone except Ms. Green.

MR. HACKNEY: I think Mr. Doak probably would like to confirm that we're done with him, sir.

THE COURT: Okay.

MR. HAMILTON: No redirect, Your Honor.

THE COURT: All right. You're all set, sir.

A Okay.

(WITNESS JAMES DOAK WAS EXCUSED AT 11:14 A.M.)

MR. SHUMAKER: Good morning, Your Honor. Greg Shumaker, Jones, Day for the City of Detroit. The city calls Kevyn Orr to the stand.

THE COURT: While we have a moment, my latest count is 243 minutes left for the city and 319 minutes left for the objecting parties.

MS. GREEN: Thank you, Your Honor.

THE COURT: Please raise your right hand.

(WITNESS KEVYN ORR WAS SWORN)

THE COURT: Please sit down.

DIRECT EXAMINATION

BY MR. SHUMAKER:

Q Good morning.

A Good morning.

Q Would you please state your name for the record?
A Kevyn D. Orr.
Q What's your current position, Mr. Orr?
A Emergency manager, City of Detroit.
Q Mr. Orr, are you aware of a document or agreement known as the forbearance and optional termination agreement?
A Yes.
Q I'm going to refer to it as the forbearance agreement this morning, is that okay with you?
A Yes.
Q Okay. What was your role in the negotiation of the forbearance agreement?
A I participated in the negotiations towards the end to final we get to definitive terms.
Q Who led the business and legal negotiations for the city?
A On the business side, it would be Ken Buckfire, the city's investment banker. And on the legal side attorneys at Jones, Day.
Q Anyone in particular at Jones, Day?
A I believe Corinne Ball and Bruce Bennett.
Q Okay. Why did you have Mr. Buckfire take the lead on the business negotiations?
A Mr. Buckfire is the city's investment banker of the restructuring effort and had participated in these types of negotiations and financial arrangements before.

Q And when did the -- the swap -- I'm sorry, when did the negotiations relating to the forbearance agreement begin?

A I believe they began in late May throughout June. I became involved in early June.

Q Okay. And why did you believe pursuing such an agreement in the May, June time period was important?

A The city was flowing cash flow negative quite severely, almost to the point that we would not have sufficient cash to make -- meet obligations as they became due.

Q Were there any other concerns that you had with regard to the city's position at that time?

A Sure. In addition to cash flow concerns, I was concerned that we wouldn't be able to provide services to the city. And that we also were at risk of being in default and might lose access to the casino revenue.

Q Was there any concern about a termination payment under the swaps?

A Yes. We have been in default and there was quite a large termination payment that could be due as well.

Q Did you have a sense as to how much that termination payment might be?

A At that time I had heard figures somewhere between 300,000,000 to 400,000,000.

Q What was your understanding of why the city was facing a termination payment at that time?

A The -- the city had been in default for a number of issues including the declaration of the emergency and the appointment of an emergency manager. Obviously in the event of default. And the swap counter parties had been forbearing for some period of time, so the city was at risk at any given time of being declared in default and those parties exercising their remedies.

Q As you started out with these negotiations, what were your objectives?

A Our objectives really were to get the best discount we could over the termination fee that was due to relieve any threat, to losing the casino revenue and to also to the extent we could, reduce the risk of litigation so we could stabilize the city's finances and go cash flow positive.

Q You talk about the cash. Any particular portion of the city's cash that you were referring to, the casino revenues has come up?

A Yes. Casino developer revenue, yes.

Q Okay. Why is access to the casino revenue so important to the city?

A Casino revenue is the single most stable source of revenue available to the city. And without it the city cannot operate.

Q Could you summarize for the Court how the negotiations progressed from your standpoint?

A Yes. They progressed at a pace in June and in approximately the June 10th to June 14th time frame. They became more critical. There were a number of different sessions that I personally was involved with where negotiations broke down and the parties would try again ultimately reaching an agreement on June 12th or 13th, I believe.

Q So you've mentioned that you got involved towards the end. What -- what do you mean by that? You -- what did you personally do?

A Well, the -- the negotiations were going forward principally on the business side from Mr. Buckfire and on the legal side with the attorneys at Jones, Day for some weeks before I got involved. But personally I began to negotiate what I hoped to be the best possible discount percentage that we could get.

Q I want to talk a little bit -- ask you a few questions about the -- the discount that you referred to. But focusing right now on negotiations, and you said that Mr. Buckfire at Miller, Buckfire, and Ms. Ball, and Mr. Bennett at Jones, Day, how often did you communicate with them about negotiations during this time frame?

A I -- I communicated either directly or indirectly regularly throughout the June time frame with Mr. Buckfire for a number of days. We actually sat in the same room and had

phone calls off and on several times a day.
Q Do you recall what the opening positions of the city and the swap counter parties were?
A Yeah. Generally speaking the -- the city wanted to get the maximum discount available, relieve itself of the threat to the casino revenue, release any liens that might -- that the parties have on that revenue. The swap counter parties wanted to take the position that they were 100% secured and wanted to recover their total amount due.
Q Do you recall what the city's opening position was?
A I recall that by the time I got involved the negotiations were in the 80% range. And we -- we wanted to push to see if we could get better.
Q Before you got to that position, how would you describe the negotiations between the city and the swap counter parties?
A My understanding that negotiations were arm's length. They were robust. And they were quite contentious from time to time.
Q Were you coming to an agreement easily?
A No, not at all.
Q Why did you think that was the case?
A Well, I -- I think the parties held very strong positions on both sides.
Q You -- you mentioned the -- the events of default and

that you were an event of default yourself. How did those events of -- of default affect the negotiations?

A Well, I -- I think the swap counter parties wanted to press and -- and suggested that they knew we were in default, so they wanted us to acknowledge that they were forbearing and there was a value to that. We wanted to press that the city's condition was quite dire. And while there were defaults, we had been paying the obligations as they had become due, but the risk to the city remained.

Q What did the -- an event of default allow the swap counter parties to do?

A Well, it could have allowed them to trap the casino revenue.

Q And you mentioned the termination payment as well?

A Yes.

Q Had the -- the swap counter parties attempted to trap the casino revenues before this time?

A I don't believe so.

Q Did you --

THE COURT: Excuse me one second. I have to interrupt. We just blew through what is probably the most significant question in this trial which is what were the arguments that the city was using to -- in support of its request to get a discount on the termination fee.

MR. SHUMAKER: I am going to get there, Your Honor.

I promise.

THE COURT: You're going to what?

MR. SHUMAKER: I am going to get there.

THE COURT: Okay.

MR. SHUMAKER: I was -- I was leading up to that.

