UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE: CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        December 17, 2013
                Debtor.         .        9:01 a.m.
. . . . . . . . . . . . . . . .


EVIDENTIARY HEARING RE. MOTION OF THE DEBTOR FOR A FINAL
ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364(c)(1),
364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and
922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III)
MODIFYING AUTOMATIC STAY (DKT#1520)

MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#17)

CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#157)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  CORINNE BALL
                       222 East 41st Street
                       New York, NY  10017-6702
                       (212) 326-7844

                       Jones Day
                       By:  JEFFREY B. ELLMAN
                       1420 Peachtree Street, N.E., Suite 800
                       Atlanta, GA  30309-3053
                       (404) 581-8309

APPEARANCES (continued):

                          Jones Day
                          By:  ROBERT W. HAMILTON
                          325 John H McConnell Blvd., Suite 600
                          Columbus, OH  43215-2673
                          (614) 281-3848

                          Jones Day
                          By:  GEOFFREY S. IRWIN
                               GEOFFREY S. STEWART
                               GREGORY SHUMAKER
                               THOMAS CULLEN, JR.
                          51 Louisiana Avenue, N.W.
                          Washington, DC  20001-2113
                          (202) 879-3939

                          Jones Day
                          By:  BRAD B. ERENS
                          77 West Wacker
                          Chicago, IL  60601-1692
                          (312) 269-4050

For Bank of               Cadwalader Wickersham & Taft, LLP
America and               By:  MARK C. ELLENBERG
Merrill Lynch             700 Sixth Street, N.W.
Capital Services:         Washington, DC  20001
                          (202) 862-2000

                          Cadwalader Wickersham & Taft, LLP
                          By:  HOWARD R. HAWKINS
                          One World Financial Center
                          New York, NY  10281
                          (212) 504-6422

For UBS AG:               Bingham McCutchen, LLP
                          By:  JARED R. CLARK
                               EDWIN E. SMITH
                          399 Park Avenue
                          New York, NY  10022-4689
                          (212) 705-7000

For Syncora               Kirkland & Ellis, LLP
Holdings, Ltd.,           By:  STEPHEN C. HACKNEY
Syncora Guarantee,             WILLIAM E. ARNAULT
Inc., and Syncora              RYAN BLAINE BENNETT
Capital Assurance,        300 North LaSalle
Inc.:                     Chicago, IL  60654
                          (312) 862-2000

APPEARANCES (continued):

```
For Ad Hoc              Allard & Fish, PC
COPs Holders:           By:  DEBORAH L. FISH
                        2600 Buhl Building
                        535 Griswold
                        Detroit, MI  48226
                        (313) 961-6141

                        Kramer Levin Naftalis & Frankel, LLP
                        By:  THOMAS MOERS MAYER
                        1177 Avenue of the Americas
                        New York, NY  10036
                        (212) 715-9169

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  JENNIFER K. GREEN
General Retirement      500 Woodward Avenue, Suite 3500
System of Detroit,      Detroit, MI  48226
Police and Fire         (313) 965-8300
Retirement System
of the City of
Detroit:

For Erste               Ballard Spahr, LLP
Europaische             By:  VINCENT J. MARRIOTT, III
Pfandbrief-und          1735 Market Street, 51st Floor
Kommunalkreditbank      Philadelphia, PA  19103-7599
Aktiengesellschaft      (215) 864-8236
in Luxemburg, S.A.:

For David Sole:         Jerome D. Goldberg, PLLC
                        By:  JEROME D. GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001

For Financial           Weil, Gotshal & Manges, LLP
Guaranty Insurance      By:  ALFREDO R. PEREZ
Company:                700 Louisiana Street, Suite 1600
                        Houston, TX  77002
                        (713) 546-5040

For Ambac               Arent Fox, LLP
Assurance               By:  CAROLINE TURNER ENGLISH
Corporation:            1717 K Street, NW
                        Washington, DC  20036-5342
                        (202) 857-6178
```

APPEARANCES (continued)

For U.S. Bank as        Waller Lansden Dortch & Davis, LLP
Trustee for Water       By:  DAVID E. LEMKE
and Sewer Bonds:        Nashville City Center
                        511 Union Street, Suite 2700
                        Nashville, TN  37219
                        (615) 850-8655

For FMS                 Schiff Hardin, LLP
Wertmanagement:         By:  RICK FRIMMER
                        233 South Wacker Drive, Suite 6699
                        Chicago, IL  60606-6473
                        (312) 258-5511

For Detroit Retired     Lippitt O'Keefe, PLLC
City Employees          By:  RYAN C. PLECHA
Association,            370 East Maple Road, 3rd Floor
Retired Detroit         Birmingham, MI  48009
Police and Fire         (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

Court Recorder:         Letrice Calloway
                        United States Bankruptcy Court
                        211 West Fort Street
                        21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Good morning.  Let me ask participating

4  counsel to put their appearances on the record, please.

5      MS. BALL:  Corinne Ball of Jones Day for the City of

6  Detroit.

7      THE COURT:  Yes.  We should use the lectern mike,

8  please.

9      MS. BALL:  Good morning, your Honor.  Corinne Ball

10  of Jones Day for the City of Detroit.

11      MR. SHUMAKER:  Good morning, your Honor.  Greg

12  Shumaker of Jones Day for the City of Detroit.

13      MR. STEWART:  Good morning, your Honor.  Geoffrey

14  Stewart, Jones Day, City of Detroit.

15      MR. HAMILTON:  Good morning, your Honor.  Robert

16  Hamilton of Jones Day on behalf of the City of Detroit.

17      MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

18  Jones Day, City of Detroit.

19      MR. ELLENBERG:  If the Court please, Mark Ellenberg,

20  Cadwalader, on behalf of Bank of America Merrill Lynch.

21      MR. HAWKINS:  Good morning, your Honor.  Howard

22  Hawkins from Cadwalader for Bank of America Merrill Lynch.

23      THE COURT:  I'm sorry, sir.  What's your last name?

24      MR. HAWKINS:  Hawkins, your Honor.  Thank you.

25      MR. CULLEN:  Thomas Cullen, Jones Day, City of

1  Detroit.

2       MR. CLARK:  Jared Clark, Bingham McCutchen, UBS AG.

3       MR. HACKNEY:  Good morning, your Honor.  Stephen

4  Hackney on behalf of Syncora Capital Assurance and Syncora

5  Guarantee.

6       MR. ARNAULT:  Good morning, your Honor.  Bill

7  Arnault from Kirkland & Ellis on behalf of Syncora.

8       THE COURT:  What's your last name, sir?

9       MR. ARNAULT:  Arnault.

10       MS. FISH:  Good morning, your Honor.  Deborah Fish

11  from the law firm of Allard & Fish on behalf of the ad hoc

12  COP's.

13       MR. MOERS MAYER:  Good morning, your Honor.  Thomas

14  Moers Mayer of Kramer, Levin, Naftalis & Frankel on behalf of

15  the ad hoc COP's.

16       MS. GREEN:  Jennifer Green on behalf of the

17  Retirement Systems for the City of Detroit.

18       MR. MARRIOTT:  Good morning, your Honor.  Vince

19  Marriott, Ballard Spahr, on behalf of EEPK and affiliates,

20  and I'm here with my colleague, Matthew Summers, and our

21  local counsel, Howard Sher, of Jacob & Weingarten.  Thank

22  you.

23       MR. GOLDBERG:  Good morning, your Honor.  Jerome

24  Goldberg on behalf of interested party David Sole.

25       MR. BENNETT:  Good morning, your Honor.  Ryan

1    Bennett on behalf of Syncora.

2         MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

3    on behalf of FGIC.

4         MS. ENGLISH:  Good morning, your Honor.  Caroline

5    English from Arent Fox on behalf of Ambac Assurance

6    Corporation.

7         MR. LEMKE:  Good morning, your Honor.  I'm David

8    Lemke on behalf of U.S. Bank as trustee for the water and

9    sewer bonds.

10        MR. FRIMMER:  Good morning, your Honor.  Rick

11   Frimmer from Schiff Hardin on behalf of FMS Wertmanagement.

12        MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

13   from Lippitt O'Keefe on behalf of the retiree association

14   parties.

15        MR. SMITH:  Good morning, your Honor.  Edwin Smith,

16   Bingham McCutchen, on behalf of UBS AG.

17        THE COURT:  Anyone else?  No?  All right.  Are we

18   ready to proceed then?

19        MR. SHUMAKER:  Your Honor, Greg Shumaker again.  If

20   I might just very quickly on the preliminaries so that your

21   Honor is -- has the latest, the -- over the last few days

22   we've been working with the other side and exchanging a lot

23   of information.  The witness order, so that your Honor knows,

24   is going to be Gaurav Malhotra, Ken Buckfire, Jim Doak, and

25   Mr. Orr.  The city has withdrawn Mr. Moore and submitted an

1  amended order for your Honor in connection with the post-

2  petition financing motion, so we've done that.

3          With regard to the joint statement of facts, I

4  wanted to share with your Honor that the parties have been

5  negotiating in good faith, have not been able to reach an

6  agreement with regard to the post-petition financing facts,

7  so I think we'll need to proceed, but that should be a more

8  limited set than with regard to the assumption motion.

9          With regard to the exhibits, your Honor, last night

10 we filed a consolidated joint exhibit list.  It reflects the

11 exhibits to which there are no objections, and then there are

12 also obviously objections listed for certain documents.  We

13 would propose that your Honor, if you would want to proceed

14 along the same lines as you did with the eligibility hearing,

15 that the exhibits to which there are no objections, that they

16 be admitted for all purposes for purposes of this hearing.

17         THE COURT:  All right.  The Court does order the

18 admission into evidence of the exhibits to which there is no

19 objection as listed in the exhibit list, Docket Entry Number

20 2185.

21         (City Exhibits 1, 2, 4, 5, 6, 7, 13, 18, 19, 30, 47-54,

22         56, 78, 79, 80, 88, 89, 93, 98, 100, 112, 113, 116-139;

23         Syncora Exhibits 201-214, 217, 223, 233-238, 240; FGIC

24         Exhibits 301, 303, 304, 307, 308, 309; Ambac Exhibits

25         401, 402, 403, 405, 406; EEPK Exhibits 801-805;

 1      Retirement Systems Exhibits 1012-1015, 1019; Sole

 2      Exhibits 1301, 1303, 1305, 1306, 1308, 1310, 1312, 1314,

 3      1316; NPFG Exhibits 1, 2 received at 9:07 a.m.)

 4          MR. SHUMAKER:  Thank you, your Honor.  Two final

 5  things.  Your Honor may wonder why an amended joint statement

 6  of facts with regard to the assumption motion was filed late

 7  last night.  The only difference with that -- with the one

 8  before was it has updated exhibit numbers for your Honor,

 9  your Honor's convenience, and then I also wanted to mention

10  that we did file this morning the affidavit in connection

11  with the privilege log that you had asked for on Friday.

12          THE COURT:  I saw that, and I did read the amended

13  statement.  Before we proceed, if it's okay with you, I did

14  promise Ms. Fish an opportunity to make her party's position

15  on the record first so that she wouldn't have to stay.  Is

16  that okay?

17          MR. SHUMAKER:  Certainly.

18          MS. FISH:  Thank you, your Honor.  Deborah Fish.

19  Actually, Mr. Mayer is going to speak on --

20          THE COURT:  Okay.

21          MS. FISH:  -- behalf of the ad hoc COP's.  He was

22  admitted in the Eastern District in 2005 in connection with

23  the Venture Holdings case.

24          THE COURT:  Okay.

25          MS. FISH:  Thank you, your Honor.

1          THE COURT:  Sure.  Go ahead, sir.

2          MR. MAYER:  Thank you, your Honor.  Again, Thomas

3    Moers Mayer of Kramer, Levin, Naftalis & Frankel for the ad

4    hoc COP's, otherwise known as Dexia Credit Local and Nord LB,

5    holders of approximately $375 million principal amount of

6    COP's.  I'm at the podium to announce a deal in connection

7    with our reservation of rights.  A small context.  We believe

8    that the contract administration agreement of 2006, which was

9    Exhibit 30 on the city's list -- I'm not sure where it is --

10         THE COURT:  Can I ask you to pause for a moment and

11   turn that microphone so that the head faces more towards you?

12   You can bend that part right by the microphone.

13         MR. MAYER:  Is this better, your Honor?  Sorry.

14         THE COURT:  Well, I don't want you to have to bend

15   over like that, so you can just --

16         MR. MAYER:  Oh, I see.

17         THE COURT:  -- lift up the microphone.  There you

18   go.

19         MR. MAYER:  There we go.

20         THE COURT:  Okay.

21         MR. MAYER:  Thank you.  The record contains what

22   used to be City Exhibit 30, contract administration

23   agreement, which contains a provision, Section 9.1.  We

24   believe that if your Honor approves the forbearance agreement

25   and it consummates and the swap counterparties get money,

1  they need to turn it over.  They believe they do not need to
2  turn it over.  This is a dispute that does not require
3  resolution in order for the forbearance agreement to be
4  approved, and the Court does not need to decide this issue
5  or, in our view, anything related to it, and we and the swaps
6  and the city all agree that it does not need to be resolved
7  in connection with this dispute.  We just did not want to be
8  prejudiced by the order that was submitted, and, therefore,
9  we have negotiated the insertion of a new decretal paragraph,
10  which I would propose to read into the record if that's okay.
11  It will not take long.

12          THE COURT:  Sure.  Go ahead.

13          MR. MAYER:  This order does not affect any claims or
14  defenses of any nondebtor party against any other nondebtor
15  party arising under or in connection with Section 9.1 of the
16  contract administration agreement dated June 12th, 2006, as
17  amended, among the Detroit Retirement Systems Funding Trust
18  2006, the service corporations, paren, as defined in the
19  forbearance agreement, close paren, and the other parties
20  thereto, period, end of proposed decretal paragraph.  If this
21  decretal paragraph is inserted into the order and the order
22  contains no provisions materially inconsistent with that
23  paragraph -- and I understand there is no intention to do
24  that -- Dexia and Nord withdraw their objections to the
25  forbearance agreement.  And with that, your Honor, if I may

1  ask if I may be excused.  Ms. Fish will, I think, continue to

2  monitor the proceedings for our clients.

3          THE COURT:  Yes, sir.

4          MR. MAYER:  Thank you very much.

5          MR. HACKNEY:  Your Honor, just a brief preliminary

6  statement if I could before I turn it over to the debtors.

7  On Friday the Court made a number of clarifying comments that

8  I think were helpful to the presentation of the trial today,

9  and we went back from Friday and processed what the Court's

10  result -- comments meant for exhibit lists, presentations of

11  cross-examination, having witnesses not fly here to the City

12  of Detroit because they wouldn't be testifying, but I did

13  want to confirm for the record what I think is an obvious

14  point, but that is that the Court's comments weren't mere

15  suggestions, that the Court's comments were in the way of

16  evidentiary rulings that the Court expects us to abide by

17  under Rule 103 and that the -- you know, the substance of the

18  excluded evidence is apparent from the Court's comments.  I

19  think if we could get confirmation of that, it will

20  streamline today's hearing.

21          THE COURT:  Yes.

22          MR. HACKNEY:  Thank you.

23          MS. ENGLISH:  Good morning, your Honor.  Caroline

24  English from Arent Fox representing Ambac.  I just have one

25  issue I'd like to raise before the debtor starts their case

1   in chief, and it's --

2         THE COURT:  Sure.  Go ahead.

3         MS. ENGLISH:  -- with respect to the admissibility

4   of the exhibits.  We just have one exhibit that the city has

5   objected to, which, frankly, we think it may be a mistake.

6   It is the offering circular for the COP's from 2006, which is

7   signed by a city official, so, therefore, it's a party

8   admission.

9         THE COURT:  What number are you referring to?

10         MS. ENGLISH:  Yes.  I'm sorry.  It is Ambac Exhibit

11   Number 404.

12         THE COURT:  Does the city object to 404?

13         MR. SHUMAKER:  It does, your Honor.

14         THE COURT:  Apparently it's not a mistake.

15         MS. ENGLISH:  I'd like to argue for its admission as

16   opposed to having to --

17         THE COURT:  Oh, let me hear what the objection is

18   before --

19         MS. ENGLISH:  Certainly, your Honor.

20         THE COURT:  -- I hear that.  That will streamline

21   matters.

22         MR. SHUMAKER:  The objection, your Honor, is hearsay

23   and authentication.  The document purports to be a document

24   from the 2005 or 2006 time frame.  There's been no sponsoring

25   witness.  There's been no effort to authenticate it.  It is

 1    hearsay.  It is being offered for the truth of the matter

 2    asserted, and that's why we raised our objection.

 3            MS. ENGLISH:  Your Honor, the document is the

 4    offering circular that was issued with the 2006 COP's.  It is

 5    signed by Roger Short, who was the city's interim finance

 6    director.  It is, therefore, a party admission under Federal

 7    Rule 801, and it should come in and be admissible.  It is a

 8    document --

 9            THE COURT:  Let's break these down.  Is it self-

10    authenticating under the Federal Rules of Evidence?

11            MS. ENGLISH:  Yes.  We believe it is, your Honor.

12            THE COURT:  What rule are you relying on there?

13            MS. ENGLISH:  I'm afraid I don't have that.

14            THE COURT:  Well, I'll tell you what.  Let me ask

15    you to look into that issue.  The second issue is you say

16    it's signed by this individual.  What you mean, of course, is

17    that it is purportedly signed by that individual, but I guess

18    the city is putting you to the test on whether there's really

19    evidence that he signed that, so you need --

20            MS. ENGLISH:  I think we're going to have a real

21    problem, your Honor, if the city is denying the authenticity

22    and validity of the statements made in its offering circular

23    under the securities laws.

24            THE COURT:  Well, I don't hear that at all.  What I

25    hear is that the document that you have identified as Exhibit

1  404 --

2  MS. ENGLISH:  404, your Honor.

3  THE COURT:  -- there's no evidence of its

4  authenticity, and in the absence of that, it's not

5  admissible.

6  MS. ENGLISH:  I understand, your Honor.

7  THE COURT:  So you can revisit this issue when it

8  comes time to present the objectors' case later.

9  MS. ENGLISH:  Yes.  Thank you, your Honor.

10  THE COURT:  All right.  Let's proceed.  Ms. Ball.

11  MS. BALL:  Thank you, your Honor.  Corinne Ball of

12  Jones Day on behalf of the city.  Good morning.  Your Honor,

13  we're here on two motions.  We seek to advance the

14  operational objectives of the city, motion to approve

15  assumption of the forbearance agreement, and the motion to

16  authorize the liens for the post-petition financing and make

17  the related findings.

18  The motion to approve the assumption -- the

19  forbearance agreement and the swap settlement was filed on

20  July 24th.  Objections were filed on August 16th, and our

21  reply, your Honor, was filed on December 12th.  The motion to

22  approve the granting of liens for post-petition financing and

23  make the related findings was filed on November 5th.

24  Objections were due on November 27th, and our reply was filed

25  on December 10th.  As we stand here this morning and after

the statements of Mr. Mayer, your Honor, there remain 11
objections to the assumption and settlement motion by our
count and 11 to the post-petition financing.  But for two
casinos and AFSCME, the eight some other objections to the
post-petition financing are also objectors to the assumption
motion.  We're here on both motions in part due to the
objectors' concerns that a 9019 motion allowing the swap
banks a secured claim should be tied to the city's ability to
realize the swap unwind discount.  Importantly, the
forbearance agreement is also contractually tied to the post-
petition financing.  You may recall last Friday, your Honor,
we reviewed that, in fact, termination of the liens on the
casino revenues pursuant to the forbearance agreement is
conditioned to the post-petition financing and not
surprisingly because both share a lien on the casino
revenues.

          The developments to date, your Honor, the retirees
committee is supporting both motions.  We're advised that
National and Assured are withdrawing their objections to both
motions.  The language changes in the order that Mr. Shumaker
referred to that was filed last night were due to resolving
the objections of Assured and National.  You heard this
morning we will be filing an additional amendment to the
order to reflect the language that Mr. Mayer read into the
record.

1    Finally, due to the constraints imposed by the

2    mediation process, the agreement by the swap banks to extend

3    the 75-percent option price through year-end, although it has

4    not yet been executed, the swap banks are prepared to

5    represent their agreement to that extension in today's

6    hearing, your Honor, and that they will execute what will

7    become the sixth amendment and what we would hope be

8    available later today.

9         As you heard during eligibility and will hear on a

10   more focused basis in these hearings, these motions address

11   stabilizing the city's working capital, anticipating cash

12   needs, anticipating the impact on the city's core working

13   capital.  In fact, your Honor, with the advice of Messrs.

14   Buckfire and Malhotra, which will be evidence before you, the

15   emergency manager has seen, as he reported in his -- in the

16   eligibility trial, 50 million in cash on hand as a floor

17   beneath which the city should not fall.  Sometimes I think

18   the aviators call that a hard deck.  In this hearing, your

19   Honor, Mr. Malhotra will testify to the cash flow numbers,

20   both actual and forecast, to various scenarios with and

21   without the swap settlement, with and without the post-

22   petition financing.  He'll also testify to the impact of the

23   swap settlement on the city's cash flows, the 50 million hard

24   deck, and the savings to be achieved through the relief

25   sought in both motions before you today.  Mr. Buckfire will

1   testify about the crisis that'll be caused if the casino

2   revenues are trapped for a substantial period.  Moreover, Mr.

3   Buckfire will testify that given the termination value of the

4   swap and the expense of the swap compared to the consent

5   value, there's clear need to unencumber the casino revenues

6   in order to provide for the financial future of the City of

7   Detroit.

8         In addition, the need to remove or neutralize a

9   continuing threat to the assured access of the city to casino

10   revenues, which is represented by a costly swap agreement

11   that is in default and has the benefit of a collateral

12   agreement, lock box arrangements, and the bankruptcy safe

13   harbors, which essentially make swap bank remedies and

14   trapping self-executing.  Mr. Buckfire will also review the

15   course of the negotiations with the swap banks.  Mr. Buckfire

16   will testify as to the inability of the city to borrow monies

17   on an unsecured basis and that the casino tax revenues and

18   income tax revenues are the strongest revenue streams

19   available to the city to provide for its financial future.

20         Moving on to Mr. Orr, Mr. Orr will testify as to the

21   litigation options considered by the city and the potential

22   impact of interrupting the city's access to casino revenues,

23   the process of weighing the uncertainty and risk in view of

24   the consequences of trapping the casino revenues for any

25   length of time, and the need to be assured of adequate

1    working capital for the city.  Mr. Orr has a responsibility
2    of moving forward.  As emergency manager, he has no interest
3    in justifying past transactions.  He has to assess options
4    and pursue the most stable reasonably reliable path forward
5    in the sound exercise of reasonable business judgment.

6            The assumption represents a question of reasonable
7    exercise of business judgment, and as will be presented in
8    this hearing and in that connection, the validity and
9    enforceability of the forbearance agreement is before the
10   Court in this hearing.

11           Through the testimony of Messrs. Malhotra, Buckfire,
12   Doak, and Orr and the documentary evidence, most of which has
13   already been admitted into evidence this morning, the city
14   believes it will demonstrate the benefits from approving the
15   forbearance and swap settlement and the financing will be
16   made clear as will the benefit from avoiding a potentially
17   broad-ranging litigation that would be lengthy, complex,
18   uncertain, threatening, and certainly expensive.

19           Your Honor, the evidence will establish that the
20   forbearance is an executory contract.  It is a separate
21   agreement which the city is assuming cum onere.  It is a
22   valid and enforceable contract, and on that point, your
23   Honor, I would note that we are in violent agreement with
24   Syncora that the Court has to find that the contract is valid
25   and enforceable to reach assumption.  Moreover, your Honor,

1  it's not an inside --

2          THE COURT:  One second, please.

3          MR. GOLDBERG:  My apologies.  I'm turning this off.

4  I thought it was off already.

5          THE COURT:  I'm going to ask you to actually turn it

6  over to our court security officer at this point, please.

7          MR. GOLDBERG:  I apologize, your Honor.

8          THE COURT:  Everyone else's electronic devices off

9  or in vibrate mode, please.  You can retrieve it at the

10  break, sir.

11          MR. GOLDBERG:  I apologize.

12          MS. BALL:  Your Honor, although the forbearance

13  agreement represents an agreement between the city, the

14  service corps, and the banks, they're just not insider deals.

15  Mr. Buckfire will testify it was heavily negotiated with swap

16  banks.  Your Honor, the 9019 presents a settlement which

17  falls within the range of reasonableness, and it essentially

18  does allow a secured claim in exchange for forbearance.

19          Turning, your Honor, to the critical assessment that

20  we discussed somewhat on Friday, the 9019 and your Honor's

21  assessment of whether the settlement is fair and equitable,

22  we will turn to the Bard factors, the four factors that your

23  Honor has asked us to reflect upon.  I would point out just

24  as a preliminary, your Honor, you should take -- you might

25  want to take note that the lineup of the objectors suggests

1   that there are real differences in view as to the probability
2   of success on any litigation challenging the swaps, their
3   collateral, or the COP's.  We have contract-based objectors.
4   As defenders, it's not dependent upon the validity of the
5   swaps, the COP's, and the lien on the casino revenues as to
6   which they assert consent rights.  The remainder of the
7   objectors led by Ambac argue that the prospects and impact of
8   litigating validity place the swap settlement outside even
9   the lowest range of reasonableness, clear divergence of
10  views, your Honor.  Representatives of the retirees and
11  pension systems echo that validity challenge objection,
12  surprising because the 1.4 billion raised in the COP's
13  transaction went to fund the pension systems.  Every annual
14  statement they produced reflect that funding.  When it comes
15  to the central debate and whether swap banks should be
16  treated secured by special revenues, the litigation issues
17  you'll hear about will revolve around special revenues.  Are
18  the casino wagering tax revenues special revenues within
19  Section 901 giving the swap banks a post-petition lien under
20  Section 928 and an exemption from the Chapter 9 stay by
21  virtue of Section 922(d)?  You'll hear about Act 34, which
22  focuses on events in 2006.  Was entry of the swap valid?  As
23  Act 34 applies to the city, are the service corps the alter
24  ego of the city, and should they otherwise be disregarded and
25  the city deemed to be the swap counterparty, thus making the

1    swap invalid?  You'll hear about Section 12 of the Michigan

2    Gaming and Control Act.  Was the pledge of casino revenues to

3    secure antecedent debt with the authorization of that

4    section?  And if it wasn't, was it void or voidable, or was

5    it preempted by the -- was any challenge preempted by the

6    bankruptcy safe harbors?

7         When it turns to the second factors, your Honor

8    instructed us on Friday the focus is the juxtaposition of the

9    quality of the secured creditors' claim, the swap banks as

10   secured against, your Honor, the preserving and protecting

11   the city's cash flow.  There is no doubt that the swap banks

12   are swap participants.  Absent a court decree to the

13   contrary, they are swap participants that have excise taxes

14   as collateral, which is a type of tax specifically referred

15   to in 901's definition of special revenues.  And as your

16   Honor may recall from our debate in August, swap participants

17   enjoy special protections which exempt them from the

18   automatic stay and the stay of Section -- of 922(a) and,

19   moreover, according to some courts, broadly permit swap

20   participants to exercise remedies.  That would be 362(b)(17)

21   and 922(d).

22         In addition, the Bankruptcy Code ties this Court's

23   hands in preventing the Court from issuing orders or

24   providing further -- and providing further that nothing in

25   Title 11 is to interfere with the swap parties terminating,

1    liquidating, et cetera.

2         You'll hear from the swap banks that they have five

3    key factors.  They can terminate, as we just discussed.  They

4    believe they can exercise remedies.  They have a statutory

5    lien on casino revenues, which are special revenues.  They

6    have control over cash collateral through lock box accounts,

7    and, your Honor, they would argue that the safe harbors

8    prevent a challenge.  Thanks to Syncora, we know they have a

9    demonstrated ability to trap the casino revenues.  Your Honor

10   would say -- you've heard the phrase that the operation was a

11   success but that the patient died from the complications.  We

12   think that analogy is apt and captures the city's concerns on

13   the second <u>Bard</u> factor, as Messrs. Buckfire, Malhotra will

14   establish and Mr. Orr will confirm, that cash is a critical

15   lifeline for the city, and that, of course, gets us the third

16   <u>Bard</u> factor, and I don't think there's any doubt, your Honor,

17   that the potential challenges described by Ambac present

18   complicated and unique questions involving municipal finance

19   law in the State of Michigan tied to swap contracts which

20   enjoy ever expanding protection from the impact of bankruptcy

21   as underscored by two Circuit Court decisions in the recent

22   past.

23        Finally, your Honor, turning to the interest of

24   creditors, one thing that we would ask that you bear in mind

25   and we view as very critical in the fourth factor, there was

1   no middle ground.  Litigate or settle with a view to

2   protecting and preserving the city's cash.  Enron and its

3   Lehman progeny demand that the swap banks act or that they

4   risk forfeiting their bankruptcy protection.  Your Honor, it

5   is only the forbearance agreement and their post-petition

6   performance under it that has prevented the swap banks from

7   initiating their remedy sequence and calling those bankruptcy

8   protections into play.

9           As to the post-petition financing, your Honor,

10  Messrs. Doak and Buckfire will provide evidence that the

11  unsecured -- that unsecured credit is not available to the

12  city.  I'm sure that comes as no surprise.  Mr. Doak will

13  also testify that following a robust process, the post-

14  petition financing represents the best feasible financing

15  available -- realistically available to the city in its

16  current condition when the city is only able to offer limited

17  collateral and the city has to additionally insist on

18  remedies which preserve the city's ability to operate even in

19  the face of default.  Your Honor, that was a tall order.

20          Mr. Doak will also testify as to the negotiations

21  with potential lenders and Barclays providing the evidence,

22  your Honor, for the findings on good faith.  Mr. Doak as well

23  as Mr. Orr will testify as to the steps taken with the state

24  treasurer, the individual members of the City Council, and

25  the Emergency Loan Board in respect to the financing and

1  related items.

2         Your Honor, I will yield to the evidence as we move

3  to witnesses, but I would like to reserve to answer the

4  contract issues, also called the consent issues, and to

5  answer the Court's questions and objectors' argument.

6         THE COURT:  Well, I don't have a question, but I do

7  have a concern that I want to bring to your attention so that

8  you can focus your evidence.  I want to understand, as best

9  you can help me to understand it, what the considerations

10  were that led to the agreement to buy out the swaps at 75

11  percent as opposed to some other percentage.

12         MS. BALL:  Understood, your Honor.  We will do that.

13  Thank you, your Honor.

14         THE COURT:  Anyone on the objecting side want to

15  give an opening statement, or shall we go directly to proofs?

16  All right.

17         MR. STEWART:  Good morning, your Honor.  Geoffrey

18  Stewart, Jones Day.  Our first witness is going to be Gaurav

19  Malhotra.  Before we start, though, I intend, as best I can,

20  to qualify Mr. Malhotra as an expert so we don't have the

21  issues that we had in our last hearing.  I spoke before court

22  today with Mr. Hackney, who may well have objections to that,

23  so we have a procedural question, and maybe instead of

24  speaking for you -- I believe it has to do -- Mr. Hackney may

25  well want to voir dire the witness on his expert credentials,

1 which we could do in the middle of his direct, or we could

2 wait for Mr. Hackney's cross, as your Honor would prefer.

3         THE COURT: No. I think it's in the best interest

4 of all concerned to have a determination regarding his

5 expertise before we hear his proffered expert opinion.

6         MR. STEWART: Good. Okay. Then, your Honor -- so

7 why don't we call the witness, and I'll get --

8         THE COURT: Yes. Step forward, please, sir.

9         MR. STEWART: We'll get that part of it done.

10         THE COURT: Before you sit down, please raise your

11 right hand.

12         GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN

13         THE COURT: All right. Please sit down over there.

14 Proceed, sir.

15         DIRECT EXAMINATION

16 BY MR. STEWART:

17 Q   Good morning, Mr. Malhotra.

18 A   Good morning.

19 Q   Would you please, for the record, state your -- give us

20 your name and where you live?

21 A   Gaurav Malhotra, and I live in Chicago, Illinois.

22 Q   And describe for us, if you could, your education.

23 A   I graduated from undergrad in India from University of

24 Delhi and finished my MBA from Case Western Reserve

25 University in 2001 with majors in finance and business

1  policy.

2  Q   After your graduation from Case Western Reserve, where

3  did you go to work?

4  A   Ernst & Young.

5  Q   And is that where you still work today?

6  A   That is correct.

7  Q   In the interim, you've been with other groups or other

8  employers?

9  A   Yes.  With other restructuring practices, yes.

10  Q   You just used the word "restructuring."  For the record,

11  tell us what you meant when you used the word

12  "restructuring."

13  A   It involves assessing and developing a business plan for

14  a client for both the short term and the long term.

15  Q   And is that development of a business plan sometimes

16  called financial analysis?

17  A   Yes.

18  Q   Would you call yourself somebody who works in the field

19  of financial analysis?

20  A   Yes.

21  Q   Now, you've been working for the City of Detroit?

22  A   Yes.

23  Q   And for how long?

24  A   For about two and a half years.

25  Q   And tell us just generally speaking what sort of work

1   you've done for the city in those two and a half years?

2   A   Our work has involved -- my work has involved extensive

3   forecasting of cash, the development of short-term and long-

4   term financial projections for the last two-plus years.

5   Q   Have you also done work for other municipalities?

6   A   Yes, I have.

7   Q   What are the other municipalities that you can tell us

8   about?

9   A   The one that's publicly disclosed is Detroit Public

10   Schools in which we did extensive cash flow forecasting as

11   well as we have two other situations in which I'm involved in

12   right now that are municipalities.

13   Q   Okay. And you cannot -- you're not free to give us the

14   names of your clients in those two other instances?

15   A   No. Those are confidential.

16   Q   Okay. In addition to representing municipalities or

17   working for municipalities, what work have you done as a

18   financial analyst for private sector clients?

19   A   I've represented both public and private companies that

20   have been distressed in terms of evaluating and creation of

21   long-term business plans.

