# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                    Chapter 9

CITY OF DETROIT, MICHIGAN.          No. 13-53846
    Debtor.

HON. STEVEN W. RHODES

_____/

## ATTORNEY GENERAL BILL SCHUETTE'S
## STATEMENT REGARDING THE MICHIGAN CONSTITUTION
## AND THE BANKRUPTCY OF THE CITY OF DETROIT

Bill Schuette
Attorney General

John J. Bursch
Solicitor General

B. Eric Restuccia
Deputy Solicitor General

Larry Brya
Special Assistant Attorney General

Michael Bell
Patrick Fitzgerald
Linus Banghart-Linn
Heather Meingast
Will Bloomfield
Assistant Attorneys General

Attorneys for
Attorney General Bill Schuette
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
BellM1@michigan.gov
P47890

Dated:  August 19, 2013

# TABLE OF CONTENTS

Page

Table of Contents ...................................................................................i

Index of Authorities...............................................................................ii

Concise Statement of Issue Presented....................................................v

Statement of Interest of Attorney General.............................................1

Introduction...........................................................................................2

Argument................................................................................................5

I.    The City of Detroit is eligible to proceed under Chapter 9,
      but the City remains subject to Michigan's Constitution. ..............5

II.   Michigan's Constitution bars the diminution or impairment
      of pensions by any means................................................................9

      A.    The Michigan Constitution established that pensioners
            have a contractual right to their pensions. ...........................9

      B.    Michigan's constitutional protection of pensions is
            broader than that afforded to ordinary contracts. ...............13

      C.    The Bankruptcy Code recognizes the State's
            constitutional limits on municipalities in Chapter 9
            bankruptcy. .........................................................................17

Conclusion and Relief Requested..........................................................19

# INDEX OF AUTHORITIES

Page

**Cases**

*Ass'n of Prof'l & Technical Employees v. City of Detroit,*
398 N.W.2d 436 (Mich. Ct. App. 1986) ................................................. 11

*Attorney General v. Connolly,*
160 N.W. 581 (Mich. 1916) ....................................................... 9

*Brown v. Highland Park,*
30 N.W.2d 798 (Mich. 1948) ..................................................... 9

*Cranford v. Wayne County,*
402 N.W.2d 64 (Mich. 1986) ..................................................... 15

*Energy Reserves Group, Inc. v. Kan. Power & Light Co.,*
459 U.S. 400 (1983) ....................................................... 3, 13

*Garcia v. San Antonio Metro. Transit Auth.,*
469 U.S. 528 (1985) ............................................................. 17

*In re Advisory Opinion re Constitutionality of 1972 PA 258,*
209 N.W.2d 200 (Mich. 1973) ........................................... 12, 16

*In re City of Stockton,*
475 B.R. 720 (Bankr. E.D. Cal. 2012) ....................................... 6, 13, 14

*In re City of Vallejo,*
403 B.R. 72 (Bankr. E.D. Cal. 2009) ................................................. 18

*In re City of Vallejo,*
432 B.R. 262 (E.D. Cal. 2010) ............................................................. 18

*In re Request for Advisory Opinion Regarding Constitutionality of
2011 PA 38,*
806 N.W. 2d 683 (Mich. 2011) ........................................................ 14

*New York v. United States,*
505 U.S. 144 (1992) ............................................................. 8

13-53846-swr Doc 2300-3 Filed 12/28/13 Entered 12/29/13 09:44:09 Page 3 of 193

197

*Romein v. General Motors Corp.*,
   462 N.W.2d 555 (Mich. 1990) ..................................................... 3, 13, 14

*Seitz v. Probate Judges Ret. Sys.*,
   474 N.W.2d 125 (Mich. Ct. App. 1991) ......................................... 11, 16

*Stone v. State*,
   651 N.W.2d 64 (Mich. 2002) ................................................................ 15

*Studier v. Michigan Pub. Sch. Employees' Retirement Bd.*,
   698 N.W.2d 350 (Mich. 2005) ......................................................... 14, 16

*United States Trust Co. v. New Jersey*,
   431 U.S. 1 (1977) .................................................................................. 14

## Statutes

11 U.S.C. § 109(c)(2) ...............................................................................2

11 U.S.C. § 1121(a) ..................................................................................2

11 U.S.C. § 1121(c) ..................................................................................2

11 U.S.C. § 365 ......................................................................................18

11 U.S.C. § 903 ........................................................................... 8, 17, 18

11 U.S.C. § 904 ......................................................................................18

11 U.S.C. § 941 ..................................................................................2, 6

11 U.S.C. § 943(b)(4)...............................................................................2

Mich Comp. Laws § 141.1549(9)(a) ........................................................5

Mich Comp. Laws § 141.1549(9)(b) ........................................................5

Mich. Comp. Laws § 141.1549(9)(c) ........................................................5

Mich. Comp. Laws § 14.28 .....................................................................1

Mich. Comp. Laws § 141.1549(2) ...........................................................5

Mich. Comp. Laws § 141.1549(3)(d) ........................................................ 5

Mich. Comp. Laws § 141.1552(1)(m)(ii) .................................................. 7

Mich. Comp. Laws § 141.1558(1) ................................................... 5, 6, 7

Mich. Comp. Laws § 15.151 ..................................................................... 5

## Other Authorities

1 Official Record of the State of Michigan Constitutional
    Convention of 1961, 770–71 .......................................................... 10, 12

2012 PA 436 .............................................................................. 5, 6, 7

5 William J. Norton, Jr. & William L. Norton III, Norton
    Bankruptcy Law and Practice § 90:4 (3d ed. 2009) .............................. 8

6 Collier on Bankruptcy ¶ 903.02 (Alan N. Resnick and Henry J.
    Sommer eds. 16th ed.) ................................................................... 6

AG Op. No. 7272, June 13, 2013 ............................................................ 15

Article 11, §11-101, ¶ 3 of the City of Detroit's Home Rule City
    Charter ......................................................................................... 11

## Constitutional Provisions

Cal. Const. art. I, § 9 ........................................................................... 14

Mich. Const. art. I, § 3 ............................................................................ 3

Mich. Const. art. I, § 4 ............................................................................ 3

Mich. Const. art. I, § 10 ..................................................................... 3, 13

Mich. Const. art. V, § 21 ......................................................................... 1

Mich. Const. art. IX, § 24 ............................................................. passim

Mich. Const. art. X, § 2 .................................................................... 11, 15

Mich. Const. art. XI, § 1 ..................................................................... 1, 5

**CONCISE STATEMENT OF ISSUE PRESENTED**

1.  Whether the City of Detroit was eligible to file Chapter 9 bankruptcy under 11 U.S.C. § 109(c).

## STATEMENT OF INTEREST OF ATTORNEY GENERAL

The Attorney General is the chief legal officer for the State of Michigan and is empowered by State law to intervene and appear in any legal action in which the People of Michigan "in his own judgment" have an interest. Mich. Comp. Laws § 14.28. His office is created by the Michigan Constitution, and he is elected by the people. Mich. Const. art. V, § 21. He is sworn to uphold the Michigan Constitution. Mich. Const. art. XI, § 1.

Consistent with this responsibility and authority, Attorney General Bill Schuette participates in this case to ensure that all necessary actions are taken to fully protect (a) the City's pensioners (as required by the Michigan Constitution and other applicable law), (b) the art collection of the Detroit Institute of Arts, and (c) all other interests of the People of Michigan.

The City of Detroit is Michigan's largest city and municipal employer. It is imperative that this bankruptcy yield a new, revitalized City, but this process must occur in such a way as to ensure the City abides by its constitutional limitations. The State's most fundamental law—its Constitution—cannot be sacrificed during the process.

1

13-53846-swr Doc 2300-3 Filed 12/28/13 Entered 12/29/13 09:04:09 Page 7 of 193
13-53846-swr Doc 481 Filed 08/19/13 Entered 08/19/13 19:49:02 Page 7 of 29    201

## INTRODUCTION

Michigan Attorney General Bill Schuette does not take issue with the City of Detroit's eligibility to file a Chapter 9 bankruptcy under 11 U.S.C. § 109(c)(2). Michigan Governor Rick Snyder had the authority to and did properly authorize the City's filing, and there is no serious question that the City is insolvent. Accordingly, this Court is the proper venue to decide the issues related to the City's financial crisis.

But a bankruptcy filing does not relieve the City and its emergency manager of their obligation to follow Michigan's Constitution. And that restriction includes the constitutional provision that prohibits a political subdivision like Detroit from diminishing or impairing an accrued financial benefit of a pension plan or retirement system. Mich. Const. art. IX, § 24.

Unlike other chapters of the Bankruptcy Code, Chapter 9 authorizes only one party to propose a plan in a municipal bankruptcy—the debtor. *Compare* 11 U.S.C. § 941 (Chapter 9 debtor "shall file a plan") *with* 11 U.S.C. § 1121(a), (c) ("any party in interest" "may" file a plan). And when the City proposes its plan, it must act within all of the state-law limits that guide the City's conduct. 11 U.S.C. § 943(b)(4).

For example, under Michigan law, the City and its emergency manager have no authority to propose a plan that supports a particular religion or violates an individual's right to religious liberty. Mich. Const. art. I, § 4. Nor could they propose a plan that limits citizens from petitioning the City for redress. Mich. Const. art. I, § 3. Similarly, the City cannot propose a plan that diminishes or impairs accrued pension rights of public employees. Mich. Const. art. IX, § 24.

It has been suggested that the constitutional protection of public pensioners is akin to Michigan's Contracts Clause, which prohibits any law "impairing the obligation of contract." Mich. Const. art. I, § 10. Not so. State and United States Supreme Court decisions have oft recognized that the Contracts Clause prohibition is not absolute and must be "accommodated to the inherent police power of the State 'to safeguard the vital interest of its people.'" *Romein v. General Motors Corp.*, 462 N.W.2d 555, 565 (Mich. 1990) (quoting *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983)). Insolvency is undoubtedly an exigency that authorizes such an accommodation; thus, there is no conflict between the bankruptcy laws and the Contracts Clause of the U.S. or any state constitution.

But under Michigan law, there is no such accommodation when it comes to the accrued financial benefits of a public pension plan or retirement system. The constitutional protection is absolute. So the City can no more authorize a plan that reduces accrued obligations to public pensions than a plan that discriminates on the basis of religion. Accordingly, while the City has the ability to address health benefits or *unaccrued* pension benefits (neither of which Michigan's Constitution specifically protects), *vested* pension benefits are inviolate.

This result is as it should be. According to the Detroit General Retirement System, general City workers like librarians or sanitation workers receive an average payment of roughly $18,000 per year. For retired City police and firefighters, the figure is roughly $30,000 per year, and without the benefit of Social Security payments. These retirees are among Michigan's most vulnerable citizens. The People of Michigan recognized as much and sought to protect them when enacting article IX, § 24. Accordingly, the City of Detroit is constitutionally obligated to keep the People's promise as it proposes a plan that will allow the City to flourish while honoring the lifelong commitment of Detroit's retired public servants.

**ARGUMENT**

## I. The City of Detroit is eligible to proceed under Chapter 9, but the City remains subject to Michigan's Constitution.

Under Public Act 436 of 2012, the City's emergency manager acts as its receiver, and stands in the place of its governing body and chief executive officer. Mich. Comp. Laws § 141.1549(2). The manager also represents the City in bankruptcy. Mich. Comp. Laws § 141.1558(1). He is a public officer subject to the laws applicable to public servants and officers. Mich. Comp. Laws § 141.1549(3)(d) and (9)(a), (b), and (c). And the emergency manager has taken an oath to uphold the Michigan Constitution. Mich. Comp. Laws § 15.151; Mich. Const. art. XI, § 1.

As a public officer, and like any citizen of the State, the emergency manager must follow the Michigan Constitution and statutes enacted by the Legislature pursuant to its constitutional authority. This inter-play of Michigan's Constitution and Public Act 436 requires that the emergency manager abide by all applicable laws in governing the City.

The same obligation to comply with the Michigan Constitution applies to the emergency manager during this Chapter 9 proceeding. "Indeed, absent a specific provision to the contrary, a municipality is required to continue to comply with state law during a Chapter 9 case."

5

13-53846-swr Doc 2801-3 Filed 03/19/13 Entered 03/19/13 15:49:02 Page 11 of 27   205

13-53846-swr Doc 480-1 Filed 08/19/13 Entered 08/19/13 09:01:29 Page 11 of 27

193

6 Collier on Bankruptcy ¶ 903.02 (Alan N. Resnick and Henry J. Sommer eds. 16th ed.)  This is significant, because under Chapter 9, the City, through the emergency manager, is the only party with authority to propose a plan of adjustment, 11 U.S.C. § 941, and therefore controls the plan process in a way that is unique to bankruptcy law.

The scope of a state's authorization of a municipal-bankruptcy filing is a "question of pure state law" and thus "state law provides the rule of decision."  *In re City of Stockton*, 475 B.R. 720, 728–29 (Bankr. E.D. Cal. 2012).  The Michigan Legislature cannot enact laws that authorize local governments to violate the Michigan Constitution, and the Legislature's enactment of Public Act 436—specifically the bankruptcy authorization in § 18(1),  Mich. Comp. Laws § 141.1558(1)— must thus be construed according to this basic legal principle.  This means that when the Legislature enacted Public Act 436 and empowered the City and its emergency manager to pursue bankruptcy, the City and the manager's actions in proposing a reorganization plan remain subject to applicable Michigan law, including article IX, § 24 of Michigan's Constitution.

Article IX, § 24 unambiguously prevents public officials from diminishing vested public-employee pension rights:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which *shall not be diminished or impaired* thereby.

Mich. Const. art. IX, § 24 (emphasis added). This provision prohibits the State, its officers, and any of its political units, including the City and its officers, from diminishing or impairing the pension benefits currently being received by retired City pensioners.

The fact that § 18(1), Mich. Comp. Laws § 141.1558(1), does not incorporate article IX, § 24 is of no moment, because the proscription arises by operation of constitutional law. Moreover, it is plain that the Michigan Legislature was aware of this constitutional provision when it enacted Public Act 436 because the Act requires emergency managers appointed under the act to "fully comply with . . . section 24 of article IX of the state constitution of 1963," in the event an emergency manager becomes the trustee for a local unit's pension fund. Mich. Comp. Laws § 141.1552(1)(m)(ii).

The continued application of state constitutional law during the Chapter 9 case is also consistent with state sovereignty principles, which are incorporated under 11 U.S.C. § 903 (Chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality . . . .").  See also *New York v. United States*, 505 U.S. 144, 155–66 (1992) (recognizing dual sovereignty and observing that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions"); 5 William J. Norton, Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 90:4 (3d ed. 2009) ("Without the consent of the municipality, the court may not interfere with any of the political or governmental powers of the debtor, any property or revenues of the debtor, or the debtor's use or enjoyment of any income-producing property.").

Based on these principles, as the City and its emergency manager progress under Chapter 9 and ultimately propose a plan for the City's reorganization, they remain subject to applicable state laws, including the Michigan Constitution and article IX, § 24.

## II. Michigan's Constitution bars the diminution or impairment of pensions by any means.

### A. The Michigan Constitution established that pensioners have a contractual right to their pensions.

At common law, public pensions in Michigan were viewed as gratuitous allowances that could be revoked at will because a retiree lacked any vested right in their continuation. *See, e.g.*, *Brown v. Highland Park*, 30 N.W.2d 798 (Mich. 1948); *Attorney General v. Connolly*, 160 N.W. 581 (Mich. 1916). That view is captured succinctly in the Michigan Supreme Court's holding in *Brown*:

> [A] public pension granted by public authorities is *not* a contractual obligation, that the pensioner has *no* vested right, and that a pension is *terminable at the will* of a municipality, at least while acting within reasonable limits.

*Brown*, 30 N.W.2d at 800 (emphasis added).

The People of Michigan reversed this public policy when they adopted art. IX, § 24 in the 1963 Michigan Constitution. The purpose for adopting this provision was made clear by delegates to the 1963 Constitutional Convention. In particular, delegate Richard VanDusen, one of the chief drafters of § 24, explained that accrued financial benefits were a kind of "deferred compensation":

13-53846-swr   Doc 2801-3   Filed 08/19/13   Entered 08/19/13 15:49:02   Page 15 of 27
13-53846-tjt   Doc 4901   Filed 04/22/13   Entered 04/24/13 00:01:29   Page 15 of 27
193
209

Now, it is the belief of the committee that the benefits of the pension plans are in the same deferred compensation for work performed. And with respect to work performed, it is the opinion of the committee that the public employee should have a contractual right to benefits of the pension plan, which should not be diminished by the employing unit after the service has been performed.

1 Official Record of the State of Michigan Constitutional Convention of

1961, 770–71 [hereinafter *Constitutional Convention Record*].

Michigan courts have supported this conclusion and have recog-

nized, repeatedly, that article IX, § 24 is an express and unambiguous

statement of the will of the People of the State of Michigan that the

accrued financial benefits of each pension plan and retirement system

of the State and its political subdivisions "shall not be diminished or

impaired." This constitutional promise thus ensures that there is never

a time, a place, or a method for diminishing or impairing the State's *or*

*a political subdivision's* obligation with respect to the accrued financial

benefits of a pension plan or retirement system.

For example, based on § 24, the Michigan Court of Appeals has

held that the City of Detroit's attempt to increase the age at which an

employee could receive his vested pension (and thereby *decrease* the

amount of pension payments) violated art. IV, § 24. *Ass'n of Prof'l &*

10

193

13-53846-swr  Doc 2801-3 Filed 03/19/13 Entered 03/19/13 15:49:02 Page 16 of 27    210
13-53846-swr  Doc 401-3 Filed 12/23/13 Entered 12/24/13 09:01:29 Page 16 of 27

*Technical Employees v. City of Detroit*, 398 N.W.2d 436 (Mich. Ct. App. 1986). The Court of Appeals has also held that § 24 prohibits the State or a local pension plan from reducing a retiree's pension. *Seitz v. Probate Judges Ret. Sys.*, 474 N.W.2d 125 (Mich. Ct. App. 1991).

Similarly, § 24 prohibits the City of Detroit and its emergency manager from unilaterally reducing the pensions of existing retirees, because any reduction would diminish or impair the accrued financial benefits previously earned by such retirees. Just as the City and its manager have no authority to propose a plan that supports a particular religion or violates an individual's right to religious liberty (or, for that matter, a plan that seizes the assets of retired employees in violation of the Michigan Constitution's Takings Clause, *see* Mich. Const. art. X, § 2), the City and the emergency manager cannot propose a plan that has the effect of diminishing or impairing the accrued rights of public-employee pensions.[1]

---

[1] Article 11, §11-101, ¶ 3 of the City of Detroit's Home Rule City Charter equally treats and protects the accrued financial benefits of active and retired city employees as contractual obligations that "shall in no event be diminished or impaired."

The entire thrust of article IX, § 24 is to safeguard a level of benefits for governmental employees who make a decision to retire.  The public employees performed the work relying on a "particular level of benefits." 1 *Constitutional Convention Record* at 770–71 ("the service in reliance upon the then prescribed level of benefits").  The *post hoc* reduction of these vested rights would create an untenable position for the retirants by reducing their compensation after the benefits have already vested.  *See In re Advisory Opinion re Constitutionality of 1972 PA 258,* 209 N.W.2d 200, 202–03 (Mich. 1973) (rejecting any new conditions on accrued financial benefits that were "unreasonable and hence subversive of the constitutional protection").  It is analogous to forcing the pensioners to return deferred compensation.  It is this very kind of reduction of pension payments that the constitutional provision is designed to prevent.

In sum, it cannot be reasonably disputed that the City has been authorized for and is eligible to file Chapter 9 bankruptcy.  But in moving forward and proposing a plan, the City and its manager are bound by the strictures of Michigan law, including article IX, § 24 of Michigan's Constitution.

**B.    Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts.**

At the core of a bankruptcy process is the adjustment of the relationship between a debtor and its creditors, and attendant in that process is the impairment of contracts. *In re Stockton*, 478 B.R. at 15. The State of Michigan's Contracts Clause, Mich. Const. art. I, § 10, mirrors that of the United States Constitution and the contracts clauses of other states, and it is well understood that such a provision must stand aside in the bankruptcy process. But the subversion of a state constitution's contracts clause does not come about as a result of bankruptcy law or the Supremacy Clause of the United States Constitution; a contracts clause steps aside as a matter of state law.

Both the Michigan Supreme Court and the United States Supreme Court have recognized that a constitutional contracts clause is not absolute. The prohibition against impairing contracts must be "accommodated to the inherent police power of the State 'to safeguard the vital interests of the people.'" *Romein*, 462 N.W.2d at 565 (quoting *Energy Reserves Group*, 459 U.S. at 410). Thus, state action can impair a contract provided that there is a legitimate public purpose for the impairment (i.e., the state is validly exercising its police power and not

13
13-53846-swr   Doc 2801-3   Filed 12/28/13   Entered 12/24/13 00:01:29   Page 19 of
193
13-53846-swr   Doc 401   Filed 08/19/13   Entered 08/19/13 15:49:02   Page 19 of 27   213

merely providing a benefit to special interests), and the means of adjustment are necessary and reasonable. *Romein*, 462 N.W.2d at 565–66 (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22-23 (1977)). Accordingly, a Michigan political subdivision is cloaked with the authority of Michigan law when it proposes a plan that impairs ordinary contracts. Here, for example, it cannot be disputed that the police power of the State and the City of Detroit is being exercised for a necessary and reasonable public purpose—to restore basic governmental services (police and fire protection, street lights, ambulance services, etc.) to the citizens of Detroit.

But article IX, § 24 is not similarly subject to such exigencies.[2] The 1963 Constitution and the language of § 24 is understood according to its plain meaning. *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W. 2d 683, 693 (Mich. 2011); *Studier v. Michigan Pub. Sch. Employees' Retirement Bd.*, 698 N.W.2d 350, 356–57 (Mich. 2005).

---

[2] Article IX, § 24 makes the City of Detroit's bankruptcy quite different than the one at issue in *In re Stockton*, because the California Constitution contains no specific protection for pensions, only a generic Contracts Clause. Cal. Const. art. I, § 9.

14

13-53846-swr   Doc 2801-3   Filed 03/19/13   Entered 03/19/13 15:49:02   Page 20 of 27
13-53846-swr   Doc 401   Filed 08/19/13   Entered 08/19/13 00:01:29   Page 20 of 27   214
193

In other words, article IX, § 24 is an impermeable imperative, and its place in the pantheon of Michigan constitutional rights is akin to the prohibition on taking property without just compensation, Mich. Const. art. X, § 2, or any other constitutional prohibition on the power of a government to affect the life, liberty, and property of its citizenry. Constitutional provisions of this nature are innate to the People of Michigan—not subject to discharge by exigency including a Chapter 9 proceeding under the federal Bankruptcy Code. The City and its emergency manager therefore cannot jettison article IX, § 24 when they propose a reorganization plan.[3]

Importantly, article IX, § 24 is not an absolute bar on the City's ability to adjust its debts in a Chapter 9 proceeding. The City may negotiate to adjust contractual terms under pension plans and retirement systems. *Cranford v. Wayne County*, 402 N.W.2d 64, 66 (Mich. 1986); *see also Stone v. State*, 651 N.W.2d 64 (Mich. 2002). Similarly, the City is not prevented from taking even unilateral action

---

[3] The same is true for similar reasons with respect to the City's role as trustee of the art collection of the Detroit Institute of Arts. Because the collection is held in charitable trust, the beneficial interest in the collection ultimately rests with the People of Michigan and is likewise inviolate. See AG Op. No. 7272, June 13, 2013.

15
193
13-53846-swr   Doc 2300-3   Filed 12/28/13   Entered 12/28/13 00:01:29   Page 21 of 27
13-53846-swr   Doc 401   Filed 08/19/13   Entered 08/19/13 15:49:02   Page 21 of 27   215

with respect to *unaccrued* financial benefits. *Advisory Opinion re Constitutionality of 1972 PA 258*, 209 N.W.2d at 202–03 (1973) ("the legislature cannot diminish or impair accrued financial benefits, but we think it may properly attach new conditions for earning financial benefits which have not accrued."); *see also Seitz*, 474 N.W.2d at 127. And § 24 does not implicate the City's obligation with respect to promised health benefits. *Studier,* 698 N.W.2d at 358 ("the ratifiers of our Constitution would have commonly understood 'financial' to include only those benefits that consist of monetary payments, and not benefits of a nonmonetary nature such as health care benefits").

These are all constitutionally acceptable ways for the City of Detroit to reduce its liabilities for its pension plans without violating the constitutional rights of existing retirees. But to the extent the City or its manager desire to diminish or impair *vested* pension benefits, Michigan law prohibits them from even proposing such a plan.

**C. The Bankruptcy Code recognizes the State's constitutional limits on municipalities in Chapter 9 bankruptcy.**

Independent of the City's obligation to act within state-law limits when proposing a plan, article IX, § 24 applies to a Chapter 9 bankruptcy by virtue of 11 U.S.C. § 903. Section 903 guarantees that state law continues to bind a political subdivision's actions once in bankruptcy:

> This chapter [9] does not limit or impair the power of a State to control, *by legislation or otherwise*, a municipality of or in such State in the exercise of the political or governmental powers of such municipality . . . .

11 U.S.C. § 903. In § 903, Congress protected the "States as States" as dual sovereigns under the federal Constitution. State participation in the national political process is the "fundamental limitation that the [United States] constitutional scheme imposes on" the powers granted to the federal government. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985). Section 903 is a result of the states' place in the constitutional framework and participation in federal government and enacted legislation. *Id.* at 552. By including § 903 in the Bankruptcy Code, Congress preserved state constitutional protection provisions, like § 24, within the Code's structure and purpose.

Indeed, nowhere in the Bankruptcy Code provisions applicable to Chapter 9 did Congress expressly provide for the treatment of municipalities' pension plans or retirement systems. Chapter 9's applicable provisions, structure, and purpose do not disclose any Congressional intent to preempt state constitutional protection provisions like § 24.[4]

Moreover, through Chapter 9 Congress has recognized that the bankruptcy of a State's political subdivision is a particular concern of a state and its relations with its political subdivisions. This conclusion is embedded in the preservation of the states of complete control over their political subdivision in the exercise of the political or governmental powers of such subdivisions, 11 U.S.C. § 903.

Consistent with § 903, the Bankruptcy Code imposes strict limitations on the power of this Court to direct municipal action regarding its political process, property, or revenue "unless the debtor consents." 11 U.S.C. § 904. Just as the City lacks the authority under

_____

[4] The pension obligations in question are not executory contracts subject to rejection under 11 U.S.C. § 365. This further distinguishes them from the collective bargaining agreement treatment set forth in *Vallejo*. *In re City of Vallejo*, 432 B.R. 262 (E.D. Cal. 2010); *In re City of Vallejo*, 403 B.R. 72 (Bankr. E.D. Cal. 2009).

Michigan law to propose a plan that diminishes accrued pension rights, it similarly lacks power to consent to any proposed action that would violate the Michigan Constitution.

## CONCLUSION AND RELIEF REQUESTED

This matter is only at the eligibility stage, and, as noted above, the Attorney General does not take issue with the City's eligibility to file bankruptcy. Michigan Governor Rick Snyder had the authority to and did properly authorize the City's filing, and there is no serious question that the City is insolvent.

But through this submission, the Attorney General seeks to illuminate the legal rights and obligations of the City and its emergency manager as they move forward and exercise their exclusive Chapter 9 authority to propose a plan of reorganization. Those obligations include the requirement to act in accord with State law, including article IX, § 24's prohibition on a Michigan political subdivision's authority to diminish or impair accrued pension rights. In this initial filing, the Attorney General also seeks to apprise the Court of his legal positions, and he will offer additional arguments and support for his positions at the appropriate stages of this important proceeding.

