# EXHIBIT A

(Deposition Transcript of Kevyn Orr)

### Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4
 5   In re                    Chapter 9
 6   CITY OF DETROIT, MICHIGAN,   Case No. 13-53846
 7              Debtor.       Hon. Steven W. Rhodes
 8   _____/
 9              VIDEOTAPED DEPOSITION
10
11   DEPONENT:  KEVYN ORR
12   DATE:      Monday, September 16, 2013
13   TIME:      10:08 a.m.
14   LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
15              150 West Jefferson, Suite 2500
16              Detroit, Michigan
17   REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
```

### Page 2

```
APPEARANCES:

JONES DAY
By:  Gregory M. Shumaker
     Dan T. Moss
51 Louisiana Avenue, NW
Washington, D.C. 20001.2113
202.879.3939
    Appearing on behalf of the Debtor

DENTONS
By:  Anthony B. Ullman
620 Fifth Avenue
New York, NY 10020.2457
212.632.8342
    Appearing on behalf of Retirees Committee

COHEN WEISS AND SIMON LLP
By:  Peter D. DeChiara
330 West 42nd Street
New York, NY 10036.6979
212.356.0216
    Appearing on behalf of UAW
```

### Page 3

```
APPEARANCES (continued):

LOWENSTEIN SANDLER LLP
By:  Sharon L. Levine
65 Livingston Avenue
Roseland, NJ 07068
973.597.2374
    -and-
AFSCME
By:  Michael L. Artz
     Tiffany Ricci
1101 17th Street, NW
Suite 900
Washington, D.C. 20036
202.775.5900
    Appearing on behalf of AFSCME

CLARK HILL PLC
By:  Jennifer K. Green
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
313.965.8274
    Appearing on behalf of Retirement Systems
```

### Page 4

```
APPEARANCES (continued):

WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
By:  Ernest J. Essad, Jr.
380 N Old Woodward Ave Ste 300
Birmingham, MI 48009
248.642.0333
    Appearing on behalf of FGIC

SIDLEY AUSTIN LLP
By:  Guy S. Neal (appearing via LiveNote Streaming)
1501 K St., NW
Washington, D.C.
202.736.8000
    Appearing on behalf of National Public Finance
    Guarantee Corp.

