Page 85

1 we talking about from the time you became the
2 Emergency Financial Manager or the EM? In other
3 words, would it be -- are we talking about the early
4 or the late March time frame?
5 A. Yeah, I don't think after the rollout and me becoming
6 effective on the 25th, I think the new statute came
7 into play within days of that. I don't think the
8 governor and I had any discussions from the -- I'm not
9 trying to draw a gap between EFM and EM.
10 Q. So this would have been within a few weeks?
11 A. Yes.
12 Q. After you became the EM would it be fair to say by
13 then you certainly had the discussions with the
14 governor?
15 A. Yeah, but here again they weren't specific discussions
16 about pension and OPEB, they were more discussions
17 about getting to what the numbers were and the initial
18 processes of getting into the City.
19 Q. Okay. And in the course there were discussions that
20 you indicated about the possibility of filing a
21 Chapter 9?
22 A. Yes, those discussions came on later.
23 Q. And one of the things the Chapter 9 filing would
24 potentially allow you to do is get out of the pension
25 obligations; is that right?

Page 86

1 A. Yes.
2    MR. SHUMAKER: Object to form.
3 Q. Now, I take it after you became Emergency Manager you
4 explored what the issues and the options were with,
5 among other things, the pension liabilities that the
6 City faced?
7 A. Not -- no, the initial thing we started to do was to
8 try to drill down on the extent of the City's
9 financial obligations.
10 Q. That really wasn't my question. I didn't ask what the
11 first thing you did was.
12    MR. ULLMAN: So why don't you just read
13 back my question?
14    (Record read back as requested.)
15 A. At some point.
16 Q. And do you recall when -- scratch that.
17    And did you look at various options that
18 were available to you as EM to reduce the pension
19 liabilities that existed for the City?
20 A. Among other things.
21 Q. And did you look at what avenues existed under state
22 law without recourse to any federal law? In other
23 words, independent of what any federal law might
24 apply, what remedies or relief if any was available
25 under state law only?

Page 87

1 A. I'm taking my time because I'm trying to remember.
2 There were a number of different analyses and briefing
3 papers and -- that would come across the desk and I'm
4 not sure any of them focused solely on state law.
5 Q. Okay. And what else -- what other law did they focus
6 on if not solely state law?
7 A. They may have focused on state law and federal law.
8 Q. So you don't recall if there was any analysis that
9 just looked at state law?
10 A. No, sitting here today, I don't recall. There may
11 have been, but I don't recall.
12 Q. And were you aware prior to the bankruptcy filing that
13 under state law alone the pension obligations could
14 not be diminished or impaired?
15 A. This is the discussion we had about five to ten
16 minutes ago about whether or not state law permitted
17 it and I will go back to my answer with that. It
18 seems to suggest a legal conclusion based upon what
19 the statute 436 provides and the intent of the
20 legislature.
21 Q. Let me ask you a different question.
22    Is there anything in PA 436 that allows in
23 your view the Emergency Manager to impact or adversely
24 affect pension rights in the absence of a Chapter 9
25 bankruptcy filing?

Page 88

1    MR. SHUMAKER: Objection, calls for legal
2 conclusion.
3 A. It's the same discussion we had five to ten minutes
4 ago that I want to be very careful with and I don't
5 want to draw legal conclusion that says there's
6 nothing there. It's a discussion we had about 436,
7 the intent of the legislature and Article 9.
8 Q. I'm asking independent of Article 9, Mr. Orr. Please
9 focus on the question.
10 A. I don't -- I don't understand your question because
11 parties can negotiate anything.
12 Q. I'm asking -- okay, putting aside negotiation --
13 A. Uh-huh.
14 Q. -- I'm asking apart from the possibility of a Chapter
15 9 filing, and by the way when we talk about impair or
16 diminish, understand that if the state is impairing or
17 diminishing, it's nonconsensual. Right? That's the
18 whole point?
19 A. No, that's -- that's a conclusion that you're making.
20 Parties can agree to I am -- an impaired class can
21 agree to diminish their interests. If you're reading
22 it that way that says it's nonconsensual, that's a
23 conclusion you're drawing but the language itself --
24 Q. We don't need to get into this.
25 A. Okay.



