Page 125

1  to issue a TRO prohibiting the bankruptcy filing from
2  taking place?
3  A. I heard that after the fact, yes.
4  Q. And are you aware that these objectors have stated
5  that in fact the state lawyers asked for a short delay
6  before the ruling was issued so they could get the
7  bankruptcy filing in before the judge came down with a
8  TRO?
9  A. I don't know if I heard it -- I may have read that
10  later. I don't know if I heard it.
11 Q. Did you have any involvement in those actions?
12 A. No, no.
13 Q. Do you deny that that's what occurred?
14 A. I only know what I've heard and I have no personal
15  knowledge, I just know what I've heard and what I've
16  read.
17 Q. And isn't it correct that you wanted to get the
18  bankruptcy petition filed as soon as possible because
19  you knew there was a risk that the state might rule it
20  was illegal -- the state court might rule it was
21  illegal under state law for the bankruptcy proceeding
22  to be filed?
23 A. No, that wasn't the reason.
24 Q. Is there a particular reason that the bankruptcy
25  filing was made at 4:06 in the afternoon of the same

Page 126

1  day a TRO was being heard in the state court other
2  than to get the jump on the state court ruling?
3     MR. SHUMAKER: Object to the form.
4  A. Not to the best of my knowledge.
5  Q. Now, you're aware that the state court in that
6  litigation in fact later issued a ruling that PA 436
7  is unconstitutional to the extent that it authorizes a
8  proceeding under Chapter 9 in the way that could
9  threaten to impair or diminish accrued pension
10  benefits?
11 A. Yes, I was informed that there are I believe three
12  TROs after the bankruptcy filing.
13 Q. And you have proceeded with the bankruptcy petition
14  notwithstanding; correct?
15 A. Well, the bankruptcy petition had been filed. There
16  were open questions about the application of the stay.
17  There was also a question about an appeal, which was
18  taken up I believe by the Attorney General's office.
19  So when you say you proceeded with the petition, we
20  filed the petition, there was a ruling, and there were
21  appeals.
22 Q. Okay. And in light of the state court ruling that
23  PA 436 was unconstitutional, you did not take any
24  steps to withdraw the bankruptcy petition from filing;
25  did you?

Page 127

1  A. No.
2  Q. And you have not taken any steps to stop the
3  bankruptcy proceeding from going forward; have you?
4  A. No.
5     MR. ULLMAN: Would this be a good time to
6  stop for lunch, a quick lunch?
7     MR. SHUMAKER: Sure.
8     MR. ULLMAN: I'm ready to continue but I
9  know --
10     THE WITNESS: You got another -- how much
11  -- do you have another line of inquiry? Whatever
12  everybody --
13     MR. ULLMAN: I'm about to switch subject
14  matters.
15     THE VIDEOGRAPHER: Going off the record at
16  12:52 p.m.
17     (Luncheon recess between
18     12:52 p.m. and 1:30 p.m.)
19     THE VIDEOGRAPHER: We're back on the record
20  at 1:35 p.m.
21 BY MR. ULLMAN:
22 Q. Welcome back, Mr. Orr.
23 A. Good afternoon.
24 Q. One other question about the June 14th proposal.
25  Referring to page 98, we talked about the defined

Page 128

1  contribution benefit plan?
2  A. Yes.
3  Q. Okay. Is it correct that under that plan
4  contributions are being made only for people who would
5  be current City employees?
6  A. Will the plan be closed?
7  Q. Yes.
8  A. Yes, I believe so.
9  Q. So under the restructuring plan there would be no
10  pension contributions made for retirees; correct?
11 A. I believe that's correct.
12 Q. Now, you I believe said that the June 14th proposal
13  was presented at a meeting to representatives of
14  various creditors, I think you said that in your
15  declaration?
16 A. On June 14th, yes.
17 Q. Okay. Did you speak at that meeting?
18 A. Yes.
19 Q. And who else spoke?
20 A. I believe all -- several members of our team, I
21  believe it was Mr. Heiman, David Heiman, I believe it
22  was Ken Buckfire, I believe Heather Lennox was on, I
23  believe Bruce Bennett was there, I believe Ken
24  Buckfire may have spoken. I'm trying to recall if
25  there was anyone else.



