Page 320

1 so I'm intentionally not asking the question with
2 regard to any --
3  A. Okay.
4  Q. -- legal discussions.
5  A. Explain for me, if you will, what you
6 mean by "political ramifications." Just -- just
7 so I make sure I understand what --
8  Q. Well, let's put it this way --
9  A. -- what you mean.
10  Q. -- what would -- what's your
11 understanding of political ramifications?
12  A. Well, I'm -- I'm not sure. That's
13 why I'm asking you.
14  Q. Did you consider any political
15 consequences at all in connection with the
16 Chapter 9 filing?
17  A. Did I consider?
18  Q. Yes.
19  A. No.
20  Q. Do you believe that -- do you
21 understand -- did you have any discussions with
22 regard to whether or not the Governor was

Page 321

1 considering any political ramifications as a
2 result of the Chapter 9 filing?
3  A. I'm -- I'm trying to understand --
4 let me put it to you this way: The answer would
5 be no, because I believe the Governor wasn't
6 concerned about political ramifications as you
7 asked.
8  Q. Okay.
9     And what do you base that
10 understanding on?
11    Why do you believe the Governor
12 wasn't concerned about political ramifications?
13  A. Without -- and -- and let me just say
14 this throughout the deposition. It is not my
15 intent to waive or in any way impact the
16 attorney-client privilege.
17    So I'm going to try to be responsive,
18 but I don't want to bleed over into any arguments
19 later that I somehow waived the privilege.
20    My impression is in any of my
21 discussions outside of attorney-client
22 communications with the Governor, he never

Page 322

1 demonstrated any concern about political
2 ramifications as they're being used today.
3  Q. Did you understand that reductions in
4 vested pension benefits would be a necessary part
5 of any restructuring for Detroit?
6  A. I think that was certainly
7 anticipated, yes.
8  Q. Is it your understanding that the
9 Governor understood that the reduction in vested
10 pension benefits would be part of any
11 restructuring for Detroit?
12    MR. SHUMAKER: Objection: foundation.
13    MS. LEVINE: I'm asking him his
14 understanding.
15    THE WITNESS: I'm not sure what the
16 Governor understood. You'd have to ask him.
17 BY MS. LEVINE:
18  Q. Did the Governor ever communicate to
19 you that he expected that vested pension benefits
20 would be part of any restructuring for Detroit?
21  A. The Governor communicated to me that
22 he expected -- no.

Page 323

1  Q. Did you discuss the reduction in
2 vested in pension benefits with the Governor prior
3 to the filing of the Chapter 9 petition?
4  A. Not outside of any attorney-client
5 communications.
6  Q. Did you discuss the reduction of
7 vested pension benefits, without going into what
8 was discussed, prior to the filing of the
9 Chapter 9 petition with the Governor?
10  A. Without waiving the attorney-client
11 privilege, we may have.
12  Q. You -- when you say "we may have,"
13 you don't recall?
14  A. I -- I don't recall a specific
15 conversation with the Governor outside of
16 attorney-client communications talking about
17 reductions in pension benefits.
18    The Governor generally -- without
19 waiving the privilege, would generally say, you
20 make the decision that's best for the City in your
21 mind.
22  Q. Was it your understanding, prior to


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

13-53846-tjt  Doc 2300-12  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 1 of 5
13-53846-swr  Doc 1175-6  Filed 10/13/13  Entered 10/14/13 00:43:09  Page 1 of 5

Page 376

1  BY MR. ULLMAN:
2  Q.  "The latter" meaning there's
3  another --
4  A.  To the City --
5  Q.  -- payment mechanism?
6  A.  -- no, no, no, not -- the latter --
7  not the -- not the discount; "the latter" meaning
8  to the City and then to the fund.
9  Q.  Okay.
10  A.  I could be wrong, because may be --
11  but I believe it's -- I believe it's that process.
12  Q.  Okay.  I'm asking because I thought I
13  had seen some other document which said that
14  the -- maybe it's the same thing -- the City gets
15  the money or has the right to bill the -- the
16  funds or the -- the liabilities to the Department
17  -- Department of Water and Sewer, and then the
18  Department of Water and Sewer would pay the City.
19      That's your understanding?
20  A.  Yeah, that -- that's -- that's what I
21  was saying; that's the approximate mechanism.
22  Q.  Okay.

