**EXHIBIT B**

**(Deposition Transcript of Charles Moore)**

Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4
 5   In re                    Chapter 9
 6   CITY OF DETROIT, MICHIGAN,   Case No. 13-53846
 7           Debtor.           Hon. Steven W. Rhodes
 8   _____/
 9
10   DEPONENT:  CHARLES M. MOORE
11   DATE:      Wednesday, September 18, 2013
12   TIME:      10:02 a.m.
13   LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
14              150 West Jefferson, Suite 2500
15              Detroit, Michigan
16   REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3   COHEN WEISS AND SIMON LLP
 4   By:  Thomas N. Ciantra
 5   330 West 42nd Street
 6   New York, NY 10036.6979
 7   212.356.0216
 8        Appearing on behalf of UAW
 9
10   LOWENSTEIN SANDLER LLP
11   By:  Sharon L. Levine
12   65 Livingston Avenue
13   Roseland, NJ 07068
14   973.597.2374
15   -and-
16   Michael L. Artz (appearing telephonically)
17        Appearing on behalf of AFSCME
18
19   CLARK HILL PLC
20   By:  Andrew Mast
21        Ed Hammond (appearing telephonically)
22   500 Woodward Avenue, Suite 3500
23   Detroit, MI 48226
24   313.965.8384
25        Appearing on behalf of Retirement Systems
```

Page 2

```
 1   APPEARANCES:
 2
 3   JONES DAY
 4   By:  Evan Miller
 5   51 Louisiana Avenue, NW
 6   Washington, D.C. 20001.2113
 7   202.879.3939
 8   -and-
 9   MILLER CANFIELD PADDOCK AND STONE PLC
10   By:  Jonathan S. Green
11   150 West Jefferson, Suite 2500
12   Detroit, MI 48226.4415
13   313.496.7997
14        Appearing on behalf of the Debtor
15
16   DENTONS US LLP
17   By:  Arthur H. Ruegger
18   1221 Avenue of the Americas
19   New York, NY 10020.1089
20   212.768.6881
21        Appearing on behalf of Retirees Committee
22
23
24
25
```

Page 4

