# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                              Chapter 9

CITY OF DETROIT, MICHIGAN                            Case No. 13-53846

         Debtor.                              Hon. Steven W. Rhodes

---

## CONSOLIDATED TRIAL BRIEF OF THE RETIREE ASSOCIATION PARTIES IN OPPOSITION TO ELIGIBILITY

The Retired Detroit Police & Fire Fighters Association ("RDPFFA"), Donald Taylor, individually and as President of the RDPFFA, the Detroit Retired City Employees Association ("DRCEA"), and Shirley V. Lightsey, individually and as President of the DRCEA (collectively "Retiree Association Parties") through their counsel, Lippitt O'Keefe, PLLC and Silverman & Morris, P.L.L.C., submit the following Consolidated Trial Brief in Opposition to the City's Eligibility to be a Debtor under Chapter 9 of the U.S. Bankruptcy Code.

# TABLE OF CONTENTS

Index of Authorities ................................................................................ iii

Brief Statement ......................................................................................1

Facts .......................................................................................................2

The Retiree Associations Were Ready, Willing and Able to Negotiate with the City........................................................................................................5

    A. The DRCEA ...............................................................................5

    B. The RDPFFA.............................................................................6

Legal Standard .......................................................................................8

    A. 11 U.S.C. §109(c)(5)(B) ...........................................................9

    B. 11 U.S.C. §109(c)(5)(C)..........................................................10

Analysis.................................................................................................11

    A. The City did not Negotiate with Retirees ................................11

    B. Negotiations with Retirees Were Practicable and Welcomed .....................13

    1. The existence of other retiree associations does not make negotiations impracticable with the Retiree Associations...........................................................13

    2. The RDPFFA is the natural representative for uniformed retirees and the DRCEA is the natural representative for non-uniformed retirees. ..........................14

    3. The mere fact that one or more union(s) now contend that they are an appropriate bargaining representative for the retirees is not enough to establish that negotiations with retirees was impracticable ...........................................................15

    4. A natural representative capable of bargaining on behalf of retirees does not need to have binding legal authority over its constituents.................................15

Conclusion .................................................................................................................15

# INDEX OF AUTHORITIES

## Case Law

*Gainey v. Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Exp. & Station Emp., D.C. Pa.,* 275 F. Supp. 292, 300 (E.D. of PA 1967) ........................................9

*In re City of Harrisburg*, 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011) ........................

*In re City of Vallejo*, 408 B.R. 280, 298 (B.A.P. 9th Cir. 2009) ......................10, 11

*In re City of Stockton, California*, 493 B.R. 772 (Bankr. E.D. Cal. 2013)........11, 15

*In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992) ....................................................................................................................10

*In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992)........................................................................................10, 12

*In re Villages at Castle Rock Metro. Dist. No. 4,* 145 B.R. 76 (Bankr. D. Colo. 1990) ....................................................................................................................10, 11

## Statutes

11 U.S. C. §109(c)(5)........................................................................................*passim*

11 U.S.C §109(c)(5)(B) ...................................................................................*passim*

11 U.S.C §109(c)(5)(C) ...................................................................................*passim*

## Other

Black's Law Dictionary, 5th Edition .........................................................................9

# BRIEF STATEMENT

The City of Detroit ("City") is not eligible to be a chapter 9 debtor because it does not satisfy the requirements of 11 U.S.C. § 109(c).  In this brief, the Retiree Association Parties will focus on the City's failure to negotiate in good-faith with retirees when such negotiations were practicable.[1]  The City cannot prove that it attempted to negotiate with retirees, or that it did so in good-faith.

The City does not contest this fact in its Consolidated Reply to Objections to the Entry of an Order for Relief.  Rather, it argues that negotiations with its creditors, including retirees, were impracticable.  The City has never claimed that it engaged in negotiations with retirees, or even attempted to do so.

Instead of attempting to, or actually, negotiating with retirees, the City decided that it was expedient to simply claim that it was impracticable to do so.  Section 109(c)(5) requires pre-filing negotiations.  The City's approach cannot possibly fulfill the requirements of §109(c)(5).

In defense of its refusal to negotiate with retirees (when both DRCEA and the RDPFFA requested to have such negotiations), the City provides an array of red-

---

[1]  The Retiree Association Parties have asserted other factual and legal objections to the City's eligibility.  There are a number of objecting parties, and the Retiree Association Parties do not intend to present duplicative evidence.  The Retiree Association Parties have not abandoned any of their objections and reserve all rights.

{00200872}6

13-53846-swr   Doc 2209-17   Filed 12/27/13   Entered 12/27/13 20:46:13   Page 6 of 21
13-53846-swr   Doc 2322   Filed 12/27/13   Entered 12/27/13 20:46:13   Page 6 of 175   544

herring arguments and ignores decades of history for each of the DRCEA and RDPFFA.

An understanding of the facts as they pertain to the DRCEA and RDPFFA's histories, qualifications, successes, organizational structures and purposes reveals that the City could have negotiated with retirees if it had intended to do so. Because the City did not negotiate with retirees when negotiations were practicable, the City fails to meet the eligibility requirements of §109(c)(5) and, therefore, cannot be a debtor under chapter 9.

## **FACTS**

The City has listed as the creditors holding the two largest unsecured claims the General Retirement System of the City of Detroit and the Police and Fire Retirement System of the City of Detroit (together, the "Retirement Systems"). The Retirement Systems may in fact be the largest creditors in the sense that the ordinances establishing the Retirement Systems provide for the Retirement Systems to determine and collect from the City the amount necessary for the City to contribute in order that retiree pensions are properly funded, but the City is directly indebted to its retirees for their accrued benefits. The Retirement Systems represent a mechanism through which the City is to fulfill its responsibilities to its retired employees. It is the retirees who have the ultimate financial stake in the fulfillment

{00200872}7

13-53846-swr   Doc 2202-17   Filed 12/27/13   Entered 12/27/13 20:46:13   Page 7 of 21
13-53846-tjt   Doc 13229   Filed 10/17/18   Entered 10/17/18 20:46:13   Page 7 of 21          545
175

by the City of its pension obligations.  Therefore, negotiation with the retirees, not just the Retirement Systems, was called for by § 109(c)(5).

The City has never denied, and in fact has affirmatively admitted, that it intends to impair the pension rights of retirees.  The Emergency Manager, Kevyn Orr, admitted in his deposition that the impairment of vested pension rights was a necessary component of the restructuring process and would be included in a plan of adjustment.  (Orr Dep. at 322: 3-7).  The City's June, 14, 2013 Proposal also reveals that the City intends to impair vested pension rights.  It specifically states that "there must be significant cuts in accrued vested pension amounts for both active and currently retired persons." (Docket 11, Ex. A at 116).  Because the City "intends to impair" pension obligations "under a plan in a case under" Chapter 9, the City must show that it "negotiated in good faith" with retirees, or that "such negotiation was impracticable".  § 109(c)(5).

The retirees, through the RDPFFA and the DRCEA, were ready, willing and able to negotiate with the City regarding retiree issues, including, but not limited to, accrued pension rights and other post-employment benefits ("OPEB").  The City claims that "the RDPFFA and the DRCEA are the natural representatives of retirees is not self evidently correct."  The evidence will show that the Retiree Associations were and are the representatives of the retirees, indeed that they are the "natural

representatives" to adopt a term used by the court in *City of Stockton*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013).

The Retiree Associations (RDPFFA and DRCEA) have provided and continue to provide a highly organized and representative voice of the retirees. The combined dues-paying membership of the Retiree Associations is estimated to be approximately 70% of all City retirees, but the Retiree Associations each represent and provide service and representation for all of their respective retirees, regardless of membership status. (Declaration of Shirley V. Lightsey, Docket 502-2, ¶6, and Declaration of Donald Taylor, Docket 502-3, ¶6). The RDPFFA has represented its constituent retirees for more than 30 years and has won and protected rights for them through litigation, (including securing the *Weiler* judgment), lobbying and other forms of representation. The DRCEA has represented its constituent retirees for more than 50 years and has likewise won and protected rights for them through litigation, lobbying and other forms of representation.

Both the RDPFFA's and the DRCEA's primary purpose is to represent the interests of their respective retiree members. Each of the Retiree Associations operates under its own by-laws and governing documents and serves its members through its elected and/or appointed board of directors and officers. The Retiree Associations regularly communicate with their constituents and hold periodic meetings to update their members on important matters.

Over the past 53 years, the DRCEA has been integral in securing pension improvements, protections and/or payment of entitled benefits. The same is true of the RDPFFA, which for over thirty years has been integral in securing pension improvements, protections and other benefits. The Retiree Associations are the natural representatives of the retirees, capable of bargaining on their memberships' behalf.

### *The Retiree Associations Were Ready, Willing and Able to Negotiate with the City*

**A.    *The DRCEA***

The DRCEA, through its President, Shirley V. Lightsey (accompanied by counsel on two occasions), attended three restructuring meetings held by the City and led by attorneys from Jones Day. The meetings were purely informational. At no point during any of these meetings was there an opportunity for negotiation or even for the consideration of the position of the retirees. The meetings are summarized as follows:

> June 20, 2013, 10:00 a.m. at the 13th floor auditorium of the Coleman A. Young Municipal Center. Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. A take-it-or-leave-it (unconstitutional) proposal was made by the City which called for pension obligations to be treated as general unsecured debt which violates the Constitution because the proposal would both diminish and impair accrued pension obligations. No negotiation was permitted by the City. The City provided a "data room" to enable the Retiree Associations to research financial and other information.

> July 10, 2013, 1:00 p.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. Attorney David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes

to the Pension Fund configuration, and a "four-step process." "
toward reaching a resolution was proposed by the City. The City
did not get past step one of its own process, the presentation by the
City of information. No negotiation occurred.

July 11, 2013, 10:00 a.m. at the Coleman A. Young Municipal
Center, 3rd floor Labor Relations Conference Room. David Heiman
and other attorneys from Jones Day conducted the presentation. The
primary topic was health care. A draft of "Medicare Advantage Plan
Design Options" was distributed. No negotiation took place because
the meeting was purely informational.

Ms. Lightsey also sent a letter to Mr. Orr on May 4, 2013, requesting a
meeting with him to discuss pension and other retirement benefits. (proposed
exhibit, Bates stamped as RetAssnParties 000181). This letter and request went
unanswered by Mr. Orr. Counsel for the Retiree Associations requested additional
meetings with Mr. Orr and his representatives and these requests likewise went
unanswered.

### B. The RDPFFA

The RDPFFA, through its president, Don Taylor, met with Michigan
Treasurer, Andy Dillon, to discuss pension and other retiree issues. Representatives
from the RDPFFA (accompanied by counsel on three occasions) also attended
various meetings with the City and its representatives. The meetings were purely
informational. At no point in the meetings was there an opportunity for negotiation
or even for the consideration of the position of the retirees. The meetings are
summarized as follows:

{00200872}11

13-53846-swr   Doc 2309-17   Filed 12/28/13   Entered 12/28/13 20:06:01   Page 11 of 21
175
13-53846-swr   Doc 1229   Filed 10/17/13   Entered 10/17/13 20:46:03   Page 11 of 21   549

April 18, 2013, 10:00 a.m. at the Coleman A Young Municipal Center – Meeting with Emergency Financial Manager, Kevyn Orr. The meeting was presentational and Mr. Orr informed the group that he had no intention of impairing pensions or health benefits for retirees. More specifically, Mr. Orr stated that he had no intention to violate the state constitution or to set aside the settlement reached in *Weiler*. No negotiation occurred.

June 14, 2013 at Detroit Metropolitan Airport. The meeting was led by Jones Day attorneys and other professionals representing the City. Mr. Orr and Mr. Dillon were in attendance but did not speak. An initial proposal was presented during the meeting. No negotiation occurred.

June 20, 2013, at the Coleman A. Young Municipal Center, 13th-floor auditorium - Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. A take-it-or-leave-it (unconstitutional) proposal was made by the City. The proposal made by the City called for pension obligations to be treated as general unsecured debt, which violates the Constitution because the proposal would both diminish and impair accrued pension obligations. No negotiation occurred. The City informed the Retiree Associations of the data room as a source for further information.

July 10, 2013, at the Coleman A. Young Municipal Center, 3rd-floor Labor Relations Conference Room. - David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the pension fund configuration, and a "four-step process."" toward reaching a resolution was proposed by the City. The City did not get past step one of its own "four-step process." No negotiation occurred.


July 11, 2013, at the Coleman A. Young Bldg. 3rd floor Labor Relations Conference Room. David Heiman and associates from Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation was invited and the presentation was unilateral.

Despite the RDPFFA and the DRCEA's willingness, ability and desire to negotiate with the City, the City neither offered to negotiate nor accepted the Retiree Associations' invitation to negotiate. Instead, the City apparently chose to roll the dice on eligibility and claim that negotiations were impracticable.

## **LEGAL STANDARD**

It is undisputed that the burden of establishing eligibility to be a Chapter 9 debtor is placed squarely on the municipality. *In re City of Harrisburg*, 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011). Again, while the Retiree Association Parties have already disputed numerous eligibility deficiencies, this brief focuses on the City's failure and inability to satisfy 109(c)(5)(B)&(C). Section 109(c) provides in pertinent part:

> An entity may be a debtor under chapter 9 of this title ***if and only if*** such entity—
>
> (5)  ***
>
> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C) is unable to negotiate with creditors because such negotiation is impracticable…….

11 U.S.C §109(c)(5)(B)&(C). An examination of the standards of both 11 U.S.C §109(c)(5)(B) and (C) reveals the City's lack of compliance therewith.

### A. *11 U.S.C. §109(c)(5)(B)*

To determine whether the City complied with the Bankruptcy Code's requirement that a debtor must "negotiate in good faith with creditors," negotiation must be defined. "Negotiation is [a] process of submission and consideration of offers until [an] acceptable offer is made and accepted." *Gainey v. Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Exp. & Station Emp.,* 275 F. Supp. 292, 300 (E.D. Pa. 1967). Similarly, Black's Law Dictionary defines negotiation as "the deliberation, discussion, or conference upon the terms of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction." BLACK'S LAW DICTIONARY (5th Ed., 1979).

The negotiation requirement of 11 U.S.C. 109(c)(5)(B) is a serious consideration and the courts must not "view lightly the negotiation requirements." *In re Villages at Castle Rock Metro. Dist. No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990). Congress, through the Bankruptcy Code, intended to provide creditor protection by providing "an opportunity to negotiate concerning a plan on a level playing field." *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992). In line with the seriousness of the negotiation requirement and the need for a level playing field, it is not surprising that no negotiations occur when a creditor presents a "take it or leave it" proposal. *In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992). A debtor must be willing to

negotiate the substantive terms of the proposed plan in order to satisfy the standard. *Id.*

### B.    11 U.S.C. §109(c)(5)(C)

Under 109(c)(5)(C)), the key to the analysis is the meaning of "impracticable" which has been defined to mean "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." *In re City of Vallejo*, 408 B.R. 280, 298 (B.A.P. 9th Cir. 2009). The determination of impracticability under 109(c)(5)(C) must consider circumstances of the case using a fact specific inquiry. *Id.* Therefore, for negotiations to be impracticable under the Bankruptcy Code a "circumstance that excuses a party from performing an act…because (though possible) it would cause ***extreme and unreasonable*** difficulty" must be present and proven by the debtor. *Id.* (Emphasis added.) The perception that negotiations would be hard or ultimately unsuccessful is not sufficient. *Id.* Lastly, the analysis of a debtor's compliance with 109(c)(5)(C) is to be done on a creditor- class by creditor-class basis. *In re Village at Castle Rock Metro, supra,* at 85.

For negotiations to be practical a creditor class need not show that it can legally bind each and every member of the respective class, but there must be a "natural representative capable of bargaining on their [the class's] behalf. *Stockton,*

*supra* at 794.  The court in *Stockton* did not state a requirement that the "natural representative" have the legal authority to bind all or any of the creditor class.  *Id.*

## ANALYSIS

### A.    The City did not Negotiate with Retirees.

The facts clearly show that (1) the City intends to impair the pension rights of retirees (and has already announced draconian reductions to health care benefits) through the bankruptcy process; (2) the City did not negotiate, or even attempt to negotiate, with retirees before the filing of the bankruptcy petition; (3) negotiations with the Retiree Associations were practicable, welcomed and requested, but the City still chose not to engage in such negotiations; (4) the admittedly informational/presentational (en masse) meetings hosted by the City were not negotiations; (5) and the City does not even contend that it negotiated with retirees, or even attempted to do so.

Each of the meetings hosted by the City and attended by the Retiree Associations can be uniformly described as unilateral presentation of proposal information from the City.  No negotiation occurred or was invited by the City.  Such a one-sided presentation of information, related to a take-it-or-leave-it proposal, does not constitute negotiations.  The hosting of *en masse* presentational meetings to explain a take-it-or-leave-it restructuring proposal is not negotiation.  *In re Ellicott School Building Authority*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992).  The mere

fact that a debtor held public meetings in *In Re Ellicott* to advise creditors of a nonnegotiable restructuring proposal was insufficient to fulfill the negotiation requirement of 109(c)(5)(B). This is the exact situation which unfolded in the current case. Therefore, the City did not negotiate with the retirees that it intended to and still intends to impair under a plan.[2]

## B.  Negotiations with Retirees Were Practicable and Welcomed

The City went all-in on its 109(c)(5) eligibility gamble claiming that negotiations with each class of its creditors were impracticable. (City of Detroit's Consolidated Reply To Objections to the Entry of an Order For Relief, Dkt. 765, pp 45-62). This is not the case.

The City makes four primary arguments to support its claim that negotiations with the retirees were not practicable:  (1) the City claims that the Retiree Associations are "but two of at least five associations purporting to represent City retirees" (City Reply at 47); (2) "neither the RDPFFA nor the DRCEA are 'the anything'" (*Id.* at 48); (3) the "unions now claim to be appropriate  bargaining representatives for the retirees as well" (*Id.*); and (4) the Retiree Associations lacked the authority to bind the City's retirees.  *Id.*  Each of these red-herring arguments is addressed below.

_____

[2] The Retiree Association Parties further assert that based on the briefing and arguments presented by other major objecting creditors, (i.e., the unions) it is clear that the City did not negotiate with any of the major creditors.

### 1. The existence of other retiree associations did not make negotiations with the Retiree Associations impracticable.

The City makes an issue of the existence of retiree associations in addition to the DRCEA and the RDPFFA. The existence of additional, newly-formed associations does not negate the histories of the DRCEA and the RDPFFA. Rather, the establishment of small specialized additional associations shows concern and commitment among retirees. Retirees may be diverse but they are well organized. The City has not disputed the Retiree Associations' histories of representation, negotiation, advocacy and success on behalf of retirees.

The Retiree Associations neither claimed to be the only two retiree associations in the City nor that they are the exclusive representative of the City's retirees. The Retiree Association Parties contend, and the facts support, that the Retiree Associations were and are the natural bargaining representatives of their respective retiree constituents. They each have the ability, expertise and experience to gather information, convey that information to their constituencies and motivate their constituencies to take action. These are all indices of a "natural representative" body, akin to appointed representative bodies like the retiree committee appointed in this case or to the creditors' committee in any other bankruptcy case.

### 2. The RDPFFA is the natural representative for uniformed retirees and the DRCEA is the natural representative for non-uniformed retirees.

{00200872}18

13-53846-swr   Doc 2399-17   Filed 12/28/13   Entered 12/28/13 09:01:29   Page 18 of 21
175
13-53846-swr   Doc 1229   Filed 10/17/13   Entered 10/17/13 20:46:13   Page 18 of 21   556

The Retiree Association Parties are not sure what the City means when it says that "neither the RDPFFA nor the DRCEA are 'the' anything." (City Reply at 48). The Retiree Associations do not claim to quasi-governmental bodies established by statute. It is also undeniable that uniformed and non-uniformed retirees were previously represented by different unions during employment, are represented by different retiree associations and receive their pension benefits from separate pension systems, but the City appears to now claim, again, that decades of history are irrelevant to the practicability consideration. Moreover, even if the City's contention is true, it cannot be said that separate negotiations with RDPFFA and the DRCEA would be impracticable, and the City does not even make that argument. In fact, each Association was present at each meeting, employed counsel, reached out to the City to meet at other times and stood ready, willing and able to negotiate through elected and knowledgeable representatives.

> 3. *The mere fact that one or more union(s) now contend that they are an appropriate bargaining representative for the retirees is not enough to establish that negotiations with retirees was impracticable.*

The mere fact that multiple parties contend to be an appropriate representative to bargain on behalf of retirees does not make negotiations impracticable. By implication, the City contends that it was not "readily apparent" who the natural representative of the retirees was and that is where its inquiry stopped. The City did not endeavor to determine by means of communication or negotiation who would be

the representative bargaining body for the retirees, likely because it had no good-faith desire to do so.

As it applies to the City's assertion that unions were jockeying for position to bargain on behalf of the retirees, a quick review of case law reveals that this is not so. Generally, "a union's duty to bargain collectively on behalf of the members of the bargaining unit that the union represents does not extend to retired workers, because they are not members of the unit." *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co*., 404 U.S. 157, 166, 182 n. 20, 92 S. Ct. 383, 30 L. Ed. 2d 341 (1971). This, combined with the histories and prior actions of the Retiree Associations, makes it clear that they were the natural representatives for the City to negotiate with regarding retirees -- a fact also made known to the City by the Retiree Associations.

> ### 4. A natural representative capable of bargaining on behalf of retirees does not need to have binding legal authority over its constituents.

Authority to enter into a binding agreement is not necessary to negotiation with a creditor organization. *In re City of Stockton, California*, supra. The proper legal standard, as announced in *Stockton*, is whether there is a "natural representative capable of bargaining on their behalf." *Id.* p 23. The Court in *Stockton* did not state a requirement that the "natural representative" have the legal authority to bind all of the retirees. *Id.*

The City's argument is even more disingenuous when viewed in light of the City's request for the appointment of an official committee of retirees, which similarly lacks the legal authority to directly bind individual retirees. Plans are routinely negotiated by creditors' committees. Indeed, the negotiation of plan terms by a creditors' committee is part of the very fabric of chapter 9 and chapter 11. The City's actions show that it failed to fulfill its responsibility to negotiate in good faith with creditors whom the City intends to impair under Plan.

## **CONCLUSION**

For reasons which include the particular factual argument outlined above, the City is not eligible to be a chapter 9 debtor and this case should be dismissed.

Lippitt O'Keefe, PLLC
Brian D. O'Keefe (P39603)
Ryan C. Plecha (P71957)
370 East Maple Road, 3rd Floor
Birmingham, Michigan 48009
(248) 646-8292
rplecha@lippittokeefe.com

SILVERMAN & MORRIS, P.L.L.C.
/s/ *Thomas R. Morris*
Thomas R. Morris (P39141)
30500 Northwestern Highway,Suite 200
Farmington Hills, Michigan 48334
(248) 539-1330
morris@silvermanmorris.com

*Counsel for Retiree Association Parties*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------------------x

In re                                                          :     Chapter 9
                                                               :
CITY OF DETROIT, MICHIGAN,                                     :     Case No. 13-53846
                                                               :
                                        Debtor.                :     Hon. Steven W. Rhodes
                                                               :
                                                               :
-------------------------------------------------------------------x

## PRE-TRIAL BRIEF OF THE OFFICIAL COMMITTEE OF RETIREES REGARDING THE CITY OF DETROIT'S ELIGIBILITY TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... iv

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

ARGUMENT ....................................................................................................................... 12

I. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING
THAT IT WAS AUTHORIZED TO FILE THE PETITION ............................. 12

II. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING
THAT IT NEGOTIATED WITH CREDITORS IN GOOD FAITH OR
THAT NEGOTIATIONS WERE IMPRACTICABLE ....................................... 13

    A. The City Cannot Establish That it Negotiated in Good Faith Under
Section 109(c)(5)(B) ................................................................................ 15

        1. The City Failed to set Forth a Plan of Adjustment as is
Required Under Section 109(c)(5)(B) ........................................ 16

        2. The City Failed to Negotiate With the Retiree Associations
and Unions in Good Faith as Required Under Section
109(c)(5)(B) ................................................................................ 19

    B. The City Cannot Establish That Negotiations Were Impracticable
Under Section 109(c)(5)(C) ..................................................................... 20

        1. The City Failed to set Forth a Plan of Adjustment as
Required Under Section 109(c)(5)(C) ........................................ 21

        2. The City Also Fails Under Section 109(c)(5)(C) Because it
did not Negotiate With Retiree Representatives .......................... 22

III. THE CITY'S BANKRUPTCY PETITION WAS NOT FILED IN GOOD
FAITH AS REQUIRED UNDER 11 U.S.C. § 921(c) AND SHOULD BE
DISMISSED ........................................................................................................ 23

    A. The Chapter 9 Petition was not Filed in Good Faith Because the
Emergency Manager Intends to use Chapter 9 to Impair Pension
Obligations in Violation of his Duty to Uphold the Michigan
Constitution, Which Prohibits Such Impairment ..................................... 25

    B. The Chapter 9 Petition was not Filed in Good Faith Because the
City's Assertions Regarding the Amount of its Underfunded
Pension Obligations Were, At a Minimum, Misleading and
Incomplete ............................................................................................... 28

- ii -

CONCLUSION.................................................................................................................... 32

81257447\V-3

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
  767 F.3d 767 (6th Cir. 2013) ....................................................................................4, 25

*Flowers v. Michigan,*
  Case No. 13-374-CZ (Ingham Cnty. Cir. Ct. July 19, 2013)....................................10

*Flowers v. Snyder,*
  Case No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013)......................................10

*Gen. Ret. Sys. of Detroit v. Orr,*
  Case No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) ...................................10

*In re City of Bridgeport,*
  129 B.R. 332 (Bankr. D. Conn. 1991) ....................................................................24

*In re City of Wellston,*
  42 B.R. 282 (Bankr. E.D. Mo. 1984) ......................................................................22

*In re Cnty. of Orange,*
  183 B.R. 594 (Bankr. C.D. Cal. 1995).....................................................................24

*In re Cottonwood Water and Sanitation Dist.,*
  138 B.R. 973 (Bankr. D. Colo. 1992) ...............................................13, 14, 16, 17

*In re Ellicott Sch. Bldg. Auth.,*
  150 B.R. 261 (Bankr. D. Colo. 1992) ...............................................................16, 19

*In re Enrolled Senate Bill 1269,*
  389 Mich. 659 (Mich. 1973).....................................................................................26

*In re Joyce, Don & Assos. Inc.,*
  No. 6:07-bk-04878-ABB, 2008 WL 343265 (Bankr. M.D. Fla. Jan. 30, 2008)....................24

*In re New York City Off-Track Betting Corp.,*
  427 B.R. 256 (Bankr. S.D.N.Y. 2010)......................................................................16

*In re Panache Dev. Co., Inc.,*
  123 B.R. 929 (Bankr. S.D. Fla. 1991) ......................................................................24

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,*
  165 B.R. 60 (Bankr. D.N.H. 1994) ...........................................................14, 16, 24

*In re Valley Health Sys.,*
  383 B.R. 156 (Bankr. C.D. Cal. 2008)................................................................20, 24

- iv -

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo),*
    408 B.R. 280 (9th Cir. B.A.P. 2009)............................................................20, 24

*Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP),*
    243 B.R. 768 (D. Colo. 2000) ............................................................................24

*Seitz v. Probate Judges Ret. Sys.,*
    189 Mich. App. 445 (Ct. App. 1991) ...........................................................6, 26

*Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. Of Shelby,*
    438 Mich. 247 (1991) .........................................................................................26

*Vills. at Castle Rock Metro. Dist. No. 4,*
    145 B.R. 76, 85 (Bankr. D. Colo. 1990) ......................................................22, 24

*Webster v. Michigan,*
    Case No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 19, 2013) ..............................10

*Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino*
    *Coast Recreation and Park Dist.),*
    No. 12-cv-02591-JST, 2013 WL 5423788 (Bankr. N.D. Cal. Sept. 27, 2013).......16

## STATUTES

11 U.S.C. § 101..................................................................................................1

11 U.S.C. § 101-1532.........................................................................................5

11 U.S.C. § 109..................................................................................................5

11 U.S.C. § 109(c) ......................................................................................16, 22

11 U.S.C. § 109(c)(2)..........................................................................................1

11 U.S.C. § 109(c)(4).........................................................................................16

11 U.S.C. § 109(c)(5)................................................................................. *passim*

11 U.S.C. § 109(c)(5)(A)....................................................................................14

11 U.S.C. § 109(c)(5)(B) ............................................................................ *passim*

11 U.S.C. § 109(c)(5)(C) ............................................................................ *passim*

11 U.S.C. § 109(c)(5)(D).....................................................................................14

11 U.S.C. § 921(c) ...............................................................................2, 3, 23, 24

11 U.S.C. § 941 .......................................................................................... *passim*

81257447\V-3

11 U.S.C. § 943(b)(4) ..................................................................................................12, 13

M.C.L. § 141.1501. ................................................................................................................4

M.C.L. §§ 141.1501-1531 ......................................................................................................4

M.C.L. § 141.1549(2) .............................................................................................................4

M.C.L. § 141.1549(3)(d) .........................................................................................................4

M.C.L. § 141.1558(1) .............................................................................................................5

MICH. CONST. art. IX § 24 ............................................................................................ *passim*

MICH. CONST. art. XI § 1 ........................................................................................................4

## OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 903.02 ....................................................................................5

124 CONG. REC., H 11091 (daily ed. Sept. 28, 1978), at IX-108 ...................................17

H.R. REP. NO. 94-938 (1976) (Conf. Rep.) ........................................................................13

Pub. L. No. 94-260, 90 Stat. 315, § 84 .........................................................................17, 21

S. REP. NO. 95-989 (1978) ..................................................................................................22

81257447\V-3

In accordance with the Court's order of August 2, 2013, the Official Committee of Retirees ("Committee") submits this pre-trial brief to summarize what it expects to demonstrate at the October 23, 2013 hearing concerning the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").[1] The Committee adopts, except as modified herein, all of the legal arguments made in its Objection to Eligibility filed September 10, 2013 (Dkt. 805) and Supplemental Objection to Eligibility filed October 11, 2013 (Dkt. 1174).

