# EXHIBIT A

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

        Plaintiffs,

vs                                                                      Case No. 13-734-CZ
                                                                        Hon.  Rosemarie Aquilina

THE STATE OF MICHIGAN;
RICHARD SNYDER, as Governor
of the State of Michigan; and
ANDY DILLON, as Treasurer of
the State of Michigan,

        Defendants.

_____/

ORDER OF DECLARATORY JUDGMENT

At a session of said Court held in Ingham County Circuit Court,
State of Michigan, this 19th day of July, 2013.

PRESENT: _Rosemarie E Aquilina_
                Circuit Court Judge

Plaintiffs request declaratory relief pursuant to MCR 2.605 concerning (1) the

constitutionality under Article IX Section 24 of the Michigan Constitution of the Local Financial

Stability and Choice Act, 2012 PA 436, MCL 141.1541, *et seq.* ("PA 436"), insofar as PA 436

permits the Governor to authorize an emergency manager to proceed under chapter 9 of the

bankruptcy code, chapter 9 of title 11 of the United States Code, 29 USC 901 to 946 ("Chapter

9") in a manner which threatens to diminish or impair accrued pension benefits; and (2) the

authority of the Governor and/or State Treasurer to authorize an emergency manager to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits.

Plaintiffs have requested, and Defendants have agreed in their Response, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time.

The Court having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises, and for the reasons stated on the record,

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

*A copy of this Order shall be transmitted to President Obama.*

*It is so Ordered.*

Rosemarie E. Aquilina

Circuit Court Judge

P37670

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

**(I) THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF
STATE, COUNTY & MUNICIAL EMPLOYEES, AFL-CIO'S OBJECTION TO
THE DEBTOR'S (A) MOTION TO EXTEND THE AUTOMATIC STAY; (B)
MOTION CONFIRMING THE PROTECTIONS OF SECTIONS 362, 365 AND
922 OF THE BANKRUPTCY CODE; AND (C) MOTION FOR ENTRY OF AN
ORDER DIRECTING AND APPROVING FORM OF NOTICE OF
COMMENCEMENT OF CASE AND MANNER OF SERVICE AND
PUBLICATION OF NOTICE AND ESTABLISHING A DEADLINE FOR
OBJECTIONS TO ELIGIBILITY AND A SCHEDULE FOR THEIR
CONSIDERATION AND (II) RESPONSE TO DEBTOR'S MOTION,
PURSUANT TO SECTIONS 102(1)(A) AND 105(a) OF THE BANKRUPTCY
CODE AND RULES 2002(m) AND 9007 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE, FOR ENTRY OF AN ORDER ESTABLISHING
<u>CASE MANAGEMENT AND SCHEDULING PROCEDURES</u>**

The Michigan Council 25 of the American Federation of State, County &

Municipal Employees, AFL-CIO ("**AFSCME**") -- the representative of the interests of

between at least forty and fifty percent (40-50%) of the about 11,943 retired City of

Detroit (the "**City**" or "**Debtor**") non-uniformed  retired employees (the "**Retired**

**AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME**

**Employee**", or about seventy percent (70%) of the active non-uniformed union-

represented employees, and together with the Retired AFSCME Employees, collectively,

the "**AFSCME Detroit Employees**") -- through its counsel submits this (I) opposition

(the "**Objection**") to the (A) *Motion of Debtor, Pursuant to Section 105(a) of the*

*Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A)*

State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor [Docket No. 56] (the "**Stay Extension Motion**"); (B) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code* [Docket No. 53] (the "**Stay Confirmation Motion**"); and (C) *Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration* [Docket No. 18] (the "**Eligibility Scheduling Motion**"); and (II) response to the *Motion of Debtor, Pursuant to Sections 102(1)(A) and 105(a) of the Bankruptcy Code and Rules 2002(m) and 9007 of the Federal Rules of Bankruptcy Procedure, for Entry of an Order Establishing Case Management and Scheduling Procedures* [Docket No. 39] (the "**Case Management Motion**").  In support of its Objection, AFSCME respectfully states as follows:

## I. PRELIMINARY STATEMENT

1.     Through the Stay Extension Motion, the City seeks procedurally improper, unprecedented and inappropriate relief purportedly extending the automatic stay imposed under sections 362 and 922 of title 11 of the United States Code (the "**Bankruptcy Code**") and allegedly enjoining, pursuant to section 105(a) of the Bankruptcy Code, actions against non-debtors including against the Michigan Governor, Richard Snyder (the "**Governor**") which would permit the non-debtors to continue to engage in conduct which is unconstitutional under the Michigan Constitution, unauthorized or, at a minimum, outside the scope of chapter 9.

2.     The AFSCME Retirees and AFSCME Active Employees look to their government pension and City-provided medical benefits for retiree benefits. Unlike

private sector employees and retirees with defined benefit pension benefits whose pension benefits are protected even in bankruptcy by government insurance through the Pension Benefit Guaranty Corporation or those with multiemployer pension benefits, where even if one employer withdraws or goes bankrupt, the vested pension benefits to the retirees continue unchanged by that withdrawal, the AFSCME Retirees and AFSCME Active Employees' pensions are not backstopped.

3.     Here, if the pension or other retiree benefits are lost, they are lost without a safety net.

4.     To protect against this, a retiree and an active employee with accrued and vested benefits, filed suit (the "**Webster Litigation**") (which was not filed against the City, the City's Emergency Manager ("**EM**") Kevyn D. Orr ("**Orr**"), or any other City employees).  This and other similar litigation brought by other plaintiffs against other non-debtors was referenced in the Stay Extension Motion with a tone that implies these litigations are improper.

5.     It is important to remember that this is against the backdrop of the average non-uniformed employee pension currently at an average of slightly less than $18,000 per year (according to a June 30, 2012 pension valuation report).

6.     These employees' pension benefits were reduced by approximately forty percent (40%) in 2012.  Previously, a thirty-year employee would receive a pension of fifty-five percent (55%) of final average pay and the pension would be increased by 2.25 percent of the original pension amount each year as inflation protection. (This is not a very generous COLA.  Social Security is increased by the inflation rate as measured by the CPI and the increase is compounded each year.) Under the new, lower benefit structure, a thirty-year employee would receive a pension of forty-five percent (45%) of final pay and there is no COLA.

7.     Further, an employee must work at least thirty years to be eligible to retire, or be at least 60 years old with 8 years of service. The average active employee

is 48.3 years old and has 15.4 years of service. Therefore, on average, a non-uniformed employee would be 63 years old upon achievement of thirty years of service.

8. Average non-uniformed employee pay is $41,385 per year and AFSCME Active Employee pay was reduced by 10% during fiscal year 2012.

9. State shared revenues with the City have dropped by $160 million (almost 50%) since 2002. Under the Governor's current administration, state shared revenues with the City dropped by $66 million from fiscal year 2011 to fiscal year ("**FY**") 2012; from $239 million to $173 million. In FY 2002, state shared revenues with the City were $333 million, in FY 2011 state shared revenues were $239 million and in FY 2012 state shared revenues were $173 million.

10. In reality, it is the Stay Extension Motion, and indeed this entire chapter 9 proceeding, including the purported authorization by the Governor permitting the chapter 9 filing by the EM, that was and remains (i) an overt act by the Governor and others in violation of state court orders and the Michigan Constitution; and (ii) in violation of an explicit, unstayed state court declaratory judgment ordering the withdrawal of the Governor's authorization to file this chapter 9 case and prohibiting other filings, including the filing of the Stay Extension Motion, which seeks to impair or diminish the AFSCME Detroit Employees' pension benefits.

11. If the City were acting properly without the relief sought in the extraordinary Stay Extension Motion, it would not need the Stay Extension Motion.

12. The continued authorization by the Governor for the filing and prosecution of this chapter 9 proceeding where the City now seeks to diminish or impair vested pension rights is illegal and unconstitutional under Michigan law and should not be countenanced by this Court using its equitable powers under section 105(a) of the Bankruptcy Code. Section 105 powers only permit the Court to implement already existing substantive rights under the Bankruptcy Code, and should not be used by the City as a sword to create for itself new and unconstitutional rights in violation of the

federalism principles contained in the Tenth Amendment of the United States Constitution.

