# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
:
In re                             :    Chapter 9

:

CITY OF DETROIT, MICHIGAN,    :    Case No. 13-53846

:

                  Debtor.    :    Hon. _____

:

:

------------------------------------------------------x

# DECLARATION OF KEVYN D. ORR IN SUPPORT OF CITY OF DETROIT, MICHIGAN'S STATEMENT OF QUALIFICATIONS PURSUANT TO SECTION 109(c) OF THE BANKRUPTCY CODE

# TABLE OF CONTENTS

OVERVIEW ...................................................................................4

DETROIT'S STEADY, PRECIPITOUS DECLINE ..............................12

    Population Loss ........................................................................12

    The Decline of Detroit Manufacturing ......................................13

    Bleak Employment Prospects....................................................15

    Eroding Tax Bases & Declining Revenues .................................16

    No Ability to Ameliorate Cash Losses by Raising Taxes ...........20

CURRENT LEVELS OF MUNICIPAL SERVICES ARE INADEQUATE ........21

    High Crime Rates .....................................................................22

    Non-Functioning Street Lights .................................................24

    Blight ......................................................................................25

    Aging, Dysfunctional Infrastructure and Equipment:
        Police, Fire & EMS ...........................................................27

    Parks and Recreation ...............................................................29

    Information Technology ............................................................30

CERTIFICATE OF PARTICIPATION OBLIGATIONS
    & RELATED SWAP AGREEMENTS.......................................33

GROWING BUDGET DEFICITS .......................................................36

INSOLVENCY ...............................................................................37

    Debt Service Requirements .......................................................38

    Negative Cash Flow..................................................................40

MEASURES TAKEN BY THE CITY TO
ADDRESS FINANCIAL CHALLENGES .................................................41

    Execution of Consent Agreement/Creation of
        Financial Advisory Board .................................................42

    Employee Headcount Reductions...............................................46

    Reductions of Labor Costs Through Implementation of CETs....46

    Increased Corporate Tax Rate ...................................................47

    Enhanced Tax Collection Initiatives ..........................................47

Increased Lighting Rates ..............................................................48

Reductions in Vendor Costs ........................................................48

Reduction in Subsidy to DDOT...................................................48

Deferred Capital Expenditures ....................................................48

Demolition Initiatives .................................................................49

APPOINTMENT OF THE EMERGENCY MANAGER ......................................50

PROPOSED FINANCIAL & OPERATIONAL RESTRUCTURING.................52

Negotiations with Swap Counterparties/Insurers .........................57

Meetings with Respect to Employee Legacy Obligations...........................59

Meetings with Funded Debt and Pension Representatives .........................64

Establishment of Data Room .......................................................67

BARRIERS TO REACHING AGREEMENT .......................................68

COMMENCEMENT OF CHAPTER 9 PROCEEDINGS ......................................73

FACTS IN SUPPORT OF FIRST DAY PLEADINGS .........................................74

Motions Regarding Administrative and Procedural Matters........................76

Notice of Commencement of the Case
and Objections to Eligibility ..............................................76

Case Management and Noticing Procedures.....................................77

Appointment of Claims and Noticing Agent ...................................78

Motions Regarding Third Party Relations....................................................79

Confirmation of the Protections of the Automatic Stay....................79

Extension of the Automatic Stay to Certain Parties............................80

Appointment of Official Committee of Retirees................................81

Authorization of Compromise with Swap Counterparties.................82

CONCLUSION...........................................................................83

## TABLE OF EXHIBITS

EXHIBIT A - June 14 Creditor Proposal

EXHIBIT B - Executive Summary of June 14 Creditor Proposal

EXHIBIT C - 2011 Treasury Report

EXHIBIT D - 2012 Financial Review Team Report

EXHIBIT E - 2012 Consent Agreement

EXHIBIT F - 2012 Treasury Report

EXHIBIT G - 2013 Financial Review Team Report

EXHIBIT H - Governor's Determination of Financial Emergency

EXHIBIT I - Press Release, Ambac Financial Group, July 8, 2013

EXHIBIT J - Emergency Manager Recommendation of Chapter 9 Filing

EXHIBIT K - Governor's Authorization of Chapter 9 Filing

EXHIBIT L - Emergency Manager Order Directing City to Commence
Chapter 9 Proceedings

I, Kevyn D. Orr, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.    I am the emergency manager ("Emergency Manager") for the City of Detroit ("Detroit" or the "City"), the debtor in the above-captioned chapter 9 case, serving in accordance with Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws ("MCL") §§ 141.1541-141.1575 ("PA 436"). I was appointed "emergency financial manager" for the City by the Local Emergency Financial Assistance Loan Board (the "LEFALB") created under the Emergency Municipal Loan Act, MCL §§ 141.931-141.942, on March 15, 2013, pursuant to Public Act 72 of 1990 of the State of Michigan, also known as the Local Government Fiscal Responsibility Act, MCL §§ 141.1201-141.1291 ("PA 72"). I formally took office as the emergency financial manager for the City under PA 72 on March 25, 2013. On March 28, 2013, the effective date of PA 436, PA 72 was repealed, and I became the Emergency Manager of the City pursuant to sections 2(e) and 31 of PA 436 (MCL §§ 141.1542(e) and 141.1571).

2.    As Emergency Manager, in accordance with PA 436, I act for, and in the place and stead of, the City's elected mayor (the "Mayor") and city council (the "City Council"), and I exercise authority over nearly all aspects of the City's government and management, including, but not limited to, budgeting,

operations, financial affairs, contracts, appropriations, collective bargaining and the use, sale and lease of assets. In the approximately four months since I became Emergency Manager, I have become familiar with the history, day-to-day functions and operations of the City and the financial affairs of the City. My tenure as Emergency Manager may be limited. Pursuant to section 9(6)(c) of PA 436 (MCL § 141.1549(6)(c)), after at least 18 months of service, I may be removed from my position as Emergency Manager by a two-thirds vote of the City Council approved by the Mayor. Accordingly, the City does not intend to tarry in chapter 9. Rather, our objective is to implement a plan of adjustment and conclude this case no later than September 2014.

3. As I have stated since my appointment, public health and safety is my top priority. Moreover, improving the quality of life of Detroiters is essential to the stabilization and revitalization of the City. Thus, the City's restructuring must provide a foundation for the City to begin to provide basic, essential services to its residents in a reliable fashion. Without this, the City's death spiral I describe herein will continue.

4. In this vein, where possible, I have already moved quickly to implement necessary reforms. For example, in the short four months since my appointment, I have taken several immediate steps designed to improve public health and safety in the short term, including: (a) undertaking a critical review of

police, fire, ambulance and other emergency medical and safety-related services to develop a comprehensive plan to upgrade outdated or poorly maintained emergency vehicles, equipment and facilities; (b) taking necessary steps to ensure that the City's new command center is operating in a timely fashion; (c) issuing an order accepting the donation of new vehicles for the police, fire and emergency response teams by private sector donors; (d) hiring a new police chief for the City; (e) developing a plan to fix street lights and address the City's power grid as promptly as possible; (f) issuing an order providing for the management and monitoring of the City's Community Development Block Grant and Neighborhood Stabilization programs (among others); and (g) taking substantial steps to streamline the process for demolition of blighted structures. Additional steps are necessary and will follow.

     5.     Contemporaneously with the filing of its petition and this Declaration, the City has filed its: (a) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Statement of Qualifications"), certifying that the City satisfies each of the criteria set forth in section 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining its eligibility to be a debtor under chapter 9 of the Bankruptcy Code; and (b) Memorandum of Law in Support of Statement of Qualifications (the "Memorandum of Law"). This Declaration (along with other declarations

-3-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 7 of 88   45
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 7 of 50

contemporaneously filed by the City)[1] provides a factual foundation underlying the Statement of Qualifications and the Memorandum of Law.

6.     Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my discussions with City personnel and/or the City's advisors,[2] my review of relevant documents and sources and/or my opinion based upon my professional experience and knowledge of the City's history, operations and financial conditions.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and sources and/or informed opinion.

## Overview

7.     After decades of fiscal mismanagement, plummeting population, employment and revenues, decaying City infrastructure, deteriorating City services and excessive borrowing that provided short term band-aids at the

---

[1]     Contemporaneously with the filing of this Declaration, the City has filed the: (a) Declaration of Gaurav Malhotra in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration"); and (b) Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code.

