reductions (implemented through the imposition of furlough days);

(b) caps/reductions on vacation/holiday pay/overtime/sick days; (c) the reduction

of pension multipliers; and (d) changes to healthcare coverage.  The City estimates

that implementation of the CETs has resulted in $102 million in annual savings

($25 million in savings attributable to wage reductions; $59 million in savings

attributable to reduced active and retiree benefits; $9 million in savings attributable

to reduced pension costs; $8 million in savings attributable to changes to work

rules).[139]

      67.    <u>Increased Corporate Tax Rate</u>.  In January 2012, the City's

corporate income tax rate was raised to 2.0% from 1.0%.  This increased rate was

projected to generate an estimated $6 million in additional annual revenue for the

City.[140]

      68.    <u>Enhanced Tax Collection Initiatives</u>.  The City has

implemented – and continues to implement – initiatives designed to:  (a) improve

collection of past due taxes; and (b) enhance collection efforts on a prospective

basis.  These efforts to enhance collection of taxes are expected to generate an

estimated $13 million in additional annual revenue for the City.[141]

---

[139]    June 14 Creditor Proposal at 53.

[140]    <u>Id.</u> at 54.

[141]    <u>Id.</u>

-47-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 51 of 88    89
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 1 of 38

69.    Increased Lighting Rates.  In January 2013, the PLD increased its rates to more closely align with market rates and eliminate the practice of charging customers less for power than the City itself was paying.  Increased PLD rates are expected to generate an estimated $9 million in additional annual revenue for the City.[142]

70.    Reductions in Vendor Costs.  The City currently is implementing an initiative to reduce its vendor related costs by 10%.  Reductions in vendor costs are expected to save the City an estimated $10 million annually.[143]

71.    Reduction in Subsidy to DDOT.  In 2012, the City undertook steps to improve the efficiency of DDOT (e.g., through route rationalization), thereby reducing the subsidy from the City's general fund to the DDOT enterprise fund by approximately $15 million annually.[144]

72.    Deferred Capital Expenditures.  The City has deferred capital expenditures on a number of its assets (notably its public lighting and its water and sewer system).  Compare the City's average aggregate capital outlays for the last five fiscal years 2008 – 2012 ($82.98 million) with the significantly larger average

---

[142]    Id.

[143]    Id.

[144]    Id.

-48-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 52 of 88      90
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 2 of 38

aggregate capital outlays for the five fiscal years preceding that period (2003 to 2007; $151.94 million).[145]

73.    Demolition Initiatives.  In April 2010, the City launched a program to take initial steps towards addressing the critical issue of urban blight within the City limits.[146]  This program had the goal of demolishing 10,000 vacant structures (i.e., approximately 13% of the vacant structures within the City and 26% of such buildings classified as dangerous) within three years.[147]  Over 5,000 structures have been demolished, but the City lacks sufficient funding to complete the project by its target date of December 2013.[148]  The City has also commenced an ancillary demolition initiative in partnership with the State of Michigan, pursuant to which $10 million has been allocated to the targeted demolition of 1,234 structures located in the vicinity of schools.[149]  As of February 28, 2013, 179 structures had been demolished pursuant to this ancillary initiative (and another 56 were under contract to be demolished).[150]

---

[145]    2012 CAFR, at 194-95; June 14 Creditor Proposal at 55.

[146]    June 14 Creditor Proposal at 55.

[147]    Id.

[148]    Id.

[149]    Id.

[150]    Id.

-49-

13-53846-swr   Doc 11    Filed 07/18/13   Entered 07/18/13 21:44:51   Page 53 of 88    91
13-53846-tjt   Doc 2334-4    Filed 12/27/13   Entered 12/27/13 13:37:04   Page 3 of 38

## Appointment of the Emergency Manager

74.     In 1990, the Michigan Legislature enacted PA 72, which empowered the State to intervene with respect to municipalities facing financial crisis through the appointment of an emergency manager who, once appointed, would assume many of the powers ordinarily held by local elected officials. Effective March 16, 2011, the Legislature repealed PA 72 and enacted PA 4. Thereafter, Michigan voters rejected PA 4 by referendum on November 5, 2012, which rejection automatically revived PA 72.

75.     On December 11, 2012, because of the City's diminishing liquidity, the FAB requested that the State initiate a preliminary review of the City's financial condition pursuant to PA 72. The Treasury reported to the Governor on December 14, 2012 that, based on its preliminary review, a "serious financial problem" existed within the City. See Treasury Report on Financial Condition of Detroit (the "2012 Treasury Report"), at 1 (copy attached hereto as Exhibit F and incorporated herein by reference).

76.     On December 18, 2012, pursuant to PA 72, the Governor appointed another Financial Review Team to review the City's financial condition. On February 19, 2013, the Financial Review Team submitted its report to the Governor, concluding "in accordance with [PA 72], that a local government financial emergency exists with the City of Detroit because no satisfactory plan

-50-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 54 of 88     92
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 4 of 38

exists to resolve a serious financial problem." See Financial Review Team Report

on Financial Condition of Detroit (together with "Supplemental Documentation of

the Detroit Financial Review Team," also dated February 19, 2013,

the "2013 Financial Review Team Report"), at 1 (attached hereto as Exhibit G and

incorporated herein by reference).

