# EXHIBIT C

# CITY OF DETROIT, MICHIGAN
## NOTICE OF PRELIMINARY FINANCIAL REVIEW FINDINGS
## AND
## APPOINTMENT OF A FINANCIAL REVIEW TEAM

The following information is provided by the City of Detroit, Michigan (the "City") pursuant to certain Continuing Disclosure Agreements executed and delivered by the City in connection with the issuance of certain obligations (the "Obligations"), in compliance with Securities and Exchange Commission Rule 15c2-12.

Since 2008, the City has been experiencing significant financial problems caused by the loss of residents, the financial challenges of the automobile industry, the disruptions in the financial markets and the overall economic issues faced by the country. In early December 2011, Governor Rick Snyder (the "Governor") directed State Treasurer Andy Dillon (the "Treasurer") to conduct a preliminary review of the City's finances pursuant to Public Act 4 of 2011, the Local Government and School District Financial Accountability Act ("Act 4"). On December 21, 2011, the Treasurer, after completing his preliminary review, issued a report in which he made a determination that the City was in a state of "probable financial stress" under Act 4 based on a number of factors set forth in the Treasurer's report.

In accordance with Act 4, upon a finding of "probable financial stress," the Governor is required to appoint a financial review team to undertake a more extensive financial management review of the City. On December 27, 2011, the Governor announced the appointments of a 10 member financial review team. Under Act 4, the financial review team must report its findings to the Governor within 60 days, unless a 30-day extension is requested and granted or the Governor requests that the review team report to him in less than 60 days. Under Act 4, the review team must reach one of the following conclusions in its report: (i) no or mild financial stress exists in the City; (ii) severe financial stress exists in the City but a consent agreement containing a plan to resolve the problem has been adopted; (iii) severe financial stress exists in the City and a consent agreement has not been adopted; or (iv) a financial emergency exists in the City and no satisfactory plan exists to resolve the emergency.

Attached to this Notice as Exhibit A is a copy of the December 21, 2011 report of the Treasurer.

Dated: January 13, 2012



STATE OF MICHIGAN
## DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:**     December 21, 2011

**TO:**     Rick Snyder, Governor

**FROM:**     Andy Dillon, State Treasurer

**SUBJECT:**     Preliminary Review of the City of Detroit

### I. Background

On December 6, 2011, the Department of Treasury commenced a preliminary review of the finances of the City of Detroit to determine whether or not a local government financial problem existed. Section 12(1) of Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, permits a preliminary review to be conducted if one or more of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivision (j), (m), (o), (q) and (r) of Section 12(1) having occurred within the City. [1]

As summarized below, based upon information received and considered as part of the preliminary review -- including the inability of the City to avoid fund deficits, recurrent accumulated deficit spending, severe projected cash flow shortages resulting in an improper reliance on inter-fund and external borrowing, the lack of funding of the City's other post-retirement benefits, and the increasing debt of the City -- I conclude that probable financial stress exists in the City of Detroit and recommend appointment of a financial review team. Appointment of a financial review team is a prerequisite step in the Act 4 process to the appointment of an emergency manager.

### II. Preliminary Review Findings

The preliminary review found the following:

- The City has violated requirements of section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, as amended, which states that the "the legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation

---

[1] Subsection (j) provides that "[t]he local government has violated a requirement of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440. Subsection (m) provides that "[a] local government is in breach of its obligations under a deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan." Subsection (o) provides that "[a] municipal government has ended a fiscal year in a deficit condition." Subsection (q) provides that [a] local government has been assigned a long-term debt rating within or below the BBB category or its equivalent by 1 or more nationally recognized credit rating agencies." Subsection (r) provides that "[t]he existence of other facts or circumstances that in the state treasurer's sole discretion for a municipal government are indicative of municipal financial stress."

www.michigan.gov/treasury

13-53846-swr   Doc 11-3   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 3 of 8   330
13-53846-tjt   Doc 2334-9   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 3 of 53

can be determined." For example for the year ending June 30, 2010, the Human Resources -
Apprentice Training program went over budget by over $2.3 million, the Insurance Premium
line item exceeded its budget by over $12 million and the Police Operations line item went
over budget by $15.8 million. Consequently, the general fund had line items that exceeded its
budget by almost $58 million. Unaudited 2011 figures indicated that line items amounting to
$97 million exceeded their budget including an excess of $25 million over budget for fire and
$44 million for police.

- City officials have not filed an adequate or approved deficit elimination plan with the De-
  partment of Treasury for the fiscal year ending June 30, 2010. On December 20, 2010, City
  officials filed an audit report that reflected a $155 million cumulative deficit in the general
  fund, a $1.4 million cumulative deficit in the airport fund, and a $3.5 million cumulative def-
  icit in the local street fund. As of December 2011, City officials have not filed a plan that
  would reduce the general fund deficit. In fact, new data estimate the general fund's deficit in-
  creasing to $196 million for 2011 (the 2011 audit report has not yet been filed). The deficits
  in the airport and local street funds have been eliminated in 2011.

There have been deficits in the general fund that exceed $100 million dating back to 2005.
These deficits have fluctuated between over $155 million and over $300 million. One of the
primary methods the City has used to reduce the deficits has been to issue more debt. Total
general fund debt and other long term liability proceeds for the years between 2005 and 2010
was over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds
reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt
service payments increase.

General Fund Deficits and Debt Proceeds:

| Year | Deficit | Debt Proceeds |
|------|---------|---------------|
| 2005 | (155,404,035) | 248,440,183 |
| 2006 | (173,678,707) | 34,892,659 |
| 2007 | (155,575,800) | |
| 2008 | (219,158,138) | 75,210,007 |
| 2009 | (331,925,012) | |
| 2010 | (155,692,159) | 251,663,225 |
| 2011 | (196,577,910) | |

For the City on a whole (excluding component units), there was a 2010 unrestricted net assets
deficit of over $1.6 billion and a similar amount for the unaudited 2011 fiscal year[2].

---

[2] Net Assets are calculated on the government-wide financial statements that use the accrual basis of accounting and
include such items as capital assets and long-term debt. The unrestricted amount measures the net assets that are
appropriable for expenditure and are not legally segregated for a specific future use.

- The City's deficit elimination plans and budget proposals have proven to be unrealistic. City officials are either incapable or unwilling to manage its own finances. For example, the 2008 deficit elimination plan reported $58 million in expenditure reductions in the general fund and $69 million (excluding debt proceeds and revenue sharing) in revenue enhancements for 2010. However, the 2010 general fund balance ended in a deficit condition of over $155 million and would have been much greater if not for $250 million in new debt. Again, the 2009 deficit elimination plan certified in November of 2010 projected a 2011 surplus while the actual fund balance for the general fund ended with a deficit estimated at close to $200 million. The City had promised restructuring and consolidation including hiring freezes and improved tax collection. Finally in mid-2011, City officials submitted a deficit elimination plan for the 2010 deficit which included revenue initiatives of over $200 million and expenditure reductions of over $300 million, most of which would take place in future periods and were questionable, such as the $10 million to sell tunnel rights and $50 million in better income tax collection. One version of the plan estimated that the City would be able to obtain an additional $154 million each year from the collection of income taxes from residents who work outside the City. Projected expenditure reductions rely heavily on union concessions which have not historically materialized.

- The City has a mounting debt problem. In 2010, annual debt service requirements exceeded $597 million. As of June of 2011, the long-term debt of the City exceeded $8 billion excluding unfunded actuarial pension and other postemployment benefit (OPEB) liabilities and discretely presented component units such as the Library and Downtown Development Authority. However, if one includes the unfunded actuarial pension liability of $615 million (offset by an almost $1.4 billion pension asset) and the unfunded other postemployment benefit liability of over $4.9 billion, the City's total long-term liabilities are over $12 billion, which does not include substantial sums of interest which are over $4.9 billion. In comparison if one took the total long-term debt of the City compared to total net assets, the City would have a 2010[3] factor of 32.64 debt to 1 in net assets or 32.64[4]. Other major cities in Michigan have factors of less than 1 such as Flint with a factor of 0.59, Lansing with a factor of 0.67 and Grand Rapids with a factor of 0.39. Major Cities around the United States have smaller factors such as the City of Los Angeles with a factor of 1.13 and Indianapolis with a factor of 4.67. [5]

---

[3] The factor for Detroit's 2011 fiscal year is not meaningful since total net assets declined by $281 million and are in a deficit condition.

[4] Less than 1 is considered good.

[5] Chicago was the only City compared that was in poor shape comparably with a factor that was not meaningful because of a negative total net assets balance.

|  | General Obligation | Revenue | POC | Other |
|---|---|---|---|---|
| Governmental | $ 1,033,233,278 | $ 125,520,622 | $ 1,194,003,260 | $ 284,276,052 |
| Sewage |  | 2,894,198,302 | 90,114,924 | 15,046,961 |
| Transportation | 6,271,722 |  | 105,143,913 | 28,238,095 |
| Water |  | 2,159,831,662 | 79,517,902 | 25,979,109 |
| Automobile |  | 11,341,382 |  | 10,225,829 |
| Other |  |  |  | 162,187 |
| Unallocable |  |  |  |  |
|  | $ 1,039,505,000 | $ 5,190,891,968 | $ 1,468,779,999 | $ 363,928,233 |

|  | OPEB | Pension Liability | Pension Asset* | Total |
|---|---|---|---|---|
| Governmental |  |  |  | $ 2,637,033,212 |
| Sewage |  |  |  | 2,999,360,187 |
| Transportation |  |  |  | 139,653,730 |
| Water |  |  |  | 2,265,328,673 |
| Automobile |  |  |  | 21,567,211 |
| Other |  |  |  | 162,187 |
| Unallocable | $ 4,982,355,243 | $ 615,701,032 | $ (1,371,848,955) | 4,226,207,320 |
|  | $ 4,982,355,243 | $ 615,701,032 | $ (1,371,848,955) | $ 12,289,312,520 |

Pension Obligation Certificates (POC); Other Postemployment Benefits (OPEB)
*Pension asset may already be factored into actuarially determined pension liability

- Prior to 2008, in order to obtain better interest rates and reduce debt related costs, the City entered into interest rate swaps and swaptions where two or more parties enter into an agreement to exchange interest cash flows. Switching or "swapping" a variable interest rate for a fixed rate would benefit the City if market interest rates increased. However, rates subsequently fell impacting the City negatively. Because the fall in interest rates was not predicted, ramifications of increased annual payments resulted. In addition to principal and interest payments, the City must pay amounts called "hedging derivatives", which over the life of the debt is an additional $1,136,007,248.

