(c)     During the period covered by any Budget, the Mayor shall propose such amendments to the existing Budget as are necessary (e.g., the reduction of budgeted expenditures under Section 3.6 of this Agreement; the adjustment of quarterly allotments) on a timely basis so as to prevent an expenditure from being made for which adequate revenues are unavailable or are projected to be unavailable (e.g., on account of a shortfall in actual revenue, or unusual or extraordinary expenditures) or otherwise to support the initiatives in the Triennial Budget. No amendments or modifications proposed by the Mayor to any proposed or approved Budget or approved by City Council shall become effective unless such amendments are consistent with the Triennial Budget, as certified by the Chief Financial Officer.

(d)     Each Budget shall be designed to ensure that the City shall not end the relevant fiscal year with an operating deficit in any fund (any such deficit, an "Operating Deficit"), provided that, upon the recommendation of the Financial Advisory Board, the Mayor shall have the authority to propose, and the City Council shall have the authority to approve, Operating Deficits proposed in Budgets or amendments thereto in the Financial Advisory Board's sole discretion.

(e)     If, during a fiscal year, it appears to the Mayor, the Chief Financial Officer or the City Council that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and other proceeds permitted by law, and will be insufficient to satisfy projected expenditures, the Mayor, within 30 days of notification of such revenue shortfall, shall present to the City Council the Chief Financial Officer's recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

(f)     During the term of this Agreement, no officer or employee of the City shall make or authorize any obligation or other liability (i) not authorized by the Budget or (ii) in excess of any amount authorized in the Budget unless approved by the Mayor and the Financial Advisory Board in compliance with applicable law.

(g)     If during a fiscal year the Chief Financial Officer becomes aware of a proposed contract, financial transaction or settlement of claim which, in the Chief Financial Officer's judgment, will have a material adverse impact on the Budget or on City's long-term ability to achieve and maintain Financial Stability, the Chief Financial Officer shall report the Chief Financial Officer's concerns respecting the proposed contract, transaction

-29-

or settlement to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department.

3.6 <u>Budget Reductions; Ordinance; Impasse</u>. Within 60 days of the effective date of this Agreement, the City Council shall adopt an amendment to the Finance and Taxation Ordinance or other appropriate provisions of the Detroit City Code providing that if the Chief Financial Officer reports to the Mayor, or if the Council Fiscal Analysis Director reports to the City Council and the Chief Financial Officer concurs, that expenditures during a fiscal year have exceeded or are likely to exceed appropriated levels, (i) the Mayor, consistent with Section 3.5(e) of this Agreement, shall submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit; and the City Council promptly shall amend appropriations to avoid the deficit; and further if City Council fails to so amend the appropriation ordinance to avoid the deficit within 30 days after the submittal of the proposed appropriation amendment, then the requested appropriation amendment submitted by the Mayor becomes effective; and further (ii) if the Mayor fails to so submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit within 30 days of notice by the Chief Financial Officer, the Council may introduce and adopt such an amendment on its own motion. The powers and actions authorized by this Section 3.6 shall be granted pursuant to MCL 141.1514a and MCL 141.1519(1)(b) to the extent necessary to implement this Section 3.6, but only to the limited extent and limited time necessary to implement this Section 3.6.

3.7 <u>Triennial Budget</u>. (a) As a means of addressing the City's fiscal imbalances and accumulated deficit and to permit continuous planning at least three

-30-

fiscal years in the future, beginning with fiscal year 2013 the City, in consultation with the Financial Advisory Board, shall develop and maintain a Triennial Budget for adoption by the City Council. The Triennial Budget shall contain specific and realistic operational metrics, expenditure reductions, revenue set-asides, or specific and realistic revenue enhancements, or any combination of them, in an amount sufficient to address, within a period of not to exceed 5 years, any current or accumulated deficit in any fund maintained by the City. The Financial Advisory Board may approve modifications to the period within which the accumulated deficit will be eliminated. In addition, the Triennial Budget shall provide for the liquidation of all significant inter-fund payables and receivables, not regularly settled, in not to exceed 5 years from the date of this Agreement. The Financial Advisory Board may approve modifications to the period within which the inter-fund payables and receivables will be settled. The Triennial Budget shall include details of the budget appropriation, reductions in employee salary, wages, employee retirement systems, other fringe benefits, debt retirement, and operating expenditures or revenue enhancements.

(b)     The initial Triennial Budget shall be prepared and adopted prior to the end of the Transition Period (defined below), or such other date determined by the Chief Financial Officer and reported to the Financial Advisory Board and the Treasury Department, and shall include the subjects set forth on <u>Annex A-1</u> hereto. When adopted by the City and approved by the Treasury Department, the initial Triennial Budget shall be attached as <u>Annex A-2</u> hereto. The Triennial Budget shall be a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140, provided that the Treasury Department shall review compliance with the Triennial Budget annually, and shall retain full discretion under law to annually approve

-31-

of or disapprove of the then-current Triennial Budget as a satisfactory deficit elimination plan.

(c)     Beginning with the City's fiscal year 2014 Budget, a copy of the proposed Triennial Budget shall be filed with the Treasury Department not later than April 12 of each year concurrently with submittal of the Mayor's annual Budget to City Council under the City's Finance and Taxation Ordinance. The City shall approve of and amend the Budget from time to time as necessary to give full effect to the Triennial Budget. The Chief Financial Officer shall have primary responsibility under the Mayor for the development of and adherence to the Triennial Budget. The Triennial Budget shall be posted on the City's website.

## 4.     COLLECTIVE BARGAINING AGREEMENTS

4.1     Authority. The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

4.2     Collective Bargaining Agreements; Restriction. The parties hereto agree that the Mayor shall not propose or execute, and the City Council shall not approve, any instrument which modifies, amends, extends, supplements or replaces the terms or conditions of, or is a successor agreement to, any collective bargaining agreement in effect as of the effective date of this Agreement or thereafter unless such modification, amendment, extension, supplement, replacement or successor agreement satisfies the requirements of Annex D as determined by the Financial Advisory Board or if a modification, amendment, extension, supplement, or replacement is required by law. For purposes of this Section 4.2, "collective bargaining agreement" includes an

-32-

arbitration award, excepting an arbitration award resulting from an arbitration proceeding concluded prior to the effective date of this Agreement.

    4.3   <u>Collective Bargaining Agreements; Approval</u>.  The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director.  Upon the prior approval of the Financial Advisory Board following consultation with the Program Management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program Management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3.

    4.4.  <u>Duty to Bargain</u>. It is the State Treasurer's determination pursuant to MCL 141.1514a(10) that beginning 30 days after the effective date of this Agreement, the City is not subject to Sec. 15(1) of Act 336, Public Acts of Michigan, 1947, as amended, MCL 423.215, for the remaining term of this Agreement.

-33-

## 5. PENDING LITIGATION REPORT

5.1 Report; Filing. Beginning on July 15, 2012, and continuing thereafter on a quarterly basis, the City's Law Department shall submit to the Financial Advisory Board a report (the "Pending Litigation Report") identifying all pending lawsuits or other legal actions or proceedings (including, but not limited to, lawsuits, actions or proceedings related to workers' compensation claims) to which the City is a party (any such lawsuit, action or proceeding, a "Pending Action"). Each Pending Litigation Report shall identify, with respect to each Pending Action: (a) all plaintiffs; (b) all defendants; (c) the court and judge before which the Pending Action is pending; (d) legal counsel representing the City (if other than the Law Department); (e) the specific cause(s) of action; (f) the length of time the Pending Action has been pending; (g) an estimate as to the budgetary impact upon the City (if any) from a disposition of the Pending Action unfavorable to the City; (h) the applicability of any liability insurance maintained by the City; (i) an assessment of the likely outcome of such Pending Action (which section of the Pending Litigation Report shall remain subject to any and all applicable privileges); and (j) any proposed settlement or disposition of any Pending Action. The City shall not settle or otherwise dispose of any Pending Action in an amount of $250,000.00 or more without the prior written consent of the Financial Advisory Board under Section 1.5(m) of this Agreement or, prior to the first meeting of the Financial Advisory Board, the State Treasurer. For purposes of the Pending Litigation Report, the Financial Advisory Board shall be the client of the City's Law Department and shall be entitled to the attorney-client privilege, the attorney work product privilege, and all other privileges and duties afforded to clients under the Michigan Rules of Professional Conduct.

