City officials to challenge the legal validity of the Financial Stability Agreement, or other considerations.

Among those other considerations would be the City's Charter. That document contains numerous restrictions and structural details that make it extremely difficult for City officials to restructure the City's operations in any meaningful manner even were one to conclude that they have been consistently committed to such reforms. For example, various provisions of the City Charter significantly hamper the ability of City officials to provide municipal services in a more efficient and cost effective manner through alternative means.[5]

In addition, the City Charter provides for cumbersome organizational structure consisting of 16 departments, nine of which are headed by boards, commissions, or advisory commissions with at least 76 members in total.[6] While the City Charter provides that the City may increase the number of departments beyond the number contemplated by the City Charter, there is no provision authorizing a reduction in the number of departments.

---

[5] For example, before any determination or action regarding privatization can take place, the City Charter requires that all of the following actions must occur :

(1) A comprehensive report must be prepared that details the need for privatization.

(2) Comprehensive written estimates must be prepared of the total cost to the City if the City agency currently providing the service did so in the most cost efficient manner.

(3) The City Council is required to approve the solicitation bids, but only after the City Council reviews items (1) and (2).

(4) Any affected City employees must be given an opportunity to organize and prepare a bid.

(5) A comprehensive written cost analysis of all bids must be prepared.

(6) Other factors must be considered such as the effect of transferring service delivery to the private sector, the reduction in employment levels of City residents, and differences in work rules and management practices in the private sector.

(7) The City Council is required to approve any final recommendation by a two-thirds vote, but only after making certain certifications.

[6] The City Charter establishes three types of departments: Staff; Programs, Services, and Activities; and Independent Departments and Offices. Staff Departments are: Budget, Planning and Development, Finance, Human Resources, and Buildings, Safety Engineering, and Environmental. The Programs, Services, and Activities Departments are: Arts, Public Works, Fire, Historical, Human Rights, Police, Public Lighting, Recreation, Transportation, Water and Sewerage, and Zoological Parks. The Independent Departments and Offices are: Auditor General, Corporation Counsel, Inspector General, and Ombudsperson. The latter have the potential to function essentially as separate and independent branches of City government.

In an apparent effort to increase accountability, various provisions of the City Charter have dispersed decision-making authority, particularly away from the mayoral office. While increased accountability is a salutary goal, one consequence has been to lessen the ability of City officials to decide important matters with appropriate dispatch. For example, whether one agrees or disagrees with specific Annex B operational reforms, their implementation has been too long in coming. In resolving the City's serious financial problem, such delays would be disastrous.

Similarly, the City Charter requires that before any final action may be taken regarding any proposed change in future retirement benefits, the City Council first must obtain from an independent actuary a report regarding the immediate and long-term costs of the change. Even then, final action still may not be taken until at least three months after the actuarial report is made public at a City Council meeting. Because retirement healthcare is the City's single largest liability (estimated to be $7 billion), any restructuring would require certainty with respect to this liability, and any uncertainties and delays relating to adjusting this obligation would greatly impede the ability of City officials to negotiate with other creditors of the City.

3. Financial Emergency

As noted, the Review Team could not conclude that a serious financial problem does not exist within the City of Detroit and, likewise, could not conclude that a consent agreement has been adopted that will resolve the City's serious financial problem. Having found those two conclusions to be inapplicable, the only remaining conclusion allowed by the Act is that a financial emergency exists because no satisfactory plan exists to resolve a serious financial problem. [7]

The Review Team acknowledges that, since its appointment, City officials have advanced various proposals intended to address the City's serious financial problem. However, in arriving at the conclusion that a financial emergency exists within the City, the dispositive consideration is not whether City officials have advanced various proposals, nor whether those proposals when taken as whole constitute a plan. Rather, the only dispositive consideration is whether there exists a *satisfactory* plan as required by the Act.

We begin with the City's cash crisis. It was noted on Page Four of this report that cash flow projections provided by City officials had estimated a cumulative cash deficit of more than $100 million

---

[7] We note that the three statutory conclusions available to this Review Team under Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, differ in both number and substance from the four statutory conclusions which were available to the previous Detroit Financial Review Team under Section 13(4) of the former Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act. The previous Detroit Financial Review Team reached the conclusion that the City of Detroit was in a condition of severe financial stress as provided in Act 4 and that a consent agreement had *not* been adopted pursuant to the Act. However, Act 72 affords this Review Team no such middle ground; if, in this case, a serious financial problem is found to exist and a consent agreement containing a plan to resolve the problem has not been adopted, then we must conclude that a financial emergency exists.

Governor Snyder
February 19, 2013
Page Thirteen

by June 30, 2013, absent the implementation of what City officials have referred to as financial countermeasures. Furthermore, it was noted that Review Team members had expressed the position that City officials would need to either increase revenues, or decrease expenditures, or both, by roughly $15 million per month during the three-month period January through March 2013 to remain financially viable.

However, City officials concluded that a $15 million per month adjustment during the three-month period January through March 2013 was not realistic. As an alternative, they proposed a series of structural and short-term countermeasures the financial impact of which is summarized in Table 5.

**Table 5**

**City's Proposal to Address Cash Deficiency[8]**
**(In Millions)**

|  | Jan. | Feb. | Mar. | April | May | June | Total* |
|---|---|---|---|---|---|---|---|
| Structural Changes | $0.1 | $3.1 | $4.7 | $5.4 | $9.8 | $10.2 | $33.3 |
| Short-Term Changes | $6.4 | $14.1 | $5.3 | $11.5 | $6.0 | $20.2 | $63.5 |
| Total | $6.5 | $17.2 | $10.0 | $16.9 | $15.8 | $30.4 | $96.8 |

Source: City of Detroit Document (January 2013). *The $96.8 million total does not include $30.0 million in escrowed bond proceeds held by the State, the release of which was conditioned upon achievement by the City of certain milestones for the months of December 2012 ($10.0 million) and January 2013 ($20.0 million).

The Review Team recognizes the difficulty of City officials having to make significant budgetary adjustments in the middle of a given fiscal year and commends them for their efforts in attempting to devise a proposal. While the Mayor and City Council deserve credit for considering and, in some instances, adopting difficult financial reforms, those reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

Likewise, City officials have yet to propose a satisfactory plan to address the City's $13.6 billion in long-term liabilities. The City has a longstanding practice of overspending. As a result, a substantial

---

[8] Among the structural changes are: employee furloughs; a one-year suspension of pension accruals; reducing the percentage ratio of employer-employee healthcare contributions from 80-20 to 70-30; and reducing the City's employment headcount by approximately 400 positions by June 30, 2013. Among the short-term changes are: deferral of certain pension payments and the selective sale of certain City assets.

Governor Snyder
February 19, 2013
Page Fourteen

portion of current long-term liabilities consists of debt that City officials issued to address General Fund expenditures in excess of General Fund revenues. For example, according to City documents, General Fund expenditures exceeded General Fund revenues by an average of $100 million annually during the five fiscal-year period 2008 through 2012. The response of City officials was to issue $75 million of debt in fiscal year 2008; $250 million of debt in fiscal year 2010; and $137 million of debt during the current fiscal year. By issuing this debt, City officials improvidently converted an annual overspending problem into a long-term liability.

City officials have projected that over the five-year period 2013 through 2017, expenditures for healthcare benefits for active employees, healthcare benefits for retirees, pension benefits, principal and interest for pension certificates, and debt service, will total approximately $1.9 billion. See Chart 1. Therefore, these long-term liabilities will pose an ongoing challenge to the City's financial condition.

**Chart 1**

**Projected Expenditures for Certain Long-term Liabilities**
**Fiscal Years 2013-17**
**(In Millions)**



Source: City of Detroit Documents (February 2013)

## D. Conclusion

Based upon the foregoing information, meetings, and review, the Review Team confirms the findings of the preliminary review, and concludes that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem.

## II. Section 14(2) Requirements

Section 14(2) of the Act requires that this report include the existence or an indication of the likely occurrence of any of the conditions set forth in subdivisions (a) through (f).[9] The conditions in subdivisions (b) (iii), (e) and (f) of Section 14(2) exist or are likely to occur, as follows:

- The City did not meet its minimum contribution requirement to its Health and Life Insurance Benefit Plan for the last several years. As of June 30, 2012, the City owed $804.7 million to the system. (Section 14(2)(b)(iii).)

---

[9] Subdivisions (a) through (f) of Section 14(2) of the Act provide as follows:

(a) A default in the payment of principal or interest upon bonded obligations or notes for which no funds or insufficient funds are on hand and segregated in a special trust fund.

(b) Failure for a period of 30 days or more beyond the due date to transfer 1 or more of the following to the appropriate agency:

(i) Taxes withheld on the income of employees.

(ii) Taxes collected by the government as agent for another governmental unit, school district, or other entity or taxing authority.

