## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Chapter 9
Case No. 13-53846-swr
Hon. Steven W. Rhodes

---

## OBJECTION OF THE RETIRED DETROIT POLICE MEMBERS ASSOCIATION TO
## CITY OF DETROIT CHAPTER 9 PETITION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   PROCEDURAL AND FACTUAL BACKGROUND ..................................... 2

      A. General Background. .......................................................................... 2

           1.   The Retired Detroit Police Members Association ..................... 2

           2.   Richard D. Snyder, Govenor of Michigan ................................. 2

           3.   Kevin Orr, Emergency Manager ................................................ 3

           4.   The History of PA 436 ............................................................... 4

      B. Procedural Posture. ............................................................................ 6

III.  ARGUMENT ............................................................................................... 8

      A. Legal Standard. ................................................................................... 8

      B. The City of Detroit is Not Eligible for Relief Under Chapter 9 ........ 9

           1.   PA 436 does not Authorize Petitioner's Chapter 9 Petition ...... 9

           2.   The City did not File its Bankruptcy Petition in Good Faith .... 12

           3.   The City is not a Debtor Authorized to Effect a Plan to Adjust Pension Debts
                Under 11 USC §109(c)(2) and (4) ............................................ 13

                a.   The Tenth Amendment Supports a State's Right to Limit Bankruptcy
                     Filings ............................................................................... 14

                b.   In California, Certain Municipalities are not Permitted to File
                     Bankruptcy Petitions ......................................................... 15

                c.   Other States Effectively Restrict which Debts a Municipality may
                     Discharge in Bankruptcy .................................................. 16

                d.   Michigan Does Not Permit a Bankruptcy that Impairs Pensions ............... 17

           4.   City of Detroit Failed to Negotiate with Creditors in Good Faith ...................... 19

           5.   City of Detroit Failed to Clearly Establish Insolvency ...................... 22

IV.   CONCLUSION ......................................................................................... 23

i

# TABLE OF AUTHORITIES

**Cases**

*Advisory Opinion re Constitutionality of 1972* PA 258, 389 Mich. 659 (Mich. 1973) .................11

*In re Alleghany-Highlands Economic Development Authority*, 270 B.R. 647 (Bankr. W.D. Va. 2001)..........................................................................................................................14

*In re Barnwell County Hosp.*, 459 B.R. 903, (Bankr. D. S.C. October 27, 2011).........................14

*California Housing Finance Agency v. Elliott*, 17 Cal. 3d 575 (1976) .........................................10

*In re City of Bridgeport,* 128 B. R. 688, 692 (Dist. Conn. 1991) ..................................................15

*City of Gaylord v. Gaylord City Clerk,* 378 Mich. 273 (1966).......................................................11

*City of Pontiac Retired Employees Ass'n v. Schimmel*, 2013 U.S. App. LEXIS 16519 (6th Cir. Mich. 2013) ...................................................................................................4, 5, 10

*In re City of Stockton, California*, 493 B.R. 772 (Bankr. E.D. Cal. 2013) .....................................13

*In re City of Vallejo,* 408 B.R. 280 (B.A.P. 9th Cir. 2009)............................................................20

*In re Cottonwood Water & Sanitation Dist.*, 138 B.R. 973 (Bankr. D. Colo. 1992)...............15, 19

*In re County of Orange,* 183 BR 594 (Bankr. C. D. Cal. 1995) .........................................9, 12, 22

*Dullam v. Willson*, 53 Mich. 392 (1884) ......................................................................................11

*In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992).............................20, 21

*Energy Reserves Group, Inc v. Kansas Power & Light Co*, 459 U.S. 400 (1983).......................11

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo*, 408 B.R. 280 (B.A.P. 9th Cir. 2009) ...........................................................................................................................................14

*Flowers v. Snyder*, Case No. 13-729-CA........................................................................................6

*Fry v United States,* 421 U.S. 542, 547 n. 7 ................................................................................14

*McCartney v. Attorney General*, 231 Mich. App. 772 (1998)........................................................12

*National League of Cities v Usery,* 426 U.S. 833, 842, 49 L. Ed. 2d 245, 96 S. Ct. 2465 (1976)..........................................................................................................................................14

*In re New York City Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010) .................14

ii

*Oliver v. Kalamazoo Board of Education*, 346 F. Supp. 766 (W.D. Mich. 1971).........................10

*In re Pierce County Housing Authority*, 414 B.R. 702 (Bankr. W.D. Wash. 2009).....................14

*Romein v. General Motors Corp.*, 436 Mich. 515 (Mich. 1990) ...................................................11

*Seitz v. Probate Judges Retirement System*, 189 Mich. App. 445 (Mich. Ct. App. 1991) ............11

*Stand Up For Democracy v. Sec'y of State*, 492 Mich. 588 (2012) .................................................5

*In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60 (Bankr. D.N.H 1994)...... 1, 9, 19

*In re Town of Westlake*, 211 B.R. 860 (Bankr. N.D. Tex. 1997).........................................…...23

*United States v. Bekins,* 304 U.S. 27, 54 (1938) .......................................................................... 15

*In re Valley Health Sys.*, 383 BR 156 (Bankr. C. D. Cal. 2008)..................................... 8, 9, 14, 19

*In re Villages at Castle Rock Metro Dist. No. 4*,145 B.R. 76 (Bankr. D. Colo. 1990)................. 12

*Webster v. Snyder*, Case No. 13-734-CA...................................................................................... 6

*Webster v. The State of Michigan* (Case No. 13-434-CZ) ............................................................ 6

### **Federal Statutes**

11 U.S.C. § 101(32)(C)................................................................................................................ 22

11 U.S.C. § 109(c) ................................................................................................................ 1, 9, 23

11 U.S.C. § 109(c)(2)............................................................................................................ 9, 13, 19

11 U.S.C. § 109(c)(3)................................................................................................................ 22

11 U.S.C. § 109(c)(4)........................................................................................................ 13, 14, 19

11 U.S.C. § 109(c)(5)............................................................................................................ 19, 21

11 U.S.C. § 903 ............................................................................................................ 13, 15

11 U.S.C. § 921(c) ............................................................................................. 8, 12, 13, 22, 23

U.S. Const. art. I, § 8, cl. 3............................................................................................................ 14

13-53846-swr   Doc 520   Filed 08/19/13   Entered 08/19/13 23:55:31   Page 4 of 52   505
13-53846-tjt   Doc 2334-13   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 4 of 52

U.S. Const, art. I § 8, cl. 4..........................................................................................14

U.S. Const, amend. 10 ...............................................................................................14

**Michigan Statutes**

M.C.L. § 141.1201, et seq. ............................................................................................3

M.C.L. § 141.1503, et seq...........................................................................................3, 4,

M.C.L. §141.1519(1)(k)................................................................................................4

M.C.L. § 141.1541, et seq............................................................................................3

M.C.L. § 141.1574 .......................................................................................................5

M.C.L. § 141.1575 .......................................................................................................5

M.C.L. §168.477(2) ......................................................................................................5

Mich. Cost., Art. II, §9............................................................................................5, 9, 10

Mich. Cost., Art. IX, §24 ...................................................................2, 5, 10, 11, 18

**Other State Statutes**

Cal. Gov't Code § 53760............................................................................................15, 16

Iowa Code Ann. § 76.16A ...........................................................................................16

Ky. Rev. Stat Ann. §66.400 ........................................................................................17

Mont. Code Ann. § 7-7-134 ........................................................................................17

53 PA Stat. § 12720.211(a).........................................................................................17

**Additional Authorities**

*1 Official Record, Constitutional Convention 1961*, 770-771.........................................11

2 COLLIER ON BANKRUPTCY ¶ 921.04[2] ...............................................................13

2 COLLIER ON BANKRUPTCY ¶ 900.02 [2][c][1]......................................................13

13-53846-swr    Doc 520    Filed 08/19/13    Entered 08/19/13 23:55:31    Page 5 of 52    506
13-53846-tjt    Doc 2334-13    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 5 of 52

Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually, CBS
    DETROIT, May 12, 2013 .................................................................................................... 21

Joe Guillen, *Pension funds plan to keep pushing for negotiations despite bankruptcy filing*,
    DETROIT FREE PRESS, July 18, 2013 ................................................................................ 21

Chad Halcom, *Detroit bankruptcy's next chapter: A velvet glove or iron fist?*, CRAIN'S DETROIT
    BUSINESS, July 21, 2013 ................................................................................................ 20

*H.R. Rep.* 95-595 at 263 (1977) ............................................................................................ 1

Kirk Pinho, *Union Reps: No 'good faith negotiations' took place before bankruptcy filing*,
    CRAIN'S DETROIT BUSINESS, July 23, 2013 ...................................................................... 21

## OBJECTION OF THE RETIRED DETROIT POLICE
## MEMBERS ASSOCIATION TO CITY OF DETROIT CHAPTER 9 PETITION

The Retired Detroit Police Members Association ("RDPMA"), by and through its attorneys, Strobl & Sharp, P.C., hereby submits this Objection to the Chapter 9 Petition filed by the City of Detroit.

## I.
## PRELIMINARY STATEMENT

The primary purpose of a Chapter 9 bankruptcy "is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors." *H.R. Rep.* 95-595 at 263 (1977), reprinted other authorities 1978 USCCAN 5963, 6221. The general policy considerations are the same as for Chapter 11 reorganization – to give "the debtor a breathing spell from debt collection efforts in order that it can work out a repayment plan with its creditors." *Id.* In order to be eligible for relief under Chapter 9, a municipality, such as the City of Detroit, must meet the eligibility requirements of Section 109(c) of the Bankruptcy Code. 11 USC § 109(c). Chapter 9 was not intended to create authority, *carte blanche,* for municipalities to seek bankruptcy relief.

> "Municipal bankruptcy is quite unlike bankruptcy for individuals or private corporations. The bankruptcy court's jurisdiction should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to chapter 9 relief has been designed to be an intentionally difficult task."

*In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 82 (Bankr. D.N.H 1994).

While Michigan authorizes the filing of a Chapter 9 by municipalities, such authorization is not without limit. Even assuming that the City of Detroit met its burden of establishing its eligibility for relief under Section 109(c) of the Bankruptcy Code, the Michigan Constitution

1

places specific restrictions on what actions the municipality can take while in Chapter 9. Article IX, Section 24, of the Michigan Constitution specifically provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Any provision in Michigan law allowing for the Chapter 9 filing by municipalities cannot simply disregard the constitutional protections afforded the pension benefits of public employees.

**II.**
**PROCEDURAL AND FACTUAL BACKGROUD**

**A. General Background**

**1. The Retired Detroit Police Members Association**

The RDPMA is a recently formed association of retired members of all ranks of the Detroit Police Department. It is properly organized and operating pursuant to bylaws and appropriate governing documents. It has actively organized retired sworn Detroit Police personnel all of whom are currently receiving or will receive pension benefits under the Police Fire Retirement System ("PFRS") in order to provide meaningful information and representation to its members. The RDPMA is a completely independent association that does not have any affiliation with other retiree associations and its chief mission is the protection of the pensions due to the retired Detroit Police Department personnel. The RDPMA currently has hundreds of active dues-paying members.

**2. Richard D. Snyder, Governor of Michigan**

Richard D. Snyder ("Snyder" or "Governor") was elected governor of the State of Michigan on November 2, 2010. On December 30, 2010, Snyder was sworn in as the 48th governor of Michigan. His oath of office, as set forth in Article XI, Section 1 of the Michigan Constitution required him to swear an oath to support the Constitution of the United States as

2

well as the Constitution of the State of Michigan. In March of 2011, Snyder signed Public Act 4 (PA 4) into law, expanding the powers of emergency managers in the State of Michigan. See M.C.L. § 141.1503 *et seq.* Since taking office, Snyder has actively and aggressively placed local governments and governmental agencies under state control.

### 3. Kevin Orr, Emergency Manager

Kevin Orr ("Orr" or "Emergency Manager") was appointed as the Emergency Financial Manager of the City of Detroit by the Governor and the State Treasurer, Andy Dillon, on March 14, 2013, pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. § 141.1201, et seq. ("PA 72"), the predecessor to PA 4 and Public Act 436, the Local Financial Stability and Choice Act, M.C. L. § 141.1541, et seq. ("PA 436") Ostenibly, PA 436 became effective on March 28, 2013. Orr has continued to act as the Emergency Manager of the City of Detroit under PA 436.

On March 23, 2013, the Governor and the State Treasurer caused the appointment of Kevyn D. Orr ("Orr") as the emergency financial manager of the City of Detroit pursuant to PA 72. On March 28, 2013 PA 436 became effective and Orr became the emergency manager of the City of Detroit.

Before taking office, Orr was required to take and swear an oath of office similar to the oath taken by Snyder. Despite the provisions in Article IX, Section 24 of the Michigan Constitution and in total disregard of his oath of office, on June 14, 2013, Orr issued a Proposal for Creditors (the "Orr Plan") which specifically provided that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." See Declaration of Kevin D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, Exhibit A, pg. 109 (hereafter "Docket No. 11"). It is

3

clear that despite his oath of office, Orr has never attempted to comply with the provisions of the Michigan Constitution as they relate to pension benefits of municipal retirees.

Pursuant to the Orr Plan issued on June 14, 2013, some 33 days prior to the filing of the Petition in this matter, it is the Emergency Manager's position that unpaid pension obligations of the Detroit retirees are "unsecured claims" to be impaired in any forthcoming Chapter 9 bankruptcy proceeding with a proposed distribution to be a *pro rata* share of an unsecured post-petition note with a face value of $2,000,000,000.00. See Docket No. 11. Even without the benefit of a Chapter 9, it is clear that Orr intended to disregard the Michigan Constitution by impairing the pension benefits of the Detroit retirees.

