# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
------------------------------------------------x
                                          :
In re                                     :      Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :      Case No. 13-53846
                                          :
                    Debtor.               :      Hon. Steven W. Rhodes
                                          :
                                          :
------------------------------------------------x
```

## CITY OF DETROIT'S CONSOLIDATED REPLY TO OBJECTIONS TO THE ENTRY OF AN ORDER FOR RELIEF

# TABLE OF CONTENTS

I.  Preliminary Statement ..................................................................................... 1

II.  The Court Has Authority and Jurisdiction to Determine the Constitutionality of Chapter 9 and PA 436 ..................................................... 5

III.  Chapter 9 is Constitutional Under Longstanding Supreme Court Precedent ........................................................................................................ 9

    A.  The Supreme Court's Decision in <u>Bekins</u> Remains Binding Precedent ............................................................................ 10

    B.  Subsequent Legal Developments Have Not Undermined the Soundness of <u>Bekins</u> and the Constitutionality of Chapter 9 ........... 13

IV.  The City Was Properly Authorized to Commence This Chapter 9 Case ................................................................................................. 19

V.  The State's Authorization of Chapter 9 Did Not Violate the Pensions Clause ................................................................................................ 21

    A.  The Authorization of Chapter 9 Does Not "Diminish or Impair" Pension Benefits ................................................................. 21

    B.  The Pensions Clause Simply Extends the Protection of the Federal and State Contracts Clauses to Cover Public Pensions ................................................................................................ 22

    C.  The Pensions Clause Does Not Require Chapter 9 Authorization to Be Conditioned on the Non-Impairment of Pensions ........................................................................................... 28

VI.  Collateral Estoppel Does Not Preclude This Court from Determining the City's Eligibility for Chapter 9 ........................................... 32

VII.  PA 436 is Constitutional ................................................................................ 38

    A.  PA 436 Does Not Conflict with Home Rule and Reflects the State Legislature's Power to Address Local Fiscal Emergencies. ..................................................................... 38

    B.  PA 436 Does Not Delegate Power to Pass Local Legislation ........... 41

   C.  PA 436 Does Not Violate the Non-Delegation Doctrine...................42

VIII. The City Satisfies Section 109(c)(5) of the Bankruptcy Code
    Because It Was Impracticable to Bargain with Thousands of
    Bondholders and Over 20,000 Retirees.........................................45

IX.  The City's Good Faith Negotiations with Its Creditors Satisfy
    Section 109(c)(5) of the Bankruptcy Code .................................53

X.   The City is Insolvent ...................................................................59

XI.  The City Desires to Effect a Plan to Adjust Its Debts.................61

XII.  The City Filed Its Petition in Good Faith....................................62

XIII. Notice of the Deadline for Objections to Eligibility Was
    Proper and Sufficient..................................................................69

XIV. Conclusion...................................................................................71

## **EXHIBITS**

Exhibit A: Non-Individual Objections to Eligibility, Summary of
     Arguments Set Forth Therein & City's Responses

Exhibit B: Individual Objections to Eligibility, Summary of Arguments
     Set Forth Therein & City's Responses

Exhibit C: Letters from various union representatives to Brian Easley

Exhibit D: Letter from Brian Easley to James Williams, President,
     AFSCME, dated June 27, 2013

Exhibit E: Letter from Evan Miller to Dennis McNamara, President,
     Detroit Fire Fighters Association, *et al.*, dated July 17, 2013

Exhibit F: Letter from Steven Kreisberg, Director of Collective Bargaining
     and Health Care Policy, AFSCME, to Brian Easley, dated
     July 2, 2013

-ii-

13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 3 of 135 639
13-53846-tjt Doc 2334-17 Filed 12/27/13 Entered 12/27/13 13:37:04 Page 3 of 67

# TABLE OF AUTHORITIES

**CASES**

Agostini v. Felton,
    521 U.S. 203 (1997).............................................................................12

Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.
    (In re Nat'l Century Fin. Enters., Inc.),
    423 F.3d 567 (6th Cir. 2005) .............................................................35

Ashton v. Cameron Cnty. Water Improvement Dist. No. 1,
    298 U.S. 513 (1936).............................................................................10

Ass'n of Retired Emps. v. City of Stockton
    (In re City of Stockton),
    478 B.R. 8 (Bankr. E.D. Cal. 2012)........................................17, 30, 31

Blue Cross & Blue Shield of Mich. v. Demlow,
    270 N.W.2d 845 (Mich. 1978).............................................................43

Blue Cross & Blue Shield of Mich. v. Milliken,
    367 N.W.2d 1 (Mich. 1985)...........................................................42, 43

Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,
    575 N.W.2d 751 (Mich. 1998).............................................................40

Bd. of Trs. v. Cary,
    373 So.2d 841 (Ala. 1979)...................................................................27

Bd. of Trs. v. City of Detroit,
    373 N.W.2d 173 (Mich. Ct. App. 1985).............................................39

Brimmer v. Vill. of Elk Rapids,
    112 N.W.2d 222 (Mich. 1961).............................................................40

City of Pontiac Retired Emps. Ass'n v. Schimmel,
    No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013).....................2

Control Module, Inc. v. Morello (In re Morello),
    No. 07-02052, 2012 WL 1945509
    (Bankr. D. Conn. May 30, 2012) .................................................. 35-36

Cnty. of Orange v. Merrill Lynch & Co., Inc.
(In re Cnty. of Orange),
191 B.R. 1005 (Bankr. C.D. Cal. 1996) ....................................... 30-31

Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA,
592 N.W.2d 408 (Mich. Ct. App. 1998) ............................................37

Detroit City Council v. Mayor of Detroit,
770 N.W.2d 117 (Mich. Ct. App. 2009) ............................................39

Easley v. Pettibone Mich. Corp.,
990 F.2d 905 (6th Cir. 1993) ............................................................35

Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,
459 U.S. 400 (1983) ...................................................................13, 15

Faitoute Iron & Steel Co. v. City of Asbury Park,
316 U.S. 502 (1942) ................................................................ 12, 14-15

First Horizon Home Loan Corp. v. Apostle (In re Apostle),
467 B.R. 433 (Bankr. W.D. Mich. 2012) .............................................8

Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),
527 N.W.2d 468 (Mich. 1994) ...........................................................23

Hanover Nat'l Bank v. Moyses,
186 U.S. 181 (1902) ................................................................... 18-19

Houston v. Governor,
810 N.W.2d 255 (Mich. 2012) ..........................................................40

In re City of Prichard,
No. 99-13465 (Bankr. S.D. Ala. Oct. 6, 2000) ..................................27

In re City of Stockton,
486 B.R. 194 (Bankr. E.D. Cal. 2013) .........................................11, 44

In re City of Stockton,
493 B.R. 772 (Bankr. E.D. Cal. 2013) ............................. 22, 27, 64-65

In re City of Vallejo,
403 B.R. 72 (Bankr. E.D. Cal. 2009) .................................................30

In re Constitutionality of 2011 PA 38,
    806 N.W.2d 683 (Mich. 2011)................................................................. 23, 25-26

In re Cottonwood Water & Sanitation Dist.,
    138 B.R. 973 (Bankr. D. Colo. 1992)......................................................... 58-59

In re Cnty. of Orange,
    183 B.R. 594 (Bankr. C.D. Cal. 1995) ........................................................64, 65

In re Ellicott Sch. Bldg. Auth.,
    150 B.R. 261 (Bankr. D. Colo. 1992)......................................................... 56-57

In re Enrolled Senate Bill
    (Advisory Opinion re Constitutionality of 1972 PA 258),
    209 N.W.2d 200 (Mich. 1973) ......................................................................23

In re Jefferson Cnty.,
    474 B.R. 228 (Bankr. N.D. Ala. 2012)..............................................................14

In re McCurtain Mun. Auth.,
    No. 07-80363, 2007 WL 4287604
    (Bankr. E.D. Okla. Dec. 4, 2007) .............................................................. 66-67

In re Sanitary & Improvement Dist., No. 7,
    98 B.R. 970 (Bankr. D. Neb. 1989).............................................................25, 59

In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,
    165 B.R. 60 (Bankr. D.N.H. 1994)..............................................................58, 64

In re Valley Health Sys.,
    383 B.R. 156 (Bankr. C.D. Cal. 2008) ...............................................................52

In re Vasko,
    6 B.R. 317 (Bankr. N.D. Ohio 1980)..................................................................19

In re Vills. at Castle Rock Metro. Dist. No. 4,
    145 B.R. 76 (Bankr. D. Colo. 1990)............................................................47, 64

Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
    (In re City of Vallejo),
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ....................................................... 27, 46-47

-v-

13-53846-swr  Doc 765  Filed 09/06/13  Entered 09/06/13 19:59:53  Page 6 of 135  642
13-53846-tjt  Doc 2334-17  Filed 12/27/13  Entered 12/27/13 13:37:04  Page 6 of 67

Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo
    (In re City of Vallejo),
    432 B.R. 262 (E.D. Cal. 2010) ...................................................................30, 31

Kosa v. State Treasurer,
    292 N.W.2d 452 (Mich. 1980)..............................................................................24

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997) .................................................................................35

Mascio v. Pub. Emps. Ret. Sys. of Ohio,
    160 F.3d 310 (6th Cir. 1998) ...............................................................................15

Mich. State Highway Comm'n v. Vanderkloot,
    220 N.W.2d 416 (Mich. 1974).............................................................................43

Mission Indep. Sch. Dist. v. Texas,
    116 F.2d 175 (5th Cir. 1940) ...............................................................................31

Monat v. State Farm Ins. Co.,
    677 N.W.2d 843 (Mich. 2004).......................................................................32, 36

Murray v. Charleston,
    96 U.S. 432 (1877)...............................................................................................15

Murray's Lessee v. Hoboken Land & Improvement Co.,
    59 U.S. 272 (1856)..................................................................................................5

Nat'l Fed'n of Indep. Bus. v. Sebelius,
    132 S. Ct. 2566 (2012).........................................................................................17

New York v. United States,
    505 U.S. 144 (1992).............................................................................................16

Olson v. Cory,
    636 P.2d 532 (Cal. 1980) ............................................................................. 26-27

People ex rel. Le Roy v. Hurlbut,
    24 Mich. 44 (1871) ................................................................................. 38, 40-41

Printz v. United States,
    521 U.S. 898 (1997).............................................................................................16

-vi-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 7 of 135   643
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 7 of 67

Richardson v. Schafer (In re Schafer),
    689 F.3d 601 (6th Cir. 2012) ........................................................................19, 31

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
    490 U.S. 477 (1989)..............................................................................................12

Sloan v. City of Madison Heights,
    389 N.W.2d 418 (Mich. 1986)..............................................................................37

South Dakota v. Dole,
    483 U.S. 203 (1987)..............................................................................................17

Stern v. Marshall,
    131 S. Ct. 2594 (2011).......................................................................................5-8

Twin City Fire Ins. Co. v. Adkins,
    400 F.3d 293 (6th Cir. 2005) ...............................................................................34

United States v. Bekins,
    304 U.S. 27 (1938)......................................................................9-13, 15-16, 24

United States Trust Co. of N.Y. v. New Jersey,
    431 U.S. 1 (1977)............................................................................................ 13-15

W.B. Worthen Co. v. Kavanaugh,
    295 U.S. 56 (1935)................................................................................................15

Webster v. Michigan,
    No. 13-734-CZ (Ingham Cnty. Cir. Ct.) ......................................................... 32-38

Weisberg v. Powell,
    417 F.2d 388 (7th Cir. 1969) ...............................................................................32

## FEDERAL CONSTITUTION AND STATUTES

U.S. Const. art. I, § 8, cl. 4..............................................................................18, 29

U.S. Const. art. I, § 10..............................................................................................9

U.S. Const. art. VI, cl. 2..........................................................................................30

11 U.S.C. § 101(32)(C)..................................................................................... 59-60

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 8 of 135   644
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 8 of 67

11 U.S.C. § 109(c) ...................................................................................passim

11 U.S.C. § 362 ................................................................................................34

11 U.S.C. § 903 ................................................................................................18

11 U.S.C. § 904 ................................................................................................44

11 U.S.C. § 921 ...........................................................................5, 6, 33, 53, 62-64, 66

11 U.S.C. § 943 ................................................................................................58

11 U.S.C. § 1129 .............................................................................................44

28 U.S.C. § 157 ................................................................................................33

28 U.S.C. § 1334 ...........................................................................................32-33

28 U.S.C. § 2403 ................................................................................................2

## STATE CONSTITUTION AND STATUTES

Mich. Const. art. IV, § 29 .............................................................................41-42

Mich. Const. art. VII, § 21 ..................................................................................40

Mich. Const. art. VII, § 22 ..................................................................................37

Mich. Const. art. IX, § 24 .........................................................................21, 23, 25

Public Act 72 of 1939 - MCL § 141.201(1) ........................................................26

Public Act 279 of 1909 - MCL § 117.36 .............................................................39

Public Act 336 of 1947 - MCL § 423.215 ...........................................................56

Public Act 436 of 2012 - MCL § 141.1543 .........................................................40

Public Act 436 of 2012 - MCL § 141.1549 .....................................................41, 43

Public Act 436 of 2012 - MCL § 141.1551 .........................................................54

Public Act 436 of 2012 - MCL § 141.1552 ......................................................41-42

-viii-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 9 of 135   645
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 9 of 67

Public Act 436 of 2012 - MCL § 141.1558 ............................................. 3, 19-21, 43

Public Act 436 of 2012 - MCL § 141.1567(3) ........................................................56

**OTHER AUTHORITIES**

6 COLLIER ON BANKRUPTCY ¶ 921.04[2]
(Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013) ...............................69

DETROIT CITY CHARTER § 1-102 ..............................................................................39

1 RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) .........................................36

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 10 of 135   646
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 10 of
67

The City of Detroit (the "City" or the "Debtor") respectfully submits this consolidated reply to the objections (each, an "Objection")[1] to the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief").

