# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---------------------------------------------------x
:
In re                         :        Chapter 9
:
CITY OF DETROIT, MICHIGAN,   :        Case No. 13-53846
:
            Debtor.      :        Hon. Steven W. Rhodes
:
:
---------------------------------------------------x

## OPPOSITION TO MICHIGAN COUNCIL 25 OF THE AFSCME, AFL-CIO, AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' MOTION TO COMPEL TESTIMONY OF KEVYN ORR AND ALL OTHER CITY AND STATE WITNESSES REGARDING CITY-STATE COMMUNICATIONS PRIOR TO JULY 17, 2003

The City of Detroit (the "City"), debtor in the above captioned case, opposes the Motion by Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees (collectively, "AFSCME") requesting that the Emergency Manager Kevyn D. Orr, and any and all future witnesses within the control of the City or the State of Michigan (the "State") appear and give testimony at depositions regarding all relevant communications between City and State officials prior to July 17, 2013, (D.E. 920). Specifically, the testimony that AFSCME seeks is privileged attorney-client communications. Because the City and State share a common interest in rectifying the City's financial emergency, this privilege has not been waived.

## BACKGROUND

1.      As is well known by now, the City is in financial crisis. The Governor of the State of Michigan (the "Governor") and Mayor publicly acknowledged this financial crisis throughout 2012 and early 2013. Because the crisis was not resolved through other means, on March 1, 2013, based on the conclusions of a State-appointed "financial review team" charged with reviewing the Detroit's financial condition, the Governor determined that a "financial emergency" existed within the City. By the end of March, this determination resulted in the Governor's appointment of Mr. Orr as the emergency financial manager for the City effective under Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws ("M.C.L.") §§ 141.1541-141.1575 ("PA 436").[1]

2.      The Governor appointed the Emergency Manager "to address a financial emergency within" the City. M.C.L. § 141.1549(1). Consistent with this charge and in accordance with PA 436, the Emergency Manager and the State

---

[1]      Mr. Orr was appointed to the position of "emergency financial manager" for the City by the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, M.C.L. §§ 141.931-141.942, on March 15, 2013, pursuant to Public Act 72 of 1990 of the State of Michigan, also known as the Local Government Fiscal Responsibility Act, M.C.L. §§ 141.1201 141.1291. Mr. Orr formally took office as the emergency financial manager for the City under PA 72 on March 25, 2013. On March 28, 2013, the effective date of PA 436, PA 72 was repealed, and Mr. Orr became the Emergency Manager of the City pursuant to sections 2(e) and 31 of PA 436 (M.C.L. §§ 141.1542(e) and 141.1571).

-2-

13-53846-swr    Doc 940    Filed 09/19/13    Entered 09/19/13 11:08:26    Page 2 of 30    825
13-53846-tjt    Doc 2334-22    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 2 of 30

entered into a "Contract for Emergency Manager Services." ("EM Contract" (Exh. A).) As outlined in the EM Contract and required in PA 436, the Emergency Manager "shall serve at the pleasure of the [G]overnor" and "shall be paid" by the State of Michigan. *See* EM Contract.; M.C.L. § 141.1549(3)(d)&(e).

3. The State conferred on the Emergency Manager "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." M.C.L. § 141.1549(2). The State Legislature's express purpose in conferring such powers was, in part, to "assure the provision of necessary governmental services essential to public health, safety, and welfare," "to protect the credit of this state and its political subdivisions," and "to remedy the financial emergency by requiring prudent fiscal management and efficient provision of services, permitting the restructuring of contractual obligations, and prescribing the powers and duties of state and local government officials and emergency managers." M.C.L. § 141.1543.

4. To address the City's financial emergency and develop a proposal to restructure and reinvest in the City, PA 436 requires the Emergency Manager to obtain the assistance and support of State officials. *See, e.g.*, MCL § 141.1551(3) (requiring submission of financial operating plan to state treasurer

-3-

13-53846-swr    Doc 940    Filed 09/19/13    Entered 09/19/13 11:08:26    Page 3 of 30    826
13-53846-tjt    Doc 2334-22    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 3 of 30

for review); § 141.1557 (requiring submission of periodic report to state officials for review); § 141.1558(1) (requiring approval of Governor to proceed in chapter 9). Accordingly, after his appointment in March of 2013 and continuing to the present time, the Emergency Manager has communicated with State officials including, but not limited to, the Governor, Treasurer and their respective staffs on a regular basis regarding his efforts to address the City's financial emergency. It was the expectation and understanding of both the City and State that, when counsel was present, the discussions addressing legal issues were privileged attorney-client communications and would remain confidential. (*See* Common Interest Ag. at 3 (Exh. B).)

5.     As memorialized in the parties' Common Interest Agreement, the City and State agreed that a common interest existed regarding the legal and policy issues related to the City's financial emergency, the appointment of the Emergency Manager, and the proceedings before this Court. (*Id.* at 2-3.)

