UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Chapter 9
Case No. 13-53846-swr
Hon. Steven W. Rhodes

---

### RETIRED DETROIT POLICE MEMBERS ASSOCIATION'S
### PRETRIAL BRIEF, PROPOSED FINDINGS OF FACT AND
### PROPOSED CONCLUSIONS OF LAW

The Retired Detroit Police Members Association ("RDPMA"), by and through its

attorneys, Strobl & Sharp, P.C., without acknowledging the jurisdiction of this Court, the

constitutionality of the City of Detroit's ("Debtor" or "Detroit") Chapter 9 bankruptcy filing, or

the eligibility of Detroit to relief under Chapter 9 of the Bankruptcy Code, hereby submits this

Pretrial Brief, Proposed Findings of Fact and Proposed Conclusions of Law in connection with

the trial on its Objection to the Chapter 9 Petition filed by the City of Detroit. The RDPMA

hereby adopts its Objection to the City of Detroit Chapter 9 Petition filed on August 18, 2013

[Docket #520] as if fully set forth herein

### I.
### BURDEN OF PROOF

Under Section 921(c) of the Bankruptcy Code, a municipality's bankruptcy petition must

be dismissed if either the debtor did not file the petition in good faith or the debtor does not meet

the requirements of Chapter 9. 11 USC § 921(c); *In re Valley Health Sys.*, 383 BR 156, 160

(Bankr. C. D. Cal. 2008) (despite permissive language of the statute, Section 921(c) requires

dismissal if debtor is not eligible for relief under Chapter 9). Thus, an entity may be a debtor

under Chapter 9 if the entity files its petition in good faith and meets the following requirements

of Section 109(c):

1

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 USC § 109(c). The debtor bears the burden of establishing that it meets each of those five statutory requirements of Section 109(c). *In re Valley Health*, 383 BR at 161; *In re County of Orange*, 183 BR 594, 599 (Bankr. C. D. Cal. 1995). As one court explained "[t]he bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases . . . .Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 BR at 82.

In the instant matter, the City of Detroit must establish that the Michigan law under which it was purportedly authorized by Governor Richard Snyder to file this Chapter 9 proceeding is constitutional under the applicable provisions of the Michigan Constitution. Specifically, the City of Detroit, and to the extent it has argued this matter, the State of

2

Michigan, bear the burden of establishing that Public Act 436, in relevant part, did not violate Article II, Section 9 of the Michigan Constitution.

## II.
## PROPOSED FINDINGS OF FACT

1.  The Michigan electorate rejected Public Act 4 of 2011 ("PA 4") in total on November 6, 2012.

2.  As early as March 2012, the Michigan Department of Treasury was considering alternatives to PA 4 in the event it was rejected in the November 2012 general election.

3.  Governor Richard Snyder and the State of Michigan, Department of Treasury participated in the drafting of the legislation that became Public Act 436 of 2012 ("PA 436").

4.  PA 436 was presented to Governor Richard Snyder on December 20, 2012 for approval.

5.  PA 436 was approved by Governor Richard Snyder on December 26, 2012.

6.  Section 34 of PA 436 provides for appropriations in the amount of $780,000 for fiscal year ending September 30, 2013 to administer the provisions of PA 436, including for the payment of the salaries of emergency managers appointed thereunder.

7.  Section 35 of PA 436 provides for appropriations in the amount of $5,000,000 for the fiscal year ending September 30, 2013 to administer the provisions of PA 436, including for the payment of professionals hired to assist emergency managers appointed thereunder.

8.  Pursuant to the State of Michigan Comprehensive Annual Financial Report for the period ending September 30, 2012, the State of Michigan program revenues for operating expenses for fiscal year 2012 were $46,495,152,000.  See RDPMA Trial Exhibit C.

9.  The appropriation provisions included in PA 436 are *de minimis* relative to the State of Michigan overall budget and spending.

10. The appropriation provisions in Sections 34 and 35 of PA 436 were included to ensure that PA 436 could not be defeated by referendum.  (See **Exhibit A**, Howard Ryan Deposition, October 14, 2013, p. 46, L 1 – 23)

3

11. The provisions in PA 436 regarding the determination of financial crisis and the appointment of an emergency manager are similar, if not identical in all critical aspects, to such provisions in PA 4. (See **Exhibit B**)

12. The provisions in PA 436 regarding the filing of a Chapter 9 petition by an emergency manager are similar, if not identical in all critical aspects, to such provisions in PA 4. (See **Exhibit B**)

13. PA 436 was implemented for the same reasons PA 4 was passed. (See **Exhibit C**, Treasurer Andrew Dillon Deposition, October 10, 2013, p. 34, L 3 – 5)

14. PA 436 was not subject to referendum under the Michigan Constitution due to the inclusion of Sections 34 and 35.

15. There was no general election in the State of Michigan after PA 4 was referred to the people of the State of Michigan for referendum and the approval of PA 436 by Governor Snyder on December 26, 2013.

### III.
### PROPOSED CONCLUSIONS OF LAW

1. Article II, Section 9 of the Michigan Constitution grants the power of referendum to the people of the State of Michigan with respect to all laws except with respect to acts containing appropriations for state institutions or meeting deficiencies in state funds.

2. Article II, Section 9 of the Michigan Constitution requires that no law that has been rejected by referendum can become effective thereafter unless approved by a majority of the voters at the next general election.

3. PA 4 was properly rejected by the Michigan voters pursuant to Article II, Section 9 of the Michigan Constitution.

4. The inclusion of the appropriation provisions in Sections 34 and 35 of PA 436 was an improper attempt to subvert the right of referendum provided to the people of the State of Michigan in Article II, Section 9 of the Michigan Constitution.

5. Article II, Section 9 of the Michigan Constitution required that the provisions of PA 436 be submitted to the general electorate before being enacted.

6. PA 436 violates Article II, Section 9 of the Michigan Constitution.

7. The provisions of PA 436 which provide for the determination of financial crisis and the appointment of an emergency manager and for the filing of a Chapter 9

4

petition by an emergency manager are unconstitutional under Article II, Section 9 of the Michigan Constitution.

8. The appointment of Kevyn Orr as the emergency financial manager over the City of Detroit was not properly authorized by PA 436 as PA 436, to the extent it provides for the appointment of an emergency manager by the governor of the State of Michigan, is unconstitutional under Article II, Section 9 of the Michigan Constitution.

9. The filing of this Chapter 9 Petition by the City of Detroit was not properly authorized by PA 436 as PA 436, to the extent it provides for the authorization by the governor of the State of Michigan of the filing of a Chapter 9 petition by emergency manager, is unconstitutional under Article II, Section 9 of the Michigan Constitution.

10. The filing of this Chapter 9 Petition by Kevyn Orr is not properly authorized by the laws of the State of Michigan.

11. The City of Detroit is not specifically authorized by the laws of the State of Michigan or by any properly authorized governmental officer or organization empowered by the laws of the State of Michigan, law to be a debtor under Chapter 9 of the Bankruptcy Code as required by Section 109(c) of the Bankruptcy Code.

## IV.
## ARGUMENT

The State of Michigan (the "State") has presented in oral argument the only response to the RPDMA's objection to eligibility based on the failure of PA 436 to comply with Article II, Section 9 of the Michigan Constitution. The State refutes the argument that PA 436 was passed in violation of the Michigan constitutional requirement that grants citizens of Michigan the power of referendum. In oral argument, counsel for the State, relied solely on the findings of the Michigan Court of Appeals in the case of *Reynolds v. Martin,* 240 Mich. App. 84 (2000), in support of the argument that PA 436 is constitutional. However, counsel for the State has misrepresented the factual application and the importance of *Reynolds* to this case.

