on the present case."[12] In *Mahanna v. Bynum*, 465 B.R. 436 (W.D. Tex. 2011), the court held that *Stern* does not prohibit the bankruptcy court from dismissing the debtors' chapter 11 case. The court concluded, "[T]his appeal is entirely frivolous, and constitutes an unjustifiable waste of judicial resources[.]" *Id.* at 442. In *In re Thalmann*, 469 B.R. 677, 680 (Bankr. S.D. Tex. 2012), the court held that *Stern* does not prohibit a bankruptcy court from determining a motion to dismiss a case on the grounds of bad faith.[13] This line of cases strongly suggests that *Stern* likewise does not preclude a bankruptcy court from determining eligibility.

### E. The Objectors Overstate the Scope of *Stern*.

Implicitly recognizing how far its objection to this Court's authority stretches *Stern*, the objectors argue that two aspects of their objection alter the analysis of *Stern* and its application here. The first is that their objections raise important issues under both the United States Constitution and the Michigan Constitution. The second is that strong federalism considerations warrant resolution of its objection by an Article III court. Neither consideration, however, is sufficient to justify the expansion of *Stern* that the objectors argue.

### 1. *Stern* Does Not Preclude This Court from Determining Constitutional Issues.

First, since *Stern* was decided, non-Article III courts have considered constitutional issues, always without objection.

---

[12] *See also In re Gow Ming Chao*, 2011 WL 5855276 (Bankr. S.D. Tex. Nov. 21, 2011).

[13] *See also In re McMahan*, 2012 WL 5267017 (Bankr. S.D. Tex. Oct. 25, 2012); *In re Watts*, 2012 WL 3400820 (Bankr. S.D. Tex. Aug. 9, 2012).

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 51 of 150
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 1 of 49

Both bankruptcy courts and bankruptcy appellate panels have done so.[14] More specifically, and perhaps more on point, in two recent chapter 9 cases, bankruptcy courts addressed constitutional issues without objection. *Association of Retired Employees v. City of Stockton, Cal. (In re City of Stockton, Cal.)*, 478 B.R. 8 (Bankr. E.D. Cal. 2012) (holding that retirees' contracts could be impaired in the chapter 9 case without offending the constitution); *In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (upholding the constitutionality of a Pennsylvania statute barring financially distressed third class cities from filing bankruptcy).

In addition, the Tax Court, a non-Article III court, has also examined constitutional issues, without objection.[15] Likewise, the Court of Federal Claims, also a non-Article III court,

---

[14] *See, e.g., Williams v. Westby (In re Westby)*, 486 B.R. 509 (10th Cir. BAP 2013) (upholding the constitutionality of the Kansas bankruptcy-only state law exemptions); *Res. Funding, Inc. v. Pacific Continental Bank (In re Washington Coast I, L.L.C.)*, 485 B.R. 393 (9th Cir. BAP 2012) (upholding the constitutionality of the final order entered by the bankruptcy court); *Richardson v. Schafer (In re Schafer)*, 455 B.R. 590 (6th Cir. BAP 2011), *rev'd on other grounds*, 689 F.3d 601 (6th Cir. 2012) (addressing the constitutionality of the Michigan bankruptcy-only state law exemptions); *Old Cutters, Inc. v. City of Hailey (In re Old Cutters, Inc.)*, 488 B.R. 130 (Bankr. D. Idaho 2012) (invalidating a city's annexation fee and community housing requirements); *In re Washington Mut., Inc.*, 485 B.R. 510 (Bankr. D. Del. 2012) (holding Oregon's corporate excise tax unconstitutional under the Commerce Clause); *In re McFarland*, 481 B.R. 242 (Bankr. S.D. Ga. 2012) (upholding Georgia's bankruptcy-specific exemption scheme); *In re Fowler*, 493 B.R. 148 (Bankr. E.D. Cal. 2012) (upholding the constitutionality of California's statute fixing the interest rate on tax claims); *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (upholding the constitutionality of 11 U.S.C. § 707(b)); *Zazzali v. Swenson (In re DBSI, Inc.)*, 463 B.R. 709, 717 (Bankr. D. Del. 2012) (upholding the constitutionality of 11 U.S.C. § 106(a)); *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R. 683 (Bankr. N.D. Ga. 2012) (upholding the constitutionality of 11 U.S.C. § 706(a)); *South Bay Expressway, L.P. v. County of San Diego (In re South Bay Expressway, L.P.)*, 455 B.R. 732 (Bankr. S.D. Cal. 2011) (holding unconstitutional California's public property tax exemption for privately-owned leases of public transportation demonstration facilities).

[15] *See, e.g., Field v. C.I.R.*, 2013 WL 1688028 (Tax Ct. 2013) (holding that the tax classification on the basis of marital status that was imposed by requirement that taxpayer file joint income-tax return in order to be eligible for tax credit for adoption expenses did not violate Equal Protection clause); *Begay v. C.I.R.*, 2013 WL 173362 (Tax Ct. 2013) (holding that the relationship classification for child tax credit did not violate Free Exercise Clause); *Byers v.*

*Footnote continued . . .*

has considered constitutional claims, without objection. This was done perhaps most famously in *Beer v. United States*, 111 Fed. Cl. 592 (Fed. Cl. 2013), which is a suit by Article III judges under the Compensation Clause of the United States Constitution.

*Stern* does not change this status quo, and nothing about the constitutional dimension of the objectors' eligibility objections warrants the expansion of *Stern* that they assert. As *Stern* itself reaffirmed, "We do not think the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute[.]" 131 S. Ct. at 2620. Expanding *Stern* to the point where it would prohibit bankruptcy courts from considering issues of state or federal constitutional law would certainly significantly change the division of labor between the bankruptcy courts and the district courts.[16]

---

*C.I.R.*, 2012 WL 265883 (Tax Ct. 2012) (rejecting the taxpayer's challenge to the authority of an IRS office under the Appointments Clause).

[16] Only one case suggests otherwise. *Picard v. Flinn Invs., LLC*, 463 B.R. 280 (S.D.N.Y. 2011). That case did state in dicta in a footnote, "If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, *a fortiori*, litigants' interest in having the Article III courts interpret the Constitution." *Id.* at 288 n.3.

This single sentence cannot be given much weight. First, it is only dicta. Second, it is against the manifest weight of the case authorities. Third, the quote assumes, without analysis, that the litigants do have an interest in having Article III courts interpret the Constitution, and thus bootstraps its own conclusion. Fourth, nothing in the *Flinn Investments* case states or even suggests that *Stern* itself prohibits a bankruptcy court from ruling on a constitutional issue where it otherwise has the authority to rule on the claim before it. Finally, the district court that issued *Flinn Investments* has now entered an amended standing order of reference in bankruptcy cases to provide that its bankruptcy court should first consider objections to its authority that parties raise under *Stern v. Marshall*. Apparently, that district court's position now is that *Stern* does not preclude the bankruptcy court from determining constitutional issues, including the constitutional issue of its own authority. The order is available at http://www.nysd.uscourts.gov/rules/StandingOrder_OrderReference_12mc32.pdf.

Two other cases are cited in support of the position that only an Article III court can determine a constitutional issue: *TTOD Liquidation, Inc. v. Lim* (*In re Dott Acquisition, LLC*), 2012 WL 3257882 (E.D. Mich. July 25, 2012), and *Picard v. Schneiderman* (*In re Madoff Secs.*), 492 B.R. 133 (S.D.N.Y. 2013). Both are irrelevant to the issue. *Dott Acquisition* did discuss

*Footnote continued . . .*

46

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 53 of 1501134
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 3 of 49

## 2. Federalism Issues Are Not
## Relevant to a *Stern* Analysis.

The objectors' federalism argument is even more perplexing and troubling. Certainly the objectors are correct that a ruling on whether the City was properly authorized to file this bankruptcy case, as required for eligibility under 11 U.S.C. § 109(c)(2), will require the interpretation of state law, including the Michigan Constitution.

However, ruling on state law issues is required in addressing many issues in bankruptcy cases. As the Supreme Court has observed, "[B]ankruptcy courts [] consult state law in determining the validity of most claims." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 444, 127 S. Ct. 1199, 1201 (2007). Concisely summarizing the reality of the bankruptcy process and the impact of *Stern* on it, the court in *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011), concluded:

> [*Stern*] certainly did not hold that a Bankruptcy Judge cannot ever decide a state law issue. Indeed, a large portion of the work of a Bankruptcy Judge involves actions in which non-bankruptcy issues must be decided and that 'stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process,' [131 S. Ct.] at 2618, for example, claims disputes, actions to bar dischargeability, motions for stay relief, and others. Those issues are likely within the 'public rights' exception as defined in *Stern*.

Other cases also illustrate the point.[17]

---

*Stern* but only in the unremarkable context of withdrawing the reference on a fraudulent transfer action. *Schneiderman* did not address a *Stern* issue at all, or even cite the case.

[17] *See, e.g., Picard v. Estate of Madoff*, 464 B.R. 578, 586 (S.D.N.Y. 2011) (quoting *In re Salander O'Reilly Galleries*, 453 B.R. 106, 118 (Bankr. S.D.N.Y. 2011)) ("It is clear" from *Stern v. Marshall* and other Supreme Court precedent that "the Bankruptcy Court is empowered to apply state law when doing so would finally resolve a claim."); *Anderson v. Bleckner (In re Batt)*, 2012 WL 4324930, at *2 (W.D. Ky. Sept. 20, 2012) ("*Stern* does not bar the exercise of the Bankruptcy Court's jurisdiction in any and all circumstances where a party to an adversary

*Footnote continued . . .*

The distinction is clear. While in some narrow circumstances *Stern* prohibits a non-Article III court from adjudicating a state law claim for relief, a non-Article III court may consider and apply state law as necessary to resolve claims over which it does have authority under *Stern*. The mere fact that state law must be applied does not by itself mean that *Stern* prohibits a non-Article III court from determining the matter.

