# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE–MI<br>Tax ID / EIN: 38–6004606 | represented by | **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489–3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |
| | | **Richard A. Roble (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–6769<br>Email: Richard.A.Roble@usdoj.gov |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364 |

(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 08/19/2013 | | 512 | Objection to Eligibility to Chapter 9 Petition *, Brief in Support, Certificate of Service* Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Lieutenants and Sergeants Association, Detroit Police Officers Association (Attachments: # 1 Exhibit A – Declaration of Mark Diaz # 2 Exhibit A–1 (PART 1) Award # 3 Exhibit A–1 (Part 2) # 4 Exhibit A–1 (Part 3) # 5 Exhibit A–2 Interim Award # 6 Exhibit B McNamara Declaration and Ex 1 and 2 # 7 Exhibit C – Young Declaration # 8 Exhibit D – Gurewitz Declaration) (Patek, Barbara) (Entered: 08/19/2013) |

IN RE:                                                    Chapter 9

City of Detroit, Michigan,                               No. 13-53846

          Debtor.                                       Hon. Steven W. Rhodes

_____/

**OBJECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE
DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE
LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT
POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S
BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS
UNDER 11 U.S.C. SECTION 109(c)**

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police

Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants

Association (the "DPLSA") and the Detroit Police Command Officers Association

(the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their

counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state their Objection to

Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C.

Section 109(c) as follows:

<u>INTRODUCTION</u>

1.     The City of Detroit (the "City") cannot establish that it is eligible to

be a chapter 9 debtor under Section 109(c) of the Bankruptcy Code.  First, the City

cannot demonstrate that its petition was "specifically authorized by State law . . . or by a governmental officer . . . empowered by State law to authorize such entity to be a debtor . . ." as required by Section 109(c)(2) because one of the City's express purposes in seeking authorization to file the petition is to attempt to use these chapter 9 bankruptcy proceedings to illegally impair the constitutionally protected pension rights of the Detroit Public Safety Union employees,[1] other City employees and City retirees, in direct violation of the Michigan Constitution, Art. IX, Sec. 24 and Public Act 436, MCL 141.1541, *et seq*. Second, the City's failure (and, indeed, in many instances, its refusal) to negotiate in good faith with the Detroit Public Safety Unions prior to filing the petition as required by Section 109(c)(5)(B) should render the City ineligible to be a Debtor in these proceedings. Third, in light of the City's refusal to negotiate with the Detroit Public Safety

---

[1] The Public Safety Unions, as set forth more fully herein, strenuously disagree that any of the Emergency Manager, the City or the Governor can use the protections afforded by Chapter 9 of the Bankruptcy Code as limited by the 10th Amendment of the United States Constitution to enlarge their state and federal constitutionally limited authority in direct violation of that authority. Nevertheless, the Emergency Manager, supported by the Governor, has repeatedly and publicly articulated an intention to do so, and, given that the filing of the Petition was temporally related to efforts by City retirees and the Retirement Systems to obtain state court orders that would unequivocally declare that the Governor and the Emergency Manager lacked the constitutional authority to impair those pension rights in any venue. See State Court Complaints, Filed July 8, 2013 and July 17, 2013, Exhibit 6.1 to Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code For Entry of An Order Extending the Chapter 9 Stay [Docket No. 56, pp. 26-62].

2

Unions and the minimal time the City allotted for such negotiations to occur, the City should not now be permitted to claim that such negotiations were impractical under Section 109(c)(5)(C). Finally, given the haste with which this chapter 9 filing occurred, the absence of any evidence of specific, give-and-take negotiations in any of the declarations and documentary evidence submitted in support of the City's petition, and given the Governor, the City and the Emergency Manager's express purpose in attempting to use these chapter 9 proceedings to illegally impair the constitutionally protected, accrued pension rights of the Detroit Public Safety Unions' active members, retirees (as well as those of other City employees and retirees), the City has failed to meet its burden under Section 109(c) of the Bankruptcy Code, its petition was not filed in good faith, as required by Section 921(c) of the Bankruptcy Code and, therefore, must be dismissed.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper before this Court under 28 U.S.C. §1409(a).

3.      The Detroit Public Safety Unions, whose collective members provide police and fire protection to the City on a daily basis under extremely difficult conditions, acknowledge that the City faces serious and severe financial challenges that must be addressed, and the Detroit Public Safety Unions have been and are prepared to work with the City to tackle those challenges. However, for the

3

reasons set forth herein, the Detroit Public Safety Unions believe that the filing of the Petition was defectively authorized and premature.

4. As a result of the severe economic challenges facing the City, the members of the Detroit Public Safety Unions must do more with fewer active members and less resources under increasingly difficult conditions. At the same time, the active members of each of the Detroit Public Safety Unions have seen their wages and benefits, including their future pension benefits, unilaterally reduced by the City, even as they attempted to negotiate with the City.

5. Contrary to certain statements made by the City in the papers filed with this Court and other statements made to the public by the Emergency Manager and the Governor, the Emergency Manager has not negotiated in good faith with the Detroit Public Safety Unions. In the weeks leading up to the City's chapter 9 filing, there were no negotiations. Rather, the City and the Emergency Manager held two publicly trumpeted "informational meetings" with the Detroit Public Safety Unions. Both occurred within a week of the filing of the Chapter 9 petition. As set forth more fully herein, the timing of these meetings, and the content of the meetings, was insufficient to satisfy the requirements of 11 U.S.C. §109(c)(5)(B).

6. Furthermore, prior to the filing of the petition, as set forth more fully herein, the City and the Emergency Manager have consistently refused to negotiate

4

with the Detroit Public Safety Unions over terms and conditions of employment under both the former Emergency Manager Law, PA 4, MCL 141.1501, *et seq*, (which was overwhelmingly repealed by Michigan voters in 2012) and since the Emergency Manager's appointment under Public Act 436, MCL 141.1541, *et seq*.

7.     Contrary to the City's claimed efforts to negotiate in good faith, at least with regard to the Detroit Public Safety Unions, the City has consistently sought to block the Detroit Public Safety Unions' efforts to negotiate terms and conditions of employment.  The City has yet to provide the Detroit Public Safety Unions with a concrete restructuring proposal.

8.     At the direction of the Emergency Manager, the City instead successfully convinced the Michigan Employment Relations Commission to dismiss petitions filed by some of the Detroit Public Safety Unions seeking arbitration under Public Act 312, MCL 423.231, *et seq* ("Act 312")[2], on the basis that the City has no duty to bargain with the Detroit Public Safety Unions. Subsequent to the successful dismissals, the City indicated its intent to unilaterally impose less favorable terms and conditions of employment on the Union members,

---

[2] Act 312 is based on ". . . the public policy of this state . . .," which recognizes, ". . . that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternative, expeditious, effective and binding procedure for the resolution of disputes." Act 312 provides the remedy for police and firefighter bargaining units if the municipality refuses to negotiate or negotiations are otherwise unsuccessful.

including reduced pay, increased health care premiums, deductibles and co-pays and reduced future pension benefits, and, in the case of some of the Detroit Public Safety Unions, in fact imposed such terms.

9. The Emergency Manager, prior to filing the chapter 9 Petition, stated his intention to use chapter 9 to significantly impair the vested pension rights and benefits of City employees and retirees.[3] These pre-petition statements provide the basis for establishing both the lack of proper legal authorization for the Petition and the Emergency Manager's intent to avoid the required pre-petition good faith negotiation process.

10. Because the City cannot satisfy the requirements of 11 U.S.C. §109(c), it therefore does not qualify to be a debtor under chapter 9.

## FACTUAL BACKGROUND

11. The background narrative of the City's financial problems does not need to be repeated in this objection. All parties understand that the City is in a woeful financial condition. Nonetheless, that financial condition does not relieve the City of the need to satisfy the requirements of 11 U.S.C. §109(c).

12. In the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the

---

[3] See, for example, the Proposal for Creditors, Doc. 11-1, page 76 -78, "Labor Costs and Terms and Conditions", "Salaries and Wages", "Operational Efficiencies/Work Rules"; page 109 "Claims for Unfunded Pension Liabilities."

6

Bankruptcy Code [Doc. No. 11] (the "Orr Declaration"), and in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Doc. No. 14] (the "Memorandum"), the City asserts that it has satisfied the requirements of §109(c)(5)(B) and (C).  The Detroit Public Safety Unions contest this assertion.  Specifically, the Detroit Public Safety Unions believe that the City cannot satisfy the requirements of §109(c)(2) or (5), as set forth in more detail below.

13.    On March 14, 2013, the Governor appointed Kevyn Orr as Detroit's Emergency Financial Manager pursuant to 1990 PA 72, MCL 141.1201, *et seq*, Orr assumed that role on March 24, 2013 (Orr Declaration, ¶78).  On March 28, 2013, PA 436, MCL 141.1541, *et seq*. became effective and Orr became the Emergency Manager under PA 436.

14.    Since the Emergency Manager's appointment, the City has steadfastly declined to negotiate with the Detroit Public Safety Unions, claiming it has no obligation to do so under PA 436.  See, generally, Exhibit A, Declaration of Mark Diaz (the "Diaz Declaration") and Exhibits 1 and 2 thereto; Exhibit B, Declaration of Daniel McNamara (the "McNamara Declaration") and Exhibits 1 and 2 thereto; Exhibit C, Declaration of Mark Young  (the "Young Declaration") and Exhibit D, Declaration of Mary Ellen Gurewitz, Esq. (the "Gurewitz Declaration").

15. However, on June 14, 2013, the Emergency Manager held a meeting at the Westin Hotel at Detroit Metropolitan Airport with the City's creditors, including the Detroit Public Safety Unions. That meeting was an en masse event at which the City presented certain general information about its restructuring intentions; questions were answered, but no negotiations took place. See "City of Detroit Proposal for Creditors" dated June 14, 2013 (the "June 14 Creditor Proposal") to all creditors in attendance [See Doc. No. 11-1] (Orr Declaration ¶ 80). The June 14 Creditor Proposal was a general overview of the financial condition of the City, the condition of city services and issues regarding payment of personnel, including the members of the Detroit Public Safety Unions. It also had broad proposals for creditor treatment including proposals that would significantly impair the accrued financial benefits of the Detroit Public Safety Union members and retirees. See Restructuring Proposal, [Docket 11-1, p. 60] (attached as Exhibit to Orr Declaration).

