D.    There are lawyers that appear before State agencies in the Cadillac Place Building;

E.    There are doctors who have offices in Macomb County and in Grosse Pointe who are operating at St. John's Hospital whose operating rooms, on information and belief, are in Detroit, thereby earning substantial income in Detroit. There are doctors who operate at Sinai, Ford and the DMC.

F.    There are lawyers from New York, Philadelphia and Washington, D.C. that try cases in the Federal Court in Detroit. There are bankruptcy lawyers that come to Detroit. There are visiting athletic teams in three major sports who come to Detroit and earn income in Detroit. There are entertainers that come to Detroit and earn income in Detroit. One does not collect by just writing letters. One needs agents "out there".

2.    The City should contact Louisville, Kentucky and ask how Louisville collects income tax from non-residents who come to Louisville. It so happens that at a regional meeting of the National Academy of Arbitrators, two arbitrators, including Richard Block, told this Chairman of their experience of going to Louisville, Kentucky and arbitrating for a non-municipality and being contacted by the city and asked to pay city income tax for their efforts in the city of Louisville. One of them was arbitrating for General Electric. One told that he was "hit" for $33.00. The question is, how does Louisville get the information? This Chairman was hit by Big Rapids, Michigan for a day he spent in Big Rapids arbitrating.

Detroit, with the cooperation of the State, can prevail on the State legislature to enact two statutes requiring all businesses outside of the city limits, as well as within the city limits, to withhold City of Detroit income tax and also a non-discrimination act so that the employer will not discriminate against hiring City of Detroit residents because some employers might avoid hiring a Detroit resident to avoid the withholding requirement.

Another idea is to pass at least for a limited time (three or four years, if not longer) a sports ticket tax for hockey, baseball and football of $1.00 to $2.00. This would bring in upwards to $10 million annually. The events do receive Police protection at their athletic events. Detroit is in a financial crisis. People go to the Lions, Tigers and the Red Wings games. Particularly at the Tigers and Lions games, there is substantial Police presence. This modest

26

amount will not keep people away. And Detroit is in a crisis. This will help pay for needed Police services. Any resistance should be overcome. These are dire financial times. The Officers must be brought up to the marketplace.

Furthermore, the general employees cannot be expected to continue to sacrifice as they have been.

Jan Lazar is correct. The State should be collecting the City of Detroit income tax at least as to residents and to non-residents who are already identified as consistent filers. And when other non-residents are identified in a comprehensive investigation, the State should add them to the State collecting efforts. The Chairman recognizes that this may not be done until 2014, but it should be part of the long range effort.

Many of the above suggestions may not be able to be implemented immediately to address the current cash crisis. In this regard, the Chairman, concerned with restoring the Detroit Police Officers to a reasonable competitive pay rate and some long established benefits necessary to keep the Detroit Police Officers competitive and benefits used to control absences, the orders will provide for civilianization permitting the Department to employ Police Officers in jobs that require MCOLES certification and that other jobs now performed by Police Officers can be performed by civilians. This will permit the Department to serve citizens with fewer sworn Officers at the same level of Police services as now with Officers being paid at the market rate. Furthermore, if necessary, as was the case in Flint, some Officers may be laid off or the force can be reduced as a result of attrition due to retirements. With civilianization, this could impact the number of Officers available for street duty. Yet, there would be, if need be, less current costs to the City while restoring some benefits and paying Officers at least a competitive wage with the distressed cities.

27

In addition, in addressing the Issues, the Chairman has voted with the City Delegate to control some overtime costs. This approach gives significance to the financial ability in Detroit's situation while recognizing other Section 9 criteria, both in the short run and in the long run.

## The Issues

### Preliminary Comment

To repeat a refrain, the parties have submitted 146 issues for the Panel to decide. The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings. Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police Department. This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan. It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

28

Furthermore, if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced. Even so, both the counsel for the City and the DPOA are to be complimented for the fact that they were able to complete the hearings in record time despite the number of issues and to present their briefs in an extraordinarily accelerated time. Those who read this Opinion, if there ever is a Hall of Fame for Lawyers, should make these two counsel the first candidates because both have put in extraordinary efforts as had the two Panel Members. Nevertheless, in a 2013 Act 312, the Chairman will repeat there should not have been 146 issues nor should there have been a CET without an opportunity to bargain for, as the Chairman, as pointed out, it has bred a demoralized Police force.

Counsel mutually numbered the Issues. The Panel will follow the parties' numbering of the Issues, but the Issues will not be discussed in numerical order. In some cases, the Issues will be discussed in interest groups for convenience.

**The reference on each Issue to "*status quo*" is a reference to the language in the Master Agreement that expired on June 30, 2012. In addition, the references to the current contract are to the Master Agreement that expired on June 30, 2012.**

**Issue No. 97 -**       *Article 48 - Contract Duration*

It is appropriate to begin the discussion of the Issues with the length of the contract. Issue No. 97 addresses duration. The City maintains that this is an economic issue. The DPOA maintains that this is a non-economic issue. As a non-economic issue, the Panel can formulate a provision without accepting the Last Best Offer of either party. The Chairman, joined by the DPOA Delegate, accepts the DPOA's position that duration is a non-economic issue.

The City proposes that the Agreement run from July 1, 2012 to June 30, 2013. The

29

DPOA proposes that the Agreement run from July 1, 2012 to June 30, 2014. The Chairman appreciates that the parties have spent a great deal of time, effort and money in presenting this case.

Yet, by any standard, the City is in a dire financial crisis. The City is in need of a serious reorganization. This is a given. The Department is in the need of reorganization as part of the City's reorganization. On the other hand, by any definition, the CET as applied to the Police brought about a demoralized Police Department that affected the productivity of the Police and the public welfare, causing this Panel to have to deal unnecessarily with 146 issues, starting with resurrecting a Collective Bargaining Agreement that was a product of 40 years or more of negotiations and interest arbitration. It would seem, therefore, to the Chairman that to bring stability to the situation that there be a two year contract beginning on July 1, 2012 with an automatic re-opener on health care insurance and pension issues, with the automatic re-opener taking place on June 30, 2013 which is not too far away. This way, all of the other issues are established, including wages, longevity, transfer rights, seniority rights and the other issues that came before the Panel, including sick leave accumulation.

Health care and pensions are major issues that the parties will be obliged without the pressure of so many issues to review beginning June 30, 2013. The re-opener is automatic as to these two issues, though it is recognized that the health care insurance, because of the enrollment, continues until January 2014. Nevertheless, health care will be re-opened for discussion beyond the open enrollment ending January 2014. To repeat, the re-opener on June 30, 2013 for all pension issues and health issues will be re-opened automatically on June 30, 2013.

The Chairman has been joined by the DPOA Delegate in voting for a two year contract except that the DPOA Delegate dissents from a re-opener. The City Delegate dissents from a

30

two year contract but would agree that if there is a two year contract he will vote for a re-opener as to pensions and health care.

| | |
|---|---|
| **Issue No. 1 - Economic -** | *Union Security - 2% Dues Collection Charge* |
| **Issue No. 5 - Economic -** | *Article 4 - Basis of Representation, Pay for Full-Time Union Officers* |
| **Issue No. 8 - Non-Economic -** | *Article 4.O - Basis of Representation, Pay for Grievance Committee* |

The Chairman, for discussion purposes, has grouped Issue Nos. 1, 5 and 8 together as the underlying principle applies. The City proposes to add a Section L to Article 3 whereby the DPOA would reimburse the City "an amount equal to 2% for all Union dues and service fees amounts remitted to the Union" which the DPOA opposes, as there is no such provision in the Master Agreement nor has there ever been such a provision in the parties' numerous past agreements.

As to Issue No. 5, presently the City pays the wages for the full-time release of the President, Vice President, Sergeant at Arms and Financial Secretary of the DPOA. Similarly, as to Issue No. 8, the City has been paying the salary and benefits for three Grievance Committee Members to be off two working days per week. The City proposes that the DPOA reimburse the City for the salary and benefits of the full-time DPOA Officers and the two working days off that the three Grievance Committee Members are off. The DPOA proposes the *status quo*.

The rationale of the City is that the 2% dues collection fee has been imposed on all City unions and that granting this provision would achieve uniformity consistent with the requirements of the Financial Stability Agreement.

In regard to reimbursement for Union Officers and the Grievance Committee Members, the City notes that it has ceased paying the wages and benefits of union officers for every union in the City that has expired labor contracts; that the cost per year for three Grievance Committee

31

Members is $296,000 per year; that the cost for four full-time Union Officers and three Grievance Committee Members is $691,096; that the cost to the City for all full-time Union representatives City-wide is $2,797,747; and that when the cost for part-time as well as full-time Union representatives City-wide is added, the grand total is $3,125,806.

The Chairman recognizes that this is a considerable amount of savings that cannot be overlooked in a financially distressed City of Detroit and the DPOA's $691,096 cannot be overlooked. However, there is a failure to recognize the unique circumstances of Police representation. Because of the nature of Police work, including physical contact with certain members of the public, Police Officers are sometimes charged with abuse of force requiring Police representation, including representation of Union Officers as well as legal counsel. This involves *Garrity* hearings where Officers are represented by both counsel and Union Officers as well as discipline hearings. There are other discipline proceedings in a quasi-military organization, putting an undue burden on the DPOA which is not as common in a civilian union.

Furthermore, though the ranks of the DPOA have been reduced, the representation needs continue. In addition, there is no showing that the 2% charge would save any appreciable sum of money for the City. There is no showing that the City has charged for deducting for charitable contributions. There is no showing that the City's payroll system is not already keyed to providing such deductions without additional appreciable costs. This has been a method of dealing between the parties for many years. Though the DPOA has approximately 2,000 individuals either paying dues or a service fee, with the cost of representation because of the nature of Police work and discipline issues in a quasi-military organization, its dues structure will have difficulty supporting the representation that the DPOA must provide.

Having said the above, however, in applying the art of the possible and recognizing the

32

City's financial situation, the Chairman will agree with the City on Issue No. 8 and provide that if the DPOA wishes to have Grievance Committee Members receive two working days off per week, on any days off those days shall be at the expense of the DPOA, namely, their salaries and benefits for those days off shall be paid by the DPOA. This will amount to a savings of $296,000 per annum by the City and can be afforded by the DPOA. This represents a compromise, recognizes the City's financial situation, and it is up to the DPOA to adjust, if it so desires, its method of delivering services to its members. The DPOA must recognize that it is somewhat being treated differently than other unions in the City. But this is because of the nature of the members it represents and the cost associated with doing so, as explained by the Chairman.

As to Issue No. 5, the Chairman believes that the Order is unique to the Detroit Police Officers Association for the reason discussed in this portion of the Opinion. For this reason, the Chairman cautions that the Order as to Issue No. 5 or the Opinion that has been written by the Chairman as to Issue No. 5 should not be taken as a precedent as to the other uniform groups as their numbers and their situations are different and may or may not support the claim for full-time Union Officers as was made by the DPOA based on the numbers of Officers represented by the DPOA that were made to this Panel and the type of representation that was required to be made on a day to day basis.

The Union Delegate concurs with the Chairman as to Issue Nos. 1 and 5, but dissents as to Issue No. 8. The City Delegate dissents as to issue Nos. 1 and 5, but concurs with the Chairman as to Issue No. 8.

**Issue No. 27** - **Economic** - *Article 12.A - Modify Funeral Leave*

Issue 27 pertains to the funeral leave provisions of Article 12. This is an economic issue. The City proposes that the number of leave days for funeral of immediate family members be

33

reduced from three (3) to two (2). Additionally, the City proposes that leave days for funerals of immediate family members exceeding two (2) days only be extended to "a total of five (5) days to be charged against current sick leave..." Conversely, the DPOA proposes that the *status quo* be maintained, which would provide three (3) days of leave for the funerals of immediate family members. The language affording three (3) days of funeral leave has been in the contract between the City and the DPOA for a number of years. The City has put forth no convincing justification for a reduction in leave days for the funerals of immediate family members. Although legitimate, the cost savings associated with the City's proposal do not justify a reduction in leave days for funerals of immediate family members in light of added stress to officers. Indeed, reducing the historical funeral leave that the officers have had would add to the stress of an already highly stressful job at times of personal crisis. Furthermore, comparables to other cities indicate that the City's proposal, frankly, is below any of the listed police jurisdictions. Accordingly, considering the lack of significant, consistent cost savings and the comparables presented, the Chairman denies the City's requested changes to Article 12. The DPOA Delegate joins the Chairman in adopting the *status quo*. The City Delegate dissents.

| | |
|---|---|
| <u>**Issue No. 79**</u> **- Economic -** | *Article 37 - Bonus Vacation Days - Eliminate* |
| <u>**Issue No. 40**</u> **- Economic -** | *Article 14.D.4 - Overtime-Bonus Vacation Days - Did Not Work Roster* |
| <u>**Issue No. 47**</u> **- Economic -** | *Article 22.A - Furlough Selection-Delete-Attach Bonus Vacation Days to Furlough Days* |
| <u>**Issue No. 49**</u> **- Economic -** | *Article 25 - Emergency/Excused Leave Days-Relation to Sick and Bonus Vacation Days* |
| <u>**Issue No. 58**</u> **- Economic -** | *Article 31.E.6 - Holidays-Bonus Vacation Days* |
| <u>**Issue No. 59**</u> **- Economic -** | *Article 31.F.2 - Holidays-Bonus Vacation Days* |
| <u>**Issue No. 135**</u> **- Economic – Union Proposal -** | *Article 22-Furlough Selection and Cancellation-Sell Furlough Time-Continue to Attach Leave Days and Bonus Vacation Days to Furlough* |
| <u>**Issue No. 142**</u> **- Economic – Union Proposal -** | *Article 37-Bank and Pay Bonus Vacation Days* |

34

**Issue No. 116** - **Economic - Union Proposal -** *Article 37-Bonus Vacation-Bonus Vacation Days Not Used to Excused Time or Comp Bank*

The above issues deal with bonus vacation days which are set forth in Article 37 of the Master Agreement which in its entirety reads:

### 37. BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time. Officers who have accumulated a minimum of fifty (50) sick days including both current and seniority days and have a minimum of six (6) years of service on July 1st of each year will be credited with one-half (1/2) of the unused current sick time from the previous fiscal year up to six (6) days. An officer may request to take his bonus vacation days in any sequence (except when attached to a furlough as stated below) by submitting a request in writing to his commanding officer. This request will be reviewed for the availability of personnel by his commanding officer. Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to use up to three (3) bonus vacation days in conjunction with a furlough. The request to utilize bonus vacation days in this manner must be included in the leave day request. Bonus vacation days, when connected to a furlough, shall not be canceled unless the accompanying furlough is canceled. This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days are expended proportionately throughout the year and arc not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign the remaining bon us vacation days at his discretion. Any request to utilize unused bonus vacation days in conjunction with a furlough scheduled during the months of April, May or June must be submitted to the commanding officer by April 1st or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before compensatory time shall be taken.

