Selection and Cancellation", which reads: "The City reserves the right to make changes to any aspect of furloughs, including but not limited to, the number of furlough days and selection process". The Master Agreement has been negotiated between the parties, including Act 312 proceedings. This is an Act 312 proceeding where proposals have been made, testimony has been taken and arguments have been made, including arguments concerning furloughs. Once Orders have been issued and agreements have been made, this is the parties' contract. What the City is proposing is inconsistent with a binding contract to be honored by both parties. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal. The City Delegate dissents.

Issue No. 89 A and B deals with wages. Issue No. 51 deals with longevity. Issue No. 90 addresses furloughs. These issues represent the core money issues with the exception of issue No. 90, which is basically a layoff issue, between the parties in this Act 312 proceedings.

As to Issue No. 89 A and B, the Last Best Offer of the City is as follows:

(CORRECTED - UPDATED)
ISSUE NO. 89 A and B - ECONOMIC

CBA Article 41.A - Wages
CET Article 38.A - Wages
CET Provision and City Last Best Offer on Issue 89 A

**WAGE DECREASE:** All classifications and positions shall receive a 10% wage reduction effective 7-17-12.

July 17, 2012 - June 30, 2013

| CLASS CODE | TITLE | Min | Max |
|------------|-------|-----|-----|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1st Step | $29,352 | $33,065 |

98

| 33-10-14 | Police Officer - Promotion List | $47,914 | $47,914 |
|---|---|---|---|
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer - Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |
| 33-12-26 | Police Data Processing Programmer - Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

IF THE ARBITRATOR AWARDS THE UNION A 2-YEAR DURATION FOR THE LABOR CONTRACT, THE CITY'S LAST BEST OFFER FOR THE TIME PERIOD JULY 1, 2013 TO JUNE 30, 2014 (ISSUE 89b) IS:

July 1, 2013 - June 30, 2014

| CLASS CODE | TITLE | Min | Max |
|---|---|---|---|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1st Step | $29,352 | $33,065 |
| 33-10-14 | Police Officer - Promotion List | $47,914 | $47,914 |
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer - Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |

| 33-12-26 | Police Data Processing Programmer - Police Officer | $48,503 | $49,652 |
|----------|--------|---------|---------|
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

As to Issue No. 51, the City proposes to eliminate Article 29, "Longevity". As to issue

No. 90, the City proposes to add to Article 41.A the following language:

BUDGET REQUIRED FURLOUGHS: The City reserves the right to reinstitute future furloughs as a means of cost containment.

The DPOA's proposal as to Issue No. 89 (wages) as well as Issue No. 51 (longevity) and

Issue No. 90 concerning budget furloughs is as follows:

DPOA
PROPOSAL NO. 89
Article 41 - Wages/Longevity

Article 41.A of the current Collective Bargaining Agreement shall be applied/enforced as follows:

**41. WAGES**

Employees hired prior to February 20, 1995, in this title shall proceed from minimum to maximum on the basis of five equal steps.

Employees hired on or after February 20, 1995 in this title shall receive wage increases and step increments in accordance with Exhibit II. B. Effective July 1, 2000, employees in this title shall proceed from minimum to maximum on the basis of five equal steps.

Employees who have already completed the Police Academy prior to July 1, 2000, but have not yet reached the 1st pay step shall have $1,000 of the 1st pay step applied to their annual salary, effective July 1, 2000. Employees who complete the Police Academy on or after July 1, 2000, will have $1,000 of the 1st pay step applied to their annual salary upon completion of the Police Academy. This increase will be considered an early entitlement to part of the first annual step increase.

Employees in the classification of Police Officer shall receive the following wage adjustment effective January 1, 2013 for the duration of this agreement.

Compensation Schedule

100

| Class Code | Title | Min. | Max. |
|---|---|---|---|
| 33-10-11 | Police Officer | $40,304 | $53,237 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $32,613 | $53,237 |
| 33-12-11 | Communications Officer - Police Officer | $40,754 | $53,687 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $54,099 | $54,099 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $54,804 | $54,804 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles – Police Officer | $54,099 | $54,099 |
| 33-12-26 | Police Data Processing Programmer - Police Officer | $53,826 | $54,975 |
| 33-12-36 | Senior Police Data Processing Programmer - Police Lieutenant | $71,870 | $74,000 |

January 1, 2013

Essentially, effective January 1, 2013, the DPOA proposed restoring the 10% wage cut in all classifications and proposing a two year agreement from July 1, 2012. The DPOA rejects the budget required furloughs and restores the longevity payments that were eliminated by the CET. The DPOA is seeking payment of longevity pay pursuant to Paragraph 29 of the Master Agreement according to the schedule thereof and according to the terms thereof.

According to Exhibit 2 of the Master Agreement Schedule, Officers who are employed after February 20, 1995 are hired in under the City's proposal at $29,352. There are five steps beginning after one year until reaching top pay which under the City's proposal would be $47,914 on an annual base wage. Under the DPOA proposal, the top pay after five years would be the rate that existed on July 1, 2008, namely, $53,237 annualized as there had been no pay raise at the base rate since July 1, 2008.

101

Succinctly put, in advocating for a one year contract, the City was proposing to maintain a 10% pay cut. In advocating for a two year contract, if the Panel was so disposed, the City was advocating for a 10% pay cut for two years. Initially, the DPOA was advocating a three year contract and advocating that it maintain the same level of pay, no pay cut, for three years. The Chairman urged the DPOA to back off to a two year contract, recognizing the situation that the parties were facing which the DPOA accepted in making an offer of a two year contract. Then the Chairman urged, based upon his belief that he would not find the financial situation in Detroit as critical as it turned out to be, that the DPOA offer to accept the 10% pay cut for the first six months and then a restoration of the 10% for the last 18 months. The DPOA accepted this suggestion from the Chairman and made this its offer, namely, to accept the 10% pay cut that had prevailed until January 1, 2013 and then a restoration of the 10% beginning January 1, 2013.

In an attempt to convince the Chairman of their respective positions, the parties offered competing comparables with the City suggesting internal comparables and suggesting that there were no external comparables. The DPOA ignored the internal comparables, suggested certain national Police comparables, and referenced 15 Southeastern Michigan Police comparables as well as Saginaw and Flint. The City suggested that there were no external Police comparables comparable to Detroit. Though the City's internal comparables do reference general employees who have taken pay cuts that were imposed, none of the internal comparables have the same working conditions as Detroit Police Officers who, as pointed out in the prologue, are faced with the same hazards of employment that have unfortunately in some cases resulted in the death of some Officers. In other words, the Police marketplace is what is being paid by other nearby communities for police services.

Nevertheless, the general employees in Detroit in recent years have taken pay cuts so that

102

in 2013 their pay cuts have averaged a 20% pay cut for both unionized and non-union employees – both supervisors/executives and general employees whereas, up to July 2012, the uniform employees have not taken a pay cut. The financial situation in Detroit is at an emergency stage. Regardless of the Police marketplace, this fact cannot be overlooked by the Chairman, regardless of the equities and the Police marketplace. Yet, the marketplace for Police work is there to behold.

The Midwest national comparables ranging from $55,000 to $80,000 annually are not particularly helpful because the taxing authority of the other national Midwest cities varies and are not comparable with Detroit. Nor are the economic conditions in the other national Midwest cities comparable with Detroit.

Likewise, the 15 suburban cities in Southeast Michigan used by the DPOA are not comparable with Detroit. Detroit is not, for example, Livonia, Birmingham, Troy, the Grosse Pointes (Public Safety Departments) or Royal Oak – cities that are financially well off and are not in financial distress. Nor can the Michigan State Police be considered a comparable because Michigan is not in financial distress as Detroit finds itself. Nevertheless, the comparables were used to point out that, for instance, Michigan in base wages on an annual basis at a five year level, exclusive of longevity, pays a State Trooper $59,988. The top pay for a Michigan State Trooper at 10 years is $64,143.36 and after 20 years, $65,730.24. The suburban districts are paying anywhere between $55,000 and $60,000 annually.

One of the criteria under Section 9 of Act 312, besides financial ability, is external comparables. A proper comparable in this situation would be, as pointed out at the beginning of this Opinion in the open letter to Emergency Manager Orr, Flint, Michigan, 60 miles away from Detroit, which is under an Emergency Financial Manager, and Saginaw, Michigan,

103

approximately 85 miles away from Detroit, which is also a financially distressed city, having a deficit in excess of $3 million. Yet, in each of those cities, the police officers are paid more than Detroit's current $47,914 based on an annual base wage at 2,080 straight time hours for a five year Officer, the top pay in Detroit.

Below is a chart comparing the base wage and total compensation between Detroit at the current $47,916 top rate, Flint and Saginaw, noting that Flint is also under an Emergency Financial Manager under Act 72:

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

As the above chart indicates, in terms of base salary Flint, under an Emergency Financial Manager, is approximately at the five year level $4,000 more than Detroit Officers. As the Officer has more years on the job, the spread, even with Flint, is more. When total compensation is compared, even at five years, the spread between Detroit and Flint is dramatic, namely, $9,000, and almost $12,000 between Saginaw and Detroit.

104

These facts are devastating.  These are not comparisons with the high paid State Police nor with Livonia, Birmingham, the Grosse Pointes (Public Safety Departments).  The Chairman has chosen to compare primarily with another nearby community that is under an Emergency Financial Manager, namely, Flint.  And look what the facts reveal.  Compared with the marketplace, Detroit Police Officers, faced with the Police working conditions of a large urban area, are by any definition underpaid even in a distressed community faced with a financial emergency.

To put it another way, there can be no doubt that the job of a Detroit Police Officer is certainly as difficult as any in Southeast Michigan or, for that matter, the State Police because of the nature of Police work in a large urban American city.  Furthermore, the Chairman is informed that the Flint figure was imposed by the Emergency Financial Manager, further emphasizing that the Detroit Police Officers, in comparison with a nearby distressed Michigan city, namely, Flint, Michigan's third largest city, are vastly underpaid.

As to Issue No. 51, longevity, the City proposes to eliminate longevity, arguing that the City has eliminated longevity with its other unions by virtue of the City Employment Terms as well as its non-union personnel.  Yet, in order to reach some semblance in the marketplace, the DPOA argues that it needs longevity and proposes that longevity pay be restored.

The external comparable of Flint and Saginaw clearly establishes that the Detroit Police Officers at $47,416 at the five year rate are grossly underpaid, even in a city that is under an Emergency Financial Manager where there is a serious question of the ability to pay.

Even though the Chairman made the suggestion of what he believes should be the Union's Last Best Offer because it was evident that Detroit Police Officers were clearly underpaid in the comparable workplace in comparable police work, the Chairman, applying the

105

312 criteria and the emphasis required to be put on financial ability, hit a roadblock of Detroit's financial crisis, causing the Chairman to reconsider his initial reaction because of his obligation to follow the statute and the criteria set forth therein as there is a question of ability to pay, though the Chairman will point out that a careful analysis suggests that the Orders that will follow will indicate that if Detroit wishes to have a viable Police force in the interest of the citizens' public welfare, there is a way to have some semblance of the ability to pay. In this regard, what a majority of the Panel has done is for the first year continue no pay raises, even though Flint during the same year is making a base wage of $4,000 more. There was recognized that those Officers who are 12 hour shifts, and that is not all of the Detroit Police Officers, are being paid if they work a full year on 12 hour shifts an extra 104 hours at 84 hours every two weeks. But this does not apply to all Detroit Police Officers. The Panel majority, the Chairman and the DPOA Delegate, although the DPOA Delegate is reluctant, believing that the Panel should have awarded a pay restoration in the first year of the contract or at least by July 1, 2013, would award a 5% restoration effective January 1, 2014. This gives the Emergency Manager and Mayor nine months to reorganize the Department, if he so chooses, in conjunction with the City and the Department. This will bring the five year Officer up to $50,311.80, based upon a 2,080 hour year, still below Flint. However, if the Department continues 12 hour shifts 84 hours in a two week cycle and makes the 84 hour cycle available, Officers will be able to earn additional monies, at least those on patrol, as they have in the past year.

