# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |
| | | **Richard A. Roble (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–6769<br>Email: Richard.A.Roble@usdoj.gov |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364 |

(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 09/06/2013 | | 765 | Brief *City of Detroit Consolidated Reply to Objections to the Entry of an Order for Relief* Filed by Debtor In Possession City of Detroit, Michigan (RE: related document(s)1 Voluntary Petition (Chapter 9), 10 Declaration). (Bennett, Bruce) (Entered: 09/06/2013) |
| 10/11/2013 | | 1156 | Objection to Eligibility to Chapter 9 Petition */ The Michigan Council 25 of the American Federation of State, County &Municipal Employees, AFL–CIO and Sub–Chapter 98, City of Detroit Retirees Amended Objection to the City of Detroits Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* Filed by Creditor Michigan Council 25 Of The American Federation of State, County &Municipal Employees, AFL–CIO and Sub–Chapter 98, City of Detroit Retirees (Levine, Sharon) (Entered: 10/11/2013) |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

------------------------------------------------------x
                                            :
In re                                       :        Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                   :        Case No. 13-53846
                                            :
                        Debtor.             :        Hon. Steven W. Rhodes
                                            :
                                            :
------------------------------------------------------x


## CITY OF DETROIT'S CONSOLIDATED REPLY TO OBJECTIONS TO THE ENTRY OF AN ORDER FOR RELIEF

13-53846-tjt Doc 2395-6 Filed 12/27/13 Entered 12/27/13 13:42:26 Page 14 of 262
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 1 of 139

4

# TABLE OF CONTENTS

I.   Preliminary Statement ..................................................................1

II.  The Court Has Authority and Jurisdiction to Determine the
     Constitutionality of Chapter 9 and PA 436 ....................................5

III. Chapter 9 is Constitutional Under Longstanding Supreme Court
     Precedent ....................................................................................9

     A.   The Supreme Court's Decision in <u>Bekins</u> Remains
          Binding Precedent .............................................................10

     B.   Subsequent Legal Developments Have Not Undermined the
          Soundness of <u>Bekins</u> and the Constitutionality of Chapter 9 ...........13

IV.  The City Was Properly Authorized to Commence This
     Chapter 9 Case ...........................................................................19

V.   The State's Authorization of Chapter 9 Did Not Violate the
     Pensions Clause ..........................................................................21

     A.   The Authorization of Chapter 9 Does Not "Diminish or
          Impair" Pension Benefits ..................................................21

     B.   The Pensions Clause Simply Extends the Protection of the
          Federal and State Contracts Clauses to Cover Public
          Pensions.............................................................................22

     C.   The Pensions Clause Does Not Require Chapter 9
          Authorization to Be Conditioned on the Non-Impairment
          of Pensions .......................................................................28

VI.  Collateral Estoppel Does Not Preclude This Court from
     Determining the City's Eligibility for Chapter 9 .........................32

VII. PA 436 is Constitutional .............................................................38

     A.   PA 436 Does Not Conflict with Home Rule and
          Reflects the State Legislature's Power to Address Local
          Fiscal Emergencies. .........................................................38

     B.   PA 436 Does Not Delegate Power to Pass Local Legislation ..........41

13-53846-tjt  Doc 2395-6  Filed 12/27/13  Entered 12/27/13 13:42:26  Page 5 of 262
13-53846-swr  Doc 765  Filed 09/06/13  Entered 09/06/13 19:59:53  Page 5 of 135

5

     C.      PA 436 Does Not Violate the Non-Delegation Doctrine...................42

VIII.   The City Satisfies Section 109(c)(5) of the Bankruptcy Code
      Because It Was Impracticable to Bargain with Thousands of
      Bondholders and Over 20,000 Retirees.........................................45

IX.    The City's Good Faith Negotiations with Its Creditors Satisfy
      Section 109(c)(5) of the Bankruptcy Code ..................................53

X.     The City is Insolvent ....................................................................59

XI.    The City Desires to Effect a Plan to Adjust Its Debts..................61

XII.   The City Filed Its Petition in Good Faith.....................................62

XIII.  Notice of the Deadline for Objections to Eligibility Was
      Proper and Sufficient...................................................................69

XIV.  Conclusion....................................................................................71

## EXHIBITS

Exhibit A:   Non-Individual Objections to Eligibility, Summary of
             Arguments Set Forth Therein & City's Responses

Exhibit B:   Individual Objections to Eligibility, Summary of Arguments
             Set Forth Therein & City's Responses

Exhibit C:   Letters from various union representatives to Brian Easley

Exhibit D:   Letter from Brian Easley to James Williams, President,
             AFSCME, dated June 27, 2013

Exhibit E:   Letter from Evan Miller to Dennis McNamara, President,
             Detroit Fire Fighters Association, *et al.*, dated July 17, 2013

Exhibit F:   Letter from Steven Kreisberg, Director of Collective Bargaining
             and Health Care Policy, AFSCME, to Brian Easley, dated
             July 2, 2013

# TABLE OF AUTHORITIES

**CASES**

Agostini v. Felton,
  521 U.S. 203 (1997)...................................................................12

Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.
  (In re Nat'l Century Fin. Enters., Inc.),
  423 F.3d 567 (6th Cir. 2005) ..................................................35

Ashton v. Cameron Cnty. Water Improvement Dist. No. 1,
  298 U.S. 513 (1936)...................................................................10

Ass'n of Retired Emps. v. City of Stockton
  (In re City of Stockton),
  478 B.R. 8 (Bankr. E.D. Cal. 2012)...........................17, 30, 31

Blue Cross & Blue Shield of Mich. v. Demlow,
  270 N.W.2d 845 (Mich. 1978)...................................................43

Blue Cross & Blue Shield of Mich. v. Milliken,
  367 N.W.2d 1 (Mich. 1985).................................................42, 43

Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,
  575 N.W.2d 751 (Mich. 1998)...................................................40

Bd. of Trs. v. Cary,
  373 So.2d 841 (Ala. 1979)..........................................................27

Bd. of Trs. v. City of Detroit,
  373 N.W.2d 173 (Mich. Ct. App. 1985).....................................39

Brimmer v. Vill. of Elk Rapids,
  112 N.W.2d 222 (Mich. 1961).....................................................40

City of Pontiac Retired Emps. Ass'n v. Schimmel,
  No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013)..............2

Control Module, Inc. v. Morello (In re Morello),
  No. 07-02052, 2012 WL 1945509
  (Bankr. D. Conn. May 30, 2012) ........................................ 35-36

-iii-
13-53846-tjt-swr Doc 2395-6 Filed 12/27/13 Entered 12/27/13 13:42:26 Page 7 of 262
13-53846-swr Doc 3756 Filed 09/06/13 Entered 09/06/13 13:59:53 Page 7 of 135

7

Cnty. of Orange v. Merrill Lynch & Co., Inc.
(In re Cnty. of Orange),
191 B.R. 1005 (Bankr. C.D. Cal. 1996) ..................................................... 30-31

Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA,
592 N.W.2d 408 (Mich. Ct. App. 1998) ............................................................37

Detroit City Council v. Mayor of Detroit,
770 N.W.2d 117 (Mich. Ct. App. 2009) ............................................................39

Easley v. Pettibone Mich. Corp.,
990 F.2d 905 (6th Cir. 1993) .............................................................................35

Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,
459 U.S. 400 (1983) ...................................................................................13, 15

Faitoute Iron & Steel Co. v. City of Asbury Park,
316 U.S. 502 (1942) ........................................................................... 12, 14-15

First Horizon Home Loan Corp. v. Apostle (In re Apostle),
467 B.R. 433 (Bankr. W.D. Mich. 2012) ...........................................................8

Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),
527 N.W.2d 468 (Mich. 1994) ..........................................................................23

Hanover Nat'l Bank v. Moyses,
186 U.S. 181 (1902) ............................................................................... 18-19

Houston v. Governor,
810 N.W.2d 255 (Mich. 2012) ..........................................................................40

In re City of Prichard,
No. 99-13465 (Bankr. S.D. Ala. Oct. 6, 2000) ..................................................27

In re City of Stockton,
486 B.R. 194 (Bankr. E.D. Cal. 2013) ..........................................................11, 44

In re City of Stockton,
493 B.R. 772 (Bankr. E.D. Cal. 2013) ............................................. 22, 27, 64-65

In re City of Vallejo,
403 B.R. 72 (Bankr. E.D. Cal. 2009) .................................................................30

13-53846-tjt Doc 2395 Filed 12/27/13 Entered 12/27/13 13:42:26 Page 8 of 262
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 13:59:53 Page 8 of 135        8

In re Constitutionality of 2011 PA 38,
    806 N.W.2d 683 (Mich. 2011).................................................................. 23, 25-26

In re Cottonwood Water & Sanitation Dist.,
    138 B.R. 973 (Bankr. D. Colo. 1992)........................................................ 58-59

In re Cnty. of Orange,
    183 B.R. 594 (Bankr. C.D. Cal. 1995) ......................................................64, 65

In re Ellicott Sch. Bldg. Auth.,
    150 B.R. 261 (Bankr. D. Colo. 1992)........................................................ 56-57

In re Enrolled Senate Bill
    (Advisory Opinion re Constitutionality of 1972 PA 258),
    209 N.W.2d 200 (Mich. 1973) ................................................................23

In re Jefferson Cnty.,
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ...............................................14

In re McCurtain Mun. Auth.,
    No. 07-80363, 2007 WL 4287604
    (Bankr. E.D. Okla. Dec. 4, 2007) ................................................................ 66-67

In re Sanitary & Improvement Dist., No. 7,
    98 B.R. 970 (Bankr. D. Neb. 1989)...........................................................25, 59

In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,
    165 B.R. 60 (Bankr. D.N.H. 1994)............................................................58, 64

In re Valley Health Sys.,
    383 B.R. 156 (Bankr. C.D. Cal. 2008) ...............................................52

In re Vasko,
    6 B.R. 317 (Bankr. N.D. Ohio 1980).........................................................19

In re Vills. at Castle Rock Metro. Dist. No. 4,
    145 B.R. 76 (Bankr. D. Colo. 1990)..........................................................47, 64

Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
    (In re City of Vallejo),
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ..................................................... 27, 46-47

-v-
13-53846-tjt Doc 2335 Filed 12/27/13 Entered 12/27/13 13:42:26 Page 9 of 262
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 13:59:53 Page 9 of 135

9

Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo
    (In re City of Vallejo),
    432 B.R. 262 (E.D. Cal. 2010) ....................................................30, 31

Kosa v. State Treasurer,
    292 N.W.2d 452 (Mich. 1980)...........................................................24

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997) .............................................................35

Mascio v. Pub. Emps. Ret. Sys. of Ohio,
    160 F.3d 310 (6th Cir. 1998) ............................................................15

Mich. State Highway Comm'n v. Vanderkloot,
    220 N.W.2d 416 (Mich. 1974)...........................................................43

Mission Indep. Sch. Dist. v. Texas,
    116 F.2d 175 (5th Cir. 1940) ............................................................31

Monat v. State Farm Ins. Co.,
    677 N.W.2d 843 (Mich. 2004)....................................................32, 36

Murray v. Charleston,
    96 U.S. 432 (1877)............................................................................15

Murray's Lessee v. Hoboken Land & Improvement Co.,
    59 U.S. 272 (1856)..............................................................................5

Nat'l Fed'n of Indep. Bus. v. Sebelius,
    132 S. Ct. 2566 (2012)......................................................................17

New York v. United States,
    505 U.S. 144 (1992)..........................................................................16

Olson v. Cory,
    636 P.2d 532 (Cal. 1980) ............................................................ 26-27

People ex rel. Le Roy v. Hurlbut,
    24 Mich. 44 (1871) ..................................................... 38, 40-41

Printz v. United States,
    521 U.S. 898 (1997)..........................................................................16

Richardson v. Schafer (In re Schafer),
    689 F.3d 601 (6th Cir. 2012) .......................................................19, 31

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
    490 U.S. 477 (1989)...................................................................12

Sloan v. City of Madison Heights,
    389 N.W.2d 418 (Mich. 1986)...................................................37

South Dakota v. Dole,
    483 U.S. 203 (1987)...................................................................17

Stern v. Marshall,
    131 S. Ct. 2594 (2011)............................................................ 5-8

Twin City Fire Ins. Co. v. Adkins,
    400 F.3d 293 (6th Cir. 2005) ..................................................34

United States v. Bekins,
    304 U.S. 27 (1938)....................................................9-13, 15-16, 24

United States Trust Co. of N.Y. v. New Jersey,
    431 U.S. 1 (1977)................................................................ 13-15

W.B. Worthen Co. v. Kavanaugh,
    295 U.S. 56 (1935)...................................................................15

Webster v. Michigan,
    No. 13-734-CZ (Ingham Cnty. Cir. Ct.) .................................... 32-38

Weisberg v. Powell,
    417 F.2d 388 (7th Cir. 1969) ..................................................32

**FEDERAL CONSTITUTION AND STATUTES**

U.S. Const. art. I, § 8, cl. 4................................................................18, 29

U.S. Const. art. I, § 10....................................................................9

U.S. Const. art. VI, cl. 2..................................................................30

11 U.S.C. § 101(32)(C)............................................................... 59-60

11 U.S.C. § 109(c) ...................................................................passim

11 U.S.C. § 362 .............................................................................34

11 U.S.C. § 903 .............................................................................18

11 U.S.C. § 904 .............................................................................44

11 U.S.C. § 921 ..................................................5, 6, 33, 53, 62-64, 66

11 U.S.C. § 943 .............................................................................58

11 U.S.C. § 1129 ...........................................................................44

28 U.S.C. § 157 .............................................................................33

28 U.S.C. § 1334 ......................................................................32-33

28 U.S.C. § 2403 .............................................................................2

## STATE CONSTITUTION AND STATUTES

Mich. Const. art. IV, § 29 ........................................................ 41-42

Mich. Const. art. VII, § 21 ...........................................................40

Mich. Const. art. VII, § 22 ...........................................................37

Mich. Const. art. IX, § 24 ...............................................21, 23, 25

Public Act 72 of 1939 - MCL § 141.201(1) ..........................................26

Public Act 279 of 1909 - MCL § 117.36 ...............................................39

Public Act 336 of 1947 - MCL § 423.215 ...............................................56

Public Act 436 of 2012 - MCL § 141.1543 ...............................................40

Public Act 436 of 2012 - MCL § 141.1549 ...............................................41, 43

Public Act 436 of 2012 - MCL § 141.1551 ...............................................54

Public Act 436 of 2012 - MCL § 141.1552 ........................................ 41-42

Public Act 436 of 2012 - MCL § 141.1558 ............................................. 3, 19-21, 43

Public Act 436 of 2012 - MCL § 141.1567(3) ........................................56

## OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 921.04[2]
   (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013) ...............69

DETROIT CITY CHARTER § 1-102 ..........................................................39

1 RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) ..........................36

The City of Detroit (the "City" or the "Debtor") respectfully submits this consolidated reply to the objections (each, an "Objection")[1] to the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief").

## I. PRELIMINARY STATEMENT

Confronting a state-declared "financial emergency" that includes approximately $18 billion in debt, over 100,000 creditors, over 100 discrete bond issuances and related loans (as well as multiple insurers of such bonds) and nearly 50 union bargaining units representing the City's employees – all of which rendered any out of court solution impracticable – the City commenced this chapter 9 case on July 18, 2013 (the "Petition Date") by filing a Petition for Relief (the "Petition"). The financial condition of the City is detailed in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum") and the City's first-day declarations.[2] These documents demonstrate the City's overwhelming need for debt relief.

---

[1] Attached hereto as Exhibit A and Exhibit B, and incorporated herein by reference, are charts specifying, for Objections filed by non-individual entities and individuals, respectively, on an Objection-by-Objection basis: (a) each Objection's docket number; (b) the arguments set forth therein (identified by category where appropriate); and (c) the City's response thereto.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Declaration of Kevyn D. Orr in Support of City of Detroit,

13-53846-tjt   Doc 2385-6   Filed 09/06/13   Entered 09/06/13 19:59:26   Page 14 of 15
13-53846-swr   Doc 765   Filed 08/19/13   Entered 08/19/13 13:43:26   Page 14 of 135
262
14

Despite these realities, over 100 persons and entities objected to the City's eligibility for relief under chapter 9 and to the entry of an Order for Relief. Most Objectors rely on anticipated treatments of their claims as a platform to argue that the City is not authorized to be a chapter 9 debtor. However, as this Court has observed,[3] neither the determination of claim amounts nor the potential treatment of claims in a plan of adjustment are before the Court at this time.

Notwithstanding the Objectors' arguments, the City is eligible to be a chapter 9 debtor and has demonstrated that an Order for Relief should be entered. First, the City is authorized to be a chapter 9 debtor because:

- After the fulfillment of certain conditions, PA 436 – which was validly passed by the Michigan legislature[4] – "empowers the local government for which an emergency manager has been appointed to become a debtor

_____

(continued…)

Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration"), filed on the Petition Date.

[3] Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 642) (the "Eligibility Scheduling Order"), entered on August 26, 2013.

[4] Recently, the Sixth Circuit questioned the validity of PA 4 (the predecessor statute to PA 436) on the grounds that the Michigan legislature may have violated the Michigan Constitution when it declared PA 4 immediately effective. City of Pontiac Retired Emps. Ass'n v. Schimmel, No. 12-2087, 2013 WL 4038582, at *5-6 (6th Cir. Aug. 9, 2013). No such potential constitutional infirmity afflicts PA 436, which became effective on March 28, 2013, more than 90 days after its enactment on December 27, 2012.

-2-
13-53846-tjt  Doc 2335-6  Filed 02/13/13  Entered 02/13/13 13:43:26  Page 15 of
262
13-53846-swr  Doc 765-6  Filed 09/06/13  Entered 09/06/13 13:59:52  Page 92 of 135    15

under title 11 of the United States Code ... as required by section 109 of title 11 of the United States Code" (<u>see</u> MCL § 141.1558(1));

- Each of the requirements of PA 436 relating to the authorization of the commencement of the City's chapter 9 case – <u>i.e.,</u> a recommendation by the Emergency Manager to the Governor and Treasurer that the City be authorized to proceed under chapter 9 and the written approval of that recommendation by the Governor – were satisfied prior to the filing of the Petition;

- Following the satisfaction of the foregoing conditions, PA 436 specifically authorizes emergency managers to commence chapter 9 cases (<u>see</u> MCL § 141.1558(1));

- The actual text of the Michigan Constitution does not prohibit the commencement of chapter 9 cases by municipalities or condition the steps that might be taken by any State or municipal official in connection with authorizing or effecting such a filing;

- The actual text of the Michigan Constitution does not create or require the imposition of any condition on actions the City might take in this chapter 9 case; and

- No statute passed by the Michigan legislature prohibits the commencement of chapter 9 cases by municipalities.

None of the Objections contest any of the foregoing points. Instead, the Objectors invent additional requirements, not found in the Michigan Constitution, and then allege that these additional requirements have not been met. We demonstrate below that there are no conditions to the City's becoming a debtor under chapter 9 other than those identified above. Accordingly, the City satisfied section 109(c)(2) of the Bankruptcy Code prior to the commencement of this case.

Moreover, objections contending that the City does not desire to adjust its debts, that the City may not be insolvent, that negotiations to adjust debts owed to

-3-

13-53846-swr   Doc 2335-6   Filed 06/13/13   Entered 06/13/13 19:59:32   Page 16 of 35
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:32   Page 16 of 135    16

262

more than 100,000 holders were practicable and that the City did not file the

Petition in good faith likewise fall short.  The Objections:

- do not include any evidence contradicting or undermining the extensive showing of the City's insolvency included in the Eligibility Memorandum (indeed, the majority of relevant Objectors do not actually state a cognizable objection on the issue, thereby conceding that no information available to them as of the objection deadline supports their Objection);

- (A) implicitly admit that none of the Objectors represent all of the City's more than 20,000 retirees in prepetition negotiations and some Objectors that claim to represent retirees do not represent any of the active employees who have vested pension benefits, (B) ignore certain Objectors' prepetition *refusal* to represent retirees in negotiations concerning pension and retiree healthcare benefits and (C) ignore the impracticability of negotiations with the City's bondholders altogether, all of which are facts that demonstrate that it was impracticable for the City to negotiate an out of court settlement of its debts and other legacy liabilities;

- mischaracterize and omit inconvenient facts relevant to the City's demonstrated efforts to negotiate in good faith a restructuring of its debts with its creditors; and

- misapply the standards governing whether the Petition was filed in good faith to side-step the demonstrated reality that the City intends to file a chapter 9 plan to adjust the City's unsustainable $18 billion debt burden.

Accordingly, as set forth in the Statement of Qualifications, the Eligibility

Memorandum and herein, the City is eligible to be a debtor under chapter 9, and

the Court should promptly enter an Order for Relief.

## II. THE COURT HAS AUTHORITY AND JURISDICTION TO DETERMINE THE CONSTITUTIONALITY OF CHAPTER 9 AND PA 436

There is no doubt that this Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. Eligibility is a question of federal law, governed by section 109(c) of the Bankruptcy Code, relevant only for purposes of accessing the federal bankruptcy scheme and the determination of which is specifically committed to the bankruptcy court by section 921(c) of the Bankruptcy Code. As the United States Supreme Court (the "Supreme Court") made clear in Stern v. Marshall, 131 S. Ct. 2594 (2011), non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights," which are matters "susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." Stern, 131 S. Ct. at 2612 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). Included within this category are cases that "can be pursued only by grace of the other branches" of the federal government (id. at 2614) because "[i]n those cases 'it depends upon the will of congress whether a remedy in the courts shall be allowed at all,' so Congress could limit the extent to which a judicial forum was available." Id. at 2612 (quoting Murray's Lessee, 59 U.S. at 284).

-5-
13-53846-tjt    Doc 2377-6   Filed 06/13/13   Entered 06/13/13 13:42:26   Page 18 of 135
262
13-53846-swr    Doc 765-6    Filed 09/13/13   Entered 09/13/13 13:53:26   Page 18 of 25    18

The eligibility proceeding fits squarely within this category of "public rights" cases recognized by the Supreme Court. The City's ability to adjust its debts in a federal bankruptcy case is, of course, only possible because Congress enacted the Bankruptcy Code. Because a chapter 9 case "can be pursued only by grace" of Congress (Stern, 131 S. Ct. at 2614), Congress can control access to chapter 9 by tasking a non-Article III judge with determining a municipality's eligibility, as it has done. 11 U.S.C. §§ 109(c), 921(c). Stern, therefore, poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9.

Indeed, no Objector has challenged the Court's ability to make a final determination regarding the City's eligibility for chapter 9. However, by selective quotation to Stern, some Objectors argue that this Court is powerless to rule on certain *objections* to the City's eligibility for chapter 9 that involve federal or state constitutional questions. See AFSCME Objection, at ¶ 70 (substituting Stern's actual reference to "common law counterclaims such as Vickie's" with "constitutional questions such as this one; misleadingly quoting Stern's actual language "on a common law cause of action" as "on a [constitutional] cause of action").[5] Such a radical expansion of Stern is unsupported by that case or any subsequent authority.

---

[5]     See Stern, 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving *common law counterclaims such as Vickie's* are the Article III

-6-
13-53846-tjt   Doc 2335-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 19 of 135
13-53846-swr   Doc 765   Filed 09/13/13   Entered 09/13/13 13:42:26   Page 19 of 135
262
19

Stern involved a statutorily core, state common law counterclaim asserted by the debtor against a creditor. Stern, 131 S. Ct. at 2620. The Supreme Court contrasted this "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy" with claims "that were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims." Id. at 2611. While the former required the bankruptcy court to impermissibly exercise the judicial power of the United States, the latter "stem[med] from the bankruptcy itself" and could, as a result, be resolved by the bankruptcy court. Id. at 2618; see also id. ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").[6]

_____

(continued…)

> courts, and it is with those courts that her claim must stay…. What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a *common law* cause of action….") (emphasis added). See also Crittendon Objection at ¶¶ 9-10.

[6]   The Supreme Court was careful to clarify that its holding should be interpreted narrowly. Stern, 131 S. Ct. at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one."); id. (noting that Congress had exceeded constitutional limitations "in one isolated respect").

Stern poses no obstacle for the Court in this case because there are no state or federal constitutional *claims* before the Court on which it could even purport to enter a final judgment. What is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself."[7] Id. at 2618. That this determination requires the Court to consider federal and state constitutional questions does not implicate Stern. Even if the Court were to conclude that chapter 9 or PA 436 is unconstitutional, it has not been called upon – indeed, it would not be permitted – to issue any relief based on those arguments beyond declaring that the City is ineligible for chapter 9 and dismissing the Petition.

For the foregoing reasons, Stern is simply not implicated by the Objectors' constitutional arguments against eligibility. See First Horizon Home Loan Corp. v. Apostle (In re Apostle), 467 B.R. 433, 436 (Bankr. W.D. Mich. 2012) ("[T]he Stern decision is extremely narrow; except for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings.").

---

[7]      Even if federal or state constitutional *claims* were before the Court, Stern would still pose no obstacle to this Court's ability to resolve the City's eligibility for chapter 9 in the first instance because the constitutionality of PA 436 is a pure legal issue, which will be reviewed *de novo* on appeal. Thus, none of the concerns regarding deferential review of bankruptcy court judgments animating Stern would be present (see Stern, 131 S. Ct. at 2611), and any error would be harmless after appellate review.

-8-

13-53846-tjt   Doc 2335-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 21 of 135
262
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 98 of 135   21

## III. CHAPTER 9 IS CONSTITUTIONAL UNDER LONGSTANDING SUPREME COURT PRECEDENT

The constitutionality of chapter 9 has been settled for more than 70 years.  In United States v. Bekins, 304 U.S. 27 (1938), the Supreme Court upheld against constitutional challenge the municipal bankruptcy provisions of the Bankruptcy Act of 1937, the predecessor of the current chapter 9.  Although the relevant statutory provisions have remained substantially unchanged since then, the Objectors argue nevertheless that intervening developments in the Supreme Court's jurisprudence on both the Contracts Clause of the United States Constitution (the "Contracts Clause")[8] and federalism have "*effectively* overruled" Bekins and that chapter 9 is no longer constitutional.[9]  The Objectors' argument is wrong for two reasons.  First, because the Supreme Court does not overrule binding precedents by mere implication, Bekins remains good law.  Second, nothing in the Supreme Court's developing jurisprudence on either the Contracts Clause or federalism casts even the slightest doubt on the fundamental soundness of Bekins and the constitutionality of chapter 9.

---

[8]  U.S. Const., art. I, § 10 ("No State shall … pass any … Law impairing the Obligation of Contracts").

[9]  See AFSCME Objection, at ¶¶ 44-46 (emphasis added).

-9-
13-53846-swr    Doc 765-6   Filed 09/06/13   Entered 09/06/13 13:59:53   Page 10 of 35
13-53846-tjt    Doc 2377-6   Filed 02/13/13   Entered 02/13/13 13:43:26   Page 22 of 135   22
262

A.   The Supreme Court's Decision in
     <u>Bekins</u> Remains Binding Precedent

AFSCME contends that chapter 9 is unconstitutional in light of federalism principles because it "allows Congress to set rules controlling State fiscal self-management – an area of exclusive state sovereignty."[10]  This argument is nothing short of an attempt to relitigate an issue that the Supreme Court resolved over seven decades ago.

In <u>Bekins</u>, the Supreme Court specifically addressed "whether the exercise of the federal bankruptcy power in dealing with a composition of the debts of [a municipality], upon its voluntary application and with the State's consent, must be deemed to be an unconstitutional interference with the essential independence of the State as preserved by the Constitution."  <u>Bekins</u>, 304 U.S. at 49.  Two years earlier, in <u>Ashton v. Cameron County Water Improvement District Number One</u>, 298 U.S. 513 (1936), the Supreme Court had held that municipal bankruptcy was unconstitutional because it "might materially restrict [the subdivision's] control over its fiscal affairs," such that it would "no longer [be] free to manage [its] own affairs."  <u>Ashton</u>, 298 U.S. at 530-31.  Responding to the Supreme Court's concerns, Congress enacted a slightly revised version of the municipal bankruptcy

---

[10]    AFSCME Objection, ¶¶ at 40.

statute.  <u>Bekins</u>, 304 U.S. at 50; <u>In re City of Stockton</u>, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013).

This revised statute was challenged and upheld in <u>Bekins</u>.  The Supreme Court concluded that the revised statute was "carefully drawn so as not to impinge upon the sovereignty of the State."  <u>Bekins</u>, 304 U.S. at 51.  Specifically, the Court explained that the "State retains control of its fiscal affairs" and that the "bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the [political subdivision] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." <u>Id.</u>

Central to the Court's reasoning was its observation that "the essence of sovereignty" is the ability to "give consents bearing upon the exertion of governmental power."  <u>Id.</u> at 51-52.  Because the adjustment of debts "was not available under state law by reason of the [Contracts Clause]," the Court held that the "bankruptcy power [was] competent to give relief," and "if there [was] any obstacle to its exercise … it [was] in the right of the State to oppose federal interference."  <u>Id.</u> at 54.

The Objectors do not point to any subsequent change in the text of chapter 9 that would warrant a different outcome than Bekins.[11]  None of the cases cited by the Objectors addresses the constitutionality of chapter 9 or casts doubt on Bekins.[12]  Nevertheless, the Objectors invite this Court to treat Bekins as having been implicitly overruled.  To do so, however, would violate the fundamental and well-established precept that "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."  Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989); see also Agostini v. Felton, 521 U.S. 203, 237 (1997) (same).  Because Bekins directly controls the Objectors' constitutional challenge to chapter 9, the Court must follow it and hold that chapter 9 is constitutional.

---

[11]    See AFSCME Objection, at ¶¶ 44-46.

[12]    Indeed, only one of the cases cited by the Objectors – Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942) – so much as mentions Bekins.

B.    Subsequent Legal Developments
      Have Not Undermined the Soundness of
      <u>Bekins</u> and the Constitutionality of Chapter 9

Although <u>Bekins</u> is dispositive of the Objectors' constitutional claim, it is also evident that legal developments since <u>Bekins</u> do not undermine the <u>Bekins</u> decision, the soundness of its reasoning or the constitutionality of chapter 9.

First, contrary to the Objectors' contention,[13] States are not generally free to adjust municipal debts by unilateral state action.  If the Objectors were correct, the Contracts Clause would be a dead letter, but the Supreme Court has made clear that "[w]hen a State itself enters into a contract, it cannot simply walk away from its financial obligations."  <u>Energy Reserves Grp., Inc. v. Kansas Power & Light Co.</u>, 459 U.S. 400, 412 n.14 (1983).  When a State seeks to impair its own contracts, "complete deference to a legislative assessment of [the] reasonableness and necessity [of the impairment] is not appropriate because the State's self-interest is at stake."  <u>United States Trust Co. of N.Y. v. New Jersey</u>, 431 U.S. 1, 26 (1977). For that reason, "a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives."  <u>Id.</u> at 30-31.

In chapter 9, by contrast, there is no risk of state self-interest because the impairment can be carried out only by an impartial federal judge.  Indeed, as one bankruptcy court put it:  "A financially prostrate municipal government has one

---

[13]    <u>See</u> AFSCME Objection, at ¶¶ 44-45.

viable option to resolve debts in a non-consensual manner.  It is in a bankruptcy case.  Outside of bankruptcy, non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible." In re Jefferson Cnty., 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), aff'd, No. CV-12-J-2203-5, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).

It comes as no surprise, therefore, that Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942), the case so prominently relied upon by the Objectors, is the *only* case "in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case." In re Jefferson Cnty., 474 B.R. at 279 n.21; see also United States Trust Co., 431 U.S. at 27.  In Asbury Park, the Court rejected a Depression-era Contracts Clause challenge to a state-law-approved plan of adjustment pursuant to which certain defaulted bonds could only be converted into new bonds with the same principal amount but bearing a lower interest rate. Asbury Park, 316 U.S. at 504-07.  Clarifying that "[w]e do not go beyond the case before us" and that "[d]ifferent considerations may come into play in different situations" (Asbury Park, 316 U.S. at 516), the Court was careful not to extend its holding beyond the facts of the case.

Therefore, far from being an authoritative pronouncement of the States' sweeping authority to adjust municipal debts, Asbury Park is an outlier and stands

only for the unremarkable point that States may adjust municipal debts in very limited ways under extraordinary circumstances without violating the Contracts Clause. "In almost every case," however, "the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." Energy Reserves Grp., 459 U.S. at 412 n.14 (citing United States Trust Co., 431 U.S. at 25-28; W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935); Murray v. Charleston, 96 U.S. 432 (1877)); see also, e.g., Mascio v. Public Emps. Ret. Sys. of Ohio, 160 F.3d 310, 313-15 (6th Cir. 1998) (barring the enforcement of a State law impairing vested pension benefits).

States must seek the aid of federal bankruptcy courts under chapter 9 precisely because they are *not* at liberty under the Contracts Clause to impair their own contracts. See Bekins, 304 U.S. at 54. For this reason, the Objectors' next contention – that a State unconstitutionally relinquishes its sovereignty to the Federal Government by authorizing chapter 9[14] – is also fundamentally flawed. As the Bekins Court explained: when a State authorizes chapter 9, it "acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of

---

[14]     See AFSCME Objection, at ¶¶ 46-57.

state sovereignty, has reduced both sovereigns to helplessness in such a case."
Bekins, 304 U.S. at 54.  The irony of the Objectors' argument is that it would actually impede, rather than protect, the States' sovereignty.

The Objectors also rely on the Supreme Court's anti-commandeering cases – New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 521 U.S. 898 (1997) – which involved involuntary federal regulatory regimes that "commandeered" State legislative processes or officials.  In New York, the challenged statute required States either to take title to low-level radioactive waste or to enact legislation regulating the waste pursuant to Congress's direction.  New York, 505 U.S. at 174-75.  In Printz, the challenged statute required State law enforcement officers to participate in the administration of a federal regulatory scheme.  Printz, 521 U.S. at 903-04.  The Supreme Court invalidated both statutes because "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program."  Id. at 933 (quoting New York, 505 U.S. at 188).

Chapter 9, by contrast, does not *compel* the States to enact, administer or otherwise participate in the federal bankruptcy scheme.  Most fundamentally, chapter 9 is "administered" by the federal bankruptcy court, not by States.  Moreover, States cannot be "forced" to participate in chapter 9 because their participation is completely voluntary.  By extending the benefits of bankruptcy to

-16-
13-53846-tjt    Doc 2335-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 29 of 135
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:32    Page 28 of 135
262
29

consenting States, chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements. E.g., South Dakota v. Dole, 483 U.S. 203, 205-06 (1987) (conditioning federal transportation funds on the States' adoption of a national minimum drinking age). Such programs are not constitutionally problematic where the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2602-03 (2012) (plurality opinion).

Because States have a "legitimate choice" whether to allow their municipalities to invoke chapter 9, chapter 9 is not an unconstitutional infringement of State sovereignty. Nor is there any danger of misplaced political accountability.[15] Where, as here, the State has a "legitimate choice" whether to participate in the federal scheme, "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2603 (plurality opinion).

Indeed, even after a State authorizes its municipalities to proceed under chapter 9, the bankruptcy court's powers are designed "to preserve the niceties of the state-federal relationship." Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012). For that reason, the

---

[15]     See AFSCME Objection, at ¶¶ 47-57.

-17-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 30 of 35
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 27 of 135

262

30

Objectors are wrong to suggest that State consent to chapter 9 is a futile effort to cure "an otherwise unconstitutional infringement of state sovereignty."[16] Even if there is some non-delegable core of sovereign state functions that cannot be ceded to the federal government by State consent, chapter 9 itself prohibits the bankruptcy court from intruding on those core functions. 11 U.S.C. § 903 (prohibiting the bankruptcy court from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality").

Finally, the Objectors also argue that chapter 9 violates the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution.[17] "[B]y ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy," argue the Objectors, "Chapter 9 permits the promulgation of non-uniform bankruptcies within states." Id. The very case that the Objectors cite, Hanover National Bank v. Moyses, 186 U.S. 181 (1902), proves otherwise. In Hanover National Bank, the Supreme Court approved federal bankruptcy provisions that relied on state law for determining exempt property. Id. at 188-90. The Supreme Court held that such a system was, "in the constitutional sense, uniform throughout the United States," even though "it may result in certain

---

[16]    AFSCME Objection, at ¶¶ 60-62.

[17]    AFSCME Objection, at ¶ 58.

particulars differently in different States." Id. at 190. Insofar as the Objectors contend that chapter 9 is unconstitutional because PA 436 is non-uniform within Michigan, that argument is erroneous because the uniformity requirement is "only controlling as to the congressional exercise of power," not as to the underlying state law. In re Vasko, 6 B.R. 317, 320 (Bankr. N.D. Ohio 1980). In any event, the process set forth in PA 436 is plainly uniform because it applies to all local governments. E.g., MCL § 141.1558. Notwithstanding the Objectors' speculation that PA 436 might have "wildly divergent effects on different cities" (AFSCME Objection, at ¶ 58), "it is not the outcome that determines the uniformity, but the uniform process" by which a defined class of debtors is treated. Richardson v. Schafer (In re Schafer), 689 F.3d 601, 611 (6th Cir. 2012).

## IV.     THE CITY WAS PROPERLY AUTHORIZED TO COMMENCE THIS CHAPTER 9 CASE

On July 16, 2013, consistent with MCL § 141.1558, the Emergency Manager provided the Governor and Treasurer with his written recommendation that the City be authorized to file for chapter 9 relief.[18] The recommendation was predicated upon, among other things, the Emergency Manager's:

---

[18]     Orr Declaration, at Exhibit J (copy of Emergency Manager's written recommendation); MCL § 141.1558(1) ("If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9.").

(A) determination that the City could not adopt a feasible financial plan that can satisfactorily rectify its financial emergency in a timely manner; and (B) judgment that no reasonable alternative to chapter 9 would allow him to rectify the City's financial emergency in a timely manner.[19]

On July 18, 2013, the Governor approved in writing the Emergency Manager's recommendation to commence this chapter 9 case.[20] Finally, also on July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued a written order directing the City to commence this chapter 9 case.[21] Accordingly, under applicable State law and pursuant to the specific approval of the Governor in accordance with MCL § 141.1558(1), the City has

---

[19] MCL § 141.1558(2)(a) (requiring that an emergency manager's recommendation include, among other things, "[a] determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.").

[20] Orr Declaration, at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation); MCL § 141.1558(1) ("the governor shall inform the state treasurer and the emergency manager in writing of the decision [to approve]….").

[21] Orr Declaration, at Exhibit L (copy of Emergency Manager's order directing commencement); MCL § 141.1558(1) (providing that, "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.").

-20-

13-53846-tjt   Doc 2335-6   Filed 06/13/13   Entered 06/13/19:53:42:26   Page 30 of 135
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:53:42   Page 33 of 135   33
262

been specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code.

## V. THE STATE'S AUTHORIZATION OF CHAPTER 9 DID NOT VIOLATE THE PENSIONS CLAUSE

Several of the Objectors claim, in one form or another,[22] that the State's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause").[23]  They are mistaken.  As explained below, the Pensions Clause itself makes no mention of bankruptcy or chapter 9 authorization.  Nor does the State's authorization of a chapter 9 filing, or even the City's becoming a chapter 9 debtor, "diminish[ ] or impair[ ]" any pension. These are simply steps that begin the bankruptcy process, where pensions *may* be impaired by order of a federal bankruptcy court at some later date.

### A. The Authorization of Chapter 9 Does Not "Diminish or Impair" Pension Benefits

In authorizing the City to file for chapter 9, the State did not violate the Pensions Clause because it did not "diminish[ ] or impair[ ]" any pension. The authorization was merely one of several conditions to the City's becoming a

---

[22]  See, e.g., AFSCME Objection, at ¶¶ 76-81; Retiree Associations Objection, at ¶¶ 35-50; UAW Objection, at ¶¶ 27-40; Detroit Retirement Systems Objection, at pp. 30-43.

[23]  Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").

chapter 9 debtor.  After the Governor authorized the City to file this case, and even

after the City filed the Petition, the City's pension obligations have remained

unimpaired.  The Objectors frame their argument as if nothing stands between

authorization and the confirmation of a plan that may reduce pension benefits.

The only way pensions could be impaired without the consent of the pertinent

beneficiaries, however, is by an order of this Court at some future date.  As another

court has recently indicated, the "main event" of pension impairment is not

properly addressed until well after the eligibility stage – at the time of plan

confirmation.  In re City of Stockton, 493 B.R. 772, 797 (Bankr. E.D. Cal. 2013).

For the same reason, there is no merit to the Objectors' argument that the

enactment of PA 436 violated the Pensions Clause (and, thus, that PA 436 is

unconstitutional as a threshold matter)[24].  The enactment of the underlying statute

empowering the Governor to authorize (and the Emergency Manager to file) a

chapter 9 case is even further removed from any possible impairment of pensions

than the Governor's authorization itself.

B.     The Pensions Clause Simply Extends the Protection of the
       Federal and State Contracts Clauses to Cover Public Pensions

The unmistakable function of the Pensions Clause is to extend the protection

of the federal and state contracts clauses to cover public pensions by treating them

---

[24]     See, e.g., Detroit Retirement Systems Objection, at p. 43.

-22-

13-53846-tjt   Doc 2375-6   Filed 09/06/13   Entered 09/06/13 13:43:26   Page 35 of
                                    262
13-53846-swr    Doc 765-6   Filed 08/19/13   Entered 08/19/13 19:59:53   Page 32 of 135      35

as contractual obligations.[25]  The text of the Pensions Clause states that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions *shall be a contractual obligation thereof* which shall not be diminished or impaired thereby."  Mich. Const. art. IX, § 24 (emphasis added).  As the Michigan Supreme Court has recognized, "*[t]he obvious intent* of § 24 … was to ensure that public pensions *be treated as contractual obligations* that, once earned, could not be diminished."  In re Constitutionality of 2011 PA 38, 806 N.W.2d 683, 694 (Mich. 2011) (emphasis added).

It is important to note that prior to the adoption of the Pensions Clause in 1963, "[i]t had long been the general rule that pensions granted by public authorities were not contractual obligations but gratuitous allowances which could be revoked at will by the authority because the pensioner was not deemed to have had any vested right in their continuation."  In re Enrolled Senate Bill (Advisory Opinion re Constitutionality of 1972 PA 258), 209 N.W.2d 200, 202 (Mich. 1973).  Against this backdrop, public employees in Michigan sought "[t]o gain protection of their pension rights," and thus "effectively lobbied for a constitutional

---

[25]     The contracts clause contained in the Michigan Constitution (the "State Contracts Clause") is indistinguishable from the federal version, and the Michigan courts have accordingly interpreted the two as having the same effect.  See Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question), 527 N.W.2d 468, 473-74 (Mich. 1994) (noting "virtually identical" language of state and federal contracts clauses, and relying on federal case law to apply state clause).

-23-

13-53846-swr    Doc 2385-6    Filed 09/06/13    Entered 09/06/13 13:53:26    Page 36 of
262
13-53846-swr    Doc 765-6    Filed 09/18/13    Entered 09/18/13 19:59:42    Page 33 of 35        36

amendment *granting contractual status* to retirement benefits." <u>Kosa v. State</u>

<u>Treasurer</u>, 292 N.W.2d 452, 454-55 (Mich. 1980) (emphasis added).  The result

was the Pensions Clause, which elevated public pensions to the same level of

constitutional protection that applied to "obligations of contract" under the

Contracts Clause.

While the Contracts Clause prohibits States from impairing contracts, it does

not pose any obstacle to chapter 9.  As the Supreme Court has recognized, a State's

authorization of municipal bankruptcy does not itself constitute an impairment of

contracts but merely "invites the intervention of the bankruptcy power to save its

agency which the State itself is powerless to rescue. " <u>Bekins</u>, 304 U.S. at 54.

Consequently, <u>Bekins</u> makes clear that the Contracts Clause is perfectly consistent

with chapter 9 proceedings from start to finish.  This is true for two reasons.  First,

a State does not impair contracts merely by authorizing a municipality to file for

bankruptcy, because no contracts are impaired at the time of authorization.  Second,

any impairment of contracts that occurs in chapter 9 does not implicate the

Contracts Clause, because the Contracts Clause only prohibits impairment *by the*

*State*, while chapter 9 only allows impairment by the federal bankruptcy court.  As

one court has observed, "the Bankruptcy Code … permits *the federal courts*

*through confirmation of a Chapter 9 plan* to impair contract rights … and such

impairment is not a violation by the state or the municipality of [the Contracts

Clause] which prohibits a state from impairing such contract rights." In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) (emphasis added). Indeed, if chapter 9 truly involved an impairment of contractual obligations by the State, then the Contracts Clause would prevent the impairment of any contract in municipal bankruptcy (or at least require a stringent Contracts Clause analysis for every contractual impairment).

Like the Contracts Clause, the Pensions Clause applies only to impairments that are imposed "[ ]by" the State and its political subdivisions. Mich. Const. art. IX, § 24. Thus, as with the Contracts Clause, chapter 9 is not limited by the Pensions Clause because the impairment of pensions and other contractual obligations in chapter 9 can only occur by order of a federal bankruptcy court.

The framework of chapter 9, including the role of States in authorizing municipal bankruptcy, was well established when the Pensions Clause was ratified in 1963. Nevertheless, the Pensions Clause does not include any restriction on the authorization or filing of municipal bankruptcy cases. Given the absence of any language regarding bankruptcy in the Pensions Clause, and the well-established principle that constitutional protection for "contractual obligations" is not a bar to chapter 9, there is no basis for concluding that the Pensions Clause was intended to give pensioners a right to block municipal bankruptcy. Cf. In re Constitutionality of 2011 PA 38, 806 N.W.2d at 697, n.24 ("Given that neither the actual language

of § 24 nor the Address to the People mentions [a right to tax-free pension benefits], the ratifiers would have had absolutely no reason to suppose that, by adopting § 24, they would be creating" such a right).

Indeed, when the Pensions Clause was ratified in 1963, Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. See Public Act 72 of 1939, MCL § 141.201(1) (repealed in 1982) ("Any … instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] … may proceed under the terms and conditions of such acts to secure a composition of its debts…. The governing authority of any such … instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress …."). It seems extremely unlikely that, by enacting the Pensions Clause, the framers of the Michigan Constitution intended to overrule Public Act 72 of 1939, which remained on the books for another 20 years, without so much as mentioning the Act's existence.

No court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. For example, in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some "new comparable or offsetting benefit

appear[s] in the modified plan." Olson v. Cory, 636 P.2d 532, 541 (Cal. 1980).

Nonetheless, California courts have found municipalities eligible to be chapter 9

debtors in several recent cases where pensions might be vulnerable to impairment

in the bankruptcy process. E.g., Stockton, 493 B.R. 772; Int'l Ass'n of Firefighters,

Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280 (B.A.P.

9th Cir. 2009). Similar constitutional protection for pensions applies in Alabama

(see Bd. of Trs. v. Cary, 373 So.2d 841 (Ala. 1979)), where chapter 9 has not only

been authorized but, consistent with constitutional protections for contracts, has

also been used to reduce pensions (see In re City of Prichard, No. 99-13465 (Bankr.

S.D. Ala. Oct. 6, 2000) (Docket No. 123), at pp. 6-7 (order confirming plan of

adjustment reducing all existing and future pension benefits payments by 8.5%)).

As in these cases, the Pensions Clause does not prohibit the State from authorizing

the City to be a debtor under chapter 9.

　　　　Indeed, if the mere prospect of impairing pensions in bankruptcy were

enough to violate the Pensions Clause, then the same prospect of impairing

contracts in bankruptcy would be enough to violate the State Contracts Clause (and,

for that matter, the federal Contracts Clause). If that were true, no Michigan

municipality (or any municipality in any other State throughout the nation) could

ever enter chapter 9, where the impairment of contracts is always on the table.

That absurd result proves that the authorization of a chapter 9 case does not equate to an impermissible impairment under the Pensions Clause.

C.    The Pensions Clause Does Not
       Require Chapter 9 Authorization to
       Be Conditioned on the Non-Impairment of Pensions

The Objectors fare no better in their argument that the Pensions Clause allows the State to authorize chapter 9 only on the condition that pensions not be impaired.[26]  Once again, the Objectors cite no authority in support of this novel argument, which has no basis in text or precedent.

To begin,  the only relevant question at the eligibility stage is whether the State has specifically authorized the City "to be a debtor under … chapter [9]." 11 U.S.C. § 109(c)(2).  If the State has granted authorization, it is entirely irrelevant for eligibility purposes whether the State has also purported to impose some further conditions.

Perhaps conceding this point, the Objectors appear to argue that the State has not validly authorized the City to become a chapter 9 debtor because the State violated the Pensions Clause by failing to make the non-impairment of pensions a condition of authorization.[27]  This argument, too, is incorrect.  As we have already seen, the Pensions Clause nowhere mentions bankruptcy in general or chapter 9

---

[26]    See AFSCME Objection, at ¶ 82; UAW Objection, at ¶ 30; Detroit Retirement Systems Objection, at pp. 43-44.

[27]    See AFSCME Objection, at ¶ 82-84; UAW Objection, at ¶ 30.

authorization in particular.  It also does not say anything about conditions that must be imposed on the authorization of chapter 9.  As discussed above, the Pensions Clause simply has the same effect as the Contracts Clause, which has never been interpreted by any Court to require any conditions on the authorization of chapter 9.

Apparently dissatisfied with the actual wording of the Michigan Constitution, the Objectors base their argument on a constitutional provision of their own imagining.  Instead of adhering to the plain terms of the Pensions Clause that require the State to *refrain* from impairing pensions, the Objectors contend that the Pensions Clause should be read to require State officials to take *affirmative steps* to prevent even the possibility of the federal bankruptcy court from impairing pensions in chapter 9.  This is not an interpretation of the Pensions Clause but a complete rewriting of it.

Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's *use* of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.  The Bankruptcy Clause of the United States Constitution empowers Congress to "establish … uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4.  Pursuant to that authority, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy, including

various powers that a municipal debtor may invoke to adjust its debts.  Under the

Supremacy Clause of the United States Constitution,[28] this comprehensive federal

scheme displaces any contrary state-law provisions that purport to alter or impair a

debtor's powers under the Bankruptcy Code.  "The federal bankruptcy power … by

operation of the Supremacy Clause, trumps the … state constitution."  <u>Stockton</u>,

478 B.R. at 16.  Thus, while the State may act as a gatekeeper in determining

whether to authorize a chapter 9 filing, State law cannot alter or override the

federal scheme for determining the tools of debt adjustment that a municipal debtor

may use once it is in bankruptcy.

 In light of the comprehensive scheme that Congress has enacted,

"[i]ncorporating state substantive law into chapter 9 to amend, modify or negate

substantive provisions of chapter 9 would violate Congress' ability to enact

uniform bankruptcy laws."  <u>In re City of Vallejo</u>, 403 B.R. 72, 76-77 (Bankr. E.D.

Cal. 2009), <u>aff'd sub nom.</u> <u>Int'l Bhd. Of Elec. Workers, Local 2376 v. City of

Vallejo (In re City of Vallejo)</u>, 432 B.R. 262 (E.D. Cal. 2010); <u>see</u> <u>also</u> <u>Cnty. of

Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)</u>, 191 B.R. 1005, 1020

(Bankr. C.D. Cal. 1996) (deviating from federal scheme would "violate the

constitutional mandate for uniform bankruptcy laws" by determining creditor

---

[28] U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States … shall be the
supreme Law of the Land … any Thing in the Constitution or Laws of any
State to the Contrary notwithstanding.").

priorities based on factors that vary from state to state).[29]  Thus, a State "must

accept chapter 9 in its totality; it cannot cherry pick what it likes while

disregarding the rest."  Cnty. of Orange, 191 B.R. at 1021; see also Stockton,

478 B.R. at 16 (holding that "[a] state cannot … condition or [ ] qualify, i.e. to

'cherry pick,' the application of the Bankruptcy Code provisions that apply in

chapter 9 cases after such a case has been filed"); Vallejo, 432 B.R. at 267-68

(same); Mission Indep. Sch. Dist. v. Texas, 116 F.2d 175, 178 (5th Cir. 1940)

(same).

For these reasons, the Pensions Clause by its plain terms did not require the

Governor to impose any of the conditions sought by the Objectors, and in any

event, such conditions would be prohibited by federal law.[30]

---

[29]    In establishing uniform bankruptcy laws, it is for Congress to determine how
and whether State law will be incorporated.  See In re Schafer, 689 F.3d
at 611 (noting that Congress "may" incorporate state law in bankruptcy).  In
chapter 9, Congress has chosen to allow state law to govern the question of
whether a municipality is authorized to become a debtor but not to govern
the powers that debtors may invoke to adjust their debts.

[30]    The City raises these arguments not to seek the Court's determination today
whether pension benefits can or should be modified in this case but merely
to respond to the Objectors' argument that the Governor's authorization of
this case must necessarily have placed a condition on the filing.  It need not
have.  It could not have.

In this vein, the Court – consistent with its findings at Section VI of the
Eligibility Scheduling Order – should reject the request that any Order for
Relief require that all actions taken by the Emergency Manager, including
the eventual proposal of a plan of adjustment, "comply with the State

-31-

13-53846-tjt   Doc 2375-6   Filed 02/13/13   Entered 02/13/13 13:42:26   Page 44 of 45
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:42   Page 44 of 135      44
262

## VI. COLLATERAL ESTOPPEL DOES NOT PRECLUDE THIS COURT FROM DETERMINING THE CITY'S ELIGIBILITY FOR CHAPTER 9

Pointing to the declaratory judgment entered in <u>Webster v. Michigan</u>,

No. 13-734-CZ (Ingham Cnty. Cir. Ct.), certain of the Objectors contend that the

City is barred by collateral estoppel from litigating whether the City's authorization

to file for chapter 9 bankruptcy was valid under the Michigan Constitution.[31]  The

Objectors' collateral estoppel argument fails for numerous reasons.

Collateral estoppel applies only to issues that have been "actually litigated

and determined by a valid and final judgment."  <u>Monat v. State Farm Ins. Co.</u>,

677 N.W.2d 843, 845 (Mich. 2004).  But the judgment in <u>Webster</u> was not "valid"

because the state court lacked jurisdiction at the time the judgment was entered.

Under 28 U.S.C. § 1334(a), federal district courts have "exclusive" jurisdiction

over "all cases under title 11."  An essential component of that exclusive

_____
(continued…)

 Constitution."  <u>See</u> AFSCME Objection, at ¶¶ 82-84.  Such amorphous and premature requests, including requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage.

[31] <u>See</u> Retirement Systems Objection, at pp. 44-58.   The Objectors' resort to collateral estoppel is necessary, of course, because a state trial court's interpretation of state law is not binding on this Court.  <u>See</u> <u>Weisberg v. Powell</u>, 417 F.2d 388, 393 (7th Cir. 1969) ("We are not necessarily bound by the decision of a state trial court on a point of state law where the highest court of the state has not spoken on it.").

-32-

13-53846-tjt   Doc 2335-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 45 of
13-53846-swr   Doc 765-6   Filed 09/18/13   Entered 09/18/13 19:53:26   Page 92 of 135
262           45

jurisdiction is to determine whether a municipality was "specifically authorized …
to be a debtor under [chapter 9] by State law." 11 U.S.C. § 109(c)(2); see also
11 U.S.C. § 921(c) (instructing the court, as part of the bankruptcy case, to
determine whether "the petition … meet[s] the requirements of this title");
Transcript of Hearing, dated July 24, 2013, at pp. 71-72 ("The Court concludes that
the issue of eligibility and each of the elements relating to eligibility are within this
Court's exclusive jurisdiction under 28 U.S.C., Section 1334(a).  Under that statute,
United States District Courts have original and exclusive jurisdiction of all cases
under Title 11, that original and exclusive jurisdiction referred to the Bankruptcy
Courts of each jurisdiction under 28 U.S.C., Section 157.  Our District Court has
referred all matters relating to bankruptcy jurisdiction to the Bankruptcy Court
under Local Rule 83.30. This is not a proceeding within 28 U.S.C., Section 1334,
over which Bankruptcy Courts would have concurrent jurisdiction with the state
courts.").

In Webster, after the City had already filed the Petition, the state court
purported to determine that the City was not validly authorized to be a debtor
under State law.  See Order of Declaratory Judgment, at 2, Webster,
No. 13-734-CZ (July 19, 2013) (declaring that the State could not "authoriz[e] an
emergency manager … to proceed under Chapter 9 in a manner which threatens to
diminish or impair accrued pension benefits").  By passing judgment on the

-33-
262
13-53846-tjt   Doc 2385-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 46 of 135   46
13-53846-swr   Doc 763-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 46 of 135

validity of the City's authorization to proceed under chapter 9, the Webster court purported to adjudicate an issue that fell squarely within this Court's exclusive jurisdiction. Because the Webster court lacked jurisdiction, the judgment is void. See Twin City Fire Ins. Co. v. Adkins, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.").

Even if the Webster court had been able to exercise jurisdiction over eligibility questions (which it was not), the declaratory judgment in Webster would still be invalid because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code as of the time of the filing of the Petition. The Objectors argue that the automatic stay did not apply to suits against the Webster defendants – the State of Michigan, the Governor, and the Treasurer – until the stay was extended to those defendants on July 25, 2013.[32]

As the City made clear in its motion to extend the automatic stay, certain prepetition lawsuits – including Webster – violated the automatic stay imposed as of the Petition Date to the extent that such suits sought "directly or indirectly to

---

[32]    See Order Extending the Chapter 9 Stay (Docket No. 166); Retirement Systems Objection, at p. 51.

enforce the plaintiffs' claims against the City or to exercise control over the City's property rights, including its powers and rights under chapter 9." Motion of Debtor for Entry of Order Extending the Chapter 9 Stay (Docket No. 56) at p. 15 n.4; see Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.), 423 F.3d 567, 578 (6th Cir. 2005) (holding that "[a]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision") (quoting Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997)). By entering judgment – a day after the Petition Date – declaring that the City's bankruptcy filing was not properly authorized under the Michigan Constitution, the Webster court sought to exercise control over the City's legal and property rights in violation of the automatic stay. Such a judgment is likely void *ab initio* (see Easley v. Pettibone Mich. Corp., 990 F.2d 905, 911 (6th Cir. 1993) (holding that "actions taken in violation of the [automatic] stay are invalid and voidable and shall be voided absent limited equitable circumstances")) and, thus, would be invalid for purposes of collateral estoppel. See Control Module, Inc. v. Morello (In re Morello), No. 07-02052, 2012 WL 1945509, at *18 (Bankr. D. Conn. May 30, 2012) (holding, where a state court entered a postpetition "supplemental judgment" against a debtor, that "because the Supplemental Judgment was issued after the filing of the Debtor's bankruptcy, the judgment of

the [state] court is void and neither side may claim that the [state] court's finding[s] are entitled to collateral estoppel….").

Collateral estoppel further fails because the City did not have "a full and fair opportunity to litigate the issue." Monat, 677 N.W.2d at 845 (quotation marks and alteration omitted). "A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts…." Id. at 845 n.2 (quoting 1 RESTATEMENT (SECOND) OF JUDGMENTS § 28, at 273 (1982)). The state court in Webster took the unusual step of issuing a final declaratory judgment on an expedited basis after the Petition had already been filed and without the benefit of full briefing on the merits. At the time of the declaratory judgment, the Webster case was little more than two weeks old, and the defendants' briefs had focused mainly on justiciability issues and the preliminary injunction standard rather than the merits of the plaintiffs' arguments. Indeed, the Webster court's failure to provide a well-reasoned explanation for its decision attests to the gross inadequacy of the process afforded to the defendants. Thus, even if (somehow) collateral estoppel otherwise could apply, the abbreviated nature of the proceedings in the state court would warrant a fresh determination of the issue by this Court.

Finally, even if (A) the Michigan state court's postpetition exercise of jurisdiction over Webster had been proper (which it was not), (B) the automatic

stay did not apply to the Webster litigation (which it did) and (C) the City had a full and fair opportunity to litigate (which it did not), collateral estoppel *still* would not apply because the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants. Collateral estoppel "precludes relitigation of an issue in a different, subsequent action between the same parties or their privies…." Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA, 592 N.W.2d 408, 411 (Mich. Ct. App. 1998). "In its broadest sense, privity has been defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." Sloan v. City of Madison Heights, 389 N.W.2d 418, 422 (Mich. 1986) (internal quotation marks omitted).

The Objectors contend that, although the City was not a party to the Webster litigation, the City was in sufficient privity with the Webster defendants to trigger collateral estoppel,[33] but the Objectors cannot have it both ways. They cannot maintain that there is an *insufficient* identity of interest between the Webster defendants and the City for purposes of the automatic stay but a *sufficient* identity of interest between the two for purposes of collateral estoppel. If there was

---

[33]    The two plaintiffs in Webster are potentially in privity only with the General Retirement System of the City of Detroit, in which they were participants, not with any other Objector. See Complaint, at ¶¶ 2-3, Webster, No. 13-734-CZ (July 3, 2013).

sufficient privity between the City and the <u>Webster</u> defendants for collateral estoppel to apply, then, by necessity, that privity would have triggered the protections of the automatic stay.

## VII.  PA 436 IS CONSTITUTIONAL

The Objectors also claim that PA 436 violates the Michigan Constitution because:  (A) the enactment of PA 436 violated the Pensions Clause by authorizing a chapter 9 filing without prohibiting the impairment of pension obligations therein; (B) PA 436 violates Michigan's home rule doctrine; and (C) PA 436 unconstitutionally delegates power to the Emergency Manager.  PA 436's consistency with the Pensions Clause is addressed at Section V.A *supra*.  The remaining objections to PA 436's constitutionality generally have nothing to do with eligibility, and, where they might, are baseless.

### A.  PA 436 Does Not Conflict with Home Rule and Reflects the State Legislature's Power To Address Local Fiscal Emergencies

The home rule provisions of Michigan law give municipalities and their residents rights of self governance by empowering residents to elect their own officials (<u>e.g.</u>, <u>People ex rel. Le Roy v. Hurlbut</u>, 24 Mich. 44, 46-47 (1871)), and by according "the electors of each city" with "the power and authority to frame, adopt and amend [the municipality's] charter."  Mich. Const. art. VII, § 22. The Objectors contend that PA 436 violates home rule provisions by placing the

Emergency Manager in the shoes of local officials and allowing the Emergency

Manager to take actions that are arguably inconsistent with the city's charter.[34]

The Objectors are mistaken.  As an initial matter, most of the Objectors'

challenges – such as their concerns about the Emergency Manager's ability to set

budgets and pass ordinances – have nothing to do with the Emergency Manager's

authority to file for chapter 9 and thus need not be addressed here.  Moreover, there

is, in fact, no conflict because Detroit's charter recognizes that its provisions are

"subject … to the limitations … imposed by statute."  DETROIT CITY

CHARTER § 1-102; see Detroit City Council v. Mayor of Detroit, 770 N.W.2d 117,

124 (Mich. Ct. App. 2009) (recognizing that by its own terms Detroit's Charter

gives way to statutes).

Even if there were a conflict between PA 436 and Detroit's Charter

regarding the Emergency Manager's authority to commence this chapter 9 case,

PA 436 would prevail.  "Where a city charter provision conflicts with general

statutory law, the statute controls in all matters which are not of purely local

character."  Bd. of Trs. v. City of Detroit, 373 N.W.2d 173, 175 (Mich. Ct.

App. 1985); see also Public Act 279 of 1909, the Home Rule City Act,

MCL § 117.36 ("No provision of any city charter shall conflict with or contravene

the provisions of any general law of the state.").  General laws are those capable of

---

[34]     See AFSCME Objection, at ¶¶ 85-94.

covering new localities over time.  See, e.g., Houston v. Governor,

810 N.W.2d 255, 257 (Mich. 2012).

PA 436, including its authorization to file for chapter 9, is most certainly a

general state law.  As the Michigan legislature's findings with respect to the impact

of local financial emergencies on the rest of the State make clear

(MCL § 141.1543), how financially distressed local governments overcome their

situation is decidedly not a matter of "purely local" character or concern.

See, e.g., Brimmer v. Village of Elk Rapids, 112 N.W.2d 222, 226 (Mich. 1961)

(statutes involving municipal utility rates, municipal debt limitations and municipal

tax rates are general rather than purely local).  Indeed, the Michigan Constitution

itself instructs the State legislature to pass "general laws … restrict[ing] the powers

of cities and villages to borrow money and contract debts."  Mich. Const. art. VII,

§ 21.

Nor does temporarily substituting the Emergency Manager for Detroit's

elected officials violate home rule by eliminating Detroit's residents' right to

choose their officials.  "[A] municipal corporation['s] … existence is entirely

dependent on the legislation that created it, and the Legislature that may also

destroy it."  Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,

575 N.W.2d 751, 760 (Mich. 1998).  Accordingly, the Michigan Supreme Court

has long recognized that the legislature must have authority to temporarily replace

local officials when exercising its undisputed power to "supervis[e] and control in matters of municipal regulation." Hurlbut, 24 Mich. at 111 (opinion of Cooley, J.). That is all PA 436 does:  it authorizes the Governor to appoint an emergency manager in a fiscal crisis (MCL § 141.1549(1)), but the emergency manager's term ends once the crisis ends or, if he has been in office more than 18 months, if an elected local government votes him out (MCL §§ 141.1549(6)(b), (c)).

     B.     PA 436 Does Not Delegate Power to Pass Local Legislation

Article IV, Section 29 of the Michigan Constitution provides that "[t]he legislature shall pass no local or special act in any case where a general act can be made applicable" and that "[n]o local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected."  Because PA 436 grants the Emergency Manager authority to adopt local ordinances (MCL § 141.1552(1)(dd)), the Objectors contend it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the State legislature could pass.[35]

Once again, this objection has nothing to do with the City's eligibility for bankruptcy:  filing a chapter 9 case is not passing legislation, the only conduct covered by Article IV, Section 29.  In any event, Article IV, Section 29 restricts

---

[35]     AFSCME Objection, at ¶¶ 95-97.

only the State *legislature*; municipalities are free to enact "local" laws as they see fit.  When the Emergency Manager acts, he exercises the *local government's* powers, not the State legislature's, so the legislature did not (and could not) violate Article IV, Section 29 when it enacted PA 436.  See, e.g., MCL § 141.1552(1)(dd); see also MCL § 141.1552(2) (allowing local leaders to repeal the Emergency Manager's ordinances after his term ends).

C.      PA 436 Does Not Violate the Non-Delegation Doctrine

Under Michigan's non-delegation doctrine, the legislature may not task executive officials with formulating "legislative policy" unless the legislature provides "sufficient standards and safeguards" to "check[ ] the exercise of delegated power."  Blue Cross & Blue Shield of Mich. v. Milliken, 367 N.W.2d 1, 27 (Mich. 1985).  The Objectors argue that PA 436 runs afoul of this rule by giving the Emergency Manager authority to act for the City in chapter 9 without providing guidance as to what he should do.[36]

The Objectors are again mistaken.  First, as explained above, the Emergency Manager exercises the local government's authority, not powers of the State legislature's.  The Emergency Manager acts for the City, not the State.  Thus the anti-delegation principles that govern when the State legislature delegates the State legislature's powers do not apply here.

_____

[36]      See AFSCME Objection, at ¶¶ 98-99.

-42-

13-53846-tjt   Doc 2335-6   Filed 02/13/13   Entered 02/13/13 13:42:26   Page 55 of
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 13:59:58   Page 92 of 135      55
262

Second, when deciding whether the legislature has provided "reasonably precise" standards (Blue Cross, 367 N.W.2d at 27) in delegating its powers, Michigan courts have emphasized that the statute "must be read as a whole" and "carries a presumption of constitutionality." Id. As a result, the "reasonably precise" test is easy to satisfy (see, e.g., Blue Cross & Blue Shield of Mich. v. Demlow, 270 N.W.2d 845, 854 (Mich. 1978) (approving delegation using a "fair and reasonable" standard)); Mich. State Highway Comm'n v. Vanderkloot, 220 N.W.2d 416, 419 (Mich. 1974) (approving use of eminent domain upon an executive finding of "necessity")).

PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection. It clearly tells the Emergency Manager to look at various possibilities for fixing the City's financial problems and instructs him to recommend bankruptcy only if "no reasonable alternative to rectifying the financial emergency … exists." MCL § 141.1558(1). PA 436 also instructs the Emergency Manager to ameliorate those problems while "assur[ing] the fiscal accountability of the local government and the local government's capacity to provide … necessary governmental services essential to the public health, safety, and welfare." MCL § 141.1549(2).

The Objectors also contend that PA 436 unconstitutionally delegates authority by not providing for judicial review of the Emergency Manager's actions

-43-
13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:53:42   Page 56 of
262
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 56 of 135     56

in bankruptcy.[37]  The Objectors, however, ignore the fact that, in many circumstances, this Court will review actions of the Emergency Manager.[38]  The Objectors argue that the Emergency Manager can escape judicial review because, under 11 U.S.C. § 904, municipalities need not seek court approval of settlements. Yet, if the City does not seek this Court's approval of a particular settlement, that settlement does not escape scrutiny forever:  "the day of reckoning comes at the plan confirmation hearing," where any "untoward settlements" would shed considerable light on whether a cram-down plan "discriminate[s] unfairly," is "fair and equitable," and has been "proposed in good faith."  <u>Stockton</u>, 486 B.R. at 199-200 (quoting 11 U.S.C. § 1129(a)(2), (b)(1)).

In sum, PA 436 neither violates Michigan's home rule doctrine nor unconstitutionally delegates authority to the Emergency Manager.  To the extent, if any, that such claims have anything to do with eligibility, the Objectors' arguments in support of these claims lack merit, and this Court should determine that PA 436 is constitutional.

---

[37]  <u>See</u> AFSCME Objection, at ¶100.

[38]  Whether or not <u>Stern</u> prohibits this Court from considering "freestanding state-law claims," it does not impact this Court's role in implementing provisions of the Bankruptcy Code that may involve determination of state law issues.  <u>See</u> Section II *supra*.

## VIII. THE CITY SATISFIES SECTION 109(c)(5) OF THE BANKRUPTCY CODE BECAUSE IT WAS IMPRACTICABLE TO BARGAIN WITH THOUSANDS OF BONDHOLDERS AND OVER 20,000 RETIREES

In the Eligibility Memorandum, the City demonstrated the impracticability of conducting negotiations with its very numerous creditors and that the requirement for eligibility set forth at section 109(c)(5)(C) of the Bankruptcy Code was satisfied. Specifically, the City explained that: (A) the "impracticability" requirement was added to the Bankruptcy Code to facilitate relief under chapter 9 for major American cities (i.e., precisely this circumstance); (B) the numerosity and fragmented nature of the City's creditors made negotiations with the creditor body impracticable; (C) in many instances, the City was unable to negotiate with representatives with authority to bind creditors because there were no such representatives; and (D) the City did not have time to conduct extended creditor negotiations. See Eligibility Memorandum, at pp. 40-53. None of the Objectors succeeds in undermining any of the foregoing.

As a threshold matter, certain facts that, by themselves, establish impracticability under section 109(c)(5)(C) of the Bankruptcy Code are ignored by the Objectors. Thousands of separate entities hold the City's billions of dollars in bond debt. For the reasons set forth in the Eligibility Memorandum (i.e., the inability to restructure key terms of the City's bond debt absent unanimous bondholder consent and the lack of any representatives with authority to bind all

such bondholders) (Eligibility Memorandum, at pp. 46-47), negotiations with the City's bondholders were impracticable. No Objection disputes this. Moreover, no holder of bonds has objected to the City's eligibility on the ground that negotiations with bondholders were practicable. These realities demonstrate that the requirements of section 109(c)(5)(C) of the Bankruptcy Code have been met.

Many of the Objectors explicitly or implicitly assert that section 109(c)(5)(C) of the Bankruptcy Code cannot be satisfied if negotiations with *any* creditor constituency (specifically, the City's retirees) were potentially practicable. This cannot possibly be the law. It would be an absurdity to interpret the phrase "is unable to negotiate with creditors" to mean "[can negotiate with some creditors but] is unable to negotiate with [other] creditors" as there will always be *some* creditor with which a municipality could negotiate.[39] Thus, courts have consistently determined that the "impracticability" requirement of section 109(c)(5)(C) of the Bankruptcy Code is satisfied where negotiations with any significant creditor constituency is impracticable. See Vallejo, 408 B.R. at 298 (holding that the impracticability of debtor's negotiations with its unions satisfied section 109(c)(5)(C) of the Bankruptcy Code because "labor costs comprised the

---

[39] For example, if such an interpretation were credited, a municipality would be required to delay filing its chapter 9 petition while it engaged those creditors with whom it could negotiate despite the facts that (a) negotiations with other creditors were impracticable and (b) the municipality ultimately would have to file and effectively restart the negotiation process.

largest slice of Vallejo's budget [and] it would have been futile to negotiate with other creditors without an agreement with the Unions"); In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (holding that negotiations were impracticable for purposes of 109(c)(5)(C) of the Bankruptcy Code where negotiations with single class of bondholders holding one third of the debtor's total bond debt would have been futile).

In any event, the Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, the RDPFFA and the DRCEA characterize themselves as "the natural representative capable of bargaining on [the retirees'] behalf" and argue that the City's alleged failure to engage the RDPFFA/DRCEA in negotiations forecloses the City's ability to argue that negotiations with its retiree constituency were impracticable. See Retiree Association Objection, at ¶¶ 64-74. The premise that the RDPFFA and the DRCEA are the natural representatives of retirees is not self evidently correct. First, the RDPFFA and the DRCEA are but two of at least five associations purporting to represent City retirees.[40] Neither the RDPFFA nor the DRCEA have any greater claim to being the natural representative of the retirees than any other

---

[40] The Detroit Firemen's Fund Association, the Detroit Police Benefit and Protective Association and the recently-formed Retired Detroit Police Members Association also purport to represent the interests of at least some percentage of the City's retirees.

informal retiree association (and the Retiree Association Objection offers no such reason). Second, neither the RDPFFA nor the DRCEA are "the" anything. They are two separate organizations, and there is no reason to believe that the RDPFFA and the DRCEA will agree on every – or any – relevant issue. Third, the RDPFFA and the DRCEA are not the only entities claiming to be natural bargaining representatives for the City's retirees. The City's unions now claim to be appropriate bargaining representatives for their retirees as well.[41] These competing claims to bargaining authority undermine the RDPFFA/DRCEA's assertion that they are "the natural bargaining representatives" for retirees. Fourth, the Retiree Association Objection concedes that the RDPFFA and the DRCEA lacked – and still lack – the authority to bind the City's retirees. See Retiree Association Objection, at *14 (noting that the RDPFFA and the DRCEA are just now in the process of obtaining proxy forms from their retiree members and have collected only 5,000 such proxies to date (there are over 20,000 retirees and active employees that have vested pension benefits)). RDPFFA/DRCEA's assertion that

_____

[41] See AFSCME Objection, at ¶ 123 (stating that "creditors such as AFSCME and similar union representatives … could have negotiated regarding the largest portion of the City's unsecured debt"); Objection (Docket No. 506) filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), at ¶ 9 (stating that the "UAW is representing the interests of active and retired employees in this case."). As set forth below, these claims are directly at odds with these Objectors' prepetition refusal to negotiate on behalf of retirees.

-48-
13-53846-tjt   Doc 2385-6   Filed 09/06/13   Entered 09/06/13 13:42:26   Page 61 of 135
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 13:53:26   Page 61 of 135     61
262

they are the "natural representative[s] capable of bargaining on [the retirees'] behalf" cannot be reconciled with their recognition of a lack of legal authority to bind retirees absent express authorization. Fifth, even if the RDPFFA and the DRCEA had been able to bind their retiree members (which they could not), the associations themselves only purport to represent "approximately 70% of all City retirees." Retiree Association Objection, at ¶ 9. Accordingly, there was no possibility that negotiations with the RDPFFA and the DRCEA – or, for much the same reasons, any other party – could have bound the more than 20,000 City retirees to a proposed restructuring, thus rendering the City's good faith attempt at such negotiations impracticable.[42] Finally, even if there were a "natural bargaining representative" of all retirees, that would still not make negotiations concerning pension benefits practicable; approximately 8,225 active employees have vested pension benefits too. Neither the RDPFFA nor the DRCEA even purports to represent the interests of these people and it is not clear that active employees would rely on such representation even if the RDPFFA and DRCEA both declared that they were "natural representatives of active employees having vested benefits."

---

[42] Moreover, the RDPFFA and the DRCEA attended multiple meetings at which the City set forth its restructuring proposals and solicited counter-proposals and other feedback. Neither the RDPFFA nor the DRCEA responded to any proposals made by the City.

The AFSCME Objection's similar argument that negotiations with "creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt" (AFSCME Objection, at ¶ 123) would have been practicable rewrites the history of those negotiations. In fact, the City *did* reach out to AFSCME and the City's other Unions regarding their willingness to represent the interests of their respective retirees in negotiations over the City's restructuring proposal.

As set forth in the Eligibility Memorandum, *the majority of the Unions either expressly indicated unwillingness or legal inability to represent retirees or neither agreed nor refused to represent retirees*. Only eight Unions (comprising 10 of the City's 47 bargaining units) agreed to represent retirees in connection with the City's restructuring. See Eligibility Memorandum, at p. 51. Notably, both AFSCME and the UAW – each of which filed Objections challenging the impracticability of negotiations with retirees – *expressly declined* to represent retirees.[43] It is difficult to see how it would be practicable for the City to conduct

---

[43] Letter from Edward L. MacNeil, Special Assistant to the President of AFSCME to Brian Easley of Jones Day, dated May 24, 2013 (advising that AFSCME "has no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive." ); Letter from Laurie Townsend Stuart, President of UAW Local 2200, to Brain Easley of Jones Day, dated May 23, 2013 (stating that the UAW would represent the interests only of "current employees" of the local Union); Letter from Robyn Brooks, President of UAW Local 2211, to Brian Easley of Jones Day, dated

negotiations with AFSCME and other Unions that refused to negotiate with the City on retirees' behalf.

Both the AFSCME and the UAW argue that, because the City allegedly made no effort to negotiate with creditors in good faith, the City should not be able to claim that such negotiations were impracticable.[44] Thus, AFSCME and the UAW essentially argue that, if the City cannot satisfy section 109(c)(5)(B) of the Bankruptcy Code (which requires good faith negotiations with creditor constituencies), then the City cannot satisfy the disjunctive requirement for eligibility set forth in section 109(c)(5)(C) of the Bankruptcy Code either. Neither the UAW nor AFSCME offer any precedent or citation for this reading of the Bankruptcy Code and the plain meaning of the statute (which connects the clauses of section 109(c)(5) with the word "or") contradicts such a reading. Indeed, the courts that have considered section 109(c)(5) of the Bankruptcy Code have

---

(continued…)

> May 22, 2013 (stating that "[t]his Union does not… represent current retirees and has no authority to negotiate on their behalf"); Letter from John Cunningham, International Representative, UAW Region 1, to Brian Easley of Jones Day, dated May 22, 2013 (stating that UAW Local 412 and UAW Local 212 "do not … represent current retirees and have no authority to negotiate on their behalf"), attached hereto, collectively, as <u>Exhibit C</u>.

[44] AFSCME Objection, at ¶¶ 121-123; UAW Objection, at ¶ 46, n.19 and Public Safety Unions Objection (Docket No. 512), at p. 17 ("It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate….").

determined that it is sufficient for a chapter 9 debtor to demonstrate the existence of one of the four alternatives included in that section. In re Valley Health Sys., 383 B.R. 156, 162, 163 (Bankr. C.D. Cal. 2008) (noting that "§ 109(c)(5) is written in the disjunctive" and, as such, must be construed "as setting out separate and distinct alternatives;" holding that "[t]here is nothing in the language of § 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case.").

Finally, the argument that the City "manufactured" impracticability through the imposition of artificial time constraints is just false.[45] If anything, the fact that the City could not delay filing its Petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments. See Valley Health Sys., 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets."). That the City's cash was rapidly dwindling and public health and

---

[45] See Public Safety Unions Objection, at pp. 16-17 ("The difficulty in the negotiation process is the result of an artificial time constraint…. The Court should not find that negotiations were impracticable, because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing.").

safety would have been threatened by any further delay in the filing of the Petition (Eligibility Memorandum, at pp. 52-53), (A) mandated a shorter time frame for determining if good faith negotiations with creditors could generate an agreement capable of implementation outside chapter 9 and (B) is a separate ground showing satisfaction of section 109(c)(5) of the Bankruptcy Code. They are not reasons for reading that section *out* of the Bankruptcy Code.

For all of the foregoing reasons (and those set forth in the Eligibility Memorandum), the City has satisfied the requirements of section 109(c)(5)(C) of the Bankruptcy Code.

## IX. THE CITY'S GOOD FAITH NEGOTIATIONS WITH ITS CREDITORS SATISFY SECTION 109(c)(5) OF THE BANKRUPTCY CODE

Numerous objections assert that the City failed to negotiate in good faith with its creditors within the meaning of section 109(c)(5)(B) of the Bankruptcy Code.[46] The Objections generally sound a common theme: that the City's restructuring proposals were presented to creditor constituencies at non-interactive

---

[46]     E.g., AFSCME Objection, at ¶¶ 101-114; UAW Objection, at ¶¶ 44-46; Joinder of Local 324, International Union of Operating Engineers as Interested Party to Objections to Detroit's Eligibility for Relief Under Sections 109(c) and 921(c) of the Bankruptcy Code (Docket No. 484) (stating, without reference to or inclusion of supporting affidavits, that "the City consistently and continuously refused to engage in any bargaining with representatives of Local 324, and presented its proposals only on a 'take it or leave it' basis.").

meetings on a "take it or leave it" basis that precluded any prospect of actual "negotiation."[47]  The Objections' characterization of the discussions initiated by the City and the multiple meetings that the City conducted with its creditors is false and misleading.  The City did *not* present its restructuring proposal as an immutable, "take it or leave it" proposition with respect to which the City had no intention of honestly engaging its creditors.  Rather, the evidence demonstrates that the City (A) actively sought continuing dialogue with, *and counter-proposals from*, its counterparties but (B) received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of this case.[48]

---

[47]    See <u>id.</u>

[48]    Also false and misleading is the attempt by certain Objectors to characterize statements made by the Emergency Manager in connection with the issuance of his "Financial and Operating Plan," dated May 12, 2013, as having been made within the context of negotiations with creditors over the restructuring of their claims.  <u>See</u>, <u>e.g.</u>, AFSCME Objection, at p.2 (quoting the Emergency Manager as having stated, on May 12, 2013, that "The public can comment [on the City's proposed financial restructuring plan], but it is under the statute, it is my plan and it's within my discretion and obligation to do it.  This isn't a plebiscite, we are not, like, negotiating the terms of the plan.  It's what I'm obligated to do.") (bracketed text in original; emphasis removed from original).  As the Objectors know, the "proposed financial restructuring plan" addressed by the foregoing quote is not the June 14 Creditor Proposal (<u>i.e.</u>, the starting point for creditor negotiations), but a discrete "Financial and Operating Plan" issued *a month earlier* (which plan did *not* address the specific treatment of creditors' claims against the City).  As the Objectors also know, the "statute" referenced in the foregoing quote is not section 109(c)(5)(B) of the Bankruptcy Code, but section 11 of PA 436.  <u>See</u> MCL § 141.1551(2) (requiring an emergency manager to submit a financial and operating plan 45 days after appointment).  Put

As set forth at pages 55-59 of the Eligibility Memorandum, in addition to the June 14 Creditor Meeting (at which the City initially presented its restructuring proposal to all creditors in attendance and answered every question asked), the City held numerous additional meetings with creditors in the weeks prior to the Petition Date. At these meetings (including the City's meetings with its unions and four retiree associations), the City repeatedly stated that it welcomed its creditors' feedback with respect to its proposed restructuring and invited counter-proposals from all parties. E.g., Letter from Brian Easley to James Williams, President, AFSCME, dated June 27, 2013) (the "June 27 Easley Letter") (noting the City's appreciation of questions and input received from AFSCME at the June 20 Union/Retiree Meeting; offering access to City data room; requesting feedback and additional ideas with respect to the City's restructuring proposal), attached hereto as Exhibit D.[49] The City urged that any feedback and/or counter-proposals be

_____

(continued…)

simply, the foregoing quote is *completely unrelated* to the City's negotiations with creditors over the treatment of their claims. The Objectors' flagrant misuse of the Emergency Manager's words out of context speaks volumes about the sincerity of their protests that the City refused to negotiate in good faith.

[49] The complaint that the City refrained from characterizing its discussions with its unions as "negotiations" is a red herring. The City has generally avoided characterizing its meetings and discussions with its unions as formal "bargaining negotiations" to avoid any argument that it has triggered obligations to collectively bargain under Michigan law that are currently

consistent with the City's financial condition but otherwise placed no restrictions

on the form or substance of any counter-proposal.  See, e.g., id. (requesting

"additional ideas about restructuring retiree benefits in a manner consistent with

the City's financial limitations"; offering access to the Data Room and assistance

acquiring any additional information); Letter from Evan Miller to Dennis

McNamara, President Detroit Fire Fighters Association, et al., dated July 17, 2013

("We are interested in hearing any pension benefit redesign thinking and proposals

that come from key union leadership, including ideas to avoid a freeze."), attached

hereto as Exhibit E.

Accordingly, comparisons between the City's good faith negotiation efforts

and the facts of In re Ellicott School Building Authority, 150 B.R. 261 (Bankr. D.

Colo. 1992), are inapposite.  The Ellicott court held that, in addition to its failure to

satisfy sections 109(c)(1), 109(c)(2), 109(c)(3) and 109(c)(5)(C) of the Bankruptcy

Code, the putative debtor failed to satisfy section 109(c)(5)(B) of the Bankruptcy

---

(continued…)

> suspended by PA 436.  See MCL § 141.1567(3) ("A local government
> placed in receivership under this act is not subject to section 15(1) of 1947
> PA 336, MCL 423.215, for a period of 5 years from the date the local
> government is placed in receivership or until the time the receivership is
> terminated, whichever occurs first.").  The City's reticence to jeopardize its
> legal rights under PA 436, however, does not alter the fundamental character
> of the meetings conducted by the City (as described herein), nor the fact that
> its requests for feedback and counter-proposals were unanswered.

-56-

13-53846-tjt  Doc 2335-6  Filed 09/06/13  Entered 09/06/13 13:59:52  Page 69 of 135
13-53846-swr  Doc 765-6  Filed 08/13/13  Entered 08/13/13 13:43:26  Page 69 of 135
262
69

Code where (A) its efforts at prepetition negotiation were limited to three public meetings and (B) the debtor conceded that it had presented its proposed plan of restructuring as non-negotiable. Ellicott, 150 B.R. at 266. In this case, however, (A) in addition to the public June 14 Creditor Meeting (i.e., the analogue to the three public meetings held by the Ellicott debtor), the City held numerous, non-public meetings with representatives of creditors, and (B) the City never presented its restructuring proposal as "non-negotiable." Indeed, the City solicited responses and counter-proposals from other parties.

Moreover, it is especially significant that no Objector transmitted a written counter-proposal on any aspect of the City's restructuring proposal. Some of the City's invitations for further dialogue were essentially rebuffed (and in a manner that seemed designed to support a future objection to eligibility rather than actually engage in discussions with the City). See Letter from Steven Kreisberg, Director of Collective Bargaining and Health Care Policy, AFSCME, to Brian Easley, dated July 2, 2013 (meeting the City's request for feedback with respect to its restructuring proposal with a request for further meetings and statements that the City "has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues"), attached hereto as Exhibit F.

Of course, good faith negotiation is a two-way street. All of the City's creditors – including each of the Objectors – had more than a month to provide the

City with counter-proposals to, or other ideas concerning, the restructuring plan set out and supported in the June 14 Creditor Proposal. All of those entities had multiple opportunities to meet with the City's representatives to discuss the restructuring proposal and access to the information necessary to formulate an informed response. That none of the Objectors chose to respond to any aspect of the June 14 Creditor Proposal does not render the City's efforts to engage and negotiate with its creditors as having been undertaken in anything other than good faith.

Finally, the Court should reject the argument that the City is unable to satisfy section 109(c)(5)(B) of the Bankruptcy Code unless it can demonstrate that the terms of its restructuring proposal constitute a confirmable plan of adjustment under section 943(b) of the Bankruptcy Code. No Objector cites to any authority that supports this proposition in any way.[50] Consistent with Section VI of the

---

[50] AFSCME's citation to In re Sullivan County Regional Refuse Disposal District, 165 B.R. 60 (Bankr. D.N.H. 1994), and In re Cottonwood Water & Sanitation District, 138 B.R. 973 (Bankr. D. Colo. 1992), in support of this argument is misleading. Neither of those cases addresses the confirmability of the debtors' proposed restructuring plan within the context of section 109(c)(5)(B) of the Bankruptcy Code at all. Rather, each case requires only that negotiations be based on "some sort of comprehensive plan." Sullivan Cnty., 165 B.R. at 78 (noting that the debtor need not even propose a "formal plan," but finding that debtor's failure to propose any plan could not satisfy section 109(c)(5)(B) of the Bankruptcy Code); Cottonwood, 138 B.R. at 978 (addressing the requirements of section 109(c)(5)(B) of the Bankruptcy Code with no reference to whether a proposed plan must satisfy

-58-

13-53846-tjt   Doc 2375-6   Filed 02/13/13   Entered 02/13/13 13:43:26   Page 71 of 135
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 88 of 105   71

262

Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable.

For the reasons set forth above and in the Eligibility Memorandum, the City has satisfied the requirements of section 109(c)(5)(B) of the Bankruptcy Code.

## X.    THE CITY IS INSOLVENT

The Eligibility Memorandum demonstrates that, unfortunately, the City meets all of the disjunctive tests for municipal insolvency contained in section 101(32)(C) of the Bankruptcy Code. Specifically, the City demonstrated that: (A) it was not paying its debts as they came due; (B) it was "cash insolvent," "budget insolvent" and "service delivery insolvent;" (C) applicable law does not require it to exhaust all possible opportunities for revenue generation or adopt every conceivable cost-cutting measure prior to seeking relief under chapter 9; (D) it has experienced and, absent restructuring, will continue to experience negative cash flows for years; (E) its revenues cannot be meaningfully increased; and (F) its expenditures cannot be further reduced. Eligibility Memorandum,

---

(continued…)

confirmation standards). In re Sanitary & Improvement District, Number 7, 98 B.R. 970 (Bankr. D. Neb. 1989), cited by multiple Objectors on this point, does not address the standards governing eligibility at all.

at pp. 12-35.  All of the foregoing is supported by evidence, including the

extensive data contained in or accompanying the Orr Declaration and Malhotra

Declaration.

No Objector challenges any of this with evidence.  Indeed, the Objections

offer little more than innuendo and supposition.[51]

For example, multiple Objectors accuse the City of having "deliberately

budgeted and spent itself into insolvency (so as to qualify under § 101(32)(C)(ii)),

when other realistic avenues and scenarios were possible."  AFSCME Objection,

at ¶ 137; RDPMA Objection, at p. 22.  Of course, no Objection offers any

---

[51]     The City notes that, despite a wealth of financial information having been
available to all interested parties for months (e.g., the City's cash flow
projections and other financial data were set forth in the June 14 Creditor
Proposal and contained in the Data Room (which was accessible to and
accessed by many of the Objectors, including AFSCME and the Retirement
Systems), none of the Objectors cite any facts already known to support their
Objections to insolvency.  Although the City is aware that, pursuant to
Section VII of the Eligibility Scheduling Order, the Court has permitted
discovery with respect to the matter of the City's insolvency, the filing of
placeholder objections to insolvency is inconsistent with the direction
provided by the Court during a colloquy with the City's counsel at a hearing
on August 2, 2013.  See Transcript of Hearing, dated August 2, 2013,
at pp. 26-27 ("Mr. Bennett:  …. We fully understand that facts currently
unknown could conceivably surface later, and we would certainly not object
if a fact unknown today found its way into a subsequent brief, but we think
the August 19th deadline should require and call for an objection – all
grounds stated and facts then known to support the objection…. The Court:
I agree, counsel. There certainly are circumstances in which the law permits
amendments to pleadings. They are limited. They apply here, but as a
general matter, the Court wants to set a firm deadline for the filing of
objections to eligibility.").

examples of "realistic avenues and scenarios" that might have allowed the City to have avoided insolvency. The AFSCME Objection essentially recommends a more aggressive approach to the collection of unspecified accounts receivable, and the RDPMA Objection does no more than cite to examples of revenue generation applicable *in an entirely different case*. There is no suggestion how these "realistic avenues and scenarios" might eliminate the negative cash flows identified in the Orr and Malhotra Declarations.

Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. Thus, the data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence.

All Objections to the City's eligibility based on speculation that the City may be solvent should be overruled.

## XI. THE CITY DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS

At Section VI of the Eligibility Scheduling Order, this Court determined that, despite the "extraordinary importance of the pension rights of the City's employees and retirees in this case and of how the City will ultimately propose to treat those rights," (A) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and

(B) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4) of the Bankruptcy Code.  Eligibility Scheduling Order, at § VI.

Only two objections – the UAW Objection and the RDPMA Objection – argue that the City does not satisfy section 109(c)(4) of the Bankruptcy Code.[52] Each of these Objections, however, is based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits.  Thus, in light of Section VI of the Eligibility Scheduling Order, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) of the Bankruptcy Code on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum.

## XII.   THE CITY FILED ITS PETITION IN GOOD FAITH

Certain Objectors have challenged the City's Petition on the grounds that it was not filed in "good faith" within the meaning of section 921(c) of the

---

[52]   Three other Objectors – (a) Local 324, International Union of Operating Engineers (Docket No. 484); (b) Local 517M, Service Employees International Union (Docket No. 486); and (c) Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman (Docket No. 504) – filed joinders in the UAW Objection, but their Objections do not contain any additional facts related to section 109(c)(4) of the Bankruptcy Code.

Bankruptcy Code.[53]  These challenges generally rely on the following arguments:

(A) the filing of the Petition in advance of a hearing in Michigan state court

requesting a temporary restraining order is evidence of the City's hasty decision to

file the Petition and, thus, of its bad faith (AFSCME Objection, at ¶ 130; RDPMA

Objection, at p.13); and (B) the City never investigated alternatives that might have

avoided the need to file the Petition (AFSCME Objection, at ¶ 131; RDPMA

Objection, at p.13).  Even if taken at face value (which they should not be), neither

of these arguments demonstrate any lack of good faith on the part of the City in

filing the Petition.

---

[53]     The brief attached to the Public Safety Unions Objection (the "Public Safety
Unions Brief") states that "[t]his Objection focuses on the requirements of
§ 109(c)(2) and (5) and the good faith requirement of Section 921(c)."
Public Safety Unions Brief, at p. 2.  However, at no point in the Public
Safety Unions Objection or the Public Safety Unions Brief is any standard
for "good faith" identified or applied to the City's conduct or Petition.
Rather, the Public Safety Unions Objection appears to regard an analysis of
"good faith" within the meaning of section 921(c) of the Bankruptcy Code as
co-extensive with the determination of whether the City has satisfied the
eligibility requirements set forth in section 109(c) of the Bankruptcy Code.
The Retirement Systems Objection also incorrectly equates these differing
standards.  See Retirement Systems Objection, at p.16, n.10 ("While the
arguments in this Objection focus on the City's inability to satisfy the
eligibility requirements under sections 109(c)(2) and (5) of the Bankruptcy
Code, the same arguments support a dismissal of the City's petition for lack
of good faith."). Because the Public Safety Unions Objection and the
Retirement Systems Objection rely on the City's alleged failure to satisfy
such requirements as evidence of the City's lack of good faith in filing the
Petition, those Objections should be overruled.

The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. Stockton, 493 B.R. at 794 (observing that the good faith requirement "serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code."); In re Cnty. of Orange, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) ("[T]he purpose of the filing must be to achieve objectives within the legitimate scope of the bankruptcy laws."); Sullivan Cnty., 165 B.R. at 80 (looking to chapter 11 case law for guidance and stating that "[t]he primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."); Vills. at Castle Rock, 145 B.R. at 81 (good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes").

A municipality's good faith "is assessed on a case-by-case basis in light of all the facts, which must be balanced against the broad remedial purpose of chapter 9." Stockton, 493 B.R. at 794. "Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing

-64-
13-53846-tjt   Doc 2385-6   Filed 09/06/13   Entered 09/06/13 23:53:26   Page 77 of 135
13-53846-swr   Doc 763-6   Filed 09/18/13   Entered 09/18/13 19:59:58   Page 94 of 135   77
262

are consistent with chapter 9, the extent of the City's prepetition efforts to address

the issues, the extent that alternatives to chapter 9 were considered, and whether

the City's residents would be prejudiced by denying chapter 9 relief." Id.;[54]

see also Cnty. of Orange, 183 B.R. at 608 (applying chapter 11 case law and

finding the debtor's financial condition and motives, local financial realities and

whether the debtor was seeking to "unreasonably deter and harass its creditors or

attempting to effect a speedy, efficient reorganization on a feasible basis" as

relevant factors).

In light of the foregoing, the City's good faith in filing the Petition is

manifest.  The City's reasons for filing – to adjust its debts and resolve its liquidity

crises – are perfectly congruent with the rehabilitative purposes of chapter 9.[55]

The Objectors' suggestion that the City's Petition was prompted not by its financial

collapse, but rather by the hurried and urgent need to evade an adverse ruling from

a Michigan state court is wrong as a matter of fact.  As the Objectors are aware, the

Emergency Manager had always indicated that the commencement of a chapter 9

---

[54]    Both the AFSCME Objection (at ¶ 128) and the RDPMA Objection (at p.12)
       cite the factors set forth by the Stockton court as the relevant considerations
       under the "good faith" analysis.

[55]    Moreover, the City's financial problems – $18 billion in debt, cash
       insolvency, budget insolvency, service delivery insolvency and the inability
       to either materially increase revenues or slash expenditures – are clearly
       problems of the sort contemplated by chapter 9.

case was an option for the City if its negotiations with creditors regarding an out-of-court restructuring proved impracticable or fruitless. Once the City determined that it was impracticable for the City to negotiate with all of its creditors and achieve a settlement that could be implemented outside of chapter 9 and that some creditors were unwilling to either accept the necessary adjustments to the City's debts or to engage the City at all, a chapter 9 filing became the City's only feasible option. Moreover, the process for authorizing the City's chapter 9 filing had been set in motion in advance of the state court hearing that ostensibly prompted the City's actions. The Emergency Manager sent his written recommendation that the City be authorized to file for chapter 9 relief to the Governor and the Treasurer on July 16, 2013 – two days in advance of the emergency, *ex parte* hearing before the Michigan state court.[56]

Finally, even if the state court hearing were a factor in the timing of the City's Petition, that fact would not render the filing as having been made in bad faith. In re McCurtain Municipal Authority, No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007), is instructive on this point. In McCurtain, a creditor sought the dismissal of the debtor's petition under section 921(c) of the Bankruptcy Code on the grounds that "the Debtor demonstrated a lack of good

---

[56]     Indeed, it seems far more likely that the state court's hearing was prompted by the City's preparations for bankruptcy (which had been reported based upon rumors and anonymous sources in advance of the Petition Date).

faith because its purpose in filing for bankruptcy relief was to avoid the appointment of a receiver." <u>McCurtain</u>, 2007 WL 4287604, at *5.  An application for the appointment of a receiver for the debtor had been filed the day before a previously-noticed meeting at which the debtor's board of trustees voted to retain a bankruptcy attorney.  <u>Id.</u>  The <u>McCurtain</u> court determined that "[w]hile the appointment of a receiver certainly was a concern to the Debtor, it was not the only reason for filing bankruptcy," citing testimony from the chairman of the debtor's board of trustees that the motivation for the filing of the debtor's petition was its economic circumstances (specifically, its inability to pay a large judgment).  <u>Id.</u>

The reasoning of the <u>McCurtain</u> court translates to the City's circumstances. Even if the state court hearing were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either (A) the city's primary motivation for commencing this case in light of the City's well-established financial crisis or (B) evidence of any bad faith on the part of the City.

The Objectors' remaining argument – that the City did not adequately explore alternatives to bankruptcy prior to the filing of the Petition – is easily dispatched.  The Orr Declaration is filled with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection.  <u>See</u> Orr Declaration, at ¶¶ 58-73 (describing various measures taken by the City over the past 16 months to address its financial challenges and avoid bankruptcy, including,

but not limited to: the execution of a consent agreement with the State of Michigan and creation of a financial advisory board; employee headcount reductions; reduction of labor costs through the implementation of CETs; the increase of corporate tax rates; and the implementation of tax collection initiatives). The Objections, on the other hand, fail to identify even one unexplored alternative that might demonstrate a lack of good faith on the part of the City.

Finally, there can be no question that the residents of the City would be prejudiced by the dismissal of the Petition. As set forth in the Orr Declaration and the Eligibility Memorandum, the City's ability to provide even the most basic municipal services to its citizens has been crippled by its dire financial circumstances. See Orr Declaration, at ¶¶ 31-44 (describing how acute underfunding of the City's core services has contributed to a violent crime rate that is the highest of any large U.S. city and five times the national average, compromised EMS and fire-fighting capabilities, resulted in a lack of adequate lighting and prevented the city from adequately addressing blight); Eligibility Memorandum, at pp. 2-3, 23-26 (describing how massive debt and other legacy liabilities have prevented the City from adequately addressing shortfalls in its provision of basic services for years, and establishing that the City is "service delivery insolvent").

This chapter 9 case is the City's sole remaining option to address its financial condition and enhance its ability to provide its citizens with core municipal services.   As COLLIER ON BANKRUPTCY states:

> For the financially distressed municipality, chapter 9 may be the only forum for protecting the long-term interests of the municipality and its residents…. A finding that a municipality did not file its chapter 9 petition in good faith will result in the municipality's not being able to impair its contractual obligations, and may result in considerable prejudice to the residents of the municipality. Accordingly, a finding that a municipality did not file in good faith should be reserved for those situations in which the evidence is compelling.

6 COLLIER ON BANKRUPTCY ¶ 921.04[2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013).  Here, the evidence that the City filed the Petition in anything other than good faith is not only not compelling, it is non-existent.  The arguments that the City did not file its Petition in good faith should be rejected.

## XIII.  NOTICE OF THE DEADLINE FOR OBJECTIONS TO ELIGIBILITY WAS PROPER AND SUFFICIENT

Numerous Objections argue that the notice of the deadline for objections to the Petition and the Statement of Qualifications (the "Eligibility Objection Deadline") – i.e., August 19, 2013 – was inadequate.  See, e.g., Objection (Docket No. 384) filed by Krystal Crittendon, at ¶ 8 ("This Notice provides inadequate notice and opportunity to be heard by the date of August 19, 2013 when objections

13-53846-swr   Doc 2335-6   Filed 02/17/13   Entered 02/17/13 13:43:26   Page 82 of 135
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 69 of 135   82
262

may be filed, as the Notice was received less than two (2) weeks before the date by which Objections must be filed.").

All Objections related to the alleged inadequacy of notice of these proceedings should be overruled. A motion setting forth a preliminary timeline for eligibility issues – which schedule proposed a deadline for objections to eligibility that was consistent with the Eligibility Objection Deadline ultimately adopted by the Court – was filed by the City on the day after the Petition Date, and all interested parties had ample opportunity to object. See Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration (Docket No. 18). The order granting that motion (Docket No. 296) (the "Case Commencement Order") established the form of the notice of commencement of this chapter 9 case, which notice (A) conspicuously identified the Eligibility Objection Deadline and (B) was served on all interested parties within three business days of its entry. Certificate of Service re: Documents Served on August 6, 2013 (Docket No. 325).

The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the number and substance of the Objections received. Over 100 parties filed Objections to the Petition and Statement of Qualifications, many

-70-

13-53846-tjt   Doc 2385-6   Filed 06/13/13   Entered 06/13/13 13:59:52   Page 80 of 135
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 13:43:26   Page 83 of 262         83

of which are elaborately argued (as indicated above).  Accordingly, all interested parties were provided sufficient notice of the Eligibility Objection Deadline, and Objections to any alleged inadequacy of notice should be overruled.

## XIV.  CONCLUSION

For the foregoing reasons, the Court should promptly enter an Order for Relief in this case.

Dated: September 6, 2013          Respectfully submitted,


  /s/  Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flowers Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 86 of
13-53846-swr   Doc 763-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 86 of 135
262   86

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | |
| Federal Structure Violation | Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling state fiscal self-management, which is an area of exclusive state sovereignty.<br><br>The Supreme Court's justifications for upholding a municipal bankruptcy statute in United States v. Bekins, 304 U.S. 27 (1938), are no longer valid because: (i) a federal municipal bankruptcy statute is no longer necessary to accomplish an adjustment of municipal debts, where states are permitted to pass their own municipal debt adjustment legislation; and (ii) the Supreme Court's development of constitutional federalism doctrine has effectively overruled Bekins.<br><br>Chapter 9 eviscerates the accountability of Michigan to its citizens and creditors.<br><br>Chapter 9's requirement of state consent cannot cure its violation of individual constitutional rights under the Tenth Amendment. | The Supreme Court's decision in Bekins — to uphold the constitutionality of a municipal bankruptcy statute that (i) provided for states to retain control of their fiscal affairs and (ii) constrained the bankruptcy power to cases authorized by state law — remains binding precedent. The Objecting Parties do not point to any change in statutory text that would warrant a different outcome than Bekins, and binding Supreme Court precedent cannot be overruled by mere implication. See Reply, at § III.A.<br><br>Subsequent legal developments have not undermined the Bekins decision, the soundness of its reasoning or the constitutionality of chapter 9. States are not at liberty under the Contracts Clause of the United States Constitution to impair their own contracts. States must seek the aid of federal bankruptcy courts to impair contracts by authorizing chapter 9. In making the decision to do so, states exercise their sovereignty rather than relinquish it. Once a state authorizes a municipality to proceed under chapter 9, the bankruptcy court's powers are designed to preserve the state-federal relationship and prohibit intrusion on the state's core functions. See Reply, at § III.B.<br><br>Chapter 9 relies on state law for determining which municipalities are authorized to seek bankruptcy protection. Although this rule may result in differences in and among states, the rule itself is "uniform throughout the United States," such that chapter 9 does not violate the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution. See Reply, at § III.B. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Lack of Jurisdiction: <u>Stern</u> | The Bankruptcy Court lacks jurisdiction to decide whether chapter 9 violates the United States Constitution as a result of <u>Stern v. Marshall</u>. | The Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. As the Supreme Court made clear in <u>Stern</u>, non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights." Included within the category of "public rights" are cases that "can be pursued only by grace of the other branches" of the federal government. Here, the City's ability to adjust its debts in a federal bankruptcy case is only possible because Congress enacted the Bankruptcy Code and, thus, this case involves "public rights." As such, <u>Stern</u> poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9. <u>See</u> Reply, at § II.<br><br>The argument that the Court is powerless to rule on certain *objections* to the City's eligibility that involve federal or state constitutional questions would constitute a radical expansion of <u>Stern</u> that is unsupported by that case or any subsequent authority. Under <u>Stern</u>, while state law actions independent of the federal bankruptcy law cannot be decided by the bankruptcy courts, federal claims stemming from the bankruptcy itself can be. Here, there are no state or federal constitutional *claims* before the Court; what is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself." Thus, <u>Stern</u> simply is not implicated by the Objectors' constitutional arguments against eligibility. <u>See</u> Reply, at § II. |

CLI-2134971v8

# Non-Individual Objections to Eligibility, Summary of Arguments Set Forth Therein and City's Responses

| Term | Description | City's Response |
|------|-------------|-----------------|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(2)** | | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." <br><br> This includes arguments that: <br><br> • The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights; <br><br> • The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly; <br><br> • The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and <br><br> • The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that: <br><br>    ○ Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law; <br><br>    ○ Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A. <br><br> The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. See Reply, at § V.B. <br><br> When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses an obstacle to a municipality's eligibility to be a chapter 9 debtor. See Reply, at § V.B. <br><br> The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. See Reply, at § V.C. |

CLI-2134971v8

13-53846-swr Doc 2335-6 Filed 12/27/13 Entered 12/27/13 13:42:26 Page 89 of
13-53846-swr Doc 765-6 Filed 09/06/13 Entered 09/06/13 13:59:52 Page 90 of 135
262

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

-4-

CLI-2134971v8

13-53846-tjt   Doc 2385-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 90 of 115
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 87 of 105
262

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This include arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. See Reply, at § V.C. |

CLI-2134971v8

13-53846-tjt    Doc 2335-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 91 of
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 93 of 135
262

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it:  (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension.  The only way pensions can be impaired is by an order of the Court at some future date.  For the same reason, the enactment of PA 436 did not violate the Pensions Clause.  See Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls.  Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation.  See Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manger to enact local legislation that not even the state legislature could pass, fails.  Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility.  See Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine.  The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority.  Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers.  In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review.  See Reply, at § VII.C. |

CLI-2134971v8

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled. The Objections offer little more than innuendo and bald supposition. For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency. Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. See Reply, at § X. |
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(4)** | | |
| Desires to Effect a Plan to Adjust Debts | The City has not satisfied section 109(c)(4) of the Bankruptcy Code — which requires the debtor to desire to effect a plan to adjust its debts — because the City has proposed a restructuring plan that cannot be confirmed under section 943(b)(4) of the Bankruptcy Code, which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." | At Section VI of the Eligibility Scheduling Order, the Court determined that (i) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and (ii) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4). The Objections that argue that the City does not satisfy section 109(c)(4) are based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits. Thus, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum. See Reply, at § XI. |

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 93 of
262
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 13:59:53   Page 90 of 135

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. See Reply, at § IX. |

CLI-2134971v8

| Term | Description | City's Response |
|---|---|---|
| Negotiations Not Impracticable | The City has not satisfied section 109(c)(5)(C) of the Bankruptcy Code because the City has not proven that it was unable to negotiate with creditors because such negotiation is impracticable.<br><br>This includes arguments that:<br><br>• The proper standard is whether there is a "natural representative capable of bargaining" on a creditor's behalf (not whether a party can bind creditors); that the City's retiree associations are such natural representatives; and that the City cannot argue that it would have caused extreme and unreasonable difficulty to engage in negotiations with such associations;<br><br>• The City predetermined that negotiations would fail and should not be able to claim that negotiations were impracticable where it had no sincere intent to negotiate and the time for negotiations was limited;<br><br>• The City has in the past negotiated for retiree health and pension benefits outside of a chapter 9 proceeding; and<br><br>• The City created an impediment to negotiations based on the artificial time constraint created by the filing on July 18. | The Objectors have not succeeded in undermining the City's showing that it has satisfied section 109(c)(5)(C) of the Bankruptcy Code.<br><br>The Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, even if the City's retiree associations are the "natural representatives of retirees" (which is incorrect), they cannot bind the City's 20,000 plus retirees, rendering the City's good faith attempt at such negotiations impracticable.<br><br>The City could not have conducted practicable negotiations with its unions where only 8 unions (comprising 10 of the City's 47 bargaining units) agreed to represent their retirees in connection with the City's restructuring and many unions expressly declined to represent their retirees.<br><br>Section 109(c)(5) is written in the disjunctive, such that section 109(c)(5)(C) (regarding impracticability) can be satisfied even if section 109(c)(5)(B) (regarding good faith negotiations) is not. Section 109(c)(5)(C) can be satisfied even if negotiations with certain creditors, such as retirees, are potentially practicable.<br><br>The argument that the City manufactured impracticability through the imposition of artificial time constraints also fails. To the contrary, the fact that the City could not delay filing its petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments. See Reply, at § VIII. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. See Reply, at § XII. |
| **ARGUMENTS RELATING TO 11 U.S.C. § 943** | | |
| Best Interests of Creditors | The City's proposed restructuring plan could not be confirmed pursuant to the "best interests of creditors" test set forth at section 943(b)(7) of the Bankruptcy Code and, thus, the City has failed to satisfy section 109(c)(5)(B). | No Objector cites to any authority that supports this proposition in any way. Consistent with Section VI of the Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable. See Reply, at § IX. |

CLI-2134971v8

13-53846-tjt Doc 2335-6 Filed 12/27/13 Entered 12/27/13 13:43:26 Page 96 of
13-53846-swr Doc 765-6 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 93 of 135
262

| Term | Description | City's Response |
|---|---|---|
| Unconfirmable Plan | The City's proposed restructuring plan cannot be confirmed under section 943(b)(4) of the Bankruptcy Code — which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan" — such that the City has failed to satisfy either section 109(c)(2) or (c)(5) of the Bankruptcy Code. | Requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C. |
| **Other Arguments** | | |
| Collateral Estoppel | Collateral estoppel precludes the City from relitigating the issue of whether the City received valid authorization from the Governor to commence the chapter 9 case because that issue has already been litigated and a declaratory judgment rendered. This includes arguments that (a) the declaratory judgment entered in the state court Webster litigation is entitled to full faith and credit; (b) the preclusive effect of the declaratory judgment is governed by Michigan law; and (c) the elements for collateral estoppel under Michigan law are satisfied. | Collateral estoppel applies only to issues that have been "actually litigated and determined by a valid and final judgment." The Webster court exceeded its jurisdiction by entering its declaratory judgment after the commencement of the City's case because the Bankruptcy Court has original and exclusive jurisdiction over the case, including questions related to eligibility. As such, the declaratory judgment is void and not "valid" for purposes of collateral estoppel. In any event, the declaratory judgment in Webster is void ab initio and not "valid" for purposes of collateral estoppel because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code. In addition, other elements of collateral estoppel are not satisfied. The City did not have a full and fair opportunity to litigate the issue where the declaratory judgment was issued on an expedited basis, and the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants. See Reply, at § VI. |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 438; 453 (Notice of Constitutional Challenges); 505 (Corrected Motion); 509 (Corrected Kreisburg Declaration) | Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("AFSCME") | • Federal Structure Violation (¶¶ 40-62).<br>• Lack of Jurisdiction (¶¶ 67-71).<br>• Governor's Authorization Invalid (¶¶ 75-84).<br>• PA 436 Unconstitutional (¶¶ 85-100).<br>• No Good Faith Negotiations (¶¶ 101-108).<br>• Unconfirmable Plan (¶¶ 109-110).<br>• Best Interests of Creditors (¶ 111).<br>• Negotiations Not Impracticable (¶¶ 115-123).<br>• Filing Not in Good Faith (¶¶ 124-131).<br>• Reserves the right to argue Insolvency (¶¶ 132-140). | • See Reply, at §§ III (Federal Structure Violation); II (Lack of Jurisdiction); V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Unconfirmable Plan); IX (Best Interests of Creditors); VIII (Negotiations Not Impracticable); XII (Filing Not in Good Faith). |
| 481 | Attorney General Bill Schuette | • Concedes that the City is eligible to be a chapter 9 debtor, but argues that the City remains subject to the Michigan Constitution (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 5-19). | • See Reply, at § V.C (Michigan Law Not Preempted). |
| 482 | Association of Professional and Technical Employees | • PA 436 Unconstitutional.<br>• Insolvency.<br>• Michigan Law Not Preempted.<br>• Wages and fringe benefits are subject to collective bargaining according to state and federal labor laws. | • See Reply, at §§ V.A, VII (PA 436 Unconstitutional); X (Insolvency); V.C (Michigan Law Not Preempted). |

CLI-2134971v8

13-53846-tjt    Doc 2335-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 98 of
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 98 of 135
262

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 484 | Local 324, International Union of Operating Engineers | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • See Response to UAW's Objection; AFSCME's Objection. |
| 486 | Local 517M, Service Employees International Union | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • See Response to UAW's Objection; AFSCME's Objection. |
| 497; 502 (502 appears to be duplicative of 497) | Retired Detroit Police & Fire Fighters Association ("RDPFFA"); Donald Taylor, individually and as President of RDPFFA; Detroit Retired City Employees Association ("DRCEA"); Shirley V. Lightsey, individually and as President of DRCEA | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 31-50).<br>• Insolvency (¶¶ 51-57).<br>• No Good Faith Negotiations (¶¶ 58-63).<br>• Negotiations Not Impracticable (¶¶ 63-74). | • See Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 506 | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 16-34, 40).<br>• Michigan Law Not Preempted (¶¶ 35-39).<br>• Desires to Effect a Plan to Adjust Debts (¶¶ 41-42).<br>• Filing Not in Good Faith/No Good Faith Negotiations (¶¶ 43-47).<br>• Negotiations Not Impracticable (¶ 46, n.19). | • See Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); XII (Filing Not in Good Faith); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

CLI-2134971v8

13-53846-tjt    Doc 2335-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 99 of
262
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 96 of 105

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 512 | Detroit Fire Fighters Association; Detroit Police Officers Association; Detroit Police Lieutenants & Sergeants Association; Detroit Police Command Officers Association | • Emergency Manager's Commencement Invalid (Brief at pp. 3-8).<br>• Filing Not in Good Faith (Brief at pp. 4-5, 18).<br>• Unconfirmable Plan (Brief at pp. 4-6).<br>• No Good Faith Negotiations (Brief at pp. 8-16).<br>• Negotiations Not Impracticable (Brief at pp. 16-18). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); XII (Filing Not in Good Faith); V.C (Unconfirmable Plan); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 514 | Center for Community Justice and Advocacy | • Emergency Manager's Commencement Invalid (¶¶ 13-14).<br>• Michigan Law Not Preempted (pp. 7-12).<br>• Alternatively, PA 436 Unconstitutional (pp. 12-13). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); V.A, VII (PA 436 Unconstitutional). |
| 517 | Michigan Auto Recovery, Inc. | • No Good Faith Negotiations (¶¶ 3-5). | • See Reply, at § IX (No Good Faith Negotiations). |
| 519 | Police and Fire Retirement System of the City of Detroit; General Retirement System of the City of Detroit | • Michigan Law Not Preempted (pp. 19-25).<br>• Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (pp. 27-43).<br>• Alternatively, PA 436 Unconstitutional (pp. 43-44).<br>• Collateral Estoppel (pp. 44-58).<br>• No Good Faith Negotiations/Negotiations Not Impracticable (pp. 59-61). | • See Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional); VI (Collateral Estoppel); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

CLI-2134971v8

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 520 | Retired Detroit Police Members Association | • PA 436 Unconstitutional (pp. 9-10). <br>• Emergency Manager's Commencement Invalid (pp. 10-11). <br>• Governor's Authorization Invalid (pp. 11-12). <br>• Filing Not in Good Faith (pp. 12-13). <br>• Michigan Law Not Preempted (pp. 14-19). <br>• Desires to Effect a Plan to Adjust Debts (pp. 18-19). <br>• No Good Faith Negotiations (pp. 13, 19-22). <br>• Insolvency (pp. 22-23). | • <u>See</u> Reply, at §§ V.A, VII (PA 436 Unconstitutional); V, VII.A (Emergency Manager's Commencement Invalid); V (Governor's Authorization Invalid); XII (Filing Not in Good Faith); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); IX (No Good Faith Negotiations); X (Insolvency). |
| 660 | St. Martins Cooperative | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 665). |

# **EXHIBIT B**

13-53846-swr Doc 2365-6 Filed 01/06/14 Entered 01/06/14 13:42:26 Page 102 of 105
13-53846-swr Doc 785-6 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 99 of 195   102
262

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | |
| Due Process | The notice of the commencement of the City's bankruptcy case (the "Case Commencement Notice") did not provide adequate notice or opportunity to be heard. | The Case Commencement Notice conspicuously identified the Eligibility Objection Deadline and, consistent with the Case Commencement Order, was served on all interested parties within three business days of its entry. The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the fact that over 100 parties filed Objections to the Petition and Statement of Qualifications, many of which are elaborately argued. See Reply, at § XIII. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(2) | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."<br><br>This includes arguments that:<br><br>• The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights;<br><br>• The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly;<br><br>• The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and<br><br>• The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that:<br><br>   ○ Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law;<br><br>   ○ Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. See Reply, at § V.B.<br><br>When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. See Reply, at § V.B.<br><br>The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. See Reply, at § V.C. |

-2-

CLI-2136816v4

13-53846-swr   Doc 2385-6   Filed 09/18/13   Entered 09/18/13 13:43:26   Page 104 of 135
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 101 of 135
262

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

-3-

CLI-2136816v4

13-53846-swr    Doc 2385-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 105 of 135
13-53846-swr    Doc 2377-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 102 of 135
262

## INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This includes arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of a debtor's powers would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. <u>See</u> Reply, at § V.C. |

-4-

CLI-2136816v4

13-53846-swr    Doc 2377-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 106 of 135
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 103 of 135
262

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it: (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the Legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls. Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation. See Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manger to enact local legislation that not even the state legislature could pass, fails. Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility. See Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine. The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority. Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers. In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review. See Reply, at § VII.C. |

CLI-2136816v4

13-53846-swr    Doc 2335-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 107 of 135
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 104 of 135
262

# INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled. The Objections offer little more than innuendo and bald supposition. For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency. Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. <u>See</u> Reply, at § X. |
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The <u>Ellicott</u> case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. <u>See</u> Reply, at § IX. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. <u>See</u> Reply, at § XII. |
| **OTHER ARGUMENTS** | | |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

-7-

CLI-2136816v4

13-53846-swr   Doc 2375-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 109 of 135
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 109 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 335 | Lou Ann Pelletier | • Michigan Law Not Preempted. | • <u>See</u> Reply, at § V.C. |
| 337 | Michael K. Pelletier | • Michigan Law Not Preempted. | • <u>See</u> Reply, at § V.C. |
| 338 | Regina G. Bryant | • As a property owner, objects to changes in tax status, any property value changes, and any deterioration or privatizing of City services. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 339 | Regina G. Bryant | • Seeks reinstatement of position with DWSD and full salary restoration, with sick and vacation time, for the period March 1, 2010 to August 31, 2013. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 388 | Michael G. Benson | • Insolvency.<br>• Michigan Law Not Preempted.<br>• Asserts that bankruptcy case illegal and morally wrong. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted).<br>• Objection that chapter 9 filing morally wrong does not address eligibility of City to be a chapter 9 debtor. |
| 398 | Karl E. Shaw | • Insolvency.<br>• Michigan Law Not Preempted. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |
| 401 | Olivia Gillon | • Insolvency.<br>• Michigan Law Not Preempted. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |

CLI-2136816v4

13-53846-swr    Doc 2377-6    Filed 12/27/13    Entered 12/27/13 13:42:26    Page 110 of 135
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 107 of 135
262

**INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE**

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 402 | Russ Bellant | • Objects to the transfer of the Public Lighting Department to a private party.<br>• Due Process. | • Objection to transfer of PLD does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 405 | Russ Bellant | • Objects to the outsourcing of the City's waste removal services.<br>• Due Process. | • Objection to outsourcing of waste removal services does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 411 | William Curtis Walton | • Michigan Law Not Preempted (¶¶ 1-5).<br>• No Good Faith Negotiations (¶ 6).<br>• Emergency Manager's Commencement Invalid (¶ 7). | • See Reply, at §§ V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations); V, VII.A (Emergency Manager's Commencement Invalid). |
| 412 | Dwight Boyd | • Insolvency. | • See Reply, at § X. |
| 415 | Mary W. Dugans | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 417 | William D. Ford | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 418 | Stephen Johnson | • Michigan Law Not Preempted.. | • See Reply, at § V.C. |
| 426 | Kwabena Shabu | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• See also Response to all other Objections. |

CLI-2136816v4

13-53846-swr    Doc 2377-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 111 of 135
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 105 of 135
262

# INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 435 | Sylvester Davis | • Emergency Manager's Commencement Invalid. | • <u>See</u> Reply, at § V, VII.A. |
| 446 | Dennis Taubitz | • Due Process (pp. 1-3).<br>• Insolvency (pp. 3-4).<br>• No Good Faith Negotiations (pp. 4-5). | • <u>See</u> Reply, at §§ XIII (Due Process); X (Insolvency); IX (No Good Faith Negotiations). |
| 448 | David Dye | • Insolvency (pp. 1-2).<br>• Swap contracts not valid (p. 2).<br>• PA 436 Unconstitutional (p. 3).<br>• Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City (p. 3).<br>• Michigan Law Not Preempted (pp. 3-4).<br>• No Good Faith Negotiations (p. 4). | • <u>See</u> Reply, at §§ X (Insolvency); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations).<br>• Allegations of fraud related to interest rate swap contracts (which fraud allegedly renders such contracts invalid) are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.<br>• The Emergency Manager's alleged conflict of interest is (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 459 | Phebe Lee Woodberry | • Michigan Law Not Preempted.<br>• Asserts that City holds in escrow an undisclosed amount of money for its taking of her apartment using its power of eminent domain. | • <u>See</u> Reply, at § V.C (Michigan Law Not Preempted).<br>• Issues related to funds allegedly held by City in connection with alleged eminent domain proceeding are unrelated to the City's eligibility to be a chapter 9 debtor. |

CLI-2136816v4

13-53846-swr   Doc 2385-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 112 of
262
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 109 of 135

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 460; 491 (Corrected) | Charles D. Brown | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• <u>See</u> <u>also</u> Response to all other Objections. |

CLI-2136816v4

13-53846-tjt Doc 2377-6 Filed 12/27/13 Entered 12/27/13 13:43:26 Page 113 of 135
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 110 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 461 | Thomas Stephens | <ul><li>Due Process (¶ 2).</li><li>Seeks a stay of the bankruptcy case and suggests that the Court formally request expedited consideration of all pending litigation raising legal and constitutional challenges to PA 436 (¶¶ 3-6).</li><li>Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City. Emergency Manager and Jones Day are acting in their private interests rather than the interest of the City (¶¶ 8, 12).</li><li>City and its professionals have violated the First Amendment in connection with public informational meetings held in April and June of 2013 (¶ 9).</li><li>PA 436 Unconstitutional (¶¶ 10-12, 14).</li><li>PA 436 abridges citizens' rights to engage in core First Amendment activities (¶ 13).</li><li>Michigan Law Not Preempted (¶ 10).</li><li>This court lacks jurisdiction to enter final orders implicating constitutionality of PA 436 (¶ 14).</li></ul> | <ul><li>Argument that chapter 9 case should be stayed pending the resolution of state court litigation challenging authority of Governor and Emergency Manager should be overruled. Only state court litigation identified by Objector (a) is subject to the automatic stay pursuant to (i) sections 362 and 922 of the Bankruptcy Code and (ii) this Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities and (b) has been administratively closed by the relevant state court. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility.</li><li>The Emergency Manager's/Jones Day's alleged conflicts of interest and alleged actions in their private interests are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.</li><li>Allegations of violations of First Amendment rights are framed generically and are not supported by any specific instance of such a violation.</li><li>See Reply, at §§ XIII (Due Process); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted).</li></ul> |

13-53846-swr   Doc 2385-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 114 of 125
13-53846-swr   Doc 763-5   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 111 of 135
262

**INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE**

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 472 | Alice R. Pruitt | • PA 436 Unconstitutional.<br>• No Good Faith Negotiations.<br>• Michigan Law Not Preempted.<br>• Emergency Manager's Commencement Invalid.<br>• Insolvency. | • See Reply, at §§ V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency). |
| 474 | Linda Bain | • Asserts that (a) the Emergency Manager's priority will be to sell Detroit's "precious and valuable assets" to stakeholders who have "illegally set up the emergency management operations"; and (b) the Emergency Manager is not going to address the inadequacy of the various City services in the bankruptcy case. | • Objector's allegations of bad faith and illegality on the part of the Emergency Manager, the Governor and the Treasurer are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 477 | Lucinda J. Darrah | • Objects to alleged secured status of "predatory and criminal acting" banks (p. 1).<br>• Michigan Law Not Preempted (p. 2).<br>• Objects to potential privatization of PLD (p. 3). | • Secured status of institutional creditors and potential privatization of PLD unrelated to City's eligibility to be a chapter 9 debtor.<br>• See Reply, at § V.C (Michigan Law Not Preempted). |
| 489 | Timothy King | • Emergency Manager's Commencement Invalid.<br>• PA 436 Unconstitutional. | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional). |

CLI-2136816v4

13-53846-tjt   Doc 2635-6   Filed 02/27/13   Entered 02/27/13 13:43:26   Page 115 of 135
13-53846-swr   Doc 763-5   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 116 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 490 | Jo Ann Watson | <ul><li>Governor's Authorization Invalid.</li><li>PA 436 Unconstitutional.</li><li>Michigan Law Not Preempted.</li><li>Reserves the right to join in "the objections raised by others which are relevant to my specific objection or this matter in general."</li></ul> | <ul><li>Objector's unsupported argument that the Bankruptcy Code requires that "local elected officials" commence any municipal bankruptcy is contrary to the plain language of section 109(c)(2) of the Bankruptcy Code and applicable case law.</li><li>Objector's argument that PA 72 was invalid at the time of the Emergency Manager's appointment is false, unsupported and contrary to applicable case law.</li><li>See Reply, at §§ V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted).</li></ul> |
| 492 | Cynthia Blair | <ul><li>Due Process.</li><li>Emergency Manager's Commencement Invalid.</li><li>Michigan Law Not Preempted.</li><li>Objects to the assertion that pensions are underfunded.</li><li>Insolvency.</li><li>No Good Faith Negotiations.</li></ul> | <ul><li>See Reply, at §§ XIII (Due Process); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); X (Insolvency); IX (No Good Faith Negotiations).</li><li>Challenge to underfunding amount of pensions unrelated to City's eligibility to be a chapter 9 debtor.</li></ul> |

13-53846-swr Doc 2377-6 Filed 12/27/13 Entered 12/27/13 13:43:26 Page 116 of 135
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 113 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 493 | James Thomas McBride, filing as The Chair of Saint Peter | • Insolvency.<br>• Asserts that: (a) the 300 year old "City of Detroit" is solvent, but the 80 year old legal fiction "The City of Detroit" is intentionally insolvent; (b) the "petition" is "intentionally confusing and misleading" and contains words with "diabolically opposed meanings;" (c) the City has tricked people into pledging their property as collateral, which has fraudulently converted the "true Creditors" into debtors, reducing the creditors to the status of insolvent paupers with no rights; and (d) the City holds "private matching funds" and refuses to execute the set off of debt for the settlement and closure of the accounts to return the City to solvency. | • See Reply, at § X (Insolvency).<br>• Allegation that "petition" is "intentionally confusing and misleading" unrelated to City's eligibility to be a chapter 9 debtor. Objector also fails to (a) specify which document filed by the debtor is "confusing and misleading;" and (b) comprehensibly explain how certain words in the referenced document have "diabolically opposed meanings."<br>• Allegations that (a) the City has tricked people into pledging their property as collateral; and (b) the City refuses to apply "private matching funds" to set off its debts are non-specific, factually unfounded and unrelated to the City's eligibility to be a chapter 9 debtor. |
| 494 | Gretchen R. Smith | • Emergency Manager's Commencement Invalid.<br>• No Good Faith Negotiations. | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); IX (No Good Faith Negotiations). |
| 495 | David Sole | • Emergency Manager's Commencement Invalid (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 8-11). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted). |
| 496 | Floreen Williams | • PA 436 Unconstitutional. | • See Reply, at §§ V.A, VII. |

13-53846-swr Doc 2385-6 Filed 12/27/13 Entered 12/27/13 13:42:26 Page 117 of 135
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 414 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 504 | Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman | • Joinder in UAW's Objection (Docket No. 506) (¶¶ 9-10).<br>• Michigan Law Not Preempted / Governor's Authorization Invalid (¶¶ 11-18). | • <u>See</u> Response to UAW's Objection.<br>• <u>See</u> Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid). |
| 510 | Michael Joseph Karwoski | • Objects to the "inclusion" of GRS in these proceedings without an objective determination of the extent to which GRS is underfunded (¶ 1).<br>• Michigan Law Not Preempted (¶ 2).<br>• Emergency Manager's Commencement Invalid (¶¶ 3-11). | • Extent to which GRS is underfunded is unrelated to City's eligibility to be a chapter 9 debtor.<br>• <u>See</u> Reply, at §§ V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid). |
| 513 | Heidi Peterson | • No Good Faith Negotiations (¶ 11(a), (c)).<br>• The City's dealings with Ms. Peterson with respect to her pending lawsuit were fraudulent (¶ 11(b)).<br>• The City allowed itself to become overburdened with debt "by virtue of down right idiotic business practices" (<u>i.e.</u>, policies regarding the assessment and collection of property taxes) (¶ 12). | • <u>See</u> Reply, at § IX (No Good Faith Negotiations).<br>• Objector fails to substantiate vague allegation that the City's failure to negotiate with the Objector prior to filing for bankruptcy protection constituted fraud. Challenged City actions were the result of the imposition of the automatic stay.<br>• City policies relating to the assessment and collection of property taxes unrelated to City's eligibility to be a chapter 9 debtor. |
| 530 | Diane Hutchersun | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |

-16-

CLI-2136816v4

13-53846-tjt    Doc 2385-6    Filed 12/27/13    Entered 12/27/13 13:43:26    Page 118 of 135
13-53846-swr    Doc 765-6    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 115 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 532 | Andrea Edwards | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 534 | Nettie Reeves | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 536; 568 (Order Denying Motion for Extension of Time) | Richard Johnson El-Bey | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 539 | Charles E. Chatman | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 541 | Xylia Hall | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 549 | Michael D. Jones | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 565 | Hassan Aleem; Carl Williams | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 633 | Donald Richardson | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 650 | Alma Armstrong | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 672). |
| 651 | Brenda Taylor | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 664). |

CLI-2136816v4

13-53846-swr   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 119 of 135
13-53846-swr   Doc 7635-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 119 of 135
262

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 667 | Josué Zizi | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 674). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 384; 385; 386; 387; 389; 390; 391; 392; 393; 394; 395; 396; 397; 399; 400; 403; 404; 407; 408; 409; 413; 414; 416; 419; 420; 421; 422; 423; 425; 427; 428; 429; 430; 431; 432; 433; 436; 437; 439; 440; 442; 443; 444; 447; 451; 454; 455; 456; 457; 458; 462; 463; 464; 465; 466; 467; 468; 469; 470; 475; 479; 480; 485 | Krystal A. Crittendon; Michael J. Abbott; Donald Glass; Calvin Turner; Joseph H. Jones; Tracey Tresvant; Charles Williams II; Joyce Davis; David Bullock; Lewis M. Dukens; Shirley Tolliver; Zelma Kinchloe; LaVern Holloway; Althea Long; Alma Cozart; Lorene Brown; Helen Powers; Preston West; Claudette Campbell; Raleigh Chambers; Johnnie R. Carr; Elmarie Dixon; Jacqueline Esters; Sallie M. Jones; Larene Parrish; Deborah Pollard; Samuel L. Riddle; Charles Taylor; Edward Lowe; Keetha R. Kittrell; Lorna Lee Mason; Ulysses Freeman; William Davis; Paulette Brown; Jerry Ford; William L. Howard; Frank M. Sloan, Jr.; Joann Jackson; Jean Vortcamp; Mary Diane Bukowski; William Hickey; Michael D. Shane; Judith West; Lucinda J. Darrah; Sheilah Johnson; Leola Regina Crittendon; Angela Crockett; Dolores A. Thomas; Ailene Jeter; Cheryl Smith Williams; Aleta Atchison-Jorgan; Arthur Evans; Horace E. Stallings; Lavarre W. Greene; Leonard Wilson; Rakiba Brown; Roosevelt Lee Sr.; Sandra Caven; Deborah Lela Moore; Marzelia Taylor; Fraustine Williams; Randy R. Beard; Anthony G. Wright, Jr. | • "Form" objections entitled "Objections to the Petition Filed by One Kevyn D. Orr Seeking to Commence a Case Under Chapter 9 of Title 11 of the United States Code on Behalf of the City of Detroit, Michigan," into which creditors insert their name and date of birth and the date on which they received the Case Commencement Notice.<br><br>• Due Process.<br><br>• Seek a stay of the bankruptcy case pending the resolution of all litigation raising legal and constitutional challenges to PA 436. | • See Reply at § XIII (Due Process).<br><br>• Argument that chapter 9 case should be stayed pending the resolution of all litigation raising legal and constitutional challenges to PA 436 should be overruled. The state court lawsuits referenced by Objectors are subject to the automatic stay pursuant to (a) sections 362 and 922 of the Bankruptcy Code and (b) the Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility. |

CLI-2136816v4

13-53846-swr   Doc 2377-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 121 of 135
13-53846-swr   Doc 765-6   Filed 08/17/13   Entered 08/17/13 19:43:26   Page 121 of 135
262

**EXHIBIT C**



# MICHIGAN COUNCIL 25

American Federation of State, County, and Municipal Employees, AFL-CIO
Detroit Office • 600 W. Lafayette, Ste. 500 • Detroit, Michigan 48226
Phone: 313.964.1711 • 1.800.AFSCME25 • Fax: 313.964.0230 • www.miafscme.org

**Albert Garrett**
*President*

**Lawrence A. Roehrig**
*Secretary-Treasurer*

**Executive Board**

Sylvester Austin
*Region 2*

Carlos Bass
*Region 3*

David Brandt
*Region 9*

Donna Cangemi
*Region 3*

Susan Christensen
*Region 11*

Sandra Crayton
*Region 6*

Barbara Dauble
*Region 3*

Lorna Davison
*Region 2*

Jonathan Drake
*Region 2*

Caryette Fenner
*Region 4*

Michael Harris
*Region 1*

Bennette Henley
*Region 1*

Lorraine Jacobson
*Region 10*

Keith January
*Region 1*

Laura Kinch
*Region 6*

Arlean King
*Region 2*

J. Phil McGuire
*Region 2*

Phyllis McMillon
*Region 1*

Dennis Moore
*Region 7*

Sam Muma
*Region 6*

Doug Murch
*Region 5*

Lois Murray
*Region 3*

Stephanie Nahas
*Region 3*

Dennis Overmyer
*Region 7*

Gloria Peterson
*Region 4*

Patricia Ramirez
*Region 6*

James Rhodes, Jr.
*Region 5*

Roger Rice
*Region 1*

Ronnie Skorupski
*Region 8*

Cindy Spurlock
*Region 2*

Chris Vandenbussche
*Region 3*

Russell Williams
*Region 11*

Sam Zettner
*Region 3*

*Advanced copy via facsimile*
*(312) 782-8585*

May 24, 2013

Brian West Easley, Esq.
Jones Day
77 West Wacker
Chicago, IL 60601-1692

**Re:**   **Letter from Brian West Easley Dated 5/20/13 Entitled** *"City of Detroit Restructuring"*

Dear Mr. Easley:

This communication is sent in response to your letter concerning the above stated matter, in which you requested to meet concerning restructuring of Pension and Retiree Medical Benefit liabilities. Please be advised that in accordance with Michigan law, we have no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive. However, we are willing to meet with you per your request. Please propose several alternative dates in which you are available.

Further you should be aware that for the first time in history, over 30 Unions came together in negotiating concessions. The cost-savings and revenues within this proposed Coalition Contract reached **hundreds of millions of dollars annually**. The Contract also contained many restructuring ideas for the City to engage. Ernst & Young participated during every facet of the negotiations and approved the final deal on behalf of the State. The Unions then ratified the concessions. The Coalition and the City celebrated the Ratification.

Unfortunately, the City did not execute the Coalition Contract. The Mayor claimed the State ordered him not to do so. City Council was not permitted to vote to ratify the Contract. By doing this, the City lost **tens of millions of dollars** in actual savings that the City should have realized from these concessions. This has been acknowledged by the City's financial expert.

Indeed, the Milliman Company being used by the City now, acknowledged that the City could have saved well over **50 million dollars** by the healthcare package called for in the Tentative Agreement. Given that the changes were not implemented as of

13-53846-tit   Doc 2377-6   Filed 02/27/13   Entered 02/27/13 13:43:26   Page 124 of 185   123
13-53846-swr   Doc 765-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 120 of 135
262

July 1, 2012, as called for in the Contract, the City lost the savings. Even when the City did unilaterally impose a healthcare plan, it botched the implementation with an excessive amount of plans and problematic rollouts.

We have repeatedly asked the reason why the Governor ordered the City not to execute and implement the Tentative Agreement. Indeed, during a hearing in Federal Judge, Arthur Tarnow's courtroom, he asked the City and State attorneys the same question, as well as what were the work rule changes they were seeking. The lawyers could give no answer.

You should know that we stand ready to meet and negotiate in an effort to save the City. We have been doing so for decades. We hope; however, that the City takes a look at the concessions our Unions already offered in lengthy negotiations last February. The Governor and the Mayor have talked frequently about **"shared sacrifices."** However, employees are the only ones who have "**truly sacrificed**."

I look forward to hearing from you in the near future.

Sincerely yours,

Edward L. McNeil
Special Assistant to the President

cc:    LaMont Satchel, Labor Relations, City of Detroit

dat/324iuoeaflcio

13-53846-swr   Doc 2377-6   Filed 02/27/13   Entered 02/27/13 13:42:26   Page 124 of 135
13-53846-swr   Doc 785-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 124 of 135   124
262



# UAW LOCAL 2211

### (Public Attorneys Association)

CAYMC
2 Woodward. Ave., Ste. 500  • Detroit, Michigan 48226



May 22, 2013

Brian West Easley
Jones Day
77 West Wacker
Chicago, IL 60601-1692

                Re:     City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts. I write to confirm that this Union – Local No. 2211 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") – represents active employees, and thus future retirees, within its bargaining unit. This Union does not, however, represent current retirees and has no authority to negotiate on their behalf. On behalf of the active employees it does represent, I accept your invitation to participate in the discussions concerning health care and pension benefits. Because these issues are so vital to members, this Union requests bargaining with respect to any changes which the Emergency Manager (or City) might propose to make in those benefits. The Union requests the earliest possible dates for meeting, and proposes that the meetings be held at the Office of Labor Relations, on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.

Please advise me of possible dates and location for our meeting at your earliest convenience.

Also, if the City has developed any proposals, potential options, or possible modifications to health care or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting. Also in advance of our meeting, please provide documents showing any calculations relating to health care costs and pension costs (both present and future) as well as the assumptions upon which the calculations are based.

                                    Sincerely,

                                    Robyn Brooks
                                    President

cc:     Jack Dietrich
        Lamont Satchel

13-53846-swr   Doc 2377-6   Filed 12/27/13   Entered 12/27/13 13:43:26   Page 125 of 135
13-53846-swr   Doc 7683-6   Filed 09/06/18   Entered 09/06/18 19:59:52   Page 122 of 135   125
262

# Metropolitan Detroit Professionals

UAW-Local 2200
5201 Woodward Avenue
Detroit, Michigan 48202



May 23, 2013

Brian West Easley
Attorney
Jones Day
77 West Wacker
Chicago, IL 60601

Dear Mr. Easley:

I am in receipt of your letter dated May 20, 2013 regarding City of Detroit Restructuring.

Today I spoke with Ms. Ms. Samantha Woo in your office.  I gave her my verbal reply that UAW LU 2200 will participate in discussions and represent the interests of current employees at the Detroit Water and Sewerage Department's Wastewater Treatment Plant who are members of this Local Union.

Please contact me at your earliest convenience with proposed dates and times for the discussions.  Telephone: 313-706-0081 or email: mimilaurie@yahoo.com.

Sincerely,

Laurie Townsend Stuart
President, UAW LU 2200

cc:   Gloria Morgan, International Representative, UAW Region 1
      Tiffani Simon, Vice President, UAW LU 2200
      DeShawn Benson, Unit Chair,
      Wastewater Treatment Plant Supervisors, UAW LU 2200
      Samantha Woo, Jones Day



**REGION 1**
27800 George Merrelll Drive
Warren, MI 48092

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA–UAW**

BOB KING, *PRESIDENT*                    DENNIS D. WILLIAMS, *SECRETARY-TREASURER*

VICE-PRESIDENTS:  JOE ASHTON  •  CINDY ESTRADA  •  GENERAL HOLIEFIELD  •  JIMMY SETTLES

CHARLES E. HALL
DIRECTOR, UAW REGION 1

May 22, 2013

Mr. Brian West Easley
Jones Day
77 W. Wacker
Chicago, IL   60601-1692

RE: City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts.  I am writing to confirm that Local No. 412 and Local No. 212 of the International Union, United Automobile, Aerospace and Agricultural Implement workers of America ("UAW") represent active employees, and thus future retirees, within their bargaining units.  These locals do not, however, represent current retirees and have no authority to negotiate on their behalf.  On behalf of the active employees we do represent, I accept your invitation to participate in discussions concerning healthcare and pension benefits.  Because these issues are so vital to members, the locals request bargaining with respect to any changes which the Emergency Manager (or city) might propose to make in those benefits.  We request the earliest possible dates for meeting, and propose that the meetings be held at the Office of Labor Relations on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.*

Please advise me of possible dates and location of our meeting at your earliest convenience.

Also, if the city has developed any proposals, potential options or possible modifications to healthcare or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting.  Any calculations regarding healthcare and pension costs (both present and future) are likewise requested.

Sincerely,

John Cunningham
International Representative
UAW Region 1

JC:ja/opeiu494
cc:    Tony Feyers, UAW Region 1
       Jeff Hagler, UAW Local 412
       Jeff Jarema, UAW Local 212
       Gloria Morgan, UAW Region 1
       Frank Stuglin, UAW Region 1

*Your letter made reference to UAW Local 414 – apparently a typographical error.  Please be advised that it is Local No. 412 which represents legal assistants.

13-53846-tjt   Doc 2335-6   Filed 02/23/13   Entered 02/27/13 13:43:26   Page 127 of 135
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:59:58   Page 124 of 135   127
262

# **EXHIBIT D**

13-53846-tjt   Doc 2385-6   Filed 02/27/13   Entered 02/27/13 13:43:26   Page 128 of 135
13-53846-swr   Doc 763-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 125 of 135   128
262

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601-1692
TELEPHONE: 312-782-3939 • FACSIMILE: 312-782-8585

June 27, 2013

**VIA E-MAIL**

James Williams
President
AFSCME, Local 207 – Non-Supervisory Unit
600 W. Lafayette, Ste. L-106
Detroit, MI 48226
afscme207@sbcglobal.net

Re:     City of Detroit Restructuring

Dear Mr. Williams:

Thank you for participating in the June 20, 2013 informational meetings pertaining to the City of Detroit's (the "City's") proposals to restructure the City's retiree medical and pension obligations. We appreciated your questions and input and look forward to discussing these issues with the American Federation of State, County and Municipal Employees, Local 207 – Non-Supervisory Unit in the coming weeks.

The City recognizes that representatives of active and retired employees will need access to additional information to analyze the restructuring proposals outlined in the June 20 meetings. Information relevant to these proposals will be made available in the on-line data room established for creditors and other stakeholders. If you do not yet have access to the data room, please contact Dan Merrett (dmerrett@jonesday.com/ (404) 581-8476), who will provide you with further instructions.

To the extent you will need additional information beyond that provided in the data room to analyze and provide input with respect to the City's retiree benefits restructuring proposals, please forward requests for such information directly to my attention. We will make every effort to make responsive and relevant information available in a timely manner.

The City is very much looking forward to the unions' feedback with respect to the City's retiree benefits restructuring proposal. As we repeatedly stated during the meeting, to the extent that your organization has additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations, the City will consider any such ideas. Please let me know if you would like to set up a time to further discuss these issues.

Sincerely,

Brian West Easley

cc:     Kevyn Orr, Esq.
        Mr. Lamont Satchel

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MEXICO CITY • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

# EXHIBIT E

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

DIRECT NUMBER: (202) 879-3840
EMILLER@JONESDAY.COM

July 17, 2013

Mr. Daniel F. McNamara
President
Detroit Fire Fighters Association
Suite 644
243 West Congress
Detroit, Michigan 48226-3217

Mr. Steve Dolunt
President
Detroit Police Command Officers Association
Post Office Box 2625
Detroit, Michigan 48202

Mr. Mark Young
President
Detroit Police Lieutenants
  & Sergeants Association
Suite 700
28 West Adams
Detroit, Michigan 48226

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 East Jefferson Street
Detroit, Michigan 48207

Re:     City of Detroit Pension Restructuring

Gentlemen:

Thank you for your letter of July 12, 2013, and thank you further for continuing to
discuss in good faith the difficult issue of pension restructuring. The Office of the Emergency
Manager appreciates your strong cooperation.

Consistent with the position Dave Heiman and I expressed at the meeting, we still think it
makes sense to first try to reach common ground with key unions and association leaders on
actuarial assumptions and methods, and the amount of PFRS underfunding, and then tackle
contributions and attendant benefit changes. Nonetheless, we are interested in hearing any
pension benefit redesign thinking and proposals that come from key union leadership, including
ideas to avoid a freeze. We stand ready to meet to discuss such ideas.

We also took seriously the concern expressed at our meeting last Thursday on two issues:
(1) that the City's retiree health proposal for uniform retirees should include amounts for pre-age
55 early retirees and not begin at age 55; and (2) if there were to be a hard freeze at PFRS, active
employees who do not have sufficient service at the freeze date to obtain a vested pension be
given an opportunity to earn such service and not lose their entire pensions. The City's advisors
are looking hard at those issues and we intend to report back to you shortly.

WAI-3135350v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Mr. Daniel F. McNamara
Mr. Steve Dolunt
Mr. Mark Young
Mr. Mark Diaz
July 17, 2013
Page 2

Thank you for your letter and please keep the lines of communication open.

Sincerely,

Evan Miller

cc:    David G. Heiman, Esq.

WAI-3135350v1

# EXHIBIT F



1625 L Street, NW
Washington, DC 20036
Phone: 202-429-1215, Fax: 202-223-3255
Website: www.afscme.org



AFSCME

# Fax



## Department of Research and Collective Bargaining Services

To: *Brian West Easterly*    From: *Steve Kreisberg*

Fax: *312 - 782 - 8585*    Pages: *4*, including cover

Phone:      Date: *7-2-2013*

Re:      CC:

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

PAGE 1/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-tw    Doc 2635-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 134 of 135   134
262



**AFSCME**
**We Make America Happen**

Lee Saunders
*President*

Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J. Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

July 2, 2013

Mr. Brian West Easterly
Jones Day
77 West Wacker
Chicago, IL 60601

Via Fax: (312) 782-8585

Dear Mr. Easterly:

You have contacted a number of Local unions affiliated with AFSCME for the purpose of offering information and inviting "feedback" on the Emergency Financial Manager's (EFM) proposal to "restructure" retiree benefits. The undersigned, in conjunction with AFSCME Council 25 President Albert Garrett and Council 25's Assistant to the President Ed McNeil will be representing our affiliated Locals in these matters. We are not representing current retirees.

I have followed the procedures and have been provided access to the on-line data room established by the EFM. I have also been in touch with Kyle Herman from Miller Buckfire as instructed by the EFM in his "Proposal to Creditors" on June 14. As I stated in an e-mail message to Mr. Herman, the electronic data room does not have all of the information I have requested of the EFM in a letter dated June 17, 2013 (copy enclosed). To reiterate, I have requested the following:

1.  A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll. Subsequent to June 17, I have been given access to Milliman analysis of the pension system which is partially responsive to my request.

2.  The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3.  A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

**American Federation of State, County and Municipal Employees, AFL-CIO**

TEL (202) 429-1000   FAX (202) 429-1293   TDD (202) 659-0446   WEB www.afscme.org   1625 L Street, NW, Washington, DC 20036-5687

PAGE 2/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr   Doc 2377-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 135 of 135
262

Brian West Easterly
July 2, 2013
Page **2** of **2**

    4.      A description of all assumptions, data, and documents relied upon to support the following revenue projections:
          a.    Municipal income tax
          b.    Wagering taxes
          c.    Property taxes
          d.    State revenue sharing
          e.    Utility users' and other taxes
          f.    "Other revenue" (page 52 of the Proposal to Creditors)

    5.      A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

To clarify, we are seeking the data relied upon by the EFM as he developed his retiree benefits restructuring proposal. Detailed information related to reorganization and restructuring initiatives consists of a one page financial summary. I am seeking the data relied upon to develop that summary, especially and including, the back-up data associated with estimated expenditures addressing "blight."

In response to your offer to provide "feedback" on the proposed restructuring of retirement benefits, we hereby request to meet with authorized representatives of the EFM on July 10, 2013 at 10:00 a.m. To date, your representatives have provided presentations, and scheduled an additional presentation on pension benefits for the afternoon of July 10, but the EFM has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues. That process should start as soon as possible. We suggest we meet at our offices in Detroit, 600 West Lafayette. It would be extremely helpful if you could provide the requested information in advance of the meeting.

Please contact me at (202)429-1237 or skreisberg@afscme.org to discuss these matters, if necessary, and to confirm our proposed meeting.

                          Sincerely,

                          Steven Kreisberg
                          Director of Collective Bargaining and
                          Health Care Policy

SK/dd

cc:    Albert Garrett, AFSCME Council 25 President
       Kevyn Orr, Emergency Financial Manager

PAGE 3/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr   Doc 2377-6   Filed 02/27/13   Entered 02/27/13 19:59:52   Page 136 of 185   136
262



Lee Saunders
President

Laura Reyes
Secretary-Treasurer

**Vice Presidents**

Ken Allen
Portland, OR

Henry L. Bayer
Chicago, IL

Ken Deitz, RN
San Dimas, CA

Greg Devereux
Olympia, WA

Danny Donohue
Albany, NY

David R. Fillman
Harrisburg, PA

Michael Fox
Harrisburg, PA

Kathleen Garrison
Latham, NY

Raglan George Jr.
New York, NY

Mattie Harrell
Williamstown, NJ

Johanna Puno Hester
San Diego, CA

Danny J. Homan
Des Moines, IA

Salvatore Luciano
New Britain, CT

John A. Lyall
Worthington, OH

Kathryn Lybarger
Oakland, CA

Roberta Lynch
Chicago, IL

Christopher Mabe
Westerville, OH

Glenard S. Middleton Sr.
Baltimore, MD

Ralph Miller
Los Angeles, CA

Gary Mitchell
Madison, WI

Douglas Moore Jr.
San Diego, CA

Frank Moroney
Boston, MA

Henry Nicholas
Philadelphia, PA

Randy Perreira
Honolulu, HI

Greg Powell
Austin, TX

Lillian Roberts
New York, NY

Eddie Rodriguez
New York, NY

Lawrence A. Roehrig
Lansing, MI

Joseph P. Rugola
Columbus, OH

Eliot Seide
South St. Paul, MN

Mary E. Sullivan
Albany, NY

Braulio Torres
San Juan, PR

David Warrick
Indianapolis, IN

Jeanette D. Wynn
Tallahassee, FL

June 17, 2013

Mr. Kyle Herman
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, NY 10022
kyle.herman@millerbuckfire.com

Dear Mr. Herman:

     In accordance with the instructions of the Detroit Office of the Emergency Financial Manager (EFM), I request the following information:

1.   A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll.

2.   The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3.   A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

4.   A description of all assumptions, data, and documents relied upon to support the following revenue projections:
    a.  Municipal income tax
    b.  Wagering taxes
    c.  Property taxes
    d.  State revenue sharing
    e.  Utility users' and other taxes
    f.  "Other revenue" (page 52 of the Proposal to Creditors)

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000    FAX (202) 429-1293    TDD (202) 659-0446    WEB www.afscme.org    1625 L Street, NW, Washington, DC 20036-5687

PAGE 4/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr   Doc 2635-6  Filed 09/06/13  Entered 09/06/13 19:59:52  Page 137 of 262

Mr. Kyle Herman
June 17, 2013
Page 2

5.  A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

I am assisting AFSCME locals and AFSCME Council 25 with issues related to the Proposal. We have been asked to meet with the EFM's representatives on Thursday. Accordingly, information related to items 1 through 3 should be provided prior to our meeting and the remaining information as soon as possible. I appreciate your cooperation. Feel free to call me at (202)429-1237 or email skreisberg@afscme.org if you have any questions or are in need of clarification.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK:tem

PAGE 5/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2635-6   Filed 09/06/13   Entered 09/06/13 19:59:52   Page 135 of 135   138

262

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

# THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' <u>AMENDED</u> OBJECTION TO THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF <u>THE BANKRUPTCY CODE</u>

-i-

13-53846-swr  Doc 2356  Filed 12/27/13  Entered 12/27/13 13:42:26  Page 139 of 124
13-53846-swr  Doc 1356  Filed 10/14/13  Entered 10/14/13 15:26:26  Page 1 of 124  139

262

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... iv

PRELIMINARY STATEMENT ....................................................................................... 2

RELEVANT BACKGROUND ......................................................................................... 9

    A.    The Webster Litigation And The Governor's Unconditional
           Authorization ................................................................................... 10

          (i)    The Governor (And Other State Officials) And City
                  Intended Through The Chapter 9 Filing To Impair And/Or
                  Terminate Pension Obligations, And The Governor Was
                  Aware Of This Prior To His Authorizing The Chapter 9
                  Filing ................................................................................... 13

    B.    The City's Pre-petition Machinations And Subsequent Meetings
           (But Not Negotiations) With Creditors Such As AFSCME .................................. 15

          (i)    The City's Bankruptcy Was Orchestrated Based On The
                  Advice Of The City's Lead Bankruptcy Counsel And
                  Discussed Before The EM Was Even Hired ............................................. 15

          (ii)    No Good Faith Negotiations Took Place Following The
                  Appointment Of The EM With Parties Such As AFSCME
                  Prior To The City's Chapter 9 Filing ....................................................... 18

          (iii)    The City's Bad Faith Refusal To Negotiate With Unions
                  Such As AFSCME Has Continued Following The City's
                  Bankruptcy Filing ....................................................................... 22

          (iv)    The City Has Previously Negotiated Labor Concessions
                  With Unions That Modified Both Active And Retiree
                  Benefits .................................................................................... 23

    C.    The City Has Failed to Establish It Is Insolvent, And The City's
           Chapter 9 Case Was Not Commenced Due to Any Imminent
           Financial Emergency, Rather To Avoid The Webster Litigation
           (And Other State Court Proceedings) .................................................... 25

ARGUMENT ................................................................................................................ 29

I.      THE CITY'S PETITION VIOLATES THE UNITED STATES
       CONSTITUTION ............................................................................................... 29

13-53846-swr   Doc 2356   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 2 of 124
13-53846-swr   Doc 1556   Filed 11/11/13   Entered 11/11/13 15:26:24   Page 2 of 124   140
262

A.  Chapter 9 Violates The Federal Structure Of Government ................................... 29

   (i)   A Federal Municipal Bankruptcy Statute Is No Longer Necessary To Accomplish An Adjustment Of Municipal Debts.......................................................................... 31

   (ii)  The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled Bekins .......................... 32

   (iii) AFSCME Does Not Seek To Relitigate Bekins And The City's Reply Brief Arguments Regarding The Constitutionality Of Chapter 9 Ignore And Misapply the Relevant Authority Discussed Above ....................................... 42

B.  AFSCME's Active And Retired Members Have Individual Standing To Assert That Chapter 9 Violates Their Individual Rights To A Federal System Of Government ....................................... 50

C.  This Court Lacks The Authority Or Jurisdiction To Decide Whether Chapter 9 Violates The United States Constitution Or Whether Pa 436 Violates The Michigan Constitution........................... 52

II.  THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE ............................................................................................... 55

A.  The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9 ......................................................... 58

   (i)   Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution.................................... 58

   (ii)  PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution....................................................... 75

   (iii) Neither The City Nor State Pleadings Answer How Detroit's Voters Could Have Constitutionally Lost Their Right To Local Self-Government Entirely, And The Loss Of That Right Invalidates Actions By The Emergency Manager Inextricably Intertwined With The Chapter 9 Petition And The Case Itself.................................................. 79

   (iv)  Despite Arguments To The Contrary By The State And City, The EM Is Not A State Agent And Therefore His Use of Unlimited Power To Pass Local Acts Which Led To This Bankruptcy Violated The State Constitution ............................... 85

|  | (v) | The City And State Cannot Evade The Non-Delegation Doctrine Because The EM Acts With The State Legislature's Authority In Bankruptcy Without Any Standards Or Judicial Review ................................................ 89 |

B.    The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9 .................................................................. 91

     (i)    The City Failed To Negotiate With Creditors Such As AFSCME .............................................................................. 92

     (ii)    Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B) .......................................................................... 96

     (iii)    Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable ...................................... 99

C.    The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith ........................................................................ 102

D.    The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency ...................................................... 106

CONCLUSION .......................................................................................... 111

# TABLE OF AUTHORITIES

**PAGES**

CASES

*Advisory Opinion re Constitutionality of
1972 PA 258,* 389 Mich. 659 (1973) ....................................................................................... 59

*Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 254 N.W. 2d
528 (1977) ............................................................................................................................. 84

*AFT Michigan v. State,*
297 Mich. App. 595, 825 N.W.2d 595 (2012) .................................................................. 31, 71

*AFT Michigan v. State,*
297 Mich. App. 597, 825 N.W.2d 595 (2012) ........................................................................ 60

*In re Alabama State Fair Authority,*
232 B.R. 252 (N.D. Ala. 1999)............................................................................................... 36

*Alden v. Maine,*
527 U.S. 706 (1999) ........................................................................................................... 33, 38

*APTE v. Detroit,*
154 Mich. App. 440, 398 N.W.2d 436 (1986) ........................................................................ 59

*Ashton v. Cameron County Water Improvement Dist. No. 1,*
298 U.S. 513 (1936) .......................................................................................................... passim

*Attorney General v. Lacy,*
180 Mich. 329, 146 N.W. 871 (1914) .................................................................................... 85

*Avery v. Midland County, Texas,*
390 U.S. 474 (1970) ............................................................................................................... 84

*BCBSM v. Governor,*
367 NW 2d 1 (Mich. 1985) ................................................................................................... 87

*BCBSM v. Governor,*
422 Mich. 1, 367 N.W.2d 1 (1985) .................................................................................. passim

*Bd. of Trs. v. Cary,*
373 So. 2d 841 (Ala. 1979) .................................................................................................... 74

*Bivens v. Grand Rapids,*
443 Mich. 391 (1993) ............................................................................................................ 75

*Blank v. Dep't of Corrections,*
   462 Mich. 103, 611 N.W.2d 530 (2000) ................................................................ 85

*Bond v. United States,*
   131 S. Ct. 2355 (2011) ...................................................................... 38, 50, 51

*Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.),*
   Case No. 03B12184, 2005 Bankr. LEXIS 1312 (Bankr. N.D. Ill. July 14, 2005) ............... 108

*Brouwer v. Bronkema,*
   377 Mich. 616, 141 N.W.2d 98 (1966) .............................................. 75, 76, 77, 82

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ................................................................................ 40

*Butner v. United States,*
   440 U.S. 48 (1979) ............................................................................... 73

*In re City of Bridgeport,*
   129 B.R. 332 (Bankr. D. Conn. 1991) ........................................... 106, 107, 110

*In re City of Harrisburg, PA,*
   465 B.R. 744 (Bankr. M.D. Pa. 2011) ........................................................... 58

*City of New York v. New York, N. H. & H. R. Co.,*
   344 U.S. 293 (1953) ............................................................................. 46

*In re City of Stockton,*
   475 B.R. 720 (Bankr. E.D. Cal. 2012) ................................................ 55, 68, 73

*In re City of Stockton,*
   493 B.R. 772 (Bankr. E.D. Cal. 2013) ......................................... 68, 74, 103, 104

*In re City of Stockton, California,*
   Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) ...................................... 88

*City of Taylor v. Detroit Edison Co.,*
   475 Mich. 109 (2006) ........................................................................... 81

*In re City of Vallejo,*
   408 B.R. 280 (B.A.P. 9th Cir. 2009) ....................................................... passim

*Clinton v. New York,*
   524 U.S. 417 (1998) ......................................................................... 61, 65

*In re Cottonwood Water and Sanitation Dist.,*
   138 B.R. 973 (Bankr. D. Colo. 1992) ...................................................... passim

*In re County of Orange,*
    183 B.R. 594 (Bankr. C.D. Cal. 1995) ......................................................... 55, 103

*In re County of Orange,*
    191 B.R. 1005 (Bankr. C.D. Cal. 1996) .............................................................. 37

*Davis v. Emergency Manager for Detroit Public Schools,*
    491 Mich. 899 (Young, C.J., concurring) ............................................................ 83

*Detroit City Council v. Detroit Mayor,*
    238 Mich. App. 442 (2009) ................................................................................ 81

*Detroit Police Officers Ass'n v. Detroit,*
    391 Mich. 44, 214 N.W.2d 803 (1974) ............................................................... 59

*Donohue v. Mangano,*
    886 F. Supp. 2d 126 (E.D.N.Y. 2012) ........................................................... 66, 67

*Dunn Const. Co. v. State Board of Adjustment,*
    234 Ala. 372 (1937) ........................................................................................... 74

*In re Ellicott School Building Authority,*
    150 B.R. 261, 266 (Bankr. D. Colo. 1992) ............................................ 93, 94, 99, 101

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
    316 U.S. 502 (1942) ..................................................................................... passim

*Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),*
    527 N.W. 2d 468 (Mich. 1994) .......................................................................... 72

*In re Global Indus. Technologies, Inc.,*
    645 F.3d 201 (3d Cir. 2011) (en banc) .............................................................. 65

*Granfinanciera, S.A. v. Nordberg,*
    492 (U.S. 33) (1989) ..................................................................................... 53, 54

*Gregory v. Ashcroft,*
    501 U.S. 452 ...................................................................................................... 35

*In re Hamilton Creek Metro. Dist.,*
    143 F.3d 1381 (10th Cir. 1998) ........................................................................ 107

*Hanover Nat'l Bank v. Moyses,*
    186 U.S. 181 (1902) ........................................................................................... 39

*INS v. Chadha,*
    462 U.S. 919 (1983) ........................................................................................... 40

*Klein v. Tabatchnick,*
    610 F.2d 1043 (2d Cir. 1979) ........................................................ 108

*Kosa v. State Treasurer,*
    292 N.W. 2d 452 (Mich. 1980) ..................................................... 71

*Lansing School Educ. Ass'n v Lansing Bd. of Educ.,*
    487 Mich. 349 ............................................................................. 63

*Lawson v. Ford Motor Co. (In re Roblin Indus.),*
    78 F.3d 30 (2d Cir. 1996) .............................................................. 108

*Le Roy v. Hurlbut,*
    24 Mich. 44 (1871) .................................................................. passim

*In re Little Creek Dev. Co.,*
    779 F.2d 1068 (5th Cir. 1986) ..................................................... 104

*Manning v. City of Hazel Park,*
    202 Mich. App 685 ..................................................................... 79

*In re McCurtain Municipal Authority,*
    2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) .............. 56, 103, 106

*In re Mendocino Coast Recreation and Park District,*
    No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697 (N.D. Cal. Sept. 27, 2013) .............. 98

*In re Mount Carbon Metropolitan Dist.,*
    242 B.R. 18 (Bankr. D. Colo. 1999) ............................................... 97

*Nat. Fed'n of Indep. Business v. Sibelius,*
    132 S. Ct. 2566 (2012) (Roberts, C.J.) .......................................... 35

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................. passim

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) ...................................................................... 53

*Opinion of the Justices,* 598 So.2d 1362, 1365 (Ala. 1992) ..................... 74

*In re Pierce County Housing Authority,*
    414 B.R. 702 (Bankr. W.D. Wash. 2009) .................................... 99, 104

*Printz v. United States,*
    521 U.S.898, 531 n. 15 (1997) ................................................ passim

*Railway Labor Executives Ass'n v. Gibbons,*
    455 U.S. 457 (1982) .............................................................. 49, 50

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ........................................................................... 70

*In re Sanitary & Improvement District, No. 7*,
98 B.R. 970 (Bankr. D. Neb. 1989) ....................................... 67, 69, 73, 97

*Seitz v. Probate Judges Retirement System*,
189 Mich. App. 445, 474 N.W. 2d 125 (1991) ......................... 59, 63, 70

*South Dakota v. Dole*,
483 U.S. 203 (1987) (Rehnquist, C.J.) ................................................ 40

*Stern v. Marshall*,
131 S. Ct. 2594, 2609 (2011) ...................................................... passim

*In re Sullivan County Regional Refuse Disposal Dist.*,
165 B.R. 60 (Bankr. D.N.H. 1994) ............................................ passim

*Sweet v. Wilkinson*,
252 Ala. 343 (1949) ............................................................................ 74

*Taxpayers of Michigan Against Casinos v. State*,
478 Mich. 99 (2007) .................................................................... 61, 63

*In re Town of Westlake, Tex.*,
211 B.R. 860 (Bankr. N.D. Tex. 1997) ....................... 91, 107, 109, 110

*U. S. Term Limits, Inc. v. Thornton*,
514 U. S. 779 (1995) ......................................................................... 34

*Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa
  Healthcare Dist.)*,
No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) ........... 107

*United States Trust Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) .................................................................. 32, 44, 46

*United States v. Bekins*,
304 U.S. 27 (1938) ..................................................................... passim

*United States v. Lopez*,
514 U.S. 549 (1995) .............................................................. 34, 35, 51

*United States v. Morrison*,
529 U.S. 598 (2000) ........................................................................... 34

*Utica State Sav. Bank v. Village of Oak Park*,
279 Mich. 568, 273 N.W. 271 (1937) .............................................. 78

-viii-

13-53846-swr   Doc 2385   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 147 of 124
262
13-53846-swr   Doc 1256   Filed 10/14/13   Entered 10/14/13 15:26:26   Page 9 of 124   147

*In re Valley Health Sys.*,
383 B.R. 156 (Bankr. C.D. Cal. 2008) ..................................................................55, 99, 100

*In re Villages at Castle Rock Metro. Dist. No. 4*,
145 B.R. 76 (Bankr. D. Colo. 1990).............................................................................91, 103

*Webster v. State of Mich.*,
No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) .......................................................11

**STATUTES**

11 U.S.C. § 101(32)(C) .............................................................................................................107

11 U.S.C. § 105 ............................................................................................................................53

11 U.S.C. § 109 .....................................................................................................................passim

11 U.S.C. § 362 ....................................................................................................................88, 92

11 U.S.C. § 365 .............................................................................................................................7

11 U.S.C. § 503 ...........................................................................................................................37

11 U.S.C. § 506 ...........................................................................................................................37

11 U.S.C. § 507 ...........................................................................................................................37

11 U.S.C. § 510 ...........................................................................................................................97

11 U.S.C. § 544(b) ......................................................................................................................97

11 U.S.C. § 548(a) ......................................................................................................................97

11 U.S.C. § 901(a) ................................................................................................................37, 79

11 U.S.C. § 902(a) ......................................................................................................................88

11 U.S.C. § 903 ....................................................................................................................passim

11 U.S.C. § 904 ...........................................................................................................................89

11 U.S.C. § 921(c) ...............................................................................................................passim

11 U.S.C. § 926(b) ......................................................................................................................36

11 U.S.C. § 928(b) ......................................................................................................................97

11 U.S.C. § 943 ....................................................................................................................passim

11 U.S.C. § 941 ................................................................................................................. 92, 96, 99

28 U.S.C. § 2403(a) & (b) ...................................................................................................... 1

MCL 141.1501 et seq. ......................................................................................................... 83

MCL 141.1549 ............................................................................................................... 77, 86

MCL 141.1550(1) .................................................................................................................. 77

MCL 141.1551(1)(d) ............................................................................................................. 61

MCL 141.1552 ............................................................................................................... passim

MCL 141.1553 ...................................................................................................................... 61

MCL 141.1558 ..................................................................................................... 39, 58, 77, 88

MCL § 141.1549 ........................................................................................................... 83, 86, 90

MCL § 141.1552(1)(d) .......................................................................................................... 87

MCL § 141.1558 ........................................................................................................... 50, 89, 90

Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice
    Act, MCL § 141.1541, *et seq.* ................................................................................... 3

## RULES

Rule 408 .............................................................................................................................. 21

Rule 9019 ............................................................................................................................ 89

## OTHER AUTHORITIES

Darryl B. Simko, *Emerging Issue in State Constitutional Law: Of Public Pensions,*
    *State Constitutional Contract Protection* .......................................................................... 73

David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism* .................. 76

Detroit Charter, § 1-102 ................................................................................................... 77, 81

Section 7-5-203 of the Detroit City Charter ....................................................................... 88

Detroit Free Press .............................................................................................................. 9, 59

*Detroit's Current Pension Assumptions Fall Within Standards: Morningstar, available*
    *at* http://www.mandatepipeline.com/news/detroits-current-pension-assumptions-
    fall-within-standards-morningstar-242817-1.html ....................................................... 28

Janie Anderson Castle, *The People's Mayor for London?* ............................................................ 39

Kate Long, *Who is representing Detroit?*
    http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ ......................... 18

Michael W. McConnell & Randal C. Picker, *When Cities Go Broke: A Conceptual*
    *Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462 (1993) .......................... 44

*State Signs Deal To Lease Belle Isle*, *available at*
    http://detroit.cbslocal.com/2013/10/01/reports-state-signs-deal-to-lease-belle-isle/ .............. 28

-xi-

13-53846-tjt   Doc 2335-6   Filed 10/27/13   Entered 10/27/13 15:23:21   Page 12 of 24
13-53846-swr   Doc 1386   Filed 10/11/13   Entered 10/11/13 15:34:26   Page 150 of 262   150

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**City**" or "**Debtor**") non-uniformed employees (the "**Retired AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME Employees**", or about seventy percent (70%) of the active non-uniformed union-represented employees, and together with the Retired AFSCME Employees, collectively, the "**AFSCME Detroit Employees**") -- through its counsel and in accordance with the Court's *First Amended Order Regarding Eligibility Objections Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)* [Docket No. 821] (the "**Scheduling Order**") submits this **amended**[1] objection (the "**Objection**") to the City's eligibility for relief under chapter 9 of the Bankruptcy Code and opposition to the City's (A) *Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 10] (the "**Statement of Eligibility**"); (B) *Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 14] (the "**Eligibility Brief**"); (C) declarations of Kevyn D. Orr [Docket No. 11] (the "**Orr Declaration**"), Gaurav Malhotra [Docket No. 12] (the "**Malhotra Declaration**") and Charles M. Moore [Docket No. 13] (the "**Moore Declaration**"); (D) *City of Detroit's*

---

[1] Pursuant to Section VII. of the Scheduling Order, "[b]ased on evidence obtained during discovery, any objecting party may file an amended objection by October 11, 2013.  Any such amended objection shall supersede the party's original objection."  Given that this objection supersedes AFSCME's original eligibility brief (*The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub Chapter 98, City of Detroit Retirees' Objection to the City Of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* [Docket No. 505] (the "**Original AFSCME Objection**")), AFSCME has included all legal and factual arguments asserted in the Original AFSCME Objection in this Objection, and further has supplemented and added additional arguments based, *inter alia*, on developments in the discovery process.  Given that discovery remains ongoing, and AFSCME continues to learn new facts and information daily, AFSCME reserves the right to assert additional factual and legal arguments at trial.

*Consolidated Reply to Objections to the Entry of an Order for Relief* (the "**Debtor's Reply**")
[Docket No. 765]; and (E) *The State of Michigan's Response to Eligibility Objections Raising
Only Legal Issues* [Docket No. 756] (the "**State's Response**"). In support of its Objection,
AFSCME (a) relies on the previously submitted *Declaration of Steven Kreisberg* [Docket No.
509] (the "**Kreisberg Declaration**"); (b) submits the (i) *Supplemental Declaration of Steven
Kreisberg* (the "**Supp. Kreisberg Declaration**"), and (ii) *Declaration of Michael Artz* (the
"**Artz Declaration**"); and (c) respectfully states as follows:

## PRELIMINARY STATEMENT

> "The public can comment [on the City's proposed financial
> restructuring plan], but it is under the statute, it is my plan and it's
> within my discretion and obligation to do it.  **This isn't a
> plebiscite, we are not, like, negotiating the terms of the plan**.
> It's what I'm obligated to do."  --Kevyn D. Orr, May 12, 2013[2]

1.      The City's petition for relief under chapter 9 of the Bankruptcy Code should be
dismissed. First, chapter 9 of the Bankruptcy Code violates federalism under the United States
Constitution through an unholy alliance permitting federal encroachment on the states'
governance rights over fiscal affairs in exchange for an unlawful extension of state powers in
excess of those the state would otherwise possess under the law and which denies Michigan
citizens their constitutional right to make the rules for their own bankruptcy. Second, Michigan
Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq*.
("**PA 436**"), purportedly authorizing the Emergency Manager to file for chapter 9 protection
runs afoul of the Michigan Constitution as applied in this chapter 9 case by not explicitly
prohibiting the diminishment or impairment of vested pension rights in bankruptcy, which
rights are prescribed in the Michigan Constitution, and further offends the Constitutional rights

---

[2] Kevyn D. Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City
Exceeding Budget By $100M Annually,* May 12, 2013*, available at* http://detroit.cbslocal.com/2013/05/12/kevyn-
orr-releases-financial-plan-for-city-of-detroit/.

-2-

13-53846-tjt   Doc 2335-6   Filed 01/27/13   Entered 01/27/13 15:23:21   Page 152 of
262
13-53846-swr   Doc 1388   Filed 10/11/13   Entered 10/11/13 15:34:26   Page 152 of 124    152

of individual Detroit citizens to local self-governance. Third, the City fails to establish that it engaged in good faith negotiations with the City's creditors or that these negotiations were impracticable under section 109(c) of the Bankruptcy Code, and indeed the entire chapter 9 petition was filed in bad faith. Fourth, the City does not qualify for chapter 9 relief because it failed to establish that it is insolvent. Further, the Bankruptcy Court lacks authority or jurisdiction over matters related to the federal constitutionality of chapter 9 of the Bankruptcy Code or the state constitutionality of PA 436.

2. The City, led by its unelected, politically appointed Emergency Manager, Kevyn D. Orr ("**Orr**" or the "**EM**"), hastily commenced this unconstitutional, unlawfully authorized chapter 9 proceeding seeking the haven of bankruptcy to illegally attempt to slash pension and other post-employment benefit obligations and cram such reductions down the throats of current and former City employees such as the AFSCME Detroit Employees. These proceedings were commenced without **any** good faith negotiations with the City's retirees or unions such as AFSCME, and the chapter 9 filing was a *fait accompli* long prior to the appointment of Orr as the City's EM – in fact, at a time when Orr was still a partner at the City's lead counsel's law firm.

3. While AFSCME expects that the City's witnesses will testify that chapter 9 bankruptcy was always the last option and the City preferred an out-of-court settlement, those are nothing more than talking points. In reality, the City's strategy of holding "check the box" meetings with creditors pre-petition at which the City purposefully refused to bargain in good faith was for the sole purpose of "making its record". Indeed, the City's eventual strategy (under the leadership of Orr) was first suggested by the City's lead bankruptcy counsel (the "**Law Firm**") beginning with a "pitch" presentation made by the Law Firm to the City on

-3-

13-53846-swr   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 153 of 124
13-53846-swr   Doc 1186   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 153 of 124   153
262

January 29, 2013 (the "**Pitch Presentation**", a copy of which is attached to the Supp. Kreisberg

Declaration, Exhibit B) in the presence of State of Michigan (the "**State**" or "**Michigan**")

officials who wanted to steer the City towards chapter 9.  As part its presentation, the Law Firm

provided a roadmap to chapter 9.  The Pitch Presentation provided in part:

- an out-of-court restructuring was "[e]xtremely difficult to achieve in practice" (Pitch Presentation, p. 13);

- "Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions."  (Pitch Presentation, p. 16);

- "Bolster Eligibility for – and Success in – Chapter 9 By Establishing Good-Faith Record of Seeking Creditor Consensus" (Pitch Presentation, p. 17);

- "[a] good-faith effort to pursue an out of court restructuring plan will establish a clear record of seeking creditor consensus before seeking chapter 9 relief.  This will deflect any eligibility complaints based on alleged failure to negotiate or bad faith." (Pitch Presentation, p. 18);

- "Include All Constituents in Planning and Negotiations" (Pitch Presentation, p. 22);

- "Establish a Strong Record of Inclusiveness and Consideration of All Options" (Pitch Presentation, p. 22);

- "Input should be obtained from all sources, documented and treated seriously, even if proposals appear unreaslistic.  Good listening skills are helpful."  (Pitch Presentation, p. 23);

- "Establish a strong record (i.e., for future litigation) of (i) inclusiveness with respect to all constituencies and (ii) consideration of all options and proposals received."  (Pitch Presentation, p. 23);

- "A record should be established that all avenues have been explored . . . to support the City's case for debt reduction if a Chapter 9 ultimately is commenced."  (Pitch Presentation, p. 28);

- "unique and creative structures for asset monetization can and should be explored. . .  Regional initiatives also could be explored (joint redevelopment, sharing of services, joint purchasing arrangements).  Note: Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash)."  (Pitch Presentation, p. 17); and

- "OPEB [retiree health benefits] has less legal protections under state law than pensions, providing a greater ability to cut and equitably restructure" and "[i]f needed, chapter 9 could be used as a means to further cut back or compromise 'accrued financial benefits' [*i.e.* accrued pension obligations] otherwise protected under the Michigan Constitution."  (Pitch Presentation, pp. 39; 41).

4.     Apparently, as discussed further below, the State officials at the January 29, 2013 pitch (including the Governor's Transformation Manager, Richard Baird ("**Baird**")) liked what they heard and decided that the Law Firm would be their firm of choice, with Orr and his extensive bankruptcy experience being utilized as the EM to complement the Law Firm's legal ability to move the City swiftly into chapter 9.  Thus, the day after the Pitch Presentation was given, on January 30, 2013, Baird reached out to The Law Firm about the potential of hiring Orr as the EM, and this led to discussions between the Governor, Baird, Orr, other State officials and the Law Firm, and the ultimate hiring of both Orr and the Law Firm to guide the City into chapter 9.

5.     This is all against the backdrop of:

- The average non-uniformed employee pension currently averages slightly less than $18,000 per year (according to a June 30, 2012 General Retirement System of the City of Detroit pension valuation report); and

- The AFSCME Retirees and AFSCME Active Employees look to their government pension and City-provided medical benefits for retiree benefits. Unlike private sector employees and retirees with defined benefit pension benefits, whose pension benefits are protected even in bankruptcy by government insurance through the Pension Benefit Guaranty Corporation, or those with multiemployer pension benefits, where even if one employer withdraws or goes bankrupt the vested pension benefits to the retirees continue unchanged by that withdrawal, the AFSCME Retirees and AFSCME Active Employees' pensions are not backstopped.  **Therefore, if this Court allows the chapter 9 proceeding to go forward with the ultimate result of the pension or other retiree benefits being lost, they are lost without a safety net**.

6.     In light of recent Supreme Court precedent, chapter 9 of the Bankruptcy Code violates the United States Constitution and should be struck down by an Article III Court with authority and jurisdiction to make this crucial Constitutional law determination.  Under *Stern v.*

*Marshall*, 131 S. Ct. 2594 (2011), such a decision is plainly outside the realm of authority properly delegated to an Article I tribunal like this Court.

7.  However, to the extent this Court disagrees and determines that it has jurisdiction to uphold the Constitutionality of chapter 9 generally, this Court should find that the City is not eligible for relief under chapter 9 pursuant to sections 109(c) and 921(c) of the Bankruptcy Code for the following reasons.

8.  *First*, under section 109(c)(2) of the Bankruptcy Code, **as already determined by at least one state court ruling** issued against Michigan Governor Richard D. Snyder (the "**Governor**") prior to entry of the Stay Extension Order [Docket No 166], the purported authorization by the Governor permitting the chapter 9 filing by the EM was and remains an overt act by the Governor and others in violation of the Michigan Constitution, as the filing seeks to impair or diminish the AFSCME Detroit Employees' pension benefits.  Indeed, the very law purporting to allow the EM to unconditionally file for chapter 9 protection, PA 436, violates several provisions of the Michigan Constitution as applied in this chapter 9 case, including (i) Article IX, Section 24 because PA 436 does not explicitly prohibit the diminishment or impairment of vested pension rights in bankruptcy, which is the goal sought in this chapter 9 proceeding; (ii) Article VI, Section 29 because PA 436 delegates power to the EM in excess of that possessed by the legislature; and (iii) Article VII because PA 436 strips power from the electors of each city and village and runs ramshackle over the principles of local self-government firmly embedded in Michigan law.

9.  *Second*, despite factual arguments to the contrary in the City's Eligibility Brief and Debtor's Reply, the City has failed to establish that it has negotiated in good faith or that such negotiations were impracticable as required under section 109(c)(5) of the Bankruptcy

-6-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:34:26   Page 156 of 124
13-53846-swr   Doc 1388   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 13 of 21   156
262

Code.  In fact, AFSCME submits (and AFSCME expects to show further at trial) that the City conducted **no good faith negotiations** with significant unions such as AFSCME prior to the filing.  Rather, the City commenced this proceeding in **bad faith** and in haste in violation of section 921(c) of the Bankruptcy Code, with the sole goal of preventing a "bad" state court ruling (i) upholding the Michigan Constitution and (ii) preventing the City from taking the very inappropriate and unconstitutional journey it now seeks to embark on.

10.     If the Court ultimately were to find that the City satisfied the eligibility requirements, the EM will seek (i) to unconstitutionally and illegally abridge vested pension and other AFSCME Detroit Employee benefits; (ii) to proceed under section 365 of the Bankruptcy Code and illegally seek to reject vested pension and other retiree benefits; and/or ultimately (iii) to propose a chapter 9 plan of adjustment that reduces vested pension and other benefits but that cannot possibly be better for creditors like AFSCME Detroit Employees than the alternative of staying out of chapter 9 where pensions are guaranteed protection under the state constitution - a clear breach of the chapter 9 "best interests test."  Such an outcome should not be countenanced.

11.     Finally, AFSCME submits that the City has failed to satisfy its high burden of proving – through expert evidence or otherwise – insolvency pursuant to section 109(c)(3) of the Bankruptcy Code.  In reality, the evidence reveals (and AFSCME expects to further demonstrate at trial) that the City may well be solvent, particularly when (i) discounting the City's unproven assertions regarding the unfunded amount of the City's pension and other retiree benefits actuarial underfunding; (ii) taking into account un-monetized assets that the City purposefully ignored (as suggested in the Pitch Presentation given by the City's lead counsel) to make the City appear insolvent; (iii) considering the possibility of funding sources

-7-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 13:34:26   Page 157 of 124
13-53846-swr   Doc 1138   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 157 of 124   157

262

not included in the City's financial projections, which projections lack any expert evidence as to their reliability and indeed do not have any reliable evidentiary basis; and (iv) considering the significant swap deal reached and finalized by the City immediately prior to the chapter 9 filing which itself helped significantly with cash flow issues. The City filed for chapter 9 protection on July 18, 2013 not because of any true budgetary insolvency or inability to pay its debts as they came due, rather because the City (i) disliked the direction in which the various pre-petition state court litigations (including the Webster Litigation, as defined below) were proceeding and (ii) worried that failure to file when it did – despite having failed to negotiate in good faith – would potentially limit or forestall the City's clear goal, as guided by the Law Firm, the EM, and other high ranking State officials, of attacking the City's pension obligations in chapter 9. It is telling (and should be shocking to all citizens of Detroit and Michigan) that despite spending millions of dollars of taxpayer funds on the City's chapter 9 cases to hire a multitude of bankruptcy and restructuring professionals, the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency.

12. In addition the City, by proceeding on its current course, has ignored some of the advice provided by its own counsel that that the "City should characterize its residents as 'customers,' a class of constituents that ordinarily is accorded significant benefits in business reorganizations" and that "[a] viable restructuring for a strong and vibrant Detroit must treat its citizens with respect, just as a successful business in the private sector treats its customers." Pitch Presentation, p. 27. Based on all of the reasons set forth herein, this Court (to the extent it finds that it has authority and/or jurisdiction) should deny the Debtor's requested eligibility for chapter 9. By doing so, the ordinary residents and citizens of Detroit (including the many

-8-

13-53846-tjt   Doc 2335-6   Filed 01/27/13   Entered 12/27/13 15:28:21   Page 20 of 124
13-53846-swr   Doc 1386   Filed 10/21/13   Entered 10/21/13 15:34:26   Page 158 of
262

158

dedicated AFSCME Detroit Employees) will regain their voices in government and be protected from the mistaken path of the EM.

## RELEVANT BACKGROUND

13. Orr currently serves as the EM of the City under PA 436.

14. The Governor appointed Orr as EM for the City on March 14, 2013, effective as of March 25, 2013. On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

15. On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." The same day, Orr publicly threatened, in an interview with the Detroit Free Press Editorial Board,[3] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court. The EM stated as follows in the interview:

> Q    You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A    The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law. Which the Ninth Circuit agrees with for now.
>
> ***
>
> A    It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy." If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism,

---

[3] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

will trump state law or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

16.     As discussed below, the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the letter on July 18, 2013 from the Governor to the EM authorizing the EM to have the City commence its chapter 9 case without any conditions or limits (the "**Governor's Authorization Letter**") of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

### A.     The Webster Litigation And The Governor's Unconditional Authorization

17.     On July 3, 2013, against the backdrop of the threatening statements made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City vested in her pension) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[4]

18.     In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and

---

[4] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

-10-

13-53846-tjt   Doc 2335-6   Filed 01/27/13   Entered 01/27/13 15:28:21   Page 22 of 24
13-53846-swr   Doc 4136   Filed 04/11/13   Entered 04/11/13 13:42:26   Page 160 of

262

160

retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby;" that there could not be a more clear and plain constitutional mandate; and that Article IX, Section 24 means what it says: accrued pension benefits shall not be reduced.

19.     Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can do anything to diminish or impair vested pension benefits:  "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the action of its officials or governing body."  2 Official Record, Constitutional Convention 1961, p. 3402.

20.     The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context.  For example:

- Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."

- Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation  and benefits of the chief administrative officer and members of the governing body of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."

- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

-11-
262
13-53846-swr    Doc 2335-6  Filed 10/27/13  Entered 10/27/13 15:28:21  Page 161 of 124
13-53846-swr    Doc 2155  Filed 12/27/13  Entered 12/27/13 15:34:26  Page 161 of 124    161

21.     But, in violation of Article IX, Section 24 of the Michigan Constitution, PA 436 fails to similarly forbid the Governor explicitly from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be sought to be diminished or impaired as a consequence of that filing. Section 18 of PA 436, which purportedly empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be sought to be diminished or impaired. Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy. Just as clearly, the Legislature omitted any constitutional protection against the impairment or diminishment of accrued pension benefits when the Governor purports to authorize a chapter 9 bankruptcy filing under Section 18 of PA 436.

22.     In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, the section of PA 436 purporting to authorize this bankruptcy, Section 18, must be unconstitutional as applied.

23.     On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", attached to the Kreisberg Declaration, Exhibit A) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).

24. Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings." Indeed, the Governor authorized and the EM directed the chapter 9 filing just minutes before the July 18, 2013 TRO hearing was set to begin (and during a brief delay in the TRO hearing requested by the Governor's attorney) in order to potentially "cut off" any argument that the filing was not properly authorized (because the Governor knew and the EM expected that the State Court Judge was prepared to grant the TRO).

25. On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**," attached to the Kreisberg Declaration as Exhibit B). The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the chapter 9 petition … and … not authorize any further chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.

26. To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits. However, subsequent to the issuance of the Declaratory Judgment, on July 25, 2013, this Court granted the City's motion to extend the automatic stay, which, *inter alia*, stayed pending appeals of the Declaratory Judgment (and other similar state court proceedings). *See* Docket No. 166.

       **(i)**     **The Governor (And Other State Officials) And City Intended Through The Chapter 9 Filing To Impair And/Or Terminate**

-13-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 163 of 124
13-53846-swr   Doc 1158   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 25 of 124   163
262

**Pension Obligations, And The Governor Was Aware Of This
Prior To His Authorizing The Chapter 9 Filing**

27.     The evidence obtained to date (as will be further demonstrated at trial) reveals that the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the Governor's Authorization Letter of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

28.     First, the June 14 Restructuring Plan (defined below) expressly provided that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons", and the Governor has admitted in deposition testimony to (i) having viewed drafts of the June 14 Restructuring Plan; (ii) being specifically aware that the Restructuring Plan provided for significant cuts to accrued, vested pensions for active and retired employees; and (iii) being specifically aware when he signed the July 18 letter authorizing the City's chapter 9 filing that Orr's position was "that there had to be significant cuts in accrued pension benefits."  *See* Governor Snyder October 9, 2013 Transcript (the "**Governor 10/9 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit A),[5] at 46:3-23; 63:9-64:18. Furthermore, in a letter dated July 16, 2013 from Orr to the Governor (and Treasurer Andy Dillon) recommending that the City be authorized to immediately commence a chapter 9 bankruptcy case, Orr noted that the City met with all of the City's unions and four retiree associations to "solicit the unions and retirees' view on their preferred way to address the **dramatic, but necessary, benefit modifications**."  *See* Orr Declaration, Exhibit J, p. 8

---

[5] Throughout this Objection, AFSCME has cited deposition testimony provided by various witnesses in connection with the City's chapter 9 eligibility litigation.  AFSCME relies on the relevant portions of these various depositions as evidence, and will be attaching copies of the full deposition transcripts to the Artz Declaration filed contemporaneously with this Objection.

-14-

13-53846-tjt   Doc 2335-6   Filed 10/27/13   Entered 10/27/13 15:28:21   Page 24 of 124
13-53846-swr   Doc 1355   Filed 10/21/13   Entered 10/21/13 15:34:26   Page 164 of
262

164

(emphasis added). The Governor admitted to reading this letter. *See* Governor 10/9 Transcript, at 52:13-15.

29. Additionally, the City has unequivocally admitted that it intends to impair or diminish pension benefits of City active and retired employees through this chapter 9 proceeding. *See*, *e.g., City of Detroit, Michigan's Objections and Responses to Detroit Retirement Systems' First Requests for Admission Directed to the City of Detroit Michigan* [Docket No. 849], at p. 12 (admitting that "City intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems through this Chapter 9 Case."); *see also* Kevyn Orr September 16, 2013 Transcript (the "**Orr 9/16 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit B), at 252:25-253:16; 288:2-9 (admitting that City intended to diminish or impair accrued pension benefits of Detroit pensioners, preferably through a consensual plan but preserving all rights to do so possibly through the use of the cramdown provisions of the bankruptcy code).

**B.      The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME**

**(i)      The City's Bankruptcy Was Orchestrated Based On The Advice Of The City's Lead Bankruptcy Counsel And Discussed Before The EM Was Even Hired**

30. In emails, documents and deposition testimony that surfaced following the City's chapter 9 filing going back to late January 2013, long prior to any alleged good faith negotiations with creditors (more about this point below), secret discussions were being held between Detroit and officials in the Governor's office and the City's legal counsel suggesting that the best course for the City would be to send it through chapter 9 bankruptcy. These facts collectively expose Orr's and the City's charade of pre-petition "negotiations" (in reality, one-

sided meetings) in the month prior to the City's chapter 9 filing.  In fact, all along, the clear goal was for the City to end up in chapter 9.

31.     For example, the Law Firm was among a number of firms to provide a "pitch" presentation made to the City on January 29, 2013 in the presence of State officials.  *See* Pitch Presentation (dated January 29, 2013); *see also* Orr 9/16 Transcript, at 18:12-21:20 (discussing how Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors").  During that pitch, Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney."  Orr 9/16 Transcript, at 21:3-6.  As part of the Pitch Presentation, as discussed extensively *supra*, ¶ 3, the City's lead bankruptcy counsel presented, in part, the following playbook for the City's road to chapter 9:  (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations (Pitch Presentation, pp. 13; 16-18; 22-23; 28); (ii) the EM could be used as political cover for difficult decisions such as an ultimate chapter 9 filing (Pitch Presentation, p. 16); (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City *against* raising money in order to will itself into insolvency (Pitch Presentation, p. 17); and (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan constitution ((Pitch Presentation, pp. 39; 41).

32.     Following the Law Firm's pitch in late January 2013, State officials (including Baird) informed attorneys at the Law Firm and Orr that they were interested in bringing Orr on board as EM, and Orr began to consider the offer.  *See* Orr 9/16 Transcript, at 24:24-25:31:5).

Orr commented regarding his proposed consideration for appointment as EM and discussed with his law firm at the time how to go about leading the City into chapter 9. In an email (attached to the Kreisberg Declaration, Exhibit 1) dated January 31, 2013, Orr's colleague at the firm stated in an email to Orr that the "ideal scenario would be that [Michigan Governor] Snyder and [Detroit Mayor] Bing both agree that the best option is simply to go through an orderly Chapter 9. This avoids an unnecessary political fight over the scope/authority of any appointed Emergency Manager appointed and, moreover, moves the ball forward on setting Detroit on the right track." *Id*[6]. Indeed, this was the exact suggestion by the City's current lead bankruptcy counsel in its pitch presentation. *See* Pitch Presentation, p. 16 ("Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.").

33. Orr's colleague then stated his own reservations about whether an emergency manager would be useful outside of bankruptcy where his "ability to actually do anything is questionable given the looming political and legal fights" *Id*. In contrast, he observed in an earlier email, "[m]aking this a national issue . . . provides political cover for the state politicians" and gives them an "incentive to do this right" because "if it succeeds, there will be more than enough patronage to allow [them] to look for higher callings—whether Cabinet, Senate, or Corporate." *See* Kreisberg Declaration, Exhibit 2.[7]

34. As noted above, others involved in the discussions prior to the chapter 9 filing included Baird, the Governor's Transformation Manager. In an email also dated January 31, 2013, Orr, in anticipation of a conversation he was to meet with Baird "in a few minutes" about

---

[6]*See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

[7] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

-17-
13-53846-tjt   Doc 2335-6  Filed 10/12/13  Entered 10/12/13 15:28:21  Page 29 of 124
13-53846-swr   Doc 2335   Filed 10/27/13  Entered 10/27/13 13:34:26  Page 167 of
262                                                                          167

whether to accept the EM position, observed that PA 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." *See* Kreisberg Declaration, Exhibit 3.[8]  According to Orr "although the new law provides the thin veneer of a revision it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing." *Id.*

35.     In a further email dated January 31, 2013, Orr indicated that Baird wanted Orr to be hired as the EM and his firm to represent the City (regardless of whether Orr took the EM job), and that Orr indicated that he would be glad to work together with the City, even if not as EM, indicating that "I [Orr] and the firm are committed to working in lockstep with the [C]ity." *See* Kreisberg Declaration, Exhibit 4.[9]

**(ii)     No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing**

36.      As indicated above, the die was cast for the City's inevitable chapter 9 filing prior to the March appointment of Orr as EM.  Following Orr's appointment, the City and Orr maneuvered to establish the veneer of formal pre-petition creditor negotiations, when in reality, Orr and the Governor knew all along that the non-interactive meetings would be held on a *pro forma* basis so the City could attempt to establish alleged good faith negotiations.

37.     The facts belie the notion of any pre-filing negotiations, whether in good faith or otherwise.  Indeed, the City itself admitted both in letters and at the meetings held in the month or so prior to the filing that the City was only interested in one-way discussions, not

---

[8] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

[9] See also Kate Long, *Who is representing Detroit?*   http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ (last visited on August 19, 2013).

negotiations.  As discussed below, **evidence obtained in discovery reveals that while these meetings were ongoing – indeed, before ever meeting face-to-face with union representative alone – the City had already made a determination as early as the beginning of July 2013 that it would be filing for chapter 9 protection on or about July 19, 2013**.

38.     On June 14, 2013, the City held a meeting of representatives of the City's creditors (the "**June 14 Meeting**") to present the City's comprehensive restructuring plan/ "Proposal for Creditors" (the "**Restructuring Plan**", attached to the Kreisberg Declaration as Exhibit C).  Even prior to these meetings, Orr confirmed that the City's discussions of a predecessor to its ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", would not involve any negotiations, explaining that "it is under the [PA 436] statute, it is my plan and it's within my discretion and obligation to do it.  **This isn't a plebiscite, we are not, like, negotiating the terms of the plan**.  It's what I'm obligated to do." *See* Kevyn Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, May 12, 2013, *available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/ (emphasis added).

39.     On June 17, 2013, Steven Kreisberg, AFSCME's director of collective bargaining and health care policy, submitted a letter requesting from the EM various categories of information, assumptions, and data for AFSCME to honestly review all the information presented and begin good faith negotiations.  *See* Kreisberg Declaration, Exhibit 5.  AFSCME made this request prior to a scheduled June 20, 2013 meeting with unions (including AFSCME) representing the City's non-uniform employees regarding the City's pensions.  At that meeting,

-19-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 169 of 174
13-53846-swr   Doc 1336   Filed 10/21/13   Entered 10/21/13 15:28:21   Page 31 of 91   169

262

the City represented that the meeting was "not a negotiation." *See* Kreisberg Declaration, ¶ 17. Furthermore, the letter inviting AFSCME to the June 20 meeting characterized the purpose of the meeting as being to "review" the Restructuring Plan (not negotiate it) and to have AFSCME "learn" about the Restructuring Plan. Kreisberg Declaration, Exhibit 6.

40.     In a letter dated June 27, 2013 to an AFSCME local union, the City indicated that it was posting certain information to a data room and was looking forward to the unions' "feedback" (again not negotiation) with respect to the EM's retiree benefits restructuring proposal. *See* Kreisberg Declaration, Exhibit 7.

41.     In a follow up letter to the City dated July 2, 2013, Mr. Kreisberg again reiterated his request for information and data, including the backup data supporting the City retiree benefits proposal (support for which previously consisted of only a one-page financial summary). AFSCME requested relevant information and the opportunity (in conjunction with a meeting scheduled with the City's unions on July 10-11) to begin meaningfully engaging "in a good faith negotiation of these issues." *See* Kreisberg Declaration, Exhibit 8.

42.     In a response letter to Mr. Kreisberg on July 3, 2013, the City advised that it would not meet separately with AFSCME, and that the July 10, 2013 scheduled meeting with the unions would be a "discussion" (again not a negotiation). *See* Kreisberg Declaration, Exhibit 9. Similarly, in an email dated June 28, 2013, the City confirmed that it wanted to meet on July 10, 2013 to "discuss" its "developing pension restructuring proposal," clearly implying that the proposal itself was not even complete yet. *See* Kreisberg Declaration, Exhibit 10. Additionally, and tellingly, at that July 10, 2013 meeting, counsel for the City attempted to invoke Rule 408 confidentiality provisions stating that doing so was a tool used in every bankruptcy, so it should be invoked that day. *See* Supp. Kreisberg Declaration, ¶ 7. This

statement made more than a week before bankruptcy was authorized or filed further demonstrating that the City intended to file for bankruptcy in any event.

43. At the July 10, 2013 meeting, the City announced at the inception that the meeting would be a discussion but not a negotiation. *See* Kreisberg Declaration, ¶ 18. At a similar meeting with AFSCME and certain and other unions held on July 11, 2013, again there was no negotiation.

44. Despite this evidence, it appears that the City now seeks to characterize its limited requests to creditors for feedback – but admitted refusal to bargain with them – on the Restructuring Plan at the four meetings held regarding that plan as satisfying chapter 9's good faith negotiation requirement. Yet, in the City's reply brief regarding eligibility and recent deposition testimony by Orr, the City and Orr have explicitly denied that the City's discussions with creditors were negotiations. *See* Debtor's Reply, at p. 55 n.49; Orr 9/16 Transcript, at 137:25-138:8 ("Q. And was there any bargaining that took place at those sessions [on June 20th, July 10th, and July 11th] where the City said it would be willing to agree to something that was different from what was in June 14? A. Here again, I'm going to stay away from bargaining as a legal conclusion, duty to bargain is suspended. I will say there was a back and forth and my understanding discussions and invitations for further information.").

45. Furthermore, and critically, Orr recently testified that media reports prior to the City's chapter 9 filing that the City was planning on filing on July 19, 2013 were inaccurate. Orr 9/16 Transcript, at 301:19-302:8 (indicating that there was no plan for the City to file on July 19, 2013 and that Orr's plan was "to have the permission, the authority, to file them and make that call at some point after I transmitted my letter of July 16 [requesting authorization from the Governor to file for chapter 9].").  Yet, evidence produced in discovery includes an

Excel/spreadsheet document attached to e-mails circulated (i) to and from Bill Nowling (who works in the EM's office) sent to individuals in the Governor's office, entitled "Chapter 9 Communications Rollout" which makes clear that during the same time period that the City was purporting to conduct ongoing "good faith negotiations" with creditors regarding the Restructuring Plan, **in fact the City was, as early as July 1, 2013 planning on filing for chapter 9 on Friday, July 19, 2013**. *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet document dated July 4, 2013 attached to e-mail from EM's office to State officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY").

> **(iii)** **The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing**

46.     The City's pattern of bad faith refusal to negotiate any of its proposals regarding pensions or health insurance benefits changes has continued post-petition.

47.     For example, on August 2, 2013, the City convened a meeting of local union representatives and discussed active health insurance.  *See* Kreisberg Declaration, ¶ 19. However, during that meeting, the City specifically advised those in attendance (including AFSCME representatives) that the meeting was not a negotiation.  *Id* at ¶ 20.  Mr. Kreisberg sent a follow up letter to the City on August 6, 2013 requesting good faith bargaining, and referenced cost savings estimates which AFSCME previously proposed in prior negotiations with the City before the development of the Emergency Manager's initial financial restructuring plan in May.  *See* Kreisberg Declaration, Exhibit 11.  In an August 8, 2013 response, the City advised that it would not engage in collective bargaining with AFSCME, but rather simply "discuss any feedback they may have regarding its health care restructuring plans."  *See* Kreisberg Declaration, Exhibit 12.

48.     On August 14, 2013, the City held a follow up meeting with AFSCME on the subject of active medical benefits but did not accept any counterproposals or suggestions, but simply responded by further explaining its current intention with respect to active medical benefits.

49.     Given Orr's repeated statements to the media about the City's willingness to bargain with its unions, AFSCME has been surprised by the City's unwillingness to negotiate, pre or post-petition.  While AFSCME has repeatedly stated its desire to move forward with constructive negotiations with the City on behalf of all AFSCME Detroit Employees, AFSCME cannot negotiate with an employer that is unwilling to come to the table for arms-length talks.

### (iv)     The City Has Previously Negotiated Labor Concessions With Unions That Modified Both Active And Retiree Benefits

50.     The City argues, in part, that negotiations with its retirees were impractical or impossible as the City could not bind the disparate group of retirees in any agreement. However, the City should be well aware (and indeed its advisors have admitted) that in February 2012, City labor negotiators reached a tentative agreement (the "**Tentative Agreement**") with a "Coalition of City of Detroit Unions", including several AFSCME local bargaining units.  *See* Supp. Kreisberg Declaration, ¶ 4, Exhibit A (attaching copy of the Tentative Agreement).  Pursuant to deposition testimony given by Gaurav Malhotra of Ernst & Young ("**E&Y**") on September 20, 2013 (one of the City's restructuring advisors), E&Y was actively involved "in assisting quantify some of the savings in conjunction and collaboration ·with the City as the City negotiated with the – its unions [regarding the Tentative Agreement]."  *See* Gaurav Malhotra September 20, 2013 Transcript (the "**Malhotra 9/20 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit C), at 86:20-23.

-23-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 35 of 124
13-53846-swr   Doc 1386   Filed 10/11/13   Entered 10/11/13 15:34:26   Page 173 of
262                                                                              173

51.     While the Tentative Agreement was never implemented, changes with respect to benefits in the proposed Tentative Agreement would have directly impacted retiree benefits, and indeed, based on projections at the time, AFSCME understands that the Tentative Agreement could have saved the City approximately $50 million annually, a number which included retiree health benefit changes. *See* Supp. Kreisberg Declaration, ¶¶ 5-6.

52.     Despite this evidence, Orr has now testified that he was unaware of the Tentative Agreement (and, thus implicitly, unaware of the City's prior success at bargaining in good faith with the City's unions, which led to changes to both active and retired employees' benefits):

```
15    Q.   Are you aware of a coalition among certain of the
16          City's unions put together in order to try and deal
17          with some of the restructuring issues with regard to
18          labor that you've been focused on?
19    A.   A coalition?  Can you please explain?  Informal
20          coalition or the retiree committee or --
21    Q.   Not the retire committee.  A coalition of unions with
22          regard to trying to deal with some of the labor issues
23          that you --
24    A.   Under the AFSCME umbrella?
25    Q.   No, no, no.

      Page 237

1    A.   Or separate union?  I'm trying to -- I'm trying to
2          understand.
3    Q.   Well, I think your answer indicates to me that perhaps
4          the answer is no.
5    A.   Yeah.  Okay.
```

Orr 9/16 Transcript, at 237:15-237:5.  Given that Orr himself was unaware of the City's ability to negotiate deals affecting both active employees and retirees outside of bankruptcy, the City's assertion that negotiations regarding changes to retiree and pension benefits were "impracticable (if not impossible)" is misguided.  Orr could not possibly have attempted to

-24-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 74 of 124
13-53846-swr   Doc 1336   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 86 of 124   174
262

negotiate in good faith if he had not done even the most preliminary investigation as to whether Detroit's several unions had ever negotiated with the city collectively in the past, indeed the very recent past.

### C. The City Has Failed to Establish It Is Insolvent, And The City's Chapter 9 Case Was Not Commenced Due to Any Imminent Financial Emergency, Rather To Avoid The Webster Litigation (And Other State Court Proceedings)

53.     The City at first glance seems to provide thick volumes which it calls evidence regarding its alleged insolvency. *See, e.g.,* Orr Declaration, ¶¶ 52-57; Malhotra Declaration, ¶¶ 10-26; Moore Declaration, ¶¶ 9-20.  However, what becomes apparent from reviewing these declarations (which serve as the basis for the City's insolvency arguments) is that (i) each often cross-relies (as purported evidence as to the truth of particular statements) on other (non-expert) testimony, other documents prepared by the City, or other assumptions/evidence convenient to the City but without any real foundation. *See, e.g.*, Orr Declaration, ¶¶ 52-57 (citing, in part, the June 14 Restructuring Plan and Malhotra Declaration as evidence); Moore Declaration, ¶¶ 13-14 (estimating pension underfunding using what the "City" believes are more realistic assumption)); Malhotra Declaration, ¶¶ 11; 15; 21-22 (discussing manner in which City's financial forecasts and projections were prepared based on certain complex assumptions, calculations and input from other City officials).  Furthermore, the City offers no expert witness to testify regarding the City's asserted insolvency despite the City having spent millions of dollars and having gone out and hired a multitude of legal, financial, actuarial and restructuring advisors.   Ultimately, the fact remains that **despite the pile of "evidence" submitted by the City, the City does not have a single witness who can stand up as an expert and testify as to the City's insolvency**.

54.     Furthermore, the City misleadingly cited its insolvency as what drove its chapter 9 filing, not the imminent state court rulings in the Webster Litigation and other state court proceeding, futher casting doubt on the reality of its conclusion that it is insolvent.  *See, e.g.,* Debtor's Reply, at pp. 65-66.  Yet, in reality (and as will be further demonstrated at trial), the discovery process has revealed several interesting facts that cut against insolvency as the true basis for the filing (*see* Debtor's Reply, at p. 65-66), and indeed Orr's recent testimony indicates that insolvency was not the driving factor behind the filing on July 18, 2013, rather the filing at that time was driven by the state court litigations.  Orr testified:

```
19    When did you decide that the timing of the
20        Chapter 9 filing should be July 18th or July 19th?
21  A.   Well, I didn't.  I decided to make the request and my
22        intent was to have the ability to file available and
23        possibly executed as soon as I got it.  It was without
24        talking or waiving privileges from my counsel or
25        counsel and investment bankers, the concerns about us
```

Page 221

```
1         losing control or being put in a situation because of
2         the ongoing litigation where I would not be able to
3         discharge my duties in an orderly fashion, in a
4         comprehensive matter to put the city on a sustainable
5         footing because of the litigation grew . . .
6         and it was made clear to me that my desire to try to
7         continue to engage in discussions was running the risk
8         of putting my obligations under the statute in peril
9         and I think I was even counseled that I was being
10        irresponsible.
```

Orr 9/16 Transcript, at 220:19-221:6-10.

55.     In addition, the City's evidence regarding insolvency is built upon unproven assertions regarding, *inter alia*, the alleged unfunded amount of the City's pension and other retiree benefits.  Indeed, in the June 14 Restructuring Plan discussing the actuarial accounting underfunding on the City's pension plans, the City suggested that such underfunding using

more "realistic assumptions" would be approximately $3.5 billion, up from the $644 million from the City's 2011 reported underfunding. Restructuring Plan, pp. 23, 109 (noting that "preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion); *see also* Orr Letter Dated July 16, 2013 to Governor Snyder and Treasurer Dillon (copy attached as Exhibit J to Eligibility Brief (recommending chapter 9 filing and discussing $3.5 billion in underfunding of pension liabilities)).

56.     However, these allegedly "realistic assumptions" were directly dictated by the City to their actuarial advisor, Milliman, Inc. For example, Charles Moore of Conway MacKenzie admitted in his deposition that the City really had no idea what the underfunded portion of the pension obligations might be (as of September 18, 2013) because "until the City completes its analysis [which is had not yet done] and completes its own actuarial valuation, neither the City nor its actuary [Milliman] nor I would be able to say what all the assumptions are that could be used to either overstate or understate the funded position [of the pensions]." *See* Charles Moore September 18, 2013 Transcript (the "**Moore 9/18 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit D), at 62:2-7; *see also* Moore 9/18 Transcript, at 63:10-12 (indicating that 7 percent rate of return figure used by Milliman in running certain calculations regarding pension underfunding "was used for illustrative purposes" only and was not recommended by any specific actuary). Furthermore, in an e-mail dated July 9, 2013 from Treasurer Dillon to the Governor and others regarding a meeting Orr would be having with the Detroit retirement systems on July 10, 2013, Treasurer Dillon indicated that "[b]ecause pensions have such a long life there are a lot of creative options we can explore to address how they [the pensions] will be treated in a restructuring." *See* Supp. Kreisberg Declaration, Exhibit D. In fact, experts that reviewed the actuarial assumptions of

-27-
13-53846-tjt   Doc 2335-6   Filed 10/21/13   Entered 10/21/13 15:28:21   Page 39 of 124
13-53846-swr   Doc 1388   Filed 10/27/13   Entered 10/27/13 15:34:26   Page 177 of
262
177

Detroit's pension systems conclude that the current assumptions generally fall within industry standards. *See*, *e.g.*, *Detroit's Current Pension Assumptions Fall Within Standards: Morningstar*, *available at* http://www.mandatepipeline.com/news/detroits-current-pension-assumptions-fall-within-standards-morningstar-242817-1.html (last visited October 8, 2013).

57. Furthermore, as discussed above, the Law Firm highlighted at the January 29, 2013 pitch that "Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash)" (Pitch Presentation, p. 17), and the City accordingly chose not to monetize certain assets prior to the filing to limit the appearance of short-term cash on the books. This is evidenced, in part, by the (i) recent announcement by the EM of the deal to lease Belle Isle to the Governor and (ii) Orr's strong hints that he is considering monetizing artwork at the Detroit Institute of Arts.[10]

58. Additionally, the City's financial projections which serve, in part, as the City's basis for establishing insolvency (which themselves were built on various assumptions not established by any **expert** testimony) fail to consider the possibility of possible funding sources outside those included in the City's financial projections. For example, Malhotra testified that the City's financial projections assume that the City will have no other funds beyond the City's general fund and that the water and sewer fund was not incorporated into the City's projections. *See* Malhotra 9/20 Transcript, at 44:21-45:17. Yet, Orr testified that with respect to the pension underfunding (which is cited throughout the City's Eligibility Brief and included as one of the major factors in the City's insolvency in numerous documents and pleadings), of the estimated $644 million in underfunding (based on the pensions funds' 2012 calculations), the majority of

---

[10] *See State Signs Deal To Lease Belle Isle*, *available at* http://detroit.cbslocal.com/2013/10/01/reports-state-signs-deal-to-lease-belle-isle/ (last visited October 8, 2013); *Orr tells DIA to earn money from its treasures; long-term leases of artworks next?*, *available at* http://www.freep.com/article/20131003/NEWS01/310030115/Kevyn-Orr-Economic-Club-Detroit (last visited October 8, 2013).

that underfunding is attributable to the water and sewer fund which generates its own revenue and which "does have some capacity" to raise rates to generate more funds. *See* Kevyn Orr October 4, 2013 Transcript (the "**Orr 10/4 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit E), at 377:1-380:13.

59.     Finally, it bears noting that on July 16, 2013, the City reached a deal with its swap counterparties, which provided for such parties to (i) forbear from pursuing remedies and (ii) allowed the City to redeem the swaps until October 31, 2013 which would result in the City saving between $70 and $85 million. *See* Supp. Kreisberg Declaration, Exhibit E (e-mail from Ken Buckfire dated July 17, 2013). Given these immediate savings and other possible avenues (noted above) for the City avoiding bankruptcy, it is clear that the City's filing had very little to do with any purported insolvency and everything to do with the City's plan to impair or modify its pension obligations.

## **ARGUMENT**

## I.     **THE CITY'S PETITION VIOLATES THE UNITED STATES CONSTITUTION**

### A.     **Chapter 9 Violates The Federal Structure Of Government**

60.     Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling State fiscal self-management – an area of exclusive state sovereignty – as part of an unholy alliance in which the State receives in exchange powers in excess of those it would otherwise possess under the law. The losers here are citizens, such as the AFSCME Employees, who, particularly as creditors of the State, benefit from the State and Congress acting within their constitutionally defined roles so that the State remains accountable during the trying process of a municipal debt adjustment.

61.     The Supreme Court recognized this violation explicitly in 1936 when the Court declared the first federal municipal bankruptcy statute unconstitutional for the following two

independent reasons: (1) the goal of a municipal bankruptcy is to enable state governments to unconstitutionally escape their debts, but states cannot accomplish the "end" of an unconstitutional act simply "by granting any permission necessary to enable Congress to do so"; and (2) municipal bankruptcy represents an incursion by Congress into the "sovereignty of the State" and its political subdivisions, which renders them "no longer free to manage their own affairs" independent of "interference" by Congress, yet the Constitution does not permit Congress to "pass laws inconsistent with the idea of sovereignty." *Ashton v. Cameron County Water Improvement Dist. No. 1,* 298 U.S. 513, 530-32 (1936).

62.    *Ashton* applies with even greater force to chapter 9 than it did to the first federal bankruptcy statute.  Chapter 9, like the municipal bankruptcy statute struck down in *Ashton,* is designed to empower municipalities – whose "fiscal affairs are those of the State, not subject to control or interference by the National Government," *id.* at 528 –to "change, modify or impair the obligation of their contracts" in ways not permissible outside of bankruptcy.  *Id.* at 530-31.  Under chapter 9 but not under the prior federal municipal bankruptcy statute at issue in *Ashton*, states are explicitly barred from designing their own process for municipal debt adjustment, further infringing on the constitutionally defined role of the states to manage their own financial affairs.  See 11 U.S.C. § 903.

63.    As *Ashton* recognized, that municipalities may not, unlike states, be immune from suit under the 11th Amendment is entirely unrelated to the question of whether their essential role in the federal system of government has been unconstitutionally diminished by an act of Congress.  *Ashton*, 298 U.S. at 531.  The Supreme Court recently reaffirmed this distinction in *Printz v. United States*: "[T]he distinction in our Eleventh Amendment jurisprudence between States and municipalities . . .  is peculiar to the question of whether a

-30-
13-53846-swr   Doc 2335-6  Filed 12/27/13  Entered 12/27/13 15:34:26   Page 180 of 124
13-53846-swr   Doc 1388  Filed 10/11/13  Entered 10/11/13 15:28:21   Page 42 of 124
262
180

governmental entity is entitled to Eleventh Amendment sovereign immunity, [and does not] apply [] to the question of whether a governmental entity is protected by the Constitution's guarantees of federalism, including the Tenth Amendment." 521 U.S.898, 531 n. 15 (1997) (citations omitted).

64.     To take just one extremely salient example, the City seeks to reduce its retiree health care obligations *permanently* in bankruptcy, which the Michigan Court of Appeals has held it could not do under state or federal law. *See AFT Michigan v. State,* 297 Mich. App. 595, 825 N.W.2d 595 (2012). Thus, under chapter 9 the City seeks to skirt the laws governing its debts outside of bankruptcy in exchange for submitting to the rules enacted by Congress for a chapter 9 filing, thereby ceding sovereign control over some of its own fiscal affairs to the federal judiciary during the bankruptcy process.

65.     Neither of the justifications provided by the Supreme Court less than two years after *Ashton* when it upheld Congress's next, substantially similar, municipal bankruptcy statute in *United States v. Bekins*, 304 U.S. 27 (1938) – (1) that the contracts clause of the federal constitution makes the passage of a state law adjusting municipal debts impossible and thus the need for a federal law providing for municipal bankruptcy pressing, and (2) that a State has a right to consent to federal intrusion into its own fiscal affairs – remains valid. This is because intervening Supreme Court precedent holds that states can fashion their own municipal reorganization statutes but cannot consent to any derogation of their sovereign powers.

### (i)     A Federal Municipal Bankruptcy Statute Is No Longer Necessary To Accomplish An Adjustment Of Municipal Debts

66.     As a threshold matter, the Supreme Court has held since *Bekins* that states *can* pass legislation to adjust municipal debts in a financial emergency. *See Faitoute Iron & Steel Co. v. City of Asbury Park,* 316 U.S. 502 (1942). In doing so, the Supreme Court scoffed at the

-31-
262
13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 181 of 124
13-53846-swr   Doc 2335   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 181 of 262    181

presumption that the federal government could "completely absorb" from a State a power "so peculiarly local as the fiscal management of its own household." *Asbury Park,* 316 U.S. at 508-09. *See also United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1 (1977) (recognizing that state legislation repealing a contractual obligation of a state may not violate the contracts clause under certain circumstances). For this reason alone, *Bekins,* which relied heavily on the Supreme Court's perception that some mechanism was needed to permit states to adjust their debts during the "[e]conomic disaster" of the Great Depression, 316 U.S. at 53-54, is no longer binding.

### (ii) The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled *Bekins*

67. Over the past two decades the Supreme Court issued a series of opinions clarifying both the importance of the federal system of government to *individual* liberty and, concomitantly, the inability of a state to consent to an affront by Congress to that federal system. The fountainhead of these cases is *New York v. United States,* 505 U.S. 144 (1992). There, Justice O'Connor, writing for the majority, explained at length that any statute exercising federal control over a power which "is an attribute of state sovereignty" – as is the case here with respect to a state's management of the fiscal affairs of its political subdivisions, *see Ashton, supra* – is "necessarily" an exercise of "a power the Constitution has not conferred on Congress" and therefore unconstitutional. 505 U.S. at 156. "The States 'form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere.'" *Alden v. Maine,* 527 U.S. 706, 714 (1999) (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)). Thus the Supreme Court's duty, Justice O'Connor has explained, is to "invalidate[] measures deviating from" the federalist "form of government" set forth in the

-32-
262

13-53846-swr   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:23:21   Page 182 of 124
13-53846-swr   Doc 2335   Filed 01/11/13   Entered 01/27/13 13:42:26   Page 182 of 124   182

Constitution, however "formalistic" the result may appear in light of "the era's perceived necessity." *New York,* 505 U.S. at 187.

<blockquote>
(a) **Chapter 9 Impinges On The AFSCME Employees' Individual Rights To Federalism By Eviscerating The Accountability Of Michigan To Its Citizens And Creditors**
</blockquote>

68. *New York* and its progeny represent a direct rebuff to *Bekins* and other Depression-era cases, which softened the requirements of federalism in moments of perceived peril, by setting forth since then a robust vision of federalism which "divides authority between federal and state governments for the protection of individuals." *New York,* 505 U.S. at 181. That vision begins with the "incontestable" truth "that the Constitution established a system of 'dual sovereignty,'" under which the sovereignty reserved to a State and its citizens is "'inviolable.'" *Printz,* 521 U.S. at 918-20 (quoting The Federalist No. 39, at 245 (J. Madison)) (other citations omitted). "Residual state sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'" *Printz,* 521 U.S. at 920.

69. The premise of the federal constitutional structure is that "Congress would exercise its legislative authority directly over individuals rather than over States." *New York*, 505 U.S. at 166 (citing 1 Records of the Federal Convention of 1787, p. 313 (M. Farrand ed. 1911) (explaining the "rejection of the New Jersey Plan in favor of the Virginia Plan")). As a corollary, individual citizens possess a vested right in the guarantee of a strongly demarcated

-33-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 183 of 124   183
13-53846-swr   Doc 2335   Filed 12/11/13   Entered 12/11/13 15:28:21   Page 183 of 124
262

separation of power between the state and federal government to ensure that each remains responsible to the citizens for the tasks with which it was charged:

> The great innovation of this design was that "our citizens would have two political capacities, one state and one federal, each protected from incursion by the other"—"a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." [*Printz,* 521 U.S. at 920 (quoting *U. S. Term Limits, Inc. v. Thornton*, 514 U. S. 779, 838 (1995) (Kennedy, J., concurring)).]

70. This structural separation of powers protects individual liberty in myriad ways by creating a "'double security as to the rights of the people.'" *Printz,* 521 U.S. at 922 (quoting The Federalist No. 51, at 323 (J. Madison)). It ensures that neither branch will accumulate "excessive power," thereby reducing "the risk of tyranny and abuse from either front." *Printz,* 521 U.S. at 921 (quotation omitted). The separation of powers principle further "contemplates that a State's government will represent and remain accountable to its own citizens." *Printz,* 521 U.S. at 920 (citations omitted). For "[i]f, as Madison expected, the Federal and State Governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function." *United States v. Lopez,* 514 U.S. 549, 576-77 (1995) (Kennedy, J., concurring). *See also United States v. Morrison,* 529 U.S. 598, 615-16 (2000) (citing the bulk of Justice Kennedy's concurrence in *Lopez* and holding that Congress may not "use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority"). Accordingly, "[t]he Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Nat. Fed'n*

*of Indep. Business v. Sibelius,* 132 S. Ct. 2566, 2578 (2012) (Roberts, C.J.) (quoting The Federalist No. 45, at 293 (J. Madison)).

71.     Chapter 9 does unconstitutional violence to the federal structure by obfuscating the system of direct accountability protected by federalism.  By outsourcing to the federal judiciary the problem of a state reorganizing its obligations, chapter 9 provides states with unconstitutional – as well as unnecessary, given *Asbury Park* – cover from its citizens by confusing them as to whom to accord "blame" and "credit" for the results.  *Printz,* 521 U.S. at 931; *New York,* 505 U.S. at 169.  *See also Gregory v. Ashcroft,* 501 U.S. 452, 459 ("These twin powers will act as mutual restraints only if both are credible.").  "The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power."  *Lopez,* 514 U.S. at 576-77 (Kennedy, J., concurring) (citations omitted).

72.     In point of fact, on January 31, 2013, Orr's colleague himself touted the deflection of accountability for state and city politicians as a benefit.  "Making this a national idea is not a bad thing," he wrote, because "[i]t provides political cover for the state politicians. Indeed, this gives them an even greater incentive to do this right because, if it succeeds, there will be more than enough patronage to allow either [Mayor] Bing or [Governor] Snyder to look for higher callings—whether Cabinet, Senate or Corporate." Kreisberg Declaration, Exhibit 2. In a subsequent reply to Orr later that day, Orr's colleague provided a clear indication of his idea of the "right" way to do "this," stating: "the ideal scenario would be that Snyder and Bing both agree that the best option is simply to go through an orderly chapter 9." Kreisberg Declaration, Exhibit 1.

-35-

13-53846-tjt   Doc 2335-6   Filed 01/27/13   Entered 01/27/13 15:23:21   Page 185 of 124
13-53846-swr   Doc 1336   Filed 10/12/13   Entered 10/12/13 15:34:26   Page 185 of 262

185

73.    This veil over accountability is woven into the very structure of chapter 9. While the City must consent to a chapter 9 filing and retains some control over the chapter 9 process, even before the City proposes a plan the Bankruptcy Judge is able to commandeer the City's operation in exchange for the protection of the Bankruptcy Code by using its equitable powers, as it already has in this case, to order the City to, *inter alia,* turn over documents and engage in mediation and negotiations which the City would not need to submit to outside of Bankruptcy.  *See Mediation Order* [Docket No. 322] ("the Court concludes that it is necessary and appropriate to **order** the parties to engage in the facilitative mediation of any matters that the Court refers in this case," moreover, the mediator is "authorized to enter any order necessary for the facilitation of mediation proceedings", including regarding discovery issues).

74.    Moreover, Bankruptcy Code section 926 provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a) or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action." 11 U.S.C. § 926(b).  In at least one reported case, *In re Alabama State Fair Authority*, 232 B.R. 252 (N.D. Ala. 1999), the bankruptcy court appointed a trustee to pursue preference actions.  Thus, the bankruptcy court has discretion, despite a municipal debtor having made the policy choice to settle a pre-petition debt, to appoint a third-party trustee to ignore the municipality's decision and pursue avoidance of such a settlement.  With regard to preference avoidance, this is a power an individual creditor could not independently assert under state law.  This power also exerts a strong effect on the City throughout bankruptcy as to what actions it can and cannot take, long before ever proposing a plan, without being rebuked by the bankruptcy judge.

75.    If the City wishes to obtain the true spoils of bankruptcy – a plan of adjustment – it must submit to a much greater degree of federal interference, thus further blurring the line

between Congress and the State as to who is to blame for the contents of that plan. This is because, in order for a debtor's plan to receive approval under chapter 9, it must incorporate priorities of distribution according to the Bankruptcy Code. The tension between chapter 9 and state law rights was highlighted in *In re County of Orange,* 191 B.R. 1005 (Bankr. C.D. Cal. 1996), where the court, on preemption grounds, invalidated California's law providing for the establishment of a trust with respect to certain securities. Relying on the doctrine of preemption alone, the County of Orange court held that "The California legislature cannot rewrite the bankruptcy priorities." *Id.* at 1017.

76.   If the people of Michigan were to enact their own laws for adjusting municipal debts – as is their constitutional right, but which they have been unconstitutionally prevented from doing by chapter 9 as amended since *Asbury Park* – those laws might have very different priorities than chapter 9. Chapter 9, for instance, allows administrative expenses under Bankruptcy Code section 503 and gives them priority under Bankruptcy Code section 507(a)(2), and adopts the definition of secured claims from Bankruptcy Code section 506, to name a few. 11 U.S.C. § 901(a). Importantly, in contrast, the people of Michigan might very well decide to treat issues such as claim priority quite differently. For instance, they might choose to place unsecured retiree health claims before administrative expenses, thus benefitting the AFSCME retirees. This is, after all, a state whose constitution explicitly protects pension rights. But chapter 9 prevents the AFSCME employees from exercising their right to petition their state government to enact a municipal debt adjustment law of this nature, in turn allowing the state to shirk its responsibility to the voice of its citizens by blaming any unjust result in bankruptcy on the claim priorities, rules, and procedures of the Bankruptcy Code. Until

-37-

13-53846-swr   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 87 of 124
13-53846-tjt   Doc 2335   Filed 12/27/13   Entered 12/27/13 13:34:26   Page 49 of 71   187

262

chapter 9 is struck down as unconstitutional, state officials can tell their constituents that they had no other choice besides chapter 9 to adjust municipal debts

77.     That the City retains some autonomy over its affairs under chapter 9 is irrelevant, for the mere incursion into territory reserved to the states is sufficient to violate the Constitution.  "[W]here, as here, it is the whole object of the law to direct the functioning of the state [government], and hence to compromise the structural framework of dual sovereignty . . . a 'balancing' analysis is inappropriate.  It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."  *Printz*, 521 U.S. at 932.

78.     Ultimately, the allocation of state resources as between competing creditors of the City should be determined "by the political process established by the citizens of the State, not by judicial decree mandated by the Federal Government."  *Alden,* 527 U.S. at 751.  "When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government."  *Id.*  While the road to adjusting the City's debts may be longer if it must first involve "greater citizen involvement in democratic processes . . . in shaping the destiny of" the City's reorganization process via state law, rather than accessing the process set forth in chapter 9, as a result of "the political processes that control a remote central power," *Bond v. United States,* 131 S. Ct. 2355, 2364 (2011), "the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."  *New York,* 505 U.S. at 187.

-38-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:23:21   Page 80 of 124
13-53846-swr   Doc 1388   Filed 10/24/13   Entered 10/24/13 19:34:26   Page 188 of 214   188

262

79.     The unconstitutionality of chapter 9 is further confirmed by its unsuccessful attempt to preserve some independence for state sovereigns within the constraint of the grant of power to Congress by Article I, Section 8 Clause 4 (the "Bankruptcy Clause") to establish "uniform" bankruptcy laws.  Although the bankruptcy code for private debtors may treat debtors differently in different states due to variations in state law and still pass muster as "uniform," within a state there must be "geographical" uniformity for debtors.  *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902).  But by ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy, chapter 9 permits the promulgation of non-uniform bankruptcies within states – as in Michigan, where Act 436 has wildly divergent effects on different cities, whose authority to declare bankruptcy purports to rest on the discretion of a Governor who can attach whichever contingencies he wishes.  *See* MCL 141.1558.  As a result, nationwide the basic eligibility for an entire class of debtors – municipalities – has no uniform federal law.  This is not a question of which state substantive law applies to a class of debtors which is universally eligible for chapter 9, rather it is a foundational problem of who among the class of debtors is even covered by the federal statute in the first place.

80.     It is no surprise that this attempt to elude the demands of federalism thereby fails for this additional reason of non-uniformity, for municipal bankruptcy would have been an entirely foreign concept to the framers who modeled much of our federal Constitution on British law which did not then, and still does not today, even contemplate municipal bankruptcy.  *See, e.g.,* Janie Anderson Castle, *The People's Mayor for London?*, 5 J. Loc. Gov't L. 29, 32 (2002); Annerose Tashiro, *Sovereign Insolvency*, 99 Eur. Law. 5 (2010)

("There is no such thing today anywhere in Europe as a sovereign insolvency regime.") (advocating implementation of a bankruptcy regime mirroring that of chapter 9 in the EU).

81.     It cannot be adequately emphasized that under *Asbury Park* the State has the authority to amend its own laws to allow for its municipalities to adjust their debts without resorting to a coercive federal statute which unconstitutionality denies the state that right, obscures accountability and is not a uniform bankruptcy law.   The State could even, furthermore, seek federal financial assistance to help meet those debts – as indeed it already has.  *See, e.g., South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (Rehnquist, C.J.) ("[O]bjectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." (internal quotation omitted)).  What the State cannot do – but what chapter 9 demands – is to submit to federal rules which would not merely incentivize the State's use of lawful power, but engorge that power at the expense of its citizens' inviolable right to control the operation of their sovereign by setting the rules by which it adjusts its own debts.

> **(b)     Chapter 9's Requirement Of State Consent Cannot Cure The Violation Of Individual Rights**

82.     The Supreme Court squarely held in *New York* that "[t]he constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States."  505 U.S. at 182.  Even when such consent is accomplished by statute.  *See, e.g., Buckley v. Valeo,* 424 U.S. 1 (1976) (Congress infringed the President's appointment power via a law signed by the President); *INS v. Chadha,* 462 U.S. 919 (1983) (legislative veto violated the constitutional requirement of presentment even where President signed law with legislative veto provision).

-40-

13-53846-tjw   Doc 2335-6   Filed 10/27/13   Entered 10/27/13 15:23:21   Page 190 of 124
13-53846-swr   Doc 2335   Filed 10/11/13   Entered 10/11/13 15:34:26   Page 190 of
262

83.     The decision in *Bekins* therefore erred in concluding that the then-operative municipal bankruptcy statute was not unconstitutional simply because the statute required the municipality's petition and plan of composition to be authorized by state law.  304 U.S. at 52. To the contrary, the conclusion in *Bekins* that the only "obstacle" to the exercise of federal bankruptcy over state political subdivisions "lies in the right of the State to *oppose* federal interference," 304 U.S. at 52-54, is squarely foreclosed by the Court's subsequent decision in *New York*.  Thus the prior rule from *Ashton* – "Neither consent nor submission by the States can enlarge the powers of Congress," and therefore states cannot "accomplish" an unavailable "end by granting any permission necessary to enable Congress to do so," 298 U.S. at 531 – remains the correct one.

84.     The Court concluded in *New York* that State consent cannot cure an otherwise unconstitutional infringement of state sovereignty for the same reason that municipal bankruptcy violates constitutional federalism in the first place: the design of federalism is meant "for the protection of individuals," not States.   *New York*, 505 U.S. at 181 ("The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States.").   State government officers may even have "powerful incentives" to consent to a diminishment of state sovereignty to evade one of the core benefits federalism promises to individual citizens: direct accountability of political officials for actions taken in their clearly demarcated domains of authority.  *Id.* at 182-83 ("[I]t is likely to be in the political interest of each individual official to avoid being held accountable to the voters.").   Therefore state consent cannot not be allowed to dismantle the delicate balance of powers protecting the accountability of each dual sovereign to its citizens.

-41-
13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 191 of 124
13-53846-swr   Doc 2188   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 183 of 124   191
262

> **(iii)  AFSCME Does Not Seek To Relitigate *Bekins* And The City's Reply Brief Arguments Regarding The Constitutionality Of Chapter 9 Ignore And Misapply the Relevant Authority Discussed Above**

85.     While the City argues (*see* Debtor's Reply, at p. 10) that AFSCME (among other objectors) seeks to "relitigate" *Bekins*, this is simply not the case.  As a threshold matter, when the Supreme Court decided *Bekins,* it reasoned that a federal municipal bankruptcy statute was constitutional in large part because "[t]he natural and reasonable remedy through composition of the debts of the district was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation."  304 U.S. 27 at 54.  Four years later, the Supreme Court reversed course and held that states can pass state statutes for composition of municipal debts, an area of law it now deemed to be "peculiarly local" because it involved "the fiscal management of its own household."  *Asbury Park,* 316 U.S. at 309.  Had *Asbury Park* been decided at the time of *Bekins,* certainly the litigation of the issues would have taken a very different form.

86.     Nor have the "relevant statutory provisions remained substantially unchanged" since *Bekins.*  Debtor's Reply, at p. 9.  To the contrary, the federal municipal bankruptcy statute has been amended numerous times, most notably four years after *Asbury Park* to undo the victory for states' rights won by the city of Asbury Park in that case.  Since then, the federal municipal bankruptcy has prohibited state composition procedures such as those upheld in *Asbury Park.*  *See* 6-903 Collier on Bankruptcy P 903.LH[2]; 11 U.S.C. § 903(1) ("[A] State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition.").  The harm, emphasized by AFSCME above and below, is that chapter 9 after *Asbury Park* represents "an unholy alliance in which the State receives in exchange [for its consent] powers in excess of those it would otherwise

-42-
13-53846-tjt  Doc 2335-6  Filed 12/27/13  Entered 12/27/13 15:24:26  Page 192 of 124
262
13-53846-swr  Doc 2335  Filed 12/11/13  Entered 12/11/13 15:28:21  Page 84 of 124  192

possess under the law." *See supra,* ¶ 60. *See also infra,* ¶¶ 100-103 ("[B]ecause chapter 9 allows the City a process for adjusting its debts which is not identical to the process for doing so under state law – either as it currently exists or if the state were to pass its own municipal composition law" – AFSCME's members rights to the protection of dual sovereign governments have been violated). This harm is enhanced by the provision of chapter 9 forbidding the states from adopting their own municipal debt adjustment laws, which coerces states into accessing chapter 9 just to receive a constitutional right it already possesses under *Asbury Park*.

87. With respect to the continued constitutionality of chapter 9, the City's core contentions are that (1) the Court's ruling in *Asbury Park* provides no meaningful opportunity for debt adjustment to municipalities, (2) chapter 9 is essential to states because they need it to sidestep the otherwise-applicable constitutional limit that "they are *not* at liberty under the Contracts Clause to impair their own contracts"; and (3) chapter 9 cannot violate federalism principles because it does not compel state or local governments to take any action. Debtor's Reply at 13-15. The first two of these arguments only further confirms the unconstitutionality of chapter 9, and the third is off-target.

88. First, the City is technically correct that a chapter 9 bankruptcy is currently the "one viable option" for a "financially prostrate municipal government" wishing to "resolve debts in a non-consensual manner," (Debtor's Reply. at pp. 13-14 (citation omitted)), but that is only because chapter 9 itself unconstitutionally bars – as a matter of statute – the type of state statute approved by the Supreme Court in *Asbury Park* which would allow adjustment of municipal debts over the objections of creditors under state law. The municipal debt

adjustment legislation in *Asbury Park,* for example, required that any plan of adjustment only be "approved by 85 percent in amount of the creditors" of the municipality. 316 U.S. at 505.

89.     It is for this reason – and *not*, as the City misleadingly contends, for any reason of constitutional law stemming from the *United States Trust* line of cases – that it "comes as no surprise" that *Asbury Park* is the only case sustaining the alteration of a municipal bond contract outside a bankruptcy case. *See* Debtor's Reply at 13-14. *United States Trust* did not consider the constitutionality of a state municipal reorganization statute enacted "for the purpose of benefiting" creditors by adjusting their debts – the issue in *Asbury Park* – but rather the statutory "repeal" of a discrete contractual promise made by state obligors to bondholders, with no state-law process for the bondholders to adjust their debts. *United States Trust Co. of NY v. New Jersey,* 431 U.S. 1, 28 (1977).

90.     The City is thus wrong to argue that AFSCME's argument "would actually impede, rather than protect, States' sovereignty." Debtor's Reply, at p. 16. Rather, it is Bankruptcy Code section 903 that impedes state sovereignty. Prior to the addition of section 903 to chapter 9 of the federal municipal bankruptcy statute, the Supreme Court held in *Asbury Park* that that statute could not preempt New Jersey's state municipal reorganization law because New Jersey was not "powerless in [the] field" of "the autonomous regulation of problems so peculiarly local as the fiscal management of its own household[.]" 316 U.S. at 509. The "explicit limitation" on state municipal reorganization statutes now found at Section 903 "was added to overturn the holding in *Asbury Park*." *See* Michael W. McConnell & Randal C. Picker, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462 (1993). As such, it represents "congressional overreaching in violation of the Tenth Amendment." 6-903 Collier on Bankrupty P 903.03[2]. In the wake of

*Asbury Park* and its subsequent Congressional overruling, the states' sovereign power to control municipal reorganization are not aided by chapter 9, they are unconstitutionally limited.

91.     Second – after misleading the Court to believe that *Asbury Park* represents a jurisprudential "outlier" whose rule has been ineffective rather than a watershed decision which Congress rushed to nullify by statute only four years later in "one of the more interesting turnabouts in the history of bankruptcy legislation," 6-903 Collier on Bankruptcy P 903.LH[2] – the City pivots to argue that because the state municipal adjustment statute sanctioned in *Asbury Park* must still satisfy the Contracts Clause of the United State Constitution, U.S. Const., Article I, § 10 (the "**Contracts Clause**"), states need chapter 9 "to impair their own contracts" in violation of the Contracts Clause.  Debtor's Reply, at p. 15.  AFSCME, in contrast, maintains that the Contracts Clause continues to constrain all municipal bankruptcies.

92.     Having thus conceded, in a surprising display of candor, that the purpose of the City's bankruptcy filing is not merely to accomplish what it cannot accomplish under a state municipal composition law as a matter of preemption by Section 903, but what it is expressly prohibited from accomplishing as a matter of unconstitutionality by the Contracts Clause, the City's papers effectively also concede that chapter 9 and/or PA 436 are unconstitutional.  The reason: the State of Michigan cannot "impair contracts" beyond what the Contracts Clause allows, and Congress lacks the power under Article I to consent to Michigan doing so.

93.     Neither *Bekins* nor *Asbury Park* directly addressed this question: whether Congress exceeded its Article I powers by passing a municipal bankruptcy law purporting to empower states to violate the Contracts Clause.  *Bekins,* instead, considered "whether the exercise of the federal bankruptcy power in dealing with a composition of the debts of [a municipality] . . . must be deemed to be an unconstitutional interference with the essential

independence of the State," *i.e.*, the federalism question raised in *Ashton* and at issue in *Bekins*. 304 U.S. at 49; *see also When Cities Go Broke, supra,* at 451-52 (noting that "a plausible argument against the Act might have been based on the rights of the creditors" to complain "that Congress could not extend its own Contracts Clause immunity to a state or local government," but that argument was not raised in *Ashton*). *Asbury Park,* meanwhile, unequivocally held that the Contracts Clause applied to state municipal reorganization legislation, and also gave every indication that a state's authority to pass municipal reorganization laws was coextensive with Congress's. 316 U.S. at 507-08. The only time a member of the Supreme Court has ever identified a potential Contracts Clause problem with the federal municipal bankruptcy statute is found in Justice Cardozo's dissent in *Ashton* but the Court in *Bekins* declined to follow Justice Cardozo's lead. *See* 298 U.S. at 541-42 (rejecting argument that federal municipal bankruptcy law violated Contracts Clause). This leaves the majority opinion in *Ashton* – which effectively rejected Justice Cardozo's argument, and which was not explicitly overruled by *Bekins* – as the only evidence consideration by a majority of the Court.

94.     The Constitution does not simply disappear once a bankruptcy petition is filed, even for holders of unsecured claims. *See, e.g., City of New York v. New York, N. H. & H. R. Co.,* 344 U.S. 293 (1953) (unsecured creditors possess right to notice and hearing under Fifth Amendment before debts can be discharged). So too with the Contracts Clause found at Article I, Section 10 of the U.S. Constitution. Article I, Section 10 contains three clauses, the last two of which permit Congress to consent to a number of otherwise-unconstitutional state acts, for example the right to "enter into any Agreement or Compact with another State," an example of which was the contract at issue in *United States Trust*. The Contracts Clause, however, is

-46-
13-53846-swr   Doc 2335-6  Filed 12/27/13   Entered 12/27/13 15:34:26   Page 96 of 124
13-53846-swr   Doc 2135  Filed 12/11/13   Entered 12/11/13 15:28:21   Page 196 of 262
196

found in the first clause of Section 10, which grants Congress no right to consent to a violation thereof.  Thus, assuming *arguendo* that the City is correct that the intent of chapter 9 and PA 436 are both to skirt the constraints of the Contracts Clause by means of Congressional consent, Congress lacks the authority under Article I to grant that consent, and the Contracts Clause further prevents the State from passing a law like PA 436 intending to end-run the Contracts Clause.  The result would be equally unconstitutional, and absurd, if Congress were to pass a statute, under its Section 8 power to coin money, which set up Article I courts to approve applications from individual states to coin their own money despite the blanket prohibition in Article I, Section 10 against states doing so.

95.     Third, no state, as argued *supra,* can "consent" to "enlarge the powers of Congress; none can exist except those which are granted." *Ashton,* 298 U.S. at 531.  The City's attempt to distinguish the Court's line of federalism cases since *New York v. United States* completely misses this point by insisting that chapter 9 does not violate the federalism principles articulated in those cases merely because "chapter 9 is 'administered' by the federal bankruptcy court, not the States."  Debtor's Reply, at p. 16.  But these cases cannot be oversimplified and read in a vacuum as the City suggests.  The Court's new federalism stands not for the narrow proposition that Congress cannot force states to administer federal regulatory programs, but for a broader constitutional rule: "if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress," and  "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions" even with "the 'consent' of the governmental unit whose domain is thereby narrowed." *New York,* 505 U.S. at 156, 162, 182.

-47-
13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 97 of 124
262
13-53846-swr   Doc 2335   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 89 of 124   197

96.     As described *supra,* chapter 9 does exactly that – if a state consents, a federal bankruptcy judge enforces a set of instructions from the Code, most notably the requirements for plan confirmation, and takes over municipal decision-making during the bankruptcy by controlling the municipality's right not to engage in discovery or mediation and by wielding the power to appoint a trustee to recover preferential transfers over the municipality's objection. These elements of chapter 9 – which the City entirely ignores in its brief – violate the Supreme Court's clear direction that ""[t]he Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *Id.* at 182. The City points to general language in Section 903 prohibiting interference with "political or governmental powers," (Debtor's Reply, at p. 18), but that language is belied by other provisions of the Code explicitly permitting interference by the bankruptcy judge.

97.     The City's related argument that "chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements," (Debtor's Reply, at pp. 16-17) is inapposite because the state does not obtain money in exchange for taking some action clearly within its power but desired by the federal government, rather the state *reacquires* its inherent power under *Asbury Park* to access a process for adjusting its debts. In exchange for a power it already would possess in the absence of chapter 9, the state is forced to give the federal government control over state sovereign functions not available to Congress under the Constitution.

98.     This aspect of chapter 9 – its nullification of all state laws for municipal debt adjustment in favor of an exclusive federal remedy which subjects state and local officials to federal rules – highlights the accountability problem of allowing state and local officials to

-48-

13-53846-tjt   Doc 2335-6   Filed 01/27/13   Entered 12/27/13 15:34:26   Page 60 of 124
13-53846-swr   Doc 1388   Filed 10/21/13   Entered 10/21/13 15:23:21   Page 98 of 124   198
262

represent to their constituents that the only way to escape financial catastrophe is to access chapter 9 and accept the rules therein, such as claim priorities in the Code, which voters in the state might wish to alter. For if a state declines Congress's offer of access to chapter 9, it has no recourse to adjust municipal debts *en masse* as a result of Section 903. Yet if a municipality is as financially distressed as the City contends it is, it faces the problem which motivated the Court in *Asbury Park* to find that states can design their own debt adjustment statutes consistent with the Contracts Clause: the City has no reasonable alternative.[11] Under such circumstances, state and local government officials face an unconstitutional conundrum: accept federal interference with their sovereign fiscal self-management, or default on municipal debt in violation of the Contracts Clause. If the former is chosen, the City accepts rules and instructions from a federal judge, which state and local officials can refer to when attempting to shift blame for the hard decisions of municipal reorganization instead of confronting a local debate over legislation at the state level about how to adjust municipal debt.

99.     Finally, the City is incorrect that chapter 9 is a uniform bankruptcy law. As noted *supra* – but ignored in the City's reply – a municipal bankruptcy law would have been inconceivable to the framers. But even had they imagined the unimaginable, they surely would have recognized that chapter 9 is a non-uniform law because it fails to "apply uniformly to a defined class of debtors." *Railway Labor Executives Ass'n v. Gibbons*, 455 U.S. 457, 473 (1982). Surely, as the City notes, the Code can give way to state substantive law, such as the exemptions at issue in *Hanover National Bank*, which apply generally within a state as to all

---

[11]   In *Asbury Park,* the Court observed that "the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power." 316 U.S. at 509-10. Where, as in *Asbury Park,* financial crisis has rendered "the effective taxing power of the municipality prostrate without state intervention to revive the famished finances of the city," *id.* at 516, the Court recognized that "what is needed is a temporary scheme of public receivership over a subdivision of the State" allowing for the "discharge[]" of municipal debt obligations, *id.* at 510-11. The City, like the municipality in *Asbury Park*, has contended that its need for bankruptcy protection stems from it having exhausted its ability to raise revenue through taxation. *See* Eligibility Brief, pp. 28-30.

debtors in the same class.  But by outsourcing to the states the decision of *who* is eligible for chapter 9 protection, Congress has enacted a bankruptcy law that, rather than "define classes of debtors and . . . structure relief accordingly," *Gibbons*, 455 U.S. at 473, fails to define a class of debtors under federal law.  This yields statutes like PA 436, which is not uniform within Michigan because it does not grant the right to file for bankruptcy to all municipalities who meet defined criteria, but rather leaves the eligibility question to the unchecked discretion of the Governor.  *See* MCL § 141.1558 (placing no standards on gubernatorial decision whether or not to grant permission to file).  Whether on its face because it allows such a result, or as applied here in the context of PA 436, chapter 9 therefore violates the limitation that Congress only pass bankruptcy laws which are uniform.

### B. AFSCME's Active And Retired Members Have Individual Standing To Assert That Chapter 9 Violates Their Individual Rights To A Federal System Of Government

100.    The Supreme Court has squarely held that individuals – and not just states – have standing to challenge that Congress has "exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States." *Bond v. United States,* 131 S. Ct. 2355 (2011).  As also analyzed *supra,* individuals have their "own constitutional interests" to "assert injury from governmental action taken in excess of the authority that federalism defines," and their "rights in this regard do not belong to the State." *Id.* at 2363-64.

101.    Two aspects of the Court's conclusion in *Bond* are of special relevance to the instant case.  First, the Court emphasized that federalism protects not just "the integrity of the [state and federal] governments themselves," but also, distinctly, "the people, from whom all governmental powers are derived." *Id.* at 2464.  Individual citizens' interests in pressing federalism complaints include the "liberties that derive from the diffusion of sovereign power," such as (1) "greater citizen involvement in democratic processes" and citizens' consequent

ability to use their voices "in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power"; and (2) the promise that "laws enacted in excess of delegated governmental power cannot direct or control their actions" and the consequent protection of citizens from the "arbitrary power" caused by giving any one government too much sway over "the concerns of public life." The City's chapter 9 petition threatens AFSCME's members with both of these harms insofar as it (1) shields the City from a democratic process of resolving its fiscal crisis by rejecting the accountability of local politicians responsive to Detroit's citizenry in favor of an unelected federal judiciary, and (2) allows the federal government to concoct rules for the resolution of disputes in an "area of traditional state concern." *Lopez,* 514 U.S. at 580 (Kennedy, J., concurring).

102.    Second, the *Bond* Court rejected the argument, pressed by the respondent, that a state's waiver of any interference with its sovereignty should trump objections by individual citizens on Tenth Amendment grounds. *See* Brief for the Amicus Curiae Appointed to Defend the Judgment Below at 25, *Bond v. United States*, 131 S. Ct. 2355 (2011) (No. 09-1227) ("Particularly when the private party's interests are not aligned with those of the State, as may well be true in this very case . . . private party suits have the potential to frustrate and undermine state policies and decisions."). To the contrary, the Court held, a claim that "a law was enacted in contravention of constitutional principles of federalism . . . need not depend on the vicarious assertion of a State's constitutional interests, even if a State's constitutional interests  are also implicated." *Bond,* 131 S. Ct. at 2365. Whether the State has invited the federal incursion upon State authority is irrelevant. Only whether the individual claimant's injury so much as "*might* not have come about if the matter were left for the [State] to decide" on its own matters to the analysis. *Id.* at 2366.

-51-

13-53846-swr   Doc 2335-6  Filed 12/27/13  Entered 12/27/13 15:28:21  Page 201 of 124
13-53846-swr   Doc 1386  Filed 10/11/13  Entered 10/11/13 15:34:26  Page 63 of 124   201
262

103.     No doubt exists that if the State of Michigan were left to devise its own scheme for adjusting municipal debts – as is squarely within its authority under *Asbury Park* – the State *might* devise a system different from the United States Bankruptcy Code.   Under the microscope of "greater citizen involvement" at the local level, the City, fulfilling the promise of federalism to its citizens, would be more directly constrained to create a process responsive to their needs – including, perhaps, the same needs which prompted the passage of the state constitutional amendment protecting the very diminishment or impairment of vested pension rights which the City now seeks to accomplish under the cover of chapter 9.   Regardless, because chapter 9 creates for the City an exclusive process for adjusting its debts which is not identical to the process for doing so under state law – either as it currently exists or as it would exist if the state were to pass its own municipal composition law – AFSCME's members, as creditors of the City, have standing to object to the City's use of chapter 9 on federalism grounds.

### C.     This Court Lacks The Authority Or Jurisdiction To Decide Whether Chapter 9 Violates The United States Constitution Or Whether Pa 436 Violates The Michigan Constitution

104.     This Court lacks jurisdiction to decide whether chapter 9 violates the U.S. Constitution (or for that matter whether PA 436 and the authorization for the City's chapter 9 filing violates the Michigan constitution).   As the Supreme Court recently explained in *Stern v. Marshall,* Article III of the Constitution assigns the job of resolving questions of constitutional law to the "judicial power of the United States."   131 S. Ct. at 2609.   Because bankruptcy judges are appointed under Article I–unlike judges appointed under Article III, who have life tenure and protection from removal or diminishment of salary – Congress may not grant to bankruptcy judges the right to exercise that power.   *Id.*

105. No doubt exists either that the resolution of federal constitutional questions comes under the "judicial power" and is not subject to any exception thereto. *Stern,* building on the Court's decisions in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982), and *Granfinanciera, S.A. v. Nordberg,* 492 (U.S. 33) (1989), held that any narrow "public rights" exception permitting bankruptcy judges to issue certain final orders does not apply to any legal claim "independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." 131 S. Ct. at 2611. The federal constitutional claims of AFSCME's members stem from the Constitution, not the Bankruptcy Code, and cannot be resolved by the very claims process whose legality is the subject of the constitutional challenge. Though technically an objection to eligibility, AFSCME's state and federal constitutional claims in fact sound as affirmative allegations that their constitutional rights have been violated by the City's filings, such as would be brought under Section 1983 (and were brought in the Webster Litigation) but for the automatic stay and its extension by this Court pursuant to Section 105 of the Code

106. Moreover, the instant constitutional challenges have nothing to do with a federal regulatory scheme. *Stern* is quite clear that the "public rights" exception is limited to claims asserting rights "integrally related to particular federal government action," *i.e.*, claims challenging action undertaken pursuant to "a federal regulatory scheme" or whose resolution "by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *Id.* at 2613. Where, as is the case with this purely constitutional argument, the determination of a legal question has nothing to do with the contours of federal regulations or expert agency fact-finding, the argument must be resolved by an Article III judge.

107. At its core, the "public rights" exception is designed to address situations where – unlike here – a party seeks to enforce rights which Congress has created by statute. *See Granfinanciera,* 492 U.S. at 51 (citations omitted). The constitutional challenges raised herein invoke no such public right; "Congress has nothing to do with it." *Stern,* 131 S. Ct. at 2613. Nor do bankruptcy judges possess any special expertise at resolving constitutional challenges to their own authority or jurisdiction. "The experts in the federal system at resolving" constitutional questions such as this one "are the Article III courts, and it is with those courts that [this] claim must stay." *Id.* at 2615. The words of the Supreme Court in *Stern* apply with equal force here:

> What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a [constitutional] cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking. [*Id.*]

108. While the City argues (*See* Debtor's Reply, at pp. 5-8) that AFSCME seeks to radically expand *Stern* andthat no private rights are at issue in this Court's determination regarding the federal constitutional issues raised above and the state constitutional issues raised extensively below, in fact, critical private rights (including rights of City pension plan participants) are ultimately at issue here, including rights specifically raised prior to the City's filing of its chapter 9 petition by parties in, *inter alia*, the Webster Litigation (and other state court proceedings).

109. The arguments against this Court's authority or jurisdiction to render any decision regarding the constitutionality of chapter 9 or, for that matter, the constitutionality of

-54-
262
13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 204 of 204
13-53846-swr   Doc 2335   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 86 of 124     204

PA 436 have (since the filing of the Original AFSCME Objection) been extensively briefed in the Official Committee of Retiree's (the "**Retiree Committee**") (i) *Motion to Withdraw the Reference* [Docket No. 806] (the "**Withdrawal Motion**") and (ii) *Reply Memorandum of Law in support of the Withdrawal Motion* (Case No. 13-cv-13873, Docket No. 12] (the "**Reply Withdrawal Motion**").  The Withdrawal Motion is now pending before the United States District Court for the Eastern District of Michigan and rather than duplicate efforts, AFSCME hereby adopts **as if fully set forth herein** all of the arguments raised by the Retiree Committee in both the Withdrawal Motion and Reply Withdrawal Motion in support of why this Court lacks the authority or jurisdiction to render any decision regarding the federal constitutional questions raised above or the state constitutional issues raised below.

110.    Accordingly, and with respect, this Court should immediately refer this constitutional challenge to chapter 9 along with the state constitutional challenges (raised below) to the United States District Court for the Eastern District of Michigan for adjudication.

## II.    THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE

111.    The City, as a purported municipal debtor, bears the burden of establishing it is eligible for relief under chapter 9.  *See, e.g.*, *In re City of Stockton*, 475 B.R. 720, 725-26 (Bankr. E.D. Cal. 2012) (citing cases); *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008); *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995); *In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. 60, 72 (Bankr. D.N.H. 1994). "[A]ccess to Chapter 9 relief has been designed to be an intentionally difficult task." *Sullivan County*, 165 B.R. at  82; *see also In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (explaining that, although the Bankruptcy Code, as remedial legislation, is generally broadly construed, "municipal bankruptcies involve significant

-55-

13-53846-tjt   Doc 1335-6   Filed 10/27/13   Entered 10/27/13 15:34:26   Page 205 of 124
13-53846-swr   Doc 1336   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 67 of 124   205

262

problems . . . not encountered in the private sector" and raise important constitutional issues, so that "Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities." (internal citation omitted)). As a result, "[t]he bankruptcy court's jurisdiction should not be exercised lightly in chapter 9 cases." *Sullivan County*, 165 B.R. at 82.

112. As demonstrated below and as will be further demonstrated at trial, the City necessarily fails to carry its burden with respect to the following eligibility requirements: (i) valid authorization under Michigan state law (section 109(c)(2) of the Bankruptcy Code); and (ii) good faith negotiations or impracticability of such negotiations (section 109(c)(5) of the Bankruptcy Code). Further, as has become apparent through discovery and as shown below (and AFSCME expects will be further shown at trial), the City's evidence regarding insolvency is woefully inadequate, supported by no expert testimony or other reliable evidence, and accordingly the City fails to satisfy the insolvency requirement under section 109(c)(3) of the Bankruptcy Code.

113. Finally, the evidence reveals that the City's bankruptcy petition was filed in bad faith and not motivated by a proper purpose under chapter 9 and should be dismissed pursuant to section 921(c) of the Bankruptcy Code. *See e.g.*, *In re McCurtain Municipal Authority*, 2007 WL 4287604 at *3 (Bankr. E.D. Okla. Dec. 4, 2007) (holding that "the inability to pay debts as they become due depend[s] upon the inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough.") (citations omitted).

114. Before proceeding to address the merits of each of these arguments regarding (i) valid authorization, (ii) good faith negotiations/impracticability of such negotiations, and (iii) bad faith filing, it bears noting that during Orr's original deposition on September 16, 2013

(and subsequent October 4, 2013 deposition), Orr continued to hide behind the common interest privilege to essentially cover up any discussions or communications Orr had with State government officials under an alleged common interest privilege.

115.    While this Court determined the common interest privilege may apply to such communications, AFSCME believes that the discussions and deliberations between City and State officials leading up to the City's filing for chapter 9 in the period prior to July 18, 2013 – discussions which the City and State have clearly worked hard to keep secret –  relate to the crux of AFSCME's (and other objectors') arguments set forth below that the City filed its chapter 9 petition in bad faith, without real negotiations with significant creditors, and that the authorization was tailored by City and State officials to circumvent the Michigan constitution's Pensions Clause.  Given the presumption that government is supposed to be transparent (*e.g.*. FOIA statutes), and the fact that significant e-mails between the State, City and the Law Firm (including between the State and Orr) were already produced in this and other litigations, to the extent that the common interest ever applied, such privilege has been waived and AFSCME **asserts its continued objection to the City and State refusing to give deposition testimony or provide documents** (some of which may have been waived by prior documents produced and deposition testimony given by the State and City in this and other proceedings) subject to an asserted common interest privilege.

116.    AFSCME believes that it already has sufficient evidence to rebut the City's case regarding authorization, good faith negotiations, general bad faith filing, and insolvency, but notes that the City and State's continued reliance on a purported common interest should be

reconsidered and AFSCME provided further testimony and documents prior to trial so AFSCME can have proper due process.[12]

### A. The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9

117.    The City contends that it is authorized to be a debtor under state law because Section 18 of PA 436, M.C.L. 141.1558, provides that "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9," and further "empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9." *See* Eligibility Brief, p. 10.   However, the Governor's blanket grant of permission to file for bankruptcy under Section 18 of PA 436 violated the Michigan Constitution because it failed to explicitly prohibit the impairment or diminishment of vested pension rights, which the Governor was fully aware was the intention of the instant chapter 9 petition.   Moreover, the appointment of the Emergency Manager under PA 436 violates the "strong home rule" provisions of the Michigan Constitution.   Where, as here, a state constitution bars the purported state law authorization, a chapter 9 petition must be dismissed.  *See In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (analyzing Pennsylvania Constitution to determine whether city was authorized to file under chapter 9).

### (i) Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution

118.    As a Michigan Circuit Court Judge has already held, Michigan State law forbids authorization of the City's bankruptcy petition insofar as it seeks to reduce accrued pension

---

[12] AFSCME did not appeal the Court's common interest ruling which was interlocutory, but reserves the right to argue on appeal that the City and State's failure to testify and produce documents on relevant subject matters, including regarding the EM and State's plans for the EM commencing the City's chapter 9 case, prevent AFSCME from a full and fair opportunity to litigate its objections to the City's eligibility.  Accordingly, AFSCME reserves all rights in this regard, including all appellate rights upon entry of a final appealable order regarding the City's eligibility.

-58-

13-53846-tjt   Doc 2335-6   Filed 01/27/13   Entered 01/27/13 15:23:21   Page 208 of 124
13-53846-swr   Doc 4336   Filed 04/11/13   Entered 04/11/13 15:34:26   Page 208 of 262   208

benefits in violation of the State Constitution. Yet the Emergency Manager has been very clear that he intends to use this chapter 9 proceeding to do just that. Indeed, the Emergency Manager had made that intent known well prior to requesting the Governor's permission to file under chapter 9. For instance, on June 14, 2013 he both (a) issued a "Proposal for Creditors" expressly stating that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons," and (b) publicly threatened, in an interview with the Detroit Free Press Editorial Board, that vested pension benefits will not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits will "not . . . protect" retirees in bankruptcy court.

119.    Article IX, Section 24 of the Michigan Constitution (the "**Pensions Clause**") provides: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." It means what it says: "[U]nder Art. 9, § 24, a retirement benefit *cannot be reduced.*" *Seitz v. Probate Judges Retirement System,* 189 Mich. App. 445, 474 N.W. 2d 125, 128 (1991) (emphasis added); see *also id.* at 127 ("Article IX, § 24 protects those persons covered by a state or local pension or retirement plan from having their benefits reduced." (citing *Detroit Police Officers Ass'n v. Detroit,* 391 Mich. 44, 69, 214 N.W.2d 803 (1974))).

120.    Article IX, Section 24 completely protects the "receipt of pension benefits related to work already performed by" any City employees, whether active or retired – i.e., any pension benefits which have "accrued" and thus become "vested pension benefits" – from being diminished *at all.* *APTE v. Detroit,* 154 Mich. App. 440, 398 N.W.2d 436, 439-40 (1986); *Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich. 659, 663 (1973)

-59-

13-53846-tjw    Doc 2335-6   Filed 01/27/13   Entered 01/27/13 15:28:21   Page 209 of 124    209
13-53846-swr    Doc 1388   Filed 10/11/13   Entered 10/11/13 15:34:26   Page 209 of 124

262

(holding that "the intention of the people in adopting" Article 9, Section 24 was that "the benefits of pension plans are in a sense deferred compensation for work performed . . . which should not be diminished by the employing unit after the service has been performed." (quoting 1 Official Record, Constitutional Convention 1961, 770-71)).  Vested pensions rights covered by Article IX, Section 24 differ in this important respect from contractual benefits protected solely by Article I, Section 10 of the Michigan Constitution (the State's "Contracts Clause"), which in a narrow set of cases may not prohibit the State from effecting "a modest, temporary impairment" of those other types of "governmental contracts . . . as a matter of last resort to address a fiscal emergency."  *AFT Michigan v. State,* 297 Mich. App. 597, 602, 825 N.W.2d 595 (2012) (noting that "[a]ll parties agree that . . . accrued financial benefits under Const. 1963, art. 9, § 24 . . . may not be impaired," but concluding that the retiree health benefits in question were not "accrued financial benefits" within the wholesale protection of Article IX, Section 24 and thus proceeding to consider whether they could be impaired under the Contracts Clause); *BCBSM v. Governor,* 422 Mich. 1, 22-23, 367 N.W.2d 1 (1985) ("The federal balancing approach has been adopted by our Court for purposes of adjudicating state Contract Clause claims as well as federal Contract Clause claims.").

121.    Governor Snyder violated Article IX, Section 24 – and with it the requirement, set forth at 11 U.S.C. § 109(c)(2), that he be "empowered by State law to authorize" the City to become a debtor – when he failed to condition the City's chapter 9 petition on the complete preservation of vested pension rights despite the Governor's clear knowledge (admitted to by the Governor in deposition testimony provided on October 9, 2013, *see supra, ¶*28)  that the Emergency Manager intended to use the Governor's authorization to diminish constitutionally sacrosanct pension benefits.  Section 18 allows the Governor to "place contingencies on a local

government in order to proceed under Chapter 9," but does not explicitly require that compliance with Article IX, Section 24 be one of those contingencies. In this case, the Governor explicitly chose "not to impose such contingencies." *See* Docket No. 1 at p. 16.

122. Section 18 is unconstitutional as applied where, as here, the Governor has abused his discretion by purporting to authorize a bankruptcy which "would violate the constitution." *Taxpayers of Michigan Against Casinos v. State,* 478 Mich. 99, 107-08 & n.3 (2007) (even "broad discretion" granted to Governor by statute to act unilaterally must be exercised "within the limits of the constitution"). Moreover, Governor Snyder's authorization has itself unconstitutionally caused an "immediate, concrete injury" to Council 25's members by creating a "contingent liability" that their inviolable rights will be disregarded, causing them to reorder their financial affairs. *See Clinton v. New York,* 524 U.S. 417 (1998) (plaintiffs had standing to challenge constitutionality of executive action which, if left unchecked, would leave undisturbed potential future harm posing, by virtue of its magnitude, immediate and direct financial consequences to plaintiffs).

123. The strings left unattached to the Governor's sign-off speak volumes because PA 436 is not ignorant of Article IX, Section 24. To the contrary, other sections of the Act explicitly reiterate that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context. *See, e.g.,* MCL 141.1551(1)(d) (requiring that the Emergency Manager's financial and operating plan provide for "[t]he timely deposit of required payments to the pension fund for the local government"); MCL 141.1552(i)(m)(ii) (allowing the Emergency Manager in certain circumstances to serve as the sole trustee of a municipality's pension fund, but requiring that he "fully comply with . . . section 24 of article IX of the state constitution"); MCL 141.1553 (eliminating the "the accrual of postemployment benefits" of local government

officers but prohibiting "the impairment of vested pension benefits"). Thus the Governor's contingency-free permission reads like an open invitation to the Emergency Manager to violate the State Constitution in bankruptcy, and therefore is unconstitutional.

124.    In the alternative, this Court should hold that any authorization the Governor sought to provide under Section 18 carried with it the implicit contingency that all actions taken pursuant to it by the Emergency Manager, including the proposal of any plan of adjustment under 11 U.S.C. § 943, must comply with the State Constitution, including Article IX, Section 24. In his letter to the Emergency Manager giving unconditional permission to file under chapter 9, Governor Snyder observed that the Bankruptcy Code "contains the most important contingency – a requirement that the plan be legally executable" under 11 U.S.C. § 943(b)(4). Docket No. 1 at p. 16. Because a plan of adjustment which would reduce vested benefits would not be legally executable under the Michigan Constitution – and because, as Governor, Snyder is forbidden from authorizing any violation of the state constitution – his letter to the EM should, in the alternative, be construed as requiring compliance with Article IX, Section 24.

125.    AFSCME and its members must not be made to wait to raise a § 943(b)(4) argument until the moment a plan is proposed – though of course they reserve the right to do so – because of the harm being suffered by the AFSCME Detroit Employees *now* as a result of their credible fear that the Emergency Manager will force them to accept the unconstitutional impairment or diminishment of their vested pension rights - the threat of which he is attempting to use as leverage against then *now*. Thus, if this Court plans to find the City eligible to file for bankruptcy under chapter 9, it should hold on the record *now* that any plan proposed by the City will have to comply with Article IX, Section 24 because the Governor could not have given permission to file under chapter 9 without including the implicit contingency that the

-62-
13-53846-tjt    Doc 2335-6    Filed 01/27/13    Entered 01/27/13 15:34:26    Page 212 of
262
13-53846-swr    Doc 1138    Filed 10/11/13    Entered 10/11/13 15:28:21    Page 74 of 124    212

City's plan of adjustment not reduce vested pension benefits. Otherwise creditors with vested pension rights will continue to suffer an unconstitutional injury throughout the course of this bankruptcy as a result of the threats of the Emergency Manager , and the Court will be virtually powerless to prevent that harm unless and until the City proposes its plan of adjustment. To prevent that harm *now*, the Court at the very least should clarify, as a preliminary condition of eligibility, that these bankruptcy proceedings cannot reduce vested pension benefits. *Cf. Seitz*, 189 Mich. App. at 456 (declining to "throw out" a pension-reform statute in its entirety where none of the plaintiff state court judges could show that they would receive reduced pension benefits under said statute, but clarifying that the state was required "to honor its obligations" not to enforce the statute wherever doing so would in fact result in a reduction to a retired judge's vested pension rights). *See also Lansing School Educ. Ass'n v Lansing Bd. of Educ.*, 487 Mich. 349, 372 n.20; 792 N.W.2d 686 (2010) (declaratory judgment appropriate under Michigan law to accomplish a "sharpening of the issues raised" (quotation omitted)).

126.     Whatever its route – either by holding that the Governor violated Article IX, Section 24 by granting the City blanket permission to file under chapter 9 despite knowing full well that the Emergency Manager plans to use chapter 9 to cram down unconstitutional pension reductions, or that the Governor's permission carried with it the implicit condition that Article IX, Section 24 not be violated in bankruptcy– this Court must, when applying state law, hold the Governor to the truism that he cannot take actions "that would violate the constitution" even where he is acting with "broad discretion" delegated to him by statute. *See Taxpayers of Michigan Against Casinos, supra.*

> **(a)** **Despite the City's Arguments to the Contrary, Parties Have Already Been Unconstitutionally Harmed By The Governor's Authorization**

127.    Addressing the above arguments, the City in the Debtor's Reply does not contest that (1) "the Emergency Manager has been very clear that he intends to use this chapter 9 proceeding to" "reduce accrued pension benefits" and "had made that intent known well prior to requesting the Governor's permission to file under chapter 9," *supra* at ¶ 118; (2) Governor Snyder's grant of permission to file under chapter 9 has caused an "'immediate, concrete injury' to Council 25's members by creating a 'contingent liability' that" they will have to "reorder their financial affairs" to address possible diminution to their pensions, *supra* at ¶ 122; (3) the EM is using this harm, which is being suffered by the AFSCME Detroit Employees now, as leverage against them in this bankruptcy, *supra* at ¶ 125; and (4) the Governor "cannot take actions that would violate the constitution even where he is acting with broad discretion delegated to him by statute," *supra* at ¶ 126.  Moreover, since the City filed its reply brief, the Governor has testified to the fact that he was entirely aware that his purported authorization of this bankruptcy was intended to enable the reduction of vested pension benefits which would not be possible outside of bankruptcy court due to Article IX, Section 24 of the Michigan Constitution.

128.    These four uncontested points, taken together with the Governor's testimony, are dispositive in answering the City's chief counterargument – made multiple times in only slightly varied terms (*see, e.g.,* Debtor's Reply, at pp. 21-22; 28-31) – that the Governor cannot have violated the state constitution's "Pensions Clause" by granting the City permission for bankruptcy, and the EM could not have done so by filing the chapter 9 petition, because, the City contends, neither act in and of itself impaired or diminished any vested pension rights.

-64-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 214 of 214
13-53846-swr   Doc 1188   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 76 of 124   214

262

129.     Boiled down, the City's claim is that no retiree has yet suffered any injury as a result of the Governor's action.  *See, e.g.,* Debtor's Reply, at p. 22 (emphasizing that "the City's pension obligations have remained unimpaired").  Not so.  Contrary to the City's argument – and left entirely unaddressed in its briefing – is the fact that the threat of diminishment posed by the Governor's grant of permission is presently causing real economic harm to vested pensioners, diminishing the value of their vested pensions right now due to the uncertainty surrounding continued vitality of those pensions in bankruptcy.

130.     An imminent threat of future harm provides standing to assert a constitutional injury, even where that injury stems from the contingent effects caused by a plan of reorganization in bankruptcy.  *In re Global Indus. Technologies, Inc.,* 645 F.3d 201, 213 (3d Cir. 2011) (en banc) ("[A]n injury's having a contingent aspect does not necessarily make that injury incognizable.").  Thus, in *Clinton v. New York,* the Supreme Court made crystal clear that where an executive branch officer takes an action which could cost a private party money, but where that cost remains contingent on the actions of another branch of government, the private party has already experienced real, justiciable harm to its "borrowing power, financial strength, and fiscal planning."   *Clinton,* 524 U.S. at 430-31.  The Court in *Clinton* analogized this injury to the injury stemming from a pending trial in a "multibillion dollar" case, *id.,* which is not unlike the harm here.  Indeed, the testimony of many individual objectors before this Court on September 19 confirmed the real harm being caused right now to the pension rights of retirees.  *See generally* September 19 Hearing Transcript.

131.     For an act of a state to impair a contract, that act need not change the contract terms itself; it is enough that the state act makes impairment possible in the future.  Just as "the First Amendment is implicated whenever free speech is *either threatened* or impaired," so too

is "the Contract Clause []implicated whenever the *passage* of a law impairs the ability to negotiate and enter into contracts" even if no term of a contract currently in effect has yet been altered pursuant to the challenged law. *Donohue v. Mangano,* 886 F. Supp. 2d 126, 151 (E.D.N.Y. 2012). In *Donahue,* the County passed a law which, much like PA 436, permitted the cancellation of CBAs upon the order of a county executive. *Id.* at 134. Although no such executive order had yet been issued, the court found that the underlying law had caused an irreparable harm warranting a preliminary injunction because the specter of future contract cancellation had effectively impaired a number of existing contracts.

132.    In reaching its conclusion, the *Donahue* court made two crucial observations about the harm caused by the law at issue there, despite the law itself not yet having caused the formal cancellation of any actual contracts. First, "[i]f a public employer can gain through legislation what it gave up during good faith negotiations . . . the negotiations that bore [that] agreement become meaningless." *Id.* at 153. Second, "even if" no further action is taken to cancel or alter a particular contract, "this law arguably places a knife to the throat of the unions to coerce them into making certain concessions, under the threat of the [government] taking more egregious actions" in the future pursuant to the passed law. *Id.* The same, of course, is true as a result of the Governor's grant of permission and the filing of the City's bankruptcy petition: regardless of what happens to vested pension rights in bankruptcy, the mere availability of bankruptcy to the City "places a knife to the throat of the unions" and retirees "to coerce them into making certain concessions" of their vested pension benefits. The retirees experience this harm whether or not their pensions are cut in bankruptcy pursuant to a voluntary settlement or a cram-down. As such, it violates the Pensions Clause under any reasonable analysis.

133.    In any case, this Court can only confirm a plan if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b). In *In re Sanitary & Improvement District, No. 7,* 98 B.R. 970 (Bankr. D. Neb. 1989), the court held that a plan could not be confirmed where that plan required less than full payment to bondholders, because although such a plan is generally permissible under chapter 9, Nebraska law required full payment to bondholders. *Id.* at 974-75. The important insight of *Sanitary & Improvement District* is that implementation of a plan of adjustment ultimately requires "action" *attributable to the debtor*, which must honor the requirements of state law. Accordingly, any reduction to pension benefits ordered by this Court would ultimately require acts attributable to the City, and thus would violate the Pensions Clause and be unconfirmable under section 943 of the Bankruptcy Code. This is especially true with respect to pension benefits because the state and its instrumentalities are forbidden by the language of the Pensions Clause from reducing vested pensions by any means whatsoever ("shall not be diminished or impaired *thereby*"). With respect to other contractual rights, the plain language of the contracts clauses of the federal and state constitutions require only that no "law" impairing such rights "be enacted."

134.    No doubt aware that any plan reducing vested pension benefits could be effectively challenged under section 943 of the Bankruptcy Code, the City argues that such a determination must wait until the City proposes a plan, so that the City in the meantime can wield the uncertainty of the outcome of such a challenge as leverage over the retirees to force them to agree to a plan which unconstitutionally reduces their pensions. This is precisely the type of injury which the *Donohue* court found to constitute an impairment warranting an injunction, and therefore this issue should be addressed *now*.

-67-

13-53846-swr   Doc 2335-6  Filed 10/27/13  Entered 10/27/13 15:23:21  Page 97 of 124
13-53846-swr   Doc 1388  Filed 10/27/13  Entered 10/27/13 15:34:26  Page 217 of
262    217

135.    *In re City of Stockton,* 493 B.R. 772 (Bankr. E.D. Cal. 2013) – which the City contends stands for the proposition that "the 'main event' of pension impairment is not properly addressed until well after the eligibility stage," (Debtor's Reply, at p. 22) – is easily distinguishable.  In *Stockton,* no creditor challenged that the city's petition was not authorized by state law as it related to pensions.  The actual statement which the City relies on is mere *dicta* in *Stockton* referring to the fact that there, unlike here, the pension system (CalPERS) was "bellowing and pawing the sidelines during the eligibility phase" rather than challenging eligibility.  493 B.R. at 797.  Thus, the *Stockton* eligibility opinion is completely inapposite. AFSCME, meanwhile, has identified no other bankruptcy court which has held that a state constitutional protection for pensions is not relevant at the eligibility stage.  This Court thus writes on a clean slate.

136.    Relatedly, the City completely misunderstands AFSCME's argument as to why the Governor's failure to attach conditions to his grant of permission to the EM to file under chapter 9 has harmed the Detroit AFSCME Employees' rights to their vested pensions. Contrary to the City's mischaracterization, AFSCME's argument is *precisely* that the State must "*refrain* from [diminishing or] impairing pensions," Debtor's Reply at 29 – it is just that once the Governor was aware of the unconstitutional threat to pension rights posed by the EM's plan to file under chapter 9, the Governor *failed to refrain* from injuring retirees by purporting to authorize the petition *without* exercising his discretion to avoid an unconstitutional result by attaching contingencies thereto.  As noted above, the City has not contested that the Governor's exercise of his discretion is no excuse for taking actions which violate the state constitution. *See* ¶ 126, *supra.*

137.    The City's fallback argument that any such conditions would have been pre-empted by the Bankruptcy Code ignores the requirement in section 903 of the Bankruptcy Code that a State may "control . . . a municipality of or in such State" with respect to chapter 9. Section 903, of course, is the provision on which the City excessively relies in its attempt to ward off AFSCME's federalism challenge to chapter 9 writ large.  But the City cannot have it both ways.  Especially if section 903 of the Bankruptcy code is anywhere close to as forceful as the City contends elsewhere in its papers (*see*, *e.g.,* Debtor's Reply, at pp. 17-18), the correct rule from *Sanitary & Improvement District* is as follows: because Section 943(b) ultimately requires that any confirmable plan not cause the debtor to violate state law, state law does definitively constrain a chapter 9 debtor.  98 B.R. at 974-75.  Any other rule leads inexorably to an unconfirmable plan, or else redoubles the inherent federalism problems of chapter 9, regardless of pre-emption issues.

### (b)    Michigan's Pensions Clause Absolutely Protects Vested Pension Rights

138.    The City's second core counterargument in the Debtor's Reply – that Michigan's Pensions Clause does not absolutely protect vested pension rights (Debtor's Reply, at pp. 22-31) – contradicts both the plain language of the clause and state court decisions based thereon.  For starters, the text of the Pensions Clause differs significantly from both the federal and state contracts clauses (together, the "**Contracts Clauses**").  While the contracts clauses, each found in Article I of its respective constitution, only prohibit any "law *impairing* the obligation of contract," the Pensions Clause, found in Article IX of the Michigan Constitution, states that pension benefits "shall be a contractual obligation thereof *which shall not be diminished or impaired* thereby."

139.    As the Attorney General has noted, "[t]he Constitution and the language of § 24 is understood according to its plain meaning," by virtue of which it "is an impermeable imperative." *See Attorney General Bill Schuette's Statement Regarding the Michigan Constitution and the Bankruptcy of the City of Detroit* [Docket No. 481], at pp. 14-15. Importantly, Section 24 prohibits not only the impairment of pensions – arguably a prohibition coextensive with the contracts clauses, which also speak in terms of impairment – but *also* their diminishment.   Because the drafters of the amendment used the disjunctive word "or" to separate the word "diminished" from the word "impaired" in Section 24, "[c]anons of construction" require that each mean something different. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979).   As emphasized by AFSCME – but entirely ignored by the City – that difference is reflected in the Michigan Court of Appeals' holding that "under Art. 9, § 24, a retirement benefit *cannot be reduced.*" *Seitz,* 474 N.W. 2d at 18.

140.    The City's "strained construction," in contrast, "would have us ignore the disjunctive 'or' and rob the term" *diminished* "of its independent and ordinary significance[.]" *Reiter,* 442 U.S. at 338-39.   Had the framers of the Pensions Clause wished it to mirror the Contracts Clause, they could easily have ended the Pensions Clause with the phrase "shall be a contractual obligation."   Or they could have limited the clause to read "shall be a contractual obligation thereof which shall not be impaired thereby."   But they did not.

141.    Instead, the framers drafted, and the People of Michigan ratified, broader language, which they placed in an entirely different section of the Constitution – one which expressly controls, in minute detail, the financial decision-making of state and local governments.   For example, and further indicating how strongly the people of Michigan sought to protect their pensions through constitutional amendment, Article IX, § 24 also includes an

affirmative requirement that all pension benefits "arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." The Pensions Clause must be read in the context of the entirety of Art. IX, § 24, and its comprehensive dual protection of vested pension rights both from diminishment and from underfinancing.

142. Thus properly read, Art. IX, § 24 belies the City's contention that the limited intent of the Pensions Clause is to make pension benefits akin to any other contract. To the contrary, as explained by one of its chief drafters, § 24 was designed to acknowledge that pension benefits constitute "deferred compensation for work performed . . . *which should not be diminished by the employing unit after the service has been performed.*" 1 Official Record of the State of Michigan Constitutional Convention of 1961, 770–71. As such – and as argued *supra* in ¶ 120, but, yet again, entirely unanswered by the City – Michigan courts have held that vested pensions are different from other types of "government contracts," which may be subject to "a modest, temporary impairment . . . as a matter of last resort to address a fiscal emergency." *AFT Michigan,* 297 Mich. App. at 602. Ironically, the sole precedential Michigan opinion that the City cites in support of its argument that § 24 merely grants "contractual status" to pension benefits – *Kosa v. State Treasurer,* 292 N.W. 2d 452 (Mich. 1980) – uses that phrase offhandedly in prefatory language, *see id.* at 455, and then goes on to emphasize in its substantive discussion "the firmly established right of public employees to receive pension payments as those payments become due." *Id.* at 460.

143. Against this overwhelming evidence that the people of Michigan ratified Article IX, Section 24 in order to render public pension benefits inviolable, the City contends that because the amendment fails to mention municipal bankruptcy, it must not have been intended

to be able to forestall a filing under chapter 9. Debtor's Reply at 25-26. In support of this argument, the City cites to an advisory opinion of the Michigan Supreme Court holding that the Pensions Clause does not create a right to receive pensions tax-free. *Id.* (citing *In re Constitutionality of 2011 PA 38,* 806 N.W.2d at 697, n.24). This argument confuses the right with the remedy. The issue in *In re Constitutionality of 2011 PA 38* was the scope of the right protected by the Pensions Clause, not the ability of that constitutional right to trump a particular state statute. As with other constitutional rights, the absolute right to vested pension benefits constrains all state statutes when they come into conflict with the right, as here. With respect to an *as applied* challenge like AFSCME's, concluding otherwise would be akin to saying that the Governor could grant an emergency manager permission to file under chapter 9 knowing full well that the EM proposed to seek approval from the bankruptcy judge for a plan loaning Detroit's credit to private investors in violation of Art. VII, § 26 – a right only protected by the state constitution.

144. Therefore, even assuming *arguendo* that the City is correct that the contracts clause in the U.S. Constitution "does not pose any obstacle to chapter 9," (*see* Debtor's Reply, at p. 24), these important differences between the contracts clauses and the Pensions Clause would avoid what the City characterizes as the "absurd result" that no Michigan municipality "could ever enter chapter 9, where the impairment of contracts is always on the table." Debtor's Reply, at pp. 27-28. For as the City admits, Michigan courts interpret Michigan's contracts clause and the federal contracts clause "as having the same effect." Debtor's Reply, at p. 23 n.25 (citing *Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),* 527 N.W. 2d 468, 473-74 (Mich. 1994)). This would also presumably be true in most other states, because contracts clauses in state constitutions have largely been interpreted as "mirroring provision[s]"

-72-
262
13-53846-tjt   Doc 2335-6   Filed 10/27/13   Entered 10/27/13 15:34:26   Page 222 of
13-53846-swr   Doc 1388   Filed 10/21/13   Entered 10/21/13 15:28:21   Page 84 of 124   222

subject to the same Supreme Court jurisprudence as the federal contracts clause, a result "consistent with the notion that a substantively identical state constitutional protection against impairment could not supplement the federal protection." *See* Darryl B. Simko, *Emerging Issue in State Constitutional Law: Of Public Pensions, State Constitutional Contract Protection*, and Fiscal Constraint, 69 Temple L. Rev. 1059, 1077-78 (1996).

145.    When dealing with state law other than a state constitutional provision which only reiterates its federal counterpart, state law constraints on bankruptcy should govern unless expressly rejected by the Code. *See In re Sanitary & Improvement Dist., No.7,* 98 B.R. 970 (Bankr. D. Neb. 1989). Chapter 9 explicitly recognizes this fact by requiring in Section 109(c)(2) that petitions be "specifically authorized . . . by State law" at the outset, and in Section 943(b)(4) that a plan not be confirmed in the end unless "the debtor is not prohibited by law from taking any action necessary to carry out the plan." After all, even though federalism concerns are less of a concern for bankruptcies filed under other chapters of the Code, in those proceedings too incorporation of substantive state law constraints is common. *See, e.g., Butner v. United States,* 440 U.S. 48, 56 (1979) ("[T]he federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued.").

146.    The recent reported *Stockton* and *Vallejo* decisions cited by the City, *see* Debtor's Reply at 26-27, are not to the contrary. In the *Stockton* case, as noted *supra*, no party contended that a constitutional protection for pensions rendered the state ineligible for chapter 9 for want of state-law authorization under Section 109(c)(2). In fact, the opposite was true at the eligibility stage: prior to bankruptcy, the municipal debtor did *not* propose "to impair its pension obligation to the California Public Employees' Retirement System ("CalPERS")," and

other creditors therefore complained that the debtor had failed to negotiate in good faith because the debtor should have been "more aggressively attacking its pensioners by way of CalPERS." 493 B.R. at 782, 786.  Nor was a § 109(c)(2) challenge brought in *Vallejo. See In re City of Vallejo,* 408 B.R. 280, 285 (B.A.P. 9th Cir. 2009) (addressing eligibility problems solely under §§ 109(c)(4) and 109(c)(5)).

147.    Finally, the City is flat wrong that *Prichard* approved reductions to vested pension benefits despite "[s]imilar constitutional protection for pensions" in Alabama. Debtor's Reply, at p. 27.  In support of the purported similarity between Michigan and Alabama law, the City cites to *Bd. of Trs. v. Cary,* 373 So. 2d 841 (Ala. 1979), which held that vested pension benefits could not be altered by state legislation by virtue of Art. 1, § 22 of the Alabama Constitution of 1901.  373 So. 2d at 842 (per curiam).  But Art. 1, § 22 of the Alabama Constitution is merely Alabama's catch-all contracts clause, which, like Art. 1, § 10 of the Michigan Constitution, just "reaffirms . . .  the inhibitions of the Federal Constitution (art. 1, § 10) against ex post facto laws, or laws impairing the obligations of contracts." *Dunn Const. Co. v. State Board of Adjustment,* 234 Ala. 372, 386 (1937).  *See also Opinion of the Justices,* 598 So.2d 1362, 1365 (Ala. 1992) (interpreting Art. I, Section 10 of the United States Constitution and Article I, Section 22 of the Alabama Constitution in tandem); *Sweet v. Wilkinson,* 252 Ala. 343, 348 (1949) (applying Supreme Court precedent about the federal contracts clause to interpret Article I, Section 22 of Alabama Constitution).  Alabama thus has no explicit protection for pensions in its state constitution distinct from the federal contracts clause.  Moreover, the City cites no evidence to suggest that pensioners objected either to (a) Prichard's eligibility to file for chapter 9 due to lack of state-law authorization under § 109(c)(2), or (b) Prichard's plan of reorganization due to violation of state law under § 943(b).

-74-

13-53846-tjt   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:24:26   Page 224 of 124
13-53846-swr   Doc 1388   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 86 of 124   224

262

Accordingly, the City's reliance on *Prichard* is simply incorrect, and the City's arguments in this regard should be rejected.

**(ii)**      **PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution**

148.      "Michigan is strongly committed to the concept of home rule," a structural state-local federalism under which "[t]he charter of a city stands as its 'constitution,'" and "once adopted by a vote of the electors, a city's charter may be amended only by a vote of the electors." *Bivens v. Grand Rapids*, 443 Mich. 391, 400-01 (1993) (quotations omitted) (striking down local ordinance which conflicted with local charter because local government could not "effectively amend the charter without subjecting the amendment to the scrutiny and approval of the local electorate"). This "strong home rule" regime reflects a bedrock principle of state law, which has been true for each of Michigan's three Constitutions beginning with the Constitution of 1850 and continuing through the current Constitution of 1963: all officers of cities are to "'be elected by the electors *thereof*, or appointed by such authorities *thereof*,'" not by the central State Government. *See Brouwer v. Bronkema*, 377 Mich. 616, 652, 141 N.W.2d 98 (1966) (quoting *People ex re. Le Roy v. Hurlbut*, 24 Mich. 44, 65 (1871) (Cooley Court)).

149.      In blatant disregard of this constitutional mandate, PA 436 – pursuant to which the Emergency Manager contends he has authority to file under chapter 9 on behalf of the City – strips the local electorate of its constitutional right to select its own officials, as well as to "frame, adopt and amend its charter" under Article VII, Section 22; to approve, by a two-thirds majority, any local act of the state legislature under Article IV, Section 9; and to be subject to administrative authority only where that authority is guided by standards created by the legislature and subject to due process of law, see *BCBSM v. Governor*, 367 N.W. 2d 1, 51 (Mich. 1985). For each of these reasons, PA 436 offends the "strong home rule" of Detroit,

and the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the

City or to act as its representative during chapter 9 proceedings

**(a)**      **PA 436 Violates The Right Of The People Of Detroit To Select Their Own Local Officers And To Structure Their Own Government Via Charter**

150.      In one of its first cases interpreting the meaning of Michigan's current

Constitution, the Michigan Supreme Court reaffirmed the hallmark holding of the legendary

Cooley Court: city residents have the state constitutional right to select their own local

representatives. *Brouwer,* 377 Mich. at 651-61. As Justice Cooley held in his seminal *Hurlbut*

opinion – the wellspring of the so-called "Cooley Doctrine" of local government, *see* David J.

Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism,* 147 Univ. Penn. L.

Rev. 487 (1999) – the right "to choose in some form the persons who are to administer the local

regulations" is a right of local electors so basic to the "traditions, practice and expectations" of

Michigan that it undergirds the State's Constitution even in the absence of express

constitutional language to that effect. *Hurlbut,* 24 Mich. at 29-33.

151.      Having lived under the Cooley doctrine for 90 years at the time of Michigan's

most recent constitutional convention, the framers of the 1963 Constitution would have

understood *Hurlbut* as an even more foundational constitutional norm than Cooley himself.

Indeed, the framers sought, in adopting the strong home rule regime which as now set forth in

Article VII, to continue the "trend . . . toward strengthening inherent local government powers"

which Justice Cooley "led" when he set forth the "rule" of local self-government in *Hurlbut.* 1

Official Record, Constitutional Convention 1961, 1052-53. As a result, Article VII provides

that "[t]he legislature *shall* provide by general laws for the incorporation of cities and villages,"

Art. VII, § 21; that under those general laws, "the electors of each city and village *shall* have

the power and authority to frame, adopt and amend its charter," Art. VII, § 22; and that "[t]he

provisions of this constitution and law concerning counties, townships, *cities* and villages *shall* be liberally construed *in their favor*," Art. VII, § 34.  (Emphases added.)

152.    PA 436 offends Article VII in myriad ways.  First, it effectively adopts a new charter for Detroit which substitutes the *unelected* Emergency Manager for the Mayor *and* City Council collectively – including by granting the EM the power to, *inter alia,* issue orders directing the mayor and city council; set the local government budget unilaterally; enter into, and break, contractual agreements for the City, including CBAs, loans, and property transfers; seize control of the pension fund from its trustees; and, most relevant here, act "exclusively on the local government's behalf in . . . . chapter 9."  *See* MCL 141.1549(2) ("Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government."); MCL 141.1550(1) ("An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary[.]"); MCL 141.1552 (EM may amend local government budget; make contracts; terminate CBAs; enter loan agreements; transfer property); MCL 141.1558 (EM directs bankruptcy).

153.    It is a direct violation of *Hurlbut* and *Brouwer* that the EM serves in the role of mayor and city council without being selected by Detroit.

154.    Moreover, despite the existence of detailed procedures in the Detroit Charter concerning the method of passing local laws and the interplay of authority between the local legislative and executive officers, the EM may even exercise, according to PA 436, all authority of the mayor and city council *simultaneously* "concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government" and "[t]ake any other

action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government." MCL 141.1552(1)(dd-ee).

155. To the drafters of the current Michigan Constitution, PA 436 would appear to parody Article VII. The provisions of Article VII directing the legislature to provide for the incorporation of cities to be governed by charters written by the cities' voters is "mandatory," and even before the 1963 Constitution – which *increased* the home rule powers of cities – it was well-established that, in executing that mandate, ""under the Constitution the legislature [does] not have the power to change the law as embodied in the charter [of a local government] without a ratifying vote of the village electors." *Utica State Sav. Bank v. Village of Oak Park,* 279 Mich. 568, 273 N.W. 271, 274 (1937) (state statute retroactively ratifying all contracts for purchase of lands by local governments could not ratify land contract which was unlawful under local charter). This is because "the power vested in the [local] electors by the Constitution" to amend their own charter necessarily requires that "the Legislature does not have the power to alter or amend a [local] charter without the approval of the [local] electors." *Id.* at 577. Nor does the Legislature have the power to enter into contracts on behalf of the local government. *Id.* at 578. Yet PA 436 purports to empower Emergency Manager to assume all the powers of the local charter – including the ability to bind a city by contract for generations to come – without the core structural accountability for those powers baked into the charter in the form of local elections and separation of powers.

156. While it cannot be denied that the state possesses a robust role in demarcating the limits within which a municipality may structure the form of its government via charter, PA 436 swallows whole the rights reserved to local electors in Article VII to execute, within limits,

their own vision of local government. For instance, typically "municipal officers can bind a municipality only if they are empowered to do so by the city charter." *Manning v. City of Hazel Park*, 202 Mich. App 685, 691; 509 N.W. 2d 874 (1993). The Emergency Manager, however, possesses no such constraint under the terms of PA 436, which grants him his extreme powers "notwithstanding any charter provision to the contrary." MCL 141.1552(1). Under PA 436, therefore, the Emergency Manager not only violates the charter by purporting to act with all of the power of the entire municipal government simultaneously as a matter of procedure, but also by doing so in direct violation of any substantive limitation that charter places on the local government. In effect, each time the Emergency Manager takes an act which contravenes the City Charter – a charter which, to be clear, has not formally been repealed – he decrees an amendment to that charter. But, as discussed *supra*, Detroit's citizens have a constitutional right to be the ones to amend their own charters. Here too PA 436 egregiously violates Article VII.

157.    Article VII does not permit such a scorched earth approach to local democracy. The Emergency Manager's purported statutory authority to act for the City is antithetical to Article VII, and therefore the Emergency Manager was never authorized by state law to file the City's chapter 9 petition. As fundamentally, the "City" has therefore not *voluntarily* filed a petition under Section 301 as incorporated by Section 901(a) of the Bankruptcy Code.

    **(iii)**    **Neither The City Nor State Pleadings Answer How Detroit's Voters Could Have Constitutionally Lost Their Right To Local Self-Government Entirely, And The Loss Of That Right Invalidates Actions By The Emergency Manager Inextricably Intertwined With The Chapter 9 Petition And The Case Itself**

158.    Contrary to the City's assertion in the City's reply brief (*see* Debtor's Reply, at p. 39), the EM's power to set budgets, pass ordinances, and approve contracts under PA 436 is

inextricably intertwined with the lawfulness of the City's chapter 9 petition. The EM wielded these core local government powers as he allegedly endeavored (unsuccessfully, in AFSCME's view) to satisfy the requirements for a chapter 9 filing: negotiations with creditors, work on the City's budget as related to solvency, and so forth. The bankruptcy filing resulted from a process directed by the EM using the virtually absolute powers accorded him by PA 436, despite his having not been elected. The exercise of those powers under PA 436 is not severable from the EM's power to file for bankruptcy under Section 18. Because he lacked the power to take those predicate acts, and for the independent reason that he was not selected by Detroit's voters, the culminating chapter 9 filing was unlawful. For the same reason, the City did not voluntarily file its petition.

159. The pre-filing orders of the EM, which are part of the public record, demonstrate the breadth of the EM's exercise of purely local powers, ranging from his explicit suspension of the City Charter, to discrete financial decisions about City expenditures, to control over potential attempts by the City to raise revenue. For example, the Order No. 10, issued by the EM on July 8, 2013, suspends the Detroit Charter's requirement for filling vacancies on City Council. *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%2010.pdf (last accessed Oct. 7, 2013). Order No. 6, issued by the EM on May 2, 2013, directs the precise amount of deposits from the City to the Public Lighting Authority. *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%206.pdf (last accessed Oct. 7, 2013). Order No. 5, issued by the EM April 11, 2013, requires that the EM approve in writing of any transfers of the City's real property. http://www.detroitmi.gov/Portals/0/docs/EM/Order%205.pdf (last accessed Oct. 7, 2013).

160.     While the State correctly asserts that Article VII, § 21 of the Michigan Constitution subjects municipalities to general laws related to taxation and debt (*see* State's Response, at p. 14), the State Constitution  contains no like limitation for run-of-the-mill real estate contracts, public service expenditures, and other purely local acts related to the City's budget and fiscal self-management.  Yet, as the State also admits, PA 436 "transfers authority to perform these duties and responsibilities to the Emergency Manager" (*see* State's Response, at p. 14)*,* thus diverting municipal self-governance at the purely local level from the City's elected officials to an unelected "contractor to the State of Michigan" as the EM has described himself.  *See* Orr 10/4 Transcript, at 454:10-14.  This is not a case in which a particular local ordinance collides with a statewide regulatory scheme, as in *City of Taylor v. Detroit Edison Co.,* 475 Mich. 109 (2006).  It is, instead, a comprehensive seizure of the City's right to self-governance in all areas, no matter how local the question at hand.

161.     Similarly, while the City may be right that, at a broad level, the Detroit Charter, Home Rule Cities Act, and case law recognize limitations on the "exercise of [City] power" stemming from general state laws, Detroit Charter, § 1-102, such general state laws do not determine *who* exercises the powers granted by the State to the City or inherent to the City's purely local affairs.  Even assuming such limitations make it lawful for the legislature to pass a general statute granting certain powers to city councils rather than mayors, s*ee, e.g., Detroit City Council v. Detroit Mayor,* 238 Mich. App. 442 (2009), it is another thing entirely for the state legislature to designate *who* those city council members are, how they are selected, or who is to manage quintessentially local affairs on a day-to-day basis.  These are questions "of purely local character" assigned by Article VII to the will of the Detroit voters regardless of whether PA 436 is a general law.  *See id.* at 175 (As against the City Charter, a general state "statute

-81-
13-53846-tjt   Doc 2335-6   Filed 10/2/13   Entered 10/2/13 15:34:22   Page 231 of
262
13-53846-swr   Doc 2335   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 93 of 124   231

controls in all matters *which are not of purely local character*." (emphasis added)). The EM has nevertheless wielded his power under PA 436 in purely local matters, even suspending the City Charter requirements for the selection of City Council members.

162. On such basic questions of self-determination, the rule remains that the local electors must select their own local government officials, whatever the powers of those officials may be, and retain control over purely local matters. *See Brouwer,* 377 Mich. at 652. As the State concedes, the powers of the legislature to amend City Charters are limited "to matters of general concern," and "the power to amend a charter is vested in the local electors in purely local matters." *See* State's Response, at p. 12. Who is to govern them is one such "purely local matter," firmly established by the Cooley Doctrine as ratified by Article VII.

163. The City's two attempts to shield PA 436 from the Cooley Doctrine both fail. Its first response – that the State may destroy a municipality entirely (*see* Debtor's Reply, at p. 40) – is inapposite, because, of course, the State has done no such thing here, and Detroit retains the rights granted to it by the State Constitution as a municipality.

164. The City's second response – that the legislature has authority to temporarily replace local officials (*see* Debtor's Reply, at p. 40) – mischaracterizes the *Hurlbut* opinion. In *Hurlbut,* Justice Cooley stated in dicta that during the "inauguration and modification of local government" forms – *i.e.*, when creating entirely new formats for permanent local government – the State may make "provisional appointments to put the new system in operation." 1871 WL 3042, at *35. PA 436, in contrast, makes no provision for any new or modified permanent form of municipal government in Detroit. Instead, it simply seizes the existing reins of power from elected officials and transfers them to an unelected individual.

-82-
262
13-53846-swr Doc 2335-6 Filed 10/27/13 Entered 10/27/13 15:34:26 Page 232 of 124
13-53846-swr Doc 2335 Filed 10/11/13 Entered 10/11/13 15:28:21 Page 94 of 124 232

165.    Moreover, while the appointment of the EM *may* prove to be temporary – if, for instance, the financial emergency ends or the City Council removes the EM by a 2/3 vote after he completes 18 months of service (*see* MCL § 141.1549) – it may also prove to be indefinite if the financial crisis is not deemed to have ended and the local government cannot muster the 2/3 of City Council votes and the mayoral approval which are both required for removal.  Where, as here, the EM has asserted the power to suspend the charter as it pertains to the makeup of City Council, the ability of the EM to perpetuate his tenure is all the more real.  Moreover, the Governor might simply try to reappoint the EM, as he successfully did the Emergency Manager of the Detroit Public Schools.  *See Davis v. Emergency Manager for Detroit Public Schools,* 491 Mich. 899, 903 (Young, C.J., concurring) ("Neither MCL 141.1501 et seq. nor the statutes applicable to emergency managers preclude reappointment of a person to the office of emergency manager if that person previously held the position.").

166.    As to the State's Response, it is curious – and telling – that the State's otherwise comprehensive and strongly worded reply to AFSCME's home rule objections neglects to cite either the *Hurlbut* case or the Cooley Doctrine at all.  The State does appeal to federal case law holding that local governments are not sovereign entities subject to the "one person, one vote" rule of the federal Equal Protection Clause and are subordinates of the State for federal constitutional purposes.  State's Response, at pp. 15-16.  However, the case on which the State relies, *Sailors v. Board of Education of Kent County,* considered *only* whether federal constitutional law created a *federal* right to elect "state or local officers of the *nonlegislative character.*"  *See* 387 U.S. 105, 108 (1967) (emphasis added).  The Cooley Doctrine, in contrast, is a rule of *state* constitutional law, and *Sailors* certainly does not cast doubt on the right to elect local officials if state law so provides, as in the case of the Michigan Constitution.

167. Furthermore, because the City Council and Mayor whose duties the EM has captured possess "general government powers over an entire geographic area," they could in fact be subject to the "one person, one vote" rule. *Avery v. Midland County, Texas,* 390 U.S. 474, 485-86 (1970) (distinguishing *Sailors).* If anything, subjecting the people of Detroit to governance by an Emergency Manager who has been appointed by the Governor – over whose election Detroit electors have only a fractional influence – violates the "one person, one vote" rule when compared to other cities in Michigan who still possess the right to elect their own local government.

      **(b)    PA 436 Purports To Delegate Authority To The Emergency Manager In Excess Of That Possessed By The Legislature**

168. Section VII is not the exclusive mechanism protecting the "home rule" rights of local electors in the Michigan Constitution. Municipalities are further protected by Article IV, Section 29, which forbids the legislature from passing a local act both (a) "in any case where a general act can be made applicable, and (b) "until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." "The requirement of a 2/3 vote of both houses and a majority vote in the area affected protects localities against arbitrary action." *Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 287, 254 N.W. 2d 528 (1977) (quoting 2 Official Record, Constitutional Convention 1961, p 2415).

169. PA 436 allows the Emergency Manager to adopt local ordinances and take purely local legal acts which would otherwise be assigned to the local government. *See* MCL 141.1552. Before the EM takes a local act of this nature, however, neither he nor the legislature makes any determination whether a general act could accomplish the same purpose; seeks the approval of two-thirds of the legislature; or submits the proposed act to the local

-84-
13-53846-swr   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:28:21   Page 234 of
262
13-53846-swr   Doc 2335   Filed 10/11/13   Entered 10/11/13 15:34:26   Page 234 of 234

electors for ratification. PA 436 therefore delegates to the EM power that the legislature simply does not possess. For even assuming *arguendo* that PA 436 is a general as opposed to local law, it contemplates the future passage of limitless local ordinances without the prophylactic mechanisms built into Artice IV, Section 29 to preserve "the settled purpose of the framers of the [Constitution] and of the people who adopted it to forever insure to the people the right to control their affairs purely local." *Attorney General v. Lacy,* 180 Mich. 329, 337, 146 N.W. 871 (1914) (striking down local law passed by legislature).

170. The legislature cannot delegate power beyond that which it possesses. "That the Michigan Legislature may legislate absent constitutional limitations does not mean that it may wield legislative power in a manner other than that carefully prescribed by the Michigan Constitution." *Blank v. Dep't of Corrections,* 462 Mich. 103, 119, 611 N.W.2d 530 (2000). Yet PA 436 does just that, subjecting Detroit's citizens to purely local acts – including the instant chapter 9 petition – taken by a central authority without the protection of Article IV, Section 29. In this case that local legislation includes not only this illegal bankruptcy, but all of the legislative acts undertaken by the EM leading up to and in support of the chapter 9 petition.

      **(iv)**      **Despite Arguments To The Contrary By The State And City, The EM Is Not A State Agent And Therefore His Use of Unlimited Power To Pass Local Acts Which Led To This Bankruptcy Violated The State Constitution**

171. The City's reply brief attempts to insulate its chapter 9 petition from these impermissibly local acts of the Emergency Manager (*see* Debtor's Reply, at p. 41), in the process again ignoring the crucial fact that the petition was the culmination of the EM's exercise of total control over the City's local affairs during the course of four crucial months. *See* ¶¶ 158 - 159, *supra.* As demonstrated, the EM pursued a chapter 9 filing for the City as a foregone conclusion. Had the City's voters, rather than the State, remained in control of

-85-

13-53846-swr   Doc 2335-6   Filed 12/27/13   Entered 12/27/13 15:34:26   Page 235 of
13-53846-swr   Doc 1138   Filed 10/11/13   Entered 10/11/13 15:28:21   Page 95 of 124   235
262

Detroit's own local affairs – as required by Article IV, Section 29 of the State Constitution – the City's elected officials could have used that power in ways which might have taken the City off the path to bankruptcy designed by the EM. But the EM explicitly took that power away by Order No. 5, a local act removing from City Council and the Mayor any ability to raise revenue using City property. By delegating the power to legislate locally entirely to the EM, the State effectively robbed the City of its local lawmaking ability and instead transferred that power – a power the State legislature cannot exercise under the State Constitution without approval of the local electors – to the EM.

172. The City concedes that the State legislature may not pass local acts under Article IV, Section 29, but nevertheless contends that there is no violation of that provision when the EM exercises that power because *municipalities* are free to do so. *See* Debtor's Reply, at pp. 41-42. The State makes essentially the same argument. *See* State's Response, at pp. 17-18 ("This is no different from the authority generally granted by law to local elected officials but exercised locally."). Both are wrong, however, that the EM exercises the "local government's powers, not the State legislature's." Debtor's Reply, at p. 42; *see also* State's Response, at p. 18-19.

173. PA 436 gives every indication that the EM exercises power as an officer of the State, not the City. He is appointed by the Governor. MCL § 141.1549(1). The EM serves "at the pleasure of the governor," making him accountable to the State, not the City. MCL § 141.1549(3)(d). The State pays his salary. MCL § 141.1549(3)(e). The EM is "subject to" the Michigan "Conflict of Interest" statute – which applies to "members of the legislature *and state officers*," 1968 PA 318 – "as if he or she were a state officer." MCL 141.1549(9)(c). That PA 436 elsewhere states that the EM exercises his powers "for and on behalf of the local

government," MCL § 141.1552(1)(d), does not alter the reality of whose authority he exercises. The EM's powers derive not from the people of Detroit, but from the State Legislature which passed PA 436 to enable the transfer of those powers from Detroit voters to the EM as a state officer – or "contractor to the State of Michigan" as the EM has described himself. *See* Orr 10/4 Transcript, at 454:10-14.

174.    The core issue here is not whether PA 436 itself is a general law, as the State insists (*see* State's Response, at pp. 13-14), but instead whether that general law includes within it an additional delegation of power permitting limitless local acts to be undertaken in the future with absolutely no limitation as to scope. The limitation placed on the legislature's power to pass local legislation by Article IV, Section 29 would be entirely meaningless if the legislature could simply delegate the power to legislate locally, without any limitation, to a State appointee. Yet that is exactly what PA 436 does, and therefore the authority exercised by the EM under PA 436 is unconstitutional and the bankruptcy petition filed as part of the exercise of that authority by the EM in violation of state law.

> **(c)    PA 436 Unconstitutionally Delegates Legislative Authority To The Emergency Manager Because It Lacks Adequate Standards To Guide The Emergency Manager's Actions In Bankruptcy, Which Are Not Subject To Judicial Review**

175.    Even assuming *arguendo* that the legislature had the authority to delegate its illegally asserted control over local self-governance, that delegation must include (1) "sufficient standards and safeguards" to "direct[] and check[] the exercise of delegated power," as well as (2) "due process requirements" ensuring judicial review of the delegated action. *BCBSM v. Governor,* 367 NW 2d 1, 51-52 (Mich. 1985). PA 436 lacks both with respect to an Emergency Manager's control of the City during bankruptcy.

176.     First, PA 436 provides no standards whatsoever to the Emergency Manager –
other than any "contingencies" which the Governor, and not the legislature, may (but did not in
this case) designate – for how to exercise the City's affairs under chapter 9. MCL 141.1558.
Thus the Emergency Manager is unfettered, for example, to enter into settlements resolving
claims by creditors – settlements which, under Section 7-5-203 of the Detroit City Charter, are
legislative acts of the City which must be approved by the City Council – without following
any guidelines provided by the State. While the Bankruptcy Court may apply its own *federal
law* constraints in the course of approving, or not, such settlements – though the authority of a
bankruptcy judge to do so is questionable in light of federalism principles, *see infra* – there is
simply no *state law* standard to refer to evaluate whether the Emergency Manager, in entering
the settlements, is effectively legislating in bankruptcy within the intent of the legislature.
"This complete lack of standards is constitutionally impermissible." *BCBS,* 367 N.W. 2d at 55,
and therefore the Emergency Manager is not authorized under state law to carry out the
Legislature's attempted delegation of authority under chapter 9.

177.     Second, and relatedly, even assuming *arguendo* that PA 436 does contain
standards constraining the absolute power of the Emergency Manager to act for the City under
chapter 9, those standards are not subject to the requisite judicial review. As a result of the
automatic stay, the Emergency Manager's actions during chapter 9 can only be litigated to the
bankruptcy court, which itself lacks authority to decide freestanding state-law claims. *See* 11
U.S.C. §§ 902(a), 362 (automatic stay); *Stern v. Marshall, supra* (Article I judge prohibited
from deciding independent state law claims unhinged from bankruptcy). But the City can
arguably enter into settlements with creditors under chapter 9 *without* receiving approval from
the Bankruptcy Judge, even if a competing creditor requests judicial review. *See In re City of*

*Stockton, California,* Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) ("11 U.S.C. § 904 gives a chapter 9 debtor freedom to decide whether to ignore or to follow Rule 9019 compromise-approval procedure[.]"). The Emergency Manager thus acts in a legal vacuum, accountable neither in state court nor federal court for exercising the legislative power delegated to him by the State. The Michigan Constitution does not permit such insulation.

**(v)     The City And State Cannot Evade The Non-Delegation Doctrine Because The EM Acts With The State Legislature's Authority In Bankruptcy Without Any Standards Or Judicial Review**

178.     Here, again, the City and State in their respective reply briefs seek refuge in the assertion that the EM exercises the powers of the City in chapter 9, not the powers of the State Legislature. And here too, for the same reasons explained *supra,* the City and State arguments fail. The EM may have been tasked by the State with governing the City, but he does so with the authority of the State as delegated by statute, not the authority of Detroit's voters. Neither the City nor State cites any case in which a Michigan Court has held that the non-delegation doctrine did not apply because the delegated powers were of either an "executive" or "local" character. *See, e.g.,* State's Response, at p. 19. The simple fact is that whatever powers the EM exercises, he does so by virtue of the State legislature's delegation of its own authority.

179.     The alternative contention by the City and State that PA 436 does provide "reasonably precise" standards to the EM for use in chapter 9 fails because it relies on standards applicable to the EM only outside of bankruptcy. *See* Debtor's Reply, at p. 43; State's Response, at pp. 19-20. The City and State each cite to MCL § 141.1558, but that provision only provides a standard for use by the EM in exercising his discretion to recommend chapter 9 to the Governor. Once the EM makes that recommendation and the Governor approves it, the EM is granted power "to act exclusively on the local government's behalf in

any such case under chapter 9" with no state-law standards whatsoever to guide him, including in the ultimate determination of whether to file for bankruptcy or not after receiving permission. *See* MCL § 141.1558(1). Nor does MCL § 141.1549(2), which the City and State also rely on, provide the EM any governing standards in bankruptcy. The City only partially quotes MCL § 141.1549(2) (*see* Debtor's Reply, at p. 43), but the full relevant quote from MCL § 141.1549(2) grants the EM virtually limitless powers rather than constraining him to any meaningful standards. MCL § 141.1549(2) states: "The emergency manager *shall have broad powers* in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and local government's capacity to provide or cause to be provided necessary government services essential to the public health, safety, and welfare." Put otherwise: the EM is to do whatever he needs to run the City as he sees fit. This is a grant of absolute power, not a limiting standard.

180.     In any case, the City does not explain how either of the standards it asserts as governing the EM's actions in chapter 9 is enforceable by judicial review during the bankruptcy. The City claims that "this Court will review actions of the Emergency Manager," (Debtor's Reply, at p. 44), but does not explain how or whether this Court's review includes application of any standards contained in PA 436. Instead, the City admits that the only authority this Court has over the City consists of "*implementing provisions of the Bankruptcy Code* that may involve determination of state law issues." Debtor's Reply, at p. 44 n.38. The City cites to no provision of the Code which would require this Court to assess whether the EM has followed the alleged state-law standards in PA 436 for his actions during chapter 9 which have been identified by the City.

181.     The State, meanwhile, alone asserts that judicial review is possible because AFSCME can move for relief from the automatic stay to sue the City in state court if the EM violates the standards set forth in PA 436.  This argument fails for two reasons.  First, the ability to *request* that the Bankruptcy Judge grant relief from the automatic stay provides no *right* of judicial review of the EM's actions during the course of the bankruptcy, as this Court could readily deny the stay and thus foreclose any hearing on the merits of a claim that the EM has violated PA 436.  Indeed, this Court has already extended the automatic stay to cover the State precisely to *prevent* creditors from obtaining judicial review of actions taken by the EM under PA 436.  Second, and just as important, PA 436 itself "provides no administrative or judicial review to challenge" the EM's decisions, either inside or outside of bankruptcy.  *See BCBSM,* 367 N.W.2d at 53.  Thus, even if relief from the stay were to be granted, there is no sure route to judicial review of actions undertaken by the EM pursuant to PA 436.

### B.     The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9

182.     The City cannot meet its burden under section 109(c)(5) of the Bankruptcy Code of proving that it conducted good faith negotiations with its creditors or that such negotiations were impracticable.

183.     Congress enacted the "negotiation" requirement of section 109(c) to prevent capricious filings of chapter 9 petitions, and Courts do not "view lightly the negotiation requirements of 11 U.S.C. § 109(c)(5)."  *See In re Villages at Castle Rock Metro. Dist. No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990); *In re Town of Westlake, Tex.,* 211 B.R. 860, 867-68 (Bankr. N.D. Tex. 1997) (suggesting that section 109(c)(5) requires that a municipality have an intent to negotiate with creditors it intends to impair).  "The 'creditor protection' provided by section 109(c)(5). . .  insures that the creditors have an opportunity to negotiate concerning a

plan on a level playing filed with the debtor before their rights are further impaired by the provisions of section 362 of the Code." *Sullivan County,* 165 B.R. at 78-79).

184.    In *Cottonwood Water*, the Court explained the good faith negotiation requirement under section 109(c)(5) of the Bankruptcy Code as follows:

> Congress consciously sought to limit accessibility to the bankruptcy court by municipalities [by requiring] . . . the municipal entity, before rushing to . . . Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the [Bankruptcy] Code. . . . The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the [Bankruptcy] Code.

138 B.R. at 979.

185.    Accordingly, the burden is on the City to demonstrate (i) that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan or (ii) why it was unable to engage in such negotiations.  ASFSCME respectfully submits that the City cannot demonstrate any negotiations with creditors such as AFSCME, let alone "good faith" negotiations, and further given that the City conducted no pre-petition negotiations with significant creditors such as AFSCME, the City should not be heard to argue that negotiations were impracticable.

**(i)    The City Failed To Negotiate With Creditors Such As AFSCME**

186.    The City claims it satisfies the section 109(c)(5)(B) requirement for negotiating with its creditors prior to the bankruptcy filing by negotiating with creditors, including unions such as AFSCME, in a few meetings held with its unions where the City discussed its restructuring proposals and took certain questions.  *See* Eligibility Brief, pp. 53-61 (citing, *inter alia*, Orr Declaration, ¶¶ 90-96).  What the City fails to mention is that, as discussed

-92-

13-53846-swr    Doc 2355-6    Filed 12/27/13    Entered 12/27/13 15:28:21    Page 243 of 262
13-53846-swr    Doc 1356    Filed 10/11/13    Entered 10/11/13 15:42:26    Page 242 of 242

extensively above and as indicated by Orr himself prior to the scheduling of these meetings, it was made clear throughout these series of 3 or 4 relatively short meetings that the meetings were "discussions" and the City was not willing to conduct **any** negotiations. The City argued that the EM "openly invited the City's creditors to contact the City and its advisors to begin negotiations." Eligibility Brief, p. 55. In fact, the City rebuffed negotiations, which require concessions from both sides and collaboration between the debtor and its significant creditors. The City (acting through Orr) simply was not interested in negotiations (and as Orr indicated regarding the predecessor to the ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", "[t]his isn't a plebiscite, we are not, like, negotiating the terms of the plan").

187. *In re Ellicott School Building Authority* is directly on point. There, the debtor held three public meetings with large creditors regarding its proposed restructuring, although creditors were advised that the economic provisions of the proposed plan were not negotiable. 150 B.R. 261, 266 (Bankr. D. Colo. 1992). The court held that even though the debtor conducted three public meetings explaining its proposed plan of restructuring to bondholders, it did not negotiate in good faith because it indicated that the economic terms of its proposed plan were non-negotiable. *Id.* (debtor must be open to negotiating the substantive terms of a proposed plan); *cf. Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009) (finding that the city did not satisfy section 109(c)(5)(B) because it "never negotiated with Unions or any of its creditors over the possible terms of a plan of adjustment."); *Sullivan County*, 165 B.R. at 78-79 ("The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate

concerning a plan on a level playing field with the debtor before their rights are further impaired . . . ." (citation omitted)).

188.    The City's a "take it or leave it" Restructuring Plan proposal that was not really open to any negotiations (good faith or otherwise) should be rejected as the court did in *Ellicott School*.  The City failed to engage in **any** negotiations with its significant creditors such as AFSCME regarding the Restructuring Plan.  Flatly refusing to conduct any negotiations (despite repeated requests by AFSCME both prior to and subsequent to the City's bankruptcy filing) falls far short of the standard required under section 109(c)(5) of the Bankruptcy Code.

189.    The City has publicly proclaimed its willingness to negotiate, yet it and its representatives' (i) statements that the meetings held to discuss the Restructuring Plan were not negotiations and (ii) continued bad faith refusal for a period of time post-petition (until required mediation began) to hold negotiations (despite requests from AFSCME to jump start negotiations) makes it more than clear that the City has conducted no good faith negotiations with AFSCME and similarly situated creditors.

190.    Moreover, as described extensively *supra* (¶¶ 3, 36, 45), to the extent that the City held a series of pre-petition meetings with creditors to discuss its Restructuring Plan, such meetings were simply scheduled as part of the EM and City's plan to bolster the City's "record (i.e. for future litigation)" as suggested by the City's lead bankruptcy counsel in the Pitch Presentation back in January 2013.  In addition, the evidence further reveals that the City had planned on filing for chapter 9 as of early July 2013 by the specific date of Friday, July 19, 2013 – even as alleged creditor "negotiations" were ongoing – regardless of how the discussions were progressing.  *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet document dated July 4, 2013 attached to e-mail from EM's office to State officials entitled

"Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY"). This evidence further establishes that the City was not really interested in any serious negotiations.

<blockquote>
(a)    **Despite The City's Creative Arguments To The Contrary, The City Cannot Escape The Fact That It Refused To Negotiate In Good Faith**
</blockquote>

191.    In the City's reply brief and in recent deposition testimony provided by Orr on October 4, 2013, the City and Orr have now taken the position that while the City may have made statements that its pre-petition meetings with the unions regarding its Restructuring Plan were not a "negotiation", such characterizations were simply to avoid any argument that the City triggered obligations to collectively bargain, which obligations may be suspended by PA 436. *See* Debtor's Reply, at p. 55 n.49; *supra*, ¶ 44. The City now argues that it was flexible in its negotiations and willing to consider other proposals, but received no counter-proposals from creditors, despite requests for same. The City's statements in that regard, however, do not establish the good faith **<u>negotiations</u>** required by the Bankruptcy Code. Requesting "feedback" or "invitations for further information" simply does not satisfy the City's burden of proof.

192.    AFSCME (and other objectors) offered on more than one occasion to engage in good faith bargaining and negotiations which were continually rebuffed by the City, and indeed as of late June/early July 2013, the City did not even have any complete proposal with respect to the restructuring of pension and other retiree benefits. Rather, the City's proposal to its creditors was no more than an ultimatum, with the City showing no real intention of negotiating economic or substantive terms. As noted, the City was interested in and spent months mapping out its path to chapter 9, and never had any real intention of bargaining in good faith.

**(ii)** **Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B)**

193.     While AFSCME submits that the City did not engage in any good faith negotiations with creditors such as AFSCME prior to the City's chapter 9 filing, even assuming this Court were to find otherwise, the City also has not satisfied section 109(c)(5)(B) of the Bankruptcy Code because the plan or terms of a plan being negotiated must be a plan that can be effectuated in chapter 9.  *See Sullivan County*, 165 B.R. at 78 (debtor failed to meet burden of showing that it negotiated in good faith because the plan that was proposed was not a plan that could be effectuated in chapter 9); *Cottonwood Water.*, 138 B.R. at 979 (finding that "in order for this Debtor to be entitled to the entry of an order for relief, it must be prepared to show that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to section 941 of the Bankruptcy Code.").

194.     Here, the proposed Restructuring Plan is patently unconfirmable because it unconstitutionally looks to reduce or eliminate guaranteed vested pension benefits pursuant to a plan that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans, without their consent.  Given that creditors owed pension obligations have absolute rights to those vested pension benefits under Michigan law as set forth extensively above, and one of the main goals of this proceeding is to modify vested pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights.  *See* 11 U.S.C. §943(b)(4) (stating that the Court shall confirm a chapter 9 plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan.").

195.     Additionally, the Restructuring Plan is not in the "best interests of creditors" and thus could not be confirmed pursuant to section 943(b)(7) of the Bankruptcy Code.  The "best

interests of creditors" test in the context of a chapter 9 case does not compare treatment under a plan of liquidation, but rather to other alternatives to creditors to the plan. *See, e.g., In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ... simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The 'best interest' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 Collier on Bankruptcy, 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

196.    Had there been no chapter 9 filing by the City, pension creditors could not be impaired under the Michigan Constitution, and any impairment of those rights under a plan of adjustment would violate Michigan law and be patently non-confirmable.    Accordingly, because the Restructuring Plan proposes to unconstitutionally wipe out guaranteed vested pension benefits, the proposal cannot satisfy the requirements of good faith negotiations over a plan that could be effectuated in chapter 9.

197.    Orr failed to consider before filing for bankruptcy protection or since the filing, an equitable argument for the pension fund beneficiaries that other creditors extending debt after funding concerns surfaced publically should be subject to equitable subordination/fraudulent conveyance under Bankruptcy Code sections 510(c) and 544(b)/548(a) and pension benefits should take priority over those claims.

198.    Further, under Bankruptcy Code section 928(b), Orr should be exploring whether certain other creditors should bear the burden of some of the City's operating expenses during bankruptcy process, before benefit cuts are implemented.

199. The City in its reply brief (*see* Debtor's Reply, at p. 58 n.50) argues that AFSCME is incorrect that to satisfy the good faith negotiation requirement of section 109(c)(5)(B), negotiations must be conducted regarding the terms of a confirmable plan. The City cites no authority for rejecting AFSCME's arguments in this regard, and the weakness of the City's argument is belied by its relegation to a footnote. There can be no doubt that the reference to good faith negotiations of the terms of a plan in section 109(c)(5)(B) of the Bankruptcy Code is to negotiations of the terms of a plan that can be effectuated in chapter 9, *i.e.*, a confirmable plan, as argued above. It is illogical for the statute to reference negotiations regarding an unconfirmable plan. Were that the case, then the whole point of good-faith negotiations would be meaningless and rendered moot, or simply, be deemed bad faith. As one recent court has explained in the chapter 9 context:

> The structure of the sentence [*i.e.* section 109(c)(5)(B)] strongly implies that in the negotiations, municipalities are seeking the creditors' agreement *to a bankruptcy plan*. **What other agreements can they be seeking?**

*In re Mendocino Coast Recreation and Park District*, No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697, at *19 (N.D. Cal. Sept. 27, 2013) (*emphasis* in original; **emphasis** added).

200. The City attempts to rebut AFSCME's reliance on *Sullivan County* and *Cottonwood*, *supra*, with respect to the meaning of a plan in section 109(c)(5)(B) of the Bankruptcy Code. Debtor's Reply, at p. 58 n.50. Although *Sullivan* does acknowledge that a *formal* plan is not required, that court states that, to be in good faith, negotiations must "revolve around the negotiating of the terms of a plan that could be effectuated if resort is required to chapter 9 of the Bankruptcy Code." *Sullivan*, at 78. For a plan to be effectuated under chapter 9, it clearly must satisfy the parameters of and be confirmable under section 943(b) of the Bankruptcy Code and be in the best interests of creditors. The *Sullivan* court's statement

that the plan need not be a "formal plan", *id.*, at 78, is underscored by the language that follows (and conveniently omitted by the City):

> While the statutory requirement does not require a formal plan as such, some sort of comprehensive plan is required as one of the 'screening factors' to avoid a too early and rapid resort to the bankruptcy courts by municipalities.

*Sullivan*, 165 B.R. at 78 (emphasis added). This language is telling and clearly negates the City's position with respect to the nature of the "plan." Both the *Sullivan*, *supra*, and *Cottonwood*, *supra*, courts concluded that, even where the parties engaged in good-faith pre-petition negotiations, the municipality failed to satisfy section 109(c)(5)(B) because the negotiations did not include the terms of a plan under chapter 9 of the Bankruptcy Code. The City would further have this Court ignore the finding in *Ellicott*, adopting the well-reasoned analysis of *Cottonwood,* that a municipality must establish that "'it engaged in good faith negotiations with creditors *concerning the possible terms of a plan to be effected under section 941 of the Bankruptcy Code.*'" *Ellicott*, 150 B.R. at 266 (citing *Cottonwood*, 138 B.R at 138) (emphasis added). The City failed to negotiate in good faith as any purported negotiations were not related to a plan that could be effectuated under section 941 and 943(b) of the Bankruptcy Code. The City, therefore, does not satisfy section 109(c)(5)(B) of the Bankruptcy Code.

### (iii) Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable

201. The City alleges that it alternatively qualifies for eligibility under section 109(c)(5)(C) of the Bankruptcy Code because negotiations were impracticable.

202. As with the other eligibility requirements, the burden of proving impracticability rests with the City. *See In re Pierce County Housing Authority,* 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009); *Vallejo*, 408 B.R. at 289 (citing *Valley Health*, 383 B.R. at 161). Courts

considering section 109(c)(5)(C) define the ordinary meaning of "impracticable" as "'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.'" *See, e.g.*, *Vallejo*, 408 B.R. at 298 (citing Valley *Health*, 383 B.R. at 163). Whether negotiations were impracticable is fact specific and depends upon the circumstances of the case. *See Vallejo*, 408 B.R. at 298.

203. The City alleges that negotiations were impracticable because, in part, the City had (i) numerous series of bonds and indebtedness held by multiple holders and (ii) approximately 20,000 retirees not represented by any formal agent or committee and other potential involuntary creditors. Furthermore, the City claims that the refusal of certain creditor constituencies to engage in good faith negotiations rendered negotiations impracticable.

204. In fact, AFSCME believes that the exact opposite is true here. The City predetermined that its pre-bankruptcy negotiations (which, as discussed above, were not negotiations) would fail. As discussed extensively above, the Governor and his staff orchestrated for several months prior to the hiring of Orr as EM to bring in Orr, as an experienced bankruptcy attorney, to lead the City on a clear path towards a chapter 9 filing, and any negotiations were a façade – the City went through the motions of pre-petition meetings but, as is evident from its pre-petition conduct *vis a vis* AFSCME, never had any intention of negotiating outside of bankruptcy.

205. While the City alleges that it has over 100,000 creditors, it is clear that the main creditors the City had to negotiate with were the unions, its retirees, and the bond trustees.

206. Moreover, as discussed extensively *supra* (¶¶ 50-51), The City itself has in the past negotiated with its unions with respect to concessionary agreements which changes impacted retiree benefits outside of a chapter 9 proceeding (even where such unions were not

explicitly representing their retirees). Thus, it is a red herring to say that negotiating medical benefits or pensions is impractical *per se*.

207. While courts have made clear that impracticability can be demonstrated by the volume of creditors to negotiate with, in no case AFSCME is aware of did a court find that negotiations were impracticable where the Debtor did not even attempt to negotiate pre-petition with its largest creditors such as AFSCME (and after repeated requests to do so). In *Ellicott School*, the court determined that the debtor holding "public meetings to which all bondholders were invited" showed that negotiations were practicable.

208. AFSCME is not suggesting that pre-petition negotiations could have bound everyone or must have involved all of the City's thousands of creditors. Rather, some level of negotiation with principal creditors could have led the City to a non-bankruptcy solution. By way of analogy, section 109(c)(5)(B) of the Bankruptcy Code contemplates pre-bankruptcy negotiations with creditors that municipality intends to impair, not all creditors.[13]

209. Given the City's lack of negotiations with creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt, the City's arguments that negotiations were impracticable should be rejected.

210. In the City's reply brief, the City cites only one case (and no cases to support its rejection of AFSCME's arguments *supra*) to support its position that negotiations were impracticable, and mainly relies on, in part, various facts, including (i) the large number of unrepresented entities holding substantial amounts of bond debt which required unanimous

---

[13] Importantly, the City describes in the Orr Declaration that of the City has nearly $12 billion in unsecured debt, but 75% of that (approximately $9.2 billion) relates to <u>accounting</u> liabilities for post-employment benefit or underfunded pension liabilities.

consent to restructure; and (ii) the apparent refusal of certain parties, including AFSCME, to negotiate on behalf of retirees. *See* Debtor's Reply, at pp. 45-46; 50-52.

211. However, the City ignores that serious bargaining and negotiations with bond trustees (even where bondholders could not have been bound 100%) and the City's unions could have yielded the major deals necessary to prevent the crash landing in chapter 9 that occurred. Additionally, while local unions may have refused to represent the interests of retirees, AFSCME never refused to bargain or negotiate in connection with the City's Restructuring Plan;[14] to the extent that the City had other organizations actively representing retirees, the City could have negotiated in good faith with such parties. In reality, the City was not truly interested in negotiating in good faith (whether or not such negotiations were impractical) because the City strongly desired a swift landing in chapter 9.

## C. The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith

212. The City's bankruptcy petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith. Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

---

[14] The City (Debtor's Reply, at p. 50 n.43) cites a May 24, 2013 letter sent by Ed McNeil on AFSCME Council 25's behalf **several weeks** prior to any good faith negotiations of the actual Restructuring Plan began as evidence of AFSCME's refusal to negotiate. Mr. McNeil indicated that at that time, AFSCME had "no authority in which to renegotiate the Pension or Medical Benefits that members" of AFSCME currently receive, but would be willing to meet with the City anyway. The letter then went on to indicate that "we stand ready to meet and negotiate in an effort to save the City." Furthermore, the fact that AFSCME as of early July 2013 was not formally representing retirees did not mean that AFSCME could not negotiate an agreement on behalf of actives or retirees. Other parties were explicitly representing retirees, and AFSCME had previously (in 2012 via the Tentative Agreement and in earlier agreements) negotiated agreements which effectuated changes that affected both active and retired employees. Subsequently, AFSCME attended all of the public meetings offered it by the City and attempted to engage the City. Thus, the City clearly had parties to negotiate with if it truly desired to reach a negotiated non-bankruptcy solution.

213.  "Good faith is not defined in the Bankruptcy Code."  *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at \*4 (Bankr. E.D. Okla. Dec. 4, 2007).  Courts have determined, however, that the primary function of the good faith requirement in chapter 9 is to "ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."  *Sullivan County*, 165 B.R. at 80 (citation omitted); *see also In re City of Stockton, California*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013) ("Section 921(c) "good faith" serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code"); *Villages at Castle Rock*, 145 B.R. at 81 (describing good faith as requirement that "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes") (internal quotation marks and citation omitted).

214.  While good faith in the chapter 9 context is not defined in the Bankruptcy Code, courts have looked to discussions of good faith in the chapter 11 context to determine whether a chapter 9 petition has been filed in good faith.  *McCurtain Mun. Auth.*, 2007 WL 4287604, at \*4 (referencing chapter 11 good faith standards to determine whether chapter 9 petition was filed in good faith) (quoting *Villages at Castle Rock*, 145 B.R. at 81); *County of Orange*, 183 B.R. at 608 (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith); *Sullivan County*, 165 B.R. at 82 (examining and applying chapter 11 good faith requirements to chapter 9 petition)).

215.   In the chapter 11 context, courts explain that the requirement of good faith

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.  Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy

> courts by rendering their powerful equitable weapons . . . available
> only to those debtors and creditors with 'clean hands.'

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986).

216.    Relevant considerations regarding good faith under chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." *Stockton*, 493 B.R. at 794.

217.    Here, a review of the various relevant factors considered by courts when analyzing good faith under section 921(c) lead to the inescapable conclusion that the City's chapter 9 case was filed in bad faith and with unclean hands.

218.    First, the City's filing came several minutes prior to a Michigan State Court issuing a TRO enjoining the Governor from authorizing the filing.  The State lawyers at the hearing on the TRO asked for a short delay when they realized that an adverse ruling was forthcoming with respect to the City's ability to authorize any chapter 9 authorization which did not proscribe the reduction of pension benefits violated the Michigan constitution.  During that recess, the City filed for chapter 9 protection.  Thus, the City commenced this proceeding "in the dark of night" to avoid a ruling it viewed as not in its favor.  Such a filing is the antithesis of the careful, deliberative decision to file required under chapter 9, as "[t]he legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort." *Pierce County*, 414 B.R. at 714 (citation omitted) (noting debtor decided to file a chapter 9 petition only after several years of failed negotiations and attempts at mediation); *cf. Valleo*, 408 B.R. at 295 ("The evidence needs to show that the 'purpose of the filing of the chapter 9 petition not simply be to

-104-
262
13-53846-swr   Doc 2285-6   Filed 12/27/13   Entered 12/27/13 15:28:42   Page 16 of 24
13-53846-swr   Doc 1186   Filed 10/11/13   Entered 10/11/13 15:42:26   Page 254 of 254

buy time or evade creditors.'"). The City filed chapter 9 to evade what it viewed as an imminent negative state court ruling – enjoining this very filing.

219. Moreover, as discussed above, while the City was purporting to negotiate with its creditors in good faith by holding several meetings, such meetings were employed as a mere strategy to bolster the record and never truly given the chance to succeed. The City simply does not have "clean hands".

220. Additionally, as discussed extensively above, the City did not reasonably consider any alternatives to chapter 9, did not give negotiations any real chance to succeed, and was preparing for a chapter 9 filing months before any creditor meetings to discuss restructuring options even started (and indeed had finalized a decision to file as of early July 2013 well before significant creditor meetings were scheduled to take place), and refused to negotiate with major creditors such as AFSCME as required. Simply put, the predetermined filing was done in bad faith and should be dismissed.

221. The City argues in its reply brief that the reason for filing the chapter 9 petition was not the imminent entry of the State Court TRO, but rather "to adjust its debts and resolve its liquidity crises [consistent] with the rehabilitative purposes of Chapter 9." Debtor's Reply, at p. 65. The City states further that it was no secret that Chapter 9 was an option if negotiations with creditors proved impracticable (which, of course, AFSCME disputes as set forth *supra*). *Id.* at 65-66. However, the City has not and cannot establish that negotiations with its creditors were impracticable under Section 109(c)(5)(C). Thus, any reliance by the City on the impracticability of negotiations with creditors to establish good faith is misplaced.

222. Moreover, the City's attempts to lay blame on the movants in the state court TRO proceeding by suggesting that it was the City's preparation for bankruptcy that prompted

the request for the TRO (*see* City Reply, at 66, n. 56), rather than the opposite (*i.e.* that the imminent entry of the TRO prompted the chapter 9 filing) is incorrect. Indeed, as discussed above, Orr admitted that the filing was being driven by the state court litigations and that he was being "irresponsible" by not authorizing the filings when he did.

223. The City relies on the *McCurtain Municipal Authority*, decision to support its position regarding the timing of its filing and the state court TRO hearing. In *McMurtain*, a creditor filed an application for the appointment of a receiver the day before the trustees of the municipal authority met to discuss a chapter 9 filing. Notice of the trustees' meeting was provided before the filing of the application for the receiver. The municipal authority argued that the potential appointment of a receiver may have been a concern, but it was not the only reason for the authority to ultimately file its petition. *McCurtain* at *5 (identifying other concerns considered by the authority trustees that precipitated the chapter 9 filing).

224. Here, in contrast, the evidence show that the City very much sought to avoid the effects of the State Court litigation and a ruling that the Governor could not authorize a filing that did not place contingencies on the EM from changing pension benefits in a chapter 9. The City likely would have considered giving creditors more time to negotiate (as was required for any significant bargaining to take place), and there was no cash crisis and the City had actually as of July 17, 2013 inked a deal with its swap counterparties which helped the City's anticipated liquidity. The City has simply not proceeded in good faith.

**D.  The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency**

225. The Bankruptcy Code does not offer relief to a city simply because it is suffering economic difficulties. *See, e.g.*, *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D. Conn. 1991) (although City projected $16 million budget deficit, it was not insolvent, and

"financial difficulties short of insolvency are not a basis for chapter 9 relief"); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1386 (10th Cir. 1998) (debtor not eligible for relief simply because it was severely economically distressed).

226.    In order to carry its burden on insolvency, the City must prove either that it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). The test under the first prong requires current non-payment of obligations, but the test under the second prong is prospective, looking to the debtor's future inability to pay. *Bridgeport*, 129 B.R. at 336-37. Solvency is measured as of the petition date. *See, e.g., In re Town of Westlake, Texas*, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997) (citing cases).

227.    The purposeful refusal to make a few payments comprising a relatively small part of the City's budget does not satisfy the definition of "insolvent" under 11 U.S.C. § 101(32)(C)(i). *See, e.g., Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa Healthcare Dist.)*, No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) (failure to pay $1.3 million out of $10-$11 million total operating expenses did not mean the debtor was "generally not paying its debts")

228.    First, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867. Second, "[t]he mere fact that a municipality has adopted a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test." COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011). A municipal budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

229. The City puts forward three declarations from Orr, Malhotra and Moore which appear to provide a voluminous amount of data to "establish" the City's insolvency, including on the basis of budget and service delivery insolvency, negative cash flows and inability to increase revenues or reduce expenses.

230. However, as discussed above, when one digs into all of the "facts" cited by these three declarants, it becomes apparent that the City failed to provide this Court or the citizens of Detroit evidence to establish insolvency.

231. It is telling (and should be shocking to all citizens of Detroit and Michigan) that despite spending millions of dollars of taxpayer funds on the City's chapter 9 cases to hire a multitude of bankruptcy and restructuring professionals, the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency. Courts in the non-chapter 9 context note that "[i]t is generally accepted that whenever possible, a determination of insolvency should be based on . . . expert testimony . . ." *Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.)*, Case No. 03B12184, 2005 Bankr. LEXIS 1312, at *18-*19 (Bankr. N.D. Ill. July 14, 2005); *see also Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 38 (2d Cir. 1996); *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (stating that "a finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses").

232. Here, the insolvency "evidence" offered by the City focuses on the non-expert testimony of Orr, Malhotra, and Moore. This testimony relies on unaudited and unfounded assumptions, unsupported statements and a complete lack of expert opinion. For example, as purported evidence for the City's insolvency, Orr (*see* Orr Declaration, ¶¶ 52-57) cites to the June 14 Restructuring Plan prepared by the City and to conclusory statements by Malhotra, one

of the City's restructuring advisors (who of course all had one goal in mind: demonstrating insolvency).

233.    While the City alleges that it was forced to suspend certain payments to "conserve its dwindling cash", the main portion of the payments not made revolve around the City's pension obligations, and those obligations are subject to dispute as to the ultimate amount required to be paid, and indeed evidence (discussed *supra*, ¶ 53-59) shows that (i) the City may have funds (or be able to raise funds from other sources such as revenues generated from the water and sewer fund) not calculated as part of its financial projections to cover such shortfalls and (ii) the City apparently chose to not actually calculate through an expert report the correct underfunding liability with respect to the pension obligations (despite presenting "definitive" numbers of such underfunding in the Restructuring Plan and other documents produced by the EM and his staff).  Thus, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.

234.    Second, "[t]he mere fact that a municipality [adopts] a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."  COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011).  The City's budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

235.    Here, the City's past and current practices, as well as current facts and circumstances, not only show that the City has many available (but unexplored) options to enable it to pay its debts as they become due, but also that the City chose to deliberately not monetize certain assets (or explore the value of such assets) prior to the filing to limit the

-109-

13-53846-swr   Doc 2235-6   Filed 12/27/13   Entered 12/27/13 15:28:42   Page 259 of 924
13-53846-swr   Doc 1356   Filed 10/11/13   Entered 10/11/13 15:42:26   Page 259 of 262

appearance of cash or revenue on its books. It is telling that the City's prized artwork collection and potential deal to lease Bell Isle are only now on the table – if these assets and other possible increased tax revenue collection could have collectively solved all of the City's short term cash issues. But, as indicated above, the City did not want such assets monetized because the City's goal and clear path was to end up in chapter 9, which the City believed provided the only means to attack its vested pension obligations.

236. Thus, in light of all of the above, the information provided in the City's current budget provides at most only "insufficient credible proof" of insolvency. *Town of Westlake*, 211 B.R. at 867; *see also Bridgeport*, 129 B.R. at 338 (requiring concrete proof "that [the city] will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year" and noting that "[o]bviously, it is necessary for cities to make informed financial projections").

237. The City's current financial difficulties currently are actually less severe than in some prior years, the City entered into a deal prior to the chapter 9 filing with its swap counterparties which potentially freed up significant cash and did not make the filing imminent, and AFSCME believes (and as will be further demonstrated at trial) that there are numerous means already show to be available to solve the City's current financial difficulties and generate sufficient funds to pay its debts coming due in the coming fiscal year. AFSCME recognizes that all parties (including current and former employees) will be required to sacrifice, but reasonable concessions outside of bankruptcy – which is not necessary and which the City does not and cannot qualify for based on all the reasons discussed above – from all significant creditors would easily bring the City back to financial stability.

## CONCLUSION

For the reasons set forth herein, AFSCME respectfully requests that this Court issue an order dismissing the City's chapter 9 petition and granting such other and further relief as is just and proper under the circumstances.

Dated: October 11, 2013

**LOWENSTEIN SANDLER LLP**
By: /s/  *Sharon L. Levine*
Sharon L. Levine, Esq.
John K. Sherwood, Esq.
Philip J. Gross, Esq.
Ira M. Levee, Esq.
Keara M. Waldron, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 11, 2013, *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees'* <u>*Amended*</u> *Objection to the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:    October 11, 2013

*/s/ Lisa M. Bonito*
Lisa M. Bonito
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
lbonito@lowenstein.com