# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |
| | | **Richard A. Roble (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–6769<br>Email: Richard.A.Roble@usdoj.gov |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364 |

(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 10/11/2013 | | 1166 | Reply to (related document(s): 519 Objection to Eligibility to Chapter 9 Petition filed by Creditor General Retirement System of the City of Detroit, Creditor Police and Fire Retirement System of the City of Detroit) *Reply in Support of Objection of the Detroit Retirement Systems to the Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code* Filed by Creditors General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit (Attachments: # 1 Exhibit List # 2 Exhibit A # 3 Exhibit B # 4 Exhibit C) (Gordon, Robert) (Entered: 10/11/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| *In re:* | Chapter 9 |
| | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | |
| *Debtor.* | Hon. Steven W. Rhodes |

## REPLY IN SUPPORT OF OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO THE ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS") (together, the "Retirement Systems") respectfully submit this Reply in support of their Objection to the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of the Bankruptcy Code [Doc. No. 519] (the "Objection").[1]

---

[1] This Reply is in reply to the City's omnibus response to eligibility objections [Doc. No. 765] and the City's response to the Retiree Committee's eligibility objection [Doc. No. 918]. It is also based on discovery obtained from the City subsequent to filing the Objection. To the extent that this Reply is required to be submitted as part of an amended objection, per Section VII of the Court's First Amended Order Regarding Eligibility Objections [Doc. No. 821], the Objection is hereby incorporated in full by reference.

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………………....1

ARGUMENT ..……………………………………………………………… 2

I.     The City's Claim That Pension Benefits Have Not Been Impaired *Yet* Is Unavailing Because the City Admits the Purpose of This Case Is To Impair Pension Benefits ……..…………………………………………….. 2

II.    Michigan's Pensions Clause Imposes an Absolute Bar to the Governor's Consenting on Behalf of the State to Diminishing or Impairing Pension Benefits …………………………………………………………… .... 6

       A.     The Pensions Clause Provides Broader Protection Than the Contracts Clause. …...………………………………………….7

       B.     The State and City Cannot Use Bankruptcy To Impair Pensions Indirectly ……………...…………………………………12

       C.     The Michigan Legislature Cannot Effectively Authorize the Governor, the Emergency Manager, or the City To Violate the Michigan Constitution .……………………………………...16

              1.     The State's Consent to the City's Bankruptcy Petition Was Ineffective Because It Abrogates the Michigan Constitution …………………………………………………..16

              2.     The Existence of the Pensions Clause as an Express Constitutional Bar to Eligibility Is Unique In this Case…….. 19

              3.     The *Harrisburg* Case Holds  Mere Compliance With An Authorizing Statute Is Insufficient to Authorize a Filing Where Authorization Violates Other State Law……………………..20

       D.     State Law Is Not Preempted In Determining Eligibility ……….... 22

              1.     The Bankruptcy Clause's "Uniformity" Requirement Recognizes That State Law Governs Eligibility…………….22

              2.     The Tenth Amendment Bars Federal Interference With Public Pension Rights In Bankruptcy Or Otherwise ………………..25

i

3.      Substantive Due Process and the Takings Clause Bar the City from Impairing Vested Pension Rights ……..……………..27

III.   The City's Arguments Regarding Collateral Estoppel Are Unavailing……30

    A.    The *Webster* Court Had Jurisdiction To Decide Questions of State Law …………..…………………………………………………..31

    B.    The *Webster* Judgment Did Not Violate the Automatic Stay………32

    C.    The Elements of Collateral Estoppel Are Satisfied ..………………36

    CONCLUSION…………………………………………………………….38

9719247.1 14893/165083

# INTRODUCTION

The City does not dispute that Michigan state law controls the threshold question of whether, under Bankruptcy Code section 109(c)(2), the City is "specifically authorized . . . by State law" to be a Chapter 9 debtor. The City also does not dispute that Article IX, Section 24 of the Michigan Constitution (the "<u>Pensions Clause</u>") forbids both the City and the State from taking any action that would "diminish or impair" accrued public pension benefits. Nevertheless, contrary to the views of both the Michigan Attorney General (the "<u>AG</u>") and the only Michigan state court that has addressed this question of Michigan law, the City contends it may file a Chapter 9 case to "diminish or impair" constitutionally protected public pension benefits.

To reach this counterintuitive result, the City argues that (1) merely authorizing and filing for bankruptcy under Chapter 9 does not "diminish or impair" pension benefits because filing bankruptcy merely seeks to have a court impair the obligations, but (2) the City may then propose a Chapter 9 plan with the express purpose and effect of diminishing and impairing pension benefits without regard to the Pensions Clause. Both arguments are demonstrably wrong.

First, the City has admitted in discovery and through statements on the record that diminishing and impairing pension benefits is indeed a primary aim of the City. Thus, the question of whether the City is properly authorized under State

1

law to proceed any further with this case and seek to diminish or impair accrued pension benefits must be decided at the eligibility stage.

Second, Michigan's Pensions Clause categorically prohibits pension benefits from being diminished or impaired, separate and apart from the protection for contractual obligations under Michigan's Contract Clause. Both the AG and the State Court for Ingham County, Michigan (the "State Court") have unequivocally concluded that the Pensions Clause of the Michigan Constitution prohibits the City from proceeding with Chapter 9 bankruptcy in any manner that threatens to diminish or impair pension benefits.

In addition, the State Court's declaratory judgment in *Webster v. Michigan*, No. 13-734-CZ (Ingham Cty. Cir. Ct. July 19, 2013) (the "*Webster* Judgment"), constitutes a valid, final judgment interpreting Michigan law and precludes the City from re-litigating the Governor's ability to authorize this bankruptcy under Michigan's Pensions Clause. Nothing in the City's briefs justifies denying collateral estoppel effect to the *Webster* Judgment.

## ARGUMENT

## I. The City's Claim That Pension Benefits Have Not Been Impaired *Yet* Is Unavailing Because the City Admits the Purpose of This Case Is To Impair Pension Benefits

The City argues that the "state's authorization of Chapter 9 did not violate the pensions clause" because the authorization and filing of the City's Chapter 9

2

petition are "simply steps that begin the bankruptcy process, where pensions *may* be impaired by order of a federal bankruptcy court at some later date." (Doc. No. 765, pg. 21) (emphasis in original).

This argument is disingenuous. The City's admissions in discovery remove any conceivable doubt that the City seeks to diminish or impair pension benefits:

- The City candidly admitted in written discovery responses that it "intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems through this Chapter 9 case." (Doc. No. 849, pg. 12);

- The City likewise admitted that each of its Restructuring Proposal and Bankruptcy Recommendation, which formed the basis for its Chapter 9 petition, "contemplates a reduction in Accrued Financial Benefits to participants of the Retirement Systems." (*Id.* at 10-11); and

- The Emergency Manager testified at deposition that if pension recipients do not consent to a restructuring plan that impairs their benefits, the City likely will try to force an involuntary resolution under the Code's cram down provisions. (Ex. A, 9/16/2013 Orr Dep, pg. 287-291).

Likewise, the Governor admitted that at the time he authorized the bankruptcy, he knew that "[b]ased on the facts going into it" there was a "likelihood" accrued pension benefits would be reduced. (Ex. B, Snyder Dep, pg. 66-67).

Accordingly, any suggestion that the impairment of pensions in this case is merely hypothetical is frivolous. The City's argument that the authorization and filing of this Chapter 9 case were merely "steps" toward impairing pension benefits

3

9719247.1 14893/165083
13-53846-swr Doc 2335 Filed 12/27/13 Entered 12/27/13 20:42:26 Page 9 of 92
13-53846-tjt Doc 33667 Filed 12/27/13 Entered 12/27/13 20:42:26 Page 9 of 92
9

also fails because even preliminary steps violate the Pensions Clause when the purpose and effect of the City's actions is to impair pension benefits. Michigan courts have struck down numerous attempts by the State to *embark* on a course that ultimately would diminish or impair pension benefits. *See, e.g.*, *Musselman v. Governor of Mich.*, 533 N.W.2d 237, 244-45 (Mich. 1995), *vacated on other grounds*, 545 N.W.2d 346, 346 (1996) (governor's issuance of an executive order changing future mechanism for funding pensions violated the Pensions Clause); *Tinsman v. City of Southfield*, 1999 Mich. App. Lexis 2112, at *10 (Dec. 3, 1999) (unpublished) ("By changing the formula and applying it to all current employees, *the net effect* was to diminish or benefits in the pension plan, contrary to Mich. Const. 1963, art. 9, § 24.") (emphasis added); *Murphy v. Wayne County Employees Retirement Bd. of Trustees*, 35 Mich. App. 480, 485-486 (1971) (affirming summary judgment for plaintiff granting specific relief in the form of reinstatement of his retirement benefits which were unconstitutionally diminished and impaired by legislative act).

Thus, any attempt by the City to distinguish between a *current* reduction in pension benefits versus a *future* reduction in benefits is futile, because either reduction violates the Pensions Clause. *See Kosa v. Treasurer of the State of Michigan*, 292 N.W.2d 452, 460 (Mich. 1980) (noting the question under the

4

Pensions Clause is whether "full pension payments are being or **will be** timely made") (emphasis added).

The City further argues that requiring the Governor to condition his authorization of a Chapter 9 filing upon the explicit preservation of the protections under the Pensions Clause is unnecessarily speculative and places an unwarranted affirmative obligation on the Governor. However, as discussed both above and below, such a contingency is necessary, because the affirmative obligation already exists. Indeed, the Governor admitted in his deposition that he could have placed such a contingency on his authorization of the City's filing. (Ex. B, Snyder Dep, pg. 84-87).

The Governor has solemnly sworn to "support" the Michigan Constitution. The City's simplistic argument that the Governor's authorization of the City's Chapter 9 filing does not itself impair or diminish accrued pension benefits reduces the Governor's solemn oath to "wink and a nod" that does not comport with the weighty obligation of supporting the sanctity of the State's highest laws. Moreover, in light of the City's admissions in discovery confirming its intent to impair and diminish benefits in the Restructuring Proposal, in the Bankruptcy Recommendation, and in this Chapter 9 case, it is pointless to proceed as if the City has any other intent. The better question is, in light of the Governor's affirmative obligation to support the Pensions Clause, and his admission in his

5

deposition that he could have conditioned the City's bankruptcy filing on the preservation of pension obligations (Ex. B, Snyder Dep. pg. 84-87) why did he not take advantage of that option instead of leaving the Pensions Clause exposed to violation?

If the City's debts consisted *only* of pension obligations, it would not be possible to separate the application of the Pensions Clause from a determination of the City's eligibility to be a Chapter 9 debtor – it would be meaningless to continue to administer a Chapter 9 case until that issue was resolved. Yet the Pensions Clause has the same force and effect whether the City has one creditor or thousands, and the fact that the City has other creditors does nothing to lessen the need to resolve the impact of the Pensions Clause on the City's eligibility now.

## II. Michigan's Pensions Clause Imposes an Absolute Bar to the Governor's Consenting on Behalf of the State to Diminishing or Impairing Pension Benefits

The City argues that the Pensions Clause poses no obstacle to the City becoming a Chapter 9 debtor now and later diminishing or impairing constitutionally protected pensions benefits through its plan of adjustment. (Doc. No. 765, pg. 25). As an initial matter, the City's narrow reading of the Pensions Clause directly conflicts with the views of both the Michigan AG and the State Court, which is the only state court that has considered this question of state law. The AG thus explained that the Pensions Clause "is an impermeable imperative"

6

and "innate to the People of Michigan—not subject to discharge by exigency including a Chapter 9 proceeding under the federal Bankruptcy Code."  (Doc. No. 481, pg. 15).  The AG further explained that while the Contracts Clause yields to accommodate certain state interests, because of the Pensions Clause "under Michigan law, there is no such accommodation when it comes to the accrued financial benefits of a public pension plan or retirement system.  The constitutional protection is absolute."  (*Id.* at 4).

The State Court in *Webster* similarly held that:

> PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under chapter 9 in any manner which threatens to diminish or impair accrued pension benefits . . . .

(Doc. No. 370, Declaratory Judgment, Exhibit 2, pg. 2).  This Court should reject the City's attempt to override the views of the State's top legal officer and its courts in interpreting state law in this regard.  In any event, the City's position is wrong.

## A.  The Pensions Clause Provides Broader Protection Than the Contracts Clause

The City argues that the only effect of the Pensions Clause is to make pension obligations contractual obligations, and therefore, pension benefits are entitled to no greater protection than under an ordinary Contract Clause analysis.

7

(Doc. No. 765, pg. 22-28).  Not so.

The City's interpretation of the Pensions Clause pays lip service to, but ultimately ignores, the fundamental rules of statutory construction.  "When interpreting statutory language, courts must ascertain the legislative intent that may reasonably be inferred from the words in a statute" and "must give effect to every word, phrase, and clause in a statute and avoid an interpretation that renders nugatory or surplusage any part of a statute."  *People v. Couzens*, 747 N.W.2d 849, 855 (Mich. 2008) (citing *Koontz v. Ameritech Services, Inc.*, 645 N.W.2d 34 (2002)).  If the City's argument that the Pensions Clause merely places pension obligations on par with any other contractual obligation was correct, then the second half of the Pensions Clause would be mere surplusage.  The City wants this Court to read the Pensions Clause as ending after the statement that "accrued financial benefits. . . shall be a contractual obligation thereof[.]"  MICH. CONST. art. IX, § 24.  But the Pensions Clause goes on to say that pension benefits "shall not be diminished or impaired thereby."  *Id.*  The City's construction of the Pensions Clause renders this latter phrase nugatory.  The only construction that reconciles *all* of the words in the Pensions Clause is the Retirement Systems' interpretation— the Pensions Clause means that, unlike *other* contractual obligations of the State, this *particular* contractual obligation "shall not be diminished or impaired."  *Id.*  "The Legislature's use of the word 'shall' generally indicates a mandatory

8

directive, not a discretionary act." *Smitter v. Thornapple Twp*., 494 Mich. 121, 136 (2013).

Further, the Pensions Clause is more recent and specific than the general prohibition in the Contract Clause against the impairment of contracts, and it therefore is treated as an *exception* to the Contract Clause. "[S]pecific provisions. . . prevail over any arguable inconsistency with the more general rule." *Miller v. Allstate Ins. Co*., 751 N.W.2d 463, 470 (Mich. 2008). "[W]hen two statutes or provisions conflict and one is specific to the subject matter while the other is only generally applicable, the specific statute prevails." *People v. Ellis*, 569 N.W.2d 917, 919 (Mich. Ct. App. 1997). In such cases, "[t]he specific statute is treated as an exception to the general one." *Id.* at 917 (citing *People v. Rogers*, 475 N.W.2d 717 (Mich. 1991)). "Similarly, a more recently enacted law has precedence." *Id*. These rules are particularly persuasive where "one statute is both the more specific and the more recent." *Id.*

In this case, the Pensions Clause is both more specific and more recent than the general Contract Clause. It is more recent, because the Contract Clause was contained in Michigan's original constitution of 1835, while the Pensions Clause was not added until 1963. It is also more specific, because the Pensions Clause delineates pension obligations as a specific form of contractual obligations ***that cannot be diminished or impaired***.

9

Thus, the Pensions Clause does not simply elevate pension obligations from the status of gifts to ordinary contractual obligations. It goes further and also forbids them from being diminished. The People of Michigan chose to elevate protection of pension benefits to the highest law in Michigan—the Constitution—and to clarify that this particular contractual obligation was not subject to the whims of the Legislature and could not be impaired by the State. *See Detroit Police Officers Ass'n v. Detroit*, 214 N.W.2d 803, 816 (Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements"); *Campbell v. Judges' Retirement Board*, 143 N.W.2d 755, 757 (Mich. 1966) ("Vested rights acquired under contract may not be destroyed by subsequent state legislation or even by an amendment to the State Constitution").

Moreover, the Michigan Contracts Clause, like its federal counterpart, is subject to limited exceptions, such as the State's police powers. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977); *Att'y Gen. v. Michigan Public Serv. Comm'n,* 642 N.W.2d 691, 698 (Mich. App. 2002) (Michigan's Contract Clause is interpreted in the same manner as the federal Contract Clause).[2] If the

---

[2] To the extent the City is attempting to justify its violation of the Pensions Clause by relying on the State's reserved general police powers, this attempt fails. No exception to the Pensions Clause exists under Michigan law. Further, the State's power to impair contractual obligations under its reserved police power is limited by other co-equal provisions of the

10

Pensions Clause merely extends the Contracts Clause's protections to pension obligations, it would be nonsensical and confusing to include an express prohibition of impairment in the Pensions Clause that conflicts with the established understanding that there are limited exceptions to the Contracts Clause. The only logical interpretation is to follow both the AG and the State Court in reading the Pensions Clause as a free-standing and absolute protection of accrued pension obligations and, per the State Court, a protection which the Governor may not place in harm's way by authorizing a Chapter 9 bankruptcy without conditioning that authorization upon the preservation of the Pensions Clause.

---

constitution:

> The primary determination of public need and character of remedy in the exercise of the police power is in the legislature, and its statutes must be sustained *unless* the remedy is palpably unreasonable and arbitrary so as needlessly *to invade property or personal rights as protected by the Constitution.*

*Grocers Dairy Co. v. Dep't of Agric. Dir.*, 138 N.W.2d 767, 770 (Mich. 1966) (quoting *Carolene Products Co. v. Thomson*, 267 N.W. 608 (Mich. 1936)) (emphasis added); see also *Mich. Beer & Wine Wholesalers Ass'n. v. Attorney General*, 370 N.W.2d 328, 337 (Mich. Ct. App. 1985), *cert denied* 479 U.S. 939 (1986) (the State's police power cannot justify restricting the advertisement of alcohol prices due to freedom of speech guarantees, hence "we do not believe that the police power, however strong, permits a state to enact measures for the welfare of its citizens which violated personal freedoms protected by both state and federal constitutions.").

Thus, as the Attorney General aptly explained in its papers: "[T]he City can no more authorize a plan that reduces accrued obligations to public pensions than a plan that discriminates on the basis of religion." (Doc. No. 481, pg. 4). "In other words, article IX, § 24 is an impermeable imperative, and its place in the pantheon of Michigan constitutional rights is akin to the prohibition on taking property without just compensation, Mich. Const. art. X, § 2, or any other constitutional prohibition on the power of a government to affect the life, liberty, and property of its citizenry. Constitutional provisions of this nature are innate to the People of Michigan—not subject to discharge by exigency including a Chapter 9 proceeding under the federal Bankruptcy Code." (*Id.* at pg. 15). Accordingly, the State's general police powers are tempered by other constitutional protections, such as the Pensions Clause.

11

The core fallacy in the City's analysis lies in its assertion that it really does not matter exactly what the Pensions Clause says because it is overridden by the federal bankruptcy power once the City is in bankruptcy just as the Michigan Contracts Clause is overridden. This cannot be the law. For example, if the Pensions Clause expressly specified that pension obligations could not be diminished or impaired in a *chapter 9 bankruptcy case*, surely the City could not plausibly argue that the Legislature could enact PA 436 or any other statute that could ignore such a constitutional prohibition. Similarly, if the Michigan Constitution expressly prohibited the filing of *any chapter 9 case*, presumably the City could not plausibly argue that statutory authorization would be sufficient. Thus, contrary to the City's facile arguments, the express prohibition on any diminishment or impairment of pension obligations must be given effect in the eligibility analysis to determine whether, and under what conditions, a Michigan municipality may file.

## B. The State and City Cannot Use Bankruptcy To Impair Pensions Indirectly

Knowing that it cannot *itself* impair pensions, the City attempts to shift the focus entirely to what it will ask the Court to do after the City is in bankruptcy. By focusing on the words "thereof" and "thereby," the City concludes that only the "state and its political subdivisions" are precluded from impairing pensions. The

12

City argues in its reply to the Retiree Committee's objection that "[t]he only ways impairment can occur in chapter 9 are (a) if the relevant parties agree to modify benefits, or (b) by order of the bankruptcy court[.]" (Doc. No. 918, pgs. 3-4). In other words, the City recognizes that it is powerless to unilaterally and directly impair pensions. Indeed, the Governor's authority (and by extension, the Emergency Manager's) is undisputedly limited by the Pensions Clause. *Kosa*, 292 N.W.2d at 465 ("neither the Legislature nor the Executive can apply funded reserves to meet unfunded retirement obligations").

While the City took great pains in its papers to point out that it will be a court order that ultimately authorizes any impairment or diminishment of the accrued pension benefits (Doc. No. 765. pg 24-25), this stance is fatally undermined by the fact that every step necessary to procure that order must and will be taken *by the City*—not by this Court. Only the City may file a Chapter 9 case in the first place; involuntary petitions are proscribed. Only the City may file a Chapter 9 plan of arrangement; creditors are barred from doing so. The Court cannot confirm any Chapter 9 plan of adjustment unless and until the City asks for it. Thus, it is simply inaccurate to say that it is the Court, rather than the City, that would be effectuating any impairment or diminishment of accrued pension benefits under a City-proposed plan.

Indeed, at the Emergency Manager's deposition, he confirmed:

13

Q. And after you file the case[,] you and your attorneys are responsible for the day-to-day activities in carrying out that Chapter 9 case; correct?

