# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | |
|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE–MI<br>Tax ID / EIN: 38–6004606 | represented by **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489–3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |
| | | **Richard A. Roble (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–6769<br>Email: Richard.A.Roble@usdoj.gov |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364 |

(202) 408−7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 10/11/2013 | | 1169 | Amended Objection to Eligibility to Chapter 9 Petition , *Brief in Support and Certificate of Service* Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Lieutenants and Sergeants Association, Detroit Police Officers Association (Patek, Barbara) (Entered: 10/11/2013) |
| 10/11/2013 | | 1170 | Amended Objection to Eligibility to Chapter 9 Petition *(Amended Joint Objection of International Union, UAW and the Flowers Plaintiffs to the City of Detroit, Michigan's Eligibility for an Order for Relief Under Chapter 9 of the Bankruptcy Code)* Filed by Creditor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Ceccotti, Babette) (Entered: 10/11/2013) |
| 10/11/2013 | | 1174 | Supplemental Objection to Eligibility to Chapter 9 Petition Filed by Retiree Committee Official Committee of Retirees (Montgomery, Claude) (Entered: 10/11/2013) |
| 10/17/2013 | | 1217 | Order Regarding Further Briefing on Eligibility (RE: related document(s)821 ). (ckata) (Entered: 10/17/2013) |
| 10/17/2013 | | 1227 | Brief *The Michigan Council 25 of the American Federation of State, County &Municipal Employees, AFL−CIO and Sub−Chapter 98, City of Detroit Retirees Pretrial Brief Regarding the City of Detroits Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* Filed by Creditor Michigan Council 25 Of The American Federation of State, County &Municipal Employees, |

| | | | |
|---|---|---|---|
| | | | AFL–CIO and Sub–Chapter 98, City of Detroit Retirees. (Levine, Sharon) (Entered: 10/17/2013) |
| 10/17/2013 | | <u>1230</u> | Brief *(Pre–Trial) Opposing Eligibility* Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Lieutenants and Sergeants Association, Detroit Police Officers Association. (Patek, Barbara) (Entered: 10/17/2013) |
| 10/17/2013 | | <u>1235</u> | Brief –– *Pre–Trial Brief of International Union, UAW and the Flowers Plaintiffs with Respect to the Eligibility of the City of Detroit, Michigan for an Order for Relief Under Chapter 9 of the Bankruptcy Code* Filed by Creditor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. (Ceccotti, Babette) (Entered: 10/17/2013) |
| 10/17/2013 | | <u>1241</u> | Brief *(Pretrial) in Opposition ot Eligibility* Filed by Retiree Committee Official Committee of Retirees. (Montgomery, Claude) (Entered: 10/17/2013) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                              Chapter 9

City of Detroit, Michigan,                          No. 13-53846

        Debtor.                                  Hon. Steven W. Rhodes

_____/

**AMENDED OBJECTION OF THE DETROIT FIRE FIGHTERS
ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION,
THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION
AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION
TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF
QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)**

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police

Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants

Association (the "DPLSA") and the Detroit Police Command Officers Association

(the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their

counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., pursuant to this

Court's First Amended Order Regarding Eligibility Objections, Notices of

Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) [Docket No.

821] state their Amended Objection to Debtor's Bankruptcy Petition and Statement

of Qualifications under 11 U.S.C. Section 109(c) (the "Amended Objection") as

follows:

# INTRODUCTION

1.    The City of Detroit (the "City") cannot establish that it is eligible to be a chapter 9 debtor under Section 109(c) of the Bankruptcy Code. First, the City cannot demonstrate that its petition was "specifically authorized by State law . . . or by a governmental officer . . . empowered by State law to authorize such entity to be a debtor . . ." as required by Section 109(c)(2) because one of the City's express purposes in seeking authorization to file the petition is to attempt to use these chapter 9 bankruptcy proceedings to illegally impair the constitutionally protected pension rights of the Detroit Public Safety Union employees,[1] other City employees and City retirees, in direct violation of the Michigan Constitution, Art. IX, Sec. 24 and Public Act 436, MCL 141.1541, *et seq.* Second, the City's failure

---

[1] The Public Safety Unions, as set forth more fully herein, strenuously disagree that any of the Emergency Manager, the City or the Governor can use the protections afforded by Chapter 9 of the Bankruptcy Code as limited by the 10th Amendment of the United States Constitution to enlarge their state and federal constitutionally limited authority in direct violation of that authority. Nevertheless, the Emergency Manager, supported by the Governor, has repeatedly and publicly articulated an intention to do so, and, given that the filing of the Petition was temporally related to efforts by City retirees and the Retirement Systems to obtain state court orders that would unequivocally declare that the Governor and the Emergency Manager lacked the constitutional authority to impair those pension rights in any venue. See State Court Complaints, Filed July 8, 2013 and July 17, 2013, Exhibit 6.1 to Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code For Entry of An Order Extending the Chapter 9 Stay [Docket No. 56, pp. 26-62].

2

(and, indeed, in many instances, its refusal) to negotiate in good faith with the Detroit Public Safety Unions prior to filing the petition as required by Section 109(c)(5)(B) should render the City ineligible to be a Debtor in these proceedings. Third, in light of the City's refusal to negotiate with the Detroit Public Safety Unions and the minimal time the City allotted for such negotiations to occur, the City should not now be permitted to claim that such negotiations were impractical under Section 109(c)(5)(C). Finally, given the haste with which this chapter 9 filing occurred, the absence of any evidence of specific, give-and-take negotiations in any of the declarations and documentary evidence submitted in support of the City's petition, and given the Governor, the City and the Emergency Manager's express purpose in attempting to use these chapter 9 proceedings to illegally impair the constitutionally protected, accrued pension rights of the Detroit Public Safety Unions' active members, retirees (as well as those of other City employees and retirees), the City has failed to meet its burden under Section 109(c) of the Bankruptcy Code, its petition was not filed in good faith, as required by Section 921(c) of the Bankruptcy Code and, therefore, must be dismissed.

2.     In filing their Amended Objection, the Detroit Public Safety Unions restate their original objections to the City's eligibility for chapter 9 bankruptcy protection [Docket No. 512], incorporate the additional facts set forth as set forth in the Michigan Council 25 of the American Federation of State, County &

3

Municipal Employees, AFL-CIO and Sub-Chapter 98, Retirees' ("AFSCME") Amended Objection to the City's Eligibility to Seek Relief Under Chapter 9 of the Bankruptcy Code (the "AFSCME Amended Objection") [Docket No. 1163], in further support of their arguments that the City's refusal to negotiate with the Detroit Public Safety Unions and other affected unions and creditors renders the City ineligible under Section 109(c)(5)(B) and that the City filed the petition in bad faith in violation of Section 921(c) of the Bankruptcy Code.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper before this Court under 28 U.S.C. §1409(a).

4. The Detroit Public Safety Unions, whose collective members provide police and fire protection to the City on a daily basis under extremely difficult conditions, acknowledge that the City faces serious and severe financial challenges that must be addressed, and the Detroit Public Safety Unions have been and are prepared to work with the City to tackle those challenges. However, for the reasons set forth herein, the Detroit Public Safety Unions believe that the filing of the Petition was defectively authorized and premature.

5. As a result of the severe economic challenges facing the City, the members of the Detroit Public Safety Unions must do more with fewer active members and less resources under increasingly difficult conditions. At the same

4

13-53846-tjt   Doc 2356   Filed 12/27/13   Entered 12/27/13 13:42:32   Page 8 of 286
13-53846-swr   Doc 3169   Filed 10/27/13   Entered 10/27/13 13:20:32   Page 4 of 26   8

time, the active members of each of the Detroit Public Safety Unions have seen their wages and benefits, including their future pension benefits, unilaterally reduced by the City, even as they attempted to negotiate with the City.

6.     Contrary to certain statements made by the City in the papers filed with this Court and other statements made to the public by the Emergency Manager and the Governor, the Emergency Manager has not negotiated in good faith with the Detroit Public Safety Unions. In the weeks leading up to the City's chapter 9 filing, there were no negotiations. Rather, the City and the Emergency Manager held two publicly trumpeted "informational meetings" with the Detroit Public Safety Unions. Both occurred within a week of the filing of the Chapter 9 petition. As set forth more fully herein, the timing of these meetings, and the content of the meetings, was insufficient to satisfy the requirements of 11 U.S.C. §109(c)(5)(B).

7.     Furthermore, prior to the filing of the petition, as set forth more fully herein, the City and the Emergency Manager have consistently refused to negotiate with the Detroit Public Safety Unions over terms and conditions of employment under both the former Emergency Manager Law, PA 4, MCL 141.1501, *et seq*, (which was overwhelmingly repealed by Michigan voters in 2012) and since the Emergency Manager's appointment under Public Act 436, MCL 141.1541, *et seq*.

5

8.     Contrary to the City's claimed efforts to negotiate in good faith, at least with regard to the Detroit Public Safety Unions, the City has consistently sought to block the Detroit Public Safety Unions' efforts to negotiate terms and conditions of employment.  The City has yet to provide the Detroit Public Safety Unions with a concrete restructuring proposal.

9.     At the direction of the Emergency Manager, the City instead successfully convinced the Michigan Employment Relations Commission to dismiss petitions filed by some of the Detroit Public Safety Unions seeking arbitration under Public Act 312, MCL 423.231, *et seq* ("Act 312")[2], on the basis that the City has no duty to bargain with the Detroit Public Safety Unions. Subsequent to the successful dismissals, the City indicated its intent to unilaterally impose less favorable terms and conditions of employment on the Union members, including reduced pay, increased health care premiums, deductibles and co-pays and reduced future pension benefits, and, in the case of some of the Detroit Public Safety Unions, in fact imposed such terms.

---

[2] Act 312 is based on ". . . the public policy of this state . . .," which recognizes, ". . . that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternative, expeditious, effective and binding procedure for the resolution of disputes."  Act 312 provides the remedy for police and firefighter bargaining units if the municipality refuses to negotiate or negotiations are otherwise unsuccessful.

10. The Emergency Manager, prior to filing the chapter 9 Petition, stated his intention to use chapter 9 to significantly impair the vested pension rights and benefits of City employees and retirees.[3] These pre-petition statements provide the basis for establishing both the lack of proper legal authorization for the Petition and the Emergency Manager's intent to avoid the required pre-petition good faith negotiation process.

11. Because the City cannot satisfy the requirements of 11 U.S.C. §109(c), it therefore does not qualify to be a debtor under chapter 9.

## FACTUAL BACKGROUND

12. The background narrative of the City's financial problems does not need to be repeated in this objection. All parties understand that the City is in a woeful financial condition. Nonetheless, that financial condition does not relieve the City of the need to satisfy the requirements of 11 U.S.C. §109(c).

13. In the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Doc. No. 11] (the "Orr Declaration"), and in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Doc. No. 14] (the "Memorandum"), the City asserts that it has

---

[3] See, for example, the Proposal for Creditors, Doc. 11-1, page 76 -78, "Labor Costs and Terms and Conditions", "Salaries and Wages", "Operational Efficiencies/Work Rules"; page 109 "Claims for Unfunded Pension Liabilities."

satisfied the requirements of §109(c)(5)(B) and (C). The Detroit Public Safety Unions contest this assertion. Specifically, the Detroit Public Safety Unions believe that the City cannot satisfy the requirements of §109(c)(2) or (5), as set forth in more detail below.

14. On March 14, 2013, the Governor appointed Kevyn Orr as Detroit's Emergency Financial Manager pursuant to 1990 PA 72, MCL 141.1201, *et seq*, Orr assumed that role on March 24, 2013 (Orr Declaration, ¶78). On March 28, 2013, PA 436, MCL 141.1541, *et seq*. became effective and Orr became the Emergency Manager under PA 436.

15. Since the Emergency Manager's appointment, the City has steadfastly declined to negotiate with the Detroit Public Safety Unions, claiming it has no obligation to do so under PA 436. See, generally, Exhibit A, Declaration of Mark Diaz (the "Diaz Declaration") [Docket No. 512-1] and Exhibits 1 and 2 thereto [Docket Nos. 512-2 through 512-5]; Exhibit B, Declaration of Daniel McNamara (the "McNamara Declaration") and Exhibits 1 and 2 thereto [Docket No. 512-6] ; Exhibit C, Declaration of Mark Young (the "Young Declaration") [Docket No. 512-7] and Exhibit D, Declaration of Mary Ellen Gurewitz, Esq. (the "Gurewitz Declaration") [Docket No. 512-8].

16. However, on June 14, 2013, the Emergency Manager held a meeting at the Westin Hotel at Detroit Metropolitan Airport with the City's creditors,

8

including the Detroit Public Safety Unions. That meeting was an en masse event at which the City presented certain general information about its restructuring intentions; questions were answered, but no negotiations took place. See "City of Detroit Proposal for Creditors" dated June 14, 2013 (the "June 14 Creditor Proposal") to all creditors in attendance [See Doc. No. 11-1] (Orr Declaration ¶ 80). The June 14 Creditor Proposal was a general overview of the financial condition of the City, the condition of city services and issues regarding payment of personnel, including the members of the Detroit Public Safety Unions. It also had broad proposals for creditor treatment including proposals that would significantly impair the accrued financial benefits of the Detroit Public Safety Union members and retirees. See Restructuring Proposal, [Docket 11-1, p. 60] (attached as Exhibit to Orr Declaration).

17. On June 20, 2013, the Emergency Manager held a second meeting with various unions and their representatives, including the Detroit Public Safety Unions, at which the City informed the Detroit Public Safety Unions of its intent to propose steep cuts to their pension and health care benefits.

18. A third meeting took place with each of the Detroit Public Safety Unions during the week of July 12, 2013 regarding these proposed cuts. Again the City made it clear that it was not negotiating with the Detroit Public Safety Unions although they were welcome to propose their own restructuring plan. The City

also indicated that it would be unwilling to negotiate any terms of such a restructuring plan unless agreement was first reached on actuarial assumptions—one of the central and most hotly disputed issues in these Chapter 9 proceedings. See Exhibit 2 to Exhibit B, McNamara Declaration.

19.     Nevertheless, in response, on July 12, 2013, the Detroit Public Safety Unions jointly wrote to the City's counsel, asking for a more concrete restructuring proposal to which they could respond.  See Exhibit 1 to Exhibit B, McNamara Declaration.

20.     On July 16, 2013, the Emergency Manager sought the Governor's authorization to file these Chapter 9 proceedings.  Orr Declaration, Exhibit J [Docket 11-10].

21.     On July 17, 2013, the Detroit Public Safety Unions received a letter from the Emergency Manager's counsel, which indicated that the Emergency Manager wanted to first reach agreement on actuarial assumptions and which provided no substantive proposals.  See Exhibit B, ¶8 and Exhibit 2 to Exhibit B.

22.     The following day, July 18, 2013, the City filed its Chapter 9 Petition.

23.     As set forth more fully herein, with regard to the Detroit Public Safety Unions, the content of the discussions at the June 14th meeting and the follow up meetings were very general, and the City continued to indicate, through the Emergency Manager, that the meetings should not be construed as negotiations.

See Exhibits A, B and C. The specifics of the City's dealings with each of the Detroit Public Safety Unions during the time period leading up to and immediately following the Chapter 9 filing are set forth below. Those dealings and the declarations that support them make it clear that the City did not meet its pre-filing obligation of good faith negotiations with the Detroit Public Safety Unions, or, upon information and belief, other unions or the Retirement Systems about a plan of adjustment.[4]

## THE DPOA

24. The DPOA consists of nearly 2000 active Detroit police officers. The DPOA's experience is addressed first because, while the DPOA has also experienced the City's refusal to negotiate, it is the only one of the Detroit Public Safety Unions who managed to obtain an Act 312 arbitration award which sets forth the terms and conditions of an employment contract with the City. Specifically, on March 25, 2013, only days before the effective date of PA 436, the Act 312 memorializing the terms and conditions of employment between the City

---

[4] The March 26, 2012 Report of the Financial Review Team [Doc. No. 11-4] references the participation between the Review Team and officers of the DPOA, DPCOA, DPLSA and DFFA. The Public Safety Unions were clearly known to the City prior to June 14, 2013.

and the DPOA was issued (the "Award").[5] A copy of the award is attached to Exhibit A, Diaz Declaration as Exhibit 1.

25.    Significantly, the Award recognized the record number of issues presented for arbitration were the direct result of the City's refusal to negotiate and its insistence on imposing on the DPOA a series of demoralizing and not necessarily cost-saving City Employment Terms ("CETs") under the now-repealed Public Act 4, former MCL 141.1501, *et seq*.  Exhibit 1 to Exhibit A, Award at p. 28. Among the Award's specific findings were:

> . . . The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings.  Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police Department.  This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan.  It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will

---

[5]  A portion of the Award (a 5% wage increase awarded to DPOA members, effective January 1, 2014) has been challenged by the City and is the subject of pending but stayed litigation.  See Diaz Declaration, ¶5.
.

reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

26. The Award further found that, " . . . if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced." Exhibit 1 to Exhibit A, Award at p. 29.

27. The Award further provided for a 5% pay raise, effective January 1, 2014 for DPOA members and for the reopening of the Act 312 proceedings to address health care issues after June 30, 2013. However, the City, through the Emergency ¶Manager, filed a complaint for judicial review of the 5% pay raise, which remains pending but stayed by these proceedings. Exhibit A, Diaz Declaration, ¶5. Relying on Public Act 436, the City has declined to reopen the Act 312 proceedings to address health care issues, and instead seeks to unilaterally impose new health care terms on the DPOA. Exhibit A, Diaz Declaration, ¶ ¶ 8-10.

## THE DFFA

28. The DFFA consists of all active Detroit fire fighters of all ranks. It has just under 800 current members. Relying on PA 436 and claiming it had neither a duty to negotiate or to arbitrate under Public Act 312, the City successfully blocked the DFFA's efforts, as well as the efforts of the DPLSA and

the DPCOA to pursue Act 312 arbitration. See Exhibit B, McNamara Declaration, In a 2-1 decision, the Michigan Employment Relations Commission ruled that, as a result of the Emergency Manager's appointment, it lacked the authority to conduct Act 312 hearings. See Exhibit C, Young Declaration, pp. 2-3.

29.     While, during communications at this time, the City declined to disclose what conditions it intended to impose and made clear its unwillingness to negotiate, the DFFA continued to attempt to engage the City in meaningful discussions regarding its restructuring. See Exhibit 1(7/12/13 Letter) to Exhibit A. By letter dated July 25, 2013, the City informed the DFFA that, effective August 16, 2013, its members wages would be cut by 10% across the board, and at a meeting on August 2, 2013 which the City emphatically indicated was not a negotiation, the City presented the terms of new health care plans it intends to impose, which will increase the out of pocket health care costs to be borne by DFFA members by as much as $3000 a year for families. See McNamara Declaration, ¶¶7, 12- 13.

<u>THE DPLSA</u>

30.     Like the DFFA, the DPLSA was blocked in its efforts to engage the City in Act 312 arbitration proceedings. On June 25, 2013, the City notified the DPLSA of the termination of its collective bargaining agreement effective July 6, 2013 and that it was not requesting bargaining at that time. After informing the

14

13-53846-swr   Doc 2185-8 Filed 12/27/13   Entered 12/27/13 21:20:26   Page 48 of 41
286
13-53846-swr   Doc 1135-8 Filed 10/1/13   Entered 10/1/13 13:04:26   Page 48 of 51   18

DPLSA that it had no duty to bargain, the Emergency Manager notified the DPLSA that changes to its wages, benefits and working conditions would be forthcoming after August 1, 2013. Exhibit C, Young Declaration, p. 3.

31.    Shortly after the chapter 9 petition was filed, the City's Labor Relations Director informed the DPLSA that the City was prepared to impose terms on its members. In July 31, 2013 correspondence and without any prior negotiation, the City identified 17 terms it intended to implement. Exhibit C, Young Declaration, p. 3.

32.    In response to an August 1, 2013 request from the DPLSA, the City has delayed imposing the 17 terms as of the date of this Objection. Exhibit C, Young Declaration, p. 4.

THE DPCOA

33.    The DPCOA has been blocked from negotiating with the City and has been subjected to unilaterally imposed City Employment Terms (the "CET") since July of 2012. Its last contract expired in 2009. The CET were a unilaterally imposed set of working conditions, including a 10% wage cut for all DPCOA members. Exhibit D, Gurewitz Declaration, ¶¶4-5.

34.    As with the DFFA and the DPLSA, the City successfully blocked the DPCOA's efforts to proceed to Act 312 arbitration. Following the suspension of PA 4, the DPCOA filed for Act 312 arbitration, an arbitrator was appointed,

15

286
13-53846-tjt    Doc 2185-8    Filed 12/27/13    Entered 12/27/13 21:30:26    Page 19 of 41
13-53846-swr    Doc 1135    Filed 10/2/13    Entered 10/2/13 21:20:32    Page 19 of 41    19

hearing dates were scheduled for March of 2013, and there were several days of productive negotiations prior to the appointment of the Emergency Manager. However, all negotiations terminated with the Emergency Manager's appointment. Exhibit D, Gurewitz Declaration, ¶6.

35.     The Emergency Manager has consistently taken the position that there is no duty to bargain and has refused to bargain or negotiate with the DPCOA. Exhibit D, Gurewitz Declaration, ¶8.

<u>ALLEGED IMPRACTICALITY</u>

36.     The City also asserts that negotiations were "impracticable" [Memorandum at p. 40]. The Detroit Public Safety Unions assert that there were, and remain, even absent the creation of a Retirees' Committee, sufficient creditor participants with whom the Emergency Manager could have had meaningful negotiations.     The City self-imposed an extremely limited time frame for negotiations during which it elected not to negotiate with the Detroit Public Safety Unions. It should not now be permitted to claim those negotiations were impractical.

37.     As set forth in the accompanying brief, based upon these facts and applicable bankruptcy, state and federal law, the City cannot meet its burden of showing it is eligible to be a Debtor under Section 109(c).

16

## RELIEF REQUESTED

WHEREFORE, the Detroit Public Safety Unions respectfully request that the City of Detroit's chapter 9 petition be dismissed.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: _/s/ Barbara A. Patek_
      Earle I. Erman  (P24296)
      Craig E. Zucker  (P39907)
      Barbara A. Patek (P34666)
      Counsel for the Detroit Public Safety Unions
      400 Galleria Officentre, Suite 444
      Southfield, MI  48034
      Telephone: (248) 827-4100
      Facsimile:  (248) 827-4106
      E-mail:  bpatek@ermanteicher.com

DATED:   October 11, 2013

F:\CHAP9\DETROIT\Amended objection to eligibility.docx

17

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      No. 13-53846

      Debtor.                                   Hon. Steven W. Rhodes

_____/

**BRIEF IN SUPPORT OF AMENDED OBJECTION OF THE DETROIT
FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS
ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS
ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS
ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND
STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)**

13-53846-swr   Doc 2185-8   Filed 12/27/13   Entered 12/27/13 21:20:52   Page 23 of 41
286
13-53846-swr   Doc 1389   Filed 10/21/13   Entered 10/21/13 13:04:26   Page 23 of 41   22

# TABLE OF CONTENTS

Index of Authorities ............................................................................ iii

Statement of Facts ................................................................................1

Argument…………………………………………………………………..2

    A.  Burden of Proof for Eligibility................................................................2

    B.   Failure to Comply with the Requirements of 11 U.S.C. §109(c)(5) ........3

    C.   11 U.S.C.§921(c) Must Be Looked At In Conjunction With the
Requirements Of §109(c) ...................................................................... 18

Relief Requested ................................................................................... 18

# INDEX OF AUTHORITIES

## Cases

*Ashton v. Cameron County Water Improvement District Number One*, 236 U.S. 513 (1936) ...................................................................................... 3

*Bond v. United States*, 131 S. Ct. 2355 (2011) .................................................. 3, 4

*In re City of Stockton, California*, 2013 WL 2629129 (Bankr. E.D. Cal. 2013)....2

*In re City of Vallejo*, 408 B.R. 280 (BAP 9th Cir. 2009)................................... 18

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado*, 138 B.R. 973 (Bankr. D.Colo. 1992) ............................................................ 7, 16

*In re County of Orange*, 183 B.R. 594 (Bankr. C.D. Cal. 1995) ...................... 2, 18

*In re Ellicot School Building Authority*, 150 B.R. 261(Bankr. D. Colo. 1992)………………………………………………14, 15

*In re New York City Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010)………………………………………………………………6, 7, 16

*In re Sullivan County Regional Refuse Disposal District*, 25 B.R. 60 (Bankr. D. N.H. 1994)...................................................................... … 15

*In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60 (Bankr. D.N.H. 1994)………………………………………………7, 17

*In re Valley Health System*, 383 B.R. 156 (Bankr. C.D. Cal. 2008)……2, 17, 18

*In re Villages at Castle Rock Metropolitan District No. 4*, 145 B.R. 76 (Bankr. D. Colo. 1990)........................................................................ .17

*United States v. Bekins*, 304 U.S. 27 (1938)…………………………………….4

## Statutes

28 U.S.C. § 959(b) ........................................................................ 5

11 U.S.C. § 943(b)(4) .................................................................... 5

11 U.S.C. § 921(c) .................................................................... 5, 18

11 U.S.C. § 109(c)……………………………………………………*passim*

Michigan Public Act 436, MCL 141.1541, *et seq* ........................... 3

## Other

Black's Law Dictionary, (9th ed. 2009) ............................................ 13

United States Constitution, Art. 1, Sec. 8, Clause 4 ......................... 3

United States Constitution, Am. X……………………………..3, 4, 6, 7

Michigan Constitution, Art. IX, Sec. 24 ......................................... 3, 5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      No. 13-53846

       Debtor.                              Hon. Steven W. Rhodes

_____/

**BRIEF IN SUPPORT OF AMENDED OBJECTION OF THE DETROIT
FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS
ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS
ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS
ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND
STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)**

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police

Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants

Association (the "DPLSA") and the Detroit Police Command Officers Association

(the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their

counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state for their Brief in

Support of Objection to Debtor's Bankruptcy Petition and Statement of

Qualifications under 11 U.S.C. Section 109(c) as follows:

**STATEMENT OF FACTS**

The Detroit Public Safety Unions rely on the facts as set forth in their

Amended Objection, including those incorporated therein by reference.

1

13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 26 of 41
286
13-53846-swr   Doc 1185   Filed 10/12/13   Entered 10/12/13 21:20:52   Page 26 of 41      26

# ARGUMENT

## A. Burden of Proof for Eligibility.

11 U.S.C. §109(c) provides:

An entity may be a debtor under chapter 9 of this title if and only if such entity ---

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

The City, as the proponent of the chapter 9 petition, bears the burden of proof to show that it is satisfies the elements of 11 U.S.C. §109(c) and is therefore eligible to file a chapter 9 petition. *In re City of Stockton, California,* 2013 WL 2629129 at *19 (Bankr. E.D.Cal. 2013); *In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995), *In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008). This Objection focuses on the requirements of §109(c)(2) and (5) and the good faith requirement of Section 921(c).

2

**B.    The City cannot meet the requirements of §109(c)(2) because Section 109(c)(2) must be read in light of the 10th Amendment of the United States Constitution and principles of federalism.  To the extent 109(c)(2) can be read to allow impairment of the Detroit Public Safety Union members and retirees' accrued financial benefits under the PFRS in violation of the Emergency Manager and the Governor's oaths of office, the Michigan Constitution, Art. IX, Sec. 24 and PA 436[1], Section 109(c)(2) would violate the Detroit Public Safety Union members' and retirees' rights under the 10th Amendment of the United States Constitution, to be free from federal intrusion on matters related to the State's administration of its fiscal affairs.**

While the United States Constitution, Art. 1, Sec. 8, Clause 4, authorizes Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States," the Supreme Court has held that such authority is subject to the limits of the 10th Amendment. *Ashton v. Cameron County Water Improvement District Number One*, 236 U.S. 513 (1936).  *Ashton* has never been overruled. Furthermore, both the express language of the 10th Amendment[2] and recent Supreme Court case law recognize that the 10th Amendment protects not only states' sovereignty but also the individual liberties of citizens.  *See, e.g. Bond v. United States*, 131 S. Ct. 2355 (2011), recognizing that principles of federalism give individuals the right to challenge unconstitutional intrusions into state

---

[1] MCL 141.1541, *et seq.*

[2] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people*." U.S. Const., Am. X (emphasis added).

3

sovereign authority even when the state does not object (or as here "consents") to those intrusions.[3]

One of the stated goals of the June 14 Creditor Proposal, and a position repeatedly and publicly articulated by the Emergency Manager and the Governor, is that chapter 9 will allow the Emergency Manager to dispense with his sworn constitutional obligation to preserve the accrued financial benefits of City employees and retirees, including Detroit Public Safety Union members and retirees, under the City Retirement Systems. Such a reading of chapter 9 is not consistent with the 10th Amendment, which not only protects state sovereignty, but also protects the rights of individuals to be free from federal interference with their vested, state constitutional rights. *See Bond, supra*.

Based upon the City's articulated goal of using the chapter 9 plan it intends to propose to impair the accrued financial benefits to which the Detroit Public Safety Union members and retirees (as well as other City employees and retirees) are entitled, the City cannot put forth a confirmable plan of adjustment. A plan which contains such provisions would be in violation of the Michigan Constitution and the restrictions placed on the Emergency Manager by PA 436 and his oath of

---

[3] To the extent *United States v. Bekins*, 304 U.S. 27 (1938) can be read to allow a State or municipality to use Chapter 9 to breach an express state constitutional obligation to its citizens in violation of individual rights protected by the10th Amendment, *Bekins* is no longer good law. In support of this argument, the Detroit Public Safety Unions adopt the arguments of other objectors that, as applied

4

office, and, as such would not be confirmable. If the goal of the chapter 9 is to file a plan which will not be able to be confirmed, the plan, and the proposal of such a plan, is a meaningless event. As such, the proposal of a non-confirmable plan should not be sufficient to satisfy the requirements of 11 U.S.C. §921(c).

Article IX, Section 24 of the Michigan Constitution states:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

28 U.S.C. §959(b) states:

**(b)** Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

11 U.S.C. §943(b)(4) addresses confirmation of a chapter 9 plan. The section, written in the affirmative, states that "the court shall confirm the plan if—(4) the debtor is **not** prohibited by law from taking any action necessary to carry out the plan" (emphasis added).

The June 14 Creditor Proposal is based on modifying Michigan constitutionally protected rights. The City has been clear that it is wedded to the

June 14 Creditor Proposal. However, the Creditor Proposal violates the Michigan constitution in that it seeks a unilateral modification of the Detroit Public Safety Union members and retirees' pension rights and employment benefits. As such, it cannot be confirmed. While there is no requirement that the pre-petition plan proposed by a possible chapter 9 debtor be the plan that is ultimately confirmed (*In re New York City Off-Track Betting Corp.*, 427 at 274), it is clear that the June 14 Creditor Proposal is the general template that the City seeks to use as its chapter 9 plan. It is illogical for the City to be able to obtain an Order for Relief when its proposed course of action, in fact, the very core of what it is seeking to accomplish, is the improper impairment of constitutional rights.

> Bankruptcy courts should review chapter 9 petitions with a jaded eye. Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtail the power of bankruptcy courts to compel municipalities to act once a petition is approved. 6 COLLIER ON BANKRUPTCY 900.01 ¶ [2][c] (observing bankruptcy courts' limited power over municipalities due to the Tenth Amendment). *See also New York v. United States,* 505 U.S. 144, 155–66, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (reviewing development of Tenth Amendment jurisprudence, recognizing dual sovereignty and observing that 'the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions'). This fundamental constitutional principle halts bankruptcy courts from regulating or otherwise controlling expenditures or activities of municipalities. 5 WILLIAM J. NORTON, JR. & WILLIAM L. NORTON III, NORTON BANKRUPTCY LAW AND PRACTICE § 90:4 (3d ed. 2009) ('Without the consent of the municipality, the court may not interfere with any of the political or governmental powers of the debtor, any property or revenues of the debtor, or the

6

debtor's use or enjoyment of any income-producing property.'); H.R.REP. NO. 95–595, at 263 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6221 ('[T]he powers of the court are subject to a strict limitation—that no order or decree may in any way interfere with the political or governmental powers of the petitioner, the property or revenue of the petitioner, or any income-producing powers.'). Congress deemed this principle so important it explicitly recognized the limits of bankruptcy courts' powers in section 904.

In light of these concerns, bankruptcy courts scrutinize petitions for relief under chapter 9. *See In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 82 (Bankr.D.N.H.1994) (observing that the jurisdiction of bankruptcy courts 'should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'); *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr.D.Colo.1992) (noting that constitutional issues in chapter 9 cases caused Congress 'to limit accessibility to the bankruptcy court by municipalities.') (quoting H.R.REP. NO. 94–938, at 10 (1976)) (internal quotation marks omitted).

*In re New York City Off-Track Betting, 427 B.R. at 264-265 (footnotes omitted).*

The concern about the limitations of chapter 9 by the Tenth Amendment was also expressed in *In re Sullivan County Regional Refuse Disposal District,* 165 B.R. at 82-83:

The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task.

Although the law is rarely painted in strokes of black and white, there are occasionally cases and situations in which there is a need and justification for a 'bright line' rule on a particular legal

7

question. This is such a situation. Municipalities that wish to come into bankruptcy under Chapter 9 in my judgment must, at a minimum, demonstrate that before filing they either used their assessment or taxing powers to a reasonable extent, or in their pre-petition negotiations have committed to the use of those powers as part of a comprehensive and appropriate work out of their financial problems. If they have undertaken that endeavor in good faith, and nevertheless <u>have failed to reach an accommodation with their creditors, they then</u> may be entitled to Chapter 9 relief if they are otherwise qualified.

## C. Failure to comply with the requirements of 11 U.S.C. §109(c)(5).

As stated above, 11 U.S.C. §109(c)(5) contains four (4) requirements as part of the qualifications for an entity to be a debtor under chapter 9. Because the City concedes that it has not satisfied §109(c)(5)(A), [Memorandum, page 40, fn. 12], and there is no suggestion that Section 109(c)(5)(D) applies, only Sections 105(c)(5)(B) and (C) are relevant here, and the Detroit Public Safety Unions assert that the City has not satisfied the remaining requirements of those sections.

Specifically, §109(c)(5)(B) requires the City to show that it:

. . . has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

The Emergency Manager submitted the June 14 Creditor Proposal to creditors just five weeks before obtaining authorization to file. However, well prior to that time, and almost a year prior to the date of the Emergency Manager's appointment on March 14, 2013, the City Financial Review Team issued its initial

8

Report, dated March 26, 2012, advising that the City "is in a condition of severe financial stress". [See Doc. No. 11-4.] This report was supplemented on February 19, 2013. [See doc. No. 11-7.].

The June 14 Creditor Proposal presented general proposals (identified by the Emergency Manager as the "Executive Summary" [Orr Declaration ¶81]) for dealing with creditors, including the Detroit Public Safety Unions' constituents. It did not provide any substantive information as to how these proposals would be put in place, the timing of any employment and/or benefit modifications, or otherwise give more than a general statement of proposed treatment. In the context of the significant issues facing the Detroit Public Safety Unions' constituents, this was "bare bones" at best. Nonetheless, the Detroit Public Safety Unions were interested in engaging in a dialogue with the Emergency Manager and his team, in an effort to work on the difficult financial issues facing the City. However, there was limited, or no, opportunity to do so, nor was there any meaningful outreach by the Emergency Manager to the representatives of the Detroit Public Safety Unions to negotiate a mutually agreeable settlement. In his Declaration, the Emergency Manager states:

> 84. The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition. The City proposed: (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax

9

GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata* distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amortization of the principal of such notes in the event that, e.g., future City revenues exceeded certain thresholds, certain assets were monetized and/or certain grants were received. See June 14 Creditor Proposal, at pp. 101-109.

85. Having provided the facts and strategies contained in the presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case. At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 presentation, the City: (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

. . .

91. On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations. These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City: (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward. Representatives and advisors of the Pension Systems attended both meetings.

92. Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees. Questions were solicited, and the City's advisors answered as many of them as could be answered before the meeting time concluded. Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes. Questions were solicited, and the City's advisors answered all questions posed. The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room . . . that the City has established as a repository for information that creditors may find relevant in their evaluation of the City's proposals.

93. Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' preferred approach to address the required changes that are expected to be severely dislocating for retirees.

94. Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger. Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions. Others took a more constructive approach. On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties.

95. On July 10, 2013, the City and certain of its advisors held separate meetings with: (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations; and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to: (a) provide additional information on the City's pension restructuring proposal;

and (b) discuss a process for reaching a consensual agreement on (i) pension underfunding issues and (ii) the treatment of any related claims. At each meeting, the parties generally discussed: (a) the actuarial assumptions underlying the Pension Systems' claims related to underfunding (and that will be used for funding purposes going forward); (b) the City's prospective ability to make contributions to the Pension Systems; and (c) adjustments to pension benefit design necessary to reduce liabilities, and consequent underfunding, to a level that will allow the City to fund the Pension Systems going forward.

96. On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for: (a) select non-uniform unions and retiree associations and the GRS; and (b) certain uniformed unions and retiree associations and the PFRS to discuss retiree health issues. At each of these meetings, the City's advisors reviewed the proposals for the modification of retiree health benefits that previously had been presented and discussed at the prior meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

97. Meetings with Funded Debt and Pension Representatives. On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "Bond Insurer"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information

and proposals that had been presented to the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

[Emphasis added][footnotes omitted]

It is clear from the Emergency Manager's Statement that the June 14, 2013 meeting and the follow up meetings were not for the purposes of negotiation of a settlement, but for the sole purposes of providing information on the changes that the City sought to unilaterally put in place and the treatment of the City's debt. This read of the Orr Declaration is corroborated by the experience of the Detroit Public Safety Unions, as documented by the Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A, B, C and D [Docket Nos. 512-1 through 512-8]. This is not negotiation as contemplated by the Bankruptcy Code, nor in any other context.

According to Black's Law Dictionary, (9th ed. 2009),

> Negotiation means
> **1.** A consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter.
> **2.** (*usu. pl.*) Dealings conducted between two or more parties for the purpose of reaching an understanding.

According to the Memorandum,

> …the City convened the June 14 Meeting . . .for the purpose of engaging its creditors with respect to a consensual restructuring of the City's various classes of debt within the framework of the June 14 Creditor Proposal. At the June 14 Meeting, the Emergency Manager openly invited the City's creditors to contact the City and its advisors to begin negotiations. [Memorandum, page 54-55]

13

This statement, in conjunction with the Emergency Manager's Declaration, supports that the June 14 Creditor Proposal was the only proposal discussed. Despite the invitation to contact the City, the June 14 Creditor Proposal was essentially presented as a "take it or leave it" proposal. The manner of presentation and the subsequent meetings only invited inquiry, and did not invite any deliberation or discussion. There was nothing to suggest that there was any kind of a "consensual bargaining process". Thus, the June 14th meeting and the subsequent meetings do not qualify as "negotiations". See Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A-D.

Further, the City did not engage with all of the required creditors including, specifically, the Detroit Public Safety Unions. The City repeatedly stressed that meetings were not negotiations and that it had no duty to bargain or negotiated. In particular, as the Diaz, McNamara, Young and Gurewitz Declarations make clear (and consistent with the Orr Declaration), there was no negotiation, whether actual or purported, prior to July 18, 2013, when the City filed its chapter 9 Petition.

11 U.S.C. §109(c)(5)(B) requires that the entity "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter." Meetings at which the debtor explains its proposed plan of restructuring do not constitute negotiations, especially when a

14

proposal is not open to discussion. There are no good faith negotiations when creditors are presented a plan as a "take it or leave it" proposal. *In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992), (even though the court held that the School Building Authority was not qualified to be a chapter 9 debtor, the judge still analyzed the requirements of 11 U.S.C. §109(c)(5)(B) and stated that a "take it or leave it" approach is not a good faith negotiation). Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of the other party" (*In re Sullivan County Regional Refuse Disposal District,* 25 B.R. 60, 78 (Bankr. D. N.H. 1994).

It is required that negotiations with creditors, sufficient to satisfy 11 U.S.C. §109(c)(5)(B), provide creditors sufficient time to evaluate a proposed plan.

> In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these problems, Congress consciously sought "to limit accessibility to the bankruptcy court" by municipalities. H.R. Conference Report, 94–938, p. 10, U.S.Code Cong. & Admin.News 1976, p. 539. One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code.

> The conditioned entry to this Court which is afforded by section 109(c) recognizes that the negotiating posture of the parties changes once the bankruptcy petition is filed. It is one thing to negotiate when the debtor is being confronted with the pressures of defaults on public debt and the requirement of certifying ever-increasing mill levies in

order to provide for the payment of such debt. It is another when the entity is being protected by the stay of section 362 of the Code and the bondholders are being faced with an indeterminate period of nonpayment of their bonds. The 'creditor protection' provided by section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the Code.

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R. 973, 979 (Bankr. D.Colo. 1992).

In addition to the lack of meaningful discussion, the short time period between the June 14 Creditor Proposal and the July 18, 2013 filing date of the chapter 9 petition did not leave any time for any serious or meaningful negotiations. The combination of all of these factors demonstrates that the City did not fulfill the requirement of 11 U.S.C. §109(c)(5)(B).

Neither can the City rely on 11 U.S.C. §109(c)(5)(C) to excuse its failure to negotiate in good faith. That section provides: "[the entity] is unable to negotiate with creditors because such negotiation is impracticable."

A determination of "impracticability" must be made on a case-by case basis, and requires a "fact sensitive inquiry". *In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010). In the present matter, the Detroit Public Safety Unions assert that the limited amount of time between the June 14 Creditor Proposal and the filing date of July 18, left little time for the City to engage the necessary constituents. The number of constituents is not, in and of

16

13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 21:30:26   Page 41 of 41
286
13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 21:30:26   Page 41 of 41   41

itself, and should not be, an impediment to negotiations. It is impossible for the Emergency Manager to say that with additional time outside of the bankruptcy process, he could not engage the necessary creditors to formulate a workable plan. The difficulty in the negotiation process is the result of an artificial time constraint, not necessarily the result of the number of creditors. The Court should not find that negotiations were "impracticable", because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing on July 18th. (See *Sullivan,* 165 B.R. at 82 ("the decision [to file chapter 9] appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises.")) It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate or there was such a limited time for negotiations. (*In re Villages at Castle Rock Metropolitan District No. 4,*145 B.R. 76, 85 (Bankr. D. Colo. 1990), six months of conceptual discussions with largest bondholder was sufficient to satisfy §109(c)(5)(C).)

The Memorandum justifies terminating negotiations based on projections of year end cash shortages and the possible end of term of the Emergency Manager. However, there still is cash for operations, and the Emergency Manager's appointment would not terminate, absent extension, until mid-September, 2014. The Emergency Manager has not claimed that the City's assets would be at risk if

13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 21:30:26   Page 42 of 41
13-53846-swr   Doc 1189   Filed 10/4/13   Entered 10/4/13 21:26:32   Page 84 of 111   42
286

some reasonable time were spent negotiating with the City's creditors. *In re Valley Health System,*383 B.R. 156, 163 (Banrk. C.D.Cal. 2008). The requirement of 11 U.S.C. §109(c)(5)(C) has not been satisfied.

**D. 11 U.S.C. §921(c) must be looked at in conjunction with the requirements of §109(c).**

11 U.S.C. §921(c) states:

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

While this section is written in the permissive ("may dismiss"), courts have held that this section requires dismissal if the chapter 9 petition was not filed in good faith or the debtor does not meet the requirements of chapter 9. *In re Valley Health System,* 383 B.R. at 160, *In re County of Orange,* 183 B.R. at 599, *In re City of Vallejo*, 408 B.R. 280, 289 (BAP 9th Cir. 2009).

## <u>RELIEF REQUESTED</u>

WHEREFORE, based on the facts of this matter and the arguments set forth herein, the Detroit Public Safety Unions request that the chapter 9 Petition be dismissed.

18

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: _/s/ Barbara A. Patek_
   Earle I. Erman  (P24296)
   Craig E. Zucker  (P39907)
   Barbara A. Patek (P34666)
   Counsel for the Detroit Public Safety
   Unions
   400 Galleria Officentre, Suite 444
   Southfield, MI  48034
   Telephone: (248) 827-4100
   Facsimile:  (248) 827-4106
   E-mail:  bpatek@ermanteicher.com

DATED:   October 11, 2013

F:\CHAP9\DETROIT\Brief in support of amended objection to eligibility.docx

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      Case No. 13-53846

              Debtor.

_____/

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 11, 2013, the Amended Objection of the Detroit Fire Fighters Association, The Detroit Police Officers Association, The Detroit Police Lieutenants & Sergeants Association and The Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications Under 11 U.S.C. Section 109(c), Brief in Support and Certificate of Service were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

                              /s/ Barbara A. Patek
                              BARBARA A. PATEK (P34666)
                              Erman, Teicher, Miller,
                              Zucker & Freedman, P.C.
                              400 Galleria Officentre, Ste. 444
                              Southfield, MI 48034
                              Telephone: 248-827-4100
                              Facsimile: 248-827-4106
                              Email: bpatek@ermanteicher.com

Dated: October 11, 2013

F:\CHAP9\DETROIT\COS amended objection eligibility.docx

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

-------------------------------------------------------- x
                             :
In re:                          :   Chapter 9
                             :
CITY OF DETROIT, MICHIGAN,    :   Case No.: 13-53846
                             :
                      Debtor.   :   Hon. Steven W. Rhodes
-------------------------------------------------------- x

### AMENDED JOINT OBJECTION OF INTERNATIONAL UNION, UAW AND THE *FLOWERS* PLAINTIFFS TO THE CITY OF DETROIT, MICHIGAN'S ELIGIBILITY FOR AN ORDER FOR RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

The International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America ("UAW") and Robbie Flowers,

Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman, as plaintiffs

in the suit *Flowers v. Snyder*, No. 13-729 CZ (Ingham County Circuit Court) (the

"*Flowers* plaintiffs")[1] hereby amend their respective August 19, 2013 objections to

the City of Detroit's (the "City") eligibility for an order of relief under chapter 9 of

the U.S. Bankruptcy Code and state for their amended objection as follows:

---

[1] The *Flowers* plaintiffs hereby restate and incorporate their *Objection of Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman to the Putative Debtor's Eligibility to be a Debtor* [DE 504] herein.

13-53846-swr   Doc 2357-8   Filed 12/27/13   Entered 12/27/13 21:24:26   Page 46 of 41
13-53846-swr   Doc 1170   Filed 10/14/13   Entered 10/14/13 21:42:02   Page 46 of 286
286
46

## **Preliminary Statement**

1. Less than three months after his appointment by State of Michigan Governor Richard Snyder ("Governor Snyder" or "Snyder"), and barely one month before filing the City of Detroit's chapter 9 petition, the City's Emergency Manager Kevyn Orr ("EM Orr" or "Orr") released a detailed proposal for creditors which he claims will transform Detroit and its operations. The June 14, 2013 "Proposal for Creditors" (the "Proposal") laid out an ambitious program of upgrades and improvements for the City's residents and businesses but spelled deep trouble for the City's employees and retirees. Orr proposed radical changes in pension and health care benefits for City workers who have already been subjected to reductions in force and wage and benefit cuts under the City's imposed employment terms. Orr's plan took particularly brutal aim at the City's retirees, proposing drastic cuts in the City's retiree health care program, and, in derogation of Article 9, Section 24 of the Michigan Constitution which expressly prohibits the impairment of accrued pension benefits, a pension funding proposal that would force "significant cuts" in accrued, vested pension benefits. Under the Proposal, the City would pay no further contributions to the retirement systems and turn enlarged estimates of the retirement plans' underfunding into bankruptcy claims to be paid pennies on the dollar. Without funding, the retirement plans would run out of

money; thus, according to the Orr's Proposal "significant cuts" in accrued vested benefits would be required.

2. That the City landed in chapter 9 so soon after Orr launched his Proposal was entirely predictable and in all likelihood the intended result in any event. The Emergency Manager and his team are gambling on federal bankruptcy law to wipe out the City's pension obligations, taking vested pension benefits earned by the City's retirees and employees down in the process. Unfortunately for the City, this strategy fatally undermines its eligibility for chapter 9 bankruptcy.

3. As we demonstrate below, the City is ineligible for chapter 9 relief on four grounds. First, there was no valid authorization for the filing as required by Section 109(c)(2) of the Bankruptcy Code. The Governor failed to condition the authorization on adherence to Article 9, Section 24 of the Michigan State Constitution and lacked authority to authorize a chapter 9 filing that would be used to impair pensions in derogation of the protections afforded by Article 9, Section 24.

4. By its design, chapter 9 reflects our system of dual federal and state sovereignty. Initially declared an unconstitutional exercise of Congressional power, *see Ashton v. Cameron County Water Improvement District*, 298 U.S. 513 (1936), the lawful exercise of federal municipal bankruptcy hinges on strict adherence to deep-rooted principles of dual sovereignty. Moreover, Michigan

citizens have the right under the Tenth Amendment to insist that chapter 9 not be used to deprive them of their Michigan constitutional rights.

5.     The Governor could not authorize a chapter 9 proceeding brought in order to force cuts in accrued pensions because the Governor has no authority to ignore, or waive, the protections of Article 9, Section 24 of the Michigan Constitution; only the citizens of Michigan are empowered to amend the State's Constitution.  And, without that authority himself, he was powerless to take action that would permit the City to do so through the actions of the Emergency Manager.

6.     Second, the City cannot meet the requirement of Section 109(c)(4) because EM Orr has plainly shown that the City desires to "effect a plan to adjust" its debts through an unlawful proposal that would lead to cuts in accrued pension benefits.  Orr and his team devised a proposal premised upon, among other things, no further pension contributions to the retirement system.  The plan offers only a miniscule recovery on a bankruptcy claim for the underfunding, and declares that, without adequate funding, accrued benefits would have to be cut significantly. A plan of adjustment incorporating these features of the Proposal could not be confirmed under Section 943 of the Bankruptcy Code, because the City could not show that "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).  Such a plan would plainly run afoul of

Article 9, Section 24 of the Michigan Constitution. Cutting off the City's retirement system contributions was Orr's plan from at least the time he presented his Proposal (and likely earlier). Therefore, because EM Orr sought authorization to commence a chapter 9 case in order to effect a plan that would be patently *unlawful* for the state to implement, the City cannot meet the threshold eligibility requirement that a debtor "desire[s] to effect a plan to adjust its debts" under Section 109(c)(4).

7. Third, the City cannot demonstrate compliance with the requirements of Section 109(c)(5)(B) or (C) in its pre-bankruptcy interactions regarding its Proposal. The City's pension proposal to force cuts in accrued vested pension benefits in derogation of the protections under the Michigan Constitution was, on its face, a proposal the City intended would lead to a result that contravened Article 9, Section 24 and, as such, was a proposal that could not be accepted. Moreover, its pension proposal was jerry-built on an incomplete picture of the pension plan underfunding, seemingly to create the specter of a large, insurmountable obligation. After a brief period of stakeholder meetings designed more to give the appearance of discussions than serve as substantive negotiations, Orr sought the Governor's approval for a chapter 9 filing barely 30 days after the launch of the Proposal.

8. Nor can the City demonstrate that further attempts to negotiate were impractical under Section 109(c)(5)(C). Impracticality, for purposes of Section

109(c)(5), cannot mean putting up a proposal that could not lawfully be implemented or accepted and then tallying up the problems associated with engaging the affected stakeholders.[2]

9. For the foregoing reasons as well, the City's chapter 9 petition was not filed in good faith. *See* 11 U.S.C. § 921(c). The City's pre-bankruptcy course of conduct shows that it determined to pursue a plan to cut its pension funding obligation that would force the retirement systems to significantly slash already modest pension benefits, rushing into bankruptcy where it thought its plan could be pursued through the processes of the Bankruptcy Code. Raising the specter of an unwieldy underfunding obligation, the City declared it would walk away from that its pension funding obligation, leaving behind a miniscule recovery, while diverting resources (and identifying other assets to monetize) for its modernization projects. The City simply wrote off inconvenient state constitutional protections as

---

[2] Such active disrespect for the Michigan Constitution by itself invalidates the City's chapter 9 proceedings. *See* Think Progress, July 23, 2013, "Banking on Bankruptcy: Emails Suggest Negotiations With Detroit Retirees Were Designed to Fail," (*e.g.*, "In one email, an assistant to Snyder promises to set a meeting with someone 'who is not FOIAble,' suggesting an intent to evade transparency laws"), *available at*: http://www.thinkprogress.org/economy/2013/07/23/ 2342511/banking-on-bankruptcy-emails-suggest-negotiations-with-detroit-retirees-were-designed-to-fail/. Because the parties' pre-trial discovery remains ongoing, the UAW reserves its rights to further amend and supplement its eligibility objections, including in connection with the submission of its pre-trial brief pursuant to this Court's case management order.

irrelevant under its weak federal supremacy theory, perhaps counting on the legal uncertainties of the bankruptcy process as a source of leverage.[3]

10.     In sum, absent a lawful state authorization for the filing, absent a plan of adjustment that the City can lawfully execute, and without the requisite showing of good faith and required pre-bankruptcy negotiations, the City of Detroit is ineligible for chapter 9 relief.  The City's chapter 9 petition therefore must be dismissed.

## Background

The UAW

11.     International Union, UAW is a labor organization headquartered in Detroit, Michigan whose members include both City of Detroit employees and retirees and employees and retirees of public entities related to the City of Detroit that participate in common with City of Detroit employees in retirement benefit plans, including the City of Detroit General Retirement System pension plan.  UAW is representing the interests of these active and retired employees in this bankruptcy case.  There are approximately 200 retirees from UAW-represented bargaining units of City of Detroit component units.  There are, additionally, many active UAW-

---

[3] *See* Jeffrey B. Ellman, Daniel J. Merrett, *Pensions and Chapter 9:  Can Municipalities Use Bankruptcy to Solve Their Pension Woes?*  27 Emory Bankr. Dev. J. 365 (2011) (hereafter, "Ellman and Merrett, *Pensions and Chapter 9*") (federal bankruptcy law offers "significant" sources of leverage which can be used to "force[]" pensioners to bargain and "place[] substantial pressure" on them to "reach a resolution as quickly as possible.")

- 7 -

13-53846-swr   Doc 2035-8   Filed 12/17/13   Entered 12/17/13 21:24:26   Page 53 of
13-53846-swr   Doc 2357-8   Filed 10/14/13   Entered 10/14/13 21:42:02   Page 53 of
286

52

represented employees who are vested in their retirement benefits, all of whose

pensions are at risk under EM Orr's Proposal. UAW-represented employees and

retirees are drawn from the following units: Civilian Police Investigators, City Law

Department attorneys, City of Detroit Law Department paralegals, Water & Sewer

waste water treatment operators, Detroit librarians and associated skilled trades

workers.

Michigan's Constitution Protects Accrued Pensions

     12.    Article 9, Section 24 of the Constitution of the State of Michigan

makes clear that neither the state nor a municipality may reduce accrued pension

benefits: "[t]he accrued financial benefits of each pension plan and retirement

system of the state and its political subdivisions shall be a contractual obligation

thereof which shall not be diminished or impaired thereby."[4] Thus, "under this

---

[4] The address to the people accompanying the 1963 Constitution states that Article 9, Section 24 "requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation *which cannot be diminished or impaired by the action of its officials or governing body*." 2 Official Record, Constitutional Convention 1961, p. 3402 (emphasis added). The Constitution also requires benefits to be funded in the year they are accrued and prohibits the legislature and municipalities from using those funds for other unfunded liabilities. Mich. Comp. Laws Const. Art. 9, § 24. The debates concerning what is not Article 9, Section 24 confirm that municipal employees have the entire assets of their employer at their disposal for these benefits: "Mr. VAN DUSEN: An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p. 774.

constitutional limitation the legislature cannot diminish or impair accrued financial benefits." *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973). *See also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) ("The obvious intent of § 24 … was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished."); *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W.2d 803, 816 (Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements.").

<u>The Emergency Manager and Pre-Bankruptcy Events</u>

13.     The Emergency Manager serves under the Local Financial Stability and Choice Act Public Law 436 (2012) Mich. Comp. Laws § 141.1541 *et seq.* ("PA 436"). PA 436 is the most recent in a series of emergency manager laws Michigan has enacted concerning Michigan's local government units. *See City of Pontiac Retired Employees Ass'n v. Schimmel, et al.*, No. 12-2087, 2013 WL 4038582, *1-*2 (6th Cir. August 9, 2013) (hereafter, "*Pontiac Retired Employees Ass'n*") (summarizing the State's Emergency Manager laws). In 1990, Michigan enacted Public Act 72, known as the "Local Government Fiscal Responsibility Act." Mich. Comp. Laws § 141.151(1)(j)(2005). In 2011, Public Act 72 was repealed with the enactment of Public Act 4, the "Local Government and School District

Fiscal Accountability Act," Mich. Comp. Laws §§ 141.1501-1531, in March 2011.

"Unlike P[ublic] A[ct] 72, PA 4 gave emergency managers the power to temporarily

reject, modify or terminate existing collective bargaining agreements." *Pontiac*

*Retired Employees Ass'n*, 2013 WL 4038582 at 3.  Public Act 4 was rejected by

Michigan voters under the state's voter rejection procedures in November, 2012.  *Id.*

at 4.  In the words of the Sixth Circuit, "[a]pparently unaffected that the voters had

just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan

Governor signed, Public Act 436.  Public Act 436 largely reenacted the provisions of

Public Act 4, the law that Michigan citizens had just revoked.  In enacting Public

Act 436, the Michigan Legislature included a minor appropriation provision,

apparently to stop Michigan voters from putting Public Act 436 to a referendum."

*Id.* (citations omitted).

        14.    Public Act 436 became effective on March 28, 2013.  As

detailed in EM Orr's Declaration, a number of legal challenges to Public Act 436

have been filed and remain pending.[5]  Declaration of Kevyn Orr ("Orr Decl."),

---

[5] The lawsuits raise serious challenges affecting the legality of the EM's
appointment and other actions taken under the statute, including whether the
Emergency Manager's appointment violated Michigan's Open Meetings laws, or
was otherwise defective as a result of the voters' repeal of PA 4; whether PA 436
violates the U.S. Constitution and the federal Voting Rights Act.  Other litigation,
such as the *Pontiac Retiree Employees Association* case recently decided by the
Sixth Circuit, involve challenges to emergency managers appointed in other towns.
To the extent Governor Snyder's appointment of EM Orr was ineffective, as UAW

Exhibit A, pp. 57-59.  Mr. Orr was appointed Emergency Manager and took office

on or about March 25, 2013, under the predecessor Emergency Manager law and

now serves under PA 436.  *Id*. at p. 57.

15.    The Creditor's Proposal was released by the Emergency

Manager on June 14, 2013.  Orr Decl., Exhibit A.  As relevant to the UAW's

objection, the Proposal takes broad aim at the City's workers and retirees; city

employees have already been subjected to headcount reductions and "City

Employment Terms" (the "CETs") imposed a year ago which cut wages and

benefits and unilaterally changed work rules.  *See* Orr Decl., Exhibit A, pp. 53-54

(describing the imposition of the CETs).  The proposal indicates that these imposed

changes will serve as a "baseline" for the City in its contract talks with the unions,

although the City may seek cuts and changes "beyond those included in the CETs."

*Id.* p. 76.  Additional reductions in staffing levels and outsourcing functions are also

contemplated.  *Id.* p. 78.  Regarding retiree obligations, the City intends to modify

retiree medical benefits through a replacement program and indicates that "claims

will result from the modification of benefits."  *Id.* p. 109.

---

believes and asserts, the City's Chapter 9 filing is void, as this Court would be
bound to find.

16.     The City's pension proposal garnered immediate and significant opposition, including at least three lawsuits commenced prior to the chapter 9 filing.[6] Although PA 436 directs that the Emergency Manager's financial and operating plan "shall provide for" the "timely deposit of required payments to the pension fund for the local government or in which the local government participates," Mich. Comp. Laws 141.1551 Sec. 11(1)(d), the Emergency Manager's proposal announced that annual contributions required to fully fund currently accrued, vested benefits "will not be made under the plan." Orr Decl., Exhibit A, p. 109. The Creditors' Proposal provides that the retirement system underfunding, which Orr and his team claimed was understated, would be "exchanged for a pro rata … principal amount of New Notes."[7] *Id.* Put another way, the Emergency Manager proposed to transform the

---

[6] *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court July 3, 2013); *General Ret. Sys. of the City of Detroit v. Kevyn D. Orr*, No. 13.768-CZ (Ingham County Circuit Court); *Webster v. State of Michigan*, 13-734-CZ (Ingham County Circuit Court July 3, 2013). The City and the State make much of the lawsuit activity in connection with the bankruptcy filing. But Orr's proposal left the affected parties little choice given the City's blatant disregard of the State Constitution.

[7] What we know from the discovery to date, and expect the evidence at trial will show, is that the City engaged an actuarial consulting firm, Milliman, in 2012, which also assisted EM Orr and his team. Milliman prepared several analyses based on different scenarios fed to the firm by a "pension task force" consisting of lawyers and Conway MacKenzie's Charles Moore. *See* Declaration of Charles M. Moore [DE 13], ¶¶ 8, 13. Among other things, the analyses were run to show the effects of various hypothetical changes in funding and funding policy, investment rate assumptions and, perhaps most critically, the use of a market value of assets more appropriate to a terminated plan analysis than to a valuation of an ongoing pension

- 12 -

13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 21:34:02   Page 57 of 41
13-53846-swr   Doc 1170   Filed 10/2/13   Entered 10/2/13 21:34:02   Page 26 of 41
286
57

plan's underfunding into a bankruptcy claim which will share a $2 billion recovery pro-rata with billions of dollars in additional general obligation bond and other general unsecured claims. The Proposal then goes on to state that "[b]ecause the amounts realized on the underfunding claims will be substantially less than the underfunding amount there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." *Id.*

17. Labor unions and retiree organizations attended a series of presentations attended by representatives of the Emergency Manager and various stakeholders. Only a handful of presentations were scheduled with labor groups despite the breadth of the proposals affecting workers and retirees. *See* Orr Decl., ¶¶ 90-96 (describing post-June 14, 2013 meetings attended by stakeholders). Abruptly, on July 18, 2013 (and apparently only one day earlier than planned, *see* Orr Decl., Exhibit L) the City filed its chapter 9 petition following a written submission by Governor Snyder issued in response to Mr. Orr's July 16, 2013 request for approval to commence the bankruptcy. Although PA 436 expressly permits the Governor to condition the authorization for a chapter 9 filing, *see* Mich. Comp. Laws 141.1558(1), he did not do so. *See* Orr Decl., Exhibit L.

---

plan. One or two of these analyses were made public and the results drew fire as controversial. *See, e.g.*, Economic Policy Institute, August 1, 2013, *Detroit's Pension Problems: Not as Bad as They're Portrayed, available at* http://www.epi.org/blog/truthiness-detroit. At best, the studies present an incomplete picture of the retirement system underfunding.

# Argument

# The Petition Must Be Dismissed Because the City Is Not Eligible For Chapter 9 Relief

The Bankruptcy Petition Must Be Dismissed
for Lack of Lawful Authorization by the State

## *Chapter 9 Reflects Our System of Dual Sovereignty*

18.     In deference to dual sovereignty principles, "[b]ankruptcy courts should review chapter 9 petitions with a jaded eye." *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010).  The debtor bears the burden of proof as to each element of eligibility under Section 109(c).  *See In re City of Harrisburg, PA,* 465 B.R. 744, 752 (Bankr. M.D. Penn. 2011).  *See also id*. at 754 (when authority to file is questioned, "bankruptcy courts exercise jurisdiction carefully, 'in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'").  Under Section 109(c)(2), to qualify for Chapter 9 protection, a debtor must be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter."  11 U.S.C. § 109(c)(2).  *See In re City of Harrisburg, PA,* 465 B.R. at 754.  ("Express authority is defined as that which confers power to do a particular identical thing set forth and declared exactly, plainly and directly with well-defined limits").

19.     Because the Governor's authorization of Detroit's chapter 9 petition did not require adherence to Article 9, Section 24 of the Michigan Constitution, the state's authorization is invalid.  In the absence of a valid state authorization duly recognizing the protections of Article 9, Section 24, chapter 9 as applied here is unconstitutional.

20.     The power of the federal courts under chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment.[8]  "Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtails the power of bankruptcy courts to act once a petition is filed."  *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010).  Thus, as this Court has observed, "[a] primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states."  *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994).

21.     The U.S. Supreme Court has twice considered the constitutionality of federal municipal bankruptcy legislation with reference to the

---

[8] The Tenth Amendment provides:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.  U.S. Const. amend X.

dual sovereignty principles embodied in the Tenth Amendment. In 1934, Congress, enacted the first federal legislation providing for municipal debt adjustments. The Supreme Court held the 1934 Act unconstitutional in *Ashton v. Cameron County Water Improvement District No. 1*, 298 U.S. 513 (1936) on the ground that the federal bankruptcy power is "impliedly limited by the necessity of preserving the independence of the States," and thus did not extend to the states or their subdivisions. *Id.* at 530. The Court held that the provisions would unconstitutionally impinge upon the "indestructible" "separate and independent existence" of the states by restricting municipal debtors' control over their fiscal affairs. *Id*. at 528, 530.

22.     Congress enacted modified municipal bankruptcy provisions in 1937 which the Court upheld in *Bekins*, rejecting a claim that the statute violated the Tenth Amendment and state sovereignty principles. The Court distinguished its earlier decision in *Ashton* by emphasizing that Congress in the 1937 Act had been "especially solicitous" to avoid interference with the autonomy of municipalities. *Bekins*, 304 U.S. at 50. The Court stressed that under the revised legislation, the federal bankruptcy power may be exercised only where the actions of the municipal agency are authorized by state law:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and ***only in a case where the action of the taxing***

- 16 -

13-53846-tjt   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 21:34:02   Page 61 of 41
286
13-53846-swr   Doc 1175   Filed 10/11/13   Entered 10/11/13 21:34:26   Page 16 of 41   61

> *agency in carrying out a plan of composition approved by the*
> *bankruptcy court is authorized by state law.*

*Id.* at 51 (emphasis added).

23. For purposes of the present case, the most significant aspect of the *Bekins* opinion is that the Court itself determined that the relief sought by the local agency was authorized by California law. The Court's ultimate conclusion that the State had given its consent to the bankruptcy proceeding was based on its own analysis of the relevant provisions of the state statute:

> [T]he State has given its consent. We think that this sufficiently appears from the statute of California enacted in 1934. St. of 1934, Ex. Sess., c. 4, p. 5. This statute (section 1) adopts the definition of 'taxing districts' as described in an amendment of the Bankruptcy Act, to wit chapter 9 approved May 24, 1934, 11 U.S.C. §§ 301-303, and further provides that the Bankruptcy Act and 'acts amendatory and supplementary thereto,' as the same may be amended from time to time, are herein referred to as the 'Federal Bankruptcy Statute.' Chapter 10 of the Bankruptcy Act is an amendment and appears to be embraced within the state's definition. We have not been referred to any decision to the contrary. Section 3 of the state act then provides that any taxing district in the State is authorized to file the petition mentioned in the Federal Bankruptcy Statute. Subsequent sections empower the taxing district upon the conditions stated to consummate a plan of readjustment in the event of its confirmation by the federal court.

*Id.* at 47-48 (internal citations and quotations omitted).

24. The teaching of *Bekins* is clear. This Court's exercise of jurisdiction over the City's petition cannot rest on the mere fact that the Emergency Manager (and based upon the Governor's authorization) filed the petition

voluntarily.  Rather, the Court must itself determine that the filing of the petition is authorized by, *and consistent with*, the law of Michigan, in this case, the Constitution of the State of Michigan.  If the Court finds that the petition is inconsistent with state law, then the further exercise of its jurisdiction is barred by the Then Amendment.

25.    In its Consolidated Reply, the City seeks to draw a distinction between the filing of the instant petition, which must admittedly be authorized by state law, and any subsequent relief granted by the Court.  It supports this distinction by citing *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) for the proposition that the Bankruptcy Code permits federal courts through confirmation of a Chapter 9 plan to impair contract rights and "such impairment is not a violation by the state or the municipality of [the Contracts Clause] which prohibits a state from impairing such contract rights."  (Consolidated Reply, pp. 24-25.)

26.    But this attempt to analogize the Contracts Clause with the Tenth Amendment is wholly unavailing.  The Contracts Clause of the U.S. Constitution applies solely to the States.[9]  By contrast, the Tenth Amendment is an explicit limitation on the power of the Federal Government, including this Court, to displace

---

[9] U.S. Const., Art. I, Sec. 10 provides: "No state shall … pass any … Law impairing the Obligation of Contracts."

state law.[10]  As the Supreme Court has put it, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States.  The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power."  *New York v. United States,* 505 U.S. 144, 157 (1992).

27.    The Court's Tenth Amendment decisions clearly show that the power of the federal courts under Chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment.  This dual system of sovereignty increases democratic governance:

> The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'  *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).  Federalism secures the freedom of the individual.  It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power.

*Bond v. United States*, 131 S.Ct. 2355, 2364 (2011) (emphasis added).  Accordingly, as the Court held in *Bond*, not only the states, but state citizens themselves have

_____

[10] In fact the court ruled that the debtor's chapter 9 plan could not be confirmed under Section 943(b)(4) for lack of compliance with *state law*.  *In re Sanitary & Improvement Dist. No. 7,* 98 B.R at 973.

standing to assert that federal law contravenes the Tenth Amendment precisely because of the vital relationship between freedom of the individual and the federal structure of our government. *Id.*

28.     Under the Bankruptcy Code, strict adherence to State sovereignty principles is intrinsic to the lawful functioning of chapter 9. Chapter 9 "was drafted to assure that application of federal bankruptcy power would not infringe upon the sovereignty, powers and rights of the states." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 226 (Bankr. N.D. Cal. 1991). "Both Congress and the Supreme Court have thus been careful to stress that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions; for as the Supreme Court held in the *Ashton* and *Bekins* cases, to the extent that the federal Bankruptcy Act does infringe on a state or a municipality's function it is unconstitutional." *Ropico, Inc v. City of N.Y.*, 425 F.Supp. 970, 983 (S.D.N.Y. 1976).

29.     The municipal bankruptcy provisions of the Bankruptcy Code chart a carefully circumscribed course limiting the power that can be lawfully exercised by the federal bankruptcy court. First, the municipality must be "specifically authorized" to be a debtor under *State* law "or by a governmental officer or organization *empowered by State law* to authorize such entity to be a debtor under" chapter 9. 11 U.S.C. § 109(c)(2) (emphasis added). *See In re City of*

- 20 -

13-53846-tjt   Doc 2375-8   Filed 10/4/13   Entered 10/4/13 21:34:02   Page 65 of
13-53846-swr   Doc 1175   Filed 10/11/13   Entered 10/11/13 21:34:02   Page 26 of 41   65
286

*Bridgeport*, 128 B.R. 688, 692 (Bankr. D. Conn. 1991). In addition, Section 903 of the Bankruptcy Code establishes that chapter 9 "does not impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality including expenditures by such exercise.…" 11 U.S.C. § 903. Section 903 "'is the constitutional mooring' for municipal debt adjustment and makes clear that nothing in chapter 9 should be construed to limit a State's power to control its municipalities." *In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr. S.D.N.Y. 2010); *see also City of Richmond*, 133 B.R. at 226 (describing Section 903 as a "reaffirmation that Chapter 9 does not limit or impair the power of the states to control municipalities").

30. Similarly, Section 904 prevents the bankruptcy court from interfering with "any of the political or governmental powers of the debtor" or "any of the property or revenues of the debtor" or "the debtor's use and enjoyment of any income-producing property." 11 U.S.C. § 904; *see In re Addison Cmty. Hosp. Auth.*, 175 B.R. at 649 (the "foundation" of Section 904 "is the doctrine that neither Congress nor the courts can change the existing system of government in this country" and that, in recognition of the Constitutional limitations on the power of the federal government, "chapter 9 was created to give courts only enough jurisdiction

to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control.").[11]

31. State sovereignty interests also operate to require that the bankruptcy court find that the debtor's plan of adjustment be consistent with state law. The bankruptcy court shall only confirm the plan if, among other requirements, "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4). Indeed, in *In re Sanitary & Improvement District, # 7*, 98 B.R. 970, 975-76 (Bankr. D. Neb. 1989) cited by the City, the court held that a plan of adjustment could not be confirmed because it conflicted with the terms of state law that required that bondholders be paid in full before warrantholders could receive compensation.[12] *See also In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 694 (Bankr. D. Colo. 1995) (ruling that plan of adjustment could not be confirmed unless and until it was approved under the elections provisions of state law: "[w]here a plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be

---

[11] "The effect [of Sections 903 and 904] is to preserve the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court." M. McConnell, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462-63 (1993).

[12] Thus, contrary to the City's assertions, the reorganization power is necessarily confined by the state's paramount authority over the governance of the municipality itself, and by such state constitutional limits as the state's citizens have placed on the power of the state itself.

- 22 -

286

13-53846-swr   Doc 2275-8   Filed 12/27/13   Entered 12/27/13 21:34:02   Page 27 of 41
13-53846-swr   Doc 1370   Filed 10/21/13   Entered 10/21/13 21:24:02   Page 67 of   67

confirmed.").[13]  *See also* 11 U.S.C. § 943(b)(6) (stating as additional plan

confirmation requirement that "any regulatory approval or electoral approval

necessary under applicable nonbankruptcy law in order to carry out any provision of

the plan has been obtained, or such provision is expressly conditioned on such

approval").  The Bankruptcy Code recognizes both that the state necessarily controls

the actions of its subdivisions and the content of the any plan of adjustment.

  32. In sum, the Tenth Amendment case law belies the City's

contention that the Bankruptcy Court is free to set aside the protections of a state's

constitution.  The state sovereignty principles that form the fabric of chapter 9 are at

the core of the bankruptcy court's constitutional exercise of authority over a

municipal debtor, whether as a matter of eligibility or otherwise.[14]

---

[13] The court further explained that this is because "[u]nlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions."  *Id*. at 693.  "Though Congress intended Chapter 9 to be a forum for reorganization of municipalities, it is clear that Congress did not intend for federal bankruptcy law to supersede or impair the power of the state to create, limit, authorize or control a municipality in the exercise of its political or governmental powers."  *Id*.

[14] The State of Michigan makes a similarly unavailing argument that because it is not the filing of the petition itself that impairs the pension benefits, the Governor's authorization was valid. However, for chapter 9 to be applied in a manner consistent with the federal Constitution, specifically, the Tenth Amendment, there is no lawful or practical distinction between disregarding state law for purposes of the City's authorization to file the petition and disregarding state law with respect to the plan that it may lawfully pursue while in chapter 9.  If the City's filing is not properly authorized, then each day the City remains in chapter 9 is a day it is not authorized to be there.

33.    Moreover, dual sovereignty principles are not merely the states' province to enforce.  The Supreme Court has extended the protections of federalism to individual citizens: "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when enforcement of those laws causes injury that is concrete, particular, and redressable.  Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 131 S.Ct. at 2364.

*The City's Reliance on Federal Preemption is Unavailing*

34.    Apart from misreading *Bekins*, the City also relies on a line of pre-emption cases to justify its position.  But the pre-emption case law actually shows that there is no legal basis for setting aside the protections of Article 9, Section 24 of the Michigan Constitution.  Chapter 9 does not "preempt" or otherwise displace the positive requirements of Michigan's Constitution or its laws.  Indeed, as shown above, because of core federalism concerns, state law defining the governmental powers of a municipality *must be honored* under chapter 9 to preserve the constitutionality of municipal reorganizations.  This is reflected even in the threshold eligibility requirement that a chapter 9 petition be specifically authorized to be a debtor under state law.  *See In re Harrisburg, PA,* 465 B.R. at 755 (rejecting City Council's contention that Supremacy Clause to bar state law prohibition filing and motive that the state "serves as a municipality as gatekeeper into Chapter 9").

- 24 -

286

13-53846-swr   Doc 1370-8   Filed 10/27/13   Entered 10/27/13 21:34:02   Page 69 of 41
13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 21:34:02   Page 69 of 41     69

The City's contention is fundamentally undermined by those specific provisions of chapter 9, *e.g.*, Sections 903 and 904, and the applicable plan confirmation requirements which plainly refute the notion that the limits on the bankruptcy court's authority imposed by the reservation of state sovereignty are somehow *superseded* with a chapter 9 filing.[15]

35.     Aside from Tenth Amendment and other federal constitutional limitations, "[i]n determining whether a state statute is pre-empted by federal law" the analysis follows three tracks, where the touchstone "is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987).

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation….
>
> As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands

---

[15] *See* Thomas Moers Mayer, *State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9*," 85 Am. Bankr. L. J. 363, 384-5 (Fall, 2011) (raising the "serious question" whether an interpretation of chapter 9 that renders section 903 a "dead letter" is "consistent with" the Tenth Amendment and state sovereignty). To the extent that it were do so, chapter 9 would be unconstitutional under the Tenth Amendment, and we ask the Court to so find.

"as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Nevertheless, pre-emption is not to be lightly presumed.

*Id.* at 280-82.

36.     Here, as shown above, federal displacement of the power of the State of Michigan and its citizens — through the State Constitution and otherwise — to control the authority of Governor Snyder and the discretion of the Emergency Manager should not "be lightly presumed" because it would violate the sovereignty of the state. Nothing in chapter 9 provides for an express federal displacement of the prerogative of the state and its citizens to define the powers of its Governor and the Emergency Manager. *Cf. Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 557 (6th Cir. 2012) (express federal preemption of state law claims which relate to an employee benefit plan under 29 U.S.C. §1144(a)).

37.     Indeed, Sections 903 and 904 are to the contrary because they expressly recognize that the Code does not "impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]" Under Section 943(b)(4), the terms of the plan of adjustment must comport with the terms of state law.

Nothing in chapter 9 supports an express preemption of the state law defining the scope and authority of Governor Snyder and EM Orr.[16]

38.     For the same reason, there is no basis to conclude from chapter 9 that Congress left no room for the operation of the constitutions of the several states, and of their legislation.  This, too, is recognized in Sections 903 and 904 expressly recognize the continued vitality of state law.  Indeed, in *Faitoute Iron & Steel Company v. City of Asbury Park*, 316 U.S. 502, 508 (1942), the Supreme Court held that Congress has not completely dominated the field of municipal reorganization as to preclude the operation of a state municipal insolvency statute.  *Cf. Molosky v. Washington Mutual, Inc.*, 664 F.2d 109, 113-14 (6th Cir. 2011) (federal Home Owners' Loan Act preempts claim under Michigan statute because Congress intended the federal act to occupy the entire field of lending regulation for federal savings associations and leave no room for state regulatory control); *Modin v. New*

---

[16] The City's reliance on *In re City of Stockton, California,* 478 B.R. 8 (Bankr. E.D. Cal. 2012) and *In re City of Vallejo,* 403 B.R. 72 (Bankr. E.D. Cal. 2009) is misplaced.  The Supremacy clause analysis in these cases is turned on its head: fundamentally, chapter 9 reflects *dual* sovereignty and must be applied with due regard for the sovereignty of *the state*.  Neither federal supremacy nor the Uniformity Clause operate to negate state sovereignty principles which, as we show above, must be given effect for chapter 9 to operate constitutionally.  Indeed, the Uniformity requirement does *not* mean that bankruptcy must look alike in every state, and the courts have so held.  *E.g., Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008) (rejecting uniformity challenge based on means-test tied to median income in debtor's state).  *In re Kulp*, 949 F.2d 1106, 1103 n.3 (10th Cir. 1991) (no uniformity violation where "11 U.S.C. § 522 expressly delegates to states the power to create bankruptcy exemptions.").

*York Cent. Co.*, 650 F.2d 829, 835 (6th Cir. 1981) (Interstate Commerce

Commission creates a comprehensive scheme of federal regulation of railroads that

preempts state law).

39.     Adherence to the impairment prohibition in Article 9, Section 24

of the Michigan Constitution is not "physically impossible," nor would it stand as an

obstacle to a successful chapter 9 plan (where, in fact, state law compliance is

*required* for confirmation).  The objectives of chapter 9 must be read consistently

with basic constitutional principles that recognize the autonomy of the state and its

citizens to control the political affairs of its subdivision as reflected in Sections 903

and 904.  While the Michigan Constitution forbids the choice of the citizens who

enacted Article 9, Section 24 of the Michigan Constitution must be honored

consistent with Sections 903, 904 and 943 of the Bankruptcy Code and the Tenth

Amendment.[17]

*The State's Authorization Was Unlawful Under Michigan's Constitution and Laws*

40.     Governor Snyder was fully aware that part of the Emergency

Manager's bankruptcy authorization request was a plan to impair accrued vested

---

[17] Article 9, Section 24 of the Michigan Constitution is plainly an exercise by its
citizens of their Tenth Amendment-based right "to control a municipality of or in
such state in the exercise of the political or governmental powers of such
municipality" under Section 903.

pensions.[18] Yet the Governor placed no contingencies on his July 18, 2013

bankruptcy authorization. *See* Orr Decl., Exhibit J. The Governor's failure to

condition his authorization on adherence to Article 9, Section 24 breached the

State's constitution. *See* 2 Official Record, Constitutional Convention 1961, p. 3402

(accrued pensions are obligations "*which cannot be diminished or impaired by the*

*action of its officials or governing body.*") (emphasis added). Governor Snyder

lacks any authority to ignore Michigan's constitutional proscription against the

impairment of accrued pensions, and the Michigan Supreme Court has made clear

that the Governor is bound by the Michigan Constitution.[19] *See Wood v. State*

*Admin. Bd.*, 238 N.W. 16 (Mich. 1931) (Governor's reduction of appropriations in

bill approved by legislature invalid due to violation of constitution's veto clause);

*Dullam v. Wilson*, 19 N.W. 112 (Mich. 1884) (Governor may not remove public

---

[18] *See, e.g.*, Orr Declaration, Exhibit J, EM Orr's letter of July 16, 2013 to
Governor Snyder and Michigan Treasurer Dillon, p. 8.

[19] Indeed, the Michigan Constitution can be altered only as set forth therein,
notably, with respect to each permitted process, requiring the approval of Michigan
voters. Under Article 12, Section 1, the Legislature, by two-thirds vote of each
chamber, can place a proposed constitutional amendment on the ballot. The
proposed amendment becomes effective only if approved by a majority of the
voters. Pursuant to Article 12, Section 2, a citizen petition for a proposed
amendment can be placed on the ballot, which becomes effective only if approved
by a majority of the voters; or 3. Pursuant to Article 12, Section 3, a duly called
constitutional convention may place a proposed constitutional amendment on the
ballot. The proposed amendment becomes effective only if approved by a majority
of the voters. *See* Mich. Comp. Laws Const. Art. 12 §§ 1-3.

- 29 -

286

13-53846-swr   Doc 2375-8   Filed 12/27/13   Entered 12/27/13 21:34:02   Page 74 of
13-53846-swr   Doc 1375   Filed 10/21/13   Entered 10/21/13 21:34:02   Page 29 of 41   74

official without due process required by constitution); *see also Buback v. Romney,* 156 N.W.2d 49 (Mich. 1968) (statute permitting Governor to use judicial officers to adjudicate removal of executive branch officials violated constitutional separation of powers and was invalid).

41.     The Governor's statement in his July 18, 2013 letter that the plan of adjustment must be legally executable, under Section 943(b)(4), Orr Decl., Exhibit K,  was insufficient because the Governor nonetheless authorized the filing knowing that EM Orr was pursuing the pension proposal.  The reference to Section 943(b)(4) — which applies to confirmation of the plan — does not provide the requisite gatekeeping "specific authorization" that is required by Section 109(c)(2). *See In re City of Harrisburg, PA,* 465 B.R at 754-55.

42.     Nor did PA 436 authorize EM Orr to contravene Article 9, Section 24 in issuing his request to file the chapter 9 case.[20]  The power of the Emergency Manager is defined by Michigan law and is subject to the Michigan

_____

[20] The Governor's authorization does not — and cannot — increase the Emergency Manager's powers shown above, the Governor has no authority to disregard the Michigan Constitution or to change Michigan's laws. Indeed, the Governor has sworn to *uphold* the state Constitution.  As mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*, the Governor swore the following oath, later filed with the Michigan Secretary of State:  *"I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability."*

Constitution as well. Under PA 436, the Emergency Manager exercises the power of the government of the City of Detroit. The Emergency Manager "Act[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2). Like the Governor, EM Orr has no authority to pursue cuts in accrued pension benefits through chapter 9 nor, consistent with the Michigan Constitution, could the Michigan legislature lawfully have given him such authority. *See In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973) ("under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits"); *see also Pontiac Retired Employees Ass'n*, No. 12-2087, 2013 WL 4038582, *1-*2 (6th Cir. August 9, 2013) (noting that State Legislature could not end the Michigan Constitution's two-thirds vote requirement to give PA 4 immediate effect because "[t]o conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution."); *Webster v. State of Michigan*, No. 13-734-CZ (Ingham County Circuit Court July 19, 2013) (order declaring "PA 436 is unconstitutional and in violation of Article 9 Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits").[21]

---

[21] The *Webster* lawsuit is stayed as a result of this Court's July 25, 2013 order.

43. Indeed, PA 436 itself expressly references Article 9, Section 24, for example, in enumerating the Emergency Manager powers in the event a municipality's pension fund became underfunded (authority EM Orr has not exercised, notwithstanding his team's review of the underfunding). Under Section 141.1552(1)(m), "[t]he emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, Mich. Comp. Laws § 38.1132 to 38.1140m, *and section 24 of article IX of the state constitution of 1963,* and any actions taken shall be consistent with the pension fund's qualified plan status under the federal internal revenue code." Mich. Comp. Laws § 141.1552(1)(m)(ii)(emphasis added). And, in authorizing the EM to suspend certain compensation of local officials, the statute also makes clear that "[t]his section does not authorize the impairment of vested pension benefits." Mich. Comp. Laws 141.1553.

44. Thus, in the exercise of their respective authority under Michigan law, Governor Snyder and EM Orr are bound by the prohibition against impairment of accrued pensions set forth in the Michigan Constitution. And, because the state legislature could not permit otherwise, the state legislature necessarily must limit the circumstances under which a chapter 9 filing could be

---

Nevertheless, the ruling was issued by a court of competent jurisdiction as a result of litigation in which those in privity with the City and EM Orr participated.

13-53846-tjt   Doc 2335-8   Filed 04/27/13   Entered 04/27/13 21:34:02   Page 77 of 41
13-53846-swr   Doc 1375   Filed 10/21/13   Entered 10/21/13 21:34:02   Page 77 of 41
286
77

pursued under the financial emergency laws. Thus the legislature could not purport to authorize either the Governor nor the Emergency Manager to take steps in contravention of the Michigan State Constitution. Nevertheless, both EM Orr and Governor Snyder unlawfully acted beyond those limits in seeking and granting, respectively, authorization for the chapter 9 filing.

45. Accordingly, because the Emergency manager has sought to use chapter 9 to impair accrued pensions and because the Governor's authorization did not condition the bankruptcy filing on adherence to Article 9, Section 24 of the Michigan Constitution, the authorization was invalid under Michigan law. The authorization is, therefore, of no force and is ineffective under Section 109(c)(2). *See In re Harrisburg*, 465 B.R. at 765 (dismissing petition because the City of Harrisburg was not "specifically authorized under state law to be a debtor" under Chapter 9).

The Bankruptcy Petition Must be Dismissed Because
the City Seeks to Effect an Unlawful Plan to Adjust Debts

46. To be eligible for Chapter 9, a debtor must demonstrate that it "desires to effect a plan to adjust [its] debts." 11 U.S.C. § 109(c)(4). For purposes of Section 109(c)(4), the debts intended for adjustment are to be measured as of the petition date. *See In re Town of Westlake, Tex.*, 211 B.R. 860, 867 (Bankr. N.D. Tex. 1997). Here, well before the petition date, the Emergency Manager made known that his plan was to use chapter 9 bankruptcy to turn the retirement system

- 33 -

286

13-53846-tjt   Doc 2375-8   Filed 01/27/13   Entered 01/27/13 21:34:26   Page 78 of
13-53846-swr   Doc 1170   Filed 10/11/13   Entered 10/11/13 21:24:02   Page 33 of 41      78

underfunding obligations into bankruptcy claims, pay them on a pro-rata basis with other unsecured debt and, based on the shortfall created in the retirement system, cut vested pension benefits and accruals. *See* Orr Decl., Exhibit A, p. 109.

47. This strategy plainly violates the Michigan Constitution's prohibition under Article 9, Section 24 against the impairment of accrued pensions, and, as we show above, invalidates the Governor's authorization and the chapter 9 petition. As such, it also violates the eligibility requirement that the debtor must "desire[] to effect a plan of adjustment" under Section 109(c)(4), in that a plan that the City pursues in order to impair accrued pensions that are protected against impairment by the Michigan Constitution could not be confirmed in any event because such a plan would require that debtor take an action that is "prohibited by law." *See Bekins*, 304 U.S. at 815 (approving municipality's bankruptcy plan where action of the taxing agency in carrying out the plan "is authorized by state law."); *see also In re Sanitary & Improvement Dist.*, # 7, 98 B.R. at 975-76; *In re City of Colorado Springs Spring Creek General Improvement District*, 177 B.R. at 694. Arguably, a proposal is a proposal and not the plan of adjustment and courts have permitted various forms of plans or indicia of proposed plans to fulfill their requirements. *E.g., In re Stockton, Cal.,* 973 B.R. 772, 791 (Bankr. E.D. Cal. 2013). But here, the City devised a pension proposal that it could not ultimately achieve under Section 943(b). The City gave no indication that its proposal was hypothetical

or tentative; instead it was determined to fulfill it, the confirmation issue notwithstanding.[22]  Accordingly, the City cannot be said to desire to effect a *lawful* plan of adjustment.  The City thus fails to meet the requirement of Section 109(c)(4).

The Bankruptcy Petition Must be Dismissed Because the Petition Was Not Filed in Good Faith and the City Cannot Demonstrate That It Has Complied With Section 109(c)(5)

48.     The Court must dismiss a chapter 9 petition "if the debtor did not file the petition in good faith" or otherwise meet the requirements of Title 11. 11 U.S.C. § 921(c).  Specifically with respect to the eligibility requirements, where a municipality has not obtained the agreement of creditors holding at least a majority in amount of the claims of each class that it intends to impair under its adjustment plan — which is the case here — then, in order to be eligible for Chapter 9, the municipality must demonstrate (as relevant here) that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan," or that it is "unable to negotiate with creditors because such negotiation is impracticable[.]" 11 U.S.C. § 109(c)(5).

---

[22] The City's Proposal reflects deliberate steps to leading to the forced cuts in benefits.  *See*  Orr Decl., Exhibit A, p. 109.  Although, as has become clear in discovery, the legwork under pinning the proposal was incomplete at best, the City's intent was clear:  show the underfunding to be prohibitively larger than expected, and stop the funding.

- 35 -

286

13-53846-swr   Doc 2335-8   Filed 01/27/13   Entered 01/27/13 21:34:02   Page 80 of
13-53846-swr   Doc 1370   Filed 10/2/13   Entered 10/2/13 13:34:26   Page 80 of 41     80

49.     Enforcing the "good faith" requirement serves "[i]mportant constitutional issues that arise when a municipality enters the bankruptcy arena" by requiring that, "before rushing to" bankruptcy court, the municipality first sought to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan. *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992). Thus, a debtor who adopts a "take it or leave it" approach to prepetition negotiations fails to satisfy the good faith element. *In re Ellicott School Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992). There, the court noted that the debtor "h[e]ld three public meetings at which it 'explained' its proposed plan of restructuring to the bondholders" but creditors "were advised that the 'economic provisions' of that proposed plan were not negotiable." *Id.* at 266. *See also id*. (court reasoned that "[i]t is difficult to imagine that any true negotiations [can] take place in an environment where the substantive terms of a proposal were not open to discussion" and dismissed the petition in part because the good faith requirement was not satisfied.). *Id.* In other words, there must be genuine substantive negotiations over the terms of a repayment plan, and Section 109(c)(5)(B) will not be satisfied where a debtor fails to negotiate prepetition over "a comprehensive workout plan dealing with all of their liabilities and all of their assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code." *See also In re Pierce County Housing Auth.*,

414 B.R. 702 (Bankr. W.D. Wash. 2009) (requirement not met where "there is no evidence that the Debtor ever negotiated prepetition with any of its creditors over the possible terms of a plan of adjustment").

50.     The City's efforts to negotiate with stakeholders over their pension proposal fall far short of the "good faith" requirement.  First, as noted above, Orr's Proposal was obviously crafted with chapter 9 in mind (or, the City's flawed view of what could be lawfully accomplished in chapter 9) and with no effort whatsoever to acknowledge the legitimacy of Article 9, Section 24 of the Michigan Constitution.  By completely disregarding the State Constitution's prohibition on impairing vested benefits, the City tendered a proposal that the affected stakeholders could not possibly accept consistent with applicable State law.

51.     The evidence will show that Orr, aided by the Governor, embarked on a direct path to chapter 9 to implement a proposal designed to shed its pension and retiree health obligations as general unsecured claims and promote an ambitious program of improvements for the City.  We show above how this gamble plays havoc with core principles of federalism and the right of the citizenry to enact State Constitutional provisions — a right protected by the Tenth Amendment.  In addition, because of the City's rush to file, its Proposal was deeply flawed.  For example, the City had barely identified certain assets that might be available either for creditors or for its program of improvements. *See*  Orr Decl., Exhibit A, pp. 83-

89.  The pension funding estimate, likewise, was based on scenarios deemed "more realistic" by the City's turnaround consultant but requiring additional work that is to this day not yet complete.  As such, the Emergency Manager's Proposal and short march toward chapter 9 indicate that the City's efforts were not intended to engage in a good faith process with their stakeholders.  Instead, the use of bankruptcy specifically to achieve its transformation proposal was always the intended goal of the process.[23]  The Proposal was not designed as a plan for discussion among stakeholders but a milepost in the road to chapter 9.  The City's filing cannot be said to be in good faith where the bankruptcy filing is, in effect, the goal of the process.

52.     The City relies upon the impracticability of negotiations available as an alternative grounds under Section 109(c)(5)(C).  *See* Consolidated Reply, pp. 45-53.  But the issues cited by the City, *i.e.*, who to identify as "representatives" of various retiree groups, competing bargaining authority, or the extent to which legal authority would be considered binding, are by-products of the proposals that involved forced cuts in accrued pensions protected from impairment under the Michigan State Constitution.  The City cannot, on the one hand, tender a

---

[23] *See* Ellman and Merrett, *Pensions and Chapter 9* at 370 (noting that "there are many unanswered questions about what can and cannot be achieved in a chapter 9 case" and "the reality that this area of the law [whether chapter 9 is an available means to address protected pensions] is largely untested in the courts and very little is certain."); *see also id.* at 391 (noting that through the use of bankruptcy tools, such as the automatic stay "chapter 9 debtors have exerted substantial pressure on retirees to negotiate over a reduction in benefits.").

proposal designed to yield an unlawful result and then attempt to shield itself behind "impracticability" to claim eligibility under Section 109. That negotiations may have been, technically speaking, "impracticable" did not so much stem from the unwieldy size and scope of the stakeholder population, as from the impossibility of lawfully engaging in negotiations over the pension proposal.

53. Accordingly, the City cannot show that its filing was made in good faith, or that is has complied with the requirements of Section 109(c)(5). Where the debtor is unable to demonstrate that all elements have been satisfied, "[t]he petition must be dismissed." *In re Harrisburg*, 465 B.R. at 752.[24]

---

[24] UAW and the *Flowers* plaintiffs reserve their right to further supplement their objections, including in connection with the pre-trial brief in this matter, in light of continuing discovery and potential challenges UAW and the *Flowers* plaintiffs may pursue with respect to material withheld on the grounds of attorney-client and other privileges.

- 39 -

286

13-53846-tjt   Doc 2375-8   Filed 12/27/13   Entered 12/27/13 21:34:02   Page 84 of 41   84
13-53846-swr   Doc 1170   Filed 10/2/13   Entered 10/2/13 21:24:02   Page 39 of 41

## Conclusion

For the foregoing reasons, the City of Detroit, Michigan's Chapter 9
Petition should be dismissed.

Dated:    New York, NY
      October 11, 2013

Respectfully submitted,

International Union, UAW

By: /s/ Babette A. Ceccotti
    Cohen, Weiss and Simon LLP
    Babette A. Ceccotti
    Keith E. Secular
    Thomas N. Ciantra
    Peter D. DeChiara
    Joshua J. Ellison
    330 West 42nd Street
    New York, New York 10036-6976
    T: 212-563-4100
    F: 212-695-5436
    bceccotti@cwsny.com

     - and -

    Niraj R. Ganatra (P63150)
    Michael Nicholson (P33421)
    8000 East Jefferson Avenue
    Detroit, Michigan  48214
    T: (313) 926-5216
    F: (313) 926-5240
    nganatra@uaw.net
    mnicholson@uaw.net

    *Attorneys for International Union,*
    *UAW*

     - and -

_/s/ William A. Wertheimer_____

William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, MI 48025
T: (248) 644-9200
billwertheimer@gmail.com

Andrew A. Nickelhoff
Sachs Waldman, P.C.
2211 East Jefferson Avenue
Deoit, MI 48207
T: (313) 965-3464
F: (313) 965-0268
anickelhoff@sachswaldman.com

_Attorneys for Flowers Plaintiffs_

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------------------x

In re
:
:
:   Chapter 9
:
CITY OF DETROIT, MICHIGAN,
:
:   Case No. 13-53846
:
Debtor.
:
:   Hon. Stephen W. Rhodes
:

-------------------------------------------------------------------x

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF RETIREES**
**TO ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN TO**
**BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

NewYork 1628490.4

# TABLE OF CONTENTS

TABLE OF SUPPLEMENTAL AUTHORITIES ............................................................................i

INTRODUCTION .........................................................................................................1

D.    The City Cannot Satisfy Bankruptcy Code Section 109(c)(5) and is Subject to Dismissal Under Bankruptcy Code 921(c). .............................................................3

    1.    The City Cannot Meet Its Burden Under 109(c)(5) of Demonstrating That it Negotiated With Creditors in Good Faith or That Negotiations Were Impracticable.................................................................................................3

        a.    The City Cannot Establish That It Negotiated In Good Faith Under Section 109(c)(5)(B) .........................................................................4

        b.    The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C) .............................................................9

    2.    The City Cannot Meet Its Burden Under 921(c) of Demonstrating That It Filed Its Chapter 9 Petition In Good Faith......................................................12

        a.    The Chapter 9 Petition Was Not Filed in Good Faith Because The Emergency Manager Intends to Use Chapter 9 to Impair Pension Obligations in Violation of His Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment...............................13

        b.    The Chapter 9 Petition Was Not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were Untrue, Misleading or Made Without a Reasonable Basis. ............................................................................15

# TABLE OF SUPPLEMENTAL AUTHORITIES

**CASES**                                                                                      Page(s)

*City of Pontiac Retired Emps. Ass'n. v. Schimmel*,
   No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013) .......................................12

*In re City of Bridgeport*,
   129 B.R. 332 (Bankr. D. Conn. 1991) ................................................................12

*In re the City of Wellston*,
   42 B.R. 282 (Bankr. E.D. Mo. 1984) ..................................................................10

*In re Cnty. of Orange*,
   183 B.R. 594 (Bankr. C.D. Cal. 1995)................................................................15

*In re Cottonwood Water and Sanitation Dist,*
   138 B.R. 973 (Bankr. D. Colo. 1992) .............................................................4, 5

*In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261 (Bankr. D.Colo. 1992).........................................4, 7

*In re Joyce, Don & Assoc.'s Inc.*,
   No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008)............15

*In re McCurtain Mun. Auth.*,
   No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) .....................................15

*In re New York City Off-Track Betting Corp.*,
   427 B.R. 256 (Bankr. S.D.N.Y. 2010).............................................................4, 14

*In re Panache Dev. Co., Inc.*,
   123 B.R. 929 (Bankr. S.D. Fla. 1991)................................................................15

*In re Sullivan Cnty. Reg'l 1 Refuse Disposal Dist.*,
   165 B.R. 60 (Bankr. D.N.H. 1994) ..........................................................3, 4, 7, 12

*In re Valley Health Sys.*,
   383 B.R. 156 (Bankr. C.D. Cal. 2008)..................................................................8

*In re Vills. at Castle Rock Metro. Dist. No. 4*,
   145 B.R. 76 (Bankr. D. Colo. 1990) ..............................................................10, 12

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
   408 B.R. 280 (9th Cir. B.A.P. 2009)......................................................................8

*Marhsall v. Marshall (In re Marshall)*,
   403 B.R. 668 (C.D. Cal. 2009) .......................................................................14, 18

*Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP),*
    243 B.R. 768 (D. Colo. 2000) ..................................................................15

*Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino*
    *Coast Recreation and Park Dist.),*
    Case No. 12-cv-02591, 2013 WL 5423788 (Bankr. N.D. Cal. Sept. 27, 2013) ........................4

## STATUTES

11 U.S.C. § 101 ..................................................................................................1

11 U.S.C. § 109(c)(4) ........................................................................................4

11 U.S.C. § 109(c)(5) ...............................................................................2, 4, 5

11 U.S.C. § 109(c)(5)(A) ..................................................................................2

11 U.S.C. § 109(c)(5)(B) ........................................................................ *passim*

11 U.S.C. § 109(c)(5)(C) ........................................................................ *passim*

11 U.S.C. § 109(c)(5)(D) ..................................................................................2

11 U.S.C. § 921(c) ......................................................................................11, 12

11 U.S.C. § 941 ....................................................................................... *passim*

28 U.S.C. § 2403(a) ...........................................................................................1

28 U.S.C. § 2403(b) ...........................................................................................1

## STATE LEGISLATURE

124 Cong. Rec., H 11091 (Daily Ed. Sept. 28, 1978), p. IX-108 ....................5

MICH. CONST. art. IX, § 24 .........................................................................11, 13

Pub. L. No. 94-260, 90 Stat. 315, § 84 ..........................................................5, 9

S. REP. NO. 95-989 (1978) ..............................................................................10

## OTHER AUTHORITIES

Chris Christoff, *Christie's Will Appraise Detroit Art Institute Collection,*
    BLOOMBERG (Aug. 6, 2013, 6:22 PM)..............................................................17

Randy Kennedy, *The Agony of Suspense in Detroit: Detroit Institute of Arts Copes With*
    *Threat of Art Selloff,* N.Y. TIMES (Oct. 2, 2013) ................................................17

NewYork 1628490.4

Mark Stryker, *Christie's Appraisal Will Reveal Value of Detroit Institute of Arts' Collection*, DETROIT FREE PRESS (Aug. 18, 2013).................................................................17

NewYork 1628490.4

## INTRODUCTION

Pursuant to the Bankruptcy Court's First Amended Order Regarding Eligibility Objections, Notice of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b), dated September 12, 2013 (the "First Amended Order"). The Official Committee of Retirees (the "Committee") hereby files this supplement (the "Supplemental Objection") to the "Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code," dated September 10, 2013 (Dkt. 805) (the "Objection") contesting the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

This Supplemental Objection is based upon new facts learned during discovery, including but not limited to the deposition discovery of the Emergency Manager and Mr. Charles M. Moore, a 30(b)(6) witness for the City and a principal of the City's operational restructuring advisor, Conway MacKenzie, Inc. These facts include, but are not limited to, the testimony described in this Supplemental Objection as well as deposition testimony from these and other witnesses that is not specifically cited herein.

Per the Bankruptcy Court's First Amended Order, this Supplemental Objection supplements and supersedes only section II.D (paragraphs 74-77) of the Objection. The Committee does not intend this Supplemental Objection to supersede any other section of the Objection which remains pending. The Committee further reserves its right to rely, at the eligibility hearing, on any and all evidence as may pertain to the subject matter of its Objection, including evidence from depositions other than those specifically referred to herein.

NewYork 1628490.4

Subject to the foregoing, in support of its Objection, and as and for its Supplement thereto, the Committee states that Section II.D of its Objection is deleted in its entirety and replaced by the following:

NewYork 1628490.4

### D. The City Cannot Satisfy Bankruptcy Code Section 109(c)(5) and is Subject to Dismissal Under Bankruptcy Code 921(c).

#### 1. The City Cannot Meet Its Burden Under 109(c)(5) of Demonstrating That it Negotiated With Creditors in Good Faith or That Negotiations Were Impracticable.

74. Section 109(c)(5) requires that a municipal debtor affirmatively establish that it:

(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title. 11 U.S.C. § 109(c)(5).

75. The City does not assert that it obtained agreement from creditors (Section 109(c)(5)(A)) or that it sought to prevent a preferential transfer (Section 109(c)(5)(D)); instead, the City contends that it satisfied the conditions of Section 109(c)(5)(B) and/or (C) because it purports to have attempted to negotiate with its creditors in good faith and contends that negotiation with creditors was impracticable. However, as set forth below, the City did not in fact meet the requirements of either of those subsections. Specifically: (i) the City failed to meet the requirements of Section 109(c)(5)(B) because did not come forward a plan of adjustment as required by that subsection, and in any event did not engage in good faith negotiations with various unions and retiree associations; and, (ii) the City failed to meet the requirements of Section 109(c)(5)(C) because it never came forward with a plan of adjustment as required by that

NewYork 1628490.4

subsection as well and has not shown that negotiations with various of the unions and retiree associations were impracticable.

76. The City bears the burden of proof on showing that it meets the standards set forth in Sections 109(c)(5)(B) and (C). *In re Sullivan Cnty. Reg'l 1 Refuse Disposal Dist.*, 165 B.R. 60, 79 (Bankr. D.N.H. 1994). Having failed to meet its burden on eligibility, the City's petition for bankruptcy must be denied.

> a. The City Cannot Establish That It Negotiated In Good Faith Under Section 109(c)(5)(B)

77. The City asserts that its June 14th proposal and certain discussion sessions with creditors prior to the Petition Date are sufficient to constitute good faith negotiations under Section 109(c)(5)(B). However, the City's assertion ignores that, in order to come within the scope of Section 109(c)(5)(B), the City must show that it put forward a plan of adjustment to be negotiated. The evidence is undisputed that the City intends to try to use its Chapter 9 filing as a vehicle to impair protected pension rights. Indeed, the City has expressly admitted this in response to a Request for Admission served on it in these proceedings. At the same time, the evidence also is undisputed that, prior to its filing, the City did not submit an actual plan of adjustment to creditors. The City's Emergency Manager has admitted that the "proposal to creditors" that it submitted on June 14, 2013 was **not** a plan of adjustment, but was rather a mere "proposal" intended to elicit "feedback" from creditors. Moreover, even if the City had proposed a plan of adjustment, as more fully set forth in the objections filed by certain Committee members and their affiliated organizations,[1] the City's discussion sessions did not in any event

---

[1] Certain members of the Committee, including the (i) Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees and (ii) International Union, UAW to the City of Detroit, filed their own objections to the City of Detroit's Eligibility Under Chapter 9 on behalf of their constituents. Other members of the Committee, including (i) Shirley V. Lightsey (Detroit Retired City

NewYork 1628490.4

4

constitute good faith negotiations because they were merely advisory, did not afford retiree representatives a meaningful opportunity to respond, and in fact presented what discovery has uncovered to be a misleading depiction of both the unfunded pension liability and the funds potentially available to meet it.

           i.          The City Failed To Set Forth A Plan Of Adjustment As Is Required Under Section 109(c)(5)(B)

78.     To meet the requirements of Section 109(c)(5)(B), it is not enough that, prior to filing a bankruptcy petition, a municipality merely "negotiate" in the abstract; rather, Section 109(c)(5)(C) requires that a municipality must, specifically, negotiate over the substantive terms of a proposed bankruptcy "plan of adjustment." *See Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino Coast Recreation and Park Dist.)*, Case No. 12-cv-02591, 2013 WL 5423788, at \*4 (Bankr. N.D. Cal. Sept. 27, 2013) (citing *In re Sullivan*, 165 B.R. at 79; *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992); *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 275-76 (Bankr. S.D.N.Y. 2010)).

79.     The conclusion that Section 109(c)(5)(B) requires a municipal debtor to set forth what is, in substance, a plan of adjustment under Section 941 is supported by both Section 109(c)'s text and legislative history. *See In re Sullivan.*, 165 B.R. at 78 (citing *In re Cottonwood Water and Sanitation Dist,*, 138 B.R. 973, 974 (Bankr. D. Colo. 1992)).

80.     The requirements of Section 109(c)(5) are appropriately read together in conjunction with Section 109(c)(4), which requires that a municipality must "desire[] to effect a plan to adjust [its] debts" to be eligible for Chapter 9. *See e.g.*, *In re Cottonwood*, 138 B.R. at

---

Employees Association), (ii) Robert A. Shinske (Detroit Fire Fighters Association), (iii) Donald Taylor (Detroit Police and Fire Fighters Association) and (iv) Gail Turner (Detroit Police Members Association) are constituents of organizations that filed objections to the City of Detroit's Eligibility Under Chapter 9. The Committee joins in the pre-trial briefs submitted by

NewYork 1628490.4

974 (citing 11 U.S.C. § 109(c)(4)).  The term "plan to adjust [a municipality's] debts is in turn defined in 11 U.S.C. § 941.  Reading these provisions together, "the concept is that the entity must desire to effect a 'plan' within the meaning of section 941 and must have negotiated in good faith concerning that proposed plan."  *In re Cottonwood,* 138 B.R. at 975.

81.    The legislative history to Section 109(c)(5) confirms Congress's intent that Section 109(c)(5)(B) requires a municipal debtor to set forth a plan of adjustment, as prerequisite to good faith negotiations.  The predecessor statute to Section 109(c)(5) under the Bankruptcy Act set forth that a debtor must "negotiate[ ] in good faith with its creditors and … fail[ ] to obtain, ***with respect to a plan of adjustment of its debts***, the agreement of creditors holding at least a majority in amount of the claims of each class which are claims affected by that plan."  Pub. L. No. 94-260, 90 Stat. 315, § 84 (emphasis added).  When Section 109(c)(5) was enacted in 1978,[2] Congress expressly indicated that it was intended to follow prior law and that any changes to the text  were "stylistic" only.[3]  Accordingly, the weight of authority is consistent with Congress' intent that the current version of Section 109(c)(5)(C) should be construed in the same way as its predecessor, which expressly stated that a Debtor must negotiate a "plan of adjustment."

82.    The City admits that it did not propose a plan of adjustment under Section 941 of the Bankruptcy Code and, therefore, cannot satisfy the "negotiation" requirement of Section

---

these organizations and refers the Court to such briefs for the facts relating to communications between the City and retiree representatives prior to the petition.

[2] As set forth above, 11 U.S.C. § 109(c)(5)(B) now sets forth that a debtor can satisfy the negotiation requirement of Section 109(c)(5) if it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter…".

[3] 124 Cong. Rec., H 11091 (Daily Ed. Sept. 28, 1978), p. IX-108 (stating with respect to the 1978 changes that Chapter 9 "follows current law with respect to the adjustment of debts of a

109(c)(5)(B). For example, the City's Emergency Manager testified explicitly that the proposal that the City presented to creditors on June 14, 2013 was merely a "proposal," not a plan. The Emergency Manager testified that, as regards the June 14th creditor proposal, "we never called this a plan, we never called this a deal, we always called it a proposal." Deposition of Kevyn Orr, dated September 16, 2013 and October 4, 2013, Case No. 13-53846 ("Orr Dep."), at 271: 18-19.[4] The Emergency Manager further testified that the City does not know whether it will ever present the June 14 proposal as such to the Bankruptcy Court. *Id.* at 279: 6.

83. The Emergency Manager's concession that at the time of filing the City had only a proposal, and not a plan, is hardly surprising. With respect to pensions in particular, discovery has established that, notwithstanding the City's avowed and admitted intend to cut the retirees' pension rights (discussed further at ¶¶ 102-05 below), the City does not know the true amount of the unfunded pension liability or the scope of the cash flows it has to work with. *See* p. 108-110 below. Likewise, and more generally, as the Emergency Manager presumably understood, it would have been premature to prepare a plan of adjustment when the City lacked information about funds that could be made available to pay its debts through the monetization of existing assets including, but not limited to, the City-owned art maintained at the Detroit Institute of Arts. Orr Dep. at 170:10-172: 18.

84. Because the City admittedly did not present a plan of adjustment to creditors prior to its July 18, 2013 bankruptcy filing, the City cannot satisfy the eligibility condition set forth in 11 U.S.C. § 109(c)(5)(B).

---

municipality. Stylistic and minor substantive revisions have been made in order to conform this chapter with other new chapters of the bankruptcy code.")

[4] The Kevyn Orr deposition transcript is attached as Exhibit A to the Declaration of Claude D. Montgomery, Esq., dated October 11, 2013, filed in support of this Supplemental Objection. ("Montgomery Dec.").

NewYork 1628490.4

ii. The City Failed To Negotiate With The Retiree Unions In Good Faith As Required Under Section 109(c)(5)(B)

85. Even assuming, *arguendo*, that the City had filed a plan of adjustment under Section 941 (which the Emergency Manager admits it did not), the City still cannot meet its burden under Section 109(c)(5)(B) because the City failed to negotiate in good faith with retiree representatives. As more fully set forth in the objections filed by certain members of the Committee and their affiliated organizations, the City's discussions with creditors were non-interactive, one-way discussions. Such a "take it or leave it" approach cannot satisfy section 109(c)(5)(B). *See In re Ellicott*, 138 B.R. at 979.

86. Moreover, any purported "negotiations" with unions and retiree associations were not in good faith because the City failed to disclose that, *inter alia*:

(a) the City did not know the amount of the unfunded pension liability; (b) the figures the City cited for high-end actuarial estimates of the unfunded pension liability were in truth founded only on "rough guesses"; and (c) a substantial percentage of the amount the City was representing to be "unfunded" pension liability was in fact allocable not to the City's general fund but instead to individual City agencies or departments that, themselves, had or could raise sufficient cash to cover the required pension contributions. *See* ¶110 below.

87. The City's lack of good faith in its purported negotiations is further demonstrated by its failure to acknowledge, during its discussions with creditors, that the retirees have rights that are clearly and constitutionally protected under Michigan law. *E.g.*, Orr Dep. at 144: 10-145: 24.

88. The City's failure to engage in good faith negotiations is shown by the fact that, as the Emergency Manager has admitted, it never provided creditors with information sufficient to allow them to know the actual monetary impact, on creditors, of the cuts the City stated that it

wanted to impose, which is a prerequisite for any meaningful discussion. (Orr Dep. at 111:2-19); Deposition of Lamont Satchel, dated September 19, 2013, Case No. 13-53846, at 88:14-89:18.[5]

> b.     The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C)

89.     The City alternatively asserts that good faith negotiations with creditors were not necessary because such negotiations were rendered "impracticable" under section 109(c)(5)(C) by the following four circumstances: (i) the City is a major American city; (ii) the City's creditors are numerous and fragmented; (iii) in many instances, the City was unable to negotiate with representatives with authority to bind creditors; and (iv) the City did not have time to conduct extended creditor negotiations. (Dkt. 14, at 40-53). The City's purported impracticability justifications ignore the clear intent of Congress that Section 109(c)(5)(C) requires that the City both set forth a plan of adjustment[6] and negotiate with impaired creditor classes for which negotiations **are** practicable.

> i.     The City Failed To Set Forth A Plan Of Adjustment As Required Under Section 109(c)(5)(C)

90.     Like Section 109(c)(5)(B), Section 109(c)(5)(C) requires that a municipal debtor put forward a plan of adjustment under Section 941 of the Bankruptcy Code as a prerequisite to assessing whether good faith negotiations are practicable.

91.     Congress' intent in this respect is clear from Section's 109(c)(5)(C)'s legislative history. As noted above, in 1976, Congress modified the requirement that a municipal debtor

---

[5] The deposition transcript of Lamont Satchel is attached as Exhibit C to the Montgomery Dec.

[6] The Committee recognizes that other bankruptcy courts have decided this issue differently. *E.g. Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009); *In re Valley Health Sys.*, 383 B.R. 156, 161-62 (Bankr. C.D. Cal. 2008). None of those decisions is binding upon this court. Moreover, the Committee submits that its interpretation of Section 109(c)(5)(C) is textually accurate and in accordance with Congress's specific intent as reflected by legislative history.

NewYork 1628490.4

must receive 51% creditor consent as a condition of eligibility. The creditor consent requirement was replaced with the following four prong eligibility test:

> "An entity is not eligible for relief under this chapter unless:
>
> …
>
> (1) it has successfully negotiated a plan of adjustment of its debts with creditors holding at least a majority in amount of the claims of each class which are claims affected by that plan;
>
> (2) it has negotiated in good faith with its creditors and has failed to obtain, with respect to a plan of adjustment of its debts, the agreement of creditors holding at least a majority in amount of the claim of each class which are claims affected by that plan;
>
> (3) such negotiation is impracticable; or
>
> (4) it has a reasonable fear that a creditor may attempt to obtain a preference."

Pub. L. No. 94-260, 90 Stat. 315, § 84. The third prong of the test that "**such negotiation** is impracticable" (emphasis added) necessarily referred back to and incorporated the antecedent good faith negotiation clause in the preceding subsection (2), which specifically contemplated negotiation with each class of claims affected by a **plan of adjustment**. *See* discussion at p. 6 above. As set forth above, the post-1976 amendments to subsection (3), now codified in the form of present Section 109(c)(5)(C), were merely "stylistic" and intended to remain consistent with prior law. Thus, Congress intended that, in accordance with its predecessors, Section 109(c)(5)(C) requires that a municipal debtor first present a plan of adjustment.

92. As set forth in §§ 82-84 above, the City admits that it did not propose a plan of adjustment under Section 941 of the Bankruptcy Code. Therefore, it cannot satisfy the "impracticability" criterion of Section 109(c)(5)(C).

NewYork 1628490.4

93.     Even if a plan of adjustment were not required for an "impracticability" finding under Section 109(c)(5)(C), the City cannot establish "impracticability" because it failed to negotiate with representatives of the retirees, a class of creditors for which negotiation was practicable.  Section 109(c)(5)(C) only excuses a debtor from negotiating with those individual classes of impaired creditors for which good faith negotiation would be impracticable; it does not eliminate the requirement that the City negotiate in good faith with classes of creditors with which negotiation **is** practicable.  *See In re the City of Wellston*, 42 B.R. 282, 285 (Bankr. E.D. Mo. 1984) (stating that "the Bankruptcy Code anticipates that a municipality will have attempted to negotiate in good faith with its creditors prior to the filing of a Chapter 9 petition"); *see also In re Vills. at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (eligibility upheld where debtor showed on a class by class basis either good faith negotiation or impracticability).

94.     Section 109(c)(5)'s legislative history confirms that the eligibility test set therein is intended to require a Debtor to negotiate in good faith to the extent practicable.  In discussing enactment of Section 109(c), which as set forth above only made "stylistic" changes to the predecessor Bankruptcy Act provision, Senator DeConcini stated, without qualification, that the "creditor protection provision, requiring a municipality to attempt a good faith negotiation with its creditors before a petition is filed, is retained."  S. REP. NO. 95-989, at 8-9 (1978).

95.     The City cannot meet its burden under Section 109(c)(5)(C) because it cannot show that negotiations with associations representing the retiree class of creditors were impracticable or that negotiations with unions were impracticable.  For example, although the City has not put forward a plan of adjustment, the economic rights and interests of retiree claims

are clearly distinct from other creditors in that, at a minimum, retiree claims are protected from impairment by the Constitution of the State of Michigan. MICH. CONST. art. IX, § 24. Further, in its course of dealings following the June 14 proposals, the City itself treated retiree organizations and unions separately and distinctly, holding separate meeting and discussions apart from discussions with other creditors. Recognizing the distinct rights and interests of the retiree creditors in particular, this Court ordered the appointment of an Official Committee of Retirees.

96.     Notwithstanding the City's conclusory assertions, at least two retiree associations, constituting the natural representatives of retiree creditors, stood ready, willing and able to negotiate with the City. (Dkt. 497 at ¶¶ 69-72). The City never pursued or even allowed good faith negotiations with those organizations. *Id.* at ¶ 71. Having failed to attempt good faith negotiations with a ready and willing creditor class, the City cannot demonstrate that negotiations were "impracticable" under 11 U.S.C. § 109(c)(5)(C).

> 2.     **The City Cannot Meet Its Burden Under 921(c) of Demonstrating That It Filed Its Chapter 9 Petition In Good Faith**

97.     Cause for dismissal pursuant to 11 U.S.C. § 921(c) exists for two reasons. First, cause exists because the Emergeny Manager admittedly commenced these proceedings with the purpose of "trumping" the Michigan Constitution, which the Emergency Manager and the Governor swore to uphold, by using Chapter 9 as a vehicle to impair constitutionally protected pension benefits. Second, cause exists because of the City's misrepresentations concerning the magnitude of the City's underfunded pension obligations and its ability to meet them.

NewYork 1628490.4

a.  The Chapter 9 Petition Was Not Filed in Good Faith Because The Emergency Manager Intends to Use Chapter 9 to Impair Pension Obligations in Violation of His Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment

98.  Section 921(c) of the Bankruptcy Code requires that a petition be filed in good faith. Specifically, it provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor *did not file the petition in good faith* or if the petition does not meet the requirements of [the Bankruptcy Code]." 11 U.S.C. § 921(c) (emphasis added). The City bears the burden of demonstrating that it filed its petition in "good faith." *In re City of Bridgeport*, 129 B.R. 332, 334 (Bankr. D. Conn. 1991) (holding that the City failed to meet its burden of proving insolvency). The essence of the good faith requirement is to "prevent abuse of the bankruptcy process." *Vills. at Castle Rock*, 145 B.R. at 81. Under 921(c) dismissal is warranted if the filing is "at odds with the legislatively intended scope of the chapter involved." *In re Sullivan*, 165 B.R. at 81.

99.  The prepetition actions of the Emergency Manger indicate that at all times since his appointment the City was on a path careening towards a Chapter 9 filing in order to impair pension benefits in violation of the Michigan Constitution. Both the Governor and Emergency Manager evidenced a desire to achieve a result that they knew was unconstitutional as a matter of Michigan law. Even before his appointment as Emergency Manager, Mr. Orr put in writing his views that the planning for a chapter 9 proceeding was a "run around" the Michigan Constitution and the repeal of PA 4, which had been crafted with the intent of impairing retirement compensation due to retired municipal employees. *City of Pontiac Retired Emps. Ass'n. v. Schimmel*, No. 12-2087, 2013 WL 4038582, at *3 (6th Cir. Aug. 9, 2013). The Emergency Manager's June 14, 2013 City Proposal specifically stated "there *must be significant cuts in*

*accrued, vested pension amounts for both active and currently retired persons.*" (Dkt. 11, Ex. A at 116) (emphasis added).

100.    The Emergency Manager's deposition testimony makes clear that the he specifically intended to use the City's Chapter 9 filing to avoid its constitutional obligations to protect accrued pension benefits.  He testified that he had read Article IX, Section 24 of the Michigan Constitution (the "Pension Clause") prior to becoming Emergency Manager.  Orr Dep. at 69:16-70:2.  Orr further testified that the language of the Pension Clause is unambiguous and speaks for itself.  *Id.* at 51: 25- 52: 17.  The Emergency Manager admitted that using Chapter 9 to trump the Pension Clause of the Michigan Constitution, Article IX, Section 24 to impair pension benefits was one of his "objectives" in filing the City's Chapter 9 petition and that it was this specific provision of the Michigan Constitution, and no other provisions of Michigan law, that he was seeking to trump.  *Id.* at 113: 13 - 114: 23.  He stated that impairing the pension rights referred to in Article IX, Section 24 of the Michigan Constitution was, in his view, a necessary part of any restructuring plan.  *Id.* at 322: 3-7.  He was unaware of any court decision upholding the use of Chapter 9 to "trump" a state constitution and was aware, at a minimum, that the Michigan Attorney General believed that the course of action he was charting was contrary to Michigan law.  *Id.* at 415: 13-22.

101.    The ability to impair pensions was both a motivation for, and also a "but for" of, the Chapter 9 filing.  The Emergency Manager testified that he would have had no alternative plan had the Governor made a filing contingent upon the preservation of pension benefits.  *Id.* at 120: 1-5.  He did not recall that there was any analysis done of how to impair pensions outside a bankruptcy context and purely as a matter of state law.  *Id.* at 87: 8-11.  As of June 14, other than a consensual chapter 9 filing, the City had not identified any other manner of implementing the Emergency Manager's proposal to cut pension benefits.  *Id.* at 112: 21 - 113: 2.  At the time of

14

the Chapter 9 filing, the Emergency Manager believed that there would have to be "significant cuts" in pension benefits. *Id.* at 247: 1-7. The City's proposed plan will cease pension contributions for current retirees. *Id.* at 128: 9-11.

102. The Emergency Manager also stated that to the "best of [his] knowledge," there was no particular reason that the Chapter 9 petition was filed in the afternoon of July 18th, other than to file the petition before the commencement of a TRO hearing being held in the Michigan Circuit Court in which the legitimacy of PA 436 was being challenged, in order to get a jump on the expected decision by the Circuit Court. *Id.* at 125: 24-127: 4. He further admitted that notwithstanding the Circuit Court's ruling that PA 436 is unconstitutional, he has not taken any steps to withdraw the bankruptcy petition from filing. *Id.*

103. The Emergency Manager's testimony clearly demonstrates that he commenced Chapter 9 proceedings with the specific intent to impair constitutionally protected pension obligations. constitutes cause for dismissal. Here, the Emergency Manager consciously and deliberately not only disregarded but sought, through the specific vehicle of a Chapter 9 filing, the Michigan constitutional proscriptions under the Pension Clause. As a result, the Chapter 9 petition cannot be deemed to have been filed in good faith and dismissal is therefore warranted.

      b.     The Chapter 9 Petition Was Not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were Untrue, Misleading or Made Without a Reasonable Basis.

104. In determining whether a petition was filed in good faith courts also look "to whether the debtor misrepresented facts in the petition." *Marhsall v. Marshall* (*In re Marshall*), 403 B.R. 668, 692 (C.D. Cal. 2009).[7] A debtor's "honesty and candor" are factors in determining

_____

[7] "Good faith" is not defined in Chapter 9. As a result, bankruptcy courts look to the Chapter 11 good faith requirements for guidance in determining whether a Chapter 9 Petition has been filed in good faith. *See, e.g., In re New York City Off-Track Betting*, 427 B.R. at 278-79;

whether a petition is filed in good faith. *See, e.g., Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*, 243 B.R. 768, 773 (D. Colo. 2000); *see also In re Joyce, Don & Assoc.'s Inc.*, No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008) (court dismissed chapter 11 petition in part due the debtor's vice president's "lack of candor in his testimony"); *In re Panache Dev. Co., Inc.*, 123 B.R. 929, 932-33 (Bankr. S.D. Fla. 1991) (misstatements and omissions in debtor's schedules constituted "cause" for dismissal of Chapter 11 petition). Such misrepresentations and omissions were made here.

105. Mr. Orr filed a Declaration in support of the Chapter 9 Petition. In it, he states, as an objective fact, that the City has approximately "$3.5 billion in underfunding pension liabilities." (Dkt. 11 at p. 6 n.3). This statement followed the Emergency Manager's prior representation to the Governor, made in the a letter of July 16, 2013, also attached to his Declaration, that the City has "$3.5 billion in underfund[ed] pension liabilities based on most recent actuarial estimates." (Dkt. 11, Ex. J, at 2). Similar representations have been made by the Emergency Manager in briefs filed by him in this Court. (Dkt. 14, at 2). In his June 14, 2013 proposal to creditors, attached to his Declaration, the Emergency Manager stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." (Dkt 11, Ex. A at 109).

106. Deposition discovery has revealed that the Emergency Manager's representations about the magnitude of the City's unfunded pension liability, and its ability to meet that liability, were untrue or, at a minimum, made without any reasonable basis. Charles Moore, a principal of Conway MacKenzie, Inc., the City's restructuring advisor, and a 30(b)(6) witness for the City,

---

*see, e.g., In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007) (chapter 11 good faith standards applied to determine whether chapter 9 petition was filed in good faith); *In re Cnty. of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal.

has testified that, contrary to the Emergency Manager's representations, there has been no reliable actuarial analysis placing the City's unfunded pension liability at $3.5 billion. Transcript of Deposition of Charles Moore, dated September 18, 2013, Case No. 13-53846 ("Moore Dep."), at 61: 18-25; 1-7.[8] In fact, Mr. Moore testified that as of September 18, 2013, two months after the petition was filed, the actuarial firm retained by the City, Milliman, Inc. ("Milliman"), had not completed its actuarial analysis of the unfunded pension liabilities and did not even have the information required to undertake such an analysis. *Id*. Mr. Moore further testified that, for this reason, the City did not know the actual size of the unfunded pension liability. *Id*. at 150: 24-151: 24. Mr. Moore added that the City did not in fact know what assets were available to pay pensions. *Id*. Further, Glenn Bowen of Milliman, the City's actuary, testified that the figures the City has cited for the high-end estimates of unfunded pension liability were predicated only on "rough guesses." Transcript of Deposition of Glenn Bowen, dated September 24, 2013, Case No. 13-53846, at 146:8-18.[9] Similarly, Treasurer Andy Dillon testified in his deposition (transcript not yet available) that the actual size of the underfunded pension liability was not known. Deposition of Andy Dillon, dated October 10, 2013, Case No. 13-53846, at 108: 15-19.[10]

107. Related to the above, during his deposition the Emergency Manager acknowledged that the City has numerous assets that could be monetized to provide additional cash and that he was exploring ways to achieve monetization. Orr Dep. at 170: 10-21 (art

---

1995) (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith).

[8] The Moore deposition transcript is attached as Exhibit B to the Montgomery Dec.

[9] The deposition transcript of Glenn Bowen is attached as Exhibit E to the Montgomery Dec.

[10] The deposition transcript of Andy Dillon is attached as Exhibit D to the Montgomery Dec.

NewYork 1628490.4

collection of Detroit Institute of Arts); 174: 10-20 (Detroit Water & Sewer Department) ("DWSD"); 183: 19- 184: 10 (City-owned land). For example, the City-owned art that is maintained at the Detroit Institute of Arts has been estimated in press reports as being worth billions of dollars.[11] However, none of these potential cash infusions were factored into the City's assessment of whether it could meet is underfunded pension liabilities (which would not be payable until some time in the future), or indeed its liabilities in general. *Id.*, 166: 12-24.

108. In addition, in the June 14th Creditor Proposal, attached to Mr. Orr's Declaration, the Emergency Manager represented that the unfunded pension liability calculated under the actuarial valuation done in 2011 (which the City believes was understated) was approximately $644 million. (Dkt. 11, Ex. A at 23). However, during his deposition Mr. Orr testified that only $250 million of that $644 million total was allocable to the City and its general fund and that the approximately $450 million balance was allocable to other City funds or Departments, such as the Detroit Water and Sewerage Department ("DWSD"). Orr Dep. at 369: 12- 375: 7. The Emergency Manager further testified that the DWSD in fact bears financial responsibility for a substantial portion of the $644 million total (which the Emergency Manager testified at his deposition was on the order of 62%), and that the DWSD, which is run as an independent department, is financially sound and has the ability to pay its share of the pension obligations.

---

[11] *See, e.g.,* Mark Stryker, *Christie's Appraisal Will Reveal Value of Detroit Institute of Arts' Collection,* DETROIT FREE PRESS, (Aug. 18, 2013), http://www.freep.com/article/20130818/ENT05/308180068/dia-detroit-bankruptcy-art-christie-s (art has a value of "at least $10 billion to $20 billion); Chris Christoff, *Christie's Will Appraise Detroit Art Institute Collection,* BLOOMBERG, (Aug. 6, 2013, 6:22 PM), http://www.bloomberg.com/news/2013-08-06/christie-s-to-appraise-detroit-art-institute-s-holdings.html (collection may be worth at least $2.5 billion); Randy Kennedy, *The Agony of Suspense in Detroit: Detroit Institute of Arts Copes With Threat of Art Selloff,* N.Y. TIMES, (Oct. 2, 2013) (collection could be worth "more than $2 billion").

NewYork 1628490.4

Orr Dep. at 377: 21-378: 22; HT, 479: 13-22.[12]  The Emergency Manager further testified that, if the unfunded pension liability were subsequently determined to be more than $644 million, including as much as $3.5 billion, these same principles -- that DWSD would be responsible for its ratable share of the increased amount --  would continue to apply.  *Id.* at 377: 21-378: 22. Thus, the facts are that a very significant portion of the City's asserted unfunded pension liability is allocable to source that has the financial wherewithal to meet it.  However, none of this was disclosed in the Petition or made known to the City's creditors, including the retirees whose pension rights the City is threatening to eliminate entirely.

109.    As apparent from the above, in filing its Petition, the City made representations that were incomplete, misleading or outright false.  The City has not acted with good faith, and its   petition must therefore be dismissed.   *See In re Marshall*, 403 B.R. at 692.

---

[12] Mr. Orr further testified that "some portion" of total unfunded other post-employment benefits ("OPEB") might be allocable to DWSD, but he did not recall the percentage.  HT, 480: 10 - 481 - 22.

NewYork 1628490.4

Dated:      October 11, 2013
            New York, New York


Carole Neville                      Sam J. Alberts                      By: /s/ Claude D. Montgomery
DENTONS US LLP                      DENTONS US LLP                      Claude D. Montgomery (P29212)
1221 Avenue of the Americas         1301 K. Street, NW                  DENTONS US LLP
New York, New York 10020            Suite 600, East Tower               1221 Avenue of the Americas
Tel:  (212) 768-6700                Washington, DC 2005-3364            New York, New York 10020
Fax:  (212) 768-6800                Tel:  (202) 408-6400                Tel:      (212) 768-6700
carole.neville@dentons.com          Fax:  (202) 408-6399               Fax:      (212) 768-6800
                                    sam.alberts@dentons.com             claude.montgomery@dentons.com

Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hal@bwst-law.com


*Counsel for the Official Committee of Retirees*

## CERTIFICATE OF SERVICE

I, Claude D. Montgomery, hereby certify that service of the Supplemental Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code was filed and served via the Court's electronic case filing and noticing system on October 11, 2013.

/s/ Claude D. Montgomery

NewYork 1628490.4

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Chapter 9
                                                Case No. 13-53846
City of Detroit, Michigan,                      Hon. Steven W. Rhodes

        Debtor.
_____/

### Order Regarding Further Briefing on Eligibility

        For the reasons stated on the record in open Court on October 16, 2013, it is hereby ordered that the objecting parties may file supplemental briefs by October 30, 2013, and the City, the State Attorney General and the United States Attorney General may file supplemental briefs by November 6, 2013. Such supplemental briefs may be no more than 10 pages in length, which page limit will not be extended. Counsel are requested not to address issues that their briefs have already addressed.

                                .

**Signed on October 17, 2013**

                                        ____/s/ Steven Rhodes____
                                        **Steven Rhodes**
                                        **United States Bankruptcy Judge**

13-53846-tjt  Doc 23851  Filed 12/17/13  Entered 12/17/13 13:42:26  Page 113 of
13-53846-swr  Doc 1217  Filed 10/17/13  Entered 10/17/13 13:40:26  Page 1 of 1
286
113

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

**THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' <u>PRETRIAL BRIEF</u> REGARDING THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF <u>THE BANKRUPTCY CODE</u>**

**TABLE OF CONTENTS**

|  | Page |
|---|---|

TABLE OF AUTHORITIES .......................................................................................... iv

PRELIMINARY STATEMENT ...................................................................................... 2

STATEMENT OF FACTS .............................................................................................. 4

    A.    The Webster Litigation And The Governor's Unconditional Authorization ........................................................................................ 6

        (i)    The Governor (And Other State Officials) And City Intended Through The Chapter 9 Filing To Impair And/Or Terminate Pension Obligations, And The Governor Was Aware Of This Prior To His Authorizing The Chapter 9 Filing .......................................................................... 9

    B.    The Facts In The Record And To Be Further Adduced At Trial Demonstrate Why PA 436, As Applied To The Facts And Circumstance Here, Violates The Strong Home Rule Provisions Of The Michigan Constitution ............................................................. 11

    C.    The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME ................................ 13

        (i)    The City's Bankruptcy Was Orchestrated Based On The Advice Of The City's Lead Bankruptcy Counsel And Discussed Before The EM Was Even Hired ............................ 13

        (ii)    No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing ...................................... 16

        (iii)    The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing .................................................................. 20

        (iv)    The City Has Previously Negotiated Labor Concessions With Unions That Modified Both Active And Retiree Benefits ............................................................................. 21

    D.    The City Has Failed to Establish It Is Insolvent, And The City's Chapter 9 Case Was Not Commenced Due to Any Imminent Financial Emergency, Rather To Avoid The Webster Litigation (And Other State Court Proceedings) .............................................. 23

ARGUMENT ..........................................................................................................29

I.    THE CITY'S PETITION VIOLATES THE UNITED STATES
      CONSTITUTION..........................................................................................29

II.   THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9
      PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY
      CODE .........................................................................................................33

      A.    The City Is Not Authorized By Michigan State Law To Be A
            Debtor Under Chapter 9 ....................................................................35

      B.    The City Failed To Participate In Any Good Faith Negotiations
            With Creditors Prior To Filing For Bankruptcy As Required For
            Eligibility Under Chapter 9 ...............................................................36

            (i)     The City Failed To Negotiate With Creditors Such As
                    AFSCME ...............................................................................37

            (ii)    Even Assuming That The City Engaged In Negotiations,
                    Such Negotiations Did Not Relate To A Plan That Is In
                    The Best Interests Of Creditors As Required By Section
                    109(c)(5)(B).............................................................................41

            (iii)   Negotiations With Certain Categories Of Creditors Such
                    As AFSCME Were Not Impracticable ....................................44

      C.    The City's Petition Should Be Dismissed Under Section 921(c)
            As Filed In Bad Faith .........................................................................47

      D.    The City Has Failed To Meet Its Burden Of Proving Its
            Insolvency, And Only Does So Based On Assumptions Used By
            The City To Show Its Insolvency .......................................................51

CONCLUSION ..........................................................................................................56

-ii-

13-53846-tjt  13-53846-swr  Doc 2335-8  Doc 1325-8  Filed 12/27/13  Filed 12/27/13  Entered 12/27/13 16:42:36  Entered 12/27/13 16:58:35  Page 3 of 65  Page 3 of 63    116
286

# TABLE OF AUTHORITIES

**PAGES**

**CASES**

*Ashton v. Cameron County Water Improvement Dist. No. 1*,
 298 U.S. 513 (1936) ............................................................................................. 31

*Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.)*,
 Case No. 03B12184, 2005 Bankr. LEXIS 1312 (Bankr. N.D. Ill. July 14, 2005) ................. 52

*In re City of Bridgeport*,
 129 B.R. 332 (Bankr. D. Conn. 1991) ............................................................. 51, 54

*In re City of Harrisburg, PA*,
 465 B.R. 744 (Bankr. M.D. Pa. 2011) ..................................................................... 35

*City of New York v. New York, N. H. & H. R. Co.*,
 344 U.S. 293 (1953) ............................................................................................. 30

*In re City of Stockton, California*,
 493 B.R. 772 (Bankr. E.D. Cal. 2013) ............................................................. 47, 48

*In re Ellicott School Building Authority*,
 150 B.R. 261, 266 (Bankr. D. Colo. 1992) ........................................... 38, 39, 44, 46

*Faitoute Iron & Steel Co. v. City of Asbury Park*,
 316 U.S. 502 (1942) ................................................................................. 30, 32, 33

*In re Hamilton Creek Metro. Dist.*,
 143 F.3d 1381 (10th Cir. 1998) ............................................................................. 51

*Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
 408 B.R. 280 (9th Cir. B.A.P. 2009) ............................................................... passim

*Klein v. Tabatchnick*,
 610 F.2d 1043 (2d Cir. 1979) ................................................................................. 52

*Lawson v. Ford Motor Co. (In re Roblin Indus.)*,
 78 F.3d 30 (2d Cir. 1996) ...................................................................................... 52

*In re Little Creek Dev. Co.*,
 779 F.2d 1068 (5th Cir. 1986) ............................................................................... 48

*In re McCurtain Mun. Auth.*,
 No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) ........................... 47, 50

-iii-

13-53846-tjw  Doc 2335-8  Filed 12/27/13  Entered 12/27/13 16:42:36  Page 4 of 63
13-53846-swr  Doc 2325-3  Filed 12/27/13  Entered 12/27/13 16:58:35  Page 4 of 63    117
286

*In re Mendocino Coast Recreation and Park District*,
No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697 (N.D. Cal. Sept. 27, 2013) .........43, 44

*In re Mount Carbon Metropolitan Dist.*,
242 B.R. 18 (Bankr. D. Colo. 1999) ........................................................................................42

*New York v. United States*,
505 U.S. 144 (1992) ..................................................................................................31, 32

*In re Pierce County Housing Authority*,
414 B.R. 702 (Bankr. W.D. Wash. 2009) .........................................................................44, 49

*In re Sanitary & Improvement Dist., #7*,
98 B.R. 970 (Bankr. D. Neb. 1989) .........................................................................................42

*In re Town of Westlake, Tex.*,
211 B.R. 860 (Bankr. N.D. Tex. 1997) ...............................................................................passim

*Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa
Healthcare Dist.)*,
No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) ..............51

*United States Trust Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) ......................................................................................................................30

*United States v. Bekins*,
304 U.S. 27 (1938) ....................................................................................................................30

*In re Villages at Castle Rock Metro. Dist. No. 4*,
145 B.R. 76 (Bankr. D. Colo. 1990) ................................................................................36, 47

*Webster v. State of Mich.*,
No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) ....................................................6, 15

## STATUTES

11 U.S.C. § 101(32)(C) ..............................................................................................................51

11 U.S.C. § 101(32)(C)(i) ..........................................................................................................51

11 U.S.C. § 903(1) ...............................................................................................................29, 32

11 U.S.C. § 943(b)(4) ..................................................................................................................2

11 U.S.C. § 943(b)(4) ................................................................................................................41

Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice
Act, MCL § 141.1541, *et seq.* ...............................................................................................2

**RULES**

Rule 408.................................................................................................................. 18, 20

-v-

13-53846-tjt   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 18:42:36   Page 119 of
13-53846-swr   Doc 1221-8   Filed 10/27/13   Entered 10/27/13 16:56:35   Page 6 of 63
286
119

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**City**" or "**Debtor**") non-uniformed employees (the "**Retired AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME Employees**", or about seventy percent (70%) of the active non-uniformed union-represented employees, and together with the Retired AFSCME Employees, collectively, the "**AFSCME Detroit Employees**") -- through its counsel and in accordance with the Court's *First Order Establishing Dates and Deadlines* [Docket No. 280] (the "**Scheduling Order**") submits this **pretrial brief** (the "**Pretrial Brief**") regarding the upcoming trial on the City's eligibility for relief under chapter 9 of the Bankruptcy Code[1] and respectfully states as follows:

---

[1] AFSCME previously submitted extensive legal and factual arguments in *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees'* **_Amended_** *Objection to the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* [Docket No. 1156] (the "**AFSCME Eligibility Objection**"). The AFSCME Eligibility Objection was submitted in opposition to the City's (A) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Docket No. 10] (the "**Statement of Eligibility**"); (B) Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Docket No. 14] (the "**Eligibility Brief**"); (C) declarations of Kevyn D. Orr [Docket No. 11] (the "**Orr Declaration**"), Gaurav Malhotra [Docket No. 12] (the "**Malhotra Declaration**") and Charles M. Moore [Docket No. 13] (the "**Moore Declaration**"); (D) City of Detroit's Consolidated Reply to Objections to the Entry of an Order for Relief (the "**Debtor's Reply**") [Docket No. 765]; and (E) The State of Michigan's Response to Eligibility Objections Raising Only Legal Issues [Docket No. 756] (the "**State's Response**"), and in support of the AFSCME Eligibility Objection, AFSCME relied on the (a) Declaration of Steven Kreisberg [Docket No. 509] (the "**Kreisberg Declaration**"); (b) Supplemental Declaration of Steven Kreisberg [Docket No. 1162] (the "**Supp. Kreisberg Declaration**"); and (c) Declaration of Michael Artz [Docket No. 1159] (the "**Artz Declaration**").

Given AFSCME's extensive AFSCME Eligibility Objection, **AFSCME incorporates by reference as if fully set forth herein all facts presented (or otherwise incorporated therein) and arguments asserted in the AFSCME Eligibility Objection which will be presented at trial, and AFSCME further reserves the right to argue and rely upon all evidence and arguments presented to this Court in filed pleadings, oral argument, and at trial.**

**To the extent this Pretrial Brief addresses issues previously covered by other filings or oral argument, this Pretrial Brief is intended to supplement but in no way to limit any of those prior filings or arguments.**

## PRELIMINARY STATEMENT

1.      For all the reasons set forth in the AFSCME Eligibility Objection, and as will be demonstrated at trial and as further set forth herein, the City's petition for relief under chapter 9 of the Bankruptcy Code should be dismissed.  First, chapter 9 of the Bankruptcy Code violates federalism under the United States Constitution through an unholy alliance permitting federal encroachment on the states' governance rights over fiscal affairs in exchange for an unlawful extension of state powers in excess of those the state would otherwise possess under the law and which denies Michigan citizens their constitutional right to make the rules for their own bankruptcy.  Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq*. ("**PA 436**") and Governor Snyder's (the "**Governor**") purported authorization thereunder authorizing the Emergency Manager to file for chapter 9 protection runs afoul of the Michigan Constitution **as applied** in this chapter 9 case by not explicitly prohibiting the diminishment or impairment of vested pension rights in bankruptcy, which rights are prescribed in the Michigan Constitution, and further offends the Constitutional rights of individual Detroit citizens to local self-governance.  Third, the evidence presented in the AFSCME Eligibility Objection, additional evidence presented herein, and evidence to be adduced at trial collectively will demonstrate that the City has failed to establish that it engaged in good faith negotiations with the City's creditors or that these negotiations were impracticable under section 109(c) of the Bankruptcy Code, and indeed the entire chapter 9 petition was filed in bad faith.  Fourth, the City does not qualify for chapter 9 relief because it failed to establish that it is insolvent.  Finally, the Bankruptcy Court lacks authority or jurisdiction over matters related to the federal constitutionality of chapter 9 of the Bankruptcy Code or the state constitutionality of PA 436.

2.     The evidence discussed herein and further to be presented at trial will demonstrate that the City, led by its unelected, politically appointed Emergency Manager, Kevyn D. Orr ("**Orr**" or the "**EM**"), hastily commenced this unconstitutional, unlawfully authorized chapter 9 proceeding seeking the haven of bankruptcy to illegally attempt to slash pension and other post-employment benefit obligations and cram such reductions down the throats of current and former City employees such as the AFSCME Detroit Employees. These proceedings were commenced without **any** good faith negotiations with the City's retirees or unions such as AFSCME, and the chapter 9 filing was a *fait accompli* long prior to the appointment of Orr as the City's EM – in fact, at a time when Orr was still a partner at the City's lead bankruptcy counsel's law firm (the "**Law Firm**").

3.     While AFSCME expects that the City's witnesses will testify that chapter 9 bankruptcy was always the last option and the City preferred an out-of-court settlement, those are nothing more than talking points. In reality, the City's strategy of holding "check the box" meetings with creditors pre-petition at which the City purposefully refused to bargain in good faith was for the sole purpose of "making its record". Indeed, the City's eventual strategy (under the leadership of Orr) was first suggested by the Law Firm beginning with a "pitch" presentation made by the Law Firm to the City on January 29, 2013 (the "**Pitch Presentation**", a copy of which is attached to the Supp. Kreisberg Declaration, Exhibit B) in the presence of State of Michigan (the "**State**" or "**Michigan**") officials who wanted to steer the City towards chapter 9.

4.     Apparently, as discussed further below, the State officials at the January 29, 2013 pitch (including the Governor's Transformation Manager, Richard Baird ("**Baird**")) liked what they heard and decided that the Law Firm would be their firm of choice, with Orr and his

extensive bankruptcy experience being utilized as the EM to complement the Law Firm's legal ability to move the City swiftly into chapter 9. Thus, the day after the Pitch Presentation was given, on January 30, 2013, Baird reached out to The Law Firm about the potential of hiring Orr as the EM, and this led to discussions between the Governor, Baird, Orr, other State officials and the Law Firm, and the ultimate hiring of both Orr and the Law Firm to guide the City into chapter 9.

5.       As discussed extensively in the AFSCME Eligibility Objection and for the reasons further set forth herein, in light of recent Supreme Court precedent, chapter 9 of the Bankruptcy Code violates the United States Constitution and should be struck down by an Article III Court with authority and jurisdiction to make this crucial Constitutional law determination.

6.       However, to the extent this Court disagrees and determines that it has jurisdiction to uphold the Constitutionality of chapter 9 generally, this Court should find that the City is not eligible for relief under chapter 9 pursuant to sections 109(c) and 921(c) of the Bankruptcy Code.

## STATEMENT OF FACTS

7.       Orr currently serves as the EM of the City under PA 436.

8.       The Governor appointed Orr as EM for the City on March 14, 2013, effective as of March 25, 2013. On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

9.       On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." The same day, Orr publicly threatened, in an interview with the

Detroit Free Press Editorial Board,[2] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court. The EM stated as follows in the interview:

> Q        You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A.        The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law. Which the Ninth Circuit agrees with for now.
>
> ***
>
> A.        It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy." If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

    10.        As discussed below and as will be further established at trial, the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the letter on July 18, 2013 from the Governor to the EM authorizing the EM to have the City commence its chapter 9 case without any conditions or limits (the "**Governor's Authorization Letter**") of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

---

[2] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

**A.      The Webster Litigation And The Governor's Unconditional Authorization**

11.      On July 3, 2013, against the backdrop of the threatening statements made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City vested in her pension) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be  reduced.  *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[3]

12.      In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby;" that there could not be a more clear and plain constitutional mandate; and that Article IX,  Section 24 means what it says: accrued pension benefits shall not be reduced.

13.      Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can do anything to diminish or impair vested pension benefits:  "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the

---

[3] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

action of its officials or governing body." 2 Official Record, Constitutional Convention 1961, p. 3402.

14.     The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context. For example:

- Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."

- Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation and benefits of the chief administrative officer and members of the governing body of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."

- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

15.     But, in violation of Article IX, Section 24 of the Michigan Constitution, PA 436 fails to similarly forbid the Governor explicitly from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be sought to be diminished or impaired as a consequence of that filing. Section 18 of PA 436, which purportedly empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be sought to be diminished or impaired. Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy. Just as clearly, the Legislature omitted any constitutional protection against the impairment or

-7-

13-53846-swr   Doc 12227   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 13 of 63
13-53846-swr   Doc 282-8   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 126 of 286

126

diminishment of accrued pension benefits when the Governor purports to authorize a chapter 9 bankruptcy filing under Section 18 of PA 436.

16.     In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, the section of PA 436 purporting to authorize this bankruptcy, Section 18, must be unconstitutional as applied.

17.     On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", attached to the Kreisberg Declaration, Exhibit A) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).

18.     Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings."  Indeed, the Governor authorized and the EM directed the chapter 9 filing just minutes before the July 18, 2013 TRO hearing was set to begin (and during a brief delay in the TRO hearing requested by the Governor's attorney) in order to potentially "cut off" any argument that the filing was not properly authorized (because the Governor knew and the EM expected that the State Court Judge was prepared to grant the TRO).

19.     On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**,"

attached to the Kreisberg Declaration as Exhibit B). The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the chapter 9 petition … and … not authorize any further chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.

20. To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits. However, subsequent to the issuance of the Declaratory Judgment, on July 25, 2013, this Court granted the City's motion to extend the automatic stay, which, *inter alia*, stayed pending appeals of the Declaratory Judgment (and other similar state court proceedings). *See* Docket No. 166.

> (i) **The Governor (And Other State Officials) And City Intended Through The Chapter 9 Filing To Impair And/Or Terminate Vested Pension Benefits, And The Governor Was Aware Of This Prior To His Authorizing The Chapter 9 Filing**

21. The evidence obtained to date (and as will be further demonstrated at trial) reveals that the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the Governor's Authorization Letter of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

22. First, the June 14 Restructuring Plan (defined below) expressly provided that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons", and the Governor has admitted in deposition testimony to (i) having viewed drafts of the June 14 Restructuring Plan; (ii) being specifically aware that the Restructuring

Plan provided for significant cuts to accrued, vested pensions for active and retired employees; and (iii) being specifically aware when he signed the July 18 letter authorizing the City's chapter 9 filing that Orr's position was "that there had to be significant cuts in accrued pension benefits." *See* Governor Snyder October 9, 2013 Transcript (the "**Governor 10/9 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit A),[4] at 46:3-23; 63:9-64:18. Furthermore, in a letter dated July 16, 2013 from Orr to the Governor (and Treasurer Andy Dillon) recommending that the City be authorized to immediately commence a chapter 9 bankruptcy case, Orr noted that the City met with all of the City's unions and four retiree associations to "solicit the unions and retirees' view on their preferred way to address the **dramatic, but necessary, benefit modifications**." *See* Orr Declaration, Exhibit J, p. 8 (emphasis added). The Governor admitted to reading this letter. *See* Governor 10/9 Transcript, at 52:13-15.

23. Additionally, the City has unequivocally admitted that it intends to impair or diminish vested pension benefits of City active and retired employees through this chapter 9 proceeding. *See*, *e.g., City of Detroit, Michigan's Objections and Responses to Detroit Retirement Systems' First Requests for Admission Directed to the City of Detroit Michigan* [Docket No. 849], at p. 12 (admitting that "City intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems through this Chapter 9 Case."); *see also* Kevyn Orr September 16, 2013 Transcript (the "**Orr 9/16 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit B), at 252:25-253:16; 288:2-9

---

[4] Throughout this Objection, AFSCME has cited deposition testimony provided by various witnesses in connection with the City's chapter 9 eligibility litigation. AFSCME relies on the relevant portions of these various depositions as evidence, and has attached copies of the full deposition transcripts from the depositions of Governor Snyder, Kevyn Orr, Charles Moore, and Guarav Malhotra to the Artz Declaration filed in connection with the AFSCME Eligibility Objection. Additionally, AFSCME relies herein on the deposition transcripts of (i) Richard Baird (the "**Baird 10/10 Transcript**"), (ii) Andrew Dillon (the "**Dillon 10/10 Transcript**"), and (iii) Mayor David Bing (rough transcript only, the "**Bing 10/14 Transcript**"), copies of which are attached as Exhibits to the **Supplemental Declaration of Michael Artz** filed in connection with this Pretrial Brief.

(admitting that City intended to diminish or impair accrued pension benefits of Detroit pensioners, preferably through a consensual plan but preserving all rights to do so possibly through the use of the cramdown provisions of the bankruptcy code).

**B.     The Facts In The Record And To Be Further Adduced At Trial Demonstrate Why PA 436, As Applied To The Facts And Circumstance Here, Violates The Strong Home Rule Provisions Of The Michigan Constitution**

24.     PA 436 effectively, but unconstitutionally, adopts a new charter for Detroit which substitutes the unelected Emergency Manager for the Mayor and City Council collectively – including by granting the EM the power to, *inter alia*, issue orders directing the mayor and city council; set the local government budget unilaterally; enter into, and break, contractual agreements for the City, including CBAs, loans, and property transfers; seize control of the pension fund from its trustees; and, most relevant here, act exclusively on the local government's behalf in chapter 9.

25.     Here, the evidence shows (as will be further adduced at trial) that the EM (and the City's agents directed by the EM) has exercised a variety of purely local governmental powers – despite being a "contractor to the State of Michigan", as the EM has described himself (*See* Orr 10/4 Transcript, at 454:10-14) – ranging from his explicit suspension of the City Charter, to discrete financial decisions about purely local City expenditures, to control over potential attempts by the City to raise revenue.  For example: (i) Order No. 10, issued by the EM on July 8, 2013, suspends the Detroit Charter's requirement for filling vacancies on City Council.  *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%2010.pdf (last accessed Oct. 7, 2013); (ii)  Order No. 6, issued by the EM on May 2, 2013, directs the precise amount of deposits from the City to the Public Lighting Authority.  *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%206.pdf (last accessed Oct. 7, 2013); and

-11-
13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 16:50:36   Page 130 of
286
13-53846-swr   Doc 1223   Filed 10/17/13   Entered 10/17/13 13:42:26   Page 17 of 63   130

(iii) Order No. 5, issued by the EM April 11, 2013, requires that the EM approve in writing of any transfers of the City's real property. http://www.detroitmi.gov/Portals/0/docs/EM/Order%205.pdf (last accessed Oct. 7, 2013).

26. Furthermore, Mayor Bing has testified extensively that following the appointment of the EM, (i) the Mayor was no longer involved in discussions with unions or coalitions of unions because "that was under the purview of the Emergency Manager"; (ii) the EM (and the consultants retained by the EM) were involved in City's budgeting functions to the exclusion of the Mayor; and (iii) among other concerns, the EM and the City's consultants (like Conway MacKenzie) were exploring outsourcing and reaching conclusions with regard to numbers prior to completing the RFP process first. *See* Bing 10/14 Transcript, at 106:11-108:9.

27. In addition to undertaking the aforementioned purely local acts, which are reserved by Article VII of the Michigan Constitution to the local electors rather than the state which appointed and controls the EM, the EM has continued to exert complete control over all aspects of the City's local affairs during the instant bankruptcy proceedings. This includes the EM's unilateral direction of the bankruptcy process itself, which he has controlled without being subject to any state-law standard of review for his discretion or judicial review thereof.

28. The EM's actions in removing control over the City's operations and finances from elected officials has prevented the City from taking actions designed to raise revenue and avoid insolvency and instead has facilitated the EM's attempt to will the City into insolvency, as discussed below (and to be further supported by facts adduced at trial), thus rendering this entire bankruptcy proceeding a harm stemming from the unconstitutionality of PA 436's grant of authority to the EM (and the consultants controlled by the EM, including Ernst & Young and Conway MacKenzie) of the means of controlling all aspects of the City's finances.

## C. The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME

### (i) The City's Bankruptcy Was Orchestrated Based On The Advice Of The City's Lead Bankruptcy Counsel And Discussed Before The EM Was Even Hired

29. As demonstrated herein and will be further shown at trial, in emails, documents and deposition testimony that surfaced following the City's chapter 9 filing going back to late January 2013, long prior to any alleged good faith negotiations with creditors (more about this point below), secret discussions were being held between Detroit and officials in the Governor's office and the Law Firm suggesting that the best course for the City would be to send it through chapter 9 bankruptcy. These facts collectively expose Orr's and the City's charade of pre-petition "negotiations" (in reality, one-sided meetings) in the month prior to the City's chapter 9 filing. In fact, all along, the clear goal was for the City to end up in chapter 9.

30. For example, the Law Firm was among a number of firms to provide a presentation made to the City on January 29, 2013 in the presence of State officials. *See* Pitch Presentation (dated January 29, 2013); *see also* Orr 9/16 Transcript, at 18:12-21:20 (discussing how Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors"); Baird 10/10 Transcript, at 13:11-15:10. During that pitch, Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney." Orr 9/16 Transcript, at 21:3-6; *see also* Bing 10/14 Transcript, at 12:7-13:7 (indicating that Baird explained to Mayor Bing that Baird was "impressed with him [Orr], that he had been part of the bankruptcy team representing Chrysler" and that Orr primarily had restructuring experience in the context of bankruptcy).

31.     As part of the Pitch Presentation, the Law Firm presented, in part, the following playbook for the City's road to chapter 9:  (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations (Pitch Presentation, pp. 13; 16-18; 22-23; 28); (ii) the EM could be used as "political cover" for difficult decisions such as an ultimate chapter 9 filing (Pitch Presentation, p. 16); (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City *against* raising money in order to will itself into insolvency (Pitch Presentation, p. 17); and (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan constitution (Pitch Presentation, pp. 39; 41).

32.     Following the Law Firm's pitch in late January 2013, State officials (including Baird) informed attorneys at the Law Firm and Orr that they were interested in bringing Orr on board as EM, and Orr began to consider the offer.  *See* Orr 9/16 Transcript, at 24:24-25:31:5; Baird 10/10 Transcript, at 19:2-20.  Orr commented regarding his proposed consideration for appointment as EM and discussed with his law firm at the time how to go about leading the City into chapter 9.  In an email (attached to the Kreisberg Declaration, Exhibit 1) dated January 31, 2013, Orr's colleague at the firm stated in an email to Orr that the "ideal scenario would be that [Michigan Governor] Snyder and [Detroit Mayor] Bing both agree that the best option is simply to go through an orderly Chapter 9.  This avoids an unnecessary political fight over the scope/authority of any appointed Emergency Manager appointed and, moreover, moves the ball forward on setting Detroit on the right track."   Kreisberg Declaration, Exhibit

1.[5]  Indeed, this was a similar suggestion made by the Law Firm in the Pitch Presentation. *See* Pitch Presentation, p. 16 ("Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.").

33.     Orr's colleague then stated his own reservations about whether an emergency manager would be useful outside of bankruptcy where his "ability to actually do anything is questionable given the looming political and legal fights" *Id*.  In contrast, he observed in an earlier email, "[m]aking this a national issue . . . provides political cover for the state politicians" and gives them an "incentive to do this right" because "if it succeeds, there will be more than enough patronage to allow [them] to look for higher callings—whether Cabinet, Senate, or Corporate." *See* Kreisberg Declaration, Exhibit 2.[6]

34.     As noted above, others involved in the discussions prior to the chapter 9 filing included Baird, the Governor's Transformation Manager.  In an email also dated January 31, 2013, Orr, in anticipation of a conversation he was to meet with Baird "in a few minutes" about whether to accept the EM position, observed that PA 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." *See* Kreisberg Declaration, Exhibit 3.[7]  According to Orr "although the new law provides the thin veneer of a revision it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing." *Id.*

---

[5]*See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

[6] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails  (last visited on August 19, 2013).

[7] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

35.      In a further email dated January 31, 2013, Orr indicated that Baird wanted Orr to be hired as the EM and his firm to represent the City (regardless of whether Orr took the EM job), and that Orr indicated that he would be glad to work together with the City, even if not as EM, indicating that "I [Orr] and the firm are committed to working in lockstep with the [C]ity." *See* Kreisberg Declaration, Exhibit 4.[8]

> **(ii)     No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing**

36.      As indicated above, the die was cast for the City's inevitable chapter 9 filing prior to the March appointment of Orr as EM.  Following Orr's appointment, the City and Orr maneuvered to establish the veneer of formal pre-petition creditor negotiations, when in reality, Orr and the Governor knew all along that the non-interactive meetings would be held on a *pro forma* basis so the City could attempt to establish alleged good faith negotiations.

37.      The facts belie the notion of any pre-filing negotiations, whether in good faith or otherwise.  Indeed, the City itself admitted both in letters and at the meetings held in the month or so prior to the filing that the City was only interested in one-way discussions, not negotiations.  As discussed below, **evidence obtained in discovery reveals (as will be further established at trial) that while these meetings were ongoing – indeed, before ever meeting face-to-face with union representatives alone – the City had already made a determination as early as the beginning of July 2013 that it would be filing for chapter 9 protection on or about July 19, 2013**.

38.      On June 14, 2013, the City held a meeting of representatives of the City's creditors (the "**June 14 Meeting**") to present the City's comprehensive restructuring plan/

---

[8] See also Kate Long, *Who is representing Detroit?*   http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ (last visited on August 19, 2013).

-16-

13-53846-swr   Doc-2325-8   Filed 01/27/13   Entered 01/27/13 13:42:36   Page 135 of 135
13-53846-swr   Doc-12227   Filed 10/17/13   Entered 10/17/13 16:30:36   Page 22 of 63
286

"Proposal for Creditors" (the **Restructuring Plan**", attached to the Kreisberg Declaration as Exhibit C). Even prior to these meetings, Orr confirmed that the City's discussions of a predecessor to its ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", would not involve any negotiations, explaining that "it is under the [PA 436] statute, it is my plan and it's within my discretion and obligation to do it. **This isn't a plebiscite, we are not, like, negotiating the terms of the plan**. It's what I'm obligated to do." *See* Kevyn Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, May 12, 2013, *available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/ (emphasis added).

39.     On June 17, 2013, Steven Kreisberg, AFSCME's director of collective bargaining and health care policy, submitted a letter requesting from the EM various categories of information, assumptions, and data for AFSCME to honestly review all the information presented and begin good faith negotiations. *See* Kreisberg Declaration, Exhibit 5. AFSCME made this request prior to a scheduled June 20, 2013 meeting with unions (including AFSCME) representing the City's non-uniform employees regarding the City's pensions. At that meeting, the City represented that the meeting was "not a negotiation." *See* Kreisberg Declaration, ¶ 17. Furthermore, the letter inviting AFSCME to the June 20 meeting characterized the purpose of the meeting as being to "review" the Restructuring Plan (not negotiate it) and to have AFSCME "learn" about the Restructuring Plan. Kreisberg Declaration, Exhibit 6.

40.     In a letter dated June 27, 2013 to an AFSCME local union, the City indicated that it was posting certain information to a data room and was looking forward to the unions'

-17-
13-53846-swr   Doc 2325-8   Filed 10/27/13   Entered 10/27/13 13:42:36   Page 136 of
286
13-53846-swr   Doc 1227   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 23 of 63    136

"feedback" (again not negotiation) with respect to the EM's retiree benefits restructuring proposal. *See* Kreisberg Declaration, Exhibit 7.

41. In a follow up letter to the City dated July 2, 2013, Mr. Kreisberg again reiterated his request for information and data, including the backup data supporting the City retiree benefits proposal (support for which previously consisted of only a one-page financial summary). AFSCME requested relevant information and the opportunity (in conjunction with a meeting scheduled with the City's unions on July 10-11) to begin meaningfully engaging "in a good faith negotiation of these issues." *See* Kreisberg Declaration, Exhibit 8.

42. In a response letter to Mr. Kreisberg on July 3, 2013, the City advised that it would not meet separately with AFSCME, and that the July 10, 2013 scheduled meeting with the unions would be a "discussion" (again not a negotiation). *See* Kreisberg Declaration, Exhibit 9. Similarly, in an email dated June 28, 2013, the City confirmed that it wanted to meet on July 10, 2013 to "discuss" its "developing pension restructuring proposal," clearly implying that the proposal itself was not even complete yet. *See* Kreisberg Declaration, Exhibit 10. Additionally, and tellingly, at that July 10, 2013 meeting, counsel for the City attempted to invoke Rule 408 confidentiality provisions stating that doing so was a tool used in every bankruptcy, so it should be invoked that day. *See* Supp. Kreisberg Declaration, ¶ 7. This statement made more than a week before bankruptcy was authorized or filed further demonstrating that the City intended to file for bankruptcy in any event.

43. At the July 10, 2013 meeting, the City announced at the inception that the meeting would be a discussion but not a negotiation. *See* Kreisberg Declaration, ¶ 18. At a similar meeting with AFSCME and certain and other unions held on July 11, 2013, again there was no negotiation.

44.     Despite this evidence, it appears that the City now seeks to characterize its limited requests to creditors for feedback – but admitted refusal to bargain with them – on the Restructuring Plan at the four meetings held regarding that plan as satisfying chapter 9's good faith negotiation requirement.  Yet, in the City's reply brief regarding eligibility and recent deposition testimony by Orr, the City and Orr have explicitly denied that the City's discussions with creditors were negotiations.  *See* Debtor's Reply, at p. 55 n.49; Orr 9/16 Transcript, at 137:25-138:8 ("Q.  And was there any bargaining that took place at those sessions [on June 20th, July 10th, and July 11th] where the City said it would be willing to agree to something that was different from what was in June 14?  A.  Here again, I'm going to stay away from bargaining as a legal conclusion, duty to bargain is suspended.  I will say there was a back and forth and my understanding discussions and invitations for further information.").

45.     Furthermore, and critically, Orr recently testified that media reports prior to the City's chapter 9 filing that the City was planning on filing on July 19, 2013 were inaccurate.  Orr 9/16 Transcript, at 301:19-302:8 (indicating that there was no plan for the City to file on July 19, 2013 and that Orr's plan was "to have the permission, the authority, to file them and make that call at some point after I transmitted my letter of July 16 [requesting authorization from the Governor to file for chapter 9].").  Yet, evidence produced in discovery includes an Excel/spreadsheet document attached to e-mails circulated (i) to and from Bill Nowling (who works in the EM's office) sent to individuals in the Governor's office, entitled "Chapter 9 Communications Rollout" which makes clear that during the same time period that the City was purporting to conduct ongoing "good faith negotiations" with creditors regarding the Restructuring Plan, **in fact the City was, as early as July 1, 2013 planning on filing for chapter 9 on Friday, July 19, 2013**.  *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet

document dated July 4, 2013 attached to e-mail from EM's office to State officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY").

46.    Additionally, Treasurer Dillon, one of the state officials intimately involved in the hiring of the EM and in advising to the Governor to authorize the chapter 9 filing, testified that his understanding of the June 14 Restructuring Plan was that the document was not really a proposal (even though it was so labeled), rather the EM was just "laying out the facts for creditors so they could understand the financial condition of [the] City. . . This is the economic reality of the City of Detroit. From there, as you know, there was various meetings with various creditors to discuss can we get this thing settled out of court." Dillon 10/10 Transcript, at 65:4-24.

(iii)    **The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing**

47.    The City's pattern of bad faith refusal to negotiate any of its proposals regarding pensions or health insurance benefits changes has continued post-petition.

48.    For example, on August 2, 2013, the City convened a meeting of local union representatives and discussed active health insurance. *See* Kreisberg Declaration, ¶ 19. However, during that meeting, the City specifically advised those in attendance (including AFSCME representatives) that the meeting was not a negotiation. *Id* at ¶ 20. Mr. Kreisberg sent a follow up letter to the City on August 6, 2013 requesting good faith bargaining, and referenced cost savings estimates which AFSCME previously proposed in prior negotiations with the City before the development of the Emergency Manager's initial financial restructuring plan in May. *See* Kreisberg Declaration, Exhibit 11. In an August 8, 2013 response, the City advised that it would not engage in collective bargaining with AFSCME, but

-20-
13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 26 of 63
13-53846-swr   Doc 1227   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 139 of
286
139

rather simply "discuss any feedback they may have regarding its health care restructuring plans." *See* Kreisberg Declaration, Exhibit 12.

49. On August 14, 2013, the City held a follow up meeting with AFSCME on the subject of active medical benefits but did not accept any counterproposals or suggestions, but simply responded by further explaining its current intention with respect to active medical benefits.

50. Given Orr's repeated statements to the media about the City's willingness to bargain with its unions, AFSCME has been surprised by the City's unwillingness to negotiate, pre or post-petition. While AFSCME has repeatedly stated its desire to move forward with constructive negotiations with the City on behalf of all AFSCME Detroit Employees, AFSCME cannot negotiate with an employer that is unwilling to come to the table for arms-length talks.

### (iv) The City Has Previously Negotiated Labor Concessions With Unions That Modified Both Active And Retiree Benefits

51. The City argues, in part, that negotiations with its retirees were impractical or impossible as the City could not bind the disparate group of retirees in any agreement. However, the City should be well aware (and indeed its advisors have admitted) that in February 2012, City labor negotiators reached a tentative agreement (the "**Tentative Agreement**") with a "Coalition of City of Detroit Unions", including several AFSCME local bargaining units. *See* Supp. Kreisberg Declaration, ¶ 4, Exhibit A (attaching copy of the Tentative Agreement). Pursuant to deposition testimony given by Gaurav Malhotra of Ernst & Young ("**E&Y**") on September 20, 2013 (one of the City's restructuring advisors), E&Y was actively involved "in assisting quantify some of the savings in conjunction and collaboration ·with the City as the City negotiated with the – its unions [regarding the Tentative Agreement]." *See* Gaurav Malhotra September 20, 2013 Transcript (the "**Malhotra 9/20**

**Transcript**", a copy of which is attached to the Artz Declaration, Exhibit C), at 86:20-23. Mayor Bing also testified that he was well aware of the Tentative Agreement ratified by the unions and that would have resulted in savings for the City, but such agreement was ultimately never implemented by the State. *See* Bing 10/14 Transcript, at 100:15-101:13

52.     While the Tentative Agreement was never implemented, changes with respect to benefits in the proposed Tentative Agreement would have directly impacted retiree benefits, and indeed, based on projections at the time, AFSCME understands that the Tentative Agreement could have saved the City approximately $50 million annually, a number which included retiree health benefit changes. *See* Supp. Kreisberg Declaration, ¶¶ 5-6.

53.     Despite this evidence, Orr has testified that he was unaware of the Tentative Agreement (and, thus implicitly, unaware of the City's prior success at bargaining in good faith with the City's unions, which led to changes to both active and retired employees' benefits):

```
15  Q.  Are you aware of a coalition among certain of the
16      City's unions put together in order to try and deal
17      with some of the restructuring issues with regard to
18      labor that you've been focused on?
19  A.  A coalition?  Can you please explain?  Informal
20      coalition or the retiree committee or --
21  Q.  Not the retire committee.  A coalition of unions with
22      regard to trying to deal with some of the labor issues
23      that you --
24  A.  Under the AFSCME umbrella?
25  Q.  No, no, no.
```

Page 237

```
1  A.  Or separate union?  I'm trying to -- I'm trying to
2      understand.
3  Q.  Well, I think your answer indicates to me that perhaps
4      the answer is no.
5  A.  Yeah.  Okay.
```

Orr 9/16 Transcript, at 237:15-237:5. Given that Orr himself was unaware of the City's ability to negotiate deals affecting both active employees and retirees outside of bankruptcy, the City's assertion that negotiations regarding changes to retiree and pension benefits were "impracticable (if not impossible)" is misguided. Orr could not possibly have attempted to negotiate in good faith if he had not done even the most preliminary investigation as to whether Detroit's several unions had ever negotiated with the city collectively in the past, indeed the very recent past.

      **D.     The City Has Failed to Establish It Is Insolvent, And The City's Chapter 9 Case Was Not Commenced Due to Any Imminent Financial Emergency, Rather To Avoid The Webster Litigation (And Other State Court Proceedings)**

      54.     The City at first glance seems to provide thick volumes which it calls evidence regarding its alleged insolvency. *See, e.g.,* Orr Declaration, ¶¶ 52-57; Malhotra Declaration, ¶¶ 10-26; Moore Declaration, ¶¶ 9-20. However, as demonstrated below (and will be further shown at trial), what becomes apparent from reviewing these declarations (which serve as the basis for the City's insolvency arguments) is that (i) each often cross-relies (as purported evidence as to the truth of particular statements) on other (non-expert) testimony, other documents prepared by the City, or other assumptions/evidence convenient to the City but without any real foundation. *See, e.g.*, Orr Declaration, ¶¶ 52-57 (citing, in part, the June 14 Restructuring Plan and Malhotra Declaration as evidence); Moore Declaration, ¶¶ 13-14 (estimating pension underfunding using what the "City" believes are more realistic assumption)); Malhotra Declaration, ¶¶ 11; 15; 21-22 (discussing manner in which City's financial forecasts and projections were prepared based on certain complex assumptions, calculations and input from other City officials). Furthermore, the City offers no expert witness to testify regarding the City's asserted insolvency despite the City having spent millions of

dollars and having gone out and hired a multitude of legal, financial, actuarial and restructuring advisors.  Ultimately, the fact remains that **despite the pile of "evidence" submitted by the City, the City does not have a single witness who can stand up as an expert and testify as to the City's insolvency**.

55.     Furthermore, the City misleadingly cited its insolvency as what drove its chapter 9 filing, not the imminent state court rulings in the Webster Litigation and other state court proceeding, futher casting doubt on the reality of its conclusion that it is insolvent.  *See, e.g.,* Debtor's Reply, at pp. 65-66.  Yet, in reality (and as will be further demonstrated at trial), the discovery process has revealed several interesting facts that cut against insolvency as the true basis for the filing (*see* Debtor's Reply, at p. 65-66), and indeed Orr's recent testimony indicates that insolvency was not the driving factor behind the filing on July 18, 2013, rather the filing at that time was driven by the state court litigations.  Orr testified:

> 19    When did you decide that the timing of the
> 20        Chapter 9 filing should be July 18th or July 19th?
> 21  A.   Well, I didn't.  I decided to make the request and my
> 22        intent was to have the ability to file available and
> 23        possibly executed as soon as I got it.  It was without
> 24        talking or waiving privileges from my counsel or
> 25        counsel and investment bankers, the concerns about us
>
> Page 221
>
> 1        losing control or being put in a situation because of
> 2        the ongoing litigation where I would not be able to
> 3        discharge my duties in an orderly fashion, in a
> 4        comprehensive matter to put the city on a sustainable
> 5        footing because of the litigation grew . . .
> 6        and it was made clear to me that **my desire to try to**
> 7        **continue to engage in discussions was running the risk**
> 8        **of putting my obligations under the statute in peril**
> 9        **and I think I was even counseled that I was being**
> 10        **irresponsible**.

Orr 9/16 Transcript, at 220:19-221:6-10.

56.     In addition, the City's evidence regarding insolvency is built upon unproven assertions regarding, *inter alia*, the alleged unfunded amount of the City's pension and other retiree benefits.  Indeed, in the June 14 Restructuring Plan discussing the actuarial accounting underfunding on the City's pension plans, the City suggested that such underfunding using more "realistic assumptions" would be approximately $3.5 billion, up from the $644 million from the City's 2011 reported underfunding.  Restructuring Plan, pp. 23, 109 (noting that "preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion); *see also* Orr Letter Dated July 16, 2013 to Governor Snyder and Treasurer Dillon (copy attached as Exhibit J to Eligibility Brief (recommending chapter 9 filing and discussing $3.5 billion in underfunding of pension liabilities)).

57.     However, these allegedly "realistic assumptions" were directly dictated by the City to their actuarial advisor, Milliman, Inc. For example, Charles Moore of Conway MacKenzie admitted in his deposition that the City really had no idea what the underfunded portion of the pension obligations might be (as of September 18, 2013) because "until the City completes its analysis [which is had not yet done] and completes its own actuarial valuation, neither the City nor its actuary [Milliman] nor I would be able to say what all the assumptions are that could be used to either overstate or understate the funded position [of the pensions]." *See* Charles Moore September 18, 2013 Transcript (the "**Moore 9/18 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit D), at 62:2-7; *see also* Moore 9/18 Transcript, at 63:10-12 (indicating that 7 percent rate of return figure used by Milliman in running certain calculations regarding pension underfunding "was used for illustrative purposes" only and was not recommended by any specific actuary).  Furthermore, in an e-mail dated July 9, 2013 from Treasurer Dillon to the Governor and others regarding a meeting Orr

-25-

13-53846-swr   Doc 22278   Filed 10/27/13   Entered 10/27/13 13:42:36   Page 144 of
286

13-53846-swr   Doc 2227   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 31 of 63          144

would be having with the Detroit retirement systems on July 10, 2013, Treasurer Dillon indicated that "[b]ecause pensions have such a long life there are a lot of creative options we can explore to address how they [the pensions] will be treated in a restructuring." *See* Supp. Kreisberg Declaration, Exhibit D.  Dillon further testified that from the period July 9, 2013 through the City's filing date, the City remained in the "informational stage" regarding the pension issue and what the underfunding status meant for retirees.  Dillon 10/10 Transcript, 119:1-25.  Dillon explained as follows:

```
 1 Q. The last question is relating to Exhibit 5 which has
 2 already been marked. It's the July 9th email.
 3 The email states "Tomorrow's meeting could
 4 lead to questions directed to you about your view on
 5 this topic." It's relating to the pension issue.
 6 Is that a fair characterization of the
 7 email?
 8 A. Right.
 9 Q. "In my view, it's too early in the process to
10 respond to hypothetical questions. We remain in
11 many ways in the informational stage. I have some
12 thoughts as to how you could address some pointed
13 questions if you're interesting in hearing them."
14 What pointed questions were you expecting?
15 A. Anything from -- well, going back in time here, but
16 just obviously the whole gamut of questions
17 regarding what the underfunding status could mean to
18 retirees, and I thought that the situation was not
19 understood enough for the Governor to go on record
20 yet because I couldn't even tell him with any degree
21 of confidence what level of funding these pension
22 funds had, so why should he get in the middle of a
23 debate about this. It's obviously a very charged
24 and sensitive issue, and it was my free political
25 comments to him.

       Page 120

 Q. And this was really just over a week before the
2 filing. That was your stance?
3 A. Yeah. I don't -- yeah, obviously. But I don't -- I
4 think it was in the context of this meeting that
```

5 Kevyn was going to have with the committee that
6 drove this email.
7 Q. Did anything change between the ninth and the filing
8 on the 18th that changed your opinion regarding what
9 you, I believe, just stated was too early to tell
10 him with any degree of confidence what level of
11 funding the pension funds had I believe is what you
12 just stated.
13 A. Yeah, I have not -- my opinion is pretty much the
14 same.
15 Q. The last sentence of the email says "I have some
16 thoughts as to how you could address some pointed
17 questions if you're interesting in hearing them."
18 What were your ideas for how to answer the
19 questions?
20 A. I don't recall specifically at this point.
21 Q. Did you ever have a conversation with him regarding
22 your thoughts on how to answer the questions?
23 A. No.
24 Q. You mentioned in the email "Because pensions have
25 such a long life there are a lot of creative options

       Page 121

1 we can explore to address how they will be treated
2 in restructuring."
3 What were your creative options that you
4 had on the table?
5 A. There's dozens. I mean, I don't have one that I
6 would pick out. But pension funds do have a long
7 life and there's a lot of creative things that can
8 be done, so I -- I don't have one or two that I
9 would just throw out, but I do know that there's a
10 lot of ways to address that issue.
**11 Q. Have there been any formal reports or proposals**
**12 identifying and explaining what you consider to be**
**13 these creative options?**
**14 A. No.**
**15 Q. Were these creative options ever explored with the**
**16 pension systems directly --**
**17 A. Not to my knowledge.**

Dillon 10/10 Transcript, 119:1-121:17 (emphasis added).

-27-
13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 34 of 63
13-53846-swr   Doc 12227   Filed 10/17/13   Entered 10/17/13 16:50:30   Page 33 of 63
286
146

58.     In fact, experts who reviewed the actuarial assumptions of Detroit's pension systems concludes that the current assumptions generally fall within industry standards. *See, e.g.*, *Detroit's Current Pension Assumptions Fall Within Standards: Morningstar*, *available at* http://www.mandatepipeline.com/news/detroits-current-pension-assumptions-fall-within-standards-morningstar-242817-1.html (last visited October 8, 2013).

59.     Furthermore, as discussed above, the Law Firm highlighted at the January 29, 2013 pitch that "Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash)" (Pitch Presentation, p. 17), and the City accordingly chose not to monetize certain assets prior to the filing to limit the appearance of short-term cash on the books.  This is evidenced, in part, by the (i) recent announcement by the EM of the deal to lease Belle Isle to the Governor and (ii) Orr's strong hints that he is considering monetizing artwork at the Detroit Institute of Arts.[9]

60.     Additionally, the City's financial projections which serve, in part, as the City's basis for establishing insolvency (which themselves were built on various assumptions not established by any **expert** testimony) fail to consider the possibility of possible funding sources outside those included in the City's financial projections.  For example, Malhotra testified that the City's financial projections assume that the City will have no other funds beyond the City's general fund and that the water and sewer fund was not incorporated into the City's projections. *See* Malhotra 9/20 Transcript, at 44:21-45:17.  Yet, Orr testified that with respect to the pension underfunding (which is cited throughout the City's Eligibility Brief and included as one of the major factors in the City's insolvency in numerous documents and pleadings), of the estimated

---

[9] *See State Signs Deal To Lease Belle Isle*, *available at* http://detroit.cbslocal.com/2013/10/01/reports-state-signs-deal-to-lease-belle-isle/ (last visited October 8, 2013); *Orr tells DIA to earn money from its treasures; long-term leases of artworks next?*, *available at* http://www.freep.com/article/20131003/NEWS01/310030115/Kevyn-Orr-Economic-Club-Detroit (last visited October 8, 2013).

-28-

13-53846-swr   Doc 12278   Filed 10/27/13   Entered 10/27/13 13:42:36   Page 34 of 63
13-53846-swr   Doc 11278   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 147 of
286

147

$644 million in underfunding (based on the pensions funds' 2012 calculations), the majority of that underfunding is attributable to the water and sewer fund which generates its own revenue and which "does have some capacity" to raise rates to generate more funds.  *See* Kevyn Orr October 4, 2013 Transcript (the "**Orr 10/4 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit E), at 377:1-380:13.

61.     Finally, it bears noting that on July 16, 2013, the City reached a deal with its swap counterparties, which provided for such parties to (i) forbear from pursuing remedies and (ii) allowed the City to redeem the swaps until October 31, 2013 which would result in the City saving between $70 and $85 million.  *See* Supp. Kreisberg Declaration, Exhibit E (e-mail from Ken Buckfire dated July 17, 2013).  Given these immediate savings and other possible avenues (noted above) for the City avoiding bankruptcy, it is clear that the City's filing had very little to do with any purported insolvency and everything to do with the City's plan to impair or modify its pension obligations.

## ARGUMENT

## I.     THE CITY'S PETITION VIOLATES THE UNITED STATES CONSTITUTION

62.     AFSCME notes for the Court's consideration at trial that under principles of constitutional avoidance, the Court should only consider AFSCME's constitutional challenge if the Court determines that the City is otherwise eligible for chapter 9.  Thus, the constitutional challenge is only relevant if the City has proven, among other things, that it is insolvent. Without conceding that AFSCME is insolvent, should the Court reach such a determination, the Court would then necessarily have to consider and rule on AFSCME's argument that for a truly insolvent municipality, chapter 9 –  specifically including the prohibition at 11 U.S.C. § 903(1) of state municipal debt adjustment statutes requiring less than 100% creditor consent, such as

-29-

13-53846-swr   Doc-2325-8   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 35 of 63
13-53846-swr   Doc 12227   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 148 of
286

that approved in *Asbury Park*[10] – represents an unconstitutional Hobson's choice that forces the state (and municipality) into a situation where the state essentially must allow for federal interference to achieve the necessary debt adjustments. Moreover, the mere possibility of a state statute which can be used to adjust debts consistent with the Contracts Clause obviates the perceived need for a federal municipal bankruptcy statute which formed the underpinning of the Court's decision in *Bekins*.[11]

63. The Constitution does not simply disappear once a bankruptcy petition is filed, even for holders of unsecured claims. *See, e.g., City of New York v. New York, N. H. & H. R. Co.,* 344 U.S. 293 (1953) (unsecured creditors possess right to notice and hearing under Fifth Amendment before debts can be discharged). So too with the Contracts Clause found at Article I, Section 10 of the U.S. Constitution. Article I, Section 10 contains three clauses, the last two of which permit Congress to consent to a number of otherwise-unconstitutional state acts, for example the right to "enter into any Agreement or Compact with another State," an example of which was the contract at issue in *United States Trust.*[12] The Contracts Clause, however, is found in the first clause of Section 10, which grants Congress no right to consent to a violation thereof. Thus, assuming *arguendo* that the City is correct that the intent of chapter 9 and PA 436 are both to skirt the constraints of the Contracts Clause by means of Congressional consent, Congress lacks the authority under Article I to grant that consent, and the Contracts Clause further prevents the State from passing a law like PA 436 intending to end-run the Contracts Clause. The result would be equally unconstitutional, and absurd, if Congress were to pass a statute, under its Section 8 power to coin money, which set up Article I courts to approve

---

[10]  *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942).

[11]  *United States v. Bekins*, 304 U.S. 27 (1938).

[12]  *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977).

applications from individual states to coin their own money despite the blanket prohibition in Article I, Section 10 against states doing so.

64.     Third, no state, as argued *supra,* can "consent" to "enlarge the powers of Congress; none can exist except those which are granted."  *Ashton v. Cameron County Water Improvement Dist. No. 1*, 298 U.S. 513, 531 (1936).  The City's attempt to distinguish the Court's line of federalism cases since *New York v. United States*[13] completely misses this point by insisting that chapter 9 does not violate the federalism principles articulated in those cases merely because "chapter 9 is 'administered' by the federal bankruptcy court, not the States." Debtor's Reply, at p. 16.  But these cases cannot be oversimplified and read in a vacuum as the City suggests.  The Court's new federalism stands not for the narrow proposition that Congress cannot force states to administer federal regulatory programs, but for a broader constitutional rule: "if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress," and  "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions" even with "the 'consent' of the governmental unit whose domain is thereby narrowed."  *New York,* 505 U.S. at 156, 162, 182.

65.     Chapter 9 does exactly that – if a state consents, a federal bankruptcy judge enforces a set of instructions from the Code, most notably the requirements for plan confirmation, and takes over municipal decision-making during the bankruptcy by controlling the municipality's right not to engage in discovery or mediation and by wielding the power to appoint a trustee to recover preferential transfers over the municipality's objection.  These elements of chapter 9 – which the City entirely ignores in its brief – violate the Supreme Court's clear direction that ""[t]he Constitution's division of power among the three branches is

---

[13]  *New York v. United States*, 505 U.S. 144 (1992).

violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *Id.* at 182. The City points to general language in section 903 of the Bankruptcy Code prohibiting interference with "political or governmental powers," (Debtor's Reply, at p. 18), but that language is belied by other provisions of the Code explicitly permitting interference by the bankruptcy judge.

66. The City's related argument that "chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements," (Debtor's Reply, at pp. 16-17) is inapposite because the state does not obtain money in exchange for taking some action clearly within its power but desired by the federal government, rather the state *reacquires* its inherent power under *Asbury Park* to access a process for adjusting its debts. In exchange for a power it already would possess in the absence of chapter 9, the state is forced to give the federal government control over state sovereign functions not available to Congress under the Constitution.

67. This aspect of chapter 9 – its nullification of all state laws for municipal debt adjustment in favor of an exclusive federal remedy which subjects state and local officials to federal rules – highlights the accountability problem of allowing state and local officials to represent to their constituents that the only way to escape financial catastrophe is to access chapter 9 and accept the rules therein, such as claim priorities in the Code, which voters in the state might wish to alter. For if a state declines Congress's offer of access to chapter 9, it has no recourse to adjust municipal debts *en masse* as a result of section 903. Yet if a municipality is as financially distressed as the City contends it is, it faces the problem which motivated the Court in *Asbury Park* to find that states can design their own debt adjustment statutes consistent

with the Contracts Clause: the City has no reasonable alternative.[14]  Under such circumstances, state and local government officials face an unconstitutional conundrum: accept federal interference with their sovereign fiscal self-management, or default on municipal debt in violation of the Contracts Clause.  If the former is chosen, the City accepts rules and instructions from a federal judge, which state and local officials can refer to when attempting to shift blame for the hard decisions of municipal reorganization instead of confronting a local debate over legislation at the state level about how to adjust municipal debt.

## II.  THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE

68.  The City, as a purported municipal debtor, bears the burden of establishing it is eligible for relief under chapter 9, and for all of the reasons asserted previously (and as will be further demonstrated at trial), the City necessarily fails to carry its burden with respect to the following eligibility requirements: (i) valid authorization under Michigan state law (section 109(c)(2) of the Bankruptcy Code); and (ii) good faith negotiations or impracticability of such negotiations (section 109(c)(5) of the Bankruptcy Code).  Further, as has become apparent through discovery and as shown above and in the AFSCME Eligibility Objection (and AFSCME expects will be further shown at trial), the City's evidence regarding insolvency is woefully inadequate, supported by no expert testimony or other reliable evidence, and accordingly the City fails to satisfy the insolvency requirement under section 109(c)(3) of the Bankruptcy Code.

---

[14]  In *Asbury Park,* the Court observed that "the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power."  316 U.S. at 509-10.  Where, as in *Asbury Park,* financial crisis has rendered "the effective taxing power of the municipality prostrate without state intervention to revive the famished finances of the city," *id.* at 516, the Court recognized that "what is needed is a temporary scheme of public receivership over a subdivision of the State" allowing for the "discharge[]" of municipal debt obligations, *id.* at 510-11.  The City, like the municipality in *Asbury Park,* has contended that its need for bankruptcy protection stems from it having exhausted its ability to raise revenue through taxation.  *See* Eligibility Brief, pp. 28-30.

69.     Finally, the evidence reveals that the City's bankruptcy petition was filed in bad faith and not motivated by a proper purpose under chapter 9 and should be dismissed pursuant to section 921(c) of the Bankruptcy Code.

70.     It bears noting that at Orr's original deposition on September 16, 2013 (and subsequent October 4, 2013 deposition) and at other State officials depositions, Orr and various State officials (including the Governor, Dillon, and Baird) continued to hide behind the common interest privilege to essentially cover up any discussions or communications between City and State government officials under an alleged common interest privilege.

71.     While this Court determined the common interest privilege may apply to such communications, AFSCME believes that the discussions and deliberations between City and State officials leading up to the City's filing for chapter 9 in the period prior to July 18, 2013 – discussions which the City and State have clearly worked hard to keep secret – relate to the crux of AFSCME's (and other objectors') arguments that the City filed its chapter 9 petition in bad faith, without real negotiations with significant creditors, and that the authorization was tailored by City and State officials to circumvent the Michigan constitution's Pensions Clause. Given the presumption that government is supposed to be transparent (*e.g.*. FOIA statutes), and the fact that significant e-mails between the State, City and the Law Firm (including between the State and Orr) were already produced in this and other litigations, to the extent that the common interest ever applied, such privilege has been waived and AFSCME **asserts its continued objection to the City and State refusing to give deposition testimony or provide documents** (some of which may have been waived by prior documents produced and deposition testimony given by the State and City in this and other proceedings) subject to an asserted common interest privilege.

-34-

13-53846-swr   Doc 2257   Filed 12/27/13   Entered 12/27/13 16:50:36   Page 40 of 63
13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 153 of
286

153

72.     AFSCME believes that it already has sufficient evidence to rebut the City's case regarding authorization, good faith negotiations, general bad faith filing, and insolvency, but notes that the City and State's continued reliance on a purported common interest should be reconsidered and AFSCME provided further testimony and documents so AFSCME can have proper due process.[15]

**A.     The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9**

73.     As set forth in the AFSCME Eligibility Objection and as will be further demonstrated at trial, the Governor's blanket grant of permission to file for bankruptcy under Section 18 of PA 436 violated the Michigan Constitution because it failed to explicitly prohibit the impairment or diminishment of vested pension rights, which the Governor was fully aware was the intention of the instant chapter 9 petition.  Moreover, the appointment of the Emergency Manager under PA 436 violates the "strong home rule" provisions of the Michigan Constitution.  Where, as here, a state constitution bars the purported state law authorization, a chapter 9 petition must be dismissed.  *See In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (analyzing Pennsylvania Constitution to determine whether city was authorized to file under chapter 9).

74.     AFSCME notes that the arguments raised in the AFSCME Eligibility Objection (and raised or to be raised at oral argument) that (i) the Governor's authorization violated of Article IX, Section 24 of the Michigan State Constitution (the "**Pensions Clause Arguments**") and (ii) PA 436 offends the "strong home rule" of Detroit (and the Emergency Manager is not

---

[15] AFSCME did not appeal the Court's common interest ruling which was interlocutory, but reserves the right to argue on appeal that the City and State's failure to testify and produce documents on relevant subject matters, including regarding the EM and State's plans for the EM commencing the City's chapter 9 case, prevent AFSCME from a full and fair opportunity to litigate its objections to the City's eligibility.  Accordingly, AFSCME reserves all rights in this regard, including all appellate rights upon entry of a final appealable order regarding the City's eligibility.

lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings) (the "**Home Rule Arguments**") are, in part, **as applied** arguments (*i.e.* arguments that involve the establishment of certain facts), and have been established (to the extent necessary) based on the factual evidence discussed above and as will be further adduced at trial.

75.      Thus, for the Home Rule Arguments, the evidence discussed herein, in the AFSCME Eligibility Objection, and to be further adduced at trial demonstrates that the EM, an unelected contractor of the State, has and continues to make local laws for the City. Furthermore, regarding the Pensions Clause Arguments, the evidence already adduced reveals, and AFSCME will further establish at trial, that the intent of the City to reduce vested pension rights in chapter 9 was well known to the Governor when he granted the EM authorization to commence the chapter 9 filing, and to the EM when he requested that permission and when he ultimately filed the petition, and that therefore each of those acts violated the Pensions Clause.

**B.      The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9**

76.      The City cannot meet its burden under section 109(c)(5) of the Bankruptcy Code of proving that it conducted good faith negotiations with its creditors or that such negotiations were impracticable.

77.      Congress enacted the "negotiation" requirement of section 109(c) to prevent capricious filings of chapter 9 petitions, and Courts do not "view lightly the negotiation requirements of 11 U.S.C. § 109(c)(5)." *See In re Villages at Castle Rock Metro. Dist. No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990); *In re Town of Westlake, Tex.,* 211 B.R. 860, 867-68 (Bankr. N.D. Tex. 1997) (suggesting that section 109(c)(5) requires that a municipality have an intent to negotiate with creditors it intends to impair). "The 'creditor protection' provided by

-36-
13-53846-swr   Doc 2225-8   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 155 of
286
13-53846-swr   Doc 1227   Filed 10/17/13   Entered 10/17/13 16:58:38   Page 42 of 63      155

section 109(c)(5). . .  insures that the creditors have an opportunity to negotiate concerning a plan on a level playing filed with the debtor before their rights are further impaired by the provisions of section 362 of the Code."  *Sullivan County,* 165 B.R. at 78-79).

78.     In *Cottonwood Water*, the Court explained the good faith negotiation requirement under section 109(c)(5) of the Bankruptcy Code as follows:

> Congress consciously sought to limit accessibility to the bankruptcy court by municipalities [by requiring] . . . the municipal entity, before rushing to . . . Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the [Bankruptcy] Code. . . . The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the [Bankruptcy] Code.

138 B.R. at 979.

79.     Accordingly, the burden is on the City to demonstrate (i) that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan or (ii) why it was unable to engage in such negotiations.  ASFSCME respectfully submits that the City cannot demonstrate any negotiations with creditors such as AFSCME, let alone "good faith" negotiations, and further given that the City conducted no pre-petition negotiations with significant creditors such as AFSCME, the City should not be heard to argue that negotiations were impracticable.

**(i)     The City Failed To Negotiate With Creditors Such As AFSCME**

80.     The City claims it satisfies the section 109(c)(5)(B) requirement for negotiating with its creditors prior to the bankruptcy filing by negotiating with creditors, including unions such as AFSCME, in a few meetings held with its unions where the City discussed its restructuring proposals and took certain questions.  *See* Eligibility Brief, pp. 53-61 (citing, *inter*

-37-

13-53846-swr   Doc 2325   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 156 of 63
13-53846-swr   Doc 1278   Filed 10/17/13   Entered 10/17/13 16:58:36   Page 43 of 63

286

156

*alia*, Orr Declaration, ¶¶ 90-96).   What the City fails to mention is that, as discussed extensively above and as indicated by Orr himself prior to the scheduling of these meetings, it was made clear throughout these series of 3 or 4 relatively short meetings that the meetings were "discussions" and the City was not willing to conduct **any** negotiations.   The City argued that the EM "openly invited the City's creditors to contact the City and its advisors to begin negotiations."   Eligibility Brief, p. 55.   In fact, the City rebuffed negotiations, which require concessions from both sides and collaboration between the debtor and its significant creditors. The City (acting through Orr) simply was not interested in negotiations (and as Orr indicated regarding the predecessor to the ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", "[t]his isn't a plebiscite, we are not, like, negotiating the terms of the plan").

81.      *In re Ellicott School Building Authority* is directly on point.   There, the debtor held three public meetings with large creditors regarding its proposed restructuring, although creditors were advised that the economic provisions of the proposed plan were not negotiable. 150 B.R. 261, 266 (Bankr. D. Colo. 1992).   The court held that even though the debtor conducted three public meetings explaining its proposed plan of restructuring to bondholders, it did not negotiate in good faith because it indicated that the economic terms of its proposed plan were non-negotiable.   *Id.* (debtor must be open to negotiating the substantive terms of a proposed plan); *cf. Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009) (finding that the city did not satisfy section 109(c)(5)(B) because it "never negotiated with Unions or any of its creditors over the possible terms of a plan of adjustment."); *Sullivan County*, 165 B.R. at 78-79 ("The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate

concerning a plan on a level playing field with the debtor before their rights are further impaired . . . ." (citation omitted)).

82. The City's a "take it or leave it" Restructuring Plan proposal that was not really open to any negotiations (good faith or otherwise) should be rejected as the court did in *Ellicott School*. The City failed to engage in **any** negotiations with its significant creditors such as AFSCME regarding the Restructuring Plan. Flatly refusing to conduct any negotiations (despite repeated requests by AFSCME both prior to and subsequent to the City's bankruptcy filing) falls far short of the standard required under section 109(c)(5) of the Bankruptcy Code.

83. The City has publicly proclaimed its willingness to negotiate, yet it and its representatives' (i) statements that the meetings held to discuss the Restructuring Plan were not negotiations and (ii) continued bad faith refusal for a period of time post-petition (until required mediation began) to hold negotiations (despite requests from AFSCME to jump start negotiations) makes it more than clear that the City has conducted no good faith negotiations with AFSCME and similarly situated creditors.

84. Moreover, as described extensively above and will be further demonstrated at trial, to the extent that the City held a series of pre-petition meetings with creditors to discuss its Restructuring Plan, such meetings were simply scheduled as part of the EM and City's plan to bolster the City's "record (i.e. for future litigation)" as suggested by the City's lead bankruptcy counsel in the Pitch Presentation back in January 2013. In addition, the evidence further reveals that the City had planned on filing for chapter 9 as of early July 2013 by the specific date of Friday, July 19, 2013 – even as alleged creditor "negotiations" were ongoing – regardless of how the discussions were progressing. *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet document dated July 4, 2013 attached to e-mail from EM's office to State

-39-

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 45 of 63
13-53846-swr   Doc 2227   Filed 12/27/13   Entered 12/27/13 16:50:36   Page 45 of 63
286

158

officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY").  This evidence further establishes that the City was not really interested in any serious negotiations.

<div style="text-align:center">

**(a)**      **Despite The City's Creative Arguments To The Contrary, The City Cannot Escape The Fact That It Refused To Negotiate In Good Faith**

</div>

85.     In the City's reply brief and in recent deposition testimony provided by Orr on October 4, 2013, the City and Orr have now taken the position that while the City may have made statements that its pre-petition meetings with the unions regarding its Restructuring Plan were not a "negotiation", such characterizations were simply to avoid any argument that the City triggered obligations to collectively bargain, which obligations may be suspended by PA 436.  *See* Debtor's Reply, at p. 55 n.49; *supra*, ¶ 44.  The City now argues that it was flexible in its negotiations and willing to consider other proposals, but received no counter-proposals from creditors, despite requests for same.  The City's statements in that regard, however, do not establish the good faith **<u>negotiations</u>** required by the Bankruptcy Code.  Requesting "feedback" or "invitations for further information" simply does not satisfy the City's burden of proof.

86.     AFSCME (and other objectors) offered on more than one occasion to engage in good faith bargaining and negotiations which were continually rebuffed by the City, and indeed as of late June/early July 2013, the City did not even have any complete proposal with respect to the restructuring of pension and other retiree benefits.   Rather, the City's proposal to its creditors was no more than an ultimatum, with the City showing no real intention of negotiating economic or substantive terms.  As noted, the City was interested in and spent months mapping out its path to chapter 9, and never had any real intention of bargaining in good faith.

-40-

13-53846-swr   Doc 1227-8   Filed 10/17/13   Entered 10/17/13 16:50:30   Page 46 of 63
13-53846-swr   Doc 2225   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 159 of 286
159

**(ii) Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B)**

87. While AFSCME submits that the City did not engage in any good faith negotiations with creditors such as AFSCME prior to the City's chapter 9 filing, even assuming this Court were to find otherwise, the City also has not satisfied section 109(c)(5)(B) of the Bankruptcy Code because the plan or terms of a plan being negotiated must be a plan that can be effectuated in chapter 9. *See Sullivan County*, 165 B.R. at 78 (debtor failed to meet burden of showing that it negotiated in good faith because the plan that was proposed was not a plan that could be effectuated in chapter 9); *Cottonwood Water*., 138 B.R. at 979 (finding that "in order for this Debtor to be entitled to the entry of an order for relief, it must be prepared to show that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to section 941 of the Bankruptcy Code.").

88. Here, the proposed Restructuring Plan is patently unconfirmable because it unconstitutionally looks to reduce or eliminate guaranteed vested pension benefits pursuant to a plan that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans, without their consent. Given that creditors owed pension obligations have absolute rights to those vested pension benefits under Michigan law as set forth extensively above, and one of the main goals of this proceeding is to modify vested pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights. *See* 11 U.S.C. §943(b)(4) (stating that the Court shall confirm a chapter 9 plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan.").

89. Additionally, the Restructuring Plan is not in the "best interests of creditors" and thus could not be confirmed pursuant to section 943(b)(7) of the Bankruptcy Code. The "best

interests of creditors" test in the context of a chapter 9 case does not compare treatment under a plan of liquidation, but rather to other alternatives to creditors to the plan. *See, e.g., In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ... simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The 'best interest' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 Collier on Bankruptcy, 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

90.     Had there been no chapter 9 filing by the City, pension creditors could not be impaired under the Michigan Constitution, and any impairment of those rights under a plan of adjustment would violate Michigan law and be patently non-confirmable.   Accordingly, because the Restructuring Plan proposes to unconstitutionally wipe out guaranteed vested pension benefits, the proposal cannot satisfy the requirements of good faith negotiations over a plan that could be effectuated in chapter 9.

91.     Orr failed to consider before filing for bankruptcy protection or since the filing, an equitable argument for the pension fund beneficiaries that other creditors extending debt after funding concerns surfaced publically should be subject to equitable subordination/fraudulent conveyance under Bankruptcy Code sections 510(c) and 544(b)/548(a) and pension benefits should take priority over those claims.

92.     Further, under Bankruptcy Code section 928(b), Orr should be exploring whether certain other creditors should bear the burden of some of the City's operating expenses during bankruptcy process, before benefit cuts are implemented.

-42-
13-53846-swr   Doc 2327-8   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 48 of 63
13-53846-swr   Doc 12257   Filed 10/17/13   Entered 10/17/13 16:50:30   Page 161 of
286
161

93.     The City in its reply brief (*see* Debtor's Reply, at p. 58 n.50) argues that AFSCME is incorrect that to satisfy the good faith negotiation requirement of section 109(c)(5)(B), negotiations must be conducted regarding the terms of a confirmable plan. The City cites no authority for rejecting AFSCME's arguments in this regard, and the weakness of the City's argument is belied by its relegation to a footnote. There can be no doubt that the reference to good faith negotiations of the terms of a plan in section 109(c)(5)(B) of the Bankruptcy Code is to negotiations of the terms of a plan that can be effectuated in chapter 9, *i.e.*, a confirmable plan, as argued above. It is illogical for the statute to reference negotiations regarding an unconfirmable plan. Were that the case, then the whole point of good-faith negotiations would be meaningless and rendered moot, or simply, be deemed bad faith. As one recent court has explained in the chapter 9 context:

> The structure of the sentence [*i.e.* section 109(c)(5)(B)] strongly implies that in the negotiations, municipalities are seeking the creditors' agreement *to a bankruptcy plan*. **What other agreements can they be seeking?**

*In re Mendocino Coast Recreation and Park District*, No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697, at *19 (N.D. Cal. Sept. 27, 2013) (*emphasis* in original; **emphasis** added).

94.     The City attempts to rebut AFSCME's reliance on *Sullivan County* and *Cottonwood*, *supra*, with respect to the meaning of a plan in section 109(c)(5)(B) of the Bankruptcy Code. Debtor's Reply, at p. 58 n.50. Although *Sullivan* does acknowledge that a *formal* plan is not required, that court states that, to be in good faith, negotiations must "revolve around the negotiating of the terms of a plan that could be effectuated if resort is required to chapter 9 of the Bankruptcy Code." *Sullivan*, at 78. For a plan to be effectuated under chapter 9, it clearly must satisfy the parameters of and be confirmable under section 943(b) of the Bankruptcy Code and be in the best interests of creditors. The *Sullivan* court's statement

that the plan need not be a "formal plan", *id.*, at 78, is underscored by the language that follows (and conveniently omitted by the City):

> While the statutory requirement does not require a formal plan as such, some sort of comprehensive plan is required as one of the 'screening factors' to avoid a too early and rapid resort to the bankruptcy courts by municipalities.

*Sullivan*, 165 B.R. at 78 (emphasis added). This language is telling and clearly negates the City's position with respect to the nature of the "plan." Both the *Sullivan*, *supra*, and *Cottonwood*, *supra*, courts concluded that, even where the parties engaged in good-faith pre-petition negotiations, the municipality failed to satisfy section 109(c)(5)(B) because the negotiations did not include the terms of a plan under chapter 9 of the Bankruptcy Code. The City would further have this Court ignore the finding in *Ellicott*, adopting the well-reasoned analysis of *Cottonwood,* that a municipality must establish that "'it engaged in good faith negotiations with creditors *concerning the possible terms of a plan to be effected under section 941 of the Bankruptcy Code.*'" *Ellicott*, 150 B.R. at 266 (citing *Cottonwood*, 138 B.R at 138) (emphasis added). The City failed to negotiate in good faith as any purported negotiations were not related to a plan that could be effectuated under section 941 and 943(b) of the Bankruptcy Code. The City, therefore, does not satisfy section 109(c)(5)(B) of the Bankruptcy Code.

### (iii) Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable

95. The City alleges that it alternatively qualifies for eligibility under section 109(c)(5)(C) of the Bankruptcy Code because negotiations were impracticable.

96. As with the other eligibility requirements, the burden of proving impracticability rests with the City. *See In re Pierce County Housing Authority,* 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009); *Vallejo*, 408 B.R. at 289 (citing *Valley Health*, 383 B.R. at 161). Courts

considering section 109(c)(5)(C) define the ordinary meaning of "impracticable" as "'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.'" *See, e.g.*, *Vallejo*, 408 B.R. at 298 (citing Valley *Health*, 383 B.R. at 163). Whether negotiations were impracticable is fact specific and depends upon the circumstances of the case. *See Vallejo*, 408 B.R. at 298.

97. The City alleges that negotiations were impracticable because, in part, the City had (i) numerous series of bonds and indebtedness held by multiple holders and (ii) approximately 20,000 retirees not represented by any formal agent or committee and other potential involuntary creditors. Furthermore, the City claims that the refusal of certain creditor constituencies to engage in good faith negotiations rendered negotiations impracticable.

98. In fact, AFSCME believes that the exact opposite is true here. The City predetermined that its pre-bankruptcy negotiations (which, as discussed above, were not negotiations) would fail. As discussed extensively above, the Governor and his staff orchestrated for several months prior to the hiring of Orr as EM to bring in Orr, as an experienced bankruptcy attorney, to lead the City on a clear path towards a chapter 9 filing, and any negotiations were a façade – the City went through the motions of pre-petition meetings but, as is evident from its pre-petition conduct *vis a vis* AFSCME, never had any intention of negotiating outside of bankruptcy.

99. While the City alleges that it has over 100,000 creditors, it is clear that the main creditors the City had to negotiate with were the unions, its retirees, and the bond trustees.

100. Moreover, as discussed extensively *supra*, The City itself has in the past negotiated with its unions with respect to concessionary agreements which changes impacted retiree benefits outside of a chapter 9 proceeding (even where such unions were not explicitly

-45-

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 164 of 83
13-53846-swr   Doc 1227   Filed 10/17/13   Entered 10/17/13 16:50:30   Page 51 of 63
286

164

representing their retirees).  Thus, it is a red herring to say that negotiating medical benefits or pensions is impractical *per se*.

101.    While courts have made clear that impracticability can be demonstrated by the volume of creditors to negotiate with, in no case AFSCME is aware of did a court find that negotiations were impracticable where the Debtor did not even attempt to negotiate pre-petition with its largest creditors such as AFSCME (and after repeated requests to do so).  In *Ellicott School*, the court determined that the debtor holding "public meetings to which all bondholders were invited" showed that negotiations were practicable.

102.    AFSCME is not suggesting that pre-petition negotiations could have bound everyone or must have involved all of the City's thousands of creditors.  Rather, some level of negotiation with principal creditors could have led the City to a non-bankruptcy solution.  By way of analogy, section 109(c)(5)(B) of the Bankruptcy Code contemplates pre-bankruptcy negotiations with creditors that municipality intends to impair, not all creditors.[16]

103.    Given the City's lack of negotiations with creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt, the City's arguments that negotiations were impracticable should be rejected.

104.    In reality, the City was not truly interested in negotiating in good faith (whether or not such negotiations were impractical) because the City strongly desired a swift landing in chapter 9.

---

[16] Importantly, the City describes in the Orr Declaration that of the City has nearly $12 billion in unsecured debt, but 75% of that (approximately $9.2 billion) relates to <u>accounting</u> liabilities for post-employment benefit or underfunded pension liabilities.

**C.** **The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith**

105.    The City's bankruptcy petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith.  Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

106.    "Good faith is not defined in the Bankruptcy Code."  *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007).  Courts have determined, however, that the primary function of the good faith requirement in chapter 9 is to "ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."  *Sullivan County*, 165 B.R. at 80 (citation omitted); *see also In re City of Stockton, California*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013) ("Section 921(c) "good faith" serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code"); *Villages at Castle Rock*, 145 B.R. at 81 (describing good faith as requirement that "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes") (internal quotation marks and citation omitted).

107.    While good faith in the chapter 9 context is not defined in the Bankruptcy Code, courts have looked to discussions of good faith in the chapter 11 context to determine whether a chapter 9 petition has been filed in good faith.  *McCurtain Mun. Auth.*, 2007 WL 4287604, at *4 (referencing chapter 11 good faith standards to determine whether chapter 9 petition was filed in good faith) (quoting *Villages at Castle Rock*, 145 B.R. at 81); *County of Orange*, 183

-47-

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:36   Page 166 of
13-53846-swr   Doc 12227   Filed 10/17/13   Entered 10/17/13 16:50:36   Page 53 of 63
286

166

B.R. at 608 (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith); *Sullivan County*, 165 B.R. at 82 (examining and applying chapter 11 good faith requirements to chapter 9 petition)).

108.    In the chapter 11 context, courts explain that the requirement of good faith

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.  Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . .  available only to those debtors and creditors with 'clean hands.'

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986).

109.    Relevant considerations regarding good faith under chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." *Stockton*, 493 B.R. at 794.

110.    Here, a review of the various relevant factors considered by courts when analyzing good faith under section 921(c) lead to the inescapable conclusion (which will be further demonstrated at trial) that the City's chapter 9 case was filed in bad faith and with unclean hands.

111.    First, the City's filing came several minutes prior to a Michigan State Court issuing a TRO enjoining the Governor from authorizing the filing.  The State lawyers at the hearing on the TRO asked for a short delay when they realized that an adverse ruling was forthcoming with respect to the City's ability to authorize any chapter 9 authorization which did not proscribe the reduction of pension benefits violated the Michigan constitution.  During that recess, the City filed for chapter 9 protection.  Thus, the City commenced this proceeding

"in the dark of night" to avoid a ruling it viewed as not in its favor. Such a filing is the antithesis of the careful, deliberative decision to file required under chapter 9, as "[t]he legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort." *Pierce County*, 414 B.R. at 714 (citation omitted) (noting debtor decided to file a chapter 9 petition only after several years of failed negotiations and attempts at mediation); *cf. Valleo*, 408 B.R. at 295 ("The evidence needs to show that the 'purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors.'"). The City filed chapter 9 to evade what it viewed as an imminent negative state court ruling – enjoining this very filing.

112. Moreover, as discussed above, while the City was purporting to negotiate with its creditors in good faith by holding several meetings, such meetings were employed as a mere strategy to bolster the record and never truly given the chance to succeed. The City simply does not have "clean hands".

113. Additionally, as discussed extensively above, the City did not reasonably consider any alternatives to chapter 9, did not give negotiations any real chance to succeed, and was preparing for a chapter 9 filing months before any creditor meetings to discuss restructuring options even started (and indeed had finalized a decision to file as of early July 2013 well before significant creditor meetings were scheduled to take place), and refused to negotiate with major creditors such as AFSCME as required. Simply put, the predetermined filing was done in bad faith and should be dismissed.

114. The City argues in its reply brief that the reason for filing the chapter 9 petition was not the imminent entry of the State Court TRO, but rather "to adjust its debts and resolve its liquidity crises [consistent] with the rehabilitative purposes of Chapter 9." Debtor's Reply,

-49-

13-53846-swr  Doc 2225-8  Filed 12/27/13  Entered 12/27/13 16:50:36  Page 55 of 63
13-53846-swr  Doc 1327  Filed 10/17/13  Entered 10/17/13 13:42:36  Page 160 of
286

168

at p. 65.  The City states further that it was no secret that Chapter 9 was an option if negotiations with creditors proved impracticable (which, of course, AFSCME disputes as set forth *supra*).  *Id.* at 65-66.  However, the City has not and cannot establish that negotiations with its creditors were impracticable under Section 109(c)(5)(C).  Thus, any reliance by the City on the impracticability of negotiations with creditors to establish good faith is misplaced.

115.    Moreover, the City's attempts to lay blame on the movants in the state court TRO proceeding by suggesting that it was the City's preparation for bankruptcy that prompted the request for the TRO (*see* City Reply, at 66, n. 56), rather than the opposite (*i.e.* that the imminent entry of the TRO prompted the chapter 9 filing) is incorrect.  Indeed, as discussed above, Orr admitted that the filing was being driven by the state court litigations and that he was being "irresponsible" by not authorizing the filings when he did.

116.    The City relies on the *McCurtain Municipal Authority*, decision to support its position regarding the timing of its filing and the state court TRO hearing.  In *McMurtain*, a creditor filed an application for the appointment of a receiver the day before the trustees of the municipal authority met to discuss a chapter 9 filing.  Notice of the trustees' meeting was provided before the filing of the application for the receiver.  The municipal authority argued that the potential appointment of a receiver may have been a concern, but it was not the only reason for the authority to ultimately file its petition.  *McCurtain* at *5 (identifying other concerns considered by the authority trustees that precipitated the chapter 9 filing).

117.    Here, in contrast, the evidence show that the City very much sought to avoid the effects of the State Court litigation and a ruling that the Governor could not authorize a filing that did not place contingencies on the EM from changing pension benefits in a chapter 9.  The City likely would have considered giving creditors more time to negotiate (as was required for

any significant bargaining to take place), and there was no cash crisis and the City had actually as of July 17, 2013 inked a deal with its swap counterparties which helped the City's anticipated liquidity. The City has simply not proceeded in good faith.

**D. The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency**

118. The Bankruptcy Code does not offer relief to a city simply because it is suffering economic difficulties. *See, e.g.*, *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D. Conn. 1991) (although City projected $16 million budget deficit, it was not insolvent, and "financial difficulties short of insolvency are not a basis for chapter 9 relief"); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1386 (10th Cir. 1998) (debtor not eligible for relief simply because it was severely economically distressed).

119. In order to carry its burden on insolvency, the City must prove either that it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). The test under the first prong requires current non-payment of obligations, but the test under the second prong is prospective, looking to the debtor's future inability to pay. *Bridgeport*, 129 B.R. at 336-37. Solvency is measured as of the petition date. *See, e.g., In re Town of Westlake, Texas*, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997) (citing cases).

120. The purposeful refusal to make a few payments comprising a relatively small part of the City's budget does not satisfy the definition of "insolvent" under 11 U.S.C. § 101(32)(C)(i). *See, e.g., Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa Healthcare Dist.)*, No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) (failure to pay $1.3 million out of $10-$11 million total operating expenses did not mean the debtor was "generally not paying its debts")

121.    First, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.  Second, "[t]he mere fact that a municipality has adopted a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."  COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011). A municipal budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

122.    The City puts forward three declarations from Orr, Malhotra and Moore which appear to provide a voluminous amount of data to "establish" the City's insolvency, including on the basis of budget and service delivery insolvency, negative cash flows and inability to increase revenues or reduce expenses.

123.    However, as discussed above and as will further be demonstrated at trial, when one digs into all of the "facts" cited by these three declarants, it becomes apparent that the City failed to provide this Court or the citizens of Detroit evidence to establish insolvency.

124.    It is telling (and should be shocking to all citizens of Detroit and Michigan) that despite spending millions of dollars of taxpayer funds on the City's chapter 9 cases to hire a multitude of bankruptcy and restructuring professionals, the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency.  Courts in the non-chapter 9 context note that "[i]t is generally accepted that whenever possible, a determination of insolvency should be based on . . . expert testimony . . ." *Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.)*, Case No. 03B12184, 2005 Bankr. LEXIS 1312, at *18‑*19 (Bankr. N.D. Ill. July 14, 2005); *see also Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 38 (2d Cir. 1996); *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (stating

-52-
13-53846-swr   Doc 2225-8   Filed 12/27/13   Entered 12/27/13 16:50:30   Page 57 of 63
13-53846-swr   Doc 1227   Filed 10/17/13   Entered 10/17/13 13:42:36   Page 58 of 63
286
171

that "a finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses").

125. Here, the insolvency "evidence" offered by the City focuses on the non-expert testimony of Orr, Malhotra, and Moore. This testimony relies on unaudited and unfounded assumptions, unsupported statements and a complete lack of expert opinion. For example, as purported evidence for the City's insolvency, Orr (*see* Orr Declaration, ¶¶ 52-57) cites to the June 14 Restructuring Plan prepared by the City and to conclusory statements by Malhotra, one of the City's restructuring advisors (who of course all had one goal in mind: demonstrating insolvency).

126. While the City alleges that it was forced to suspend certain payments to "conserve its dwindling cash", the main portion of the payments not made revolve around the City's pension obligations, and those obligations are subject to dispute as to the ultimate amount required to be paid, and indeed evidence (discussed above and to be further adduced at trial) shows that (i) the City may have funds (or be able to raise funds from other sources such as revenues generated from the water and sewer fund) not calculated as part of its financial projections to cover such shortfalls and (ii) the City apparently chose to not actually calculate through an expert report the correct underfunding liability with respect to the pension obligations (despite presenting "definitive" numbers of such underfunding in the Restructuring Plan and other documents produced by the EM and his staff). Treasurer Dillon admitted that as late as the filing date, the City had not calculated the correct underfunding liability with respect to the pension obligations. Thus, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.

127.    Second, "[t]he mere fact that a municipality [adopts] a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."  COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011).  The City's budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances."  *Id.*

128.    Here, the City's past and current practices, as well as current facts and circumstances, not only show that the City has many available (but unexplored) options to enable it to pay its debts as they become due, but also that the City chose to deliberately not monetize certain assets (or explore the value of such assets) prior to the filing to limit the appearance of cash or revenue on its books.  It is telling that the City's prized artwork collection and potential deal to lease Bell Isle are only now on the table – if these assets and other possible increased tax revenue collection could have collectively solved all of the City's short term cash issues.  But, as indicated above, the City did not want such assets monetized because the City's goal and clear path was to end up in chapter 9, which the City believed provided the only means to attack its vested pension obligations.

129.    Thus, in light of all of the above, the information provided in the City's current budget provides at most only "insufficient credible proof" of insolvency.  *Town of Westlake*, 211 B.R. at 867; *see also Bridgeport*, 129 B.R. at 338 (requiring concrete proof "that [the city] will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year" and noting that "[o]bviously, it is necessary for cities to make informed financial projections").

130.    The City's current financial difficulties currently are actually less severe than in some prior years, the City entered into a deal prior to the chapter 9 filing with its swap

-54-

13-53846-swr   Doc 2225   Filed 12/27/13   Entered 12/27/13 16:50:30   Page 60 of 63
13-53846-swr   Doc 1227-8   Filed 10/17/13   Entered 10/17/13 13:42:36   Page 60 of 63
286

173

counterparties which potentially freed up significant cash and did not make the filing imminent, and AFSCME believes (and as will be further demonstrated at trial) that there are numerous means already shown to be available to solve the City's current financial difficulties and generate sufficient funds to pay its debts coming due in the coming fiscal year. AFSCME recognizes that all parties (including current and former employees) will be required to sacrifice, but reasonable concessions outside of bankruptcy – which is not necessary and which the City does not and cannot qualify for based on all the reasons discussed above – from all significant creditors would easily bring the City back to financial stability.

## CONCLUSION

For the reasons set forth herein, AFSCME respectfully requests that this Court issue an order following the eligibility trial dismissing the City's chapter 9 petition and granting such other and further relief as is just and proper under the circumstances.

Dated: October 17, 2013

**LOWENSTEIN SANDLER LLP**
By: /s/ *Sharon L. Levine*
Sharon L. Levine, Esq.
John K. Sherwood, Esq.
Philip J. Gross, Esq.
Ira M. Levee, Esq.
Keara M. Waldron, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

-56-

13-53846-swr   Doc 1225   Filed 10/17/13   Entered 10/17/13 13:42:36   Page 62 of 63
13-53846-swr   Doc 12278   Filed 10/17/13   Entered 10/17/13 16:59:39   Page 175 of 286

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 17, 2013, *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees' Pretrial Brief Regarding the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:   October 17, 2013

*/s/ Lisa M. Bonito*
Lisa M. Bonito
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
lbonito@lowenstein.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      No. 13-53846

            Debtor.                             Hon. Steven W. Rhodes

_____/


**PRE-TRIAL BRIEF OF THE DETROIT PUBLIC SAFETY UNIONS, CONSISTING OF THE DETROIT FIRE FIGHTERS ASSOCIATION (THE "DFFA"), THE DETROIT POLICE OFFICERS ASSOCIATION (THE "DPOA"), THE DETROIT POLICE LIEUTENANTS & SARGEANTS ASSOCIATION (THE "DPLSA") AND THE DETROIT POLICE <u>COMMAND OFFICERS ASSOCIATION (THE "DPCOA")</u>**

1

13-53846-swr Doc 2335 Filed 12/27/13 Entered 12/27/13 13:42:36 Page 1 of 19
13-53846-swr Doc 1230 Filed 10/27/13 Entered 10/27/13 21:06:35 Page 177 of
286                                                                          177

# TABLE OF CONTENTS

I.   Statement of Facts ................................................................................................................1

II.  Legal Argument.....................................................................................................................8

    A.   Burden of Proof for Eligibility.......................................................................................8

    B.   Issues of Law...................................................................................................................8

        Issue 1:   The City failed to negotiate with the Detroit Public Safety Unions
                  in good faith, as required by 11 U.S.C. §109(c)(5)(B) ..................................8

        Issue 2:   The City was not "unable to negotiate with creditors because such
                  negotiation is impracticable," as required (in the alternative) for
                  eligibility by 11 U.S.C. §109(c)(5)(C)......................................................11

               Other legal issues ........................................................................................12

III.  Witnesses ............................................................................................................................13

IV.  Key Documents ...................................................................................................................14

V.   Conclusion ..........................................................................................................................15

i

13-53846-tjt   Doc 2335   Filed 12/27/13   Entered 12/27/13 21:06:36   Page 1 of 19
13-53846-swr   Doc 1230   Filed 10/27/13   Entered 10/27/13 13:42:36   Page 178 of 286                                                                178

# TABLE OF AUTHORITIES

## Cases:

*In re City of Stockton, California,* 493 BR 772, 794  (Bankr. E.D.Cal. 2013) ...............................8

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado,*138 B.R. 973, 979 (Bankr. D.Colo. 1992)  .........................................................10,11

*In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995) ............................................8

*In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992) ...................................................................................................10

*In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010) ................................................................................11

*In re Sullivan County Regional Refuse Disposal District,* 165 B.R. 60, 78, 82 (Bankr. D. N.H. 1994) ...........................................................................10, 12

*In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008).........................................8

*In re Villages at Castle Rock Metropolitan District No. 4,*145 B.R. 76, 85 (Bankr. D. Colo. 1990) ...........................................................................12

## Statutes:

11 U.S.C. §362....................................................................................................11

11 U.S.C. §109(c) ...............................................................................................8

11 U.S.C. §109(c)(5)(B) ...............................................................................8, 10,16

11 U.S.C. §109(c)(5)(C) ...............................................................................11, 12,16

**PRE-TRIAL BRIEF OF THE DETROIT PUBLIC SAFETY UNIONS, CONSISTING OF THE DETROIT FIRE FIGHTERS ASSOCIATION (THE "DFFA"), THE DETROIT POLICE OFFICERS ASSOCIATION (THE "DPOA"), THE DETROIT POLICE LIEUTENANTS & SARGEANTS ASSOCIATION (THE "DPLSA") AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION (THE "DPCOA")**

The Detroit Public Safety Unions submit their Pre-trial Brief[1] as follows:

## I.    Statement of Facts

1.      On March 14, 2013, the Governor appointed Kevyn Orr as Detroit's Emergency Financial Manager pursuant to 1990 PA 72, MCL 141.1201, *et seq*, Orr assumed that role on March 24, 2013 (Orr Declaration, ¶78).  On March 28, 2013, PA 436, MCL 141.1541, *et seq*. became effective and Orr became the Emergency Manager under PA 436.

2.      The Detroit Public Safety Unions collective members provide police and fire protection to the City on a daily basis under extremely difficult conditions. They have worked under increasingly difficult conditions, which have included fewer active members and fewer resources.  At the same time, their wages and benefits, including their future pension benefits, have been unilaterally reduced by the City.

---

[1] In submitting their Pre-Trial Brief, the Detroit Public Safety Unions reserve their rights to rely on additional facts in support of their arguments based upon the evidence introduced at trial by any other objecting party, the City or the State.

3. Since the Emergency Manager's appointment, the City has steadfastly declined to negotiate with the Detroit Public Safety Unions, claiming it has no obligation to do so under PA 436.

4. On June 14, 2013, the Emergency Manager held a meeting at the Westin Hotel at Detroit Metropolitan Airport with the City's creditors, including the Detroit Public Safety Unions. That meeting was an en masse event at which the City presented certain general information about its restructuring intentions; questions were answered, but no negotiations took place. See "City of Detroit Proposal for Creditors" dated June 14, 2013 (the "June 14 Creditor Proposal") to all creditors in attendance [See Doc. No. 11-1] (Orr Declaration ¶ 80).

5. The June 14 Creditor Proposal was a general overview of the financial condition of the City, the condition of city services and issues regarding payment of personnel, including the members of the Detroit Public Safety Unions. It also had broad proposals for creditor treatment including proposals that would significantly impair the accrued financial benefits of the Detroit Public Safety Union members and retirees. See Restructuring Proposal, [Docket 11-1, p. 60] (attached as Exhibit to Orr Declaration).

6. On June 20, 2013, the Emergency Manager held a second meeting with various unions and their representatives, including the Detroit Public Safety

Unions, at which the City informed the Detroit Public Safety Unions of its intent to propose steep cuts to their pension and health care benefits.

7.     A third meeting took place with each of the Detroit Public Safety Unions during the week of July 12, 2013 regarding these proposed cuts.  Again the City made it clear that it was not negotiating with the Detroit Public Safety Unions although they were welcome to propose their own restructuring plan.  The City also indicated that it would be unwilling to negotiate any terms of such a restructuring plan unless agreement was first reached on actuarial assumptions.

8.     There is no agreement about the actuarial assumptions utilized by the City.

9.     On July 16, 2013, the Emergency Manager sought the Governor's authorization to file these Chapter 9 proceedings.  Orr Declaration, Exhibit J [Docket 11-10].

10.     On July 17, 2013, the Detroit Public Safety Unions received a letter from the Emergency Manager's counsel, which indicated that the Emergency Manager wanted to first reach agreement on actuarial assumptions and which provided no substantive proposals.

11.     On July 18, 2013, the City filed its Chapter 9 Petition.

12.     With regard to the Detroit Public Safety Unions, the content of the discussions at the June 14th meeting and the follow up meetings were very general,

3

13-53846-tjr  Doc 2335  Filed 12/27/13  Entered 12/27/13 13:42:36  Page 6 of 19
13-53846-swr  Doc 1250  Filed 10/27/13  Entered 10/27/13 13:06:36  Page 4 of 10
286
182

and the City continued to indicate, through the Emergency Manager, that the meetings should not be construed as negotiations.

13. With regard to the DPOA, which consists of approximately 1900 active Detroit Police Officers:

a. On March 25, 2013, only days before the effective date of PA 436, the Act 312 Award memorializing the terms and conditions of employment between the City and the DPOA was issued (the "Award"). The Award becomes the collective bargaining agreement.

b. The Award recognized the record number of issues presented for arbitration were the direct result of the City's refusal to negotiate and its insistence on imposing on the DPOA a series of demoralizing and not necessarily cost-saving City Employment Terms ("CETs") under the now-repealed Public Act 4, former MCL 141.1501, *et seq.*

c. Among the Award's specific findings were:

. . . The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings. Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police

4

Department. This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan. It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

d.     The Award further found that, " . . . if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced." Award at p. 29.

e.     The Award further provided for a 5% pay raise, effective January 1, 2014 for DPOA members and for the reopening of the Act 312 proceedings to address health care issues after June 30, 2013.

f.     The City, through the Emergency Manager, filed a complaint for judicial review of the 5% pay raise, which remains pending but stayed by these proceedings. Diaz Declaration, ¶5.

g.     Relying on Public Act 436, the City has declined to reopen the Act 312 proceedings to address health care issues, and instead seeks to unilaterally impose new health care terms on the DPOA. Diaz Declaration, ¶¶ 8-10.

5

14.     With regard to the DFFA, which consists of all active Detroit fire fighters of all ranks (presently just under 800 members):

a.      The DFFA's collective bargaining agreement with the City expired June 30, 2013.

b.      In reliance on PA 436, and claiming it did not have a duty to negotiate or arbitrate under Public Act 312, the City blocked the DFFA's efforts to pursue Act 312 arbitration.  In a 2-1 decision, the Michigan Employment Relations Commission ruled that, as a result of the Emergency Manager's appointment, it lacked the authority to conduct Act 312 hearings.

c.      By letter dated July 25, 2013, the City informed the DFFA that, effective August 16, 2013, its members' wages would be cut by 10% across the board.

d.      At a meeting on August 2, 2013 which the City emphatically indicated was not a negotiation, the City presented the terms of new health care plans it intends to impose, which will increase the out-of-pocket health care costs to be borne by DFFA members by as much as $3000 a year for families.

15.     With regard to the DPLSA:

a.      On June 25, 2013, the City notified the DPLSA of the termination of its collective bargaining agreement effective July 6, 2013,  and that it was not requesting bargaining at that time.

6

b.      After informing the DPLSA that it had no duty to bargain, the Emergency Manager notified the DPLSA that changes to its wages, benefits and working conditions would be forthcoming after August 1, 2013.

c.      Shortly after the chapter 9 petition was filed, the City's Labor Relations Director informed the DPLSA that the City was prepared to impose terms on its members.  In July 31, 2013 correspondence and without any prior negotiation, the City identified 17 terms it intended to implement.  In response to an August 1, 2013 request from the DPLSA, the City has delayed imposing the 17 terms as of the date of this Objection.

16.      In regard to the DPCOA, whose members are  9 Commanders and 23 Captions:

a.      The DPCOA's last contract expired in 2009.

b.      The City imposed CET as of July 2012, which were a unilaterally imposed set of working conditions, including a 10% wage cut for all DPCOA members.

c.      The City successfully blocked the DPCOA's efforts to proceed to Act 312 arbitration.  Following the suspension of PA 4, the DPCOA filed for Act 312 arbitration, an arbitrator was appointed, hearing dates were scheduled for March of 2013, and there were several days of productive negotiations prior to the

appointment of the Emergency Manager. However, all negotiations terminated with the Emergency Manager's appointment.

        d.    The Emergency Manager has consistently taken the position that there is no duty to bargain and has refused to bargain or negotiate with the DPCOA.

## II.    Legal Argument

### A.    Burden of Proof for Eligibility:

The City, as the proponent of the chapter 9 petition, bears the burden of proof to show that it is satisfies the elements of 11 U.S.C. §109(c) and is therefore eligible to file a chapter 9 petition. *In re City of Stockton, California,* 493 BR 772, 794 (Bankr. E.D.Cal. 2013); *In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995), *In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008).

### B.    Issues of Law:

**ISSUE 1:  The City failed to negotiate with the Detroit Public Safety Unions in good faith, as required by 11 U.S.C. §109(c)(5)(B).**

§109(c)(5)(B) requires the City to show that it:

. . . has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

8

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 21:09:56   Page 187 of 286

187

There are a number of aspects to the dealings between the City and the Detroit Public Safety Unions which demonstrate that the City did not negotiate in good faith with its creditors, and in particular with the Detroit Public Safety Unions, prior to the filing of the Chapter 9 petition. The failure of the City to negotiate is demonstrated by the City's April 18, 2013 Emergency Motion for Determination of Arbitral Jurisdiction and dismissal of Act 312 Petitions and Motion for Stay Pending Ruling, filed in the matters affecting the DPCOA (MERC Case No. D11 J-1169), the DPLSA (MERC Case No. D13 A-0005), and the POAM (Emergency Medical Technician Unit (MERC Case No. D09 F-0703). The ruling on the Emergency Motion resulted in a stay of the Act 312 proceedings, and thus a cessation to negotiations with these unions. After the cessation of the negotiations, there was no effort to engage the Detroit Public Safety Unions in conversations or negotiations about wages, hours, benefits and other terms and conditions of employment.

The next action by the City was its presentation of its June 14 Creditor Proposal, which was presented as, essentially, a "take it or leave it" proposal. All communications from the City regarding the June 14 Creditor Proposal was premised with the condition that the June 14 Creditor Proposal was not subject to negotiation. Thus, based on this premise, and the limited time between the June 14 Creditor Proposal and the July 18, 2013 filing date, there was not any reasonable

9

effort by the City, or time by any party, to develop any meaningful or serious negotiations.

There are no good faith negotiations when creditors are presented a plan as a "take it or leave it" proposal. *In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992), (even though the court held that the School Building Authority was not qualified to be a chapter 9 debtor, the judge still analyzed the requirements of 11 U.S.C. §109(c)(5)(B) and stated that a "take it or leave it" approach is not a good faith negotiation). Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of the other party" (*In re Sullivan County Regional Refuse Disposal District,* 165 B.R. 60, 78 (Bankr. D. N.H. 1994)).

Creditors need a sufficient time to evaluate a proposed plan in order to satisfy 11 U.S.C. §109(c)(5)(B). Moreover, prior to the filing of the Chapter 9 petition, the creditors and debtor can negotiate on a level playing field, without the Debtor having the benefit of Section 362 of the Bankruptcy Code. *In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R. 973, 979 (Bankr. D.Colo. 1992).

> In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these

problem, Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities. . . .One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code. (internal citations omitted)

*In re Cottonwood Water and Sanitation District,* 138 B.R. at 979.

Even before the filing of the Chapter 9 petition, the Emergency Manager used the provisions of Public Act 436 to exert leverage on the bargaining process and end Act 312 arbitration, and the negotiations and conversations that go along with the arbitration process. Thus, the City took two different approaches to changing the "playing field"—the first with regard to the cessation of the Act 312 arbitration process, and the second with the imposition of the automatic stay of 11 U.S.C. § 362 as a result of the Chapter 9 filing. The fact that the filing occurred, and the stay was imposed, so soon after the Emergency Manager was appointed further points to the lack of interest in the City to engage in meaningful negotiations.

**ISSUE 2: The City was not "unable to negotiate with creditors because such negotiation is impracticable," as required (in the alternative) for eligibility by 11 U.S.C. §109(c)(5)(C).**

11 U.S.C. §109(c)(5)(C) provides: "[the entity] is unable to negotiate with creditors because such negotiation is impracticable."

A determination of "impracticability" must be made on a case-by case basis, and requires a "fact sensitive inquiry". *In re New York City Off-Track Betting*

*Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010). In the instant case, the limited time between the June 14 Creditor Proposal and the July 18, 2013 filing date did not provide sufficient time for meaningful negotiations with creditors. However, this was a "self-imposed" time-limit by the Emergency Manager. The assertion that there was an inability to engage in negotiations with the various creditor constituents, as a result of acts on the Emergency Manager's own making, does not support that such negotiations are impracticable. See *In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60, 82 (Bankr. D. N.H. 1994) "the decision [to file chapter 9] appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises."

It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate or there was such a limited time for negotiations. (*In re Villages at Castle Rock Metropolitan District No. 4,*145 B.R. 76, 85 (Bankr. D. Colo. 1990), six months of conceptual discussions with largest bondholder was sufficient to satisfy §109(c)(5)(C).)

Moreover, the City's refusal to reopen Act 312 proceedings demonstrates its unwillingness to negotiate.

**Other legal issues:**

12

The Detroit Public Safety Unions reserve the right to rely on any legal argument of other objecting parties in this matter.

## III.    Witnesses

1.    <u>Daniel F. McNamara</u>:  President of the Detroit Fire Fighters Association ("DFFA"), Local 344, IAFF, AFL – CIO.  Mr. McNamara will testify about his duties as president of the DFFA, his responsibilities and the responsibilities of the DFFA on behalf of its members, and his dealings with representatives of the City prior to and after the filing of the chapter 9 petition.  In particular, he will testify about correspondence with Lamont Satchel, the city's Labor Relations Director, that addressed the termination of 2009 – 2013 Collective Bargaining Agreement effective 11:59 p.m. June 30, 2013; the City's terms and conditions of employment following the expiration of the CBA; and follow up meetings.  Mr. McNamara will testify about the City's unilateral imposition of wage cuts, cuts to health care benefits and pension restructuring proposals, and that there were no negotiations between the City and the DFFA, despite the DFFA's willingness to participate at meetings.

2.    <u>Mark Diaz</u>:  President of the Detroit Police Officers Association ("DPOA") since Jan. 1, 2013.  Mr. Diaz will testify about his duties as president, his responsibilities and the responsibilities of the DPOA on behalf of its members, and his efforts to negotiate and arbitrate labor matters with the City.  In particular, Mr. Diaz will testify about the Act 312 Arbitration and the awards that were issued as a result of same.   He will testify that the City's lack of negotiations; the City's announcement of its intention to impose new health care plans on the DPOA and other Detroit Public Safety Unions which significantly increase the members' out of pocket medical costs; and about the "informational meetings" in June and July 2013, at which representatives from Jones Day presented very general outlines of the City's restructuring proposal.

3.    <u>Mark Young</u>: President of the Detroit Police Lieutenants & Sergeants Association ("DPLSA").   Mr. Young will testify about his duties as president, his responsibilities and the responsibilities of the DPLSA on behalf of its members.  Mr. Young will testify about the DPLSA Feb. 4, 2013 Petition for Act 312 arbitration and the subsequent action of the City claiming it was not obligated to

13

13-53846-swr    Doc 2825-8    Filed 12/27/13    Entered 12/27/13 21:42:26    Page 193 of
286
13-53846-swr    Doc 1250    Filed 10/17/13    Entered 10/17/13 23:09:56    Page 193 of    192

engage in bargaining under the Public Employment Relations Act, MCL 423.201 et seq as a result of Section 27(3) of Public Act 436; the decision of the MERC on July 14, 2013 granting the City's motion to dismiss the Act 312 arbitration; and the City's subsequent statements that it had no obligation to bargain with the DPLSA. He will also testify about the City's actions in June and July 2013 relative to the termination of the CBA, the City's intent to impose changes to wages, benefits and working conditions, and correspondence with Lamont Satchel, the City Labor Relations Director. Mr. Young will testify about presentations made by the City in June and July 2013 relative to pension restructuring and health plan changes for DPLSA members, other meetings with the City/Emergency Manager to talk about employment issues for DPLSA members, and the City's statement that the meetings should not be categorized as negotiations.

4. <u>Mary Ellen Gurewitz</u>   Labor counsel for the Detroit Police Command Officers Association ("DPCOA").   Ms. Gurewitz will testify about the lack of negotiations between the DPCOA and the City, the terms that have been imposed by the City, and, in particular, the lack of negotiations with the City prior to the chapter 9 filing.

## IV.   Key Documents

A.   Declaration of Dan McNamara (subject to reaching an agreement with the City) [Doc. No. 512-6]
B.   Declaration of Mark Diaz (subject to reaching an agreement with the   City) [Doc. No. 512-1]
C.   Declaration of Mark Young (subject to reaching an agreement with the City) [Doc. No. 512-7]
D.   Declaration of Mary Ellen Gurewitz(subject to reaching an agreement with the City) [Doc. No. 512-8]
E.    DFFA letter dated July 12, 2013 [Doc. No. 512-6, p. 8]
F.   Jones Day letter of July 17, 2013 [Doc. No. 512-6, p. 10]
G.   <u>City of Detroit and Detroit Police Officers Association</u>, MERC Case No. D12 D-0354 Panel's Findings, Opinion and Orders [Doc. No. 512-2, 512-3, 512-4]
H.   <u>City of Detroit and Detroit Police Officers Association</u>, MERC Case No. D12 D-0354, Supplemental Award [Doc. No. 512-5]

14

13-53846-swr   Doc-2325-8   Filed 12/27/13   Entered 12/27/13 21:06:56   Page 17 of 19
13-53846-swr   Doc-1250   Filed 10/17/13   Entered 10/17/13 13:42:26   Page 193 of
286
193

I.  City of Detroit v. DPOA  MERC Case No. D12 D-0354
    Chairman's Partial Award on Health Insurance [Doc. No. 512-5]
J.  Letter from Jones Day, Brian West Easley, dated June 14, 2013
K.  Letter from Jones Day, Brian West Easley, dated June 27, 2013
L.  DFFA Master Agreement, 2001-2009
M.  DFFA Act 312 Award dated October 31, 2011
N.  DFFA Supplemental Act 312 Award dated October 31, 2011
O.  DFFA Temporary Agreement
P.  DPLSA Master Agreement, 2009
Q.  DPCOA Master Agreement,
R.  DPCOA Temporary Agreement
S.  MERC Opinion City of Detroit v. POAM/DPCOA/DPLSA


## V.  Conclusion

The City, prior to and through Mr. Orr as the Emergency Manager,

established a clear picture that prior to the filing of the chapter 9 petition it was not

interested in negotiating with the Detroit Public Safety Unions. This is

demonstrated by the imposition of the City Employment Terms in 2012, by the

City's successful blocking of the Act 312 arbitrations (that were in process at the

time of the Emergency Manager's appointment) after the Emergency Manager was

appointed, and by the June 14 Creditor Proposal, which was presented as a "take it

or leave it" proposition to creditors, with no opportunity for discussion or

negotiation.

Moreover, the Detroit Public Safety Unions had, and continue to have, the

authority to negotiate on behalf of their respective members. The City cannot

reasonably claim that negotiations were or would have been impracticable—the City never engaged in negotiations, so not having tried, it cannot say that it could not be done.

Based on the actions, and lack of actions by the City, the Detroit Public Safety Unions assert that the City has not satisfied the conditions of 11 U.S.C. §109(c)(5)(B) and (C) and therefore, do not satisfy the conditions for eligibility under Chapter 9 of the Bankruptcy Code. The Detroit Public Safety Unions therefore request that this Chapter 9 petition be dismissed.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: /s/ Barbara A. Patek
        Earle I. Erman  (P24296)
        Craig E. Zucker  (P39907)
        Barbara A. Patek (P34666)
        Counsel for the Detroit Public Safety Unions
        400 Galleria Officentre, Suite 444
        Southfield, MI  48034
        Telephone: (248) 827-4100
        Facsimile:  (248) 827-4106
        E-mail:  bpatek@ermanteicher.com

DATED:  October 17, 2013

16

13-53846-swr   Doc 1225   Filed 10/17/13   Entered 10/17/13 21:36:26   Page 195 of 195
13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 195 of 195
286

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

-------------------------------------------------------- x
                             :

In re:                         :    Chapter 9
                             :

CITY OF DETROIT, MICHIGAN,    :    Case No.: 13-53846
                             :

             Debtor.      :    Hon. Steven W. Rhodes
-------------------------------------------------------- x

**PRE-TRIAL BRIEF OF INTERNATIONAL
UNION, UAW AND THE *FLOWERS* PLAINTIFFS
WITH RESPECT TO THE ELIGIBILITY OF THE CITY
OF DETROIT, MICHIGAN FOR AN ORDER FOR
RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

      The International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America ("UAW") and Robbie Flowers,

Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman, as plaintiffs

in the suit *Flowers v. Snyder*, No. 13-729 CZ (Ingham County Circuit Court) (the

"*Flowers* plaintiffs") submit this pre-trial brief in further support of their respective

August 19, 2013 and October 11, 2013 objections to the eligibility of the City of

Detroit (the "City")  for an order of relief under chapter 9 of the U.S. Bankruptcy

Code and in support of its case at trial.

13-53846-swr  Doc 2335-8  Filed 12/27/13  Entered 12/27/13 22:42:36  Page 196 of
286
13-53846-swr  Doc 1235-3  Filed 10/27/13  Entered 10/27/13 13:41:36  Page 1 of 51  196

# PRELIMINARY STATEMENT

UAW's objections to the City's eligibility for an order of relief involve an inter-related set of legal and factual considerations. UAW's principal factual challenge to eligibility is that the Governor and the City from the beginning intended to use chapter 9 for the purpose of reducing the pension benefits of Michigan citizens in derogation of their rights under Article 9, Section 24 of the Michigan Constitution. The governor and the City thus intentionally violated the Michigan Constitution with their chapter 9 filing. That allegation is based on the City's plan, revealed in its pre-bankruptcy proposal to creditors, to cut its pension funding obligation and force significant reductions in accrued pension benefits of City retirees – reductions which would violate the express terms of the Michigan Constitution. The City planned to pursue these cuts in bankruptcy court, where it presumed that the processes of the Bankruptcy Code would allow it to overcome the express prohibition in the Michigan Constitution against diminishment or impairment of accrued pension benefits.[1] Raising the specter of an unwieldy

---

[1] The City's strategy was telegraphed in an article authored by attorneys at Jones Day, the law firm that the City chose as restructuring counsel. *See* Jeffrey B. Ellman, Daniel J. Merrett, *Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?* 27 Emory Bankr. Dev. J. 365 (2011) (hereafter, "Ellman and Merrett, *Pensions and Chapter 9*") (describing how federal bankruptcy law offers "significant" sources of leverage which can be used to "force[]" pensioners to bargain and "place[] substantial pressure" on them to "reach a resolution [regarding cuts to their benefits] as quickly as possible").

underfunding obligation, the amount of which it has never determined with any degree of certainty, the City declared it would walk away from its pension funding obligation, leaving pensioners with significantly reduced benefits and a miniscule recovery on their claims. Money saved by not paying the funding obligations would be diverted to modernization projects.

In particular, less than three months after his appointment by Michigan Governor Richard Snyder ("Governor Snyder" or "Snyder"), and barely one month before filing the City of Detroit's chapter 9 petition, the City's Emergency Manager Kevyn Orr ("EM Orr" or "Orr") released a comprehensive proposal which he claimed would transform Detroit and its operations. The June 14, 2013 "Proposal for Creditors" (the "Proposal") laid out an ambitious program of upgrades and improvements for the City's residents and businesses but proposed radical changes in pension and health care benefits for City workers who had already been subjected to reductions in force and wage and benefit cuts under the City's imposed employment terms.

Orr's plan proposed drastic cuts in its retiree benefit programs. Importantly, in derogation of Article 9, Section 24 of the Michigan Constitution, which expressly prohibits the diminishment or impairment of accrued pension benefits, Orr's proposal would compel unspecified yet "significant cuts" in accrued, vested pension benefits. Under the Proposal, the City would pay no further

- 3 -

13-53846-tjt   Doc 2335-3   Filed 12/27/13   Entered 12/27/13 22:42:36   Page 198 of 52
13-53846-swr   Doc 1253-3   Filed 10/27/13   Entered 10/27/13 22:41:35   Page 3 of 51
286

198

contributions to the retirement systems, leaving retirees with unsecured bankruptcy claims to be paid pennies on the dollar.

Under these circumstances, there could be no valid authorization for the chapter 9 filing as required by Section 109(c)(2) of the Bankruptcy Code. The Governor was well aware of Orr's plan to cut its "legacy" liabilities when he issued the authorization (which expressed his approval of Orr's "priorities" for the City, while acknowledging that public employees "now fear for the financial future in retirement"). Orr Decl. Ex. L. The Governor could not authorize a chapter 9 proceeding brought in order to force cuts in accrued pensions because the Governor had no authority to ignore, or waive, the protections of Article 9, Section 24 of the Michigan Constitution; only the people of the State of Michigan can, through the constitution's amendment procedures, change the requirements of Article 9, Section 24. Because the Governor could not validly authorize a filing in contravention of law, he was powerless to take action that would permit the City to do so through the actions of the Emergency Manager.[2]

---

[2] Chapter 9 reflects our system of dual federal and state sovereignty. Initially declared an unconstitutional exercise of Congressional power, *see Ashton v. Cameron County Water Improvement District*, 298 U.S. 513 (1936), the lawful exercise of federal municipal bankruptcy hinges on strict adherence to deep-rooted principles of dual sovereignty. Moreover, Michigan citizens have the right under the Tenth Amendment to insist that chapter 9 not be used to deprive them of their rights under the Michigan constitution.

In addition, the City cannot meet the eligibility requirement of Section 109(c)(4) because it is evident that the plan that EM Orr desired to "effect" was one which would – unlawfully – lead to cuts in accrued pension benefits and therefore could not be approved in bankruptcy.  Orr proposes that the City make no further pension contributions to the retirement system, offering only a meager recovery on a bankruptcy claim for the underfunding.  The proposal flatly declares that, without the  funding, accrued benefits would have to be cut significantly, although the City has (as of yet) failed to specify the level of the cuts it demands.  A plan of adjustment incorporating these features could not be confirmed under Section 943 of the Bankruptcy Code, because the City could not show that "the debtor is not prohibited by law from taking any action necessary to carry out the plan."  11 U.S.C. § 943(b)(4).  Such a plan would plainly run afoul of Article 9, Section 24 of the Michigan Constitution.  Because EM Orr sought authorization to commence a chapter 9 case in order to effect a plan that would be patently *unlawful* for the state to implement, the City cannot meet the threshold eligibility requirement that a debtor "desire[s] to effect a plan to adjust its debts" under Section 109(c)(4).

Nor did the City comply with Sections 109(c)(5)(B) or (C) of the Code because it failed to negotiate in good faith (nor was it precluded from doing so) in its pre-bankruptcy interactions with stakeholders regarding its Proposal.  The City wants to launch a comprehensive program of upgrades and "reinvent" itself  without

its legacy obligations. Orr has prioritized reinvestment projects at the expense of protected pension benefits and has done so by relegating those obligations to "legacy" liabilities to be washed away in bankruptcy. *See* Orr Decl. Ex. A (June 14 Proposal to Creditors). These were choices made by the Emergency Manager even though he could have constructed a different plan that did not attack pension benefits protected by the Michigan Constitution.

Focused on using chapter 9 and the bankruptcy tools available as a chapter 9 debtor, the City simply made a radical proposal to force cuts in pension benefits and then gave itself barely a month before requesting authorization to file its chapter 9 case. Such a proposal could not have been in good faith. The City thus made the pension proposal intent on using chapter 9 rather than meaningfully engaging with stakeholders over its effort to reorder the City's priorities. A proposal the City thought it could achieve in bankruptcy and which it could not have expected the union to accept in any event (because the union could not do so – as unions are also bound by the prohibitions of Article 9, Section 24 of the Michigan Constitution) does not reflect good faith negotiations.

Moreover, the City's pension proposal was jerry-built on an incomplete and hotly contested picture of the financial condition of the pension plans, seemingly to present the scenario that the unfunded liability was too big to fund. The City's proposal called for benefit cuts that would be "significant," and – since its plan was

to implement the funding cuts through bankruptcy – offered no concrete avenue to preserve the benefits protected by the Michigan constitution.  It was, therefore, not a serious basis for discussion.

After a brief period during which the City conducted stakeholder meetings designed more to give the appearance of discussions than serve as substantive negotiations (including meetings at which those in attendance were not even allowed to speak freely) Orr sought the Governor's approval for a chapter 9 filing barely 30 days after the launch of the Proposal.  The evidence will show that the State and EM planned to file bankruptcy long before the purported negotiations had run their course, confirming that the "negotiations" were no more than a check-the-box exercise on the way to the courthouse.

Nor can the City demonstrate that further attempts to negotiate were impractical under Section 109(c)(5)(C).  Impracticality, for purposes of Section 109(c)(5), cannot mean putting up a proposal that could not lawfully be implemented or accepted and then claiming that negotiations over it were impractical.

In sum, absent a valid and lawful state authorization for the filing, absent a plan of adjustment that the City could lawfully execute, and without the requisite showing of good faith and required pre-bankruptcy good faith negotiations,

the City of Detroit is ineligible for chapter 9 relief. The City's chapter 9 petition therefore must be dismissed.

## STATEMENT OF FACTS

UAW and the *Flowers* plaintiffs submit that the following facts will be established at trial.

The UAW

International Union, UAW is a labor organization headquartered in Detroit, Michigan whose members include both City of Detroit employees and retirees and employees and retirees of public entities related to the City of Detroit that participate in common with City of Detroit employees in retirement benefit plans, including the City of Detroit General Retirement System pension plan. UAW is representing the interests of these active and retired employees in this bankruptcy case. There are approximately 200 retirees from UAW-represented bargaining units of City of Detroit component units. There are, additionally, many active UAW-represented employees who are vested in their retirement benefits, all of whose pensions are at risk under EM Orr's Proposal. UAW-represented employees and retirees are drawn from the following units: Civilian Police Investigators, City Law Department attorneys, City of Detroit Law Department paralegals, Water & Sewer waste water treatment operators, Detroit librarians and associated skilled trades workers.

<u>Michigan's Constitution Protects Accrued Pensions</u>

Article 9, Section 24 of the Constitution of the State of Michigan makes clear that neither the state nor a municipality may reduce accrued pension benefits: "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."[3] Thus, "under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits." *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973). *See also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) ("The obvious intent of § 24 … was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished."); *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W.2d 803, 816

---

[3] The address to the people accompanying the 1963 Constitution states that Article 9, Section 24 "requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation *which cannot be diminished or impaired by the action of its officials or governing body*." 2 Official Record, Constitutional Convention 1961, p. 3402 (emphasis added). The Constitution also requires benefits to be funded in the year they are accrued and prohibits the legislature and municipalities from using those funds for other unfunded liabilities. Mich. Comp. Laws Const. Art. 9, § 24. The debates concerning what is now Article 9, Section 24 confirm that municipal employees have the entire assets of their employer at their disposal for these benefits: "Mr. VAN DUSEN: An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p. 774.

- 9 -

13-53846-tjt   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 22:41:36   Page 204 of 52
13-53846-swr   Doc 2335-8   Filed 12/27/13   Entered 12/27/13 22:42:35   Page 9 of 51   204
286

(Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements.").

Pension Benefits Under the General Retirement System

The pension benefits afforded retired City employees are modest. According to the actuarial report prepared by the actuaries for the General Retirement System, which covers the City's non-uniformed personnel, and dated June 30, 2011, the average annual benefit received by retired pensioners or their beneficiaries was $18,955. By comparison the federal poverty threshold in 2013 for a family of two is $15,510.[4] Unlike private-sector defined benefit plans, which are insured by the federal Pension Benefit Guaranty Corporation, there is no guaranty program or insurance protection for the pension benefits paid under the General Retirement System. There is only Article 9, Section 24.

The Emergency Manager and Pre-Bankruptcy Events

The Emergency Manager serves under the Local Financial Stability and Choice Act Public Law 436 (2012) Mich. Comp. Laws § 141.1541 *et seq.* ("PA 436"). PA 436 is the most recent in a series of emergency manager laws Michigan has enacted concerning Michigan's local government units. *See City of Pontiac Retired Employees Ass'n v. Schimmel, et al*., No. 12-2087, 2013 WL 4038582, *1-

---

[4] *See* *http://aspe.hhs.gov/poverty/13poverty.cfm#thresholds*.

*2 (6th Cir. August 9, 2013) (hereafter, "*Pontiac Retired Employees Ass'n*")
(summarizing the State's Emergency Manager laws).  In 1990, Michigan enacted
Public Act 72, known as the "Local Government Fiscal Responsibility Act."  Mich.
Comp. Laws § 141.151(1)(j)(2005).

In 2011, Public Act 72 was repealed with the enactment of Public Act
4, the "Local Government and School District Fiscal Accountability Act," Mich.
Comp. Laws §§ 141.1501-1531, in March 2011.  "Unlike P[ublic] A[ct] 72, PA 4
gave emergency managers the power to temporarily reject, modify or terminate
existing collective bargaining agreements." *Pontiac Retired Employees Ass'n*, 2013
WL 4038582, at *3.

Pursuant to PA 4, the City entered into a Consent Agreement with the
State on April 4, 2012, under which a financial advisory board was appointed to
monitor Detroit's finances.  Orr Decl. Ex. E.  Jack Martin was appointed as the
City's Chief  Financial Manager and William "Kriss" Andrews as Program
Management Director under the Consent Agreement.

Public Act 4 generated immediate public opposition.  It was rejected by
Michigan voters under the state's voter rejection procedures in November, 2012. *Id.*
at 4.  In the words of the Sixth Circuit, "[a]pparently unaffected that the voters had
just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan
Governor signed, Public Act 436.  Public Act 436 largely reenacted the provisions of

Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum." *Id.* (citations omitted).[5] Public Act 436 became effective on March 28, 2013. A number of legal challenges to Public Act 436 have been filed and remain pending.[6] Declaration of Kevyn Orr ("Orr Decl."), Ex. A, pp. 57-59.

Retention of Jones Day and EM Orr

Beginning in 2012, the State and the City acts with various restructuring professionals. In late January 2013, Jones Day was one of several firms which made presentations to State Treasurer Andy Dillon, Richard Baird, Jack Martin, Kriss Andrews and members of the Financial Advisory Board in connection with their efforts to be retained. Buckfire Dep. Tr. 197. Dillon requested that Kenneth Buckfire of the Miller Buckfire investment banking firm, which had earlier

---

[5] In a contemporaneous e-mail to a Jones Day colleague Orr opined that PA 436 was a "thin veneer of a revision, it is essentially a redo of the prior rejected law." Orr Dep. Tr. at 48.

[6] The lawsuits raise serious challenges affecting the legality of the EM's appointment and other actions taken under the statute, including whether the Emergency Manager's appointment violated Michigan's Open Meetings laws, or was otherwise defective as a result of the voters' repeal of PA 4; whether PA 436 violates the U.S. Constitution and the federal Voting Rights Act. Other litigation, such as the *Pontiac Retiree Employees Association* case recently decided by the Sixth Circuit, involve challenges to emergency managers appointed in other towns. To the extent Governor Snyder's appointment of EM Orr was ineffective, as UAW believes and asserts, the City's Chapter 9 filing is void, as this Court would be bound to find.

been retained by the City on restructuring, rate each of the law firm candidates. Buckfire Dep. Tr. at 25.

In a presentation on January 29, 2013, Jones Day, among other things, opined that federal bankruptcy power would permit the City to reduce accrued pension benefits of City employees and retirees, notwithstanding the specific protections afforded those benefits under the Michigan Constitution. Orr Dep. Ex. 21 p. 41. It noted that an Emergency Manager "could be used as political cover for difficult restructuring decisions." *Id.* at p. 16. And Jones Day recommended as a part of planning for a Chapter 9 filing pursuing a consensual out-of-court restructuring that, while unlikely to be successful, could be used as a record of good faith negotiations. *Id.* at 13, 16-18, 22-23, 28. Kevyn Orr, a partner at Jones Day, was part of the firm's team that made the presentation.

Buckfire, who ranked the firms following the various presentations, gave Jones Day top marks, and shared its estimation of Jones Day with the State. Buckfire Dep. Tr. 32-33.

On January 31, just two days after Jones Day made its presentation, Richard Baird, advisor to the Governor, spoke with Orr in an attempt to recruit him to be Emergency Manager position. Baird Dep. Tr. at 19, 25. Baird was not directly employed by the State, but served as a consultant to the Governor, compensated through the Governor's non-profit New Energy To Reinvent and Diversify Fund

(the "NERD Fund").  Baird Dep. Tr. at 10.  Baird told one of Orr's partners at Jones

Day that Orr's decision on whether to accept the EM position would have no impact

on whether the City decided to hire Jones Day.   Baird Dep. Tr. at 23.  Baird

admitted he had no authority to make a commitment on behalf of the City that Orr's

decision would have no impact on the City's decision to hire Jones Day or not. *Id.*

That he nonetheless made the commitment shows how the State and its operatives

were calling the shots and steering Detroit down the road to a bankruptcy filing.

Even before Orr became EM in March, while he was still a partner at

Jones Day, Baird included him in decision-making about how the City would

operate after the EM was appointed, and he reassured Orr that he was already acting

as an "agent of the State."  Baird Dep. Ex. 6 and Tr. at 38-39.

On March 11, 2013, Detroit Mayor Dave Bing announced that the City

would retain Jones Day as restructuring counsel to the City.  Three days after Bing's

announcement, on March 14, 2013, Governor Snyder announced Orr's appointment

as Emergency Manager for the City.  Orr took office on or about March 25, 2013,

under the predecessor Emergency Manager law and now serves under PA 436.

Orr's salary is paid by the State but certain of his personal expenses are paid by the

NERD Fund.

Under PA 436, the Emergency Manager exercises the power of the

government of the City of Detroit.  The Emergency Manager "Act[s] for and in the

place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2).

Retention of Milliman

In conjunction with the Consent Agreement, the City retained the Milliman actuarial consulting firm to provide analysis concerning the City's two retirement systems, the General Retirement System of the City of Detroit and the Police and Fire Retirement System of the City of Detroit as reported by the plans' actuaries, Gabriel Roeder Smith. Beginning no later than July 2012, Milliman produced various analyses and opinions concerning the funding status of the plans. In July 2012, Milliman provided "very rough preliminary guesstimates ('VRPG') of the potential actual state of the systems" which it stated "are not based on any detailed calculations." Bowen Dep. Ex. 1 at p. 2.

As recently as September 24, 2013, Milliman had still not yet completed a replication of the most recent actuarial reports on the plans. It had no present estimate of when its work will be completed, having submitted its most recent request for information to the plans in August 2013. Bowen Dep. at 93-94.

Since the appointment of the EM, a "Pension Task Force" consisting of Milliman actuaries, Conway MacKenzie's Charles Moore, who is not an actuary, and with the participation of counsel has been convened to review the state of the City's retirement plans. Bowen Dep. Tr. at 59. Milliman prepared several analyses

based on different scenarios fed to the firm by this task force. Milliman did not select, nor were they asked for opinions concerning, what scenarios should be considered, rather they were directed by other members of the task force. *See* Bowen Dep. Tr. at 65-66, 72-73, 80-81.

On June 4, 2013, Milliman produced a ten year projected cost analysis with respect to each plan. Bowen Dep. Exs. 4, 12. As noted with respect to the General Retirement System, this analysis was based on the valuation results, actuarial assumptions and methods used by the plan's actuaries. Milliman used "[r]ecursive formulas, actuarial judgment and rules of thumb" to project results in future years. Bowen Dep. Ex. 12. As a "baseline" projection, Milliman adjusted the earnings assumptions the plan's actuaries made from 7.9 % to 6.3%, 7% or 7.5 % noting that 6.3% was Milliman's recommendation based on its own "capital market assumptions." *Id*. at p. 3. Milliman also modified the amortization schedule the plan used with respect to unfunded liability. *Id*. at p. 2. Milliman noted that the actuarial value of the General Retirement System's assets ($2.806 billion) exceeded the market value of the assets by $648 million as compared to liabilities of $4.433 billion. *Id*. at Ex. II-A. Its analysis projected that the General Retirement System

would be 55% funded on an actuarial basis in ten years (assuming a 7% rate of return on assets). *Id.*[7]

In setting out the "Basis for Analysis," Milliman states that its work was "prepared exclusively for the City of Detroit for a specific and limited purpose … It is not for the use or benefit of any third party for any purpose." Bowen Dep. Ex. 12 at p. 8. Nonetheless and despite the fact that Milliman does not have the information to be able to replicate the work of the plans' actuaries, Milliman's work became the basis for the City's demands with respect to retirement benefits.

June 14, 2013 Creditor Proposal

The Creditor's Proposal was released by the Emergency Manager on June 14, 2013. Orr Decl. Ex. A. As relevant to the UAW's objection, the Proposal takes broad aim at the City's workers and retirees; city employees have already been subjected to headcount reductions and "City Employment Terms" (the "CETs") imposed a year ago which cut wages and benefits and unilaterally changed work rules. *See* Orr Decl., Ex. A, pp. 53-54 (describing the imposition of the CETs). The proposal indicated that these imposed changes would serve as a "baseline" for the City in its contract talks with the unions, although the City may seek cuts and

---

[7] With respect to the Police and Fire Retirement System, the Milliman report stated that the $3.765 billion actuarial value of assets exceeded market value by $701 million as compared to total liabilities of $4.316 million. Bowen Dep. Ex. 4 at Ex. II-A. The Police and Fire Retirement System was projected to be 79% funded in ten years. *Id.*

changes "beyond those included in the CETs." *Id.* p. 76. Additional reductions in staffing levels and outsourcing functions are also contemplated. *Id.* p. 78. Regarding retiree obligations, the City intends to modify retiree medical benefits through a replacement program and indicates that "claims will result from the modification of benefits." *Id.* p. 109.

The City's pension proposal garnered immediate and significant opposition, including at least three lawsuits commenced prior to the chapter 9 filing.[8] Although PA 436 directs that the Emergency Manager's financial and operating plan "shall provide for" the "timely deposit of required payments to the pension fund for the local government or in which the local government participates," Mich. Comp. Laws 141.1551 Sec. 11(1)(d), the Emergency Manager announced that annual contributions required to fully fund currently accrued, vested benefits "will not be made under the plan." Orr Decl., Ex. A, p. 109.

The Creditors' Proposal provided that the retirement system underfunding would be "exchanged for a pro rata ... principal amount of New Notes." *Id.* Put another way, the Emergency Manager proposed to transform the

---

[8] *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court July 3, 2013); *General Ret. Sys. of the City of Detroit v. Kevyn D. Orr*, No. 13.768-CZ (Ingham County Circuit Court); *Webster v. State of Michigan*, 13-734-CZ (Ingham County Circuit Court July 3, 2013). The City and the State make much of the lawsuit activity in connection with the bankruptcy filing. But Orr's proposal left the affected parties little choice given the City's blatant disregard of the State Constitution.

plan's underfunding into a bankruptcy claim which would share a $2 billion recovery pro-rata with billions of dollars in additional general obligation bond and other general unsecured claims. Because the City has yet to assign value to any assets it might monetize, under the proposal creditor recoveries would not be affected by any asset sales. Buckfire Dep. Tr. at 107.

The Proposal then goes on to state that "[b]ecause the amounts realized on the underfunding claims will be substantially less than the underfunding amount **there must be significant cuts in accrued, vested pension amounts** for both active and currently retired persons." Orr Decl. Ex. A at 109 (emphasis supplied).

In particular, the proposal opined that the City's actuarial valuation of pension plan underfunding was "substantially understated" and that under "more realistic assumptions" the plans were underfunded by $3.5 billion. Orr Decl. Ex. A p. 29. But the proposal contained no quantification of the "significant cuts in accrued, vested pension amounts" that would be required. Moore Dep. Tr. at 150-51.

There are substantial reasons to question the $3.5 billion estimate. First, as noted above, the City admits that its actuarial analysis is incomplete because it still lacks necessary data. Moreover, it has reviewed the actuarial assumptions at issue and the head of its Pension Task Force testified that neither the task force nor Milliman had arrived at the view that the actuarial assumptions that the Detroit

pension plans have used are inconsistent with actuarial standards of practice. Moore Dep. Tr. at 140-41.

Moreover, apparently uncertain of the state of the plans, the Emergency Manager has not acted on Milliman's funding analysis. Under Section 12(1)(m) of PA 436, an Emergency Manager may remove the governing body of a public retirement plan if its funding level (net of pension related indebtedness) is below 80%. The task force asked Milliman to analyze this issue months ago and in April 2013 Milliman provided the Pension Task force with its analysis that the funding level for the General Retirement System was below 80%. Although the Task Force was of the opinion that Milliman properly accounted for pension-related indebtedness in its analysis, no action was recommended or taken with respect to the plan's governance. Moore Dep. Tr. at134-35.

While the City's June 14 proposal to creditors was emphatic in its assertion that accrued pension benefits had to be reduced, discovery has shown that the City has no solid basis for insisting on such cuts. For example, when he was deposed, EM Orr conceded that a substantial portion – approximately 62% – of the calculated actuarial underfunding of the General Retirement System is attributable to the Detroit Water and Sewerage Department which is run as a separate department of the City and is financially sound. Orr Dep. Tr. at 369-78. The notion that the

- 20 -

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 23:44:56   Page 215 of
13-53846-swr   Doc 1255   Filed 10/17/13   Entered 10/17/13 22:42:36   Page 20 of 92   215
286

plans' underfunding is "substantially understated" is at best half-baked and at worse a litigation contrivance which does not bear close analysis.

Notwithstanding the substantial uncertainty with respect to the issue of pension underfunding, the EM proceeded with the June 14 proposal in the face of the constitutional prohibition. The City's Pension Task Force discussed the provisions of the Michigan constitution so that "everyone on the task force was aware of it" including the scope of an "Attorney General opinion regarding that provision back from the late 1970s … [and] how far those protections go." Moore Dep. Tr. at 154. But the Task Force did not seek to reach a consensus with respect to the effect of the provision on in event of a Chapter 9 filing, *id*. at 156, and the City proceeded with its proposal to cut pension benefits nonetheless.

Presentations to Creditors

Labor unions and retiree organizations attended a series of presentations in late June and early July made by representatives of the Emergency Manager and various stakeholders. Only a handful of presentations were scheduled with labor groups despite the breadth of the proposals affecting workers and retirees. *See* Orr Decl. ¶¶ 90-96 (describing post-June 14, 2013 meetings attended by stakeholders).

Orr refused to characterize these meetings as "bargaining" sessions. Orr Dep. Tr. at 137-38. Nor could they be deemed bargaining. For example, the

attendees at the meeting were not permitted to speak; to communicate with those making the presentation, attendees were required to write any questions they had on a card, which would then be read aloud. No true negotiation occurs when one side is muzzled.

With respect to the critical issue of pensions, even assuming the City could demand reductions in accrued benefits under threat of Chapter 9 – and it could not as a matter of law – there could be no negotiation since the City had not (and has yet to) quantify its demands. Rather, consistent with Jones Day's January 29, 2013 presentation these meetings were window dressing – an attempt to create a record of good faith negotiations to support a Chapter 9 filing decided upon earlier.

In this respect it is important to note that the City has for many years conducted successful collective bargaining negotiations with UAW and unions representing its other employees. While the City complains that it must negotiate with a number of labor organizations, that has not presented an insurmountable obstacle to concessionary bargaining. Most recently, in February 2012, the City reached a tentative agreement with 30 unions representing its non-uniformed employees including UAW that included substantial pay and benefit concessions. Orr was apparently unaware of this history. Orr Dep. Tr. at 236-37. Bargaining here was not an impossibility.

<u>The Filing</u>

On July 16, 2013, EM Orr wrote to the Governor and recommended pursuant to Section 18(1) of PA 436 that the Governor authorize the City to file for bankruptcy under Chapter 9.  Orr Decl. Ex. J.  Orr's July 16 letter contained numerous questionable or controversial assertions, claiming, for example, that the Detroit pension funds faced $3.5 billion in unfunded liability and that the EM had engaged in good faith negotiations over his proposal.  *Id.*  The Governor accepted these assertions at face-value, without undertaking any independent investigation to confirm their truth.  At the point he received the Orr's request, the Governor acknowledged that "a lot of work still needed to be done" on determining what assets the City could monetize.  Snyder Tr. at 55-56; *see* Buckfire Dep. at 107 (noting that creditor proposal structured recovery based on inability to assign value to City's assets aside from projected cash flows from operating cash flows).  That, however, did not stop the Governor from writing to Orr that Orr could proceed with the filing.

Orr's letter to the Governor was clear about his plan to cut back on obligations to retirees so that a larger share of the City's revenues could be devoted to City services and reinvestment: "The City's debt and legacy liabilities must be significantly reduced to permit this reinvestment."  Orr Decl. Ex. J at p. 2.  In his authorization, the Governor indicates his agreement with Orr's priorities and while

he expresses "concern" for public employees who "now fear for their financial future in retirement" merely states that he is "confident" that all of the City's creditors will be treated fairly. Orr Decl. Ex. K at p. 3. The Governor did not attach any contingencies to the letter but cited section 943(b)(4), a provision that is only at plan confirmation. Orr Decl. Ex. K at p. 4.

In fact, the Governor rushed to respond, providing Orr the green light to file just two days after Orr's request arrived. Indeed, a schedule prepared by the Governor's staff on July 17 planned a public announcement by the Governor of authorization to file the case on Thursday July 19. Dillon Dep. at 88.

Abruptly, on July 18, 2013 the Governor authorized the filing and later that same day, the City filed its chapter 9 petition. *See* Orr Decl. Ex. L at p. 3. The Governor and Dillon discussed the pending litigation challenging the Governor's right to authorize a chapter 9 filing and knew that a hearing was scheduled for Monday, July 22. Dillon Tr. at 84-85. Although the Governor denied that pending state court litigation challenging the Governor's right to authorize a bankruptcy had anything to do with the rush to the bankruptcy court, Orr conceded in his deposition that the litigation created the risk that he would be unable to execute his plans. Orr Dep. Tr. at 220-21, 222-23. The only conclusion that can be drawn from this rush to file is that EM Orr and the state feared that the courts would enjoin a filing.

The Governor has testified that he was aware at the time he authorized the filing that Orr's June 14 proposal demanded reductions in accrued pension benefits. Snyder Dep. Tr. at 63-64. He further testified that he knew PA 436 expressly permits the Governor to condition the authorization for a chapter 9 filing, *see* Mich. Comp. Laws 141.1558(1), but that he chose not to condition Detroit's filing on a promise that the City not seek to cut vested pension benefits in violation of the Michigan Constitution. *See* Orr Decl. Ex. L.

## ARGUMENT

## THE PETITION MUST BE DISMISSED BECAUSE THE CITY IS NOT ELIGIBLE FOR CHAPTER 9 RELIEF

A.  The State's Authorization Was Unlawful
    Under Michigan's Constitution and Laws

Governor Snyder was fully aware that part of the Emergency Manager's bankruptcy authorization request was a plan to impair accrued vested pensions. Yet the Governor placed no contingencies on his July 18, 2013 bankruptcy authorization. *See* Orr Decl. Ex. J. The Governor's failure to condition his authorization on adherence to Article 9, Section 24 breached the State's constitution. *See* 2 Official Record, Constitutional Convention 1961, p. 3402 (accrued pensions are obligations "*which cannot be diminished or impaired by the action of its officials or governing body.*") (emphasis added). Governor Snyder lacks any authority to ignore Michigan's constitutional proscription against the impairment of accrued pensions, and the Michigan Supreme Court has made clear

- 25 -

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 23:44:58   Page 26 of 92
13-53846-swr   Doc 1335   Filed 10/17/13   Entered 10/17/13 22:42:59   Page 220 of
286                                                                           220

that the Governor is bound by the Michigan Constitution.[9] *See Wood v. State*

*Admin. Bd.*, 238 N.W. 16 (Mich. 1931) (Governor's reduction of appropriations in

bill approved by legislature invalid due to violation of constitution's veto clause);

*Dullam v. Wilson*, 19 N.W. 112 (Mich. 1884) (Governor may not remove public

official without due process required by constitution); *see also Buback v. Romney*,

156 N.W.2d 49 (Mich. 1968) (statute permitting Governor to use judicial officers to

adjudicate removal of executive branch officials violated constitutional separation of

powers and was invalid).

The Governor's statement in his July 18, 2013 letter that the plan of

adjustment must be legally executable, under Section 943(b)(4), Orr Decl., Ex. K,

was insufficient because the Governor nonetheless authorized the filing knowing

that EM Orr was pursuing the pension proposal. The reference to Section 943(b)(4)

— which applies to confirmation of the plan — does not provide the requisite

---

[9] Indeed, the Michigan Constitution can be altered only as set forth therein, notably, with respect to each permitted process, requiring the approval of Michigan voters. Under Article 12, Section 1, the Legislature, by two-thirds vote of each chamber, can place a proposed constitutional amendment on the ballot. The proposed amendment becomes effective only if approved by a majority of the voters. Pursuant to Article 12, Section 2, a citizen petition for a proposed amendment can be placed on the ballot, which becomes effective only if approved by a majority of the voters; or 3. Pursuant to Article 12, Section 3, a duly called constitutional convention may place a proposed constitutional amendment on the ballot. The proposed amendment becomes effective only if approved by a majority of the voters. *See* Mich. Comp. Laws Const. Art. 12 §§ 1-3.

gatekeeping "specific authorization" that is required by Section 109(c)(2). *See In re City of Harrisburg, PA,* 465 B.R. at 754-55.

Nor did PA 436 authorize EM Orr to contravene Article 9, Section 24 in issuing his request to file the chapter 9 case.[10]  The power of the Emergency Manager is defined by Michigan law and is subject to the Michigan Constitution as well.  Under PA 436, the Emergency Manager exercises the power of the government of the City of Detroit.  The Emergency Manager "Act[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government."  Mich. Comp. Laws § 141.1549(2).  Like the Governor, EM Orr has no authority to pursue cuts in accrued pension benefits through chapter 9 nor, consistent with the Michigan Constitution, could the Michigan legislature lawfully have given him such authority.  *See In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973) ("under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits"); *see also Pontiac Retired Employees Ass'n*, No. 12-2087, 2013 WL 4038582, *1-*2 (6th Cir. August 9, 2013)

_____

[10] The Governor's authorization does not – and cannot – increase the Emergency Manager's powers and the Governor has no authority to disregard the Michigan Constitution or to change Michigan's laws. Indeed, the Governor has sworn to *uphold* the state Constitution.  As mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*, the Governor swore the following oath, later filed with the Michigan Secretary of State:  "*I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability.*"

(noting that State Legislature could not end the Michigan Constitution's two-thirds vote requirement to give PA 4 immediate effect because "[t]o conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution."); *Webster v. State of Michigan*, No. 13-734-CZ (Ingham County Circuit Court July 19, 2013) (order declaring "PA 436 is unconstitutional and in violation of Article 9 Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits").[11]

Indeed, PA 436 itself expressly references Article 9, Section 24 in requiring that the financial plan developed by the EM require the "timely deposit" of pension contributions, Mich. Comp. Laws §141.1551(1)(d) and in enumerating the Emergency Manager powers in the event a municipality's pension fund became underfunded (authority EM Orr has not exercised, notwithstanding his team's view of the underfunding). Under Section 141.1552(1)(m), "[t]he emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, Mich. Comp. Laws § 38.1132 to 38.1140m, *and section 24 of article IX of the state constitution of 1963,* and any actions taken shall be consistent with the

---

[11] The *Webster* lawsuit is stayed as a result of this Court's July 25, 2013 order. Nevertheless, the ruling was issued by a court of competent jurisdiction as a result of litigation in which those in privity with the City and EM Orr participated.

pension fund's qualified plan status under the federal internal revenue code." Mich. Comp. Laws § 141.1552(1)(m)(ii)(emphasis added). And, in authorizing the EM to suspend certain compensation of local officials, the statute also makes clear that "[t]his section does not authorize the impairment of vested pension benefits." Mich. Comp. Laws §141.1553.

Thus, in the exercise of their respective authority under Michigan law, Governor Snyder and EM Orr are bound by the prohibition against impairment of accrued pensions set forth in the Michigan Constitution. And, because the state legislature could not permit otherwise, the state legislature necessarily must limit the circumstances under which a chapter 9 filing could be pursued under the financial emergency laws. Thus the legislature could not purport to authorize either the Governor nor the Emergency Manager to take steps in contravention of the Michigan State Constitution. Nevertheless, both EM Orr and Governor Snyder unlawfully acted beyond those limits in seeking and granting, respectively, authorization for the chapter 9 filing.

Accordingly, because the Emergency Manager has sought to use chapter 9 to impair accrued pensions and because the Governor's authorization did not condition the bankruptcy filing on adherence to Article 9, Section 24 of the Michigan Constitution, the authorization was invalid under Michigan law. The authorization is, therefore, of no force and is ineffective under Section 109(c)(2).

- 29 -

13-53846-swr    Doc 2355    Filed 12/27/13    Entered 12/27/13 23:44:26    Page 224 of
286
13-53846-swr    Doc 2255-8    Filed 12/17/13    Entered 12/17/13 22:42:58    Page 224 of 224

*See In re Harrisburg*, 465 B.R. at 765 (dismissing petition because the City of Harrisburg was not "specifically authorized under state law to be a debtor" under Chapter 9).[12]

B.     The Bankruptcy Petition Must be Dismissed Because
       <u>the City Seeks to Effect an Unlawful Plan to Adjust Debts</u>

To be eligible for Chapter 9, a debtor must demonstrate that it "desires to effect a plan to adjust [its] debts." 11 U.S.C. § 109(c)(4). For purposes of Section 109(c)(4), the debts intended for adjustment are to be measured as of the petition date. *See In re Town of Westlake, Tex.*, 211 B.R. 860, 867 (Bankr. N.D. Tex. 1997). Here, well before the petition date, the Emergency Manager made known that his plan was to use chapter 9 bankruptcy to turn the retirement system underfunding obligations into bankruptcy claims, pay them on a pro-rata basis with other unsecured debt and, based on the shortfall created in the retirement system, cut vested pension benefits and accruals. *See* Orr Decl. Ex. A, p. 109.

This strategy plainly violates the Michigan Constitution's prohibition under Article 9, Section 24 against the impairment of accrued pensions, and, as we show above, invalidates the Governor's authorization and the chapter 9 petition. As such, it also violates the eligibility requirement that the debtor must "desire[] to

---

[12] UAW intends to submit a supplemental brief in support of its objection under Section 109(c)(2) to address issues raised at the oral argument on October 15-16, 2013.

effect a plan of adjustment" under Section 109(c)(4), in that a plan that the City

pursues in order to impair accrued pensions that are protected against impairment by

the Michigan Constitution could not be confirmed in any event because such a plan

would require that debtor take an action that is "prohibited by law." *See Bekins*, 304

U.S. at 815 (approving municipality's bankruptcy plan where action of the taxing

agency in carrying out the plan "is authorized by state law."); *see also In re Sanitary*

*& Improvement Dist.*, # 7, 98 B.R. at 975-76; *In re City of Colorado Springs Spring*

*Creek General Improvement District*, 177 B.R. at 694.  Arguably, a proposal is a

proposal and not the plan of adjustment and courts have permitted various forms of

plans or indicia of proposed plans to fulfill their requirements.  *E.g., In re Stockton,*

*Cal.,* 973 B.R. 772, 791 (Bankr. E.D. Cal. 2013).  But here, the City devised a

pension proposal that it could not ultimately achieve under Section 943(b).  The City

gave no indication that its proposal was hypothetical or tentative; instead it was

determined to fulfill it, the confirmation issue notwithstanding.[13]  Accordingly, the

City cannot be said to desire to effect a *lawful* plan of adjustment.  The City thus

fails to meet the requirement of Section 109(c)(4).

---

[13] The City's Proposal reflects deliberate steps leading to the forced cuts in
benefits.  *See* Orr Decl. Ex. A p. 109.  Although, as has become clear in discovery,
the legwork under pinning the proposal was incomplete at best, the City's intent was
clear:  show the underfunding to be prohibitively larger than expected, and stop the
funding.

C.    The Bankruptcy Petition Must Be Dismissed
      for Lack of Lawful Authorization By the State

    1.    *Chapter 9 Reflects Our System of Dual Sovereignty*

    In deference to dual sovereignty principles, "[b]ankruptcy courts should

review chapter 9 petitions with a jaded eye." *In re N.Y. Off-Track Betting Corp.*,

427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010).  The debtor bears the burden of proof as

to each element of eligibility under Section 109(c).  *See In re City of Harrisburg,*

*PA,* 465 B.R. 744, 752 (Bankr. M.D. Penn. 2011).  *See also id.* at 754 (when

authority to file is questioned, "bankruptcy courts exercise jurisdiction carefully, 'in

light of the interplay between Congress' bankruptcy power and the limitations on

federal power under the Tenth Amendment'").  Under Section 109(c)(2), to qualify

for Chapter 9 protection, a debtor must be "specifically authorized, in its capacity as

a municipality or by name, to be a debtor under such chapter by State law, or by a

governmental officer or organization empowered by State law to authorize such

entity to be a debtor under such chapter."  11 U.S.C. § 109(c)(2).  *See In re City of*

*Harrisburg, PA,* 465 B.R. at 754.  ("Express authority is defined as that which

confers power to do a particular identical thing set forth and declared exactly, plainly

and directly with well-defined limits").

    Because the Governor's authorization of Detroit's chapter 9 petition did

not require adherence to Article 9, Section 24 of the Michigan Constitution, the

state's authorization is invalid.  In the absence of a valid state authorization duly

recognizing the protections of Article 9, Section 24, chapter 9 as applied here is unconstitutional.

The power of the federal courts under chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment.[14] "Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtails the power of bankruptcy courts to act once a petition is filed." *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010). Thus, as this Court has observed, "[a] primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states." *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994).

The U.S. Supreme Court has twice considered the constitutionality of federal municipal bankruptcy legislation with reference to the dual sovereignty principles embodied in the Tenth Amendment. In 1934, Congress, enacted the first federal legislation providing for municipal debt adjustments. The Supreme Court held the 1934 Act unconstitutional in *Ashton v. Cameron County Water*

---

[14] The Tenth Amendment provides:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. U.S. Const. Amend X.

*Improvement District No. 1*, 298 U.S. 513 (1936) on the ground that the federal bankruptcy power is "impliedly limited by the necessity of preserving the independence of the States," and thus did not extend to the states or their subdivisions. *Id.* at 530. The Court held that the provisions would unconstitutionally impinge upon the "indestructible" "separate and independent existence" of the states by restricting municipal debtors' control over their fiscal affairs. *Id*. at 528, 530.

Congress enacted modified municipal bankruptcy provisions in 1937 which the Court upheld in *Bekins*, rejecting a claim that the statute violated the Tenth Amendment and state sovereignty principles. The Court distinguished its earlier decision in *Ashton* by emphasizing that Congress in the 1937 Act had been "especially solicitous" to avoid interference with the autonomy of municipalities. *Bekins*, 304 U.S. at 50. The Court stressed that under the revised legislation, the federal bankruptcy power may be exercised only where the actions of the municipal agency are authorized by state law:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and ***only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law.***

*Id*. at 51 (emphasis added).

For purposes of the present case, the most significant aspect of the

*Bekins* opinion is that the Court itself determined that the relief sought by the local

agency was authorized by California law. The Court's ultimate conclusion that the

State had given its consent to the bankruptcy proceeding was based on its own

analysis of the relevant provisions of the state statute:

> [T]he State has given its consent. We think that this sufficiently
> appears from the statute of California enacted in 1934. St. of 1934, Ex.
> Sess., c. 4, p. 5. This statute (section 1) adopts the definition of 'taxing
> districts' as described in an amendment of the Bankruptcy Act, to wit
> chapter 9 approved May 24, 1934, 11 U.S.C. §§ 301-303, and further
> provides that the Bankruptcy Act and 'acts amendatory and
> supplementary thereto,' as the same may be amended from time to
> time, are herein referred to as the 'Federal Bankruptcy Statute.'
> Chapter 10 of the Bankruptcy Act is an amendment and appears to be
> embraced within the state's definition. We have not been referred to
> any decision to the contrary. Section 3 of the state act then provides
> that any taxing district in the State is authorized to file the petition
> mentioned in the Federal Bankruptcy Statute. Subsequent sections
> empower the taxing district upon the conditions stated to consummate a
> plan of readjustment in the event of its confirmation by the federal
> court.

*Id.* at 47-48 (internal citations and quotations omitted).

The teaching of *Bekins* is clear. This Court's exercise of jurisdiction

over the City's petition cannot rest on the mere fact that the Emergency Manager

(and based upon the Governor's authorization) filed the petition voluntarily. Rather,

the Court must itself determine that the filing of the petition is authorized by, *and*

*consistent with*, the law of Michigan, in this case, the Constitution of the State of

Michigan.  If the Court finds that the petition is inconsistent with state law, then the further exercise of its jurisdiction is barred by the Then Amendment.

The City has sought to draw a distinction between the filing of the instant petition, which must admittedly be authorized by state law, and any subsequent relief granted by the Court.  It supports this distinction by citing *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) for the proposition that the Bankruptcy Code permits federal courts through confirmation of a Chapter 9 plan to impair contract rights and "such impairment is not a violation by the state or the municipality of [the Contracts Clause] which prohibits a state from impairing such contract rights."  (Consolidated Reply, pp. 24-25).

But this attempt to analogize the Contracts Clause with the Tenth Amendment is wholly unavailing.  The Contracts Clause of the U.S. Constitution applies solely to the States.[15]  By contrast, the Tenth Amendment is an explicit limitation on the power of the Federal Government, including this Court, to displace state law.  As the Supreme Court has put it, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States.  The Tenth Amendment thus directs us to

_____

[15] U.S. Const., Art. I, Sec. 10 provides: "No state shall … pass any … Law impairing the Obligation of Contracts."

determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power." *New York v. United States*, 505 U.S. 144, 157 (1992).

The Court's Tenth Amendment decisions clearly show that the power of the federal courts under Chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment. This dual system of sovereignty increases democratic governance:

> The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.' *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power.

*Bond v. United States*, 131 S.Ct. 2355, 2364 (2011). Accordingly, as the Court held in *Bond*, not only the states, but state citizens themselves have standing to assert that federal law contravenes the Tenth Amendment precisely because of the vital relationship between freedom of the individual and the federal structure of our government. *Id*.

Under the Bankruptcy Code, strict adherence to State sovereignty principles is intrinsic to the lawful functioning of chapter 9. Chapter 9 "was drafted

to assure that application of federal bankruptcy power would not infringe upon the sovereignty, powers and rights of the states." *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 226 (Bankr. N.D. Cal. 1991). "Both Congress and the Supreme Court have thus been careful to stress that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions; for as the Supreme Court held in the *Ashton* and *Bekins* cases, to the extent that the federal Bankruptcy Act does infringe on a state or a municipality's function it is unconstitutional." *Ropico, Inc. v. City of N.Y.*, 425 F.Supp. 970, 983 (S.D.N.Y. 1976).

The municipal bankruptcy provisions of the Bankruptcy Code chart a carefully circumscribed course limiting the power that can be lawfully exercised by the federal bankruptcy court. First, the municipality must be "specifically authorized" to be a debtor under *State* law "or by a governmental officer or organization *empowered by State law* to authorize such entity to be a debtor under" chapter 9. 11 U.S.C. § 109(c)(2) (emphasis added). *See In re City of Bridgeport*, 128 B.R. 688, 692 (Bankr. D. Conn. 1991). In addition, Section 903 of the Bankruptcy Code establishes that chapter 9 "does not impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality including expenditures by such exercise ...." 11 U.S.C. § 903. Section 903 "'is the constitutional mooring'

for municipal debt adjustment and makes clear that nothing in chapter 9 should be construed to limit a State's power to control its municipalities."  *In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr. S.D.N.Y. 2010); *see also City of Richmond*, 133 B.R. at 226 (describing Section 903 as a "reaffirmation that Chapter 9 does not limit or impair the power of the states to control municipalities").

Similarly, Section 904 prevents the bankruptcy court from interfering with "any of the political or governmental powers of the debtor" or "any of the property or revenues of the debtor" or "the debtor's use and enjoyment of any income-producing property."  11 U.S.C. § 904; *see In re Addison Cmty. Hosp. Auth.*, 175 B.R. at 649 (the "foundation" of Section 904 "is the doctrine that neither Congress nor the courts can change the existing system of government in this country" and that, in recognition of the Constitutional limitations on the power of the federal government, "chapter 9 was created to give courts only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control.").[16]

State sovereignty interests also operate to require that the bankruptcy court find that the debtor's plan of adjustment be consistent with state law.  The

---

[16] "The effect [of Sections 903 and 904] is to preserve the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court."  M. McConnell, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462-63 (1993).

bankruptcy court shall only confirm the plan if, among other requirements, "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).  Indeed, in *In re Sanitary & Improvement District, # 7*, 98 B.R. 970, 975-76 (Bankr. D. Neb. 1989) cited by the City, the court held that a plan of adjustment could not be confirmed because it conflicted with the terms of state law that required that bondholders be paid in full before warrantholders could receive compensation.[17]  *See also In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 694 (Bankr. D. Colo. 1995) (ruling that plan of adjustment could not be confirmed unless and until it was approved under the elections provisions of state law: "[w]here a plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be confirmed.").[18]  *See also* 11 U.S.C. § 943(b)(6) (stating as additional plan confirmation requirement that "any regulatory approval or electoral approval

---

[17] Thus, contrary to the City's assertions, the reorganization power is necessarily confined by the state's paramount authority over the governance of the municipality itself, and by such state constitutional limits as the state's citizens have placed on the power of the state itself.

[18] The court further explained that this is because "[u]nlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions." *Id*. at 693.  "Though Congress intended Chapter 9 to be a forum for reorganization of municipalities, it is clear that Congress did not intend for federal bankruptcy law to supersede or impair the power of the state to create, limit, authorize or control a municipality in the exercise of its political or governmental powers." *Id*.

necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval"). The Bankruptcy Code recognizes both that the state necessarily controls the actions of its subdivisions and the content of the any plan of adjustment.

In sum, the Tenth Amendment case law belies the City's contention that the Bankruptcy Court is free to set aside the protections of a state's constitution. The state sovereignty principles that form the fabric of chapter 9 are at the core of the bankruptcy court's constitutional exercise of authority over a municipal debtor, whether as a matter of eligibility or otherwise.[19]

Moreover, dual sovereignty principles are not merely the states' province to enforce. The Supreme Court has extended the protections of federalism to individual citizens: "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when enforcement of those laws causes injury that is concrete, particular, and

---

[19] The State of Michigan makes a similarly unavailing argument that because it is not the filing of the petition itself that impairs the pension benefits, the Governor's authorization was valid. However, for chapter 9 to be applied in a manner consistent with the federal Constitution, specifically, the Tenth Amendment, there is no lawful or practical distinction between disregarding state law for purposes of the City's authorization to file the petition and disregarding state law with respect to the plan that it may lawfully pursue while in chapter 9. If the City's filing is not properly authorized, then each day the City remains in chapter 9 is a day it is not authorized to be there.

redressable.  Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 131 S.Ct. at 2364.

    2.    <u>*The City's Reliance on Federal Preemption is Unavailing*</u>

Apart from misreading *Bekins*, the City also relies on a line of pre-emption cases to justify its position.  But the pre-emption case law actually shows that there is no legal basis for setting aside the protections of Article 9, Section 24 of the Michigan Constitution.  Chapter 9 does not "preempt" or otherwise displace the positive requirements of Michigan's Constitution or its laws.  Indeed, as shown above, because of core federalism concerns, state law defining the governmental powers of a municipality *must be honored* under chapter 9 to preserve the constitutionality of municipal reorganizations.  Indeed the "authorization" requirement  under Section 109(c)(2) expressly requires that the municipality be "specifically authorized" to be a debtor "by State law" or by a governmental officer "empowered by State law" to authorize the entity to be a debtor.  *See In re Harrisburg, PA,* 465 B.R. at 755 (rejecting City Council's contention that Supremacy Clause to bar state law prohibition filing and motive that the state "serves as a municipality as gatekeeper into Chapter 9").  The City's contention is fundamentally undermined by those specific provisions of chapter 9, *e.g.*, Sections 903 and 904, and the applicable plan confirmation requirements which plainly refute

the notion that the limits on the bankruptcy court's authority imposed by the reservation of state sovereignty are somehow *superseded* with a chapter 9 filing.[20]

Aside from Tenth Amendment and other federal constitutional limitations, "[i]n determining whether a state statute is pre-empted by federal law" the analysis follows three tracks, where the touchstone "is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987). Under *Guerra*:

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation….

> As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Nevertheless, pre-emption is not to be lightly presumed.

*Id*. at 280-82.

---

[20] *See* Thomas Moers Mayer, *State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9*," 85 Am. Bankr. L. J. 363, 384-5 (Fall, 2011) (raising the "serious question" whether an interpretation of chapter 9 that renders section 903 a "dead letter" is "consistent with" the Tenth Amendment and state sovereignty). To the extent that it were do so, chapter 9 would be unconstitutional under the Tenth Amendment, and we ask the Court to so find.

Here, as shown above, federal displacement of the power of the State of Michigan and its citizens – through the State Constitution and otherwise – to control the authority of Governor Snyder and the discretion of the Emergency Manager should not "be lightly presumed" because it would violate the sovereignty of the state. Nothing in chapter 9 provides for an express federal displacement of the prerogative of the state and its citizens to define the powers of its Governor and the Emergency Manager. *Cf. Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 557 (6th Cir. 2012) (express federal preemption of state law claims which relate to an employee benefit plan under 29 U.S.C. §1144(a)).

Indeed, Sections 903 and 904 are to the contrary because they expressly recognize that the Code does not "impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]" Under Section 943(b)(4), the terms of the plan of adjustment must comport with the terms of state law. Nothing in chapter 9 supports an express preemption of the state law defining the scope and authority of Governor Snyder and EM Orr.[21]

---

[21] The City's reliance on *In re City of Stockton, California,* 478 B.R. 8 (Bankr. E.D. Cal. 2012) and *In re City of Vallejo,* 403 B.R. 72 (Bankr. E.D. Cal. 2009) is misplaced. The Supremacy clause analysis in these cases is turned on its head: fundamentally, chapter 9 reflects *dual* sovereignty and must be applied with due regard for the sovereignty of *the state*. Neither federal supremacy nor the Uniformity Clause operate to negate state sovereignty principles which, as we show above, must be given effect for chapter 9 to operate constitutionally. Indeed, the

For the same reason, there is no basis to conclude from chapter 9 that Congress left no room for the operation of the constitutions of the several states, and of their legislation. This, too, is recognized in Sections 903 and 904 expressly recognize the continued vitality of state law. Indeed, in *Faitoute Iron & Steel Company v. City of Asbury Park*, 316 U.S. 502, 508 (1942), the Supreme Court held that Congress has not completely dominated the field of municipal reorganization as to preclude the operation of a state municipal insolvency statute. See also *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 505 (1986) (noting that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws"); *Cf. Molosky v. Washington Mutual, Inc.*, 664 F.2d 109, 113-14 (6th Cir. 2011) (federal Home Owners' Loan Act preempts claim under Michigan statute because Congress intended the federal act to occupy the entire field of lending regulation for federal savings associations and leave no room for state regulatory control); *Modin v. New York Cent. Co.*, 650 F.2d 829, 835 (6th Cir. 1981) (Interstate Commerce Commission creates a comprehensive scheme of federal regulation of railroads that preempts state law).

---

Uniformity requirement does *not* mean that bankruptcy must look alike in every state, and the courts have so held. *E.g., Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008) (rejecting uniformity challenge based on means-test tied to median income in debtor's state). *In re Kulp*, 949 F.2d 1106, 1103 n.3 (10th Cir. 1991) (no uniformity violation where "11 U.S.C. § 522 expressly delegates to states the power to create bankruptcy exemptions.").

- 45 -

Adherence to the impairment prohibition in Article 9, Section 24 of the Michigan Constitution is not "physically impossible," nor would it stand as an obstacle to a successful chapter 9 plan (where, in fact, state law compliance is *required* for confirmation). The objectives of chapter 9 must be read consistently with basic constitutional principles that recognize the autonomy of the state and its citizens to control the political affairs of its subdivision as reflected in Sections 903 and 904. Here, the Michigan Constitution requires that the choice of its citizens in enacting Article 9, Section 24 of the Michigan Constitution must be honored, admitting of no exception.[22]

      D.      **The Bankruptcy Petition Must be Dismissed Because "the Petition Was Not Filed in Good Faith and the City Cannot Demonstrate That It Has Complied With Section 109(c)(5)**

The Court must dismiss a chapter 9 petition "if the debtor did not file the petition in good faith" or otherwise meet the requirements of Title 11. 11 U.S.C. § 921(c). The Bankruptcy Code specifically requires the municipality to demonstrate (as relevant here) that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan," or that it

---

[22] Article 9, Section 24 of the Michigan Constitution is plainly an exercise by its citizens of their Tenth Amendment-based right "to control a municipality of or in such state in the exercise of the political or governmental powers of such municipality" under Section 903.

- 46 -

13-53846-swr   Doc 2325-8   Filed 12/27/13   Entered 12/27/13 22:44:58   Page 46 of 52
13-53846-swr   Doc 1255   Filed 10/17/13   Entered 10/17/13 23:42:36   Page 241 of 286   241

is "unable to negotiate with creditors because such negotiation is impracticable[.]" 11 U.S.C. § 109(c)(5).

Enforcing the "good faith" requirement serves "[i]mportant constitutional issues that arise when a municipality enters the bankruptcy arena" by requiring that, "before rushing to" bankruptcy court, the municipality first sought to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan. *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992). Thus, a debtor who adopts a "take it or leave it" approach to prepetition negotiations fails to satisfy the good faith element. *In re Ellicott School Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992). There, the court noted that the debtor "h[e]ld three public meetings at which it 'explained' its proposed plan of restructuring to the bondholders" but creditors "were advised that the 'economic provisions' of that proposed plan were not negotiable." *Id.* at 266. *See also id*. (court reasoned that "[i]t is difficult to imagine that any true negotiations [can] take place in an environment where the substantive terms of a proposal were not open to discussion" and dismissed the petition in part because the good faith requirement was not satisfied.). *Id.* In other words, there must be genuine substantive negotiations over the terms of a repayment plan, and Section 109(c)(5)(B) will not be satisfied where a debtor fails to negotiate prepetition over "a comprehensive workout plan dealing with all of their liabilities and all of their

- 47 -

13-53846-swr Doc 2325-8 Filed 12/27/13 Entered 12/27/13 23:44:26 Page 47 of 92
13-53846-swr Doc 8255 Filed 11/07/14 Entered 11/07/13 22:42:59 Page 242 of 286     242

assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code." *See also In re Pierce County Housing Auth.*, 414 B.R. 702 (Bankr. W.D. Wash. 2009) (requirement not met where "there is no evidence that the Debtor ever negotiated prepetition with any of its creditors over the possible terms of a plan of adjustment").

        The City's efforts to negotiate with stakeholders over their pension proposal fall far short of the "good faith" requirement under Section 109(c)(5) and manifestly show that the filing was not in good faith under Section 921(c). First, as noted above, the City clearly crafted the pension proposal with chapter 9 in mind and with no effort whatsoever to acknowledge the legitimacy of Article 9, Section 24 of the Michigan Constitution. By completely disregarding the State Constitution's prohibition on impairing vested benefits, the City signaled that it was prepared to achieve the funding cuts through bankruptcy, thus short-circuiting any meaningful effort to negotiate with stakeholders over alternatives. As noted above, the funding figures were soft in any event, and more indicative of an effort to walk away from its pension obligations than negotiate to maintain them. Moreover, the City tendered a proposal that the affected stakeholders could not possibly accept consistent with applicable State law.

        The evidence will show that Orr, aided by the Governor, embarked on a direct path to chapter 9 to implement a proposal designed to shed its pension and

retiree health obligations as general unsecured claims and promote an ambitious program of improvements for the City.[23]  As shown above this gamble plays havoc with core principles of federalism and the right of the citizenry to enact State Constitutional provisions – a right protected by the Tenth Amendment.

In addition, because of the City's rush to file, its Proposal was deeply flawed.  For example, the City had barely identified certain assets that might be available either for creditors or for its program of improvements.  *See* Orr Decl. Ex. A, pp. 83-89.  The pension funding estimate, likewise, requires additional work that is to this day not yet complete because the City's actuaries lack necessary data.  As such, the Emergency Manager's Proposal and short march toward chapter 9 indicate that the City's efforts were not intended to engage in a good faith process with their stakeholders but to "mark time" until the chapter 9 filing some 34 days later.  Instead, the use of bankruptcy specifically to achieve its transformation proposal was always the intended goal of the process.  The Proposal was not designed as a plan for discussion among stakeholders but a milepost in the road to chapter 9.  The City's filing cannot be said to have fulfilled a good faith requirement to negotiate with stakeholders over its plan of adjustment where the bankruptcy filing is, in

---

[23] A different choice by the City regarding its expenditures – to honor the pension obligations and protect the benefits covered by Article 9, Section 24 – would be well within the City's prerogative as a chapter 9 debtor under Sections 903 and 904.  The City is not forced to treat these obligations in the manner it has proposed; it has *chosen* to renege on the funding obligations and use the money for other purposes.

effect, the intended result and vehicle for achieving its pension funding proposal. The process set up by the State with the appointment of the Emergency Manager and the City's focus on getting to chapter 9 to achieve a plan to cut its pension funding obligation and force cuts to accrued pensions cannot be deemed to be a filing in good faith. [24]

The City relies upon the impracticability of negotiations available as an alternative grounds under Section 109(c)(5)(C). *See* Consolidated Reply, pp. 45-53. But the issues cited by the City, *i.e.*, who to identify as "representatives" of various retiree groups, competing bargaining authority, or the extent to which legal authority would be considered binding, are by-products of the proposals that involved forced cuts in accrued pensions protected from impairment under the Michigan State Constitution. The City cannot, on the one hand, tender a proposal designed to yield an unlawful result and then attempt to shield itself behind "impracticability" to claim eligibility under Section 109. The City has been able to negotiate concessionary agreements in collective bargaining with multiple unions. The purported "impracticability" did not so much stem from the unwieldy size and scope of the

---

[24] *See* Ellman and Merrett, *Pensions and Chapter 9* at 370 (noting that "there are many unanswered questions about what can and cannot be achieved in a chapter 9 case" and "the reality that this area of the law [whether chapter 9 is an available means to address protected pensions] is largely untested in the courts and very little is certain."); *see also id.* at 391 (noting that through the use of bankruptcy tools, such as the automatic stay "chapter 9 debtors have exerted substantial pressure on retirees to negotiate over a reduction in benefits.").

stakeholder population, as from the impossibility of lawfully engaging in negotiations over the pension proposal.

Accordingly, the City cannot show that its filing was made in good faith, or that is has complied with the requirements of Section 109(c)(5). Where the debtor is unable to demonstrate that all elements have been satisfied, "[t]he petition must be dismissed." *In re Harrisburg*, 465 B.R. at 752.

## CONCLUSION

For the foregoing reasons, [25] the City of Detroit, Michigan's Chapter 9 Petition should be dismissed.

Dated:     New York, New York
            October 17, 2013

                                    Respectfully submitted,

                                    International Union, UAW

                         By: /s/ Babette A. Ceccotti
                               Cohen, Weiss and Simon LLP
                               Babette A. Ceccotti
                               Keith E. Secular
                               Thomas N. Ciantra
                               Peter D. DeChiara
                               Joshua J. Ellison
                               330 West 42nd Street
                               New York, New York 10036-6979
                               T: 212-563-4100

---

[25] UAW and the *Flowers* plaintiffs reserve their right to further supplement their presentation at trial in light of continuing discovery and potential challenges UAW and the *Flowers* plaintiffs may pursue with respect to material withheld on the grounds of attorney-client and other privileges.

F: 212-695-5436
bceccotti@cwsny.com

-    and -

Niraj R. Ganatra (P63150)
8000 East Jefferson Avenue
Detroit, Michigan 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net


*Attorneys for International Union, UAW*

-    and -


 /s/ William A. Wertheimer
William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, Michigan 48025
T: (248) 644-9200
billwertheimer@gmail.com

Andrew A. Nickelhoff
Sachs Waldman, P.C.
2211 East Jefferson Avenue
Detroit, Michigan 48207
T: (313) 965-3464
F: (313) 965-0268
anickelhoff@sachswaldman.com

*Attorneys for Flowers Plaintiffs*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------------x
|  |  |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

-------------------------------------------------------------------x

# PRE-TRIAL BRIEF OF THE OFFICIAL COMMITTEE
# OF RETIREES REGARDING THE CITY OF DETROIT'S ELIGIBILITY
# TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

81257447\V-3

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT ............................................................................................................ 12

I.  THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING
    THAT IT WAS AUTHORIZED TO FILE THE PETITION ............................. 12

II. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING
    THAT IT NEGOTIATED WITH CREDITORS IN GOOD FAITH OR
    THAT NEGOTIATIONS WERE IMPRACTICABLE ....................................... 13

    A.  The City Cannot Establish That it Negotiated in Good Faith Under
        Section 109(c)(5)(B) ................................................................................. 15

        1.  The City Failed to set Forth a Plan of Adjustment as is
            Required Under Section 109(c)(5)(B) ........................................... 16

        2.  The City Failed to Negotiate With the Retiree Associations
            and Unions in Good Faith as Required Under Section
            109(c)(5)(B) ................................................................................. 19

    B.  The City Cannot Establish That Negotiations Were Impracticable
        Under Section 109(c)(5)(C) ....................................................................... 20

        1.  The City Failed to set Forth a Plan of Adjustment as
            Required Under Section 109(c)(5)(C) ........................................... 21

        2.  The City Also Fails Under Section 109(c)(5)(C) Because it
            did not  Negotiate With Retiree Representatives .......................... 22

III. THE CITY'S BANKRUPTCY PETITION WAS NOT FILED IN GOOD
     FAITH AS REQUIRED UNDER 11 U.S.C. § 921(c) AND SHOULD BE
     DISMISSED ................................................................................................. 23

    A.  The Chapter 9 Petition was not Filed in Good Faith Because the
        Emergency Manager Intends to use Chapter 9 to Impair Pension
        Obligations in Violation of his Duty to Uphold the Michigan
        Constitution, Which Prohibits Such Impairment ....................................... 25

    B.  The Chapter 9 Petition was not Filed in Good Faith Because the
        City's Assertions Regarding the Amount of its Underfunded
        Pension Obligations Were, At a Minimum, Misleading and
        Incomplete ............................................................................................... 28

- ii -

CONCLUSION ........................................................................................................................ 32

81257447\V-3

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
   767 F.3d 767 (6th Cir. 2013) .........................................................................4, 25

*Flowers v. Michigan,*
   Case No. 13-374-CZ (Ingham Cnty. Cir. Ct. July 19, 2013).................................10

*Flowers v. Snyder,*
   Case No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013)...................................10

*Gen. Ret. Sys. of Detroit v. Orr,*
   Case No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) ................................10

*In re City of Bridgeport,*
   129 B.R. 332 (Bankr. D. Conn. 1991) ................................................................24

*In re City of Wellston,*
   42 B.R. 282 (Bankr. E.D. Mo. 1984) ..................................................................22

*In re Cnty. of Orange,*
   183 B.R. 594 (Bankr. C.D. Cal. 1995).................................................................24

*In re Cottonwood Water and Sanitation Dist.,*
   138 B.R. 973 (Bankr. D. Colo. 1992) ..............................................13, 14, 16, 17

*In re Ellicott Sch. Bldg. Auth.,*
   150 B.R. 261 (Bankr. D. Colo. 1992) .............................................................16, 19

*In re Enrolled Senate Bill 1269,*
   389 Mich. 659 (Mich. 1973).................................................................................26

*In re Joyce, Don & Assos. Inc.,*
   No. 6:07-bk-04878-ABB, 2008 WL 343265 (Bankr. M.D. Fla. Jan. 30, 2008)....................24

*In re New York City Off-Track Betting Corp.,*
   427 B.R. 256 (Bankr. S.D.N.Y. 2010) ................................................................16

*In re Panache Dev. Co., Inc.,*
   123 B.R. 929 (Bankr. S.D. Fla. 1991) ................................................................24

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,*
   165 B.R. 60 (Bankr. D.N.H. 1994) ..........................................................14, 16, 24

*In re Valley Health Sys.,*
   383 B.R. 156 (Bankr. C.D. Cal. 2008)...........................................................20, 24

81257447\V-3

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
  408 B.R. 280 (9th Cir. B.A.P. 2009)..................................................................20, 24

*Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*,
  243 B.R. 768 (D. Colo. 2000) ................................................................................24

*Seitz v. Probate Judges Ret. Sys.*,
  189 Mich. App. 445 (Ct. App. 1991) ..................................................................6, 26

*Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. Of Shelby*,
  438 Mich. 247 (1991) ............................................................................................26

*Vills. at Castle Rock Metro. Dist. No. 4*,
  145 B.R. 76, 85 (Bankr. D. Colo. 1990) ..........................................................22, 24

*Webster v. Michigan*,
  Case No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 19, 2013) ................................10

*Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino
  Coast Recreation and Park Dist.)*,
  No. 12-cv-02591-JST, 2013 WL 5423788 (Bankr. N.D. Cal. Sept. 27, 2013).......16

STATUTES

11 U.S.C. § 101....................................................................................................................1

11 U.S.C. § 101-1532..........................................................................................................5

11 U.S.C. § 109....................................................................................................................5

11 U.S.C. § 109(c)........................................................................................................16, 22

11 U.S.C. § 109(c)(2)...........................................................................................................1

11 U.S.C. § 109(c)(4)..........................................................................................................16

11 U.S.C. § 109(c)(5) ................................................................................................. *passim*

11 U.S.C. § 109(c)(5)(A)....................................................................................................14

11 U.S.C. § 109(c)(5)(B) ........................................................................................... *passim*

11 U.S.C. § 109(c)(5)(C) ........................................................................................... *passim*

11 U.S.C. § 109(c)(5)(D)....................................................................................................14

11 U.S.C. § 921(c) ....................................................................................................2, 3, 23, 24

11 U.S.C. § 941 ......................................................................................................... *passim*

81257447\V-3

11 U.S.C. § 943(b)(4) .................................................................................12, 13

M.C.L. § 141.1501. .................................................................................................4

M.C.L. §§ 141.1501-1531 .......................................................................................4

M.C.L. § 141.1549(2) .............................................................................................4

M.C.L. § 141.1549(3)(d)..........................................................................................4

M.C.L. § 141.1558(1) .............................................................................................5

Mich. Const. art. IX § 24 .................................................................................. *passim*

Mich. Const. art. XI § 1 ..........................................................................................4

**Other Authorities**

6 Collier on Bankruptcy ¶ 903.02.........................................................................5

124 Cong. Rec., H 11091 (daily ed. Sept. 28, 1978), at IX-108................................17

H.R. Rep. No. 94-938 (1976) (Conf. Rep.) ...........................................................13

Pub. L. No. 94-260, 90 Stat. 315, § 84 .............................................................17, 21

S. Rep. No. 95-989 (1978) ....................................................................................22

81257447\V-3

In accordance with the Court's order of August 2, 2013, the Official Committee of Retirees ("Committee") submits this pre-trial brief to summarize what it expects to demonstrate at the October 23, 2013 hearing concerning the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").[1]  The Committee adopts, except as modified herein, all of the legal arguments made in its Objection to Eligibility filed September 10, 2013 (Dkt. 805) and Supplemental Objection to Eligibility filed October 11, 2013 (Dkt. 1174).

### INTRODUCTION

1.     The Committee represents the interests of more than 23,000 retirees of the City. These individuals retired with pensions from the City that were not only vested but protected with special and specific safeguards by the Michigan Constitution itself.  Yet, in filing for bankruptcy under Chapter 9, the City's Emergency Manager has made clear that he intends to try to substantially cut the City's pensions payment obligations, notwithstanding that such action would be in plain contravention of the Michigan Constitution.

2.     Questions of the City's eligibility to file as a Chapter 9 debtor that involve factual eligibility issues will be addressed at the trial commencing on October 23.  The Committee intends to present fact-based objections to eligibility on three grounds:  (a) that the City cannot meet its burden of showing that it was authorized to file a Chapter 9 Petition as required by Section 109(c)(2) of the Bankruptcy Code; (b) that the City cannot show that it negotiated with creditors in good faith or that negotiations were impracticable, as required under Bankruptcy

---

[1] Pursuant to this Court's First Amended Order Regarding Eligibility Objections, dated September 12, 2013 (Dkt. 821), the Eligibility Objections that will be addressed on October 23, 2013 require resolution of genuine issues of material fact.  This pre-trial brief is limited to the matters identified by this Court in its September 12, 2013 order.

13-53846-swr  Doc 2354  Filed 12/27/13  Entered 12/27/13 23:42:26  Page 254 of 39
13-53846-tjt  Doc 1354-3  Filed 10/27/13  Entered 10/27/13 23:42:26  Page 254 of 39
286
254

Code Sections 109(c)(5)(B) and (C); and (c) that, in filing its Petition, the City did not act in good faith, so that its Petition should be dismissed under Section 921(c) of the Bankruptcy Code.

3.     The City cannot show that it was authorized to file the Chapter 9 Petition because, as the Emergency Manager has admitted, it did so with the intent of impairing pension rights and reneging on pension benefit obligations that are constitutionally protected under Michigan law. As the Emergency Manager is bound by the strictures of the Michigan Constitution, a bankruptcy filing that was admittedly in derogation of those strictures was unauthorized as a matter of state law and thus the petition was ineffective.

4.     The City also cannot show that it meets the eligibility criteria under Sections 109(c)(5)(B) and (C), for the following reasons:

5.     First, the City failed to meet the requirements of Section 109(c)(5)(B) because it did not come forward with a plan of adjustment as required by that Section, and in any event did not engage in good-faith negotiations with various unions and retiree associations as, or representing, the City's largest creditor constituency.  Rather than submit a plan of adjustment, the Emergency Manager provided only a June 14, 2013 "Proposal to Creditors" which the Emergency Manager has admitted was not a plan of adjustment but rather only a "proposal." Further, even as to this proposal, the City did not engage in any actual, good faith negotiations with creditors.  On the contrary, the City's discussions of this proposal with the retiree associations and unions were merely advisory, one-sided presentations by the City that offered no opportunity to negotiate.  Indeed, during the period when those discussions took place, the City had not even provided the underlying data necessary for the retiree associations and unions to analyze and evaluate the City's proposal and prepare a meaningful response.  Equally important, discovery has revealed that the City's proposal, and its submissions to this Court,

- 2 -

contain a misleading depiction of both the unfunded pension liability and the funds that are potentially available to the City to meet it, as well as the City's obligations in general.

6.  <u>Second</u>, the City failed to meet the requirements of Section 109(c)(5)(C) because its June 14 "proposal" was admittedly not a proposed plan of adjustment, which should exist before any determination as to impracticability can be made, as required by that Section as well. Also, to show impracticability under Section 109(c)(5)(C), the City must show that negotiations were impracticable as to all classes of creditors. That showing cannot be made here because, at minimum, the retiree associations and unions were ready, willing and able to negotiate – but the City never took them up on these offers. The City may not use its own unwillingness to meaningfully engage with the various classes of creditors that were prepared to negotiate as a bootstrap to demonstrate that negotiations were "impracticable" under this Section.

7.  Finally, regarding Section 921(c), the City cannot meet its burden of demonstrating that it filed its Chapter 9 Petition in good faith as required by that Section. The Emergency Manager has admitted that, notwithstanding his sworn oath to uphold the Michigan Constitution, he commenced these proceedings with the express purpose of "trumping" the Michigan Constitution in order to impair vested pension benefits that the Michigan Constitution explicitly provides cannot be impaired. Cause for dismissal under Section 921(c) further exists because, in connection with its Petition, the City made representations concerning the magnitude of its underfunded pension obligations and its potential ability to meet those obligations as well as its obligations in general, that were, at a minimum, misleading and incomplete.

## FACTUAL BACKGROUND

8.  On March 14, 2013, Governor Richard D. Snyder appointed Kevyn D. Orr, a bankruptcy lawyer by training and trade, as the City's Emergency Financial Manager pursuant to

- 3 -

81257447\V-3

Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. § 141.1201, *et seq.* 2013. On March 28, 2013, Mr. Orr automatically became emergency manager (the "Emergency Manager") upon the effectiveness of Michigan's most recent[2] emergency manager law, Public Act 436, the Local Financial Stability and Choice Act, M.C.L. § 141.1541, *et seq.* ("PA 436"). Under Public Act 436 of 2012, the City's Emergency Manager acts as its receiver, and stands in the place of its governing body and chief executive officer. M.C.L. § 141.1549(2). He is a public officer subject to the laws applicable to public servants and officers. M.C.L. § 141.1549(3)(d) and (9)(a), (b) and (c). As a public officer, and like any citizen of the State, the Emergency Manager must follow the Michigan Constitution and statutes enacted by the Legislature pursuant to its constitutional authority.

9. At the time of the Emergency Manager's appointment, Mr. Orr swore to support and uphold the constitutions of both the State of Michigan and the United States stating: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager - City of Detroit according to the best of my ability." MICH. CONST. art. XI § 1.[3]

---

[2] In March 2011, Public Act 72, the "Local Government Fiscal Responsibility Act," was repealed and replaced with Public Act 4, the "Local Government and School District Fiscal Accountability Act." M.C.L. §§ 141.1501 *et seq.* "Public Act 4 is not Michigan's first law governing emergency managers, but it is the first legislation that allowed emergency managers to break collective bargaining agreements and to ignore retirement commitments." *See City of Pontiac Retired Emps. Ass'n v. Schimmel,* 767 F.3d 767, 769-70 (6th Cir. 2013) (citing M.C.L. §§ 141.1501-1531). Public Act 4 was rejected by voters in a referendum shortly after passage in March 2011. *Id.* at 770. "Apparently unaffected that the voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum." *Id.* (citations omitted).

[3] Governor Snyder was required to swear the same oath upon his appointment as Governor of the State of Michigan. *See* MICH. CONST. art. XI §1 (requiring oath of "[a]ll officers, legislative executive and judicial").

- 4 -

81257447\V-3

10.     This inter-play of Michigan's Constitution and Public Act 436 requires that the Emergency Manager abide by all applicable laws in governing the City.  The same obligation to comply with the Michigan Constitution applies to the Emergency Manager during this Chapter 9 proceeding.  "Indeed, absent a specific provision to the contrary, a municipality is required to continue to comply with state law during a Chapter 9 case."  6 COLLIER ON BANKRUPTCY ¶ 903.02 (Alan N. Resnick and Henry J. Sommer eds. 16th ed. 2012).  This is significant, because under Chapter 9, the City, through the Emergency Manager, is the only party with authority to propose a plan of adjustment, 11 U.S.C. § 941, and therefore controls the plan process in a way that is unique to bankruptcy law.

11.     PA 436 authorizes a municipality to file a Chapter 9 Petition upon the recommendation of the emergency manager if, in his judgment, "no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists" and the governor provides written approval.  M.C.L. § 141.1558(1).[4]  PA 436 permits, but does not require, the governor to "place contingencies on a local government in order to proceed under chapter 9."  *Id.*

---

[4] In its entirety, PA 436(18) provides:

> If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and state treasurer that the local government be authorized to proceed under chapter 9.  If the governor approves of the recommendation, the governor shall inform the state treasurer and emergency manager in writing of the decision … Upon receipt of this written approval, the emergency manager is authorized to proceed under chapter 9.  This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 U.S.C. § 101-1532, as required by section 109 of title 11 of the United States Code, 11 U.S.C. § 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

81257447\V-3

12.     There is no question that, at the time the Emergency Manager was appointed, Detroit was under severe financial pressure.  Detroit faced substantial short and long term liabilities.  Among those liabilities were vested pension obligations owed to City retirees as well as to active employees.  The City's pension obligations, however, differed from other liabilities owed by the City in one fundamental and critical way:  unlike liabilities in general, the City's payment obligations for accrued and vested pension benefits are explicitly protected from being impaired or diminished by the state or its political subdivisions (such as Detroit) under Article IX, Section 24 of the Michigan Constitution (the "Pension Clause").  *Seitz v. Probate Judges Ret. Sys.,* 189 Mich. App. 445, 449 (Ct. App. 1991).[5]  The Pension Clause expressly provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
>
> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

MICH. CONST. art. IX § 24.

13.     It is undisputed that, as of the time of his appointment, the Emergency Manager was aware of the above provision of the Michigan Constitution.  Transcripts of the Kevyn Orr Deposition, dated September 16, 2013 and October 4, 2013, Case No. 13-53846 (collectively the "Orr Dep.") at 51:25-52:2; 69:16-70:2.[6]  There also is no contention that the wording of the Pension Clause is ambiguous in any way.  Manifestly, the language of that Section is clear and, as the Emergency Manager put it, "speaks for itself."  *Id.* at 51:25-52:19.

---

[5] *See also*, cases cited at n. 18, *infra*.
[6] The Orr Dep. are attached as Exhibit A to the Declaration of Claude D. Montgomery, Esq., dated October 17, 2013, filed in support of this Pre-Trial Brief ("Montgomery Dec.").

- 6 -

14.     Notwithstanding the Pension Clause's plain meaning, shortly after his appointment, the Emergency Manager informed both Detroit's creditors and the media of his intent to renege on the very pension benefits - the vested pension payments - that were protected from being diminished under that same constitutional provision.  For example, in a financial plan put forward in May 2013, the Emergency Manager expressly stated that he wanted and intended to cut vested pension rights – and to cut them **substantially**.  *See Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, CBS DETROIT, (May 12, 2013), http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-finacial-plan-for-city-of-detroit/;   *see generally* Orr Dep. at 247:1-7.   Ongoing pensions payments for both retirees and active employees  would be affected.

15.     To implement his plan, the Emergency Manager still had to get around the Pension Clause of the Michigan Constitution.   Under the laws of Michigan, the path was blocked.  Therefore, the Emergency Manager decided to use a Chapter 9 filing as a vehicle to trump the very state Constitution that he had sworn to uphold.   There is no dispute about this: the Emergency Manager has publicly and freely admitted that the City's Chapter 9 filing was intended to try to trump state law.[7]  Similar admissions were made at his deposition.  Orr Dep. at 113:13-114:23.  Indeed, at his deposition, the Emergency Manager candidly admitted that the bankruptcy filing was intended, specifically, to "trump" the Michigan Constitution's Pension Clause, and no other provisions of Michigan law.  *Id.*  The Emergency Manager also admitted that he was aware of no decision that had ever upheld or allowed a municipality's using a Chapter 9 proceeding to trump the guarantees of a state Constitution and that, prior to his

---

[7] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, DETROIT FREE PRESS, (June 14, 2013),  http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orrdetroit-emergency-manager-creditors-fiscal-crisis.

81257447\V-3

Chapter 9 filing, the Michigan Attorney General advised him that, in the view of the Attorney General, the course of conduct being followed by the Emergency Manager was in violation of Michigan law. *Id.* at 415:13-22. The Emergency Manager's intent to attempt to override the Pension Clause is not subject to dispute: in response to a Request for Admission, the Emergency Manager has admitted this expressly. (Dkt. 849, ¶¶ 11-12).

16.      On June 14, 2013 the Emergency Manager presented his "Proposal for Creditors" (the "City Proposal"). (Dkt. 11, Ex. A). In it, the Emergency Manager stated, among other things, that the City's unfunded pension liability, based on a June 2011 actuarial valuation, was approximately $643 million and that a more recent actuarial analysis showed an unfunded pension liability of $3.5 billion. (Dkt. 11, Ex. A at 23). In the June 14 City Proposal, the Emergency Manager further indicated that he intended to cut the City's total ongoing contributions by at least 80%, and that, for retirees, he intended to cut pension contributions **entirely**. Orr Dep. at 106:19-23; 107:13-108:7. In addition to stopping on going contributions for retired City employees, the City Proposal cuts off on-going vested pension contributions for active employees in violation of the second paragraph of the Pension Clause. This paragraph protects retirees as well as active employees because failure to pay active employees means that fewer funds will be available to earn investment returns that can be used to help to pay retirees. *See* Mich. Const. art. IX § 24.

17.      The Emergency Manager has testified that his June 14 "Proposal to Creditors" was simply a proposal, and not a plan of adjustment as that term is defined under the Bankruptcy Code. Orr Dep. at 271:18-19. Nonetheless, after it was made, the Emergency Manager conducted "discussions" concerning it with certain unions and retiree associations. These discussions were nothing more than one-sided presentations by the City, and were not

- 8 -

negotiations. Indeed, at the time they were taking place, the City had not even made available the information that would have been needed by creditors to understand and evaluate the City Proposal and formulate a response. (Dkt. 509, Ex. 8) (stating access to data room does not provide requested information); (Dkt. 509, Ex. 9) (describing July 10 meeting as a "discussion between the Emergency Manager's advisors and a relatively small group of key stakeholders who may include, the GRS and its advisor only team, high level representatives of up to four (4) non uniform unions, and representatives from the Detroit Retired City Employees Association.").

18. On July 16, 2013 the Emergency Manager submitted a recommendation to the Governor, which recommended a Chapter 9 proceeding to implement his City Proposal. (Dkt. 11, Ex. J). In that letter, the Emergency Manager represented, *inter alia*, that the City had over $18 billion in debt and that, according to an "actuarial analysis," the City's unfunded pension liability was $3.5 billion. *Id.* More generally, the letter presented the City's financial situation as dire, as it unquestionably was. *Id.* Although, the letter did not address whether the City owned assets that could be monetized to alleviate the financial stress, or parts of it, it did state squarely "[t]he City's debt and legacy liabilities must be significantly reduced to permit this reinvestment." *Id.*

19. By letter dated July 18, 2013, the Governor purportedly authorized the Emergency Manager's request to file for bankruptcy under Chapter 9 and did not place any contingencies on such filing. (Dkt. 1 at 16). The Governor's letter did, however, state that the Bankruptcy Code itself provided a contingency on the filing, namely that there be compliance with state law. Orr Dep. at 117:19-118:6.

20. In response to the City Proposal, and anticipating that the Emergency Manager would seek to effectuate his plan to impair pension benefits in Chapter 9, several current and

- 9 -

81257447\V-3

13-53846-swr Doc 2251-8 Filed 12/27/13 Entered 12/27/13 23:42:26 Page 263 of 35
286
262

former employees of the City commenced lawsuits (collectively, the "State Court Lawsuits") in the Michigan Circuit Court seeking both declaratory and injunctive relief.[8]

21.     In one of the State Court Lawsuits, a hearing on a TRO that, if granted, would have prohibited the Emergency Manager from filing for Chapter 9, was scheduled to take place in the afternoon of July 18.  It has been reported that the state expected an adverse decision, and requested that the hearing be delayed until later that day, which it was.  During the period of that delay, and before the TRO hearing began, the Emergency Manager filed the City's bankruptcy petition.  The Emergency Manager has testified that he is aware of no particular reason for the timing of his filing other than to get a jump on the state court - which later that afternoon issued the TRO.  *Id.* at 124:18-126:4.  By the time it did, the bankruptcy petition had already been filed.[9]

---

[8] *See Flowers v. Snyder,* Case No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013) (seeking to enjoin the Governor from authorizing the Emergency Manager to file a Chapter 9 petition and other declaratory relief); *Webster v. Michigan,* Case No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 19, 2013) (seeking to enjoin same and a declaration that PA 436 is unconstitutional in violation of Article IX, Section 24 of the Michigan Constitution); *Gen. Ret. Sys. of Detroit v. Orr,* Case No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) (seeking (i) declarations that PA 436 does not permit the Governor to authorize and the Emergency Manager to take any actions to impair the City's pension obligations under Chapter 9, or in the alternative declarations that PA 436 is unconstitutional, and (ii) enjoining the Emergency Manager from acting pursuant to future unconstitutional authorization by the Governor).

[9] On July 19, 2013, Judge Rosemarie Aquilina issued an Order of Declaratory Judgment finding: (a) PA 436 is unconstitutional and violates the Michigan Constitution to the extent that it permits the Governor to authorize and Emergency Manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; (b) the Governor is prohibited by the Michigan Constitution from authorizing an Emergency Manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of the Michigan Constitution; and (c) by authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, the Governor acted without authority under Michigan law and in violation of the Michigan Constitution.  *Flowers v. Michigan,* Case No. 13-374-CZ (Order of Declaratory Judgment dated July 19, 2013).  Judge Aquilina further issued an injunction (1) directing the Emergency Manager "to immediately withdraw the Chapter 9 petition filed on July 18," and (2) to "not authorize any further Chapter 9 filing which threatens to diminish or impair

81257447\V-3

22.     In connection with his Chapter 9 filing, the Emergency Manager represented, without qualification, that the City has over $18 billion in "accrued obligations" and that the City's current unfunded pension liability is $3.5 billion.  He also represented that, according to a June 2011 actuarial valuation, the City's unfunded pension liability was, as of that date, $643.8 million.  Discovery has revealed that those statements were, at a minimum, misleading and incomplete.  In fact, and as discussed at ¶¶ 58-63 below, the evidence is undisputed that (a) of the asserted approximately $18 billion in debt, at least $6 billion pertains to bonds that were issued by the Detroit Water and Sewer Department ("DWSD"), a self sustaining enterprise which bears financial responsibility for those bonds and is able to pay them, and (b) no current actuarial analysis calculating the City's unfunded pension liability had yet been done, thus the City does not really know what the amount of the unfunded pension liability is or what future cash flows are available to meet it.  It likewise is admitted that, for the $643.8 million unfunded pension liability valuation that was done in 2011, only $250 million of that liability was allocable to the City's General Fund.  A very substantial portion of the balance was allocable to the DWSD - which is responsible for meeting those obligations and is financially capable of so doing.  It is admitted that these same points would apply even if the total unfunded pension liability were even greater.  *See* ¶ 62 below.  None of this, however, was disclosed in the Emergency Manager's bankruptcy filings, nor was it disclosed to creditors during the discussions held prior to that filing.

23.     Further, the City owns numerous assets that can be monetized, some of which are identified in the City Proposal.  Probably the most significant of these is the City-owned art

---

accrued pension benefits."  *Id.*  Notwithstanding, the Emergency Manager has refused to withdraw his bankruptcy filing.  Orr Dep. at 126:22-127:4.

81257447\V-3

maintained at the Detroit Institute of Arts, which according to press reports could well be worth billions of dollars, and is currently being appraised by Christie's. Orr Dep. at 168:25-170:9. The Emergency Manager's bankruptcy filings, however, do not account for this available cash source, which, if monetized, would obviously change the City's financial picture as regards its ability to meet not only pension obligations but obligations in general. *See* Transcript of Deposition of Gaurav Malhotra, dated September 20, 2013, Case No. 13-53846 ("Malhotra Dep.") at 52:13-55-12.[10] This highly significant potential cash source was not discussed during the City's discussions with creditors either.

## <u>ARGUMENT</u>

### I. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT IT WAS AUTHORIZED TO FILE THE PETITION

24. The Emergency Manager's July 16 letter to the Governor requesting authorization to file for Chapter 9 did not explicitly state that the Emergency Manager intended to take actions in contravention of the Pension Clause of the Michigan Constitution. The Governor's July 18 response letter likewise did not explicitly state that the Emergency Manager could violate the Pension Clause.

25. Moreover, the Governor's response letter by its terms (as opposed to the Governor's existing but unstated intent)[11] contemplated that there would be no such violations. In his letter, the Governor wrote that, as he understood it, Section 943(b)(4) of the Bankruptcy Code was a **contingency for the filing of a Chapter 9 petition**. (Dkt. 11, Ex. K at 5; Orr Dep.

---

[10] The Malhotra Dep. is attached as Exhibit B to the Montgomery Dec.

[11] The Governor has admitted that he was aware that the Emergency Manager was taking the position that there had to be significant pension cuts. Transcript of Deposition of Richard Snyder, dated October 9, 2013, Case No. 13-53846 ("Snyder Dep."), at 64:14-18. The Snyder Dep. is attached as Exhibit C to the Montgomery Dec.

- 12 -

at 120:7-121:9). The Emergency Manager testified that his understanding was the same. Orr Dep. at 121:10-12. Section 943(b)(4) of the Bankruptcy Code requires that, for a plan to be legally executable, it must not violate state law. Thus, as the Emergency Manager testified, both he and the Governor in fact acknowledged that compliance with state law was a contingency to the City's Chapter 9 filing.

26. Notwithstanding, the evidence is clear that, in filing for Chapter 9, the Emergency Manager, as well as the Governor, intended to affect and violate accrued and vested rights to pension payments that are expressly protected under the Pension Clause. *See* ¶12 above and ¶¶ 54-57 below. Accordingly, in filing the Petition, the Emergency Manager went far beyond what was permitted by the Governor's July 18 letter. Therefore, the filing that the Emergency Manager did make was not authorized and, lacking authorization, was void *ab initio*.

## II. THE CITY CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT IT NEGOTIATED WITH CREDITORS IN GOOD FAITH OR THAT NEGOTIATIONS WERE IMPRACTICABLE

27. Recognizing that "[i]mportant constitutional issues arise when a municipality enters the bankruptcy arena . . . Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities." *In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (quoting H.R. REP. NO. 94-938, at 10 (1976) (Conf. Rep.)). Certain of these limits are set forth in 11 U.S.C. § 109(c)(5). In particular, Section 109(c)(5) requires, as a precondition for eligibility to proceed under Chapter 9, that a municipal debtor affirmatively establish that it:

> (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

- 13 -

81257447\V-3

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5). The "negotiation" requirements contained in Section 109(c)(5) are intended to provide "creditor protection" by "insur[ing] that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired." *Cottonwood*, 138 B.R. at 979.

28. In this case, the City does not assert that it obtained agreement from creditors (Section 109(c)(5)(A)) or that it sought to prevent a preferential transfer (Section 109(c)(5)(D)); instead, the City contends that it satisfied the conditions of Section 109(c)(5)(B) and/or (C) because it purports to have attempted to negotiate with its creditors in good faith and, in any event, contends that negotiation with creditors was impracticable. However, as set forth below, the City did not in fact meet the requirements of either of those subsections. Specifically: (i) the City failed to meet the requirements of Section 109(c)(5)(B) because it did not come forward with a plan of adjustment as required by that subsection, and in any event did not engage in good faith negotiations with various unions and retiree associations; and, (ii) the City failed to meet the requirements of Section 109(c)(5)(C) because it did not come forward with a plan of adjustment as required by that subsection as well and has not shown that negotiations with various of the unions and retiree associations were impracticable.

29. The City bears the burden of proof on showing that it meets the standards set forth in Sections 109(c)(5)(B) and (C). *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60,

- 14 -

81257447\V-3

79 (Bankr. D.N.H. 1994).  Having failed to meet its burden on eligibility, the City's petition for bankruptcy must be denied.

### A. The City Cannot Establish That it Negotiated in Good Faith Under Section 109(c)(5)(B)

30.     The City asserts that its June 14th City Proposal and certain discussion sessions with creditors prior to the Petition Date are sufficient to constitute good faith negotiations under Section 109(c)(5)(B).  However, the City's assertion **ignores** the fundamental point that, in order to come within the scope of Section 109(c)(5)(B) in the first place, the City must show that it put forward a **plan of adjustment** to be negotiated.  The evidence is undisputed that the City intends to try to use its Chapter 9 filing as a vehicle to impair protected pension benefits.  Indeed, the City has expressly admitted this.  (Dkt. 849, ¶¶ 11-12).

31.     At the same time, the evidence also is undisputed that, prior to its filing, the City did not submit an actual plan of adjustment to creditors.  The Emergency Manager has admitted that the "proposal to creditors" that it submitted on June 14, 2013 was **not** a plan of adjustment, but was rather a mere "proposal" intended to elicit "feedback" from creditors.  Orr Dep. at 271:18-19.

32.     Moreover, even if the City had proposed a plan of adjustment, as more fully set forth in the objections filed by certain Committee members and their affiliated organizations,[12]

---

[12] Certain members of the Committee, including the (i) Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees and (ii) International Union, UAW to the City of Detroit, filed their own objections to the City of Detroit's Eligibility Under Chapter 9 on behalf of their constituents.  Other members of the Committee, including (i) Shirley V. Lightsey (Detroit Retired City Employees Association), (ii) Robert A. Shinske (Detroit Fire Fighters Association), (iii) Donald Taylor (Detroit Police and Fire Fighters Association) and (iv) Gail Turner (Detroit Police Members Association) are constituents of organizations that filed objections to the City of Detroit's eligibility.  The Committee joins in the submissions of co-objector unions and retiree associations and refers the Court to such submissions for the facts relating to communications between the City and retiree representatives prior to the petition.

81257447\V-3

the City's discussion sessions did not in any event constitute good-faith negotiations because they were merely advisory, did not afford retiree representatives a meaningful opportunity to respond, and in fact presented what discovery has uncovered to be a misleading depiction of both the unfunded pension liability and the funds potentially available to meet it.

### 1. The City Failed to set Forth a Plan of Adjustment as is Required Under Section 109(c)(5)(B)

33. It is the "near-unanimous" consensus of bankruptcy courts that, to meet the requirements of Section 109(c)(5)(B), it is not enough that, prior to filing a bankruptcy petition, a municipality merely "negotiate" in the abstract; rather, Section 109(c)(5)(C) requires that a municipality must, specifically, negotiate over the substantive terms of a proposed "plan of adjustment." *See Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino Coast Recreation and Park Dist.)*, No. 12-cv-02591-JST, 2013 WL 5423788, at *4 (Bankr. N.D. Cal. Sept. 27, 2013) (citing *Sullivan*, 165 B.R. at 79; *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992); *In re N.Y.C. Off-Track Betting Corp.*, 427 B.R. 256, 275-76 (Bankr. S.D.N.Y. 2010)).

34. The conclusion that Section 109(c)(5)(B) requires a municipal debtor to set forth what is, in substance, a plan of adjustment under Section 941 is supported by both Section 109(c)'s text and legislative history. *See Sullivan*, 165 B.R. at 78 (citing *Cottonwood*, 138 B.R. at 974).

35. The requirements of Section 109(c)(5) are appropriately read together in conjunction with Section 109(c)(4), which requires that a municipality must "desire[] to effect a plan to adjust [its] debts" to be eligible for Chapter 9. *Cottonwood*, 138 B.R. at 975 (citing 11 U.S.C. § 109(c)(4)). The term "plan to adjust [a municipality's] debts" is in turn defined in 11 U.S.C. § 941. Read together, "the concept is that the entity must desire to effect a 'plan' within

- 16 -

the meaning of section 941 and must have negotiated in good faith concerning that proposed plan." *Id.*

36.    The legislative history to Section 109(c)(5)(B) requires a municipal debtor to set forth a plan of adjustment as a prerequisite to good faith negotiations.  Under federal bankruptcy law as it existed in 1946,  in order to be eligible for bankruptcy under the Bankruptcy Act, municipalities had "to come to the court with a 'plan of composition' which had been approved by creditors owning not less than 51 per centum in amount of the securities affected by the plan." *Id.* at 976 (quoting Bankruptcy Act § 84, as amended by 60 Stat. 410 (1946)).  In 1976, Congress enacted the predecessor statute to Section 109(c)(5) under the Bankruptcy Act, which modified the requirement that a municipality obtain creditor consent and permitted a municipality to file for bankruptcy if it could show that it had "negotiated in good faith with its creditors and has failed to obtain, *with respect to a plan of adjustment of its debts*, the agreement of creditors holding at least a majority in amount of the claims *of each class* which are claims affected by that plan." Pub. L. No. 94-260, 90 Stat. 315, § 84 (emphasis added).  It thus "is clear from the provisions of Public Law 94-260 that a municipality seeking to file a petition under Chapter IX had to have negotiations concerning the 'plan of adjustment' which was to have been the 'plan' to be filed under section 90 of the Act." *Cottonwood*, 138 B.R. at 977.  When Section 109(c)(5)(B) was enacted in 1978,[13] Congress expressly indicated that it was intended to follow prior law and that any changes to the text were "stylistic" only.[14]  Accordingly, the weight of authority is

---

[13] As set forth above, 11 U.S.C. § 109(c)(5)(B) now sets forth that a debtor can satisfy the negotiation requirement of Section 109(c)(5) if it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter…."

[14] 124 CONG. REC., H 11091 (daily ed. Sept. 28, 1978), at IX-108 (stating with respect to the 1978 changes that Chapter 9 "follows current law with respect to the adjustment of debts of a municipality.

81257447\V-3

consistent with Congress' intent that the current version of Section 109(c)(5)(B) should be construed in the same way as its predecessor, which expressly stated that a debtor must negotiate a "plan of adjustment."

37.     The City admits that it did not propose a plan of adjustment under the Bankruptcy Code and therefore cannot satisfy the "negotiation" requirement of Section 109(c)(5)(B).  For example, the Emergency Manager testified explicitly that the proposal that the City  presented to creditors on June 14, 2013 was merely a "proposal" - not a plan.  The Emergency Manager thus emphasized in his deposition testimony that, as regards the June 14th City Proposal, "we never called this a plan, we never called this a deal, we always called it a proposal."  Orr Dep. at 271:18-19.  The Emergency Manager further testified that the City does not know whether it will ever present the June 14 City Proposal as such to the Bankruptcy Court.  *See id.* at 279:2-6.

38.     The Emergency Manager's concession that at the time of filing the City had only a proposal, and not a plan, is hardly surprising.  With respect to pensions in particular, discovery has established that, notwithstanding the City's avowed and admitted intent to cut both retirees' and active employees' pension payment rights (discussed further at ¶¶ 54-57 below), the City does not know the true amount of the unfunded pension liability or scope of the cash flows it has to work with.  *See* ¶ 59 below.  Likewise, and more generally, as the Emergency Manager presumably understood, it would have been premature to prepare a plan of adjustment when the City lacked information about funds that could be made available to pay its debts through the monetization of existing assets, including, but not limited to, the City-owned art maintained at the Detroit Institute of Arts.  Orr Dep. at 170:10-172:18.

---

Stylistic and minor substantive revisions have been made in order to conform this chapter with other new chapters of the bankruptcy code.")

81257447\V-3

39. Because the City admittedly did not present a plan of adjustment to creditors prior to its July 18, 2013 bankruptcy filing, the City cannot satisfy the eligibility condition set forth in 11 U.S.C. § 109(c)(5)(B).

### 2. The City Failed to Negotiate With the Retiree Associations and Unions in Good Faith as Required Under Section 109(c)(5)(B)

40. Even assuming, *arguendo*, that the City had filed a plan of adjustment (which the Emergency Manager admits it did not), the City still cannot meet its burden under Section 109(c)(5)(B) because the City in all events failed to negotiate in good faith with retiree representatives. As more fully addressed in papers submitted by co-objector unions and retiree associations, the City's discussions with creditors were non-interactive, one-way presentations. Such a "take it or leave it" approach cannot satisfy Section 109(c)(5)(B). *See Ellicott*, 150 B.R. at 266.

41. Moreover, any purported "negotiations" with unions and retiree associations were not in good faith because the City failed to disclose that, *inter alia*:

(a) the City did not know the amount of the unfunded pension liability;

(b) the figures the City cited for high-end actuarial estimates of the unfunded pension liability were in truth founded only on "rough guesses"; and

(c) a substantial percentage of the amount the City was representing to be "unfunded" pension liability was in fact allocable not to the City's general fund but instead to individual City agencies or departments that, themselves, had or could raise sufficient cash to cover the required pension contributions. *See* ¶¶ 58-63 below.

42. The City's lack of good faith in its purported negotiations is further demonstrated by its failure to acknowledge, during its discussions with creditors, that the retirees have rights that are clearly and constitutionally protected under Michigan law. Orr Dep. at 144:10-145:24.

43. The City's failure to engage in good faith negotiations is shown by the fact that, as the Emergency Manager has admitted, it never provided creditors with information sufficient to

- 19 -

allow them to know the actual monetary impact, on creditors, of the cuts the City stated that it wanted to impose, which is a prerequisite for any meaningful discussion. Orr Dep. at 111:2-24; Transcript of Deposition of Lamont Satchel, dated September 19, 2013 ("Satchel Dep."), Case No. 13-53846, at 88:14-89:18;[15] (Dkt. 509, Ex. 8) (stating access to data room does not provide requested information).

### B. The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C)

44. The City alternatively asserts that good faith negotiations with creditors were not necessary because such negotiations were rendered "impracticable" under section 109(c)(5)(C) by the following four circumstances: (i) the City is a major American city; (ii) the City's creditors are numerous and fragmented; (iii) in many instances, the City was unable to negotiate with representatives with authority to bind creditors; and (iv) the City did not have time to conduct extended creditor negotiations. (Dkt. 14, at 40-53). The City's purported impracticability justifications ignore the clear intent of Congress that Section 109(c)(5)(C) requires that the City both set forth a plan of adjustment and negotiate with impaired creditor classes for which negotiations **are** practicable.[16]

---

[15] The Satchel Dep. is attached as Exhibit D to the Montgomery Dec.

[16] The Committee recognizes that other bankruptcy courts have decided this issue differently. *E.g. Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009); *In re Valley Health Sys.*, 383 B.R. 156, 161-62 (Bankr. C.D. Cal. 2008). None of those decisions are binding upon this Court. Moreover, the Committee submits that its interpretation of Section 109(c)(5)(C) is textually accurate and in accordance with Congress' specific intent as reflected by legislative history.

- 20 -

81257447\V-3

**1.     The City Failed to set Forth a Plan of Adjustment as Required Under Section 109(c)(5)(C)**

45.     Like Section 109(c)(5)(B), Section 109(c)(5)(C) requires that a municipal debtor put forward a plan of adjustment under Section 941 of the Bankruptcy Code as a prerequisite to assessing whether good faith negotiations are practicable.

46.     Congress' intent in this respect is clear from Section 109(c)(5)(C)'s legislative history.  As noted above, in 1976, Congress modified the requirement that a municipal debtor must receive 51% creditor consent as a condition of eligibility.  The creditor consent requirement was replaced with the following four prong eligibility test:

> An entity is not eligible for relief under this chapter unless:
>
> …
>
> (1) it has successfully negotiated a plan of adjustment of its debts with creditors holding at least a majority in amount of the claims of each class which are claims affected by that plan;
>
> (2) it has negotiated in good faith with its creditors and has failed to obtain, with respect to a plan of adjustment of its debts, the agreement of creditors holding at least a majority in amount of the claim of each class which are claims affected by that plan;
>
> (3) such negotiation is impracticable; or
>
> (4) it has a reasonable fear that a creditor may attempt to obtain a preference.

Pub. L. No. 94-260, 90 Stat. 315, § 84.  The third prong of the test that "**such** negotiation is impracticable" (emphasis added) necessarily referred back to and incorporated the antecedent good faith negotiation clause in the preceding subsection (2), which specifically contemplated negotiation with each class of claims affected by a **plan of adjustment**.  *See* discussion at ¶ 36 above.  As set forth above, the post-1976 amendments to subsection (3), now codified as Section 109(c)(5)(C), were merely "stylistic" and intended to remain consistent with prior law.  Thus,

81257447\V-3

Congress intended that, in accordance with its predecessors, Section 109(c)(5)(C) requires that a municipal debtor first present a plan of adjustment.

47. As set forth in ¶¶ 37-38 above, the City admits that it did not propose a plan of adjustment under Section 941 of the Bankruptcy Code. Therefore, it cannot satisfy the "impracticability" criterion of Section 109(c)(5)(C).

### 2. The City Also Fails Under Section 109(c)(5)(C) Because it did not Negotiate With Retiree Representatives

48. Even if a plan of adjustment were not required for an "impracticability" finding under Section 109(c)(5)(C), the City cannot establish "impracticability" because it failed to negotiate with representatives of the retirees and unions, classes of creditors for which negotiation **was** practicable. Section 109(c)(5)(C) only excuses a debtor from negotiating with those individual classes of impaired creditors for which good faith negotiation would be impracticable. It does not eliminate the requirement that the City negotiate in good faith with classes of creditors with which negotiation **is** practicable. *See In re City of Wellston*, 42 B.R. 282, 285 (Bankr. E.D. Mo. 1984) (stating that "the Bankruptcy Code anticipates that a municipality will have attempted to negotiate in good faith with its creditors prior to the filing of a Chapter 9 petition"); *see also Vills. at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (eligibility upheld where debtor showed on a class by class basis either good-faith negotiation or impracticability).

49. Section 109(c)(5)(C)'s legislative history confirms that the eligibility test set forth therein is intended to require a debtor to negotiate in good faith to the extent practicable. In discussing enactment of Section 109(c), which as set forth above only made "stylistic" changes to the predecessor Bankruptcy Act provision, Senator DeConcini stated, without qualification, that the "creditor protection provision, requiring a municipality to attempt a good faith

- 22 -

81257447\V-3

negotiation with its creditors before a petition is filed, is retained." S. REP. NO. 95-989, at 8-9 (1978).

50.     The City cannot meet its burden under section 109(c)(5)(C) because it cannot show that negotiations with associations representing the retiree class of creditors were impracticable or that negotiations with unions were impracticable.  For example,  although the City has not put forward a plan of adjustment, the economic rights and interests of retiree claims are clearly distinct from other creditors in that, at a minimum, retiree claims are protected from impairment by the Pension Clause of the Michigan Constitution.  MICH. CONST. art. IX § 24. Further, in its course of dealings following the June 14 proposals, the City itself treated retiree organizations and unions separately and distinctly, holding separate meetings and discussions apart from meetings and discussions with other creditors.  Recognizing the distinct rights and interests of the retiree creditors in particular, this Court ordered the appointment of an Official Committee of Retirees.

51.     Notwithstanding the City's conclusory assertions, at least two retiree associations, constituting the natural representatives of retiree creditors, stood ready, willing, and able to negotiate with the City.  (Dkt. 497 at ¶¶ 69-72).  So did the unions.  (Dkt. 505, Dkt. 506). Regrettably, the City never pursued or even allowed good faith negotiations with those organizations.  (Dkt. 497 at ¶ 71).  Having failed to even attempt to negotiate with a ready and willing creditor class, the City cannot now take the bootstrap position that the negotiations called for under 11 U.S.C. § 109(c)(5)(C) were "impracticable."

## III.    THE CITY'S BANKRUPTCY PETITION WAS NOT FILED IN GOOD FAITH AS REQUIRED UNDER 11 U.S.C. § 921(C) AND SHOULD BE DISMISSED

52.     The City's Petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith, and not in compliance with section

- 23 -

109(c)(5).  *See* 11 U.S.C. § 921(c).[17]  The good faith requirement is intended to "prevent abuse of the bankruptcy process."  *Vills. at Castle Rock*, 145 B.R. at 81.  Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of another party."  *Sullivan,* 165 B.R. at 78.  A debtor's "honesty and candor" are factors in determining whether a petition is filed in good faith.  *See, e.g.*, *Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*, 243 B.R. 768, 773 (D. Colo. 2000); *see also In re Joyce, Don & Assos. Inc.*, No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008) (court dismissed chapter 11 petition in part due the debtor's vice president's "lack of candor in his testimony"); *In re Panache Dev. Co., Inc.*, 123 B.R. 929, 932-33 (Bankr. S.D. Fla. 1991) (misstatements and omissions in debtor's schedules constituted "cause" for dismissal of Chapter 11 petition).  The City bears the burden of demonstrating that it filed its petition in "good faith." *In re City of Bridgeport*, 129 B.R. 332, 334 (Bankr. D. Conn. 1991) (holding that the City failed to meet its burden of proving insolvency).

53.     Here, the City's burden of showing that it filed in good faith cannot be met, both because (a) there can be no finding of good faith when the Emergency Manager, an appointed state official, intentionally sought to use this Chapter 9 filing as a vehicle to take actions that are prohibited by the Pension Clause he swore to uphold and (b) in connection with the filing of the City's Petition, the Emergency Manager made representations that were, at a minimum, misleading and incomplete.

---

[17] While this section of the Bankruptcy Code provides that a court "may" dismiss the petition if the debtor did not file the petition in good faith, many courts have held that this section requires dismissal if the Chapter 9 Petition was not filed in good faith or if the debtor does not meet the requirements of chapter 9. *Valley Health Sys.*, 383 B.R. at 160; *In re Cnty. of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995); *City of Vallejo*, 408 B.R. at 289.

81257447\V-3

**A.** **The Chapter 9 Petition was not Filed in Good Faith Because the Emergency Manager Intends to use Chapter 9 to Impair Pension Obligations in Violation of his Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment**

54. The Pre-Petition actions of the Emergency Manager show that, at all times since his appointment, the City was on a path careening towards a Chapter 9 filing in order to impair pension benefits and renege on pension payment obligations in violation of the Michigan Constitution. Both the Governor and Emergency Manager evidenced a desire to achieve a result that they knew was unconstitutional as a matter of Michigan law. Even before his appointment as Emergency Manager, Mr. Orr recognized that PA 436, the act pursuant to which he purported to act, was only a "thin veneer of a revision" to PA 4 - which as stated by the Sixth Circuit in *City of Pontiac Retired Emps. Ass'n.* court, had been crafted with the intent of impairing retirement compensation owed to retired municipal employees, 767 F.3d at 769-70, and had been repealed by voter referendum - and was essentially an "end-run" around and "a redo of the prior rejected law." Orr Dep. at 44:17-24; 48:21-49:1, Ex. 4. In a June 13, 2013 interview with the Detroit Free Press, the Emergency Manager admitted that he believes accrued pension benefits could be impaired in a Chapter 9 proceeding:

> Q: You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.

*See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, DETROIT FREE PRESS, (June 14, 2013), http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orrdetroit-emergency-manager-creditors-fiscal-crisis. He further confirmed this view in his June 14, 2013 City Proposal when he specifically stated "there *must be significant cuts in*

- 25 -

81257447\V-3

*accrued, vested pension amounts for both active and currently retired persons*." (Dkt. 11, Ex A at 116) (emphasis added).

55. Mr. Orr's deposition testimony again demonstrates that the Emergency Manager intended to use the Chapter 9 filing to avoid the City's constitutional obligations to protect the pension benefits of the City's employees. He testified that he had read Article IX, Section 24 of the Michigan Constitution prior to becoming Emergency Manager. Orr Dep. at 69:16-70:2. Mr. Orr further testified that the language of the Pension Clause is unambiguous and speaks for itself. *Id.* at 51:25-52:19.[18] After becoming Emergency Manager, he had discussions with the Governor about using a Chapter 9 filing to "get out of the pensions obligations that the City owed." Orr Dep. at 84:13-18. The Emergency Manager admitted that using Chapter 9 to try to "trump" the Pension Clause of the Michigan Constitution in order to impair pension rights and obligations was one of his "objectives" in filing the City's Chapter 9 petition and that it was this specific provision of the Michigan Constitution, and no other provisions of Michigan law, that he was seeking to trump. *Id.* at 113:13-114:23. He went on to state that impairing the pension rights referred to in the Pension Clause was, in his view a necessary part of any restructuring plan. *Id.* at 322:3-7. He testified that he was unaware of any court decision upholding the use of Chapter 9 to "trump" a state constitution and was aware, at a minimum, that the Michigan Attorney General believed that the course of action he was charting was contrary to Michigan

---

[18] Michigan courts have repeatedly upheld the validity and scope of the Pension Clause. *See, e.g., Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. Of Shelby*, 438 Mich. 247, 254 (1991) ("Our interpretation of the constitutional framers' intent compelled us to conclude that the Legislature could not diminish or impair accrued financial benefits."); *In re Enrolled Senate Bill 1269*, 389 Mich. 659, 663 (Mich. 1973) ("Under this constitutional limitation [i.e. the Pension Clause] the legislature cannot diminish or impair accrued financial benefits . . . ."); *Seitz v. Probate Judges Ret. Sys.*, 189 Mich. App. 445, 449, 474 N.W.2d 125, 127 (Ct. App. 1991) ("Article 9, § 24 protects those persons covered by a state or local pension or retirement plan from having their benefits reduced."). "Accrued financial benefits" are "the right to receive certain pension payments on the basis of service performed." *Shelby Twp. Police and Fire Ret. Bd.*, 438 Mich. at 254 n. 3.

81257447\V-3

law. *Id.* at 192:2-8; 415:13-22. As noted above, in these proceedings the Emergency Manager has expressly admitted his intent to impair the very pension rights that are protected by the Pension Clause. *See* ¶ 30 above.

56.     The ability to impair pensions rights and payment obligations was both a motivation for, and also a "but for" of, the Chapter 9 filing. The Emergency Manager testified that he would have had no alternative plan had the Governor made a filing contingent upon the preservation of pension benefits. *Id.* at 120:1-5. He did not recall that there was any analysis done of how to impair pensions outside a bankruptcy context and purely as a matter of state law. *Id.* at 87:8-11. As of June 14, other than a consensual reduction, the City had not identified any other manner of implementing the Emergency Manager's proposal to cut pension benefits. *Id.* at 112:21-113:2. As evident from his testimony, the Emergency Manager maintained his belief that there would have to be "significant cuts" in pension benefits both as of the petition and thereafter:

> Q: At the time the City filed for bankruptcy, was it your view that there had to be significant cuts in accrued vested pension amounts for both active and currently retired person?
>
> A: Yes.
>
> Q: And is it still -- still your view today?
>
> A: Yes, based upon our analysis, yes.

*Id.* at 247:1-7. The City has stated that it wants to cease pension contributions for current retirees. *Id.* at 128:9-11; 155:11-15. It also wants to substantially cut the City's Constitutionally-enshrined obligation to make ongoing pension contributions for active employees. Orr Dep. at 106:19-:23; 107:13-108:7.

57. The Emergency Manager has also admitted that state court proceedings challenging the constitutionality of PA 436 were part of the motivation for the Chapter 9 filing. During his deposition, the Emergency Manager explained that to the "best of [his] knowledge," there was no particular reason that the Chapter 9 petition was filed in the afternoon of July 18th, other than to file before the commencement of a TRO hearing being held in the Michigan Circuit Court in which the legitimacy of PA 436 was being challenged. *Id.* at 125:24-127:4. He acknowledged that petition was made at that time in order to get a jump on the expected decision by the state court. *Id.* Mr. Orr further admitted that notwithstanding the state court ruling that PA 436 is unconstitutional, he has not taken any steps to withdraw the bankruptcy petition from filing. *Id.*

**B.     The Chapter 9 Petition was not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were, At a Minimum, Misleading and Incomplete**

58. In his Declaration in support of the Chapter 9 Petition, the Emergency Manager states that the City has approximately "$3.5 billion in underfunding pension liabilities." (Dkt. 11 at 6 n. 3.) The Emergency Manager reiterated that the City maintained approximately $3.5 billion in "unfunded liability" in discussions with City officials, even going so far as to say that the estimate had been shown through an actuarial valuation. Transcript of Deposition of David Bing, dated October 14, 2013, Case No. 13-53846 ("Bing Dep."), at 68:4-9.[19] These statements were consistent with the Emergency Manager's prior representation to the Governor, made in the Emergency Manager's letter of July 16, 2013, also attached to his Declaration, that the City has "$3.5 billion in underfunding pension liabilities based on the most recent actuarial analysis." (Dkt. 11, Ex. J at 2.) Similar statements have been made to this Court in pleadings filed with this

---

[19] The Bing Dep. is attached as Exhibit E to the Montgomery Dec.

81257447\V-3

Court. (Dkt. 14 at 2). In his June 14, 2013 proposal to creditors, attached to his Declaration, the Emergency Manager stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." (Dkt. 11, Ex. A at 109.)

59. Deposition discovery has revealed that the Emergency Manager's representations regarding the magnitude of the City's unfunded liability, and its ability to meet that liability, were, at a minimum, misleading and incomplete. Charles Moore, a principal of Conway MacKenzie, Inc., the City's restructuring advisor, and a 30(b)(6) witness for the City, has testified that, contrary to the Emergency Manager's representations, there has been no reliable actuarial analysis placing the City's unfunded pension liability at $3.5 billion. Transcript of Deposition of Charles Moore, dated September 18, 2013, Case No. 13-53846 ("Moore Dep."), at 61:18-62:7.[20] In fact, Mr. Moore testified that, as of his September 18, 2013 deposition, the actuarial firm retained by the City (Milliman) had not completed its actuarial analysis of the unfunded pension liabilities and did not even have the information to undertake such an analysis. *Id.* Mr. Moore further testified that, for this reason, the City did not know the actual size of the unfunded pension liability. *Id.* at 150:24-151:24. Mr. Moore continued that the City did not know what assets were available to pay pensions. *Id.* Further, Charles Bowen of Milliman, the City's actuary, testified that the figures the City has cited for the high-end estimates of unfunded pension liability were predicated only on "rough guesses." Transcript of Deposition of Glenn Bowen, dated September 24, 2013, Case No. 13-53846 ("Bowen Dep."), at 146:8-18.[21] Similarly, State Treasurer Andrew Dillon testified in his deposition that the actual size of the underfunded pension liability was not known. Transcript of Deposition of Andrew Dillon, dated

---

[20] The Moore Dep. is attached as Exhibit F to the Montgomery Dec.
[21] The Bowen Dep. is attached as Exhibit G to the Montgomery Dec.

- 29 -

81257447\V-3

October 10, 2013, Case No. 13-53846 ("Dillon Dep."), at 68:23-71:12; 94:11-95-19; 119:1-120:14.[22]

60.    Along similar lines, in his Declaration in support of the Petition, the Emergency Manager represented that the City's total liability exceeded $18 billion, but omitted to state that approximately $6 billion of that was allocable to DWSD bonds for which the DWSD was responsible and that the obligations on the bonds were paid by the DWSD from its own, separate funds.  Bing Dep. at 60:11-61:8.

61.    The Emergency Manager has also admitted that the City has numerous assets that could be monetized to provide additional cash and that he was exploring ways to achieve monetization.[23]   Yet, none of these potential cash infusions were factored into the City's assessment of whether it could meet is unfunded pension liabilities (which would not be payable until some time in the future), or indeed its liabilities in general.  Orr Dep. at 166:12-24; Malhotra Dep. at 52:13-55:12.

62.    In addition, in his June 14 Creditor Proposal, attached to his Declaration filed with the Court, the Emergency Manager represented that the unfunded pension liability calculated under the actuarial valuation done in 2011 (which the City believes was understated) was approximately $644 million. (Dkt. 11, Ex. A at 23.)  However, during his deposition, Mr. Orr testified that only $250 million of that $644 million total was allocable to the City and its general fund and that the approximately $400 million balance was allocable to other City funds or Departments, such as the DWSD.  Orr Dep. at 369:12-375:7.  The Emergency Manager

---

[22] The Dillon Dep. is attached as Exhibit H to the Montgomery Dec.

[23] These assets include, but are not  limited to, the City-owned art that is maintained at the Detroit Institute of Arts, which, according to press reports, could be worth billions of dollars.  Orr Dep. at 170: 10-21 (art collection of Detroit Institute of Arts); 174:10-20 (Detroit Water & Sewer Department) ("DWSD"); 183:19-184:10 (City-owned land).

81257447\V-3

further testified that the DWSD in fact bears financial responsibility for a substantial portion of the $644 million total (which the Emergency Manager testified at his deposition was on the order of 62%), and that the DWSD, which is run as an independent department, is financially sound and has the ability to pay its share of the pension obligations. Orr Dep. at 377:21-378:22; 479:13-21.[24] The Emergency Manager further testified that, if the unfunded pension liability were subsequently determined to be more than $644 million, including as much as $3.5 billion, these same principles - that DWSD would be responsible for its ratable share of the increased amount - would continue to apply. *Id.* at 377:21- 378:22.

63. As a result, the facts demonstrate that a significant portion of the City's asserted unfunded pension liability is allocable to a source that has the financial wherewithal to meet it. Yet, none of this information was disclosed in the City's Petition or made known to the City's creditors, including the retirees whose pension rights the City is threatening to eliminate entirely. In filing its Petition, the City failed to provide a complete or accurate picture of its financial condition.[25] Worse yet, it made representations that were, at a minimum, misleading and incomplete. The City has not acted with good faith, and its petition must therefore be dismissed.

---

[24] Mr. Orr further testified that "some portion" of total unfunded other post-employment benefits might be allocable to DWSD, but he did not recall the percentage. Orr Dep. at 480:10-481:22.

[25] The City also failed to disclose that the Emergency Manager had failed to pursue additional revenue sources that had been identified by Mayor Bing prior to the appointment of the Emergency Manager and that were still available following such appointment and had chosen not to pursue, or delayed, other restructuring initiatives that would have helped improve the City's financial situation. *See generally* Bing Dep. at 48:16-51:25; Bing Dep., Ex. 5.

- 31 -

81257447\V-3

## CONCLUSION

Wherefore, for the above reasons, the City of Detroit, Michigan's Chapter 9 petition should be dismissed and the Committee afforded all further relief that is just and equitable.

Dated: October 17, 2013
      New York, New York

Carole Neville
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel:    (212) 768-6700
Fax:    (212) 768-6800
carole.neville@dentons.com

Sam J. Alberts
DENTONS US LLP
1301 K. Street, NW
Suite 600, East Tower
Washington, DC 2005-3364
Tel:    (202) 408-6400
Fax:    (202) 408-6399
sam.alberts@dentons.com

By: /s/ Claude D. Montgomery
Claude D. Montgomery (P29212)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel:    (212) 768-6700
Fax:    (212) 768-6800
claude.montgomery@dentons.com

Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hal@bwst-law.com

*Counsel for the Official Committee of Retirees*

## CERTIFICATE OF SERVICE

I, Claude D. Montgomery, hereby certify that service of the Supplemental Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code was filed and served via the Court's electronic case filing and noticing system on October 17, 2013.

/s/ Claude D. Montgomery