# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE–MI<br>Tax ID / EIN: 38–6004606 | represented by | **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489–3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769
Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364 |

(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 10/17/2013 | | 1242 | Declaration *in Support of Pre–Trial Brief in Opposition to Elligibility* Filed by Retiree Committee Official Committee of Retirees. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H) (Montgomery, Claude) (Entered: 10/17/2013) |
| 10/17/2013 | | 1244 | Brief *Pre–Hearing Brief of the Detroit Retirement Systems in Support of Their Eligibility Objections Sepcifically Pursuant to Sections 109(c)(5) and 921(c) of the Bankruptcy Code* Filed by Creditors General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit. (Gordon, Robert) (Entered: 10/17/2013) |
| 10/30/2013 | | 1467 | Supplemental Brief *Regarding Eligibility* Filed by Creditor Michigan Council 25 Of The American Federation of State, County &Municipal Employees, AFL–CIO and Sub–Chapter 98, City of Detroit Retirees (RE: related document(s)1217 Order (Generic)). (Levine, Sharon) (Entered: 10/30/2013) |
| 10/30/2013 | | 1469 | Supplemental Objection to Eligibility to Chapter 9 Petition *(Supplemental Brief of International Union, UAW in Support of Their Amended Objection [DE 1170])* Filed by Creditor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Ceccotti, Babette) (Entered: 10/30/2013) |
| 10/30/2013 | | 1472 | Brief *Supplemental Brief in Support of Objection of the Detroit Retirement Systems to the Eligibility of the City of Detroit,* |

| | | | |
|---|---|---|---|
| | | | *Michigan, to Be a Debtor Under Chapter 9 of the Bankruptcy Code* Filed by Creditors General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit (RE: related document(s)519 Objection to Eligibility to Chapter 9 Petition, 1166 Reply – motions). (Gordon, Robert) (Entered: 10/30/2013) |
| 10/30/2013 | | 1473 | Amended Objection to Eligibility to Chapter 9 Petition *(Supplemental Brief in Support of* Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Lieutenants and Sergeants Association, Detroit Police Officers Association (Patek, Barbara) (Entered: 10/30/2013) |
| 11/06/2013 | | 1556 | Brief */City of Detroit's Supplemental Brief in Support of Entry of an Order for Relief* Filed by Debtor In Possession City of Detroit, Michigan. (Bennett, Bruce) (Entered: 11/06/2013) |

-------------------------------------------------------------- x
                           :

In re                              :

                           :   Chapter 9

                           :

City of Detroit, Michigan,          :   Case No. 13-53846

                           :

                   Debtor.      :   Hon. Steven W. Rhodes

                           :

-------------------------------------------------------------- x

### DECLARATION OF CLAUDE D. MONTGOMERY, ESQ. IN SUPPORT OF THE PRE-TRIAL BRIEF OF THE OFFICIAL COMMITTEE OF RETIREES REGARDING THE CITY OF DETROIT'S ELIGIBILITY TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

I, Claude D. Montgomery, Esq., hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a Partner at Dentons US LLP ("Dentons") and am admitted to practice in the Courts of the State of Michigan.

2.      Dentons represents the Official Committee of Retirees (the "Committee"). In an order entered on August 2, 2013, the Bankruptcy Court directed the appointment of the Committee in the bankruptcy proceeding, the members of which were appointed on August 22, 2013. (Dkt. 279).

3.      On July 19, 2013, the Debtor filed a Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration ("Eligibility Motion"). (Dkt. 18).

4.      On August 2, 2013, the Bankruptcy Court entered an Order establishing Dates and Deadlines, including an October 17, 2013 deadline to file pre-trial briefs. (Dkt. 280).

5.      On August 26, 2013, the Bankruptcy Court entered an Order setting forth a discovery schedule with respect to the Eligibility Motion and setting a trial on any objections to the City's eligibility for Chapter 9 relief (the "Eligibility Objections") for October 23, 2013.  (Dkt. 296).

6.      On September 10, 2013, the Committee filed an Objection to the Eligibility of the City to Be a Debtor under Chapter 9 of the Bankruptcy Code (the "Committee Eligibility Objection").  (Dkt. 805).

7.      On September 12, 2013, the Bankruptcy Court entered an Order establishing hearing dates of October 15 and 16 for Eligibility Objections that raise only legal issues. (Dkt. 821).

8.      On October 11, 2013, the Committee filed its Supplemental Objection to Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code.  (Dkt. 1174).

9.      Pursuant to the Bankruptcy Court's order of August 2, 2013, the Committee is submitting its Pre-Trial Brief Regarding the City of Detroit's Eligibility to be a Debtor Under Chapter 9 of the Bankruptcy Code (the "Pre-Trial Brief") in order to summarize what it expects to show at the October 23, 2013 hearing concerning the eligibility of the City of Detroit to be a debtor.

10.      Attached hereto as Exhibit A in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcripts for the deposition of Kevyn Orr, taken on September 16, 2013 and October 4, 2013, together with Exhibit 4 to the deposition.

11.     Attached hereto as Exhibit B in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Gaurav Malhotra, taken on September 20, 2013.

12.     Attached hereto as Exhibit C in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Richard Snyder, taken on October 9, 2013.

13.     Attached hereto as Exhibit D in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Lamont Satchel, taken on September 19, 2013.

14.     Attached hereto as Exhibit E in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of David Bing, taken on October 14, 2013, together with Exhibit 5 to the deposition.

15.     Attached hereto as Exhibit F in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Charles Moore, taken on September 18, 2013.

16.     Attached hereto as Exhibit G in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Glenn Bowen, taken on September 24, 2013.

17.     Attached hereto as Exhibit H in support of the Pre-Trial Brief are true and correct copies of selected pages of the Transcript for the deposition of Andrew Dillon, taken on October 10, 2013.

81276541\V-1

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: October 17, 2013
    New York, New York

                                        /s/ Claude D. Montgomery
                                        Claude D. Montgomery (P29212)
                                        1221 Avenue of the Americas
                                        New York, New York  10020
                                        Tel:  (212) 768-6700
                                        Fax: (212) 768-6800
                                        Email: claude.montgomery@dentons.com

                                        *Counsel for the Official Committee of
                                        Retirees*

# EXHIBIT A

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## CITY OF DETROIT, MICHIGAN

Case NO. 13-53846

## KEVYN ORR

*September 16, 2013*



800.211.DEPO (3376)
EsquireSolutions.com

1   A.   Yes.

2   Q.   -- you're talking again -- at this point in time had

3        you decided whether to accept the Emergency Manager

4        job?  This is later in the afternoon on January 31.

5   A.   No, I didn't.  I -- no, there was no time in the

6        initial two days that this came up that I decided to

7        accept the Emergency Manager job.

8   Q.   Okay.  And in this email you're giving some thoughts

9        on some of the issues that pertain to that; aren't

10       you?

11  A.   Yes.

12  Q.   And in particular you start talking about the

13       legislation that pertains to the EM position.  You

14       said you went back and reviewed various laws; do you

15       see that?

16  A.   Yes.

17  Q.   And you talked about some laws in DC control board and

18       then you go on in the last sentence -- or I'm sorry,

19       the second to the last sentence to write, and I quote,

20       "By contrast Michigan's new EM law is a clear

21       end-around the prior initiative that was rejected by

22       the voters in November."

23            You wrote that?

24  A.   Yes.

25  Q.   And by the new EM law, you were referring to PA 436?

ESQUIRE                    800.211.DEPO (3376)
                                          EsquireSolutions.com

```
 1   Q.   And you go on then in the -- and you were -- I guess
 2        -- were you aware that for either the case of the
 3        Chapter 9 being filed with the governor's approval
 4        without the Emergency Manager being involved or the
 5        Chapter 9 filing with the Emergency Manager, that in
 6        either case PA 436 did not require the governor to
 7        impose any contingencies on the bankruptcy filing?
 8                  MR. SHUMAKER:  Objection, calls for legal
 9        conclusion.
10   A.   I don't recall if I had done a deep dive in that
11        question at this time.  Please understand, counselor,
12        at this time I was doing a preliminary review of the
13        statute based upon I believe some published reports
14        and a look at it online.  I may have gotten to that
15        point, I just don't recall if at this time during that
16        day I had.
17   Q.   Okay.
18   A.   But I did at some point.
19   Q.   But you certainly knew that ultimately?
20   A.   At some point I did, sure.
21   Q.   Obviously.  And then you go on in the next sentence in
22        this email to say, "So although the new law provides
23        the thin veneer of a revision, it is essentially a
24        redo of the prior rejected law and appears to merely
25        adopt the conditions necessary for Chapter 9 filing."
```



```
 1  A.   Yes, I said that.
 2  Q.   And were you writing truthfully when you said that?
 3  A.   Yeah, and I think the balance of the paragraph, the
 4       news reports state that opponents of the prior law are
 5       already lining up to challenge this law.  So as I just
 6       testified, this was my preliminary analysis based upon
 7       a number of sources, some of them were the news
 8       reports.
 9  Q.   And you were aware in fact that as you just indicated
10       that there were either challenges already made or that
11       were going to be made to the law?
12  A.   I was not aware that there were challenges already
13       made.  I was aware the news report states that
14       opponents of the prior law were already lining up to
15       challenge the law.
16  Q.   And did you have any understanding at this time as to
17       what those grounds of challenge were or may be?
18  A.   No.  As I said, this was, you know, within the span of
19       a day when this was going back and forth about what it
20       may require, I was beginning to familiarize myself to
21       some degree with the statute.
22  Q.   Your email goes on to say you're going to speak with
23       Baird in a few minutes and see what his thinking is.
24  A.   Yes.
25  Q.   Did you speak with Mr. Baird that day?
```



```
 1        potential ground for challenge, was that it allowed
 2        the governor to authorize a bankruptcy filing without
 3        imposing a condition that would prevent pension
 4        obligations from being impaired?
 5   A.   I don't know if I was aware of that issue at this
 6        time, no.
 7   Q.   Well, were you aware -- you became aware of it if not
 8        then at some point shortly thereafter; correct?
 9   A.   Yeah, let me say this.  There was no broad based
10        concern at this point about with what the authority
11        was with regards to pensions so any sort of
12        insinuation that that was the focus at this point is
13        just inaccurate.  That wasn't true.  This as I said
14        before was a very cursory and initial sort of review
15        of what I was being asked to do so when I had a
16        discussion with Mr. Baird later I would have some
17        information and that's what I gleaned based upon a few
18        hours since apparently I got the call -- I was
19        informed that day, that morning or the day before to
20        the time I was going to have a call that afternoon.
21   Q.   But I take it at some point in time you became aware
22        that Article 9, Section 24 of the Michigan
23        Constitution protects pension benefits from being
24        diminished or impaired?
25   A.   I believe at some point in time I became aware that
```



13-53846-swr   Doc 2325-9   Filed 10/27/13   Entered 10/27/13 23:42:06   Page 64 of 66
193                                                                      14

1    Article 9, Section 24 purports to protect pensions and

2    benefits in certain circumstances, yes.

3            MR. ULLMAN:  Let's mark Exhibit 5.

4            (Marked Exhibit No. 5.)

5  Q.  Exhibit 5 is just a printout of Article 9, Section 24

6    of the Michigan Constitution.  Do you recognize it as

7    such?

8  A.  I mean, the document speaks for itself, but that

9    appears to be what it is, yes.

10 Q.  Okay, and I think your last answer you said that in

11   your view Section 24, Article 9 purports to protect

12   pensions and benefits in certain circumstances.

13 A.  Yes.

14 Q.  And are you contending that the words of Article 9,

15   Section 24 means something other than what they say?

16           MR. SHUMAKER:  Objection, calls for legal

17   conclusion.

18 A.  Yeah, I -- here again, I think the document speaks for

19   itself.  I think that my response to that issue is

20   throughout the arc of my career, whether in federal

21   government or in private practice at the Chrysler

22   case, there have been many state laws, some of them

23   quite sacrosanct, that have been abrogated by federal

24   law, not just bankruptcy law.  At the RTC we preempted

25   state, New York state, rent control litigation, law;



800.211.DEPO (3376)
EsquireSolutions.com

1       we preempted California state escheat law; we

2       preempted -- and that was the model for 50s.  In

3       Chrysler, we preempted 50 states have dealer franchise

4       laws that were preempted.  So when I said I recognize

5       this, there are federal laws that preempt state laws.

6                    MR. ULLMAN:  I'm going to move to strike as

7       nonresponsive.

8   Q.  Mr. Orr, I appreciate your perhaps trying to be

9       helpful, but my question was really very limited and I

10      would appreciate it if you could just answer it.

11                   MR. ULLMAN:  Could I have my question read

12      back, please?

13                   (Record read back as requested.)

14  A.  I think that calls for a legal conclusion and I

15      contend that they speak for themselves.

16  Q.  Now, you made mention in your -- I think when you were

17      giving your prior response, you made some allusion to

18      federal law.

19  A.  Uh-huh.

20  Q.  Is there any question in your mind that apart from

21      anything that may come into play under federal law,

22      that the constitution of Michigan, Article 9, Section

23      24, prohibits pension rights from being diminished or

24      impaired?

25                   MR. SHUMAKER:  Objection, calls for legal



```
 1        conclusion.
 2   A.   The document, as I said, speaks for itself.  Certainly
 3        I think I've said before that parties can negotiate a
 4        resolution of contracts.
 5   Q.   That's -- that's not my question.
 6                  MR. ULLMAN:  Could you -- can you read my
 7        question back?  If there's anything about it you don't
 8        understand, I would be glad to rephrase.
 9                  THE WITNESS:  Uh-huh.
10                  (Record read back as requested.)
11                  MR. SHUMAKER:  Objection to form, calls for
12        legal conclusion.  You can answer.
13   A.   Yeah, I think it does call for legal conclusion, but
14        as I said, contractual obligations can be negotiated
15        at any time.
16   Q.   Let me rephrase it.
17                  You understand what the constitution is
18        talking about is diminishing or impairing is
19        nonconsensual; correct?
20                  MR. SHUMAKER:  Objection, calls for legal
21        conclusion.
22   Q.   Let me rephrase it so there can't be any ambiguity.
23        Clearly parties can if they so choose change their
24        contract; rights?
25   A.   Yes.
```



ESQUIRE                                    800.211.DEPO (3376)
                                           EsquireSolutions.com

1    Q.   Is there any question in your mind that Article 9,

2         Section 24 of the Michigan Constitution protects

3         pension rights from being diminished or impaired if

4         the beneficiaries of those rights do not agree

5         consensually to such diminishment or impairment?

6              MR. SHUMAKER:  Objection, calls for legal

7         conclusion.

8    A.   I think I've answered that before.  I think there's

9         certain federal laws that allow for preemption --

10   Q.   I'm asking about independent of any federal law.  The

11        Michigan Constitution on its own, apart from any

12        overlay that you say may apply from federal law, is

13        there any question that the Michigan Constitution,

14        assuming that the beneficiaries of the retirement

15        obligations don't consent, any question that in that

16        circumstance the Michigan Constitution prohibits

17        pension rights from being diminished or impaired?

18             MR. SHUMAKER:  Objection, calls for legal

19        conclusion.

20   A.   Here again, Mr. Ullman, you're asking me -- I'm a fact

21        30(b)(6) witness, you're asking me for a legal

22        conclusion about what the statute says.  I'll say that

23        the statute speaks for itself and I certainly have

24        heard that people take that position.

25   Q.   Okay, and I'm asking you -- I'm not asking you to give



ESQUIRE

 1        wasn't.  It was the Emergency Manager's duties writ

 2        large.

 3   Q.   And when you say you were pouring over the law, you

 4        yourself were doing legal analysis, reading various

 5        laws; is that right?

 6   A.   Yes, I was trying to get background information, yes.

 7   Q.   And as part of that background information did you

 8        read Article 9, Section 24 of the Michigan

 9        Constitution?

10   A.   I may have.

11   Q.   Is there any question in your mind that you didn't?

12   A.   I -- if you have a document to refresh my

13        recollection, I'm happy to look at it.  Sitting here

14        on this day on February 20th, I don't recall whether

15        or not I read that article of the constitution.

16   Q.   There's no question that at some point after February

17        20th you read Article 9, Section 24 of the Michigan

18        Constitution; correct?

19   A.   My testimony is it may have been before or after the

20        20th.  I don't recall whether I did that sitting here

21        today.

22   Q.   Okay, but it was either one or the other, but you

23        certainly have read it?

24   A.   Yes, I've read it.  I read it today.

25   Q.   And you read it before you became Emergency Manager;



1       didn't you?

2   A.  Yes.

3   Q.  One other question on this document actually.  As you

4       look at page 460, at the bottom there's a February 21

5       email.

6   A.  Yes.

7   Q.  And it refers to point 8 of the attachment.  This

8       again has to do with the mayor's existing executive

9       team; right?

10  A.  Yes.

11  Q.  And in this time -- this is from Mr. Baird again;

12      right?

13  A.  Yes.

14  Q.  And he's really explicit.  He says, other than a few

15      grammatical nits, and some more language around point

16      8, so we can manage expectations if Kevyn needs to

17      make some personnel changes.  So he's clearly

18      referring here to you making personnel changes that

19      could affect the mayor's existing executive team;

20      isn't he?

21  A.  Yes, this wasn't written to me, but I'll read it.  I

22      mean to myself.  Yes, document speaks for itself, but

23      that seems to say that.

24  Q.  Isn't it clear at this point that it was envisioned

25      and understood that Kevyn Orr, you Mr. Orr, were in



800.211.DEPO (3376)
EsquireSolutions.com

1    | that right?

2  A. | I believe so.

3  Q. | And did the governor share that view with you?

4  A. | No.

5  Q. | He thought that the pension and OPEB obligations were

6    | not impediments to Detroit's fiscal health?

7  A. | No, the governor -- the only discussion I had with the

8    | governor was at a very high level about the dire

9    | straits of the City and the need for some -- it was

10   | actually the dire straits of the City and the need for

11   | some reform.  There was no specific discussion about

12   | pension or OPEB.

13 Q. | Now, at some point after you became the Emergency

14   | Manager, did you have discussions with the governor

15   | about a Chapter 9 filing to among other things get out

16   | of the pension obligations that the City owed?

17   |               MR. SHUMAKER:  Object to form.

18 A. | Yes, I believe so.

19 Q. | And when did those take place?

20 A. | Since becoming Emergency Manager on the 25th I've had

21   | regular conversations with the governor.  Typically

22   | weekly.  I don't recall the specific conversation when

23   | they came up.  I will say that it wasn't within our

24   | initial conversations.

25 Q. | Okay.  And we're talking -- these conversations, are



*800.211.DEPO (3376)*
*EsquireSolutions.com*

```
 1   A.   I'm taking my time because I'm trying to remember.
 2        There were a number of different analyses and briefing
 3        papers and -- that would come across the desk and I'm
 4        not sure any of them focused solely on state law.
 5   Q.   Okay.  And what else -- what other law did they focus
 6        on if not solely state law?
 7   A.   They may have focused on state law and federal law.
 8   Q.   So you don't recall if there was any analysis that
 9        just looked at state law?
10   A.   No, sitting here today, I don't recall.  There may
11        have been, but I don't recall.
12   Q.   And were you aware prior to the bankruptcy filing that
13        under state law alone the pension obligations could
14        not be diminished or impaired?
15   A.   This is the discussion we had about five to ten
16        minutes ago about whether or not state law permitted
17        it and I will go back to my answer with that.  It
18        seems to suggest a legal conclusion based upon what
19        the statute 436 provides and the intent of the
20        legislature.
21   Q.   Let me ask you a different question.
22               Is there anything in PA 436 that allows in
23        your view the Emergency Manager to impact or adversely
24        affect pension rights in the absence of a Chapter 9
25        bankruptcy filing?
```



800.211.DEPO (3376)
EsquireSolutions.com

1  A.  Defined contribution.

2  Q.  Defined contribution?

3  A.  Uh-huh.

4  Q.  Now, the existing -- the pension plan that exists

5      under the steady state projections, is that defined

6      contribution plan?

7  A.  That would be switched over.  No, no, defined -- the

8      steady state scenario?

9  Q.  That's a defined benefit?

10  A.  That's a defined benefit plan.

11  Q.  So what you're projecting here is a switch over to a

12      defined contribution program and for 2014 we see the

13      number for the city's contributions is now

14      25.4 million; is that right?

15  A.  Yes, that's -- yes.

16  Q.  And that compares with the -- what was the figure?

17      199.5 million that we saw under the as is?

18  A.  Yes, projections.

19  Q.  Yes.  So the diminution it looks just on the rough

20      math that the City's pension contributions under the

21      restructuring are being cut by about 80 percent; is

22      that right?

23  A.  Under 75 million, 80 percent, sure, roughly.

24  Q.  And for health, the health benefits, which we saw that

25      were, what, under the current scenario something like

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com



1      147 million?

2  A.  Retiree health, yes.

3  Q.  For retiree health?

4  A.  Uh-huh.

5  Q.  Under this proposal, the restructuring proposal, I

6      don't see any line entry for the retiree health

7      benefits.

8  A.  Yes.

9  Q.  So they're essentially being cut; correct?

10 A.  Well, the obligation is being provided with a

11     different program, but yes, the City would not have an

12     obligation going forward of that magnitude.

13 Q.  And going back to the pension contributions, you know,

14     we had talked about a diminution on the order of 80

15     percent from the 199.5 figure, and I think it's the

16     City's contention that the 199.5 figure is really

17     understated, right, because the obligations are really

18     a lot higher?

19 A.  I think we think the liabilities -- this is the steady

20     state projection on 91.  I think we think the

21     liabilities are higher because what we represented on

22     the second page of 98 is the estimated undersecured

23     claims for out years as opposed to a ten-year

24     projection.

25 Q.  Right.  And if the liabilities were really greater



1　　　than the diminution from the steady state to the

2　　　restructuring scenario would be greater than 80

3　　　percent; wouldn't it?

4　A.　It might be.  I mean, we've said 80 percent.  I mean,

5　　　199.5 less 25, you know, you just roughly cut those in

6　　　half, that's a 12 and 1/2 percent, but you know, 88

7　　　percent, somewhere in that neighborhood.

8　Q.　Now, the people who are -- the retirees who are

9　　　getting impacted from these -- by these cuts in the

10　　　proposed restructuring, these are who?  These are men

11　　　and women who previously served the City and are now

12　　　retired?

13　A.　Yeah, they're two pension plans: one for General

14　　　services and the other for Police and Fire.

15　Q.　And these individuals that serve the City in both

16　　　public safety and nonpublic safety capacities?

17　A.　Uniform and nonuniform, yes.

18　Q.　And were these -- I guess the issue comes because the

19　　　pension liabilities and the healthcare benefits that

20　　　may be due are not -- there's not sufficient funding

21　　　that was put into them; correct?

22　A.　Well, the healthcare benefit has no funding, the

23　　　$5.7 billion.  And the pension underfunding has our

24　　　estimate of the level of underfunding, the unfunded

25　　　portion of the pensions, in them.  There are assets



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

| 1 | | propose to reduce would get a share of the note, yes. |
|---|---|---|
| 2 | Q. | And is there any way to tell from this document how |
| 3 | | much any individual retiree would ultimately get if |
| 4 | | the notes go ahead and are issued? |
| 5 | A. | Not from this document. |
| 6 | Q. | There's no way to tell how much cash value any retiree |
| 7 | | would receive under this plan that's laid out here |
| 8 | | where they get notes? |
| 9 | A. | It is my understanding that there are a number of |
| 10 | | different plans and benefits and factors that go into |
| 11 | | that determination for any specific retiree. |
| 12 | Q. | Okay.  Now, Chapter 9 is not referred to in this |
| 13 | | restructuring plan; is it? |
| 14 | A. | I don't think we did. |
| 15 | Q. | And I think you indicated before that if this was not |
| 16 | | agreed to by the various constituencies, then the only |
| 17 | | way to implement this restructuring plan would be, if |
| 18 | | at all, would be to try to go ahead and do that |
| 19 | | through Chapter 9; is that right? |
| 20 | A. | I think what I said before, I think you're referring |
| 21 | | to the May 12th 45-day operating plan, but I think |
| 22 | | what I said before on June 10th and June 14th is we |
| 23 | | needed to engage in a dialogue, because we didn't want |
| 24 | | to go to Chapter 9. |
| 25 | | MR. ULLMAN:  That wasn't my question.  Can |



1   you read my question back?

2              (Record read back as requested.)

3   A.   Yeah, I indicated that here today.

4   Q.   I'll just ask the question again.  As you understood

5        it, if the proposal here were not agreed to or some

6        other consensual resolution was not reached, was there

7        any way for you as Emergency Manager to implement this

8        plan other than to try to get it put in place through

9        a Chapter 9 filing?

10  A.   Subject to the discussion that we've had a couple of

11       times earlier today, what I have said is that Chapter

12       9 is an option to achieve these goals.

13  Q.   And were you at this point aware of any option to

14       achieve these goals other than Chapter 9 if a

15       consensual resolution was not reached?

16  A.   There were various briefing memos and discussions, but

17       given the time frames that we were under, and I said

18       this at the June 10th meeting and I said it at the

19       June 14th meeting and I want to be responsive, that if

20       we didn't, Chapter 9 was an alternative.

21  Q.   And I don't think that's fully responsive at this

22       point.  Had you identified anything else as of June 14

23       to get this plan implemented, any other course,

24       putting aside consensual resolution, other than a

25       chapter 9 file?



 1  A.  Nothing that would give us an orderly and

 2      comprehensive resolution of these problems.

 3  Q.  Now, you gave an interview, that I'm sure you're

 4      familiar with, with the Detroit Free Press on or

 5      around June 14th.  Do you remember it?  I'll just tell

 6      you what -- I believe you said -- and I'm sure you

 7      remember this one and you can tell me.  If not, I have

 8      the quote.

 9  A.  Yeah, you can give me the quote.  There's so many

10      interviews, but I'll trust your quote.

11  Q.  Okay.

12  A.  Okay.

13  Q.  This is the quotation.  Question, you said in this

14      report, referring to the June 14th proposal, that you

15      don't believe there is an obligation under our state

16      constitution to pay pensions if the City can't afford

17      it?  Answer, the reason we said it that way is to

18      quantify the bankruptcy question.  We think federal

19      supremacy trumps state law.

20  A.  Yes.

21  Q.  You don't deny making that statement?

22  A.  No, I think I've said that several times.

23  Q.  And the state law you were referring to that you

24      referred to as being trumped was Article 9, Section 24

25      of the state constitution; is that right?



800.211.DEPO (3376)
EsquireSolutions.com

1  | A. | I believe so.
2  | Q. | There's no other state law that you view as relevant
3  |    | to the pension issue; is there?
4  | A. | Subject to the discussions that we had earlier today.
5  | Q. | As being trumped?  There's no other state law that you
6  |    | regarded as being trumped; is there?
7  | A. | No, there's no other as being trumped.
8  | Q. | Trumped.
9  | A. | Right.
10 | Q. | So the answer to my question -- just so the record is
11 |    | clear, the answer to my question is no other?
12 | A. | We're not referring to another state law.
13 | Q. | Okay, thank you.
14 | A. | Okay.
15 | Q. | Now, ultimately -- so when the subsequent bankruptcy
16 |    | filing was made -- which it was; right?
17 | A. | Yes.
18 | Q. | The intention -- specific intention was indeed to
19 |    | trump Article 9, Section 24 of the state constitution;
20 |    | correct?
21 | A. | That wasn't the only intention.
22 | Q. | But that was an intention; was it not?
23 | A. | That was one of the objectives.
24 | Q. | Now, ultimately you did request authorization for the
25 |    | governor to file; right?



1          was the singular focus.  I think most of our

2          discussions were about the need for the City to deal

3          overall with its balance sheet and its obligations,

4          which would include pensions.

5                  MR. ULLMAN:  Uh-huh.  Okay, can you read my

6          question back?  Listen a little more closely because I

7          was really -- it was a little more specific of a

8          question.

9                  THE WITNESS:  Okay.

10                 (Record read back as requested.)

11  A.     We probably had that discussion.  I don't recall

12         anything specific, but we probably did.

13  Q.     And do you recall any discussion during those same

14         conversations with the governor or anyone from his

15         staff as to the impact, if any, of Article 9, chapter

16         -- Section 24 of the Michigan Constitution as regards

17         pension benefits?

18  A.     I don't recall having discussions in that regard.  No.

19  Q.     Now, if you look at the governor's response letter,

20         okay, and the last page, you see at the top there's a

21         heading called contingencies?

22  A.     Yes.

23  Q.     And it says 2012 PA 436 provides that my approval of

24         the recommendation to commence a Chapter 9 proceeding

25         may place contingencies on such a filing and it gives



```
 1            the citation.  It continues, I am choosing not to
 2            impose any such contingencies today.  Federal law
 3            already contains the most important contingency, a
 4            requirement that the plan be legally executable,
 5            11 U.S.C. Section 943(b)(4).  Do you see that?
 6   A.   Yes.
 7   Q.   And did you have any discussions with the governor or
 8            anyone from his staff about that language before you
 9            received this letter back?
10   A.   No.
11   Q.   Were you -- did you have any understanding before
12            receiving this that as to whether or not the governor
13            was going to place any contingencies on the bankruptcy
14            filing?
15   A.   No, but I was concerned about it.
16   Q.   And what were you concerned about?
17   A.   I was concerned that the governor might place some
18            contingency in any regards, not just related to the
19            pensions and others, but that the inner array on
20            limiting what authority I might have would impact what
21            discretion I would have under either 436 or Chapter 9.
22            I was just concerned about contingencies.
23   Q.   And was one of the contingencies that you were
24            concerned about the contingency that could impair your
25            ability or restrict your ability to cut back the
```



1   Q.   And did you have any plan in place as to what you

2        would do if the letter came back that imposed a

3        contingency that in any Chapter 9 filing nothing could

4        be done that would affect pension rights that were

5        protected under the Michigan Constitution?