THE COURT: Okay. So this was like a preview. Okay. If -- if that's your plan, I will let you pursue it. Otherwise, I was going to.

MR. SHUMAKER: Okay. Hopefully, I'll cover everything that Your Honor is -- is interested in. And I do recognize what Your Honor is interested in.

Q I believe my question was, Mr. Orr, was why did you think at this time when the negotiations were going on, in the May, June time frame, that the -- the swap counter parties might trap the casino revenues when they hadn't previously?

A Well, there have been multiple events of default as I have mentioned with me as well. And also to the extent there were other litigation risks, it appeared that -- at least to us, it appeared that the parties had come to sort of a head in their respective positions.

We also could not operate on the basis that hope was a strategy for stabilizing the city's finances given the precarious nature that they were going into that we were having a very significant financial crisis at the time. So the concept that they would forbear indefinitely was not

reasonable.

Q And during this time were you -- fair to say that the -- the city was -- you started considering thinking about a filing of bankruptcy for the city, correct?

A Yes, I think that's fair.

Q If you were -- if the -- if the possibility of a bankruptcy filing was out there for you, why were you concerned about the banks and the casino revenues?

A Well, I -- I believe in consultation with our attorneys, there was a possibility that the swap counter parties wouldn't be bound for several -- by several provisions of the Bankruptcy Code by the automatic stay and would still be able to exercise their security interest.

Q And do you -- do you recall the -- the provisions that -- that were coming into play?

A I don't have the Code in front of me, but I think 362(a)(17) and don't quote me on this, there are a lot of attorneys, 546.

Q I'm not trying to quiz you. I -- is the --

A I just don't remember.

Q Is the term a safe harbor --

A Safe harbor provision, sure. There's the safe -- I'm just -- I don't remember the specific Code provision.

Q Okay. And I'm sorry. What would the -- what would the safe harbor have allowed the banks to do arguably?

A The safe harbor provision allows banks with -- with interest of -- of this kind to execute on their security interests.

Q Around this time of -- of negotiation, was there any interruption in the negotiation process?

A Oh, sure, yeah.

Q And -- and who in your mind interrupted?

MR. HACKNEY: Your Honor, I'd like to interpose an objection if I could. I think he's about to go down a pathway that I construed the Court to have determined to be collateral by excluding Ms. Schwartzman's testimony. This is about Syncora and whether it impacted the negotiations that were ongoing and I do think that this is a sufficiently collateral matter that is just not relevant to the proceeding. But to the extent we're going to delve into it, then it gets into the sort of who said what to whom and why didn't various things happen.

MR. SHUMAKER: Well, Your Honor, the importance of the casino revenues and what Mr. Orr's testifying to is -- and its critical importance was what Syncora was -- was up to and that's why the witness' account of what the city -- how the city approached that issue and what it might do and what it did in order to protect those casino revenues is -- is important.

MR. HACKNEY: Your Honor, to the -- much as when Mr.

Buckfire testified yesterday why he was also heavily involved, to the extent they want to introduce testimony that Syncora sought to trap the revenue and that impacted the desire to conclude the negotiations, I don't have a problem with limited testimony to that effect.

As you get into the temporary restraining order that was obtained on an ex parte basis and whether that was appropriately obtained, or whether we were sitting around waiting for them to turn a confidentiality agreement to us, all of the things that were in the testimony that we wanted to introduce, I think you cross over to a point where it -- it becomes prejudicial for us to have them tell their side of the story and I do believe it's also -- I think it's collateral.

MR. SHUMAKER: And, Your Honor, I -- I don't plan on going into this in any significant detail.

THE COURT: Well, I'll let you proceed with the understanding that you are potentially opening up doors you don't want to open. And I'll leave you to decide whether to take that risk.

Q Let me switch to this, Mr. Orr. Let -- let me ask you, when did you reach a final agreement with -- with the swap counter parties?

A We reached an agreement in principal on June, I believe it was June 13th and actually signed a document, I believe July 15th.

Q So how long did it take from -- from start to finish?

A Almost a month and a half approximately.

Q Now, in your view as the emergency manager, what benefits does the forbearance agreement provide to the city?

A Well, it gives us access, unfettered access to the cash. It gives us a significant discount over and above the par rate of the termination fee. It helps us avoid costly and expensive litigation which is a cost drain on the city. Equally important is it helps stabilizes the city's finances and also allows us an opportunity to get at some well needed services to the citizens of the city.

Q Now, so is it fair to say that -- that in your view you achieved your objectives that you started out with in negotiating the forbearance agreement?

A Yes.

Q Now you talked a little bit about a discount on the termination payment, correct? Do you recall what the original discount percentages were that were negotiated under the forbearance agreement?

A Yes.

Q And -- and what were they?

A The original percentages were -- I believe there was 82, 77, and 75.

Q And when you say 82, 77, and 75, what -- what do you mean?

A There -- there was a -- a sliding scale related to how quickly you could pay the discount and as you went by certain time frames, the discount began to get reduced. So initially if you paid it quickly it was 75%, if you paid it less quickly it became 77%. And if you took out the entire term of the agreement it went to 82%.

Q Okay. Now, there have been subsequent amendments to the forbearance agreement, correct?

A Yes.

Q And the discount numbers have changed and the -- and the date thresholds have changed, is that correct?

A Yes.

Q And what is your understanding of what the current discount percentages are on the termination payment?

A I want to be clear when I say discount. It's the amount that you have to pay. So the discount is actually 25%. And when I say 82, it's actually 18%.

Q Right. What -- what are they right now? As we sit here today December 18th, 2013?

A Twenty-five and 18%.

Q Okay. And do you know when the city must exercise its rights under the agreement in order to get the 75%, by what date?

A I think we need to exercise them by December 31st.

Q Now did you -- did you approve these discount

percentages?

A Yes.

Q How did you arrive at these percentages?

A It was subject to negotiation. We kept pressing and testing how far we could go and they kept resisting and they would hang up and we'd come back and press and test and finally we got to the point where they said those are the percentages that we're willing to accept.

If we don't accept those percentages we would not have a deal. We pushed back and said, you know, we have to have 25% because we felt that was a fair discount for a secured interest.

Q Okay. Do you believe the city got a good deal with the discount percentages that you approved?

A I believe we got the best deal available, yes.

Q Why?

A Well, as I said during the negotiations, they had broken down several times, literally broken down. Phone calls were hung up and the parties did not speak for several days. And went up -- as I understand it went up to the highest levels of the counter parties organization as far as what they were willing to accept. And in fact we were prepared to potentially pursue litigation if we had to.