22   Q   What are the names of some of those companies?

23   A   Some of the publicly disclosed ones are Delta Airlines,

24   Eagle-Picher, Liberty Medical, going on right now, some of

25   the publicly disclosed ones.

1  Q   Now, have you been engaged by my law firm, Jones Day, to

2  testify as an expert witness in this hearing?

3  A   Yes.

4  Q   And to testify about what?

5  A   To testify about financial analyses related to the City

6  of Detroit.

7  Q   Let me ask you then about your background a little bit.

8  How many years have you worked as a financial analyst?

9  A   Since I graduated from grad school, 13-plus -- almost 13

10 years.

11 Q   Are you a member of any professional associations that

12 focus upon financial analysis?

13 A   Yes.  I'm a chartered financial analyst, a CFA.

14 Q   And is that a qualification for which you have to take a

15 test and be approved by some board?

16 A   Yes.  You have to take tests for three years and be

17 approved.

18 Q   What about other professional organizations?

19         THE COURT:  Excuse me one second.  You have to take

20 tests what, sir?

21         THE WITNESS:  And get approved.

22         THE COURT:  And get approved.  All right.

23         THE WITNESS:  Yes.

24 BY MR. STEWART:

25 Q   And other associations as well?

1    A    Yes.  I'm a member of the Association of Insolvency and

2    Restructuring Advisors as well as the Turnaround Management

3    Association and have completed my tests for the certification

4    of insolvency and restructuring advisors.

5    Q    And who gives that certification?

6    A    It's the Association of Insolvency and Restructuring

7    Advisors.

8    Q    Okay.  And that's pending?

9    A    That's correct.

10   Q    And what remains to be done before that is finished?

11   A    I have to send in my paperwork.

12   Q    Okay.  Tell us, if you could, what knowledge and skills

13   you need in order to do the work of financial analysis.

14   A    You have to be able to assess and evaluate data from

15   multiple sources from a historical perspective in terms of

16   how they come together, how the data cross-checks with each

17   other, and what within that data would be considered as one-

18   time items versus long-term trends, and the evaluation of how

19   that historical performance impacts future performance from a

20   forecast standpoint.

21   Q    And you're able to do that work because of specialized

22   knowledge that you have?

23   A    Yes.

24   Q    What is the specialized knowledge?

25   A    It's my years of experience doing this, my financial

1  education, as well as my business experience in terms of
2  dealing with multiple situations like this.
3  Q    Okay.  Now, in the course of your work for the city, who
4  from the city have you worked with?
5  A    We've worked with the emergency manager.  We've worked
6  with the former CFO, the mayor, the chief of staff, the chief
7  operating officer, department heads, so --
8  Q    Have you worked with the finance director?
9  A    Yes.
10 Q    And the treasurer?
11 A    Yes.
12 Q    Sorry.  Anyone else?
13 A    Various department heads at the city and the CFO and the
14 COO.
15 Q    And what books and records of the city have you had
16 access to and have you relied upon?
17 A    We have relied upon bank statements, the comprehensive
18 annual financial report, the internal operating reports
19 presented by the city.
20 Q    Let me stop you there.  What would be a good example of
21 such an internal operating report?
22 A    It would be a report that would summarize some of the
23 revenues and expenses from an interim standpoint as well as
24 some cash posting activity that is available on an
25 internal -- from an internal standpoint.

1  Q   And what's -- how many internal reports have you looked

2  at if you can count them?

3  A   I would say it's dozens in terms of the number of

4  reports.

5  Q   Have you also looked at the city's budgets?

6  A   Yes.

7  Q   What's the relevance of the budgets to your work?

8  A   Because the budget provides some sort of a framework for

9  providing the projections going forward, and we are able to

10 evaluate the budget in terms of how it compares to the

11 historical performance and the actual performance activity

12 that we have seen over the last two-plus years.

13 Q   Now, you use the term "we."  Are you referring to a group

14 above and beyond yourself?

15 A   Yes.  I have multiple members of my team that are

16 assisting me on this engagement.

17 Q   And how large is the team that reports to you on this

18 engagement?

19 A   It's between ten and fifteen people at any given point in

20 time.

21 Q   Let me ask you this.  Is there a standard and accepted

22 methodology that financial analysts follow in performing

23 their work?

24 A   Yes.

25 Q   Tell us, if you could, what is that standard and accepted

1   methodology?

2   A    It is the -- it is to study and evaluate the historical

3   performance in detail, to understand what one-time items are

4   impacting the historical performance, what are trends, and

5   are there any other one-time events that are impacting the

6   performance, and then also the process of discussing those

7   trends and observations with the management team, getting

8   their input, and then collectively the combination of using

9   the historical data, the combination of discussions with the

10  management team, coming up with forecasts that are reasonable

11  based on the overall assumptions.

12  Q    And what do you do to test assumptions?

13  A    To test the assumptions, we study as to how those

14  assumptions have played out from a historical standpoint,

15  what the basis of those assumptions are in our view along

16  with the view of the management team.  We also study if there

17  are any anomalies in terms of the assumptions compared to

18  what the historical performance has been.

19  Q    Now, do you use computer software to help you conduct

20  this analysis?

21  A    Yes.

22  Q    What is the computer software?

23  A    We use Excel.

24  Q    Is that a standard computer application that people use

25  in the field of financial analysis?

1    A    Yes.

2    Q    Now, as a result of your work, have you prepared cash

3    flow forecasts for the City of Detroit?

4    A    Yes, we have.

5    Q    And walk us through the steps you followed to prepare

6    these cash flow forecasts.

7    A    We have gone -- we have and I have evaluated bank

8    statements of the city, internal operating reports of the

9    city, the analysis of the CAFR, also discussions with the

10   management team to highlight what the receipts and

11   disbursements activity has been within certain

12   classifications on a historical standpoint in terms of our

13   analysis of the bank statements.  Based on that summary, in

14   conjunction with the budgets and discussions with the

15   management team, we have gone ahead and extrapolated

16   assumptions with respect to what the data would be, for

17   instance, for payroll, for revenues to come up with what we

18   think is a reasonable cash flow forecast for the city.

19   Q    How long, by the way, has it taken you and your team --

20   pardon me -- to prepare these cash flow forecasts?

21   A    Several months.

22        MR. STEWART:  Your Honor, I would move to qualify

23   Mr. Malhotra as an expert witness in the field of financial

24   analysis for the purpose of testifying about the cash flow

25   forecast he has prepared relating to the finances of the City

1  of Detroit.

2          MR. ARNAULT:  Good morning, your Honor.  Bill

3  Arnault on behalf of Syncora.  Just a few questions for the

4  witness.

5                    VOIR DIRE EXAMINATION

6  BY MR. ARNAULT:

7  Q   Good morning, Mr. Malhotra.  How are you?

8  A   Good morning.  Fine.  Thank you.

9  Q   Good to see you again.  Just a few questions about your

10  general background and qualifications.  You've never been

11  qualified as an expert witness before; correct?

12  A   That is correct.

13  Q   And before this case, you've never worked on a Chapter 9

14  case; is that right?

15  A   That is correct.

16  Q   But you have done work in the public sector, it sounds

17  like; right?

18  A   Yes, I have.

19  Q   But those are the two instances that you're not willing

20  to disclose because of confidentiality reasons; correct?

21  A   Two plus the Detroit Public Schools.

22  Q   Okay.

23  A   That's correct.

24  Q   I'm assuming, however, without knowing what those are,

25  that the cash forecasts and the work that you've done for the

1    other two municipalities wasn't on the size or scale of the
2    City of Detroit; is that correct?
3    A    I think Detroit Public Schools, in terms of their general
4    fund budget, was similar to the size of the general fund for
5    the City of Detroit in terms of its magnitude.
6    Q    Really?  So the general fund for the Detroit Public
7    Schools is as large as the general fund for the City of
8    Detroit?
9    A    I think it's close enough.  I would have to go back and
10   look at the exact number, but I think it's reasonably close.
11   Q    Okay.  And all the same assumptions that would go into
12   building the forecast for the City of Detroit, would those
13   also go into the Detroit Public Schools?
14   A    Generally, yes, because they also have -- Detroit Public
15   Schools has significant tax revenues that come in as well as
16   has a significant amount of its fixed obligations in the
17   amount of payroll and other operating expenses, so the
18   overall revenue landscape I would say is similar; however, it
19   gets impacted, of course, by student count.  So in terms of
20   magnitude, I think the general fund impact is roughly
21   similar.
22   Q    And the magnitude of the expenses is the same in the
23   Detroit Public Schools as it is for the City of Detroit?
24   A    For the general fund, my recollection is yes, but I can
25   go back and look at the details, but my recollection is that

1  the general fund impact is roughly the same.

2  Q    And correct me if I'm wrong.  My understanding would be

3  that the Detroit Public Schools is just one entity, whereas

4  the City of Detroit has a number of various departments;

5  correct?

6  A    Detroit Public Schools has various departments.  It's not

7  just one department.  It has various departments that roll

8  into the financial profile of Detroit Public Schools.

9  Q    But not as many departments as the City of Detroit;

10  correct?

11  A    I'm not sure as to exactly how many departments the

12  Detroit Public School has right now.

13  Q    And you're not a CPA; is that right?

14  A    That is correct.

15  Q    And you're not an economist, are you?

16  A    I'm not.

17  Q    Okay.  Nor are you an actuary; correct?

18  A    That is correct.

19  Q    Okay.

20      MR. ARNAULT:  Your Honor, we would object to the

21  city's offer of Mr. Malhotra as an expert based on the

22  grounds that he lacks the qualifications and the technical

23  experience to create the cash flow forecast that he will be

24  offering.

25      MR. MARRIOTT:  Your Honor, Vince Marriott, Ballard

 1  Spahr, on behalf of EEPK and also the other objectors.  In

 2  addition to the qualification issue, Judge, I'd like to make

 3  a relevance objection to what sounds to be the opinion

 4  testimony that Mr. Malhotra will be giving.  Given the

 5  limitations on the scope of this Court's inquiry --

 6          THE COURT:  Well, let me ask you to hold on your

 7  relevance objection, to the extent it relates to the opinion

 8  that will be given, until it is proffered.

 9          MR. MARRIOTT:  Very well, your Honor.  Thank you.

10          MR. STEWART:  Your Honor, in response to Mr.

11  Arnault's point, I don't think it's necessary that

12  Mr. Malhotra be an economist or a CPA.  He said he's a

13  certified financial analyst, and he's described at length his

14  credentials.  I think he satisfies the requirements of Rule

15  702, which are fourfold, and I hope that I covered them in

16  that order.  First, that the expert's specialized knowledge,

17  it speaks of scientific, technical or other specialized

18  knowledge without getting into whether it's scientific or

19  even technical.  I believe that it's clear it's specialized,

20  and it's specialized because of its complexity, because of

21  the need to take different data sources into account, and to

22  follow the processes and methods that he described.  And

23  the -- this part of the rule says it would help the trier of

24  fact to understand the evidence or to determine a fact that

25  is in issue.  And understanding Mr. Marriott's objection as

1   to relevance, which we'll deal with shortly, I believe the

2   cash flow forecasts we intend to speak about are relevant

3   because they would show the effect upon the city's finances

4   if it were the case that the casino revenues that Ms. Ball

5   mentioned earlier were not available to the city.

6           THE COURT:  All right.  On the qualifications issue,

7   the Court will find that the witness is qualified by his

8   experience and training to proffer to the Court an expert

9   opinion on his cash flow analyses of the City of Detroit, and

10  the objection is overruled.  You may proceed.

11          MR. STEWART:  Thank you, your Honor.

12          DIRECT EXAMINATION (CONTINUING)

13  BY MR. STEWART:

14  Q   So the first exhibit will be Exhibit -- City Exhibit 36.

15  So, Mr. Malhotra, let me ask you about some of your cash flow

16  work that you've done.  On the screen before you is Exhibit

17  36.  Are you able to see it on the monitor there at the

18  witness stand?

19  A   Yes, I am.

20  Q   Okay.  Did you prepare cash flow -- and by the way, what

21  is this document?

22  A   This was the proposal for creditors that was presented on

23  June 14, 2013, by the emergency manager.

24  Q   Okay.  And if you could speak more slowly because the

25  court reporter has to take all of this down, and the faster

 1  you talk, the harder her job gets.

 2  A   Sure.

 3  Q   And you don't want her --

 4          THE COURT:  Thank you for that caution.  And, Mr.

 5  Marriott, I don't want you to feel the need to rush the

 6  lectern when you want to object, so just pull one of those

 7  microphones closer to you, and I'll ask you to make your

 8  objection at the time you think it's appropriate from the

 9  lectern -- from the table there.

10          MR. MARRIOTT:  Thank you, your Honor.

11          THE COURT:  Okay.

12  BY MR. STEWART:

13  Q   And, Mr. Malhotra, were you at the June 14, 2013,

14  meeting?

15  A   Yes, I was.

16  Q   And what use was made of that document that day?

17  A   It was used to show the city's financial position and its

18  projections over the next ten years and what cash was

19  available for unsecured creditors.

20  Q   Did you prepare any cash flow forecasts that are

21  contained within Exhibit 36?

22  A   Yes, I did.

23  Q   Could you please direct us to those within the exhibit?

24  A   Yes.  They would be, I believe, on pages 57 and 58.

25  Q   Okay.  Can you scroll to those, please?  Let's go to

1    page -- you see there's competing page numbering of this

2    exhibit, Mr. Malhotra.  Were you referring to the page that

3    we have before us that appears to be page 49?

4    A    Yes.

5    Q    And you prepared this?

6    A    Yes.

7    Q    What is it?

8    A    It is a summary of the actual cash flows for the city's

9    general fund for -- from July 2012 to May 2013 and a one-

10   month forecast for the month of June 2013 to give a snapshot

11   of fiscal year '13's cash flow activity compared to fiscal

12   year 2012's cash flow activity.

13   Q    And what does the next page show?

14   A    Next page shows the forecasted cash flows for fiscal year

15   2014 on a monthly basis.

16   Q    Did you prepare these cash flow forecasts in the manner

17   you described to us a few minutes ago when I asked you about

18   how you went about your work as a financial analyst?

19   A    Yes.

20   Q    Are there other forecasts that you prepared also in

21   Exhibit 36?

22   A    Yes.

23   Q    Where are those?

24   A    Those should be on pages 97, 98, which broke down the

25   ten-year projections for the city from 2014 to 2023.

1  Q   Okay.  All right.  Thank you.

2          MR. STEWART:  Your Honor, I would move the admission

3  of Exhibit 36, although I think it may actually have been

4  stipulated in as Sole Exhibit 1360.

5          MR. MARRIOTT:  Objection, your Honor.  I'm not sure

6  it was stipulated in, and I think relevance objections and

7  potentially hearsay objections were asserted to it.  Let me

8  explain to you my issue, Judge, and the purposes for which

9  it's being introduced may impact whether the -- how much I

10  object.

11          THE COURT:  I'm sorry, sir.  I do have to ask you to

12  stand while you make your objection and use the microphone as

13  best you can.

14          MR. MARRIOTT:  It might be easier to come to the

15  podium then because --

16          THE COURT:  If that's your preference, that's fine

17  with me.

18          MR. MARRIOTT:  -- the mike then isn't so far from

19  the -- people complain about not being able to hear me

20  without a mike, so -- Judge, given the limitation on the

21  scope of this Court's inquiry with respect to approval of the

22  post-petition financing and the forbearance agreement, it's

23  our contention that Mr. Malhotra can relevantly testify as to

24  the amount that will be payable under the forbearance

25  agreement if the Court approves it and may testify as to the

 1   city's cash savings if the transactions are approved and
 2   funded as distinguished from disapproved.  It is our
 3   contention that he may not testify and we object to any
 4   testimony as to the need or uses of the additional cash flow
 5   generated by the proposed transaction nor can he testify as
 6   to the city's projected cash balances going forward because
 7   imbedded in any such projections are assumptions as to the
 8   needs and uses of the city.  We similarly object to any
 9   exhibit to the extent it is purported to be introduced for
10   purposes other than those to which we believe Mr. Malhotra
11   can testify; i.e., amount of the payment and cash savings
12   resultant from the transaction; in other words, it's going to
13   cost the city 50 million a year if we don't do this deal, and
14   it will only cost the city $20 million a year if we do.  He
15   can testify as to that.  He can testify as to what it's going
16   to cost under the forbearance agreement if it's approved.
17   But if he gets into net cash balance testimony, if he gets --
18   if we start introducing projections, those projections are
19   built up from needs and uses assumptions, which we have taken
20   out of this hearing as relevant and as to which, if they were
21   relevant, we would have produced witnesses that would have
22   contested some of the assumptions underlying needs and uses
23   and the like in those projections, so we don't object to
24   Mr. Malhotra testifying as to cost of the forbearance
25   agreement and the savings resulting from it, nor do we object

1   to exhibits insofar as they are introduced solely for the

2   purpose of reflecting those two numbers, but for any other

3   purposes and as to any other testimony, we object.

4         MR. STEWART: Your Honor, a few responses. First of

5   all, I think the forecasts are relevant and material to the

6   decision of the emergency manager to enter into this

7   agreement and the reasons why the city submits that the

8   forbearance agreement should be approved. As to the fact

9   that the forecast bundle and assumptions about spending and

10   other things have been given to the witness by others, we

11   don't intend to one way or the other speak about them other

12   than the fact that they are numbers that are part of the

13   city's budgeting and part of this forecasting process. I

14   don't understand the objection to the extent it seems to

15   suggest that somehow forecasts should be developed that put

16   those numbers to one side because one really cannot put those

17   numbers to one side. That is the budget, that is the

18   forecast, and so I must have misunderstood the objection to

19   that degree.

20         THE COURT: Well, but I didn't quite hear in your

21   response how the information in these cash flows bears upon

22   whether these motions should be granted.

23         MR. STEWART: Well, it demonstrates, first of all,

24   the first cash flows, what financial information was

25   available to those who -- to the emergency manager and to the

1  city when they decided it was necessary or appropriate or

2  proper or advisable to enter into the forbearance agreement,

3  and other cash flows will show what the effect would be upon

4  the city if they had not entered into the forbearance

5  agreement, which corroborates the decision of their business

6  judgment to enter into it.

7      THE COURT:  All right.  Mr. Plecha, you're standing

8  there patiently.  Is there something you want to add to

9  this --

10     MR. PLECHA:  Just briefly, your Honor.

11     THE COURT:  -- without repeating anything that's

12  already been said?

13     MR. PLECHA:  And that's why I rise, your Honor, just

14 so I don't have to rise later so that the parties that are

15 not making live objections can rely on the objections and

16 arguments stated on the record by the objecting parties.

17 Thank you, your Honor.

18     THE COURT:  Yes, sir.  Absolutely.

19     MR. STEWART:  Your Honor, I believe I said this

20 before, but one of the -- one of the points this testimony

21 will make is of critical importance to the city's finances of

22 having access to the casino revenues, which, of course, are

23 the very -- is the very stream of income that is freed up by

24 the forbearance agreement.

25     THE COURT:  Let's dig a little deeper here.  What is

1    the -- you say you offer this to show what information the

2    emergency manager and presumably his advisors had when they

3    were negotiating and deciding to enter into the forbearance

4    agreement.

5           MR. STEWART:  Correct, yes.

6           THE COURT:  What will your evidence show is the link

7    between -- the connection between what's in these forecasts

8    and that decision?

9           MR. STEWART:  It will show that unless the casino

10   revenue is unencumbered and available freely to the city to

11   use to fund its operations and its plans, the city would not

12   have sufficient cash to operate.

13          THE COURT:  Well, but to that Mr. Marriott says

14   that's only true because the city has made decisions to spend

15   its income in -- its other income in other ways, and he

16   points out that this is not a trial on how the city is

17   supposed to be spending its money.

18          MR. STEWART:  Correct.  And the city --

19          THE COURT:  So how do I conduct this trial without

20   opening up that enormous issue and still admit this?

21          MR. STEWART:  Because, your Honor, first of all,

22   we -- as I understood your ruling on Friday, it is that the

23   city's decisions on how it wishes to spend its money are not

24   what we're here to deal with today.  That is why we're not

25   putting proofs on as to that, why we haven't -- for example,

1   why we don't intend to call Mr. Moore.  We're instead taking

2   those as a given.

3          THE COURT:  Well, but isn't this cash flow that very

4   evidence?

5          MR. STEWART:  Well, the cash flow is the evidence of

6   what you have after you've made those expenditures, yes, but

7   that's true, of course, all expenditures, not just

8   restructuring or other ones that have come up, that came up

9   on Friday or that were the subject of other testimony or

10   argument before the Court.  Since cash is fungible and every

11   expenditure made reduces cash to the amount of the

12   expenditure, this is true -- I think my thinking on Mr.

13   Marriott's objection is it would require, if we were to

14   accept it, that we strip the city's budget all the way down

15   to zero balance it and rebuild the entire thing before we go

16   further, but my understanding of your Honor's rulings have

17   been we sort of take the expenditures as we find them, and

18   what we have here is should we approve the assumption of this

19   contract, the settlement agreement, and one of the elements

20   as to should it be assumed is the sound exercise of business

21   judgment by the person who made the decision to enter into

22   it.  And the financial effects of an agreement that is about

23   finances I would submit is very important to analyzing that

24   business judgment.

25          THE COURT:  Mr. Marriott, what I hear Mr. Stewart

1  saying is that there's nothing inconsistent with admitting

2  this document and limiting the scope of this trial as I

3  proposed because under Section 903 and 904, the Court and,

4  frankly, the objecting parties are required to accept the

5  political decisions that it reflects.

6          MR. MARRIOTT:  Judge, let me respond to that because

7  that exhibit and testimony embedded in that exhibit about

8  needs and uses is exactly the rabbit hole that I believe you

9  declined to go down on Friday, and, therefore, it's exactly

10 the rabbit hole as to which we have withdrawn witnesses that

11 would have provided testimony to that respect.

12         As and to the -- Mr. Stewart also indicated that the

13 finances of the city were important to the emergency

14 manager's decision to enter into the forbearance agreement.

15 The finances of the city is a need -- that's a need-based

16 argument.  It's an argument from here's where we are, here's

17 where we need to be, and, therefore, we're going to enter

18 into the forbearance agreement, therefore, we're going to

19 enter into the DIP.  And it was just that inquiry that was

20 cordoned off on Friday.

21         What I am proposing is left -- and I don't think

22 there's anything inconsistent or budgetary destroying about

23 this -- is Mr. Malhotra can certainly testify, Judge, it's

24 going to cost this under this forbearance agreement.  This is

25 what the city is going to be out of pocket.  The city's cash

1   position, the delta -- forget about the net.  The net starts
2   to get into the need and uses.  The city's cash position will
3   improve if we do this by $30 million.  Now, the city can then
4   argue persuasively or not that this deal was a good idea for
5   $30 million in extra cash that the delta is sufficient
6   justification without getting into needs and uses, and it
7   seems to me, your Honor, that after Friday that's what
8   they're left to, and I don't think there's anything
9   inconsistent about holding them to that and refusing to admit
10  testimony or exhibits that go beyond that from Mr. Malhotra
11  or any other witness.
12          MR. STEWART:  Your Honor, I'm not sure I still
13  understand Mr. Marriott's objection.  As I understood him, he
14  was saying on Friday it was determined that we're not going
15  to go into the city's decisions about what it does and
16  doesn't want to spend money on, that those are something
17  that's beyond what the Court is going to do and beyond what
18  we're here to do this week.  In other words, those
19  expenditures are in the budget.
20          THE COURT:  I'm prepared to rule.  The Court is
21  going to overrule the objection.  It's a long way from the
22  Court will not judge the political decisions of the city on
23  how it will spend its money to considering as evidence what
24  those political decisions were regarding how the city spent
25  its money when those political decisions are relevant to the

1  issues before the Court, and the Court concludes they clearly

2  are.  You may proceed.

3          MR. STEWART:  Thank you, your Honor.

4          MR. MARRIOTT:  Your Honor, can I -- given your

5  ruling and so I don't totally disrupt the case as it

6  proceeds, if I may assert a standing objection to testimony

7  or exhibits in connection with Mr. Malhotra's presentation

8  here today that go beyond those two areas that I believe are

9  appropriate.

10          THE COURT:  Yes, sir.  We will --

11          MR. MARRIOTT:  Thank you.

12          THE COURT:  We will allow that standing objection.

13          MR. STEWART:  I believe, your Honor, I had moved the

14  admission of Exhibit -- City Exhibit 36.

15          THE COURT:  36?  36 is admitted.

16          MR. STEWART:  Thank you, your Honor.  Your Honor,

17  can I clarify?  Was that the entire exhibit?

18          THE COURT:  Ah, that's a good question.  Thank you.

19  I meant to -- I meant to inquire about that myself.  Your

20  examination justifies the admission into evidence of the

21  pages that you asked the witness about.  Is that your offer?

22          MR. STEWART:  I was going to offer the entire

23  document, your Honor, because he testified about having

24  attended the meeting that the proposal was made.  This was

25  something shared with creditors, and although I didn't

1   examine him about the entire document, I think it's certainly

2   authenticated by the witness, and I think beyond that

3   objection --

4           THE COURT:  Well, but what's the relevance of the

5   rest of this document?

6           MR. STEWART:  It would have to be for others who are

7   going to be examining witnesses later, your Honor.  I believe

8   it is because it is the baseline financial case for the city

9   that certainly did change between that date and when the

10  forbearance agreement was executed but is relevant because it

11  shows maybe for want of a better word the starting point and

12  explains in detail sort of how the city got to that starting

13  point.

14          THE COURT:  Well, all right.  I'm going to ask you

15  to reserve your offer of the rest of the document until that

16  relevance is more completely established.  Let's review the

17  specific pages to make sure we all agree.  What pages did you

18  ask of the -- ask the witnesses about?

19          MR. STEWART:  Your Honor, like others --

20          THE COURT:  And let's be sure --

21          MR. STEWART:  -- I've been defeated by the number

22  system.

23          THE COURT:  -- we use the precise page numbers and

24  not the conflicting page numbers.

25          MR. STEWART:  Page 49 and 50 of the original

1 numbering.

2         THE COURT: Yes. Let's use the original numbering.

3         MR. STEWART: The original. Okay. And then I

4 believe thereafter it was 91. No. 90 and 91 if I have that

5 correct.

6         THE COURT: Is that right, sir? Mr. Malhotra, is

7 that right?

8         THE WITNESS: Yes, your Honor, that's right.

9         THE COURT: Those are the original page numbers with

10 your cash flow analyses on them? Yes?

11         THE WITNESS: Yes.

12         THE COURT: Is that right?

13         MR. STEWART: Yes. I thought the witness had said

14 "yes."

15         THE WITNESS: Yes. And 97 and 98.

16         MR. STEWART: Well, are you -- okay. 97 and 98,

17 your Honor.

18         THE COURT: There are three sets of numbers or there

19 are two? I thought there were two.

20         MR. STEWART: I thought there were two as well, your

21 Honor --

22         THE WITNESS: Okay.

23         MR. STEWART: -- so the witness is saying, your

24 Honor, I guess it's 49 and 50 and 97 and 98.

25         THE COURT: Is that right, sir?

```
 1          THE WITNESS:  Yes.  That is correct.
 2          THE COURT:  All right.  The Court will admit those
 3   four pages only from Exhibit 36 at this time.
 4       (City Exhibit 36, pages 49, 50, 97, and 98, received at
 5       10:13 a.m.)
 6          MR. STEWART:  Thank you.  Can we go to our next
 7   exhibit, Exhibit Number 106?
 8   BY MR. STEWART:
 9   Q   Mr. Malhotra, Exhibit 106 has been put on the screen for
10   you.  Can you tell me what this exhibit is?
11   A   This is the monthly cash flow forecast that was prepared
12   in June of this year.
13   Q   And is there a date in the upper right-hand corner of the
14   document?
15   A   June 21st, 2013.
16   Q   Is that -- does that indicate the date it was prepared?
17   A   Yes.
18   Q   Who prepared this?
19   A   I along with my team and members of the city.
20   Q   And in preparing this, did you follow the same methods
21   and practices and techniques that you described to us earlier
22   when I was questioning you about your background?
23   A   Yes.
24   Q   If I could, let me ask -- and by the way, it's entitled
25   "Project Piston"?
```

1  A    Yes.

2  Q    What is Project Piston?

3  A    That's the internal project name that we had created at

4  Ernst & Young for this engagement.

5  Q    For your work for the City of Detroit?

6  A    That is correct.

7  Q    Let me direct your attention, if I could, to the last two

8  pages of our exhibit.  That would be page 6 of 7 and 7 of 7.

9  Do you have them before you?

10  A    Yes.

11  Q    What are these?

12  A    These are the monthly cash flow forecasts for fiscal year

13  2014 under a restructuring scenario.

14  Q    And what do you mean when you say "restructuring

15  scenario"?

16  A    I mean that we had removed from the disbursements any

17  payments related to unsecured obligations other than the

18  continuing payment of retiree healthcare from these

19  projections.

20  Q    Okay.  And where does one find any reference in this

21  document to the cost associated with restructuring?

22  A    The investment related to the cost related to the

23  restructuring is highlighted on the last line, which says

24  "cumulative reinvestment expenditures" on that particular

25  page.

1  Q   And where did that number come from?

2  A   That number came from the work that was given to us by

3  the Conway MacKenzie team.

4  Q   Now, let's look at the rest of your cash flow forecast

5  here, and I'm going to be very brief.  As a general matter,

6  what does it -- what does it present for us?

7  A   What it presents is what the cash position net of

8  distributions of the city would be on a monthly basis

9  throughout fiscal year 2014, and those cash numbers do not

10 include the reinvestment expenditures that are highlighted on

11 the last line of that page.

12 Q   All right.  So in the lower right-hand corner for

13 forecast for fiscal year 2014 --

14         MR. STEWART:  And could we blow that up and

15 highlight it, please, lower right-hand corner?

16 BY MR. STEWART:

17 Q   That is the number you have forecast before reinvestment

18 expenditures?

19 A   That is correct.

20 Q   And the reinvestment expenditures for that fiscal year

21 are a few lines below?

22 A   That is correct.

23 Q   Let's look at the next page, and if you'd tell us what

24 that is.

25 A   The cumulative reinvestment expenditures through fiscal

1    year 2015 are 480.9 million, which is shown on the last line

2    of --

3    Q    Generally, what is this -- what is this page?

4    A    This page is the monthly cash forecast for fiscal year

5    2015.

6    Q    So it's for the next fiscal year?

7    A    That is correct.

8    Q    And was it prepared in the same manner as the previous

9    one we talked about?

10   A    Yes.

11   Q    In the lower right-hand corner it shows a number of 367

12   million.  Do you see that?

13   A    Yes, I do.

14   Q    What is that number?

15   A    That represents the cash balance for the general fund

16   under the restructuring scenario without any reinvestment

17   expenditures.

18   Q    And then there are reinvestment expenditures, however?

19   A    That is correct.

20   Q    And what is that number?

21   A    480.9 on a cumulative basis between '14 and '15.

22   Q    And so both of those numbers are in the lower right-

23   hand corner of that page?

24   A    That is correct.

25        MR. STEWART:  Your Honor, I'd move the admission of

1   Exhibit 106.

2          THE COURT:  Again, are you moving the entire

3   document or just pages 6 and 7?

4          MR. STEWART:  The entire document, your Honor.  In

5   the interest of time, I examined him in detail only about the

6   last two pages.  If you'd like -- I mean I think I asked him

7   the question whether the entire document had been prepared

8   using the techniques and methods that he described to us, and

9   he said it had been.

10          THE COURT:  Well, can you just tell us briefly

11   what -- briefly what the other pages are?

12          THE WITNESS:  The first two pages would be the cash

13   flow scenarios under the base case; that is, if the city had

14   continued, your Honor, to make its unsecured payments per the

15   original schedule.  And it showed the actual months plus what

16   the projected cash flows would look like under the base case.

17   And then the pages 6 and 7 show the cash flows under the

18   restructuring scenario where we pulled out the unsecured

19   payments out for unsecured creditors.

20          THE COURT:  Any objections to the admission of the

21   document?

22          MR. MARRIOTT:  Quick question, your Honor.  Is it

23   correct that this is coming in as part of his opinion

24   testimony?

25          MR. STEWART:  I was actually offering it for what it

1  is, which is it's coming in as an exhibit for the city.

2      MR. MARRIOTT:  I mean otherwise if it's -- if it's

3  not reflecting his opinion, I think it's hearsay.  If it's

4  simply reflecting his opinion, then -- I mean if this is

5  offered as his opinion as to --

6      THE COURT:  I think it's abundantly clear that it

7  is.

8      MR. MARRIOTT:  Okay.  I just wanted to clarify that.

9  The other thing, your Honor, is -- and I won't do this again,

10  but this would be subject to my standing objection.

11      THE COURT:  Yes, absolutely.

12      MR. STEWART:  And, your Honor, to pretermit the

13  objection, I'm prepared to go into a business record

14  foundation for it that would take care of the hearsay

15  objection, but I wanted to move things along.

16      THE COURT:  Exhibit 106 is admitted.

17    (City Exhibit 106 received at 10:20 a.m.)

18      MR. STEWART:  Thank you, your Honor.

19  BY MR. STEWART:

20  Q   Let's, if we could, now go to our next exhibit, which is

21  Exhibit 111.  And, Mr. Malhotra, before I ask you details

22  about this, I'm going to ask you a couple of background

23  questions.  In connection with the pending motions, were you

24  asked to perform certain financial analyses?

25  A   Yes.

1  Q   And are your analyses reflected on Exhibit 111?

2  A   Yes.

3  Q   What is it that you were asked to do?

4  A   I was asked to prepare three scenarios that -- from a

5  cash standpoint for through fiscal year 2015.

6  Q   And let me ask you scenario by scenario what they are

7  before we get into the substance of this exhibit.  What is

8  scenario number one?

9  A   Scenario number one is the cash balance if the post-

10  petition financing was closed, the swap settlement was

11  completed, and none of the city's casino monies were trapped.

12  Q   I'm going to stop you right there so we have our

13  terminology straight.  You here speak of something called DIP

14  financing.  That's the post-petition financing; correct?