Respectfully submitted,

Bill Schuette
Attorney General

John J. Bursch
Solicitor General

B. Eric Restuccia
Deputy Solicitor General

Larry Brya
Special Assistant Attorney General

<u>/s/ Michael Bell</u>

Michael Bell
Patrick Fitzgerald
Linus Banghart-Linn
Heather Meingast
Will Bloomfield
Assistant Attorneys General

Attorneys for
Attorney General Bill Schuette
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
BellM1@michigan.gov
Dated: August 19, 2013          P47890

20

13-53846-swr   Doc 2801-3   Filed 12/23/13   Entered 12/23/13 00:01:29   Page 26 of 27
13-53846-swr   Doc 401   Filed 08/19/13   Entered 08/19/13 15:49:32   Page 26 of 27
193                                                                                    220

# CERTIFICATE OF SERVICE (E-FILE)

I hereby certify that on August 19, 2013, I electronically filed the
above document(s) with the Clerk of the Court using the ECF System,
which will provide electronic copies to counsel of record.

/s/ Michael Bell
Assistant Attorney General
Attorney for
Attorney General Bill Schuette
Revenue and Collections
Division
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
BellM1@michigan.gov
Dated:  August 19, 2013              P47890

13-53846-swr   Doc 401-3   Filed 08/19/13   Entered 08/19/13 15:49:02   Page 27 of 27
13-53846-tjt   Doc 2800-3   Filed 01/02/23   Entered 01/02/13 15:00:29   Page 27 of
193                                                                                      221

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                          Chapter 9

CITY OF DETROIT, MICHIGAN                        Case No. 13-53846

　　　　　Debtor.                                Hon. Steven W. Rhodes

---

## CONSOLIDATED OBJECTION
## OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

The Retired Detroit Police & Fire Fighters Association ("RDPFFA"), Donald Taylor, individually and as President of the RDPFFA, the Detroit Retired City Employees Association ("DRCEA"), and Shirley V. Lightsey, individually and as President of the DRCEA (collectively "Retiree Association Parties") through their counsel, Lippitt O'Keefe, PLLC and Silverman & Morris, P.L.L.C., submit the following Consolidated Objection to the City of Detroit's Eligibility to be a Debtor Under Chapter 9 of the U.S. Bankruptcy Code:[1]

### BRIEF STATEMENT

The City of Detroit ("City") is not eligible to be a chapter 9 debtor because it does not satisfy the requirements of 11 U.S.C. § 109(c). The City cannot meet its burden to show that it: received valid authorization (any authorization received by

---

[1] Declarations of Shirley V. Lightsey and Donald Taylor in support of this Consolidated Objection of the Retiree Association Parties to Eligibility are attached as Exhibits A & B.

{00199051}1

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:21:29   Page 28 of
13-53846-swr   Doc 502   Filed 08/19/13   Entered 08/19/13 17:02:52   Page 1 of 25    222
193

the City was illegal, unconstitutional and erroneous); is insolvent; and/or that it negotiated in good-faith with creditors or that it was impracticable to do so (when in fact negotiations were practicable and welcomed). Therefore, for these reasons and for those reasons as more fully stated below the City is not eligible to be a chapter 9 debtor.[2]

## RELIEF REQUESTED

1. The Retiree Association Parties seek an order dismissing the case for the reason that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code.

2. The Retiree Association Parties further request that the order specifically state that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code because Article IX § 24 of the Michigan Constitution prohibits the City from diminishing or impairing accrued pensions.

## FACTS RELEVANT TO THIS OBJECTION

### I. *Retirement Benefits Are a Substantial Debt of the City*

3. The City has listed as the creditors holding the two largest unsecured claims the General Retirement System of the City of Detroit and the Police and Fire Retirement System of the City of Detroit (together, the "Retirement

---

[2] The Retiree Association Parties expect an objection filing by the Retiree Committee, being formed by the U.S. Trustee's office, and anticipate concurring with the position to be taken by the Retiree Committee.

{00199051}2

13-53846-swr Doc 2300-3 Filed 12/23/13 Entered 12/24/13 00:21:29 Page 29 of 25
13-53846-tjt Doc 302 Filed 08/19/13 Entered 08/19/13 17:02:52 Page 2 of 25    223
193

Systems"). The Retirement Systems may in fact be the largest creditors in the sense that the ordinances establishing the Retirement Systems provide for the Retirement Systems to determine and collect from the City the amount necessary for the City to contribute in order that retiree pensions are properly funded, but the function of the Retirement Systems is to administer pension funds for the City for the benefit of the City's retired employees. The City is indebted to its retirees for their accrued benefits, and the Retirement Systems represent a mechanism through which the City is obligated to fulfill its responsibilities to its retired employees. It is the retirees who have the ultimate financial stake in the fulfillment by the City of its pension obligations.

4.     It is undeniable that the retirement benefits due to the retirees from the City are substantial. This is in part because the City's pension obligations represent a continuing obligation to its retirees.

## II.     *Article IX § 24 of the Michigan Constitution Prohibits the City from Diminishing or Impairing its Obligations for Accrued Pensions.*

5.     Article IX § 24 of the Michigan Constitution provides as follows:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

6.     Accrued public pensions were not protected by the Michigan Constitution until the adoption of the Michigan Constitution of 1963. The

{00199051}3

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:21:29   Page 30 of 25
13-53846-swr   Doc 302   Filed 08/19/13   Entered 08/19/13 17:02:52   Page 30 of 25
193     224

applicable language was originally contained in Proposal 40 at the 1961 Constitutional Convention, which was adopted on April 19, 1962, by a vote of 117-1.

7.    The City has stated, for example in its June 14, 2013 "Proposal for Creditors" (Docket # 11-1, filed 7/18/13, p. 109), its intention to treat its pension obligations as ordinary unsecured debt.  Although the Court must determine the issue of the City's authority to propose a plan of adjustment which diminishes or impairs the "accrued financial benefits of [its] pension plan and retirement system," this issue will not be ripe for determination until the City has proposed such treatment under a plan.  Nevertheless, the City's present posture on this issue, in contravention of the Michigan Constitution, precludes a finding that the City attempted to negotiate with the retirees in good faith (especially considering there were no negotiations at all). This lack of good faith negotiation by the City renders the City ineligible for relief under chapter 9.

### III.    *The Retiree Associations Have Been and Continue to Be Natural Representatives for Retirees*

8.    The Retiree Associations (RDPFFA and DRCEA) have provided and continue to provide a highly organized and representative voice of the retirees.

9.    The combined membership of the Retiree Associations is estimated to be approximately 70% of all City retirees.

10.     The RDPFFA has represented its constituent retirees for more than 30 years and has won and protected rights for them through litigation, lobbying and other forms of representation.

11.     The DRCEA has represented its constituent retirees for more than 50 years and has won and protected rights for them through litigation, lobbying and other forms of representation.

12.     Both the RDPFFA and DRCEA's primary purpose is to represent the interests of their respective retiree members.  Each of the Retiree Associations operates under its own by-laws and governing documents and serves its members through its elected and/or appointed board of directors and officers.

13.     The Retiree Associations are the natural representatives of the retirees capable of bargaining on their behalf.

14.     The Retiree Associations are in the process of obtaining proxy forms from their members providing that the retiree appoints his or her respective association to represent him or her in these proceedings. The Retiree Associations have in a short period received over 5,000 proxies and they expect to receive thousands more in the near future.

## IV. The Retiree Associations' Histories of Negotiating and/or Representing Retirees

## A. The DRCEA

15. Over the past 53 years, the DRCEA has been integral in securing pension improvements, protections and/or payment of entitled benefits. The list below is a summary of the many accomplishments made by the DRCEA on behalf of retirees and examples of DRCEA's involvement retiree advocacy:

- 1971: Retiree representative appointed by the mayor begins service as a member of the General Retirement System Board of Trustees.

- 1974: New city charter requires retiree representative serving on the General Retirement System Board of Trustees to be elected by retirees

- 1981: Option to withdraw annuity savings when leaving city service prior to retirement while retaining a right to a vested pension permitted.

- 1996: Pre-July 1992 retirees win part of equity lawsuit in circuit court. City ordered to raise pension payments to reflect 1.56% factor for service beyond 10 years. Retirees do not receive adjustment until February 1999.

- 1996: DRCEA helps defeat Proposal T which would have limited and reduced distribution of excess earnings on investments to retirees.

- 1997: Factors for service years of pre-July 1992 retirees increased to 1.63% by court-ordered pension equity adjustment. Retirees receive increased rate in November 1999.

- 2000-2003: Medical insurance premiums reduced by 50% for retirees and beneficiaries of retirees who retired between July 1, 1984 and June 30, 1994.

- 2008: Most pre-July 1998 retirees receive a $30 monthly stipend to pay a portion of Medicare Part B monthly health-care premium. (Recently taken away by the City).

{00199051}6

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:21:29   Page 33 of
13-53846-swr   Doc 2302-3   Filed 03/13/13   Entered 03/13/13 17:02:52   Page 33 of 35
193                                                                                    227

### B.    The RDPFFA

16.    Over the past thirty-plus years, the RDPFFA has been integral in securing over eighty million dollars in pension improvements, protections and/or secured payment of entitled benefits.  The list below is a summary of the many accomplishments made by the RDPFFA on behalf of retirees:

- 1992: Yank/Gentile lawsuit. When a dispute arose between the City and its police and firemen over the determination of pension benefits, after extensive litigation, the Wayne County Circuit Court ruled that certain fringe benefits such as longevity pay, certain types of holiday pay, and vacation pay, leave time, overtime, shift differential, and cost-of-living allowance were payments made in the course of the policemen and firemen's work for regular work done and must all be included when calculating pension payments.

- 2001: Secured payment of 13th checks totaling $13,820.00 for each eligible retiree (1999-2000-2001).

- 2009: *Weiler v. City of Detroit* healthcare settlement agreement, $12,000,000.00 in direct payment back to retirees and guaranteed life-time healthcare benefits. In July 2006, the City of Detroit changed healthcare benefits for police and fire fighter retirees by increasing co-payments, deductibles, and contributions for monthly healthcare premiums.  A representative action was filed against the City of Detroit over these changes on behalf of approximately 8,000 retirees, their spouses, surviving spouses, and dependents.  The case resulted in a settlement which provided restitution to the class members, along with healthcare cost and benefit-level certainty, broadly reducing the overall financial impact of rising healthcare costs on class members. Importantly, the City agreed that these terms, including the healthcare benefits, were "unchangeable".

- 2011: House Bill 4135 signed into law Public Act 25 of 2011 requiring enforcement of Detroit City Charter placing retiree on Police & Fire Retirement Board.

{00199051}7

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:25:29   Page 34 of 25
13-53846-swr   Doc 302-3   Filed 08/19/13   Entered 08/19/13 17:02:52   Page 7 of 25
193                                        228

- 2012: House Bill 5192 signed into law Public Act 12 of 2012 clarifying language contained in PA 25 of 2011 requiring retiree representation on Police & Fire Retirement Board.

- 2011: Amended Detroit City Charter to require two retiree representatives on Police & Fire Retirement Board, one police and one firefighter retiree elected by all retirees.

- 2012: Senate Bill 1189 passed signed into law PA 492 of 2012 requiring equal treatment of elected retiree representatives.

- 2012: Senate Bill 409 passed and signed into law PA 597 of 2012 addressed the issue of pension tax for those that retired from governmental agencies that did not participate in Social Security.

### V.  The Retiree Associations Were Ready, Willing and Able to Negotiate with the City

### A.  The DRCEA

17.  The DRCEA, through its President, Shirley V. Lightsey (accompanied by counsel on two occasions), attended three restructuring meetings held by the City and led by attorneys from Jones Day. The meetings were purely informational. At no point during any of these meetings was there an opportunity for negotiation or even for the consideration of the position of the retirees. The meetings are summarized as follows:

> June 20, 2013, 10:00 a.m. at the 13th floor auditorium of the Coleman A. Young Municipal Center. Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. A take-it-or-leave-it (unconstitutional) proposal was made by the City which called for pension obligations to be treated as general unsecured debt which violates the Constitution because the proposal would both diminish and

{00199051}8

13-53846-tjt  Doc 2300-3  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 35 of 25
13-53846-swr  Doc 302  Filed 08/19/13  Entered 08/19/13 17:02:52  Page 35 of 25  229
193

impair accrued pension obligations. No negotiation was permitted by the City. The City provided a "data room" to enable the Retiree Associations to research financial and other information.

July 10, 2013, 1:00 p.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. Attorney David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the Pension Fund configuration, a "four-step process." The presentation did not get past step one, the presentation by the City of information. No negotiation occurred.

July 11, 2013, 10:00 a.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. David Heiman and other attorneys from Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation took place because the meeting was purely informational.

18. Ms. Lightsey also sent a letter to Mr. Orr on May 4, 2013, requesting a meeting with him to discuss pension and other retirement benefits. This letter and request went unanswered by Mr. Orr. Counsel for the Retiree Associations also requested additional meetings with Mr. Orr and his representatives and these requests went unanswered.

### B.   The RDPFFA

19. The RDPFFA, through its president, Don Taylor, met with Michigan Treasurer, Andy Dillon, to discuss pension and other retiree issues. Representatives from the RDPFFA (accompanied by counsel on three occasions) also attended various meetings with the City and its representatives. The meetings

{00199051}9

13-53846-tjt   Doc 2300-3   Filed 12/28/13   Entered 12/24/13 00:15:29   Page 36 of
193
13-53846-swr   Doc 302   Filed 08/19/13   Entered 08/19/13 17:02:52   Page 36 of   230

were purely informational. At no point in the meetings was there an opportunity for negotiation or even for the consideration of the position of the retirees. The meetings are summarized as follows:

> April 18, 2013, 10:00 a.m. at the Coleman A Young Municipal Center – Meeting with Emergency Financial Manager, Kevyn Orr. The meeting was presentational and Mr. Orr informed the group that he had no intention of impairing pensions or health benefits for retirees. More specifically, Mr. Orr stated that he had no intention to violate the state constitution or to set aside the settlement reached in *Weiler.* No negotiation occurred.

> June 14, 2013 at Detroit Metropolitan Airport. The meeting was led by Jones Day attorneys and other professionals representing the City. Mr. Orr and Mr. Dillon were in attendance but did not speak. An initial proposal was presented during the meeting. No negotiation occurred.

> June 20, 2013, at the Coleman A. Young Municipal Center, 13th-floor auditorium - Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. A take-it-or-leave-it (unconstitutional) proposal was made by the City. The proposal made by the City called for pension obligations to be treated as general unsecured debt, which violates the Constitution because the proposal would both diminish and impair accrued pension obligations. No negotiation occurred. The City informed the Retiree Associations of the data room as a source for further information.

> July 10, 2013, at the Coleman A. Young Municipal Center, 3rd-floor Labor Relations Conference Room. - David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the pension fund configuration, a "four-step process." The presentation did not get past step one of the "four-step process." No negotiation occurred.

> July 11, 2013, at the Coleman A. Young Bldg. 3rd floor Labor Relations Conference Room. David Heiman and associates from

Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation was invited and the presentation was unilateral.

## VI.    Inaccuracies and Omissions in the City's Filings and Declarations.

20.    The City in its "Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code" (Docket # 10)  stated that it "is unable to negotiate (or further negotiate) with creditors because such negotiation is impracticable". *Id. ¶ 5.* That statement is not accurate as it relates to retirees.

21.    The City goes on to state that it "nevertheless, has negotiated in good faith with creditors who *are represented and organized* and has failed to obtain the agreement of creditors..." *Id.*  That statement is likewise not accurate as it relates to retirees.

22.    The retirees are represented and organized through the Retiree Associations, but no negotiations with the Retiree Associations occurred.

23.    The "Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code" (Docket # 11) only discusses "meetings" with parties concerned with employee legacy obligations (i.e. retirees), but makes no mention of negotiations with retirees, whereas; Mr. Orr specifically mentions "negotiations" with other creditors, such as Swap counterparties and insurers.

24. The Retiree Associations do not object to the formation of a Retiree Committee as requested by the City, but dispute some of the statements made by Mr. Orr in his declaration regarding the formation of a Retiree Committee insofar as those statements may be relevant to the City's lack of pre-petition negotiations with retirees, and therefore the City's eligibility for relief under chapter 9:

A. Mr. Orr's statement that "most of [the City's] approximately 23,500 retirees are not familiar with chapter 9 and lack the means to obtain sophisticated representation in this case on an individual basis", *Id. ¶ 124*, is misleading because most of the City's retirees are members in their respective Retiree Associations, and the Retiree Associations at all times have had the means to obtain sophisticated representation and, in fact, have representation.

B. Mr. Orr states that the "small number of unions and retiree associations that have offered to represent retirees possess no legal authority to bind those individuals to restructure pension and retiree health benefits," but Mr. Orr's statement fails to recognize that all negotiations relative to retirees will be on a representative basis and subject to ratification by the retirees. Even the Retiree Committee requested by the City and being formed by the United States Trustee's Office does not have the unilateral power to bind all retirees. Likewise, Mr. Orr ignores the history of the Retiree Associations which have in the past negotiated on behalf of and won significant benefits for retirees.

## BASIS FOR RELIEF

25.     The Retiree Association Parties object to the City's eligibility because it has failed to meet its burden to show that it has satisfied all of the eligibility requirements of 11 U.S.C. § 109(c).

26.     11 U.S.C §109(c) codifies the eligibility requirements for a municipality to qualify as a chapter 9 debtor, and provides:

> An entity may be a debtor under chapter 9 of this title if and only if such entity—
>
> (1) is a municipality;
>
> (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
> (3) is insolvent;
>
> (4) desires to effect a plan to adjust such debts; and
>
> (5)     (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

27.     The burden of establishing eligibility as a chapter 9 debtor is on the municipality.  *In re City of Harrisburg*, 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011)(citing *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008)); *In re Barnwell County Hosp.*, 459 B.R. 903, (Bankr. D. S.C. October 27, 2011); *In re Pierce County Housing Authority*, 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009); UNITED STATES TRUSTEE PROGRAM POLICY & PRACTICES MANUAL, Vol.5, CHAPTER 9 ADMINISTRATION 6 ("The municipality filing the petition bears the burden of proving each element in the chapter 9 eligibility calculus.").

28.     The Retiree Association Parties do not contest that the City is a municipality.

29.     The Retiree Association Parties also do not contest that the City desires to effect a plan to adjust its debt.

30. The Retiree Associations dispute that: (*I*) the City received a lawful authorization to file for bankruptcy under Chapter 9; (*II*) that the City is insolvent; and (*III*) that the City negotiated in good-faith with creditors (i.e., the retirees) when negotiations were practicable.

I.     ***Any Unconditional Authorization Received by the City to File for Bankruptcy that Could Impair or Diminish Accrued Pensions was Illegal, Unconstitutional and Erroneous.***

31.     Governor Snyder is an executive officer of the state of Michigan and has sworn to "support the…Constitution of this state."

32.     Governor Snyder also has the obligation to ensure that the laws of the state "be faithfully executed." Mich. Const. 1963, Art. V, §8.

33.     Kevyn Orr, as Emergency Manager of the City, has also sworn to "support the…Constitution of this state."

34.     Article IX § 24 of the Michigan Constitution prevents the state and its political subdivisions from impairing or diminishing accrued pensions of the state and its political subdivisions. Mich. Const. 1963 Art. XI, § 1.

35.     The Constitutional protections provided to accrued public pension benefits cannot be abrogated by state statute, state executive action or any other state action short of a duly adopted constitutional amendment. Specifically, nothing in PA 436 or any other statute gives the power to Governor Snyder or Mr. Orr to impair or diminish accrued pension obligations of the City.

36.     Contrary to the oaths taken by Governor Snyder and Mr. Orr, each has taken, and/or threatened to take, affirmative steps to impair or diminish accrued pension obligations.

37.     Mr. Orr's request for Governor Snyder to authorize the City to file for bankruptcy, without excluding accrued pension obligations from the request, is unconstitutional.

38.     Section 18 of PA 436 provides Governor Snyder with the power to authorize Mr. Orr to file for bankruptcy on behalf of the City as follows:

> If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and emergency manager in writing of the decision…Upon receipt of this written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101-1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

39.     Governor Snyder, under section 26(2) of PA 436, also has the power to "place contingencies on a local government in order to proceed under chapter 9."

40.     Despite the constitutional protection of accrued public pensions, Governor Snyder failed to condition his authorization for the City to file bankruptcy on the requirement that all accrued pension benefits not be impaired or diminished.

41.     In drafting chapter 9 eligibility requirements in the Bankruptcy Code, Congress contemplated federalism concerns and stated that a municipality may only be a chapter 9 debtor if it "is specifically authorized, in its capacity as a

municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization *__empowered by State law to authorize such entity to be a debtor under such chapter.__*"

42. Congress, in section 109(c) of the Bankruptcy Code, does not discuss the treatment of contracts or any other obligation once a municipality meets the eligibility requirements of 109(c) and is a chapter 9 debtor, but **only** articulates eligibility requirements. The treatment of debts once a municipality is a chapter 9 debtor is a completely different question and is irrelevant to the inquiry here.

43. Congress tempered its bankruptcy power over municipalities in section 109(c) and provided that the states and only the states have the ability to authorize municipalities to seek relief as a chapter 9 debtor.

44. Nothing in the Bankruptcy Code alters the hierarchy of state laws and in the state of Michigan the constitution is supreme. All laws of the state and all persons acting on behalf of the state must comply with the Michigan Constitution. *Campbell v. Detroit*, 51 Mich. App. 34, 37 (1973) (internal citations omitted) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never passed.")

45. No state law, governmental officer or organization is empowered by the laws of the state of Michigan to violate the Michigan Constitution.

46.     Mr. Orr's request for unconditional authority from the governor to file for chapter 9 bankruptcy violates the Michigan Constitution because it is a step (the first step and a significant step) towards the unconstitutional impairment or diminishment of accrued pension benefits.

47.     Governor Snyder's unconditional approval for Mr. Orr to file chapter 9 bankruptcy is unconstitutional because it fails to protect accrued pensions as required by the Constitution.

48.     Any unconditional authorization given by the state for the City to file bankruptcy that does not expressly preclude impairing or diminishing accrued pension benefits is unconstitutional, illegal, and void. *Taxpayers of Michigan Against Casinos v. State*, 478 Mich. 99, 107-08 & n.3 (2007) (even "broad discretion" granted to Governor by statute to act unilaterally must be exercised "within the limits of the constitution").

49.     The City did not receive an authorization empowered by and lawful under State law.

50.     The City fails to satisfy the eligibility requirement of 11 U.S.C. § 109(c)(2) and, therefore, the City is not eligible to be a chapter 9 debtor.

## II.     *There are Issues of Fact with respect to Insolvency*

51.     To qualify as a chapter 9 the City must meet its burden of showing that the City is insolvent.

52.    Section 101(32)(C) of the Bankruptcy Code defines insolvency for a municipality as having a financial condition such that the municipality is:

> **(i)** generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
>
> **(ii)** unable to pay its debts as they become due.

53.    The City in its "Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code" (Docket # 11) claims that the "City is insolvent." *Id. ¶ 3.*

54.    The City's financial statements and analyses submitted during the bankruptcy proceeding have been the subject of much scrutiny, criticism and concern.   The critiques concerning the accuracy of the City's financial statements and analyses range from disputes over actuarial assumptions to questions pertaining to more basic accounting issues.   Such concerns, include, but are not limited to:

A.    President of the Detroit Fire Fighters Association, Dan McNamara, has publicly stated that Mr. Orr "is engaged in a propaganda campaign, using, 'deeply flawed research that grossly inflates pension liabilities to the city's police and fire fighters." (July 24, 2013, Press Release from Detroit Fire Fighters Association).

B.      Reuters reporter, Cate Long, has also questioned the pension assumptions by stating "[t]here is a question as to whether the EM's plan is inflating pension liabilities. The unfunded pension liability was adjusted from $650 million reported in 2011 to approximately $3.5 billion – increasing more than five times over two years through unspecified changes to accounting assumptions."

C.      Gabriel Roeder Smith & Company, a highly regarded actuarial firm, has pegged the city of Detroit's liability at $977 million, a far cry from the $3.5 billion alleged by Milliman, a company hired by the City and directed by Mr. Orr.

D.      Milliman has described their own conclusions and actuarial reports as "guesstimates."

E.      Richard P. Larkin, Sr. VP, Director of Credit Analysis at HJ Sims & Co., recently questioned the City's debt calculation in a commentary article published in the Bond Buyer.  Richard P. Larkin, *Why Detroit Could Have Avoided Bankruptcy*, THE BOND BUYER, Aug. 8, 2013, available at http://www.bondbuyer.com/ issues/122_153/ richard-larkin-detroit-bankruptcy-commentary-1054496-1.html. One of Larkin's main criticisms of the City's financial analyses is the calculation of its long term liabilities.  Larkin stated "Detroit's bankruptcy is NOT $18 billion; it's only $15.7 billion."

F.    Larkin also comments on the improper use of 4% to 9% annual salary increases, "In general, if you assume high future salary increases, pension liabilities will grow faster because pensions are based on final salaries. In Detroit, the assumption is that salary increases will range from 4% to 9% annually. In light of Detroit's economic and financial distress, I don't believe that raises of that magnitude are realistic." Moreover, the City has actually enforced two 10% pay cuts on City employees in the past 3 years.

55.    The Retiree Association Parties do not take a position on the accuracy or validity of the many critiques concerning the City's financial analyses or even of the City's own figures and analyses.

56.    However, the Retiree Association Parties **_do assert_** that the presence of so many questions and uncertainties about the City's finances shows that the City has not met its burden of establishing insolvency.

57.    Since the City fails to satisfy the eligibility requirement of 11 U.S.C. § 109(c)(3), the City is not eligible to be a chapter 9 debtor.

### III.    *The City Did Not Negotiate in Good-Faith With Retirees When Negotiation Was Practicable*

58.    Negotiation is[a]process of submission and consideration of offers until [an] acceptable offer is made and accepted.  *Gainey v. Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Exp. & Station Emp., D.C. Pa.,* 275 F. Supp. 292, 300 (E.D. of PA 1967).  The deliberation, discussion, or conference upon the terms

of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction. Black's Law Dictionary, 5th Edition, 1979.

59.     The City does not contend that it negotiated with retirees in this case.

60.     The City did not negotiate with retirees in this case.

61.     To the extent that the City views its meetings with the unions and Retiree Associations, or its presentation of its take-it-or-leave-it (unconstitutional) proposal, as negotiations, the negotiations were not in good faith because the proposed diminution and impairment of pension obligations is prohibited by the Michigan Constitution. *City of Bethany v. Public Employees Relation Board of the State of Oklahoma*, 904 P.2d 604, 611 (Okl. 1995) (a party violates "their duty to bargain in good faith when they assert a position…if accepted, require the other side to agree to terms contrary to those mandated by statute); *In re White Crane Trading Co.,* 170 B.R. 694 (E.D. of Cal 1994) (actions taken in violation of law are not made in good-faith).

62.     The City does not satisfy the requirement of 11 U.S.C. § 109(c)(5)(a).

63.     Therefore, the City is ineligible to be a chapter 9 debtor, unless it can meet its burden to show that negotiation with retirees was impracticable.

64.     The City cannot meet this burden of showing that negotiation was impracticable because negotiation was practicable.

65. The determination of "whether negotiations with creditors is impracticable depends on the circumstances of the case." *In re City of Vallejo*, 408 B.R. 280, 298 (9th Cir. B.A.P 2009).

66. Impracticability is defined as a "circumstance that excuses a party from performing an act…., because (though possible) it would cause ***extreme and unreasonable*** difficulty." *Id.* (emphasis added; internal citation omitted).

67. The City alleges that negotiation with retirees was impracticable because there is no representative body that can bind each and every retiree.

68. The City may be correct in its assertion that there is not a single body that can bind all of the City's retirees, but that is irrelevant because the City does not use the proper legal standard. *In re City of Stockton, California*, ___ B.R.____, 2013 WL 2629129 ( E.D. Cal. 2013).

69. The proper legal standard, as announced in *Stockton*, is whether there is a "natural representative capable of bargaining on their behalf." *Id.* p 23. The Court in *Stockton* did state a requirement that the "natural representative" have the legal authority to bind all of the retirees. *Id.* Even the retiree committee formed in *Stockton* and the one being formed in the present case do not or will not have the authority to bind any retiree.