WINSTON & STRAWN LLP
By:  Bianca M. Forde (appearing via LiveNote Streaming)
200 Park Avenue
New York, NY 10166.4193
212.294.4733
    Appearing on behalf of Assured Guaranty Municipal
    Corp.
ALSO PRESENT: Mark Meyers, videographer
```



Page 49

1　A.　Yes, I said that.
2　Q.　And were you writing truthfully when you said that?
3　A.　Yeah, and I think the balance of the paragraph, the
4　　　news reports state that opponents of the prior law are
5　　　already lining up to challenge this law. So as I just
6　　　testified, this was my preliminary analysis based upon
7　　　a number of sources, some of them were the news
8　　　reports.
9　Q.　And you were aware in fact that as you just indicated
10　　 that there were either challenges already made or that
11　　 were going to be made to the law?
12　A.　I was not aware that there were challenges already
13　　 made. I was aware the news report states that
14　　 opponents of the prior law were already lining up to
15　　 challenge the law.
16　Q.　And did you have any understanding at this time as to
17　　 what those grounds of challenge were or may be?
18　A.　No. As I said, this was, you know, within the span of
19　　 a day when this was going back and forth about what it
20　　 may require, I was beginning to familiarize myself to
21　　 some degree with the statute.
22　Q.　Your email goes on to say you're going to speak with
23　　 Baird in a few minutes and see what his thinking is.
24　A.　Yes.
25　Q.　Did you speak with Mr. Baird that day?

Page 50

1　A.　I don't recall, but I probably did.
2　Q.　And do you recall any discussions with Mr. Baird that
3　　　day on the subject of the possibility of a Chapter 9
4　　　filing by the City?
5　A.　No. I don't recall any discussions with Rich Baird
6　　　about the possibility of a Chapter 9 filing at this
7　　　point, no.
8　Q.　Okay. But clearly at this point in time one of the
9　　　things you were focused on was the possibility of a
10　　 Chapter 9 filing and the legal issues that might
11　　 pertain to that as reflected in this email; correct?
12　A.　As I have said before, the issue of a Chapter 9 filing
13　　 had been discussed many, many times with regard to
14　　 Detroit for the better part of the prior decade, so in
15　　 doing my sort of due diligence of what the statute
16　　 required, part of what I was doing was reading some of
17　　 those very articles that I mentioned earlier today
18　　 where some of the prior City employees were
19　　 recommending that there was a filing in 2005 in
20　　 connection with the cops, 2006 with the cops, 2009
21　　 with the SWAPs, so yes, Chapter 9 had been discussed
22　　 many, many times in the papers I was reading.
23　Q.　And from all the discussions that you had to date with
24　　 various people including those at Jones Day, were you
25　　 aware that one of the issues with PA 436, one

Page 51

1　　　potential ground for challenge, was that it allowed
2　　　the governor to authorize a bankruptcy filing without
3　　　imposing a condition that would prevent pension
4　　　obligations from being impaired?
5　A.　I don't know if I was aware of that issue at this
6　　　time, no.
7　Q.　Well, were you aware -- you became aware of it if not
8　　　then at some point shortly thereafter; correct?
9　A.　Yeah, let me say this. There was no broad based
10　　 concern at this point about with what the authority
11　　 was with regards to pensions so any sort of
12　　 insinuation that that was the focus at this point is
13　　 just inaccurate. That wasn't true. This as I said
14　　 before was a very cursory and initial sort of review
15　　 of what I was being asked to do so when I had a
16　　 discussion with Mr. Baird later I would have some
17　　 information and that's what I gleaned based upon a few
18　　 hours since apparently I got the call -- I was
19　　 informed that day, that morning or the day before to
20　　 the time I was going to have a call that afternoon.
21　Q.　But I take it at some point in time you became aware
22　　 that Article 9, Section 24 of the Michigan
23　　 Constitution protects pension benefits from being
24　　 diminished or impaired?
25　A.　I believe at some point in time I became aware that

Page 52

1　　　Article 9, Section 24 purports to protect pensions and
2　　　benefits in certain circumstances, yes.
3　　　　　　MR. ULLMAN: Let's mark Exhibit 5.
4　　　　　　(Marked Exhibit No. 5.)
5　Q.　Exhibit 5 is just a printout of Article 9, Section 24
6　　　of the Michigan Constitution. Do you recognize it as
7　　　such?
8　A.　I mean, the document speaks for itself, but that
9　　　appears to be what it is, yes.
10　Q.　Okay, and I think your last answer you said that in
11　　 your view Section 24, Article 9 purports to protect
12　　 pensions and benefits in certain circumstances.
13　A.　Yes.
14　Q.　And are you contending that the words of Article 9,
15　　 Section 24 means something other than what they say?
16　　　　　MR. SHUMAKER: Objection, calls for legal