Page 109

1. within both pension funds, it's the level of
2. underfunding that we're talking to.
3. Q. Right. And it's the underfunding that's resulting in
4. the cuts to the retirees; correct?
5. A. Well, this is a proposal I'll say again. We have said
6. again and again we want to have a discussion so we can
7. figure out what the rightsizing is.
8. Q. Can you please just answer the question, Mr. Orr?
9. A. I am, but you say cuts, you say cuts and that has a
10. different connotation and I'm trying to explain it
11. fully.
12. Q. This proposal the benefits get cut substantially;
13. don't they?
14. A. Yes, but we need to have a discussion.
15. Q. Now, the individuals whose rights and expectations and
16. benefits are being impacted under this, they weren't
17. themselves responsible for the lack of funding that's
18. resulted in these problems; were they?
19.     MR. SHUMAKER: Objection, form, foundation.
20. A. That's -- that's a loaded question about
21. responsibility and --
22. Q. I'm asking if the individual retirees whose pensions
23. and healthcare benefits may be impacted under this.
24. A. That's a loaded question.
25.     MR. SHUMAKER: Same objection.

Page 110

1. A. I'm going to be very careful here because while
2. recognizing that these are typically rank and file
3. employees, there's a whole bunch of issues regarding
4. responsibility and some of it has been written about
5. quite extensively.
6. Q. And you're aware that at least the vast majority of
7. the City employees, the retirees, count on their
8. pension and healthcare benefits in order to help make
9. ends meet?
10. A. I don't know if I'm aware of that as a fact. I know
11. certainly that pensions are important to retirees.
12. Q. Now, going back to page 98 of this restructuring
13. proposal, you pointed to a box --
14. A. Yes.
15. Q. -- that shows a very large unsecured claim amount for
16. unsecured pension and OPEB?
17. A. Yes.
18. Q. And that's 9.2 billion?
19. A. Yes.
20. Q. And as I understand this proposal, the retirees who
21. fall into this category whose pensions and healthcare
22. benefits are being cut back by this would end up with
23. unsecured claims and get a share of the notes that the
24. City is intending to issue; is that right?
25. A. The retirees whose pensions and healthcare benefits we

Page 111

1. propose to reduce would get a share of the note, yes.
2. Q. And is there any way to tell from this document how
3. much any individual retiree would ultimately get if
4. the notes go ahead and are issued?
5. A. Not from this document.
6. Q. There's no way to tell how much cash value any retiree
7. would receive under this plan that's laid out here
8. where they get notes?
9. A. It is my understanding that there are a number of
10. different plans and benefits and factors that go into
11. that determination for any specific retiree.
12. Q. Okay. Now, Chapter 9 is not referred to in this
13. restructuring plan; is it?
14. A. I don't think we did.
15. Q. And I think you indicated before that if this was not
16. agreed to by the various constituencies, then the only
17. way to implement this restructuring plan would be, if
18. at all, would be to try to go ahead and do that
19. through Chapter 9; is that right?
20. A. I think what I said before, I think you're referring
21. to the May 12th 45-day operating plan, but I think
22. what I said before on June 10th and June 14th is we
23. needed to engage in a dialogue, because we didn't want
24. to go to Chapter 9.
25.     MR. ULLMAN: That wasn't my question. Can

Page 112

1. you read my question back?
2.     (Record read back as requested.)
3. A. Yeah, I indicated that here today.
4. Q. I'll just ask the question again. As you understood
5. it, if the proposal here were not agreed to or some
6. other consensual resolution was not reached, was there
7. any way for you as Emergency Manager to implement this
8. plan other than to try to get it put in place through
9. a Chapter 9 filing?
10. A. Subject to the discussion that we've had a couple of
11. times earlier today, what I have said is that Chapter
12. 9 is an option to achieve these goals.
13. Q. And were you at this point aware of any option to
14. achieve these goals other than Chapter 9 if a
15. consensual resolution was not reached?
16. A. There were various briefing memos and discussions, but
17. given the time frames that we were under, and I said
18. this at the June 10th meeting and I said it at the
19. June 14th meeting and I want to be responsive, that if
20. we didn't, Chapter 9 was an alternative.
21. Q. And I don't think that's fully responsive at this
22. point. Had you identified anything else as of June 14
23. to get this plan implemented, any other course,
24. putting aside consensual resolution, other than a
25. chapter 9 file?