**Page 141**

1. of letters of what could be addressed based upon our
2. June 14th proposal.
3. Q. Okay. And with whom were those discussions? Which
4.    groups? You said you met with one or two groups or
5.    you were aware of meetings with one or two groups.
6. A. I think those are confidential, because as I said,
7.    those discussions are ongoing, so I don't want to
8.    interfere with settlement negotiations or breach
9.    confidentiality so I'm reluctant to answer your
10.    question.
11. Q. Okay, well, will you answer my question or will you
12.    not?
13. A. I don't think I can. I think they're supposed to be
14.    confidential.
15. Q. Well, you know, you have to answer the question unless
16.    your counsel instructs you not to.
17.       MR. SHUMAKER: If you think it's going to
18.    reveal privileged communications, I'm going to
19.    instruct you not to answer.
20.       THE WITNESS: I'll be -- I don't know so
21.    much -- can I consult with my counsel?
22.       MR. ULLMAN: Yes.
23.       THE WITNESS: Can we go off the record?
24.       MR. ULLMAN: Yes.
25.       THE WITNESS: Let's step out.

**Page 142**

1.       THE VIDEOGRAPHER: Going off the record at
2.    1:53 p.m.
3.       (A brief recess was taken.)
4.       THE VIDEOGRAPHER: We're back on the record
5.    at 1:57 p.m.
6. BY MR. ULLMAN:
7. Q. Okay, will you answer my question, Mr. Orr?
8. A. No, I think this is -- concerns commercially sensitive
9.    potentially confidential settlement negotiations and
10.    implicates the attorney-client privilege so I cannot
11.    answer your question.
12. Q. Okay, so apart from the discussions that you won't
13.    tell me about, would the City actually sit down with
14.    any union or retiree association in an attempt to
15.    reach an agreement on a structuring plan on terms that
16.    are different than the terms set out in the June 14th
17.    proposal as of July 17th?
18. A. As I said before, subject to the meetings we've had,
19.    we've exchanged information which may constitute the
20.    type of sit down you're talking about. Other than the
21.    ones that have been recounted and phone calls and
22.    meetings I may not be aware of, this is what I know in
23.    my declaration.
24. Q. And as of June 17th then, I take it you had not
25.    received any actual proposal -- I'm sorry, I keep

**Page 143**

1.    saying June.
2. A. July.
3. Q. As of July 17th, you had not received any actual
4.    proposal outside possibly with the settlement
5.    discussions you were talking about from any union or
6.    retiree association; is that right?
7. A. Outside of those settlement negotiations --
8. Q. Yes.
9. A. -- that is correct.
10. Q. Now, as of July 17, had the City told any union or
11.    retiree association that it would in fact be willing
12.    to proceed with the restructuring on terms that did
13.    not include the elimination of ongoing pension
14.    contributions for retirees?
15. A. When you mean the City, you mean all of my consultants
16.    and others; correct?
17. Q. Yes.
18. A. There may have been discussions in that regard. I
19.    think I recall hearing that there was -- I can't
20.    recall a specific meeting, a discussion about how that
21.    would be arranged, but I'm not sure.
22. Q. So you personally did not make any such statement; did
23.    you?
24. A. Statement about?
25. Q. Saying to anyone -- to any union or retiree

**Page 144**

1.    association that the City would in fact be willing to
2.    agree to a restructuring that did not involve the
3.    elimination of ongoing pension contributions for
4.    retirees.
5. A. No, I didn't say that.
6. Q. And do you know in fact whether anyone working on your
7.    team ever said that to any union or retiree
8.    association?
9. A. No.
10. Q. Okay. During the time from June 14th to July 17, did
11.    you or anyone else from your team tell any union or
12.    retiree association that the City acknowledged that
13.    under Michigan law pension rights were explicitly
14.    protected from being impaired or diminished?
15. A. I don't --
16.       MR. SHUMAKER: Objection, form, calls for
17.    speculation.
18. A. I don't recall anyone saying that, but it may have
19.    happened.
20. Q. But you personally didn't make that statement; did
21.    you?
22. A. I don't recall saying that. I may -- you know,
23.    anything is possible, I just don't recall saying it.
24. Q. And as of July 17, had the City, you or anyone working
25.    for you, told any union or retiree association that it