Page 377

1  A.  I could go back and check it to be
2  sure, but I think that's the approximate mechanism
3  as I understand it.
4  Q.  Okay.  Now, by my math -- I make no
5  representations as to my math, but just looking at
6  the numbers, it looked -- actually, do I have a
7  calculator here?  I don't think I do.
8      What percentage is 250 over 650?  I
9  actually didn't do the math.
10  A.  Four -- it's 40-some odd.
11  Q.  It's 40-some -- yeah, we can get it
12  precisely.
13      Zero?  Oh.
14      250 divided by 6 -- let's say 650 --
15  shoot, I didn't do that right.  I apologize.  Let
16  me try to clear this and do it again.
17      250 divided -- 6.  This isn't right.
18      Okay.  It looks like about
19  38 percent.
20  A.  Right.
21  Q.  Okay.  You recall that -- that during
22  the last deposition, you indicated that you

Page 378

1  thought that the actual unfunded liability was --
2  was higher than the 644 number and could be as
3  much as 3.5 billion or something like that?
4  A.  Yes.
5  Q.  Okay.  My question is, does the --
6  does the -- is the proportion of unfunded
7  liability allocable to the general fund versus the
8  Department of Water Sewer personnel constant if
9  you -- if you use a higher liability figure?
10      In other words --
11  A.  If we went up to 3.5 --
12  Q.  Yeah, yeah --
13  A.  -- million, would it be --
14  Q.  -- would the Department of Water and
15  Sewer still be approximately 38 percent of the
16  total unfunded liability?
17  A.  I'm -- I'm not sure.  I would think
18  that a rough estimate might be.  But as I said, I
19  think, in September 16th, part of those
20  calculations had to do with a number of factors,
21  so I don't want to say that my testimony is as
22  exactly proportioned.

Page 379

1  Q.  Okay.  And is it correct that the
2  Department of Water and Sewer itself, I think you
3  indicated last time, is run as a separate entity,
4  even though it's, I think, technically part of the
5  City, but it has its own books and records?
6  A.  The Department of Water and Sewer is
7  a department of the City both technically and
8  practically.  Pursuant to Judge Cox's order, it
9  has certain functions, which it can run
10  semiautonomously, but it remains a department of
11  the City.
12  Q.  Okay.  And as -- as a separate --
13  as -- as an entity or a department of the City
14  that keeps its own books and records, the
15  Department of Water and Sewer itself shows a
16  profit for its own operations; is that right?
17  A.  I'm not sure it shows a profit for
18  its own operations.  I -- I'd have to look into
19  the word "profit" --
20  Q.  Okay.
21  A.  -- but -- but it -- it stands -- it
22  generates revenue of its own and pays its


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

13-53846-tjt  Doc 2300-12  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 2 of 5
13-53846-swr  Doc 1175-6  Filed 10/23/13  Entered 10/24/13 00:45:09  Page 2 of 5

Page 412

1  A. I think in a meeting with my attorney
2  and someone from his office.
3  Q. Okay. And when was that?
4  A. I don't recall the day. I don't -- I
5  don't recall the -- it was after March. It may
6  have been prior to or after the bankruptcy filing.
7  I don't recall.
8  Q. Okay. And who was at the meeting?
9  A. I was at the meeting;
10 Attorney General Schuette was at the meeting; an
11 attorney from his office, Matt, was there -- I
12 forget his last name -- and my attorney,
13 David Heiman, was on the phone.
14 Q. Okay. And who -- how did the meeting
15 come about? Did someone ask to have the meeting?
16 A. I think -- yes, I think the Attorney
17 General's Office contacted my office and asked to
18 schedule a meeting.
19 Q. Did the person who asked to schedule
20 the meeting explain why they -- the Attorney
21 General wanted a meeting?
22 A. No.