```
 1   APPEARANCES (continued):
 2
 3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
 4   By:  Ernest J. Essad, Jr.
 5   380 N Old Woodward Ave Ste 300
 6   Birmingham, MI 48009
 7   248.642.0333
 8        Appearing on behalf of FGIC
 9
10   WINSTON S STRAWN LLP
11   By:  Bianca M. Forde (appearing telephonically)
12   200 Park Avenue
13   New York, NY 10166.4193
14   212.294.4733
15        Appearing on behalf of Assured Guaranty Municipal
16        Corp.
17
18   STROBL & SHARP
19   By:  Meredith Cox (appearing telephonically)
20   300 East Long Lake Road, Suite 200
21   Bloomfield Hills, MI 48304
22   248.540.2300
23        Appearing on behalf of Retired Detroit Police Members
24        Association
25
```



Page 61

1  A.  The rate of payouts is another area where the
2      actuaries make assumptions as to what benefits will be
3      paid in what periods and to the extent that those are
4      underestimated, that can impact the funded position as
5      well.  Tying into previous assumptions that I had
6      indicated.
7  Q.  So is it -- is it your position that the City views
8      the actuarial payout assumptions as understating
9      unfunded liabilities?
10         MR. MILLER:  Object to form.  Go ahead.
11  A.  As an example, Mr. Ruegger, the actuarial valuation
12      assumes certain payouts.  The actual payouts in the
13      most recent completed year of plan assets were
14      substantially higher than what was anticipated prior
15      to that valuation being done and so at a minimum that
16      would indicate that there were more assets that were
17      paid out than what was assumed by the actuary.
18  Q.  Other than the assumptions and methods you've
19      identified, are there any other assumptions and
20      methods that to your understanding the City views as
21      understating the systems' unfunded liabilities?
22  A.  The City and most importantly its actuary has not
23      completed its analysis on the unfunded position.  The
24      City is trying to undertake a process to actually
25      develop a more concrete valuation model on its own so

Page 62

1      it's been relying on the valuation model of the
2      pension systems' actuary.  As such we have focused on
3      a few items here, but until the City completes its
4      analysis and completes its own actuarial valuation,
5      neither the City nor its actuary nor I would be able
6      to say what all the assumptions are that could be used
7      to either overstate or understate the funded position.
8  Q.  Very well.
9          Let's turn to one of the assumptions that
10      you address in your declaration and specifically in
11      paragraph 11 you talk about the projected net rate of
12      return.  The 7.0 percent or 7.25 percent figure, do
13      you see that in paragraph 11?
14  A.  Yes, sir.
15  Q.  Those were not figures that were recommended by a
16      particular actuary; were they?
17  A.  The 7 percent is actually higher than the rate that
18      Milliman, the City's actuary, had originally put
19      forward, which in its view would result -- the rate at
20      which there was a fifty-fifty chance of achieving that
21      rate.
22          MR. RUEGGER:  All right.  I'm going to move
23      to strike, because with all respect that was not
24      responsive to my question, Mr. Moore.
25  Q.  I understand Milliman has prepared a variety of

Page 63

1      letters and reports and we'll take those up with the
2      Milliman folks, but I'm trying now to focus on the 7.0
3      figure.  That was a figure selected by the City for
4      illustrative purposes; correct?
5          MR. MILLER:  Object to form.
6  A.  Yes.
7  Q.  And that was not the specific figure or a specific
8      figure recommended by Milliman or any other actuary;
9      correct?
10  A.  I can't speak to any other actuary, but going back to
11      the previous question, yes, 7 percent was used for
12      illustrative purposes.
13  Q.  The -- and the Milliman analysis that's been
14      undertaken so far, to your understanding, that hasn't
15      been the product of work on the actual data for the
16      systems; has it?
17          MR. MILLER:  Object to form.
18          MR. RUEGGER:  Okay, that was a poor
19      question, I'll try again.  Actually withdrawn.
20  Q.  Related to the projected net return, in paragraph 15
21      of your declaration, I believe it's 15, you have a --
22      we'll get to it.
23          Let's talk now about the concept of
24      smoothing that you reference in paragraph 12.  In your
25      understanding smoothing is a common calculation used

Page 64

1      by actuaries related to pension projections; correct?
2  A.  I would clarify your question from the standpoint of
3      typically pension boards will decide on the policies
4      and then actuaries will perform calculations based on
5      the policies that a board will decide to use.
6  Q.  But smoothing is a common practice for actuaries; is
7      it not?
8          MR. MILLER:  Object to form.
9  A.  Based on my experience, yes, there is a number of
10      plans that I've looked at that involve a smoothing.
11  Q.  And would you agree that smoothing is a method to
12      manage the effect of investment volatility on
13      contributions and to provide a more consistent measure
14      of plan funding over time?
15          MR. MILLER:  Object to form.
16  A.  Generally speaking, yes.  What's important to note is
17      that smoothing is a concept, and I agree with the
18      purpose of that concept.  The number of years over
19      which a pension system may smooth can differ
20      significantly.
21  Q.  Based on the -- well, withdrawn.
22          To your knowledge is smoothing generally
23      consistent with the actuarial standards of practice?