## INTRODUCTION

1. The Committee represents the interests of more than 23,000 retirees of the City. These individuals retired with pensions from the City that were not only vested but protected with special and specific safeguards by the Michigan Constitution itself. Yet, in filing for bankruptcy under Chapter 9, the City's Emergency Manager has made clear that he intends to try to substantially cut the City's pensions payment obligations, notwithstanding that such action would be in plain contravention of the Michigan Constitution.

2. Questions of the City's eligibility to file as a Chapter 9 debtor that involve factual eligibility issues will be addressed at the trial commencing on October 23. The Committee intends to present fact-based objections to eligibility on three grounds: (a) that the City cannot meet its burden of showing that it was authorized to file a Chapter 9 Petition as required by Section 109(c)(2) of the Bankruptcy Code; (b) that the City cannot show that it negotiated with creditors in good faith or that negotiations were impracticable, as required under Bankruptcy

---

[1] Pursuant to this Court's First Amended Order Regarding Eligibility Objections, dated September 12, 2013 (Dkt. 821), the Eligibility Objections that will be addressed on October 23, 2013 require resolution of genuine issues of material fact. This pre-trial brief is limited to the matters identified by this Court in its September 12, 2013 order.

Code Sections 109(c)(5)(B) and (C); and (c) that, in filing its Petition, the City did not act in good faith, so that its Petition should be dismissed under Section 921(c) of the Bankruptcy Code.

3.     The City cannot show that it was authorized to file the Chapter 9 Petition because, as the Emergency Manager has admitted, it did so with the intent of impairing pension rights and reneging on pension benefit obligations that are constitutionally protected under Michigan law. As the Emergency Manager is bound by the strictures of the Michigan Constitution, a bankruptcy filing that was admittedly in derogation of those strictures was unauthorized as a matter of state law and thus the petition was ineffective.

4.     The City also cannot show that it meets the eligibility criteria under Sections 109(c)(5)(B) and (C), for the following reasons:

5.     First, the City failed to meet the requirements of Section 109(c)(5)(B) because it did not come forward with a plan of adjustment as required by that Section, and in any event did not engage in good-faith negotiations with various unions and retiree associations as, or representing, the City's largest creditor constituency. Rather than submit a plan of adjustment, the Emergency Manager provided only a June 14, 2013 "Proposal to Creditors" which the Emergency Manager has admitted was not a plan of adjustment but rather only a "proposal." Further, even as to this proposal, the City did not engage in any actual, good faith negotiations with creditors. On the contrary, the City's discussions of this proposal with the retiree associations and unions were merely advisory, one-sided presentations by the City that offered no opportunity to negotiate. Indeed, during the period when those discussions took place, the City had not even provided the underlying data necessary for the retiree associations and unions to analyze and evaluate the City's proposal and prepare a meaningful response. Equally important, discovery has revealed that the City's proposal, and its submissions to this Court,

- 2 -

81257447\V-3

contain a misleading depiction of both the unfunded pension liability and the funds that are potentially available to the City to meet it, as well as the City's obligations in general.

6. Second, the City failed to meet the requirements of Section 109(c)(5)(C) because its June 14 "proposal" was admittedly not a proposed plan of adjustment, which should exist before any determination as to impracticability can be made, as required by that Section as well. Also, to show impracticability under Section 109(c)(5)(C), the City must show that negotiations were impracticable as to all classes of creditors. That showing cannot be made here because, at minimum, the retiree associations and unions were ready, willing and able to negotiate – but the City never took them up on these offers. The City may not use its own unwillingness to meaningfully engage with the various classes of creditors that were prepared to negotiate as a bootstrap to demonstrate that negotiations were "impracticable" under this Section.

7. Finally, regarding Section 921(c), the City cannot meet its burden of demonstrating that it filed its Chapter 9 Petition in good faith as required by that Section. The Emergency Manager has admitted that, notwithstanding his sworn oath to uphold the Michigan Constitution, he commenced these proceedings with the express purpose of "trumping" the Michigan Constitution in order to impair vested pension benefits that the Michigan Constitution explicitly provides cannot be impaired. Cause for dismissal under Section 921(c) further exists because, in connection with its Petition, the City made representations concerning the magnitude of its underfunded pension obligations and its potential ability to meet those obligations as well as its obligations in general, that were, at a minimum, misleading and incomplete.

## FACTUAL BACKGROUND

8. On March 14, 2013, Governor Richard D. Snyder appointed Kevyn D. Orr, a bankruptcy lawyer by training and trade, as the City's Emergency Financial Manager pursuant to

- 3 -

Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. § 141.1201, *et seq.* 2013. On March 28, 2013, Mr. Orr automatically became emergency manager (the "Emergency Manager") upon the effectiveness of Michigan's most recent[2] emergency manager law, Public Act 436, the Local Financial Stability and Choice Act, M.C.L. § 141.1541, *et seq.* ("PA 436"). Under Public Act 436 of 2012, the City's Emergency Manager acts as its receiver, and stands in the place of its governing body and chief executive officer. M.C.L. § 141.1549(2). He is a public officer subject to the laws applicable to public servants and officers. M.C.L. § 141.1549(3)(d) and (9)(a), (b) and (c). As a public officer, and like any citizen of the State, the Emergency Manager must follow the Michigan Constitution and statutes enacted by the Legislature pursuant to its constitutional authority.

9.     At the time of the Emergency Manager's appointment, Mr. Orr swore to support and uphold the constitutions of both the State of Michigan and the United States stating: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager - City of Detroit according to the best of my ability." MICH. CONST. art. XI § 1.[3]

---

[2] In March 2011, Public Act 72, the "Local Government Fiscal Responsibility Act," was repealed and replaced with Public Act 4, the "Local Government and School District Fiscal Accountability Act." M.C.L. §§ 141.1501 *et seq.* "Public Act 4 is not Michigan's first law governing emergency managers, but it is the first legislation that allowed emergency managers to break collective bargaining agreements and to ignore retirement commitments." *See City of Pontiac Retired Emps. Ass'n v. Schimmel,* 767 F.3d 767, 769-70 (6th Cir. 2013) (citing M.C.L. §§ 141.1501-1531). Public Act 4 was rejected by voters in a referendum shortly after passage in March 2011. *Id.* at 770. "Apparently unaffected that the voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum." *Id.* (citations omitted).

[3] Governor Snyder was required to swear the same oath upon his appointment as Governor of the State of Michigan. *See* MICH. CONST. art. XI §1 (requiring oath of "[a]ll officers, legislative executive and judicial").

- 4 -

10.     This inter-play of Michigan's Constitution and Public Act 436 requires that the Emergency Manager abide by all applicable laws in governing the City.  The same obligation to comply with the Michigan Constitution applies to the Emergency Manager during this Chapter 9 proceeding.  "Indeed, absent a specific provision to the contrary, a municipality is required to continue to comply with state law during a Chapter 9 case."  6 COLLIER ON BANKRUPTCY ¶ 903.02 (Alan N. Resnick and Henry J. Sommer eds. 16th ed. 2012).  This is significant, because under Chapter 9, the City, through the Emergency Manager, is the only party with authority to propose a plan of adjustment, 11 U.S.C. § 941, and therefore controls the plan process in a way that is unique to bankruptcy law.

11.     PA 436 authorizes a municipality to file a Chapter 9 Petition upon the recommendation of the emergency manager if, in his judgment, "no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists" and the governor provides written approval.  M.C.L. § 141.1558(1).[4]  PA 436 permits, but does not require, the governor to "place contingencies on a local government in order to proceed under chapter 9."  *Id.*

---

[4] In its entirety, PA 436(18) provides:

> If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and state treasurer that the local government be authorized to proceed under chapter 9.  If the governor approves of the recommendation, the governor shall inform the state treasurer and emergency manager in writing of the decision … Upon receipt of this written approval, the emergency manager is authorized to proceed under chapter 9.  This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 U.S.C. § 101-1532, as required by section 109 of title 11 of the United States Code, 11 U.S.C. § 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

12.     There is no question that, at the time the Emergency Manager was appointed, Detroit was under severe financial pressure.  Detroit faced substantial short and long term liabilities.  Among those liabilities were vested pension obligations owed to City retirees as well as to active employees.  The City's pension obligations, however, differed from other liabilities owed by the City in one fundamental and critical way:  unlike liabilities in general, the City's payment obligations for accrued and vested pension benefits are explicitly protected from being impaired or diminished by the state or its political subdivisions (such as Detroit) under Article IX, Section 24 of the Michigan Constitution (the "Pension Clause").  *Seitz v. Probate Judges Ret. Sys.,* 189 Mich. App. 445, 449 (Ct. App. 1991).[5]  The Pension Clause expressly provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

MICH. CONST. art. IX § 24.

13.     It is undisputed that, as of the time of his appointment, the Emergency Manager was aware of the above provision of the Michigan Constitution.  Transcripts of the Kevyn Orr Deposition, dated September 16, 2013 and October 4, 2013, Case No. 13-53846 (collectively the "Orr Dep.") at 51:25-52:2; 69:16-70:2.[6]  There also is no contention that the wording of the Pension Clause is ambiguous in any way.  Manifestly, the language of that Section is clear and, as the Emergency Manager put it, "speaks for itself."  *Id.* at 51:25-52:19.

---

[5] *See also*, cases cited at n. 18, *infra*.

[6] The Orr Dep. are attached as Exhibit A to the Declaration of Claude D. Montgomery, Esq., dated October 17, 2013, filed in support of this Pre-Trial Brief ("Montgomery Dec.").

- 6 -

81257447\V-3

14. Notwithstanding the Pension Clause's plain meaning, shortly after his appointment, the Emergency Manager informed both Detroit's creditors and the media of his intent to renege on the very pension benefits - the vested pension payments - that were protected from being diminished under that same constitutional provision. For example, in a financial plan put forward in May 2013, the Emergency Manager expressly stated that he wanted and intended to cut vested pension rights – and to cut them **substantially**. *See Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, CBS DETROIT, (May 12, 2013), http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-finacial-plan-for-city-of-detroit/; *see generally* Orr Dep. at 247:1-7. Ongoing pensions payments for both retirees and active employees would be affected.

15. To implement his plan, the Emergency Manager still had to get around the Pension Clause of the Michigan Constitution. Under the laws of Michigan, the path was blocked. Therefore, the Emergency Manager decided to use a Chapter 9 filing as a vehicle to trump the very state Constitution that he had sworn to uphold. There is no dispute about this: the Emergency Manager has publicly and freely admitted that the City's Chapter 9 filing was intended to try to trump state law.[7] Similar admissions were made at his deposition. Orr Dep. at 113:13-114:23. Indeed, at his deposition, the Emergency Manager candidly admitted that the bankruptcy filing was intended, specifically, to "trump" the Michigan Constitution's Pension Clause, and no other provisions of Michigan law. *Id.* The Emergency Manager also admitted that he was aware of no decision that had ever upheld or allowed a municipality's using a Chapter 9 proceeding to trump the guarantees of a state Constitution and that, prior to his

---

[7] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, DETROIT FREE PRESS, (June 14, 2013), http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orrdetroit-emergency-manager-creditors-fiscal-crisis.

81257447\V-3

Chapter 9 filing, the Michigan Attorney General advised him that, in the view of the Attorney General, the course of conduct being followed by the Emergency Manager was in violation of Michigan law.  *Id.* at 415:13-22.  The Emergency Manager's intent to attempt to override the Pension Clause is not subject to dispute: in response to a Request for Admission, the Emergency Manager has admitted this expressly.  (Dkt. 849, ¶¶ 11-12).

16.     On June 14, 2013 the Emergency Manager presented his "Proposal for Creditors" (the "City Proposal").  (Dkt. 11, Ex. A).  In it, the Emergency Manager stated, among other things, that the City's unfunded pension liability, based on a June 2011 actuarial valuation, was approximately $643 million and that a more recent actuarial analysis showed an unfunded pension liability of $3.5 billion.  (Dkt. 11, Ex. A at 23).  In the June 14 City Proposal, the Emergency Manager further indicated that he intended to cut the City's total ongoing contributions by at least 80%, and that, for retirees, he intended to cut pension contributions **entirely**.  Orr Dep. at 106:19-23; 107:13-108:7.  In addition to stopping on going contributions for retired City employees, the City Proposal cuts off on-going vested pension contributions for active employees in violation of the second paragraph of the Pension Clause.  This paragraph protects retirees as well as active employees because failure to pay active employees means that fewer funds will be available to earn investment returns that can be used to help to pay retirees. *See* MICH. CONST. art. IX § 24.

17.     The Emergency Manager has testified that his June 14 "Proposal to Creditors" was simply a proposal, and not a plan of adjustment as that term is defined under the Bankruptcy Code.  Orr Dep. at 271:18-19.  Nonetheless, after it was made, the Emergency Manager conducted "discussions" concerning it with certain unions and retiree associations.  These discussions were nothing more than one-sided presentations by the City, and were not

- 8 -

negotiations. Indeed, at the time they were taking place, the City had not even made available the information that would have been needed by creditors to understand and evaluate the City Proposal and formulate a response. (Dkt. 509, Ex. 8) (stating access to data room does not provide requested information); (Dkt. 509, Ex. 9) (describing July 10 meeting as a "discussion between the Emergency Manager's advisors and a relatively small group of key stakeholders who may include, the GRS and its advisor only team, high level representatives of up to four (4) non uniform unions, and representatives from the Detroit Retired City Employees Association.").

18. On July 16, 2013 the Emergency Manager submitted a recommendation to the Governor, which recommended a Chapter 9 proceeding to implement his City Proposal. (Dkt. 11, Ex. J). In that letter, the Emergency Manager represented, *inter alia*, that the City had over $18 billion in debt and that, according to an "actuarial analysis," the City's unfunded pension liability was $3.5 billion. *Id.* More generally, the letter presented the City's financial situation as dire, as it unquestionably was. *Id.* Although, the letter did not address whether the City owned assets that could be monetized to alleviate the financial stress, or parts of it, it did state squarely "[t]he City's debt and legacy liabilities must be significantly reduced to permit this reinvestment." *Id.*

19. By letter dated July 18, 2013, the Governor purportedly authorized the Emergency Manager's request to file for bankruptcy under Chapter 9 and did not place any contingencies on such filing. (Dkt. 1 at 16). The Governor's letter did, however, state that the Bankruptcy Code itself provided a contingency on the filing, namely that there be compliance with state law. Orr Dep. at 117:19-118:6.

20. In response to the City Proposal, and anticipating that the Emergency Manager would seek to effectuate his plan to impair pension benefits in Chapter 9, several current and

former employees of the City commenced lawsuits (collectively, the "State Court Lawsuits") in the Michigan Circuit Court seeking both declaratory and injunctive relief.[8]

21.     In one of the State Court Lawsuits, a hearing on a TRO that, if granted, would have prohibited the Emergency Manager from filing for Chapter 9, was scheduled to take place in the afternoon of July 18.  It has been reported that the state expected an adverse decision, and requested that the hearing be delayed until later that day, which it was.  During the period of that delay, and before the TRO hearing began, the Emergency Manager filed the City's bankruptcy petition.  The Emergency Manager has testified that he is aware of no particular reason for the timing of his filing other than to get a jump on the state court - which later that afternoon issued the TRO.  *Id.* at 124:18-126:4.  By the time it did, the bankruptcy petition had already been filed.[9]

---

[8] *See Flowers v. Snyder,* Case No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013) (seeking to enjoin the Governor from authorizing the Emergency Manager to file a Chapter 9 petition and other declaratory relief); *Webster v. Michigan,* Case No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 19, 2013) (seeking to enjoin same and a declaration that PA 436 is unconstitutional in violation of Article IX, Section 24 of the Michigan Constitution); *Gen. Ret. Sys. of Detroit v. Orr,* Case No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) (seeking (i) declarations that PA 436 does not permit the Governor to authorize and the Emergency Manager to take any actions to impair the City's pension obligations under Chapter 9, or in the alternative declarations that PA 436 is unconstitutional, and (ii) enjoining the Emergency Manager from acting pursuant to future unconstitutional authorization by the Governor).

[9] On July 19, 2013, Judge Rosemarie Aquilina issued an Order of Declaratory Judgment finding: (a) PA 436 is unconstitutional and violates the Michigan Constitution to the extent that it permits the Governor to authorize and Emergency Manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; (b) the Governor is prohibited by the Michigan Constitution from authorizing an Emergency Manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of the Michigan Constitution; and (c) by authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, the Governor acted without authority under Michigan law and in violation of the Michigan Constitution.  *Flowers v. Michigan,* Case No. 13-374-CZ (Order of Declaratory Judgment dated July 19, 2013).  Judge Aquilina further issued an injunction (1) directing the Emergency Manager "to immediately withdraw the Chapter 9 petition filed on July 18," and (2) to "not authorize any further Chapter 9 filing which threatens to diminish or impair

81257447\V-3

22.     In connection with his Chapter 9 filing, the Emergency Manager represented, without qualification, that the City has over $18 billion in "accrued obligations" and that the City's current unfunded pension liability is $3.5 billion.  He also represented that, according to a June 2011 actuarial valuation, the City's unfunded pension liability was, as of that date, $643.8 million.  Discovery has revealed that those statements were, at a minimum, misleading and incomplete.  In fact, and as discussed at ¶¶ 58-63 below, the evidence is undisputed that (a) of the asserted approximately $18 billion in debt, at least $6 billion pertains to bonds that were issued by the Detroit Water and Sewer Department ("DWSD"), a self sustaining enterprise which bears financial responsibility for those bonds and is able to pay them, and (b) no current actuarial analysis calculating the City's unfunded pension liability had yet been done, thus the City does not really know what the amount of the unfunded pension liability is or what future cash flows are available to meet it.  It likewise is admitted that, for the $643.8 million unfunded pension liability valuation that was done in 2011, only $250 million of that liability was allocable to the City's General Fund.  A very substantial portion of the balance was allocable to the DWSD - which is responsible for meeting those obligations and is financially capable of so doing.  It is admitted that these same points would apply even if the total unfunded pension liability were even greater.  *See* ¶ 62 below.  None of this, however, was disclosed in the Emergency Manager's bankruptcy filings, nor was it disclosed to creditors during the discussions held prior to that filing.

23.     Further, the City owns numerous assets that can be monetized, some of which are identified in the City Proposal.  Probably the most significant of these is the City-owned art

---

accrued pension benefits."  *Id.*  Notwithstanding, the Emergency Manager has refused to withdraw his bankruptcy filing.  Orr Dep. at 126:22-127:4.

81257447\V-3

maintained at the Detroit Institute of Arts, which according to press reports could well be worth billions of dollars, and is currently being appraised by Christie's. Orr Dep. at 168:25-170:9. The Emergency Manager's bankruptcy filings, however, do not account for this available cash source, which, if monetized, would obviously change the City's financial picture as regards its ability to meet not only pension obligations but obligations in general. *See* Transcript of Deposition of Gaurav Malhotra, dated September 20, 2013, Case No. 13-53846 ("Malhotra Dep.") at 52:13-55-12.[10] This highly significant potential cash source was not discussed during the City's discussions with creditors either.

## ARGUMENT

## I. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT IT WAS AUTHORIZED TO FILE THE PETITION

24. The Emergency Manager's July 16 letter to the Governor requesting authorization to file for Chapter 9 did not explicitly state that the Emergency Manager intended to take actions in contravention of the Pension Clause of the Michigan Constitution. The Governor's July 18 response letter likewise did not explicitly state that the Emergency Manager could violate the Pension Clause.

25. Moreover, the Governor's response letter by its terms (as opposed to the Governor's existing but unstated intent)[11] contemplated that there would be no such violations. In his letter, the Governor wrote that, as he understood it, Section 943(b)(4) of the Bankruptcy Code was a **contingency for the filing of a Chapter 9 petition**. (Dkt. 11, Ex. K at 5; Orr Dep.

---

[10] The Malhotra Dep. is attached as Exhibit B to the Montgomery Dec.

[11] The Governor has admitted that he was aware that the Emergency Manager was taking the position that there had to be significant pension cuts. Transcript of Deposition of Richard Snyder, dated October 9, 2013, Case No. 13-53846 ("Snyder Dep."), at 64:14-18. The Snyder Dep. is attached as Exhibit C to the Montgomery Dec.

81257447\V-3

at 120:7-121:9). The Emergency Manager testified that his understanding was the same. Orr Dep. at 121:10-12. Section 943(b)(4) of the Bankruptcy Code requires that, for a plan to be legally executable, it must not violate state law. Thus, as the Emergency Manager testified, both he and the Governor in fact acknowledged that compliance with state law was a contingency to the City's Chapter 9 filing.

26. Notwithstanding, the evidence is clear that, in filing for Chapter 9, the Emergency Manager, as well as the Governor, intended to affect and violate accrued and vested rights to pension payments that are expressly protected under the Pension Clause. *See* ¶12 above and ¶¶ 54-57 below. Accordingly, in filing the Petition, the Emergency Manager went far beyond what was permitted by the Governor's July 18 letter. Therefore, the filing that the Emergency Manager did make was not authorized and, lacking authorization, was void *ab initio*.

## II. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT IT NEGOTIATED WITH CREDITORS IN GOOD FAITH OR THAT NEGOTIATIONS WERE IMPRACTICABLE

27. Recognizing that "[i]mportant constitutional issues arise when a municipality enters the bankruptcy arena . . . Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities." *In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (quoting H.R. REP. NO. 94-938, at 10 (1976) (Conf. Rep.)). Certain of these limits are set forth in 11 U.S.C. § 109(c)(5). In particular, Section 109(c)(5) requires, as a precondition for eligibility to proceed under Chapter 9, that a municipal debtor affirmatively establish that it:

(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

- 13 -

81257447\V-3

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5). The "negotiation" requirements contained in Section 109(c)(5) are intended to provide "creditor protection" by "insur[ing] that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired." *Cottonwood*, 138 B.R. at 979.

28. In this case, the City does not assert that it obtained agreement from creditors (Section 109(c)(5)(A)) or that it sought to prevent a preferential transfer (Section 109(c)(5)(D)); instead, the City contends that it satisfied the conditions of Section 109(c)(5)(B) and/or (C) because it purports to have attempted to negotiate with its creditors in good faith and, in any event, contends that negotiation with creditors was impracticable. However, as set forth below, the City did not in fact meet the requirements of either of those subsections. Specifically: (i) the City failed to meet the requirements of Section 109(c)(5)(B) because it did not come forward with a plan of adjustment as required by that subsection, and in any event did not engage in good faith negotiations with various unions and retiree associations; and, (ii) the City failed to meet the requirements of Section 109(c)(5)(C) because it did not come forward with a plan of adjustment as required by that subsection as well and has not shown that negotiations with various of the unions and retiree associations were impracticable.

29. The City bears the burden of proof on showing that it meets the standards set forth in Sections 109(c)(5)(B) and (C). *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60,

81257447\V-3

79 (Bankr. D.N.H. 1994). Having failed to meet its burden on eligibility, the City's petition for bankruptcy must be denied.

**A.** **The City Cannot Establish That it Negotiated in Good Faith Under Section 109(c)(5)(B)**

30.     The City asserts that its June 14th City Proposal and certain discussion sessions with creditors prior to the Petition Date are sufficient to constitute good faith negotiations under Section 109(c)(5)(B). However, the City's assertion **ignores** the fundamental point that, in order to come within the scope of Section 109(c)(5)(B) in the first place, the City must show that it put forward a **plan of adjustment** to be negotiated. The evidence is undisputed that the City intends to try to use its Chapter 9 filing as a vehicle to impair protected pension benefits. Indeed, the City has expressly admitted this. (Dkt. 849, ¶¶ 11-12).

31.     At the same time, the evidence also is undisputed that, prior to its filing, the City did not submit an actual plan of adjustment to creditors. The Emergency Manager has admitted that the "proposal to creditors" that it submitted on June 14, 2013 was **not** a plan of adjustment, but was rather a mere "proposal" intended to elicit "feedback" from creditors. Orr Dep. at 271:18-19.

32.     Moreover, even if the City had proposed a plan of adjustment, as more fully set forth in the objections filed by certain Committee members and their affiliated organizations,[12]

---

[12] Certain members of the Committee, including the (i) Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees and (ii) International Union, UAW to the City of Detroit, filed their own objections to the City of Detroit's Eligibility Under Chapter 9 on behalf of their constituents. Other members of the Committee, including (i) Shirley V. Lightsey (Detroit Retired City Employees Association), (ii) Robert A. Shinske (Detroit Fire Fighters Association), (iii) Donald Taylor (Detroit Police and Fire Fighters Association) and (iv) Gail Turner (Detroit Police Members Association) are constituents of organizations that filed objections to the City of Detroit's eligibility. The Committee joins in the submissions of co-objector unions and retiree associations and refers the Court to such submissions for the facts relating to communications between the City and retiree representatives prior to the petition.

81257447\V-3

the City's discussion sessions did not in any event constitute good-faith negotiations because they were merely advisory, did not afford retiree representatives a meaningful opportunity to respond, and in fact presented what discovery has uncovered to be a misleading depiction of both the unfunded pension liability and the funds potentially available to meet it.

### 1. The City Failed to set Forth a Plan of Adjustment as is Required Under Section 109(c)(5)(B)

33. It is the "near-unanimous" consensus of bankruptcy courts that, to meet the requirements of Section 109(c)(5)(B), it is not enough that, prior to filing a bankruptcy petition, a municipality merely "negotiate" in the abstract; rather, Section 109(c)(5)(C) requires that a municipality must, specifically, negotiate over the substantive terms of a proposed "plan of adjustment." *See Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino Coast Recreation and Park Dist.)*, No. 12-cv-02591-JST, 2013 WL 5423788, at *4 (Bankr. N.D. Cal. Sept. 27, 2013) (citing *Sullivan*, 165 B.R. at 79; *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992); *In re N.Y.C. Off-Track Betting Corp.*, 427 B.R. 256, 275-76 (Bankr. S.D.N.Y. 2010)).

34. The conclusion that Section 109(c)(5)(B) requires a municipal debtor to set forth what is, in substance, a plan of adjustment under Section 941 is supported by both Section 109(c)'s text and legislative history. *See Sullivan*, 165 B.R. at 78 (citing *Cottonwood*, 138 B.R. at 974).