13. If the Court grants the Stay Extension Motion and permits the Governor to continue to ignore the court-ordered, state law and constitutional obligations he is bound to uphold, the EM will seek (i) to unconstitutionally and illegally abridge pension and other AFSCME Detroit Employee benefits; (ii) to proceed under section 365 of the Bankruptcy Code and illegally seek to reject vested pension and other retiree benefits; and/or ultimately (iii) to propose a chapter 9 plan of adjustment that reduces pension and other benefits but that cannot possibly be better for creditors like AFSCME Detroit Employees than the alternative of staying out of chapter 9 - a clear breach of the chapter 9 "best interests test." This Court should not allow the City to use section 105(a) of the Bankruptcy Code to stay non-debtors from complying with applicable non-bankruptcy law or to create new bankruptcy law not provided for under the Bankruptcy Code.

14. This Court should deny the Stay Extension Motion.

15. Additionally, consistent with the infirmities of the City's chapter 9 filing discussed above and at length below, including the unconstitutional or otherwise improper actions in violation of Michigan state law raised in this Objection, the Court should withhold ruling on the Stay Confirmation Motion until ruling on the issues raised herein.

16. Given the myriad issues that need to be addressed, there is little reason to rush through a highly expedited, non-negotiated schedule given the unique state and federal constitutional issues here.

17. Finally, with regard to the Case Management Motion, AFSCME seeks to clarify (and to the extent necessary, request) that AFSCME will be considered one of the unions on the "Special Service List" that are "representing certain of the City's

employees and retirees or their counsel where known" and that the below-identified counsel for AFSCME will be served all pleadings filed in this proceeding.

## I. RELEVANT BACKGROUND

18. Orr currently serves as the EM of the City under Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("**PA 436**").

19. Orr was appointed as EM for the City on March 14, 2013 at the request of the Governor, effective as of March 25, 2013. On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

20. Under section 18 of PA 436, the Governor was empowered to authorize Orr to file for chapter 9 bankruptcy on behalf of the City if the Governor approved the EM's recommendation to do so.

21. On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." The same day, Orr publicly threatened, in an interview with the Detroit Free Press Editorial Board,[1] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court. The EM stated as follows in the interview:

> Q   You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?

---

[1] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

A.   The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.  Which the Ninth Circuit agrees with for now.

A.   It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy."  **If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you.  If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate**.  The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

(Emphasis added).  The City has since filed with this Court its *Motion for the Entry of an Order Directing the Appointment of a Committee of Retired Employees* [Docket No. 20], the plain intent of which is to seek to negotiate a reduction or impairment of accrued pension benefits.

(A)    The Webster Litigation

22.    On July 3, 2013, against the backdrop of the threatening statements being made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be

- 7 -

13-53846-tjw Doc 2282-3   Filed 12/27/13   Entered 12/27/13 16:08:20   Page 11 of 49
13-53846-swr Doc 2282-7   Filed 12/27/13   Entered 12/27/13 16:08:20   Page 21 of 42    19

reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[2]

23.     In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby," that there could not be a more clear and plain constitutional mandate and that Article IX, Section 24 means what it says: accrued pension benefits "shall not be diminished or impaired." (citing *AFT Michigan v State of Michigan*, 297 Mich App 597, 610; 825 NW2d 595 (2012); *Mt Clemens Firefighters Union, Local 838, IAFF v City of Mt Clemens*, 58 Mich App 635, 644; 228 NW2d 500 (1975)).

24.     Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can do anything to diminish or impair vested pension benefits:  "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the action of its officials or governing body."  2 Official Record, Constitutional Convention 1961, p. 3402.

25.     The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context.[3]  But, in violation of Article IX, Section 24 of the Michigan Constitution, PA

---

[2] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

[3]  For example:
  • Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."
  • Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation  and benefits of the chief administrative officer and members of the governing body

- 8 -

13-53846-tjt  Doc 2333-3  Filed 12/27/13  Entered 12/27/13 16:08:20  Page 12 of 49
13-53846-swr  Doc 1884  Filed 12/13/13  Entered 12/13/13 16:08:20  Page 12 of 49     20

436 fails to similarly prevent the Governor from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be diminished or impaired as a consequence of that filing.[4]  In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, that section must be unconstitutional.

26.    On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", a copy of which was attached to the Stay Extension Motion as Exhibit 6.2) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from  authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).[5]

27.    Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings," including the eventual filing of the Stay Extension Motion on July 19.

---

of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."

- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

[4] Section 18 of PA 436, which empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, no where  prohibits the Governor  from authorizing such a filing if accrued pension benefits may be diminished or impaired. Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy. Just as clearly, the Legislature omitted any constitutional protection against the impairment or diminishment of accrued pension benefits when the Governor authorizes a chapter 9 bankruptcy filing under Section 18 of PA 436.

[5] The Stay Extension Motion incorrectly implies that the TROs in *Webster* and the related cases were entered *ex parte*.  They were not.

- 9 -

13-53846-tjt  Doc 2388  Filed 12/27/13  Entered 12/27/13 19:08:20  Page 13 of 49
13-53846-swr  Doc 2234  Filed 12/27/13  Entered 12/27/13 16:08:26  Page 13 of 49    21

28.     On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**", a copy of which was attached to the Stay Extension Motion as Exhibit 6.4). The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the Chapter 9 petition … and … not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.[6]

29.     To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits.  As a matter of federalism and *res judicata*, this Court should abide by the prior rulings of the State Court.

30.     Even if this Court is not persuaded by the unconstitutional and illegal nature of this chapter 9 filing, in light of the unstayed and binding orders and rulings issued by the State Court in the form of the TRO and subsequent Declaratory Judgment (which vacated the TRO that preceded it), this Court should find that it cannot rule on the Stay Extension Motion and the Stay Extension Motion must be denied.

## II. ARGUMENT

31.     The Stay Extension Motion must be denied because (i) it is procedurally improper; (ii) it seeks unprecedented and inappropriate relief extending the automatic stay pursuant to section 105(a) of Bankruptcy Code to the Governor and other non-debtor parties despite the clear TRO and Declaratory Judgment negating the

---

[6] The Declaratory Judgment does not, contrary to the City's assertion at ¶ 27 in the Stay Extension Motion, purport to bind the EM's "agents and representatives."  The Declaratory Judgment does not use either "agent" or "representative" even once.

Governor's authorization to continue with this proceeding (including the Stay Extension Motion); (iii) given that the State Court has already ruled on the constitutional issues, the Bankruptcy Court should abstain from interfering and allow the state courts to fully and finally adjudicate the state law issues; (iv) the chapter 9 filing itself violates the United States Constitution; (v) at minimum, PA 436 or any alleged authorization from the Governor allowing for a chapter 9 filing by the City pursuant to PA 436 without limiting the disturbing of accrued pension rights cannot be permitted under the U.S. Constitution in view of the State Court rulings and Michigan law; and (vi) the end result of the granting of the Stay Extension Motion would be the City seeking to unconstitutionally wipe out guaranteed vested pension benefits, either couched as a motion to reject pursuant to section 365 of the Bankruptcy Code or under a plan of adjustment, both impermissible.

32.     Additionally, consistent with the infirmities of the City's chapter 9 filing discussed below, (i) the Court should withhold ruling on the Stay Confirmation Motion until ruling on the issues raised herein; and (ii) the Court should not enter the Eligibility Scheduling Motion scheduling a briefing schedule until the Court decides whether it will rule at this juncture whether the City is even properly in chapter 9, and even once the Court does rule, the major parties should at least have the opportunity to meet and confer regarding a reasonable schedule as to eligibility.

33.     Finally, with regard to the Case Management Motion, AFSCME requests that it be considered and listed as one of the unions on the "Special Service List" that are "representing certain of the City's employees and retirees or their counsel where known" and that the below-identified counsel for AFSCME should be served all pleadings filed in this proceeding.

- 11 -

13-53846-swr   Doc 2332-8   Filed 12/27/13   Entered 12/27/13 14:08:20   Page 15 of 49
13-53846-swr   Doc 2324   Filed 12/26/13   Entered 12/26/13 16:08:26   Page 14 of 34      23

# I.     The Stay Extension Motion Is Procedurally Flawed.

34.     The Stay Extension Motion is procedurally improper.  Although captioned as seeking an order extending the automatic stay, the Debtors actually seek an injunction pursuant to section 105(a) of the Bankruptcy Code.  The automatic stay and section 362 do not apply to actions against non-debtors.  *See* 11 U.S.C. § 362(a) ("a petition filed …. operates as a stay, applicable to all entities, of … the commencement or continuation…. of a[n] … action or proceeding against the debtor"); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d. Cir. 1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt defendants").  Thus, the automatic stay does not apply to, in part, the Webster Litigation and/or the Governor, a non-debtor.  *See, e.g., United Steelworkers of Am. v. Retirement Income Plan for Hourly-Rated Employees of ASARCO*, 512 F.3d 555 (9th Cir. 2008) (affirming district court decision, issued after employer filed for bankruptcy, ordering an ERISA plan to pay over $140,000 in attorney's fees); *In re Motors Liquidation Co.*, 2010 WL 4966018, at *5 (S.D.N.Y. Nov 17, 2010) ("the automatic stay would not apply to a suit against the Pension Plan alone"); Buchanan v. Golden Casting Corp. Hourly Health Benefit Plan, 2003 WL 22951936, at *3 (S.D. Ind. Oct. 10, 2003) ("an automatic stay of suits against an employer during its bankruptcy does not affect claims against its employee benefit plan").