[2]     The City has retained numerous advisors in connection with its restructuring efforts, including: (a) Miller Buckfire & Co. LLC, as financial advisor and investment banker; (b) Jones Day, as primary restructuring counsel; (c) Ernst & Young LLP, as financial restructuring advisor; (d) Conway MacKenzie, as operational restructuring advisor; (e) Pepper Hamilton LLP, as special litigation counsel; and (f) Miller Canfield P.L.C., as corporation and local counsel.

-4-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 8 of 88      46
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 8 of 50

cost of deepening insolvency, the City of Detroit today is a shadow of the thriving metropolis that it once was. The City does not provide basic and essential services to the residents who remain in the City. Crime is endemic. The City is infested with urban blight, which: (a) depresses property values; (b) provides a fertile breeding ground for crime and tinder for fires (with the attendant disproportionate devotion of police and firefighting resources to abandoned lots); and (c) compels the City to devote precious resources to demolition.

8.     Significant additional resources are required to improve public safety before the City can begin its rehabilitation. City operations, policies and procedures must be streamlined and overhauled to implement best practices and eliminate waste and inefficiencies. Related to this, the City's technology systems are in desperate need of upgrades, as they have been neglected for years, and the City's systems are not integrated. In short, the City requires substantial investment to allow it to: (a) provide basic, essential services to current residents; (b) attract new residents and businesses to foster growth and redevelopment; and (c) ultimately begin what will be a long recovery.

9.     The City's current financial obligations prevent this recovery. The City has over $18 billion in accrued obligations – approximately $11.9 billion

in unsecured obligations to lenders and retirees[3] and over $6.4 billion in

obligations backed by enterprise revenues or that are otherwise secured

(collectively, the "Revenue Bonds").[4] Currently, more than $0.38 of every tax

dollar that the City collects goes to service legacy debt and other obligations rather

than toward providing services for the City's residents and businesses. If nothing

---

[3] On June 14, 2013, I, along with my advisors, met with representatives of all creditor groups of the City to present information with respect to the state of the City's finances and operations and a comprehensive proposal to provide needed investment in the City and restructure the City's obligations. See City of Detroit: Proposal for Creditors, dated June 14, 2013 (hereinafter, "June 14 Creditor Proposal," attached hereto as Exhibit A and incorporated herein by reference), at 23-29 (identifying obligations consisting of approximately: (a) $5.7 billion in other post-employment benefit ("OPEB") accounting liabilities ($6.4 billion if the present value of future expected benefits is used); (b) $3.5 billion in underfunding pension liabilities; (c) $650.7 million in unsecured general obligation ("GO") liabilities (consisting of $1.13 billion in total GO debt less $479.3 million in secured GO debt); (d) $1.43 billion in liabilities under pension-related certificates of participation ("COPs"); (e) $343.6 million in swap liabilities related to the COPs (collectively, the "Swap Obligations"), which liabilities were valued at $296.5 million as June 28, 2013; and (f) $300 million in other liabilities). An executive summary of the June 14 Creditor Proposal (the "Executive Summary"), also presented at the June 14, 2013 meeting with creditors, is attached hereto as Exhibit B and incorporated herein by reference.

[4] June 14 Creditor Proposal at 23, 27 (consisting of $5.85 billion in enterprise fund debt, $479.3 million in secured GO debt and $87.8 million in miscellaneous notes payable to the federal government).

changes, that number is expected to grow to almost $0.65 of every dollar in less than five years.[5]

10.     For years, the City has spent more than it takes in and has borrowed and deferred paying certain obligations to make ends meet. The City is insolvent. Excluding the proceeds of debt issuances, the City has incurred operating deficits for each of the past six years through fiscal year 2013. As of the end of the City's 2012 fiscal year,[6] the City had an accumulated unrestricted general fund deficit of $326.6 million, an increase of $130.0 million over fiscal year 2011.[7] Excluding the impact of a recent debt issuance generating approximately $137 million in proceeds for the City, this deficit increased by an additional $47.4 million in fiscal year 2013.[8]

11.     The City also has experienced negative cash flow for years, and that trend is expected to continue and accelerate if not addressed. The City had negative cash flows of $115.5 million in fiscal year 2012, excluding the impact of

---

[5]     Id. at 34.

[6]     References to the City's fiscal years in this Declaration are references to the 12-month period beginning on July 1st of the previous year and ending on June 30th of the referenced year. For example, the City's 2013 fiscal year began on July 1, 2012 and ended on June 30, 2013. The City's fiscal years are expressed herein as "fiscal year [year]" (e.g., the 2013 fiscal year is expressed as "fiscal year 2013").

[7]     June 14 Creditor Proposal at 6.

[8]     Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated July 15, 2013 (the "Quarterly Report"), at 3.

proceeds from short term borrowings.[9]  In March 2012, to avoid running out of

cash, the City borrowed $80 million on a secured basis.[10]  Absent ongoing cash

conservation steps (primarily in the form of non-payment or deferral of obligations

that are due and payable and cost-cutting), the City would have run out of cash

before the end of fiscal year 2013 (i.e., June 30, 2013).[11]

        12.    The City had a positive general fund cash balance net of

accumulated property tax distributions of $36.0 million as of June 30, 2013, but

only as a result of: (a) deferring approximately $108 million of current and prior

year pension contributions (including approximately $37 million in pension

contributions for fiscal year 2012 and an estimated $71 million in such

contributions for fiscal year 2013); (b) drawing $10 million of the escrowed

proceeds of the recent $129.5 million debt issuance; and (c) the City's recent

decision not to make the scheduled $39.7 million payments due to certain

pension-related service corporations, among other cash conservation measures.[12]

Absent restructuring, the City is projecting cash flows of negative $198.5 million

---

[9]     June 14 Creditor Proposal at 7.

[10]    Id.

[11]    Quarterly Report at 2.

[12]    Id. In addition, the City for many years has deferred critical reinvestment in
the City and its infrastructure due to lack of financial resources.

in the current 2014 fiscal year and negative $260.4 million in fiscal year 2015.[13] This cash depletion would leave the City in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013.[14] In the absence of restructuring, the City's net negative cash position (after required property tax distributions) will continue its downward spiral, reaching negative $143.3 million as of the end of the current 2014 fiscal year and negative $404.5 million as of the end of fiscal year 2015.[15]

13.    As noted above, the City has not been – and currently is not – paying its debts as they come due.  For example, the City has deferred payment of pension funding contributions to both its General Retirement System ("GRS") and Police and Fire Retirement System ("PFRS" and, together with the GRS, the "Pension Systems"), and it accrues interest on such deferrals at a rate of 8%.  As of June 30, 2013, the City had deferred approximately $108 million in contributions to the Pension Systems in the aggregate.  In addition, to conserve cash for City operations, including payroll, the City did not make the scheduled

---

[13]    June 14 Creditor Proposal at 50.

[14]    Quarterly Report at 3.

[15]    June 14 Creditor Proposal at 50.

-9-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 13 of 88    51
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 13 of 50

$39.7 million payments under certain pension-related service contracts that were due on June 14, 2013.[16]

14.     Faced with several years of expenditures exceeding revenues, the City has taken aggressive steps to address its financial distress. These measures included: (a) entering into a consent agreement with the State of Michigan and the resulting creation of a financial advisory board to oversee the City's operations and conduct limited reforms; (b) reducing the number of City employees by more than 22% since fiscal year 2010;[17] (c) implementing revised City employment terms ("CETs") for non-union employees and union employees under expired collective bargaining agreements; (d) increasing certain tax and utility rates; (e) enhancing tax collection initiatives; and (f) reducing other expenditures. By these reforms, the City estimates that it has been able to realize more than $200 million in annual savings.[18]

15.     Unfortunately, these savings have not been sufficient to balance the City's budget or improve its cash position. Moreover, as a practical matter, the City cannot meaningfully increase revenues by raising taxes. Citizens of Detroit already pay significantly more taxes than citizens of surrounding communities.

---

[16]     Id. at 8.

[17]     Id. at 53.

[18]     Id.

-10-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 14 of 88    52
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 14 of 50

The City's current tax rates are at their statutory maximums and, even if the City could raise taxes, its residents lack the financial wherewithal to bear them. Nor can the City significantly reduce expenditures at this time by further reducing employee headcount or cutting services beyond the skeleton coverage currently provided given the archaic state of the City's technological systems and certain mandates in the City's Charter. Further cuts would only further jeopardize public health, safety and welfare.