77.     The Financial Review Team's finding of a "local government

financial emergency" was based primarily upon the following considerations:

- Cash Crisis: The City continued to experience a significant depletion of
  its cash, with a projected $100 million cumulative cash deficit as of
  June 30, 2013. Cost-cutting measures undertaken by the Mayor and City
  Council were characterized as too heavily weighted to one-time savings
  and non-union personnel. Id.

- General Fund Deficits. The City's cumulative general fund deficit had
  not experienced a positive year-end fund balance since 2004 and stood at
  $326.6 million as of June 30, 2012. If the City had not issued substantial
  debt to reduce the cumulative fund balance over the last ten years, the
  accumulated general fund deficit would have been $936.8 million for
  fiscal year 2012. Id. at 2.

- Long-Term Liabilities. The City's long-term liabilities exceeded
  $14 billion as of June 30, 2013, with approximately $1.9 billion coming
  due over the next five years. The City had not devised a satisfactory plan
  to address these liabilities. Id.

- Bureaucratic Structure. The City Charter contains numerous restrictions
  and structural details that make it extremely difficult to restructure the
  City's operations in a meaningful or timely manner. Id.

- Variances from Budgets. Audits for the City's last six fiscal years
  reflected significant variances between budgeted and actual revenues and
  expenditures, owing primarily to the City's admitted practice of

-51-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 55 of 88   93
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 5 of 38

knowingly overestimating revenues and underestimating expenditures. Id. at pages 5 and 6 of Supplemental Documentation.

- Weaknesses in Internal Controls. The management letter accompanying the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations. Id. at Attachment 1 to Supplemental Documentation.

78.     On March 1, 2013, in response to the 2013 Financial Review Team Report, the Governor announced his determination that a "financial emergency" existed within the City. See Exhibit H at 1 (Governor's determination of financial emergency, incorporated herein by reference). After a public hearing to consider the City Council's appeal of the Governor's determination, on March 14, 2013, the Governor confirmed his determination of a "financial emergency" within the City and requested that the LEFALB appoint an emergency manager pursuant to PA 72. I was appointed as the emergency financial manager by the LEFALB on March 14, 2013 and formally took office on March 25, 2013. On March 28, 2013, upon the effectiveness of PA 436, I became the Emergency Manager under PA 436.

### Proposed Financial & Operational Restructuring

79.     Immediately upon my appointment as Emergency Manager, I began to focus on developing a comprehensive restructuring plan to: (a) ensure that the City is able to provide or procure governmental services essential to the public health, safety and welfare of its citizens; (b) assure the fiscal accountability

-52-

and stability of the City; and (c) promote investment in the City and revitalization of the community in a sustainable fashion. In tandem with my advisors, I have developed such a restructuring proposal, which is reflected in the June 14 Creditor Proposal.

80.     On June 14, 2013 (i.e., less than three months after formally assuming the position of Emergency Manager), at a meeting in the Detroit area, I presented the June 14 Creditor Proposal to approximately 150 invited representatives of the City's creditors, including representatives of: (a) all of the City's funded debt; (b) the insurers of such debt; (c) all of the City's unions; (d) certain retiree associations; (e) the Pension Systems; and (f) many individual bondholders.

81.     At this meeting, my advisors and I presented the Executive Summary and attendees received the full proposal as they exited. I also caused the full proposal and the Executive Summary to be posted publicly on the City's website the same day.[151] The meeting lasted approximately two hours, and my advisors and I answered all questions posed by attendees. At the conclusion of the meeting, we invited all creditor representatives to meet and engage in a dialogue with the City representatives regarding the proposal. I indicated that I would

---

[151]     http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20 Detroit%20Proposal%20for%20Creditors1.pdf

-53-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 57 of 88    95
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 7 of 38

welcome proposed modifications and alternative ideas consistent with the City's:
(a) urgent need for reinvestment to improve essential City services; and (b) current
and projected cash flows.[152]

      82.    In addition to describing the economic circumstances and
headwinds that resulted in Detroit's current financial condition, the 128-page
June 14 Creditor Proposal described a thorough overhaul and restructuring of the
City's operations, finances and capital structure, as well as proposed recoveries for
each creditor group.

      83.    Among other things, the June 14 Creditor Proposal included
and/or identified:

- the City's plans to achieve a sustainable restructuring through investing
over $1.25 billion over ten years to improve basic and essential City
services to citizens, including: (a) substantial investment in, and/or the
restructuring of, various City departments (e.g., DPD; DFD/EMS;
DDOT; the Assessor's office/property tax division; BSEED; and the
36th District Court); (b) substantial investment in the City's blight
removal efforts; (c) the transition of the City's electricity transmission
business to an alternative provider; (d) the implementation of a
population-based streetlight footprint and the outsourcing of lighting
operations to the newly-created Public Lighting Authority; (e) substantial
investments in upgraded information technology for police, fire, EMS,
transportation, payroll, grant management, tax collection, budgeting and
accounting and the City's court system; (f) a comprehensive review of the

---

[152]    At the City's meeting with creditors on June 14, 2013, the City also
announced its decision: (a) not to make the scheduled $39.7 million
payments due to certain pension related service corporations; and (b) to
impose a moratorium on principal and interest payments related to
unsecured debt.