The City is in risk of a termination event which would occur if the City's credit is downgraded below Baa3 or its equivalent. On January 8, 2009, such an event occurred. However, the City avoided the immediate demand for payment by entering into another agreement that would allocate wagering tax revenues to a Trust to be used as collateral for future payments thus reducing the benefits of those cash flows to the City. New termination events include the agreement that the Trust will maintain a certain level of funds, further downgrades in the City's credit rating, and the appointment of an emergency manager. As stated by the City's auditors, "[s]hould such Termination Events occur in connection with the Swap Agreements, and not be cured, there presently exists significant risk in connection with the City's ability to meet the cash demands under the terms of the amended Swap Agreements." According to estimates if an "event" occurred, the City would be facing a $280 million to $400 million termination pay-

ment. According to recent reports, the City intends to sell water and sewer bonds to unwind a portion of the swaps. The notional amount, or face value, of these outstanding hedging derivatives in 2011 was over $3.8 billion and had a market value of ($560 million).

- The City's long-term bond rating fell below the BBB category and is considered "junk", speculative or highly speculative. According to a Thomson Reuters June 24, 2011 article, "Fitch downgraded the rating on about $453 million of Detroit's unlimited-tax general obligation bonds to BB-minus from BB-plus, and dropped the rating on the City's approximately $486 million of limited-tax GO bonds to B-plus from BB. The rating on about $1.5 billion of pension bonds was cut to BB-minus from BB-plus. The lower unlimited-tax GO rating from Fitch matches the Ba3 rating with a negative outlook from Moody's Investors Service. Standard & Poor's Ratings Services rates Detroit's GO bonds BB with a stable outlook."

- Not only does the City have large external debts, but it also has large debts due to itself in the form of interfund loans. As of June 30, 2010, the City had interfund balances amounting to over $447 million and unaudited 2011 balances of $334 million. Concurrently, the City has been able to have net operating surpluses in its general fund for most of the more recent fiscal years. However, the City incurs substantial deficits in the fund because of the subsidies it pays to other funds such as $72 million to the transportation fund. However, most of the transfers ($133 million) were made for debt service and pension funds. The total amount transferred from the general fund according to 2011 draft figures is $215 million.

- The City is experiencing significant cash flow shortages. In 2010, the City received $250 million in fiscal stabilization bonds. The City has also received $55 million in delinquent property tax receipts from the county and $20 million from the DTE Escrow account. However despite these inflows of substantial amounts of cash, the City is projecting a cash shortage.

  Based on recent projections made available by the City, the general fund had a forecasted ending cash balance of $115,500,000 as of October 28, 2011. The actual cash balance as of that date was $96,100,000, an overestimation of $19,400,000. The City revised its cash forecast based on a series of new assumptions and it is projected that the City will experience a cash shortage starting in April 2012, of ($1,600,000) and will end its fiscal year in June 2012 with a cash shortage of ($44,100,000).

- The City has had trouble making its required payments to its pension plans. Years of exceptional pension benefits have increased the costs to the City. Current police and fire employees enjoy multipliers of 2.5 for 25 years of service and 2.1 thereafter[6]. However, a newer one-year agreement was approved to limit the factor for earnings after September 2011 to

---

[6] Multipliers are used in calculating retirement pay in defined benefit plans. For example, a 2.5 multiplier would be used by calculating 2.5% of the years of service times the final average compensation to calculate the yearly pension. For example, an employee working 30 years and making $50,000 per year before retiring would receive $37,500 in retirement (.025x30x50,000). Compare that to a factor of 1.5 and the annual retirement would be $22,500, a $15,000 difference annually.

2.1. General employees have negotiated a tiered system of 1.6 for the first 10 years, 1.8 for the next 10 years, 2.0 for the next five years, and 2.2 for the remaining years.

In June of 2005, the City issued $1.44 billion of new debt in the form of Pension Obligation Certificates (POC) to fund its two retirement systems with a renegotiated repayment schedule of 30 years. More recently, the City contemplated not making required payments to the plans to save money. However, subsequent negotiations with representatives of the plans resulted in a "smoothing" that would allow them to make five-year pension payments over a seven-year period. Annual required payments as of the last audit report filed, not including debt payments related to the POCs, is $110 million which is an increase of $41 million from 2010.

Other legacy costs include growing unfunded pension and other postemployment benefits that have already been noted, but also include the current salary and benefit structure. Others have calculated the fringe benefit costs to the City in addition to salaries and benefits at almost $1 billion annually. However, this amount has not been verified.

- There are questionable balances in the 2010 audit report of the City's pension plans. The auditors were unable to obtain sufficient evidence supporting approximately $216 million of the retirement plans' alternative investments.

- Audit reports for the fiscal year ending June 30, 2010 show that the City's poor financial management impacts the City's administration of Federal grant programs and poses likely threats to the City's continued receipt of Federal funds for social service programs. Eighty pages of a KPMG audit site numerous findings and offer the following examples of questioned and potentially disallowed costs:

    o Nutrition for Women, Infants and Children – Approximately $1.0 million in questioned costs in addition to accounting, eligibility and fund reconciliation issues.
    o Community Development Block Grant – Approximately $12.7 million in questioned salary costs.
    o HOME (Home investment partnership program) – Approximately $846,000 in salary costs; $273,000 in questioned indirect planning costs.

cc: Roger Fraser, Deputy State Treasurer
    Frederick Headen, Director, Bureau of Local Government Services

# EXHIBIT D

3500 (Rev. 01-11)



STATE OF MICHIGAN
DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:** March 26, 2012

**TO:** Governor Snyder

**FROM:** Detroit Financial Review Team:
Andy Dillon
Frederick Headen
Jack Martin
Conrad Mallet, Jr.
Isaiah McKinnon
Glenda D. Price
Irvin D. Reid
Doug Ringler
Shirley R. Stancato
Brom Stibitz

**SUBJECT:** Report of the Detroit Financial Review Team

On January 10th, 17th, 19th, 24th, and 31st; February 28th; and March 13th, 21st, and 26th 2012, Detroit Financial Review Team members met and reviewed information relevant to the financial condition of the City. Based upon those reviews, the Review Team concludes, in accordance with Section 13(4)(c) of Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, that the City of Detroit is in a condition of severe financial stress as provided in Section 14 of the Act, and that a consent agreement has not been adopted pursuant to Section 13(1)(c) of the Act.

I. Background

A. Preliminary Review

On December 6th through December 21st, 2011, the Department of Treasury conducted a preliminary review of the finances of the City of Detroit to determine whether or not probable financial stress existed. Section 12(1) of the Act provides that a preliminary review may be conducted if one or more of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivisions (j), (m), (o), (q) and (r) of Section 12(1) having occurred within the City. [1]

---

[1] Subsection (j) provides that "[t]he local government has violated a requirement of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440. Subsection (m) provides that "[a] local government is in breach of its obligations under a deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan." Subsection (o) provides that "[a] municipal government has ended a fiscal year in a deficit condition." Subsection (q) provides that [a] local government has been assigned a long-term debt rating within or below the BBB category or its equivalent by 1 or more nationally recognized credit rating agencies." Subsection (r) provides that

www.michigan.gov/treasury

The preliminary review found, or confirmed, the following:

- The City had violated requirements of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act. Section 17 of the Act provides that "[t]he legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined."[2]

  For example, for the year ending June 30, 2010, the human resources apprentice training program exceeded its budget by over $2.3 million, the insurance premium line item exceeded its budget by over $12 million, and the police operations line item exceeded its budget by $15.8 million. Consequently, the general fund had line items that exceeded budgeted amounts, in the aggregate, by almost $58 million. Unaudited 2011 figures indicated that line items amounting to $97 million exceeded their budget, including an excess of $25 million for fire and $44 million for police.

---

"[t]he existence of other facts or circumstances that in the state treasurer's sole discretion for a municipal government are indicative of municipal financial stress."

[2] The Review Team was advised by a member of the City Council that the implication of the preliminary review (i.e., that the City Council had failed to amend budgets to prevent over expenditures) was incorrect in that the City Council is not authorized to initiate budget amendments. The point made by the City Councilmember is well taken.

Section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, reads, in part, as follows:

> (1) Except as otherwise provided in section 19, a deviation from the original general appropriations act shall not be made without amending the general appropriations act. Subject to section 16(2), the legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined. An amendment shall indicate each intended alteration in the purpose of each appropriation item affected by the amendment. The legislative body may require that the chief administrative officer or fiscal officer provide it with periodic reports on the financial condition of the local unit.

> (2) If, during a fiscal year, it appears to the chief administrative officer or to the legislative body that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and the proceeds from bonds or other obligations issued under the fiscal stabilization act, 1981 PA 80, MCL 141.1001 to 141.1011, or the balance of the principal of these bonds or other obligations, *the chief administrative officer or fiscal officer shall present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year.* Emphasis supplied.

We would read the obligation of a legislative body to amend a budget under subsection (1) of Section 17 of the Act to apply only upon receipt of a recommendation from the chief administrative officer or fiscal officer pursuant to subsection (2) of the Act.

- City officials had not filed an adequate or approved deficit elimination plan with the Department of Treasury for the 2010 fiscal year. On December 20, 2010, City officials filed an audit report that reflected a $155 million cumulative deficit in the general fund, a $1.4 million cumulative deficit in the airport fund, and a $3.5 million cumulative deficit in the local street fund. As of December 2011, City officials had not filed a plan that would reduce the general fund deficit. In fact, new data estimated the general fund's deficit increasing to $196 million for 2011. The deficits in the airport and local street funds were eliminated in 2011.