-34-

## 6. DEFAULTS AND REMEDIES

6.1 <u>Obligations of the parties</u>. (a) The City, through its officers and the City Council and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement. Timely achievement of the Reform Program and performance of the financial and operational requirements set forth in this Agreement are of the essence of this Agreement. The Mayor and the City Council (and all departments, agencies and other entities organized within, and all officers acting on behalf of, the Mayor and the City Council, including in particular the Program Management Director and the Program Management Office) shall provide the Financial Advisory Board with access to all information, documentation and personnel as may be reasonably requested by the Financial Advisory Board from time to time, with respect to all matters related to the Reform Program and/or addressed in this Agreement. During the term of this Agreement, no officer or employee of the City shall knowingly (a) take any action in violation of the terms of, or shall fail or refuse to take any action reasonably required by, this Agreement; or (b) prepare, present or certify any information (including any projections or estimates) or report for the Mayor, the Chief Financial Officer, the Program Management Office, the City Council, the Revenue Conference or the Financial Advisory Board that is false or misleading in any material respect, or, upon learning that any such information is false or misleading in a material respect, shall fail promptly to advise the Financial Advisory Board or the Mayor, the Chief Financial Officer and the Program Management Director thereof. The parties intend that this Agreement may be deemed and function as an agreement entered into under MCL 141.1513.

-35-

(b)     The Treasury Department, through the State Treasurer and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement, consistent with applicable law.

6.2     _Material Breach; Default_. (a) For purposes of this Agreement, a breach of the obligations set forth in this Agreement, if uncured, shall be considered a material breach of this Agreement if, in the judgment of the Financial Advisory Board, the breach (i) materially impairs the timely and complete implementation of the Reform Program, (ii) materially impairs the Financial Advisory Board's ability to exercise its express responsibilities under this Agreement, or (iii) materially adversely affects the completion of 1 or more Reform Initiatives. Without limiting the foregoing, the obligations set forth in Section 1 (Financial Advisory Board), Section 2 (The Mayor and City Council), Section 3 (Financial and Budget Process; Revenue Conferences; Triennial Budget), Section 4.2, Annex B and Annex D shall be considered of primary importance in the achievement of the Reform Program whose performance is essential to the achievement of this Agreement's urgent public purposes.

(b)     If the Financial Advisory Board determines that a material breach of this Agreement has occurred or is occurring, the Financial Advisory Board shall immediately notify the Mayor, the City Council and the Treasury Department of its determination. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the material breach within 30 days, or, if the material breach is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department. The Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the cure or attempted cure by the

Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the material breach and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the material breach has been adequately cured. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement. A declaration that a default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

6.3 <u>Default; Remedies</u>. A declaration of default on account of a material uncured breach of this Agreement as provided in Section 6.2 may result in (a) the suspension by the Treasury Department of (i) discretionary State revenue sharing initiatives and agreements between the Treasury Department or the State and the City pursuant to Act 140 and/or (ii) Economic Vitality Incentive Program payments or other intergovernmental assistance between the Treasury Department or the State and the City pursuant to Act 140 and other applicable law, in each case to the extent permitted by law; (b) the withholding by the Treasury Department of approvals to enter the capital markets under Act 34; (c) accelerating or exercising other rights and remedies by the Treasury Department for collection of any existing loans from the State to the City under, e.g., Act 243 or other applicable law; (d) the filing of court proceedings by the Financial Advisory Board or the State Treasurer in the Circuit Court for Wayne County, Michigan, or the U.S. District Court for the Eastern District of Michigan seeking mandamus, an injunction, appointment of a referee, or other equitable relief consistent with the urgent public purposes of this Agreement so as to cause the obligations of this

-37-

Agreement to be fully and timely performed; (e) the placement by the State Treasurer of the City in receivership as provided in MCL 141.1515; and/or (f) other remedies available to the Treasury Department or under State law. The remedies provided in this Section 6.3 shall be cumulative.

6.4 <u>Program Management Director; Board; Reform Initiative Remedies</u>. Timely achievement of the Reform Program being of the essence of this Agreement, in addition to the other remedies provided in this Agreement, the City and the Treasury Department agree that the following provisions shall apply in respect of individual Reform Initiatives:

(a) If in the judgment of the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department a breach in the provisions of this Agreement, including the Annexes, has occurred or is imminently likely to occur which is materially frustrating or will materially frustrate the timely implementation of one or more Reform Initiatives (a "<u>Reform Default Condition</u>"), the Program Management Director shall provide written notice of the Reform Default Condition to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the Reform Default Condition within 30 days, or, if the Reform Default Condition is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.

(b) Upon receipt of the notice of a Reform Default Condition, the Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the

13-53846-swr   Doc 11-5   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 39 of 60   390
13-53846-tjt   Doc 2334-10   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 10 of
48

cure or attempted cure by the Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the Reform Default Condition and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the Reform Default Condition has been adequately cured so as to prevent a material breach of this Agreement respecting one or more Reform Initiatives. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement in respect of one or more Reform Initiatives has occurred (a "Reform Default"). A declaration that a Reform Default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

(c)     In the event of a determination of a Reform Default by the Financial Advisory Board, and immediately upon the approval of the declaration that a Reform Default has occurred, the Mayor shall be deemed to have delegated his executive authority with respect of the Reform Initiative or Initiatives for which a Reform Default has been declared, but only in respect of such Reform Initiative or Initiatives, to the Program Management Director; and the City Council, by approval of this Agreement, shall be deemed to have given full legislative approval and authority to proceed with the implementation and execution of such Reform Initiative or Initiatives, but only in respect of such Reform Initiative or Initiatives. The Program Management Director thereafter shall exercise all lawful authority of the City in respect of the accomplishment, implementation and execution of the Reform Initiative or Initiatives for which the Reform Default was declared, provided that the Program Management Director shall be under

-39-

the supervision of, and shall report frequently, but not less often than monthly, to the Financial Advisory Board, the Treasury Department, the Mayor and the City Council in respect of the Program Management Director's actions, and the Financial Advisory Board shall review and approve or disapprove the proposed actions of the Program Management Director, including specifically the approval of any contracts proposed to be executed by the Program Management Director. The powers and actions of the Program Management Director authorized by this Section 6.4(c) additionally shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i) to the extent necessary to implement this Section 6.4(c), but only to the limited extent and limited time necessary to implement this Section 6.4(c).

(d)     Upon the earlier of (i) the accomplishment of the Reform Initiative or Initiatives for which the Financial Advisory Board had declared a Reform Default or (ii) the elimination or cure of the event or condition which was the basis of the Reform Default, the Financial Advisory Board, upon the recommendation of the Program Management Director or on its own motion, shall, by majority vote, declare the Reform Default terminated. The Financial Advisory Board also may consider a declaration that the Reform Default is terminated upon petition by the Mayor or the City Council. Immediately upon such declaration, the executive authority of the Mayor and the legislative approval of the City Council temporarily empowering the Program Management Director in respect of the specific Reform Initiative or Initiatives shall be deemed restored to the Mayor and City Council and the grants under Section 6.4(c) shall be withdrawn.

6.5     Additional Forbearance by Treasury Department.     Provided that this Agreement remains in effect and there is no material failure to comply with, or adhere

-40-

to, this Agreement on the part of the City, the Treasury Department and the Financial Advisory Board shall forbear from exercising any of its respective remedies under Section 6.3.

6.6    Obligation Not Discharged by Contingencies.  The obligations of the City as expressed and agreed to herein are not subject to release or discharge due to any contingencies within the City's reasonable control, including, but not limited to, clerical errors, computer failures, late mailings or the failure to comply with reporting due dates or other scheduled due dates excepting due to adverse weather, acts of God, acts of third parties or compliance with court orders. If the due date for a report, listing or other document falls on a weekend or legal holiday, then the report, listing, or other document shall be due on the first day thereafter that is not a weekend or legal holiday.

6.7    Transitional Provisions.

(a)  The parties acknowledge that on account of inadequate systems and other operational constraints, the City will be unable to satisfy the reporting and budgeting requirements set forth in this Agreement as of the effective date of this Agreement. The parties agree that from the effective date of this Agreement until 60 days after the date that the Chief Financial Officer commences serving (the "Transitional Period"), the City will make every effort to comply with the reporting requirements set forth in this Agreement, but any failure to comply with the any such reporting requirements during the Transitional Period shall not be deemed to be a material breach of this Agreement.