(iii) Any contribution required by a pension, retirement, or benefit plan.

(c) Failure for a period of 30 days or more to pay wages and salaries or other compensation owed to employees or retirees.

(d) The total amount of accounts payable for the current fiscal year, as determined by the state treasurer's uniform chart of accounts, is in excess of 10% of the total expenditures of the local government in that fiscal year.

(e) Failure to eliminate an existing deficit in any fund of the local government within the 2-year period preceding the end of the local government's fiscal year during which the review team report is received.

(f) Projection of a deficit in the general fund of the local government for the current fiscal year in excess of 10% of the budgeted revenues for the general fund.

Governor Snyder
February 19, 2013
Page Sixteen

- The City had a General Fund deficit of $269.5 million (and an unrestricted General Fund deficit of $326.6 million) as of June 30, 2012, which was not eliminated within the two-year period preceding the end of the fiscal year of the City during which this Review Team report is received. (Section 14(2)(e).)

- The projected General Fund deficit of $385.6 million as of June 30, 2013, exceeds 10 percent of the $1.0 billion in General Fund revenues which the City has budgeted for the 2013 fiscal year as reported in the 2012-13 Executive Budget Summary. (Section 14(2)(f).)

### III. Review Team Report Transmittal Requirements

Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc: Dave Bing, Mayor
    Detroit City Councilmembers
    James Bolger, Speaker of the House of Representatives
    Randy Richardville, Senate Majority Leader

Attachment 1

1. Material Weaknesses

The December 28, 2012, management letter which accompanied the City of Detroit's fiscal year 2012 financial audit report identified a number of material weaknesses in the City's financial operations. The management letter defined a "material weakness" as "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the City's financial statements will not be prevented, or detected and corrected on a timely basis." The material weaknesses, contained in findings 2012-01, 2012-02, and 2012-03, are recited verbatim:

Finding 2012-01, Financial Closing and Reporting

"Although the City of Detroit (City) has made incremental improvement in their financial closing and reporting processes, deficiencies still exist in the processes to evaluate accounts, and timely record entries into the general ledger in a complete and accurate manner. These deficiencies include the following:

"The process to prepare closing entries and financial statements relies partly upon decentralized accounting staff and software applications other than the City's DRMS general ledger. The process requires a significant amount of manual intervention in order to get information from these other systems in to DRMS.

"The process to identify significant transactions throughout the City's fiscal year to determine the appropriate accounting treatment does not result in timely consideration of how to record or report such transactions. These transactions often are not identified until the end of the fiscal year during the financial reporting process. There is inadequate communication between various City departments on transactions and on how they affect the individual stand-alone financial reports and the Comprehensive Annual Financial Report (CAFR). Information necessary to effectuate a timely and accurate closing of the books is sometimes not communicated between certain departments and agencies of the City.

"The process to close the books and prepare financial statements includes the recording of a significant number of manual post-closing entries. For the year ended June 30, 2012, there were approximately 350 manual journal entries that were made after the books were closed for the year (i.e., after frozen trial balance).

"The process to close the books and evaluate accounts occurs only on an annual basis instead of monthly or quarterly. As a result, certain key account reconciliations and account evaluations are not performed timely and require an extended amount of time to complete during the year-end closing process.

"The established internal control procedures for tracking and recording capital asset activities are not consistently followed. Physical inventories of capital assets are not being performed annually as required by City policy."

1

<u>Finding 2012-02, Reconciliations, Transaction Processing, Account Analysis, and Document Retention</u>

"Operations of the City are carried out by numerous City departments utilizing a variety of people, processes, and systems. This type of environment requires diligence in ensuring accurate information is processed and shared with others in the City. Performing reconciliations of data reported from different systems and sources and account analysis are an integral part of ensuring transactional data integrity and accurate financial reporting. During our audit, we noted deficiencies in the areas of transaction processing, account analysis, data integrity, reconciliation performance, and document retention. Those deficiencies include the following:

"The City's process to identify accrued expenses is not adequate. Our audit procedures identified expenditures related to fiscal year 2012 that were not appropriately recorded as expenditures in fiscal year 2012.

"Certain date related information regarding terminations and new hires in the human resources system did not match information in the personnel files.

"Reconciliations of subsidiary ledgers to general ledgers and other IT systems to DRMS are either not being completed, not completed timely, or contain unsupported or unreconciled items.

"A listing of internal controls employed by service organizations is not prepared and evaluated for adequacy by the City. The City uses various service organizations to process significant transactions such as health and dental claims and payroll. The City does not review the service organization auditor reports (SAS 70 Reports) to ensure that the service organization has effective internal controls. Further, the City does not evaluate the user controls outlined in the SAS 70 reports to ensure that the City has these controls in place to ensure complete and accurate processing of transactions between the City and the Service Organization.

"Bank, investment, and imprest cash reconciliations are not prepared timely and contain unreasonably aged reconciling items.

"The calculation of inventory reserves used data from the prior year that contained errors and is not reviewed by a member of management.

"Interfund and inter-departmental transactions are not reconciled throughout the year on a timely basis or reviewed for proper financial statement classification.

"A physical inventory count of fixed assets is not routinely completed by all agencies, as indicated in the City's asset management policies.

"The calculation of average weekly wage as a basis for weekly payment of workers compensation is a manual calculation that contained errors and was not reviewed or verified by a member of management.

2

"The City of Detroit does not maintain individual claim data typically maintained as insurance statistics for self-insurance programs for its workers compensation program. Therefore, only actual payment data is available for the actuary's analysis.

"Data provided to the actuaries that assist in estimating workers' compensation liabilities is not reviewed by the City for accuracy nor reconciled by the City to supporting data prior to submission.

"Certain invoices and receipts of goods and services were not matched against purchase orders in the correct period.

"The City's process to follow up with audit findings is not effectively designed.

"The calculation of grant accounts receivables is inappropriate as the beginning balances being carried forward were not originally performed on a grant by grant basis. The calculation contained errors and was not reviewed by management.

"Manual journal entries are not consistently and accurately reviewed and approved.

"The City of Detroit does not perform a sufficient review of open Accounts Receivable items and their related collectability.

"Certain money market fund investments were incorrectly classified as cash and management review process was not performed at a level to detect the misstatement.

"Certain cash accounts were inappropriately excluded from the trial balance.

"The City's Accounts Receivable write off policy is not specific enough to explain when and how amounts determined to be uncollectable should be written off. In addition, the City is not following their current policy to write off balances.

"Legal reserve documents are not updated in a timely manner when facts pertaining to the status of cases arise. As such, the City had over accrued claims and judgments.

"The City does not have a process for anonymous reporting of ethical or fraud violations to the City Board of Ethics.

"Supporting documentation is not consistently retained in accordance with the City's record retention policies."

Finding 2012-03, Information Technology

"General controls and application controls work together to ensure the completeness, accuracy, and validity of financial and other information in the systems. Deficiencies exist in the areas of general and application controls. Those deficiencies include the following for some or all systems:

3

"Administrative access is granted to unauthorized accounts.

"Segregation of duties conflicts exist between the database administration function and the backend database administration function.

"Adequate procedures are not in place to remove and review segregation of duties conflicts.

"Automated methods are not in place for tracking of the changes and customizations made to certain applications.

"Program developers have access to move program changes into production for certain applications."

2. Significant Deficiencies

The management letter also identified three significant deficiencies which did not rise to the level of material weaknesses. The significant deficiencies, contained in findings 2012-04, 2012-05, and 2012-06, are recited verbatim:

Finding 2012-04, Escheats Law

"The City filed the required annual report of unclaimed property to the State of Michigan; however, it was inaccurate as it did not include property tax overpayments. Additionally, the City has not remitted escheatable property to the State. In discussing this with City officials, the stated changes in personnel combined with the lack of written City policies and procedures regarding the monitoring and calculating of escheatment rules caused the City to fail to comply with the rules.

"The Uniform Unclaimed Property Act (Public Act 29 of 1995) requires the Michigan Holder Transmittal Annual Report of Unclaimed Property be submitted annually by July 1.

"Any holder of unclaimed property who fails to file a report of unclaimed property is subject to fines and penalties as prescribed in Public Act 29 of 1995."

Finding 2012-05, Act 51

"The City of Detroit's Major and Local Street funds were not in compliance with the State of Michigan Public Act 51. The General Fund borrowed cash and investments from the Street funds, which are restricted for a specific purpose, as stated in Act 51. In discussing this with City officials, because multiple funds, including the General and Street funds, share the same bank account as well as the lack of general awareness of the Street funds' restricted use caused the City to be noncompliant with Act 51.

4

"Public Act 51 Section 247.663 states what the Street funds can be used for. Failure to comply with the Act will result in forfeiture of funds to which it may have been entitled for a period of 1 year from and after the failure to apply the money appropriately as prescribed in Act 51 247.666."