### 4. The History of PA 436

In 1990, the Michigan Legislature enacted PA 72, the Local Government Fiscal Responsibility Act. PA 72 established a procedure for Michigan's Governor to appoint emergency managers, and gave those emergency managers the power to address a local government's financial crises. *City of Pontiac Retired Employees Ass'n v. Schimmel*, 2013 U.S. App. LEXIS 16519 (6th Cir. Mich. 2013). See Exhibit A. However, PA 72 failed to provide such emergency managers with a mechanism through which they could effectively modify collective bargaining acts and pension agreements, two municipal obligations that are frequently cited as the largest causes of the brand fiscal strain leading to the appointment of an emergency manager.

In March of 2011, Snyder signed PA 4, the Local Government and School District Fiscal Accountability Act into law. M.C.L. §141.1503. PA 4 not only repealed PA 72, it also provided emergency managers with specific authority to temporarily reject modify or terminate existing collective bargaining agreements. *Id.* (citing M.C.L. §141.1519(1)(k)).

4

The enactment of PA 4 provoked litigation and in August of 2012, the Michigan Supreme Court ordered the Board of State Canvasers to certify the referendum for the November 2012 ballot. *Id* (citing *Stand Up For Democracy v. Sec'y of State*, 492 Mich. 588 (2012)). This certification suspended the operation of PA 4 pending the outcome of the referendum *Id* (citing M.C.L. §168.477(2)).

On November 6, 2012, Michigan voters voted to reject PA 4, thereby cancelling PA 4.

Upon the cancellation of PA 4, the lame duck Michigan Legislature passed, and Snyder signed into law, a substantively similar law in PA 436. In an effort to insulate PA 436 from a voter referendum, the Legislature attached an insignificant spending provision to the bill rendering the bill beyond voter review.

> Apparently unaffected that voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum.

*City of Pontiac*, 2013 U.S. App. LEXIS 16519, at **5-6 (citing M.C.L. §§ 141.1574, 1575). Exhibit A. The enactment of PA 436 made a mockery of the Michigan constitutional provision preserving to the people the power to approve and reject laws. Mich. Const., Art. II, Section 9.

On July 3, 2013, participants in the City of Detroit General Retirement System filed two suits against Snyder and the State Treasurer in Ingham County Circuit Court seeking declaratory judgments finding that PA 436 violates Article IX, Section 24 of the Michigan Constitution to the extent it purports to allow the impairment of accrued retiree benefits in a chapter 9 bankruptcy proceeding and temporary restraining orders prohibiting the Governor from authorizing the filing of a Chapter 9 by the Emergency Manager. *See Flowers v. Snyder*, Case

5

No. 13-729-CA; *Webster v. Snyder*, Case No. 13-734-CA (the "Retiree State Court Cases").

Based on the allegations of counsel in the Retiree State Court Cases, the Governor and his agents

duped the plaintiffs into delaying the hearing on their requests for restraining orders in order to

allow the City to time file its Chapter 9 proceeding before the state court could issue any order.

See Objection of Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce

Goldman and International Union, UAW to Motion of Debtor, Pursuant to Section 105(a) of the

Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State

Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket

No. 146)(the "Flowers Objection").  On July 17, 2013, the Police and Fire Retirement System of

the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit

("GRS")(collectively PFRS and GRS will be referred to as the "Retirement Systems") filed a

third complaint in Ingham County Circuit Court against the Governor and Emergency Manager

seeking similar relief as requested in the Retiree State Court Cases.

On July 19, 2013, Ingham County Circuit Court Judge Rosemarie Aquilina, entered an

Order of Declaratory Judgment (the "Declaratory Judgment") in the matter of *Webster v. The*

*State of Michigan* (Case No. 13-434-CZ) concluding that the State of Michigan's legal basis for

commencement of the City of Detroit's Chapter 9 proceeding violated the Constitution of the

State of Michigan.  Therefore, Judge Aquilina concluded, the filing of the Chapter 9 Petition by

the Emergency Manager was without proper authority.  See Exhibit B.

**B. Procedural Posture**

On July 18, 2013, at approximately 4:06 p.m., as the Plaintiffs in the Retiree State Court

Cases were seeking an injunction in the Ingham County Circuit Court, the City of Detroit filed

its Chapter 9 Petition.  On July 19, 2013, the Debtor filed a Motion Pursuant to Section 105(a) of

6

the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor and a Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code (Docket Nos. 56 and 53 respectively)(collectively, the "Stay Motions"). The RDPMA did not object to the entry of the orders relating to the Stay Motions, and on July 25, 2013 the Court entered orders granting the relief requested, and staying the Pre-Petition Litigation.

Also on July 19, 2013 the Debtor filed a Motion Pursuant to Section 1102(a)(2) of the Bankruptcy Code for Entry of an Order Directing the Appointment of a Committee of Retired Employees (the "Committee Appointment Motion"). The RDPMA filed a limited objection to the Committee Appointment Motion. After a hearing held on August 2, 2013, the Court entered an Order Pursuant to Section 1102(a)(2) of the Bankruptcy Code Directing the Appointment of a Committee of Retired Employees (the "Retiree Committee Order"). As a result of the entry of the Retiree Committee Order, the Office of the United States Trustee has solicited interest in participation on the retiree committee and has scheduled a formation meeting for Tuesday, August 20, 2013. It is anticipated that a retiree committee will be formed and will engage professionals that will be granted sufficient time to file an objection to eligibility on behalf of the Retiree Committee.

Finally, on August 6, 2013, this Court entered a Notice of Commencement of Case Under Chapter 9, Notice of Automatic Stay and Purposes of Chapter 9, Notice of Deadline and Procedures for Filing Objections to the Chapter 9 Petition and Notice of the City's Motion to Limit Notice (the "Commencement Notice".) The Commencement Notice detailed a proposed schedule for the adjudication of any objections to the City of Detroit's eligibility as a Chapter 9

7

debtor. The proposed schedule relating to objections to the Debtor's eligibility begins with an objection deadline of August 19, 2013 and concludes with a hearing on eligibility to be held on October 23, 2013.

## III.
## ARGUMENT

### A. Legal Standard

Under Section 921(c) of the Bankruptcy Code, a municipality's bankruptcy petition must be dismissed if either the debtor did not file the petition in good faith or the debtor does not meet the requirements of Chapter 9. 11 USC § 921(c); *In re Valley Health Sys.*, 383 BR 156, 160 (Bankr. C. D. Cal. 2008) (despite permissive language of the statute, section 921(c) requires dismissal if debtor is not eligible for relief under Chapter 9). Thus, an entity may be a debtor under Chapter 9 if the entity files its petition in good faith, and:

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

8

11 USC § 109(c). The debtor bears the burden of establishing that it meets each of those five statutory requirements of Section 109(c). *In re Valley Health*, 383 BR at 161; *In re County of Orange*, 183 BR 594, 599 (Bankr. C. D. Cal. 1995). As one court explained "[t]he bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases . . . .Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 BR at 82.

### B. The City of Detroit is Not Eligible for Relief Under Chapter 9

#### 1. PA 436 does not Authorize Petitioner's Chapter 9 Petition

Bankruptcy Code Section 109(c) allows those municipalities that have been specifically authorized by state law or a state official empowered by state to authorize such entity to be a debtor under Chapter 9. 11 USC § 109(c)(2). It follows that any law upon which the state or a state official relies upon for the authorization for a Chapter 9 filing must be consistent with the balance of the laws, including the constitution, of the state in question.

In the present instance, PA 436 was passed in derogation of the Michigan constitutional requirement granting citizens of the State of Michigan the power of referendum and, even if not subject to attack, cannot be interpreted to allow the Governor or an Emergency Manager to disregard constitutional mandates. As indicated, PA 436 was passed in the dark of night after the Michigan electorate had rejected PA 4, a law inherently designed to accomplish the same goals as PA 436. In an effort to avoid subjecting PA 436 to rejection through the referendum process, an insignificant spending provision was attached. The spending provision removed PA 436 from scrutiny of the Michigan electorate as required by Article II, Section 9 of the Michigan Constitution which provides, in relevant part specifically that "[t]he people reserve to themselves

9

. . . the power to approve or reject laws enacted by the legislature, called the referendum. . . . The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds" Mich. Const., Art. II, §9. In reviewing the manner in which PA 4 was enacted and rendered effective, the Sixth Circuit noted that "[a]pparently, the Michigan Legislature believes the Michigan Constitution can be ignored." *City of Pontiac Retired Employees Ass'n.,* supra, at *17. The *City of Pontiac* Court noted that PA 4 typifies the "farce" the Michigan Legislature is willing to engage in in passing legislation beyond the scope of the Michigan Constitution. *Id.* "An act of the legislature, repugnant to the constitution, is void." *Oliver v. Kalamazoo Board of Education,* 346 F. Supp. 766 (W.D. Mich. 1971).

Assuming that upon review PA 436 would be held to be constitutional despite the Michigan Legislature's clear disregard of the rejection of PA 4 by the electorate and the artifice used by the Legislature to avoid the constitutional provision requiring a referendum, PA 436 must nonetheless be read in conjunction with the balance of the Michigan Constitution. "Thus, wherever possible, we will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute. [citations omitted]." *California Housing Finance Agency v. Elliott,* 17 Cal. 3d 575, 594 (1976). PA 436 cannot simply read Article IX, Section 24 out of the Michigan Constitution. It is beyond the power of the Legislature to delegate to the federal bankruptcy courts the power to do indirectly that which the City is prohibited from doing directly itself.

In its June 14, 2013 "Proposal for Creditors," the City of Detroit and Orr declared that it would treat the pension obligations as unsecured debt. (Docket No. 11, p. 116). By intending to treat the pension obligations as unsecured debt, the City of Detroit is acting in direct violation of the Michigan Constitution. Michigan has held that the contracts clause can be impaired in order

10

to "safeguard the vital interests of the people." *See Romein v. General Motors Corp.*, 436 Mich. 515, 534 (Mich. 1990)(quoting *Energy Reserves Group, Inc v. Kansas Power & Light Co*, 459 U.S. 400, 410 (1983)). However, Article IX, §24 does not allow a similar impairment of pension obligations. Case law reaffirms that the pension provision of the Michigan Constitution "protects those persons covered by a state or local pension or retirement plan from having their benefits reduced." *Seitz v. Probate Judges Retirement System,* 189 Mich. App. 445, 451 (Mich. Ct. App. 1991). It is further explained that "the benefits of pension plans are in a sense deferred compensation for work performed…which should not be diminished by the employing unit after the service has been performed." *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich. 659, 663 (1973)(quoting *1 Official Record, Constitutional Convention 1961*, 770-771). Thus, the City of Detroit cannot diminish the already accrued financial benefits without ignoring the constitutional obligations set forth in Article IX, §24.

Any action taken by the Governor or State Treasurer pursuant to PA 436 that ignores the constitutional mandates in Article IX, Section 24, would be beyond their constitutional authority and therefore "null and void." The Michigan Supreme Court has historically recognized that the governor is bound by the Michigan Constitution and any action outside his constitutional authority is *ultra vires* and void *ab initio*. *Dullam v. Willson,* 53 Mich. 392 (1884) (finding for the respondent trustee on the ground that the statute pursuant to which the governor purported to act was invalid because it violated the Constitution of 1835, in effect when the statute was enacted, notwithstanding that our Constitution of 1850, as amended in 1862, expressly authorized the governor to exercise the power of removal such as the legislature had purported to grant him in the statute of 1846). *See also, City of Gaylord v. Gaylord City Clerk*, 378 Mich.

273, 331 (1966); *McCartney v. Attorney General*, 231 Mich. App. 772, 726 (1998). An act that is void *ab initio*, is null and void for all purposes as of the time it occurs.

Snyder exceeded his constitutional authority when he authorized the filing of a Chapter 9 Petition by the Emergency Manager knowing he would propose a plan of adjustment impairing the accrued pension benefits of the City of Detroit Retirees. Section 26(a) of PA 436 specifically authorizes the Govenor to place contingencies on any bankrupty filing by the City of Detroit. By failing to condition the actions the Emergency Manager could take with respect to the Detroit retirees' pensions. The authorization for the Emergency Manager to file a Chapter 9 was void *ab initio* and therefore the Chapter 9 filing by City of Detroit was void.

### 2. The City did not File its Bankruptcy Petition in Good Faith

Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title." 11 USC §921(c). The essence of this good faith requirement is to "prevent abuse of the bankruptcy process." *In re Villages at Castle Rock Metro Dist. No. 4,*145 B.R. 76, 81 (Bankr. D. Colo. 1990).

The Bankruptcy Code does not define good faith. Courts have looked to the good faith requirements for Chapter 11 cases to determine whether a Chapter 9 Petition has been filed in good faith. *Id.; see also, In re County of Orange*, 183 B.R. at 608. The "relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's prepetition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced

12

by denying chapter 9 relief." *In re City of Stockton, California*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013)(citing 2 COLLIER ON BANKRUPTCY ¶ 921.04[2]).

It is clear that the City of Detroit's bankruptcy filing lacks the good faith required by Section 921(c). As demonstrated by the *Flowers* Objection (Docket No. 146), the Chapter 9 Petition was filed literally minutes before the plaintiffs in the various state court suits argued their motions for restraining orders prohibiting the filings. The hearings on the restraining orders were delayed in good faith by the state court plaintiffs, based on the *Flowers* Objection, based upon the bad faith request of the Attorney General's Office in a ruse to avoid a hearing before the Chapter 9 Petition could be filed. The filing was an attempt by the Emergency Manager to avoid a negative state court ruling that may have prohibited or at least limited his authority to file a Chapter 9 Petition.

Moreover, the prepetition actions of the Emergency Manager tend to indicate that at all times since his appointment the City was on a path careening towards a Chapter 9 filing. There were no negotiations with creditors – merely a take it or leave it proposal. There is no evidence the City investigated other alternatives that may have avoided the Chapter 9 bankruptcy. The bankruptcy filing was, and always has been, viewed by the Governor and the Emergency Manager as the only means available to take control of the City's finances.