## I.  PRELIMINARY STATEMENT

Confronting a state-declared "financial emergency" that includes approximately $18 billion in debt, over 100,000 creditors, over 100 discrete bond issuances and related loans (as well as multiple insurers of such bonds) and nearly 50 union bargaining units representing the City's employees – all of which rendered any out of court solution impracticable – the City commenced this chapter 9 case on July 18, 2013 (the "Petition Date") by filing a Petition for Relief (the "Petition"). The financial condition of the City is detailed in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum") and the City's first-day declarations.[2] These documents demonstrate the City's overwhelming need for debt relief.

---

[1]  Attached hereto as Exhibit A and Exhibit B, and incorporated herein by reference, are charts specifying, for Objections filed by non-individual entities and individuals, respectively, on an Objection-by-Objection basis: (a) each Objection's docket number; (b) the arguments set forth therein (identified by category where appropriate); and (c) the City's response thereto.

[2]  Capitalized terms not otherwise defined herein have the meanings given to them in the Declaration of Kevyn D. Orr in Support of City of Detroit,

Despite these realities, over 100 persons and entities objected to the City's eligibility for relief under chapter 9 and to the entry of an Order for Relief. Most Objectors rely on anticipated treatments of their claims as a platform to argue that the City is not authorized to be a chapter 9 debtor. However, as this Court has observed,[3] neither the determination of claim amounts nor the potential treatment of claims in a plan of adjustment are before the Court at this time.

Notwithstanding the Objectors' arguments, the City is eligible to be a chapter 9 debtor and has demonstrated that an Order for Relief should be entered. First, the City is authorized to be a chapter 9 debtor because:

- After the fulfillment of certain conditions, PA 436 – which was validly passed by the Michigan legislature[4] – "empowers the local government for which an emergency manager has been appointed to become a debtor

---

(continued...)

Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration"), filed on the Petition Date.

[3] Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 642) (the "Eligibility Scheduling Order"), entered on August 26, 2013.

[4] Recently, the Sixth Circuit questioned the validity of PA 4 (the predecessor statute to PA 436) on the grounds that the Michigan legislature may have violated the Michigan Constitution when it declared PA 4 immediately effective. City of Pontiac Retired Emps. Ass'n v. Schimmel, No. 12-2087, 2013 WL 4038582, at *5-6 (6th Cir. Aug. 9, 2013). No such potential constitutional infirmity afflicts PA 436, which became effective on March 28, 2013, more than 90 days after its enactment on December 27, 2012.

-2-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 12 of 135   648
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 12 of
67

under title 11 of the United States Code ... as required by section 109 of title 11 of the United States Code" (<u>see</u> MCL § 141.1558(1));

- Each of the requirements of PA 436 relating to the authorization of the commencement of the City's chapter 9 case – <u>i.e.</u>, a recommendation by the Emergency Manager to the Governor and Treasurer that the City be authorized to proceed under chapter 9 and the written approval of that recommendation by the Governor – were satisfied prior to the filing of the Petition;

- Following the satisfaction of the foregoing conditions, PA 436 specifically authorizes emergency managers to commence chapter 9 cases (<u>see</u> MCL § 141.1558(1));

- The actual text of the Michigan Constitution does not prohibit the commencement of chapter 9 cases by municipalities or condition the steps that might be taken by any State or municipal official in connection with authorizing or effecting such a filing;

- The actual text of the Michigan Constitution does not create or require the imposition of any condition on actions the City might take in this chapter 9 case; and

- No statute passed by the Michigan legislature prohibits the commencement of chapter 9 cases by municipalities.

None of the Objections contest any of the foregoing points. Instead, the Objectors invent additional requirements, not found in the Michigan Constitution, and then allege that these additional requirements have not been met. We demonstrate below that there are no conditions to the City's becoming a debtor under chapter 9 other than those identified above. Accordingly, the City satisfied section 109(c)(2) of the Bankruptcy Code prior to the commencement of this case.

Moreover, objections contending that the City does not desire to adjust its debts, that the City may not be insolvent, that negotiations to adjust debts owed to

-3-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 13 of 135   649
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 13 of 67

more than 100,000 holders were practicable and that the City did not file the

Petition in good faith likewise fall short. The Objections:

- do not include any evidence contradicting or undermining the extensive showing of the City's insolvency included in the Eligibility Memorandum (indeed, the majority of relevant Objectors do not actually state a cognizable objection on the issue, thereby conceding that no information available to them as of the objection deadline supports their Objection);

- (A) implicitly admit that none of the Objectors represent all of the City's more than 20,000 retirees in prepetition negotiations and some Objectors that claim to represent retirees do not represent any of the active employees who have vested pension benefits, (B) ignore certain Objectors' prepetition *refusal* to represent retirees in negotiations concerning pension and retiree healthcare benefits and (C) ignore the impracticability of negotiations with the City's bondholders altogether, all of which are facts that demonstrate that it was impracticable for the City to negotiate an out of court settlement of its debts and other legacy liabilities;

- mischaracterize and omit inconvenient facts relevant to the City's demonstrated efforts to negotiate in good faith a restructuring of its debts with its creditors; and

- misapply the standards governing whether the Petition was filed in good faith to side-step the demonstrated reality that the City intends to file a chapter 9 plan to adjust the City's unsustainable $18 billion debt burden.

Accordingly, as set forth in the Statement of Qualifications, the Eligibility

Memorandum and herein, the City is eligible to be a debtor under chapter 9, and

the Court should promptly enter an Order for Relief.

-4-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 14 of 135   650
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 14 of
67

## II. THE COURT HAS AUTHORITY AND JURISDICTION TO DETERMINE THE CONSTITUTIONALITY OF CHAPTER 9 AND PA 436

There is no doubt that this Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. Eligibility is a question of federal law, governed by section 109(c) of the Bankruptcy Code, relevant only for purposes of accessing the federal bankruptcy scheme and the determination of which is specifically committed to the bankruptcy court by section 921(c) of the Bankruptcy Code. As the United States Supreme Court (the "Supreme Court") made clear in Stern v. Marshall, 131 S. Ct. 2594 (2011), non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights," which are matters "susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." Stern, 131 S. Ct. at 2612 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). Included within this category are cases that "can be pursued only by grace of the other branches" of the federal government (id. at 2614) because "[i]n those cases 'it depends upon the will of congress whether a remedy in the courts shall be allowed at all,' so Congress could limit the extent to which a judicial forum was available." Id. at 2612 (quoting Murray's Lessee, 59 U.S. at 284).

The eligibility proceeding fits squarely within this category of "public rights" cases recognized by the Supreme Court. The City's ability to adjust its debts in a federal bankruptcy case is, of course, only possible because Congress enacted the Bankruptcy Code. Because a chapter 9 case "can be pursued only by grace" of Congress (Stern, 131 S. Ct. at 2614), Congress can control access to chapter 9 by tasking a non-Article III judge with determining a municipality's eligibility, as it has done. 11 U.S.C. §§ 109(c), 921(c). Stern, therefore, poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9.

Indeed, no Objector has challenged the Court's ability to make a final determination regarding the City's eligibility for chapter 9. However, by selective quotation to Stern, some Objectors argue that this Court is powerless to rule on certain *objections* to the City's eligibility for chapter 9 that involve federal or state constitutional questions. See AFSCME Objection, at ¶ 70 (substituting Stern's actual reference to "common law counterclaims such as Vickie's" with "constitutional questions such as this one; misleadingly quoting Stern's actual language "on a common law cause of action" as "on a [constitutional] cause of action").[5] Such a radical expansion of Stern is unsupported by that case or any subsequent authority.