### ARGUMENT

6.     It is well-established that the common interest privilege extends the attorney-client privilege to confidential communications between parties that share a substantially similar legal interest. "The attorney-client privilege protects from disclosure confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client." *Ross v. City of*

13-53846-swr   Doc 940   Filed 09/19/13   Entered 09/19/13 11:08:26   Page 4 of 30   827
13-53846-tjt   Doc 2334-22   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 4 of 30

*Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (citation omitted). While attorney-client privilege generally is waived when an otherwise privileged communication is made in the presence of a third party, *Cozzens v. City of Lincoln Park*, 2009 WL 2242396, at *3 (E.D. Mich. 2009), an exception to this waiver rule exists where privileged information is shared with an allied third party pursuant to a "common interest" agreement. *State Farm Mut. Automobile Ins. Co. v. Hawkins*, 2010 WL 2287454, at *7 (E.D. Mich. 2010); *see In re Smirman*, 267 F.R.D. 221, 223 (E.D. Mich. 2010) (similar).

7. The "common interest" privilege thus maintains attorney-client privilege over a communication made in the presence of a third party where three elements are met: ***First***, the parties of the agreement formally or informally agreed to exchange information concerning the matter in confidence. *See In Re Smirman*, 267 F.R.D. at 223; *State Farm*, 2010 WL 2287454, at *7. ***Second***, the parties share a "substantially similar legal interest" with respect to the subject matter of the communication. *See In re Leslie Controls. Inc.*, 437 B.R. 493, 496 (Bankr. D. Del. 2010), *citing In re Teleglobe Communications Corp.*, 493 F.3d 345, 364 (3d. Cir. 2007). This interest need not be related to actual or imminent litigation and may be "outside of the litigation context altogether." *MPT, Inc. v. Marathon Labels, Inc.*, 2006 WL 314435, at *7 (N.D. Ohio 2006) (applying common interest privilege in context of patent prosecution); Restatement (Third) Law Governing

Lawyers § 76 cmt. b (noting that the privilege applies "whether or not" the members are "involved in litigation"). ***Third***, one of the parties' attorneys must have been involved in the communication. *See State Farm*, 2010 WL 2287454, at *8.

8.     When these three elements are met, "privileged communications remain privileged unless *all parties agree* to waive that privilege." *In Re Smirman*, 267 F.R.D. at 223 (emphasis added), *citing United States v. BDO Seidman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007).

9.     Because all three elements are plainly met here, the common interest privilege allows the City, the State, and their counsel to share attorney-client privileged communications with each other without waiving attorney-client privilege.

10.     ***First***, the City and State entered into a common interest agreement at the time of the appointment of the Emergency Manager. *See* Common Interest Ag. at 2; *In Re Smirman*, 267 F.R.D. at 223. Specifically, at that time, the City and State agreed to share in confidence information "in connection with the legal and policy issues that arise as a result of and in relation to the City's Financial Emergency, [and] the appointment of the Emergency Manager." Common Interest Ag. at 2; *see Pac. Pictures Corp. v. United States Dist. Court, 11-71844*, 2012 U.S. App. LEXIS 7643, at *17-18 (9th Cir. 2012) (noting that

formal agreement not required for privilege to apply); Restatement (Third) Law Governing Lawyers § 76 cmt. c (2000) ("Exchanging communications may be predicated on an express agreement, but formality is not required"). This agreement was reduced to writing on September 12, 2013. (Common Interest Ag. at 7.)

11. **Second**, pursuant to PA 436, the City, acting through its Emergency Manager, and State share the same legal interest in "rectify[ing] the financial emergency" and "assur[ing] the fiscal accountability" of the City during the Emergency Manager's term of service. M.C.L. § 141.1549(2); s*ee In re Leslie Controls. Inc.*, 437 B.R. at 496. The Emergency Manager is aligned with the State in taking legal actions to address the financial emergency. Specifically, the Governor appointed the Emergency Manager, the Emergency Manager "serve[s] at the pleasure of the governor," and his compensation is paid by the State. § 141.1549(1), (3)(d), (e); *see also* EM Contract at § 1.4 (requiring the Emergency Manager to file quarterly reports with the Michigan Department of the Treasury). PA 436 further provides that the Emergency Manager's authority to renegotiate the City's legal obligations outside of Chapter 9 and his authority to enter Chapter 9 proceedings is conferred by the State. *See, e.g.*, MCL § 141.1552(k) ("rejection, modification, or termination" of terms of collective bargaining agreement is "a legitimate exercise of the state's sovereign powers"); *id.* § 141.1558(1) (providing

that emergency manager must seek approval from governor to proceed under chapter 9).[2]

12.    ***Third,*** the City has only asserted common interest privilege over communications in which the City or the State's counsel participated. *See State Farm*, 2010 WL 2287454, at *8; *compare* Orr Rough Dep. Tr. at 197-199 *with* 208.[3]

13.    Nonetheless, AFSCME contends that the common interest privilege does not apply here. AFSCME appears to be making two separate arguments. First, AFSCME suggests that the common interest privilege may be raised only in the context of pending litigation. (*See* Mot. to Compel at 10-11.) AFSCME is wrong. It is well-established that the common interest privilege is not merely a "joint defense" privilege that applies in the context of pending litigation.