In *Reynolds*, the Court analyzed a provision of the Bingo Act, MCL 432.103(6) (the "Bingo Act"), which authorized political candidate committees to conduct bingo activities. 240

5

Mich. App. 84 (2000). In 1994, the Michigan Legislature passed Public Act 118 ("PA 118"), which amended the Bingo Act to exclude all political committees from conducting bingo. Individual citizens petitioned for a statewide referendum on PA 118. However, a question regarding the validity of the signatures on the petition created a delay before the matter could be placed on the statewide ballot. *Reynolds*, 240 Mich. App. at 88. During the period of time the signatures were under review, the Legislature enacted 1995 PA 275 ("PA 275"), an almost identical bill to PA 118. 240 Mich. App. at 89. Following several judicial proceedings, it was determined that the signatures collected in regard to PA 118 were valid, and the referendum was certified for the 1996 general election. 240 Mich. App. at 90. During the 1996 election, 1994 PA 118 was rejected by the majority of the voters. *Id.* When the Plaintiffs filed an application for a bingo license, they were denied based upon the amended statute, PA 275. *Id.* The Plaintiffs in *Reynolds* challenged PA 275 on the grounds that it violated the constitutional right of referendum. In reviewing the referendum provisions of the Michigan Constitution, the *Reynolds* court held that the Michigan Legislature did not undermine the peoples' referendum authority when it passed PA 275 because there had been an intervening general election after PA 118 was referred for a referendum vote and prior to the enactment of PA 275.

In analogizing *Reynolds* with the case at hand, the State of Michigan has misled this Court with respect to the key aspects of the case. Of paramount importance to the *Reynolds* court was the protection of the peoples' right of referendum. The *Reynolds* court looked to the Michigan Supreme Court case *Michigan Farm Bureau v. Secretary of State*, 379 Mich. 387 (1967) in support of its conclusion that PA 275 was valid. In *Michigan Farm Bureau*, the Michigan Supreme Court held that the Michigan Legislature could not subvert the right of referendum with respect to an act involving the implementation of daylight savings time by

6

simply passing the act annually early in the session and repealing it prior end of the session.

Actually, *Michigan Farm Bureau* supports the position that PA 436 is unconstitutional. The *Reynolds* court noted that the Supreme Court in *Michigan Farm Bureau*

> was concerned that, with respect to the rather unique legislative issue presented there, a contrary result [not allowing the referendum petition] would have meant that the people might never be afforded the referendum right to express at a general election their will with respect to the enacted law...The Court's ruling thus prevented 'outright legislative defeat, not just hindrance, of the people's reserved right' to a referendum.

*Reynolds*, 240 Mich. App. at 93-94 (citing *Michigan Farm Bureau*, 379 Mich. at 394). The *Reynolds* court further stated that:

> The only logical and consistent interpretation is that when an act of the legislature is referred, that particular act is suspended in its operation, but that such suspension does not deprive the legislature of the right thereafter to pass, **in the legal manner** any measure it may deem advisable, notwithstanding such measure may deal with exactly the same subject as the referred act, and in the same manner, **but subject, or course, to the same right of reference as was the original act.**

*Michigan Farm Bureau*, 379 Mich. at 396 (*quoting McBride v. Kerby*, 32 Ariz. 515 (1927))(emphasis added).

The most important consideration to the *Reynolds* court was the fact that the peoples' right to referendum was preserved with respect to PA 118 as well as PA 275. In fact, the *Reynolds* court specifically noted that "**should the legislators not be responsive to the will of the people expressed at the referendum vote, the second legislation itself is "subject . . . to the same right of reference as was the original act.**" *Reynolds*, 240 Mich. App. at 100 (citations omitted)(emphasis added).

When reviewing Article II, Section 9 of the Michigan Constitution and its application to PA 436, this Court must be mindful of the well-settled principles of the construction of

7

constitutional provisions. The Michigan Supreme Court has noted that the dominant principle to the analysis of constitutional provisions is the maxim that such provisions are to be construed in accordance with "common understanding." *American Axle & Mfg., Inc. v. Hamtramck*, 461 Mich. 352, 363 (2000)(citation omitted). The *Reynolds* court noted that "[w]hen interpreting the constitution the primary duty of the judiciary is to 'ascertain as best the Court may, the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or provisions.'" *Reynolds,* 240 Mich. App. at 86-87 (citations omitted). Moreover, the Michigan Supreme Court in *Kuhn v. Dep't. of Treas.*, 382 Mich. 378 (1971), noted specifically that "under a system of government based on grants of power from the people, constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed." *Kuhn,*. 384 Mich. at 385. In other words, the right of referendum as provided for in the Michigan Constitution is to be liberally construed in favor of the people.

In the instant case, not only was the right of referendum not protected with respect to PA 436, the Governor, the Michigan Department of Treasury and Michigan Legislature specifically intended to deprive the Michigan citizens of their right of referendum. In an effort to undermine the will of the people as demonstrated in the November 2012 general election, insignificant spending provisions were tacked on to PA 436, an act that is essentially identical to the rejected PA 4 with respect to the power of the governor to appoint emergency managers and to authorize the filing of a Chapter 9 proceeding. Unlike in *Reynolds*, PA 436 has never been presented to the statewide general election and therefore the peoples' right to referendum has been improperly denied. As this Court noted, the Governor, the Department of Treasury and the Michigan

8

Legislature have made a mockery of the Michigan Constitution and the peoples' right of referendum.

## V.
## CONCLUSION

Based upon the foregoing, Public Act 436 should be found to be unconstitutional under Article II, Section 9 of the Michigan Constitution and therefore the City of Detroit has failed to establish that it is eligible for Chapter 9 relief under Section 109(c) and Section 921(c). Therefore, this case must be dismissed.

Respectfully Submitted,

**STROBL & SHARP, P.C.**

/s/    *Lynn M. Brimer*
LYNN M. BRIMER (P43291)
MEREDITH E. TAUNT (P69698)
MALLORY A. FIELD (P75289)
Attorneys for the Retired Detroit
Police Members Association
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
E-mail: lbrimer@stroblpc.com
        mtaunt@stroblpc.com
        mfield@stroblpc.com

Dated: October 17, 2013

*S&B\85244\001\PLDG\SB431916.DOCX

9

# EXHIBIT A

*In Re: City of Detroit, Debtor*

---

*Howard Ryan*
*October 14, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 101413HR.TXT
Min-U-Script® with Word Index