Moreover, nothing about a chapter 9 case suggests a different result. In *City of Cent. Falls, R.I.*, 468 B.R. at 52, the court stated, "Nor did [*Stern*] address concerns of federalism; although the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code. The operative dichotomy was not federal versus state, but bankruptcy versus nonbankruptcy."

The troubling aspect of the objectors' federalism argument is that it does not attempt to define, even vaguely, what interest of federalism is at stake here.

In *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012), the Supreme Court stated, "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Accordingly, federalism is about the federal and state governments respecting each other's sovereignty. It has nothing to do with the requirements of Article III or, to use the phraseology of *Stern*, with the "division of labor" between the district courts and the bankruptcy courts.[18] 131 S. Ct. at 2620. *See also City of Cent. Falls, R.I.*, 468 B.R. at 52, quoted above.

---

proceeding has not filed a proof of claim, or where the issue in an adversary proceeding is a matter of state law.").

[18] Genuine federalism concerns are fully respected in bankruptcy through the process of permissive abstention under 28 U.S.C. § 1334(c)(1).

## F. Conclusion Regarding the *Stern* Issue

For these reasons, the Court concludes that it does have the authority to determine the constitutionality of chapter 9 under the United States Constitution and the constitutionality of P.A. 436 under the Michigan Constitution.

## VIII. Chapter 9 Does Not Violate
## the United States Constitution.

The objecting parties argue that chapter 9 of the bankruptcy code violates several provisions of the United States Constitution, both on its face and as applied in this case. The Court will first address the arguments that chapter 9 is facially unconstitutional under the Bankruptcy Clause of Article I, Section 8, and the Contracts Clause of Article I, Section 10 of the United States Constitution. The Court will then address the argument that chapter 9, on its face and as applied, violates the Tenth Amendment to the United States Constitution and the principles of federalism embodied therein.

### A. Chapter 9 Does Not Violate the Uniformity Requirement
### of the Bankruptcy Clause of the United States Constitution.

Article I, Section 8 of the United States Constitution provides: "The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."

The objecting parties, principally AFSCME, assert chapter 9 violates the uniformity requirement of the United States Constitution because chapter 9 "ced[es] to each state the ability to define its own qualifications for a municipality to declare bankruptcy, chapter 9 permits the promulgation of non-uniform bankruptcies within states." AFSCME's Corrected Objection to Eligibility, ¶ 58 at 25 (citing M.C.L. § 141.1558). (Dkt. #505) AFSCME argues that this is particularly so in Michigan, where P.A. 436 allows the governor to exercise discretion when

49

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 56 of 1501137
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 6 of 49

determining whether to authorize a municipality to seek chapter 9 relief, and also allows the governor to "attach whichever contingencies he wishes." *Id.*

### 1. The Applicable Law

The Supreme Court has addressed the uniformity requirement in several cases. In *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 22 S. Ct. 857 (1902), the Court held that the incorporation into the bankruptcy law of state laws relating to exemptions did not violate the uniformity requirement of the United States Constitution. The Court stated, "The general operation of the law is uniform although it may result in certain particulars differently in different states." *Id.* at 190.

In *Stellwagen v. Clum*, 245 U.S. 605, 38 S. Ct. 215 (1918), the Court upheld the Bankruptcy Act's incorporation of varying state fraudulent conveyance statutes, despite the fact that the laws "may lead to different results in different states." *Id.* at 613.

In *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 159, 95 S. Ct. 335 (1974), the Court held, "The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems."

The Supreme Court has struck down a bankruptcy statute as non-uniform only once. In *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 102 S. Ct. 1169 (1982), the Court struck down a private bankruptcy law that affected only the employees of a single company. The Court concluded, "The uniformity requirement, however, prohibits Congress from enacting a bankruptcy law that, by definition, applies only to one regional debtor. To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." *Id.* at 473.

50

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 57 of 1501138
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 7 of 49

More recently, the Sixth Circuit has addressed the uniformity requirement in two cases. In *Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008), the court concluded, "Over the last century, the Supreme Court has wrestled with the notion of geographic uniformity, ultimately concluding that it allows different effects in various states due to dissimilarities in state law, so long as the federal law applies uniformly among classes of debtors." Summarizing the Supreme Court's decisions in *Moyses*, *Stellwagen*, and *Blanchette*, the court stated, "Congress does not exceed its constitutional powers in enacting a bankruptcy law that permits variations based on state law or to solve geographically isolated problems." *Id*. at 353.

In *Richardson v. Schafer (In re Schafer)*, 689 F.3d 601 (6th Cir. 2012), the court stated, "the Bankruptcy Clause shall act as 'no limitation upon congress as to the classification of persons who are to be affected by such laws, provided only the laws shall have uniform operation throughout the United States.'" *Id*. at 611 (quoting *Leidigh Carriage Co. v. Stengel*, 95 F. 637, 646 (6th Cir. 1899)). It added, "*Schultz* clarified that it is not the *outcome* that determines the uniformity, but the uniform *process* by which creditors and debtors in a certain place are treated." *Id*.

### 2. Discussion

Chapter 9 does exactly what these cases require to meet the uniformity requirement of the Bankruptcy Clause of the United States Constitution. The "defined class of debtors" to which chapter 9 applies is the class of entities that meet the eligibility requirements of 11 U.S.C. § 109(c). One such qualification is that the entity is "specifically authorized . . . to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter[.]" § 109(c)(2). As *Moyses* and *Stellwagen* specifically held, it is of no consequence in the uniformity analysis that this

51

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 58 of 1501139
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 8 of 49

requirement of state authorization to file a chapter 9 case may lead to different results in different states.

It appears that AFSCME objects to the lack of uniformity that may arise from the differing circumstances of municipalities that the governor might authorize to file a chapter 9 petition. That it not the test. Rather, the test is whether chapter 9 applies uniformly to all chapter 9 debtors. It does.

Accordingly, the Court concludes that chapter 9 satisfies the uniformity requirement of the Bankruptcy Clause of the United States Constitution.

### B. Chapter 9 Does Not Violate the Contracts Clause of the United States Constitution.

The Contracts Clause of the United States Constitution, which is Article I, Section 10, provides, "No State shall … pass any … Law impairing the Obligation of Contracts, …" AFSCME argues that chapter 9 violates the Contracts Clause. This argument is frivolous. Chapter 9 is a federal law. Article I, Section 10 does not prohibit Congress from enacting a "Law impairing the Obligation of Contracts." *Id.*

As the court stated in *In re Sanitary & Imp. Dist., No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989):

> The Court further concludes that the Bankruptcy Code adopted pursuant to the United States Constitution Article 1, Section 8 permits the federal courts through confirmation of a Chapter 9 plan to impair contract rights of bondholders and that such impairment is not a violation by the state or the municipality of Article 1, Section 10 of the United States Constitution which prohibits a state from impairing such contract rights.

*Id.* at 973.

Or, more succinctly stated, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails

52

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 59 of 1501140
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 9 of 49

impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

### C. Chapter 9 Does Not Violate the Tenth Amendment to the United States Constitution.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

This Amendment reflects the concept that the United States Constitution "created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S. Ct. 2395 (1991); *see also United States v. Darby*, 312 U.S. 100, 124, 61 S. Ct. 451 (1941) (The Tenth Amendment "states but a truism that all is retained which has not been surrendered.").

The Supreme Court's "consistent understanding" of the Tenth Amendment has been that "[t]he States unquestionably do retain a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *New York v. United States*, 505 U.S. 144, 156, 112 S. Ct. 2408 (1992) (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 549, 105 S.Ct. 1005 (1985) (quotation marks omitted); *see also South Carolina v. Baker*, 485 U.S. 505, 511 n.5, 108 S. Ct. 1355 (1988) ("We use 'the Tenth Amendment' to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution."); *United States v. Sprague*, 282 U.S. 716, 733, 51 S. Ct. 220 (1931) ("The Tenth Amendment was intended to confirm the understanding of the people at the time the Constitution was adopted, that powers not granted to the United States were reserved to the states or to the people.").

53

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 60 of 1501141
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 10 of 49

The objecting parties argue that chapter 9 violates these principles of federalism because, in the words of AFSCME, it "allows Congress to set the rules controlling State fiscal self-management—an area of exclusive state sovereignty." AFSCME's Corrected Objection to Eligibility, ¶ 40 at 15-16. (Dkt. #505) The Court interprets this argument as a facial challenge to the constitutionality of chapter 9. The as-applied challenge, as stated by the Retiree Committee and other objecting parties, is that *if* the State of Michigan can properly authorize the City of Detroit to file for chapter 9 relief without the explicit protection of accrued pension rights for individual retired city employees, then chapter 9 "must be found to be unconstitutional as permitting acts in derogation of Michigan's sovereignty." Retiree Committee Objection to Eligibility, ¶ 3 at 1-2. (Dkt. #805)

Before addressing the merits of these arguments, however, the Court must first address two preliminary issues that the United States raised in its "Memorandum in Support of Constitutionality of Chapter 9 of Title 11 of the United States Code" – standing and ripeness. (Dkt. #1149)

### 1. The Tenth Amendment Challenges to Chapter 9 Are Ripe for Decision and the Objecting Parties Have Standing.

The United States argues that the creditors who assert that chapter 9 violates the Tenth Amendment as applied in this case lack standing and that this challenge is not ripe for adjudication at this stage in the case. [19] The Court concludes that the objecting parties do have standing and that their challenge is now ripe for determination.