16. On June 20, 2013, the Emergency Manager held a second meeting with various unions and their representatives, including the Detroit Public Safety Unions, at which the City informed the Detroit Public Safety Unions of its intent to propose steep cuts to their pension and health care benefits.

17. A third meeting took place with each of the Detroit Public Safety Unions during the week of July 12, 2013 regarding these proposed cuts. Again the

City made it clear that it was not negotiating with the Detroit Public Safety Unions although they were welcome to propose their own restructuring plan. The City also indicated that it would be unwilling to negotiate any terms of such a restructuring plan unless agreement was first reached on actuarial assumptions—one of the central and most hotly disputed issues in these Chapter 9 proceedings. See Exhibit 2 to Exhibit B, McNamara Declaration.

18.     Nevertheless, in response, on July 12, 2013, the Detroit Public Safety Unions jointly wrote to the City's counsel, asking for a more concrete restructuring proposal to which they could respond.  See Exhibit 1 to Exhibit B, McNamara Declaration.

19.     On July 16, 2013, the Emergency Manager sought the Governor's authorization to file these Chapter 9 proceedings.  Orr Declaration, Exhibit J [Docket 11-10].

20.     On July 17, 2013, the Detroit Public Safety Unions received a letter from the Emergency Manager's counsel, which indicated that the Emergency Manager wanted to first reach agreement on actuarial assumptions and which provided no substantive proposals. See Exhibit B, ¶8 and Exhibit 2 to Exhibit B.

21.     The following day, July 18, 2013, the City filed its Chapter 9 Petition.

22.     As set forth more fully herein, with regard to the Detroit Public Safety Unions, the content of the discussions at the June 14th meeting and the follow up

meetings were very general, and the City continued to indicate, through the Emergency Manager, that the meetings should not be construed as negotiations. See Exhibits A, B and C. The specifics of the City's dealings with each of the Detroit Public Safety Unions during the time period leading up to and immediately following the Chapter 9 filing are set forth below. Those dealings and the declarations that support them make it clear that the City did not meet its pre-filing obligation of good faith negotiations with the Detroit Public Safety Unions, or, upon information and belief, other unions or the Retirement Systems about a plan of adjustment.[4]

<u>THE DPOA</u>

23.    The DPOA consists of nearly 2000 active Detroit police officers. The DPOA's experience is addressed first because, while the DPOA has also experienced the City's refusal to negotiate, it is the only one of the Detroit Public Safety Unions who managed to obtain an Act 312 arbitration award which sets forth the terms and conditions of an employment contract with the City. Specifically, on March 25, 2013, only days before the effective date of PA 436, the Act 312 memorializing the terms and conditions of employment between the City

---

[4] The March 26, 2012 Report of the Financial Review Team [Doc. No. 11-4] references the participation between the Review Team and officers of the DPOA, DPCOA, DPLSA and DFFA. The Public Safety Unions were clearly known to the City prior to June 14, 2013.

10

and the DPOA was issued (the "Award").[5]  A copy of the award is attached  to Exhibit A, Diaz Declaration as Exhibit 1.

24.     Significantly, the Award recognized the record number of issues presented for arbitration were the direct result of the City's refusal to negotiate and its insistence on imposing on the DPOA a series of demoralizing and not necessarily cost-saving City Employment Terms ("CETs") under the now-repealed Public Act 4, former MCL 141.1501, *et seq.*  Exhibit 1 to Exhibit A, Award at p. 28.  Among the Award's specific findings were:

> . . . The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings.  Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police Department.  This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan.  It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will

---

[5]  A portion of the Award (a 5% wage increase awarded to DPOA members, effective January 1, 2014) has been challenged by the City and is the subject of pending but stayed litigation.  See Diaz Declaration, ¶5.
.

reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

25.     The Award further found that, " . . . if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced." Exhibit 1 to Exhibit A, Award at p. 29.

26.     The Award further provided for a 5% pay raise, effective January 1, 2014 for DPOA members and for the reopening of the Act 312 proceedings to address health care issues after June 30, 2013.   However, the City, through the Emergency ¶Manager, filed a complaint for judicial review of the 5% pay raise, which remains pending but stayed by these proceedings.   Exhibit A, Diaz Declaration, ¶5.  Relying on Public Act 436, the City has declined to reopen the Act 312 proceedings to address health care issues, and instead seeks to unilaterally impose new health care terms on the DPOA.  Exhibit A, Diaz Declaration, ¶ ¶ 8-10.

<u>THE DFFA</u>

27.     The DFFA consists of all active Detroit fire fighters of all ranks.  It has just under 800 current members.  Relying on PA 436 and claiming it had neither a duty to negotiate or to arbitrate under Public Act 312, the City successfully blocked the DFFA's efforts, as well as the efforts of the DPLSA and

12

the DPCOA to pursue Act 312 arbitration. See Exhibit B, McNamara Declaration, In a 2-1 decision, the Michigan Employment Relations Commission ruled that, as a result of the Emergency Manager's appointment, it lacked the authority to conduct Act 312 hearings. See Exhibit C, Young Declaration, pp. 2-3.

28. While, during communications at this time, the City declined to disclose what conditions it intended to impose and made clear its unwillingness to negotiate, the DFFA continued to attempt to engage the City in meaningful discussions regarding its restructuring. See Exhibit 1(7/12/13 Letter) to Exhibit A. By letter dated July 25, 2013, the City informed the DFFA that, effective August 16, 2013, its members wages would be cut by 10% across the board, and at a meeting on August 2, 2013 which the City emphatically indicated was not a negotiation, the City presented the terms of new health care plans it intends to impose, which will increase the out of pocket health care costs to be borne by DFFA members by as much as $3000 a year for families. See McNamara Declaration, ¶¶7, 12- 13.

THE DPLSA

29. Like the DFFA, the DPLSA was blocked in its efforts to engage the City in Act 312 arbitration proceedings. On June 25, 2013, the City notified the DPLSA of the termination of its collective bargaining agreement effective July 6, 2013 and that it was not requesting bargaining at that time. After informing the

13

DPLSA that it had no duty to bargain, the Emergency Manager notified the DPLSA that changes to its wages, benefits and working conditions would be forthcoming after August 1, 2013. Exhibit C, Young Declaration, p. 3.

30. Shortly after the chapter 9 petition was filed, the City's Labor Relations Director informed the DPLSA that the City was prepared to impose terms on its members. In July 31, 2013 correspondence and without any prior negotiation, the City identified 17 terms it intended to implement. Exhibit C, Young Declaration, p. 3.

31. In response to an August 1, 2013 request from the DPLSA, the City has delayed imposing the 17 terms as of the date of this Objection. Exhibit C, Young Declaration, p. 4.

### THE DPCOA

32. The DPCOA has been blocked from negotiating with the City and has been subjected to unilaterally imposed City Employment Terms (the "CET") since July of 2012. Its last contract expired in 2009. The CET were a unilaterally imposed set of working conditions, including a 10% wage cut for all DPCOA members. Exhibit D, Gurewitz Declaration, ¶¶4-5.

33. As with the DFFA and the DPLSA, the City successfully blocked the DPCOA's efforts to proceed to Act 312 arbitration. Following the suspension of PA 4, the DPCOA filed for Act 312 arbitration, an arbitrator was appointed,

14

hearing dates were scheduled for March of 2013, and there were several days of productive negotiations prior to the appointment of the Emergency Manager. However, all negotiations terminated with the Emergency Manager's appointment. Exhibit D, Gurewitz Declaration, ¶6.

34.    The Emergency Manager has consistently taken the position that there is no duty to bargain and has refused to bargain or negotiate with the DPCOA. Exhibit D, Gurewitz Declaration, ¶8.

<u>ALLEGED IMPRACTICALITY</u>

35.    The City also asserts that negotiations were "impracticable" [Memorandum at p. 40]. The Detroit Public Safety Unions assert that there were, and remain, even absent the creation of a Retirees' Committee, sufficient creditor participants with whom the Emergency Manager could have had meaningful negotiations. The City self-imposed an extremely limited time frame for negotiations during which it elected not to negotiate with the Detroit Public Safety Unions. It should not now be permitted to claim those negotiations were impractical.

36.    As set forth in the accompanying brief, based upon these facts and applicable bankruptcy, state and federal law, the City cannot meet its burden of showing it is eligible to be a Debtor under Section 109(c).

## RELIEF REQUESTED

WHEREFORE, the Detroit Public Safety Unions respectfully request that the City of Detroit's chapter 9 petition be dismissed.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: _/s/ Barbara A. Patek_
     Earle I. Erman  (P24296)
     Craig E. Zucker  (P39907)
     Barbara A. Patek  (P34666)
     Counsel for the Detroit Public Safety
     Unions
     400 Galleria Officentre, Suite 444
     Southfield, MI  48034
     Telephone: (248) 827-4100
     Facsimile:  (248) 827-4106
     E-mail:  bpatek@ermanteicher.com

DATED:   August 19, 2013

F:\OTHERINS\Detroit, CIty of\Detroit objection 8 19 13 (2).docx

16

13-53846-tjt  Doc 23852   Filed 08/19/13   Entered 08/19/13 19:36:36   Page 19 of 74
13-53846-swr  Doc 3855-2   Filed 04/27/13   Entered 04/27/13 18:42:36   Page 19 of 404     19

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

City of Detroit, Michigan,

            Debtor.