As the first sentence of Article 37 clearly indicates, bonus vacation days are linked to

"unused current sick time". In other words, bonus vacation days are granted as an incentive to

35

encourage an Officer's attendance.

The Department continues to be concerned with Officers who have absentee issues. This is the reason that the parties have negotiated an attendance program set forth in Article 36, namely, the D.P.D. 350 program. Absenteeism causes the Department overtime costs in that the Department on occasion finds it necessary to backfill for absent Officers on an overtime basis. Thus, when the City proposes in Issue No. 79 to eliminate bonus vacation days and suggests that it would save $1.2 million per year in the Police Department alone, the proposal ignores the cost of absenteeism.

The DPOA objects to eliminating Article 37, the bonus vacation days, and proposes that the *status quo* be maintained. This is an economic issue requiring the Panel to elect one of the parties' proposals. In the view of the Chairman, for the reasons already suggested, namely, absences add to the cost of the Department's operations, any savings resulting from the elimination of the Bonus Vacation Days program would be outweighed by the cost of backfilling because of absenteeism. Furthermore, the Bonus Vacation Day program has been a part of the Collective Bargaining Agreement between the DPOA and the City for a number of years. Considering the City has show no convincing reason justifying the elimination of the Bonus Vacation Days program, the Chairman decides to maintain the *status quo*. The DPOA Delegate joins the Chairman. The City Delegate dissents.

As to Issue No. 40, since a majority of the Panel is not eliminating bonus vacation days, bonus vacation days will be part of the Did Not Work Roster. Therefore, the City's Issue No. 40 will no longer be necessary and will be rejected with the DPOA Delegate voting with the Chairman on this rejection as the proposal would remove bonus vacation days from the Did Not Work Roster. The City Delegate dissents.

36

As to Issue 47, the City's Last Best Offer proposes the elimination of language contained in Article 22.A regarding Bonus Vacation Days granted in connection with furlough days. The DPOA objects to the elimination of this language and supports maintaining the *status quo*. This is an economic issue with the Panel obliged to select one or the other Last Best Offer. Since a majority of the Panel, in addressing Issue No. 79, opted not to eliminate bonus days, it follows that as to Issue No. 47 that the Chairman, joined by the DPOA Delegate, will opt to maintain the *status quo* as to Article 22.A since bonus vacation days shall remain in the Master Agreement. The City Delegate dissents.

Issue 49 makes reference to Article 25, "Emergency/Excused Leave Days". The last sentence of that Article in the first paragraph reads: "All excused days will be deducted from the member's accumulated sick bank and will consequently affect the accumulation of bonus vacation days." The City proposes to remove the phrase "and will consequently affect the accumulation of bonus vacation days". The DPOA proposes the *status quo*. The City's proposal was on the assumption that bonus vacation days will be eliminated. Since a majority of the Panel rejected the proposal to eliminate bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to reject the elimination of the bonus vacation language from Article 25. The City Delegate dissents.

Issue No. 58 addresses Article 31.E.6 and the preparation and maintenance of holiday rosters and the elimination of the phrase "and up to three (3) bonus vacation days" as proposed by the City. The DPOA proposes the *status quo*. Since a majority, namely the Chairman and the DPOA Delegate, have voted to maintain the bonus vacation days, the same majority rejects the elimination of the preparation and maintenance of holiday rosters, the language "and up to three (3) bonus vacation days", and will vote to maintain the *status quo* and keep the reference to

37

the three bonus vacation days in Article 31.E.6.d. The City Delegate dissents.

Issue No. 59 is similar to issue No. 58 in that Article 31.F.2 addresses Special Rules Affecting Rotation. The City proposes to delete from Article 31.F.2 the following language:

> F.  Special Rules Affecting Rotation.
>
> \* \* \*
>
> 2.  **Employees on Furlough**. For purposes of this Article, a furlough period includes the customary five (5) attached leave days ~~and up to three (3) bonus vacation days~~. The furlough includes the holiday even if it should fall on the first day of the regularly scheduled furlough.
>
> \* \* \*

The language that the City proposed to delete is the strikeout language. The DPOA proposes the *status quo* and to keep the deleted language. Since the deletion assumes the elimination of the bonus vacation days and a majority of the Panel has opted to maintain the bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to deny the request to delete the above language with the City Delegate dissenting.

As to Issue Nos. 135, 142 and 116, which are DPOA proposals, the DPOA has made the following proposals:

**DPOA**
**PROPOSAL NO. 116**
**Article 37 - Bonus Vacation Days**

**ARTICLE 37 (NON-ECONOMIC)**

Paragraph 3 of the current collective bargaining agreement shall be amended by addition the following proposed new language:

**"Effective July 1, 2012 any bonus vacation days not used by June 30 of each year, shall be automatically credited with an equivalent amount of "excused time" which will be placed in the officers compensatory bank."**

38

**DPOA**
**PROPOSAL NO. 135**
Article 22 ¶G - Furlough Selection and Cancellation

### ARTICLE 22 (NON-ECONOMIC)

Paragraph G – Shall be amended as follows: "Effective with the first furlough draw after August 28, 2011, members may elect to sell up to one (1) week of furlough time (5 consecutive days) per furlough period. This shall not diminish the election to attach five leave days and up to three (3) Bonus Vacation Days in connection with the furlough. An election to sell furlough time shall be at the time of the furlough draw. Payment shall be made within thirty (30) days after the furlough draw.

**DPOA**
**PROPOSAL NO. 142**
Article 37 - Bonus Vacation Days

### ARTICLE 37 - BONUS VACATION DAYS

Article 37, "Bonus Vacation Days," shall be modified upon issuance of this Award to provide that bonus vacation days that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking.

In regard to these proposals, the City's Advocate at pages 87 and 88 of his post-hearing brief writes:

3.  **Union Issue No. 135 - Right To Attach Bonus Vacation Days To Furlough Days Even If Furlough Days Are Sold**

The City agreed to allow Officers to sell one week of furlough time. With this agreement Officers gave up their right to schedule time off using furlough time and agreed to be at work. It is inconsistent to allow that an Officer to then schedule leave days and bonus vacation days for the same time period.

Further, to allow the Officer to schedule up to eight consecutive days off even though he has sold his furlough time is unfair to others who want furlough time and maybe prevented from taking it because the employee continues to schedule leave time and bonus vacation time during that period. It is hard enough to schedule furlough time when an Officer has sold furlough days to take available vacation time for Bonus Vacation Days and leave days.

39

4. **The DPOA Wants The Right To Bank And Sell Any Bonus Vacation Days Not Utilized Within The Fiscal Year**

This request should be denied for the following reasons:

- Bonus Vacation Days were agreed upon because they had to be used and could not be paid out costing the City much needed cash. This is the premise upon which Bonus Vacation Days were agreed upon and placed in the Labor Contract. To now allow them to be paid out would violate the principle underlying this contract provision.

- If police officers are allowed to bank and sell unused Bonus Vacation Days it will be costly to the City. It will cost the City $985,000 to payoff Bonus Vacation Days if all eligible officers bank and sell them. See Ex. 663.

- In the Ability To Pay portion of this Brief the City made it clear it has no cash. To allow Police Officers to convert Bonus Vacation Days into paid days negatively affects the City's cash, cash which the City does not have.

5. **Conversion of Bonus Vacation Time To Excuse Days To Be Placed In Officer's Compensatory Time Bank**

The DPOA wants to convert any unused bonus vacation days to excuse time to placed in Officers' compensatory time bank. The City opposes this request for the following reasons.

- At the present time bonus vacation days must be used or lost. It was negotiated as time off to be utilized during the fiscal year so that the problems of carryover would not exist. Further, they were negotiated such that they would be used and not cash out as compensatory time at retirement.

- Allowing the conversion of bonus vacation days to compensatory time would allow the officer to have these days paid out as compensatory time bank at retirement. The City is trying to decrease the retirement leave bank payments it must make not increase them.

- See cost implications set forth in the prior section. Ex. 663.

These proposals will add approximately $1 million annually in cost. Based upon the City's fiscal condition, this is not the contract to add costs. The only reason the Chairman opted with the DPOA Delegate to maintain the bonus vacation days is because the bonus vacation days

40

was an incentive to encourage good attendance and, for this reason, had the potential of not only being cost neutral but cost effective, *i.e.*, discouraging absences and, therefore, controlling overtime. Thus, the Chairman, with the concurrence of the City Delegate, will vote to reject Union Issue Nos. 135, 142 and 116. The DPOA Delegate dissents.

**Issue 50 - Economic -**       *Article 27 - Police Reserves*

Issue 50 addresses Article 27 of the Collective Bargaining Agreement dealing with police reserves. The DPOA proposes to maintain the current language of Article 27 and keep the status quo. Conversely, the City, in its Last Best Offer, proposes the following modified language:

> The City may deploy Police Reserve Officers to assist on-duty police officers or to assist the Department by performing tasks that do not require MCOLES certification. These tasks shall be limited to traffic duty, crowd control, riding with a Police Officer if the Police Officer consents, school patrol, handling and assisting in handling abandoned vehicle, helping with special events and central events, issuing parking tickets, and taking police reports.

Since at least 1998, the current Article 27 language has been in the contract. The question of police reserves is always a difficult one for the Police unions and municipalities to negotiate to their mutual satisfaction. In Detroit, under the current contract language, which either was negotiated or awarded in a 312 arbitration, the parties have developed certain practices as to the use of police reserves. In the absence of any current negotiations on the issue, the City wishes to impose an employment term that the City may hire and deploy police reserve officers in a manner deemed appropriate by the Chief of Police. There is no evidence that the parties were negotiating to an impasse on this subject. Nor were they making any concrete proposals prior to this 312 arbitration proceeding to modify the existing practices. Based upon the lack of bargaining history, which suggests no need to change the current practice, the Chairman, joined by the DPOA Delegate, decides to adopt the *status quo*. Article 27 will continue to read:

41

ARTICLE 27

In continuing its policy on police reserves, the City will in no event use
police reserves to perform the essential core duties of bargaining unit
members or to circumvent the holiday overtime and/or any other
provisions of this agreement. Should a dispute over the deployment of
reserves arise, the burden of proceeding and the burden of proof in any
grievance/arbitration matter shall be on the Employer to establish by
probative, objective evidence, that its use of reserves did not circumvent
any provision of the collective bargaining agreement, and, but for the
deployment of reserves, bargaining unit members would not have been
used to participate in the particular event, duty, function, activity, etc.

Reserves cannot be assigned to ride with employees unless the employee
consents. Reserves shall not ride with employees assigned to one person
cars except in such situations that arise under Article 6.E.4.f. of this
Agreement.

The City Delegate dissents.

**Issue No. 70** - **Economic** -    *Article 33 - Pension Provisions - City Right to Modify DB Plans*

In Issue 70, the City proposes the addition of new language to Article 33. The language

of the City's proposed Article 33.X reads as follows:

The City reserves the right to modify, amend, and/or eliminate any and
all aspects of its pension/retirement plan(s), unless prohibited by law.

The DPOA objects to the insertion of the City's proposed Article 33.X. This is an

economic issue. The City's proposed Article 33.X is too open ended. When parties enter into a

contract, they agree to be bound by the agreed upon terms. The proposed Article 33.X could

serve to deny the DPOA of the agreed upon terms contained in the contract. Once orders are

issued, they should be final and binding. Accordingly, the Chairman, joined by the DPOA

Delegate, declines to adopt Article 33.X. The City Delegate dissents.

**Issue No. 85** - **Non-Economic** -    *Article 40.F - Miscellaneous-Service Weapon*

The City wishes to amend Article 40, Miscellaneous, Section F, as follows, represented

by the strikeouts, suggesting that a weapon costs in excess of $600 and can be recycled:

42

F.C.    Service Weapon.  All employees shall be provided at no charge with their department-issued service weapon upon full service retirement, provided, however, that no employee who retires before July 1, 1995 shall be entitled to receive their Department issued Glock semi-automatic weapon unless the employee has been qualified with the Glock semi-automatic weapon for one year as of the date of retirement.

      Effective July 1, 1989, this provision shall apply to employees who take a 40 & 8 vested pension.

      The Department may refuse to give employees their weapon for good cause shown.

This has been designated as a non-economic issue by the parties.

The City is correct that the proviso should be eliminated because there are no Officers now employed who would be subject to the proviso. Except for eliminating the proviso, there is no reason to change the language. It has been in the parties' Master Agreement for some time, including the provision for employees who can retire at 40 and 8. For this reason, the Chairman, joined by the DPOA Delegate, will vote to maintain the current language minus the proviso. The City Delegate dissents. The language will now read:

F.    Service Weapon.  All employees shall be provided at no charge with their department-issued service weapon upon full service retirement.

    Effective July 1, 1989, this provision shall apply to employees who take a 40 & 8 vested pension.

    The Department may refuse to give employees their weapon for good cause shown.

**Issue No. 88** - **Economic** - *Article 40.I - Miscellaneous-Correction of Overpayments and Underpayments*

Issue No. 88 addresses Article 40.I of the Master Agreement which is entitled "Correction of Overpayments and Underpayments." The City wishes to delete the current language and replace it with the following language:

43

> When by payroll error an employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment pursuant to applicable law. The City reserves the right to seek immediate recovery through appropriate legal proceedings.

Here, again, the Chairman is faced with no current history of bargaining. But the Chairman is faced with a contract provision that has survived at least two 312 arbitration proceedings, if not before. The whole idea of PERA is to bargain. When this Chairman remanded these proceedings back to bargaining, as permitted by Act 312, he was hoping that he would not be faced with provisions such as this to be decided as this is a provision that should have been resolved by the parties. As it is, this provision has obviously been resolved by the parties long ago, since it has been, there is no reason, in the view of this Chairman, to modify the contract language. Therefore, the Chairman, with the DPOA Delegate concurring, will reject the City's position and continue the language of Article 40.I in the Master Agreement. The City Delegate dissents.