The reason for not restoring the longevity is there is the claimed ability to pay proposition and the fact that longevity was eliminated with the Lieutenants and Sergeants in an Act 312 proceeding, has been eliminated throughout the City, although imposed, and is not available in Flint. What the majority of the Panel has done is illustrated by the following chart:

106

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

The Emergency Manager, the Mayor and the Treasurer of the State of Michigan should consider, with the blessings of the Governor, moving the date of the 5% restoration to July 1, 2013 when considering the above comparisons.

In regard to the longevity, again recognize what the longevity payments were in the Master Agreement that expired on June 30, 2012 that had been in the Master Agreement for some time. After five years, an Officer received 1% of base wage; after 11 years, 2% of base wage; after 16 years, 3% of base wage; and after 21 years, 4% of base wage. Using these figures, if the Emergency Manager and the Mayor should consider, recognizing that longevity is being eliminated in Detroit, to bake in as part of the base wage the previous longevity into the Police Officer's base wage. If this is done, look at the figures in comparison with Flint and Saginaw:

| Five (5) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$50,814.92** |
| Flint | $51,336 |
| Saginaw | $53,700 |

107

| Eleven (11) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$51,318.04** |
| Flint | $51,336 |
| Saginaw | $53,700 |

| Sixteen (16) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$51,821.15** |
| Flint | $52,176 |
| Saginaw | $53,700 |

| Twenty-One (21) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$52,324.27** |
| Flint | $53,148 |
| Saginaw | $53,700 |

If the longevity is baked in, it should be done by the Emergency Manager and Mayor. The Panel has not done this although the DPOA Delegate would do it as he believes longevity should have been included in the Order. It should be noted that the City Delegate dissents on any pay increases or any consideration of longevity. The City Delegate agrees with the Chairman that the Chairman has no authority to include longevity. The DPOA Delegate would have included longevity in any event.

Now, where is this money coming from, given the City's ability to pay? First, the Emergency Manager has nine months to reorganize the Department to bring efficiencies to the Department, including controlling overtime. And, in this regard:

(1) there are provisions to work out, including 12 hour shifts and perhaps an arrangement of a dual eight hour/12 hour program which can eliminate, according to the Department, substantial overtime;

(2) in regard to going to court on tickets and ordinance violations, the Detroit Police Department, in conjunction with the 36th District Court, can adopt the techniques used in the suburban courts and departments where a supervisor can conduct pre-trials and arrange for pleas

108

from citizens to avoid having Officers appear in court, thereby saving overtime. This is a well-known technique in suburban departments and apparently has not been used in Detroit and can save overtime;

(3) working with the Chief Judge of the 36th District Court, address the question of Judges who do not appear timely in court which contributes to the overtime that Officers spend in court;

(4) move a number of Officers who are not doing police work out of their positions and into field work. The importance of this is that when these proceedings began there were over 2,000 Police Officers. The latest count is there are under 2,000 Officers either as a result of resignations or retirements. It is anticipated that there will be more retirements before the proposed raises take effect. In the opinion of the Chairman, it is unnecessary to replace the retiring Officers as probably the same or even more police service can be performed for the citizens of Detroit with less Officers if Police Officers are put out on the street.

One example suffices. In Central District, when one walks into that District, there is an Officer assigned to the screening device. Right behind that Officer there are two or three civilian employees at a security desk. If one turns right and walks down the hall, there are three counters where fully uniformed Officers are serving the public for some type of licenses. Every time the Chairman has gone by there, there have been rarely one or two citizens being served. Exactly why there are three full service Officers behind those counters when that work could be done by civilians or whether one Officer rather than three Officers could be doing the work. In other words, a careful survey throughout the Department might reveal a substantial number of Police Officers who could be doing police work rather than civilian work or their jobs could be combined. The significance of this is, rather than replacing Officers who are resigning or

109

retiring, Officers could be performing work out in the field with no increased cost. It is estimated that assuming the overhead cost of a $51,000 or $53,000 Officer is one-third, these Officers not replaced represents an $80,000 reduction in the budget. If 100 Officers are not replaced, but instead 100 Officers are moved out of counters or out of Precincts where they are not doing police work, this provides the financing to give these Police Officers a wage comparable with Flint and Saginaw. The Emergency Manager and the City government has nine months to accomplish this consistent with the City's ability to pay.

Detroit is in a serious financial crisis. There is a need to have more Police Officers on the street. But the Orders here limit the number of non-IOD limited duty Officers. The Orders provide for civilianization. The Chairman has illustrated the one example where there are Officers who seemingly are wearing full uniforms and are not doing police work, answering calls of citizens and who could replace retiring Officers without adding to the force and still serve the citizens and not strain the City's finances. It may be that, with retirements and resignations and utilizing available person power that could be put out on the street without hiring any other personnel, the Department could operate with between 1,800 to 1,900 Officers and provide the same current service and even increased service to the citizens of Detroit and pay the comparable wages ordered by the majority of the Panel and be cost neutral, in other words without adding costs to the Department. This comment goes hand in hand with the recognition in the Orders of attempts at the need to save overtime costs. The Panel has clearly recognized the City's dire financial crisis.

There is the Section 9(h) criteria that fact finding and arbitrators consider, namely, the art of the possible. The Chairman appreciates that the civilian employees have taken pay cuts. This is unfortunate. But, police work is different. It is dangerous. It has resulted in Police Officers

110

losing their lives. And, as one can see, all the majority of this Panel has done is made a comparison with another city, Flint, that has an Emergency Financial Manager, and the comparison has been with wages that were imposed by that Emergency Financial Manager. Any court that might be called upon to review this Opinion should recognize that the art of the possible means that a strike should be avoided. That is the purpose of Act 312. And it would seem that it is possible by applying careful management techniques to get Police Officers out on the street; that it means a smaller Department in terms of numbers, a more effective Department that can do it with less money with Officers who are paid at least a reasonable rate with a comparable community, then this should be done.

Incidentally, this is what is happening in other communities, even to the effect, based upon this Chairman's experience in Chicago, that even Command Officers are now out on the street as a matter of course. Thus, the Chairman realizes there are a number of things that could be done in the Department based on his own observations that can be tightened up consistent with protecting the integrity of the contract and the integrity of the Department, consistent with the City's limited ability to pay.

If the observations of the Chairman are followed, the Order may even be cost neutral. If the Emergency Manager with the Mayor bake in the longevity payments, it is suggested that it still could be in the $5 million to $6 million range as the longevity payments would not have been due until December 2013. And, then, as pointed, it still would be cost neutral. In other words, the ruling of the majority of the Panel, although the DPOA Delegate reluctantly signed the Order only to get a majority ruling, gives the Emergency Manager the opportunity to accelerate the restoration of 5% as early as July 2013. And, even then, the Chairman is of the view that it could be cost neutral if the resignations and retirements are not replaced. But, certainly, the

111

baking in of the longevity payments at a minimum should be voluntarily done by the Emergency Manager and the Mayor because these are, in the view of the Chairman, cost neutral.

The DPOA Delegate very reluctantly concurs with the Chairman, but if the DPOA Delegate had his druthers would have restored the complete amount of the cut on January 1, 2013. The City Delegate dissents. The City Delegate agrees with the Chairman that longevity should not be restored. The DPOA Delegate voted to restore longevity.

Concerning Issue No. 90, the City proposes to add to Article 41.A the following provision: "Budget Required Furloughs. The City reserves the right to reinstitute future furloughs as a means of cost containment." The DPOA objects to such a provision. Hopefully, such a provision will not during the life of this Agreement be instituted. But the financial crisis in Detroit is such that this is a possibility. Furthermore, this is consistent with management rights. For this reason, the Chairman, joined by the City Delegate, will vote to include such a provision. The DPOA Delegate dissents.

**Issue No. 103** - Economic - City Proposal -    *12-Hour Shifts*
**Issue No. 122** - Non-Economic - Union Proposal - *10-Hour Shifts*

Issue No. 103 is a City issue which the City has dubbed as an economic proposal dealing with 12 hour shifts. The DPOA has proposed Issue No. 122 dealing with work schedules which the DPOA has dubbed as non-economic. Both offers deal with work schedules. The dilemma that the parties have presented is that if an economic issue, then the Panel must select one or the other Offer. If a non-economic issue, the Panel can fashion an award. The two Issues involve work schedules. Work schedules represent a condition of employment which is not necessarily an economic issue. Therefore, the Chairman concludes that since the two Issues are schedules that both Issue No. 103 (12 Hour Shifts) and the proposed 4/10 work schedule is also a work

112

schedule; that the two issues are non-economic. The DPOA Delegate agrees with the Chairman. The City Delegate dissents. This means that the Panel can fashion its own Orders as to scheduling.

As to the 4/10 work schedule, this was a proposal in the Tentative Agreement if 10 hours shifts are utilized as a development of a pilot program. Commander Benson testified that he did a study on a 10 hour shift model and concluded that it would increase the cost to the Department in instituting such a schedule. Commander Benson explained that two 10-hour shifts would cover 20 hours per day which he believed would mean the need to have more equipment and Officers to cover the additional four hours per day which the Department does not have the equipment or the personnel available to accommodate the additional needed squad cars. The Chairman was persuaded by this testimony and for this reason will join with the City Delegate in rejecting Issue No. 122, as mandating a 10 hour shift. On this point, the City Delegate joins with the Chairman in agreeing that this is a management right. The DPOA Delegate believes, again, that the Panel should have issued an Order mandating a 10 hour shift. However, the Department retains the management right to determine whether the Department wishes to initiate a 10 hour shift. The DPOA Delegate dissents.

As to the 12-hour shifts, the Department maintains that the 12-hour shifts project a savings annually in overtime of approximately $3 million per year; that in the Second Precinct, comparing January 2012 before 12-hour shifts with November 2012, there was an increase of Officers on the street from 52% to 76%; that in the Eighth Precinct there was an increase from 75% to 86%. Inspector Rivers testified that there were examples of Officers working on the eight hour shift basis on double shifts. She gave an example in Exhibit 710 in the period between June 27, 2011 through August 7, 2011 in the Southwestern District there were 63 double

113

shifts, meaning Officers worked 63 double shifts or 16 straight hours. The proposed schedule in one scenario provides for a five day week, followed by a two day week, with one three day weekend.

The Chairman appreciates that there are consistent runs in Detroit; that the schedule does provide all Officers with every other weekend off. It does provide a savings in overtime and allegedly provides for more cars on the street.

On the other hand, there has been a ground squall from Officers indicating that there is a fatigue factor that Officers, because of the consistent runs in a large urban area, are having difficulty adjusting to 12 hour days. Yet, other Officers welcome the 12 hour shift. Under such circumstances, this is a matter that should have been developed with more care on the part of the Department with input from Union representatives, recognizing that the Department does have the management right to institute a 12 hour shift. The Chairman, joined by the City Delegate with the Union Delegate dissenting, recognizes the Department's management right to institute a 12 hour shift. However, the Order will also provide, with the City Delegate dissenting, with the Chairman and the DPOA Delegate concurring, that there be established a committee consisting of one member of the Department and one Officer of the DPOA to meet within one week of this Order to explore the possibility of providing an opportunity to operate 12 hour shifts with volunteers and allowing other Officers to work eight hour shifts and to report their findings to the Chief within two weeks of this Order. If the Chief accepts the recommendations of the committee and in doing so implements a volunteer 12 hour program, this ends the matter. If the Chief does not accept a voluntary program by May 1, 2013, then within one month of May 1, 2013 the matter may be submitted to the Chairman of this Panel as the senior Umpire under the Umpire System, to determine whether the Chief has been arbitrary in exercising his management

discretion in determining not to accept a voluntary program, with the standard being to curtail overtime and to have more patrol cars on the street.