A. Yes.

Q. And in a Chapter 9 case only the municipality itself can propose a plan of adjustment; correct?

A. Correct.

Q. So ultimately it will be the city that proposes a plan of adjustment?

A. I believe so.

Q. And ultimately it will be the city that places in front of the court a method to deal with its pension debt?

A. I believe so.

Q. And it is only the Court after the city has first proposed the plan, it is the court that can confirm that plan?

A. Yes.

Q. But all the steps leading up to that confirmation are acts taken by the city; correct?

A. I believe that's the Chapter 9 scheme.

(Ex. A, Orr Dep, pg. 293) (emphasis added).

As the Emergency Manager acknowledged, the only source of the City's plan (a plan which *will* contain an impairment of pension benefits, as admitted by the City several times now) will be the City, not the Court. This directly undercuts the City's contention that it is the Court who will be imposing pension benefit reductions. In fact, a bankruptcy court cannot *sua sponte* take any action that would impair the City's pension benefits.

14

If the Governor and the City are unable to impair pensions directly, they are also unable to impair them indirectly by attempting to use the Chapter 9 process to circumvent this constitutional limit on their power. *See Attorney Gen ex rel. Eaves v. State Bridge Com.*, 269 N.W. 388, 392 (Mich. 1936) ("It is a fundamental and familiar proposition of law that the State may not do indirectly that which it is forbidden to do directly."); *Blank v. Dep't of Corrections,* 564 N.W.2d 130, 136 (Mich. App. 1997) ("The Legislature may not do indirectly what it cannot do directly."); *Socialist Workers Party v. Secretary of State*, 317 N.W. 1, 11 (Mich. 1982) (holding that the Legislature could not "do indirectly what art 2, § 4, forbids it from doing directly"); *Regents of University of Mich. v. State*, 235 N.W.2d 1, 17 (Mich. 1975) ("The condition may not be designed to permit the Legislature to indirectly accomplish that which it may not do directly.").

As a result, the City's tortured reading of the Pensions Clause as permitting impairment by someone other than the "State and its political subdivisions" is not only counter-factual (insofar as the City ascribes responsibility for such impairment to the bankruptcy court), it is also irrelevant—because it is solely a question of whether the *State* and the *City* have the authority under the Michigan Constitution to do so.

9719247.1 14893/165083

**C.    The Michigan Legislature Cannot Effectively Authorize the Governor, the Emergency Manager, or the City To Violate the Michigan Constitution**

The only way for PA 436 to be constitutional under the Michigan Constitution is to construe it as requiring that the Governor impose contingencies protecting pension obligations from diminution or impairment.   Under section 109(c)(2), a *State* must *consent* to the municipality's entrance to the bankruptcy court.   The crux of the eligibility question here is whether the *State* has effectively consented to the filing of a Chapter 9 petition that is, by the City's own admission, intended to evade the constitutional protections of the Pensions Clause.   The Legislature and the Governor may have taken steps to "consent" to the City's Chapter 9 filing, but their consent is void, because it has been given in direct violation of a constitutional mandate under state law.   *Young v. Ann Arbor*, 255 N.W. 579, 581 (Mich. 1934) (noting the State's legislative power is subject to "the restraints and limitations imposed by the people upon such power by the Constitution of the State itself").

**1.    The State's Consent to the City's Bankruptcy Petition Was Ineffective Because It Abrogates the Michigan Constitution**

Thus, the question is not whether a state, through its officials, "has" consented, it is also a question of whether the state "may" consent, within the constraints of its own constitution:

16

> In the bankruptcy realm, part of the balancing of state versus federal interests encompasses whether a state ***may and has* consented** to an act by the federal government regarding an action that otherwise is one reserved to the states under the Constitution as well as whether the federal government may and has agreed to allow a state to take an action otherwise reserved to it under the Constitution.

*In re Jefferson County*, 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012) (emphasis added). In this case, the City makes a misleadingly simple argument: that by passing PA 436, the State of Michigan has consented to a process under which the City may impair pensions under federal bankruptcy law in violation of the Pensions Clause. But the Legislature did not have authority to simply "consent," by enacting PA 436, to an abrogation of the Michigan Constitution. *Young v. Ann Arbor*, 255 N.W. at 580. This is not the kind of effective state authorization required by Chapter 9 to be in compliance with applicable Supreme Court jurisprudence. *See United States v. Bekins*, 304 U.S. 27, 50-51 (1938) (in enacting predecessor to Chapter 9 "Congress was especially solicitous" that authorizations to file municipal bankruptcies be in accordance with State law); *Ashton v. Cameron County Dist.*, 298 U.S. 513, 531-32 (1936) (Congress may not override State sovereignty on the matter of the authority of an instrumentality of the state to file bankruptcy).

9719247.1 14893/165083

Instead, PA 436 expressly requires the Pensions Clause be upheld. PA 436 mandates that any financial and operating plan developed by the Emergency Manager shall provide for "[t]he timely deposit of required payments to the pension fund for the local government or in which the local government participates." M.C.L. § 141.1551(1)(d). PA 436 also expressly mandates that the Emergency Manager "shall fully comply" with the Pensions Clause if he becomes the sole trustee of either of the Retirement Systems. M.C.L. § 141.1552(1)(m)(ii).

In summary, the City ignores the analysis of whether the State "may" consent to bankruptcy and simply argues that the State "has" consented through PA 436. But that is not enough. *See Jefferson Cty.*, 474 B.R. at 279; *In re City of Harrisburg*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (holding that (i) a state's laws— all of them, not just the authorizing statute—must be considered and the authorizing statute alone cannot override conflicting state law and (ii) the Supremacy Clause has no application at the eligibility phase, because Congress expressly granted the states the power to act as gatekeepers under section 109(c)(2)); *see also In re Suffolk Regional Off-Track Betting Corp.*, 462 B.R. 397, 420 (Bankr. E.D.N.Y. 2011) (a court may not "turn a blind eye" to law governing the scope of authority to file a municipal bankruptcy case).

9719247.1 14893/165083

### 2. The Existence of the Pensions Clause as an Express Constitutional Bar to Eligibility Is Unique In this Case

The City argues that "[n]o court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor" and cites cases from California and Alabama as supporting examples. (Doc. No. 765, pg. 26-27). The City fails to mention that ***no bankruptcy court has ever considered the novel questions presented here***. The City's reliance on cases from other states is misplaced. California and Alabama do *not* have *constitutional* provisions like Michigan's Pensions Clause. Rather, they only have general Contract Clauses.

*Olson v. Cory*, 609 P.2d 991 (Cal. 1980), was mischaracterized by the City, which cited it  for the proposition that "in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some 'new or comparable or offsetting benefit appear[s] in the modified plan.'" (Doc. No. 765, pg. 26-27 (citation omitted)). But *Olson* is a judicial gloss on California's constitution, and does not rely upon nor cite any provision of the California Constitution expressly protecting pensions from impairment. Similarly misplaced is the City's reliance on *In re Stockton*, 493 B.R. 772 (Bankr. E.D. Cal. 2013) and *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (B.A.P. 9th Cir. 2009). Neither case considered whether authorization

9719247.1 14893/165083

13-53846-tjt  Doc 2335  Filed 12/27/13  Entered 12/27/13 20:42:26  Page 25 of 92

under state law to file a Chapter 9 petition was valid if such authorization violated a specific state constitutional prohibition against the impairment of pensions. In *Stockton*, the eligibility objection was based on the good faith requirement, *Stockton*, 493 B.R. at 784-785, and in *Vallejo*, the objecting parties appealed the bankruptcy court's determination that the city "desire[d] to effect a plan" under section 109(c)(4) and that the good faith negotiation requirement of section 109(c)(5) was met. Section 109(c)(2) was not at issue.

Like the California Constitution, the Alabama Constitution lacks any equivalent to Michigan's Pensions Clause. The opinion *In Bd. Of Trs. v. Cary*, 373 So.2d 841, 842 (Ala. 1979) does not interpret or apply an express constitutional protection for pensions. Alabama has only a general contracts clause in its state constitution and no provision analogous to the Pensions Clause. Any reliance upon *In re City of Prichard,* No. 99-13465 (Bankr. S.D. Ala. October 6, 2000) (Docket No. 123) at p. 6-7 is similarly misplaced, as the bankruptcy court did not address a state *constitutional* provision at odds with the bankruptcy petition.

    **3.**    **The *Harrisburg* Case Holds Mere Compliance With An Authorizing Statute Is Insufficient to Authorize a Filing Where Authorization Violates Other State Law**

In the *Harrisburg* case, the court observed that:

20

> [The authorizing statute] is intended to address the needs of financially distressed cities. Its provisions, however, are not intended to replace the entire scheme of governance set forth in the Charter Law and the Third Class City Code. *Statutory provisions should be construed with reference to similar enactments and not simply read in a vacuum.*

*In re City of Harrisburg*, 465 B.R. at 764-765 (emphasis added). *Harrisburg* stands for the proposition that compliance with an authorizing statue alone is insufficient to satisfy § 109(c)(2). Accordingly, this Court must examine the entire scheme of Michigan governance in determining whether the City is specifically authorized to be a debtor under Chapter 9 as required by § 109(c)(2). PA 436 cannot be "read in a vacuum." *Id.* Examination of PA 436 in conjunction with the Pensions Clause demonstrates that the City cannot satisfy §109(c)(2) because state law prohibits the City from taking any action, including filing a Chapter 9 bankruptcy petition, that will diminish or impair accrued financial benefits in violation of the Michigan Constitution.

The City's Reply fails to address the *Harrisburg* case at all, and the State of Michigan's Response to Eligibility Objections Raising Only Legal Issues [Doc. No. 756] (the "State's Response") feebly attempts to distinguish *Harrisburg* by arguing that Pennsylvania law expressly precluded Harrisburg from being a chapter 9 debtor while Michigan law permits the City to proceed under chapter 9. State's Response at p. 8. The State reads *Harrisburg* too narrowly.

9719247.1 14893/165083

In *Harrisburg*, the court considered three different state laws and determined that the city council did not have authority under those state laws to commence a bankruptcy on behalf of the city of Harrisburg as required by §109(c)(2). *Harrisburg*, 465 B.R. at 765. Although the authorizing statute in *Harrisburg* (Act 26) explicitly restricted the ability of distressed cities of the third class to file chapter 9 bankruptcy, this fact was not outcome determinative. Instead, it was the "entire scheme of governance " under Pennsylvania law, and the fact that the city council violated Act 26, violated the Charter Law, and usurped authority from the mayor when it authorized the filing under Act 47, that led the court to conclude that Harrisburg was not specifically authorized to be a debtor as required by § 109(c)(2).

### D. State Law Is Not Preempted In Determining Eligibility

As set forth in detail in the Retirement Systems' original objection (Doc. No. 370, pg. 19-23), federal law does not trump state law with respect to eligibility under section 109(c)(2); indeed, under both the Bankruptcy Clause's "uniformity" requirement and the Tenth Amendment, *Michigan law* must determine the City's eligibility.

### 2. The Bankruptcy Clause's "Uniformity" Requirement Recognizes That State Law Governs Eligibility

The City argues that the Bankruptcy Code is a "comprehensive federal

22

9719247.1 14893/165083

13-53846-tjt Doc 1566   Filed 10/27/13   Entered 10/27/13 20:42:26   Page 28 of 92
13-53846-swr Doc 2335   Filed 10/27/13   Entered 10/27/13 18:47:15   Page 28 of 92    28

scheme" that "displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code." (City's Response, pg. 30). Thus, the City concludes that incorporating any state law, such as permitting a contingency on the filing "would be prohibited by federal law" and would offend the "uniformity" aspect of the Bankruptcy Clause.[3]

The Bankruptcy Clause's "uniformity" requirement has no impact when Congress in the Bankruptcy Code has specifically recognized state law. The Supreme Court long has held that "[n]otwithstanding this requirement as to uniformity, the bankruptcy acts of Congress may recognize the laws of the State in certain particulars, although such recognition may lead to different results in different states. . . . Such recognition in the application of state laws does not affect the constitutionality of the Bankruptcy Act, although in these particulars the operation of the act is not alike in all the states." *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918). Thus, while the Bankruptcy Clause creates a "presumption of uniformity against incorporating state law as the rule of decision," the presumption does not apply where "the language or context of a particular provision requires otherwise." *In re Whipple*, 417 B.R. 86, 89-90 (Bankr. C.D. Ill. 2009). "Where

---

[3]     The federal Constitution's Bankruptcy Clause grants Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" and the Supremacy Clause makes the laws that Congress passes pursuant to that power the "supreme Law of the Land[.]" *Richardson v. Schafer (In re Schafer)*, 689 F.3d 601, 603 (6th Cir. 2012), *cert denied* 133 S. Ct. 1244 (2013) (quoting U.S. CONST. ART. I, § 8, cl. 4; U.S. CONST. ART. VI, cl. 2).

23

Congress finds a reason for variation, even the requirement of geographically uniform federal action can be relaxed." *In re Sullivan*, 11 B.R. 432 (Bankr. C.D. Ill. 1981) (citing *Stellwagen* and *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102 (1974)).

In the chapter 9 context, Congress found a "reason for variation," because it expressly granted the power of consent and "authorization" to the states. *See* 11 U.S.C. 109(c)(2). As a result, honoring Michigan law at the eligibility stage does not *offend* the Bankruptcy Clause—it is actually *required* by the Bankruptcy Clause, because this is how Congress intended chapter 9 to work. This conclusion is bolstered by the cases cited in the Retirement Systems' principal objection, which demonstrate that there are provisions of the Bankruptcy Code expressly reserved to the states (such as a debtor's exemptions under section 522 of the Code), and those cases hold that where the Bankruptcy Code grants authority to the States, the State's law is entitled to be upheld by the Bankruptcy Court.[4]

In this context, the City's reliance on *In re City of Vallejo*, 403 B.R. 72, 76-77 (Bankr. E.D. Cal. 2009) and *County of Orange v. Merrill Lynch & Co.* (*In re County of Orange*), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) is inapposite because both cases were predicated on a valid authorization under state law.

---

[4]    *See e.g., Rhodes*, 705 F.2d at 163; *Storer v. French (In re Storer)*, 58 F.3d 1125, 1127 (6th Cir. 1995); see also *Richardson v. Schafer (In re Schafer),* 689 F.3d 601, 603 (6th Cir. 2012), *cert denied* 133 S. Ct. 1244 (2013).

9719247.1 14893/165083

*Vallejo*, 403 B.R. at 76; *County of Orange*, 191 B.R. at 1021. Those cases dealt with issues of the applicability of certain provisions of the Bankruptcy Code (section 365 in *Vallejo* and section 507 in *County of Orange*) in a validly authorized case, not the threshold issue of eligibility.[5]

### 2. The Tenth Amendment Bars Federal Interference With Public Pension Rights In Bankruptcy Or Otherwise

Congress lacks authority under Article I, including the Bankruptcy Clause, to authorize the elimination of state and municipal pension benefits because the Tenth Amendment reserves the power to regulate such benefits exclusively to the States. *A fortiori* Congress cannot authorize the elimination of municipal pension debt or the modification of pension plans and benefits when a State such as Michigan has not consented to federal regulation. Congress and courts long have recognized that the Tenth Amendment bars federal interference with public pension rights. For instance, ERISA governs only private pension plans and expressly excludes public pension plans, which "evinces 'Congress' intent to refrain from interfering with the manner in which state and local governments operate employee benefit systems.'" *Roy v. Teachers Ins. & Annuity Assoc.*, 878 F.2d 47, 49 (2d Cir. 1989) (quoting *Feinstein v. Lewis*, 477 F. Supp. 1256, 1261

---

[5]     The same distinction between eligibility and the application of substantive provisions of the Bankruptcy Code applies to the *Mission Indep. Sch. Dist. V. Texas*, 116 F.2d 175 (5th Cir. 1940), which involved a validly authorized proceeding under the Bankruptcy Act. *Id.* at 178-79.

(S.D.N.Y. 1979), *aff'd* 622 F.2d 573 (2d Cir. 1980)). "Plans established by state and local governments are generally excluded from coverage under ERISA because of concerns of federalism. State and local governments must be allowed to make their own determinations of the best method to protect the pension rights of municipal and state employees. These are questions of state and local sovereignty and the Federal Government should not interfere." *Feinstein*, 477 F. Supp. at 1261 (quoting 1 Legislative History of the Employee Retirement Income Security Act of 1974, at 220 (1976)).

When the Tenth Amendment reserves a sphere of authority to the States, Congress cannot interfere in that sphere, even in the exercise of its enumerated powers under Article I. As the Supreme Court recently held, "[t]he principles of limited national powers and state sovereignty are intertwined. While neither originates in the Tenth Amendment, both are expressed by it. *Impermissible interference with state sovereignty is not within the enumerated powers of the National Government*, and action that exceeds the National Government's enumerated powers undermines the sovereign interests of States." *Bond v. United States*, 131 S. Ct. 2355 (2011) (citing *New York v. United States*, 505 U.S. 144, 155-59 (1992); *United States v. Lopez*, 514 U.S. 549, 564 (1995)) (emphasis added). Thus, neither the Bankruptcy Clause nor any other Article I enumerated power authorizes Congress to regulate state and municipal pension benefits. This

26

9719247.1 14893/165083
13-53846-swr Doc 1166  Filed 10/27/13  Entered 10/27/13 20:42:26  Page 32 of 92
13-53846-tjt Doc 2335-7  Filed 12/27/13  Entered 12/27/13 20:17:15  Page 33 of 42    32

principle alone forecloses the City's attempt to discharge pension debt through this Chapter 9 proceeding.

Beyond the right to regulate public pensions, the Tenth Amendment also gives States the right to control whether and on what terms their municipalities can enter bankruptcy, thus mandating the eligibility limitation in section 109(c)(2) of the Code. *See Bekins*, 304 U.S. at 51-52 ("The [predecessor of Chapter 9] is carefully drawn so as not to impinge upon the sovereignty of the State"). The State of Michigan is therefore fully within its sovereign right both to enact a state constitutional protection for public pension benefits, and also to insist upon enforcement of that protection notwithstanding a Chapter 9 bankruptcy. Allowing the City to proceed in Chapter 9 with the express purpose and effect of impairing public pension benefits thus would run afoul of Michigan's Pensions Clause and section 109(c)(2) of the Code, and also the Tenth Amendment. On the other hand, respecting Michigan's Pensions Clause at the eligibility stage does not offend federal law, but rather comports with the Tenth Amendment reserving to States the right to regulate public pensions and serve as gatekeepers to Chapter 9 bankruptcy.

### 3. Substantive Due Process and the Takings Clause Bar the City from Impairing Vested Pension Rights

Allowing the City to proceed under Chapter 9 in a manner that impairs vested pension benefits also would violate pension recipients' substantive due

27

process rights and the Takings Clause.  At a minimum, the prospect of impairing vested pension benefits through this case raises serious constitutional questions that strongly support construing Michigan law not to authorize the City to proceed under Chapter 9 with the purpose and effect of impairing pension benefits.  Where a possible interpretation of a statute raises "serious doubts" as to its constitutionality, a court should construe the statute to avoid the constitutional problem absent an "affirmative intention . . . clearly expressed" to raise the serious constitutional question.  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 584 (1988).  Here, interpreting Michigan law to authorize the City to proceed under Chapter 9 in a manner that impairs pension benefits would raise serious constitutional doubts regarding substantive due process and the Takings Clause.  No provision of Michigan law expresses the requisite clear intention to violate substantive due process and the Takings Clause by authorizing the City to impair vested pension benefits in bankruptcy.

At least one district court within the Sixth Circuit has held that stripping retired city employees of vested retirement benefits "shocks the conscience of the Court" and thus violated the retirees' substantive due process rights under the Fourteenth Amendment.  *Mayborg v. City of St. Bernard*, No. 1:04-CV-00249, 2006 U.S. Dist. LEXIS 85276, at *11-12 (S.D. Ohio Nov. 22, 2006).  As the court explained, the Supreme Court and Sixth Circuit have held that "the property

28

interests in a person's means of livelihood is one of the most significant that an individual can possess." *Id.* at * 12 (quoting *Ramsey v. Bd. of Educ., Whitley Co., Ky.*, 844 F.2d 1268, 1273 (6th Cir. 1988) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U .S. 532, 543 (1985)). The court further found that the retirees had "adequately established a due process violation of a constitutionally protected property interest, because they have shown that governmental conduct deprived them of a right previously held under state law"—*i.e.*, "a retirement benefit that had been promised, assured, contracted, confirmed and earned." *Id.* at *11. After the retirees' decades of "loyal, dedicated and, at times life-threatening, service to the City," the court concluded that substantive due process was violated because the retirees not only lost their benefits, but also "suffer[ed] the social stigma of having the City diminish the value of their public service, reduce the amount of the pension available, and the loss of economic autonomy their public careers were expected to provide." *Id.* at *12.