6   A.   No.

7   Q.   Now, in his letter the governor -- the portion we've

8        just looked at on the back of page 5, the governor

9        says, having a legally executable plan under Section

10       943(b)(4).  That's a reference, 943(b)(4), the

11       bankruptcy code; isn't it?

12  A.   I believe so.

13  Q.   So he says, he the governor says, having a legally

14       executable plan under Section 943(b)(4) of the

15       bankruptcy code is a contingency for Detroit's filing

16       a bankruptcy petition.  Correct?

17            MR. SHUMAKER:  Objection, document speaks

18       for itself.

19  A.   That's -- I was going to say the document speaks for

20       itself.  You're sort of reading it, you know, just

21       inversing it, but it says federal law already contains

22       the most important contingency requirement that the

23       plan is legally executable.

24  Q.   Right.  And this is in the context of him asking or

25       noting that under PA 436 he could, he the governor,



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

 1        could place contingencies on a Chapter 9 filing;
 2        right?
 3   A.   Yes.
 4   Q.   And he goes on to say that federal law also contains
 5        what he calls the most important contingency on the
 6        Chapter 9 filing, that it be legally executable;
 7        correct?
 8   A.   Yes, the letter speaks -- that's the language of the
 9        letter.
10   Q.   Did you agree with the governor's analysis here?
11   A.   I -- do I agree?  Yes, I mean, I agree that that's the
12        most important contingency that we get to, yes.
13   Q.   Now, petition was filed -- the bankruptcy petition was
14        filed on July 18th, like at 4 in the afternoon, 4:05,
15        something like that?
16   A.   That's what I was told.  I don't know the specific
17        time.
18   Q.   Now, in doing -- in making your bankruptcy filing,
19        were you intending to do something that was in
20        violation of state law?
21             MR. SHUMAKER:  Objection, calls for legal
22        conclusion.
23   A.   Here again, subject to all the discussions that we had
24        earlier today, I was intending to aleve the City of a
25        very dire situation and provide it with the maximum



 1        telephone conversations with him and I recall meeting
 2        with him.  I don't recall whether it was prior or
 3        after the filing.  I know from time to time -- I just
 4        don't recall when it was.
 5   Q.   Would there have been any reason for you not to
 6        consult the Attorney General prior to the bankruptcy
 7        filing on that issue?
 8   A.   No, I think the State Attorney General made his
 9        position known prior to the filing.
10   Q.   Now, as of this time the petition was filed there were
11        various state court litigations that had been begun?
12   A.   Yes.
13   Q.   And those challenged, among other things, PA 436;
14        correct?
15   A.   Yes.
16   Q.   And its constitutionality?
17   A.   Yes.
18   Q.   And in fact, the petition was filed just prior to the
19        start of a TRO hearing in one of those state
20        litigations; wasn't it?
21   A.   I was told that either that night or the following
22        day.
23   Q.   And are you aware that certain objectors in this
24        proceeding have stated that the bankruptcy petition
25        was filed just before the judge in the case was about



1          to issue a TRO prohibiting the bankruptcy filing from

2          taking place?

3    A.    I heard that after the fact, yes.

4    Q.    And are you aware that these objectors have stated

5          that in fact the state lawyers asked for a short delay

6          before the ruling was issued so they could get the

7          bankruptcy filing in before the judge came down with a

8          TRO?

9    A.    I don't know if I heard it -- I may have read that

10         later.  I don't know if I heard it.

11   Q.    Did you have any involvement in those actions?

12   A.    No, no.

13   Q.    Do you deny that that's what occurred?

14   A.    I only know what I've heard and I have no personal

15         knowledge, I just know what I've heard and what I've

16         read.

17   Q.    And isn't it correct that you wanted to get the

18         bankruptcy petition filed as soon as possible because

19         you knew there was a risk that the state might rule it

20         was illegal -- the state court might rule it was

21         illegal under state law for the bankruptcy proceeding

22         to be filed?

23   A.    No, that wasn't the reason.

24   Q.    Is there a particular reason that the bankruptcy

25         filing was made at 4:06 in the afternoon of the same



 1          day a TRO was being heard in the state court other

 2          than to get the jump on the state court ruling?

 3               MR. SHUMAKER:  Object to the form.

 4    A.    Not to the best of my knowledge.

 5    Q.    Now, you're aware that the state court in that

 6          litigation in fact later issued a ruling that PA 436

 7          is unconstitutional to the extent that it authorizes a

 8          proceeding under Chapter 9 in the way that could

 9          threaten to impair or diminish accrued pension

10          benefits?

11    A.    Yes, I was informed that there are I believe three

12          TROs after the bankruptcy filing.

13    Q.    And you have proceeded with the bankruptcy petition

14          notwithstanding; correct?

15    A.    Well, the bankruptcy petition had been filed.  There

16          were open questions about the application of the stay.

17          There was also a question about an appeal, which was

18          taken up I believe by the Attorney General's office.

19          So when you say you proceeded with the petition, we

20          filed the petition, there was a ruling, and there were

21          appeals.

22    Q.    Okay.  And in light of the state court ruling that

23          PA 436 was unconstitutional, you did not take any

24          steps to withdraw the bankruptcy petition from filing;

25          did you?



800.211.DEPO (3376)
EsquireSolutions.com

1   A.   No.

2   Q.   And you have not taken any steps to stop the

3        bankruptcy proceeding from going forward; have you?

4   A.   No.

5              MR. ULLMAN:  Would this be a good time to

6        stop for lunch, a quick lunch?

7              MR. SHUMAKER:  Sure.

8              MR. ULLMAN:  I'm ready to continue but I

9        know --

10             THE WITNESS:  You got another -- how much

11       -- do you have another line of inquiry?  Whatever

12       everybody --

13             MR. ULLMAN:  I'm about to switch subject

14       matters.

15             THE VIDEOGRAPHER:  Going off the record at

16       12:52 p.m.

17             (Luncheon recess between

18             12:52 p.m. and 1:30 p.m.)

19             THE VIDEOGRAPHER:  We're back on the record

20       at 1:35 p.m.

21  BY MR. ULLMAN:

22  Q.   Welcome back, Mr. Orr.

23  A.   Good afternoon.

24  Q.   One other question about the June 14th proposal.

25       Referring to page 98, we talked about the defined



1     contribution benefit plan?

2  A. Yes.

3  Q. Okay.  Is it correct that under that plan

4     contributions are being made only for people who would

5     be current City employees?

6  A. Will the plan be closed?

7  Q. Yes.

8  A. Yes, I believe so.

9  Q. So under the restructuring plan there would be no

10    pension contributions made for retirees; correct?

11 A. I believe that's correct.

12 Q. Now, you I believe said that the June 14th proposal

13    was presented at a meeting to representatives of

14    various creditors, I think you said that in your

15    declaration?

16 A. On June 14th, yes.

17 Q. Okay.  Did you speak at that meeting?

18 A. Yes.

19 Q. And who else spoke?

20 A. I believe all -- several members of our team, I

21    believe it was Mr. Heiman, David Heiman, I believe it

22    was Ken Buckfire, I believe Heather Lennox was on, I

23    believe Bruce Bennett was there, I believe Ken

24    Buckfire may have spoken.  I'm trying to recall if

25    there was anyone else.



800.211.DEPO (3376)
EsquireSolutions.com

 1        association that the City would in fact be willing to

 2        agree to a restructuring that did not involve the

 3        elimination of ongoing pension contributions for

 4        retirees.

 5   A.   No, I didn't say that.

 6   Q.   And do you know in fact whether anyone working on your

 7        team ever said that to any union or retiree

 8        association?

 9   A.   No.

10   Q.   Okay.  During the time from June 14th to July 17, did

11        you or anyone else from your team tell any union or

12        retiree association that the City acknowledged that

13        under Michigan law pension rights were explicitly

14        protected from being impaired or diminished?

15   A.   I don't --

16             MR. SHUMAKER:  Objection, form, calls for

17        speculation.

18   A.   I don't recall anyone saying that, but it may have

19        happened.

20   Q.   But you personally didn't make that statement; did

21        you?

22   A.   I don't recall saying that.  I may -- you know,

23        anything is possible, I just don't recall saying it.

24   Q.   And as of July 17, had the City, you or anyone working

25        for you, told any union or retiree association that it



 1    |    would in fact be willing to agree to a restructuring
 2    |    plan that did not effectively eliminate the prior
 3    |    existing health benefits for retirees?
 4    |              MR. SHUMAKER:  Objection, foundation, calls
 5    |    for legal speculation.
 6  A. |    Healthcare benefit for retirees?
 7  Q. |    Yeah.
 8  A. |    That did not eliminate it?
 9  Q. |    Yeah, that you --
10  A. |    Did not adjust it in some fashion?
11  Q. |    Did not essentially cut it out the way it was being
12    |    cut out in the June 14th proposal.
13  A. |    Yeah, I want to be careful with the frame cut out,
14    |    because I think there were subsequent discussions
15    |    about what would be provided instead --
16  Q. |    Uh-huh.
17  A. |    -- as a proposal, so I don't want my testimony to seem
18    |    as if we were not proposing an alternative to the
19    |    existing healthcare plan and that had not been
20    |    discussed prior to July 17th, but subject to those
21    |    qualifications the answer to your question is yes.
22  Q. |    Now, I've been asking you as of July 17 and then the
23    |    bankruptcy filing was the very next day; correct?
24  A. |    Yes.
25  Q. |    Now, in your declaration do you recall making



ESQUIRE
SOLUTIONS

*800.211.DEPO (3376)*
*EsquireSolutions.com*

```
 1   Q.   And on the pension side of things has there been any
 2        change from what was set out in the June 14th
 3        proposal?  As I understand this, it's still a defined
 4        contribution plan for current employees and no
 5        contributions being made by the City for retired --
 6        for retirees; is that right?
 7                  MR. SHUMAKER:  Object to the form.
 8   A.   Yeah, the general consensus is that you would close
 9        the plan and there would be contributions for
10        currents, yes.
11   Q.   And so again, just to be clear, that means for
12        retirees no ongoing contributions provided by the
13        City?
14   A.   None other than their participation in the note that's
15        proposed in the June 14th proposal.
16   Q.   And with no new funding for their pensions the
17        payments will stop -- to the retirees would stop being
18        made when the retirement funds run out; is that right?
19   A.   That's a loaded question.  I mean, the -- and the
20        reason I say it's a loaded question, some of the
21        retirement funds have said their payments won't run
22        out so that's why we want to have a dialogue.  We
23        think they're at risk.  They've told us they're not.
24   Q.   And by the City's estimation the pension funding will
25        run out when?  If no new funds are put in?
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1       unreasonable assumptions either way.  But your general

2       question as to whether or not if the information going

3       in was inaccurate, revealed an inaccurate result, I

4       think it's true as a matter of just common sense and

5       logic.

6   Q.  And the same thing as to assumptions.  If the

7       assumption made was wrong, then the output would be

8       wrong also?

9   A.  I think that's why we asked several times to have a

10      discussion about the assumptions that are necessary

11      for pension benefits.

12  Q.  Now, the cash flows that are being reported in your

13      declaration, those do not include any assumptions as

14      to the monetization of various assets that the City

15      continues to hold; is that right?

16              MR. SHUMAKER:  This is paragraph 56 that

17      you're referring to, counsel?

18              MR. ULLMAN:  Yeah, I'm looking in general.

19              MR. SHUMAKER:  In cash flow?

20              MR. ULLMAN:  Yeah, cash flow.

21  A.  You're talking about generally do the cash flows

22      include any monetization of any City assets?

23  Q.  Yeah.

24  A.  No, they do not.

25  Q.  And obviously if assets currently held by the City



1         for some period of time; true?

2                   MR. SHUMAKER:  Objection to form.

3    A.   Here again, depending upon the size of the asset, but

4         anything is possible.

5    Q.   Okay.  Now, the City of Detroit owns certain pieces of

6         art that are stored at the Detroit Institute of Art;

7         is that right?

8    A.   Yes.

9    Q.   And how many is that?

10   A.   I think the City owns approximately 66,000 pieces of

11        art.

12   Q.   Now, those --

13   A.   No, strike that.  Let me be clear so we can move on.

14   Q.   Yeah.

15   A.   I think there are 66,000 pieces of art over at Detroit

16        Institute of Art.  I'm not sure the City owns all

17        66,000 pieces.  I've been informed that it owns 35,000

18        of those pieces in an undisputed capacity.

19   Q.   Okay, that's what I was getting at.  And that's

20        distinct from art that is subject to a public -- or is

21        or may be subject to a public trust or something like

22        that.  This is 35,000 pieces that the City owns, as

23        you said, in an undisputed capacity?

24   A.   Outright, yes.

25   Q.   Outright.  Now, is it correct that the City has



1      reports.

2  Q.  Do you have any reason to believe that the value of

3      the City-owned art is less than something on that

4      order of magnitude?

5  A.  I'm relatively agnostic on the value of the art at

6      this point.  I'm waiting to see the appraisal.

7  Q.  Do you have any understanding as you sit here today as

8      to what the value of the City-owned art is?

9  A.  No.

10 Q.  Are you considering selling the City-owned art to

11     generate cash?

12 A.  What I've said consistently is all options on the

13     table, but we first have to decide what we're talking

14     about.

15 Q.  Do you have any understanding as to how long it would

16     take to sell the art if a decision were made to sell

17     it?

18 A.  No.

19 Q.  Have you considered other ways to monetize the art

20     besides an outright sale?

21 A.  All options are on the table.

22 Q.  Well, have you considered any others in particular?

23 A.  We have not made -- meaning my team and I have not

24     made any decisions with regard to the art contained at

25     DIA.



1   Q.   I'm not asking about decisions, I'm just asking what

2        you considered.

3   A.   We considered a lot of things, yes.

4   Q.   And have you -- well, then can you answer my question

5        more specifically?  What if any ways to monetize the

6        art have you considered other than an outright sale?

7   A.   I think there's been discussions about some form of --

8        and I'm not clear because to be direct, I know that

9        some of my -- I've never been to DIA, I don't think

10       I've ever spoken with their board, I know that some of

11       my consultants have been over there and have had

12       various discussions about the art.  I think the

13       discussions were very high level and very general.

14       That's what I know.

15  Q.   Okay, that's really very nonspecific.  Are you aware

16       of any specific consideration given to any form of

17       monetizing the art other than an outright sale?

18  A.   No, nothing specific.

19  Q.   Could be a lease -- sorry, but nothing has been

20       identified as a possible route to monetize?

21  A.   Nothing specific.  There have been discussions, but

22       nothing specific.

23  Q.   Have there been discussions of leasing as a possible

24       way to monetize?

25  A.   Possibly, yes.



1    Q.   Okay.  And do you have any understanding of the amount
2         of cash flow that could be generated on an annual
3         basis if the art were leased?
4    A.   Sitting here today, no.
5    Q.   Has that number been talked about?  Is there a
6         document that might discuss that?
7    A.   No, no, there's no document.  I -- I -- in an effort
8         to be accurate, I think I had a discussion with one of
9         the representatives at Christie's that was generally
10        speaking leasing is a very difficult thing to do.
11        That's the nature of the discussion, that you would
12        have to have the right pieces at the right time at the
13        right market to generate cash.
14   Q.   So there was no discussion about the amount of money
15        it could generate?
16   A.   No, no, it -- there was some discussion about
17        $1 million, for instance, or something like that, but
18        it's nothing substantive.
19   Q.   Okay.  Now, the City also has a department of water
20        and sewers; is that right?
21   A.   Yes.
22   Q.   And as I understand it, the department of water and
23        sewers operates as a separate entity for accounting
24        and operating purposes?
25   A.   As a result of Judge Cox's opinion, it has separate



ESQUIRE

```
 1   A.   When you talk about asset values, you're talking about
 2        switches, pipes, valves, things along that nature.  I
 3        don't think I've ever seen an appraisal of the value
 4        of the assets of the water and sewer department.
 5   Q.   Do you have a general understanding of what the value
 6        of the assets --
 7   A.   No.
 8   Q.   -- is worth?
 9   A.   No.
10   Q.   Have you taken any steps to monetize the value of the
11        assets owned by the water and sewer department?
12   A.   When you say monetize, I'm going to respond to the
13        question on the basis that monetize is in the broad
14        sense --
15   Q.   Uh-huh.
16   A.   -- not whether it's a lease, whether it's a sale,
17        getting authority.
18   Q.   Just get money for it.
19   A.   Get money for it, get some dough, okay, just want to
20        be clear.  Discussions are ongoing in that regard.
21   Q.   What are those discussions in a nutshell?
22   A.   Those are commercially sensitive so I don't want to
23        interfere.  Suffice it to say, the -- Judge Cox's
24        opinion spoke to the possibility of creating an
25        authority that would remove the water and sewer
```



1       when you talk about values, there's a range of values

2       from asset disposition and outright sale and

3       privatization to creating an operation or an authority

4       where someone has brought in, as has been done in

5       Washington, D.C., to actually operate the garages and

6       meters.  So we're looking at a range of alternatives

7       to determine what those values could be.

8    Q.  What's the range of values you're looking at so far?

9    A.  We don't have that yet.

10   Q.  How concrete have you -- let me withdraw that.

11           What specific steps have been taken so far?

12   A.  Our investment advisors and consultants are beginning

13       discussions with various parties that undertake these

14       types of operations within a range of alternatives to

15       try to assess values.

16   Q.  And the investment advisors, would that be Buckfire?

17   A.  Yeah, it would be our investment banker, Ken Buckfire,

18       Miller Buckfire.

19   Q.  Okay.  In the June 14th proposal you also make

20       reference to about 22 square miles of land that the

21       City owns?

22   A.  City-owned land, yes.

23   Q.  Do you have an understanding as to the value of that

24       land?

25   A.  I've been informed that some of the value is at best



| | | |
|---|---|---|
| 1 | | nominal, but no, sitting here today, I do not have a |
| 2 | | number as to the value of the land. |
| 3 | Q. | Have any steps been taken to try to monetize that |
| 4 | | value, to get dough as you put it? |
| 5 | A. | Yeah.  Well, here again, you're -- to get income |
| 6 | | realization perhaps I should say more articulately, |
| 7 | | but here again, we're at the preliminary steps of |
| 8 | | examining potential alternatives regarding land. |
| 9 | Q. | So you don't know yet? |
| 10 | A. | No. |
| 11 | Q. | The Belle Isle Park, that's also referenced in the |
| 12 | | June 14th proposal? |
| 13 | A. | Yes. |
| 14 | Q. | It's indicated that there's a prospective lease to the |
| 15 | | state? |
| 16 | A. | Yes. |
| 17 | Q. | Okay.  And do you expect that to go through? |
| 18 | A. | I'm going to ask for it.  It was proposed and was not |
| 19 | | accepted in time so the state withdrew it, but I do |
| 20 | | believe we're going to intend to ask that that lease |
| 21 | | be renewed. |
| 22 | Q. | And what's the annual rent the City would get under |
| 23 | | that lease? |
| 24 | A. | The City has a $6 million maintenance obligation and |
| 25 | | that would be taken up by the state so that wouldn't |



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   A.   I can't -- it was an attorney-client communication.
 2   Q.   And are you aware of any cases where, to use your
 3        phraseology, as a result of a Chapter 9 filing by a
 4        municipality the state constitution was trumped?
 5   A.   Chapter 9 filing?
 6   Q.   Yes.
 7   A.   I'm not sure, because the case I'm aware of, I don't
 8        know if it was a state constitution.  I don't recall.
 9             MR. ULLMAN:  Okay, I have no more questions
10        at this time.  But I may reserve the right, we have
11        some other people that are going to ask questions, at
12        the end of that to ask some follow-ups, if that's
13        possible.
14             THE WITNESS:  Okay.
15             MR. SHUMAKER:  You want to take a quick
16        break?
17             MR. ULLMAN:  Yeah, why don't we take a
18        break.  Someone else has to sit here.
19             THE VIDEOGRAPHER:  Going off the record at
20        2:53 p.m.
21             (A brief recess was taken.)
22             THE VIDEOGRAPHER:  We're back on record at
23        3:07 p.m.
24                       EXAMINATION
25   BY MS. LEVINE:
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1   Q.   At the time the City filed for bankruptcy, was it your
2        view that there had to be significant cuts in accrued
3        vested pension amounts for both active and currently
4        retired persons?
5   A.   Yes.
6   Q.   And is it still -- still your view today?
7   A.   Yes, based upon our analysis, yes.
8   Q.   This conclusion that there must be significant cuts in
9        accrued vested pension amounts for both active and
10       currently retired persons, was that assertion or that
11       idea or that notion discussed by you with the governor
12       at any time before June 14th, 2013?
13  A.   Outside of meetings with attorneys?
14            MR. SHUMAKER:  Outside of meetings or calls
15       with attorneys present.
16  Q.   Yeah, I'm not looking to infringe your attorney-client
17       privilege.
18  A.   I know.  I just don't recall all of the meetings.  It
19       may have been discussed outside those meetings.
20  Q.   Well, do you have a recollection?
21  A.   I do not have a recollection of specific discussions.
22  Q.   Just so I understand your testimony, are you saying it
23       was -- it may have been discussed but you're not sure
24       whether or not it was discussed in meetings that were
25       outside the attorney-client privilege?  Is that your



ESQUIRE                                       800.211.DEPO (3376)
                                              EsquireSolutions.com

1    June 14th meeting.

2  A.  Okay.

3  Q.  Do you have a recollection of any words you used to

4      communicate to those in attendance that you were open

5      to consider anything, if that's a fair

6      characterization of your prior testimony?  Did you use

7      words to that effect and if so what were those words?

8  A.  I don't remember the exact words, but I think we

9      expressed the sentiment that this is a proposal and

10     we're open to discussions.

11 Q.  Well, that's a little different.  I mean, to be open

12     to discussion.  I'm not asking you -- I think you

13     testified a few minutes ago that you were open to

14     anything and if I'm mischaracterizing that, correct

15     me.

16 A.  Well, no, anything -- and I meant anything meaning

17     anything in terms of discussions, that's why we styled

18     this, we never called this a plan, we never called

19     this a deal, we always called it a proposal because we

20     were open for discussions, any response, meaning

21     anything, so I think they're the same thing.  I'm not

22     trying to be cute in any fashion, I'm just saying we

23     were open to responses, yes.

24 Q.  Did you ever say to the attendees at the meetings or

25     communicate to the attendees in writing that the City



```
 1        movement on it.
 2   Q.   So as things now stand, there's no plan to put forward
 3        anything else if the creditors and in particular the
 4        retirees do not agree to what's set out in the June
 5        14th proposal?
 6   A.   As it stands right now, we don't have a plan.
 7             MR. ULLMAN:  I have nothing further.  Thank
 8        you, Mr. Orr.
 9             MR. SHUMAKER:  Thank you, counsel.
10             THE WITNESS:  Thank you.
11             THE VIDEOGRAPHER:  Going off the record at
12        5:41 p.m.
13             (Discussion held off the record.)
14             THE VIDEOGRAPHER:  We're back on the record
15        at 5:43 p.m.
16                     EXAMINATION
17   BY MS. GREEN:
18   Q.   Hi, Mr. Orr.  We've met before.
19   A.   Yes.
20   Q.   My name is Jennifer Green, I represent the two
21        Retirement Systems for the City of Detroit.
22   A.   Yes, Jennifer -- Ms. Green.  Good to see you again.
23   Q.   Thank you.  Nice to you see you again too.
24             I have a question about Exhibit 11.  I
25        don't know if you have it in front of you or not.
```



1  State of Michigan)

2  County of Genesee)

3          Certificate of Notary Public

4      I certify that this transcript is a complete, true and

5  correct record of the testimony of the witness held in this

6  case.

7      I also certify that prior to taking this deposition,

8  the witness was duly sworn or affirmed to tell the truth.

9      I further certify that I am not a relative or an

10  employee of or an attorney for a party; and that I am not

11  financially interested, directly or indirectly, in the

12  matter.

13          WITNESS my hand this 19th day of September,

14  2013.

15

16

17

18          Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19          Certified Realtime Reporter

20          Registered Merit Reporter

21          Certified LiveNote Reporter

22          Certified Shorthand Reporter

23          Notary Public, Genesee, Michigan

24          Acting in Oakland County, Michigan

25          My Commission Expires:  9-19-18

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com



1              UNITED STATES BANKRUPTCY COURT

2              EASTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4    -------------------------------X

5    IN RE                        ) Chapter 9

6    CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846

7              Debtor.            ) Hon. Steven W. Rhodes

8    -------------------------------X

9

10

11         CONTINUED VIDEOTAPED DEPOSITION of

12                    KEYVN D. ORR

13                     Volume II

14                   Washington, D.C.

15              Friday, October 4, 2013

16

17

18   Pages:   308 - 496

19   Reported by:  Cindy L. Sebo, RMR, CSR, RPR, CRR,

20              CCR, CLR, RSA

21   Assignment Number:   14008

22   File Number:  105824



800.211.DEPO (3376)
EsquireSolutions.com

1  demonstrated any concern about political

2  ramifications as they're being used today.

3     Q.    Did you understand that reductions in

4  vested pension benefits would be a necessary part

5  of any restructuring for Detroit?

6     A.    I think that was certainly

7  anticipated, yes.

8     Q.    Is it your understanding that the

9  Governor understood that the reduction in vested

10  pension benefits would be part of any

11  restructuring for Detroit?

12          MR. SHUMAKER:  Objection: foundation.

13          MS. LEVINE:  I'm asking him his

14  understanding.

15          THE WITNESS:  I'm not sure what the

16  Governor understood.  You'd have to ask him.

17  BY MS. LEVINE:

18     Q.    Did the Governor ever communicate to

19  you that he expected that vested pension benefits

20  would be part of any restructuring for Detroit?

21     A.    The Governor communicated to me that

22  he expected -- no.



1        Q.      Yeah.

2        A.      -- for the City who had been

3   retained, the City representatives were there and

4   the State representatives were there.

5        Q.      Okay.  I'll talk -- call that the --

6   the review team --

7        A.      Review team --

8        Q.      -- is that the term you like?

9                Okay --

10       A.      -- yeah.

11       Q.      -- so as I understand what you're

12   saying, the -- the -- the slides themselves were

13   present -- given over to the review team as a --

14   a -- a bound --

15       A.      Yes.

16       Q.      -- volume or attached in some way?

17       A.      Yes, the -- the -- the slide deck as

18   the pitch book was given to the review team.

19       Q.      Okay.  And then, at the presentation,

20   were -- how did that work?  Did you -- did people

21   sort of go through the slides orally and then --

22   and -- and make comments as they were going



1    through the different pages in the pitch book?

2        A.    No.  As I recall, we handed out the

3    pitch book and began sort of going through the

4    slide, but within the first page or two, the

5    discussion exceeded the slides.  And we really

6    ended up not going through the pitch book in any

7    meaningful manner --

8        Q.    Okay.

9        A.    -- at the presentation.

10       Q.    Okay.  And this -- at the time of the

11   presentation, you were indeed still part of

12   Jones Day --

13       A.    Yes.

14       Q.    -- and part of the pitch team?

15       A.    Yes, absolutely.

16       Q.    Okay.

17             Okay.  I'm going to mark another

18   document, Mr. Orr, and ask if you've ever seen

19   this, which is Number 22.

20       A.    Two.

21             MR. ULLMAN:  Here's a copy for you,

22   two copies for you, and an extra, and an extra.  I



```
 1    don't want to bring these back with me is all.

 2                         -   -   -

 3                  (Whereupon, City of Detroit —

 4                  Restructuring Plan, Mayor's

 5                  Implementation Progress Report was

 6                  marked, for identification purposes,

 7                  as Orr Deposition Exhibit

 8                  Number 22.)

 9                         -   -   -

10                  THE WITNESS:  Thank you.

11    BY MR. ULLMAN:

12         Q.     Okay.  What we've marked as

13    Exhibit 22, Mr. Orr, is entitled, City of Detroit

14    — Restructuring Plan, Mayor's Implementation

15    Progress Report, with the date of March 2013.

16                  Have you ever seen this document

17    before?

18         A.     I think I've seen it before, but I

19    think that was after I became emergency manager.

20         Q.     Okay.  That's fine.

21                  And what I'd like to do is try to

22    just ask you about one page of this.
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1      A.      Um-hum.

2      Q.      If you could look at Page 6.

3      A.      Um-hum.

4      Q.      Okay.  What we --

5              MR. SHUMAKER:  Of the -- of the

6  actual document?

7              MR. ULLMAN:  Of the -- yes.  I'm

8  sorry, yeah.

9              And just for clarity, this document

10  bears Bates Number DTMI00129416, and Page 6 of the

11  document bears the Bates number ending in 422.

12             THE WITNESS:  Um-hum.

13  BY MR. ULLMAN:

14     Q.      Okay.  And this page, in general, is

15  entitled, The Mayor's plan includes strategies to

16  implement changes that will significantly reduce

17  general fund long-term liabilities.

18             I'd like you to focus on Number -- or

19  Letter (b) --

20     A.      Yes.

21     Q.      -- you see 3(b)?

22     A.      Um-hum.


ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

1  Q.    It says, Pension unfunded

2  liabilities, and the first bullet point says,

3  Approximately 650 million of unfunded liability as

4  of fiscal year 2012, of which only 250 million

5  relates to general fund.

6  A.    Yes, I see that.

7  Q.    And do you have an understanding as

8  to what's being said there and what that reference

9  is?

10  MR. SHUMAKER:  Objection: foundation.

11  THE WITNESS:  Yeah.  I was obviously

12  not responsible for drafting, developing or the

13  due diligence behind the document.  The document

14  speaks for itself.