Q I want to -- I want to focus on that in just a bit, but -- but still in the negotiation phase, I want to ask you a

question which is in connection with your negotiations, did the swap counter parties ask you on behalf of the city to reaffirm their swaps deal with the city?

A    Yes.

Q    Did they ask you to reaffirm their collateral rights with regard to the casino revenues?

A    Yes.

Q    Did you agree to do so?

A    No.

Q    Why not?

A    Well, we -- we felt there were issues with regard to their rights and we don't want to affirm because we're in the midst of negotiations and wanted to preserve our options if those negotiations fell through.

Q    During this time of the negotiations, were you looking at the possibility of suing the swap counter parties?

A    Yes.

Q    Did you receive legal advice regarding the potential claims the city might have against the swap counter parties?

A    Yes.

Q    From whom?

A    From our attorneys.

Q    Who were your attorneys? The law firms, how about that? Okay.

A    Attorneys at Jones, Day and also attorneys at Pepper,

Hamilton.

Q And that's Mr. Hertzberg at Pepper, Hamilton?

A Yes.

Q Why was Pepper, Hamilton involved?

A We had retained Pepper, Hamilton -- Pepper, Hamilton because issues had been raised regarding a potential conflict with Jones, Day and we didn't want to have any issues regarding whether or not we were pursuing potentially any claims against the swap counter parties zealously.

Q Now were -- were the Jones, Day lawyers and -- and the Pepper, Hamilton lawyers involved in the meetings and communications with the swap counter parties while you were negotiating the agreement?

A Yes.

Q Why did you have -- was -- was -- was Ms. Ball one of the lawyers who participated in those calls?

A Yes.

Q Why did you have both Ms. Ball and Mr. Hertzberg participate in those calls?

A Well, we wanted to make sure that they were fully informed and prepared if those calls broke down from the legal perspective to take appropriate relief. There may have been other attorneys involved in those discussions as well. I'm just identifying Ms. Ball, Ms. Bennett, Mr. Hertzberg as the principal ones participating.

Q Did those law firms, did Jones, Day and Pepper, Hamilton prepare any legal analyses of the claims that the city might have against the COPS and the swaps?

A Yes.

Q And those memos were conveyed to you, is that correct?

A Yes, I believe so.

Q Were any legal analyses prepared by Jones, Day or Pepper, Hamilton regarding the pledge of the casino revenues that was a part of the 2009 collateral agreement?

A Yes.

Q Without divulging the substance of the communications, the privileged discussions that you might have had with Jones, Day lawyers and Pepper, Hamilton, what kinds of claims were addressed in the memoranda that you saw and/or heard about?

MR. HACKNEY: Your Honor, I'll just interpose an objection on two fronts here. The first one is that during the discovery on the forbearance agreement, we were -- we were not actually granted the opportunity to obtain document discovery and they did not provide us a privilege log.

But after the testimony of Mr. Orr in which he asserted, I took advice on all these subjects, don't worry, I considered everything and -- and took it into account, I asked counsel to provide a privilege log so the extent to which we could see were memoranda transmitted to Mr. Orr for his consideration. These are complicated legal issues. These aren't the types of

things that you can just process by having a five minute conversation with someone. And I think -- and -- and counsel for the city refused to do that.

I think that they are now inquiring of testimony of the witness that I don't have a fair opportunity to cross examine the witness about. Even if it's not the substance of the communication, if they were going to elicit testimony from Mr. Orr about all the different memoranda and email that he concluded that he considered as part of his decision, I think it was incumbent upon them to produce such a privilege log so that we could see that it maps up with the decision time frame that's laid out around the negotiation.

MR. SHUMAKER: Your Honor --

THE COURT: You received memoranda from your lawyers outlining claims that the city might have in regard to the COPS and the swaps.

A Yes, claims and defenses, Your Honor.

THE COURT: And you're claiming the privilege as to those memoranda?

A Yes, Your Honor.

THE COURT: And you're claiming the privilege as to those memoranda even though you want to take $270,000,000 from the taxpayers of this city to pay to terminate those swaps?

A I am claiming the privilege, Your Honor.

THE COURT: I don't get it.

MR. SHUMAKER: Well, Your Honor, responding to --

THE COURT: Just because the -- you have the privilege doesn't mean you have to claim it.

MR. SHUMAKER: Well, Your Honor, that's true. But the -- the city has asserted the privilege and --

THE COURT: I don't get it. How can I decide whether this was a fair settlement without understanding what the city's assessment of the strength of its claims against the COPS and the swaps were? How can I do that?

MR. SHUMAKER: Well, Your Honor, you can do that as I think we set forth in the -- our response to the motion in limine on this point that the objectors filed, it's really an objective standard. And you have the theories laid out by the objectors. This -- this -- the city has, you know, asserted the privilege, but obviously the consideration of those claims --

THE COURT: Why has the city asserted the privilege?

MR. SHUMAKER: Well, Your Honor, it's not my privilege, but --

THE COURT: I'm asking you. You're their lawyer. Why have you asserted it?

MR. SHUMAKER: Well, Your Honor, you know, this is a -- it is a well known effort to protect the city with regard to its communications between, you know, its client and its lawyers. The free exchange of ideas is critical to the

system.

And we were negotiating with large banks who would love to have the Jones, Day, or the Pepper, Hamilton memoranda revealed for all the world so it would inform their negotiating position.

MR. CULLEN: If I may add one thing, Your Honor. Thomas Cullen for the city. I think, Your Honor, that one of the reasons we haven't disclosed those memoranda, and we didn't want to disclose those memoranda, is that we may still sue the banks. If we are in a position of --

THE COURT: All right. Let's walk down -- let's walk down that road for a second. Assume the Court denies its approval of this forbearance agreement and you wind up in litigation, right.

They're going to file a complaint, or you're going to file a complaint, or the other -- and -- and regardless the other side is going to file a counter claim and sooner or later you're going to file your motions for summary judgment and answers to motions for summary judgment, or trial briefs and answers to trial briefs, it's all going to come out.

MR. CULLEN: Your Honor, perhaps not -- not suggesting to split the baby here, but we did have --

THE COURT: Let's pause. Let's just take a pause here. It's a little early for lunch, but we're going to take lunch now and I want you to think about how to resolve this

issue over lunch.

MR. CULLEN: May I suggest one thing, Your Honor?

THE COURT: Yes.

MR. CULLEN: There was a draft complaint and perhaps the Court could -- we could certainly waive with respect to that if we weren't on the subject matter waiver provision.

THE COURT: Let -- let -- let's reconvene at, it will be 1:15, 90 minutes from now and -- and -- and you think about what position to take that's in the best interest of the city.

MR. CULLEN: I understand, Your Honor.