15  A   Yes.

16  Q   And scenario number one assumes that that part of the

17  motion is approved by the Court and that the financing

18  closes; correct?

19  A   Yes.

20  Q   Okay.  Next you have something called a swap settlement.

21  Tell us, please, what you mean when you use the words "swap

22  settlement"?

23  A   I mean the out -- the swaps that are currently out of the

24  money are paid by the DIP financing or the post-petition

25  financing and thereby the city no longer has to pay any swap

1    interest that it's currently scheduled to pay.

2    Q    And is the forbearance agreement that we've been talking

3    about, is that a synonym for the swap settlement?

4    A    Yes.

5    Q    Third, you have something called no casino trap.  What do

6    you mean when you say "no casino trap"?

7    A    I mean that the city continues to have free access to its

8    casino revenues as it always has, and they are not trapped by

9    the swap counterparties.

10   Q    So let me ask you a minute about the casino revenues.

11   What are the casino revenues?

12   A    Those are the revenues the city gets from the three

13   casinos that are in Detroit.

14   Q    And how much are the casino revenues every year?

15   A    Approximately $170 million annually.

16   Q    And why do you refer to them being trapped?

17   A    Because the city is in default under its existing

18   agreements with the swap counterparties, and my understanding

19   is that the swap counterparties have the right to trap those

20   monies.

21   Q    What happens if the monies are trapped?

22   A    If the monies are trapped, the city would lose

23   potentially on an annualized basis $170 million of tax

24   receipts; however, that would get offset by $50 million of

25   swap interest that the city would thereby not make, so it

1  would be a net impact of approximately $120 million on an

2  annualized basis in terms of a reduction of cash available to

3  the city.

4  Q   So that was scenario number one.  What is scenario number

5  two?

6  A   Scenario number two represents the forecasted cash

7  balances under the scenario that there is no DIP financing,

8  there is no swap settlement, and the city continues to have

9  access to its casino revenues.

10 Q   And what is scenario number three?

11 A   Scenario three shows the city having no DIP financing, no

12 swap settlements, the casino revenues are trapped, and the

13 city does not make any swap interest payments going forward.

14 Q   Now, something you referred -- I'm going to go briefly to

15 a related matter.  When you spoke about the swap settlement,

16 you mentioned something called swaps payments.

17 A   Yes.

18 Q   What are swaps payments?

19 A   The swap payments I was referring to are the swap

20 interest payments of $4.2 million the city makes every month.

21 Q   Now, if there's a swap settlement, what happens to the

22 swap payments?

23 A   The city will not be required to make those payments

24 going forward.

25 Q   What effect would that have upon the city's cash

1  position?

2  A   The city's cash position would improve for that $4.2

3  million that the city would not have to make in swap interest

4  and would get offset by any interest the city pays on the

5  take-out financing.

6  Q   Now, you mentioned that -- the interest the city pays on

7  the take-out financing.  What is that?

8  A   I was referring to the financing that is used to -- for

9  the swap settlement.  The city would have to pay interest on

10 that, and that would reduce the net impact of the benefit on

11 a monthly basis the city would get from the swap settlement.

12 Q   And have you calculated what the net benefit would be?

13 A   Yes.

14 Q   And what have you concluded?

15 A   In terms of the monthly impact, the amount of swap

16 interest that the city is currently paying is $4.2 million,

17 and the potential interest on the new financing on a monthly

18 basis could be somewhere between $700,000 to about a million

19 five on a monthly basis, so on a net monthly impact, the

20 amount could be -- the benefit of the interest could be as

21 high as $3 million a month, or on the low end the benefit

22 could be about, I think, a million five a month.

23 Q   Have you prepared a demonstrative exhibit to show how

24 your calculations were made?

25 A   Yes.

 1          MR. STEWART:  Could we put up demonstrative Exhibit

 2    141?

 3    BY MR. STEWART:

 4    Q    And could you tell us, once again, how your calculations

 5    work?  But we don't need to redo them all.  You can be brief.

 6    A    Sure.

 7    Q    First of all, what years?  What periods does this relate

 8    to?

 9    A    This refers to fiscal year '14 and fiscal year '15.

10    Q    Okay.  And it shows swap payments.

11    A    That's right.  It shows swap payments of $45 million

12    annually in terms of the approximate payments that have to be

13    made.  The swap termination loan refers to the interest that

14    would be payable on the approximate $227 million of the swap

15    settlement amount at a range of an interest rate ranging from

16    3-1/2 percent, which would equate to the $7.3 million in

17    interest, and roughly -- I think it was about five percent on

18    the $13.6 million.

19    Q    And so you reach a conclusion about cash flow benefits?

20    A    Yes.

21    Q    And that's what appears here, that it is between 31.4 and

22    37.7 million per year for this fiscal year and the next

23    fiscal year?

24    A    Yes, under these assumptions.

25    Q    Okay.  Thank you.  Mr. Malhotra, going back to Exhibit

1    111, did you prepare -- the numbers that appear on this

2    exhibit, are they the result of cash flow calculations that

3    you performed?

4    A    Yes.

5         MR. STEWART:  Let's put up Exhibit 108, page 1.

6    BY MR. STEWART:

7    Q    Do you see Exhibit 108?

8    A    Yes, I do.

9    Q    What is Exhibit 108?

10   A    Exhibit 108 is the cash flow forecast under the scenario

11   that the DIP financing is completed is the way we had shown

12   it here.

13   Q    In other words, under scenario number one?

14   A    That is correct.

15   Q    Who prepared Exhibit 108?

16   A    I did in conjunction with my team and members of the

17   city's management team.

18   Q    And was it prepared using the same methods and approaches

19   that you testified about earlier?

20   A    Yes.

21   Q    Let's look, if we could, at page 2 of Exhibit 108.  What

22   does page 2 tell us?

23   A    Page 2 is a summary of the cash flows as were shown in

24   the June 14th proposal.

25   Q    Okay.  Now, where is that?

1  A    It's in the first line that says "funds available for

2  unsecured claims per creditor proposal."

3  Q    So that's referring to the June 14 document?

4  A    That is correct.

5  Q    Okay.  And then you have a series of items below that.

6  Could we -- and I'm going to ask you to describe a few of

7  them.  What is the first one?  It says "retiree healthcare

8  transition cost in CF."  What is that item?

9  A    That represents the estimate for retiree healthcare costs

10  that are in the cash flows that are shown as a DDOT because

11  they were not included in the line item up above to show that

12  retiree healthcare costs, which were an unsecured claim, were

13  being paid out from a liquidity standpoint per the decision

14  of the emergency manager, and that's what we were showing in

15  the first line.

16  Q    And the next line is "higher transportation department

17  subsidy"?

18  A    Those were other cash impact at the Department of

19  Transportation in which the department would likely require a

20  higher subsidy in the next couple of years for -- related to

21  the payment of retiree healthcare and other working capital

22  that was not incorporated in the first line.

23  Q    And next, account payable vendor risk in CF.  What is

24  that?

25  A    That was the cash impact of potential critical vendor

1  payments or other potential trade disruption that could have

2  been caused as a result of the bankruptcy filing, so those

3  are, again, cash flow impacts that were not reflected in the

4  first line.

5  Q    And where do these numbers come from?

6  A    They were -- they came together based on discussions with

7  the emergency manager, the other advisors, and the city's

8  management team.

9  Q    We then have a couple of smaller items.  Then we have an

10  item called reinvestment timing change, see memo one below.

11  First of all, what is a timing change?

12  A    A timing change is a -- compared to the original budget,

13  a timing change is when the total amount of the expense or

14  the revenues has not changed; however, the timeline in terms

15  of when that revenue or expense would be realized has been

16  changed.

17  Q    And there's a reference to memo one below?

18  A    That is correct.

19  Q    What is memo one?

20  A    Memo one down below reflects the net impact of changing

21  the expenditures or deferring certain expenditures compared

22  to the original proposal on June 14th and what the latest

23  thinking was to -- with respect to the reinvestment

24  expenditures so that the city could maintain a base level of

25  liquidity over the forecast period.

1   Q   The next two lines refer to DIP -- the DIP --

2           THE COURT:  Is there something you'd like to say,

3   sir?

4           MR. PEREZ:  Yes, your Honor.  Alfredo Perez.  Your

5   Honor, if he's going to testify about the exhibit, I think he

6   should -- they should proffer it into evidence before they do

7   that.  I've been trying to get the Court's attention, but --

8           MR. STEWART:  Oh, I was going to actually do it

9   after examining him, Judge.  I'm happy to move it now.

10           THE COURT:  If you have an objection, feel free to

11   interrupt.

12           MR. PEREZ:  Yes, your Honor.

13           THE COURT:  I'm sorry, Mr. Stewart.

14           MR. STEWART:  I was actually going to lay this

15   foundation and then move it into evidence to pretermit an

16   objection, but I'm happy to move it right now.

17           THE COURT:  Well, I would only say to you that as a

18   general rule, you shouldn't ask the witness about the

19   contents of a document until it's in evidence, but you're

20   offering Exhibit 108 now?

21           MR. STEWART:  Yes, I do.

22           THE COURT:  Is there any objection to Exhibit 108?

23           MR. PEREZ:  Your Honor, in addition to the

24   objections raised by Mr. Marriott, this exhibit is dated

25   September 16th, so it's well after the July swap settlement

1  agreement, so, your Honor, it could not have been the premise

2  for the political considerations at that time.

3       MS. ENGLISH:  Your Honor, Caroline English.  The

4  same objection also applies to Exhibit Number 111, which was

5  discussed just prior to Exhibit 108.

6       THE COURT:  Okay.  And that has not been offered, so

7  hold that until it is.  We're talking about Exhibit 108 now.

8       MR. STEWART:  Your Honor, in response to the

9  objection, because of the terms of the forbearance agreement,

10  which gives the city the right in certain circumstances to

11  walk away from it, it is relevant what the financial picture

12  is today just as it was when the city chose to enter into the

13  agreement.

14       THE COURT:  I think the relevance is arguable, so

15  the Court will overrule that objection and admit Exhibit 108

16  into evidence.

17     (City Exhibit 108 received at 10:34 a.m.)

18       MR. MARRIOTT:  Your Honor, I'm --

19       THE COURT:  Sir.

20       MR. MARRIOTT:  -- sorry to ask for this

21  clarification again, but is this being offered as a component

22  of his expert opinion?

23       MR. STEWART:  It is.

24       MR. MARRIOTT:  Thank you.

25       MR. STEWART:  In fact, just to simplify it, so will

1    the next few opinions, Mr. Marriott, the next few documents.

2          MR. MARRIOTT:  That's fine.  If you would just tell

3    me if we get to one that's not.

4          MR. STEWART:  Okay.

5          MR. MARRIOTT:  Thank you.

6          MR. STEWART:  All right.

7    BY MR. STEWART:

8    Q   Mr. Malhotra, let's go back to where we were.  There's a

9    line that says "swap payment savings from settlement."  Do

10   you see that?

11   A   Yes.

12   Q   Okay.  And is that the -- are those the savings you

13   described to us a few minutes ago?

14   A   Yes.

15   Q   And then below that something entitled "refunding bond

16   proceeds drawn from escrow."

17   A   Yes.  Those are $20 million that we've continued to

18   forecast of receiving from the bond proceeds escrow, the

19   escrow agreement that exists with the city today.

20   Q   And so as a result of the --

21          THE COURT:  Excuse me one second.  I want to be sure

22   I follow this.  On the line that says "swap payment savings

23   from settlement" that you just testified about, you've got

24   33.7 for fiscal year '14.  That's our current fiscal year;

25   right?

1          THE WITNESS:  That is correct.

2          THE COURT:  And then you've got 50.6 for '15; right?

3          THE WITNESS:  Yes, your Honor, fiscal year '14.

4          THE COURT:  Are those the two numbers you just

5  testified to when you were showing us this demonstrative

6  exhibit?  I think it was 141.

7          THE WITNESS:  Your Honor, the 50.6 is a gross

8  number, which would compare to the 40, and the 33.7 is for a

9  partial year.  Those numbers would align close to the $45

10  million that was in the first line of the swap payments;

11  however, to compare the two --

12          THE COURT:  Let's go back to 141, please.  That was

13  the demonstrative, wasn't it?

14          MR. STEWART:  Indeed, yes, your Honor.

15          THE COURT:  Okay.  I don't see $50 million on here.

16  What am I missing?

17          THE WITNESS:  The first line, your Honor, of the

18  swap payments was an approximate number that was used here of

19  45 million versus 50.  The payments are $4.2 million a month,

20  and that's how we come up with somewhere between this 45 and

21  $50 million range that we always use, but the swap payments

22  that would -- the swap interest payments that would not be

23  made would be synonymous with that first line of swap

24  payments of $45 million or, as laid out in the cash flows, as

25  you will see, of $50.6 million, so those two numbers ideally

1 should be exactly the same, but that would be -- that's the

2 line item that's being referred to, your Honor, in that

3 particular exhibit.

4 BY MR. STEWART:

5 Q   So which of the two numbers, 45.9 or 50 million, is the

6 more accurate number?

7 A   50 million.

8         THE COURT:  All right.  Let's just go back to 108,

9 please.  So the 33.7 and the swap payment savings from

10 settlement for fiscal year -- thank you -- fiscal year 2014

11 is a partial year?

12         THE WITNESS:  That is correct, your Honor.

13         THE COURT:  What part?

14         THE WITNESS:  At the time we were doing this, we

15 would have estimated the closing to be in the November time

16 frame during this scenario.

17         THE COURT:  You may proceed, sir.

18         MR. STEWART:  Thank you.

19 BY MR. STEWART:

20 Q   And so our calculations here, Mr. Malhotra, produce

21 something called net cash flow per DIP financing scenario?

22 That's $87.6 million?

23 A   That is correct.

24 Q   And what does that represent?

25 A   That represents the net cash flow that will actually be

1  generated over the fiscal year 2014 under the scenario where

2  the DIP proceeds were received, the swaps were settled, the

3  city does not make the swap interest payments as well as

4  continues to make the payments as highlighted in the first

5  few line items with respect to ongoing payment of retiree

6  healthcare, accounts payable payments, et cetera.

7  Q   Let's look at the next two pages of Exhibit 108.  Can you

8  tell me what these two pages are?

9  A   Page 3 of 17 represents the monthly cash flow forecast

10  for fiscal year 2014, including two months of actuals for the

11  month of July and August under the DIP financing scenario.

12  Q   And the next page?

13  A   The next page shows the monthly projections through

14  fiscal year 2015 under the same scenario.

15  Q   And what is page 5?

16  A   Page 5 is a summary of the annual receipts and

17  disbursements for fiscal year 2014 through fiscal year 2017

18  under the same scenario.

19  Q   Okay.  And after that are a series of appendices.

20  A   Yes.

21  Q   And without getting into their contents, what are these

22  appendices?

23  A   Those would be supporting schedules that would show the

24  details behind the calculation of the swap interest payments

25  as well as the details with respect to certain other

1  subschedules like the reinvestment cost detail broken down in

2  different line items that were included in the first

3  scenario.

4  Q   Now, let's move, if we could, to Exhibit 109, and what is

5  Exhibit 109?

6  A   Exhibit 109 shows the -- is the cash flow forecast

7  through fiscal year 2017 under the scenario where there was

8  no DIP financing and no swap settlement and the casino monies

9  continued to flow to the city.

10  Q   Is this scenario two that you spoke about with respect to

11  Exhibit 111?

12  A   Yes.

13  Q   And who prepared this?

14  A   I did along with my team and members of the management

15  team.

16  Q   And did you prepare it consistent with the methods you

17  used for Exhibit 108?

18  A   Yes.

19  Q   And with the methods you described to us earlier?

20  A   Yes.

21  Q   Look, if we could, at page 2 of this exhibit.  Do you

22  have it before you?

23  A   Yes.

24  Q   Have some items been removed from the part of the

25  document that speaks of funds available for unsecured claims?

1   A   Yes.

2   Q   Why have they been removed?

3   A   Because this scenario had no DIP, and so the DIP proceeds

4   were removed.  So was the financing cost of the DIP financing

5   as well as the swap interest payments in this format will

6   continue to get paid, so the savings line was no longer in

7   this scenario.

8           MR. STEWART:  Your Honor, I'd move the admission of

9   109, and I apologize for not having done it before I asked my

10  last question.

11          MR. PEREZ:  Your Honor, I would make the same

12  objection.  This is in October, which is even further removed

13  from the decision date.

14          THE COURT:  The objection is overruled, and Exhibit

15  109 is admitted.

16      (City Exhibit 109 received at 10:42 a.m.)

17          MR. STEWART:  Put up Exhibit 110.

18  BY MR. STEWART:

19  Q   Mr. Malhotra, what is Exhibit 110?

20  A   Exhibit 110 is the cash flow forecast for fiscal year

21  2017 under the scenario where --

22  Q   Is this just scenario three?

23  A   Yes.

24  Q   And you've already described scenario three to us.

25  A   I have.

1  Q   Okay.  Who prepared Exhibit 110?

2  A   I did along with my team and the management team of the

3  city.

4  Q   And did you prepare it using the same methods that you

5  used in the previous two exhibits?

6  A   Yes.

7          MR. STEWART:  Your Honor, I'd move the admission of

8  Exhibit 110.

9          MR. PEREZ:  Same objection, your Honor.

10         THE COURT:  All right.  Exhibit 110 is admitted.

11     (City Exhibit 110 received at 10:43 a.m.)

12  BY MR. STEWART:

13  Q   And if we could go to page 2 of Exhibit 110,

14  Mr. Malhotra.  Once again, there's been a change in the items

15  under "funds available for unsecured claims."  Do these

16  changes or differences simply reflect that the scenario has

17  different assumptions?

18  A   Yes.

19  Q   Let's go, if we could, to Exhibit 111, and this, of

20  course, is the graphic representation that you prepared.

21         MR. STEWART:  And, your Honor, I would move the

22  admission of Exhibit 111 before I ask the witness more

23  detailed questions; however, I could ask one foundational

24  question which might make it simpler.

25  BY MR. STEWART:

1   Q   Are Exhibits 108, 109, and 110 the calculations that were

2   used to develop the graphic representation of cash position

3   that we see in Exhibit 111?

4   A   Yes.

5           MR. STEWART:  I'd move the admission of the exhibit.

6           THE COURT:  Any objection to 111?

7           MS. ENGLISH:  Objection, your Honor.  Carol English

8   appearing on behalf of Ambac.  Same objection that this

9   document again was prepared in September long after the

10  decision was made to enter into the forbearance agreement.

11          THE COURT:  All right.  That objection is overruled,

12  and Exhibit 111 is admitted.

13      (City Exhibit 111 received at 10:44 a.m.)

14  BY MR. STEWART:

15  Q   Mr. Malhotra, let me now ask you about what Exhibit 111

16  depicts.  First of all, scenario number one, is that the top

17  line of the exhibit?

18  A   Yes.

19  Q   And if I understood you correctly, that shows the city's

20  cash position if the swap settlement occurs; correct?

21  A   Yes.

22  Q   And no trapping of the casino revenues?

23  A   That is correct.

24  Q   And what is the conclusion that you've reached with

25  respect to the city's cash position under that scenario at

1  the end of this fiscal year and also at the end of next

2  fiscal year?

3  A  That the city's liquidity would be in excess of a hundred

4  million dollars of -- through the balance of this calendar --

5  approximately the balance of this calendar year and come down

6  to about $61 million by the end of June 2015 based on the

7  assumptions that were used for these cash flows.

8  Q  Now, let's look at scenario number three.  Is that the

9  bottom line?

10  A  Yes.

11  Q  Okay.  And scenario number three is the scenario where

12  there's no swap settlement and the casino revenues are

13  trapped; is that right?

14  A  That is correct.

15  Q  What conclusions did you reach about the city's cash flow

16  or cash position, I should say, under that scenario at the

17  end of this fiscal year and also at the end of next fiscal

18  year?

19  A  Under that scenario, based on the assumptions we're

20  using, the city would likely run out of cash by the end of

21  this calendar year, face a cash shortfall in excess of a

22  hundred million dollars by about July of 2014 with the cash

23  hole being as high as $284 million by June of 2015.

24  Q  I should have asked you, by the way, about the dotted

25  line that appears, the horizontal dotted line on Exhibit 111.

1   What is that?  What does that depict?

2   A    That is showing what -- when the city's cash balances go

3   below $50 million.

4   Q    And why have you chosen $50 million as the place on

5   Exhibit 111 -- pardon me -- to put that dotted line?

6   A    We use that to represent for about five weeks' worth of

7   payroll and benefits payments, and so essentially to

8   encapsulate what should ideally be some sort of minimum level

9   of liquidity the city should maintain.

10        MR. MARRIOTT:  Objection, your Honor.  This witness

11  was qualified to give cash flow projections, not to give an

12  opinion as to what the appropriate liquidity state of the

13  city is.

14        MR. STEWART:  I simply asked him why he put the line

15  where he put it.

16  BY MR. STEWART:

17  Q    Did that -- did you develop the 50 number or did someone

18  else tell you about it?

19  A    We did.

20        MR. MARRIOTT:  Your Honor, again, same objection.

21  This testimony is now being offered on the basis that $50

22  million is the appropriate liquidity balance for the city,

23  and this witness was not qualified.  I mean he may have done

24  the math after he was told, "This is what we have to be able

25  to pay," but as and to the extent it was his conclusion that

1  $50 million is the appropriate liquidity balance for the

2  city, he hasn't been qualified to give that opinion.

3            MR. STEWART:  I think he testified, Judge, that's

4  five weeks' payroll, and he is qualified to tell us what five

5  weeks' payroll is.  If one is to then say, well, he's not

6  qualified --

7            THE COURT:  Well, but the underlying premise is that

8  five weeks' payroll and benefits are an appropriate minimum

9  liquidity for a municipality of this size.  Yeah, I have to

10 agree that I didn't quite hear his qualifications to make

11 that judgment, so the objection is sustained.  You may try --

12           MR. STEWART:  Let me try it again.

13           THE COURT:  -- of course, to qualify him for that

14 purpose.

15 BY MR. STEWART:

16 Q   Mr. Malhotra, I believe you testified that $50 million is

17 five weeks' payroll and benefits for the city?

18 A   Yes.

19 Q   If the city's cash is below $50 million, what is the --

20 is the city able to make its payroll?

21 A   It depends on the week and the receipts that come in

22 during the week.  It depends on that particular week.

23 Q   Is it in jeopardy of not making its payroll?

24 A   Given the fixed nature of the payments and the timing of

25 when receipts come in, that's what we were highlighting as a

1  risk threshold.

2  Q    In the course of doing financial analysis for the city,

3  you have had occasion to see what its -- how much its

4  expenses happen to be week by week and month by month?

5  A    Yes.

6  Q    And what have you found when it comes to payroll and

7  benefits?

8  A    That the estimate of -- you know, it's five weeks' worth

9  of payroll and benefits -- is $50 million, and when cash has

10 been extremely tight because of lumpiness of payments that

11 come in, for instance, state aid, which come in every other

12 month, there have been low points from an intra-month

13 standpoint on a week-by-week basis where liquidity is tight

14 or has been tight historically.

15 Q    When you say liquidity is tight, what do you mean?

16 A    The cash available for the city to make its ongoing

17 obligations is under pressure because of the amount of cash

18 available compared to the amount of disbursements that need

19 to be made.

20      MR. STEWART:  Your Honor, with that clarification, I

21 guess the $50 million line is a line at which the city's

22 liquidity comes under pressure as he testified to.

23      MR. MARRIOTT:  Your Honor, I'm going to object

24 again.  It comes under pressure only if one assumes that five

25 weeks' worth of payroll is the right number versus four,

1  versus three, versus six, versus seven.  Again, this witness

2  can testify that he came up with $50 million because he used

3  five weeks of payroll as the appropriate benchmark, but he

4  can't testify and has not been qualified to testify on the

5  basis -- to the effect that five weeks is the right number.

6        MR. STEWART:  Your Honor, I think it goes to weight.

7  I'd like to move on.  50 million is where he says in his

8  analysis liquidity comes under pressure, and I'd leave it at

9  that.

10        THE COURT:  The Court is satisfied that the witness

11  has established his expertise to give an opinion regarding

12  this, and the objection is overruled.

13        MR. STEWART:  Okay.

14  BY MR. STEWART:

15  Q   Finally, Mr. Malhotra, we have the middle scenario,

16  scenario number two.  That's the scenario where there's no

17  swap settlement but also no trapping of the casino monies.

18  A   That is correct.

19  Q   And what did you determine in terms of the city's cash

20  position for the end of this fiscal year and the end of next

21  fiscal year under that scenario?

22  A   Under the assumptions we were using that the scenario

23  where there was no DIP financing and no swap settlement and

24  the city had ongoing access to the casino revenues, the

25  city's liquidity -- the city's cash available for the general

1    fund would be out of cash by roughly March of 2014 and

2    dipping down below that $50 million threshold even earlier

3    than that, and the city would likely have a cash shortfall of

4    $78 million by December of 2014 and approximately $69 million

5    by June of 2015.

6    Q    Now, these were analyses you prepared back in September

7    and October of this year?

8    A    Yes.

9    Q    And a couple of months of actuals have happened since

10   then?

11   A    Yes.

12   Q    To your knowledge, how have actual results affected the

13   conclusions that you show on Exhibit 111?

14   A    Based on the information that we are working with as of

15   now, the cash balances are likely to be lower based on the

16   current assumptions we have compared to the cash flows

17   illustrative on this page.

18   Q    Let's put up Exhibit 115 finally.  What is Exhibit 115?

19   A    Exhibit 115 is an interim working draft of cash flows

20   that we are working on through fiscal year 2015 and '17.

21   Q    And when you say "interim," what do you mean?

22   A    The assumptions -- all of the assumptions with respect to

23   the forecasts have not been approved by the emergency manager

24   yet, which we are working through.

25   Q    Who prepared Exhibit 115?

1   A    It is myself, my team, along with the other advisors.

2   Q    And what -- did you use the same methods and approaches

3   that you used in Exhibits 108, 109, 110, and other cash flows

4   I've asked you about?

5   A    Yes.

6           MR. STEWART:  Your Honor, I'd move the admission of

7   Exhibit 115.

8           THE COURT:  Any objections?

9           MR. PEREZ:  Yes, your Honor.  Same objection, your

10  Honor.  These are dated December 9th, basically last week, so

11  it could not have had anything to do with the political

12  decision.

13          THE COURT:  The Court concludes they are arguably

14  relevant, and -- it is arguably relevant, so Exhibit 115 is

15  admitted.

16      (City Exhibit 115 received at 10:54 a.m.)

17  BY MR. STEWART:

18  Q    If we could look at page 2 of Exhibit 115, Mr. Malhotra,

19  what scenario is this exhibit describing?

20  A    It would be describing scenario one.

21  Q    Scenario number one.  And if we could go to the

22  calendarization, which would be page 2 and page 3, let's

23  start with page -- I'm sorry -- page 3 and page 4, let's

24  start with page 4.  What does this forecast show the city's

25  projected cash position net of distribution as being -- and

1  that would be the lower right-hand corner of the document --

2  at the end of fiscal year 2015?

3  A   Based on the assumption that we were working with in this

4  interim draft, the cash position would be $6.5 million by

5  June of 2015.

6  Q   Do you know why it is so low?

7  A   Yes.  It's due to new information that we have gotten in

8  the last couple of months.

9  Q   Let's look at page 3 of 13 and to the projection of cash

10  positions for the fiscal year '14.  First of all, what does

11  this predict or forecast that the cash position will be at

12  the end of the year?

13  A   Under these assumptions, it shows that the cash forecast

14  would be $72.9 million at June 2014.

15  Q   And that's less than what Exhibit 111 had forecast?

16  A   Yes.

17  Q   And what's the reason for the lower number?

18  A   The number is lower because of the new information that

19  we received in the last couple of months related to other

20  events that are causing the cash balance to be lower, such as

21  approximately $20 million in incremental retiree healthcare

22  costs because the implementation of the new plans has been

23  pushed back two months compared to what the original

24  forecasts had assumed.  In addition, we have received updated

25  professional fee estimates from some of the advisors,

```
 1   including using an estimate for the payment of professional
 2   fees for the Retiree Committee that were not in the original
 3   forecast.  In addition, compared to the original forecast
 4   where the swap settlement and DIP financing was likely to be
 5   in the November time frame, these -- that did not happen, so
 6   the city had to make an extra $4 million worth of a swap
 7   interest payment that was not in the original forecast as
 8   well as based on the information given to us by the
 9   investment banker, we are using the full flex terms of the
10   interest rate under the post-petition financing, so those are
11   some of the reasons why the cash flows are trending lower
12   compared to what we had originally thought.  Of course,
13   there's other ins and outs, but those are the major items.
14   Q   I noticed that the cash flow -- cash position actual for
15   November of this fiscal year -- and it's in the middle at the
16   bottom -- is said to be $107.1 million.
17   A   That is correct.
18   Q   Is that higher than originally predicted?
19   A   It is higher than originally predicted, yes.
20   Q   Can you tell us why?
21   A   Yes, because the original forecast did include the city
22   starting its -- to spend its money on reinvestment
23   expenditures through the September through November time
24   frame.  That was budgeted to be approximately $25 million,
25   which payments have not been made.  The professional fees
```

1   that have been made to date are roughly $13 million lower

2   than forecast due to timing.  The city is also behind in

3   terms of making certain accounts payable payments because of

4   the classification of the pre-petition and post-petition

5   invoices and the analyses that are going on in the accounts

6   payable department, which are essentially timing related, so

7   I would say those are some of the primary reasons why the

8   cash position from a timing standpoint is better.

9       MR. STEWART:  Thank you.  That's all the questions I

10  have of the witness, your Honor.

11      THE COURT:  All right.  We'll take our morning break

12  now.  For your information, by my calculations, the city has

13  remaining 319 minutes.  The objectors have 477.  We'll be in

14  recess until 11:20, please.

15      THE CLERK:  All rise.  Court is in recess.

16      (Recess at 10:59 a.m., until 11:20 a.m.)

17      THE CLERK:  All rise.  Court is in session.  Please

18  be seated.

19      MR. ARNAULT:  Bill Arnault on behalf of Syncora.

20                   CROSS-EXAMINATION

21  BY MR. ARNAULT:

22  Q   Hello again, Mr. Malhotra.  How are you?

23  A   Good.  Thank you.

24  Q   I take it you believe that the testimony that you

25  provided this morning was reliable expert testimony; isn't

1   that correct?

2   A   Yes.

3   Q   And you believe that the information that you provided

4   this morning is something that the Court can rely upon;

5   correct?

6   A   Yes.

7   Q   You believe that the cash flow forecasts that you

8   provided are forecasts that the Court can rely upon; correct?

9   A   Yes, with those assumptions in there.

10  Q   Yeah.  And the testimony that you provided about the

11  projections and the scenarios that we saw, those incorporated

12  the cash flow forecasts; correct?

13  A   Can you repeat your question, please?

14  Q   Yeah, sure.  So the scenarios that we saw in your

15  testimony, that was based upon the cash flow forecasts that

16  you discussed this morning; correct?

17  A   Yes.

18  Q   If you could turn to City Exhibit 106, please.

19          THE COURT:  Do you want it on the screen, counsel?

20          MR. ARNAULT:  Page 1 on the screen.

21          THE COURT:  You do want it on the screen?

22          MR. ARNAULT:  Yes, please.

23          THE COURT:  Okay.

24          THE WITNESS:  I'm there.

25  BY MR. ARNAULT:

1   Q   All set?  Okay.  Let's take a look at this first page of

2   City Exhibit 106.  If we look at the title, it says, "Work in

3   process subject to material change."  Do you see that?

4   A   Yes.

5   Q   And that was a true statement at the time; correct?

6   A   Yes.

7   Q   And if we go down and we look at the first paragraph

8   there in red, if we look at the second sentence -- actually,

9   let me back up.  You prepared this document; correct?

10  A   We did in conjunction with the management team and the

11  other advisors, yes.

12  Q   Okay.  And you reviewed this document; correct?

13  A   Yes.

14  Q   Let's take a look at the second sentence of that first

15  paragraph there.  In it you say the information contained

16  herein is not intended to be and should not be relied upon by

17  any third party or as legal, auditing, or accounting advice;

18  correct?

19  A   That's what it says.

20  Q   And that was a true statement at the time you made it;

21  correct?

22  A   That's our standard disclaimer, yes.

23  Q   And that was a true statement at the time you made it;

24  correct?

25  A   Yes.

1    Q    If we move down to the second paragraph and we take a

2    look at the second sentence, you write, "With respect to

3    prospective financial information relative to the client,

4    Ernst & Young, LLP, did not examine, compile, or apply

5    agreed-upon procedures to such information in accordance with

6    attestation standards established by the AICPA, and E&Y

7    expresses no assurance of any kind on the information

8    presented."  That was a true statement at the time; correct?

9    A    Yes.  We did not perform audit procedures.

10   Q    Yeah.  And E&Y expresses no assurance of any kind on the

11   information presented; correct?

12   A    That is correct.  That is what it says, yes.

13   Q    Okay.  If we move down to the last sentence of the second

14   paragraph, it says, "Accordingly, reliance on this report is

15   prohibited by any third party as the projected financial

16   information contained herein is subject to material change

17   and may not reflect actual results"; correct?

18   A    That's what the sentence reads, yes.

19   Q    And that was a true statement; correct?

20   A    Yes.

21   Q    If we could now turn to City Exhibit 108, please.

22   Mr. Malhotra, this is another cash flow forecast; correct?

23   A    That is correct.

24   Q    And it appears as though it was prepared on September 16,

25   2013; is that correct?

1  A   Yes.

2  Q   And you prepared this document; correct?

3  A   Yes, under the similar way I explained earlier.

4  Q   I'm sorry.  What was that?

5  A   Yes, in conjunction with my team, the other advisors, and

6  the management team, yes.

7  Q   And you reviewed this document before it went out;

8  correct?

9  A   I did, yes.

10  Q   And if we look at the title, like City Exhibit 106, this

11  document also states that it's a work in progress subject to

12  material change; correct?

13  A   Yes.

14  Q   And that was a true statement at the time; correct?

15  A   That's what it -- yes.  That's what it says.

16  Q   And that was a true statement; correct?

17  A   It includes forecasted information.  Assumptions are

18  always subject to change, so, yes.