70.     In *Stockton*, the court reasoned that in order for negotiations with numerous retirees to be practicable, there needs to be "natural representative capable of bargaining on their behalf."

71.     The Retiree Associations are the natural representatives of the retirees and are capable of bargaining and negotiating on their behalf.  The Retiree Associations (with counsel) attended presentational meetings held by the City and its representatives.  The City could have engaged in good-faith negotiations with retiree representatives at these meetings, but chose not to do so.  Follow-up requests to the City by the Retiree Associations (and counsel) for additional meetings were ignored.

72.     The City has not and cannot argue that it would have "cause[d] **extreme and unreasonable** difficulty" to engage in negotiations at the many meetings held and attended by the Retiree Associations (with counsel) or at future meetings that it could have held and at which the Retiree Associations (with counsel) would have been prepared to negotiate.

73.     The City cannot prove that good-faith pre-petition negotiations were impracticable.

74.     Therefore, the City fails to satisfy the eligibility requirement of 11 U.S.C. § 109(c)(5)(d) and, accordingly, the City is not eligible to be a chapter 9 debtor.

## **CONCLUSION**

75.     For the reasons stated above, the Retirees Association Parties are entitled to an Order:

A.     Dismissing the case for the reason that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code.

B.     Specifically stating that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code because Article IX § 24 of the Michigan Constitution prohibits the City from diminishing or impairing accrued pensions.

Dated: August 19, 2013                    Lippitt O'Keefe, PLLC

/s/ Ryan C. Plecha
Brian D. O'Keefe (P39603)
Ryan C. Plecha (P71957)
Counsel for Retiree Association Parties
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
(248) 646-8292
rplecha@lippittokeefe.com

SILVERMAN & MORRIS, P.L.L.C.
Thomas R. Morris (P39141)
Co-Counsel Retiree Association Parties
30500 Northwestern Highway,Suite 200
Farmington Hills, Michigan 48334
(248) 539-1330
morris@silvermanmorris.com

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                        Chapter 9

CITY OF DETROIT, MICHIGAN                      Case No. 13-53846

        Debtor.                       Hon. Steven W. Rhodes

---

## EXHIBIT LIST

## CONSOLIDATED OBJECTION
## OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

A.    Declaration Of Shirley V. Lightsey In Support Of Consolidated Objection Of The Retiree Association Parties To Eligibility

B.    Declaration Of Donald Taylor In Support Of Consolidated Objection Of The Retiree Association  Parties To Eligibility

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Chapter 9

CITY OF DETROIT, MICHIGAN                                 Case No. 13-53846

        Debtor.                                         Hon. Steven W. Rhodes

---

## DECLARATION OF SHIRLEY V. LIGHTSEY IN SUPPORT OF
## CONSOLIDATED OBJECTION
## OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

1.  Except as otherwise stated herein, I make the statements contained herein from personal knowledge, and if sworn as a witness, will testify to the truth thereof.

2.  I am the President the Detroit Retired City Employees Association (DRCEA).

3.  Approximately 7,900 of an estimated 12,100 "non-uniformed" retirees of the City of Detroit (i.e. retirees who were not employed as police officers or fire fighters) are members of the DRCEA. The DRCEA operates under its own by-laws and governing documents and serves its members through its elected board of directors and appointed officers.

4.  The DRCEA was founded more than fifty-two years ago and has been active in protecting and improving pensions for retirees since its inception. The DRCEA has been integral in advocating on behalf of retirees before the City and state governments, and has participated in court cases and administrative actions on behalf of retirees as a group.

5.  The DRCEA, through its President, Shirley V. Lightsey (together with counsel two occasions), attended three restructuring meetings held by the City and led by attorneys from Jones Day. The meetings were purely informational and conducted as unilateral presentations; at

/001990281

---

no point during any of these meetings was there bilateral negotiation. The meetings are summarized as follows:

> June 20, 2013, 10 a.m. at the 13th floor auditorium of the Coleman A. Young Municipal Center. Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. No proposal was made by the City and no negotiation was permitted by the City. The City provided a "data room" to enable the DRCEA to research financial and other information.

> July 10, 2013, 1 p.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. Attorney David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the Pension Fund configuration, a "four-step process," was discussed.

> July 11, 2013, 10 a.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. David Heiman and other attorneys from Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation took place because the meeting was purely informational.

6.  Although, like the committee of retirees to be appointed by the United States Trustee in this case, the DRCEA is not empowered to enter into a binding agreement with the City regarding pension benefits, the DRCEA is the representative of the interests of its members and other non-uniformed City retirees and was at all times relevant to this matter in a position to negotiate on their behalf. The DRCEA retained counsel to assist it in the discussions with the City.

7.  No negotiation with the City occurred with the DRCEA, or, to the best of my knowledge, any other organization purporting to represent the interests of retirees. The DRCEA also reached out to Mr. Orr directly to discuss pension and other retirement benefit issues, that request went unanswered.

/001990281

8.  The sole proposal made by the City with respect to pensions called for the City's pension obligations to be treated as a non-priority unsecured claim, notwithstanding the prohibition contained in the Michigan Constitution of the City's impairment or diminishment of "the accrued financial benefits of each pension plan and retirement system."

9.  It is therefore my belief that the City did not engage in good-faith negotiations with retirees.

10.  The DRCEA was prepared and willing to enter into good-faith negotiations with the City.

11.  My counterparts with the Retired Detroit Police and Fire Fighters Association expressed to me their willingness to enter into good-faith negotiations with the City, and I believe that they were likewise prepared and willing to enter into good-faith negotiations.

12.  Negotiations between the City and its retirees were therefore practicable.

I certify under penalty of perjury that the foregoing is true and correct.


Executed on August 19, 2013.

Shirley V. Lightsey

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

       Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

---

## DECLARATION OF DONALD TAYLOR IN SUPPORT OF CONSOLIDATED OBJECTION OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

1.  Except as otherwise stated herein, I make the statements contained herein from personal knowledge, and if sworn as a witness, will testify to the truth thereof.

2.  I am the President the Retired Detroit Police and Fire Fighters Association (RDPFFA).

3.  Approximately 6,500 of an estimated 7,800 "uniformed" retirees of the City of Detroit (i.e. retirees who were employed as police officers or fire fighters) are members of the RDPFFA. The RDPFFA operates under its own by-laws and governing documents and serves its members through its elected board of directors and elected officers.

4.  The predecessor of the RDPFFA was founded in 1946 and became known, in 1970, upon the merger of two organizations, as the RDPFFA. The RDPFFA has been active in protecting and improving pensions for police and fire retirees since its inception. The RDPFFA has been integral in advocating on behalf of retirees before the City and state governments, and has participated in court cases and administrative actions on behalf of police and fire retirees as a group.

5.    The RDPFFA, through its President, Donald Taylor (together with counsel on three

occasions), attended five restructuring meetings held by the City and led by attorneys from Jones

Day. The meetings were purely informational and conducted as unilateral presentations; at no

point during any of these meetings was there negotiation. The meetings are summarized as

follows:

> April 18, 2013, 10 a.m. at the Coleman A Young Municipal Center – Meeting
> with Emergency Financial Manager, Kevyn Orr. The meeting was
> presentational and Mr. Orr informed the group that he had no intention of
> impairing pensions or health benefits for retirees. More specifically, Mr. Orr
> stated that he had no intention to violate the state constitution or to set aside
> the settlement reached in *Wieler*. No negotiation occurred.

> June 14, 2013 at Detroit Metropolitan Airport. The meeting was led by Jones
> Day attorneys and other professionals representing the City. Mr. Orr and Mr.
> Dillon were in attendance but did not speak. An initial proposal was presented
> during the meeting. No negotiation occurred.

> June 20, 2013, at the Coleman A. Young Municipal Center, 13th-floor
> auditorium - Several Jones Day attorneys and financial advisors presented a
> 23-page document and discussed the information. No negotiation occurred.
> The City informed the RDPFFA of the data room as a source of further
> information.

> July 10, 2013, at the Coleman A. Young Municipal Center, 3rd-floor Labor
> Relations Conference Room. - David Heiman led the discussion and other
> Jones Day attorneys were present. There were presentations regarding
> potential changes to the pension fund configuration, and a methodology for
> negotiating the proposed changes- a "four-step process." The presentation did
> not get past step one of the "four-step process." No negotiation occurred.

> July 11, 2013, at the Coleman A. Young Municipal Center, 3rd floor Labor
> Relations Conference Room. David Heiman and associates from Jones Day
> conducted the presentation. The primary topic was health care. A draft of
> "Medicare Advantage Plan Design Options" was passed out.

6.    Although, like a committee of retirees to appointed by the United States Trustee in this

case, the RDPFFA is not empowered to enter into a binding agreement with the City regarding

pension benefits, the RDPFFA is the representative of the interests of its members and other

police and fire City retirees and was at all times relevant to this matter in a position to negotiate on their behalf, to communicate and comment upon proposals made by the City, and to recommend to its members, and to all police and fire retirees, an acceptable proposal. The RDPFFA retained counsel to assist it in the discussions with the City.

7.      No negotiation with the City occurred with the RDPFFA, or, to the best of my knowledge, any other organization purporting to represent the interests of retirees.

8.      The sole proposal made by the City with respect to pensions called for the City's pension obligations to be treated as a non-priority unsecured claim, notwithstanding the prohibition contained in the Michigan Constitution of the City's impairment or diminishment of "the accrued financial benefits of each pension plan and retirement system."

9.      It is therefore my belief that the City did not engage in good-faith negotiations with retirees.

10.     The RDPFFA was prepared and willing to enter into good-faith negotiations with the City.

11.     My counterparts with the Detroit Retired City Employees Association expressed to me their willingness to enter into good-faith negotiations with the City, and I believe that they were likewise prepared and willing to enter into good-faith negotiations.

12.     Negotiations between the City and its retirees were therefore practicable.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2013.

_____
Donald Taylor

{00199035}

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------x
                                                       :
In re                                                  :    Chapter 9
                                                       :
CITY OF DETROIT, MICHIGAN,                             :    Case No. 13-53846
                                                       :
                                        Debtor.        :    Hon. Steven W. Rhodes
                                                       :
                                                       :
-------------------------------------------------------x

## CITY OF DETROIT'S CONSOLIDATED REPLY TO
## <u>OBJECTIONS TO THE ENTRY OF AN ORDER FOR RELIEF</u>

# TABLE OF CONTENTS

I.     Preliminary Statement .................................................................1

II.    The Court Has Authority and Jurisdiction to Determine the
       Constitutionality of Chapter 9 and PA 436 ...................................5

III.   Chapter 9 is Constitutional Under Longstanding Supreme Court
       Precedent .................................................................................9

       A.     The Supreme Court's Decision in <u>Bekins</u> Remains
              Binding Precedent ...........................................................10

       B.     Subsequent Legal Developments Have Not Undermined the
              Soundness of <u>Bekins</u> and the Constitutionality of Chapter 9 ...........13

IV.    The City Was Properly Authorized to Commence This
       Chapter 9 Case ........................................................................19

V.     The State's Authorization of Chapter 9 Did Not Violate the
       Pensions Clause ......................................................................21

       A.     The Authorization of Chapter 9 Does Not "Diminish or
              Impair" Pension Benefits .................................................21

       B.     The Pensions Clause Simply Extends the Protection of the
              Federal and State Contracts Clauses to Cover Public
              Pensions ........................................................................22

       C.     The Pensions Clause Does Not Require Chapter 9
              Authorization to Be Conditioned on the Non-Impairment
              of Pensions ....................................................................28

VI.    Collateral Estoppel Does Not Preclude This Court from
       Determining the City's Eligibility for Chapter 9 .........................32

VII.   PA 436 is Constitutional .........................................................38

       A.     PA 436 Does Not Conflict with Home Rule and
              Reflects the State Legislature's Power to Address Local
              Fiscal Emergencies. ........................................................38

       B.     PA 436 Does Not Delegate Power to Pass Local Legislation ...........41

      C.      PA 436 Does Not Violate the Non-Delegation Doctrine...................42

VIII.   The City Satisfies Section 109(c)(5) of the Bankruptcy Code
        Because It Was Impracticable to Bargain with Thousands of
        Bondholders and Over 20,000 Retirees.........................................45

IX.    The City's Good Faith Negotiations with Its Creditors Satisfy
        Section 109(c)(5) of the Bankruptcy Code ...................................53

X.     The City is Insolvent ....................................................................59

XI.    The City Desires to Effect a Plan to Adjust Its Debts..................61

XII.   The City Filed Its Petition in Good Faith.....................................62

XIII.  Notice of the Deadline for Objections to Eligibility Was
        Proper and Sufficient....................................................................69

XIV.  Conclusion....................................................................................71

## EXHIBITS

Exhibit A:   Non-Individual Objections to Eligibility, Summary of
             Arguments Set Forth Therein & City's Responses

Exhibit B:   Individual Objections to Eligibility, Summary of Arguments
             Set Forth Therein & City's Responses

Exhibit C:   Letters from various union representatives to Brian Easley

Exhibit D:   Letter from Brian Easley to James Williams, President,
             AFSCME, dated June 27, 2013

Exhibit E:   Letter from Evan Miller to Dennis McNamara, President,
             Detroit Fire Fighters Association, *et al.*, dated July 17, 2013

Exhibit F:   Letter from Steven Kreisberg, Director of Collective Bargaining
             and Health Care Policy, AFSCME, to Brian Easley, dated
             July 2, 2013

# TABLE OF AUTHORITIES

## CASES

Agostini v. Felton,
    521 U.S. 203 (1997)............................................................12

Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.
    (In re Nat'l Century Fin. Enters., Inc.),
    423 F.3d 567 (6th Cir. 2005) ...........................................35

Ashton v. Cameron Cnty. Water Improvement Dist. No. 1,
    298 U.S. 513 (1936)............................................................10

Ass'n of Retired Emps. v. City of Stockton
    (In re City of Stockton),
    478 B.R. 8 (Bankr. E.D. Cal. 2012)........................17, 30, 31

Blue Cross & Blue Shield of Mich. v. Demlow,
    270 N.W.2d 845 (Mich. 1978)............................................43

Blue Cross & Blue Shield of Mich. v. Milliken,
    367 N.W.2d 1 (Mich. 1985)........................................42, 43

Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,
    575 N.W.2d 751 (Mich. 1998)............................................40

Bd. of Trs. v. Cary,
    373 So.2d 841 (Ala. 1979).................................................27

Bd. of Trs. v. City of Detroit,
    373 N.W.2d 173 (Mich. Ct. App. 1985)............................39

Brimmer v. Vill. of Elk Rapids,
    112 N.W.2d 222 (Mich. 1961)............................................40

City of Pontiac Retired Emps. Ass'n v. Schimmel,
    No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013)....................2

Control Module, Inc. v. Morello (In re Morello),
    No. 07-02052, 2012 WL 1945509
    (Bankr. D. Conn. May 30, 2012)................................. 35-36

Cnty. of Orange v. Merrill Lynch & Co., Inc.
    (In re Cnty. of Orange),
    191 B.R. 1005 (Bankr. C.D. Cal. 1996) ....................................................... 30-31

Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA,
    592 N.W.2d 408 (Mich. Ct. App. 1998) ............................................................37

Detroit City Council v. Mayor of Detroit,
    770 N.W.2d 117 (Mich. Ct. App. 2009) ...........................................................39

Easley v. Pettibone Mich. Corp.,
    990 F.2d 905 (6th Cir. 1993) .............................................................................35

Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,
    459 U.S. 400 (1983) .....................................................................................13, 15

Faitoute Iron & Steel Co. v. City of Asbury Park,
    316 U.S. 502 (1942) .............................................................................. 12, 14-15

First Horizon Home Loan Corp. v. Apostle (In re Apostle),
    467 B.R. 433 (Bankr. W.D. Mich. 2012) ...........................................................8

Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),
    527 N.W.2d 468 (Mich. 1994) .........................................................................23

Hanover Nat'l Bank v. Moyses,
    186 U.S. 181 (1902) ................................................................................... 18-19

Houston v. Governor,
    810 N.W.2d 255 (Mich. 2012) .........................................................................40

In re City of Prichard,
    No. 99-13465 (Bankr. S.D. Ala. Oct. 6, 2000) .................................................27

In re City of Stockton,
    486 B.R. 194 (Bankr. E.D. Cal. 2013) .........................................................11, 44

In re City of Stockton,
    493 B.R. 772 (Bankr. E.D. Cal. 2013) ............................................. 22, 27, 64-65

In re City of Vallejo,
    403 B.R. 72 (Bankr. E.D. Cal. 2009) ................................................................30

In re Constitutionality of 2011 PA 38,
    806 N.W.2d 683 (Mich. 2011).................................................................. 23, 25-26

In re Cottonwood Water & Sanitation Dist.,
    138 B.R. 973 (Bankr. D. Colo. 1992)........................................................... 58-59

In re Cnty. of Orange,
    183 B.R. 594 (Bankr. C.D. Cal. 1995) ........................................................64, 65

In re Ellicott Sch. Bldg. Auth.,
    150 B.R. 261 (Bankr. D. Colo. 1992)........................................................... 56-57

In re Enrolled Senate Bill
    (Advisory Opinion re Constitutionality of 1972 PA 258),
    209 N.W.2d 200 (Mich. 1973) ........................................................................23

In re Jefferson Cnty.,
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ..............................................................14

In re McCurtain Mun. Auth.,
    No. 07-80363, 2007 WL 4287604
    (Bankr. E.D. Okla. Dec. 4, 2007) .............................................................. 66-67

In re Sanitary & Improvement Dist., No. 7,
    98 B.R. 970 (Bankr. D. Neb. 1989)............................................................25, 59

In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,
    165 B.R. 60 (Bankr. D.N.H. 1994)............................................................58, 64

In re Valley Health Sys.,
    383 B.R. 156 (Bankr. C.D. Cal. 2008) ............................................................52

In re Vasko,
    6 B.R. 317 (Bankr. N.D. Ohio 1980)................................................................19

In re Vills. at Castle Rock Metro. Dist. No. 4,
    145 B.R. 76 (Bankr. D. Colo. 1990)...........................................................47, 64

Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
    (In re City of Vallejo),
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ...................................................... 27, 46-47

Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo
    (In re City of Vallejo),
    432 B.R. 262 (E.D. Cal. 2010) ....................................................30, 31

Kosa v. State Treasurer,
    292 N.W.2d 452 (Mich. 1980)...........................................................24

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997) ..............................................................35

Mascio v. Pub. Emps. Ret. Sys. of Ohio,
    160 F.3d 310 (6th Cir. 1998) .............................................................15

Mich. State Highway Comm'n v. Vanderkloot,
    220 N.W.2d 416 (Mich. 1974)............................................................43

Mission Indep. Sch. Dist. v. Texas,
    116 F.2d 175 (5th Cir. 1940) .............................................................31

Monat v. State Farm Ins. Co.,
    677 N.W.2d 843 (Mich. 2004)......................................................32, 36

Murray v. Charleston,
    96 U.S. 432 (1877)............................................................................15

Murray's Lessee v. Hoboken Land & Improvement Co.,
    59 U.S. 272 (1856)..............................................................................5

Nat'l Fed'n of Indep. Bus. v. Sebelius,
    132 S. Ct. 2566 (2012)......................................................................17

New York v. United States,
    505 U.S. 144 (1992)..........................................................................16

Olson v. Cory,
    636 P.2d 532 (Cal. 1980) .............................................................26-27

People ex rel. Le Roy v. Hurlbut,
    24 Mich. 44 (1871) .....................................................................38, 40-41

Printz v. United States,
    521 U.S. 898 (1997)..........................................................................16

Richardson v. Schafer (In re Schafer),
   689 F.3d 601 (6th Cir. 2012) .......................................................................19, 31

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
   490 U.S. 477 (1989).................................................................................................12

Sloan v. City of Madison Heights,
   389 N.W.2d 418 (Mich. 1986).............................................................................37

South Dakota v. Dole,
   483 U.S. 203 (1987)................................................................................................17

Stern v. Marshall,
   131 S. Ct. 2594 (2011)......................................................................................... 5-8

Twin City Fire Ins. Co. v. Adkins,
   400 F.3d 293 (6th Cir. 2005) ...............................................................................34

United States v. Bekins,
   304 U.S. 27 (1938)........................................................................9-13, 15-16, 24

United States Trust Co. of N.Y. v. New Jersey,
   431 U.S. 1 (1977)............................................................................................. 13-15

W.B. Worthen Co. v. Kavanaugh,
   295 U.S. 56 (1935).................................................................................................15

Webster v. Michigan,
   No. 13-734-CZ (Ingham Cnty. Cir. Ct.) ..................................................... 32-38

Weisberg v. Powell,
   417 F.2d 388 (7th Cir. 1969) ...............................................................................32

## FEDERAL CONSTITUTION AND STATUTES

U.S. Const. art. I, § 8, cl. 4.................................................................................18, 29

U.S. Const. art. I, § 10.....................................................................................................9

U.S. Const. art. VI, cl. 2...............................................................................................30

11 U.S.C. § 101(32)(C)........................................................................................... 59-60

11 U.S.C. § 109(c) ..............................................................passim

11 U.S.C. § 362 ..............................................................34

11 U.S.C. § 903 ..............................................................18

11 U.S.C. § 904 ..............................................................44

11 U.S.C. § 921 ..............................................5, 6, 33, 53, 62-64, 66

11 U.S.C. § 943 ..............................................................58

11 U.S.C. § 1129 ..............................................................44

28 U.S.C. § 157 ..............................................................33

28 U.S.C. § 1334 ..............................................................32-33

28 U.S.C. § 2403 ..............................................................2

## STATE CONSTITUTION AND STATUTES

Mich. Const. art. IV, § 29 ..............................................41-42

Mich. Const. art. VII, § 21 ..............................................40

Mich. Const. art. VII, § 22 ..............................................37

Mich. Const. art. IX, § 24 ..............................................21, 23, 25

Public Act 72 of 1939 - MCL § 141.201(1) ..............................26

Public Act 279 of 1909 - MCL § 117.36 ..............................39

Public Act 336 of 1947 - MCL § 423.215 ..............................56

Public Act 436 of 2012 - MCL § 141.1543 ..............................40

Public Act 436 of 2012 - MCL § 141.1549 ..............................41, 43

Public Act 436 of 2012 - MCL § 141.1551 ..............................54

Public Act 436 of 2012 - MCL § 141.1552 ..............................41-42

Public Act 436 of 2012 - MCL § 141.1558 ............................................. 3, 19-21, 43

Public Act 436 of 2012 - MCL § 141.1567(3) .........................................................56

OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 921.04[2]
   (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013) ................................69

DETROIT CITY CHARTER § 1-102 ..........................................................................39

1 RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) ..........................................36

-ix-
193
13-53846-swr    Doc 2300-3    Filed 12/23/13    Entered 12/24/13 00:01:29    Page 68 of
13-53846-swr    Doc 789-3    Filed 09/06/13    Entered 09/06/13 19:00:03:29    Page 90 of 135    262

The City of Detroit (the "City" or the "Debtor") respectfully submits this consolidated reply to the objections (each, an "Objection")[1] to the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief").

## I.  PRELIMINARY STATEMENT

Confronting a state-declared "financial emergency" that includes approximately $18 billion in debt, over 100,000 creditors, over 100 discrete bond issuances and related loans (as well as multiple insurers of such bonds) and nearly 50 union bargaining units representing the City's employees – all of which rendered any out of court solution impracticable – the City commenced this chapter 9 case on July 18, 2013 (the "Petition Date") by filing a Petition for Relief (the "Petition").  The financial condition of the City is detailed in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum") and the City's first-day declarations.[2]  These documents demonstrate the City's overwhelming need for debt relief.

---

[1]    Attached hereto as Exhibit A and Exhibit B, and incorporated herein by reference, are charts specifying, for Objections filed by non-individual entities and individuals, respectively, on an Objection-by-Objection basis: (a) each Objection's docket number; (b) the arguments set forth therein (identified by category where appropriate); and (c) the City's response thereto.

[2]    Capitalized terms not otherwise defined herein have the meanings given to them in the Declaration of Kevyn D. Orr in Support of City of Detroit,

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:01:29   Page 69 of 135
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:08:29   Page 9 of 95
193                                                                              263

Despite these realities, over 100 persons and entities objected to the City's eligibility for relief under chapter 9 and to the entry of an Order for Relief. Most Objectors rely on anticipated treatments of their claims as a platform to argue that the City is not authorized to be a chapter 9 debtor. However, as this Court has observed,[3] neither the determination of claim amounts nor the potential treatment of claims in a plan of adjustment are before the Court at this time.

Notwithstanding the Objectors' arguments, the City is eligible to be a chapter 9 debtor and has demonstrated that an Order for Relief should be entered. First, the City is authorized to be a chapter 9 debtor because:

- After the fulfillment of certain conditions, PA 436 – which was validly passed by the Michigan legislature[4] – "empowers the local government for which an emergency manager has been appointed to become a debtor

_____

(continued…)

Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration"), filed on the Petition Date.

[3] Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 642) (the "Eligibility Scheduling Order"), entered on August 26, 2013.

[4] Recently, the Sixth Circuit questioned the validity of PA 4 (the predecessor statute to PA 436) on the grounds that the Michigan legislature may have violated the Michigan Constitution when it declared PA 4 immediately effective. City of Pontiac Retired Emps. Ass'n v. Schimmel, No. 12-2087, 2013 WL 4038582, at *5-6 (6th Cir. Aug. 9, 2013). No such potential constitutional infirmity afflicts PA 436, which became effective on March 28, 2013, more than 90 days after its enactment on December 27, 2012.

-2-

13-53846-swr Doc 2380-3 Filed 02/13/13 Entered 02/14/13 00:01:29 Page 70 of 135
13-53846-swr Doc 790 Filed 09/06/13 Entered 09/06/13 00:03:29 Page 92 of 193   264
193

under title 11 of the United States Code ... as required by section 109 of title 11 of the United States Code" (see MCL § 141.1558(1));

- Each of the requirements of PA 436 relating to the authorization of the commencement of the City's chapter 9 case – i.e., a recommendation by the Emergency Manager to the Governor and Treasurer that the City be authorized to proceed under chapter 9 and the written approval of that recommendation by the Governor – were satisfied prior to the filing of the Petition;

- Following the satisfaction of the foregoing conditions, PA 436 specifically authorizes emergency managers to commence chapter 9 cases (see MCL § 141.1558(1));

- The actual text of the Michigan Constitution does not prohibit the commencement of chapter 9 cases by municipalities or condition the steps that might be taken by any State or municipal official in connection with authorizing or effecting such a filing;

- The actual text of the Michigan Constitution does not create or require the imposition of any condition on actions the City might take in this chapter 9 case; and

- No statute passed by the Michigan legislature prohibits the commencement of chapter 9 cases by municipalities.

None of the Objections contest any of the foregoing points. Instead, the Objectors invent additional requirements, not found in the Michigan Constitution, and then allege that these additional requirements have not been met. We demonstrate below that there are no conditions to the City's becoming a debtor under chapter 9 other than those identified above. Accordingly, the City satisfied section 109(c)(2) of the Bankruptcy Code prior to the commencement of this case.

Moreover, objections contending that the City does not desire to adjust its debts, that the City may not be insolvent, that negotiations to adjust debts owed to

-3-

13-53846-swr   Doc 2300-3   Filed 09/06/13   Entered 09/06/13 19:00:01:29   Page 71 of 135   265
193
13-53846-swr   Doc 700   Filed 09/06/13   Entered 09/06/13 19:00:03:29   Page 93 of 115

more than 100,000 holders were practicable and that the City did not file the

Petition in good faith likewise fall short. The Objections:

- do not include any evidence contradicting or undermining the extensive showing of the City's insolvency included in the Eligibility Memorandum (indeed, the majority of relevant Objectors do not actually state a cognizable objection on the issue, thereby conceding that no information available to them as of the objection deadline supports their Objection);

- (A) implicitly admit that none of the Objectors represent all of the City's more than 20,000 retirees in prepetition negotiations and some Objectors that claim to represent retirees do not represent any of the active employees who have vested pension benefits, (B) ignore certain Objectors' prepetition *refusal* to represent retirees in negotiations concerning pension and retiree healthcare benefits and (C) ignore the impracticability of negotiations with the City's bondholders altogether, all of which are facts that demonstrate that it was impracticable for the City to negotiate an out of court settlement of its debts and other legacy liabilities;

- mischaracterize and omit inconvenient facts relevant to the City's demonstrated efforts to negotiate in good faith a restructuring of its debts with its creditors; and

- misapply the standards governing whether the Petition was filed in good faith to side-step the demonstrated reality that the City intends to file a chapter 9 plan to adjust the City's unsustainable $18 billion debt burden.