17　　 conclusion.
18　A.　Yeah, I -- here again, I think the document speaks for
19　　 itself. I think that my response to that issue is
20　　 throughout the arc of my career, whether in federal
21　　 government or in private practice at the Chrysler
22　　 case, there have been many state laws, some of them
23　　 quite sacrosanct, that have been abrogated by federal
24　　 law, not just bankruptcy law. At the RTC we preempted
25　　 state, New York state, rent control litigation, law;



Page 69

1 wasn't. It was the Emergency Manager's duties writ
2 large.
3 Q. And when you say you were pouring over the law, you
4 yourself were doing legal analysis, reading various
5 laws; is that right?
6 A. Yes, I was trying to get background information, yes.
7 Q. And as part of that background information did you
8 read Article 9, Section 24 of the Michigan
9 Constitution?
10 A. I may have.
11 Q. Is there any question in your mind that you didn't?
12 A. I -- if you have a document to refresh my
13 recollection, I'm happy to look at it. Sitting here
14 on this day on February 20th, I don't recall whether
15 or not I read that article of the constitution.
16 Q. There's no question that at some point after February
17 20th you read Article 9, Section 24 of the Michigan
18 Constitution; correct?
19 A. My testimony is it may have been before or after the
20 20th. I don't recall whether I did that sitting here
21 today.
22 Q. Okay, but it was either one or the other, but you
23 certainly have read it?
24 A. Yes, I've read it. I read it today.
25 Q. And you read it before you became Emergency Manager;

Page 70

1 didn't you?
2 A. Yes.
3 Q. One other question on this document actually. As you
4 look at page 460, at the bottom there's a February 21
5 email.
6 A. Yes.
7 Q. And it refers to point 8 of the attachment. This
8 again has to do with the mayor's existing executive
9 team; right?
10 A. Yes.
11 Q. And in this time -- this is from Mr. Baird again;
12 right?
13 A. Yes.
14 Q. And he's really explicit. He says, other than a few
15 grammatical nits, and some more language around point
16 8, so we can manage expectations if Kevyn needs to
17 make some personnel changes. So he's clearly
18 referring here to you making personnel changes that
19 could affect the mayor's existing executive team;
20 isn't he?
21 A. Yes, this wasn't written to me, but I'll read it. I
22 mean to myself. Yes, document speaks for itself, but
23 that seems to say that.
24 Q. Isn't it clear at this point that it was envisioned
25 and understood that Kevyn Orr, you Mr. Orr, were in

Page 71

1 fact going to be the Emergency Manager for the City of
2 Detroit?
3   MR. SHUMAKER: Objection, calls for
4 speculation.
5 A. No.
6 Q. And you agree the document speaks for itself; don't
7 you?
8 A. I just said that.
9   MR. ULLMAN: Maybe this would be a good
10 time for a break.
11   THE VIDEOGRAPHER: Going off the record at
12 11:28 a.m.
13   (A brief recess was taken.)
14   THE VIDEOGRAPHER: We're back on the record
15 at 11:42 a.m.
16 BY MR. ULLMAN:
17 Q. Mr. Orr, is it correct that prior to the official
18 announcement that you said was in March -- on March
19 13th or 14th you had had conversations with the State
20 where you said that you would take the OM job -- I'm
21 sorry, the EM job?
22 A. I think at that time in all fairness it was EFM.
23 Q. Correct.
24 A. Prior to the official announcement? I think at some
25 point I became the candidate select, but I don't think

Page 72

1 that I actually accepted the job -- that I was going
2 to take the job until the day I resigned, which was
3 March 15th. I mean, I may have said yes, I'm all in
4 or something like that, subject to background
5 investigation and stuff like that.
6 Q. And that would have been sometime prior to March 13th?
7 A. I think I became the finalist sometime prior to March
8 13th, yes.
9 Q. And that's when it became final subject to passing the
10 background, yes?
11 A. Right, and resigning from the firm and some other
12 things.
13 Q. Now, at that point and time and up to the time that it
14 became official that you were going to be the EM, did
15 you have any conversations with anyone at the state or
16 city level about the possibility of the Chapter 9
17 filing?
18 A. Probably, yes.
19 Q. And can you tell me with whom those conversations took
20 place and when?
21 A. No, I don't think I had them -- those types of
22 conversations with Rich Baird, those were more about
23 the job requirements and background. If you have
24 something to refresh my recollection.
25 Q. I'm just asking a question.



ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com
13-53846-swr  Doc 2175-1  Filed 12/23/13  Entered 12/24/13 00:43:09  Page 4 of 4
13-53846-tjt  Doc 2302-1  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 4 of 4