Page 113

1 A. Nothing that would give us an orderly and
2 comprehensive resolution of these problems.
3 Q. Now, you gave an interview, that I'm sure you're
4 familiar with, with the Detroit Free Press on or
5 around June 14th. Do you remember it? I'll just tell
6 you what -- I believe you said -- and I'm sure you
7 remember this one and you can tell me. If not, I have
8 the quote.
9 A. Yeah, you can give me the quote. There's so many
10 interviews, but I'll trust your quote.
11 Q. Okay.
12 A. Okay.
13 Q. This is the quotation. Question, you said in this
14 report, referring to the June 14th proposal, that you
15 don't believe there is an obligation under our state
16 constitution to pay pensions if the City can't afford
17 it? Answer, the reason we said it that way is to
18 quantify the bankruptcy question. We think federal
19 supremacy trumps state law.
20 A. Yes.
21 Q. You don't deny making that statement?
22 A. No, I think I've said that several times.
23 Q. And the state law you were referring to that you
24 referred to as being trumped was Article 9, Section 24
25 of the state constitution; is that right?

Page 114

1 A. I believe so.
2 Q. There's no other state law that you view as relevant
3 to the pension issue; is there?
4 A. Subject to the discussions that we had earlier today.
5 Q. As being trumped? There's no other state law that you
6 regarded as being trumped; is there?
7 A. No, there's no other as being trumped.
8 Q. Trumped.
9 A. Right.
10 Q. So the answer to my question -- just so the record is
11 clear, the answer to my question is no other?
12 A. We're not referring to another state law.
13 Q. Okay, thank you.
14 A. Okay.
15 Q. Now, ultimately -- so when the subsequent bankruptcy
16 filing was made -- which it was; right?
17 A. Yes.
18 Q. The intention -- specific intention was indeed to
19 trump Article 9, Section 24 of the state constitution;
20 correct?
21 A. That wasn't the only intention.
22 Q. But that was an intention; was it not?
23 A. That was one of the objectives.
24 Q. Now, ultimately you did request authorization for the
25 governor to file; right?

Page 115

1 A. Yes.
2 Q. I'm just going to put these letters into the record so
3 we have them.
4 A. Okay.
5 Q. I'm not sure I'm going to ask you much about them.
6 The first one is what we're going to mark
7 as Exhibit 10.
8 (Marked Exhibit No. 10.)
9 Q. This is 10. This is 10.
10 A. Thank you.
11 MR. ULLMAN: And I might as well mark 11
12 also. They kind of go together.
13 THE WITNESS: Okay.
14 (Marked Exhibit No. 11.)
15 Q. Okay, what we've marked as Exhibits 10 and 11
16 respectively are the July 16th, 2013 letter from you
17 to the governor and to the treasurer and then the
18 governor's response letter of July 18, 2013.
19 A. Yes.
20 Q. And you're obviously familiar with these documents?
21 A. Yes.
22 Q. And you wrote Exhibit 10, you signed it at least?
23 A. Yes.
24 Q. And Exhibit 11 is the governor's response; correct?
25 A. Yes.

Page 116

1 Q. Now, did you have discussions with the governor's
2 office or anyone on the governor's team leading up to
3 the request letter that you sent in?
4 MR. SHUMAKER: Objection to form.
5 A. Leading up to?
6 Q. Yeah, before.
7 A. Before that. I think there were discussions with the
8 treasurer and even the governor that if we weren't
9 making progress on negotiations, I might have to
10 submit the letter.
11 Q. Okay. And in those conversations was there any
12 mention of the impact that the bankruptcy filing might
13 have or was intended to have as regards the pension
14 benefits?
15 A. Probably, yes.
16 Q. And do you recall anything specific about that?
17 A. I -- um -- as I said, I had regular meetings of the
18 governor and his staff, we probably discussed this. I
19 don't recall a specific discussion.
20 Q. Do you recall telling the governor and his staff in
21 general that one of the purposes, I'm not saying the
22 only purpose, one of the purposes or intentions of the
23 Chapter 9 filing would be to allow you to cut back the
24 pension benefits?
25 A. Yeah, I don't want to give the misimpression that that