### Page 145

1  would in fact be willing to agree to a restructuring
2  plan that did not effectively eliminate the prior
3  existing health benefits for retirees?
4      MR. SHUMAKER: Objection, foundation, calls
5  for legal speculation.
6  A. Healthcare benefit for retirees?
7  Q. Yeah.
8  A. That did not eliminate it?
9  Q. Yeah, that you --
10 A. Did not adjust it in some fashion?
11 Q. Did not essentially cut it out the way it was being
12    cut out in the June 14th proposal.
13 A. Yeah, I want to be careful with the frame cut out,
14    because I think there were subsequent discussions
15    about what would be provided instead --
16 Q. Uh-huh.
17 A. -- as a proposal, so I don't want my testimony to seem
18    as if we were not proposing an alternative to the
19    existing healthcare plan and that had not been
20    discussed prior to July 17th, but subject to those
21    qualifications the answer to your question is yes.
22 Q. Now, I've been asking you as of July 17 and then the
23    bankruptcy filing was the very next day; correct?
24 A. Yes.
25 Q. Now, in your declaration do you recall making

### Page 146

1  statements to the effect that there were expressions
2  by certain union representatives that they would not,
3  and I quote, countenance discussions over proposals to
4  modify either retiree healthcare or pensions?
5  A. Yes, I think those are quite publicly stated.
6  Q. And you refer in your declaration to newspaper reports
7     from June 20 and 21?
8  A. Yes, and I'm trying to recall if people said that to
9     me personally as well. Yes, but I do recall the press
10    reports, yes.
11 Q. And those are in fact press reports that you referred
12    to as you said?
13 A. Yeah, but I think -- and I'm just -- was your question
14    asked about union representatives or union members?
15 Q. Union representatives.
16 A. Could that include members?
17 Q. I'm not asking about people who are just members and
18    not officials in the union.
19 A. So you're talking about union officials?
20 Q. Union officials.
21 A. Okay. That they would not countenance any change
22    to --
23 Q. I think the language from your declaration is that
24    they would not countenance discussions over proposals
25    to modify either retiree healthcare or pensions.

### Page 147

1  A. Yeah, I don't think that was just a function of press
2     reports, I think that was relayed to me upon my
3     information and belief by others as well.
4  Q. Upon your information and belief sounds like you
5     didn't hear it personally?
6  A. No, I just don't recall whether I heard it personally.
7     I have heard it personally in other meetings from
8     union representatives prior to July 17th, sure.
9  Q. With respect to the statements that you quote in the
10    newspaper, those are just newspaper reports; right?
11 A. Well, if they're newspaper -- they speak for
12    themselves if they're newspaper reports, but have I
13    heard that from union representatives?
14 Q. I'm --
15 A. I'm responding to your question. Have I heard that
16    from union representative? Yes.
17 Q. I'm going to get these in two phases; okay?
18 A. Okay.
19 Q. For the newspaper reports, you're relying on what was
20    said in the newspaper?
21 A. Yes.
22 Q. So you have no personal knowledge as to whether the
23    quotation in the newspaper was accurate or anything
24    like that?
25 A. Unless I was there, I'm not the reporter, yes.

### Page 148

1  Q. Now, what statements were made to you outside of what
2     you read in the newspaper?
3  A. Quite early on I had heard from union representatives,
4     I believe at DFFA, DPLSA, DPOA, I'm not sure it
5     includes AFSCME, UAW, but I had heard statements in
6     that regard in many of the meetings that I've had with
7     them previously prior to July 17th.
8  Q. And did they specifically -- what statements, saying
9     specifically what?
10 A. Generally -- you know, I don't know the exact quotes,
11    but generally speaking what I said. They would not
12    countenance cuts to healthcare and benefits.
13 Q. That wasn't actually what you said in your
14    declaration.
15 A. That's what I said generally.
16 Q. What you said in your declaration is they would not
17    countenance discussions over proposals to modify
18    either retiree healthcare or pensions.
19 A. Yeah, healthcare, okay, yes.
20 Q. So who said what -- I would like to know specific as
21    to who said what to you when?
22 A. As I said, I had meetings early on with DFFA, I don't
23    recall the specific members, but I recall the meeting,
24    they were quite heated. Might have been one with
25    Mr. McNamara, Mr. Shinsky and others. I've had many