Page 413

1  Q. Did you have an understanding of why
2  he wanted a meeting?
3  A. I don't think so. I think -- you
4  know -- no, I don't think so until we got to the
5  meeting. It was in Lansing.
6  Q. Okay. Do you recall the meeting?
7  A. Yes.
8  Q. What was said in the meeting?
9  A. Is that privileged?
10 MR. SHUMAKER: To -- to the extent
11 that there was a common interest between what the
12 Attorney General and his counsel was relating with
13 you and Mr. Heiman, I'm going to ask you --
14 instruct you not to answer.
15 If it related to issues where there
16 was no common interest, you can testify to that.
17 MR. DECHIARA: I -- I just -- can we
18 just pause? Are we on -- is there -- are you out
19 of tape or what's --
20 THE VIDEOGRAPHER: I've got
21 five minutes on the tape.
22 MR. DECHIARA: Okay. You'll tell me

Page 414

1  when the tape runs out?
2  THE VIDEOGRAPHER: Two minutes.
3  MR. DECHIARA: Okay.
4  Why don't -- why don't we take a --
5  maybe this is a good time -- do you have to -- how
6  long does it take to change the -- change --
7  THE VIDEOGRAPHER: I can go off the
8  record now and change.
9  MR. DECHIARA: Okay.
10 MR. ULLMAN: Why don't we take a
11 break and --
12 MR. DECHIARA: Why we don't take a
13 break now? Is that --
14 THE WITNESS: Sure.
15 MR. DECHIARA: -- is that good? He
16 has to change the tape.
17 THE VIDEOGRAPHER: Going off the
18 record at 12:42. This marks the end of Tape
19 Number 1.
20        - - -
21 (Whereupon, a brief recess was taken
22  from 12:42 p.m. to 1:06 p.m.)

Page 415

1        - - -
2  THE VIDEOGRAPHER: Going back on the
3  record at 1306. This marks the beginning of
4  Tape Number 2.
5  MR. DECHAIRA: Okay.
6  BY MR. DECHAIRA:
7  Q. Mr. Orr, before we broke, I was
8  asking you about a meeting you had with the
9  Michigan Attorney General.
10 And my question was, what was said at
11 that meeting?
12 A. Yes.
13 With Attorney General Schuette, I
14 don't recall the exact date; but, generally
15 speaking, the Attorney General -- at the meeting,
16 as I said, was Mr. Heiman on the phone, the
17 Attorney General and an attorney from his office,
18 Matt, whose last name escapes me right now. And
19 generally what was said, the Attorney General
20 wanted to express why he felt duty-bound to take a
21 position that the Michigan State Constitution
22 protected vested pension obligations.


ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

13-53846-tjt  Doc 2300-12  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 3 of 5
13-53846-swr  Doc 1975-6  Filed 12/13/13  Entered 12/14/13 00:45:09  Page 3 of 5

Page 476

1  BY MR. DECHAIRA:
2  Q. Do you know who Bill Brandt is?
3  A. I've -- I've heard that name before.
4  I -- I think he was -- he's a bankruptcy trustee.
5  Q. Do you know whether he was considered
6  for any -- for the EM position?
7  A. I do not.
8  Q. Do you know whether he was considered
9  for any position as -- any professional position
10 in connection with the restructuring of the City
11 of Detroit?
12 A. I do not.
13 Q. Okay.
14     MR. DECHAIRA: Thank you for your
15 time, Mr. Orr. I have no further questions.
16     THE WITNESS: Thank you.
17     MR. ULLMAN: I have a few follow-ups.