24          MR. MILLER:  Object to form.
25  A.  Well, I can tell you, Mr. Ruegger, later this year new



Page 149

1　City of Detroit to put into that pension fund as of
2　July of next year; correct? July of this year;
3　correct?
4　　　　MR. MILLER: Object to form. Go ahead.
5　A.　Obviously there are a number of potential sources of
6　　cash that are still uncertain.
7　Q.　Okay.
8　A.　But to answer your question about why this was done --
9　Q.　Yeah.
10　A.　-- there were a number of comments that were made
11　　indicating that the plan is only $830 million
12　　underfunded or some people refer to the June 30th of
13　　2011 number and our point on this was to indicate that
14　　even if the plan was topped off from an actuarial
15　　standpoint, meaning that it was funded at 100 percent,
16　　if you roll forward using certain assumptions, what
17　　potentially happens to plan assets.
18　Q.　I see. But one of the assumptions is there's going to
19　　be no further contributions into the plan after that
20　　lump sum; correct?
21　A.　Yes. And what that is getting at is there's no future
22　　accrual of benefits. So you fully fund it based on
23　　the benefits that have been accrued --
24　Q.　Okay.
25　A.　-- which if that was the case, if it was fully funded

Page 150

1　　from an actuarial standpoint and no new benefits
2　　accrued and you experience a 7.9 percent assumed rate
3　　of return -- or actual rate of return, what would
4　　happen to the plan assets.
5　Q.　Let me ask you if you have Moore Exhibit 3 there, I
6　　want to ask you a few questions with regard to that.
7　　　　Let me direct you to page 95 of that
8　　presentation. Hang on for a second. I'm sorry, I was
9　　in the wrong place. Page 109. Looking at the heading
10　　there, claims for unfunded pension liabilities.
11　A.　Yes, sir.
12　Q.　Were you involved at all in the drafting of that part
13　　of this presentation?
14　A.　I don't think I wrote that, but I was aware of this
15　　language.
16　Q.　Okay. How about the specifically the language of the
17　　third bullet point? Because the amounts realized on
18　　the underfunding claims would be substantially less
19　　than the underfunding amount, there must be
20　　significant cuts in accrued vested pension amounts for
21　　both active and currently retired persons. Were you
22　　involved in formulating that?
23　A.　Yes, sir.
24　Q.　And has the City -- I noticed in this presentation
25　　there's no quantification of what -- of the cuts that

Page 151

1　　would be -- that in the City's view must occur;
2　　correct?
3　A.　Correct.
4　Q.　Has there been a specification of those level of cuts
5　　that the City contends must occur?
6　　　　MR. MILLER: Object to form.
7　Q.　I mean, have you put a dollar amount on it?
8　A.　No, and our analysis of this continues. Right now we
9　　still don't know what assets could be available to put
10　　towards the pensions. We still have not had the type
11　　of dialogue that we would like to have related to the
12　　calculation of the unfunded amount, so because of
13　　those two uncertainties among others we don't know
14　　what cuts, if any, there may need to be.
15　Q.　Well, doesn't it say there must be significant cuts?
16　　Am I -- are you saying that there's some -- that the
17　　City's position may be that there are no cuts that are
18　　necessary in accrued vested pension amounts?
19　　　　MR. MILLER: Object to form.
20　A.　We don't know. That's where we want to continue to
21　　engage in discussions and negotiations with the
22　　parties, but depending on what the unfunded amount is
23　　and what assets may be available for those claims, it
24　　certainly is possible.
25　Q.　So maybe that should have been worded there may be

Page 152

1　　significant cuts rather than must?
2　　　　MR. MILLER: Object to form. It asks for
3　　speculation.
4　　　　MR. CIANTRA: I don't think it asks for
5　　speculation at all.
6　　　　MR. MILLER: It asks for speculation, but
7　　you can go ahead and speculate.
8　A.　Possibly.
9　Q.　But in any event, there's been no specific
10　　quantification of any level of cuts to accrued vested
11　　pension amounts that the City has formulated in this
12　　restructuring process to date; isn't that correct?
13　A.　Correct.
14　Q.　And I would assume from that that you have not
15　　provided the unions or any of the retiree groups with
16　　any -- any quantification of cuts that the City would
17　　like to see made?
18　A.　No, we have met with parties regarding the pension
19　　multiple times and we've laid out a process that we
20　　propose to follow; however, that process really has
21　　not been started unfortunately.
22　Q.　Are you aware of provisions of the Michigan State
23　　Constitution that affect the ability of the State or
24　　its municipalities to alter accrued pension benefits?
25　A.　Generally, yes.



```
 1   State of Michigan)

 2   County of Genesee)

 3                   Certificate of Notary Public

 4       I certify that this transcript is a complete, true and

 5   correct record of the testimony of the witness held in this

 6   case.

 7       I also certify that prior to taking this deposition,

 8   the witness was duly sworn or affirmed to tell the truth.

 9       I further certify that I am not a relative or an

10   employee of or an attorney for a party; and that I am not

11   financially interested, directly or indirectly, in the

12   matter.

13                   WITNESS my hand this 20th day of September,

14   2013.

15

16

17

18                   Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19                   Certified Realtime Reporter

20                   Registered Merit Reporter

21                   Certified LiveNote Reporter

22                   Certified Shorthand Reporter

23                   Notary Public, Genesee, Michigan

24                   Acting in Oakland County, Michigan

25                   My Commission Expires:  9-19-18
```



ESQUIRE
SOLUTIONS