35. The requirements of Section 109(c)(5) are appropriately read together in conjunction with Section 109(c)(4), which requires that a municipality must "desire[] to effect a plan to adjust [its] debts" to be eligible for Chapter 9. *Cottonwood*, 138 B.R. at 975 (citing 11 U.S.C. § 109(c)(4)). The term "plan to adjust [a municipality's] debts" is in turn defined in 11 U.S.C. § 941. Read together, "the concept is that the entity must desire to effect a 'plan' within

- 16 -

the meaning of section 941 and must have negotiated in good faith concerning that proposed plan." *Id.*

36.     The legislative history to Section 109(c)(5)(B) requires a municipal debtor to set forth a plan of adjustment as a prerequisite to good faith negotiations. Under federal bankruptcy law as it existed in 1946, in order to be eligible for bankruptcy under the Bankruptcy Act, municipalities had "to come to the court with a 'plan of composition' which had been approved by creditors owning not less than 51 per centum in amount of the securities affected by the plan." *Id.* at 976 (quoting Bankruptcy Act § 84, as amended by 60 Stat. 410 (1946)). In 1976, Congress enacted the predecessor statute to Section 109(c)(5) under the Bankruptcy Act, which modified the requirement that a municipality obtain creditor consent and permitted a municipality to file for bankruptcy if it could show that it had "negotiated in good faith with its creditors and has failed to obtain, *with respect to a plan of adjustment of its debts*, the agreement of creditors holding at least a majority in amount of the claims *of each class* which are claims affected by that plan." Pub. L. No. 94-260, 90 Stat. 315, § 84 (emphasis added). It thus "is clear from the provisions of Public Law 94-260 that a municipality seeking to file a petition under Chapter IX had to have negotiations concerning the 'plan of adjustment' which was to have been the 'plan' to be filed under section 90 of the Act." *Cottonwood*, 138 B.R. at 977. When Section 109(c)(5)(B) was enacted in 1978,[13] Congress expressly indicated that it was intended to follow prior law and that any changes to the text were "stylistic" only.[14] Accordingly, the weight of authority is

---

[13] As set forth above, 11 U.S.C. § 109(c)(5)(B) now sets forth that a debtor can satisfy the negotiation requirement of Section 109(c)(5) if it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter…."

[14] 124 CONG. REC., H 11091 (daily ed. Sept. 28, 1978), at IX-108 (stating with respect to the 1978 changes that Chapter 9 "follows current law with respect to the adjustment of debts of a municipality.

81257447\V-3

consistent with Congress' intent that the current version of Section 109(c)(5)(B) should be construed in the same way as its predecessor, which expressly stated that a debtor must negotiate a "plan of adjustment."

37.     The City admits that it did not propose a plan of adjustment under the Bankruptcy Code and therefore cannot satisfy the "negotiation" requirement of Section 109(c)(5)(B).  For example, the Emergency Manager testified explicitly that the proposal that the City  presented to creditors on June 14, 2013 was merely a "proposal" - not a plan.  The Emergency Manager thus emphasized in his deposition testimony that, as regards the June 14th City Proposal, "we never called this a plan, we never called this a deal, we always called it a proposal."  Orr Dep. at 271:18-19.  The Emergency Manager further testified that the City does not know whether it will ever present the June 14 City Proposal as such to the Bankruptcy Court.  *See id.* at 279:2-6.

38.     The Emergency Manager's concession that at the time of filing the City had only a proposal, and not a plan, is hardly surprising.  With respect to pensions in particular, discovery has established that, notwithstanding the City's avowed and admitted intent to cut both retirees' and active employees' pension payment rights (discussed further at ¶¶ 54-57 below), the City does not know the true amount of the unfunded pension liability or scope of the cash flows it has to work with.  *See* ¶ 59 below.  Likewise, and more generally, as the Emergency Manager presumably understood, it would have been premature to prepare a plan of adjustment when the City lacked information about funds that could be made available to pay its debts through the monetization of existing assets, including, but not limited to, the City-owned art maintained at the Detroit Institute of Arts.  Orr Dep. at 170:10-172:18.

---

Stylistic and minor substantive revisions have been made in order to conform this chapter with other new chapters of the bankruptcy code.")

- 18 -

81257447\V-3

39.     Because the City admittedly did not present a plan of adjustment to creditors prior to its July 18, 2013 bankruptcy filing, the City cannot satisfy the eligibility condition set forth in 11 U.S.C. § 109(c)(5)(B).

### 2.     The City Failed to Negotiate With the Retiree Associations and Unions in Good Faith as Required Under Section 109(c)(5)(B)

40.     Even assuming, *arguendo*, that the City had filed a plan of adjustment (which the Emergency Manager admits it did not), the City still cannot meet its burden under Section 109(c)(5)(B) because the City in all events failed to negotiate in good faith with retiree representatives.  As more fully addressed in papers submitted by co-objector unions and retiree associations, the City's discussions with creditors were non-interactive, one-way presentations. Such a "take it or leave it" approach cannot satisfy Section 109(c)(5)(B).  *See Ellicott*, 150 B.R. at 266.

41.     Moreover, any purported "negotiations" with unions and retiree associations were not in good faith because the City failed to disclose that, *inter alia*:

(a) the City did not know the amount of the unfunded pension liability;

(b) the figures the City cited for high-end actuarial estimates of the unfunded pension liability were in truth founded only on "rough guesses"; and

(c) a substantial percentage of the amount the City was representing to be "unfunded" pension liability was in fact allocable not to the City's general fund but instead to individual City agencies or departments that, themselves, had or could raise sufficient cash to cover the required pension contributions.  *See* ¶¶ 58-63 below.

42.     The City's lack of good faith in its purported negotiations is further demonstrated by its failure to acknowledge, during its discussions with creditors, that the retirees have rights that are clearly and constitutionally protected under Michigan law.  Orr Dep. at 144:10-145:24.

43.     The City's failure to engage in good faith negotiations is shown by the fact that, as the Emergency Manager has admitted, it never provided creditors with information sufficient to

- 19 -

allow them to know the actual monetary impact, on creditors, of the cuts the City stated that it wanted to impose, which is a prerequisite for any meaningful discussion. Orr Dep. at 111:2-24; Transcript of Deposition of Lamont Satchel, dated September 19, 2013 ("Satchel Dep."), Case No. 13-53846, at 88:14-89:18;[15] (Dkt. 509, Ex. 8) (stating access to data room does not provide requested information).

### B. The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C)

44. The City alternatively asserts that good faith negotiations with creditors were not necessary because such negotiations were rendered "impracticable" under section 109(c)(5)(C) by the following four circumstances: (i) the City is a major American city; (ii) the City's creditors are numerous and fragmented; (iii) in many instances, the City was unable to negotiate with representatives with authority to bind creditors; and (iv) the City did not have time to conduct extended creditor negotiations. (Dkt. 14, at 40-53). The City's purported impracticability justifications ignore the clear intent of Congress that Section 109(c)(5)(C) requires that the City both set forth a plan of adjustment and negotiate with impaired creditor classes for which negotiations **are** practicable.[16]

---

[15] The Satchel Dep. is attached as Exhibit D to the Montgomery Dec.

[16] The Committee recognizes that other bankruptcy courts have decided this issue differently. *E.g. Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009); *In re Valley Health Sys.*, 383 B.R. 156, 161-62 (Bankr. C.D. Cal. 2008). None of those decisions are binding upon this Court. Moreover, the Committee submits that its interpretation of Section 109(c)(5)(C) is textually accurate and in accordance with Congress' specific intent as reflected by legislative history.

- 20 -

81257447\V-3

### 1. The City Failed to set Forth a Plan of Adjustment as Required Under Section 109(c)(5)(C)

45.     Like Section 109(c)(5)(B), Section 109(c)(5)(C) requires that a municipal debtor put forward a plan of adjustment under Section 941 of the Bankruptcy Code as a prerequisite to assessing whether good faith negotiations are practicable.

46.     Congress' intent in this respect is clear from Section 109(c)(5)(C)'s legislative history.  As noted above, in 1976, Congress modified the requirement that a municipal debtor must receive 51% creditor consent as a condition of eligibility.  The creditor consent requirement was replaced with the following four prong eligibility test:

> An entity is not eligible for relief under this chapter unless:
>
> …
>
> (1) it has successfully negotiated a plan of adjustment of its debts with creditors holding at least a majority in amount of the claims of each class which are claims affected by that plan;
>
> (2) it has negotiated in good faith with its creditors and has failed to obtain, with respect to a plan of adjustment of its debts, the agreement of creditors holding at least a majority in amount of the claim of each class which are claims affected by that plan;
>
> (3) such negotiation is impracticable; or
>
> (4) it has a reasonable fear that a creditor may attempt to obtain a preference.

Pub. L. No. 94-260, 90 Stat. 315, § 84.  The third prong of the test that "**such** negotiation is impracticable" (emphasis added) necessarily referred back to and incorporated the antecedent good faith negotiation clause in the preceding subsection (2), which specifically contemplated negotiation with each class of claims affected by a **plan of adjustment**.  *See* discussion at ¶ 36 above.  As set forth above, the post-1976 amendments to subsection (3), now codified as Section 109(c)(5)(C), were merely "stylistic" and intended to remain consistent with prior law.  Thus,

- 21 -

81257447\V-3

Congress intended that, in accordance with its predecessors, Section 109(c)(5)(C) requires that a municipal debtor first present a plan of adjustment.

47.     As set forth in ¶¶ 37-38 above, the City admits that it did not propose a plan of adjustment under Section 941 of the Bankruptcy Code.   Therefore, it cannot satisfy the "impracticability" criterion of Section 109(c)(5)(C).

### 2.     The City Also Fails Under Section 109(c)(5)(C) Because it did not Negotiate With Retiree Representatives

48.     Even if a plan of adjustment were not required for an "impracticability" finding under Section 109(c)(5)(C), the City cannot establish "impracticability" because it failed to negotiate with representatives of the retirees and unions, classes of creditors for which negotiation **was** practicable.  Section 109(c)(5)(C) only excuses a debtor from negotiating with those individual classes of impaired creditors for which good faith negotiation would be impracticable. It does not eliminate the requirement that the City negotiate in good faith with classes of creditors with which negotiation **is** practicable.  *See In re City of Wellston*, 42 B.R. 282, 285 (Bankr. E.D. Mo. 1984) (stating that "the Bankruptcy Code anticipates that a municipality will have attempted to negotiate in good faith with its creditors prior to the filing of a Chapter 9 petition"); *see also Vills. at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (eligibility upheld where debtor showed on a class by class basis either good-faith negotiation or impracticability).

49.     Section 109(c)(5)(C)'s legislative history confirms that the eligibility test set forth therein is intended to require a debtor to negotiate in good faith to the extent practicable.  In discussing enactment of Section 109(c), which as set forth above only made "stylistic" changes to the predecessor Bankruptcy Act provision, Senator DeConcini stated, without qualification, that the "creditor protection provision, requiring a municipality to attempt a good faith

- 22 -

81257447\V-3

negotiation with its creditors before a petition is filed, is retained." S. REP. NO. 95-989, at 8-9 (1978).

50.     The City cannot meet its burden under section 109(c)(5)(C) because it cannot show that negotiations with associations representing the retiree class of creditors were impracticable or that negotiations with unions were impracticable. For example, although the City has not put forward a plan of adjustment, the economic rights and interests of retiree claims are clearly distinct from other creditors in that, at a minimum, retiree claims are protected from impairment by the Pension Clause of the Michigan Constitution. MICH. CONST. art. IX § 24. Further, in its course of dealings following the June 14 proposals, the City itself treated retiree organizations and unions separately and distinctly, holding separate meetings and discussions apart from meetings and discussions with other creditors. Recognizing the distinct rights and interests of the retiree creditors in particular, this Court ordered the appointment of an Official Committee of Retirees.

51.     Notwithstanding the City's conclusory assertions, at least two retiree associations, constituting the natural representatives of retiree creditors, stood ready, willing, and able to negotiate with the City. (Dkt. 497 at ¶¶ 69-72). So did the unions. (Dkt. 505, Dkt. 506). Regrettably, the City never pursued or even allowed good faith negotiations with those organizations. (Dkt. 497 at ¶ 71). Having failed to even attempt to negotiate with a ready and willing creditor class, the City cannot now take the bootstrap position that the negotiations called for under 11 U.S.C. § 109(c)(5)(C) were "impracticable."

## III.     THE CITY'S BANKRUPTCY PETITION WAS NOT FILED IN GOOD FAITH AS REQUIRED UNDER 11 U.S.C. § 921(C) AND SHOULD BE DISMISSED

52.     The City's Petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith, and not in compliance with section

- 23 -

109(c)(5). *See* 11 U.S.C. § 921(c).[17] The good faith requirement is intended to "prevent abuse of the bankruptcy process." *Vills. at Castle Rock*, 145 B.R. at 81. Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of another party." *Sullivan,* 165 B.R. at 78. A debtor's "honesty and candor" are factors in determining whether a petition is filed in good faith. *See, e.g.*, *Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*, 243 B.R. 768, 773 (D. Colo. 2000); *see also In re Joyce, Don & Assos. Inc.*, No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008) (court dismissed chapter 11 petition in part due the debtor's vice president's "lack of candor in his testimony"); *In re Panache Dev. Co., Inc.*, 123 B.R. 929, 932-33 (Bankr. S.D. Fla. 1991) (misstatements and omissions in debtor's schedules constituted "cause" for dismissal of Chapter 11 petition). The City bears the burden of demonstrating that it filed its petition in "good faith." *In re City of Bridgeport*, 129 B.R. 332, 334 (Bankr. D. Conn. 1991) (holding that the City failed to meet its burden of proving insolvency).

53.     Here, the City's burden of showing that it filed in good faith cannot be met, both because (a) there can be no finding of good faith when the Emergency Manager, an appointed state official, intentionally sought to use this Chapter 9 filing as a vehicle to take actions that are prohibited by the Pension Clause he swore to uphold and (b) in connection with the filing of the City's Petition, the Emergency Manager made representations that were, at a minimum, misleading and incomplete.

---

[17] While this section of the Bankruptcy Code provides that a court "may" dismiss the petition if the debtor did not file the petition in good faith, many courts have held that this section requires dismissal if the Chapter 9 Petition was not filed in good faith or if the debtor does not meet the requirements of chapter 9. *Valley Health Sys.*, 383 B.R. at 160; *In re Cnty. of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995); *City of Vallejo*, 408 B.R. at 289.

81257447\V-3

**A. The Chapter 9 Petition was not Filed in Good Faith Because the Emergency Manager Intends to use Chapter 9 to Impair Pension Obligations in Violation of his Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment**

54. The Pre-Petition actions of the Emergency Manager show that, at all times since his appointment, the City was on a path careening towards a Chapter 9 filing in order to impair pension benefits and renege on pension payment obligations in violation of the Michigan Constitution. Both the Governor and Emergency Manager evidenced a desire to achieve a result that they knew was unconstitutional as a matter of Michigan law. Even before his appointment as Emergency Manager, Mr. Orr recognized that PA 436, the act pursuant to which he purported to act, was only a "thin veneer of a revision" to PA 4 - which as stated by the Sixth Circuit in *City of Pontiac Retired Emps. Ass'n.* court, had been crafted with the intent of impairing retirement compensation owed to retired municipal employees, 767 F.3d at 769-70, and had been repealed by voter referendum - and was essentially an "end-run" around and "a redo of the prior rejected law." Orr Dep. at 44:17-24; 48:21-49:1, Ex. 4. In a June 13, 2013 interview with the Detroit Free Press, the Emergency Manager admitted that he believes accrued pension benefits could be impaired in a Chapter 9 proceeding:

> Q: You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.

*See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, DETROIT FREE PRESS, (June 14, 2013), http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orrdetroit-emergency-manager-creditors-fiscal-crisis. He further confirmed this view in his June 14, 2013 City Proposal when he specifically stated "there *must be significant cuts in*

- 25 -

*accrued, vested pension amounts for both active and currently retired persons*." (Dkt. 11, Ex A at 116) (emphasis added).

55.     Mr. Orr's deposition testimony again demonstrates that the Emergency Manager intended to use the Chapter 9 filing to avoid the City's constitutional obligations to protect the pension benefits of the City's employees.  He testified that he had read Article IX, Section 24 of the Michigan Constitution prior to becoming Emergency Manager.  Orr Dep. at 69:16-70:2.  Mr. Orr further testified that the language of the Pension Clause is unambiguous and speaks for itself. *Id.* at 51:25-52:19.[18]     After becoming Emergency Manager, he had discussions with the Governor about using a Chapter 9 filing  to "get out of the pensions obligations that the City owed."  Orr Dep. at 84:13-18.  The Emergency Manager admitted that using Chapter 9 to try to "trump" the Pension Clause of the Michigan Constitution in order to impair pension rights and obligations was one of his "objectives" in filing the City's Chapter 9 petition and that it was this specific provision of the Michigan Constitution, and no other provisions of Michigan law, that he was seeking to trump.  *Id.* at 113:13-114:23.  He went on to state that impairing the pension rights referred to in the Pension Clause was, in his view a necessary part of any restructuring plan.  *Id.* at 322:3-7.  He testified that he was unaware of any court decision upholding the use of Chapter 9 to "trump" a state constitution and was aware, at a minimum, that the Michigan Attorney General believed that the course of action he was charting was contrary to Michigan

---

[18] Michigan courts have repeatedly upheld the validity and scope of the Pension Clause.  *See, e.g., Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. Of Shelby*, 438 Mich. 247, 254 (1991) ("Our interpretation of the constitutional framers' intent compelled us to conclude that the Legislature could not diminish or impair accrued financial benefits."); *In re Enrolled Senate Bill 1269*, 389 Mich. 659, 663 (Mich. 1973) ("Under this constitutional limitation [i.e. the Pension Clause] the legislature cannot diminish or impair accrued financial benefits . . . ."); *Seitz v. Probate Judges Ret. Sys.*, 189 Mich. App. 445, 449, 474 N.W.2d 125, 127 (Ct. App. 1991) ("Article 9, § 24 protects those persons covered by a state or local pension or retirement plan from having their benefits reduced.").  "Accrued financial benefits" are "the right to receive certain pension payments on the basis of service performed."  *Shelby Twp. Police and Fire Ret. Bd.*, 438 Mich. at 254 n. 3.

law.  *Id.* at 192:2-8; 415:13-22.  As noted above, in these proceedings the Emergency Manager has expressly admitted his intent to impair the very pension rights that are protected by the Pension Clause.  *See* ¶ 30 above.

56.  The ability to impair pensions rights and payment obligations was both a motivation for, and also a "but for" of, the Chapter 9 filing.  The Emergency Manager testified that he would have had no alternative plan had the Governor made a filing contingent upon the preservation of pension benefits.  *Id.* at 120:1-5.  He did not recall that there was any analysis done of how to impair pensions outside a bankruptcy context and purely as a matter of state law. *Id.* at 87:8-11. As of June 14, other than a consensual reduction, the City had not identified any other manner of implementing the Emergency Manager's proposal to cut pension benefits.  *Id.* at 112:21-113:2.  As evident from his testimony, the Emergency Manager maintained his belief that there would have to be "significant cuts" in pension benefits both as of the petition and thereafter:

> Q: At the time the City filed for bankruptcy, was it your view that there had to be significant cuts in accrued vested pension amounts for both active and currently retired person?
>
> A: Yes.
>
> Q: And is it still -- still your view today?
>
> A: Yes, based upon our analysis, yes.

*Id.* at 247:1-7.  The City has stated that it wants to cease pension contributions for current retirees.  *Id.* at 128:9-11; 155:11-15.  It also wants to substantially cut the City's Constitutionally-enshrined obligation to make ongoing pension contributions for active employees.  Orr Dep. at 106:19-:23; 107:13-108:7.

81257447\V-3

57.     The Emergency Manager has also admitted that state court proceedings challenging the constitutionality of PA 436 were part of the motivation for the Chapter 9 filing. During his deposition, the Emergency Manager explained that to the "best of [his] knowledge," there was no particular reason that the Chapter 9 petition was filed in the afternoon of July 18th, other than to file before the commencement of a TRO hearing being held in the Michigan Circuit Court in which the legitimacy of PA 436 was being challenged. *Id.* at 125:24-127:4.  He acknowledged that petition was made at that time in order to get a jump on the expected decision by the state court. *Id.*  Mr. Orr further admitted that notwithstanding the state court ruling that PA 436 is unconstitutional, he has not taken any steps to withdraw the bankruptcy petition from filing. *Id.*

### B.     The Chapter 9 Petition was not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were, At a Minimum, Misleading and Incomplete

58.     In his Declaration in support of the Chapter 9 Petition, the Emergency Manager states that the City has approximately "$3.5 billion in underfunding pension liabilities." (Dkt. 11 at 6 n. 3.)  The Emergency Manager reiterated that the City maintained approximately $3.5 billion in "unfunded liability" in discussions with City officials, even going so far as to say that the estimate had been shown through an actuarial valuation.  Transcript of Deposition of David Bing, dated October 14, 2013, Case No. 13-53846 ("Bing Dep."), at 68:4-9.[19]  These statements were consistent with the Emergency Manager's prior representation to the Governor, made in the Emergency Manager's letter of July 16, 2013, also attached to his Declaration, that the City has "$3.5 billion in underfunding pension liabilities based on the most recent actuarial analysis." (Dkt. 11, Ex. J at 2.)  Similar statements have been made to this Court in pleadings filed with this

---

[19] The Bing Dep. is attached as Exhibit E to the Montgomery Dec.

81257447\V-3

Court.  (Dkt. 14 at 2).   In his June 14, 2013 proposal to creditors, attached to his Declaration, the Emergency Manager stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons."  (Dkt. 11, Ex. A at 109.)

59.     Deposition discovery has revealed that the Emergency Manager's representations regarding the magnitude of the City's unfunded liability, and its ability to meet that liability, were, at a minimum, misleading and incomplete.   Charles Moore, a principal of Conway MacKenzie, Inc., the City's restructuring advisor, and a 30(b)(6) witness for the City, has testified that, contrary to the Emergency Manager's representations, there has been no reliable actuarial analysis placing the City's unfunded pension liability at $3.5 billion.  Transcript of Deposition of Charles Moore, dated September 18, 2013, Case No. 13-53846 ("Moore Dep."), at 61:18-62:7.[20]   In fact, Mr. Moore testified that, as of his September 18, 2013 deposition, the actuarial firm retained by the City (Milliman) had not completed its actuarial analysis of the unfunded pension liabilities and did not even have the information to undertake such an analysis. *Id.*  Mr. Moore further testified that, for this reason, the City did not know the actual size of the unfunded pension liability.   *Id.* at 150:24-151:24.  Mr. Moore continued that the City did not know what assets were available to pay pensions.  *Id.*  Further, Charles Bowen of Milliman, the City's actuary, testified that the figures the City has cited for the high-end estimates of unfunded pension liability were predicated only on "rough guesses."  Transcript of Deposition of Glenn Bowen, dated September 24, 2013, Case No. 13-53846 ("Bowen Dep."), at 146:8-18.[21] Similarly, State Treasurer Andrew Dillon testified in his deposition that the actual size of the underfunded pension liability was not known.  Transcript of Deposition of Andrew Dillon, dated

---

[20] The Moore Dep. is attached as Exhibit F to the Montgomery Dec.
[21] The Bowen Dep. is attached as Exhibit G to the Montgomery Dec.

81257447\V-3

October 10, 2013, Case No. 13-53846 ("Dillon Dep."), at 68:23-71:12; 94:11-95-19; 119:1-120:14.[22]

60.     Along similar lines, in his Declaration in support of the Petition, the Emergency Manager represented that the City's total liability exceeded $18 billion, but omitted to state that approximately $6 billion of that was allocable to DWSD bonds for which the DWSD was responsible and that the obligations on the bonds were paid by the DWSD from its own, separate funds.  Bing Dep. at 60:11-61:8.

61.     The Emergency Manager has also admitted that the City has numerous assets that could be monetized to provide additional cash and that he was exploring ways to achieve monetization.[23]  Yet, none of these potential cash infusions were factored into the City's assessment of whether it could meet is unfunded pension liabilities (which would not be payable until some time in the future), or indeed its liabilities in general.  Orr Dep. at 166:12-24; Malhotra Dep. at 52:13-55:12.

62.     In addition, in his June 14 Creditor Proposal, attached to his Declaration filed with the Court, the Emergency Manager represented that the unfunded pension liability calculated under the actuarial valuation done in 2011 (which the City believes was understated) was approximately $644 million. (Dkt. 11, Ex. A at 23.)  However, during his deposition, Mr. Orr testified that only $250 million of that $644 million total was allocable to the City and its general fund and that the approximately $400 million balance was allocable to other City funds or Departments, such as the DWSD.  Orr Dep. at 369:12-375:7.  The Emergency Manager

_____

[22] The Dillon Dep. is attached as Exhibit H to the Montgomery Dec.

[23] These assets include, but are not  limited to, the City-owned art that is maintained at the Detroit Institute of Arts, which, according to press reports, could be worth billions of dollars.  Orr Dep. at 170: 10-21 (art collection of Detroit Institute of Arts); 174:10-20 (Detroit Water & Sewer Department) ("DWSD"); 183:19-184:10 (City-owned land).

- 30 -

81257447\V-3

further testified that the DWSD in fact bears financial responsibility for a substantial portion of the $644 million total (which the Emergency Manager testified at his deposition was on the order of 62%), and that the DWSD, which is run as an independent department, is financially sound and has the ability to pay its share of the pension obligations.   Orr Dep. at 377:21-378:22; 479:13-21.[24]   The Emergency Manager further testified that, if the unfunded pension liability were subsequently determined to be more than $644 million, including as much as $3.5 billion, these same principles - that DWSD would be responsible for its ratable share of the increased amount - would continue to apply.  *Id.* at 377:21- 378:22.

63.     As a result, the facts demonstrate that a significant portion of the City's asserted unfunded pension liability is allocable to a source that has the financial wherewithal to meet it. Yet, none of this information was disclosed in the City's Petition or made known to the City's creditors, including the retirees whose pension rights the City is threatening to eliminate entirely. In filing its Petition, the City failed to provide a complete or accurate picture of its financial condition.[25]   Worse yet, it made representations that were, at a minimum, misleading and incomplete.  The City has not acted with good faith, and its  petition must therefore be dismissed.

---

[24] Mr. Orr further testified that "some portion" of total unfunded other post-employment benefits might be allocable to DWSD, but he did not recall the percentage.  Orr Dep. at 480:10-481:22.

[25] The City also failed to disclose that the Emergency Manager had failed to pursue additional revenue sources that had been identified by Mayor Bing prior to the appointment of the Emergency Manager and that were still available following such appointment and had chosen not to pursue, or delayed, other restructuring initiatives that would have helped improve the City's financial situation.  *See generally* Bing Dep. at 48:16-51:25; Bing Dep., Ex. 5.

81257447\V-3

## CONCLUSION

Wherefore, for the above reasons, the City of Detroit, Michigan's Chapter 9 petition should be dismissed and the Committee afforded all further relief that is just and equitable.

Dated: October 17, 2013
        New York, New York

| | | |
|---|---|---|
| Carole Neville | Sam J. Alberts | By: /s/ Claude D. Montgomery |
| DENTONS US LLP | DENTONS US LLP | Claude D. Montgomery (P29212) |
| 1221 Avenue of the Americas | 1301 K. Street, NW | DENTONS US LLP |
| New York, New York 10020 | Suite 600, East Tower | 1221 Avenue of the Americas |
| Tel:    (212) 768-6700 | Washington, DC 2005-3364 | New York, New York 10020 |
| Fax:    (212) 768-6800 | Tel:    (202) 408-6400 | Tel:    (212) 768-6700 |
| carole.neville@dentons.com | Fax:    (202) 408-6399 | Fax:    (212) 768-6800 |
| | sam.alberts@dentons.com | claude.montgomery@dentons.com |

Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hal@bwst-law.com

*Counsel for the Official Committee of Retirees*

## CERTIFICATE OF SERVICE

I, Claude D. Montgomery, hereby certify that service of the Supplemental Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code was filed and served via the Court's electronic case filing and noticing system on October 17, 2013.

/s/ Claude D. Montgomery

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

```
-------------------------------------------------------------- x
                                                               :
In re                                                          :
                                                               :    Chapter  9
                                                               :
                                                               :    Case No. 13-53846
City of Detroit, Michigan,                                     :
                                                               :    Hon. Steven W. Rhodes
                         Debtor.                               :
                                                               :
-------------------------------------------------------------- x
```

**DECLARATION OF CLAUDE D. MONTGOMERY, ESQ. IN SUPPORT OF THE
PRE-TRIAL BRIEF OF THE OFFICIAL COMMITTEE OF RETIREES
REGARDING THE CITY OF DETROIT'S ELIGIBILITY TO BE
A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

I, Claude D. Montgomery, Esq., hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.     I am a Partner at Dentons US LLP ("Dentons") and am admitted to practice in the Courts of the State of Michigan.