35.     Instead, the City must seek an injunction by way of adversary proceeding pursuant to § 105(a).  As the Sixth Circuit has explained, "although referred to as extensions of the automatic stay, [orders extending the automatic stay to cover non-debtors] in fact [are] injunctions issued by the bankruptcy court after [a] hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate."  *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993); *see also In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 247 n. 6 (9th Cir. 1994).  Because an "extension" of the automatic stay to cover non-debtors is in fact an injunction, "[a]

- 12 -

request for such an extension must be made by adversary proceeding." *In re Richard B. Vance and Co.,* 289 B.R. 692, 697 (Bankr. C.D. Il. 2003); *see also In re Hillsborough Holdings Corp.*, 130 B.R. 603, 606 (Bankr. M.D. Fla.1991) ("the debtor must commence an adversary proceeding" to seek an injunction against non-debtors).

36.     At a minimum, this type of extraordinary relief in this sensitive and unusual case should not be granted where, as here, the City failed to follow the Federal Rules designed to provide the very basic statutorily required safeguards for those in harms way.  The current procedural posture created by the EM (*i.e.* the filing of the Stay Extension Motion instead of properly commencing an adversary proceeding as required by the Federal Rules for a party seeking injunctive relief) forecloses the Court from ordering the relief sought by the City in the Stay Extension Motion, in essence steam rolling quickly over the AFSCME Employees, regardless of the merits of the Stay Extension Motion.

## II.     <u>Bankruptcy Code § 105 Cannot Be Used To Create Rights That Do Not Exist Elsewhere In the Law.</u>

37.     A bankruptcy court's equitable powers are derived from section 105(a) of the Bankruptcy Code, which provides, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see also In re Stinson*, 221 B.R. 726, 729 (Bankr. E.D.Mich. 1998) (invoking section 105 power to deny chapter 7 debtor's claim of exemption in unauthorized settlement or proceeds thereof and requiring turnover of such proceeds to chapter 7 trustee).

38.     The plain meaning of section 105(a) authorizes a bankruptcy court to enter only those orders necessary to carry out the other provisions of the Bankruptcy Code.  The Sixth Circuit Court of Appeals has made clear on a number of occasions that section 105(a) may be used only to implement powers already expressed in the provisions of the Bankruptcy Code, not to add to those powers or create rights that Congress did not

expressly confer. *See In re Middleton Arms, Ltd. Partnership*, 934 F.2d 723, 725 (6th Cir.1991) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)); *In re Granger Garage, Inc.*, 921 F.2d 74, 77 (6th Cir. 1990) ("[a] bankruptcy court does not have unfettered equity powers."); *In re Glenn*, 760 F.2d 1428, 1440–41 (6th Cir.1985), cert. denied, 474 U.S. 849, 106 S.Ct. 144 (1985) (section 105 should not be construed to allow a bankruptcy court to use its equitable powers to create rights that do not exist under state law; section 105 was intended to affect parties' actions rather than undermine state statutes); *see also In re Dow Corning Corp.*, 244 B.R. 721, 742 (Bankr. E.D. Mich. 1999) (section 105(a) does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute roving commission to do equity) (citations and quotations omitted), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002). To allow a bankruptcy court, through principles of equity, to grant any more or less than what the clear language of a statute mandates would be tantamount to judicial legislation and is something that should be left to Congress, not the courts. *In re Scrivner*, 535 F.3d 1258, 1263 (10th Cir. 2008).

39.     Here, however, the City seeks a section 105(a) injunction not to carry out any provisions of the Bankruptcy Code and not to shield it from interference with the existing protections of the Bankruptcy Code, but rather as a sword that creates substantive and unconstitutional rights not otherwise provided for under the Bankruptcy Code generally or chapter 9 specifically.

40.     Indeed, the Bankruptcy Code contains no provision that would permit the City to extend the automatic stay to the requested non-debtor parties (nor does the City cite to any such provision). Lacking the appropriate authority, the City seeks to expand the powers created in the Bankruptcy Code to create substantive and unconstitutional rights not otherwise provided. This would allow the continuance of this chapter 9 proceeding, in which the City seeks to diminish or impair vested accrued

- 14 -

13-53846-swr Doc 2232-8 Filed 12/27/13 Entered 12/27/13 14:08:20 Page 18 of 49
13-53846-swr Doc 2232-8 Filed 12/27/13 Entered 12/27/13 14:08:20 Page 18 of 49     26

pension rights in violation of the Michigan State Constitution and in violation of an explicit, unstayed state court declaratory judgment.

41. Moreover, the Michigan Constitution is clear and unambiguous in its declaration that accrued pension rights may not be diminished or impaired. As such, "[a] bankruptcy court may not use its equitable powers 'to defeat clear statutory language, nor to reach results inconsistent with the statutory scheme established by the Code.'" *In re Reinertson*, 241 B.R. 451, 455 (9th Cir. BAP. 1999) (quoting *In re Powerline Oil Co.,* 59 F.3d 969, 973 (9th Cir.1995)). *See also In re C-L Cartage Co., Inc.*, 899 F.2d 1490, 1494 (6th Cir. 1990) (bankruptcy courts cannot use equitable principles to disregard unambiguous statutory language.). To allow a bankruptcy court, through principles of equity, to grant any more or less than what the clear language of a statute mandates – here, the Michigan Constitution -- would be tantamount to judicial legislation. *In re Scrivner*, 535 F.3d 1258, 1263 (10th Cir. 2008).

42. Section 105(a) cannot be used to alter rights established under state law in a manner not expressly authorized by the Bankruptcy Code. *See In re Amatex Corp.*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989) (holding that the court was not authorized, pursuant to section 105(a), or any other authority, to disregard established state law principles in providing relief to the debtor). Accordingly, the City's attempt to circumvent the Michigan Constitution through the requested application of the Court's section 105 equitable powers is impermissible and the Stay Extension Motion should be denied.

43. In support of its position, the City cites to *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992). But *Eagle-Picher* addresses a bankruptcy court's power to issue a preliminary injunction pursuant to section 105(a), not a court's power to extend the automatic stay to non-debtors.

44. In *Eagle-Picher*, the Sixth Circuit made clear that the granting of a section 105(a) injunction is a radical measure to be granted only in "unusual

circumstances." *Id*. at 861. What constitutes "unusual circumstances" is described as an identity of interests between the debtor and the third party such that a judgment against the third party will in effect be a judgment against the debtor. *Id*. (adopting the standard in *In re A.H. Robins Co., Inc,* 788 F.2d 994, 999 (4th Cir.1986). An example is given as a case in which a third-party defendant is entitled to absolute indemnity by the debtor on account of any judgment that might result. *Id.*; *see also In re Dow Corning Corp.,* 280 at 658 (setting forth a detailed list of the factors that must be present to support including a permanent injunction or release benefiting non-debtor third parties in a Chapter 11 plan of reorganization if the injunction is to be enforced against non-consenting creditors).

45.     Relying on *Eagle-Picher*, the City claims that the Court is authorized to employ its section 105(a) powers to extend the automatic stay given the "unusual circumstances" of the case. *See* Stay Extension Motion at ¶ 19. The City goes on to imply that there is an identity between it and the State Entities because "[t]he State Entities are closely connected to the City and the Emergency Manager", the EM "serves at the pleasure of the Governor", and the State Entities "all have ongoing roles with respect to the Emergency Manager's management of the City…."[7] *Id*. at ¶ 21.

46.     However, the City has not shown that a mere "close relationship" or the alleged authority that the State Entities may have over the EM automatically makes the State Entities' interests identical to those of the City such that the Court should treat them as one and the same for purposes of extending the automatic stay. The idea that the State and City would have identical interests in all instances seems illogical, and the City and State's interests have already diverged with respect to the State's decision to share decreased revenues with the City as discussed above, paragraph 9. In fact, given the extreme nature of the injunctive remedy that the City seeks through application of section

---

[7] Note that the City does not offer any argument for how it and the Non-Officer Employees and the City's Agents and Representatives are identical such that a judgment against the City would operate like a judgment against those individuals and entities.