16.    If left unchecked, the City's deteriorating financial condition will only get worse. The time to stop the downward spiral is now. Along with my team of advisors, I have crafted a plan to permit the City to pay its employees and its bills, live within its means, provide meaningful (but modest relative to the overall need) reinvestment in the City of approximately $125 million annually for the next 10 years,[19] satisfy secured obligations and restructure unsecured obligations. That proposed plan, the negotiations around it, the challenges confronting the City and past attempts to meet them are described in more detail below. Unfortunately, despite good faith efforts by the City to negotiate with its creditors (where such negotiations could be had), no reasonable alternative for the restructuring of the City's operations and obligations exists other than through this chapter 9 case.

---

[19]    Id. at 61.

-11-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 15 of 88      53
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 15 of 50

## Detroit's Steady, Precipitous Decline

17.    The financial decline that has led Detroit to this debt adjustment case is not of recent origin. Rather, Detroit's decline is the product of a confluence of demographic and economic forces that have been mounting for decades.

18.    In 1952, at the height of its prosperity and prestige, Detroit – rightfully referred to as the cradle of the American automobile industry – had a population of approximately 1.85 million,[20] a 600% increase from the population in 1900.[21] Detroit's population explosion coincided with the rise of the automakers. From 1900 to 1930, Detroit was the fastest-growing city in the world and by 1929 it was the fourth-largest city in America.[22] In 1950, Detroit was building half of the world's cars.[23] During that time, half a million people came to Detroit looking for work.[24]

19.    <u>Population Loss</u>. Since its peak in the 1950s, however, Detroit has been losing both people and jobs. Detroit's population declined by nearly 45%

---

[20]    Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[21]    Kevin Boyle, The Ruins of Detroit: Exploring the Urban Crisis in the Motor City, 27 Michigan Historical Review 109 (Spring 2001).

[22]    Tom Bethell, Detroit's Fate: Intransigent Unions, Declining Automakers, and Poor Public Policy Have Wrecked Both Michigan and Its Largest City, 2 The American 36 (2008).

[23]    Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[24]    David Lepeska, The Historical Roots of Detroit's Ruin, The Atlantic (Mar. 12, 2012).

to just over one million as of June 1990.[25] In the 23 years since, this population

decline has continued unabated. Detroit's population stands at 684,799 as of

December of 2012, an astonishing 63% decline from its postwar peak of

1.85 million residents.[26] Detroit has gone from the fifth largest city in America in

1950 to the eighteenth largest today.[27] No other American city has experienced a

comparable decline in population over a similar period of time.[28]

      20.    The Decline of Detroit Manufacturing. A considerable amount

of migration out of the City has been, and continues to be, a result of economic

dislocation. In particular, changes in the auto industry over the years have had an

outsized impact on Detroit's economy. Almost immediately after World War II,

Detroit began to lose manufacturing jobs as the auto companies automated their

---

[25]    Compare *Population of the 100 Largest Urban Places: 1950*, U.S. BUREAU
OF THE CENSUS tbl.18 (June 15, 1998),
http://www.census.gov/population/www/documentation/twps0027/tab18.txt
(stating that the City had a population of 1,849,568 in 1950) with *City of
Detroit Fast Facts: 1990*, U.S. BUREAU OF THE CENSUS,
http://www.census.gov/history/www/through_the_decades/fast_facts/1990_
new.html (stating that the City had a population of 1,027,974 in 1990).

[26]    Population and Household Estimates for Southeast Michigan, Southeast
Michigan Conference of Governments (December 2012) (available at
http://www.semcog.org/uploadedFiles/Population_and_Household_
Estimates_for_December_2012.pdf) (last accessed April 30, 2012).

[27]    Kate Linebaugh, Detroit's Population Crashes, The Wall Street Journal
(Mar. 23, 2011), *available at* http://online.wsj.com/article/
SB10001424052748704461304576216850733151470.html.

[28]    Bruce Katz & Jennifer Bradley, The Detroit Project: A Plan for Solving
America's Greatest Urban Disaster, The New Republic 29 (Dec. 2, 2009).

-13-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 17 of 88   55
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 17 of 50

facilities and moved their remaining jobs out of the City.[29]  Between 1947 and

1963, Detroit lost approximately 150,000 manufacturing jobs as smaller auto

manufacturers disappeared (e.g., Packard and Studebaker), and the "Big Three"

began to move operations to the suburbs and out of the state.[30]

21.     These trends only accelerated as the Detroit automakers began

to lose ground to international competitors.  Foreign automakers entered the U.S.

market during the 1950s with fuel-efficient vehicles and, when the oil crisis of

1973 hit, U.S. automakers were unprepared.  Automobile production fell nearly

30% in the next two years,[31] and the market share of U.S. automobile companies

declined from 95% in 1955 to 75% in 1980.[32]  By 2008, Detroit's share of

U.S. auto sales had declined to 47%.[33]

22.     The collapse of Detroit's manufacturing industry during the

second half of the 20th century was not limited to the automobile sector.  Non-auto

---

[29]     Kevin Boyle, The Ruins of Detroit:  Exploring the Urban Crisis in the Motor
         City, 27 Michigan Historical Review 114 (Spring 2001).

[30]     Tom Bethell, Detroit's Fate:  Intransigent Unions, Declining Automakers,
         and Poor Public Policy Have Wrecked Both Michigan and Its Largest City,
         2 The American 36 (2008).

[31]     David Lepeska, The Historical Roots of Detroit's Ruin, The Atlantic
         (Mar. 12, 2012).

[32]     Thomas H. Klier & James Rubenstein, Federal Reserve Bank of Chicago,
         Detroit Back from the Brink?  Auto Industry Crisis and Restructuring,
         2008-11, 36 Economic Perspectives 35 (2012).

[33]     Id.

-14-

13-53846-swr   Doc 11    Filed 07/18/13   Entered 07/18/13 21:44:51   Page 18 of 88    56
13-53846-tjt   Doc 2334-3    Filed 12/27/13   Entered 12/27/13 13:37:04   Page 18 of 50

companies also shuttered operations. In the 1970s and 1980s, companies such as Uniroyal, Vernor's Ginger Ale and Revere Copper closed their plants and left abandoned sites behind.[34] From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments.[35]

23.   <u>Bleak Employment Prospects</u>.  The demise of Detroit's industrial sector has proven catastrophic for its citizens' employment prospects. The number of jobs in Detroit (for residents and non-residents) declined from 735,104 in 1970, to 562,120 in 1980, to 412,490 in 1990, to 346,545 in 2012.[36] The "Great Recession" of the past decade dealt an especially punishing blow. Detroit's unemployment rate already stood at an alarming 16% as of June 2008.[37] When the recession took hold, the production and sales of automobiles in the U.S. cratered. Combined sales for Detroit's automakers fell from 8.1 million in 2007 to 4.6 million in 2009, with two of the Big Three and numerous parts suppliers filing

---

[34]   Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[35]   Detroit City Government Revenues, Citizens Research Council of Michigan, Report 382 (April 2013) ("CRC Report"), at 19.

[36]   http://library.semcog.org/InmagicGenie/DocumentFolder/HistoricalPopulationSEMI.pdf.

[37]   City of Detroit Comprehensive Annual Report for the Fiscal Year Ended June 30, 2008, at 23 ("For June 2008, Detroit's jobless rate was 16.5%....").

-15-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 19 of 88   57
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 19 of 50

for bankruptcy in 2009.[38] The decline in production and restructuring of Detroit's auto industry resulted in massive job cuts.[39] Detroit's unemployment rate skyrocketed to 23.4% as of June 2010 and remained above 18% well into 2012.[40] The number of employed Detroit residents fell sharply, from approximately 353,000 in 2000 to less than 280,000 in 2012.[41]

24.    Eroding Tax Bases & Declining Revenues. Declines in both population and the economy are mutually reinforcing trends. As more people leave the City, there is less economic activity and, thus, a decreased need for workers. Less economic activity and fewer jobs induce even more people to leave, thus further reducing economic activity and exacerbating job losses. Detroit has been in the grip of this vicious spiral for decades, and it has taken a tremendous toll on the City's ability to generate revenue. Detroit's municipal income tax receipts – traditionally the City's largest source of revenue – have decreased by

---

[38]    Thomas H. Klier & James Rubenstein, Federal Reserve Bank of Chicago, Detroit Back from the Brink? Auto Industry Crisis and Restructuring, 2008-11, 36 Economic Perspectives 35 (2012).

[39]    Id.