-54-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 58 of 88   96
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 8 of 38

City's leases and contracts; and (g) a proposed overhaul of the City's labor costs and related work rules (see June 14 Creditor Proposal, at 61-78);

- the City's intention to expand its income and property tax bases, rationalize and adjust its nominal tax rates and various initiatives to improve and enhance its tax and fee collection efforts (see June 14 Creditor Proposal, at pp. 79-82);

- the City's intention to potentially realize value from the Detroit Water and Sewer Department ("DWSD") through the creation of a new metropolitan area water and sewer authority that will conduct the operations currently conducted by the DWSD pursuant to the City's concession or lease of the DWSD's assets in exchange for a recurring (and unrestricted) payment in lieu of taxes, lease payment or other form of payment (the "Proposed DWSD Transaction") (see June 14 Creditor Proposal, at pp. 83-86);

- the potential realization of value from City-owned assets currently exhibited and/or housed at the Detroit Institute of Arts (see June 14 Creditor Proposal, at pp. 88);[153]

---

[153] The City has made no decisions regarding the treatment of any particular asset. The City's intentions with respect to the City-owned assets exhibited and/or stored at the Detroit Institute of Arts and managed by the non-profit DIA Corporation has generated a significant amount of controversy and media attention. The Attorney General for the State of Michigan has issued a formal opinion expressing his belief that such assets are held in a public trust for the benefit of the City's residents. The City's creditor constituencies have expressed contrary views, taking the position that all non-essential City assets should be made available for their recoveries. The City reiterates its intention (previously expressed in the June 14 Creditor Proposal) to continue to: (a) engage all interested parties in dialogue regarding the City-owned art collection; (b) attempt to reconcile the competing positions expressed by such parties; and (c) reach a resolution with respect to such assets that will maximize the long term benefits to the City and the prospects for a successful restructuring.

-55-

- the City's commitment to evaluate what value may be realized from other City assets (e.g., City-owned real property; municipal parking operations; the Detroit-Windsor Tunnel; and Belle Isle Park) (see June 14 Creditor Proposal, at pp. 87-89);

- the City's projected financial statements over a ten-year period and the assumptions underlying those projections (see June 14 Creditor Proposal, at pp. 90-100); and

- the City's actual and forecasted cash flows for the 2013 and 2014 fiscal years in the absence of restructuring (see June 14 Creditor Proposal, at pp. 49-50).

84.     The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition. The City proposed: (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata* distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amortization of the principal of such notes in the event that, e.g., future City

-56-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 60 of 88        98
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 10 of 38

revenues exceeded certain thresholds, certain assets were monetized and/or certain grants were received. See June 14 Creditor Proposal, at pp. 101-109.

85.     Having provided the facts and strategies contained in the presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case. At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 presentation, the City: (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

86.     Negotiations with Swap Counterparties/Insurers. In March 2012, the City suffered ratings downgrades with respect to its unlimited tax GO bonds, which again gave rise to the risk that the Swap Counterparties could terminate the Swap Contracts and seek a termination payment from the City. As reported in the 2012 CAFR, the City commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade.

-57-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 61 of 88    99
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 11 of 38

87. Following my appointment, discussions with the Swap Counterparties intensified to find a resolution that would enable the City to exit the Swap Contracts with no impact on the Swap Insurers and assure the City continued access to the wagering tax revenues. The negotiations included: (a) several in-person and telephonic meetings among the City, Swap Counterparties and their respective advisors; (b) the exchange of various economic offers between the parties; and (c) the generation of numerous draft agreements memorializing such offers.

88. Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the wagering tax revenues, following the assertion of alleged rights by Syncora, the City's access to funds was blocked, and the negotiations with the Swap Counterparties stalled. Accordingly, the City acted to protect its interests and preserve its access to its wagering tax revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek: (a) the release of revenues held by U.S. Bank as custodian; and (b) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships. In connection with that proceeding, I submitted an affidavit in support of the City's Verified Complaint for Declaratory and Injunctive Relief, which contains additional factual background concerning the Swap Contracts,

-58-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 62 of 88   100
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 12 of 38

Collateral Agreement and related matters. On July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving its access to wagering tax revenues.

89. Following those activities, the City was able to make timely payment on the Swap Obligations, making the required deposit into the Holdback Account and triggering the release of wagering tax revenues to the City. Concurrently, the City was able to restart negotiations with the Swap Counterparties. Negotiations culminated in the Forbearance and Optional Termination Agreement, dated as of July 15, 2013, by and among the City, the Swap Counterparties and the Service Corporations, which agreement is the subject of a motion, filed contemporaneously with this Declaration, seeking approval to assume such agreement and compromise the issues regarding the validity and enforceability of the pledge and lockbox arrangements with respect to the wagering tax revenues.

90. <u>Meetings with Respect to Employee Legacy Obligations</u>. Both prior to and after my appointment, many of the City's financial and legal advisors have been analyzing the City's retiree healthcare and pension obligations. These advisors have been developing ideas for restructured programs that would preserve healthcare and retirement benefits for retirees, to the extent feasible, in a structure

-59-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 63 of 88    101
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 13 of 38

that the City will be able to afford in light of its projected cash flows and other critical needs over the next decade.

91.     On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations. These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City: (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward. Representatives and advisors of the Pension Systems attended both meetings.

92.     Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees. Questions were solicited, and the City's advisors answered as many of them as could be answered before the meeting time concluded. Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes. Questions were solicited, and the City's advisors answered all questions posed. The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room (as such term is defined below) that the City has

-60-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 64 of 88      102
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 14 of 38

established as a repository for information that creditors may find relevant in their evaluation of the City's proposals.