  There had been deficits in the general fund exceeding $100 million dating back to 2005. These deficits had fluctuated between over $155 million and over $300 million. One of the primary methods the City had used to reduce the deficits had been to issue more debt. Total general fund debt, and other long term liability proceeds for the years between 2005 and 2010, was over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

### General Fund (Unrestricted) Deficits and Debt Proceeds

| Year | Deficit | Debt Proceeds |
|------|---------|---------------|
| 2005 | ($155,404,035) | $248,440,183 |
| 2006 | ($173,678,707) | $34,892,659 |
| 2007 | ($155,575,800) | -- |
| 2008 | ($219,158,138) | $75,210,007 |
| 2009 | ($331,925,012) | -- |
| 2010 | ($155,692,159 | $251,663,225 |
| 2011 | ($196,577,910) | -- |

- The City's deficit elimination plans and proposed budgets proved to be unrealistic. City officials either had been incapable or unwilling to manage the finances of the City. For example, the 2008 fiscal year deficit elimination plan reported $58 million in expenditure reductions in the general fund and $69 million (excluding debt proceeds and revenue sharing) in revenue enhancements for 2010. However, the 2010 general fund balance ended in a deficit condition of over $155 million and would have been much greater if not for $250 million in new debt. Again, the 2009 deficit elimination plan certified in November of 2010 projected a 2011 surplus while the actual fund balance for the general fund ended with a deficit estimated at close to $200 million.

  City officials had promised restructuring and consolidation, including hiring freezes and improved tax collection. Finally in mid-2011, City officials submitted a deficit elimination plan for the 2010 deficit which included revenue initiatives of over $200 million and expenditure reductions of over $300 million, most of which were to take place in future periods and were questionable, such $10 million from selling Windsor tunnel rights and $50 million in improved income tax collections. One version of the deficit elimination plan estimated that the City would

be able to realize an additional $154 million annually from collecting income taxes from residents who work outside the City. Projected expenditure reductions relied heavily upon union concessions which had not historically materialized.

- The City had a mounting debt problem. In 2010, annual debt service requirements exceeded $597 million. As of June of 2011, the long-term debt of the City exceeded $8 billion, excluding unfunded actuarial pension, other postemployment benefit liabilities, and discretely presented component units such as the library and downtown development authority. However, if one included the unfunded actuarial pension liability of $615 million (offset by an almost $1.4 billion pension asset) and the other postemployment benefit liability of over $4.9 billion, the City's total long-term debt liabilities were more than $12 billion. (See table below.) The latter amount did not include substantial sums of interest which were over $4.9 billion. In comparison, if one took the total long-term debt of the City compared to total net assets, the City would have had for 2010 a debt to net assets ratio of 32.64 to 1.

| | General Obligations | Revenue Bonds | Pension Obligation Certificates | Other |
|---|---|---|---|---|
| Governmental | $1,033,233,278 | $125,520,622 | $1,194,003,260 | $284,276,052 |
| Sewage | | $2,894,198,302 | $90,114,924 | $15,046,961 |
| Transportation | $6,271,722 | | $105,143,913 | $28,238,095 |
| Water | | $2,159,831,662 | $79,517,902 | $25,979,109 |
| Automobile | | $11,341,382 | | $10,225,829 |
| Other | | | | $162,187 |
| Unallocable | | | | |
| | $1,039,505,000 | $5,190,891,968 | $1,468,799,999 | $363,928,233 |

| | Other Post Employ-ment Benefits | Pension Liability | Pension Asset* | Total |
|---|---|---|---|---|
| Governmental | | | | $2,637,033,212 |
| Sewage | | | | $2,999,360,187 |
| Transportation | | | | $139,653,730 |
| Water | | | | $2,265,328,673 |
| Automobile | | | | $21,567,211 |
| Other | | | | $162,187 |
| Unallocable | $4,982,355,243 | $615,701,032 | ($1,371,848,955) | $4,226,207,320 |
| | | | | |
| Total | $4,982,355,243 | $615,701,032 | ($1,371,848,955) | $12,289,312,520 |

*Pension asset may already be factored into actuarially determined pension liability

- Prior to 2008, in order to obtain better interest rates and reduce debt related costs, the City entered into interest rate swaps and swap options (i.e., where two or more parties enter into an agreement to exchange interest cash flows). Exchanging, or "swapping," a variable interest rate for a fixed rate would have benefited the City had market interest rates increased. However, rates subsequently decreased, impacting the City negatively. Because the fall in interest rates was not predicted, ramifications of increased annual payments resulted. In addition to principal and interest payments, the City must pay amounts called "hedging derivatives", which over the life of the debt is an additional $1,136,007,248.

  The preliminary review found the City to be at risk of a termination event which would occur if the City's credit rating were downgraded below Baa3 or its equivalent. On January 8, 2009, such an event occurred. However, the City avoided the immediate demand for payment by entering into another agreement which allocated wagering tax revenues to a trust to be used as collateral for future payments thus reducing the benefits of those cash flows to the City. New termination events included the failure to maintain a certain level of funds in the trust, further downgrades in the City's credit rating, or appointment of an emergency manager.

  As stated by the City's auditors, "[s]hould such Termination Events occur in connection with the Swap Agreements, and not be cured, there presently exists significant risk in connection with the City's ability to meet the cash demands under the terms of the amended Swap Agreements." According to estimates, if an "event" occurred, the City would face a $280 million to $400 million termination payment. According to the preliminary review, City officials intended to sell water and sewer bonds to unwind a portion of the swaps. The notional amount, or face value, of these outstanding hedging derivatives in 2011 was over $3.8 billion and had a market value of ($560 million).

- The City's long-term bond rating fell below the BBB category and is considered "junk", speculative, or highly speculative. According to a Thomson Reuters June 24, 2011 article, "Fitch downgraded the rating on about $453 million of Detroit's unlimited-tax general obligation bonds to BB-minus from BB-plus, and dropped the rating on the City's approximately $486 million of limited-tax GO bonds to B-plus from BB. The rating on about $1.5 billion of pension bonds was cut to BB-minus from BB-plus. The lower unlimited-tax general obligation rating from Fitch matches the Ba3 rating with a negative outlook from Moody's Investors Service. Standard & Poor's Ratings Services rates Detroit's GO bonds BB with a stable outlook."

- Not only did the City have large external debts, but it also had large debts owed to itself in the form of inter-fund loans. As of June 30, 2010, the City had inter-fund balances amounting to over $447 million and unaudited 2011 balances of $334 million. Concurrently, the City had operating surpluses in its general fund for most of the more recent fiscal years. However, the general fund incurred substantial deficits because of the subsidies it paid to other funds, such as $72 million to the transportation fund. However, most of the outgoing transfers $133 million

were made for debt service and pension funds. The total amount transferred from the general fund according to 2011 draft figures was $215 million.

- The City experienced significant cash-flow shortages. In 2010, the City received $250 million in fiscal stabilization bond proceeds. The City also received $55 million in delinquent property tax receipts from Wayne County and $20 million from a DTE Energy escrow account. However, despite these inflows of substantial amounts of cash, City officials were projecting a cash shortage.

  Based upon projections made available by the City at the time of preliminary review, the general fund had a forecasted ending cash balance of $115.5 million as of October 28, 2011. However, the actual cash balance as of that date was $96.1 million, an overestimation of $19.4 million. The City revised its cash forecast based on a series of new assumptions which projected that the City would experience a cash shortage starting in April 2012, of $1.6 million and would end its fiscal year in June 2012 with a cash shortage of $44.1 million absent remedial action.

- The City experienced difficulty making its required payments to its pension systems. Years of exceptional pension benefits had increased costs to the City. The preliminary review found that current police and fire employees enjoy multipliers of 2.5 percent for 25 years of service and 2.1 percent thereafter.[3] However, a newer one-year agreement was approved to limit to 2.1 percent the multiplier for earnings after September 2011. General employees (i.e., non-police and fire) had negotiated a tiered system of 1.6 percent for the first 10 years, 1.8 percent for the next 10 years, 2.0 percent for the next five years, and 2.2 percent for any remaining years.

  In June of 2005, City officials issued $1.44 billion of pension obligation certificates to fund the City's two retirement systems with a renegotiated payment schedule of 30 years. More recently, City officials contemplated not making required payments to pension systems as a cost-savings measure. However, subsequent negotiations with representatives of the pension systems resulted in a "smoothing" that allowed City officials to make five years of pension payments over a seven-year period. Annual required payments reflected in the 2011 fiscal year financial audit, excluding debt payments related to the certificates, was $110 million, an increase of $41 million from the 2010 fiscal year.

- There were questionable balances in the 2010 audit report of the City's pension systems. The auditors were unable to obtain sufficient evidence supporting approximately $216 million of the retirement systems' alternative investments.

---

[3] Multipliers are used in calculating retirement pay in defined benefit plans. For example, for an employee with 30 years of service who was making $50,000 at retirement, a 2.5 percent multiplier would yield $37,500 in annual retirement benefits (0.025x30x50,000). By comparison, a 1.5 percent multiplier would yield an annual retirement benefit of $22,500, a difference of $15,000 annually.

- The financial audit report for the 2010 fiscal year indicated that the City's poor financial management impacted the City's administration of various federal grant programs and posed potential threats to the City's continued receipt of such grants. The audit report cited numerous findings and offered the following examples of questioned and potentially disallowed costs:

  -- Nutrition for Women, Infants and Children (approximately $1.0 million in questioned costs in addition to accounting, eligibility and fund reconciliation issues).

  -- Community Development Block Grant (approximately $12.7 million in questioned salary costs).

  -- HOME, a home investment partnership program, (approximately $846,000 in salary costs; $273,000 in questioned indirect planning costs).

Based upon the foregoing preliminary review, the State Treasurer concluded, and reported to the Governor on December 21, 2011, that probable financial stress existed in the City of Detroit and recommended the appointment of a financial review team.

B. Review Team Findings

On December 27, 2011, the Governor appointed a ten-member Financial Review Team. The Review Team convened on January 10th, 17th, 19th, 24th, and 31st; February 28th; and March 13th, 21st, and 26th 2012.

1. Conditions Indicative of a Financial Emergency

The Review Team found, or confirmed, the existence of the following conditions based upon information provided by City officials, or the City's audit firm, or other relevant sources:

- According to the City's fiscal year 2011 financial audit, the cumulative general fund deficit increased by 62.5 percent, from $91,094,688 as of June 30, 2010 to $148,071,674 as of June 30, 2011. While the general fund had an operating surplus (i.e., revenues in excess of expenditures) of $150,077,184, net transfers out of the general fund of $206,947,605 resulted in a negative net change in the general fund balance of $56,870,421.