(b)    The parties acknowledge that as of the effective date of this Agreement and during the Transitional Period, the City will be in the midst of its budget preparation process for the fiscal year 2013 Budget, and that therefore the Budget provisions of this Agreement, including the responsibilities of the Financial Advisory Board and the

adoption of the initial Triennial Budget, cannot be fully accomplished for the fiscal year 2013 Budget. The City and the Treasury Department agree that during the Transitional Period, the City will make every effort to comply with the Budget process requirements set forth in this Agreement, and any failure to comply with any such Budget process requirements during the Transitional Period may be waived by the State Treasurer. Until the Board Chair of the Financial Advisory Board has been appointed and the Chief Financial Officer has commenced serving, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the Revenue Estimation for fiscal year 2013, and State Treasurer shall approve of the Revenue Estimation in lieu of the Financial Advisory Board under Sections 3.1 and 3.2 of this Agreement, which shall form the basis of the Mayor's proposed fiscal year 2013 Budget submitted pursuant to Section 3.3 of this Agreement and the City Council's approved fiscal year 2013 Budget pursuant to Section 3.4 of this Agreement. Notwithstanding the provisions of this Section 6.7(b), the Mayor and the City Council shall fully perform their respective obligations under Act 2 and the Charter in respect of the fiscal year 2013 Budget preparation and shall cause the fiscal year 2013 Budget and the 2013 general appropriations ordinance to be in effect as of July 1, 2012. During the Transitional Period, the Mayor shall not propose, and the City Council shall not approve, a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that reflects revenues in excess of, or collected from sources not included in, the applicable Revenue Estimation, net of any Set-Aside, for the 2013 Budget year.

7.     **AMENDMENT; WAIVER OF PROVISIONS**

7.1     <u>Amendment; Waiver.</u>  This Agreement and the Annexes hereto may be amended only in writing by the mutual consent of the Financial Advisory Board, the

-42-

State Treasurer and the City (or their respective successors or permitted assigns), evidenced by all necessary and proper authority. By agreement of the parties, the Financial Advisory Board, in its sole discretion, may waive or forbear from any provision of this Agreement that requires an act by the City, provided that, for the avoidance of doubt, no entity other than the Financial Advisory Board shall be permitted to waive or forbear from any provision hereof that otherwise relates to a power reserved for the Financial Advisory Board. No waiver of or forbearance from any provision of this Agreement shall arise from any action or inaction of the Financial Advisory Board, except pursuant to an instrument in writing expressly waiving or forbearing from the provision executed by the party entitled to the benefit of the provision. The parties anticipate that Annex B to this Agreement will be amended and updated from time to time to reflect the dynamic nature of the Reform Program. Amendments to Annex B may be adopted by the Mayor and City Council with the approval of the Financial Advisory Board, as set forth in Section 2.4(a) of this Agreement. Amendments to Annex B may be proposed by the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department.

8. **DURATION OF AGREEMENT; RELEASE**

   8.1 _Duration of Agreement; Termination; City's Release from Obligations_. This Agreement shall remain in effect until both of the following occur ("Financial Stability"):

   (a)     The date of the earlier of:

   (i)     the end of the third consecutive fiscal year of the City in which each of the following conditions have been satisfied: (A) the City's audited financial statements indicate, on the basis of accounting

-43-

principles generally accepted in the United States, that the City general fund, excluding any revenues derived from borrowed funds, is not in a deficit condition; and (B) the City's accumulated deficit has been eliminated; or

 (ii) the City has achieved and maintained for at least two consecutive calendar years a credit rating by two or more nationally recognized securities rating agencies (without regard to any third party credit enhancement) on the City's outstanding long-term unsubordinated debt in any of the four highest long-term debt rating categories of such rating agency (BBB/Baa or higher), without regard to any refinement or gradation of such rating category by numerical modifier or otherwise; and

 (b) The date that the State Treasurer certifies to the Governor that no material condition exists within the City, and that no action has been taken, or is being contemplated, by City officials, that would (A) implicate the need for a deficit elimination plan under Sec. 21 of Act 140, excepting for fund deficits of an immaterial nature; or (B) require implementation of the Treasury Department's authority under Sec. 802 of Act 34.

 (c) The Mayor, with the approval of the City Council, may apply to the Financial Advisory Board to be released from the terms and conditions of this Agreement. If the financial conditions set forth in Section 8.1(a) and (b) have been satisfied by the City, the Financial Advisory Board shall release the City from the terms and conditions of this Agreement.

 (d) Notwithstanding the provisions of subsections 8.1(a), (b) and (c) of this Section 8.1, this Agreement shall be earlier terminated by the Financial Advisory Board, with the consent of the State Treasurer, if requested by the Mayor and the City Council on behalf of City or by the Treasury Department.

-44-

9. **CONTINUING EFFECT; EMPLOYEES; SEVERABILITY**

9.1 <u>Continuing Effect</u>. This Agreement shall remain in effect until terminated or until the Financial Advisory Board has released the City from the terms and conditions of this Agreement pursuant to Sections 8.1(c) or 8.1(d).

9.2 <u>Joint Exercise of Power; Transfer</u>. While this Agreement represents a joint exercise of power by the City and the Treasury Department, this Agreement does not transfer functions or services from the City or the Treasury Department to the Financial Advisory Board. Nothing in this Agreement prohibits the City from subsequently entering into a contract with the Financial Advisory Board for the transfer of functions or services from the City to the Financial Advisory Board, to the extent authorized under 1967 (Ex Sess) PA 8, as amended, MCL 124.531 to 124.536. The City and the Treasury Department intend that this Agreement be construed as an agreement between the City and the Treasury Department authorized under Act 7, Public Acts of Michigan, Extra Session of 1967, as amended, the Urban Cooperation Act of 1967, with the exception of the provisions of this Agreement authorized solely under MCL 141.1501 to 141.1531.

9.3 <u>Employees</u>. In no event shall this Agreement direct, permit or enable the transfer of employees or groups of employees from the City to the Financial Advisory Board or otherwise to merge or create a "workforce" of the Financial Advisory Board.. Nothing in this Agreement creates an employment relationship between the employees of the City or the Treasury Department and the Financial Advisory Board. The City shall function as the employer of personnel and staff of the City needed for the joint exercise of power under this Agreement. The Treasury Department shall function as the employer of personnel and staff of the Treasury Department needed for the joint

-45-

exercise of power under this Agreement. The Financial Advisory Board shall function as the employer of any personnel and staff of the Financial Advisory Board not otherwise employed by the City or the Treasury Department needed for the joint exercise of power under this Agreement. No employees of the City or the Treasury Department are transferred from the City or the Treasury Department to the Financial Advisory Board under this Agreement.

9.4 _Management and Direction_. The Financial Advisory Board has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Financial Advisory Board performed or exercised by the Financial Advisory Board under this Agreement. The City has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the City performed or exercised by the City under this Agreement. The State Treasurer has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Treasury Department performed or exercised by the Treasury Department under this Agreement. The functions or services of the Financial Advisory Board, the City, and the Treasury Department, respectively, under this Agreement are deemed to be in the interests of the public health, safety and welfare, and the accomplishment of the objectives of this Agreement is an urgent public purpose.

9.5 _Severability_. If any provision of this Agreement, or its application to any person, party or circumstance, is determined to be invalid or unenforceable for any reason, the remainder of this Agreement and its application to other persons, parties or circumstances shall not be affected and shall remain enforceable to the full extent permitted by law. On account of the urgent public purpose and the protection of the

-46-

public health, safety and welfare sought to be accomplished by this Agreement, It is the intent of the parties to continue to implement the provisions of this Agreement, in whole or in part, to the fullest extent possible under applicable law.

## 10. COUNTERPARTS

10.1 Counterparts; Signatures. This Agreement may be executed in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Execution may be accomplished by delivery of original or electronic copies of the signature page hereto (e.g., by facsimile or email).

## 11. EFFECTIVE DATE

11.1 Effective Date. The effective date ("Effective Date") for this Agreement and the joint exercise of power under this Agreement shall be the date on which the last of all of the following have occurred: (a) the Agreement is approved and executed by the Mayor; (b) the Agreement is approved by the City Council, (c) the Agreement is approved and executed by the State Treasurer; (e) the Agreement is approved by the Governor; (d) the Agreement is filed with the Clerk for the Charter County of Wayne, Michigan, (e) the Agreement is filed with the Clerk for the County of Ingham, Michigan; and (f) the Agreement is filed in the Office of the Great Seal, Michigan Department of State.

IN WITNESS WHEREOF, the parties, by their designated representatives, have signed and executed this Agreement on this 4th day of April, 2012.

**ON BEHALF OF THE CITY OF DETROIT:**

_____
Kirk J. Lewis, Deputy Mayor  (Acting As Mayor)


_____
Dave Bing, Mayor




**ON BEHALF OF THE MICHIGAN DEPARTMENT OF TREASURY:**

_____
Andy Dillon, State Treasurer

Consistent with my duty under Section 8 of Article V of the State Constitution to take care that the laws be faithfully executed, I find that this Agreement is in proper form, and is compatible with the laws of the State of Michigan.