Finding 2012-06, Uniform Budgeting and Accounting Act

"The City was not in compliance with Michigan Compiled Laws Act 2 of 1968, Uniform Budgeting and Accounting Act. For certain appropriations stated in footnote 2(d),[10] the City's actual expenditures were more than budgeted expenditures. City Council passed an amendment on November 20, 2012 to remove negative balances in various General Fund appropriations by redirecting unused authority within the total budgets of affected departments. However, because the amendment was passed after the fiscal year end, the City was still considered noncompliant as of June 30, 2012.

"Per Act 2 of 1968, Section 141.438 (3), 'Except as otherwise provided in section 19, an administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body.'"

---

[10] Footnote 2(d) refers to Note II of the City's fiscal year 2012 financial audit report entitled "Stewardship, Compliance, and Accountability." Subsection (d) of Note II, entitled "Excess of Expenditures Over General Fund Appropriations," listed expenditures that exceeded their corresponding appropriation for the year ended June 30, 2012.

5

# EXHIBIT H

RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

March 1, 2013

Dave Bing, Mayor
City of Detroit
2 Woodward Avenue
Detroit, Michigan 48226

Detroit City Council
2 Woodward Avenue
Detroit, Michigan 48226

Dear Mayor Bing and Detroit City Councilmembers:

Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, requires that I, as Governor, reach one of the following three conclusions within 30 days of receiving a financial review team report:

> (a) A serious financial problem does not exist in the local government.

> (b) A serious financial problem does exist in the local government, but a consent agreement containing a plan to resolve the problem has been adopted pursuant to Section 14(1)(c) of the Act.

> (c) A local government financial emergency exists because no satisfactory plan to resolve a serious financial problem exists.

I have reviewed in detail the report and supplemental documentation submitted to me on February 19, 2013, by the Detroit Financial Review Team. I agree with the conclusion of the report, which was that a financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem.

Therefore, I wish to inform you that, pursuant to Section 15(1)(c) of the Local Government Fiscal Responsibility Act, I have determined that a local government financial emergency exists within the City of Detroit because no satisfactory plan to resolve a serious financial problem exists.

### Findings of Fact

Section 15(2) of the Act requires that, upon a determination by me of a financial emergency, I provide you with findings of fact utilized as the basis upon which this determination was made, and a concise and explicit statement of the underlying facts supporting the factual findings.

Dave Bing, Mayor
Detroit City Council
March 1, 2013
Page 2

## Preliminary Review

On December 11th through December 14th, 2012, the Department of Treasury conducted a preliminary review of the finances of the City of Detroit to determine whether or not a serious financial problem existed. Section 12(1) of the Act provides that a preliminary review must be conducted if one, or more, of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivisions (j) and (k) of Section 12(1) having occurred within the City.[1] The preliminary review found, or confirmed, the following:

- The City violated requirements of Section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, which requires that local officials monitor and promptly amend an adopted budget as necessary to prevent deficit spending. In addition, City officials violated requirements of Sections 18 and 19 of the Act providing, respectively, that local officials not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body and that local officials not authorize or participate in the expenditure of funds except as authorized by a general appropriations act.

- The City experienced cash flow problems throughout the 2010 and 2011 fiscal years, some of which had been alleviated by the issuing or refinancing of debt. The City projected possibly depleting its cash prior to its June 30, 2013 fiscal year end. However, because of inherent problems within the reporting function of the City, the projections continued to change from month to month making it difficult to make informed decisions regarding its fiscal health. The City would not have experienced significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed.

- The City incurred overall deficits in various funds, including the General Fund. In fact, the City experienced cumulative General Fund deficits that had exceeded $100 million dating back to 2005. These deficits had fluctuated between $155.4 million and $331.9 million. One of the primary methods City officials had used to reduce the deficits had been to issue more debt. Total General Fund debt and other long-term liability proceeds for the years between 2005 and 2011 were over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduced the deficit in the year the debt was issued, but reduced fund balance over time as debt service payments increased.

Based upon the foregoing preliminary review, the State Treasurer concluded, and reported to me on December 14, 2012, that a serious financial problem existed in the City of Detroit and recommended the appointment of a financial review team.

---

[1] Subsection (j) provides that "[t]he local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general." Subsection (k) provides that "[t]he local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan."

**Review Team Findings**

On December 18, 2012, I appointed a six-member Financial Review Team. The Review Team convened on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, February 1st, 14th, and 15th 2013.

The Review Team found, or confirmed, the existence of the following conditions based upon information provided by City officials, or the City's audit firm, or other relevant sources:

- The City continues to experience a significant depletion of its cash. Projections estimated a cumulative cash deficit in excess of $100.0 million by June 30, 2013, absent implementation of financial countermeasures. The Review Team noted that while City officials deserved credit for considering and, in some instances, adopting difficult financial reforms, those reforms were too heavily weighted toward one-time savings and applied only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

- The City's General Fund had not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012. The primary method by which City officials had sought to address these deficits had been by issuing long-term debt. While such an approach reduced the deficit in the year in which the debt was issued, it also reduced fund balance over time as debt service payments increased. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

- As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials had not yet devised a satisfactory plan to address the long-term liability issue.

- The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

In addition to the foregoing information, the Review Team found that:

- According to the City's fiscal year 2012 financial audit, the cumulative General Fund deficit increased by 82 percent, from $148.1 million as of June 30, 2011 to $269.5 million as of June 30, 2012. (The unrestricted General Fund deficit increased by 66.1 percent, from $196.6 million

to $326.6 million.) While the General Fund had an operating surplus (i.e., recurring revenues in excess of recurring expenditures) of $105.8 million, net transfers out of the General Fund of $227.5 million resulted in a negative net change in the General Fund balance of $121.7 million.

- According to information provided to the Michigan Legislative Auditor General's Office by the State Court Administrative Office, as of June 30, 2012, the City's 36th District Court had $279.3 million in outstanding accounts receivables. Of that amount, it is estimated that $199 million is owed to the City of Detroit, $76 million is owed to the State of Michigan, and $100.9 million has been outstanding for more than seven years. The accounts receivables were comprised of fines, fees, and other costs related to parking violations, civil infractions, misdemeanor traffic and drunken driving violations, and other misdemeanor violations. As of June 30, 2012, the 36th District Court's collection rate for accounts receivables was only 7.7 percent compared to an average collection rate of 60 percent for other courts within the seven county region of Genesee, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne.

In addition, as of January of 2013, 36th District Court officials had taken no actions to reduce expenditures in light of a $6 million reduction in its appropriation. In fact, the Court's current budget funds 285 employees, but the Court presently has 350 employees, excluding judges.

- The December 28, 2012, management letter which accompanied the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

- Financial audit reports for the City reflected significant variances between General Fund revenues and expenditures, both as initially budgeted and amended, versus General Fund revenues and expenditures actually realized. The variances showed that City officials consistently had overestimated fund revenues and expenditures and called into question the ability of City officials to adopt and effectively monitor budgets, or to estimate revenues and expenditures upon which those budgets are built.

- Operational dysfunction contributed to the City's serious financial problem. For example, the Police Department has approximately 2,030 employees. However, the views of City officials differed significantly as to how many of those employees are engaged in police work as opposed to ancillary administrative functions such as payroll. Some City officials asserted to the Review Team that only a third of the Police Department employees are engaged in patrolling the City, while Police Department officials indicated that approximately 68 percent of employees are engaged in patrol work and another 15 percent are engaged in investigations. The Review Team could not resolve this discrepancy because the City's administration has no reliable information concerning what staffing levels are, or should be, within the Police Department.

### Conclusion

Based upon the foregoing information, the Review Team confirmed the findings of the preliminary review, and concluded that a financial emergency existed within the City because no satisfactory plan existed to resolve a serious financial problem. After thoroughly reviewing the report and supplemental documentation of the Review Team, I concur with their conclusion. Therefore, pursuant to Section 15(1)(c) of the Act, I have determined that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem.

### Notice of Hearing

Pursuant to Section 15(2) of the Local Government Fiscal Responsibility Act, the chief administrative officer or governing body may within 10 days request a hearing upon the determination of a financial emergency. The deadline for requesting a hearing is 5:00 P.M., Monday March 11, 2013. In the event that a hearing is requested, it will be convened on Tuesday March 12, 2013, at 10:00 A.M., at the Richard H. Austin (Treasury) Building before Mary G. MacDowell, Chief Deputy Treasurer.

It should be noted that the hearing would not be an original fact finding proceeding. Its purpose would be to afford City officials an opportunity to indicate whether the findings of the Review Team report were supported by competent, material, and substantial evidence on the whole record. Therefore, any information which City officials may wish to present that was not available to the Review Team, or that concerns actions taken by City officials since the Review Team filed its report, or that concerns actions City officials anticipate taking in the future to address the financial emergency in the City, will be considered beyond the scope of the hearing.