### 3. The City is not a Debtor Authorized to Effect a Plan to Adjust Pension Debts Under 11 USC §109(c)(2) and (4)

To be eligible for Chapter 9 relief, a petitioning municipality must meet the five criteria listed in § 109(c). Specifically, under § 109(c)(2) a municipality may be a Chapter 9 debtor only if it, "is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter . . . ." Further, the municipality must,

13

"desire[ ] to effect a plan to adjust such debts." 11 U.S.C. §109(c)(4). The burden of establishing eligibility is on the debtor. *In re Valley Health Sys.,* 383 B.R. at 161 (Bankr. CD. Cal. 2008); *see also In re Barnwell County Hosp.,* 459 B.R. 903, (Bankr. D. S.C. October 27, 2011); *In re Pierce County Housing Authority,* 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009); *In re Alleghany-Highlands Economic Development Authority,* 270 B.R. 647, 649 (Bankr. W.D. Va. 2001). If the petitioner is unable to demonstrate that all elements have been satisfied, the petition must be dismissed. *In re New York City Off-Track Betting Corp.,* 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) *(citing Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo),* 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009).

### a. The Tenth Amendment Supports a State's Right to Limit Bankruptcy Filings

The Tenth Amendment to the United States Constitution provides that, "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People." U.S. Const. amend. X. The separation of powers between the federal government and those of state governments have been well defined by the Supreme Court of the United States. In *National League of Cities v Usery*, 426 U.S. 833, 842, 49 L. Ed. 2d 245, 96 S. Ct. 2465 (1976), the Supreme Court held:

> Insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Article I, § 8, cl. 3.

See also, *Fry v United States*, 421 U.S. 542, 547 n. 7 (the Tenth Amendment precludes Congress from exercising any power in a fashion that impairs a State's integrity or its ability to function effectively in a federal system).

While Congress is the sole entity with the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" (U.S. Const, art. I § 8, cl. 4), where federal

14

bankruptcy law overlaps with the rights of an individual state to regulate the activities of political subdivisions created by the state, the Tenth Amendment and the concept of dual sovereignty as defined therein must be examined. In short, Congress has made protections under the Bankruptcy Code available to municipalities, however, states retain their rights to limit access by their political subdivisions to bankruptcy relief. The court in *In re City of Bridgeport*, 128 B. R. 688, 692 (Dist. Conn. 1991) explained this concept as follows:

> Thus, chapter 9 does not give a city the power to file a bankruptcy petition. Rather, it is the state which must decide whether to empower its cities to file. As the Supreme Court stated in *United States v. Bekins, 304 U.S. 27, 54, 82 L. Ed. 1137, 58 S. Ct. 811 (1938)*, bankruptcy law is designed so that a state may allow "the intervention of the bankruptcy power to save its agency [the city] which the State itself is powerless to rescue. Through [the State's] cooperation with the national government the needed relief is given."

In fact, Section 903 of the Bankruptcy Code explicitly recognizes the power of the States as, "this chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality . . . ." 11 USC § 903. Therefore, when the authority to file under state law is questioned, bankruptcy courts must exercise jurisdiction carefully, "in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment." *In re Cottonwood Water & Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992).

### b. In California, Certain Municipalities are not Permitted to File Bankruptcy Petitions

The California statute authorizing its municipalities to file bankruptcy petitions provides: "except as otherwise provided by statute, a local public entity in this state may file a petition and exercise powers pursuant to applicable federal bankruptcy law." Cal. Gov't Code § 53760. "This section is intended to provide the broadest possible state authorization for municipal bankruptcy

15

proceedings, and thus provides the specific state law authorization for municipal bankruptcy filing required under federal law." Cal. Gov't Code § 53760 (Law Revision Comm'n Comments, 2002 Addition) (emphasis added).

Despite California's broad grant of authority for municipalities to file bankruptcies, the right is not unrestricted. In Section 53760, the prefatory phrase, "except as otherwise provided by statute," opened the door for some municipalities to be precluded from filing a bankruptcy petition. The 2002 Comments to section 53760 identify various California statutes that impose limitations on the right to file as follows:

> As recognized in the introductory clause of subdivision (a), this broad grant of authority is subject to specific limitations provided by statute. See, e.g., Ins. Code § 10089.21 (California Earthquake Authority precluded from resort to bankruptcy); Sts. & Hy. Code § 9011 (prerequisites to bankruptcy filing under Improvement Bond Act of 1915). See also Educ. Code § 41325 (control of insolvent school district by Superintendent of Public Instruction); Health & Safety Code § 129173 [**7] (health care district trusteeship).

Cal. Gov't Code § 53760 (Law Revision Comm'n Comments, 2002 Addition).

### c. Other States Effectively Restrict which Debts a Municipality may Discharge in Bankruptcy

Michigan is not the only state that restricts municipalities from impairing certain debts in a bankruptcy. In Iowa, a city, county, or other political subdivision is authorized to file for a Chapter 9 bankruptcy if they are insolvent and the debt is involuntarily incurred. The statute specifically states that a valid and binding collective bargaining agreement or previously authorized bond issues are not eligible debts. Iowa Code Ann. § 76.16A.[1] In Kentucky, taxing

---

[1] The Iowa statute provides: "A city, county, or other political subdivision may become a debtor under chapter nine of the federal bankruptcy code, 11 U.S.C. § 901 et seq., if it is rendered insolvent, as defined in 11 U.S.C. § 101(32)(c), as a result of a debt involuntarily incurred. As used herein, *"debt"* means an obligation to pay money, other than pursuant to a valid and binding collective bargaining agreement or previously authorized bond issue, as to which the governing body of the city, county, or other political subdivision has made a specific finding set forth in a duly adopted resolution of each of the following: 1. That all or a portion of such obligation will not be paid from available insurance proceeds

16

agencies are authorized to file for bankruptcy however, counties must have their plan approved by the state local debt officer as well as the state local finance officer. Ky. Rev. Stat Ann. §66.400. This effectively gives the state the opportunity to approve only those plans that do not seek to discharge debts that are inconsistent with the state's goals.[2] In Montana, a municipality's right to file bankruptcy is limited by any other municipal entity that holds securities for the local entity seeking to file for bankruptcy. In essence, the state or any arm of the state may reject the plan if it does not comport with its goals. Mont. Code Ann. § 7-7-134.[3] Finally, in Pennsylvania, a municipality that has outstanding bond debt is not eligible to file for federal bankruptcy relief. 53 PA Stat. § 12720.211(a).[4]

### d. Michigan Does Not Permit a Bankruptcy that Impairs Pensions

---

and must be paid from an increase in general tax levy. 2. That such increase in the general tax levy will result in a severe, adverse impact on the ability of the city, county, or political subdivision to exercise the powers granted to it under applicable law, including without limitation providing necessary services and promoting economic development. 3. That as a result of such obligation, the city, county, or other political subdivision is unable to pay its debts as they become due. 4. That the debt is not an obligation to pay money to a city, county, entity organized pursuant to chapter 28E, or other political subdivision."

[2] The text of the Kentucky statute provides: "Any taxing agency or instrumentality defined in Chapter IX of the Federal Bankruptcy Act as amended by the Acts of Congress of August 16, 1937, Chapter 657, June 22, 1938, Chapter 575, March 4, 1940, Chapter 41, June 28, 1940, Chapter 438 and acts amendatory and supplementary thereto or acts extending the date of expiration thereof, as the same may be amended or extended from time to time, may file a petition for the composition of tis debts and to do all things necessary to comply with the provisions of the Federal Bankruptcy Act. No county shall file a petition as provided in the Federal Bankruptcy Act unless the proposed plan is first approved by the state local debt officer and the state local finance officer, as defined in KRS 68.001. No changes or modifications shall be made in the plan of composition after the filing of the petition without the approval of the sate local debt officer and the state local finance officer. The state local debt officer and the state local finance officer shall approve or disapprove the proposed plan of composition or any changes or modifications thereof under the same procedure and for the same reasons as bonds are approved or disapproved under KRS 66.280 to 66.390."

[3] The Montana statute provides: "The state or any department or agency of the state holding any of the securities of a local entity has the power to consent to any plan of adjustment of the indebtedness of the local entity by the board or official that has custody of and control over the securities."

[4] The Pennsylvania statute provides as follows: "Notwithstanding any other provision of law, so long as the authority shall have outstanding any bonds issued pursuant to this act, the authority and any assisted city shall not be authorized to file a petition for relief under 11 U.S.C. Ch. 9 (relating to bankruptcy) or any successor Federal bankruptcy law, and no government agency shall authorize the authority or such city to become a debtor under 11 U.S.C. Ch. 9 or any successor Federal bankruptcy law."

17

The Michigan Constitution guarantees that the accrued pension benefits of each pension plan and retirement system of the state and its political subdivisions, including those of the City of Detroit, shall not be impaired under any set of circumstances. Article 9, Section 24 of the Michigan Constitution provides in pertinent part:

> The accrued financial benefits of each pension plan and retirement system in the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Furthermore, PA 436 further guarantees the protection of pension funds. MCL 141.1551 provides in pertinent part that, "An emergency manager shall develop and amend a written financial operating plan for the local government [and] . . . [t]he financial and operating plan shall provide for . . . [t]he timely deposit of the required payments to the pension fund for the local government or in which the local government participates." As such, not only the Michigan Constitution but the PA 436 guarantees the protection of pension funds.

Regardless, on May 12, 2013, Orr issued his financial plan ostensibly pursuant to PA 436. Contrary to the express language of the PA 436, the plan does not provide for the "timely deposit of required payments" to pension funds. Rather, Orr's plan indicates that such payments have been deferred to address the City's ongoing financial crisis. On June 14, 2013, Orr issued a proposal for creditors wherein he presented various options for restructuring. Contrary to the Michigan Constitution, Orr's proposal indicates that "there must be significant cuts in accrued vested pension amounts for both active and currently retired persons." See also, Docket No. 11.

The Michigan Constitution precludes the state and its political subdivisions from impairing or diminishing any accrued pension benefits. Even PA 436 requires the timely deposit of payments to all pension funds. Given these explicit prohibitions against impairing pensions, it is clear that the City is not authorized to proceed under this Chapter 9 as it is not empowered to

18

13-53846-swr   Doc 520   Filed 08/19/13   Entered 08/19/13 23:55:31   Page 24 of 52   525
13-53846-tjt   Doc 2334-13   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 24 of 52

be a debtor that desires to effect a plan to adjust certain debts including the pension obligation to the City's retirees. 11 U.S.C. § 109(c)(2) and (4).

### 4. City of Detroit Failed to Negotiate with Creditors in Good Faith

Pursuant to 11 USC §109(c)(5), the City of Detroit must meet one of the statutory requirements regarding creditor negotiations. Section 109(c)(5)(B) of the Bankruptcy Code states that a debtor is eligible to file for bankruptcy if the debtor "negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter." The City of Detroit bears the burden of establishing that it is eligible under §109(c). *In re Valley Health Sys.*, 383 B.R. at 161. Prior to filing, the City of Detroit failed to negotiate in good faith with creditors that will be impaired if this case is allowed to proceed. Therefore, the City of Detroit is not eligible to file Chapter 9 bankruptcy and its case should be dismissed.

Section 109(c)(5)(B) of the Bankruptcy Code offers protection to creditors during the bankruptcy process.

> Congress consciously sought to limit accessibility to the bankruptcy court by municipalities. One way to do so was to require the municipal entity, before rushing to the court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under § 941 of the Bankruptcy Code.

*In re Cottonwood Water & Sanitation Dist.*, 138 B.R. at 973. This provision "insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the Code." *In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. at 78-79. In negotiating, the debtor does not need to provide a complete and formal plan, but "some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary." *In re City of Vallejo*, 408

B.R. at 297. However, if the debtor offers a "take it or leave it" proposal and is unwilling to compromise and negotiate with the creditors, then the city's actions will not constitute good faith. *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992).

Prior to filing this Chapter 9 bankruptcy on July 18, 2013, the City of Detroit failed to negotiate in good faith with creditors. The City of Detroit argues that it held a meeting on June 14, 2013 with 150 representatives of unions, bondholders, and pensioners in which it invited creditors to begin negotiations (the "June 14 Meeting"). *See* Memorandum in Support of Statement of Qualifications at pgs. 54-55. However, none of the members of RDPMA were contacted to negotiate current pension obligations or to attend the June 14 Meeting. In fact, the June 14 Meeting was widely described as a presentation, not as an opportunity to negotiate. Michael VanOverbeke, general counsel for the General Employees Retirement System of the City of Detroit stated that:

> The initiation of the process by the EM was really just presentation to us (on the city's debts, in June). There was no negotiation going on in the truest sense. Only in the last session was it really clear what they were looking for from us, and that was two just weeks ago, he said. We haven't even got to the presumption of having had any meaningful dialogue. And we were a bit surprised by the timing of this petition.

Chad Halcom, *Detroit bankruptcy's next chapter: A velvet glove or iron fist?*, CRAIN'S DETROIT BUSINESS, July 21, 2013, http://www.crainsdetroit.com/article/20130721 /NEWS/307219984/ 1060&template=MOBBR. Additionally, Robert Gordon, an attorney representing the Retirement Systems of the City of Detroit stated that:

> We are surprised and disappointed that the emergency manager would file a Chapter 9 petition before he has had substantial negotiations with the retirement systems and other significant creditor constituencies. To be clear, the EM's team and the retirement systems have not engaged in in-depth negotiations to date.

20

13-53846-swr   Doc 520   Filed 08/19/13   Entered 08/19/13 23:55:31   Page 26 of 52   527
13-53846-tjt   Doc 2334-13   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 26 of 52

Joe Guillen, *Pension funds plan to keep pushing for negotiations despite bankruptcy filing*, DETROIT FREE PRESS, July 18, 2013, http://www.freep.com/article/20130718/NEWS05/307180154/Police-Fire-Pension-Fund-General-Retirement-System.