---

[5]     See Stern, 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving *common law counterclaims such as Vickie's* are the Article III

Stern involved a statutorily core, state common law counterclaim asserted by the debtor against a creditor. Stern, 131 S. Ct. at 2620. The Supreme Court contrasted this "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy" with claims "that were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims." Id. at 2611. While the former required the bankruptcy court to impermissibly exercise the judicial power of the United States, the latter "stem[med] from the bankruptcy itself" and could, as a result, be resolved by the bankruptcy court. Id. at 2618; see also id. ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").[6]

---

(continued...)

courts, and it is with those courts that her claim must stay.... What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a *common law* cause of action....") (emphasis added). See also Crittendon Objection at ¶¶ 9-10.

[6] The Supreme Court was careful to clarify that its holding should be interpreted narrowly. Stern, 131 S. Ct. at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one."); id. (noting that Congress had exceeded constitutional limitations "in one isolated respect").

-7-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 17 of 135   653
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 17 of 67

Stern poses no obstacle for the Court in this case because there are no state or federal constitutional *claims* before the Court on which it could even purport to enter a final judgment. What is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself."[7] Id. at 2618. That this determination requires the Court to consider federal and state constitutional questions does not implicate Stern. Even if the Court were to conclude that chapter 9 or PA 436 is unconstitutional, it has not been called upon – indeed, it would not be permitted – to issue any relief based on those arguments beyond declaring that the City is ineligible for chapter 9 and dismissing the Petition.

For the foregoing reasons, Stern is simply not implicated by the Objectors' constitutional arguments against eligibility. See First Horizon Home Loan Corp. v. Apostle (In re Apostle), 467 B.R. 433, 436 (Bankr. W.D. Mich. 2012) ("[T]he Stern decision is extremely narrow; except for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings.").

---

[7]     Even if federal or state constitutional *claims* were before the Court, Stern would still pose no obstacle to this Court's ability to resolve the City's eligibility for chapter 9 in the first instance because the constitutionality of PA 436 is a pure legal issue, which will be reviewed *de novo* on appeal. Thus, none of the concerns regarding deferential review of bankruptcy court judgments animating Stern would be present (see Stern, 131 S. Ct. at 2611), and any error would be harmless after appellate review.

## III.    CHAPTER 9 IS CONSTITUTIONAL UNDER LONGSTANDING SUPREME COURT PRECEDENT

The constitutionality of chapter 9 has been settled for more than 70 years.  In United States v. Bekins, 304 U.S. 27 (1938), the Supreme Court upheld against constitutional challenge the municipal bankruptcy provisions of the Bankruptcy Act of 1937, the predecessor of the current chapter 9.  Although the relevant statutory provisions have remained substantially unchanged since then, the Objectors argue nevertheless that intervening developments in the Supreme Court's jurisprudence on both the Contracts Clause of the United States Constitution (the "Contracts Clause")[8] and federalism have "*effectively* overruled" Bekins and that chapter 9 is no longer constitutional.[9]  The Objectors' argument is wrong for two reasons.  First, because the Supreme Court does not overrule binding precedents by mere implication, Bekins remains good law.  Second, nothing in the Supreme Court's developing jurisprudence on either the Contracts Clause or federalism casts even the slightest doubt on the fundamental soundness of Bekins and the constitutionality of chapter 9.

---

[8]    U.S. Const., art. I, § 10 ("No State shall … pass any … Law impairing the Obligation of Contracts").

[9]    See AFSCME Objection, at ¶¶ 44-46 (emphasis added).

A.     The Supreme Court's Decision in
       _Bekins_ Remains Binding Precedent

AFSCME contends that chapter 9 is unconstitutional in light of federalism

principles because it "allows Congress to set rules controlling State fiscal

self-management – an area of exclusive state sovereignty."[10] This argument is

nothing short of an attempt to relitigate an issue that the Supreme Court resolved

over seven decades ago.

In _Bekins_, the Supreme Court specifically addressed "whether the exercise

of the federal bankruptcy power in dealing with a composition of the debts of [a

municipality], upon its voluntary application and with the State's consent, must be

deemed to be an unconstitutional interference with the essential independence of

the State as preserved by the Constitution." _Bekins_, 304 U.S. at 49. Two years

earlier, in _Ashton v. Cameron County Water Improvement District Number One_,

298 U.S. 513 (1936), the Supreme Court had held that municipal bankruptcy was

unconstitutional because it "might materially restrict [the subdivision's] control

over its fiscal affairs," such that it would "no longer [be] free to manage [its] own

affairs." _Ashton_, 298 U.S. at 530-31. Responding to the Supreme Court's

concerns, Congress enacted a slightly revised version of the municipal bankruptcy

---

[10]     AFSCME Objection, ¶¶ at 40.

-10-

13-53846-swr     Doc 765     Filed 09/06/13     Entered 09/06/13 19:59:53     Page 20 of 135     656
13-53846-tjt     Doc 2334-17     Filed 12/27/13     Entered 12/27/13 13:37:04     Page 20 of
67

statute. <u>Bekins,</u> 304 U.S. at 50; <u>In re City of Stockton</u>, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013).

This revised statute was challenged and upheld in <u>Bekins</u>. The Supreme Court concluded that the revised statute was "carefully drawn so as not to impinge upon the sovereignty of the State." <u>Bekins,</u> 304 U.S. at 51. Specifically, the Court explained that the "State retains control of its fiscal affairs" and that the "bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the [political subdivision] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." <u>Id.</u>

Central to the Court's reasoning was its observation that "the essence of sovereignty" is the ability to "give consents bearing upon the exertion of governmental power." <u>Id.</u> at 51-52. Because the adjustment of debts "was not available under state law by reason of the [Contracts Clause]," the Court held that the "bankruptcy power [was] competent to give relief," and "if there [was] any obstacle to its exercise … it [was] in the right of the State to oppose federal interference." <u>Id.</u> at 54.

13-53846-swr    Doc 765    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 21 of 135   657
13-53846-tjt    Doc 2334-17    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 21 of
67

The Objectors do not point to any subsequent change in the text of chapter 9 that would warrant a different outcome than <u>Bekins</u>.[11] None of the cases cited by the Objectors addresses the constitutionality of chapter 9 or casts doubt on <u>Bekins</u>.[12] Nevertheless, the Objectors invite this Court to treat <u>Bekins</u> as having been implicitly overruled. To do so, however, would violate the fundamental and well-established precept that "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." <u>Rodriguez de Quijas v. Shearson/Am. Express, Inc.</u>, 490 U.S. 477, 484 (1989); <u>see also</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997) (same). Because <u>Bekins</u> directly controls the Objectors' constitutional challenge to chapter 9, the Court must follow it and hold that chapter 9 is constitutional.

---

[11]  <u>See</u> AFSCME Objection, at ¶¶ 44-46.

[12]  Indeed, only one of the cases cited by the Objectors – <u>Faitoute Iron & Steel Co. v. City of Asbury Park</u>, 316 U.S. 502 (1942) – so much as mentions <u>Bekins</u>.

-12-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 22 of 135   658
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 22 of 67

B.   Subsequent Legal Developments
     Have Not Undermined the Soundness of
     <u>Bekins</u> and the Constitutionality of Chapter 9

Although <u>Bekins</u> is dispositive of the Objectors' constitutional claim, it is

also evident that legal developments since <u>Bekins</u> do not undermine the <u>Bekins</u>

decision, the soundness of its reasoning or the constitutionality of chapter 9.

First, contrary to the Objectors' contention,[13] States are not generally free to

adjust municipal debts by unilateral state action.  If the Objectors were correct, the

Contracts Clause would be a dead letter, but the Supreme Court has made clear that

"[w]hen a State itself enters into a contract, it cannot simply walk away from its

financial obligations."  <u>Energy Reserves Grp., Inc. v. Kansas Power & Light Co.</u>,

459 U.S. 400, 412 n.14 (1983).  When a State seeks to impair its own contracts,

"complete deference to a legislative assessment of [the] reasonableness and

necessity [of the impairment] is not appropriate because the State's self-interest is

at stake."  <u>United States Trust Co. of N.Y. v. New Jersey</u>, 431 U.S. 1, 26 (1977).

For that reason, "a state is not completely free to consider impairing the obligations

of its own contracts on a par with other policy alternatives."  <u>Id.</u> at 30-31.

In chapter 9, by contrast, there is no risk of state self-interest because the

impairment can be carried out only by an impartial federal judge.  Indeed, as one

bankruptcy court put it: "A financially prostrate municipal government has one

---

[13]   <u>See</u> AFSCME Objection, at ¶¶ 44-45.

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 23 of 135   659
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 23 of
67

viable option to resolve debts in a non-consensual manner. It is in a bankruptcy case. Outside of bankruptcy, non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible." In re Jefferson Cnty., 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), aff'd, No. CV-12-J-2203-5, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).

It comes as no surprise, therefore, that Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942), the case so prominently relied upon by the Objectors, is the *only* case "in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case." In re Jefferson Cnty., 474 B.R. at 279 n.21; see also United States Trust Co., 431 U.S. at 27. In Asbury Park, the Court rejected a Depression-era Contracts Clause challenge to a state-law-approved plan of adjustment pursuant to which certain defaulted bonds could only be converted into new bonds with the same principal amount but bearing a lower interest rate. Asbury Park, 316 U.S. at 504-07. Clarifying that "[w]e do not go beyond the case before us" and that "[d]ifferent considerations may come into play in different situations" (Asbury Park, 316 U.S. at 516), the Court was careful not to extend its holding beyond the facts of the case.

Therefore, far from being an authoritative pronouncement of the States' sweeping authority to adjust municipal debts, Asbury Park is an outlier and stands

only for the unremarkable point that States may adjust municipal debts in very limited ways under extraordinary circumstances without violating the Contracts Clause. "In almost every case," however, "the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." Energy Reserves Grp., 459 U.S. at 412 n.14 (citing United States Trust Co., 431 U.S. at 25-28; W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935); Murray v. Charleston, 96 U.S. 432 (1877)); see also, e.g., Mascio v. Public Emps. Ret. Sys. of Ohio, 160 F.3d 310, 313-15 (6th Cir. 1998) (barring the enforcement of a State law impairing vested pension benefits).

Courts must seek the aid of federal bankruptcy courts under chapter 9 precisely because they are *not* at liberty under the Contracts Clause to impair their own contracts. See Bekins, 304 U.S. at 54. For this reason, the Objectors' next contention – that a State unconstitutionally relinquishes its sovereignty to the Federal Government by authorizing chapter 9[14] – is also fundamentally flawed. As the Bekins Court explained: when a State authorizes chapter 9, it "acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of

---

[14]     See AFSCME Objection, at ¶¶ 46-57.

state sovereignty, has reduced both sovereigns to helplessness in such a case." Bekins, 304 U.S. at 54. The irony of the Objectors' argument is that it would actually impede, rather than protect, the States' sovereignty.