---

[2] That the Emergency Manager's efforts to address the City's financial emergency pursuant to PA 436 have political and business implications does not alter the fact that renegotiation and restructuring of the City's legal obligations is an effort that is primarily legal in nature. *See* MCL § 141.1552 (outlining emergency manager's powers including, among others, (j) modifying terms of existing contracts; (k) modifying terms of collective bargaining agreements; (m) assuming fiduciary obligations of pension board; and (q) initiating court proceedings); *Dura Global, Techs., Inc. v. Magna Donnelly Corp.*, 2008 WL 2217682 (E.D. Mich. 2008) (applying common interest privilege over communications where "some overlap" between legal issues and parties' shared business venture).

[3] *See also, e.g., id.* at 210 "[I]f the communications were [with] the Governor [and] were with counsel present, then I don't want you (Mr. Orr) to reveal what was said...If at another meeting where there was not counsel present, that's a different story."

-8-

13-53846-swr    Doc 940    Filed 09/19/13    Entered 09/19/13 11:08:26    Page 8 of 30    831
13-53846-tjt    Doc 2334-22    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 8 of 30

*See, e.g., BDO Seidman*, 492 F.3d at 815 & n.6 (holding "communications need

not be made in anticipation of litigation to fall within the common interest

doctrine" and citing cases); *Dura Global*, 2008 WL 2217682, at \*3 (applying

common interest privilege in transactional context). Rather, the common interest

privilege is available "irrespective of litigation begun or contemplated" and

"applies whenever the communication is made in order to facilitate the rendition of

legal services to each of the clients involved in the conference." *In re Leslie

Controls*, 437 B.R. at 496.

14.    In addition, AFSCME also suggests that the common interest

privilege does not apply because the State and City have different interests in the

Flowers and Webster litigations and in the chapter 9 proceeding . But, even if

there are minor differences in the parties' positions in these suits, the common

interest privilege continues to apply. As *In re Teleglobe* recognized, the common

interest privilege may apply even if the parties do not share identical positions

regarding all matters related to the broader, shared common interest. *See In re

Teleglobe*, 493 F.3d at 366 (reasoning that "[i]n the community-of-interest context,

on the other hand, because the clients have separate attorneys, courts can afford to

relax the degree to which clients' interests must converge without worrying that

their attorneys' ability to represent them zealously and single-mindedly will

-9-

13-53846-swr    Doc 940    Filed 09/19/13    Entered 09/19/13 11:08:26    Page 9 of 30    832
13-53846-tjt    Doc 2334-22    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 9 of 30

suffer").[4] Thus, the common interest privilege continues to apply to the City and State's communications relating to the City's financial emergency even if the City and State's interests are not identical as to all matters related to the financial emergency.

      15.    Lastly, AFSCME also argues that the State waived the common interest privilege by failing to assert the privilege in its papers objecting to depositions, and that the Emergency Manager waived the privilege by discussing the timing of the chapter 9 filing. (Mot. to Compel at 12-13.) Both arguments fail. First, as an initial matter, one party's unilateral action cannot waive the common-interest privilege for both parties. *See In Re Smirman*, 267 F.R.D. at 223. Thus, an action by the State alone cannot waive the common-interest privilege for the City, and vice-versa. *Id.* In any event, the common-interest privilege is not a distinct privilege that must be affirmatively raised. Rather, as discussed above, it is an exception to the traditional waiver rules of the attorney-client privilege. *See State Farm*, 2010 WL 2287454, at *7; *United States v. BDO Seidman, LLP*, 492 F.3d

---

[4] Although a minority of courts have required the parties to share an "identical legal interest" as AFSCME noted, Mot. to Compel at 10, citing *High Point SARL v. Sprint Nextel Corp.*, 2012 WL 234024, at *5 (D. Kan. Jan. 25, 2012), the majority position is that the parties must share only a similar (and not necessarily identical) interest for the privilege to apply. *See* Restatement (Third) Law Governing Lawyers § 76 (requiring only a "common interest"); *State Farm*, 2010 WL 2287454, at *7 (same). In any event, the Emergency Manager and State share an identical legal interest in rectifying the financial emergency in Detroit.

806, 815 (7th Cir. 2007) ("Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person."). Moreover, the City asserted the common interest privilege over certain documents before Mr. Orr's deposition as evidenced by the City's privilege log that was provided to AFSCME and other objectors on September 13, 2013. Second, the Emergency Manager did not waive the common interest privilege in stating that he discussed the timing of the chapter 9 filing with counsel. As the transcript makes clear, the Emergency Manager repeatedly declined to answer questions relating to conversations with the State about the timing of the chapter 9 filing on the basis of common-interest privilege. (*See* Orr Rough Dep. Tr. at 196-200.)

WHEREFORE, the City respectfully requests that this Court deny AFSCME's motion to compel.