| Page 45 | Page 47 |
|---|---|
| 1 Q. And by the vote, you're referring to the repeal of | 1 today as a 30(b)(6) witness you have not checked |
| 2 PA 4? | 2 with either the Governor or the State Treasurer or |
| 3 A. Yes. | 3 any of their aides or agents to see whether any of |
| 4 Q. 2011 PA 4? | 4 them had any conversations with the Legislative |
| 5 A. Yes. | 5 Branch regarding Public Act 436? |
| 6 Q. I don't think I have anymore questions. Thank you, | 6 MR. DONNELLY: Well, I'm going to object to |
| 7 Mr. Ryan. | 7 the form of that question because you've been |
| 8 A. Thank you. | 8 produced documents and this witness has reviewed |
| 9 MR. DONNELLY: Anybody on the phone with | 9 documents that show communications between the |
| 10 questions? Anybody still on the phone? | 10 Governor's office and the Executive Branch, so |
| 11 MS. BRUNO: Yeah, no questions. | 11 that's an unfair question. Did he beyond that — |
| 12 MR. DeCHIARA: No questions. | 12 MR. WERTHEIMER: That's right. |
| 13 MS. WALDRON: No questions. | 13 MR. DONNELLY: — have conversations? |
| 14 MR. MANSON: No questions. | 14 MR. WERTHEIMER: No, that's fair. |
| 15 MR. DONNELLY: Do you have anymore | 15 BY MR. WERTHEIMER: |
| 16 questions? | 16 Q. Beyond reviewing those documents, you did not take |
| 17 MR. WERTHEIMER: Give me just a minute. | 17 the next step and talk to either the Governor, the |
| 18 Let's just go off the record for a second. | 18 State Treasurer or any of either of their aides or |
| 19 VIDEO TECHNICIAN: We're going off the | 19 agents to determine whether any of them had |
| 20 record at 9:58. | 20 communicated with the Legislative Branch relative to |
| 21 (A pause was had in the proceedings.) | 21 436, did you? |
| 22 VIDEO TECHNICIAN: We are going back on the | 22 MR. DONNELLY: Well, I'm going to object to |
| 23 record at 9:59 a.m. | 23 the form of that question because it |
| 24 RE-EXAMINATION | 24 mischaracterizes his earlier testimony because it's |
| 25 BY MR. WERTHEIMER: | 25 compound, and if you want to break it down between |

| Page 46 | Page 48 |
|---|---|
| 1 Q. I'd just like to ask a follow-up to a question | 1 the Governor and the Treasurer — |
| 2 counsel asked you. You said that the appropriation | 2 MR. WERTHEIMER: Fine. I'll break it down. |
| 3 language was put in the — early on in the process; | 3 MR. DONNELLY: — because he had different |
| 4 is that correct? | 4 testimony with regard to the Treasury and the |
| 5 A. Yes. | 5 Governor. |
| 6 Q. Based on your conversations with the people at the | 6 BY MR. WERTHEIMER: |
| 7 time, was it your understanding that one or more of | 7 Q. Fair enough. I'll break it down, just so the record |
| 8 the reasons to put the appropriation language in | 8 is clear. |
| 9 there was to make sure that it could not — the new | 9 In preparing as a 30(b)(6) witness, which |
| 10 act could not be defeated by a referendum? | 10 you did, correct? |
| 11 A. Yes. | 11 A. Yes. |
| 12 Q. And where did you get that knowledge from? | 12 Q. Okay. You did not talk to either the Governor or |
| 13 A. Well, having watched the entire process unfold over | 13 any of his aides to determine whether any of them |
| 14 the past two years. | 14 had communicated with the Legislature about what |
| 15 Q. The Governor's office knew that that was the point | 15 became 436, did you? |
| 16 of it? | 16 MR. DONNELLY: Beyond the caveat that we |
| 17 A. Yes. | 17 had in terms of reviewing documents — |
| 18 Q. That your department knew that that was the point of | 18 MR. WERTHEIMER: Yes. |
| 19 it? | 19 MR. DONNELLY: — that show those |
| 20 A. Yes. | 20 communications. |
| 21 Q. The legislators you were dealing with knew that that | 21 MR. WERTHEIMER: Yes, beyond that. |
| 22 was the point of it? | 22 MR. DONNELLY: Beyond the emails and beyond |
| 23 A. Yes. | 23 all those paper communications, no. |
| 24 Q. Okay. And I don't want to raise any hackles, but I | 24 BY MR. WERTHEIMER: |
| 25 want to make sure I understand that in testifying | 25 Q. You didn't talk to any of those folks and say did |

13-53846-swr    Doc 1231-1    Filed 10/17/13    Entered 10/17/13 21:52:20    Page 3 of 3 1024
13-53846-tjt    Doc 2334-30    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 12 of
36

# EXHIBIT B

| Public Act 4 | Public Act 436 |
|---|---|
| **Determination of Financial Crisis and Appointment of Emergency Manager:** | **Determination of Financial Crisis and Appointment of Emergency Manager:** |
| **Sec. 15.** (1) Within 10 days after receipt of the report provided for in section 13, the governor shall make 1 of the following determinations:<br><br>(a) The local government is not in a condition of severe financial stress.<br><br>(b) The local government is in a condition of severe financial stress as provided in section 14, but a consent agreement containing a plan to resolve the financial stress has been adopted under this act.<br><br>(c) A local government financial emergency exists as provided in section 14 and no satisfactory plan exists to resolve the emergency.<br><br>(d) The local government entered into a consent agreement containing a continuing operations plan or recovery plan to resolve a financial problem, but materially breached that consent agreement.<br><br>(2) If the governor determines pursuant to subsection (1) that a financial emergency exists, the governor shall provide the governing body and chief administrative officer of the local government with a written notification of the determination, findings of fact utilized as the basis upon which this determination was made, a concise and explicit statement of the underlying facts supporting the factual findings, and notice that the chief administrative officer or the governing body of the local government has 7 days after the date of the notification to request a hearing conducted by the state financial authority or the state financial authority's designee. Following the hearing, or if no hearing is requested following the expiration of the deadline by which a hearing may be requested, the governor, in his or her sole discretion based upon the record, shall either confirm or revoke, | **Sec. 6.** (1) Within 10 days after receipt of the report under section 5, the governor shall make 1 of the following determinations:<br><br>(a) A financial emergency does not exist within the local government.<br><br>(b) A financial emergency exists within the local government.<br><br>(2) Before making a determination under subsection (1), the governor, in his or her sole discretion, may provide officials of the local government an opportunity to submit a written statement concerning their agreement or disagreement with the findings and conclusion of the review team report under section 5. If the governor determines pursuant to subsection (1) that a financial emergency exists, the governor shall provide the governing body and chief administrative officer of the local government with a written notification of the determination, findings of fact utilized as the basis upon which this determination was made, a concise and explicit statement of the underlying facts supporting the factual findings, and notice that the chief administrative officer or the governing body of the local government has 7 days after the date of the notification to request a hearing conducted by the state financial authority or the state financial authority's designee. Following the hearing, or if no hearing is requested following the expiration of the deadline by which a hearing may be requested, the governor, in his or her sole discretion based upon the record, shall either confirm or revoke, in writing, the determination of the existence of a financial emergency. If confirmed, the governor shall provide a written report to the governing body and chief administrative officer of the local government of the findings of fact of the continuing or newly developed conditions or events providing a basis for the |

2

in writing, the determination of the existence of a financial emergency. If confirmed, the governor shall provide a written report to the governing body and chief administrative officer of the local government of the findings of fact of the continuing or newly developed conditions or events providing a basis for the confirmation of a financial emergency, and a concise and explicit statement of the underlying facts supporting these factual findings.

(3) A local government for which a financial emergency determination under this section has been confirmed to exist may, by resolution adopted by a vote of 2/3 of the members of its governing body elected and serving, appeal this determination within 10 business days to the Ingham county circuit court. The court shall not set aside a determination of financial emergency by the governor unless it finds that the determination is either of the following:
    (a) Not supported by competent, material, and substantial evidence on the whole record.
    (b) Arbitrary, capricious, or clearly an abuse or unwarranted exercise of discretion.