---

[19] The standing and ripeness issues are discussed here because the United States and the City framed this issue in the context of the Tenth Amendment challenge to chapter 9 of the

*Footnote continued . . .*

54

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 61 of 1501142
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 11 of 49

### a. Standing

"As a rule, a party must have a 'personal stake in the outcome of the controversy' to satisfy Article III." *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 852 (6th Cir. 2002) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197 (1975), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703 (1962)).

In a bankruptcy case, the standing of a party requesting to be heard turns on whether the party is a "party in interest." *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3rd Cir. 2011). A party in interest is one who "has a sufficient stake in the proceeding so as to require representation." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985).

11 U.S.C. § 1109(b), provides, "A party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 901(a) makes this provision applicable in a chapter 9 case.

In the chapter 9 case of *In re Barnwell County Hosp.*, 459 B.R. 903, 906 (Bankr. D.S.C. 2011), the court stated, "'Party in interest' is a term of art in bankruptcy. Although not defined in the Bankruptcy Code, it reflects the unique nature of a bankruptcy case, where the global financial circumstances of a debtor are resolved with respect to all of debtor's creditors and other affected parties."

In a chapter 9 case on point, *In re Suffolk Regional Off-Track Betting Corp.*, 462 B.R. 397, 403 (Bankr. E.D.N.Y. 2011), the court held that a party to an executory contract with a municipal debtor has standing to object to the debtor's eligibility.

---

bankruptcy code. To the extent that the argument might also be made to the other constitutional challenges to chapter 9, the same considerations would apply and would lead to the same conclusion.

55

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 62 of 1501143
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 12 of 49

Similarly, in *In re Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. 610 (D .Colo. 1992), also a chapter 9 case, the court stated, "[M]any courts have concluded that the party requesting standing must either be a creditor of a debtor . . . or be able to assert an equitable claim against the estate." *Id.* at 616 (citation and quotation marks omitted). *See also In re Addison Community Hospital Authority*, 175 B.R. 646 (Bankr. E.D. Mich. 1994) (holding that creditors are parties in interest and have standing to be heard).

Under 11 U.S.C. § 1109(b) and these cases, it is abundantly clear that the objecting parties, who are creditors with pension claims against the City, have standing to assert their constitutional claim as part of their challenge to this bankruptcy case.

Nevertheless, the United States asserts that *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992), precludes standing here. In that case, the Supreme Court adopted this test to determine whether a party has standing under Article III of the constitution:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'". Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61 (internal citations omitted). The United States asserts that the objecting parties do not meet this standard because their injury is not "imminent" at this stage of the proceedings.

The Court concludes that the contours of standing under 11 U.S.C. § 1109(b) are entirely consistent with the constitutional test for standing that the Supreme Court adopted in *Lujan*. A creditor has a direct, personal stake in the outcome of a bankruptcy case and thus has standing to

56

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 63 of 1501144
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 13 of 49

challenge the bankruptcy filing. Accordingly, the Court concludes that every creditor of the City of Detroit has standing to object to its eligibility to be a debtor under chapter 9.

### b. Ripeness

The United States argues that the issue of whether chapter 9 is constitutional as applied in this case is not ripe for determination at this time. The City joins in this argument. City's Reply to Retiree Committee's Objection to Eligibility at 3-5. (Dkt. #918)

The premise of the argument is that the filing of the case did not result in the impairment of any pension claims. Thus the United States argues that this issue will be ripe only when the City proposes a plan that would impair pensions if confirmed. Until then, it argues, their injury is speculative.[20]

In *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533 (6th Cir. 2010), the Sixth Circuit summarized the case law on the ripeness doctrine:

> The ripeness doctrine encompasses "Article III limitations on judicial power" and "prudential reasons" that lead federal courts to "refus[e] to exercise jurisdiction" in certain cases. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L.Ed.2d 1017 (2003). The "judicial Power" extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2, not to "any legal question, wherever and however presented," without regard to its present amenability to judicial resolution. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc). And the federal courts will not "entangl[e]" themselves "in abstract disagreements" ungrounded in the here and now. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L.Ed.2d 681 (1967); see *Warshak*, 532 F.3d at 525. Haste makes waste, and the "premature adjudication" of legal questions compels courts to resolve matters, even constitutional matters, that may with time be

---

[20] The United States agrees that the objecting parties' facial challenge to chapter 9 is appropriate for consideration at this time. Memorandum in Support of Constitutionality at 3. (Dkt. #1149)

57

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 64 of 150
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 14 of 49

satisfactorily resolved at the local level, *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807, 123 S .Ct. 2026; *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 617 (6th Cir. 2008), and that "may turn out differently in different settings," *Warshak*, 532 F.3d at 525.

To decide whether a dispute has ripened into an action amenable to and appropriate for judicial resolution, we ask two questions: (1) is the dispute "fit" for a court decision in the sense that it arises in "a concrete factual context" and involves "a dispute that is likely to come to pass"? and (2) what are the risks to the claimant if the federal courts stay their hand? *Warshak*, 532 F.3d at 525; *see Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. 1507.

*Id.* at 537.

Although the argument of the United States has some appeal,[21] the Court must reject it, largely for the same reasons that it found that the objecting parties have standing. The ultimate issue before the Court at this time is whether the City is eligible to be a debtor in chapter 9. This dispute arises in the concrete factual context of the City of Detroit filing this bankruptcy case under chapter 9 of the bankruptcy code and the objecting parties challenging the constitutionality of that very law. This dispute is not an "abstract disagreement ungrounded in the here and now." It is here and it is now.

The Court further concludes that as a matter of judicial prudence, resolving this issue now will likely expedite the resolution of this bankruptcy case. The Court notes that the parties have fully briefed and argued the merits. Further, if the Tenth Amendment challenge to chapter 9 is resolved now, the parties and the Court can then focus on whether the City's plan (to be filed shortly, it states) meets the confirmation requirements of the bankruptcy code.

---

[21] Early in the case, the Court expressed its doubts about the ripeness of this constitutional issue in the eligibility context. The Court was concerned that the issue of whether pension rights can be impaired in bankruptcy would be more appropriately considered a confirmation issue, as the United States argues now. At the request of the objecting parties, however, the Court reconsidered that position and now agrees that the issue is ripe at this point.

58

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 65 of 1501146
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 15 of 49

Accordingly, the Court concludes that the objecting parties' challenge to chapter 9 of the bankruptcy code as applied in this case is ripe for determination at this time.

## 2. The Supreme Court Has Already
## Determined That Chapter 9 Is Constitutional.

The question of whether a federal municipal bankruptcy act can be administered consistent with the principles of federalism reflected in the Tenth Amendment has already been decided. In *United States v. Bekins*, 304 U.S. 27, 58 S. Ct. 811 (1938), the United States Supreme Court specifically upheld the Municipal Corporation Bankruptcy Act, 50 Stat. 653 (1937), over objections that the statute violated the Tenth Amendment. *Bekins*, 304 U.S. at 53-54.

In upholding the 1937 Act, the *Bekins* court found:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law. It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power. . . . The reservation to the States by the Tenth Amendment protected, and did not destroy, their right to make contracts and give consents where that action would not contravene the provisions of the Federal Constitution.

*Bekins*, 304 U.S. at 51-2.

The Court further noted that two years earlier, it had struck down a previous version of the federal municipal bankruptcy law for violating the Tenth Amendment. *Ashton v. Cameron*

59

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 66 of 1501147
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 16 of
49

*County Water Improvement Dist. No. 1*, 298 U.S. 513, 56 S. Ct. 892 (1936).[22] The Court found,

however, that in the 1937 Act, Congress had "carefully" amended the law "to afford no ground

for [the Tenth Amendment] objection." *Bekins*, 304 U.S. at 50. The Court quoted approvingly,

and at length, from a House of Representatives Committee report on the 1937 Act:

---

[22] It is interesting that Justice Cardozo did not participate in the *Bekins* decision. 304 U.S. at 54. In his dissent in *Ashton* two years before, he made this astute observation about the economic realities of municipal bankruptcies:

> If voluntary bankruptcies are anathema for governmental units, municipalities and creditors have been caught in a vise from which it is impossible to let them out. Experience makes it certain that generally there will be at least a small minority of creditors who will resist a composition, however fair and reasonable, if the law does not subject them to a pressure to obey the general will. This is the impasse from which the statute gives relief. . . . *To hold that this purpose must be thwarted by the courts because of a supposed affront to the dignity of a state, though the state disclaims the affront and is doing all it can to keep the law alive, is to make dignity a doubtful blessing.* Not by arguments so divorced from the realities of life has the bankruptcy power been brought to the present state of its development during the century and a half of our national existence.