_____/

Chapter 9

No. 13-53846

Hon. Steven W. Rhodes

**BRIEF IN SUPPORT OF OBJECTION OF THE DETROIT FIRE
FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS
ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS
ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS
ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND
STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)**

# TABLE OF CONTENTS

Index of Authorities ................................................................................................ iii

Statement of Facts .................................................................................................1

Argument…………………………………………………………………………..2

    A.  Burden of Proof for Eligibility.................................................................2

    B.   Failure to Comply with the Requirements of 11 U.S.C. §109(c)(5) ........3

    C.   11 U.S.C.§921(c) Must Be Looked At In Conjunction With the Requirements Of §109(c) .....................................................................................  18

Relief Requested .................................................................................................  18

# INDEX OF AUTHORITIES

## Cases

*Ashton v. Cameron County Water Improvement District Number One*, 236 U.S. 513 (1936) ...................................................................................... 3

*Bond v. United States*, 131 S. Ct. 2355 (2011) ................................................. 3, 4

*In re City of Stockton, California,* 2013 WL 2629129 (Bankr. E.D. Cal. 2013)....2

*In re City of Vallejo*, 408 B.R. 280 (BAP 9th Cir. 2009).................................. 18

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado*, 138 B.R. 973 (Bankr. D.Colo. 1992) ................................................ 7, 16

*In re County of Orange*, 183 B.R. 594 (Bankr. C.D. Cal. 1995) ..................... 2, 18

*In re Ellicot School Building Authority*, 150 B.R. 261(Bankr. D. Colo. 1992)……………………………………………14, 15

*In re New York City Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010)……………………………………………………………6, 7, 16

*In re Sullivan County Regional Refuse Disposal District*, 25 B.R. 60 (Bankr. D. N.H. 1994)....................................................... … 15

*In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60 (Bankr. D.N.H. 1994)……………………………………………7, 17

*In re Valley Health System*, 383 B.R. 156 (Bankr. C.D. Cal. 2008)……2, 17, 18

*In re Villages at Castle Rock Metropolitan District No. 4*, 145 B.R. 76 (Bankr. D. Colo. 1990)......................................................................17

*United States v. Bekins*, 304 U.S. 27 (1938)…………………………………4

**Statutes**

28 U.S.C. § 959(b) ........................................................................... 5

11 U.S.C. § 943(b)(4) ...................................................................... 5

11 U.S.C. § 921(c) ...................................................................... 5, 18

11 U.S.C. § 109(c)……………………………………………………………*passim*

Michigan Public Act 436, MCL 141.1541, *et seq* ........................................... 3

**Other**

Black's Law Dictionary, (9th ed. 2009) ............................................... 13

United States Constitution, Art. 1, Sec. 8, Clause 4 .......................................... 3

United States Constitution, Am. X……………………………………………..3, 4, 6, 7

Michigan Constitution, Art. IX, Sec. 24 ............................................... 3, 5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      No. 13-53846

      Debtor.                              Hon. Steven W. Rhodes

_____/

## BRIEF IN SUPPORT OF OBJECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants Association (the "DPLSA") and the Detroit Police Command Officers Association (the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state for their Brief in Support of Objection to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c) as follows:

## STATEMENT OF FACTS

The Detroit Public Safety Unions rely on the facts as set forth in their Objection.

## ARGUMENT

**A. Burden of Proof for Eligibility.**

11 U.S.C. §109(c) provides:

An entity may be a debtor under chapter 9 of this title if and only if such entity ---
    (1)  is a municipality;
    (2)  is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
    (3)  is insolvent;
    (4)  desires to effect a plan to adjust such debts; and
    (5)    (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
        (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
        (C) is unable to negotiate with creditors because such negotiation is impracticable; or
        (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

The City, as the proponent of the chapter 9 petition, bears the burden of proof to show that it is satisfies the elements of 11 U.S.C. §109(c) and is therefore eligible to file a chapter 9 petition. *In re City of Stockton, California,* 2013 WL 2629129 at *19 (Bankr. E.D.Cal. 2013); *In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995), *In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008). This Objection focuses on the requirements of §109(c)(2) and (5) and the good faith requirement of Section 921(c).

2

**B.     The City cannot meet the requirements of §109(c)(2) because Section 109(c)(2) must be read in light of the 10th Amendment of the United States Constitution and principles of federalism.  To the extent 109(c)(2) can be read to allow impairment of the Detroit Public Safety Union members and retirees' accrued financial benefits under the PFRS in violation of the Emergency Manager and the Governor's oaths of office, the Michigan Constitution, Art. IX, Sec. 24 and PA 436[1], Section 109(c)(2) would violate the Detroit Public Safety Union members' and retirees' rights under the 10th Amendment of the United States Constitution, to be free from federal intrusion on matters related to the State's administration of its fiscal affairs.**

While the United States Constitution, Art. 1, Sec. 8, Clause 4, authorizes Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States," the Supreme Court has held that such authority is subject to the limits of the 10th Amendment. *Ashton v. Cameron County Water Improvement District Number One*, 236 U.S. 513 (1936).  *Ashton* has never been overruled. Furthermore, both the express language of the 10th Amendment[2] and recent Supreme Court case law recognize that the 10th Amendment protects not only states' sovereignty but also the individual liberties of citizens.  *See, e.g. Bond v. United States,* 131 S. Ct. 2355 (2011), recognizing that principles of federalism give individuals the right to challenge unconstitutional intrusions into state

---

[1] MCL 141.1541, *et seq.*

[2] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people*." U.S. Const., Am. X (emphasis added).

3

sovereign authority even when the state does not object (or as here "consents") to those intrusions.[3]

One of the stated goals of the June 14 Creditor Proposal, and a position repeatedly and publicly articulated by the Emergency Manager and the Governor, is that chapter 9 will allow the Emergency Manager to dispense with his sworn constitutional obligation to preserve the accrued financial benefits of City employees and retirees, including Detroit Public Safety Union members and retirees, under the City Retirement Systems. Such a reading of chapter 9 is not consistent with the 10th Amendment, which not only protects state sovereignty, but also protects the rights of individuals to be free from federal interference with their vested, state constitutional rights. *See Bond, supra.*

Based upon the City's articulated goal of using the chapter 9 plan it intends to propose to impair the accrued financial benefits to which the Detroit Public Safety Union members and retirees (as well as other City employees and retirees) are entitled, the City cannot put forth a confirmable plan of adjustment. A plan which contains such provisions would be in violation of the Michigan Constitution and the restrictions placed on the Emergency Manager by PA 436 and his oath of office, and, as such would not be confirmable. If the goal of the chapter 9 is to file

---

[3] To the extent *United States v. Bekins*, 304 U.S. 27 (1938) can be read to allow a State or municipality to use Chapter 9 to breach an express state constitutional obligation to its citizens in violation of individual rights protected by the10[th] Amendment, *Bekins* is no longer good law.

4

a plan which will not be able to be confirmed, the plan, and the proposal of such a plan, is a meaningless event. As such, the proposal of a non-confirmable plan should not be sufficient to satisfy the requirements of 11 U.S.C. §921(c).

Article IX, Section 24 of the Michigan Constitution states:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

28 U.S.C. §959(b) states:

**(b)** Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

11 U.S.C. §943(b)(4) addresses confirmation of a chapter 9 plan. The section, written in the affirmative, states that "the court shall confirm the plan if— (4) the debtor is **not** prohibited by law from taking any action necessary to carry out the plan" (emphasis added).

The June 14 Creditor Proposal is based on modifying Michigan constitutionally protected rights. The City has been clear that it is wedded to the June 14 Creditor Proposal. However, the Creditor Proposal violates the Michigan

constitution in that it seeks a unilateral modification of the Detroit Public Safety

Union members and retirees' pension rights and employment benefits. As such, it

cannot be confirmed. While there is no requirement that the pre-petition plan

proposed by a possible chapter 9 debtor be the plan that is ultimately confirmed (*In

re New York City Off-Track Betting Corp.*, 427 at 274), it is clear that the June 14

Creditor Proposal is the general template that the City seeks to use as its chapter 9

plan. It is illogical for the City to be able to obtain an Order for Relief when its

proposed course of action, in fact, the very core of what it is seeking to

accomplish, is the improper impairment of constitutional rights.

> Bankruptcy courts should review chapter 9 petitions with a jaded eye.
> Principles of dual sovereignty, deeply embedded in the fabric of this
> nation and commemorated in the Tenth Amendment of the United
> States Constitution, severely curtail the power of bankruptcy courts to
> compel municipalities to act once a petition is approved. 6 COLLIER
> ON BANKRUPTCY 900.01 ¶ [2][c] (observing bankruptcy courts'
> limited power over municipalities due to the Tenth Amendment). *See
> also New York v. United States,* 505 U.S. 144, 155–66, 112 S.Ct.
> 2408, 120 L.Ed.2d 120 (1992) (reviewing development of Tenth
> Amendment jurisprudence, recognizing dual sovereignty and
> observing that 'the Constitution has never been understood to confer
> upon Congress the ability to require the States to govern according to
> Congress' instructions'). This fundamental constitutional principle
> halts bankruptcy courts from regulating or otherwise controlling
> expenditures or activities of municipalities. 5 WILLIAM J.
> NORTON, JR. & WILLIAM L. NORTON III, NORTON
> BANKRUPTCY LAW AND PRACTICE § 90:4 (3d ed. 2009)
> ('Without the consent of the municipality,
> the court may not interfere with any of the political or governmental
> powers of the debtor, any property or revenues of the debtor, or the
> debtor's use or enjoyment of any income-producing property.');
> H.R.REP. NO. 95–595, at 263 (1977), *reprinted in* 1978

6

U.S.C.C.A.N. 5963, 6221 ('[T]he powers of the court are subject to a strict limitation—that no order or decree may in any way interfere with the political or governmental powers of the petitioner, the property or revenue of the petitioner, or any income-producing powers.'). Congress deemed this principle so important it explicitly recognized the limits of bankruptcy courts' powers in section 904.

In light of these concerns, bankruptcy courts scrutinize petitions for relief under chapter 9. *See In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 82 (Bankr.D.N.H.1994) (observing that the jurisdiction of bankruptcy courts 'should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'); *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr.D.Colo.1992) (noting that constitutional issues in chapter 9 cases caused Congress 'to limit accessibility to the bankruptcy court by municipalities.') (quoting H.R.REP. NO. 94–938, at 10 (1976)) (internal quotation marks omitted).

*In re New York City Off-Track Betting, 427 B.R. at 264-265 (footnotes omitted).*

The concern about the limitations of chapter 9 by the Tenth Amendment was

also expressed in *In re Sullivan County Regional Refuse Disposal District,* 165

B.R. at 82-83:

The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task.

Although the law is rarely painted in strokes of black and white, there are occasionally cases and situations in which there is a need and justification for a 'bright line' rule on a particular legal question. This is such a situation. Municipalities that wish to come into bankruptcy under Chapter 9 in my judgment must, at a minimum,

7

demonstrate that before filing they either used their assessment or taxing powers to a reasonable extent, or in their pre-petition negotiations have committed to the use of those powers as part of a comprehensive and appropriate work out of their financial problems. If they have undertaken that endeavor in good faith, and nevertheless <u>have failed to reach an accommodation with their creditors, they then</u> may be entitled to Chapter 9 relief if they are otherwise qualified.

## C. Failure to comply with the requirements of 11 U.S.C. §109(c)(5).

As stated above, 11 U.S.C. §109(c)(5) contains four (4) requirements as part of the qualifications for an entity to be a debtor under chapter 9. Because the City concedes that it has not satisfied §109(c)(5)(A), [Memorandum, page 40, fn. 12], and there is no suggestion that Section 109(c)(5)(D) applies, only Sections 105(c)(5)(B) and (C) are relevant here, and the Detroit Public Safety Unions assert that the City has not satisfied the remaining requirements of those sections.