**Issue No. 91** - **Economic** -   *Article 41.A - Wages-Additional Classification Payments*

As to Issue No. 91, which references Article 41.B of the Master Agreement, the City proposes the following language with the addition of "unless modified" and the strikeout "Beginning July 1, 200~~4~~8 through June 30, 2009":

> Unless modified, salaries for the following classifications will be maintained at the dollar differentials indicated for the term of this Agreement ~~beginning July 1, 2004 8 through June 30, 2009~~.

> 1. **Communications Officer - Police Officer (Class Code 33-12-11)**
>
> | | |
> |---|---|
> | Start | $450 over starting salary of Police Officer |
> | After one year | $450 over starting salary of one-year Police Officer |
> | After two years | $450 over starting salary of two-year Police Officer |
> | After three years | $450 over starting salary of three- year Police |

44

|                 | Officer                                                      |
| After four years | $450 over starting salary of four-year Police Officer      |
| After five years | $450 over starting salary of five-year Police Officer      |

2. **Band Director - Police Officer (Class Code 33-12-14)**
$821 over maximum of salary of Police Officer

3. **Assistant Supervisor of Motor Vehicles - Police Officer (Class Code 33-12-15)**
$862 over maximum salary of Police Officer

4. **Police Data Processing Programmer - Police Officer (Class Code 33-12-26)**
Minimum: $589 over maximum salary of Police Officer
Maximum: $1,738 over maximum salary of a Police Officer

5. **Radio Maintenance Officer - Police Officer (Class Code 33-12-12)**
$862 over maximum salary of a Police Officer

6. **Radio Systems and Planning Officer - Police Officer (Class Code 33-12-13)**
$1,567 over maximum salary of a Police Officer

7. **Senior Police Data Processing Programmer - Police Officer (Class Code 33- 12-36)**
Police Lieutenant salary

The DPOA agrees with this language which is in the Master Agreement except the DPOA does not agree with the addition of "unless modified" and the DPOA referenced *status quo* without mentioning striking the "beginning July 1, 2008" language. The Chairman, along with the DPOA Delegate would agree with striking the "unless modified" language because once an agreement is consummated it is the parties' agreement. If the parties want to modify it, that is up to the parties. As a housekeeping matter, the "beginning" language should be struck and the DPOA Delegate agrees that the language "beginning July 1, 2008 through June 30, 2009" should be struck because it is redundant and obsolete. On this assumption, in striking the words "unless modified", the Chairman and the DPOA Delegate adopts the DPOA's *status quo* language. The

45

# EXHIBIT A-1 (Part 2)

City Delegate dissents as he would include the "unless modified" language.

**Issue No. 106 - Economic -** *Article 33 - Sick Leave-Restricted Duty Assignments in Discretion of City: Restricted Limited to One Year*

Issue No. 106 is a proposal by the City to limit limited duty for Officers who are not injured on duty or have illnesses not connected to injuries on duty, as contrasted to injuries obtained while on duty to serving in a limited duty capacity for one year. This Chairman is familiar with such a provision whereby the Department would be distinguishing as to limited duty between Officers injured on duty and non-injured on duty Officers as this Chairman was called upon by the Chicago Police Department and the Fraternal Order of Police Chicago Lodge No. 7 to issue an opinion dated February 18, 2013 on the same subject against a background of numerous opinions issued by arbitrators in Chicago on the subject.

The Opinion gives the history of the matter in Chicago. Here, in Detroit, the record reveals that there are upwards to 60 non-IOD limited duty Officers serving in a Department of 2,000 Officers. In contrast, in Chicago, in a Department of 10,000 Officers, there are approximately 220 such Officers. This does make the point. Time lines do encourage Officers to get well and get back to full duty. This is particularly important in economically difficult times when the services of all Officers are needed on full duty.

There are provisions for disability retirements. This proposal only applies to non-IOD Officers. It does not apply to injury on duty Officers. The DPOA proposed the *status quo*, namely, no limitation, and the City proposed the one year limitation. As the Chairman understands the City's offer, the one year limitation would begin effective the date of the Order. Furthermore, the Panel must choose one or the other offer. Recognizing that the City needs full-time duty Officers and there are provisions for disability retirement and it seems that one year is a

46

reasonable time to recover from a disability, the Chairman, along with the City Delegate, will accept the one year limitation. The DPOA Delegate dissented, maintaining that there should be no limitation. Thus, the Order of the majority would be a one year limitation for non-IOD injuries or illnesses. There is no limitation for IOD injuries or illnesses.

**Issue No. 45** - **Economic** - *Article 20 - Eliminate Educational Reimbursement*

The City has proposed that the educational stipend set forth in Article 20 under the conditions set forth therein, namely, that Officers can receive a maximum of $850 per fiscal year applied toward tuition in seeking a graduate degree from an accredited university, a maximum of $700 per fiscal year seeking an undergraduate degree, and $600 per fiscal year to be applied toward payment for participating in an employment development program be eliminated. The DPOA proposes to keep the *status quo*.

This provision has been in the parties' contract since 2000. It is similar to the provision that has been in union contracts throughout the City. The City in the current financial crisis in imposed contracts has eliminated the tuition reimbursement program throughout the City. In the Tentative Agreement the DPOA agreed to suspend the educational reimbursement until July 1, 2015.

In the overall scheme of economic benefits, this benefit has not been a major factor between the parties. In fiscal year 2011-2012, there were 43 requests of an average amount of $621 for a total of $26,716. In fiscal year 2009-2010, there were 97 requests of an average of $591 for a total of $57,365. This is an economic issue. The Panel is obliged to select one or the other Last Best Offer. It is a minuscule amount. Nevertheless, it is a saving and the DPOA at one time, in view of the current history of usage, was willing to suspend the payment for three years. The Chairman is aware of the circumstances of the Tentative Agreement which was

47

eventually rejected by the State. Nevertheless, this was the Tentative Agreement and gives some indication of what the parties would bargain on this issue, all other things being equal.

If this was the Last Best Offer of the DPOA, the Chairman would embrace it. But it was not.

Under the circumstances and with little usage and given the City history city-wide, the Chairman will join with the City Delegate and eliminate Article 20. The DPOA Delegate dissents.

**Issue No. 81** - **Non-Economic** -  *Article 40.A - Miscellaneous-Maintenance of Conditions-Eliminate*

The City proposes to eliminate Article 40.A, the Maintenance of Conditions clause, which reads:

> Wages, hours and conditions of employment legally in effect at the execution of this Agreement shall, except as improved herein, be maintained during the term of this Agreement. No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

The DPOA proposes the *status quo.*

Under normal circumstances, to the Chairman, this would be a "no brainer" and the Chairman would opt to maintain such a clause. But, because of the City's financial crisis, there will be changes in the parties' Master Agreement as a result of this Act 312. In fact, as a result of the Tentative Agreement of February 2012, there were major changes. Thus, the Maintenance of Conditions clause under such conditions is not appropriate. Hopefully, this clause can return in the future. However, under current conditions, the Chairman reluctantly must vote to at least temporarily eliminate the clause and save it for future negotiations. The City Delegate joins with the Chairman in so voting. The DPOA Delegate dissents.

48

**Issue No. 84 - Economic -**   *Article 40.E - Miscellaneous-Execution of Agreement Without Prejudice to Any Grievances, etc.*

Article 40.E in the Master Agreement reads:

> The execution of this collective bargaining agreement shall be without prejudice to any pending grievances, arbitration or other litigation except where the subject matter in dispute may be resolved herein.

The City proposes to eliminate this provision. The DPOA proposes the *status quo.*

This provision has been in the parties' Master Agreement for a number of years. To the Chairman, it is an end run to avoid pending disputes which the parties have chosen to resolve other than through negotiations or Act 312. If the parties had wished to resolve the grievances in negotiations or Act 312, they should have done so.

Having chosen not to do so, then the parties, as they have in the past, should rely on other procedures. It is for these reasons that the Chairman, joined by the DPOA Delegate, votes to keep the present language. The City Delegate dissents.

**Issue No. 83 - Economic -**   *Article 40 - Miscellaneous-Savings Clause*

Article 40.D of the Master Agreement reads:

> **Savings Clause.** If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

The City proposes to remove the clause "the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually" and replace it with the clause "the City shall in its discretion determine". The DPOA proposes the *status quo.*

The Chairman, along with the DPOA Delegate, agrees to keep the *status quo.* This is a

49

mutual contract. If a provision of the Agreement is held invalid, then the parties should mutually agree on a replacement. It is just that simple. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 140 - Economic - Union Proposal -** | *Article ___ - Award of 20% of Savings from Reduction in Certain Benefits* |
| **Issue No. 114 - Economic - Union Proposal -** | *Article 18-Leave Days-Pay 1 ½x for All Time on Restricted Weekends* |
| **Issue No. 136 - Economic - Union Proposal -** | *New Rank of Corporal to be Established; Any Officer With 15 Years of Service Automatically Promoted to Corporal; 2% Increase* |
| **Issue No. 119 - Economic - Union Proposal -** | *$500 Per Year For Cell Phone Use* |
| **Issue No. 125 - Economic - Union Proposal -** | *$1,000 Bonus for All Officers* |
| **Issue No. 134 - Economic - Union Proposal -** | *Field Training Officers 5% Increase in Wages* |
| **Issue No. 121 - Economic - Union Proposal** | *Bank or Sell Furlough Time* |

The Chairman has grouped Issue Nos. 140 (Union Proposal), which is different than City Issue No. 140; Union Issue No. 114; Union Issue No. 136; Union Issue No. 119; Union Issue No. 125; Union Issue No. 134 and Union Issue No. 121 as a group. The reason that the Chairman has done so is that these proposals represent economic enhancement over the expired Master Agreement. The Chairman has already discussed the City's ability to pay. As this Opinion and Award is being written, a State Financial Review Team on February 19, 2013 issued a report confirming the Chairman's conclusion, along with the financial private agencies' conclusions, that the City of Detroit is in a financial crisis, to say the least. Thus, when the Chairman reviews Union Issue No. 140 and Issue Nos. 114, 136, 119, 126, 134 and 121, these are all issues that seek economic improvements of one sort or another that would be proffered in a situation where there was some semblance of an ability to pay.

The Chairman appreciates that as to Union Issue No. 140, an award of 20% of savings from reduction in certain benefits had its genesis in the Tentative Agreement of February 2012 and was no doubt the result of the give and take of bargaining. But that Agreement was rejected

50

by the State. The savings were necessary in order to arrive at an agreement in a critical financial situation. Seeking a Corporal rank is an attempt to get a pay raise where general employees are taking a pay reduction and the City is virtually, if not, insolvent. The Chairman acknowledges that this is an attempt to mirror what occurred with the Wayne County Deputies. But it is not in the cards at this time in Detroit because of the financial crisis which is the proposal represented by Issue No. 132 to provide a 2% increase for Officers with 15 years of service to be automatically promoted to Corporal.

Issue No. 119 provides for $500 per year for cell phone use. Again, this is a cost that the City cannot at this time afford.

Issue No. 125 represents a $1,000 bonus for all Officers – another cost that the City does not have the financial ability to provide.

As to a 5% increase for Field Training Officers, there are some departments that do provide a stipend for Field Training Officers such as, for example, Chicago. But, again, this Chairman with these financial difficult times in Detroit, with the amendments to Act 312 brought about by Act 116 emphasizing financial ability, if there was ever a case where financial improvements, absent compelling circumstances, can be made, this is the case. The proposals listed above, including one and one-half time pay for restricted weekends, fall in this category. This does not mean, in the Chairman's view, that there might be a situation where the marketplace might compel an economic improvement. But the cost associated with these proposals would impede the ability to maintain a competitive wage in these difficult financial times. For instance, the $500 per year cell phone payment and the $1,000 per year bonus just for the Police Officers is estimated to be $3 million. This is no small change.

If 50% of the Officers sold one week of furlough time, this would cost the Department

51

approximately $900,000.

There would be an additional cost for the time and one-half on the restricted leave day. In addition, this provision had been rejected by three Act 312 Arbitrators, including this Chairman. this Chairman in the mid 1990's in *Case No. D92 C-0554*, noted that the issues concerning restricted days should be resolved through the grievance procedure.

Second, in his August 2003 Act 312 Award, Arbitrator William E. Long rejected an identical proposal for three reasons:

- First, Arbitrator Long stated the language in the DPOA's LBO stating that if the Department restricts leave days for any command district, precinct or part thereof, no matter how small, that this counts toward one of the six restricted days for the entire Department was unreasonable. Sec Ex. 674, second exhibit, at 84. The Panel also noted that "there is concern with the fiscal impact of the provision in the last sentence, which in the view of the Panel majority, unnecessarily restricts management in managing its personnel needs and adds unnecessary costs." *Id.* at Ex. 674, second exhibit, at 87.

- Second, Arbitrator Long credited the City's analysis of the cost of this provision should they need to exceed the number of restricted days at between $154,000 and $218,000 each day. This is obviously an astronomical cost that the City cannot afford if it is required to restrict leave days for any kind of an emergency. See Ex. 674, second exhibit, at 86.

- Third, Arbitrator Long noted that there was no record evidence to support how a six day limit on the City's ability to restrict weekend days would be enough or appropriate. Ex. 674, second exhibit, at 86-87.

Arbitrator Richard Block rejected the proposal in his March 2007 Act 312 Award. See Ex. 674, first exhibit. Arbitrator Block found that the provision would be too costly, that the City needed flexibility concerning restricted days in the event of an emergency and that there was no need shown.

Like the Long and Block Awards, this provision continues to be too costly and there has been no need shown for a change, particularly in a financially distressed city.

It is for these reasons in the economic climate in Detroit that the Chairman must vote

52

along with the City Delegate to deny the DPOA's request as to Union Issue No. 140 and to deny the DPOA's request as to Issue Nos. 114, 136, 119, 125, 134 and 121. The DPOA Delegate dissents.