The City Delegate agrees with the Chairman that the decision to have 12 hour shifts is a management right, but disagrees with the committee approach as spelled out in the Order. The DPOA Delegate dissents on the issue of 12 hour shifts, maintaining that it is a condition of employment to be negotiated, but would concur with the Chairman as to the committee approach and the opportunity to grieve in the event that the Chief does not accept the committee recommendation or implements, in any event, a volunteer program in establishing 12 hour shifts.

One final point which is a point made by the Chairman. The Chairman, in writing this portion of the Opinion as to 12 hour shifts, does so on the proposition that the schedule that will be adopted will be an 84 hour schedule on a two week cycle as this has been the schedule that the Department has used since implementing the 12 hour schedule. The Department's testimony on this point has been that a 10 hour day is not as effective as a 12 hour day in having cars on the road and in eliminating overtime.

**Issue No. 102 - Non-Economic - City Proposal -** *Emergency Manager*

The City proposes the following language as to an Emergency Manager:

> An Emergency Manager appointed under the Local Financial Statutory and Choice Act may reject, modify or terminate this collective bargaining agreement as provided within the Local Financial Stability and Choice Act 436 P.A. 2012.

> Inclusion of the foregoing language does not constitute an agreement by the DPOA to the substantive or procedural content of the language. In addition, inclusion of the language does not constitute a waiver of the DPOA's right to raise Constitutional and/or other legal challenges (including contractual or administrative challenges) to: (1) the validity of the Local Financial Stability and Choice 436 P.A. 2012; (2) appointment of an Emergency Manager; or (3) any action of an Emergency Manager which acts to reject, modify or terminate the collective bargaining agreement.

The difficulty with this proposal is the failure to recognize that it is not a mandatory subject of bargaining. Act 312 is designed to resolve disputes between public employers and police and fire unions when the parties have reached impasse over mandatory subjects of bargaining. An Act 312 Panel's jurisdiction is limited to resolving mandatory subjects of bargaining.

Section 15(7) of the Public Employment Relations Act provides:

> (7) Each collective bargaining agreement entered into between a public employer and public employees under this act after March 16, 2011 shall include a provision that allows an emergency manager appointed under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, to reject, modify, or terminate the collective bargaining agreement as provided in the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. Provisions required by this subsection are prohibited subjects of bargaining under this act.

Subsequent to the rejection of Public Act 4, the Legislature enacted Act 436 of Public Acts of 2012. Pursuant to Section 30 of Act 436 and Act 212 30(1) as well as 30(2), it seems that the references to Act 4 of Public Acts of 2011 contained in 15(7) of PERA would also apply to Act 436 of 2012. The point is "provisions required by this subjection are prohibited subjects of bargaining under this Act". This means, in the view of this Chairman, that placing the proposed provision is not a mandatory subject of bargaining, but is required by PERA; that the refusal by the DPOA to agree to such a provision in their contract may well be an unfair labor practice. But that would be a matter before the Michigan Employment Relations Commission and is not a matter to be resolved by this Act 312 Panel, whose jurisdiction is to address mandatory subjects of bargaining. For this reason, the Chairman declines to join either party in issuing an Order including the City's offer on this subject for lack of jurisdiction. Having received no majority, the proposal fails for lack of a majority vote, with the City Delegate

116

dissenting as the City Delegate would vote to include the City's Last Best Offer. The DPOA Delegate takes the position that it would not be an unfair labor practice to resist including such language in the contract.

**Issue No. 60 - Economic -** *Article 33.J - Pension Provisions-Longevity Delete from AFC*

In Issue No. 60, the City proposes to delete longevity from the average final compensation of the pension plan. Though a majority of the Panel has not included longevity in this contract, longevity has been in previous contracts and it is hoped that the City and the Emergency Manager may in their wisdom reinstate longevity and for this reason the Chairman, joined by the DPOA Delegate, will reject the City's Issue No. 60 which the DPOA obviously objects to. The City Delegate dissents.

**Issue No. 66 - Economic -** *Article 33 - Pension Provisions-Right to Create/Amend/Eliminate DC Plan*
**Issue No. 67 - Economic -** *Article 31.U.10 - Pension Provisions-City May Create Loan Program from DC Plan*

The City proposes in issue No. 67 to modify Article 31.U as follows:

    **U.**    **Defined Contribution Plan.**

* * *

    10.    Participant Loan Program. ~~There shall be a~~ The City may create a participant loan program which will conform with the requirements of Section 72(p) of the Internal Revenue Code and shall be limited to "hardship" circumstances, as defined by the Plan Administrator and will only be available if no other loans from the Plan are outstanding. A participant who satisfies applicable rules and procedures as established by the Administrator may borrow from the participant's accounts an amount which does not exceed the lesser of fifty (50%) percent of the participant's vested accumulated balance or Fifty Thousand and 00/100 ($50,000.00) Dollars. Loans must be for a minimum of One Thousand and 00/100 ($1,000.00) Dollars. Repayment shall be done through payroll deduction. However, any outstanding balance shall be due upon termination of employment.

117

* * *

Thus, the City proposes to amend Section U.10 by making the Participant Loan Program permissive rather than mandatory, and not only to new hires but to all Officers without negotiating with the DPOA.

Article 31 - Pension Provisions

U.  **Defined Contribution Plan for Current and New Hires** - The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement Health Care Plan.

This Plan shall be effective for all bargaining unit members hired into the Department on or after June 30, 2012 and when employee contributions may be made on a pre-tax basis.

Bargaining unit members hired into the Department at or after that time, other than as provided herein in regard to duty-disability beneficiaries, will not accrue benefits under the old plan. Rather, those bargaining unit members hired into the Department on or after the effective date shall accrue benefits exclusively under this Section.

* * *

10.  See Issue 67.

* * *

The issue of the type of pension plan is usually an issue of negotiation between the parties. Likewise, the parties did agree that the loan program would be mandatory. There has been no showing after the parties previously agreed that it would be mandatory; that there is any persuasive reason that now the program should be permissive. For both of these reasons, the Chairman, joined by the DPOA Delegate, will vote to deny the request of the City to adopt the proposal represented by Issue No. 66 and 67 which the DPOA objects. The City Delegate dissents.

118

**Issue No. 68 - Economic -** *Article 33.V.1 - Pension Provisions-City Right to Amend Disability Retirement*

In Article 33.V.1, the City proposed the following amendment represented by the underscoring:

> V.    Duty Disability Retirement Provisions
>
>    1.    Subject <u>to the City's reserved authority to amend and modify the following and</u> subject to c, below, applicable to all bargaining unit members who file application for disability retirement benefits, the definition of "total disability" and "total incapacity" for the duty disability retirement provisions is as follows:

* * *

There was no showing of a need for this provision. The duty disability retirement provisions have been in the contract for some. They are a result of negotiations or an Act 312 between the parties. Subsections a, b and c under Section V.1 were carefully drafted. If there are changes, the changes should be mutually negotiated between the parties or mutually contested in an Act 312. For these reasons, the Chairman, concurred in by the DPOA Delegate, will vote to deny the issue No. 68 proposal by the City. The City Delegate dissents.

**Issue No. 69 -**    *Article 33 - New Pension provision. Eliminate vision and dental care*

The City proposes to add to Article 33 a new section on pensions reading:

> Upon the effective date of this Agreement, all vision and dental pensions shall no longer be provided for any future retirees after January 1, 2013.

The DPOA opposes.

The rationale that the City presents is that this is a cost item to the City as the City is required to fund this benefit; that its consultants suggest that this benefit is not prevalent in other pension plans. The DPOA questions this fact. Though the Chairman appreciates that the City is

119

in financial difficulty, there are disputes between the parties as to the financial condition of the pension plan plus the need to make reforms. The problem that the Chairman sees is that with no history of bargaining and an attempt to resolve such issues as this, given the City's financial plight, more needs to be done at the bargaining table before submitting the issue to the Panel. It is for this reason that the Chairman, joined by the DPOA Delegate, will at this time reject this proposal. Though the DPOA Delegate did not agree with the Chairman's position on a re-opener as to pensions, and therefore expressed concern as to the re-opener, in order to obtain a majority vote at this time, agrees to vote to reject the City's proposal on Issue No. 69. The City Delegate dissents, believing that the issue should be addressed at this time.

**Issue No. 62 - Economic -** *Article 33.R.1 - Pension Provisions-Full Time to Stay in DROP*
**Issue No. 63 - Economic -** *Article 33.R.2 - Pension Provisions-DROP Limited to 5 Years*

Issue Nos. 62 and 63 are proposals by the City as to the DROP Plan. These are proposals to amend the DROP Plan which the DPOA opposes. Issue No. 62 is a proposal by the City to amend Article 33.R.1 to add the following language:

> Members entering the DROP Plan after the effective date of this Agreement must remain in a full duty status for the duration of their participation in the DROP Plan. If a member is not able to return to full duty status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.

The proposal also proposes to delete the reference to the 2.25 escalator in Section R.5 and in R.9. Likewise, in R.2, the proposal proposes to incorporate the City's proposal as to Issue No. 63, the five year limitation on participation in the DROP Plan.

The Chairman would agree with the elimination of the reference to the 2.25% escalator because this is a housekeeping matter related to the stipulation in the 2011 Act 312 arbitration before Chairman Frankland. Thus, this would take care of subsections 5 and 9. As to subsection

2, this will be discussed in the discussion on Issue No. 63.

The Chairman appreciates the proposal put forth by the City. But the difficulty is that the language is drafted as an internal inconsistency and it does not distinguish between IOD and non-IOD injuries or address the overall issue of limited duty. For this reason, the Chairman, concurred with by the DPOA Delegate, will deny the City's proposal except as to Sections R.5 and 9. The City Delegate dissents as to Section s R.1 and 2, but will concur with the Chairman as to Sections R.5 and 9, and as to Sections R.5 and 9, the DPOA Delegate dissents.

As to issue No. 63, the City seeks to limit the participation in the DROP Plan to five years. When the DROP Plan was adopted by the parties, there was no limitation. There would have to be a further record developed to establish a cost factor that would strain the already fragile financial condition of the City to convince this Chairman that this provision is needed. At this point, the Chairman is not convinced. For this reason, the Chairman will join with the DPOA Delegate and deny this proposal but, as the Chairman did with Issue No. 63, he again repeats that as to Sections R.5 and 9, he will agree with the City Delegate that the reference to the 2.25 multiplier will be deleted. On this point, the DPOA Delegate dissents. On the point of denying the limitation, the City Delegate dissents, but does agree with the Chairman as to Sections R.5 and 9 in deleting the 2.25 references to the multiplier.

**Issue No. 61** - Economic - *Article 35.K - Pension Provisions-Delete Reference to 2.25% Escalator-No Escalator for Future*
**Issue No. 64** - Economic - *Article 33.R.5- Pension Provisions-Delete Reference to 2.25% Escalator*
**Issue No. 65** - Economic - *Article 31.R.8 - Pension Provisions-Delete Reference to 2.25% Escalator*

Issue Nos. 61, 64 and 65 are what the City proposes are cleanup provisions representing the stipulated award of 2011 concerning eliminating the 2.25% escalator for service credits

121

earned after September 1, 2011.  As to Article 33.K, the City proposes as follows:

K.    On or after July 1,1992, and the first of July each year
thereafter, the pension portion of any retirement allowance or
death benefit of a member or beneficiary of a member as
defined in Article IV, Section 1 (d) of the plan provisions, and
Article 31. K of this Agreement (to include those members who
opt to retire under the new plan provisions) shall be increased at
the rate of 2.25% per annum computed on the basis of the
amount of the pension received at the time of retirement by all
new plan members who are currently retired or who retire on or
after July 1, 1992.