In addition, because vested public pension benefits are constitutionally protected property rights, diminishing those benefits would constitute a taking without just compensation in violation of the Takings Clause. The Fifth Amendment provides, in pertinent part, that private property shall not "be taken for public use, without just compensation." U.S. CONST. AMEND. V; *see also Chicago Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (holding that

29

the Takings Clause applies to the states). "The Supreme Court has held that certain statutes can effect a per se taking of funds." *McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2010) (discussing *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155 (1980), and *Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003)). In each of those cases, "the state law at issue operated to seize a sum of money from a specific fund." *Id.* In addition, "in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), five Justices indicated that the Takings Clause is implicated only by laws that 'appropriate, transfer, or encumber' an estate in land, intellectual property, or other specific 'identified property interest[s],' such as a bank account or accrued interest." *Id.* (quoting *Eastern Enters.*, 524 U.S. at 540 (Kennedy, J., concurring in the judgment and dissenting in part)). Here, the City expressly proposes to eliminate pension recipients' rights to their vested and accrued pension benefits without paying just compensation. Doing so would violate the Takings Clause.[6]

## III.    The City's Arguments Regarding Collateral Estoppel Are Unavailing

The State Court in *Webster* found that "PA 436 is unconstitutional and in violation of [the Pensions Clause] to the extent that it permits the Government to

---

[6]    For the avoidance of doubt, this and any other argument herein is intended at this stage in the bankruptcy case to address whether there is valid State authorization of the City's bankruptcy petition and is not intended to preclude similar and additional arguments that may be made in connection with any plan adjustment that may be proposed by the City in the event that the Court finds the City eligible to be a debtor in this case, including without limitation any arguments in the Bankruptcy Code section 943(b).

30

authorize the emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits," and that "[t]he Governor is prohibited by [the Pensions Clause] from authorizing the emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Government is without authority and in violation of [the Pensions Clause]." (Doc. No. 370, Declaratory Judgment, Exhibit 2, pg. 2). Hence, the State Court concluded, "[b]y authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of [the Pensions Clause]." (*Id.* at 3). The City is precluded from re-litigating those determinations under the doctrine of collateral estoppel.

### A. The *Webster* Court Had Jurisdiction To Decide Questions of State Law

The City argues that collateral estoppel does not apply because the State Court in *Webster* supposedly "lacked jurisdiction" to decide whether PA 436 violates Michigan's Pensions Clause and whether Michigan state law permitted the Governor to authorize the Emergency Manager to proceed under Chapter 9. (Doc. No. 765, pg. 32). In the City's view, federal courts have "exclusive jurisdiction" to decide these questions of Michigan state law because they bear upon whether

31

9719247.1 14893/165083

13-53846-swr Doc 2335 Filed 10/27/13 Entered 10/27/13 20:42:26 Page 37 of 92
13-53846-tjt Doc 1166 Filed 10/27/13 Entered 10/27/13 20:42:26 Page 37 of 92    37

the City is eligible to be a Chapter 9 debtor under section 109(c)(2) of the Bankruptcy Code. *Id.* The City's argument has no merit. The State Court in *Webster* did not analyze the City's eligibility to be a Chapter 9 debtor under section 109(c)(2). Rather, the *Webster* Judgment rules squarely on the constitutionality of PA 436 and the Governor's authorization of the Emergency Manager to proceed under Chapter 9 in light of the Pensions Clause in the Michigan Constitution. No credible argument can be made that a Michigan state court lacks jurisdiction to rule upon the validity of a state statute and an issue of state constitutional law.

### B. The *Webster* Judgment Did Not Violate the Automatic Stay

The City next argues that the *Webster* Judgment is "invalid because it was entered in violation of the automatic stay imposed . . . as of the filing of the Petition." (Doc. No. 765, pg. 34). To the contrary, the automatic stay did not apply to the *Webster* case because the City was not a party in *Webster*. And this Court did not extend the automatic stay to cover the defendants in *Webster* (the State, the Governor, and the Treasurer) until July 19, 2012, five days *after* the State Court entered the *Webster* Judgment. The *Webster* Judgment is thus a final, valid state law precedent. *See* MCR 2.605(E) ("Declaratory judgments have the force and effect of, and are reviewable as, final judgments").

9719247.1 14893/165083

Because the City was not a party in *Webster*, the automatic stay did not apply to *Webster* as of the filing of the Petition. The automatic stay is only "automatic" as to the debtor, not non-debtor third parties. *See* 11 U.S.C. 362(a)(1) (noting the stay applies to "the commencement or continuation. . . of a judicial. . . action or proceeding *against the debtor* ….") (emphasis added); *see also In re Pitts*, 2009 Bankr. LEXIS 4023, 14 (Bankr. E.D.N.Y. Dec. 8, 2009) ("Subsection 362(a)(1) is generally not available to non-debtors") (citing *Teachers Ins. & Annuity Ass'n of America v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986); *In re Bidermann Industries U.S.A., Inc.*, 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996)). This is precisely why the City had to file a motion to ***extend*** the automatic stay to apply to the defendants in *Webster*. In an analogous case, the bankruptcy court in *Bidermann Industries* rejected the same argument the City raises here, holding that "section 362(a)(1) does not apply automatically to stay actions against non-debtors. The debtor must obtain a stay order from the bankruptcy court, *and until it does, the action against the non-debtor may proceed*." 200 B. R. at 782 (emphasis added). In this case, the order extending the stay to the Webster Defendants was not entered until July 24, after the Declaratory Judgment was entered on July 19. The automatic stay did not apply to the *Webster* case until this order was entered, and thus there was no violation of the stay.

33

9719247.1 14893/165083

13-53846-tjt Doc 1566 Filed 10/27/13 Entered 10/27/13 20:42:26 Page 38 of 92
13-53846-swr Doc 2335 Filed 12/27/13 Entered 12/27/13 23:47:22 Page 39 of 92    39

Nor did this Court's extension of the automatic stay somehow operate retroactively to invalidate the *Webster* Judgment. Indeed, the City's motion did not ask for retroactive effect. Thus, in extending the automatic stay, this Court expressly cautioned that it was "not ruling on whether the state court orders should be given preclusive effect under principles of res judicata, collateral estoppel, Rooker-Feldman, or any other preclusive doctrine. ***The Court is <u>not</u> ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay.***" (7/24/2013 Hrg. Tr., pg. 84) (emphasis added). In similar circumstances, however, other bankruptcy courts have held that their orders extending the automatic stay cannot operate retroactively to void state court judgments. For instance, in *In re Pitts*, the bankruptcy court explained:

> To the extent the Debtor requests that this Court use its powers under § 105(a) to extend the automatic stay to the [non-debtor] Defendants, the Court denies the request. . . ***such injunctive relief would <u>not</u> apply nunc pro tunc, but would be <u>prospective</u> in nature***. Because any relief under § 105(a) would be prospective, granting injunctive relief to stay the State Court Action would not provide the Debtor with any real relief ***<u>because the State Court has already made its rulings, which cannot be voided under this section.</u>*** Therefore, even if the Court were to find that the Debtor has established grounds for extending the stay to the [non-debtor]Defendants under § 105(a), the judgment against the [non-debtor]Defendants would still stand[.]

*Id.* at *8 (citations omitted) (emphases added).

34

9719247.1 14893/165083

Likewise, the court in *In re Union Trust Philadelphia, LLC*, 460 B.R. 644 (E.D. Pa. 2011), echoed *Pitts* and noted that a bankruptcy court's power under section 105 does not extend to voiding state court judgments:

> [A] bankruptcy court generally is considered to possess the power to enjoin a pending state action that violates the automatic stay. This authorization is not without limits, however. While a bankruptcy court has the power to stay proceedings in state court, it does not possess any power to vacate a judgment of the state court.

*Id.* at 659-60 (citations omitted).

This Court's July 24 order specifically did *not* void the Declaratory Judgment, but rather limited its scope and effect to prospective relief, as the foregoing authorities confirm was appropriate. The City did not ask for retroactive relief in its motion. However, the City vainly attempts to now read into the July 24 order the kind of relief that this Court expressly declined to provide and that the *Pitts* and *Union Trust* courts found improper—using a section 105(a) injunction to retroactively vacate a state court judgment. The City cannot enlist section 105(a) to enlarge this Court's powers. *In re Yadidi*, 274 B.R. 843, 848 (B.A.P. 9th Cir. 2006) ("§ 105 is not a roving commission to do equity or to do anything inconsistent with the Bankruptcy Code"). Any attempt to vacate or re-litigate the *Webster* court's declaratory judgment would, in addition to exceeding the Court's equitable powers under section 105(a), effectively constitute federal court review

9719247.1 14893/165083

of a state court judgment in violation of federal law. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 291-292 (2005) (district courts lack jurisdiction to act as appellate courts over state court judgments under 28 U.S.C. 1257). Thus, the City cannot use section 105(a) as an excuse to override otherwise well-established rules (such as the Full Faith & Credit clause, which demands that a federal court enforce a state court judgment). *See Union Trust,* 460 B.R. 659-60.

## C. The Elements of Collateral Estoppel Are Satisfied

Finally, the City argues that collateral estoppel does not apply on the grounds that there was no "full and fair opportunity to litigate the issue" in *Webster*, and the City lacks privity with the defendants in *Webster*. (Doc. No. 765, pg. 36). Both arguments fail.

Contrary to the City's contention, the timing of the *Webster* Judgment was not "unusual" or unreasonably "expedited." (*Id*). In the *Webster* Judgment, the State Court explained that "Plaintiffs have requested, ***and Defendants have agreed in their Response***, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time." (Emphasis added). The State Court, moreover, entered the *Webster* Judgment after "having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises . . . ."

36

Nor can the City reasonably dispute that it is in privity with the State, which was a defendant in *Webster*. Collateral estoppel applies to nonparties who are in privity with parties to the underlying case. *See Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*, 592 N.W.2d 408, 412 (Mich. App. 1998) (nonparty may be bound if "that party controlled the earlier proceeding or if the party's interests were adequately represented in the original matter"). For these purposes, privity exists where there is a "substantial identity of interests" and a "working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee v. Rogers*, 582 N.W.2d 852, 854 (Mich. App. 1998). Applying that standard, privity between the City and the State has now been established beyond reasonable dispute. At a court hearing on September 19, 2013, representatives for the City asserted a "common interest" existed between the City and State. In the Common Interest Agreement entered into between the State and the City, they admitted that the City and the State "share certain common interests including, but not limited to, those in connection with the legal and policy issues that arise as a result of and in relation to the City's Financial Emergency, the appointment of the Emergency Manager, and the Bankruptcy Case." (Doc. No. 940, Exhibit B, pg. 2). These admissions satisfy the privity requirement for application of collateral estoppel.

9719247.1 14893/165083

## CONCLUSION

The Pensions Clause of the Michigan Constitution is an absolute bar to any attempt by the City to diminish or impair its pension obligations. It cannot be overridden simply due to public necessity or financial exigency. Any valid authorization by the State sovereign of the filing of a Chapter 9 petition by a political subdivision must therefore support and protect the Pensions Clause as the will of the people of the State. Accordingly, the Retirement Systems respectfully submit that the Court must either follow the State Court and hold PA 436 unconstitutional, in which case the City is not eligible to be a debtor under Chapter 9, or determine that PA 436 is limited by the Pensions Clause of the Michigan Constitution, in which case the City's Chapter 9 case can proceed, but only on the express condition that the City's accrued pension obligations may not be impaired.

Respectfully submitted,

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

38

-and-

ARNOLD & PORTER LLP
Lisa Hill Fenning (admitted *pro hac vice*)
777 South Figueroa Street
44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
lisa.fenning@aporter.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

Dated:  October 11, 2013

9719247.1 14893/165083

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                              )        Chapter 9
                                    )
CITY OF DETROIT, MICHIGAN,          )        Case No. 13-53846
                                    )
                                    )        Hon. Steven W. Rhodes
        Debtor.                     )

## EXHIBIT LIST

| Exhibit No. | Description |
| --- | --- |
| A | Excerpt from Transcript of Kevyn Orr's 9/16/13 Deposition |
| B | Excerpt from Transcript of Governor Richard D. Snyder's 10/9/13 Deposition |
| C | Unpublished Cases Cited in Reply |

# EXHIBIT A

**1**

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re
CITY OF DETROIT, MICHIGAN,                Chapter 9
                Debtor.                   Case No. 13-53846
                                          Hon. Steven W. Rhodes

VIDEOTAPED DEPOSITION

DEPONENT:  KEVYN ORR
DATE:      Monday, September 16, 2013
TIME:      10:08 a.m.
LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
           150 West Jefferson, Suite 2500
           Detroit, Michigan
REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267

**2**

1   APPEARANCES:
2
3   JONES DAY
4   By: Gregory M. Shumaker
5       Dan T. Moss
6   51 Louisiana Avenue, NW
7   Washington, D.C. 20001.2113
8   202.879.3939
9       Appearing on behalf of the Debtor
10
11  DENTONS
12  By: Anthony B. Ullman
13  620 Fifth Avenue
14  New York, NY 10020.2457
15  212.632.8342
16      Appearing on behalf of Retirees Committee
17
18  COHEN WEISS AND SIMON LLP
19  By: Peter D. DeChiara
20  330 West 42nd Street
21  New York, NY 10036.6979
22  212.356.0216
23      Appearing on behalf of UAW
24
25

**3**

1   APPEARANCES (continued):
2
3   LOWENSTEIN SANDLER LLP
4   By: Sharon L. Levine
5   65 Livingston Avenue
6   Roseland, NJ 07068
7   973.597.2374
8   -and-
9   AFSCME
10  By: Michael L. Artz
11      Tiffany Ricci
12  1101 17th Street, NW
13  Suite 900
14  Washington, D.C. 20036
15  202.775.5900
16      Appearing on behalf of AFSCME
17
18  CLARK HILL PLC
19  By: Jennifer K. Green
20  500 Woodward Avenue, Suite 3500
21  Detroit, MI 48226
22  313.965.8274
23      Appearing on behalf of Retirement Systems
24
25

**4**

1   APPEARANCES (continued):
2
3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
4   By: Ernest J. Essad, Jr.
5   380 N Old Woodward Ave Ste 300
6   Birmingham, MI 48009
7   248.642.0333
8       Appearing on behalf of FGIC
9
10  SIDLEY AUSTIN LLP
11  By: Guy S. Neal (appearing via LiveNote Streaming)
12  1501 K St., NW
13  Washington, D.C.
14  202.736.8000
15      Appearing on behalf of National Public Finance
16      Guarantee Corp.
17
18  WINSTON & STRAWN LLP
19  By: Bianca M. Forde (appearing via LiveNote Streaming)
20  200 Park Avenue
21  New York, NY 10166.4193
22  212.294.4733
23      Appearing on behalf of Assured Guaranty Municipal
24      Corp.
25  ALSO PRESENT: Mark Meyers, videographer

285

1    A. No, at that time I hadn't even -- I hadn't even
2    thought about the Michigan constitutional questions at
3    that time.
4    Q. Have you since expressed any similar reservations?
5    A. No, I have not.
6    Q. Earlier you were handed Exhibit 17 I believe it was,
7    which was a copy of the City's request for admissions.
8    A. Yes.
9    Q. I'm sorry, the City's responses to the Retirement
10   Systems' request for admissions.
11   A. Yes.
12   Q. Do you have a copy in front of you?
13          MR. SHUMAKER: He has the only copy right
14   now.
15          MS. GREEN: I have a few extras because
16   they were --
17          THE COURT REPORTER: He took it back. He
18   took the original back.
19          MR. DeCHIARA: Oh, I have it? I have it.
20          MS. GREEN: He's got it. We're fine.
21          MR. SHUMAKER: Was it marked?
22          MS. GREEN: It was marked.
23          MR. SHUMAKER: It was marked. You need it
24   for the record.
25          THE WITNESS: Okay.

286

1          MR. SHUMAKER: Peter, you want to take this
2    one?
3          MR. DeCHIARA: Thanks.
4    Q. A few moments ago you stated, and I don't want to
5    mischaracterize your testimony, I believe you said if
6    you can't reach a consensual deal, there are "serious
7    questions about the City for a number of reasons."
8    A. Yes.
9    Q. What did you mean when you said that?
10   A. Oh, I meant what do we do? We have a lot of liability
11   on pension and OPEB, we simply don't have the money,
12   we can't go to the capital markets and borrow that
13   magnitude of money, we'd have to try to figure out
14   what to do next. That's all I meant.
15   Q. Okay. I would like to direct your attention to
16   request for admission number five, it's on page 10 of
17   Exhibit 17. The request to admit asked the City to
18   admit that the restructuring proposal proposes to
19   impair or diminish accrued financial benefits of the
20   participants of the Retirement Systems and the City
21   stated it admits that the restructuring proposal
22   contemplates a reduction in accrued financial benefits
23   to participants of the Retirement Systems but seeks
24   agreement and acceptance by plan beneficiaries. The
25   City's intention are to gain consensus with its

287

1    creditors and propose a confirmable plan.
2          Did I read that correctly?
3    A. Yes.
4    Q. And similarly with respect to number 6, the request
5    was for the City to admit that the bankruptcy
6    recommendation proposes among other things to diminish
7    or impair accrued financial benefits of the
8    participants in the Retirement Systems. And the
9    response is the same; correct?
10   A. Yes.
11   Q. Number 12 asks the City to admit that you intend to
12   seek to diminish or impair the accrued financial
13   benefits of the participants in the Retirement Systems
14   through the Chapter 9 case?
15   A. Yes.
16   Q. And you see that distinction between the three
17   questions?
18   A. Yes.
19   Q. Your response to number 5 and number 6 both state that
20   the City seeks a consensual agreement; correct?
21   A. Yes.
22   Q. Your response to number 12, which is whether you would
23   seek to diminish or impair through the Chapter 9 case,
24   does not have the caveat regarding a consensual deal
25   being reached; correct?

288

1    A. Yes.
2    Q. Why is there that difference? Is it because the City
3    intends to use the cramdown provisions of the
4    bankruptcy code to force a nonconsensual deal?
5          MR. SHUMAKER: Object to the form.
6    A. Without getting into discussions with counsel, I think
7    I can -- I think I can safely say without any waiver
8    that the City intends to preserve all of its rights in
9    answer number 12.
10   Q. A few moments ago when asked about what the City's
11   plan was if a consensual agreement could not be
12   reached, I believe your response was the City
13   currently has no plan if a consensual agreement is not
14   reached; correct?
15   A. That is correct, yes.
16   Q. Sitting here today is it your testimony the City has
17   no backup plan if a consensual deal is not reached?
18          MR. SHUMAKER: Object to the form.
19   A. Sitting here today it's my testimony that we have no
20   plan other -- first we have no plan, but we have no
21   plan or no effort other than to try to reach a
22   consensual resolution.
23   Q. If you don't get that consensual resolution, would you
24   resort to the cramdown provisions that are contained
25   within the bankruptcy code?

289

1   A.  I don't know.  We'll have to -- as I've said before,
2       we'll have to cross that bridge when we get to it.
3   Q.  So the City has no present intent to resort to any
4       cramdown provisions?
5   A.  We haven't formulated a plan based upon consensus or
6       not yet.
7   Q.  Maybe you haven't formulated a plan but have you
8       discussed the option?
9   A.  Oh, we've discussed a lot of options.  That's why I
10      say we want to reserve all rights.
11  Q.  Let's get into the discussions.  When was your first
12      discussion regarding using the cramdown provisions if
13      a nonconsensual agreement was not reached?
14          MR. SHUMAKER:  Objection.  I want to
15      caution the witness about getting into any
16      attorney-client communications.  Subject to not
17      revealing anything along those lines, you can answer.
18  A.  Without getting into any communications, I'm not sure
19      there was a specific discussion about the cramdown
20      provision.
21  Q.  A moment ago I thought you said, and I'm quoting from
22      right in front of me, we discussed a lot of options,
23      that's why I say we want to reserve all rights and you
24      had mentioned that there was an analysis about
25      cramdown provision.  So there either was or there was

290

1       not.
2   A.  I'm not -- what I'm trying to -- my testimony is I'm
3       not sure that we specifically discussed if we can't
4       get a consensual resolution, we go to cramdown.  There
5       were other options that were discussed --
6   Q.  Okay.
7   A.  -- including that.  I don't want to give you a binary
8       response.
9   Q.  So I have two follow-up questions then.
10  A.  Uh-huh.
11  Q.  Number one, when was the cramdown issue discussed?
12  A.  I don't recall a -- we -- without discussing what was
13      said with counsel, I don't recall --
14          MR. SHUMAKER:  The question is when.
15          THE WITNESS:  When?
16  A.  We haven't -- I don't want to be unclear.  There
17      hasn't been a specific cramdown discussion, but
18      cramdown is one of the options has been mentioned.  We
19      have not sought to make a determination of if and when
20      we would pursue that alternative.
21  Q.  Well, I don't suppose you're willing to offer any sort
22      of assurance today that the City won't resort to
23      the cramdown provisions if a consensual deal was not
24      struck?
25  A.  I just said we want to preserve all options.  I can't

291

1       do that.
2   Q.  And is it also true that you cannot remember the first
3       time that that option was discussed?
4   A.  Ah --
5   Q.  Let's put it this way.  Was it prior to the filing on
6       July 18th or is it something you have discussed after
7       the filing?
8   A.  I mean, the reason I'm hesitant is I'm a bankruptcy
9       practitioner, I'm certainly aware of nonconsensual
10      creditors being subject to cramdown, I'm just not
11      recalling a specific discussion.  I'm not sure we had
12      to have a discussion.
13  Q.  Okay.
14  A.  Okay, I mean.
15  Q.  What other options were discussed?  You said you
16      discussed multiple options?
17  A.  Well, without getting into negotiations, options
18      regarding which if any classes you could get, which
19      participants, other alternatives, anything short of
20      consensual, what else you might be able to offer,
21      whether you would listen to different factors that go
22      into the payout, whether the beneficiaries would come
23      with a different proposal.  A number of things were
24      discussed.
25  Q.  Who did you discuss those options with?