15  But what I think is being said there

16  is that the unfunded liability for the -- and I

17  assume it's speaking to both pension funds; it may

18  be one or the other --

19  BY MR. ULLMAN:

20  Q.    Um-hum.

21  A.    -- but the unfunded liability for

22  fiscal year 2012 is 250, and 250 million of that



 1    is somehow an obligation of the general fund.

 2         Q.      Okay.  Did you say 250?  It's -- you

 3    meant to say 650, right?

 4         A.      No, no.  It's 650 total --

 5         Q.      Right.

 6         A.      -- but 250 million of that is an

 7    obligation of the general fund.

 8         Q.      You had misspoken and said 250 both

 9    times --

10         A.      Oh, I'm sorry --

11         Q.      -- so --

12         A.      -- oh, no -- okay.  650 and 250, I'm

13    sorry.  I was --

14         Q.      Okay.

15         A.      -- thinking ahead, thinking quicker

16    than my mouth moved.

17         Q.      Okay.  And as I -- I understand that

18    the 650 million that's referred here -- to here by

19    the Mayor corresponds pretty closely, if I recall,

20    to the $644 million figure that was referred to in

21    the June 14th proposal; is that right?

22         A.      I would -- I -- yes, I -- I would



1    think it does --

2         Q.    Okay.

3         A.    -- I'm -- I'm -- here again, I'm

4    not -- I'm assuming it -- it speaks for itself and

5    it's facially correct; but, yes, I would think

6    that's the reference.

7         Q.    Okay.  And so can you tell me what --

8    what is your understanding when the Mayor says

9    here that 250 million relates to the general fund,

10   what the other 300 --

11        A.    400.

12        Q.    -- 400 million relates to?  And

13   what's -- what is the distinction being drawn

14   between what relates to the general fund versus

15   what relates to something other than the general

16   fund?

17        A.    I'm not sure.

18        Q.    Well, is it correct that -- that some

19   portion -- let's just stick with the -- we can use

20   the $644 million number --

21        A.    Um-hum.

22        Q.    -- because I think that's what you



1    would probably say is more accurate.

2                    That's the number that's cited in the

3    June 14th proposal, right?

4        A.      Yeah, they may have -- they may have

5    rounded up here --

6        Q.      Okay.

7        A.      -- but we'll -- it's -- it's

8    approximately that amount.

9        Q.      Okay.  Is it correct that for the

10   approximately 644 million unfunded pension

11   liability that you refer to in the June 14th

12   proposal, that some portion of that is allocable

13   to a payment source other than the general fund?

14       A.      I think that's correct.

15       Q.      Okay.  And what are those --

16   what is -- what are the other payment sources to

17   which the total 650 -- or I'm sorry -- 644 million

18   is allocable other than the general fund?

19       A.      Well, there are other sources, but it

20   could be principally related to the Water

21   department.

22       Q.      Okay.  And what is your understanding



1   as to how much of the approximately 644 million

2   unfunded pension liability relates to liability

3   for personnel from the Department of Water and

4   Sewer?

5          A.     Approximately that difference.

6          Q.     Okay.  So it's about 450 million?

7          A.     Approximately, yeah.

8          Q.     Okay.  And I'm trying to recall from

9   your last testimony.

10              For the -- the pension monies that

11   are due relative to personnel from the Department

12   of Water and Sewer, are the pension payments made

13   directly by the Department of Water Sewer to the

14   retirement systems, or is the money paid first by

15   the retirement -- I'm sorry -- by the Water and

16   Sewer Department to the City, which then transmits

17   it to the retirement system, or is there another

18   mechanism for the payment?

19              MR. SHUMAKER:  Objection to form.

20              THE WITNESS:  I believe it's the -- I

21   believe it's the latter.

22



1    A.    I could go back and check it to be

2  sure, but I think that's the approximate mechanism

3  as I understand it.

4    Q.    Okay.  Now, by my math -- I make no

5  representations as to my math, but just looking at

6  the numbers, it looked -- actually, do I have a

7  calculator here?  I don't think I do.

8          What percentage is 250 over 650?  I

9  actually didn't do the math.

10   A.    Four -- it's 40-some odd.

11   Q.    It's 40-some -- yeah, we can get it

12  precisely.

13          Zero?  Oh.

14          250 divided by 6 -- let's say 650 --

15  shoot, I didn't do that right.  I apologize.  Let

16  me try to clear this and do it again.

17          250 divided -- 6.  This isn't right.

18          Okay.  It looks like about

19  38 percent.

20   A.    Right.

21   Q.    Okay.  You recall that -- that during

22  the last deposition, you indicated that you



1    thought that the actual unfunded liability was --

2    was higher than the 644 number and could be as

3    much as 3.5 billion or something like that?

4            A.      Yes.

5            Q.      Okay.  My question is, does the --

6    does the -- is the proportion of unfunded

7    liability allocable to the general fund versus the

8    Department of Water Sewer personnel constant if

9    you -- if you use a higher liability figure?

10              In other words --

11           A.      If we went up to 3.5 --

12           Q.      Yeah, yeah --

13           A.      -- million, would it be --

14           Q.      -- would the Department of Water and

15   Sewer still be approximately 38 percent of the

16   total unfunded liability?

17           A.      I'm -- I'm not sure.  I would think

18   that a rough estimate might be.  But as I said, I

19   think, in September 16th, part of those

20   calculations had to do with a number of factors,

21   so I don't want to say that my testimony is as

22   exactly proportioned.



```
 1                    -  -  -

 2            THE VIDEOGRAPHER:  Going back on the

 3   record at 1306.  This marks the beginning of

 4   Tape Number 2.

 5            MR. DECHAIRA:  Okay.

 6   BY MR. DECHAIRA:

 7       Q.    Mr. Orr, before we broke, I was

 8   asking you about a meeting you had with the

 9   Michigan Attorney General.

10            And my question was, what was said at

11   that meeting?

12       A.    Yes.

13            With Attorney General Schuette, I

14   don't recall the exact date; but, generally

15   speaking, the Attorney General -- at the meeting,

16   as I said, was Mr. Heiman on the phone, the

17   Attorney General and an attorney from his office,

18   Matt, whose last name escapes me right now.  And

19   generally what was said, the Attorney General

20   wanted to express why he felt duty-bound to take a

21   position that the Michigan State Constitution

22   protected vested pension obligations.
```



1  approximately 61.5 percent?

2       A.     But, remember, I said that you have

3  to be careful with trying to draw a straight-line

4  comparison between the two numbers you may

5  calculate in.  But generally speaking, if we're

6  just talking about the math, that -- that --

7       Q.     Right --

8       A.     -- would be the estimate.

9       Q.     -- I'm right here just talking about

10 the ratio on the -- the number that's referred to

11 as the 650 -- the approximately 650 by the Mayor.

12      A.     Yes.

13      Q.     And then I think the next question I

14 asked you, which I think is what you were alluding

15 to, that if you assumed a larger liability figure,

16 would that ratio continue to hold; and my

17 recollection is, your answer was roughly it would,

18 but you may have to, you know, fine-tune the math.

19      A.     It -- it -- it might roughly hold,

20 but you need to be careful to not draw the

21 conclusion that is -- it's exactly comparable.

22      Q.     Okay.  I understand.



```
 1        A.      Okay.

 2        Q.      Okay.

 3                And then the other question I have

 4   for you -- this is referring to the unfunded

 5   pension liability --

 6        A.      Um-hum.

 7        Q.      -- you're also familiar with the

 8   medical benefits for retirees --

 9        A.      Yes.

10        Q.      -- the health -- and I think that's

11   sometimes referred to as OPEB?

12        A.      Yes, other [sic] employee benefits.

13        Q.      Okay.  And for the OPEB is -- are --

14   is the -- is the situation similar that some

15   amount of the total OPEB liability that the City

16   faces is allocable to sources other than the

17   general fund?

18        A.      You -- you know, I think it is; but

19   I'm not recalling that mechanism as well as I

20   recall the pension mechanism, but I think it is.

21        Q.      Okay.  And would then some portion of

22   the total OPEB unfunded liability be allocable
```



1   also to the Department of Water and Sewer to their

2   retirees?

3      A.    It might well be, but I'd need to

4   confirm that.

5      Q.    Okay. And have you done any analysis

6   of that question?

7      A.    Yes --

8      Q.    Okay.

9      A.    -- well, our contractors have done an

10   analysis of the question.

11      Q.    Okay. And who specifically has done

12   an analysis of that?

13      A.    Oh, I think our team at -- the entire

14   team: Conway MacKenzie, Ernst & Young,

15   Miller Buckfire.

16      Q.    And do you recall their general

17   conclusions to what percentage of the total

18   unfunded OPEB liability is allocable to the -- A,

19   to the Department of Water of Sewer; or, B, some

20   other fund or entity apart from the general fund?

21      A.    I'm -- I'm not -- I don't recall if

22   it is, and I don't recall the percentage.



```
 1              C E R T I F I C A T E

 2   DISTRICT OF COLUMBIA:

 3              I, Cindy L. Sebo, a Notary Public within

 4   and for the Jurisdiction aforesaid, do hereby

 5   certify that the foregoing deposition was taken

 6   before me, pursuant to notice, at the time and place

 7   indicated; that said deponent was by me duly sworn

 8   to tell the truth, the whole truth, and nothing but

 9   the truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition is

13   a true record of the testimony given by the witness;

14   and that I am neither of counsel nor kin to any

15   party in said action, nor interested in the outcome

16   thereof.

17

18                              Cindy L. Sebo
                       District of Columbia, Notary Public
19                          My Commission Expires
                               April 14, 2015
20   _____

21          Cindy L. Sebo, RMR, CRR, RPR, CSR,

22             CCR, CLR, RSA, Notary Public
```

From: CN=Kevyn Orr/O=JonesDay
Sent: 1/31/2013 3:45:47 PM
To: CN=Corinne Ball/O=JonesDay@JonesDay
CC: "Stephen Brogan" <sjbrogan@jonesday.com>
Subject: Re: D

CB,

Thank you for thinking about alternative ways to skin this cat. But I don't think we should look at this right now for at least two reasons. First, the state already has EMs appointed or five cities and four school districts. I wouldn't want it to seem like I have a special deal. Second, in thinking about the EM position I went back and looked at the SIGTARP legislation and the federal law authorizing the creation of the D.C. Control Board in 95. Both gave those managers tremendous powers, but neither was subject to questions about the authority of the Congress to enact them and the President's authority to sign them into law. By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. The new EM law gives local governments four choices to fix their financial emergency:

Consent Agreement, in which local leaders remain in charge but must meet certain conditions in an agreement negotiated with the state (Detroit is already under a CA and it sounds like it's not working);
A state appointed EM that has broad authority over local finances;
Chapter 9 bankruptcy with the Governor's approval; and
Mediation, in which the local government and interested parties meet with a neutral party to resolve financial issues, such as employee contracts (this is essentially required to file a Chapter 9 petition).

So although the new law provides the thin veneer of a revsion it is essentially a redo of the prior rejected law and appears to merely adopts the conditions necessary for a chapter 9 filing. The news reports state that opponents of the prior law are already lining up to challenge this law.

Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks.

Kevyn


Kevyn D. Orr
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.5560 • Fax: 202.626.1700 •
Cell: [Redacted] • korr@jonesday.com



From:     Corinne Ball/JonesDay
To:       "Kevyn Orr" <korr@jonesday.com>
Cc:       "Stephen Brogan" <sjbrogan@jonesday.com>
Date:     01/31/2013 08:10 AM
Subject:       D


Kevyn--

Food for thought for your conversation with Baird and us --
I understand that the Bloomberg Foundation has a keen interest in this area. I

CONFIDENTIAL

JD-RD-0000295

Exhibit No.: 4
Name: Orr
Date: 9-16-13
ESQUIRE

was thinking about whether we should talk to Baird about financial support for this project and in particular the EM. Harry Wilson--from the auto task force--told me about the foundation and its interest. I can ask Harry for contact info--this kind of support in ways "nationalizes" the issue and the project.

------------------

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

------------------

CONFIDENTIAL

# EXHIBIT B

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**In the Matter Of:**

IN RE CITY OF DETROIT, MICHIGAN

13-53846

---

**GAURAV MALHOTRA**

*September 20, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

1    So they were looking at those forecasts in isolation.

2    But that work sort of stopped I think right around in

3    the first four or five months of the engagement.

4        Q.    And why did that work stop?

5        A.    It was because the focus continued to be

6    on the general fund and these were self-sustaining

7    funds with respect to at least the Water and Sewer

8    Department.  And so they were monitoring their -- and

9    dealing with their cash activity, although connected

10   to the City, but we weren't helping forecast receipts

11   and disbursements because they were not impacting the

12   general fund.

13       Q.    You previously testified in your prior

14   deposition that Ernst & Young was not asked to look at

15   possible disposition of City assets, is that correct?

16       A.    That's correct.

17       Q.    Why -- did you have a discussion with the

18   City regarding whether that would be valuable work for

19   Ernst & Young to provide?

20       MR. STEWART:  Objection.

21   BY THE WITNESS:

22       A.    I -- I'm not sure I follow the question.

23   BY MS. BRUNO:

24       Q.    How did it come about that Ernst & Young



1  didn't evaluate the value of disposition of some of

2  the City assets?

3      A.    It was not a part of our scope of work.

4      Q.    You would agree that there could be cash

5  value to the disposition of some of those assets,

6  would you not?

7      MR. STEWART:  Objection.

8  BY THE WITNESS:

9      A.    I think that's a better question to ask

10  for the City's investment banker.

11  BY MS. BRUNO:

12      Q.    Well, I'm not talking about the specific

13  numbers here, but you know what some of the assets

14  available to the City are, correct?

15      A.    In general, yes.

16      Q.    And you understand that some of those

17  assets could be valuable or quite valuable, correct?

18      MR. STEWART:  Objection.

19  BY THE WITNESS:

20      A.    It depends on what assets you are talking

21  about.

22  BY MS. BRUNO:

23      Q.    Why don't we look at Exhibit No. 4 -- oh,

24  I'm sorry.  I'll hand it to you.  Exhibit No. 4 from


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1  your prior deposition, I'll hand it to you.  It was

2  the Proposal For Creditors --

3      A.    Okay.

4      Q.    -- dated June 14.

5          And I believe the assets are identified on

6  90.  And it is 90 of the computer generated numbers on

7  the bottom.

8          And on pages 90 through 96, the

9  presentation discussed various assets that the City

10  could derive some cash benefit from, correct?

11      MR. STEWART:  Objection.

12  BY THE WITNESS:

13      A.    Yes.

14  BY MS. BRUNO:

15      Q.    And, well, I don't want to quarrel or even

16  discuss with you what the actual specific value of any

17  one of those assets are, but you would agree that the

18  implementation of any of these proposals would improve

19  the City's cash position, would it not?

20      MR. STEWART:  Objection.

21  BY THE WITNESS:

22      A.    Here is what I would say.  The current

23  ten-year projections right now do not include any

24  incremental proceeds that could be available to the



1    City from asset sales.  And that's where I -- because

2    that's what's very clearly laid out in the proposal.

3          If there are proceeds available that are

4    available to the City, those numbers would change.

5    But I can at least highlight and articulate what the

6    assumptions are with respect to the ten-year forecast

7    that the City has put out.

8    BY MS. BRUNO:

9          Q.    And so your assumptions include that none

10   of these assets will be disposed of in any way, is

11   that correct?

12         A.    That's generally correct.

13         Q.    Sticking with Exhibit No. 4 before you, if

14   you'd turn to page 80 of the document.  I'm sorry.  I

15   should say 87 of the computer generated numbers.

16         And this is a portion of the presentation

17   that discusses increasing the tax collection.  You

18   look like you are on a different page than I am here.

19         A.    87.

20         Q.    You've got it?

21         A.    Yes.

22         Q.    You would agree that increasing the tax

23   collection rates and improving the collection of past

24   due taxes could materially improve the City's



```
1              REPORTER'S CERTIFICATE

2         I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

3    a Certified Shorthand Reporter, do hereby certify:

4         That previous to the commencement of the

5    examination of the witness herein, the witness was

6    duly sworn to testify the whole truth concerning the

7    matters herein;

8         That the foregoing deposition transcript

9    was reported stenographically by me, was thereafter

10   reduced to typewriting under my personal direction and

11   constitutes a true record of the testimony given and

12   the proceedings had;

13        That the said deposition was taken before

14   me at the time and place specified;

15        That I am not a relative or employee or

16   attorney or counsel, nor a relative or employee of

17   such attorney or counsel for any of the parties

18   hereto, nor interested directly or indirectly in the

19   outcome of this action.

20        IN WITNESS WHEREOF, I do hereunto set my

21   hand on this 21st day of September, 2013.

22

23

24   JULIANA F. ZAJICEK, Certified Reporter
```



ESQUIRE                           800.211.DEPO (3376)
                                  EsquireSolutions.com

EXHIBIT C

TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

*In Re: City of Detroit, Debtor*

*Governor Richard D. Snyder*
*October 9, 2013*

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 100913RS.TXT
Min-U-Script with Word Index

09:55:47 1    Q.    Okay.  Let me direct your attention -- strike that.

09:55:54 2          Let me back up.

09:55:55 3                Did you put your comments in writing to

09:55:58 4          anyone -- your comments about the June 14th, 2013

09:56:02 5          proposal, did you put your comments in writing to

09:56:04 6          anyone whether by letter or email or phone text or

09:56:08 7          in any other written format?

09:56:09 8    A.    I don't believe so.  I don't believe so.

09:56:13 9    Q.    Let me now turn your attention to page 109 of

09:56:21 10         Exhibit 3, and I'm going to in particular read the

09:56:30 11         second line of the third bullet point from the

09:56:34 12         bottom.  It says "There must be significant cuts in

09:56:39 13         accrued vested pension amounts for both active and

09:56:42 14         currently retired persons."

09:56:45 15               Were you aware that the proposal said this?

09:56:49 16   A.    I'm aware the proposal said that in the context that

09:56:53 17         this was to be a negotiation and a mutual agreement

09:56:56 18         between parties.

09:56:56 19   Q.    My only question was --

09:56:57 20   A.    Yeah.

09:56:57 21   Q.    -- were you aware that this proposal said this?

09:57:00 22   A.    Yes.

09:57:00 23   Q.    And you were aware that at the time that you signed

09:57:05 24         what's been marked as Exhibit 2, the July 18th

09:57:07 25         letter, you were aware that the proposal contained

09:57:10 1        the language I just read, correct?

09:57:12 2  A.    Yes.

09:57:14 3  Q.    So you were aware when you signed the July 18th,

09:57:24 4        2013 letter that it was Kevyn Orr's view that there

09:57:30 5        had to be significant cuts in accrued pension

09:57:32 6        liabilities, correct?

09:57:34 7  A.    I would say it was Kevyn Orr putting a proposal out

09:57:38 8        to parties to say he believed this was necessary to

09:57:41 9        achieve an outcome, that they would need to agree to

09:57:44 10       that.

09:57:45 11  Q.    I'm not sure that was responsive. Let me try that

09:57:49 12       question again.

09:57:49 13  A.    Okay.

09:57:50 14  Q.    Isn't it correct that at the time that you signed

09:57:54 15       your July 18th letter that you were aware that it

09:58:00 16       was Kevyn Orr's position that there had to be

09:58:01 17       significant cuts in accrued pension benefits?

09:58:04 18  A.    Yes.

09:58:05 19  Q.    Did you speak to Kevyn Orr about -- strike that.

09:58:12 20            Did you agree with that position as of

09:58:15 21       July 18th? And by the position I mean that there

09:58:19 22       had to be significant cuts in accrued pension

09:58:21 23       liabilities?

09:58:23 24  A.    The approval of my letter was not addressing that as

09:58:27 25       an issue. It was about authorizing a bankruptcy.

                              CERTIFICATE

STATE OF MICHIGAN          )
                           ) SS:
COUNTY OF OAKLAND          )


          I, LAUREL A. JACOBY, Certified Shorthand

reporter, a Notary Public, hereby certify that I recorded

in shorthand the examination of GOVERNOR RICHARD D.

SNYDER, the deponent in the foregoing deposition; and that

prior to the taking of said deposition the deponent was

first duly sworn, and that the foregoing is a true,

correct and complete transcript of the testimony of said

deponent.

          I further certify that no request was made for

submission of the transcript to the deponent for reading

and signature and that no such submission was made.

          I also certify that I am not a relative or

employee of a party or an attorney for a party; or

financially interested in the action.




_____
LAUREL A. JACOBY, CSR-5059, RPR

Notary Public, Oakland County, Michigan

My commission expires: 9/1/18

Dated:  This 11th day of October, 2013.

# EXHIBIT D

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**In the Matter Of:**

CITY OF DETROIT, MICHIGAN

Case No. 13-53846

---

**LAMONT SATCHEL**

*September 19, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   A.   Yes.

 2   Q.   I didn't mean to.

 3   A.   I was not aware of that.

 4   Q.   And as regards pension benefits, which is what we've

 5        been looking at, do you know whether the plan, the

 6        proposal that was presented by the City on September

 7        11 changed in any way from what it presented first on

 8        June 14th and then again on June 20th?

 9   A.   I haven't -- I'm not aware of nor have I seen a

10        proposal that the City made on September 11.

11   Q.   So you don't know one way or the another?

12   A.   I don't.

13   Q.   Okay, fair enough.

14             Now, is it -- to your knowledge can someone

15        or a retiree, for example, look at the information

16        that's contained in S18 and be able to figure out

17        monetarily what the total impact of this proposal is

18        on that particular individual?

19   A.   I don't know.

20   Q.   Okay.  And you think that's something that someone

21        would want to be able to understand in order to

22        analyze a proposal that's being made and respond

23        intelligently to it?

24             MR. MILLER:  Object to form.  Calls for

25        speculation.
```



ESQUIRE

*800.211.DEPO (3376)*
*EsquireSolutions.com*

1   A.   Could you rephrase that?

2              MR. ULLMAN:  Can you repeat it?

3              (Record read back as requested.)

4   A.   What's the that?

5   Q.   Being able to understand the monetary impact to the

6        affected individual of what is being proposed.  If I

7        were presenting you with a proposal, you would want to

8        understand how -- a proposal that purports to affect

9        how much money you're going to get, how many benefits

10       you're going to receive, you would want to know what

11       the monetary impact on you is overall in order to

12       think about it, understand it and respond to; true?

13  A.   If it had a monetary impact and --

14             MR. MILLER:  Let me interpose an objection.

15       Object to form.

16  Q.   You can answer the question.

17  A.   If it had a monetary impact and I had an interest in

18       that regard, I would.  If I didn't, I wouldn't.

19  Q.   Okay.  Now, we talked about the June 20 meeting.  What

20       I'm going to do is show you two documents.  I'm going

21       to have them marked serially, but I'm going to show

22       them to you at the same time and then ask you about

23       them because they're related; okay?

24  A.   All right.

25             MR. ULLMAN:  So we're going to mark these



```
1   State of Michigan)

2   County of Genesee)

3                Certificate of Notary Public

4       I certify that this transcript is a complete, true and

5   correct record of the testimony of the witness held in this

6   case.

7       I also certify that prior to taking this deposition,

8   the witness was duly sworn or affirmed to tell the truth.

9       I further certify that I am not a relative or an

10  employee of or an attorney for a party; and that I am not

11  financially interested, directly or indirectly, in the

12  matter.

13               WITNESS my hand this 20th day of September,

14  2013.

15

16

17

18               Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19               Certified Realtime Reporter

20               Registered Merit Reporter

21               Certified LiveNote Reporter

22               Certified Shorthand Reporter

23               Notary Public, Genesee, Michigan

24               Acting in Oakland County, Michigan

25               My Commission Expires:  9-19-18
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

# EXHIBIT E

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

Page 1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2             EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4
 5   In re                     Chapter 9
 6   CITY OF DETROIT, MICHIGAN,  Case No. 13-53846
 7             Debtor.          Hon. Steven W. Rhodes
 8   _____/
 9
10   DEPONENT:  MAYOR DAVE BING
11   DATE:      Monday, October 14, 2013
12   TIME:      10:27 a.m.
13   LOCATION:  CITY OF DETROIT MAYOR'S OFFICE
14              2 Woodward Avenue
15              11th Floor Conference Room
16              Detroit, Michigan
17   REPORTER:  Jeanette M. Pallon, CRR/RMR/CSR-3267
18
19
20
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3   JONES DAY
 4   By:  Thomas Cullen
 5        Dan T. Moss
 6   51 Louisiana Avenue, NW
 7   Washington, D.C. 20001.2113
 8   202.879.3939
 9        Appearing on behalf of the Debtor
10
11   DENTONS US LLP
12   By:  Anthony B. Ullman
13   620 Fifth Avenue
14   New York, NY 10020.2457
15   212.632.8342
16        Appearing on behalf of Official Committee of Retirees
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3   COHEN WEISS AND SIMON LLP
 4   By:  Joshua J. Ellison
 5   330 West 42nd Street
 6   New York, NY 10036.6979
 7   212.356.0216
 8        Appearing on behalf of UAW
 9
10   LOWENSTEIN SANDLER LLP
11   By:  Sharon L. Levine
12   65 Livingston Avenue
13   Roseland, NJ 07068
14   973.597.2374
15        Appearing on behalf of AFSCME
16
17   CLARK HILL PLC
18   By:  Jennifer K. Green
19   500 Woodward Avenue, Suite 3500
20   Detroit, MI 48226
21   313.965.8384
22        Appearing on behalf of Retirement Systems
23
24
25
```

Page 4

```
 1   APPEARANCES (continued):
 2
 3   WILLIAMS WILLIAMS RATINER & PLUNKETT PC
 4   By:  Ernest J. Essad, Jr.
 5   380 N Old Woodward Ave Ste 300
 6   Birmingham, MI 48009
 7   248.642.0333
 8        Appearing on behalf of FGIC
 9
10   CITY OF DETROIT LAW DEPARTMENT
11   By:  Portia L. Roberson
12   2 Woodward Avenue, Suite 500
13   Detroit, Michigan 48226
14   313.237.3018
15        Appearing on behalf of the City of Detroit,
16        Residents of the City, Mayor's Office and City Council
17
18
19
20
21
22
23
24   ALSO PRESENT:
25   Patrick Murphy, videographer
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

Page 45

1 Q. Well, did you -- as part of this initial -- this
2    restructuring program, were you aware in any way that
3    anything that was being proposed was contrary to the
4    laws or Constitution of the State of Michigan?
5 A. No.
6 Q. And do you recall specifically how if at all the
7    pension liabilities were to be dealt with under your
8    proposed approach?
9 A. No.
10 Q. Would that be set out in whatever documents there are
11    that describe your initiatives?
12 A. I didn't understand your question.
13 Q. Would the approach to pensions be set out in whatever
14    documents exist that describe the initiatives that
15    you've referred to?
16 A. Those probably were internal meetings between the CFO
17    and the COO and probably people from the labor
18    department. Those aren't meetings that I sat in.
19 Q. So you don't recall the specifics of how the pension
20    issues were --
21 A. No.
22 Q. -- being dealt with?
23 A. No.
24 Q. But as you understood it, the City's -- if the
25    proposed restructuring, the initiatives that you put

Page 46

1    in place went through, you believe that the City would
2    be able to survive without bankruptcy and would
3    continue to be able to meet its legal obligations?
4         MR. CULLEN: Objection, foundation, form.
5 A. The answer would be we wanted that opportunity.
6 Q. Okay. And you thought that if you had that
7    opportunity, you could make it happen; is that right?
8 A. That would be correct.
9 Q. But you weren't given that opportunity; were you?
10 A. That is correct.
11 Q. Let me go back to what we've marked as Orr Exhibit --
12    that we haven't marked but we've identified as Orr
13    Deposition Exhibit 7, which has the proposed summary
14    of partnership.
15 A. Uh-huh.
16 Q. Was this partnership agreement, the document that
17    appears here where it has a draft label on it, was
18    that ever made final?
19 A. Not to my knowledge.
20 Q. When you met with Mr. Orr -- at the end of February
21    in DC, you indicated that you discussed this with him,
22    though; correct?
23 A. Correct.
24 Q. And did he tell you that he was -- that he was
25    agreeable to it?

Page 47

1 A. He was agreeable in working together, but we didn't go
2    step by step and say that I agree or I don't agree.
3 Q. Okay. So did you have an understanding as when you
4    left that meeting in DC whether Mr. Orr had in fact
5    agreed to the points that were set out in this summary
6    of partnership document?
7         MR. CULLEN: Objection, foundation, form.
8 A. One of the areas that I do recall and me saying is
9    that it made reference to keeping the executive team
10    intact. He wanted the opportunity to make an
11    assessment himself.
12 Q. Okay, and did he make an assessment?
13         MR. CULLEN: Objection, foundation, form.
14 A. I think over the time that he's been here, I don't
15    think he personally made an assessment. I think there
16    were others who may have made an assessment and made
17    recommendations to him.
18 Q. And was your team -- your executive team left intact?
19 A. No.
20 Q. And who was gotten rid of besides Mr. Andrews, if
21    anyone?
22 A. Jack Martin is no longer here as the CFO. Karla
23    Henderson, who was the group executive for planning
24    and development and BC, is no longer here. I think
25    before Kevyn came on Kirk Lewis was already gone. I

Page 48

1    do think that Chris Brown was already gone. As of
2    today our purchasing director is no longer here,
3    Andre DuPerry. Richard Kay, who was the director of
4    the lighting department, is no longer here. The
5    director of DDOT is no longer here. I think there --
6    that's right off the top of my head. I think there
7    were nine or ten department heads that are no longer
8    here.
9 Q. And were they asked to leave by Mr. Orr or --
10 A. For the most -- for the most part, yes. There was one
11    guy who headed up -- he was the director of homeland
12    security, he left on his own accord because of the
13    environment that he felt he could no longer work in,
14    but for the most part all of those other people were
15    asked to leave.
16 Q. Now -- and are the positions that those people held
17    vacant or have they been replaced with other people?
18 A. There's a mixed bag, quite frankly. I mean, some of
19    them -- I think you got some consultants in some of
20    those positions. I mean, I had no input at all. I
21    mean, I found out after the fact that either people
22    were removed or if somebody was coming in. I had -- I
23    never had the opportunity to interview even the new
24    CFO who came in, the new COO who came in. Those were
25    selected by Kevyn in a vacuum, as far as I'm



ESQUIRE

Page 49

1 concerned.