THE COURT: All right. We're going to be in recess.

(WITNESS KEVYN ORR WAS EXCUSED AT 11:43 A.M.)

THE CLERK: All rise. Court is in recess.

(Court in Recess at 11:43 a.m.; Resume at 1:18 p.m.)

THE CLERK: All rise. Court is in session. Please be seated. Recalling case number 13-53846, City of Detroit, Michigan.

THE COURT: It appears that everyone is here. Mr. Shumaker.

MR. SHUMAKER: Good afternoon, Your Honor. Over lunch I have to confess that I was thinking about what Your Honor had told us at the pre-trial conference on Friday about the proponent of a settlement being in a -- an awkward position in its approach to how it discusses or it doesn't --

at the same time -- at the same time asking for settlement of the claims, it does not reveal the strengths and the weaknesses in case the -- the Court decides that it can't approve the settlement. And I've -- and I've kind of -- think we find ourselves in that awkward zone.

We interpreted what you were saying, Your Honor, that you did not want to know what Jones, Day or Kevyn Orr, or any of the employees thought about the strengths and weaknesses of the -- the case. You thought we were asking what did he consider and were memoranda prepared. Did you receive advice from counsel, were there -- was all of that considered. So again I stand here awkwardly, or hopefully less so after -- after a busy lunch.

With regard to what your -- Your Honor has requested, I guess my -- my answer is -- is twofold in nature. One, we have -- I'm going to admit that there was a bit of scurrying in the lunch and we have pulled together a -- a packet of what I think Your Honor would find under normal circumstances clearly privileged attorney/client communications and attorney/client work product. And including draft complaints that were prepared.

And in trying to figure out what to propose to Your Honor, Rule 502(d) comes to mind of -- of the Federal Rules of Civil Procedure. I'm not sure -- oh, I'm sorry, the Federal Rules of Evidence which the 502(d) states as Your Honor knows,

controlling effect of a Court order. A Federal Court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the Court in which event the disclosure is also not a waiver in any other federal or state proceeding.

If Your Honor would like us to, we can make a motion or Your Honor could, I imagine issue an order pursuant to 502(d) right now in which we -- the city would provide those to Your Honor and if Your Honor believes that we need to publish those to the world, we will publish those to the world. If -- if you're able to -- if the Court is --

THE COURT: I don't -- I have to interrupt you here. I don't want you to misunderstand what my request was. I was not requesting you to disclose privileged information. My request was that you consider whether maintaining the privilege is in the best interest of the city. That was my request.

If you come to the conclusion it is, and you think you can prove what you need to prove to get this settlement approved, go for it. I think your challenge is more difficult if you maintain the privilege. It's not impossible. That was -- and I apologize to you if I wasn't clear enough on that point.

MR. SHUMAKER: No, no. Yeah, I was just --

THE COURT: You know, that's -- that's it. I will

say in hindsight now that I understand what the issue was regarding the privilege log that Mr. Hackney had raised, that if I had understood when that motion was addressed briefly as it was the other day, that these memos were the subject of that request for a privilege log, I certainly would have ordered it. And in fact I do order it now, I'm going to change my order on that and order a privilege log.

MR. HACKNEY: So I have to clarify for the record, Your Honor, to be very precise, there is actually a -- a meaningful distinction about what you and I were talking about on Friday and this issue. And if I could clarify it.

THE COURT: Oh, all right. Go ahead.

MR. HACKNEY: On the original forbearance agreement, we were not entitled to any discovery period at the end of our colloquy. And then after Mr. Shumaker indicated that this would be an evidentiary hearing, the Court then said, okay.

THE COURT: Right.

MR. HACKNEY: I'll let you take depositions. But we weren't allowed to engage in written discovery. And when you engage in written discovery, that's what triggers the privilege log coming back because that's what they withhold.

The privilege log you and I were talking about on Friday was with respect to DIP discovery where we were entitled to issues in written discovery and then they did not give us a privilege log.

THE COURT: Okay. That was -- so that -- that was my disconnect, okay.

MR. HACKNEY: Yes, sir. And I -- I wanted to clarify that, but on the forbearance agreement after we went through the depositions and there was the repetitive assertion of the privilege, which I understood. I understand the position that's being taken.

What I then said to the city was, I know I haven't been given the right to take written discovery, but given the widespread assertion of the privilege, and the complexity of the issues, won't you please agree to produce to me a privilege log so that what we could do is we can see --

THE COURT: Okay.

MR. HACKNEY: -- the deliberative process. Because you'll see the memoranda and the email going to Mr. Orr on the relevant issues.

You do have to disclose the subject matter of a communication, even if you don't disclose the communication itself. Then we'd be able to test the proposition that don't worry, I considered the gambit of the issues. That's the privilege log, it was a voluntary request.

My objection today was simply that having rejected that request, I do think that they have now put the objectors in a position where it's difficult to meaningfully cross examine Mr. Orr even on the subject of what he considered. Because

you don't have access to seeing the -- the communications go to him.

MR. SHUMAKER: And if I could address that, Your Honor. At Mr. Orr's deposition, objectors count on the assumption motion back when it was Your Honor's order was that the city just proffered whoever was going to testify in support of the assumption motion.

The -- the objectors' counsel did ask a number of questions about what sort of topics, what sort of claims did you consider Mr. Orr. And he was allowed to answer those questions. That is similar to what you would find on a privilege log.

But when they went deeper and they started asking what about -- what were the likelihood of success on the merits there, that's when I said that is invading the privilege. That's how I drew the line.

And so in effect I think the objectors have the kind of information that they would have received in connection with the privilege log had we -- had there been written discovery in connection with the assumption motion. And frankly, Your Honor, that was what I was going to be asking Mr. Orr about.

THE COURT: So I -- I take it that it is -- it is still the city's judgment that it is in the best interest to maintain the claim of privilege as to whatever legal memoranda Mr. Orr relied on in coming to this settlement on the -- on

the swaps?

MR. SHUMAKER: I have consulted with -- obviously, Your Honor, it's the client, the city's decision.

THE COURT: Right.

MR. SHUMAKER: Mr. Cullen and I were given -- were -- had very little time to speak with Mr. Orr prior to him walking into the courtroom after lunch. And we simply posited to him what we were going to propose the -- the twofold proposal that I was going to make to Your Honor. We did not ask do you want to fully waive the privilege which -- which we could do if Your Honor would like us to do that.

THE COURT: Well -- sir?

MR. CULLEN: To -- to be hopefully slightly more clear. What we said to Mr. Orr, or what we're saying to the Court, is that we're willing to make A, these documents available. We would like to have a 502(d) order with respect to those documents which would restrict the waiver -- it would make the documents available, but the privilege would not be waived, the documents would be made available --

THE COURT: Available to the Court and to the objecting parties?