19  Q   And if we move down to the first paragraph, and, again,

20  looking at the second sentence there, you say, "Accordingly,

21  the information contained herein is not intended to be and

22  should not be relied upon by any third party or as legal,

23  auditing, or accounting advice"; correct?

24  A   That is correct.  It is not legal, accounting, or audit

25  advice.  That is correct.  That's what it says.

1  Q   Right.  And it also says it should not be relied upon by

2  any third party; correct?

3  A   That's what the sentence reads.  That's correct.

4  Q   And that was a true statement; correct?

5  A   Yes.

6  Q   If we move down to the second paragraph and we look at

7  the second sentence, it says, "With respect to prospective

8  financial information relative to the client, Ernst & Young,

9  LLP, did not examine, compile, or apply agreed-upon

10  procedures to such information in accordance with attestation

11  standards established by the AICPA, and E&Y expresses no

12  assurance of any kind on the information presented."  That

13  was a true statement; correct?

14  A   That's what the sentence reads.  We did not perform audit

15  or attestation procedures on this document.

16  Q   And you express no assurance of any kind on the

17  information presented; correct?

18  A   That's right.  If management assumptions changes, the

19  numbers herein will change.

20  Q   Right.  Okay.  So just so I'm clear, you express no

21  assurance of any kind on the information presented; correct?

22  A   That's what the sentence reads.

23  Q   If we move to the last sentence, it says, "Accordingly,

24  reliance on this report is prohibited by any third party as

25  the projected financial information contained herein is

1    subject to material change and may not reflect actual

2    results."  That statement was correct at the time; correct?

3    A    Yes.  As assumptions change, the numbers herein will

4    change.

5    Q    If we could move to City Exhibit 109, Mr. Malhotra, this

6    is another cash flow forecast; correct?

7    A    That is correct.

8    Q    And this was prepared on October 3rd, 2013; correct?

9    A    Yes.

10   Q    And you prepared this document; correct?

11   A    Yes, in conjunction with the city's management team, the

12   other advisors and my team.

13   Q    And you reviewed this document before it went out;

14   correct?

15   A    I did, yes.

16   Q    And much like the other cash flow forecasts we've seen,

17   the title here says that it's a work in progress subject to

18   material change; correct?

19   A    That is correct.  It's subject to the assumptions

20   changing at any point in time.

21   Q    Okay.  And that was a true statement at the time;

22   correct?

23   A    That is correct.

24   Q    And if we move down again to the second sentence of the

25   first paragraph, it says, "The information contained herein

1   is not intended to be and should not be relied upon by any

2   third party or as legal, auditing, or accounting advice";

3   correct?

4   A   Should not be considered as legal, auditing or accounting

5   advice by any third party.  That is correct.

6   Q   And it should not be relied upon by any third party;

7   correct?

8   A   That's what the sentence reads.

9   Q   And that was a true statement at the time; correct?

10  A   That is correct.

11  Q   And, again, I'll try and speed this up a little bit, but

12  if we look at the second sentence of the first paragraph, you

13  again say that with respect to prospective financial

14  information relative to the client, Ernst & Young did not

15  examine, compile, or apply agreed-upon procedures to such

16  information in accordance with attestation standards

17  established by the AICPA, and E&Y expresses no assurance of

18  any kind on the information presented; correct?

19  A   That is correct.  We did not perform audit procedures on

20  the data herein as established by the AICPA, and with respect

21  to the assumptions, if they change, the numbers will change,

22  so we cannot provide any assurance that the numbers will not

23  change because if the assumptions change, the numbers will

24  change.

25  Q   Right.  You couldn't provide any assurance of any kind on

1  the information presented; right?

2  A   That is correct.  That's what the statement says.

3  Q   Finally, if you go to the last sentence, "Reliance on

4  this report is prohibited by any third party as the projected

5  financial information contained herein is subject to material

6  change and may not reflect actual results," that was a true

7  statement; correct?

8  A   Yes.  As all the assumptions change or any of the

9  assumptions change, the data herein will change.

10  Q   If we could go to City Exhibit 110, please.  And, again,

11  Mr. Malhotra, this is another cash flow forecast; correct?

12  A   That is correct.

13  Q   And it was prepared on September 17th, 2013; correct?

14  A   Yes.

15  Q   And you prepared this document; correct?

16  A   Yes, I did, with my team, the other advisors, and the

17  city's management team.

18  Q   And you prepared this document before it went out;

19  correct?

20  A   I analyzed this document before it went out, yes.

21  Q   Okay.  And like the other cash flow forecasts we've seen,

22  it states "work in progress subject to material change";

23  correct?

24  A   The assumptions are subject to material change.  That is

25  correct.

1  Q   Okay.  But here it says just "work in progress subject to

2  material change"; correct?

3  A   That's what it says on that page, yes.

4  Q   And that was a true statement at the time; correct?

5  A   That is.

6  Q   And, again, if we look at the first paragraph, second

7  sentence, you write, "Accordingly, the information contained

8  herein is not intended to be and should not be relied upon by

9  any third party or as legal, auditing, or accounting advice";

10  correct?

11  A   That is correct.  The assumptions herein are subject to

12  change and should not be relied upon by any third party as

13  stated here.

14  Q   Right.  It says the information contained herein should

15  not be relied upon by any third party; correct?

16  A   That's what the statement reads based on the information

17  we have here, based on the assumptions that are in here, the

18  fact that the assumptions are always subject to change.

19  Q   Right.  And that was a true statement at the time;

20  correct?

21  A   Yes.  It's a true statement.  The data reflects the

22  assumptions.  The document reflects the data based on the

23  assumptions supporting that data.  If the assumptions change,

24  the numbers will change as well.

25  Q   And if we go down and look at the second sentence in the

1  second paragraph, again, you write, "With respect to

2  prospective financial information relative to the client,

3  Ernst & Young, LLP, did not examine, compile, or apply

4  agreed-upon procedures to such information in accordance with

5  attestation standards established by the AICPA, and E&Y

6  expresses no assurance of any kind on the information

7  presented."  That's a true statement; right?

8  A    That's right.  We did not perform audit procedures.

9  Ernst & Young is a Big Four accounting firm, and this clearly

10 states that we are not providing any audit or assurance-type

11 services for this particular client.

12 Q    Right.  It says that you don't express any assurance of

13 any kind on the information presented; right?

14 A    That is correct.  That's what it reads.

15 Q    And that was a true statement; right?

16 A    Yes.

17 Q    Then, finally, if we go to the last sentence, it

18 states -- or you write, "Reliance on this report is

19 prohibited by any third party as the projected financial

20 information contained herein is subject to material change

21 and may not reflect actual results."  That was a true

22 statement, too; correct?

23 A    That is correct.  If the assumptions change, the data

24 herein will change.

25 Q    If we could go to City Exhibit 115, please.

1    Mr. Malhotra, this is another cash flow forecast; correct?

2    A   That's right.  This is the interim forecast.

3    Q   And this is from December 9th, 2013; correct?

4    A   That is correct.

5    Q   So relatively recent.  And you prepared this document;

6    correct?

7    A   Yes, similar to how I've highlighted earlier.

8    Q   Sure.  And you reviewed this document before it went out;

9    correct?

10    A   This document is still, as I mentioned, an interim draft

11    that has not been approved by the emergency manager yet, but

12    I am -- I have looked at this document and analyzed it before

13    it went out.

14    Q   Right.  Okay.  And, again, if we look at the title, it

15    says, "Work in progress subject to material change"; correct?

16    A   Yes.  The assumptions are subject to material change.

17    Q   If we go to the first paragraph, second sentence, we see

18    the same sentence, "Accordingly, the information contained

19    herein is not intended to be and should not be relied upon by

20    any third party or as legal, auditing, or accounting advice";

21    correct?

22    A   That's what it says, yes.

23    Q   And that's a true statement; right?

24    A   That's what it would have been, yes.  It would be a true

25    statement.

1    Q   If we again go to the second paragraph, second sentence,

2    it states or you write, "With respect to prospective

3    financial information relative to the client, Ernst & Young

4    did not examine, compile, or apply agreed-upon procedures to

5    such information in accordance with attestation standards

6    established by the AICPA, and E&Y expresses no assurance of

7    any kind on the information presented."  That's a true

8    statement; right?

9    A   That is correct.  We did not perform audit procedures.

10   Q   And you express no assurance of any kind on the

11   information presented; right?

12   A   The information is based on the assumptions, and we are

13   not providing any assurance on the information presented

14   herein.  That is correct.

15   Q   Finally, you write, "Reliance on this report is

16   prohibited by any third party as the projected financial

17   information contained herein is subject to material change

18   and may not reflect actual results."  That's also a true

19   statement; right?

20   A   If the assumptions change, that is correct, the data will

21   change.

22           MR. ARNAULT:  If we could turn to City Exhibit 36,

23   please, and if we could actually bring up -- it's the second

24   actual page, but it's not page 2 if that makes sense.  That's

25   it.  Thank you.

1        THE COURT:  This page is not in evidence.

2        MR. ARNAULT:  Oh, okay.

3        THE COURT:  Do you want to move it into evidence?

4        MR. ARNAULT:  No, I do not.

5    BY MR. ARNAULT:

6    Q    Then we'll move on to page 97 and 98, which I do believe

7    are in evidence.  And, Mr. Malhotra, just a few quick

8    questions about the projections on this page.  You stated

9    that you prepared these projections; correct?

10   A    That is correct.  In conjunction with the other advisors

11   and the management team, we did.

12   Q    Right.  But the reinvestment expenditures and

13   adjustments, those were actually prepared by Conway

14   MacKenzie; correct?

15   A    Some of those line items, correct, not all of them.

16   Q    Right, but some of them were prepared by Conway

17   MacKenzie; correct?

18   A    Yes.

19   Q    Okay.  If we could turn now to City Exhibit 111, please,

20   and if we could look at the second page, please.  All right.

21   Let's begin by taking a look at scenario number one, please.

22   Scenario one is the scenario where the city obtains DIP

23   financing, makes the swap termination payments, and there is

24   no casino trap; correct?

25   A    That is correct.

1  Q   And I assume that to build this forecast, you had to bake

2  in certain assumptions; correct?

3  A   Yes.  The numbers are based on the assumptions, yes.

4  Q   For example, you assume that the interest rate on the DIP

5  financing loan would be five percent; correct?

6  A   That is correct.

7  Q   You are aware, however, that the Barclays DIP is subject

8  to market flex; right?

9  A   That is correct.

10 Q   And the market flex provision of the Barclays DIP means

11 that the minimum interest rate of the DIP loan could increase

12 to 6.5 percent; correct?

13 A   Could you repeat that last question?

14 Q   Sure.  The market flex provision of the Barclays DIP

15 means that the minimum interest rate of the DIP loan could

16 increase to 6.5 percent; correct?

17 A   That is my understanding that it could, but I don't know

18 if that's the minimum floor that's already set --

19 Q   Right.

20 A   -- at 6.5.

21 Q   Sorry.  But if exercised, it could increase to a minimum

22 of 6.5 percent; correct?

23 A   It could.  That is my understanding, yes.

24 Q   Yeah.  And obviously if the interest rate increases to

25 6.5 percent, that would have an impact on this forecast;

1  correct?

2  A    That is correct.  The amount of interest would have an

3  impact on the forecast.

4  Q    In fact, the projected incremental cash balances

5  illustrated in the exhibit between scenario one and two would

6  actually be narrower; correct?

7  A    That is correct.

8  Q    In addition to the assumption regarding market flex, this

9  cash balance forecast also includes certain assumptions

10  regarding LIBOR; correct?

11  A    I apologize.  Can we go back to your previous question

12  with respect to the narrower?

13  Q    Sure.

14  A    Would you mind asking that question again?

15  Q    Yeah, of course.  The projected incremental cash balances

16  illustrated in this exhibit would be narrower if the market

17  flex provision was exercised; correct?

18  A    Yes.  The first line would come down in terms of the

19  amount of available cash flow accounting for that increased

20  interest rate, yes.

21  Q    So, in addition to the assumption regarding market flex,

22  this cash balance forecast also includes certain assumptions

23  regarding LIBOR; correct?

24  A    Yes.

25  Q    And I assume that you've utilized a forward LIBOR curve

1  as part of your assumptions; right?

2  A   That would have been the data given to us by the

3  investment banker, Miller Buckfire.

4  Q   Okay.  And the forward LIBOR curve, that's based on

5  interest rates as of today; right?

6  A   That is my assumption, but, like I said, the assumptions

7  on the forward LIBOR assumptions were given to us by Miller

8  Buckfire, so in the assumptions that you see herein, a flat

9  five percent has been used until the default rate of seven

10  percent kicks in.

11  Q   Right.  So the assumptions on the LIBOR curve, those were

12  provided by Miller Buckfire; correct?

13  A   Yes.

14  Q   And you didn't independently test those assumptions;

15  right?

16  A   That is correct.

17  Q   But you would agree with me that the forward LIBOR curve

18  is subject to change; right?

19  A   Like any forward curve, it is.

20  Q   And it's subject to a number of different factors; right?

21  A   I presume so.

22  Q   For example, the actions of the Federal Reserve might

23  impact the forward LIBOR curve; right?

24  A   I don't know if I can comment on that.

25  Q   But you could comment if the interest rates perform

1  differently than the assumptions that Miller Buckfire

2  provided, that would impact the city's projected cash

3  balances; correct?

4  A   Yes.

5  Q   But you didn't conduct any type of sensitivity analysis

6  regarding the volatility of the LIBOR curve, did you?

7  A   No, we did not.

8  Q   Finally, interest rates will also have an effect on the

9  cost of the swaps; right?

10  A   Could you rephrase what you mean by "cost of the swaps"?

11  Q   Well, if interest rates increase over time, that's going

12  to decrease the cost of the swaps; right?

13  A   Presumably if you mean the out of the money swap

14  settlement, if the interest rates were to increase, that

15  would have a reduction impact on the out of the money swaps.

16  Q   Right.  And it's an -- if interest rates rise over time,

17  that would increase the cost of the DIP financing; right?

18  A   Yes, compared to what's projected in the forecast within

19  these certain flex terms.  If the interest rates do increase

20  compared to what's assumed in here, the cost of the financing

21  would increase.

22  Q   Right.  So the interest rate -- the rising interest rate

23  would actually have an opposite effect on the cost of the DIP

24  and the cost of the swaps; right?

25  A   The take-out value of the swaps is impacted by the

1  interest rate at that point of time; however, depending on if

2  those swaps have already not been terminated prior to

3  whatever theoretical interest rate time frame you're

4  referring to.

5  Q   Right.  So if they haven't been terminated; right?

6  A   If they haven't been settled, yes.

7  Q   But you didn't conduct any type of sensitivity analysis

8  that would look at where the cost of the DIP and the cost of

9  the swaps would cross over, did you?

10 A   I did not, no.

11          MR. ARNAULT:  No further questions, your Honor.

12          MS. ENGLISH:  Caroline English for Ambac.  I just

13 have maybe two questions is all.  Could we bring 111 back up

14 on the screen, please?  Flip to the next page.

15                    CROSS-EXAMINATION

16 BY MS. ENGLISH:

17 Q   Mr. Malhotra, you testified below that those were the

18 three primary options the city was looking at, the scenario

19 one, two, and three; correct?

20 A   Those are the three scenarios that are illustrative on

21 this page.

22 Q   Okay.  And of those three illustrative scenarios,

23 scenario number one is the only one that includes looking at

24 cash flows based on receiving a DIP loan; is that correct?

25 A   That is correct.

 1    Q    And, in fact, sir, isn't it true that when the city was

 2   negotiating the forbearance agreement in June of 2013, they

 3   never asked Ernst & Young to prepare a cash flow analysis

 4   that would look at the cost of funding a litigation with the

 5   swap counterparties as opposed to settling with them?

 6    A    That is correct.  I don't recall running a scenario like

 7   that.

 8    Q    I'm sorry.  The last part of your answer?

 9    A    You're correct.  I do not recall running a scenario on

10   the litigation costs associated with the swaps transaction.

11    Q    And you didn't run a scenario not only looking at

12   litigation costs, but also you didn't run a scenario that

13   looked at the city getting a DIP loan to finance litigation

14   costs; correct?

15    A    Can you rephrase that question, please?

16    Q    You didn't run any cash flow analysis that looked at the

17   city funding the cost of litigating with the swap

18   counterparties as opposed to settling with them; correct?

19    A    I think that's sort of reflective in that scenario three

20   maybe, unless I'm thinking about this wrong, that if you

21   don't have a DIP and you don't have a swap settlement and you

22   potentially have the risk of your casino monies trapped --

23    Q    Right.  What I'm asking you, though, is at the time the

24   city was negotiating with the swap counterparties this

25   summer, right, did the city ask Ernst & Young to do a cash

 1  flow analysis that looked at getting DIP financing and

 2  litigating with the swap counterparties instead of settling?

 3  A   I cannot recall if we ran a scenario in which the city

 4  was receiving DIP financing and not settling the swaps

 5  because I thought they were intertwined, that the DIP

 6  financing was intertwined with the settlement of the swaps.

 7          MS. ENGLISH:  Okay.  Thank you very much.

 8                     CROSS-EXAMINATION

 9  BY MR. MARRIOTT:

10  Q   Good morning, Mr. Malhotra.

11  A   Good morning.

12  Q   Vince Marriott representing EEPK and affiliates.

13          MR. MARRIOTT:  Could I have demonstrative 140?  Do

14  we have that anywhere?

15          UNIDENTIFIED SPEAKER:  What?

16          MR. MARRIOTT:  Demonstrative Exhibit 140?

17          UNIDENTIFIED SPEAKER:  Oh, 140.

18  BY MR. MARRIOTT:

19  Q   Okay.  Mr. Malhotra, if I understand the intention of

20  this demonstrative exhibit, it's to demonstrate the cash flow

21  benefits to the city if the swap payments are eliminated and

22  the DIP loan is borrowed; correct?

23  A   That is correct.

24  Q   Okay.  I want to understand a couple of things about this

25  to make sure that we verify the cash flow benefit numbers.

1  The swap termination loan line, you see that?  The 7.3

2  million to 13.6 million in fiscal year 2014 and the 7.3

3  million to 13.6 million in fiscal year 2015, are those

4  estimates of the range of interest payments due with respect

5  to the swap termination loan for those two years?

6  A   It would be, yes.  It's the swap interest.  It's the

7  interest payment only on the portion of the DIP financing

8  that would be used to settle the swaps, so it would be the

9  interest on the 227-odd million dollars that would be

10 calculated for fiscal year '14 and '15 and does not include

11 anything else.

12 Q   Okay.  Now, the range, 7.3 to 13.6, is that designed to

13 reflect the market flex provision and the difference in

14 potential minimum interest rates payable under the swap

15 termination loan?

16 A   I would have to check if it includes the maximum flex of,

17 you know, whatever that maximum flex is, but I think this is

18 run at three and a half percent, which is the --

19 Q   The minimum.

20 A   -- the minimum --

21 Q   Right.

22 A   -- and I believe the cap was about six or six and a half

23 percent.  I would have to -- about six percent.

24 Q   So the 13.6 million may or may not reflect maximum flex?

25 A   The maximum flex under a default scenario, I do not think

1 it reflects that total.

2 Q   Okay.  But does it reflect the maximum nondefault flex of

3 a minimum interest rate of 6.5 percent?

4 A   I would just have to do a calculation real quick.  I

5 think it's a little shy of the six and a half, so I think

6 it's closer to five and a half or six percent based on the

7 numbers I'm seeing here.

8 Q   Okay.  So the 13.6 million, in fact, if there was maximum

9 flex, could be higher?

10 A   It depends actually really on the date you picked with

11 respect to the swap settlement amount in terms of the 227

12 million and the corresponding interest on that, so, yes, you

13 are right.  If the interest is higher, that amount would be

14 higher.  However, if the overall take-out amount is lower,

15 that amount would be lower, so it is a factor of not only the

16 amount of interest --

17 Q   Um-hmm.

18 A   -- but also the amount of the swap settlement.

19 Q   But you would agree with me -- and let's get to that

20 point.  You would agree with me that the city is borrowing

21 more or proposing to borrow more under the post-petition

22 financing than just the swap termination loan.  It's also

23 borrowing what it calls the quality of life loan; correct?

24 A   Yes.

25 Q   Okay.  And the total proposed borrowing is 350 million;

1  correct?

2  A   That is correct.

3  Q   And the city will have an interest cost against the whole

4  350 million, not just the swap termination fees; correct?

5  A   Yeah, but now the illustrative on 1 -- on Exhibit 140

6  compares the swap interest to the swap interest.  The quality

7  of life loan DIP interest would be in addition to that, but

8  it's sort of not reflected in this net analysis over here.

9  Q   Right.  It's not -- and I agree.  It's not reflected,

10 but, in fact, it will be a cost to the city associated with

11 the proposed transaction; correct?

12 A   As the cash flows have shown, the city needs the money,

13 and that requires -- so, yes, it will pay interest on the

14 quality of life loan.  That is correct.

15 Q   And since the quality of life loan and the swap

16 termination loan are a single $350 million loan, in fact, the

17 cash flow benefits to the city are diminished not just by the

18 interest payable on the swap termination fees but also by the

19 interest payable on the quality of life piece; correct?

20 A   No.

21 Q   Why not?

22 A   Because you're also ensuring that you have ongoing

23 collection of your casino revenues.

24 Q   No.  You're not -- let me try to be more clear.  As I

25 understand this demonstrative, it's designed to demonstrate

1  in a very limited sense the difference between the swap

2  payments and the cost to the city of the swap termination

3  loan; correct?

4  A   That is correct.

5  Q   All right.  Isn't it also correct, however, that the city

6  is not just borrowing the swap termination loan in connection

7  with the forbearance agreement and termination of the swaps

8  and the post-petition financing?  It's also borrowing the

9  quality of life loan such that its total borrowings on which

10 it will pay interest is $350 million; correct?

11 A   That is correct.

12 Q   And that total interest cost on $350 million is not

13 reflected on this demonstrative; correct?

14 A   That is correct.

15 Q   Now, the city also has to pay a commitment fee with

16 respect to the post-petition financing; correct?

17 A   Yes, I believe that is correct.

18 Q   And that commitment fee is --

19          MR. STEWART:  Your Honor, if I -- may I -- if he

20 wants to go down this road, I suppose maybe that's his

21 decision.  I thought his objection when I was examining the

22 witness was that this very area was not relevant and

23 certainly is beyond the scope of direct, but maybe he's going

24 somewhere on that, but wasn't this Mr. Marriott's objection

25 an hour and a half ago?

1          MR. MARRIOTT:  It was not, your Honor.  This is

2     precisely what -- the limits of what I believe Mr. Malhotra

3     ought to be allowed to testify to, and that is the cash flow

4     benefits to the city, and that beyond that he's gotten into

5     needs and uses and all of that.  What I'm attempting to

6     demonstrate here is that this is an overstatement of the cash

7     flow benefits to the city at this --

8          THE COURT:  I'll permit that.  Go ahead.

9     BY MR. MARRIOTT:

10    Q    Back to the commitment fee.  You understand that there is

11    a commitment fee payable with respect to the post-petition

12    financing; correct?

13    A    Yes.  I -- yes.

14    Q    And are you aware of the amount of that commitment fee?

15    A    I don't recall off the top of my head.

16    Q    If I were to tell you it's one and a half percent of $350

17    million, would that refresh your recollection?

18    A    That would sound in the ballpark, yes.

19    Q    Okay.  You would agree with me that one and a half

20    percent of 350 million is about $4.3 million?

21    A    Sounds right.

22    Q    Okay.  Is that $4.3 million reflected anywhere on the

23    comparative -- on the cash flow benefit calculation on this

24    demonstrative?

25    A    No, it is not.

1          MR. MARRIOTT:  If we could have 111.

2     BY MR. MARRIOTT:

3     Q   Just a couple quick questions on this exhibit.  You run

4     it out to June 2015; correct?

5     A   On this particular chart, yes.

6     Q   Right.  And it doesn't go out past that; correct?

7     A   Not on this chart. That's correct.

8     Q   The post-petition financing, the $350 million, is going

9     to have to be repaid; right?

10    A   Yes.

11    Q   This does not reflect the cash impact of having to repay

12    the $350 million post-petition financing facility; correct?

13    A   This does not include the impact of repaying $350

14    million; however, it does include an assumed amortization of

15    $8 million a month starting in December of 2014, and that

16    would reflect a four-year amortization, so it does not

17    include repaying $350 million over this time frame.

18          MR. MARRIOTT:  Nothing further.

19                    CROSS-EXAMINATION

20    BY MR. GOLDBERG:

21    Q   Good morning, sir.  Jerome Goldberg representing

22    interested party David Sole.

23          MR. GOLDBERG:  I was wondering if 140 could be put

24    up again, please.

25          THE COURT:  I'm sorry, sir.  What number?

1          MR. GOLDBERG:  140.

2    BY MR. GOLDBERG:

3    Q    Just so I'm clear, sir, you stated that 140, the swap

4    termination loan reflects the interest on the swap

5    termination loan reflective pre-termination, pre-calling in

6    the loan, pre-default on the loan; is that not correct?

7    A    I'm sorry.  I didn't understand your question.

8    Q    Let's be clear.  The city pays an interest rate of three

9    and a half to six and a half percent on the loan until the

10   bankruptcy is over, approximately; is that not correct?

11   A    The city's -- on the DIP financing.

12   Q    Yes, on the DIP financing.

13   A    Yeah.  The city is going to pay the -- once the DIP is

14   closed, the interest rate could be as low as three and a half

15   percent or could be as high as six and a half percent.

16   Q    And once the bankruptcy is over, then there's an

17   automatic termination event on that loan where the city then

18   begins paying a rate of two percent higher than that and with

19   payments of $4 million a month for the swap termination fee

20   and $4 million a month on the quality of life loan; is that

21   not correct?

22   A    The $8 million, which is the four and four that you just

23   referred to, is going to be an all-in number, principal and

24   interest.

25   Q    I'm sorry.  I couldn't hear you, sir.

1  A   The $8 million is designed to be an all-in payment versus

2  just interest.  It's going to be principal and interest

3  combined.  The terms of the default rates are two percent

4  higher, and the Miller Buckfire team can talk to this better

5  with respect to exit financing and the assumptions that go

6  with that.

7  Q   But the figures you're showing here do not factor that in

8  whatsoever in this chart, do they?

9  A   No.  These are specifically --

10 Q   Okay.  That answered that question.  Thank you.

11        MR. GOLDBERG:  Can I see chart -- have chart 108 put

12 up, please -- I mean Exhibit 108, page 2?

13 BY MR. GOLDBERG:

14 Q   I'm looking at the line that says "DIP financing

15 principal interest payments."  It would be the third line

16 from -- on top of total reconciling item -- reconciling

17 items.

18 A   I'm sorry.  Can I see the cover of this packet for a

19 moment so I know which packet this is just -- thank you.

20 Q   Now, in --

21        MR. GOLDBERG:  Thank you.  Very good.  I appreciate

22 it.  If you can take that line all the way across, that would

23 be very helpful, that line and the line below it.

24 BY MR. GOLDBERG:

25 Q   Now, for fiscal year 2015, that reflects payments on the

1    DIP financing of 63.3 million.  Is it fair to say that

2    includes a period of time where the payment is just the

3    interest payment and then the full amortization is kicked in?

4    A   It's shown on the memo two on that page.  42.4 million of

5    that payment is principal on the second to last line of that

6    page, and 20.8 million is interest.

7    Q   Okay.  And then for fiscal year 2016, it shows a payment

8    of $96 million a year; is that not correct?

9    A   Including $76.9 million of principal and $19.1 million of

10   interest.

11   Q   And of that 96 million, 4 million a month is allocated to

12   the swap termination payment; is that not correct?

13   A   I do not know specifically if it's four million.  The way

14   we have modeled it is a total payment of $8 million a month.

15   The split of that between the quality of life loan versus the

16   swap is something that Miller Buckfire will have to talk to.

17   Q   I'm sorry.

18   A   What we have included in the model is $8 million a

19   month --

20   Q   Exactly.

21   A   -- with respect to principal and interest.  Your question

22   about how much of that is the quality of life loan versus the

23   swap settlement, that's a question for Miller Buckfire.

24   Q   Okay.  We'll question Mr. Buckfire.  I mean you haven't

25   looked at the Barclay loan terms?

1  A    Not in detail, no.

2  Q    You haven't looked at how the payments get allocated

3  under the Barclay loan terms?

4  A    I never -- what we have looked at is the $8 million a

5  month for principal and interest in aggregate.  I have not

6  reviewed the split of that towards the quality of life loan

7  versus the swap settlement amount.

8  Q    Okay.  Well, I'd be glad to pull it out.  If it's helpful

9  to pull it out now, we can pull it out, but I can tell you

10 straight up that it reflects $4 million a month allocated to

11 the swap termination.

12          THE COURT:  I have to ask you just to ask a

13 question, please.

14          MR. GOLDBERG:  Okay.  Okay.

15 BY MR. GOLDBERG:

16 Q    Assuming -- assuming that that loan is split at least

17 until the quality of life payment toward -- $4 million toward

18 the swap termination and $4 million to the quality of life,

19 that would mean 48 million is being paid to terminate the

20 swaps; is that not correct?

21 A    No.  Under that assumption, the 48 million is just a

22 repayment of the loan undertaken to settle the swaps.

23 Q    Okay.  That's fair enough.  And 48 million is a repayment

24 to Barclays for paying -- for repaying the -- for paying

25 the -- for terminating the swaps with UBS and Bank of

1  America; is that not correct?  Is that a fair statement?

2  A   Why don't you -- please, could you rephrase that

3  question?

4  Q   Certainly.  The Barclay loan -- the swap termination part

5  of the Barclay loan is to pay off UBS and Bank of America on

6  the swaps; is that not correct?

7  A   It's to settle the swaps.  That is correct, yes.

8  Q   Okay.  And so assuming that the 96 million, at least for

9  2016, is split four million a month toward the swap

10  termination loan and $4 million toward the quality of life

11  loan, four million times 12 is 48 million.  That means 48

12  million is dedicated to give to Barclay to pay off the

13  satisfied funds that were paid to UBS and Bank of America?

14         MR. STEWART:  Objection, your Honor.  He's making

15  assumptions of facts that are not on the record, and I'm not

16  sure he's phrased this in a proper way if what he's doing is

17  asking this opinion for a witness -- of this witness for an

18  opinion based on new hypotheticals.

19         THE COURT:  I'll permit it if the witness can

20  answer.  Can you answer that question, sir?

21         THE WITNESS:  Under the assumptions that you're

22  highlighting of $4 million a month, if you say $4 million a

23  month is going towards swap settlement over 12 months, that

24  could equate to 48 million bucks -- $48 million.  That's just

25  the math that I would -- I can talk about the 12 times 4, but

1  anything beyond that I would not be comfortable talking

2  about.

3  BY MR. GOLDBERG:

4  Q    No problem.  So would you agree with me then that the

5  figure there when you say swap payment savings from the

6  settlement is deceptive in that, in fact, $48 million is

7  being used to pay off the swaps, so the actual savings,

8  according to you, would be $2.6 million.

9  A    No.

10  Q    Okay.  And, in fact, the $50.6 million, as has been

11  stated previously, is based on a projection of the current

12  LIBOR rate, which is very low; correct?

13  A    No.  That is a fixed payment.

14  Q    The 50.6 million is based on a fixed payment?

15  A    Yeah.  It's the $4.2 million a month that the city has

16  contracted to pay on its swap interest.

17  Q    But isn't that based on the -- a margin of -- between

18  the -- 3.34 margin plus LIBOR and the fixed -- and the fixed

19  interest rate that's paid to the banks?

20  A    I would have to go back and check.

21  Q    Okay.  No problem.  You're not the one who calculated the

22  termination fees.  You said Mr. Buckfire was involved in

23  that?

24  A    I did not calculate the termination fee.

25  Q    And you're not familiar with how that's done?

1  A    The swap settlement fee?

2  Q    Yes.

3  A    I have a general understanding, but I have not been

4  involved in calculating the fee.

5        MR. GOLDBERG:  Okay.  I have no further questions.

6  Thank you.

7        THE COURT:  Any other questions for the witness?

8  Any redirect?

9        MR. STEWART:  Just a few, if I might.

10                   REDIRECT EXAMINATION

11  BY MR. STEWART:

12  Q    Mr. Malhotra, you were asked about market flex.

13  A    Yes.

14  Q    Isn't it the case that 6.5 percent is not the minimum,

15  it's the maximum?

16  A    Yes.

17        MR. STEWART:  Let's put up Exhibit 106, just the

18  first page.

19  BY MR. STEWART:

20  Q    You remember you were asked about some of the disclaimer

21  language that appears on the first page of this exhibit and

22  other exhibits?

23  A    Yes.

24  Q    Does the term "assurance" have a particular meaning

25  within the auditing profession?

1   A   Yes, it does.

2   Q   What is that particular meaning?

3   A   It's supposed to relate to audit-type opinions, audit-

4   related specific work as under the guidelines of the AICPA.

5   Q   So when there's reference here to assurance of any kind,

6   that's a reference to auditing assurance?

7   A   Yes.  We are not providing auditing assurance here.

8   Q   Also, there were references here to third parties, about

9   reliance by third parties.  Remember those questions?

10  A   Yes.

11  Q   Okay.  Who's your client in your work for the city?

12  A   The City of Detroit.

13  Q   You're the first party because you're doing the work;

14  right?

15  A   That is correct.

16  Q   The second party is the city; correct?

17  A   Yes.

18  Q   Who's the third party?

19  A   I don't know.

20  Q   By this disclaimer, was E&Y suggesting that the city

21  could not rely upon its work?

22  A   No.  The city could.

23  Q   Now, the work -- you've described how you went about it.

24  Does this --

25          THE COURT:  Excuse me.  Am I a third party?

1          THE WITNESS:  Your Honor, I don't know.

2    BY MR. STEWART:

3    Q   And in preparing your forecasts, did you believe them to

4    be as accurate as you can make them?