Accordingly, as set forth in the Statement of Qualifications, the Eligibility

Memorandum and herein, the City is eligible to be a debtor under chapter 9, and

the Court should promptly enter an Order for Relief.

## II. THE COURT HAS AUTHORITY AND JURISDICTION TO DETERMINE THE CONSTITUTIONALITY OF CHAPTER 9 AND PA 436

There is no doubt that this Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. Eligibility is a question of federal law, governed by section 109(c) of the Bankruptcy Code, relevant only for purposes of accessing the federal bankruptcy scheme and the determination of which is specifically committed to the bankruptcy court by section 921(c) of the Bankruptcy Code. As the United States Supreme Court (the "Supreme Court") made clear in Stern v. Marshall, 131 S. Ct. 2594 (2011), non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights," which are matters "susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." Stern, 131 S. Ct. at 2612 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). Included within this category are cases that "can be pursued only by grace of the other branches" of the federal government (id. at 2614) because "[i]n those cases 'it depends upon the will of congress whether a remedy in the courts shall be allowed at all,' so Congress could limit the extent to which a judicial forum was available." Id. at 2612 (quoting Murray's Lessee, 59 U.S. at 284).

The eligibility proceeding fits squarely within this category of "public rights" cases recognized by the Supreme Court. The City's ability to adjust its debts in a federal bankruptcy case is, of course, only possible because Congress enacted the Bankruptcy Code. Because a chapter 9 case "can be pursued only by grace" of Congress (Stern, 131 S. Ct. at 2614), Congress can control access to chapter 9 by tasking a non-Article III judge with determining a municipality's eligibility, as it has done. 11 U.S.C. §§ 109(c), 921(c). Stern, therefore, poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9.

Indeed, no Objector has challenged the Court's ability to make a final determination regarding the City's eligibility for chapter 9. However, by selective quotation to Stern, some Objectors argue that this Court is powerless to rule on certain *objections* to the City's eligibility for chapter 9 that involve federal or state constitutional questions. See AFSCME Objection, at ¶ 70 (substituting Stern's actual reference to "common law counterclaims such as Vickie's" with "constitutional questions such as this one; misleadingly quoting Stern's actual language "on a common law cause of action" as "on a [constitutional] cause of action").[5] Such a radical expansion of Stern is unsupported by that case or any subsequent authority.

---

[5]     See Stern, 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving *common law counterclaims such as Vickie's* are the Article III

Stern involved a statutorily core, state common law counterclaim asserted by the debtor against a creditor.  Stern, 131 S. Ct. at 2620.  The Supreme Court contrasted this "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy" with claims "that were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims."  Id. at 2611.  While the former required the bankruptcy court to impermissibly exercise the judicial power of the United States, the latter "stem[med] from the bankruptcy itself" and could, as a result, be resolved by the bankruptcy court.  Id. at 2618; see also id. ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").[6]

---

(continued…)

> courts, and it is with those courts that her claim must stay….   What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a *common law* cause of action….") (emphasis added).  See also Crittendon Objection at ¶¶ 9-10.

[6]  The Supreme Court was careful to clarify that its holding should be interpreted narrowly.  Stern, 131 S. Ct. at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one."); id. (noting that Congress had exceeded constitutional limitations "in one isolated respect").

Stern poses no obstacle for the Court in this case because there are no state or federal constitutional *claims* before the Court on which it could even purport to enter a final judgment. What is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself."[7] <u>Id.</u> at 2618. That this determination requires the Court to consider federal and state constitutional questions does not implicate <u>Stern</u>. Even if the Court were to conclude that chapter 9 or PA 436 is unconstitutional, it has not been called upon – indeed, it would not be permitted – to issue any relief based on those arguments beyond declaring that the City is ineligible for chapter 9 and dismissing the Petition.

For the foregoing reasons, <u>Stern</u> is simply not implicated by the Objectors' constitutional arguments against eligibility. See <u>First Horizon Home Loan Corp. v. Apostle (In re Apostle)</u>, 467 B.R. 433, 436 (Bankr. W.D. Mich. 2012) ("[T]he <u>Stern</u> decision is extremely narrow; except for the types of counterclaims addressed in <u>Stern v. Marshall</u>, a bankruptcy judge remains empowered to enter final orders in all core proceedings.").

---

[7]    Even if federal or state constitutional *claims* were before the Court, <u>Stern</u> would still pose no obstacle to this Court's ability to resolve the City's eligibility for chapter 9 in the first instance because the constitutionality of PA 436 is a pure legal issue, which will be reviewed *de novo* on appeal. Thus, none of the concerns regarding deferential review of bankruptcy court judgments animating <u>Stern</u> would be present (see <u>Stern</u>, 131 S. Ct. at 2611), and any error would be harmless after appellate review.

## III. CHAPTER 9 IS CONSTITUTIONAL UNDER LONGSTANDING SUPREME COURT PRECEDENT

The constitutionality of chapter 9 has been settled for more than 70 years. In United States v. Bekins, 304 U.S. 27 (1938), the Supreme Court upheld against constitutional challenge the municipal bankruptcy provisions of the Bankruptcy Act of 1937, the predecessor of the current chapter 9. Although the relevant statutory provisions have remained substantially unchanged since then, the Objectors argue nevertheless that intervening developments in the Supreme Court's jurisprudence on both the Contracts Clause of the United States Constitution (the "Contracts Clause")[8] and federalism have "*effectively* overruled" Bekins and that chapter 9 is no longer constitutional.[9] The Objectors' argument is wrong for two reasons. First, because the Supreme Court does not overrule binding precedents by mere implication, Bekins remains good law. Second, nothing in the Supreme Court's developing jurisprudence on either the Contracts Clause or federalism casts even the slightest doubt on the fundamental soundness of Bekins and the constitutionality of chapter 9.

---

[8]    U.S. Const., art. I, § 10 ("No State shall … pass any … Law impairing the Obligation of Contracts").

[9]    See AFSCME Objection, at ¶¶ 44-46 (emphasis added).

A.      The Supreme Court's Decision in
        <u>Bekins</u> Remains Binding Precedent

AFSCME contends that chapter 9 is unconstitutional in light of federalism

principles because it "allows Congress to set rules controlling State fiscal

self-management – an area of exclusive state sovereignty."[10]  This argument is

nothing short of an attempt to relitigate an issue that the Supreme Court resolved

over seven decades ago.

In <u>Bekins</u>, the Supreme Court specifically addressed "whether the exercise

of the federal bankruptcy power in dealing with a composition of the debts of [a

municipality], upon its voluntary application and with the State's consent, must be

deemed to be an unconstitutional interference with the essential independence of

the State as preserved by the Constitution."  <u>Bekins</u>, 304 U.S. at 49.  Two years

earlier, in <u>Ashton v. Cameron County Water Improvement District Number One</u>,

298 U.S. 513 (1936), the Supreme Court had held that municipal bankruptcy was

unconstitutional because it "might materially restrict [the subdivision's] control

over its fiscal affairs," such that it would "no longer [be] free to manage [its] own

affairs."  <u>Ashton</u>, 298 U.S. at 530-31.  Responding to the Supreme Court's

concerns, Congress enacted a slightly revised version of the municipal bankruptcy

---

[10]      AFSCME Objection, ¶¶ at 40.

-10-

13-53846-swr    Doc 2300-3  Filed 09/06/13  Entered 09/06/13 00:01:29  Page 78 of
13-53846-swr    Doc 730    Filed 08/23/13  Entered 08/23/13 00:03  Page 20 of 135    272
193

statute.  <u>Bekins</u>, 304 U.S. at 50; <u>In re City of Stockton</u>, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013).

This revised statute was challenged and upheld in <u>Bekins</u>.  The Supreme Court concluded that the revised statute was "carefully drawn so as not to impinge upon the sovereignty of the State." <u>Bekins</u>, 304 U.S. at 51.  Specifically, the Court explained that the "State retains control of its fiscal affairs" and that the "bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the [political subdivision] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." <u>Id.</u>

Central to the Court's reasoning was its observation that "the essence of sovereignty" is the ability to "give consents bearing upon the exertion of governmental power." <u>Id.</u> at 51-52.  Because the adjustment of debts "was not available under state law by reason of the [Contracts Clause]," the Court held that the "bankruptcy power [was] competent to give relief," and "if there [was] any obstacle to its exercise … it [was] in the right of the State to oppose federal interference." <u>Id.</u> at 54.

-11-
193
13-53846-swr   Doc 2380-3  Filed 09/06/13   Entered 09/06/13 00:01:29   Page 79 of 135
13-53846-swr   Doc 709-3  Filed 08/23/13   Entered 08/23/13 00:08:29   Page 21 of 45   273

The Objectors do not point to any subsequent change in the text of chapter 9 that would warrant a different outcome than Bekins.[11]  None of the cases cited by the Objectors addresses the constitutionality of chapter 9 or casts doubt on Bekins.[12]  Nevertheless, the Objectors invite this Court to treat Bekins as having been implicitly overruled.  To do so, however, would violate the fundamental and well-established precept that "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."  Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989); see also Agostini v. Felton, 521 U.S. 203, 237 (1997) (same).  Because Bekins directly controls the Objectors' constitutional challenge to chapter 9, the Court must follow it and hold that chapter 9 is constitutional.

---

[11]  See AFSCME Objection, at ¶¶ 44-46.

[12]  Indeed, only one of the cases cited by the Objectors – Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942) – so much as mentions Bekins.

B.     Subsequent Legal Developments
       Have Not Undermined the Soundness of
       *Bekins* and the Constitutionality of Chapter 9

Although *Bekins* is dispositive of the Objectors' constitutional claim, it is

also evident that legal developments since *Bekins* do not undermine the *Bekins*

decision, the soundness of its reasoning or the constitutionality of chapter 9.

First, contrary to the Objectors' contention,[13] States are not generally free to

adjust municipal debts by unilateral state action.  If the Objectors were correct, the

Contracts Clause would be a dead letter, but the Supreme Court has made clear that

"[w]hen a State itself enters into a contract, it cannot simply walk away from its

financial obligations."  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,

459 U.S. 400, 412 n.14 (1983).  When a State seeks to impair its own contracts,

"complete deference to a legislative assessment of [the] reasonableness and

necessity [of the impairment] is not appropriate because the State's self-interest is

at stake."  *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26 (1977).

For that reason, "a state is not completely free to consider impairing the obligations

of its own contracts on a par with other policy alternatives."  *Id.* at 30-31.

In chapter 9, by contrast, there is no risk of state self-interest because the

impairment can be carried out only by an impartial federal judge.  Indeed, as one

bankruptcy court put it:  "A financially prostrate municipal government has one

---

[13]     *See* AFSCME Objection, at ¶¶ 44-45.

viable option to resolve debts in a non-consensual manner.  It is in a bankruptcy

case.  Outside of bankruptcy, non-consensual alteration of contracted debt is, at the

very least, severely restricted, if not impossible." In re Jefferson Cnty.,

474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), aff'd, No. CV-12-J-2203-5,

2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).

It comes as no surprise, therefore, that Faitoute Iron & Steel Co. v. City of

Asbury Park, 316 U.S. 502 (1942), the case so prominently relied upon by the

Objectors, is the *only* case "in this and the last century when the Supreme Court of

the United States has sustained the alteration of a municipal bond contract outside

a bankruptcy case." In re Jefferson Cnty., 474 B.R. at 279 n.21; see also United

States Trust Co., 431 U.S. at 27.  In Asbury Park, the Court rejected a

Depression-era Contracts Clause challenge to a state-law-approved plan of

adjustment pursuant to which certain defaulted bonds could only be converted into

new bonds with the same principal amount but bearing a lower interest rate.

Asbury Park, 316 U.S. at 504-07.  Clarifying that "[w]e do not go beyond the case

before us" and that "[d]ifferent considerations may come into play in different

situations" (Asbury Park, 316 U.S. at 516), the Court was careful not to extend its

holding beyond the facts of the case.

Therefore, far from being an authoritative pronouncement of the States'

sweeping authority to adjust municipal debts, Asbury Park is an outlier and stands

-14-
13-53846-tjt    Doc 2300-3    Filed 09/13/13    Entered 09/13/13 00:01:29    Page 24 of 35
13-53846-swr    Doc 790    Filed 09/06/13    Entered 09/06/13 00:03:29    Page 82 of
193
276

only for the unremarkable point that States may adjust municipal debts in very limited ways under extraordinary circumstances without violating the Contracts Clause. "In almost every case," however, "the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." Energy Reserves Grp., 459 U.S. at 412 n.14 (citing United States Trust Co., 431 U.S. at 25-28; W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935); Murray v. Charleston, 96 U.S. 432 (1877)); see also, e.g., Mascio v. Public Emps. Ret. Sys. of Ohio, 160 F.3d 310, 313-15 (6th Cir. 1998) (barring the enforcement of a State law impairing vested pension benefits).

   States must seek the aid of federal bankruptcy courts under chapter 9 precisely because they are *not* at liberty under the Contracts Clause to impair their own contracts. See Bekins, 304 U.S. at 54. For this reason, the Objectors' next contention – that a State unconstitutionally relinquishes its sovereignty to the Federal Government by authorizing chapter 9[14] – is also fundamentally flawed. As the Bekins Court explained: when a State authorizes chapter 9, it "acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of

---

[14]    See AFSCME Objection, at ¶¶ 46-57.

-15-
13-53846-tjt    Doc 2300-3    Filed 09/06/13    Entered 09/06/13 00:01:29    Page 83 of 135
193
13-53846-swr    Doc 780    Filed 09/06/13    Entered 09/06/13 00:03:29    Page 26 of 135    277

state sovereignty, has reduced both sovereigns to helplessness in such a case." Bekins, 304 U.S. at 54.  The irony of the Objectors' argument is that it would actually impede, rather than protect, the States' sovereignty.

The Objectors also rely on the Supreme Court's anti-commandeering cases – New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 521 U.S. 898 (1997) – which involved involuntary federal regulatory regimes that "commandeered" State legislative processes or officials.  In New York, the challenged statute required States either to take title to low-level radioactive waste or to enact legislation regulating the waste pursuant to Congress's direction.  New York, 505 U.S. at 174-75.  In Printz, the challenged statute required State law enforcement officers to participate in the administration of a federal regulatory scheme.  Printz, 521 U.S. at 903-04.  The Supreme Court invalidated both statutes because "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program."  Id. at 933 (quoting New York, 505 U.S. at 188).

Chapter 9, by contrast, does not *compel* the States to enact, administer or otherwise participate in the federal bankruptcy scheme.  Most fundamentally, chapter 9 is "administered" by the federal bankruptcy court, not by States. Moreover, States cannot be "forced" to participate in chapter 9 because their participation is completely voluntary.  By extending the benefits of bankruptcy to

consenting States, chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements. E.g., South Dakota v. Dole, 483 U.S. 203, 205-06 (1987) (conditioning federal transportation funds on the States' adoption of a national minimum drinking age). Such programs are not constitutionally problematic where the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2602-03 (2012) (plurality opinion).

Because States have a "legitimate choice" whether to allow their municipalities to invoke chapter 9, chapter 9 is not an unconstitutional infringement of State sovereignty. Nor is there any danger of misplaced political accountability.[15] Where, as here, the State has a "legitimate choice" whether to participate in the federal scheme, "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2603 (plurality opinion).

Indeed, even after a State authorizes its municipalities to proceed under chapter 9, the bankruptcy court's powers are designed "to preserve the niceties of the state-federal relationship." Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012). For that reason, the

---

[15]     See AFSCME Objection, at ¶¶ 47-57.

Objectors are wrong to suggest that State consent to chapter 9 is a futile effort to cure "an otherwise unconstitutional infringement of state sovereignty."[16]  Even if there is some non-delegable core of sovereign state functions that cannot be ceded to the federal government by State consent, chapter 9 itself prohibits the bankruptcy court from intruding on those core functions.  11 U.S.C. § 903 (prohibiting the bankruptcy court from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality").

Finally, the Objectors also argue that chapter 9 violates the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution.[17]  "[B]y ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy," argue the Objectors, "Chapter 9 permits the promulgation of non-uniform bankruptcies within states."  Id.  The very case that the Objectors cite, Hanover National Bank v. Moyses, 186 U.S. 181 (1902), proves otherwise.  In Hanover National Bank, the Supreme Court approved federal bankruptcy provisions that relied on state law for determining exempt property.  Id. at 188-90.  The Supreme Court held that such a system was, "in the constitutional sense, uniform throughout the United States," even though "it may result in certain

---

[16]     AFSCME Objection, at ¶¶ 60-62.

[17]     AFSCME Objection, at ¶ 58.

-18-

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:61:29   Page 86 of 135
13-53846-swr   Doc 769   Filed 09/06/13   Entered 09/06/13 19:38:29   Page 28 of 35   280
193

particulars differently in different States." <u>Id.</u> at 190. Insofar as the Objectors

contend that chapter 9 is unconstitutional because PA 436 is non-uniform within

Michigan, that argument is erroneous because the uniformity requirement is "only

controlling as to the congressional exercise of power," not as to the underlying

state law. <u>In re Vasko</u>, 6 B.R. 317, 320 (Bankr. N.D. Ohio 1980). In any event,

the process set forth in PA 436 is plainly uniform because it applies to all local

governments. <u>E.g.</u>, MCL § 141.1558. Notwithstanding the Objectors' speculation

that PA 436 might have "wildly divergent effects on different cities" (AFSCME

Objection, at ¶ 58), "it is not the outcome that determines the uniformity, but the

uniform process" by which a defined class of debtors is treated. <u>Richardson v.

Schafer (In re Schafer)</u>, 689 F.3d 601, 611 (6th Cir. 2012).

## IV.  THE CITY WAS PROPERLY AUTHORIZED TO COMMENCE THIS CHAPTER 9 CASE

On July 16, 2013, consistent with MCL § 141.1558, the Emergency

Manager provided the Governor and Treasurer with his written recommendation

that the City be authorized to file for chapter 9 relief.[18]  The recommendation was

predicated upon, among other things, the Emergency Manager's:

---

[18]    Orr Declaration, at Exhibit J (copy of Emergency Manager's written recommendation); MCL § 141.1558(1) ("If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9.").

(A) determination that the City could not adopt a feasible financial plan that can satisfactorily rectify its financial emergency in a timely manner; and (B) judgment that no reasonable alternative to chapter 9 would allow him to rectify the City's financial emergency in a timely manner.[19]

On July 18, 2013, the Governor approved in writing the Emergency Manager's recommendation to commence this chapter 9 case.[20]  Finally, also on July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued a written order directing the City to commence this chapter 9 case.[21]  Accordingly, under applicable State law and pursuant to the specific approval of the Governor in accordance with MCL § 141.1558(1), the City has

---

[19]     MCL § 141.1558(2)(a) (requiring that an emergency manager's recommendation include, among other things, "[a] determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.").

[20]     Orr Declaration, at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation); MCL § 141.1558(1) ("the governor shall inform the state treasurer and the emergency manager in writing of the decision [to approve]….").

[21]     Orr Declaration, at Exhibit L (copy of Emergency Manager's order directing commencement); MCL § 141.1558(1) (providing that, "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9.  This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.").

been specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code.

## V.   THE STATE'S AUTHORIZATION OF CHAPTER 9 DID NOT VIOLATE THE PENSIONS CLAUSE

Several of the Objectors claim, in one form or another,[22] that the State's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause").[23]  They are mistaken.  As explained below, the Pensions Clause itself makes no mention of bankruptcy or chapter 9 authorization.  Nor does the State's authorization of a chapter 9 filing, or even the City's becoming a chapter 9 debtor, "diminish[ ] or impair[ ]" any pension.  These are simply steps that begin the bankruptcy process, where pensions *may* be impaired by order of a federal bankruptcy court at some later date.

### A.    The Authorization of Chapter 9 Does Not "Diminish or Impair" Pension Benefits

In authorizing the City to file for chapter 9, the State did not violate the Pensions Clause because it did not "diminish[ ] or impair[ ]" any pension. The authorization was merely one of several conditions to the City's becoming a

---

[22]    See, e.g., AFSCME Objection, at ¶¶ 76-81; Retiree Associations Objection, at ¶¶ 35-50; UAW Objection, at ¶¶ 27-40; Detroit Retirement Systems Objection, at pp. 30-43.

[23]    Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").

-21-
193

13-53846-swr   Doc 2300-3   Filed 09/06/13   Entered 09/06/13 00:01:29   Page 89 of
13-53846-swr   Doc 769   Filed 09/06/13   Entered 09/06/13 00:03:29   Page 91 of 135   283

chapter 9 debtor. After the Governor authorized the City to file this case, and even after the City filed the Petition, the City's pension obligations have remained unimpaired. The Objectors frame their argument as if nothing stands between authorization and the confirmation of a plan that may reduce pension benefits. The only way pensions could be impaired without the consent of the pertinent beneficiaries, however, is by an order of this Court at some future date. As another court has recently indicated, the "main event" of pension impairment is not properly addressed until well after the eligibility stage – at the time of plan confirmation. In re City of Stockton, 493 B.R. 772, 797 (Bankr. E.D. Cal. 2013).

For the same reason, there is no merit to the Objectors' argument that the enactment of PA 436 violated the Pensions Clause (and, thus, that PA 436 is unconstitutional as a threshold matter)[24]. The enactment of the underlying statute empowering the Governor to authorize (and the Emergency Manager to file) a chapter 9 case is even further removed from any possible impairment of pensions than the Governor's authorization itself.

**B. The Pensions Clause Simply Extends the Protection of the Federal and State Contracts Clauses to Cover Public Pensions**

The unmistakable function of the Pensions Clause is to extend the protection of the federal and state contracts clauses to cover public pensions by treating them

---

[24] See, e.g., Detroit Retirement Systems Objection, at p. 43.

-22-

13-53846-tjt   Doc 2300-3   Filed 09/06/13   Entered 09/06/13 00:01:29   Page 90 of 135
13-53846-swr   Doc 789   Filed 09/06/13   Entered 09/06/13 00:03:29   Page 92 of 135   284
193

as contractual obligations.[25]  The text of the Pensions Clause states that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions *shall be a contractual obligation thereof* which shall not be diminished or impaired thereby."  Mich. Const. art. IX, § 24 (emphasis added).  As the Michigan Supreme Court has recognized, "*[t]he obvious intent* of § 24 … was to ensure that public pensions *be treated as contractual obligations* that, once earned, could not be diminished."  In re Constitutionality of 2011 PA 38, 806 N.W.2d 683, 694 (Mich. 2011) (emphasis added).

It is important to note that prior to the adoption of the Pensions Clause in 1963, "[i]t had long been the general rule that pensions granted by public authorities were not contractual obligations but gratuitous allowances which could be revoked at will by the authority because the pensioner was not deemed to have had any vested right in their continuation."  In re Enrolled Senate Bill (Advisory Opinion re Constitutionality of 1972 PA 258), 209 N.W.2d 200, 202 (Mich. 1973).  Against this backdrop, public employees in Michigan sought "[t]o gain protection of their pension rights," and thus "effectively lobbied for a constitutional

---

[25]  The contracts clause contained in the Michigan Constitution (the "State Contracts Clause") is indistinguishable from the federal version, and the Michigan courts have accordingly interpreted the two as having the same effect.  See Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question), 527 N.W.2d 468, 473-74 (Mich. 1994) (noting "virtually identical" language of state and federal contracts clauses, and relying on federal case law to apply state clause).

amendment *granting contractual status* to retirement benefits." <u>Kosa v. State</u>

<u>Treasurer</u>, 292 N.W.2d 452, 454-55 (Mich. 1980) (emphasis added).  The result

was the Pensions Clause, which elevated public pensions to the same level of

constitutional protection that applied to "obligations of contract" under the

Contracts Clause.

While the Contracts Clause prohibits States from impairing contracts, it does

not pose any obstacle to chapter 9.  As the Supreme Court has recognized, a State's

authorization of municipal bankruptcy does not itself constitute an impairment of

contracts but merely "invites the intervention of the bankruptcy power to save its

agency which the State itself is powerless to rescue. " <u>Bekins</u>, 304 U.S. at 54.

Consequently, <u>Bekins</u> makes clear that the Contracts Clause is perfectly consistent

with chapter 9 proceedings from start to finish.  This is true for two reasons.  First,

a State does not impair contracts merely by authorizing a municipality to file for

bankruptcy, because no contracts are impaired at the time of authorization.  Second,

any impairment of contracts that occurs in chapter 9 does not implicate the

Contracts Clause, because the Contracts Clause only prohibits impairment *by the*

*State*, while chapter 9 only allows impairment by the federal bankruptcy court.  As

one court has observed, "the Bankruptcy Code … permits *the federal courts*

*through confirmation of a Chapter 9 plan* to impair contract rights … and such

impairment is not a violation by the state or the municipality of [the Contracts

Clause] which prohibits a state from impairing such contract rights." In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) (emphasis added). Indeed, if chapter 9 truly involved an impairment of contractual obligations by the State, then the Contracts Clause would prevent the impairment of any contract in municipal bankruptcy (or at least require a stringent Contracts Clause analysis for every contractual impairment).

Like the Contracts Clause, the Pensions Clause applies only to impairments that are imposed "[ ]by" the State and its political subdivisions. Mich. Const. art. IX, § 24. Thus, as with the Contracts Clause, chapter 9 is not limited by the Pensions Clause because the impairment of pensions and other contractual obligations in chapter 9 can only occur by order of a federal bankruptcy court.

The framework of chapter 9, including the role of States in authorizing municipal bankruptcy, was well established when the Pensions Clause was ratified in 1963. Nevertheless, the Pensions Clause does not include any restriction on the authorization or filing of municipal bankruptcy cases. Given the absence of any language regarding bankruptcy in the Pensions Clause, and the well-established principle that constitutional protection for "contractual obligations" is not a bar to chapter 9, there is no basis for concluding that the Pensions Clause was intended to give pensioners a right to block municipal bankruptcy. Cf. In re Constitutionality of 2011 PA 38, 806 N.W.2d at 697, n.24 ("Given that neither the actual language

-25-
13-53846-tjt   Doc 2300-3   Filed 09/06/13   Entered 09/06/13 00:61:29   Page 93 of 195
13-53846-swr   Doc 790-3   Filed 09/06/13   Entered 09/06/13 00:03:29   Page 93 of 135   287
193

of § 24 nor the Address to the People mentions [a right to tax-free pension benefits], the ratifiers would have had absolutely no reason to suppose that, by adopting § 24, they would be creating" such a right).

Indeed, when the Pensions Clause was ratified in 1963, Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898.  See Public Act 72 of 1939, MCL § 141.201(1) (repealed in 1982) ("Any … instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] … may proceed under the terms and conditions of such acts to secure a composition of its debts….  The governing authority of any such … instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress …."). It seems extremely unlikely that, by enacting the Pensions Clause, the framers of the Michigan Constitution intended to overrule Public Act 72 of 1939, which remained on the books for another 20 years, without so much as mentioning the Act's existence.

No court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor.  For example, in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some "new comparable or offsetting benefit

-26-

13-53846-swr   Doc 2300-3   Filed 09/13/13   Entered 09/13/13 00:01:29   Page 94 of 135
13-53846-swr   Doc 780   Filed 09/06/13   Entered 09/06/13 00:03:29   Page 96 of 135

193

288

appear[s] in the modified plan." Olson v. Cory, 636 P.2d 532, 541 (Cal. 1980).