### Page 117

1 was the singular focus. I think most of our
2 discussions were about the need for the City to deal
3 overall with its balance sheet and its obligations,
4 which would include pensions.
5     MR. ULLMAN: Uh-huh. Okay, can you read my
6 question back? Listen a little more closely because I
7 was really -- it was a little more specific of a
8 question.
9     THE WITNESS: Okay.
10     (Record read back as requested.)
11 A. We probably had that discussion. I don't recall
12 anything specific, but we probably did.
13 Q. And do you recall any discussion during those same
14 conversations with the governor or anyone from his
15 staff as to the impact, if any, of Article 9, chapter
16 -- Section 24 of the Michigan Constitution as regards
17 pension benefits?
18 A. I don't recall having discussions in that regard. No.
19 Q. Now, if you look at the governor's response letter,
20 okay, and the last page, you see at the top there's a
21 heading called contingencies?
22 A. Yes.
23 Q. And it says 2012 PA 436 provides that my approval of
24 the recommendation to commence a Chapter 9 proceeding
25 may place contingencies on such a filing and it gives

### Page 118

1 the citation. It continues, I am choosing not to
2 impose any such contingencies today. Federal law
3 already contains the most important contingency, a
4 requirement that the plan be legally executable,
5 11 U.S.C. Section 943(b)(4). Do you see that?
6 A. Yes.
7 Q. And did you have any discussions with the governor or
8 anyone from his staff about that language before you
9 received this letter back?
10 A. No.
11 Q. Were you -- did you have any understanding before
12 receiving this that as to whether or not the governor
13 was going to place any contingencies on the bankruptcy
14 filing?
15 A. No, but I was concerned about it.
16 Q. And what were you concerned about?
17 A. I was concerned that the governor might place some
18 contingency in any regards, not just related to the
19 pensions and others, but that the inner array on
20 limiting what authority I might have would impact what
21 discretion I would have under either 436 or Chapter 9.
22 I was just concerned about contingencies.
23 Q. And was one of the contingencies that you were
24 concerned about the contingency that could impair your
25 ability or restrict your ability to cut back the

### Page 119

1 pensions?
2 A. I was concerned about all contingencies. I didn't
3 know what the governor was going to say.
4 Q. That's really not my question. Can you read my
5 question?
6 A. Yes, I was concerned about all of them. That's what I
7 said.
8 Q. And that includes specifically the one about not being
9 able to affect the pensions; correct?
10 A. All contingencies.
11 Q. Thank you.
12     Had you discussed within your staff the
13 possibility of the governor putting a contingency that
14 would prohibit the Emergency Manager from taking
15 actions that would impair pensions?
16 A. My staff, including my legal counsel and consultants,
17 the entirety of staff at large?
18 Q. Yes.
19 A. Yes.
20 Q. And did you view the risk as substantial, that the
21 governor was going to do that?
22 A. Without disclosing any attorney-client confidences, I
23 don't know if we handicapped the risk. It was just a
24 general discussion. I had submitted a letter, I
25 wasn't sure what I was going to get back.

### Page 120

1 Q. And did you have any plan in place as to what you
2 would do if the letter came back that imposed a
3 contingency that in any Chapter 9 filing nothing could
4 be done that would affect pension rights that were
5 protected under the Michigan Constitution?
6 A. No.
7 Q. Now, in his letter the governor -- the portion we've
8 just looked at on the back of page 5, the governor
9 says, having a legally executable plan under Section
10 943(b)(4). That's a reference, 943(b)(4), the
11 bankruptcy code; isn't it?
12 A. I believe so.
13 Q. So he says, he the governor says, having a legally
14 executable plan under Section 943(b)(4) of the
15 bankruptcy code is a contingency for Detroit's filing
16 a bankruptcy petition. Correct?
17     MR. SHUMAKER: Objection, document speaks
18 for itself.
19 A. That's -- I was going to say the document speaks for
20 itself. You're sort of reading it, you know, just
21 inversing it, but it says federal law already contains
22 the most important contingency requirement that the
23 plan is legally executable.
24 Q. Right. And this is in the context of him asking or
25 noting that under PA 436 he could, he the governor,