Page 165

1 Q. But that's never been subject to an audit; has it?
2 A. To the best of my knowledge I don't know when they
3     have or when they haven't.
4 Q. Okay. And I think you indicated that in coming up
5     with these figures various people were consulted in
6     various fields and a number of assumptions were made;
7     is that right?
8 A. I believe so.
9 Q. And I think you also indicated in your structuring
10    proposal from June 14th that the numbers are subject
11    to various assumptions which could or could not prove
12    right; correct?
13 A. Well, I think in June 14th we've said that it's a
14    proposal and there may be various issues that may or
15    may not be correct.
16 Q. Yeah. Okay, and obviously if any of the assumptions
17    that went into the underlying numbers that appear in
18    your declaration are wrong, then the numbers
19    themselves would also be subject to inaccuracy; true?
20 A. Let me say this about that. Both in June 14th
21    presentation and in this declaration, we've tried to
22    present an accurate picture of the City's books and
23    records and status to the best extent possible that we
24    have. Where there were questions we have tried to err
25    on the side of reasonable assumptions as opposed to

Page 166

1    unreasonable assumptions either way. But your general
2    question as to whether or not if the information going
3    in was inaccurate, revealed an inaccurate result, I
4    think it's true as a matter of just common sense and
5    logic.
6 Q. And the same thing as to assumptions. If the
7    assumption made was wrong, then the output would be
8    wrong also?
9 A. I think that's why we asked several times to have a
10    discussion about the assumptions that are necessary
11    for pension benefits.
12 Q. Now, the cash flows that are being reported in your
13    declaration, those do not include any assumptions as
14    to the monetization of various assets that the City
15    continues to hold; is that right?
16        MR. SHUMAKER: This is paragraph 56 that
17    you're referring to, counsel?
18        MR. ULLMAN: Yeah, I'm looking in general.
19        MR. SHUMAKER: In cash flow?
20        MR. ULLMAN: Yeah, cash flow.
21 A. You're talking about generally do the cash flows
22    include any monetization of any City assets?
23 Q. Yeah.
24 A. No, they do not.
25 Q. And obviously if assets currently held by the City

Page 167

1    were monetized, that would provide additional cash to
2    pay obligations including retirement and health
3    obligations; correct?
4 A. Well, additional cash from onetime asset sales may not
5    necessarily equal cash flows. As I understand the
6    analysis we've tried to present is cash flows based
7    upon a recurring basis as opposed to onetime assets
8    but it would yield additional cash.
9 Q. Yes. If you sold an asset and had money, you would
10    have the money available to pay something?
11 A. Yeah, you might have a onetime -- I'm not an
12    accountant, but you might have a onetime cash charge,
13    yes.
14 Q. And if the cash, the amount you got was large, it
15    could last for a long period of time; correct?
16 A. Well, it depends upon what --
17        MR. SHUMAKER: Objection, form.
18 A. Depends upon what it was used for. I mean, what are
19    you talking about? When you say could last for a long
20    period of time, it could be a one -- you could sell
21    one asset for $5 million and that wouldn't last a
22    month.
23 Q. Yes, and depending on the amount of assets that were
24    sold, if you got a substantial amount of money, that
25    could enable the City of Detroit to pay ongoing bills

Page 168

1    for some period of time; true?
2        MR. SHUMAKER: Objection to form.
3 A. Here again, depending upon the size of the asset, but
4    anything is possible.
5 Q. Okay. Now, the City of Detroit owns certain pieces of
6    art that are stored at the Detroit Institute of Art;
7    is that right?
8 A. Yes.
9 Q. And how many is that?
10 A. I think the City owns approximately 66,000 pieces of
11    art.
12 Q. Now, those --
13 A. No, strike that. Let me be clear so we can move on.
14 Q. Yeah.
15 A. I think there are 66,000 pieces of art over at Detroit
16    Institute of Art. I'm not sure the City owns all
17    66,000 pieces. I've been informed that it owns 35,000
18    of those pieces in an undisputed capacity.
19 Q. Okay, that's what I was getting at. And that's
20    distinct from art that is subject to a public -- or is
21    or may be subject to a public trust or something like
22    that. This is 35,000 pieces that the City owns, as
23    you said, in an undisputed capacity?
24 A. Outright, yes.
25 Q. Outright. Now, is it correct that the City has