Page 477

1           - - -
2       EXAMINATION (CONTINUED)
3     BY COUNSEL FOR RETIREES COMMITTEE
4           - - -
5  BY MR. ULLMAN:
6  Q. Hello, Mr. Orr.
7  A. Hello, Mr. Ullman.
8  Q. I just have a few questions for you
9  just to clarify the record, because I saw when I
10 was looking at the transcript that as sometimes
11 happens when lawyers do math, I got some numbers
12 transposed.
13 A. Okay.
14 Q. So if you could turn back to
15 Exhibit 22.
16 A. Okay.
17     Um-hum.
18     Okay.
19 Q. And if you could look at the Bates
20 page that we were looking at before which ends in
21 422.
22 A. Yes.

Page 478

1  Q. Okay. And you see we had talked
2  about the 250 million general fund relative to the
3  650 million total unfunded liability?
4  A. Yes.
5  Q. And we had calculated ratio
6  approximately 38-1/2 percent?
7  A. Right.
8  Q. And I think previously, when I was
9  asking about this, I had referred to the
10 38.5 percent as being the amount of the unfunded
11 liability allocable to the Department of Water and
12 Sewer. I think I -- I misspoke in that, because
13 the 250 would be -- the 38.5 percent would be the
14 amount allocable to the general fund, correct?
15 A. Yes, I -- I think that's accurate,
16 yes, we were talking about the numbers, but --
17 Q. We had them backwards?
18 A. -- we had them backwards.
19 Q. And so if the -- if the math is right
20 and it was about 38.5 percent, then the percentage
21 of the unfunded liability allocable to the
22 Department of Water and Sewer would be

Page 479

1  approximately 61.5 percent?
2  A. But, remember, I said that you have
3  to be careful with trying to draw a straight-line
4  comparison between the two numbers you may
5  calculate in. But generally speaking, if we're
6  just talking about the math, that -- that --
7  Q. Right --
8  A. -- would be the estimate.
9  Q. -- I'm right here just talking about
10 the ratio on the -- the number that's referred to
11 as the 650 -- the approximately 650 by the Mayor.
12 A. Yes.
13 Q. And then I think the next question I
14 asked you, which I think is what you were alluding
15 to, that if you assumed a larger liability figure,
16 would that ratio continue to hold; and my
17 recollection is, your answer was roughly it would,
18 but you may have to, you know, fine-tune the math.
19 A. It -- it -- it might roughly hold,
20 but you need to be careful to not draw the
21 conclusion that is -- it's exactly comparable.
22 Q. Okay. I understand.


ESQUIRE

800.211.DEPO (3376)  
EsquireSolutions.com

13-53846-tjt  Doc 2300-12  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 4 of 5
13-53846-swr  Doc 1175-6  Filed 10/23/13  Entered 10/24/13 00:43:09  Page 4 of 5

```
 1                  C E R T I F I C A T E
 2   DISTRICT OF COLUMBIA:
 3              I, Cindy L. Sebo, a Notary Public within
 4   and for the Jurisdiction aforesaid, do hereby
 5   certify that the foregoing deposition was taken
 6   before me, pursuant to notice, at the time and place
 7   indicated; that said deponent was by me duly sworn
 8   to tell the truth, the whole truth, and nothing but
 9   the truth; that the testimony of said deponent was
10   correctly recorded in machine shorthand by me and
11   thereafter transcribed under my supervision with
12   computer-aided transcription; that the deposition is
13   a true record of the testimony given by the witness;
14   and that I am neither of counsel nor kin to any
15   party in said action, nor interested in the outcome
16   thereof.
17
18                              Cindy L. Sebo
                                District of Columbia, Notary Public
19   _____    My Commission Expires
                                April 14, 2015
20
21        Cindy L. Sebo, RMR, CRR, RPR, CSR,
22             CCR, CLR, RSA, Notary Public
```



ESQUIRE                     800.211.DEPO (3376)
                            EsquireSolutions.com

13-53846-tjt  Doc 2300-12  Filed 12/23/13  Entered 12/24/13 00:01:29  Page 5 of 5
13-53846-swr  Doc 1975-6   Filed 10/12/13  Entered 10/12/13 00:45:09  Page 5 of 5