2.     Dentons represents the Official Committee of Retirees (the "Committee").  In an order entered on August 2, 2013, the Bankruptcy Court directed the appointment of the Committee in the bankruptcy proceeding, the members of which were appointed on August 22, 2013.  (Dkt. 279).

3.     On July 19, 2013, the Debtor filed a Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration ("Eligibility Motion").  (Dkt. 18).

81276541\V-1

13-53846-tjt   Doc 2302   Filed 12/27/13   Entered 12/27/13 20:04:09   Page 61 of 175
13-53846-swr   Doc 1224   Filed 10/17/13   Entered 10/17/13 20:40:08   Page 63 of 599

4.      On August 2, 2013, the Bankruptcy Court entered an Order establishing Dates and Deadlines, including an October 17, 2013 deadline to file pre-trial briefs. (Dkt. 280).

5.      On August 26, 2013, the Bankruptcy Court entered an Order setting forth a discovery schedule with respect to the Eligibility Motion and setting a trial on any objections to the City's eligibility for Chapter 9 relief (the "Eligibility Objections") for October 23, 2013.  (Dkt. 296).

6.      On September 10, 2013, the Committee filed an Objection to the Eligibility of the City to Be a Debtor under Chapter 9 of the Bankruptcy Code (the "Committee Eligibility Objection").  (Dkt. 805).

7.      On September 12, 2013, the Bankruptcy Court entered an Order establishing hearing dates of October 15 and 16 for Eligibility Objections that raise only legal issues. (Dkt. 821).

8.      On October 11, 2013, the Committee filed its Supplemental Objection to Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code.  (Dkt. 1174).

9.      Pursuant to the Bankruptcy Court's order of August 2, 2013, the Committee is submitting its Pre-Trial Brief Regarding the City of Detroit's Eligibility to be a Debtor Under Chapter 9 of the Bankruptcy Code (the "Pre-Trial Brief") in order to summarize what it expects to show at the October 23, 2013 hearing concerning the eligibility of the City of Detroit to be a debtor.

10.     Attached hereto as Exhibit A in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcripts for the deposition of Kevyn Orr, taken on September 16, 2013 and October 4, 2013, together with Exhibit 4 to the deposition.

11.     Attached hereto as Exhibit B in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Gaurav Malhotra, taken on September 20, 2013.

12.     Attached hereto as Exhibit C in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Richard Snyder, taken on October 9, 2013.

13.     Attached hereto as Exhibit D in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Lamont Satchel, taken on September 19, 2013.

14.     Attached hereto as Exhibit E in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of David Bing, taken on October 14, 2013, together with Exhibit 5 to the deposition.

15.     Attached hereto as Exhibit F in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Charles Moore, taken on September 18, 2013.

16.     Attached hereto as Exhibit G in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Glenn Bowen, taken on September 24, 2013.

17.     Attached hereto as Exhibit H in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Andrew Dillon, taken on October 10, 2013.

81276541\V-1

13-53846-tjt   Doc 2302-17   Filed 12/27/13   Entered 12/27/13 20:41:09   Page 63 of 175
13-53846-swr   Doc 2302   Filed 12/17/13   Entered 12/17/13 20:41:09   Page 63 of 601

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: October 17, 2013
       New York, New York

/s/ Claude D. Montgomery

Claude D. Montgomery (P29212)
1221 Avenue of the Americas
New York, New York  10020
Tel:  (212) 768-6700
Fax: (212) 768-6800
Email: claude.montgomery@dentons.com

*Counsel for the Official Committee of
Retirees*

# EXHIBIT A

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## CITY OF DETROIT, MICHIGAN

Case NO. 13-53846

---

# KEVYN ORR

*September 16, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

1  A.  Yes.

2  Q.  -- you're talking again -- at this point in time had

3      you decided whether to accept the Emergency Manager

4      job?  This is later in the afternoon on January 31.

5  A.  No, I didn't.  I -- no, there was no time in the

6      initial two days that this came up that I decided to

7      accept the Emergency Manager job.

8  Q.  Okay.  And in this email you're giving some thoughts

9      on some of the issues that pertain to that; aren't

10     you?

11 A.  Yes.

12 Q.  And in particular you start talking about the

13     legislation that pertains to the EM position.  You

14     said you went back and reviewed various laws; do you

15     see that?

16 A.  Yes.

17 Q.  And you talked about some laws in DC control board and

18     then you go on in the last sentence -- or I'm sorry,

19     the second to the last sentence to write, and I quote,

20     "By contrast Michigan's new EM law is a clear

21     end-around the prior initiative that was rejected by

22     the voters in November."

23              You wrote that?

24 A.  Yes.

25 Q.  And by the new EM law, you were referring to PA 436?


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1  Q.  And you go on then in the -- and you were -- I guess

2      -- were you aware that for either the case of the

3      Chapter 9 being filed with the governor's approval

4      without the Emergency Manager being involved or the

5      Chapter 9 filing with the Emergency Manager, that in

6      either case PA 436 did not require the governor to

7      impose any contingencies on the bankruptcy filing?

8           MR. SHUMAKER:  Objection, calls for legal

9      conclusion.

10 A.  I don't recall if I had done a deep dive in that

11     question at this time.  Please understand, counselor,

12     at this time I was doing a preliminary review of the

13     statute based upon I believe some published reports

14     and a look at it online.  I may have gotten to that

15     point, I just don't recall if at this time during that

16     day I had.

17 Q.  Okay.

18 A.  But I did at some point.

19 Q.  But you certainly knew that ultimately?

20 A.  At some point I did, sure.

21 Q.  Obviously.  And then you go on in the next sentence in

22     this email to say, "So although the new law provides

23     the thin veneer of a revision, it is essentially a

24     redo of the prior rejected law and appears to merely

25     adopt the conditions necessary for Chapter 9 filing."



```
1    A.   Yes, I said that.

2    Q.   And were you writing truthfully when you said that?

3    A.   Yeah, and I think the balance of the paragraph, the

4         news reports state that opponents of the prior law are

5         already lining up to challenge this law.  So as I just

6         testified, this was my preliminary analysis based upon

7         a number of sources, some of them were the news

8         reports.

9    Q.   And you were aware in fact that as you just indicated

10        that there were either challenges already made or that

11        were going to be made to the law?

12   A.   I was not aware that there were challenges already

13        made.  I was aware the news report states that

14        opponents of the prior law were already lining up to

15        challenge the law.

16   Q.   And did you have any understanding at this time as to

17        what those grounds of challenge were or may be?

18   A.   No.  As I said, this was, you know, within the span of

19        a day when this was going back and forth about what it

20        may require, I was beginning to familiarize myself to

21        some degree with the statute.

22   Q.   Your email goes on to say you're going to speak with

23        Baird in a few minutes and see what his thinking is.

24   A.   Yes.

25   Q.   Did you speak with Mr. Baird that day?
```



1   |   potential ground for challenge, was that it allowed

2   |   the governor to authorize a bankruptcy filing without

3   |   imposing a condition that would prevent pension

4   |   obligations from being impaired?

5   A.  I don't know if I was aware of that issue at this

6   |   time, no.

7   Q.  Well, were you aware -- you became aware of it if not

8   |   then at some point shortly thereafter; correct?

9   A.  Yeah, let me say this.  There was no broad based

10  |   concern at this point about with what the authority

11  |   was with regards to pensions so any sort of

12  |   insinuation that that was the focus at this point is

13  |   just inaccurate.  That wasn't true.  This as I said

14  |   before was a very cursory and initial sort of review

15  |   of what I was being asked to do so when I had a

16  |   discussion with Mr. Baird later I would have some

17  |   information and that's what I gleaned based upon a few

18  |   hours since apparently I got the call -- I was

19  |   informed that day, that morning or the day before to

20  |   the time I was going to have a call that afternoon.

21  Q.  But I take it at some point in time you became aware

22  |   that Article 9, Section 24 of the Michigan

23  |   Constitution protects pension benefits from being

24  |   diminished or impaired?

25  A.  I believe at some point in time I became aware that



1      Article 9, Section 24 purports to protect pensions and

2      benefits in certain circumstances, yes.

3             MR. ULLMAN: Let's mark Exhibit 5.

4             (Marked Exhibit No. 5.)

5 Q.   Exhibit 5 is just a printout of Article 9, Section 24

6      of the Michigan Constitution. Do you recognize it as

7      such?

8 A.   I mean, the document speaks for itself, but that

9      appears to be what it is, yes.

10 Q.   Okay, and I think your last answer you said that in

11      your view Section 24, Article 9 purports to protect

12      pensions and benefits in certain circumstances.

13 A.   Yes.

14 Q.   And are you contending that the words of Article 9,

15      Section 24 means something other than what they say?

16             MR. SHUMAKER: Objection, calls for legal

17      conclusion.

18 A.   Yeah, I -- here again, I think the document speaks for

19      itself. I think that my response to that issue is

20      throughout the arc of my career, whether in federal

21      government or in private practice at the Chrysler

22      case, there have been many state laws, some of them

23      quite sacrosanct, that have been abrogated by federal

24      law, not just bankruptcy law. At the RTC we preempted

25      state, New York state, rent control litigation, law;



1    we preempted California state escheat law; we

2    preempted -- and that was the model for 50s.  In

3    Chrysler, we preempted 50 states have dealer franchise

4    laws that were preempted.  So when I said I recognize

5    this, there are federal laws that preempt state laws.

6            MR. ULLMAN:  I'm going to move to strike as

7    nonresponsive.

8  Q.  Mr. Orr, I appreciate your perhaps trying to be

9    helpful, but my question was really very limited and I

10    would appreciate it if you could just answer it.

11            MR. ULLMAN:  Could I have my question read

12    back, please?

13            (Record read back as requested.)

14  A.  I think that calls for a legal conclusion and I

15    contend that they speak for themselves.

16  Q.  Now, you made mention in your -- I think when you were

17    giving your prior response, you made some allusion to

18    federal law.

19  A.  Uh-huh.

20  Q.  Is there any question in your mind that apart from

21    anything that may come into play under federal law,

22    that the constitution of Michigan, Article 9, Section

23    24, prohibits pension rights from being diminished or

24    impaired?

25            MR. SHUMAKER:  Objection, calls for legal



1    conclusion.

2  A.  The document, as I said, speaks for itself.  Certainly

3      I think I've said before that parties can negotiate a

4      resolution of contracts.

5  Q.  That's -- that's not my question.

6              MR. ULLMAN:  Could you -- can you read my

7      question back?  If there's anything about it you don't

8      understand, I would be glad to rephrase.

9              THE WITNESS:  Uh-huh.

10             (Record read back as requested.)

11             MR. SHUMAKER:  Objection to form, calls for

12     legal conclusion.  You can answer.

13 A.  Yeah, I think it does call for legal conclusion, but

14     as I said, contractual obligations can be negotiated

15     at any time.

16 Q.  Let me rephrase it.

17             You understand what the constitution is

18     talking about is diminishing or impairing is

19     nonconsensual; correct?

20             MR. SHUMAKER:  Objection, calls for legal

21     conclusion.

22 Q.  Let me rephrase it so there can't be any ambiguity.

23     Clearly parties can if they so choose change their

24     contract; rights?

25 A.  Yes.



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   Q.   Is there any question in your mind that Article 9,

 2        Section 24 of the Michigan Constitution protects

 3        pension rights from being diminished or impaired if

 4        the beneficiaries of those rights do not agree

 5        consensually to such diminishment or impairment?

 6             MR. SHUMAKER:  Objection, calls for legal

 7        conclusion.

 8   A.   I think I've answered that before.  I think there's

 9        certain federal laws that allow for preemption --

10   Q.   I'm asking about independent of any federal law.  The

11        Michigan Constitution on its own, apart from any

12        overlay that you say may apply from federal law, is

13        there any question that the Michigan Constitution,

14        assuming that the beneficiaries of the retirement

15        obligations don't consent, any question that in that

16        circumstance the Michigan Constitution prohibits

17        pension rights from being diminished or impaired?

18             MR. SHUMAKER:  Objection, calls for legal

19        conclusion.

20   A.   Here again, Mr. Ullman, you're asking me -- I'm a fact

21        30(b)(6) witness, you're asking me for a legal

22        conclusion about what the statute says.  I'll say that

23        the statute speaks for itself and I certainly have

24        heard that people take that position.

25   Q.   Okay, and I'm asking you -- I'm not asking you to give
```



ESQUIRE

*800.211.DEPO (3376)*
*EsquireSolutions.com*

1       wasn't.  It was the Emergency Manager's duties writ

2       large.

3  Q.  And when you say you were pouring over the law, you

4       yourself were doing legal analysis, reading various

5       laws; is that right?

6  A.  Yes, I was trying to get background information, yes.

7  Q.  And as part of that background information did you

8       read Article 9, Section 24 of the Michigan

9       Constitution?

10  A.  I may have.

11  Q.  Is there any question in your mind that you didn't?

12  A.  I -- if you have a document to refresh my

13       recollection, I'm happy to look at it.  Sitting here

14       on this day on February 20th, I don't recall whether

15       or not I read that article of the constitution.

16  Q.  There's no question that at some point after February

17       20th you read Article 9, Section 24 of the Michigan

18       Constitution; correct?

19  A.  My testimony is it may have been before or after the

20       20th.  I don't recall whether I did that sitting here

21       today.

22  Q.  Okay, but it was either one or the other, but you

23       certainly have read it?

24  A.  Yes, I've read it.  I read it today.

25  Q.  And you read it before you became Emergency Manager;



13-53846-tjt   Doc 2309-17   Filed 12/28/13   Entered 12/28/13 09:40:39   Page 75 of 66
13-53846-swr   Doc 1242-17   Filed 10/17/13   Entered 10/17/13 20:01:09   Page 75 of 613
175

 1    |      didn't you?
 2    | A.   Yes.
 3    | Q.   One other question on this document actually.  As you
 4    |      look at page 460, at the bottom there's a February 21
 5    |      email.
 6    | A.   Yes.
 7    | Q.   And it refers to point 8 of the attachment.  This
 8    |      again has to do with the mayor's existing executive
 9    |      team; right?
10    | A.   Yes.
11    | Q.   And in this time -- this is from Mr. Baird again;
12    |      right?
13    | A.   Yes.
14    | Q.   And he's really explicit.  He says, other than a few
15    |      grammatical nits, and some more language around point
16    |      8, so we can manage expectations if Kevyn needs to
17    |      make some personnel changes.  So he's clearly
18    |      referring here to you making personnel changes that
19    |      could affect the mayor's existing executive team;
20    |      isn't he?
21    | A.   Yes, this wasn't written to me, but I'll read it.  I
22    |      mean to myself.  Yes, document speaks for itself, but
23    |      that seems to say that.
24    | Q.   Isn't it clear at this point that it was envisioned
25    |      and understood that Kevyn Orr, you Mr. Orr, were in



*800.211.DEPO (3376)*
*EsquireSolutions.com*

1    that right?

2  A.  I believe so.

3  Q.  And did the governor share that view with you?

4  A.  No.

5  Q.  He thought that the pension and OPEB obligations were

6      not impediments to Detroit's fiscal health?

7  A.  No, the governor -- the only discussion I had with the

8      governor was at a very high level about the dire

9      straits of the City and the need for some -- it was

10     actually the dire straits of the City and the need for

11     some reform.  There was no specific discussion about

12     pension or OPEB.

13  Q.  Now, at some point after you became the Emergency

14     Manager, did you have discussions with the governor

15     about a Chapter 9 filing to among other things get out

16     of the pension obligations that the City owed?

17          MR. SHUMAKER:  Object to form.

18  A.  Yes, I believe so.

19  Q.  And when did those take place?

20  A.  Since becoming Emergency Manager on the 25th I've had

21     regular conversations with the governor.  Typically

22     weekly.  I don't recall the specific conversation when

23     they came up.  I will say that it wasn't within our

24     initial conversations.

25  Q.  Okay.  And we're talking -- these conversations, are



800.211.DEPO (3376)
EsquireSolutions.com

1  A.  I'm taking my time because I'm trying to remember.

2      There were a number of different analyses and briefing

3      papers and -- that would come across the desk and I'm

4      not sure any of them focused solely on state law.

5  Q.  Okay.  And what else -- what other law did they focus

6      on if not solely state law?

7  A.  They may have focused on state law and federal law.

8  Q.  So you don't recall if there was any analysis that

9      just looked at state law?

10 A.  No, sitting here today, I don't recall.  There may

11     have been, but I don't recall.

12 Q.  And were you aware prior to the bankruptcy filing that

13     under state law alone the pension obligations could

14     not be diminished or impaired?

15 A.  This is the discussion we had about five to ten

16     minutes ago about whether or not state law permitted

17     it and I will go back to my answer with that.  It

18     seems to suggest a legal conclusion based upon what

19     the statute 436 provides and the intent of the

20     legislature.

21 Q.  Let me ask you a different question.

22              Is there anything in PA 436 that allows in

23     your view the Emergency Manager to impact or adversely

24     affect pension rights in the absence of a Chapter 9

25     bankruptcy filing?



800.211.DEPO (3376)
EsquireSolutions.com

1   A.   Defined contribution.

2   Q.   Defined contribution?

3   A.   Uh-huh.

4   Q.   Now, the existing -- the pension plan that exists

5        under the steady state projections, is that defined

6        contribution plan?

7   A.   That would be switched over.  No, no, defined -- the

8        steady state scenario?

9   Q.   That's a defined benefit?

10  A.   That's a defined benefit plan.

11  Q.   So what you're projecting here is a switch over to a

12       defined contribution program and for 2014 we see the

13       number for the city's contributions is now

14       25.4 million; is that right?

15  A.   Yes, that's -- yes.

16  Q.   And that compares with the -- what was the figure?

17       199.5 million that we saw under the as is?

18  A.   Yes, projections.

19  Q.   Yes.  So the diminution it looks just on the rough

20       math that the City's pension contributions under the

21       restructuring are being cut by about 80 percent; is

22       that right?

23  A.   Under 75 million, 80 percent, sure, roughly.

24  Q.   And for health, the health benefits, which we saw that

25       were, what, under the current scenario something like



800.211.DEPO (3376)
EsquireSolutions.com

1          147 million?

2    A.    Retiree health, yes.

3    Q.    For retiree health?

4    A.    Uh-huh.

5    Q.    Under this proposal, the restructuring proposal, I

6          don't see any line entry for the retiree health

7          benefits.

8    A.    Yes.

9    Q.    So they're essentially being cut; correct?

10   A.    Well, the obligation is being provided with a

11         different program, but yes, the City would not have an

12         obligation going forward of that magnitude.

13   Q.    And going back to the pension contributions, you know,

14         we had talked about a diminution on the order of 80

15         percent from the 199.5 figure, and I think it's the

16         City's contention that the 199.5 figure is really

17         understated, right, because the obligations are really

18         a lot higher?

19   A.    I think we think the liabilities -- this is the steady

20         state projection on 91.  I think we think the

21         liabilities are higher because what we represented on

22         the second page of 98 is the estimated undersecured

23         claims for out years as opposed to a ten-year

24         projection.

25   Q.    Right.  And if the liabilities were really greater



1     than the diminution from the steady state to the

2     restructuring scenario would be greater than 80

3     percent; wouldn't it?

4  A.  It might be.  I mean, we've said 80 percent.  I mean,

5     199.5 less 25, you know, you just roughly cut those in

6     half, that's a 12 and 1/2 percent, but you know, 88

7     percent, somewhere in that neighborhood.

8  Q.  Now, the people who are -- the retirees who are

9     getting impacted from these -- by these cuts in the

10     proposed restructuring, these are who?  These are men

11     and women who previously served the City and are now

12     retired?

13  A.  Yeah, they're two pension plans: one for General

14     services and the other for Police and Fire.

15  Q.  And these individuals that serve the City in both

16     public safety and nonpublic safety capacities?

17  A.  Uniform and nonuniform, yes.

18  Q.  And were these -- I guess the issue comes because the

19     pension liabilities and the healthcare benefits that

20     may be due are not -- there's not sufficient funding

21     that was put into them; correct?

22  A.  Well, the healthcare benefit has no funding, the

23     $5.7 billion.  And the pension underfunding has our

24     estimate of the level of underfunding, the unfunded

25     portion of the pensions, in them.  There are assets



| 1 | | propose to reduce would get a share of the note, yes. |
| 2 | Q. | And is there any way to tell from this document how |
| 3 | | much any individual retiree would ultimately get if |
| 4 | | the notes go ahead and are issued? |
| 5 | A. | Not from this document. |
| 6 | Q. | There's no way to tell how much cash value any retiree |
| 7 | | would receive under this plan that's laid out here |
| 8 | | where they get notes? |
| 9 | A. | It is my understanding that there are a number of |
| 10 | | different plans and benefits and factors that go into |
| 11 | | that determination for any specific retiree. |
| 12 | Q. | Okay. Now, Chapter 9 is not referred to in this |
| 13 | | restructuring plan; is it? |
| 14 | A. | I don't think we did. |
| 15 | Q. | And I think you indicated before that if this was not |
| 16 | | agreed to by the various constituencies, then the only |
| 17 | | way to implement this restructuring plan would be, if |
| 18 | | at all, would be to try to go ahead and do that |
| 19 | | through Chapter 9; is that right? |
| 20 | A. | I think what I said before, I think you're referring |
| 21 | | to the May 12th 45-day operating plan, but I think |
| 22 | | what I said before on June 10th and June 14th is we |
| 23 | | needed to engage in a dialogue, because we didn't want |
| 24 | | to go to Chapter 9. |
| 25 | | MR. ULLMAN: That wasn't my question. Can |



ESQUIRE

*800.211.DEPO (3376)*
*EsquireSolutions.com*

1   |   you read my question back?

2   |                (Record read back as requested.)

3   | A.  Yeah, I indicated that here today.

4   | Q.  I'll just ask the question again.  As you understood

5   |      it, if the proposal here were not agreed to or some

6   |      other consensual resolution was not reached, was there

7   |      any way for you as Emergency Manager to implement this

8   |      plan other than to try to get it put in place through

9   |      a Chapter 9 filing?

10  | A.  Subject to the discussion that we've had a couple of

11  |      times earlier today, what I have said is that Chapter

12  |      9 is an option to achieve these goals.

13  | Q.  And were you at this point aware of any option to

14  |      achieve these goals other than Chapter 9 if a

15  |      consensual resolution was not reached?

16  | A.  There were various briefing memos and discussions, but

17  |      given the time frames that we were under, and I said

18  |      this at the June 10th meeting and I said it at the

19  |      June 14th meeting and I want to be responsive, that if

20  |      we didn't, Chapter 9 was an alternative.

21  | Q.  And I don't think that's fully responsive at this

22  |      point.  Had you identified anything else as of June 14

23  |      to get this plan implemented, any other course,

24  |      putting aside consensual resolution, other than a

25  |      chapter 9 file?



800.211.DEPO (3376)
EsquireSolutions.com

1  A.  Nothing that would give us an orderly and

2      comprehensive resolution of these problems.

3  Q.  Now, you gave an interview, that I'm sure you're

4      familiar with, with the Detroit Free Press on or

5      around June 14th.  Do you remember it?  I'll just tell

6      you what -- I believe you said -- and I'm sure you

7      remember this one and you can tell me.  If not, I have

8      the quote.

9  A.  Yeah, you can give me the quote.  There's so many

10     interviews, but I'll trust your quote.

11 Q.  Okay.

12 A.  Okay.

13 Q.  This is the quotation.  Question, you said in this

14     report, referring to the June 14th proposal, that you

15     don't believe there is an obligation under our state

16     constitution to pay pensions if the City can't afford

17     it?  Answer, the reason we said it that way is to

18     quantify the bankruptcy question.  We think federal

19     supremacy trumps state law.

20 A.  Yes.

21 Q.  You don't deny making that statement?

22 A.  No, I think I've said that several times.

23 Q.  And the state law you were referring to that you

24     referred to as being trumped was Article 9, Section 24

25     of the state constitution; is that right?