- 16 -

13-53846-swr  Doc 2332-8  Filed 12/27/13  Entered 12/27/13 14:02:20  Page 20 of 49    28
13-53846-swr  Doc 2332-8  Filed 12/27/13  Entered 12/27/13 14:02:20  Page 18 of 42

105(a), this Court should not use section 105(a) to extend the stay in contravention of the Bankruptcy Code and in clear violation of the Michigan Constitution. *See In re Saleh*, 427 B.R. 415, 420-421 (Bankr. S.D. Ohio 2010) ("[T]he court cannot emphasize enough that the imposition of an injunction benefitting a non-debtor third party is an extreme remedy and one that appears to contravene the Bankruptcy Code… It not only deprives a creditor of the benefits of its bargain, but also permits the nondebtor party to receive a major benefit of the bankruptcy process without having to be subject to any of its burdens and safeguards.") (citations and quotations omitted).

47.     The use of section 105 in this context is therefore fatally flawed and the Stay Extension Motion must be denied.

### III.     Given that the State Court has Already Ruled on the Michigan Constitutional Issues, the Bankruptcy Court Should Abstain from Interfering and Allow the State Courts to Fully and Finally Adjudicate the Michigan Constitutional Issues.

48.     Where state courts have previously rendered rulings (and particularly on internal state constitutional issues), the Court should be particularly careful extending the automatic stay to an action and actor such as the Governor already determined by the State Court to be in derogation of the Michigan Constitution. *See, e.g.*, *Go West Entm't v. N.Y. State Liquor Auth. (In re Go West Entm't)*, 387 B.R. 435, 442-43 (Bankr. S.D.N.Y. 2008).

49.     A bankruptcy court has no power to review or overturn a final state determination. *Id*. at 442 (citing *Locurto v. Giuliani*, 447 F.3d 159, 170–71 (2d Cir. 2006) (federal courts give State administrative proceedings the "same preclusive effect to which it would be entitled in the State's courts," and New York "give[s] quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate."), citing Univ. of Tennessee v. Elliott, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) and *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 310 (2d Cir.2005); *Ryan v. New York Tel. Co*., 62 N.Y.2d 494, 499, 478 N.Y.S.2d 823, 826, 467

N.E.2d 487, 489 (1984); see also *Kelleran v. Andrijevic*, 825 F.2d 692 (2d Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988) (default judgment in State Court binding in bankruptcy case)).

50. Here, the State Court has issued a declaratory judgment, which is now pending appeal. "'[T]he rule in Michigan is that a judgment pending on appeal is deemed res judicata.'" *Farmers Ins. Exchange v. Young*, 2010 WL 3021860, at *6 (Mich. App. 2010) (concluding, "for purposes of collateral estoppel or res judicata" that a declaratory judgment, despite pending appeal, was a "final judgment") (citing, in part, *City of Troy Building Inspector v. Hershberger*, 27 Mich. App. 123, 127, 183 N.W.2d 430) (1970) (emphasis in original); *Temple v. Kelel Distributing Co., Inc.*, 183 Mich. App. 326, 328, 454 N.W.2d 610 (1990) ("Although defendant has appealed an adverse ruling that plaintiff's decedent was not an employee at the time of the accident, the decision nevertheless has res judicata effect."); *Roskam Baking Co. v. Lanham Machinery Co.*, 105 F. Supp. 2d 751, 755 (W.D. Mich. 2000) ("Michigan and federal courts hold that appeal of a judgment does not alter the judgment's preclusive effect"); *Robinson v. Fiedler*, 91 F.3d 144 (6th Cir. 1996) (decision of lower court is res judicata, regardless of pending appeal).

51. *Go West,* 387 B.R. 435, is directly on point. There, the debtor sought to have the bankruptcy court use its equitable powers to extend the automatic stay for the duration of a pending state court appeal, where the state appellate court had twice denied the same relief (staying the action pending appeal). 387 B.R. at 442-43. The bankruptcy court explained that such an order

> would directly violate the principle of comity and avoidance of needless friction between Federal and State courts that has been incorporated in several abstention doctrines. The most relevant for present purposes is so-called *Younger* abstention, which instructs that 'Federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings.' . . . 'This principle of abstention is grounded in interrelated principles of

- 18 -

comity and federalism.' . . . The same comity principles apply with respect to State administrative proceedings . . . 'in which important state interests are vindicated.' . . . *Younger* abstention has been deemed applicable in bankruptcy cases. *See In re Franceschi*, 268 B.R. 219 (9th Cir. BAP 2001), *aff'd*, 43 Fed.Appx. 87, 2002 WL 1763749 (9th Cir.2002) (on abstention grounds only).

*Go West*, 387 B.R. at 442-43 (omitting some internal citations). The bankruptcy court also relied on the case of *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), where the Supreme Court reversed a federal court ruling that prohibited enforcement of Texas law, asserting "'that the States have important interests in administering certain aspects of their judicial systems.'. . . The State's interest in *Pennzoil v. Texaco* was in the manner in which private litigants could enforce or obtain a stay of a judgment." 387 B.R. at 443.

52.     Here, as in *Go West*, given the final Declaratory Judgment issued by the State Court, this Court should abstain from extending the automatic stay and allow the state court appellate process to fully and finally resolve the issue of whether the authorization for this chapter 9 filing conflicted with Article IX, Section 24 of the Michigan Constitution.

**IV.     The Chapter 9 Petition For The City Violates The Federalism Principles Embodied By The Tenth Amendment Of The United States Constitution.**

53.     In 1936, the Supreme Court declared the first municipal bankruptcy statute unconstitutional, holding that Congress' bankruptcy power under Article III, like its Article III power to tax, does not include the power to "materially restrict" a state's "fiscal affairs" – including those of its political subdivisions, whose "fiscal affairs are those of the State." *Ashton v. Cameron County Water Improvement District Number One,* 298 U.S. 513, 528-30 (1936). Moreover, the Court held, to the extent that a state is, pursuant to the Contracts Clause of the U.S. Constitution, constrained from impairing a contract, that state cannot simply "accomplish the same end by granting any permission necessary to enable Congress to do so." *Id.* at 531.

- 19 -

13-53846-swr  Doc 2232-8  Filed 12/27/13  Entered 12/27/13 14:02:20  Page 23 of 49
13-53846-swr  Doc 2232-8  Filed 12/27/13  Entered 12/27/13 14:02:20  Page 12 of 42     31

54.     The Supreme Court has never reversed *Ashton.* Instead, when the Court, only two years later, declined to strike down a revised (but nearly identical) municipal bankruptcy statute, it emphasized that the successor statute was "carefully drawn so as not to impinge upon the sovereignty of the State" under the Tenth Amendment, because the "State retains control of its fiscal affairs" insofar as, *inter alia,* a municipal bankruptcy proceeding "is authorized by state law." *United States v. Bekins,* 304 U.S. 27, 51-52 (1938).[8]

55.     Keenly aware of the Tenth Amendment problems recognized by both *Ashton* and *Bekins,* Congress amended the municipal bankruptcy statute numerous times, gradually requiring more rigorous state-law authorization. *See, e.g.,* H. Rep. 95-595, 95th Cong., 1st Sess. 319 (1977) (recognizing that *Ashton* and *Bekins* require state authorization of municipal bankruptcy to protect state sovereignty). Most recently, the Bankruptcy Reform Act of 1994, Pub. L. 103-394, has provided that state law must "specifically," rather than generally, authorize any municipal bankruptcy petition. *See In re City of Harrisburg,* 465 B.R. 744, 754 (Bankr. M.D. Pa. 2011) ("Because the term 'generally' was interpreted too broadly by some courts and narrowly by others, Congress amended § 109(c)(2) to clarify that a state must provide 'specific' authorization to comply with Tenth Amendment constraints.").

56.     The Supreme Court has not revisited the constitutionality of municipal bankruptcy since 1938, but since then the Court's federalism jurisprudence has clarified that, contrary to *Bekins,* Tenth Amendment rights are not reserved solely to state governments that may waive them, but rather belong simultaneously to the citizens of the states as individual constitutional liberties. Just two years ago, the Court held that an individual plaintiff has standing to challenge a federal statute on grounds that Congress,

---

[8]  Notably, *Bekins* was decided only one year after the Supreme Court effected a jurisprudential about-face in favor of expansive federal power under the commerce clause in *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1 (1937). The contemporary Supreme Court has begun scaling back commerce clause powers on federalism grounds, beginning with *United States v. Lopez,* 514 U.S. 549 (1995).

by enacting it, has exceeded its powers and thus violated the Tenth Amendment by "intruding upon the sovereignty and authority of the States" – even if the State is not a party and has lodged no objection to the federal law. *Bond v. United States,* 131 S. Ct. 2355, 2360 (2011). This is because federalism under the Tenth Amendment "has more than [just] one dynamic" of delimiting "the prerogatives of the State and National Government vis-à-vis one another":

> Federalism is more than an exercise in setting the boundary between different institutions of government for their own integrity. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power. . . .
>
> . . . Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power. True, of course, these objects cannot be vindicated by the Judiciary in the absence of a proper case or controversy; ***but the individual liberty secured by federalism is not simply derivative of the rights of the States***.
>
> Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake.
>
> The limitations that federalism entails are not therefore a matter of rights belonging only to the States. States are not the sole intended beneficiaries of federalism. [*Id.* at 2364 (citations omitted) (emphasis added).]