[40]    Population and Household Estimates for Southeast Michigan, Southeast Michigan Conference of Governments (December 2012) (available at http://www.semcog.org/uploadedFiles/Population_and_Household_Estimates_for_December_2012.pdf) (last accessed April 30, 2012).

[41]    Bureau of Labor Statistics, Local Area Unemployment Statistics, Data Chart ID: LAUPS26025003, LAUPS26025004, LAUPS26025005, LAUPS26025006.

approximately $95 million (or 30%) since 2002 and by $43 million (or more than

15%) since 2008, driven lower primarily by high unemployment and declining *per*

*capita* income.[42]

      25.    Detroiters' average *per capita* annual income from 2007 to 2011

was $15,261; the median household income for that same period was $27,862.[43]

During that period, an estimated 36% of Detroiters were living below the poverty

line.[44]  Only 54% of Detroiters owned a home, the median value of which was

$71,100.[45]  To put these numbers in perspective, the average *per capita* annual

income in Michigan from 2007 to 2011 was $25,482,[46] the median household

income was $48,669[47] and only 16% of Michigan citizens lived below the poverty

---

[42]    CRC Report, at vi. <u>See</u> June 14 Creditor Proposal at 52 (showing municipal income tax revenue of $276.5 million in fiscal year 2008 and $233 million in fiscal year 2012).

[43]    U.S. Census Bureau, State & County QuickFacts, Detroit, Michigan, http://quickfacts.census.gov/qfd/states/26/2622000.html.

[44]    <u>Id.</u>

[45]    <u>Id.</u>

[46]    <u>Id.</u> Per capita annual income for residents of the surrounding communities of Dearborn, Livonia and Southfield are $22,816, $31,959 and $29,228, respectively. <u>Id.</u>

[47]    <u>Id.</u>

-17-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 21 of 88   59
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 21 of 50

line.[48]  The state-wide homeownership rate was 74%, and the median home value was $137,300.[49]

26.  Detroit's property tax receipts likewise have suffered.  Between 1970 and 1990, the real value of the City's property tax base declined by nearly two-thirds.[50]  This trend has reasserted itself in earnest in the wake of the Great Recession.  According to the Citizens' Research Council of Michigan, over the last five years, Detroit's assessed property values have decreased by approximately $1.6 billion.[51]  Property tax revenues for the City's 2013 fiscal year were $134.9 million, a $12.9 million (or approximately 10%) reduction from the prior fiscal year and $23.6 million (or approximately 15%) lower than the average property tax revenue for the preceding five fiscal years.[52]

27.  Ancillary taxes imposed by the City likewise have either declined or are expected to decline on a prospective basis.  Detroit is the only city in Michigan to impose a "utility users' tax" on its citizens.  The City's receipts from this utility users' tax have decreased approximately 28% over the last decade (from approximately $55.3 million in fiscal year 2003 to approximately $39.8 million in

---

[48]  Id.

[49]  Id.

[50]  Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[51]  CRC Report, at vi.

[52]  June 14 Creditor Proposal at 52, 90; Quarterly Report at Appendix B.

-18-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 22 of 88      60
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 22 of 50

fiscal year 2012).[53] Detroit is also the only municipality in Michigan authorized to levy a casino wagering tax.[54] Although these wagering tax revenues recently have remained steady, the City estimates that such revenues will decrease in fiscal year 2013 by approximately 5% and fail to recover to their fiscal year 2012 level until fiscal year 2023 due to expected loss of market share to casinos opening in nearby locations (e.g., Toledo and Cleveland, Ohio).[55]

28.     Detroit receives unrestricted aid from the State of Michigan in connection with constitutional and statutory sharing of sales tax revenue and "economic vitality incentive payments." Due to the City's declining population and significant cuts by the State, Detroit's share of distributed state revenue for fiscal year 2012 had decreased by more than $161 million (or approximately 48%) since fiscal year 2002 and by approximately $76 million (or approximately 31%) since 2008.[56] Although higher projected tax revenues collected by the State are expected to halt the decline in the City's receipt of shared revenue over the coming fiscal years, revenue sharing payments: (a) remain at risk of further decrease given

---

[53]     CRC Report, at vi.

[54]     Id.

[55]     June 14 Creditor Proposal at 52, 90.

[56]     CRC Report at vii.

-19-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 23 of 88    61
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 23 of 50

the City's declining population; and (b) are projected to remain approximately 20% below fiscal year 2011 levels for the foreseeable future.[57]

29. <u>No Ability to Ameliorate Cash Losses by Raising Taxes</u>. A number of factors render the challenges posed by the City's declining tax revenue essentially intractable. The *per capita* tax burden on Detroit residents is the highest in Michigan, which burden is made heavier still by the residents' relative inability to pay given their level of *per capita* income.[58] The City's income tax – 2.4% for residents, 1.2% for non-residents and 2.0% for businesses – is the highest in Michigan,[59] and Detroiters pay the highest total property tax rates of residents of Michigan cities with a population over 50,000 (inclusive of property taxes paid to overlapping jurisdictions (<u>e.g.</u>, the State; Wayne County)).[60]

30. In any event, the City is currently levying all taxes at the statutory maximums.[61] In particular: (a) Public Act 394 of 2012 of the State of Michigan fixed the City's maximum income tax rates at their current levels;[62]

---

[57]     June 14 Creditor Proposal at 52, 90 (showing state revenue sharing of $239.3 million in 2011 and projected revenue sharing between $184.3 million and $193.0 million through 2023).

[58]     <u>Id.</u> at 4.

[59]     CRC Report, at 21.

[60]     <u>Id.</u> at vi.

[61]     June 14 Creditor Proposal at 4.

[62]     MCL § 141.503(2).

-20-

(b) State law limits municipalities' property tax rates to 20 mills[63] and a constitutionally-required "Headlee rollback" further limits that rate to 19.952 mills (which is the rate charged by the City);[64] and (c) the utility users' tax and casino wagering tax are fixed at their current 5% and 10.9% levels, respectively, by the State statutes authorizing these Detroit-specific taxes.[65] See Exhibit A at 5 (comparing Detroiters' tax burden to comparable local municipalities).

### Current Levels of Municipal Services are Inadequate

31.    The severe demands on the City's financial resources have left it unable to render proper services to its citizens over a 139-square mile municipal footprint that is nearly 20% larger than that of Boston, Manhattan and San

---

[63]    MCL § 117.3 ("Each city charter shall provide for all of the following:" ... (g) The annual laying and collecting taxes in a sum, except as otherwise provided by law, not to exceed 2% of the taxable value of the real and personal property in the city."); MCL § 117.5 ("(1) A city does not have power to do any of the following:  (a) To increase the rate of taxation now fixed by law, unless the authority to do so is given by a majority of the electors of the city voting at the election at which the proposition is submitted, but the increase in any case shall not be in an amount as to cause the rate to exceed 2%, except as provided by law, of the assessed value of the real and personal property in the city.").

[64]    CRC Report, at 15.

[65]    MCL § 141.1152(1) ("[t]he governing body shall set the rate of tax in increments of 1/4 of 1% that shall not exceed 5%"); MCL § 432.212(4),(6), (7) (providing for an aggregate maximum wagering tax in the amount of 10.9%).

-21-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 25 of 88    63
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 25 of 50

Francisco *combined*.[66] The City's core services (e.g., police; fire; EMS; public lighting; transportation; parks and recreation) generally are underfunded and inadequate. Drastic cost-cutting actions taken over the years (as described in further detail below) have gutted many City departments, resulting in the deferral of many necessary investments and decreasing levels of services to Detroiters. Indeed, departments accounted for in separate funds are not self-sufficient and rely heavily on subsidies from the general fund (e.g., Department of Transportation (fiscal year 2013 subsidy estimated to be $60-$70 million); Public Lighting Department (fiscal year 2013 subsidy estimated to be $20-$30 million)). Lack of adequate funding further results in leadership and staff positions within City departments often going unfilled or under-filled, in part because the compensation offered by the City often does not allow for the hiring of top talent.

32.  High Crime Rates. During calendar year 2011, approximately 136,000 crimes were reported in the City; 15,245 of these were violent crimes (e.g., homicide, forcible rape, robbery, aggravated assault).[67] In 2012, *the City's*

---

[66]  Financial Advisory Board Discussion Document, June 15, 2012, at 4. The combined area of Boston, Manhattan and San Francisco is 116.96 square miles.

[67]  United States Department of Justice, Federal Bureau of Investigation, Uniform Crime Report 2011: Master File excerpts - Return A Record Cards for Group 1 and Group 3 cities (provided upon request by Criminal Justice Information Services); June 14 Creditor Proposal at 9.