93.     Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' preferred approach to address the required changes that are expected to be severely dislocating for retirees.

94.     Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger.[154] Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions.[155] Others took a more constructive

---

[154]     See, e.g., See, e.g., Detroit Free Press, "Kevyn Orr orders corruption probe of pensions, benefits; unions vow fight against cuts," June 20, 2013 (quoting a district clerk for the City's Department of Public Works and a member of the Association of City of Detroit Supervisors; "That was the biggest crock of crap I've ever heard in my life. They're talking about freezing our pensions. I just feel like crying."); Bloomberg News, "Detroit Manager Outlines Pension-Cut Plans for Workers," June 21, 2013 (quoting union official: "People are angry because it's the same old horse crap - it's their way or the highway.").

[155]     See, e.g., Detroit Free Press, "Kevyn Orr orders corruption probe of pensions, benefits; unions vow fight against cuts," June 20, 2013 (quoting the president of Amalgamated Transit Union Local 26: "We'll fight you in

-61-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 65 of 88    103
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 15 of 38

approach.[156] On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties.

95.     On July 10, 2013, the City and certain of its advisors held separate meetings with: (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations; and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to: (a) provide additional information on the City's pension restructuring proposal; and (b) discuss a process for reaching a consensual agreement on (i) pension

---

court. We'll probably stand a better chance, because one thing about a bankruptcy judge, he's not going to feed into all this nonsense stuff.... If you're going to come, you're going to have to come correct in bankruptcy court"; quoting union official: "This is not a bargaining session. We're not bargaining with them at this point. They really didn't have a legitimate proposal.").

[156]   See, e.g., Bloomberg News, "Detroit Manager Outlines Pension-Cut Plans for Workers," June 21, 2013 (quoting the President of the Detroit Fire Fighters Association: "We have to go back and deliberate and come back with some form of unified response. This is reality, we're trying to find the best way, if possible, to work together and come to a solution for the city.").

underfunding issues and (ii) the treatment of any related claims.[157] At each

meeting, the parties generally discussed: (a) the actuarial assumptions underlying

the Pension Systems' claims related to underfunding (and that will be used for

funding purposes going forward); (b) the City's prospective ability to make

contributions to the Pension Systems; and (c) adjustments to pension benefit design

necessary to reduce liabilities, and consequent underfunding, to a level that will

allow the City to fund the Pension Systems going forward.

     96.    On July 11, 2013, the City and its advisors held separate

follow-up meetings with representatives and advisors for: (a) select non-uniform

unions and retiree associations and the GRS; and (b) certain uniformed unions and

retiree associations and the PFRS to discuss retiree health issues. At each of these

meetings, the City's advisors reviewed the proposals for the modification of retiree

health benefits that previously had been presented and discussed at the prior

---

[157]    In light of certain lawsuits recently filed against the Governor and the
Treasurer in which the City has an interest (described in further detail at
paragraph 109 below), the City requested, at each meeting, that any
statements made during the respective meetings, and the conduct of the
parties at such meetings, not be introduced in any court proceeding in
accordance with Rule 408 of the Federal Rules of Evidence ("FRE") and
Rule 408 of the Michigan Rules of Evidence ("MRE"). Representatives of
the United Auto Workers and its counsel – who attended the City's meeting
with the GRS – refused to comply with this request and were asked to, and
did, leave that meeting. All other attendees at each meeting agreed to adhere
to FRE 408 and MRE 408, but reserved all rights to argue that the meetings
could not be protected from disclosure to a court under those rules.

-63-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 67 of 88   105
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 17 of 38

meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

97.    Meetings with Funded Debt and Pension Representatives. On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "Bond Insurer"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information and proposals that had been presented to

-64-

13-53846-swr   Doc 11    Filed 07/18/13   Entered 07/18/13 21:44:51   Page 68 of 88    106
13-53846-tjt   Doc 2334-4    Filed 12/27/13   Entered 12/27/13 13:37:04   Page 18 of 38

the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

98.     Also on June 25, 2013, the City's advisors held a discrete meeting with U.S. Bank and its advisors to discuss: (a) the City's intentions with respect to the DWSD (and the special revenue bond debt related thereto); (b) the City's proposed treatment of its general obligation debt (including the COPs); and (c) various other issues raised by U.S. Bank.

99.     In addition, on June 26, 2013, and June 27, 2013, the City's advisors held individual follow-up meetings with each Bond Insurer that requested one.[158]  On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation ("Ambac")  in a 90-minute meeting.  Financial Guaranty Insurance Corporation ("FGIC") had originally requested a meeting for June 26, 2013 but subsequently cancelled.  On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora in a 90-minute meeting and Assured Guaranty Municipal Corporation ("Assured Guaranty") in a 90-minute meeting.

---

[158]     In addition, at the request of National Public Finance Guarantee Corporation ("NPFGC"), the City's restructuring counsel and investment banker met with NPFGC's advisors on June 20, 2013.

100. At these various meetings with the Bond Insurers, the City's advisors discussed many aspects of the June 14 Creditor Proposal, including but not limited to: (a) the treatment of GO debt; (b) legal issues related to the Swap Contracts; (c) the City's contemplated restructuring and reinvestment initiatives; (d) urban blight; and (e) potential asset dispositions. The City team answered all questions posed by the Bond Insurers. The City team invited counterproposals or alternative views on the June 14 Creditor Proposal that were consistent with the City's current and projected financial condition.