- Financial audit reports for the City for its last nine fiscal years reflect significant variances between general fund revenues and expenditures, as initially budgeted and as amended, versus general fund revenues and expenditures actually realized. These variances, which are depicted on the next two pages, are reflective of the practice of which the Review Team was informed, of City officials adopting budgets that knowingly overestimated revenues. However, the overestimates of revenue largely were offset by corresponding overestimates in general fund expenditures.

General Fund (Amended) Budget to Actual Variances
Fiscal Years 2003-11

|  | **2002-03** | **%** | **2003-04** | **%** | **2004-05** | **%** |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,411,438,181 | | $1,491,324,664 | | $1,411,559,555 | |
| Amended | $1,455,091,091 | | $1,557,611,152 | | $1,573,240,100 | |
| Actual | $1,379,940,668 | | $1,375,067,276 | | $1,357,023,161 | |
| Variance | ($75,150,423) | (5.16) | ($ 182,543,876) | (11.71) | ($ 216,216,939) | (13.74) |
| **Expenditures** | | | | | | |
| Budgeted | $1,500,934,902 | | $1,645,328,307 | | $1,486,784,830 | |
| Amended | $1,603,280,231 | | $1,849,483,383 | | $1,733,451,270 | |
| Actual | $1,463,658,564 | | $1,577,561,963 | | $1,492,451,332 | |
| Variance | $ 139,621,667 | 8.71 | $ 271,921,420 | 14.70 | $ 240,999,938 | 13.90 |

|  | **2005-06** | **%** | **2006-07** | **%** | **2007-08** | **%** |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,446,899,263 | | $1,460,450,319 | | $1,511,369,289 | |
| Amended | $1,716,282,293 | | $1,685,082,568 | | $1,711,079,894 | |
| Actual | $1,400,871,987 | | $1,487,435,488 | | $1,303,429,698 | |
| Variance | ($315,410,306) | (18.37) | ($ 197,647,080) | (11.73) | ($ 407,650,196) | (23.82) |
| **Expenditures** | | | | | | |
| Budgeted | $1,484,834,179 | | $1,466,705,687 | | $1,580,231,599 | |
| Amended | $1,631,152,256 | | $1,702,154,178 | | $1,696,476,581 | |
| Actual | $1,410,081,217 | | $1,278,109,169 | | $1,181,358,285 | |
| Variance | $ 221,071,039 | 13.55 | $ 424,045,009 | 24.91 | $ 515,118,296 | 30.36 |

General Fund (Amended) Budget to Actual Variances
Fiscal Years 2003-11
(Continued)

| | 2008-09 | % | 2009-10 | % | 2010-11 | % |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,424,125,131 | | $1,651,938,137 | | $1,361,741,809 | |
| Amended | $1,755,335,605 | | $1,695,653,435 | | $1,650,138,387 | |
| Actual | $1,268,371,151 | | $1,187,977,093 | | $1,220,258,093 | |
| Variance | ($ 486,964,454) | (27.74) | ($ 507,676,342) | (29.93) | ($ 429,880,294) | (26.05) |
| **Expenditures** | | | | | | |
| Budgeted | $1,557,486,518 | | $1,644,170,276 | | $1,374,762,769 | |
| Amended | $1,798,321,382 | | $1,834,191,680 | | $1,558,893,986 | |
| Actual | $1,155,896,702 | | $1,068,938,078 | | $1,070,180,909 | |
| Variance | $ 642,424,680 | 35.72 | $ 765,253,602 | 41.72 | $ 448,713,077 | 31.35 |

- The general fund of the City has not experienced a positive year-end fund balance since the 2004 fiscal year, when the year end balance was $69,216,269. (See Table 1.) Beginning with the 2005 fiscal year, the general fund has had a negative year-end fund balance that has ranged from $33,594,434 for the 2005 fiscal year to 266,733,641 for the 2009 fiscal year. During a number of these years, general fund revenues actually exceeded general fund expenditures. However, there were sizable transfers out of the general fund to support other City operations, such as transportation, that resulted in negative year end balances in the general fund.

- The City has experienced, and continues to experience, a significant depletion of its cash.[4] Early in 2012, City officials had estimated that the City would deplete its cash by spring and have a negative cash balance of $44.0 million by June 30, 202. In an effort to address this situation,

---

[4] Confirmation by the Review team of the City's ongoing cash shortages is consistent with the conclusion reached by other financial assessments. For example, the report of the Mayor's Crisis Turnaround Team, that was commissioned by the current City administration, noted the following:

> The City is critically short of cash as a result of a $280 million estimated accumulated deficit and a growing structural deficit in the current fiscal year as projected revenues decline. The new administration must act quickly to realize substantial improvements in selected revenues and cost categories in the $2.1 billion General City Agency Budget. The [Crisis Turnaround] team recommends that the new administration establish a financial recovery strategy based on the projected deficit

City officials had proposed adjustments to collective bargaining agreements projected to save $102.0 million for fiscal year 2012 and $258.0 million for fiscal year 2013. However, the tentative collective bargaining agreements negotiated to date are projected to yield, at best, savings of only $47.0 million and $172.0 million for fiscal years 2012 and 2013, respectively.

- On March 20, 2012, Moody's Investor Service downgraded approximately $2.5 billion of the City's existing debt, some of it to five to six levels below investment grade. Among the reasons cited by Moody's Investor Service for the downgrade were the City's "weakened financial position, as evidenced by its narrow cash position, its reliance upon debt financing, and ongoing negotiations with its labor unions regarding contract concessions." On March 22, 2012, Fitch Ratings also downgraded approximately $2.5 billion of the City's existing debt for substantially similar reasons.

2. Review Team Meetings

At its initial meeting on January 10, 2012, the Review Team met with Joseph A. Kowalski of the certified public accounting firm KPMG.

On January 17, 2012, Review Team members conducted a series of meetings in the City of Detroit with Dave Bing, Mayor; Kirk Lewis, Chief of Staff; Chris Brown, Chief Operating Officer; Charles Pugh, City Council President; Gary Brown, City Council President Pro Tem; Ralph Godbee, Jr., Police Chief; Donald Austin, Fire Commissioner; Cheryl Johnson, Finance Director and City Treasurer; Alfred Jordan, Group Executive, Utilities; Ed McNeil, Special Assistant to the President of AFSCME, Council 25; and John Mack, Assistant to Ed McNeil.

On January 19, 2012, Review Team members conducted a series of meetings in the City of Detroit with Patrick Aquart, Human Resources Director; Joseph Martinico, Labor Relations Director; Karla Henderson, Group Executive, Planning and Facilities; Charles Dodd, Information Technology Services Director; Pamela Scales, Budget Director; Linda Bade, City Assessor; Joseph Duncan, President, Detroit Police Officers Association; James Moore, Vice-President, Detroit Police Command Officers Association; Junetta Wynn, President, Detroit Police Lieutenants and Sergeants Association; Daniel F. McNamara, President, Detroit Fire Fighters Association; Jeffrey Pegg, Vice President, Detroit Fire Fighters Association; Teresa Sanderfer, Secretary, Detroit Fire Fighters Association; and Robert Shinske, Treasurer, Detroit Fire Fighters Association.

On January 24, 2012, Review Team members conducted a series of meetings in the City of Detroit with Dave Bing, Mayor; Kirk Lewis, Chief of Staff; Chris Brown, Chief Operating Officer; Gaurav Malhotra, of the certified public accounting firm Ernst & Young; Charles Pugh, City Council

---

for the 2010-2011 fiscal year and repayment of ad hoc funding actions. This would require a target of $250 million to $300 million in ongoing annual revenue increases and cost savings.

President; Gary Brown, City Council President Pro Tem; Andre Spivey, Councilmember; and Joe Harris, Former City of Detroit Auditor General.

On January 31, 2012, Review Team members conducted a series of meetings in the City of Detroit with Kenneth V. Cockrel, Jr., Councilmember; Robert Anderson, Planning and Development Director; George Jackson, Jr., President and Chief Executive Officer, Detroit Economic Growth Corporation; Brian Holdwick, Executive Vice President, Detroit Economic Growth Corporation; Waymon Guillebeaux, Executive Vice President, Detroit Economic Growth Corporation; and Glenn Long, Vice President and Chief Operating Officer, Detroit Economic Growth Corporation; James Tate, Councilmember; Saunteel Jenkins, Councilmember; Brenda Jones, Councilmember; Irvin Corley, City Council Fiscal Analyst; Jerry Pokorski, City Council Financial Analyst; and Deputy City Treasurer Mike Bridges.

The Review Team also conducted public meetings in the City on February 28th, and March 13th, 21st, and 26th. At these public meetings, the Review Team received public comment and considered the options afforded to the Review Team by statute.

### C. Conclusion

Based upon the foregoing information, meetings and review, the Review Team confirms the findings of the preliminary review, concludes in accordance with Section 13(4)(c) of Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, that the City of Detroit is in a condition of severe financial stress as provided in Section 14 of the Act, and that a consent agreement has not been adopted pursuant to Section 13(1)(c) of the Act.

### II. Section 13(3) Requirements

Section 13(3) of the Act requires that this report include the existence or an indication of the likely occurrence of any of the conditions set forth in subdivisions (a) through (l).[5] The conditions in subdivisions (e), (f), and (g) of Section 13(3) exist or are likely to occur, as follows:

---

[5] Subdivisions (a) through (l) of Section 13(3) of the Act provide as follows:

(a) A default in the payment of principal or interest upon bonded obligations, notes, or other municipal securities for which no funds or insufficient funds are on hand and, if required, segregated in a special trust fund.

(b) Failure for a period of 30 days or more beyond the due date to transfer 1 or more of the following to the appropriate agency:

(*i*) Taxes withheld on the income of employees.

(*ii*) For a municipal government, taxes collected by the municipal government as agent for another governmental unit, school district, or other entity or taxing authority.

- The City had a general fund deficit of $148,071,674 as of June 30, 2011, which was not eliminated within the two-year period preceding the end of the fiscal year of the City during which this Review Team report is received. (Section 13(3)(e)).

- As of January 31, 2012, the City Council's Fiscal Analysis Division was projecting a general fund deficit of $270.0 million for the current fiscal year ending June 30, 2012, which would exceed five percent of the $1.2 billion budgeted revenues for the general fund. (Section 13(3)(f)).