Dated: 4/5/12

Richard D. Snyder, Governor

## CERTIFICATION

I, Janice M. Winfrey, City Clerk for the City of Detroit, hereby certify that the foregoing Agreement has been duly authorized by resolution adopted by the City Council of the City of Detroit, County of Wayne, State of Michigan, at a Special Session held on April 4, 2012, that said resolution remains in effect, and that the foregoing meeting was conducted and public notice of said meeting was given pursuant to and in full compliance with the Open Meetings Act, being Act 267, Public Acts of Michigan, 1976, and that the minutes of said meeting were kept and will be or have been made available as required by said Act.

Janice M. Winfrey, City Clerk

Date of Certification: April 9, 2012

Time of Certification: 4:27 , p.m.

-2-

**BY THE FINANCIAL REVIEW TEAM FOR THE CITY OF DETROIT:**

_____
Andy Dillon

_____
Glenda D. Price

_____
Frederick Headen

_____
Irvin D. Reid

_____
Jack Martin

_____
Doug Ringler

_____
Conrad Mallett, Jr.

_____
Shirley R. Stancato

_____
Isaiah McKinnon

_____
Brom Stibitz

**APPROVED AS STATE FINANCIAL AUTHORITY:**

_____
Andy Dillon, State Treasurer

4-4-12

-3-

## ANNEX A-1

The Triennial Budget and General Appropriations Act shall, at a minimum, include all of the following:

(a) A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that, subject to exceptions, the City's general fund expenditures will not exceed its general fund revenues and that any existing deficits will be eliminated during the projected budget period.

(b) A cash flow projection for the budget period.

(c) An operating plan for the budget period.

(d) A plan showing reasonable and necessary maintenance and capital expenditures for the budget period.

(e) An evaluation of the costs associated with pension and postemployment health care obligations for which the City is responsible and a plan for how those costs will be addressed over the budget period.

(f) A provision for submitting quarterly compliance reports to the Financial Advisory Board demonstrating compliance with the Triennial Budget.

The Triennial Budget shall be updated annually as part of the approval of the annual Budget under Act 2 and the Charter.

-4-

## ANNEX A-2

*[Initial Triennial Budget to be included pursuant to Section 3.7(b) upon approval following appointment of CFO]*

## ANNEX B

### City's Operational Reform Program

**(Prioritization and timing to be mutually agreed upon by Mayor and Council and approved by Financial Advisory Board as provided in the Agreement)**

1. Public safety initiatives;

2. Lighting Department Changes;

3. DDOT Changes;

4. Income tax collection;

5. Implementation of payroll system upgrade if needed – following a review of other options that streamline payroll process and implement;

6. Implementation of new grants management system to streamline requisition and monitoring process of grants;

7. Integration of budgeting, accounting and financial reporting system with appropriate process mapping;

8. Demolition of structures;

9. Implementation of medical and pension changes;

10. Labor reform to streamline and consolidate number of collective bargaining agreements into single template and evaluating integration with statewide plans as available;

11. Health and Wellness Department changes;

12. Human Services Department changes;

13. Real estate management;

14. Workers Compensation Reform;

15. Employee Training;

16. Bank Project to improve AR and AP process;

17. Fire Authority review;

18. Permits;

19. Planning and Development to DEGC;

20. Claim/Risk Management for reducing claims costs;

21. Long-Term Liability Restructuring;

-6-

## ANNEX C

### Revenue Estimation and Budget Approval Calendar

| Date (on or before) | Action |
|---|---|
| December 8 | All officers, departments, commissions and boards of the City are required to transmit to the Budget Director their estimates of the amounts of money required for each activity within their respective Departments for the ensuing fiscal year. |
| January 31* | Semi-annual Revenue Conference |
| February 22 | The Budget Director shall transmit to the Mayor an estimated Budget showing the Budget Director's estimate of the total amount of money required to be raised for each of the City's funds. |
| March 15 | Revenue Estimation for next fiscal year established by Financial Advisory Board following Revenue Conference. |
| March 29 | The Mayor shall complete a revision of the Budget and return the Budget to the Budget Director for tabulation. |
| | The Mayor shall submit the proposed Budget and Triennial Budget to Financial Advisory Board |
| April 12 | The Mayor shall transmit the Budget (including Triennial Budget) to City Council. |
| | The Mayor shall transmit the Triennial Budget to the Treasury Department. |
| May 24 | The City Council shall complete its consideration of the Budget. |
| May 27 | The City Council shall transmit the Budget to the Mayor for the Mayor's approval or rejection. |
| May 27 + 3 business days | The Mayor shall return the Budget to the City Council with the Mayors' approval, or, if the Mayor shall disapprove the whole or any item or items, with a statement of reasons for the disapproval. |
| Later of 3 calendar days or 2 business days following maximum return date of the Budget by the Mayor | The City Council shall act upon any item that shall have been disapproved by the Mayor. |
| July 1 | Beginning of Fiscal Year |
| July 31* | Semi-annual Revenue Conference |

\* Or as otherwise determined by the Revenue Confernce or Financial Advisory Board

-7-

## ANNEX D

### Required Provisions of Collective Bargaining Agreements

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012. The newly negotiated agreements shall include among other items the following terms and conditions, which shall set the pattern for future agreements:

1.    Uniformity goal: All new labor agreements will be structured so as to achieve the goal of creating a common base form of agreement enabling a known, measurable basis for cost evaluation and comparison.

2.    Joint committees, if any, will be patterned in structure and role after the committees included in the contracts recently negotiated between the State and unions representing State employees.

3.    Outsourcing will be permitted where service improvements or cost savings can be achieved. Language shall require the City to provide advance notice of competitive bids to its Unions and enabling Unions to bid on the work.

4.    Departmental consolidation shall be permitted where service improvements or cost savings can be achieved.

5.    There may be no snap-back provisions during the term or at expiration of the agreement. Wage increases shall be subject to negotiation.

6.    New hires will have a defined contribution retirement health care benefit.

7.    Merit-based promotions shall be permitted for certain key positions (specific positions to be defined by the common agreement form).

8.    Current resources should be maximized, therefore to exercise bumping rights an employee must have current or prior year service in the classification into which they are bumping and employees shall be permitted to work outside their classification.

9.    Existing favorable concessions negotiated in the TAs shall remain, especially those dealing with wages, benefits and pension multipliers, as approved by the Project Management Director, Labor Relations Director, and the Financial Advisory Board.

10.    Multi-year term of the new agreement to be determined by the Labor Relations Director, Project Management Director, and Financial Advisory Board as required to support the City's financial restructuring.

11.    Dispute resolution procedures shall be made simpler and the process expedited to achieve predictability for both sides.

12.    The parties will agree to address work rule modifications during the first year of the new agreement where changes will support the City's financial restructuring, achieve efficient use of labor resources, and/or improve cost-effective service.

-8-

## SUPPORTIVE ACTIVITIES OF TREASURY DEPARTMENT AND STATE

### Introduction

The Treasury Department and the State remain committed to the overall growth and health of Michigan cities, and particularly so with the city of Detroit, the State's largest municipality. Ways to ensure this growth and health are emerging through a number of supportive initiatives.

Supportive activities already in process include:

### Improve Quality of Life and Safety for Detroiters

- *Street lighting* – Improve public lighting by working with the city to create a separate authority to manage and finance streetlights. State legislation can create a new option for separate governmental authorities (similar to those for sewers) that allow for independent bonding authority against revenue as well as general funds. Detroit can then create such an entity to make financing more attractive to bondholders and thus lower the overall cost of the upgrades. This group would also have to develop multi-year lighting plans with the revenue to support them.
- *Law Enforcement* – As discussed in the governor's public safety message, over the next two years MSP will graduate two trooper classes – meaning approximately 180 troopers will be added, and will support our strategy to increase law enforcement resources in four Michigan cities, including Detroit.
- *Demolition* – Streamline, coordinate and accelerate demolition activities in the city.
- *Land Stewardship* – Improve the state's stewardship of its own land in the city with an emphasis on redevelopment, including undertaking a full review to determine what land can be redeveloped effectively and responsible ways to transition other parcels to successional landscapes.
- *Client Service* – The state will continue to enhance its presence within the city to better serve the client base for both DHS assistance and unemployment insurance.
- *Auto insurance* – Reduce auto insurance costs for residents through the Michigan Automobile Insurance Placement Facility, creating a base rate that reflects a more neutral score, resulting in noticeable rate reductions.

### Enhance Education

- *K-12* – Ensure a quality school for every Detroit child through continued reforms of DPS, a strong start for the Education Achievement Authority, and support for Excellent Schools Detroit. Continue to drive a philanthropic agenda to provide post-secondary scholarship funding to Detroit graduates.
- *Early Childhood Education* – Ensure high quality early childhood education through a partnership with the Office of Great Start and increased collaboration with private and non-profit entities involved in providing these services to Detroiters.
- *Foundations for Learning* – Provide better access to services that enhance a child's learning process by moving DHS family independence specialists out of county offices and stationing them within 50 Detroit elementary schools. This will help eligible families access resources immediately, before barriers such as transportation, child care, housing instability, food insecurity, and access to healthcare impede a child's learning process.