Sincerely,

Rick Snyder
Governor

**EXHIBIT I**



July 8, 2013

## Ambac Comments on Detroit

NEW YORK, July 8, 2013 (GLOBE NEWSWIRE) -- **Ambac Assurance Corporation** (Ambac) believes that the proposal put forth by the City of Detroit's state-appointed emergency manager, as well as the failure on the part of the State of Michigan to protect the status of General Obligation bonds, is harmful to Detroit and the interests of taxpayers in Michigan. A successful revitalization of the City will be dependent upon its ability to access cost-effective financing in the future, including General Obligation funding. Such access will be needlessly imperiled as a result of the emergency manager's approach and the State's apparent support thereof.

Ambac has hired Harrison J. Goldin of Goldin Associates, LLC to help advise Ambac on Detroit. Mr. Goldin helped lead New York City through its fiscal crisis and revitalization as the elected Comptroller of The City of New York. Mr. Goldin commented: "The State of Michigan is making a grave error in its support for the proposed treatment of the General Obligation bonds previously issued by the City of Detroit that are backed by a pledge of the City's full faith and credit. The revitalization of Detroit depends on its ability to re-access the credit markets in order to finance critical improvements to its infrastructure. It is short-sighted to signal to lenders that they cannot trust the City's unconditional pledge to repay its general obligation debts, especially given that the General Obligation bonds in question comprise less than 3% of the City's estimate of its liabilities."

Additionally, in response to investor inquiries on the matter, Ambac confirms that the liabilities associated with its Detroit insured exposure are obligations of Ambac's general account. Ambac honors general account claims with full, timely payments in accordance with the terms of such policies. Ambac's current insured exposure is summarized below:

| Type of Exposure | Outstanding Net Par |
|---|---|
| Detroit Limited Tax GO | $92.7 million |
| Detroit Unlimited Tax GO | $77.6 million |

### About Ambac

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose subsidiaries, including its principal operating subsidiary, Ambac Assurance Corporation ("Ambac Assurance"), Everspan Financial Guarantee Corporation, and Ambac Assurance UK Limited, provided financial guarantees and other financial services to clients in both the public and private sectors globally. Ambac Assurance, including the Segregated Account of Ambac Assurance (in rehabilitation), is a guarantor of public finance and structured finance obligations. Ambac Financial Group, Inc. is also exploring opportunities involving the development or acquisition of new financial services businesses. Ambac Financial Group Inc.'s common stock trades on the NASDAQ Global Select Market (Nasdaq:AMBC).

CONTACT: Michael Fitzgerald

(212) 208-3222

mfitzgerald@ambac.com

*Ambac*

Source: Ambac Financial Group, Inc.

News Provided by Acquire Media

**EXHIBIT J**



COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3400
FAX 313•224•4433
WWW.DETROITMI.GOV

CITY OF DETROIT
EMERGENCY MANAGER'S OFFICE

July 16, 2013

**VIA HAND DELIVERY**

The Honorable Richard D. Snyder
Governor, State of Michigan
Executive Office of the Governor
111 South Capitol Avenue
P.O. Box 30013
Lansing, Michigan  48909

The Honorable Andrew Dillon
Treasurer, State of Michigan
Michigan Department of Treasury
4th Floor Treasury Building
430 West Allegan Street
Lansing, Michigan  48992

Re:     Recommendation Pursuant to Section 18(1) of PA 436

Dear Governor Snyder and Treasurer Dillon:

I write as the emergency manager ("Emergency Manager") for the City of Detroit,
Michigan ("Detroit" or the "City"), serving in accordance with Public Act 436 of 2012 of the
State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan
Compiled Laws §§ 141.1541-141.1575 ("PA 436").  Pursuant to section 18(1) of PA 436 and for
the reasons set forth in detail below, I hereby recommend that the City be authorized
immediately to file a case, and proceed to adjust its debts, under chapter 9 of title 11 of the
United States Code (the "Bankruptcy Code").

Since my appointment as Emergency Manager, I have endeavored to keep you informed
of all of my activities to address the financial emergency faced by the City.  In addition to
providing the reports required by PA 436, I have maintained open lines of communication with
both of you and the members of your staffs relating to the progress of my restructuring efforts
and the challenges I have faced in that process.  I believe that both of you have been well
informed of the City's financial condition and its restructuring activities and negotiations that
have been pursued to date, including those efforts that began before my appointment.
Nevertheless, to support my recommendation, this letter:  (a) provides a brief background on the

dire situation faced by the City; (b) summarizes certain of the efforts taken to date to rectify the City's financial emergency; and (c) concludes by discussing the need for chapter 9.

Based on the current facts and circumstances, I have concluded that no reasonable alternative to rectifying the City's financial emergency exists other than the confirmation of a plan of adjustment for the City's debts pursuant to chapter 9 of the Bankruptcy Code because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency outside of a chapter 9 process in a timely manner.

## Situational Overview

### *Inadequate City Services and Infrastructure Impacting Quality of Life*

The City is in the midst of a severe financial emergency. After decades of fiscal mismanagement; plummeting population, employment and revenues; decaying City infrastructure; and deteriorating City services, Detroit today is a shell of the thriving metropolis that it once was. Basic infrastructure is failing, such as the City's streetlights, many of which do not work. Crime is endemic. The City is plagued by blight and a diminishing quality of life. City operations, ordinances, policies and procedures must be streamlined and overhauled to implement best practices and eliminate waste and inefficiencies. Related to this, the City's technology systems, none of which are integrated, are in desperate need of upgrades, as they have been neglected for years. The lack of modern systems undermines many of the initiatives to establish essential improvements to City services and reduce operational costs.

For an extended period of time, the City has simply failed to make the investments required to provide its residents with an adequate quality of life, as limited resources have been diverted elsewhere. The City's urgent need to address large and growing legacy liabilities, and other substantial debts, is self-evident. Failure to address these liabilities will prevent the City from devoting sufficient resources to providing basic and essential services to its residents. Indeed, significant additional resources are required to improve public health and safety. The City must devote a larger share of its revenues to: (a) effectively provide basic, essential services to current residents; (b) attract new residents and businesses to foster growth and redevelopment; and (c) ultimately begin what will be a long process of rehabilitation and revitalization for the City. The City's debt and legacy liabilities must be significantly reduced to permit this reinvestment. Failure to do so directly endangers the health, safety and welfare of all residents of the City.

### *Growing Debt and Legacy Liabilities*

The City's current obligations are unsustainable and prevent the investments needed to revitalize the City and promote public health and safety. The City has over $18 billion in accrued obligations, including: (a) $3.5 billion in underfunding pension liabilities based on the most recent actuarial analysis; (b) $5.7 billion in other post-employment benefit ("OPEB")

liabilities ($6.4 billion if the present value of future expected benefits is used); (c) $1.13 billion in general obligation ("GO") liabilities (consisting of $650.7 million in unsecured GO debt, plus $479.3 million in secured GO debt); (d) $1.43 billion in liabilities under pension-related certificates of participation ("COPs"); (e) $343.6 million in swap liabilities related to the COPs; (f) approximately $6.4 billion in obligations backed by enterprise revenues or that are otherwise secured; and (g) $300 million in other liabilities.

The City's substantial long-term obligations and legacy liabilities impede its ability to operate within its budget. Debt service for the City's general fund related to limited tax and unlimited tax GO debt and the COPs was $225.3 million for fiscal year 2012, and is projected to exceed $247 million in fiscal year 2013 and to increase further in the future. Currently, more than $0.38 of every tax dollar that the City collects goes to service legacy costs, debt and other obligations rather than toward providing services for the City's residents and businesses. Without adjustment, that number is expected to grow to almost $0.65 of every dollar by 2017.

This level of debt is simply unsustainable. This situation has been managed to date only by deferring other obligations, cutting services to the bone and ignoring the substantial and obvious need for reinvestment in the City. Residents have paid for this approach with a diminishing quality of life in a City that, over time, has increasingly struggled to protect the health, safety and welfare of its citizens.

### *Growing Budget Deficits*

For many years, the City's expenditures have exceeded its revenues, and the City has deferred paying certain obligations just to make ends meet. Excluding the proceeds of debt issuances (e.g., $75 million in fiscal year 2008; $250 million in fiscal year 2010; $129.5 million in fiscal year 2013), the City has incurred operating deficits for each of the past six years (through fiscal year 2013), and the City's accumulated deficit continues to grow. As of the end of fiscal year 2012, the City had an accumulated unrestricted general fund deficit of $326.6 million, an increase of $130 million over fiscal year 2011. This deficit increased by an additional $47.4 million in fiscal year 2013 (excluding the impact of a recent debt issuance generating approximately $137 million in proceeds for the City). In the absence of the recent debt issuances, the City's accumulated deficit would have been over $650 million for fiscal year 2012 and approximately $700 million of fiscal year 2013. Absent structural changes, at its current run rate, the City's accumulated deficit could grow to over $1.3 billion by fiscal year 2017.