As is explained in *In re Ellicott Sch. Bldg. Auth.,* a take it or leave it proposal does not constitute "good faith negotiations" as they are required by 11 U.S.C. §109(c)(5)(B). The court explained that three public meetings were held in which the municipality explained the proposed restructuring to the bondholders; however, bondholders stated that the city was unwilling to compromise. *In re Ellicott Sch. Bldg. Auth.,* 150 B.R. at 266. In merely presenting his proposal to creditors, Orr's intent was not to open negotiations but to fulfill a formality. As Orr explained regarding the Restructuring Plan, "[t]he public can comment, but it is under the statute, it is my plan and it's within my discretion and obligation to do it. This isn't a plebiscite, we are not, like, negotiating the terms of the plan. It's what I'm obligated to do." Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually, CBS DETROIT, May 12, 2013, http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/.

Steve Kreisberg, director of collective bargaining and pensions for American Federation of State, County and Municipal Employees Michigan Council 25 (AFSCME) stated:

> Our members and our retirees were never given the opportunity to discuss the issues of serious cutbacks. To date, the emergency manager has not even specified the degree of reduction in existing pension benefits. We still do not know what his plans are for current employees and retirees.

Kirk Pinho, *Union Reps: No 'good faith negotiations' took place before bankruptcy filing*, CRAIN'S DETROIT BUSINESS, July 23, 2013, http://www.crainsdetroit.com/article/20130723/BLOG016/130729968/union-reps-no-good-faith-negotiations-took-place-before-bankruptcy.

Section 921(c) of the Bankruptcy Code states that "after any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in

21

good faith or if the petition does not meet the requirements of this title." 11 USC §921(c). Case law states, that "although the language of § 921(c) is permissive...that § 921(c) must be given a mandatory effect if the defect in the filing is in the debtor's eligibility to file Chapter 9." *In re County of Orange*, 183 B.R. at 599. Therefore, the City of Detroit's Chapter 9 filing *must* be dismissed based on lack of eligibility.

### 5. City of Detroit Has Failed to Clearly Establish Insolvency

As part of its eligibility test under Section 109(c), the City must establish that it is insolvent. 11 USC §109(c)(3). Section 101(32)(C) of the Bankruptcy Code provides that any municipality seeking protection pursuant to chapter 9 of the Bankruptcy Code must prove that it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 USC §101(32)(C). "The mere fact that a municipality has adopted a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test" Collier on Bankruptcy ¶ 900.02(2)(c)(1) (16th ed. 2011) Furthermore, "[t]he obligations with respect to which there is a projected shortfall must be inescapably due and the prospect that they will not be paid must be reasonably certain, not a mere possibility or a speculative probability." Id.

Provided the City's historical financial difficulties, it is quite possible that the Debtor may not have exhausted all of its non-bankruptcy alternatives prior to the Petition Date. "11 USC Section 101(32)(C)(ii) does not appear to encompass a situation where a municipality deliberately budgets or spends itself into insolvency (so as to qualify under 101(32)(C)(ii)), when other realistic avenues and scenarios are possible, such as: refiguring road expenses in light of the discussion above, negotiating with attorneys about fee contracts, approaching developers,

22

seeking business relocations, conserving and maximizing remaining ample funds, etc." *In re Town of Westlake*, 211 B.R. 860 (Bankr. N.D. Tex. 1997).

Based upon the many issues that have been raised regarding the level of underfunding of the Retirement Funds and other matters relative to the City's finances, it is not clear that the City has unequivocally established that it is insolvent. Given the size and nature of a proposed inquiry into the Debtor's insolvency, the RDPMA reserves the right to raise additional arguments relating to the City's alleged insolvency upon completion of discovery.

## IV.
## CONCLUSION

Based upon the foregoing, the City of Detroit has failed to establish that it is eligible for chapter 9 relief under Section 109(c) and Section 921(c). Therefore, this case must be dismissed.

Respectfully Submitted,

**STROBL & SHARP, P.C.**

_/s/    Lynn M. Brimer_
LYNN M. BRIMER (P43291)
MEREDITH E. TAUNT (P69698)
MALLORY A. FIELD (P75289)
Attorneys for the Retired Detroit
Police Members Association
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
E-mail: lbrimer@stroblpc.com
        mtaunt@stroblpc.com
        mfield@stroblpc.com

Dated: August 19, 2013
*S&B\85244\001\PLDG\SB425105.DOCX

23

# EXHIBIT A



1 of 1 DOCUMENT

**CITY OF PONTIAC RETIRED EMPLOYEES ASSOCIATION; DELMER ANDERSON; THOMAS HUNTER; HENRY C. SHOEMAKER; YVETTE TALLEY; DEBRA WOODS; JOHN CLAYA, Plaintiffs - Appellants, v. LOUIS SCHIMMEL, Individually and in his capacity as Emergency Manager of the City of Pontiac; CATHY SQUARE, Individually and in her official capacity as the Director of Human Resources and Labor Relations for the City of Pontiac; CITY OF PONTIAC, Defendants - Appellees.**

No. 12-2087

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

13a0215p.06; *2013 U.S. App. LEXIS 16519; 2013 FED App. 0215P (6th Cir.)*

January 15, 2013, Argued
August 9, 2013, Decided
August 9, 2013, Filed

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 2:12-cv-12830—Lawrence P. Zatkoff, District Judge.
*City of Pontiac Retired Emples. v. City of Pontiac, 2012 U.S. Dist. LEXIS 98858 (E.D. Mich., July 17, 2012)*

**COUNSEL:** ARGUED:Alec Scott Gibbs, LAW OFFICE OF GREGORY T. GIBBS, Flint, Michigan, for Appellants.

Stephen J. Hitchcock, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.

ON BRIEF: Alec Scott Gibbs, Gregory Thomas Gibbs, LAW OFFICE OF GREGORY T. GIBBS, Flint, Michigan, for Appellants.

Stephen J. Hitchcock, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.

**JUDGES:** Before: COLE and GRIFFIN, Circuit Judges; GWIN, District Judge.\* GWIN, D. J., delivered the

opinion of the court, in which COLE, J., joined. GRIFFIN, J., delivered a separate dissenting opinion.

> \* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

**OPINION BY:** James S. Gwin

**OPINION**

[**2] GWIN, District Judge. Like many Michigan municipalities, the City of Pontiac has experienced significant economic difficulties, especially since the 2008 financial collapse. To address Pontiac's problems, Michigan's Governor appointed Louis Schimmel as Pontiac's emergency manager. Acting under Public Act 4, Michigan's then-existing emergency manager [*2] law, Schimmel modified the collective bargaining agreements of Pontiac's retired employees. He also modified severance benefits, including pension benefits, that Pontiac had given to other retirees not covered by collective bargaining agreements. In this case, those retired employees challenge the emergency manager's

power to reduce their retirement benefits.

The retired employees say that Schimmel and Pontiac violated their federal constitutional rights, including rights given under the *Contracts Clause*, the *Due Process Clause*, and the Bankruptcy Clause. The retired employees do not specifically argue that Schimmel violated Michigan's Constitution when he changed their pension rights. But, the Michigan Legislature may have violated the Michigan Constitution when it passed Public Act 4. In addition, Michigan voters rejected Public Act 4 by referendum, and this rejection may have rendered Schimmel's actions void.

Despite the parties' inadequate briefing of these state-law issues, we decline to decide the case on federal constitutional grounds. Because state law could provide an alternative basis for deciding this case, we **VACATE** and **REMAND** to the district court to conduct additional fact-finding [*3] and consider these state-law issues. Specifically, did two-thirds of both houses of the Michigan Legislature vote to make Public Act 4 immediately effective? And, since Michigan voters rejected Public Act 4 in a referendum, do the acts taken under the rejected law have any power? Because similar [**3] issues face many Michigan municipalities, we ask the district court to expedite consideration of the remanded case.

## I. Background

### A. Michigan's Emergency Manager Laws

Emergency Manager Louis Schimmel (the "Emergency Manager") changed contractual and pension commitments under Public Act 4. Public Act 4 is not Michigan's first law governing emergency managers, but it is the first legislation that allowed emergency managers to break collective bargaining agreements and to ignore retirement commitments. *Mich. Comp. Laws §§ 141.1501-1531* (rejected by referendum 2012). In 1990, the Michigan Legislature enacted a predecessor to Public Act 4, the Local Government Fiscal Responsibility Act ("Public Act 72"). *Mich. Comp. Laws § 141.1519(1)(j)* (2005). Public Act 72 established a procedure for Michigan's Governor to appoint emergency managers, and gave those emergency managers the power to address local [*4] governments' financial crises. But Public Act 72 did not give emergency managers the power to modify collective bargaining agreements or pension rights. Critics of Public Act 72 complained that it did not give

emergency managers the powers sometimes necessary to address municipalities' structural budget problems, especially financial problems flowing from pension commitments. Critics called for a new law, and Public Act 4 was born.

In March 2011, Michigan's Governor signed Public Act 4 into law. *§ 141.1503*. Unlike Public Act 72, Public Act 4 gave emergency managers the power to temporarily reject, modify, or terminate existing collective bargaining agreements. *Id.* at *§§ 141.1519(1)(k), (k)(iv)*. Public Act 4 also repealed Public Act 72. *Id.* at *§ 141.1503* (enacting § 1).

As we discuss, Michigan's Constitution purposely makes it difficult for laws to take immediate effect. Generally, laws do not become effective until ninety days after the end of the legislative session in which they are passed. *Mich. Const. art. IV, § 27.* [**4] However, this general rule does not apply if two-thirds of each house in the Legislature vote to make the law take immediate effect. *Id.* Public Act 4 passed by only [*5] a narrow margin. Nevertheless, the Michigan Legislature claims that two-thirds of its members voted to make Public Act 4 become immediately effective.

Michigan also has a voter rejection procedure that allows citizen-initiated rejection of Michigan legislation. In response to Public Act 4, critics collected enough signatures to have Michigan citizens vote on whether Public Act 4 should be rejected.[1] On November 6, 2012, Michigan voters rejected Public Act 4 by a fifty-two percent to forty-eight percent margin. Michigan's citizens cancelled Public Act 4.

> 1 In August 2012, after litigation over the petition, the Michigan Supreme Court ordered the Board of State Canvassers to certify the referendum for the November ballot. *Stand Up for Democracy v. Sec'y of State, 492 Mich. 588, 822 N.W.2d 159, 161 (Mich. 2012).* That certification suspended the operation of Public Act 4 pending the outcome of the referendum. *Mich. Comp. Laws § 168.477(2)* ("a law that is the subject of the referendum continues to be effective until the referendum is properly invoked").

Apparently unaffected that voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public [*6] Act 436 largely reenacted the provisions of Public Act 4,

the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum.[2] *Mich. Comp. Laws §§ 141.1574, 1575.*

> 2  *See Mich. Const. Art. II, § 9* ("The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds").

### B. City of Pontiac

In March 2009, Michigan's Governor appointed Schimmel as Pontiac's emergency manager under Public Act 72, Michigan's then-controlling emergency manager law. Although Schimmel has managed Pontiac for a number of years, Pontiac continues to struggle. Currently, Pontiac's liabilities to the benefit plans of its employees is its greatest expense, totaling $302 million.

[**5] With the passage of Public Act 4 and for the first time, Michigan gave emergency managers the power to change collective bargaining agreements and the power to stop pension benefits. In December 2011, the Emergency Manager modified Pontiac's collective bargaining agreements to shift a large portion of the city's benefits obligations [*7] onto its employees.[3] Among the changes, Pontiac cancelled disability, vision, and hearing coverage; increased annual deductibles; and cut pensions. This case resulted.

> 3  The Pontiac collective bargaining agreements at issue deal primarily with healthcare benefits.

### C. Procedural History

In June 2012, the City of Pontiac Retired Employees Association and a group of retired employees (collectively the "Retired Employees") filed this putative class action. They alleged several federal claims, including the unconstitutional impairment of contract, preemption under federal bankruptcy law, and deprivation of a property interest without due process of law. With the complaint, the Retired Employees filed a motion for a temporary restraining order ("TRO") and a motion for a preliminary injunction to stop certain Emergency Manager orders from taking effect. In July 2012, the district court denied the TRO motion and denied the motion for a preliminary injunction. The Retired Employees appealed.

## II. Law and Analysis

As became clear during oral argument, both parties ask this Court to reach the substantive merits of their dispute. But doing so requires us to resolve important federal constitutional issues, [*8] which are closer questions than the dissent suggests. Unlike the district court here, another Michigan federal district granted injunctive relief when faced with similar federal questions.[4] Against this backdrop, the better course of action asks the district court to see if state-law issues could avoid the need to rule on the federal claims. Because state law could provide an alternative basis for deciding this case, the [**6] more prudent approach is to allow the district court to conduct additional fact-finding and to consider the state-law issues.

> 4  *See Welch v. Brown, No. 12-13808, 2013 U.S. Dist. LEXIS 45681, 2013 WL 1292373, at *13 (E.D. Mich. March 29, 2013).*

### A. Constitutional Avoidance

Under the doctrine of constitutional avoidance, we avoid constitutional determinations when a case can be resolved on other grounds. *See Ashwander v. TVA, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936)* (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotation marks omitted); *see also Muller Optical Co. v. EEOC, 743 F.2d 380, 386 (6th Cir. 1984)* ("The duty to avoid decisions of constitutional questions . . . [is] [*9] based upon the general policy of judicial restraint."). When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution. *See Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 191, 29 S. Ct. 451, 53 L. Ed. 753 (1909)* ("This court has the same right, and can, if it deem it proper, decide the local questions only, or omit to decide the federal questions, or decide them adversely to the party claiming their benefit.") (citations omitted).