The Objectors also rely on the Supreme Court's anti-commandeering cases – New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 521 U.S. 898 (1997) – which involved involuntary federal regulatory regimes that "commandeered" State legislative processes or officials. In New York, the challenged statute required States either to take title to low-level radioactive waste or to enact legislation regulating the waste pursuant to Congress's direction. New York, 505 U.S. at 174-75. In Printz, the challenged statute required State law enforcement officers to participate in the administration of a federal regulatory scheme. Printz, 521 U.S. at 903-04. The Supreme Court invalidated both statutes because "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." Id. at 933 (quoting New York, 505 U.S. at 188).

Chapter 9, by contrast, does not *compel* the States to enact, administer or otherwise participate in the federal bankruptcy scheme. Most fundamentally, chapter 9 is "administered" by the federal bankruptcy court, not by States. Moreover, States cannot be "forced" to participate in chapter 9 because their participation is completely voluntary. By extending the benefits of bankruptcy to

consenting States, chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements. E.g., South Dakota v. Dole, 483 U.S. 203, 205-06 (1987) (conditioning federal transportation funds on the States' adoption of a national minimum drinking age). Such programs are not constitutionally problematic where the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2602-03 (2012) (plurality opinion).

Because States have a "legitimate choice" whether to allow their municipalities to invoke chapter 9, chapter 9 is not an unconstitutional infringement of State sovereignty. Nor is there any danger of misplaced political accountability.[15] Where, as here, the State has a "legitimate choice" whether to participate in the federal scheme, "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2603 (plurality opinion).

Indeed, even after a State authorizes its municipalities to proceed under chapter 9, the bankruptcy court's powers are designed "to preserve the niceties of the state-federal relationship." Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012). For that reason, the

---

[15]    See AFSCME Objection, at ¶¶ 47-57.

Objectors are wrong to suggest that State consent to chapter 9 is a futile effort to cure "an otherwise unconstitutional infringement of state sovereignty."[16] Even if there is some non-delegable core of sovereign state functions that cannot be ceded to the federal government by State consent, chapter 9 itself prohibits the bankruptcy court from intruding on those core functions. 11 U.S.C. § 903 (prohibiting the bankruptcy court from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality").

Finally, the Objectors also argue that chapter 9 violates the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution.[17] "[B]y ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy," argue the Objectors, "Chapter 9 permits the promulgation of non-uniform bankruptcies within states." Id. The very case that the Objectors cite, Hanover National Bank v. Moyses, 186 U.S. 181 (1902), proves otherwise. In Hanover National Bank, the Supreme Court approved federal bankruptcy provisions that relied on state law for determining exempt property. Id. at 188-90. The Supreme Court held that such a system was, "in the constitutional sense, uniform throughout the United States," even though "it may result in certain

---

[16]    AFSCME Objection, at ¶¶ 60-62.

[17]    AFSCME Objection, at ¶ 58.

-18-

13-53846-swr    Doc 765    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 28 of 135    664
13-53846-tjt    Doc 2334-17    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 28 of
67

particulars differently in different States." Id. at 190. Insofar as the Objectors

contend that chapter 9 is unconstitutional because PA 436 is non-uniform within

Michigan, that argument is erroneous because the uniformity requirement is "only

controlling as to the congressional exercise of power," not as to the underlying

state law. In re Vasko, 6 B.R. 317, 320 (Bankr. N.D. Ohio 1980). In any event,

the process set forth in PA 436 is plainly uniform because it applies to all local

governments. E.g., MCL § 141.1558. Notwithstanding the Objectors' speculation

that PA 436 might have "wildly divergent effects on different cities" (AFSCME

Objection, at ¶ 58), "it is not the outcome that determines the uniformity, but the

uniform process" by which a defined class of debtors is treated. Richardson v.

Schafer (In re Schafer), 689 F.3d 601, 611 (6th Cir. 2012).

## IV.  THE CITY WAS PROPERLY AUTHORIZED TO COMMENCE THIS CHAPTER 9 CASE

On July 16, 2013, consistent with MCL § 141.1558, the Emergency

Manager provided the Governor and Treasurer with his written recommendation

that the City be authorized to file for chapter 9 relief.[18] The recommendation was

predicated upon, among other things, the Emergency Manager's:

---

[18]    Orr Declaration, at Exhibit J (copy of Emergency Manager's written
        recommendation); MCL § 141.1558(1) ("If, in the judgment of the
        emergency manager, no reasonable alternative to rectifying the financial
        emergency of the local government which is in receivership exists, then the
        emergency manager may recommend to the governor and the state treasurer
        that the local government be authorized to proceed under chapter 9.").

-19-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 29 of 135   665
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 29 of 67

(A) determination that the City could not adopt a feasible financial plan that can

satisfactorily rectify its financial emergency in a timely manner; and (B) judgment

that no reasonable alternative to chapter 9 would allow him to rectify the City's

financial emergency in a timely manner.[19]

On July 18, 2013, the Governor approved in writing the Emergency

Manager's recommendation to commence this chapter 9 case.[20] Finally, also on

July 18, 2013, consistent with the Governor's written approval, the Emergency

Manager issued a written order directing the City to commence this chapter 9

case.[21] Accordingly, under applicable State law and pursuant to the specific

approval of the Governor in accordance with MCL § 141.1558(1), the City has

---

[19] MCL § 141.1558(2)(a) (requiring that an emergency manager's recommendation include, among other things, "[a] determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.").

[20] Orr Declaration, at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation); MCL § 141.1558(1) ("the governor shall inform the state treasurer and the emergency manager in writing of the decision [to approve]....").

[21] Orr Declaration, at Exhibit L (copy of Emergency Manager's order directing commencement); MCL § 141.1558(1) (providing that, "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.").

-20-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 30 of 135   666
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 30 of
67

been specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code.

## V. THE STATE'S AUTHORIZATION OF CHAPTER 9 DID NOT VIOLATE THE PENSIONS CLAUSE

Several of the Objectors claim, in one form or another,[22] that the State's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause").[23] They are mistaken. As explained below, the Pensions Clause itself makes no mention of bankruptcy or chapter 9 authorization. Nor does the State's authorization of a chapter 9 filing, or even the City's becoming a chapter 9 debtor, "diminish[ ] or impair[ ]" any pension. These are simply steps that begin the bankruptcy process, where pensions *may* be impaired by order of a federal bankruptcy court at some later date.

### A. The Authorization of Chapter 9 Does Not "Diminish or Impair" Pension Benefits

In authorizing the City to file for chapter 9, the State did not violate the Pensions Clause because it did not "diminish[ ] or impair[ ]" any pension. The authorization was merely one of several conditions to the City's becoming a

---

[22]     See, e.g., AFSCME Objection, at ¶¶ 76-81; Retiree Associations Objection, at ¶¶ 35-50; UAW Objection, at ¶¶ 27-40; Detroit Retirement Systems Objection, at pp. 30-43.

[23]     Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").

-21-

13-53846-swr    Doc 765    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 31 of 135    667
13-53846-tjt    Doc 2334-17    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 31 of 67

chapter 9 debtor. After the Governor authorized the City to file this case, and even after the City filed the Petition, the City's pension obligations have remained unimpaired. The Objectors frame their argument as if nothing stands between authorization and the confirmation of a plan that may reduce pension benefits. The only way pensions could be impaired without the consent of the pertinent beneficiaries, however, is by an order of this Court at some future date. As another court has recently indicated, the "main event" of pension impairment is not properly addressed until well after the eligibility stage – at the time of plan confirmation. In re City of Stockton, 493 B.R. 772, 797 (Bankr. E.D. Cal. 2013).

For the same reason, there is no merit to the Objectors' argument that the enactment of PA 436 violated the Pensions Clause (and, thus, that PA 436 is unconstitutional as a threshold matter)[24]. The enactment of the underlying statute empowering the Governor to authorize (and the Emergency Manager to file) a chapter 9 case is even further removed from any possible impairment of pensions than the Governor's authorization itself.

B.   The Pensions Clause Simply Extends the Protection of the
     Federal and State Contracts Clauses to Cover Public Pensions

The unmistakable function of the Pensions Clause is to extend the protection of the federal and state contracts clauses to cover public pensions by treating them

---

[24]   See, e.g., Detroit Retirement Systems Objection, at p. 43.

-22-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 32 of 135   668
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 32 of
67

as contractual obligations.[25] The text of the Pensions Clause states that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions *shall be a contractual obligation thereof* which shall not be diminished or impaired thereby." Mich. Const. art. IX, § 24 (emphasis added). As the Michigan Supreme Court has recognized, "*[t]he obvious intent* of § 24 ... was to ensure that public pensions *be treated as contractual obligations* that, once earned, could not be diminished." In re Constitutionality of 2011 PA 38, 806 N.W.2d 683, 694 (Mich. 2011) (emphasis added).

It is important to note that prior to the adoption of the Pensions Clause in 1963, "[i]t had long been the general rule that pensions granted by public authorities were not contractual obligations but gratuitous allowances which could be revoked at will by the authority because the pensioner was not deemed to have had any vested right in their continuation." In re Enrolled Senate Bill (Advisory Opinion re Constitutionality of 1972 PA 258), 209 N.W.2d 200, 202 (Mich. 1973). Against this backdrop, public employees in Michigan sought "[t]o gain protection of their pension rights," and thus "effectively lobbied for a constitutional

---

[25]    The contracts clause contained in the Michigan Constitution (the "State Contracts Clause") is indistinguishable from the federal version, and the Michigan courts have accordingly interpreted the two as having the same effect. See Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question), 527 N.W.2d 468, 473-74 (Mich. 1994) (noting "virtually identical" language of state and federal contracts clauses, and relying on federal case law to apply state clause).

amendment *granting contractual status* to retirement benefits." Kosa v. State

Treasurer, 292 N.W.2d 452, 454-55 (Mich. 1980) (emphasis added). The result

was the Pensions Clause, which elevated public pensions to the same level of

constitutional protection that applied to "obligations of contract" under the

Contracts Clause.

While the Contracts Clause prohibits States from impairing contracts, it does

not pose any obstacle to chapter 9. As the Supreme Court has recognized, a State's

authorization of municipal bankruptcy does not itself constitute an impairment of

contracts but merely "invites the intervention of the bankruptcy power to save its

agency which the State itself is powerless to rescue. " Bekins, 304 U.S. at 54.

Consequently, Bekins makes clear that the Contracts Clause is perfectly consistent

with chapter 9 proceedings from start to finish. This is true for two reasons. First,

a State does not impair contracts merely by authorizing a municipality to file for

bankruptcy, because no contracts are impaired at the time of authorization. Second,

any impairment of contracts that occurs in chapter 9 does not implicate the

Contracts Clause, because the Contracts Clause only prohibits impairment *by the*

*State*, while chapter 9 only allows impairment by the federal bankruptcy court. As

one court has observed, "the Bankruptcy Code ... permits *the federal courts*

*through confirmation of a Chapter 9 plan* to impair contract rights ... and such

impairment is not a violation by the state or the municipality of [the Contracts

-24-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 34 of 135   670
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 34 of
67

Clause] which prohibits a state from impairing such contract rights." In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) (emphasis added). Indeed, if chapter 9 truly involved an impairment of contractual obligations by the State, then the Contracts Clause would prevent the impairment of any contract in municipal bankruptcy (or at least require a stringent Contracts Clause analysis for every contractual impairment).