-11-

13-53846-swr   Doc 940   Filed 09/19/13   Entered 09/19/13 11:08:26   Page 11 of 30   834
13-53846-tjt   Doc 2334-22   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 11 of 30

Dated: September 19, 2013

Respectfully submitted,

/s/  Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

# EXHIBIT A



RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

March 26, 2013

**BY ELECTRONIC MAIL**

Kevyn Orr
Emergency Financial Manager
City of Detroit
1126 Coleman A. Young Municipal Center
Detroit, Michigan 48226

Dear Mr. Orr:

This letter confirms your existing status as an Emergency Financial Manager, having been appointed pursuant to Section 18(1) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act and now maintained under Section 9(10) and Section 31 of Public Act 436 of 2012. Enclosed is a contract for your execution, reflecting the terms and conditions of your continuing appointment as an Emergency Manager under Public Act 436 of 2012, the Local Financial Stability and Choice Act.

Sincerely,

Rick Snyder
Governor

Enclosure

GEORGE W. ROMNEY BUILDING • 111 SOUTH CAPITOL AVENUE • LANSING, MICHIGAN 48909
www.michigan.gov

13-53846-swr    Doc 940    Filed 09/19/13    Entered 09/19/13 11:08:26    Page 14 of 30    837
13-53846-tjt    Doc 2334-22    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 14 of 30

89 (Rev. 02-11)



STATE OF MICHIGAN
### DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

## CONTRACT FOR EMERGENCY MANAGER SERVICES

Rick Snyder, Governor of the State of Michigan (Governor) and the Michigan Department of Treasury retain and appoint Kevyn Orr as the Emergency Manager (Emergency Manager) for the City of Detroit (City) under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq*, (the Act).

The Emergency Manager will provide services to the City pursuant to the terms and conditions set forth in this Contract and the Act.

The Emergency Manager's role is to remedy the financial distress of the City by requiring, within available resources, prudent fiscal management and an efficient provision of municipal services by exercising the necessary authority conferred herein to take appropriate action on behalf of the City and its residents. In accepting this appointment, the Emergency Manager agrees to leverage all the Emergency Manager's skills and abilities to accomplish these objectives on behalf of City residents.

## 1. PARTIES, PURPOSE, DUTIES, AND REPORTS

1.1 <u>Parties</u>. The parties to this Contract are the State of Michigan by the Department of Treasury and Kevyn Orr.

1.2 <u>Purpose</u>. The parties to this Contract agree that Kevyn Orr will act as the Emergency Manager for the City. The Emergency Manager's duties and responsibilities are delineated in the Act and include conducting all aspects of the operations of the City and establishing and implementing a written financial plan as required by Section 11 of the Act.

1.3 <u>Duties</u>. The Emergency Manager shall possess all the powers and duties authorized under the Act, including those specifically related to local governments. In addition, the Emergency Manager shall work cooperatively with the Office of the Governor and the State Treasurer. The Emergency Manager agrees to continue to keep these officials informed of major initiatives to be undertaken in furtherance of this Contract before their public announcement. The Emergency Manager shall seek the approval of the State Treasurer before entering into a new collective bargaining agreement.

1.4 <u>Reports</u>. The Emergency Manager shall file quarterly reports with the Department of Treasury beginning on July 15, 2013, for the immediately preceding quarter and shall file the first report required by Section 17 of the Act within six months of the Emergency Manager's appointment and every three months thereafter.

P.O. BOX 30716 • LANSING, MICHIGAN 48909
13-53846-swr   Doc 940   Filed 09/19/13   Entered 09/19/13 11:08:26   Page 15 of 30   838
13-53846-tjt   Doc 2334-22   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 15 of 30

1.5 Communications. The Emergency Manager shall establish and maintain an appropriate protocol for ongoing communications with officials of the City, City residents, and the media. The communications protocol should include a variety of means, including personal interactions.

## 2. TERM OF CONTRACT

2.1 The Emergency Manager serves at the pleasure of the Governor except as provided in Section 9(3)(d) and Section 9(6)(c) of the Act.

2.2 Effective Date. This contract is effective on Thursday March 28, 2013.

## 3. COMPENSATION FOR SERVICES PROVIDED

3.1 Source of Payment. The State shall pay the compensation of the Emergency Manager for all services rendered under this Contract.

3.2 Salary. The Emergency Manager's salary for services rendered under this Contract shall be $275,000 per year. If this Contract is terminated after the Emergency Manager has provided services for a portion of a month, the Emergency Manager shall be entitled, for that portion of that month, to $22,916.67 multiplied by the proportion that the number of days of the month for which services were provided bears to the number of days of the whole month. The Emergency Manager shall not receive or accept any compensation from the City or the State except as provided for in this contract.

3.3 Payment for Services. The Emergency Manager salary shall be paid in installments consistent with the established written policies and procedures of the Michigan Department of Treasury. If requested by the State Treasurer, the Emergency Manager shall provide to the Michigan Department of Treasury additional information regarding services performed pursuant to this Contract. Performance and/or any early termination payments not to exceed the annual salary amount (prorated) shall be paid as mutually agreed among the parties.

3.4 Reimbursement for Actual and Necessary Expenses. The actual and necessary expenses of the Emergency Manager, including customary expenses related to travel, meals, and lodging which are incurred in connection with service to the City will be reimbursed by the City. The Emergency Manager shall provide original copies of all receipts for meals, lodging, and travel reimbursement with any request for reimbursement. Any reimbursement for expenses, including commuting, housing, and security detail automobile expenses, under this contract shall be reviewed and approved in writing by the City's Chief Financial Officer.