(4) Upon the confirmation of a finding of a financial emergency, the governor shall declare the local government in receivership and shall appoint an emergency manager to act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Upon the declaration of receivership and during the pendency of receivership, the governing body and the chief administrative officer of the local government may not exercise any of the

confirmation of a financial emergency and a concise and explicit statement of the underlying facts supporting these factual findings. In addition, a copy of the report shall be provided to each state senator and state representative who represents that local government. The report shall be posted on the department of treasury's website within 7 days after the report is provided to the governing body and chief executive officer of the local government.

(3) A local government for which a financial emergency determination under this section has been confirmed to exist may, by resolution adopted by a vote of 2/3 of the members of its governing body elected and serving, appeal this determination within 10 business days to the Michigan court of claims. A local government may, by resolution adopted by a vote of 2/3 of the members of its governing body elected and serving, waive its right to appeal as provided in this subsection. The court shall not set aside a determination of financial emergency by the governor unless it finds that the determination is either of the following:
    (a) Not supported by competent, material, and substantial evidence on the whole record.
    (b) Arbitrary, capricious, or clearly an abuse or unwarranted exercise of discretion.

**Sec. 9.** (1) The governor may appoint an emergency manager to address a financial emergency within that local government as provided for in this act.

(2) Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the

powers of those offices except as may be specifically authorized in writing by the emergency manager and are subject to any conditions required by the emergency manager.

(5) All of the following apply to an emergency manager:

(a) The emergency manager shall have a minimum of 5 years' experience and demonstrable expertise in business, financial, or local or state budgetary matters.

(b) The emergency manager may but need not be a resident of the local government.

(c) The emergency manager shall be an individual.

(d) Except as otherwise provided in this subdivision, the emergency manager shall serve at the pleasure of the governor. An emergency manager is subject to impeachment and conviction by the legislature as if he or she were a civil officer under section 7 of article XI of the state constitution of 1963. A vacancy in the office of emergency manager shall be filled in the same manner as the original appointment.

(e) The emergency manager's compensation and reimbursement for actual and necessary expenses shall be paid by the local government and shall be set forth in a contract approved by the state treasurer. The contract shall be posted on the department of treasury's website within 7 days after the contract is approved by the state treasurer.

(6) In addition to staff otherwise authorized by law, an emergency manager shall appoint additional staff and secure professional assistance as the emergency manager considers necessary to fulfill his or her appointment.

(7) The emergency manager shall make quarterly reports to the state treasurer with respect to the financial condition of the local

local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager.

(3) All of the following apply to an emergency manager:

(a) The emergency manager shall have a minimum of 5 years' experience and demonstrable expertise in business, financial, or local or state budgetary matters.

(b) The emergency manager may, but need not, be a resident of the local government.

(c) The emergency manager shall be an individual.

(d) Except as otherwise provided in this subdivision, the emergency manager shall serve at the pleasure of the governor. An emergency manager is subject to impeachment and conviction by the legislature as if he or she were a civil officer under section 7 of article XI of the state constitution of 1963. A vacancy in the office of emergency manager shall be filled in the same manner as the original appointment.

(e) The emergency manager's compensation shall be paid by this state and shall be set forth in a contract approved by the state treasurer. The contract shall be posted on the department of treasury's website within 7 days after the contract is approved by the state treasurer.

(f) In addition to the salary provided to an emergency manager in a contract

4

government in receivership, with a copy to the superintendent of public instruction if the local government is a school district.

(8) The emergency manager shall continue in the capacity of an emergency manager as follows:

    (a) Until removed by the governor or the legislature as provided in subsection (5)(d). If an emergency manager is removed pursuant to this subsection, the governor shall within 30 days of the removal appoint a new emergency manager.

    (b) Until the financial emergency is rectified.

(9) A local government shall be removed from receivership when the financial conditions are corrected in a sustainable fashion as determined by the state treasurer in accordance with this act.

(10) The governor may delegate his or her duties under this section to the state treasurer.

**Sec. 15a.** Notwithstanding section 3(1) of 1968 PA 317, MCL 15.323, an emergency manager appointed under this act or former 1988 PA 101 or former 1990 PA 72 is subject to all of the following:

    (a) 1968 PA 317, MCL 15.321 to 15.330, as a public servant.

    (b) 1973 PA 196, MCL 15.341 to 15.348, as a public officer.

    (c) 1968 PA 318, MCL 15.301 to 15.310, as if he or she were a state officer.

**Sec. 16.** An emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72, and serving on the effective date of this act, shall continue under this act to fulfill his or her powers and duties.

approved by the state treasurer under subdivision (e), this state may receive and distribute private funds to an emergency manager. As used in this subdivision, "private funds" means any money the state receives for the purpose of allocating additional salary to an emergency manager. Private funds distributed under this subdivision are subject to section 1 of 1901 PA 145, MCL 21.161, and section 17 of article IX of the state constitution of 1963.

(4) In addition to staff otherwise authorized by law, an emergency manager shall appoint additional staff and secure professional assistance as the emergency manager considers necessary to fulfill his or her appointment.

(5) The emergency manager shall submit quarterly reports to the state treasurer with respect to the financial condition of the local government in receivership, with a copy to the superintendent of public instruction the local government is a school district and a copy to each state senator and state representative who represents that local government. In addition, each quarterly report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer.

(6) The emergency manager shall continue in the capacity of an emergency manager as follows:

    (a) Until removed by the governor or the legislature as provided in subsection (3)(d). If an emergency manager is removed, the governor shall within 30 days of the removal appoint a new emergency manager.

    (b) Until the financial emergency is rectified.

    (c) If the emergency manager has served for at least 18 months after his or her appointment under this act, the emergency manager may, by resolution,

5

be removed by a 2/3 vote of the governing body of the local government. If the local government has a strong mayor, the resolution requires strong mayor approval before the emergency manager may be removed. Notwithstanding section 7(4), if the emergency manager is removed under this subsection and the local government has not previously breached a consent agreement under this act, the local government may within 10 days negotiate a consent agreement with the state treasurer. If a consent agreement is not agreed upon within 10 days, the local government shall proceed with the neutral evaluation process pursuant to section 25.

(7) A local government shall be removed from receivership when the financial conditions are corrected in a sustainable fashion as provided in this act. In addition, the local government may be removed from receivership if an emergency manager is removed under subsection (6)(c) and the governing body of the local government by 2/3 vote approves a resolution for the local government to be removed from receivership. If the local government has a strong mayor, the resolution requires strong mayor approval before the local government is removed from receivership. A local government that is removed from receivership while a financial emergency continues to exist as determined by the governor shall proceed under the neutral evaluation process pursuant to section 25.

(8) The governor may delegate his or her duties under this section to the state treasurer.