298 U.S. at 541 (emphasis added). He then made this argument regarding the constitutional foundation for municipal bankruptcy law, which, arguably, the Court in *Bekins* adopted:

> The act does not authorize the states to impair through their own laws the obligation of existing contracts. Any interference by the states is remote and indirect. At most what they do is to waive a personal privilege that they would be at liberty to claim. *If contracts are impaired, the tie is cut or loosened through the action of the court of bankruptcy approving a plan of composition under the authority of federal law. There, and not beyond in an ascending train of antecedents, is the cause of the impairment to which the law will have regard.* Impairment by the central government through laws concerning bankruptcies is not forbidden by the Constitution. Impairment is not forbidden unless effected by the states themselves. No change in obligation results from the filing of a petition by one seeking a discharge, whether a public or a private corporation invokes the jurisdiction. *The court, not the petitioner, is the efficient cause of the release.*

*Id.* at 541-42 (citations omitted) (emphasis added).

60

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 67 of 1501148
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 17 of 49

There is no hope for relief through statutes enacted by the States, because the Constitution forbids the passing of State laws impairing the obligations of existing contracts. Therefore, relief must come from Congress, if at all. The committee are not prepared to admit that the situation presents a legislative no-man's land. It is the opinion of the committee that the present bill removes the objections to the unconstitutional statute, and gives a forum to enable those distressed taxing agencies which desire to adjust their obligations and which are capable of reorganization, to meet their creditors under necessary judicial control and guidance and free from coercion, and to affect such adjustment on a plan determined to be mutually advantageous.

*Id.* at 51 (quotation marks omitted).

*Bekins* thus squarely rejects the challenges that the objecting parties assert to chapter 9 in this case and it has not been overruled.

It is well-settled that this Court is bound by the decisions of the Supreme Court. In *Agostini v. Felton*, 521 U.S. 203, 117 S. Ct. 1997 (1997), the Court stated, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id.* at 237 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917 (1989) (quotation marks omitted)). *See also Grutter v. Bollinger*, 288 F.3d 732, 744 (6th Cir. 2002).

Nevertheless, the objecting parties assert that subsequent amendments to the municipal bankruptcy statute and subsequent Supreme Court decisions regarding the Tenth Amendment compel the conclusion that *Bekins* is no longer good law, or at least that it is inapplicable in this case. Specifically, in its objection, AFSCME argues that since *Bekins* was decided, "intervening Supreme Court precedent holds that states can fashion their own municipal reorganization statutes, but cannot consent to any derogation of their sovereign powers." AFSCME's

61

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 68 of 1501149
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 18 of 49

Corrected Objection to Eligibility, ¶ 44 at 17. (Dkt. #505)  Although the Court concludes that

*Bekins* remains good law and is controlling here, the Court will address these arguments.

### 3. Changes to Municipal Bankruptcy Law Since 1937
### Do Not Undermine the Continuing Validity of *Bekins*.

The only relevant change to municipal bankruptcy law that AFSCME identifies is the

addition of § 903 to the bankruptcy code, the substance of which was added in 1946 as § 83(i) of

the 1937 Act.  That section provided, "[N]o State law prescribing a method of composition of

indebtedness of such agencies shall be binding upon any creditor who does not consent to such

composition, and no judgment shall be entered under such State law which would bind a creditor

to such composition without his consent."

In slightly different form, § 903 of the bankruptcy code now provides:

> This chapter does not limit or impair the power of a State to
> control, by legislation or otherwise, a municipality of or in such
> State in the exercise of the political or governmental powers of
> such municipality, including expenditures for such exercise, but—
> (1) a State law prescribing a method of composition of
> indebtedness of such municipality may not bind any creditor that
> does not consent to such composition; and
> (2) a judgment entered under such a law may not bind a
> creditor that does not consent to such composition.

11 U.S.C. § 903.

AFSCME argues that this provision created a new exclusivity in chapter 9 that forces the

states to adopt the federal scheme for adjusting municipal debts.  This exclusivity, the argument

goes, deprives the states of the ability to enact state legislation providing for municipal debt

adjustment, which is inconsistent with the principles of federalism set forth in *New York v.*

*United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), and *Printz v. United States*, 521 U.S. 898,

117 S. Ct. 2365 (1997).

62

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 69 of 1501150
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 19 of
49

This argument fails on two levels. First, other than in one limited instance, *Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*, 316 U.S. 502, 62 S. Ct. 1129 (1942), courts have always interpreted the Contracts Clause of the United States Constitution to prohibit the states from enacting legislation providing for municipal bankruptcies. The 1946 amendment that added the provision that is now § 903 did not change this law.

Second, neither *New York* nor *Printz* undermine *Bekins*. As developed above, at its core, *Bekins* rests on state consent. As will be developed below, like *Bekins*, both *New York* and *Printz* are also built on the concept of state consent. Indeed, it was the lack of state consent to the federal programs in those cases that caused the Supreme Court to find them unconstitutional.

### a. The Contracts Clause of the United States Constitution Prohibits States from Enacting Municipal Bankruptcy Laws.

The Contracts Clause of the United States Constitution, Article I, Section 10, states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"

Applying this clause, the Supreme Court has stated, "When a State itself enters into a contract, it cannot simply walk away from its financial obligations." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 n.14, 103 S. Ct. 697 (1983). "It long has been established that the Contracts Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17, 97 S. Ct. 1505 (1977) (citing *Dartmough College v. Woodward*, 4 L. Ed. 629 (1819); *Fletcher v. Peck*, 3 L. Ed. 162 (1810)). Section 903 simply restates this principle.

Moreover, contrary to AFSCME's assertion, it is clear that *Bekins* fully considered this issue. It found, "The natural and reasonable remedy through [bankruptcy] was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation." *Bekins*, 304 U.S. at 54.

63

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 70 of 150
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 20 of 49

## b. *Asbury Park* Is Limited to Its Own Facts.

As noted above, only one case, *Asbury Park*, is to the contrary. The Court concludes, however, that this case represents a very narrow departure from these principles and its holding is limited to the unique facts of that case. Indeed, the Court itself stated, "We do not go beyond the case before us." 316 U.S. at 516.

The adjustment plan at issue in *Asbury Park* was "authorized" by the New Jersey state court on July 21, 1937. This was after the federal municipal bankruptcy law was struck down in *Ashton* and before the enactment of the municipal bankruptcy act that *Bekins* approved. Moreover, in *Asbury Park*, the bonds affected by the plan of adjustment, which the Court found were worthless prior to the adjustment, were reissued without a reduction in the principal obligation and became significantly more valuable as a result of the adjustment. *Asbury Park*, 316 U.S. at 507-08, 512-13.

The limited application of *Asbury Park* to its own facts has been repeatedly recognized. The cases now firmly establish that the Contracts Clause of the United States Constitution bars a state from enacting municipal bankruptcy legislation. In U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 27, 97 S. Ct. 1505 (1977), the Supreme Court observed, "The only time in this century that alteration of a municipal bond contract has been sustained by this Court was in [*Asbury Park*]."[23]

---

[23] Interestingly, in *U.S. Trust Co.*, the Court further observed that when a State seeks to impair its own contracts, "complete deference to a legislative assessment of [the] reasonableness and necessity [of the impairment] is not appropriate because the State's self-interest is at stake." *Id.* 431 U.S. at 26. For that reason, "a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Id.* at 30-31. The Constitution astutely recognizes that a federal court brings no such self-interest to a municipal bankruptcy case.

64

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 71 of 1501152
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 21 of 49

In *In re Jefferson Cnty., Ala.*, 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), *aff'd sub nom.*

*Mosley v. Jefferson Cnty.* (*In re Jefferson Cnty.*), 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012),

the court stated, "A financially prostrate municipal government has one viable option to resolve

debts in a non-consensual manner. It is a bankruptcy case. Outside of bankruptcy, non-

consensual alteration of contracted debt is, at the very least, severely restricted, if not

impossible." The court added, "There has been only one instance in this and the last century

when the Supreme Court of the United States has sustained the alteration of a municipal bond

contract outside a bankruptcy case." *Id.* at 279 n.21. It further observed that *Asbury Park* has

since been "distinguished and its precedent status, if any, is dubious." *Id.*

Accordingly, the Court concludes that the addition of § 903 to our municipal bankruptcy

law does not undermine the continuing validity of *Bekins*.

### 4. Changes to the Supreme Court's Tenth Amendment Jurisprudence Do Not Undermine the Continuing Validity of *Bekins*.

#### a. *New York v. United States*

In *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), the Supreme Court

considered a Tenth Amendment objection to the Low-Level Radioactive Waste Policy

Amendments Act of 1985, 42 U.S.C. § 2021b, *et seq.* Congress enacted that law to address the

problem of identifying storage sites for low-level radioactive waste. 505 U.S. at 152-54. The

Act provided three different incentives for each state to take responsibility over the nuclear waste

generated within its borders. *Id.*

The first was a monetary incentive to share in the proceeds of a surcharge on radioactive

waste received from other states, based on a series of milestones. 505 U.S. at 171. The Court

found this program constitutional because it was, in fact, nothing more than an incentive to the

65

state to regulate. Congress had "placed conditions—the achievement of the milestones—on the receipt of federal funds." *Id.* at 171. The states could choose to achieve these milestones, and receive the federal funds, or not. *Id.* at 173. "[T]he location of such choice in the States is an inherent element in any conditional exercise of Congress' spending power." *Id.*

The Court then stated, "In the second set of incentives, Congress has authorized States and regional compacts with disposal sites gradually to increase the cost of access to the sites, and then to deny access altogether, to radioactive waste generated in States that do not meet federal deadlines." *Id.* The Court held that this provision was also constitutional, again because the states retained the choice to participate in the federal program or not.