Specifically, §109(c)(5)(B) requires the City to show that it:

. . . has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

The Emergency Manager submitted the June 14 Creditor Proposal to creditors just five weeks before obtaining authorization to file. However, well prior to that time, and almost a year prior to the date of the Emergency Manager's appointment on March 14, 2013, the City Financial Review Team issued its initial Report, dated March 26, 2012, advising that the City "is in a condition of severe

8

financial stress". [See Doc. No. 11-4.] This report was supplemented on February 19, 2013. [See doc. No. 11-7.].

The June 14 Creditor Proposal presented general proposals (identified by the Emergency Manager as the "Executive Summary" [Orr Declaration ¶81]) for dealing with creditors, including the Detroit Public Safety Unions' constituents. It did not provide any substantive information as to how these proposals would be put in place, the timing of any employment and/or benefit modifications, or otherwise give more than a general statement of proposed treatment. In the context of the significant issues facing the Detroit Public Safety Unions' constituents, this was "bare bones" at best. Nonetheless, the Detroit Public Safety Unions were interested in engaging in a dialogue with the Emergency Manager and his team, in an effort to work on the difficult financial issues facing the City. However, there was limited, or no, opportunity to do so, nor was there any meaningful outreach by the Emergency Manager to the representatives of the Detroit Public Safety Unions to negotiate a mutually agreeable settlement. In his Declaration, the Emergency Manager states:

> 84. The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition. The City proposed: (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata*

9

distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amortization of the principal of such notes in the event that, e.g., future City revenues exceeded certain thresholds, certain assets were monetized and/or certain grants were received. See June 14 Creditor Proposal, at pp. 101-109.

85. Having provided the facts and strategies contained in the presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case. At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 presentation, the City: (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

. . .

91. On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations. These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City: (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward. Representatives and advisors of the Pension Systems attended both meetings.

92. Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees. Questions were solicited, and the City's advisors

10

answered as many of them as could be answered before the meeting time concluded. Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes. Questions were solicited, and the City's advisors answered all questions posed. The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room . . . that the City has established as a repository for information that creditors may find relevant in their evaluation of the City's proposals.

93. Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' preferred approach to address the required changes that are expected to be severely dislocating for retirees.

94. Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger. Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions. Others took a more constructive approach. On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties.

95. On July 10, 2013, the City and certain of its advisors held separate meetings with: (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations; and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to: (a) provide additional information on the City's pension restructuring proposal; and (b) discuss a process for reaching a consensual agreement on (i) pension underfunding issues and (ii) the treatment of any related claims. At each meeting, the parties generally discussed: (a) the

11

actuarial assumptions underlying the Pension Systems' claims related to underfunding (and that will be used for funding purposes going forward); (b) the City's prospective ability to make contributions to the Pension Systems; and (c) adjustments to pension benefit design necessary to reduce liabilities, and consequent underfunding, to a level that will allow the City to fund the Pension Systems going forward.

96. On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for: (a) select non-uniform unions and retiree associations and the GRS; and (b) certain uniformed unions and retiree associations and the PFRS to discuss retiree health issues. At each of these meetings, the City's advisors reviewed the proposals for the modification of retiree health benefits that previously had been presented and discussed at the prior meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

97. Meetings with Funded Debt and Pension Representatives. On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "Bond Insurer"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information and proposals that had been presented to the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

12

[Emphasis added][footnotes omitted]

It is clear from the Emergency Manager's Statement that the June 14, 2013 meeting and the follow up meetings were not for the purposes of negotiation of a settlement, but for the sole purposes of providing information on the changes that the City sought to unilaterally put in place and the treatment of the City's debt. This read of the Orr Declaration is corroborated by the experience of the Detroit Public Safety Unions, as documented by the Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A, B, C and D. This is not negotiation as contemplated by the Bankruptcy Code, nor in any other context.

According to Black's Law Dictionary, (9th ed. 2009),

> Negotiation means
> **1.** A consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter.
> **2.** (*usu. pl.*) Dealings conducted between two or more parties for the purpose of reaching an understanding.

According to the Memorandum,

> …the City convened the June 14 Meeting . . .for the purpose of engaging its creditors with respect to a consensual restructuring of the City's various classes of debt within the framework of the June 14 Creditor Proposal. At the June 14 Meeting, the Emergency Manager openly invited the City's creditors to contact the City and its advisors to begin negotiations. [Memorandum, page 54-55]

This statement, in conjunction with the Emergency Manager's Declaration, supports that the June 14 Creditor Proposal was the only proposal discussed.

Despite the invitation to contact the City, the June 14 Creditor Proposal was essentially presented as a "take it or leave it" proposal. The manner of presentation and the subsequent meetings only invited inquiry, and did not invite any deliberation or discussion. There was nothing to suggest that there was any kind of a "consensual bargaining process". Thus, the June 14th meeting and the subsequent meetings do not qualify as "negotiations". See Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A-D.

Further, the City did not engage with all of the required creditors including, specifically, the Detroit Public Safety Unions. The City repeatedly stressed that meetings were not negotiations and that it had no duty to bargain or negotiated. In particular, as the Diaz, McNamara, Young and Gurewitz Declarations make clear (and consistent with the Orr Declaration), there was no negotiation, whether actual or purported, prior to July 18, 2013, when the City filed its chapter 9 Petition.

11 U.S.C. §109(c)(5)(B) requires that the entity "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter." Meetings at which the debtor explains its proposed plan of restructuring do not constitute negotiations, especially when a proposal is not open to discussion. There are no good faith negotiations when creditors are presented a plan as a "take it or leave it" proposal. *In re Ellicot*

*School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992), (even though the court held that the School Building Authority was not qualified to be a chapter 9 debtor, the judge still analyzed the requirements of 11 U.S.C. §109(c)(5)(B) and stated that a "take it or leave it" approach is not a good faith negotiation). Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of the other party" (*In re Sullivan County Regional Refuse Disposal District,* 25 B.R. 60, 78 (Bankr. D. N.H. 1994).

It is required that negotiations with creditors, sufficient to satisfy 11 U.S.C. §109(c)(5)(B), provide creditors sufficient time to evaluate a proposed plan.

In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these problems, Congress consciously sought "to limit accessibility to the bankruptcy court" by municipalities. H.R. Conference Report, 94–938, p. 10, U.S.Code Cong. & Admin.News 1976, p. 539. One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code.

The conditioned entry to this Court which is afforded by section 109(c) recognizes that the negotiating posture of the parties changes once the bankruptcy petition is filed. It is one thing to negotiate when the debtor is being confronted with the pressures of defaults on public debt and the requirement of certifying ever-increasing mill levies in order to provide for the payment of such debt. It is another when the entity is being protected by the stay of section 362 of the Code and the bondholders are being faced with an indeterminate period of nonpayment of their bonds. The 'creditor protection' provided by

15

section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the Code.

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R.    973, 979 (Bankr. D.Colo. 1992).

In addition to the lack of meaningful discussion, the short time period between the June 14 Creditor Proposal and the July 18, 2013 filing date of the chapter 9 petition did not leave any time for any serious or meaningful negotiations.    The combination of all of these factors demonstrates that the City did not fulfill the requirement of 11 U.S.C. §109(c)(5)(B).

Neither can the City rely on 11 U.S.C. §109(c)(5)(C) to excuse its failure to negotiate in good faith.  That section provides: "[the entity] is unable to negotiate with creditors because such negotiation is impracticable."

A determination of "impracticability" must be made on a case-by case basis, and requires a "fact sensitive inquiry".  *In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010).  In the present matter, the Detroit Public Safety Unions assert that the limited amount of time between the June 14 Creditor Proposal and the filing date of July 18, left little time for the City to engage the necessary constituents. The number of constituents is not, in and of itself, and should not be, an impediment to negotiations.  It is impossible for the Emergency Manager to say that with additional time outside of the bankruptcy

16

process, he could not engage the necessary creditors to formulate a workable plan. The difficulty in the negotiation process is the result of an artificial time constraint, not necessarily the result of the number of creditors. The Court should not find that negotiations were "impracticable", because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing on July 18th. (See *Sullivan,* 165 B.R. at 82 ("the decision [to file chapter 9] appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises.")) It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate or there was such a limited time for negotiations. (*In re Villages at Castle Rock Metropolitan District No. 4,*145 B.R. 76, 85 (Bankr. D. Colo. 1990), six months of conceptual discussions with largest bondholder was sufficient to satisfy §109(c)(5)(C).)

The Memorandum justifies terminating negotiations based on projections of year end cash shortages and the possible end of term of the Emergency Manager. However, there still is cash for operations, and the Emergency Manager's appointment would not terminate, absent extension, until mid-September, 2014. The Emergency Manager has not claimed that the City's assets would be at risk if some reasonable time were spent negotiating with the City's creditors. *In re Valley*

*Health System,* 383 B.R. 156, 163 (Banrk. C.D.Cal. 2008). The requirement of 11 U.S.C. §109(c)(5)(C) has not been satisfied.

**D.    11 U.S.C. §921(c) must be looked at in conjunction with the requirements of §109(c).**

11 U.S.C. §921(c) states:

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

While this section is written in the permissive ("may dismiss"), courts have held that this section requires dismissal if the chapter 9 petition was not filed in good faith or the debtor does not meet the requirements of chapter 9. *In re Valley Health System,* 383 B.R. at 160, *In re County of Orange,* 183 B.R. at 599, *In re City of Vallejo,* 408 B.R. 280, 289 (BAP 9th Cir. 2009).

## RELIEF REQUESTED

WHEREFORE, based on the facts of this matter and the arguments set forth herein, the Detroit Public Safety Unions request that the chapter 9 Petition be dismissed.

18

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By:  /s/ Barbara A. Patek
       Earle I. Erman  (P24296)
       Craig E. Zucker  (P39907)
       Barbara A. Patek (P34666)
       Counsel for the Detroit Public Safety
       Unions
       400 Galleria Officentre, Suite 444
       Southfield, MI  48034
       Telephone: (248) 827-4100
       Facsimile:  (248) 827-4106
       E-mail:  bpatek@ermanteicher.com

DATED:  August 19, 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      Case No. 13-53846

        Debtor.