**Issue No. 124 - Economic - Union Proposal -**     *Economic Promotion to Sergeant Based on Seniority Only*

The DPOA as to Issue No. 124 has proposed to add a provision that promotion to and through the rank of Sergeant shall be based on length of service therein and as defined length of service. The rationale for this proposal is that promotions in the Detroit Fire Department are by seniority only rather than examination as in the Police Department. The DPOA has not pointed to any comparable police department in Southeast Michigan or anywhere in the State of Michigan where Police Officers are not promoted by examination.

Furthermore, the matter of promotion in the Detroit Police Department has been in existence since the time the parties have been negotiating. There is no basis to change.

For this reason, the Chairman, along with the City Delegate will vote to deny this request. The DPOA Delegate dissents.

**Issue No. 115 - Economic - Union Proposal -**     *Article - Legal Representation-Increase Amount to $300,000 for Legal Fees*

Article 28 is entitled "Legal Representation and Identification". Paragraph 5 of Article 28 provides:

> Effective July 2004 and each fiscal year thereafter, the City shall either defend or reimburse the DPOA and/or member for all legal expenses and fees incurred by the DPOA or member if the member is criminally charged and/or prosecuted for conduct that arises out of/or involved with the good faith performance of the official duties of the employee and the member is either exonerated or the criminal charges are dismissed. The City's obligation to defend or reimburse shall be capped at an amount of one hundred thousand dollars ($100,000) each fiscal year. The DPOA shall upon request provide documentation supporting a

53

claim for reimbursement.

The DPOA proposes that the amount be increased to $300,000. The City proposes the *status quo.* This is a cost item. As in this round of contract 312, the City opposes any increase in cost and is seeking reductions. This proposal would be costly.

In his brief, the City's Advocate notes, "With no demonstration that the $100,000 allotted per year has either been exceeded was ever close to being exceeded, there is no justification for a change in this provision." Furthermore, the City can elect to defend with its own counsel and, indeed, $100,000 can buy substantial services. Without a proven need for an increased amount, this Chairman, along with the City Delegate, will deny this request. The DPOA Delegate dissents.

**Issue No. 117 - Economic -Union Proposal -**      *Article 40-Miscellaneous - City shall provide DPOA members with all greater benefits provided to others*

The Union proposes a new Section L to Article 40 to read:

> The City shall propose DPOA bargaining unit members with all greater economic benefits awarded and/or provided to DPCOA, DPLSA and/or DFFA.

There is presently no such provision in the Master Agreement. This is sometimes known in labor parlance as a "favorite nation" clause.

The argument being made by the City is there should be no such provision. There has not been such a provision in the past. The City proposes that the *status quo* remain.

The Panel has put together a contract based upon the unique circumstances of Police work in Detroit and more specifically the work of the Detroit Police Officers – not the Command, not the Supervisors, not the Commanders, and not the Detroit Fire Department. Each of these units have different factors and in a reorganized and reconstituted City government may

54

be expected in each case to be reconstituted in order to respond to the economic realities of what will become a new Detroit. In the meantime, this Panel must address the needs and limitations involved with the Detroit Police Officers Association. This Panel is addressing the City's financial ability in conjunction with the public welfare of having Police protection. The marketplace for Police Officers, which is different than the marketplace, for example, of the DPLSA or the DPCOA and the art of the possible as to Detroit Police Officers when comparing with similarly situated police officers doing police work.

It is for these reasons that the Chairman, along with the City Delegate, will deny the requested addition of Section L to Article 40. The DPOA Delegate dissents.

**Issue No. 52** - **Economic** -   *Article 30 - Modify Shift Differential*

Article 30 of the Master Agreement provides for shift differential, namely, if the tour of duty begins between 11:00 a.m. and 6:59 p.m., the rate of shift premium is 50¢ per hour. If the tour of duty begins between 7:00 p.m. and 3:59 a.m., the rate of shift premium is 60¢ per hour.

The City proposes to reduce the shift premium for the 11:00 a.m. to 6:59 p.m. period to 25¢ per hour and from 7:00 p.m. to 3:59 a.m. to 50¢ per hour, maintaining that this is an attempt to obtain uniformity with all bargaining units throughout the City; that this has been obtained with all the non-uniform units. The DPOA seeks to maintain the *status quo.*

There is no question that this reduction would result in a savings. But it fails to recognize that Police work does not lend itself to uniformity as might be suggested by the fiscal agreement. Here is why.

In his travels among police departments over the years, particularly in large municipalities, the Chairman has been led to believe that there are two major periods in a 24-hour period of high Police activities, namely, between 4:00-8:00 p.m. and at the time that bars

55

close which the Chairman is led to believe in Michigan is 2:00 a.m. And it is also recognized that criminal activity has a tendency to occur during hours of darkness. This is not always true, of course, but there is the tendency.

In addition, as a Police force grows older and is on permanent shifts as compared to rotating shifts, older Officers tend to use seniority to obtain positions on the day shift. The value of shift premiums, which usually are not available when there are rotating shifts, is to encourage some senior Officers to take the night shifts. Thus, there is a reason for shift differentials in Police work that does not apply to general employees in both the public and the private sectors.

In other words, the work of Police Officers on the afternoon and midnight shifts, by the nature of criminal activity, can be more demanding and the Department may wish to encourage a more experienced, older Officer to seek employment on the night shift by a reasonable shift differential that is not necessary to make available to employees in other types of work. Though there may be a cost savings in halfing the afternoon shift differential and in docking the night shift differential by 10¢, the nature of Police work and the need for experienced Officers in times of heavy Police activity, coupled with the fact that these shift differentials have been negotiated over a long period of time, even in a fiscal crisis, causes this Chairman to vote with the DPOA Delegate to maintain the current shift differential, namely, the *status quo*. The City Delegate dissents.

**Issue No. 108** - Economic - Union Proposal -     *Article 33-Pension Benefits-2.2% Multiplier*
**Issue No. 109** - Economic - Union Proposal -     *Article 33.D.H-Pension-Include Banked*
                                                    *Vacation and Sick Time in Pension*
                                                    *Calculation*
**Issue No. 110** - Economic - Union Proposal -     *Article 33-Pension-Best 3 of 5 Years*
**Issue No. 111** - Economic - Union Proposal -     *Article 33-Pension-1.5% Escalator and*
                                                    *Same for DROP Plan*

The Chairman has grouped together Union Proposals represented by Issue Nos. 108, 109,

56

110 and 111. The DPOA and the City of Detroit entered into a Stipulated Act 312 Award in

September 2011 concerning a pension multiplier and the loss of an escalator. What the DPOA

proposes to introduce in Issue No. 111 is an escalator of 1.5%, to increase the multiplier from

2.1% to 2.2% (Issue No. 108), and by changing the years to be utilized in the final average

compensation (Issue No. 110) from the last 60 months prior to retirement to the best three of the

last five years, and to include banked vacation and sick time in average final compensation (Issue

No. 109), which the City argues is contrary to the Stipulated Act 312 Award in September 2011

and is designed to alter that Award. The City introduced a report dated January 8, 2013 from

actuary Joseph Esuchanko as Exhibit 741 that set forth the cost of these proposals as follows:

> Increase multiplier from 2.1% to 2.2%: $8.5M
>
> Include longevity again, plus all banked vacation and sick leave time in AFC: $103M
>
> Change the definition of Average Final Compensation from last 60 months to highest three years of the last of five years: $8.6M
>
> Reinstitution of longevity, inclusion of banked vacation and sick time and change in years of Average Final Compensation if all were granted: $19.5M
>
> Add 1.5% per annum pension escalator: $40.4M
>
> Cost to increase multiplier, change Average Final Compensation to highest three of five years, include vacation and sick banks and add 1.5% annum pension escalator: $73.2M. See Report, Ex. 741 at 11.

After setting forth this cost analysis, the City's Advocate at page 70 of his brief

concludes:

> In view of the stipulated Act 312 Award in September 2011 and the City's current financial condition, awarding the DPOA any of its proposed pension proposals is totally and completely unwarranted. Furthermore, considering that the City has already borrowed $1.5B (the POCs) to fund the pension, any more liability is simply unwarranted.

The Chairman agrees that with the City's financial situation and the fact that only a year

57

previously the DPOA stipulated to the changes referenced in the Stipulated Act 312 Award of September 2011, this is not the time to make the changes sought . For this reason, the Chairman, concurred in by the City Delegate, will vote to reject the DPOA's proposals as to Issue Nos. 108, 109, 110 and 111. The DPOA Delegate dissents.

**Issue Nos. 95 and 96** - Economic - *Article 46-Pension Board to Provide Information to City; City Right to Change Board*
**Issue No. 120** - Economic - Union Proposal - *Article 46-Pension Board-Add Two DPOA Representatives*

The parties have two competing issues as to the Pension Board. The DPOA proposes to have the right to add two Trustees elected to the Police and Fire Pension Board. Presently, the Pension Board's composition has a 50/50 representation as a result of an Act 312 decision by Arbitrator William Long and then confirmed by Arbitrator Ken Frankland as a result of the September 2011 Stipulated Award. Although there was testimony by DPOA President Diaz suggesting that the Commander representative favored management, with the Long and Frankland Awards favoring the current composition and the method in the contract for breaking ties, there is no persuasive reason to overrule previous arbitrators on this issue.

For this reason, the Chairman, along with the City Delegate, will vote for the *status quo*. The DPOA Delegate dissents.

As to Issue No. 95, this issue is the opposite of Issue No. 121 and is an attempt to change the composition of the Board proposed by the City by eliminating the deadlock mechanism implemented by Arbitrator Long in *Case No. D01 D-0568* and to provide in Paragraph L language "The City reserves the right to change the composition structure and decision making procedures of the Pension Board". The Chairman, joined by the DPOA Delegate, will vote for the *status quo*. The City Delegate dissents.

58

As to Issue No. 96, except with the elimination of the reference to the CET and replacing it with the word "order", which is housekeeping language, the Chairman, joined by the City Delegate, will adopt Issue No. 96 which provides as follows:

> M. Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modification, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the amendment.

This seems to be a reasonable provision as, since the City is supplying funds for financing the pension obligations, the City is entitled to the pension documents as set forth in the above provision and Paragraph M should be incorporated into Article 96 of the Master Agreement.

**Issue No. 123** - **Economic** - **Union Proposal** -  *Article 40-Miscellaneous-Canine*

Article 40.K of the Master Agreement provides:

> K. **Canine**. With respect to any assignment made to Canine (K-9) on or after July 1, 2007, the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

The DPOA proposes to replace Section K as follows:

> Paragraph K - Deleted to reflect the fact that DPOA bargaining unit members retiring from and/or leaving the canine unit will be permitted to keep their canine.

There is no evidence that there was bargaining over this provision. The City proposes to keep the *status quo*, making the return of equipment optional at the discretion of the Department

59

for dogs under the age of five. This provision was in the Master Agreement as a result of negotiations. There is a cost, although minor, in the scheme of things. But, with the lack of negotiations, even on the remand, the Chairman will not vote to modify the Master Agreement. This is a matter that should be negotiated between the parties. For this reason, the Chairman will vote with the City Delegate to maintain the *status quo*. The DPOA Delegate dissents.

**Issue No. 28 - Economic -** *Article 13.A and B - Off-Duty Court Appearance-2x Straight Time*
**Issue No. 29 - Economic -** *Article 13.D - Off-Duty Court Appearance First 60 Hours as Comp Time*
**Issue No. 30 - Economic -** *Article 13.G - Off-Duty Court Appearance - Holiday Court Appearance 1 ½x*

The City proposes to modify four Sections of Article 13 addressing off-duty court appearances. The City as to Article 13.A proposes to change the minimum time for off-duty court appearances from three hours at time and one-half to two hours at straight time (Issue No. 28) and to delete the sentence, "Off-duty court appearances for a period of less than 45 minutes which abut a prescheduled shift may be treated as either overtime or court time at the option of the Department".

As part of Issue No. 28, the City proposes to amend Article 13.B so that the second paragraph shall read, "If the actual amount of time spent in court is less than two hours, the member shall be credited with two hours worked at straight time" and to amend the third paragraph of Article 13.B to read, "If the court appearance is for two hours or more, the member shall be carried working for the actual amount of time worked".

Issue No. 29 addresses Article 13.D and provides, as proposed by the City, "Each fiscal year, the first sixty (60) hours of off-duty court time for any member shall be compensated through credited compensatory leave time placed in the member's leave bank and not cash payment. After the sixty hours of off-duty court time are worked in the fiscal year, the member

60

shall have the option of being paid in cash or being credited with compensatory time. Furthermore, such off-duty court time shall be paid in cash rather than granting compensatory time when necessary to comply with F.L.S.A. requirements". In the Master Agreement, the member has the option to be credited with compensatory time or being paid in cash, subject to FLSA requirements.

Issue No. 30 is a proposal that "a member who is required to appear in court on a holiday will receive credit either for an off-duty court appearance at the two hours straight time minimum or holiday premium pay (1x) for the actual time spent on the court appearance whichever is greater". The Master Agreement had provided in Section 13.G, "...at three hour minimum or holiday premium pay (2x) for the actual time spent on the court appearance, whichever is greater".

The DPOA proposes the *status quo*, namely, the language in the Master Agreement.

The City notes, as in Exhibit 646, overtime costs for the Department for 2011-2012 were $24 million; that changing court time for two hours straight time from three hours at time and one-half would save the Department $1.5 million annually; that requiring the first 60 hours of court time as banked as compensatory time would save the Department $700,000 per year.

The fact is that in the Tentative Agreement of February 2012, the DPOA, as an attempt to assist the City to save money, did agree to these proposals as to off-duty court appearances, namely, "Article 13 'Off-Duty Court Appearances' of the collective bargaining agreement shall be modified through August 13, 2015 to provide as follows ...". As the Chairman interprets the Agreement, the DPOA was willing to agree to these modifications for a period of three years on the condition that the savings represented by the modifications, along with other savings, would first sunset and, in the Tentative Agreement, would provide that the DPOA members would

61

receive 20% of the savings represented by the Tentative Agreement. Then, too, there was to be

no reduction in salary and longevity. Nevertheless, the State rejected the Tentative Agreement

because allegedly there was not sufficient economic savings.

The matter has come before an Act 312 Panel. This Panel will recommend a two year

contract under certain conditions. The Panel will provide for certain additional savings that were

not in the Tentative Agreement, including certain provisions for structural changes that will aid

in reorganizing the Department to be economically more efficient and yet provide the Officers

with a pathway for a more competitive wage.