~~For persons retiring on or after July 1, 2001, under the new plan
provisions, the 2.25% per annum escalation amount shall be re
computed each fiscal year on the basis of the amount of pension
received in the previous fiscal year (i.e., the 2.25% per annum
escalation amount shall be compounded).~~

The pension portion of any retirement allowance or death
benefit of a member, or beneficiary of a member as defined in
Article IV, Section 1 (d) of the plan provisions, and Article 31
(K) of this Agreement (to include those members who opt to
retire under the new plan provisions) earned on or after
September 1, 2011, shall not be increased whatsoever, per
annum or otherwise.  The pension portion of any retirement
allowance or death benefit of a member, or beneficiary of a
member as defined herein, accrued prior to September 1, 2011,
shall still be increased as provided herein.  Hence pension
benefits earned based on service rendered on or after September
1, 2011 will no longer receive the 2.25% per annum escalation
amount.  The 2.25% per annum escalation amount shall
continue to apply to pension benefits earned based on service
rendered before September 1, 2011.

Pension benefits based on service rendered after the effective
date of this Agreement shall continue to not be subject to any
escalation amounts.

The City proposes to delete one full paragraph as struck out and add a sentence as

underscored, plus a reference to Article 31.K of this Agreement.

As to Issue No. 64, the City proposed to amend Article 33.R.5 as represented by the

following underscoring and strikeout:

122

R.    DROP Plan:

      1.    See Issue No. 62.
      2.    See Issue No. 63.

* * *

      5.    The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the annual escalator <u>applicable to the credited service years</u> ~~of 2.25% times that portion of any retirement allowance earned prior to September 1, 2011.~~

* * *

      8.    See Issue 65.

* * *

Likewise, as to Issue No. 65, the City proposes to amend Article 31.R.8 with the following strikeouts and underscoring:

R.    DROP Plan:

      1.    See Issue 62.

      2.    See Issue 63.

* * *

      5.    See Issue 64.

* * *

      8.    When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. <u>The member's retirement allowance shall include all annual escalator amounts</u> ~~2.25%~~ <u>subject to Article 31(K)</u> that would have been added while the member was participating in the DROP plan.

* * *

The history behind this language goes back to correspondence between the then counsel of the City, Kenneth Wilson, and the current counsel of the DPOA, Donato Iorio, when in a letter dated July 14, 2011 Mr. Wilson wrote Mr. Iorio as follows:

    I am writing to confirm that the City of Detroit and the Detroit

123

Police Officers Association (DPOA) have negotiated the agreement summarized below subject to ratification. This agreement would resolve changes to the collective bargaining agreement that would otherwise have been determined by a majority of a panel pursuant to Public Act 312 of 1969, as amended. Subject to ratification, this agreement is as follows:

* * *

iv. **Elimination of Escalator.** Pension benefits earned based on service rendered **after September 1, 2011** would no longer receive a 2.25% per annum escalation. Pension benefits earned pursuant to service rendered prior to that date would still be subject to the escalator. (Identical to LSA award other than the effective date.)

This language then became part of a Stipulated 312 Award before Chairman Kenneth P. Frankland signed on September 22, 2011 in MERC Case No. D09 F-0731 wherein the Stipulated Award provided:

iv. **Elimination of Escalator.** Pension benefits earned based on service rendered **after September 1, 2011** would no longer receive a 2.25% per annum escalation. Pension benefits earned pursuant to service rendered prior to that date would still be subject to the escalator.

Based upon this history, the Chairman concludes that the language proposed by the City in Issue Nos. 61, 64 and 65 reflects this stipulation. It is clarifying language. And, by placing this history in this Opinion, confirming the history, all will understand the meaning of the language. For this reason, the Chairman, voting with the City Delegate, accepts the City's proposal as to Issue Nos. 61, 64 and 65. The DPOA objected, arguing for the *status quo*. Based on the history, the Chairman cast his vote as indicated with the City Delegate. The DPOA Delegate dissents.

| | |
|---|---|
| **<u>Issue No. 9</u> - Non-Economic -** | *Article 6.A - Management Rights-Add Law and FSA* |
| **<u>Issue No. 10</u> - Non-Economic -** | *Article 6.D, E and F - New Management Rights Provision* |
| **<u>Issue No. 11</u> - Economic -** | *Article 6.G - Management Rights-Delete Confusing Section G about CBA Supplementing Charter* |
| **<u>Issue No. 12</u> - Economic -** | *Article 6 - Management Rights-Reserve all Rights* |

124

These Issues proposed by the City address management rights and are amendments to Article 6 of the Master Agreement. All of the amendments proposed are opposed by the DPOA, who propose that the *status quo* remain.

The amendments essentially mirror the City Employment Terms. The fact of the matter is the management rights and responsibilities provisions in the Master Agreement have been negotiated over a long period of time and, in the opinion of the Chairman, gives the Department broad rights only subject to any negotiated "provisions of this Agreement".

The management rights in the Master Agreement are two pages long. They have been tested in the umpire system and the Department has fared quite well among the umpires. All the proposals do is represent a stylistic change. There is no need to reinvent the wheel. The present management rights language gives the Department broad rights which the Department has in the past and will continue to exercise. For these reasons, the Chairman, joined by the DPOA Delegate, declines to adopt the City's proposals as to Issue Nos. 9, 10, 11 and 12 and votes to continue the *status quo*. The City Delegate dissents.

**Issue No. 17** - **Non-Economic -** *Article 9 - Discipline-Department Can Implement Disciplinary Policies, etc.*

The City has proposed to amend the introduction to Article 9, "Discipline", as follows:

> All alleged charges and specifications against employees will indicate the specific violation of Departmental rules and regulations including the date, time and location of such alleged violations and a statement in simple concise language of the facts constituting the allegations. The Department reserves the right to implement and/or modify disciplinary policies, rules and penalties, including but not limited to policies relating to use of alcohol and marijuana and other controlled substances with at least thirty (30) days prior notice to the Union.

This, again, is a non-economic issue. Under its management rights, it would seem that the Department has the right to amend policies. But this is asking to confirm this right in the

contract. Likewise, the DPOA has the right to challenge the reasonableness of the rule. Therefore, the Chairman would add the language to the Union's right to challenge the reasonableness of the rule in the grievance procedure. With this added provision, the Chairman would adopt the City's Last Best Offer. The City Delegate reluctantly would agree. The DPOA Delegate dissents with amending the provision.

## Uniforms

The parties had proposals on uniforms but, during these proceedings, there was a representation that the parties were reaching an agreement on the issue of uniforms. Based upon this representation, the Panel will not issue an award on uniforms. If the Chairman is mistaken, then the Chairman shall be so advised within five days of the issuance of this Opinion and Award and the Panel will meet to address the issue of uniforms.

### Issue No. 94 - City Issue - *Eliminate Adoption by Reference*

Issue No. 94 is a proposal by the City to delete Article 45 of the Master Agreement which is entitled "Adoption by Reference or Relevant Charter Provisions, Ordinances and Resolutions" and reads:

> Except as otherwise provided in this Agreement, the parties further agree that all provisions of the City Charter, Ordinances and Resolutions of the City Council relating to the working conditions and compensation of employees are incorporated herein by reference and made a part hereof to the same extent as if they were specifically set forth. These charter provisions, ordinances and resolutions include, but are not necessarily limited to, the following subject matter:
>
> A. Hours of work and method of compensation
> B. Overtime payments
> C. Premium payments
> D. Uniforms and equipment
> E. Vacations (furlough and leave days)
> F. Holidays
> G. Non duty connected illness or disability (sick leave)
> H. Duty connected illness or disability

126

I.  ~~Retirement System (pension)~~
J.  ~~Longevity pay~~

The Chairman agrees that there is no reason to reference the Charter Provisions,

Ordinances and Resolutions; that the contract involved here should stand by itself.  For this

reason, the Chairman, joined by the City Delegate, will agree to the elimination with the DPOA

Delegate dissenting as the DPOA objects to the elimination of Article 45.

**Issue No. 93** - Economic -  *Article 43 - Civilianization*

The City proposes to amend Article 43, "Civilianization", as follows:

> The Department shall have the right to use civilians <u>in any function/classification not requiring MCOLES certification, including in any of the functions/classifications listed below.  Any police officer in a function/classification that is civilianized shall be reassigned.</u> ~~as it deems appropriate so long as it does not reduce the force or erode the membership of the bargaining unit as a result of the use of civilians in the following commands and district assignments~~ ~~including of the following s/classifications:~~

Commands
<u>1.</u>  Fleet Management
<u>2.</u>  Equipment Property Control Section
<u>3.</u>  Communication Systems Section
4.  Communications Operations
5.  Uniform Store
6.  Auto Pound
7.  Records/Identification Section
8.  Print Shop
9.  Graphic Arts
10. Crime Analysis
11. Technology Liaison Office
<u>12.  Technical Support</u>
<u>13.  Any administrative function or classification</u>

District Assignments
<u>1.</u>  Vehicle Maintenance Officer
<u>2.</u>  Property Officer
<u>3.  Any administrative function or classification</u>

~~To the extent civilians are employed to replace sworn officers it shall be done on the basis of either adding civilian staff, or by attrition when an officer voluntarily leaves the positions he/she currently holds.~~

127

~~Should the Department decide to utilize officers in any of the above
mentioned positions, those positions shall be made available for officers
to submit DPD 568 Inter Office Memorandums for the transfer requests
for the commands. Unless a position is abolished, the Department must
fill all vacancies as soon as practicable if not with civilian than with
sworn officers.~~

Effective September 1, 2011, the Department may, at its discretion,
reassign bargaining unit members from the 36th District Court in order
that they may be replaced with civilian staff or civilian security
personnel.

The provisions of Article 10 shall not apply to this provision.

The strikeouts in the text represent deletions. There is also an added addition, namely, "The
provisions of Article 10 shall not apply to this provision". There is also some additional
language in the text concerning MCOLES certification. The City has also added under
"Commands" three additional entities, namely, Communications Operations, Technical Support
and "Any administrative function or classification". Under "District Assignments", the City has
added "Any administrative function or classification".

The DPOA proposes the *status quo*.

Although the City maintains there are 90 Officers affected, some of the City's count
includes present entities that can be civilianized, including Fleet Management, which the City
claims involves 14 Officers. The present Article 43 already provides for civilianization of Fleet
Management. The largest group in the City's proposal is Communications Operations involving
approximately 42 Officers.

The City does make a point. In their presentations, the parties did refer to the contract
between the City of Chicago and the Fraternal Order of Police Chicago Lodge No. 7 which
represents the Chicago Police Officers. Section 23.12 of that contract recognizes civilianization
of the functions that the city is seeking to civilianize and the amendment proposed to Article 43.

128

The City is seeking with less certified Officers in the Department to put more Officers on the street performing Police work. The City is seeking what other major departments are doing as evidenced by the Chicago contract. This civilianization process will take some time. Based upon the record, the City, even with its present language, has not always been able to civilianize. Yet, the City should have the opportunity to do so as part of the reorganization of the Department and the well being of the citizens served by the Department.

For these reasons, the Chairman, with the concurrence of the City Delegate, will vote to accept the proposal of the City to amend Article 43. The DPOA Delegate dissents.

**Issue No. 99** - **City Proposal - Economic -**     *Article 33 - Pension-Lump Sum-Actuarial Reduction*

**Issue No. 100** - **City Proposal - Economic -**     *Article 33 - Pension-Gaines and Losses on Annuity Accounts*

These are two issues dealing with pensions. As to Issue No. 99, the City proposes an amendment to Article 33 that reads: "Bargaining unit members may not receive a lump sum cashout of all or part of their accrued financial benefits from the Police and Fire Retirement System without actuarial reduction of benefits fully equivalent to and otherwise of equal value to such payment." As to Issue No. 100, the City proposes to add the following language:

> Bargaining unit members having participant accounts with the Police and Fire Retirement System which may be distributed to participant's beneficiaries in one or more installments rather than as an annuity, sometimes referred to as annuity accounts, shall have such accounts ratably adjusted, not less frequently than once per year, based on actual returns, positive or negative, experienced by the Trust during the fiscal year preceding the crediting date. Final distribution of the account balance due a participant or beneficiary shall be delayed until the final adjustment has been made.