292

1   A.  Our counsel and investment bankers.
2   Q.  Have you ever discussed -- so internally you discussed
3       those options?
4   A.  Yes, yes, yes, yes.
5   Q.  Have you discussed those options with the Retirement
6       Systems?
7   A.  Have I personally discussed those with the Retirement
8       Systems?  I don't recall.  I don't think so.
9   Q.  Have you discussed those options with any of the
10      actual individuals within the Retirement Systems?
11  A.  I may have.
12  Q.  And who would that be?
13  A.  I don't remember.  There are so -- I've had over -- I
14      think at this point I'd had over 200 meetings, some
15      of those including individual members of the various
16      groups and that may have come up.
17  Q.  So you've said several times throughout today and in
18      your responses to our discovery that the City's intent
19      and the City's hope, I think you used the word hope,
20      would be to get a consensual agreement.
21  A.  Yes.
22  Q.  And I think I recall you saying that your reading of
23      Article 9, Section 24 is that it would permit
24      consensual contractual negotiations?
25  A.  I believe that's a fair characterization.

293

```
 1    Q.  If that cannot be achieved, would you agree that
 2        Article 9, 24, Section 24, would prohibit any other
 3        impairment or diminution of the pension benefits?
 4    A.  No.
 5            MR. SHUMAKER:  Objection, calls for
 6        speculation and for a legal conclusion.
 7    Q.  And why would you disagree with that?
 8    A.  For all the reasons we discussed earlier today and in
 9        addition I think it calls for a legal conclusion as
10        far as what the import of 436 versus that provision
11        is.
12    Q.  Let's talk a little bit about the Chapter 9 process
13        itself.
14    A.  Yes.
15    Q.  You seek authorization from the governor, step one?
16    A.  Yes.
17    Q.  Step two, the governor gives his authorization?
18    A.  Yes.
19    Q.  And then the City, you acting on behalf of the City,
20        are responsible for filing the Chapter 9 case itself;
21        correct?
22    A.  Yes.
23    Q.  And after you file the case, you and your attorneys
24        are responsible for the day-to-day activities in
25        carrying out that Chapter 9 case; correct?
```

294

```
 1    A.  Yes.
 2    Q.  And in a Chapter 9 case only the municipality itself
 3        can propose a plan of adjustment; correct?
 4    A.  Correct.
 5    Q.  So ultimately it will be the City that proposes a plan
 6        of adjustment?
 7    A.  I believe so.
 8    Q.  And ultimately it will be the City that places in
 9        front of the Court a method to deal with its pension
10        debt?
11    A.  I believe so.
12    Q.  And it is only the Court -- after the City has first
13        proposed the plan, it is the Court that can confirm
14        that plan?
15    A.  Yes.
16    Q.  But all the steps leading up to that confirmation are
17        acts taken by the City; correct?
18    A.  I believe that's the Chapter 9 scheme.
19    Q.  You mentioned earlier that in the June time frame
20        there were certain pieces of litigation that were all
21        coming to a head; correct?  I'm referring to the
22        Syncora litigation and the Michigan state court
23        litigation.
24    A.  Yeah, but I think we were talking about July when the
25        state court litigation began.
```

295

```
 1    Q.  That's true.  The state court litigation was not until
 2        July, you mentioned in your testimony that you were
 3        throughout the month of June there were concerns about
 4        "losing control."
 5    A.  June through -- I think the testimony was at various
 6        time frames, June 14th through July 3rd and June 1
 7        through July 18th, and I was saying those time frames
 8        there are a number of different issues.  In the June
 9        time frame I seem to remember, as in the prior
10        deposition you attended, we reached an agreement in
11        principal, then things started to go off the rails
12        with Syncora the following Monday on June 17th so
13        that's what my discussion was.
14    Q.  And so consistent with that you said you agreed there
15        were concerns that throughout June things were
16        beginning to spin out of control and I think you used
17        the words losing control?
18    A.  Yes, in June we were dealing with a number of
19        different issues, but we were trying to manage them as
20        best we could and then for the better part of
21        June/July we started being hit with a number of pieces
22        of litigation that just kept coming over the transom
23        and it appeared that we were starting to lose the
24        initiative.
25    Q.  Okay.  You mentioned earlier when you were
```

296

```
 1        characterizing the losing control phase of what was
 2        going on --
 3    A.  Uh-huh.
 4    Q.  -- you said that someone counseled you that it was
 5        irresponsible to be delaying the bankruptcy filing?
 6            MR. SHUMAKER:  Object to the form.
 7    A.  Uh-huh.
 8    Q.  Who was it that accused you of being irresponsible for
 9        holding off on the bankruptcy filing?
10    A.  Well, I wouldn't characterize it as accusation.
11    Q.  Who counseled you that it was irresponsible?
12    A.  It was --
13            MR. SHUMAKER:  To the extent that it was
14        counsel, I don't want you to get into the
15        communication.
16    A.  Okay, it was a privileged communication.
17    Q.  So an attorney at Jones Day?
18    A.  No, not necessarily.  It -- various discussions with a
19        number of my team members including attorneys,
20        investment bankers and consultants.
21    Q.  So during that time frame what was the event that
22        finally pushed you to actually start preparing the
23        documents to file the bankruptcy petition?
24    A.  I don't know if there was an event that pushed me, but
25        I think there was a general consensus that if things
```

# EXHIBIT B

*In Re: City of Detroit, Debtor*

---

*Governor Richard D. Snyder*
*October 9, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 100913RS.TXT
**Min-U-Script® with Word Index**

| | | |
|---|---|---|
| 09:58:31 | 1 | It doesn't say I agree with that or disagree with |
| 09:58:34 | 2 | that. It simply says I authorized it to go forward |
| 09:58:37 | 3 | where a plan would be presented to a judge that |
| 09:58:40 | 4 | could be the result of further negotiations, |
| 09:58:42 | 5 | mediations, all kinds of work that ultimately a |
| 09:58:44 | 6 | judge would decide. |
| 09:58:45 | 7 | Q. Okay. I'm not addressing your July 18th letter. |
| 09:58:48 | 8 | A. Yeah. |
| 09:58:48 | 9 | Q. I'm just pegging the question -- |
| 09:58:51 | 10 | A. Okay. |
| 09:58:51 | 11 | Q. -- by time frame as of July 18th. |
| 09:58:54 | 12 | A. Okay. |
| 09:58:54 | 13 | Q. So as of July 18th, did you share Mr. Orr's view |
| 09:58:58 | 14 | that there had to be significant cuts in pension |
| 09:59:02 | 15 | liabilities? |
| 09:59:04 | 16 | A. Based on the current situations with negotiations, |
| 09:59:11 | 17 | that continued to be the position that would be on |
| 09:59:13 | 18 | the table going into bankruptcy. |
| 09:59:17 | 19 | Q. Again, I'm not sure that was responsive. |
| 09:59:20 | 20 | A. Uh-huh. |
| 09:59:21 | 21 | Q. As of July 18th, 2013, did you share Mr. Orr's view |
| 09:59:29 | 22 | that whether through negotiation or other means that |
| 09:59:38 | 23 | there as an end result had to be significant cuts in |
| 09:59:42 | 24 | accrued pension liabilities? |
| 09:59:44 | 25 | A. I wouldn't use the word had to be but likely could |

MORETTI GROUP  800-536-0804
Court Reporting and Videoconferencing

13-53846-swr  Doc 2335-3  Filed 12/7/13  Entered 12/7/13 14:22:6  Page 54 of 92
13-53846-swr  Doc 1366-3  Filed 10/11/13  Entered 10/11/13 20:27:12  Page 3 of 10    54

| | | |
|---|---|---|
| 09:59:47 | 1 | be. |
| 09:59:47 | 2 | Q. Okay. Well, Mr. Orr used the word "there must be". |
| 09:59:50 | 3 | A. Uh-huh. |
| 09:59:51 | 4 | Q. Did you share that view that there had to be? |
| 09:59:53 | 5 | A. Not necessarily. |
| 09:59:55 | 6 | Q. Okay. |
| 09:59:55 | 7 | A. Just as I said. |
| 09:59:56 | 8 | Q. Okay. So did you think about this issue as of -- or |
| 10:00:01 | 9 | as of the July 18th, 2013 time frame, had you given |
| 10:00:04 | 10 | thought to whether or not there had to be cuts to |
| 10:00:10 | 11 | accrued pension benefits? |
| 10:00:12 | 12 | A. I gave thought to the issue because I have concern |
| 10:00:14 | 13 | for the retirees, and that was why one of the |
| 10:00:16 | 14 | important questions in my view was to have a retiree |
| 10:00:20 | 15 | representative in the bankruptcy. |
| 10:00:22 | 16 | Q. And what was your -- since you said you gave thought |
| 10:00:27 | 17 | to it, can you articulate what your position was as |
| 10:00:29 | 18 | to whether or not there had to be cuts in accrued |
| 10:00:33 | 19 | pension liabilities? And I'm focusing on your views |
| 10:00:36 | 20 | on the matter as of July 18th, 2013. |
| 10:00:40 | 21 | A. My view going back prior to that is is I had hoped |
| 10:00:47 | 22 | that there would be negotiations to resolve this |
| 10:00:50 | 23 | short of bankruptcy because bankruptcy was a last |
| 10:00:54 | 24 | resort; that I hoped that people could come to the |
| 10:00:57 | 25 | table and come up with a mutual understanding and |

**MORETTI GROUP  800-536-0804**
**Court Reporting and Videoconferencing**

13-53846-tjt  Doc 2335-7  Filed 12/27/13  Entered 12/27/13 14:22:26  Page 55 of 92
13-53846-swr  Doc 3166-3  Filed 10/11/13  Entered 10/11/13 20:27:12  Page 4 of 10   55

| | | |
|---|---|---|
| 10:01:00 | 1 | negotiation that would be satisfactory to the |
| 10:01:01 | 2 | parties involved. |
| 10:01:02 | 3 | That didn't happen in terms of that regard |
| 10:01:05 | 4 | but I still had hope to say that as you go through |
| 10:01:09 | 5 | the bankruptcy process I viewed it as likelihood |
| 10:01:11 | 6 | that there was less flexibility under the bankruptcy |
| 10:01:14 | 7 | process just because of the nature of federal |
| 10:01:17 | 8 | bankruptcy law than there probably was before. |
| 10:01:19 | 9 | Q. Was it your view that as of July 18th in the |
| 10:01:28 | 10 | bankruptcy one way or another accrued pension |
| 10:01:32 | 11 | liabilities would have to be reduced? |
| 10:01:34 | 12 | A. Based on the facts going into it, it was one of |
| 10:01:37 | 13 | those questions, as you said, there was a likelihood |
| 10:01:40 | 14 | of that happening. |
| 10:01:41 | 15 | Q. That's not my question. |
| 10:01:42 | 16 | A. Yes. Yeah, I believe there's a likelihood there |
| 10:01:46 | 17 | could be reductions in unfunded pension liabilities. |
| 10:01:50 | 18 | Q. Okay. I'm not asking -- |
| 10:01:51 | 19 | A. Yeah. |
| 10:01:52 | 20 | Q. Governor, I'm not asking you to predict the |
| 10:01:55 | 21 | likelihood of what might have happened. |
| 10:01:56 | 22 | A. Okay. |
| 10:01:56 | 23 | Q. I'm asking you whether you believed that in |
| 10:02:00 | 24 | bankruptcy there would have had to be one way or |
| 10:02:03 | 25 | another reductions in Detroit's accrued pension |

| | | |
|---|---|---|
| 10:18:27 | 1 | investigation of any facts or legal conclusions that |
| 10:18:30 | 2 | were in the July 16th letter before you made your |
| 10:18:34 | 3 | decision to sign the July 18th letter? |
| 10:18:39 | 4 | A. Well, I mentioned the lawsuit issue, but besides |
| 10:18:43 | 5 | that it was more looking at the consistency of what |
| 10:18:47 | 6 | was in this letter with prior reports from Kevyn Orr |
| 10:18:50 | 7 | and prior reports from the review team. Review |
| 10:18:54 | 8 | teams I should say. |
| 10:18:54 | 9 | Q. Let me refer you to page four of the July 18th |
| 10:18:59 | 10 | letter. At the top there's a paragraph that bears |
| 10:19:05 | 11 | the heading contingencies. |
| 10:19:07 | 12 | A. Uh-huh. |
| 10:19:08 | 13 | Q. And I'm going to read the first sentence. It says |
| 10:19:12 | 14 | "2002 PA 436 provides that my approval of the |
| 10:19:18 | 15 | recommendation to commence a Chapter 9 proceeding |
| 10:19:20 | 16 | may place contingencies on such a filing." That's |
| 10:19:24 | 17 | the end of the sentence. Then there's a legal |
| 10:19:27 | 18 | citation, and then the next sentence says "I am |
| 10:19:30 | 19 | choosing not to impose any such contingencies |
| 10:19:32 | 20 | today." |
| 10:19:34 | 21 | Did you consider at any point after you |
| 10:19:39 | 22 | received the July 16th letter placing any |
| 10:19:42 | 23 | contingencies on the City's bankruptcy filing? |
| 10:19:46 | 24 | A. My legal counsel made me aware that contingencies |
| 10:19:50 | 25 | were permitted under the law, but I chose not to |

10:19:55  1      place any.

10:19:55  2  Q.  Okay.

10:19:57  3  A.  Yeah.

10:19:57  4  Q.  It's clear from your letter that you chose not to

10:20:00  5      place any.

10:20:00  6          My question is before you made that

10:20:02  7      decision not to place any, was there any period when

10:20:05  8      you considered placing any -- any contingencies on

10:20:08  9      the filing?

10:20:08 10  A.  I'm not trying to be difficult, but the matter was

10:20:11 11      brought to my attention and I dismissed it without

10:20:14 12      major discussion with my legal counsel because the

10:20:16 13      way I viewed it was placing contingencies could only

10:20:21 14      cause -- most likely cause more delay or confusion

10:20:24 15      in the bankruptcy process; that I have confidence in

10:20:27 16      the bankruptcy process itself in terms of being a

10:20:30 17      legal process, an appropriately legal process; and

10:20:33 18      that's why, in fact, I wanted that sentence added.

10:20:36 19  Q.  What sentence are you referring to?

10:20:38 20  A.  The sentence about federal law already contains the

10:20:41 21      most important contingency, a requirement that the

10:20:44 22      plan be legally executable.

10:20:46 23  Q.  Okay.  And I'm going to ask you about that in a

10:20:47 24      minute, but I just want to focus first on your

10:20:51 25      decision not to place any contingencies.

| | | |
|---|---|---|
| 10:20:53 | 1 | A. Well, that's why I didn't. I simply said I thought |
| 10:20:58 | 2 | that was the one contingency that was appropriate, |
| 10:21:01 | 3 | that it be in line with being legal. |
| 10:21:03 | 4 | Q. Okay. You were aware as of July 18th that some |
| 10:21:09 | 5 | people, some entities, argued that the Michigan |
| 10:21:15 | 6 | Constitution prohibited the reduction of accrued |
| 10:21:19 | 7 | pension benefits? |
| 10:21:22 | 8 | Were you aware of that as of July 18th? |
| 10:21:24 | 9 | A. Yes. |
| 10:21:24 | 10 | Q. Did you consider making the Detroit City bankruptcy |
| 10:21:31 | 11 | filing contingent on the City not seeking to cut |
| 10:21:38 | 12 | accrued pension liabilities? Did you consider that? |
| 10:21:41 | 13 | A. I considered it by adding this sentence, which |
| 10:21:47 | 14 | basically says it's a matter -- it's a legal |
| 10:21:49 | 15 | question to say Michigan Constitution versus federal |
| 10:21:53 | 16 | law versus other Michigan statutes, and I was going |
| 10:21:57 | 17 | to leave that, that's a legal question that I |
| 10:21:59 | 18 | thought best left to the courts. |
| 10:22:01 | 19 | Q. So is it your testimony that you did consider |
| 10:22:04 | 20 | putting that contingency on but you decided not to |
| 10:22:07 | 21 | because of the reason you just said? |
| 10:22:09 | 22 | A. Well, again, I viewed this as an overriding |
| 10:22:10 | 23 | statement that I thought whatever came out of this |
| 10:22:12 | 24 | process through the bankruptcy needed to be a legal |
| 10:22:14 | 25 | answer, because I do follow the law. |

| | | |
|---|---|---|
| 10:22:17 | 1 | Q. Okay. I just want to be clear -- |
| 10:22:19 | 2 | A. Yeah. |
| 10:22:19 | 3 | Q. -- I'm understanding your testimony. |
| 10:22:21 | 4 | You did consider at some point before you |
| 10:22:24 | 5 | signed -- is it true that at some point before you |
| 10:22:27 | 6 | signed the July 18th letter that you considered |
| 10:22:30 | 7 | making the bankruptcy filing contingent on the City |
| 10:22:34 | 8 | not seeking to cut accrued pension benefits? |
| 10:22:39 | 9 | A. I would say -- I wouldn't describe it that way. I |
| 10:22:42 | 10 | would describe it not just on pensions or anything |
| 10:22:44 | 11 | else, just the totality of the situation to say that |
| 10:22:49 | 12 | there are many legal questions that are being |
| 10:22:51 | 13 | litigated through this bankruptcy process, as you |
| 10:22:54 | 14 | can see. |
| 10:22:55 | 15 | In terms of objections and my overriding |
| 10:22:57 | 16 | concern is that anything that should come out of |
| 10:22:59 | 17 | this needed to be legal. So that's where I did |
| 10:23:02 | 18 | basically -- rather than specifically even |
| 10:23:04 | 19 | considering contingencies on one area or another, |
| 10:23:08 | 20 | because I viewed that as a troublesome area to say |
| 10:23:10 | 21 | should there -- if you put one contingency could you |
| 10:23:13 | 22 | end up with 15 contingencies versus saying the |
| 10:23:16 | 23 | overriding concern is that this plan be legal, and |
| 10:23:18 | 24 | that's already provided for under federal bankruptcy |
| 10:23:21 | 25 | law. |

| | | |
|---|---|---|
| 10:23:21 | 1 | Q. Was it your understanding that you could have placed |
| 10:23:25 | 2 | just one contingency on the filing which is that the |
| 10:23:30 | 3 | City could not seek to cut accrued pension benefits? |
| 10:23:35 | 4 | A. Again, my concern is -- |
| 10:23:37 | 5 | Q. I'm not asking your concern. |
| 10:23:39 | 6 | A. Yes. |
| 10:23:39 | 7 | Q. Was it your understanding that you, if you had |
| 10:23:42 | 8 | chosen to, could have placed just one contingency? |
| 10:23:44 | 9 | A. Yes. |
| 10:23:45 | 10 | Q. Okay. Let me now refer you to the last sentence of |
| 10:23:48 | 11 | the paragraph that says "Federal law already |
| 10:23:50 | 12 | contains the most important contingency, a |
| 10:23:52 | 13 | requirement that the plan be legally executable, and |
| 10:23:56 | 14 | then it cites 11 USC 943(b)(4)." |
| 10:24:06 | 15 | What was your understanding, if you had one |
| 10:24:10 | 16 | as of July 18th when you signed this letter, of what |
| 10:24:13 | 17 | 11 USC 943(b)(4) was? |
| 10:24:17 | 18 | A. The statement was my primary concern. I had very |
| 10:24:21 | 19 | good legal counsel. My legal advisors work on the |
| 10:24:25 | 20 | citation. They thought it would be helpful. |
| 10:24:27 | 21 | Q. Okay. So whose -- I should have asked you earlier. |
| 10:24:31 | 22 | Who prepared this letter that's the |
| 10:24:33 | 23 | July 18th letter? |
| 10:24:34 | 24 | A. I did in conjunction with my legal counsel. |
| 10:24:37 | 25 | Q. Okay. Was it just you and legal counsel that |

# EXHIBIT C

Get a Document - by Citation - 1999 Mich. App. LEXIS 2112

Page 1 of 5

Switch Client | Preferences | Help | Sign Out

## Lexis®

| Search | Get a Document | Shepard's® | More | | History | Alerts |

FOCUS™ Terms      Advanced...   **Get a Document**    View Tutorial

Service: **Get by LEXSEE®**
Citation: **1999 Mich. App. Lexis 2112**

*1999 Mich. App. LEXIS 2112, ***

DONALD E. TINSMAN, JOHN E. VARNHAGEN, WILLIAM P. KEMPER and STANLEY R. STEINKE, Plaintiffs-Appellants, v CITY OF SOUTHFIELD, Defendant, and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM BOARD, Defendants-Appellees. DONALD E. TINSMAN, JOHN E. VARNHAGEN, WILLIAM P. KEMPER and STANLEY R. STEINKE, Plaintiffs-Appellees, v CITY OF SOUTHFIELD, Defendant, and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM BOARD, Defendants-Appellants.

No. 207035, No. 207056

COURT OF APPEALS OF MICHIGAN

1999 Mich. App. LEXIS 2112

December 3, 1999, Decided

**NOTICE:** **[\*1]** IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** No. 207035. Oakland Circuit Court. LC No. 95-491548 CK.

No. 207056. Oakland Circuit Court. LC No. 95-491548 CK.

**DISPOSITION:** Affirmed.

**CORE TERMS:** formula, accrued, collective bargaining agreements, financial benefits, retirement, Civil Rights Act, retire, pension plans, years of service, pension, retirement benefits, retirement system, retiree's, tier, pension benefits, life expectancy, disparate treatment, advisory opinions, contractual, diminished, diminish, older, phase, right to rely, respect to count, performed services, prima facie case, bona fide, persuasive authority, individual rights

**JUDGES:** Before: Gribbs, P.J., and Smolenski and Gage, JJ.

**OPINION**

PER CURIAM.