2 Q. Moving on past February of 2013, as I recall, the
3 official appointment of Mr. Orr as the emergency -- I
4 forget whether it was the Emergency Financial Manager
5 or Emergency Manager, but it took place sometime
6 around the end of March. Is that generally consistent
7 with your recollection?

8 A. Yeah, I think March 25th was his first day.

9 Q. And from the meeting in DC up to March -- say March
10 25th, did you have any conversations with Mr. Orr?

11 A. I may have had one phone -- one other phone
12 conversation with him.

13 Q. And do you recall what the substance of that call was
14 about?

15 A. I think more than anything else it was making sure
16 that when he came on board, we were having a press
17 conference, introducing him as the Emergency Financial
18 Manager and wanted me to stand with he and the
19 Governor at that, because we didn't want, quote
20 unquote, a divided house, if you will, and I thought
21 it was better since an Emergency Manager was coming on
22 board, it was no sense in us continuing to fight that.
23 If he could be helpful to turn this City around, it
24 would be better we do it together.

25 Q. So in that phone conversation was there any discussion

Page 50

1 of Chapter 9 filing?

2 A. No.

3 Q. Was there any discussion of anything related to
4 pensions?

5 A. No.

6 Q. I'm going to show you another document, Mr. Mayor,
7 which we'll mark as Bing Number 3.

8     (Marked Exhibit No. 3.)

9 Q. For the record what we've marked as Bing Exhibit --
10 what is this, 4? Three. Actually I think we had
11 previously marked this as Exhibit 22 to the Orr
12 deposition, but since I've forgotten about that, now
13 we'll just leave it as Bing Number 3, but I believe it
14 is the same document.

15     Do you recognize this document, Mr. Mayor?

16 A. Yes.

17 Q. For the record it's entitled City of Detroit
18 Restructuring Plan, dated March 23, begins with Bates
19 number DTMI00129416.

20 A. Yes.

21 Q. And just briefly tell me what this is and I'll ask you
22 a few questions about it.

23 A. Well, it speaks to the things that we were working on,
24 the recommendations that we had put together to get us
25 through a very tumultuous time in the City of Detroit.

Page 51

1 We knew that this plan was going to negatively impact
2 a lot of folks in order for us to move forward with
3 implementation, but it was all about trying to manage
4 our way through without going to the route of
5 bankruptcy.

6 Q. And this was a document that was put together by you
7 and people on your team; is that right?

8 A. That would be correct.

9 Q. And I see we've been going for a little over an hour,
10 an hour and 20 minutes. It's probably a good time for
11 a break, but let me ask you first up to this time this
12 is now March 13, towards the -- by the end of March
13 had you had any conversations with anyone else from
14 the Governor's staff or with the Governor himself
15 about Mr. Orr as the Emergency Financial Manager or
16 the Emergency Manager?

17     MR. CULLEN: Objection, foundation, form.
18 You can address the question.

19 A. It was obvious to me in this time frame that Lansing
20 had made their selection, so, I mean, that's something
21 that I couldn't control so it was more important to
22 me, once again, to be part of the team to help fix the
23 City as opposed to constantly fighting and pushing --
24 and pushing back. I didn't think that would get us
25 anywhere.

Page 52

1 Q. Okay. So after you had your initial conversations
2 with Baird in February, you then met with Orr in the
3 end -- towards the end of February also in DC, and
4 then Orr -- there was an official announcement at the
5 end of March saying Orr's the new EM or the new EFM.
6 Prior to the meeting in DC and the official
7 announcement of Orr, did you have any contact with
8 anyone from the State about Mr. Orr's being made the
9 Emergency Manager or Emergency Financial Manager?

10 A. The answer would be very little, if any, because they
11 had the right to make the decision, they made the
12 decision, so once again, I would prefer to work with
13 the individual seeing what we could do together to fix
14 the City, a broken City.

15 Q. Okay, so let me just ask more directly. Did you have
16 advanced notice before the public announcement that
17 the City -- the State was going to come out and make
18 an announcement saying Kevyn Orr is our man?

19 A. Yes.

20 Q. And when were you told?

21 A. That had to be in early -- early to mid March.

22 Q. And do you remember the specifics of that discussion,
23 who told you what was said?

24 A. Whether that was Rich Baird or Andy Dillon, it wasn't
25 the Governor.


ESQUIRE

Page 57

1  A.  Yes, it did.

2  Q.  And was that taken out of your hands also?

3  A.  Yes, it was.

4  Q.  And that like the other real estate you mentioned was

5      taken out of your hands by the Emergency Manager and

6      his team I take it?

7  A.  The whole process --

8          MR. CULLEN:  Objection, foundation, form.

9  A.  -- yeah.

10  Q.  And did there come a time when someone -- how did this

11      process come about that it was taken out of your

12      hands? Did the Emergency Manager or someone from his

13      staff actually tell you or your staff, don't worry

14      about these things anymore, it's not your business or

15      words to that effect?

16          MR. CULLEN:  Objection.

17  A.  No.

18          MR. CULLEN:  Foundation, form.

19  Q.  How did it come about that it was taken out of your

20      hands?

21  A.  I actually went to the Emergency Manager and told him

22      about these potential deals and in order for them to

23      go forward, he had to sign-off on it. He said to me

24      that it looked like they were decent deals and that he

25      would, but obviously that hasn't happened yet.

Page 58

1  Q.  And has there been any follow-up with the Emergency

2      Manager between him and you as to why he hasn't signed

3      off?

4          MR. CULLEN:  Objection, foundation, form.

5  A.  I think more than anything else he wants to look at

6      some of the bigger issues that he's got to deal with

7      as opposed to these things which he may consider, you

8      know, not big issues.

9  Q.  Even though if these things went through, they would

10      at least bring in some immediate cash; is that right?

11  A.  They would.

12  Q.  As part of the asset monetization, did you give any

13      consideration to try to monetize art that is owned by

14      the City of Detroit and maintained at the Detroit

15      Institute of Arts?

16  A.  The answer would be no.

17  Q.  And was there a particular reason you didn't give any

18      consideration to that?

19  A.  Back at that time when we were thinking about it, that

20      never came up, that was never a conversation that we

21      had internally. I think since he's been on board, the

22      subject obviously has gotten a lot of heat and a lot

23      of visibility. I'm not sure what's going to happen

24      there.

25  Q.  Okay. And do you -- let me ask it this way.

Page 59

1      Did you as of the March 2013 time frame

2      have any understanding, just a general understanding,

3      as to what the value was of the art that's owned by

4      the City of Detroit?

5          MR. CULLEN:  Objection, foundation, form.

6  A.  The answer would be no.

7  Q.  And as you sit here today, do you have any

8      understanding as to the value of the art that's owned

9      by the City of Detroit?

10          MR. CULLEN:  Same objection.

11  A.  The answer would still be no.

12  Q.  Are you aware of reports in the press stating that the

13      city-owned art could easily be worth billions of

14      dollars?

15  A.  I have read that, yes.

16  Q.  And do you have any reason to believe those reports

17      are inaccurate?

18          MR. CULLEN:  Objection, foundation, form.

19      Of what they report or the value or what, counsel?

20          MR. ULLMAN:  I think my question was clear.

21  Q.  You can answer my question.

22  A.  I know that he's engaged Christie's to do an

23      evaluation and I'm not sure that that's complete yet,

24      so I have no idea of what the value may or may not be.

25  Q.  Okay. Let me ask you to turn now to the next page of

Page 60

1      this document, which is ending in Bates page 422. And

2      this heading says, and I quote, "The Mayor's plan

3      includes strategies to implement changes that will

4      significantly reduce general fund long-term

5      liabilities."

6      Do you see that?

7  A.  Yes.

8  Q.  And so we're clear, what in brief is the general fund?

9  A.  That's the -- the general fund is what we use to run

10      the City on a day-to-day basis.

11  Q.  Now, in subpoint A, 3A, you give some -- you give two

12      subpoints, two bullets. The second one says,

13      approximately 6 billion of City debt is owed by the

14      water and sewer department and does not have an impact

15      on the general fund. Do you see that?

16  A.  Yes.

17  Q.  Can you explain what you were referring to by those

18      words?

19  A.  That -- that debt is paid by the users of the water

20      and sewerage department, so there's a revenue stream

21      that pays that debt down, so it's not part of the

22      general fund.

23  Q.  Okay, and as you put it here, that that debt, while

24      it's on the books as City debt because the department

25      of water and sewer is part of the City, that doesn't,



Page 61

1 as you put it, have an impact on the general fund
2 because it's -- the water and sewer debt is paid for
3 by the department of water and sewer?
4 A. That would be correct.
5 Q. And that, as I understand it, is run as a separate
6 authority and has its own books and records and is
7 solvent; is that right?
8 A. That would be correct.
9 Q. You then go on in the next point, sub B, to refer to
10 pension unfunded liabilities, and you say
11 approximately 650 million of unfunded liability as of
12 FY 2012 of which only 250 million relates to general
13 fund.
14 A. Uh-huh.
15 Q. Do you see that? And could you tell me what you meant
16 when you wrote that?
17 MR. CULLEN: Objection, foundation, form.
18 A. I believe that makes reference to both the payment to
19 the pension fund and maybe even to the healthcare
20 benefits.
21 Q. Okay, I'm going to be a little more specific. The
22 language of this restructuring plan states that
23 there's 650 million of unfunded pension liability. Do
24 you see that?
25 A. Uh-huh.

Page 62

1 Q. And then it says of that only 250 million relates to
2 the general fund.
3 Can you tell me what that's referring to?
4 A. No, not right off the top of my head I can't, no.
5 Q. So you don't recall what that level of detail is as to
6 the --
7 A. Correct, correct, correct.
8 Q. Then the next bullet it -- well, I guess – do you
9 recall where the 650 million liability -- unfunded
10 liability number comes from?
11 A. We have not -- we're not current with our pension
12 contributions.
13 Q. I guess let me ask it a little -- let me mark then
14 another document. We'll make this as Bing 4.
15 (Marked Exhibit No. 4.)
16 Q. And Bing 4 for the record is an excerpt from a
17 document entitled Comprehensive Annual Financial
18 Report for the City of Detroit for its fiscal
19 year-ended June 30, 2012 and I've attached just two
20 pages of it because it's a very long document.
21 Okay, Mr. Mayor? You've seen -- you know
22 what the Comprehensive Annual Financial Report is;
23 right?
24 A. Yes.
25 Q. And I've attached the pages that pertain to the

Page 63

1 pensions and if you look on page 124, it talks about
2 the unfunded AAL on line 3 of that table.
3 A. Uh-huh.
4 Q. And which stands for unfunded actuarial -- as I
5 understand it, actuarial accrued liability?
6 A. Correct.
7 Q. And then if you look at the table, it says for the
8 General Retirement System there's a number of
9 approximately 640 million and on the Police and Fire
10 Retirement System it's about 4 million. Do you see
11 that?
12 A. Yes.
13 Q. And is it correct that that -- so that adds up to
14 about 644 million. Does that correspond to the
15 650 million that's in the restructuring plan that we
16 have as Exhibit 3?
17 A. Yes, yes.
18 MR. CULLEN: Objection, foundation, form.
19 Q. And when you -- the restructuring document refers to
20 the unfunded liability at fiscal year 2012, is that
21 referring to the valuation that's referred to at the
22 top of page 124 of Bing 4 where it says, and I quote,
23 "The funded status of each plan as of June 30, 2011,
24 the most recent actuarial valuation date, is as
25 follows" and then gives a table?

Page 64

1 MR. CULLEN: Objection, foundation, form.
2 A. And your question was?
3 MR. ULLMAN: Do you want to read it back?
4 If you don't understand, I'll rephrase it, but --
5 THE WITNESS: Yes. I just need --
6 Q. Would it be easier if I just rephrased the question?
7 A. Go ahead.
8 Q. Okay. When you referred to the approximately
9 650 million of unfunded liability as of fiscal year
10 2012, okay, the unfunded liability as of 2012, is that
11 referring to the underfunding as reported as of the
12 June 30, 2011 actuarial valuation which is referred to
13 on the top of page 124?
14 A. The answer would be --
15 MR. CULLEN: Objection, foundation, form.
16 When you say when you refer, you mean -- are you
17 implying that he wrote this document personally?
18 MR. ULLMAN: No, he and his team.
19 Q. I'm obviously referring to that in the general sense.
20 I didn't intend to imply that you physically drafted
21 this, Mr. Mayor. I understand this was put together
22 by you and people working for you.
23 A. And the answer to that would be yes.
24 Q. And also under this -- going back to page 422 of
25 Exhibit 3 under the subheading B under pension



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

Page 65

1   unfunded liabilities it says, the City is developing a
2   plan to reduce the unfunded liability.
3           Do you have any recollection as to the
4   specifics of that plan?
5   A.  No, I don't.
6   Q.  Now, you recall -- or let me ask you.
7           Are you aware that on June 14th, 2013 the
8   Emergency Manager had a meeting with creditors?
9   A.  I'm aware.
10  Q.  Prior to the time that he was appointed or I should
11  say -- let me withdraw that.
12          Prior to the time that the Emergency
13  Manager's appointment was formally announced and June
14  14, 2013, did you have any conversations with the
15  Emergency Manager himself?
16  A.  Yes.
17  Q.  And do you recall how many?
18  A.  We don't -- we don't meet that often.  You know, if we
19  meet once or twice a week, that's about it and the
20  meetings are usually very short meetings.  Usually
21  called by me.
22  Q.  And can you say how long a typical meeting would last?
23  A.  Thirty minutes tops.
24  Q.  During that time between March 25th and June 14th do
25  you recall any discussions with the Emergency Manager

Page 66

1   concerning pensions, anything to do with pensions?
2   A.  I -- yes.
3   Q.  And tell me what you recall.
4   A.  You know, the general conversation was that pensions
5   are a major problem that we have and we've got to
6   address it.
7   Q.  And do you recall when those conversations took place?
8   A.  Probably more in the May time frame.
9   Q.  And was there any conversation with the Emergency
10  Manager as to how the Emergency Manager intended to
11  address the issues of pensions?
12  A.  No.
13  Q.  Was there any discussion with the Emergency Manager
14  during the period I've been asking about, the end of
15  March and June 14, about the City's filing for Chapter
16  9 bankruptcy?
17  A.  I think the only conversations we may have had about
18  that is that's the last resort and that's from him
19  saying, you know, that's not the direction we want to
20  go in and it would be last resort.
21  Q.  Did the emergency -- did you have any discussions with
22  the Emergency Manager in which he indicated that he
23  had any approaches or thoughts as to how to address
24  issues relating to pensions other than filing for
25  Chapter 9 bankruptcy?

Page 67

1   A.  No.
2   Q.  And did you have any conversations with him in which
3   he specifically referred to a Chapter 9 bankruptcy as
4   a way to deal with the pension issues?
5   A.  I believe the answer to that would be yes.  I can't be
6   very specific, I don't recall, but I think -- I
7   believe that conversation -- or a conversation like
8   that did occur.
9   Q.  Okay, and can you give me, as best you can recall, a
10  time frame as to when?
11  A.  I think it would be in that same May time frame in one
12  of our discussions.
13  Q.  And can you tell me with as much specificity as you
14  can remember what the Emergency Manager said during
15  that conversation?
16  A.  Once again, with not a lot of specifics, but in order
17  to fix the problems of the City where -- I know this
18  number has been thrown out a lot, the $3.5 billion of
19  unfunded liabilities, etc., etc., I mean, he talked
20  about that, but that was a generality and so it was no
21  more -- it was not more specific than that.
22  Q.  But he referred to Chapter 9 as a way to get rid of or
23  address what he referred to as a 3.5 billion unfunded
24  liability?
25  A.  As a possibility.

Page 68

1           MR. CULLEN:  Objection, foundation, form.
2   You can answer.
3   A.  As a possibility.
4   Q.  And did Mr. Orr tell you at that time that the
5   unfunded liability was indeed 3.5 billion?
6   A.  The answer to that would be yes.
7   Q.  And did he tell you that that had been shown through
8   an actuarial valuation?
9   A.  The answer to that would be yes.
10  Q.  During that conversation or any other conversation
11  with Mr. Orr during the March 25 through June 14 time
12  frame, was there any discussion with Mr. Orr of what
13  we've referred to previously and I've shown you the
14  pension clause in the Michigan Constitution or any
15  other legal impediments to -- affecting pension
16  rights?
17  A.  No.
18  Q.  Let me ask you the same questions now -- well, let me
19  preface it by saying you're aware, of course, that
20  there was a bankruptcy filing on July 18.
21  A.  That would be correct.
22  Q.  Okay.  Now, during the period between June 14, that
23  was when the creditor proposal was issued, and the
24  filing, did you have any conversations with Mr. Orr
25  A.  About?


ESQUIRE

Page 117

1 Q. Did you hire them?

2 A. No.

3 Q. Who retained them?

4 A. I think -- once again, most of these companies were
5 being -- they were being pressed by the -- we were
6 pressed by the State to my understanding, the State
7 had a lot of input into the selection process and in
8 some cases where the City has a responsibility for
9 paying part of the fees, you know, I've always had a
10 problem that I was not at the table to participate in
11 the selection process.

12 Q. Do you pay part of the fees for Miller Buckfire?

13 A. Yes.

14 Q. Does the State pay part of the fees for Miller
15 Buckfire?

16 A. Yes.

17 Q. Does the NERD Fund pay part of the fees for Miller
18 Buckfire?

19 A. I wouldn't know that.

20 Q. Do you have a copy of Miller Buckfire's retention or
21 engagement letter?

22 A. I would think we have that. I don't -- I don't have
23 it personally, but I would think we do in the purchase
24 department and maybe in the law department.

25     MS. LEVINE: We would request a copy of

Page 118

1 that letter. I know that there's been a lot of
2 documents that have been produced but we didn't happen
3 to see what in there so we would make that specific
4 request.

5     MR. GREEN: And if I may add the 2012
6 engagement letter from Miller Buckfire as well. I
7 understand they were initially engaged the prior year.
8 There may be two engagement letters.

9     MR. MOSS: Please put that in a letter so
10 we make sure we get it part of the record. We'll take
11 a look.

12     MS. LEVINE: So the request will be for any
13 engagement letters or contracts with Miller Buckfire
14 and we'll clarify that.

15 Q. During the deposition last week with Treasurer Dillon
16 he made a reference to a report with regard to certain
17 tax write-offs or uncollected taxes. Are you familiar
18 with that?

19 A. No, I'm not. Not specifically.

20 Q. Are you familiar with any issue with regard to
21 potential tax write-offs where the taxes could have
22 been collected?

23     MR. CULLEN: Objection, foundation, form.

24 A. No, I'm not. You know, we've got uncollected taxes
25 that go back ten, 12 years, and so prior

Page 119

1 administrations in my -- in my perspective a lot of
2 that should have been written off a long time ago but
3 they've been carrying it on books and I just think
4 that's the wrong approach.

5 Q. Under your administration were -- how many -- how much
6 did you write-off in what you believe to be
7 uncollected taxes?

8 A. I'm not sure of that. I would have to get with the
9 CFO.

10 Q. Do you have an approximate number?

11 A. No, I don't.

12     MS. LEVINE: I don't have anything further.
13 Thank you.

14     THE WITNESS: Thank you.

15     MR. GREEN: No, I don't have any questions.

16     MR. CULLEN: We don't need the Pistons
17 question on the record.

18     MR. ESSAD: No.

19     MR. CULLEN: Thank you very much.

20     THE VIDEOGRAPHER: This completes the
21 deposition. We're off the record, 1:22.

22     (Deposition concluded at 1:22 p.m.)

23         *  *  *

24

25

Page 120

1 State of Michigan)

2 County of Genesee)

3         Certificate of Notary Public

4     I certify that this transcript is a complete, true and
5 correct record of the testimony of the witness held in this
6 case.

7     I also certify that prior to taking this deposition,
8 the witness was duly sworn or affirmed to tell the truth.

9     I further certify that I am not a relative or an
10 employee or an attorney for a party; and that I am not
11 financially interested, directly or indirectly, in the
12 matter.

13     WITNESS my hand this 16th day of October,
14 2013.

15

16

17

18 Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19 Certified Realtime Reporter

20 Registered Merit Reporter

21 Certified LiveNote Reporter

22 Certified Shorthand Reporter

23 Notary Public, Genesee, Michigan

24 Acting in Oakland County, Michigan

25 My Commission Expires: 9-19-18



ESQUIRE

**To:**     Bing, Dave[BingD@detroitmi.gov]; Martin, Jack[MartinJack@detroitmi.gov]; Warfield,
Robert[WarfieldR@detroitmi.gov]
**Cc:**     Andrews, Kriss[AndrewsK@detroitmi.gov]
**From:**   Kriss Andrews
**Sent:**   Wed 7/10/2013 8:56:40 AM
**Subject:** Emergency Management

You have asked for some views of how the emergency management process is going and how it
contrasts with what we were doing without regard to the Emergency Manager.

In answering this one needs to consider we did not have certain opportunities that the EM did, such as
filing for bankruptcy, or credibly threatening to do so. Thus, unless we were allowed to operate under PA
436 (which we were not given the opportunity to do) we had to defer attacking certain of the long term
obligations as we would not have been able to threaten bankruptcy.

We did attack both health care and pension, which the EM continued, and I would say continued well.
They put in place the pension task force that I recommended after some irregularities surfaced which
Jack's folks brought to our attention. They continued and I would say improved on the health care work
we started. But Jack brought in the actuary they used, and that actuary was really key. So overall, in
long term liabilities they continued and improved on what we started, and had tools we simply did not
have. Overall I give them good marks in long term liabilities, but that does not mean they will be
successful or we did poorly. We simply did not have the tools we needed and they are not done.

Operations are a different matter altogether. Kevyn did well attacking long term liabilities because we
gave him a good headstart, it is an area he knows well, and he has the tools to be successful.

In operations he threw away the headstart we gave him, he frankly is not competent at all (in fact, he is
embarrassingly incompetent and only listened to his equally incompetent staff) and did not well exercise
the added powers he has. I would give him an A in long term liabilities and an F in operations. Given his
limited background (legal representation really is all he has, since his other roles are so narrow and
unrelated to running a complex operation) and the weak experience the folks from the state have
(experienced folks around town will tell you Andy is resume light and highlights disasterous deals as his
credentials), this is not surprising.

Since March 28 we have been forced sideways on operations, or simply been told to stand down. A few
areas where progress has been slowed are as follows.

1. We should now be installing a new management team in DDOT. We diagnosed this problem correctly,
ran a compliant RFP process, and were ready to choose MV as the manager when the EM slowed the
process. Though he gave me a poor excuse for doing so, it does not hold water. In addition, he told me
a disaster at DDOT would not be a problem for him since it would highlight how screwed up the city is.
So I guess the good citizens of Detroit can wait for busses that do not come because it is not
inconvenient to Kevyn for them to do so.

2. We should also be progressing on providing a new management team in PLD. As I have said, it is not
operationally reasonable to conclude PLD can work through a several year wind-down. We need to
outsource the management there and make the operations safe and reasonably compliant. The EM
slowed the process here also, and said the same thing: a disaster at PLD would not be a bad thing
because it would highlight how messed up the city is. Again, we can expose our employees to safety
issues and violate federal regulations because it is not inconvenient to Kevyn to do so.

3. Similar issues surfaced around the lighting authority. After the authority could only get a workable
agreement with us (which gave them what they needed but no more, since Detroit has no more) they
went to Kevyn and got a deal which forces the City to put in more money than they need, sooner than
they need it, while the city struggles. And they cut this deal without coordinating with us so we were just
wasting our time since the Authority had softer hands to negotiate with than us.

4. The rest of the control of operations was equally incompetent. Ordering us not to coordinate with the consultants we hired to help us, putting in place very inexperienced staff that controlled things. Not listening to Conway MacKenzie. Every department and thinking person is left wondering.

They also pursued the wrong things, as follows.

1. Focussing on outsourcing solid waste first. While this may be something we should look at, no informed person puts it first. However, it was something they could do, so they focussed on what they could do, not on what needed to be done. Moreover, the announced savings of $15 million are ridiculous. They have no idea what the savings are, presuming there are savings.

2. Moving PDD to DEGC. When I told Kevyn we had issued a plan to the state on this and said we had studied it carefully, Kevyn gave me a legalistic view of Annex B. it was clear Kevyn had his marching orders and logic and operations had nothing to do with his orders. This whole sordid matter you all know well and needs no more documentation. The state's plan is poorly thought out and will just create a mess.

3. Public Safety. While there is emotional appeal to putting in place a new Chief, not giving insiders a real shot and not going through a thorough search were poor choices. Hopefully this will turn out okay, but we should be able to rely on more than hope. Also, I am lost as to where we are on the choice of a consultant, which I also do not believe was followed wisely from a process standpoint.

There are many other areas that could be discussed, I am sure Jack and the Mayor can add to the above lists. The question is how do we stay honest and complete without sounding complaining and negative? There are signs they are realizing how poorly they have done in operations. But the inherent problem is they do not know what they do not know. And that is not changing. I doubt they have learned to look and listen, which is what is needed.

We can talk at your convenience (evenings are best, though today we are at sea and I could talk anytime) or when I get back. But we need to plan this communication well. How do we get out a message that helps matters?

This is especially so since the press has so poorly reported on matters and seems to just write what the state gives them. Apparently keeping peace with their sources of information (the state) is more important than critically thinking about what is happening and doing a little investigation. And the gag orders from Kevyn only support the very poor reporting.

But remember, though they have completed nothing to date, they get an A in my book in teeing up a reduction in long term liabilities. That is worth a lot; they could just do a lot more by looking and listening.

Kriss

Sent from my iPad
Krissandrews@hotmail.com
Cell 586-202-2035

# EXHIBIT F

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## CITY OF DETROIT, MICHIGAN

Case No. 13-53846

---

# CHARLES M. MOORE

*September 18, 2013*

---



ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1   A.   The rate of payouts is another area where the

2        actuaries make assumptions as to what benefits will be

3        paid in what periods and to the extent that those are

4        underestimated, that can impact the funded position as

5        well.  Tying into previous assumptions that I had

6        indicated.

7   Q.   So is it -- is it your position that the City views

8        the actuarial payout assumptions as understating

9        unfunded liabilities?

10              MR. MILLER:  Object to form.  Go ahead.

11  A.   As an example, Mr. Ruegger, the actuarial valuation

12       assumes certain payouts.  The actual payouts in the

13       most recent completed year of plan assets were

14       substantially higher than what was anticipated prior

15       to that valuation being done and so at a minimum that

16       would indicate that there were more assets that were

17       paid out than what was assumed by the actuary.

18  Q.   Other than the assumptions and methods you've

19       identified, are there any other assumptions and

20       methods that to your understanding the City views as

21       understating the systems' unfunded liabilities?

22  A.   The City and most importantly its actuary has not

23       completed its analysis on the unfunded position.  The

24       City is trying to undertake a process to actually

25       develop a more concrete valuation model on its own so



ESQUIRE                                    800.211.DEPO (3376)
                                           EsquireSolutions.com

1    it's been relying on the valuation model of the

2    pension systems' actuary.  As such we have focused on

3    a few items here, but until the City completes its

4    analysis and completes its own actuarial valuation,

5    neither the City nor its actuary nor I would be able

6    to say what all the assumptions are that could be used

7    to either overstate or understate the funded position.

8  Q.  Very well.

9        Let's turn to one of the assumptions that

10   you address in your declaration and specifically in

11   paragraph 11 you talk about the projected net rate of

12   return.  The 7.0 percent or 7.25 percent figure, do

13   you see that in paragraph 11?

14  A.  Yes, sir.

15  Q.  Those were not figures that were recommended by a

16   particular actuary; were they?

17  A.  The 7 percent is actually higher than the rate that

18   Milliman, the City's actuary, had originally put

19   forward, which in its view would result -- the rate at

20   which there was a fifty-fifty chance of achieving that

21   rate.

22        MR. RUEGGER:  All right.  I'm going to move

23   to strike, because with all respect that was not

24   responsive to my question, Mr. Moore.

25  Q.  I understand Milliman has prepared a variety of



800.211.DEPO (3376)
EsquireSolutions.com

1      from an actuarial standpoint and no new benefits

2      accrued and you experience a 7.9 percent assumed rate

3      of return -- or actual rate of return, what would

4      happen to the plan assets.

5  Q.  Let me ask you if you have Moore Exhibit 3 there, I

6      want to ask you a few questions with regard to that.

7            Let me direct you to page 95 of that

8      presentation.  Hang on for a second.  I'm sorry, I was

9      in the wrong place.  Page 109.  Looking at the heading

10     there, claims for unfunded pension liabilities.

11  A.  Yes, sir.

12  Q.  Were you involved at all in the drafting of that part

13     of this presentation?

14  A.  I don't think I wrote that, but I was aware of this

15     language.

16  Q.  Okay.  How about the specifically the language of the

17     third bullet point?  Because the amounts realized on

18     the underfunding claims would be substantially less

19     than the underfunding amount, there must be

20     significant cuts in accrued vested pension amounts for

21     both active and currently retired persons.  Were you

22     involved in formulating that?

23  A.  Yes, sir.

24  Q.  And has the City -- I noticed in this presentation

25     there's no quantification of what -- of the cuts that



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1       would be -- that in the City's view must occur;

2       correct?

3   A.  Correct.

4   Q.  Has there been a specification of those level of cuts

5       that the City contends must occur?