MR. CULLEN: And to the objecting parties. As long as they weren't waived.

Now, the other thing because we've changed direction on the nature of the evidence to some degree, we also in the

interest of fully informing the Court of the other questions that the Court pressed, one of them being what exactly was conveyed in terms of the -- how are these theories used in the negotiations in -- in detail.

What we would propose is the following. And this would save the -- this would address both the Court's issue with respect to the underlying memoranda and with respect to the subject matter of those meetings.

We would propose to make Ms. Ball as a percipient witness at those meetings who is charged with Mr. -- charged by Mr. Orr with both formulating those theories and conveying them in negotiations with the other side about potential litigation.

I don't know whether we'd call her a rebuttal witness or not, profess to make her available for a deposition on those topics and to authenticate those documents, many of which Mr. Orr would not be in a position to authenticate even if he had -- if he had seen them or not.

So what she would do -- what we would do, and propose to the Court, is that we'd make Ms. Ball available for deposition tonight and we'd put her on tomorrow with respect to those issues. And they -- that we would make available for that deposition -- for that deposition, the documents that we have gathered which fit Your Honor's discussion here which are the memos relating to the claims against the banks which were the subject matter of the negotiations.

We have -- we may find some more, but we -- as of right now, we have a -- a group of oh, maybe 25 documents that fit that description including two draft complaints.

THE COURT: Including what?

MR. CULLEN: Including two draft complaints.

THE COURT: Mr. Hackney.

MR. HACKNEY: So this is sufficiently material that I -- I do at some -- you know, I don't speak for the objectors and I guess I have one suggestion.

Which is, I know the evidence and I question the relevance of Ms. Ball's proffered testimony. And perhaps I can make a suggestion to the Court.

Perhaps the Court might reserve its decision about this until the end of Mr. Orr's cross examination. And also perhaps until after I've been able to caucus with the objectors. Because I, based on my knowledge of the record, I do not understand how Ms. Ball's testimony would materially change what we are talking about right now.

MS. ENGLISH: Your Honor, may I speak?

THE COURT: Yes.

MS. ENGLISH: I would just like to make two points here and again I -- I would also echo Mr. Hackney's comments that the objectors would like to caucus on these new developments first.

But two points I would like to make. One, is that I

think the assertion of privilege in the depositions of Mr. Orr and Mr. Buckfire were much broader in fact than Mr. Shumaker has represented to the Court.

In fact in Mr. Orr's testimony, I just want to read a couple of lines to you, please. Mr. Hackney asked Mr. Orr about what claims were being settled by the forbearance agreement that the city had against the swap counter parties. He said, and if I ask you to tell me what claims you have, will you tell me or will you assert the privilege? Mr. Shumaker responded, I would instruct the witness that that may implicate attorney/client communications. And Mr. Orr then responded, I would have no independent knowledge of what claims the city may have other than discussions I've had with my counsel so I would not answer. So I think the claim of privilege was much broader.

The second point I would like to make is because the assertion of privilege was made so much throughout the city witnesses depositions, the city must be precluded from now admitting privileged as evidence, waiving the privilege and admitting that in trial. And opening up -- allowing us to take a deposition of Ms. Ball would not be sufficient.

We would need to re-depose Mr. Orr and Mr. Buckfire and possibly examine what other witnesses need to be deposed as well as a result of this new development. Thank you, Your Honor.

MR. SHUMAKER: Your Honor, just to respond quickly on the assertion of privilege. Let me read another quote, this one from Ms. English at the -- the deposition of Mr. Orr which was question from Ms. English. “Can you just list for me what the topics were ...”

THE COURT: What page are you on?

MR. SHUMAKER: Page 16, Your Honor, of the objector -- I mean the city’s opposition to the objectors motion in limine. It’s Footnote 5. Ms. English asks, “can you just list for me what the topics were on which you got advice or would you claim the privilege as to just the topics as well? Mr. Orr, maybe I can do it this way. I think I’ve said before that in this case for instance your client Ambac, I filled that in, has filed an objection. Ms. English, yes, it has. Mr. Orr’s response, and in this case many objections have been filed and many of the topics listed in those objections, whether it was subordination, prioritization, equitable estoppel, tort, invalidation of liens ab initio, whatever they were, none of those analyses or claims came as a surprise to me and that in some fashion without divulging what I had spoken with to my counsel, in some fashion issues such as those have been discussed and analyzed with my counsel, attorneys, and advisors”.

I don’t think Ms. English is -- is giving you an accurate picture of what happened there. There was a lot of assertion

of privilege because of the awkwardness that Your Honor had noted.

And so we were trying to draw the line in a way that was permissible and allowed the objectors to get at the kind -- we talked a little bit about this, Your Honor, in the opposition too which is really it's for Your Honor, it's not for Mr. Orr to decide -- he obviously has to make a decision as to whether -- whether to enter into the agreement, but you have all of the claims spelled out for you.

And -- and it's your -- you know, your decision, your objective decision as to whether it was reasonable to compromise those claims. And we also quoted in that --

THE COURT: Here's the -- here's the difference. You know, I -- I think back to the hundreds or thousands of motions to settle that I have been called upon to determine in the last 28 1/2 years. And in virtually every one of those cases, everyone knew what the claims were, what the defenses were, what the factual -- the alleged factual bases were for those claims, the alleged factual bases for the defenses, and where the strengths and weaknesses were on either side.

I don't have that here. Not -- not from your brief and not yet at least from Mr. Orr. I certainly didn't get it from Mr. Buckfire. So I'm at a loss as to how to evaluate the fairness of the settlement without that data.

MR. SHUMAKER: Well, you may not --

THE COURT: And so I -- and I think the burden is on the city to -- to -- to show the fairness of the settlement, right?

MR. SHUMAKER: Correct, Your Honor.

THE COURT: So you know, this is -- in the end it's your call. I mean you have to decide how you want to persuade me regarding the fairness of this settlement if you -- and if you fail, the motion is denied. You don't want that.

MR. SHUMAKER: Understood.

THE COURT: At least I don't think you do.

MR. SHUMAKER: That's correct, Your Honor. And I guess the -- the -- for the Court's consideration is this. Although this is not your normal 9019 situation.

You do -- the Court does know what the -- the subject of the -- of the potential legal attacks are, the -- the swaps and the -- the pledge of the collateral. And at -- at this stage, given all the different considerations that were going on and that have been described to you with regard to the city's financial condition at the time of May to June and the May numbers came in and they were much worse than anyone thought. And the -- the city had very limited time.