5    A   Yes.

6          MR. STEWART:  Thank you.  That's all I have.

7          THE COURT:  Any other questions of the witness?  One

8    second, please.  Could somebody please put Exhibit 108 back

9    up at whatever page it was that Mr. Goldberg was asking

10   about?  Thank you.  You see the line in the middle that says

11   "net cash flow per DIP financing scenario"?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  And then there are the four numbers for

14   the fiscal years '14 through '17?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  Can you explain to the Court what those

17   four numbers mean?

18         THE WITNESS:  Yes, your Honor.  It would mean that

19   in fiscal year 2014, if the city had completed the DIP

20   financing and settled the swaps, the city would have $87.6

21   million of cash generated in that particular fiscal year.  In

22   year -- fiscal year 2015, there would be $62.9 million of

23   cash used that year of which, your Honor, $42.4 million would

24   be a repayment of principal under the current assumptions

25   that we are using.  In years -- fiscal year 2016, the net

1  cash flow would be $6.6 million generated for the city under

2  the assumption that $76.9 million of principal would be

3  repaid in that particular year subject to the ongoing

4  discussions, and the fiscal year 2017, your Honor, would show

5  a use of $17 million of cash under the scenario that $82.5

6  million of principal was repaid in that particular year.

7         THE COURT:  Can we have a look, please, at Exhibit

8  111, the chart?  Is this a representation of the projected

9  cash balances in these three scenarios taking into account

10  the city's revenue and expenses?

11         THE WITNESS:  Yes, your Honor.

12         THE COURT:  Did you prepare projected cash balances

13  for these three scenarios beyond June of '15?

14         THE WITNESS:  On a monthly basis, your Honor, we did

15  it through June 2015.  We did do it for fiscal year '16 and

16  '17 on an annual basis.

17         THE COURT:  What does scenario one look like for

18  those two subsequent years?

19         THE WITNESS:  Under these assumptions, assuming that

20  the cash flows and the cash balances assumptions with respect

21  to the exit financing are similar to those shown in the

22  previous exhibit, those numbers would get added upon to this

23  cash balance, so I would just have to do the math, your

24  Honor, with respect to the cash flow for fiscal year '16 and

25  fiscal year '17 cumulatively would get added onto that $61

1    million ending cash balance.

2              THE COURT:  What's the number for '16?

3              THE WITNESS:  For fiscal year '16, your Honor, the

4    net cash flow is $6.6 million positive, so it would become

5    $67 million of ending cash balance.

6              THE COURT:  And for '17?

7              THE WITNESS:  For '17 it would be a negative $17

8    million, so it would be an ending cash number of $50 million.

9              THE COURT:  Thank you.  Were you involved -- may I

10   have your attention, sir?  Were you involved in preparing --

11   were you asked to prepare projections in connection with the

12   city's decision as to how much money to borrow?

13             THE WITNESS:  No.

14             THE COURT:  Were you asked to prepare projections in

15   connection with the city's negotiations over how much money

16   to pay to terminate the swaps?

17             THE WITNESS:  No, your Honor.

18             THE COURT:  In a general sense, what would the line

19   for scenario one look like if instead of paying whatever the

20   current amount is to terminate the swaps -- what is that

21   amount, approximately?

22             THE WITNESS:  Your Honor, I believe it's about

23   approximately $227 million.

24             THE COURT:  227.  All right.  If instead of paying

25   that, what would line 1 look like, for example, if the city

1   had negotiated a number, say, 150 million?

2         THE WITNESS:  Your Honor, it would have no impact on

3   line 1.

4         THE COURT:  Assuming the same DIP loan amount?

5         THE WITNESS:  Assuming the same DIP loan amount,

6   yes, your Honor, and assuming the amortization remains the

7   same in the latter half of this forecast period, but it would

8   not change that amount assuming the DIP loan was the same.

9         THE COURT:  Where would that extra $77 million go?

10        THE WITNESS:  Your Honor, assuming the DIP amount

11  was the same, the city would have additional cash if the swap

12  settlement amount was then lower if -- assuming the 350

13  million is still the same, and actually the city can get --

14  instead of the net $120 million quality of life loan, the

15  city can actually expand that to 197.  Only under that

16  scenario would the cash be higher as that $350 million is the

17  key number that drives the scenario one way or the other,

18  your Honor.

19        THE COURT:  I don't have any further questions.

20  Anything further for the witness?

21        MR. STEWART:  Only this, Judge.  I think the

22  witness' response to your questions about the future --

23        THE COURT:  I'm sorry.  I do need to ask you to

24  stand by a microphone.

25        MR. STEWART:  I'm sorry, Judge.  When you had asked

1  the witness about the forecast for fiscal 2016 and 2017 and

2  he was responding to you, he was looking at page 5 of 17 of

3  Exhibit 108.

4          THE COURT:  All right.  Is that right, sir?

5          THE WITNESS:  Yes.  That page will reflect the cash

6  balances for --

7          THE COURT:  Okay.

8          THE WITNESS:  -- fiscal year '16 and '17.

9          THE COURT:  Thank you for clarifying that.  All

10  right.  If there's nothing further for the witness, we will

11  break for lunch now and reconvene at two o'clock, please.

12          THE CLERK:  All rise.  Court is in recess.

13      (Recess at 12:18 p.m., until 2:00 p.m.)

14          THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Recalling Case Number 13-53846, City of Detroit,

16  Michigan.

17          THE COURT:  Before we proceed, we have been asked to

18  provide a little service for Judge Cleland of the District

19  Court, so we need to go off the record, please.

20      (Recess at 2:00 p.m., until 2:02 p.m.)

21          THE COURT:  All right.  Back on the record, please.

22          THE CLERK:  Recalling Case Number 13-53846, City of

23  Detroit, Michigan.

24          THE COURT:  Your next witness, please.

25          MR. LEMKE:  If your Honor please, I'm David Lemke on

1  behalf of U.S. Bank as trustee for the water and sewer bonds,

2  and counsel have agreed, if your Honor will permit, to let me

3  make a short announcement regarding an objection so that I

4  might be able to be excused.

5         THE COURT:  Yes, sir.  Go ahead.

6         MR. LEMKE:  The trustee filed a limited objection to

7  the post-petition financing motion.  We have resolved that

8  objection with agreeable language with both the city and with

9  Barclays.  That language is found in paragraph 6(b) of the

10  proposed order.  The version that has been filed with your

11  Honor has the correct language with one exception.  There is

12  an "of" that's an extra "of" that's going to be deleted in

13  the first sentence.  It's the middle "of."

14         THE COURT:  Okay.

15         MR. LEMKE:  And with that change then, that -- the

16  language in the order then does resolve the trustee's limited

17  objection to the financing motion, and with your Honor's

18  permission I may stick around for the rest of the day, but if

19  you'll permit, I will excuse myself at the end of the day.

20         THE COURT:  Yes, sir.

21         MR. LEMKE:  Okay.  Thank you, your Honor.

22         MR. CULLEN:  Your Honor, the city -- good afternoon,

23  your Honor.  Thomas Cullen of Jones Day for the city.  The

24  city would now like to call Kenneth Buckfire as our next

25  witness.

1          THE COURT:  Okay.  One second.  For your

2   information, the city has 317 minutes left and the objectors

3   431.  Please raise your right hand.

4              KENNETH BUCKFIRE, DEBTOR'S WITNESS, SWORN

5          THE COURT:  All right.  Please sit down.

6                          DIRECT EXAMINATION

7   BY MR. CULLEN:

8   Q   Good afternoon, Mr. Buckfire.

9   A   Good afternoon.

10  Q   Could you please provide your full name for the record,

11  sir?

12  A   Kenneth Buckfire.

13  Q   And where do you reside?

14  A   New York City.

15  Q   And what's your job?

16  A   I am the co-president of Miller Buckfire & Company, an

17  investment banking firm.

18  Q   And what is the nature of Miller Buckfire's business?

19  A   We advise companies, countries, and municipalities in

20  financial distress.

21  Q   And could you describe your professional background

22  before you came to Miller Buckfire?

23  A   After receiving my MBA from Columbia University in 1987,

24  I went to work as an investment banker specializing in

25  restructuring.  I was with Lehman Brothers in the early part

1  of my career.  After leaving Lehman Brothers, I joined
2  Wasserstein Perella to start their financial restructuring
3  practice, which we did successfully.  In 2002 my then
4  partner, Henry Miller, and I bought our business from the
5  successor to Wasserstein Perella and formed Miller Buckfire &
6  Company.
7  Q   As an investment banker working in the restructuring
8  area, have you had occasion to work on issues regarding
9  restructuring finance?
10 A   Yes.
11 Q   Could you describe what restructuring finance entails for
12 the Court, please?
13 A   Restructuring finance entails raising capital for
14 companies or cities from time to time or countries either in
15 or out of court under conditions where the normal capital
16 markets are simply not available, and that requires a much
17 more tailored and more diagnostic approach to raising capital
18 and particularly if it's in bankruptcy because the conditions
19 of bankruptcy pose an additional burden on the entities
20 issuing capital.
21 Q   When you say "the normal markets are not available," why
22 not, sir?
23 A   Typically an enterprise which -- by this I mean also a
24 country or a municipality which has financial issues is not
25 able to issue debt in the ordinary course or equity in the

1    ordinary course.  There are issues about financial

2    statements, issues about solvency, issues about going

3    concerns, sustainability, and the normal providers of capital

4    are not usually willing to provide capital in the

5    circumstances.

6    Q    How often does an issue of restructuring finance come up

7    in the course of Miller Buckfire's engagements?

8    A    In every engagement, that's a central element.

9    Q    And have you ever been qualified as an expert to testify

10   in the area of restructuring finance?

11   A    Yes, many times.

12   Q    Directionally how many?

13   A    Over 20.

14   Q    And in particular, have you been ever qualified as an

15   expert to testify concerning debtor in possession financing?

16   A    Yes, many times.

17   Q    You have experience and expertise in analyzing a

18   distressed entity's liquidity needs?

19   A    Yes.

20   Q    Do these areas of expertise extend to companies on the

21   brink, if you will, or threatened by bankruptcy as well as

22   those that have declared?

23   A    Yes.

24   Q    Do you have any experience with municipal restructuring?

25   A    Yes.

1  Q    Could you explain that for me, please?

2  A    My firm did some pro bono work for Harrisburg,

3  Pennsylvania.  We are currently advising a bond insurer in

4  the case of Stockton, California.  We're also advising a bond

5  insurer with respect to Harris County Sports Authority in

6  Texas.  I've also had substantial governmental experience

7  advising both the federal government and a sovereign country

8  on their issues.

9  Q    Since you became engaged by the city early in this year,

10  how much time have you spent familiarizing yourself with the

11  city's financial needs?

12  A    Substantial time.

13  Q    Give me a ballpark.

14  A    Well, personally I probably have spent 75 percent of my

15  time related strictly to the City of Detroit as well as the

16  efforts of my banking team.  We've been very heavily engaged

17  even predating this current engagement in January.  We were

18  first hired to do a 60-day review of the city's financial

19  condition in 2012.  We were reengaged in January of this year

20  to be a general financial advisor, and in the construct of

21  those two engagements we became very familiar with the city's

22  financial condition.

23  Q    And in the course of this -- these engagements, did you

24  have access to the city's books and records?

25  A    We did.

1  Q   And did you have access to the assistance of other

2  professionals?

3  A   Yes.  We had substantial interaction with not only the

4  other outside professionals, Ernst & Young and Conway

5  MacKenzie, but also the city's own finance team.

6  Q   Soon after your engagement, did you become familiar with

7  issues regarding something which -- some things which have

8  been called in the course of this case the COP's and the

9  swaps?

10  A   Yes.

11  Q   Did you have an opportunity to --

12          MR. CULLEN:  Oh, before we start getting any

13  further, I'd like to offer Mr. Buckfire as an expert in the

14  area of restructuring finance.

15          MR. HACKNEY:  Your Honor, we do object to that.  I

16  believe there's going to be opinion testimony that's more

17  specific than the general area of restructuring finance, and

18  we do have objections to his qualifications.

19          THE COURT:  What is your objection?

20          MR. HACKNEY:  Our objection, your Honor, is that the

21  witness is not qualified as an expert in sourcing municipal

22  finance and has never done it before.

23          THE COURT:  Is that true, sir?

24          THE WITNESS:  My expertise is in the origin of DIP

25  financing for corporations.  This is the first municipal DIP

1  financing we have arranged.

2       THE COURT:  What is your assessment on whether the

3  expertise in corporate DIP finance applies to municipal DIP

4  finance?

5       THE WITNESS:  Well, I think it's highly relevant,

6  your Honor, because the sources of capital who could provide

7  this kind of financing are very limited.  There are people

8  who have DIP financing expertise as well as municipal

9  financing expertise.  People who only have municipal

10 financing expertise were not able to assess a DIP financing

11 in this area, so we needed to find people who had both.  And,

12 of course, we know all the sources of DIP financing, and so

13 our expertise was directly applicable to running that process

14 for the city.  The fact that we only had available to act as

15 collateral revenues of the city was the only aspect of

16 municipal finance that was relevant here, but, of course, we

17 dealt with that through the financing process itself.  And

18 this, by the way, I think is the only municipal DIP financing

19 ever done.

20      THE COURT:  All right.  The objection is overruled.

21 The Court will permit the testimony.

22      MR. CULLEN:  Thank you, your Honor.

23 BY MR. CULLEN:

24 Q   With respect to the COP's and the swaps, did you form an

25 opinion of their importance to the city's financial

1   situation?

2   A    I did.

3   Q    What was that opinion?

4   A    When we were reengaged in January of this year, we began

5   to do an assessment of the financial risks the city faced in

6   order to formulate our strategy in resolving the city's

7   financial condition.  It was at the time evident to us that

8   the default the city already was burdened by under the swaps

9   agreement was a source of financial risk, so we began to

10  study that whole issue with the perspective of eliminating

11  that risk factor from the city's ability to access its cash.

12  Q    Can you describe how the swap transactions worked at the

13  time you became aware of them?

14  A    Well, the original swap transactions, of course, were

15  entered into by the city in 2006.  They were modified in

16  2009, and at that time the swap counterparties were granted a

17  collateral interest in the gaming revenue.  They were granted

18  additional events of default, and they also secured an

19  increase in interest rate effectively leaving the city on the

20  hook for net 45 million or so of cash costs every year while

21  the swaps were in place, but, as I mentioned earlier, not

22  only was it a huge cash burden on the city to keep them in

23  place, but because of the defaults that existed in January,

24  it created a risk that at any time the banks might take

25  advantage of their rights under the agreements and foreclose

1   the city's access to gaming revenue.

2   Q   Let's go back to the 2009 amendment for a moment.  What

3   impact did that amendment have on the hedging function of the

4   swaps?

5          MR. HACKNEY:  And, your Honor, I would interpose an

6   objection.  I think it's fair to ask the negotiator what he

7   understood to be the case, but to actually ask him the truth

8   of the matter would render a legal conclusion out of a

9   witness that is not an attorney, so I would with that caveat

10  make the objection.

11  BY MR. CULLEN:

12  Q   What was your understanding?

13  A   My understanding was as part of that 2009 amendment, the

14  city lost all benefits of the swap.  The swap was intended to

15  protect the city from a rise in interest rates above the base

16  rate, which in this case was around six percent, but the city

17  gave up that right to the banks.  The banks acquired what's

18  called an optional termination right, which meant that if the

19  swap ever went in the money for the city and out of the money

20  for the banks, the banks could terminate, so it was

21  effectively a one-sided arrangement only to the benefit of

22  the banks.

23  Q   And with respect to the other impacts of the 2009

24  amendment, what is your understanding of how the pledge of

25  the casino revenues worked?

1  A    Well, the arrangement that the city agreed to in 2009
2  required the providers of gaming tax revenues, the casinos
3  themself, to transmit their gaming tax revenues into a lock
4  box under the control of U.S. Bank as trustee -- or
5  custodian, rather.  Excuse me.  And only after the account
6  was filled up to a certain amount would the custodian
7  disburse funds to the city after paying, in fact, the banks
8  what they were owed.
9  Q    And did that arrangement for the gathering and
10  distribution of these funds pose any risks for the city?
11  A    It posed substantial risks.
12  Q    Could you explain, please?
13  A    Well, because of the defaults that the city had incurred
14  in the beginning of this year and before this, the swap
15  counterparties at any time theoretically had the right to
16  instruct the custodian to stop distributing the city's share
17  of gaming revenues to the city's general fund, which would
18  have been approximately $120 million a year net of the cost
19  of the swap itself.
20  Q    When was the decision made to enter into negotiations
21  with the swap counterparties for what became the forbearance
22  agreement, which is at issue here?
23  A    Well, beginning in January when we became the financial
24  advisor to the city, we began to study this issue.  There had
25  been attempts made by the banks to enter into a new amendment

 1  with the city where the city would, you know, cure, quote,

 2  the defaults but give up certain other rights, so we

 3  basically tried to downplay those.  We didn't think those

 4  were in the city's best interest, but in May of this year

 5  when we finally saw the real cash flow numbers that we were

 6  working with, we were very concerned that come June the city

 7  would run out of money.  And we were concerned that if that

 8  was the case, then the ability of the city to survive if the

 9  gaming revenues were lost would be cataclysmic, and in May we

10  decided we had to begin a discussion with the banks.

11  Q   Can you describe the degree of urgency with respect to

12  these negotiations that the May numbers caused?

13  A   Well, after reviewing the financial forecasts with the

14  emergency manager and others, I was directed to immediately

15  begin negotiations with the banks to try to reach some kind

16  of a standstill or forbearance that would stabilize the

17  city's access to its revenues, so on June 4th or thereabouts

18  I had the first meeting with the banks here, Bank of America

19  Merrill Lynch and UBS, to begin that negotiation.

20  Q   When you entered these negotiations, was it with the

21  advice, guidance, collaboration of the emergency manager?

22  A   Well, he was certainly involved in overseeing the

23  process, but I was the lead negotiator for the city and

24  obviously assisted by counsel at Jones Day and Pepper

25  Hamilton.

1    Q    What did you want to accomplish in these negotiations?

2    A    Well, we wanted to accomplish two things.  First, we

3    wanted to preserve the city's access to cash flow.  We

4    couldn't afford the loss of that much cash from the budget.

5    And we also wanted to, if we could, find a way to get rid of

6    the swaps altogether and eliminate them from being considered

7    as part of our overall restructuring plan.

8    Q    And why did you want to get rid of them altogether?

9    A    Well, they were a very high cost financing for the city.

10   One could argue that with a $45 million, you know, annual

11   cash cost and a, you know, termination value of anywhere

12   around $300 million, it was the highest cost capital the city

13   had incurred.  Secondly, by freeing up the gaming tax

14   revenues altogether, that would be made available for the

15   benefit of all the city's creditors, not just the secured

16   parties here.

17   Q    Can you give the Court some sense of the atmosphere, the

18   progress of these negotiations?

19   A    I would say it was one of the most difficult negotiations

20   I've ever had to conduct.

21   Q    Why?

22   A    Well, we had extraordinary time pressure, for number one.

23   We knew that the city's cash position was dire.  There was a

24   strong possibility that the city would decide not to make the

25   June 15th payment to the COP's holders because it would have

1   no cash, and I was very worried that if we did not have an

2   agreement with the two swap counterparties in place by the

3   time that decision might be taken, they would finally lose

4   their patience and exercise their remedies to protect their

5   own economic position.  At that point, we had at least three

6   defaults under the swap agreement.  They had not exercised

7   any of their remedies.  We were paying them current, but if

8   they knew the city had no more money, I didn't know how long

9   their benevolence or their patience would last, and they

10  might feel they had no choice but to block all of our access

11  to gaming revenues.

12  Q   You said it was difficult because -- you've talked about

13  the time and cash flow issues.  Other things that made it

14  difficult?

15  A   Well, we didn't have a very strong negotiating position.

16  They had a security interest in our gaming revenues.  The

17  city had agreed to it in 2009.  We only had 11 days to try to

18  get to an agreement in principle before the time when the

19  emergency manager might have to make another fairly dramatic

20  decision.  That didn't leave us much to work with, and we

21  didn't really have any good way of preserving our access to

22  gaming revenues without their consent.

23  Q   Who were the actual people that you negotiated with?

24  A   Well, primarily it was negotiated with UBS and BAML,

25  their business people.

1  Q    And what people?  At what level in these organizations?

2  A    Managing directors.

3  Q    And did they have the authority to settle?

4  A    They represented that they did.

5           THE COURT:  What were their names?

6           THE WITNESS:  Jim Nacos from Bank of America Merrill

7  Lynch, and William Chandler from UBS.

8  BY MR. CULLEN:

9  Q    And with respect to the amount of the discount which has

10  been discussed in this case, where did the negotiations go on

11  that number?

12  A    Well, that's what made this negotiation so different.  I

13  didn't have very good cards to play, and we also had no time,

14  so I had to take a fairly aggressive position against the

15  banks by letting them know that we thought the entire

16  transaction, the COP's and the swaps, was very questionable

17  and that if they were forcing us to litigate, we thought we

18  had a really good case, but, frankly, I was taking that

19  position from a negotiating position, not making a legal

20  conclusion, and I basically took the position that we thought

21  that it could happen one of two ways.  If we litigated and we

22  were right, they would get nothing for their secured

23  position, zero, but if they were right, they'd get all of it

24  a hundred percent on the dollar.  And at that time, we

25  thought the value of the swap was $400 million.  It's a very

1   large number.  So we started the negotiation kind of with

2   that background, and I basically said that --

3           THE COURT:  Where would they get $400 million from?

4           THE WITNESS:  Good question.  They would get it from

5   the gaming revenues, your Honor.  They would use their rights

6   to block the gaming revenues, and they would have the right

7   to direct all that gaming revenue to pay themselves back.

8   BY MR. CULLEN:

9   Q   Was that related --

10          THE COURT:  How long would that take?

11          THE WITNESS:  Well, we have about $170 of gaming

12  revenues.  Allowing for interest on the 400 million, four

13  years give or take.  Remember, at the time we were

14  negotiating this, interest rates were lower, and, therefore,

15  the swap termination cost was greater.  Today it's a lot less

16  because rates have moved up.

17  BY MR. CULLEN:

18  Q   So with that backdrop, what was the first number that you

19  came up with?  What was the first number that they came up

20  with?

21  A   Well, we struggled to find an analytical basis for

22  settlement.  We couldn't because there's no good way of doing

23  it, so we basically took the position that if it was binary,

24  zero or a hundred, we'd start at 50 cents on the dollar.

25  Q   And how did that work for us?

1   A   Well, they were very upset at such a low offer.  They

2   thought that it was aggressive, that it was not giving due

3   credit for their collateral position, and then they responded

4   by asking for, I believe, 89.  And we went through this

5   negotiation for literally nine or ten days and finally

6   arrived at a compromise where we had the low ending 75, which

7   had no other rationale except it was between 50 and 100, and

8   then we agreed on a scale of option prices that would

9   increase.  That would give us -- if it took too long to buy

10  back their option, the price would go up, so we both kind of

11  got what we wanted.  At the time, they did not believe, I

12  don't think, that we would ever find the financing to take

13  advantage of the option.

14  Q   Now, you say that there was a scale and a time period for

15  different gradations in the discount based on how long it

16  took to pay the swaps off.  Why?

17  A   It was just part of the negotiation.  We negotiated this

18  in June.  I believe we originally said it would be 75, and we

19  had until -- I think it was August, and then it would go up

20  the end of September.  December to the end of March would be

21  at the high price.  It was just a way of cutting a deal.

22  Q   And with respect to litigation as a financial option for

23  the city, how did you assess that?

24  A   Well, our first objective was to make sure the city had

25  unimpeded access to the gaming revenues.  I, as a business

 1   matter, could not afford to recommend to the emergency

 2   manager we take the risk that litigation would be our way of

 3   securing our access to gaming revenues because, in fact, they

 4   had secured rights.  There was a lock box arrangement.  Even

 5   if we were right in the end, it might take months, if not

 6   years, to resolve who had control of the gaming revenues, and

 7   by that time the city would be dead.  It was not a risk worth

 8   taking.

 9   Q   Were there other financial alternatives that you

10   identified at the time you were doing this negotiation,

11   financial alternatives to the forbearance agreement?

12   A   Well, we reviewed everything that one could logically

13   consider, novation, finding a new swap party, raising enough

14   cash to pay off the swap pursuant to its terms, but we didn't

15   have any time to do it, and, in fact, I don't believe that

16   anybody in the marketplace would have provided the funds for

17   us to do that given the fact that on June 15th we announced

18   we weren't making the COP's payment, and we were, therefore,

19   in default across our entire capital structure.

20   Q   You say that it was your inference that the swap parties

21   didn't think that you could get financing to take them out.

22   What was the basis for your confidence that you could?

23   A   Well, we've done financings for distressed companies and

24   now cities for many years.  We knew the marketplace extremely

25   well.  We believed that we could construct a financing

1    package that would attract interest in the marketplace.  And

2    having done this for 27 years, I felt confident in

3    recommending this course to our client.

4    Q    Can you describe in summary the exchange of consideration

5    under the forbearance agreement?

6    A    Well, the city would -- in exchange for the banks

7    terminating -- exercising their right to terminate, would

8    agree to pay off that swap at a significant discount.  That

9    would realize, rough numbers today, about $75 million of

10   value for the city, which would actually reduce secured

11   claims and increase potential recoveries for all of our other

12   creditors, which is obviously an important issue for us;

13   secondly, would allow the city to have unencumbered access to

14   its gaming revenues, which would allow the rehabilitation and

15   payment of debt service to go forward unimpeded by litigation

16   risk.  Thirdly, it would clear up a major source of

17   controversy in the case and eliminate litigation.

18   Q    In terms of the trapping of this cash during that period,

19   was there any threats?  Did anything come up that intensified

20   your concern about that?

21   A    Yes.  Immediately after the June 15th meeting, we were --

22   my understanding, some of the bond insurers actually put in

23   actions to block our access to gaming revenues.  They

24   instructed U.S. Bank to not distribute our share of the

25   gaming revenues to the city alleging that they had rights

1  that we were not allowed to overcome, and that made my

2  concern even greater because clearly we could not risk losing

3  even two weeks of cash.  We had no money.  We had no other

4  source of funding, and that only made this a higher priority

5  for us.

6  Q   At the time you entered into this deal, the forbearance

7  agreement, was it the best deal you could make?

8  A   In my judgment it was.  Otherwise I wouldn't have

9  recommended it.

10 Q   Did you feel that there might be another round of bidding

11 or trading on this issue after you entered into the deal?

12 A   I did.  I really expected after we ended up filing for

13 bankruptcy that the creditors for whom this deal is a direct

14 benefit would find a reason to come back in and ask for a

15 better price, and it just has never happened.

16 Q   Now, have you addressed the issue -- had you addressed

17 the issue of why not waiting a certain amount of time to

18 consummate this deal, to take out the swap counterparties?

19 A   Well, time is not the city's friend.  We need to file our

20 plan.  We need to begin the reinvestment program.  We need

21 access to cash.  We need stability.  This has to get resolved

22 sooner rather than later, and, frankly, the other reason is

23 interest rates, frankly, have been in our favor.  Now, we've

24 gotten a lot of benefit from the rise in interest rates

25 because it's reduced the total cost of taking out the swap.

1  Q    Explain how that works if you would, sir.

2  A    The present value of the swap termination is directly

3  tied to the future interest rate curve.  In the last few

4  months, future interest rate curve has risen from where it

5  was in March of this year, which is close to an all time low.

6  That's why the termination cost to swap has been reduced from

7  about $400 million to around 270 million as we sit here

8  today.  No guarantee that that could not reverse, and,

9  therefore, to take advantage of this discount today and take

10  out the swap at what may well be a relatively low point is a

11  great value to the city.

12  Q    Can you suggest for the Court under today's circumstances

13  what is the value of the discount if the swaps are taken out

14  before the discount goes down?

15  A    Well, goes up.

16  Q    Well, let me ask that question again.  We're all

17  embarrassed for me.  That was a terrible question.  If we

18  take out the swaps before the end of the year, what's the

19  value of the discount?

20  A    The city would be able to take out the swap at a price of

21  75 cents.  That means for a termination cost of $270 million

22  the city would realize a, you know, discount of about $68

23  million.

24  Q    And if we go past that trip date, what would the discount

25  be worth?

1  A    Well, the price would go to 82 on January 1, and that

2  would mean the city would lose $19 million of that discount.

3  Q    How do you plan to finance -- how did you always plan to

4  finance the take-out of the swap counterparties?

5  A    Through a post-petition financing facility.

6  Q    And what was your involvement in deciding to and then

7  seeking that post-petition financing?

8  A    Well, I played a supervisory role in this process, but I

9  did make the recommendation to the emergency manager that

10  this would be the best way to take advantage of the discount

11  and provide additional capital to the city.

12  Q    Did you have any role in the sizing of the loan?

13  A    Yes.

14  Q    What was your role?

15  A    Well, raising capital for an entity is always a multi-

16  factor analysis.  There's no one thing you look at and decide

17  how much to raise.  You don't want to over-borrow because

18  it's expensive, and you don't want more cash than you need.

19  You don't want to under-borrow because you might need the

20  money.  In this case, we had to consider the cost of taking

21  out the swap.  We had to consider the fact that we only had

22  so much collateral to go around, which is a limiting factor

23  as well. We also had to consider, most importantly, the depth

24  of the market for this kind of financing.  This has never

25  been done before.  No one has ever done a post-petition

1 | financing for a municipality, so it's new and different. We
2 | didn't want to have to raise so much money that there would
3 | not be enough depth of the market to take it. And lastly, of
4 | course, we had to consider the fact that the city itself
5 | needed cash to stabilize its balance sheet and allow it to
6 | reinvest. That led us to the conclusion that around $350
7 | million was the right number. Rough numbers, about 120
8 | million would stay with the city as cash, so the net debt
9 | number we're talking about here is not that much different
10 | from the amount of the swap cost being taken out.
11 | Q   And when you say the depth of the market, what does that
12 | mean?
13 | A   Well, normally when you're raising a debtor in possession
14 | financing in today's world, there are dozens if not hundreds
15 | of people that are willing to provide debtor in possession
16 | financing for small and large cases. In this case, however,
17 | there were two important requirements a lender would have to
18 | consider. One, you've got to be a qualified DIP lender.
19 | You've done it before. You understand the logistics,
20 | understand how to do it. And, secondly, you have to have
21 | experience in municipal finance. That automatically knocks
22 | out most of the what I would call nonbank providers of DIP
23 | loans. That means you're talking to people who are
24 | effectively banks or investment banks with both capabilities.
25 | There are not very many of those.

1   Q   And when you say "not very many," can you give me a sense

2   of the size of the universe?

3   A   Well, we went out to 50 parties, which included nonbanks,

4   of course.  We ended up with proposals from over a dozen, and

5   we ended up with proposals from four, two of which were real

6   banks.

7   Q   And you had debt to the swap counterparties.  You're

8   going to have debt to the post-petition financier.  What's

9   the difference?  Debt debt?

10  A   I have a lot less debt this way.

11  Q   How does that work?

12  A   Well, the city has a right to terminate these swaps at a

13  value of $270 million.  That's the value today.  But we have

14  a right to repay that debt for less than $200 million, so

15  it's a net savings to the city of $70 million, which comes

16  ahead of the unsecured parties, which is, therefore, a net

17  benefit to them.

18  Q   What impact does the forbearance agreement and the post-

19  petition financing have on the other creditors of the city?

20          MR. HACKNEY:  Your Honor, I would interpose an

21  objection on this front.  I think we're now crossing over

22  into the needs and uses debate that I thought we had agreed

23  we would not have a mini trial on on Friday.  I think the

24  witness has testified with respect to his view of the benefit

25  of the forbearance agreement, is talking about the value of

1  the DIP and that front, but to go past that into the best

2  interest of creditors by reference to who's going to get what

3  and why it would be better I think is right into the mini

4  trial of how the money is anticipated to be used and what its

5  anticipated benefit will be.

6         MR. CULLEN:  I'm asking, your Honor, only in terms

7  of the financial structure of the city as a debtor at Point A

8  and their financial structure as a debtor at Point B.  It's a

9  strictly financial structure kind of question.

10         THE COURT:  Why don't you rephrase the question?

11         MR. CULLEN:  Pardon me?

12         THE COURT:  Please rephrase the question more

13  specifically then.

14         MR. CULLEN:  Sure, sure.

15  BY MR. CULLEN:

16  Q   Comparing the difference in the city's financial

17  structure before and after the execution of the post-petition

18  financing, are there -- is there any impact of the latter

19  structure on creditors?

20  A   Yes.  Yes, there is.

21  Q   Explain, please.

22  A   Well, if the forbearance agreement and post-petition

23  financing are approved, the city will have reduced secured

24  claims, which will allow unsecured claims to get a better

25  recovery.  It will also stabilize cash flows.  We'll no

1   longer have the risk of losing the gaming revenues, which

2   means the city will have access to that cash flow either for

3   reinvestment or future debt service.

4   Q   Do you have an understanding of the term "working

5   capital"?

6   A   Yes.

7   Q   What is the importance of working capital on an

8   enterprise or a city's balance sheet?

9   A   Working capital allows an enterprise the ability to

10  manage through cyclicality and lags in revenue receipts

11  against expenses.  Expenses tend to get paid on a regular

12  basis.  Revenues can, unfortunately, come in on an irregular

13  basis.  Working capital is normally retained to allow the

14  city to operate in an ordinary course with its creditors on

15  the trade side and make sure it can pay its bills when they

16  come in irrespective of when the revenues come in.

17  Q   Is there a relationship between the portion of the

18  financing which is not directed to taking out the swap

19  counterparties and the concept of working capital?

20  A   Yes.  When we sized the loan, we determined that the city

21  really needed to maintain two to three months of cash on its

22  balance sheet in order to be able to operate in the ordinary

23  course.  $120 million is roughly that number.

24  Q   And in the process of going out to seek this DIP

25  financing, did you consider the idea of seeking unsecured

1  financing?

2  A   We thought about it and dismissed it as impractical.

3  Q   When you say you dismissed it as impractical, why is

4  that?