Nonetheless, California courts have found municipalities eligible to be chapter 9 debtors in several recent cases where pensions might be vulnerable to impairment in the bankruptcy process. E.g., Stockton, 493 B.R. 772; Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280 (B.A.P. 9th Cir. 2009). Similar constitutional protection for pensions applies in Alabama (see Bd. of Trs. v. Cary, 373 So.2d 841 (Ala. 1979)), where chapter 9 has not only been authorized but, consistent with constitutional protections for contracts, has also been used to reduce pensions (see In re City of Prichard, No. 99-13465 (Bankr. S.D. Ala. Oct. 6, 2000) (Docket No. 123), at pp. 6-7 (order confirming plan of adjustment reducing all existing and future pension benefits payments by 8.5%)). As in these cases, the Pensions Clause does not prohibit the State from authorizing the City to be a debtor under chapter 9.

Indeed, if the mere prospect of impairing pensions in bankruptcy were enough to violate the Pensions Clause, then the same prospect of impairing contracts in bankruptcy would be enough to violate the State Contracts Clause (and, for that matter, the federal Contracts Clause). If that were true, no Michigan municipality (or any municipality in any other State throughout the nation) could ever enter chapter 9, where the impairment of contracts is always on the table.

That absurd result proves that the authorization of a chapter 9 case does not equate to an impermissible impairment under the Pensions Clause.

C.    The Pensions Clause Does Not
      Require Chapter 9 Authorization to
      Be Conditioned on the Non-Impairment of Pensions

The Objectors fare no better in their argument that the Pensions Clause allows the State to authorize chapter 9 only on the condition that pensions not be impaired.[26]  Once again, the Objectors cite no authority in support of this novel argument, which has no basis in text or precedent.

To begin,  the only relevant question at the eligibility stage is whether the State has specifically authorized the City "to be a debtor under … chapter [9]." 11 U.S.C. § 109(c)(2).  If the State has granted authorization, it is entirely irrelevant for eligibility purposes whether the State has also purported to impose some further conditions.

Perhaps conceding this point, the Objectors appear to argue that the State has not validly authorized the City to become a chapter 9 debtor because the State violated the Pensions Clause by failing to make the non-impairment of pensions a condition of authorization.[27]  This argument, too, is incorrect.  As we have already seen, the Pensions Clause nowhere mentions bankruptcy in general or chapter 9

---

[26]    See AFSCME Objection, at ¶ 82; UAW Objection, at ¶ 30; Detroit
        Retirement Systems Objection, at pp. 43-44.

[27]    See AFSCME Objection, at ¶ 82-84; UAW Objection, at ¶ 30.

-28-

13-53846-tjt   Doc 2300-3   Filed 12/13/13   Entered 12/14/13 00:01:29   Page 96 of 135
13-53846-swr   Doc 789-3   Filed 09/06/13   Entered 09/06/13 19:00:03   Page 98 of 135   290
193

authorization in particular. It also does not say anything about conditions that must be imposed on the authorization of chapter 9. As discussed above, the Pensions Clause simply has the same effect as the Contracts Clause, which has never been interpreted by any Court to require any conditions on the authorization of chapter 9.

Apparently dissatisfied with the actual wording of the Michigan Constitution, the Objectors base their argument on a constitutional provision of their own imagining. Instead of adhering to the plain terms of the Pensions Clause that require the State to *refrain* from impairing pensions, the Objectors contend that the Pensions Clause should be read to require State officials to take *affirmative steps* to prevent even the possibility of the federal bankruptcy court from impairing pensions in chapter 9. This is not an interpretation of the Pensions Clause but a complete rewriting of it.

Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's *use* of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law. The Bankruptcy Clause of the United States Constitution empowers Congress to "establish … uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Pursuant to that authority, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy, including

various powers that a municipal debtor may invoke to adjust its debts. Under the Supremacy Clause of the United States Constitution,[28] this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. "The federal bankruptcy power … by operation of the Supremacy Clause, trumps the … state constitution." Stockton, 478 B.R. at 16. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.

In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." In re City of Vallejo, 403 B.R. 72, 76-77 (Bankr. E.D. Cal. 2009), aff'd sub nom. Int'l Bhd. Of Elec. Workers, Local 2376 v. City of Vallejo (In re City of Vallejo), 432 B.R. 262 (E.D. Cal. 2010); see also Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (deviating from federal scheme would "violate the constitutional mandate for uniform bankruptcy laws" by determining creditor

---

[28]    U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

priorities based on factors that vary from state to state).[29]  Thus, a State "must

accept chapter 9 in its totality; it cannot cherry pick what it likes while

disregarding the rest."  Cnty. of Orange, 191 B.R. at 1021; see also Stockton,

478 B.R. at 16 (holding that "[a] state cannot … condition or [ ] qualify, i.e. to

'cherry pick,' the application of the Bankruptcy Code provisions that apply in

chapter 9 cases after such a case has been filed"); Vallejo, 432 B.R. at 267-68

(same); Mission Indep. Sch. Dist. v. Texas, 116 F.2d 175, 178 (5th Cir. 1940)

(same).

        For these reasons, the Pensions Clause by its plain terms did not require the

Governor to impose any of the conditions sought by the Objectors, and in any

event, such conditions would be prohibited by federal law.[30]

_____

[29]     In establishing uniform bankruptcy laws, it is for Congress to determine how
        and whether State law will be incorporated.  See In re Schafer, 689 F.3d
        at 611 (noting that Congress "may" incorporate state law in bankruptcy).  In
        chapter 9, Congress has chosen to allow state law to govern the question of
        whether a municipality is authorized to become a debtor but not to govern
        the powers that debtors may invoke to adjust their debts.

[30]     The City raises these arguments not to seek the Court's determination today
        whether pension benefits can or should be modified in this case but merely
        to respond to the Objectors' argument that the Governor's authorization of
        this case must necessarily have placed a condition on the filing.  It need not
        have.  It could not have.

        In this vein, the Court – consistent with its findings at Section VI of the
        Eligibility Scheduling Order – should reject the request that any Order for
        Relief require that all actions taken by the Emergency Manager, including
        the eventual proposal of a plan of adjustment, "comply with the State

-31-
13-53846-tjt   Doc 2300-3   Filed 09/13/13   Entered 09/13/13 00:01:29   Page 99 of
13-53846-swr   Doc 766   Filed 09/06/13   Entered 09/06/13 19:00:03   Page 41 of 135   293
193

## VI. COLLATERAL ESTOPPEL DOES NOT PRECLUDE THIS COURT FROM DETERMINING THE CITY'S ELIGIBILITY FOR CHAPTER 9

Pointing to the declaratory judgment entered in <u>Webster v. Michigan</u>, No. 13-734-CZ (Ingham Cnty. Cir. Ct.), certain of the Objectors contend that the City is barred by collateral estoppel from litigating whether the City's authorization to file for chapter 9 bankruptcy was valid under the Michigan Constitution.[31]  The Objectors' collateral estoppel argument fails for numerous reasons.

Collateral estoppel applies only to issues that have been "actually litigated and determined by a valid and final judgment." <u>Monat v. State Farm Ins. Co.</u>, 677 N.W.2d 843, 845 (Mich. 2004).  But the judgment in <u>Webster</u> was not "valid" because the state court lacked jurisdiction at the time the judgment was entered.  Under 28 U.S.C. § 1334(a), federal district courts have "exclusive" jurisdiction over "all cases under title 11."  An essential component of that exclusive

---

(continued…)

Constitution." <u>See</u> AFSCME Objection, at ¶¶ 82-84.  Such amorphous and premature requests, including requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage.

[31]  <u>See</u> Retirement Systems Objection, at pp. 44-58.   The Objectors' resort to collateral estoppel is necessary, of course, because a state trial court's interpretation of state law is not binding on this Court.  <u>See</u> <u>Weisberg v. Powell</u>, 417 F.2d 388, 393 (7th Cir. 1969) ("We are not necessarily bound by the decision of a state trial court on a point of state law where the highest court of the state has not spoken on it.").

jurisdiction is to determine whether a municipality was "specifically authorized …

to be a debtor under [chapter 9] by State law." 11 U.S.C. § 109(c)(2); see also

11 U.S.C. § 921(c) (instructing the court, as part of the bankruptcy case, to

determine whether "the petition … meet[s] the requirements of this title");

Transcript of Hearing, dated July 24, 2013, at pp. 71-72 ("The Court concludes that

the issue of eligibility and each of the elements relating to eligibility are within this

Court's exclusive jurisdiction under 28 U.S.C., Section 1334(a).  Under that statute,

United States District Courts have original and exclusive jurisdiction of all cases

under Title 11, that original and exclusive jurisdiction referred to the Bankruptcy

Courts of each jurisdiction under 28 U.S.C., Section 157.  Our District Court has

referred all matters relating to bankruptcy jurisdiction to the Bankruptcy Court

under Local Rule 83.30. This is not a proceeding within 28 U.S.C., Section 1334,

over which Bankruptcy Courts would have concurrent jurisdiction with the state

courts.").

In Webster, after the City had already filed the Petition, the state court

purported to determine that the City was not validly authorized to be a debtor

under State law.  See Order of Declaratory Judgment, at 2, Webster,

No. 13-734-CZ (July 19, 2013) (declaring that the State could not "authoriz[e] an

emergency manager … to proceed under Chapter 9 in a manner which threatens to

diminish or impair accrued pension benefits").  By passing judgment on the

validity of the City's authorization to proceed under chapter 9, the Webster court purported to adjudicate an issue that fell squarely within this Court's exclusive jurisdiction. Because the Webster court lacked jurisdiction, the judgment is void. See Twin City Fire Ins. Co. v. Adkins, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.").

Even if the Webster court had been able to exercise jurisdiction over eligibility questions (which it was not), the declaratory judgment in Webster would still be invalid because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code as of the time of the filing of the Petition. The Objectors argue that the automatic stay did not apply to suits against the Webster defendants – the State of Michigan, the Governor, and the Treasurer – until the stay was extended to those defendants on July 25, 2013.[32]

As the City made clear in its motion to extend the automatic stay, certain prepetition lawsuits – including Webster – violated the automatic stay imposed as of the Petition Date to the extent that such suits sought "directly or indirectly to

---

[32]    See Order Extending the Chapter 9 Stay (Docket No. 166); Retirement Systems Objection, at p. 51.

enforce the plaintiffs' claims against the City or to exercise control over the City's property rights, including its powers and rights under chapter 9." Motion of Debtor for Entry of Order Extending the Chapter 9 Stay (Docket No. 56) at p. 15 n.4; see Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.), 423 F.3d 567, 578 (6th Cir. 2005) (holding that "[a]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision") (quoting Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997)). By entering judgment – a day after the Petition Date – declaring that the City's bankruptcy filing was not properly authorized under the Michigan Constitution, the Webster court sought to exercise control over the City's legal and property rights in violation of the automatic stay. Such a judgment is likely void ab initio (see Easley v. Pettibone Mich. Corp., 990 F.2d 905, 911 (6th Cir. 1993) (holding that "actions taken in violation of the [automatic] stay are invalid and voidable and shall be voided absent limited equitable circumstances")) and, thus, would be invalid for purposes of collateral estoppel. See Control Module, Inc. v. Morello (In re Morello), No. 07-02052, 2012 WL 1945509, at *18 (Bankr. D. Conn. May 30, 2012) (holding, where a state court entered a postpetition "supplemental judgment" against a debtor, that "because the Supplemental Judgment was issued after the filing of the Debtor's bankruptcy, the judgment of

-35-

13-53846-swr   Doc 2369-3   Filed 01/06/14   Entered 01/06/14 19:59:13   Page 103 of 135
13-53846-swr   Doc 769-3   Filed 09/06/13   Entered 09/06/13 19:59:13   Page 45 of 135   297
193

the [state] court is void and neither side may claim that the [state] court's finding[s] are entitled to collateral estoppel…").

Collateral estoppel further fails because the City did not have "a full and fair opportunity to litigate the issue." Monat, 677 N.W.2d at 845 (quotation marks and alteration omitted). "A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts…." Id. at 845 n.2 (quoting 1 RESTATEMENT (SECOND) OF JUDGMENTS § 28, at 273 (1982)). The state court in Webster took the unusual step of issuing a final declaratory judgment on an expedited basis after the Petition had already been filed and without the benefit of full briefing on the merits. At the time of the declaratory judgment, the Webster case was little more than two weeks old, and the defendants' briefs had focused mainly on justiciability issues and the preliminary injunction standard rather than the merits of the plaintiffs' arguments. Indeed, the Webster court's failure to provide a well-reasoned explanation for its decision attests to the gross inadequacy of the process afforded to the defendants. Thus, even if (somehow) collateral estoppel otherwise could apply, the abbreviated nature of the proceedings in the state court would warrant a fresh determination of the issue by this Court.

Finally, even if (A) the Michigan state court's postpetition exercise of jurisdiction over Webster had been proper (which it was not), (B) the automatic

stay did not apply to the Webster litigation (which it did) and (C) the City had a full and fair opportunity to litigate (which it did not), collateral estoppel *still* would not apply because the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants.  Collateral estoppel "precludes relitigation of an issue in a different, subsequent action between the same parties or their privies…."  Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA, 592 N.W.2d 408, 411 (Mich. Ct. App. 1998).  "In its broadest sense, privity has been defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right."  Sloan v. City of Madison Heights, 389 N.W.2d 418, 422 (Mich. 1986) (internal quotation marks omitted).

The Objectors contend that, although the City was not a party to the Webster litigation, the City was in sufficient privity with the Webster defendants to trigger collateral estoppel,[33] but the Objectors cannot have it both ways.  They cannot maintain that there is an *insufficient* identity of interest between the Webster defendants and the City for purposes of the automatic stay but a *sufficient* identity of interest between the two for purposes of collateral estoppel.  If there was

---

[33]    The two plaintiffs in Webster are potentially in privity only with the General Retirement System of the City of Detroit, in which they were participants, not with any other Objector.  See Complaint, at ¶¶ 2-3, Webster, No. 13-734-CZ (July 3, 2013).

sufficient privity between the City and the Webster defendants for collateral estoppel to apply, then, by necessity, that privity would have triggered the protections of the automatic stay.

## VII.  PA 436 IS CONSTITUTIONAL

The Objectors also claim that PA 436 violates the Michigan Constitution because:  (A) the enactment of PA 436 violated the Pensions Clause by authorizing a chapter 9 filing without prohibiting the impairment of pension obligations therein; (B) PA 436 violates Michigan's home rule doctrine; and (C) PA 436 unconstitutionally delegates power to the Emergency Manager.  PA 436's consistency with the Pensions Clause is addressed at Section V.A *supra*.  The remaining objections to PA 436's constitutionality generally have nothing to do with eligibility, and, where they might, are baseless.

### A.  PA 436 Does Not Conflict with Home Rule and Reflects the State Legislature's Power To Address Local Fiscal Emergencies

The home rule provisions of Michigan law give municipalities and their residents rights of self governance by empowering residents to elect their own officials (e.g., People ex rel. Le Roy v. Hurlbut, 24 Mich. 44, 46-47 (1871)), and by according "the electors of each city" with "the power and authority to frame, adopt and amend [the municipality's] charter."  Mich. Const. art. VII, § 22. The Objectors contend that PA 436 violates home rule provisions by placing the

Emergency Manager in the shoes of local officials and allowing the Emergency

Manager to take actions that are arguably inconsistent with the city's charter.[34]

The Objectors are mistaken. As an initial matter, most of the Objectors'

challenges – such as their concerns about the Emergency Manager's ability to set

budgets and pass ordinances – have nothing to do with the Emergency Manager's

authority to file for chapter 9 and thus need not be addressed here. Moreover, there

is, in fact, no conflict because Detroit's charter recognizes that its provisions are

"subject … to the limitations … imposed by statute." DETROIT CITY

CHARTER § 1-102; see Detroit City Council v. Mayor of Detroit, 770 N.W.2d 117,

124 (Mich. Ct. App. 2009) (recognizing that by its own terms Detroit's Charter

gives way to statutes).

Even if there were a conflict between PA 436 and Detroit's Charter

regarding the Emergency Manager's authority to commence this chapter 9 case,

PA 436 would prevail. "Where a city charter provision conflicts with general

statutory law, the statute controls in all matters which are not of purely local

character." Bd. of Trs. v. City of Detroit, 373 N.W.2d 173, 175 (Mich. Ct.

App. 1985); see also Public Act 279 of 1909, the Home Rule City Act,

MCL § 117.36 ("No provision of any city charter shall conflict with or contravene

the provisions of any general law of the state."). General laws are those capable of

---

[34]     See AFSCME Objection, at ¶¶ 85-94.

covering new localities over time.  See, e.g., Houston v. Governor,

810 N.W.2d 255, 257 (Mich. 2012).

PA 436, including its authorization to file for chapter 9, is most certainly a

general state law.  As the Michigan legislature's findings with respect to the impact

of local financial emergencies on the rest of the State make clear

(MCL § 141.1543), how financially distressed local governments overcome their

situation is decidedly not a matter of "purely local" character or concern.

See, e.g., Brimmer v. Village of Elk Rapids, 112 N.W.2d 222, 226 (Mich. 1961)

(statutes involving municipal utility rates, municipal debt limitations and municipal

tax rates are general rather than purely local).  Indeed, the Michigan Constitution

itself instructs the State legislature to pass "general laws … restrict[ing] the powers

of cities and villages to borrow money and contract debts."  Mich. Const. art. VII,

§ 21.

Nor does temporarily substituting the Emergency Manager for Detroit's

elected officials violate home rule by eliminating Detroit's residents' right to

choose their officials.  "[A] municipal corporation['s] … existence is entirely

dependent on the legislation that created it, and the Legislature that may also

destroy it."  Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,

575 N.W.2d 751, 760 (Mich. 1998).  Accordingly, the Michigan Supreme Court

has long recognized that the legislature must have authority to temporarily replace

local officials when exercising its undisputed power to "supervis[e] and control in matters of municipal regulation." <u>Hurlbut</u>, 24 Mich. at 111 (opinion of Cooley, J.). That is all PA 436 does: it authorizes the Governor to appoint an emergency manager in a fiscal crisis (MCL § 141.1549(1)), but the emergency manager's term ends once the crisis ends or, if he has been in office more than 18 months, if an elected local government votes him out (MCL §§ 141.1549(6)(b), (c)).

B. <u>PA 436 Does Not Delegate Power to Pass Local Legislation</u>

Article IV, Section 29 of the Michigan Constitution provides that "[t]he legislature shall pass no local or special act in any case where a general act can be made applicable" and that "[n]o local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." Because PA 436 grants the Emergency Manager authority to adopt local ordinances (MCL § 141.1552(1)(dd)), the Objectors contend it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the State legislature could pass.[35]

Once again, this objection has nothing to do with the City's eligibility for bankruptcy: filing a chapter 9 case is not passing legislation, the only conduct covered by Article IV, Section 29. In any event, Article IV, Section 29 restricts

_____

[35] AFSCME Objection, at ¶¶ 95-97.

only the State *legislature*; municipalities are free to enact "local" laws as they see fit. When the Emergency Manager acts, he exercises the *local government's* powers, not the State legislature's, so the legislature did not (and could not) violate Article IV, Section 29 when it enacted PA 436. <u>See</u>, <u>e.g.</u>, MCL § 141.1552(1)(dd); <u>see also</u> MCL § 141.1552(2) (allowing local leaders to repeal the Emergency Manager's ordinances after his term ends).

C. <u>PA 436 Does Not Violate the Non-Delegation Doctrine</u>

Under Michigan's non-delegation doctrine, the legislature may not task executive officials with formulating "legislative policy" unless the legislature provides "sufficient standards and safeguards" to "check[ ] the exercise of delegated power." <u>Blue Cross & Blue Shield of Mich. v. Milliken</u>, 367 N.W.2d 1, 27 (Mich. 1985). The Objectors argue that PA 436 runs afoul of this rule by giving the Emergency Manager authority to act for the City in chapter 9 without providing guidance as to what he should do.[36]

The Objectors are again mistaken. First, as explained above, the Emergency Manager exercises the local government's authority, not powers of the State legislature's. The Emergency Manager acts for the City, not the State. Thus the anti-delegation principles that govern when the State legislature delegates the State legislature's powers do not apply here.

---

[36]    <u>See</u> AFSCME Objection, at ¶¶ 98-99.

Second, when deciding whether the legislature has provided "reasonably precise" standards (<u>Blue Cross</u>, 367 N.W.2d at 27) in delegating its powers, Michigan courts have emphasized that the statute "must be read as a whole" and "carries a presumption of constitutionality." <u>Id.</u> As a result, the "reasonably precise" test is easy to satisfy (<u>see, e.g.</u>, <u>Blue Cross & Blue Shield of Mich. v. Demlow</u>, 270 N.W.2d 845, 854 (Mich. 1978) (approving delegation using a "fair and reasonable" standard)); <u>Mich. State Highway Comm'n v. Vanderkloot</u>, 220 N.W.2d 416, 419 (Mich. 1974) (approving use of eminent domain upon an executive finding of "necessity")).

PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection. It clearly tells the Emergency Manager to look at various possibilities for fixing the City's financial problems and instructs him to recommend bankruptcy only if "no reasonable alternative to rectifying the financial emergency … exists." MCL § 141.1558(1). PA 436 also instructs the Emergency Manager to ameliorate those problems while "assur[ing] the fiscal accountability of the local government and the local government's capacity to provide … necessary governmental services essential to the public health, safety, and welfare." MCL § 141.1549(2).

The Objectors also contend that PA 436 unconstitutionally delegates authority by not providing for judicial review of the Emergency Manager's actions

in bankruptcy.[37]  The Objectors, however, ignore the fact that, in many circumstances, this Court will review actions of the Emergency Manager.[38]  The Objectors argue that the Emergency Manager can escape judicial review because, under 11 U.S.C. § 904, municipalities need not seek court approval of settlements. Yet, if the City does not seek this Court's approval of a particular settlement, that settlement does not escape scrutiny forever:  "the day of reckoning comes at the plan confirmation hearing," where any "untoward settlements" would shed considerable light on whether a cram-down plan "discriminate[s] unfairly," is "fair and equitable," and has been "proposed in good faith."  Stockton, 486 B.R. at 199-200 (quoting 11 U.S.C. § 1129(a)(2), (b)(1)).

In sum, PA 436 neither violates Michigan's home rule doctrine nor unconstitutionally delegates authority to the Emergency Manager.  To the extent, if any, that such claims have anything to do with eligibility, the Objectors' arguments in support of these claims lack merit, and this Court should determine that PA 436 is constitutional.

---

[37]     See AFSCME Objection, at ¶100.

[38]     Whether or not Stern prohibits this Court from considering "freestanding state-law claims," it does not impact this Court's role in implementing provisions of the Bankruptcy Code that may involve determination of state law issues.  See Section II supra.

## VIII. THE CITY SATISFIES SECTION 109(c)(5) OF THE BANKRUPTCY CODE BECAUSE IT WAS IMPRACTICABLE TO BARGAIN WITH THOUSANDS OF BONDHOLDERS AND OVER 20,000 RETIREES

In the Eligibility Memorandum, the City demonstrated the impracticability of conducting negotiations with its very numerous creditors and that the requirement for eligibility set forth at section 109(c)(5)(C) of the Bankruptcy Code was satisfied. Specifically, the City explained that: (A) the "impracticability" requirement was added to the Bankruptcy Code to facilitate relief under chapter 9 for major American cities (i.e., precisely this circumstance); (B) the numerosity and fragmented nature of the City's creditors made negotiations with the creditor body impracticable; (C) in many instances, the City was unable to negotiate with representatives with authority to bind creditors because there were no such representatives; and (D) the City did not have time to conduct extended creditor negotiations. See Eligibility Memorandum, at pp. 40-53. None of the Objectors succeeds in undermining any of the foregoing.

As a threshold matter, certain facts that, by themselves, establish impracticability under section 109(c)(5)(C) of the Bankruptcy Code are ignored by the Objectors. Thousands of separate entities hold the City's billions of dollars in bond debt. For the reasons set forth in the Eligibility Memorandum (i.e., the inability to restructure key terms of the City's bond debt absent unanimous bondholder consent and the lack of any representatives with authority to bind all

such bondholders) (Eligibility Memorandum, at pp. 46-47), negotiations with the City's bondholders were impracticable. No Objection disputes this. Moreover, no holder of bonds has objected to the City's eligibility on the ground that negotiations with bondholders were practicable. These realities demonstrate that the requirements of section 109(c)(5)(C) of the Bankruptcy Code have been met.

Many of the Objectors explicitly or implicitly assert that section 109(c)(5)(C) of the Bankruptcy Code cannot be satisfied if negotiations with *any* creditor constituency (specifically, the City's retirees) were potentially practicable. This cannot possibly be the law. It would be an absurdity to interpret the phrase "is unable to negotiate with creditors" to mean "[can negotiate with some creditors but] is unable to negotiate with [other] creditors" as there will always be *some* creditor with which a municipality could negotiate.[39] Thus, courts have consistently determined that the "impracticability" requirement of section 109(c)(5)(C) of the Bankruptcy Code is satisfied where negotiations with any significant creditor constituency is impracticable. See Vallejo, 408 B.R. at 298 (holding that the impracticability of debtor's negotiations with its unions satisfied section 109(c)(5)(C) of the Bankruptcy Code because "labor costs comprised the

---

[39] For example, if such an interpretation were credited, a municipality would be required to delay filing its chapter 9 petition while it engaged those creditors with whom it could negotiate despite the facts that (a) negotiations with other creditors were impracticable and (b) the municipality ultimately would have to file and effectively restart the negotiation process.

largest slice of Vallejo's budget [and] it would have been futile to negotiate with other creditors without an agreement with the Unions"); In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (holding that negotiations were impracticable for purposes of 109(c)(5)(C) of the Bankruptcy Code where negotiations with single class of bondholders holding one third of the debtor's total bond debt would have been futile).

In any event, the Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, the RDPFFA and the DRCEA characterize themselves as "the natural representative capable of bargaining on [the retirees'] behalf" and argue that the City's alleged failure to engage the RDPFFA/DRCEA in negotiations forecloses the City's ability to argue that negotiations with its retiree constituency were impracticable. See Retiree Association Objection, at ¶¶ 64-74. The premise that the RDPFFA and the DRCEA are the natural representatives of retirees is not self evidently correct. First, the RDPFFA and the DRCEA are but two of at least five associations purporting to represent City retirees.[40] Neither the RDPFFA nor the DRCEA have any greater claim to being the natural representative of the retirees than any other

---

[40] The Detroit Firemen's Fund Association, the Detroit Police Benefit and Protective Association and the recently-formed Retired Detroit Police Members Association also purport to represent the interests of at least some percentage of the City's retirees.

-47-
193
13-53846-swr Doc 2369-3 Filed 01/02/13 Entered 01/02/13 00:00:00 Page 71 of 95
13-53846-swr Doc 765-3 Filed 09/06/13 Entered 09/06/13 19:59:33 Page 71 of 95    309

informal retiree association (and the Retiree Association Objection offers no such reason). Second, neither the RDPFFA nor the DRCEA are "the" anything. They are two separate organizations, and there is no reason to believe that the RDPFFA and the DRCEA will agree on every – or any – relevant issue. Third, the RDPFFA and the DRCEA are not the only entities claiming to be natural bargaining representatives for the City's retirees. The City's unions now claim to be appropriate bargaining representatives for their retirees as well.[41] These competing claims to bargaining authority undermine the RDPFFA/DRCEA's assertion that they are "the natural bargaining representatives" for retirees. Fourth, the Retiree Association Objection concedes that the RDPFFA and the DRCEA lacked – and still lack – the authority to bind the City's retirees. See Retiree Association Objection, at *14 (noting that the RDPFFA and the DRCEA are just now in the process of obtaining proxy forms from their retiree members and have collected only 5,000 such proxies to date (there are over 20,000 retirees and active employees that have vested pension benefits)). RDPFFA/DRCEA's assertion that

---

[41]   See AFSCME Objection, at ¶ 123 (stating that "creditors such as AFSCME and similar union representatives … could have negotiated regarding the largest portion of the City's unsecured debt"); Objection (Docket No. 506) filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), at ¶ 9 (stating that the "UAW is representing the interests of active and retired employees in this case."). As set forth below, these claims are directly at odds with these Objectors' prepetition refusal to negotiate on behalf of retirees.