```
 1   A.   I believe so.
 2   Q.   There's no other state law that you view as relevant
 3        to the pension issue; is there?
 4   A.   Subject to the discussions that we had earlier today.
 5   Q.   As being trumped?  There's no other state law that you
 6        regarded as being trumped; is there?
 7   A.   No, there's no other as being trumped.
 8   Q.   Trumped.
 9   A.   Right.
10   Q.   So the answer to my question -- just so the record is
11        clear, the answer to my question is no other?
12   A.   We're not referring to another state law.
13   Q.   Okay, thank you.
14   A.   Okay.
15   Q.   Now, ultimately -- so when the subsequent bankruptcy
16        filing was made -- which it was; right?
17   A.   Yes.
18   Q.   The intention -- specific intention was indeed to
19        trump Article 9, Section 24 of the state constitution;
20        correct?
21   A.   That wasn't the only intention.
22   Q.   But that was an intention; was it not?
23   A.   That was one of the objectives.
24   Q.   Now, ultimately you did request authorization for the
25        governor to file; right?
```



800.211.DEPO (3376)
EsquireSolutions.com

1  was the singular focus. I think most of our

2  discussions were about the need for the City to deal

3  overall with its balance sheet and its obligations,

4  which would include pensions.

5       MR. ULLMAN: Uh-huh. Okay, can you read my

6  question back? Listen a little more closely because I

7  was really -- it was a little more specific of a

8  question.

9       THE WITNESS: Okay.

10      (Record read back as requested.)

11 A.  We probably had that discussion. I don't recall

12     anything specific, but we probably did.

13 Q.  And do you recall any discussion during those same

14     conversations with the governor or anyone from his

15     staff as to the impact, if any, of Article 9, chapter

16     -- Section 24 of the Michigan Constitution as regards

17     pension benefits?

18 A.  I don't recall having discussions in that regard. No.

19 Q.  Now, if you look at the governor's response letter,

20     okay, and the last page, you see at the top there's a

21     heading called contingencies?

22 A.  Yes.

23 Q.  And it says 2012 PA 436 provides that my approval of

24     the recommendation to commence a Chapter 9 proceeding

25     may place contingencies on such a filing and it gives



```
 1        the citation.  It continues, I am choosing not to
 2        impose any such contingencies today.  Federal law
 3        already contains the most important contingency, a
 4        requirement that the plan be legally executable,
 5        11 U.S.C. Section 943(b)(4).  Do you see that?
 6   A.   Yes.
 7   Q.   And did you have any discussions with the governor or
 8        anyone from his staff about that language before you
 9        received this letter back?
10   A.   No.
11   Q.   Were you -- did you have any understanding before
12        receiving this that as to whether or not the governor
13        was going to place any contingencies on the bankruptcy
14        filing?
15   A.   No, but I was concerned about it.
16   Q.   And what were you concerned about?
17   A.   I was concerned that the governor might place some
18        contingency in any regards, not just related to the
19        pensions and others, but that the inner array on
20        limiting what authority I might have would impact what
21        discretion I would have under either 436 or Chapter 9.
22        I was just concerned about contingencies.
23   Q.   And was one of the contingencies that you were
24        concerned about the contingency that could impair your
25        ability or restrict your ability to cut back the
```



```
 1   Q.   And did you have any plan in place as to what you
 2        would do if the letter came back that imposed a
 3        contingency that in any Chapter 9 filing nothing could
 4        be done that would affect pension rights that were
 5        protected under the Michigan Constitution?
 6   A.   No.
 7   Q.   Now, in his letter the governor -- the portion we've
 8        just looked at on the back of page 5, the governor
 9        says, having a legally executable plan under Section
10        943(b)(4).  That's a reference, 943(b)(4), the
11        bankruptcy code; isn't it?
12   A.   I believe so.
13   Q.   So he says, he the governor says, having a legally
14        executable plan under Section 943(b)(4) of the
15        bankruptcy code is a contingency for Detroit's filing
16        a bankruptcy petition.  Correct?
17             MR. SHUMAKER:  Objection, document speaks
18        for itself.
19   A.   That's -- I was going to say the document speaks for
20        itself.  You're sort of reading it, you know, just
21        inversing it, but it says federal law already contains
22        the most important contingency requirement that the
23        plan is legally executable.
24   Q.   Right.  And this is in the context of him asking or
25        noting that under PA 436 he could, he the governor,
```



```
 1        could place contingencies on a Chapter 9 filing;
 2        right?
 3   A.   Yes.
 4   Q.   And he goes on to say that federal law also contains
 5        what he calls the most important contingency on the
 6        Chapter 9 filing, that it be legally executable;
 7        correct?
 8   A.   Yes, the letter speaks -- that's the language of the
 9        letter.
10   Q.   Did you agree with the governor's analysis here?
11   A.   I -- do I agree?  Yes, I mean, I agree that that's the
12        most important contingency that we get to, yes.
13   Q.   Now, petition was filed -- the bankruptcy petition was
14        filed on July 18th, like at 4 in the afternoon, 4:05,
15        something like that?
16   A.   That's what I was told.  I don't know the specific
17        time.
18   Q.   Now, in doing -- in making your bankruptcy filing,
19        were you intending to do something that was in
20        violation of state law?
21             MR. SHUMAKER:  Objection, calls for legal
22        conclusion.
23   A.   Here again, subject to all the discussions that we had
24        earlier today, I was intending to aleve the City of a
25        very dire situation and provide it with the maximum
```



800.211.DEPO (3376)
EsquireSolutions.com

1           telephone conversations with him and I recall meeting

2           with him.  I don't recall whether it was prior or

3           after the filing.  I know from time to time -- I just

4           don't recall when it was.

5    Q.    Would there have been any reason for you not to

6           consult the Attorney General prior to the bankruptcy

7           filing on that issue?

8    A.    No, I think the State Attorney General made his

9           position known prior to the filing.

10   Q.    Now, as of this time the petition was filed there were

11          various state court litigations that had been begun?

12   A.    Yes.

13   Q.    And those challenged, among other things, PA 436;

14          correct?

15   A.    Yes.

16   Q.    And its constitutionality?

17   A.    Yes.

18   Q.    And in fact, the petition was filed just prior to the

19          start of a TRO hearing in one of those state

20          litigations; wasn't it?

21   A.    I was told that either that night or the following

22          day.

23   Q.    And are you aware that certain objectors in this

24          proceeding have stated that the bankruptcy petition

25          was filed just before the judge in the case was about



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        to issue a TRO prohibiting the bankruptcy filing from
 2        taking place?
 3  A.    I heard that after the fact, yes.
 4  Q.    And are you aware that these objectors have stated
 5        that in fact the state lawyers asked for a short delay
 6        before the ruling was issued so they could get the
 7        bankruptcy filing in before the judge came down with a
 8        TRO?
 9  A.    I don't know if I heard it -- I may have read that
10        later.  I don't know if I heard it.
11  Q.    Did you have any involvement in those actions?
12  A.    No, no.
13  Q.    Do you deny that that's what occurred?
14  A.    I only know what I've heard and I have no personal
15        knowledge, I just know what I've heard and what I've
16        read.
17  Q.    And isn't it correct that you wanted to get the
18        bankruptcy petition filed as soon as possible because
19        you knew there was a risk that the state might rule it
20        was illegal -- the state court might rule it was
21        illegal under state law for the bankruptcy proceeding
22        to be filed?
23  A.    No, that wasn't the reason.
24  Q.    Is there a particular reason that the bankruptcy
25        filing was made at 4:06 in the afternoon of the same
```



```
 1         day a TRO was being heard in the state court other
 2         than to get the jump on the state court ruling?
 3              MR. SHUMAKER:  Object to the form.
 4    A.   Not to the best of my knowledge.
 5    Q.   Now, you're aware that the state court in that
 6         litigation in fact later issued a ruling that PA 436
 7         is unconstitutional to the extent that it authorizes a
 8         proceeding under Chapter 9 in the way that could
 9         threaten to impair or diminish accrued pension
10         benefits?
11    A.   Yes, I was informed that there are I believe three
12         TROs after the bankruptcy filing.
13    Q.   And you have proceeded with the bankruptcy petition
14         notwithstanding; correct?
15    A.   Well, the bankruptcy petition had been filed.  There
16         were open questions about the application of the stay.
17         There was also a question about an appeal, which was
18         taken up I believe by the Attorney General's office.
19         So when you say you proceeded with the petition, we
20         filed the petition, there was a ruling, and there were
21         appeals.
22    Q.   Okay.  And in light of the state court ruling that
23         PA 436 was unconstitutional, you did not take any
24         steps to withdraw the bankruptcy petition from filing;
25         did you?
```



1   A.   No.

2   Q.   And you have not taken any steps to stop the

3        bankruptcy proceeding from going forward; have you?

4   A.   No.

5             MR. ULLMAN:  Would this be a good time to

6        stop for lunch, a quick lunch?

7             MR. SHUMAKER:  Sure.

8             MR. ULLMAN:  I'm ready to continue but I

9        know --

10            THE WITNESS:  You got another -- how much

11       -- do you have another line of inquiry?  Whatever

12       everybody --

13            MR. ULLMAN:  I'm about to switch subject

14       matters.

15            THE VIDEOGRAPHER:  Going off the record at

16       12:52 p.m.

17            (Luncheon recess between

18            12:52 p.m. and 1:30 p.m.)

19            THE VIDEOGRAPHER:  We're back on the record

20       at 1:35 p.m.

21   BY MR. ULLMAN:

22   Q.   Welcome back, Mr. Orr.

23   A.   Good afternoon.

24   Q.   One other question about the June 14th proposal.

25        Referring to page 98, we talked about the defined



*800.211.DEPO (3376)*
*EsquireSolutions.com*

1      contribution benefit plan?

2  A.   Yes.

3  Q.   Okay.  Is it correct that under that plan

4      contributions are being made only for people who would

5      be current City employees?

6  A.   Will the plan be closed?

7  Q.   Yes.

8  A.   Yes, I believe so.

9  Q.   So under the restructuring plan there would be no

10      pension contributions made for retirees; correct?

11  A.   I believe that's correct.

12  Q.   Now, you I believe said that the June 14th proposal

13      was presented at a meeting to representatives of

14      various creditors, I think you said that in your

15      declaration?

16  A.   On June 14th, yes.

17  Q.   Okay.  Did you speak at that meeting?

18  A.   Yes.

19  Q.   And who else spoke?

20  A.   I believe all -- several members of our team, I

21      believe it was Mr. Heiman, David Heiman, I believe it

22      was Ken Buckfire, I believe Heather Lennox was on, I

23      believe Bruce Bennett was there, I believe Ken

24      Buckfire may have spoken.  I'm trying to recall if

25      there was anyone else.

1      association that the City would in fact be willing to

2      agree to a restructuring that did not involve the

3      elimination of ongoing pension contributions for

4      retirees.

5  A.  No, I didn't say that.

6  Q.  And do you know in fact whether anyone working on your

7      team ever said that to any union or retiree

8      association?

9  A.  No.

10  Q.  Okay.  During the time from June 14th to July 17, did

11      you or anyone else from your team tell any union or

12      retiree association that the City acknowledged that

13      under Michigan law pension rights were explicitly

14      protected from being impaired or diminished?

15  A.  I don't --

16             MR. SHUMAKER:  Objection, form, calls for

17      speculation.

18  A.  I don't recall anyone saying that, but it may have

19      happened.

20  Q.  But you personally didn't make that statement; did

21      you?

22  A.  I don't recall saying that.  I may -- you know,

23      anything is possible, I just don't recall saying it.

24  Q.  And as of July 17, had the City, you or anyone working

25      for you, told any union or retiree association that it



 1        would in fact be willing to agree to a restructuring

 2        plan that did not effectively eliminate the prior

 3        existing health benefits for retirees?

 4              MR. SHUMAKER:  Objection, foundation, calls

 5        for legal speculation.

 6   A.   Healthcare benefit for retirees?

 7   Q.   Yeah.

 8   A.   That did not eliminate it?

 9   Q.   Yeah, that you --

10   A.   Did not adjust it in some fashion?

11   Q.   Did not essentially cut it out the way it was being

12        cut out in the June 14th proposal.

13   A.   Yeah, I want to be careful with the frame cut out,

14        because I think there were subsequent discussions

15        about what would be provided instead --

16   Q.   Uh-huh.

17   A.   -- as a proposal, so I don't want my testimony to seem

18        as if we were not proposing an alternative to the

19        existing healthcare plan and that had not been

20        discussed prior to July 17th, but subject to those

21        qualifications the answer to your question is yes.

22   Q.   Now, I've been asking you as of July 17 and then the

23        bankruptcy filing was the very next day; correct?

24   A.   Yes.

25   Q.   Now, in your declaration do you recall making



```
 1   Q.   And on the pension side of things has there been any
 2        change from what was set out in the June 14th
 3        proposal?  As I understand this, it's still a defined
 4        contribution plan for current employees and no
 5        contributions being made by the City for retired --
 6        for retirees; is that right?
 7                 MR. SHUMAKER:  Object to the form.
 8   A.   Yeah, the general consensus is that you would close
 9        the plan and there would be contributions for
10        currents, yes.
11   Q.   And so again, just to be clear, that means for
12        retirees no ongoing contributions provided by the
13        City?
14   A.   None other than their participation in the note that's
15        proposed in the June 14th proposal.
16   Q.   And with no new funding for their pensions the
17        payments will stop -- to the retirees would stop being
18        made when the retirement funds run out; is that right?
19   A.   That's a loaded question.  I mean, the -- and the
20        reason I say it's a loaded question, some of the
21        retirement funds have said their payments won't run
22        out so that's why we want to have a dialogue.  We
23        think they're at risk.  They've told us they're not.
24   Q.   And by the City's estimation the pension funding will
25        run out when?  If no new funds are put in?
```



1       unreasonable assumptions either way.  But your general

2       question as to whether or not if the information going

3       in was inaccurate, revealed an inaccurate result, I

4       think it's true as a matter of just common sense and

5       logic.

6   Q.  And the same thing as to assumptions.  If the

7       assumption made was wrong, then the output would be

8       wrong also?

9   A.  I think that's why we asked several times to have a

10      discussion about the assumptions that are necessary

11      for pension benefits.

12  Q.  Now, the cash flows that are being reported in your

13      declaration, those do not include any assumptions as

14      to the monetization of various assets that the City

15      continues to hold; is that right?

16              MR. SHUMAKER:  This is paragraph 56 that

17      you're referring to, counsel?

18              MR. ULLMAN:  Yeah, I'm looking in general.

19              MR. SHUMAKER:  In cash flow?

20              MR. ULLMAN:  Yeah, cash flow.

21  A.  You're talking about generally do the cash flows

22      include any monetization of any City assets?

23  Q.  Yeah.

24  A.  No, they do not.

25  Q.  And obviously if assets currently held by the City



800.211.DEPO (3376)
EsquireSolutions.com

1       for some period of time; true?

2               MR. SHUMAKER:  Objection to form.

3   A.  Here again, depending upon the size of the asset, but

4       anything is possible.

5   Q.  Okay.  Now, the City of Detroit owns certain pieces of

6       art that are stored at the Detroit Institute of Art;

7       is that right?

8   A.  Yes.

9   Q.  And how many is that?

10  A.  I think the City owns approximately 66,000 pieces of

11      art.

12  Q.  Now, those --

13  A.  No, strike that.  Let me be clear so we can move on.

14  Q.  Yeah.

15  A.  I think there are 66,000 pieces of art over at Detroit

16      Institute of Art.  I'm not sure the City owns all

17      66,000 pieces.  I've been informed that it owns 35,000

18      of those pieces in an undisputed capacity.

19  Q.  Okay, that's what I was getting at.  And that's

20      distinct from art that is subject to a public -- or is

21      or may be subject to a public trust or something like

22      that.  This is 35,000 pieces that the City owns, as

23      you said, in an undisputed capacity?

24  A.  Outright, yes.

25  Q.  Outright.  Now, is it correct that the City has



```
 1        reports.
 2   Q.   Do you have any reason to believe that the value of
 3        the City-owned art is less than something on that
 4        order of magnitude?
 5   A.   I'm relatively agnostic on the value of the art at
 6        this point.  I'm waiting to see the appraisal.
 7   Q.   Do you have any understanding as you sit here today as
 8        to what the value of the City-owned art is?
 9   A.   No.
10   Q.   Are you considering selling the City-owned art to
11        generate cash?
12   A.   What I've said consistently is all options on the
13        table, but we first have to decide what we're talking
14        about.
15   Q.   Do you have any understanding as to how long it would
16        take to sell the art if a decision were made to sell
17        it?
18   A.   No.
19   Q.   Have you considered other ways to monetize the art
20        besides an outright sale?
21   A.   All options are on the table.
22   Q.   Well, have you considered any others in particular?
23   A.   We have not made -- meaning my team and I have not
24        made any decisions with regard to the art contained at
25        DIA.
```



800.211.DEPO (3376)
EsquireSolutions.com

1  Q.  I'm not asking about decisions, I'm just asking what

2      you considered.

3  A.  We considered a lot of things, yes.

4  Q.  And have you -- well, then can you answer my question

5      more specifically?  What if any ways to monetize the

6      art have you considered other than an outright sale?

7  A.  I think there's been discussions about some form of --

8      and I'm not clear because to be direct, I know that

9      some of my -- I've never been to DIA, I don't think

10     I've ever spoken with their board, I know that some of

11     my consultants have been over there and have had

12     various discussions about the art.  I think the

13     discussions were very high level and very general.

14     That's what I know.

15 Q.  Okay, that's really very nonspecific.  Are you aware

16     of any specific consideration given to any form of

17     monetizing the art other than an outright sale?

18 A.  No, nothing specific.

19 Q.  Could be a lease -- sorry, but nothing has been

20     identified as a possible route to monetize?

21 A.  Nothing specific.  There have been discussions, but

22     nothing specific.

23 Q.  Have there been discussions of leasing as a possible

24     way to monetize?

25 A.  Possibly, yes.



800.211.DEPO (3376)
EsquireSolutions.com

 1  Q.  Okay.  And do you have any understanding of the amount
 2      of cash flow that could be generated on an annual
 3      basis if the art were leased?
 4  A.  Sitting here today, no.
 5  Q.  Has that number been talked about?  Is there a
 6      document that might discuss that?
 7  A.  No, no, there's no document.  I -- I -- in an effort
 8      to be accurate, I think I had a discussion with one of
 9      the representatives at Christie's that was generally
10      speaking leasing is a very difficult thing to do.
11      That's the nature of the discussion, that you would
12      have to have the right pieces at the right time at the
13      right market to generate cash.
14  Q.  So there was no discussion about the amount of money
15      it could generate?
16  A.  No, no, it -- there was some discussion about
17      $1 million, for instance, or something like that, but
18      it's nothing substantive.
19  Q.  Okay.  Now, the City also has a department of water
20      and sewers; is that right?
21  A.  Yes.
22  Q.  And as I understand it, the department of water and
23      sewers operates as a separate entity for accounting
24      and operating purposes?
25  A.  As a result of Judge Cox's opinion, it has separate



800.211.DEPO (3376)
EsquireSolutions.com

13-53846-tjt  Doc 2302-17  Filed 12/29/13  Entered 12/24/13 20:01:09  Page 102 of 66
175
13-53846-swr  Doc 2302-17  Filed 12/29/13  Entered 12/24/13 20:04:09  Page 302 of 640

```
 1   A.   When you talk about asset values, you're talking about
 2        switches, pipes, valves, things along that nature.  I
 3        don't think I've ever seen an appraisal of the value
 4        of the assets of the water and sewer department.
 5   Q.   Do you have a general understanding of what the value
 6        of the assets --
 7   A.   No.
 8   Q.   -- is worth?
 9   A.   No.
10   Q.   Have you taken any steps to monetize the value of the
11        assets owned by the water and sewer department?
12   A.   When you say monetize, I'm going to respond to the
13        question on the basis that monetize is in the broad
14        sense --
15   Q.   Uh-huh.
16   A.   -- not whether it's a lease, whether it's a sale,
17        getting authority.
18   Q.   Just get money for it.
19   A.   Get money for it, get some dough, okay, just want to
20        be clear.  Discussions are ongoing in that regard.
21   Q.   What are those discussions in a nutshell?
22   A.   Those are commercially sensitive so I don't want to
23        interfere.  Suffice it to say, the -- Judge Cox's
24        opinion spoke to the possibility of creating an
25        authority that would remove the water and sewer
```



1        when you talk about values, there's a range of values

2        from asset disposition and outright sale and

3        privatization to creating an operation or an authority

4        where someone has brought in, as has been done in

5        Washington, D.C., to actually operate the garages and

6        meters.  So we're looking at a range of alternatives

7        to determine what those values could be.

8   Q.   What's the range of values you're looking at so far?

9   A.   We don't have that yet.

10  Q.   How concrete have you -- let me withdraw that.

11            What specific steps have been taken so far?

12  A.   Our investment advisors and consultants are beginning

13       discussions with various parties that undertake these

14       types of operations within a range of alternatives to

15       try to assess values.

16  Q.   And the investment advisors, would that be Buckfire?

17  A.   Yeah, it would be our investment banker, Ken Buckfire,

18       Miller Buckfire.

19  Q.   Okay.  In the June 14th proposal you also make

20       reference to about 22 square miles of land that the

21       City owns?

22  A.   City-owned land, yes.

23  Q.   Do you have an understanding as to the value of that

24       land?

25  A.   I've been informed that some of the value is at best



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1         nominal, but no, sitting here today, I do not have a
 2         number as to the value of the land.
 3    Q.   Have any steps been taken to try to monetize that
 4         value, to get dough as you put it?
 5    A.   Yeah.  Well, here again, you're -- to get income
 6         realization perhaps I should say more articulately,
 7         but here again, we're at the preliminary steps of
 8         examining potential alternatives regarding land.
 9    Q.   So you don't know yet?
10    A.   No.
11    Q.   The Belle Isle Park, that's also referenced in the
12         June 14th proposal?
13    A.   Yes.
14    Q.   It's indicated that there's a prospective lease to the
15         state?
16    A.   Yes.
17    Q.   Okay.  And do you expect that to go through?
18    A.   I'm going to ask for it.  It was proposed and was not
19         accepted in time so the state withdrew it, but I do
20         believe we're going to intend to ask that that lease
21         be renewed.
22    Q.   And what's the annual rent the City would get under
23         that lease?
24    A.   The City has a $6 million maintenance obligation and
25         that would be taken up by the state so that wouldn't
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   A.   I can't -- it was an attorney-client communication.

 2   Q.   And are you aware of any cases where, to use your

 3        phraseology, as a result of a Chapter 9 filing by a

 4        municipality the state constitution was trumped?

 5   A.   Chapter 9 filing?

 6   Q.   Yes.

 7   A.   I'm not sure, because the case I'm aware of, I don't

 8        know if it was a state constitution.  I don't recall.

 9             MR. ULLMAN:  Okay, I have no more questions

10        at this time.  But I may reserve the right, we have

11        some other people that are going to ask questions, at

12        the end of that to ask some follow-ups, if that's

13        possible.

14             THE WITNESS:  Okay.

15             MR. SHUMAKER:  You want to take a quick

16        break?

17             MR. ULLMAN:  Yeah, why don't we take a

18        break.  Someone else has to sit here.

19             THE VIDEOGRAPHER:  Going off the record at

20        2:53 p.m.

21             (A brief recess was taken.)

22             THE VIDEOGRAPHER:  We're back on record at

23        3:07 p.m.

24                        EXAMINATION

25   BY MS. LEVINE:
```


ESQUIRE

```
 1   Q.   At the time the City filed for bankruptcy, was it your
 2        view that there had to be significant cuts in accrued
 3        vested pension amounts for both active and currently
 4        retired persons?
 5   A.   Yes.
 6   Q.   And is it still -- still your view today?
 7   A.   Yes, based upon our analysis, yes.
 8   Q.   This conclusion that there must be significant cuts in
 9        accrued vested pension amounts for both active and
10        currently retired persons, was that assertion or that
11        idea or that notion discussed by you with the governor
12        at any time before June 14th, 2013?
13   A.   Outside of meetings with attorneys?
14             MR. SHUMAKER:   Outside of meetings or calls
15        with attorneys present.
16   Q.   Yeah, I'm not looking to infringe your attorney-client
17        privilege.
18   A.   I know.  I just don't recall all of the meetings.  It
19        may have been discussed outside those meetings.
20   Q.   Well, do you have a recollection?
21   A.   I do not have a recollection of specific discussions.
22   Q.   Just so I understand your testimony, are you saying it
23        was -- it may have been discussed but you're not sure
24        whether or not it was discussed in meetings that were
25        outside the attorney-client privilege?  Is that your
```



800.211.DEPO (3376)
EsquireSolutions.com

 1        June 14th meeting.

 2   A.   Okay.

 3   Q.   Do you have a recollection of any words you used to

 4        communicate to those in attendance that you were open

 5        to consider anything, if that's a fair

 6        characterization of your prior testimony?  Did you use

 7        words to that effect and if so what were those words?

 8   A.   I don't remember the exact words, but I think we

 9        expressed the sentiment that this is a proposal and

10        we're open to discussions.

11   Q.   Well, that's a little different.  I mean, to be open

12        to discussion.  I'm not asking you -- I think you

13        testified a few minutes ago that you were open to

14        anything and if I'm mischaracterizing that, correct

15        me.

16   A.   Well, no, anything -- and I meant anything meaning

17        anything in terms of discussions, that's why we styled

18        this, we never called this a plan, we never called

19        this a deal, we always called it a proposal because we

20        were open for discussions, any response, meaning

21        anything, so I think they're the same thing.  I'm not

22        trying to be cute in any fashion, I'm just saying we

23        were open to responses, yes.

24   Q.   Did you ever say to the attendees at the meetings or

25        communicate to the attendees in writing that the City



```
 1        movement on it.
 2   Q.   So as things now stand, there's no plan to put forward
 3        anything else if the creditors and in particular the
 4        retirees do not agree to what's set out in the June
 5        14th proposal?
 6   A.   As it stands right now, we don't have a plan.
 7                  MR. ULLMAN:  I have nothing further.  Thank
 8        you, Mr. Orr.
 9                  MR. SHUMAKER:  Thank you, counsel.
10                  THE WITNESS:  Thank you.
11                  THE VIDEOGRAPHER:  Going off the record at
12        5:41 p.m.
13                  (Discussion held off the record.)
14                  THE VIDEOGRAPHER:  We're back on the record
15        at 5:43 p.m.
16                         EXAMINATION
17   BY MS. GREEN:
18   Q.   Hi, Mr. Orr.  We've met before.
19   A.   Yes.
20   Q.   My name is Jennifer Green, I represent the two
21        Retirement Systems for the City of Detroit.
22   A.   Yes, Jennifer -- Ms. Green.  Good to see you again.
23   Q.   Thank you.  Nice to you see you again too.
24                  I have a question about Exhibit 11.  I
25        don't know if you have it in front of you or not.
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   State of Michigan)
 2   County of Genesee)
 3              Certificate of Notary Public
 4       I certify that this transcript is a complete, true and
 5   correct record of the testimony of the witness held in this
 6   case.
 7       I also certify that prior to taking this deposition,
 8   the witness was duly sworn or affirmed to tell the truth.
 9       I further certify that I am not a relative or an
10   employee of or an attorney for a party; and that I am not
11   financially interested, directly or indirectly, in the
12   matter.
13              WITNESS my hand this 19th day of September,
14   2013.
15
16
17
18              Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19              Certified Realtime Reporter
20              Registered Merit Reporter
21              Certified LiveNote Reporter
22              Certified Shorthand Reporter
23              Notary Public, Genesee, Michigan
24              Acting in Oakland County, Michigan
25              My Commission Expires:  9-19-18
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1       UNITED STATES BANKRUPTCY COURT

2       EASTERN DISTRICT OF MICHIGAN

3       SOUTHERN DIVISION

4    -------------------------------X

5    IN RE                    ) Chapter 9

6    CITY OF DETROIT, MICHIGAN,     ) Case No. 13-53846

7            Debtor.          ) Hon. Steven W. Rhodes

8    -------------------------------X

9

10

11       CONTINUED VIDEOTAPED DEPOSITION of

12            KEYVN D. ORR

13            Volume II

14           Washington, D.C.

15         Friday, October 4, 2013

16

17

18   Pages:   308 - 496

19   Reported by:  Cindy L. Sebo, RMR, CSR, RPR, CRR,

20           CCR, CLR, RSA

21   Assignment Number:   14008

22   File Number:  105824



800.211.DEPO (3376)
EsquireSolutions.com

1　demonstrated any concern about political

2　ramifications as they're being used today.

3　　　Q.　　Did you understand that reductions in

4　vested pension benefits would be a necessary part

5　of any restructuring for Detroit?

6　　　A.　　I think that was certainly

7　anticipated, yes.

8　　　Q.　　Is it your understanding that the

9　Governor understood that the reduction in vested

10　pension benefits would be part of any

11　restructuring for Detroit?

12　　　　　　MR. SHUMAKER:  Objection: foundation.

13　　　　　　MS. LEVINE:  I'm asking him his

14　understanding.

15　　　　　　THE WITNESS:  I'm not sure what the

16　Governor understood.  You'd have to ask him.

17　BY MS. LEVINE:

18　　　Q.　　Did the Governor ever communicate to

19　you that he expected that vested pension benefits

20　would be part of any restructuring for Detroit?

21　　　A.　　The Governor communicated to me that

22　he expected -- no.



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
1        Q.      Yeah.

2        A.      -- for the City who had been

3   retained, the City representatives were there and

4   the State representatives were there.

5        Q.      Okay.  I'll talk -- call that the --

6   the review team --

7        A.      Review team --

8        Q.      -- is that the term you like?

9                Okay --

10       A.      -- yeah.

11       Q.      -- so as I understand what you're

12  saying, the -- the -- the slides themselves were

13  present -- given over to the review team as a --

14  a -- a bound --

15       A.      Yes.

16       Q.      -- volume or attached in some way?

17       A.      Yes, the -- the -- the slide deck as

18  the pitch book was given to the review team.