57. In light of *Bond,* any individual whose rights – here, creditors' rights to have contractual obligations honored – are threatened by the federal government's regulation of an area reserved by the Constitution to the sovereign power of the states – here, fiscal self-management – has standing to protect those rights by

challenging the federal statute impairing those rights, irrespective of any waiver or authorization of that impairment by the state. And the Supreme Court has made increasingly and abundantly clear since 1938 that Tenth Amendment federalism is no longer to be ignored. *See, e.g., Printz v. United States,* 521 U.S. 898, 935 (1997); *United States v. Windsor,* 133 S. Ct. 2675, 2697 (2013) (Roberts, C.J., dissenting) ("[I]t is undeniable that [the majority's] judgment is based on federalism.").

58. Accordingly, contrary to the repeated assertions of Congress, "authorization" of municipal bankruptcy by a State cannot save a chapter 9 petition from the Tenth Amendment, and *Bekins* is no longer good law. Thus, because (i) the City's bankruptcy petition is aimed at impairing its creditors' rights using federal law to an extent not currently available under state law and (ii) the City's fiscal self-management is an area of state sovereign concern, it therefore follows that the chapter 9 petition violates the Tenth Amendment. As a corollary, relief under Bankruptcy Code § 105 is not permitted and must be denied.

## V. The City's Bankruptcy Petition Further Contravenes The Tenth Amendment Of The United States Constitution Because The Petition Violates Article IX, Section 24 Of The Michigan State Constitution

59. Because, as the State Court judge has already held, Michigan law does not authorize the City's bankruptcy petition insofar as it seeks to impair or reduce accrued pension benefits, the City is not only ineligible to proceed with its petition under the statutory terms of chapter 9 itself, but allowing the City to persist with its petition would violate the Tenth Amendment rights possessed by city retirees and employees with accrued pension benefits to be free from federal interference with their pension rights.

60. As explained above*,* the core feature of chapter 9 purporting to save it from violating the federalism principles embodied by the Tenth Amendment is the presence of the eligibility requirements found at 11 U.S.C. § 109(c), especially including the requirement that the municipal debtor be "specifically authorized . . . by State law" to

- 22 -

13-53846-tjt Doc 2332-8 Filed 12/27/13 Entered 12/27/13 14:08:20 Page 26 of 49
13-53846-swr Doc 2317 Filed 12/23/13 Entered 12/23/13 16:26:28 Page 23 of 34   34

file for bankruptcy. It is black-letter law that these eligibility requirements are mandatory. "If the petitioner is unable to demonstrate that all elements have been satisfied, the petition must be dismissed." *In re City of Harrisburg,* 465 B.R. at 752 (collecting cases). As Chief Judge France observed when dismissing the City of Harrisburg's chapter 9 petition for want of state-law authorization:

> The allegation that the City has sought bankruptcy relief in defiance of [state law] raises important concerns of federalism and respect for the power of states to manage their internal affairs. Primary among these concerns is the Tenth Amendment to the U.S. Constitution . . . . [W]here federal bankruptcy law intersects with the rights of states to regulate the activities of political subdivisions created by the state, principles of dual sovereignty as defined by the Tenth Amendment must be considered. Congress has made bankruptcy available to municipalities, but states retain their concomitant rights to limit access by their political subdivisions to bankruptcy relief.

*Id.* at 753 (citations omitted).

61. A Michigan State Court has already considered the state-law question of authorization. It correctly concluded, in a binding Declaratory Judgment, that the state statute relied upon by the City as authorizing its chapter 9 petition, Michigan PA 436, directly violates the Michigan Constitution. Indeed, the judge could not have held otherwise. Article IX, Section 24 of the Michigan Constitution unambiguously prohibits the diminution or impairment of accrued pension benefits. Yet a central purpose of the City's petition, as its EM has himself admitted "*ad nauseam*" in numerous public fora*, is to reduce accrued pension benefits. While such a reduction may at first blush appear to be permitted by the language of PA 436 – for example, by virtue of the fact that Section 18, which allows the Governor to approve a request by a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be unconstitutionally diminished or impaired --

- 23 -

13-53846-swr Doc 2332-8 Filed 12/27/13 Entered 12/27/13 14:08:20 Page 27 of 49
13-53846-swr Doc 2324 Filed 12/23/13 Entered 12/23/13 14:08:20 Page 26 of 52    35

certainly it cannot be disputed that statutes in Michigan are in fact constrained by the Michigan Constitution, which trumps Section 18 of PA 436.[9]

62.     Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."   There could not be a more clear and plain constitutional mandate.   Article IX, Section 24 means what it says:   accrued pension benefits "shall not be diminished or impaired."   *See AFT Michigan v State of Michigan*, 297 Mich App 597, 610; 825 NW2d 595 (2012); *Mt Clemens Firefighters Union, Local 838, IAFF v City of Mt Clemens*, 58 Mich App 635, 644; 228 NW2d 500 (1975).   And thus, as the State Court has already declared:

> PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect.
>
> The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

63.     The state court's conclusions are self-evident, and thus this Court may justifiably wish to dismiss the Debtor's petition at this early juncture for want of authorization.   But cardinal principles of abstention and constitutional avoidance caution instead in favor of abstaining from this question of state constitutional law, which the Michigan Courts should be left to finish deciding through the appellate process,[10] because

---

[9]  PA 436 violates the Michigan and Federal Constitution for additional reasons beyond those presented to, and found by, the state court in the Webster Litigation, and AFSCME reserves all of its rights.

[10]  Because a state court has already ruled that the City's petition was not properly authorized under state law, the instant case differs from other municipal bankruptcies in which bankruptcy judges considered

- 24 -

13-53846-swr  Doc 2232-8   Filed 12/27/13   Entered 12/27/13 14:08:20   Page 28 of 49
13-53846-swr  Doc 2232-8   Filed 12/27/13   Entered 12/27/13 14:08:20   Page 24 of 45     36

it has the potential to obviate the need for this court to encroach on tender Tenth Amendment territory. *See generally Arizonans for Official English v. Arizona,* 520 U.S. 43, 75-80 (1997) (discussing the advantages of certifying state-law questions to state courts before reaching federal constitutional questions, as well as the related doctrine of *Pullman* abstention); *Go West*, 387 B.R. at 442-43 (holding that *Younger* abstention applies to bankruptcy courts). Bankruptcy judges, of course, derive their authority from Article I of the U.S. Constitution and therefore are not vested with the authority to decide contested questions of federal constitutional law. *See Stern v. Marshall,* 131 S. Ct. 2594, 2609 (2011) (citation omitted).

        64. In the alternative, and at the very least, the Tenth Amendment requires that even if this Court were to find the instant petition authorized under PA 436, that authorization cannot have been made in violation of the Michigan Constitution, and therefore the Debtor lacks authority to diminish or impair pension rights in any eventual plan of adjustment. Indeed, the Tenth Amendment's limiting principle is further embodied in 11 U.S.C. § 903, which provides that chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality . . . in the exercise of the political or governmental powers of such municipality." Article IX, Section 24 is, of course, precisely such an instance of "control" exercised by the people of Michigan. *See, e.g., In re Sanitary & Improvement Dist., No. 7,* 98 B.R. 970 (Bankr. D. Neb. 1989) (holding that chapter 9 plan which did not provide that bondholders would be paid in full prior to payment to warrant holder, as required by Nebraska law decided by state Supreme Court, could not be confirmed.

---

questions of state constitutional law bearing on whether the debtor's petition was appropriately authorized by state law. *Compare, e.g., Harrisburg,* 465 B.R. 744 at 756-64 (considering state constitutional law issue apparently not addressed by any state court, and ultimately avoiding any Tenth Amendment quandary by dismissing petition).