-22-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 26 of 88   64
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 26 of 50

*violent crime rate was five times the national average and the highest of any city*

*with a population in excess of 200,000.*[68] In 2011, the number of murders,

non-negligent manslaughters and aggravated assaults in Detroit exceeded that of

Cleveland, Pittsburgh, St. Louis and Milwaukee *combined.*[69] See Exhibit A at 9

(comparing 2011 crime data across major categories of crime for selected national

and local municipalities). The City's case clearance rates for violent crimes and all

crimes (18.6% and 8.7%, respectively) are substantially below that of comparable

municipalities nationally and surrounding local municipalities,[70] and the response

times of the Detroit Police Department are far in excess of comparable and

surrounding cities.[71] See Exhibit A at 10-11 (comparing clearance rates for

comparable national municipalities and certain Michigan municipalities) and 13

---

[68]     United States Department of Justice, Federal Bureau of Investigation,
         Uniform Crime Report 2011: Master File excerpts - Return A Record Cards
         for Group 1 and Group 3 cities (provided upon request by Criminal Justice
         Information Services); "Detroit Tops The 2012 List Of America's Most
         Dangerous Cities," Forbes,
         http://www.forbes.com/sites/danielfisher/2012/10/18/detroit-tops-the-2012-
         list-of-americas-most-dangerous-cities/; June 14 Creditor Proposal at 9.

[69]     United States Department of Justice, Federal Bureau of Investigation,
         Uniform Crime Report 2011: Master File excerpts - Return A Record Cards
         for Group 1 and Group 3 cities (provided upon request by Criminal Justice
         Information Services); June 14 Creditor Proposal at 9.

[70]     City of Detroit, Detroit Police Department – Criminal Investigations
         Division; June 14 Creditor Proposal at 10-11.

[71]     City of Detroit, Detroit Police Department – Computer Aided Dispatch
         System; Federal Bureau of Investigation.

-23-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 27 of 88    65
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 27 of 50

(identifying response times for the Detroit Police Department ("DPD") in 2012 and 2013). Certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol certain sections of the City underserved by the DPD.[72]

      33.   Non-Functioning Street Lights. As of April 2013, about 40% of the approximately 88,000 street lights operated and maintained by the City's Public Lighting Department ("PLD") were not working, primarily due to disrepair and neglect.[73] Many outages are attributable to burned-out bulbs, but others are the result of the obsolescence of the distribution-only electrical grid maintained by the PLD.[74] The total of functioning street lights per square mile in Detroit generally is less than half that of comparable national municipalities.[75] This failure in the provision of basic municipal service – the City is literally struggling to keep the

---

[72]   http://online.wsj.com/article/
SB10001424127887323916304578407662589454102.html (last accessed May 27, 2013).

[73]   June 14 Creditor Proposal at 12.

[74]   Id.

[75]   Id.; see also http://northcity.fox2now.com/content/st-louis-tests-new-street-lighting-option;
http://www.lafollette.wisc.edu/publications/workshops/2009/lights.pdf;
http://www.cmu.edu/rci/images/projects/led-updated-web-report.pdf;
http://www.bloomberg.com/news/2012-05-24/half-of-detroit-s-streetlights-may-go-out-as-city-shrinks.html;
http://www.cleveland.com/cityhall/index.ssf/2013/04/
cleveland_public_power_to_test.html.

-24-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 28 of 88   66
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 28 of 50

lights on – is compounded by the fact that many of the street lights that *are* working do not meet the residents' actual needs. Functioning street lights often serve under-populated sections of the City's historical population footprint, and there is a backlog of approximately 3,300 complaints related to the City's lighting.[76]

34.    Blight. Perhaps no issue is as fundamental to – or emblematic of – Detroit's decline as urban blight. The City's long-term population decline and falling property values have resulted in large numbers of abandoned, forfeited or foreclosed land and structures within the City. These decrepit eyesores dramatically undermine Detroit's efforts to maintain public safety (as they contribute to the proliferation of crime and arson) and contribute to declines in property values.

35.    There are approximately 78,000 abandoned and blighted structures in the City (approximately 20% of the City's housing stock),[77] nearly half of which are considered dangerous. This number increases steadily due to

---

[76]    June 14 Creditor Proposal at 12.

[77]    Kate Linebaugh, Detroit's Population Crashes, The Wall Street Journal (Mar. 23, 2011), *available at* http://online.wsj.com/article/SB1000142405274870446130457621685073315 1470.html; June 14 Creditor Proposal at 15.

-25-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 29 of 88    67
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 29 of 50

vacancy (particularly foreclosures) and fires, among other things.[78] Approximately 60% of the 11,000 to 12,000 fires that the City has experienced each year for the past decade occur in blighted and unoccupied buildings, forcing the Detroit Fire Department ("DFD") to expend a disproportionate amount of time and resources fighting fires in vacant structures.[79] Similarly, there are approximately 66,000 blighted and vacant parcels of real property within the City limits.[80]

36.     Compounding this problem is the fact that removing blight is an expensive, time-consuming and highly-regulated endeavor. The average cost to demolish a residential structure (accounting for surveys and abatements, utility disconnection costs, administrative costs and the demolition itself) is

---

[78]    As of April 2013, 16,700 structures within the City have been inspected and classified as dangerous, 14,263 have open complaints of being dangerous, 6,657 were scheduled to go before City Council for an order of demolition and 1,159 are considered "emergency demolitions." See Financial Advisory Board Discussion Document, October 8, 2012, at 57; Jillian Kay Melchior, Battling Blight in Detroit, National Review Online, March 6, 2013 (available at http://www.nationalreview.com/articles/342267/battling-blight-detroit-jillian-kay-melchior) (last accessed July 16, 2013).

[79]    Financial Advisory Board Discussion Document, November 12, 2012, at 24; Jillian Kay Melchior, Battling Blight in Detroit, National Review Online, March 6, 2013 (available at http://www.nationalreview.com/articles/342267/battling-blight-detroit-jillian-kay-melchior) (last accessed July 16, 2013); June 14 Creditor Proposal at 16.

[80]    June 14 Creditor Proposal at 16.

-26-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 30 of 88    68
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 30 of 50

approximately $8,500.[81] The current regulatory framework – involving multiple codes and regulations and a number of jurisdictions – increases costs and slows the process.[82]

37.    Aging, Dysfunctional Infrastructure and Equipment:  Police, Fire & EMS.  Numerous City assets are in states of neglect and disrepair.  The infrastructure and equipment for the City's police, fire and EMS departments, in particular, are aged and inadequately maintained.

38.    The average age of the City's 35 fire stations is 80 years, and maintenance costs often exceed $1 million annually.[83] Due to lack of funding, Detroit's firefighters are often forced to make necessary repairs to the fire stations themselves.[84] The DFD's fire apparatus fleet is plagued with mechanical issues, contains no reserve vehicles and lacks equipment ordinarily regarded as standard.[85]

---

[81]    Financial Advisory Board Discussion Document, October 8, 2012, at 61. See also Third Quarterly Report on Demolition Projects, February 28, 2013, issued by the Michigan State Housing Development Authority in cooperation with the Department of Human Services (identifying $8,500 as the per-structure cost for demolitions to date); June 14 Creditor Proposal at 17.

[82]    June 14 Creditor Proposal at 27.

[83]    June 14 Creditor Proposal at 18.

[84]    Financial Advisory Board Discussion Document, November 12, 2012, at 28.

[85]    Detroit Public Safety Foundation, Department Needs, http://www.detroitpublicsafetyfoundation.org/dfd-fire/department-needs/ (last visited Apr. 22, 2013).

-27-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 31 of 88    69
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 31 of 50

Once staffed with 63 people and now down to 26, the DFD's Apparatus Division

has a mechanic to vehicle ratio of 1 to 39, resulting in an inability to complete

preventative maintenance on schedule.[86] Detroit firefighters frequently operate

shorthanded due to a lack of serviceable equipment. The City has recently

accepted donations towards the inspections of fire ladders on trucks and ground

ladders because the City could not afford required inspections.[87] Indeed, in

February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not

to use hydraulic ladders on DFD ladder trucks except in cases involving an

"immediate threat to life" because the ladders had not received safety inspections

"for years."[88]

39.    The City's EMS vehicles suffer from similar problems. During

the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were

---

[86]    Financial Advisory Board Discussion Document, November 12, 2012, at 22; June 14 Creditor Proposal at 18.