101. On July 9-10, 2013, the City and its advisors held follow-up diligence sessions in Detroit with representatives and/or advisors of NPFGC, Ambac, FGIC, Assured Guaranty, Syncora and the Pension Systems. At these sessions, the City generally addressed its baseline 10-year business plan and its proposed restructuring and reinvestment initiatives. Key discussion points included: (a) the City's revenue forecasts (and the assumptions and detail underlying the same); (b) alternatives with respect to taxation and increasing the City's attractiveness to private investment; (c) the restructuring of, and reinvestment in, key City departments, the cost of such reinvestment and the assumptions and detail underlying the City's proposal; (d) the City's proposal for addressing its urban blight; (e) the structure of the limited recourse participation notes proposed to be provided to unsecured creditors by the City; (f) the City's

-66-

knowledge of the State's position with respect to the City's restructuring; and (g) logistical matters (e.g., timing; access to information). The City answered all questions posed by the attendees and invited requests for further diligence and analyses.

102.    On July 12, 2013, the City's advisors met with advisors to the Pension Systems to discuss:  (a) the Proposed DWSD Transaction (and, particularly, the amount of any recurring payment that would be received by the City in connection therewith); and (b) the implications of such transaction for the Pension Systems.

103.    On July 17, 2013, the City and its advisors held separate meetings with representatives and advisors for NPFGC and Assured Guaranty to discuss:  (a) the Proposed DWSD Transaction (and, particularly, the amount of any recurring payment that would be received by the City in connection therewith); (b) the City's proposed restructuring of the special revenue debt related to the DWSD (as set forth at pages 101-102 of the June 14 Creditor Proposal); and (c) the insurers' response to the foregoing.  Each meeting lasted approximately two hours.

104.    Establishment of Data Room.  In early June 2013, Miller Buckfire & Co., LLC ("Miller Buckfire"), the City's financial advisor and investment banker, established an online database (the "Data Room") to facilitate creditors' timely access to documents containing information relevant to the City's

-67-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 71 of 88    109
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 21 of 38

proposed restructuring actions, as well as the City's past, present and projected

financial performance. Shortly thereafter, beginning on June 21, 2013, Miller

Buckfire began issuing usernames and passwords to creditors' representatives and

advisors so that they could view the documents posted to the Data Room. As of

July 15, 2013, the Data Room contained 320 documents and over 68,000 pages of

information. Since that time, the City has continued to upload documents that

address a range of issues, including information relating to current and former

employees and retirees. The City will continue to populate the Data Room as

additional documents become available or specific information requests are

received.

## Barriers To Reaching Agreement

105. The City cannot practicably negotiate a consensual

restructuring with any of its key constituencies in an out-of-court setting. The pool

of potential creditors in this chapter 9 case is vast. The City estimates that the

number of employees, retirees, vendors, bondholders, insurers and other parties in

interest in this case reaches into the many tens of thousands (and that many of

these creditors are presently unknown and unidentified). Collectively, these parties

hold claims against the City in the amount of more than $18 billion. Moreover,

some of the largest components of the City's debt — including, for example, the

City's actuarially accrued $6.4 billion in unfunded other post employment benefit

-68-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 72 of 88    110
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 22 of 38

obligations[159] — are fragmented among numerous individuals as opposed to being centralized with a single entity.

106.   With respect to the City's retirees, many of the unions have taken the position that they do not and cannot represent their former members who are current retirees.  It is my understanding that, absent their consent, the approximately 20,000 retirees entitled to receive retiree healthcare and pension benefits from the City cannot be bound by out-of-court negotiations between the City and the 47 discrete bargaining units of the 28 unions that might represent these retirees.[160]  Moreover, even if such retirees were willing to be bound by the City's negotiations with its various bargaining units (which is unlikely), the majority of those units have expressly refused to represent such retirees.[161]  Despite

---

[159]   June 14 Creditor Proposal at 35.

[160]   At least four retiree associations also provide voluntary membership to retirees of the City's unions.

[161]   Prior to the commencement of this chapter 9 case, the City sent letters to each of its unions to determine whether they are willing to represent their respective retirees in connection with the City's restructuring.  As of the date hereof, eight unions (comprising ten bargaining units) offered to represent their retirees in restructuring discussions.  Thirteen unions (comprising 28 bargaining units) have expressly indicated that they are *unwilling* to represent their retirees.  Another seven unions (comprising nine bargaining units) have neither explicitly agreed nor refused to represent their retirees.  The City also sent letters to each of the retiree associations to determine whether they are willing to represent union retirees in connection with the City's restructuring.  Two associations – the Detroit Retired City Employees Association and the Retired Detroit Police and Fire Fighters Association –

-69-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 73 of 88   111
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 23 of 38

the City's best efforts to organize the retirees prior to the commencement of this chapter 9 case, most retirees remained unrepresented in negotiations. Accordingly, the negotiation of changes to pension and retiree benefits with the City's retiree constituency – changes that are critical to any restructuring of the City given the approximately $9 billion owed to these constituencies – is impracticable (if not impossible) outside of the chapter 9 context.