- As previously noted, City officials did not filed an adequate or approvable deficit elimination plan with the Department of Treasury for the 2010 fiscal year. Nor did City officials do so for the 2011 fiscal year. Furthermore, past deficit elimination plans have proven to be unrealistic. For example, the 2009 fiscal year deficit elimination plan projected a 2011 fiscal year general fund surplus, but the general fund ended with an actual deficit of $148,071,674. (Section 13(3)(g)).

---

(*iii*) Any contribution required by a pension, retirement, or benefit plan.

(c) Failure for a period of 7 days or more after the scheduled date of payment to pay wages and salaries or other compensation owed to employees or benefits owed to retirees.

(d) The total amount of accounts payable for the current fiscal year, as determined by the state financial authority's uniform chart of accounts, is in excess of 10% of the total expenditures of the local government in that fiscal year.

(e) Failure to eliminate an existing deficit in any fund of the local government within the 2-year period preceding the end of the local government's fiscal year during which the review team report is received.

(f) Projection of a deficit in the general fund of the local government for the current fiscal year in excess of 5% of the budgeted revenues for the general fund.

(g) Failure to comply in all material respects with the terms of an approved deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan.

(h) Existence of material loans to the general fund from other local government funds that are not regularly settled between the funds or that are increasing in scope.

(i) Existence after the close of the fiscal year of material recurring unbudgeted subsidies from the general fund to other major funds as defined under government accounting standards board principles.

(j) Existence of a structural operating deficit.

(k) Use of restricted revenues for purposes not authorized by law.

(l) Any other facts and circumstances indicative of local government financial stress or financial emergency.

Governor Snyder
March 26, 2012
Page Thirteen

### III. Review Team Report Transmittal Requirements

Section 13(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.


cc: Dave Bing, Mayor
    Detroit City Councilmembers
    James Bolger, Speaker of the House of Representatives
    Randy Richardville, Senate Majority Leader

**Table 1**

**City of Detroit
General Fund Revenues, Expenditures,
And Change in Fund Balance**

| | 2002-03 | 2003-04 | 2004-05 |
|---|---|---|---|
| Revenue | $1, 379,940,668 | $1,375,067,276 | $1,357,023,161 |
| Expenditures | $ 1,463,658,564 | $1,577,561,963 | $1,492,451,332 |
| Current Surplus/ (Deficit) | ($83,717,896) | ($202,494,687) | ($135,428,171) |
| Other Financing Sources | ($32, 790,755) | $86,278,519 | 47,986,831 |
| Net Change in Fund Balance | ($52,758,651) | ($77,966,168) | (487,441,340) |
| Beginning Fund Balance | $206,220,362 | $140,304,407 | $69,216,269 |
| Change in Inventories | ($13,157,304) | $6,878,030 | ($15,369,363) |
| Ending Fund Balance | $140,304,407 | $69,216,269 | ($33,594,434) |

| | 2005-06 | 2006-07 | 2007-08 |
|---|---|---|---|
| Revenue | $1,400,871,987 | $1,487,435,488 | $1,303,429,698 |
| Expenditures | $1,410,081,217 | $1,278,109,169 | $1,181,358,285 |
| Current Surplus/ (Deficit) | ($9,209,230) | $209,326,319 | $122,071,413 |
| Other Financing Sources | ($54,277,434) | ($194,233,601) | ($175,016,228) |
| Net Change in Fund Balance | ($63,486,664) | 15,092,718 | ($52,944,815) |
| Beginning Fund Balance | ($33,594,434) | ($107,176,088) | ($91,406,096) |
| Change in Inventories | ($10,094,990) | $677,274 | $2,665,757 |
| Ending Fund Balance | ($107,176,088) | ($91,406,096) | ($141,685,154) |

**Table 1**
**(Continued)**

**City of Detroit**
**General Fund Revenues, Expenditures,**
**And Change in Fund Balance**

|  | 2008-09 | 2009-10 | 2010-11 |
|---|---|---|---|
| Revenues | $1,268,371,151 | $1,187,977,093 | 1,220,258,093 |
| Expenditures | $1,155,896,702 | $1,068,938,078 | 1,070,180,909 |
| Current Surplus/(Deficit) | $112,474,449 | $119,039,015 | $150,077,184 |
| Other Financing Sources | ($236,535,259) | ($209,943,411) | ($206,947,605) |
| Net Change in Fund Balance | ($124,060,810) | $178,349,536 | ($56,870,421) |
| Beginning Fund Balance | ($141,685,154) | ($266,733,641) | ($91,094,688) |
| Change in Inventories | ($987,677) | ($2,710,583) | ($106,565) |
| Ending Fund Balance | ($266,733,641) | ($91,094,688) | ($148,071,674) |

Source: City of Detroit Annual Financial Audits

# **EXHIBIT E**

# FINANCIAL STABILITY AGREEMENT

WHEREAS, the City of Detroit (the "City"), like many industrial cities throughout the United States, has experienced a prolonged period of economic change stretching over several decades which has eroded the quality of life of the City's residents and businesses; and

WHEREAS, the City currently confronts daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions, aggravated by the deterioration in revenues received from property taxes, income taxes, interest earnings, utility revenues, and intergovernmental revenues resulting from the recent serious recession in the U.S. and Michigan economies; by the growth in the City's legacy costs concurrently with the City's diminished ability to carry such costs; and by the difficulty in rapidly restructuring the City's operations so as to bring short-term and long-term expenditures in line with current and projected revenues; and

WHEREAS, a financially stable and vibrant City is important as a catalyst for the State of Michigan's overall image and success in economic development, business attractiveness, quality of life, and a host of other factors; and

WHEREAS, fundamentally changing the City's current trajectory can restore the quality of life which families, businesses and visitors have a right to expect and enjoy; and

WHEREAS, the City, through the Mayor and City Council, seeks to pursue this long-term vision by achieving, first, financial stability for the City, and, second, a sustainable and stable platform for growth ensuring the City's financial integrity in a manner that enables the City to grow, prosper and thrive; and

WHEREAS, the People of the State of Michigan have required the establishment of the Department of Treasury as a principal department of state government under Section 3 of Article V of the State Constitution of 1963 (the "Treasury Department") and provided that the State Treasurer, a constitutional officer appointed by the Governor with the advice and consent of the Michigan Senate (the "State Treasurer"), shall serve as the head of the Department, which is vested with responsibilities related to local government finance, budgeting and administration under state law; and

WHEREAS, the City is a political subdivision of the State of Michigan organized as a body corporate under Act 279, Public Acts of Michigan, 1909, as amended, the Home Rule City Act ("Act 279"), with the People of Detroit having created and provided for their continuing control of the municipal government of the City by adopting a Home Rule Charter of the City of Detroit (the "Charter"), and the People of the State of Michigan conferring comprehensive home rule power to the City through the State Constitution of 1963, subject to the limitations on the exercise of that power contained in the Constitution or the Charter, or imposed by statute;

WHEREAS, the Treasury Department desires to undertake jointly with the City efforts for the betterment of the residents of the City and the State of Michigan (the "State") as a whole through the adoption of this Financial Stability Agreement (this "Agreement"); and

WHEREAS, as a commitment to the long-term cooperative process established in this Agreement, the Mayor and the City Council desire to authorize and perform certain initial restructuring actions detailed herein with the Treasury Department; and

-2-

WHEREAS, the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas; and

WHEREAS, this Agreement contains the terms and conditions authorizing a cooperative undertaking between public agencies for efficiently restructuring the City's operations and tackling the City's systemic issues and accumulated deficit with the goals of (i) ensuring that the City remains a safe and secure environment where residents and visitors can live and work, (ii) promoting the delivery of quality, efficient, and effective public services to residents and businesses, and (iii) creating a civic culture and environment that attracts as well as retains investment, businesses, jobs and new residents to the City and the State; and

WHEREAS, approval of this Agreement is intended to reaffirm the role of the City's executive and legislative branches under the Charter in the development of the strategy, policies and long-term vision of a revitalized City; and

WHEREAS, under this Agreement the City and the Treasury Department agree to jointly exercise powers relating to public finance, budgeting, and administration that they share in common and that each may exercise separately, including, but not limited to, the powers, privileges and authorities of the Treasury Department to protect the credit of the State and municipalities in the State, and to aid, advise and consult with the municipalities with respect to fiscal questions and certain other matters under Act 34,

-3-

Public Acts of Michigan, 2001, as amended, the Revised Municipal Finance Act ("Act 34"), and to require local units of government to agree to plans to correct deficit conditions under Act 140, Public Acts of Michigan, 1971, as amended, the Glenn Steil State Revenue Sharing Act of 1971 ("Act 140"), and under other applicable law; and the power and authority of the City under Act 34 and Act 140 in respect of the foregoing, and the comprehensive home rule and other powers, privileges and authority of the City to enter into contracts on matters of municipal concern including, but not limited to, under Act 279, the Charter, and other applicable law; and

WHEREAS, under Act 140 the City previously has submitted to the Treasury Department a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140; and

WHEREAS, this Agreement shall update, supplement and restate the City's deficit elimination plan currently on file with the Treasury Department, as the same may be modified from time to time, and constitutes the City's request that the Treasury Department assist and cooperate with the City in the joint formulation of the financial plan to correct the City's deficit condition.

NOW, THEREFORE, the parties hereby agree as set forth below. Without limiting the foregoing, the City, through its Mayor (the holder of such office at any given time, the "Mayor") and the City Council of the City of Detroit (the holders of such offices, collectively, at any given time, the "City Council"), hereby agree and promise to undertake the steps outlined in this Agreement in consideration of and reliance upon: (i) subject to the terms of this Agreement, the Treasury Department maintaining existing discretionary state revenue sharing initiatives and agreements under Act 140; (ii) subject to the terms of this Agreement, the City's continuing ability to issue new

-4-

municipal securities with appropriate approvals under Act 34 until such time as the City achieves "qualified status;" (iii) subject to the terms of this Agreement, the City's ability to obtain additional financing pursuant to Act 243, Public Acts of Michigan, 1980, as amended, the Emergency Municipal Loan Act ("Act 243") with appropriate approvals; and (iv) the other agreements and commitments made herein by and on behalf of the Treasury Department.