**Invest in Transportation Infrastructure**

- Move ahead with the New International Trade Crossing project.
- Expand and facilitate the Detroit Intermodal Freight Terminal, ensuring that southeast Michigan has regional facilities with sufficient capacity and interconnectivity to provide for existing and future intermodal demand and reducing time, monetary costs, and congestion.
- Establish the authority and board for, and develop a funding mechanism for, the new Regional Transit Authority. Invest in a regional, multi-modal system including BRT, bike paths and walkability.
- Working with CN and Amtrak, create a commuter rail station and stop at the former state fairgrounds, expand the West Grand Blvd. station to include better facilities for transfers and assist in the rebuilding of the Royal Oak and Troy stops.
- Accelerate a capacity improvement project for I-94 from I-96 to Conner Avenue, supporting more than 13,000 jobs between 2012 and 2020.
- Complete final engineering and start construction this summer for the West Detroit Junction Railroad Project to provide a shorter, faster route for intercity passenger trains, relieve congestion for freight trains, and help lay the groundwork for future commuter rail service between Ann Arbor and Detroit.

## Invest in Physical Assets and Economic Drivers

- *Citywide –*
  - o Consolidate the planning and economic development functions for the city within the Detroit Economic Growth Corporation to avoid duplication, enable the development of unified strategy and execution, and simplify the process for new economic development within the city.
  - o Coordinate and/or consolidate the state, Wayne County and city land banks to ensure the creation and execution of a common plan.
  - o Devote $3 million of state funds to clearing title on parcels identified by DEGC to ready them for speedy economic development.
- *Eastern Market –* Contribute to the revitalization of Eastern Market by investing in the conversion of Shed 1 (including incubator kitchens, entrepreneurial training, and business start-ups) and the renovation of Shed 5 into a full-scale grocery. Position the market as a Regional Food Innovation Cluster, focusing on science, technologies and enhanced management practices that will reshape food production and business. Assist the market in applying for a federal TIGER grant to create a seamless trail system from the Riverfront through the Eastern Market, Brush Park, and Wayne State University areas.
- *Riverfront –* Develop the Globe Building, expand Milliken State Park, dedicate a new launch for citizens near Riverfront Park and assist DEGC with resources and talent to transform Hart Plaza.
- *Belle Isle –* Create park funding for Belle Isle while ensuring continued City ownership by designating Belle Isle as a part of a cooperative relationship with Milliken State Park. This would include a long-term lease that would accrue the cost of the park's maintenance and improvements out of the Park Endowment Fund. We will partner with Belle Isle Conservancy and the City to implement a master plan for the Island.
- *Fairgrounds –* Transfer ownership of the former state fairgrounds to the State Land Bank and create a neighborhood and commercial center on the site.
- *Cobo Center –* Encourage its continued expansion in coordination with the Metropolitan Detroit CVB, and support improvements.

- *Midtown* – Continue to be a key partner in local efforts to create a Regional Innovation Cluster in Midtown through MEDC investments in the incubation and growth of small business, as well as support for residential, commercial and retail development projects.
- *Community Ventures* – A public-private partnership will identify employers willing to create new jobs and organizations that can provide training and other job readiness services for the structurally unemployed. For the first time, state agencies like MEDC, Workforce Development Agency and Department of Human Services will bring together employers, job readiness partners and private funders in a comprehensive and measurable program to assist young people aged 15 to 29 and ex-offenders. The outcome will create new, long-term jobs in Detroit.
- *Detroit-Focused Economic Gardening* – Use a comprehensive set of tools for accelerating entrepreneurship, business growth, access to capital, placemaking and talent enhancement.
- *Detroit Works Project* – Support concentrated services of blight elimination and rehabilitation for four city-targeted neighborhoods contiguous to important economic development anchors. This will be supported through coordination with MSHDA's Neighborhood Stabilization Program and the MEDC's Community Revitalization Program.

## Improve Detroit's Capacity to Collect Tax Revenues

- Enhance city revenue collection capacity as requested by city of Detroit through technical assistance for collections, audit and city income tax administration.
- *Create a common assessment template* – Move the property assessment function from the city to the county to allow for efficiencies, commonality of method and improvements in communication between taxing entities as well as between property owners.

## Municipal Assistance/Services Authority

- The Department of Treasury will partner with municipal governments in this state to establish the Municipal Assistance/Services Authority. The Authority will function as a center of best practices for the delivery of local government services and provide enhanced opportunities for local governments in Michigan to engage in service sharing and consolidation of activities, with State support.

-11-

# **EXHIBIT F**

3500 (Rev. 01-11)



STATE OF MICHIGAN
## DEPARTMENT OF TREASURY

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:**     December 14, 2012

**TO:**       Rick Snyder, Governor

**FROM:**     Andy Dillon, State Treasurer

**SUBJECT:**  Preliminary Review of the City of Detroit

### I. Background

On December 11, 2012, the Department of Treasury commenced a preliminary review of the finances of the City of Detroit to determine whether or not a serious financial problem existed. Section 12(1) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, requires that a preliminary review be conducted if one or more of the conditions enumerated therein occurs.[1] The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivision (j) and (k) of Section 12(1) having occurred within the City.[2]

As summarized below, based upon information received and considered as part of the preliminary review, I conclude that a serious financial problem does exist in the City of Detroit and recommend appointment of a financial review team. Appointment of a financial review team is a prerequisite step in the Act 72 process to the appointment of an emergency financial manager.

### II. Preliminary Review Findings

The preliminary review found the following:

- The City has violated requirements of Section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, as amended, which provides that local officials monitor and

---

[1] The City presently is subject to a consent agreement in the form of the Financial Stability Agreement which was executed on April 4, 2012. The Financial Stability Agreement was executed pursuant to Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, and various other Acts. Subsequently, Act 4 was disapproved by voters at the November 2012 general election. The Attorney General's Office concluded in Opinion No. 7267 that, as a result of the disapproval of Act 4, Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, was revived. Various Michigan courts have concurred in this conclusion. Therefore, it is under Act 72 that this preliminary review was conducted.

[2] Subsection (j) provides that "[t]he local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general." Subsection (k) provides that "[t]he local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan."

promptly amend an adopted budget to the extent necessary to prevent deficit spending. For example in the General Fund for the year ending June 30, 2011, the insurance premium line item exceeded its budget by more than $6.7 million, the adjustment and undistributed costs line item exceeded its budget by more than $8.0 million, and the fire fighting operations line item exceeded its budget by more than $21.0 million. As a result of these, and other, line items, the General Fund had line items that exceeded its budget by more than $97 million.

- As has been shown above, City officials have violated requirements of Section 18 of Public Act 2 of 1968, as amended, which states that "[a]n administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body. The chief administrative officer, an administrative officer, or an employee of the local unit shall not apply or divert money of the local unit for purposes inconsistent with those specified in the appropriations of the legislative body." City officials have also violated requirements of Section 19 of Public Act 2 of 1968, as amended, which states that "[a] member of the legislative body, the chief administrative officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general appropriations act. An expenditure shall not be incurred except in pursuance of the authority and appropriations of the legislative body of the local unit."

- The City has also experienced cash flow problems throughout the 2010 and 2011 fiscal years some of which have been alleviated by the issuing or refinancing of debt. The City has projected possibly depleting its cash prior to its June 30, 2013 fiscal year end. However because of inherent problems within the reporting function of the City, the projections continue to change from month to month making it difficult to make informed decisions regarding its fiscal health. For example, a cash flow estimate in August projected a June 2013 cash deficit of $62 million while estimates for October and November projected deficits of $84 million and $122 million respectively. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In turn, such compliance requires the ability to produce timely and accurate financial information which City officials have not been able to produce.

- The City has incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41 million from a June 30, 2010 amount of $155 million to a June 30, 2011 amount of $196 million and is projected to increase even further for 2012, which would not have happened if the City had complied with its budgets.

City officials have not filed an adequate or approved deficit elimination plan with the Department of Treasury for the fiscal year ending June 30, 2011. On December 27, 2011, City officials filed an audit report that reflected a $196 million cumulative deficit in the General Fund, a $97 million cumulative deficit in the Transportation Fund, and a $17 million cumulative deficit in the Automobile Parking Fund.