The City has funded its continuing deficits in a variety of unorthodox and financially imprudent ways, including: (a) the deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) the issuance of both short-term and long-term debt; (c) the deferral of trade payments; (d) borrowing by the City's general fund from other funds, deferrals and cash pooling; and (e) significant furloughs and reductions-in-force. As of June 30, 2013, the City's general fund had outstanding deferrals and

amounts due to other funds and entities of approximately $272 million. Instead of solving the City's financial troubles, these tactics mask the City's true financial condition and continue to bury the City in an ever deepening financial crisis that exacerbates the City's already precarious condition.

### *Continued Liquidity Problems and Negative Cash Flows*

The City also has experienced continued liquidity problems and year after year of negative cash flows, which trends are expected to continue absent intervention. All of the borrowing and cash conservation tactics — including the deferrals described above, as well as wage cuts, employee furloughs/layoffs and other operational cuts — have not stemmed the losses.

With respect to the City's cash flows, the City had negative cash flows of $115.5 million in fiscal year 2012, excluding the impact of proceeds from short-term borrowings. The City had positive net cash flows of $41.5 million in fiscal year 2013, but only as a result of deferring approximately $119 million of current and prior year pension contributions and other payments, among other cash conservation measures. Absent intervention and/or restructuring, the City: (a) is projecting negative cash flows of $198.5 million in the current fiscal year 2014; and (b) will be left in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013.

The City has not been — and currently is not — paying debts as they come due. The City has deferred payment of certain of its General Retirement System ("GRS") and Police and Fire Retirement System ("PFRS") pension funding contributions, and it accrues interest on such deferrals at a rate of 8%. As of June 30, 2013, the City had deferred approximately $106 million in GRS and PFRS pension contributions in the aggregate. Moreover, the City's estimated liability with respect to OPEBs is $6.4 billion, which is almost entirely unfunded. To conserve cash for City operations, including payroll, the City did not make the scheduled $39.7 million in payments on its pension-related COPs that were due on June 14, 2013. The City is insolvent.

### *Measures Already Taken by the City to Address Financial Challenges*

Faced with several years of expenditures exceeding revenues, the City has taken aggressive steps to cut costs from its operations. These measures included, by way of example: (a) entering into a financial stability agreement with the State of Michigan and the resulting creation of a financial advisory board to oversee the City's operations and conduct limited reforms; (b) reducing the number of City employees by more than 22% since fiscal year 2010; (c) implementing revised City employment terms ("CETs") for non-union employees and union employees under expired collective bargaining agreements; (d) increasing certain tax and utility rates; (e) enhancing tax collection initiatives; and (f) reducing other expenditures. By these

reforms, the City estimates that it has been able to realize more than $200 million in annual savings.

Unfortunately, these savings are insufficient to stem the bleeding. Raising new revenues is not a viable option. The City cannot access funds in the capital markets given its financial status at this time, and doing so would only exacerbate its unsustainable debt load. Both as a legal and practical matter, the City cannot increase revenues by raising taxes. The City's current tax rates are at their current statutory maximums. Even if the City somehow could raise taxes, the vast majority of its residents lack the financial wherewithal to bear them. For example, a study earlier this year showed that 47 percent of the City's taxable parcels were delinquent on their 2011 property taxes. In any event, Detroit cannot survive and grow if it remains a high tax, low service city.

Just as the City lacks new revenue sources, it lacks any further leeway to address its financial emergency through operational cuts. The City cannot significantly reduce expenditures by further reducing employee headcount or cutting services beyond the skeleton coverage currently provided, particularly given the archaic state of the City's technological systems and certain mandates in the City's Charter. As just one example, the City's police force already is being paid below market salaries, and is required to combat extraordinary crime rates using outdated and/or inadequate equipment. In 2012, the City's violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000. Further cuts would only exacerbate this safety crisis in the City.

### The City's Circumstances Constitute an Ongoing Financial Emergency

The City's circumstances have been well documented. On February 19, 2013, a financial review team appointed by Governor Snyder (the "Financial Review Team") submitted its report, concluding "that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem." See http://www.freep.com/assets/freep/pdf/C4201116219.PDF. The Financial Review Team's report details many of the issues described above, which led the Governor to make a finding of a financial emergency within the City, and in turn led to my appointment as Emergency Manager. I have further detailed these issues in (among other places) my Financial and Operating Plan and my June 14 Creditor Proposal (both as defined and described below).

### The Efforts of the Emergency Manager to Address the City's Financial Emergency

#### Initial Evaluations and Development of Financial and Operating Plan

Upon my appointment as Emergency Manager in March of this year, we immediately began the process of developing a comprehensive restructuring plan for the City, as well as addressing the City's other urgent needs. At the outset of my term, we met with scores of interested parties, government officials and professional advisors to gather information about the

City's restructuring needs and priorities and participated in interviews and press conferences with local, regional and national news outlets to provide information to the public and promote transparency. I established the Emergency Manager's office and hired limited support staff.

Notably, from day one, I have spent significant time working with the City's financial and legal advisors to cast a critical eye on all of the City's financial obligations and operational issues to develop a realistic assessment of the City's problems, obstacles, needs and opportunities. In particular, I directed these advisors to help me develop the terms of a comprehensive plan to: (a) ensure that the City is able to provide or procure governmental services essential to the health, safety and welfare of its citizens; (b) assure the fiscal accountability and stability of the City; and (c) promote private investment in the City and revitalization of the community in a sustainable fashion.

As a first step in this process, I worked with the City's advisors to develop a financial and operating plan for the City (the "Financial and Operating Plan"), which placed the City's challenges in context and defined a series of key restructuring goals and initiatives. The Financial and Operating Plan, dated May 12, 2013, was submitted to Treasurer Dillon as required by section 11(2) of PA 436 and is available on the City's website at http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20Detroit%20-%20Final%20Financial%20&%20Operational%20Plan%20_45%20Day%20Pl.pdf. The Financial and Operating Plan, by its terms, was a "preliminary report based on the Emergency Manager's work [as of that] date and remain[ed] subject to material change as this work progresses."

### *Development of Creditor Proposal and Negotiations with Creditors*

In the month following the submission of the Financial and Operating Plan, I worked with the City's advisors to complete a comprehensive plan to rectify the City's financial emergency, assure the City's financial accountability and revitalize the City's operations. Developing such a plan required substantial efforts to: (a) evaluate the true financial state of the City (including by developing a more realistic assessment of legacy liabilities and likely revenue streams); and (b) analyze the specific operational and reinvestment needs of the City. The outcome of this work is reflected in the Proposal for Creditors, dated June 14, 2013, a copy of which is enclosed with this letter and is available on the City's website at http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20Detroit%20Proposal%20for%20Creditors1.pdf (the "June 14 Creditor Proposal").

The June 14 Creditor Proposal contains extensive information regarding the state of the City's finances and operations and a comprehensive proposal to restructure the City's obligations. In addition to describing Detroit's current economic circumstances, the 128-page June 14 Creditor Proposal describes a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group.

The June 14 Creditor Proposal is based on revised ten-year financial projections that provide a realistic basis for evaluating the City's financial wherewithal to address creditor claims and achieve its restructuring goals.

### *Meeting to Discuss June 14 Creditor Proposal*

On June 14, 2013, at an approximately two-hour meeting, I presented an Executive Summary of the June 14 Creditor Proposal to approximately 150 invited representatives of the City's creditors, including representatives of: (a) the City's funded debt; (b) the insurers of such debt; (c) all of the City's unions (representing over 45 bargaining units); (d) certain retiree associations; (e) the GRS and the PFRS; and (f) many bondholders. Attendees received copies of both the Executive Summary and the full June 14 Creditor Proposal. At the conclusion of the meeting, my advisors and I invited all creditor representatives to meet and engage in a dialogue with City representatives regarding the proposal. I indicated that I would welcome modifications and alternative ideas consistent with the City's (a) urgent need for reinvestment to improve essential City services and (b) current and projected cash flows.

### *Individual Follow-Up Meetings*

Having provided the facts and proposals contained in the June 14 Creditor Proposal to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the date hereof. The City offered to meet with as many creditor representatives as were interested in doing do.

These negotiations and follow-up meetings with creditors included the following:

- On June 20, 2013, the City's advisors conducted meetings with representatives of all of the City's unions and four retiree associations to: (a) present a more in-depth look at the City's analysis of its retiree health and pension obligations; (b) suggest proposals for the modification thereof that the City could fund within its means going forward; and (c) solicit the unions' and retirees' views on their preferred way to address the dramatic, but necessary, benefit modifications.