The dissent would decide the Retired Employees' contracts clause and due process claims. But these federal constitutional issues are closer questions than the dissent suggests. If the Michigan Legislature gave Public Act 4 immediate effect in violation of the Michigan Constitution, or if the voters' rejection of Public Act 4 by referendum rendered the Emergency Manager's actions

void, we could avoid the federal constitutional issues. Doing otherwise forces us to decide federal constitutional questions and potentially render an advisory opinion. We should avoid this if we can.

### B. Waiver

What should a court do when the parties fail to raise an obvious issue? Here, neither the Retired [*10] Employees nor Schimmel raised the issue of whether the Michigan Legislature's giving Public Act 4 immediate effect violated the Michigan Constitution. [**7] Nor did they raise the issue of whether the voters' referendum rejection of Public Act 4 rendered the Emergency Manager's actions void. Both issues are potentially dispositive of this appeal.

Generally, we have found that a party waives an issue when they have not raised it or sufficiently addressed it. *See, e.g., Marks v. Newcourt Credit Grp., Inc., 342 F.3d 444, 462 (6th Cir. 2003)* (holding that a party "waives an issue when he fails to present it in his initial briefs") (citations omitted). But, the waiver rule is neither jurisdictional nor is it absolute. *See, e.g., In re Morris, 260 F.3d 654, 664 (6th Cir. 2001)* (holding that the waiver rule is "an accepted practice or rule of procedure rather than a jurisdictional bar to hearing issues for the first time on appeal") (citations omitted).

The dissent says that we are bound by the parties' framing of the issues. But the United States Supreme Court rejects a blanket rule. In *Independent Insurance Agents of America*, the Court held that courts of appeals have the discretion to consider [*11] issues *sua sponte* despite the parties' failure to raise the issue in the district court, the court of appeals, or at oral argument. *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 445-47, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993)* ("The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory.").[5]

> 5 There, the United States Court of Appeals for the District of Columbia Circuit reversed the district court's judgement based on a theory that neither party argued to the district court or the court of appeals. *See Indep. Ins. Agents of Am., Inc. v. Clarke, 955 F.2d 731, 293 U.S. App. D.C. 403 (D.C. Cir. 1992), rev'd on other grounds sub*

*nom. Indep. Ins. Agents of Am., 508 U.S. at 445-47.* In denying rehearing *en banc*, Judge Sentelle said:

> Our colleagues question the "judicial power" of a federal court to decide an issue of law concededly dispositive of the case where parties have not raised the issue. I think it most apparent that federal courts do possess this power. The alternative is that the parties could force a federal [*12] court to render an advisory opinion. What the dissenters in effect argue is that the parties can stipulate to the state of underlying law; frame a law suit, assuming that stipulation; and obtain from the court a ruling as to what the otherwise dispositive law would be if the stipulated case were in fact the law.

*Clarke, 965 F.2d at 1078* (Sentelle, J., concurring).

After the Supreme Court granted *certiorari*, the respondents argued that the court of appeals erred in considering the issue *sua sponte. Indep. Ins. Agents of Am., 508 U.S. at 445.* Here, the dissent attempts to revive that argument. But, the Supreme Court dismissed the argument made by the dissent, the *Clarke* dissenters, and the respondents. *Id. at 446-47.*

[**8] Despite the importance of whether Public Act 4 should have been given immediate effect, or if the voter's referendum rejection of Public Act 4 rendered the Emergency Manager's actions void, we should not decide these issues now because the parties failed to develop these issues sufficiently for our review. In *Independent Insurance Agents of America*, the Supreme Court found that the court of appeals' *sua sponte* consideration of the unasserted issue was proper only after "giving [*13] the parties ample opportunity to address the issue." *Id. at 448.*

Thus, we return these issues to the district court to develop a factual record and consider the parties'

arguments. We have generally applied the waiver exception where the issue involved a question of law that required no additional factual development. *See, e.g., Morris, 260 F.3d at 664.* But here, where additional fact-finding is necessary, remand to the district court is more appropriate. *See, e.g., City of Mt. Clemens v. EPA, 917 F.2d 908, 916 n.7 (6th Cir. 1990)* (remanding to district court and declining to affirm on alternative grounds "[b]ecause these arguments were not addressed by the district court and additional fact finding would be required to resolve the issues raised").[6] The parties' failure to brief important state-law questions should not force this Court to decide important federal constitutional questions. A remand is therefore the best course of action.

> 6 *See also Burkholder v. UAW Local No. 12, 299 F. App'x 531, 534 (6th Cir. 2008), overruled on other grounds by Chapman v. UAW Local 1005, 670 F.3d 677 (6th Cir. 2012); Dandridge v. Williams, 397 U.S. 471, 476 n.6, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970)* ("When attention has been focused [*14] on other issues, or when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court.").

In January 2013, after this Court heard oral argument, Michigan's Attorney General moved to intervene to brief the referendum rejection issue. While the Attorney General's supplemental briefing may aid a fact-finder considering these issues, the district court should conduct that fact-finding. *See Birth Control Ctrs., Inc. v. Reizen, 743 F.2d 352, 366 (6th Cir. 1984)* ("When an appellate court discerns that additional fact findings are necessary, the usual rule is to remand for further proceedings to permit the [**9] trial court to make the necessary findings."). The motion to intervene is therefore denied.[7] Our decision is limited to this proceeding. On remand, the Attorney General may refile its motion with the district court.

> 7 The dissent would grant the motion to intervene and direct the Michigan Attorney General to file his brief within twenty-eight days.

## C. Immediate Effect

On remand, the district court should consider whether the Michigan Legislature violated the Michigan

[*15] Constitution when it gave Public Act 4 "immediate effect." There is reason to believe that it did.

Generally, the Michigan Constitution makes bills effective ninety days after the end of the legislative session in which they are passed. *Mich. Const. art. IV, § 27.* That general rule, however, is subject to the immediate effect exception that permits the Legislature to "give *immediate effect* to acts by a *two-thirds vote* of the members elected to and serving in each house." *Id.* (emphasis added).

Discussing the framers' intent for this provision, the Michigan Supreme Court said:

> Several delegates expressed concern that granting the Legislature the power to give immediate effect to any law would endanger the referendum because it would not give the people time to gather signatures for petitions to prevent the law from going into effect. Also, there was the danger that statutes would be passed without giving people adequate time to become acquainted with the statutes and adjust to them before they went into effect. To reduce this danger, the framers decided to maintain the requirement that no act passed by the Legislature could take immediate effect *unless passed by a two-thirds vote of the* [*16] *elected members of each house.*

*Frey v. Dep't of Mgmt. & Budget, 429 Mich. 315, 414 N.W.2d 873, 880-81 (Mich. 1987)* (emphasis added) (footnotes omitted).

[**10] The Michigan Legislature seems to have ignored the two-thirds vote requirement when it gave Public Act 4 immediate effect. The Michigan Legislature has a Senate with thirty-eight members and a House with 110 members. Thus, the two-thirds vote requirement is twenty-six votes in the Senate and seventy-four votes in the House. But, Public Act 4 passed in the House with sixty-two votes—twelve short of the two-thirds requirement for an immediate effect motion. Yet, despite the clear absence of the necessary two-thirds vote, the House proceeded to give Public Act 4 immediate effect over the objections of the minority party.[8]

> 8 Rep. Kandrevas made the statement: "I vote

NO . . . and protest the events that transpired on the floor today. . . . [including] an utter disregard for demands by the requisite number of voting members for a record roll call vote on the question of Immediate Effect."

To achieve this result, the House used a rule that allows it to conduct a "rising vote," where the presiding officer examines the chamber to see whether the requisite two-thirds [*17] support exists. *See Hammel v. Speaker of House of Representatives, 297 Mich. App. 641, 825 N.W.2d 616, 619 (Mich. Ct. App. 2012), appeal denied, 493 Mich. 973, 829 N.W.2d 862 (Mich. 2013).* Apparently, a two-thirds vote occurs whenever the presiding officer says it occurs--irrespective of the actual vote. This authority is unchecked and often results in passing motions for immediate effect that could not receive the constitutionally required two-thirds vote. Apparently, the Michigan Legislature believes the Michigan Constitution can be ignored.

Public Act 4 exemplifies the farce. The Michigan House presiding officer refused a request for a roll call vote and made Public Act 4 immediately effective through the obvious fiction that twelve House members immediately changed their positions. This process has been the subject of considerable contention and scrutiny.[9] [**11] In effect, the Michigan Legislature has made their "rising vote" rule trump the Michigan Constitution.

> 9   *See, e.g.,* Mark Brush, *Michigan Court of Appeals Rejects House Dems Bid to Stop 'Immediate Effect',* Michigan Radio (Aug. 16, 2012, 5:28 PM), http://www.michiganradio.org/term/immedi ate-effect; Paul Egan, *Michigan Court of Appeals Debates Republican Legislature's* [*18] *Immediate Effect,* Detroit Free Press (Aug. 8, 2012, 12:40 PM), http://www.freep.com/apps/pbcs.dll/artic le?AID=/201208081240/NEWS15/120808051; Libby Spencer, *Michigan House Republicans Repeatedly Violated State Constitution,* The Detroit News (Apr. 6, 2012, 4:13 PM), http://blogs.detroitnews.com/politics/20 12/04/06/michigan-house-republicans-repe atedly-violated-state-constitution/; Jennifer White, *Immediate Effect Sheds National Light on Michigan, So What?,* Michigan Radio (Apr. 12, 2012, 9:39 PM),

http://www.michiganradio.org/post/immedi ate-effect-sheds-national-light-michigan -so-what; Paul Egan, *Michigan House Democrats Lose Challenge to GOP's Voice Votes that Give Laws Immediate Effect* (Aug. 17, 2012), http://www.freep.com/article/20120817/NE WS15/308170058/Michigan-House-Democrats- losechallenge-to-GOP-s-voice-votes-that- give-laws-immediate-effect.

Despite the Michigan Constitution's express limitation, the Legislature has perverted the immediate effect exception to swallow the constitutional rule. Under Republican control of the House, in 2011, the Legislature passed 319 out of 323 bills with immediate effect. In 2010, it passed 345 out of 363 bills with immediate effect. Democrats [*19] have also abused the exception. Under Democratic control of the House, in 2006, the Legislature passed 664 out of 682 bills with immediate effect. Plainly, the Legislature will not self-correct its abuse of the immediate effect exception because the majority party controls and benefits from the process.

The issue has been examined by Michigan's lower courts. *See Hammel, 825 N.W.2d at 618.* In *Hammel,* the plaintiffs said that under the Michigan Constitution, "*article 4, § 27,* motions for immediate effect are required to be resolved by a roll call vote, and that *article 4, § 18* prohibits a requirement that motions for immediate effect and for a roll call vote be made orally." *Id. at 619.* The trial court agreed and entered an order for a preliminary injunction. *Id.*

But the Michigan Court of Appeals reversed. *Id. at 623.* It found that the plaintiffs had failed to demonstrate a likelihood of success on the merits because "[t]he constitutional provisions at issue permit the manner in which they are applied to be determined by adoption of the rules of the House." *Id. at 622.* This reasoning make little sense. The Michigan Constitution expressly limits the Legislature's power to give laws immediate [*20] effect. Yet, the Michigan Court of Appeals says that the Michigan Legislature has the power to decide whether that constitutional limitation applies? Alternatively, the court of appeals also made the illogic finding that the plaintiffs failed [**12] to show irreparable harm because the "plaintiffs' ability to vote and the effectiveness of their vote have not been impaired." *Id.*

On May 1, 2013, the Michigan Supreme Court denied the plaintiffs' application for leave to appeal the

Hammel case. Hammel v. Speaker of House of Representatives, 493 Mich. 973, 829 N.W.2d 862 (Mich. 2013). The dissent here characterizes the Michigan Supreme Court's review as somehow affirming the Hammel opinion. But the Michigan Supreme Court simply has not spoken on the immediate effect issue and no conclusion can be taken from its declining to review the case.

Where "a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us." Kirk v. Hanes Corp. of N.C., 16 F.3d 705, 707 (6th Cir. 1994) (citation omitted). Where a state appellate court has resolved an issue to which the high court has not spoken, [*21] the Supreme Court has said that the appellate court decision "is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. American Tel. & Tel. Co., 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940). "We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly, but we 'should not reject a state rule just because it was not announced by the highest court of the state,' even if we believe that the rule is 'unsound.'" Ziebart Int'l Corp. v. CNA Ins. Cos., 78 F.3d 245, 250-51 (6th Cir. 1996) (quoting FL Aerospace v. Aetna Cas. & Sur. Co., 897 F.2d 214, 218-19 (6th Cir. 1990)).

On remand, the district court should consider whether the Michigan Supreme Court would overrule Hammel. There is reason to believe it would. The Michigan constitutional provision seems obviously directed at restricting its Legislature's ability to give bills immediate effect unless a real two-thirds of the elected members in each house agree. And the court of appeals's belief that house members do not need to vote on immediate effect if they have [*22] had a chance to vote on the underlying legislation turns Michigan's Constitution article IV, § 27 on its head.

[**13] Michigan courts do not refrain from scrutinizing the Legislature's determination that a bill is passed with immediate effect. First, before 1963, the Michigan Constitution imposed additional requirements on the Legislature before it could give a bill immediate effect: it said that the bill must be "immediately necessary

for the preservation of the public peace, health or safety." Indus. Bank of Wyandotte v. Reichert, 251 Mich. 396, 232 N.W. 235, 236 (Mich. 1930). At that time, when the Legislature said a bill should take immediate effect, courts reviewed the Legislature's determination to ensure that the bill was immediately necessary for those reasons. See, e.g., Attorney Gen. v. Lindsay, 178 Mich. 524, 145 N.W. 98, 103 (Mich. 1914) ("The determination of the Legislature by giving [the act] immediate effect is not conclusive upon the courts, and they must decide, as a matter of law, whether the act so declared is . . . within this constitutional provision. This is clearly a judicial question.").[10] Likewise, courts should review the Legislature's compliance with the Michigan Constitution's two-thirds vote [*23] requirement to give a bill immediate effect.