Like the Contracts Clause, the Pensions Clause applies only to impairments that are imposed "[ ]by" the State and its political subdivisions. Mich. Const. art. IX, § 24. Thus, as with the Contracts Clause, chapter 9 is not limited by the Pensions Clause because the impairment of pensions and other contractual obligations in chapter 9 can only occur by order of a federal bankruptcy court.

The framework of chapter 9, including the role of States in authorizing municipal bankruptcy, was well established when the Pensions Clause was ratified in 1963. Nevertheless, the Pensions Clause does not include any restriction on the authorization or filing of municipal bankruptcy cases. Given the absence of any language regarding bankruptcy in the Pensions Clause, and the well-established principle that constitutional protection for "contractual obligations" is not a bar to chapter 9, there is no basis for concluding that the Pensions Clause was intended to give pensioners a right to block municipal bankruptcy. Cf. In re Constitutionality of 2011 PA 38, 806 N.W.2d at 697, n.24 ("Given that neither the actual language

of § 24 nor the Address to the People mentions [a right to tax-free pension benefits], the ratifiers would have had absolutely no reason to suppose that, by adopting § 24, they would be creating" such a right).

Indeed, when the Pensions Clause was ratified in 1963, Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. See Public Act 72 of 1939, MCL § 141.201(1) (repealed in 1982) ("Any ... instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] ... may proceed under the terms and conditions of such acts to secure a composition of its debts.... The governing authority of any such ... instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress ...."). It seems extremely unlikely that, by enacting the Pensions Clause, the framers of the Michigan Constitution intended to overrule Public Act 72 of 1939, which remained on the books for another 20 years, without so much as mentioning the Act's existence.

No court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. For example, in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some "new comparable or offsetting benefit

appear[s] in the modified plan." Olson v. Cory, 636 P.2d 532, 541 (Cal. 1980).

Nonetheless, California courts have found municipalities eligible to be chapter 9

debtors in several recent cases where pensions might be vulnerable to impairment

in the bankruptcy process. E.g., Stockton, 493 B.R. 772; Int'l Ass'n of Firefighters,

Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280 (B.A.P.

9th Cir. 2009). Similar constitutional protection for pensions applies in Alabama

(see Bd. of Trs. v. Cary, 373 So.2d 841 (Ala. 1979)), where chapter 9 has not only

been authorized but, consistent with constitutional protections for contracts, has

also been used to reduce pensions (see In re City of Prichard, No. 99-13465 (Bankr.

S.D. Ala. Oct. 6, 2000) (Docket No. 123), at pp. 6-7 (order confirming plan of

adjustment reducing all existing and future pension benefits payments by 8.5%)).

As in these cases, the Pensions Clause does not prohibit the State from authorizing

the City to be a debtor under chapter 9.

   Indeed, if the mere prospect of impairing pensions in bankruptcy were

enough to violate the Pensions Clause, then the same prospect of impairing

contracts in bankruptcy would be enough to violate the State Contracts Clause (and,

for that matter, the federal Contracts Clause). If that were true, no Michigan

municipality (or any municipality in any other State throughout the nation) could

ever enter chapter 9, where the impairment of contracts is always on the table.

That absurd result proves that the authorization of a chapter 9 case does not equate

to an impermissible impairment under the Pensions Clause.

      C.     The Pensions Clause Does Not
              Require Chapter 9 Authorization to
              <u>Be Conditioned on the Non-Impairment of Pensions</u>

The Objectors fare no better in their argument that the Pensions Clause

allows the State to authorize chapter 9 only on the condition that pensions not be

impaired.[26]  Once again, the Objectors cite no authority in support of this novel

argument, which has no basis in text or precedent.

To begin,  the only relevant question at the eligibility stage is whether the

State has specifically authorized the City "to be a debtor under ... chapter [9]."

11 U.S.C. § 109(c)(2).  If the State has granted authorization, it is entirely

irrelevant for eligibility purposes whether the State has also purported to impose

some further conditions.

Perhaps conceding this point, the Objectors appear to argue that the State has

not validly authorized the City to become a chapter 9 debtor because the State

violated the Pensions Clause by failing to make the non-impairment of pensions a

condition of authorization.[27]  This argument, too, is incorrect.  As we have already

seen, the Pensions Clause nowhere mentions bankruptcy in general or chapter 9

---

[26]    <u>See</u> AFSCME Objection, at ¶ 82; UAW Objection, at ¶ 30; Detroit
       Retirement Systems Objection, at pp. 43-44.

[27]    <u>See</u> AFSCME Objection, at ¶ 82-84; UAW Objection, at ¶ 30.

authorization in particular. It also does not say anything about conditions that must be imposed on the authorization of chapter 9. As discussed above, the Pensions Clause simply has the same effect as the Contracts Clause, which has never been interpreted by any Court to require any conditions on the authorization of chapter 9.

Apparently dissatisfied with the actual wording of the Michigan Constitution, the Objectors base their argument on a constitutional provision of their own imagining. Instead of adhering to the plain terms of the Pensions Clause that require the State to *refrain* from impairing pensions, the Objectors contend that the Pensions Clause should be read to require State officials to take *affirmative steps* to prevent even the possibility of the federal bankruptcy court from impairing pensions in chapter 9. This is not an interpretation of the Pensions Clause but a complete rewriting of it.

Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's *use* of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law. The Bankruptcy Clause of the United States Constitution empowers Congress to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Pursuant to that authority, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy, including

-29-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 39 of 135  675
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 39 of
67

various powers that a municipal debtor may invoke to adjust its debts. Under the

Supremacy Clause of the United States Constitution,[28] this comprehensive federal

scheme displaces any contrary state-law provisions that purport to alter or impair a

debtor's powers under the Bankruptcy Code. "The federal bankruptcy power ... by

operation of the Supremacy Clause, trumps the ... state constitution." Stockton,

478 B.R. at 16. Thus, while the State may act as a gatekeeper in determining

whether to authorize a chapter 9 filing, State law cannot alter or override the

federal scheme for determining the tools of debt adjustment that a municipal debtor

may use once it is in bankruptcy.

In light of the comprehensive scheme that Congress has enacted,

"[i]ncorporating state substantive law into chapter 9 to amend, modify or negate

substantive provisions of chapter 9 would violate Congress' ability to enact

uniform bankruptcy laws." In re City of Vallejo, 403 B.R. 72, 76-77 (Bankr. E.D.

Cal. 2009), aff'd sub nom. Int'l Bhd. Of Elec. Workers, Local 2376 v. City of

Vallejo (In re City of Vallejo), 432 B.R. 262 (E.D. Cal. 2010); see also Cnty. of

Orange v. Merrill Lynch & Co. (In re Cnty. of Orange), 191 B.R. 1005, 1020

(Bankr. C.D. Cal. 1996) (deviating from federal scheme would "violate the

constitutional mandate for uniform bankruptcy laws" by determining creditor

---

[28]     U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States ... shall be the
        supreme Law of the Land ... any Thing in the Constitution or Laws of any
        State to the Contrary notwithstanding.").

-30-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 40 of 135   676
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 40 of
67

priorities based on factors that vary from state to state).[29] Thus, a State "must accept chapter 9 in its totality; it cannot cherry pick what it likes while disregarding the rest." Cnty. of Orange, 191 B.R. at 1021; see also Stockton, 478 B.R. at 16 (holding that "[a] state cannot … condition or [ ] qualify, i.e. to 'cherry pick,' the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed"); Vallejo, 432 B.R. at 267-68 (same); Mission Indep. Sch. Dist. v. Texas, 116 F.2d 175, 178 (5th Cir. 1940) (same).

For these reasons, the Pensions Clause by its plain terms did not require the Governor to impose any of the conditions sought by the Objectors, and in any event, such conditions would be prohibited by federal law.[30]

---

[29] In establishing uniform bankruptcy laws, it is for Congress to determine how and whether State law will be incorporated. See In re Schafer, 689 F.3d at 611 (noting that Congress "may" incorporate state law in bankruptcy). In chapter 9, Congress has chosen to allow state law to govern the question of whether a municipality is authorized to become a debtor but not to govern the powers that debtors may invoke to adjust their debts.

[30] The City raises these arguments not to seek the Court's determination today whether pension benefits can or should be modified in this case but merely to respond to the Objectors' argument that the Governor's authorization of this case must necessarily have placed a condition on the filing. It need not have. It could not have.

In this vein, the Court – consistent with its findings at Section VI of the Eligibility Scheduling Order – should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, "comply with the State

-31-

## VI. COLLATERAL ESTOPPEL DOES NOT PRECLUDE THIS COURT FROM DETERMINING THE CITY'S ELIGIBILITY FOR CHAPTER 9

Pointing to the declaratory judgment entered in <u>Webster v. Michigan,</u>

No. 13-734-CZ (Ingham Cnty. Cir. Ct.), certain of the Objectors contend that the

City is barred by collateral estoppel from litigating whether the City's authorization

to file for chapter 9 bankruptcy was valid under the Michigan Constitution.[31] The

Objectors' collateral estoppel argument fails for numerous reasons.

Collateral estoppel applies only to issues that have been "actually litigated

and determined by a valid and final judgment." <u>Monat v. State Farm Ins. Co.,</u>

677 N.W.2d 843, 845 (Mich. 2004). But the judgment in <u>Webster</u> was not "valid"

because the state court lacked jurisdiction at the time the judgment was entered.

Under 28 U.S.C. § 1334(a), federal district courts have "exclusive" jurisdiction

over "all cases under title 11." An essential component of that exclusive

---

(continued...)

Constitution." <u>See</u> AFSCME Objection, at ¶¶ 82-84. Such amorphous and premature requests, including requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage.

[31] <u>See</u> Retirement Systems Objection, at pp. 44-58. The Objectors' resort to collateral estoppel is necessary, of course, because a state trial court's interpretation of state law is not binding on this Court. <u>See</u> <u>Weisberg v. Powell</u>, 417 F.2d 388, 393 (7th Cir. 1969) ("We are not necessarily bound by the decision of a state trial court on a point of state law where the highest court of the state has not spoken on it.").