## 4. ADDITIONAL STAFF AND CONSULTANT FEES

4.1 Staff. The Emergency Manager may, as provided in the Act, appoint additional staff as necessary to fulfill the obligations of the Emergency Manager's appointment and duties under this Contract. Payment of compensation for additional staff will be the obligation of the City. While authority to hire additional staff rests with the Emergency Manager, the Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours

2

before extending offers of employment for positions paying $50,000.00, or more, annually. The Emergency Manager shall issue a written employment contract to each individual hired pursuant to this Section, regardless of the compensation paid to that individual. The employment contract issued pursuant to this Section shall, as of the date the individual is hired by the Emergency Manager, prohibit the individual from engaging in any other employment for remuneration without the express written approval of the Emergency Manager. The Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before approving outside employment for any individual. A breach of this Section shall be a material breach of this Contract.

4.2 Professional Assistance. The Emergency Manager may, as provided in the Act, secure professional assistance as necessary to fulfill the obligations of the Emergency Manager's appointment and duties under this Contract. Payment of compensation for additional professional assistance will be the obligation of the City. The Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before authorizing professional services contracts of $50,000.00, or more, per engagement or project.

4.3 Security. The Emergency Manager will be entitled to receive security protection in connection with the Emergency Manager's duties under this Contract. Security personnel will be retained only upon the approval of the State Treasurer, or the designee of the State Treasurer, and only after consultation with the Director of the Michigan Department of State Police, or the designee of the Director of the Michigan Department of State Police. Payment of compensation for security personnel will be the obligation of the City.

## 5. REPRESENTATIONS

5.1 Qualifications. By signing this Contract, the Emergency Manager, represents that the Emergency Manager meets the minimum qualifications for appointment set forth in the Act. The Emergency Manager shall perform the duties of that office on a full-time basis, except as otherwise approved by the State Treasurer, and shall not accept any other employment or engage in any other activity for remuneration without the express written approval of the State Treasurer.

5.2 Conflict of Interest. The Emergency Manager represents and warrants that the Emergency Manager has no personal or financial interest, and will not acquire any such interest, that would conflict in any manner or degree with the performance of this Contract.

5.3 Non-competition. The Emergency Manager represents and warrants that the Emergency Manager is not subject to any non-disclosure, non-competition, or similar clause with current or prior clients or employers that will interfere with the performance of this Contract. The State will not be subject to any liability for any such claim.

5.4 Facilities and Personnel. The City will provide the Emergency Manager with proper facilities and personnel to perform the services and work required to be performed pursuant to this Contract.

5.5 Records. The Emergency Manager shall maintain complete records in accordance with

3

generally accepted accounting practices and sound business practices. This requirement applies to all information maintained or stored in the computer system of the Emergency Manager or computer system of the City. The State Treasurer and his designees shall have the right to inspect all records related to this Contract.

### 5.6 Non-Discrimination.

a) The Emergency Manager shall comply with Public Act 220 of 1976, the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*, and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Manager covenants that the Emergency Manager will not discriminate against any employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position. The Emergency Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

b) The Emergency Manager shall comply with Public Act 453 of 1976, the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Manager covenants that the Emergency Manager will not discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, or marital status. The Emergency Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

5.7 Unfair Labor Practices. The Emergency Manager shall not enter into a contract for the performance of any obligation imposed by this Contract with a subcontractor, manufacturer, or supplier whose name appears in the register prepared pursuant to Public Act 278 of 1980, MCL 423.322, of employers found in contempt of court for failure to correct unfair labor practices. The State may void this Contract if the Emergency Manager, or any subcontractor, manufacturer, or supplier of the Emergency Manager that is a party to a contract for the performance of any obligation imposed by this Contract, appears in the above mentioned register.

5.8 Independent Contractor. The relationship of the Emergency Manager to the State and to the City under this Contract is that of an independent contractor. Except as specifically provided in the Act, no liability, benefits, workers compensation rights or liabilities, insurance rights or liabilities, or any other rights or liabilities arising out of, or related to, a contract for hire, nor employer-employee relationship, shall arise, accrue, or be implied to either party under this Contract or to an agent, subcontractor, or employee of either party under this Contract, as a result of the performance of this Contract.

4

13-53846-swr   Doc 940   Filed 09/19/13   Entered 09/19/13 11:08:26   Page 18 of 30
13-53846-tjt   Doc 2334-22   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 18 of 30

## 6. NOTICES

6.1 The State Treasurer is the designee for this Contract unless notice of another designation is provided by the Governor. All notices, correspondence, requests, inquiries, billing statements, and other documents mentioned in this Contract shall be directed to the attention of the State Treasurer, Andy Dillon, and to the following:

For the State:

Michigan Department of Treasury
Office of Legal Affairs
Richard H. Austin Building, 430 West Allegan Street
Lansing, Michigan 48922
Phone: (517) 373-3223

For the Emergency Manager:

Kevyn Orr
1126 Coleman A. Young Municipal Center
Detroit, Michigan 48226

## 7. LIMITATION UPON LIABILITY

7.1 The State. The State, the Governor, the State Treasurer, and all other State officials are not liable for any obligation of or claim against the City resulting from actions taken in accordance with the Act or this Contract.