(9) Notwithstanding section 3(1) of 1968 PA 317, MCL 15.323, an emergency manager is subject to all of the following:

6

|  | (a) 1968 PA 317, MCL 15.321 to 15.330, as a public servant.<br>(b) 1973 PA 196, MCL 15.341 to 15.348, as a public officer.<br>(c) 1968 PA 318, MCL 15.301 to 15.310, as if he or she were a state officer.<br><br>(10) An emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72, and serving immediately prior to the effective date of this act, shall be considered an emergency manager under this act and shall continue under this act to fulfill his or her powers and duties. Notwithstanding any other provision of this act, the governor may appoint a person who was appointed as an emergency manager under former 2011 PA 4 or an emergency financial manager under former 1988 PA 101 or former 1990 PA 72 to serve as an emergency manager under this act.<br><br>(11) Notwithstanding section 7(4) and subject to the requirements of this section, if an emergency manager has served for less than 18 months after his or her appointment under this act, the governing body of the local government may pass a resolution petitioning the governor to remove the emergency manager as provided in this section and allow the local government to proceed under the neutral evaluation process as provided in section 25. If the local government has a strong mayor, the resolution requires strong mayor approval. If the governor accepts the resolution, notwithstanding section 7(4), the local government shall proceed under the neutral evaluation process as provided in section 25. |
|---|---|
| **Emergency Manager Orders:**<br><br>**Sec. 17.** (1) The emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the manager considers necessary to accomplish | **Emergency Manager Orders:**<br><br>**Sec. 10.** (1) An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to |

7

| | |
|---|---|
| the purposes of this act, including, but not limited to, orders for the timely and satisfactory implementation of a financial and operating plan developed pursuant to section 18, including an academic and educational plan for a school district, or to take actions, or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan. | accomplish the purposes of this act, including, but not limited to, orders for the timely and satisfactory implementation of a financial and operating plan, including an educational plan for a school district, or to take actions, or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan. |
| (2) If an order of the emergency manager under subsection (1) is not reasonably carried out and the failure to carry out an order is disrupting the emergency manager's ability to manage the local government, the emergency manager, in addition to other remedies provided in this act, may prohibit the local elected or appointed official or employee, agent, or contractor of the local government from access to the local government's office facilities, electronic mail, and internal information systems. | (2) If an order of the emergency manager under subsection (1) is not carried out and the failure to carry out an order is disrupting the emergency manager's ability to manage the local government, the emergency manager, in addition to other remedies provided in this act, may prohibit the local elected or appointed official or employee, agent, or contractor of the local government from access to the local government's office facilities, electronic mail, and internal information systems. |
| **Amendment of Financial and Operating Plan by Emergency Manager:** | **Amendment of Financial and Operating Plan by Emergency Manager:** |
| **Sec. 18.** (1) The emergency manager shall develop and may amend a written financial and operating plan for the local government. The plan shall have the objectives of assuring that the local government is able to provide necessary or cause to be provided governmental services essential to the public health, safety, and welfare and assuring the fiscal accountability of the local government. The financial and operating plan shall provide for all of the following: | **Sec. 11.** (1) An emergency manager shall develop and may amend a written financial and operating plan for the local government. The plan shall have the objectives of assuring that the local government is able to provide or cause to be provided governmental services essential to the public health, safety, and welfare and assuring the fiscal accountability of the local government. The financial and operating plan shall provide for all of the following: |

8

(a) Conducting all aspects of the operations of the local government within the resources available according to the emergency manager's revenue estimate.

(b) The payment in full of the scheduled debt service requirements on all bonds, notes, and municipal securities of the local government and all other uncontested legal obligations.

(c) The modification, rejection, termination, and renegotiation of contracts pursuant to section 19.

(d) The timely deposit of required payments to the pension fund for the local government or in which the local government participates.

(e) For school districts, an academic and educational plan.

(f) Any other actions considered necessary by the emergency manager in the emergency manager's discretion to achieve the objectives of the financial and operating plan, alleviate the financial emergency, and remove the local government from receivership.

(2) Within 45 days after the emergency manager's appointment, the emergency manager shall submit the financial and operating plan to the state treasurer, with a copy to the superintendent of public instruction if the local government is a school district, and to the chief administrative officer and governing body of the local government. The plan shall be regularly reexamined by the emergency manager and the state treasurer and may be modified from time to time by the emergency manager with notice to the state treasurer. If the emergency manager reduces his or her revenue estimates, the emergency manager shall modify the plan to conform to the revised revenue estimates.

(3) The financial and operating plan shall be in a form as provided by the state treasurer and

---

(a) Conducting all aspects of the operations of the local government within the resources available according to the emergency manager's revenue estimate.

(b) The payment in full of the scheduled debt service requirements on all bonds, notes, and municipal securities of the local government, contract obligations in anticipation of which bonds, notes, and municipal securities are issued, and all other uncontested legal obligations.

(c) The modification, rejection, termination, and renegotiation of contracts pursuant to section 12.

(d) The timely deposit of required payments to the pension fund for the local government or in which the local government participates.

(e) For school districts, an educational plan.

(f) Any other actions considered necessary by the emergency manager in the emergency manager's discretion to achieve the objectives of the financial and operating plan, alleviate the financial emergency, and remove the local government from receivership.

(2) Within 45 days after the emergency manager's appointment, the emergency manager shall submit the financial and operating plan, and an educational plan if the local government is a school district, to the state treasurer, with a copy to the superintendent of public instruction if the local government is a school district, and to the chief administrative officer and governing body of the local government. The plan shall be regularly reexamined by the emergency manager and the state treasurer and may be modified from time to time by the emergency manager with notice to the state treasurer. If the emergency manager reduces his or her revenue estimates, the emergency manager

9

shall contain that information for each year during which year the plan is in effect that the emergency manager, in consultation with the state financial authority, specifies. The financial and operating plan may serve as a deficit elimination plan otherwise required by law if so approved by the state financial authority.

(4) The emergency manager, within 30 days of submitting the financial and operating plan to the state financial authority, shall conduct a public informational meeting on the plan and any modifications to the plan. This subsection does not mean that the emergency manager must receive public approval before he or she implements the plan or any modification of the plan.

shall modify the plan to conform to the revised revenue estimates.

(3) The financial and operating plan shall be in a form as provided by the state treasurer and shall contain that information for each year during which year the plan is in effect that the emergency manager, in consultation with the state financial authority, specifies. The financial and operating plan may serve as a deficit elimination plan otherwise required by law if so approved by the state financial authority.

(4) The emergency manager, within 30 days of submitting the financial and operating plan to the state financial authority, shall conduct a public informational meeting on the plan and any modifications to the plan. This subsection does not mean that the emergency manager must receive public approval before he or she implements the plan or any modification of the plan.

(5) For a local government in receivership immediately prior to the effective date of this act, a financial and operating plan for that local government adopted under former 2011 PA 4 or a financial plan for that local government adopted under former 1990 PA 72 shall be effective and enforceable as a financial and operating plan for the local government under this act until modified or rescinded under this act.

| Additional Actions by Emergency Manager: | Additional Actions by Emergency Manager: |
|---|---|
| **Sec. 19.** (1) An emergency manager may take 1 or more of the following additional actions with respect to a local government which is in receivership, notwithstanding any charter provision to the contrary:<br><br>    (a) Analyze factors and circumstances contributing to the financial emergency of the local government and initiate | **Sec. 12.** (1) An emergency manager may take 1 or more of the following additional actions with respect to a local government that is in receivership, notwithstanding any charter provision to the contrary:<br><br>    (a) Analyze factors and circumstances contributing to the financial emergency of the local government and initiate |