The Court explained, "Where federal regulation of private activity is within the scope of the Commerce Clause, we have recognized the ability of Congress to offer States the *choice* of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *Id.* at 173-74 (emphasis added). "[T]he choice remains at all times with the residents of the State, not with Congress. The State need not expend any funds, or participate in any federal program, if local residents do not view such expenditures or participation as worthwhile." *Id.* at 174.

These two provisions of the Act passed constitutional muster precisely because states could consent to participation in the federal program or withhold their consent as they saw fit. The Court held that these two programs:

> represent permissible conditional exercises of Congress' authority under the Spending and Commerce Clauses respectively, in forms that have now grown commonplace. Under each, Congress offers the States a legitimate choice rather than issuing an unavoidable command. The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.

*Id.* at 185.

66

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 73 of 1501154
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 23 of 49

In contrast, the third of these provisions - the "take title" provision" - forced the states to choose between either regulating the disposal of radioactive waste according to Congress's standards or "taking title" to that waste, thereby assuming all the liabilities of its producers. *Id.* at 174-75. The Court held that this provision violated the Tenth Amendment, because it offered the states no choice but to do the bidding of the federal government. This provision, the Court determined, did not ask for state "consent" but instead "commandeered" the states.

The Court's precedent is clear that the federal government may not require the states to regulate according to federal terms. "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* at 162. "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288, 101 S. Ct. 2352 (1981)).

The "take title" provision did just that. Although guised as a "so-called incentive" scheme, the Court found that the "take title" provisions offered the states no real choice at all.

> Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two.

*Id.* at 176. The "take title" provisions did not give the states what the Court deemed the constitutionally "critical alternative[.]" *Id.* at 176. "A State may not decline to administer the federal program. No matter which path the State chooses, it must follow the direction of Congress." *Id.* at 177.

The cornerstone of *United States v. New York*, then, is state consent. The federal government may constitutionally encourage, incentivize, or even entice, states to do the federal government's bidding. It may not command them to do so.

### b. *Printz v. United States*

The Supreme Court reiterated these principles in *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997), and extended them to Congressional efforts to compel state officers to act. At issue in *Printz* were provisions of the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922, that required state and local law enforcement officers to carry out background checks for firearms dealers in connection with proposed sales of firearms. It also required that the background checks be performed in accordance with the federal law. *Printz*, 521 U.S. at 903-04.

The Court concluded that while state and local governments remained free to voluntarily participate in the background check program, the "mandatory obligation imposed on [law enforcement officers] to perform background checks on prospective handgun purchasers plainly runs afoul [of the Constitution]." *Id.* at 933. Again, the stumbling block was a lack of state consent:

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.

521 U.S. at 935.

68

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 75 of 1501156
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 25 of 49

### c. *New York* and *Printz*
### Do Not Undermine *Bekins*.

*Printz* acknowledged that states could volunteer to carry out federal law. *Id*. at 910-11,

916-17 (describing the history of state officers carrying out federal law as involving "voluntary"

action on the part of the states). Concurring, Justice O'Connor added, "Our holding, of course,

does not spell the end of the objectives of the Brady Act. States and chief law enforcement

officers may voluntarily continue to participate in the federal program." *Id*. at 936.

By the same token, *New York* acknowledged that states can and do enter into voluntary

contracts with the federal government whereby states agree to legislate according to federal

terms in exchange for some federal benefit or forbearance. *New York*, 505 U.S. at 166-67.

What makes those federal programs constitutionally permissible, and the commandeering

at issue in *New York* and *Printz* impermissible, is consent, and nothing more. If the state is

acting voluntarily, it is free to engage with the federal government across a broad range of

subject areas. The Tenth Amendment to the United States Constitution is violated only when the

state does not consent.

Chapter 9 simply does not implicate the concerns of *New York* and *Printz*. As *Bekins*

emphasized, chapter 9 "is limited to *voluntary* proceedings for the composition of debts."

*Bekins*, 304 U.S. at 47 (emphasis added). The *Bekins* Court explained:

> The bankruptcy power is competent to give relief to debtors in
> such a plight and, if there is any obstacle to its exercise in the case
> of the districts organized under state law it lies in the right of the
> State to oppose federal interference. The State steps in to remove
> that obstacle. The State acts in aid, and not in derogation, of its
> sovereign powers. It invites the intervention of the bankruptcy
> power to save its agency which the State itself is powerless to
> rescue. Through its cooperation with the national government the
> needed relief is given. We see no ground for the conclusion that
> the Federal Constitution, in the interest of state sovereignty, has
> reduced both sovereigns to helplessness in such a case.

69

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 76 of 1501157
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 26 of
49

*Id.*, 304 U.S. at 54.

The federal government cannot and does not compel states to authorize municipalities to file for chapter 9 relief, and municipalities are not permitted to seek chapter 9 relief without specific state authorization. 11 U.S.C. § 109(c)(2). There is simply no "commandeering" involved. *New York*, 505 U.S. at 161. Chapter 9 does not compel a state to enact a specific regulatory program, as in *New York*. Nor does chapter 9 press state officers into federal service, as in *Printz*. Instead, as *Bekins* held, valid state authorization is required for a municipality to proceed in chapter 9.

Moreover, during the pendency of the chapter 9 case, § 904 of the bankruptcy code mandates that the bankruptcy court "may not . . . interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or employment of any income-producing property." 11 U.S.C. § 904. At the same time, bankruptcy code § 903 mandates, "This chapter does not limit or impair the power of a State to control . . . a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]"

Because the state and local officials must authorize the filing of a chapter 9 petition, 11 U.S.C. § 109(c)(2), and because they retain control over "the political or governmental powers" of the municipality, these state officials remain fully politically accountable to the citizens of the state and municipality. *See New York*, 505 U.S. at 186 ("The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.").

70

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 77 of 1501158
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 27 of 49

### d. Explaining Some Puzzling
### Language in *New York*

To be sure, some language in *New York* (not repeated in *Printz*) lends support to the

argument that state consent cannot cure a federal law that would otherwise violate the Tenth

Amendment. In *New York*, Justice O'Connor's opinion for the Court explained that federalism

does not exist for the benefit of states, as such, but rather is a part of the constitutional structure

whose purpose is to benefit individuals. 505 U.S. at 182. Justice O'Connor continued:

> Where Congress exceeds its authority relative to the States, . . .
> the departure from the constitutional plan cannot be ratified by the
> "consent" of state officials. . . . The constitutional authority of
> Congress cannot be expanded by the "consent" of the
> governmental unit whose domain is thereby narrowed, whether
> that unit is the Executive Branch or the States."

*Id.*

Some of the parties in this case have seized upon this language to argue that "the

Supreme Court has weakened if not rejected *Bekins'* foundation – that a State's consent can

remedy any violation of the Tenth Amendment and principles of federalism as they affect

individual citizens." Retiree Committee Objection to Eligibility, ¶ 37 at 19. (Dkt. #805)

The difficulty with this argument is that it proves too much. If this language from *New*

*York* has the sweeping force that the objecting parties ascribe to it, then a state's consent could

never "cure" what would otherwise be a Tenth Amendment violation. The two incentives in

*New York* that were constitutionally sustained would instead have been struck down like the

"take title" provision. As the Court emphasized in *New York*, "even where Congress has the

authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the

power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at

166.

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 78 of 1501159
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 28 of
49

Yet, despite Congress' inability to compel states to regulate according to federal standards, it may unquestionably invite, encourage, or entice the states to do so. *New York* specifically held that Congress may "encourage a State to regulate in a particular way," or "hold out incentives to the States as a method of influencing a State's policy choices." *Id.* The key is consent. *New York* further held, "Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests." *Id.* Consent to what would otherwise be an unlawful commandeering of state governments was the very basis for upholding two of the regulatory programs at issue in *New York*. *Id.* at 173-74.

It is not entirely clear, therefore, what Justice O'Connor meant when she wrote that states "cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.* at 182. In a very real sense, the holding of *New York* rests on the premise that states can do just that. Congress cannot require the states to legislate with respect to the problem of radioactive waste, but it can unquestionably hold out incentives that induce the states to consent to do so. More broadly put, states can "consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.*

The Court can only conclude that Justice O'Connor meant something else - that a state cannot consent to be compelled. As the Court saw the "choice" in *New York*, it was a choice between two unconstitutional alternatives - regulating according to federal standards or taking title to all of the low level radioactive waste produced by private parties in the state. Justice O'Connor likely concluded that the latter alternative was so unpalatable that it was really no choice at all. After all, here is where the Court found that "Congress had crossed the line distinguishing encouragement from coercion." *Id.* at 175. Understood this way, Justice

72

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 79 of 150
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 29 of
49

O'Connor may have been saying nothing more than that one cannot consent to have a gun held to one's head. The idea of "consent" in such a scenario is meaningless.

If this understanding is correct, it would be incumbent upon the objecting parties to identify some way in which federal authority has compelled state action here. They have not.

Whatever the intended meaning of this language, it cannot be that state consent can never "cure" what would otherwise violate the Tenth Amendment. That meaning would sweep aside the holding of *New York* itself. Nor does this language undo the holding in *Bekins*, which, as stated before, this Court must apply until the Supreme Court overrules it.

Accordingly, the Court concludes that chapter 9 is not facially unconstitutional under the Tenth Amendment.

### 5. Chapter 9 Is Constitutional As Applied in This Case.

Several of the objecting parties also raise "as-applied" challenges to the constitutionality of chapter 9 under the Tenth Amendment to United States Constitution. Although variously cast, the primary thrust of these arguments is that if chapter 9 permits the State of Michigan to authorize a city to file a petition for chapter 9 relief without explicitly providing for the protection of accrued pension benefits, the Tenth Amendment is violated.