_____/

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 19, 2013, the Objection of the

Detroit Fire Fighters Association, The Detroit Police Officers Association, The

Detroit Police Lieutenants & Sergeants Association and The Detroit Police

Command Officers Association to Debtor's Bankruptcy Petition and Statement of

Qualifications Under 11 U.S.C. Section 109(c), Brief in Support and Certificate of

Service were electronically filed with the Clerk of the Court for the United States

Bankruptcy Court, Eastern District of Michigan, Southern Division using the

CM/ECF System, which will send notification of such filing to all attorneys and

parties of record registered electronically.

/s/  Barbara A. Patek
BARBARA A. PATEK (P34666)
Erman, Teicher, Miller,
Zucker & Freedman, P.C.
400 Galleria Officentre, Ste. 444
Southfield, MI 48034
Telephone: 248-827-4100
Facsimile: 248-827-4106
Email: bpatek@ermanteicher.com

Dated:  August 19, 2013

F:\OTHERINS\Detroit, CIty of\cert of service - obj re petition.docx

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                      Chapter 9

City of Detroit, Michigan,                  Case No. 13-53846

        Debtor.                            Hon. Steven W. Rhodes
_____/

## DECLARATION OF MARK DIAZ
### IN SUPPORT OF OJBECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

I, Mark Diaz, declare as follows:

1.      I have been a Detroit Police Officer for nearly twenty years and have been the President of the Detroit Police Officers Association ("DPOA") since January 1, 2013. In that capacity, I have been involved in the DPOA's efforts to negotiate and to arbitrate its labor matters with the City of Detroit. I make this declaration based on my personal knowledge, and if called upon to do so, I could and would testify to the facts set forth herein.

2.      This declaration is submitted in support of the Objection of the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit

Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

3. Among the matters in which I have been involved as President of the DPOA is an Act 312 Arbitration Award issued in an arbitration completed before Chairman George Roumell in January of 2013 and which resulted in a decision dated March 25, 2013 (the "Award"). A copy of the Award is attached hereto as Exhibit 1. An interim award addressing DPOA health care was also issued on December 31, 2013 (the "Interim Award"). A copy of the Interim Award is attached hereto as Exhibit 2.

4. Act 312, MCL 423.231 *et seq* is a Michigan statute that provides for the compulsory arbitration of labor disputes involving police and firefighter collective bargaining units. Its purpose is to assure the speedy resolution of such disputes.

5. The Award that resulted from the DPOA's most recent Act 312 hearing is the subject of a pending complaint filed by the City on April 15, 2013 seeking judicial review of the Award (Case No. D12 D-0354). The DPOA filed its answer to the City's complaint on July 11, 2013, and the matter has been stayed by these bankruptcy proceedings.

6. There were more than 140 issues before the arbitrator in the proceedings that resulted in the Award. The Award provides for the DPOA to receive a 5% wage increase, effective January 1, 2014, and it is that increase that is the subject of the City's complaint.

7. The reason that there were so many issues before the arbitration panel was that the City had refused to negotiate with the DPOA under former Public Act 4, instead choosing to unilaterally impose terms and conditions of employment on the DPOA, which the Award rejected and found were both demoralizing to DPOA members and not necessarily productive of cost savings.

8. The Award established contractual terms of employment which govern the relationship between the DPOA and the City. It also provided for the Act 312 proceedings to be reopened as of June 30, 2013 to address health care benefits for DPOA members. To the best of my knowledge, information and belief, at no time after June 30, 2013 through the date of the bankruptcy petition (July 18, 2013) did the City engage in any negotiations with the DPOA with regard to the health care reopener issue.

9. Rather than reopening the award, it is my understanding that, as of August 2, 2013, the City announced its intention to impose new health care plans on the DPOA and other Public Safety Unions which significantly increase the members' out of pocket medical costs. At an August 2, 2013 meeting with representatives

from Jones Day, we were presented with an outline of the new health care plans the City intends to impose on the DPOA effective January 1, 2014. Among other imposed changes, that proposal will increase the out-of-pocket costs for health care for DPOA members with insured dependents by $3000 per year.

10. I was also involved in informational meetings with representatives from Jones Day in June and July of this year, at which very general outlines of the City's restructuring proposal were discussed. In the course of these meetings, up through and including the August 2, 2013 meeting, we have, at times, asked if the discussions we had were negotiations. The City, through its representatives, has been very clear with us in asserting that these were not negotiations but that they looked forward to input and suggestions from us. These sessions were mainly presentations with minimal explanations of the data, nothing more.

Dated: August 19, 2013

_____
MARK DIAZ,
PRESIDENT, DPOA

13-53846-tjt Doc 2385-1 Filed 12/27/13 Entered 12/27/13 14:22:38 Page 48 of 74
13-53846-swr Doc 851-1 Filed 08/19/13 Entered 08/19/13 19:33:38 Page 8 of 54

48

# EXHIBIT A-1 (Part 1)

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
MICHIGAN EMPLOYMENT RELATIONS COMMISSION
ACT 312, PUBLIC ACTS OF 1969 AS AMENDED

*In the Matter of:*

CITY OF DETROIT

-and-                                                          MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

## PANEL'S FINDINGS, OPINION AND ORDERS

**George T. Roumell, Jr., Chairman**
**Craig Schwartz, Esq., Employer (City) Designee**
**Theodore Iorio, Esq., Union (DPOA) Designee**

APPEARANCES:

FOR THE CITY OF DETROIT:                    FOR DETROIT POLICE OFFICERS
                                            ASSOCIATION:

Malcolm D. Brown, Attorney                  Donato Iorio, Attorney

### Prologue

This Act 312 proceeding between the Detroit Police Officers Association (DPOA), who

represents approximately 2,000 Police Officers in the City of Detroit, and the City of Detroit

(City), began with the filing of an Act 312 Petition by the DPOA on June 22, 2012. After legal

and political issues concerning P.A. 4 and the duty to bargain were resolved, the Chairman was

appointed as the Arbitrator in this matter on August 23, 2012. After numerous meetings with the

Chairman, Last Best Offers were exchanged by the parties on October 3, 2012. Opening

statements were made by the parties on November 5, 2012 and hearings were held on November

16, 19 and 29, 2012, December 12, 13, 18, 2012 and on January 8, 11 and 12, 2013.

Following the City's presentation on financial ability, the DPOA presented John Bibish, along with comments of its attorney, Donato Iorio, concerning the City's financial ability at the January 12, 2013 hearing. In order to expedite the proceedings, the Chairman, with the consent of the Panel Members, in lieu of scheduling a subsequent hearing date, stated that the City should file a written response to the DPOA's January 12, 2013 financial ability presentation, which the City did on February 1, 2013, and amplified its response in its post-hearing brief.

The Chairman, pursuant to the request of the DPOA, made an Interim Award on most aspects of the health care issues and the parties filed briefs on the remaining issues on January 25, 2013. A decision on the remaining health care issues is still pending before the Chairman. After the Chairman makes a ruling on the remaining health care issues, the parties are to submit their final health care contract language to the Chairman and a meeting or telephone conference will be held regarding the contract language.

Post-hearing briefs were filed by the parties on all non-health care issues with the last brief being filed February 15, 2013.

Between the issues presented by the City and the DPOA, there are 146 issues in dispute. The issues will be listed when discussed by the Panel rather than separately at this point.

This is the Findings, Opinion and Award pursuant to Act 312 of Public Acts of 1969, as amended, based on the Petition filed by the Detroit Police Officers Association. Subsequent to the June 30, 2012 expiration of the Master Agreement between the City of Detroit and the Detroit Police Officers Association, on July 18, 2012 the City instituted the City Employment Terms (CET) with the Detroit Police Officers Association essentially stripping the previous terms of the expired Master Agreement, which represented 40 years of negotiations.

In doing so, even though apparently the City was acting pursuant to Public Act 4 of

2

Public Acts of 2011 and the Consent Agreement with the State, no attempt was made after March 2012 to negotiate even though the City had previously negotiated a Tentative Agreement with the DPOA dated February 9, 2012 which had the goal of saving approximately $6 million annually. The CET, for example, paid attention unnecessarily to such minor details as stripping funeral leaves to two days whereas universally, throughout Southeast Michigan, police contracts provided for three days which is reasonable when a Police Officer under the stress of daily dealing with crime loses a spouse or a child. And, in the big picture, attacking funeral leave is not where the savings are. But, in the Tentative Agreement of February 2012, the DPOA was willing voluntarily to address a suspension of a wage differential worth $332,000 per year as one example and an overtime issue worth $598,000 per year.

At the same time, the CET in the view of this Chairman, ignored a very fundamental cost issue.

Even in this Act 312 arbitration the DPOA, to some extent, recognized the City's financial crisis by a Last Best Offer for essentially the first four and one-half months of a 10% wage cut and then continuing of a previous no wage increase from 2008 levels, as the DPOA members have not received a wage increase since 2008.

The CET has been devastating on crime fighting in Detroit. The CET with its 10% wage cut from a previous no wage increase since 2008 brought about by any other name a demoralized Police force. The morale of the Detroit Police Officers by any standard is at an all-time low. As Gertrude Stein wrote in *Sacred Emily*, "A rose is a rose is a rose". The record reveals that ticket writing is at an all-time low. Arrests are at an all-time low. The Department is completely demoralized. This has all occurred since the CET. And this is taking place in a major American urban area where reputedly the homicide rate per capita is among the highest in the country,

3

where Police response times are lacking.

The reduced arrest and ticket writing has had a cascading effect on crime prevention as established by the enlightened successor to O.W. Wilson, namely, Chief Bracton of New York City and Los Angeles fame who pioneered the concept that more ticket writing and mundane misdemeanor enforcement creates an atmosphere of law abiding citizens. But Police morale in Detroit is at an all-time low impacting effecting law enforcement. And as this Chairman observes, the CET missed a major economic point while emasculating contract language without at least negotiating.

In addition, 146 issues have now been presented to the Act 312 Panel as there has now been a struggle between the City and the DPOA with the DPOA attempting to regain some of the provisions of the previous Master Agreement, with the City concerned about cost savings. The existence of 146 issues presented to the Act 312 Panel was most unusual, some 43 years after the enactment of Act 312 when arguably, even in Detroit's financial crisis, the critical issues, if there had been negotiations and this would apply to both sides, could have been narrowed down.

The Chairman recognizes that the financial crisis of Detroit will require reorganization, even within the Detroit Police Department, as has been the case in other major city police departments.