As the Chairman sees the proposal of the City, it is in three parts, namely, the court

appearance being two times straight time, the first 60 hours as comp time, and holiday court

appearance as time and one-half. The City noted at page 59 of its advocate's brief that "The City

requests these changes for the following reasons". The fourth reason that the City gives is:

> The DPOA agreed to this provision as part of the Tentative Agreement.
> See Ex. 771, p. 1. Although the Tentative Agreement was rejected by
> the State of Michigan because it did not provide sufficient overall
> savings and because the Labor Contract would be extended to June 30,
> 2015, there is support for this concept from the DPOA.

As to Issue No. 29, the bank of compensatory time would save the Department $700,000

per year and for this reason this Chairman, along with the City Delegate, will opt for this

proposal with the DPOA Delegate dissenting. However, as to changing Article 13.A and B as

proposed and Article 13.G as to holiday court appearances as proposed, the Chairman, along with

the DPOA Delegate, will opt for the *status quo.* Though the changes would represent a savings

in overtime, depriving the Officers of a long time benefit is not the way to obtain the savings.

What needs to be done is to encourage the Officers to write tickets. If the Department wishes to

control overtime as to court appearances and holiday court appearances, then the Department

62

should consider adopting the technique that is prevalent in other Michigan municipal police departments, namely, to have a supervisor negotiate with the citizens who are ticketed and only have the court Officers come to court in the event there are contested tickets. This works well, particularly in suburban departments and controls overtime. There was no showing that the Department has utilized this technique to control overtime justifying eliminating a long-standing contractual benefit.

Based upon this analysis, a majority of the Panel will continue the *status quo* as to Article 38.A and B and Article 13.G with the City Delegate dissenting. As to Issue No. 29, the Chairman, concurred in by the City Delegate, will agree to adopt the City's proposal as to off-duty court appearances for 60 hours at comp time. The DPOA Delegate dissents.

| | |
|---|---|
| **Issue Nos. 71 and 72 - Economic -** | *Article 35.A.2 - Sick Leave-Freeze Sick Leave Banks; Limit Future Accrual of Sick Leave; Elimination of Seniority Sick Leave* |
| **Issue No. 73 - Economic -** | *Article 35.B - Sick Leave-Use of Sick Time for Family and Relatives Discretionary* |
| **Issue No. 74 - Non-Economic -** | *Article 35.F - Sick Leave-Call in Sick Daily Until Doctor Note* |
| **Issue No. 75 - Economic -** | *Eliminate Pay-Out of Sick Leave Accrued After July 17, 2012* |
| **Issue No. 76 -** | *Interest Payments* |
| **Issue No. 77 -** | *Drop Plan Participants-Receipt of Payouts* |
| **Issue No. 78 -** | *Reservation of Right to Cap Accumulation of Sick Leave and Compensatory Time* |

The City has proposed the above four listed Issues. Issue Nos. 71, 72, 73, 76, 77 and 78 are proposed amendments to Article 35 addressing sick leave. Issue No. 75 addresses an overall elimination of payout of sick leave accrued after July 17, 2012. All of the Issues are deemed economic except Issue No. 74, which is deemed non-economic.

There are two types of sick leave in the Master Agreement. The current sick leave provides that an Officer earns one sick day per month which is placed in a sick leave bank,

63

namely, the current sick leave bank. In addition, after one year, an Officer is credited with five seniority sick days in his or her sick bank. Both banks, current and seniority sick time bank, can accumulate without limitation.

Issue No. 71 is a City proposal that the current sick leave bank be frozen as of July 17, 2012 and that further accumulation of current sick leave banks will be capped at 300 hours.

Issue No. 72 eliminates seniority sick days and freezes existing seniority sick banks.

Though the City maintains, based on Exhibit 659, that the value of seniority sick banks in the Police Department is approximately $2 million every year and that this is an ongoing liability, the fact is that seniority sick banks have been part of the parties' Master Agreement for a number of years. This provision is in the parties' contract as a guarantee against catastrophic injury or illnesses. With no evidence of negotiations to limit the effect of this provision, the Chairman, joined by the DPOA Delegate, will vote to maintain the *status quo*, namely, the present provision in the Master Agreement as to seniority sick bank and the unlimited accumulation of seniority sick leave with the City Delegate dissenting.

As to Issue No. 71, the Chairman recognized that the payout of sick time at retirement is a cost. The DPOA proposes as to Issue No. 71 that the *status quo* be maintained, noting that the unlimited accumulation of current sick time has been in the parties' Master Agreement for some time. The Chairman appreciates that this creates a substantial economic obligation on the part of the City. Yet, the Department is concerned about absenteeism and its effect on the Department's 24/7 operation and the need to have Police on the streets; that absenteeism interferes with the Department's operation. If Officers in effect have no incentive not to use sick days despite the possibility of discipline, the incentive to accumulate sick days as insurance against catastrophic illnesses or the award in accumulation could very well impact on the efforts of the Department to

64

avoid absenteeism and the overtime caused by absences.

There are creative ways that the Chairman has seen in other departments to address the so-called legacy costs created by the payouts at retirement or leaving the Department of accumulated sick time. But the proposal of capping, particularly at the low number of 300 hours, would not fit in to the concept of the art of the possible and would not, in the opinion of the Chairman, shared by the DPOA Delegate, have been reached at the bargaining table.

For this reason, as to Issue No. 71, the Chairman, joined by the DPOA Delegate, will opt to remain the *status quo* and reject the City's proposal. The City Delegate dissents.

As to Issue No. 75, the City proposes that a member shall receive full pay for 100% of the unused accumulated sick bank accumulated as of the date of July 17, 2012. Payment shall be made after permanent retirement/separation within 90 days if the amount is less than $10,000 and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on September 1st and August 1st with no interest due.

The DPOA proposes the *status quo* as to Article 35.M which gives the Officer the option to take a payment of the accumulated sick time or choose to receive the three year average of 25% of the unused accrued sick leave bank in one (1) ... and have the sum included in the final average compensation used to compute the member's service pension of the retirement allowance. ... The lump sum payment the member will receive will be the remaining value of the unused accrued sick leave as provided ... above.

The Panel must choose one or the other option. Issue No. 75 assumes a cap on sick leave and, as explained on Issue No. 73, a majority of the Panel has rejected the cap on sick leave because such a cap could well encourage absenteeism which the Department wishes to avoid. For this reason, the Chairman, along with the DPOA Delegate, votes to maintain the *status quo*

65

as to issue No. 75 and maintain Article 35.M. The City Delegate dissents.

As to Issue No. 76, the City in the event, which was the case, that a majority of the Panel rejected the City's Issue No. 75, nevertheless proposed that payments made on sick leave accumulations, if the amount is less than $10,000, be paid within 90 days after permanent retirement/separation and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on February 1st and August 1st with no interest due. The Chairman interprets this to mean that if the payments are not made when due, then interest would be paid. On this basis, the Chairman will vote with the City Delegate to accept this proposal as to issue No. 76. The DPOA Delegate dissents. This ruling is subject to the ruling on Issue No. 77.

As to Issue No. 77, the City proposes that DROP Plan participants may only receive payout of sick time when they permanently retire, not when they enter the DROP Plan. Under the expired Master Agreement, DROP Plan participants receive sick leave payout when they enter the DROP Plan and continue to work as Police Officers. This proposal could save money to the City. However, it has an unintentional consequence. For this reason, the City would ask to amend the proposal to permit Drop Plan participants at the time they enter the Drop Plan to exercise the option, if desired, set forth in Article 35.M.2 and defer after collecting the three year average of 25% of the unused accrued sick leave bank available at the time of entering the Drop Plan would be received at the time the participant permanently retires. The City agrees to amend the proposal accordingly with the concurrence of the DPOA. Though the DPOA objects to the proposal, the Chairman and the City Delegate concur in the proposal with this amendment, namely, that the Drop Plan participant may exercise the 35.M.2 option at the time of entering the Drop Plan with the understanding that the remaining value of the unused accrued sick leave bank

66

shall not be paid to the Drop Plan participant until the Drop Plan participant permanently retires.

As to Issue No. 78, the City proposes, "The City reserves the right for purposes of retirement payout to cap the number of hours a member may accumulate in their sick leave and compensatory time banks or to the extent allowed by law, cap the amount of payouts from such banks upon retirement." The DPOA objects to such language.

The Chairman has been asked in these proceedings to rule on provisions, including proposals as to caps on payouts. The Chairman, with one or the other Delegate, has made rulings. Once making these rulings, this becomes part of the contract. If the rulings do not modify the Master Agreement, the language or the practices developed under the Master Agreement remain. What Issue No. 78 does is to ignore negotiations, ignore the provisions of the contract that have been crafted between the parties over the years, and these Act 312 proceedings which were carefully developed by the parties through testimony and extensive briefs. There is no place in these proceedings or in the Master Agreement for such language. It fails to recognize that there are two parties to the Agreement. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal on Issue No. 78. The City Delegate dissents.

In Issue No. 73, the City seeks to amend Article 35.B by amending the last sentence of the first paragraph entitled "Sick Time Credit" as follows:

> The granting of sick time for attendance upon these relatives is <u>at the discretion of the City</u> ~~and not limited to any given number of days per fiscal year~~. However, no more than three (3) days will be granted in one instance.

The City is adding the language "at the discretion of the City" and striking out "and not limited to any given number of days per fiscal year".

67

The City's Advocate correctly recognizes in his brief the possible impact of the Family and Medical Leave Act on this language, as does the Chairman. Furthermore, the current language has been in Master Agreement for some time. The DPOA objects to this language change.

For these reasons, the Chairman, joined by the DPOA Delegate, will opt for the *status quo* as proposed by the DPOA. The City Delegate dissents.

Issue No. 74 is non-economic. The issue deals with Article 35.E which is entitled "Reporting Illness or Disability". The City proposes one change, namely, notification on a daily basis. The City tells the story of an Officer who when asked to notify the Officer's Command, actually sought a protective order. The Chairman finds this incredible. Though the Chairman appreciates that the DPOA objects, the Chairman finds that this proposal is reasonable to a point. The language should be further refined to clarify that if an Officer is hospitalized that the Officer does not have to call in daily or if the Officer is recuperating from a hospital stay at home that the Officer, if producing a medical statement that indicates when the Officer may return, that this would not require the Officer to call in daily.

In other words, the language should be refined so that it is clear when the daily requirement is to be met.

The Chairman, along with the City Delegate, will approve of the concept once the City clarifies exactly when the daily requirement is to be met. In other words, if an Officer is out, presumably the daily requirement will be met until the Officer produces a doctor's statement indicating the times of illness and return date or when the Command knows that the Officer is recuperating under a direction of a doctor and has documentation to that effect or is in the hospital. The language should be refined. If there is a dispute between the parties as to the

68

refinement, then it should be returned to the Panel for refinement. Otherwise, the concept is sound.

Therefore, the Chairman will join with the City Delegate, recognizing that the DPOA objects to this change but, in the interest of completing this contract immediately, will adopt this language subject to the comments of the Chairman here. If there is a dispute in any given case as to any discipline over the failure to call in because it fell into one of the categories discussed by this Chairman, that dispute should be attached either to an expedited arbitration at the next expedited arbitration date if the discipline is meted out or to a regular arbitration with these comments so that the umpire will understand the intent behind the change approved by a majority of this Panel. The DPOA Delegate dissents.

### Issue No. 80 - Economic -    *Jury Duty*

The City proposes to replace Article 35, "Jury Duty" with entirely new language. The new language proposes that "An employee shall be allowed to attend jury duty without pay. An employee may elect to use paid leave for any day he/she serves on jury duty. Jury duty time shall not be counted as time worked for the purposes of computing overtime." This is Section A of the new Article 35. There is also Sections B and C. In Section B there is a provision that provides, "that the Department shall have the discretion in seeking to have the employee excused when his services are essential".

The DPOA proposes to maintain the *status quo* which provides that jury time is paid time and that the jury fees are to be returned to the City.

The City's rationale for the change as set forth in its counsel's brief is, "One of the goals of the Annex D of the Financial Stability Agreement was that there be uniformity in contract provisions." The brief goes on to point out that, except with unexpired labor contracts, the City's

expired contracts now have the proposed language.

The Chairman appreciates the desire for uniformity. But there are two reasons why the Chairman will vote with the DPOA Delegate to maintain the *status quo*. First, there is only so much that can be accomplished in an Act 312 and one negotiations. The provisions for jury duty would not be the main focus of negotiations between the parties because there is no showing that it represents a financial savings. Second, the provision as to seeking to have the employee excused is always the Department prerogative. The Department could issue a Special Order without any contract provision asking that all Officers notify the Department as to pending jury duty notification and then exercise the right to seek to have the Officer excused.

Finally, in many cases, an Officer will no doubt be excused as compared to the general employee population. It is doubtful that a Police Officer would be permitted to sit on a jury involving a criminal matter. It is doubtful that a Police Officer would be permitted to sit on a jury involving litigation against another Police Officer or the City. Thus, there was no persuasive reason in the grand scheme of things, particularly when there were no negotiations, to change this provision. For these reasons, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents.

| **Issue No. 26** - Economic - | *Article 10.C. - Seniority-Assign to Avoid OT* |
| **Issue No. 31** - Economic - | *Article 14.A - Overtime-Dept. Has Right To Limit OT by Reassigning, etc.* |
| **Issue No. 36** - Economic - | *Article 14.D - Overtime-Assign OT Without Regard to Preschedule OT* |
| **Issue No. 43** - Economic - | *Article 14.E.9.F - Overtime-Assign From Straight time From Any Entity* |
| | |
| **Issue No. 32** - Economic - | *Article 14.B.1 - Overtime-Eliminate Daily Overtime* |
| **Issue No. 34** - Economic - | *Article 14.C - Overtime-Work 80 Hours for OT* |
| **Issue No. 33** - Economic - | *Article 14.B.4 - Overtime-Not Include Sick Time For OT* |
| **Issue No. 35** - Economic - | *Article 14.C - Overtime-Calculation* |

70

**Issue Nos. 37 and 38** - **Economic** -  *Article 14.D.2 - Overtime-Notice of OT*
**Issue No. 39** - **Economic** -    *Article 14.D.3 - Overtime-Union Verify OT Lists*
**Issue No. 42** - **Economic** -    *Article 14.D.9 - Overtime-Not Call More than 10 For OT*
**Issue No. 129** - **Economic** - **Union Proposal** -    *Article 14 - Overtime-Eligible to Work*
                                                          *Overtime on a Furlough Day*

Overtime is an important issue to both the DPOA and the City.  For a financially strapped

City in fiscal year 2011-2012, the overtime cost for the Police Department was $24.9 million.  In

fiscal year 2010-2011, it was $24.3 million.  Not all of this was attributable to the Police

Officers.  Some was attributable to the Lieutenants and Sergeants as well as the Command.  Yet,

this is a substantial cost.  On the other hand, Police Officers do rely on overtime.