The DPOA objects to these proposals.

The provisions for employee pension contributions and annuity funds have been in the

129

parties' Master Agreement since January 1, 1987. There was no evidence that there was any negotiation on these proposals by the City. Given the length of time that the concept at issue has been in the contract and the lack of negotiation between the parties, the Chairman will vote to maintain the *status quo*. This is the type of proposal, given its longevity, whereby there should be a history of negotiation. Therefore, the Chairman, along with the DPOA Delegate, will vote to maintain the *status quo* as to Issue Nos. 99 and 100. The City Delegate dissents.

**Issue No. 107** - **Economic - Union Proposal -**     *Article 34 - Regularity in Use of Sick Leave-Discipline*

Issue No. 107 addresses regularity in the use of sick leave benefits and proposes to amend Article 34.A as follows:

     **A.**     **General:**

The Detroit Police Department is responsible for providing efficient law enforcement services. Maximum attendance is required from all members if this responsibility is to be fulfilled.

The Department shall provide a guideline (copy attached) for determining excessive/improper use of sick usage. It is, therefore, necessary to identify and correct members who have developed a pattern or regularity in the use of their sick leave benefits.

**CITY LAST BEST OFFER**

     **A.**     **General:**

The Detroit Police Department is responsible for providing efficient law enforcement services. Maximum attendance is required from all members if this responsibility is to be fulfilled.

The Department shall provide a guideline (copy attached) for determining excessive/improper use of sick usage. It is, therefore, necessary to identify and correct members who have developed a pattern or regularity in the use of their sick leave benefits.

Attached to the Offer is an extensive Guideline. The actual proposal refers to Article 34.

However, the proposal would best fit into Article 36 which is the Article in the Master

130

Agreement referring to regularity in the use of sick leave benefits.

The DPOA opposes the addition of this language and, therefore, opts for the *status quo*. The Chairman, concurred in by the DPOA Delegate, believes that this is a non-economic issue and that the Panel, therefore, is not bound by one Offer or the other of the parties.

There was little bargaining on this issue, even though the Chairman is aware that the question of the use of sick leave benefits has generated grievances between the parties. Therefore, the Chairman believes that the matter requires more discussion and negotiations between the parties than was discussed in these proceedings. For this reason, the Chairman, joined by the DPOA Delegate, will opt for a Letter of Understanding to be attached to the contract whereby the parties are to form a regularity in the use of sick leave benefits committee with two members from the Police administration and two members from the DPOA selected by the President. The committee shall meet within one month of the issuance of these Orders. The committee shall attempt to reach agreement on the guidelines for determining excessive and improper sick leave usage. If the committee is not able to reach agreement by October 1st, the matter shall be referred to the Panel of existing Umpires who shall render a final and binding opinion by January 15, 2014. The referenced referral should be done no later than October 15, 2013. A majority opinion of the Panel shall be binding on the parties. This shall be in reference to the amendment to Article 36.A. Otherwise, all the provisions of Article 36.A as well as the remaining provisions of Article 36.A shall remain in place.

The DPOA Delegate will join with the Chairman in accepting the Chairman's proposal. The City Delegate would have agreed with the City's proposal as to the amendment to Section A, but would agree with the Chairman and the DPOA Delegate that all the other provisions of Article 36.B through H and the portions of Article 36.A that were not proposed to be amendment

131

would stay.

**Issue No. 82** - *Article 40.C - Miscellaneous- Extent of Agreement*

The City proposes to eliminate Article 40.C, "Miscellaneous", which both parties agree is non-economic, and reads:

> **Extent of Agreement.** The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the City and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and agrees that the other shall not be obliged to bargain collectively with respect to any subject or matter referred to or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject matter may not have been within the knowledge or contemplation of either or both parties at the time that they negotiated or signed this Agreement, unless otherwise provided for herein.

The DPOA objects, noting that this language has been in the parties' contract for a number of years. The Chairman sees no reason why this language should not be in the parties' contract. With the number of issues involved in this Act 312, certainly the parties have the opportunity to present the issues they wish put forward. Therefore, it would seem that Article 40.C is an appropriate provision. For this reason, the Chairman, joined with the DPOA Delegate, will vote to retain Article 40.C as it was in the expired Master Agreement expiring on June 30, 2012, with the City Delegate objecting.

**Retroactivity**

The provisions of the Orders are prospective if involving economic matters from the date of the Opinion and Orders, with the City Delegate agreeing with the Chairman on this point and the DPOA Delegate dissenting.

<u>**Issue No. 57**</u> - Economic -  *Article 31.E.5 - Holidays*

The City has proposed to amend Article 31.E.5, "Holidays", as follows:

> **E.**     **Preparation and Maintenance of Holiday Rosters.**
>
> * * *
>
> **5.**     **District Rosters.** <u>At the discretion of the Employer</u>, all district personnel shall be included on one of the following rosters with the exception as noted in 31.E.5.e.:
>
> > a.     **Platoon One.** All employees who start work between 12:00 a.m. and 3:59 a.m.
> >
> > b.     **Platoon Two.** All employees who start work between 4:00 a.m. and 10:59 a.m. (including staff personnel).
> >
> > c.     **Platoon Three.** All employees who start work between 11:00 a.m. and 4:00 p.m.
> >
> > d.     **Platoon Four.** An employees who start work between 4:01 p.m. and 11:59 p.m.
> >
> > e.     The exception to the above is personnel assigned to <u>Central Events</u> ~~Special Operations (formerly Special Events Section) of the First Precinct. Only First Precinct Special Operations shall maintain their own rosters.~~

**NOTE:**   These start times shall not include roll call time, nor desk personnel who start earlier than normal hours.

In other words, the City proposes to add the words "At the discretion of the Employer" and add to E.5.e "Central Events" and to delete the remaining language as indicated. The DPOA objects to the changes.

The Chairman believes that this language, namely, the change to "Central Events" represents the current organization in the Department. The Chairman also believes that the reference to the addition of "At the discretion of the Employer" is a reasonable addition, consistent with management rights. For this reason, the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

133

**Issue No. 112 - Economic -** *Article 33 - Pension Provisions*

The Union has proposed to add the following Paragraph P to Article 33:

> Paragraph P – New 13    "Effective July 1, 2009, all members that elect
> DROP, with the immediate payout option shall be paid for all bank time,
> including sick time, within thirty (30) days. Should any member not
> receive their lump sum payments within thirty (30) days, they shall
> receive Michigan judgment interest."

The City opposed this proposal and has made Last Best Offers set forth in Issue Nos. 75, 87 and
145.

The Chairman, joined by the City Delegate, rejects the Union's proposal for the reasons
discussed under Issue Nos. 75, 87 and 145. The DPOA Delegate dissents.

**Issue No. 102 - Economic - City Issue**    *Health Care Coverage For All Spouses of*
*Employees Hired on or after January 1, 2003*

The City is proposing that there be no health care coverage for all spouses of employees
hired on or after January 1, 2003. The DPOA opposes such a provision. This would affect
Officers who have been on the force for 10 years. It would obviously affect the City's ability to
recruit qualified candidates because retiree health care for one's spouse is a plus for recruitment.
It is doubtful that in negotiations the City would prevail in this request without a major
concession on the part of the City. For this reason, the Chairman, joined by the DPOA Delegate,
will vote to deny this request. The City Delegate dissents.

**Issue No. 113 - Economic**    *DPOA Shall Have The Authority to Name an Alternate Health*
*Care Provider*

The DPOA proposes to add to Article 21 a new Section H, namely, "The DPOA shall
have the authority to name an alternate health care provider consistent with the terms enumerated
in Article 21." The DPOA has not been able to prevail in such a provision in the past.
Furthermore, in the view of the Chairman, it is the responsibility of the City to present insurance

134

plans and proposals. If the DPOA has an insurance carrier that it wishes to propose to the City, it may at the bargaining table. Furthermore, as the City points out, it is the City that administers various health plans in many bargaining units. For this reason, the Chairman, joined by the City Delegate, chooses not to adopt the DPOA's proposal as to a new Section H as proposed. The DPOA Delegate dissents.

## Issue No. 137 - Non-Economic - DPOA Proposal

The DPOA has proposed to add a new Section R to Article 21 requesting that the City provide the DPOA certain information from Blue Cross Blue Shield each May 1st. This provision has not been in the parties' contract for some time, if ever. In the view of the Chairman, there is no reason to have such a provision in the contract. This is a matter for discussion between the parties during their day-to-day relationship. Therefore, the Chairman, joined by the City Delegate, will vote to deny this request. The DPOA Delegate dissents.

## Issue No. 92 A and B - Economic - City Issue    *Permanent Shift Program*

Article 42 of the Master Agreement provides for the permanent shift program. In 42.A, the City proposes to add the following sentences: "The City reserves the right to modify, amend, terminate or suspend the permanent shift program in its sole discretion. In the event that the City exercises this right, the City may give prior notice to the Union." As the parties well know, this Chairman in a previous Act 312 at the request of the parties initiated the permanent shift program. The program has been successful and there is no reason to abandon the program. It was a joint initiated program and if it is abandoned, in the view of the Chairman, its elimination should be jointly negotiated as was its creation. For this reason, the Chairman, along with the DPOA Delegate, will vote to deny the addition of the proposed language. The City Delegate dissents.

135

As to Issue 92B, which is a proposal to eliminate the Joint Labor Management Permanent Shift Committee set forth in Sections D and E, this language is now obsolete as it was necessary when the permanent shift program was in its infancy and as a result the City has proposed to eliminate this language, which apparently the DPOA objects to the elimination. There is no reason after permanent shifts have been in place in excess of 10 years to have such language. Therefore, voting with the City, the Chairman agrees to eliminate Sections D and E of the current language. The DPOA Delegate dissents.

## O R D E R S

The Orders and the votes of the Delegates are as set forth in the body of the Opinion. The views expressed in the Opinion are the views of the Chairman and those voting with the Chairman do not necessarily represent the views of the Delegate voting with the Chairman. But the vote of the Delegate with the Chairman was necessary to obtain a majority vote on the Issue involved. For convenience, these Orders have been signed by the Delegates on separate pages, but have the same effect as if signed on the same pages with the Chairman.

March 25, 2013

GEORGE T. ROUMELL, JR., Chairman

136

March 25, 2013

CRAIG S. SCHWARTZ, City Delegate, concurring
and dissenting where indicated

137

March 25, 2013

_Theodore M Iorio_
THEODORE M. IORIO, DPOA Delegate,
concurring and dissenting where indicated

138

# EXHIBIT A-2

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
MICHIGAN EMPLOYMENT RELATIONS COMMISSION
ACT 312, PUBLIC ACTS OF 1969 AS AMENDED

*In the Matter of:*

CITY OF DETROIT

-and-                                                        MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

## CHAIRMAN'S PARTIAL AWARD ON HEALTH INSURANCE

**George T. Roumell, Jr., Chairman**
**Craig Schwartz, Esq., Employer Designee**
**Theodore Iorio, Esq., Union Designee**

APPEARANCES:

FOR THE CITY OF DETROIT:              FOR DETROIT POLICE OFFICERS
                                       ASSOCIATION:

Malcolm D. Brown, Attorney            Donato Iorio, Attorney

## OPINION AND FINDINGS

The hearings involving this Act 312 have occurred after numerous pre-conference and

pre-trial conferences with the Chairman on November 5, 16, 19, 29, 30, December 12 and 18,

2012. On December 18, 2012, there was a hearing on the issue of health care. Because there

was an ongoing open enrollment on health care that affected the choices that members of the

Detroit Police Officers Association could make which was scheduled to end on December 27,

2012, it was imperative that this Chairman issue an Opinion and Award dealing with the issue of

health care, dealing with health insurance as it affected current employees in order to give said

Officers the opportunity to make informed choices.