Plaintiffs are retired members of the City of Southfield's police department. They filed a two-count complaint alleging that they were deprived of retirement benefits previously earned contrary to the state constitution, Const 1963, art 9, § 24, and the Civil Rights Act, MCL 37.2202; MSA 3.548(202). Plaintiffs' claims arise from a change in their retirement benefits as set forth in the collective bargaining agreements. Plaintiffs alleged that under the collective bargaining agreement entered before 1988, each of them were entitled to receive a regular retirement pension payable throughout his life of two and one-half percent of his average final compensation (AFC) multiplied by the first twenty-five years of service credited to him, plus one percent of his AFC multiplied by the number of years, and fraction of [*2] a year, of service rendered by him in excess of twenty-five years. Under a new collective bargaining agreement dated July 1, 1988, the computation of plaintiffs' benefits was limited to credit for only twenty-five years of service, with the compensation multiplier increased from two and one-half percent to 2.8 percent of their AFC.

The parties agreed that the trial court could decide the matter pursuant to cross-motions for summary disposition, based on stipulated facts. The trial court ruled in favor of plaintiffs with respect to count I, holding that the new formula adopted in the 1988 collective bargaining agreement to compute retirement benefits violated Const 1963, art 9, § 24, because application of the new formula to plaintiffs deprived them of financial benefits they had already accrued for work performed. However, the trial court ruled in favor of defendants with respect to count II of plaintiffs' complaint, holding that plaintiffs failed to establish age discrimination under the Civil Rights Act. Plaintiffs appeal as of right the trial court's decision in Docket No. 207035. Defendants appeal as of right the court's decision in Docket No. 207056. The appeals have been consolidated [*3] for this Court's consideration. We affirm.

This Court reviews a trial court's decision on summary disposition de novo. *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 202; 544 NW2d 727 (1996). A motion under MCR 2.116(C)(10) tests the factual support for a claim. *Id.* A court reviewing such a motion must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence. *Baker, supra* at 202. Summary disposition may be granted if, except as to the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v Robertson*, 212 Mich App 45, 48; 536 NW2d 834 (1995).

*Docket No. 207035*

In Docket No. 207035, plaintiffs contend that the trial court erred in dismissing count II of their complaint, in which they alleged that defendants' retirement system discriminated against older employees with regard to the amount of benefits paid. We disagree.

Defendants' retirement system was primarily funded by the City of Southfield, but employees were required to contribute five percent of their income to the system. Upon [*4] retirement, employees had the option of withdrawing their mandatory contributions. The parties agree that, when retiring officers elected to withdraw their contributions at the time of retirement, defendants reduced the benefits paid to those retirees based in part on the retiree's life expectancy and the life expectancy of a spouse. Defendants made this adjustment because, after withdrawals were made from the retirement system, there was less time for defendants to recoup the funding of benefits related to those employees that retire at a more advanced age. To offset this difference, the benefits of older retirees were reduced more, although not a substantial amount.

Plaintiffs rely upon a disparate treatment theory. In order to establish a prima facie case involving disparate treatment, plaintiffs were required to show that they were members of a protected class and that they were treated differently than persons of a different class for the same or similar conduct. *Barnell v Taubman Co, Inc*, 203 Mich App 110, 120-121; 512 NW2d 13 (1993). Age need not be the sole factor in an employment decision in order to constitute discrimination, but it must be [*5] a determining factor. *Matras v Amoco Oil Co*, 424 Mich 675, 682; 385 NW2d 586 (1986). Furthermore, for a disparate treatment theory, the plaintiff

must show that the defendant had a discriminatory motive in order to establish a prima facie case. *Farmington Education Ass'n v Farmington School District*, 133 Mich App 566, 572; 351 NW2d 242 (1984). However, MCL 37.2202(2); MSA 3.548(202)(2) provides that the prohibition against discrimination in the Civil Rights Act shall not apply to the implementation or establishment of a bona fide retirement policy or system if it is not a subterfuge to evade the purposes of the act. A retirement policy is considered bona fide where it "exists and pays benefits." *Zoppi v Chrysler Corp*, 206 Mich App 172, 177; 520 NW2d 378 (1994).

Plaintiffs' contention involves a dispute over how defendants' actuaries reduced payments made to older retirees using mortality tables to estimate life expectancies. However, plaintiffs have not shown that the method to compute the annuity withdrawals is a subterfuge to evade the Civil Rights Act. See **[*6]** *McNabb v Mich Consolidated Gas Co*, 656 F. Supp. 866, 869 (ED Mich, 1987) (the Civil Rights Act does not require employers to alter actuarial reality).

Plaintiffs also contend that defendants violated the Civil Rights Act by requiring plaintiffs to continue to contribute five percent of their income towards retirement when they were not credited for service beyond twenty-five years after the new formula went into effect. The trial court did not address the merits of this argument, apparently because it concluded that the twenty-five-year cap for accruing benefits did not apply to plaintiffs, given that application of the new pension formula to plaintiffs was unconstitutional. As hereinafter discussed, we agree that the state constitution was violated. Thus, the new pension formula does not apply to plaintiffs to the extent that they would receive greater benefits under the old formula. Moreover, to the extent that plaintiffs would fare better under the new formula, it follows that they have not been harmed by the change in formulas, and the requirement that they must continue to contribute to their pension plans, because their benefits would not decrease overall as a result of the switch in formulas.

Accordingly, the trial court correctly **[*7]** granted defendants' motion for summary disposition as to count II of plaintiffs' complaint.

*Docket No. 207056*

In Docket No. 207056, defendants contend that the trial court erred in holding that the new formula adopted in 1988 for computing retirement benefits is unconstitutional as applied to plaintiffs. Defendants further contend that Const 1963, art 9, § 24 was not violated because plaintiffs had no vested right in the formula for computing benefits. We disagree and hold that the trial court correctly granted summary disposition for plaintiffs on this count.

Const 1963, art 9, § 24 provides in pertinent part that, "the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." We agree with plaintiffs and the trial court that, under the facts of this case, by changing the formula for calculation of pension benefits, defendants diminished plaintiffs' accrued financial benefits. In *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659, 662-663; 209 NW2d 200 (1973), our Supreme Court **[*8]** construed the term "accrued financial benefits" as the right to receive pension payments upon retirement for services performed based upon the framers' intent expressed at the 1961 Constitutional Convention. [1] We agree with the trial court's findings that, under the facts in this case, the framers intended to include plaintiffs' "second tier" pension benefits (i.e., benefits earned for service beyond twenty-five years under the old formula) as "accrued financial benefits" under Const 1963, art 9, § 24:

> The Court finds that all four Plaintiffs had accrued financial benefits under the second tier or phase of the "old formula" pension plan. Plaintiffs Kemper and Steinke both had over 30 years of service accumulated at the time the "new formula" was ratified by the tentative agreement in November 1989. Plaintiffs Varnhagen and Tinsman both had over 25 years of service. All four Plaintiffs had reached the second phase or tier of the plan and effectively vested in the formula in

existence at the time. All four had already performed services under a benefit formula which provided a 1% multiplier of their AFC for that service and contained no limits on the total pension earned.

This **[*9]** Court finds that once Plaintiffs entered the post 25 year phase under the "old formula," the Constitution guaranteed them the right to rely upon those benefits. Indeed, a delegate to the 1961 Constitutional Convention, where the constitutional provision was added, aptly explained:

> "Once the employee, by working pursuant to an understanding that this is the benefit structure presently provided, has worked in reliance thereon, he has the contractual right to those benefits which may not be diminished or impaired." 1 Official Record, Constitutional Convention 1961, p 774.

This case illustrates the reliance of a member of a benefit plan who has already performed services under a certain benefit scheme. Prior to the modification of the "old formula," all four Plaintiffs chose not to retire at 25 years. The existence of service credit beyond 25 years is obviously an important consideration to a member who is determining whether to retire or to continue to work beyond 25 years. These Plaintiffs, who all entered the second tier of the system prior to its modification, had a right to rely on its continued validity.

**FOOTNOTES**

1 Advisory opinions of the Supreme Court are not considered binding authority, but the Court's advisory opinions may be followed as persuasive authority. *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 460 n 1; 208 NW2d 469 (1973).

**[*10]** By changing the formula and applying it to all current employees, the net effect was to diminish or impair plaintiffs' accrued financial benefits in the pension plan, contrary to Const 1963, art 9, § 24. While a legislative body may increase pension benefits, it may not reduce the benefits with respect to those individuals who have accrued rights under the pension plan at the time of the legislative enactment. *Seitz v Probate Judges Retirement System*, 189 Mich App 445, 455-456; 474 NW2d 125 (1991). See also *Campbell v Judges' Retirement Bd*, 378 Mich 169, 181-182; 143 NW2d 755 (1966) ("The legislature may add to but not diminish benefits without running afoul of [the] constitutional prohibition against impairment of the obligation of a contract.") Under the facts of this case, and in light of the principle expressed in *Campbell* and *Seitz*, we agree with the trial court that the individual plaintiffs may follow the formula that provides them with the greatest benefits.

Defendants also contend that plaintiffs were subject to the terms of the new collective-bargaining agreement negotiated by their union and, therefore, **[*11]** they are bound by the new agreement. We disagree. While plaintiffs are subject to the new agreement, their union could not diminish or impair their individual rights to benefits already accrued. OAG, 1983-1984, No 6244, p 1688 (August 31, 1984); OAG, 1981-1982, No. 5941, p 2349 (August 5, 1981). 2 "While a union may bargain away collective rights, individual rights of employees may not be bargained away." *Grand Rapids v Grand Rapids Lodge No 97, Fraternal Order of Police*, 415 Mich 628, 637-638, n 6; 330 NW2d 52 (1982). Accordingly, we conclude that the new collective bargaining agreement does not apply to plaintiffs to the extent that its provisions violate plaintiffs' accrued financial benefits under Const 1963, art 9, § 24.

Get a Document - by Citation - 1999 Mich. App. LEXIS 2112

Page 5 of 5

**FOOTNOTES**

2 Attorney General opinions, while not precedentially binding, can be persuasive authority. *Macomb Co Prosecutor v Murphy*, 233 Mich App 372, 382; 592 NW2d 745 (1999).

We also find no merit in defendants' contention that plaintiffs [*12] waived their rights to retire under the old formula when they failed to retire earlier. This contention lacks merit because a waiver requires a voluntary and intentional relinquishment of a known right or advantage. *Van Antwerp v Detroit*, 47 Mich App 707, 717; 210 NW2d 3 (1973). Under the facts of this case, we cannot say that plaintiffs intentionally waived their rights to retire under the old formula.

Finally, we reject defendants' contention that plaintiffs' claims are barred for failure to exhaust their contractual remedies. Plaintiffs do not contend that defendants violated the collective bargaining agreement. Rather, plaintiffs contend that defendants' violated their constitutional rights. Although a union speaks for its members, it has no duty to pursue for its members rights possessed independent of the collective bargaining agreement. *Florence v Dep't of Social Services*, 215 Mich App 211, 214; 544 NW2d 723 (1996).

Affirmed.

/s/ Roman S. Gribbs

/s/ Michael R. Smolenski

/s/ Hilda R. Gage

Service: **Get by LEXSEE®**
Citation: **1999 Mich. App. Lexis 2112**
View: Full
Date/Time: Friday, October 11, 2013 - 7:19 PM EDT

**LexisNexis®** About LexisNexis | Privacy Policy | Terms & Conditions | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



Switch Client | Preferences | Help | Sign Out

Lexis®

| Search | Get a Document | *Shepard's®* | More | | History | Alerts |

FOCUS™ Terms _____ Search Within   Original Results (1 - 2)      View Tutorial
Advanced...

Source: **Legal > / . . . / > OH Federal District Courts** [i]
Terms: **name(mayborg)** (Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

*2006 U.S. Dist. LEXIS 85276, \**

FRANK G. **MAYBORG**, et al., Plaintiffs, v. CITY OF ST. BERNARD, et al., Defendants.

NO. 1:04-CV-00249

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

2006 U.S. Dist. LEXIS 85276

November 22, 2006, Decided
November 22, 2006, Filed

**SUBSEQUENT HISTORY:** Settled by Mayborg v. City of St. Bernard, 2007 U.S. Dist. LEXIS 77492 (S.D. Ohio, Oct. 17, 2007)

**CORE TERMS:** retiree's, ordinance, retirement benefits, premium, reimbursement, retired, pension, retirement, bargained, trust fund, eligible, pension funds, no-cost, vested rights, eligibility, class members, health insurance, fire-fighter, retired employees, contractual, impairment, coverage, conclusions of law, public purpose, bargaining, Law Director, public employees, moral obligation, medical coverage, insurance coverage

**COUNSEL:** [\*1] For Frank G Mayborg, Kenneth Davis, Forrest L Hudson, Terrance L Hawley, Plaintiffs: James Francis McCarthy, III ✎, LEAD ATTORNEY, Katz Teller Brant & Hild, Cincinnati, OH.

For St Bernard, City of, Curtis Walden, William Burkhardt, Michael Schildmeyer, Philip Stegman, Gregory Zix, Barbara Kalb, Glenn Wilson, Peggy Brickweg, Edward Geiser Law Director, Defendants: John William Hust ✎, LEAD ATTORNEY, Lawrence Edward Barbiere ✎, LEAD ATTORNEY, Schroeder Mundrell Barbiere & Powers, Cincinnati, OH.

**JUDGES:** S. Arthur Spiegel, United States Senior District Judge.

**OPINION BY:** S. Arthur Spiegel

**OPINION**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

This matter is before the Court for decision following a bench trial conducted on October 4, 2006, and continued until October 24, 2006. In rendering its decision on this matter, the Court has considered the testimony of the witnesses, the documents admitted into evidence, Defendants' Stipulation of Fact (doc. 36), Plaintiffs' Proposed Findings of Fact and Conclusions of Law (doc. 37), Defendants' Proposed Findings of Fact and Conclusions of Law (doc. 38), Plaintiffs' Proposed Rebuttal Findings of Fact and Conclusions of Law (doc. 42), and Defendants' Supplemental [*2] Proposed Findings of Fact and Conclusions of Law (doc. 43). For the reasons indicated herein, the Court ENTERS Judgment in favor of Plaintiffs on Counts One through Five of their contract and federal constitutional claims, and CONTINUES this matter for a hearing on damages.

In weighing the testimony of the witnesses, the Court evaluated the credibility of each witness, their interest in the outcome of the trial, their manner of testifying, and the extent to which such testimony was supported or contradicted by other credible evidence. Under Fed. R. Civ. P. 52, the Court has set forth its findings of fact and conclusions of law, below.

The decision rendered today follows a long and difficult dispute between the City of St. Bernard and its retired employees. The Court notes that both sides have been represented by very competent and well-prepared attorneys, who presented their cases well and acted in accordance with standards of professionalism and civility. The Court was further impressed with the sensitive position of the City of St. Bernard's law director, who took a position in the case adverse to the interests of his own father, a retiree [*3] of the City. In light of the nature of the case, it is to the credit of all parties that the trial on the merits proceeded in the spirit of cooperation.

## I. Introduction

In May 2003, the City of St. Bernard (hereinafter "City") informed its retired employees that it was suspending certain retirement benefits because of a legal opinion that payment of such benefits was illegal under Ohio law. In the Defendant City's view, "no public purpose is served by the extension of benefits to already retired employees, and therefore such benefits are illegal and public money cannot be expended for such purposes" (doc. 27). Plaintiffs Frank Mayborg and Kenneth Davis, retired City police officers, Plaintiff Forrest Hudson, a retired City fire-fighter, and Plaintiff Terrance Hawley, a retired City service employee, filed suit in April 2004, alleging the City, the members of City Council, and the City Law Director unlawfully revoked and impaired their vested rights to the benefits they had been receiving and expected to receive from the City in exchange for their years of service to the City (doc. 4). On September 29, 2004, the Court certified the case as a class action, and defined the [*4] class of approximately 185 retired employees as:

> All individuals formerly employed by the City of St. Bernard and who retired from the City of St. Bernard and have received certain retirement benefits from the City of St. Bernard and/or their surviving beneficiaries entitled to those retirement benefits (doc. 16).

During the course of the trial it became clear that there are three subgroups of retirees: 1) service department employees who qualified for the City program after becoming eligible to retire under the public employees retirement system ("PERS"), 2) police and fire retirees who retired prior to July 1, 1992, and 3) police and fire retirees who retired after July 1, 1992.

Plaintiffs' Amended Complaint asserts claims for (1) violation of the contract clauses of Article 1, Section 10 of the United States Constitution, and Section 28, Article II of the Ohio Constitution, (2) an illegal practice of denying and/or substantially interfering with vested retirement benefits, (3) denial of Plaintiffs' civil rights without due process, pursuant to 42 U.S.C. § 1983, (4) denial of Plaintiffs' substantive due process, (5) breach of contract under [*5] state law, and (6) promissory estoppel. Plaintiffs dropped a claim for violation of ERISA, and subsequently asserted three new claims in their proposed findings of facts and conclusions of law, which were neither

listed in the Amended Complaint nor the final pretrial order: for breach of fiduciary duty, unjust enrichment, and for violation of the moral obligation doctrine (docs. 42, 43). Plaintiffs seek an injunction to restore the benefits, damages relating to the suspension of benefits, and attorneys' fees.

Defendants contend 1) Plaintiffs have no federal cause of action, 2) the state law claims should be dismissed for lack of jurisdiction, 3) the benefits as originally granted were illegal under Ohio law, 4) the benefits at issue were not vested, and 5) promissory estoppel is not applicable to municipalities performing governmental functions, under the Ohio Supreme Court's recent decision in *Hortman v. City of Miamisburg*, 110 Ohio St. 3d 194, 2006 Ohio 4251, 852 N.E.2d 716 (Ohio 2006). Defendants further argue Plaintiffs' claims asserted in their Rebuttal Findings of Fact and Conclusions of law, for breach of fiduciary duty, unjust enrichment, and for violation of the moral obligation **[\*6]** doctrine, should be dismissed under *Moore v. Fenex, Inc.*, 809 F.2d 297 (6th Cir. 1987).

The core issue in this case is whether Plaintiffs were unlawfully deprived, in violation of the Constitution and/or state law, of vested rights they had in retirement benefits, or whether Defendants are correct that the benefits were illegal. Resolution of this question is determinative of Plaintiffs' claims.

## II. Background and History

The facts of this case are long, and in some respects dense. Therefore, the Court finds it appropriate to briefly summarize the historical background prior to enumerating its findings.

Prior to public employee collective bargaining under Ohio law, with the enactment of Ohio Rev. Code § 4117 in 1984, the City and its employees would negotiate wage and benefits and then embody the agreement in the form of an ordinance. The starting point for this case is the year 1961, when the City established by Ordinance No. 4-1961 no-cost enrollment in the City's health care program for qualified employees. In order to qualify for the program, employees had to have completed five years of service and be eligible to retire under one of two state pension **[\*7]** programs: the state police and fire program, or the public employees retirement system ("PERS"). From the inception, the City reimbursed PERS participants for the cost of premiums, while the state police and fire program had no premiums. According to Plaintiffs, these original benefits of no-cost medical insurance coverage were hard-fought through negotiation with the City, and were granted by ordinance in exchange for their employment with the City. According to Defendants, these original benefits were only applicable to the narrow class of "present active employees" as of the year 1961, under the express language of the Ordinance.

In January 1985, the City learned that its insurance coverage overlapped with state pension medical insurance programs, and therefore that it could save money, approximately $130,000.00, by repealing all overlapping coverage. The City therefore enacted an Ordinance authorizing the Auditor "to discontinue any medical coverage where there is coverage provided by the State of Ohio pension funds and systems." In Defendants' view, the 1985 Ordinance cancelled all prior ordinances; while Plaintiffs view this as merely a change in the mechanism meeting the City's **[\*8]** enduring 1961 commitment.

In June 1985, the City passed Ordinance No. 24, 1985, noting in the preamble its previous action in terminating overlapping coverage, and directing the Mayor to execute a trust fund in accordance with Section 501(c) (9) of the Internal Revenue Code (hereinafter "C-9" Trust). The purpose of the fund, on its face, was to reimburse qualified City retirees for costs not paid for by the state insurance plan. At the trial, the parties indicated that the sorts of benefits at issue were physicals or prescription costs above the state allotment. Defendants argue that the 1985 Ordinances were illegal extensions of retroactive benefits to already retired employees; Plaintiffs view the ordinances as adopted to preserve the status quo of no-cost health benefits for retirees. In 1985 the City also passed Ordinance 25, 1985, to ensure premium reimbursement for service department employees retiring under PERS.

In 1986, the City and its employees completed their first collective bargaining agreements. Such agreements included negotiated terms for C-9 benefits. Subsequent agreements continued to do so, and those applicable to service employees included [*9] premium reimbursement.

In 1992, the state police and fire-fighter health insurance changed such that retired police officers and firefighters had to start paying a premium, similar to that which service employees had been paying under the PERS system. The City passed Ordinance No. 49-1992, granting retroactive reimbursement to qualified city police and fire-fighter retirees who had retired prior to July 1, 1992.