6               MR. MILLER:  Object to form.

7   Q.  I mean, have you put a dollar amount on it?

8   A.  No, and our analysis of this continues.  Right now we

9       still don't know what assets could be available to put

10      towards the pensions.  We still have not had the type

11      of dialogue that we would like to have related to the

12      calculation of the unfunded amount, so because of

13      those two uncertainties among others we don't know

14      what cuts, if any, there may need to be.

15  Q.  Well, doesn't it say there must be significant cuts?

16      Am I -- are you saying that there's some -- that the

17      City's position may be that there are no cuts that are

18      necessary in accrued vested pension amounts?

19              MR. MILLER:  Object to form.

20  A.  We don't know.  That's where we want to continue to

21      engage in discussions and negotiations with the

22      parties, but depending on what the unfunded amount is

23      and what assets may be available for those claims, it

24      certainly is possible.

25  Q.  So maybe that should have been worded there may be



1    State of Michigan)

2    County of Genesee)

3                    Certificate of Notary Public

4        I certify that this transcript is a complete, true and

5    correct record of the testimony of the witness held in this

6    case.

7        I also certify that prior to taking this deposition,

8    the witness was duly sworn or affirmed to tell the truth.

9        I further certify that I am not a relative or an

10   employee of or an attorney for a party; and that I am not

11   financially interested, directly or indirectly, in the

12   matter.

13                   WITNESS my hand this 20th day of September,

14   2013.

15

16

17   _Jeanette M. Fallon_

18                   Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19                   Certified Realtime Reporter

20                   Registered Merit Reporter

21                   Certified LiveNote Reporter

22                   Certified Shorthand Reporter

23                   Notary Public, Genesee, Michigan

24                   Acting in Oakland County, Michigan

25                   My Commission Expires: 9-19-18



800.211.DEPO (3376)
EsquireSolutions.com

# EXHIBIT G

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**In the Matter Of:**

IN RE CITY OF DETROIT, MICHIGAN

13-53846

---

**GLENN DAVID BOWEN**

*September 24, 2013*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
                                      Page
 1   it was based upon a lower expectation of future

 2   benefits, which generates a lower liability.  And

 3   then the cancellation of future COLAs generates

 4   lower future benefit payments as well.

 5             So in using information we were able to

 6   draw from the valuation reports, we prepared

 7   estimates of those two topics.

 8        Q.    Are these the estimates that you, in an

 9   earlier document, called "guesses"?

10        A.    I'm not sure which -- I mean, you can

11   put that particular document back in front of me.

12   I've used the phrase "rough guess"; I've used the

13   phrase "estimate" --

14        Q.    Rough guess.

15        A.    Rules of thumb, I would say, by

16   definition, are rough guesses.  They're defined to

17   give us a proxy of what we -- the result we would

18   arrive at had we done more detailed modeling.

19        Q.    And you have a workpaper showing this

20   calculation?