I would suggest that Your Honor you -- there is no full factual record here for you to review because the settlement decision had to be made very quickly under the dire circumstances that Mr. Orr and the city faced.

And so you do have the theories. You do have the subjects. You do have Mr. Orr who will say that I was given plenty of legal memoranda and -- and emails and -- and counsel. And then if Your Honor believes that that's not sufficient, I mean I agree that there is a decision that -- that -- that we need to make. And that's why we're trying to find a compromise.

THE COURT: Since you've raised the question, I'm going to say this to you. Every transaction, including this one, that the city has entered into in connection with these swaps and COPS has been with a gun to its head.

That has to stop. It has to stop. And -- and I think it's part of a Bankruptcy Judge's role to carefully scrutinize a debtor's request to approve a settlement when that settlement was made with the debtor's -- with a -- with a gun to the debtor's head. I mean --

MR. SHUMAKER: We dare not agree -- we could not agree to --

THE COURT: Just one more thought.

MR. SHUMAKER: I'm sorry.

THE COURT: And the reason is obvious. Because, you know, it's not just the debtor who is impacted by this, right. I got a whole courtroom full of people who are impacted by this.

So I have to scrutinize this very carefully. So, you

know, if you want me to do that, I'm happy to. If you -- if you want to take your chances, that's your call.

MR. SHUMAKER: Two responses to that, Your Honor. First, we couldn't be in more complete agreement. Under the circumstances they were not perhaps ideal given the financial emergency that was in place.

Mr. Orr came in in April. The numbers that Mr. Malhotra and Ernst and Young provided in May showed holy cow, we're running out of time. And so no one likes to make a decision with a gun to their head, but a big big reason why we believe that this -- this forbearance agreement is necessary and the post-petition financing is needed to finance it, is to stabilize the city. That is exactly what we're trying to do. We don't -- we know it's not ideal, but this is how we come to -- that's how Mr. Orr came to the -- came to the problem.

THE COURT: You know, stabilizing the city is exactly what motivated the original swaps and COPS. And it's exactly what motivated the 2009 transaction and look where we are.

MR. SHUMAKER: It's not a great spot, I agree with Your Honor. But that's why Mr. -- a financial emergency was declared and Mr. Orr was put in to take the steps necessary to right the ship. And I don't know how he can right the ship without keeping these casino revenues available to the city so they can be used to do bigger and better things as opposed to,

you know, serve as collateral that can be tied up by a couple of banks for as long as they want. Which is the -- the difficult decision Mr. Orr faced.

THE COURT: Of course, but the question is whether you're overpaying for that, right?

MR. SHUMAKER: Yes, Your Honor.

THE COURT: Or one -- one of the questions.

MR. SHUMAKER: Yes, Your Honor.

THE COURT: And that depends -- I don't know why the considerations for that determination in this case should be any different than in any of the other hundreds or thousands that I've dealt with.

MR. SHUMAKER: Understood, Your Honor. And I guess that's why we -- we tried to come up with a compromise over lunch which was if Your Honor's willing to enter the 502(d) order so that there's no some broad expansive waiver, and if Ms. Ball can get on the stand and explain what -- what the advice that you will see is and how that was communicated to the other side, you clearly are going to be in a much much much better position to be able to determine whether the city is overpaying.

THE COURT: Well, let me ask the -- well, the objecting attorneys have -- or the attorneys for the objecting parties have requested an opportunity to -- to caucus regarding this and I think it is appropriate to grant that.

How much time would you like?

MR. HACKNEY: Can we have 20 minutes?

THE COURT: Absolutely.

MR. HACKNEY: Can we reconvene at 2:00, Your Honor?

THE COURT: Yes. We will reconvene at --

MR. HACKNEY: Yeah.

THE COURT: I'm sorry?

MR. HACKNEY: Whatever works for you. I'm sorry.

THE COURT: I'm here regardless. So let's say 2:00. If you find you need a few more minutes, you know, we'll work that out. In the meantime, I urge -- I urge you all to consult among yourselves on both sides to see what the best way to resolve this is.

MR. SHUMAKER: Thank you, Your Honor.

THE CLERK: All rise. Court is in recess.

(Court in Recess at 1:42 p.m.; Resume at 2:00 p.m.)

THE CLERK: Court is in session. Please be seated.

MR. HACKNEY: Your Honor, can I approach the podium?

THE COURT: Yes. Which reminds me, I've been asked to remind everyone again that -- that when you address the Court to speak near a microphone, not only so that it's on the record, but so that the people in the overflow courtrooms can hear as well.

MR. HACKNEY: Will do, Your Honor. Thank you for that.

Your Honor, the objectors have caucused together and what we did was we basically articulated kind of broad principals and order and then determined that there was no objection to my relaying this to the Court on behalf of all of the objectors.

THE COURT: Okay.

MR. HACKNEY: That's the easiest way to operate when you have a lot of people.

THE COURT: Yes.

MR. HACKNEY: So, Your Honor, with respect to the idea that they might produce these memoranda that they're referring to, and then produce Ms. Ball for a deposition in the nighttime tonight that we would -- and then she would then testify tomorrow.

The objectors do not believe that that proffered testimony would be relevant. Because, Your Honor, the record shows, and I can relay additional record evidence that's not yet in the record, but is about to be, moments from now. But the record for Mr. Buckfire's testimony shows that he was the lead negotiator on the deal. That he had not evaluated any of the claims of the city and that he was unaware as to whether anyone else had done so either at the time he was negotiating the deal.

That he never argued the city's case to the swap counter parties. And that he never witnessed anyone else do so

either. That testimony, I think, is -- is compelling testimony and what they now want to do is they effectively want to rebut their own case by calling in Ms. Ball to back and fill and say no, I was -- I was heavily involved in arguing and threatening the swap counter parties and fully apprised of all the various issues.

We don't think that Ms. Ball's testimony is sufficient to contradict the record evidence of Mr. Buckfire's testimony that he was the lead negotiator on this deal and that he never saw anyone else do this and is unaware of it. We think that -- that -- that the city --

THE COURT: Well, assuming what you say is true, I don't know that it is, but assuming it is for this -- for this purpose, that doesn't make the testimony inadmissible, does it?

MR. HACKNEY: Well, it would --

THE COURT: It may go to its weight, but does it go to its admissibility?

MR. HACKNEY: I -- well, I think what you would say is that it doesn't make it inadmissible because the two witnesses can contradict each other. And she can come in and say, oh, here's all the stuff that Mr. Buckfire somehow forgot happened on the deal that he was the lead negotiator on.