5  A   Well, again, based on my experience, I've never seen any

6  post-petition financing be done on an unsecured basis.

7  Lenders in this field always want security.  They're not

8  going to take what I would call plan risk.  If they were an

9  unsecured lender, they would be taking that.  And I don't

10  think there's any case that I'm aware of where that's been

11  done.

12         MR. HACKNEY:  Your Honor, I would renew my objection

13  to this limited opinion testimony and move to strike it.  I

14  understand the Court's prior ruling with respect to his

15  general expertise, but when you go a step further and you

16  say, "Based on my experience in the non-municipal context,

17  I've decided that we have no chance of getting unsecured

18  financing here in the municipal context," the lack of

19  experience sourcing municipal financing just seems

20  particularly germane.

21         THE WITNESS:  Well, we did test this.  Sorry.

22         MR. CULLEN:  He gets a turn.

23         THE WITNESS:  I'm sorry.  Apologize.

24         THE COURT:  Yeah.  We don't usually let witnesses

25  respond to evidentiary objections.  No.  The objection is

1  overruled.  The Court is satisfied that the witness has

2  sufficient experience to provide the -- to provide the Court

3  with reliable information on this.

4          MR. CULLEN:  Thank you, your Honor.

5  BY MR. CULLEN:

6  Q   Make it clear.  You've been at this for 27 years; is that

7  correct?

8  A   That's correct.

9  Q   Is it your testimony that there has never been, in your

10  experience, a post-petition financing that was unsecured?

11  A   I have never placed such a financing nor am I aware of

12  one, but in this case we actually tested the hypothesis of

13  whether one could even be available because in July before we

14  actually started --

15  Q   Let's question and answer.

16  A   Okay.  Sorry.

17  Q   How did you test the hypothesis?

18  A   Well, recognizing this would be the first time the city

19  had ever done it, we wanted to go and test the market early

20  to find out, well, could we even do it, would it be

21  practical, and so in July we contacted a very limited number

22  of major banks, and we asked them would they be willing to

23  provide debtor in possession financing to the city if and

24  when that became necessary to do so.  And we actually got

25  responses back indicating that they might be willing to do

1    it, but not on any basis except security being granted.

2            MR. PEREZ:  Objection, your Honor.  That's just

3    blatant hearsay, what he testified to.

4            THE COURT:  You'd have them bring in representatives

5    of each of the banks to testify?

6            MR. PEREZ:  No, I wouldn't, your Honor, but it is

7    hearsay, your Honor.

8            MR. CULLEN:  It's a normal part -- can I -- I'll

9    just ask him another question to lay a foundation if the

10   Court wants me to or --

11           THE COURT:  No.  The Court will overrule the

12   objection.

13   BY MR. CULLEN:

14   Q   Normal part of your function in going out and getting DIP

15   financing is testing the market; is that correct?

16   A   Yes.

17   Q   Okay.  And you did that here, as you testified?

18   A   Yes, we did.

19   Q   I'd like to show you a document which has not been

20   admitted into evidence, I think objected to on hearsay

21   grounds, the Exhibit 61, City 61, letter from JPMorgan.  I'm

22   going to move this into evidence after I show it to him.  Do

23   you want to object now and then have me do it?

24           MR. PEREZ:  No, no.

25           MR. CULLEN:  How do you want to do it?

1      THE COURT:  Well, let's have the witness identify

2  it, and then you can move for its admission.

3  BY MR. CULLEN:

4  Q   Can you just take a look at that, please?

5      MR. CULLEN:  No.  Don't put it up yet.  We haven't

6  gotten --

7  BY MR. CULLEN:

8  Q   Can you identify that, sir?

9  A   Yes, I can.

10  Q   Tell us what it is.

11  A   Well, we -- as I testified earlier, we'd gone to a

12  handful of major banks and asked them if they'd provide post-

13  petition financing for the city.  JPMorgan was one of the

14  banks we asked, and this was their response.

15      MR. CULLEN:  Could I move the admission of City 61,

16  please?

17      THE COURT:  Any objections?

18      MR. HACKNEY:  Yeah.  I object.  I mean this is

19  classic hearsay.

20      MR. PEREZ:  Yes.

21      THE COURT:  What's the purpose of offering it?

22      MR. CULLEN:  This is what he got back when he tested

23  the market.  It speaks directly to the issue of whether

24  JPMorgan was telling him that it might be available or might

25  not on an unsecured basis.  It's the result of his testing of

1  the market which corroborates his testimony which was

2  objected to earlier.

3          THE COURT:  The Court will admit it for the purpose

4  of showing the response that he got.

5      (City Exhibit 61 received at 2:40 p.m.)

6          THE COURT:  And that's 61, did you say?

7          MR. CULLEN:  61.

8  BY MR. CULLEN:

9  Q   If I could go to the fourth page of the exhibit, which is

10  page 1 of the confidential memorandum attached to the

11  correspondence -- do you have that, sir?

12  A   Yes.

13  Q   And if you could read out for the Court what JPMorgan was

14  telling you in -- under the third shaded heading, the second

15  paragraph beginning "The keys."

16  A   The entire --

17  Q   Can you read --

18  A   The entire paragraph?  I can read it, yeah.

19  Q   Yeah.

20  A   "The keys to any DIP financing and to the city's ongoing

21  access to capital will be the strength of the security

22  interest in certain of the city's general fund revenues and

23  the ability to restore investor confidence and achieve access

24  to the capital markets for the DIP financing take-out."

25          MR. HACKNEY:  Your Honor, I'd move to strike this

1  testimony.  We're now reading the words of someone else and

2  asking Mr. Buckfire what they mean.  I don't think it's

3  appropriate.

4  　　　　MR. PEREZ:  And I think it also goes beyond the

5  extent that you allowed it in, your Honor, because now

6  it's --

7  　　　　THE COURT:  No.

8  　　　　MR. PEREZ:  -- going for the truth of the matter.

9  　　　　THE COURT:  No.  It's not being offered for the

10  truth.  It's being offered to show that this is the -- the

11  significance of this is the legal significance that this is

12  what the city got when it inquired.  Go ahead and read it.

13  　　　　THE WITNESS:  "The city does not currently have

14  market access on its own credit, and we believe it is

15  unlikely the city will regain market access immediately upon

16  emergence from bankruptcy, at least not without paying an

17  extraordinarily high market premium if access could be

18  achieved."

19  BY MR. CULLEN:

20  Q　　In performing your, as you testified, customary function

21  of testing the market with respect to the features of a

22  proposed financing, what would you -- what did you conclude

23  when you received this?

24  A　　That we would not be able to raise financing unless we

25  had collateral to offer to the marketplace, and we'd gotten

1  this response in early July.  We had gone out in June well in
2  advance of having to actually decide whether or not we needed
3  a DIP at all.
4       MR. CULLEN:  You can take it down.
5  BY MR. CULLEN:
6  Q   With respect to the DIP bidding process, what would you
7  call that?  What would be your word, easier --
8  A   The solicitation process.
9  Q   The solicitation process.  With respect to the
10  solicitation process, what was your role?
11  A   Supervisory.
12  Q   And when you say "supervisory," what does that actually
13  entail?
14  A   Well, my partners, Ms. Corio and Mr. Doak, were primarily
15  responsible for managing the process.  They would let me know
16  from time to time how it was going.  They would from to time
17  ask me a question about how this might relate to other
18  aspects of our planning and our bankruptcy process, but
19  pretty much they ran the entire thing.
20  Q   Okay.  And in the terms of the solicitation itself, was
21  there a template or guideline sent out?
22  A   Yes.  We'd sent out a request for proposal, which had an
23  attachment called an indicative term sheet we asked people to
24  respond to.
25  Q   And what was the function of that term sheet?

1  A    We wanted to guide people who might have an interest in

2  lending to the city to what, in fact, we thought we could

3  offer so they wouldn't waste their time in proposing things

4  we did not want to or could not offer.  We also wanted to

5  make sure that if they did want to propose something

6  different, they knew they were going to be offering something

7  off of a baseline that everybody else hopefully would respond

8  directly to.

9  Q    Did you have any role in assessing the bids that actually

10  came in?

11  A    No.

12  Q    Do you have any basis for opining as to whether or not

13  the city got a good deal in this DIP financing?

14  A    Yes.  Based on the proposal we received, I think the city

15  got a highly competitive and low cost financing.

16  Q    Okay.  When you say based on the proposal you received

17  you had a highly competitive and low cost answer, what leads

18  you to that conclusion?  Could you unpack that for me,

19  please?

20  A    Well, we asked in excess of 50 people for proposals.  We

21  got back over a dozen.  We ended up, I think, with four or

22  five that were fully committed to and proposed by lenders,

23  and we picked the cheapest one.

24  Q    Did at various -- were there various Syncora proposals

25  throughout this period?

1    A    There were at least two.

2    Q    Can you describe the first one?

3    A    Well, the first one was not responsive to our term sheet

4    or RFP, but on its face it was extremely expensive.  I think

5    it required something like $70 million in fees to the lenders

6    in exchange for making a DIP loan.  And we had concerns

7    beyond that about whether or not they really could perform

8    their role.  We asked them directly if they'd ever made a DIP

9    loan before.  The answer was no.  We were concerned about

10   their own financial condition, the fact that they were

11   willing to expose potentially $350 million of cash to a loan

12   to the city that would represent a material portion of their

13   cash reserves.  I would be surprised if they would actually

14   be allowed to do that.  In any case, they weren't willing to

15   respond to the RFP or the term sheet we put out nor were they

16   willing to propose it on a basis we thought could be

17   competitive.

18   Q    And was there a later Syncora bid or offer?

19   A    Well, the understanding is they provided one to the City

20   Council after we announced we had decided to work with

21   Barclays, and the terms of that one were also very expensive.

22           MR. CULLEN:  That's all I have, your Honor.

23                           CROSS-EXAMINATION

24   BY MR. HACKNEY:

25   Q    Good afternoon, Mr. Buckfire.  My name is Steve Hackney.

1    We've had the chance to meet before at your deposition, I

2    think.  Nice to see you again.

3    A    Good afternoon.

4    Q    I'm going to be asking you some questions today.  I think

5    some of them may sound familiar, but we'll see how it goes.

6    Your firm, Miller Buckfire, is employed by the city as its

7    investment banker; isn't that correct?

8    A    Yes.

9    Q    And the forbearance agreement that I think is already in

10   evidence at Exhibit 8 is the document that you led the

11   negotiation of the business terms of; isn't that correct?

12   A    That's correct.

13   Q    Now, your role in connection with the agreement was to

14   negotiate its business terms on behalf of the City of

15   Detroit; isn't that right?

16   A    That's correct.

17   Q    The decision to enter into this agreement on behalf of

18   the city was made by Mr. Orr; correct?

19   A    Correct.

20   Q    Now, Mr. Buckfire, you have negotiated a few deals in

21   your lifetime as an investment banker; isn't that correct?

22   A    Yes.

23   Q    As a negotiator, you need to have an understanding of the

24   financial needs and desires of your client as well as the

25   counterparty with whom you're negotiating; isn't that

1  correct?

2  A    Yes.

3  Q    You also have to have some understanding of the legal

4  framework in order to negotiate effectively; isn't that

5  right?

6  A    Yes.

7  Q    Now, I'd like to discuss your state of mind as you're

8  entering into your first round of negotiations with the swap

9  counterparties.  One thing that you understood was that there

10  were events of default under the collateral agreement that

11  would allow the swap counterparties to trap cash if they

12  chose to do so; correct?

13  A    Yes.

14  Q    You also believe that the swap counterparties could

15  declare a termination event and potentially be paid

16  approximately $400 million; isn't that right?

17  A    Yes.

18  Q    And your understanding was that they could do so

19  unilaterally; isn't that right?

20  A    Yes.

21  Q    And your understanding was also that there was no other

22  party out there that could direct the swap counterparties'

23  actions; isn't that correct?

24  A    Yes.

25  Q    Your understanding also was that FGIC and Syncora had no

1  rights under the collateral agreement; isn't that correct?

2  A    Yes.

3  Q    And your understanding on these points remained

4  consistent all the way up until the execution of the

5  forbearance agreement on July 15, 2013; isn't that right?

6  A    Yes.

7  Q    Now, I'd like to ask you about a couple things that you

8  did not understand to be true at the time that you were

9  conducting these negotiations.  First, you did not understand

10  that the collateral agreement and the cash trapping were

11  securing the city's obligation to the service corporations

12  and the service corporations' obligations to the swap

13  counterparties under the swap; correct?

14          MR. CULLEN:  I'll object to the form of that

15  question.  It seems a little complicated for a lay witness.

16          MR. HACKNEY:  Your Honor, this is already in

17  evidence in the statement of facts in terms of the nature

18  of --

19          THE COURT:  If the witness doesn't understand the

20  question, he can say so, but I'll permit it.  Go ahead, sir.

21          THE WITNESS:  Would you mind repeating it?

22  BY MR. HACKNEY:

23  Q    Yeah, sure.  You did not understand that the collateral

24  agreement and the cash trapping associated with the

25  collateral agreement were securing the city's obligation to

 1  the service corporations and the service corporations'
 2  obligations to the swap counterparties under the swap;
 3  correct?
 4  A   That's a very complicated question.
 5  Q   I'll represent to you it's not the first time I've asked
 6  it to you, but if you'd like to take a look at your
 7  deposition, I'm happy to --
 8  A   No.  That's fine.  I've done a lot of depositions, so I
 9  can't remember all of them.
10  Q   That's okay.  Isn't what I'm saying correct?  You did not
11  understand that to be the case?
12  A   That's correct.
13  Q   And you also did not understand that the collateral
14  agreement ultimately secured the termination payment that
15  might be made under the swaps; correct?
16  A   No.  The cash from the gaming revenues was, in fact, the
17  security for the swaps.  That was the whole point of the
18  collateral agreement.
19          MR. HACKNEY:  If I can approach, your Honor?
20          THE COURT:  Sure.
21          MR. HACKNEY:  Your Honor --
22  BY MR. HACKNEY:
23  Q   Mr. Buckfire, these are a copy of your two depositions in
24  this case.  They're separated by a little tab two.  I'd like
25  you to look at the first deposition, which was at page 113,

1 line 23.  Tell me when you have it, sir.  You have that page

2 and line, sir?

3 A   No.  I see it.

4 Q            "Question:  Did you understand that the

5            collateral agreement and the cash trapping were

6            securitizing the city's obligations to the service

7            corporations and the service corporations'

8            obligations to the swap counterparties under the

9            swap?

10               No.

11               Question:  Did you understand that the

12            collateral agreement, what it was ultimately

13            securing was the termination payment that might be

14            made under the swaps?"

15            And then there was an objection, and then you

16 answered, "No."  Were you asked those questions, and did you

17 give those answers, sir?

18 A   I did.

19 Q   In negotiating this agreement, you never considered

20 whether the casino revenues constituted special revenues

21 under the Bankruptcy Code; isn't that correct?

22 A   That's correct.

23 Q   You also did not evaluate whether the city had claims

24 against the swap counterparties; correct?

25 A   I was advised there might be a risk of that.

1  Q   My question was that you did not consider, you did not
2  evaluate whether the city had claims against the swap
3  counterparties; correct?
4  A   Correct.
5  Q   And this is important.  And you don't know whether anyone
6  else working for the city had evaluated whether the city had
7  claims against the swap counterparties; isn't that correct?
8  A   You lost me.  You want to try the question again?
9  Q   I've already established that you didn't evaluate any
10 claims; correct?
11 A   Correct.
12 Q   But you also didn't know whether anyone else had
13 evaluated whether the city had claims against the swap
14 counterparties; isn't that correct?
15 A   That's correct.
16 Q   Now, your testimony was that access to these casino
17 revenues is an issue of life or death for the city, I
18 believe, or words to that effect; isn't that right?  It was a
19 very important issue.
20 A   Yes.
21 Q   Now, your retention dates back to January -- Miller
22 Buckfire's retention dates back to January of 2013; isn't
23 that right?
24 A   That's correct.
25 Q   Now, despite the fact that this was an important issue --

1  and I assume you recognized it one at the earliest times of

2  your retention; is that right?

3  A    Yes, in January.

4  Q    But isn't it true that you did not attempt to engage the

5  swap counterparties in negotiation in January, February,

6  March, April, or May of 2013; isn't that correct?

7  A    That's correct.

8  Q    And you delayed negotiating with the swap counterparties

9  even though it was your understanding dating back to January

10 2013 that their patience was wearing thin; correct?

11 A    That's correct.

12 Q    Now, at the time your firm reengaged, you got yourself

13 back up to speed on the relevant issues, including the state

14 of play on the swap; isn't that correct?

15 A    Correct.

16 Q    Your understanding at that time was that the swap

17 counterparties had had the right to terminate the swap dating

18 back to March of 2012; isn't that right?

19 A    Correct.

20 Q    And during the 14-month period between March 2012 and the

21 end of May 2013, you understood that the swap counterparties

22 had never terminated the swap; isn't that right?

23 A    That's right.

24 Q    And your understanding also was that during that same 14-

25 month period, they had never demanded that cash be trapped;

1    isn't that correct?

2    A    That's correct.

3    Q    And in addition to that, the swap counterparties never

4    communicated to you that they would terminate the swap if

5    resolution was not reached by a certain date; isn't that

6    correct?

7    A    Correct.

8    Q    Now, the initial meeting with the swap counterparties on

9    June 4, 2013, was held at the behest of the city; isn't that

10   correct?

11   A    That's correct.

12   Q    During those meetings, you told the swap counterparties

13   that the city was going to fight to stop them from trapping

14   cash or words to that effect; isn't that correct?

15   A    That was the second part of the meeting.

16   Q    During this time period, you told them that; correct?

17   A    After we explained the financial condition of the city to

18   them, yes.

19   Q    But you did not describe what claims the city would

20   litigate aggressively to the swap counterparties; isn't that

21   right?

22   A    That's correct.

23   Q    And you did not express the city's views on the merits of

24   the litigation; isn't that right?

25   A    That's correct.

1  Q   And you never attempted to argue the merits of why the

2  swap counterparties wouldn't be able to trap cash; isn't that

3  correct?

4  A   That's correct.

5  Q   And you don't recall anyone else doing so on behalf of

6  the city either.  Isn't that also correct?

7  A   Yes.

8  Q   Between June 11th and the July 15th execution of the

9  forbearance agreement, you never attempted to argue the

10  merits of the city's case to the swap counterparties; isn't

11  that correct?

12  A   That's correct.

13  Q   And you never witnessed anyone else do so on behalf of

14  the city either; isn't that right?

15  A   That's correct.

16  Q   Now, prior to the agreement in principle being struck,

17  neither you nor anyone else at Miller Buckfire performed

18  analysis of what interest rates were likely to be in the

19  future; isn't that correct?

20  A   I don't understand that question.  We, of course, looked

21  at the LIBOR forward curve to try to determine what our

22  interest rate risk would look like.

23  Q   Let me direct your attention to page 22 of your

24  deposition --

25  A   Which one?

1  Q   -- line 4.  It's the first one, page 122, line 4.  Do you

2  have that, sir?

3  A   I do.

4  Q   Page 122, line 4,

5           "I have a broader question, which is at anytime

6           prior to June 11th, did you or anyone else at Miller

7           Buckfire, to your knowledge, perform an analysis of

8           what interest rates were likely to do in the future?

9               Answer:  No."

10      Were you asked that question?  Did you give that

11  answer?

12  A   I did.

13  Q   And prior to June 11th, you didn't study any forward

14  LIBOR curves; isn't that right?

15  A   That's correct.

16  Q   In fact, as of the execution date of the forbearance

17  agreement on July 15, 2013, neither you nor anyone else at

18  Miller Buckfire had undertaken an assessment of what interest

19  rates were likely to do in the future; isn't that correct?

20  A   That's correct.

21  Q   Now, by June 11th, you have struck an agreement in

22  principle that involves three key parts, according to your

23  testimony, swap counterparties will allow the casino revenue

24  to continue to flow, the city will be granted an option to

25  direct the termination of the swap, and the termination value

1  will be at a discount to the one provided for in the swap; is

2  that correct?

3  A    That's correct.

4  Q    Now, I understand that you're not an attorney, but you

5  are a sophisticated businessman who -- and you're probably

6  glad that you're not an attorney, so --

7  A    I'll stipulate I'm not an attorney.

8  Q    There you go.  But you -- I understand that you are not

9  an attorney, but you are a sophisticated businessman who

10  deals with legal documents on a regular basis; isn't that

11  right?

12  A    Yes.

13  Q    And your understanding of one of the benefits of the

14  forbearance agreement is that the swap counterparties have

15  waived their right to trap cash in exchange for the other

16  things that they got; isn't that correct?

17  A    Yes.

18  Q    I'd like to ask you some questions about the service

19  corporations now if I could.  The service corporations are

20  also a party to the forbearance agreement; isn't that

21  correct?

22  A    You're beyond my knowledge.  I never studied the service

23  corporations.

24  Q    I'm just -- so let's go in baby steps.  I know that's

25  true and that you were unfamiliar with them, and we're going

1  to get to that, but baby steps.

2  A    I'm still unfamiliar with --

3  Q    To this day.  Okay.  You do understand that they are

4  parties to the forbearance agreement; isn't that correct?

5  A    Yes.

6  Q    But the service corporations were not at any of the

7  meetings in early June that led to the agreement in principle

8  with the swap counterparties; isn't that right?

9  A    Yes.

10  Q    And you never engaged in any arm's length negotiations

11  with the service corporations; isn't that correct?

12  A    Yes.

13  Q    And you never witnessed anyone else do so either;

14  correct?

15  A    Correct.

16  Q    Your understanding was that the service corporations were

17  controlled by the city; correct?

18  A    Yes.

19  Q    And your understanding was that the city was acting on

20  behalf of the service corporations in connection with the

21  forbearance agreement; isn't that right?

22  A    Yes.

23  Q    In fact, your understanding is that Mr. Orr directed the

24  service corporations to execute the agreement, and that's

25  what they did; right?

1  A   Yes.

2  Q   I'd like to ask you a couple brief questions about

3  Syncora and FGIC, which is during this first half of June

4  when you're negotiating the business terms of the forbearance

5  agreement, you did not invite Syncora to participate in those

6  negotiations; isn't that correct?

7  A   That's correct.

8  Q   And you also did not invite Federal Guaranty Insurance

9  Company, affectionately known of as FGIC, to participate in

10  those negotiations, did you?

11  A   That's correct.

12  Q   And to your knowledge, no one else did either; isn't that

13  right?

14  A   Yes.

15  Q   Now, your understanding that you testified to on direct

16  was that as part of the 2009 restructuring that led to the

17  collateral agreement -- you remember that testimony?

18  A   I do.

19  Q   Your understanding was that the swap counterparties

20  obtained the right to walk away from the swaps if interest

21  rates ever looked like they were going into territory where

22  it might be positive for the city and the service

23  corporations.  Isn't that your testimony?

24  A   That's my understanding.

25  Q   And you understand that that's called an optional early

1 termination under the swap; right?

2 A   Yes.

3 Q   You know that's distinct from an early termination;

4 right?

5 A   Yes.

6 Q   And you understand obviously that when the swap

7 counterparties exercise an optional early termination, they

8 take nothing from the service corporations; correct?

9 A   I don't know that.

10 Q   You don't know that to be true?

11 A   I've never studied the service corporations or what their

12 rights are.

13 Q   My point was that when the swap counterparties exercise

14 this optional early termination, they are paid nothing.  That

15 was the point of your testimony about --

16 A   Yes.  That's right.

17 Q   That's the walk-away; right?

18 A   That's correct.

19 Q   But they get paid nothing; right?

20 A   Well, if they terminate the swap, then by definition they

21 would be paying nothing to the city.

22 Q   They would be paying nothing to the city, but they would

23 also be paid nothing; correct?

24 A   Well, that's right.

25 Q   Now, as we stand here today, I believe you testified the

1  swap counterparties are very much in the money with the

2  swaps; correct?

3  A    Correct.

4  Q    And isn't it a fact that the swap counterparties have

5  never threatened to you that they were going to exercise an

6  optional early termination; isn't that correct?

7  A    That's correct.

8  Q    And that's because it wouldn't be economically rational

9  to terminate a swap on an optional early basis and be paid

10  nothing when the swaps are substantially in the money;

11  correct?

12  A    No, because the optional termination event would only

13  take place when they were out of the money, not in the money.

14  Q    Let me direct your attention to page 151, line 2.  Do you

15  have that in front of you, sir?

16  A    I do.

17  Q    Let me take us -- let me back you up to page 150, line

18  17.  You have that, sir?

19  A    I'm sorry.  What page are you on again?

20  Q    That's okay.  Page 150, line 17.  Page 150, line 17.  Do

21  you have it, Mr. Buckfire?

22  A    Yes, I do.

23  Q    All right.  "Question:  And obviously the swap

24  counterparties have never threatened to exercise an optional

25  early termination, correct," and there was an objection, and

1   then I said "to you?"

2          "Answer:  No.

3          Question:  That wouldn't make sense, would it?

4          Answer:  Not as long as you're being paid on

5       time.

6          Question:  And also why would you terminate a

7       swap on an optional early basis and be paid nothing

8       when it is worth, by your testimony, approximately

9       $300 million; correct?"

10         And there was an objection.

11         "Answer:  It wouldn't be economically rational."

12         Were you asked those questions?  Did you give those

13  answers?

14  A    Yeah, but you're confusing optional termination versus

15  their right to terminate in the event of a default.  Optional

16  termination refers to their right to terminate at any time,

17  which rationally they would only do if the swap moved against

18  them where instead of the city owing them money, they would

19  owe the city money.

20  Q    I agree with you 100 percent.

21  A    Good.

22  Q    Now, your understanding is that in exchange for all the

23  consideration, the swap counterparties termination rights are

24  being discounted to somewhere between 75 percent and 82

25  percent depending on when the option is exercised; isn't that

1  correct?

2  A    That's correct.

3  Q    Now, I wanted to follow up on something that you said on

4  your direct testimony, which was you testified that this

5  is -- that this was one of the most hard-fought negotiations

6  of your entire career; is that right?

7  A    Yes.

8  Q    And you have, I will say, quite a distinguished career, I

9  think it was noted on your direct examination.  I'm assuming

10  that you've been in a lot of hard-fought negotiations.  Is

11  that fair?

12  A    That's fair.

13  Q    But is it your testimony that a negotiation that lasted a

14  week that basically went you opened at 50 and then you guys

15  ended around 75 where you had no analytical basis to

16  challenge the swap counterparties was one of the hardest

17  fought negotiations of your life?

18  A    Yes.

19  Q    And there were also very hard-fought negotiations around

20  the dates on which those discounts would increase; correct?

21  A    That's correct.

22  Q    And the initial negotiation led to the 75 percent date

23  expiring on August 30; correct?

24  A    Correct.

25  Q    So they only gave you six weeks of time to really get

1   that big August 30 75-percent discount rate; correct?

2   A   Correct.

3   Q   And then we had the objections, and this hearing got all

4   involved; isn't that right?

5   A   That's right.

6   Q   And somewhere along the line, the swap counterparties

7   managed to extend that 75-percent discount rate that you had

8   fought so hard for by four months; isn't that correct?

9   A   Correct.

10  Q   Did you handle those negotiations as well?

11  A   No.

12  Q   Okay.  I'd like to ask you some questions, if I could,

13  sir, about the post-petition financing.  To begin, the

14  agreement with Barclays contains a provision for market flex;

15  correct?

16  A   Correct.

17  Q   And under the terms of the market flex, the LIBOR floor

18  can be increased from one percent to two percent, and the

19  margin above that can be increased from two and a half

20  percent to four and a half percent; correct?

21  A   Correct.

22  Q   And I just want to emphasize that's a floor, a LIBOR

23  floor; correct?

24  A   That's right.

25  Q   So if the interest rates in the future go up above two

1  percent, the interest rate could continue to rise with it.

2  It just means it couldn't be lower than six and a half

3  percent if the full amount of the market flex is expired --

4  is implemented; correct?

5  A   Yes.

6  Q   And so if the market flex provision is fully implemented,

7  the interest rate on the DIP financing loan would increase

8  from three and a half percent to a minimum of six and a half

9  percent; correct?

10  A   Correct.

11  Q   Now, in addition to the market flex provision, Barclays

12  will also receive a commitment fee; right?

13  A   Correct.

14  Q   And when evaluating the various proposals that you all

15  received at Miller Buckfire, you evaluated the costs of those

16  proposals; isn't that correct?

17  A   Correct.

18  Q   And the cost of this facility was an important factor in

19  Miller Buckfire's evaluation of the proposals; isn't that

20  right?

21  A   Yes.

22  Q   Now, I'd like to go back and touch on these issues with

23  respect to unsecured financing.  Let me ask you a question,

24  Mr. Buckfire.  Do you remember that you opined that it was

25  not feasible for the city to obtain unsecured financing

1  during these cases?  Do you remember that testimony?

2  A    I do.

3  Q    What is your understanding of the nature of the unsecured

4  credit there?

5  A    The promise to the city to repay.

6  Q    How would it be treated in a subsequent bankruptcy in the

7  plan?

8  A    Well, if it was an unsecured promise to repay, it would

9  be treated as a general unsecured obligation.

10  Q    That's right.  Your understanding is that it would be

11  treated just like my -- or some COP's that I hold; right?

12  A    Potentially, yes.

13  Q    And so what would happen is they would lend the money at

14  a hundred cents on the dollar, and they would lend $350

15  million to the city, but then they'd immediately just be in

16  the throngs with all the unsecured creditors who are likely

17  to get far less than that; correct?

18  A    No.  That's not what they would ask for.  You would

19  ask -- they certainly would have asked for priority in

20  payment as part of a plan.

21  Q    Because they'd be treated as an administrative expense;

22  right?

23  A    Presumably.  That's what they would ask for --

24  Q    And you under -- well --

25  A    -- but there was no one to ask.

1  Q   There was no one to ask?

2  A   We already tried that.

3  Q   Okay.  Because -- and you also understand, by the way,

4  that it's my understanding that a debtor cannot confirm a

5  plan of adjustment unless it pays off all of its

6  administrative expenses; isn't that right?

7  A   Correct.

8  Q   In fact, it's my understanding that your firm is

9  providing services to these debtors during the bankruptcy

10  case; correct?

11  A   We're the investment banker to the city.

12  Q   Right.

13  A   That's correct.

14  Q   Pursuant to a service contract; isn't that right?

15  A   That's correct.

16  Q   And your service contract is not secured; isn't that

17  right?

18  A   That's correct.

19  Q   And neither are any of the other professionals' service

20  contracts secured; right?

21  A   That's correct.

22  Q   And, in fact, isn't the total amount of the fees to the

23  service professionals currently ballparked in the area of $95

24  million?

25  A   That's an estimate that's floating around, yes.

1  Q   And that's all unsecured amounts; correct?

2  A   Correct.

3  Q   But all of those folks, I assume yourself included,

4  expect those to be treated as administrative expenses and

5  paid in full; correct?

6  A   It's a risk we accept by being professionals who work

7  with bankrupt companies and cities.

8  Q   Now, the City of Detroit is your first engagement on

9  behalf of a Chapter 9 debtor in the context of an actual

10  Chapter 9 proceeding; isn't that correct?

11  A   That's true.

12  Q   Prior to this case, you had no personal experience

13  sourcing municipal financing; isn't that correct?

14  A   That's correct.

15  Q   And, in fact, to your knowledge, no one at Miller

16  Buckfire has previous experience sourcing municipal debt on

17  behalf of a municipality; isn't that right?

18  A   That's correct.

19  Q   Now, as part of the city's first proposal -- okay -- and

20  I'm talking in late August when you send out the RFP.  Okay?

21  That's what I mean by the first proposal.

22  A   Well, we think of it as the second proposal, but go

23  ahead.

24  Q   Are you thinking of the one in July?

25  A   The one in June.

1  Q   The one in June?  I'll come back to that in a second

2  because I'll ask a similar question there, but let's deal

3  with the second proposal then.  With respect to the second

4  proposal, it began by -- it included within it offering as

5  collateral income tax revenues, wage tax revenues, and asset

6  proceeds; isn't that right?

7  A   Yes.

8  Q   And do you agree that your colleague, Mr. Doak, is also

9  someone who you view as having great expertise in the field

10  of sourcing financing?

11  A   Yes.

12  Q   Okay.  Wouldn't you agree that when you go out to the

13  market with a proposed collateral, that it's unlikely that

14  the people whom you solicit are going to call you back and

15  say, "I will take less collateral"?

16  A   That's possible.

17  Q   Isn't it likely?

18  A   No.  It's possible.

19  Q   Okay.  So if Mr. Doak said it's likely, you would

20  disagree with him?

21  A   I'm not sure we're saying anything different.  It's just

22  completely off market to expect a debtor to raise money on an

23  unsecured basis.

24  Q   To your knowledge, before going out to the prospective

25  lenders with a term sheet in late August that proposed

1  collateral, Miller Buckfire did not attempt to test the

2  market for the availability of unsecured credit; isn't that

3  correct?

4  A   Aside from what we did in June, that's correct.

5  Q   Let me direct you to the second deposition you gave, sir,

6  which is at page 23, line 22.  Do you have that, sir?

7  A   Yes.

8  Q          "Question:  Okay.  Before going out to

9              prospective lenders with a term sheet that proposed

10             collateral, was any effort made to test the market

11             for the availability of unsecured credit?

12             Answer:  Not to my knowledge.

13             Question:  You didn't make any phone calls to

14             see whether anybody would offer unsecured credit?

15             Answer:  No."

16             Were you asked those questions?  Did you give that

17  answer, sir?

18  A   I did.

19  Q   Now, in fact, your role in the process of soliciting and

20  negotiating post-petition proposals was very limited; isn't

21  that right?

22  A   That's correct.

23  Q   And your role was supervisory only to Mr. Doak; right?

24  A   Correct.

25  Q   Principal responsibility for the post-petition financing

1  was with Mr. Doak; isn't that right?

2  A    Correct.

3      MR. HACKNEY:  Now, just -- I'd like to, if I could,

4  impose upon the city perhaps to put this document up again,

5  which was the JPMorgan letter that we received -- or

6  whomever, yes.  Thank you.  It's City's Exhibit 61.