-48-
193
13-53846-swr   Doc 2369-3   Filed 01/02/13   Entered 01/24/13 00:00:29   Page 116 of 195
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:33   Page 48 of 195      310

they are the "natural representative[s] capable of bargaining on [the retirees']

behalf" cannot be reconciled with their recognition of a lack of legal authority to

bind retirees absent express authorization.  Fifth, even if the RDPFFA and the

DRCEA had been able to bind their retiree members (which they could not), the

associations themselves only purport to represent "approximately 70% of all City

retirees."  Retiree Association Objection, at ¶ 9.  Accordingly, there was no

possibility that negotiations with the RDPFFA and the DRCEA – or, for much the

same reasons, any other party – could have bound the more than 20,000 City

retirees to a proposed restructuring, thus rendering the City's good faith attempt at

such negotiations impracticable.[42]  Finally, even if there were a "natural bargaining

representative" of all retirees, that would still not make negotiations concerning

pension benefits practicable; approximately 8,225 active employees have vested

pension benefits too.  Neither the RDPFFA nor the DRCEA even purports to

represent the interests of these people and it is not clear that active employees

would rely on such representation even if the RDPFFA and DRCEA both declared

that they were "natural representatives of active employees having vested

benefits."

---

[42]    Moreover, the RDPFFA and the DRCEA attended multiple meetings at
which the City set forth its restructuring proposals and solicited
counter-proposals and other feedback.  Neither the RDPFFA nor the
DRCEA responded to any proposals made by the City.

-49-

13-53846-swr   Doc 2369-3   Filed 01/06/13   Entered 01/06/13 09:59:29   Page 14 of 95
193
13-53846-swr   Doc 765-3   Filed 09/06/13   Entered 09/06/13 19:55:53   Page 14 of 95   311

The AFSCME Objection's similar argument that negotiations with "creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt" (AFSCME Objection, at ¶ 123) would have been practicable rewrites the history of those negotiations. In fact, the City *did* reach out to AFSCME and the City's other Unions regarding their willingness to represent the interests of their respective retirees in negotiations over the City's restructuring proposal.

As set forth in the Eligibility Memorandum, *the majority of the Unions either expressly indicated unwillingness or legal inability to represent retirees or neither agreed nor refused to represent retirees*. Only eight Unions (comprising 10 of the City's 47 bargaining units) agreed to represent retirees in connection with the City's restructuring. See Eligibility Memorandum, at p. 51. Notably, both AFSCME and the UAW – each of which filed Objections challenging the impracticability of negotiations with retirees – *expressly declined* to represent retirees.[43] It is difficult to see how it would be practicable for the City to conduct

---

[43] Letter from Edward L. MacNeil, Special Assistant to the President of AFSCME to Brian Easley of Jones Day, dated May 24, 2013 (advising that AFSCME "has no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive." ); Letter from Laurie Townsend Stuart, President of UAW Local 2200, to Brain Easley of Jones Day, dated May 23, 2013 (stating that the UAW would represent the interests only of "current employees" of the local Union); Letter from Robyn Brooks, President of UAW Local 2211, to Brian Easley of Jones Day, dated

negotiations with AFSCME and other Unions that refused to negotiate with the City on retirees' behalf.

Both the AFSCME and the UAW argue that, because the City allegedly made no effort to negotiate with creditors in good faith, the City should not be able to claim that such negotiations were impracticable.[44]  Thus, AFSCME and the UAW essentially argue that, if the City cannot satisfy section 109(c)(5)(B) of the Bankruptcy Code (which requires good faith negotiations with creditor constituencies), then the City cannot satisfy the disjunctive requirement for eligibility set forth in section 109(c)(5)(C) of the Bankruptcy Code either.  Neither the UAW nor AFSCME offer any precedent or citation for this reading of the Bankruptcy Code and the plain meaning of the statute (which connects the clauses of section 109(c)(5) with the word "or") contradicts such a reading.  Indeed, the courts that have considered section 109(c)(5) of the Bankruptcy Code have

_____

(continued…)

> May 22, 2013 (stating that "[t]his Union does not… represent current retirees and has no authority to negotiate on their behalf"); Letter from John Cunningham, International Representative, UAW Region 1, to Brian Easley of Jones Day, dated May 22, 2013 (stating that UAW Local 412 and UAW Local 212 "do not … represent current retirees and have no authority to negotiate on their behalf"), attached hereto, collectively, as <u>Exhibit C</u>.

[44]   AFSCME Objection, at ¶¶ 121-123; UAW Objection, at ¶ 46, n.19 and Public Safety Unions Objection (Docket No. 512), at p. 17 ("It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate….").

determined that it is sufficient for a chapter 9 debtor to demonstrate the existence of one of the four alternatives included in that section.  In re Valley Health Sys., 383 B.R. 156, 162, 163 (Bankr. C.D. Cal. 2008) (noting that "§ 109(c)(5) is written in the disjunctive" and, as such, must be construed "as setting out separate and distinct alternatives;" holding that "[t]here is nothing in the language of § 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case.").

Finally, the argument that the City "manufactured" impracticability through the imposition of artificial time constraints is just false.[45]  If anything, the fact that the City could not delay filing its Petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments.   See Valley Health Sys., 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets.").  That the City's cash was rapidly dwindling and public health and

---

[45]    See Public Safety Unions Objection, at pp. 16-17 ("The difficulty in the negotiation process is the result of an artificial time constraint…. The Court should not find that negotiations were impracticable, because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing.").

-52-
193
13-53846-swr   Doc 2369-3   Filed 01/02/18   Entered 01/02/18 19:59:53   Page 121 of 195
13-53846-swr   Doc 765-3   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 52 of 95   314

safety would have been threatened by any further delay in the filing of the Petition (Eligibility Memorandum, at pp. 52-53), (A) mandated a shorter time frame for determining if good faith negotiations with creditors could generate an agreement capable of implementation outside chapter 9 and (B) is a separate ground showing satisfaction of section 109(c)(5) of the Bankruptcy Code. They are not reasons for reading that section *out* of the Bankruptcy Code.

For all of the foregoing reasons (and those set forth in the Eligibility Memorandum), the City has satisfied the requirements of section 109(c)(5)(C) of the Bankruptcy Code.

## IX. THE CITY'S GOOD FAITH NEGOTIATIONS WITH ITS CREDITORS SATISFY SECTION 109(c)(5) OF THE BANKRUPTCY CODE

Numerous objections assert that the City failed to negotiate in good faith with its creditors within the meaning of section 109(c)(5)(B) of the Bankruptcy Code.[46] The Objections generally sound a common theme: that the City's restructuring proposals were presented to creditor constituencies at non-interactive

---

[46] E.g., AFSCME Objection, at ¶¶ 101-114; UAW Objection, at ¶¶ 44-46; Joinder of Local 324, International Union of Operating Engineers as Interested Party to Objections to Detroit's Eligibility for Relief Under Sections 109(c) and 921(c) of the Bankruptcy Code (Docket No. 484) (stating, without reference to or inclusion of supporting affidavits, that "the City consistently and continuously refused to engage in any bargaining with representatives of Local 324, and presented its proposals only on a 'take it or leave it' basis.").

-53-
13-53846-swr   Doc 2369-3   Filed 01/02/13   Entered 01/02/13 19:59:33   Page 121 of
                                                    193
13-53846-swr   Doc 765-3   Filed 09/06/13   Entered 09/06/13 19:59:33   Page 83 of 95   315

meetings on a "take it or leave it" basis that precluded any prospect of actual

"negotiation."[47]  The Objections' characterization of the discussions initiated by the

City and the multiple meetings that the City conducted with its creditors is false

and misleading.  The City did *not* present its restructuring proposal as an

immutable, "take it or leave it" proposition with respect to which the City had no

intention of honestly engaging its creditors.  Rather, the evidence demonstrates that

the City (A) actively sought continuing dialogue with, *and counter-proposals from*,

its counterparties but (B) received no concrete proposal or comprehensive

feedback from any Objector prior to the commencement of this case.[48]

---

[47]     See id.

[48]     Also false and misleading is the attempt by certain Objectors to characterize
statements made by the Emergency Manager in connection with the issuance
of his "Financial and Operating Plan," dated May 12, 2013, as having been
made within the context of negotiations with creditors over the restructuring
of their claims.  See, e.g., AFSCME Objection, at p.2 (quoting the
Emergency Manager as having stated, on May 12, 2013, that "The public
can comment [on the City's proposed financial restructuring plan], but it is
under the statute, it is my plan and it's within my discretion and obligation to
do it.  This isn't a plebiscite, we are not, like, negotiating the terms of the
plan.  It's what I'm obligated to do.") (bracketed text in original; emphasis
removed from original).  As the Objectors know, the "proposed financial
restructuring plan" addressed by the foregoing quote is not the June 14
Creditor Proposal (i.e., the starting point for creditor negotiations), but a
discrete "Financial and Operating Plan" issued *a month earlier* (which plan
did *not* address the specific treatment of creditors' claims against the City).
As the Objectors also know, the "statute" referenced in the foregoing quote
is not section 109(c)(5)(B) of the Bankruptcy Code, but section 11 of
PA 436.  See MCL § 141.1551(2) (requiring an emergency manager to
submit a financial and operating plan 45 days after appointment).  Put

As set forth at pages 55-59 of the Eligibility Memorandum, in addition to the June 14 Creditor Meeting (at which the City initially presented its restructuring proposal to all creditors in attendance and answered every question asked), the City held numerous additional meetings with creditors in the weeks prior to the Petition Date. At these meetings (including the City's meetings with its unions and four retiree associations), the City repeatedly stated that it welcomed its creditors' feedback with respect to its proposed restructuring and invited counter-proposals from all parties. E.g., Letter from Brian Easley to James Williams, President, AFSCME, dated June 27, 2013) (the "June 27 Easley Letter") (noting the City's appreciation of questions and input received from AFSCME at the June 20 Union/Retiree Meeting; offering access to City data room; requesting feedback and additional ideas with respect to the City's restructuring proposal), attached hereto as Exhibit D.[49] The City urged that any feedback and/or counter-proposals be

---

(continued…)

simply, the foregoing quote is *completely unrelated* to the City's negotiations with creditors over the treatment of their claims. The Objectors' flagrant misuse of the Emergency Manager's words out of context speaks volumes about the sincerity of their protests that the City refused to negotiate in good faith.

[49] The complaint that the City refrained from characterizing its discussions with its unions as "negotiations" is a red herring. The City has generally avoided characterizing its meetings and discussions with its unions as formal "bargaining negotiations" to avoid any argument that it has triggered obligations to collectively bargain under Michigan law that are currently

consistent with the City's financial condition but otherwise placed no restrictions on the form or substance of any counter-proposal. See, e.g., id. (requesting "additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations"; offering access to the Data Room and assistance acquiring any additional information); Letter from Evan Miller to Dennis McNamara, President Detroit Fire Fighters Association, *et al.*, dated July 17, 2013 ("We are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze."), attached hereto as Exhibit E.

Accordingly, comparisons between the City's good faith negotiation efforts and the facts of In re Ellicott School Building Authority, 150 B.R. 261 (Bankr. D. Colo. 1992), are inapposite. The Ellicott court held that, in addition to its failure to satisfy sections 109(c)(1), 109(c)(2), 109(c)(3) and 109(c)(5)(C) of the Bankruptcy Code, the putative debtor failed to satisfy section 109(c)(5)(B) of the Bankruptcy

---

(continued…)

suspended by PA 436. See MCL § 141.1567(3) ("A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first."). The City's reticence to jeopardize its legal rights under PA 436, however, does not alter the fundamental character of the meetings conducted by the City (as described herein), nor the fact that its requests for feedback and counter-proposals were unanswered.

Code where (A) its efforts at prepetition negotiation were limited to three public meetings and (B) the debtor conceded that it had presented its proposed plan of restructuring as non-negotiable. Ellicott, 150 B.R. at 266. In this case, however, (A) in addition to the public June 14 Creditor Meeting (i.e., the analogue to the three public meetings held by the Ellicott debtor), the City held numerous, non-public meetings with representatives of creditors, and (B) the City never presented its restructuring proposal as "non-negotiable." Indeed, the City solicited responses and counter-proposals from other parties.

Moreover, it is especially significant that no Objector transmitted a written counter-proposal on any aspect of the City's restructuring proposal. Some of the City's invitations for further dialogue were essentially rebuffed (and in a manner that seemed designed to support a future objection to eligibility rather than actually engage in discussions with the City). See Letter from Steven Kreisberg, Director of Collective Bargaining and Health Care Policy, AFSCME, to Brian Easley, dated July 2, 2013 (meeting the City's request for feedback with respect to its restructuring proposal with a request for further meetings and statements that the City "has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues"), attached hereto as Exhibit F.

Of course, good faith negotiation is a two-way street. All of the City's creditors – including each of the Objectors – had more than a month to provide the

-57-

193

13-53846-swr   Doc 2369-3   Filed 01/06/13   Entered 01/24/13 00:01:29   Page 125 of 195
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:55:33   Page 71 of 195   319

City with counter-proposals to, or other ideas concerning, the restructuring plan set out and supported in the June 14 Creditor Proposal. All of those entities had multiple opportunities to meet with the City's representatives to discuss the restructuring proposal and access to the information necessary to formulate an informed response. That none of the Objectors chose to respond to any aspect of the June 14 Creditor Proposal does not render the City's efforts to engage and negotiate with its creditors as having been undertaken in anything other than good faith.

Finally, the Court should reject the argument that the City is unable to satisfy section 109(c)(5)(B) of the Bankruptcy Code unless it can demonstrate that the terms of its restructuring proposal constitute a confirmable plan of adjustment under section 943(b) of the Bankruptcy Code. No Objector cites to any authority that supports this proposition in any way.[50] Consistent with Section VI of the

---

[50]    AFSCME's citation to In re Sullivan County Regional Refuse Disposal District, 165 B.R. 60 (Bankr. D.N.H. 1994), and In re Cottonwood Water & Sanitation District, 138 B.R. 973 (Bankr. D. Colo. 1992), in support of this argument is misleading. Neither of those cases addresses the confirmability of the debtors' proposed restructuring plan within the context of section 109(c)(5)(B) of the Bankruptcy Code at all. Rather, each case requires only that negotiations be based on "some sort of comprehensive plan." Sullivan Cnty., 165 B.R. at 78 (noting that the debtor need not even propose a "formal plan," but finding that debtor's failure to propose any plan could not satisfy section 109(c)(5)(B) of the Bankruptcy Code); Cottonwood, 138 B.R. at 978 (addressing the requirements of section 109(c)(5)(B) of the Bankruptcy Code with no reference to whether a proposed plan must satisfy

-58-
193
13-53846-swr   Doc 2369-3   Filed 01/02/13   Entered 01/02/13 00:00:29   Page 126 of 195
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 58 of 95    320

Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable.

For the reasons set forth above and in the Eligibility Memorandum, the City has satisfied the requirements of section 109(c)(5)(B) of the Bankruptcy Code.

## X.    THE CITY IS INSOLVENT

The Eligibility Memorandum demonstrates that, unfortunately, the City meets all of the disjunctive tests for municipal insolvency contained in section 101(32)(C) of the Bankruptcy Code.  Specifically, the City demonstrated that:  (A) it was not paying its debts as they came due; (B) it was "cash insolvent," "budget insolvent" and "service delivery insolvent;" (C) applicable law does not require it to exhaust all possible opportunities for revenue generation or adopt every conceivable cost-cutting measure prior to seeking relief under chapter 9; (D) it has experienced and, absent restructuring, will continue to experience negative cash flows for years; (E) its revenues cannot be meaningfully increased; and (F) its expenditures cannot be further reduced.  Eligibility Memorandum,

_____

(continued…)

confirmation standards).  In re Sanitary & Improvement District, Number 7, 98 B.R. 970 (Bankr. D. Neb. 1989), cited by multiple Objectors on this point, does not address the standards governing eligibility at all.

-59-
193

13-53846-swr   Doc 2269-3   Filed 01/06/28-13   Entered 01/24/13 00:00:29   Page 127 of 95
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 127 of 195   321

at pp. 12-35.  All of the foregoing is supported by evidence, including the

extensive data contained in or accompanying the Orr Declaration and Malhotra

Declaration.

No Objector challenges any of this with evidence.  Indeed, the Objections

offer little more than innuendo and supposition.[51]

For example, multiple Objectors accuse the City of having "deliberately

budgeted and spent itself into insolvency (so as to qualify under § 101(32)(C)(ii)),

when other realistic avenues and scenarios were possible."  AFSCME Objection,

at ¶ 137; RDPMA Objection, at p. 22.  Of course, no Objection offers any

---

[51]     The City notes that, despite a wealth of financial information having been
available to all interested parties for months (e.g., the City's cash flow
projections and other financial data were set forth in the June 14 Creditor
Proposal and contained in the Data Room (which was accessible to and
accessed by many of the Objectors, including AFSCME and the Retirement
Systems), none of the Objectors cite any facts already known to support their
Objections to insolvency.  Although the City is aware that, pursuant to
Section VII of the Eligibility Scheduling Order, the Court has permitted
discovery with respect to the matter of the City's insolvency, the filing of
placeholder objections to insolvency is inconsistent with the direction
provided by the Court during a colloquy with the City's counsel at a hearing
on August 2, 2013.  See Transcript of Hearing, dated August 2, 2013,
at pp. 26-27 ("Mr. Bennett:  …. We fully understand that facts currently
unknown could conceivably surface later, and we would certainly not object
if a fact unknown today found its way into a subsequent brief, but we think
the August 19th deadline should require and call for an objection – all
grounds stated and facts then known to support the objection…. The Court:
I agree, counsel. There certainly are circumstances in which the law permits
amendments to pleadings. They are limited. They apply here, but as a
general matter, the Court wants to set a firm deadline for the filing of
objections to eligibility.").

-60-
193
13-53846-swr   Doc 2369-3  Filed 01/06/14   Entered 01/06/14 19:59:53   Page 128 of 195
13-53846-swr   Doc 765-3  Filed 09/06/13  Entered 09/06/13 19:59:53  Page 129 of 195   322

examples of "realistic avenues and scenarios" that might have allowed the City to have avoided insolvency. The AFSCME Objection essentially recommends a more aggressive approach to the collection of unspecified accounts receivable, and the RDPMA Objection does no more than cite to examples of revenue generation applicable *in an entirely different case*. There is no suggestion how these "realistic avenues and scenarios" might eliminate the negative cash flows identified in the Orr and Malhotra Declarations.

Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. Thus, the data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence.

All Objections to the City's eligibility based on speculation that the City may be solvent should be overruled.

## XI. THE CITY DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS

At Section VI of the Eligibility Scheduling Order, this Court determined that, despite the "extraordinary importance of the pension rights of the City's employees and retirees in this case and of how the City will ultimately propose to treat those rights," (A) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and

(B) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4) of the Bankruptcy Code. Eligibility Scheduling Order, at § VI.

Only two objections – the UAW Objection and the RDPMA Objection – argue that the City does not satisfy section 109(c)(4) of the Bankruptcy Code.[52] Each of these Objections, however, is based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits. Thus, in light of Section VI of the Eligibility Scheduling Order, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) of the Bankruptcy Code on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum.

## XII. THE CITY FILED ITS PETITION IN GOOD FAITH

Certain Objectors have challenged the City's Petition on the grounds that it was not filed in "good faith" within the meaning of section 921(c) of the

---

[52] Three other Objectors – (a) Local 324, International Union of Operating Engineers (Docket No. 484); (b) Local 517M, Service Employees International Union (Docket No. 486); and (c) Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman (Docket No. 504) – filed joinders in the UAW Objection, but their Objections do not contain any additional facts related to section 109(c)(4) of the Bankruptcy Code.

Bankruptcy Code.[53]  These challenges generally rely on the following arguments:

(A) the filing of the Petition in advance of a hearing in Michigan state court

requesting a temporary restraining order is evidence of the City's hasty decision to

file the Petition and, thus, of its bad faith (AFSCME Objection, at ¶ 130; RDPMA

Objection, at p.13); and (B) the City never investigated alternatives that might have

avoided the need to file the Petition (AFSCME Objection, at ¶ 131; RDPMA

Objection, at p.13).  Even if taken at face value (which they should not be), neither

of these arguments demonstrate any lack of good faith on the part of the City in

filing the Petition.

---

[53]  The brief attached to the Public Safety Unions Objection (the "Public Safety Unions Brief") states that "[t]his Objection focuses on the requirements of § 109(c)(2) and (5) and the good faith requirement of Section 921(c)." Public Safety Unions Brief, at p. 2.  However, at no point in the Public Safety Unions Objection or the Public Safety Unions Brief is any standard for "good faith" identified or applied to the City's conduct or Petition. Rather, the Public Safety Unions Objection appears to regard an analysis of "good faith" within the meaning of section 921(c) of the Bankruptcy Code as co-extensive with the determination of whether the City has satisfied the eligibility requirements set forth in section 109(c) of the Bankruptcy Code. The Retirement Systems Objection also incorrectly equates these differing standards.  See Retirement Systems Objection, at p.16, n.10 ("While the arguments in this Objection focus on the City's inability to satisfy the eligibility requirements under sections 109(c)(2) and (5) of the Bankruptcy Code, the same arguments support a dismissal of the City's petition for lack of good faith."). Because the Public Safety Unions Objection and the Retirement Systems Objection rely on the City's alleged failure to satisfy such requirements as evidence of the City's lack of good faith in filing the Petition, those Objections should be overruled.

The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code.  Stockton, 493 B.R. at 794 (observing that the good faith requirement "serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code."); In re Cnty. of Orange, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) ("[T]he purpose of the filing must be to achieve objectives within the legitimate scope of the bankruptcy laws."); Sullivan Cnty., 165 B.R. at 80 (looking to chapter 11 case law for guidance and stating that "[t]he primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."); Vills. at Castle Rock, 145 B.R. at 81 (good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes").

A municipality's good faith "is assessed on a case-by-case basis in light of all the facts, which must be balanced against the broad remedial purpose of chapter 9." Stockton, 493 B.R. at 794.  "Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing

are consistent with chapter 9, the extent of the City's prepetition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." Id.;[54] see also Cnty. of Orange, 183 B.R. at 608 (applying chapter 11 case law and finding the debtor's financial condition and motives, local financial realities and whether the debtor was seeking to "unreasonably deter and harass its creditors or attempting to effect a speedy, efficient reorganization on a feasible basis" as relevant factors).

In light of the foregoing, the City's good faith in filing the Petition is manifest. The City's reasons for filing – to adjust its debts and resolve its liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.[55] The Objectors' suggestion that the City's Petition was prompted not by its financial collapse, but rather by the hurried and urgent need to evade an adverse ruling from a Michigan state court is wrong as a matter of fact. As the Objectors are aware, the Emergency Manager had always indicated that the commencement of a chapter 9

---

[54]   Both the AFSCME Objection (at ¶ 128) and the RDPMA Objection (at p.12) cite the factors set forth by the Stockton court as the relevant considerations under the "good faith" analysis.

[55]   Moreover, the City's financial problems – $18 billion in debt, cash insolvency, budget insolvency, service delivery insolvency and the inability to either materially increase revenues or slash expenditures – are clearly problems of the sort contemplated by chapter 9.

-65-
193
13-53846-swr   Doc 2369-3   Filed 01/06/18   Entered 01/06/18 19:59:33   Page 133 of 195
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 00:00:29   Page 51 of 95   327

case was an option for the City if its negotiations with creditors regarding an out-of-court restructuring proved impracticable or fruitless. Once the City determined that it was impracticable for the City to negotiate with all of its creditors and achieve a settlement that could be implemented outside of chapter 9 and that some creditors were unwilling to either accept the necessary adjustments to the City's debts or to engage the City at all, a chapter 9 filing became the City's only feasible option. Moreover, the process for authorizing the City's chapter 9 filing had been set in motion in advance of the state court hearing that ostensibly prompted the City's actions. The Emergency Manager sent his written recommendation that the City be authorized to file for chapter 9 relief to the Governor and the Treasurer on July 16, 2013 – two days in advance of the emergency, *ex parte* hearing before the Michigan state court.[56]

Finally, even if the state court hearing were a factor in the timing of the City's Petition, that fact would not render the filing as having been made in bad faith. In re McCurtain Municipal Authority, No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007), is instructive on this point. In McCurtain, a creditor sought the dismissal of the debtor's petition under section 921(c) of the Bankruptcy Code on the grounds that "the Debtor demonstrated a lack of good

---

[56] Indeed, it seems far more likely that the state court's hearing was prompted by the City's preparations for bankruptcy (which had been reported based upon rumors and anonymous sources in advance of the Petition Date).

-66-

13-53846-swr Doc 2369-3 Filed 01/02/2013 Entered 01/02/2013 00:00:00 Page 134 of 195
13-53846-swr Doc 769 Filed 09/06/18 Entered 09/06/18 19:59:33 Page 134 of 195    328

193

faith because its purpose in filing for bankruptcy relief was to avoid the appointment of a receiver." <u>McCurtain</u>, 2007 WL 4287604, at *5. An application for the appointment of a receiver for the debtor had been filed the day before a previously-noticed meeting at which the debtor's board of trustees voted to retain a bankruptcy attorney. <u>Id.</u> The <u>McCurtain</u> court determined that "[w]hile the appointment of a receiver certainly was a concern to the Debtor, it was not the only reason for filing bankruptcy," citing testimony from the chairman of the debtor's board of trustees that the motivation for the filing of the debtor's petition was its economic circumstances (specifically, its inability to pay a large judgment). <u>Id.</u>

The reasoning of the <u>McCurtain</u> court translates to the City's circumstances. Even if the state court hearing were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either (A) the city's primary motivation for commencing this case in light of the City's well-established financial crisis or (B) evidence of any bad faith on the part of the City.

The Objectors' remaining argument – that the City did not adequately explore alternatives to bankruptcy prior to the filing of the Petition – is easily dispatched. The Orr Declaration is filled with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. <u>See</u> Orr Declaration, at ¶¶ 58-73 (describing various measures taken by the City over the past 16 months to address its financial challenges and avoid bankruptcy, including,

but not limited to: the execution of a consent agreement with the State of Michigan and creation of a financial advisory board; employee headcount reductions; reduction of labor costs through the implementation of CETs; the increase of corporate tax rates; and the implementation of tax collection initiatives). The Objections, on the other hand, fail to identify even one unexplored alternative that might demonstrate a lack of good faith on the part of the City.

Finally, there can be no question that the residents of the City would be prejudiced by the dismissal of the Petition. As set forth in the Orr Declaration and the Eligibility Memorandum, the City's ability to provide even the most basic municipal services to its citizens has been crippled by its dire financial circumstances. See Orr Declaration, at ¶¶ 31-44 (describing how acute underfunding of the City's core services has contributed to a violent crime rate that is the highest of any large U.S. city and five times the national average, compromised EMS and fire-fighting capabilities, resulted in a lack of adequate lighting and prevented the city from adequately addressing blight); Eligibility Memorandum, at pp. 2-3, 23-26 (describing how massive debt and other legacy liabilities have prevented the City from adequately addressing shortfalls in its provision of basic services for years, and establishing that the City is "service delivery insolvent").

This chapter 9 case is the City's sole remaining option to address its financial condition and enhance its ability to provide its citizens with core municipal services.   As COLLIER ON BANKRUPTCY states:

> For the financially distressed municipality, chapter 9 may be the only forum for protecting the long-term interests of the municipality and its residents…. A finding that a municipality did not file its chapter 9 petition in good faith will result in the municipality's not being able to impair its contractual obligations, and may result in considerable prejudice to the residents of the municipality. Accordingly, a finding that a municipality did not file in good faith should be reserved for those situations in which the evidence is compelling.