19       Q.      Okay.  And then, at the presentation,

20  were -- how did that work?  Did you -- did people

21  sort of go through the slides orally and then --

22  and -- and make comments as they were going
```



*ESQUIRE*

800.211.DEPO (3376)
EsquireSolutions.com

1  through the different pages in the pitch book?

2          A.      No.  As I recall, we handed out the

3  pitch book and began sort of going through the

4  slide, but within the first page or two, the

5  discussion exceeded the slides.  And we really

6  ended up not going through the pitch book in any

7  meaningful manner --

8          Q.      Okay.

9          A.      -- at the presentation.

10         Q.      Okay.  And this -- at the time of the

11 presentation, you were indeed still part of

12 Jones Day --

13         A.      Yes.

14         Q.      -- and part of the pitch team?

15         A.      Yes, absolutely.

16         Q.      Okay.

17                 Okay.  I'm going to mark another

18 document, Mr. Orr, and ask if you've ever seen

19 this, which is Number 22.

20         A.      Two.

21                 MR. ULLMAN:  Here's a copy for you,

22 two copies for you, and an extra, and an extra.  I



ESQUIRE                    800.211.DEPO (3376)
                           EsquireSolutions.com

1   don't want to bring these back with me is all.

2                          -   -   -

3               (Whereupon, City of Detroit —

4               Restructuring Plan, Mayor's

5               Implementation Progress Report was

6               marked, for identification purposes,

7               as Orr Deposition Exhibit

8               Number 22.)

9                          -   -   -

10              THE WITNESS:   Thank you.

11  BY MR. ULLMAN:

12       Q.      Okay.   What we've marked as

13  Exhibit 22, Mr. Orr, is entitled, City of Detroit

14  — Restructuring Plan, Mayor's Implementation

15  Progress Report, with the date of March 2013.

16              Have you ever seen this document

17  before?

18       A.      I think I've seen it before, but I

19  think that was after I became emergency manager.

20       Q.      Okay.   That's fine.

21              And what I'd like to do is try to

22  just ask you about one page of this.



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1       A.      Um-hum.

2       Q.      If you could look at Page 6.

3       A.      Um-hum.

4       Q.      Okay.  What we --

5               MR. SHUMAKER:  Of the -- of the

6   actual document?

7               MR. ULLMAN:  Of the -- yes.  I'm

8   sorry, yeah.

9               And just for clarity, this document

10  bears Bates Number DTMI00129416, and Page 6 of the

11  document bears the Bates number ending in 422.

12              THE WITNESS:  Um-hum.

13  BY MR. ULLMAN:

14      Q.      Okay.  And this page, in general, is

15  entitled, The Mayor's plan includes strategies to

16  implement changes that will significantly reduce

17  general fund long-term liabilities.

18              I'd like you to focus on Number -- or

19  Letter (b) --

20      A.      Yes.

21      Q.      -- you see 3(b)?

22      A.      Um-hum.



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.    It says, Pension unfunded

2    liabilities, and the first bullet point says,

3    Approximately 650 million of unfunded liability as

4    of fiscal year 2012, of which only 250 million

5    relates to general fund.

6    A.    Yes, I see that.

7    Q.    And do you have an understanding as

8    to what's being said there and what that reference

9    is?

10    MR. SHUMAKER:  Objection: foundation.

11    THE WITNESS:  Yeah.  I was obviously

12    not responsible for drafting, developing or the

13    due diligence behind the document.  The document

14    speaks for itself.

15    But what I think is being said there

16    is that the unfunded liability for the -- and I

17    assume it's speaking to both pension funds; it may

18    be one or the other --

19    BY MR. ULLMAN:

20    Q.    Um-hum.

21    A.    -- but the unfunded liability for

22    fiscal year 2012 is 250, and 250 million of that



ESQUIRE

1 is somehow an obligation of the general fund.

2     Q.    Okay.  Did you say 250?  It's -- you

3 meant to say 650, right?

4     A.    No, no.  It's 650 total --

5     Q.    Right.

6     A.    -- but 250 million of that is an

7 obligation of the general fund.

8     Q.    You had misspoken and said 250 both

9 times --

10     A.    Oh, I'm sorry --

11     Q.    -- so --

12     A.    -- oh, no -- okay.  650 and 250, I'm

13 sorry.  I was --

14     Q.    Okay.

15     A.    -- thinking ahead, thinking quicker

16 than my mouth moved.

17     Q.    Okay.  And as I -- I understand that

18 the 650 million that's referred here -- to here by

19 the Mayor corresponds pretty closely, if I recall,

20 to the $644 million figure that was referred to in

21 the June 14th proposal; is that right?

22     A.    I would -- I -- yes, I -- I would


ESQUIRE

```
 1    think it does --
 2         Q.    Okay.
 3         A.    -- I'm -- I'm -- here again, I'm
 4    not -- I'm assuming it -- it speaks for itself and
 5    it's facially correct; but, yes, I would think
 6    that's the reference.
 7         Q.    Okay.  And so can you tell me what --
 8    what is your understanding when the Mayor says
 9    here that 250 million relates to the general fund,
10    what the other 300 --
11         A.    400.
12         Q.    -- 400 million relates to?  And
13    what's -- what is the distinction being drawn
14    between what relates to the general fund versus
15    what relates to something other than the general
16    fund?
17         A.    I'm not sure.
18         Q.    Well, is it correct that -- that some
19    portion -- let's just stick with the -- we can use
20    the $644 million number --
21         A.    Um-hum.
22         Q.    -- because I think that's what you
```



13-53846-swr   Doc 2300-17   Filed 12/29/13   Entered 12/24/13 20:04:09   Page 51 of 66   657
175

1  would probably say is more accurate.

2               That's the number that's cited in the

3  June 14th proposal, right?

4       A.     Yeah, they may have -- they may have

5  rounded up here --

6       Q.     Okay.

7       A.     -- but we'll -- it's -- it's

8  approximately that amount.

9       Q.     Okay.  Is it correct that for the

10  approximately 644 million unfunded pension

11  liability that you refer to in the June 14th

12  proposal, that some portion of that is allocable

13  to a payment source other than the general fund?

14       A.     I think that's correct.

15       Q.     Okay.  And what are those --

16  what is -- what are the other payment sources to

17  which the total 650 -- or I'm sorry -- 644 million

18  is allocable other than the general fund?

19       A.     Well, there are other sources, but it

20  could be principally related to the Water

21  department.

22       Q.     Okay.  And what is your understanding

ESQUIRE                    800.211.DEPO (3376)
                                  EsquireSolutions.com

1  as to how much of the approximately 644 million

2  unfunded pension liability relates to liability

3  for personnel from the Department of Water and

4  Sewer?

5          A.      Approximately that difference.

6          Q.      Okay.  So it's about 450 million?

7          A.      Approximately, yeah.

8          Q.      Okay.  And I'm trying to recall from

9  your last testimony.

10              For the -- the pension monies that

11 are due relative to personnel from the Department

12 of Water and Sewer, are the pension payments made

13 directly by the Department of Water Sewer to the

14 retirement systems, or is the money paid first by

15 the retirement -- I'm sorry -- by the Water and

16 Sewer Department to the City, which then transmits

17 it to the retirement system, or is there another

18 mechanism for the payment?

19              MR. SHUMAKER:  Objection to form.

20              THE WITNESS:  I believe it's the -- I

21 believe it's the latter.

22



```
1        A.      I could go back and check it to be

2   sure, but I think that's the approximate mechanism

3   as I understand it.

4        Q.      Okay.  Now, by my math -- I make no

5   representations as to my math, but just looking at

6   the numbers, it looked -- actually, do I have a

7   calculator here?  I don't think I do.

8               What percentage is 250 over 650?  I

9   actually didn't do the math.

10       A.      Four -- it's 40-some odd.

11       Q.      It's 40-some -- yeah, we can get it

12  precisely.

13              Zero?  Oh.

14              250 divided by 6 -- let's say 650 --

15  shoot, I didn't do that right.  I apologize.  Let

16  me try to clear this and do it again.

17              250 divided -- 6.  This isn't right.

18              Okay.  It looks like about

19  38 percent.

20       A.      Right.

21       Q.      Okay.  You recall that -- that during

22  the last deposition, you indicated that you
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1    thought that the actual unfunded liability was --

2    was higher than the 644 number and could be as

3    much as 3.5 billion or something like that?

4         A.    Yes.

5         Q.    Okay.  My question is, does the --

6    does the -- is the proportion of unfunded

7    liability allocable to the general fund versus the

8    Department of Water Sewer personnel constant if

9    you -- if you use a higher liability figure?

10             In other words --

11        A.    If we went up to 3.5 --

12        Q.    Yeah, yeah --

13        A.    -- million, would it be --

14        Q.    -- would the Department of Water and

15   Sewer still be approximately 38 percent of the

16   total unfunded liability?

17        A.    I'm -- I'm not sure.  I would think

18   that a rough estimate might be.  But as I said, I

19   think, in September 16th, part of those

20   calculations had to do with a number of factors,

21   so I don't want to say that my testimony is as

22   exactly proportioned.



*800.211.DEPO (3376)*
*EsquireSolutions.com*

```
 1                      -  -  -

 2              THE VIDEOGRAPHER:  Going back on the

 3      record at 1306.  This marks the beginning of

 4      Tape Number 2.

 5              MR. DECHAIRA:  Okay.

 6      BY MR. DECHAIRA:

 7          Q.      Mr. Orr, before we broke, I was

 8      asking you about a meeting you had with the

 9      Michigan Attorney General.

10              And my question was, what was said at

11      that meeting?

12          A.      Yes.

13              With Attorney General Schuette, I

14      don't recall the exact date; but, generally

15      speaking, the Attorney General -- at the meeting,

16      as I said, was Mr. Heiman on the phone, the

17      Attorney General and an attorney from his office,

18      Matt, whose last name escapes me right now.  And

19      generally what was said, the Attorney General

20      wanted to express why he felt duty-bound to take a

21      position that the Michigan State Constitution

22      protected vested pension obligations.
```


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1    approximately 61.5 percent?

2        A.    But, remember, I said that you have

3    to be careful with trying to draw a straight-line

4    comparison between the two numbers you may

5    calculate in.  But generally speaking, if we're

6    just talking about the math, that -- that --

7        Q.    Right --

8        A.    -- would be the estimate.

9        Q.    -- I'm right here just talking about

10   the ratio on the -- the number that's referred to

11   as the 650 -- the approximately 650 by the Mayor.

12       A.    Yes.

13       Q.    And then I think the next question I

14   asked you, which I think is what you were alluding

15   to, that if you assumed a larger liability figure,

16   would that ratio continue to hold; and my

17   recollection is, your answer was roughly it would,

18   but you may have to, you know, fine-tune the math.

19       A.    It -- it -- it might roughly hold,

20   but you need to be careful to not draw the

21   conclusion that is -- it's exactly comparable.

22       Q.    Okay.  I understand.

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com



1        A.      Okay.

2        Q.      Okay.

3                And then the other question I have

4    for you -- this is referring to the unfunded

5    pension liability --

6        A.      Um-hum.

7        Q.      -- you're also familiar with the

8    medical benefits for retirees --

9        A.      Yes.

10       Q.      -- the health -- and I think that's

11   sometimes referred to as OPEB?

12       A.      Yes, other [sic] employee benefits.

13       Q.      Okay.  And for the OPEB is -- are --

14   is the -- is the situation similar that some

15   amount of the total OPEB liability that the City

16   faces is allocable to sources other than the

17   general fund?

18       A.      You -- you know, I think it is; but

19   I'm not recalling that mechanism as well as I

20   recall the pension mechanism, but I think it is.

21       Q.      Okay.  And would then some portion of

22   the total OPEB unfunded liability be allocable





1   also to the Department of Water and Sewer to their

2   retirees?

3       A.      It might well be, but I'd need to

4   confirm that.

5       Q.      Okay.  And have you done any analysis

6   of that question?

7       A.      Yes --

8       Q.      Okay.

9       A.      -- well, our contractors have done an

10  analysis of the question.

11      Q.      Okay.  And who specifically has done

12  an analysis of that?

13      A.      Oh, I think our team at -- the entire

14  team: Conway MacKenzie, Ernst & Young,

15  Miller Buckfire.

16      Q.      And do you recall their general

17  conclusions to what percentage of the total

18  unfunded OPEB liability is allocable to the -- A,

19  to the Department of Water of Sewer; or, B, some

20  other fund or entity apart from the general fund?

21      A.      I'm -- I'm not -- I don't recall if

22  it is, and I don't recall the percentage.



```
 1              C E R T I F I C A T E

 2   DISTRICT OF COLUMBIA:

 3          I, Cindy L. Sebo, a Notary Public within

 4   and for the Jurisdiction aforesaid, do hereby

 5   certify that the foregoing deposition was taken

 6   before me, pursuant to notice, at the time and place

 7   indicated; that said deponent was by me duly sworn

 8   to tell the truth, the whole truth, and nothing but

 9   the truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition is

13   a true record of the testimony given by the witness;

14   and that I am neither of counsel nor kin to any

15   party in said action, nor interested in the outcome

16   thereof.

17

18                              Cindy L. Sebo
                        District of Columbia, Notary Public
19                         My Commission Expires
                               April 14, 2015
20   _____

21        Cindy L. Sebo, RMR, CRR, RPR, CSR,

22          CCR, CLR, RSA, Notary Public
```

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com



From: CN=Kevyn Orr/O=JonesDay
Sent: 1/31/2013 3:45:47 PM
To: CN=Corinne Ball/O=JonesDay@JonesDay
CC: "Stephen Brogan" <sjbrogan@jonesday.com>
Subject: Re: D

CB,

Thank you for thinking about alternative ways to skin this cat. But I don't think we should look at this right now for at least two reasons. First, the state already has EMs appointed or five cities and four school districts. I wouldn't want it to seem like I have a special deal. Second, in thinking about the EM position I went back and looked at the SIGTARP legislation and the federal law authorizing the creation of the D.C. Control Board in 95. Both gave those managers tremendous powers, but neither was subject to questions about the authority of the Congress to enact them and the President's authority to sign them into law. By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. The new EM law gives local governments four choices to fix their financial emergency:

Consent Agreement, in which local leaders remain in charge but must meet certain conditions in an agreement negotiated with the state (Detroit is already under a CA and it sounds like it's not working);
A state appointed EM that has broad authority over local finances;
Chapter 9 bankruptcy with the Governor's approval; and
Mediation, in which the local government and interested parties meet with a neutral party to resolve financial issues, such as employee contracts (this is essentially required to file a Chapter 9 petition).

So although the new law provides the thin veneer of a revsion it is essentially a redo of the prior rejected law and appears to merely adopts the conditions necessary for a chapter 9 filing. The news reports state that opponents of the prior law are already lining up to challenge this law.

Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks.

Kevyn


Kevyn D. Orr
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.5560 • Fax: 202.626.1700 •
Cell: [Redacted] • korr@jonesday.com


From:     Corinne Ball/JonesDay
To:       "Kevyn Orr" <korr@jonesday.com>
Cc:       "Stephen Brogan" <sjbrogan@jonesday.com>
Date:     01/31/2013 08:10 AM
Subject:       D


Kevyn--

Food for thought for your conversation with Baird and us --
I understand that the Bloomberg Foundation has a keen interest in this area. I

CONFIDENTIAL

Exhibit
Exhibit No.: 4
Name: Orr
Date: 9-16-13
ESQUIRE

was thinking about whether we should talk to Baird about financial support for this project and in particular the EM.  Harry Wilson--from the auto task force--told me about the foundation and its interest. I can ask Harry for contact info--this kind of support in ways "nationalizes" the issue and the project.

------------------

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

------------------

CONFIDENTIAL

# EXHIBIT B

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## IN RE CITY OF DETROIT, MICHIGAN

13-53846

---

## GAURAV MALHOTRA

*September 20, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

1   So they were looking at those forecasts in isolation.

2   But that work sort of stopped I think right around in

3   the first four or five months of the engagement.

4       Q.    And why did that work stop?

5       A.    It was because the focus continued to be

6   on the general fund and these were self-sustaining

7   funds with respect to at least the Water and Sewer

8   Department.  And so they were monitoring their -- and

9   dealing with their cash activity, although connected

10  to the City, but we weren't helping forecast receipts

11  and disbursements because they were not impacting the

12  general fund.

13      Q.    You previously testified in your prior

14  deposition that Ernst & Young was not asked to look at

15  possible disposition of City assets, is that correct?

16      A.    That's correct.

17      Q.    Why -- did you have a discussion with the

18  City regarding whether that would be valuable work for

19  Ernst & Young to provide?

20      MR. STEWART:  Objection.

21  BY THE WITNESS:

22      A.    I -- I'm not sure I follow the question.

23  BY MS. BRUNO:

24      Q.    How did it come about that Ernst & Young



ESQUIRE

1   didn't evaluate the value of disposition of some of

2   the City assets?

3        A.    It was not a part of our scope of work.

4        Q.    You would agree that there could be cash

5   value to the disposition of some of those assets,

6   would you not?

7        MR. STEWART:  Objection.

8   BY THE WITNESS:

9        A.    I think that's a better question to ask

10  for the City's investment banker.

11  BY MS. BRUNO:

12       Q.    Well, I'm not talking about the specific

13  numbers here, but you know what some of the assets

14  available to the City are, correct?

15       A.    In general, yes.

16       Q.    And you understand that some of those

17  assets could be valuable or quite valuable, correct?

18       MR. STEWART:  Objection.

19  BY THE WITNESS:

20       A.    It depends on what assets you are talking

21  about.

22  BY MS. BRUNO:

23       Q.    Why don't we look at Exhibit No. 4 -- oh,

24  I'm sorry.  I'll hand it to you.  Exhibit No. 4 from



1    your prior deposition, I'll hand it to you.  It was

2    the Proposal For Creditors --

3         A.    Okay.

4         Q.    -- dated June 14.

5              And I believe the assets are identified on

6    90.  And it is 90 of the computer generated numbers on

7    the bottom.

8              And on pages 90 through 96, the

9    presentation discussed various assets that the City

10   could derive some cash benefit from, correct?

11        MR. STEWART:  Objection.

12   BY THE WITNESS:

13        A.    Yes.

14   BY MS. BRUNO:

15        Q.    And, well, I don't want to quarrel or even

16   discuss with you what the actual specific value of any

17   one of those assets are, but you would agree that the

18   implementation of any of these proposals would improve

19   the City's cash position, would it not?

20        MR. STEWART:  Objection.

21   BY THE WITNESS:

22        A.    Here is what I would say.  The current

23   ten-year projections right now do not include any

24   incremental proceeds that could be available to the


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1  City from asset sales.  And that's where I -- because

2  that's what's very clearly laid out in the proposal.

3        If there are proceeds available that are

4  available to the City, those numbers would change.

5  But I can at least highlight and articulate what the

6  assumptions are with respect to the ten-year forecast

7  that the City has put out.

8  BY MS. BRUNO:

9        Q.    And so your assumptions include that none

10  of these assets will be disposed of in any way, is

11  that correct?

12        A.    That's generally correct.

13        Q.    Sticking with Exhibit No. 4 before you, if

14  you'd turn to page 80 of the document.  I'm sorry.  I

15  should say 87 of the computer generated numbers.

16        And this is a portion of the presentation

17  that discusses increasing the tax collection.  You

18  look like you are on a different page than I am here.

19        A.    87.

20        Q.    You've got it?

21        A.    Yes.

22        Q.    You would agree that increasing the tax

23  collection rates and improving the collection of past

24  due taxes could materially improve the City's



1                    REPORTER'S CERTIFICATE

2            I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

3    a Certified Shorthand Reporter, do hereby certify:

4            That previous to the commencement of the

5    examination of the witness herein, the witness was

6    duly sworn to testify the whole truth concerning the

7    matters herein;

8            That the foregoing deposition transcript

9    was reported stenographically by me, was thereafter

10   reduced to typewriting under my personal direction and

11   constitutes a true record of the testimony given and

12   the proceedings had;

13           That the said deposition was taken before

14   me at the time and place specified;

15           That I am not a relative or employee or

16   attorney or counsel, nor a relative or employee of

17   such attorney or counsel for any of the parties

18   hereto, nor interested directly or indirectly in the

19   outcome of this action.

20           IN WITNESS WHEREOF, I do hereunto set my

21   hand on this 21st day of September, 2013.

22

23   _____

24   JULIANA F. ZAJICEK, Certified Reporter



ESQUIRE                          800.211.DEPO (3376)
                                 EsquireSolutions.com

# EXHIBIT C

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

*In Re: City of Detroit, Debtor*

---

*Governor Richard D. Snyder*
*October 9, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 100913RS.TXT
Min-U-Script® with Word Index

| | | |
|---|---|---|
| 09:55:47 | 1 | Q. Okay. Let me direct your attention -- strike that. |
| 09:55:54 | 2 | Let me back up. |
| 09:55:55 | 3 | Did you put your comments in writing to |
| 09:55:58 | 4 | anyone -- your comments about the June 14th, 2013 |
| 09:56:02 | 5 | proposal, did you put your comments in writing to |
| 09:56:04 | 6 | anyone whether by letter or email or phone text or |
| 09:56:08 | 7 | in any other written format? |
| 09:56:09 | 8 | A. I don't believe so. I don't believe so. |
| 09:56:13 | 9 | Q. Let me now turn your attention to page 109 of |
| 09:56:21 | 10 | Exhibit 3, and I'm going to in particular read the |
| 09:56:30 | 11 | second line of the third bullet point from the |
| 09:56:34 | 12 | bottom. It says "There must be significant cuts in |
| 09:56:39 | 13 | accrued vested pension amounts for both active and |
| 09:56:42 | 14 | currently retired persons." |
| 09:56:45 | 15 | Were you aware that the proposal said this? |
| 09:56:49 | 16 | A. I'm aware the proposal said that in the context that |
| 09:56:53 | 17 | this was to be a negotiation and a mutual agreement |
| 09:56:56 | 18 | between parties. |
| 09:56:56 | 19 | Q. My only question was -- |
| 09:56:57 | 20 | A. Yeah. |
| 09:56:57 | 21 | Q. -- were you aware that this proposal said this? |
| 09:57:00 | 22 | A. Yes. |
| 09:57:00 | 23 | Q. And you were aware that at the time that you signed |
| 09:57:05 | 24 | what's been marked as Exhibit 2, the July 18th |
| 09:57:07 | 25 | letter, you were aware that the proposal contained |

09:57:10 1    the language I just read, correct?

09:57:12 2  A.  Yes.

09:57:14 3  Q.  So you were aware when you signed the July 18th,

09:57:24 4    2013 letter that it was Kevyn Orr's view that there

09:57:30 5    had to be significant cuts in accrued pension

09:57:32 6    liabilities, correct?

09:57:34 7  A.  I would say it was Kevyn Orr putting a proposal out

09:57:38 8    to parties to say he believed this was necessary to

09:57:41 9    achieve an outcome, that they would need to agree to

09:57:44 10   that.

09:57:45 11 Q.  I'm not sure that was responsive.  Let me try that

09:57:49 12   question again.

09:57:49 13 A.  Okay.

09:57:50 14 Q.  Isn't it correct that at the time that you signed

09:57:54 15   your July 18th letter that you were aware that it

09:58:00 16   was Kevyn Orr's position that there had to be

09:58:01 17   significant cuts in accrued pension benefits?

09:58:04 18 A.  Yes.

09:58:05 19 Q.  Did you speak to Kevyn Orr about -- strike that.

09:58:12 20        Did you agree with that position as of

09:58:15 21   July 18th?  And by the position I mean that there

09:58:19 22   had to be significant cuts in accrued pension

09:58:21 23   liabilities?

09:58:23 24 A.  The approval of my letter was not addressing that as

09:58:27 25   an issue.  It was about authorizing a bankruptcy.

                              CERTIFICATE

STATE OF MICHIGAN          )
                           ) SS:
COUNTY OF OAKLAND          )


          I, LAUREL A. JACOBY, Certified Shorthand

reporter, a Notary Public, hereby certify that I recorded

in shorthand the examination of GOVERNOR RICHARD D.

SNYDER, the deponent in the foregoing deposition; and that

prior to the taking of said deposition the deponent was

first duly sworn, and that the foregoing is a true,

correct and complete transcript of the testimony of said

deponent.

          I further certify that no request was made for

submission of the transcript to the deponent for reading

and signature and that no such submission was made.

          I also certify that I am not a relative or

employee of a party or an attorney for a party; or

financially interested in the action.




_____
LAUREL A. JACOBY, CSR-5059, RPR

Notary Public, Oakland County, Michigan

My commission expires: 9/1/18

Dated:  This 11th day of October, 2013.

# EXHIBIT D

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**In the Matter Of:**

CITY OF DETROIT, MICHIGAN

Case No. 13-53846

---

**LAMONT SATCHEL**

*September 19, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

1  A.  Yes.

2  Q.  I didn't mean to.

3  A.  I was not aware of that.

4  Q.  And as regards pension benefits, which is what we've

5      been looking at, do you know whether the plan, the

6      proposal that was presented by the City on September

7      11 changed in any way from what it presented first on

8      June 14th and then again on June 20th?

9  A.  I haven't -- I'm not aware of nor have I seen a

10     proposal that the City made on September 11.

11 Q.  So you don't know one way or the another?

12 A.  I don't.

13 Q.  Okay, fair enough.

14          Now, is it -- to your knowledge can someone

15     or a retiree, for example, look at the information

16     that's contained in S18 and be able to figure out

17     monetarily what the total impact of this proposal is

18     on that particular individual?

19 A.  I don't know.

20 Q.  Okay.  And you think that's something that someone

21     would want to be able to understand in order to

22     analyze a proposal that's being made and respond

23     intelligently to it?

24          MR. MILLER:  Object to form.  Calls for

25     speculation.



1   A.   Could you rephrase that?

2              MR. ULLMAN:  Can you repeat it?

3              (Record read back as requested.)

4   A.   What's the that?

5   Q.   Being able to understand the monetary impact to the

6        affected individual of what is being proposed.  If I

7        were presenting you with a proposal, you would want to

8        understand how -- a proposal that purports to affect

9        how much money you're going to get, how many benefits

10       you're going to receive, you would want to know what

11       the monetary impact on you is overall in order to

12       think about it, understand it and respond to; true?

13  A.   If it had a monetary impact and --

14             MR. MILLER:  Let me interpose an objection.

15       Object to form.

16  Q.   You can answer the question.

17  A.   If it had a monetary impact and I had an interest in

18       that regard, I would.  If I didn't, I wouldn't.

19  Q.   Okay.  Now, we talked about the June 20 meeting.  What

20       I'm going to do is show you two documents.  I'm going

21       to have them marked serially, but I'm going to show

22       them to you at the same time and then ask you about

23       them because they're related; okay?

24  A.   All right.

25             MR. ULLMAN:  So we're going to mark these



1   State of Michigan)

2   County of Genesee)

3                   Certificate of Notary Public

4       I certify that this transcript is a complete, true and

5   correct record of the testimony of the witness held in this

6   case.

7       I also certify that prior to taking this deposition,

8   the witness was duly sworn or affirmed to tell the truth.

9       I further certify that I am not a relative or an

10  employee of or an attorney for a party; and that I am not

11  financially interested, directly or indirectly, in the

12  matter.

13              WITNESS my hand this 20th day of September,

14  2013.