## VI. The Use Of Chapter 9 To "Modify" Pension And Other Retiree Benefits Is Not Permitted Under Bankruptcy Code § 365.

65.     While the City may argue that it will not completely be wiping out benefits, a debtor cannot retain the beneficial aspects of a contract while rejecting the contract's burdens under section 365 of the Bankruptcy Code.  *See In re Ritchey*, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988) (citing *In re Tirenational Corp.*, 47 B.R. 647, 650 (Bankr.N.D.Ohio 1985); *In re Texstone Venture, Ltd.*, 54 B.R. 54, 56 (Bankr. S.D.Tex. 1985); *In re LHD Realty Corp.*, 20 B.R. 717, 719 (Bankr. S.D. Ind. 1982)).

66.     Consequently, if a debtor must assume or reject an entire agreement, including pension and benefits agreements, as it appears it must, then there is no option for a small modification to these contracts by the Governor or EM under section 365.  The only way to modify pensions or benefits provided for under for executory contracts would be to illegally or unconstitutionally reject (terminate) them under Bankruptcy Code § 365.

67.     The chapter 9 case for the County of Orange is instructive and cautionary.  There, the County of Orange (the "**County**") filed for chapter 9 bankruptcy protection and, about two weeks later, adopted a series of resolutions to address a severe shortfall in its general fund. *County of Orange*, 179 B.R. at 179.   Through these resolutions, the County unilaterally suspended certain provisions of its employee agreements, which effectively eliminated employee security and grievance rights. *Id.* at 179-80.   The bankruptcy court considered relief filed by a coalition of ten County employee organizations (the "**Coalition**") and enjoined the County from treating any of the employees as permanently laid off.  *Id*. at 185.

68.     The bankruptcy court held that although the *Bildisco* standard applied to the rejection of the collective bargaining agreements, application of that standard required the debtor to satisfy certain of California labor law standards "if not as a legal matter, certainly from an equitable standpoint." *Id*. at 184.  The court agreed with

the Coalition that chapter 9 recognized the delicate balance between state and federal interests and enjoined the debtor from conducting permanent layoffs in breach of labor contracts and in violation of California law.

69. Here too, the Court should recognize the constitutional and other inherent federalism impediments in abridging pension and other benefits and deny the Stay Extension Motion.

## VII. The Use Of Chapter 9 To "Modify" Pension And Other Retiree Benefits In Any Plan of Adjustment Would Violate the Best Interest of Creditors.

70. In addition to utilizing the tools of section 365 of the Bankruptcy Code, if the Court grants the Stay Extension Motion and allows the stay to be extended, the end result could further be the City seeking to unconstitutionally wipe out guaranteed vested pension benefits pursuant to a plan of adjustment that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans. Given that creditors owed pension obligations have absolute rights to such obligations under Michigan law as set forth above, and the main goal of this proceeding is to modify vested pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights.

71. As the Court is well aware, under chapter 11 of the Bankruptcy Code, the best interest of creditors test is designed to measure whether creditors will receive under a plan at least as much as would be received in a liquidation under Chapter 7 of the Code. See 11 U.S.C. § 1129(a)(7). However, this analysis is not applicable in the context of a chapter 9 case, where the municipal debtor cannot be liquidated. The best interest of creditors test in the context of a Chapter 9 case does not compare treatment under the plan of liquidation, but rather to other alternatives to creditors to the plan. *See In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ...

simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The "best interest" requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 collier on Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

72. Had there been no chapter 9 filing, pension creditors could not be impaired under the Michigan Constitution, and thus any impairment of such rights would violate Michigan law and be patently non-confirmable.

73. Accordingly, using extraordinary equitable relief to extend the automatic stay to permit unconstitutional, illegal actions or a plan that would be patently unconfirmable is not permissible and, frankly, makes no sense.

74. The Stay Extension Motion should be denied.

**VIII.   The Stay Confirmation Motion Should Not Be Entered at this Time.**

75. Additionally, consistent with the infirmities of the City's chapter 9 filing discussed above, including the unconstitutional or otherwise improper actions in violation of Michigan state law raised in this Objection, the Court should withhold ruling on the Stay Confirmation Motion until these issues are resolved.

76. The Stay Confirmation Motion is not appropriate where, as here, the chapter 9 filing is improper.

**IX.   The Eligibility Scheduling Motion Should Not Be Granted and at Minimum, Should Await the Parties Meeting and Conferring at the Appropriate Time.**

77. Furthermore, the Court should not enter the Eligibility Scheduling Motion scheduling a briefing schedule until the Court decides the issue of whether this case results from, at least in part, an inappropriate filing. Given the myriad issues that need to be addressed, the Court need not approve in shotgun fashion a highly compressed, non-negotiated schedule before these issues are resolved and, at a minimum,

- 28 -

13-53846-swr  Doc 2232-8  Filed 12/27/13  Entered 12/27/13 14:08:20  Page 32 of 49
13-53846-swr  Doc 2321  Filed 12/23/13  Entered 12/23/13 16:05:28  Page 21 of 30    40

before the major parties have the opportunity to meet and confer regarding a reasonable schedule, particularly given the unique state and federal constitutional issues here.

## X. AFSCME and Its Counsel Should be Automatically Included in the Special Service List Pursuant to the Case Management Motion.

78.     Finally, with regard to the Case Management Motion, AFSCME seeks to clarify (and to the extent necessary, request) that AFSCME will be considered one of the unions on the "Special Service List" that are "representing certain of the City's employees and retirees or their counsel where known" and that the below-identified counsel for AFSCME will be served with all pleadings filed in this proceeding.

## CONCLUSION

For the reasons set forth herein, AFSCME respectfully requests that this Court deny the Stay Extension Motion, the Stay Confirmation Motion and Eligibility Scheduling Motion as set forth above, provide for the inclusion of AFSCME and its counsel listed below on the Special Service List established under the Case Management Motion, and grant such other and further relief as may be just and proper under the circumstances.

Dated: July 22, 2013

**LOWENSTEIN SANDLER LLP**
By: /s/  Sharon L. Levine
Sharon L. Levine, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
pgross@lowenstein.com

-and-

**MCKNIGHT, MCCLOW, CANZANO, SMITH & RADTKE, P.C.**
John R. Canzano, Esq.

400 Galleria Officentre, #117
Southfield, MI 48034
(248) 354-9650 (Telephone)
(248) 354-9656 (Facsimile)
jcanzano@michworklaw.com

-and-

Herbert A. Sander, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

*Counsel to Michigan Council 25 of the American
Federation of State, County and Municipal
Employees (AFSCME), AFL-CIO*

- 30 -

13-53846-tdr   Doc 2328   Filed 12/27/13   Entered 12/27/13 14:02:30   Page 34 of 49
13-53846-swr   Doc 2327   Filed 12/27/13   Entered 12/27/13 14:08:20   Page 35 of 42   42

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

### LIMITED OBJECTION AND RESERVATION OF RIGHTS REGARDING (1) MOTION OF DEBTOR, PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER CONFIRMING THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE BANKRUPTCY CODE AND (2) MOTION OF DEBTOR, PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

TO THE HONORABLE STEVEN RHODES
UNITED STATES BANKRUPTCY JUDGE:

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "*Syncora*") file this limited objection and reservation of rights (this "*Limited Objection*") in response to: (1) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code* [ECF No. 53] (the "*Stay Confirmation Motion*") and (2) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor* [ECF No. 56] (the "*Stay Extension Motion*," and together with the Stay Confirmation Motion, the "*Motions*"),[1] filed by the above-captioned debtor (the "*Debtor*" or the "*City*") on July 19, 2013. In support of this Limited Objection, Syncora respectfully states as follows:

---

[1] Capitalized terms used but not defined herein have the meanings provided in the Motions and the *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [ECF No. 11] (the "*Orr Declaration*"), as applicable.

## Preliminary Statement

1.        Syncora files this Limited Objection to the Motions to the extent the City seeks to extend the automatic stay to City employees, including officers, in their respective capacities other than as employees of the City (the "*Employees*"), and to Swap Counterparties, Service Corporations, and certain other non-debtor parties (collectively, the "*Non-Debtor Parties*") in connection with the Pension Systems and associated Swap Contracts.  Any such extension would prejudice Swap Insurers' rights, as well as the rights of COP holders, relating to the Swap Contracts and COPs, and the City has shown no factual and legal bases to extend the automatic stay to the Employees or the Non-Debtor Parties.  Syncora preserves all of its rights as against such parties.