[87]    Detroit Free Press, "Detroit's New Police Chief: 'I've Come Home'", May 15, 2013 (available at http://www.freep.com/article/20130515/NEWS01/305150098/; last accessed May 17, 2013). These donations fall well short of redressing the City's chronic inability to perform required maintenance.

[88]    Elisha Anderson, Detroit Firefighters Ordered Off Ladders on Aerial Trucks; Fleet Hasn't Been Inspected in Years, Detroit Free Press (Feb. 4, 2013), http://www.freep.com/article/20130204/NEWS01/302040035/Detroit-firefighters-ordered-off-ladders-on-aerial-trucks-fleet-hasn-t-been-inspected-in-years; June 14 Creditor Proposal at 18.

-28-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 32 of 88        70
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 32 of 50

in service.[89] Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles and break down frequently.[90] Again, the City has been forced to accept charitable donations to upgrade its EMS fleet. In March 2013, a group of corporations pledged to donate approximately $8 million to the City, a portion of which will be used to upgrade the city's fleet of EMS vehicles.[91] Similarly, the DPD operates with an extremely old fleet of 1,291 vehicles, a majority of which have reached replacement age and lack modern information technology.[92]

     40. <u>Parks and Recreation</u>. The number of City parks is dwindling, and many are in poor or fair condition due to lack of funding.[93] The City closed 210 parks during fiscal year 2009, reducing its total by 66% (from 317 to 107), and

---

[89]    Steve Neavling, Major U.S. Automakers Come to the Aid of Destitute Detroit, reuters.com (Mar. 25, 2013, 10:35 AM), http://www.reuters.com/article/2013/03/25/usa-detroit-manager-idUSL2N0CH0ED20130325; June 14 Creditor Proposal at 18.

[90]    Dave LewAllen, Businesses to Donate $8 million for Detroit Police, EMS Vehicle Fleet, wxyz.com (Mar. 25, 2013), http://www.wxyz.com/dpp/news/region/detroit/businesses-to-donate-8-million-for-detroit-police-ems-vehicle-fleet; June 14 Creditor Proposal at 29.

[91]    <u>Id.</u>; June 14 Creditor Proposal at 18. Again, these donations are not sufficient to fund all needed upgrades to the City's vehicle fleet.

[92]    June 14 Creditor Proposal at 19.

[93]    Detroit Recreation Department Strategic Master Plan, Volume II, May 2006, at 14-15, 17, http://www.detroitmi.gov/Portals/0/docs/recreation/pdf/PDF%20files/Final%20Report/Volume%20II.pdf; Detroit Free Press, Bing to announce parks and recreation cuts, closures following collapse of Belle Isle deal, January 31, 2013; June 14 Creditor Proposal at 15.

-29-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 33 of 88    71
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 33 of 50

recently announced that 50 of its remaining 107 parks would be closed, another 38 would shift to limited maintenance and the already under-served Belle Isle would receive decreased services.[94]

41.   Information Technology.  Nearly all of the City's departments are saddled with obsolete and non-integrated information technology ("IT") infrastructure and software.  The IT systems employed by the DPD and DFD: (a) are outdated to the point that vendors no longer provide full support; and (b) lack integrated solutions, resulting in redundant data entry, no meaningful reporting and limited query capabilities.[95]  DPD's IT systems, in particular, are highly manual, poorly implemented and non-integrated, resulting in highly inefficient DPD operations; the DPD has no IT systems in place *at all* for such functions as jail management, electronic ticketing and activity logs.[96]

42.   The City's payroll systems are similarly anachronistic, resulting in massive inefficiencies and excessive costs.  The City currently uses multiple, non-integrated payroll systems that are highly manual and prone to human error

---

[94]   Huffington Post, Detroit Parks Closing: Mayor Dave Bing to Abandon 50 Recreation Areas After Belle Isle Deal Collapses, February 1, 2013, available at http://www.huffingtonpost.com/2013/02/01/detroit-parks-closing-dave-bing_n_2598938.html (last accessed July 15, 2013); June 14 Creditor Proposal at 15.

[95]   City of Detroit, Detroit Police Department Information Technology – Statement of Need, April 10, 2013, at 4.

[96]   June 14 Creditor Proposal at 20.

and erroneous payments. A majority of the City's employees are on an archaic payroll system that has limited reporting capabilities and no way to clearly track, monitor or report expenditures by category.[97] Accordingly, the City's cost of payroll administration is significantly higher than for comparable entities.[98] Current cost to process payroll is $62 per check ($19.2 million per year), which is more than four times more costly than the general average of $15 per paycheck, and almost 3.5 times more costly than other public-sector organizations, which average $18 per paycheck.[99] The payroll process involves 149 full-time employees, 51 of which are uniformed officers – meaning that highly and expensively trained and high cost personnel are performing clerical duties.[100]

43.     Similar IT issues handicap the City's tax collection systems. The City's highly manual income tax collection and data management systems are simply outdated (having been purchased in the mid-1990s) with little to no automation capability; in July 2012, they were characterized as "catastrophic" by the IRS.[101] The billing, processing and collection of property taxes are likewise

---

[97]     Financial Advisory Board Discussion Document, July 26, 2012, at 17.

[98]     Id.

[99]     Id. at 18; June 14 Creditor Proposal at 20.

[100]    Financial Advisory Board Discussion Document, July 26, 2012, at 18; June 14 Creditor Proposal at 20.

[101]    Financial Advisory Board Discussion Document, July 26, 2012, at 21, 23; June 14 Creditor Proposal at 20.

inefficient. Recommendations recently received from a third-party consultant designed to increase the efficiency of the City's property tax collection process have not been implemented, and the City must rely on Wayne County for funding and the collection of delinquent property taxes.[102]

44.     The City's core financial, accounting and budgeting systems similarly suffer from the lack of modern IT. The City's financial reporting and budget development systems: (a) are 10 to 15 years old; (b) require a manual interface (70% of journal entries are booked manually); (c) lack reliable fail-over and back-up systems; and (d) lack a formal, documented IT governance structure, all of which impairs the reporting, efficiency and accuracy of the data and the accountability of the systems.[103] The City's grant tracking systems are fragmented and unstandardized to the extent that the City is unable to comprehensively track citywide grant funds and status or prevent disallowed costs.[104] Aged IT infrastructure within the City's Buildings, Safety Engineering and Environmental Department ("BSEED") and the DFD leads to bottlenecks in permit invoicing and

---

[102]     Financial Advisory Board Discussion Document, August 13, 2012, at 12; Financial Advisory Board Discussion Document, October 8, 2012, at 14.

[103]     Financial Advisory Board Discussion Document, October 8, 2012, at 17, 43; June 14 Creditor Proposal at 21.

[104]     Financial Advisory Board Discussion Document, October 8, 2012 at 42; June 14 Creditor Proposal at 21.

-32-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 36 of 88      74
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 36 of 50

collection.[105] Finally, to improve both service and safety, the Detroit Department of Transportation ("DDOT") requires funding for technology updates (e.g., GPS/bus cameras) both on its buses and at DDOT facilities.[106]

## Certificate of Participation Obligations & Related Swap Agreements

45.    In 2005 and 2006, the City entered into a series of financing transactions to fund the unfunded actuarial accrued liabilities ("UAAL") related to each of the Pension Systems through arranging for the issuance of certificates of participation supported by services contracts between the City and each of the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation (together, the "Service Corporations"), i.e., specially created vehicles for each of the Pension Systems.[107]

46.    As of the end of fiscal year 2012, the aggregate outstanding amount of such certificates approximated $1.45 billion and, by series, are as follows:

- Series 2005-A in the aggregate amount of $503,365,000 bearing interest at 4.50 - 4.95% (the "2005 COPs");

---

[105]    Financial Advisory Board Discussion Document, October 8, 2012 at p. 17, 37; June 14 Creditor Proposal at 22.

[106]    Financial Advisory Board Discussion Document, October 8, 2012 at p. 27; June 14 Creditor Proposal at 22.

[107]    Comprehensive Annual Financial Report of the City of Detroit, Michigan for Fiscal Year Ended June 30, 2012 (the "2012 CAFR") at 111.