107.     With respect to the City's bond debt, certain of the City's bond issuances permit a majority of holders to agree to certain amendments to the terms of such bonds. However, in many, if not all, cases, an extension of the maturity date of the indebtedness or an agreement to reduce its principal amount requires the consent of all outstanding bondholders. In many instances, the City is unable to negotiate with a single contact with the authority to bind bondholders of a particular series of debt, thus rendering negotiations regarding the out-of-court restructuring of such bonds impracticable. Either: (a) U.S. Bank acts solely as a paying agent (and not as a trustee) with respect to a given series of bonds (e.g., the City's Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds); (b) the debt is uninsured, such that no Bond Insurer has the right to control an out-of-court restructuring of the debt (e.g., the City's Series 2008A-(1) and 2008

---

offered to represent retirees in these discussions, while the other two associations have expressly indicated that they will not represent retirees.

A(2) limited tax bonds); or (c) the debt is insured but the Bond Insurer has no control rights (provided that the Bond Insurer has not made a payment under its respective policy) (e.g., Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds). To date, no bondholder group holding a majority of any of the 60 series of debt issued by the City has organized so that the City could negotiate with it.

108. Although the City could not practicably negotiate with its entire creditor body, as described above, it has nevertheless attempted, in good faith, to negotiate with many key creditors, presenting its proposals to all known constituencies and soliciting feedback and engaging in meetings with all parties willing to come to the table. However, the fragmented and often non-binding nature of these negotiations has frustrated the City's ability to negotiate a consensual restructuring of its debt.

109. Moreover, the City's restructuring proposals have met with resistance from a number of its creditor constituencies. For example, on July 3, 2013, multiple lawsuits were filed by certain of the City's employees (both active and retired) against the Governor and Treasurer seeking, among other things: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 proceedings within which vested pension benefits might be compromised; and (b) an injunction

-71-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 75 of 88   113
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 25 of 38

preventing the defendants from authorizing any chapter 9 proceeding for the City

within which vested pension benefits might be adjusted. On July 17, 2013, the

Pension Systems commenced a similar lawsuit against me, in my capacity as

Emergency Manager, and the Governor, seeking declaratory judgments that

PA 436: (a) does not authorize the defendants to take any action that may result in

the compromise of the City's pension obligations; and (b) when read in conjunction

with the Michigan Constitution, requires the defendants to refrain from attempting

to compromise pension obligations within a chapter 9 proceeding (or, alternatively,

that PA 436 violates the Michigan Constitution).[162]

110. Further, on July 8, 2013, a Bond Insurer serving as surety for

approximately $170 million of the City's limited and unlimited tax general

obligation debt issued a public statement declaring that the June 14 Creditor

Proposal was "harmful to Detroit and the interests of the taxpayers in Michigan"

and "necessarily imperiled" the City's access to cost effective financing. See Press

Release, Ambac Financial Group, dated July 8, 2013, attached hereto as Exhibit I.

111. Although the City believes that (a) its discussions with its

various creditor constituencies were constructive, (b) significant data was

---

[162]  See Complaints filed in: (a) Flowers v. Snyder, No. 13-729-CZ (Ingham
       Cnty. Circuit Court), dated July 3, 2013; (b) Webster v. Snyder,
       No. 13-734-CZ (Ingham Cnty. Circuit Court), dated July 3, 2013; and
       (c) General Retirement System of the City of Detroit v. Orr, No. 13-768-CZ
       (Ingham Cnty. Circuit Court), dated July 17, 2013.

-72-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 76 of 88   114
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 26 of 38

conveyed or made available to such creditors, (c) the negotiations were conducted in good faith on the City's part and (d) the City achieved a limited amount of success (e.g., the forbearance agreement with the Swap Counterparties and Service Corporations), the City ultimately has not been able to reach a comprehensive agreement for the restructuring of its outstanding obligations. Moreover, the feedback received from creditors has led the City to determine that such a comprehensive agreement is unlikely in the near term or without this filing. Further negotiations with all of the City's various stakeholders is impracticable in light of the City's cash crisis and the urgent need to move forward with its restructuring. The City requires a clear and centralized forum within which parties may negotiate and ultimately be bound.

### Commencement of Chapter 9 Proceedings

112.  Unable to negotiate an out-of-court resolution that simultaneously addressed the City's dire financial situation while laying the foundation for a strong and prosperous City going forward (and with no prospect of such a resolution), on July 16, 2013, and in accordance with section 18(1) of PA 436, I recommended to the Governor and the Treasurer in writing that the City file for chapter 9 relief. A copy of my recommendation is attached hereto as Exhibit J and incorporated herein by reference. This recommendation was based on my judgment that no reasonable alternative to rectifying the financial

-73-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 77 of 88   115
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 27 of 38

emergency of the City existed because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency in a timely manner. On July 18, 2013, in accordance with section 18(1) of PA 436, I received the written authorization of the Governor to commence chapter 9 relief. A copy of the Governor's written approval is attached hereto as <u>Exhibit K</u> and incorporated herein by reference. On July 18, 2013, consistent with the Governor's written approval, I issued an order directing the City to commence this chapter 9 case. A copy of this order is attached hereto as <u>Exhibit L</u> and incorporated herein by reference.