1.  **FINANCIAL ADVISORY BOARD**

    1.1.  Establishment and Purpose.

    (a)    Pursuant to this Agreement and applicable law, a financial advisory board (the "Financial Advisory Board") shall be immediately established to administer and execute this Agreement. The Financial Advisory Board shall be a public body politic and an intergovernmental entity that is neither a commission, board or council of the City nor a commission, board or council of the State.

    (b)    The parties agree that the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas the City may identify from time to time (the "Support Subjects"). In response to those needs, the Financial Advisory Board is charged with: (a) consulting with and assisting the City regarding implementation of systems and improvements in the Support Subjects; (b) monitoring and reporting upon the City's ongoing financial performance; (c) making certain findings and recommendations to and assisting the City with the City's preparation,

-5-

implementation and execution of an annual Triennial Budget and General Appropriations Act (as described in Section 3.7 of this Agreement, the "Triennial Budget"), which shall include the City's annual Budget (defined below); (d) assisting the City in achieving Financial Stability (defined below); (e) monitoring compliance with this Agreement; and (f) taking certain actions respecting, and pursuing remedies for, non-compliance with this Agreement as provided in this Agreement.

    1.2.   Composition. The Financial Advisory Board shall be composed of nine members, each of whom shall possess professional qualifications in the Support Subjects and character suitable for the rendering of well-informed judgments within the context of highly complex transactions. The initial Financial Advisory Board shall be appointed by the Governor of the State of Michigan (the holder of such office at any given time, the "Governor"), the Mayor, the City Council, and the State Treasurer (for purposes of this Section 1.2, each respectively an "Appointing Entity") as follows:

    (a)    Three individuals appointed by the Governor;

    (b)    Two individuals appointed by the Mayor;

    (c)    Two individuals appointed by the City Council;

    (d)    One individual appointed jointly by the Governor and the Mayor and subject to confirmation by the City Council; and

    (e)    One individual appointed by the State Treasurer.

Each member of the Financial Advisory Board (any such member, a "Member") shall possess at least ten years' experience with one or more of (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, or (e) local government management with government units having consolidated revenues of $250

-6-

million or more. Prior to appointment of an individual as a Member, the Appointing Entity shall request independent confirmation that the individual possesses the qualifications required under this Section 1.2 from the Michigan Association of Certified Public Accountants or the Michigan Government Finance Officers Association.

Members shall not be officers or employees of the City or the State, or of the Mayor's executive staff, or a member or former member of the City Council. The terms of all Members shall be three years, _provided_ that of the members initially appointed (a) of the Members identified in Section 1.2(a), one shall be appointed for an initial 24-month term and one shall be appointed for an initial 12-month term; (b) of the Members identified in Section 1.2(b), one shall be appointed for an initial 24-month term; (c) of the Members identified in Section 1.2(c), one shall be appointed for an initial 12-month term; and (d) the Member identified in Section 1.2(d) shall be appointed for an initial 12-month term; _and provided further_ that one of the Members identified in Section 1.2(c) and the Member identified in Section 1.2(e) shall be appointed to and serve at the will of the respective Appointing Entity (the "At-Will Members"). After the initial appointments, subsequent appointments shall be made in the same manner as the original appointment. Vacancies shall be filled by the Appointing Entity for the balance of the unexpired term. Excepting the At-Will Members, Members may only be removed by the respective Appointing Entity for Cause. "Cause" means misfeasance, malfeasance, gross neglect of duty, corrupt conduct in office, pleading to or conviction of a felony, absence from 3 consecutive meetings without being formally excused, or at the discretion of the Appointing Entity, absence from more than 15% of meetings within a calendar year. Upon the formation of the Financial Advisory Board and thereafter, the Governor and the Mayor shall jointly designate a Member to serve as the Chair of the

Financial Advisory Board (the "Board Chair"). The Board Chair shall serve as such officer at the will of the Governor and the Mayor.

1.3    Compensation. Members shall be entitled to annual compensation in the amount of $25,000.00 (such compensation, the "Annual Compensation") during their terms of service, provided that (a) such Annual Compensation shall be payable in four equal installments on a quarterly basis, (b) such Annual Compensation shall be prorated as necessary in the event that a Member serves less than a full quarter for any reason, and (c) a Member may elect to serve without compensation by notifying the Board Chair of the election in writing within 30 days of his or her appointment and while serving without compensation shall not be considered employed by the Board, the City or the Treasury Department.

. All Members shall be entitled to reimbursement of actual, reasonable, necessary and documented expenses in accordance with applicable standards in force for State employees and appointees (including, but not limited to, expenses related to travel, meals and lodging) incurred in connection with their service as Members of the Financial Advisory Board (such expenses, the "Reimbursable Expenses"). The City shall be responsible for the payment of each Member's Annual Compensation, with 50% of each Member's Annual Compensation reimbursed by the Treasury Department. The City shall be responsible for the payment of each Member's Reimbursable Expenses of up to $3,000.00 each, with 50% of each Member's Reimbursable Expenses of up to $3,000.00 reimbursed by the Treasury Department. Reimbursable Expenses for each Member in excess of $3,000.00 may be 100% reimbursed by the Treasury Department but only with the approval of the State Treasurer. Reimbursement shall be made by the Treasury Department no later than the earlier of (a) 45 days after

the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made and (ii) incorporated in the Budget (defined below), provided that neither the State, the City, the Treasury Department nor any other entity shall be responsible for the payment of any Reimbursable Expense that is not evidenced by a copy of the corresponding receipt. The Financial Advisory Board shall adopt procedures and policies having the objective of using current technology, communication and other means to constrain Reimbursable Expenses to the extent reasonably practicable.

    1.3a  Standards of Conduct, Conflicts of Interest and Ethics

(a)    Members of the Financial Advisory Board are public officials in a position of public trust. Upon appointment, each Member shall take the constitutional oath of office under Article XI, § 1 of the State Constitution of 1963.

(b)    Members of the Financial Advisory Board are public servants subject to the provisions of Act 317, Public Acts of Michigan, 1968, as amended ("Act 317"), pertaining to contracts of public servants with public entities.

(c)    Within thirty (30) days of its initial meeting, the Financial Advisory Board shall adopt a Standards of Conduct, Conflicts of Interest and Ethics Policy ("Policy"). The Policy shall be designed to assure that governmental decisions are made in the public's best interest by prohibiting members of the Board and its employees and contractors from participating in matters that affect their personal or financial interests. The Policy shall be no less stringent than requirements under (a) Act 317; (b) Act 196, Public Acts of Michigan, 1973, as amended; and (c) Section 2-106 et seq. of the Charter. The Policy also shall include, without limitation, all of the following:

(i)     Provision for the reasonable disclosure of substantial financial interests held by any Member or employee of the Board who regularly exercises significant authority over the approval or renewal of any contracts.

(ii)    Standards of conduct designed to assure the ethical behavior of Members and employees and contractors of the Board.

(iii)   A Member or employee or agent of the Board shall discharge the duties of his or her position in a nonpartisan manner, with good faith, and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging the duties, a Member or an employee or agent, when acting in good faith, may rely upon the opinion of counsel for the Board, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Board or the City represented to the Member or employee or agent of the Board to be correct by the person having charge of its books or account, or stated in a written report by a certified public accountant or firm of certified public accountants fairly to reflect the financial condition of the Board or the City.

(iv)    A Member shall not make, participate in making, or in any way attempt to use his or her position as a Member to influence a decision providing a personal, family or business benefit to the Member.

(v)     A Member or employee or agent of the Board shall not engage in any conduct that constitutes a conflict of interest and shall immediately advise the Board Chair in writing of the details of any incident or circumstances that may present the existence of a conflict of interest with respect to the performance of the Board-related

work or duty of the member, employee, or agent. The Board Chair will immediately advise the Treasurer and the Mayor of any personal conflict of interest.

(vi)     A Member with a conflict of interest related to any matter before the Board shall disclose the conflict of interest before the Board takes any action with respect to the matter, which disclosure shall become a part of the record of the Board's official proceedings. The member with the conflict of interest shall refrain from doing all of the following with respect to the matter that is the basis of the conflict of interest:

(A) Voting in the Board's proceedings related to the matter.

(B) Participating in the Board's discussion of and deliberation on the matter.

(C) Being present at the meeting of the Board when the discussion, deliberation, and voting on the matter take place.

(D) Discussing the matter with any other Member.

(vii)     Members may not directly or as a result of their affiliation with other organizations do business with the City, have any contracts with the City, respond to any RFPs or seek or be seeking any no-bid contracts (pending or future), nor have immediate family or "close kin" relationships with officers or employees of the City.

(ix)     Members may not have or acquire financial interest in any property or asset owned by the City, nor have an interest in any provider of goods and services to the City, unless such interest comes through ownership of publicly-traded shares constituting not more than 0.1% ownership in such provider.

(x)     Members will be required to formally attest to their independence and understanding of the Standards of Conduct, Conflicts of Interest and Ethics Policy.

(xi)     Except as otherwise provided by applicable law, Members or employees or agents of the Board shall not knowingly:

-11-

A. Willfully or grossly neglect the discharge of his or her duties;

B. Use or disclose confidential information concerning the property, government or affairs of the Board not available to members of the public and gained by reason of his or her official position;

C. Engage in or accept private employment or render services when such employment or service is in conflict or incompatible with the proper discharge of his or her official duties or would tend to impair his or her independence of judgment or action in the performance of official duties;

D. Represent a private person, business or organization in any action or proceeding pending before the Board or the City or any office, department or agency thereof.

E. Vote or otherwise participate in the approval of any contract, or any other type of transaction, with any business entity in which he or she or an immediate family member has a financial interest; or

F. Use his or her official position, in violation of applicable law, to improperly influence a decision of the Board, the Mayor, City Council members, City Clerk, appointees or other City employees.

G. Attempt to influence any decision to fill a position in City government with an immediate family member.

(xii)    A Member shall not accept gifts, gratuities, honoraria, or other things of value from any person or company doing business or seeking to do business with the City or the Board, is seeking official action from the City or the Board, has interests that could be substantially affected by the performance of the person's official duties, except as specifically provided in the Policy.

-12-

(xiii)  The Policy may, by reference, incorporate ethics policies of the City that impact the Board.