As can be seen in Table 1 on the following page, the City has experienced cumulative General Fund deficits that have exceeded $100 million dating back to 2005. These deficits have fluctuated between $155.4 million and $331.9 million. One of the primary methods the City

Governor Snyder
December 14, 2012
Page 3

has used to reduce the deficits has been to issue more debt. Total General Fund debt and other long-term liability proceeds for the years between 2005 and 2011 was over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

Table 1
General Fund Deficits and Debt Proceeds

| Year | Actual Deficit | Debt Proceeds | Approximate Cummulative Deficit Without Debt Proceeds* |
|------|----------------|---------------|--------------------------------------------------------|
| 2005 | $(155,404,035) | $ 248,440,183 | $ (403,844,218) |
| 2006 | (173,678,707) | 34,892,659 | (457,011,549) |
| 2007 | (155,575,800) | | (438,908,642) |
| 2008 | (219,158,138) | 75,210,007 | (577,700,987) |
| 2009 | (331,925,012) | | (690,467,861) |
| 2010 | (155,692,159) | 251,663,225 | (765,898,233) |
| 2011 | (196,577,910) | | (806,783,984) |

* Represents what the deficit would have been without the issuance of additional debt. The approximate amount would be reduced if subsequent debt service payments were added back in.

For the City on a whole (excluding component units), there was a 2011 unrestricted net assets deficit of almost $1.6 billion.[3]

---

[3] Net Assets are calculated on the government-wide financial statements that use the accrual basis of accounting and include such items as capital assets and long-term debt. The unrestricted amount measures the net assets that are appropriable for expenditure and are not legally segregated for a specific future use.

# **EXHIBIT G**

3500 (Rev. 4-06)



STATE OF MICHIGAN
**DEPARTMENT OF TREASURY**
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:** February 19, 2013[1]

**TO:** Governor Snyder

**FROM:** Detroit Financial Review Team:
Andy Dillon
Darrell Burks
Ronald E. Goldsberry
Frederick Headen
Thomas H. McTavish
Kenneth Whipple

**SUBJECT:** Report of the Detroit Financial Review Team

The Detroit Financial Review Team met on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, and February 1st, 14th, and 15th 2013, to review information relevant to the financial condition of the City of Detroit. Based upon those reviews, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Accompanying this report is supplemental documentation in support of our conclusion.

Our conclusion is based primarily upon the following considerations:

1. <u>Cash Crisis.</u> The City continues to experience a significant depletion of its cash. Projections have estimated a cumulative cash deficit in excess of $100.0 million by June 30, 2013, absent implementation of financial countermeasures. While the Mayor and City Council deserve credit for considering and, in some instances, adopting difficult financial reforms, those reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

---

[1] Pursuant to Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, a Review Team is required to report its findings to the Governor within 60 days of its appointment, unless the Governor specifies an earlier date or grants a one-time 30-day extension. This Review Team was appointed on December 18, 2012, and in accordance with statutory convention, 60 days thereafter was February 16, 2013, a Saturday.

However, Section 6 of the Revised Statutes of 1846, which applies to statutes and administrative rules, provides that "[i]n computing a period of days, the first day is excluded and the last day is included. If the last day of any period or a fixed or final day is a Saturday, Sunday or legal holiday, the period or day is extended to include the next day which is not a Saturday, Sunday or legal holiday." Therefore, this Review Team report is due on February 19, 2013.

2. <u>General Fund Deficits</u>. The City's General Fund has not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund has had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012. The primary methods by which City officials have sought to address these deficits has been by issuing long-term debt. While such an approach reduces the deficit in the year in which the debt is issued, it also reduces fund balance over time as debt service payments increase. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

3. <u>Long-Term Liabilities</u>. As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials have not yet devised a satisfactory plan to address the long-term liability issue.

4. <u>Bureaucratic Structure</u>. The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

Based upon the foregoing, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc: Dave Bing, Mayor
    Detroit City Councilmembers
    James Bolger, Speaker of the House of Representatives
    Randy Richardville, Senate Majority Leader



3500 (Rev. 01-11)

STATE OF MICHIGAN
## DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:**     February 19, 2013

**TO:**       Governor Snyder

**FROM:**     Detroit Financial Review Team:
Andy Dillon
Darrell Burks
Ronald E. Goldsberry
Frederick Headen
Thomas H. McTavish
Kenneth Whipple

**SUBJECT:**  Supplemental Documentation of the Detroit Financial Review Team

This document is supplemental to our report of February 19, 2013, and is intended to constitute competent, material, and substantial evidence upon the whole record in support of the conclusion that a financial emergency exists within the City of Detroit.

### I. Background

### A. Preliminary Review

On December 11th through December 14th, 2012, the Department of Treasury conducted a preliminary review of the finances of the City of Detroit to determine whether or not a serious financial problem existed. Section 12(1) of the Act provides that a preliminary review may be conducted if one, or more, of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivisions (j) and (k) of Section 12(1) having occurred within the City.[1] The preliminary review found, or confirmed, the following:

- The City violated requirements of Section 17 of Public Act 2 of 1968, the Uniform Budgeting

---

[1] Subsection (j) provides that "[t]he local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general." Subsection (k) provides that "[t]he local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan."

www.michigan.gov/treasury

13-53846-swr   Doc 11-7   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 4 of 24   419
13-53846-tjt   Doc 2334-10   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 39 of 48

and Accounting Act, which requires that local officials monitor and promptly amend an adopted budget as necessary to prevent deficit spending. For example, in the General Fund for the year ending June 30, 2011, the insurance premium line item exceeded its budget by more than $6.7 million, the adjustment and undistributed costs line item exceeded its budget by more than $8 million, and the fire fighting operations line item exceeded its budget by more than $21 million. As a result of these and other line items, the General Fund had line items that exceeded its budget by more than $97 million.

- In addition, City officials violated requirements of Section 18 of the Uniform Budgeting and Accounting Act providing that "[a]n administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body. The chief administrative officer, an administrative officer, or an employee of the local unit shall not apply or divert money of the local unit for purposes inconsistent with those specified in the appropriations of the legislative body." City officials also violated requirements of Section 19 of the Act providing that "[a] member of the legislative body, the chief administrative officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general appropriations act."

- The City experienced cash flow problems throughout the 2010 and 2011 fiscal years, some of which had been alleviated by the issuing or refinancing of debt. The City projected possibly depleting its cash prior to its June 30, 2013 fiscal year end. However, because of inherent problems within the reporting function of the City, the projections continued to change from month to month making it difficult to make informed decisions regarding its fiscal health. For example, a cash flow estimate in August projected a June 2013 cash deficit of $62 million, while estimates for October and November projected deficits of $84 million and $122 million, respectively. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In turn, such compliance requires the ability to produce timely and accurate financial information which City officials have not been able to produce.

- The City incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41 million from a June 30, 2010 amount of $155.7 million to a June 30, 2011 amount of $196.6 million and was projected to increase even further for 2012, which would not have happened if the City had complied with its budgets.

As depicted in Table 1 on the next page, the City has experienced cumulative General Fund deficits that have exceeded $100 million dating back to 2005. These deficits have fluctuated between $155.4 million and $331.9 million. One of the primary methods the City has used to reduce the deficits has been to issue more debt. Total General Fund debt and other long-term liability proceeds for the years between 2005 and 2011 were over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

**Table 1**

**General Fund Deficits, Debt Proceeds, and Effect Of**
**(In Millions)**

| Year | Actual Deficit | Debt Proceeds | Approximate Cumulative Deficit without Debt Proceeds* |
|------|----------------|---------------|------------------------------------------------------|
| 2005 | ($155.4) | $248.4 | ($403.8) |
| 2006 | ($173.7) | $34.9 | ($457.0) |
| 2007 | ($155.6) | -- | ($438.9) |
| 2008 | ($219.2) | $75.2 | ($577.7) |
| 2009 | ($331.9) | -- | ($690.5) |
| 2010 | ($155.7) | $251.7 | ($765.9) |
| 2011 | ($196.6) | -- | ($806.8) |
| 2012 | ($326.6) | | ($936.8) |

Source: City of Detroit Annual Financial Audits, 2005 through 2012. * Represents what the deficit would have been if additional debt had not been issued. The approximate amount would be reduced if subsequent debt service payments were added back in.

- On December 27, 2011, City officials filed an audit report that reflected a $196.6 million cumulative deficit in the General Fund, a $97.2 million cumulative deficit in the Transportation Fund, and a $17.1 million cumulative deficit in the Automobile Parking Fund. However, City officials did file, as legally required, an adequate or approved deficit elimination plan with the Department of Treasury.

Based upon the foregoing preliminary review, the State Treasurer concluded, and reported to the Governor on December 14, 2012, that a serious financial problem existed in the City of Detroit and recommended the appointment of a financial review team.

B. Review Team Findings

On December 18, 2012, the Governor appointed a six-member Financial Review Team. The Review Team convened on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, February 1st, 14th, and 15th 2013.