- On June 25, 2013, City advisors met with representatives and advisors for (a) all six insurers of the City's funded bond debt, (b) the GRS and the PFRS and (c) U.S. Bank, National Association ("U.S. Bank"), the trustee or paying agent for the bulk of the City's bond issuances. At this meeting, the City provided a detailed, comprehensive review of the City's finances and its financial and operating plan. In addition, from June 25, 2013 to June 27, 2013, the City's advisors held individual follow-up meetings with each insurer that requested such a meeting.

- On July 9, 2013 and July 10, 2013, the City held extensive follow-up diligence sessions with business people and financial advisors for the GRS, PFRS and debt insurers focused on the City's ten-year projections, operating plan and restructuring initiatives.

- On July 10, 2013, the City held follow-up diligence sessions with representatives and advisors of the GRS and PFRS and the unions related to the City's ability to continue to provide for the underfunded GRS and PFRS pensions and the ramifications to the pensions.

- On July 11, 2013, the City held follow-up diligence sessions with business people and advisors for the unions to engage in discussions on retiree benefit issues.

- The City's negotiations with the counterparties to its pension-related swap contracts (which have been ongoing since 2012) intensified in recent weeks and included: (a) several in-person and telephonic meetings among the City, swap counterparties and their respective advisors; (b) the exchange of various economic offers between the parties; and (c) the generation of numerous draft agreements memorializing such offers.

### *Barriers to Reaching Agreement*

Although these creditor meetings generally were constructive and were conducted by the City in good faith, the City has been unable through this process to achieve both: (a) sufficient consensual savings from its major creditor constituencies to ameliorate its cash crisis; and (b) sufficient contract amendments to successfully restructure its finances. Likewise, there is no realistic prospect of reaching agreements with all affected constituencies in a timely fashion (or at all). Given the vast and fragmented pool of potential creditors, the City cannot practicably negotiate a consensual restructuring with all of its creditors outside of a court process.

For example, the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable without court intervention because: (a) the approximately 20,000 retirees entitled to receive retiree benefits from the City cannot be bound by out-of-court negotiations between the City and the 47 discrete union bargaining units that might or might not represent these retirees; and (b) in any event, the majority of those units have expressly refused to represent such retirees.

Moreover, the City generally is unable to negotiate with bargaining representatives with the authority to bind the City's bondholders. Either (a) U.S. Bank acts solely as a paying agent (and not as a trustee) with respect to a given series of bonds; (b) the debt is uninsured, such that no insurer of the City's funded bond debt (any such insurer, a "Bond Insurer") has the right to control an out-of-court restructuring of the debt; or (c) the debt is insured but the Bond Insurer

has no control rights (provided that the Bond Insurer has not made a payment under its respective policy). In addition, to date, no bondholder group holding a majority of any of the 60 series of debt has organized so that the City could negotiate with them. Under these circumstances, negotiations regarding the out-of-court restructuring of the City's bonds is impracticable because in many instances the City is unable to negotiate with a single contact with the authority and willingness to bind its bondholders.

Despite these impediments to achieving an out-of-court resolution with creditors, as set forth above, the City nevertheless attempted, in good faith, to negotiate with many key creditors, presenting its proposals to all known constituencies, soliciting feedback and engaging in meetings with all parties willing to come to the table. The City responded to all requests for additional information and to all questions it received in these negotiations. The fragmented and often non-binding nature of these negotiations has frustrated the City's ability to achieve a consensual restructuring of its debt. Certain parties rejected the City's proposals altogether. In other cases, creditors made untenable "counterproposals" suggesting that they should not be materially impaired or should not be impaired at all. These proposals were made notwithstanding explicit or implicit agreement that the City's debt and other legacy liabilities must be reduced.

Even in the face of numerous obstacles, the City was able to make some progress in creditor negotiations. For example, the City's good faith attempts to negotiate with the counterparties to its swap contracts have been productive. These discussions were temporarily sidetracked when a certain swap insurer blocked the City's access to wagering tax revenues (which were pledged in 2009 as collateral to resolve a prior termination event under the swap contracts). The insurer's actions stalled negotiations and forced the City to protect its interests by commencing litigation, seeking, among other things: (a) the recovery of damages suffered by the City; and (b) the release of revenues held by U.S. Bank, as custodian. The City obtained a temporary restraining order in this matter, but litigation with the swap insurer remains in progress. After the initial flurry of litigation activity, negotiations with the swap counterparties continued, leading to an agreement in principle to resolve the significant swap claims and related issues potentially impacting the City's liquidity. This agreement with the swap counterparties is beneficial to the City, but, by itself, it falls far short of addressing all of the City's restructuring needs.

In light of the overall inability or failure of many stakeholders to respond to the negotiations and the limited successes in creditor negotiations to date, and considering the urgency of the City's situation, a global consensual resolution will not be achieved in a timely fashion. We have evaluated other alternatives to address the City's financial emergency, but none of these alternatives would resolve the critical problems faced by the City and its residents.

**Recommendation to Seek Relief under Chapter 9**

Unable to negotiate an out-of-court resolution that simultaneously addresses the City's dire financial situation while laying the foundation for a strong and prosperous City going forward, and having exhausted all other available options, I hereby recommended, in accordance with section 18(1) of PA 436, that the City be authorized to file for relief under chapter 9 of the Bankruptcy Code. This recommendation is based on my determination that, without such a filing, no reasonable alternative to rectifying the financial emergency of the City exists because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency in a timely manner, as described herein.

I believe that chapter 9 provides a framework that will permit the City to rectify its financial emergency. Chapter 9 will enable the City to negotiate with and bind creditors in a way that has proven to be impossible outside of chapter 9. For example, the City intends to seek the appointment of an official committee of retirees that can negotiate for and bind retirees. The plan of adjustment process set forth in the Bankruptcy Code likewise creates a mechanism by which the City may bind all of its creditors, even if all creditors do not assent to the City's restructuring plan. Given the impracticability of negotiating with the City's various stakeholders outside of chapter 9, and in light of the City's cash crisis and the urgent need to move forward with its restructuring, the time to seek chapter 9 relief is now.

Based on my discussions with the City's advisors, I believe that, if authorized to proceed under chapter 9 as requested herein, the City will have satisfied all five of the chapter 9 eligibility requirements and will be in a strong position to address any eligibility issues in court as necessary. In particular, the five elements of chapter 9 eligibility are the following:

- The City must be a municipality, which it is.

- The City must be specifically authorized, in its capacity as a municipality or by name, to be a debtor under chapter 9 by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under chapter 9. PA 436 authorizes the commencement of a chapter 9 case by the Emergency Manager upon the Governor's authorization.

- The City must be insolvent. As described herein, it is.

- The City must desire to effect a plan to adjust its debts. As described herein, the City desires to, and must, adjust its debts in chapter 9 to alleviate its financial emergency and to implement its restructuring plan.

- The City also must meet one of four remaining alternate requirements, two of which are particularly relevant here. First, the City is unable to negotiate with creditors

because such negotiation is impracticable for the various reasons described above. In addition, despite the impracticability, the City has negotiated in good faith with the creditors willing to engage in a discussion, but has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that the City intends to impair under a chapter 9 plan. For both of these reasons, the City satisfies the final element of eligibility for chapter 9.

If the City is authorized to proceed under chapter 9, I intend to move the chapter 9 case along as expeditiously as possible. A focused effort on pursuing a chapter 9 plan will provide the City with the opportunity to achieve a reasonably prompt path out of bankruptcy and towards the bright and prosperous future that it deserves.

Please note that, if the City is authorized to proceed under chapter 9, I will continue to serve as the Emergency Manager with the powers afforded by PA 436. In addition, under section 18(1) of PA 436, I will act exclusively on the City's behalf in a chapter 9 case. In that capacity, I will continue to provide regular updates to you, to other stakeholders and to the public as necessary or appropriate. Indeed, given that after 18 months I may be removed from my position as Emergency Manager under PA 436, my goal is to implement a plan of adjustment and conclude the City's chapter 9 case no later than September 2014. I also intend to pursue ongoing operational and performance reforms within this timeframe.

~ ~ ~

In sum, despite aggressive cost cutting measures already implemented by the City and despite good faith negotiations (where they could be had), no reasonable alternative for the restructuring of the City's operations and obligations exists other than through chapter 9. Without chapter 9 relief, there is no clear path for rectifying the City's financial emergency and the City's deteriorating financial cycle will not only continue, but accelerate. As such, I respectfully recommend that the City be authorized to proceed under chapter 9 so that we may, at last, stop the City's downward spiral and correct the City's financial condition in a sustainable fashion.