> 10  See also People v. Asta, 343 Mich. 507, 72 N.W.2d 282, 287 (Mich. 1955) ("It may fairly be said that the imposition of the specific tax in question and amendment to the act in question have to do with the public peace, health and safety."); Newberry v. Starr, 247 Mich. 404, 225 N.W. 885, 887 (Mich. 1929) ("The act relates to important state agencies having to do with preservation of public health, peace, and safety."); Mich. Taxpayers United, Inc. v. Governor, 236 Mich. App. 372, 600 N.W.2d 401, 403 (Mich. Ct. App. 1999) ("Whether the Legislature properly gave immediate effect to the bill is a question of law that we review de novo.") (citation omitted).

Second, in the federal system, the Supreme Court has said that courts should review congressional procedural rules to determine if they violate the Constitution. See, e.g., United States v. Ballin, 144 U.S. 1, 5, 12 S. Ct. 507, 36 L. Ed. 321 (1892) ("The constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights.") (emphasis added). A contrary rule--that the Legislature's creation of procedural rules is not limited by constitutional restraints--could lead to absurd results. [*24] The Michigan Legislature cannot end the Michigan Constitution's two-thirds requirement by passing a rule saying it will ignore the requirement. To conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution.

[**14] Because the Legislature gave Public Act 4

immediate effect, the bill purportedly became effective on March 16, 2011, after the governor signed it into law. In December 2011, the Emergency Manager gave the orders we review in this case. Those orders modified the retirement plans of over 1000 municipal retirees. But, if the Legislature's attempt to give Public Act 4 immediate effect violated the Michigan Constitution, then Public Act 4 would not have become effective until March 2012, ninety days after the legislative session ended. Consequently, the Emergency Manager would not have possessed the power to modify the employees' retirement plans when he did.

The district court, after conducting additional fact-finding, could conclude that the immediate effect issue resolves the case because the Emergency Manager did not have the power to modify the employees' retirement plans at the time he acted. Because the immediate effect issue [*25] is potentially dispositive and is a state-law ground, we remand to the district court.

### D. Rejection by Referendum

Even if the Michigan Legislature's passage of Public Act 4 with immediate effect did not violate the Michigan Constitution, remand is also warranted to allow the district court to consider whether the voters' November 2012 referendum of Public Act 4 voided the Emergency Manager's actions. After Michigan voters rejected Public Act 4, do actions taken under Public Act 4 continue to have effect?

In an August 6, 2012, opinion (the "Referendum Opinion"), the Michigan Attorney General said that:

> If 2011 PA 4 [Public Act 4] is disapproved by voters pursuant to the power of referendum under Const 1963, *art 2, § 9, that law will no longer have any effect* and the formerly repealed law, 1990 PA 72 [Public Act 72], is permanently revived upon certification of the November 2012 general election results.

> Once the effect of 2011 PA 4 [Public Act 4], the Local Government and School District Fiscal Accountability Act, *MCL 141.1501 et seq.*, was suspended under Const 1963, *art 2, § 9* and *MCL 168.477(2)*, the prior repealed law, 1990 PA 72 [Public Act 72], is revived until

certification [**15] of the [*26] November 2012 general election results. Depending on the vote of the electorate, the temporary revival of 1990 PA 72 [Public Act 72] will either cease with the approval of Public Act 4, or become permanent with the Act's disapproval.

2012 Mich. Op. Att'y Gen. No. 7267 (Aug. 6, 2012) (emphasis added). On November 6, 2012, Michigan voters rejected Public Act 4 by a 52-percent to 48-percent margin.

Nevertheless, the effect of the referendum on actions that the Emergency Manager took before the rejection is uncertain. First, Proposal 12-1, the referendum on Public Act 4, does not expressly say what effect referendum rejection would have on past Emergency Manager actions. The referendum text did not specifically say whether a rejection would invalidate past Emergency Manager actions. Moreover, the text accompanying the referendum was merely the full text of Public Act 4. Neither the ballot text nor its accompanying explanatory text stated the effect of rejection on past Emergency Manager actions.

Second, the Michigan Constitution does not say what effect a referendum rejection of Public Act 4 would have. The Michigan Constitution gives voters the power to approve or reject laws enacted by [*27] the Legislature. It provides, in relevant part:

> The people reserve to themselves . . . the power to approve or reject laws enacted by the legislature, called the referendum . . . . The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

*Mich. Const. art. II, § 9.*[11]

> 11    The record of the 1963 constitutional convention is also unhelpful. *See* Secretary of the Convention, State of Michigan Constitutional Convention Official Record 2955-56 (Austin C. Knapp ed., 1962).

[**16] The Michigan Constitution thus merely outlines the referendum process. It does not say what effect a referendum rejection has on action taken under the rejected statute, but before the referendum. [*28] While *Michigan Compiled Laws § 168.477(2)* says that "a law that is the subject of the referendum continues to be effective until the referendum is properly invoked," *§ 168.477(2)* controls only to suspend operation of the challenged statute until the voters' decide the referendum. Put simply, "properly invoked" more likely describes certification of the referendum for the ballot, and *§ 168.477(2)* does not control after rejection of the statute by the voters. The Michigan Constitution outlines only the procedures for, and not the effect of, referendum.

Third, in Public Act 436, the successor to Public Act 4, the Michigan Legislature arguably expressed doubt about the lawfulness of Emergency Manager action taken before the November 2012 referendum. Specifically, Public Act 436 provides:

> All proceedings and actions taken . . . under former 2011 PA 4 [Public Act 4], former 1988 PA 101, or former 1990 PA 72 [Public Act 72] before the effective date of this act are ratified and are enforceable as if the proceedings and actions were taken under this act.

*Mich. Comp. Laws § 141.1544.* Thus, by making prior Emergency Manager actions taken under Public Act 4 or Public Act 72 enforceable as if they [*29] were taken under Public Act 436, the Legislature seems to have anticipated that courts would find past Emergency Manager actions unlawful.[12] Consequently, it is arguable that even the Legislature expressed doubt about the lawfulness of past Emergency Manager actions in light of the voters' rejection of Public Act 4.

> 12    On remand, the district court should also consider whether the Michigan Legislature possesses the power to retroactively immunize its

own acts that the voters rejected by referendum. Because of the voters' rejection of Public Act 4 by referendum, and because Public Act 4 is substantially similar to Public Act 436, such a power could infringe on the voters' referendum power under the *Michigan Constitution article II, § 9.*

Fourth, in state court filings, the Michigan Attorney General has failed to cite to any authority supporting his position that the Emergency Manager's actions under Public Act 4 are valid after the referendum. To the contrary, in his brief to the Michigan [**17] Supreme Court in *Davis v. Emergency Manager for the Detroit Pub. Sch., 491 Mich. 899, 810 N.W.2d 555 (Mich. 2012),* the Michigan Attorney General says that "the rejection of a law by referendum is *more powerful* than the repeal of a law because *the rejection* [*30] *erases the Legislature's and Governor's original enactment.*" Opposition Brief for Appellee at 16 *Davis v. Emergency Manager for the Detroit Pub. Sch., 491 Mich. 899, 810 N.W.2d 555 (Mich. 2012)* (No. 146187) (emphasis added).

The Attorney General suggests that the referendum rendered prior Emergency Manager actions void. Yet, in the same brief, the Attorney General also says "[t]he voters' rejection does not render [Public Act 4] void *ab initio* since it was lawfully enacted by the Legislature in the first instance. Thus the disapproval has no effect on lawful actions taken by the emergency managers during the time [Public Act 4] was effective." *Id.* at 21. Despite recognizing that a "referendum is more powerful than a repeal," and despite saying that the referendum "erase[d]" Public Act 4, the Michigan Attorney General seems to argue the inconsistent position that the Emergency Manager's action under Public Act 4 are valid after the referendum. The district court should consider this issue after more specific briefing. Consequently, we remand to the district court so that it can decide if the voters' referendum rendered the Emergency Manager's actions void.

## III. Conclusion

We refuse to rush to decide federal constitutional issues. Because [*31] the immediate effect issue and the referendum issue are state-law grounds on which the Court could decide this case, we vacate and remand to the district court to conduct additional fact-finding and consider these issues.

**DISSENT BY: GRIFFIN**

**DISSENT**

[**18] GRIFFIN, Circuit Judge, dissenting. The majority remands the case to the district court on the grounds that issues of state law never raised by the parties "could" provide an alternative basis for deciding this case. In doing so, the majority misapplies the constitutional avoidance doctrine, directs the district court to address issues more appropriately left to the Michigan courts, and unjustifiably departs from our well-established principles of appellate review that generally bar this court from deciding issues that are not argued, preserved, or ruled upon by the lower court or tribunal. In my view, only the federal constitutional issues raised by the parties are properly before us. Addressing those issues, I would affirm the district court's judgment because it did not abuse its discretion when it denied the Retired Employees' request for injunctive relief. In addition, I would grant the Michigan Attorney General's motion to intervene. Accordingly, I respectfully [*32] dissent.

I.

In enacting 2011 PA 4, the Michigan Legislature recognized that "the health, safety, and welfare of the citizens of this state would be materially and adversely affected by the insolvency of local governments" and "the fiscal accountability of local governments is vitally necessary . . . to assure the provision of necessary governmental services essential to public health, safety, and welfare." *Mich. Comp. Laws § 141.1503.* The law permitted the "state to take action and to assist a local government in a condition of financial stress or financial emergency . . . by requiring prudent fiscal management and efficient provision of services, permitting the restructuring of contractual obligations, and prescribing the powers and duties of state and local government officials and emergency managers." *Id.* It authorized emergency managers ("EMs") to temporarily reject, modify, or terminate existing collective bargaining [**19] agreements ("CBAs") if certain conditions were met. *Id.* at *§ 141.1519(1)(k), (k)(iv).* It also allowed them to adopt or amend ordinances. *Id.* at *§ 141.1519(1)(dd).*

The City of Pontiac has experienced difficult economic times and has been operating under an emergency [*33] manager for many years. For the fiscal year ending June 30, 2008, the city budget deficit was

$7,007,957; for the fiscal year ending June 30, 2009, the deficit was $5,607,638; and for the fiscal year ending June 30, 2010, the deficit was $4,089,199. For the fiscal year ending June 30, 2011, the budget indicates that there was a surplus of $554,732, but apparently only because the City of Pontiac failed to make certain contributions in excess of $11 million. For the fiscal year ending June 30, 2012, the budget projects a deficit of $8,376,527. For the fiscal year ending June 30, 2013, the budget projects that expenses will exceed revenue by $5,903,485.

For the fiscal year ending June 30, 2013, although a budget surplus is expected from the sale of a wastewater treatment facility, which is to be transferred to Oakland County, the EM believes that declining property taxes and unfunded liabilities continue to create a structural deficit in the city budget. The City of Pontiac's unfunded liability to the General Employees Healthcare System is over $221 million, and its unfunded liability to the Police and Fire System is over $81 million. At present, retiree healthcare is the City of Pontiac's [*34] largest expense. For the fiscal year ending June 30, 2013, it will spend $13.5 million on medical and dental insurance coverage, of which only $1.2 million is for current employees.

Over the years, the City of Pontiac has negotiated numerous CBAs under which it has contracted to provide health insurance coverage for certain municipal retirees. In addition, with regard to non-union retirees, Chapter 92 established a plan and trust "to provide health care and life insurance benefits . . . for the welfare of certain retirees of the city who are eligible to receive a retirement benefit . . . and the spouses and eligible dependents of such retirees through a prefunded group health and insurance benefits plan." The City of Pontiac has also promised certain health insurance benefits by virtue of separation agreements and past practice.

[**20] At issue in this case are the EM's actions, made pursuant to PA 4, to address the City of Pontiac's financial troubles. In a series of orders issued in December 2011, the EM modified CBAs and other agreements in such a way that shifted the cost of prescriptions and insurance co-payments onto retirees. The EM also repealed Chapter 92.

The Retired Employees filed [*35] a class action in federal court, asserting the following federal claims: (1) impairment of contract under the federal constitution; (2) federal preemption in the area of municipal debt reduction; and (3) deprivation of a property interest

without due process of law. On these grounds, among others, the Retired Employees asked the district court to enjoin the City of Pontiac from implementing proposed changes to their healthcare benefits and to reinstate their coverage to previous levels.

The district court denied the Retired Employees' request for injunctive relief, and this appeal followed. The issues presented in this case and controversy are limited to whether the Retired Employees are entitled to injunctive relief based on an unconstitutional impairment of contract, preemption under federal bankruptcy law, or deprivation of a property interest without due process of law.

II.

Rather than address the issues ruled on below and raised by the parties on appeal, the majority contrives "potentially dispositive" state-law grounds for resolving this case, under the guise of "constitutional avoidance." Specifically, the majority considers whether PA 4 was properly given immediate effect and [*36] whether the EM's past actions remain valid in light of the voters' rejection by referendum. Having raised these issues *sua sponte*, the majority directs the district court to address them on remand.

In doing so, the majority misunderstands and misapplies the constitutional avoidance doctrine. As explained in *Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346, 56 S. Ct. 466, 80 L. Ed. 688 (1936)* (Brandeis, J., concurring), "[t]he Court developed . . . a series of rules under [**21] which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Among them is the rule against "anticipat[ing] a question of constitutional law in advance of the necessity of deciding it." *Id.* (internal quotation marks omitted). "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Id.* (internal quotation marks omitted). This avoidance principle does not apply here, first, because the federal constitutional questions raised in this case are not "anticipated." Rather, the issues were ruled on below and are properly presented on appeal. We unquestionably have jurisdiction to "adjudge the legal rights of litigants [*37] in actual controversies." *Liverpool, N.Y. & P. S.S. Co. v. Comm'rs of Emigration, 113 U.S. 33, 39, 5 S. Ct. 352, 28 L. Ed. 899 (1885)*.