-32-

jurisdiction is to determine whether a municipality was "specifically authorized …

to be a debtor under [chapter 9] by State law." 11 U.S.C. § 109(c)(2); see also

11 U.S.C. § 921(c) (instructing the court, as part of the bankruptcy case, to

determine whether "the petition … meet[s] the requirements of this title");

Transcript of Hearing, dated July 24, 2013, at pp. 71-72 ("The Court concludes that

the issue of eligibility and each of the elements relating to eligibility are within this

Court's exclusive jurisdiction under 28 U.S.C., Section 1334(a). Under that statute,

United States District Courts have original and exclusive jurisdiction of all cases

under Title 11, that original and exclusive jurisdiction referred to the Bankruptcy

Courts of each jurisdiction under 28 U.S.C., Section 157. Our District Court has

referred all matters relating to bankruptcy jurisdiction to the Bankruptcy Court

under Local Rule 83.30. This is not a proceeding within 28 U.S.C., Section 1334,

over which Bankruptcy Courts would have concurrent jurisdiction with the state

courts.").

    In Webster, after the City had already filed the Petition, the state court

purported to determine that the City was not validly authorized to be a debtor

under State law. See Order of Declaratory Judgment, at 2, Webster,

No. 13-734-CZ (July 19, 2013) (declaring that the State could not "authoriz[e] an

emergency manager … to proceed under Chapter 9 in a manner which threatens to

diminish or impair accrued pension benefits"). By passing judgment on the

validity of the City's authorization to proceed under chapter 9, the Webster court purported to adjudicate an issue that fell squarely within this Court's exclusive jurisdiction. Because the Webster court lacked jurisdiction, the judgment is void. See Twin City Fire Ins. Co. v. Adkins, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.").

Even if the Webster court had been able to exercise jurisdiction over eligibility questions (which it was not), the declaratory judgment in Webster would still be invalid because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code as of the time of the filing of the Petition. The Objectors argue that the automatic stay did not apply to suits against the Webster defendants – the State of Michigan, the Governor, and the Treasurer – until the stay was extended to those defendants on July 25, 2013.[32]

As the City made clear in its motion to extend the automatic stay, certain prepetition lawsuits – including Webster – violated the automatic stay imposed as of the Petition Date to the extent that such suits sought "directly or indirectly to

---

[32]     See Order Extending the Chapter 9 Stay (Docket No. 166); Retirement Systems Objection, at p. 51.

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 44 of 135   680
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 44 of
67

enforce the plaintiffs' claims against the City or to exercise control over the City's property rights, including its powers and rights under chapter 9." Motion of Debtor for Entry of Order Extending the Chapter 9 Stay (Docket No. 56) at p. 15 n.4; see Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.), 423 F.3d 567, 578 (6th Cir. 2005) (holding that "[a]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision") (quoting Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997)). By entering judgment – a day after the Petition Date – declaring that the City's bankruptcy filing was not properly authorized under the Michigan Constitution, the Webster court sought to exercise control over the City's legal and property rights in violation of the automatic stay. Such a judgment is likely void *ab initio* (see Easley v. Pettibone Mich. Corp., 990 F.2d 905, 911 (6th Cir. 1993) (holding that "actions taken in violation of the [automatic] stay are invalid and voidable and shall be voided absent limited equitable circumstances")) and, thus, would be invalid for purposes of collateral estoppel. See Control Module, Inc. v. Morello (In re Morello), No. 07-02052, 2012 WL 1945509, at *18 (Bankr. D. Conn. May 30, 2012) (holding, where a state court entered a postpetition "supplemental judgment" against a debtor, that "because the Supplemental Judgment was issued after the filing of the Debtor's bankruptcy, the judgment of

-35-

the [state] court is void and neither side may claim that the [state] court's finding[s] are entitled to collateral estoppel....").

Collateral estoppel further fails because the City did not have "a full and fair opportunity to litigate the issue." Monat, 677 N.W.2d at 845 (quotation marks and alteration omitted). "A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts...." Id. at 845 n.2 (quoting 1 RESTATEMENT (SECOND) OF JUDGMENTS § 28, at 273 (1982)). The state court in Webster took the unusual step of issuing a final declaratory judgment on an expedited basis after the Petition had already been filed and without the benefit of full briefing on the merits. At the time of the declaratory judgment, the Webster case was little more than two weeks old, and the defendants' briefs had focused mainly on justiciability issues and the preliminary injunction standard rather than the merits of the plaintiffs' arguments. Indeed, the Webster court's failure to provide a well-reasoned explanation for its decision attests to the gross inadequacy of the process afforded to the defendants. Thus, even if (somehow) collateral estoppel otherwise could apply, the abbreviated nature of the proceedings in the state court would warrant a fresh determination of the issue by this Court.

Finally, even if (A) the Michigan state court's postpetition exercise of jurisdiction over Webster had been proper (which it was not), (B) the automatic

stay did not apply to the Webster litigation (which it did) and (C) the City had a full and fair opportunity to litigate (which it did not), collateral estoppel *still* would not apply because the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants. Collateral estoppel "precludes relitigation of an issue in a different, subsequent action between the same parties or their privies...." Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA, 592 N.W.2d 408, 411 (Mich. Ct. App. 1998). "In its broadest sense, privity has been defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." Sloan v. City of Madison Heights, 389 N.W.2d 418, 422 (Mich. 1986) (internal quotation marks omitted).

The Objectors contend that, although the City was not a party to the Webster litigation, the City was in sufficient privity with the Webster defendants to trigger collateral estoppel,[33] but the Objectors cannot have it both ways. They cannot maintain that there is an *insufficient* identity of interest between the Webster defendants and the City for purposes of the automatic stay but a *sufficient* identity of interest between the two for purposes of collateral estoppel. If there was

---

[33] The two plaintiffs in Webster are potentially in privity only with the General Retirement System of the City of Detroit, in which they were participants, not with any other Objector. See Complaint, at ¶¶ 2-3, Webster, No. 13-734-CZ (July 3, 2013).

sufficient privity between the City and the <u>Webster</u> defendants for collateral estoppel to apply, then, by necessity, that privity would have triggered the protections of the automatic stay.

## VII.  PA 436 IS CONSTITUTIONAL

The Objectors also claim that PA 436 violates the Michigan Constitution because:  (A) the enactment of PA 436 violated the Pensions Clause by authorizing a chapter 9 filing without prohibiting the impairment of pension obligations therein; (B) PA 436 violates Michigan's home rule doctrine; and (C) PA 436 unconstitutionally delegates power to the Emergency Manager.  PA 436's consistency with the Pensions Clause is addressed at Section V.A *supra*.  The remaining objections to PA 436's constitutionality generally have nothing to do with eligibility, and, where they might, are baseless.

      A.      PA 436 Does Not Conflict with Home Rule and Reflects the
                 <u>State Legislature's Power To Address Local Fiscal Emergencies</u>

The home rule provisions of Michigan law give municipalities and their residents rights of self governance by empowering residents to elect their own officials (<u>e.g.</u>, <u>People ex rel. Le Roy v. Hurlbut</u>, 24 Mich. 44, 46-47 (1871)), and by according "the electors of each city" with "the power and authority to frame, adopt and amend [the municipality's] charter." Mich. Const. art. VII, § 22. The Objectors contend that PA 436 violates home rule provisions by placing the

Emergency Manager in the shoes of local officials and allowing the Emergency
Manager to take actions that are arguably inconsistent with the city's charter.[34]

The Objectors are mistaken. As an initial matter, most of the Objectors'
challenges – such as their concerns about the Emergency Manager's ability to set
budgets and pass ordinances – have nothing to do with the Emergency Manager's
authority to file for chapter 9 and thus need not be addressed here. Moreover, there
is, in fact, no conflict because Detroit's charter recognizes that its provisions are
"subject ... to the limitations ... imposed by statute." DETROIT CITY
CHARTER § 1-102; see Detroit City Council v. Mayor of Detroit, 770 N.W.2d 117,
124 (Mich. Ct. App. 2009) (recognizing that by its own terms Detroit's Charter
gives way to statutes).

Even if there were a conflict between PA 436 and Detroit's Charter
regarding the Emergency Manager's authority to commence this chapter 9 case,
PA 436 would prevail. "Where a city charter provision conflicts with general
statutory law, the statute controls in all matters which are not of purely local
character." Bd. of Trs. v. City of Detroit, 373 N.W.2d 173, 175 (Mich. Ct.
App. 1985); see also Public Act 279 of 1909, the Home Rule City Act,
MCL § 117.36 ("No provision of any city charter shall conflict with or contravene
the provisions of any general law of the state."). General laws are those capable of

---

[34]     See AFSCME Objection, at ¶¶ 85-94.

covering new localities over time. See, e.g., Houston v. Governor, 810 N.W.2d 255, 257 (Mich. 2012).

PA 436, including its authorization to file for chapter 9, is most certainly a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear (MCL § 141.1543), how financially distressed local governments overcome their situation is decidedly not a matter of "purely local" character or concern. See, e.g., Brimmer v. Village of Elk Rapids, 112 N.W.2d 222, 226 (Mich. 1961) (statutes involving municipal utility rates, municipal debt limitations and municipal tax rates are general rather than purely local). Indeed, the Michigan Constitution itself instructs the State legislature to pass "general laws ... restrict[ing] the powers of cities and villages to borrow money and contract debts." Mich. Const. art. VII, § 21.

Nor does temporarily substituting the Emergency Manager for Detroit's elected officials violate home rule by eliminating Detroit's residents' right to choose their officials. "[A] municipal corporation['s] ... existence is entirely dependent on the legislation that created it, and the Legislature that may also destroy it." Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n, 575 N.W.2d 751, 760 (Mich. 1998). Accordingly, the Michigan Supreme Court has long recognized that the legislature must have authority to temporarily replace

-40-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 50 of 135   686
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 50 of
67

local officials when exercising its undisputed power to "supervis[e] and control in matters of municipal regulation." Hurlbut, 24 Mich. at 111 (opinion of Cooley, J.). That is all PA 436 does: it authorizes the Governor to appoint an emergency manager in a fiscal crisis (MCL § 141.1549(1)), but the emergency manager's term ends once the crisis ends or, if he has been in office more than 18 months, if an elected local government votes him out (MCL §§ 141.1549(6)(b), (c)).

### B. PA 436 Does Not Delegate Power to Pass Local Legislation

Article IV, Section 29 of the Michigan Constitution provides that "[t]he legislature shall pass no local or special act in any case where a general act can be made applicable" and that "[n]o local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." Because PA 436 grants the Emergency Manager authority to adopt local ordinances (MCL § 141.1552(1)(dd)), the Objectors contend it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the State legislature could pass.[35]

Once again, this objection has nothing to do with the City's eligibility for bankruptcy: filing a chapter 9 case is not passing legislation, the only conduct covered by Article IV, Section 29. In any event, Article IV, Section 29 restricts

---

[35] AFSCME Objection, at ¶¶ 95-97.

-41-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 51 of 135   687
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 51 of 67

only the State *legislature*; municipalities are free to enact "local" laws as they see

fit. When the Emergency Manager acts, he exercises the *local government's*

powers, not the State legislature's, so the legislature did not (and could not) violate

Article IV, Section 29 when it enacted PA 436. See, e.g., MCL § 141.1552(1)(dd);

see also MCL § 141.1552(2) (allowing local leaders to repeal the Emergency

Manager's ordinances after his term ends).