7.2 The Emergency Manager. Pursuant to the Act, in performing this Contract the Emergency Manager is engaging in a governmental function and is immune from liability for any action taken which the Emergency Manager reasonably believes to be within the scope of the Emergency Manager's authority granted by the Act or by this Contract.

## 8. INSURANCE

8.1 General. The Emergency Manager may procure and maintain, at the expense of the City, health, worker's compensation, general liability, professional liability, and motor vehicle insurance for the Emergency Manager and any employee, agent, appointee, or contractor of the Emergency Manager as may be provided to elected officials, appointed officials, or employees of the City. The insurance procured and maintained by the Emergency Manager may extend to any claim, demand, or lawsuit asserted or costs recovered against the Emergency Manager and any employee, agent, appointee, or contractor of the Emergency Manager to the extent permitted by the Act.

8.2 Post-Contract. If, after the date that the service of the Emergency Manager is concluded, the Emergency Manager or any employee, agent, appointee, or contractor of the Emergency Manager is subject to a claim, demand, or lawsuit arising from an action taken during the service of the Emergency Manager, and not covered by a procured insurance policy, litigation

5

expenses, including but not limited to attorney fees, payments in satisfaction of judgments, and payments made in settlement as specified pursuant to the Act, shall be paid by the City. If such expenses are not paid by the City, they shall be treated as a debt owed to this State pursuant to section 17a(5) of Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act of 1971, MCL 141.917a.

8.3 Additional Insurance. If the City has purchased, or otherwise obtained, an errors and omissions policy, then the Emergency Manager may choose to be covered under such policy at the expense of the City.

8.4 Payment by City. All insurance required under this Contract shall be acquired at the expense of the City under valid and enforceable policies, issued by insurers of recognized responsibility. The State Treasurer reserves the right to reject as unacceptable any insurer.

## 9. TERMINATION OF CONTRACT AND APPOINTMENT

9.1 Termination by the State.

a) The State. The Emergency Manager serves at the pleasure of the Governor except as provided in Section 9(3)(d) and Section 9(6)(c) of the Act. The Governor has the power to rescind the appointment and terminate this Contract at any time, and without cause, by issuing a Notice of Termination to the Emergency Manager.

9.2 Termination Process. Upon receipt of a Notice of Termination, and except as otherwise directed, the Emergency Manager shall:

a) Cease work under this Contract upon the date and to the extent specified in the Notice of Termination;

b) Incur no costs beyond the date specified by the Notice of Termination;

c) Submit to the State Treasurer on the date the termination is effective all records, reports and documents as this State shall specify and carry out such directives as the State Treasurer may issue concerning the safeguarding and disposition of files and property; and

d) Submit within 30 calendar days a closing memorandum and final billing, which shall be paid within 30 days.

9.3 Termination by Emergency Manager. The Emergency Manager may terminate this Contract at any time, with or without cause, with 30 days written notice to the State Treasurer. Within 30 days of the Emergency Manager's final day of service, the Emergency Manager shall submit a closing memorandum and final billing, which shall be paid within 30 calendar days.

## 10. GENERAL PROVISIONS

10.1 Governing Law and Jurisdiction. This Contract shall be subject to, and construed ac-

6

13-53846-swr    Doc 940    Filed 09/19/13    Entered 09/19/13 11:08:26    Page 20 of 30
13-53846-tjt    Doc 2334-22    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 20 of 30

cording to, the laws of the State of Michigan, and no action shall be commenced against this State, its agents, or employees for any matter whatsoever arising out of this Contract, in any court other than a Michigan State court.

10.2 <u>No Waiver</u>. A party's failure to insist on the strict performance of this Contract shall not constitute waiver of any breach of the Contract.

10.3 <u>Other Debts</u>. The Emergency Manager represents and warrants that the Emergency Manager is not, and will not become, in arrears on any contract, debt, or other obligation to the State of Michigan, including taxes.

10.4 <u>Invalidity</u>. If any provision of this Contract or its application to any persons or circumstances shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Contract shall not be affected, and each remaining provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

10.5 <u>Headings</u>. Section headings contained in this Contract are for convenience only and shall not be used to interpret the scope or intent of this Contract.

10.6 <u>Entire Agreement</u>. This Contract represents the entire and exclusive agreement between the parties and supersedes all proposals or other prior agreements, oral or written, and all other communications between the parties.

10.7 <u>Amendment</u>. No Contract amendment will be effective and binding upon the parties to this Contract unless the amendment expressly makes reference to this Contract, is in writing, and is signed by duly authorized representatives of all parties and all the requisite State approvals are obtained.

10.8 <u>Order of Priority</u>. This Contract and the Act shall be read to be consistent one with the other. However, if a conflict is deemed to exist between the terms of this Contract and the Act, the Act shall supersede the terms of this Contract.