10

steps to correct the condition.
(b) Amend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended.
(c) Receive and disburse on behalf of the local government all federal, state, and local funds earmarked for the local government. These funds may include, but are not limited to, funds for specific programs and the retirement of debt.
(d) Require and approve or disapprove, or amend or revise a plan for paying all outstanding obligations of the local government.
(e) Require and prescribe the form of special reports to be made by the finance officer of the local government to its governing body, the creditors of the local government, the emergency manager, or the public.
(f) Examine all records and books of account, and require under the procedures of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, or 1919 PA 71, MCL 21.41 to 21.55, or both, the attendance of witnesses and the production of books, papers, contracts, and other documents relevant to an analysis of the financial condition of the local government.
(g) Make, approve, or disapprove any appropriation, contract, expenditure, or loan, the creation of any new position, or the filling of any vacancy in a position by any appointing authority.
(h) Review payrolls or other claims against the local government before payment.
(i) Notwithstanding any minimum staffing level requirement established by charter or contract, establish and implement staffing levels for the local government.
(j) Reject, modify, or terminate 1 or more terms and conditions of an existing

steps to correct the condition.
(b) Amend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended.
(c) Receive and disburse on behalf of the local government all federal, state, and local funds earmarked for the local government. These funds may include, but are not limited to, funds for specific programs and the retirement of debt.
(d) Require and approve or disapprove, or amend or revise, a plan for paying all outstanding obligations of the local government.
(e) Require and prescribe the form of special reports to be made by the finance officer of the local government to its governing body, the creditors of the local government, the emergency manager, or the public.
(f) Examine all records and books of account, and require under the procedures of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, or 1919 PA 71, MCL 21.41 to 21.55, or both, the attendance of witnesses and the production of books, papers, contracts, and other documents relevant to an analysis of the financial condition of the local government
(g) Make, approve, or disapprove any appropriation, contract, expenditure, or loan, the creation of any new position, or the filling of any vacancy in a position by any appointing authority.
(h) Review payrolls or other claims against the local government before payment.
(i) Notwithstanding any minimum staffing level requirement established by charter or contract, establish and implement staffing levels for the local government.
(j) reject, modify, or terminate 1 or more terms and conditions of an existing

contract.

(k) After meeting and conferring with the appropriate bargaining representative and, if in the emergency manager's sole discretion and judgment, a prompt and satisfactory resolution is unlikely to be obtained, reject, modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement. The rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement under this subdivision is a legitimate exercise of the state's sovereign powers if the emergency manager and state treasurer determine that all of the following conditions are satisfied:

(i) The financial emergency in the local government has created a circumstance in which it is reasonable and necessary for the state to intercede to serve a significant and legitimate public purpose.

(ii) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is reasonable and necessary to deal with a broad, generalized economic problem.

(iii) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is directly related to and designed to address the financial emergency for the benefit of the public as a whole.

(iv) Any plan involving the rejection, modification, or

---

contract.

(k) Subject to section 19, after meeting and conferring with the appropriate bargaining representative and, if in the emergency manager's sole discretion and judgment, a prompt and satisfactory resolution is unlikely to be obtained, reject, modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement. The rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement under this subdivision is a legitimate exercise of the state's sovereign powers if the emergency manager and state treasurer determine that all of the following conditions are satisfied:

(i) The financial emergency in the local government has created a circumstance in which it is reasonable and necessary for the state to intercede to serve a significant and legitimate public purpose.

(ii) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is reasonable and necessary to deal with a broad, generalized economic problem.

(iii) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is directly related to and designed to address the financial emergency for the benefit of the public as a whole.

(iv) Any plan involving the rejection, modification, or

termination of 1 or more terms and conditions of an existing collective bargaining agreement is temporary and does not target specific classes of employees.

(l) Act as sole agent of the local government in collective bargaining with employees or representatives and approve any contract or agreement.

(m) If a municipal government's pension fund is not actuarially funded at a level of 80% or more, according to the most recent governmental accounting standards board's applicable standards, at the time the most recent comprehensive annual financial report for the municipal government or its pension fund was due, the emergency manager may remove 1 or more of the serving trustees of the local pension board or, if the state treasurer appoints the emergency manager as the sole trustee of the local pension board, replace all the serving trustees of the local pension board. For the purpose of determining the pension fund level under this subdivision, the valuation shall exclude the net value of pension bonds or evidence of indebtedness. The annual actuarial valuation for the municipal government's pension fund shall use the actuarial accrued liabilities and the actuarial value of assets. If a pension fund uses the aggregate actuarial cost method or a method involving a frozen accrued liability, the retirement system actuary shall use the entry age normal actuarial cost method. If the emergency manager serves as sole trustee of the local pension board, all of the following apply:

  (i) The emergency manager shall assume and exercise the authority and fiduciary responsibilities of the local pension board, including to the

extent applicable, setting and approval of all actuarial assumptions for pension obligations of a municipal government to the local pension fund.

(ii) The emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, MCL 38.1132 to 38.1140m, and section 24 of article IX of the state constitution of 1963, and any actions taken shall be consistent with the pension fund's qualified plan status under the federal internal revenue code.

(iii) The emergency manager shall not make changes to a local pension fund without identifying the changes and the costs and benefits associated with the changes and receiving the state treasurer's approval for the changes. If a change includes the transfer of funds from 1 pension fund to another pension fund, the valuation of the pension fund receiving the transfer must be actuarially funded at a level of 80% or more, according to the most recent governmental accounting standards board's applicable standards, at the time the most recent comprehensive annual financial report for the municipal government was due.

(iv) The emergency manager's assumption and exercise of the authority and fiduciary responsibilities of the local pension board shall end not later than the termination of the receivership of the municipal

14

| | |
|---|---|
| government as provided in this act.<br>(n) Consolidate or eliminate departments of the local government or transfer functions from department to another and appoint, supervise, and, at his or her discretion, remove administrators, including heads of departments other than elected officials.<br>(o) Employ or contract for, at the expense of the local government and with the approval of the state financial authority, auditors and other technical personnel considered necessary to implement this act.<br>(p) Retain 1 or more persons or firms, which may be an individual or firm selected from a list approved by the state treasurer, to perform the duties of a local inspector or a local auditor as described in this subdivision. The duties of a local inspector are to assure integrity, economy, efficiency, and effectiveness in the operations of the local government by conducting meaningful and accurate investigations and forensic audits, and to detect and deter waste, fraud, and abuse. At least annually, a report of the local inspector shall be submitted to the emergency manager, the state treasurer, and the superintendent of public instruction if the local government is a school district. The duties of a local auditor are to assure that internal controls over local government operations are designed and operating effectively to mitigate risks that hamper the achievement of the emergency manager's financial plan, assure that local government operations are effective and efficient, assure that financial information is accurate, reliable, and timely, comply with policies, regulations, and applicable laws, and assure assets are properly | government as provided in this act.<br>(n) Consolidate or eliminate departments of the local government or transfer functions from 1 department to another and appoint, supervise, and, at his or her discretion, remove administrators, including heads of departments other than elected officials.<br>(o) Employ or contract for, at the expense of the local government and with the approval of the state financial authority, auditors and other technical personnel considered necessary to implement this act.<br>(p) Retain 1 or more persons or firms, which may be an individual or firm selected from a list approved by the state treasurer, to perform the duties of a local inspector or a local auditor as described in this subdivision. The duties of a local inspector are to assure integrity, economy, efficiency, and effectiveness in the operations of the local government by conducting meaningful and accurate investigations and forensic audits, and to detect and deter waste, fraud, and abuse. At least annually, a report of the local inspector shall be submitted to the emergency manager, the state treasurer, the superintendent of public instruction if the local government is a school district, and each state senator and state representative who represents that local government. The annual report of the local inspector shall be posted on the local government's website within 7 days after the report is submitted. The duties of a local auditor are to assure that internal controls over local government operations are designed and operating effectively to mitigate risks that hamper the achievement of the emergency manager's financial plan, assure that local government |

15

managed. At least annually, a report of the local auditor shall be submitted to the emergency manager, the state treasurer, and the superintendent of public instruction if the local government is a school district.