The Court concludes that these arguments must be rejected.

### a. When the State Consents to a Chapter 9 Bankruptcy, the Tenth Amendment Does Not Prohibit the Impairment of Contract Rights That Are Otherwise Protected by the State Constitution.

The basis for this result begins with the recognition that the State of Michigan cannot legally provide for the adjustment of the pension debts of the City of Detroit. This is a direct result of the prohibition against the State of Michigan impairing contracts in both the United

73

States Constitution and Michigan Constitution, as well as the prohibition against impairing the contractual obligations relating to accrued pension benefits in the Michigan Constitution.

The federal bankruptcy court, however, is not so constrained. As noted in Part VIII B, above, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

The state constitutional provisions prohibiting the impairment of contracts and pensions impose no constraint on the bankruptcy process. The Bankruptcy Clause of the United States Constitution, and the bankruptcy code enacted pursuant thereto, explicitly empower the bankruptcy court to impair contracts and to impair contractual rights relating to accrued vested pension benefits. Impairing contracts is what the bankruptcy process does.

The constitutional foundation for municipal bankruptcy was well-articulated in *Stockton*:

> In other words, while a state cannot make a law impairing the obligation of contract, Congress can do so. The goal of the Bankruptcy Code is adjusting the debtor-creditor relationship. Every discharge impairs contracts. While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy.
> It follows, then, that contracts may be impaired in this chapter 9 case without offending the Constitution. The Bankruptcy Clause gives Congress express power to legislate uniform laws of bankruptcy that result in impairment of contract; and Congress is not subject to the restriction that the Contracts Clause places on states. Compare U.S. Const. art. I, § 8, cl. 4, with § 10, cl. 1.

478 B.R. at 16.

For Tenth Amendment and state sovereignty purposes, nothing distinguishes pension debt in a municipal bankruptcy case from any other debt. If the Tenth Amendment prohibits the impairment of pension benefits in this case, then it would also prohibit the adjustment any other debt in this case. *Bekins* makes it clear, however, that with state consent, the adjustment of

74

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 81 of 1501162
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 31 of 49

municipal debts does not impermissibly intrude on state sovereignty. *Bekins*, 304 U.S. at 52. This Court is bound to follow that holding.

### b. Under the Michigan Constitution, Pension Rights Are Contractual Rights.

The Plans seek escape from this result by asserting that under the Michigan Constitution, pension debt has greater protection than ordinary contract debt. The argument is premised on the slim reed that in the Michigan Constitution, pension rights may not be "impaired or diminished," whereas only laws "impairing" contract rights are prohibited.

There are several reasons why the slight difference between the language that protects contracts (no "impairment") and the language that protects pensions (no "impairment" or "diminishment") does not demonstrate that pensions were given any extraordinary protection.

Before reviewing those reasons, however, a brief review of the history of the legal status of pension benefits in Michigan is necessary.

At common law, before the adoption of the Michigan Constitution in 1963, public pensions in Michigan were viewed as gratuitous allowances that could be revoked at will, because a retiree lacked any vested right in their continuation. In *Brown v. Highland Park*, 320 Mich. 108, 114, 30 N.W.2d 798, 800 (Mich. 1948), the Michigan Supreme Court stated:

> We are convinced that the majority of cases in other jurisdictions establishes the rule that a pension granted by public authorities is not a contractual obligation, that the pensioner has no vested right, and that a pension is terminable at the will of a municipality, at least while acting within reasonable limits. At best plaintiffs in this case have an expectancy based upon continuance of existing charter provisions.

Similarly, in *Kosa v. Treasurer of State of Mich.*, 408 Mich. 356, 368-69, 292 N.W.2d 452, 459 (1980), the court observed this about the status of pension benefits before the 1963 Constitution was adopted:

75

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 82 of 1501163
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 32 of 49

> Until the adoption of Const. 1963, art. 9, s 24, legislative appropriation for retirement fund reserves was considered to be an ex gratia action. Consequently, the most that could be said about "pre-con" legislative appropriations for retirees was that there was some kind of implied commitment to fund pension reserves.

*Id.* (footnote omitted).

In the 1963 Constitution, this provision enhancing the protection for pensions was included: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich. Const. art. IX, § 24.

In *Kosa*, 408 Mich. at 370 n.21, 292 N.W.2d at 459, the Michigan Supreme Court quoted the following history from the constitutional convention regarding article 9, section 24:

> "MR. VAN DUSEN: Mr. Chairman, if I may elaborate briefly on Mr. Brake's answer to Mr. Downs' question, I would like to indicate that the words 'accrued financial benefits' were used designedly, so that the *contractual right of the employee* would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits. It is not intended that an individual employee should, as a result of this language, be given the right to sue the employing unit to require the actuarial funding of past service benefits, or anything of that nature. *What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them.* "And, in answer to your second question, *he has the contractual right to sue for them.* So that he has no particular interest in the funding of somebody else's benefits as long as *he has the contractual right to sue for his.*
>
> "MR. DOWNS: I appreciate Mr. Van Dusen's comments. Again, I want to see if I understand this. Then he would not have a remedy of legally forcing the legislative body each year to set aside the appropriate amount, but when the money did come due this would be a *contractual right* for which he could sue a ministerial officer that could be mandamused or enjoined; is that correct?
>
> "MR. VAN DUSEN: Thats my understanding, Mr. Downs."

76

1 Official Record, Constitutional Convention 1961, pp. 773-774.

*Id.* (emphasis added).

*Kosa* also offered an explanation for the origin of the provision. "To gain protection of their pension rights, Michigan teachers effectively lobbied for a constitutional amendment granting *contractual status* to retirement benefits." 408 Mich. at 360, 292 N.W.2d at 455 (emphasis added).

The *Kosa* court summarized the provision, again using contract language, as follows:

> To sum up, while the Legislature's constitutional *contractual obligation* is not to impair "accrued financial benefits", even if that obligation also related to the funding system, there would be no impairment of the *contractual obligation* because the substituted "entry age normal" system supports the benefit structure as strongly as the replaced "attained age" system.

*Id.*, 408 Mich. at 373, 292 N.W.2d at 461(emphasis added).

> While counting such blessings as have come to them, public school employees are understandably still concerned about their pension security. In that regard, this opinion reminds the Legislature that the constitutional provision adopted by the people of this state is indeed a *solemn contractual obligation* between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired.

*Id.*, 408 Mich. at 382, 292 N.W.2d at 465 (emphasis added).

More recently, in *In re Constitutionality of 2011 PA 38*, 490 Mich. 295, 806 N.W.2d 683 (2011), the Michigan Supreme Court unequivocally stated, "The obvious intent of § 24, however, was to ensure that public pensions be treated as *contractual obligations* that, once earned, could not be diminished." *Id.* at 311, 806 NW.2d at 693 (emphasis added).

77

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 84 of 1501165
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 34 of
49

That historical review begins to demonstrate the several reasons why the slight difference in the language that protects contracts and the language that protects pensions does not suggest that pensions were given any extraordinary protection:

**First**, the language of article IX, section 24, gives pension benefits the status of a "contractual obligation." The natural meaning of the words "contractual obligation" is certainly inconsistent with the greater protection for which the Plans now argue.

**Second**, if the Michigan Constitution were meant to give the kind of absolute protection for which the Plans argue, the language in the article IX, section 24 simply would not have referred to pension benefits as a "contractual obligation." It also would not have been constructed by simply copying the verb from the contracts clause - "impair" - and then adding a lesser verb -"diminish" in the disjunctive.

**Third**, linguistically, there is no functional difference in meaning between "impair" and "impair or diminish." There certainly is a preference, if not a mandate, to give meaning to every word in written law. In *Koontz v. Ameritech Servs., Inc.*, 466 Mich. 304, 312, 645 N.W.2d 34, 39 (2002), the Michigan Supreme Court summarized the familiar command, "Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." The court went on to state, however, "we give undefined statutory terms their plain and ordinary meanings." *Id.*

Under *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), discussed in more detail in Part IX A, below, this Court is bound by these commands of statutory interpretation that the Michigan Supreme Court embraced in *Koontz*. But if this Court gives these terms - "diminish" and "impair" - their plain and ordinary meanings, as *Koontz* requires, those meanings would not be substantively different from each other. The terms are not

78

synonyms, but they cannot honestly be given meanings so different as to compel the result that the Plans now seek. "Diminish" adds nothing material to "impair." All "diminishment" is "impairment." And, "impair" includes "diminish."

**Fourth**, the Plans' argument for a greater protection is inconsistent with the Michigan Supreme Court's interpretation of the constitutional language in *Kosa* and in *In re Constitutionality of 2011 PA 38*. Those cases also used contract language to describe the status of pensions. This is important because the Sixth Circuit has held that on questions of state law, this Court is bound to apply the holdings of the Michigan Supreme Court. *See Kirk v. Hanes Corp. of North Carolina*, 16 F.3d 705, 706 (6th Cir. 1994).