It is also true that the general employees have taken some big hits with furlough days. The Chairman is aware of this. But, during the hearings, a number of which were conducted in the offices of the DPOA, on the wall there were pictures of approximately 42 Officers since 1974 who were killed in the line of duty, two of which have been killed in the last three years. This does not include those who have been injured while on duty. Thus, being a Police Officer in Detroit, a large urban area with a substantial homicide rate and citizen concern about this rate and

4

crime in general, demands personal sacrifice.

In addition to the City's financial ability, an essential issue with the Detroit Police Department is that in the marketplace the Detroit Police Officers, with the CET wages, are paid below the marketplace. The DPOA attempts to use higher paid suburban departments and of course the higher paid Michigan State Police to compare. But, even if one compares Flint and perhaps Saginaw, financially distressed cities with Flint having an Emergency Financial Manager, the Detroit Police are underpaid.

Try as hard as the DPOA has done through its counsel to shift the financial ability focus, the City is running out of cash. The City is in financial crisis. There is no question about it.

On the other hand, the City needs Police Officers to survive and grow.

An effective Detroit Police force is essential to Southeast Michigan. Southeast Michigan is critical to the growth of the great State of Michigan. A Detroit Police force consisting of demoralized Officers not paid the marketplace will have trouble, as is evident today, serving effectively. It is just that simple. But the realities of the financial situation must be faced.

Throughout the hearings, the DPOA in particular, and at some times the Chairman, asked questions about the efforts being made by the City concerning efforts in collecting taxes that were made in the past and even currently. Yet, as Jan Lazar pointed out, the past is the past. The question that might be asked is what is going to be done currently and in the future? But, again, currently, the City is in financial crisis. The Chairman and Panel majority will prepare Findings, Opinions and Orders on this basis while recognizing that a demoralized Detroit Police Department, being paid substantially under the marketplace of even financially distressed cities in the area, does not serve the interests of the public as these are Detroit Police Officers that are necessary, even at the risk of their own lives, to protect the public interest of Detroit.

5

The aim of the Chairman, joined by one member or the other of the Panel to form a majority, is to frame Orders that will withstand challenge, help the City, Department and the Officers get back on track, deal with the current financial crisis, and set the foundation for more fruitful (for both the City and the Officers) negotiations in the near future.

It should also be noted that the Chairman, joined by the DPOA Delegate, crafts the Orders based on the proposition that the Master Agreement that expired on June 30, 2012 except as otherwise modified by the Orders herein is effective the date of these Findings, Opinion and Orders; and that the CET no longer applies.

### The History

The brief submitted by the current labor counsel of the City, though the Chairman and certainly the Union Designee do not agree with some of the editorial or advocacy statements therein, essentially gives the basic facts as leading to this Act 312 proceedings and are worth quoting in total and are as follows:

| | |
|---|---|
| September 18, 2009 | The City institutes a 10% pay reduction in the form of budget required furlough days for all employees, except uniform employees. These are implemented for non-union employees immediately. For union-represented employees, the furlough days are implemented when the union labor contracts expired if a mid-term modification could not be negotiated. ATU had an 8% pay reduction effective October 1, 2010 because furlough days would not work operationally for DDOT bus drivers. The City is seeking the additional 2% and is now in Fact-Finding required by Section 13(c) of the Federal Transit Act. See Exhibit 695 at xix. |
| 2010 | City of Detroit borrows $250M through issuance of Fiscal Stabilization Bonds. City grants second lien on State revenue sharing to secure the bonds. Ex. 451 at 8. |

6

| | |
|---|---|
| March 2011 | Passage of P.A. 4 |
| December 2, 2011 | State Treasurer Andy Dillon requests that Governor Snyder undertake a preliminary review of the financial condition of the City of Detroit pursuant to P.A. 4. See Ex. 404. |
| Mid-December 2011 | City begins negotiations with its labor unions for concessions to avoid upcoming cash crisis and possible appointment of an Emergency Manager under P.A 4. |
| December 21, 2011 | State Treasurer Andy Dillon issues a preliminary review of the City's financial condition, finding probable financial stress exists in the City of Detroit and recommends the appointment of a Financial Review Team by Governor Snyder pursuant to P.A. 4. See Ex. 405. |
| December 27, 2011 | Governor Snyder appoints a Financial Review Team. Ex. 406 at 7. |
| January 2012 | Furlough days are converted to an actual 10% wage reduction for non-union employees. Ex. 695 at xix. |
| January 2012 | Financial Review Team begins reviewing City financial condition. Ex. 406 at 1, 7. |
| February 2012 | City concludes discussions with DPOA, DPCOA, DPLSA, DFFA and other unions for concessions which arc placed in separate documents for each union titled "Tentative Agreement". The Tentative Agreements are subject to and require approval by State Treasurer Andy Dillon. See Tentative Agreement between DPOA and City, Ex. 771 at page 1 (introductory paragraph). The Tentative Agreements would extend the labor contracts until June 30, 2015. |
| March 2012 | City of Detroit enters into a financing transaction (referred to as the Refunding Transaction) through the Michigan Fiscal Authority under which it will borrow $137M. This transaction will take several months (Summer, 2012) to actually close. See disc |

7

containing Refunding Transaction documents provided on February 6, 2013.

As part of the transaction, the City grants to bondholders a third lien on its State revenue sharing.

Part of the transaction documents provide that no loan proceeds can be advanced to the City of Detroit without the approval of the State.

Since the City is in desperate need of cash, the City, with State approval, enters into a short term bridge loan arrangement with Bank of America under which the City borrows $80M which is placed in an escrow account to be released only upon State approval. This loan will be repaid when the Refunding Transaction closes. See disc containing Refunding Transaction documents.

March 26, 2012 — Report from Detroit Financial Review Team to Governor Snyder finding that Detroit is in a condition of severe financial distress as provided under P.A. 4 and that a consent agreement pursuant to P.A. 4 needs to be entered into between the City and the State. See Ex. 406 at 11-12.

Late March 2012 — State declines to approve Tentative Agreements entered into between the City and its various unions, including DPOA, because, according Brom Stibitz, Senior Policy Advisory to State Treasurer Andy Dillon, there was insufficient concessions to meet the needs of the City of Detroit and because the City's severe financial condition requires flexibility and the State refused to be bound by labor contracts that would not expire until June 30, 2015. Vol. 9, pp. 172-173.

April 4, 2012 — City of Detroit and State of Michigan enter into Financial Stability Agreement. Ex, 407.

The Financial Stability Agreement ("FSA") provides for the establishment of the Financial Advisory Board ("FAB") which is to plan, implement and complete financial restructuring

8

with the City of Detroit.  Ex. 407 at 5.

The FSA provides for a Chief Financial Officer and a Project Management Director.  Ex. 407 at 16, 18.

Annex D of the FSA sets forth requirements for labor contracts which includes:

- Uniformity
- Outsourcing
- Consolidation of operations
- Changes to support financial restructuring
- Maintaining the favorable concessions from the tentative agreements (note the testimony of Brom Stibitz at Vol. 9 at 257 that the concessions in the Tentative Agreements were insufficient).

Pursuant to P.A. 4, upon execution of the Financial Stability Agreement the duty to bargain under PERA is suspended.  However, existing labor contracts continue in force until their expiration.  The FAB has no power under the FSA and P.A. 4 to terminate existing labor contracts.

| | |
|---|---|
| April 2012 | State approves the transfer of $30M of bridge loan proceeds from the Bank of America to the City so that the City can meet payroll, debt and other obligations.  Ex. 451 at 19. |
| May 25, 2012 | Jack Martin hired as Chief Financial Officer.  Vol. 9, pp. 257-258. |
| June 2012 | State approves transfer of an additional $20M from the Bank of America bridge loan proceeds so that Detroit can meet payroll, debt service and other obligations.  Ex. 451 at 19. |
| June 22, 2012 | DPOA files Petition for Act 312 arbitration.  Petition is stayed pursuant to P.A. 4 and the suspension of the duty to bargain under P.A. 4. |
| June 30, 2012 | DPOA labor contract and most other City labor contracts expire, except for DPLSA, DFFA, and |

9

| | |
|---|---|
| | the Emergency Service Operators ("ESO") in the Fire Department (expiration dates June 30, 2013). Note: DDOT and its labor contracts with the A TU and other unions are subject to Federal Transit Act Section 13(c) requirements, The Water and Sewerage Department and its labor contracts arc subject to federal court control although payroll, benefits, and other related matters are administered by the City of Detroit. |
| June 30, 2012 | City ends FY2012 with $1.9M in cash. See CAFR and see Ex. 451 at 19. |
| | City is in violation of Act 51 by using $38.1M from the Street Fund for General Fund purposes. The City is required to repay this money to the Street Fund. Vol. 10, pp. 5-6, 15 and CAFR at 80. |
| July 9, 2012 | Kriss Andrews hired as Program Management Director. Vol. 9, p. 105. |
| July 17, 2012 | City implements City Employment Terms ("CET") for DPOA and separate CETs for each union that had a labor contract that expired on or before June 30, 2012. See CET applicable to DPOA, Ex. 401. |
| | Furlough days for non-uniform union-represented employees are converted to an actual 10% wage reduction. See Ex, 695 at xx. |
| July 27, 2012 | PFRS enters a judgment against City in Wayne County Circuit Court in the amount of $47M for past due pension plan contributions. Judgment payable with interest in 12 monthly installments. Ex. 455. |
| August 3, 2012 | Michigan Supreme Court approves placement of ballot petition seeking repeal of P.A. 4 on the ballot for the November 6, 2012 election. |
| August 9, 2012 | Board of State Canvassers enters ballot proposal on ballot. |
| | Entry of ballot proposal for November 6, 2012 election suspends P.A. 4. However, actions |