Issue No. 33 is a proposal to amend Article 14.B.4 as follows: "Time off due to furlough,

liquidation of compensatory time, and other paid absences (not including sick leave) shall be

considered as time worked when applying overtime rules."

The Chairman begins with the discussion that in the Tentative Agreement of February

2011 the DPOA did agree to a modification besides court time as to overtime costs for, in

Paragraph 6 of the Tentative Agreement, the following was provided:

> Overtime.  Article 14, "Overtime," shall be modified to provide that
> unless otherwise compelled by the Fair Labor Standards Act, members
> shall not be eligible for any overtime compensation in any pay period in
> which the member fails to work at least eighty (80) hours.  Sick time
> shall not be considered as time worked in meeting the 80 hour work
> requirement, but time off due to furlough, liquidation of compensatory
> time, and other paid absences shall continue to be considered as time
> worked.

The DPOA rejected the City's proposal despite the Tentative Agreement.  There is a

logical reason for accepting the City's proposal.  It discourages the casual taking of sick time on

a daily basis for an Officer can still be called in to work overtime without any penalty for taking

off sick.  The taking of casual sick time will be discouraged, thereby aiding in the control of sick

time.

Based upon this analysis and the fact that the DPOA was agreeable to this provision at one time, the Chairman, along with the City Delegate, will agree with the City's proposal as to Issue No. 33. The DPOA Delegate dissents.

As to Issue No. 34, the City proposes that overtime shall be calculated on the following basis: " ... unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours". In the City's brief, it is stated that the purpose of this provision is "elimination of sick leave as time worked for purposes of calculating the 80 work hour requirement before overtime begins. Time off for furlough, compensatory time and other leave time (except sick time) will be considered time worked". The provision provides elimination of daily overtime (i.e., overtime after eight hours in a day) and payment of overtime only after 80 hours worked in a pay period.

The Chairman, along with the City Delegate, will vote to include this clause with the DPOA Delegate dissenting, with the clear understanding that the clause should have language consistent with the post-hearing brief that "time off for furlough, compensatory time and other leave time (except sick time) will still be considered time worked". This is the intent of the language and it should be in the contract. This is not an amendment. This is the intent and it is consistent with Issue No. 33. The whole idea of the language is to eliminate time and one-half for time after eight hours.

As to Issue No. 26, the City proposes to add to Article 10.C.4, "The Department may transfer, assign members to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime or for other staffing or manpower purposes." The DPOA objects.

72

This came from the CET.

As to Issue No. 31, the City proposes to add in Article 14.A, "The Department retains the right to limit overtime in determining the deployment, assignment of personnel and resources, including transferring/reassigning employees to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime."

There are difficulties with these two proposals, causing the DPOA to object to these additions. Until very recently, the Department had a Tactical Unit – one on the east side and one on the west side – where the Officers in that Unit were familiar with the entire City and could fill in where there was a need in any District or Precinct. The Chairman appreciates that that Unit has been disbanded. Based upon the proposed Issue Nos. 26 and 31, the proposals ignore seniority and could be causing seniority Officers being transferred while junior Officers are not being transferred. In the case of Issue No. 26, there appears to be an end run around seniority provisions as the last phrase, "or for any other staffing or manpower purposes", does not seem to have anything to do with overtime provisions. Then there is the safety problem in that an Officer could be transferred to an area where the Officer is unfamiliar. An Officer could be transferred to a so-called delta zone and be unaware that the Officer is in a delta zone. The Chairman understands a delta zone is a zone known as being an area where there is a tendency of hostility toward Police Officers. Officers who work such an area are familiar with such dangerous parts, whereas Officers unfamiliar with the area, coming from other areas in the City, would not be.

It is all these factors that cause this Chairman to join with the DPOA Delegate in rejecting the proposals of the City in adding in the contract proposals represented by Issue Nos. 26 and 31. The City Delegate dissents.

As to Issue No. 39, the City proposes to add to Article 14.E.3.a.c which reads, "The

73

Union shall verify and notify the City of any discrepancies in the overtime roster and indemnify the City if its failure to notify the City results in a grievance for overtime". The DPOA objects to this provision. In the absence of negotiations over this provision, the Chairman will opt not to honor this request. This is a matter for the bargaining table, not Act 312, particularly when there were so many other issues presented. The DPOA Delegate agrees with the Chairman. The City Delegate dissents.

Issue Nos. 36, 37 and 38 address changes as to the procedures in addressing prescheduled overtime. Presently, the Department is operating in patrol on a 12 hour schedule.

Issue No. 42 addresses a limitation on the number of calls that are to be made before on-duty personnel are offered the opportunity to accept overtime and does provide by mandatory overtime by inverse seniority when the daily on-duty roster in the event a sufficient number do not accept the overtime assignment. With 12 hour shifts there is a problem with such a provision if the junior Officer or any Officer on duty has already worked 12 hours, namely, a problem with fatigue.

A majority of the Panel will address the 12 hour schedule on patrol elsewhere. It seems that even if, based upon the majority opinion, the Department and Patrol goes back to eight hours, there is no showing of a need for the changes proposed by the City as to Issue Nos. 36, 37, 38 and 42; that without negotiation there is no indication that the parties would have reached some accommodation. Thus, the Panel has not been given any guidance of what would have occurred at the bargaining table. Since the present language on these subjects has been in the contract for some time, the Chairman, along with the DPOA Delegate, will opt to make no changes to the Master Agreement as to Issue Nos. 36, 37, 38 and 42. The City Delegate dissents as to Issue Nos. 36, 37, 38 and 42.

74

As to Issue No. 43, the City proposes to add an Article 14.E.9.f which would read, "The Department reserves the right to assign Officers on straight time from any entity in the City to avoid utilization of any overtime." The DPOA objects. The Chairman appreciates the sentiment behind the City's Last Best Offer as to Issue No. 43. There is, however, a limit to the quest to control overtime. There are the seniority provisions in the contract. There are the bid rights to certain entities which are to be followed. There is the limitation on assigning out rights. This language, to the Chairman, seems too broad and ignores other provisions of the contract that the parties over the years have negotiated. There are provisions sustained by this Chairman, with the concurrence of the City Delegate, in this Opinion that will assist the City in controlling overtime costs and yet protect basic contract rights that have been negotiated over the years between the City and the DPOA. This language as written would not pass muster at the bargaining table. This is another situation where the Chairman is limited to the parties' Last Best Offers. Without protective language giving recognition to other provisions in the contract, this Chairman cannot adopt this language.

It is based upon this analysis that the Chairman is joined by the DPOA Delegate in rejecting the City's proposal as to Issue No. 43. The City Delegate dissents.

Issue No. 129 seeks to amend Article 14.D.5, Overtime, by adding furloughs to the times that employees "are entitled to participate in pre-scheduled overtime opportunities". Reviewing Article 14.5, the symmetry of the provision and its meaning would suggest that furloughs should be included if in fact there is pre-scheduled overtime. Therefore, the Chairman, along with the DPOA Delegate, will vote to add furlough to Article 14.5 as proposed by the DPOA. The City Delegate dissents.

Finally, as to Issue No. 35, Overtime Calculation, because longevity will be restored the

75

second year of the contract by a majority vote, the calculation in Article 14.C shall remain as in the Master Agreement with the Chairman voting with the DPOA Delegate to maintain the Article 14.C overtime calculation without changes. The City Delegate dissents.

**Arbitration:**

| | |
|---|---|
| **Issue No. 14** - Non-Economic - | *Article 8.A - Arbitration-2 Umpires, Not 4* |
| **Issue No. 128** - Economic - Union Proposal - | *Article 4 - Basis of Rep - Special Conferences Held Within 5 Days)* |
| **Issue No. 130** - Non-Economic - Union Proposal - | *Article 14-Overtime-Prescheduled O.T. Grievance Heard by Arbitrator Within 30 Days* |
| **Issue No. 131** - Non-Economic - Union Proposal - | *Article 17-Arbitration on Performance Review Within 30 Days* |
| **Issue No. 132** - Non-Economic - Union Proposal - | *Article 36 - Regularity in Sick Leave Benefits - Arbitration on Attendance Issues Within 30 Days* |
| **Union Proposal No. 146** - Economic - | *Article 7 - Non-Economic: Payment of Umpire for cancellation days by party cancelling hearing)* |
| **Issue No. 16** - Non-Economic - | *Article 8.F - Arbitration-Back Wages* |

There are seven issues dealing with arbitration or related to dispute resolution in the parties' Master Agreement. The Chairman has grouped these issues together for the purposes of convenience.

The Master Agreement provides for four Umpires. Currently, the parties are operating with three Umpires with one vacancy. This is Issue No. 14. The City proposes to reduce the number of four Umpires to two. The City's rationale is threefold. First, the number of Officers assigned to the Labor Relations Law Unit has decreased since 2008 from a high of six Officers in the unit plus an Inspector to three Officers in the unit plus an Inspector, although recently a fourth Officer has been added to the unit.

In addition, the Law Department in most cases has not been furnishing counsel as it has in the past, adding further strain to the Labor Relations Law Unit. Though this Chairman, who also

serves as an Umpire for the parties, is aware of the situation, and also the argument that the parties have been able, nevertheless, to dispose of a number of cases under these circumstances as the parties have embarked on an ambitious mediation process, the Chairman is not persuaded that at this juncture there is a need to reduce the number of Umpires. This may be an issue in the future or by negotiations between the parties. But, this is not a matter that at this time should be addressed in Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will opt to vote to decline the City's proposal to reduce the number of Umpires. The City Delegate dissents.

Issue No. 128 addresses Article 4, Section 2, the provision for Special Conferences, which provides that "arrangements for such special conferences shall be made five (5) calendar days in advance whenever possible." The DPOA proposes to amend Section 2 to read, "Arrangements for such special conferences shall be made and take place within five (5) calendar days of the request". The argument was made that there have been delays in scheduling Special Conferences. The response of the Department was that it takes time to gather information needed to be presented for Special Conferences and whether the Chief or other high ranking Officers are needed to be present. Particularly in this time of reorganization in the City and within the Department itself, there will be substantial time demands on the Chief and other high ranking Department Officers that could very well make it not possible to meet the five day deadline and the fact that the present "wherever possible" language has been in the contract for some time, causing the Chairman, along with the City Delegate, to vote to decline to adopt the DPOA proposal and adopt the City's proposal to keep the *status quo*.

Issue No. 130 is a proposal by the DPOA to add a sentence to Section D.10 concerning overtime grievances to reflect "the grievance shall be heard by an arbitrator within thirty (30) days from the date of the submission of the grievance as an extra day on an expedited basis."

77

Issue No. 131 is a proposal by the DPOA amending Article 17.D to read, "The Personnel Bureau shall convene the Performance Evaluation Board to hear the matter within forty-five (45) days of the date of the written request to appeal. If the appeal is not heard within forty-five (45) days, the Performance Evaluation shall be increased to its prior rating." The City points out that there may be reasons that the Evaluation Board may not be able to be convened within 45 days and that the result could well be that an underperforming Officer could, by a technicality, not have his or her true rating recorded.

Issue No. 132 is a proposal to add an extra arbitration date under Article 36.H addressing disputes concerning the Attendance Control procedures. The City objects to these proposals. The DPOA argues that such disputes need expedited resolution. The City argues that with its limited staff which also have other duties it will not be able to keep such deadlines.

The Chairman, in reviewing these proposals, would vote to deny same. The current expediting process has been resolving a number of the attendance issues promptly. In fact, there is time on the regular one-day process per month to resolve additional cases. The parties need more time to develop the current procedures. If they are not working, then the parties can sit down and refine the process. Until this is done, within the parties' respective current resources, there is no reason to memorialize any changes. This may be necessary in the future, but not until there has been further experience both in the Performance Evaluation Board and in the expedited process. It is for this reason that the Chairman, along with the City Delegate, votes to reject the DPOA's proposals as to Issue Nos. 130, 131 and 132. The DPOA Delegate dissents.

In this arbitration section, the Chairman appreciates that he has voted in most cases to reject the DPOA's proposals along with one City proposal. But these proposals, including the City proposal, should have been addressed at the bargaining table. They are proposals that in a

78

true impasse situation would have not reached impasse. The Chairman's approach was to address the larger issues that these circumstances have brought to the Panel and to recognize that the issues brought forth that the Chairman has dubbed the "arbitration issues" need time to be worked out between the parties based upon further experience. This explains the Chairman's approach.

As to Issue No. 16, the City proposes an overhaul of Article 8. F regarding arbitration of back wages claims of DPOA members. Specifically, the City Proposes that Article 8.F read:

ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation for *temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Family Independence Agency, City-Funded Long-Term Disability Insurance, Sickness and Accident Insurance or Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein; and* when an employee is suspended pending disposition of charges against him, there shall be no offset of interim earnings provided he is exonerated and restored to duty. In consideration for the above, the Union agrees to process cases of officers under suspension in a prompt manner.

The City's proposed changes to Article 8.F would significantly alter a contractual provision that has been included in the agreement between the City and DPOA for many years. Conversely, the DPOA argues for maintaining the *status quo*. Under the current circumstances, there is no reason for a change to the current language of Article 8.F. As an economic issue, the Chairman adopts the proposal of the DPOA. The DPOA Delegate joins the Chairman. The City Delegate dissents. Therefore, Article 8.F will continue to read:

ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any compensation for

79

personal services he may have received from any source during the period in question excluding documented overtime and Department authorized income earned outside his regularly scheduled work period.

When an employee is suspended pending disposition of charges against him, there shall be no offset of interim earnings provided he is exonerated and restored to duty. In consideration for the above, the Union agrees to process cases of officers under suspension in a prompt manner.