With the concurrence of the parties and the members of the Panel, the Chairman, with the splendid work of the reporter to issue a transcript of the hearing within 12 hours of the hearing, issues an Interim Award on most aspects of the health care issue so that the members of the Detroit Police Officers Association can make their choices.

The genesis of the dispute stems from the fact that at one point the City entered into a tentative agreement with the DPOA on February 9, 2012 addressing the health care plans offered to Officers, namely, a PPO Plan, HAP, Blue Care Network Plans and the THC Plan, whereby the City's maximum contribution for any health plan was to be 80% of the Option I Plan offered by BCBSM1/CVS Caremark and the employee was to contribute 20% of the premium. This tentative agreement was not ratified by the City. Following a Consent Agreement between the State and the City, there were City Employment Terms imposed by the City of Detroit on the Detroit Police Officers Association. This Act 312 was instituted.

The DPOA presented Last Best Offers essentially as to COPS Trust mirroring the tentative agreement of February 9, 2012. The City presented a Last Best Offer modifying the benchmark to the BCBSM Community Blue PPO Modified Option III Plan offered by BCBSM/CVS Caremark. The City's Last Best Offer also provided, "Participants in COPS Trust must pay 20% of the BCBSM Community Blue PPO Modified Option III Plan offered by BCBSM/CVS Caremark plus any additional premium cost, if any, between COPS Trust and Community Blue PPO BCBSM/CVS Caremark". The City's Last Best Offer also provided that the COPS Trust could keep its plan design. The difficulty with the City's proposal was for Officers seeking COPS Trust and there were 400 Officers using COPS Trust is that those Officers would be paying substantially more toward premiums than the 80/20.

What then occurred is, as the record reveals, for a period of about three to four hours the

2

parties engaged in off-record negotiations where the parties did modify their positions, but then the negotiations broke down over one issue to be discussed by the Chairman, namely, the issue of working spouse coverage. As the Chairman views it, the working spouse coverage is not economic as it is a language part of the plan which permitted the Chairman to make a choice. Furthermore, the Chairman views the parties' positions as modifying their offers as permitted by the Commission's proposed rules for Last Best Offers.

What now follows is the Award of the Panel on health care, health insurance for current employees, joined by the City Delegate. The Chairman does state that the Union Delegate was active in the negotiations but will dissent because of the issue of the spouse. The representative of COPS Trust, Daniel Gorczyca, testified that COPS Trust on January 1, 2013 through December 31, 2013 will guarantee the following health care insurance rates:

|  | Monthly Premium Amounts |
| --- | --- |
| One Person | $   485.25 |
| Two Persons | $1,016.65 |
| Family | $1,151.53 |

Based upon these rates, the Award shall be that the City shall pay 80% of the premium and the employee shall pay 20% based upon this calculation of the above premiums, the City shall pay no more than the following amounts:

|  | City Pays These Amounts Monthly |
| --- | --- |
| One Person | $388.20 |
| Two Persons | $813.32 |
| Family | $921.22 |

The employees' contribution shall be monthly as follows:

|  |  |
| --- | --- |
| One Person | $  97.05 |
| Two Persons | $203.33 |
| Family | $230.31 |

The City's obligation to pay 80% shall not be any higher than 80% of the highest

3

premium that it pays for any plan and the City's benchmark shall be as proposed the BCBSM Community Blues PPO Modified Option III Plan offered by BCBSM/CVS Caremark. The Chairman notes that the City pays a premium higher than COPS Trust for HAP.

The Hospitalization Plan Design Changes attached to the tentative agreement of February 9, 2012 and reattached to this Award as Exhibit A shall apply to all plans including COPS Plan and that the parties are to draft appropriate language to be included in the contract. The COPS Plan as designed as well as the design of the other plans attached as Exhibit B to the tentative agreement shall apply except as modified by this Award.

This Award also intends that Paragraph H of Article 20 of the 2004-2011 Agreement be removed as the parties did indicate to the Chairman that a committee is no longer needed. It is the intention of the Award that language be drafted by the parties to comply with this Award.

There were other changes proposed by the City that this Award does not address which will have to be addressed at the January 8, 2013 hearing so that the language changes are clear to the Chairman, namely, proposals as to 20.E and F. Furthermore, this Award does address proposal 20.F as the Award addressed this issue. The language as to Article 21.A is reserved for further discussion. Likewise, the issue of dental and optical care for retirees is reserved and not covered by this Award for further discussion, namely, the proposed Article 21.CC language.

The issues represented by the proposed Article 21.Y, BB and DD are rejected.

The issues represented by the proposed language in Paragraphs O and Z are reserved.

The reservation of issues means that this Award has not addressed those issues or that language and will do so after further discussion with the parties in January 2013.

The final issue was raised by the DPOA and that is spousal coverage, particularly under the COPS Trust. The issue involves the working spouse who works for an employer other than

4

the City who has health care insurance coverage. The City's position is that if the other employer furnishes the working spouse's health care insurance, then the City should not be obligated to furnish health care coverage for that spouse. The City, with the other carriers and Blue Cross Plans, furnished the DPOA members and other City employees except groups in which there are still existing collective bargaining agreements have this provision. It does have a cost saving feature. This particular provision became an area of contention between the parties. As it is, the City has provided that COPS Trust can have its own plan design with modifications. It only seems fair in the area just discussed that all plans have the same features, namely, as long as a spouse has health care coverage by another employer, then the City should not provide spousal coverage, since this will be a universal feature, should be a feature in the COPS Trust provision and for this reason the Chairman will accept this as his position on this issue based on the representation that it is in all other plans offered by the City to the Officers and for that matter to a large number of City employees.

As to the open enrollment, the open enrollment will be extended until January 15, 2013 so that Officers will have the opportunity to make choices. Member Theodore Iorio dissents from this Interim Award. Member Craig Schwartz concurs.

<u>**A W A R D**</u>

The Award incorporates as the Award the statements made above and does not include the reservations stated above.

GEORGE T. ROUMELL, JR., Chairman

December 19, 2012

5

EXHIBIT A

OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

A. **Mandatory Use of Generic Drugs**. Generic drugs required unless pre-determined that brand name drug is medically required or a generic equivalent is not available. If brand drug requested but not medically required or generic is available, employee, retiree, or covered dependent must pay the applicable brand name co-pay amount plus the difference between the cost of the generic drug and brand name drug, even if dispense as written (DAW) is written on the prescription. Appeal procedure for any dispute is available under applicable healthcare plan.

B. **Limitation on Prescription Drugs**. City will not pay for fertility or impotence prescription drugs under the City's prescription drug programs. This provision does not apply to prescription birth control pills.

C. **Medicare Advantage**. Enrollment options for retirees and covered dependents that are Medicare-eligible shall be limited to the Medicare advantage plans offered by the City. In the event such Medicare Advantage plans are no longer offered or not cost effective, enrollment in alternate plans will be permitted as determined by the City.

D. **New Hire**. Eligibility qualifier for hospitalization-medical coverage is the first of the month after new hire completes 91st day of employment.

E. **New Hire**. Optical coverage eligibility qualifier changed from 60 days to 6 months.

F. **Sponsored Dependent coverage eliminated in its entirety.**

G. **Remarriage**. If a retiree marries or remarries after retirement, new spouse and his/her dependents are not eligible for coverage under the City's healthcare plans.

H. **Dependent Health Care Coverage**. The child of a divorced spouse or a new spouse of a retiree who is neither the biological, legally adopted nor legally guardian child of the employee or retiree is ineligible for dependent health care coverage under this Agreement.

I. **Requirement to Obtain Medicare A & B**. Consistent with current practice, all retirees and covered dependents are required to enroll into Medicare Parts A & B. Failure to enroll or maintain Medicare Parts A & B, City hospitalization-medical coverage will be terminated.

# OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

| PPO Plan, HAP/BCN plan(s), THC plan | In-Network | Out-of-Network ** |
|---|---|---|
| Participant Premium Contribution | 20% for all plans | 20% for all plans |
| Plan Deductible | $250/$500 | $500/$1000 |
| Co-insurance % | 20% | 40% |
| Co-insurance maximum (OOP Max) | $1,000/$2,000 | $2,000/$4,000 |
| Office visit | $15 | Subject to deductible and coinsurance |
| Urgent care co-pay | $15 | Subject to deductible and coinsurance |
| Emergency room | $75 | $75 |
| Hospital co-pay | $0 | $0 |
| | | |
| **Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15/$30 | |
| Mandatory mail | After 34 days | |
| Mandatory generic | Required | |
| Traditional generic – step therapy | Required | |
| Exclusion of lifestyle drugs | Required | |
| | | |
| **COPS Trust** | | |
| Deductible | $175/$350 | |
| Coinsurance % | 10% | |
| Co-insurance maximum (OOP Max) | $825/$1650 | |
| Office visit/Urgent Care co-pay | $10 | |
| Emergency Room co-pay | $75 | |
| Hospital co-pay | $0 | |
| | | |
| **COPS Trust Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15 | |
| Mandatory mail | N/A | |
| | | |
| | | |
| | | |
| **Other Changes** | | |
| Participants contribute 20% for dental and vision coverage | | |
| Participants may choose any dental benefit currently in force with the City of Detroit including COPS Trust. | | |
| Participants may choose any vision benefit currently in force with the City of Detroit including COPS Trust. Co-op Optical eliminated | | |

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
MICHIGAN EMPLOYMENT RELATIONS COMMISSION
ACT 312, PUBLIC ACTS OF 1969 AS AMENDED

*In the Matter of:*

CITY OF DETROIT

-and-                                                            MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

_____

## PANEL'S SUPPLEMENTAL AWARD ON HEALTH INSURANCE

**George T. Roumell, Jr., Chairman**
**Craig Schwartz, Esq., Employer Designee**
**Theodore Iorio, Esq., Union Designee**

APPEARANCES:

FOR THE CITY OF DETROIT:          FOR DETROIT POLICE OFFICERS
                                  ASSOCIATION:

Malcolm D. Brown, Attorney        Donato Iorio, Attorney

## OPINION, FINDINGS AND ORDERS

On December 21, 2012, a majority of the Panel in the above matter issued a Partial

Award On Health Insurance. The Panel reserved Issue No. 46, Section O, Issue No. 46, Section

Z, issue No. 46, Section AA, Issue No. 46, Section CC, and Issue No. 46, Section D. There were

three other issues – Issue Nos. 101, 113 and 137 – which were also not addressed in the Interim

Award. As to Issue Nos. 101, 113 and 137, the Chairman has elected for convenience purposes

to address those Issues in the main Opinion rather than this Supplemental Award-Order.

**Issue No. 46, Section O** - **Non-Economic - City Proposal**

As to Issue No. 46, Section O, the City has proposed to amend Article 21, Section O of

the 2009-2012 labor contract by adding the following underscored phrase:

> The City shall be entitled to implement a self-insured prescription drug program to replace other prescription drug providers, provided such change does not cause a material change in health care benefits. Any dispute over whether such change does not cause a material change in health care benefits shall be subject to the grievance procedures, <u>after the grievant has first exhausted the vendor appeal process</u>. (Change underlined).

The DPOA proposes no change.

In the view of the City, "It is only fair that before any change in a self-insured prescription program is submitted to arbitration, that the individual employee seek a change for a particular drug exhaust the vendor appeal procedure". The Chairman agrees with this observation and for this reason, along with the City Delegate, will vote for this change. The DPOA Delegate objects.