## III. Findings of Fact

Having summarized the general background, the Court now proceeds to its more detailed factual findings:

1. Pursuant to Ordinance No. 4, 1961, the Council of the City of St. Bernard promised its present active employees at the time of their retirement, hospital and medical insurance coverage similar to that presently furnished by the City to members in active service, provided that the employee completed five years of continuous active service immediately preceding retirement and was eligible for retirement benefits under either PERS or Police and Fire Pension Fund. (Plaintiffs' Exhibit A).

2. The Retirees have offered evidence that then current employees of the City received the benefit upon retirement.

3. The City has proffered [*10] no evidence that pre-1961 retirees received a benefit they had not earned.

4. The practice of the City has been to provide this benefit of no cost health insurance upon retirement to all City employees. Mr. Walter St. Clair, Auditor for the City, has acknowledged that the City has had a history of providing no-cost health insurance to its retirees.

5. This past practice is evidence of the City's original intent to provide this benefit prospectively to its current employees.

6. Plaintiff Frank Mayborg, a retired patrolman from the City's Police Department, described the wage and hour negotiations with the City prior to public employee bargaining. Members of the Wage Committee of the Fraternal Order of Police, composed of two patrolmen and one supervisor, would negotiate with the Finance Committee of City Council. Once agreement was reached between the two committees, the Wage Committee would present the proposed contract to the rank and file members of the Fraternal Order of Police. Following an approval vote of the membership, the Wage Committee would report agreement to the Finance Committee. The Finance Committee would then report the agreement to the full Council. [*11] The Council would then memorialize that agreement in an ordinance.

7. Mr. Mayborg testified that during the almost twenty-two years he served on the Wage Committee, he regularly raised retirement benefits in wage negotiations with the councilmembers on the Finance Committee. He testified that councilmembers on the Finance Committee repeatedly assured him that the City would continue to provide no-cost health insurance to retirees, because the City "takes care of its own".

8. The City has a history of substituting the means of delivering the same benefit to its employees and retirees. *See, e.g.,* Ordinance No. 4, 1961.

9. Pursuant to Ordinance No. 46, 1984, the Council of the City of St. Bernard substituted medical insurance coverage to its retirees where there was coverage provided by the Police and Fire Pension Fund and/or PERS. The Council stated in the preamble of the Ordinance that the Police

and Fire Pension Fund and PERS were providing the same medical coverage at no cost as was being provided by the City. (Plaintiffs' Exhibit G).

10. In exchange for the substitution of the hospital and medical insurance provided through the statewide pension systems, the **[*12]** City passed two ordinances intended to offset the added costs to retirees to assure the delivery of the no-cost health insurance retirement benefit.

11. Pursuant to Ordinance No. 24, 1985, the Council of the City of St. Bernard established a fund for the purpose of reimbursing qualified City retirees and their dependents for the health care costs they incurred which were not paid by the health insurance provided by either the Police and Fire-fighter's Pension Fund and/or PERS. Pursuant to Ordinance No. 24, 1985, the Council of the City of St. Bernard directed the Mayor to establish a C-9 Trust. (Plaintiffs' Exhibit I).

12. The C-9 Trust was not a new benefit for retirees of the City, but rather continued the no-cost hospital and medical insurance benefit retirees had been receiving from the City. In addition, the C-9 Trust, by its express definition of "employee," was intended for current retirees as well as current employees upon their meeting the eligibility criteria and retiring from City employment.

13. Mr. St. Clair testified that the C-9 Trust Fund was intended to substitute one type of benefit for another type of benefit retirees had been receiving. The City offered **[*13]** no evidence to rebut that testimony.

14. In addition to the added cost for medical coverage under the pension sponsored insurance, the elimination of the City sponsored health insurance had an added premium cost for retirees eligible under PERS. Specifically, the City's substitution of healthcare insurance coverage provided by PERS required eligible retirees to pay a premium differential for the same healthcare coverage.

15. At the Committee of the Whole on August 13, 1992, Mr. Ed Geiser, Sr., Auditor for the City of St. Bernard, explained to the Council that changes had taken place in the Police and Fire Pension Fund. (Plaintiffs' Exhibit R). Mr. Geiser explained that medical benefits were no longer "cost free" to these retirees and their dependents. (Plaintiffs' Exhibit R). Mr. Geiser explained to the Council that the cost of the insurance would be deducted from their monthly pension checks as of July 1, 1992, unless Council elected to reimburse these costs. "After discussing the matter, Council agreed 7-0 to prepare an ordinance to cover the insurance costs for those employees, retired prior to July 1, 1992. It was the unanimous feeling of Council that these retirees were **[*14]** promised coverage at no expense to them and it was the City's obligation to continue this benefit." (Plaintiffs' Exhibit R).

16. Pursuant to Ordinance No. 49, 1992, the Council of the City of St. Bernard provided those retirees who had retired prior to July 1, 1992 and who were members of the Police and Fire Pension Fund, their spouses and/or dependents with reimbursement for the monthly medical premiums deducted from their monthly pension check. (Plaintiffs' Exhibit Q).

17. The reimbursement benefit provided to those retirees who were members of the Police and Fire Pension Fund and who had retired prior to July 1, 1992 was not a new benefit. At the Council meeting on September 3, 1992, Councilmember Weidner stated: "When the retirees did retire, they were under the idea that they were going to have this paid for. All of a sudden, the State put this on it (sic). I think that we ought to take care of the ones that did retire already." Councilmember Keller stated: ". . .historically the City has maintained this benefit for the retirees. . .if the historical perspective has been that we've taken care of this all these years, then I think that we ought to continue to do so for **[*15]** those families." Councilmember Hausfeld stated: "I think that when the people retired from the City, when the C-9 Trust Fund was established, they felt that they wouldn't have to worry about insurance and I think we're just fulfilling a moral obligation to the people who have retired, to continue to pay their 100% insurance. I am all in favor of passing this on an emergency basis." (Plaintiffs' Exhibit R).

18. The Council did not give a new benefit to retirees who had retired prior to July 1, 1992. The

comments of the Mayor, the members of Council and the Auditor demonstrate that Council was simply providing the retirement benefit which had been consistently promised to City employees, no-cost hospital and medical insurance upon retirement.

19. Mr. Carl Deutch, a retired St. Bernard fire-fighter, testified that upon his retirement from the City's Fire Department, he had available both the Police and Fire Pension Fund medical insurance and the City's medical insurance. Following passage of Ordinance No. 24, 1985, he received C-9 Trust Fund benefits and his pension medical insurance. Following passage of Ordinance 49, 1992, Mr. Deutch received premium reimbursement. Mr. Deutch's **[\*16]** experience illustrates that the C-9 Trust Fund and premium reimbursement were not new benefits for retirees but a substitution of a mechanism to deliver the same benefit the retirees had been promised. Instead of enrolling in the City's health insurance, Retirees were entitled to C-9 Trust Fund reimbursement and premium reimbursement.

20. The City agreed to "maintain" the C-9 Trust Fund in the bargained contracts with the bargaining units for City employees. To "maintain" the Fund certainly means to keep it in a state of efficiency for the furnishing and rendition of those benefits which are prescribed. Similarly, the City agreed to keep the Fund solvent. To keep the Fund solvent means to keep sufficient funds available to pay the benefits prescribed.

21. Mr. St. Clair and City Law Director Edward Geiser, Jr., acknowledged that the wages and benefits in the bargained contracts since the mid-1980's have been offered by the City as an incentive to continue employment with the City. Geiser conceded that payment of the wages and benefits pursuant to those bargained contracts was not giving away of public funds. Geiser conceded on cross examination that those contracts had a public **[\*17]** purpose.

22. By the express terms of the contracts, upon retirement from City employment, Fire Department, Police Officer, and Service Department Employees had a vested right to the benefits of the C-9 Trust Fund, which the City agreed to maintain and keep solvent.

23. The City paid the premiums for medical insurance for its retirees from 1961 until passage of Ordinance No. 46, 1984. (Plaintiffs' Exhibit G).

24. The City has paid C-9 Trust benefits to eligible retirees since the adoption of Ordinance No. 24, 1985, June 7, 1985.

25. Although the City did not set up a separate trust fund, the City has established a restricted fund from which Trustees of the C-9 Trust could authorize reimbursement of the eligible medical costs.

26. The City has not vetoed, disapproved or refused to pay any expense approved by the Trustees for reimbursement.

27. The City has paid the premium reimbursement benefit to eligible PERS retirees since the adoption of Ordinance No. 25, 1985, June 7, 1985. (Plaintiff's Exhibit J).

28. The City has not vetoed, disapproved or refused to pay any premium reimbursement benefit to those retirees.

29. The Business & Industry Committee **[\*18]** of the City Council has concluded that "there is no cut off date for this practice to end." (Plaintiffs' Exhibit JJJ).

30. The City has not revoked or rescinded Ordinance No. 25, 1985.

31. The City has paid the premium reimbursement benefit to eligible police and fire-fighter retirees since the adoption of Ordinance No. 49, 1992, September 17, 1992. (Plaintiffs' Exhibit Q)

32. The City has not vetoed, disapproved or refused to pay any premium reimbursement to any eligible police and fire-fighter retirees.

33. Mr. St. Clair acknowledged that the cutoff date for this benefit would be when those retirees pass away.

34. The City has not revoked or rescinded Ordinance No. 49, 1992.

35. In April of 2003, the Council of the City of St. Bernard requested the Law Director to investigate the legality of the retirement benefits provided to the retirees of the City of St. Bernard. The Law Director concluded that he could find no statutory basis, express or implied, that would permit the City to expend public funds for either the C-9 Trust benefit or the premium reimbursement benefit. The Law Director concluded that the expenditure of City funds did not serve a public **[*19]** purpose. The Law Director cited an Ohio Attorney General opinion that the mere giving away of public funds to private persons without such persons rendering any service or providing any sort of consideration in return is clearly not the expenditure of public funds for a public purpose, but rather is the expenditure of public funds for a private purpose. Based on this analysis, the Law Director questioned whether the C-9 Trust Fund and the premium reimbursement could properly be considered a "fringe benefit" since they were not offered as an incentive to continue one's employment with the City. The Law Director concluded that those benefits would not be proper fringe benefits for current employees since the legislation was passed for already retired employees.

36. On May 5, 2003, Mayor Barbara Siegel, Walter St. Clair, City Auditor, and Edward Geiser, Jr., Law Director, met with the Trustees of the C-9 Trust Fund. At that meeting, the Trustees were advised that the City of St. Bernard would not issue further funds for the C-9 Trust benefit or the premium reimbursement benefit. No retiree was given any notice, any opportunity to respond or opportunity to offer any rebuttal.

37. **[*20]** At the City Council meeting on October 2, 2003, Mayor Barbara Siegel stated:

> No one ever told the City of St. Bernard that we were doing something illegal or wrong with having the C-9 Trust Fund. We were never told that. The Auditors are here every year and we always have had a good report. So, if it was up to the Administration, in my office, it would have never been stopped because no one told us to stop it. No one told me that anything we were doing was illegal, so let's make that very clear, and I feel that we should get both attorneys here and try to get this resolved as soon as possible because I can't believe it has gone on this long. The City Council years ago set up this fund for the retirees and to do a good deed for the retirees, and now we are going to say it is illegal. Let's make it legal, let's get with it. The whole City is in turmoil over this and I can't blame them a bit. *They have worked for this.* So, I agree with Mr. Burkhardt that we should get this resolved as soon as possible, get whoever we have to get in here, and let's discuss it. (Plaintiffs' Exhibit RRR) (emphasis added).

## IV. Conclusions of Law

### A. The City Has Had Contracts [*21] with its Employees Since 1961, Reflecting Its Commitment to Provide No-Cost Medical Care

#### 1. The City's Ordinances Are Entitled to a Presumption of Constitutionality.

The Court recognizes that all legislative enactments enjoy a presumption of constitutionality and the courts must apply all presumptions and pertinent rules of construction so as to uphold, if at all possible, a statute or ordinance. *State ex rel. Taft v. Franklin County Court of Common Pleas,*

81 Ohio St. 3d 480, 481, 1998 Ohio 333, 692 N.E.2d 560, 561 (1998). In enacting an ordinance, it is presumed that Council intended a just and reasonable result, feasible of execution.

In this case, the Court presumes that when the City promulgated and passed Ordinance No. 4, 1961, it had the just and reasonable intention to provide health benefits for its current active employees who would be retiring. The Court sees no evidence in the record that the Ordinance was illegally designed to provide retroactive benefits to already retired employees or that in fact this was the practical result. The Court accepts the testimony of Plaintiffs as credible, that they were told on successive occasions that they had no-cost medical [*22] coverage as a part of their employment package, and that the City's course of conduct over the years indicated the City had the intent to provide no-cost medical coverage for its qualifying employees, starting in 1961. Columbus, H.V. & T Ry Co. v. Pennsylvania Co., 143 F. 757, 763 (6th Cir. 1906) ("The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indicators of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error").

The Court's review of intervening Ordinances until 1985 shows that the City substituted the means to provide health benefits to its employees and retirees. However, this is not evidence of provision of a new benefit, as Defendants argue, but only reflects developments in the mechanism by which the City could meet its obligations.

In 1985, when the City passed Ordinance No. 46, 1984, it explicitly stated in the preamble that whereas it provided "medical coverage for retired employees, eligible dependents, and surviving beneficiaries," and that such coverage [*23] overlapped with state pension fund benefits, the Auditor was authorized to discontinue duplicative coverage. A few months later, the City took this Ordinance into account when it directed the Mayor to set up the C-9 program "for the purpose of reimbursing qualified City retirees. . . for health care costs not paid by [the state plan]." Similar to the earlier developments in the 1960's, the Court does not view these changes as the granting of a new benefit, as contended by Defendants, but rather as a modification of the means to provide an existing benefit that retirees had earned. Indeed the Mayor at the time explained that the C-9 Trust was "to cover any added expenses you might incur due to the change in medical insurance coverage."

Although the C-9 Trust document was never executed, and the City chose to set it up by funding an account as opposed to setting up a trust, the Court finds evidence in the record showing the City incorporated the language of the trust document by reference in subsequent Ordinances, such that its terms are clearly binding on the City. See Ordinance No. 27, 1989 (adopting amendments both of which acknowledge that the City adopted the C-9 Trust document [*24] as of June 7, 1985). The terms of the C-9 Trust document give the City the right to terminate the trust, after paying all benefits incurred. The City has never taken action to terminate the trust and pay benefits incurred as required by the terms of the agreement. The Court finds therefore that the terms of the C-9 Trust remain binding on the City. [1]

### FOOTNOTES

[1] The Court does not find well-taken Defendants' argument that the language in the C-9 Trust document precludes beneficiaries from bringing a cause of action for its enforcement. The language of the Trust allows for the Trustees to enforce the collection of unpaid contributions due and owing. Three of the Trustees are class members to this action.

Moreover, in the subsequent collectively bargained agreements, the City agreed to maintain the C-9 fund as solvent. The bargained agreements contained no such limitation as to their enforcement.

## 2. The Collectively Bargained Contracts Continued to Reflect the Provision of C-9

## Benefits

With the advent of collective [*25] bargaining, the evidence shows that City employees continued to value the C-9 benefit and ensured that this benefit remained a part of their employment package. As such, the benefit, which the City could have terminated according to its terms, continued to accrue for those new employees who continued to qualify for retirement. The collectively bargained contracts in the record show the City agreed to maintain the C-9 Trust Fund through 2007 for fire-fighters, through 2003 for police officers, and through 2004 for service workers. The agreements for the officers and service workers subsequent to 2003 and 2004 reflect the uncertainty on the part of the City as to its obligation to continue to fund the C-9, and hold the provision on maintaining the solvency of the fund in limbo pending this Court's decision on the City's obligation or lack thereof. The Court finds that as the City has never terminated the C-9 agreement, employees and retirees originally covered by it in 1985, and employees who were employed through the present date, reasonably understood the agreement to cover them by its express terms and its incorporation into collectively bargained contracts.

Indeed, the City Law [*26] Director conceded on cross examination that any of the employees covered by collectively bargained agreements that included the C-9 language were eligible for the benefit. Such conclusion is correct.

Having concluded the C-9 benefit is applicable to qualified employees and retirees to the present date, the Court does not find the City bound eternally by its 1985 agreement. The terms of the agreement allow it to terminate the agreement, and should the City do so, such termination would apply prospectively, and not retroactively. *Ebert v. Stark County Board of Mental Retardation*, 63 Ohio St.2d 31, 406 N.E.2d 1098 (1980)

## 3. The Premium Reimbursement

The evidence in the record shows that service department employees were given premium reimbursement since 1961, that such practice was embodied in Ordinance No. 25, 1985, and that "there is no cut-off date for this practice to end." Plaintiffs' Exhibit JJJ. The Court notes, however, that Plaintiffs proffer evidence that in their present bargaining agreement, effective May 2004, current service department employees agreed to a buy out in exchange for foregoing premium reimbursement. Plaintiffs' Exhibit VV. The Court [*27] finds no question that qualified service department employees are entitled to premium reimbursement under the 1985 Ordinance, until the time they bargained this away.

The evidence in the record also shows that in 1992 changes took place in the police and fire pension fund resulting in monthly medical premiums being deducted from the pension checks of police and fire-fighter retirees. The City passed Ordinance No. 49, 1992, providing premium reimbursement for those retirees who had retired prior to July 1, 1992. This grant of premium reimbursement was not a new benefit, but a replacement of the previously earned benefit.

## B. Qualifying Employees Who Retired under the Ordinances or the Collectively Bargained Agreements Had a Vested Right to Health Benefits.

The City prescribed two conditions for eligibility for the retirement benefit. The City required "present active employees" to complete "five (5) years of continuous active service immediately preceding retirement" and be "eligible for retirement benefits under" either the Police and Fire Pension Fund or PERS. All class members have met those eligibility requirements.

Both the Ohio Revised Code for the pension through the [*28] Police and Fire Fund or PERS, and the relevant ordinances and the collective bargaining agreements of the City of St. Bernard narrow the substantive range of decision-making to particularized eligibility criteria. Once an employee meets those particularized standards, administrators have no discretion not to award benefits or to apply additional or alternate eligibility criteria.

The pension benefits of Ohio public employees vest, by statute, at the time when the retirement

allowance or pension is granted by the retirement board. Ohio Rev. Code § 145.561. *Mascio v. Public Employees Retirement System of Ohio,* 160 F.3d 310, 313 (6th Cir. 1998). The effect of this vested rights statute is "to make the engagement of public authorities to pay a pension, upon conditions fulfilled, a contractual obligation founded upon a valid consideration, giving to the pensioner a vested right in his pension which cannot afterwards be impaired or revoked." *Mascio, Id. quoting State ex rel. Cunat v. Trustees of Cleveland Police Relief & Pension Fund,* 149 Ohio St. 477, 482, 79 N.E.2d 316, supplemented, 150 Ohio St. 377, 82 N.E.2d 743 (1948). **[\*29]**

The City has tied eligibility for the retirement benefit to eligibility for a pension in the statewide pension systems without reservation. Having tied eligibility for the retirement benefit to eligibility in the statewide pension systems without a reservation of right to terminate that benefit, the City has made the retirement benefit a contractual obligation founded upon valid consideration, giving the retirees a vested right which cannot afterwards be impaired or revoked. *Mascio, Id. quoting State ex rel. Cunat v. Trustees of Cleveland Police Relief & Pension Fund,* 149 Ohio St. 477, 482, 79 N.E.2d 316, supplemented, 150 Ohio St. 377, 82 N.E.2d 743 (1948).

The ordinances and bargained contracts of the City speak in compulsory terms. "[T]his benefit *shall* be applicable. . . upon their retirement"; or "the City agrees to maintain and assume responsibility for the solvency"; or the "City shall reimburse qualified City Retirees". This mandatory language in the ordinances and contracts creates a legitimate claim of entitlement to the retirement benefit in the Retirees.

In both Ordinance No. 25, 1985 and Ordinance No. 49, 1992, the Council *directed* **[\*30]** the Auditor to pay the premiums for health insurance deducted from pension checks. In each of the bargained contracts, the City agreed to "maintain and assume responsibility for the solvency of the C-9 Trust Fund." The City did not limit or restrict that obligation.

In addition to the mandatory language of the ordinances and bargained contracts, the City has acknowledged the retirement benefit to be a vested right. In its recent negotiations with PERS employees, it agreed to buy out their right to premium reimbursement in exchange for cash payments.

The claim of entitlement in this case is bolstered by the nature of the benefit at stake. The right to this retirement benefit arises by virtue of past labor services. The retirement benefit was offered to "present active employees" as compensation for their dedicated and loyal service. Once the retirees met the eligibility requirements, they had earned the right to receive the benefit. Here the City created a vested right to the retirement benefit both by design and contract.

Having reviewed this matter, the Court finds the record shows class members had a vested right to the retirement benefits in dispute. The provision of such retirement **[\*31]** benefits serves the public purpose of providing benefits to public employees who earned them. The City's actions in withholding payments amount to a breach of the City's contract with its employees.

## C. The Deprivation of the Vested Property Right Here Rises to the Level of a Constitutional Violation of Plaintiffs' Substantive Due Process Rights.

A violation of substantive due process rights can be established by showing either the "denial of a right, privilege or immunity secured by the Constitution or by federal statue" or an official act which "'shocks the conscience' of the court." *Mertik v. Blalock,* 983 F.2d 1353, 1367-1368 (6th Cir. 1993). Here, the City ended a history of forty-two years paying a retirement benefit that had been promised, assured, contracted, confirmed and earned. Despite the history, the promises, the representations, the finding of the Business & Industry Committee, and the urgings of the Mayor, the Council suspended all benefits to all retirees. Such conduct shocks the conscience of the Court.