21        A.    Yes.  We would have developed two

22   calculations, one for the impact of the plan freeze
```



                                              Page
1                 C E R T I F I C A T E

2     DISTRICT OF COLUMBIA:

3          I, Cindy L. Sebo, a Notary Public within

4     and for the Jurisdiction aforesaid, do hereby

5     certify that the foregoing deposition was taken

6     before me, pursuant to notice, at the time and place

7     indicated; that said deponent was by me duly sworn

8     to tell the truth, the whole truth, and nothing but

9     the truth; that the testimony of said deponent was

10    correctly recorded in machine shorthand by me and

11    thereafter transcribed under my supervision with

12    computer-aided transcription; that the deposition is

13    a true record of the testimony given by the witness;

14    and that I am neither of counsel nor kin to any

15    party in said action, nor interested in the outcome

16    thereof.

17

18

19

20    _____

21    Cindy L. Sebo   Cindy L. Sebo, RMR, CRR, RPR, CSR,
      District of Columbia, Notary Public
      My Commission Expires
22    April 14, 2015        CCR, CLR, RSA, Notary Public

ESQUIRE                    800.211.DEPO (3376)
                           EsquireSolutions.com

EXHIBIT H

TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

*In Re: City of Detroit, Debtor*

---

*Treasurer Andrew Dillon*
*October 10, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 101013AD.TXT

Min-U-Script® with Word Index

Page 65

1  A.  I don't agree with that.
2       MS. NELSON: Objection; argumentative.
3  BY MR. SHERWOOD:
4  Q.  And without giving your -- as a Treasurer, as a
5       former Legislator, is it your view or do you agree
6       that the proposed treatment on June 14th, 2013,
7       providing for cuts in accrued vested pension amounts
8       for both active and currently retired persons would
9       be violative of Section 24 of the Michigan
10      Constitution?
11 A.  No, because that doesn't provide for it. To my
12      mind, and this is how this Governor does business,
13      is he hires good people and lets them do their job.
14          To me that document was laying out the
15      facts for creditors so they could understand the
16      financial condition of City.
17 Q.  So this wasn't a proposal even though it's -- even
18      though the title of the document is proposal for
19      creditors?
20 A.  I think he's just laying out the facts. This is the
21      economic reality of the City of Detroit. From
22      there, as you know, there was various meetings with
23      various creditors to discuss can we get this thing
24      settled out of court.
25 Q.  Did you participate in any of those meetings?

Page 66

1  A.  I don't believe so.
2  Q.  Were you given reports by the emergency manager as
3       to how those meetings were going?
4  A.  We typically had a weekly either meeting or call
5       where we were given an update on the status of
6       events.
7  Q.  Who was on the weekly meeting call?
8  A.  It would be Kevyn and some of the members from his
9       team, various members of the Governor's office as
10      well as my office.
11 Q.  And what was reported in terms of the progress that
12      the emergency manager was or wasn't making with the
13      out-of-court negotiations?
14          MS. NELSON: I'm going to object to the
15      extent that it calls for attorney-client
16      communications and instruct him not to answer.
17          That, in fact, is what it calls for.
18 BY MR. SHERWOOD:
19 Q.  Did you have any communications with Mr. Orr outside
20      the presence of counsel --
21 A.  Yes.
22 Q.  -- concerning -- concerning negotiations with
23      creditors before the Chapter 9?
24 A.  Yes.
25 Q.  And what did you say during those communications?

Page 67

1  A.  I was mostly just listening because I was getting an
2       update about how things were going.
3  Q.  What was the -- what did he say?
4  A.  The only specific memory I have would be the one
5       dealing with the SWOPS, discussions with the SWOP
6       providers and whether or not there could be a
7       settlement reached with them.
8  Q.  What did Mr. Orr say about the SWOPS?
9  A.  He reached an agreement with two of the SWOP
10      providers that he could get a discount on the monies
11      owed on the SWOPS, and that's my only memory of a
12      specific -- I knew every week that he was meeting
13      with various creditors, but that's the only one that
14      I remember kind of a specific deliverable for.
15 Q.  And do you recall anything else about those
16      nonprivileged conversations?
17          Did he report that the negotiations were
18      going well, that they were going poorly, that they
19      were not going at all, anything along those lines or
20      do you just recall the specific discussion about the
21      SWOPS?
22 A.  Yeah. I -- there was, I think, just general
23      comments that they weren't real productive, right,
24      that we weren't making progress.
25 Q.  Did he say why?

Page 68

1  A.  I'm sure he did, but it would require going through
2       each of the various creditors that he met with at
3       the time so I don't have specific memories of each.
4           The only one I have a specific memory right
5       now about would be very difficult discussions with
6       the suretys, the insurance companies, a lot of
7       unwillingness to embrace what the economic realities
8       were, and then a lot of concern about the number of
9       retirees and the unions not wanting to represent the
10      retirees, making it difficult to negotiate for
11      20,000 people.
12 Q.  Did he say it was impossible to negotiate with all
13      of the creditors of the City of Detroit? Did he
14      reach that conclusion in your presence?
15 A.  I don't recall the specific words he used but
16      clearly he was expressing that it was very difficult
17      to work and negotiate with a pool of creditors that
18      include 20,000 individuals, yes.
19
20          (Deposition Exhibit 5 was marked.)
21
22 BY MR. SHERWOOD:
23 Q.  Treasurer Dillon, we've marked as Dillon 5 an email
24      from you dated July 9th to the Governor and others.
25          Are you familiar with this email?

Page 69

1  A.  Yes.

2  Q.  And it says that "Kevyn will meet with the Detroit
3       pensions tomorrow after all."
4            I want to ask you about the word after all.
5       Was there a suggestion before you wrote this email
6       that Kevyn was not going to meet with the Detroit
7       pensions?

8  A.  Yeah. I think before that there was some thought
9       that that meeting was going to get cancelled.

10 Q.  And who was going to cancel it?

11 A.  My memory is Kevyn might have. There was a lawsuit
12      that was filed that I think caused some
13      consternation about whether or not he should meet
14      with them.

15 Q.  So initially Mr. Orr was considering not meeting
16      with the pensions on July 10th, 2013, and then he
17      changed his mind and decided to meet with them?

18 A.  My memory is there was a plan to meet with them,
19      then some lawsuits got filed which I think he
20      contemplated not going forward with the meeting.
21      And from reading this, apparently he went forward
22      with the meeting.

23 Q.  Going down to the last paragraph it says "Tomorrow's
24      meeting could lead to questions directed to you
25      about your view on this topic."

Page 70

1            Obviously, you is the Governor, and the
2       Governor's view on this topic, I assume this topic
3       is the Detroit pensions. Would that -- is that
4       right? Am I right saying those things?

5  A.  Right.

6  Q.  So and then you -- then you say "...it's too
7       early in the process to respond to hypothetical
8       questions. We remain in many ways in the
9       informational stage."

10           Does that mean that at this point in time,
11      July 9th, 2013, you were still in the informational
12      stage vis-a-vis the Detroit pensions?

13 A.  We were learning things. We were learning about an
14      annuity program that the City had offered employees.
15      We were learning that there was alternative
16      investments that were made that were not written
17      down. We were learning what assumptions the
18      City's actuarial firm was making versus the ones
19      that Milliman was hired to really appreciate and
20      understand what was the level of underfunding.

21           So on that date in question I couldn't tell
22      you that these funds were funded at X percent
23      because there was too many moving pieces to the
24      puzzle.

25 Q.  So your advice to the Governor was in response to

Page 71

1       questions about his view on the Detroit pensions was
2       to just say it was too early in the process and you
3       were still in the informational stage; is that
4       right?

5  A.  That's right.

6  Q.  And this was before the Governor authorized
7       Chapter 9 filing, correct?

8  A.  Correct.

9  Q.  Did your -- did your view of the Governor's -- what
10      the Governor's position should be change before
11      July 18th, in the next week?

12 A.  No.

13           MR. SHERWOOD: All right. I'm going to
14      stop here, Treasurer. Thank you.

15           I reserve the right if we have time to ask
16      a question or two later, but I think as a courtesy
17      to my -- the other lawyers here I'm going to turn
18      over the mic to them.

19           Thank you for your testimony this morning.
20      Should we take a quick break?

21           VIDEO TECHNICIAN: Off the record 11:02
22      a.m.

23           (A brief recess was taken.)

24           VIDEO TECHNICIAN: We're back on the record
25      at 11:06 a.m.

Page 72

1            EXAMINATION
2  BY MR. WERTHEIMER:

3  Q.  Mr. Dillon, my name is Bill Wertheimer. We've met
4       off the record. I'm going to be asking you some
5       questions.

6            I represented and represent what we've
7       called the Flowers Plaintiffs. That is one of the
8       group of retirees that filed lawsuits in state court
9       before the bankruptcy was filed.

10           You indicated early in your testimony that
11      you were involved in some discussions shortly after
12      you took office as Treasurer about replacing Public
13      Act 72. Do you recall that?

14 A.  Uh-huh. Yes.

15 Q.  You need to say your answer.

16 A.  Yes.

17 Q.  And you talked about competing constitutional
18      provisions, one of them being the constitutional
19      provision relating to public health, safety,
20      welfare, correct?

21 A.  Correct.

22 Q.  And as I understand it, your focus at the time had
23      to do with your ability to modify CBAs; is that
24      right?

25 A.  That's right.

Page 93

1    pension funds.
2 Q.   Okay. All right.
3        Did you have any conversations with the
4    Governor about the issue of whether Orr should file
5    for bankruptcy say in the couple weeks preceding the
6    filing?
7        MS. NELSON: Again, are you speaking just
8    one-on-one other than attorney-client?
9 BY MR. WERTHEIMER:
10 Q.  One-on-one or in group conversations -- I don't
11    want -- I'm not asking you to violate the
12    attorney-client privilege. I think you understand
13    what we're getting at here.
14 A.  Yeah.
15 Q.  So my questions you should assume are modified in
16    that respect.
17 A.  Yeah, so can you restate the question?
18        (Reporter read record as follows:
19        "Q. Did you have any conversations with the
20        Governor about the issue of whether Orr
21        should file for bankruptcy say in the
22        couple weeks preceding the filing?")
23        THE WITNESS: I have a question for my
24    lawyer.
25        MR. WERTHEIMER: That's fine. If you want

Page 94

1    to take a break or just go outside.
2        VIDEO TECHNICIAN: Off the record 11:35
3    a.m.
4        (A brief recess was taken.)
5        VIDEO TECHNICIAN: We're back on the record
6    at 11:37 a.m.
7        THE WITNESS: Yeah, I don't recall any
8    conversations with the Governor outside the presence
9    of counsel on that topic.
10 BY MR. WERTHEIMER:
11 Q.  Okay. If you take a look at the July 9 -- do you
12    have that one in front -- that's five. This one
13    here.
14 A.  Okay.
15 Q.  And let me direct your attention to the first
16    paragraph. You're telling the Governor that the
17    emergency manager's going to meet relative to the
18    pensions the next day, and then a couple of
19    sentences down you say he, meaning Orr, will not
20    translate that into an impact on retirees or
21    employees' vested rights or what share of monies
22    available to unsecured creditors would go to the
23    pension plans.
24        What was your understanding of why Orr was
25    not going to do that? What's the point, and why are

Page 95

1    you telling the Governor?
2        That's -- your attorney's going to object.
3    That was three questions.
4 A.  Okay.
5        MS. NELSON: Yes, which one would you like
6    him to answer first?
7        MR. WERTHEIMER: He can do it in order or
8    however he'd like.
9        MS. NELSON: Well, I don't know that he's
10    going to remember them all by the time he gets to
11    the last one.
12        THE WITNESS: I mean, to me the building
13    block is what's the funded status. And that issue
14    was fluid, and I think that's the first issue that
15    if you're going to reach a settlement with your
16    creditors it's important to understand, all right,
17    what's the funding level. From there you can start
18    to figure out how do you solve this equation going
19    forward. So I was comfortable with that.
20 BY MR. WERTHEIMER:
21 Q.  Well, isn't there a political reason to not
22    translate it into the impact on retirees because the
23    impact is going to be negative? All we need to do
24    is look at the June 14th creditors' proposal to know
25    that, don't we?

Page 96

1        MS. NELSON: Objection; form, foundation,
2    calls for speculation.
3 BY MR. WERTHEIMER:
4 Q.  Go ahead.
5 A.  That wasn't my thinking. My thinking was until you
6    really know the funding status, it's hard to really
7    understand what the impact may be.
8        So it was more important to understand that
9    first.
10 Q.  Okay. I have nothing further. Thank you.
11        MS. NELSON: Is everybody done?
12        MR. SHERWOOD: I have one or two followup,
13    but I'll let you go first.
14        MS. GREEN: You can go. Do your followup
15    first. We'll wait.
16        MR. SHERWOOD: Can I use this microphone?
17        MS. NELSON: Well, you're the Retiree
18    Committee and I don't believe you --
19        MR. GALLAGHER: We're not the Committee,
20    we're the Retirement Systems.
21        MS. NELSON: I'm sorry, the Retirement
22    Systems. You did not subpoena -- did not issue a
23    subpoena to the Treasurer, and it's my understanding
24    the parties that didn't subpoena aren't entitled to
25    question.

## Page 117

1    was provided to the media, and it states it's being
2    done solely off the record and it's critical this
3    information is not traced back to the Department
4    because it has not been finalized.
5         Is it the practice of the Treasury
6    Department to allow admittedly incomplete
7    information regarding the pensions to be leaked to
8    the media?
9  A.  I would say it's unusual.
10 Q.  Why would it be critical, as stated in the email,
11   for the Milliman summary that Mr. Stanton had asked
12   for to be deleted and not in connection to the
13   Treasury Department?
14 A.  Does it say deleted in here?  Oh, yeah.  I see.
15   Okay.
16       I assume he didn't want to -- yeah, he
17   thought it was out there with other news media.
18   Rick Pluta must have been asking about it, so he
19   shared with him that which he thought other media
20   outlets probably already had.
21 Q.  You mentioned that there was a cap for the fees that
22   the State would pay in connection with the
23   Chapter 9.  Have we reached --
24 A.  Actually, you mischaracterized it.
25 Q.  I'm sorry, what was your --

## Page 118

1  A.  We offered to pay 50 percent of consulting fees
2    prior to the filing.
3  Q.  Up to five million?
4  A.  Up to five million.
5  Q.  And so in June of 2013 that would have been prior to
6    the filing and the State was still contributing to a
7    portion of those fees, correct?
8  A.  I believe so.
9  Q.  We can mark this as Exhibit 9.
10
11       (Deposition Exhibit 9 was marked.)
12
13   BY MS. GREEN:
14 Q.  Do you recall sending this email?
15 A.  I do.
16 Q.  Is it safe to say the five million dollar cap has
17   been maxed out?
18 A.  What I was reviewing was both the forecast as well
19   as the historical, so I was looking at more than
20   just the history.
21 Q.  So what is the summary of fees that you were
22   referring to?
23 A.  We were given an estimate of what the fees were
24   looking like and I reviewed it and it wasn't very
25   happy.

## Page 119

1  Q.  The last question is relating to Exhibit 5 which has
2    already been marked.  It's the July 9th email.
3        The email states "Tomorrow's meeting could
4    lead to questions directed to you about your view on
5    this topic."  It's relating to the pension issue.
6        Is that a fair characterization of the
7    email?
8  A.  Right.
9  Q.  "In my view, it's too early in the process to
10   respond to hypothetical questions.  We remain in
11   many ways in the informational stage.  I have some
12   thoughts as to how you could address some pointed
13   questions if you're interesting in hearing them."
14       What pointed questions were you expecting?
15 A.  Anything from -- well, going back in time here, but
16   just obviously the whole gamut of questions
17   regarding what the underfunding status could mean to
18   retirees, and I thought that the situation was not
19   understood enough for the Governor to go on record
20   yet because I couldn't even tell him with any degree
21   of confidence what level of funding these pension
22   funds had, so why should he get in the middle of a
23   debate about this.  It's obviously a very charged
24   and sensitive issue, and it was my free political
25   comments to him.

## Page 120

1  Q.  And this was really just over a week before the
2    filing.  That was your stance?
3  A.  Yeah.  I don't -- yeah, obviously.  But I don't -- I
4    think it was in the context of this meeting that
5    Kevyn was going to have with the committee that
6    drove this email.
7  Q.  Did anything change between the ninth and the filing
8    on the 18th that changed your opinion regarding what
9    you, I believe, just stated was too early to tell
10   him with any degree of confidence what level of
11   funding the pension funds had I believe is what you
12   just stated.
13 A.  Yeah, I have not -- my opinion is pretty much the
14   same.
15 Q.  The last sentence of the email says "I have some
16   thoughts as to how you could address some pointed
17   questions if you're interesting in hearing them."
18       What were your ideas for how to answer the
19   questions?
20 A.  I don't recall specifically at this point.
21 Q.  Did you ever have a conversation with him regarding
22   your thoughts on how to answer the questions?
23 A.  No.
24 Q.  You mentioned in the email "Because pensions have
25   such a long life there are a lot of creative options

13-58846-siw   Doc 2335-28   Filed 12/27/13   Entered 12/27/13 23:42:05   Page 68 of
193

118

Page 121

1    we can explore to address how they will be treated
2    in restructuring."
3         What were your creative options that you
4    had on the table?
5 A.  There's dozens. I mean, I don't have one that I
6    would pick out. But pension funds do have a long
7    life and there's a lot of creative things that can
8    be done, so I -- I don't have one or two that I
9    would just throw out, but I do know that there's a
10   lot of ways to address that issue.
11 Q. Have there been any formal reports or proposals
12   identifying and explaining what you consider to be
13   these creative options?
14 A.  No.
15 Q. Were these creative options ever explored with the
16   pension systems directly --
17 A.  Not to my knowledge.
18 Q. -- to your knowledge?
19        I don't have any further questions.
20        MR. SHERWOOD: Anybody else have questions?
21        MR. WERTHEIMER: I do not.
22           RE-EXAMINATION
23   BY MR. SHERWOOD:
24 Q. I have one question about D-7, which I hadn't seen
25   before the deposition. It's an email to you from

Page 122

1    Heather Lennox.
2         I just want to know what your understanding
3    of the sentence "Many provisions in here are
4    designed to take advantage of PA 4 while it is still
5    in existence, but this also references other state
6    laws that would buttress the FCB and PCA powers..."
7         What is FCB -- what is your understanding
8    of what FCB and PCA powers, what that means?
9 A.  FCB I don't know. She might be referring to
10   Financial Control Board, but as opposed to the FAB
11   I'm surmising.
12        PCA is not ringing a bell either.
13 Q. At this time there was a Financial Control Board in
14   existence, right?
15 A.  No, I think that -- well, I think it was part of the
16   financial stability agreement, the creation of the
17   FAB, I think.
18 Q. And PCA, you don't know what that means?
19 A.  I'm not recalling offhand, no.
20 Q. Was it -- did you express a desire to buttress the
21   powers of the Financial Control Board and insulate
22   those powers from attack in the event of a repeal?
23 A.  Can you restate the question? I'm sorry.
24 Q. Was it -- were you interested at this point in time,
25   in March of 2012, to take steps to buttress the

Page 123

1    power of the Financial Control Board and insulate
2    those powers from being attacked in the event PA 4
3    was repealed?
4 A.  I don't know if buttress is the right word. If
5    you're going to put in place all the structuring and
6    negotiate a consent agreement with the City, there's
7    other ways -- other legal basis to do that through
8    interlocal agreements. There's other laws that we
9    could use to that would give us the authority to
10   have this agreement have meaning to it.
11        So the thought was, you know, identify all
12   those legal arguments that would give legal standing
13   to the Financial Advisory Board and the consent
14   agreement is my memory.
15        MR. SHERWOOD: That's all.
16        MS. NELSON: All right, we're done. Thank
17   you.
18        THE WITNESS: Thank you.
19        VIDEO TECHNICIAN: Deposition has concluded
20   at 12:23 p.m.
21        (Deposition concluded at 12:23 p.m.)
22              -  -  -
23
24
25

Page 124

1              CERTIFICATE
2    STATE OF MICHIGAN    )
                          ) SS:
3    COUNTY OF OAKLAND    )
4
5         I, LAUREL A. JACOBY, Certified Shorthand
6    reporter, a Notary Public, hereby certify that I recorded
7    in shorthand the examination of TREASURER ANDREW DILLON,
8    the deponent in the foregoing deposition; and that prior
9    to the taking of said deposition the deponent was first
10   duly sworn, and that the foregoing is a true, correct and
11   complete transcript of the testimony of said deponent.
12        I further certify that no request was made for
13   submission of the transcript to the deponent for reading
14   and signature and that no such submission was made.
15        I also certify that I am not a relative or
16   employee of a party or an attorney for a party; or
17   financially interested in the action.
18
19
20   LAUREL A. JACOBY, CSR-5059, RPR
21
22   Notary Public, Oakland County, Michigan
23   My commission expires: 9/1/18
24   Dated:  This 13th day of October, 2013.
25

119

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                              )      Chapter 9
                                    )
CITY OF DETROIT, MICHIGAN,          )      Case No. 13-53846
                                    )
                                    )      Hon. Steven W. Rhodes
         Debtor.                    )
                                    )
_____        )

# PRE-HEARING BRIEF OF THE DETROIT RETIREMENT SYSTEMS IN SUPPORT OF THEIR ELIGIBILITY OBJECTIONS SPECIFICALLY PURSUANT TO SECTIONS 109(c)(5) AND 921(c) <u>OF THE BANKRUPTCY CODE</u>

Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
CLARK HILL PLC
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the
City of Detroit and the General Retirement System of the City of Detroit*

# **TABLE OF CONTENTS**

Introduction ……………………………………………………………1

Factual Background …………………………………………………..…2

    I.    The Retirement Systems ……………………………………...…2

    II.   The Michigan Constitution ………………………………………3

    III.  The Emergency Manager and the Restructuring Proposal ………..…4

    IV.  Pre-Petition Meetings Attended by the Retirement Systems ………..6

    V.   The Authorization and Filing of the Chapter 9 Bankruptcy Petition....8

    VI.  The City's and the Governor's Admissions ……………………9

Argument ………………………………………………………10

    I.    The City Cannot Meet Its Burden of Proof Under Section
          109(c)(5)(B) of the Bankruptcy Code Because it Failed to Negotiate in
          Good Faith With Its Creditors ………..................................................10

        A.    Standard of Review ……………………………………10

        B.    The City Did Not Negotiate with the Retirement Systems …13

            1.    Meetings attended by representatives of the Retirement
                 Systems were informational only …………………13

    II.   Negotiations With Its Creditors Were Not Impracticable Per Section
          109(c)(5)(C) of the Bankruptcy Code ………………………17

    III.  The City Did Not File the Petition in Good Faith and It Must Be
          Dismissed Under Section 921(c) of the Bankruptcy Code . . . . . . . . 18

        A.    The Petition Was Not Filed In Good Faith Because It
            Was Filed With the Intention of Impairing Accrued
            Pension Benefits In Violation of the Pensions

i

Clause.
............................................................20

B.  Material Financial Information Required for
Good Faith Negotiations Was Not Complete
Pre-Petition ......................…..................................20

Conclusion ...........................................................22

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Retirement Systems") submit the following as their pre-hearing brief in connection with the October 23, 2013 evidentiary hearing and in support of their objections[1] to the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), specifically pursuant to sections 109(c)(5) and 921(c) of the Bankruptcy Code.

## Introduction

The City filed this Chapter 9 case mere weeks after presenting its Restructuring Proposal (defined below) to creditors, before it reasonably understood its own finances, including the value of its assets, anticipated cash flows, and the scope of its liabilities. The Restructuring Proposal treats the City's legacy pension liabilities as unsecured debts, in violation of the Michigan Constitution, and does not propose any go-forward plan for the continuation or modification of the pension plans themselves. Abdicating its responsibilities to

---

[1] The Retirement Systems incorporate by reference and rely upon the facts and arguments set forth in the Objection of the Detroit Retirement Systems to the Eligibility Of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code [Dkt. No. 519] (the "Eligibility Objection") and in the Reply in Support of Objection of the Detroit Retirement Systems to the Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code [Dkt. No. 1166].

1

negotiate with its creditors, the City instead filed Chapter 9 to improperly evade the restrictions on the diminishment or impairment of accrued financial benefits imposed by the Pensions Clause (defined below), and to gain leverage over creditors through the Chapter 9 process. At the evidentiary hearing on the section 109(c)(5) and 921(c) issues, the Retirement Systems will demonstrate that: (i) the City failed to negotiate in good faith with its creditors; (ii) negotiations were not impracticable; and (iii) the petition was not filed in good faith. As a result, the petition must be dismissed.

## Factual Background[2]

I. **The Retirement Systems**

The residents of the City established the Retirement Systems through amendments to the City's Charter of 1918 (effective July 1, 1938, and effective

---

[2] On October 8, 2013, after reviewing requests from the UAW and the Retirement Systems, the City produced documents that it had previously claimed as privileged. Upon becoming aware that the Retirement Systems intended to use these documents as exhibits at the evidentiary hearing, the City reasserted the attorney-client privilege with respect to certain of the documents that it had produced. The Retirement Systems had intended to rely upon the documents at issue in support of its arguments that the City did not negotiate with its creditors in good faith as required by Bankruptcy Code section 109(c)(5) and that the City did not file the petition in good faith as required by Bankruptcy Code section 921(c). Although the Retirement Systems have attempted to resolve this issue through discussions with the City, it has not been able to do so as of the filing of this brief. Therefore, the Retirement Systems reserve the right to supplement this brief to include the additional facts learned during discovery and to supplement its legal arguments accordingly.

2

July 1, 1941, respectively) as authorized by Article VII, section 22 of the Michigan Constitution and sections 4i, 4j, and 21 of the Home Rule City Act, 1909 PA 267 (as amended), M.C.L. § 117.1 *et seq.* Among other things, the Retirement Systems: (i) administer retirement, disability, and survivor benefits to eligible uniformed and non-uniformed City employees and their beneficiaries (*i.e.,* the participants); (ii) ensure that the City actually honors its collective bargaining agreements by tendering to the Retirement Systems the City's annual and obligatory pension contributions; and (iii) protect the vested pension benefits (*i.e.,* "accrued financial benefits") of the Retirement Systems and their participants. There are more than 32,000 active and retired employees of the City, who are participants in the Retirement Systems and whose "accrued financial benefits" the Retirement Systems must protect.

## II.    The Michigan Constitution

To ensure protection of public pension benefits, the Michigan Constitution states: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." MICH. CONST., art. IX, § 24. Article IX, §24 of the Michigan Constitution is referred to as the "Pensions Clause" herein.

3

## III. The Emergency Manager and the Restructuring Proposal

On March 14, 2013, Kevyn D. Orr was appointed as the emergency financial manager of the City pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. §141.1201, *et seq.* On March 28, 2013, upon the effectiveness of Public Act 436, the Local Financial Stability and Choice Act, M.C.L. §141.1541, *et seq.* ("PA 436"), Mr. Orr became, and continues to act as, the emergency manager with respect to the City (the "Emergency Manager").

On March 14, 2013, as mandated by Article XI, section 1 of the Michigan Constitution and section 1 of the Constitutional Oath of Office Act, 1951 PA 22, M.C.L. § 15.151 *et seq.*, ("PA 22"), the Emergency Manager swore the following oath, which was later filed with the Michigan Secretary of State: *"I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager – City of Detroit according to the best of my ability."*

In a June 13, 2013 interview with The Detroit Free Press, the Emergency Manager addressed the protection under the Pensions Clause against the impairment of accrued public pension benefits, expressing his intention to evade

this provision of the Michigan Constitution through a federal Chapter 9 bankruptcy proceeding:[3]

> Q: You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.
>
> Q: Which the 9th Circuit agrees for now.
>
> A: It is what it is—so we said that in a soft way of saying, "Don't make us go into bankruptcy." **If you think your state-vested pension rights, either as an employee or retiree—that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law** or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

On June 14, 2013, the Emergency Manager issued his Proposal for Creditors (the "<u>Restructuring Proposal</u>") wherein he took the position that: (i) pension debts are unsecured claims that may be, and must be, impaired in any prospective Chapter 9 bankruptcy proceeding; and (ii) the City's alleged approximate $3.5 billion underfunding liability would be placed in a pool of unsecured claims

---

[3] *See Q & A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

5

comprising approximately $11.5 billion in claims, and exchanged for a *pro rata* share of an unsecured note in the face amount of $2.0 billion. The Restructuring Proposal is attached as Exhibit A to the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code. [Dkt. No. 11] (the "Orr Declaration").

## IV. Pre-Petition Meetings Attended by the Retirement Systems

On June 14, 2013, a meeting occurred at which the Emergency Manager and the City's advisors presented the Restructuring Proposal to many representatives of the City's creditors. Representatives for the Retirement Systems were in attendance at the June 14, 2013 presentation. The meeting was an informational presentation, with no negotiations.

On the morning of June 20, 2013, a meeting occurred that was attended by certain of the City's advisors and representatives from the City's unions and retiree associations, representing the City's non-uniformed employees and retirees, relating to health and pension obligations. Advisors from the GRS attended this meeting. The meeting was informational, and negotiations did not occur.

In the afternoon of June 20, 2013, a meeting occurred that was attended by certain of the City's advisors and representatives from the City's unions and retiree associations, representing the City's uniformed employee and retirees, relating to

6

retiree health and pension obligations. Advisors from the PFRS attended this meeting. The meeting was informational, and negotiations did not occur.

On or about June 20, 2013, access was first granted to the Retirement Systems' professionals to the City's electronic data room. That data room had a limited population of documents, which was supplemented over ensuing periods of time.

On June 25, 2013, a meeting occurred that was attended by certain of the City's advisors and representatives and advisors from the City's bond insurers and U.S. Bank, the trustee or paying agent on all of the City's bond issuances, to review various financial information. The Retirement Systems financial advisors attended this meeting. The meeting was informational, and negotiations did not occur.

On July 9, 2013 and July 10, 2013, representatives of the Retirement Systems attended the diligence sessions regarding the City's finances that were held at The Cadillac Place in Detroit, Michigan (the "July Diligence Sessions"). The July Diligence Sessions were attended by, among other persons, representatives of and advisors to the Emergency Manager, the City, and various creditors of the City. The July Diligence Sessions were informational, and negotiations did not occur.

## V. The Authorization and Filing of the Chapter 9 Bankruptcy Petition

On July 16, 2013, upon information and belief, the Emergency Manager delivered a letter to the Governor and the State Treasurer recommending, pursuant to section 18(l) of PA 436, that the City be authorized to file a case under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Recommendation"). The Bankruptcy Recommendation is attached as Exhibit J to the Orr Declaration. In the Bankruptcy Recommendation, the Emergency Manager states that "[t]he City's debt and legacy liabilities must be significantly reduced" and that, in recommending a Chapter 9 bankruptcy, "the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable without court intervention." Bankruptcy Recommendation at pp. 2, 8. Based on the foregoing and many other excerpts from the Bankruptcy Recommendation, it is clear that the Emergency Manager contemplated use of the Chapter 9 process to implement his Restructuring Proposal, including the impairment and diminishment of "legacy" accrued pension benefits.

On July 18, 2013, the Governor sent a letter to the Emergency Manager and the State Treasurer purporting to grant to the Emergency Manager authorization to place the City into Chapter 9 bankruptcy (the "Governor's Authorization"). The Governor's Authorization is attached as Exhibit K to the Orr Declaration. The Governor expressly recognized that section 18(1) of PA 436 authorized him to

place "contingencies" on a bankruptcy filing, but he nevertheless declined to do so. *Id.* at p. 4. Citing section 943(b)(4) of the Bankruptcy Code, the Governor concluded: "Federal law already contains the most important contingency—a requirement that the plan be legally executable." *Id.*

On July 18, 2013 (the "Petition Date"), the City filed its Voluntary Petition under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Petition") and also filed the City Eligibility Submissions.[4]

## VI.   The City's and the Governor's Admissions

In the City of Detroit, Michigan's Objections and Responses to Detroit Retirement Systems' First Requests for Admission Directed to the City of Detroit, Michigan [Dkt. No. 849] (the "City's Responses to Requests for Admissions"):

- "The City admits that the Restructuring Proposal contemplates a reduction in Accrued Financial Benefits to participants of the Retirement Systems, but seeks agreement and acceptance by plan beneficiaries." City's Responses to Requests for Admissions, Response No. 5.

- "The City admits that the Bankruptcy Recommendation contemplates a reduction in Accrued Financial Benefits

---

[4] The Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Dkt. No. 10] (the "Statement of Qualifications"), the Orr Declaration, the Declaration of Gaurav Malhotra in Support of Statement of Qualifications [Dkt. No. 12] (the "Malhotra Declaration"), the Declaration of Charles M. Moore in Support of Statement of Qualifications [Dkt. No. 13] (the "Moore Declaration"), and the Memorandum in Support of Statement of Qualifications [Dkt. No. 14] (the "Eligibility Memorandum") are collectively referred to herein as the "City Eligibility Submissions."

to participants of the Retirement Systems, but seeks agreement and acceptance by plan beneficiaries." *Id.* at Response No. 6.

- The City admits that the Governor's Authorization adopts the Bankruptcy Recommendation without modification. *Id.* at Response No. 7.

- The City admits that the Governor's Authorization enables the City to seek to diminish or impair Accrued Financial Benefits through this Chapter 9 Case. *Id.* at Response No. 11.

- The City admits that it intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems though this Chapter 9 Case. *Id.* at Response No. 12.

Likewise, the Governor admitted that at the time he authorized the bankruptcy, he knew that "[b]ased on the facts going into it" there was a "likelihood" accrued pension benefits would be reduced in the Chapter 9 case. (Ex. A, Snyder Dep. 10/9/2013, pp. 66-67).

## Argument

## I. THE CITY CANNOT MEET ITS BURDEN OF PROOF UNDER SECTION 109(C)(5)(B) OF THE BANKRUPTCY CODE BECAUSE IT FAILED TO NEGOTIATE IN GOOD FAITH WITH ITS CREDITORS.

### A. Standard of Review

The City may be a debtor under Chapter 9 of the Bankruptcy Code if, and only if, it:

(1)     is a municipality;

(2)    is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State Law to authorize such entity to be a debtor under such chapter;

(3)    is insolvent;

(4)    desires to effect a plan to adjust such debts; and

(5)    (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

        (B) has negotiated in good faith with creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

        (C) is unable to negotiate with creditors because such negotiation is impracticable; or

        (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(1-5). The burden rests with the debtor to establish by a preponderance of the evidence that the requirements of Bankruptcy Code section 109(c) have been met. *In re City of Stockton*, 475 B.R. 720, 725 (Bankr. E.D. Cal. 2012 (internal citations omitted) ("The burden of proof, at least as to the five § 109(c) elements, is on the municipality as the proponent of voluntary relief. . . . The quantum of proof . . . is the familiar preponderance-of-evidence standard of

basic civil litigation."); *In re City of Harrisburg,* 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011) (citations omitted) ("The burden of establishing eligibility is on the debtor.").

Further, Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of [the Bankruptcy Code]." 11 U.S.C. § 921(c). Courts have ruled that after an objection to the petition, the bankruptcy court must dismiss the case if the petition does not meet the requirements of the Bankruptcy Code, notwithstanding the seemingly permissive language of section 921(c). *See, e.g., In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) ("Courts must dismiss the petitions of debtors filing under chapter 9 who fail to satisfy [the] requirements [of section 109(c)].")*,* citing *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo),* 408 B.R. 280, 289 (9th Cir. B.A.P. 2009); *In re Suffolk Regional Off-Track Betting Corp.,* 462 B.R. 397, 421 (Bankr. E.D.N.Y. 2011) (citation omitted) ("Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under §109(c).").

## B.    The City Did Not Negotiate with the Retirement Systems

### 1.    Meetings attended by representatives of the Retirement Systems were informational only.

In the weeks prior to the Petition Date, the Retirement Systems, its counsel and advisors, attended the informational presentations on June 14, June 20, June 25, July 10, and July 11, 2013.  At the evidentiary hearing, Bradley A. Robins and Eric Mendelsohn, both of Greenhill & Co., LLC, the Retirement Systems' restructuring advisor with respect to the City's finances, will testify that these sessions were primarily presentational and informational, with multiple parties in attendance, and that no negotiations occurred during those sessions.

Although the City suggests that the informational presentations made to various creditors regarding its Restructuring Proposal satisfied its obligation to negotiate under section 109(c)(5)(B), in reality, no negotiations ever took place between the City and the Retirement Systems regarding the City's financial restructuring.  With respect to the June 14, 2013 presentation, the Emergency Manager admits that negotiations did not occur.  *See* Ex. B, Orr Dep, at 129:14-18 ("Q:  There were no actual negotiations at that [June 14, 2013] meeting; were they?  A:  I don't think that—you know, be careful of the word negotiations, but no, not as it's generally understood.").

The extent to which a debtor must, prior to bankruptcy, engage in good-faith negotiations with creditors is subject to judicial review based on the facts of each

13

case. *Compare In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992) (debtor did not negotiate in good faith where it indicated that the economic terms of its proposed plan were nonnegotiable), *with In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 84-86 (Bankr. D. Colo. 1990) (debtor's meetings with institutional bondholders to develop a financial model and to reach a conceptual agreement held to be sufficient). *See also In re Cottonwood Water & Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (requiring an evidentiary hearing on the scope of prepetition negotiations).

From the outset, it was made clear that the terms of the Restructuring Proposal were not negotiable. The Emergency Manager admitted: "The public can comment [on the City's proposed restructuring plan], but. . . it is my plan and it's within my discretion and obligation to do it. This isn't a plebiscite, *we are not, like, negotiating the terms of the plan*."[5]

It is evident from the City's actions that it had no intention of truly negotiating with its creditors. Indeed, the evidence will show that at least as early as July 1, 2013, the City had determined that its chapter 9 petition would be filed on July 19, 2013. Therefore, chapter 9 was already an inevitability by the time the City met with creditors on July 10 and 11, 2013.

---

[5] Orr Interview to Detroit WWJ Newsradio 950/AP, Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually, May 12, 2103, available at http://detroit.cbslocal.com/2103/05/12/kevin-orr-releases-finanical-plan-for-city-of-detroit/.

The Retirement Systems submit that one of the primary purposes of requiring good faith negotiations with creditors prior to filing a petition under chapter 9 is to ensure that the entity seeking chapter 9 protection has sufficiently considered its alternatives to bankruptcy before filing. *See In re New York City Off-Track Betting Corp.*, 2010 Bankr. LEXIS 791, at *64-65 (Bankr. S.D.N.Y. Mar. 22, 2010) (suggesting that alternatives to bankruptcy must be considered to file a chapter 9 petition in good faith under section 921(c)). Here, the City arrived at the decision to file a petition under chapter 9 before its discussions with creditors had hardly begun, which indicates that the City engaged in these discussions merely as a "check the box" exercise as a means of establishing the record for eligibility under section 109(c)(5)(B) of the Bankruptcy Code, rather than to earnestly attempt to avoid bankruptcy by negotiating a consensual deal with creditors.

Indeed, with respect to negotiating with creditors, it is clear that the City's ultimate intent was not to strike a deal with creditors which could have avoided the necessity of a chapter 9 petition, but rather to negotiate *inside* the bankruptcy proceeding so that it would have the leverage provided to it by the provisions of the Bankruptcy Code. Filing a petition for such purposes is not within the spirit of chapter 9 and should not be considered "good faith" sufficient to satisfy sections 109(c)(5)(B) or 921(c). As explained by the court in *In re Cottonwood Water*:

In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these problems, Congress consciously sought "to limit accessibility to the bankruptcy court" by municipalities. H.R. Conference Report, 94-938, p. 10. One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code. The conditioned entry to this Court which is afforded by section 109(c) recognizes that *the negotiating posture of the parties changes once the bankruptcy petition is filed. . . . The "creditor protection" provided by section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor <u>before</u> their rights are further impaired by the provisions of section 362 of the Code."*

*In re Cottonwood Water & Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (emphasis added). In this case, the City made no real effort to negotiate prior to filing its petition. Instead, the Emergency Manager followed the model set forth in the Jones Day pitch presentation to the City. That pitch presentation encouraged negotiations in the shadow of chapter 9 because it "Creates Leverage in Creditor Negotiations." *See Ex. C, Jones Day Presentation to the City of Detroit,* p. 17.

The Bankruptcy Code requires that good faith negotiations occur *before* filing. In *In re Ellicott School Building Authority,* 150 B.R. at 266, court held that good faith negotiations had not taken place when the debtor held three public

meetings with its creditors regarding its restructuring plan but informed the creditors at those meetings that the substantive terms of the plan were non-negotiable. *In re Ellicott School Building Authority*, 150 B.R. at 266. The court found it "difficult to imagine that any true negotiations [could] take place in an environment where the substantive terms of a proposal were not open to discussion." *Id.* Similarly, the City held several informational meetings regarding its Restructuring Proposal, but the evidence will show that the City's representatives made several statements to creditors that the discussions involving the Restructuring Proposal were not negotiations. Ultimately, the evidence will show that the City determined that it would file its petition before two of the meetings even took place. Both the Restructuring Proposal and the restructuring plan presented to creditors in the *Ellicott* case were presented with a "take it or leave it" approach, and, like in *Ellicott*, this Court should reject the notion that the City negotiated in good faith with its creditors.

## II. Negotiations With Its Creditors Were Not Impracticable Per Section 109(c)(5)(C) of the Bankruptcy Code.

Absent good faith negotiations with its creditors, the City must demonstrate that negotiations were impracticable under section 109(c)(5)(C) to be eligible to be a debtor under chapter 9, which it cannot do. *See In re Pierce County Housing Authority*, 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009). While the City suggests that its large number of creditors rendered negotiations "impracticable" under

section 109(c)(5)(B), the fact that the City may have certain creditors with whom they were not able to negotiate does not remove the City from the obligation under the statute to negotiate with those creditors who are able to organize themselves and negotiate with the City. *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990).

Moreover, the number of a municipality's creditors alone does not, and should not, automatically render negotiations with creditors impracticable. If that were the case, every municipality with more than a handful of creditors would be able to prove the impracticability of negotiations without any evidence other than the number of creditors identified on the list of creditors. Here, multiple unions and retiree associations exist which could have and were willing to engage in negotiations with the City on behalf of their members. That the City failed and refused to negotiate with any of them, as alleged in declarations filed by other objecting parties, does not evidence impracticability of negotiations.

## III. The City Did Not File The Petition In Good Faith And It Must Be Dismissed Under Section 921(c) of the Bankruptcy Code.

Under section 921(c), the court may dismiss the petition if the debtor did not file it in good faith. 11 U.S.C. § 921(c). "Good faith is not defined in the Code." *In re McCurtain Mun. Auth.*, 2007 Bankr. LEXIS 4160, *10 (Bankr. E.D. Okla. Dec. 4, 2007). The "primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its

protection to those situations for which it was intended." *In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. 60, 80 (Bankr. D.N.H. 1994). Courts have found the bad faith standard applied in Chapter 11 cases equally applicable to Chapter 9 cases. *In re McCurtain*, 2007 Bankr. LEXIS 4160, *10 (Bankr. E.D. Okla. Dec. 4, 2007); *In re Villages at Castle Rock Metropolitan Dist. No.* 4, 145 B.R. 76, 81 (Bankr. D. Colo. 1990) (citations omitted) (internal citation omitted).

As one court explained:

> In the Chapter 11 context, "good faith" has been described as a requirement which prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Determining whether a petition has been filed in good faith requires an evaluation of a debtor's financial condition, motives, and the local financial realities. These comments would appear to be equally applicable, at least in part, to a Chapter 9 petition.

*In re Villages at Castle Rock Metropolitan Dist. No.* 4, 145 B.R. 76, 81 (Bankr. D. Colo. 1990) (citations omitted). Other relevant considerations regarding good faith under Chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." *In re City of Stockton*, 493 B.R. 772, 794 (2013). The evidence needs to demonstrate that the "purpose of

the filing of the chapter 9 petition not simply be to evidence needs to buy time or

evade creditors." *In re City of Vallejo*, 408, B.R. 280, 295 (2009).

### A. The Petition Was Not Filed In Good Faith Because It Was Filed With The Intention of Impairing Accrued Financial Benefits In Violation Of The Pensions Clause.

As discussed above, and as admitted by the City, the City intends to seek to

diminish or impair the accrued pension benefits of the participants in the

Retirement Systems though this Chapter 9 Case. *See* City's Responses to Requests

for Admissions, at Response No. 12. Because the City seeks to impair vested

pension benefits in violation of the Pensions Clause, and to evade paying its

pension obligations, the filing is in bad faith under 921(c).

### B. Material Financial Information Required For Good Faith Negotiations Was Not Complete Pre-petition.

Prior to the Petition Date, the City did not have the requisite financial

information necessary to reasonably assess whether a Chapter 9 was necessary to

restructure its debts. As of the Petition Date, the City did not have a complete

understanding of the value of its assets, the income that could be generated from

the monetization of its assets, its projected cash flows, or the scope of its liabilities.

Notwithstanding these financial uncertainties, and the resulting inability to assess

out-of-court restructuring options, the City filed the petition in the hopes of gaining

leverage in negotiations with its creditors. As such, the petition was not filed in

good faith.

In fact, the information needed for such discussions is still not complete. Charles M. Moore, a senior managing director at Conway MacKenzie, Inc., the City's operational restructuring advisor, testified:

> Q.  Has there been a specification of those levels of cuts [in accrued vested pension amounts] that must occur?
>
> Mr. Miller:  Object to form.
>
> Q.  I mean, have you put a dollar amount on it?
>
> A.  No, and our analysis of this continues. Right now we still don't know what assets could be available to put towards the pensions. We still have not had the type of dialogue that we would like to have related to the calculation of the underfunded amount, so because of those two uncertainties among others, we don't know what cuts, if any, there may need to be.
>
> Q.  Well, doesn't it say there must be significant cuts? Am I - - are you saying that there's some - - that the City's position may be that there are no cuts that are necessary in accrued vested pension amounts?
>
> Mr. Miller:  Object to form.
>
> A.  We don't know. That's where we want to continue to engage in discussions and negotiations with the parties, but depending on what the unfunded amount is and what assets may be available for those claims, it certainly is possible.

Ex. D, Moore Dep 9/18/2013, p. 151: 4-24. In addition, as of the petition date, and

still to date, the City does not know the value derivable from two of its primary assets: the Water and Sewerage Department (and its potential disposition into a Water Authority) and the City-owned art work at the Detroit Institute of Arts. Because the City does not yet know what assets are available to satisfy liabilities and does not know the scope of its liabilities, the Chapter 9 filing was premature and not in good faith.

## Conclusion

For the reasons set forth herein and in the Eligibility Objection, the petition should be dismissed.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: October 17, 2013

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## AFSCME'S SUPPLEMENTAL BRIEF REGARDING ELIGIBILITY

Pursuant to this Court's Order Regarding Further Briefing On Eligibility [Docket No. 1217], AFSCME submits this supplemental brief. The guiding principle of AFSCME's arguments is: whether the state constitution by PA 436 or the federal constitution by chapter 9, legislation cannot rewrite or violate a constitution. The City fails to meet the eligibility requirements because this chapter 9 filing violates both the state and federal constitutions generally and as applied in this case, including by seeking to impair or diminish vested pension benefits. This Court should not allow the challenges facing a distressed municipality, however daunting, to be solved by violating fundamentally protected constitutional rights.[1]

## I.  STATE CONSTITUTIONAL PENSION RIGHTS ARE NON-DISCHARGEABLE RIGHTS NOT PRE-EMPTED BY THE CODE

Because the Pensions Clause creates a constitutional right, not a statutory priority, chapter 9 does not preempt it. Instead, this constitutional right renders the City's accrued pension obligations non-dischargeable. Even where a state law not enshrined in a state constitution advances "an essential state interest," the Bankruptcy Code "must be clear and manifest" if it is "[t]o displace" the state law. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545 (1994). "[W]here the intent to override" state law "is doubtful, our federal system demands deference to long-established traditions of state regulation." *Id.* at 546.

*First,* no provision in chapter 9 preempts state constitutional rights, let alone the right to accrued public pensions, which have long been subject to state regulation. To the contrary, chapter 9 explicitly protects state law. *See, e.g.*, 11 U.S.C. §§ 109(c)(2), 903, and 943(b)(4). Most important, a chapter 9 bankruptcy is impossible without state consent. As a result, chapter

---

[1] The City's attempt to use chapter 9 to sidestep the Michigan and U.S. Constitutions was outlined in counsel for the City's journal article for using chapter 9 as a "toolbox that is unavailable outside of bankruptcy" for "compromising a municipality's pension debt" and as a mechanism to "generate leverage for the municipality and pave the way for consensual modifications to its pension obligations." Jeffrey B. Ellman & Daniel J. Merrett, *Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?,* 27 Emory Bankr. Dev. J. 365, 383-84 (2011).

9 *cannot* preempt state constitutional rights where, as here, that consent is given by state statute. For even assuming *arguendo* that "a state's authorization . . . is a declaration of state policy that the benefits of Chapter 9 take precedence over control of its municipalities" and that therefore state *statutes* conflicting with chapter 9 are made inapposite once a state authorizes a municipal bankruptcy, *In re City of Vallejo,* 432 B.R. 262, 268 (E.D. Cal. 2010), state legislatures lack the power to declare *by statute* that state policy takes precedence over the higher authority of the state *constitution*. Rather than preempt state constitutional rights, chapter 9 *requires* that state constitutional rights be honored at the outset as a condition of authorization under Section 109(c)(2), as a mechanism of state control under Section 903, and as a limit on the terms of the plan under Section 943(b)(4).

For this reason, *Matter of Sanitary & Imp. Dist. No. 7,* 98 B.R. 970 (Bankr. D. Neb. 1989), does not support the proposition that the City can impair its constitutional pension obligations through chapter 9. The issue there was whether Nebraska statutes, not the Nebraska c*onstitution,* which "grant a priority of payment in favor of bonds over warrants" applied in chapter 9. 98 B.R. at 973. The bankruptcy was authorized by a state statute. *See id.* at 971 (citing Neb. Rev. Stat. Section 77–2419). The court's holding that state priorities could be overcome in bankruptcy merely allowed the state authorization *statute* to trump the state priority *statute*. State statutes routinely trump one another, and state legislatures are free to rewrite their own statutes as a matter of legislative prerogative. But a state legislature cannot, by merely passing a statute, rewrite the state constitution. Likewise, the Michigan legislature cannot authorize municipal bankruptcy by passing PA 436 and thereby rewrite the Pensions Clause, let alone write the Pension Clause out of the Michigan Constitution.

**Second,** the Supreme Court clearly instructed that "the federal bankruptcy court should

2

13-53846-tjt   Doc 2335-9   Filed 12/27/13   Entered 12/27/13 18:42:26   Page 147 of 21
13-53846-swr   Doc 1436-7   Filed 10/30/13   Entered 10/30/13 18:26:15   Page 3 of 11

193

147

take whatever steps are necessary to ensure that" a creditor is "afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." *Butner v. United States,* 440 U.S. 48, 56 (1979). Under Michigan law, an AFSCME retiree's *constitutional right,* as distinct from a statutory priority, provides that accrued pension "shall not be diminished or impaired," "shall be funded during" the year in which they "arise," and "shall not be used for financing unfunded accrued liabilities." The Constitution thus provides not a mine-run contract right, but an absolute guarantee of non-reduction and affirmative funding. *See* AFSCME Am. Elig. Obj. ¶¶ 119-20, 138-43. *Butner* further holds that the Code should not "afford . . . rights that are not" available "as a matter of state law." *Id.* Allowing pension rights expressly protected from reduction or non-funding to be discharged as unsecured claims would operate to convert a constitutional right to a claim on par with other unsecured creditors, thereby creating a right of equal treatment for other non-pension creditors they would not have outside of bankruptcy because the Pensions Clause is stronger than the Contracts Clause. *See* AFSCME Am. Elig. Obj. ¶¶138-43. This result would violate the Code by allowing other non-pension creditors to receive "a windfall merely by reason of the happenstance of bankruptcy." *Id.* at 55.

   ***Third,*** not only should the rights created by the Pensions Clause survive bankruptcy under *Butner* because they are constitutional rights rather than statutory priorities, but separately, the Pensions Clause is an exercise of the right to enact "state or local laws designed to protect public health or safety" which cannot be disregarded by the debtor. *Midlantic Nat'l Bank v. New Jersey Dep't of Env. Protection,* 474 U.S. 494, 502 (1986). In *Midlantic,* the Supreme Court held that a bankruptcy trustee's power to abandon property of the estate under chapter 11 did not include the power to violate state or local environmental protection laws because "the efforts of the trustee to marshal and distribute the assets of the estate must yield to the *governmental*

<center>3</center>

13-53846-tjt  Doc 2335-9  Filed 12/27/13  Entered 12/27/13 13:42:25  Page 4 of 11
13-53846-swr  Doc 1467  Filed 10/30/13  Entered 10/30/13 18:20:15  Page 4 of 11      148
193

*interest in public health and safety.*" *Id.* Even a liquidating debtor cannot ignore state disposal requirements if doing so would create a public "hazard with no one clearly responsible for remedial action." *In re Wall Tube & Metal Prods. Co.,* 831 F.2d 118, 122 (6th Cir. 1987).

If the City cannot dump its toxic waste in violation of state law, surely it cannot put its elderly pensioners in harm's way by taking away their only source of income and violating their constitutional rights. For just as this "Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety" from environmental danger, *Midlantic,* 474 U.S. at 507, this Court does not have the power to authorize cuts to vested pension rights which the Michigan Constitution recognizes as sacrosanct and not protected by federal government insurance. Until this Court holds conclusively that the state is responsible for the accrued pensions in full (or another funding source is provided by agreement), the Bankruptcy Code will not allow abandonment of this constitutional obligation.

## II. CHAPTER 9 VIOLATES THE U.S. CONSTITUTION REGARDLESS OF WHO TECHNICALLY "IMPAIRS" CONTRACT RIGHTS

For three reasons, the City's argument that chapter 9 is constitutional because the federal government, not the state, technically orders the impairment is flawed.

*First,* chapter 9 unconstitutionally permits the federal government to consent to a state impairment of contracts. Article I, Section 10, which contains the Contracts Clause, has three paragraphs. The second and third paragraphs prohibit states from taking certain acts "without the consent of Congress." The first, in contrast, contains a wholesale prohibition on defined state actions, including, along with the impairment of contracts, printing money and the entering into of any treaty, alliance, or confederation, *with no exception for federal consent*.

The plain language of Article I, Section 10 therefore makes clear that Congress cannot

4

pass a law consenting to an impairment of contracts by the state. Supreme Court case law supporting this interpretation is found in *Rhode Island v. Massachusetts,* 37 U.S. 657 (1838), where the Supreme Court held that it had original jurisdiction over a boundary controversy between states. Reaching that holding required the Court to analyze Article I, Section 10. The Supreme Court interpreted the "first clause" as "a positive prohibition against any state" taking certain actions, and stated conclusively that "no power under the government could make such an act valid, or dispense with the constitutional prohibition." 37 U.S. at 724-25. The Court thus left no doubt that Article I, Section 10, Clause 1 does not allow an end-run of state contracts.

The plan approval process in chapter 9 constitutes such unconstitutional federal consent. State and municipal actors take all the major steps on the road to debt adjustment: specific legal authorization of chapter 9, filing of the petition, and proposal of the plan. *See* 11 U.S.C. §§ 109(c)(2) & 941. Only then does the federal bankruptcy court provide *consent* – and violate the Contracts Clause – by confirming a plan proposed by the municipality. *See* 11 U.S.C. § 943(b).

This issue is a question of first impression on which this Court is not bound by precedent. Any comments in Justice Cardozo's dissent in *Ashton* are not precedent binding this Court. *See, e.g., United States v. Jahns,* 2012 WL 928725, at *6 (N.D. Ohio Mar. 19, 2012) ("Dissenting Supreme Court opinions are not binding precedent."). While the City points to language in *Bekins* which it claims "zeroes in on that they're dealing with this particular issue," Tr. 10/15/13 at 157:12-13, in fact *Bekins* identified the sole issue decided in that section of the opinion: "whether the exercise of the federal bankruptcy power in dealing with the composition of the debts of the [municipality], upon its voluntary application and with the State's consent, must be deemed to be an unconstitutional interference with the essential independence of the State as preserved by the Constitution." 304 U.S. at 49. Thus, the *Bekins* Court reconsidered the

5

13-53846-tjt   Doc 2335-9   Filed 12/27/13   Entered 12/27/13 18:42:25   Page 6 of 21
13-53846-swr   Doc 1465-9   Filed 10/30/13   Entered 10/30/13 18:26:25   Page 6 of 11      150
193

federalism holding from *Ashton,* nothing more.

**Second,** even assuming *arguendo* (and, AFSCME submits, incorrectly) that chapter 9 only involves state consent to federal impairment, *Bekins* is no longer good law**.** *Asbury Park* and the Court's federalism jurisprudence since *New York* render *Bekins* inapposite because chapter 9 unconstitutionally allows a state to lose sovereign powers by consent.

Both the Court's decision in *Bekins* and Justice Cardozo's dissent in *Ashton* hinged on two since-disproven notions: (1) that "composition of debts . . . was not available under state law" due to the Contracts Clause, *Bekins,* 304 U.S. at 54; and (2) that "dispensing with the consent of the state" would render a federal municipal bankruptcy law "a dislocation of that balance between the powers of the states and the powers of the central government which is essential to our federal system." *Ashton,* 298 U.S. at 538 (Cardozo, J., dissenting). *See also Bekins,* 304 U.S. at 51-52 ("It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power.")

As we know from *Asbury Park*, the first assumption is not true because "the necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation." 316 U.S. at 511. Thus, although the Contracts Clause continues to apply as a limit on the precise features of "a state insolvency act," *id.* at 513, such acts are allowed under the Constitution as an exercise of a state's "autonomous regulation" of the "peculiarly local" problem of "the fiscal management of its own household." *Id.* at 509.

The second assumption is untrue because in *New York* the Supreme Court made clear that state consent *cannot* enlarge the powers of Congress. AFSCME Am. Elig. Obj. ¶¶ 82-84. As noted, both Justice Cardozo's dissent in *Ashton* and the Court's opinion in *Bekins* assumed that state consent was *precisely* what was required to "remove the obstacle," 304 U.S. at 52, and

extend the power of municipal bankruptcy legislation to Congress. But this enlargement of federal power is what *New York* forbids – the incursion into the sovereign powers of another branch of government by the consent of that branch. The *Bekins* Court apparently tolerated that incursion because it thought the City "was powerless" to adjust debts under state law and therefore acted "in aid, and not in derogation, of its sovereign powers" by consenting to federal bankruptcy. 304 U.S. at 54. Since *Asbury Park* made clear that the City is not so powerless, state consent to federal control in chapter 9 *is* an encroachment on a sovereign power and therefore is unconstitutional under *New York*.

**Third and in the alternative,** further assuming *arguendo* (and, AFSCME submits, incorrectly) both that chapter 9 does not violate the constitutional prohibition on federal consent to state impairment *and* that *Bekins* is still good law, chapter 9 as amended violates the only remaining reasonable reading of *Bekins* consistent with the subsequently decided *Asbury Park* because use of a state municipal debt adjustment scheme requiring less than 100% creditor consent must be a remedy available to states. At the very least, therefore, the federal municipal bankruptcy statute ceased to be constitutional four years after *Asbury Park* when Congress amended it to deny states the sovereign right to adjust the debts of their own municipalities with less than 100% creditor consent, which is still the law today under Section 903(1).

If a municipality is so insolvent that it has no choice but to adjust its debts, Section 903(1) unconstitutionally forces it to reach 100% creditor consent and effectively compels it to resort to chapter 9. Doing so likewise forces the municipality to enlist its officers in designing a plan of adjustment according to federal rules and policies rather than different state rules and policies which might otherwise have been available under state insolvency law passed consistent with *Asbury Park* – for, as the City observed, Section 903(1) constitutes a "prohibition on

7

competing state municipal schemes." Tr. 10/15/13 at 161:12-13. Congress's attempt to coerce states into chapter 9 regardless of their desire to manage their affairs differently constitutes "overreaching in violation of the Tenth Amendment." 16 Collier's on Bankruptcy P 903.03[2].

The City's counterargument that the Code's prohibition on competing state municipal schemes represents "recognition that they're not possible or workable" and that therefore Congress could not have "coerced anybody," Tr. 10/15/13 at 161:12-13. 22, is inaccurate. The House "favored" amending the statute to revive states' rights under *Asbury Park* in order to provide for "the availability of state composition proceedings as a less drastic alternative than bankruptcy," but the Senate "opposed" the House "in the interest of national uniformity," and "[t]he Senate's view ultimately prevailed[.]" 16 Collier on Bankruptcy § P 903.LH[2]. This attempt to undo *Asbury Park* to deny to States an "alternative" to chapter 9 was unconstitutional coercion. See *Dickerson v. United States,* 530 U.S. 428, 437 (2000) ("Congress may not legislatively supersede our decisions interpreting and applying the Constitution.").

## III.    SECTION 109(C)(2) APPLIES A STATE LAW STANDARD AND BECAUSE PA 436 VIOLATES THE STATE CONSTITUTION THEREFORE THE CITY IS NOT ELIGIBLE FOR CHAPTER 9

As a threshold matter, because the state-law-authorization eligibility requirement in Section 109(c)(2) refers explicitly to "State law," every court to consider the issue has correctly held that Section 109(c)(2) is "governed by a state rule of decision." *In re City of Stockton,* 475 B.R. 720, 728-29 (Bankr. E.D. Cal. 2012) (collecting cases). An analogy between Section 109(c)(2) and the Supreme Court's 11th Amendment sovereign immunity jurisprudence confirms this result for two reasons. First, under *Palmer v. Ohio,* 248 U.S. 32 (1918), the question of whether a state has waived sovereign immunity by passing a state law remains a question of state, not federal, law. *See Lee-Thomas v. Prince George's County Public Schools,* 666 F.3d

244, 249-50 (4th Cir. 2012). Second, cases which have used a federal standard when deciding whether the state has waived sovereign immunity in other circumstances are distinguishable because the 11th Amendment, unlike Section 109(c)(2), does not explicitly refer to state law.

The State suggests that under its interpretation of the Michigan Constitution, the State could pass a law granting to the Governor the right to pick the mayor of Detroit. Tr. 10/16/13 at 14:8-12. But if, as the State contends, "[i]t's not too simplistic" to say that the City "sets its own form of government through its charter unless the state dictates otherwise through its legislation," Tr. 10/16/13 at 13:7-14, then the need for a home rule provision in the Constitution vanishes; local government could simply be governed by statute. However, it remains a bedrock principle of Michigan constitutional law that the Legislature *cannot* select the mayor of Detroit, or any other local representative. Any power the Legislature may have to amend the powers of local governments does not extend to the ability to appoint the EM because the legislature at most defines *what* powers the elected government has but not *who* will exercise those powers. As the Michigan Supreme Court has held, the Michigan Constitution incorporates the holdings of the Cooley Court establishing "the importance of elected representatives in any scheme of local government." *Brouwer,* 377 Mich. at 653. At the local level, "while the people are suffered to go through the forms of an election, there shall not rest in some authority at a distance, the power to deprive the election of any valuable significance." *Id.* (citation omitted). Local voters have the right to elect local officials, and the State cannot substitute unelected persons in their stead.

The State next argues that PA 436 "allows the emergency manager to simply execute the same executive powers that the elected officials of the community would have" and that therefore, because he is a local official as opposed to a state official, the Legislature has simply delegated to the EM the same powers it has delegated to the local government Tr. 10/16/13 at

9

13-53846-swr   Doc 2337-9   Filed 12/27/13   Entered 12/27/13 18:20:16   Page 154 of
193
13-53846-swr   Doc 1467   Filed 10/30/13   Entered 10/30/13 18:42:16   Page 105 of 91   154

16:21-23.  The State argues that the EM can execute local power because he is a local official, not a state official, and thus the EM is delegated the same powers delegated to the local government.  This argument fails for two reasons.  First, the EM is a state official, not a local official.  *See* AFSCME Am. Elig. Obj. ¶173.  Second and regardless, the Legislature lacks the power to delegate local authority because under Article IV, Section 29 local authority already belongs to the local electors –inherently, with nothing left to delegate.  *See* AFSCME Am. Elig. Obj. ¶ 151.  The State unconstitutionally delegated this power without any *state law* standards to guide the EM *during bankruptcy*.  Because local authority derives from the local electors, the State incorrectly suggests that the EM "is guided by the same standards that would have applied to the local officials when they were exercising that power." Tr. 10/16/13 at 17:14-16.  For if the Mayor or City Council take actions in bankruptcy which the people of Detroit dislike, the people of Detroit who elected them can vote them out of office.  Not so for the EM.

## CONCLUSION

AFSCME respectfully requests that this Court issue an order dismissing the City's chapter 9 petition, or, in the alternative, ensuring that accrued pension benefits protected by Article IX, Section 24 of the Michigan Constitution are not endangered by this bankruptcy.

Dated: October 30, 2013

| **LOWENSTEIN SANDLER LLP**<br>By: /s/ *Sharon L. Levine*<br>Sharon L. Levine, Esq.<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>(973) 597-2500 (Telephone)<br>(973) 597-6247 (Facsimile)<br>slevine@lowenstein.com | Herbert A. Sanders, Esq.<br>THE SANDERS LAW<br>FIRM PC<br>615 Griswold St., Suite 913<br>Detroit, MI 48226<br>(313) 962-0099 (Telephone)<br>(313) 962-0044 (Facsimile)<br>hsanders@miafscme.org | Richard G. Mack, Jr., Esq.<br>Miller Cohen, P.L.C.<br>600 West Lafayette<br>Boulevard<br>4th Floor<br>Detroit, MI 48226-3191 |

*Counsel to AFSCME Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