Okay. Fine, it's a theoretical matter. But the idea that we're going to allow a witness who was not disclosed on

the list where the city insisted that only those witnesses testify, and that the only other people that could be identified by a date certain were rebuttal witnesses.

That they're now going to add a witness as a rebuttal to their own case before their case in chief is done. That's out of the order and prejudicial to us and now we have to take the rush deposition.

But in addition, I think what the Court can do, is the Court can say, I saw Mr. Buckfire testify and I'm not going to allow you to back and fill your way out of that. And I'm not going to go through extraordinary steps to do it. And that's our second point.

Which is if you decide that given the -- the significance of this settlement and all that goes into it, consistent with the comments that you've made, that you want to hear the testimony and you want to see the documents. You think that's appropriate to your decision.

Then we -- we will understand that. But then we will say, we have got to do this in an orderly way. That --

THE COURT: I'm just going to stop you there. Because I -- I view what I want as irrelevant. It's not my motion.

MR. HACKNEY: Let me rephrase if I could. If the city decides no, you know, we have to do this. We -- we are going to give these documents. We've decided to change our

case in response to the Court's comments. We have to have Ms. Ball testify. Then our point is that this must be done in an orderly way.

THE COURT: Uh-huh.

MR. HACKNEY: And that means not just a rush deposition of Ms. Ball tonight with the five documents that they picked out and said look at these. It's let's get order to the discovery. Let's get order to the -- where the privilege being asserted, where not.

Let's take the depositions in an orderly way and Mr. Orr is going to, you know, hate me for saying this, but we will have to re-depose certain witnesses. I mean when you roll out with these -- these documents --

THE COURT: He won't -- he won't hate you.

MR. HACKNEY: Well --

THE COURT: He may dislike you, but he won't hate you.

MR. HACKNEY: These are --

THE WITNESS: Well, Your Honor.

MR. HACKNEY: We teach our -- at work we teach our daughters that you're not supposed to say hate, but I think that --

THE COURT: Right.

MR. HACKNEY: -- people actually do hate depositions. The --

THE COURT: All right. I'll accept that.

MR. HACKNEY: So that -- that was our second point which -- and the only thing we wanted to say though was in support of this idea that if the city changes and says, here you go, here's all the stuff that we relied upon and here's Ms. Ball who was the legal eagle on the deal.

You know, we articulated in the motion in limine that we filed a long time ago in anticipation of the first hearing, this was a big issue for us. Because we had lived through the depositions and had raised the questions and seen the assertion of the privilege.

And, you know, I think that the city waiting all the way until the last week, I think on the 9th, even to respond to that in limine motion. And I think that should factor in somewhat to the Court's consideration of whether if the city decides to go in this fashion, whether it will allow the types of rush depositions that are sometimes appropriate in different contexts where it's like sufficiently not material that you're like oh, we're just going to get it done and you'll have to stay up late and do a cross tomorrow, but you can do it.

This is core. So given that we put this issue out there to try to join issue on the city with it and the city, you know, didn't respond until recently and has now sort of changed its mind and said, far from opposing that motion in

limine, now we're thinking about saying we kind of agree with it. That's a sufficiently material change. I think it should factor in to your consideration of the time line. If I can make one last comment.

The gun that's to our head in this case from the standpoint of schedule, you know, at first it was the discount posts in the forbearance agreement. You know, so it's like we got it -- you know, this was the way there was a -- you talked about a gun to the head of the city. There was a little bit of a gun to all of our heads under the schedule. Because it's like we have to do this by this time to get this by this time.

But then the original hearing was just adjourned for several months and it turned out the discount post extended out by four months when they -- after the hard fought negotiations had only been able to get like six weeks.

Now there's -- that's a bit of a gun at our head, is now it really expires on December 31 and so we have to get it done. And then also is the Barclays commitment expires on January 7th.

That's another gun to our head from a scheduling time frame. And given -- I will say given the holidays, this -- these all don't go together very well if we adopt this second course.

And what I wanted to say is that if we go this way, I've seen Federal Bankruptcy Judges look at certain parties like

potential DIP lenders and ask them about certain provisions in their agreements and ask them, is that -- that January 7th, you know, as firm as it says there in black and white. And -- and in some instances, Your Honor, and we often heard debtor's counsel as well, but it turns out that -- that it was flexible.

And I think that if we -- I know that we don't know which way we're going. But if we're going to go this second way, can't we have a practical conversation about this? Because this scheduling gun to our head, and this is isn't a harangue, it's an observation.

It's -- it's infected everything. It's infected how much discovery we did, the scope, the pace of discovery, and it's had an impact on our ability to present the case to you -- to you. Bless you, Mr. Orr.

And I think that you've made observations today about the magnitude of this transaction and its significance that if we could get a little bit of the gun stopped to be pointing at our head as we're considering this idea of what's the schedule going to be, what is the process going to be from the standpoint of discovery. If we go that second way, I think that will be important to the objectors. That's all I have to say, Your Honor. I don't know if other objectors would also like to be heard, but that -- that's the consensus. Thank you.

THE COURT: Thank you. Mr. Shumaker.

MR. SHUMAKER: Your Honor, a couple of points. First of all, Mr. Hackney has talked about how important this issue of the assertion of the city's privilege has been to the objectors for a long time.

Your Honor should not think that this was anything other than calculated from the beginning. Back when Mr. Orr was deposed, the first question that Mr. Hackney asked was, Mr. Orr, in the course of negotiating and executing the forbearance agreement, did you receive legal advice? Answer, yes.

And then five questions later, after some predicate, who did you get the legal advice from. Five questions later, from Mr. Hackney. Are you waiving the attorney/client privilege in connection with the motion to assume the forbearance agreement? When that answer was no, that led to about 50 questions intended to invade the city's privilege.

In that motion in limine, opposition that Mr. Hackney referred to, that the city has put forth, it's been very clear in the -- in the Washington Mutual case, which I believe is in the Bankruptcy Court in one of the districts in New York, the agreement was very clear that with regard to this kind of motion you do not need to waive.

So that's one thing. I think that this -- the notion that this was a surprise and holy cow, this was a tactic. It

was a tactic from the get go. The second thing, is that this gun is not going away.

THE COURT: Look, everyone uses tactics. The question when you talk about tactics is, is it -- is it a legitimate tactic, right?

MR. SHUMAKER: Well --

THE COURT: You can't say it was illegitimate.

MR. SHUMAKER: No, and I --

THE COURT: I asked the same questions just before lunch that Mr. Hackney asked in -- in this deposition that you quoted from.

MR. SHUMAKER: I was not suggesting you were undertaking a tactic, Your Honor, not in the least.

THE COURT: Okay.