7  BY MR. HACKNEY:

8  Q    That's the JPMorgan document that you were talking about

9  earlier.  Do you remember that?

10 A    I do.

11     MR. HACKNEY:  And if I could impose on someone to

12 flip to what I think is called page 1 of the document but is

13 really page 4 --

14 BY MR. HACKNEY:

15 Q    Do you see that there?  That was what you were going back

16 for -- back and forth with Mr. Cullen on.  You see that?

17 A    I do.

18 Q    So I want to focus your attention on something up at the

19 top there, which is that language that says, "The City of

20 Detroit is seeking potential debtor in possession financing."

21 By the way, I'll make a quick note.  Isn't it true that a

22 city is not a debtor in possession?

23 A    It's nomenclature.  We refer to it as debtor in

24 possession.  That's correct.

25 Q    In your experience, all of your prior sourcings had been

1    on behalf of debtors in possession; isn't that right?

2    A    That's right.

3    Q    Okay.  And so you used the common nomenclature even

4    though a city is not a debtor in possession; correct?

5    A    That's right.

6    Q    If you look at the second sentence there, it says, "The

7    city and its advisors have identified four distinct revenue

8    streams to be used as security to secure any potential

9    lending facility"; right?

10   A    Correct.

11   Q    And that's JPMorgan.  They're writing back to you about

12   what they understand you've made inquiry of them about;

13   correct?

14   A    Correct.

15   Q    And so isn't it fair to say, Mr. Buckfire, that that

16   proposal that you sent out there also suggested collateral to

17   the market?

18   A    But no one ever raises debtor in possession financing

19   without collateral.

20   Q    My question was isn't it true that when you sent that

21   letter out --

22   A    Yeah.

23   Q    -- it proposed collateral to the market?

24   A    Yes, it did.

25   Q    Now, take a look down at the second paragraph under

1  "general fund" that you were focusing on with Mr. Cullen that

2  says, "the keys to any DIP financing."  Do you see that?

3  A    I do.

4  Q    Now, the line you quoted I want to focus on.  It says,

5  "The city does not currently have market access on its own

6  credit."  Do you see that?

7  A    I do.

8  Q    And at the time that the city and you sent this to

9  JPMorgan, the city was not in bankruptcy; correct?

10  A    No.

11         MR. CULLEN:  Objection, your Honor.  Sent what to

12  JPMorgan?

13         MR. HACKNEY:  Whatever the solicitation was that

14  generated this response.

15         THE COURT:  Just clarify the question for the

16  witness.

17         MR. HACKNEY:  Sure.

18  BY MR. HACKNEY:

19  Q    At the time that you sent the solicitation that generated

20  this response, the city was not in bankruptcy; correct?

21  A    That's correct.

22  Q    In fact, as of the time you got the response, the city

23  was still not in bankruptcy; correct?

24  A    That's correct.

25  Q    And so when JPMorgan said the city does not currently

1    have market access on its own credit, it was referring to the

2    pre-bankruptcy City of Detroit; correct?

3    A    Read the rest of the sentence.  The rest of --

4    Q    I'm going to.  That's where I'd like to take you next.

5    "We believe it is unlikely that the city will regain market

6    access immediately upon emergence from bankruptcy"; correct?

7    A    Correct.

8    Q    They did not address the concept of being paid on an

9    administrative basis like your firm is during the pendency of

10   the bankruptcy; isn't that correct?

11   A    That's correct.

12            MR. HACKNEY:  Your Honor, I have finished the lead

13   questioner portion of the examination and would tender the

14   podium to my objector colleagues.

15            THE COURT:  Okay.

16            MS. ENGLISH:  Good afternoon.  Caroline English on

17   behalf of Ambac Assurance Corporation.

18                        CROSS-EXAMINATION

19   BY MS. ENGLISH:

20   Q    Good afternoon, Mr. Buckfire.

21   A    Good afternoon.

22   Q    Mr. Hackney did a great job of ruining my outline, so I

23   have -- I had 40 questions, and I now have 4.  Okay?

24   A    Okay.

25   Q    Isn't it true, Mr. Buckfire, that when you went into the

1   negotiations with the swap counterparties, you went in under

2   the assumption that the swap counterparties had valid liens?

3   A   Yes.

4   Q   And isn't it also true that you never discussed with the

5   swap counterparties any legal arguments that the city might

6   have had with respect to the validity of their liens?

7   A   That's correct.

8   Q   Isn't it also true that you never discussed any of the

9   city's legal arguments or claims against the swap

10   counterparties with Mr. Orr?

11   A   That's correct.

12   Q   And, in fact, you were not even aware of what claims the

13   forbearance agreement was settling and releasing; isn't that

14   true?

15   A   That's correct.

16         MS. ENGLISH:  Thank you.

17                   CROSS-EXAMINATION

18   BY MR. MARRIOTT:

19   Q   Good afternoon, Mr. Buckfire.

20   A   Good afternoon.

21   Q   Vince Marriott.  Nice to see you again.  I think I --

22   Mr. Hackney did even better with my outline.  You

23   testified -- I believe you testified earlier that the city --

24   you ultimately recommended the Barclays proposal to the

25   emergency manager on the basis that it was -- and I think

1  your phrase was "the cheapest one."  Do you recall that

2  testimony?

3  A   I do.

4  Q   In order to evaluate among alternatives what's the

5  cheapest one, you have to know what the cost of each of the

6  alternatives is; correct?

7  A   Correct.

8  Q   I mean otherwise there's no basis to make a comparison;

9  correct?

10 A   Correct.

11         MR. MARRIOTT:  I have nothing further.  Anyone else?

12         MR. GOLDBERG:  Yes.  I just need a minute, sir.

13 Sorry.

14                      CROSS-EXAMINATION

15 BY MR. GOLDBERG:

16 Q   Mr. Buckfire, you testified that the 2009 arrangement was

17 a one-sided arrangement only to benefit of the banks; is that

18 not correct?  Wasn't that your words?

19 A   Yes.  The only benefit the city got was to cure the

20 default that existed at the time.

21 Q   Okay.  Have you looked at similar cases that have been

22 filed by the SEC against -- in connection with interest rate

23 swaps around the country, sir?

24 A   No.

25 Q   Have you looked at cases filed against Bank of America in

 1  connection with wrongdoing with regard to municipal interest

 2  rate swaps?

 3  A    No.

 4        MR. GOLDBERG:  Your Honor, I have a copy here of a

 5  report on the municipal securities market.  I've marked it as

 6  Sole 1328.  It's a report by the U.S. Securities and Exchange

 7  Commission.  I'd like to move for entry as evidence as a

 8  public report.

 9        MR. CULLEN:  No objection, your Honor.

10        MR. GOLDBERG:  You know, I can --

11        THE COURT:  It is admitted.

12     (Sole Exhibit 1328 received at 3:21 p.m.)

13        MR. GOLDBERG:  For simplification purposes -- it's a

14  140-page report.  There's a specific section that I'm

15  interested in that I'll be looking at, so -- if it's okay

16  with your Honor.

17        THE COURT:  What do you mean, "looking at"?

18        MR. GOLDBERG:  That I'll be questioning the -- Mr.

19  Buckfire concerning this section.

20        THE COURT:  Have you ever heard of this report?

21        THE WITNESS:  No, your Honor.

22        THE COURT:  I can't permit you to question the

23  witness about a report he's never seen.

24        MR. GOLDBERG:  Your Honor, what I'm questioning him

25  about isn't about the content of the report.  It's simply

 1   that the report indicates various actions that have been

 2   taken by the SEC in connection with interest rate swaps, and

 3   it goes to whether a proper investigation in this case was

 4   taken.  In other words, what the issue in this case, is my

 5   understanding --

 6            THE COURT:  You can ask him -- you can ask him if he

 7   investigated anything you'd like to ask him --

 8            MR. GOLDBERG:  Okay.

 9            THE COURT:  -- but you can't confront him with a

10   report he's never seen.

11            MR. GOLDBERG:  Okay.  No problem, your Honor.

12   BY MR. GOLDBERG:

13   Q   Did you do any investigation into whether the city

14   officials were properly informed of the dangers of the --

15   hedging derivatives in 19 -- in 2006 when they first went

16   into account?

17   A   No.

18   Q   Did you do any investigation into whether the city

19   officials were ever properly informed of the potential

20   dangers of hedging derivatives of interest rate swaps on a

21   city like Detroit in 2009?

22   A   No.

23   Q   Did you take a look at who was the swap advisor?

24   A   No.

25   Q   Did you take a look at whether the -- one swap advisor

1  was employed for both counterparties at the time these deals

2  took place?

3  A    No.

4  Q    Did you take a look at who paid the swap advisor?

5  A    No.

6  Q    Are you aware of questions concerning the LIBOR?  Did you

7  do any investigation as to whether there were problems with

8  the application of the LIBOR in this case considering that

9  the LIBOR -- that UBS, for example, has admitted to

10  wrongdoing in connection with manipulation of the LIBOR?

11  A    No.

12  Q    Are you aware of UBS admitting to wrongdoing in

13  connection with the LIBOR?

14  A    I've read newspaper reports about that.

15  Q    Okay.  In light of those newspaper reports, did you

16  consider looking into the effect of this considering that the

17  LIBOR was the index to which the swaps was tied?

18  A    No.

19  Q    Did you look into the fact that the City of Detroit was

20  actually in litigation -- that the SEC had done an

21  investigation of interest rate swaps with regard to the water

22  board, the Detroit Water Board?

23  A    I'm not aware of that.

24  Q    Did you call in the SEC, which is the body that basically

25  investigates these matters, between January of 2012 and May

1   of 2012?  Did you make a call to the SEC to see -- "Come to

2   Detroit.  Give us a hand taking a look and investigating

3   these," in light of the consequences for the City of Detroit?

4   A   We weren't engaged by the city during that period.

5   Q   I'm sorry.  In January of 2013 to --

6   A   No.

7   Q   -- May 2013.

8   A   No, we didn't call the SEC.

9   Q   Okay.  You indicated that the interest rate has become

10  more favorable based on -- I don't want to misstate it --

11  based on the future interest rate?

12  A   Interest rates have increased since March of this year.

13  Q   What interest rates have increased?

14  A   Both forward LIBOR and forward treasuries.

15  Q   The LIBOR has increased since March of this year?

16  A   As has the treasury rate, yes.

17          MR. GOLDBERG:  May I approach the witness, your

18  Honor?

19          THE COURT:  With what, sir?

20          MR. GOLDBERG:  This is a chart on LIBOR rates that

21  charts LIBOR rates historically and for this year and that

22  reflects what the current three-month LIBOR rate is as of

23  December of this year.

24          THE COURT:  You may ask the witness if he's familiar

25  with that.

1    MR. GOLDBERG:  Okay.

2    BY MR. GOLDBERG:

3    Q    How did you make the --

4         MR. GOLDBERG:  I'll do this a little -- I appreciate

5    that, your Honor.

6         THE COURT:  Okay.

7    BY MR. GOLDBERG:

8    Q    How did you make the determination that LIBOR rates had

9    gone down between March of this year and this current -- and

10   December, the three-month LIBOR rate?

11   A    I didn't testify to that.  I said LIBOR rates have gone

12   up.

13   Q    Have gone up.  I apologize.  How did you -- strike that.

14   How did you make the determination -- you're specifically

15   talking about the three-month LIBOR; correct?

16   A    No.  I'm talking about the LIBOR curve, which is reported

17   publicly on the Bloomberg News Services, which goes out

18   effectively 20 or 30 years.

19   Q    Okay.  So you're not saying that the LIBOR -- the three-

20   month LIBOR is going down.  You're saying that the LIBOR

21   curve --

22   A    The curve itself has shifted up.

23   Q    Okay.  Okay.  I appreciate the clarification.  Mr.

24   Buckfire, in the months that you were in Detroit from January

25   to May of 2013 or to the present, have you had a chance to go

1   around the city and take a look at our neighborhoods?

2   A   Yes.

3   Q   Have you witnessed the absolute devastation in

4   neighborhoods all across the city?

5   A   Yes, sir.  I grew up here.

6   Q   Where did you grow up?

7   A   I'm well-aware of the condition of the city.

8   Q   I'm sorry.  Where did you grow up?

9   A   Northwest side.

10  Q   So the northwest side doesn't look like it did 30 years

11  ago, does it?

12  A   No, it doesn't.

13  Q   Boarded up buildings everywhere, isn't it?

14  A   Yes.

15  Q   Did you look into the effect of subprime lending by banks

16  like Bank of America and UBS on causing this devastation in

17  the City of Detroit?

18  A   No.

19  Q   Are you aware that Detroit led the country in subprime

20  loans from the period of 2004 to 2009?

21  A   No.

22  Q   Are you aware that according to city reports the city --

23          MR. CULLEN:  Objection.  Go ahead.

24          THE COURT:  Sir?

25          MR. CULLEN:  Finish your question.

1    MR. GOLDBERG:  Thank you.

2    MR. CULLEN:  I was going to object to the relevance

3    of this line.

4    THE COURT:  What is the relevance?

5    MR. GOLDBERG:  The relevance is that we're talking

6    about fairness.  We're talking about paying banks, two banks

7    that had a major role in causing the financial crisis in the

8    city through their mortgage lending practices are now going

9    to be getting hundreds of millions of dollars and have

10   already received hundreds of millions of dollars.  I think it

11   goes to the equitable question as to whether or not they are

12   entitled to this --

13   THE COURT:  It's arguable.  I'll permit you to --

14   MR. GOLDBERG:  Thank you.

15   THE COURT:  -- pursue it.  Go ahead.

16   BY MR. GOLDBERG:

17   Q   Are you aware that the City of Detroit had 69,000

18   mortgage foreclosures from 2004 to -- 2005 to 2009?

19   A   I didn't know the exact number.  I knew it was a lot.

20   Q   Are you aware that the city -- that 40,000 of those

21   buildings will remain vacant according to a report issued by

22   the City of Detroit?

23   A   Yes.

24   Q   Are you aware that the bulk of those foreclosures were a

25   direct product of subprime lending?

1  A    I did not know that.

2  Q    Have you looked at the Wall Street -- Senate Select

3  Committee on Wall Street and the Financial Crisis which

4  documents the role of the banks in predatory lending

5  practices?

6  A    No.

7  Q    Clearly you never raised that to Bank of America.

8  A    Not specifically, no.

9  Q    Okay.  And you are aware that Bank of America had one of

10  the largest subprime lending units since Countrywide.  You

11  are aware of that.

12  A    I am aware of that.

13  Q    And I'm sure you're aware that they have many, many loans

14  in the City of Detroit if you're a financier?

15  A    Yes.

16  Q    You're also aware that UBS has been implicated in

17  subprime lending to a great extent, more than any other

18  foreign bank?

19        MR. CULLEN:  Objection, your Honor.  Implicated?

20        MR. GOLDBERG:  I'm asking if he's aware of it.

21        THE COURT:  Yeah.  What do you mean by "implicated"?

22  Clarify the question, please.

23        MR. GOLDBERG:  Okay.  Sure.  One second.  I'm sorry.

24  BY MR. GOLDBERG:

25  Q    In 2008 UBS had to write off $19 billion in bad debt

1    because of its role in subprime lending.

2    A    I'm not aware of that.

3    Q    Are you aware that the Detroit Retirement Board filed an

4    action against both UBS and Bank of America for fraudulent

5    mortgage securities and the detrimental affect they had on

6    the Retirement Board?

7    A    No.

8    Q    I want to correct that.  It was the Police and Fire

9    Retirement System who filed the action -- I apologize -- to

10   correct the record.  They filed a class action in May of

11   2009, and among the entities named were Merrill Lynch, Bank

12   of America as successor to Merrill Lynch, and UBS.

13   A    I didn't know that.

14   Q    Are you aware that Chase Bank just was compelled by the

15   U.S. government to pay $19 billion in damages for its role in

16   subprime lending and predatory lending practices?

17   A    Yes.

18   Q    You never considered any of these factors in terms of how

19   you would approach Bank of America and UBS?

20   A    No.

21   Q    I just have a couple more questions.  You were involved

22   with the Barclay -- in negotiating the Barclay loan deal

23   itself; correct?

24   A    No.

25   Q    Are you familiar with the terms of the Barclay loan deal?

1   A    In general, yes.

2   Q    So is it fair to say that under the Barclay loan deal,

3   once the bankruptcy is over, once the bankruptcy is over,

4   there's a termination event where the entire swap termination

5   gets called in; correct?

6   A    I'm sorry.  I don't understand.

7   Q    Okay.  Let me clarify that, that once the bankruptcy is

8   over, the interest on the Barclay -- the 350 million loan

9   rises by two percentage points; correct?

10  A    If we haven't repaid it in full, that's correct.

11  Q    Okay.  And that the -- and it's pledged by a four -- that

12  the swap termination part of the loan is paid by a $4 million

13  a month payment?

14  A    I don't recall specifically if that's there.  We have to

15  pay the loan off at bankruptcy exit.  We intend to do that.

16  Q    Okay.  And that that's secured by our city tax dollars?

17  A    I'm sorry.  Secured by what?

18  Q    By city income tax dollars?

19  A    Yes.

20  Q    Okay.  In the motion that was filed by the city in

21  connection with the approval of the DIP financing, they cited

22  that the city income tax revenues totaled about $232 million.

23  Does that sound correct?

24  A    Yes.

25  Q    So $48 million a year would be 20 percent of our tax

1  dollars being diverted to pay Barclays to pay off UBS and

2  Bank of America?

3  A    I'm sorry.  I think your math is incorrect.  Are you

4  confusing the current swap with the Barclays post-petition --

5  A    No.

6  Q    -- financing?

7  Q    No.  I'm calculating the payments post-bankruptcy based

8  on $48 million a year being used to pay off the Barclay loan,

9  the swap termination portion of the Barclay loan.

10  A    I'd have to look at the terms you're referring to, but in

11  any case those are penalty provisions.  We expect to pay off

12  the loan in full upon exit.

13  Q    Okay.  I'm just saying that the -- it's secured.  It

14  means for the people of Detroit, the people that are going to

15  be here after this bankruptcy is over, 20 percent of our

16  tax -- income tax dollars are going to be diverted to pay off

17  a loan -- pay off a loan from Barclays to pay off UBS and

18  Bank of America.  Is that a correct statement?

19  A    The city has over a billion dollars in revenues.  You're

20  talking about a penalty provision, which is highly unlikely

21  to be in effect because we intend to pay off the post-

22  petition financing upon exit with more advantageous

23  financing.

24  Q    Oh, you do.  Okay.  Sounds good.

25  A    But I don't understand what you're talking about.

1  Q   You're going to get more, but you don't have that

2  financing in place, correct, sir?

3  A   That's correct.  We don't.

4  Q   And what's pledged right now is that 20 percent -- is

5  that $4 million a year is pledged post-bankruptcy.

6          MR. CULLEN:  Objection.  Asked and answered.

7          THE COURT:  I'll permit it again.  Go ahead.

8  BY MR. GOLDBERG:

9  Q   Is that what's pledged?

10 A   Could you repeat the question?

11 Q   What's pledged right now is that post-bankruptcy, $4

12 million a year secured by income tax revenues from the people

13 of Detroit is going to be used to pay off a loan from

14 Barclays to pay off a swap termination event in order to --

15 to the benefit of UBS and Bank of America?

16 A   If we haven't been able to repay it any other way, that's

17 right.

18 Q   And, in fact, according to Doak, my understanding is that

19 once the quality of life portion is paid off, then there will

20 be eight million.  Eight million a month is going to be

21 sucked from income tax revenues to pay off the swap

22 termination; is that correct?

23          MR. CULLEN:  Objection.  Using one witness testimony

24 to question another.

25 BY MR. GOLDBERG:

1    Q   Well, I mean is that correct?

2           MR. GOLDBERG:  I shouldn't have --

3           THE COURT:  The objection is --

4           MR. GOLDBERG:  I shouldn't have --

5           THE COURT:  The objection is sustained.  Please

6    rephrase.

7           MR. GOLDBERG:  Yeah.  I'll phrase it differently.

8    BY MR. GOLDBERG:

9    Q   That once the quality of life portion of the 350 million

10   Barclay loan is paid off, then $8 million a month will be set

11   aside from Detroit income tax revenue or be secured by income

12   tax revenue to pay off this loan in order -- which is the

13   swap termination part of the loan; is that correct?

14   A   I believe so.

15   Q   Okay.  So 96 -- another 40 percent of our tax revenues

16   will be going to pay off UBS and Bank of America.

17   A   Only that portion of the city's revenues.

18          MR. GOLDBERG:  Okay.  I have no further questions,

19   your Honor.

20          THE COURT:  Any further questions by objectors?

21                     CROSS-EXAMINATION

22   BY MS. GREEN:

23   Q   Good afternoon, Mr. Buckfire.  Jennifer Green on behalf

24   of the Retirement Systems for the City of Detroit.  I have

25   very few questions as well since the first set of objecting

1  parties have asked all of my questions.  You admit that the

2  quality of life loan proceeds are really intended to provide

3  adequate working capital; correct?

4  A   That's one way of looking at it, yes.

5  Q   And I think you previously characterized it as a true

6  working capital facility; correct?

7  A   That's correct.

8  Q   And you admit that the title of the loan as a quality of

9  life loan is actually not the best choice of words; correct?

10 A   You know, it's nomenclature.  If you have working capital

11 to allow reinvestment in the city, that supports quality of

12 life.

13 Q   Isn't it true that you have previously testified that the

14 title of this loan is probably not the best choice of words

15 because it should be called a working capital loan instead?

16 A   From a banking perspective, that's what it is.

17 Q   And you understand that under PA 436 it provides a

18 process for City Council to review and vote upon the post-

19 petition financing; correct?

20 A   Yes.

21 Q   And City Council also can develop its own alternative

22 proposal under PA 436?

23 A   I'm sorry.  I didn't hear that.

24 Q   City Council can develop its own alternative proposal to

25 the post-petition financing?

1  A    Yes.

2  Q    But you did not personally meet with City Council;

3  correct?

4  A    No.

5  Q    And you don't know what documents City Council was

6  provided with; correct?

7  A    No.

8  Q    So you don't know if they were provided with the fee

9  letter?

10  A    I don't know.

11  Q    And you don't know if they were provided with information

12  relating to the market flex provision or the applicable

13  interest rates?

14  A    I don't know.

15  Q    And according to you, the reason these documents were not

16  provided to City Council is because you kept this very close

17  to people who really needed to know in order to ostensibly

18  protect the city's ability to raise the lowest cost

19  financing; isn't that right?

20          MR. CULLEN:  Objection, your Honor.  I believe she

21  just asked him if he knew what was provided.  He said he

22  didn't know, and now she's asking him why something wasn't

23  provided.  I think she's undermined the premise of her

24  question.

25          MS. GREEN:  Your Honor, those are his words from his

1    deposition.  I can pull out his deposition transcript.  He

2    answered it at the deposition.

3           THE COURT:  I'll permit it.  Go ahead.

4    BY MS. GREEN:

5    Q    Do you need me to rephrase the question or repeat it?

6    A    Please repeat it.

7    Q    According to you, the reason these documents were not

8    provided to City Council was because you were keeping it very

9    close to people who really needed to know in order to protect

10   the city's ability to raise the lowest cost financing;

11   correct?

12   A    That's correct.

13   Q    But you're aware, aren't you, that the Barclays

14   commitment letter expressly permits the commitment letter and

15   the fee letter both to be disclosed to City Council; correct?

16   A    I don't know that.

17   Q    Are you familiar with the Barclays commitment letter?

18   A    I haven't reviewed it in quite some time.

19          MS. GREEN:  Can we pull up City Exhibit 94, page 6,

20   paragraph 8, please?

21   BY MS. GREEN:

22   Q    Sub 3 in that paragraph, I'd like to draw your attention

23   to that portion.  Do you recognize this document, Mr.

24   Buckfire?

25   A    I read it a long time ago.  I haven't seen it recently.

1  Q   All right.  Do you see the portion where it says, "This
2  commitment letter and fee letter may be disclosed to the
3  extent required pursuant to applicable law, including any
4  disclosures required to be made to the city -- to the City
5  Council or any local emergency financial assistance loan
6  board pursuant to Michigan PA 436"?
7  A   I do.
8  Q   Okay.  So you could have shared the fee letter with City
9  Council?
10 A   Yes.
11 Q   And you thought City Council didn't need to know the fee
12 and interest rate terms because you didn't consider City
13 Council to be a decision-maker; correct?
14 A   That's correct.
15 Q   And you used those terms even though you disagreed with
16 me that PA 436 actually requires City Council to vote on the
17 post-petition financing; correct?
18 A   That's correct.
19 Q   And compliance with PA 436 --
20         THE COURT:  Ms. Green, would you slow down --
21         MS. GREEN:  Yes.  I'm sorry, your Honor.
22         THE COURT:  -- your questions for me, please?
23         MS. GREEN:  Standing order for me to slow down.
24 BY MS. GREEN:
25 Q   Compliance with PA 436 is also a condition to closing

1    under the loan documents; correct?

2    A    I believe so, yes.

3    Q    And the Emergency Loan Board also has to approve the

4    post-petition financing under the terms of the loan; correct?

5    A    That's my understanding.

6    Q    But the post-petition financing documents were not

7    actually submitted to the Emergency Loan Board until November

8    6th; right?

9    A    I don't know.  I believe that's right.

10   Q    And to your knowledge, the Emergency Loan Board has not

11   yet voted --

12   A    That's correct.

13   Q    -- nor has a date been set?

14   A    That's my understanding.

15   Q    And your understanding is also that the Emergency Loan

16   Board is actually waiting for this Court to rule first before

17   it will vote on the post-petition financing?

18   A    That's my understanding.

19          MS. GREEN:  I don't have any further questions, your

20   Honor.

21          MR. CULLEN:  I don't have any questions, your Honor.

22          THE COURT:  Stand by one second, please.  I have

23   just a few questions for you, sir.  I ask this.  Are you

24   familiar with interest rate swap transactions generally?

25          THE WITNESS:  I am.

1          THE COURT:  Have you ever negotiated on behalf of
2     one party or another for an interest rate swap?
3          THE WITNESS:  It's infrequent in my line of work,
4     but I have done it twice.
5          THE COURT:  In the ordinary course of investigating
6     and negotiating an interest rate swap, do the parties
7     investigate the financial ability of the other party to pay
8     as required under the swap should it go that way?
9          THE WITNESS:  Yes.
10          THE COURT:  In your work for the city here, did you
11     investigate whether the city's swap counterparties in 2005
12     and 2006 investigated the ability of the city to pay should
13     interest rates go down as dramatically as they wound up
14     doing?
15          THE WITNESS:  Right.  We did not investigate that.
16          THE COURT:  And it's your testimony that as a matter
17     of ordinary due diligence the swap counterparties would have
18     and should have performed that investigation; is that right?
19          THE WITNESS:  Yes.
20          THE COURT:  Do you have an opinion on whether the
21     obligations on the city that resulted from the dramatic and
22     longstanding reduction of interest rates contributed to its
23     need to file bankruptcy?
24          THE WITNESS:  Yes.
25          THE COURT:  What is your opinion?

1    THE WITNESS:  Well, go back to the original

2 transactions, your Honor.  When the city borrowed a billion

3 four to finance the pension plan, some of it was fixed --

4    THE COURT:  To do what, sir?

5    THE WITNESS:  They took the proceeds and put it into

6 the pension plans.  A portion of it was fixed rate; a portion

7 was floating.  But then for whatever reason in their business

8 judgment they put on a fixed rate swap, which converted the

9 entire thing to fixed rate, which eliminated any value they

10 would have otherwise received from a decline in interest

11 rates.  That was a poor idea, and I don't know why they did

12 it, but the fact is that because interest rates then declined

13 so rapidly beginning in 2007, it put an enormous cash burden

14 on the city because the fixed rate, if I recall correctly,

15 was about $50 million a year.  When interest rates were much

16 higher, the net cash cost to the city was not 50.  It would

17 be some fraction of that, call 10, but then when rates went

18 down, it became unsustainable.  And, in fact, from 2007 to

19 2013, you know, it sucked hundreds of millions of dollars out

20 of the city for no real benefit.

21    THE COURT:  So what's your answer to my question

22 about the extent to which it contributed to the bankruptcy?

23    THE WITNESS:  I think it had a great deal to do with

24 the bankruptcy, your Honor, because of that loss of cash over

25 the intervening period of time and because after the

 1  disastrous decision in 2009 to pledge their collateral, it
 2  exposed the city to the loss of that collateral if they
 3  defaulted, which, indeed, they did.
 4          THE COURT:  The city borrowed approximately how much
 5  through the COP's?
 6          THE WITNESS:  Approximately a billion four, and they
 7  took out 800 million initial amount against the underlying
 8  securities on the swap.
 9          THE COURT:  What does that mean?
10          THE WITNESS:  They had interest rate swaps on $800
11  million of underlying debt.  Sorry for using technical
12  jargon.
13          THE COURT:  Did all of the proceeds go to the
14  pension funds?
15          THE WITNESS:  Well, there's some dispute about that.
16  I don't have the facts in my head, but I believe that some of
17  it did not go to the pension funds.
18          THE COURT:  Did you or are you aware whether anyone
19  investigated where the money went that didn't go to the
20  pension funds?
21          THE WITNESS:  I believe that that's been looked at
22  by other consultants of the city.  I do not know what the
23  result of their investigation is.
24          THE COURT:  Has anyone else on behalf of the city,
25  to your knowledge, investigated whether the swap

1  counterparties knew the city would not be able to pay if

2  interest rates dropped as low and as dramatically as they

3  did?

4          THE WITNESS:  I don't know.

5          THE COURT:  All right.  Any further questions for

6  the witness?  All right.  Sir, you may step down.

7          MR. ELLENBERG:  Your Honor, may I ask a --

8          THE COURT:  You may.

9          MR. ELLENBERG:  If the Court please, Mark Ellenberg

10  on behalf of Bank of America Merrill Lynch.

11                      CROSS-EXAMINATION

12  BY MR. ELLENBERG:

13  Q   Good afternoon, Mr. Buckfire.

14  A   Good afternoon.

15  Q   Mr. Buckfire, when the city entered into a floating rate

16  bond, that left them exposed to fluctuations in interest

17  rates; is that correct?

18  A   That's correct.

19  Q   And had interest rates gone up, that would have

20  dramatically increased the cost to the city?

21  A   Correct.

22  Q   And so if they did nothing else, they would have, in

23  effect, been speculating on interest rates; is that correct?

24  A   That's correct.

25  Q   Now, the fixed rate swap -- I'm sorry -- the interest

1   rate swap that was entered into exchanged a fixed rate for a

2   floating rate?

3   A   Correct.

4   Q   And the city was paying the fixed rate under that swap?

5   A   Yes.

6   Q   And Bank of America Merrill Lynch or UBS was paying the

7   floating rate?

8   A   Correct.

9   Q   So the swap effectively transferred the interest rate

10  risk from the city to the two banks?

11  A   Correct.

12  Q   And what it did was fix the city's interest rate cost at

13  approximately five percent?

14  A   That's correct.

15  Q   And no matter which direction interest rates moved in,

16  the city's interest rate cost stayed the same.  It was five

17  percent.

18  A   That's correct.

19  Q   So the fact that the interest rates, in fact, went down

20  did not change the deal the city struck.  They struck a deal

21  to have a guaranteed five-percent interest rate associated

22  with those bonds?

23  A   That's correct.

24  Q   And so it was the synthetic equivalent of issuing fixed

25  rate debt?

1  A   That's correct.

2          MR. ELLENBERG:  Thank you.

3          THE COURT:  Okay.  Let's take our afternoon recess

4  now, and we will reconvene at 4:10.  For your information, I

5  show the city has 274 minutes left and the objecting parties

6  378.

7          THE CLERK:  All rise.  Court is in recess.

8      (Recess at 3:48 p.m., until 4:10 p.m.)

9          THE CLERK:  All rise.  Court is in session.  Please

10  be seated.

11          THE COURT:  Looks like everyone is here.  Before we

12  proceed with the next witness, I'd like to ask someone from

13  counsel for the city about this question that was raised

14  about approval by the loan board.  Who volunteers?

15          MR. HAMILTON:  I'll try it, your Honor.  Robert

16  Hamilton of Jones Day on behalf of the city.

17          THE COURT:  So the matter isn't to be submitted to

18  the loan board for its approval until after this Court gives

19  its approval?

20          MR. HAMILTON:  No, your Honor.  As Mr. Buckfire

21  testified on cross and as Mr. Doak will testify, we already

22  submitted it to the loan board in early November.  It is our

23  understanding that the loan board will issue its -- whether

24  it approves it or not, it is waiting for this Court -- our

25  understanding is that it is waiting for this Court to issue

1    its ruling on whether it's going to approve the post-petition

2    financing facility before it issues -- before the loan board

3    issues its ruling.  We expect that we would get the ruling

4    from the board promptly after this Court issues its ruling,

5    and it is a condition to closing.

6         THE COURT:  Well, is there any chance that we're

7    wasting our time here?

8         MR. HAMILTON:  Logically, that's a hypothetical

9    possibility.  That's not our expectation.  Our expectation is

10   that it will receive the board's approval once this Court

11   approves it.

12        THE COURT:  Who's on this board?

13        MR. HAMILTON:  I used to know the answer to that

14   question, and I have blocked it out of my mind.  I can get

15   you that answer in just a second.

16        MR. ERENS:  Apologize, your Honor.  Brad Erens.  I

17   did not previously provide an appearance, but I can answer

18   your questions.  A couple things.  First of all, there are

19   three members of the Emergency Loan Board.  One is the

20   individual who previously provided the consent letter from

21   the Department of Treasury for this transaction to go

22   forward, so that individual was acting in a different

23   capacity with a different hat, but that is one of three

24   members who's already approved this transaction.