6 COLLIER ON BANKRUPTCY ¶ 921.04[2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013).  Here, the evidence that the City filed the Petition in anything other than good faith is not only not compelling, it is non-existent.  The arguments that the City did not file its Petition in good faith should be rejected.

## XIII.  NOTICE OF THE DEADLINE FOR OBJECTIONS TO ELIGIBILITY WAS PROPER AND SUFFICIENT

Numerous Objections argue that the notice of the deadline for objections to the Petition and the Statement of Qualifications (the "Eligibility Objection Deadline") – i.e., August 19, 2013 – was inadequate.  See, e.g., Objection (Docket No. 384) filed by Krystal Crittendon, at ¶ 8 ("This Notice provides inadequate notice and opportunity to be heard by the date of August 19, 2013 when objections

-69-

193

13-53846-swr   Doc 2369-3   Filed 01/02/13   Entered 01/02/13 00:00:29   Page 137 of 195
13-53846-swr   Doc 765-3   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 137 of 195   331

may be filed, as the Notice was received less than two (2) weeks before the date by which Objections must be filed.").

All Objections related to the alleged inadequacy of notice of these proceedings should be overruled. A motion setting forth a preliminary timeline for eligibility issues – which schedule proposed a deadline for objections to eligibility that was consistent with the Eligibility Objection Deadline ultimately adopted by the Court – was filed by the City on the day after the Petition Date, and all interested parties had ample opportunity to object. <u>See</u> Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration (Docket No. 18). The order granting that motion (Docket No. 296) (the "<u>Case Commencement Order</u>") established the form of the notice of commencement of this chapter 9 case, which notice (A) conspicuously identified the Eligibility Objection Deadline and (B) was served on all interested parties within three business days of its entry. Certificate of Service re: Documents Served on August 6, 2013 (Docket No. 325).

The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the number and substance of the Objections received. Over 100 parties filed Objections to the Petition and Statement of Qualifications, many

of which are elaborately argued (as indicated above). Accordingly, all interested parties were provided sufficient notice of the Eligibility Objection Deadline, and Objections to any alleged inadequacy of notice should be overruled.

## XIV. CONCLUSION

For the foregoing reasons, the Court should promptly enter an Order for Relief in this case.

-71-

193

13-53846-swr Doc 2369-3 Filed 01/02/13 Entered 01/02/13 00:00:29 Page 139 of 195
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 81 of 195    333

Dated: September 6, 2013          Respectfully submitted,


                                   /s/  Bruce Bennett
                                  Bruce Bennett (CA 105430)
                                  JONES DAY
                                  555 South Flowers Street
                                  Fiftieth Floor
                                  Los Angeles, California  90071
                                  Telephone:  (213) 243-2382
                                  Facsimile:  (213) 243-2539
                                  bbennett@jonesday.com

                                  David G. Heiman (OH 0038271)
                                  Heather Lennox (OH 0059649)
                                  JONES DAY
                                  North Point
                                  901 Lakeside Avenue
                                  Cleveland, Ohio  44114
                                  Telephone:  (216) 586-3939
                                  Facsimile:  (216) 579-0212
                                  dgheiman@jonesday.com
                                  hlennox@jonesday.com

                                  Jonathan S. Green (MI P33140)
                                  Stephen S. LaPlante (MI P48063)
                                  MILLER, CANFIELD, PADDOCK AND
                                     STONE, P.L.C.
                                  150 West Jefferson
                                  Suite 2500
                                  Detroit, Michigan  48226
                                  Telephone:  (313) 963-6420
                                  Facsimile:  (313) 496-7500
                                  green@millercanfield.com
                                  laplante@millercanfield.com

                                  ATTORNEYS FOR THE CITY

-72-
193
13-53846-swr   Doc 2369-3   Filed 01/06/14   Entered 01/06/14 19:59:33   Page 140 of 95
13-53846-swr   Doc 769-3   Filed 09/06/13   Entered 09/06/13 19:59:33   Page 82 of 195   334

# EXHIBIT A

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | |
| Federal Structure Violation | Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling state fiscal self-management, which is an area of exclusive state sovereignty.<br><br>The Supreme Court's justifications for upholding a municipal bankruptcy statute in United States v. Bekins, 304 U.S. 27 (1938), are no longer valid because: (i) a federal municipal bankruptcy statute is no longer necessary to accomplish an adjustment of municipal debts, where states are permitted to pass their own municipal debt adjustment legislation; and (ii) the Supreme Court's development of constitutional federalism doctrine has effectively overruled Bekins.<br><br>Chapter 9 eviscerates the accountability of Michigan to its citizens and creditors.<br><br>Chapter 9's requirement of state consent cannot cure its violation of individual constitutional rights under the Tenth Amendment. | The Supreme Court's decision in Bekins — to uphold the constitutionality of a municipal bankruptcy statute that (i) provided for states to retain control of their fiscal affairs and (ii) constrained the bankruptcy power to cases authorized by state law — remains binding precedent. The Objecting Parties do not point to any change in statutory text that would warrant a different outcome than Bekins, and binding Supreme Court precedent cannot be overruled by mere implication. See Reply, at § III.A.<br><br>Subsequent legal developments have not undermined the Bekins decision, the soundness of its reasoning or the constitutionality of chapter 9. States are not at liberty under the Contracts Clause of the United States Constitution to impair their own contracts. States must seek the aid of federal bankruptcy courts to impair contracts by authorizing chapter 9. In making the decision to do so, states exercise their sovereignty rather than relinquish it. Once a state authorizes a municipality to proceed under chapter 9, the bankruptcy court's powers are designed to preserve the state-federal relationship and prohibit intrusion on the state's core functions. See Reply, at § III.B.<br><br>Chapter 9 relies on state law for determining which municipalities are authorized to seek bankruptcy protection. Although this rule may result in differences in and among states, the rule itself is "uniform throughout the United States," such that chapter 9 does not violate the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution. See Reply, at § III.B. |

# Non-Individual Objections to Eligibility, Summary of Arguments Set Forth Therein and City's Responses

| Term | Description | City's Response |
|------|-------------|-----------------|
| Lack of Jurisdiction: <u>Stern</u> | The Bankruptcy Court lacks jurisdiction to decide whether chapter 9 violates the United States Constitution as a result of <u>Stern v. Marshall</u>. | The Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. As the Supreme Court made clear in <u>Stern</u>, non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights." Included within the category of "public rights" are cases that "can be pursued only by grace of the other branches" of the federal government. Here, the City's ability to adjust its debts in a federal bankruptcy case is only possible because Congress enacted the Bankruptcy Code and, thus, this case involves "public rights." As such, <u>Stern</u> poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9. <u>See</u> Reply, at § II.<br><br>The argument that the Court is powerless to rule on certain *objections* to the City's eligibility that involve federal or state constitutional questions would constitute a radical expansion of <u>Stern</u> that is unsupported by that case or any subsequent authority. Under <u>Stern</u>, while state law actions independent of the federal bankruptcy law cannot be decided by the bankruptcy courts, federal claims stemming from the bankruptcy itself can be. Here, there are no state or federal constitutional *claims* before the Court; what is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself." Thus, <u>Stern</u> simply is not implicated by the Objectors' constitutional arguments against eligibility. <u>See</u> Reply, at § II. |

CLI-2134971v8

| Term | Description | City's Response |
|------|-------------|-----------------|
| | | |
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(2)** | | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." <br><br>This includes arguments that: <br><br>• The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights; <br><br>• The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly; <br><br>• The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and <br><br>• The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that: <br><br>   o Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law; <br><br>   o Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A. <br><br>The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. See Reply, at § V.B. <br><br>When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses an obstacle to a municipality's eligibility to be a chapter 9 debtor. See Reply, at § V.B. <br><br>The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. See Reply, at § V.C. |

CLI-2134971v8

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This include arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. See Reply, at § V.C. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it: (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls. Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation. See Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the state legislature could pass, fails. Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility. See Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine. The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority. Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers. In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review. See Reply, at § VII.C. |

CLI-2134971v8

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled.  The Objections offer little more than innuendo and bald supposition.  For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency.  Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date.  See Reply, at § X. |
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(4)** | | |
| Desires to Effect a Plan to Adjust Debts | The City has not satisfied section 109(c)(4) of the Bankruptcy Code — which requires the debtor to desire to effect a plan to adjust its debts — because the City has proposed a restructuring plan that cannot be confirmed under section 943(b)(4) of the Bankruptcy Code, which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." | At Section VI of the Eligibility Scheduling Order, the Court determined that (i) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and (ii) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4).  The Objections that argue that the City does not satisfy section 109(c)(4) are based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits.  Thus, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum.  See Reply, at § XI. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. See Reply, at § IX. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Negotiations Not Impracticable | The City has not satisfied section 109(c)(5)(C) of the Bankruptcy Code because the City has not proven that it was unable to negotiate with creditors because such negotiation is impracticable.<br><br>This includes arguments that:<br><br>• The proper standard is whether there is a "natural representative capable of bargaining" on a creditor's behalf (not whether a party can bind creditors); that the City's retiree associations are such natural representatives; and that the City cannot argue that it would have caused extreme and unreasonable difficulty to engage in negotiations with such associations;<br><br>• The City predetermined that negotiations would fail and should not be able to claim that negotiations were impracticable where it had no sincere intent to negotiate and the time for negotiations was limited;<br><br>• The City has in the past negotiated for retiree health and pension benefits outside of a chapter 9 proceeding; and<br><br>• The City created an impediment to negotiations based on the artificial time constraint created by the filing on July 18. | The Objectors have not succeeded in undermining the City's showing that it has satisfied section 109(c)(5)(C) of the Bankruptcy Code.<br><br>The Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, even if the City's retiree associations are the "natural representatives of retirees" (which is incorrect), they cannot bind the City's 20,000 plus retirees, rendering the City's good faith attempt at such negotiations impracticable.<br><br>The City could not have conducted practicable negotiations with its unions where only 8 unions (comprising 10 of the City's 47 bargaining units) agreed to represent their retirees in connection with the City's restructuring and many unions expressly declined to represent their retirees.<br><br>Section 109(c)(5) is written in the disjunctive, such that section 109(c)(5)(C) (regarding impracticability) can be satisfied even if section 109(c)(5)(B) (regarding good faith negotiations) is not. Section 109(c)(5)(C) can be satisfied even if negotiations with certain creditors, such as retirees, are potentially practicable.<br><br>The argument that the City manufactured impracticability through the imposition of artificial time constraints also fails. To the contrary, the fact that the City could not delay filing its petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments. See Reply, at § VIII. |

CLI-2134971v8

**NON-INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN AND CITY'S RESPONSES**

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. See Reply, at § XII. |
| **ARGUMENTS RELATING TO 11 U.S.C. § 943** | | |
| Best Interests of Creditors | The City's proposed restructuring plan could not be confirmed pursuant to the "best interests of creditors" test set forth at section 943(b)(7) of the Bankruptcy Code and, thus, the City has failed to satisfy section 109(c)(5)(B). | No Objector cites to any authority that supports this proposition in any way. Consistent with Section VI of the Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable. See Reply, at § IX. |

-10-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Unconfirmable Plan | The City's proposed restructuring plan cannot be confirmed under section 943(b)(4) of the Bankruptcy Code — which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan" — such that the City has failed to satisfy either section 109(c)(2) or (c)(5) of the Bankruptcy Code. | Requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage. <u>See</u> Reply, at § V.C. |
| **OTHER ARGUMENTS** | | |
| Collateral Estoppel | Collateral estoppel precludes the City from relitigating the issue of whether the City received valid authorization from the Governor to commence the chapter 9 case because that issue has already been litigated and a declaratory judgment rendered.<br><br>This includes arguments that (a) the declaratory judgment entered in the state court <u>Webster</u> litigation is entitled to full faith and credit; (b) the preclusive effect of the declaratory judgment is governed by Michigan law; and (c) the elements for collateral estoppel under Michigan law are satisfied. | Collateral estoppel applies only to issues that have been "actually litigated and determined by a valid and final judgment." The <u>Webster</u> court exceeded its jurisdiction by entering its declaratory judgment after the commencement of the City's case because the Bankruptcy Court has original and exclusive jurisdiction over the case, including questions related to eligibility. As such, the declaratory judgment is void and not "valid" for purposes of collateral estoppel.<br><br>In any event, the declaratory judgment in <u>Webster</u> is void *ab initio* and not "valid" for purposes of collateral estoppel because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code.<br><br>In addition, other elements of collateral estoppel are not satisfied. The City did not have a full and fair opportunity to litigate the issue where the declaratory judgment was issued on an expedited basis, and the City was not a party to the <u>Webster</u> lawsuit and was not otherwise in privity with the <u>Webster</u> defendants. <u>See</u> Reply, at § VI. |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 438; 453 (Notice of Constitutional Challenges); 505 (Corrected Motion); 509 (Corrected Kreisburg Declaration) | Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("<u>AFSCME</u>") | • Federal Structure Violation (¶¶ 40-62).<br>• Lack of Jurisdiction (¶¶ 67-71).<br>• Governor's Authorization Invalid (¶¶ 75-84).<br>• PA 436 Unconstitutional (¶¶ 85-100).<br>• No Good Faith Negotiations (¶¶ 101-108).<br>• Unconfirmable Plan (¶¶ 109-110).<br>• Best Interests of Creditors (¶ 111).<br>• Negotiations Not Impracticable (¶¶ 115-123).<br>• Filing Not in Good Faith (¶¶ 124-131).<br>• Reserves the right to argue Insolvency (¶¶ 132-140). | • <u>See</u> Reply, at §§ III (Federal Structure Violation); II (Lack of Jurisdiction); V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Unconfirmable Plan); IX (Best Interests of Creditors); VIII (Negotiations Not Impracticable); XII (Filing Not in Good Faith). |
| 481 | Attorney General Bill Schuette | • Concedes that the City is eligible to be a chapter 9 debtor, but argues that the City remains subject to the Michigan Constitution (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 5-19). | • <u>See</u> Reply, at § V.C (Michigan Law Not Preempted). |
| 482 | Association of Professional and Technical Employees | • PA 436 Unconstitutional.<br>• Insolvency.<br>• Michigan Law Not Preempted.<br>• Wages and fringe benefits are subject to collective bargaining according to state and federal labor laws. | • <u>See</u> Reply, at §§ V.A, VII (PA 436 Unconstitutional); X (Insolvency); V.C (Michigan Law Not Preempted). |

CLI-2134971v8

| Objection Docket No(s) | Objector(s) | Summary Of Arguments | City Response |
|---|---|---|---|
| 484 | Local 324, International Union of Operating Engineers | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • See Response to UAW's Objection; AFSCME's Objection. |
| 486 | Local 517M, Service Employees International Union | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • See Response to UAW's Objection; AFSCME's Objection. |
| 497; 502 (502 appears to be duplicative of 497) | Retired Detroit Police & Fire Fighters Association ("RDPFFA"); Donald Taylor, individually and as President of RDPFFA; Detroit Retired City Employees Association ("DRCEA"); Shirley V. Lightsey, individually and as President of DRCEA | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 31-50).<br>• Insolvency (¶¶ 51-57).<br>• No Good Faith Negotiations (¶¶ 58-63).<br>• Negotiations Not Impracticable (¶¶ 63-74). | • See Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 506 | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 16-34, 40).<br>• Michigan Law Not Preempted (¶¶ 35-39).<br>• Desires to Effect a Plan to Adjust Debts (¶¶ 41-42).<br>• Filing Not in Good Faith/No Good Faith Negotiations (¶¶ 43-47).<br>• Negotiations Not Impracticable (¶ 46, n.19). | • See Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); XII (Filing Not in Good Faith); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

CLI-2134971v8

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 512 | Detroit Fire Fighters Association; Detroit Police Officers Association; Detroit Police Lieutenants & Sergeants Association; Detroit Police Command Officers Association | • Emergency Manager's Commencement Invalid (Brief at pp. 3-8).<br>• Filing Not in Good Faith (Brief at pp. 4-5, 18).<br>• Unconfirmable Plan (Brief at pp. 4-6).<br>• No Good Faith Negotiations (Brief at pp. 8-16).<br>• Negotiations Not Impracticable (Brief at pp. 16-18). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); XII (Filing Not in Good Faith); V.C (Unconfirmable Plan); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 514 | Center for Community Justice and Advocacy | • Emergency Manager's Commencement Invalid (¶¶ 13-14).<br>• Michigan Law Not Preempted (pp. 7-12).<br>• Alternatively, PA 436 Unconstitutional (pp. 12-13). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); V.A, VII (PA 436 Unconstitutional). |
| 517 | Michigan Auto Recovery, Inc. | • No Good Faith Negotiations (¶¶ 3-5). | • See Reply, at § IX (No Good Faith Negotiations). |
| 519 | Police and Fire Retirement System of the City of Detroit; General Retirement System of the City of Detroit | • Michigan Law Not Preempted (pp. 19-25).<br>• Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (pp. 27-43).<br>• Alternatively, PA 436 Unconstitutional (pp. 43-44).<br>• Collateral Estoppel (pp. 44-58).<br>• No Good Faith Negotiations/Negotiations Not Impracticable (pp. 59-61). | • See Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional); VI (Collateral Estoppel); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 520 | Retired Detroit Police Members Association | • PA 436 Unconstitutional (pp. 9-10).<br>• Emergency Manager's Commencement Invalid (pp. 10-11).<br>• Governor's Authorization Invalid (pp. 11-12).<br>• Filing Not in Good Faith (pp. 12-13).<br>• Michigan Law Not Preempted (pp. 14-19).<br>• Desires to Effect a Plan to Adjust Debts (pp. 18-19).<br>• No Good Faith Negotiations (pp. 13, 19-22).<br>• Insolvency (pp. 22-23). | • <u>See</u> Reply, at §§ V.A, VII (PA 436 Unconstitutional); V, VII.A (Emergency Manager's Commencement Invalid); V (Governor's Authorization Invalid); XII (Filing Not in Good Faith); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); IX (No Good Faith Negotiations); X (Insolvency). |
| 660 | St. Martins Cooperative | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 665). |

CLI-2134971v8

# EXHIBIT B

| Term | Description | City's Response |
|---|---|---|
| **Arguments That Chapter 9 Violates the United States Constitution** | | |
| Due Process | The notice of the commencement of the City's bankruptcy case (the "Case Commencement Notice") did not provide adequate notice or opportunity to be heard. | The Case Commencement Notice conspicuously identified the Eligibility Objection Deadline and, consistent with the Case Commencement Order, was served on all interested parties within three business days of its entry.  The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the fact that over 100 parties filed Objections to the Petition and Statement of Qualifications, many of which are elaborately argued.  See Reply, at § XIII. |

CLI-2136816v4

13-53846-swr    Doc 2800-3   Filed 02/13/13   Entered 02/14/13 00:01:29   Page 158 of
13-53846-swr    Doc 780   Filed 09/06/13   Entered 09/06/13 19:00:03   Page 160 of 135
193

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(2)** | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."<br><br>This includes arguments that:<br><br>• The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights;<br><br>• The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly;<br><br>• The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and<br><br>• The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that:<br><br>   ○ Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law;<br><br>   ○ Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. *See* Reply, at § V.A.<br><br>The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by <u>Bekins</u>: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. *See* Reply, at § V.B.<br><br>When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. *See* Reply, at § V.B.<br><br>The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. *See* Reply, at § V.C. |

-2-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

-3-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This includes arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of a debtor's chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. See Reply, at § V.C. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|------|-------------|-----------------|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it: (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the Legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. <u>See</u> Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls. Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation. <u>See</u> Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manger to enact local legislation that not even the state legislature could pass, fails. Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility. <u>See</u> Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine. The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority. Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards are provided when the legislature delegates it powers. In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review. <u>See</u> Reply, at § VII.C. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled. The Objections offer little more than innuendo and bald supposition. For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency. Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. See Reply, at § X. |
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. See Reply, at § IX. |

-6-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| ARGUMENTS RELATING TO 11 U.S.C. § 921(C) | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. *See* Reply, at § XII. |
| OTHER ARGUMENTS | | |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

-7-

**I**NDIVIDUAL **O**BJECTIONS TO **E**LIGIBILITY, **S**UMMARY OF **A**RGUMENTS **S**ET **F**ORTH **T**HEREIN & **C**ITY'S **R**ESPONSE

| Objection Docket No(s). | Objector(s) | Summary of Arguments | City's Response |
|---|---|---|---|
| 335 | Lou Ann Pelletier | • Michigan Law Not Preempted. | • <u>See</u> Reply, at § V.C. |
| 337 | Michael K. Pelletier | • Michigan Law Not Preempted. | • <u>See</u> Reply, at § V.C. |
| 338 | Regina G. Bryant | • As a property owner, objects to changes in tax status, any property value changes, and any deterioration or privatizing of City services. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 339 | Regina G. Bryant | • Seeks reinstatement of position with DWSD and full salary restoration, with sick and vacation time, for the period March 1, 2010 to August 31, 2013. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 388 | Michael G. Benson | • Insolvency.<br>• Michigan Law Not Preempted.<br>• Asserts that bankruptcy case illegal and morally wrong. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted).<br>• Objection that chapter 9 filing morally wrong does not address eligibility of City to be a chapter 9 debtor. |
| 398 | Karl E. Shaw | • Insolvency.<br>• Michigan Law Not Preempted. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |
| 401 | Olivia Gillon | • Insolvency.<br>• Michigan Law Not Preempted. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 402 | Russ Bellant | • Objects to the transfer of the Public Lighting Department to a private party.<br>• Due Process. | • Objection to transfer of PLD does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 405 | Russ Bellant | • Objects to the outsourcing of the City's waste removal services.<br>• Due Process. | • Objection to outsourcing of waste removal services does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 411 | William Curtis Walton | • Michigan Law Not Preempted (¶¶ 1-5).<br>• No Good Faith Negotiations (¶ 6).<br>• Emergency Manager's Commencement Invalid (¶ 7). | • See Reply, at §§ V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations); V, VII.A (Emergency Manager's Commencement Invalid). |
| 412 | Dwight Boyd | • Insolvency. | • See Reply, at § X. |
| 415 | Mary W. Dugans | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 417 | William D. Ford | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 418 | Stephen Johnson | • Michigan Law Not Preempted.. | • See Reply, at § V.C. |
| 426 | Kwabena Shabu | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• See also Response to all other Objections. |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 435 | Sylvester Davis | • Emergency Manager's Commencement Invalid. | • <u>See</u> Reply, at § V, VII.A. |
| 446 | Dennis Taubitz | • Due Process (pp. 1-3).<br>• Insolvency (pp. 3-4).<br>• No Good Faith Negotiations (pp. 4-5). | • <u>See</u> Reply, at §§ XIII (Due Process); X (Insolvency); IX (No Good Faith Negotiations). |
| 448 | David Dye | • Insolvency (pp. 1-2).<br>• Swap contracts not valid (p. 2).<br>• PA 436 Unconstitutional (p. 3).<br>• Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City (p. 3).<br>• Michigan Law Not Preempted (pp. 3-4).<br>• No Good Faith Negotiations (p. 4). | • <u>See</u> Reply, at §§ X (Insolvency); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations).<br>• Allegations of fraud related to interest rate swap contracts (which fraud allegedly renders such contracts invalid) are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.<br>• The Emergency Manager's alleged conflict of interest is (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 459 | Phebe Lee Woodberry | • Michigan Law Not Preempted.<br>• Asserts that City holds in escrow an undisclosed amount of money for its taking of her apartment using its power of eminent domain. | • <u>See</u> Reply, at § V.C (Michigan Law Not Preempted).<br>• Issues related to funds allegedly held by City in connection with alleged eminent domain proceeding are unrelated to the City's eligibility to be a chapter 9 debtor. |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 460; 491 (Corrected) | Charles D. Brown | <ul><li>Emergency Manager's Commencement Invalid (p. 2).</li><li>Michigan Law Not Preempted (p. 2).</li><li>Joinder in all other Objections (p. 2).</li></ul> | <ul><li><u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).</li><li><u>See</u> <u>also</u> Response to all other Objections.</li></ul> |

CLI-2136816v4

13-53846-swr    Doc 2800-3   Filed 02/23/13   Entered 02/24/13 00:01:29   Page 168 of
13-53846-swr    Doc 765-3   Filed 09/06/13   Entered 09/06/13 19:00:53   Page 110 of 135
193

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 461 | Thomas Stephens | • Due Process (¶ 2).<br><br>• Seeks a stay of the bankruptcy case and suggests that the Court formally request expedited consideration of all pending litigation raising legal and constitutional challenges to PA 436 (¶¶ 3-6).<br><br>• Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City. Emergency Manager and Jones Day are acting in their private interests rather than the interest of the City (¶¶ 8, 12).<br><br>• City and its professionals have violated the First Amendment in connection with public informational meetings held in April and June of 2013 (¶ 9).<br><br>• PA 436 Unconstitutional (¶¶ 10-12, 14).<br><br>• PA 436 abridges citizens' rights to engage in core First Amendment activities (¶ 13).<br><br>• Michigan Law Not Preempted (¶ 10).<br><br>• This court lacks jurisdiction to enter final orders implicating constitutionality of PA 436 (¶ 14). | • Argument that chapter 9 case should be stayed pending the resolution of state court litigation challenging authority of Governor and Emergency Manager should be overruled. Only state court litigation identified by Objector (a) is subject to the automatic stay pursuant to (i) sections 362 and 922 of the Bankruptcy Code and (ii) this Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities and (b) has been administratively closed by the relevant state court. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility.<br><br>• The Emergency Manager's/Jones Day's alleged conflicts of interest and alleged actions in their private interests are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.<br><br>• Allegations of violations of First Amendment rights are framed generically and are not supported by any specific instance of such a violation.<br><br>• See Reply, at §§ XIII (Due Process); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted). |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 472 | Alice R. Pruitt | <ul><li>PA 436 Unconstitutional.</li><li>No Good Faith Negotiations.</li><li>Michigan Law Not Preempted.</li><li>Emergency Manager's Commencement Invalid.</li><li>Insolvency.</li></ul> | <ul><li>See Reply, at §§ V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency).</li></ul> |
| 474 | Linda Bain | <ul><li>Asserts that (a) the Emergency Manager's priority will be to sell Detroit's "precious and valuable assets" to stakeholders who have "illegally set up the emergency management operations"; and (b) the Emergency Manager is not going to address the inadequacy of the various City services in the bankruptcy case.</li></ul> | <ul><li>Objector's allegations of bad faith and illegality on the part of the Emergency Manager, the Governor and the Treasurer are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.</li></ul> |
| 477 | Lucinda J. Darrah | <ul><li>Objects to alleged secured status of "predatory and criminal acting" banks (p. 1).</li><li>Michigan Law Not Preempted (p. 2).</li><li>Objects to potential privatization of PLD (p. 3).</li></ul> | <ul><li>Secured status of institutional creditors and potential privatization of PLD unrelated to City's eligibility to be a chapter 9 debtor.</li><li>See Reply, at § V.C (Michigan Law Not Preempted).</li></ul> |
| 489 | Timothy King | <ul><li>Emergency Manager's Commencement Invalid.</li><li>PA 436 Unconstitutional.</li></ul> | <ul><li>See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional).</li></ul> |

-13-

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 490 | Jo Ann Watson | • Governor's Authorization Invalid.<br>• PA 436 Unconstitutional.<br>• Michigan Law Not Preempted.<br>• Reserves the right to join in "the objections raised by others which are relevant to my specific objection or this matter in general." | • Objector's unsupported argument that the Bankruptcy Code requires that "local elected officials" commence any municipal bankruptcy is contrary to the plain language of section 109(c)(2) of the Bankruptcy Code and applicable case law.<br>• Objector's argument that PA 72 was invalid at the time of the Emergency Manager's appointment is false, unsupported and contrary to applicable case law.<br>• See Reply, at §§ V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted). |
| 492 | Cynthia Blair | • Due Process.<br>• Emergency Manager's Commencement Invalid.<br>• Michigan Law Not Preempted.<br>• Objects to the assertion that pensions are underfunded.<br>• Insolvency.<br>• No Good Faith Negotiations. | • See Reply, at §§ XIII (Due Process); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); X (Insolvency); IX (No Good Faith Negotiations).<br>• Challenge to underfunding amount of pensions unrelated to City's eligibility to be a chapter 9 debtor. |