15

16

17

18              Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19              Certified Realtime Reporter

20              Registered Merit Reporter

21              Certified LiveNote Reporter

22              Certified Shorthand Reporter

23              Notary Public, Genesee, Michigan

24              Acting in Oakland County, Michigan

25              My Commission Expires:  9-19-18



# EXHIBIT E

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**Page 1**

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2             EASTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4
 5    In re                    Chapter 9
 6    CITY OF DETROIT, MICHIGAN,   Case No. 13-53846
 7              Debtor.          Hon. Steven W. Rhodes
 8    _____/
 9
10    DEPONENT:  MAYOR DAVE BING
11    DATE:      Monday, October 14, 2013
12    TIME:      10:27 a.m.
13    LOCATION:  CITY OF DETROIT MAYOR'S OFFICE
14               2 Woodward Avenue
15               11th Floor Conference Room
16               Detroit, Michigan
17    REPORTER:  Jeanette M. Pallon, CRR/RMR/CSR-3267
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1    APPEARANCES:
 2
 3    JONES DAY
 4    By:  Thomas Cullen
 5         Dan T. Moss
 6    51 Louisiana Avenue, NW
 7    Washington, D.C. 20001.2113
 8    202.879.3939
 9         Appearing on behalf of the Debtor
10
11    DENTONS US LLP
12    By:  Anthony B. Ullman
13    620 Fifth Avenue
14    New York, NY 10020.2457
15    212.632.8342
16         Appearing on behalf of Official Committee of Retirees
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1    APPEARANCES (continued):
 2
 3    COHEN WEISS AND SIMON LLP
 4    By:  Joshua J. Ellison
 5    330 West 42nd Street
 6    New York, NY 10036.6979
 7    212.356.0216
 8         Appearing on behalf of UAW
 9
10    LOWENSTEIN SANDLER LLP
11    By:  Sharon L. Levine
12    65 Livingston Avenue
13    Roseland, NJ 07068
14    973.597.2374
15         Appearing on behalf of AFSCME
16
17    CLARK HILL PLC
18    By:  Jennifer K. Green
19    500 Woodward Avenue, Suite 3500
20    Detroit, MI 48226
21    313.965.8384
22         Appearing on behalf of Retirement Systems
23
24
25
```

**Page 4**

```
 1    APPEARANCES (continued):
 2
 3    WILLIAMS WILLIAMS RATINER & PLUNKETT PC
 4    By:  Ernest J. Essad, Jr.
 5    380 N Old Woodward Ave Ste 300
 6    Birmingham, MI 48009
 7    248.642.0333
 8         Appearing on behalf of FGIC
 9
10    CITY OF DETROIT LAW DEPARTMENT
11    By:  Portia L. Roberson
12    2 Woodward Avenue, Suite 500
13    Detroit, Michigan 48226
14    313.237.3018
15         Appearing on behalf of the City of Detroit,
16         Residents of the City, Mayor's Office and City Council
17
18
19
20
21
22
23
24    ALSO PRESENT:
25    Patrick Murphy, videographer
```



Page 45

1 Q. Well, did you -- as part of this initial -- this
2   restructuring program, were you aware in any way that
3   anything that was being proposed was contrary to the
4   laws or Constitution of the State of Michigan?
5 A. No.
6 Q. And do you recall specifically how if at all the
7   pension liabilities were to be dealt with under your
8   proposed approach?
9 A. No.
10 Q. Would that be set out in whatever documents there are
11   that describe your initiatives?
12 A. I didn't understand your question.
13 Q. Would the approach to pensions be set out in whatever
14   documents exist that describe the initiatives that
15   you've referred to?
16 A. Those probably were internal meetings between the CFO
17   and the COO and probably people from the labor
18   department. Those aren't meetings that I sat in.
19 Q. So you don't recall the specifics of how the pension
20   issues were --
21 A. No.
22 Q. -- being dealt with?
23 A. No.
24 Q. But as you understood it, the City's -- if the
25   proposed restructuring, the initiatives that you put

Page 46

1   in place went through, you believe that the City would
2   be able to survive without bankruptcy and would
3   continue to be able to meet its legal obligations?
4         MR. CULLEN: Objection, foundation, form.
5 A. The answer would be we wanted that opportunity.
6 Q. Okay. And you thought that if you had that
7   opportunity, you could make it happen; is that right?
8 A. That would be correct.
9 Q. But you weren't given that opportunity; were you?
10 A. That is correct.
11 Q. Let me go back to what we've marked as Orr Exhibit --
12   that we haven't marked but we've identified as Orr
13   Deposition Exhibit 7, which has the proposed summary
14   of partnership.
15 A. Uh-huh.
16 Q. Was this partnership agreement, the document that
17   appears here where it has a draft label on it, was
18   that ever made final?
19 A. Not to my knowledge.
20 Q. When you met with Mr. Orr -- at the end of February
21   in DC, you indicated that you discussed this with him,
22   though; correct?
23 A. Correct.
24 Q. And did he tell you that he was -- that he was
25   agreeable to it?

Page 47

1 A. He was agreeable in working together, but we didn't go
2   step by step and say that I agree or I don't agree.
3 Q. Okay. So did you have an understanding as when you
4   left that meeting in DC whether Mr. Orr had in fact
5   agreed to the points that were set out in this summary
6   of partnership document?
7         MR. CULLEN: Objection, foundation, form.
8 A. One of the areas that I do recall and me saying is
9   that it made reference to keeping the executive team
10   intact. He wanted the opportunity to make an
11   assessment himself.
12 Q. Okay, and did he make an assessment?
13         MR. CULLEN: Objection, foundation, form.
14 A. I think over the time that he's been here, I don't
15   think he personally made an assessment. I think there
16   were others who may have made an assessment and made
17   recommendations to him.
18 Q. And was your team -- your executive team left intact?
19 A. No.
20 Q. And who was gotten rid of besides Mr. Andrews, if
21   anyone?
22 A. Jack Martin is no longer here as the CFO. Karla
23   Henderson, who was the group executive for planning
24   and development and BC, is no longer here. I think
25   before Kevyn came on Kirk Lewis was already gone. I

Page 48

1   do think that Chris Brown was already gone. As of
2   today our purchasing director is no longer here,
3   Andre DuPerry. Richard Kay, who was the director of
4   the lighting department, is no longer here. The
5   director of DDOT is no longer here. I think there --
6   that's right off the top of my head. I think there
7   were nine or ten department heads that are no longer
8   here.
9 Q. And were they asked to leave by Mr. Orr or --
10 A. For the most -- for the most part, yes. There was one
11   guy who headed up -- he was the director of homeland
12   security, he left on his own accord because of the
13   environment that he felt he could no longer work in,
14   but for the most part all of those other people were
15   asked to leave.
16 Q. Now -- and are the positions that those people held
17   vacant or have they been replaced with other people?
18 A. There's a mixed bag, quite frankly. I mean, some of
19   them -- I think you got some consultants in some of
20   those positions. I mean, I had no input at all. I
21   mean, I found out after the fact that either people
22   were removed or if somebody was coming in. I had -- I
23   never had the opportunity to interview even the new
24   CFO who came in, the new COO who came in. Those were
25   selected by Kevyn in a vacuum, as far as I'm



Page 49

1    concerned.
2  Q.   Moving on past February of 2013, as I recall, the
3       official appointment of Mr. Orr as the emergency -- I
4       forget whether it was the Emergency Financial Manager
5       or Emergency Manager, but it took place sometime
6       around the end of March.  Is that generally consistent
7       with your recollection?
8  A.   Yeah, I think March 25th was his first day.
9  Q.   And from the meeting in DC up to March -- say March
10      25th, did you have any conversations with Mr. Orr?
11 A.   I may have had one phone -- one other phone
12      conversation with him.
13 Q.   And do you recall what the substance of that call was
14      about?
15 A.   I think more than anything else it was making sure
16      that when he came on board, we were having a press
17      conference, introducing him as the Emergency Financial
18      Manager and wanted me to stand with he and the
19      Governor at that, because we didn't want, quote
20      unquote, a divided house, if you will, and I thought
21      it was better since an Emergency Manager was coming on
22      board, it was no sense in us continuing to fight that.
23      If he could be helpful to turn this City around, it
24      would be better we do it together.
25 Q.   So in that phone conversation was there any discussion

Page 50

1       of Chapter 9 filing?
2  A.   No.
3  Q.   Was there any discussion of anything related to
4       pensions?
5  A.   No.
6  Q.   I'm going to show you another document, Mr. Mayor,
7       which we'll mark as Bing Number 3.
8           (Marked Exhibit No. 3.)
9  Q.   For the record what we've marked as Bing Exhibit --
10      what is this, 4?  Three.  Actually I think we had
11      previously marked this as Exhibit 22 to the Orr
12      deposition, but since I've forgotten about that, now
13      we'll just leave it as Bing Number 3, but I believe it
14      is the same document.
15          Do you recognize this document, Mr. Mayor?
16 A.   Yes.
17 Q.   For the record it's entitled City of Detroit
18      Restructuring Plan, dated March 23, begins with Bates
19      number DTMI00129416.
20 A.   Yes.
21 Q.   And just briefly tell me what this is and I'll ask you
22      a few questions about it.
23 A.   Well, it speaks to the things that we were working on,
24      the recommendations that we had put together to get us
25      through a very tumultuous time in the City of Detroit.

Page 51

1       We knew that this plan was going to negatively impact
2       a lot of folks in order for us to move forward with
3       implementation, but it was all about trying to manage
4       our way through without going to the route of
5       bankruptcy.
6  Q.   And this was a document that was put together by you
7       and people on your team; is that right?
8  A.   That would be correct.
9  Q.   And I see we've been going for a little over an hour,
10      an hour and 20 minutes.  It's probably a good time for
11      a break, but let me ask you first up to this time this
12      is now March 13, towards the -- by the end of March
13      had you had any conversations with anyone else from
14      the Governor's staff or with the Governor himself
15      about Mr. Orr as the Emergency Financial Manager or
16      the Emergency Manager?
17          MR. CULLEN:  Objection, foundation, form.
18      You can address the question.
19 A.   It was obvious to me in this time frame that Lansing
20      had made their selection, so, I mean, that's something
21      that I couldn't control so it was more important to
22      me, once again, to be part of the team to help fix the
23      City as opposed to constantly fighting and pushing --
24      and pushing back.  I didn't think that would get us
25      anywhere.

Page 52

1  Q.   Okay.  So after you had your initial conversations
2       with Baird in February, you then met with Orr in the
3       end -- towards the end of February also in DC, and
4       then Orr -- there was an official announcement at the
5       end of March saying Orr's the new EM or the new EFM.
6       Prior to the meeting in DC and the official
7       announcement of Orr, did you have any contact with
8       anyone from the State about Mr. Orr's being made the
9       Emergency Manager or Emergency Financial Manager?
10 A.   The answer would be very little, if any, because they
11      had the right to make the decision, they made the
12      decision, so once again, I would prefer to work with
13      the individual seeing what we could do together to fix
14      the City, a broken City.
15 Q.   Okay, so let me just ask more directly.  Did you have
16      advanced notice before the public announcement that
17      the City -- the State was going to come out and make
18      an announcement saying Kevyn Orr is our man?
19 A.   Yes.
20 Q.   And when were you told?
21 A.   That had to be in early -- early to mid March.
22 Q.   And do you remember the specifics of that discussion,
23      who told you what was said?
24 A.   Whether that was Rich Baird or Andy Dillon, it wasn't
25      the Governor.



Page 57

1 A. Yes, it did.

2 Q. And was that taken out of your hands also?

3 A. Yes, it was.

4 Q. And that like the other real estate you mentioned was

5 taken out of your hands by the Emergency Manager and

6 his team I take it?

7 A. The whole process --

8 MR. CULLEN: Objection, foundation, form.

9 A. -- yeah.

10 Q. And did there come a time when someone -- how did this

11 process come about that it was taken out of your

12 hands? Did the Emergency Manager or someone from his

13 staff actually tell you or your staff, don't worry

14 about these things anymore, it's not your business or

15 words to that effect?

16 MR. CULLEN: Objection.

17 A. No.

18 MR. CULLEN: Foundation, form.

19 Q. How did it come about that it was taken out of your

20 hands?

21 A. I actually went to the Emergency Manager and told him

22 about these potential deals and in order for them to

23 go forward, he had to sign-off on it. He said to me

24 that it looked like they were decent deals and that he

25 would, but obviously that hasn't happened yet.

Page 58

1 Q. And has there been any follow-up with the Emergency

2 Manager between him and you as to why he hasn't signed

3 off?

4 MR. CULLEN: Objection, foundation, form.

5 A. I think more than anything else he wants to look at

6 some of the bigger issues that he's got to deal with

7 as opposed to these things which he may consider, you

8 know, not big issues.

9 Q. Even though if these things went through, they would

10 at least bring in some immediate cash; is that right?

11 A. They would.

12 Q. As part of the asset monetization, did you give any

13 consideration to try to monetize art that is owned by

14 the City of Detroit and maintained at the Detroit

15 Institute of Arts?

16 A. The answer would be no.

17 Q. And was there a particular reason you didn't give any

18 consideration to that?

19 A. Back at that time when we were thinking about it, that

20 never came up, that was never a conversation that we

21 had internally. I think since he's been on board, the

22 subject obviously has gotten a lot of heat and a lot

23 of visibility. I'm not sure what's going to happen

24 there.

25 Q. Okay. And do you -- let me ask it this way.

Page 59

1 Did you as of the March 2013 time frame

2 have any understanding, just a general understanding,

3 as to what the value was of the art that's owned by

4 the City of Detroit?

5 MR. CULLEN: Objection, foundation, form.

6 A. The answer would be no.

7 Q. And as you sit here today, do you have any

8 understanding as to the value of the art that owned

9 by the City of Detroit?

10 MR. CULLEN: Same objection.

11 A. The answer would still be no.

12 Q. Are you aware of reports in the press stating that the

13 city-owned art could easily be worth billions of

14 dollars?

15 A. I have read that, yes.

16 Q. And do you have any reason to believe those reports

17 are inaccurate?

18 MR. CULLEN: Objection, foundation, form.

19 Of what they report or the value or what, counsel?

20 MR. ULLMAN: I think my question was clear.

21 Q. You can answer my question.

22 A. I know that he's engaged Christie's to do an

23 evaluation and I'm not sure that that's complete yet,

24 so I have no idea of what the value may or may not be.

25 Q. Okay. Let me ask you to turn now to the next page of

Page 60

1 this document, which is ending in Bates page 422. And

2 this heading says, and I quote, "The Mayor's plan

3 includes strategies to implement changes that will

4 significantly reduce general fund long-term

5 liabilities."

6 Do you see that?

7 A. Yes.

8 Q. And so we're clear, what in brief is the general fund?

9 A. That's the -- the general fund is what we use to run

10 the City on a day-to-day basis.

11 Q. Now, in subpoint A, 3A, you give some -- you give two

12 subpoints, two bullets. The second one says,

13 approximately 6 billion of City debt is owed by the

14 water and sewer department and does not have an impact

15 on the general fund. Do you see that?

16 A. Yes.

17 Q. Can you explain what you were referring to by those

18 words?

19 A. That -- that debt is paid by the users of the water

20 and sewerage department, so there's a revenue stream

21 that pays that debt down, so it's not part of the

22 general fund.

23 Q. Okay, and as you put it here, that that debt, while

24 it's on the books as City debt because the department

25 of water and sewer is part of the City, that doesn't,



Page 61

1 as you put it, have an impact on the general fund
2 because it's -- the water and sewer debt is paid for
3 by the department of water and sewer?
4 A. That would be correct.
5 Q. And that, as I understand it, is run as a separate
6 authority and has its own books and records and is
7 solvent; is that right?
8 A. That would be correct.
9 Q. You then go on in the next point, sub B, to refer to
10 pension unfunded liabilities, and you say
11 approximately 650 million of unfunded liability as of
12 FY 2012 of which only 250 million relates to general
13 fund.
14 A. Uh-huh.
15 Q. Do you see that? And could you tell me what you meant
16 when you wrote that?
17 MR. CULLEN: Objection, foundation, form.
18 A. I believe that makes reference to both the payment to
19 the pension fund and maybe even to the healthcare
20 benefits.
21 Q. Okay, I'm going to be a little more specific. The
22 language of this restructuring plan states that
23 there's 650 million of unfunded pension liability. Do
24 you see that?
25 A. Uh-huh.

Page 62

1 Q. And then it says of that only 250 million relates to
2 the general fund.
3 Can you tell me what that's referring to?
4 A. No, not right off the top of my head I can't, no.
5 Q. So you don't recall what that level of detail is as to
6 the --
7 A. Correct, correct, correct.
8 Q. Then the next bullet it -- well, I guess – do you
9 recall where the 650 million liability -- unfunded
10 liability number comes from?
11 A. We have not -- we're not current with our pension
12 contributions.
13 Q. I guess let me ask it a little -- let me mark then
14 another document. We'll make this as Bing 4.
15 (Marked Exhibit No. 4.)
16 Q. And Bing 4 for the record is an excerpt from a
17 document entitled Comprehensive Annual Financial
18 Report for the City of Detroit for its fiscal
19 year-ended June 30, 2012 and I've attached just two
20 pages of it because it's a very long document.
21 Okay, Mr. Mayor? You've seen -- you know
22 what the Comprehensive Annual Financial Report is;
23 right?
24 A. Yes.
25 Q. And I've attached the pages that pertain to the

Page 63

1 pensions and if you look on page 124, it talks about
2 the unfunded AAL on line 3 of that table.
3 A. Uh-huh.
4 Q. And which stands for unfunded actuarial -- as I
5 understand it, actuarial accrued liability?
6 A. Correct.
7 Q. And then if you look at the table, it says for the
8 General Retirement System there's a number of
9 approximately 640 million and on the Police and Fire
10 Retirement System it's about 4 million. Do you see
11 that?
12 A. Yes.
13 Q. And is it correct that that -- so that adds up to
14 about 644 million. Does that correspond to the
15 650 million that's in the restructuring plan that we
16 have as Exhibit 3?
17 A. Yes, yes.
18 MR. CULLEN: Objection, foundation, form.
19 Q. And when you -- the restructuring document refers to
20 the unfunded liability at fiscal year 2012, is that
21 referring to the valuation that's referred to at the
22 top of page 124 of Bing 4 where it says, and I quote,
23 "The funded status of each plan as of June 30, 2011,
24 the most recent actuarial valuation date, is as
25 follows" and then gives a table?

Page 64

1 MR. CULLEN: Objection, foundation, form.
2 A. And your question was?
3 MR. ULLMAN: Do you want to read it back?
4 If you don't understand, I'll rephrase it, but --
5 THE WITNESS: Yes. I just need --
6 Q. Would it be easier if I just rephrased the question?
7 A. Go ahead.
8 Q. Okay. When you referred to the approximately
9 650 million of unfunded liability as of fiscal year
10 2012, okay, the unfunded liability as of 2012, is that
11 referring to the underfunding as reported as of the
12 June 30, 2011 actuarial valuation which is referred to
13 on the top of page 124?
14 A. The answer would be --
15 MR. CULLEN: Objection, foundation, form.
16 When you say when you refer, you mean -- are you
17 implying that he wrote this document personally?
18 MR. ULLMAN: No, he and his team.
19 Q. I'm obviously referring to that in the general sense.
20 I didn't intend to imply that you physically drafted
21 this, Mr. Mayor. I understand this was put together
22 by you and people working for you.
23 A. And the answer to that would be yes.
24 Q. And also under this -- going back to page 422 of
25 Exhibit 3 under the subheading B under pension



## Page 65

1  unfunded liabilities it says, the City is developing a
2  plan to reduce the unfunded liability.
3       Do you have any recollection as to the
4  specifics of that plan?
5  A.  No, I don't.
6  Q.  Now, you recall -- or let me ask you.
7       Are you aware that on June 14th, 2013 the
8  Emergency Manager had a meeting with creditors?
9  A.  I'm aware.
10  Q.  Prior to the time that he was appointed or I should
11  say -- let me withdraw that.
12       Prior to the time that the Emergency
13  Manager's appointment was formally announced and June
14  14, 2013, did you have any conversations with the
15  Emergency Manager himself?
16  A.  Yes.
17  Q.  And do you recall how many?
18  A.  We don't -- we don't meet that often.  You know, if we
19  meet once or twice a week, that's about it and the
20  meetings are usually very short meetings.  Usually
21  called by me.
22  Q.  And can you say how long a typical meeting would last?
23  A.  Thirty minutes tops.
24  Q.  During that time between March 25th and June 14th do
25  you recall any discussions with the Emergency Manager

## Page 66

1  concerning pensions, anything to do with pensions?
2  A.  I -- yes.
3  Q.  And tell me what you recall.
4  A.  You know, the general conversation was that pensions
5  are a major problem that we have and we've got to
6  address it.
7  Q.  And do you recall when those conversations took place?
8  A.  Probably more in the May time frame.
9  Q.  And was there any conversation with the Emergency
10  Manager as to how the Emergency Manager intended to
11  address the issues of pensions?
12  A.  No.
13  Q.  Was there any discussion with the Emergency Manager
14  during the period I've been asking about, the end of
15  March and June 14, about the City's filing for Chapter
16  9 bankruptcy?
17  A.  I think the only conversations we may have had about
18  that is that's the last resort and that's from him
19  saying, you know, that's not the direction we want to
20  go in and it would be last resort.
21  Q.  Did the emergency -- did you have any discussions with
22  the Emergency Manager in which he indicated that he
23  had any approaches or thoughts as to how to address
24  issues relating to pensions other than filing for
25  Chapter 9 bankruptcy?

## Page 67

1  A.  No.
2  Q.  And did you have any conversations with him in which
3  he specifically referred to a Chapter 9 bankruptcy as
4  a way to deal with the pension issues?
5  A.  I believe the answer to that would be yes.  I can't be
6  very specific, I don't recall, but I think -- I
7  believe that conversation -- or a conversation like
8  that did occur.
9  Q.  Okay, and can you give me, as best you can recall, a
10  time frame as to when?
11  A.  I think it would be in that same May time frame in one
12  of our discussions.
13  Q.  And can you tell me with as much specificity as you
14  can remember what the Emergency Manager said during
15  that conversation?
16  A.  Once again, with not a lot of specifics, but in order
17  to fix the problems of the City where -- I know this
18  number has been thrown out a lot, the $3.5 billion of
19  unfunded liabilities, etc., etc., I mean, he talked
20  about that, but that was a generality and so it was no
21  more -- it was not more specific than that.
22  Q.  But he referred to Chapter 9 as a way to get rid of or
23  address what he referred to as a 3.5 billion unfunded
24  liability?
25  A.  As a possibility.

## Page 68

1       MR. CULLEN:  Objection, foundation, form.
2  You can answer.
3  A.  As a possibility.
4  Q.  And did Mr. Orr tell you at that time that the
5  unfunded liability was indeed 3.5 billion?
6  A.  The answer to that would be yes.
7  Q.  And did he tell you that that had been shown through
8  an actuarial valuation?
9  A.  The answer to that would be yes.
10  Q.  During that conversation or any other conversation
11  with Mr. Orr during the March 25 through June 14 time
12  frame, was there any discussion with Mr. Orr of what
13  we've referred to previously and I've shown you the
14  pension clause in the Michigan Constitution or any
15  other legal impediments to -- affecting pension
16  rights?
17  A.  No.
18  Q.  Let me ask you the same questions now -- well, let me
19  preface it by saying you're aware, of course, that
20  there was a bankruptcy filing on July 18.
21  A.  That would be correct.
22  Q.  Okay.  Now, during the period between June 14, that
23  was when the creditor proposal was issued, and the
24  filing, did you have any conversations with Mr. Orr
25  A.  About?



Page 117

1  Q.  Did you hire them?

2  A.  No.

3  Q.  Who retained them?

4  A.  I think -- once again, most of these companies were

5      being -- they were being pressed by the -- we were

6      pressed by the State to my understanding, the State

7      had a lot of input into the selection process and in

8      some cases where the City has a responsibility for

9      paying part of the fees, you know, I've always had a

10     problem that I was not at the table to participate in

11     the selection process.

12 Q.  Do you pay part of the fees for Miller Buckfire?

13 A.  Yes.

14 Q.  Does the State pay part of the fees for Miller

15     Buckfire?

16 A.  Yes.

17 Q.  Does the NERD Fund pay part of the fees for Miller

18     Buckfire?

19 A.  I wouldn't know that.

20 Q.  Do you have a copy of Miller Buckfire's retention or

21     engagement letter?

22 A.  I would think we have that. I don't -- I don't have

23     it personally, but I would think we do in the purchase

24     department and maybe in the law department.

25         MS. LEVINE: We would request a copy of

Page 118

1      that letter. I know that there's been a lot of

2      documents that have been produced but we didn't happen

3      to see what in there so we would make that specific

4      request.

5         MR. GREEN: And if I may add the 2012

6      engagement letter from Miller Buckfire as well. I

7      understand they were initially engaged the prior year.

8      There may be two engagement letters.

9         MR. MOSS: Please put that in a letter so

10     we make sure we get it part of the record. We'll take

11     a look.

12        MS. LEVINE: So the request will be for any

13     engagement letters or contracts with Miller Buckfire

14     and we'll clarify that.

15 Q.  During the deposition last week with Treasurer Dillon

16     he made a reference to a report with regard to certain

17     tax write-offs or uncollected taxes. Are you familiar

18     with that?

19 A.  No, I'm not. Not specifically.

20 Q.  Are you familiar with any issue with regard to

21     potential tax write-offs where the taxes could have

22     been collected?

23        MR. CULLEN: Objection, foundation, form.

24 A.  No, I'm not. You know, we've got uncollected taxes

25     that go back ten, 12 years, and so prior

Page 119

1      administrations in my -- in my perspective a lot of

2      that should have been written off a long time ago but

3      they've been carrying it on books and I just think

4      that's the wrong approach.

5  Q.  Under your administration were -- how many -- how much

6      did you write-off in what you believe to be

7      uncollected taxes?

8  A.  I'm not sure of that. I would have to get with the

9      CFO.

10 Q.  Do you have an approximate number?

11 A.  No, I don't.

12        MS. LEVINE: I don't have anything further.

13     Thank you.

14        THE WITNESS: Thank you.

15        MR. GREEN: No, I don't have any questions.

16        MR. CULLEN: We don't need the Pistons

17     question on the record.

18        MR. ESSAD: No.

19        MR. CULLEN: Thank you very much.

20        THE VIDEOGRAPHER: This completes the

21     deposition. We're off the record, 1:22.

22        (Deposition concluded at 1:22 p.m.)

23              *   *   *

24

25

Page 120

1  State of Michigan)

2  County of Genesee)

3           Certificate of Notary Public

4      I certify that this transcript is a complete, true and

5  correct record of the testimony of the witness held in this

6  case.

7      I also certify that prior to taking this deposition,

8  the witness was duly sworn or affirmed to tell the truth.

9      I further certify that I am not a relative or an

10 employee of or an attorney for a party; and that I am not

11 financially interested, directly or indirectly, in the

12 matter.

13        WITNESS my hand this 16th day of October,

14 2013.

15

16

17

18     Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19     Certified Realtime Reporter

20     Registered Merit Reporter

21     Certified LiveNote Reporter

22     Certified Shorthand Reporter

23     Notary Public, Genesee, Michigan

24     Acting in Oakland County, Michigan

25     My Commission Expires: 9-19-18

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com



**To:** Bing, Dave[BingD@detroitmi.gov]; Martin, Jack[MartinJack@detroitmi.gov]; Warfield, Robert[WarfieldR@detroitmi.gov]
**Cc:** Andrews, Kriss[AndrewsK@detroitmi.gov]
**From:** Kriss Andrews
**Sent:** Wed 7/10/2013 8:56:40 AM
**Subject:** Emergency Management

You have asked for some views of how the emergency management process is going and how it contrasts with what we were doing without regard to the Emergency Manager.

In answering this one needs to consider we did not have certain opportunities that the EM did, such as filing for bankruptcy, or credibly threatening to do so. Thus, unless we were allowed to operate under PA 436 (which we were not given the opportunity to do) we had to defer attacking certain of the long term obligations as we would not have been able to threaten bankruptcy.

We did attack both health care and pension, which the EM continued, and I would say continued well. They put in place the pension task force that I recommended after some irregularities surfaced which Jack's folks brought to our attention. They continued and I would say improved on the health care work we started. But Jack brought in the actuary they used, and that actuary was really key. So overall, in long term liabilities they continued and improved on what we started, and had tools we simply did not have. Overall I give them good marks in long term liabilities, but that does not mean they will be successful or we did poorly. We simply did not have the tools we needed and they are not done.

Operations are a different matter altogether. Kevyn did well attacking long term liabilities because we gave him a good headstart, it is an area he knows well, and he has the tools to be successful.

In operations he threw away the headstart we gave him, he frankly is not competent at all (in fact, he is embarrassingly incompetent and only listened to his equally incompetent staff) and did not well exercise the added powers he has. I would give him an A in long term liabilities and an F in operations. Given his limited background (legal representation really is all he has, since his other roles are so narrow and unrelated to running a complex operation) and the weak experience the folks from the state have (experienced folks around town will tell you Andy is resume light and highlights disasterous deals as his credentials), this is not surprising.

Since March 28 we have been forced sideways on operations, or simply been told to stand down. A few areas where progress has been slowed are as follows.

1. We should now be installing a new management team in DDOT. We diagnosed this problem correctly, ran a compliant RFP process, and were ready to choose MV as the manager when the EM slowed the process. Though he gave me a poor excuse for doing so, it does not hold water. In addition, he told me a disaster at DDOT would not be a problem for him since it would highlight how screwed up the city is. So I guess the good citizens of Detroit can wait for busses that do not come because it is not inconvenient to Kevyn for them to do so.

2. We should also be progressing on providing a new management team in PLD. As I have said, it is not operationally reasonable to conclude PLD can work through a several year wind-down. We need to outsource the management there and make the operations safe and reasonably compliant. The EM slowed the process here also, and said the same thing: a disaster at PLD would not be a bad thing because it would highlight how messed up the city is. Again, we can expose our employees to safety issues and violate federal regulations because it is not inconvenient to Kevyn to do so.

3. Similar issues surfaced around the lighting authority. After the authority could only get a workable agreement with us (which gave them what they needed but no more, since Detroit has no more) they went to Kevyn and got a deal which forces the City to put in more money then they need, sooner than they need it, while the city struggles. And they cut this deal without coordinating with us so we were just wasting our time since the Authority had softer hands to negotiate with than us.

4. The rest of the control of operations was equally incompetent. Ordering us not to coordinate with the consultants we hired to help us, putting in place very inexperienced staff that controlled things. Not listening to Conway MacKenzie. Every department and thinking person is left wondering.

They also pursued the wrong things, as follows.

1. Focussing on outsourcing solid waste first. While this may be something we should look at, no informed person puts it first. However, it was something they could do, so they focussed on what they could do, not on what needed to be done. Moreover, the announced savings of $15 million are ridiculous. They have no idea what the savings are, presuming there are savings.

2. Moving PDD to DEGC. When I told Kevyn we had issued a plan to the state on this and said we had studied it carefully, Kevyn gave me a legalistic view of Annex B. it was clear Kevyn had his marching orders and logic and operations had nothing to do with his orders. This whole sordid matter you all know well and needs no more documentation. The state's plan is poorly thought out and will just create a mess.

3. Public Safety. While there is emotional appeal to putting in place a new Chief, not giving insiders a real shot and not going through a thorough search were poor choices. Hopefully this will turn out okay, but we should be able to rely on more than hope. Also, I am lost as to where we are on the choice of a consultant, which I also do not believe was followed wisely from a process standpoint.

There are many other areas that could be discussed, I am sure Jack and the Mayor can add to the above lists. The question is how do we stay honest and complete without sounding complaining and negative? There are signs they are realizing how poorly they have done in operations. But the inherent problem is they do not know what they do not know. And that is not changing. I doubt they have learned to look and listen, which is what is needed.

We can talk at your convenience (evenings are best, though today we are at sea and I could talk anytime) or when I get back. But we need to plan this communication well. How do we get out a message that helps matters?

This is especially so since the press has so poorly reported on matters and seems to just write what the state gives them. Apparently keeping peace with their sources of information (the state) is more important than critically thinking about what is happening and doing a little investigation. And the gag orders from Kevyn only support the very poor reporting.

But remember, though they have completed nothing to date, they get an A in my book in teeing up a reduction in long term liabilities. That is worth a lot; they could just do a lot more by looking and listening.

Kriss

Sent from my iPad
Krissandrews@hotmail.com
Cell 586-202-2035

# EXHIBIT F

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## CITY OF DETROIT, MICHIGAN

Case No. 13-53846

---

## CHARLES M. MOORE

*September 18, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

1   A.   The rate of payouts is another area where the
2        actuaries make assumptions as to what benefits will be
3        paid in what periods and to the extent that those are
4        underestimated, that can impact the funded position as
5        well.  Tying into previous assumptions that I had
6        indicated.
7   Q.   So is it -- is it your position that the City views
8        the actuarial payout assumptions as understating
9        unfunded liabilities?
10              MR. MILLER:  Object to form.  Go ahead.
11  A.   As an example, Mr. Ruegger, the actuarial valuation
12       assumes certain payouts.  The actual payouts in the
13       most recent completed year of plan assets were
14       substantially higher than what was anticipated prior
15       to that valuation being done and so at a minimum that
16       would indicate that there were more assets that were
17       paid out than what was assumed by the actuary.
18  Q.   Other than the assumptions and methods you've
19       identified, are there any other assumptions and
20       methods that to your understanding the City views as
21       understating the systems' unfunded liabilities?
22  A.   The City and most importantly its actuary has not
23       completed its analysis on the unfunded position.  The
24       City is trying to undertake a process to actually
25       develop a more concrete valuation model on its own so



1        it's been relying on the valuation model of the

2        pension systems' actuary.  As such we have focused on

3        a few items here, but until the City completes its

4        analysis and completes its own actuarial valuation,

5        neither the City nor its actuary nor I would be able

6        to say what all the assumptions are that could be used

7        to either overstate or understate the funded position.

8   Q.   Very well.

9              Let's turn to one of the assumptions that

10       you address in your declaration and specifically in

11       paragraph 11 you talk about the projected net rate of

12       return.  The 7.0 percent or 7.25 percent figure, do

13       you see that in paragraph 11?

14  A.   Yes, sir.

15  Q.   Those were not figures that were recommended by a

16       particular actuary; were they?

17  A.   The 7 percent is actually higher than the rate that

18       Milliman, the City's actuary, had originally put

19       forward, which in its view would result -- the rate at

20       which there was a fifty-fifty chance of achieving that

21       rate.

22             MR. RUEGGER:  All right.  I'm going to move

23       to strike, because with all respect that was not

24       responsive to my question, Mr. Moore.

25  Q.   I understand Milliman has prepared a variety of



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1        from an actuarial standpoint and no new benefits

2        accrued and you experience a 7.9 percent assumed rate

3        of return -- or actual rate of return, what would

4        happen to the plan assets.

5   Q.   Let me ask you if you have Moore Exhibit 3 there, I

6        want to ask you a few questions with regard to that.

7                 Let me direct you to page 95 of that

8        presentation.  Hang on for a second.  I'm sorry, I was

9        in the wrong place.  Page 109.  Looking at the heading

10       there, claims for unfunded pension liabilities.

11  A.   Yes, sir.

12  Q.   Were you involved at all in the drafting of that part

13       of this presentation?

14  A.   I don't think I wrote that, but I was aware of this

15       language.

16  Q.   Okay.  How about the specifically the language of the

17       third bullet point?  Because the amounts realized on

18       the underfunding claims would be substantially less

19       than the underfunding amount, there must be

20       significant cuts in accrued vested pension amounts for

21       both active and currently retired persons.  Were you

22       involved in formulating that?

23  A.   Yes, sir.

24  Q.   And has the City -- I noticed in this presentation

25       there's no quantification of what -- of the cuts that


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1            would be -- that in the City's view must occur;
 2            correct?
 3    A.     Correct.
 4    Q.     Has there been a specification of those level of cuts
 5            that the City contends must occur?
 6                   MR. MILLER:  Object to form.
 7    Q.     I mean, have you put a dollar amount on it?
 8    A.     No, and our analysis of this continues.  Right now we
 9            still don't know what assets could be available to put
10            towards the pensions.  We still have not had the type
11            of dialogue that we would like to have related to the
12            calculation of the unfunded amount, so because of
13            those two uncertainties among others we don't know
14            what cuts, if any, there may need to be.
15    Q.     Well, doesn't it say there must be significant cuts?
16            Am I -- are you saying that there's some -- that the
17            City's position may be that there are no cuts that are
18            necessary in accrued vested pension amounts?
19                   MR. MILLER:  Object to form.
20    A.     We don't know.  That's where we want to continue to
21            engage in discussions and negotiations with the
22            parties, but depending on what the unfunded amount is
23            and what assets may be available for those claims, it
24            certainly is possible.
25    Q.     So maybe that should have been worded there may be
```