## Background

2.        As explained in the Orr Declaration,[2] in 2005 and 2006, the City engaged in a series of funding transactions to remedy certain underfunded, accrued, actuarial liabilities.  *See* Orr Decl. ¶ 45.  The City arranged for the creation of two entities:  the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation, each a Michigan nonprofit corporation incorporated by the City.  *Id.*  The Service Corporations, in turn, entered into contracts with the City (each a "*Service Contract*,"), whereby the Service Corporations covenanted to facilitate the funding transactions in exchange for the City's promise to pay for ongoing obligations in connection therewith.  *Id.*  The Service Corporations then created certain trusts (the "*Funding Trusts*"), which issued the COPs that were then sold to investors.  *Id.* at ¶¶ 45–47.  In 2005 and 2006, Syncora entered into insurance policies with the

---

[2]        Mr. Kevyn D. Orr is the City's Emergency Manager (the "*Emergency Manager*") appointed pursuant to Public Act 436 of 2012 of the State of Michigan, codified at Mich. Comp. Laws §§ 141.1201–141.1291.  Orr Decl. ¶ 1.

Funding Trusts with respect to certain of the COPs and, as of July 23, 2013, has exposure thereon in the amount of approximately $352 million.

3. To hedge the interest rate exposure in respect of the floating-rate COPs that were issued in 2006, the Service Corporations entered into the several Swap Contracts with the Swap Counterparties. Orr Decl. ¶ 47. The City then arranged for monoline insurance polices with the Swap Insurers, which guaranteed certain payments to the Swap Counterparties. *Id.* ¶ 48. Syncora insures four of the Swap Contracts and, as of July 23, 2013, Syncora's current exposure on the Swap Contracts is approximately $100 million.

4. In January 2009, the Swap Counterparties notified the City and the Service Corporations that a termination event had occurred under the Swap Contracts that would have allowed the Swap Counterparties to terminate the Swap Contracts. If they had, it would have imposed on the Service Corporations an immediate obligation of approximately $300 million to $400 million. Instead of terminating, however, the Swap Counterparties sought and obtained additional assurance that the Service Corporations would be able to meet their obligations under the Swap Contracts. *Id.* at ¶ 49.

5. Specifically, the parties entered into the Collateral Agreement pursuant to which the City agreed to pledge (and subject to a lock-box arrangement) millions of dollars in receivables it was owed from various casinos (the "*Wagering Tax Revenues*") operating in the City as security for its payment obligations to the Service Corporations for amounts due under the Swap Contracts. *Id.* The City granted a lien on its Wagering Tax Revenues in favor of the Service Corporations to secure those payments. *Id.* In turn, the Service Corporations granted a security interest over those Wagering Tax Revenues. *Id.*

3

6. On June 14, 2013, at a meeting among certain of the City's creditors and advisors (the "*June 14 Meeting*"), the Emergency Manager stated that the City would not make $39.7 million in payments due and owing to the Service Corporations on account of the City's obligations thereto. *See id.* at ¶ 56.

7. On June 17, 2013, Syncora sent a letter to U.S. Bank, as Custodian under the Collateral Agreement, memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed its independent view that the Service Corporation's default in not making a $40 million payment to the COP holders—which flowed from the City's failure to make the above-mentioned payment to the Service Corporations—triggered a cross-default under the Swap Contracts that led to *automatic* cash trapping under the Collateral Agreement. *See Decl. of Todd R. Snyder* filed in *City of Detroit v. Syncora Guarantee Inc.*, Case No. 13-cv-12987 (LPZ) (E.D. Mich. July 12, 2013) [ECF No. 10-3] and attached hereto at **Exhibit 1** (the "*Snyder Declaration*"). Thus, as a result of the cross-default, approximately $15 million in Wagering Tax Revenue was trapped in the General Receipts Subaccount.

8. Over the course of the last two weeks in June and first week in July, Syncora attempted to engage the City in good-faith negotiations in an effort to reach a consensual resolution regarding the trapped cash. Snyder Decl. ¶¶ 4–11. These negotiations failed to progress, however, because the City was unwilling to agree to an industry-standard term of a vanilla non-disclosure agreement. *Id.* And, without any formal or informal notice, on July 5, 2013, the City filed a civil complaint in the Circuit Court for the County of Wayne against Syncora, U.S. Bank, and three casinos (the "*State Court Action*") seeking, among other things, a temporary restraining order to obtain the release of the trapped cash. *Id.* at ¶ 12. That same afternoon, the City requested an immediate *ex parte* hearing for its temporary restraining order.

4

The City claimed that it did not have time to notify Syncora, a known party in interest with which the City was negotiating, of the hearing. *See Ex Parte Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue* ¶ 6, attached hereto at **Exhibit 2** (the "*Ex Parte Restraining Order*").

9.    Thereafter, Syncora filed a notice of removal to remove the State Court Action to the United States District Court for the Eastern District of Michigan on July 11, 2013.  And on the following day, Syncora filed a motion to dissolve the *Ex Parte* Restraining Order—an order that allowed the approximately $15 million of Wagering Tax Revenue held in the General Receipts Subaccount to escape.  After Syncora filed its motion to dissolve, the City agreed to a dissolution of the *Ex Parte* Restraining Order; however, the City refused to return $15 million into the General Receipts Subaccount.

10.    On July 18, 2013, the City commenced this case under chapter 9 of the Bankruptcy Code (the "*Chapter 9 Case*").

**Limited Objection**

**I.    The Stay Confirmation Motion Must be Denied to the Extent the City Seeks to Expand the Scope of the Automatic Stay.**

11.    The City seeks in the Stay Confirmation Motion an order confirming that the automatic stay applies to "any action or proceeding against a City Officer that seeks to enforce a claim against the City, in whatever capacity the applicable City Officer is serving."  Stay Confirmation Mot. ¶ 26.  This request goes beyond the text of section 922(a), which extends the protections afforded under section 362 to "an officer or inhabitant of the debtor,"  11 U.S.C. § 922(a), because it applies to City Officers "in whatever capacity the applicable City Officer is serving."  Stay Confirmation Mot. ¶ 26.  Thus, the City's request covers Employees acting in a capacity other than for the City.  In fact, certain City Officers and members of the City Council

5

are directors of the non-debtor Service Corporations and, in such capacity, owe fiduciary duties to such corporations and their stakeholders. As described above, the Service Corporations play a critical roll in the funding structure related to the COPs, Swap Contracts, and Collateral Agreement (the "*Funding Structure*").

12.     Section 922(a) does not stay actions against officers or inhabitants of the debtor that do not seek to enforce a claim against the debtor. *See* 11 U.S.C. § 922(a); *see also In re Jefferson Cnty., Ala.*, 484 B.R. 427, 447 (Bankr. N.D. Ala. 2012) (stating that the stay of section 922(a) only applies to actions brought to enforce a claim against the debtor). And the City has shown no cause to extend the automatic stay to Employees in their respective capacities other than as employees of the City and on account of claims against the City. Accordingly, to the extent the City seeks impermissibly to expand the automatic stay to Employees and Non-Debtor Parties, Syncora objects and the Stay Confirmation Motion should be denied. Syncora further objects to any attempt by the City to extend the automatic stay to actions against the Service Corporations, Swap Counterparties, or any Non-Debtor Parties and Employees for which the City has not shown the requisite factual and legal bases.

## II.     The Stay Extension Motion Must be Denied to the Extent the City Seeks to Expand the Scope of the Automatic Stay as to the Employees and Non-Debtor Parties.

13.     The City has also sought an order extending the automatic stay to certain non-debtor State Entities, Non-Officer Employees, and the City's Agents and Representatives pursuant to section 105(a) of the Bankruptcy Code and this Court's equitable powers. Stay Extension Mot. ¶¶ 19, 20–27. Understandably, the City is concerned that "certain parties [] are, or are likely to become, the targets of claims, lawsuits and other enforcement actions prosecuted by parties in interest that have the direct or practical effect of denying the City the protections of the automatic stay . . . ." Stay Extension Mot. ¶ 15. As discussed above, however, section

922(a)(1) only applies to actions or proceedings that seek "to enforce a claim *against the debtor*." 11 U.S.C. § 922(a)(1) (emphasis added). To the extent the City seeks to expand the scope of the automatic stay in addition to merely extending the automatic stay, Syncora objects and the Court should deny the Stay Extension Motion.