-33-

- Series 2006-A in the aggregate amount of $148,540,000 bearing interest at 5.989% (the "2006-A COPs"); and

- Series 2006-B in the aggregate amount of $800,000,000 bearing interest at a floating rate (the "2006-B COPs" and, together with the 2006-A COPs, the "2006 COPs," and the 2006 COPS together with the 2005 COPs, the "COPs").[108]

47.     Concurrently with the issuance of the 2006-B COPs, the Service Corporations entered into various pay-fixed, receive-variable interest rate swap transactions under eight separate 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) (collectively, the "Swap Contracts") with either (a) UBS AG or (b) SBS Financial Products Company LLC ("SBS" and, together with UBS AG, the "Swap Counterparties"), with Merrill Lynch Capital Services, Inc. as credit support provider to SBS, with an aggregate notional amount equal to the outstanding amount of the 2006-B COPS, or $800 million.[109]

48.     The City arranged for insurance policies to guaranty certain of the payments on the Swap Contracts with the Financial Guaranty Insurance Company ("FGIC") and Syncora Guarantee Inc., as successor to XL Capital Assurance Inc. ("Syncora" and, together with FGIC, the "Swap Insurers").[110] For instance, with respect to the policies issued by Syncora, if the Service Corporations

---

[108]     2012 CAFR at 111; 2005 COPs Offering at cover pages.

[109]     2012 CAFR at 33; June 14 Creditor Proposal at 28.

[110]     See Swap Contracts; 2005 COPs Offering Circular at 16; 2006 COPs Offering Circular at 18.

-34-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 38 of 88        76
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 38 of 50

fail to perform under the Swap Contracts, Syncora may be called upon to pay most

of the quarterly swap payment, which is no more than, and can be significantly less

than, $12.6 million.[111] If the Swap Counterparty elects to terminate, Syncora is

either not responsible for such payments or, if such terminations are premised on

an additional termination event, then Syncora's total exposure with respect to the

Swap Contracts is capped at a predetermined limit of $27 million.[112]

      49.    As part of a 2009 restructuring of the City's swap obligations,

the City provided collateral to the Swap Counterparties for amounts owed to them

under the Swap Contracts pursuant to a Collateral Agreement dated as of

June 15, 2009 (the "Collateral Agreement"), among the City, the Service

Corporations, the Swap Counterparties and U.S. Bank National Association, as

Custodian (the "Custodian").[113] To secure the obligations to the Swap

Counterparties, the City agreed to direct its wagering tax revenues into a lockbox

account (the "General Receipts Account") pending payment each month into a

---

[111]    See XL Capital Assurance Financial Guaranty Insurance Policy
Nos. CA03049B, CA03049C, CA03049D and CA03049E.

[112]    See XL Capital Assurance Financial Guaranty Insurance Policy
Nos. CA03049B, CA03049C, CA03049D and CA03049E.

[113]    City Ordinance No. 18-16; 2012 CAFR at 33; Custodian's Certificate
executed by U.S. Bank National Association, dated June 26, 2009.

-35-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 39 of 88   77
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 39 of 50

second lockbox account (the "Holdback Account") of one-third of the quarterly payment next due to the Swap Counterparties.[114]

### Growing Budget Deficits

50. The City has run substantial deficits (excluding financing proceeds) for the last six fiscal years of approximately $128 million (2008), $124 million (2009), $72 million (2010), $57 million (2011), $122 million (2012) and $47 million (2013).[115] Including the effect of recent debt issuances (e.g., $75 million in fiscal year 2008; $250 million in fiscal year 2010; $129.5 million in fiscal year 2013) (the "Recent Debt Issuances"), the City's accumulated general fund deficit stood at approximately $327 million as of the end of fiscal year 2012 and $237 million as of the end of fiscal year 2013.[116] *Excluding* the effect of the Recent Debt Issuances (which, as an accounting matter, reduce the amount of the accumulated deficit by an amount equal to the funds borrowed), the City's accumulated general fund deficit: (a) has grown continuously over an extended period; and (b) would have been over $650 million for fiscal year 2012 and approximately $700 million for fiscal year 2013.[117] See Exhibit A at 6 (showing the growth of the City's accumulated deficit). Absent structural changes,

---

[114]    City Ordinance No. 18-16; 2012 CAFR at 33.

[115]    June 14 Creditor Proposal, at 52.

[116]    Quarterly Report, at 3; June 14 Creditor Proposal at 6.

[117]    June 14 Creditor Proposal at 6.

-36-

at its current run rate, the City's accumulated deficit could grow to approximately $1.3 billion by fiscal year 2017.[118]

51.     The City has funded its continuing deficits in a variety of ways, including: (a) deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) issuance of short term and long term debt; (c) deferral of trade payments; and (d) borrowing by the general fund from other funds, deferrals and cash pooling. As of June 30, 2013, the City's general fund had outstanding deferrals and amounts due to other funds and entities of approximately $274.3 million: (a) approximately $53.8 million owed to other funds; (b) approximately $77.2 million of other funds' cash held in the general fund's operating account; (c) approximately $35.3 million owed to other taxing authorities; and (d) approximately $108 million in deferred pension contributions owing for the current and prior fiscal years.

### Insolvency

52.     As a result of the City's recurring operating deficits, the City has continued to experience liquidity problems as it has depleted all cash reserves. For years, the City's cash shortfalls have been addressed through the issuance of short term and long term debt. As noted above, the City's Recent Debt Issuances

---

[118]     <u>Id.</u> at 91.

-37-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 41 of 88    79
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 41 of 50

provided the City with approximately $460 million in proceeds.[119] To avoid

running out of cash, in March 2012, the City borrowed $80 million on a short term,

secured basis (of which the City spent $50 million in fiscal year 2012).[120] More

recently, the shortfalls have been addressed with deferrals of payments on current

obligations, wage cuts, employee furloughs/layoffs, cash pooling, borrowings from

other City funds and other working capital tactics.

53.     Further, the City's ability to access the credit markets to satisfy

its cash needs is compromised by its plummeting credit ratings. The City's credit

ratings have reached historic lows and currently are below investment grade. No

major U.S. city has a lower credit rating than Detroit.[121] As of June 17, 2013, S&P

and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively.[122]

54.     Debt Service Requirements. Debt service for the City's general

fund related to limited tax and unlimited tax GO debt and the COPs was

$225.3 million for fiscal year 2012, and is projected to exceed $247 million in

---

[119]   Id. at 6.

[120]   Id. at 7.

[121]   Id. at 8.

[122]   See Press Release, Standard & Poor's, "Detroit GO Debt Rating Lowered to
        'CC' from 'CCC-' on Announced Cessation of Debt Service Payments"
        (June 14, 2013); Press Release, Moody's, "Rating Action: Moody's
        Downgrades Detroit's GOULT Rating to Caa3" (June 17, 2013).

-38-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 42 of 88   80
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 42 of 50

fiscal year 2013.[123]  Payments related to the COPs are forecast to increase

substantially over the next two years due to a back-loaded amortization schedule.

As set forth in the following chart, when combined with retiree legacy obligations,

these obligations consumed over 38% of revenues in fiscal year 2012 and are

projected to increase to 65% of revenues by 2017 if not stemmed.

| ($ in millions) | Fiscal year ended actual | | | | | Preliminary forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| | | | | | | | | | | |
| Total revenues (excl. financing proceeds) | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| | | | | | | | | | | |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

See also Exhibit A at p. 52 (chart summarizing growth over time, and projected

levels, of legacy liabilities).

---

[123]  June 14 Creditor Proposal at 52; Quarterly Report at Appendix B.

-39-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 43 of 88   81
13-53846-tjt   Doc 2334-3   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 43 of 50

55.    Going forward, amounts required to service legacy liabilities are expected to more than double.[124] Required pension contributions are projected to increase in light of: (a) an increasingly mature population already in pension pay status; (b) the anticipated revision of aggressive and unrealistic actuarial assumptions used in the past; (c) updated actuarial calculations; and (d) past deferrals of contributions.[125]

56.    <u>Negative Cash Flow</u>. The City had negative cash flows of $115.5 million in fiscal year 2012.[126] The City's preliminary estimates show positive cash flows of $31.5 million (excluding the impact of borrowings) for fiscal year 2013, but only as a result of, among other things, the deferral of nearly $108 million in pension contributions and the City's recent decision, on June 14, 2013, not to make $39.7 million in payments due and owing to the Service Corporations.[127] As of June 30, 2013, the City had only $36 million in cash on hand (net of accumulated property tax distributions), but had outstanding deferrals (including the $108 million in deferred pension contributions referenced

---

[124]    June 14 Creditor Proposal at 52.

[125]    <u>Id.</u>

[126]    <u>Id.</u> at 7.

[127]    Quarterly Report at Appendix A.