## Facts in Support of First Day Pleadings

113. To preserve the City's ability to function efficiently within chapter 9 and provide uninterrupted services to its citizens, a number of pleadings (the "<u>First Day Pleadings</u>")[163] designed to achieve a seamless transition into chapter 9 will be filed contemporaneously with this Declaration. Generally, the First Day Pleadings seek to: (a) establish procedures for the smooth and efficient administration of this chapter 9 case (the largest chapter 9 case in history); (b) ensure that the City receives the benefit of certain protections afforded under the Bankruptcy Code; and (c) lay the groundwork for a successful restructuring of

---

[163]   Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

the City's liabilities. I have reviewed each of the First Day Pleadings with the City's outside counsel, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will promote the City's ability to complete the chapter 9 process and confirm a plan of adjustment.

114. The City seeks the entry of an order scheduling a hearing to consider the First Day Pleadings on shortened notice (the "First Day Hearing"). I believe that an expedited First Day Hearing is necessary to, among other things: (a) establish procedures for the prompt notification of the tens of thousands of potential creditors and other parties in interest of the commencement of this chapter 9 case and other procedures to promote the efficient administration of the City's case; (b) promptly clarify and confirm certain rights afforded to the City and the Emergency Manager in this chapter 9 case to eliminate potential uncertainty for the City's creditors, vendors, residents and other parties in interest and thereby minimize potential disruptions to the City's operations and restructuring efforts from the outset of this case; and (c) lay the groundwork for other restructuring activities to allow the City to move forward as promptly and efficiently as possible in this case.

-75-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 79 of 88   117
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 29 of 38

***Motions Regarding Administrative and Procedural Matters***

115.   Notice of Commencement of the Case and Objections to

Eligibility.  To provide expedient and effective notice of the commencement of the

City's chapter 9 case to known and potential creditors as well as other parties in

interest, the City is seeking the entry of an order approving a form of notice that

provides due and proper notice of:  (a) the commencement of the case; (b) the

opportunity for parties in interest to file objections to eligibility and the schedule

and procedures for addressing any such objections; (c) the automatic stay, as it

applies in chapter 9; and (d) the Emergency Manager's continued authority to act

exclusively on behalf of the City pursuant to section 904 of the Bankruptcy Code.

In addition to sending such notice to each party identified on the City's list of

creditors and as required by section 923 of the Bankruptcy Code, the City proposes

to publish such notice for three consecutive weeks in:  (a) the *Detroit Free Press*, a

newspaper of general circulation in Detroit and surrounding communities; and

(b) *The Bond Buyer*, a newspaper of general circulation among bond dealers and

bondholders.  In addition, the City proposes to post notice of the commencement of

the case on the Electronic Municipal Market Access database at

www.emma.msrb.com, which will provide further notice to bondholders.

116.   The City also requests that the Court fix a deadline of

approximately 30 days after the Petition Date for the filing of any objections to

-76-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 80 of 88   118
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 30 of 38

eligibility (any such objection, an "Eligibility Objection"). Setting a prompt

deadline for Eligibility Objections will: (a) promote the efficient administration of

the City's case; (b) eliminate any uncertainty created by the absence of an express

timing provision in the Bankruptcy Code for such objections in chapter 9 cases;

and (c) expedite the Court's consideration of any Eligibility Objections and the

entry of an order for relief in this case. Further, the City requests that the Court

establish a schedule and certain procedures for the consideration of Eligibility

Objections, as described in the motion.

117.    Case Management and Noticing Procedures. The City has filed

a motion seeking an order providing for certain notice, hearing and other case

management procedures in this chapter 9 case. The City has tens of thousands of

creditors and expects that numerous other parties in interest will request notice in

this chapter 9 case. Requiring that hard copy service of every filing in this

chapter 9 case be made upon all notice parties would be a waste of the City's

limited resources.

118.    The City proposes instead to serve documents filed in this

chapter 9 case on most parties by electronic mail while requiring paper service of

certain pleadings only upon certain primary parties in interest. The primary parties

in interest that the City proposes should receive paper service of all documents

includes, among other parties: (a) the City; (b) the City's largest secured and

-77-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 81 of 88   119
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 31 of 38

unsecured creditors; (c) counsel to the trustee and contract administrator for the

COPs; (d) certain significant holders of the COPs; (e) counsel to the Swap

Counterparties; (f) counsel to the insurers of the City's bonds, COPs and Swap

Contracts; and (g) counsel to the unions and retiree associations representing

certain of the City's employees and/or retirees. I believe that authorizing service in

this manner will promote efficiency and save the City significant time and expense

during this chapter 9 case.

119.    In addition, due to the anticipated number of motions and other

pleadings that will be filed in this chapter 9 case, the City believes that special

hearing procedures should be established to assist in administering the case docket

and avoid constant (and unpredictable) hearings before this Court. These

procedures will permit the Court, the City and the other primary parties in interest

in this chapter 9 case to address groups of motions at regular omnibus hearings,

thereby avoiding the substantial time and expense of scheduling separate hearings

on each discrete matter. The motion further seeks the establishment of a number of

other case management procedures to be utilized in this chapter 9 case for the

benefit of the Court, the City and other parties in interest.

120.    Appointment of Claims and Noticing Agent. The City

recognizes that the large number of creditors and other parties in interest involved

in its chapter 9 case may impose heavy administrative and other burdens upon the

-78-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 82 of 88    120
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 32 of 38

Court and the Clerk's Office. To relieve the Court and the Clerk's Office of these burdens, the City will seek the entry of an order appointing Kurtzman Carson Consultants ("KCC") as the City's claims and noticing agent in its chapter 9 case. KCC may, among other things: (a) serve as the Court's agent to mail notices to creditors of the City and other parties in interest, including notice of the commencement of the case; (b) provide computerized claim and objection database services; and (c) provide expertise, consultation and assistance in claim processing and with other administrative tasks as necessary to conduct the City's chapter 9 case and complete its restructuring expeditiously. The City obtained and reviewed engagement proposals from four claims and noticing agents before selecting KCC based on its capability and experience.