(xiv)  By a vote of six members of the Board, the Board may waive a portion of this Policy on a case-by-case basis when the Board determines a waiver is in the public interest.

1.4  <u>Board Organizational Matters</u>.  The Financial Advisory Board may:

(a)  Adopt rules of procedure governing the conduct of its business, including, but not limited to, the (i) identification of the responsibilities of the Board Chair (which will include the role of chairing Revenue Conferences (defined below)), (ii) appointment of its officers as necessary and appropriate and (iii) adoption of specific procedures governing the Board's performance of its purposes described in this Agreement.

(b)  Hire, employ, appoint and/or supervise professional staff to assist in the completion of its duties and to assist State and local officials. The City shall be responsible for the payment of all reasonable fees and expenses incurred by the Financial Advisory Board in connection with such professionals' services up to an annual maximum of not more than $250,000.00 or such other amount as shall be agreed to by the City and the Treasury Department, with 50% of all such payments by the City to be (i) reimbursed by the Treasury Department no later than the earlier of (a) 45 days after the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made; and (ii) incorporated in the Budget (defined below).

(c)  Enter into contracts to assist in the completion of its duties and sue and be sued in its own name.

(d)  Obtain appropriate levels of insurance for its Members, including director and officer insurance or its equivalent. The Treasury Department shall be responsible for the payment of all reasonable premiums and expenses incurred by the Financial Advisory Board in connection with such insurance.

1.5  <u>Board Authority</u>.  Consistent with this Agreement and applicable law, the Financial Advisory Board shall have authority to do all of the following:

(a)  Recommend financial and operational metrics by which the City's financial performance and operations shall be monitored and evaluated consistent with best management practices for local government entities.

-13-

(b)     Monitor the City's financial and operational performance and the timely implementation of the Triennial Budget consistent with the terms of this Agreement and periodically advise the Governor, the Mayor, and the City Council of the Board's conclusions. Reports of the Financial Advisory Board under this subsection shall be made available to the public.

(c)     Evaluate the City's existing debt structure and recommend means of achieving rating and credit improvements; and, from and after July 20, 2012, receive from the Mayor, and review, assist, and advise prior to submission to City Council by the Mayor, (i) any material capital markets transaction (including transactions involving new or existing swaps) proposed to be entered into by the City (including, but not limited to, any proposed exchange offers), and (ii) any proposed changes to the City's debt structure or restructuring of the City's outstanding debt; and assist, advise and provide technical support to the City in respect to ratings presentations and other presentations to third-party capital markets participants.

(d)     With respect to debt instruments, securities, financing leases, installment contracts and other financial instruments or securities which are not otherwise subject to Treasury Department approval under Act 34, review and approve or disapprove the issuance of such instruments following City Council approval of appropriate authorizing resolutions or ordinances.

(e)     Provide assistance, advice and technical support to the City in respect of the Support Subjects and in the preparation of the City's annual proposed operating and capital budgets (any such budget a "Budget") and the Triennial Budget. The Budget shall be prepared on a consistent basis with the Triennial Budget.

(f)     As part of the Revenue Estimation process under Sections 3.1 and 3.2 of and Annex C to this Agreement, review and approve the Revenue Estimation, including any Set-Aside (defined below) for deficit reduction or budget stabilization, to be included in the Budget to be prepared by the Mayor.

(g)     Review, assist, advise and comment to the Mayor and City Council on the financial impact of (i) any proposed amendment or modification to any material contracts to which the City is party (including, but not limited to, the Support Subjects), (ii) any proposed sale of any material asset of the City, and (iii) any other proposed action by the City that could have a material impact on the financial condition of the City.

(h)     Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding any plan or proposed transaction related to the consolidation, disposition or elimination of City departments, including with respect to the impact of such transactions on the Triennial Budget.

(i)     Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding proposed changes to the organizational

-14-

structure of the City involving any positions appointed by or that report directly to the Mayor or City Council.

(j) Receive from the Mayor, and review, evaluate, analyze and comment on proposed judgment levies before submission to a court pursuant to Public Act 236 of 1961, the Revised Judicature Act of 1961.

(k) Monitor the performance by the City and the Treasury Department of compliance with this Agreement.

(l) Take remedial steps set forth in Section 6.3 of this Agreement in the event of a determination by the Board of a material breach of this Agreement under Section 6.2 of this Agreement; supervise the Program Management Director's (defined below) actions in the event of a Reform Default (defined below) as provided in Section 6.4 of this Agreement; and exercise the authority assigned to it by the Mayor and the City Council to take certain additional actions under this Agreement in the event of a material breach of this Agreement.

(m) Consent to the approval of City settlements of claims as provided in Section 5.1 of this Agreement.

1.6    Quorum and Voting.  A majority of the members of the Financial Advisory Board appointed and serving shall constitute quorum. Except as otherwise provided in this Agreement, the Financial Advisory Board may act by a majority vote of its Members present and voting, _provided_ that a declaration of a default under Section 6.2 of this Agreement or of a Reform Default under Section 6.4 of this Agreement shall require a majority vote of all Members then in office.

1.7    Meetings.  The Financial Advisory Board shall be subject to and comply with Act 267, Public Acts of Michigan, 1976, as amended, the Open Meetings Act.

1.8.    Procurement.    The Financial Advisory Board shall adopt rules and/or regulations governing its procurement practices.  As an intergovernmental entity, the Financial Advisory Board is not subject to City rules and/or regulations governing procurement activities or requirements applicable to procurement by State departments or agencies.  The City's and Treasury Department's aggregate obligation for all costs and expenses incurred by the Financial Advisory Board, inclusive of procurement, shall

-15-

not exceed $1,000,000.00 each per year unless otherwise expressly agreed to by the Mayor, the City Council and the Treasury Department.

    1.9.   <u>Taxes and Incurring Debt</u>.  The Financial Advisory Board is not authorized under this Agreement to levy any type of tax within the boundaries of the City or to in any way indebt the City, except as otherwise expressly authorized in this Agreement. The Financial Advisory Board is not authorized under this Agreement to in any way indebt the Treasury Department or the State.

## 2.    THE MAYOR AND CITY COUNCIL

    2.1   <u>Powers and Authority</u>.  The Mayor and the City Council shall continue to exercise all such powers, privileges and authorities as are granted to each under the Charter and applicable law.  The Mayor and the City Council each have determined, in the exercise of their discretion and in furtherance of the joint exercise of power and cooperative undertaking detailed in this Agreement, to restrain their respective exercise of powers, privileges and authorities in certain circumstances as provided in this Agreement.

    2.2   <u>Chief Financial Officer</u>.

    (a)   Within 7 days after the effective date of this Agreement, the Mayor shall create the position of Chief Financial Officer as a group executive within the executive office of the Mayor.  The Chief Financial Officer shall supervise all finance and budget activities of the City, shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor.  The Chief Financial Officer shall directly assist the Chief Operating Officer, the Program Management Director and other Directors, senior executive staff and financial staff on all strategic and tactical matters as they relate to budget management, financial management, financial reporting, cost benefit analysis,

forecasting needs, the securing of new funding, and adherence to the Budget and the Triennial Budget. The Chief Financial Officer shall be responsible for completing a comprehensive examination of the Budget in order to improve services and promote efficiency. The Directors of the Budget Department and the Finance Department shall report directly to the Chief Financial Officer. The Chief Financial Officer shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Chief Financial Officer shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving.

(b) Not more than 30 days after the creation of the position of Chief Financial Officer, the Mayor shall appoint a Chief Financial Officer from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have substantial experience with at least 2 of the following disciplines: (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, and (e) local government management with government units having aggregated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Chief Financial Officer. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Chief Financial Officer. In the event of a vacancy in the office of Chief Financial Officer, the Mayor immediately shall appoint an interim Chief

-17-

Financial Officer with substantially the same qualifications as required by this Section 2.2(b) for the Chief Financial Officer. Within 60 days of the occurrence of the vacancy, the Mayor shall appoint a successor Chief Financial Officer from a list of 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor as set forth above. The Chief Financial Officer from time to time may propose amendments to the projects, priorities and timing set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department. The Chief Financial Officer's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor and the City Council shall approve such amendments to the City's 2011-2012 Official Compensation Schedule (the "White Book") as necessary to reflect the agreed-to compensation.

2.3    Program Management Office; Director.

(a)    Within 7 days after the effective date of this Agreement, the Mayor shall create the Program Management Office within the executive office of the Mayor, headed by the position of Program Management Director as a group executive. The Program Management Office shall implement the Reform Program (defined below) projects set forth on Annex B, as amended and updated from time to time (the "Reform Initiatives" and each a "Reform Initiative"). The Program Management Director shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Program Management Director shall supervise each Reform Initiative and shall have primary responsibility for designing, developing, managing, implementing and executing each Reform Initiative, including acting in the place and stead of the Mayor and the City Council with respect to a Reform Initiative in the event that the Financial Advisory Board

-18-

finds a Reform Default of this Agreement in respect of a Reform Initiative, as provided in and subject to Section 6.4 of this Agreement. The Program Management Director shall coordinate implementation of the Reform Initiatives with the Chief Operating Officer and the Chief Financial Officer to minimize disruptions in City services resulting from the Reform Initiatives. The Program Management Director from time to time may propose amendments to the projects set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department.

(b)     Not more than 30 days of the creation of the position of Program Management Director, the Mayor shall appoint an individual as Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have not less than fifteen years' experience with 1 or more of (a) Support Subjects in the context of distress and transition environments, (b) complex, multi-dimensional governmental restructurings, or (c) local government management with government units having consolidated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Program Management Director. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Program Management Director.

(c)     The Program Management Director shall directly assist the Chief Operating Officer, the Chief Financial Officer and other Directors and senior executive staff, and shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Program Management Director shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to

-19-

the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving. In the event of a vacancy in the office of Program Management Director, the Mayor, within 60 days of the occurrence of the vacancy, shall appoint a successor Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. The Program Management Director's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor, and the City Council shall approve such amendments to the White Book as necessary to reflect the agreed-to compensation.

(d) The Program Management Director shall make periodic reports to the City Council, as requested by the City Council but no less often than monthly, in respect of the Reform Initiatives.