1. Conditions Indicative of a Serious Financial Problem

The Review Team found, or confirmed, the existence of the following conditions based upon information provided by City officials or other relevant sources:

Governor Snyder
February 19, 2013
Page Four

- According to the City's fiscal year 2012 financial audit, the cumulative General Fund deficit increased by 82 percent, from $148.1 million as of June 30, 2011 to $269.5 million as of June 30, 2012. (The unrestricted General Fund deficit increased by 66.1 percent, from $196.6 million to $326.6 million.) While the General Fund had an operating surplus (i.e., recurring revenues in excess of recurring expenditures) of $105.8 million, net transfers out of the General Fund of $227.5 million resulted in a negative net change in the General Fund balance of $121.7 million.

- The City continues to experience a significant depletion of its cash. As noted in the preliminary review, cash flow projections provided by City officials have been inconsistent with the precise magnitude of the problem varying somewhat from one projection to another. However, in general, the most recent projections have estimated a cumulative cash deficit in excess of $100 million by June 30, 2013, absent implementation of financial countermeasures. During its review, the Review Team expressed the position that City officials would need to either increase revenues, or decrease expenditures, or both, by roughly $15 million per month during the three-month period January through March 2013 to remain financially viable.

- The City has substantial long-term debt. As of June 30, 2012, such debt, exclusive of unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $8.6 billion. However, upon inclusion of those other obligations, the City's total long-term debt was $13.6 billion. (Total long-term debt is $14.99 billion depending upon whether $1.4 billion in pension system assets is, or is not, factored in the unfunded actuarial accrued liabilities.) The City's long-term liabilities as of June 30, 2012, are summarized by category in Table 2.

**Table 2**

**Long-Term Liabilities by Category**
**As of June 30, 2012**
**(In Millions)**

| Category | Amount |
|---|---|
| Non-General Obligation | $6,106.1 |
| Other Post Employment Benefits Unfunded Actuarial Accrued Liability | $5,727.2 |
| Pension Certificates of Participation | $1,451.9 |
| General Obligation | $963.4 |
| General Retirement System Unfunded Actuarial Accrued Liability | $639.9 |
| Other | $101.9 |
| Police and Fire Retirement System | $3.9 |
| Total | $14,994.2 |

Source: City of Detroit Annual Financial Audit 2012

- According to information provided to the Michigan Legislative Auditor General's Office by the State Court Administrative Office, as of June 30, 2012, the City's 36th District Court had $279.3 million in outstanding accounts receivables. Of that amount, it is estimated that $199 million is owed to the City of Detroit, $76 million is owed to the State of Michigan, and $100.9 million has been outstanding for more than seven years. The accounts receivables were comprised of fines, fees, and other costs related to parking violations, civil infractions, misdemeanor traffic and drunken driving violations, and other misdemeanor violations. As of June 30, 2012, the 36th District Court's collection rate for accounts receivables was only 7.7 percent compared to an average collection rate of 60 percent for other courts within the seven county region of Genesee, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne.

  In addition, as of January of 2013, 36th District Court officials had taken no actions to reduce expenditures in light of a $6 million reduction in its appropriation. In fact, the Court's current budget funds 285 employees, but the Court presently has 350 employees, excluding judges.

- The December 28, 2012, management letter which accompanied the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations. These are recited in Attachment 1.

- Financial audit reports for the City reflect significant variances between General Fund revenues and expenditures, both as initially budgeted and amended, versus General Fund revenues and expenditures actually realized. Variances over the last six fiscal years are depicted in Table 3 on the next page. The variances show that City officials consistently have overestimated fund revenues and expenditures and call into question the ability of City officials to adopt and effectively monitor budgets, or to estimate revenues and expenditures upon which those budgets are built.[2]

---

[2] Various provisions of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, govern the budget adoption and implementation process for units of local government in Michigan. For example, Section 16 of the Act requires, unless another method is provided for by charter, that the local legislative body adopt a general appropriations act which shall set forth "the amounts appropriated by the legislative body to defray the expenditures and meet the liabilities of the local unit for the ensuing fiscal year, and shall set forth a statement of estimated revenues, by source, in each fund for the ensuing fiscal year." Section 17 requires, among other things, that if during a fiscal year, it appears to the chief administrative officer or to the legislative body that actual and probable revenues are less than estimated revenues, the chief administrative officer or fiscal officer must present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year.

Finally, Section 18 requires, among other things that, "[e]xcept as otherwise provided in section 19, *an administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body.* The chief administrative officer, an administrative officer, or an employee of the local unit shall not apply or divert money of the local unit for purposes inconsistent with those specified in the appropriations of the legislative body." Emphasis supplied. The sum of the foregoing statutory provisions is not an aspirational goal, but a legal requirement that officials in units of local government annually adopt a balanced budget, monitor throughout the course of the fiscal year the revenues and expenditures contained in that adopted budget, and adjust the budget to the extent necessary to maintain it in balance.

## Table 3

### General Fund (Amended) Budget to Actual Variances
### (In Millions)

|              | 2006-07     | %        | 2007-08     | %        | 2008-09     | %        |
|--------------|-------------|----------|-------------|----------|-------------|----------|
| Revenues     |             |          |             |          |             |          |
| Budgeted     | $1,460.5    |          | $1,511,4    |          | $1,424.1    |          |
| Amended      | $1,685.1    |          | $1,711.1    |          | $1,755.3    |          |
| Actual       | $1,487.4    |          | $1,303.4    |          | $1,268.4    |          |
| Variance     | ($197.6)    | (11.73)  | ($407.6)    | (23.82)  | ($487.0)    | (27.74)  |
| Expenditures |             |          |             |          |             |          |
| Budgeted     | $1,466.7    |          | $1,580.2    |          | $1,557.5    |          |
| Amended      | $1,702.2    |          | $1,696.5    |          | $1,798.3    |          |
| Actual       | $1,278.1    |          | $1,181.4    |          | $1,155.9    |          |
| Variance     | $ 424.0     | 24.91    | $ 515.1     | 30.36    | $642.4      | 35.72    |

|              | 2009-10     | %        | 2010-11     | %        | 2011-12     | %        |
|--------------|-------------|----------|-------------|----------|-------------|----------|
| Revenues     |             |          |             |          |             |          |
| Budgeted     | $1,651.9    |          | $1,361.7    |          | $1,275.5    |          |
| Amended      | $1,695.7    |          | $1,650.1    |          | $1,564.0    |          |
| Actual       | $1,188.0    |          | $1,220.3    |          | $1,102.3    |          |
| Variance     | ($507.7)    | (29.93)  | ($429.9)    | (26.05)  | ($461.8)    | (29.53)  |
| Expenditures |             |          |             |          |             |          |
| Budgeted     | $1,644.2    |          | $1,374.8    |          | $1,289.8    |          |
| Amended      | $1,834.2    |          | $1,558.9    |          | $1,473.0    |          |
| Actual       | $1,068.9    |          | $1,070.2    |          | $996.4      |          |
| Variance     | $765.3      | 41.72    | $488.7      | 31.35    | $476.6      | 32.36    |

Source: City of Detroit Annual Financial Audits, 2007 through 2012

Governor Snyder
February 19, 2013
Page Seven

- The City's General Fund has not experienced a positive year-end fund balance within recent years. As depicted in Table 4, the General Fund had negative year-end balances that ranged from $91.1 million in the 2010 fiscal year to $269.5 million in the 2012 fiscal year.

**Table 4**

**General Fund Revenues, Expenditures, and Change in Fund Balance**
**(In Millions)**

|                          | 2006-07   | 2007-08   | 2008-09   |
|--------------------------|-----------|-----------|-----------|
| Revenue                  | $1,487.4  | $1,303.4  | $1,268.4  |
| Expenditures             | $1,278.1  | $1,181.4  | $1,155.9  |
| Current Surplus/(Deficit)| $209.3    | $122.1    | $112.5    |
| Other Financing Sources  | ($194.2)  | ($175.0)  | ($236.5)  |
| Net Change in Fund Balance| 15.1     | ($52.9)   | ($124.1)  |
| Beginning Fund Balance   | ($107.2)  | ($91.4)   | ($141.7)  |
| Change in Inventories    | $0.7      | $2.7      | ($0.9)    |
| Ending Fund Balance      | ($91.4)   | ($141.7)  | ($266.7)  |

|                          | 2009-10   | 2010-11   | 2011-12   |
|--------------------------|-----------|-----------|-----------|
| Revenue                  | $1,188.0  | $1,220.3  | $1,102.2  |
| Expenditures             | $1,068.9  | $1,070.2  | $996.4    |
| Current Surplus/(Deficit)| $119.0    | $150.1    | $105.8    |
| Other Financing Sources  | $59.3     | ($206.9)  | ($227.5)  |
| Net Change in Fund Balance| 178.3    | ($56.9)   | ($121.7)  |
| Beginning Fund Balance   | ($266.7)  | ($91.1)   | ($148.1)  |
| Change in Inventories    | ($2.7)    | ($0.1)    | $0.2      |
| Ending Fund Balance      | ($91.1)   | ($148.2)  | ($269.5)  |

Source: City of Detroit Annual Financial Audits, 2007 through 2012

- Operational dysfunction contributes to the City's serious financial problem. For example, the Police Department has approximately 2,030 employees. However, the views of City officials differ significantly as to how many of those employees are engaged in police work as opposed to ancillary administrative functions such as payroll. Some City officials asserted to the Review Team that only a third of the Police Department employees are engaged in patrolling the City, while Police Department officials indicated that approximately 68 percent of employees are engaged in patrol work and another 15 percent are engaged in investigations. The Review Team could not resolve this discrepancy because the City's administration has no reliable information concerning what staffing levels are, or should be, within the Police Department.