I am available at your convenience to discuss the content of this letter with both of you and your staffs and to answer any questions you may have. I recognize that the recommendation made in this letter is somewhat unprecedented, but it is my firmly held finding, as Emergency Manager, that a chapter 9 bankruptcy filing is the only available means to comprehensively rectify the City's unsustainable financial condition. I look forward to your response with respect to this matter of utmost importance to the City of Detroit and to the great State of Michigan.

Sincerely,

Kevyn D. Orr
Emergency Manager

Enclosure

# EXHIBIT K



STATE OF MICHIGAN
### EXECUTIVE OFFICE
LANSING

RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

VIA HAND AND ELECTRONIC DELIVERY

July 18, 2013

Kevyn D. Orr
Emergency Manager
City of Detroit
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 1126
Detroit, MI 48226

Andrew Dillon
State Treasurer
Michigan Department of Treasury
4th Floor Treasury Building
430 W. Allegan Street
Lansing, MI 48992

Re: Authorization to Commence Chapter 9 Bankruptcy Proceeding

Dear Mr. Orr and Mr. Dillon,

I have reviewed Mr. Orr's letter of July 16, 2013, requesting my approval of his recommendation to commence a bankruptcy proceeding for the City of Detroit under Chapter 9 of title 11 of the United States Code. As you know, state law requires that any such recommendation must first be approved by the Governor before the emergency manager may take that step. MCL 141.1558. For the reasons discussed below, I hereby approve that recommendation and authorize Mr. Orr to make such a filing.

### Current Financial Emergency

In reviewing Mr. Orr's letter, his Financial and Operating Plan, and his report to creditors, it is clear that the financial emergency in Detroit cannot be successfully addressed outside of such a filing, and it is the only reasonable alternative that is available. In other words, the City's financial emergency cannot be satisfactorily rectified in a reasonable period of time absent this filing.

I have reached the conclusion that this step is necessary after a thorough review of all the available alternatives, and I authorize this necessary step as a last resort to return this great City to financial and civic health for its residents and taxpayers. This decision comes in the wake of 60 years of decline for the City, a period in which reality was often

ignored. I know many will see this as a low point in the City's history. If so, I think it will also be the foundation of the City's future – a statement I cannot make in confidence absent giving the City a chance for a fresh start, without burdens of debt it cannot hope to fully pay. Without this decision, the City's condition would only worsen. With this decision, we begin to provide a foundation to rebuild and grow Detroit.

Both before and after the appointment of an emergency manager, many talented individuals have put enormous energy into attempting to avoid this outcome. I knew from the outset that it would be difficult to reverse 60 years of decline in which promises were made that did not reflect the reality of the ability to deliver on those promises. I very much hoped those efforts would succeed without resorting to bankruptcy. Unfortunately, they have not. We must face the fact that the City cannot and is not paying its debts as they become due, and is insolvent.

After reading Mr. Orr's letter, the Financial and Operating Plan, and the report to creditors, I have come to four conclusions.

1. Right now, the City cannot meet its basic obligations to its citizens.

2. Right now, the City cannot meet its basic obligations to its creditors.

3. The failure of the City to meet its obligations to its citizens is the primary cause of its inability to meet its obligations to its creditors.

4. The only feasible path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring via the bankruptcy process that recognizes the fundamental importance of ensuring the City can meet its basic obligations to its citizens.

I will explain how I came to each conclusion.

**Inability to Meet Obligations to Its Citizens.** As Mr. Orr's Financial and Operating Plan and the June 14 Creditor Proposal have noted, the scale and depth of Detroit's problems are unique. The City's unemployment rate has nearly tripled since 2000 and is more than double the national average. Detroit's homicide rate is at the highest level in nearly 40 years, and it has been named as one of the most dangerous cities in America for more than 20 years. Its citizens wait an average of 58 minutes for the police to respond to their calls, compared to a national average of 11 minutes. Only 8.7% of cases are solved, compared to a statewide average of 30.5%. The City's police cars, fire trucks, and ambulances are so old that breakdowns make it impossible to keep up the fleet or properly carry out their roles. For instance, only a third of the City's ambulances were in service in the first quarter of 2013. Similarly, approximately 40% of the City's street lights were not functioning in that quarter and the backlog of complaints is more than 3,300 long. Having large swaths of largely abandoned structures -- approximately 78,000 – creates additional public safety problems and reduces the quality of life in the City. Mr. Orr is correct that meeting the obligations the City has to

its citizens to provide basic services requires more revenue devoted to services, not less.

**Inability to Meet Obligations to Its Creditors.** The City has more than $18 billion in accrued obligations. A vital point in Mr. Orr's letter is that Detroit tax rates are at their current legal limits, and that even if the City was legally able to raise taxes, its residents cannot afford to pay additional taxes. Detroiters already have a higher tax rate than anywhere in Michigan, and even with that revenue the City has not been able to keep up with its basic obligations, both to its citizens and creditors. Detroit simply cannot raise enough revenue to meet its current obligations, and that is a situation that is only projected to get worse absent a bankruptcy filing.

**Failure to Meet Obligations to Citizens Creates Failure to Meet Obligations to Creditors.** Mr. Orr's letter and prior report put in stark reality the dramatic impact of the City's plummeting population. While many who love Detroit still live there, many other Detroiters at heart could not justify the sacrifice of adequate services. The City's population has declined 63% from its peak, including a 28% decline since 2000. That exodus has brought Detroit to the point that it cannot satisfy promises it made in the past. A decreasing tax base has made meeting obligations to creditors impossible. Mr. Orr is correct when he says the City cannot raise the necessary revenue through tax increases, and it cannot save the necessary revenue through reducing spending on basic services. Attempts to do so would only decrease the population and tax base further, making a new round of promises unfulfillable.

**Only One Feasible Path Offers a Way Out.** The citizens of Detroit need and deserve a clear road out of the cycle of ever-decreasing services. The City's creditors, as well as its many dedicated public servants, deserve to know what promises the City can and will keep. The only way to do those things is to radically restructure the City and allow it to reinvent itself without the burden of impossible obligations. Despite Mr. Orr's best efforts, he has been unable to reach a restructuring plan with the City's creditors. I therefore agree that the only feasible path to a stable and solid Detroit is to file for bankruptcy protection.

The past weeks have reaffirmed my confidence that Mr. Orr has the right priorities when it comes to the City of Detroit. I am reassured to see his prioritization of the needs of citizens to have improved services. I know we share a concern for the public employees who gave years of service to the City and now fear for their financial future in retirement, and I am confident that all of the City's creditors will be treated fairly in this process. We all believe that the City's future must allow it to make the investment it needs in talent and in infrastructure, all while making only the promises it can keep. Let us remain in close communication regarding measures Mr. Orr might take so we can discuss the possible impacts that might occur both within and outside of the City.

## Contingencies

2012 PA 436 provides that my approval of the recommendation to commence a Chapter 9 proceeding may place contingencies on such a filing. MCL 141.1558(1). I am choosing not to impose any such contingencies today. Federal law already contains the most important contingency – a requirement that the plan be legally executable. 11 USC 943(b)(4).

## Conclusion

In conclusion, I find Mr. Orr's Recommendation Letter to be persuasive, especially in conjunction with his prior reports laying out the level of services the City can provide and its financial ability to meet its obligations to creditors. I am also convinced that Mr. Orr has exercised his best efforts to arrive at a restructuring plan with the City's creditors outside of bankruptcy, to no avail. Given these facts, the only feasible path to sustainability for the City of Detroit is a filing under chapter 9 of the bankruptcy code. Therefore, I hereby approve Mr. Orr's recommendation and authorize the emergency manager to make such a filing on behalf of the City of Detroit and to take all actions that are necessary and appropriate toward that end.

Sincerely,

Richard D. Snyder
Governor
State of Michigan

# EXHIBIT L



### EMERGENCY MANAGER
### CITY OF DETROIT

### ORDER No. 13

### FILING OF A PETITION UNDER CHAPTER 9
### OF TITLE 11 OF THE UNITED STATES CODE

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of this act;" and

Section 18(1) of PA 436 provides that "[i]f, in the judgment of the [EM], no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the [EM] may recommend to the governor and the

state treasurer that the local government be authorized to proceed under chapter 9" of title 11 of the United States Code (the "Bankruptcy Code"); and

Section 18(1) of PA 436 further provides that "[i]f the governor approves of the [EM's] recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision.... Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9 [of the Bankruptcy Code]. This section empowers the local government for which an emergency manager has been appointed to become a debtor under [the Bankruptcy Code], as required by section 109 of [the Bankruptcy Code], and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9" of the Bankruptcy Code; and

In accordance with section 18 of PA 436, the EM has recommended to the Governor of Michigan (the "Governor") and the Michigan State Treasurer (the "State Treasurer") that the City be authorized to proceed under chapter 9 of the Bankruptcy Code (the "Recommendation"); and

The Governor has provided the State Treasurer and the EM with his written approval of the Recommendation, a true and correct copy of which is attached hereto as Exhibit A, thereby authorizing the City to proceed under chapter 9.