Second, the constitutional avoidance doctrine presumes that a nonconstitutional ground for resolving the case is properly before the court. *Ashwander, 297 U.S. at 347* (Brandeis, J., concurring). "The Court will not pass upon a constitutional question although properly presented by the record, if there is also *present* some other ground upon which the case may be disposed of." *Id.* (emphasis added). The majority asserts that we should not allow the litigants to force us into deciding constitutional questions, apparently believing that courts are responsible for framing the issues. This is not so. "[W]e rely on the parties to frame the issues for decision," as "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States, 554 U.S. 237, 243, 244, 128 S. Ct. 2559, 171 L. Ed. 2d 399 (2008)* (internal quotations marks omitted); *accord Carducci v. Regan, 714 F.2d 171, 177, 230 U.S. App. D.C. 80 (D.C. Cir. 1983)* (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as [*38] self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

In addition, we should not avoid a constitutional question when its resolution is necessary to dispose of the case. *Ashwander, 297 U.S. at 347* (Brandeis, J., concurring). Here, the majority concedes that the state issues are merely "potentially dispositive." Although offering an opinion on their resolution, the majority admits that the case cannot [**22] be decided on the basis of state law "because the parties have failed to develop these issues sufficiently for our review." Indeed, the parties have failed to argue or develop them at all.

Just as the majority is incapable of deciding the case on state-law grounds, there is no reason to believe that the district court will be able to do so on remand. The Michigan Constitution provides that "the legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house." Const. 1963, *art. 4, § 27*. Significantly, whether the House passes an act and whether it gives it immediate effect are two separate votes. For example, the House passed HB 4246 and [*39] HB 4929 by less than a two-thirds vote, yet two-thirds of the House voted orally in favor of their immediate effect. *Hammel v. Speaker of House of Representatives (Hammel I), 297 Mich. App. 641, 825 N.W.2d 616, 619 (Mich. Ct. App. 2012)*. Thus, the mere

fact that the House passed PA 4 short of a two-thirds vote is not reason to doubt the validity of its immediate effect.

In *Hammel I*, the plaintiffs sought to enjoin the immediate effect of HB 4246 and HB 4929, arguing that the Michigan Constitution required a role call vote on the record, but the Michigan Court of Appeals rejected the argument. The court explained that "[a] general challenge to the governing procedures in the House of Representatives is not appropriate for judicial review."[1] *Id.* The court also observed that the House rule allowing motions for immediate effect to be resolved by a rising vote did not conflict with the plain language of § 27, and, in any case, the plaintiffs did not challenge the House rule. *Id.* at 621. According to the court, an injunction was improper because "[t]he constitutional provisions at issue permit the manner in which they are applied to be determined by adoption of the rules of the House, which [the] plaintiffs [*40] concede they do not challenge, and which we do not oversee." *Id.* at 622. The Michigan Supreme [**23] Court denied the plaintiffs' application for leave to appeal. *Hammel v. Speaker of the House of Representatives (Hammel II), 493 Mich. 973, 829 N.W.2d 862 (Mich. 2013)*. Thus, *Hammel I* is the law of Michigan. Contrary to the majority's assertion, I do not characterize *Hammel II* "as somehow affirming" *Hammel I*. Rather, I characterize *Hammel II* as a denial of leave to appeal, the effect of which leaves *Hammel I* intact. *Michigan Court Rule 7.215(J)(1)* provides that published decisions of the Michigan Court of Appeals issued on or after November 1, 1990, are precedentially binding on subsequent panels of the Michigan Court of Appeals. Accordingly, *Hammel I* is precedent on this issue until or unless it is overruled by the Michigan Supreme Court.

> 1 The majority is correct that, before 1963, the Michigan courts would scrutinize whether the legislature properly passed a bill with immediate effect. At the time, the state constitution limited the availability of immediate effect to "acts immediately necessary for the preservation of the public peace, health or safety," Mich. Const. 1908, *art. 5, § 21*, and courts would [*41] review the legislative determination of public necessity, see *Attorney General ex rel. Barbour v. Lindsay, 178 Mich. 524, 145 N.W. 98, 103 (Mich. 1914)*. The Michigan Constitution no longer imposes a public necessity requirement. *See Mich. Const. 1963, art. 4, § 27.*

The majority apparently disagrees with the *Hammel I* decision. According to the majority, the reasoning in *Hammel I* on this issue of state law "make[s] little sense." But because "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments," it is unclear what the majority hopes to be accomplished on remand. *Marks v. Tennessee, 554 F.3d 619, 622 (6th Cir. 2009)* (internal quotation marks omitted). A federal court is bound by a state appellate court's judgment on a question of state law "absent a *strong showing* that the state's highest court would decide the issue differently." *Kirk v. Hanes Corp. of N.C., 16 F.3d 705, 707 (6th Cir. 1994)* (internal quotation marks omitted); *accord West v. AT&T, 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940)* (explaining that a federal court lacks authority to disregard a state appellate court's judgment on a question of state law "unless it is convinced . . . that the highest court [*42] of the state would decide otherwise"). Where, as here, "the highest court has refused to review the lower court's decision," the possibility that it will reach a conclusion contrary to that decision at a later date "remains a matter of conjecture." *West, 311 U.S. at 237-38.* Thus, because there does not exist a "strong showing" that the Michigan Supreme Court would reach a contrary conclusion, *Hammel I* is binding on federal courts, and, consequently, the federal district court has no basis to question the validity of PA 4's immediate effect on remand.

It is also inappropriate to direct the district court to review whether the rejection by referendum of PA 4 rendered the EM's past actions void. The Michigan courts have [**24] not squarely addressed this issue. The Michigan courts are in a better position to rule on novel questions of Michigan law. *Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 560 (6th Cir. 2008)*. It is especially inappropriate for a federal court to rule on an unanswered question of state law *sua sponte*. In *United States National Bank of Oregon v. Independent Insurance Agents of America, 508 U.S. 439, 446-47, 113 S. Ct. 2173, 124 L. Ed. 2d 402*, cited by the majority, the United States Supreme Court approved the [*43] D.C. Circuit's *sua sponte* consideration of an issue of *federal* law, relying on the Article III federal judicial power, which "extend[s] to all Cases . . . arising under . . . the Laws of the United States." Art. III, § 2, cl. 1. However, the decision does not support a federal court's *sua sponte* consideration of novel questions of *state* law, as ordered here. To my knowledge, the majority's chosen action is unprecedented.

The issues created by the majority have not been raised, decided, or preserved. The Retired Employees have never (neither below nor on appeal) argued that P.A 4 was improperly given immediate effect or its rejection by referendum rendered the EM's past actions void, thereby forfeiting those issues. Moreover, the Retired Employees expressly waived the latter issue at oral argument.[2] Imprudently, my colleagues have departed from our proper judicial role by becoming advocates in their zeal to create controversies that do not exist.

> 2   Courts frequently confuse the concepts of "waiver" and "forfeiture." Waiver is the intentional relinquishment or abandonment of a known right, whereas forfeiture is the failure to make the timely assertion of a right. *United States v. Olano, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).* [*44] Here, there was an express waiver regarding one of the issues and a forfeiture of the other.

"As a general rule, appellate courts do not consider any issue not passed upon below." *In re Morris, 260 F.3d 654, 663 (6th Cir. 2001).* Our cases have developed three circumstances that justify departure from the general rule. *Id. at 664.* Under the exception relied on by the majority, although not passed upon below, this court may address issues presented with sufficient clarity and requiring no factual development where their resolution would promote the finality of litigation in the case. *Id.* Issues are presented with sufficient clarity when "extensively briefed" by both parties. *United States v. Pickett, 941 F.2d 411, 415 (6th Cir. 1991).* Here, the parties never raised the [**25] issues (much less extensively briefed them), and the majority concedes that the issues lack the factual development necessary for their resolution. More importantly, the resolution of the issues on remand will not serve the interest of finality, because the district court's decision will not be precedentially binding regarding Michigan law. *Doe v. Young Marines of the Marine Corps League, 277 Mich. App. 391, 745 N.W.2d 168, 172 (Mich. Ct. App. 2007)* [*45] ("We are not bound to follow a federal court's interpretation of state law[.]").

The cases relied on by the majority do not involve forfeited or waived issues. *See Dandridge v. Williams, 397 U.S. 471, 476 n.6, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970); Burkholder v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local*

*No. 12, 299 F. App'x 531, 534 (6th Cir. 2008), overruled on other grounds by Chapman v. UAW Local 1005, 670 F.3d 677 (6th Cir. 2012); City of Mt. Clemens v. EPA, 917 F.2d 908, 916 n.7 (6th Cir. 1990).* Rather, in those cases, the preserved issues raised and argued below were simply not addressed by the lower court. In such situation, "[w]hen attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question," the appellate court may find it appropriate to remand the case for additional factual development and resolution by the lower court. *Dandridge, 397 U.S. at 476 n.6.* But "forfeiture" or "waiver" is not the appropriate term for this occurrence. The majority's reliance on *Dandridge, Burkholder,* and *Mt. Clemens* is therefore misplaced.

In addition to dissenting from the consideration of waived and forfeited issues, [*46] I also respectfully dissent from the majority's order denying the Michigan Attorney General's motion to intervene. In the rare case when *sua sponte* consideration on appeal is proper, interested parties should be provided "ample opportunity to address the issue." *Indep. Ins. Agents of Am., 508 U.S. at 448.* My colleagues disregard this principle. Having characterized the state-law issues as important and potentially dispositive of the case, the majority paradoxically denies the Attorney General's request to defend the state's position with respect to those issues. They do this despite the Attorney General's statutorily protected right to intervene in any matter in which the people of Michigan [**26] may be interested. *See Mich. Comp. Laws § 14.28.* In my view, allowing intervention on remand provides inadequate recourse to the damage the majority has done already.

III.

Only the federal constitutional issues ruled on below and raised by the parties on appeal are properly before us and therefore should be decided. We review the district court's denial of injunctive relief for an abuse of discretion. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002).* We review [*47] a district court's underlying legal conclusions de novo and its factual findings for clear error. *Ne. Ohio Coal. for the Homeless v. Husted, 696 F.3d 580, 591 (6th Cir. 2012).* Our review is "highly deferential," and we will disturb the district court's determination "only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an

erroneous legal standard." *McNeilly v. Land, 684 F.3d 611, 614 (6th Cir. 2012)* (internal quotation marks omitted).

A district court evaluating a plaintiff's request for injunctive relief considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Id. at 615.* "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012)* (quoting *Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009)).* [*48] The burdens of production and persuasion fall on the plaintiff. *McNeilly, 684 F.3d at 615.* "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion"; an injunction is an "extraordinary remedy" available only when the circumstances "clearly demand it." *Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000)* (internal quotation marks omitted).

[**27] A. Likelihood of Success on the Merits

1. *Contracts Clause*

The district court determined that the Retired Employees failed to show a likelihood of success on the merits of their *Contracts Clause* claim. It reached this conclusion because they challenged the EM's actions, which it determined did not constitute an exercise of a legislative power, making the *Contracts Clause* inapplicable. *See New Orleans Waterworks Co. v. La. Sugar Refining Co., 125 U.S. 18, 30, 8 S. Ct. 741, 31 L. Ed. 607 (1888)* ("The prohibition [against the impairment of contracts] is aimed at the legislative power of the State, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals."); *Ross v. Oregon, 227 U.S. 150, 162, 33 S. Ct. 220, 57 L. Ed. 458 (1913).* [*49] Second, the district court stated that the Retired Employees failed to allege that the state denied them an opportunity to seek recourse through the courts or that the state foreclosed the imposition of an adequate state remedy for an established impairment. *See Crosby v. City of Gastonia, 635 F.3d 634, 640 (4th Cir. 2011)*

("[R]ecourse to *§ 1983* for the deprivation of rights secured by the *Contracts Clause* is limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts . . . or has foreclosed the imposition of an adequate remedy for an established impairment. *Section 1983* provides no basis to complain of an alleged impairment in the first instance.").

The court also indicated that some impairments of contract are constitutional, but this does not appear to be a basis for its conclusion that the Retired Employees' claim was unlikely to succeed. Nonetheless, this court may affirm based on any reason advanced by the City of Pontiac against the issuance of a preliminary injunction that was presented before the district court. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 349 (6th Cir. 1998).* [*50] Therefore, it is appropriate to consider the City of Pontiac's claim that the alleged impairment survives constitutional scrutiny.

[**28] The *Contracts Clause* provides that "No state shall . . . pass any . . . Law impairing the Obligation of Contracts." *U.S. Const. art. I § 10, cl. 1.* The prohibition against impairments of contracts, however, is not absolute. *Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428, 54 S. Ct. 231, 78 L. Ed. 413 (1934).* A claim under the *Contracts Clause* requires a showing that: "(1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial." *Mascio v. Pub. Emps. Ret. Sys. of Ohio, 160 F.3d 310, 313 (6th Cir. 1998)* (internal quotation marks omitted). Absent such a showing, there is no constitutional violation.

In this case, it is apparent that the EM impaired the contractual rights of at least some retirees who had been guaranteed various healthcare benefits in CBAs. Indeed, if such contractual rights did not exist or had expired, then seemingly, it would have been unnecessary for the EM to utilize his power under PA 4 to modify the CBAs.

Assuming a contractual impairment, the question becomes whether the impairment is substantial. A court assessing [*51] whether an impairment is substantial considers "the extent to which reasonable expectations under the contract have been disrupted." *Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 368 (2d Cir. 2006)* (internal quotation marks omitted). In *Buffalo Teachers Fed'n,* the Second Circuit determined that a

wage freeze worked such a disruption to employees' reasonable expectations to contractually negotiated wage increases that the impairment was substantial. *Id.* Because this case involves a reduction of benefits, as opposed to a freeze of benefits, the impairment here very well may be more substantial than in *Buffalo Teachers Fed'n.* For this reason, and because defendants do not argue otherwise, a substantial impairment can be presumed.