    C.    PA 436 Does Not Violate the Non-Delegation Doctrine

Under Michigan's non-delegation doctrine, the legislature may not task

executive officials with formulating "legislative policy" unless the legislature

provides "sufficient standards and safeguards" to "check[ ] the exercise of

delegated power." Blue Cross & Blue Shield of Mich. v. Milliken, 367 N.W.2d 1,

27 (Mich. 1985). The Objectors argue that PA 436 runs afoul of this rule by giving

the Emergency Manager authority to act for the City in chapter 9 without providing

guidance as to what he should do.[36]

The Objectors are again mistaken. First, as explained above, the Emergency

Manager exercises the local government's authority, not powers of the State

legislature's. The Emergency Manager acts for the City, not the State. Thus the

anti-delegation principles that govern when the State legislature delegates the State

legislature's powers do not apply here.

---

[36]    See AFSCME Objection, at ¶¶ 98-99.

Second, when deciding whether the legislature has provided "reasonably precise" standards (Blue Cross, 367 N.W.2d at 27) in delegating its powers, Michigan courts have emphasized that the statute "must be read as a whole" and "carries a presumption of constitutionality." Id. As a result, the "reasonably precise" test is easy to satisfy (see, e.g., Blue Cross & Blue Shield of Mich. v. Demlow, 270 N.W.2d 845, 854 (Mich. 1978) (approving delegation using a "fair and reasonable" standard)); Mich. State Highway Comm'n v. Vanderkloot, 220 N.W.2d 416, 419 (Mich. 1974) (approving use of eminent domain upon an executive finding of "necessity")).

PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection. It clearly tells the Emergency Manager to look at various possibilities for fixing the City's financial problems and instructs him to recommend bankruptcy only if "no reasonable alternative to rectifying the financial emergency ... exists." MCL § 141.1558(1). PA 436 also instructs the Emergency Manager to ameliorate those problems while "assur[ing] the fiscal accountability of the local government and the local government's capacity to provide ... necessary governmental services essential to the public health, safety, and welfare." MCL § 141.1549(2).

The Objectors also contend that PA 436 unconstitutionally delegates authority by not providing for judicial review of the Emergency Manager's actions

in bankruptcy.[37] The Objectors, however, ignore the fact that, in many circumstances, this Court will review actions of the Emergency Manager.[38] The Objectors argue that the Emergency Manager can escape judicial review because, under 11 U.S.C. § 904, municipalities need not seek court approval of settlements. Yet, if the City does not seek this Court's approval of a particular settlement, that settlement does not escape scrutiny forever: "the day of reckoning comes at the plan confirmation hearing," where any "untoward settlements" would shed considerable light on whether a cram-down plan "discriminate[s] unfairly," is "fair and equitable," and has been "proposed in good faith." Stockton, 486 B.R. at 199-200 (quoting 11 U.S.C. § 1129(a)(2), (b)(1)).

In sum, PA 436 neither violates Michigan's home rule doctrine nor unconstitutionally delegates authority to the Emergency Manager. To the extent, if any, that such claims have anything to do with eligibility, the Objectors' arguments in support of these claims lack merit, and this Court should determine that PA 436 is constitutional.

---

[37]   See AFSCME Objection, at ¶100.

[38]   Whether or not Stern prohibits this Court from considering "freestanding state-law claims," it does not impact this Court's role in implementing provisions of the Bankruptcy Code that may involve determination of state law issues. See Section II supra.

-44-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 54 of 135   690
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 54 of
67

## VIII. THE CITY SATISFIES SECTION 109(c)(5) OF THE BANKRUPTCY CODE BECAUSE IT WAS IMPRACTICABLE TO BARGAIN WITH THOUSANDS OF BONDHOLDERS AND OVER 20,000 RETIREES

In the Eligibility Memorandum, the City demonstrated the impracticability of conducting negotiations with its very numerous creditors and that the requirement for eligibility set forth at section 109(c)(5)(C) of the Bankruptcy Code was satisfied. Specifically, the City explained that: (A) the "impracticability" requirement was added to the Bankruptcy Code to facilitate relief under chapter 9 for major American cities (i.e., precisely this circumstance); (B) the numerosity and fragmented nature of the City's creditors made negotiations with the creditor body impracticable; (C) in many instances, the City was unable to negotiate with representatives with authority to bind creditors because there were no such representatives; and (D) the City did not have time to conduct extended creditor negotiations. See Eligibility Memorandum, at pp. 40-53. None of the Objectors succeeds in undermining any of the foregoing.

As a threshold matter, certain facts that, by themselves, establish impracticability under section 109(c)(5)(C) of the Bankruptcy Code are ignored by the Objectors. Thousands of separate entities hold the City's billions of dollars in bond debt. For the reasons set forth in the Eligibility Memorandum (i.e., the inability to restructure key terms of the City's bond debt absent unanimous bondholder consent and the lack of any representatives with authority to bind all

-45-

such bondholders) (Eligibility Memorandum, at pp. 46-47), negotiations with the City's bondholders were impracticable. No Objection disputes this. Moreover, no holder of bonds has objected to the City's eligibility on the ground that negotiations with bondholders were practicable. These realities demonstrate that the requirements of section 109(c)(5)(C) of the Bankruptcy Code have been met.

Many of the Objectors explicitly or implicitly assert that section 109(c)(5)(C) of the Bankruptcy Code cannot be satisfied if negotiations with *any* creditor constituency (specifically, the City's retirees) were potentially practicable. This cannot possibly be the law. It would be an absurdity to interpret the phrase "is unable to negotiate with creditors" to mean "[can negotiate with some creditors but] is unable to negotiate with [other] creditors" as there will always be *some* creditor with which a municipality could negotiate.[39] Thus, courts have consistently determined that the "impracticability" requirement of section 109(c)(5)(C) of the Bankruptcy Code is satisfied where negotiations with any significant creditor constituency is impracticable. See <u>Vallejo</u>, 408 B.R. at 298 (holding that the impracticability of debtor's negotiations with its unions satisfied section 109(c)(5)(C) of the Bankruptcy Code because "labor costs comprised the

---

[39]    For example, if such an interpretation were credited, a municipality would be required to delay filing its chapter 9 petition while it engaged those creditors with whom it could negotiate despite the facts that (a) negotiations with other creditors were impracticable and (b) the municipality ultimately would have to file and effectively restart the negotiation process.

largest slice of Vallejo's budget [and] it would have been futile to negotiate with other creditors without an agreement with the Unions"); In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (holding that negotiations were impracticable for purposes of 109(c)(5)(C) of the Bankruptcy Code where negotiations with single class of bondholders holding one third of the debtor's total bond debt would have been futile).

In any event, the Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, the RDPFFA and the DRCEA characterize themselves as "the natural representative capable of bargaining on [the retirees'] behalf" and argue that the City's alleged failure to engage the RDPFFA/DRCEA in negotiations forecloses the City's ability to argue that negotiations with its retiree constituency were impracticable. See Retiree Association Objection, at ¶¶ 64-74. The premise that the RDPFFA and the DRCEA are the natural representatives of retirees is not self evidently correct. First, the RDPFFA and the DRCEA are but two of at least five associations purporting to represent City retirees.[40] Neither the RDPFFA nor the DRCEA have any greater claim to being the natural representative of the retirees than any other

---

[40]    The Detroit Firemen's Fund Association, the Detroit Police Benefit and Protective Association and the recently-formed Retired Detroit Police Members Association also purport to represent the interests of at least some percentage of the City's retirees.

-47-

13-53846-swr    Doc 765    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 57 of 135    693
13-53846-tjt    Doc 2334-17    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 57 of 67

informal retiree association (and the Retiree Association Objection offers no such reason). Second, neither the RDPFFA nor the DRCEA are "the" anything. They are two separate organizations, and there is no reason to believe that the RDPFFA and the DRCEA will agree on every – or any – relevant issue. Third, the RDPFFA and the DRCEA are not the only entities claiming to be natural bargaining representatives for the City's retirees. The City's unions now claim to be appropriate bargaining representatives for their retirees as well.[41] These competing claims to bargaining authority undermine the RDPFFA/DRCEA's assertion that they are "the natural bargaining representatives" for retirees. Fourth, the Retiree Association Objection concedes that the RDPFFA and the DRCEA lacked – and still lack – the authority to bind the City's retirees. See Retiree Association Objection, at *14 (noting that the RDPFFA and the DRCEA are just now in the process of obtaining proxy forms from their retiree members and have collected only 5,000 such proxies to date (there are over 20,000 retirees and active employees that have vested pension benefits)). RDPFFA/DRCEA's assertion that

---

[41]     See AFSCME Objection, at ¶ 123 (stating that "creditors such as AFSCME and similar union representatives … could have negotiated regarding the largest portion of the City's unsecured debt"); Objection (Docket No. 506) filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), at ¶ 9 (stating that the "UAW is representing the interests of active and retired employees in this case."). As set forth below, these claims are directly at odds with these Objectors' prepetition refusal to negotiate on behalf of retirees.

they are the "natural representative[s] capable of bargaining on [the retirees']

behalf" cannot be reconciled with their recognition of a lack of legal authority to

bind retirees absent express authorization. Fifth, even if the RDPFFA and the

DRCEA had been able to bind their retiree members (which they could not), the

associations themselves only purport to represent "approximately 70% of all City

retirees." Retiree Association Objection, at ¶ 9. Accordingly, there was no

possibility that negotiations with the RDPFFA and the DRCEA – or, for much the

same reasons, any other party – could have bound the more than 20,000 City

retirees to a proposed restructuring, thus rendering the City's good faith attempt at

such negotiations impracticable.[42] Finally, even if there were a "natural bargaining

representative" of all retirees, that would still not make negotiations concerning

pension benefits practicable; approximately 8,225 active employees have vested

pension benefits too. Neither the RDPFFA nor the DRCEA even purports to

represent the interests of these people and it is not clear that active employees

would rely on such representation even if the RDPFFA and DRCEA both declared

that they were "natural representatives of active employees having vested

benefits."

---

[42]   Moreover, the RDPFFA and the DRCEA attended multiple meetings at
       which the City set forth its restructuring proposals and solicited
       counter-proposals and other feedback. Neither the RDPFFA nor the
       DRCEA responded to any proposals made by the City.

-49-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 59 of 135   695
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 59 of
67

The AFSCME Objection's similar argument that negotiations with "creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt" (AFSCME Objection, at ¶ 123) would have been practicable rewrites the history of those negotiations. In fact, the City *did* reach out to AFSCME and the City's other Unions regarding their willingness to represent the interests of their respective retirees in negotiations over the City's restructuring proposal.