10.9 <u>Counterparts</u>. This Contract may be executed in separate counterparts, each of which when executed shall be deemed an original, but all of which when taken together shall constitute one and the same Contract.

7

13-53846-swr   Doc 940   Filed 09/19/13   Entered 09/19/13 11:08:26   Page 21 of 30
13-53846-tjt   Doc 2334-22   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 21 of 30

IN WITNESS WHEREOF, the Governor and the Emergency Manager have signed and executed this Contract.

STATE OF MICHIGAN

Dated: _3/27/13_

Rick Snyder, Governor

Dated: _March 27th 2013_

Kevyn Orr, Emergency Manager

Approved as to form and content pursuant to Section 9(3)(e) of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq.*

Dated: _March 27, 2013_

Andy Dillon, State treasurer

8

# EXHIBIT B

## Common Interest Agreement

This Common Interest Agreement (this "Agreement") is entered into between the following undersigned parties (collectively, the "Parties"): (a) the State of Michigan (the "State"), and (b) the City of Detroit, Michigan (the "City"), by and through its Emergency Manager, Kevyn D. Orr (in his capacity as the Emergency Manager for the City and hereinafter the "Emergency Manager"). This Agreement memorializes and confirms the oral understanding of the Parties with respect to the formation of their Common Interests (as defined below) and extends to any information that the Parties (including their departments and subdivisions, as applicable), their counsel, and their agents already have exchanged or will exchange in connection with their Common Interests, which are discussed below.

WHEREAS, the Governor of the State of Michigan, Richard Snyder (the "Governor") declared the City to be in a financial emergency as early as February 2012 (the "Financial Emergency");

WHEREAS, the City and the State entered into a Financial Stability Agreement, which was certified on April 9, 2012;

WHEREAS, the continuing Financial Emergency resulted in the appointment of the Emergency Manager for the City on March 14, 2013;

WHEREAS, the Parties have been and continue to be engaged in taking steps to evaluate and alleviate the Financial Emergency;

WHEREAS, by letter dated July 16, 2013, the Emergency Manager recommended to the Governor that the City commence a bankruptcy case under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, by letter dated July 18, 2013, the Governor of the State of Michigan authorized the City to commence a chapter 9 case;

WHEREAS, the City commenced a case under chapter 9 of the Bankruptcy Code (Case No. 13-53846) (the "Bankruptcy Case") by filing its petition with the United States Bankruptcy Court for the Eastern District of Michigan on July 18, 2013, after receiving the Governor's written approval;

WHEREAS, the Emergency Manager and officials of the State of Michigan are both defendants in the case of *General Retirement System of the City of Detroit vs. Orr*, Case No. 13-768 filed in Ingham County Circuit Court on July 17, 2013;

WHEREAS, the validity of the appointment and actions of the Emergency Manager and the State of Michigan and its officials have been challenged in a number of other court actions;

WHEREAS, the Parties have reason to expect additional litigation regarding the authority of the Emergency Manager or of the State to have taken and to take actions to address the City's Financial Emergency in the Bankruptcy Case, separate and apart from the State's position as a creditor of the City;

WHEREAS, the City's Financial Emergency continues notwithstanding the filing of the Bankruptcy Case;

WHEREAS, on or around the appointment of the Emergency Manager, the Parties verbally agreed to a common interest agreement and have now concluded that placing the terms of that verbal agreement and newly agreed upon terms in written form is reasonable and appropriate;

WHEREAS, the Parties share certain common interests including, but not limited to, those in connection with the legal and policy issues that arise as a result of and in relation to the City's Financial Emergency, the appointment of the Emergency Manager, and the Bankruptcy

2

Case (collectively, the "Common Interests");

WHEREAS, the Parties and their counsel wish to pursue their Common Interests, and wish to avoid any suggestion of waiver of confidentiality or immunity of communications and documents protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity;

WHEREAS, the Parties and their counsel, in pursuing their Common Interests, may wish to enlist the services of experts, consultants, advisors, or other agents, and intend for such agents to be bound by the restrictions created by this Agreement, as appropriate;

WHEREAS, it is the intention of the Parties that past and future communications among or between them, their counsel, or their agents related to their Common Interests are and shall remain confidential and continue to be protected from disclosure to any third party by applicable privileges and immunities, except as set forth herein;

WHEREAS, to pursue their Common Interests effectively, the Parties and their counsel also have concluded that, from time to time, their Common Interests will be best served by sharing among themselves and their agents documents, factual material, mental impressions, memoranda, data or information analyses, written or oral reports, litigation strategies, and other information, including the confidences of the Parties with counsel (hereinafter "Shared Materials"); and,

WHEREAS, it is the intention of the Parties that no Shared Materials shall be disclosed to any member of the Attorney General's office or other state representative that has taken, is taking, or plans to take a position in the Bankruptcy Case adverse to the position of the City and the Emergency Manager consistent with the Attorney General's internal conflict wall;

3

IT IS THEREFORE AGREED as follows:

1.      Any communications made between or among the Parties, their counsel, and/or their agents with respect to the Common Interests shall be considered confidential and subject to the common interest privilege, as well as any and all other applicable privileges.