(q) An emergency manager may initiate court proceedings in Ingham county circuit court in the name of the local government to enforce compliance with any of his or her orders or any constitutional or legislative mandates, or to restrain violations of any constitutional or legislative power of his or her orders.

(r) If provided in the financial and operating plan, or otherwise with the prior written approval of the governor or his or her designee, sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government, provided the use or transfer of assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of residents of the local government or unconstitutionally impair a bond, note, security, or uncontested legal obligation of the local government.

(s) Apply for a loan from the state on behalf of the local government, subject to the conditions of the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942, in a sufficient amount to pay the expenses of the emergency manager and for other lawful purposes.

(t) Order, as necessary, 1 or more millage elections for the local government consistent with the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992, sections 6 and 25 through 34 of article IX of the state constitution of 1963, and any other

operations are effective and efficient, assure that financial information is accurate, reliable, and timely, comply with policies, regulations, and applicable laws, and assure assets are properly managed. At least annually, a report of the local auditor shall be submitted to the emergency manager, the state treasurer, the superintendent of public instruction if the local government is a school district, and each state senator and state representative who represents that local government. The annual report of the local auditor shall be posted on the local government's website within 7 days after the report is submitted.

(q) An emergency manager may initiate court proceedings in the Michigan court of claims or in the circuit court of the county in which the local government is located in the name of the local government to enforce compliance with any of his or her orders or any constitutional or legislative mandates, or to restrain violations of any constitutional or legislative power or his or her orders.

(r) Subject to section 19, if provided in the financial and operating plan, or otherwise with the prior written approval of the governor or his or her designee, sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government, provided the use or transfer of assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of residents of the local government or unconstitutionally impair a bond, note, security, or uncontested legal obligation of the local government.

(s) Apply for a loan from the state on behalf of the local government, subject

16

applicable state law. A millage election ordered for a local government pursuant to this subdivision shall only be held at the general November election.

(u) Authorize the borrowing of money by the local government as provided by law.

(v) Approve or disapprove of the issuance of obligations of the local government on behalf of the local government under this subdivision. An election to approve or disapprove of the issuance of obligations of the local government pursuant to this subdivision shall only be held at the general November election.

(w) Enter into agreements with creditors or other persons or entities for the payment of existing debts, including the settlement of claims by the creditors.

(x) Enter into agreements with creditors or other persons or entities to restructure debt on terms, at rates of interest, and with security as shall be agreed among the parties, subject to approval by the state treasurer.

(y) Enter into agreements with other local governments, public bodies, or entities for the provision of services, the joint exercise of powers, or the transfer of functions and responsibilities.

(z) For municipal governments, enter into agreements with other units of municipal government to transfer property of the municipal government under 1984 PA 425, MCL 124.21 to 124.30, or as otherwise provided by law, subject to approval by the state treasurer.

(aa) Enter into agreements with 1 or more other local governments or public bodies for the consolidation of services.

(bb) For a city, village, or township, the emergency manager may recommend to

to the conditions of the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942.

(t) Order, as necessary, 1 or more millage elections for the local government consistent with the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992, sections 6 and 25 through 34 of article IX of the state constitution of 1963, and any other applicable state law.

(u) Subject to section 19, authorize the borrowing of money by the local government as provided by law.

(v) Approve or disapprove of the issuance of obligations of the local government on behalf of the local government under this subdivision. An election to approve or disapprove of the issuance of obligations of the local government pursuant to this subdivision shall only be held at the general November election.

(w) Enter into agreements with creditors or other persons or entities for the payment of existing debts, including the settlement of claims by the creditors.

(x) Enter into agreements with creditors or other persons or entities to restructure debt on terms, at rates of interest, and with security as shall be agreed among the parties, subject to approval by the state treasurer.

(y) Enter into agreements with other local governments, public bodies, or entities for the provision of services, the joint exercise of powers, or the transfer of functions and responsibilities.

(z) For municipal governments, enter into agreements with other units of municipal government to transfer property of the municipal government under 1984 PA 425, MCL 124.21 to 124.30, or as otherwise provided by

the state boundary commission that the municipal government consolidate with 1 or more other municipal governments, if the emergency manager determines that consolidation would materially alleviate the financial emergency of the municipal government and would not materially and adversely affect the financial situation of the government or governments with which the municipal government in receivership is consolidated. Consolidation under this subdivision shall proceed as provided by law.

(cc) For municipal governments, with approval of the governor, disincorporate or dissolve the municipal government and assign its assets, debts, and liabilities as provided by law.

(dd) Exercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government as provided in the following acts:

    (i) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38.

    (ii) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20.

    (iii) The charter township act, 1947 PA 359, MCL 42.1 to 42.34.

    (iv) 1851 PA 156, MCL 46.1 to 46.32.

    (v) 1966 PA 293, MCL 45.501 to 45.521.

    (vi) The general law village act, 1895 PA 3, MCL 61.1 to 74.25.

    (vii) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28.

    (viii) The revised school code, 1976 PA 451, MCL 380.1 to 380.1852.

law, subject to approval by the state treasurer.

(aa) Enter into agreements with 1 or more other local governments or public bodies for the consolidation of services.

(bb) For a city, village, or township, the emergency manager may recommend to the state boundary commission that the municipal government consolidate with 1 or more other municipal governments, if the emergency manager determines that consolidation would materially alleviate the financial emergency of the municipal government and would not materially and adversely affect the financial situation of the government or governments with which the municipal government in receivership is consolidated. Consolidation under this subdivision shall proceed as provided by law.

(cc) For municipal governments, with approval of the governor, disincorporate or dissolve the municipal government and assign its assets, debts, and liabilities as provided by law. The disincorporation or dissolution of the local government is subject to a vote of the electors of that local government if required by law.

(dd) Exercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government as provided in the following acts:

    (i) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38.

    (ii) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20.

    (iii) The charter township act, 1947 PA 359, MCL 42.1 to 42.34.

(ix) 1979 PA 94, MCL 388.1601 to 388.1772.

(ee) Take any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the emergency manager shall be superior to and supersede the power of any of the foregoing officers or entities.

(ff) Remove, replace, appoint, or confirm the appointments to any office, board, commission, authority, or other entity which is within or is a component unit of the local government.

(2) Except as otherwise provided in this act, during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the emergency manager.

(3) Except as otherwise provided in this subsection, any contract involving a cumulative value of $50,000.00 or more is subject to competitive bidding by an emergency manager. However, if a potential contract involves a cumulative value of $50,000.00 or more, the emergency manager may submit the potential contract to the state treasurer for review and the state treasurer may authorize that the potential contract is not subject to competitive bidding.

(4) An emergency manager appointed for a city or village shall not sell or transfer a public utility furnishing light, heat, or power without the approval of a majority of the electors of the city or village voting thereon, or a greater number if the city or village charter provides, as required by section 25 of article VII of the

(iv) 1851 PA 156, MCL 46.1 to 46.32.

(v) 1966 PA 293, MCL 45.501 to 45.521.

(vi) The general law village act, 1895 PA 3, MCL 61.1 to 74.25.

(vii) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28.

(viii) The revised school code, 1976 PA 451, MCL 380.1 to 380.1852.

(ix) The state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1896.

(ee) Take any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the emergency manager shall be superior to and supersede the power of any of the foregoing officers or entities.

(ff) Remove, replace, appoint, or confirm the appointments to any office, board, commission, authority, or other entity which is within or is a component unit of the local government.

(2) Except as otherwise provided in this act, during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the emergency manager.