**Fifth**, an even greater narrative must be considered here, focusing on 1963. *Bekins* had long since determined that municipal bankruptcy was constitutional. That of course meant that even though states could not impair municipal contracts, federal courts could do that in a bankruptcy case. Indeed, Michigan law then allowed municipalities to file bankruptcy.[24]

It was within that framework of rights, expectations, scenarios and possibilities that the newly negotiated, proposed and ratified Michigan Constitution of 1963 explicitly gave accrued pension benefits the status of contractual obligations. That new constitution could have given pensions protection from impairment in bankruptcy in several ways. It could have simply prohibited Michigan municipalities from filing bankruptcy. It could have somehow created a

---

[24] See Public Act 72 of 1939, MCL § 141.201(1) (repealed by P.A. 70 of 1982) ("Any . . . instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] . . . may proceed under the terms and conditions of such acts to secure a composition of its debts. . . . The governing authority of any such . . . instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress[.]").

79

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 86 of 1501167
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 36 of 49

property interest that bankruptcy would be required to respect under *Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914 (1979) (holding that property issues in bankruptcy are determined according to state law). Or, it could have established some sort of a secured interest in the municipality's property. It could even have explicitly required the State to guaranty pension benefits. But it did none of those.

Instead, both the history from the constitutional convention, quoted above, and the language of the pension provision itself, make it clear that the only remedy for impairment of pensions is a claim for breach of contract.

Because under the Michigan Constitution, pension rights are contractual rights, they are subject to impairment in a federal bankruptcy proceeding. Moreover, when, as here, the state consents, that impairment does not violate the Tenth Amendment. Therefore, as applied in this case, chapter 9 is not unconstitutional.

Nevertheless, the Court is compelled to comment. No one should interpret this holding that pension rights are subject to impairment in this bankruptcy case to mean that the Court will necessarily confirm any plan of adjustment that impairs pensions. The Court emphasizes that it will not lightly or casually exercise the power under federal bankruptcy law to impair pensions. Before the Court confirms any plan that the City submits, the Court must find that the plan fully meets the requirements of 11 U.S.C. § 943(b) and the other applicable provisions of the bankruptcy code. Together, these provisions of law demand this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan.

80

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 87 of 150
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 37 of 49

## IX. Public Act 436 Does Not
## Violate the Michigan Constitution.

Section 109(c)(2) of the bankruptcy code requires that a municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). The evidence establishes that the City was authorized to file this case. The issue is whether that authorization was proper under the Michigan Constitution.

Section 18 of P.A. 436, M.C.L. § 141.1558, establishes the process for authorizing a municipality to file a case under chapter 9 of the bankruptcy code:

> (1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision . . . . The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

M.C.L. § 141.1558(1).

On July 16, 2013, Mr. Orr gave the governor and the treasurer his written recommendation that the City be authorized to file for chapter 9 relief. Ex. 28. On July 18, 2013, the governor approved this recommendation in writing. Ex. 29. Later that day, Mr. Orr

81

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 88 of 1501169
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 38 of 49

issued a written order directing the City to file this chapter 9 case. Ex. 30. Thus the City of Detroit's bankruptcy filing was authorized under state law.

Nevertheless, several objectors assert various arguments that the City of Detroit is not authorized to file this case.

First, several objectors argue that the authorization is not valid because P.A. 436, the statute establishing the underlying procedure for a municipality to obtain authority for filing, is unconstitutional. Broadly stated, these are the challenges to P.A. 436:

The Retired Detroit Police Members Association ("RDPMA") challenges the constitutionality of P.A. 436 on the grounds that it was enacted immediately after the referendum rejection of a similar statute, P.A. 4.

The RDPMA also asserts that P.A. 436 is unconstitutional on the grounds that the Michigan Legislature added an appropriation provision for the purpose of evading the peoples' constitutional right to referendum.

Several objectors argue that P.A. 436 is unconstitutional because it fails to protect pensions from impairment in bankruptcy.

AFSCME asserts that P.A. 436 is unconstitutional because it violates the "Strong Home Rule" provisions in the Michigan Constitution.

### A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute.

The validity of P.A. 436 under the Michigan Constitution is a question of state law. Determining the several constitutional challenges to P.A. 436 requires this Court to apply state law. In *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), the Sixth Circuit provided this guidance on determining state law:

82

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 89 of 150
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 39 of
49

In construing questions of state law, the federal court must apply state law in accordance with the controlling decisions of the highest court of the state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the "majority" rule in making this determination. *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir.1987). A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S. Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

Similarly, in *Demczyk v. Mut. Life Ins. Co. of N.Y.* (*In re Graham Square, Inc.*), 126 F.3d 823, 827 (6th Cir. 1997), the court stated, "Where the relevant state law is unsettled, we determine how we think the highest state court would rule if faced with the same case."

The Michigan Supreme Court has not ruled directly on the validity P.A. 436. As a result, this Court must attempt to ascertain how that court would rule if it were faced with the issue.

In *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich. 295, 307-8, 806 N.W.2d 683, 692 (2011), the Michigan Supreme Court summarized its decisions on evaluating a constitutional challenge to a state law:

"Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v. Gate Pharm.*, 468 Mich. 1, 6, 658 N.W.2d 127 (2003). "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v. Mirac, Inc.*, 470 Mich. 415, 422, 685 N.W.2d 174 (2004). "'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.'" *Id.* at 423, 685 N.W.2d 174, quoting *Cady v. Detroit*, 289 Mich. 499, 505, 286 N.W. 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with

83

the party challenging it[.]" *In re Request for Advisory Opinion Regarding Constitutionality of 2005 Pa. 71*, 479 Mich. 1, 11, 740 N.W.2d 444 (2007)[.]

This guidance, as well as the decisions of the Michigan Supreme Court on issues relating to the right to referendum, home rule, and the pension clause, will inform this Court's determinations on the objectors' challenges to P.A. 436.

### B. The Voters' Rejection of Public Act 4 Did Not Constitutionally Prohibit the Michigan Legislature from Enacting Public Act 436.

On March 16, 2011, the governor signed P.A. 4 into law. P.A. 4 repealed P.A. 72. However, the voters rejected P.A. 4 by referendum in the November 6, 2012 election. Shortly after that election, on December 26, 2012, the governor signed P.A. 436 into law. It took effect on March 28, 2013.

The RDPMA argues that P.A. 436 is unconstitutional because it is essentially a reenactment of P.A. 4. The City and the State of Michigan assert that there are several differences between P.A. 436 and P.A. 4, such that they are not the same law.

The right of referendum is established in article 2, section 9 of the Michigan Constitution, which provides:

> Sec. 9. The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

84

Referendum, approval

> No law as to which the power of referendum properly has been
> invoked shall be effective thereafter unless approved by a majority
> of the electors voting thereon at the next general election.

Mich. Const. art. II, § 9.

In *Reynolds v. Bureau of State Lottery*, 240 Mich. App. 84, 610 N.W.2d 597 (2000), the

Michigan Court of Appeals considered the power of the legislature to reenact a law while a

referendum process regarding that law was pending. The court explained:

> [N]othing in the Michigan Constitution suggests that the
> referendum had a broader effect than nullification of [the 1994
> act]. We cannot read into our constitution a general "preemption
> of the field" that would prevent further legislative action on the
> issues raised by the referendum. The Legislature remained in full
> possession of all its other ordinary constitutional powers, including
> legislative power over the subject matter addressed in [the 1994
> act].

*Reynolds*, 240 Mich. App. at 97, 610 N.W.2d at 604-05.

This Michigan Court of Appeals decision strongly suggests that the referendum rejection

of P.A. 4 did not prohibit the Michigan legislature from enacting P.A. 436, even though P.A. 436

addressed the same subject matter as P.A. 4 and contained very few changes.

As noted above, the Sixth Circuit has instructed, "A federal court should not disregard the

decisions of intermediate appellate state courts unless it is convinced by other persuasive data

that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co.*, 197 F.3d at

1181. No data, let alone any persuasive data, suggests that the Michigan Supreme Court would

decide this issue otherwise. Accordingly, the RDPMA's challenge on this ground must be

rejected.

85

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 92 of 150
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 42 of
49

### C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional.

The RDPMA also contends that P.A. 436 is unconstitutional because the Michigan legislature included appropriations provisions in P.A. 436 for the sole purpose of shielding the Act from referendum. Section 34 of P.A. 436 appropriates $780,000 for 2013 to pay the salaries of emergency managers. Section 35 of P.A. 436 appropriates $5,000,000 for 2013 to pay professionals hired to assist emergency managers.

There certainly was some credible evidence in support of the RDPMA's assertion that the appropriations provisions in P.A. 436 were motivated by a desire to immunize it from referendum. For example, Howard Ryan testified in his deposition on October 14, 2013:

> Q. I'd just like to ask a follow-up to a question counsel asked you. You said that the appropriation language was put in the - early on in the process; is that correct?
> A. Yes.
> Q. Based on your conversations with the people at the time, was it your understanding that one or more of the reasons to put the appropriation language in there was to make sure that it could not - the new act could not be defeated by a referendum?
> A. Yes.
> Q. And where did you get that knowledge from?
> A. Well, having watched the entire process unfold over the past two years.
> Q. The Governor's office knew that that was the point of it?
> A. Yes.
> Q. That your department knew that that was the point of it?
> A. Yes.
> Q. The legislators you were dealing with knew that that was the point of it?
> A. Yes.

86

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 93 of 1501174
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 43 of 49

Howard Dep. Tr. 46:1-23, Oc. 14, 2013.[25]

Other evidence in support includes: a January 31, 2013 e-mail addressed from Mr. Orr to partners at Jones Day, in which he observed that P.A. 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." Ex. 403 (Dkt. #509-3) According to Mr. Orr "although the new law provides the thin veneer of a revsion (sic) it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing." Ex. 403. (Dkt. #509-3)

There are, however, several difficulties with the RDPMA's argument.