10

|                     |                                                                                                                                                                                                                                 |
|---------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                     | taken under P.A. 4 remain valid.                                                                                                                                                                                                |
| August 2012         | City Refunding Transaction through State Fiscal Authority closes.                                                                                                                                                               |
|                     | $80M of bridge loan proceeds is repaid to Bank of America.                                                                                                                                                                      |
|                     | At this time, City has actually received $50M of loan proceeds leaving $87M of loan proceeds available but subject to approval of State of Michigan before disbursement to the City of Detroit.                                 |
| August 15, 2012     | MERC formally begins processing DPOA Act 312 Petition.                                                                                                                                                                          |
| August 23, 2012     | George Roumell appointed as Act 312 Arbitrator.                                                                                                                                                                                 |
| October 3, 2012     | Parties exchange Last Best Offers.                                                                                                                                                                                              |
| November 6, 2012    | Voters repeal P.A. 4.                                                                                                                                                                                                           |
|                     | PA 72 is revived.                                                                                                                                                                                                              |
|                     | All actions taken under or pursuant to P.A. 4 prior to its suspension on or about August 9, 2012 remain valid.                                                                                                                  |
| December, 2012      | State approves transfer of an additional $10M of loan proceeds to the City of Detroit for payroll and other purposes. Ex. 451 at 20 and at fn. 1.                                                                               |
| December 2012       | Governor appoints a Financial Review Team under P.A. 72n. Ex. 464, Attachment B.                                                                                                                                                |
| December 2012       | City begins negotiations with non-uniform unions for additional 10% pay reduction in the form of furlough days. See Ex. 750.                                                                                                    |
| December 21, 2012   | Interim Award on health care made by Arbitrator Roumell. A number of issues remained which were briefed on January 25, 2013. Once a ruling is made on the remaining issues, the parties will submit final healthcare contract language to the Arbitrator and oral |

11

| | |
|---|---|
| | presentations will be made by telephone or in person regarding the contract language. |
| December 27, 2012 | Passage of Act 436 (new EFM law) effective March 28, 2013. |
| February 5, 2013 | City Council passes Resolution and Mayor Bing issues Executive Order for an additional 10% pay reduction in the form of furlough days for non-union employees to be effective February 11, 2013.  Exs. 757 and 758. |
| | Bargaining continues with non-uniform union-represented employees for the furlough days. |
| February 8, 2013 | City seeks approval for an additional $20M of loan proceeds from the Refunding Transaction. |
| | If approved this will leave approximately $57M of loan proceeds.  The State has indicated it will hold in reserve at least $57M of the loan proceeds in the event the State needs funds to assist an Emergency Financial Manager or for other purposes. |
| February 11, 2013 | Furlough days equivalent to a 10% pay reduction begin for non-union employees. |

The DPOA through its attorneys filed lawsuits seeking, based upon the provisions of Act 312, to maintain the *status quo*, namely, the terms of the Master Agreement while the Act 312 was pending, but thus far the Courts have refused to maintain the *status quo* and the CET is currently in effect.

### The Criteria

Act 312 of Public Acts of 1969, as amended, in Section 9 thereof sets forth the criteria to be followed by an arbitration panel.  Act 116 of Public Acts of 2011 amended Section 9, which Section 9 as amended by Act 116 providing as follows:

Sec. 9. (1) If the parties have no collective bargaining agreement
or the parties have an agreement and have begun negotiations or

12

discussions looking to a new agreement or amendment of the existing agreement and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions, and order upon the following factors:

(a) The financial ability of the unit of government to pay. All of the following shall apply to the arbitration panel's determination of the ability of the unit of government to pay:

(i) The financial impact on the community of any award made by the arbitration panel.

(ii) The interests and welfare of the public.

(iii) All liabilities, whether or not they appear on the balance sheet of the unit of government.

(iv) Any law of this state or any directive issued under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection.

(b) The lawful authority of the employer.

(c) Stipulations of the parties.

(d) Comparison of the wages, hours, and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours, and conditions of employment of other employees performing similar services and with other employees generally in both of the following:

(i) Public employment in comparable communities.

(ii) Private employment in comparable communities.

(e) Comparison of the wages, hours, and conditions of employment of other employees of the unit of government outside of the bargaining unit in question.

(f) The average consumer prices for goods and services, commonly known as the cost of living.

(g) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays, and other excused time, insurance and pensions, medical and

13

hospitalization benefits, the continuity and stability of employment, and all other benefits received.

       (h) Changes in any of the foregoing circumstances while the arbitration proceedings are pending.

         (i) Other factors that are normally or traditionally taken into consideration in the determination of wages, hours, and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration, or otherwise between the parties, in the public service, or in private employment.

       (2) The arbitration panel shall give the financial ability of the unit of government to pay the most significance, if the determination is supported by competent, material, and substantial evidence.

Though the Act 116 amendment does require the Panel to give financial ability the most significance, the Legislature recognized that the Panel could consider other factors. The amendment also included the 9(1)(e) comparison with other employees of the unit of government outside of the bargaining unit in question. Obviously, the City wishes the Panel to consider the fact that other employees of the City, including union employees, have taken wage cuts in the 10-20% category.

There is the a(ii) interest and welfare of the public. In this case, this is an important consideration, namely, the fact that public safety is involved; that Detroit Police Officers are not writing tickets and arrests are not being made, which affects safety issues and therefore the interest and welfare of the public. Then there is 9(1)(h)(i), other factors. There is the so-called demoralized criteria and what this Chairman has many times referred to as the art of the possible criteria, namely, what is needed to avoid a demoralized Police force in a high crime area and what is the art of the possible? In this case, as pointed out, the approach of the CET and the failure to attempt to negotiate after March 2012 demoralized the Department, affecting the delivery of Police service. Then there is the art of the possible. What is possible to resolve this

14

dispute short of further disruption in the Department? These factors, when combined with the ability to pay, which is dominant in this situation, must be considered by the Panel in considering the proposals.

It must be recognized that the internal comparisons cannot be overlooked. The unionized general employees as well as union employees have taken a pay reduction by way of furlough days due to the financial emergency in Detroit. Another 24/7 operation in the City, the ATU, namely, the bus drivers, have taken an 8% reduction and are in fact finding for a remaining 2% reduction. These facts cannot be overlooked by the Panel in balancing the economic proposals. On the other hand, as already pointed out by the Chairman, Police work is inherently dangerous, suggesting that some recognition must be placed on this factor and the comparison of the marketplace for well trained Police Officers capable of dealing with crime prevention and intervention by reviewing the marketplace for Police Officers in Southeast Michigan by making comparisons with Police employment in comparable financially distressed communities while considering the financial emergency in Detroit and the financial sacrifices of other Detroit employees.

As already alluded to, the DPOA counsel attempts as a good advocate to have the Panel look to such communities as Birmingham, Livonia, Grosse Pointe, Sterling Heights, all communities with substantial fund balances, rather high pay, as well as the Michigan State Police whose top pay is in the $67,000 range. The City of Detroit, under financial stress, cannot afford those ranges because of financial problems. But, as the Chairman addresses wages, it is very difficult to suggest that the job of a Detroit Police Officer is not as difficult as a State Trooper or Police in the surrounding communities if not more so because of the nature of criminal activity in Detroit, only emphasizing that Detroit Officers are underpaid. Yet, there are two distressed

15

communities nearby whose wages, as will be pointed out, are above what the CET is suggesting that Detroit Officers should be paid, namely, Flint and Saginaw, which make the point.

Then the issue becomes one of priorities and the question of the interest and welfare of the public in Detroit that has one of the highest homicide rates per capita in the country. The Chairman, when turning to the issues, recognizing that the financial ability is "the most significant", also considered other criteria including the marketplace and the welfare of the public and the nature of Police employment including, as compared to other Detroit City employees as representative in the Southeast, the significant number of Detroit Police Officers who have been killed on duty as compared to Michigan State Troopers and other municipal police departments in Michigan.

Yet, the Panel must recognize that the civilian employees of the City of Detroit during Detroit's financial emergency have taken up to a 20% pay cut which, in evaluating the situation with the Police, the Panel cannot overlook.

Section 8 of Act 312 provides:

> **423.238 Identification of economic issues in dispute; submission and adoption of settlement offers; findings, opinion, and order.**
>
> Sec. 8. The arbitration panel shall identify the economic issues in dispute and direct each of the parties to submit to the arbitration panel and to each other its last offer of settlement on each economic issue before the beginning of the hearing. The determination of the arbitration panel as to the issues in dispute and as to which of these issues are economic is conclusive. The arbitration panel, within 30 days after the conclusion of the hearing, or within up to 60 additional days at the discretion of the chair, shall make written findings of fact and promulgate a written opinion and order. As to each economic issue, the arbitration panel shall adopt the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9. The findings, opinions and order as to all other issues shall be based upon the applicable factors prescribed in section 9.

16

Pursuant to this provision, certain of the issues presented by the parties have been determined to be economic issues requiring the Panel to adopt the Last Best Offer of one party or the other. Other issues have been determined not to be economic and as to those the Panel may formulate an order based upon the applicable factors prescribed in Section 9. As to each issue that follows, there will be a majority vote.

## City's Financial Ability

Detroit's poor financial health can be attributed to a number of factors. With hindsight, a careful observer could point to a number of things that the City's leadership should have been done differently. Today, however, the fact remains that the City is dangerously low on cash. Unfortunately, this situation is unlikely to change in the near term. While many drastic reform measures have been implemented, true reform does not happen overnight.

Over the past several decades, Detroit suffered from declining population and high unemployment. For these reasons, tax revenue has substantially declined. Since 1990, the City's population has declined by approximately 30%. In addition, unemployment has increased by roughly 200%. When the associated loss of income tax revenue is combined with recent decreases in state revenue sharing, it is not surprising that the City has experienced debilitating cash flow problems. Between property taxes, municipal income taxes, and wagering taxes, only wagering taxes have remained somewhat steady over the past six years. Since 2008, property tax revenue has decreased approximately 12% due to declining taxable property valuations and increasing charge-backs due to delinquency rates. Income tax revenues have declined due to lower taxable income of both residents and non-residents. While wagering tax revenues have remained steady, they are projected to decrease beginning in 2013 due to a loss of market share caused by a new casino in Toledo.

17

Declining population has also affected state revenue sharing. Since 2008, revenue sharing has decreased by approximately 30%. Between 2011 and 2012, revenue sharing declined from $239 million to $173 million. This startling decrease is primarily due to the population decline illustrated by the 2010 census. If Detroit continues to lose population, this amount will decline even further.

While Mayor Bing and his team can be applauded for effectuating large cost cutting measures, revenue has continued to decline faster than expenses. Because the City has issued debt to cover the significant shortfalls between revenue and expenditures, debt service costs have increased substantially. For example, debt service and POC expenditures are expected to increase from $126 million in 2008 to $151 million in 2013. Additionally, due to the growing number of retiree and legacy costs, the benefit and pension costs per active employee have jumped from $18,000 in 2000 to $28,000 in 2012. While reductions to the active workforce have occurred, the number of retirees and their associated costs are rising. These costs do not decline when headcount of active employees is reduced.