**Issue No. 146 -**    *Article 7 - Non-Economic: Payment of Umpire for cancellation days by party cancelling hearing*

The DPOA proposes to place in the contract a provision that the party who cancels an arbitration hearing shall be responsible for paying the Umpire's cancellation fee.

This is one of the items that should never be in an Act 312. This is an item that should have been negotiated if the parties had been negotiating. Furthermore, this Chairman, who has had the privilege of serving as an Umpire with the parties for some time, never realized that the Umpires were charging cancellation fees because this Chairman was under the impression that under the contract with the parties the Umpires were not to charge cancellation fees. This came as a revelation to this Chairman. Because this Chairman believes this matter should be at the bargaining table and not at Act 312, and because this is a matter that should be resolved by the parties at the time the issue arises, noting that at the last cancellation with this Umpire, due to unexpected illness of one of the attorneys, this Umpire never thought of charging a cancellation fee and this Umpire did not. For these reasons, joined by the City Delegate, this Chairman rejects this proposal. The DPOA Delegate dissents.

**Union Representation:**

| | |
|---|---|
| **Issue No. 2 - Non-Economic -** | *Article 4.A - Basis of Representation-One Steward/One Alternate* |
| **Issue No. 4 - Non-Economic -** | *Article 4.D - Basis of Representation-Seniority of Chief Steward and Steward* |

80

Article 4.A of the Master Agreement provides that "Employees shall be represented by one (1) steward for each shift" in each represented district. Maintaining that this provision has not been followed in all cases, the City has proposed to add the following sentence to Article 4.A, "Any current practice inconsistent with this representation provision shall be discontinued". The DPOA opposes the addition of this sentence and seeks the *status quo*. This is a matter for the parties to negotiate in the view of this Chairman and not a matter that should be brought to Act 312 with so many other issues. For this reason, the Chairman will vote with the DPOA Delegate and maintain the *status quo*. The City Delegate dissents.

As to Issue No. 4, the City proposes the following changes as underlined, namely, to amend Article 4.D as follows:

> D.    Except as otherwise provided, only one (1) chief steward and one (1) steward from each shift shall enjoy top seniority ·insofar as remaining with their district, precinct, section, unit, or platoon during their term of office, and they shall not be transferred out of or reassigned from their district, section, unit or platoon, except for justifiable cause or reduction in force, or when a district. precinct, section. unit or platoon is discontinued or otherwise inactivated or consolidated.

The City has agreed to remove the phrase "except as otherwise provided". Thus, the Panel is considering this proposal with the "except as" phrase removed. The DPOA apparently objects to the proposal. But there is, in the view of the Chairman, no reason to object because, frankly, the language is cleanup language. This is a simply adjustment and one that the DPOA should have agreed to long ago. For this reason, the Chairman, joined by the City Delegate, will accept the proposed language as amended with the "except as otherwise provided" removed as proposed by the City. The DPOA Delegate dissents.

**Transfer and Assignments:**

81

| | |
|---|---|
| **Issue No. 21 - Non-Economic -** | *Article 10.C.1.a - Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |
| **Issue No. 24 - Non-Economic -** | *Article 10.C.2.a-Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |
| **Issue No. 22 - Economic -** | *Article 10.C.1.A - Seniority -Assignments and Transfers-Additional Entities Exempt* |
| **Issue No. 23 - Non-Economic -** | *Article 10.C.1.c-Seniority-Assignments and Transfers Additional Entities Exempt* |
| **Issue No. 104 - Economic - City Proposal -** | *Article 10C.1.d -Seniority-Transfer From Assigned Duty After 5 years* |
| **Issue No. 126 - Economic - Union Proposal -** | *Article 10 - Seniority - 50 Day Duration on Temporary Assignments* |
| **Issue No. 21 - Non-Economic -** | *Art. 10.C.1.a, Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |

In Issue 21, the City's Last Best Offer proposes an overhaul to Article 10.C.1.a, which deals with assignments and transfers based upon seniority. Under the current agreement, "[a]ll assignments and transfers except those excluded herein, shall be based upon seniority provided the employee is qualified." Essentially, the City proposes that assignments and transfers be based upon a number of factors, including seniority, attendance, and the employee's disciplinary record. With respect to attendance, the City proposes that "the employee cannot have been on initial counseling regarding attendance or on the attendance control program – D.P.D. 350 program – within six (6) months." Regarding the employee's disciplinary record, the City proposes that the employee's record, the preceding six (6) months, shall be considered. The DPOA asserts that the *status quo* should be maintained. This is a non-economic issue.

Accordingly, the Chairman, joined by the DPOA Delegate, declines to adopt the City's Last Best Offer with the City Delegate dissenting. The current language of Article 10.C.1 has been a part of the agreement between the City and the DPOA for some time and the City has put forth no cogent reason, in the view of the Chairman, for changing the current provision. Indeed, the City has D.P.D. 350 for controlling attendance and Bonus Vacation Days for incentivizing

82

attendance. In addition, attendance misconduct can be addressed through disciplinary procedures. It would seem that the parties would not have chosen to modify the current techniques for absence control and disciplinary procedures contained in the Collective Bargaining Agreement if faced with a strike. Therefore, Article 10.C.1 a will continue to read:

ARTICLE 10.C.1.a

All assignments and transfers except those excluded herein, shall be based on seniority provided the employee is qualified.

1. Transfers;

   a. The present practice of individual officers filing requests (Police Manuel Vol. IV, Chapter 1, Sec. 4) for transfers between various districts, and entities shall be continued. The requests shall be valid for a period until October 1st each year. Continuation requests may be submitted on or after August 15th. Whenever openings occur in districts, or entities, the most senior employee on the list shall be transferred provided the employee is qualified. Any time there are common seniority dates on the transfer list, the transfer shall be given to the member who was first recorded as approved by the Personnel Section. In the event members with common seniority dates also have a common recording date, the selection shall be by blind draw. An association representative shall be present at the tie-breaking procedure. The following entities shall be excluded from this procedure…

**Issue No. 24 - Non-Economic -** *Article 10.C.2.a - Seniority-Assignments and Transfers-Additional Entities Exempt*

Regarding Issue 24, the City proposes the addition of substantive language to Article 10.C.2.a. Specifically, the City's Last Best Offer proposes the following addition:

An assignment list shall be maintained. Placement on the assignment list shall be based on the following factors: seniority, attendance, (the employee cannot have been on initial counseling regarding attendance or on the attendance control program – D.P.D. 350 program – within six (6) months) and the employee's disciplinary record, excluding written reprimands, over the preceding six (6) months (such discipline shall be utilized only after all administrative remedies have been exhausted).

83

Employees who have been placed on the assignment list shall be
removed from the assignment list if the member receives an initial
counseling regarding attendance, is placed on the attendance control
program, or receives written disciplinary action, excluding written
reprimands (such discipline shall be utilized only after all administrative
remedies have been exhausted).

This is a non-economic issue, with the DPOA asserting that the *status quo* of Article

24.C.2.a should remain.  The provisions of Article 24.C.2.a have been included in the contractual

arrangement between the City and the DPOA for some time and there has been no showing of

problem with the current provisions.  Furthermore, the City has other effective methods of

controlling and rewarding attendance, including Bonus Vacation Days.  Additionally, the City

may exact discipline upon those who maintain poor attendance records.  Accordingly, with

respect to Article 10.C.2.a, the Chairman decides that the *status quo* should be maintained.  The

Chairman, joined by the DPOA Delegate, adopts the *status quo*.  The City Delegate dissents.

Article 10.C.2.a will continue to read:

> A request for assignments within a district, or entity once an employee is
> assigned there, can be made by submitting DPD Form #31 (referred to as
> a Blue Slip) to the Commanding Officer.  The request shall be valid for a
> period until October 1st each year.  An employee may have only one
> assignment request on file at any time; the most recent request will
> replace earlier requests.  Whenever openings occur within districts, or
> entities, the most senior employee on the list shall be assigned provided
> the employee is qualified.  Any time there are common seniority dates
> on a job assignment list the job assignment shall be given to the member
> whose request was first received by supervision...

As to Issue No. 104, the City proposes to add the following provision to Article 10.C.1.d,

Transfers: "Notwithstanding anything set forth in this Article, the Department may transfer any

member from any non-patrol entity to a patrol entity after the completion of five (5) years in the

non-patrol entity."  The DPOA objects and proposes the *status quo*, namely, objects to any such

provision in the contract.  The Chairman understands the Department's desirability to have such

84

a provision. But, presumably, with the reorganization of the Department, a number of entities will be eliminated. First, there is no need for such a provision and second, if there are some non-patrol entities, Officers who have seniority will have the opportunity to bid into those positions and their seniority rights should be honored. It is for these reasons that the Chairman, along with the DPOA Delegate, will vote not to include such language in this contract round. The City Delegate dissents.

Issue No. 126 is the Union proposal to amend Article 10.C.2.c to modify the parties' longstanding provision that temporary assignments will not exceed 84 days to 60 days. The City opposes such a change. The Chairman, along with the City Delegate, will vote to maintain the *status quo* which is the City's Last Best Offer, with the DPOA Delegate dissenting. The reason for this is that the 84 day provision has been in the contract for some time. There is no persuasive reason to change. This is the way the parties have operated for some time. In this era of reorganization in the Department, this is not the time for such a change.

In regard to Issue No. 22, Article 10.C.1.a addresses transfers and particularly exempts from seniority transfers 29 entities in the Department. The City proposes to add to this exemption list the following additional entities: Bomb Squad, City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Technical Support, Tactical Operations and Task Force Administration. The DPOA objects to adding these additional entities. This is a one-third increase. The DPOA argues that there is "no demonstrated need" for the change.

As the Chairman views the situation, in reviewing the arguments and Exhibit 639, there is an argument as to the Bomb Squad because of the expense of six weeks of military bomb disposal training in Alabama and one year of probation training with the Unit plus the six written

85

examinations and six practical examination application testing. There is a need to choose an applicant with the aptitude for this type of work. It is also understandable that in terms of Technical Support that there may be special aptitudes in this day and age of computers and advanced technology that may not necessarily involve the most senior Officers.

But, beyond these two entities, when compared to the type of entities that the parties over the years have excluded, the Chairman believes that the Department has not made its case for the other eight proposed entities. The City Delegate would concur as to the Bomb Squad and the Technical Support, but would dissent as to the exclusion of the City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration. The DPOA Delegate would dissent as to the Bomb Squad and the Technical Support inclusion, but would concur with the Chairman as to the exclusion of City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration.

**Issue No. 86 - Economic -** *Article 40.G - Miscellaneous-Deferred comp Selected by City and Direct Deposit*

The City has proposed to amend Article 40.G "Miscellaneous" as follows, represented by the strikeouts, with the DPOA objecting, proposing the *status quo*, namely, objecting to the strikeouts:

> ~~G~~D. **Deferred Compensation and Direct Deposit**. Members of the bargaining unit may participate in the deferred compensation and direct deposit programs offered by the City. ~~The Association shall be entitled to arrange for the establishment of a deferred compensation program by a company of its choosing, which shall be included in the deferred compensation programs offered by the City.~~

The City notes that it pays for the administrative costs of the deferred compensation

program. Therefore, its counsel writes, "Accordingly, the City wants this provision changed such that the City will select the deferred compensation company and program. The City operates a number a number of benefit plans and there are cost savings to the City in combining the various benefit plans available to employees. ... If the City is going to pare the cost, it should choose the carrier to limit that cost".

The difficulty with this argument is there has been no negotiation between the parties; that the present language has been in the contract for some time. It is possible that the DPOA selected carrier could match the City's cost or even below the City's cost. In other words, the blanket statement, without a history of negotiations and the possibility that the DPOA could meet or even with its chosen carrier be able to save the City money in this area, suggests that this provision has not been well thought out by the City. For this reason, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents. There just was not a history of negotiations addressing the potential cost savings either way.

**Issue No. 87** - **Economic** - *Article 40.H - Miscellaneous-Payment of Banked Time*

The City proposes to amend Article 40.H as follows:

> **Lump Sum for Banked Time.** Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. DROP plan participants shall only receive payout for banked time when they permanently retire, not when they enter the DROP plan.
>
> ~~Payment shall be made pursuant to the City's schedule for that specific payment.~~ Payment shall be paid within 90 days if the amount is less than Ten Thousand ($10,000.00) Dollars, and if in excess of Ten Thousand ($10,000.00) Dollars, the amount shall be made in semi-annual installments over a three-year period with the installments due on February 1 and August 1 with no interest due.

87

The underscoring represents the City's proposed additional language. The strikeouts represent the deletions. The DPOA proposes the *status quo*.

The Chairman reviewed the language as proposed as two proposals – one addressing DROP Plan participants; the second dealing with the payout. The proposed amendment of the City, objected to by the DPOA, proposes that the DROP Plan participants receive the payout for bank time other than sick time when they permanently retire. To the Chairman, this is a reasonable proposition for it prevents the participant from being in a higher tax bracket and it preserves cash funds for the City during a time when the City is in financial crisis. For this reason, the Chairman, joined by the City Delegate, will vote to adopt this amendment. The DPOA Delegate dissents.

As to the provision for a payout, the Chairman interprets the no interest language which in Issue No. 144 the DPOA in effect proposed, except the Chairman interprets the City's proposal to include that if the installments are not made when due then interest would be paid. On this basis, the Chairman would accept the City's payout proposal with the City Delegate agreeing and the DPOA Delegate dissenting.

**Issue No. 144** - Economic - Union Proposal -     *Article 33 - Separation Payments*

The DPOA has proposed the following new language to Article 33:

> X.     All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that effective January 1, 2013, for future separation payments to members who were already eligible to retire as of the effective date of the Award, a member will have the option of receiving (a) lump sum payment ninety (90) days after separation, or (b) semiannual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ERIP established as part of the Award.

With the exception of the last sentence, this option shall not be available to members in

88

the ERIP established as part of this Award which, as will be explained elsewhere, there will be

no ERIP.  The Chairman does not believe this language is appropriate, as this is contrary to other

issues that the Panel has ruled upon and, therefore, the Chairman, joined by the City Delegate,

will opt to deny the proposal.  The DPOA Delegate dissents.

**Issue No. 145 - Non-Economic - Union Proposal -**      *Article 33 - Payment of Accumulated*

This is another proposal by the DPOA which reads:

**ARTICLE 33 - PAYMENT OF ACCUMULATED BANKED**
**TIME UPON ELECTION TO PARTICIPATE**
**IN THE D.R.O.P.**

Upon issuance of this Award, the provisions of Article 133,
"Pension Provisions," pertaining to 'DROP' payments shall be modified
in accordance with the Memorandum of Understanding attached hereto
as Exhibit B.