### Issue No. 46, Section Z - Economic - City Proposal     *City's Premium Contribution*

This issue is laid out in the brief of the City as follows:

> This issue concerns a provision that in no event shall the City's contribution exceed 80%. As noted, the Arbitrator should continue to reserve this issue for decision until he meets with the parties to determine the final contract language. However, some explanation is necessary in this regard which will highlight the issues.

> COPS Trust is offering greater benefits than the benchmark plan which is Option III BCBSM PPO CVS Caremark. Further, the Arbitrator ruled that some of the benefit changes the City sought in order to limit costs would <u>not</u> apply to COPS Trust. As the Arbitrator noted on the record, "Let's make it very simple. There is no doubt that COPS Trust is a richer plan." (Vol. 7, 12/18/12 at 18).

> In regard to cost contributions, the City has proposed that it pay no more than 80% of the premium cost for any plan and the employee would pay 20%, <u>except</u> for COPS Trust which has more generous benefits. The City proposed for COPS Trust that the employees selecting COPS Trust would pay 20% <u>plus</u> the difference between COPS Trust and Option III BCBSM/PPO CVS Caremark. The DPOA then asserted that this was unfair because one of the City's Plans, HAP, had a higher premium than COPS Trust even though HAP offered the Option

2

III benefit package which was a lesser plan design that COPS Trust. The DPOA, through David Gorcyca, then added that COPS Trust would maintain its current premium costs until December 31, 2013.

If after December 31, 2013 COPS Trust raises its premium (as the City believes it must because of its enhanced benefits) and becomes the highest cost (premium) plan, the City will then be paying more for COPS Trust with its enhanced benefits than the benchmark plan. In this event, the City will be subsidizing COPS Trust by paying more for COPS Trust with its more generous benefits than the benchmark plan. For example, if all other plans have the same basic plan design, which they do, and if the highest cost plan other than COPS Trust is $900 per month for a family plan and COPS Trust with its better benefits is $930 per month for a family plan, the City will pay more than it should for COPS Trust per month (i.e. 80% of the $930 is obviously more than 80% of $900).

If COPS Trust wants to offer better benefits than the benchmark plan, the Arbitrator ruled they could do so, but not at the City's expense. The employee voluntarily choosing COPS Trust must pay the difference, i.e. 20% of $930 plus $30 (the difference between COPS Trust $930 and the highest premium cost of the benchmark plans $900).

Furthermore, in order to continue to qualify for Economic Vitality Incentive Funds (EVIP Funds), formerly known as state revenue sharing, the City must comply with the requirements of the Act (see e.g., 2012 P.A. 107 §402(3)) by having new hires pay a minimum of 20% of healthcare costs. If the City is paying more than 80% of the COPS Trust Plan premium costs, then employees are paying less than 20% and the City is not compliant with the law for purposes of EVIP Funds. The City has received approximately $100M in EVIP funds (or statutory revenue sharing) every year since 2009. (See new Ex. 462 attached hereto; see also Ex. 450; p. B- 31). Loss of a portion of revenue sharing could be devastating to the City.

At this point, all the City is asking is that the Arbitrator reserve decision on this provision until the cost sharing formula in relation to COPS Trust is determined with the final contract language.

This explains the problem. It is the intention of the Chairman, joined by the City Delegate, that in the event that COPS Trust has a premium higher than the highest premium cost of the benchmark plan than those in COPS Trust will pay 20% of the COPS Trust premium plus the difference between the COPS Trust premium and the highest premium cost of the benchmark plan if this becomes an issue at any point during the life of the contract. It is further the intent of

3

the majority, namely, the Chairman and the City Delegate, that if there is a dispute about the language that is drafted, the dispute will be decided by the Chairman of this Panel serving in his capacity as Senior Umpire between the parties under the parties' Umpire System. The Order here clearly sets forth the intent of a majority of the Panel. The DPOA Delegate dissents.

**Issue No. 46 - Section AA -** *Non-Duty Retirees Eligibility for Hospitalization, Medical and Prescription Drug Insurance Coverage, Article 21, Section A, Coverage*

The City notes that Article 21, Section A, of the 2009-2012 contract provides insurance coverage for "duty disability retirees and their legal dependents". What has developed is a past practice for non-duty disability retirees to have insurance benefits if said individuals meet the minimum vesting requirements, which for DPOA members is five years, and said individuals qualify for a non-duty disability pension. In some cases, the individual could retire at a young age with six years of seniority and suffer a permanent non-duty related disability costing the City substantial funds. The City seeks contract language changing this practice. The DPOA objects to the change. The Panel must choose one or the other Offer as this is an economic issue.

The difficulty with the City's proposal is there are 20 individuals who are now receiving this benefit. If the proposal was prospective, the Chairman would be more inclined to adopt the City's proposal. But, without this provision, there is an element of unfairness to the individuals who now rely on the practice. It is for this reason at this point in time that the Chairman, along with the DPOA Delegate, will vote to deny the City's request. The City Delegate dissents.

**Issue No. 46, Section CC - Section D**

The City proposes that future retirees, those retiring after January 1, 2003, will not have dental or optical insurance. This is based on the Millman Report suggesting that dental insurance and optical insurance for retirees are generous benefits; that on an annual basis, retirees' dental

4

insurance costs the City among all employees $8,341,000 and retiree vision insurance costs the City $1,362,000.  However, this cost is not limited to Police Officers.

The Chairman appreciates that the City is in dire financial crisis, causing the need for financial restructuring.  But, during the hearings and the Panel discussions, it was insisted that the Police and Firemen Pension Plan was 96% funded as compared to other pension plans.  Furthermore, the issue of pensions will be re-opened on July 1, 2013.  At that point, the whole issue of pensions as well as health care will be re-opened and can be revisited when there are not 146 issues on the table and the matter can be more carefully scrutinized.  It is for this reason that the Chairman, along with the DPOA Delegate, will vote to deny this request.  The City Delegate dissents.

## O R D E R S

The Orders and the votes of the Delegates are set forth in the body of this Opinion.  The views expressed in this Opinion are the views of the Chairman and those voting with the Chairman do not necessarily represent the views of the Delegate voting with the Chairman.  But, the vote of the Delegate with the Chairman was necessary to obtain a majority vote on the issue involved.  For convenience, these Orders have been signed by the Delegates on separate pages, but have the same effect as if signed on the same pages with the Chairman.

March 25, 2013

GEORGE T. ROUMELL, JR., Chairman

5

March 21, 2013

_____
CRAIG S. SCHWARTZ, City Delegate, concurring
and dissenting where indicated

6

March 5, 2013

_Theodore M. Iorio_
THEODORE M. IORIO, DPOA Delegate,
concurring and dissenting where indicated

7

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:                                          Chapter 9

City of Detroit, Michigan,                      Case No. 13-53846

          Debtor.                               Hon. Steven W. Rhodes

_____/

## DECLARATION OF DANIEL F. McNAMARA
## IN SUPPORT OF OJBECTION OF THE DETROIT FIRE FIGHTERS
## ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION,
## THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION
## AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION
## TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF
## QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)


I, Daniel F. McNamara, declare as follows:

1.      I am President of the Detroit Fire Fighters Association, Local 344,

IAFF, AFL-CIO (DFFA).    I make this declaration based on my personal

knowledge, and if called upon to do so, I could and would testify to the facts set

forth herein.

2.      The DFFA consists of all active Detroit fire fighters of all ranks.  It

has just under 800 current active members.  My responsibilities, as quoted from

our Constitution and By-Laws (Article X Section 3), are as follows: "It shall be the

duty of the President to preside at all meetings of the Local and at meetings of the

Executive Board and Board of Directors. He shall be the executive head of the Local. He shall be a member ex-officio of all committees. He shall appoint such committees as may be provided for in this Constitution and By-Laws and such special committees as may be authorized by the Local. He shall enforce strict observance of the Constitution and By-Laws of the International as this document relates to the Local and the Constitution and By-Laws of the Local. He shall have general supervision of the activities of the other officers and chairmen of committees." I would also consider the President to be in charge of all negotiations and other activities to which the Local may be obligated by Federal, State, and Local laws, as well as ordinances, charters, and contracts.

3. This declaration is submitted in support of the Objection of the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

4. The DFFA received a letter from Lamont Satchel dated June 25, 2013. This letter was in regard to "Termination of 2009-2013 Collective Bargaining Agreement." It stated, "Pursuant to its Duration provisions, the City hereby gives notice that the 2009-2013 Collective Bargaining Agreement between the City and

the Detroit Fire Fighters Association will not be extended beyond 11:59 PM, June 30, 2013."

5.     Days later, on June 28, 2013, the DFFA received another letter from Lamont Satchel regarding "Terms and Conditions of employment following the expiration of the 09-13 Collective Bargaining Agreement (CBA)." It carried an addendum of "Economic Changes to be implemented effective July 1, 2013."

The June 28 letter also stated that, "The City is available to meet with the DFFA Executive Board to answer any questions about the items in the Addendum. Please advise as to your availability during the week of July 8, 2013.  The City will also provide a timetable to meet with DFFA Executive Board to review the other terms and conditions to be implemented after expiration of the current CBA."

6.     I responded on July 1, 2013 to the City's June 28 letter.  I responded, "The DFFA Executive Board is available to meet with you about the items in the 'addendum' at any time next week.  However, since we have another meeting on Wednesday, July 10, 2013 in CAYMC at 3:30 p.m. I suggest that we schedule our meeting for that day."

7.     The City and the DFFA did meet over the clarification of the addendum but have never had a meeting or been notified about any other changes to be implemented after the expiration date of the CBA.  We did receive a letter dated July 26, 2013 informing the DFFA that the 10% wage cut for our members

who had not received one yet would be implemented in the August 16, 2013 paycheck.

8.     On July 12, 2013, the DFFA and the other Detroit Public Safety Unions sent a letter to Jones Day about the City's failure to provide specific proposals for pension restructuring at our July 10 meeting with the City. (Exhibit 1). On July 17, the City responded to our July 12 letter. (Exhibit 2). In its response, the City failed to provide any substantive proposals in its letter. Instead, the letter merely reiterated the City's promise to negotiate.

9.     The following day, July 18, 2013, the City filed its bankruptcy petition.

10.     In addition, in early 2013, prior to the March 28, 2013 effective date of Public Act 436, the DFFA attempted to get eligibility for Act 312. We worked with a Michigan Employment Relations Commission (MERC) mediator to commence mediation in order to put forth a timely application. We were not successful because of a lack of any real bargaining with the City as well as a subsequent MERC decision.

11.     It was during this time that, at a meeting between the DFFA and City representatives, Mr. John Willems, labor negotiator for the City, responded to our questions as to what we will see in our City Employment Terms by saying, "You know what we want. You can figure it out for yourselves." The City's

unwillingness to even disclose the terms it intended to impose made it clear that the City had no intention of negotiating further with the DFFA.

12.    At an August 2, 2013 meeting with representatives from Jones Day, we were presented with an outline of the new health care plans the City intends to impose on the DFFA effective January 1, 2014. Among other imposed changes, that proposal will increase the out-of-pocket costs for health care for DFFA members with insured dependents by $3000 per year.

13.    At our meetings with representatives from Jones Day, we have, at times, asked if the discussions we had were negotiations. They were very clear with us in asserting that these were not negotiations but that they looked forward to input and suggestions from us. These sessions were mainly presentations with minimal explanations of the data, nothing more.

Dated: August 19, 2013

Daniel F. McNamara

Exhibit 1



# DETROIT FIRE FIGHTERS ASSOCIATION

I.A.F.F. Local 344 · Organized May 1933

243 West Congress, Suite 644 · Detroit, MI 48226-3217

(313) 962-7546 · (313) 962-7899 fax · www.dffa344.org

**Daniel F. McNamara**
*President*

**Jeffrey M. Pegg**
*Vice President*

**Teresa S. Sanderfer**
*Secretary*

**Robert A. Shinske**
*Treasurer*

**Directors**
E. Carrington
C. Manczuk
J. Berlin
R. Jones
D. McLaurin
J. Plieth
R. Foster
D. Small

**Daniel Delegato**
*President Emeritus*

July 12, 2013

Evan Miller
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
emiller@jonesday.com

David G. Heiman
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114-1190
dgheiman@jonesday.com

RE:     City of Detroit Pension Restructuring

Gentlemen:

This letter is a follow-up to the July 10 3:30 p.m. meeting set by the City to discuss "pension restructuring proposals."