The Court further finds that Plaintiffs have adequately established a due process violation of a

constitutionally protected property interest, **[\*32]** because they have shown that governmental conduct deprived them of a right previously held under state law. *Whaley v. County of Tuscola,* 58 F.3d 1111, 1113-1114 (6th Cir. 1995), *cert. denied* 516 U.S. 975, 116 S. Ct. 476, 133 L. Ed. 2d 404 (1995). As the Supreme Court has explained, "property interests. . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577.

The City cites *Charles v. Baesler,* 910 F.2d 1349 (6th Cir. 1990) for the proposition that "most, if not all, state-created contract rights, while assuredly protected by a procedural due process, are not protected by substantive due process" because "the substantive Due Process Clause is not concerned with the garden variety issues of common law contract." *Id.* at 1353. However, the scope of substantive due process protections with respect to property rights turns not on the availability of state contract remedies, but on whether "liberty and justice are threatened, **[\*33]** in the constitutional sense, by the failure of the government and its officials to abide by their contract." *Id.* at 1353.

The City trivializes the deprivation in this case as a loss of a finite interest that can be compensated merely by an ordinary breach of contract action. At trial Defendants invoked *Bacher v. City of North Ridgeville,* No. 94-4338, 1996 U.S. App. LEXIS 14495 (May 14, 1996, 6th Cir.), for the proposition that the benefits at stake here do not involve interests implicating substantive due process. The Defendant further relied on *Ramsey v. Board of Education, Whitley Co., Ky,* 844 F.2d 1268 (6th Cir. 1988), a case in which the Sixth Circuit found a dispute involving the reduction of sick leave benefits belonged in state court (doc. 43). The Court does not find these authorities on point, as the benefits at issue here are of greater significance than those at issue in cited authorities.

"The Supreme Court has held repeatedly that the property interests in a person's means of livelihood is one of the most significant that an individual can possess." *Ramsey,* 844 F.2d at 1273 *citing Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 543, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). **[\*34]** The Court cannot accept the dimunition of the retirement benefit as a finite loss. For thirty years on average, the Retirees provided loyal, dedicated and, at times life-threatening, service to the City. In addition to the heart-felt thanks of the citizenry of St. Bernard, these Retirees gave that dedicated service with the reasonable expectation that their retirement from City service would bring a pension and medical benefits. By its actions, the City is effectively taking some part of the years of service of each Retiree. This deprivation causes more than the loss of premium reimbursement and C-9 Trust Fund reimbursement. The Retirees also suffer the social stigma of having the City diminish the value of their public service, reduce the amount of the pension available, and the loss of economic autonomy their public careers were expected to provide.

### D. Defendants' Actions Amount to an Impairment of Plaintiffs' Contract Rights in Violation of the Contract Clauses of Article 1, Section 10 of the United States Constitution, and Section 28, Article II of the Ohio Constitution

The Contract Clause of the Constitution provides that "no state shall. . .pass any. . .law impairing **[\*35]** the obligation of contracts." U.S. Const. Art. I, § 10, Cl. 1. The language of the Ohio Constitution is virtually identical to the Contract Clause of the United States Constitution. Ohio courts addressing claims under the Ohio Constitution generally look to federal law under the Contract Clause. Consequently, an impairment of contract under the United States Constitution is also an impairment under the Ohio Constitution. The Contract Clause applies to actions of state subdivisions, including municipalities and City Councils.

To prove a violation of the Contract Clause, a plaintiff must demonstrate that a "change in state law has 'operated as a substantial impairment of a contractual relationship.'" *Mascio v. Public Employment Retirement System of Ohio,* 160 F.3d 310, at 313 (6th Cir. 1998), *quoting General Motors Corp v. Romein,* 503 U.S. 181 at 186, 112 S. Ct. 1105, 117 L. Ed. 2d 328 (1992). "In deciding whether such a demonstration has been made, the court must ask whether (1) a

contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial." *Mascio, quoting Linton v. Comm'r of Health & Environment,* 65 F.3d 508, 518 (6th Cir. 1995), **[\*36]** *cert. denied,* 517 U.S. 1155, 116 S. Ct. 1542, 134 L. Ed. 2d 646 (1996). "If a contractual obligation is substantially impaired by the change in law, the court must further inquire whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in the service of a legitimate and important public purpose." *Mascio, Id.* "Where the State is a party to the contractual obligation in question, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Mascio, Id.* at 315, *quoting United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 26, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977). "Moreover, a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Id.*

The Court has already found that a contract exists in this case, such that the City's actions constituted a breach of its promise to provide certain benefits. The City argues that it passed no law, but "suspended" payment of benefits upon the legal opinion of the Law Director. The City's argument is not well-taken. Council exercised its legislative power **[\*37]** to effect policy blocking payment of benefits to class members. There is no question as far as the Court is concerned that a change in law impaired the class members' contractual rights. The Court further finds, in the light of all the facts articulated above, such impairment is substantial, and in violation of Article I, Section 10 of the United States Constitution. *The Association of Pennsylvania State College and University Faculties v. State System of Higher Education,* 505 Pa. 369, 479 A.2d 962 (Pa. 1984). The Court further notes that such impairment was not reasonable and appropriate in the service of a legitimate and important public purpose. *Mascio,* 160 F.3d 310.

### E. The Plaintiffs Were Denied a Fair Hearing in Violation of Constitutional Due Process

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving individuals of life, liberty or property without due process of law. "To establish a due process violation, a plaintiff must first establish a deprivation of life, liberty or property, and then, that the afforded process was less than that due." *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). **[\*38]**

In determining whether the afforded process in a particular case comported with due process, three factors must be balanced: "first, the private interest that will be affected by the official action, second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interests." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

Here the Court determines that the class members were deprived of a substantial vested property interest in their retirement benefits. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972). The Court next turns to what process was due. "When a plaintiff has a protected property interest, a predeprivation hearing of some sort is generally required to satisfy the dictates of due process." *Leary v. Daeschner,* 228 F.3d 729, 742 (6th Cir. 2000); *Mallette v. Arlington County Employees' Supplemental Retirement System II,* 91 F.3d 630, at 640 (4th Cir. 1996) ("At a minimum, the Constitution requires notice and some opportunity to be heard"), *citing Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 178, 71 S. Ct. 624, 95 L. Ed. 817 (1951). **[\*39]**

The facts of this case show the City elected to suspend all benefits to all retirees without any individualized consideration. The Council, the Administration and the Law Director did not offer any retiree the opportunity to demonstrate the legitimacy or validity of the retirement benefit to which he or she was entitled. The Council, the Administration and the Law Director treated all employees alike despite the fact that some of the retirees had retired under the terms of a bargained contract which clearly and unquestionably described retirement benefits that would be available upon retirement.

The retirees had a strong interest in their benefits. The City's massive, unilateral termination of the retirement benefit resulted in an unacceptable likelihood of error. "The risk of an inaccurate and unfair deprivation mounts when decisionmaking is one-sided." *Mallette,* 91 F.3d at 641 citing *McGrath,* 341 U.S. at 170.

Had the City simply provided each retiree with an opportunity to be heard before suspending the retirement benefit, the City could have addressed the legal issues with which they were concerned while preserving the property rights to which **[*40]** the retirees were rightfully entitled. The City was concerned with the origin of each retiree's benefit. A pre-deprivation hearing could have addressed that issue. Two simple questions could have been asked, 1) "What retirement benefits are you entitled to" and, 2) "What source do you claim for that benefit?"

With the answer to those questions, rights could have been preserved, issues could have been narrowed and resolution facilitated. Consequently, many retirees claiming benefits through the bargained contracts would not have had to suffer the loss of those benefits. The City would not have been unduly burdened by providing such a predeprivation hearing. *Mallette,* 91 F.3d at 641. For all of these reasons, the Court concludes that the City violated the procedural due process rights of the class.

### F. Plaintiffs' Claims for Promissory Estoppel Fail as a Matter of Ohio Law

Defendants correctly indicate that the Ohio Supreme Court's decision in *Hortman v. City of Miamisburg,* 110 Ohio St.3d 194, 2006 Ohio 4251, 852 N.E. 2d 716 (Ohio 2006) precludes Plaintiffs' claims based on the theories of promissory and equitable estoppel. In *Hortman,* the Ohio Supreme Court **[*41]** held that these doctrines "are inapplicable against a political subdivision when the political subdivision is engaged in a governmental function." *Id.* at 199. The Court understands the management of retirement fund benefits by a municipality to fall within the realm of a government function.

### G. Plaintiffs' Claims for Breach of Fiduciary Duties, Unjust Enrichment, and Breach of the Moral Obligation Doctrine Fail

Plaintiffs did not assert their claims for breach of fiduciary duty, unjust enrichment, or breach of moral obligation doctrine in their Amended Complaint. Nor were these claims listed in the Joint Final Pretrial Order. The Court finds well-taken Defendants' argument that for these reasons, the claims should be dismissed. *Moore v. Fenex, Inc.,* 809 F.2d 297, 301 (6th Cir. 1987).

### V. Conclusion

Having reviewed this matter, the Court concludes that the City's actions in this matter, based on the erroneous application of a legal principle, resulted in a breach of contract with class members that rises to constitutional proportions. The Court finds the City violated class members' substantive due process rights because its actions **[*42]** shock the conscience of the Court, and because the City deprived class members of a substantive property interest. The Court further finds the City's policy of suspending payment of benefits amounted to an impairment of contract rights in violation of the Contract Clauses of Article 1, Section 10 of the United States Constitution, and Section 28, Article II of the Ohio Constitution, and that the City's failure to provide any predeprivation hearing amounts to a violation of procedural due process. The Court exercises supplemental jurisdiction over Plaintiffs' state law claims, 28 U.S.C. § 1367 (a), and finds that the City breached its contractual duties to the class, violated the Ohio Constitution, and the laws of the state of Ohio. The Court however DISMISSES Plaintiffs' claims for promissory and equitable estoppel, as inconsistent with Ohio law, and DISMISSES Plaintiffs' Claims for Breach of Fiduciary Duties, Unjust Enrichment, and Breach of the Moral Obligation Doctrine, for failure to include them in their Amended Complaint or Final Pretrial Order.

In accordance with the Opinion expressed herein, the Court ENTERS Judgment for Plaintiffs on Counts One through **[*43]** Five of their Amended Complaint, and for Defendant on Count Six of

the Amended Complaint, ORDERS Defendant to restore, in conformity with this Opinion, the benefits it has withheld, and CONTINUES this matter until 10:00 A.M. on January 31, 2007, for a hearing on the relief to be accorded, including damages, costs, and related matters.

SO ORDERED.

Dated: November 22, 2006

*s/ S. Arthur Spiegel*

United States Senior District Judge

Source: **Legal** > / . . . / > **OH Federal District Courts** [i]
Terms: **name(mayborg)**  (Suggest Terms for My Search)
View: Full
Date/Time: Friday, October 11, 2013 - 5:55 PM EDT

* Signal Legend:
● -  Warning: Negative treatment is indicated
⊞ -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
❶ -  Citation Information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

**LexisNexis®**  About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 2009 Bankr. LEXIS 4023

Page 1 of 11

Switch Client | Preferences | Help | Sign Out

# Lexis®

| Search | Get a Document | Shepard's® | More | | History | Alerts |

FOCUS™ Terms [    ]    Advanced...    **Get a Document** [    ]    View Tutorial

Service: **Get by LEXSEE®**
Citation: **2009 Bankr. LEXIS 4023**

*2009 Bankr. LEXIS 4023, \**

⬇ View Available Briefs and Other Documents Related to this Case

In the Matter of ROBERT J. PITTS, JR. a/k/a BOB PITTS, Debtor. MOKUBA NEW YORK LLC, RIBBTRIM, INC. and ALAN SILVERMAN, Plaintiffs, - against - ROBERT PITTS, JR., Defendant.

Chapter 7, Case No. 808-74860-reg, Adv. Proc. no. 809-8230-reg

UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK

2009 Bankr. LEXIS 4023

December 8, 2009, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff creditor filed this adversary action seeking to have certain debts allegedly owed by the debtor deemed non-dischargeable pursuant to 11 U.S.C.S. § 523 (a)(2)(A). The debtor filed a motion alleging that the creditor violated the automatic stay of 11 U.S.C.S. § 362 by proceeding with a state court action against related corporate defendants who were non-debtors.

**OVERVIEW:** A state court found that, since an action against the debtor was severed from an action against non-debtor corporate defendants, the continuation of the state action against the corporate defendants after the debtor filed for bankruptcy did not violate the automatic stay. The bankruptcy court agreed that there was no exception under the current evidence that would negate the rule that non-debtors are generally not covered by the automatic stay. For example, there was no risk to any reorganization if the stay was not extended to the corporate defendants because the debtor was liquidating. The imposition of liability against the corporate defendants only served to fix liability against them and would not hamper the bankruptcy proceedings. In fact, there was no evidence that the continuation of the state court action post-petition had any effect on the debtor's bankruptcy case. Based on the record, the court could not find at this point that there was an identity between the debtor and the corporate defendants. However, the court noted that to the extent that such evidence was developed in the future, that could change its finding that no violation of the stay occurred.

**OUTCOME:** The court denied the debtor's motion seeking sanctions for violation of the automatic stay.

**CORE TERMS:** automatic stay, non-debtor, adversary proceeding, post-petition, severed,

Get a Document - by Citation - 2009 Bankr. LEXIS 4023

Page 2 of 11

injunctive relief, unusual circumstances, commencement, continuation, injunction, default, void, bankruptcy code, summary judgment, non-bankruptcy, applicability, scheduling, settlement, correctly, discovery, matter of law, bankruptcy case, judgment obtained, force and effect, corporate veils, exclusive jurisdiction, citations omitted, wholly owned, co-defendants, contractual

## LEXISNEXIS® HEADNOTES

☐ **Hide**

Bankruptcy Law > Case Administration > Administrative Powers > Stays > General Overview 🔁

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > Enforcement of Judgments 🔁

Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts 🔁

*HN1* ⬇ The federal district courts, and by reference, the bankruptcy courts, have original and exclusive jurisdiction of all cases under title 11 and original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11. 28 U.S.C.S. § 1334. The automatic stay, which is an injunction issued by the bankruptcy court, is self-executing and is effective upon the filing of the petition. The injunctive nature of the automatic stay imposes on affected parties an obligation to obey such decree until it is modified or reversed, even if there are grounds to object to the order. In addition, any action taken in violation of the stay, even if such action is a judicial proceeding, is void and of no force and effect. Such act by a court in violation of the stay is not entitled to full faith and credit in the federal courts. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > General Overview 🔁

Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview 🔁

*HN2* ⬇ Courts have uniformly found that the bankruptcy court has sole and exclusive jurisdiction to determine whether the automatic stay should be modified pursuant to 11 U.S.C.S. § 362(d). This sole and exclusive jurisdiction over any modification of the stay emanates from § 362(d), which states that on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, and from the legislative history of § 362(d), which clearly identifies the bankruptcy court as the sole authority to grant relief from the stay. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > General Overview 🔁

Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview 🔁

*HN3* ⬇ The United States Court of Appeals for the Second Circuit has held that where a pre-petition action is pending in federal court, that court has concurrent jurisdiction with the bankruptcy court to determine whether the automatic stay applies to the non-bankruptcy action. Other courts have agreed with this analysis under the theory that a court has inherent jurisdiction to determine its own jurisdiction. Despite the presiding court's inherent jurisdiction to determine whether the stay applies, the Second Circuit and other courts have recognized that the ultimate determination of whether the automatic stay applies to a non-bankruptcy action lies with the bankruptcy court, which originally issued the injunction. Granting to the bankruptcy court the final say as to whether the automatic stay applies to an action pending in another court is also consistent with the bankruptcy court's power to enforce its own

injunctions under the Supremacy Clause. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage >
Claims Against Debtors

*HN4* ↓ 11 U.S.C.S. § 362(a)(1) stays the commencement or continuation of a judicial action
or proceeding against the debtor that was or could have been commenced before the
commencement of the case under this title, or to recover a claim against the debtor
that arose before the commencement of the case under this title. 11 U.S.C.S. § 362
(a)(1). Subsection 362(a)(1) is generally not available to non-
debtors. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > General Overview

*HN5* ↓ According to the United States Court of Appeals for the Second Circuit, the automatic
stay can apply to non-debtors, but normally does so only when a claim against the
non-debtor will have an immediate adverse economic consequence for the debtor's
estate. The Second Circuit listed several examples of such immediate adverse
economic consequences including: (1) a claim against a non-debtor for an obligation
for which the debtor was a guarantor, (2) a claim against a debtor's insurer, and (3)
actions where there is an identity between the debtor and third-party defendant that
a judgment against the third-party defendant will in effect be a judgment or finding
against the debtor, and specifically cited to the A.H. Robins decision in the Fourth
Circuit in support of this third instance. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > General Overview

Bankruptcy Law > Case Administration > Court Powers

*HN6* ↓ A bankruptcy court may only issue injunctive relief, under 11 U.S.C.S. § 105, to
extend an automatic stay to non-debtors if the court finds that the debtor would
suffer some cognizable prejudice if the injunction did not issue. The burden is on the
moving party to show by clear and convincing evidence that injunctive relief is
warranted. Finally, such injunctive relief would not apply nunc pro tunc, but would be
prospective in nature. More Like This Headnote | *Shepardize:* Restrict By Headnote

**⇧Available Briefs and Other Documents Related to this Case:**

U.S. Bankruptcy Court Motion(s)
U.S. Bankruptcy Court Pleading(s)

**COUNSEL:** [*1] For Robert J. Pitts, Jr., aka Bob Pitts, Debtor: Marc A Pergament 👤, Weinberg
Gross & Pergament LLP, Garden City, NY.

For Kenneth Kirschenbaum, Trustee: Kirschenbaum & Kirschenbaum, Garden City, NY; Steven B
Sheinwald, Kirschenbaum & Kirschenbaum, Garden City, NY.

U.S. Trustee: Diana G. Adams, Office of the United States Trustee, Central Islip, NY.

**JUDGES:** Robert E. Grossman ▾, United States Bankruptcy Judge.

**OPINION BY:** Robert E. Grossman ▾

**OPINION**

## MEMORANDUM DECISION

This matter is before the Court pursuant to two motions made in an adversary proceeding pending in the bankruptcy case of Robert Pitts, Jr. ("Debtor" or "Defendant"). Mokuba New York LLC, Ribbtrim Inc. and Alan Silverman ("Plaintiffs") seeking to have certain debts allegedly owed by the Debtor deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The Plaintiffs have filed a motion seeking entry of summary judgment on the first cause of action pursuant to Bankruptcy Code § 523(a)(2)(A). The Debtor has filed a motion seeking to have a state court judgment entered post-petition against certain non-debtors upon which the Plaintiffs rely in their summary judgment motion, deemed void *ab initio* (the "Debtor's Motion"). The Debtor argues that upon the commencement **[*2]** of the Debtor's case, the automatic stay applied to actions against these non-debtor defendants and as a result, the orders entered by the state court post-petition are void and of no force and effect. The Debtor also argues that the Plaintiffs' actions in the state court proceeding after the commencement of the Debtor's bankruptcy constituted a willful violation of the automatic stay pursuant to Bankruptcy Code § 362(k). In the alternative, the Debtor argues that if the automatic stay did not apply to the non debtor defendants, the Court should use its equitable powers and extend the automatic stay to the non-debtor defendants in the state court action pursuant to Bankruptcy Code § 105(a). For the reasons set forth below, the Court finds that the state court correctly concluded that the automatic stay did not apply to the non-debtor defendants and there are insufficient grounds to extend the automatic stay to the non-debtor defendants under the Court's § 105(a) injunctive powers. Furthermore, because the actions by the state court already took place, granting injunctive relief under Bankruptcy Code § 105(a) at this point would not be appropriate. For these reasons, the Plaintiffs' **[*3]** post-petition actions in the state court proceeding did not violate the automatic stay. However, if this Court ultimately finds in this adversary proceeding that the Debtor's liability is derivative of the non-debtor defendants' actions then the post petition proceedings in the state court may be deemed a violation of the automatic stay, and the judgment obtained in the state court action against the non-debtor defendants would then be void and of no force and effect.