```
-------------------------------------------------------- x
                                                         :
In re:                                                   :
                                                         :   Chapter 9
CITY OF DETROIT, MICHIGAN,                                :
                                                         :   Case No.: 13-53846
                           Debtor.                       :
                                                         :   Hon. Steven W. Rhodes
                                                         :
-------------------------------------------------------- x
```

### SUPPLEMENTAL BRIEF OF INTERNATIONAL UNION, UAW IN SUPPORT OF THEIR AMENDED OBJECTION TO THE CITY OF DETROIT, MICHIGAN'S ELIGIBILITY FOR AN ORDER FOR <u>RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE</u>

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") submits this supplemental brief regarding its Amended Objections to the City of Detroit, Michigan's Eligibility for Relief under Chapter 9 [DE 1170] (the "Amended Objection").

### <u>Argument</u>

### The Governor's Approval of the Chapter 9 Filing Was Invalid <u>Under State Law and Cannot Be Saved by Federal Bankruptcy Law</u>

In issuing the July 18, 2013 approval letter, Governor Snyder was acting, and could only act, under *state* law. *See* 11 U.S.C. Section 109(c)(2) (requiring that the municipality be specifically authorized to be a debtor under State law, or by an officer empowered by State law). Here, confronted with a proposal by the Emergency Manager Kevyn Orr (the "EM") that, on its face compelled a significant reduction in accrued vested pension benefits, thus implicating Article 9, Section 24 of the Michigan Constitution, the Governor's approval necessarily required a condition

excepting accrued pensions. The Governor could not, consistent with State law, sign an approval for bankruptcy plan proposed that, as presented by the EM, would plainly violate the Michigan Constitution. Skirting that issue, however, Governor Snyder was apparently counting on *federal* law—through the federal bankruptcy court—to sort out the legal issues regarding the applicability of Article 9, Section 24.

But the Governor's deferral to the federal bankruptcy court as the basis for not applying Article 9, Section 24 to his approval cannot save a defective authorization, which must be issued consistent with *state* law. The Governor cannot simply ignore a substantive provision of the Michigan Constitution that plainly applies to him in his official acts and was plainly implicated by the EM's request for approval and instead rely upon federal law. Indeed, the conditions that led the Supreme Court to uphold the municipal bankruptcy law in *Bekins* were exactly the reverse: there, the Court expressly found that the taxing authority *was authorized by state law* to file the petition and to take the necessary steps to consummate the plan. *United States v. Bekins*, 304 U.S. 27, 47-48 (1938).[1] The state's authorization did not depend upon the

---

[1] The *Ashton* dissent is not to the contrary. Justice Cardozo emphasized that the municipal bankruptcy law "does not dislocate the balance" between the powers of the states and those of the federal government, citing, among other things, the requirement for consent by the state where necessary by local law and that the "composition, though approved by the requisite majority, shall not be confirmed" unless the municipality is authorized by law to take all action necessary to carry out the plan. *Ashton v. Cameron County Water Improvement Dist.*, 298 U.S. 513, 538-40 (1936) (Cardozo, J., dissenting). *See also id.* at 540 (noting that "it is clear to the point of demonstration that the filing of a voluntary petition by a political subdivision does not violate the local law or any local public policy. Petitioners are not the champions of any rights except their own."). Chapter 9 was deemed constitutional on these same grounds —adherence to state law—in *Bekins*. As expressed in the *Ashton* dissent, the operative function of the federal law was the ability to bind the minority—

*federal* law to paper over a violation of state law; then-chapter IX would have been found unconstitutional had the *Bekins* Court not found that the municipality was following *state* law in filing the bankruptcy case.

These are not the Depression-era conditions of municipal debt compositions, where holders of debt securities, having determined that the municipal well has run dry, could voluntarily decide to compromise their bond recoveries and obtain the requisite numbers to bind a minority through chapter IX. Here, the EM—aided by the Governor—embarked upon a plan to cut off the City's pension funding obligations and use the money for a massive revitalization program, transforming those obligations into bankruptcy claims. Little wonder that pensioners, relying upon their state's constitution to protect their accrued benefits, didn't recognize that the Governor and the EM expected them to replicate the voluntary debt compositions of Depression-era bondholders.[2]

Thus, Section 109(c)(2) requires that authorization be based on state law and state law *alone*. *See In re Harrisburg, PA,* 465 B.R. 744, 755 (Bankr. M.D. Penn. 2011) (rejecting Supremacy Clause argument to support eligibility and dismissing Chapter 9 petition as not authorized by state law).

---

the majority having agreed to the plan of composition as a condition of the bankruptcy filing—not overriding the state law. *See id.* at 541.

[2] Nor does the Governor have any authority to consent to the impairment or diminishment of accrued benefits on their behalf. Simply put, there was no state law source of authority for the Governor to approve the chapter 9 filing but not protect accrued pension benefits covered by Article 9, Section 24.

Article 9, Section 24 was plainly implicated in the EM's proposal and, under well-established principles applied by the Michigan courts to the interpretation of the state's constitution, plainly applied to the Governor's approval under PA 436. "The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification." *County of Wayne v. Hathcock*, 684 N.W.2d 765, 779 (2004) (citing *People v. Nutt*, 677 N.W.2d 1, 6 (2004)). "*The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.*" *Federated Publ'ns, Inc. v. Bd. of Trustees of Mich. State Univ.,* 594 N.W.2d 491, 496 (Mich. 1999) (quoting 1 Cooley, Constitutional Limitations (6th ed.), p. 81 ) (emphasis in original); *see also Comm. for Constitutional Reform v. Secretary of State*, 389 N.W.2d 430, 432 (1986) (" 'The cardinal rule of construction, concerning language, is to apply to it that meaning which it would naturally convey to the popular mind ….' '[W]e should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time ….' ") (quoting, respectively, *People v. Dean*, 14 Mich. 406, 417 (1866); *Pfeiffer v. Detroit Bd. of Ed.*, 77 N.W. 250, 251 (1898)).

Applying these principles, the Michigan courts have emphasized that Article 9, Section 24 expresses "the firmly established right of public employees to receive pension payments as those payments become due." *Kosa v. Treasurer of State of Mich.*, 292 N.W.2d 452, 460 (Mich. 1980). The courts have construed Article 9, Section 24 to protect pension benefits earned as deferred compensation for services performed and to establish that such benefits, having been earned, are vested and cannot be reduced. *E.g., Advisory Opinion re Constitutionality of 1972 P.A. 258*, 209

N.W.2d at 202 (" '[T]he benefits of pension plans are in a sense deferred compensation for work performed.  And with respect to work performed, … the public employee should have a contractual right to benefits of the pension plan, which should not be diminished by the employing unit after the service has been performed.' ") (quoting 1 Official Record, Constitutional Convention 1961, 770-771). S*ee also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W. 2d 683, 694 (Mich. 2011) ("The obvious intent of § 24 [ ] was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished.").[3]

The absence of a reference to municipal bankruptcy in Article 9, Section 24 does not render it inapplicable in chapter 9 nor ambiguous in that regard.  The provision itself expresses no exceptions, and the Michigan courts have said that every possible condition to which a constitutional provision would apply need not be spelled out.  *See Nat'l Pride at Work, Inc. v. Governor*, 748 N.W.2d 524, 540 n.21 (Mich. 2008) ("the fact that a constitutional provision does not explicitly set forth every specific action that is prohibited does not mean that such a provision is ambiguous").  Moreover, the courts apply the words that are there—nothing is superfluous.  *See Syntex Labs., Inc. v. Dep't of Treasury*, 470 N.W. 2d 665, 667-68 (1991) (interpreting constitutional provision prohibiting sales and use taxes and declining to ignore reference to use tax as surplusage, noting "we borrow from the rules of statutory

---

[3] A "vested right" is "an interest that the government is compelled to recognize and protect of which the holder could not be deprived without injustice." *City of Detroit v. Walker,* 520 N.W.2d 135, 143 (Mich. 1994).

construction the rule that no word should be treated as surplusage or rendered nugatory if at all possible.").

A reference to municipal bankruptcy would have been most unlikely in 1963 in any event. Chapter IX at the time was in a form much closer to the 1946 version than to the current statute. *See generally*, 6 Collier on Bankruptcy, ¶ 900.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that, until 1976, "Chapter IX, remained unchanged and virtually unused for 30 years …. Chapter IX as it then existed was scarcely usable by a large city…." (citations to legislative history of 1976 revision of Act omitted). Moreover, the idea that pension funding obligations—only just memorialized in the 1963 constitution—were debts subject to "composition" under Michigan's 1939 bankruptcy authorization statute would have been unimaginable. This is particularly so since from 1946 to 1976, "only securities debts could be modified in a chapter IX plan." *In re Stockton, Cal.*, 486 B.R. 194, 196 (Bankr. E.D. Cal. 2013).

Nor can the City's attempt to hide behind its own label of the funding obligations—unsecured claims to be treated the same as other unsecured claims under its plan—cannot shield the City from Article 9, Section 24. First, as shown above, *state* law governs authorization and, consistent with the courts' well established principles of construction, Article 9, Section 24 plainly forbids impairment or diminishment of accrued vested pensions through a bankruptcy principles of construction, authorized by the State. In any event, the EM must have known that as a chapter 9 debtor, the City would have wide latitude to spend its money for any reason, including "even in a manner that disadvantages other creditors" unless the

- 6 -

13-53846-tjt Doc 2385-9 Filed 12/30/13 Entered 12/30/13 13:36:02 Page 6 of 9
13-53846-swr Doc 2385-69 Filed 12/30/13 Entered 12/30/13 13:42:20 Page 161 of 193    161

municipality consents to judicial oversight. *In re Stockton, Cal.,* 486 B.R. at 198-99. Section 904 of the Bankruptcy Code (called by the *Stockton* court "a keystone in the constitutional arch between federal bankruptcy power and state sovereignty," *id. at* 198) means that the City can expend its property and revenues during the chapter 9 case as it wishes." *Id.* at 199. The City has simply adopted a label of convenience for the pension funding obligations, in part because it wishes to divert the funding obligation money to its revitalization program—a deliberate choice on the City's part—and in part, perhaps, to avoid having to explain the choice to maintain its obligation to fund accrued vested pensions to its bondholders or their insurers.[4]

Moreover, the City cannot rely upon the characterization of pension funding obligations from chapter 11 case law, because the courts have made clear that the cessation of a private company's funding obligations, leading to termination of a pension plan, is inextricably linked to the guaranty program Congress enacted to backstop accrued pensions in the event the employer's funding ceased. *E.g., PBGC v. LTV Corp.*, 496 U.S. 633 (1990) (upholding PBGC's restoration of company pension plan when company and union negotiated a follow-on plan contrary to agency's policies as pension insurance guarantor); *In re UAL Corporation*, 428 F.3d 677 (7th Cir. 2005) (upholding settlement between PBGC and airline as consistent with PBGC's authority as federal "backstop" for pension benefits). Here, there is no

---

[4] One might ask whether the City's insistence on treating the funding obligations as unsecured claims operates as a form of "consent" under Section 904, by casting the Court as the decision-maker on the pension issues, and yet not expressly consenting to the Court's authority over spending under Section 904.

similar guaranty program.  There is only Article 9, Section 24.  The basis on which the City can cease its funding obligations cannot simply be decreed as a mere claims recovery exercise.[5]  Accordingly, federal law cannot save an authorization that violated state law, and therefore violates Section 109(c)(2).

---

[5] Indeed, Congress did not extend ERISA to public sector plans because "'the ability of the governmental entities to fulfill their obligations to employees through their taxing powers' was an adequate substitute for both minimum funding standards and plan termination insurance." *Rose v. Long Island Pension Plan,* 828 F.2d 910, 914 (2d Cir. 1987) (quoting legislative history of ERISA).  In addition, Congress determined that extending ERISA's requirement to state pension plans would unduly interfere with the administration of public retirement plans, or, put another way, in recognition of principles of federalism.  *Id.*  Thus, allowing the City to use federal bankruptcy law to create its own plan termination rules by simply wiping out its funding obligation, devoid of any guaranty program, creates the very interference of federal authority that Congress has rejected in connection with state pension plans.

- 8 -

13-53846-tjt  Doc 2356   Filed 12/30/13   Entered 12/30/13 13:32:02   Page 8 of 9
13-53846-swr  Doc 1469   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 163 of 193

163

## CONCLUSION

For the foregoing reasons, and those set forth in the Amended Objection, the

City's chapter 9 petition should be dismissed.

Dated:  New York, New York
        October 30, 2013

<div style="margin-left:40%">

/s/ Babette A. Ceccotti
Cohen, Weiss and Simon LLP
Babette A. Ceccotti
330 West 42nd Street
New York, New York 10036-6976
T: 212-563-4100
F: 212-695-5436
bceccotti@cwsny.com

- and -

Niraj R. Ganatra (P63150)
Michael Nicholson (P33421)
8000 East Jefferson Avenue
Detroit, Michigan  48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

*Attorneys for International Union, UAW*

</div>

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | Hon. Steven W. Rhodes |
| *Debtor.* | ) | |
| | ) | |

# SUPPLEMENTAL BRIEF IN SUPPORT OF
# OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO
# THE ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN, TO BE
# A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE[1]

---

[1]   The Retirement Systems are filing this Supplemental Brief pursuant to the Court's Order Regarding Further Briefing on Eligibility, dated October 17, 2013 (Dkt. No. 1217).   This Supplemental Brief is filed subject to the reservations of rights in the Appearance filed by the undersigned counsel in this case, including the Retirement Systems' right to argue that this Court lacks subject matter jurisdiction.   This Supplemental Brief incorporates by reference the arguments and objections previously raised by the Retirement Systems in the Objection of the Detroit Retirement Systems to the Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code (Dkt. No. 519) (the "Objection") and the Reply in Support of Objection of the Detroit Retirement Systems to the Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code (Dkt. No. 1166) (the "Reply").   The Retirement Systems also join in the objection of the Retired Detroit Police Members Association that PA 436 is ineffective because it was enacted in violation of the Referendum Clause of the Michigan Constitution.

# **TABLE OF CONTENTS**

I.  THE PENSIONS CLAUSE CAN BE ENFORCED CONSISTENTLY
    WITH THE BANKRUPTCY CODE...............................................................1

    A.  State Law Determines the Legal Nature and Substance of Claims
    in Bankruptcy...............................................................................................2

    B.  Under Michigan Law, Accrued Pension Obligations are Vested Property
    Rights that Cannot Be Impaired ..................................................................2

    C.  The Bankruptcy Code Provides for Different Treatment of Legally
    Distinct Claims ...........................................................................................4

    D.  Non-Impairment of Pension Obligations Will Not Violate the Bankruptcy
    Code ..........................................................................................................6

II.  IMPAIRMENT OF ACCRUED BENEFITS IN THIS CASE WOULD
    INDEED VIOLATE THE PENSIONS CLAUSE ...........................................9

III.  UNLESS ELIGIBILITY IS CONDITIONED UPON NON-
    IMPAIRMENT OF PENSIONS, THE CASE MUST BE DISMISSED.........10

9780159.4 14893/165083

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Clerk* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996)................................................................5

*Bekins v. United States*, 304 U.S. 27 (1938)................................9

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ...................................2, 3

*Butner v. U.S.*, 440 U.S. 48, 55 (1979) .................................2, 8

*Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 661-63 (6th Cir. 2002) .......................................4

*Cty. of Orange v. Merrill Lynch & Co.* (*In re Cty. of Orange*), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996)............................................. 5-6, 10

*In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 695 (Bankr. D. Colo. 1995) ...................................................8

*In re General Homes Corp.*, 134 B.R. 853, 863 (Bankr. S.D. Tex. 1991)...............4

*In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).......................5

*In re Weingarden*, 84 B.R. 691, 692 (Bankr. S.D. Cal. 1988)................................7

*Marconi v. Chicago Heights Police Pension Bd.*, 361 Ill. App. 3d. 1, 24 (Ill. App. 2005) ...........................................................3

*Musselman v. Governor of Mich.*, 533 N.W.2d 237, 243 (Mich. 1995)....................3

*Rhodes v. Stewart*, 705 F.2d 159, 163 (6th Cir. 1983) ...............................8

*Richardson v. Schafer* (*In re Schafer*), 689 F.3d 601, 607 (6th Cir. 2012)...........8, 9

*Russell v. Dunston*, 896 F.2d 664, 668-669 (2d Cir. 1990) ......................................3

*Sanitary & Improvement Dist. 65 of Sarpy Cty., Neb. v. First Nat'l Bank of Aurora*, 79 B.R. 877 (D. Neb. 1987) ...................................................5

*Seitz v. Probate Judges Ret. Sys.*, 474 N.W.2d 125, 130 (Mich. App. 1991) ...........4

9780159.4 14893/165083

*Stellwagen v. Clum*, 245 U.S. 605, 613 (1918)............................................................9

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 584-87 (6th Cir. 1986) ........................................4

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007)..................................................................................................2, 8

**Statutes**

11 U.S.C. §109(c)(2) ....................................................................................................10

11 U.S.C. §109(c)(5) ......................................................................................................9

11 U.S.C. §901 ........................................................................................................5, 6, 7

11 U.S.C. §943(b)(4) ......................................................................................................8

11 U.S.C. §943(b)(7) ......................................................................................................5

11 U.S.C. §943(b)(6) ......................................................................................................8

11 U.S.C. §944(c) ....................................................................................................6, 7, 9

11 U.S.C. §1122 .........................................................................................................5, 7

11 U.S.C. §1123(a)(1) ....................................................................................................7

11 U.S.C. §1129(b)(2)(B) ..............................................................................................7

9780159.4 14893/165083

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (together, the "<u>Retirement Systems</u>") respectfully submit this Supplemental Brief in support of their objection to the eligibility of the City of Detroit, Michigan (the "<u>City</u>") to be a debtor under Chapter 9 of the Bankruptcy Code.  For the reasons set forth in the Retirement Systems' Objection and Reply and in other objections: (a) the Pensions Clause does not conflict with the Bankruptcy Code's priority scheme; (b) any impairment of accrued pension benefits in this case is prohibited by the Pensions Clause; and (c) if the Court were to conclude that the protections of the Pensions Clause are irreconcilable with Chapter 9, then the only conclusion is that the City's petition must be dismissed.

## I.    THE PENSIONS CLAUSE CAN BE ENFORCED CONSISTENTLY WITH THE BANKRUPTCY CODE

An order for relief that gives effect to the Pensions Clause and prohibits diminution or impairment of the City's pensions does not contravene any provision of the Bankruptcy Code, including the claims priority scheme under Chapter 9.[2]

---

[2] To what extent a priority scheme exists under Chapter 9 is not entirely clear, in the absence of the incorporation of most of section 507(a) into Chapter 9.  The Retirement Systems reserve all rights regarding this issue.

1

## A. State Law Determines the Legal Nature and Substance of Claims in Bankruptcy

The nature of a claim, and the substantive rights of creditors, are always determined in the first instance by state law. *See Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) ("'state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law'") (citation omitted); *Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."). Here, applicable state law – the Michigan Constitution – provides that vested pensions constitute property rights that shall not be diminished or impaired.

## B. Under Michigan Law, Accrued Pension Obligations are Vested Property Rights that Cannot Be Impaired

*Board of Regents v. Roth*, 408 U.S. 564 (1972), explains that certain types of contract rights rise to the level of "property" protected by the Constitution from deprivation by state action:

> To have a property interest in a benefit [provided by the state], a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. . . .
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as

> state law-rules or understandings that secure certain benefits and that
> support claims of entitlement to those benefits.

*Id.* at 577. The vested pension benefits of Detroit's employees and retirees fall squarely within this definition of "property" for purposes of constitutional protection: they are claims of entitlement which are protected under the State's highest law, and public employees rely in their daily lives upon the inviolability of these rights. Indeed, courts have applied *Roth* to pension benefits when interpreting constitutional provisions very similar to the Pensions Clause. *See, e.g., Russell v. Dunston*, 896 F.2d 664, 668-669 (2d Cir. 1990) (applying *Roth* to pension obligations protected by state constitutional provision); *Marconi v. Chicago Heights Police Pension Bd.*, 361 Ill. App. 3d. 1, 24 (Ill. App. 2005), *rev'd on other grounds*, 225 Ill.2d 497 (2006) (same).

Michigan case law confirms that accrued pension benefits are earned and vested rights, to which, in accordance with *Roth*, each vested employee or retiree has a "legitimate claim of entitlement," amounting to a "property interest in a benefit." As the Michigan Supreme Court has recognized, "pension obligations differ from nearly every other type of government spending insofar as they simply cannot be reduced or cut. . . . Michigan governmental units do not have the option . . . of not paying retirement benefits." *Musselman v. Governor of Mich.*, 533 N.W.2d 237, 243 (Mich. 1995), *aff'd on reh'g*, 545 N.W.2d 346 (Mich. 1996). Moreover, "the state may not reduce the pension benefit of any state employee or

official, or local employee or official, once a pension right has been granted." *Seitz v. Probate Judges Ret. Sys.*, 474 N.W.2d 125, 130 (Mich. App. 1991), *appeal denied*, 482 N.W.2d 459 (Mich. 1992), *reconsideration denied*, 483 N.W.2d 898 (Mich. 1992).

### C. The Bankruptcy Code Provides for Different Treatment of Legally Distinct Claims

Giving full effect to Michigan law protecting pension benefits is fully consistent with the Bankruptcy Code. The Code defines claims by their rights under state law, and not all unsecured claims are equal under state law. The Code permits even radically different treatment among classes of unsecured claims, when such distinctions are justified by differences in the claims' legal rights and attributes. The Sixth Circuit has so held. *See, e.g.*, *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 661-63 (6th Cir. 2002), *cert. denied*, 537 U.S. 816 (2002) (separate classification and treatment of foreign and domestic unsecured tort claimants, resulting in a recovery differential of 35-60%, was proper because tort awards in other countries were significantly lower than U.S. tort awards); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 584-87 (6th Cir. 1986) (permitting separate classification of union's claims, due to unique interest of its represented employees in debtor's ongoing business and impact on future collective bargaining process); *In re General Homes Corp.*, 134 B.R. 853, 863

9780159.4 14893/165083

(Bankr. S.D. Tex. 1991) ("The legal character of a claim may also itself justify both disparate classification and treatment."). Indeed, where the legal rights differ materially from one type of claim to another, separate classification is not just permitted, it is *required*. As provided by §1122(a), "a plan may place a claim or an interest in a particular class *only if such claim or interest is substantially similar to the other claims or interests of such class*." (emphasis supplied). *See also Aetna Cas. & Sur. Co. v. Clerk* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996) ("Dissimilar claims may not be classified together . . . ."). Separate classification and disparate treatment is not limited to Chapter 11: it is also appropriate in Chapter 9, as §901 expressly incorporates §1122. *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (upholding separate classification and disparate treatment of, *inter alia*, employee benefit plan claims versus trade creditor claims); *Sanitary & Improvement Dist. 65 of Sarpy Cty., Neb. v. First Nat'l Bank of Aurora*, 79 B.R. 877 (D. Neb. 1987), *aff'd on other grounds*, 873 F.2d 209 (8th Cir. 1989) (upholding separate classification and treatment of bondholders versus warrantholders, due to different attributes and rights of repayment under state law). Unsecured claims with substantially different legal rights under applicable state law are simply *not* required to be treated *pari passu*.[3]

---

[3] Similarly, §943(b)(7)'s "best interests of creditors" requirement would not bar preservation of accrued pension obligations under a plan. Unlike Chapter 11, Chapter 9 does not test a plan by comparison to a liquidation alternative – the alternative is dismissal of the case. *See Cty. of*

5

## D. Non-Impairment of Pension Obligations Will Not Violate the Bankruptcy Code

Enforcing the Pensions Clause by prohibiting the impairment of accrued pension benefits in this case does not conflict with any claims priority scheme under Chapter 9. To the contrary, Chapter 9 itself contemplates classes of unimpaired unsecured claims. Section 944(c)(1) provides that a municipal debtor will not be discharged from any debt that is "excepted from discharge by the plan or order confirming the plan . . . ." Yet Chapter 9 contains no specific provisions identifying claims that may or must be excepted from discharge.[4] The City argued in rebuttal that §944(c) was simply designed to provide unilateral flexibility to the reorganizing entity. But nothing in the Bankruptcy Code suggests that §944(c) is so limited, and that it cannot accommodate a constitutional mandate to protect certain claims. Rather, §944(c) can and should be interpreted as recognizing the nondischargeability of pension benefits under the Michigan Constitution, due to the unique sovereignty and federalism issues implicated in Chapter 9.

---

*Orange v. Merrill Lynch & Co.* (*In re Cty. of Orange*), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996). For the tens of thousands of Detroit pensioners, absent non-impairment in the Chapter 9 case, their non-bankruptcy alternative is better: strict enforcement of the Pensions Clause under Michigan law.

[4] Other than incorporating parts of §524(a) describing the *effect* of a discharge, §944(c) is the only provision of Chapter 9 that addresses discharge; §§523, 727, and 1141(d) of the Bankruptcy Code are not applicable in Chapter 9. *See* 11 U.S.C. § 901(a).

It is widely accepted that cities *may* separately classify pension obligations and treat them as unimpaired, while materially impairing bondholders and other classes of unsecured creditors: Vallejo's plan did so;[5] Stockton's plan proposes to do so.[6] If such treatment is permitted on a voluntary basis, it is likewise appropriate when compelled by fundamental differences in the legal rights granted to pensions under state law and the cities' special relationship to their employees.[7] No conflict exists between Chapter 9 and state laws protecting pensions.

Here, the City could comply with the Michigan Constitution by excepting accrued pension obligations from discharge, consistent with the Pensions Clause. Such compliance would avoid (i) rendering PA 436 unconstitutional or (ii)

---

[5] *In re City of Vallejo, CA.*, Case No. 08-26813, Order Confirming Second Amended Plan for the Adjustment of Debts of City of Vallejo, California, as Modified August 2, 2011, Ex. 1, at 34 (Doc. No. 1113) (Bankr. E.D. Cal. Aug. 4, 2011) (CalPERS pension plan was not impaired; city would continue to honor its pension obligations pursuant to non-bankruptcy law).

[6] *In re City of Stockton, CA.*, Case No. 12-32118, Plan for the Adjustment of Debts of City of Stockton, California, at 71-72 (Doc. No. 1133) (Bankr. E.D. Cal. Oct. 10, 2013) (CalPERS pension plan not impaired; city would continue to honor its pension obligations pursuant to non-bankruptcy law).

[7] Non-impairment of pension obligations would be permissible whether a plan is confirmed consensually or under the Code's cram-down provisions, because the absolute priority rule in §1129(b)(2)(B) (which is incorporated by §901) requires only that if a class of unsecured claims is not paid in full, no *junior* class will receive or retain any property on account of such claim, and the Retirement Systems' claims are not junior to any other unsecured claims. Even without the imprimatur of §944(c), §§1122(a) and 1123(a)(1) have been held to permit separate classification of nondischargeable claims and different treatment from that afforded to unsecured creditors whose claims are subject to the §1141(d)(1)(A) discharge. *See In re Weingarden*, 84 B.R. 691, 692 (Bankr. S.D. Cal. 1988).

7

13-53846-swr Doc 2352 Filed 01/07/13 Entered 01/07/13 23:06:26 Page 175 of 193
193
175

rendering the City's eventual plan unconfirmable, either as contrary to state law under §943(b)(4) or because it is subject to a popular vote on a constitutional amendment of the Pensions Clause under §943(b)(6).[8] Nor would treating accrued pension obligations as unimpaired, as required by the Pensions Clause, violate the uniformity of bankruptcy law. Federal bankruptcy law does not preempt the field with respect to the characterization and treatment of claims in bankruptcy cases. On the contrary, *Butner* and *Travelers* **require** bankruptcy courts to look to state law to determine claims and property interests. Absent a direct conflict between state and federal law, "the state and federal legislatures share concurrent authority to promulgate bankruptcy laws . . . ." *Rhodes v. Stewart*, 705 F.2d 159, 163 (6th Cir. 1983), *cert. denied*, 464 U.S. 983 (1983) (citations omitted). Accordingly, states are presumptively permitted to act in the sphere of bankruptcy laws, subject to the Supremacy Clause and the doctrine of conflict preemption. *See Richardson v. Schafer* (*In re Schafer*), 689 F.3d 601, 607 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1244 (2013) (upholding Michigan exemption statute).

No grounds for conflict preemption exist here: (1) state law determines the legal character of pension-benefit claims in bankruptcy, (2) the Bankruptcy Code

---

[8] *See, e.g., In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 695 (Bankr. D. Colo. 1995) ("Federal law cannot obliterate or supersede requirements for elections imposed by Colorado law. Chapter 9 provides only a forum and a mechanism for reorganization; state law establishes the eligibility and substantive requirements for and limitations upon reorganization").

permits different treatment of claims based on their underlying legal rights, (3) such differences in treatment do not violate any priority scheme of Chapter 9, and (4) §944(c)(1) broadly permits a municipal debtor to except claims from discharge. The Pensions Clause is not *actually* in conflict with any federal bankruptcy provision or policy, and can and must be enforced in the City's Chapter 9 case. *See Schafer*, 689 F.3d at 613 ("state laws are thus suspended *only to the extent of actual conflict* with the system provided by the Bankruptcy Act of Congress") (quoting *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918)).

## II. IMPAIRMENT OF ACCRUED BENEFITS IN THIS CASE WOULD INDEED VIOLATE THE PENSIONS CLAUSE

The City has argued that the only "impairer" of accrued pension benefits in this case would be the federal government, and therefore the Pensions Clause's prohibition against impairment by the State or its political subdivisions is of no moment. At oral argument, the City specifically relied upon *Bekins v. United States*, 304 U.S. 27 (1938). However, *Bekins* did not hold that the Chapter 9 debtor is not an active participant in the impairment of contracts under its own proposed plan. Moreover, this argument runs directly contrary to the language of §109(c)(5)(A) and (B), which recognizes that the *debtor* is the relevant actor by explicitly referring to the *debtor entity's* intention to impair claims under a plan.[9]

---

[9] *Bekins* interprets only the *federal* Constitution, not Michigan's, in holding that, provided the state has affirmatively consented to a filing, the predecessor of Chapter 9 is not unconstitutional.

9

## III. UNLESS ELIGIBILITY IS CONDITIONED UPON NON-IMPAIRMENT OF PENSIONS, THE CASE MUST BE DISMISSED

The only way for the City to proceed in Chapter 9 without violating the United States and Michigan Constitutions is to condition the filing on the non-impairment of accrued pension benefits. If the Court were to find that this condition conflicts impermissibly with the Bankruptcy Code, then the City simply is not eligible to be a debtor under §109(c), and the petition must be dismissed.[10] Respectfully, this is the only solution that comports with the Tenth Amendment.

Dated: October 30, 2013

Respectfully submitted,

CLARK HILL PLC

/s/Robert D. Gordon
Robert D. Gordon (P48627)
151 South Old Woodward Ave., Ste. 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

ARNOLD & PORTER LLP

Lisa Hill Fenning
777 South Figueroa St., 44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
lisa.fenning@aporter.com

*Counsel to Police and Fire Retirement System of the City of Detroit and General Retirement System of the City of Detroit*

---

*Bekins* does not address, much less rule upon, the issue of whether the circumstances of a Chapter 9 filing might violate a *state* constitution.

[10] *Cty. of Orange* and the City's other authorities are inapposite because they neither (a) involved a state *constitutionally* protected class of claims, nor (b) addressed such a protection as a **threshold, gating** eligibility issue under §109(c)(2).

10

9780159.4 14893/165083

13-53846-swr Doc 2325 Filed 12/27/13 Entered 12/27/13 23:42:26 Page 14 of 15
13-53846-swr Doc 1472 Filed 10/30/13 Entered 10/30/13 22:06:26 Page 178 of
193

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 30, 2013, the foregoing document was filed using the Court's CM/ECF system, which CM/ECF system will send notification of such filing to all parties of record.

CLARK HILL PLC

/s/ *Robert D. Gordon*
Robert D. Gordon
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
rgordon@clarkhill.com

Dated: October 30, 2013

9780159.4 14893/165083

13-53846-swr  Doc 2852  Filed 12/27/13  Entered 12/27/13 23:42:36  Page 179 of
13-53846-swr  Doc 1472  Filed 10/30/13  Entered 10/30/13 22:06:06  Page 15 of 15    179
193

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:                                            Chapter 9

City of Detroit, Michigan,                        No. 13-53846

          Debtor.                                 Hon. Steven W. Rhodes

_____/

## SUPPLEMENTAL BRIEF OF THE DETROIT PUBLIC SAFETY UNIONS ON ELIGIBILILTY PURSUANT TO ORDER REGARDING FURTHERH BRIEFING ON ELIGIBILITY [DOCKET NO. 1217]

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants Association (the "DPLSA") and the Detroit Police Command Officers Association (the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state as follows for their Supplemental Brief in Support of Eligibility:

1.      The Detroit Public Safety Unions join in the supplemental briefs filed by the Detroit Retirement Systems [Docket No. 1472], by the UAW [Docket No. 1469] and AFSCME [1467].

2.      The Detroit Public Safety Unions further note that under applicable state and federal law, the Detroit Public Safety Unions are not eligible for and,

1

hence, do not receive Social Security retirement or disability benefits. Although Title II of the Social Security Act allows states, after a referendum, to consent to extend social security retirement and disability benefits to state and municipal employees, 42 U.S.C. §218,01, Section 218(d)(5)(A) precludes the extension of such benefits to police and firefighters.[1] Hence, Michigan's act extending such benefits to certain state and municipal employees, MCL 38.851, *et seq*, does not apply to police and firefighters, leaving them entirely dependent on the pension provided by the Detroit Police and Fire Retirement System upon their retirement or disability.

3.      As such, active and retired Detroit police and firefighters, whose pensions the Emergency Manager proposes to significantly impair in direct violation of Art IX, Sec. 24 of the Michigan constitution have even less of a "backstop" than that provided by the PBGC. *See* UAW Supplemental Brief at pp. 7-8.

4.      Given the lack of "social security" extended to police and firefighters, including Detroit police and fire fighters, it seems unimaginable that the citizens of Michigan, when they ratified this provision in 1962, thought the protections

---

[1]  As set forth in 42 U.S.C. §218(d)(5)(a), "Nothing in paragraph (3) of this subsection shall authorize the extension of the insurance system established by this title to service in any policeman's or fireman's position."

provided by Art. IX, Sec. 24 could be "trumped" by federal bankruptcy law. As the Michigan Supreme Court has noted, quoting Justice Cooley, "'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim 81)." *Traverse City School District v. Attorney General*, 384 Mich. 390, 405; 185 N.W.2d 9, 14 (1971).

5.      Given the specific and absolute protection afforded public employees by Art. IX, Sec. 24 and given the limitations imposed by the 10th Amendment on this Court's authority to interfere with the City's the political decisions necessitated by its obligation to provide essential services to its citizens, the Governor's authorization of the filing of the bankruptcy petition can only be squared with those constitutional requirements if it is read, consistent with the state law from which that specific authority flows, to preclude the impairment of the vested, accrued pension rights of active and retired Detroit fire and police officers.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By:___*/s/Barbara A. Patek*_____
        Earle I. Erman  (P24296)

3

13-53846-tjt  Doc 2385-3  Filed 12/27/13  Entered 12/27/13 23:53:20  Page 182 of
13-53846-swr  Doc 1857  Filed 12/20/13  Entered 12/20/13 23:42:10  Page 183 of
193
182

Craig E. Zucker  (P39907)
Barbara A. Patek (P34666)
Counsel for the Detroit Public Safety
Unions
400 Galleria Officentre, Suite 444
Southfield, MI  48034
Telephone: (248) 827-4100
Facsimile:  (248) 827-4106
E-mail:  bpatek@ermanteicher.com

DATED:   October 30, 2013

4

13-53846-tjt   Doc 1573   Filed 10/30/13   Entered 10/30/13 23:42:10   Page 183 of
193
13-53846-swr   Doc 2357-3   Filed 12/27/13   Entered 12/27/13 23:52:10   Page 183 of   183

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-----------------------------------------------------x
                                        :
In re                                   :       Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :       Case No. 13-53846
                                        :
                      Debtor.           :       Hon. Steven W. Rhodes
                                        :
                                        :
                                        :
-----------------------------------------------------x
```