MR. SHUMAKER: But I -- but I -- but I was -- I was commenting on it because -- because of the awkward position that the city finds itself in. And it does not believe it needs to waive but --

THE COURT: Well --

MR. SHUMAKER: Appreciate your honest concern.

THE COURT: But as far -- you know, as I've said before, the burden is on -- if you want to -- to put these memos in with this 502(d) order we can talk about that. If you want to call Ms. Ball, we can talk about how to -- how to properly create an orderly process to do that.

But as I said before, this -- this approval will get the closest scrutiny from me and it's your burden. So, you know, you have to decide what you want to do to -- to meet that burden.

MR. SHUMAKER: Yes, Your Honor. Perhaps --

THE COURT: And I can tell you, that I agree with Mr. Hackney. That if -- if we're going to open it up in the -- in the ways that you and Mr. Cullen have -- have suggested, it's not going to be done today and tomorrow. And I'm not available between December 22nd and January 1st.

MR. SHUMAKER: May I consult with my colleagues, Your Honor, for a minute?

THE COURT: How much time would you like?

MR. SHUMAKER: Ten minutes, Your Honor.

THE COURT: Mr. Hertzberg says you want ten minutes.

MR. SHUMAKER: Yes, please, Your Honor.

THE COURT: We'll be in recess for ten minutes.

MR. SHUMAKER: Thank you, Your Honor.

THE CLERK: All rise. Court is in recess.

(Court in Recess at 2:13 p.m.; Resume at 2:41 p.m.)

THE CLERK: All rise. Court is in session. Please be seated.

MR. CULLEN: Good afternoon, Your Honor.

THE COURT: Sir.

MR. CULLEN: The city would like to -- to propose

the following. If that -- if it makes sense to the -- to the Court.

Given the Court's guidance, given the procedural posture we're in now, given the concerns of the objectors about the ripeness of the various issues in front of us, and given our need to reach out to other parties to talk about how we can accommodate all of those things, what we would propose is that we and the other parties take tomorrow to try and work out a procedural schedule for your -- Your Honor.

We will in that -- in the course of that time, to be frank with all concerned, we'll have to -- we will be reaching out to the -- the counter parties, the Barclays about what we can do with them.

In our discussions with the objectors, we will be talking about various things, including the -- the options I've laid forth before the Court and see if we can get the -- we can cabin those in such a way so that we can get the right discovery and the right things in front of the Court. And -- and get to the Court -- do something within the Court's schedule and in a way that will allow us to stop the city paying money on a notional $800,000,000 rather than the amount of 270,000,000, the settlement amount.

So that's all the things we're going to try and accomplish tomorrow to make this easier. I can also tell the Court that we are not deaf to the implications of the Court's

questions about the various underlying deals and the history and the issue of -- of -- of gun to the head.

The banks who are in the room here and the counter parties in the post-petition financing are also in the -- in the room here. They have been educated as well.

We have asked to the objectors to discuss with us tomorrow among the other things that they would discuss, if -- if in their view there is a -- a number, a sweetening of the deal that would make it go away. It is my suspicion that there is no number that makes all of them disappear, but it's an issue.

And we would propose then to report back to the Court on Friday if that would be amenable to the Court's schedule about what we have achieved with respect to all of those procedural and financial constraints to lay at the front of the Court because I think otherwise we're going to have a series of running hand battles while the -- while witnesses sit here that won't be productive for -- for anyone.

And I'm sensible to the fact that it's taken a long time for us all to schedule this. We have a lot of money invested in this -- in this proceeding to date. We're going to see what we can preserve of that. That will also be part of what we are -- what we are talking about.

THE COURT: All right. Mr. Hackney.

MR. HACKNEY: May I have a brief moment, Your Honor?

THE COURT: Sure. Sir.

MR. HACKNEY: So, Your Honor, I'm going to state what I think the sense of the senate is and perhaps then we can just poll the room and see if any -- if I got it wrong. But I think I -- I think I can say that it is the sense of the objectors that what the city is -- is asking the Court to do is to continue the hearing on its motion until a later date.

And I think that the objectors would -- this -- I think the objectors would agree to that continuance. I will note that there has been a lot of money spent getting ready for this hearing to get it done, but whatever things change and we acknowledge that.

So -- but I just offer that, you know, agreeing to a continue it I think is -- is a sign of good faith. And I also say the objectors I think are willing to meet with the city and hear the city's ideas about how to handle evidence and discovery and so on and so forth. So we are amenable to that idea.

I wanted to offer two -- two points for the Court's consideration. One of them is that I hope the city will think about the fact that it's not clear the extent to which you can change this evidential record with new evidence. So I think that should be a consideration for the city.

And I also don't want to -- I'm not backing off what I said earlier which is that I think I know what happened with

respect to this deal and -- and I just wanted to reiterate that point.

The second one is that having lived under the gun of these deadlines before, I would like the city to make sure that it's expressing our views about process to the folks that are setting these deadlines, whether it's the discount or the expiration of a commitment.

I -- you know, it will -- it will be a problem for us if they come back and say Barclays was very accommodating, they've extended it from January 7th to January 9th and so we're going to do all this over the Christmas week. And then we're going to come back on January 2nd and do it again.

That's going to be a problem for the objectors, I think. And I want to say that now just so it's not a surprise later. Long way around, if the city is asking for a continuance we would not object to it.

We did want to confirm that Friday's hearing would be a -- in the way of a status conference to report to you on progress we've made in sorting this puzzle out. Thank you.

THE COURT: Thank you, sir. Mr. Cullen, to -- to the extent I heard you say that you are willing to use the time of any continuance in an attempt to re-negotiate the deal that you are asking me to approve, I would encourage that as strongly as I can.

Because anyone who has been practicing in bankruptcy law

as long as we all have, or in litigation even for that matter knows, that even if -- even if a winning party gets a judgment, they'll take 75%. Do you hear what I'm saying?

MR. CULLEN: I understand you, Your Honor.

THE COURT: All right. What time on Friday?

MR. CULLEN: What time is good for the Court?

THE COURT: Well, I'm here, so --

MR. CULLEN: 10:00.

THE COURT: 10:00, is that all right with everybody? All right. I'll see you then.

THE CLERK: All rise.

THE COURT: If it's not this room, ladies and gentlemen, one second. If it's not this room, we'll post a notice on ECF, otherwise assume it's this room.

MR. SHUMAKER: Thank you, Your Honor.

MS. GREEN: Thank you, Your Honor.

THE COURT: Court is adjourned.

(Court Adjourned at 2:50 p.m.)

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Deborah L. Kremlick, CER-4872 Dated: 11-20-13
Letrice Calloway