25        THE COURT:  Who's that?

1          MR. ERENS:  I don't believe I have the name, but we
2    do have as an exhibit the approval from the treasury.
3          MR. HAMILTON:  Andy Dillon.
4          MR. ERENS:  Okay.  It was Mr. Dillon then.  The two
5    other members of the loan --
6          THE COURT:  He's still on the loan board even though
7    he has resigned as treasurer?
8          MR. ERENS:  I don't believe -- I think he --
9          THE COURT:  Is there something the matter, Letrice?
10         THE CLERK:  Someone was speaking from the pod phone.
11         THE COURT:  I'm sorry.
12         THE CLERK:  Someone was speaking from the phone,
13   from the pod phone.
14         THE COURT:  Oh, we can't have that.
15         THE CLERK:  I'm just going to turn it down.
16         THE COURT:  One second, sir.  Okay.
17         MR. ERENS:  Apologize, your Honor.  It's my
18   understanding Mr. Dillon is still a member of the loan board
19   at least.  And I'm not actually sure, while he has tendered
20   his resignation, if that's yet effective, although I'm not
21   sure.  I think it may be effective at the end of the year or
22   sometime in January.  In any case, the other two members --
23   and I don't have their names -- of the Emergency Loan Board
24   are gubernatorial at-will appointees, so the point of that is
25   that the administration has already expressed its support,

1  okay, for this loan, but --

2          THE COURT:  Well, but why are they waiting?

3          MR. ERENS:  Well, there's a couple of reasons, your

4  Honor.  I think the technical legal reason is because the

5  liens that are being granted pursuant to this facility are a

6  creature of federal statute and your Honor's approval, and

7  the state has concluded that for them to approve the

8  transaction, those liens actually have to be in existence and

9  approved.  They're not in existence and approved yet because

10  the way the Emergency Loan Board --

11          THE COURT:  What's the point of their approval if

12  the liens are in place by the time they give their approval?

13          MR. ERENS:  My understanding of the way they're

14  thinking about it is right now those liens don't exist, and

15  the way the statutes work, they have to approve the terms and

16  conditions of the financing, and until those liens exist

17  pursuant to a Bankruptcy Court order, there's nothing for

18  them to approve.

19          THE COURT:  Did someone in the attorney general's

20  office give them this idea?

21          MR. ERENS:  That I can't speak to.  I'm not

22  obviously involved in the internal legal considerations of

23  the Emergency Loan Board.

24          THE COURT:  Does this board have an attorney?

25          MR. ERENS:  I'm not sure the board has an attorney

1   assigned solely to the loan board, but the board apparently

2   is advised by counsel to the state or state agencies.

3           THE COURT:  Who?

4           MR. ERENS:  I'm not sure, your Honor.

5           THE COURT:  You get my concern.

6           MR. ERENS:  Oh, absolutely.

7           THE COURT:  What are we going to do about it?

8           MR. ERENS:  Well, again, the Emergency Loan Board

9   has to meet.  Okay.  It has to make considerations.  The

10  administration is in support of the transaction, as we know,

11  through the Department of Treasury letter, and we have every

12  expectation the Emergency Loan Board will approve the

13  transaction.

14          THE COURT:  If it's a mere formality, fine, you

15  know, we'll proceed, but if there's any chance that they're

16  not going to approve this and we're wasting three days of

17  trial with really expensive lawyers --

18          MR. ERENS:  Understood, your Honor.  I guess I would

19  say the city is relying on a couple things, that one of the

20  three members had already approved it in a different

21  capacity, the administration is supportive of the

22  transaction, and that the other two members are at-will

23  appointees of the governor.

24          THE COURT:  Well, all right.  I'm going to ask for a

25  more complete report from Jones Day or an attorney for the

1  city on what the prospects are for loan board approval in

2  terms of how it perceives its role here, when it will

3  exercise that role, who's on the loan board because it's

4  unfair to everyone in this courtroom for us to be proceeding

5  for it just to be disapproved by the state's administrative

6  process after we're done, assuming it's approved.

7            MR. ERENS:  Certainly understand, your Honor.  I

8  guess I could say from the city's perspective, we obviously

9  would not be pursuing this court hearing if we didn't have

10 every expectation that it would be approved, but we are not

11 the Emergency Loan Board.  So we will work on a full --

12            THE COURT:  I want a report tomorrow morning.

13            MR. ERENS:  Okay.  Thank you.  At the start of the

14 hearing?

15            THE COURT:  If you can.

16            MR. ERENS:  Okay.  Thank you.

17            THE COURT:  All right.  Next witness, please.

18            MR. HAMILTON:  Good afternoon, your Honor.  Robert

19 Hamilton of Jones Day on behalf of the city.  The city calls

20 James Doak to the stand.

21            THE COURT:  Step forward, please, sir, and raise

22 your right hand.

23            JAMES DOAK, DEBTOR'S WITNESS, SWORN

24            THE COURT:  Please sit down over there.  You may

25 proceed.

1                    DIRECT EXAMINATION

2    BY MR. HAMILTON:

3    Q    Sir, can you say your full name for the record, please?

4    A    James Leland Doak.

5    Q    And, Mr. Doak, where do you live?

6    A    I live in New Canaan, Connecticut.

7    Q    And where are you currently employed?

8    A    I'm currently employed at Miller Buckfire & Co., an

9    investment bank that is owned by Stifel Financial

10   Corporation.

11   Q    Sir, did you get a degree from college?

12   A    Yes, I did.

13   Q    What was your degree in?

14   A    I have a degree in social studies from Harvard College.

15   Q    When did you graduate from Harvard College?

16   A    1994.

17   Q    And did you pursue post-graduate work?

18   A    Yes, I did.

19   Q    What post-graduate work did you do?

20   A    I received two degrees from Harvard University in 2000, a

21   JD from Harvard Law School and an MBA from Harvard Graduate

22   School of Business.

23   Q    Approximately how long have you had experience in the

24   investment banking industry?

25   A    I've had over 15 years of experience.

1   Q   Where did you start that experience?

2   A   My experience started with the financial analyst program

3   at Goldman Sachs where I worked in the investment banking

4   division.

5   Q   Where did you go after you worked at Goldman Sachs?

6   A   After Goldman Sachs, I returned to the JD/MBA program,

7   and upon graduating from the JD/MBA program at Harvard

8   University, I took employment with Wasserstein Perella & Co.

9   and its restructuring group in 2000.

10  Q   And at some point did that restructuring group become

11  what was -- what is now known as Miller Buckfire?

12  A   Yes.

13  Q   And have you worked at that restructuring group under its

14  prior name and as Miller Buckfire ever since?

15  A   That's correct.

16  Q   Okay.  And what is your current position at Miller

17  Buckfire?

18  A   I am a managing director.

19  Q   And how long have you been a managing director at Miller

20  Buckfire?

21  A   Approximately four years.

22  Q   Okay.  And so you've had then -- looks like if I total it

23  up right, about 13 years of experience at Miller Buckfire and

24  its predecessor; is that right?

25  A   That's correct.

1    Q    Okay.  Can you describe for the Court what your

2    experience has been at Miller Buckfire in soliciting and

3    arranging financing and other capital transactions for

4    entities that are in financial distress?

5    A    Over the last 13 years, I've worked on well over a dozen

6    engagements for borrowers, in some cases debtors, and

7    stakeholders around financially distressed enterprises and

8    other entities.  At the core, if not the periphery of every

9    one of those situations, has been a process of soliciting,

10   marketing, amending or extending credit to distressed

11   entities.  In some cases it was sourcing financing for a

12   borrower.  In other cases it was sourcing financing for a

13   buyer, and in some cases it was negotiating, you know,

14   additional time on a credit facility with an existing set of

15   stakeholders.

16   Q    All right.  Can you describe just generally for the Court

17   what the process of soliciting and arranging a financing

18   facility for an entity in distress involves?

19   A    The process of soliciting financing for an entity in

20   distress has several different phases that you have to take

21   into account.  There's a considerable amount of planning

22   initially, and hopefully you have a fair amount of time to do

23   that.  Sometimes you don't.  But in that time, you have to

24   evaluate what the financial condition is of the entity, what

25   the markets look like as far as the markets that you're going

1    to go into, and determine, based on the financial condition

2    in the market, what type of process you believe is going to

3    best work, how broadly that process should go, who are the

4    key parties, who are the relevant markets and submarkets of

5    the debt capital markets that you should be going to, and you

6    have to work through that process design concept.

7              Once you have a sense of what your process design is

8    and you've prepared whatever materials you think are

9    necessary to introduce parties to the process, you begin

10   with, to the extent you can do it and you have the time, a

11   competitive solicitation process where you're informing

12   would-be providers of financing as to the nature of the

13   opportunity and the type of process that you are going to ask

14   them to participate in.  From there you frequently have a --

15   anywhere from a very short period to an extended period of

16   due diligence and back and forth getting the lenders informed

17   of the overall process.  At some point, depending on the

18   nature of the process and how robust it is and how much time

19   it is, you will ask for responses from the would-be providers

20   of financing so that you can make assessments as to how many

21   parties should continue on in the process and whether you

22   should have then one stage or multiple stages.

23             Eventually, you select key parties and best

24   financing providers to move on to final stages, and

25   eventually you engage in detailed negotiation with one or

1  more parties in order to get to a best possible outcome.  All

2  along that process, depending on the nature of the situation,

3  there's also very critical elements here as far as keeping

4  the relevant stakeholders and decision-makers informed as to

5  how the process is going to go so that they're able to make

6  those decisions at key moments, and then depending on the

7  nature of the situation, there are other stakeholders around

8  the process that you're going to at least have to provide

9  some background recognizing how they may fit into the overall

10 transaction.

11 Q   All right.  And over the course of your 13 years at

12 Miller Buckfire engaging in this process, do you believe that

13 you have developed specialized knowledge in conducting such

14 processes?

15 A   Yes.

16 Q   Can you give the Court some idea of how you use that

17 specialized knowledge in conducting these processes?

18 A   The specialized knowledge that someone gains from going

19 through multiple financing processes is -- allows one to

20 anticipate how a financing process will likely develop,

21 anticipate the reaction of would-be lenders and structure

22 both the process and also the invitation, introduction, and

23 information they'll be receiving so that the lenders will

24 best be able to absorb the information and provide productive

25 responses for you to run the process.

1          Another critical element from my years of experience

2     is the -- is learning how to interpret the signals and

3     massaging that one gets back from potential lenders, how to

4     interpret their questions when it comes to due diligence

5     calls, what they think is important, what they think is not

6     important, whether they're really interested or whether

7     they're less interested, how to interpret the written

8     submissions that they provide and whether they're complete,

9     what they leave in, what they take out, what they add, and

10    interpreting how the process is going to progress based on

11    how those letters look.  Then as one moves along and engages

12    in detailed negotiation with parties and detailed dialogue

13    with parties, over the years you begin to get a better sense

14    of whether parties are -- you know, parties are negotiating

15    in earnest.  Occasionally parties are negotiating to get out

16    basically of where they managed to find themselves, and you

17    have to learn who's -- which entities are really interested

18    in getting to the end point in a financing.

19    Q    Mr. Doak, have you ever been qualified to provide expert

20    testimony on -- with respect to post-petition financing in a

21    bankruptcy case prior to this proceeding?

22    A    Yes, I have.

23    Q    On how many occasions?

24    A    On two occasions in one particular bankruptcy.

25    Q    Which case was that?

1　A　　That was the bankruptcy of <u>Allied Holdings Corporation</u> in

2　2006 through -- 2005 through 2007 in Georgia.

3　Q　　In which Bankruptcy Court was that?

4　A　　Maybe the Northern District of Georgia.  It was the

5　courthouse in Atlanta.  It was Ray Mullins' courtroom.

6　Q　　Okay.  And what was the nature of your expert testimony

7　in that case?

8　A　　The nature of my expert testimony included the

9　superiority of a replacement debtor in possession facility

10　and extension of additional borrowings that occurred mid-

11　case, and then nine months later the replacement of the DIP

12　facility that was negotiated and approved with a convertible

13　DIP exit facility that was provided by another lender and the

14　superiority of that particular proposal at that time to allow

15　the company to emerge eventually from Chapter 11.

16　Q　　Did you also give expert testimony in the <u>Lenox</u> case?

17　A　　In the bankruptcy of the <u>Lenox Group</u>, which was in the

18　Southern District of New York, Judge Gropper's court, I

19　provided expert testimony in regards to the comparative

20　recoveries for stakeholders in two competing -- basically two

21　competing bids for the company.

22　Q　　All right.  And when did your engagement with the City of

23　Detroit begin here?

24　A　　Miller Buckfire's engagement with the City of Detroit

25　began in January of 2013.

1  Q    When did you start working on the matter?

2  A    I began working at the inception of the engagement and

3  began working in October and November of 2012, which was the

4  time frame of the solicitation run by the city and the state

5  seeking financial advisors.

6  Q    And during that period to date, have you had access to

7  the city's books and records in providing investment banking

8  services to the city?

9  A    Yes.

10  Q    And have you had access to the city's outside advisors

11  and the city's finance personnel?

12  A    Yes.

13        MR. HAMILTON:  Your Honor, at this time, I would

14  proffer Mr. Doak and ask him to be qualified as an expert in

15  soliciting and negotiating financing facilities for entities

16  in financial distress.

17        THE COURT:  Any objections?

18        MR. ARNAULT:  Permission to voir dire the witness,

19  your Honor?

20        THE COURT:  Okay.

21              VOIR DIRE EXAMINATION

22  BY MR. ARNAULT:

23  Q    Good afternoon, Mr. Doak.  How are you?

24  A    I'm fine.  Thank you.

25  Q    Good.  My name is Bill Arnault, and I represent Syncora.

1  I just have a few questions for you about your background and

2  some of your qualifications.  So to begin, you've only been

3  involved with one Chapter 9 case in your career; right?

4  A    That's correct.

5  Q    And that one Chapter 9 case is this one; right?

6  A    That's correct.

7  Q    And to the best of your knowledge, Miller Buckfire has

8  only been engaged on one occasion by an issuer to structure

9  and solicit municipal debt; right?

10 A    There was an element of the -- our Foxwoods restructuring

11 assignment, which I worked on, where there was tax-fee debt

12 that -- or tax-exempt debt that was in the municipal market,

13 so restructuring that and reissuing that was part of that

14 assignment, but this would be the only financing for a

15 municipality that I'm aware of that we've engaged in.

16 Q    Okay.  And the DIP loan at issue in this case is your

17 first attempt at sourcing and structuring municipal debt;

18 right?

19 A    Yes.  It's my first personal attempt at sourcing and

20 soliciting and structuring municipal debt.

21 Q    It follows then that you've never attempted to source

22 unsecured financing on behalf of a Chapter 9 debtor; right?

23 A    No, I have not.

24        MR. ARNAULT:  Your Honor, we object to the offer of

25 Mr. Doak as an expert witness on the grounds that he lacks

1  the necessary qualifications in the Chapter 9 context to

2  testify about structuring and sourcing post-petition

3  financing.

4      MR. HAMILTON:  I would say two things, your Honor.

5  One, there's got to be a first time for everybody, and nobody

6  is an expert by counsel's standard because this is really the

7  first contested municipal DIP that we're aware of.  Second,

8  you've already ruled on this in connection with Mr. Buckfire

9  on this very same objection.  We're not proffering him as an

10 expert on Chapter 9 finance.  We're proffering him as an

11 expert on solicitation and negotiation of post-petition -- or

12 of financing facilities for entities in distress generally.

13     THE COURT:  Well, we had a little more complete

14 record when we qualified Mr. Buckfire than we do for this

15 witness.  For example, what, in your judgment, might form the

16 basis for any difference in the experience necessary to

17 properly represent a municipal debtor as opposed to a

18 commercial debtor in a Chapter 11 case who's looking for DIP

19 financing?

20     THE WITNESS:  I think there are many elements of

21 similarity associated with sourcing of financing in this

22 context, and there are certainly many that differ.  The

23 critical elements of similarity include the universe of

24 potential investors who are looking at this situation, how

25 they review any credit because there if it's not this, it's

1  Puerto Rico, but if it's not Puerto Rico, it's a Chapter 11

2  DIP financing, and if it's not that, it's a corporate

3  distress situation.  They are focused on risk and return.

4  They're focused on plays on capital structures, and they're

5  focused on structuring, you know, maximum protection with

6  maximum return.  And those elements that are present in the

7  corporate setting are present here as well.  The other

8  critical elements that are similar are the essential nature

9  associated with planning of the overall process, doing the

10  analytics to understand what you should be asking for and

11  what sort of information you can provide parties in a time

12  frame to achieve a goal in an environment of extraordinary

13  information uncertainty.  I mean that's what investment

14  bankers for distressed companies and borrowers and debtors,

15  you know, face on an everyday basis, and that's -- you know,

16  certainly here in spades when it comes to working through the

17  challenges associated with sourcing financing in an uncertain

18  operating prospect.  There are certainly differences.  There

19  are -- but, you know, the different -- here we have -- you

20  know, we have a different type of debtor, so the type of

21  remedies that parties are going to want is different.  The

22  types of ways that the debt will get formally issued and

23  approved are going to be different, but that's going to be

24  the same if -- that sort of difference is the same if you

25  look at something with United States assets, and at the same

1 time it may have overseas assets, and so you have to get into

2 what sort of security interest you think you can really

3 provide people and whether you have to pledge stock because

4 you can't pledge assets, so, you know, I don't profess to be

5 an expert in Chapter 9, but the concepts here that we have

6 from Chapter 11 and, more importantly, just all around

7 distress and how you get rescues done, exits done, DIP

8 financings done, they're all very applicable to this

9 particular circumstance.

10       THE COURT:  All right.  The Court will qualify the

11 witness as an expert in sourcing financing in municipal

12 cases.

13       MR. HAMILTON:  Thank you, your Honor.

14           DIRECT EXAMINATION (CONTINUING)

15 BY MR. HAMILTON:

16 Q  Mr. Doak, what did you do starting in about May with

17 respect to the process of soliciting financing proposals for

18 the City of Detroit?

19 A  At that time, recognizing that the city's liquidity was

20 very challenged and we had the potential of a Chapter 9 if

21 restructuring negotiations didn't proceed, we wanted to have

22 a better understanding of whether additional liquidity would

23 be available for the city both on a pre-petition basis or on

24 a --

25       THE COURT:  Mr. Doak, I have to stop you.  The

1 | question was what did you do.

2 | THE WITNESS: Okay. In May we determined it was

3 | appropriate to contact several leading institutions to ask

4 | them for their thoughts on whether financing would be

5 | available for the city on both a pre-petition and post-

6 | petition basis.

7 | BY MR. HAMILTON:

8 | Q   How many did you contact?

9 | A   We contacted four institutions.

10 | Q   How did you decide which institutions to contact?

11 | A   We contacted leading institutions, large investment

12 | banks, that we thought brought both municipal financing

13 | expertise and also distressed situation expertise to the

14 | table.

15 | Q   What were the four that you contacted?

16 | A   We contacted JPMorgan, Citibank, Wells Fargo, and

17 | Deutsche Bank.

18 | Q   What did you tell them?

19 | A   We informed them that we wanted to have a preliminary

20 | dialogue with them about some financing ideas associated with

21 | the city and its restructuring process.

22 | Q   Did you meet with each one of those four?

23 | A   Yes, we did.

24 | Q   And what happened as a result of those meetings? What

25 | happened with Deutsche Bank?

1  A    With Deutsche Bank, we had a preliminary meeting, and

2  then subsequently they -- the dialogue with them did not

3  continue.  It was a process that they weren't really -- there

4  wasn't enough information for them to respond to something or

5  provide a response, so they declined to continue the

6  dialogue.

7  Q    What happened with Wells Fargo?

8  A    Wells Fargo expressed a concern over the very high

9  profile nature of the overall situation and declined an

10  opportunity to continue a dialogue.

11  Q    What happened with Citi?

12  A    Citi -- we had a few more conversations, and eventually

13  when we sent an e-mail to them as well as the other three

14  asking for their best thoughts as to where -- their

15  interpretation of where we were in process and what might be

16  available, they submitted a written notice back to us.

17  Q    And what did they say in that notice?

18  A    They indicated that they were not --

19           MR. PEREZ:  Your Honor, it calls for hearsay.

20           THE COURT:  I'll permit it.  Go ahead, sir.

21           THE WITNESS:  Okay.  The letter indicated that Citi

22  was not prepared to work towards extending credit to the

23  city.  They expressed a concern about casino revenues and

24  lending based on casino revenues and cash flow capacity, and

25  they also expressed a general concern about the high profile

1  nature of Detroit and also the fact that there was swap

2  terminations involved in the process which they thought was

3  another bad sort of public element of the overall process.

4  BY MR. HAMILTON:

5  Q   What happened with JPMorgan?

6  A   JPMorgan also submitted a written response somewhat

7  lengthier that indicated that they were not willing to work

8  towards any sort of lending at this time, but they wanted to

9  be helpful or I think they -- we believe they wanted to be

10 helpful, so they extended some of -- they extended a letter,

11 and they provided some of their thoughts on how we could

12 potentially raise financing in the future.

13 Q   Do experts in the field of restructuring finance

14 reasonably rely on such responses that -- such as the one you

15 got from JPMorgan Chase when you reach out for initial

16 expressions of interest?

17 A   Yes, we do.

18 Q   And you reasonably rely on those responses in forming

19 your opinion on what sources of financing are available to

20 your client?

21 A   Yes, we do.

22 Q   Okay.

23       MR. HAMILTON:  At this point, your Honor, I'd like

24 to ask the witness about Exhibit -- City's Exhibit 61, and if

25 we could turn to what I believe everybody has identified as

1  the fourth page of the exhibit.

2  BY MR. HAMILTON:

3  Q   Mr. Doak, is this the fourth page of the letter that you

4  got back from JPMorgan that you just described?

5  A   Yes, it is.

6  Q   All right.  And can we -- I want to focus on the first

7  paragraph if we could blow that up.  Could you explain to the

8  Court what the context is -- of the first two sentences of

9  that paragraph are as to what you had contacted or how you

10  had described to JPMorgan what you were looking for?

11  A   We indicated to JPMorgan that we were examining whether

12  the debtor in possession financing would potentially be

13  available for the city as well as any other financing may be

14  available for the city recognizing we hadn't made a

15  determination yet on Chapter 9, so this is their recitation

16  back to us as to what they thought we had asked of them, and

17  they indicate here, I think, you know, appropriately, that we

18  were seeking potential debtor in possession financing should

19  we decide to restructure under court supervision.  They then

20  outline that there's four distinct revenue streams that we

21  had identified to be used as security to secure any potential

22  lending facility.

23  Q   What were the four revenue streams that you had

24  identified to JPMorgan Chase?

25  A   The revenue streams that we had identified were the

1  casino gaming tax revenues, the income tax revenues, the

2  utility tax revenues, and also the water and sewer revenues.

3  Q   Why had you identified the utility tax revenues and the

4  water and sewer revenues?

5  A   The water and sewer revenues were identified because one

6  element of a potential DIP that we were exploring was whether

7  there was immediate interest savings that the water fund and

8  sewer fund could take advantage of with a debtor in

9  possession facility, so this would be refinancing existing

10 special revenue debt with lower interest rate special revenue

11 debt.  The utility tax revenues we had identified because at

12 the time the city was in the process of raising the financing

13 for the public lighting authority, and that financing process

14 had stalled, so we wanted to know whether there was a way to

15 use what was already out there in legislation that the

16 utility taxes should go to a PLA debt vehicle and see whether

17 that could be incorporated into a debtor in possession

18 facility.

19 Q   All right.  Now, if we can go to the paragraph towards

20 the bottom of the page, the second paragraph under the last

21 heading, and blow that up, when you received this letter and

22 you read that paragraph, Mr. Doak, did that contribute to

23 forming your opinion on what type of financing would be

24 available to the City of Detroit?

25 A   Yes, it did.  It informed and also confirmed, you know,

1    our understanding that the city's access to financing on an
2    immediate pre-petition basis was simply not there and that on
3    a go forward basis it was going to be important to provide
4    security interests for any would-be lender to convince them
5    to provide the city with additional financing.
6    Q    All right.  At some point after the bankruptcy petition
7    for the City of Detroit was filed, did you become involved in
8    the process of soliciting and negotiating the post-petition
9    financing facility with Barclays?
10   A    Yes.
11   Q    All right.  How would you characterize your role in that
12   process, Mr. Doak?
13   A    I was one of the lead bankers at Miller Buckfire, if not
14   the lead banker at Miller Buckfire, working on the post-
15   petition financing process.  My role extended from planning
16   the overall process, developing the initial solicitation
17   materials, developing the universe of potential lenders we
18   would contact to actually contacting those lenders, providing
19   them information, and assisting them in their substantive and
20   structural due diligence for the process.
21   Q    How did you develop the list of parties to contact?
22   A    We made the determination to solicit a broad range of
23   commercial institutions and alternative financing providers
24   that were active in providing credit to distressed
25   situations.

1 Q   All right.  At this time, I'd like to ask you, sir, about

2 what's been marked as City's Exhibit 56.

3        MR. HAMILTON:  And it's my understanding, your

4 Honor, this has already been admitted into evidence earlier

5 this morning because there was no objection.

6        THE COURT:  Which number, sir?

7        MR. HAMILTON:  56.

8 BY MR. HAMILTON:

9 Q   Mr. Doak, what is this document?

10 A   This is the introductory materials and e-mail that we

11 sent to Barclays.  They received the materials on -- late on

12 Tuesday, September 3rd.  That's approximately four days after

13 the bulk of the initial parties participating in the process

14 received their materials.  The parties that received this had

15 executed a nondisclosure agreement so that they could receive

16 these materials, which included private information that was

17 not otherwise available in the debt capital markets, and in

18 this case, as with the others, Barclays received an

19 introductory letter describing the process, a model term

20 sheet for the financing that was designed by the city's

21 advisors and team, and also a copy of the executed swap

22 forbearance agreement.  And at that time, we had not yet

23 completed the liquidity forecast that we wanted to use for

24 the financing.  That was completed probably several days

25 later, so they and other parties received the forecast at

1   that particular time.

2   Q   All right.  And if you look at the last two pages of this

3   exhibit because it has attachments to it, is this the

4   introductory cover letter that's described in your e-mail to

5   Barclays?

6   A   Yes.  This is the cover letter that we sent to all the

7   parties who participated in the process and executed a

8   nondisclosure agreement, and you can see in this cover letter

9   we highlight both a check-in concept on September 6th and

10  also an initial deadline to provide us with an indicative

11  term sheet on September 16th.

12  Q   And if you look at the second page of this exhibit --

13          MR. HAMILTON:  If we bring that up -- no, the second

14  page -- just the second page of the exhibit, page after the

15  e-mail.

16  BY MR. HAMILTON:

17  Q   What is this document, Mr. Doak?

18  A   This is the indicative or model term sheet that we

19  provided to the potential sources of financing to provide

20  them with some sort of background and insight as to the type

21  of financing that the city was looking to source.

22  Q   All right.  And if you look at the second -- the next

23  page, page 2 and page 3 of this document, you'll see a

24  section down for collateral and priority.  Do you see that?

25  A   Yes.

1   Q   And it indicates the collateral for both the swap

2   termination loan and the quality of life loan on the next

3   page; is that right?

4   A   That's correct.

5   Q   Why did you include this collateral package in the

6   indicative term sheet that you sent out to all 50 of the

7   potential lenders that you contacted?

8   A   We provided this collateral package because it was --

9   after a substantial dialogue, we determined that unless we

10  provided the parties with some guidance as to what sort of

11  collateral arrangement the city thought it could possibly

12  agree to, we would get back from parties a very wide range of

13  responses.

14  Q   Did you think there was a benefit to the city to

15  specifying what collateral the city was interested in

16  discussing in the initial package that was sent out to

17  lenders?

18  A   Yes.

19  Q   What is that benefit?

20  A   Benefit was that it clarified the discussion with

21  parties.  It focused them on what we felt was the key

22  provisions that we could deliver, and it also allowed us to

23  move the process along, you know, at the time frame -- within

24  the time frames that we felt we needed to hit in order to

25  secure the financing in time to address the forbearance

1  agreement.

2  Q    What does that mean?  What was the time frame -- how is

3  that relevant to what you were putting in the indicative term

4  sheet?

5  A    This was the -- because this was the -- one of the first

6  if not the first post-petition financing for a municipality,

7  and even -- while we were dealing with very sophisticated

8  parties potentially looking at the financing, they -- we did

9  not have the time to attempt to educate and dialogue with

10 every one of them from ground zero as to what sort of

11 potential collateral arrangements we could provide and how a

12 potential post-petition financing facility could possibly

13 work, so it was helpful for us to provide this particular

14 guidance because we had concerns about, you know, what we

15 could receive back and find acceptable from the parties.

16 Q    All right.  And then can you describe just briefly and

17 quickly and generally what then occurred between -- in the

18 month of September after you sent out that package to the 50

19 potential lenders?

20 A    We sent out the package to the 50 potential -- sorry.  We

21 contacted 50 lenders.  We sent out the package all told to

22 around 40 because that was the -- the parties had to execute

23 NDA's to receive the materials.  We then engaged in calls and

24 other forms of communication with those potential parties

25 getting to September 16th, which was a key time frame for

1    potential parties to submit back to us their indications of

2    interest in providing financing for the city.

3    Q    All right.  And at this time I'd like to ask you, Mr.

4    Doak, about what's been marked as City's Exhibit 88.

5              MR. HAMILTON:  If we could bring that up -- this one

6    is also already in evidence, your Honor, based on your ruling

7    this morning because there was no objection.

8    BY MR. HAMILTON:

9    Q    What is this document, Mr. Doak?

10   A    This was a briefing document that we created for the

11   benefit of the city's team of -- city's leadership and

12   advisors and also other key stakeholders who were

13   participating and monitoring the financing process, and --

14   Q    Who did you provide this document to?

15   A    This document was provided to Treasurer Dillon; the

16   director of the Michigan Finance Authority, Tom Saxton.  It

17   was provided to Kevyn Orr and the emergency manager's office.

18   Jim Bonsall, the city's CFO, also received it as well as Gary

19   Brown, other members of the EM staff, and then the city's

20   advisor -- some of the city's advisors also had it.

21   Q    Why did you provide it to State Treasurer Dillon?

22   A    We provided it to State Treasurer Dillon because we

23   anticipated that his approval of a commitment letter would

24   probably be required as the process went along as well as

25   approval of the ELB over the course of the process, and by

 1  providing him with the periodic updates, it would make

 2  eventually coming to him for approval, you know, all the more

 3  easier as it would be as far as bringing him in potentially

 4  an extremely short time period.  In addition, he's the -- he,

 5  at the time, was the treasurer of the state.  That gave him a

 6  very broad knowledge of the municipal financing activities

 7  that were taking place, you know, across the state with other

 8  municipalities, and he brought that experience to the table,

 9  as did Tom Saxton in his role as director of the Michigan

10  Finance Authority.

11  Q   All right.  If we go to the second page of this document,

12  it lists a number of different entities under the heading of

13  "Traditional."  What does that mean, "traditional"?

14  A   These are potential lenders who we categorized as

15  traditional financial institutions, commercial banks,

16  investment banks, and the like, entities that are regularly

17  in the business of extending and syndicating credit

18  facilities.

19  Q   And if we turn to page -- or turn to the next page of the

20  exhibit, we now have a much longer list of entities under the

21  heading of "alternative."  Can you tell the Court what does

22  "alternative" mean?

23  A   This is -- that is short for the alternative financing

24  providers.  The debt capital markets have changed

25  substantially over the last decade, especially around

1   distressed situations.  Credit is now more frequently

2   provided by these nontraditional institutions whether they

3   are hedge funds or other sort of entities that aggregate

4   assets and spin them out into syndicated vehicles, but these

5   entities tend to work in different manners than the

6   traditional ones, and so we thought that this grouping would

7   be of assistance to the parties that we provided this to.

8           In addition, considering we had the EM and the

9   treasurer and the director of the finance authority,

10  "traditional" also meant, you know, entities that they had

11  most frequently spent more time with, right --

12  Q   Okay.

13  A   -- and "alternatives" were people more from our universe.

14  Q   When you say "our universe," you mean the financial

15  restructuring universe?

16  A   The financial restructuring universe.

17          THE COURT:  Excuse me.  I think it's in all of our

18  best interests to stop now for the day, so let's do that, and

19  we'll reconvene at nine o'clock tomorrow morning, please.  I

20  do need to remind everyone that while you are free to leave

21  your boxes of exhibits or whatever you like here in the

22  courtroom, the courtroom will be locked.  There will,

23  however, be other people in the courtroom, maintenance, IT,

24  housekeeping, et cetera, so it's at your own risk.

25          MR. HAMILTON:  Thank you, your Honor.

1          THE COURT:  We'll be in recess.

2          THE CLERK:  All rise.

3      (Proceedings concluded at 5:00 p.m.)

INDEX

| WITNESSES: | Direct | Voir Dire | Cross | Redirect |
|---|---|---|---|---|
| Gaurav Malhotra | 26/39 | 35 | 86/104 106/112 | 119 |
| Kenneth Buckfire | 127 | | 159/187 188/189 202/211 | |
| James Doak | 219/230 | 226 | | |

| EXHIBITS: | Received |
|---|---|
| City Exhibits 1, 2, 4, 5, 6, 7, 13, 18, 19, 30 47-54, 56, 78, 79, 80, 88, 89, 93, 98, 100, 112, 113, 116-139 | 9 |
| City Exhibit 36 (pages 49, 50, 97, 98) | 53 |
| City Exhibit 61 | 155 |
| City Exhibit 106 | 58 |
| City Exhibit 108 | 68 |
| City Exhibit 109 | 74 |
| City Exhibit 110 | 75 |
| City Exhibit 111 | 76 |
| City Exhibit 115 | 83 |
| Syncora Exhibits 201-214, 217, 223, 233-238, 240 | 9 |
| FGIC Exhibits 301, 303, 307, 308, 309 | 9 |
| Ambac Exhibits 401, 402, 403, 405, 406 | 9 |
| EEPK Exhibits 801-805 | 9 |
| Retirement Systems Exhibits 1012-1015, 1019 | 9 |
| Sole Exhibits 1301, 1303, 1306, 1308, 1310, 1312, 1314, 1316 | 9 |
| Sole Exhibit 1328 | 190 |
| NPFG Exhibits 1, 2 | 9 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    December 23, 2013
_____          _____
Lois Garrett