CLI-2136816v4

13-53846-tjt Doc 2300-3 Filed 12/23/13 Entered 12/24/13 00:01:29 Page 171 of 193
13-53846-swr Doc 765-3 Filed 09/06/13 Entered 09/06/13 00:03:29 Page 13 of 135
193

**INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE**

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 493 | James Thomas McBride, filing as The Chair of Saint Peter | <ul><li>Insolvency.</li><li>Asserts that: (a) the 300 year old "City of Detroit" is solvent, but the 80 year old legal fiction "The City of Detroit" is intentionally insolvent; (b) the "petition" is "intentionally confusing and misleading" and contains words with "diabolically opposed meanings;" (c) the City has tricked people into pledging their property as collateral, which has fraudulently converted the "true Creditors" into debtors, reducing the creditors to the status of insolvent paupers with no rights; and (d) the City holds "private matching funds" and refuses to execute the set off of debt for the settlement and closure of the accounts to return the City to solvency.</li></ul> | <ul><li>See Reply, at § X (Insolvency).</li><li>Allegation that "petition" is "intentionally confusing and misleading" unrelated to City's eligibility to be a chapter 9 debtor. Objector also fails to (a) specify which document filed by the debtor is "confusing and misleading;" and (b) comprehensibly explain how certain words in the referenced document have "diabolically opposed meanings."</li><li>Allegations that (a) the City has tricked people into pledging their property as collateral; and (b) the City refuses to apply "private matching funds" to set off its debts are non-specific, factually unfounded and unrelated to the City's eligibility to be a chapter 9 debtor.</li></ul> |
| 494 | Gretchen R. Smith | <ul><li>Emergency Manager's Commencement Invalid.</li><li>No Good Faith Negotiations.</li></ul> | <ul><li>See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); IX (No Good Faith Negotiations).</li></ul> |
| 495 | David Sole | <ul><li>Emergency Manager's Commencement Invalid (pp. 5-8).</li><li>Michigan Law Not Preempted (pp. 8-11).</li></ul> | <ul><li>See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).</li></ul> |
| 496 | Floreen Williams | <ul><li>PA 436 Unconstitutional.</li></ul> | <ul><li>See Reply, at §§ V.A, VII.</li></ul> |

CLI-2136816v4

13-53846-swr    Doc 2800-3    Filed 12/23/13    Entered 12/24/13 00:01:29    Page 172 of 193
13-53846-swr    Doc 765-3    Filed 09/06/13    Entered 09/06/13 19:00:03    Page 14 of 135

# INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 504 | Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman | • Joinder in UAW's Objection (Docket No. 506) (¶¶ 9-10).<br>• Michigan Law Not Preempted / Governor's Authorization Invalid (¶¶ 11-18). | • See Response to UAW's Objection.<br>• See Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid). |
| 510 | Michael Joseph Karwoski | • Objects to the "inclusion" of GRS in these proceedings without an objective determination of the extent to which GRS is underfunded (¶ 1).<br>• Michigan Law Not Preempted (¶ 2).<br>• Emergency Manager's Commencement Invalid (¶¶ 3-11). | • Extent to which GRS is underfunded is unrelated to City's eligibility to be a chapter 9 debtor.<br>• See Reply, at §§ V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid). |
| 513 | Heidi Peterson | • No Good Faith Negotiations (¶ 11(a), (c)).<br>• The City's dealings with Ms. Peterson with respect to her pending lawsuit were fraudulent (¶ 11(b)).<br>• The City allowed itself to become overburdened with debt "by virtue of down right idiotic business practices" (i.e., policies regarding the assessment and collection of property taxes) (¶ 12). | • See Reply, at § IX (No Good Faith Negotiations).<br>• Objector fails to substantiate vague allegation that the City's failure to negotiate with the Objector prior to filing for bankruptcy protection constituted fraud. Challenged City actions were the result of the imposition of the automatic stay.<br>• City policies relating to the assessment and collection of property taxes unrelated to City's eligibility to be a chapter 9 debtor. |
| 530 | Diane Hutchersun | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 532 | Andrea Edwards | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 534 | Nettie Reeves | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 536; 568 (Order Denying Motion for Extension of Time) | Richard Johnson El-Bey | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 539 | Charles E. Chatman | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 541 | Xylia Hall | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 549 | Michael D. Jones | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 565 | Hassan Aleem; Carl Williams | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 633 | Donald Richardson | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 650 | Alma Armstrong | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 672). |
| 651 | Brenda Taylor | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 664). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 667 | Josué Zizi | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 674). |

-18-

CLI-2136816v4

13-53846-swr    Doc 2300-3    Filed 12/23/13    Entered 12/24/13 00:01:29    Page 175 of 135
13-53846-swr    Doc 785-3    Filed 09/06/13    Entered 09/06/13 19:00:33    Page 17 of 135
193

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 384; 385; 386; 387; 389; 390; 391; 392; 393; 394; 395; 396; 397; 399; 400; 403; 404; 407; 408; 409; 413; 414; 416; 419; 420; 421; 422; 423; 425; 427; 428; 429; 430; 431; 432; 433; 436; 437; 439; 440; 442; 443; 444; 447; 451; 454; 455; 456; 457; 458; 462; 463; 464; 465; 466; 467; 468; 469; 470; 475; 479; 480; 485 | Krystal A. Crittendon; Michael J. Abbott; Donald Glass; Calvin Turner; Joseph H. Jones; Tracey Tresvant; Charles Williams II; Joyce Davis; David Bullock; Lewis M. Dukens; Shirley Tolliver; Zelma Kinchloe; LaVern Holloway; Althea Long; Alma Cozart; Lorene Brown; Helen Powers; Preston West; Claudette Campbell; Raleigh Chambers; Johnnie R. Carr; Elmarie Dixon; Jacqueline Esters; Sallie M. Jones; Larene Parrish; Deborah Pollard; Samuel L. Riddle; Charles Taylor; Edward Lowe; Keetha R. Kittrell; Lorna Lee Mason; Ulysses Freeman; William Davis; Paulette Brown; Jerry Ford; William L. Howard; Frank M. Sloan, Jr.; Joann Jackson; Jean Vortcamp; Mary Diane Bukowski; William Hickey; Michael D. Shane; Judith West; Lucinda J. Darrah; Sheilah Johnson; Leola Regina Crittendon; Angela Crockett; Dolores A. Thomas; Ailene Jeter; Cheryl Smith Williams; Aleta Atchison-Jorgan; Arthur Evans; Horace E. Stallings; Lavarre W. Greene; Leonard Wilson; Rakiba Brown; Roosevelt Lee Sr.; Sandra Caven; Deborah Lela Moore; Marzelia Taylor; Fraustine Williams; Randy R. Beard; Anthony G. Wright, Jr. | • "Form" objections entitled "Objections to the Petition Filed by One Kevyn D. Orr Seeking to Commence a Case Under Chapter 9 of Title 11 of the United States Code on Behalf of the City of Detroit, Michigan," into which creditors insert their name and date of birth and the date on which they received the Case Commencement Notice.<br><br>• Due Process.<br><br>• Seek a stay of the bankruptcy case pending the resolution of all litigation raising legal and constitutional challenges to PA 436. | • See Reply at § XIII (Due Process).<br><br>• Argument that chapter 9 case should be stayed pending the resolution of all litigation raising legal and constitutional challenges to PA 436 should be overruled. The state court lawsuits referenced by Objectors are subject to the automatic stay pursuant to (a) sections 362 and 922 of the Bankruptcy Code and (b) the Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility. |

13-53846-swr    Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:01:29   Page 176 of 185
13-53846-swr    Doc 760-3   Filed 09/06/13   Entered 09/06/13 00:09:53   Page 113 of 135
193

# EXHIBIT C



# MICHIGAN COUNCIL 25

**American Federation of State, County, and Municipal Employees, AFL-CIO**
Detroit Office • 600 W. Lafayette, Ste. 500 • Detroit, Michigan 48226
Phone: 313.964.1711 • 1.800.AFSCME25 • Fax: 313.964.0230 • www.miafscme.org

**Albert Garrett**
*President*

**Lawrence A. Roehrig**
*Secretary-Treasurer*

**Executive Board**

Sylvester Austin
*Region 2*

Carlos Bass
*Region 3*

David Brandt
*Region 9*

Donna Cangemi
*Region 3*

Susan Christensen
*Region 11*

Sandra Crayton
*Region 6*

Barbara Dauble
*Region 3*

Lorna Davison
*Region 2*

Jonathan Drake
*Region 2*

Caryette Fenner
*Region 4*

Michael Harris
*Region 1*

Bennette Henley
*Region 1*

Lorraine Jacobson
*Region 10*

Keith January
*Region 1*

Laura Kinch
*Region 6*

Arlean King
*Region 1*

J. Phil McGuire
*Region 2*

Phyllis McMillon
*Region 1*

Dennis Moore
*Region 7*

Sam Muma
*Region 6*

Doug Murch
*Region 5*

Lois Murray
*Region 3*

Stephanie Nahas
*Region 3*

Dennis Overmyer
*Region 7*

Gloria Peterson
*Region 4*

Patricia Ramirez
*Region 6*

James Rhodes, Jr.
*Region 5*

Roger Rice
*Region 1*

Ronnie Skorupski
*Region 8*

Cindy Spurlock
*Region 2*

Chris Vandenbussche
*Region 3*

Russell Williams
*Region 11*

Sam Zettner
*Region 3*

*Advanced copy via facsimile*
*(312) 782-8585*

May 24, 2013

Brian West Easley, Esq.
Jones Day
77 West Wacker
Chicago, IL 60601-1692

**Re:** **Letter from Brian West Easley Dated 5/20/13 Entitled** *"City of Detroit Restructuring"*

Dear Mr. Easley:

This communication is sent in response to your letter concerning the above stated matter, in which you requested to meet concerning restructuring of Pension and Retiree Medical Benefit liabilities. Please be advised that in accordance with Michigan law, we have no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive. However, we are willing to meet with you per your request. Please propose several alternative dates in which you are available.

Further you should be aware that for the first time in history, over 30 Unions came together in negotiating concessions. The cost-savings and revenues within this proposed Coalition Contract reached **hundreds of millions of dollars annually**. The Contract also contained many restructuring ideas for the City to engage. Ernst & Young participated during every facet of the negotiations and approved the final deal on behalf of the State. The Unions then ratified the concessions. The Coalition and the City celebrated the Ratification.

Unfortunately, the City did not execute the Coalition Contract. The Mayor claimed the State ordered him not to do so. City Council was not permitted to vote to ratify the Contract. By doing this, the City lost **tens of millions of dollars** in actual savings that the City should have realized from these concessions. This has been acknowledged by the City's financial expert.

Indeed, the Milliman Company being used by the City now, acknowledged that the City could have saved well over **50 million dollars** by the healthcare package called for in the Tentative Agreement. Given that the changes were not implemented as of

13-53846-swr    Doc 2800-3   Filed 09/06/13   Entered 09/06/13 00:01:29   Page 120 of 135
13-53846-swr    Doc 7300-3   Filed 09/06/13   Entered 09/06/13 00:01:29   Page 178 of 185    372
193

July 1, 2012, as called for in the Contract, the City lost the savings. Even when the City did unilaterally impose a healthcare plan, it botched the implementation with an excessive amount of plans and problematic rollouts.

We have repeatedly asked the reason why the Governor ordered the City not to execute and implement the Tentative Agreement. Indeed, during a hearing in Federal Judge, Arthur Tarnow's courtroom, he asked the City and State attorneys the same question, as well as what were the work rule changes they were seeking. The lawyers could give no answer.

You should know that we stand ready to meet and negotiate in an effort to save the City. We have been doing so for decades. We hope; however, that the City takes a look at the concessions our Unions already offered in lengthy negotiations last February. The Governor and the Mayor have talked frequently about **"shared sacrifices."** However, employees are the only ones who have "**truly sacrificed**."

I look forward to hearing from you in the near future.

Sincerely yours,

*Edward L. McNeil*

Edward L. McNeil
Special Assistant to the President

cc:     LaMont Satchel, Labor Relations, City of Detroit

dat/324iuoeaflcio



# UAW LOCAL 2211

**(Public Attorneys Association)**

CAYMC
2 Woodward. Ave., Ste. 500    • Detroit, Michigan 48226



May 22, 2013

Brian West Easley
Jones Day
77 West Wacker
Chicago, IL 60601-1692

      *Re:*      City of Detroit

Dear Mr. Easley:

    Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts. I write to confirm that this Union – Local No. 2211 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") – represents active employees, and thus future retirees, within its bargaining unit. This Union does not, however, represent current retirees and has no authority to negotiate on their behalf. On behalf of the active employees it does represent, I accept your invitation to participate in the discussions concerning health care and pension benefits. Because these issues are so vital to members, this Union requests bargaining with respect to any changes which the Emergency Manager (or City) might propose to make in those benefits. The Union requests the earliest possible dates for meeting, and proposes that the meetings be held at the Office of Labor Relations, on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.

    Please advise me of possible dates and location for our meeting at your earliest convenience.

    Also, if the City has developed any proposals, potential options, or possible modifications to health care or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting. Also in advance of our meeting, please provide documents showing any calculations relating to health care costs and pension costs (both present and future) as well as the assumptions upon which the calculations are based.

                          Sincerely,

                          Robyn Brooks
                          President

cc:   Jack Dietrich
       Lamont Satchel

13-53846-swr   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:31:29   Page 180 of 185
13-53846-swr   Doc 780-3   Filed 09/06/13   Entered 09/06/13 00:53:29   Page 122 of 135   374
193

# Metropolitan Detroit Professionals

UAW-Local 2200
5201 Woodward Avenue
Detroit, Michigan 48202



May 23, 2013

Brian West Easley
Attorney
Jones Day
77 West Wacker
Chicago, IL 60601

Dear Mr. Easley:

I am in receipt of your letter dated May 20, 2013 regarding City of Detroit Restructuring.

Today I spoke with Ms. Ms. Samantha Woo in your office. I gave her my verbal reply that UAW LU 2200 will participate in discussions and represent the interests of current employees at the Detroit Water and Sewerage Department's Wastewater Treatment Plant who are members of this Local Union.

Please contact me at your earliest convenience with proposed dates and times for the discussions. Telephone: 313-706-0081 or email: mimilaurie@yahoo.com.

Sincerely,

Laurie Townsend Stuart
President, UAW LU 2200


cc:   Gloria Morgan, International Representative, UAW Region 1
      Tiffani Simon, Vice President, UAW LU 2200
      DeShawn Benson, Unit Chair,
      Wastewater Treatment Plant Supervisors, UAW LU 2200
      Samantha Woo, Jones Day



PAGE 1/1 * RCVD AT 5/29/2013 12:14:39 PM [Eastern Daylight Time] * SVR:NAFX02MS/22 * DNIS:60572 * CSID:3138335012 * DURATION (mm-ss):00-55

13-53846-swr    Doc 2800-3  Filed 09/06/13   Entered 09/06/13 00:03:29   Page 181 of 185    375
193

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA–UAW**

BOB KING, *PRESIDENT*           DENNIS D. WILLIAMS, *SECRETARY-TREASURER*

VICE-PRESIDENTS:  JOE ASHTON  •  CINDY ESTRADA  •  GENERAL HOLIEFIELD  •  JIMMY SETTLES

CHARLES E. HALL
DIRECTOR, UAW REGION 1

May 22, 2013

Mr. Brian West Easley
Jones Day
77 W. Wacker
Chicago, IL  60601-1692

RE: City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts.  I am writing to confirm that Local No. 412 and Local No. 212 of the International Union, United Automobile, Aerospace and Agricultural Implement workers of America ("UAW") represent active employees, and thus future retirees, within their bargaining units.  These locals do not, however, represent current retirees and have no authority to negotiate on their behalf.  On behalf of the active employees we do represent, I accept your invitation to participate in discussions concerning healthcare and pension benefits.  Because these issues are so vital to members, the locals request bargaining with respect to any changes which the Emergency Manager (or city) might propose to make in those benefits.  We request the earliest possible dates for meeting, and propose that the meetings be held at the Office of Labor Relations on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.*

Please advise me of possible dates and location of our meeting at your earliest convenience.

Also, if the city has developed any proposals, potential options or possible modifications to healthcare or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting.  Any calculations regarding healthcare and pension costs (both present and future) are likewise requested.

Sincerely,

John Cunningham
International Representative
UAW Region 1

JC:ja/opeiu494
cc:    Tony Feyers, UAW Region 1
       Jeff Hagler, UAW Local 412
       Jeff Jarema, UAW Local 212
       Gloria Morgan, UAW Region 1
       Frank Stuglin, UAW Region 1

*Your letter made reference to UAW Local 414 – apparently a typographical error.  Please be advised that it is Local No. 412 which represents legal assistants.

# EXHIBIT D

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601-1692

TELEPHONE: 312-782-3939 • FACSIMILE: 312-782-8585

June 27, 2013

**VIA E-MAIL**

James Williams
President
AFSCME, Local 207 – Non-Supervisory Unit
600 W. Lafayette, Ste. L-106
Detroit, MI 48226
afscme207@sbcglobal.net

Re:     <u>City of Detroit Restructuring</u>

Dear Mr. Williams:

  Thank you for participating in the June 20, 2013 informational meetings pertaining to the City of Detroit's (the "City's") proposals to restructure the City's retiree medical and pension obligations. We appreciated your questions and input and look forward to discussing these issues with the American Federation of State, County and Municipal Employees, Local 207 – Non-Supervisory Unit in the coming weeks.

  The City recognizes that representatives of active and retired employees will need access to additional information to analyze the restructuring proposals outlined in the June 20 meetings. Information relevant to these proposals will be made available in the on-line data room established for creditors and other stakeholders. If you do not yet have access to the data room, please contact Dan Merrett (dmerrett@jonesday.com/ (404) 581-8476), who will provide you with further instructions.

  To the extent you will need additional information beyond that provided in the data room to analyze and provide input with respect to the City's retiree benefits restructuring proposals, please forward requests for such information directly to my attention. We will make every effort to make responsive and relevant information available in a timely manner.

  The City is very much looking forward to the unions' feedback with respect to the City's retiree benefits restructuring proposal. As we repeatedly stated during the meeting, to the extent that your organization has additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations, the City will consider any such ideas. Please let me know if you would like to set up a time to further discuss these issues.

  Sincerely,

Brian West Easley

cc: Kevyn Orr, Esq.
  Mr. Lamont Satchel

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MEXICO CITY • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

13-53846-swr   Doc 785   Filed 09/06/13   Entered 09/06/13 19:09:33   Page 184 of 185
193
378

# EXHIBIT E

13-53846-tjt   Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:31:29   Page 185 of
13-53846-swr   Doc 765-3   Filed 09/06/13   Entered 09/06/13 19:00:53   Page 127 of 135   379
193

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

DIRECT NUMBER: (202) 879-3840
EMILLER@JONESDAY.COM

July 17, 2013

Mr. Daniel F. McNamara
President
Detroit Fire Fighters Association
Suite 644
243 West Congress
Detroit, Michigan 48226-3217

Mr. Steve Dolunt
President
Detroit Police Command Officers Association
Post Office Box 2625
Detroit, Michigan 48202

Mr. Mark Young
President
Detroit Police Lieutenants
    & Sergeants Association
Suite 700
28 West Adams
Detroit, Michigan 48226

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 East Jefferson Street
Detroit, Michigan 48207

Re:    City of Detroit Pension Restructuring

Gentlemen:

Thank you for your letter of July 12, 2013, and thank you further for continuing to discuss in good faith the difficult issue of pension restructuring. The Office of the Emergency Manager appreciates your strong cooperation.

Consistent with the position Dave Heiman and I expressed at the meeting, we still think it makes sense to first try to reach common ground with key unions and association leaders on actuarial assumptions and methods, and the amount of PFRS underfunding, and then tackle contributions and attendant benefit changes. Nonetheless, we are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze. We stand ready to meet to discuss such ideas.

We also took seriously the concern expressed at our meeting last Thursday on two issues: (1) that the City's retiree health proposal for uniform retirees should include amounts for pre-age 55 early retirees and not begin at age 55; and (2) if there were to be a hard freeze at PFRS, active employees who do not have sufficient service at the freeze date to obtain a vested pension be given an opportunity to earn such service and not lose their entire pensions. The City's advisors are looking hard at those issues and we intend to report back to you shortly.

WAI-3135350v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Mr. Daniel F. McNamara
Mr. Steve Dolunt
Mr. Mark Young
Mr. Mark Diaz
July 17, 2013
Page 2

Thank you for your letter and please keep the lines of communication open.

Sincerely,

Evan Miller

cc:    David G. Heiman, Esq.

WAI-3135350v1

# EXHIBIT F

13-53846-swr    Doc 2800-3   Filed 02/13/13   Entered 02/14/13 00:31:29   Page 188 of 135
13-53846-swr    Doc 700-3   Filed 09/06/13   Entered 09/06/13 10:00:03   Page 130 of 135    382
193



**AFSCME**
*We Make America Happen*

1625 L Street, NW
Washington, DC 20036
Phone: 202-429-1215, Fax: 202-223-3255
Website: www.afscme.org



**AFSCME**

# Fax



## Department of Research and Collective Bargaining Services

To: *Brian West Easterly*   From: *Steve Kreisberg*

Fax: *312 - 782 - 8585*   Pages: *4* , including cover

Phone:                        Date: *7-2-2013*

Re:                           CC:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

PAGE 1/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-tvt    Doc 2800-3   Filed 02/23/13   Entered 02/24/13 00:31:29   Page 189 of 193
13-53846-swr    Doc 780-3   Filed 09/06/13   Entered 09/06/13 09:63   Page 181 of 185   383
193



### AFSCME®
**We Make America Happen**

Lee Saunders
*President*

Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J. Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

July 2, 2013

Mr. Brian West Easterly
Jones Day
77 West Wacker
Chicago, IL 60601

Via Fax: (312) 782-8585

Dear Mr. Easterly:

You have contacted a number of Local unions affiliated with AFSCME for the purpose of offering information and inviting "feedback" on the Emergency Financial Manager's (EFM) proposal to "restructure" retiree benefits. The undersigned, in conjunction with AFSCME Council 25 President Albert Garrett and Council 25's Assistant to the President Ed McNeil will be representing our affiliated Locals in these matters. We are not representing current retirees.

I have followed the procedures and have been provided access to the on-line data room established by the EFM. I have also been in touch with Kyle Herman from Miller Buckfire as instructed by the EFM in his "Proposal to Creditors" on June 14. As I stated in an e-mail message to Mr. Herman, the electronic data room does not have all of the information I have requested of the EFM in a letter dated June 17, 2013 (copy enclosed). To reiterate, I have requested the following:

1.  A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll. Subsequent to June 17, I have been given access to Milliman analysis of the pension system which is partially responsive to my request.

2.  The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3.  A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000    FAX (202) 429-1293    TDD (202) 659-0446    WEB www.afscme.org    1625 L Street, NW, Washington, DC 20036-5687

PAGE 2/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2000-3  Filed 09/06/13  Entered 09/06/13 00:01:29  Page 190 of 193
193                                                                                  384

Brian West Easterly
July 2, 2013
Page 2 of 2

4.     A description of all assumptions, data, and documents relied upon to support the following revenue projections:
    a.     Municipal income tax
    b.     Wagering taxes
    c.     Property taxes
    d.     State revenue sharing
    e.     Utility users' and other taxes
    f.     "Other revenue" (page 52 of the Proposal to Creditors)

5.     A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

To clarify, we are seeking the data relied upon by the EFM as he developed his retiree benefits restructuring proposal. Detailed information related to reorganization and restructuring initiatives consists of a one page financial summary. I am seeking the data relied upon to develop that summary, especially and including, the back-up data associated with estimated expenditures addressing "blight."

In response to your offer to provide "feedback" on the proposed restructuring of retirement benefits, we hereby request to meet with authorized representatives of the EFM on July 10, 2013 at 10:00 a.m. To date, your representatives have provided presentations, and scheduled an additional presentation on pension benefits for the afternoon of July 10, but the EFM has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues. That process should start as soon as possible. We suggest we meet at our offices in Detroit, 600 West Lafayette. It would be extremely helpful if you could provide the requested information in advance of the meeting.

Please contact me at (202)429-1237 or skreisberg@afscme.org to discuss these matters, if necessary, and to confirm our proposed meeting.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK/dd

cc:     Albert Garrett, AFSCME Council 25 President
      Kevyn Orr, Emergency Financial Manager

PAGE 3/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2300-3   Filed 12/23/13   Entered 12/24/13 00:03:29   Page 191 of 193   385
193



AFSCME®
We Make America Happen

Lee Saunders
President

Laura Reyes
Secretary-Treasurer

Vice Presidents

Ken Allen
Portland, OR

Henry L. Bayer
Chicago, IL

Ken Deitz, RN
San Dimas, CA

Greg Devereux
Olympia, WA

Danny Donohue
Albany, NY

David R. Fillman
Harrisburg, PA

Michael Fox
Harrisburg, PA

Kathleen Garrison
Latham, NY

Raglan George Jr.
New York, NY

Mattie Harrell
Williamstown, NJ

Johanna Puno Hester
San Diego, CA

Danny J. Homan
Des Moines, IA

Salvatore Luciano
New Britain, CT

John A. Lyall
Worthington, OH

Kathryn Lybarger
Oakland, CA

Roberta Lynch
Chicago, IL

Christopher Mabe
Westerville, OH

Glenard S. Middleton Sr.
Baltimore, MD

Ralph Miller
Los Angeles, CA

Gary Mitchell
Madison, WI

Douglas Moore Jr.
San Diego, CA

Frank Moroney
Boston, MA

Henry Nicholas
Philadelphia, PA

Randy Perreira
Honolulu, HI

Greg Powell
Austin, TX

Lillian Roberts
New York, NY

Eddie Rodriguez
New York, NY

Lawrence A. Roehrig
Lansing, MI

Joseph P. Rugola
Columbus, OH

Eliot Seide
South St. Paul, MN

Mary E. Sullivan
Albany, NY

Braulio Torres
San Juan, PR

David Warrick
Indianapolis, IN

Jeanette D. Wynn
Tallahassee, FL

June 17, 2013

Mr. Kyle Herman
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, NY 10022
kyle.herman@millerbuckfire.com

Dear Mr. Herman:

In accordance with the instructions of the Detroit Office of the Emergency Financial Manager (EFM), I request the following information:

1. A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll.

2. The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3. A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

4. A description of all assumptions, data, and documents relied upon to support the following revenue projections:
   a. Municipal income tax
   b. Wagering taxes
   c. Property taxes
   d. State revenue sharing
   e. Utility users' and other taxes
   f. "Other revenue" (page 52 of the Proposal to Creditors)

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000    FAX (202) 429-1293    TDD (202) 659-0446    WEB www.afscme.org    1625 L Street, NW, Washington, DC 20036-5687

1064-12
12/12

PAGE 4/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2000-3 Filed 09/06/13 Entered 09/06/13 00:31:29    Page 192 of 135    386
193

Mr. Kyle Herman
June 17, 2013
Page 2

5.  A description of all projected services and investments included in the "Reorganization
(Capital investments and Professional fees)" budget line item in the ten year
Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the
development of major initiatives (for example, investments on technology) should be
provided as well. Documents and other supporting data that support the cost projections
should be provided as well.  If the identity of vendors has been established, please
provide that information.

I am assisting AFSCME locals and AFSCME Council 25 with issues related to the
Proposal.  We have been asked to meet with the EFM's representatives on Thursday.
Accordingly, information related to items 1 through 3 should be provided prior to our meeting
and the remaining information as soon as possible.  I appreciate your cooperation.  Feel free to
call me at (202)429-1237 or email skreisberg@afscme.org if you have any questions or are in
need of clarification.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK:tem

PAGE 5/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2300-3    Filed 09/06/13    Entered 09/06/13 00:03:29    Page 193 of 193
193                                                                                    387