1  State of Michigan)

2  County of Genesee)

3            Certificate of Notary Public

4      I certify that this transcript is a complete, true and

5  correct record of the testimony of the witness held in this

6  case.

7      I also certify that prior to taking this deposition,

8  the witness was duly sworn or affirmed to tell the truth.

9      I further certify that I am not a relative or an

10  employee of or an attorney for a party; and that I am not

11  financially interested, directly or indirectly, in the

12  matter.

13            WITNESS my hand this 20th day of September,

14  2013.

15

16

17

18      Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19      Certified Realtime Reporter

20      Registered Merit Reporter

21      Certified LiveNote Reporter

22      Certified Shorthand Reporter

23      Notary Public, Genesee, Michigan

24      Acting in Oakland County, Michigan

25      My Commission Expires:  9-19-18



# EXHIBIT G

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**In the Matter Of:**

IN RE CITY OF DETROIT, MICHIGAN

13-53846

---

**GLENN DAVID BOWEN**

*September 24, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

Page

1  it was based upon a lower expectation of future

2  benefits, which generates a lower liability.  And

3  then the cancellation of future COLAs generates

4  lower future benefit payments as well.

5          So in using information we were able to

6  draw from the valuation reports, we prepared

7  estimates of those two topics.

8      Q.    Are these the estimates that you, in an

9  earlier document, called "guesses"?

10     A.    I'm not sure which -- I mean, you can

11 put that particular document back in front of me.

12 I've used the phrase "rough guess"; I've used the

13 phrase "estimate" --

14     Q.    Rough guess.

15     A.    Rules of thumb, I would say, by

16 definition, are rough guesses.  They're defined to

17 give us a proxy of what we -- the result we would

18 arrive at had we done more detailed modeling.

19     Q.    And you have a workpaper showing this

20 calculation?

21     A.    Yes.  We would have developed two

22 calculations, one for the impact of the plan freeze



```
                                        Page
 1                C E R T I F I C A T E

 2   DISTRICT OF COLUMBIA:

 3        I, Cindy L. Sebo, a Notary Public within

 4   and for the Jurisdiction aforesaid, do hereby

 5   certify that the foregoing deposition was taken

 6   before me, pursuant to notice, at the time and place

 7   indicated; that said deponent was by me duly sworn

 8   to tell the truth, the whole truth, and nothing but

 9   the truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition is

13   a true record of the testimony given by the witness;

14   and that I am neither of counsel nor kin to any

15   party in said action, nor interested in the outcome

16   thereof.

17                _____

18

19

20                _____

21   Cindy L. Sebo   Cindy L. Sebo, RMR, CRR, RPR, CSR,
     District of Columbia, Notary Public
22   My Commission Expires
         April 14, 2015      CCR, CLR, RSA, Notary Public
```

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com



# EXHIBIT H

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

*In Re: City of Detroit, Debtor*

---

*Treasurer Andrew Dillon*
*October 10, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 101013AD.TXT

Min-U-Script® with Word Index

Page 65

1  A.  I don't agree with that.
2         MS. NELSON: Objection; argumentative.
3  BY MR. SHERWOOD:
4  Q.  And without giving your -- as a Treasurer, as a
5       former Legislator, is it your view or do you agree
6       that the proposed treatment on June 14th, 2013,
7       providing for cuts in accrued vested pension amounts
8       for both active and currently retired persons would
9       be violative of Section 24 of the Michigan
10      Constitution?
11 A.  No, because that doesn't provide for it. To my
12      mind, and this is how this Governor does business,
13      is he hires good people and lets them do their job.
14         To me that document was laying out the
15      facts for creditors so they could understand the
16      financial condition of City.
17 Q.  So this wasn't a proposal even though it's -- even
18      though the title of the document is proposal for
19      creditors?
20 A.  I think he's just laying out the facts. This is the
21      economic reality of the City of Detroit. From
22      there, as you know, there was various meetings with
23      various creditors to discuss can we get this thing
24      settled out of court.
25 Q.  Did you participate in any of those meetings?

Page 66

1  A.  I don't believe so.
2  Q.  Were you given reports by the emergency manager as
3       to how those meetings were going?
4  A.  We typically had a weekly either meeting or call
5       where we were given an update on the status of
6       events.
7  Q.  Who was on the weekly meeting call?
8  A.  It would be Kevyn and some of the members from his
9       team, various members of the Governor's office as
10      well as my office.
11 Q.  And what was reported in terms of the progress that
12      the emergency manager was or wasn't making with the
13      out-of-court negotiations?
14         MS. NELSON: I'm going to object to the
15      extent that it calls for attorney-client
16      communications and instruct him not to answer.
17         That, in fact, is what it calls for.
18 BY MR. SHERWOOD:
19 Q.  Did you have any communications with Mr. Orr outside
20      the presence of counsel --
21 A.  Yes.
22 Q.  -- concerning -- concerning negotiations with
23      creditors before the Chapter 9?
24 A.  Yes.
25 Q.  And what did you say during those communications?

Page 67

1  A.  I was mostly just listening because I was getting an
2       update about how things were going.
3  Q.  What was the -- what did he say?
4  A.  The only specific memory I have would be the one
5       dealing with the SWOPS, discussions with the SWOP
6       providers and whether or not there could be a
7       settlement reached with them.
8  Q.  What did Mr. Orr say about the SWOPS?
9  A.  He reached an agreement with two of the SWOP
10      providers that he could get a discount on the monies
11      owed on the SWOPS, and that's my only memory of a
12      specific -- I knew every week that he was meeting
13      with various creditors, but that's the only one that
14      I remember kind of a specific deliverable for.
15 Q.  And do you recall anything else about those
16      nonprivileged conversations?
17         Did he report that the negotiations were
18      going well, that they were going poorly, that they
19      were not going at all, anything along those lines or
20      do you just recall the specific discussion about the
21      SWOPS?
22 A.  Yeah. I -- there was, I think, just general
23      comments that they weren't real productive, right,
24      that we weren't making progress.
25 Q.  Did he say why?

Page 68

1  A.  I'm sure he did, but it would require going through
2       each of the various creditors that he met with at
3       the time so I don't have specific memories of each.
4         The only one I have a specific memory right
5       now about would be very difficult discussions with
6       the suretys, the insurance companies, a lot of
7       unwillingness to embrace what the economic realities
8       were, and then a lot of concern about the number of
9       retirees and the unions not wanting to represent the
10      retirees, making it difficult to negotiate for
11      20,000 people.
12 Q.  Did he say it was impossible to negotiate with all
13      of the creditors of the City of Detroit? Did he
14      reach that conclusion in your presence?
15 A.  I don't recall the specific words he used but
16      clearly he was expressing that it was very difficult
17      to work and negotiate with a pool of creditors that
18      include 20,000 individuals, yes.
19
20         (Deposition Exhibit 5 was marked.)
21
22 BY MR. SHERWOOD:
23 Q.  Treasurer Dillon, we've marked as Dillon 5 an email
24      from you dated July 9th to the Governor and others.
25         Are you familiar with this email?

MORETTI GROUP  800-536-0804
Court Reporting and Videoconferencing

(17) Pages 65 - 68

13-53846-tjt  Doc 2304-8  Filed 12/23/13  Entered 12/24/13 08:04:28  Page 171 of
175

709

Page 69

1 A. Yes.
2 Q. And it says that "Kevyn will meet with the Detroit
3 pensions tomorrow after all."
4 I want to ask you about the word after all.
5 Was there a suggestion before you wrote this email
6 that Kevyn was not going to meet with the Detroit
7 pensions?
8 A. Yeah. I think before that there was some thought
9 that that meeting was going to get cancelled.
10 Q. And who was going to cancel it?
11 A. My memory is Kevyn might have. There was a lawsuit
12 that was filed that I think caused some
13 consternation about whether or not he should meet
14 with them.
15 Q. So initially Mr. Orr was considering not meeting
16 with the pensions on July 10th, 2013, and then he
17 changed his mind and decided to meet with them?
18 A. My memory is there was a plan to meet with them,
19 then some lawsuits got filed which I think he
20 contemplated not going forward with the meeting.
21 And from reading this, apparently he went forward
22 with the meeting.
23 Q. Going down to the last paragraph it says "Tomorrow's
24 meeting could lead to questions directed to you
25 about your view on this topic."

Page 70

1 Obviously, you is the Governor, and the
2 Governor's view on this topic, I assume this topic
3 is the Detroit pensions. Would that -- is that
4 right? Am I right saying those things?
5 A. Right.
6 Q. So and then you -- then you say "...it's too
7 early in the process to respond to hypothetical
8 questions. We remain in many ways in the
9 informational stage."
10 Does that mean that at this point in time,
11 July 9th, 2013, you were still in the informational
12 stage vis-a-vis the Detroit pensions?
13 A. We were learning things. We were learning about an
14 annuity program that the City had offered employees.
15 We were learning that there was alternative
16 investments that were made that were not written
17 down. We were learning what assumptions the
18 City's actuarial firm was making versus the ones
19 that Milliman was hired to really appreciate and
20 understand what was the level of underfunding.
21 So on that date in question I couldn't tell
22 you that these funds were funded at X percent
23 because there was too many moving pieces to the
24 puzzle.
25 Q. So your advice to the Governor was in response to

Page 71

1 questions about his view on the Detroit pensions was
2 to just say it was too early in the process and you
3 were still in the informational stage; is that
4 right?
5 A. That's right.
6 Q. And this was before the Governor authorized
7 Chapter 9 filing, correct?
8 A. Correct.
9 Q. Did that -- did your view of the Governor's -- what
10 the Governor's position should be change before
11 July 18th, in the next week?
12 A. No.
13 MR. SHERWOOD: All right. I'm going to
14 stop here, Treasurer. Thank you.
15 I reserve the right if we have time to ask
16 a question or two later, but I think as a courtesy
17 to my -- the other lawyers here I'm going to turn
18 over the mic to them.
19 Thank you for your testimony this morning.
20 Should we take a quick break?
21 VIDEO TECHNICIAN: Off the record 11:02
22 a.m.
23 (A brief recess was taken.)
24 VIDEO TECHNICIAN: We're back on the record
25 at 11:06 a.m.

Page 72

1 EXAMINATION
2 BY MR. WERTHEIMER:
3 Q. Mr. Dillon, my name is Bill Wertheimer. We've met
4 off the record. I'm going to be asking you some
5 questions.
6 I represented and represent what we've
7 called the Flowers Plaintiffs. That is one of the
8 group of retirees that filed lawsuits in state court
9 before the bankruptcy was filed.
10 You indicated early in your testimony that
11 you were involved in some discussions shortly after
12 you took office as Treasurer about replacing Public
13 Act 72. Do you recall that?
14 A. Uh-huh. Yes.
15 Q. You need to say your answer.
16 A. Yes.
17 Q. And you talked about competing constitutional
18 provisions, one of them being the constitutional
19 provision relating to public health, safety,
20 welfare, correct?
21 A. Correct.
22 Q. And as I understand it, your focus at the time had
23 to do with your ability to modify CBAs; is that
24 right?
25 A. That's right.

Page 93

1  pension funds.
2  Q.  Okay.  All right.
3        Did you have any conversations with the
4  Governor about the issue of whether Orr should file
5  for bankruptcy say in the couple weeks preceding the
6  filing?
7        MS. NELSON: Again, are you speaking just
8  one-on-one other than attorney-client?
9  BY MR. WERTHEIMER:
10 Q.  One-on-one or in group conversations -- I don't
11 want -- I'm not asking you to violate the
12 attorney-client privilege. I think you understand
13 what we're getting at here.
14 A.  Yeah.
15 Q.  So my questions you should assume are modified in
16 that respect.
17 A.  Yeah, so can you restate the question?
18       (Reporter read record as follows:
19       "Q.  Did you have any conversations with the
20       Governor about the issue of whether Orr
21       should file for bankruptcy say in the
22       couple weeks preceding the filing?")
23       THE WITNESS: I have a question for my
24 lawyer.
25       MR. WERTHEIMER: That's fine.  If you want

Page 94

1  to take a break or just go outside.
2        VIDEO TECHNICIAN: Off the record 11:35
3  a.m.
4        (A brief recess was taken.)
5        VIDEO TECHNICIAN: We're back on the record
6  at 11:37 a.m.
7        THE WITNESS: Yeah, I don't recall any
8  conversations with the Governor outside the presence
9  of counsel on that topic.
10 BY MR. WERTHEIMER:
11 Q.  Okay. If you take a look at the July 9 -- do you
12 have that one in front -- that's five. This one
13 here.
14 A.  Okay.
15 Q.  And let me direct your attention to the first
16 paragraph. You're telling the Governor that the
17 emergency manager's going to meet relative to the
18 pensions the next day, and then a couple of
19 sentences down you say he, meaning Orr, will not
20 translate that into an impact on retirees or
21 employees' vested rights or what share of monies
22 available to unsecured creditors would go to the
23 pension plans.
24       What was your understanding of why Orr was
25 not going to do that? What's the point, and why are

Page 95

1  you telling the Governor?
2        That's -- your attorney's going to object.
3  That was three questions.
4  A.  Okay.
5        MS. NELSON: Yes, which one would you like
6  him to answer first?
7        MR. WERTHEIMER: He can do it in order or
8  however he'd like.
9        MS. NELSON: Well, I don't know that he's
10 going to remember them all by the time he gets to
11 the last one.
12       THE WITNESS: I mean, to me the building
13 block is what's the funded status. And that issue
14 was fluid, and I think that's the first issue that
15 if you're going to reach a settlement with your
16 creditors it's important to understand, all right,
17 what's the funding level. From there you can start
18 to figure out how do you solve this equation going
19 forward. So I was comfortable with that.
20 BY MR. WERTHEIMER:
21 Q.  Well, isn't there a political reason to not
22 translate it into the impact on retirees because the
23 impact is going to be negative? All we need to do
24 is look at the June 14th creditors' proposal to know
25 that, don't we?

Page 96

1        MS. NELSON: Objection; form, foundation,
2  calls for speculation.
3  BY MR. WERTHEIMER:
4  Q.  Go ahead.
5  A.  That wasn't my thinking. My thinking was until you
6  really know the funding status, it's hard to really
7  understand what the impact may be.
8        So it was more important to understand that
9  first.
10 Q.  Okay. I have nothing further. Thank you.
11       MS. NELSON: Is everybody done?
12       MR. SHERWOOD: I have one or two followup,
13 but I'll let you go first.
14       MS. GREEN: You can go. Do your followup
15 first. We'll wait.
16       MR. SHERWOOD: Can I use this microphone?
17       MS. NELSON: Well, you're the Retiree
18 Committee and I don't believe you --
19       MR. GALLAGHER: We're not the Committee,
20 we're the Retirement Systems.
21       MS. NELSON: I'm sorry, the Retirement
22 Systems. You did not subpoena -- did not issue a
23 subpoena to the Treasurer, and it's my understanding
24 the parties that didn't subpoena aren't entitled to
25 question.

Page 117

1   was provided to the media, and it states it's being
2   done solely off the record and it's critical this
3   information is not traced back to the Department
4   because it has not been finalized.
5       Is it the practice of the Treasury
6   Department to allow admittedly incomplete
7   information regarding the pensions to be leaked to
8   the media?
9 A.  I would say it's unusual.
10 Q.  Why would it be critical, as stated in the email,
11   for the Milliman summary that Mr. Stanton had asked
12   for to be deleted and not in connection with the
13   Treasury Department?
14 A.  Does it say deleted in here? Oh, yeah. I see.
15   Okay.
16       I assume he didn't want to -- yeah, he
17   thought it was out there with other news media.
18   Rick Pluta must have been asking about it, so he
19   shared with him that which he thought other media
20   outlets probably already had.
21 Q.  You mentioned that there was a cap for the fees that
22   the State would pay in connection with the
23   Chapter 9. Have we reached --
24 A.  Actually, you mischaracterized it.
25 Q.  I'm sorry, what was your --

Page 118

1 A.  We offered to pay 50 percent of consulting fees
2   prior to the filing.
3 Q.  Up to five million?
4 A.  Up to five million.
5 Q.  And so in June of 2013 that would have been prior to
6   the filing and the State was still contributing to a
7   portion of those fees, correct?
8 A.  I believe so.
9 Q.  We can mark this as Exhibit 9.
10
11       (Deposition Exhibit 9 was marked.)
12
13   BY MS. GREEN:
14 Q.  Do you recall sending this email?
15 A.  I do.
16 Q.  Is it safe to say the five million dollar cap has
17   been maxed out?
18 A.  What I was reviewing was both the forecast as well
19   as the historical, so I was looking at more than
20   just the history.
21 Q.  So what is the summary of fees that you were
22   referring to?
23 A.  We were given an estimate of what the fees were
24   looking like and I reviewed it and it wasn't very
25   happy.

Page 119

1 Q.  The last question is relating to Exhibit 5 which has
2   already been marked. It's the July 9th email.
3       The email states "Tomorrow's meeting could
4   lead to questions directed to you about your view on
5   this topic." It's relating to the pension issue.
6       Is that a fair characterization of the
7   email?
8 A.  Right.
9 Q.  "In my view, it's too early in the process to
10   respond to hypothetical questions. We remain in
11   many ways in the informational stage. I have some
12   thoughts as to how you could address some pointed
13   questions if you're interesting in hearing them."
14       What pointed questions were you expecting?
15 A.  Anything from -- well, going back in time here, but
16   just obviously the whole gamut of questions
17   regarding what the underfunding status could mean to
18   retirees, and I thought that the situation was not
19   understood enough for the Governor to go on record
20   yet because I couldn't even tell him with any degree
21   of confidence what level of funding these pension
22   funds had, so why should he get in the middle of a
23   debate about this. It's obviously a very charged
24   and sensitive issue, and it was my free political
25   comments to him.

Page 120

1 Q.  And this was really just over a week before the
2   filing. That was your stance?
3 A.  Yeah. I don't -- yeah, obviously. But I don't -- I
4   think it was in the context of this meeting that
5   Kevyn was going to have with the committee that
6   drove this email.
7 Q.  Did anything change between the ninth and the filing
8   on the 18th that changed your opinion regarding what
9   you, I believe, just stated was too early to tell
10   him with any degree of confidence what level of
11   funding the pension funds had I believe is what you
12   just stated.
13 A.  Yeah, I have not -- my opinion is pretty much the
14   same.
15 Q.  The last sentence of the email says "I have some
16   thoughts as to how you could address some pointed
17   questions if you're interesting in hearing them."
18       What were your ideas for how to answer the
19   questions?
20 A.  I don't recall specifically at this point.
21 Q.  Did you ever have a conversation with him regarding
22   your thoughts on how to answer the questions?
23 A.  No.
24 Q.  You mentioned in the email "Because pensions have
25   such a long life there are a lot of creative options

Page 121

```
 1    we can explore to address how they will be treated
 2    in restructuring."
 3         What were your creative options that you
 4    had on the table?
 5 A. There's dozens. I mean, I don't have one that I
 6    would pick out. But pension funds do have a long
 7    life and there's a lot of creative things that can
 8    be done, so I -- I don't have one or two that I
 9    would just throw out, but I do know that there's a
10    lot of ways to address that issue.
11 Q. Have there been any formal reports or proposals
12    identifying and explaining what you consider to be
13    these creative options?
14 A. No.
15 Q. Were these creative options ever explored with the
16    pension systems directly --
17 A. Not to my knowledge.
18 Q. -- to your knowledge?
19         I don't have any further questions.
20         MR. SHERWOOD: Anybody else have questions?
21         MR. WERTHEIMER: I do not.
22             RE-EXAMINATION
23 BY MR. SHERWOOD:
24 Q. I have one question about D-7, which I hadn't seen
25    before the deposition. It's an email to you from
```

Page 122

```
 1    Heather Lennox.
 2         I just want to know what your understanding
 3    of the sentence "Many provisions in here are
 4    designed to take advantage of PA 4 while it is still
 5    in existence, but this also references other state
 6    laws that would buttress the FCB and PCA powers..."
 7         What is FCB -- what is your understanding
 8    of what FCB and PCA powers, what that means?
 9 A. FCB I don't know. She might be referring to
10    Financial Control Board, but as opposed to the FAB
11    I'm surmising.
12         PCA is not ringing a bell either.
13 Q. At this time there was a Financial Control Board in
14    existence, right?
15 A. No, I think that -- well, I think it was part of the
16    financial stability agreement, the creation of the
17    FAB, I think.
18 Q. And PCA, you don't know what that means?
19 A. I'm not recalling offhand, no.
20 Q. Was it -- did you express a desire to buttress the
21    powers of the Financial Control Board and insulate
22    those powers from attack in the event of a repeal?
23 A. Can you restate the question? I'm sorry.
24 Q. Was it -- were you interested at this point in time,
25    in March of 2012, to take steps to buttress the
```

Page 123

```
 1    power of the Financial Control Board and insulate
 2    those powers from being attacked in the event PA 4
 3    was repealed?
 4 A. I don't know if buttress is the right word. If
 5    you're going to put in place all the structuring and
 6    negotiate a consent agreement with the City, there's
 7    other ways -- other legal basis to do that through
 8    interlocal agreements. There's other laws that we
 9    could look to that would give us the authority to
10    have this agreement have meaning to it.
11         So the thought was, you know, identify all
12    those legal arguments that would give legal standing
13    to the Financial Advisory Board and the consent
14    agreement is my memory.
15         MR. SHERWOOD: That's all.
16         MS. NELSON: All right, we're done. Thank
17    you.
18         THE WITNESS: Thank you.
19         VIDEO TECHNICIAN: Deposition has concluded
20    at 12:23 p.m.
21         (Deposition concluded at 12:23 p.m.)
22                 -   -   -
23
24
25
```

Page 124

```
 1                 CERTIFICATE
 2 STATE OF MICHIGAN      )
                          ) SS:
 3 COUNTY OF OAKLAND      )
 4
 5      I, LAUREL A. JACOBY, Certified Shorthand
 6 reporter, a Notary Public, hereby certify that I recorded
 7 in shorthand the examination of TREASURER ANDREW DILLON,
 8 the deponent in the foregoing deposition; and that prior
 9 to the taking of said deposition the deponent was first
10 duly sworn, and that the foregoing is a true, correct and
11 complete transcript of the testimony of said deponent.
12      I further certify that no request was made for
13 submission of the transcript to the deponent for reading
14 and signature and that no such submission was made.
15      I also certify that I am not a relative or
16 employee of a party or an attorney for a party; or
17 financially interested in the action.
18
19
20 _____
   LAUREL A. JACOBY, CSR-5059, RPR
21
22 Notary Public, Oakland County, Michigan
23 My commission expires: 9/1/18
24 Dated:  This 13th day of October, 2013.
25
```

MORETTI GROUP  800-536-0804
Court Reporting and Videoconferencing

(31) Pages 121 - 124

13-53846-tjt  Doc 2304-8  Filed 12/23/13  Entered 12/24/13 08:04:28  Page 175 of
175

713