14.     Further, extend-stay motions pursuant to section 105(a) are commonly treated as requests for preliminary injunctions, as modified for the bankruptcy context. *See In re Eagle-Picher*, 963 F.2d at 858 ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions . . . ."); *see also In re Storozhenko*, 459 B.R. 697, 708 *reconsideration denied,* 458 B.R. 905 (Bankr. E.D. Mich. 2011) (denying a request to extend the automatic stay pursuant to section 105(a) where, among other things, the debtor failed to address traditional preliminary injunction factors); *Collins & Aikman Corp. v. Eglesston* (*In re Collins & Aikman Corp.*), Adversary Case No. 06-4211(SWR), Hr'g Tr. 61–65, May 4, 2006 (Bankr. E.D. Mich. 2005) (denying a request to extend the automatic stay where the debtor failed to satisfy its burden under the preliminary injunction factors); *accord In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (applying preliminary injunction factors). The City did not even attempt to satisfy the preliminary injunction factors in either the Stay Extension Motion or in those portions of the Stay Confirmation Motion that seek relief pursuant to section 105(a). *See* Stay Extension Mot. ¶ 19; Stay Confirmation Mot. nn. 5, 6.

15.     In fact, the City has only made a cursory attempt—at best—to satisfy its burden under applicable case law. *See* Stay Extension Mot. ¶ 19 (citing *Eagle-Picher* for the proposition that the City must only show "unusual circumstances" to extend the stay to non-debtor persons or entities). Also, as the court observed in *Storozhenko*, Federal Rule of Bankruptcy Procedure

(the "*Bankruptcy Rules*") 7001(7) provides that a debtor must initiate an adversary proceeding "to obtain an injunction or other equitable relief . . . ." Fed. R. Bankr. P. 7001(7); *see also Storozhenko*, 459 B.R. at 708. The City has failed to initiate an adversary proceeding here. In sum, the City has ignored procedure and a vast amount of bankruptcy case law regarding extension of the automatic stay under section 105(a).[3] That case law weighs heavily against the City. Therefore, because the City has not supported the relief sought with law and facts, and because the City has not complied with the Bankruptcy Rules, the Court should deny the Stay Extension Motion.

### Reservation of Rights

16.    Syncora respectfully reserves its rights to (a) amend, supplement, or otherwise modify this Limited Objection, (b) assert or raise such other and further objections or responses to the Motions based on additional information received from the Debtor or other sources, and (c) assert all rights and remedies under the Bankruptcy Code and applicable non-bankruptcy state and federal law against the Service Corporations, Swap Counterparties, Funding Trusts, Employees, Non-Debtor Parties, and any other party in connection with, or under, agreements governing the Funding Structure.

*[Remainder of page intentionally left blank.]*

---

[3]    *See, e.g.*, *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 315 (6th Cir. 2000) (holding that a contractual agency relationship was not an unusual circumstance that warranted extending the automatic stay); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992) (holding that a debtor must show unusual circumstances before a injunction pursuant to section 105(a) may issue); *Saginaw Prop., LLC v. Value City Dep't Stores*, LLC, 08-13782-BC, 2009 WL 189963 (E.D. Mich. Jan. 27, 2009) (declining to extend the stay where a judgment against the non-debtor would not have an effect on the property of the bankruptcy estate); *see also In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 1302604, at *2 (Bankr. S.D.N.Y. Apr. 30, 2007) ("The debtor bears the burden of demonstrating that circumstances warrant extending the stay.").

WHEREFORE, Syncora respectfully requests that the Court deny the Stay Motions to the extent set forth in this Limited Objection and grant to Syncora such other and further relief as may be just and proper.

Dated: July 23, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
**MCDONALD HOPKINS PLC**
39533 Woodward Ave.
Suite 318
Bloomfield Hills, Michigan 48304
Telephone:     (248) 646-5070
Facsimile:     (248) 646-5075

*Counsel to Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

**Exhibit 1**
**Snyder Declaration**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan,**

        **Plaintiff,**

    **v.**

**SYNCORA GUARANTEE INC., a New York Corporation**

**and**

**U.S. BANK, N.A.,**

**and**

**MGM GRAND DETROIT, LLC,**

**and**

**DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,**

**and**

**GREEKTOWN CASINO, LLC,**

        **Defendants.**

**Case No.: 2:13-cv-12987-LPZ-MKM**

**Hon. Lawrence P. Zatkoff**

## DECLARATION OF TODD R. SNYDER

I, Todd R. Snyder, hereby declare that I am an adult and have personal knowledge of the following:

1.    I am the Executive Vice Chairman of Rothschild Inc. and Co-Chair of its North American Debt Advisory and Restructuring Group.

2.    I was involved in the discussions between Syncora Guarantee Inc. ("Syncora") and the City of Detroit (the "City") regarding U.S. Bank's decision to trap the funds in the

General Receipts Subaccount.   My declaration describes these discussions and the events surrounding them.

3.      On June 17, 2013, Syncora sent U.S. Bank a letter memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed the view that it would not make any payment to the City from the General Receipts Subaccount while an Event of Default is continuing under a Hedge. (*See* Ex. D to Orr. Aff., 6/17/13 letter from C. LeBlanc to S. Brown.)  I was personally a party to the referenced conversation, which took place in Detroit on June 14, 2013, and involved myself, William Smith (counsel to U.S. Bank N.A.), and Ryan Bennett (counsel to Syncora).  During that conversation, which was witnessed by a number of individuals, including representatives of U.S. Bank, Mr. Bennett expressed his understanding that the City's failure to make the $40 million payment to the Service Corporations, would cause the Service Corporation's to default on their interest payment to the Certificates of Participation and would also constitute a cross-default under the Swap Agreement, triggering automatic cash trapping under the Collateral Agreement.  Neither Mr. Smith nor his client disagreed with Mr. Bennett, and Mr. Smith added words to the effect of "The cash ain't going anywhere until there is resolution."

4.      After several communications between Syncora, the City, and U.S. Bank regarding the propriety of trapping the cash under the Collateral Agreement, representatives from Syncora and the City held an in-person meeting on June 27, 2013.  We understood that the primary purpose of this meeting was to discuss the statements made by the City's Emergency Manager during his June 14, 2013 creditors' meeting.  It soon became clear, however, that the City's representatives were most interested in discussing U.S. Bank's recent decision to trap the funds in the General Receipts Subaccount.

5.    Initially, the City maintained that Syncora was solely responsible for the U.S. Bank's decision.  While Syncora explained that the City was mistaken in its view, given the automatic aspects of the cash trapping provisions in the Collateral Agreement, Syncora stated that it was willing to work with the City to craft a mutually satisfactory resolution to the issues surrounding the funds in the General Receipts Subaccount.  As the parties continued to discuss this issue, we reiterated our desire to engage in constructive discussions surrounding a potential settlement — a point that I personally communicated to City representatives during a break in the meeting.

6.    During the meeting, the City representatives seemed amenable to such discussions and asked Syncora to provide the City with a proposal.  The City further explained that this issue presented immediate concerns and asked us to put together our proposal as quickly as possible.

7.    The next morning I contacted one of the City's representatives and informed him that we had started to create a settlement proposal.  I explained, however, that we could not provide the City with anything more than a rough outline of our proposal unless we better understood what the City and the Swap Counterparties had been discussing about a discounted payoff of the termination liability for the Collateral Agreement.  As we had only recently discovered, the City had been negotiating with the Swap Counterparties, who, it appears, were secretly purporting to waive the cash trapping requirements of section 5.4 of the Collateral Agreement.  However, the City had never notified us of these negotiations or explained what the parties had been discussing.  The City representative stated that he understood why we needed that information but would need to speak with Ken Buckfire, the individual conducting the negotiations with the Swap Counterparties on behalf of the City.

3

8.     At that time, we tried calling Mr. Buckfire but were unable to reach him.  He was unavailable for the rest of the business day.  As a result, we set up a conference call for the following day.

9.     During my June 29, 2013 conference call with Mr. Buckfire, I explained that we needed one or two data inputs from the City in order to complete our proposal.  Mr. Buckfire stated that he was not willing to share the data I requested and instead requested details of our proposal.  I described, at a high level, the structure of our proposal.  In response, he asked for greater financial detail regarding our proposal.  I explained, though, that it was impossible to provide greater financial detail unless we first received some limited data from the City — which is exactly why we had made such a request.

10.     Despite this explanation, Mr. Buckfire remained unwilling to provide the requested information.  He stated, however, that he would consider providing the requested data after the parties executed a non-disclosure agreement ("NDA").

11.     Accordingly, that day, attorneys for Syncora and the City began negotiating the terms of this NDA.  My understanding is that over the next few days Syncora and the City exchanged a draft of a proposed NDA and held numerous discussions regarding its terms.

12.     While these discussions were still ongoing, on July 5, 2013, the City filed its Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion").  Though representatives for the City and Syncora had been talking almost daily, the City never notified Syncora that it intended to file a Motion.  Instead, Syncora first learned of the Motion when the City emailed Syncora the temporary restraining order minutes after it was entered.

4

Todd R. Snyder

Executed this 12 day of July, 2013.

5