-40-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 44 of 88    82
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 44 of 50

above) and amounts due to other funds and entities of approximately $274.3 million.[128]

57.     Absent restructuring, the City is projecting cash flows of negative $198.5 million in the current 2014 fiscal year and negative $260.4 million in fiscal year 2015.[129] This cash depletion would leave the City in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013.[130] In the absence of restructuring, the City's net negative cash position (after required property tax distributions) will continue its downward spiral, reaching negative $143.3 million as of the end of the current 2014 fiscal year and negative $404.5 million as of the end of fiscal year 2015.[131] Accordingly, the City (a) is not paying its debts as they come due and (b) is unlikely to be able to service its debts in the foreseeable future. The City is insolvent.

## Measures Taken by the City to Address Financial Challenges

58.     The City already has taken numerous steps prior to commencing this chapter 9 case to improve its financial position, including the adoption of various measures to reduce expenses and increase revenues. These initiatives save the City an estimated $200 million per year, but they also impose

---

[128]     Quarterly Report at 2, Appendix A.

[129]     June 14 Creditor Proposal at 50; Malhotra Declaration, at 21.

[130]     Quarterly Report at 3.

[131]     June 14 Creditor Proposal at 50; Malhotra Declaration, at 22.

-41-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 45 of 88    83
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 45 of 50

substantial burdens on the City's workforce and residents. The following paragraphs provide detail with respect to certain of the key actions taken by the City to alleviate its liquidity pressures and redress its lopsided balance sheet in the period leading up to the commencement of this chapter 9 case.

59. **Execution of Consent Agreement/Creation of Financial Advisory Board.** On December 6, 2011, the Michigan Department of the Treasury (the "Treasury") initiated a preliminary review of the City's financial condition pursuant to former Public Act 4 of 2011 of the State of Michigan, also known as the "Local Government and School District Fiscal Accountability Act," MCL §§ 141.1501-1531 ("PA 4"). On December 21, 2011, having completed its preliminary review, the Treasury reported to the Governor of the State of Michigan (the "Governor") that "probable financial stress" existed in Detroit and recommended the appointment of a "Financial Review Team" pursuant to PA 4. See Treasury Report on Financial Condition of Detroit (the "2011 Treasury Report"), at 1 (copy attached hereto as Exhibit C and incorporated herein by reference).

60. The Treasury's finding of "probable financial stress" was based upon the following considerations (among others):

- Violation of Uniform Budget and Accounting Act. Detroit arguably had violated Section 17 of the Uniform Budget and Accounting Act (Public Act 2 of 1968 of the State of Michigan) by failing to amend the City's general appropriations act when it became apparent that various line

-42-

items in the City's budget for fiscal year 2010 exceeded appropriations by an aggregate of nearly $58 million (and that unaudited fiscal year 2011 figures indicated that expenditures would exceed appropriations by $97 million). Id. at 1-2.

- Inadequate Deficit Elimination Efforts. City officials did not file an adequate or approved "deficit elimination plan" with the Treasury for fiscal year 2010. The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "[c]ity officials either had been incapable or unwilling to manage the finances of the City." Id. at 2.

- Mounting Debt Problems. The City had a "mounting debt problem" with debt service requirements exceeding $597 million in 2010 and long term debt exceeding $8 billion as of June 2011 (excluding the City's then-estimated $615 million in unfunded actuarial pension liabilities, $4.9 billion in OPEB liability and other "discretely presented component" debt). The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1. Id. at 3-4.

- Risk of Termination Payment Under Swap Contracts. The Treasury identified a significant risk that the City would become subject to a demand for a termination payment (estimated at the time to be in the range of $280 million to $400 million) under its Swap Contracts. Id. at 4-5.

- Falling Credit Ratings. The City's long term bond rating had fallen below the BBB category and was considered "junk," speculative or highly speculative. Id. at 5.

- Cash Flow Shortages. The City was experiencing significant cash flow shortages. The City projected that its cash balance of $96.1 million as of October 28, 2011 (which was nearly $20 million lower than the City's previous estimates) would be quickly eroded and that the City would experience a cash shortage of $1.6 million in April 2012 and would end fiscal year 2012 with a cash shortfall of $44.1 million absent remedial action. Id.

61.     On March 26, 2012, the Financial Review Team appointed by the Governor pursuant to PA 4 submitted its report to the Governor, finding that

-43-

"the City of Detroit is in a condition of severe financial stress ... and that a consent agreement has not been adopted [pursuant to PA 4]." See Financial Review Team Report on Financial Condition of Detroit (the "2012 Financial Review Team Report"), at 1 (attached hereto as Exhibit D and incorporated herein by reference).

62.     The Financial Review Team's finding of "severe financial stress" was based upon the following considerations (among others):

- Increasing Budget Deficit. Owing primarily to transfers to other funds, the City's cumulative general fund deficit for fiscal year 2011 had increased from $91 million to $148 million and the City had not experienced a positive year-end fund balance since 2004. The City was predicting a $270 million general fund deficit for fiscal year 2012. Id. at 7.

- Variances from Budgets. Audits for the City's previous nine fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures. Id. at 7-9.

- Cash Crisis. The City was continuing to experience significant cash depletion. The City had proposed adjustments to collective bargaining agreements ("CBAs") to save $102 million in fiscal year 2012 and $258 million in fiscal year 2013, but the tentative CBAs negotiated as of the date of the report were projected to yield savings of only $219 million. Id. at 9-10.

- Debt Downgrades. The City's existing debt had suffered significant downgrades. Id. at 10.

- Failure to File Adequate Deficit Elimination Plans. The City had not filed adequate or approvable deficit elimination plans for the 2010 or 2011 fiscal years. Id. at 12.

-44-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 48 of 88    86
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 48 of 50

63.     Contemporaneously with the investigation and review of

Detroit's financial condition by the Financial Review Team, in early 2012, the City

and the State of Michigan negotiated a "Financial Stability Agreement"

(the "Consent Agreement") in an effort to achieve:  (a) financial stability for the

City; and (b) a stable platform for the City's future growth.  The City Council

approved the Consent Agreement on April 4, 2012.  The Consent Agreement

subsequently was executed by the Mayor, the members of the Financial Review

Team, the Treasurer of the State of Michigan (the "Treasurer") and the Governor as

of April 5, 2012.  See Exhibit E attached hereto and incorporated herein by

reference (copy of the Consent Agreement).  Having negotiated and executed a

"consent agreement" within the meaning of PA 4, no emergency manager was

appointed for the City despite the Financial Review Team's finding of "severe

financial stress."

64.     The Consent Agreement created a "Financial Advisory Board"

(the "FAB") of nine members selected by the Governor, the Treasurer, the Mayor

and City Council.[132]  The Consent Agreement granted the FAB an oversight role

and limited powers over certain City reform and budget activities.[133]  The FAB has

held, and continues to hold, regular public meetings and to exercise its oversight

---

[132]     Consent Agreement, at §§ 1.1; 1.2.

[133]     Id. at § 1.5.

-45-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 49 of 88    87
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 49 of 50

functions consistent with the Consent Agreement. To implement the reform efforts set forth in the Consent Agreement,[134] the positions of "Chief Financial Officer" and "Program Management Director" were established, each reporting to the Mayor.[135]

65.    Employee Headcount Reductions.  Since 2010, the City has reduced its employee headcount by more than 2,700 (from 12,302 employees as of the close of fiscal year 2010 to approximately 9,591 as of June 30, 2013).[136] The City estimates that its headcount reductions have resulted in annual savings of over $100 million.[137]

66.    Reductions of Labor Costs Through Implementation of CETs. On July 12, 2012, the Financial Advisory Board approved the CETs[138] for: (a) employees in unions with expired CBAs; and (b) non-union employees, effective as of July 17, 2012.  Among other things, the CETs provide for:  (a) wage

---

[134]    Specific reform efforts are identified on Annex D to the Consent Agreement.

[135]    Consent Agreement, at §§ 2.2; 2.3.

[136]    June 14 Creditor Proposal at 53; Quarterly Report at 3.

[137]    Id.

[138]    The CETs were imposed on union employees with expired CBAs pursuant to the Consent Agreement between the City and State. Then-in-effect PA 4 suspended the City's obligation to engage in collective bargaining upon entry of the Consent Agreement. CBAs for approximately 80% of union employees expired as of June 30, 2012; the remaining CBAs were expired as of June 13, 2013.

-46-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 50 of 88    88
13-53846-tjt    Doc 2334-3    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 50 of 50