### *Motions Regarding Third Party Relations*

121. <u>Confirmation of the Protections of the Automatic Stay</u>. The City seeks an order confirming the application of two key protections afforded to the City under the Bankruptcy Code to: (a) aid in the administration of the City's bankruptcy case; (b) protect and preserve the City's property for the benefit of citizens and stakeholders; and (c) ensure that the City has the breathing space it needs to focus on negotiating a plan for adjusting its debts. These bankruptcy protections are: (a) the automatic stay provisions of sections 362 and 922 of the Bankruptcy Code (together, the "<u>Chapter 9 Stay</u>"); and (b) the anti-termination and

-79-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 83 of 88    121
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 33 of 38

anti-modification provisions of section 365 of the Bankruptcy Code (together, the "Contract Protections").

122.    Although the Chapter 9 Stay and Contract Protections are self-executing, the City believes that, due to the historically limited use of chapter 9, some parties may not appreciate the full significance and impact of these provisions or how they apply in chapter 9.  In addition, the City also requests that the Court's order granting the relief requested in the motion confirm the application of the Chapter 9 Stay to:  (a) the Emergency Manager; and (b) city officers in whatever capacity they serve.

123.    Extension of the Automatic Stay to Certain Parties.  The City also requests that the Chapter 9 Stay be extended to stay any actions or proceedings against (a) employees of the City that are neither officers nor inhabitants of the City and (b) the Governor, the Treasurer, the members of the LEFALB and the staff members of these entities (collectively, the "State Entities"), that seek, directly or indirectly, to enforce claims against the City or interfere with the City's activities in this chapter 9 case.  Because the State Entities are closely connected to the City and the Emergency Manager, and because parties in interest already have initiated lawsuits against certain of the State Entities seeking to block the commencement of this chapter 9 case and interfere with the Emergency Manager's administration of the City under PA 436, I believe that this relief is

-80-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 84 of 88   122
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 34 of 38

necessary and appropriate to: (a) foreclose attempts by creditors to circumvent the protections of the Chapter 9 Stay through collateral attacks on the State Entities; and (b) provide the City with the breathing spell it needs at the outset of this case.

124. Appointment of Official Committee of Retirees. The City also requests that the Court direct the United States trustee to appoint an official committee of retired employees of the City (a "Retiree Committee"). As previously stated, the City's post-employment obligations are a crushing burden on the City's financial well being, and a restructuring of these obligations is a critical component of the City's rehabilitation. The City expects that most of its approximately 23,500 retirees are not familiar with chapter 9 and lack the means to obtain sophisticated representation in this case on an individual basis. Absent the appointment of a Retiree Committee, only a minority of the City's retirees stand to receive any form of collective representation in this chapter 9 case, and, perhaps more importantly, it appears that the small number of unions and retiree associations that have offered to represent retirees possess no legal authority to bind those individuals to restructure pension and retiree health benefits. In addition, the appointment of a Retiree Committee will provide the City with a centralized point of contact, and the retirees with sophisticated representation, to engage in negotiations regarding the restructuring of the City's retirement benefit obligations. I believe, therefore, that the appointment of a Retiree Committee is

-81-

13-53846-swr    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 85 of 88    123
13-53846-tjt    Doc 2334-4    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 35 of 38

necessary to provide adequate representation to these individuals and to facilitate the City's restructuring of its pension and other post-employment benefit liabilities.

125. <u>Authorization of Compromise with Swap Counterparties</u>. The City also requests that the Court authorize the assumption of the City's Forbearance and Optional Termination Agreement with the Swap Counterparties and approve such agreement as a compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure. As discussed herein, shortly prior to the Petition Date, the City reached a resolution with the Swap Counterparties, whereby: (a) the Swap Counterparties will forbear from seeking a termination of the Swap Contracts and allow the City continued access to its Casino Revenues; and (b) the City is granted an option to terminate the Swap Contracts for a period of time at a favorable discount. In exchange, the City has agreed to, among other things: (a) perform certain of its obligations under the Swap Contracts, Collateral Agreement and other agreements; (b) refrain from challenging the validity of the Swap Contracts, Collateral Agreement and other agreements; and (c) take certain steps to assist the Swap Counterparties in realizing upon the pledged property should the City default on its obligations. I believe that the assumption and approval of the compromise is fair, reasonable, equitable and in the best interests of the City and its creditors. The compromise, if approved, will allow the City access to much needed cash flows, provide for a workable unwind of its unfavorable swap obligations at a

-82-

discounted price and avoid potentially protracted litigation involving the swap transactions.

## Conclusion

126.   I respectfully request that all of the relief requested in the First Day Pleadings be granted along with such other relief as is just.

-83-

13-53846-swr   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 87 of 88   125
13-53846-tjt   Doc 2334-4   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 37 of 38

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.


Dated: July 18, 2013          By:  /s/  Kevyn D. Orr
                                   Kevyn D. Orr
                                   Office of Emergency Manager
                                   City of Detroit