2.4    Implementation of Phase I Reform.

(a) The City desires to implement a number of actions in fiscal years 2012 and 2013 including, but not limited to, the development and implementation of the City's "Operational Reform Program" attached hereto as Annex B (the "Phase I Reform"). The Mayor and/or City Council may make modifications to Annex B from time to time, and shall promptly make modifications which are required to efficiently accomplish the Reform Program (defined below), including establishing measurable outcomes and metrics and establishing specific program timelines, with the approval of the Financial Advisory Board. In the event that the Mayor and City Council cannot agree to modifications to Annex B, the Financial Advisory Board may modify Annex B but only with the consent of either the Mayor or the City Council.

-20-

(b)    By approval of this Agreement, the City Council has approved of the "Operational Reform Program" attached hereto as Annex B and authorized its implementation. The City Council shall make such other changes in ordinances and resolutions and coordinate its staff as may be necessary or convenient to fully implement Annex B as contemplated by this Agreement, as well as approve other actions consistent with the Reform Program.

2.5.    Support of Phase I Reform.    Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the Phase I Reform actions taken by the City under Sec. 2.4:

(a)    Cash stabilization transaction:  The Treasury Department will assist with structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012.  The anticipated aggregate size of the refinancing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses.  Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

(b)    Technical and financial assistance:  The Treasury Department shall provide the City with technical assistance (which may include in-kind financial assistance) and support to the City in rapidly implementing the following information technology projects:

(1)    Completion of a payroll system upgrade.

(2)    Integration of budgeting, accounting and financial reporting systems.

(3)    Implementation of a new grants management system.

(c)    Income tax collection:  The Treasury Department will assist the City in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and

improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and distribution of the City income tax in conjunction with the collection and distribution of the State income tax.

(d)   <u>Legislative assistance</u>:  The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.4 (Phase I Reform) objectives, including, but not limited to legislation:

    (1)   Enabling PLD changes;

    (2)   Enabling Bus Rapid Transit legislation;

    (3)   If determined appropriate by the Financial Advisory Board, enabling the long-term funding of unfunded pension and other post-employment benefit liabilities.

    (4)   Enabling appropriations proportional to the City's progress in achieving Reform Initiatives.

The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase I Reform objectives.

2.6   <u>Implementation of Phase II Reform—Following Actions</u>. Consistent with Mayor's and City Council's development of the strategy, policies and long-term vision of a revitalized City and to preserve financial integrity, following the implementation of the Phase I Reform actions detailed in Section 2.4, the City intends to implement a number of additional actions (the "<u>Phase II Reform</u>"), including, but not limited to, the development and implementation of plans related to (a) the further consolidation, disposition or elimination of City departments, (b) grants management restructuring, (c) property management review, and (d) the implementation of "best practices" with respect to the City's pension and other post-employment benefits in consultation with the Financial Advisory Board and in furtherance of the long-term vision. (The Phase I

-22-

Reform and the Phase II Reform are referred to collectively in this Agreement as the "Reform Program.")

2.7 **Support of Phase II Reform.** Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the City's Phase II Reform actions taken under Sec. 2.6:

(a) Legislative assistance: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.6 (Phase II Reform) objectives, including but not limited to legislation enabling greater intergovernmental cooperation. The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase II Reform objectives.

(b) Health plan and post-employment benefits: The Treasury Department agrees to work cooperatively with the City in formulating options for statewide medical plan designs, retiree health care, and other post-employment benefits funding management and consolidation to achieve administrative simplicity and economies of scale.

(c) Demolition of structures: The Treasury Department, at the City's request, will provide technical assistance and support to the City in pursuing and administering federal grant funds to pay for the demolition of abandoned structures.

(d) Real estate management: The Treasury Department, at the City's request, will provide technical assistance and support in respect of the City's real estate management efforts.

2.8 Reporting Requirements.

(a) In addition to any other reporting requirements herein, the Chief Financial Officer shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding (a) the City's financial performance in respect of the financial and operational metrics recommended under Section 1.5(a) and (b) the City's adherence to the Budget and the

-23-

Triennial Budget. Any such updates shall be reported in writing to the Financial Advisory Board and the Treasury Department and shall be posted to the City's website.

(b)     In addition to any other reporting requirements herein, the Program Management Director shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding the status of Reform Initiatives and completion of Annex B projects. Any such updates shall be reported in writing to the Financial Advisory Board and shall be posted to the City's website.

(c)     Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall submit to the Treasury Department a detailed listing of all accounts payable in amounts of $250,000.00 or more, together with the total aggregate amount of all accounts payable, which are more than 30 days beyond each respective due date. For each detailed account payable, the listing shall specify the date upon which payment originally was due, the amount of the payment due including any accrued interest, the name of the person, business, unit of government, or other entity to which payment is due, and a proposed schedule for timely payment. The detailed listing required by this paragraph shall be in a format prescribed by the Treasury Department.

(d)     Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall prepare and maintain a forecast of monthly cash demands to meet the expenditures planned in the Budget. The cash flow forecast, prepared in a format acceptable to the Treasury Department, shall be updated and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month. A monthly report

-24-

of actual revenues and expenditures, prepared in a format acceptable to the Treasury Department, shall be prepared and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.

2.9    Appropriation; Limitation.    The Treasury Department's obligation to provide financial assistance in the form of money to the Reform Program under this Agreement shall at all times be subject to the mandate under Section 17 of Article IX of the State Constitution of 1963 that no money may be paid out of the state treasury except in pursuance of appropriations made by law.

## 3.    FINANCIAL AND BUDGET PROCESS; REVENUE CONFERENCES; TRIENNIAL BUDGET

3.1    Revenue Conferences; Conduct.

(a)  Consistent with Section 8-213 of the Charter, the Directors of the Finance Department, Budget Department, Auditor General and City Council's Fiscal Analysis Division shall hold a revenue estimating conference ("Revenue Conference") each January and July, or such other dates as shall be determined by the Board Chair of the Financial Advisory Board or agreed to by the participants in the Revenue Conference, for the purpose of arriving at a consensus estimate of revenues to be available for the then current fiscal year of the City and the next fiscal year beginning the following July 1st (such estimate, a "Revenue Estimation"). The Board Chair of the Financial Advisory Board or his or her designee and the Chief Financial Officer shall attend and participate in the revenue estimating conference. The Board Chair of the Financial Advisory Board shall set the meeting dates of the Revenue Conference and shall preside over the Revenue Conference or, in the absence of the Board Chair, the Chief Financial Officer

shall preside. The revenues under consideration shall include all general fund, solid waste fund, and risk-management fund revenues, revenues of enterprise agencies that require a general fund subsidy, and all other revenues of the City. The parties shall also compile and consider any and all outstanding delinquent receivables in the possession of City agencies, departments and entities and, in conjunction with Corporation Counsel, recommend to the Mayor, the Chief Financial Officer, the City Council and the Financial Advisory Board the most efficient means to collect this revenue, which may include collection procedures undertaken by the Law Department. Revenue Conference reports should adhere to the reporting standards recommended by the City Council's Fiscal Analysis Division except as otherwise determined by the Financial Advisory Board.

(b)     At or in connection with a Revenue Conference, the Revenue Conference may (a) take testimony from persons with municipal finance, budgetary, economic or related expertise and (b) request and receive from all public officers, departments, agencies and authorities of the City or the Treasury Department any assistance and information necessary to arrive at a Revenue Estimation (together with all other information considered by the Revenue Conference, such testimony, assistance and information, the "Revenue Estimation Evidence").

(c)     The Revenue Estimation shall include a determination by the Revenue Conference of the amount of revenue to be applied to reduce any accumulated deficit or, if there is no accumulated deficit, to a budget stabilization account (the "Set-Aside").

(d)     The Revenue Estimation, including any Set-Aside, shall be reviewed and approved by the Financial Advisory Board as provided in Section 1.5(f) and thereafter shall be effective and binding for the Budget period to which it applies.

-26-

(e)     For purposes of the City's fiscal year 2013 Budget, and in lieu of the foregoing procedure, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the applicable Revenue Estimation and Set-Aside, which shall be provided to the State Treasurer for approval in lieu of approval by the Financial Advisory Board.

3.2     Revenue Conferences; Limitation on Adjournment.     A Revenue Conference shall not be adjourned until the Board Chair, in the Board Chair's discretion, determines that either (a) a consensus regarding the Revenue Estimation based upon reasonable assumptions (economic and otherwise) has been reached or (b) sufficient Revenue Estimation Evidence exists to allow for a Revenue Estimation, despite any inability to reach a consensus with respect to such Revenue Estimation. A Revenue Estimation shall set forth discrete revenue estimates from each of the City's major revenue sources, in a form consistent with Treasury Department pronouncements, including all of the following: (a) property taxes; (b) income taxes; (c) casino gaming taxes; (d) State revenue sharing and other State grants; (e) federal grants; (f) licenses, fees, and permits; (g) interest income; (h) proceeds from the sale or lease of any City-owned assets; (i) operating transfers or reimbursements from other funds; and (i) other funds if required by the Charter. If a consensus cannot be reached with respect to a Revenue Estimation within 14 days after the beginning of the Revenue Conference, the Revenue Estimation Evidence shall be submitted by the Board Chair to the State Treasurer, who shall determine the Revenue Estimation, including any Set-Aside, for the upcoming Budget period.

3.3     Limitation on Mayor's Budget Proposal.  Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the Mayor shall not develop or propose

-27-

a Budget or any amendment to a Budget that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 (as defined below) or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

3.4    Limitation on City Council's Budget Approval.  Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the City Council shall not approve a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

3.5.    Budget Proceedings and Adoption.  The Budget adopted for each fiscal year for the City shall comply with the following requirements:

(a)    Subject to Sections 3.1 to 3.4 of this Agreement, each Budget shall be prepared and presented, and each appropriations act proposed by the City shall be adopted, in accordance with the provisions of Act 2, Public Acts of Michigan, 1968, as amended, the Uniform Budgeting and Accounting Act ("Act 2"), applicable provisions of the Charter, and Secs. 18-2-16 through 18-2-25 of the Detroit City Code, as amended from time to time.  The milestones for annual Budget adoption, including Revenue Conferences, are set forth on Annex C hereto.

(b)    Beginning with the first Budget adopted after the execution of this Agreement, the proposed Budget for each fiscal year shall be transmitted by the Mayor to the Financial Advisory Board not later than March 29 of each year.

-28-