2. Review Team Meetings

On December 20, 2012, Review Team members Andy Dillon, Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Thomas H. McTavish conducted a series of meetings in the City of Detroit with Linda Bade, City Assessor; Charles Pugh, City Council President; Gary Brown, City Council President Pro Tem (by conference telephone); Kenneth V. Cockrel, Jr., Councilmember; Irvin Corley, Jr., Fiscal Analyst, Fiscal Analysis Division (City Council); Mary Anne Langan, Deputy Fiscal Analyst, Fiscal Analysis Division (City Council); Mark Lockridge, Deputy Auditor General; David Whitaker, Director, Research and Analysis Division (City Council); Jerry Pokorski, Financial Consultant; Jack Martin, Chief Financial Officer; William Andrews, Program Management Director; Cheryl Johnson, Finance Director and City Treasurer; Gaurav Malhotra and Daniel Jerneycic, of the certified public accounting firm Ernst & Young; Donald Austin, Fire Commissioner; Edsel Jenkins, Deputy Fire Commissioner; Chester Logan, Interim Police Chief; Charles Wilson, Chief of Staff; Todd Bettison, Commander, Communications Operations; Scott Hayes, Director, Technology Services Bureau; Tina Tolliver, Second Deputy Chief, Budget Operations; Patrick Aquart, Human Resources Director; and Lamont Satchel, Labor Relations Director; Dave Bing, Mayor; and Kirk Lewis, Deputy Mayor and Chief of Staff.

On January 3, 2013, Review Team members Andy Dillon, Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Kenneth Whipple (by conference telephone) met with Mark Diaz, President, Detroit Police Officers Association; Steven Dolunt, President, Detroit Police Command Officers Association; Brian E. Harris, Secretary-Treasurer, Detroit Police Lieutenants and Sergeants Association; John F. Kennedy, Sergeant at Arms, Detroit Police Lieutenants and Sergeants Association; Donna Latouf, Secretary-Treasurer, Detroit Police Officers Association; James Moore, Vice-President, Detroit Police Command Officers Association; Teresa Sanderfer, Secretary, Detroit Fire Fighters Association; Rodney Sizemore, Vice-President, Detroit Police Lieutenants and Sergeants Association; Junetta Wynn, Past President, Detroit Police Lieutenants and Sergeants Association; and Mark Young, President, President, Detroit Police Lieutenants and Sergeants Association.

On January 7, 2013, Review Team members Andy Dillon (by conference telephone), Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Kenneth Whipple (by conference telephone) met with

William Andrews, Program Management Director; Jack Martin, Chief Financial Officer; Gaurav Malhotra and Daniel Jerneycic, of the certified public accounting firm Ernst & Young; Irvin Corley, Jr., Fiscal Analyst, Fiscal Analysis Division (City Council); Mary Anne Langan, Deputy Fiscal Analyst, Fiscal Analysis Division (City Council); and Jerry Pokorski, Financial Consultant.

On January 16, 2013, Review Team members Andy Dillon (by conference telephone), Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Thomas McTavish (by conference telephone), met with William Andrews, Program Management Director; Jack Martin, Chief Financial Officer; David Brayshaw, of First Southwest Company; Lamont Satchel, Labor Relations Director; Suzanne Taranto, Milliman Company; Cheryl Johnson, Finance Director and City Treasurer; Donita Crumpler, Manager, Debt Management Division; Gaurav Malhotra, of the certified public accounting firm Ernst & Young; and Kenneth A. Buckfire, of Miller Buckfire and Company.

On February 1, 2013, Review Team members Andy Dillon, Ronald E. Goldsberry, Frederick Headen, Thomas McTavish (by conference telephone), and Kenneth Whipple met with Lamont Satchel, Labor Relations Director; William Andrews, Program Management Director; Jan Anderson, Program Management Deputy Director; Jack Martin, Chief Financial Officer; Gaurav Malhotra, Daniel Jerneycic, and Juan Santambrogio, of the certified public accounting firm Ernst & Young, and James Doak, of Miller Buckfire and Company.

### C. Statutory Conclusions

Section 14(3) of the Local Government Fiscal Responsibility Act requires a review team to include in its report to the Governor one of three conclusions. Those conclusions are: that a serious financial problem does not exist in the unit of local government, or that a serious financial problem exists but that a consent agreement containing a plan to resolve the problem has been adopted, or that a financial emergency exists because no satisfactory plan exists to resolve a serious financial problem.

1. Serious Financial Problem

The findings of the preliminary review and of this Review Team have been set out above. Given those findings, the Review Team could not reasonably conclude that a serious financial problem does not exist within the City of Detroit. To the contrary, those findings, when assessed as a whole, clearly constitute competent, material, and substantial evidence upon the whole record to support the conclusion that a serious financial problem does exist within the City of Detroit. Therefore, we turn next to the option of a consent agreement.

2. Consent Agreement

This State has executed consent agreements with various units of local government under three successive emergency financial management statutes dating back to 1988. That experience has shown consent agreements to be most effective in circumstances in which serious financial problems have

remained unresolved despite diligent attempts at resolution by local officials. In such circumstances, consent agreements have provided cooperative local officials with beneficial guidance and a structural framework within which to resolve the financial difficulties confronting them.[3]

Given the City of Detroit's financial condition, and the uneven manner in which City officials have dealt with it, the Review Team could not conclude that another consent agreement would provide a satisfactory resolution of the City of Detroit's serious financial problem. We say *another* consent agreement because the existing Financial Stability Agreement is in the nature of a consent agreement. The Financial Stability Agreement was executed on April 4, 2012, between City officials and the previous Detroit Financial Review Team that was appointed on December 27, 2011, pursuant to former Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act.

The Financial Stability Agreement established a detailed framework within which, among other things, City officials were to restructure the City's financial and operational activities. A component of this detailed framework was a nine-member Financial Advisory Board established to assist City officials in achieving the objectives of the Financial Stability Agreement. In particular, Annex B of the Financial Stability Agreement enumerated 21 specific operational reforms which were to be implemented in the priority and timing as mutually agreed upon by City officials and the Financial Advisory Board.

Candor compels the conclusion that City officials have made limited progress in respect to the financial and operational reforms and restructuring contemplated by the Financial Stability Agreement in the ten months since it was executed.[4] This conclusion is unaltered by whether the lack of progress lies in the complexity of the City's financial and operational activities, subsequent litigation initiated by

---

[3] Among these have been the Detroit School District, 2008; and the cities of Highland Park, 1996-99; Hamtramck, 2000; Pontiac, 2008-09; River Rouge, 2009-present; Inkster, 2012-present; and the City of Detroit, 2012-present.

[4] In fact, the initial work upon a number of the financial and operational reforms did not commence until the fall of 2012, some five months after the Financial Stability Agreement was executed. For example:

- Integration of Budgeting, Accounting, and Financial Reporting System: The initial organizational meeting was not held until September 24, 2012, at which time a steering committee and work groups were established. The identification of system needs was ongoing as of December 20, 2012.

- Bank Project to improve Accounts Payable and Accounts Receivables Processes: The initial organizational meeting was not held until September 12, 2012, at which time an external consultant was engaged. The prioritization and implementation of short-term recommendation was to commence in December of 2012.

- Transfer of Planning and Development Department Functions to the Detroit Economic Growth Corporation: A baseline inventory of Planning and Development Department services was compiled in October 1, 2012.

- Long-Term Liability Restructuring: This initiative was not assigned to the City's Chief Financial Officer and Program Management Director until September 15, 2012.

- Workers Compensation Reform: The initial meeting with the City's risk manager was not held until September 12, 2012, and City officials selected a consultant on December 11, 2012.