**It is hereby ordered that:**

1. The City shall file a petition for relief under chapter 9 of the Bankruptcy Code (the "Petition") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court").

2. The City's Corporation Counsel, financial advisors, outside legal advisors and other officers and employees of the City, as applicable, are hereby authorized and directed, on behalf of and in the name of the City, to execute and verify the Petition and related Bankruptcy Court filings and perform any and all such acts as are reasonable, appropriate, advisable, expedient, convenient, proper or necessary to carry out this Order, as and to the extent directed by the EM or his designee.

3. If any component of this Order is declared illegal, unenforceable or ineffective in a legal or other forum or proceeding such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

4. This Order is effective immediately upon the date of execution below.

5. This Order shall be distributed to the Mayor, City Council members and all department heads.

6. The EM may modify, rescind, or replace this Order at any time.

Dated: July 18, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
       Mayor David Bing
       Members of Detroit City Council

3

# EXHIBIT A

## Governor's Written Approval of Recommendation



RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

VIA HAND AND ELECTRONIC DELIVERY

July 18, 2013

Kevyn D. Orr
Emergency Manager
City of Detroit
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 1126
Detroit, MI 48226

Andrew Dillon
State Treasurer
Michigan Department of Treasury
4th Floor Treasury Building
430 W. Allegan Street
Lansing, MI 48992

Re: Authorization to Commence Chapter 9 Bankruptcy Proceeding

Dear Mr. Orr and Mr. Dillon,

I have reviewed Mr. Orr's letter of July 16, 2013, requesting my approval of his recommendation to commence a bankruptcy proceeding for the City of Detroit under Chapter 9 of title 11 of the United States Code. As you know, state law requires that any such recommendation must first be approved by the Governor before the emergency manager may take that step. MCL 141.1558. For the reasons discussed below, I hereby approve that recommendation and authorize Mr. Orr to make such a filing.

### **Current Financial Emergency**

In reviewing Mr. Orr's letter, his Financial and Operating Plan, and his report to creditors, it is clear that the financial emergency in Detroit cannot be successfully addressed outside of such a filing, and it is the only reasonable alternative that is available. In other words, the City's financial emergency cannot be satisfactorily rectified in a reasonable period of time absent this filing.

I have reached the conclusion that this step is necessary after a thorough review of all the available alternatives, and I authorize this necessary step as a last resort to return this great City to financial and civic health for its residents and taxpayers. This decision comes in the wake of 60 years of decline for the City, a period in which reality was often

GEORGE W. ROMNEY BUILDING • 111 SOUTH CAPITOL AVENUE • LANSING, MICHIGAN 48909
www.michigan.gov

13-53846-tjt   Doc 11 Filed 07/18/13   Entered 07/18/13 16:05:24   Page 66 of 9   471
13-53846-tjt   Doc 2334-11   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 43 of
46

ignored. I know many will see this as a low point in the City's history. If so, I think it will also be the foundation of the City's future – a statement I cannot make in confidence absent giving the City a chance for a fresh start, without burdens of debt it cannot hope to fully pay. Without this decision, the City's condition would only worsen. With this decision, we begin to provide a foundation to rebuild and grow Detroit.

Both before and after the appointment of an emergency manager, many talented individuals have put enormous energy into attempting to avoid this outcome. I knew from the outset that it would be difficult to reverse 60 years of decline in which promises were made that did not reflect the reality of the ability to deliver on those promises. I very much hoped those efforts would succeed without resorting to bankruptcy. Unfortunately, they have not. We must face the fact that the City cannot and is not paying its debts as they become due, and is insolvent.

After reading Mr. Orr's letter, the Financial and Operating Plan, and the report to creditors, I have come to four conclusions.

1. Right now, the City cannot meet its basic obligations to its citizens.

2. Right now, the City cannot meet its basic obligations to its creditors.

3. The failure of the City to meet its obligations to its citizens is the primary cause of its inability to meet its obligations to its creditors.

4. The only feasible path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring via the bankruptcy process that recognizes the fundamental importance of ensuring the City can meet its basic obligations to its citizens.

I will explain how I came to each conclusion.

**Inability to Meet Obligations to Its Citizens.** As Mr. Orr's Financial and Operating Plan and the June 14 Creditor Proposal have noted, the scale and depth of Detroit's problems are unique. The City's unemployment rate has nearly tripled since 2000 and is more than double the national average. Detroit's homicide rate is at the highest level in nearly 40 years, and it has been named as one of the most dangerous cities in America for more than 20 years. Its citizens wait an average of 58 minutes for the police to respond to their calls, compared to a national average of 11 minutes. Only 8.7% of cases are solved, compared to a statewide average of 30.5%. The City's police cars, fire trucks, and ambulances are so old that breakdowns make it impossible to keep up the fleet or properly carry out their roles. For instance, only a third of the City's ambulances were in service in the first quarter of 2013. Similarly, approximately 40% of the City's street lights were not functioning in that quarter and the backlog of complaints is more than 3,300 long. Having large swaths of largely abandoned structures -- approximately 78,000 – creates additional public safety problems and reduces the quality of life in the City. Mr. Orr is correct that meeting the obligations the City has to

its citizens to provide basic services requires more revenue devoted to services, not less.

**Inability to Meet Obligations to Its Creditors.** The City has more than $18 billion in accrued obligations. A vital point in Mr. Orr's letter is that Detroit tax rates are at their current legal limits, and that even if the City was legally able to raise taxes, its residents cannot afford to pay additional taxes. Detroiters already have a higher tax rate than anywhere in Michigan, and even with that revenue the City has not been able to keep up with its basic obligations, both to its citizens and creditors. Detroit simply cannot raise enough revenue to meet its current obligations, and that is a situation that is only projected to get worse absent a bankruptcy filing.

**Failure to Meet Obligations to Citizens Creates Failure to Meet Obligations to Creditors.** Mr. Orr's letter and prior report put in stark reality the dramatic impact of the City's plummeting population. While many who love Detroit still live there, many other Detroiters at heart could not justify the sacrifice of adequate services. The City's population has declined 63% from its peak, including a 28% decline since 2000. That exodus has brought Detroit to the point that it cannot satisfy promises it made in the past. A decreasing tax base has made meeting obligations to creditors impossible. Mr. Orr is correct when he says the City cannot raise the necessary revenue through tax increases, and it cannot save the necessary revenue through reducing spending on basic services. Attempts to do so would only decrease the population and tax base further, making a new round of promises unfulfillable.

**Only One Feasible Path Offers a Way Out.** The citizens of Detroit need and deserve a clear road out of the cycle of ever-decreasing services. The City's creditors, as well as its many dedicated public servants, deserve to know what promises the City can and will keep. The only way to do those things is to radically restructure the City and allow it to reinvent itself without the burden of impossible obligations. Despite Mr. Orr's best efforts, he has been unable to reach a restructuring plan with the City's creditors. I therefore agree that the only feasible path to a stable and solid Detroit is to file for bankruptcy protection.

The past weeks have reaffirmed my confidence that Mr. Orr has the right priorities when it comes to the City of Detroit. I am reassured to see his prioritization of the needs of citizens to have improved services. I know we share a concern for the public employees who gave years of service to the City and now fear for their financial future in retirement, and I am confident that all of the City's creditors will be treated fairly in this process. We all believe that the City's future must allow it to make the investment it needs in talent and in infrastructure, all while making only the promises it can keep. Let us remain in close communication regarding measures Mr. Orr might take so we can discuss the possible impacts that might occur both within and outside of the City.

## Contingencies

2012 PA 436 provides that my approval of the recommendation to commence a Chapter 9 proceeding may place contingencies on such a filing. MCL 141.1558(1). I am choosing not to impose any such contingencies today. Federal law already contains the most important contingency – a requirement that the plan be legally executable. 11 USC 943(b)(4).

## Conclusion

In conclusion, I find Mr. Orr's Recommendation Letter to be persuasive, especially in conjunction with his prior reports laying out the level of services the City can provide and its financial ability to meet its obligations to creditors. I am also convinced that Mr. Orr has exercised his best efforts to arrive at a restructuring plan with the City's creditors outside of bankruptcy, to no avail. Given these facts, the only feasible path to sustainability for the City of Detroit is a filing under chapter 9 of the bankruptcy code. Therefore, I hereby approve Mr. Orr's recommendation and authorize the emergency manager to make such a filing on behalf of the City of Detroit and to take all actions that are necessary and appropriate toward that end.

Sincerely,

Richard D. Snyder
Governor
State of Michigan