If the impairment is substantial, to survive constitutional scrutiny, the government must have a legitimate public purpose behind the impairment, and the impairment must be reasonable and necessary to serve that purpose. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411-12, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983); U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 25, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977).* "A legitimate public purpose is one aimed [**29] at remedying an important general social or economic problem [*52] rather than providing a benefit to special interests." *Buffalo Teachers Fed'n, 464 F.3d at 368* (internal quotation marks omitted). An impairment may be considered reasonable and necessary if: (1) impairing the contract was considered on par with other policy alternatives; (2) a more moderate course would not have served the legitimate public purpose equally well; and (3) the impairment was reasonable in light of the surrounding circumstances. *Id. at 371.*

The City of Pontiac argues that impairing the Retired Employees' contractual rights was reasonable and necessary to serve a legitimate public purpose. The City of Pontiac relies on *Buffalo Teachers Fed'n,* where several teachers unions sought to enjoin a wage freeze implemented by the city board pursuant to the Buffalo Fiscal Responsibility Authority Act. *Id. at 365-66.* Pursuant to the Act, the city board froze the wages of union members, despite contractually negotiated wage increases that had been memorialized in CBAs. *Id. at 366.* The district court granted the defendants' motion for summary judgment, concluding as a matter of law that the wage freeze did not violate the *Contracts Clause,* and the Second Circuit affirmed. *Id. at 367, 376.*

The [*53] Second Circuit determined that the wage freeze was a reasonable and necessary means of addressing the city's fiscal crisis. *Id. at 368-71.* First, the wage freeze was implemented "only after other alternatives had been considered and tried," including a hiring freeze and school closings and layoffs. *Id. at 371.* Second, a temporary wage freeze was moderate relative to the more drastic measure of eliminating more municipal jobs and closing more schools. *Id.* As a further indication of reasonableness, the court considered the temporary and prospective nature of the wage freeze. *Id. at 372.* Finally, although the unions argued that the existence of alternatives made the wage freeze unnecessary, the court declined "to second-guess the wisdom of picking the wage freeze over other policy alternatives, especially those that appear more Draconian, such as further layoffs or elimination of essential services." *Id.* Accordingly, the impairment survived constitutional scrutiny. *Id.*

[**30] Likewise, the EM's efforts to address the City of Pontiac's impending insolvency serve a legitimate public purpose. *See Buffalo Teachers Fed'n, 464 F.3d at 368* (stating that addressing a city's financial problems is a legitimate [*54] public purpose); *see also Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997)* (explaining that a legitimate public purpose is one aimed at remedying an important and general social or economic problem). Further, the modifications to the CBAs were implemented only after the City of Pontiac took other drastic steps to reduce its budgetary problems, including elimination of the police department, emergency dispatch services, animal control services, the vital records department, the fire department, and the near elimination of the department of public works. Because retiree healthcare is the City of Pontiac's largest expense, reducing (but not eliminating) healthcare benefits for retirees appears to be the most effective means to improve its financial troubles. It is improper to second-guess the wisdom of the EM's choice to modify retirees' healthcare benefits over other alternatives such as the elimination of further public services. The modifications thus appear reasonable and necessary. Most significantly, the Retired Employees, who have the burden of showing entitlement to injunctive relief, have made absolutely no argument to the contrary.

The [*55] Retired Employees filed two letters and notices of supplemental authority, but they still fail to explain how the EM's orders were either unreasonable or unnecessary. In *Yurk v. City of Flint,* No. 01-71149-NZ (Genesee Cnty. Cir. Ct. Dec. 11, 2012), the plaintiffs sought to enjoin the implementation of Order No. 13, which modified the terms of a settlement agreement issued by Flint's emergency manager pursuant to PA 4.[3]

Critically, the court reasoned that Order No. 13 was not "necessary" to save the local government from bankruptcy because a more moderate course would have served its public purpose just as well--rather than require the plaintiffs to advance a $100 co-payment for name-brand drugs and seek a refund after the fact by jumping through certain hoops, a more moderate course would have been to require the plaintiffs [**31] to pay the $100 co-payment only after they failed to jump through those same hoops. *Id.* at 8. Unlike the plaintiffs in Yurk, the Retired Employees have not advanced a more moderate course.

> 3 Incidentally, Flint's emergency manager issued Order No. 13 during PA 4's operative life. Therefore, the court reasoned, "the referendum defeat of 2011 PA 4 has not rendered Order [*56] No. 13 invalid or moot." *Id.* at 3.

The Retired Employees also point to *Providence Retired Police & Firefighter's Ass'n v. City of Providence, 2012 R.I. Super. LEXIS 23 (R.I. Super. Ct. Jan. 30, 2012)*, a case involving the constitutionality of an ordinance requiring retirees to enroll in Medicare as a condition of receiving healthcare benefits, contrary to the terms of their CBAs. Granting the retirees' motion for a preliminary injunction, the court found two indications that the ordinance was unreasonable: (1) Providence was aware of its chronic financial problems when it continuously entered into CBAs guaranteeing healthcare benefits; and (2) the transfer to Medicare was intended to be permanent. *2013 U.S. Dist. LEXIS 45681, [WL] at *52, 56.* Many of the CBAs at issue here, however, were entered into long before the City of Pontiac could have anticipated the economic crisis that has set in over the last several years, and it is unclear whether shifting healthcare costs onto retirees is intended to be permanent.

Lastly, the Retired Employees call our attention to *Welch v. Brown, No. 12-13808, 2013 U.S. Dist. LEXIS 45681, 2013 WL 1292373 (E.D. Mich. Mar. 29, 2013)*, where the plaintiffs argued that the reduction of their healthcare benefits was [*57] unreasonable and unnecessary, and they suggested more moderate alternatives that would achieve the defendants' stated legitimate public purpose. In this case, however, the Retired Employees have not argued that the reduction of their benefits was unreasonable and unnecessary, and they have not suggested a more moderate course that would address the City of Pontiac's fiscal crisis.

Moreover, in all of the above cases (*Yurk, Providence Retired Police & Firefighter's Ass'n,* and *Welch*), the court ruled on a request for injunctive relief in the first instance. Our judgment as an appellate court is confined by the standard of review. We can reverse only when we are convinced that the district court abused its discretion. That a court *could* reasonably grant a preliminary injunction in the first instance does not make the district court's decision in this case an abuse of discretion. Albeit for different [**32] reasons than relied on below, I would conclude that the district court acted within its discretion when it concluded that the Retired Employees failed to show a likelihood of success on the merits of their *Contracts Clause* claim. This factor weighs in favor of the City of Pontiac.

## 2. Federal [*58] Preemption

The Retired Employees next allege that the EM's orders are preempted by the Bankruptcy Code, *11 U.S.C. § 903(1)*, which provides that "a State law prescribing a method of composition [i.e., reduction] of indebtedness of [a] municipality may not bind any creditor that does not consent to such composition." Although the Retired Employees certainly did not consent to the reduction of their healthcare benefits, they fail to offer authority supporting their contention that PA 4 prescribes a "method of composition," and the only authority on point that has been brought to this court's attention suggests the contrary. *See Subway-Surface Supervisors Ass'n v. New York City Transit Auth., 44 N.Y.2d 101, 375 N.E.2d 384, 391, 404 N.Y.S.2d 323 (N.Y. 1978)* (holding that a wage freeze in violation of a CBA made pursuant to the Financial Emergency Act for the City of New York did not constitute "composition" and, thus, was not preempted by federal bankruptcy law).

This is not a bankruptcy proceeding, and the EM's orders do not purport to discharge any incurred debt. Rather, the EM's orders modify the terms of CBAs, a measure that appears to be an effort to eliminate the incurrence of additional debt. Further, the Supreme [*59] Court "has sustained provisions arguably affecting the bankruptcy power where the state laws were not directly in conflict with the Bankruptcy Act" and has "stress[ed] that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions." *Ropico, Inc. v. City of New York, 425 F. Supp. 970, 983 (S.D. N.Y. 1976)*. Because the Retired Employees' preemption

arguments are not well supported, a likelihood of success on the merits at this stage has not been established, and this factor weighs in favor of the City of Pontiac.

[**33] 3. Due Process

Third, the district court determined that the Retired Employees were unlikely to succeed on the merits of their due process claims. To establish a procedural due process claim, a plaintiff must demonstrate that he or she has been deprived of a protected property interest without adequate process. *Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006)*. "A contract, such as a collective bargaining agreement, may create a property interest." *Leary, 228 F.3d at 741*. Yet it is unclear whether there can be a property interest in lifetime, unchanging healthcare benefits. [*60] *See Bell v. Westmoreland Cent. Sch. Dist., No. 87-CV-1592, 1991 U.S. Dist. LEXIS 3063, 1991 WL 33161, *3 (N.D. N.Y. Mar. 11, 1991)* (stating that "a constitutionally protected property interest in the continuation of post-retirement health insurance benefits does not exist"); *cf. Lawrence v. Town of Irondequoit, 246 F. Supp. 2d 150, 158 (W.D. N.Y. 2002)* (finding no constitutionally protected property interest where the plaintiffs continued to receive retirement benefits but at a different level).

Further, having reviewed the excerpts of CBAs provided by the Retired Employees, as the district court observed, there is no provision forever entitling retirees to the exact same healthcare benefits. Indeed, such a guarantee would be impractical; as the City of Pontiac asserts, "the insurance provided ten years ago is not even commercially available." Additionally, in the context of an ERISA claim, this court has stated that "[i]f a welfare benefit has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006)* (internal quotation marks omitted). [*61] Because we have not been provided with the CBAs in their entirety, it is difficult to discern the intent of the contracting parties and whether healthcare benefits were guaranteed indefinitely or were instead subject to change. Accordingly, the Retired Employees have failed to carry their burden to demonstrate a likelihood of success on the merits of their due process claim, which tends to weigh in favor of the City of Pontiac.

[**34] B. Irreparable Harm

Turning to the next factor in the preliminary injunction analysis, the district court determined that the Retired Employees failed to show that they would suffer irreparable harm if an injunction were not granted. One way to show irreparable harm is by demonstrating a constitutional violation. *See Overstreet, 305 F.3d at 578*. As explained in detail above, however, the Retired Employees have not shown a reasonable likelihood that their constitutional rights have been violated, a conclusion which tends to weigh against a finding of irreparable harm.

The other source of irreparable harm asserted in this case is the reduction of retiree healthcare benefits. The district court's analysis of this argument is very limited. Although acknowledging that [*62] the EM's orders reduce the Retired Employees' healthcare benefits and force them to pay more out-of-pocket expenses (or forego medical treatment), the court did not consider the harm to be irreparable given that their benefits were not being eliminated entirely. The district court's reasoning is not compelling and overlooks the threat to the Retired Employees' health and safety caused by even a reduction in coverage. A reduction in healthcare benefits is a recognized source of irreparable harm for purposes of a preliminary injunction. *See Golden v. Kelsey-Hayes Co., 845 F. Supp. 410, 415 (E.D. Mich. 1994)* (stating that "reductions in retiree insurance coverage constitute irreparable harm"); *Hinckley v. Kelsey-Hayes Co., 866 F. Supp. 1034, 1044 (E.D. Mich. 1994)* (same). With this in mind, but taking into account that a constitutional violation is unlikely, this factor weighs slightly in favor of the Retired Employees.

C. Balance of Equities and Public Interest

Nonetheless, the harm to the Retired Employees must be balanced against the threatened harm to others, and consideration must also be given to the public interest. The district court concluded that issuing an injunction would likely [*63] cause the City of Pontiac's financial troubles to continue, which would likely result in a complete elimination of healthcare benefits for the Retired Employees, further layoffs, and fewer [**35] public services being provided for the benefit of all residents. Given the drastic measures that the City of Pontiac has already taken to address its fiscal crisis, I cannot disagree with the district court's forecast. These factors thus weigh against the Retired Employees. Balancing the four factors together, and given the highly

deferential standard of review, I would hold that the district court did not abuse its discretion when it denied the extraordinary remedy of injunctive relief.

IV.

In my view, the majority improperly remands the case to the district court to address uncontested issues of state law. Instead, I would address the federal constitutional issues raised on appeal and affirm the district court's judgment denying the Retired Employees' request for injunctive relief. In addition, I would grant the Attorney General's motion to intervene. For these reasons, I respectfully dissent.

# EXHIBIT B

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

       Plaintiffs,

vs

       Case No. 13-734-CZ
       Hon. Rosemarie Aquilina

THE STATE OF MICHIGAN;
RICHARD SNYDER, as Governor
of the State of Michigan; and
ANDY DILLON, as Treasurer of
the State of Michigan,

       Defendants,

_____/

ORDER OF DECLARATORY JUDGMENT

At a session of said Court held in Ingham County Circuit Court,
State of Michigan, this _19th_ day of July, 2013.

PRESENT: _Rosemarie E. Aquilina_
       Circuit Court Judge

Plaintiffs request declaratory relief pursuant to MCR 2.605 concerning (1) the

constitutionality under Article IX Section 24 of the Michigan Constitution of the Local Financial

Stability and Choice Act, 2012 PA 436, MCL 141.1541, *et seq.* ("PA 436"), insofar as PA 436

permits the Governor to authorize an emergency manager to proceed under chapter 9 of the

bankruptcy code, chapter 9 of title 11 of the United States Code, 29 USC 901 to 946 ("Chapter

9") in a manner which threatens to diminish or impair accrued pension benefits; and (2) the

authority of the Governor and/or State Treasurer to authorize an emergency manager to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits.

Plaintiffs have requested, and Defendants have agreed in their Response, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time.

The Court having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises, and for the reasons stated on the record,

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant

Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

A copy of this Order shall be transmitted to President Obama.

It is so Ordered.

Rosemarie E. Aquilina

Circuit Court Judge          P37670