As set forth in the Eligibility Memorandum, *the majority of the Unions either expressly indicated unwillingness or legal inability to represent retirees or neither agreed nor refused to represent retirees.* Only eight Unions (comprising 10 of the City's 47 bargaining units) agreed to represent retirees in connection with the City's restructuring. See Eligibility Memorandum, at p. 51. Notably, both AFSCME and the UAW – each of which filed Objections challenging the impracticability of negotiations with retirees – *expressly declined* to represent retirees.[43] It is difficult to see how it would be practicable for the City to conduct

---

[43]   Letter from Edward L. MacNeil, Special Assistant to the President of AFSCME to Brian Easley of Jones Day, dated May 24, 2013 (advising that AFSCME "has no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive." ); Letter from Laurie Townsend Stuart, President of UAW Local 2200, to Brain Easley of Jones Day, dated May 23, 2013 (stating that the UAW would represent the interests only of "current employees" of the local Union); Letter from Robyn Brooks, President of UAW Local 2211, to Brian Easley of Jones Day, dated

negotiations with AFSCME and other Unions that refused to negotiate with the City on retirees' behalf.

Both the AFSCME and the UAW argue that, because the City allegedly made no effort to negotiate with creditors in good faith, the City should not be able to claim that such negotiations were impracticable.[44] Thus, AFSCME and the UAW essentially argue that, if the City cannot satisfy section 109(c)(5)(B) of the Bankruptcy Code (which requires good faith negotiations with creditor constituencies), then the City cannot satisfy the disjunctive requirement for eligibility set forth in section 109(c)(5)(C) of the Bankruptcy Code either. Neither the UAW nor AFSCME offer any precedent or citation for this reading of the Bankruptcy Code and the plain meaning of the statute (which connects the clauses of section 109(c)(5) with the word "or") contradicts such a reading. Indeed, the courts that have considered section 109(c)(5) of the Bankruptcy Code have

---

(continued...)

May 22, 2013 (stating that "[t]his Union does not... represent current retirees and has no authority to negotiate on their behalf"); Letter from John Cunningham, International Representative, UAW Region 1, to Brian Easley of Jones Day, dated May 22, 2013 (stating that UAW Local 412 and UAW Local 212 "do not ... represent current retirees and have no authority to negotiate on their behalf"), attached hereto, collectively, as <u>Exhibit C</u>.

[44]    AFSCME Objection, at ¶¶ 121-123; UAW Objection, at ¶ 46, n.19 and Public Safety Unions Objection (Docket No. 512), at p. 17 ("It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate....").

determined that it is sufficient for a chapter 9 debtor to demonstrate the existence

of one of the four alternatives included in that section. In re Valley Health Sys.,

383 B.R. 156, 162, 163 (Bankr. C.D. Cal. 2008) (noting that "§ 109(c)(5) is written

in the disjunctive" and, as such, must be construed "as setting out separate and

distinct alternatives;" holding that "[t]here is nothing in the language of

§ 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition

negotiations with its creditors to an impasse or to satisfy a numerosity requirement

before determining that negotiation is impracticable under the specific facts and

circumstances of a case.").

Finally, the argument that the City "manufactured" impracticability through

the imposition of artificial time constraints is just false.[45] If anything, the fact that

the City could not delay filing its Petition in light of its financial and operational

crises – and thus extend its opportunity for negotiation – *supports* the City's

impracticability arguments. See Valley Health Sys., 383 B.R. at 163

("Negotiations may also be impracticable when a municipality must act to preserve

its assets and a delay in filing to negotiate with creditors risks a significant loss of

those assets."). That the City's cash was rapidly dwindling and public health and

---

[45]    See Public Safety Unions Objection, at pp. 16-17 ("The difficulty in the
negotiation process is the result of an artificial time constraint…. The Court
should not find that negotiations were impracticable, because the City
created the impediment to continued negotiations based on the artificial time
constraint created by the filing.").

-52-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 62 of 135   698
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 62 of
67

safety would have been threatened by any further delay in the filing of the Petition (Eligibility Memorandum, at pp. 52-53), (A) mandated a shorter time frame for determining if good faith negotiations with creditors could generate an agreement capable of implementation outside chapter 9 and (B) is a separate ground showing satisfaction of section 109(c)(5) of the Bankruptcy Code. They are not reasons for reading that section *out* of the Bankruptcy Code.

For all of the foregoing reasons (and those set forth in the Eligibility Memorandum), the City has satisfied the requirements of section 109(c)(5)(C) of the Bankruptcy Code.

## IX. THE CITY'S GOOD FAITH NEGOTIATIONS WITH ITS CREDITORS SATISFY SECTION 109(c)(5) OF THE BANKRUPTCY CODE

Numerous objections assert that the City failed to negotiate in good faith with its creditors within the meaning of section 109(c)(5)(B) of the Bankruptcy Code.[46] The Objections generally sound a common theme: that the City's restructuring proposals were presented to creditor constituencies at non-interactive

---

[46] E.g., AFSCME Objection, at ¶¶ 101-114; UAW Objection, at ¶¶ 44-46; Joinder of Local 324, International Union of Operating Engineers as Interested Party to Objections to Detroit's Eligibility for Relief Under Sections 109(c) and 921(c) of the Bankruptcy Code (Docket No. 484) (stating, without reference to or inclusion of supporting affidavits, that "the City consistently and continuously refused to engage in any bargaining with representatives of Local 324, and presented its proposals only on a 'take it or leave it' basis.").

-53-

13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 63 of 135   699
13-53846-tjt   Doc 2334-17   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 63 of 67

meetings on a "take it or leave it" basis that precluded any prospect of actual

"negotiation."[47] The Objections' characterization of the discussions initiated by the

City and the multiple meetings that the City conducted with its creditors is false

and misleading. The City did *not* present its restructuring proposal as an

immutable, "take it or leave it" proposition with respect to which the City had no

intention of honestly engaging its creditors. Rather, the evidence demonstrates that

the City (A) actively sought continuing dialogue with, *and counter-proposals from,*

its counterparties but (B) received no concrete proposal or comprehensive

feedback from any Objector prior to the commencement of this case.[48]

---

[47]   See id.

[48]   Also false and misleading is the attempt by certain Objectors to characterize
statements made by the Emergency Manager in connection with the issuance
of his "Financial and Operating Plan," dated May 12, 2013, as having been
made within the context of negotiations with creditors over the restructuring
of their claims. See, e.g., AFSCME Objection, at p.2 (quoting the
Emergency Manager as having stated, on May 12, 2013, that "The public
can comment [on the City's proposed financial restructuring plan], but it is
under the statute, it is my plan and it's within my discretion and obligation to
do it. This isn't a plebiscite, we are not, like, negotiating the terms of the
plan. It's what I'm obligated to do.") (bracketed text in original; emphasis
removed from original). As the Objectors know, the "proposed financial
restructuring plan" addressed by the foregoing quote is not the June 14
Creditor Proposal (i.e., the starting point for creditor negotiations), but a
discrete "Financial and Operating Plan" issued *a month earlier* (which plan
did *not* address the specific treatment of creditors' claims against the City).
As the Objectors also know, the "statute" referenced in the foregoing quote
is not section 109(c)(5)(B) of the Bankruptcy Code, but section 11 of
PA 436. See MCL § 141.1551(2) (requiring an emergency manager to
submit a financial and operating plan 45 days after appointment). Put

As set forth at pages 55-59 of the Eligibility Memorandum, in addition to the

June 14 Creditor Meeting (at which the City initially presented its restructuring

proposal to all creditors in attendance and answered every question asked), the City

held numerous additional meetings with creditors in the weeks prior to the Petition

Date. At these meetings (including the City's meetings with its unions and four

retiree associations), the City repeatedly stated that it welcomed its creditors'

feedback with respect to its proposed restructuring and invited counter-proposals

from all parties. E.g., Letter from Brian Easley to James Williams, President,

AFSCME, dated June 27, 2013) (the "June 27 Easley Letter") (noting the City's

appreciation of questions and input received from AFSCME at the June 20

Union/Retiree Meeting; offering access to City data room; requesting feedback and

additional ideas with respect to the City's restructuring proposal), attached hereto

as Exhibit D.[49] The City urged that any feedback and/or counter-proposals be

---

(continued...)

> simply, the foregoing quote is *completely unrelated* to the City's negotiations
> with creditors over the treatment of their claims. The Objectors' flagrant
> misuse of the Emergency Manager's words out of context speaks volumes
> about the sincerity of their protests that the City refused to negotiate in good
> faith.

[49]    The complaint that the City refrained from characterizing its discussions
with its unions as "negotiations" is a red herring. The City has generally
avoided characterizing its meetings and discussions with its unions as formal
"bargaining negotiations" to avoid any argument that it has triggered
obligations to collectively bargain under Michigan law that are currently

consistent with the City's financial condition but otherwise placed no restrictions on the form or substance of any counter-proposal. See, e.g., id. (requesting "additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations"; offering access to the Data Room and assistance acquiring any additional information); Letter from Evan Miller to Dennis McNamara, President Detroit Fire Fighters Association, *et al.*, dated July 17, 2013 ("We are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze."), attached hereto as Exhibit E.

Accordingly, comparisons between the City's good faith negotiation efforts and the facts of In re Ellicott School Building Authority, 150 B.R. 261 (Bankr. D. Colo. 1992), are inapposite. The Ellicott court held that, in addition to its failure to satisfy sections 109(c)(1), 109(c)(2), 109(c)(3) and 109(c)(5)(C) of the Bankruptcy Code, the putative debtor failed to satisfy section 109(c)(5)(B) of the Bankruptcy

---

(continued...)

suspended by PA 436. See MCL § 141.1567(3) ("A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first."). The City's reticence to jeopardize its legal rights under PA 436, however, does not alter the fundamental character of the meetings conducted by the City (as described herein), nor the fact that its requests for feedback and counter-proposals were unanswered.

Code where (A) its efforts at prepetition negotiation were limited to three public meetings and (B) the debtor conceded that it had presented its proposed plan of restructuring as non-negotiable. Ellicott, 150 B.R. at 266. In this case, however, (A) in addition to the public June 14 Creditor Meeting (i.e., the analogue to the three public meetings held by the Ellicott debtor), the City held numerous, non-public meetings with representatives of creditors, and (B) the City never presented its restructuring proposal as "non-negotiable." Indeed, the City solicited responses and counter-proposals from other parties.

Moreover, it is especially significant that no Objector transmitted a written counter-proposal on any aspect of the City's restructuring proposal. Some of the City's invitations for further dialogue were essentially rebuffed (and in a manner that seemed designed to support a future objection to eligibility rather than actually engage in discussions with the City). See Letter from Steven Kreisberg, Director of Collective Bargaining and Health Care Policy, AFSCME, to Brian Easley, dated July 2, 2013 (meeting the City's request for feedback with respect to its restructuring proposal with a request for further meetings and statements that the City "has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues"), attached hereto as Exhibit F.

Of course, good faith negotiation is a two-way street. All of the City's creditors – including each of the Objectors – had more than a month to provide the