2.      Except as expressly stated in writing to the contrary, any and all Shared Materials obtained by any of the Parties, their counsel, or their agents are being provided solely for use of the Parties, their counsel, and their agents in connection with the Common Interests and shall remain confidential and shall be protected from disclosure to any third party by the common interest privilege, attorney-client privilege, work product doctrine, and other applicable privileges and immunities, except to the extent waived by a Party asserting the privilege. All Shared Materials shall be used solely in connection with the Common Interests.

3.      All persons permitted access to the Shared Materials will be advised that the materials are confidential, privileged, and subject to the terms of this Agreement. In addition, Shared Materials shall be marked to the extent practicable with the following (or similar) header or footer:

> **PRIVILEGED AND CONFIDENTIAL**
> **ATTORNEY WORK PRODUCT**
> **ATTORNEY-CLIENT COMMUNICATION**
> **SUBJECT TO COMMON INTEREST AGREEMENT**
> **NOT SUBJECT TO DISCLOSURE UNDER FOIA**

Failure to include this header/footer will not undermine the protections afforded hereunder.

4.      If any person or entity subpoenas, requests under the Michigan Freedom of Information Act, or otherwise demands any Shared Materials from any of the Parties, their counsel, or their agents, such recipient of the subpoena, request, or demand shall immediately

4

notify all of the Parties' counsel. In addition, the recipient shall take all steps necessary to assert all applicable rights, privileges, and immunities with respect to the Shared Materials to ensure that the Shared Materials remain confidential unless that confidentiality or privilege has been expressly waived in writing by the Party asserting confidentiality or privilege. If a request for Shared Materials is made under the Michigan Freedom of Information Act, the recipient shall raise any and all applicable defenses and/or exemptions under Mich. Comp. Laws § 15.243 available to it or to any other Party to avoid disclosure unless the confidentiality or privilege for the Shared Materials or individual documents or communications that are part of the Shared Materials has been expressly waived in writing by the Party asserting confidentiality or privilege. Waiver of the confidentiality or privilege for an individual document or communication does not waive the confidentiality or privilege of all Shared Materials. The recipient also shall allow the other affected Parties a reasonable opportunity to intervene and be heard, and otherwise cooperate fully with the other affected parties in any administrative or judicial proceeding relating to the disclosure of Shared Materials.

5. The Parties, their counsel, and their agents are not obliged to communicate any independently obtained or created materials with any other Party, counsel, or agent as a result of this Agreement.

6. Nothing in this Agreement shall be deemed to create an attorney-client relationship between any persons, including the attorneys that have signed this Agreement. The fact that any attorney has signed this Agreement shall not in any way preclude that attorney from representing any interest that may be construed to be adverse to any other Party or Party's agent, and shall not be used as a basis for seeking to disqualify any counsel from representing any other

5

party in this or any other proceeding or matter; and no attorney who has signed this Agreement shall be disqualified from examining or cross-examining any Party or other person who testifies at any proceeding, whether under a grant of immunity or otherwise, because of such attorney's participation in this Agreement.

7.     Either Party may withdraw from this Agreement by promptly sending written notice to the other Party, in which case this Agreement shall no longer be operative. The withdrawing Party shall comply with any request to return or destroy any Shared Materials, and shall continue to be bound by the obligations of confidentiality with respect to the Shared Materials previously furnished pursuant to this Agreement.

8. ·    If a Party inadvertently produces any Shared Materials provided by another Party to an entity that is not a Party to this Agreement, in a manner that is not authorized by the terms of this Agreement, such production shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity of any Party hereto. In such circumstances, the producing Party must immediately notify the Party whose Shared Materials are included in such inadvertently produced Shared Materials and must further notify the receiving entity of the inadvertent production and request the return or confirmed destruction of the privileged materials.

9.     If a Party inadvertently produces to any or all of the other Parties a privileged document or privileged material that was not intended to be provided under this Agreement, the production of that document or other material shall not be deemed to constitute the waiver of any applicable privileges. In such circumstances, the producing Party must immediately notify the receiving Party of the inadvertent production, and request the return or confirmed destruction of

6

the privileged materials. Within five days of receiving such notification, the receiving Party shall return or confirm destruction of all such documents or other materials, including any derivative works thereof.

10.     This Agreement incorporates all prior oral understandings and it extends to all prior exchanges of Shared Materials. This Agreement is the entire understanding of the Parties with respect to this subject matter and may be modified only by a duly signed writing.

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

12.     This Agreement may not be amended or modified except by a written agreement signed by each signatory of this Agreement.

13.     This Agreement may be executed in any number of counterparts, each counterpart constituting an original, but all together one and the same agreement.


Dated:  September 12, 2013

Matthew Schneider
Chief Legal Counsel
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI  48909
Phone: (517) 373-1110
Fax: (517) 373-3042

By: _____
     Matthew Schneider
     SchneiderM7@michigan.gov

*Counsel for the State of Michigan*

Heather Lennox
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

By: _____
     Heather Lennox
     hlennox@jonesday.com

*Counsel for the City of Detroit*

7