(3) Except as otherwise provided in this subsection, any contract involving a cumulative value of $50,000.00 or more is subject to competitive bidding by an emergency manager. However, if a potential contract involves a cumulative value of $50,000.00 or more, the emergency manager may submit the potential contract to the state

19

state constitution of 1963. In addition, an emergency manager appointed for a city or village shall not utilize the assets of a public utility furnishing heat, light, or power, the finances of which are separately maintained and accounted for by the city or village, to satisfy the general obligations of the city or village.

treasurer for review and the state treasurer may authorize that the potential contract is not subject to competitive bidding.

(4) An emergency manager appointed for a city or village shall not sell or transfer a public utility furnishing light, heat, or power without the approval of a majority of the electors of the city or village voting thereon, or a greater number if the city or village charter provides, as required by section 25 of article VII of the state constitution of 1963. In addition, an emergency manager appointed for a city or village shall not utilize the assets of a public utility furnishing heat, light, or power, the finances of which are separately maintained and accounted for by the city or village, to satisfy the general obligations of the city or village.

## Chapter 9 Bankruptcy Filing

**Sec. 23.** (1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under title 11 of the United States Code, 11 USC 101 to 1532. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision, with a copy to the superintendent of public instruction if the local government is a school district. Upon receipt of the written approval, the emergency manager is authorized to proceed under title 11 of the United States Code, 11 USC 101 to 1532. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the

## Chapter 9 Bankruptcy Filing

**Sec. 18.** (1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision, with a copy to the superintendent of public instruction if the local government is a school district. The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and

20

emergency manager to act exclusively on the local government's behalf in any such case under title 11 of the United States Code, 11 USC 101 to 1532.

(2) The recommendation to the governor and the state treasurer under subsection (1) shall include 1 of the following:

> (a) A determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.

> (b) A determination by the emergency manager that a plan, in effect for at least 180 days, cannot be implemented as written or as it might be amended in a manner that can satisfactorily rectify the financial emergency in a timely manner.

(3) The emergency manager shall provide a copy of the recommendation as provided under subsection (1) to the superintendent of public instruction if the local government is a school district.

empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

(2) The recommendation to the governor and the state treasurer under subsection (1) shall include 1 of the following:

> (a) A determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.

> (b) A determination by the emergency manager that a plan, in effect for at least 180 days, cannot be implemented as written or as it might be amended in a manner that can satisfactorily rectify the financial emergency in a timely manner.

(3) The emergency manager shall provide a copy of the recommendation as provided under subsection (1) to the superintendent of public instruction if the local government is a school district.

# EXHIBIT C

*In Re: City of Detroit, Debtor*

---

*Treasurer Andrew Dillon*
*October 10, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 101013AD.TXT
Min-U-Script® with Word Index

**Page 33**

```
 1      those concerns?
 2  A.  That's how we've set it up.
 3  Q.  And are you saying that in the case of Detroit, city
 4      government did not fulfill those needs?
 5  A.  I think we've found there are circumstances where
 6      local units have been unable to provide essential
 7      services or gotten themselves too far into debt that
 8      it becomes very difficult to navigate out of.
 9  Q.  What was your understanding of the repeal of PA 4?
10      How did that operate practically?  Did that mean,
11      based on your understanding, that there was no
12      emergency manager law as of the date of that repeal?
13  A.  My memory is the Attorney General told us that upon
14      the repeal of PA 4, PA 72 was the law that we should
15      follow.
16  Q.  And but didn't -- wasn't that opinion struck down by
17      the Supreme Court of the State of Michigan?
18  A.  I don't recall that.
19  Q.  Okay.  Was that opinion challenged in court?
20  A.  It may have been.  I don't recall.
21  Q.  And you don't know what the result of that legal
22      challenge was?
23  A.  I don't ever remember that PA 72 was not a law that
24      we at Treasury were supposed to rely upon during
25      these windows where PA 4 was repealed and before
```

**Page 34**

```
 1      PA 436 took effect.
 2  Q.  All right.  So let's turn to PA 436 real quick.
 3          Why was PA 436 implemented if PA 72 was in
 4      effect?
 5  A.  Because the same reason we put PA 4 in place.  We
 6      thought PA 72 could be improved upon.  So after the
 7      election there's a few meetings where we really did
 8      gather what were the criticisms of PA 4 and looked
 9      to see if we could improve PA 4 to make it address
10      those concerns.
11          And then as we had worked with PA 4 for a
12      period of time, we identified some areas that we
13      would want to seek improvement, and I'll give you
14      one example.  Often times we would want to give the
15      reigns, the power back to the local electeds, and in
16      order to do that under Public Act 4 you'd have to
17      end the emergency.  And we were uncomfortable about
18      that because we were prepared to give -- return the
19      power before we were a hundred percent certain that
20      the financial emergency was over.
21          So if you see in 436 what we did was we put
22      in place something called a Transition Advisory
23      Board, and that allows us to transfer power back to
24      the Mayor and the City Councils without having to
25      terminate the emergency status, so it allows us to
```

**Page 35**

```
 1      get out sooner.  That would be something we learned
 2      during, you know, using or relying on Public Act 4.
 3          We also looked at, you know, various
 4      criticisms and we tried to put more local
 5      involvement into Public Act 436.  So, for example,
 6      you'll see if the locals don't like a decision, a
 7      material decision being made by a manager, they're
 8      given a chance to come up with a better idea.  And
 9      there's various ingredients like that that we added
10      to address some of the criticisms of PA 4.
11  Q.  So in enacting PA 436 after the repeal of PA 4, it
12      was not your view that the Legislature and the
13      Governor were going against the will of the voters?
14  A.  I think we tried to accommodate the criticisms we
15      heard during the campaign.
16  Q.  Well, the voters didn't -- they didn't like the EM
17      law.  They thought it was a dictatorship, they
18      thought it was undemocratic.
19          How specifically did 436 address the
20      concern of, you know, the EM law being a
21      dictatorship?
22  A.  Well, for example, one of the changes were, you
23      know, it wasn't just right to emergency.  We had a
24      path for a consent agreement, we had a path for
25      emergency, we had a path for a restructuring, and
```

**Page 36**

```
 1      then the fourth option was an actual Chapter 9 in
 2      case someone was really out of cash.
 3          So we tried to create options for the local
 4      units and we tried to give them a chance to come up
 5      with better ideas if they didn't like the plans of
 6      the manager.  From the meetings I sat in, I think
 7      there was a sincere effort to address that.  And,
 8      you know, my memory was that the vote on PA 4 was
 9      not a landslide.  It was actually -- there was not
10      anyone advocating for the protection of PA 4, and
11      the vote was pretty close.
12          If -- it wasn't one of six ballot measures
13      and the only one -- I think it was the only one that
14      you wanted a vote the other way.  I forget whether
15      it was yes or no kept the law, but it was the only
16      one where I think you had to vote yes to keep it and
17      all the other ones, you know, required a no vote.
18          So it was a pretty close vote without one
19      advocate out there saying why this law makes sense.
20      And in my experience, I don't know that a lot of
21      people spent a lot of time really reading through PA
22      4 and why it was necessary.
23  Q.  Did any of the changes between PA 4 and PA 436 deal
24      specifically with the ability of the emergency
25      manager to file bankruptcy?
```

**MORETTI GROUP  800-536-0804**
**Court Reporting and Videoconferencing**

13-53846-swr    Doc 1231-3    Filed 10/17/13    Entered 10/17/13 21:52:20    Page 3 of 3 1048

13-53846-tjt    Doc 2334-30    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 36 of
36