The Court must conclude that the Michigan Supreme Court would not, if faced with this issue, hold that P.A. 436 is unconstitutional. In *Michigan United Conservation Clubs v. Secretary of State*, 464 Mich. 359, 367, 630 N.W.2d 297, 298 (2001), that court concisely held that a public act with an appropriations provision is not subject to referendum, regardless of motive. Concurring, Chief Justice Corrigan added that even if the motive of a legislative body could be discerned as opposed to the motives of individual legislators, "This Court has repeatedly held that courts must not be concerned with the alleged motives of a legislative body in enacting a law, but only with the end result—the actual language of the legislation." *Id.* at 367.

Similarly, in *Houston v. Governor*, 491 Mich. 876, 877, 810 N.W.2d 255, 256 (2012), the Michigan Supreme Court stated, "[T]his Court possesses no special capacity, and there are no legal standards, by which to assess the political propriety of actions undertaken by the legislative

---

[25] The parties agreed to use Ryan's deposition testimony in lieu of live testimony. However, in the pre-trial order the City had objected to this portion of testimony on the grounds of speculation, hearsay, format and foundation. (Dkt. #1647 at 118) Those objections are overruled.

87

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 94 of 150
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 44 of 49

branch. Instead, it is the responsibility of the democratic, and representative, processes of government to check what the people may view as political or partisan excess by their Legislature."

In *People v. Gibbs*, 186 Mich. 127, 134-35, 152 N.W. 1053, 1055 (1915), the Michigan Supreme Court stated, "Courts are not concerned with the motives which actuate the members of the legislative body in enacting a law, but in the results of their action. Bad motives might inspire a law which appeared on its face and proved valid and beneficial, while a bad and invalid law might be, and sometimes is, passed with good intent and the best of motives." *See also Kuhn v. Dep't of Treasury*, 384 Mich. 378, 383-84, 183 N.W.2d 796, 799 (1971).

Finally, it must also be noted that on November 8, 2013, the Sixth Circuit vacated pending rehearing *en banc* the decision on which the RDPMA heavily relies. *City of Pontiac Retired Employees Assoc. v. Schimmel*, 726 F.3d 767 (6th Cir. 2013).

Accordingly, the Court concludes that P.A. 436 is not unconstitutional as a violation of the right to referendum in article II, section 9 of the Michigan Constitution.

### D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution.

Certain objectors argue that P.A. 436 violates Article VII, Section 22 of the Michigan Constitution, which states:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section.

The argument is that the appointment of an emergency manager for a municipality under P.A. 436 is inconsistent with the right of the electors to adopt and amend the City charter and the city's right to adopt ordinances. AFSCME asserts that "Michigan is strongly committed to the concept of home rule[.]" AFSCME Amended Objection at 75-91. (Dkt. #1156) "This 'strong home rule' regime reflects a bedrock principle of state law, . . . all officers of cities are to 'be elected by the electors thereof, or appointed by such authorities thereof' not by the central State Government." *Id.* (citing *Brouwer v. Bronkema*, 377 Mich. 616, 141 N.W.2d 98 (1966)). AFSCME further asserts that in authorizing the appointment of an emergency manager with broad powers that usurp the powers of elected officials, "PA 436 offends the 'strong home rule' of Detroit and that the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings." AFSCME Amended Objection at 75-91. (Dkt. #1156)

AFSCME's argument fails for the simple reason that the broad authority the Michigan Constitution grants to municipalities is subject to constitutional and statutory limits. This constitutional provision itself embodies that principle. It states, "Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*." Mich. Const. art. VII, § 22 (emphasis added).

State law recognizes the same limitation on local government authority:

Each city may in its charter provide:

(3) Municipal powers. For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns *subject to the constitution and general laws of this state.*

89

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 96 of 1501177
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 46 of
49

M.C.L. § 117.4j(3) (emphasis added).

Similarly, M.C.L. § 117.36, states, "No provision of any city charter shall conflict with or contravene the provisions of any general law of the state."

Indeed, § 1-102 of the Charter of the City of Detroit states: "The City has the comprehensive home rule power conferred upon it by the Michigan Constitution, *subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute.*" *Id.* (emphasis added). *See Detroit City Council v. Mayor of Detroit*, 283 Mich. App. 442, 453, 770 N.W.2d 117, 124 (Mich. Ct. App. 2009) ("The charter itself thus recognizes that it is subject to limitations imposed by statute.").

"Municipal corporations have no inherent power. They are created by the state and derive their authority from the state." *Bivens v. Grand Rapids*, 443 Mich. 391, 397, 505 N.W.2d 239, 241 (1993).

The Michigan case law establishes that the powers granted to municipalities by the "home rule" sections of the Michigan Constitution are subject to the limits of the power and authority of the State to create laws of general concern. *Brimmer v. Village of Elk Rapids*, 365 Mich. 6, 13, 112 N.W.2d 222, 225 (1961).

> "Municipal corporations are state agencies, and, subject to constitutional restrictions, the Legislature may modify the corporate charters of municipal corporations at will. 12 C.J. [p.] 1031. Powers are granted to them as state agencies to carry on local government. The state still has authority to amend their charters and enlarge or diminish their powers." [1] Cooley, Const. Lim. (8th Ed.), [p.] 393. * * * Its powers are plenary.

*City of Hazel Park v. Mun. Fin. Comm'n*, 317 Mich. 582, 599-600, 27 N.W.2d 106, 113-14 (1947).

> The Home Rule provision of the constitution does not deprive the legislature of its power to enact laws affecting municipalities operation under that provision except as to matters of purely local

90

concern. . . . *The right to pass general laws is still reserved to the l[e]gislature of the state*, and consequently it is still competent for the state through the law making body to enact measures pursuant to the police power or pursuant to other general powers inherent in the state and to require municipalities to observe the same.

*Local Union No. 876, Int'l Bhd. of Elec. Workers v. State of Mich. Labor Mediation Bd.*, 294 Mich. 629, 635-36, 293 N.W. 809, 811 (1940) (emphasis added). *See also Mack v. City of Detroit*, 467 Mich. 186, 194, 649 N.W.2d 47, 52 (2002); *American Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 377, 604 N.W.2d 330, 342 (2000) (In *Harsha* we held that "the legislature might modify the charters of municipal corporations at will and that the State still retained authority to amend charters and enlarge and diminish their powers."); *Board of Trustees of Policemen & Firemen Retirement System v. City of Detroit*, 143 Mich. App. 651, 655, 373 N.W.2d 173, 175 (Mich. Ct. App. 1985) ("Where a city charter provision conflicts with general statutory law, the statute controls in all matters which are not of purely local character."); *Oakland Cnty. Board of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n*, 456 Mich. 590, 609, 575 N.W.2d 751, 760 (1998) ("Like a municipal corporation, the road commission's existence is entirely dependent on the legislation that created it, and the Legislature that may also destroy it.").

AFSCME asserts that P.A. 436 is a "local law" because it gives the emergency manager broad authority to pass local legislation, and that therefore it violates article IV, section 29 of the Michigan Constitution. That section provides, in pertinent part, "The legislature shall pass no local or special act in any case where a general act can be made applicable[.]"

One plain difficulty with this argument is that this provision of the Michigan Constitution constrains the Michigan Legislature, not the emergency manager.

In defining a general law, the Michigan Supreme Court has stated, "'A general law is one which includes all persons, classes and property similarly situated and which come within its

91

13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 98 of 150
13-53846-tjt   Doc 2334-36   Filed 12/27/13   Entered 12/27/13 13:37:04   Page 48 of 49

limitations.'" *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 359 n.5, 604 N.W.2d 330, 334 (2000) (citing *Tribbett v. Village of Marcellus*, 294 Mich. 607, 618, 293 N.W. 872 (1940), quoting *Punke v. Village of Elliott*, 364 Ill. 604, 608-9, 5 N.E.2d 389, 393 (1936)).

Clearly, P.A. 436 is a general law, potentially applicable to all municipalities similarly situated within the State of Michigan. According to its preamble, its purposes are: "to safeguard and assure the financial accountability of local units of government and school districts; to preserve the capacity of local units of government and school districts to provide or cause to be provided necessary services essential to the public health, safety and welfare[.]"

Accordingly, the Court finds that P.A. 436 does not violate the home rule provisions of the Michigan Constitution.

### E. Public Act 436 Does Not Violate the Pension Clause of the Michigan Constitution.

Many objectors argue that the bankruptcy authorization section of P.A. 436, M.C.L. § 141.1558, does not conform to the requirements of the pension clause of the Michigan Constitution and is therefore unconstitutional. Accordingly, the objectors argue that P.A. 436 cannot provide the basis for authorization as required by 11 U.S.C. § 109(c)(2).

As noted, the premise of this argument is that under the Michigan constitution, pension benefits are entitled to greater protection than contract claims. That premise, however, is, the same as the premise of the argument that chapter 9 is unconstitutional as applied in this case.

In Part VIII C 5 b, above, the Court rejected this argument, concluding that pension benefits are a contractual obligation of the municipality.

It follows that if a state consents to a municipal bankruptcy, no state law can protect contractual pension rights from impairment in bankruptcy, just as no law could protect any other types of contract rights. Accordingly, the failure of P.A. 436 to protect pension rights in a

92

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 99 of 1501180
13-53846-tjt    Doc 2334-36    Filed 12/27/13    Entered 12/27/13 13:37:04    Page 49 of
49