The City's cumulative unrestricted deficit indicates that the City is insolvent. Over the past five years, the City has run an average annual operating deficit of nearly $100 million. These large financial shortfalls have been addressed with long term debt issuances and drastic cost-cutting actions. Despite the receipt of loan proceeds from the issuance of new debt, cash balances have declined since 2008 due to large operating deficits. Even with the current cost saving measures, the city will have an estimated $110 million shortfall at the end of FY2013. Remaining proceeds from the August 2012 issuance of the "Refunding Bonds," together with remaining short term borrowings, are currently held in escrow and can only be used with State approval. The state has mandated that the city reduce cash outflow by between $30 million and

18

$45 million. In addition, the State may release some of the escrow funds; however, it is unlikely that the State will release more than $20 million by the end of FY2013. Even if the City fully reduces cash outflow by the stipulated amount and the State releases a portion of the escrow account, the city is still left with a $50 million to $60 million cash shortfall at the end of FY2013. Quite simply, the city could be out of cash.

In the past, the city has issued debt to cover such shortfalls, but due to recent debt downgrades, this is no longer possible. The City's credit ratings have been deteriorating rapidly and are at all-time lows. Currently, Detroit's credit ratings are below investment grade (junk status) and are lower than any other major US city. Since the beginning of 2012, Moody's has downgraded the City's credit rating from B2 to Caa1. Similarly, Fitch has downgraded the City's rating from B to CCC. According to Moody's November 2012 report, "[t]hese downgrades reflect the City's ongoing precariously narrow cash position and a weakened State oversight framework following the repeal of Public Act 4. ... The negative outlook ... is based on the rising possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months, the general uncertainty of the State oversight as challenges to Public Act 72 persist following the repeal of Public Act 4, and the City's ongoing inability to implement reforms necessary to regain financial stability." Furthermore, the City has nearly reached its legal debt limit. It is currently leveraged to 93% of its general obligation borrowing capacity. This illustrates that the City is no longer able to cover cash shortfalls with debt.

According to the McKenzie Group, there exists a $183 million income tax opportunity for the City. According to another, more conservative estimate created by DPOA witness John Bibish, approximately $54 million of income taxes are left on the table every year. Thus, the DPOA questions the City's performance of collecting income taxes over the years. In fact, the

19

income tax staff positions were reduced from 49 in 2009 to 32 currently. Of all the departments from which employees can be cut, the DPOA asks why make cuts from the group that collects the revenue?

Then, too, as the McKenzie Group and Bibish estimates are just that, a realistic income tax figure is not known.

According to Cheryl Johnson, the current computer system used in the Department of Finance has not been updated since 1998. However, the city has worked with Compuware to build an application that will allow the City to identify non-filer residents (those city residents who file with the IRS but failed to file with the City). The DPOA has indicated that uncollected income taxes could bolster the city's cash. To this effect, letters are currently being sent to resident non-filers. While the City has started the process to collect income taxes from resident non-filers, the success of such an initiative is uncertain.

According to Janet Lazar, an expert in city income taxes, collecting from non-filers will probably not be overly successful. This prediction is based on her observations of other Michigan cities, such as Highland Park. According to Lazar, the City's population is aging. Many of the City's residents receive pension benefits, Social Security, and other governmental assistance that are not taxable by the city. In addition, due to the low income status of many of the city's residents, the cost of collection could often exceed the amount owed. Furthermore, the collection of unpaid income taxes takes time, often in excess of one year. Unfortunately, the City is running out of cash and does not have the luxury of time.

According to Mr. Bibish, it does not need to take over a year to improve tax collections. To improve collections, the City should create work groups that are responsible for collection. For example, light duty police officers could be assigned to work with collection investigators.

20

However, this suggestion is unlikely to work. The employees in the Income Tax Division belong to one of three unions in the treasury Department, the AFSCME, the Association of Professional and Technical Employees, or the Detroit Income Tax Investigators Association. Each union has a labor contract. The use of non-unit personal to perform bargaining unit work could be problematic.

The City should also devise a way to more effectively collect income tax from non-residents. According to Cheryl Johnson, letters are not being sent to non-resident non-filers because the city does not have data on non-resident non-filers. However, even if the City increased its efforts in this regard, there was testimony questioning the results because the tax rate of a non-resident is lower than that of a resident.

In order to increase income tax collections, Lazar has suggested that local income taxes be collected along with State income tax. This has worked in other states. It has worked in Michigan, too. When a pilot program was attempted in Albion, compliance increased significantly. In Albion, revenue increased 18% in the first year. An 18% income tax revenue increase in Detroit could be substantial. Despite its success in Albion, other cities refused to participate due to territorial disputes. The local tax divisions incorrectly claimed that the state would keep the revenue. They improperly compared the initiative to state revenue sharing. Just as state revenue sharing was cut, they claimed that the state would also keep the local tax revenue. However, this is a weak argument. By law, the local revenue must be given to the locality. Unfortunately, the argument was enough to scare many mayors.

While the City's financial information may appear to indicate that cash is available to pay police officers, certain restrictions often disallow such funds to be used for such purposes. For example, Mr. Bibish claims that there is approximately $68.1 million available in the Capital

21

Improvement Project Fund. This amount represents the Revised Free Balance from outstanding project balances. However, all the monies listed under Capital Projects Funds are special project funds raised from voter approved bond issues. The money can only be used for the specific purpose set forth in the bond issue. The City cannot transfer capital project funding to pay debt service for anything other than the project for which the debt was incurred. Therefore, the suggestion that the old capital projects should be closed out and the unused bond funds transferred to pay debt service for other projects is not possible.

Mr. Bibish has also suggested that too much has been budgeted for the 2013 Claims Fund. The official red-book budget for 2013 included a $100 million provision for the Claims Fund. In 2010 and 2011 respectively, only $70 million and $68 million were needed for claims. This indicates that there is approximately $31 million budgeted in excess over the amount needed in 2010 and 2011. If the administration originally thought $80 million was enough (the 2013 Executive Legal Budget only listed $80 million), why was the amount increased to $100 million? It may appear that $100 million may be excessive.

Nevertheless, had the State not released $10 million from escrow in December 2012, the city would have run out of cash. In addition, the only reason the City did not run out of cash in mid-2012 was because the City borrowed more money. Now, the City has borrowed all it can. Its credit rating has decreased to such a low level that additional borrowing is no longer possible.

In his brief, counsel for the DPOA questioned the priorities in the 2012-2013 budget. The Chairman will not go there, so to speak, for those are financial decisions. The City is obligated to provide fire fighting services, emergency medical services, street and sidewalk maintenance, recreation services, garbage pickup, waste disposal, legal defense and the list goes on. Hopefully, those who make the City's financial decisions will recognize the obvious – that

22

public safety is a major concern to the citizens of Detroit; that the issue is whether the Detroit Police Officers are being compensated comparable with other distressed cities, given the hazards of serving in a municipality such as Detroit and the responsibilities in controlling mounting crime concerns in the community.

A State Financial Review Team consisting of financial experts following a review of the City's finances concluded that the City's finances were in a crisis situation and so reported to the Governor in the following letter dated February 19, 2013:

DATE:     February 19, 2013[1]

TO:       Governor Snyder

FROM:     Detroit Financial Review Team:
          Andy Dillon
          Darrell Burks
          Ronald E. Goldsberry
          Frederick Headen
          Thomas H. McTavish
          Kenneth Whipple

SUBJECT:  Report of the Detroit Financial Review Team

The Detroit Financial Review Team met on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, and February 1st, 14th, and 15th 2013, to review information relevant to the financial condition of the City of Detroit. Based upon those reviews, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Accompanying this report is supplemental documentation in support of our conclusion.

Our conclusion is based primarily upon the following considerations:

1.  Cash Crisis. The City continues to experience a significant depletion of its cash. Projections have estimated a cumulative cash deficit in excess of $100.0 million by June 30, 2013, absent implementation of financial countermeasures. While the Mayor and City Council deserve credit for considering and, in some instances, adopting difficult financial reforms, those

23

reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

2.    <u>General Fund Deficits</u>. The City's General Fund has not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund has had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012: The primary methods by which City officials have sought to address these deficits has been by issuing long-term debt. While such an approach reduces the deficit in the year in which the debt is issued, it also reduces fund balance over time as debt service payments increase. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

3.    <u>Long-Term Liabilities</u>. As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials have not yet devised a satisfactory plan to address the long-term liability issue.

4.    <u>Bureaucratic Structure</u>. The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

Based upon the foregoing, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc:    Dave Bing, Mayor
       Detroit City Councilmembers
       James Bolger, Speaker of the House of Representatives

24

Randy Richardville, Senate Majority Leader

¹ Pursuant to Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal
Responsibility Act, a Review Team is required to report its findings to the Governor within 60
days of its appointment, unless the Governor specifies an earlier date or grants a one-time 30-
day extension. This Review Team was appointed on December 18, 2012, and in accordance
with statutory convention, 60 days thereafter was February 16, 2013, a Saturday.

However, Section 6 of the Revised Statutes of 1846, which applies to statutes and
administrative rules, provides that "[i]n computing a period of days, the first day is excluded
and the last day is included. If the last day of any period or a fixed or final day is a Saturday,
Sunday or legal holiday, the period or day is extended to include the next day which is not a
Saturday, Sunday or legal holiday." Therefore, this Review Team report is due on February 19,
2013.

Though counsel for the DPOA questioned the conclusions of the report, the Chairman and the City Delegate, based upon the record made before the Panel, including comments of the rating agencies and the financial information furnished, is in agreement with the Review Team's conclusions in that Detroit is in a financial crisis, having limited ability to pay.

There are ways to raise revenue from both residents who can afford to pay as well as non-residents. Here are the ideas because, without interfering with the political process, this Chairman believes that a Chairman in this situation must take some responsibilities and make some revenue raising suggestions:

1.    Instead of laying off or furloughing people in the Finance Section, the City should add to the Finance Section to aid in collecting taxes and in particular income taxes so that it can have agents that can go into the field and monitor the non-residents and particularly the following types of individuals:

    A.    All the lawyers advertising on the billboards on the freeways of Detroit because many of them, if not all, are earning income in Detroit, even though having offices out of Detroit. Whether they are trial lawyers or probate lawyers in the Circuit and Federal Courts, 36th District Courts or Probate Courts, they earn portions of their fees in Detroit;

    B.    There are lawyers that advertise that they are Social Security specialists who have offices outside of Detroit but earn their income in Detroit at the Social Security Administrative Tribunals;

    C.    There are labor lawyers who appear before the National Labor Relations Board in the McNamara Building and before MERC at Cadillac Place;

25