The City objects.  There is a Memorandum signed by the parties dated February 9, 2011.

It is reasonable and it dovetails with the other Orders in regard to payouts and the limits of when

payouts are made for those participating under the DROP Plan as issues under the Orders herein.

By agreeing to this proposal, the Chairman would be acting in contradiction to other proposals

that the Chairman has agreed to and for this reason rejects the DPOA proposal as to Issue No.

145, joined by the City Delegate.  The DPOA Delegate dissents.

**Issue No. 143 - Economic - Union Proposal -**      *Article 33 - Early Retirement*

The DPOA has proposed in Article 33, "Early Retirement", which reads:

**ARTICLE 33 - EARLY RETIREMENT**

**New language:  ¶W**

W.      An Early Retirement Incentive Program ("ERIP") will be offered
to a limited number of officers in the Department and the participation
will be based on seniority upon the issuance of this Award.  The total
maximum number of early retirements will be 150, to be allocated to
members of the DPOA (76%), the DPLSA (23%) and the DPCOA (1%).

89

Employees will be eligible to participate in ERIP if they (a) are three (3) years or less away from completing either 20 or 25 years of service, and (b) have sufficient banked time to purchase the remaining service time. Officers participating in the program will retire immediately using their years of service and banked time to get to 20 years of service and their pension will be calculated based on 20 years of service. All banked time will be relinquished in exchange for retirement service credit.

The City will offer members with between 17 and 20 years of service the ability to early retire as follows, as well as between 22 and 25 years: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory), and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

DROP participants with 22 years of service who have not received their lump sum payout from their banks may use such banked time to participate in the ERIP in accordance with the above.

Any language not expressly modified remains current language (i.e. CBA *status quo).*

The City opposes adding this provision.

This language was in the Tentative Agreement signed on February 9, 2012 which at that time the City had agreed to it. In his post-hearing brief at page 71, the City's counsel writes in part:

The Tentative Agreement contained an early retirement plan under which 100 DPOA members would be able to retire three years early by forfeiting certain accrued banks or by purchasing time. This proposal was agreed to because the City believed it was in a position to allow 100 DPOA Officers to retire early and leave the force. The underlying concept was that these Officers would not need to be replaced and there would be substantial savings.

90

# EXHIBIT A-1 (Part 3)

This is no longer the case. Since January/February 2012, the
Department has had more than 100 DPOA members retire. See Ex.
742, January 31, 2012 headcount showing 2,091 DPOA members, and
Ex. 743 November 30, 2012 headcount showing 2,001 DPOPA. Since
November 30, 2012 there has also been an additional 20 retirements. ...

Furthermore, during the hearing, counsel for the DPOA suggested there would be more

retirements. It is problematical whether any of these retirees will be replaced in the economic

environment in Detroit. Thus, there is no room to encourage any Officers to retire. For this

reason, the Chairman, joined by the City Delegate, as the City opposes the early retirement plan

at this point, rejects the early retirement proposal. The DPOA Delegate dissents.

**Issue No. 53** - **Economic** - *Article 31.A - Holidays- Eliminate Holidays-Election Day and 8th and 9th Holidays*
**Issue No. 54** - **Economic** - *Article 31.B - Holidays- Excuse Day and Holiday*
**Issue No. 55** - **Economic** - *Article 31.C.1 - Holidays- 1 ½x on Holidays if Scheduled and Not Appear to Holiday Pay*
**Issue No. 141** - **Economic** - **Union Proposal** - *Article 31 - Holiday Pay*
**Issue No. 56** - **Economic** - *Article 31.C.2 - Holidays-Holiday Rosters Employer Discretion*

The above five issues all deal with holidays.

Article 31.A of the Master Agreement provides for a schedule of holidays. The City's

Last Best Offer with strikeouts is as follows:

### A.    Schedule of Holidays

Each employee shall be entitled to the following holidays in accordance
with this schedule.

| | |
|---|---|
| Independence Day | July 4th |
| Labor Day | First Monday in September |
| Veteran's Day | November 11th |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25th |
| New Year's Day | January 1st |
| Memorial Day | Last Monday in May |

~~In addition, each employee shall be entitled to a holiday on one Election~~
~~Day in each year or an eighth holiday if an election is not scheduled.~~
~~(Notification will be made by Special Order.) A ninth holiday shall be~~

91

~~granted to employees who have been employed ninety (90) days or more~~
~~and who are entitled to regular holidays under existing ordinances.~~
~~This holiday shall be taken at any time during the fiscal year which is~~
~~mutually acceptable to the employee and the Department. To insure that~~
~~the ninth holidays are expended proportionately throughout the year and~~
~~not carried until the last months of the fiscal year, on May 1st, the~~
~~commanding officer shall assign the remaining ninth holidays at his~~
~~discretion. Ninth holidays which are not used prior to the end of the~~
~~fiscal year will be lost.~~

Thus, the City proposes to eliminate the so-called 8th and 9th holiday. The DPOA

proposes to maintain the *status quo*. In support of its position, the City Advocate in his post-

hearing brief writes:

### Elimination of Election Day and Eighth and Ninth Holidays

While there are three holidays involved, in reality the City seeks
to eliminate only two holidays per year. In years in which there is an
election for which Officers have the day off they day off they have an
eighth and ninth holiday. These holidays should be eliminated for two
reasons:

- First, pursuant to the Financial Stability Agreement and
  Annex D it will conform the DPOA contact and the
  labor contracts of all other City employees whose
  contract has expired. As noted above, uniformity and
  thus ease of administration are one of the goals set forth
  in the Financial Stability Agreement.

- City will receive cost savings in the amount of
  approximately $390,000 per holiday, and with DFFA
  parity and approximately the City will save $500,000
  per holiday and $1M for both holidays. Ex. 654.
  approximately $500,000 per holiday or $1M for both
  holidays.

The Chairman acknowledges that the City makes a point. The problem, however, is that

though the City is in serious financial stress the Chairman must consider the nature of Police

work and the marketplace. No one can doubt the stress of Police who are working the street and

the need, when available, for holiday time off. Furthermore, even when compared with

distressed cities such as Flint and Saginaw, the holiday made available by the so-called 8th and 9th

92

holiday in Detroit, which has been available for numerous years, is competitive. There is a difference between the Police and general employees and the need to have the time off, if available, to relieve the stress of Police work. And, as indicated, the number of holidays is competitive even with the distressed cities such as Flint and Saginaw. It is for these reasons that the Chairman concludes, along with the DPOA Delegate, that the deletion of the 8th and 9th holidays, particularly in the absence of negotiations, is not the area for savings and therefore would opt with the DPOA Delegate to maintain the *status quo*. The City Delegate dissents.

However, for the period from July 1, 2012 through June 30, 2013, there shall not be an 8th or 9th holiday. The 8th and 9th holiday will commence the second year of the contract, July 1, 2013. On this point, the DPOA Delegate would dissent as he would opt to have an 8th and 9th holiday begin in the first year of the contract. The City Delegate, though objecting to the 8th and 9th holiday, would nevertheless join with the Chairman in agreeing that in any event there would not be an 8th and 9th holiday in the first year of the contract.

Issue No. 54 addresses a proposed change by the City in Article 31.B.3 as follows:

> 3.  Should the holiday fall on Sunday and the Monday leave day begins the next 28 day work cycle, the leave day will be the Friday prior to the holiday or a day mutually agreed upon between the employee and the Department. ~~Should that Friday already be used in conjunction with article 32~~ [Excuse Time] ~~then the leave day will be Thursday or a day mutually agreed upon.~~

The DPOA proposes the *status quo*. The City's reason for the change is set forth in the following statement in its counsel's post-hearing brief:

> Under the Labor Contract, if a holiday falls on a weekend and Friday is an excuse day for the Officer, then the Officer has Thursday off. This sometimes creates scheduling issues for the Department. The Department wants to eliminate the requirement that if Friday is an excuse day that the Officer has Thursday off and wants to replace it with a day to be mutually agreed upon. In this way, the Officer receives his

93

day off and the Department can better schedule for the holiday week.

> Therefore, the City requests that its Last Best Offer, Issue No. 54, be granted.

This statement, as the Chairman views it, is a perfect example of the failure to bargain.

If the parties had bargained rather than take this issue to Act 312, the parties would have been able to resolve the matter. The matter should have been resolved on the remand. It was not. Yet, the parties have had language on the issue in the Master Agreement for some time. This is a signal to the Chairman that the language should not be changed. If the language is to be changed, it is to be changed at the bargaining table. This is not an issue for Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will vote for the *status quo* on this issue. The City Delegate dissents.

Issue No. 55 seeks to change the rate of pay for those Officers required to work from double time to time and one-half the regular rate of pay for all hours actually worked in addition to their regular day's pay of eight hours and a provision that employees who are scheduled to work on any holiday, but fail to report to work, shall not be eligible for holiday pay.

Issue No. 56 is a proposal concerning flexibility in assigning employees to various holiday rosters at the discretion of the Department by eliminating the following language in 31.C.2 under "example": "In those cases where an employee works four (4) or more hours into a holiday as a result of overtime, he is not entitled to holiday premium rate for that shift; the overtime hours shall be compensated at the regular time and one-half rate".

Issue No. 141 is a Union proposal that Officers be able to take part of their holiday pay in compensatory time. As to the DPOA's proposal, the City favors the *status quo*. Holiday pay from double time to time and one-half, though the City has suggested that there is no City

comparable to Detroit, the City did offer the comparables of St. Louis, Pittsburgh, Cleveland, Philadelphia, Baltimore and Chicago in terms of holiday pay. Only one (Pittsburgh) paid more than Detroit at 2.5 times. One (Philadelphia) paid straight time. Three (Cleveland, Baltimore and Chicago) paid time and one-half. St. Louis paid straight time plus four hours comp time. Yet, it seems with the long bargaining history of double time plus eight hours it is difficult, despite the fiscal crisis, to reduce this benefit. For this reason, the Chairman will vote with the DPOA Delegate and continue the double time for holiday work with the City Delegate dissenting as to Issue No. 55.

On Issue No. 55, there was a second Issue concerning employees who are scheduled to work on any holiday and fail to report. The Chairman believes this is a fair provision and would vote with the City Delegate and agree that such employees who fail to report will lose their holiday pay. The DPOA Delegate dissents.

As to Issue No. 56, the holiday roster issue, this seems reasonable to the Chairman and the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

As to the DPOA's proposal on Issue No. 141, if the City wants to pay cash, the Chairman will go along with the City and vote with the City Delegate to reject the DPOA's proposal. The DPOA Delegate dissents.

**Issue No. 139** - **Economic - City Proposal -**      *Eliminate 2% Promotional Increase*

The annual cost of the 2% increase on Officers who pass the promotional test and are on a promotional list waiting promotion is approximately $270,000 per year. During the time period July 1, 2012 to October 12, 2012, a period of three and one-half months, the 2% promotional increase cost to the city was $73,000. The 2% promotional increase has cost as much as

$340,000 annually to the City. *See* Exhibit 691. To the City, in financial crisis, this is no small amount.

Recognizing that the DPOA itself agreed to suspend the educational reimbursement, albeit on a sunset basis until July 1, 2015, the Chairman will agree to the elimination of the 2% promotional increase, recognizing that the parties at the end of this two year agreement can again revisit the issue. The City Delegate will join with the Chairman in adopting the City's proposal. The DPOA Delegate dissents.

**Issue No. 127 - Economic - Union Proposal -** *Article 11 - No Requirement to Perform*

The DPOA has proposed amending Article 11, Section B, as follows:

> Employees shall not be assigned duties normally performed by a person of higher rank, except in emergency situations, and shall receive the wages of the first year sergeant for all time/hours worked.

As the parties know, this matter is in arbitrating, awaiting an opinion. That opinion will be forthcoming when this Act 312 assignment is completed. That opinion will answer the issue raised. For this reason, the Chairman, joined by the City Delegate, will reject this proposal. The DPOA Delegate dissents.

**Issue No. 133 - Economic - Union Proposal -** *Field Training Officers*

The DPOA had proposed that once an Officer is certified FTO, namely, Field Training Officer, the Officer shall receive a 5% adjusted gross wage annually. The Chairman appreciates that in other large city departments there is a precedent for such a proposal. However, the City is in a financial crisis. This is not the time, unfortunately, for such an economic improvement. The Chairman notes that, though there are arguments for such a benefit, the parties over the years, when the City was perhaps able to afford such a benefit, have not negotiated or obtained such a benefit in previous Act 312.

96

Thus, considering the financial circumstances and the previous bargaining history, the Chairman, joined by the City Delegate, will vote not to include a stipend at this time for a Field Training Officer. The DPOA Delegate dissents.

**Issue No. 133** - **Union Proposal** - **Economic** -    *Article 40 - Miscellaneous - Include Sick Time in Lump Sum Payments*

The DPOA has proposed to amend Article 40.H as follows:

> **H.**    **Lump Sum for Banked Time**. Whenever an employee leaves employment with the City, such employee will be paid for all banked time, ~~other than~~ including sick time, in a lump sum payment within thirty (30) calendar days of the separation, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability.

The City objects.

The Chairman, along with the City Delegate, agrees with the City that Article 40.H should not be amended as proposed by the DPOA. As the City points out in the transcript at Vol. 6, pg. 93, some payments involve several hundred thousand dollars and there are concerns as to sick leave that sometimes it takes anywhere from 30 days to six months to reconcile sick leave banks. This explains that the parties over the years have negotiated the language "other than sick time". It is for this reason that the Chairman was not persuaded to adopt the proposed amendment and opted with the City Delegate to continue the present Article 40.H language. The DPOA Delegate dissents.

**Issue No. 48** - **Economic** -    *Article 22-Furlough Selection City Can Change*
**Issue No. 51** - **Economic** -    *Article 29-Eliminate Longevity*
**Issue No. 89 A and B** - **Economic** -    *Article 41.A - Wages-10% Reduction*
**Issue No. 90** - **Economic** -    *Article 41.A - Wages-City Right to Institute Furlough Days*

As to Issue No. 48, the City proposes to add a subparagraph I to Article 22, "Furlough