During that meeting, you discussed, in general terms, the City's interest in reaching agreements on funding liability to the PFRS Pension Fund, actuarial assumptions and amortization schedules.

You also stated that you wished to discuss pension restructuring proposals. You then were asked, by DPOA President Mark Diaz, for specific City pension benefit restructuring proposals. You declined to give any specific proposals. Instead, while acknowledging that the City does not necessarily have the best or only ideas on how to "restructure" pension benefits, you invited us to submit proposals.

We are reviewing and will provide the City with specific proposals.

But, it would be productive if the City could provide us with its specific proposals on pension benefit restructuring as soon as possible. We have had two meetings with the City where pension benefits were addressed and still have only the City's general observation that pension benefits must be reduced.

We look forward to the next opportunity to meet. We hope that, sufficiently prior to our next meeting, the City will have provided us with specific proposals on pension benefit restructuring so that our meetings can be genuinely good faith negotiations on the City's debt.

Sincerely,

DANIEL F. McNAMARA, President
DETROIT FIRE FIGHTERS ASSOCIATION

STEVE DOLUNT, President
DETROIT POLICE COMMAND
OFFICERS ASSOCIATION

MARK YOUNG, President
DETROIT POLICE LIEUTENANTS
& SERGEANTS ASSOCIATION

MARK DIAZ, President
DETROIT POLICE OFFICERS
ASSOCIATION

**Affiliated**

| International Association of Fire Fighters AFL-CIO | Michigan State AFL-CIO | Metropolitan Detroit AFL-CIO |
|---|---|---|

# Exhibit 2

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

DIRECT NUMBER: (202) 879-3840
EMILLER@JONESDAY.COM

July 17, 2013

Mr. Daniel F. McNamara
President
Detroit Fire Fighters Association
Suite 644
243 West Congress
Detroit, Michigan 48226-3217

Mr. Steve Dolunt
President
Detroit Police Command Officers Association
Post Office Box 2625
Detroit, Michigan 48202

Mr. Mark Young
President
Detroit Police Lieutenants
   & Sergeants Association
Suite 700
28 West Adams
Detroit, Michigan 48226

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 East Jefferson Street
Detroit, Michigan 48207

Re:  **City of Detroit Pension Restructuring**

Gentlemen:

Thank you for your letter of July 12, 2013, and thank you further for continuing to discuss in good faith the difficult issue of pension restructuring. The Office of the Emergency Manager appreciates your strong cooperation.

Consistent with the position Dave Heiman and I expressed at the meeting, we still think it makes sense to first try to reach common ground with key unions and association leaders on actuarial assumptions and methods, and the amount of PFRS underfunding, and then tackle contributions and attendant benefit changes. Nonetheless, we are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze. We stand ready to meet to discuss such ideas.

We also took seriously the concern expressed at our meeting last Thursday on two issues: (1) that the City's retiree health proposal for uniform retirees should include amounts for pre-age 55 early retirees and not begin at age 55; and (2) if there were to be a hard freeze at PFRS, active employees who do not have sufficient service at the freeze date to obtain a vested pension be given an opportunity to earn such service and not lose their entire pensions. The City's advisors are looking hard at those issues and we intend to report back to you shortly.

WAI-3135350v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Mr. Daniel F. McNamara
Mr. Steve Dolunt
Mr. Mark Young
Mr. Mark Diaz
July 17, 2013
Page 2

JONES DAY

Thank you for your letter and please keep the lines of communication open.

Sincerely,

Evan Miller

cc:    David G. Heiman, Esq.

WAI-3135350v1

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                              Chapter 9

City of Detroit, Michigan,                          Case No. 13-53846

        Debtor.                                 Hon. Steven W. Rhodes

_____/

## DECLARATION OF MARK YOUNG, PRESIDENT OF THE DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION IN SUPPORT OF OJBECTIONS OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

I, Mark Young, President of the Detroit Police Lieutenants and Sergeants Association, declare as follows:

1.    I am the current President of the Detroit Police Lieutenants and Sergeants Association, the exclusive bargaining representative for the purpose of collective bargaining with respect to wages, hours and other terms and conditions of employment for employees of the City of Detroit Police Department in the following classifications: Police Investigator, Police Sergeant, Police Sergeant-Promotional List, Senior Communications Officer-Police Sergeant, Senior Radio Maintenance Officer-Police Sergeant, Police Sergeant-Chemist, Police Lieutenant, Assistant Supervisor of Operations-Police Lieutenant, Supervisor of Radio Systems and Planning-Police Lieutenant, Supervisor of Operations-Police Lieutenant, Supervisor of Radio Maintenance-Police Lieutenant, Supervisor of Firearms Identification and Explosives-Police Lieutenant.

I make this declaration based on my personal knowledge, and if called upon to do so, I could and would testify to the facts set forth herein.

2.    I am responsible for the day to day administration of the Union including but not necessarily limited to contract administration, collective bargaining, negotiations, and the processing of grievances.

1

3.     This Declaration is submitted in support of the Objections of the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

4.     This Declaration covers the period of the Detroit Police Lieutenants and Sergeants Association Act 312 proceedings, MERC Case No. D13 A-0005, up to and through the dismissal of those proceeding by the Michigan Employment Relations Commission, as well as the significant dates and events related to the bankruptcy filing by the City.

<u>The Act 312 Proceedings</u>

The DPLSA filed its Petition for Act 312 arbitration on February 4, 2013.  Its existing collective bargaining agreement had a termination date of June 30, 2013.  In accordance with Sec. 13 of Act 312, "…existing wages, hours and other conditions of employment shall not be changed by either party without the consent of the other but a party may so consent without prejudice to his rights or position under the Act."  Arbitrator Francis L. Hill was appointed as the neutral arbitrator on February 19, 2013.  A pre-hearing conference was held on February 26, 2012.  Subsequently, hearing dates were scheduled for May 15, 16, and 21, and June 11 and 13, 2013.

On or about April 12, 2013, after the appointment of the Emergency Manager in March 2013, the City of Detroit filed an Emergency Motion for an Award of Dismissal of the Act 312 Proceeding due to the lack of arbitral jurisdiction.  The City claimed that it was not obligated to engage in bargaining under the Public Employment Relations Act ("PERA"), MCL 423.201 et seq., by operation of Sec. 27 (3) of Public Act 436, MCL 141.1541, et seq., the Local Financial Stability and Choice Act.  Sec. 27(3) states:

> A local government placed in receivership under this act is not subject to Sec. 15(1) of 1947 PA 336, MCL 423.215 for a period of five years from the date the local government was placed in receivership or until the time the receivership is terminated, whichever comes first.

According to the City, the suspension of the duty to bargain under Act 436 extends to all bargaining-related proceedings under PERA and Act 312.

In its decision dated June 14, 2013, the Michigan Employment Relations Commission granted the City's motion to dismiss the Act 312 arbitration proceeding pending between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association.  The Commission declared that the City's duty to bargain was statutorily suspended by operation of Sec. 27(3) of PA 436.

It must be emphasized that the DPLSA does not concede that the dismissal of the Act 312 case inexorably resulted in the termination of its collective bargaining agreement after June 30, 2013. While the duty to bargain may have been suspended, the existing agreement survives

subject to Sec. 12 (1) (j) and (k) of the LFSCA. Under Sec. 12 the EM may reject, modify or terminate one or more terms of a collective bargaining agreement, but only where agreement with the bargaining representative is unlikely, the modification is reasonable and necessary to address the broad financial problem, and any modification is temporary (not to exceed five years). Sec. 12(l) does permit the EM to act as the sole agent of the local government in collective bargaining with employees or representatives and approve any contract or agreement. In the opinion of the DPLSA, Sec. 12 does impose constraints on the right of the EM to reject, modify or terminate one or more terms of the collective bargaining agreement. Acting outside of those constraints could subject the EM to legal action. At various times since the dismissal of the Act 312 proceeding, the City has declared that it has no obligation to bargain with the DPLSA

### The Time Period Following the MERC Decision

Following the dismissal of the DPLSA Act 312 case, the City did not move to impose City Employment Terms ("CETs") on DPLSA members. Emergency Manager Kevyn Orr released a Financial and Operating Plan for the City o Detroit on May 12, 2013. On or about May 20, 2013, the Jones Day law firm notified the DPLSA that it would be evaluating the existing pension and medical plans to determine whether modifications are necessary. Pension restructuring and health plan "discussions" were scheduled in June and July 2013. While representatives of City unions were invited to these "discussions" and told that their input would be welcomed, the discussions amounted to presentations as to what the City planned to implement in these areas. The City indicated that the discussions were not to be construed as "negotiations."

On several occasions during the period preceding the filing of the City's bankruptcy petition, DPLSA representatives met with the EM to engage in dialogue about solutions to problems affecting members of the DPLSA. These meetings were constructive although prefaced by the caveat that the meetings should not be characterized as negotiations.

On June 25, 2013, the City notified the DPLSA of the termination of the cba effective July 6, 2013 and that it was not requesting bargaining at this time. After expressly stating that there was no duty to bargain, the EM on June 28, 2013 further notified the DPLSA that changes to wages, benefits and working conditions would be necessary but that any changes would be postponed until after August 1, 2013 ostensibly to provide the new Chief of Police time to evaluate the needs of the Department and also have time to provide input into the restructuring process.

On July 18, 2013, the City filed its petition for bankruptcy. Not long thereafter, the Labor Relations Director Lamont Satchel on July 31, 2013 sent correspondence to the DPLSA that the City was prepared to impose City Employment Terms on DPLSA members. No effective date was indicated in the correspondence. In a separate addendum to the letter, the City identified 17 terms that it intended to implement. No negotiations preceded the letter from the Labor Relations Director.

The DPLSA responded in writing in a letter dated August 1, 2013. It expressed disagreement with the proposed CETs and requested a delay in their imposition until it could engage in further discussions with the City. The DPLSA also requested immediate open enrollment for the City of Detroit Deferred Compensation Plans to help offset the proposed 10% pay reduction. It further requested the opportunity for DPLSA members to utilize a "hardship provision" under the deferred comp plan to permit withdrawals.

The DPLSA understands that the EM has given favorable consideration to the August 1 response of the DPLSA. The DPLSA has engaged the EM in discussions over the proposed CETs. As of today's date, August 15, 2013, none of the CETs have yet been imposed on members.

Dated: August 16, 2013

Mark Young, President,
Detroit Police Lieutenants and Sergeants Association

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:                                                  Chapter 9

City of Detroit, Michigan,                              Case No. 13-53846

            Debtor.                                     Hon. Steven W. Rhodes

_____/

**DECLARATION OF MARY ELLEN GUREWITZ IN SUPPORT OF
OJBECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE
DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE
LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT
POLICE COMMAND OFFICERS ASSOCIATION  TO DEBTOR'S
BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS
UNDER 11 U.S.C. SECTION 109(c)**

I, Mary Ellen Gurewitz, declare as follows:

1.     I am the attorney for the Detroit Police Command Officers Association (the "DPCOA").   The DPCOA is composed of the Inspectors and Commanders in the Detroit Police Department.  My firm, Sachs, Waldman P.C. has been representing the DPCOA since 1995. I have been the responsible attorney for this client for at least the past ten years. I have handled, among other things, their unfair labor practice litigation, Act 312 proceedings, and collective bargaining negotiations.

2.     I make this declaration based on my personal knowledge, and if called upon to do so, I could and would testify to the facts set forth herein.