## Facts:

On August 17, 2005, prior to the date the Debtor's petition was filed, the Plaintiffs commenced an action in the Supreme Court of the State of New York, New York County, against Microvisions Complete Computer Configurations, Inc., Microvisions, Microvisions One (I), Microvisions Two (II), Just Computers of New York, Inc., Microvisions CCC, Just Computers in New York, JCINY (collectively, the "Corporate Defendants") and the Debtor (collectively with the Corporate Defendants, the "State Court Defendants") based on fraud, breach of contract, breach of express and implied warranty, and breach of the covenant of good faith and fair dealing (the "State Court Action"). In the State Court Action, the Plaintiffs alleged that, **[*4]** based on the fraudulent scheme of the State Court Defendants, they induced the Plaintiffs to enter into a contractual relationship with the Corporate Defendants whereby the Plaintiffs would pay for information technologies ("IT") goods and services that were to be provided by State Court Defendants to the Plaintiffs. According to the complaint in the State Court Action, (i) the State Court Defendants fraudulently concealed from the Plaintiffs that they installed "bootleg" software on the Plaintiffs' computers instead of genuine Microsoft or other brand name software, (ii) the State Court Defendants provided the Plaintiffs with IT equipment that had incorrect specifications and configurations, and that they sold used IT equipment to the Plaintiffs while promising to install new IT equipment, and (iii) the State Court billed the Plaintiffs for services which were never performed. The Plaintiffs alleged that various false representations were made to deceive the Plaintiffs to pay consideration to the Corporate Defendants which was not earned, and the Corporate Defendants overcharged the Plaintiffs for goods and services and otherwise exploited the Plaintiffs' IT resources for the **[*5]** State Court Defendants' benefit. The complaint in the State Court Action includes the allegations that the Debtor, who was director, agent and sole shareholder or principal of the Corporate Defendants, was also liable along with the Corporate Defendants because he intermingled and controlled the Corporate Defendants and disregarded

their corporate identity so as to defeat their corporate identity, and therefore the corporate identities of the Corporate Defendants should be merged into one entity for the purposes of their liabilities and obligations. The Plaintiffs asserted that the corporate veils of each of the Corporate Defendants should be pierced, and the Debtor should be liable for the acts of the Corporate Defendants. Based on the complaint in the State Court Action, the Debtor's liability requires a finding that the Debtor's relationship with the Corporate Defendants was sufficiently close that as a matter of law, the Debtor was liable for the contractual obligations of the Corporate Defendants.

The State Court Defendants filed answers and took active roles in the litigation, which included several discovery disputes between the parties. On January 4, 2008, the State Court entered [*6] an order directing the Debtor and the Corporate Defendants to provide discovery to the Plaintiffs. On May 2, 2008, another order was entered striking the answer of the Debtors and the Corporate Defendants in the event that the Debtor and the Corporate Defendants did not produce certain discovery on or before May 23, 2008.

On May 23, 2008, the Plaintiffs made a motion to strike the answer of the Debtor and the Corporate Defendants on the grounds that they willfully failed to comply with prior orders of the State Court. The Defendants opposed the motion and filed a cross-motion to strike the complaint and to compel discovery.

On July 7, 2008, Hon. Louis Crespo, as special referee, granted the Plaintiffs' motion to strike the State Court Defendants' answer. Judge Crespo further directed the Plaintiffs to move before Justice Bernard Fried for entry of a default judgment. Accordingly, the Plaintiffs filed a motion for default judgment before Justice Fried returnable on September 10, 2008. By stipulation entered on August 20, 2008, the Debtor and the State Court Defendants agreed that the Plaintiff's motion for default judgment would be adjourned to September 17, 2008. On September 8, 2008 [*7] (the "Petition Date"), the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code.

Justice Fried was advised that the Debtor filed for bankruptcy protection, and on September 25, 2008, Justice Fried *sua sponte* issued an order scheduling a hearing on notice to the State Court Defendants and their counsel of record to determine whether "there is any good reason why this action should not be severed and continued as to the non-bankrupt defendants, while the action remains stayed as to the bankrupt defendants as required by 11 U.S.C. § 362(a)(1)." The Debtor's bankruptcy counsel was not served with the order scheduling the hearing. At the hearing held on October 3, 2008 neither the Corporate Defendants nor the Debtor appeared. By order of the state court entered on October 6, 2008, the Debtor was severed from the State Court Action, and judgment by default as to all issues of liability was to be granted only against the Corporate Defendants. Because the Debtor was severed from the State Court Action prior to entry of judgment, the State Court made no findings that the Debtor participated in any fraud committed by the Corporate Defendants or that the Debtor was responsible [*8] as a matter of law for the actions of the Corporate Defendants. Pursuant to the October 6, 2008 order, Justice Fried held that either party could apply by order to show cause to vacate or modify the stay against the Debtor after obtaining a final order vacating the stay issued by the Bankruptcy Court in the Debtor's case. On January 20, 2009, the State Court entered a judgment by default as to all issues of liability only against the Corporate Defendants. An inquest was to be scheduled to fix damages, but such inquest has not taken place.

**Discussion**:

**1. Jurisdiction to Determine Applicability of the Automatic Stay**

The Plaintiffs and the Debtor agree that the State Court had the jurisdiction to determine whether the automatic stay applied to the State Court Action, and that the Bankruptcy Court has the jurisdiction to review the decision by Justice Fried and make its own determination as to whether the automatic stay applied to stay any portion of the State Court Action. The Court agrees. *HN1* The federal district courts, and by reference, the bankruptcy courts, have "original

and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings [*9] arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334. The automatic stay, which is an injunction issued by the bankruptcy court, is self-executing and is effective upon the filing of the petition. *In re Gruntz*, 202 F.3d.1074, 1081 (9th Cir., 2000) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 315, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (other citations omitted)). As the Ninth Circuit noted in *Gruntz*, the injunctive nature of the automatic stay imposes on affected parties an obligation to obey such decree until it is modified or reversed, even if there are grounds to object to the order. *Id.* at 1082 (other citations omitted). In addition, any action taken in violation of the stay, even if such action is a judicial proceeding, is void and of no force and effect. *Kalb v. Feuerstein*, 308 U.S. 433, 439, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (*citing Valiely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353-54, 41 S.Ct. 116, 65 L.Ed. 297 (1920)); *48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir.1987); *Maritime Elec. Co. v. United Jersey Bank.*, 959 F.2d 1194, 1204 (3d Cir.1991); *Phoenix Bond & Indem. Co. v. Shamblin (In re Shamblin)*, 890 F.2d 123, 125-26 (9th Cir.1989). [*10] Such act by a court in violation of the stay is not entitled to full faith and credit in the federal courts. *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 482-83, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

*HN2* Courts have uniformly found that the bankruptcy court has sole and exclusive jurisdiction to determine whether the automatic stay should be modified pursuant to section 362(d). *Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60, 62 (6th Cir. 1983), *In re Gruntz*, 202 F.3d at 1083; and *In re Mid-City Parking, Inc.*, 332 B.R. 798, 803 (Bankr. N.D. Ill. 2005). This sole and exclusive jurisdiction over any modification of the stay emanates from § 362(d), which states that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section," and from the legislative history of § 362(d), which clearly identifies the bankruptcy court as the sole authority to grant relief from the stay. *Cathey v. Johns-Manville Sales Corp.*, 711 F.2d at 62, 63 (*citing* House Report No. 95-595, U.S.Code Cong. & Admin. News 1978, p. 5787, Notes of Committee on the Judiciary).

*HN3* The Second Circuit has held that where a prepetition [*11] action is pending in federal court, that court has concurrent jurisdiction with the bankruptcy court to determine whether the automatic stay applies to the non-bankruptcy action. *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litigaton)*, 765 F.2d 343, 347 (2d Cir. 1985) ("*Baldwin-United*"). Other courts have agreed with this analysis under the theory that a court has inherent jurisdiction to determine its own jurisdiction. *In re Mid-City Parking, Inc.*, 332 B.R. at 804 (citing *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1105-07 (9th Cir. 2005); *Baldwin-United*, 765 F.2d at 347; and *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 216 (Bankr. D. Del.1995) ("*Conference of African Union*")). Despite the presiding court's inherent jurisdiction to determine whether the stay applies, the Second Circuit and other courts have recognized that the ultimate determination of whether the automatic stay applies to a non-bankruptcy action lies with the bankruptcy court, which originally issued the injunction. *See Baldwin-United*, 765 F.2d at 346, 348-49; *Conference of African Union*, 184 B.R. at 216; *In re Hunt*, 93 B.R. 484, 488-89 (Bankr. N.D. Tex. 1988). [*12] Granting to the bankruptcy court the final say as to whether the automatic stay applies to an action pending in another court is also consistent with the bankruptcy court's power to enforce its own injunctions under the Supremacy Clause. *In re Mid-City Parking, Inc*, 332 B.R. at 798. Therefore, this Court has the authority to review the decision by Justice Fried and if this Court disagrees with his ruling, to determine on its own the extent to which the automatic stay applies with respect to any aspect of the State Court Action.

## 2. Applicability of Bankruptcy Code § 362(a)(1) to the State Court Action

In order to determine whether Justice Fried properly determined whether the automatic stay applied, Justice Fried's rulings must be examined. In the State Court's order scheduling hearing, Justice Fried noted that the automatic stay does not apply to non-debtor co-defendants except

Get a Document - by Citation - 2009 Bankr. LEXIS 4023

Page 7 of 11

"under certain limited circumstances" and cited to *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Oxford Venture Partners, LLC*, 13 A.D.3d 89, 786 N.Y.S.2d 161, 162 (1st Dept. 2004). The order scheduling hearing was issued to determine whether the circumstances in the State Court Action warranted a finding that **[\*13]** the stay applied equally to the Debtor and to the Corporate Defendants. The Corporate Defendants failed to appear at the hearing and Justice Fried ruled that the automatic stay prevented the Debtor from remaining in the State Court Action and severed him entirely from the State Court Action. As a result, the causes of action regarding the Debtor's role in the fraudulent scheme of the Corporate Defendants were severed from the State Court Action and remain undetermined to date. Justice Fried also held in a subsequent order that prosecution of the State Court action against the Corporate Defendants was not stayed. Therefore it appears that Justice Fried concluded there were no grounds to find that the automatic stay applied to the Corporate Defendants. Because Justice Fried severed the Debtor from the State Court Action, there are no findings at all as to the Debtor - not that he committed fraud individually or that the corporate veils of the Corporate Defendants should be pierced. Justice Fried made no findings that the acts of the Corporate Defendants should be imputed to the Debtor. His rulings show a deference to the imposition of the automatic stay.

The Court believes the State Court **[\*14]** correctly framed the issue before it regarding the applicability of the automatic stay to the Corporate Defendants, and correctly found that Bankruptcy Code § 362(a)(1) did not apply to the Corporate Defendants. *HN4*Section 362(a)(1) stays "the commencement or continuation ... of a judicial ... action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Subsection 362(a)(1) is generally not available to non-debtors. *Teachers Ins. & Annuity Ass'n of America v. Butler*, 803 F.2d 61, 65 (2nd Cir. 1986) ("*Teachers*"); *In re Bidermann Industries U.S.A., Inc.*, 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996). Justice Fried recognized that a narrow exception to this proposition exists, but did not conclude that the facts in the case before him would warrant a finding that the stay applied to the Corporate Defendants. The Debtor now urges this Court to find that, Justice Fried's rulings notwithstanding, the exception did apply to the Corporate Defendants and they were covered by the automatic stay. According **[\*15]** to the Debtor, the Court should adopt the argument made by the Plaintiffs in this adversary proceeding that the Debtor and the Corporate Defendants are one and the same solely for the purposes of this motion, and find that based on this shared identity, the judgment against the Corporate Defendants is equivalent to a judgment against the Debtor. As a result, the continuation of the State Court Action post-petition violated the automatic stay and the rulings of the State Court post-petition are void *ab initio*.

The leading case enunciating the exception to the general rule that the automatic stay does not apply to non-debtors is *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986) ("*A.H. Robins*"). In *A.H. Robins*, the Court of Appeals for the Fourth Circuit found that in "unusual circumstances," the automatic stay could be extended to actions against non-debtors. *Id.* at 999. The debtor in *A.H. Robins* manufactured the Dalkon Shield, an intrauterine device, which was later discovered to be defective. As a result, thousands of actions were initiated against the debtor and its insurance provider, forcing the debtor to file for **[\*16]** bankruptcy. The plaintiffs in the non-bankruptcy actions sought to sever their actions against the debtor in order to proceed against the co-defendants. The Fourth Circuit affirmed the district court's decision to issue an injunction staying the plaintiffs' suits against the debtor, and held that a court may stay proceedings under "unusual circumstances," which would require "something more than the mere fact that one of the parties to the lawsuit has filed . . . bankruptcy." *A.H. Robins*, 788 F.2d at 999. According to the court in *A.H. Robins*, "unusual circumstances" would include a situation "where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id.* The court identified such a situation where a suit has been commenced against a third party who is entitled to absolute indemnity by the debtor as a result of any judgment that might be entered against the third party in the non-bankruptcy case. *Id.*

Although the Plaintiffs argue that in the *Teachers* decision, the Second Circuit implicitly rejected

[*17] this theory, the Court disagrees. In *Teachers*, the plaintiffs entered into a long-term loan with the defendants for the development and construction of an office building in Sacramento, California, which the defendant subsequently breached. After a trial, judgment was entered in favor of the plaintiff. Three days later, a petition for relief under chapter 11 was filed by one of the defendants which was a partnership, and the debtor partnership obtained a temporary restraining order from the bankruptcy court (i) restraining the plaintiff from enforcing the judgment against the debtor partnership and (ii) preventing the plaintiff from enforcing the judgment against each of the three defendant general partners, none of whom had filed bankruptcy petitions. The question before the Second Circuit on appeal was whether the district court wrongly denied the request by the non-debtor partners for a stay of the proceedings against them. The Second Circuit concluded that the bad faith conduct of the non-filing partners did not provide sufficient grounds for granting injunctive relief to extend the stay to these non-debtors under § 105(a).

In its ruling, the Second Circuit held that "it is well-established [*18] that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants" and cited to a number of cases in support. *Teachers*, 803 F.2d at 65. The Second Circuit did note the *A.H.Robins* case prefaced its citation with "*But cf.*" which has led several courts to conclude that the Second Circuit has implicitly rejected the "unusual circumstances" theory set forth in *A.H. Robins* for extending the stay to non-debtor entities. [1]

---

**FOOTNOTES**

[1] See *Signature Bank v. Ahava Food Corp.*, 2008 U.S. Dist. LEXIS 67464, *5 (Bankr. S.D.N.Y. 2008); and *Bidermann Indus. USA v. Zelnick*, 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996).

---

Second Circuit case law post-*Teachers* supports the vitality of *A.H. Robins* in this Circuit. In *Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282 (2d Cir. 2003), the Court of Appeals for the Second Circuit concluded that the automatic stay applied to an action commenced against, *inter alia*, a non-debtor corporation which was wholly owned by an individual chapter 11 debtor. **HN5** ⚓According to to the Second Circuit, "the automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for [*19] the debtor's estate." *Id.* at 287.

The Second Circuit in *Queenie* listed several examples of such immediate adverse economic consequences including: (1) a claim against a non-debtor for an obligation for which the debtor was a guarantor, (2) a claim against a debtor's insurer, and (3) actions where there is an identity between the debtor and third-party defendant that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor, and specifically cited to *A.H. Robins* in support of this third instance. *Id.* at 288.

While it is clear from *Queenie* that the Second Circuit has not implicitly rejected *A.H. Robins*, it is equally clear that the application of this exception does not apply in our case. In our case, there is no risk to any reorganization if the stay is not extended to the Corporate Defendants because the Debtor is liquidating. The imposition of liability against the Corporate Defendants only serves to fix liability against the Corporate Defendants at this point, and will not hamper the bankruptcy proceedings pending before this Court. In fact, there is no evidence that the continuation of the State Court Action post-petition had any effect [*20] on the Debtor's bankruptcy case as the Debtor was severed from the State Court Action.

The Debtor's reliance on *Neuman v. Hospital Consultants (In re Neuman)*, 128 B.R. 333 (Bankr.S.D.N.Y. 1991) is similarly unavailing. In *Neuman*, Carl Neuman filed a petition for relief under chapter 11 of the Bankruptcy Code. The debtor and his spouse were the 78% owner of stock in a corporation which had not filed for relief under the Bankruptcy Code. The debtor's case was marked by significant litigation and an operating trustee was appointed. After much

litigation, the trustee and the debtor negotiated a settlement. The bankruptcy court approved the settlement over one creditor's objection, but before the bankruptcy court entered an order approving the settlement, another creditor commenced a shareholders derivative action seeking to, *inter alia*, remove the debtor as officers and directors of the corporation in which the debtor and his wife owned 78% of the stock. The debtor responded with an order to show cause seeking to restrain the creditor from continuing the action and finding the creditor in violation of the automatic stay. The court determined that since the debtor owned 78% of the stock **[*21]** and the other companies involved were wholly owned subsidiaries of the corporation, there was such an identity between the entities as to render the derivative action in violation of the automatic stay. The court concluded that any relief granted in the state court would have affected the settlement agreement approved by the bankruptcy court, and furthermore, the complaint actually named the debtor both individually and as a trustee for the corporations.

The *Neuman* case does not apply to the case before this Court. First, the debtor in *Neuman*, like the debtor in *Queenie* and unlike the Debtor in this case, were seeking to reorganize under chapter 11 of the bankruptcy code, and the actions taken against the non-debtor defendants were found to have had a significant and immediate impact on the debtor's ongoing bankruptcy cases. The same cannot be said for this case, as the mere existence of a claim against a corporation wholly owned by the Debtor does not affect his bankruptcy.

There has been no finding that there is such identity between the Debtor and the Corporate Defendants that the judgment against the Corporate Defendants is tantamount to a judgment against the Debtor. A **[*22]** finding that there is an identity between the Corporate Defendants and the Debtor requires a legal conclusion that Justice Fried did not make and which may be critical to the success of the Plaintiff's adversary proceeding pending before this Court. Without a finding that the Debtor is liable as a matter of law for the debts of the Corporate Defendants the Plaintiffs seemingly have no independent claim in this case because the contractual relationship at issue in this adversary proceeding was between the Plaintiffs and the Corporate Defendants. Based on the record before the Court and having reviewed the record in the State Court, this Court cannot find at this point that there is an identity between the Debtor and the Corporate Defendants as urged by the Debtor. Any such finding must be established in this adversary proceeding by summary judgment or by trial. Since the Court does not find that the automatic stay applied to the Corporate Defendants in the State Court Action, and the Debtor was severed from the State Court Action, the Plaintiffs did not violate the automatic stay by continuing to participate in the State Court Action post-petition. Therefore, the Plaintiffs cannot be **[*23]** liable for sanctions for their actions under § 362(k) of the Bankruptcy Code.

### 3. Stay of the State Court Action under Bankruptcy Code § 105(a)

To the extent the Debtor requests that this Court use its powers under § 105(a) to extend the automatic stay to the Corporate Defendants, the Court denies the request. As noted by the Bankruptcy Court for the Southern District of New York in *In re Bidermann*, **HN6** the court may only issue such injunctive relief if the court finds that "the debtor would suffer some cognizable prejudice if the injunction did not issue." 200 B.R. at 783 (other citations omitted). The burden is on the moving party to show by clear and convincing evidence that injunctive relief is warranted. *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146, n.3 (5th Cir. 1987). Finally, such injunctive relief would not apply *nunc pro tunc*, but would be prospective in nature. *In re Bidermann*, 200 B.R. at 782-83 (citing *A.H. Robins*, 788 F.2d at 1001). Because any relief under § 105(a) would be prospective, granting injunctive relief to stay the State Court Action would not provide the Debtor with any real relief because the State Court has already made its rulings, which cannot be voided **[*24]** under this section. Therefore, even if the Court were to find that the Debtor has established grounds for extending the stay to the Corporate Defendants under § 105(a), the judgment against the Corporate Defendants would still stand and the Plaintiffs would only be precluded from continuing the inquest. As a result, relief under this section is not appropriate under these circumstances.

### 4. Applicability of the Findings in the State Court Action to the Dischargeability Action

Having found that the State Court correctly concluded that the automatic stay did not apply to the Corporate Debtors in the State Court Action and that there are no grounds to extend the stay to the Corporate Defendants under § 105(a), the Court now examines the Debtor's argument that even if this Court finds that the continuation of the State Court Action against the Corporate Defendants post-petition did not violate the stay, the stay prohibits the Plaintiffs from using the judgment obtained against the Corporate Defendants in the State Court Action in this adversary proceeding. According to the Plaintiffs, the automatic stay does not bar them from using collateral estoppel to preclude the Debtor from re-litigating  [*25] the issues of fraud resolved in the judgment obtained against the Corporate Defendants.

The Court concludes that the stay does not bar the Plaintiffs from using collateral estoppel offensively against the Debtor in this adversary proceeding. The automatic stay would never preclude this Court from making a determination in this adversary proceeding, nor could any action taken by the Plaintiffs in this adversary proceeding violate the automatic stay as to the Debtor. However, to the extent this Court concludes that the Debtor is derivatively liable for the actions of the Corporate Defendants, then the Court will be required to re-examine whether the automatic stay was applicable to the Corporate Defendants upon the filing of the Debtor's petition. As a result, the continuation of the State Court Action against the Corporate Defendants post-petition may then be deemed a violation of the automatic stay. This is because if the Plaintiffs are successful in piercing the corporate veils of the Corporate Defendants, then the unusual circumstances warranting application of the stay to non-debtors exist because the judgments against the Corporate Defendants will have an immediate, adverse effect  [*26] against the Debtor.

**Conclusion**:

For the foregoing reasons, the Debtor's Motion is denied. A status hearing on the Plaintiff's motion for summary judgment is scheduled for January 13, 2010 at 9:30 a.m. An order memorializing this decision shall be entered forthwith.

Dated: Central Islip, New York

December 8, 2009

By: */s/ Robert E. Grossman* ▾

Robert E. Grossman ▾

United States Bankruptcy Judge

Service: **Get by LEXSEE®**
Citation: **2009 Bankr. LEXIS 4023**
View: Full
Date/Time: Friday, October 11, 2013 - 7:20 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
🄌 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
➕ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

Get a Document - by Citation - 2009 Bankr. LEXIS 4023

Page 11 of 11

**LexisNexis®** About LexisNexis | Privacy Policy | Terms & Conditions | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.