## CITY OF DETROIT'S SUPPLEMENTAL BRIEF
## IN SUPPORT OF ENTRY OF AN ORDER FOR RELIEF

The City of Detroit (the "<u>City</u>") respectfully submits this supplemental brief in support of the entry of an Order for Relief[1] in this chapter 9 case and in response to supplemental briefs (each, a "<u>Supplemental Brief</u>") filed by certain Objectors.

## I.     <u>PA 436 Does Not Violate Art. II, § 9 of the Michigan Constitution</u>

The Objectors suggest that PA 436 violates Article 2, Section 9 of the Michigan Constitution because it is allegedly a "contrive[d] mechanism[ ] designed

---

[1]     Capitalized terms used but not defined herein shall have the meaning given to them in the (a) Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "<u>Orr Declaration</u>") and (b) City of Detroit's Pre-Trial Brief in (I) Support of Entry of an Order for Relief and (II) Opposition to Objections Requiring the Resolution of Issues of Material Fact (Docket No. 1240) (the "<u>City Pre-Trial Brief</u>").

13-53846-swr Doc 2335 Filed 12/27/13 Entered 12/27/13 16:42:26 Page 184 of 10
13-53846-tjt Doc 13859 Filed 12/27/13 Entered 12/27/13 16:56:36 Page 184 of 193

184

specifically to 'thwart' the referral process."  <u>See</u>, <u>e.g.</u>, RDPMA Supplemental Brief,

at 8-9.[2]  This assertion is unwarranted.

Under Michigan law, the motives of the Michigan legislature in passing

PA 436 (or any provision thereof) are irrelevant to an inquiry into the statute's

constitutionality.  <u>Michigan United Conservation Clubs v. Secretary of State</u>,

630 N.W.2d 297 (Mich. 2001), is instructive on this point.  Concurring with the

<u>Michigan United</u> majority's reversal of the Court of Appeals' holding that a statute

including an appropriations provision was nevertheless subject to referendum,

Chief Justice Corrigan observed that

> the Legislature's subjective motivation for making a
> $1,000,000 appropriation … – assuming one can be
> accurately identified – is irrelevant.    Intervening
> defendant contends that … the "purpose" of the
> appropriation … was to evade a referendum.    This
> argument is misplaced.    This Court has repeatedly held
> that courts must not be concerned with the alleged
> motives of a legislative body in enacting a law, but only
> with the end result – the actual language of the
> legislation….

---

[2]     A related argument offered by the RDPMA – that PA 436 is ineffective and
violates Article 2, Section 9 by virtue of having been enacted by the State
legislature prior to having been approved by a majority of the Michigan
voters – improperly assumes an identity between the rejected PA 4 and
PA 436 and is easily dispatched.  Unlike PA 4, PA 436 has never been the
subject of a referendum pursuant to Article 2, Section 9, and cannot be the
target of such power.  Voter approval of PA 436 was not a prerequisite to the
effectiveness thereof.  Likewise, Objectors identify no constitutional
prohibition against PA 436's passage solely because it addressed subject
matter similar to the recently-rejected PA 4 and none should be implied.

> [T]o make legislation depend upon motives would render all statute law uncertain…. Therefore the courts do not permit a question of improper legislative motives to be raised, but they will in every instance assume that the motives were public and befitting the station. They will also assume that the legislature had before it any evidence necessary to enable it to take the action it did take.

Mich. United, 630 N.W.2d at 298-99 (Corrigan, C.J., concurring) (quoting Cooley, Constitutional Law, pp. 154-55).[3]  The Michigan Supreme Court has made clear that, if the State's citizens believe its legislators to have been improperly motivated, their recourse is not the judiciary, but the constitutional powers of referendum and initiative *and the ballot box*.  See, e.g., Houston, 810 N.W.2d at 256 ("[I]t is the responsibility of the democratic, and representative, processes of government to check what the people may view as political or partisan excess by their Legislature."); Mich. United, 630 N.W.2d at 298 (emphasizing that "the intervening defendant retains a direct remedy, the initiative process.  Under our

---

[3]  See also Houston v. Governor, 810 N.W.2d 255, 256 (Mich. 2012) (stating that "nothing that is relevant [to determining the constitutionality of a statute] can be drawn from the political or partisan motivations of the parties"); Kuhn v. Dep't of Treasury, 183 N.W.2d 796, 799 (Mich. 1971) (rejecting argument that statutory language addressing meeting deficiencies in state funds was "a devious attempt to avoid the people's constitutional power of referendum;" stating that "[w]e will not concern ourselves with the legislators' motives for inserting the language regarding meeting deficiencies in the Act"); People v. Gardner, 106 N.W. 541, 542 (Mich. 1906) ("Nothing is better settled than the rule that the motives of a legislature or of the members cannot be inquired into, for the purpose of determining the validity of its laws.").

-3-

13-53846-swr  Doc 2335-9  Filed 12/27/13  Entered 12/27/13 16:56:36  Page 186 of 10
13-53846-tjt  Doc 1355  Filed 12/27/13  Entered 12/27/13 16:42:26  Page 186 of 10
193                                                                              186

state constitution, this remedy is available even when the Legislature has made an appropriation….").[4]

Even if Michigan law did not prohibit an inquiry into the motivations of Michigan's legislators (which it does), the evidence does not demonstrate that the State included appropriations provisions in PA 436 for the sole purpose of improperly insulating the legislation from referendum.  The RDPMA's citation to the deposition testimony of Howard Ryan, the State's Rule 30(b)(6) witness, shows only that (A) the appropriations provision was included in the legislation at an early stage in its development and (B) that PA 436 was intended to provide the State with options in the event of a municipal financial emergency should PA 4 be rejected.  See RDPMA Supplemental Brief, at 4-5.  There is nothing in the testimony cited by the RDPMA that suggests – much less that demonstrates – that such provisions were included for the allegedly improper purpose of frustrating

---

[4]    Consideration of the evidentiary challenges inherent in the attempt to divine a legislature's motivations demonstrates that the Michigan Supreme Court's long-standing rule against such attempts is well-founded.  For example, it would be essentially impossible for a court to determine the intentions of the sundry legislators in each of the legislature's two houses involved in a bill's passage.  Even if such a determination were possible, the court would be charged with determining whose intent was relevant (the majority's?  a majority of the majority?) and possibly whether such intent was the legislators' sole or even primary motivation.  See Houston, 810 N.W.2d at 256 ("[T]his Court possesses no special capacity, and there are no legal standards, by which to assess the political propriety of actions undertaken by the legislative branch.").

-4-

13-53846-tjt  Doc 2335-9  Filed 12/27/13  Entered 12/27/13 16:42:26  Page 187 of
13-53846-swr  Doc 1350  Filed 12/06/13  Entered 12/06/13 16:56:36  Page 4 of 10
193

187

Article 2, Section 9.[5]  Mr. Ryan is not a State legislator and, thus, did not vote on the bill, nor could he divine the intent of each legislator that voted on the bill.[6]

Moreover, the inclusion of appropriations provisions in PA 436 is simply irrelevant to an inquiry into the constitutionality of the statute.  The inclusion of appropriation provisions may be relevant to a frustrated attempt to subject legislation to the referendum process.  See Mich. United, 630 N.W.2d at 299-300 (Young, J., concurring) (describing an unsuccessful attempt to subject legislation to referendum).  Yet even a successful challenge to the inclusion of such provisions would not render the legislation unconstitutional; it would merely render it subject to referendum.  Where no such challenge has been made and no referendum process ever initiated (as is the case with PA 436), there is no practical, much less constitutional, consequence to the inclusion of such provisions.

---

[5]   Similarly, contrary to the RDPMA's suggestion, Jones Day and the State did not conspire to include an appropriations provision in PA 436.  The document cited to this effect – Objectors' Exhibit 201 – is an email dated March 2, 2012 (i.e., months prior to the drafting and proposal of PA 436) that does not even refer to an emergency manager statute in discussing the effect of appropriations provisions.  The notion that a months-old email – on a different topic – might have influenced the drafting of PA 436 is absurd.

[6]   Moreover, on October 28, 2013, the Governor testified – under direct examination from the RDPMA – that the appropriations provisions in PA 436 were included (a) to relieve municipalities of the burden of paying the salaries of emergency managers and the costs of financial consultants and (b) in direct response to concerns raised during the referendum process related to PA 4.  See Transcript of Hearing regarding Eligibility Trial conducted on October 28, 2013, at 223:4-14.

Accordingly, PA 436 does not violate Article 2, Section 9 of the Michigan Constitution and the City's satisfaction of section 109(c)(2) of the Bankruptcy Code cannot be undermined by the circumstances of PA 436's passage.

## II.    *Bekins* Confirms That Impairment of Municipal Contractual Obligations is Effected by the Bankruptcy Court

Numerous Objectors – concerned that the Pensions Clause's prohibition on impairment of pension obligations "[ ]by" the State would not apply to potential impairments of such obligations pursuant to a plan of adjustment – contest the proposition that any impairment of the City's various contractual obligations in this chapter 9 case will be effected not by the City or the State, but by the federal government through the Court.  E.g., AFSCME Supplemental Brief, at 4-8; Retiree Associations Supplemental Brief, at 7-8.  Yet the United States Supreme Court in United States v. Bekins, 304 U.S. 27 (1938), made clear that it is federal, and not state, power being exercised.  Citing the legislative history of former Chapter X of the Bankruptcy Act (the predecessor to chapter 9), the Bekins court identified the dilemma confronting "taxing agencies" (i.e., Chapter X's version of "municipality") in the absence of federal relief:  an inability to pay their debts on one hand and the lack of recourse to state municipal debt adjustment regimes forbidden by the Contracts Clause on the other.  "There is no hope for relief through statutes enacted by the States, because the Constitution forbids the passing of State laws impairing the obligations of existing contracts.  *Therefore, relief must come from Congress, if*

*at all.*" Bekins, 304 U.S. at 51 (citing S. Rep. No. 911, 75th Cong., 1st Sess.)

(emphasis added).

Chapter X resolved this dilemma:

> In the instant case we have cooperation to provide a remedy for a serious condition in which the States alone were unable to afford relief…. The natural and reasonable remedy through composition of the debts of the district was not available under State law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation. The bankruptcy power is competent to give relief to debtors in such a plight…. Through [the State's] cooperation with the national government the needed relief is given.

Id. at 53-54. Thus, Bekins confirms that, through consenting to the filing of a

municipality's bankruptcy petition, a State that is constitutionally forbidden from

impairing a municipality's improvident contracts nevertheless may allow such

municipality to obtain relief from the entity that *is* empowered to impair such

contracts: the federal government, acting through the bankruptcy court.

That federal power is exercised to impair municipal contracts in bankruptcy

was likewise recognized in Justice Cardozo's dissent in Ashton v. Cameron County

Improvement District No. 1, 298 U.S. 513 (1936), which dissent was joined by

three of the Justices in the Bekins majority, including Chief Justice Hughes, the

author of Bekins.

> The Act does not authorize the states to impair through their own laws the obligation of existing contracts. Any interference by the states is remote and indirect…. If

contracts are impaired, the tie is cut or loosened through the action of the court of bankruptcy approving a plan of composition under the authority of federal law. There, and not beyond in an ascending train of antecedents, is the cause of the impairment to which the law will have regard. Impairment by the central government through laws concerning bankruptcies is not forbidden by the Constitution. Impairment is not forbidden unless effected by the states themselves. No change in obligation results from the filing of a petition by one seeking a discharge, whether a public or a private corporation invokes the jurisdiction. The court, not the petitioner, is the efficient cause of the release.

Ashton, 298 U.S. at 541-42 (Cardozo, J., dissenting) (citations omitted). This rationale would be adopted by the Bekins majority just two years later in confirming the constitutionality of chapter 9's predecessor. Accordingly, longstanding Supreme Court precedent confirms that it is the federal – and not state – government that impairs contractual obligations in chapter 9, and the Objectors' arguments to the contrary must be rejected.

## III. The Pensions Clause Enjoys No Special Status in Chapter 9

The Objectors contend that the constitutional status of the Pensions Clause renders it qualitatively different than mere state statutory law and, thus, insulates it from pre-emption by the federal Bankruptcy Code. See AFSCME Supplemental Brief, at 2. The Objectors, however, offer no citation that might support their differentiation of one form of state law from another for pre-emption purposes. Indeed, as demonstrated in the City's prior briefing, far from being forbidden, the

pre-emption of state constitutional law – notably, the various state contracts clauses – is a commonplace in municipal bankruptcies. See Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 16 (Bankr. E.D. Cal. 2012) ("The federal bankruptcy power also, by operation of the Supremacy Clause, trumps the similar contracts clause in the California state constitution.").

The Pensions Clause similarly establishes no special priority for claims for pension underfunding. It merely establishes that such claims are contractual obligations of the State. Accordingly, arguments that claims for underfunding require separate classification under a plan of adjustment or that such claims should be exempted from discharge (see Retirement Systems' Supplemental Brief, at 6-8), in addition to being premature and irrelevant to a determination of eligibility, should be rejected.

Finally, multiple Objectors (see, e.g., AFSCME Supplemental Brief, at 3-4) identify the Supreme Court's decision in Midlantic National Bank v. New Jersey Department of Environmental Protection, 474 U.S. 494 (1986), as a source of protection for rights created by the Pensions Clause, which are characterized as necessary to public health and safety. The Objectors offer no citation in support of the proposition that the impairment of monetary claims implicates public health and safety, and the City's research has uncovered none. Accordingly, this argument must be rejected.

-9-
13-53846-tjt  Doc 2335-9  Filed 12/27/13  Entered 12/27/13 18:42:26  Page 9 of 10
13-53846-swr  Doc 1358  Filed 12/06/13  Entered 12/06/13 16:56:36  Page 192 of
193

192

For the foregoing reasons, and those set forth in the Prior Submissions and City Pre-Trial Brief, the Court should enter an Order for Relief in this case.

Dated:  November 6, 2013          Respectfully submitted,

 /s/  Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flowers Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY