# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

**Debtor In Possession**
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE−MI
Tax ID / EIN: 38−6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489−3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075−1505
248−359−7300
Fax : 248−359−7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky−Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359−7300
Fax : (248) 359−7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075−1505
(248) 359−7300
Fax : (248) 359−7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496−8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212−326−3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496−7591
Email: swansonm@millercanfield.com

(202) 408−7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2313 | Transcript Order Form of Hearing October 15, 2013, Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name __David M. Eisenberg__

Firm __Erman, Teicher, Miller, Zucker & Freedman, P.C.__

Address __400 Galleria Officentre, Suite 444__

City, State, Zip __Southfield, MI 48034__

Phone __248-827-4100__

Email __deisenberg@ermanteicher.com__

**Case/Debtor Name:**

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** _Hon. Steven Rhodes_

◉ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/15/2013_ **Time of Hearing:** _9:00 a.m._ **Title of Hearing:** Eligibility Hearing

Please specify portion of hearing requested:   ◉ **Original/Unredacted**   ○ Redacted   ○ Copy (2nd Party)

◉ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

---

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

◉ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com



FOR COURT USE ONLY

Transcript To Be Prepared By

_____ _____
(Date)            (By)

Order Received: _____

Transcript Ordered: _____

Transcript Received: _____

**Signature of Ordering Party:**

/s/ David M. Eisenberg _____ Date: __12/26/13__

By signing, I certify that I will pay all charges upon completion of the transcript request.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        October 15, 2013
                Debtor.         .        10:00 a.m.
. . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
        BEFORE THE HONORABLE STEVEN W. RHODES
        UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

For the State of       Michigan Department of Attorney General
Michigan:              By:  MARGARET A. NELSON
                       P.O. Box 30758
                       Lansing, MI  48909
                       (517) 373-1124

For AFSCME,            Lowenstein Sandler, LLP
AFL-CIO, and Sub-      By:  SHARON L. LEVINE
Chapter 98, City       65 Livingston Avenue
of Detroit             Roseland, NJ  07068
Retirees:              (973) 597-2374

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT GORDON
General Retirement     151 South Old Woodward, Suite 200
System of Detroit,     Birmingham, MI  48009
Police and Fire        (248) 988-5882
Retirement System
of the City of
Detroit:

APPEARANCES (continued):

```
For the Official      Dentons
Committee of          By:  CLAUDE D. MONTGOMERY
Retirees:             620 Fifth Avenue
                      New York, NY  10020
                      (212) 632-8390

For the Inter-        Cohen, Weiss & Simon, LLP
national Union,       By:  BABETTE A. CECCOTTI
UAW:                       PETER D. DECHIARA
                      330 West 42nd Street, 25th Floor
                      New York, NY  10036-6976
                      (212) 356-0227

For the Flowers       Law Offices of William A. Wertheimer
Plaintiffs:           By:  WILLIAM WERTHEIMER
                      30515 Timberbrook Lane
                      Bingham Farms, MI  48025
                      (248) 644-9200

For the Detroit       Erman, Teicher, Miller, Zucker &
Fire Fighters            Freedman, P.C.
Association, the      By:  BARBARA A. PATEK
Detroit Police        400 Galleria Officentre, Suite 444
Officers Associa-     Southfield, MI  48034
tion and the          (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

Interested            KRYSTAL CRITTENDON
Party:                19737 Chesterfield
                      Detroit, MI  48221

For Retired           Strobl & Sharp, PC
Detroit Police        By:  LYNN M. BRIMER
Members               300 East Long Lake Road, Suite 200
Association:          Bloomfield Hills, MI  48304-2376
                      (248) 540-2300

For Detroit           Silverman & Morris, PLLC
Retired City          By:  THOMAS R. MORRIS
Employees             30500 Northwestern Highway, Suite 200
Association,          Farmington Hills, MI  48334
Retired Detroit       (248) 539-1330
Police and Fire
Fighters Association,
Shirley V. Lightsey,
and Donald Taylor:
```

APPEARANCES (continued):

```
For David Sole:         Jerome D. Goldberg, PLLC
                        By:  JEROME GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001

For the United          U.S. Department of Justice
States:                 Civil Division
                        By:  MATTHEW J. TROY
                        P.O. Box 875
                        Ben Franklin Station
                        Washington, D.C.  20044
                        (202) 514-9038

For Center for          Vanessa G. Fluker, Esq., PLLC
Community Justice        By:  VANESSA G. FLUKER
and Advocacy:           2921 East Jefferson, Suite 200
                        Detroit, MI  48207
                        (313) 393-6005


Court Recorder:         Letrice Calloway
                        United States Bankruptcy Court
                        211 West Fort Street
                        21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning, everybody.  I'd like to

4   take appearances from the attorneys who will be speaking here

5   today first.  Can we do that?

6          MR. BENNETT:  Thank you, your Honor.  Bruce Bennett,

7   Jones Day, on behalf of the city.

8          MS. NELSON:  Good morning, your Honor.  Assistant

9   Attorney General Margaret A. Nelson on behalf of the State of

10  Michigan.

11         MS. LEVINE:  Good morning, your Honor.  Sharon

12  Levine, Lowenstein Sandler, for AFSCME.

13         MR. GORDON:  Good morning, your Honor.  Robert

14  Gordon of Clark Hill on behalf of the Detroit Retirement

15  Systems.

16         MR. MONTGOMERY:  Good morning, your Honor.  Claude

17  Montgomery, Dentons U.S., for the Official Committee of

18  Retirees.

19         MS. CECCOTTI:  Good morning, your Honor.  Babette

20  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.

21         MR. WERTHEIMER:  Good morning, your Honor.  William

22  Wertheimer on behalf of the Flowers plaintiffs.

23         MS. PATEK:  Good morning, your Honor.  Barbara Patek

24  of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

25  Detroit Public Safety Unions.

1    MS. CRITTENDON:  Good morning, your Honor.  Krystal

2    Crittendon, interested party.

3    MS. BRIMER:  Good morning, your Honor.  Lynn M.

4    Brimer appearing on behalf of the Retired Detroit Police

5    Members Association.

6    MR. MORRIS:  Good morning, your Honor.  Thomas

7    Morris of Silverman & Morris on behalf of the Retiree

8    Association parties.

9    MR. GOLDBERG:  Good morning, your Honor.  Jerome

10   Goldberg on behalf of interested party David Sole.

11   MR. TROY:  Good morning, your Honor.  Matthew Troy,

12   Department of Justice, Civil Division, on behalf of the

13   United States.  It is not my intention to speak this morning,

14   your Honor, unless you have specific questions regarding our

15   filing from Friday.

16   THE COURT:  Thank you, sir.  Mr. Gordon.

17   MR. GORDON:  Thank you, your Honor.  I just wanted

18   to provide the introduction relative to our proposed

19   allocation of the time and order of presentation here this

20   morning.  As your Honor can see from the document that was

21   filed, there are 11 objectors who wish to speak, and, of

22   course, they all have important points to make, but -- and we

23   very much appreciate the cooperation amongst all of them.  It

24   was a good and constructive process.  Not only was that easy,

25   but everyone has been very cooperative, and we've allocated

1 the time accordingly to various parties to have the

2 opportunity to speak today.

3          You will note, your Honor, a couple things.  One, we

4 did not allocate the full 120 minutes in the morning.

5 There's a few minutes left over.  Similarly, in the afternoon

6 there's about five minutes left over of the 90 minutes.

7 That, of course, is not intended to necessarily waive our

8 opportunity to have the full time, but we thought that would

9 build in some flexibility and some error margin as people

10 stand up and sit down to make sure that we fit within the

11 time frame.

12          Also, as footnote one indicates, the presentation

13 order does not necessarily tie -- correspond discretely with

14 each of the issues as listed in your scheduling order, your

15 Honor.  There is some correlation, but various parties, as

16 the Court, I'm sure, can understand, have a number of issues

17 that they would like to address.  There will be some overlap.

18 The parties are going to try to overlap as little as

19 possible, but it was not really feasible to try to identify

20 discrete issues that each party was going to take on, so

21 instead the hope is that as each party comes to the podium,

22 they'll try to give you a little bit of a road map as to the

23 particular issues that they're going to touch upon.

24          THE COURT:  Thank you, and thank you for your

25 extraordinary effort in coordinating this.  I'm sure it was a

1   challenge.  And I also want to thank all of the attorneys for

2   cooperating with Mr. Gordon and with the Court in trying to

3   organize this as best we can.  So we're going to start then

4   with AFSCME's counsel, and we're going to try to run the

5   timing mechanism for your convenience.  Kelli, have we got

6   that available?  I'm sorry.

7          MS. LEVINE:  They were teasing me that if I'm

8   nervous, it'll take 20 minutes, but if I remember to speak

9   slowly, it'll take 35.

10         THE COURT:  Okay.  So for 35 minutes you may

11   proceed.

12         MS. LEVINE:  Thank you, your Honor.  First, we

13   appreciate the opportunity.  We think these issues are

14   extremely important, and we're glad that we have the

15   opportunity to speak.  Second, as Mr. Gordon correctly noted,

16   the parties who are speaking here today have made a concerted

17   effort to divide up the time and to try not to duplicate our

18   comments, so in that regard we're reserving the right to rely

19   on the filed objections along with the other arguments of

20   other counsel simply because we won't have time to do it all

21   ourselves.

22         With that, your Honor, we started this endeavor by

23   looking at PA 436 specifically concerned, as you might

24   imagine, with the pension issues and with the fact that we

25   believe that the Michigan Constitution provides for

1 protections for vested pension benefits, and then that

2 potentially conflicted with PA 436, and, therefore, we

3 started looking at the issue of whether PA 436 was, in

4 fact -- was, in fact, unconstitutional in that it allowed a

5 Chapter 9 filing in light of the pensions -- in light of the

6 pension restriction in the Constitution.

7 In addition to that, we were looking at the

8 governor's authorization in allowing the Chapter 9 filing in

9 light of PA 436 and in light of the Michigan Constitution and

10 grappling with the issue of whether or not that authorization

11 without any contingencies caused this Chapter 9 filing to be

12 unconstitutional as applied.

13 In addition to that, we grappled with the ripeness

14 issue as to whether or not all of these issues should be

15 raised now or whether they should be raised in connection

16 with a plan of adjustment, specifically, your Honor,

17 grappling with the issue as it was presented to us by our

18 members where we have folks literally sitting at their

19 kitchen table deciding whether or not they can take medicine

20 today or do they have to start taking it every other day, do

21 they feed themselves, do they feed their children, do they

22 pay rent, so we came to this Court anxious to have some of

23 these issues decided quickly.

24 On top of that, as it turns out, involved in the

25 mediations and the other efforts with regard to the serious

1  issues that are confronting Detroit, we do think

2  understanding your Honor's views of the rules of the game

3  could be useful for the parties in that process, but that's

4  really by way of introduction because what we've done, your

5  Honor, in addition to that, is we started researching how we

6  thought PA 436 fit in the overall scheme of Chapter 9 and, in

7  looking at those issues, delving into whether or not Chapter

8  9 itself was, in fact, unconstitutional, which is what we

9  will address before your Honor this morning.  And I'd like

10  to, with the Court's permission, set the table a little bit

11  but promise to get into Bekins and some of the cases that are

12  cited by folks who disagree with our views later on in the

13  comments.

14        So I'd ask you, your Honor, to come back with me, if

15  you will, to elementary and high school when we first started

16  talking about what the Constitution is and what it means,

17  and, respectfully, when we go back, we remember that the

18  framers of the Constitution were fleeing an oppressive,

19  overbearing, centralized government.  So when we started

20  looking at how we framed our Constitution, we were very

21  careful to make sure that there was a federal Constitution

22  that was extremely limited only to specific rights that we

23  believed should transcend every single state in the union,

24  and we've come to call those the unalienable rights, and they

25  refer to things like freedom of speech and freedom of

1    religion.  And under the Tenth Amendment, your Honor,

2    everything else is reserved for the states, so specifically

3    reserved for the states are the state municipal governments'

4    rights to handle their own financial management.  And this is

5    done, your Honor, not to protect the states, which would have

6    been as suggested by the New Jersey plan, but was actually

7    done to protect the individual citizens, as suggested by the

8    Virginia plan, and the specific rationale behind protecting

9    the individual citizens was in order to have accountability

10   from our government and particularly, more importantly, from

11   our local governments, which were viewed as being more

12   accessible to the citizens that they were -- that they were

13   supposed to be taking care of.  So, for example, if somebody

14   infringes on my right of free speech or my right of freedom

15   of religion, I know I point my finger to D.C., and I look at

16   the federal government, and I say to the federal government,

17   who is accountable for those federally protected rights,

18   "Make them stop," but if somebody says to me that there's an

19   inappropriate use of the power over the financial management

20   of a state municipality, of, for example, Detroit, I look to

21   my local government.  I look to my local politicians and my

22   local leaders, and I say, "I'm holding you accountable," and

23   we saw that working well very recently with the mayor of

24   Detroit -- with the prior -- apologies -- prior mayor of

25   Detroit, so this direct accountability, which is a

1  cornerstone of how we -- of how we run our country and how we
2  run this democracy, is there for a reason, and it's not there
3  to protect the states.  It's there to protect the citizens.
4  The Constitution doesn't start "We the states."  It doesn't
5  say, "I the general federal government."  It starts, "We the
6  People."  So now, as we indicated in our brief, we believe
7  there is what we've called this unholy alliance between the
8  state giving authorization to the federal government to run
9  this Chapter 9 process.  And what we said there, your Honor,
10 is that the states are, in essence, ceding the responsibility
11 and the accountability for their own financial management, so
12 by turning over under Chapter 9 to the federal government and
13 being able to hide behind the bankruptcy process and this
14 Court, we lose that accountability that's a cornerstone of
15 what our Constitution requires of us, and we've seen that
16 already.  We saw that debtor's counsel correctly noted in an
17 internal e-mail exchange back in January of 2013 that making
18 this a federal issue provides political cover, and we've seen
19 it in the depositions where we're talking to the EM and the
20 governor, and they are talking about the fact that they're
21 not exactly sure what's going to happen with the pensions.
22 The bankruptcy process takes care of that.  And we would
23 respectfully submit, your Honor, that we're seeing play out
24 in real time and real life the exact loss of accountability
25 that the Constitution was designed to protect, so --

1      THE COURT:  Well, but hasn't state consent been a
2  cornerstone of the Supreme Court's Tenth Amendment
3  jurisprudence?

4      MS. LEVINE:  Your Honor, we'll talk about the
5  consent in <u>Bekins</u>, and we don't believe that what we're
6  saying here today is inconsistent with state consent.  And if
7  your Honor will give me a little bit more leeway, we'll reach
8  that point --

9      THE COURT:  Sure.

10      MS. LEVINE:  -- because we understand the issue.  So
11  one of the comments that's being made is that in order for
12  there to be -- that the reason why we can't do it at the
13  state level, the reason why the state municipal governments
14  can't do it is because it violates the contract clause, and
15  by violating the contract clause, you can't do a plan of
16  adjustment unless you have a hundred percent consent.

17      Now, we would respectfully submit, your Honor, that
18  there's two responses to that, and they are -- and I'll admit
19  they're diametrically opposed, but under either response you
20  don't get to the place where you get to take it away from the
21  states.  Number one, if you believe, as suggested, that you
22  need a hundred percent consent at the state level because of
23  the contract clause, then we would respectfully submit that
24  the states can't cede control to the federal government and
25  then suddenly it becomes legal to do a plan of adjustment

 1  without a hundred percent consent.  And, your Honor, in doing
 2  that, we're actually just reading from the Constitution
 3  itself.  The contract clause is in Section 10 of Article I of
 4  the Constitution.  Section 10, Article I, of the Constitution
 5  has three subsections, one, two, and three.  In the first
 6  section, it talks about no state shall enter into treaties
 7  with foreign countries, print money, and it's the contract
 8  clause.  Under sections two and three, not where the contract
 9  clause sits, it says, "No State shall without the consent of
10  Congress," so by the plain reading of the Constitution, if
11  "no state shall" means no state shall, then no state shall do
12  it with or without the consent of Congress, and the framers
13  clearly understood that if they wanted the states to be able
14  to do it with the consent of Congress, they could have done
15  what they did in the two other subsections and basically
16  said, okay, instead we'll do it -- we'll do it with a federal
17  municipal bankruptcy statute where the federal government
18  will consent, and, therefore, you can violate the contract
19  clause.  So our first point is under the contract clause, "no
20  state shall" means no state shall, and if we're going to be
21  intellectually honest with ourselves, that applies regardless
22  of whether or not Congress consents because it's not, as in
23  Section 10, the second and the third paragraph, "No State
24  shall without the consent of Congress."
25          THE COURT:  What Supreme Court case law supports

1   this interpretation?

2        MS. LEVINE:  Your Honor, we respectfully submit that

3   it's <u>Ashton</u>.

4        THE COURT:  The case that <u>Bekins</u> overruled?

5        MS. LEVINE:  Well, we don't believe that <u>Bekins</u>

6   overruled it, and if I can keep going, the alternative

7   approach -- and, frankly, the plain meaning of the statute we

8   don't believe yet -- or I'll admit we haven't found yet a

9   constitutional case that comes right out and says it is or it

10  isn't done this way, but it is the plain reading of the

11  Constitution, which we thought was --

12       THE COURT:  Okay.

13       MS. LEVINE:  -- a good place to start.  But moving

14  past that, let's assume -- and we believe the better answer

15  is that there has to be a way to adjust debts.  Then we go

16  back to where we started, your Honor, which is this is

17  absolutely a state municipal right.  What <u>Bekins</u> was looking

18  at -- and remember <u>Bekins</u> was decided in -- right in the

19  middle of the Great Depression.  Okay.  And so up until

20  the -- up until just before <u>Bekins</u> was decided, there was no

21  municipal federal bankruptcy law at all.  It wasn't really

22  contemplated by the framers, and I'll get into that a little

23  bit more in a minute, but what <u>Bekins</u> found was we now have

24  this new federal municipal bankruptcy law.  There is no state

25  counterpart, so the only option that's available to the state

1   and the only way that the state can be accountable to its

2   citizens to fix this problem if there is no other option

3   available is to then consent to the federal court stepping in

4   and doing this.  Consistent with that, your Honor, we

5   believe, is _Asbury Park_, and we would respectfully submit

6   that _Asbury Park_ was decided after _Bekins_.  It was decided --

7   it wasn't a unanimous decision, but there was only one

8   concurrence, so there was no dissent.  It was drafted by

9   Judge Frankfurter, hardly, you know, a slouch, and it

10  specifically upheld _Bekins_ but further found that a state --

11  in that case, New Jersey -- could correctly under its state

12  municipal authority do a plan of adjustment that did not

13  require 100 percent of consent, and in dealing with this

14  issue, it found that to be consistent with _Bekins_ because

15  _Bekins_ was looking at a situation where there was no state

16  alternative for the state to choose, and the state only had

17  one alternative, and it made the alternative to rely on the

18  federal statute.  And it further found -- and I'm going to

19  quote just for a moment, Judge, but in dealing with this

20  issue, the Court posed and then answered this very question.

21  "Can it be that a power that was not recognized until 1938,"

22  which is a federal municipal bankruptcy law, "when so

23  recognized, was carefully circumscribed to reserve full

24  freedom" -- that's how _Bekins_ interprets it -- "to the States

25  has now been completely absorbed by the Federal Government -

1  that a State which, as in the case of New Jersey, has after

2  long study devised elaborate machinery for the autonomous

3  regulation of problems as peculiarly local as the fiscal

4  management of its own household, is powerless in this field?

5  We think not."  And we think that's very telling, your Honor.

6  And by the way, Asbury Park is still good law.  Like Bekins,

7  which it is consistent with, it has not been overruled, so

8  the -- then we were grappling with, well, why hasn't anybody

9  looked at this issue.  What happened after Asbury Park was

10  that the Bankruptcy Act incorporated a federal municipal

11  bankruptcy statute, which is a predecessor to 903, which

12  specifically includes a provision that provides, like 903,

13  that no state can enter into a plan of adjustment unless

14  there is a hundred percent consent.  We find that interesting

15  that it's the federal statute.  Basically, that's Article --

16  that's Chapter 9 saying Chapter 9 is constitutional, and the

17  states can't enter into an alternate separate plan of

18  adjustment with less than a hundred percent because Chapter 9

19  says so.  It's a circular argument, we would submit, your

20  Honor, that can't possibly be the reason why the states can't

21  enter into a plan of adjustment, especially in light of

22  Asbury Park, with less than a hundred percent consent.

23       In addition to that, the other telling conclusion in

24  Asbury Park was when they addressed head on the issue of the

25  contract clause, they determined that the contract clause is

1    not violated when you don't actually violate the underlying

2    contract.  They were analogizing it to like the property

3    rights, so while you have a contract right and that can't go

4    away or you have a property right and that can't go away,

5    what they were talking about in Asbury Park was what's the

6    remedy, and the remedy in a Chapter 9 -- and we would

7    respectfully submit the remedy in a state -- appropriate

8    state plan of adjustment is to take what is now a valueless

9    right -- contract right because the state municipality is

10   insolvent and create a plan of adjustment that, like in the

11   corporate bankruptcy setting, creates value for a right that

12   had no value.  We're not doing away with the contract, and a

13   lot of the cases that come after that -- for example, United

14   Trust that talks about taking away the bonds or changing the

15   bonds -- Asbury Park says you're not taking away the

16   contract, you're not taking away the bonds, you're not taking

17   away our retiree benefits.  All you're doing is you're

18   saying, "Look, there's not enough money here to pay for it.

19   We can't get it through taxation.  We need to -- we need to

20   fashion a remedy."  And that, your Honor, we would

21   respectfully submit is consistent with Bekins, with Asbury

22   Park, and with an appropriate reading of the contract clause.

23          Turning now to the bankruptcy clause, there is a --

24   there is a provision that provides for a national bankruptcy

25   statute.  How can Chapter 9 be unconstitutional if we have

1   a -- if we have a bankruptcy clause that says there's a

2   national uniform bankruptcy statute?  Number one, we're

3   directing our comments specifically at Chapter 9.  We're not

4   saying there is no statute that could be -- that could fit

5   within the parameters.  But that said, one of the things we

6   would observe about the bankruptcy clause is when the framers

7   framed the Constitution, it was inconceivable to them that

8   there would be a national municipal bankruptcy law.  To this

9   day there is no national municipal bankruptcy law in the EU.

10  And while Chapter 11 provides a very viable way to enable

11  commerce and Chapter 7 provides a very viable way for there

12  to be a fresh start -- and we've avoided debtor's prison and

13  all of the things that the framers were focused on at the

14  time -- there was no -- and there wasn't until the Great

15  Depression a national municipal bankruptcy law.

16          Second, we think there's a problem with Chapter 9

17  specifically because the requirement of the national

18  bankruptcy law is that it be uniform, so whether I'm here in

19  Detroit or in any other state or city in the country, I know

20  what the -- I know what the criteria is to be a corporate

21  debtor.  It's right in the Code.  I know what the criteria is

22  to be a Chapter 7 debtor.  It's right in the Code.  But

23  because Chapter 9 is struggling with the difference of the

24  separation of what's a federal power and what's a state

25  power -- and we respectfully submit struggling in a way that

1  didn't work -- Chapter 9 is not a uniform statute.  There are

2  some states that have objective standards so that everybody

3  in their particular state has to meet a certain criteria in

4  order to be a Chapter 9 debtor.  There are some states that

5  don't even have the ability to be a Chapter 9 debtor, and

6  then there are some states, like Michigan, where even though

7  there's a statute that purports to authorize Chapter 9

8  filings, it is completely and totally subjective with regard

9  to who qualifies, whether they get authorization to file, and

10  whether or not there are any contingencies that are attached

11  to what they do when they're in that filing.

12          THE COURT:  Okay.  So how do you distinguish the

13  cases that uphold the nonuniformity of exemptions in Chapter

14  7?

15          MS. LEVINE:  Your Honor, one of the -- two responses

16  to that.  First of all, we understand the case law that says

17  that you can have conformity in a geographic location, so we

18  understand, for example, that if every state had an objective

19  standard the way every state has its own exemptions in

20  Chapter 7, that that could meet the criteria for uniform

21  standards, but we're saying something different.  In Chapter

22  9 we don't know that every state has a standard or that

23  they -- and if they don't have a -- and if they don't have a

24  standard for becoming a Chapter 9 debtor, there is no default

25  back to that which is provided under the Code.  In other

1   words, in Chapter 7, if I like Detroit's exemptions, I use

2   Detroit's exemptions. If I like the federal exemptions, I

3   use the federal exemptions. But there is no place where I

4   don't get to be a debtor or I don't get exemptions.

5         THE COURT: Well, but still the question remains how

6   does a nonuniformity among states in authorizing or not

7   authorizing Chapter 9 or in having different standards for

8   seeking Chapter 9 protection make the federal law nonuniform?

9         MS. LEVINE: Well, your Honor, if you take that to

10   its natural conclusion, you can say that I have a federal law

11   that basically says you can do whatever you want, but because

12   I'm saying you can do whatever you want to everybody, it's

13   uniform. We would respectfully submit that that doesn't --

14         THE COURT: Isn't that just about what the Chapter 7

15   exemption cases say? Beyond that, federal law outside of

16   Chapter 9 applies state property law, generally speaking,

17   and, of course, the property law differs from state to state

18   to state.

19         MS. LEVINE: Yes. And that goes back to the line of

20   cases that talk about geographic, that they can be -- that

21   they can be uniform within a geographic area. The difference

22   between all of those cases -- and then I'll let the point

23   rest because you are the Judge, and we may have to agree to

24   disagree --

25         THE COURT: I'm just asking questions.

1    MS. LEVINE:  But the -- but we view that, as I said

2    earlier, that those exemptions, those criteria are published.

3    Okay.  So even if I know that I'm not going to follow -- that

4    if I'm going to follow state law with regard to UCC

5    priorities or if I'm going to follow state law with regard to

6    exemptions, in a specific geographic area I know exactly what

7    that is.  In the states that have the subjective test with

8    regard to whether or not to file a Chapter 9, Detroit has a

9    different standard than Lansing and has a different standard

10   than other cities, and that's the issue, and the issue -- and

11   not only that, but none of those cities know what that

12   standard is.  And I'll leave it there.

13        THE COURT:  Okay.

14        MS. LEVINE:  Your Honor, the other argument that's

15   out there is, well, doesn't the state have -- doesn't the

16   state have the ability to cede control if there's federal

17   aid.  Your Honor, we would respectfully submit that's a very

18   different situation.  If you're looking at a situation, for

19   example, like Sandy or like Katrina where the federal

20   government is saying we're going to give you money under

21   specific terms and conditions, that's different.  Nobody is

22   saying to Detroit or nobody is saying to every single Chapter

23   9 debtor if you file Chapter 9, you get "X" amount of money

24   from the United States of America, and in exchange for that,

25   you have to follow these certain rules.  There's a difference

1 between entering into a contract for money and for support

2 than ceding control just to do the plan of adjustment with no

3 financial support.

4       THE COURT: Well, but the cases in which the Supreme

5 Court has held the Tenth Amendment is violated by the federal

6 government or the federal government's legislation involve

7 what's called commandeering. Is there any of that here?

8       MS. LEVINE: Well, your Honor, we think that's -- we

9 think that is, in part, what is happening here. The

10 commandeering is they're taking away the state's right or

11 the -- to do their own financial management.

12       THE COURT: But only because the state showed up.

13       MS. LEVINE: But that's not true, and this is where

14 we go back to the Bekins --

15       THE COURT: Is there anything in Chapter 9 that

16 compelled the state to authorize the city to file this case?

17       MS. LEVINE: Yes, and this is -- and this is where

18 the argument comes. Okay. In Bekins there was no state

19 alternative at all. In Asbury Park -- so, therefore, the

20 Bekins Supreme Court made the decision that the state had no

21 choice if it wanted to adjust its debt but to come to the --

22 but to come to the federal court. In Asbury Park there was a

23 state alternative to the federal statute that was -- and that

24 was permitted by both the federal statute and the state

25 statute, so the arguments outside of the federal statute that

1  said you can't go to federal -- you can't do it statewide,

2  you have to go to federal court under the commerce clause and

3  otherwise, were rejected for some of the reasons that we're

4  discussing here today.  In Chapter 9 four year -- or the

5  predecessor to Chapter 9, four years after Asbury Park, the

6  Bankruptcy Code in its municipal statute said we can adjust

7  debts at the federal level if you use the Bankruptcy Act, now

8  the Bankruptcy Code, but you, states, cannot because of how

9  we read the commerce clause only -- state municipal

10  governments cannot adjust debt except with a hundred percent

11  consent, so what the -- so what Chapter 9 says to the

12  governor is if you want to do a plan of adjustment without a

13  hundred percent consent, you must come to the federal

14  government, number one.  Number two, your Honor --

15       THE COURT:  Well, but the commandeering cases

16  address situations where the state and -- the federal

17  government imposes on the state to carry out some federal

18  program, some federal policy.  How does that work here?  So,

19  for example, in the New York case, which involved the waste,

20  right, nuclear waste or whatever, the state was forced to

21  take title to it under certain circumstances, and the Court

22  held that the state couldn't be imposed upon to do that to

23  carry out the federal policy of how to dispose of this waste.

24  How is that analogous here?

25       MS. LEVINE:  Well, your Honor, the reason why we

1   believe it's analogous is because in order to do a plan of

2   adjustment, arguably there's no other way to do that without

3   using Chapter 9 unless you have a hundred percent consent,

4   and that's the commandeering.  The requirement that there be

5   a hundred percent consent unless you're the federal

6   government means that the state has no ability to do a plan

7   of adjustment unless it cedes control to the federal

8   government and to the bankruptcy process.

9           Your Honor, I'm coming up on time.  If I -- unless

10  your Honor has more questions, if I could just close briefly.

11          THE COURT:  Well, the other question I have for you

12  is what about the cases that hold that the lower courts are

13  to apply Supreme Court precedent until the Supreme Court

14  itself overrules it, and this is, of course, the Bekins case?

15          MS. LEVINE:  Well, your Honor, our -- we would

16  respectfully submit that Asbury Park was decided after

17  Bekins.  Right now where the Supreme Court sits is that

18  Bekins stands for the proposition that in the face of no

19  state alternative, which is what existed there, you can turn

20  to the federal statute.  Asbury Park stands for the

21  proposition that side by side an appropriate municipal

22  bankruptcy law and an appropriate state law, that's where the

23  state gets to choose, and if the state, as it did in Asbury

24  Park, chooses an appropriate state law that does permit for

25  the adjustment of debt, then the state is accountable to its

1 | citizens.  If the state chooses the municipal law, then the
2 | state is accountable to its citizens.  But either way, it's a
3 | true state decision.  Consistent with both of those cases, we
4 | find ourselves here in Detroit with a situation where there
5 | is prohibited by Chapter 9, we believe unconstitutionally, no
6 | ability to have that second state decision.

7 | THE COURT:  Just so I understand, your argument is
8 | that the current Chapter 9 is different enough from Bekins
9 | because of its exclusivity that Bekins is not binding on this
10 | Court.

11 | MS. LEVINE:  Correct, and secondarily that Bekins
12 | never reached the issue because regardless of whether or not
13 | Bekins had an inappropriate -- the Bekins statute had an
14 | inappropriate clause, the state wasn't looking to have a
15 | separate -- you know, here we have PA 436 looking to try and
16 | pigeonhole itself into the strictures of Chapter 9 reviewing
17 | Chapter 9 as unconstitutional.

18 | Your Honor, we believe your Honor is faced with a
19 | difficult decision here.  We understand that Detroit is --
20 | all that's happening here is difficult.  Detroit is in dire
21 | financial straits, and it's not lost on any of us that the
22 | decisions that you make with regard to the criteria for
23 | eligibility, particularly with regard to Chapter 9, will have
24 | implications for blighted cities throughout the United
25 | States.  We also understand that constitutional issues are

1   difficult issues.  We heard -- you know, we've been grappling

2   since 9/11, for example, with the balancing between homeland

3   security and individual privacy rights.  We started talking

4   earlier about the First Amendment, and as a society we

5   grapple between where does First Amendment end and where does

6   a hate crime, for example, begin.  This is no less an

7   important constitutional issue because of the impact this

8   will have on state sovereignty and the ability of its

9   citizens to hold its own municipal leaders accountable.

10          Your Honor spent a long time listening to a lot of

11  individual objectors here in this courtroom talk about how

12  bad they felt things were in Detroit trying to deal with the

13  fact that their firemen were using garden hoses, you know,

14  street lights are out, all of these things, and your Honor

15  was clearly sympathetic.  And it was -- and concluded that

16  hearing, we believe correctly so, by saying that this was a

17  great day for democracy, but we would also add, your Honor,

18  that despite the fact that these things are at the forefront

19  of your mind and you want to do what's right, that doesn't

20  necessarily mean that you can do what's expedious -- what's

21  expedient.  Democracy is hard, and we would respectfully ask

22  that your Honor consider these issues with the same depth and

23  consideration that you've considered everything in this case

24  to date.  Thank you.

25          THE COURT:  Thank you.  Mr. Montgomery also for 35

1  minutes.

2        MR. MONTGOMERY:  Yes, sir.  Thank you.

3        THE COURT:  You may begin.

4        MR. MONTGOMERY:  Good morning.  Your Honor, my task

5  today is to discuss with you constitutionality as applied,

6  the standing and ripeness issue that the U.S. government has

7  posed to our constitutionality as applied to argument, and to

8  identify for you the predicate of that unconstitutionality as

9  applied, which, of course, we believe is the unconstitutional

10  behavior of Emergency Manager Orr and the governor in the

11  context of PA 436.

12        I'd like to set the stage briefly for you, your

13  Honor, on the question of standing by setting up two lines

14  of -- view of history here.  One is that in 1963 the State of

15  Michigan amended its Constitution to protect the pensions of

16  municipal workers.  Partly in reliance on that protection, a

17  small minority of the millions of people who have lived and

18  worked in the city went to work directly for the city.  Of

19  those, thousands of people who worked, about 23,000 people

20  are alive today who are retirees of the City of Detroit,

21  their beneficiaries and surviving spouses.

22        Now, those 23,000 people have been, in our view,

23  stalked by the emergency manager, who, with the blessing and

24  support of his advisors, has proposed to eliminate pensions

25  through a Chapter 9 process.  On July 16th the emergency

1   manager sought permission from the governor to file a Chapter

2   9.  On July 18 the governor, with full knowledge of the plans

3   of his emergency manager, gave unconditional permission to

4   the emergency manager to file that Chapter 9 petition.  And

5   the first overt harm has, in fact, now been announced.  On

6   October 11, the city mailed its books to the retirees

7   announcing the termination of the retiree health insurance

8   program for those same 23,000 people.

9          Now, the committee that I represent, your Honor,

10  consists of nine individuals, including retirees, deferred

11  vested, retirement eligible, surviving spouses and

12  beneficiaries, all of whom are protected by the pension

13  clause, all of whom are adversely affected by the harm that

14  was just announced by the city.  Each has or represents

15  vested accrued pension benefits, and they are participants in

16  the city's retirement health system.

17         The retiree committee consists of creditors

18  appointed by the U.S. Trustee to act in connection with the

19  case under 1102 and we think, therefore, have standing under

20  1109.  Now, the 1109 standing of being an interested party

21  may not be sufficient for either standing or ripeness on a

22  constitutionality issue, but we say to you -- we ask your

23  Honor to look at the current situation in the following

24  analogy.  When can somebody turn and defend themselves when

25  they are being threatened with harm?  We think that you don't

1   actually have to wait until the harm has befallen you if the
2   threat is imminent, if the threat is capable of redress by
3   the Court, and it is identifiable.  The redress by the Court
4   is, of course, denial of eligibility to the city.  The threat
5   is loss of pensions as announced by the emergency manager.

6           THE COURT:  Of course, if eligibility is denied, the
7   city is also denied its right to deal with all of its other
8   debts, isn't it?

9           MR. MONTGOMERY:  Your Honor, that may be a temporary
10  delay because if your Honor holds that the current
11  authorization papers are not constitutional or if accepted,
12  despite their lack of constitutionality, the challenge to
13  Chapter 9 becomes insurmountable, we think that the
14  reasonable thing this Court could do if it were so inclined
15  would be to deny the city its eligibility for the reasons of
16  the challenge to the pension clause and then invite the city
17  to come back with either a conditional acceptance by the
18  governor or otherwise correct their manifest intent to
19  violate Article IX, Section 24.

20          THE COURT:  Well, what do I do if in Detroit two, as
21  you propose, the bondholders come in waving the state
22  contracts clause?

23          MR. MONTGOMERY:  Well, your Honor, first, we think
24  that there is a difference between Article IX, Section 24,
25  and both the federal contracts impairments clause and the

1  state's own contracts impairment clause.  We think that can

2  be found in two places.  First, there are extra words that

3  can be found in Article IX, Section 24.  In its entirety,

4  Article IX, Section 24, has a phrase that appears at the end,

5  which says "shall not be diminished or impaired thereby," the

6  entire phrase, if I may, your Honor, "The accrued financial

7  benefits of each pension plan and retirement system of the

8  state and its political subdivisions shall be a contractual

9  obligation thereof which shall not be diminished or impaired

10  thereby," and, of course, your Honor, the second funding

11  clause, which is, "Financial benefits arising on account of

12  service rendered in each fiscal year shall be funded during

13  such year and such funding shall not be used for financing

14  unfunded accrued liabilities."  Your Honor, that is, to my

15  mind, certainly textually quite different than the state's

16  own simple contract impairment clause, and we think

17  meaningfully it's different.  What Section -- Article IX,

18  Section 24, does for -- in our view, your Honor, is tell the

19  state that no matter what you are doing, you cannot take a

20  step to adversely affect those accrued financial benefits,

21  and we cite, of course, the Seitz case, which is the judicial

22  probate case in which judges in the State of Michigan asked

23  for protection of their pensions, and the Michigan Supreme

24  Court agreed.  We think it's also consistent with the

25  Musselman case, which the Michigan Supreme Court said that,

1   again, the funding of retirement benefits that were otherwise

2   protected or protectable had to be done, and the state could

3   not take any action to not do that.  Now, of course, that's a

4   mandamus case in which the Court denied mandamus, but the

5   legal proposition was squarely stated.

6         We also think the advisory opinions that the Court

7   entered with respect to the tax exempt nature of retirement

8   benefits clearly show that the Michigan Supreme Court looks

9   to see if the state is doing something to impair the actual

10   benefit.  And that particular advisory opinion dealing with

11   the tax exempt nature of retirement benefits, the Michigan

12   Supreme Court said, no, merely taxing you or removing the

13   special exemption is not an impairment of the financial

14   benefit itself, so we step back and we ask your Honor to say,

15   okay, is a plan proffered by the emergency manager with the

16   knowledge and support or blessing of the governor authorized

17   by a statute an unconstitutional series of events?  Is the

18   emergency manager's action unconstitutional, is the

19   governor's action unconstitutional, or is the statute itself?

20   Knowing that there is a judicial predilection for the

21   narrowest possible reading of major problems, we submit to

22   you that your Honor can start with the emergency manager's

23   plan.  Stop it.  No eligibility if the emergency manager's

24   plan is to be put forward.  If that isn't enough because the

25   governor authorized it, then you have to challenge the

1    governor.

2            THE COURT:  Let me rewind the clock here just --

3            MR. MONTGOMERY:  Sure.

4            THE COURT:  -- a couple of minutes and ask you about

5    this nonimpairment provision in the Constitution.  The

6    question we all are struggling with is what is the meaning,

7    the substantive meaning of that provision in the context of a

8    political subdivision that doesn't have the money to comply

9    with it?  What's the meaning of it?

10           MR. MONTGOMERY:  First, I think this might be a good

11   opportunity to agree with your Honor that impairment in the

12   classic sense is something the Bankruptcy Code, of course,

13   has dealt with for many years by saying the allocation of

14   assets is not all by itself impairment.  I think we -- I

15   think it's fairly well established that just because a

16   creditor gets less than a hundred cents does not mean that

17   their contract is impaired.  On the other hand --

18           THE COURT:  I thought that's exactly what it meant.

19           MR. MONTGOMERY:  That's if the state does it, but

20   that's not that the -- remember the -- it was not a taking of

21   property by the federal government to authorize the

22   Bankruptcy Code.  It was --

23           THE COURT:  Oh, if that's what you mean --

24           MR. MONTGOMERY:  Yes.

25           THE COURT:  Absolutely.

1    MR. MONTGOMERY:  Totally.

2    THE COURT:  Absolutely, sure.

3    MR. MONTGOMERY:  But it is a taking of property if

4 the emergency manager says to its retirees, "I, either by

5 virtue of a plan I put in or otherwise, am taking your right

6 to receive pension benefits in the future," which is what he

7 is proposing.  He is not merely proposing to alter the

8 funding system in violation of Article IX, Section 24.  He is

9 proposing to actually eliminate or reduce already accrued

10 financial benefits.

11    THE COURT:  Right, so what's -- how do we give

12 meaning to nonimpairment, as you propose is constitutionally

13 required, if the city doesn't have the money to pay?  What

14 does it -- what's the meaning of that requirement?

15    MR. MONTGOMERY:  Well, your Honor, I think that if

16 there is to be some allocation -- let's back up for half a

17 moment.  Let us assume for the moment that, in fact, the city

18 has proposed to utilize all of its assets to deal with it, so

19 we're not talking about a situation in which the city has

20 capacity on its balance sheet or cash flows to deal with

21 something that it just refuses to do.  We think that the

22 proper answer is not for the federal government to invite the

23 state to violate its own Constitution but to have the state

24 adjust its own laws, have the state, using its people, its

25 either constitutional ratification process or the state

1   through its legislative process create the system for

2   adjustments that Asbury Park tells us is still at least

3   viable. Putting that aside, whether or not Asbury Park is or

4   is not still --

5         THE COURT: Well, but hang on, Mr. Montgomery. If

6   the pension right is as inviolate as you say it is, the

7   legislature can't adjust the pensions either.

8         MR. MONTGOMERY: No, but it can adjust other

9   people's assets, other people's entitlements. It can make

10   the accommodations to its Constitution that may be required.

11   It has the capacity to levy. It has the capacity to change

12   property rights. The state legislature has those property --

13   and the only thing we are asking this Court to consider --

14         THE COURT: Well, let me ask this question then.

15         MR. MONTGOMERY: Yes, sir.

16         THE COURT: Is it your position that because of this

17   nonimpairment requirement in the Michigan Constitution, the

18   State of Michigan is a guarantor of retirees' pension rights?

19         MR. MONTGOMERY: We have not garnered nor do we

20   propose to express a view today whether or not the state is a

21   guarantor. What we are proposing to express a view today is

22   that no state actor can do something in violation of the

23   state Constitution and have that act be other than void ab

24   initio. And if those acts are void ab initio, the requisite

25   authorizations either don't exist or, if this Court has the

1   power to accept those authorizations notwithstanding their

2   unconstitutionality under Michigan law, then your Honor is

3   engaged not in aiding the sovereignty of the state, as

4   suggested was required by Bekins, but you are aiding -- you

5   are going in the direction of derogation of the sovereignty

6   of the state.  And why do I say that?  Because you are

7   telling the people of Michigan they can't control their own

8   Constitution, they can't control their own legislature, they

9   can't control their own executive officers, and we think that

10  is a pure Tenth Amendment problem.

11         You mentioned earlier in discussion with Ms. Levine

12  the commandeering issue.  It is absolutely true, as you have

13  identified, that first states must act in aid, not in

14  derogation of sovereignty.  That's the Bekins.  Under Printz

15  they can't compel a state official to do something that is

16  otherwise the subject of a federal program.  They can invite,

17  they can entice, but they can't commandeer.  That's the

18  Printz -- that's the Brady Bill decision.  And in the New

19  York versus United States case, which, again, your Honor

20  identified, you can't compel ownership of radioactive waste.

21  Again, you can create programs, you can create enticements,

22  you can create an exhaustive federal regulatory scheme that

23  keeps the states out of regulating the business, but here the

24  federal government can't, by virtue of the Tenth Amendment,

25  keep the states out of regulating the financial obligations

 1   of its citizens.  It can't keep the states out of the

 2   business of deciding when their elected officials can or

 3   cannot do something, and it is that issue that causes the as

 4   applied problem as opposed to the facial and validity issues

 5   that were raised by AFSCME in the arguments of Ms. Levine.

 6   We think it --

 7          THE COURT:  I want to -- well, I want you to focus

 8   on why the mere filing of this case resulted in an imminent

 9   threat to the pension rights of the retirees of the city

10   because the filing itself didn't result in anyone's payments

11   being reduced; right?

12          MR. MONTGOMERY:  Well, I will note for you they --

13   on the healthcare side, they apparently are.

14          THE COURT:  Well, but that's not a result of the

15   Chapter 9.

16          MR. MONTGOMERY:  Well, actually, I don't think that

17   could be done under state law because these are all

18   collectively bargained -- or mostly collectively bargained,

19   and to the extent they were collectively bargained,

20   they're --

21          THE COURT:  Well, but with or without the Chapter 9,

22   Mr. Orr was free to do that or not under state law.

23          MR. MONTGOMERY:  Or not under state law.

24          THE COURT:  There's nothing about Chapter 9 that

25   impacts his decision to do that.  He hasn't asked, at least

1   as far as I know, the Court's permission to do that.

2          MR. MONTGOMERY:  No.  As far as we know, he hasn't

3   asked either.  So if I may answer the question, which, if I

4   understood it correctly, was why is the mere filing --

5          THE COURT:  An imminent injury.

6          MR. MONTGOMERY:  -- an imminent threat, first, I go

7   back to the factual predicate that I think underlays this,

8   that the mere threat of filing -- excuse me -- the mere

9   threat of a filing is not the harm all by itself, but it was

10  preceded by an announced plan, the June 14 proposal, and a

11  series of other events that the emergency manager undertook

12  and statements made, which evidenced -- evidenced -- a desire

13  to violate the state Constitution.  Now, the only way in the

14  emergency manager's own mind that he can do that is if he has

15  access to the Bankruptcy Court because he believes it will

16  trump the state constitution with respect to pension

17  protections.  Now, right or wrong, it is the -- it is the

18  threat that those pension benefits will be eliminated as part

19  of a plan, a series of steps of which have already been

20  undertaken, the most recent of which was the filing of the

21  Chapter 9 petition.  The problem we face, at least in my

22  view, your Honor, is that the world that you face today for

23  deciding whether or not the emergency manager's actions are

24  or are not constitutional under Michigan law is different in

25  the eligibility context than we think you're going to be

1  faced with at a plan confirmation context.  Once you're

2  inside the box of bankruptcy -- excuse me -- everyone,

3  putting aside whether -- how vigorously we will try to get

4  state law to say something different, but everyone seems to

5  suggest that the priority schemes and the allocation schemes

6  of the Bankruptcy Code preclude a contrary result that would

7  be allowable under state law.

8          THE COURT:  Oh, but you're going to fight that.

9          MR. MONTGOMERY:  But, your Honor, I've lost before,

10  and I might lose again.  The issue of --

11          THE COURT:  Well, but if you lose, it will be on

12  legal grounds.

13          MR. MONTGOMERY:  But, your Honor, it will be.  If we

14  are fighting this issue at the back end of the case and we

15  are arguing, as we will if we are required to, that

16  notwithstanding 109, that the emergency manager can't propose

17  a plan in good faith in which he violates his constitutional

18  rights for --

19          THE COURT:  Constitutional obligations, yeah.

20          MR. MONTGOMERY:  Constitutional obligations.  I

21  apologize.  For that to be a viable argument, in effect, you

22  have to rule today, your Honor, that it would be a violation

23  of his constitutional obligations because if it's not a

24  violation in the context of adhering to the Bankruptcy Code

25  provisions, which some cases say only provide with respect to

1  prospective obligations -- that is, a new pension plan would

2  be subject to the protections -- well, we're not talking

3  about a new pension plan, your Honor.  We're talking about

4  one that's been around for 60 or 70 years now, and we're

5  talking about a retirement plan that has people who are a

6  hundred years old.

7          THE COURT:  Suppose the plan is confirmable because

8  it results in the consent of those impaired after

9  negotiation.

10          MR. MONTGOMERY:  Your Honor, if our understanding of

11  the law is correct, it's going to be very hard for a state

12  official to agree in good faith to propose a plan that

13  impairs financial benefits without a hundred percent of the

14  retirees consenting either under 109 or under state law, and

15  so the -- in order to get to the point where a less than 100-

16  percent majority of the retirees are accepting the plan, you

17  have to have decided that state law doesn't control the

18  exercise of those rights.

19          THE COURT:  Suppose you or one of your objecting

20  colleagues decides to assert that the Michigan Constitution

21  requires the state to guarantee the federal -- the retirees'

22  pension.

23          MR. MONTGOMERY:  Well, your Honor, the -- again, you

24  are asking for advisory hypotheticals here, but --

25          THE COURT:  Well, but that's what looking at

1   ripeness is all about.

2           MR. MONTGOMERY:  The issue will be then not whether

3   or not the bankruptcy process has harmed the retirees because

4   it will have -- if the state is a guarantor or arguably a

5   guarantor, it must be sued, query whether or not that lawsuit

6   can be brought in the Bankruptcy Court or some other place,

7   and, secondly, the -- under the <u>Sittler</u> case, I believe,

8   there is a question of whether or not there's a cause of

9   action for damages for unconstitutional behavior.  There may

10  be a remedy, an injunction against unconstitutional behavior,

11  but the Michigan Supreme Court has not yet adopted a per se

12  rule that says if there is a violation of the state

13  Constitution --

14          THE COURT:  Suppose the state agrees that the

15  Constitution obligates it to guarantee the city's pension

16  obligations.

17          MR. MONTGOMERY:  Then the state will have remedied

18  the harm caused by the bankruptcy, your Honor, but the harm

19  was still being caused by the bankruptcy.

20          THE COURT:  What harm?

21          MR. MONTGOMERY:  The harm was the diminution of

22  pension benefits.

23          THE COURT:  Well, but if the state backs it up,

24  there's no diminution.

25          MR. MONTGOMERY:  Yeah.  If, as part of a plan of

1   arrangement, the state backstops -- you're right, your

2   Honor -- then the -- this is like a situation --

3        THE COURT:  Okay.  Okay.  If I'm right about that,

4   then why is the issue ripe now as opposed to then?

5        MR. MONTGOMERY:  This is like the landlord case, if

6   I may, your Honor, in which the -- I think it's Bennett

7   versus City of San Jose, which, if I may, your Honor, since

8   we didn't brief this issue, I can give you the cite for, but

9   as I'm looking for the citation, I believe that case stands

10  for the proposition that a landlord need not await the actual

11  failure to collect more rent than he could under the new

12  ordinance.  He's allowed to challenge the ordinance when it's

13  being passed.  All right.  We think this situation is very

14  similar to that.  We have a situation in which the emergency

15  manager has undertaken an act, has sought the aid of this

16  Court, and the question is do we have to wait for this Court

17  to, in effect, put it to us before --

18       THE COURT:  No, no.  The question isn't that.  The

19  question is do you have to wait for the emergency manager to

20  actually propose a plan that impairs pensions -- that's the

21  question -- and then object to that on constitutional

22  grounds.

23       MR. MONTGOMERY:  In the Thomas More Law Center case,

24  your Honor, the -- which is the commerce clause challenge to

25  minimum coverage provisions under the Affordable Care Act,

 1    three and a half years in advance, the Sixth Circuit found
 2    standing because notwithstanding the fact that it was a long
 3    way off and many things could occur, including Congress
 4    changing the law, different rules being applied, that was
 5    enough because there was nothing the party asserting the
 6    claim had to do in order to become injured.  Now, yes, there
 7    were things that any member of the law center group could do
 8    that could escape the harm, but the fact that they had to
 9    undertake affirmative steps to escape the harm was enough.

10         Here the only thing we can do to escape the harm
11    which the emergency manager has announced he will undertake
12    is to escape, and the only way to escape is through the gates
13    that your Honor is standing at the door of.  You are the
14    keeper of the protection for the retirees.  You are the one
15    who can stop the emergency manager from doing what is
16    unconstitutional under Michigan law.  And apparently, by the
17    way, both the state and the city are inviting you to rule on
18    constitutionality issues, you know.  They are perfectly
19    comfortable with your going down that road, your Honor, and
20    notwithstanding our hesitancy --

21         THE COURT:  Does that make an otherwise not ripe
22    issue ripe?

23         MR. MONTGOMERY:  No, obviously not, your Honor, but
24    we do think that where there's -- where the voluntary
25    cessation by the city or the temporary cessation or the

1  temporary abandonment of its statements that, oh, we are

2  going to impair the pensions does not create a situation that

3  moots the controversy nor do we think it eliminates the

4  ripeness of the controversy because your Honor can still see

5  the identifiable harm and can still issue an order that

6  redresses that identifiable harm by telling the city it may

7  not enter the portals of your courtroom.

8        Now, your Honor, I think we have, in effect,

9  distinguished the Barnwell case, which is cited by, I

10  believe, the U.S. government, because that was an ad hoc

11  committee of citizens instead of an 1102 committee.  Here

12  we're clearly creditors.  Here 1109 grants us statutory

13  standing as parties of interest, and I think we have

14  indicated to you that the harm is factual, imminent, and you

15  are at the gates.

16        One other thing I might want to sort of identify in

17  this ripeness issue, why now as opposed to what, why later,

18  of course, your Honor is familiar with the City of Stockton

19  case, and we are not urging you to adopt that case obviously,

20  but it does suggest that once in Chapter 11, the State of

21  California couldn't decide which rules it was going to

22  follow.

23        THE COURT:  Chapter 9?

24        MR. MONTGOMERY:  Right, in Chapter 9, the same thing

25  your Honor might decide here; that is, once inside Chapter 9,

1   the city is not free to do whatever it wants to do except

2   with respect to its own property and its own future

3   governance.  That you cannot touch in any way, shape, or

4   form, but that doesn't mean that you have to approve a plan

5   that violates what your Honor thinks are the rules of the

6   road.  And it is that danger that you would be called upon to

7   make a ruling inconsistent with Michigan law at the back end

8   of the case that has us asking you at the front end of the

9   case to prevent the city from engaging in that dialogue.

10          Now, the -- I think worth making as a final, if you

11  will, point -- and, again, later this afternoon you will hear

12  a more fulsome discussion, I believe, on all of the issues

13  associated with PA 436, but I think the void ab initio issue

14  is important to our constitutionality position; that is, were

15  it not for the fact that under Michigan law an

16  unconstitutional act is considered void ab initio, we think

17  you might be able to go down the road of accepting the

18  authorization papers as having been legitimately delivered to

19  your Honor without fear of violating our view of how Chapter

20  9 would be unconstitutional as applied; that is, if Michigan

21  law did not regard unconstitutional acts as void ab initio,

22  then all you would be faced with is a remediable situation

23  rather than an absence of action or an absence of

24  authorization action.  And with respect to the void ab initio

25  cases, we have cited those in our brief, your Honor, and we

1  think that you should accept as a truism, if you will, the

2  simple words actually uttered by Attorney General Schuette in

3  his paper that the city lacks authority under Michigan law to

4  propose a plan that diminishes accrued pension rights.  It

5  similarly lacks power to consent to any proposed action that

6  would violate the Michigan Constitution.  The proposed action

7  was the petition.  The proposed action was the petition as

8  part of a plan to eliminate the pension rights induced -- the

9  emergency manager got the governor to say yes to an act that

10  was unquestionably contrary to the pension clause.  As a void

11  ab initio act, that means that the legitimacy of the filing

12  is called into question, pure question of state law for your

13  Honor to rule upon, pure question of whether or not, in fact,

14  the city has obtained valid authorization papers -- pretty

15  hard to be valid if the underlying actions are void ab

16  initio, which is the norm under Michigan law, and we think,

17  therefore, your Honor has two ways to go down the path of

18  blocking eligibility independently of the factual disputes

19  under 109.  One is to hold that it's unconstitutional, the

20  authorization was unconstitutional because it was part of a

21  scheme to eliminate the pension rights or to say even if it

22  wasn't void ab initio, the acceptance of those actions by

23  this Court raise a huge constitutional challenge under the

24  Tenth Amendment to Chapter 9 itself.  Obviously the principle

25  of limiting federal constitutionality challenges would favor

1    finding that the narrower ground would be that the emergency

2    manager couldn't have filed his papers.  And I think, your

3    Honor, just because I must, I just want to argue we are not

4    arguing -- we are not rearguing today all those issues which

5    we were in front of your Honor before several weeks ago about

6    Stern v. Marshall and whether or not the Court should do

7    that.  We are in front of you.  You have determined that you

8    have the power to decide issues of state and federal

9    constitutionality.  We are asking you to exercise that power

10   and to preclude the city's eligibility.

11            THE COURT:  So if you don't -- we have a little time

12   left.  I have some more questions for you.

13            MR. MONTGOMERY:  Sure.  Happy to engage, your Honor.

14            THE COURT:  One is sort of a procedural one.  You

15   mentioned that you didn't brief the ripeness issue.  Would

16   you like an opportunity to do that?

17            MR. MONTGOMERY:  That would be fine, your Honor.

18            THE COURT:  I'd leave it to your discretion.

19            MR. MONTGOMERY:  Yes, yes.

20            THE COURT:  How much time --

21            MR. MONTGOMERY:  We'd be happy to do that, your

22   Honor.

23            THE COURT:  How much time would you like?

24            MR. MONTGOMERY:  Give us a week, your Honor.

25            THE COURT:  Okay.  You have a --

 1          MR. MONTGOMERY:  Yeah.  Give us a week.  It'll be --

 2     if you don't mind, we'll submit it to you on the first day of

 3     the trial.

 4          THE COURT:  Okay.  I want to ask you about a couple

 5     of entries in the brief that you did file.

 6          MR. MONTGOMERY:  Okay.

 7          THE COURT:  On page 27, you say -- and I want to

 8     quote here.  This is the brief you filed at Docket Number

 9     805.

10          MR. MONTGOMERY:  Yes.

11          THE COURT:  You say, "As noted by the Sixth Circuit

12     in City of Pontiac Retired Employees Association, 213 Westlaw

13     4038528 at *1-2, the Michigan legislature evidenced an

14     unconstitutional, and undemocratic purpose in crafting PA

15     436," close quote.  Similarly, on page 29 of that brief you

16     say, "The Michigan legislature, the Governor, and the

17     Emergency Manager have each made clear that abrogation of

18     municipal retirement compensation rights was the legislative

19     intent of the Act," referring to PA 436, "and is a central

20     purpose of this bankruptcy.  That intent also was recently

21     recognized by the 6th Circuit in City of Pontiac Retired

22     Employees Association," same cite at *3.  I have to say, Mr.

23     Montgomery, that I have studied that opinion by the Sixth

24     Circuit several times, and I cannot find these references.  I

25     cannot find where the Sixth Circuit addressed or even

1  suggested anything about the constitutionality of PA 436.  Am
2  I missing something or was this a mistake?

3          MR. MONTGOMERY:  Well, unless my memory fails me,
4  your Honor, I think what we're referring to is the fact that
5  the Sixth Circuit said that PA 4, which was the immediate
6  predecessor of 436, had each of those purposes, your Honor,
7  and that, therefore, by extension --

8          THE COURT:  Perhaps so, but the Court didn't say
9  anything about PA 436.

10         MR. MONTGOMERY:  Well, other than that it was
11  adopted despite the fact that the referendum had overruled PA
12  4 and that it was virtually the same but for -- I believe the
13  phrase was an add-on for --

14         THE COURT:  The Sixth Circuit did not say anything
15  about the purpose or intent of PA 436.

16         MR. MONTGOMERY:  But it did as to 4, your Honor.

17         THE COURT:  It did.

18         MR. MONTGOMERY:  And it says 4 -- 436 is the same as
19  4.  That's how we got there.  Rightly or wrongly, that is how
20  we got there, your Honor.  We say if the Sixth Circuit
21  identified a purpose of PA 4 as being the impairment of
22  pension --

23         THE COURT:  Well, since you're going to file an
24  amended brief --

25         MR. MONTGOMERY:  Yes, sir.

1          THE COURT:  -- I want you to tell me very

2    specifically where in this City of Pontiac case the Court

3    said anything or suggested anything about the

4    constitutionality of PA 436.

5          MR. MONTGOMERY:  All right.  Your Honor, we will --

6          THE COURT:  I agree with you it addressed it at

7    length with regard to PA 4 and expressed grave concerns about

8    it, but that's not the act before this Court today, so I

9    invite you to do that in your --

10          MR. MONTGOMERY:  Of course.

11          THE COURT:  -- new brief.

12          MR. MONTGOMERY:  We'll add that discussion to our

13    ripeness supplemental brief.

14          THE COURT:  All right.  Thank you.

15          MR. MONTGOMERY:  Thank you, your Honor.

16          THE COURT:  Ms. Brimer, you may proceed for ten

17    minutes, please.

18          MS. BRIMER:  Thank you, your Honor.  Lynn M. Brimer

19    appearing on behalf of the Retired Detroit Police Members

20    Association.  Your Honor, your concluding arguments or

21    discussion with Mr. Montgomery leads directly into the

22    discussion that I will have with you this morning, and that

23    has to do with the constitutionality of PA 436 under the

24    Michigan Constitution, your Honor.  And first and foremost,

25    your Honor, I'd like to point out that in our brief we

1   noted -- and we cited the <u>Schimmel</u> case -- we noted that PA

2   436 was passed in what we believe is derogation of the

3   Michigan referendum provision in Article II, Section 9, of

4   the Michigan Constitution.  It is well worth noting at the

5   outset of this discussion, your Honor, that that issue was

6   not addressed by either the city or the State of Michigan in

7   the pleadings they have filed.

8           With that, your Honor -- and I'll address that a bit

9   briefly later, your Honor.  Article I, Section 1, of the

10   Michigan Constitution specifically provides that, "All

11   political power is inherent in the people.  Government is

12   instituted for their equal benefit, security and protection."

13   Consistent with that maxim, Article II, Section 9, of the

14   Constitution specifically provides -- and it's a lengthy

15   provision, your Honor, so I'll read the relevant

16   provisions -- "The people reserve to themselves the power to

17   propose laws and to enact and reject laws, called the

18   initiative, and the power to approve or reject laws enacted

19   by the legislature, called the referendum.  The power of the

20   referendum does not extend to acts making appropriations for

21   state institutions or to meet deficiencies in state funds."

22   As has been noted, your Honor, in a handful of cases that we

23   can find that address this case, this provision of referendum

24   is so significant and vital to our Constitution that Article

25   II, Section 9, further provides that, "No law as to which the

1   power of referendum properly has been invoked shall be

2   effective thereafter unless approved by a majority of the

3   electors voting thereon at the next general election."

4           As this Court is aware, I'm sure, on November 6,

5   2012, by referendum, the people of the State of Michigan

6   rejected Public Act 4 on a vote of 52 to 48 percent.  That

7   was the Local Government and School District Act --

8   Accountability Act.  On December 26, Governor Snyder approved

9   Public Act 436, the Local Financial Stability and Choice Act,

10  a virtually identical law to Public Act 4.

11          In order to avoid subjecting Public Act 436 to

12  referendum, two very minor spending provisions were tacked on

13  at the back end.  Section 34 of the Act provides that for the

14  fiscal year ending 9-30, 2013, $780,000 is appropriated to

15  administer the Act, in essence, to pay the salaries of the

16  emergency managers appointed thereunder, and Section 35

17  provides that $5 million is appropriated for the same time

18  frame for the professionals such as lawyers and financial

19  consultants that are engaged under the Act.  The spending

20  provision was not at all a general spending provision for the

21  State of Michigan but a very limited provision relating

22  directly to the Act.

23          We have researched, your Honor, and cannot find a

24  single instance where the voters of Michigan have

25  specifically rejected a law and shortly thereafter the

1    governor passes a very similar law, if not identical, and

2    tacked on a spending provision in an effort to remove it from

3    the otherwise democratic process of the State of Michigan.

4            There are a handful of cases in Michigan that do

5    address the referendum.  In the case of Kuhn v. Department of

6    Treasury at 384 Mich. 378, 1971, the Michigan Supreme Court

7    specifically provided or held that the phrase in the preamble

8    of that -- the Income Tax Act of 1967, which provides that

9    the Act is for the purpose of meeting deficiencies in state

10    funds was not, in fact, sufficient when at the time the state

11    did not have any state deficiencies in its funding, and,

12    therefore, that provision in the preamble did not, in fact,

13    remove the Income Tax Act of 1967 from the power of

14    referendum.  Unfortunately, in that case the plaintiff had

15    not complied with the requirements for referring the matter

16    to the -- or the law to the referendum, and so the Court was

17    not able to render any further opinion regarding that

18    language and its impact on the -- whether or not that case

19    had -- that law had it been brought to referendum.  However,

20    it's instructive to this Court.  The law at issue in that

21    case had not previously been rejected on referendum, so,

22    therefore, it does have some influence in how this Court

23    should interpret how the Michigan Supreme Court may view the

24    two spending provisions tacked onto Public Act 436.  Public

25    Act 4 had, in fact, been rejected by the state through a

1    proper referendum.  The spending provisions were added on in

2    an effort to remove the case -- the law from the referendum

3    in derogation of the provision in Article II, Section 9,

4    which provides specifically that no law to which the power of

5    referendum had been properly applied shall be effective

6    thereafter unless approved by a majority of the electors

7    voting thereon at the next general election.

8            THE COURT:  Okay.  So I have this question for you

9    regarding this argument, and it's, again, a ripeness question

10   and a standing question.  How does any party have standing to

11   challenge the constitutionality of PA 436 on this ground or

12   why is it ripe until such a party has complied with all of

13   the legal requirements to have a referendum regarding that

14   put on the ballot and it being rejected because the law isn't

15   subject to a referendum because of this appropriations

16   provision?

17           MS. BRIMER:  I don't believe, your Honor, that by

18   adding on the spending provision, which on its face took

19   Public Act 436 out of the referendum provision of the

20   statute -- if that is the case, your Honor, then you have

21   read out the referendum from the Michigan Constitution.  I

22   think this is precisely the mechanism by which the

23   constitutionality of the law now should be challenged.  When

24   that law was then relied upon for purposes of the appointment

25   of an emergency manager, that is precisely, I believe, your

1   Honor, how this would come to a court for review.  On its
2   face, the governor attempted to remove this from the
3   referendum.  It was removed from the referendum, but you
4   can't read that out of the law and read out of the
5   Constitution the second provision, which requires that any
6   law that has been rejected by referendum be resubmitted to
7   the electorate.
8           I see I'm running out of time, your Honor.  What I
9   would like to note, your Honor, is that while you are correct
10  that the Sixth Circuit did not specifically rule on 436 --
11  I've read that case closely several times -- 436 was not
12  before the Court, and, as you'll recall, some of the matters
13  at issue in that case were what precisely is before the Court
14  because some of the arguments had not even been preserved on
15  appeal.  However, I think the tone of the Sixth Circuit when
16  it said, "Apparently unaffected that voters had just rejected
17  Public Act 4, the Michigan Legislature enacted, and the
18  Michigan governor signed, Public Act 436.  Act 436 largely
19  reenacted the provisions of Public Act 4, the law the
20  Michigan citizens had just revoked.  In enacting 436, the
21  Michigan Legislature included a minor appropriations
22  provision, apparently" -- they didn't say "in fact," but
23  "apparently to stop Michigan voters from putting Public Act
24  436 to a referendum."  I think that gives us a tone, and I
25  also think it's noteworthy, your Honor, that despite the fact

1  that the city noted on page 15 of Exhibit A to their
2  consolidated response to the objections that we had raised
3  this specific issue, it is not addressed.  It is not
4  responded to by either the state or the city.  It stands
5  unrefuted at this point, your Honor.

6        THE COURT:  Thank you.

7        MR. GOLDBERG:  Good morning, your Honor.  Jerome
8  Goldberg appearing on behalf of interested party David Sole,
9  who is a city retiree, as is his wife, Joyce Sole.

10        THE COURT:  And you may proceed for ten minutes,
11  sir.

12        MR. GOLDBERG:  Thank you, your Honor.  While I
13  certainly concur with many of the eloquent arguments put
14  forth by counsel prior to myself, I want to approach the
15  issue from a somewhat narrower point of view from the prism
16  of Michigan state law and specifically from the Michigan --
17  how Michigan state law views the issue of statutory
18  construction.

19        As we know, 11 U.S.C. 109 states that a local
20  municipality must be specifically authorized by state law to
21  file a Chapter 9 bankruptcy.  The phrase "authorized by law"
22  refers to the law of the state, and I cited <u>Bekins</u> for that
23  principle.  States act as gatekeepers to their municipalities
24  and access to relief under the Bankruptcy Code.

25        As we all know, the basis for the state law

1   authorizing the filing of this Chapter 9 is Public Act 436,

2   and Public Act 436 has several different provisions that I

3   think it's worth looking at to get an understanding for why

4   we believe the failure to include a contingency to bar the

5   impairment of pensions is violative of state law.  It

6   provides the emergency -- Section 1551(c) provides the

7   emergency manager with the power to carry out the

8   modification, rejection, termination, and renegotiation of

9   contracts.  Section 1552 provides the emergency manager again

10  with the power to reject, modify, or terminate, one, terms of

11  an existing contract.  Section K gives the emergency manager

12  the power to reject, modify, or terminate an existing

13  collective bargaining agreement.  Section 12 contains

14  provisions for the renegotiation of debt, and it's laid out

15  in Section 12.  But what Section 1552(m) -- Section 12(m),

16  when it deals with the question of pensions, it explicitly

17  includes within the section, within the statute, the --

18  states that the emergency manager must fully comply with

19  Article IX, Section 24, of the Michigan Constitution, which

20  is the constitutional prohibition on diminishing or impairing

21  contract.  In addition, Section 1558 states that the governor

22  may place contingencies on a local government in order to

23  proceed.

24          When you view the statute -- the authorizing statute

25  from the prism of the Michigan rules on statutory

1  construction -- and I cited the <u>Pohutski</u> case, which many --

2  is the seminal case on statutory construction in the State of

3  Michigan, <u>Pohutski</u> -- the Michigan Supreme Court in <u>Pohutski</u>

4  stated, "When parsing a statute, we presume every word is

5  used for a purpose.  As far as possible, we give effect to

6  every clause and sentence.  'The Court may not assume that

7  the Legislature inadvertently made use of one word or phrase

8  instead of another.'  Similarly, we would take care to avoid

9  a construction that renders any part of the statute

10  surplusage or nugatory."  And, in addition, Michigan courts

11  follow the doctrine of expression unius exclusion alterius,

12  the expression of one thing is the exclusion of another.

13        We would submit that in construing Public Act 436 as

14  a whole, in construing it as a whole, any -- you can't allow

15  for the filing of a Chapter 9 unless the Chapter 9 includes

16  the contingency for not impairing the pension rights under

17  Article 24.  Otherwise it would negate that section or

18  declare that section void, and that would be an express

19  violation of the Michigan Rules of Statutory Construction,

20  which the Court is bound to follow at this stage in the

21  proceeding because in the eligibility proceeding, it is state

22  law, state law that is dominant.  We believe, based on --

23        THE COURT:  But aren't there many, many, many

24  conditions that the governor could have put on the filing in

25  order to assure the emergency manager's compliance with state

1  law?

2        MR. GOLDBERG:  There are certainly different --

3        THE COURT:  Equal protection, due process of law,

4  freedom of speech.

5        MR. GOLDBERG:  But what I'm submitting, your

6  Honor --

7        THE COURT:  There are lots of constitutional rights.

8        MR. GOLDBERG:  Certainly.  But what I'm submitting

9  is we have to look at the statute as it is written.  That's

10  what the Michigan courts rule over and over again.  Those are

11  the fundamental rules of statutory construction enunciated by

12  the Michigan Supreme Court in case after case.  In this case,

13  we look at the words of the statute.  We don't read into the

14  statute.  We look at the words of the statute.  This statute

15  contains an explicit guarantee of pensions, a guarantee --

16        THE COURT:  Well, and the governor says --

17        MR. GOLDBERG:  It includes Article IX.

18        THE COURT:  The governor says the filing will comply

19  with state law, doesn't he?

20        MR. GOLDBERG:  Well, the governor may say it, but

21  the governor is not the final arbiter, your Honor.  That's

22  what the Court is for, and what we -- and the governor is not

23  above the law.

24        THE COURT:  Why isn't that a sufficient protection?

25        MR. GOLDBERG:  I'm sorry.

1          THE COURT:  Why isn't that a specific -- a

2   sufficient protection?

3          MR. GOLDBERG:  Why isn't what the governor says a --

4          THE COURT:  No.  Why isn't the fact that this Court

5   will apply state law a sufficient protection?

6          MR. GOLDBERG:  Well, we would submit, your Honor,

7   that state law at this stage of the proceeding, at the

8   authorization stage, is the determinative factor.  Once we go

9   into the -- once you make the eligibility determination, as

10  Mr. Montgomery indicated and as the case law as I've read it

11  indicates as well, that's where federal law -- there's a

12  question of federal supremacy over state law, but at this

13  stage it's state law that is determinative, and the state law

14  in this case explicitly mandates a contingency for the

15  guaranteeing of pensions.  Otherwise we've written that

16  section --

17         THE COURT:  If we're going --

18         MR. GOLDBERG:  -- out of the authorization

19  statute --

20         THE COURT:  If we're going to look at --

21         MR. GOLDBERG:  -- and that's an explicit violation

22  of statutory construction.

23         THE COURT:  If we're going to look at statutory law

24  and every word of it, how do you deal with the city's

25  argument that the word "thereby" in the constitutional

1  provision only prohibits the impairment of pensions by the

2  state or its political subdivisions; it does not prohibit the

3  impairment of pensions by a United States Bankruptcy Court?

4          MR. GOLDBERG:  That's exactly the point, your Honor.

5  That's exactly the point.  At this stage of the proceeding,

6  according to Bekins, according to Harrisburg, and according

7  to every case I've read, according to Collier's, it's state

8  law that is determinative.  That's why --

9          THE COURT:  And that's what I'm asking.

10          MR. GOLDBERG:  That's why the question --

11          THE COURT:  And that's exactly what I'm asking you

12  about.  If we're going to read every word of the statute and

13  apply every word of the statute, including the word

14  "thereby," why doesn't state law permit the Bankruptcy Court

15  to impair pensions?

16          MR. GOLDBERG:  Because the authorization statute

17  that this Court is relying upon, which it has to rely upon

18  because otherwise there would be no Chapter 9 filing, there

19  has to be a specific authorization under state law; correct?

20  I mean there are 20 -- many states don't have one.  You have

21  to rely on the state law.  That state law contains an

22  explicit clause that impair -- pensions cannot be impaired.

23  It's not just written in one place actually.  It's written in

24  two places in that statute.  Again, I'm submitting that down

25  the road, if we get past this eligibility question on this,

1  perhaps what you said is correct.  At that point federal

2  law -- you make the determination based on federal law, but

3  right now you are duty bound to make that determination based

4  on your examination of state law and by applying the state

5  law --

6          THE COURT:  What is the --

7          MR. GOLDBERG:  -- principles of statutory

8  construction.

9          THE COURT:  What is the exact state law language in

10  PA 436 that you rely on?

11          MR. GOLDBERG:  I rely on the language -- here, let

12  me find it right here.

13          THE COURT:  Okay.

14          MR. GOLDBERG:  "The emergency manager shall fully

15  comply with the public employee retirement system investment

16  act and Section 24 of Article IX of the state Constitution,

17  and any actions taken shall be consistent with the pension's

18  qualified status"; that he's -- this emergency manager has to

19  abide by the constitutional impairment.

20          THE COURT:  So my question for you remains if this

21  Bankruptcy Court were to approve a plan -- and I want to say

22  here I have no predisposition on this issue at all.  This is

23  strictly hypothetical legal talk to figure out where we are.

24  If this Court were to approve a plan that impairs pensions --

25  again, not presuming at all that it will -- but if it did, is

1  that the city impairing pensions, or is that the Bankruptcy

2  Court impairing pensions because --

3         MR. GOLDBERG:  That would be impairing --

4         THE COURT:  -- the law prohibits the city from doing

5  it?  There's a question about whether it prohibits the

6  Bankruptcy Court from doing it.

7         MR. GOLDBERG:  That's precisely why I'm making the

8  argument, your Honor.  There is a -- there is a question as

9  to whether -- once we get past the eligibility and this Court

10 is looking at the plan, whether this Court then has the

11 authority under federal law to ignore the state law and state

12 constitutional protection.  I'm not saying it does, but

13 there's at least a question, and a lot of the case law

14 indicates that, but we're not at that stage right now.  We're

15 at the eligibility stage, and clearly at the eligibility

16 stage it's state law that predominates.  It's state law

17 that's determinative, and it's state law that this Court has

18 to look at, not federal law but state law that this Court has

19 to look at in making its determination as to whether the

20 authorization meets the muster.  And what I would submit,

21 that under state law principles, as I indicated, we look at

22 the authorization statute, we look at the plain language of

23 the statute, and we look at the Michigan rules on statutory

24 construction as a -- and there's no way to allow for a filing

25 that would not have a contingency that bars the impairment of

1    pensions.  It's interesting to me you raised before to Mr.

2    Montgomery --

3            THE COURT:  Actually, your time has expired, so I do

4    have to ask you to wrap up.

5            MR. GOLDBERG:  Okay.  Well, I'll make one last

6    point.  You raised very briefly to Mr. Montgomery why not

7    every contract, but, as I indicated, other contracts are

8    provided for the impairment of those contracts under the PA

9    436.  It's the impairment of pensions that's explicitly taken

10   away from the authority of the emergency manager, and I

11   submit because of that that any authorization that doesn't

12   include a contingency barring the impairment of pensions

13   would violate Michigan state law and violate the Bankruptcy

14   Code, in essence, itself.  Thank you.

15           THE COURT:  Thank you.

16           MS. CRITTENDON:  Good morning, your Honor.  Krystal

17   Crittendon, and I want to thank the Court for giving me the

18   opportunity to speak this morning.

19           THE COURT:  Welcome, and you may proceed for five

20   minutes.

21           MS. CRITTENDON:  Thank you, your Honor.  Before the

22   Court goes any further, I would just ask that the Court step

23   back and look at the process and how we got to where we are

24   from a legal foundational standpoint, and to that end, I make

25   three objections, your Honor.

1    First, the City of Detroit does not have a duly
2    appointed emergency manager because there was no EM or EFM
3    law in place at the time that appointment was made.  As the
4    Court knows, in 2011, Public Act 4, commonly known as the
5    Emergency Manager Act, repealed Public Act 72.  In November
6    of 2012, the people of the State of Michigan repealed Public
7    Act 4 by referendum.  Pursuant to Michigan law -- and this is
8    at MCL, Michigan Compiled Law, 8.4 -- "Whenever a statute, or
9    any part thereof shall be repealed by a subsequent statute,
10   such statute, or any part thereof, so repealed, shall not be
11   revived by the repeal of such subsequent repealing statute."
12   In short, that is saying that when PA 4 repealed Public Act
13   72 and PA 4 was then repealed by referendum, PA 72 was not
14   revived.  It did not spring back to life.
15       On March 14, 2013, a contract was purportedly
16   entered into between the State of Michigan and Kevyn Orr
17   appointing him EFM for the City of Detroit.  However -- under
18   PA 72.  However, because PA 72 was not alive at that time,
19   that appointment was not legal and is defective, and for that
20   reason, Mr. Orr is not a duly appointed emergency manager for
21   the City of Detroit.
22       The second argument, even had there been an
23   emergency manager law in place, Mr. Orr would not have been
24   an EFM at the time PA 436 came into place because his
25   contract, the contract between he and the state, was expired

1  on the day that PA 436 came into place, so he would not have

2  been grandfathered in under PA 436.

3         Finally, under Chapter 9 of the Bankruptcy Code,

4  there is no ability for there to be an involuntary

5  bankruptcy, and because the municipality would had to have

6  filed the petition, and in this case the municipality, being

7  the mayor and City Council, did not file the petition, the

8  petition filed by Mr. Orr was defective, and the filing

9  should be dismissed.

10         For those reasons -- and I see that my yellow light

11  is on -- time goes really really quickly when you have five

12  minutes, but I'd answer any questions the Court has.

13         THE COURT:  Hoe much time is left when the yellow

14  goes on, Kelli?  Do you know?

15         THE CLERK:  Three minutes.

16         THE COURT:  It's three minutes, so you only --

17         MS. CRITTENDON:  Okay.

18         THE COURT:  -- had two under green and three under

19  the yellow, so --

20         MS. CRITTENDON:  Okay.  Thank you, your Honor.

21         THE COURT:  -- you may proceed.

22         MS. CRITTENDON:  Mr. Orr's contract at Section 2.2

23  of that contract provides that his contract was effective on

24  Monday, March 25th, and terminated at midnight on Wednesday,

25  March 27th.  Midnight March 27th was a Wednesday morning at

1   12 o'clock a.m.  The new emergency manager law, PA 436, did

2   not take place -- did not become effective until Thursday,

3   March 28th.  Under 14 -- MCL 141.1572, it provides that an

4   emergency manager or emergency financial manager appointed

5   and serving under state law immediately prior to the

6   effective date of this Act shall continue under this Act as

7   an emergency manager for the local government.  Because the

8   City of Detroit was without an emergency manager or emergency

9   financial manager for one full day before the Emergency

10  Manager Act, PA 436, became effective, Mr. Orr could not

11  continue in that capacity, as used in this section, because

12  he was without a contract.

13          Finally, I would just say there are a number of

14  cases under the federal Bankruptcy Court law that talk about

15  involuntary bankruptcies.  This is akin to an involuntary

16  bankruptcy when someone other than the City of Detroit, which

17  is its mayor and City Council, filed the petition.  And for

18  those reasons, the petition was defective.  Section 109 of

19  the Bankruptcy Code talks to the authorization of the state

20  to approve a bankruptcy if filed by a municipality.  In this

21  case, that is not what happened.  It was the state

22  effectively filing the petition and approving the petition

23  being that the emergency financial manager, assuming that we

24  had one, would be an operative of the state and not an

25  operative of the City of Detroit.  Thank you, your Honor.

1          THE COURT:  Is the contract on which you rely in the

2     record of the case?

3          MS. CRITTENDON:  I don't believe it is.  I do have a

4     copy of the contract with me if the Court would like to see

5     it.  I'm assuming that one of the parties --

6          THE COURT:  If you'd like me to consider it, you

7     should --

8          MS. CRITTENDON:  I will file it.

9          THE COURT:  -- file it.

10          MS. CRITTENDON:  I will, and I will file a brief

11     that memorializes everything that was said today.

12          THE COURT:  All right.

13          MS. CRITTENDON:  Thank you, your Honor.

14          MR. MORRIS:  Good morning, your Honor.  Thomas

15     Morris on behalf of the Retiree Association parties.  The

16     Retiree Association parties who I represent include two

17     individuals.  There was some discussion about the committee's

18     standing to raise certain objections.  The committee argued

19     those objections very ably.  We concur in those objections,

20     and that includes the concurrence of those individuals.  We

21     trust that would take care of any standing issue if there

22     were one.  And the comments that preceded us -- preceded me

23     were very ably made, so I'm just going to address a very few

24     points.

25          One is a point the Court -- a question the Court had

1    raised about the "thereby" language in the pensions clause.

2    It's important for the Court to note that it's the city that

3    files any plan, the city that proposes any plan, negotiates

4    any plan.  Chapter 9 precludes the Court from appointing a

5    trustee, from converting the case, from interfering with the

6    city's ability to manage its fiscal affairs.  A case cannot

7    be filed involuntarily under Chapter 9.  As the Bekins court

8    said, quoting from the legislative history on page 51, "The

9    taxing agency itself is the only instrumentality which can

10   seek the benefits of the proposed legislation."  We think

11   it's clear that any action to impair the pensions by the city

12   would, first of all, be improper, but, second of all, it

13   would be the city's action.

14          Now, the city has taken the position that somehow

15   the pensions clause of the Michigan Constitution is

16   preempted, and we disagree with that, but the city can't have

17   it both ways.  They have a theory -- they've made a number of

18   multiple arguments, but they have a theory that once they got

19   into Bankruptcy Court -- or if they get -- are found

20   eligible, then the pensions clause is off.  Well, if that's

21   the case -- and it's not the case, but if that were the case,

22   then it would be the action of the authorization of the

23   filing and the action of the city in filing the case which

24   would be impairing the pensions.  What happens if the city is

25   found ineligible?

1        THE COURT:  Well, but that's true only if as part of

2    eligibility the Court ruled on the issue of pension rights

3    and ruled in the city's favor.

4        MR. MORRIS:  This ties in with arguments that were

5    made by other counsel, and if Public Act 436 enables the city

6    to impair the pensions, then Public Act 436 in that respect

7    is unconstitutional.  It's inconsistent with the pensions

8    clause.  Of course, the pensions clause is part of the

9    Michigan Constitution, the supreme law of our state, and the

10   Public Act 436 must comply with it.  Public Act 436, in fact,

11   gives recognition to the pension clause and acknowledges it,

12   and it even authorizes the governor to make compliance with

13   the pension clause a precondition.  However, that didn't

14   happen in this case, and that's one of the -- one of the

15   issues that has been raised by other counsel.

16       Your Honor, if the city is found to be ineligible,

17   from the standpoint of the retirees, the city will have to

18   make a choice.  It can choose to comply with the pensions

19   clause and not impair pensions, just say we're going to

20   comply with the Michigan Constitution, or it can negotiate

21   with the retirees through their associations.  That process

22   was shortcut here, and that will be one of the factual issues

23   we've raised.

24       Now, if the city goes forward with a plan that does

25   not impair pensions, one of the Court -- one of the questions

1  the Court had was what happens then, what happens if the city

2  just doesn't have the money.  Well, there's an issue of

3  whether the state is liable.  There's the potential issue.

4  But those are all issues apart from -- they're nonlegal

5  issues.  The most the retirees can ask for is that the city

6  doesn't impair the pensions.  The ultimate solution for the

7  retirees comes elsewhere.  Will the city have -- will the

8  state have to step in to help the city?  Will the city have

9  to do other things to raise money?  I don't know, but those

10  are beyond our legal issues.

11         Your Honor, the city holds the key on this issue of

12  eligibility.  It can agree to comply with the Michigan

13  Constitution or it can negotiate with the retirees and reach

14  a resolution.  The proper outcome here is for the city to go

15  back -- as Section 109 intends, go back and either not impair

16  the pensions, which is our preference, or negotiate with the

17  retirees.  Thank you.

18         THE COURT:  Thank you.

19         MS. FLUKER:  Good morning, your Honor.  Vanessa

20  Fluker on behalf of Center for Community Justice and

21  Advocacy.

22         THE COURT:  Would you repeat your name for me,

23  please?

24         MS. FLUKER:  Vanessa Fluker.

25         THE COURT:  Okay.  Thank you.

1          MS. FLUKER:  F-l-u-k-e-r.  Your Honor, the issue I'm

2    raising today before this Court with respect to eligibility

3    is a failure of the emergency manager to comply with the

4    statutory mandates under PA 436, Section 16, which is

5    actually Section 1556.  That section specifically mandates,

6    and I quote, "an emergency manager shall," not "may," not

7    "might, "shall, on his own -- his or her own or upon the

8    advice of the local inspector if a local inspector has been

9    retained, make a determination as to whether possible

10   criminal conduct contributed to the financial situation

11   resulting in the local government's receivership status.  If

12   the emergency manager determines that there is a reason to

13   believe criminal conduct has occurred, the manager shall

14   refer the matter to the attorney general or local prosecuting

15   attorney for investigation."  There has been some extensive

16   arguments about the tenets of statutory construction, so I

17   won't go through <u>Pohutski</u> step by step, but we're all aware

18   that you must adhere to the plain unambiguous language of the

19   statute.

20          In this particular instance, two of the city's

21   largest creditors, UBS and Bank of America, have been found

22   convicted -- criminally convicted in UBS's case of criminal

23   conduct involving municipal bonds.  In fact, the SEC fined

24   UBS $47,207,180 in Case Number 11-2539, U.S. District Court,

25   New Jersey.  Three UBS executives were indicted and convicted

1  of fraud related to municipal bond rigging, and that was in

2  New York, Southern Division, Case Number 10-1217.  A Bank of

3  America executive was indicted July 19th, 2012, for bid

4  rigging of fraud municipal bonds.  And what's so significant

5  about this, in the criminal conviction with the SEC case, the

6  civil penancy case, it involved a Detroit bond.  This

7  provision cannot be ignored, and the mere fact that it's

8  mandatory because it indicates "shall" is very significant.

9  In fact, it is common knowledge at this point that the

10  emergency manager had knowledge of this information and did

11  not act on it.  In his deposition on August 30th, 2013, he

12  was specifically asked on these issues,

13          "Are you aware of issues that have come out with

14          regard to the LIBOR specifically with UBS and Bank

15          of America in the setting of using the LIBOR as a

16          standard?

17          Answer:  I am aware.

18          Question:  Are you aware that UBS has been sued

19          by the Securities and Exchange Commission for

20          rigging in regard to municipal bonds?

21          In past years?

22          There was a final judgment -- yes, in past

23          years.

24          Answer:  Yes.  I've heard that.  I have not read

25          the final judgment.

1          Question:  Are you aware that Bank of America

2              has been investigated for potential bond rigging

3              with regard to the municipal bond market?

4          Answer:  I am aware that Bank of America has

5              been investigated.  The exact specifics of the

6              investigation I am not aware of."

7          This clearly shows that there is not just a

8   noncompliance with 1556, there's a knowing noncompliance with

9   1556.  There should have been a criminal investigation, which

10  is mandated by the statute, and, in essence, is necessary to

11  even get to the point of making a recommendation for a

12  bankruptcy.  How can you say that we need bankruptcy when you

13  don't know whether there is going to be fraud determined and

14  there may be funds that may be necessary to be paid back to

15  the city that can offset any debt, which also goes to the

16  issue of how are you saying that you're eligible for

17  bankruptcy when you really don't know what the debt is based

18  on the potentiality of fraud in these municipal bond

19  transactions, who are also standing --

20          THE COURT:  Are you saying that the emergency

21  manager, whose term in office is limited by law, was required

22  to await what could be years of litigation to determine these

23  issues and UBS's liability before filing bankruptcy?

24          MS. FLUKER:  I don't think he had to determine years

25  of litigation, but I think that it would be very evident that

1   you would look at least at the debt that you're alleging that

2   the city owes, and if there is common knowledge of such

3   information, which this is -- this is not something that you

4   have to wait years in litigation.  This has been all over the

5   news, the Internet, and everything else.  And as he admitted

6   in his deposition, he was aware of it, and that being the

7   case, that actually heightens the duty, in addition to the

8   mandatory language of Section 1556, which says "shall."

9           THE COURT:  Shall do what?

10          MS. FLUKER:  The statute specifically says the

11  emergency manager shall, on his or her own or upon the advice

12  of a local inspector, make a determination -- there had to be

13  a determination made -- whether there was criminal conduct

14  that affected the financial situation of the city.  Even if

15  he didn't know all this, say for some reason this

16  information -- I see my time is up.  I'll just complete this

17  sentence.  Say this information he had no knowledge of.

18  There was -- we just don't know about it.  He still had a

19  duty to make a determination.  Well, in my estimation,

20  there's been no criminal conduct that contributed to the

21  financial situation of the city.  This provision was not

22  complied with at all, and you cannot try to exercise one part

23  of the statute by totally ignoring and having noncompliance

24  with another.  Therefore, I would request that this Honorable

25  Court deny eligibility for the reasons set forth by all the

1  objectors.

2          THE COURT:  Thank you.

3          MS. FLUKER:  Thank you.

4          THE COURT:  Mr. Gordon, may I have your attention,

5  please?

6          MR. GORDON:  Yes, your Honor.

7          THE COURT:  Are you up next?

8          MR. GORDON:  I am.

9          THE COURT:  Okay.  Do you want to give part of your

10  argument now, or do you want to take a lunch break now and

11  then do your entire argument after lunch?  I leave it to you.

12          MR. GORDON:  If it's okay with the Court, I would

13  prefer the latter, to just start after lunch.

14          THE COURT:  Okay.  All right.  We will take our

15  lunch break now, and we will reconvene in an hour and a half,

16  so that'll be 1:20, please.  Twenty after one we'll

17  reconvene.

18          MR. GORDON:  Thank you, your Honor.

19          THE CLERK:  All rise.  Court is in recess.

20      (Recess at 11:48 a.m., until 1:20 p.m.)

21          THE CLERK:  Court is in session.  Please be seated.

22  Recalling Case Number 13-53846, City of Detroit, Michigan.

23          THE COURT:  Good afternoon, everyone.  It looks like

24  everybody is here.  Actually, Mr. Gordon, with your

25  permission, before I hear from you, I have a follow-up

1    question for one of your colleagues.

2            MR. GORDON:  By all means, your Honor.

3            THE COURT:  Ms. Brimer, would you resume the

4    lectern, please?

5            MS. BRIMER:  Should I bring something with me, your

6    Honor?

7            THE COURT:  Possibly.

8            MS. BRIMER:  I didn't know I was going to the

9    principal's office.

10           THE COURT:  No, no, no.  It's nothing like that.

11   You argued that the enactment of PA 436 violated the people's

12   referendum rights because PA 436 was so similar to PA 4.

13           MS. BRIMER:  Yes, your Honor.

14           THE COURT:  That was your argument.  Was there a

15   statutory basis for that argument, or was it just based on

16   the people's right of referendum?

17           MS. BRIMER:  It's based on the constitutional right

18   of referendum, your Honor.

19           THE COURT:  Okay.  So there's not a statute we

20   should be looking for on that.

21           MS. BRIMER:  Not that I'm aware of, your Honor.

22           THE COURT:  All right.  That was it.

23           MS. BRIMER:  Thank you, your Honor.

24           THE COURT:  That was it.  Okay.  Mr. Gordon.

25           MR. GORDON:  Thank you, your Honor.  Just to give

1  your Honor a little bit of a road map of the things that I

2  want to touch upon, if that's of help, I thought I would

3  touch upon some of the issues regarding the state law

4  consent, some of the issues that have been raised this

5  morning, then move on to a discussion of some other

6  considerations relevant to the difference between the

7  pensions clause and the contract clause, and then address the

8  issue of what would happen if the Court ruled in our favor

9  that the accrued pension benefits cannot be impaired and what

10 that means for the restructuring, and I think I can add some

11 important information there.  And then finally, if there's

12 still time, I would touch upon the collateral estoppel

13 Webster issue, which is in our papers.

14         So, your Honor, we will start with the consent

15 issues under 109(c)(2), and to be clear, in our papers, while

16 we talk -- touch upon the possibility of PA 436 being

17 unconstitutional as applied, the thrust of our papers is that

18 PA 436 needs to be read and can be read in a way that's

19 consistent with the pensions clause and so forth so that

20 there's no need to get to issues of constitutionality.

21 109(c)(2) clearly is an issue that is an issue purely of

22 state law.  It is a threshold issue.  It is an eligibility

23 issue, and we want to emphasize that it stands on its own,

24 and it can't be conflated with plan confirmation issues.

25         THE COURT:  And with apologies, I have to stop you

 1   there with this question.  There seems to be a general thread

 2   of assumption that whether a state has given authorization

 3   under 109(c)(2) is a question of state law, as you just said.

 4   I have to say that's not altogether clear to me.  It seems to

 5   me there might very well be an argument that the standard as

 6   to whether the state has given proper authorization is a

 7   federal standard, not a state standard.  Why?  Because in

 8   addressing cases in the amendment right next door to Article

 9   X -- that is, Article XI -- sorry -- Amendment XI, the 11th

10   Amendment, when we talk about sovereign immunity, the issue

11   of whether a state has given its consent or its waiver of

12   sovereign immunity is a question to be determined by federal

13   law, not state law.

14          MR. GORDON:  Your Honor, in that regard, I think

15   that the Tenth Amendment is different, and it looks first to

16   respect the contours of what is reserved to the states in the

17   first instance, so here I think you have to start with

18   whether there is valid -- I think, at a minimum, the question

19   is is there valid state authorization for submitting a

20   political subdivision of the state to the jurisdiction of the

21   federal government and the federal courts.  I would at least

22   put it that way.  And so that does turn on state law, and we

23   would submit that all portions of state law need to be looked

24   to and harmonized in that regard, and that's sort of the

25   holding of <u>Harrisburg</u>, which we submit is instructive here

1  and which has not been really in any way refuted by the city.
2  And even the United States Attorney has stated that Congress
3  reserved to the state the right to regulate, and I quote,
4  "under what terms," end quote, its political subdivisions may
5  avail themselves of Chapter 9, so it really is a matter, I
6  believe, of state sovereignty, and it's up to the state to
7  determine how and when a political subdivision can avail
8  itself, and how it does that is in part expressed by the will
9  of the people, as embodied in the pension clause, and it
10  needs to be respected.
11        The response of the city and the state is on two
12  levels.  One, first of all, it is asserted that the actions
13  of the governor in authorizing do not conflict with the
14  pensions clause because the authorization itself didn't
15  create any impairment and that it's unclear whether the city
16  will ultimately seek to impair, and if such impairment
17  occurs, it won't be the city or the state that has done it.
18  It'll be the Bankruptcy Court.  Respectfully, we say that
19  those arguments are all unavailing.  First of all, one of the
20  things that I think has not been made clear this morning is
21  some of the things that have come out in discovery.  I don't
22  actually think these things are relevant, but I'll get to why
23  I think they're not relevant in a minute, but I think it's
24  important for the Court to know that in discovery propounded
25  by the Retirement Systems or conducted by the Retirement

1    Systems, the city has admitted that it was an explicit intent

2    in the restructuring plan proposed in June and in the

3    bankruptcy recommendation letter submitted on July 16th by

4    Mr. Orr that accrued pension benefits needed to be impaired.

5    The city has also admitted in admissions that its intent in

6    the Chapter 9 case is to impair and diminish accrued pension

7    benefits, so there is absolutely nothing speculative about

8    that.  The governor has also testified that he was aware that

9    accrued pension benefits may be impaired.  He also testified

10   that he understood that he could put conditions on the

11   consent and authorization and that he chose not to.  Mr. Orr

12   also testified that he could not guarantee that if a

13   consensual plan couldn't be achieved, that he would not

14   resort to cramdown provisions in order to cram down upon the

15   retirees.  So there really is nothing speculative here, and

16   for anyone to say that it is speculative is really -- I mean

17   it just is not -- it's just not factual.

18           THE COURT:  Well, but what would be the --

19           MR. GORDON:  The other thing is that --

20           THE COURT:  What would be the impact on that

21   argument if the state, under this Constitution, does have a

22   legal constitutional obligation to guarantee the pension

23   payments, an issue not yet determined?  And I don't mean to

24   suggest the outcome of that by raising this possibility.

25           MR. GORDON:  Your Honor, I mean if the -- the

1   problem is that today is the day for eligibility, and we

2   don't know that today.  If the state came forward today and

3   said that they would backstop, you know, the full accrued

4   pension benefits, that might be a different situation, but it

5   not being here today, that isn't --

6           THE COURT:  And you're not prepared to say here

7   today that you're not going to request that conclusion, are

8   you?

9           MR. GORDON:  No.  I will not say that, but that's --

10          THE COURT:  That would not be in your client's best

11  interest.

12          MR. GORDON:  Of course not.  Of course not, but that

13  has not been determined today.  The state is not coming

14  forward today.  And eligibility goes to whether this Court

15  even has jurisdiction, and what the city is asking is for the

16  Court to essentially suspend the issue of whether it even has

17  jurisdiction in order to get everybody together, and really

18  you're putting the will of the people and the protections of

19  the Michigan Constitution in jeopardy or being held in the

20  hold while the city wants to move forward with its proposals

21  and bring people to the table, and I would submit that that's

22  inappropriate.  This is an eligibility hearing, and the

23  governor's responsibility is an affirmative responsibility to

24  uphold the Constitution.  To suggest that we don't know

25  what's going to happen down the road reduces his obligation

 1    to sort of a wink and nod type of standard, and we submit

 2    that that is just inappropriate.  He is to uphold the

 3    people's will.

 4             THE COURT:  Well, he's to uphold the law.

 5             MR. GORDON:  The other thing is, your Honor, that to

 6    say that someone other than the state or the emergency

 7    manager would be the one impairing the benefits is just not

 8    correct.  As the Court well knows, the city is the one that

 9    would have to propose the plan.  The Court would not propose

10    the plan.  Essentially what is happening here would be that

11    the governor, through the authorization, is delegating

12    authority that he does not have.  He does not have the

13    authority to abrogate the state Constitution.  By authorizing

14    the emergency manager to pursue the bankruptcy -- again,

15    we're at the eligibility stage -- he cannot give authority to

16    the emergency manager that he does not have, so the question

17    becomes --

18             THE COURT:  The argument is he doesn't have the

19    authority to impair the pensions.

20             MR. GORDON:  That's correct.  If he wanted to do

21    that, he'd have to go get a constitutional amendment.

22             THE COURT:  And -- okay.

23             MR. GORDON:  So he does not have the authority to

24    delegate or to bestow upon anybody else the ability to

25    impair, so the question really is why wouldn't we put a

1    condition today saying that you can move forward in the

2    Chapter 9, but you can't impair the accrued pension benefits?

3    That to us complies with the requirements of the state

4    structure, and there has absolutely been no explanation of

5    why that wouldn't be done today.  We think that's the real

6    question is why wouldn't you -- why wouldn't the governor put

7    that condition in or why can't the Court imply that as a

8    matter of law?

9         If I may, your Honor, I'd like to move on to the

10   pensions versus contracts issue.

11        THE COURT:  Well, hold on one second.  The Sixth

12   Circuit has actually addressed -- I know you're concerned

13   about time --

14        MR. GORDON:  Okay.

15        THE COURT:  -- the issue of how to determine

16   eligibility in bankruptcy, now not in Chapter 9, but it did

17   so in Chapter 13 because there is a factual eligibility issue

18   there, has to do with debt limits, and there are times when

19   creditors say that the debtor's debts are above the debt

20   limits, and, therefore, the debtor is not eligible, so the

21   Sixth Circuit -- the case is Pearson if you're familiar with

22   it.  It says -- it recognizes that at the eligibility stage

23   of a bankruptcy, you don't want to go through the process of

24   fixing claims, but there is this law that sets debt limits,

25   so we have to give it some respect.  So the solution it came

1    up with in that context was we're just going to look at

2    whether the debtor in good faith asserts that its debts are

3    below the debt limit.  And for those of you who want it, it's

4    773 F.2d 751, 773 F.2d 751, a 1985 case from the Sixth

5    Circuit.  Pearson is P-e-a-r-s-o-n.  Why not apply a similar

6    standard to eligibility here?

7         MR. GORDON:  Because there's no good faith issue

8    here.  The question is very simple and can be solved today.

9    Are you going to impair pension -- accrued pension

10   obligations?  You can't.  The law says so.  So put the

11   condition on it today, and we move forward.

12        THE COURT:  So your assertion is that it wouldn't

13   even be a good faith argument by the city.

14        MR. GORDON:  Doesn't matter what their intention

15   actually is.  The condition should be applied today because

16   that is how -- that is the only way a --

17        THE COURT:  It wouldn't be a good faith --

18        MR. GORDON:  -- political subdivision can avail

19   itself --

20        THE COURT:  It wouldn't be a good faith argument for

21   the city to assert that although the Michigan Constitution

22   prohibits it from impairing pensions, it does not prohibit

23   the Bankruptcy Court from impairing pensions.  That would not

24   be a good faith argument?

25        MR. GORDON:  No, your Honor.  I think that that's

1   something that can and should be dealt with today.  Let me

2   give an example.  What if the only debts of the city today --

3   as we stand here today were pension obligations?  Would you

4   say then we should wait and see what happens?  We know what

5   would happen.  Is it any different because there's other

6   creditors in the room?

7         THE COURT:  Well, do we know --

8         MR. GORDON:  I haven't --

9         THE COURT:  Do we know -- do we know what would

10   happen?  Do we know, for example, that there would be no

11   agreed upon negotiation?  Do we know, for example, that the

12   state won't fill in the gap?

13         MR. GORDON:  Well, let's -- I can talk about that.

14         THE COURT:  Now would be the time.

15         MR. GORDON:  If you want to talk about that, I'll

16   skip to that.  I'll skip to that since that seems to be

17   something that is troubling your Honor or at least on your

18   mind.  We have emphasized --

19         THE COURT:  A question.

20         MR. GORDON:  We have emphasized that the Retirement

21   Systems aren't saying the city can't proceed with a Chapter 9

22   case.  It simply must condition the case upon the

23   preservation of the pensions clause.  And certainly in some

24   people's minds this begs the question of whether in the event

25   the Court agreed and ruled that accrued pension benefits may

1  not be impaired, could the city still effectively reorganize

2  and restore itself to financial health through a bankruptcy,

3  and while we've indicated that there is still information

4  that we need -- and it's material information -- we continue

5  to do so -- I believe I can stand here today and say that

6  based upon the information that we do have, it is clear that

7  the city can effectively reorganize even if accrued pension

8  benefits cannot be impaired.

9        Just some thoughts and facts for your Honor.  The

10  city talks about $18 billion in debt, but $6 billion of that

11  $18 billion is special revenues that are supported by the

12  Detroit Water and Sewer System, so now you really have $12

13  billion of debt that needs to be supported by the general

14  fund and other cash flows from the enterprise funds and so

15  forth.  Of that $12 billion of debt, roughly half, six

16  billion, is OPEB healthcare actuarially calculated.  Another

17  two billion is unsecured bond debt.  So fully two-thirds of

18  the $12 billion of debt is very much subject to restructuring

19  and compromise in bankruptcy.  Those are unsecured claims.

20  That's two-thirds of the $12 billion of debt right there.  So

21  there's a tremendous opportunity to unburden the city of the

22  debt obligations -- of these debt obligations and the demands

23  on its cash flow.

24        In addition, although not critical to this position,

25  above the line in the emergency manager's restructuring plan

1  proposed in June is the swap periodic payment, which is

2  soaking up $50 million a year in casino tax revenues.  And as

3  the Court knows -- and, again, I'm not going to argue it

4  here, but, as the Court knows, the Retirement Systems have

5  objected to the treatment of the swaps as secured in those

6  revenues both because the lien is not valid and, even if

7  valid, it does not reach the post-petition revenues.  Also --

8  and if it was determined to be an unsecured claim, then you

9  have a $300 million claim now that is given unsecured status

10  and can also be a compromise in the bankruptcy.

11       Also, it should be kept in mind that we're talking

12  about accrued benefits that need to not be impaired.  There

13  are obviously prospective benefits that could be impaired, so

14  there are a number of different ways that the city can

15  achieve real relief from its debts.  Obviously it spreads the

16  pain in different directions, but we've -- but by looking at

17  it, your Honor, there is absolutely an opportunity to do

18  something.  And when they --

19       THE COURT:  Isn't there also a question of fact as

20  to what the underfunded liability is for pensions?

21       MR. GORDON:  And let me get to that.  It's also

22  critical for the Court to understand that if the Court ruled

23  in our favor and said that there cannot be an impairment of

24  the accrued benefits, that does not mean the Retirement

25  Systems walk away from the table.  The Retirement Systems has

 1  said that they are committed to working with the city to be
 2  part of the solution here.  That means a number of things.
 3  The city has indicated that it needs to devote significant
 4  cash flows in the next five years, according to the proposal
 5  in June, $1.25 billion in the next five years for
 6  reinvestment in the city.  The Retirement Systems don't
 7  object to the concept and understand that the city needs to
 8  reinvest, but after that five years, that reinvestment is
 9  done.  The cash flows of the city become much larger again,
10  and they will improve at five years and the next five years
11  and the next five years.  And the Retirement Systems can be
12  flexible because the Retirement Systems issues, the pension
13  issues, are long-term issues.  They're not short-term issues.
14  So if there are cash flow issues, the Retirement Systems can
15  work with that.  The $3-1/2 billion number that's been thrown
16  out there is not an amount that is due today if the pension
17  systems are not frozen and closed.  That is an actuarial
18  calculation of what will be due over the next 30 years to
19  bring the funding level up to what it needs to be.  That's
20  not the amount that is due on a cash flow basis tomorrow or
21  the next day, so there is flexibility there.
22          Also, it should be understood that over time if the
23  economy improves or interest rates rise, and/or, the
24  underfunding level may go up or down, so there's a lot of
25  things in play there, and when you take that all together,

1   we --

2          THE COURT:  And I certainly appreciate and commend

3   your clients' willingness to work with the city, but

4   prudentially from the standpoint of ripeness apart from

5   constitutional issues, doesn't that suggest putting off until

6   plan confirmation the issue of the constitutional right?

7          MR. GORDON:  Your Honor, again, I would submit that

8   that is conflating eligibility, which is one question, with

9   what can be done under a plan.  If this Court does not have

10  jurisdiction because the authorization was not appropriate,

11  if you're putting -- what you're suggesting -- or the city is

12  suggesting is you're putting the uncertainty -- you're

13  putting at risk a state protected benefit in order to

14  leverage people to get in a room and negotiate.  And I

15  suggest, as a matter of jurisprudence, that is inappropriate.

16         I wanted to also mention, your Honor, other benefits

17  of a ruling in favor of the concept that the pension benefits

18  cannot be impaired.  It, in fact, would help the city in its

19  restructuring in other ways.  Absent a ruling on this issue

20  in favor of the nonimpairment of pension benefits, the

21  parties will struggle to negotiate in the shadows of this

22  unresolved issue.  What will happen is that the parties will

23  have to negotiate on a dual path against the backdrop of

24  still having these arguments under the pensions clause, under

25  Section 943, and so forth that are all or nothing arguments

1　that would -- if ruled on in a certain way, would come to the

2　conclusion that you can't impair us at all.  So it makes the

3　negotiations very difficult, and it also obviously -- as long

4　as that matter is not resolved or if it's not resolved in

5　favor of the pension systems, it becomes -- it makes the case

6　much more litigious and encumbers the entire process.  If the

7　Court rules in our favor -- and, again, these are just, you

8　know, some additional thoughts for the Court because I

9　understand the struggle.  If the Court rules in our favor,

10　there will be less moving parts for the city to deal with and

11　for the parties to deal with, and it makes the negotiation

12　process much more streamlined.  And if at some point in time

13　that decision were reversed and there was a decision that

14　said that the pension clause can be abrogated or impaired in

15　some fashion, having to revise the negotiations at that point

16　and spread the pain around a different way is a lot easier

17　than starting from the other end.  If you start from the end

18　that we're at now, it's very hard, again, for the parties to

19　negotiate.  And if the -- and if it's determined ultimately

20　that you can't abrogate the pension clause, then you're

21　really going back to square one, and we've lost a ton of time

22　in the negotiation process.  We submit that it's much easier

23　to negotiate against a backdrop that says that the pension

24　clause must be upheld.

25　　　　　　　Moreover, a ruling in our favor in that regard helps

1   the city in other ways.  It calms the workforce knowing the

2   accrued and prospective accrued pension benefits will be

3   protected.  This will enable the city to retain its most

4   talented personnel.  In addition, the ultimate commitment of

5   funds to the Retirement Systems as opposed to financial

6   creditors benefits the city because the systems will also

7   invest in the city, as they always have done.  And a majority

8   of the pensioners live within the city and pay taxes and

9   consume goods and services in the city, so the Retirement

10  Systems are an economic engine that really is part of the

11  solution for the city, so I want to address all those.

12          THE COURT:  Well, but so were the bondholders and

13  the bond investors.

14          MR. GORDON:  They don't live in the city, and they

15  aren't putting money back into the city, your Honor.  They

16  are not part of that economic engine, and if they get paid

17  their debt service, there's no --

18          THE COURT:  Hang on.

19          MR. GORDON:  -- guarantee that they're going to

20  reinvest in the city.

21          THE COURT:  Didn't I read in the newspaper that the

22  city just got $350 million?

23          MR. GORDON:  I'm sorry.

24          THE COURT:  Didn't I just read in the newspaper that

25  the city just got $350 million to help with its reinvestment?

1          MR. GORDON:  No, your Honor.  What we read was that

2     there's a proposal to secure unidentified assets at this

3     point but probably to encumber all sorts of assets of the

4     city in order to get $350 million of which 200 million would

5     immediately go out to pay swap participants who don't deserve

6     to get paid anything as a secured creditor, and then the

7     other 150 million is going to be used in some ways that's

8     been unidentified, so basically you're encumbering assets of

9     the city for purposes that don't benefit the city in any

10    demonstrable way at this time, so I would disagree with that

11    characterization.

12          THE COURT:  Okay.

13          MR. GORDON:  So, your Honor, for all those reasons,

14    I think that if the Court were to rule, again, as a pragmatic

15    matter, in favor of finding that this case should not move

16    forward without the condition that there cannot be an

17    impairment and that the pension clause must be upheld, it

18    does not mean this case comes to an end by a long -- quite

19    the opposite.  In our opinion, it makes this case much more

20    manageable.  It makes the negotiations easier.  And it, in

21    our minds, provides a much clearer path to a consensual

22    resolution.

23          THE COURT:  So you think I can find them eligible

24    and find that pensions can't be impaired?  How do I do that

25    because the issue is yes or no, the city is eligible.

1       MR. GORDON: That's correct, your Honor. You would

2 have to -- it would be up to the city to either -- and the

3 state to either agree to -- well, there's a couple different

4 ways.

5       THE COURT: This is the refiling scenario?

6       MR. GORDON: You could either -- you could either

7 rule that the obligation to uphold the pension clause is

8 implied by law because otherwise you don't have valid

9 authorization, there isn't valid state authorization, or you

10 can provide the option to the state and the city to

11 explicitly confirm that process.

12       THE COURT: Oh, I see. So you're saying I can read

13 into the authorization the nonimpairment of pensions even

14 though the governor explicitly rejected that.

15       MR. GORDON: The governor actually didn't. The

16 governor testified that he didn't know whether he had to

17 uphold that, and he decided to choose not to put the

18 condition on it and leave it to the courts, which we suggest

19 is not necessarily appropriate but is --

20       THE COURT: So he rejected the concept of

21 conditioning his authorization on nonimpairment of pensions.

22       MR. GORDON: He did, but he also said he was

23 basically deferring to the courts as to how that should play

24 out, which is ironic because the Webster court has already

25 ruled on that issue.

1          Your Honor, I'll turn to the pensions clause, which

2     is the contracts clause, if I may.

3          THE COURT:  Sure.

4          MR. GORDON:  The concept that the pensions clause is

5     the same thing as the contracts clause just applying to

6     pensions does violence to the language of the pensions

7     clause, as has already been discussed.

8          THE COURT:  Right.

9          MR. GORDON:  I won't get into that.  Obviously we've

10    pointed out that the pensions clause is more specific and

11    that it was enacted long after the contracts clause and that

12    those things together, as a matter of the canons of

13    construction, would indicate that the pension clause must

14    mean something more and something different from the

15    contracts clause.

16         THE COURT:  Right.  So what more and what different?

17         MR. GORDON:  Well, it starts with looking at why and

18    the environment in which these things were done and looking

19    at the actual language of the two clauses.  The contracts

20    clause was adopted back when the government was being formed,

21    and it helps sort of support the structure of the government

22    as it's being developed in terms of federalism and making

23    sure that states don't impair their -- pass laws that impair

24    their own contracts or pass laws that favor their citizens

25    over other citizens.  That was the general nature of it.  And

1   it's directed, you'll note, to the legislature of the state.

2   The state shall not pass laws that will impair contracts.  So

3   that's the contracts clause.  Now you fast forward --

4           THE COURT:  That's the federal contracts clause.

5           MR. GORDON:  And the state, as well as the state

6   contracts clause.  So then you fast forward -- I don't know

7   how long -- 150 years to 1963, and you're talking about the

8   constitutional convention and the pensions clause, and what's

9   going on at that point in time?  Well, pensions are not being

10  funded.  They're underfunded across the state I'm told to the

11  tune of maybe $600 million, and guess what?  Front and center

12  is the City of Detroit that was not paying pensions for its

13  teachers' pensions funds.  So the convention decided it

14  needed to do two things.

15          THE COURT:  Well, at that point they were also not

16  being treated as contracts; right?  They were being treated

17  as gifts I think was the phraseology.

18          MR. GORDON:  As gratuities.  That's correct, your

19  Honor.  So the convention decided it needed to do two things.

20  The convention decided, first of all, to avoid municipalities

21  digging a deeper hole, they were going to put a provision in

22  the Constitution that said that local governmental units will

23  fund their current year's employer contributions in that year

24  to help avoid digging a deeper hole.  Secondly, to protect

25  the accrued and unfunded liabilities and to move away from

 1  the concept that they are a gratuity, the convention said

 2  we're going to call it a contract but not a contract in the

 3  sense of a contract but subject to the bankruptcy.  I mean

 4  there was no -- there was no talk about bankruptcy, nor was

 5  there any talk about the contracts clause in this regard.

 6  They talked about this is going to be a contract that's in

 7  the concept of a solemn binding obligation that will be paid

 8  over time, so it is a contract.  There's a contractual right,

 9  and it shall not be diminished or impaired, meaning it will

10  be paid over time by the state and its political

11  subdivisions.  It is absolute.  There is no -- there is no --

12  as the attorney general's papers say themselves, there is --

13  it's impermeable unlike the contracts clause, which has

14  developed over time to say otherwise.  Now, the difference is

15  in part --

16        THE COURT:  But how can the -- how can the state

17  contract -- how can the state promise that given that under

18  the federal Constitution it can't print money?

19        MR. GORDON:  It's a matter of insuring that what

20  dollars are available are devoted where they need to be

21  devoted.

22        THE COURT:  Suppose there's not enough then.

23        MR. GORDON:  I don't know the answer to that

24  question, your Honor, but that's not the issue we have here

25  today.  As I've told you, I think that there is enough money

 1    here.

 2         THE COURT:  It's an important issue.

 3         MR. GORDON:  There is -- I'm sorry.

 4         THE COURT:  It is an important issue.

 5         MR. GORDON:  It's an important issue, but --

 6         THE COURT:  It demonstrates that there's a

 7    constitutional right there.  It is stated there, but what's

 8    it worth?  What's it worth?  I mean Ms. Levine posed that

 9    question.  What's it worth if the entity that has the

10    obligation doesn't have the means?

11         MR. GORDON:  First of all, I mean every situation is

12    different.

13         THE COURT:  Yeah.

14         MR. GORDON:  Does it have the means today or will it

15    have the means tomorrow, over time?  Musselman, a state

16    Supreme Court case, says, though, that the pension clause

17    cannot be abrogated in the face of financial exigency.

18    That's what it says.  If there's a need to amend the state

19    Constitution, then it needs to be amended, but it can't be

20    abrogated by one branch of the government.  The will of the

21    people has spoken.  The Constitution is a limit, and it

22    circumscribes the power of the government.  The government

23    can't say, "Gee, we've got an exigency here.  I guess we're

24    going to ignore the state Constitution."  It cannot do that.

25    The contracts clause is different, and this is the point --

1    part of the point is there are contracts and then there are

2    contracts.

3         THE COURT:  Is there any other constitutional right,

4    state or federal, that is that absolute, any other?

5         MR. GORDON:  Sure.

6         THE COURT:  And even freedom of the press has its

7    exceptions.

8         MR. GORDON:  Well, you know, if you look at even the

9    attorney general's papers, you couldn't -- the legislature

10   can't pass laws that would abrogate freedom of religion,

11   freedom of speech, things of that nature, and it puts the

12   pension clause on the same level.  It is absolute in that

13   regard.  There are contracts, and there are --

14        THE COURT:  We have laws that limit speech.  Can't

15   threaten the President; can't yell "fire" in a crowded

16   theater.  You can't commit libel.

17        MR. GORDON:  So that maybe there's some regulation

18   on the federal level, but this is a state issue.  It is an

19   issue that has been -- it is the will of the people of the

20   state.

21        THE COURT:  Even the contracts clause has its

22   limits; right?

23        MR. GORDON:  Contracts clause does.  The reason is

24   different, though.  There are contracts, and then there are

25   contracts.  And if you look at, for example, you know, some

1  contracts fall under the contracts clause, but the pensions
2  were determined to be different, and that's why you have a
3  pensions clause.  That's the whole point of it.  The
4  contracts clause recognizes that when you contract with the
5  government, there is an inherent reserve police power to act
6  in the public's welfare, and, therefore, to the extent
7  necessary, in certain situations they can impair contracts.
8  That's the contracts clause.  Then you have the pensions
9  clause.  It doesn't say that it is subject to the contracts
10 clause.  It elevates pensions to a different level, and the
11 reason is fairly clear.  If you look at the Musselman case,
12 in particular, again, Musselman says that Michigan
13 governmental -- and I quote.  This is from 448 Mich. 503
14 where it talks about the pension clause being absolute and
15 that it -- and it recognizes that the pension clause protects
16 pensions for work performed, so I quote, "Michigan
17 governmental units do not have the option, however, of not
18 paying retirement benefits.  Unlike highway construction or
19 police protection, which a governmental unit can choose to
20 receive less of, it is impossible to receive less service
21 from the pensioner.  The pension payment is payment for work
22 already completed, or deferred compensation," end quote.
23 What's being referenced there is the complete difference --
24 the relationship between the public employer and labor is
25 different than the relationship between the public employer

1   and a bondholder.  A bondholder makes an investment.  There's

2   risk involved.  That is understood, and that risk is factored

3   into the pricing of the bond.  A laborer has -- the

4   relationship with the employer is different.  The laborer

5   works.  The employer pays.  And to the extent that part of it

6   is deferred compensation in the form of a pension, so be it,

7   but it's for -- but what the pension clause protects is

8   accrued benefits.

9           THE COURT:  Isn't there an argument that labor takes

10  risks with its employer, too?

11          MR. GORDON:  Not in the State of Michigan, your

12  Honor, and I want to emphasize that.  Michigan is only one of

13  seven or eight states in the country that has this clause.

14  This is unique to Michigan and the seven or eight other

15  states involved.

16          THE COURT:  Excuse me one second.  I want you to

17  ignore --

18          MR. GORDON:  Oh.

19          THE COURT:  No.  I want you to ignore that yellow.

20  My staff advises me that Ms. Levine didn't use seven of her

21  minutes, so I'm going to yield them to you.

22          MR. GORDON:  Thanks, Sharon.

23          THE COURT:  So reset the clock at ten.  I assume

24  that's okay with you.

25          MR. GORDON:  Yes, absolutely, your Honor.  I can't

1    even remember where we were now.  Where were we?

2          THE COURT:  Oh, I'm sorry.  I interrupted your train

3    of thought.  Well, take another minute to recollect --

4          MR. GORDON:  Oh, yes.  I think I finished that

5    point, I suppose.  It really is that, you know, some contract

6    rights are just contract rights, and other contract rights do

7    rise to the level of property rights, and that's in the

8    United States Trust Company of New York versus New Jersey,

9    the Supreme Court case, 431 U.S. 1.  In Michigan AFT Michigan

10   versus Michigan, 297 Mich. App. 597, the Court held that

11   withheld salary of public school employees constituted the

12   taking of property in violation of substantive due process

13   and the takings clause, so there are relationships,

14   contractual relationships relative to accrued benefits for

15   labor, pension obligations, that are treated as property.

16         THE COURT:  Is there a State of Michigan case that

17   holds that pension rights are property rights?

18         MR. GORDON:  Well, this relates to salary of public

19   school employees.  I don't know --

20         THE COURT:  Right.  So I was asking you about

21   pensions.

22         MR. GORDON:  About pension obligations specifically?

23   I would have to check on that, your Honor, but I believe that

24   there are pension cases in the state that talk about pension

25   rights as property, including in such a situation, as you can

1   imagine, as divorce settlements.  There are pension

2   obligations that become property that get part of a property

3   settlement even, but that's just one example, but I can get

4   you --

5          THE COURT:  Well, we have to be careful here because

6   a contract right is in the bundle of property rights.  Every

7   contract is property of the parties to the contract; right?

8          MR. GORDON:  Yes, your Honor.  I'm not sure that all

9   contract rights rise to the level if they're abrogated of a

10  taking, but here vis-a-vis the pension --

11         THE COURT:  Right.  That's exactly the point.

12         MR. GORDON:  That's right, but the pension clause --

13         THE COURT:  So when the federal, you know,

14  Bankruptcy Court discharges creditors' contract rights

15  against debtors, which we do all day every day, we're not

16  taking the creditors' property rights even though we are

17  discharging those contracts or if we are it's not a Fifth

18  Amendment violation; right?

19         MR. GORDON:  True.  By the same token, there are

20  other property rights that are determined under state law

21  that -- cases such as Butner and Travelers respect the state

22  law property interest, and it flows through the bankruptcy.

23         THE COURT:  Right, but the point is that it has to

24  be a property right under state law over and above what would

25  be the contract right, like, for example, a security

1    interest.

2         MR. GORDON:  Or a state constitutionally protected

3    right that is impermeable we would submit, your Honor.

4         THE COURT:  Okay.

5         MR. GORDON:  It's like a nondischargeable debt, your

6    Honor, and it doesn't mean that it can't be dealt with in a

7    way that doesn't impair it but gets dealt with in a way that

8    is -- you know, provides some flexibility for the

9    reorganizing entity, but it's a nondischargeable debt.

10        THE COURT:  Well, nothing in Chapter 9 provides for

11   any nondischargeable debts, is there?

12        MR. GORDON:  I'm stating it by analogy, your Honor,

13   obviously.

14        THE COURT:  Okay.  All right.

15        MR. GORDON:  By putting the condition on that you

16   can't impair, it becomes a nondischargeable debt essentially,

17   and the state has that authority to place the appropriate

18   conditions on the filing of the bankruptcy to protect the

19   statutory structure.  And it's not just statute.  I mean this

20   is -- the difference here again, this is really unique.  It's

21   not like California or Alabama.

22        THE COURT:  Hypothetically, a state legislature

23   passes a law authorizing municipalities to file Chapter 9 so

24   long as the plan provide -- the municipality's plan provides

25   for a priority of payment, and it turns out that that

 1   priority of payment legislatively required by the state
 2   legislature is different from the Bankruptcy Code.  Let's
 3   assume that.  Would it be your position that no municipality
 4   could file Chapter 9 in that case because the state law
 5   contravenes the superior -- or the supreme federal law?

 6         MR. GORDON:  Well, that's an interesting question
 7   because it sounds more like one of those situations where
 8   once you're in bankruptcy, you have to accept the structure
 9   of the Bankruptcy Code itself, and that highlights --

10         THE COURT:  That's exactly what the city is arguing
11   here.

12         MR. GORDON:  And that highlights the point here that
13   eligibility has to be dealt with at the eligibility stage and
14   that -- and to put off the question of whether you can impair
15   the pension clause leads to those vagaries of questions
16   about, "Well, now we're in bankruptcy.  Does the Bankruptcy
17   Code have vitality and in what regard?"  No.  You don't get
18   to those questions unless you have valid state authorization.
19   You don't have valid state authorization unless you've taken
20   into account what provisions need to be there to protect the
21   state Constitution and other statutes, and that's sort of
22   what Harrisburg talks about.  You may have facial authority
23   under one statute, but you got to look at the other statutes.
24   And in here in this case it's --

25         THE COURT:  So in my hypothetical you would say

1   there's no valid authorization.

2          MR. GORDON:  I would say that the state may be very

3   disappointed if it authorizes and allows the debtor into

4   bankruptcy only to find that the -- that part of the

5   protection goes away.

6          THE COURT:  It's hard for me to be concerned about

7   how the state feels.  Is it your position that there would be

8   no authorization, no proper authorization in that case?

9          MR. GORDON:  Let me understand the hypothetical

10  then.  I know time is short.  The hypothetical is that the

11  state would pass a statute that says that you can file

12  Chapter 9, but the priority of payments is going to be --

13         THE COURT:  But here are the priorities.  Here are

14  the priorities.  You got to pay bonds first, and, you know,

15  you got to pay --

16         MR. GORDON:  Perish the thought.

17         THE COURT:  Sorry?

18         MR. GORDON:  Perish the thought, but go ahead.

19         THE COURT:  Okay.  Perish the thought all you like,

20  but this is the hypo.

21         MR. GORDON:  Yes.

22         THE COURT:  You got to -- you pay the bonds first,

23  and you got to pay trades, and then you got to pay employees'

24  wages, and then you pay pensioners last, and understand,

25  everyone who's listening to this, this is strictly

 1  hypothetical.  It's inconsistent with the Bankruptcy Code.

 2  I'm sorry.

 3          MR. GORDON:  I forgot about the overflow.  Sorry.

 4          THE COURT:  Well, and this is being recorded.

 5  Anyway, it's inconsistent with the Bankruptcy Code.  However,

 6  whatever hypothetical you create, and the governor says, you

 7  know, "We've got to comply with state law.  I'm authorizing

 8  this bankruptcy, but the municipality's plan has to comply

 9  with the state law that sets forth these priorities."  Is

10  that a proper authorization or not?

11          MR. GORDON:  I would say not.

12          THE COURT:  Okay.

13          MR. GORDON:  Well, it's --

14          THE COURT:  Now you're saying that when state law

15  says the priority has to be given to pensions --

16          MR. GORDON:  Well, let me back up.

17          THE COURT:  -- that's not proper if it's

18  inconsistent with the Bankruptcy Code.

19          MR. GORDON:  Actually, I would say -- no.  I would

20  say that the authorization is proper, but, again, a portion

21  of that authorization is actually going to come into conflict

22  with the Bankruptcy Code itself, so I think it's just a

23  flawed concept.  So if you had that provision in there, I --

24  you know what?  The difference is -- let me think about this.

25  I think the difference is the cases such as Vallejo and

1    others dealt with situations where someone tried to cherry

2    pick various provisions of the Bankruptcy Code after they got

3    into bankruptcy.  It didn't involve the actual state

4    authorization.  So here I think if you were presented with

5    that, you would have two choices.  You would either have to

6    acknowledge that state authorization as is and agree to that

7    structure and say that will supersede the Bankruptcy Code

8    because that's the only way the state is allowing you to get

9    into bankruptcy, or you would have to dismiss the case.

10            THE COURT:  Which should I do?

11            MR. GORDON:  In that situation, I think you would

12   give the state the opportunity to decide, but in the first

13   instance, if the state doesn't do anything, you would have to

14   dismiss that case because you don't have the authority to

15   amend the Bankruptcy Code.

16            THE COURT:  I would have to give them the

17   opportunity to revise the authorization?

18            MR. GORDON:  That's correct, your Honor.  They'd

19   either have to amend the --

20            THE COURT:  How could --

21            MR. GORDON:  -- authorization or understand that if

22   they go into --

23            THE COURT:  How could the governor provide an

24   authorization that's inconsistent with the state statute?

25            MR. GORDON:  He couldn't.  He would either have to

1  go back and --

2      THE COURT:  What's there to revise?

3      MR. GORDON:  -- change the statute -- he'd either --

4  he has two choices.

5      THE COURT:  Oh, go back and change the statute.

6      MR. GORDON:  There are two choices.  Either the

7  Court agrees to allow the case to go forward with that

8  structure because that's the only way the state will

9  authorize it and that's what 109(c)(2) talks about, or if

10  this Court for some reason believes that that is in conflict

11  with the Bankruptcy Code, then this -- I guess I don't know.

12  The state could either -- the state would have to go back and

13  amend its statute in some fashion.  I don't really know, but

14  I think that if the state --

15      THE COURT:  Or if it's constitutional, amend its

16  Constitution?

17      MR. GORDON:  Wait.  What couldn't be done is that

18  this Court could not accept the authorization and then say,

19  "I'm cherry picking.  I'm not allowing that part of the state

20  statute to stand because that is the only way that they got

21  into bankruptcy in the first place."  That's my answer, your

22  Honor.  All right.  Can I move on?

23      THE COURT:  You can.

24      MR. GORDON:  We're really out of time here probably,

25  I notice, in a minute, but I just wanted to touch upon

1  collateral estoppel because I promised I would unless your

2  Honor has a different --

3        THE COURT:  No, no.  You argue what you like.

4        MR. GORDON:  As far as collateral estoppel is

5  concerned, your Honor, the city and the state have argued

6  that there was not a full fair opportunity to litigate in the

7  Webster matter.  We've addressed that in our papers.  We

8  believe that that is not accurate.  There was full briefing.

9  Both sides filed cross-motions for summary disposition, so

10  they addressed the merits of the matter.  The Court

11  acknowledged that there had been briefing and oral argument

12  before it entered its order.  The city and the state also

13  argued that there was no privity between the city and the

14  defendants in Webster, but on September 19th, your Honor, the

15  city argued in this court that there was a common interest

16  agreement between the city and the state and that there was

17  common interest with respect to the financial situation of

18  the city and the bankruptcy, so privity is certainly there.

19  And then finally the city and the state argued that the state

20  court doesn't have authority or jurisdiction to rule on

21  eligibility issues.  The Webster court didn't rule on

22  eligibility issues.  It doesn't mention 109(c)(2) of the

23  Bankruptcy Code.  It merely ruled on the interplay between

24  two state statutes, PA 436 and the pensions clause, and ruled

25  that those two had to be harmonized and that, therefore, any

1   authorization of a bankruptcy under PA 436 must comport with

2   the pensions clause or otherwise it was unconstitutional, so

3   it did not infringe on this Court's jurisdiction in that

4   regard.  So we think that collateral estoppel is valid and

5   applies here under the Webster judgment.

6            THE COURT:  Thank you.

7            MR. GORDON:  Thank you, your Honor.

8            MS. CECCOTTI:  Good afternoon, your Honor.  Babette

9   Ceccotti for the UAW.

10           THE COURT:  Good afternoon.

11           MS. CECCOTTI:  And with admittedly some trepidation,

12  I am also going to cover the authorization under state law,

13  and I think -- I guess I'd like to start with just a couple

14  of threshold comments.  First, I think the exchange that

15  you've had with Mr. Gordon and perhaps with others -- and I'm

16  sure it's not going to be limited there -- will probably lead

17  you to conclude that at least some of the issues that you've

18  slated as purely legal will -- are better served awaiting the

19  outcome of the trial.  I'm just -- you know, Mr. Gordon took

20  you through a series of numbers.  There are all kinds of

21  facts and information that are probably best developed

22  through the evidentiary record, and that may well inform your

23  Honor's views of a number of the questions that you've asked

24  here today so far, so I'll just start with that observation.

25  I'd like to just, if I might, also --

1          THE COURT:  Well, just so the record is clear -- and
2   I may have indicated this before even perhaps in writing --
3   it's certainly not the Court's intention to rule on these
4   issues before the trial, and to the extent any of the facts
5   that come out at trial bear on these, sure, they'll be taken
6   into account.
7          MS. CECCOTTI:  Thank you, your Honor.
8          THE COURT:  But I did hold out to all of you that
9   one of the purposes of today's hearing was to see whether
10  there are any genuine issues of material fact in advance of
11  the trial so that you can address those at the trial, and I
12  intend to do that.
13         MS. CECCOTTI:  Thank you, your Honor.  I guess
14  the -- let me just interject another thought into the
15  exchange that you had with Mr. Gordon on your hypothetical, a
16  couple of thoughts.  First, the -- and I will -- I'm going to
17  start and go through this in a little more organized way, but
18  I just wanted to make sure I get this point out.  It's
19  important to keep in mind that as inviolable and as absolute
20  and as definitive as those of us on the objectors' side
21  believe the pension clause is and as much as we believe that
22  it was the right of the citizens of the Michigan -- of
23  Michigan to so provide in adopting it, remember that we are
24  here in the public sector.  We are not in the private sector
25  where there is a federally regulated and federally

1   established pension insurance system so that when plans get

2   underfunded, when plan sponsors are overburdened, there is a

3   system that takes over.  And I would have to say all --

4   certainly the lion's share of the decisions that have come

5   down on this topic arise because of the -- because of the way

6   that that system is constructed.  There's a federal agency

7   that provides a safety net.  You know, there are moral hazard

8   issues.  There's a whole balancing that goes on in that

9   system.  We don't have that here.  Michigan pensioners have

10  Article IX, Section 24.  That's it.  That's what they have.

11  So as, you know, perhaps a -- it might take a bit of a leap

12  to see that that section means what it says and really,

13  really, really means what it says, I think it's important to

14  bear in mind that that is a safety net for pensions for

15  Michigan pensioners.  Okay.

16          So, now, to try to get back a little bit towards

17  more of an organized progression here on the 109(c)(2)

18  issues, the governor, as we've been discussing, had issued

19  the letter of authorization -- the letter of authorization

20  without any contingencies, so I think it's in -- and your

21  Honor asked the question this morning -- a couple of

22  questions this morning that have to do with, you know,

23  where's the impairment and where's the harm and questions of

24  that nature, and why wasn't the governor's reference to 943

25  sufficient.  So I think what's important to do first is take

1   a look at -- briefly just take a look at the authorization
2   letters.  And, again, this is without reference to any
3   testimony or anything else that you're going to hear next
4   week.  You know, just looking at the letters that were
5   attached to Mr. Orr's declaration, the July 16th
6   authorization makes quite plain in his situational
7   overview -- he says for an extended period of time, the city
8   has simply failed to make the investments required to provide
9   its residents with an adequate quality of life as limited
10  resources have been diverted elsewhere.  He says the city's
11  urgent need to address large and growing legacy liabilities
12  and other substantial debts is self-evident.  Failure to
13  address these liabilities will prevent -- excuse me --
14  prevent the city from devoting sufficient resources to
15  providing basic and essential services to its residents.
16  Indeed, significant additional resources are required to
17  improve health and safety.  And he goes on to say that the
18  city must devote a larger share of its revenues to
19  effectively providing basic essential services to current
20  residents, attract new residents and businesses to foster
21  growth and redevelopment, ultimately begin -- and ultimately
22  begin what will be a long process of rehabilitation and
23  revitalization for the city.  The city's debt and legacy
24  liabilities must be significantly reduced to permit this
25  reinvestment.  Plain as day in Mr. Orr's letter.  He

1  incorporates his entire proposal, the -- I don't have the
2  whole thing here.  I've just got some of it.  This is the
3  June 14th proposal.  Goes to the governor, and the governor
4  writes back again providing the authorization and saying in
5  part that he's reaffirming his confidence that Mr. Orr has
6  the right priorities when it comes to the City of Detroit.  I
7  am reassured to see his prioritization of the needs of
8  citizens to have improved services.  I know we share a
9  concern for the public's -- for the public employees who gave
10 years of service to the city and now fear for their financial
11 future in retirement, and I'm confident that all of the
12 city's creditors will be treated fairly in this process.  We
13 all believe that the city's future must allow it to make the
14 investment it needs in talent and infrastructure all while
15 making only promises it can keep.  So I think it's very clear
16 from these letters -- excuse me -- as it is abundantly clear
17 from the proposal that the city is proposing to take
18 resources from what it's calling the legacy liabilities or,
19 fill in the blank, accrued pensions, and divert those
20 resources to the list that Mr. Orr has laid out here,
21 reinvestment and services and the like, so when we talk about
22 not impairing the pensions and who took what action and when
23 does the impairment happen, the governor's letter, we submit,
24 in fact, is the impairment because it has -- the governor is
25 stating that he is acknowledging Mr. Orr's priorities,

 1   including the priorities to take money from the pensions and
 2   use them to pay other things.  And so when the pension clause
 3   talks about -- excuse me.  I'm sorry.  I just lost my brief.
 4   I apologize, your Honor.  I think I -- I have it.  So when we
 5   talk about the text of Article IX, Section 24, "The accrued
 6   financial benefits of each pension plan and retirement system
 7   of the state and its political subdivisions shall be a
 8   contractual obligation thereof which shall not be diminished
 9   or impaired thereby," and we look and we are -- we see that
10   among the records in the constitutional convention is the
11   explanation that Article IX, Section 24, quote, "requires
12   that accrued financial benefits of each pension plan and
13   retirement system of the state and its political subdivisions
14   be a contractual obligation which cannot be diminished or
15   impaired by the actions of its officials or governing body,"
16   the impairment occurs when the governor signs this
17   authorization with no contingencies.  That's when it happens.
18   So not impairing thereby, meaning -- means very specifically
19   this document, and the "this" I'm holding up here now is the
20   governor's consent.  Now, why is --
21          THE COURT:  Oh, but this raises two questions.
22          MS. CECCOTTI:  Sure.
23          THE COURT:  Is there a scenario in which the city
24   would have the ability to meet its pension obligations in the
25   very long term unless it makes the kind of investments that

1    Mr. Orr and Mr. Snyder have suggested should be part of the

2    city's priorities?  That's question number one.  Question

3    number two is actually a much more important question, and

4    that is is question number one a question for now, or is it a

5    question for plan confirmation?

6              MS. CECCOTTI:  It is absolutely a question for now

7    because --

8              THE COURT:  What's the answer then?  How can the

9    city maximize its chance of paying its pension obligations

10   unless it makes the kind of investments that Mr. Orr and Mr.

11   Snyder are talking about?

12             MS. CECCOTTI:  It may be that the investments

13   themselves or the idea for the investments is fine.  The

14   question is can it get there lawfully by taking money from

15   pensioners?  That is the question that the state Constitution

16   answers by saying no.  Now, as Mr. Gordon pointed out or as I

17   think is evident from his presentation, there's a lot of

18   numbers here, Judge.  There were numbers in Mr. Orr's

19   request, his July 16th request.  You're going to hear an

20   awful lot about those numbers and what they are and what they

21   are not, so I would suggest that the notion that we somehow

22   have already today, quote, no reasonable alternative in the

23   words of PA 436 I would suggest very much should await your

24   Honor's review of the evidence on all of that, so --

25             THE COURT:  Okay.

1    MS. CECCOTTI:  I realize it's a question that has

2  been on your mind all day, but I really think unless you

3  really want us up here freelancing numbers -- and you really

4  don't -- that it is best to simply --

5    THE COURT:  I'll grant you that one.

6    MS. CECCOTTI:  Right; right.  But I guess my point

7  is the answer cannot be because the problem seems hard, we're

8  just going to try to find a way to say perhaps that this

9  language doesn't mean what it says because I think once I

10  start down that road, you run into all kinds of problems.

11  You run into the Chapter 9 dual sovereignty problems.  You

12  run into problems of who gets to decide what, right, whether

13  this Court gets to construe Article IX, 24, to, in fact, say

14  it can be invaded.  These are problems that are simply too

15  thorny -- certainly too thorny to start with, and maybe we'll

16  see where your Honor is after the evidence.

17    Okay.  So why isn't the reference to 943(b) enough,

18  and I think -- and I think you've heard it, but just to say

19  it again and hopefully crystalize it a bit, I think the

20  governor assumed in wording the letter the way that he did

21  that somehow this all gets sorted out, and I think that seems

22  to be a lot of the presumption here, and I must say I am not

23  in full company with those who say that once you cross the

24  threshold of 109(c) using state law that somehow you can

25  start, you know, running around employing federal supremacy.

1   I think that that -- we'd probably have a lot more

2   conversations about that with a lot more time with a lot more

3   specificity before we get there.  We think -- and we spent a

4   bunch of time on this in our brief, Judge, and given your

5   handling of the Addison case you probably didn't need all of

6   this, but our view is that you must look -- in order for

7   Chapter 9 to be constitutional, you have to look at all of

8   these pieces that import or give recognition to the state

9   law.  Just to take you back to another colloquy that you had

10   with Mr. Gordon and why I think maybe that the Chapter 13

11   example isn't a good fit here, 109(c) says that an entity may

12   be a debtor under Chapter 9 if and only if such entity is

13   specifically authorized to be a debtor under such chapter by

14   state law.  So while we're all here today obviously under

15   109(c) and 109(c) is in the Bankruptcy Code and so you're

16   right -- the law that must be applied is state law, and the

17   Court decides whether -- you, the Court, you, the Bankruptcy

18   Court, decide under 109(c) whether, in fact, the municipality

19   is specifically authorized to be a debtor under Chapter 9 by

20   state law or by a governmental officer empowered by state

21   law.  And so I think that that may help to distinguish the

22   Sixth Circuit case that you discussed with Mr. Gordon, but it

23   also points out that getting through the door is a state law

24   question.  903 and 904 are obvious limitations on the Court's

25   authority.  943 is a limitation on the plan.  All of these

1   things work together, and I think your Honor's opinion
2   actually in the <u>Addison</u> case on the motion to intervene was
3   exactly right in recognizing the limitations not only of the
4   Court's caution in addressing the questions precisely because
5   of the questions that 903 -- the issues that 903 and 904
6   import into the bankruptcy process, but another observation
7   which takes me back to the letters and the taking of the
8   money from the pensioners and putting it towards something
9   else, which is, I think, your court -- your observation in
10  that case that Chapter 9 is about debt adjustment and should
11  not be overburdened I think applies very well here, too, and
12  I think, again, when we get to the trial and the full array
13  of the plan and everything else comes out and we start
14  talking about that in the evidentiary context, I think that
15  it is at least a question as to whether or not this issue
16  that we're all talking about here is in a narrow sense debt
17  adjustment or whether it is more than debt adjustment and
18  whether that shouldn't inform the Court's caution in ensuring
19  that the state law is being adhered to.
20          And I guess -- and I don't often get to the point of
21  imploring at the podium.  It's not always pretty, but I'm
22  going to break my rule on this whole subject of where is the
23  impairment.  To me it's like a shell game.  Okay.  Under
24  which of these cups is the impairment; right?  Is the
25  impairment -- I've told you where I think the impairment is;

1  right?  I don't think the Court impairs.  The debtor proposes

2  the plan.  Under Chapter 9 only the debtor can propose the

3  plan.  The debtor was supposed to have come up with something

4  that passes muster to meet the 109(c) criteria in advance of

5  getting to this point, and they --

6          THE COURT:  Well, but the proposal of a plan, the

7  filing of a plan which proposes to impair pensions doesn't

8  result in the reduction of anyone's pension check any more

9  than the filing of the case did.

10         MS. CECCOTTI:  Your Honor, I --

11         THE COURT:  That doesn't happen until the Court

12  confirms it under law.

13         MS. CECCOTTI:  And, your Honor, then why are we

14  talking about it?  Why are we talking about it?

15         THE COURT:  Answer that question.

16         MS. CECCOTTI:  If it hadn't been --

17         THE COURT:  I'm having my issues with that very

18  question.  Why are we talking about it?

19         MS. CECCOTTI:  We're talking about it because it's

20  in their proposal.  We're talking about it because it was in

21  the authorization that went to the governor.  We're talking

22  about it because the governor clearly recognized it or at

23  least recognized it sufficiently to draft the letter that he

24  did.  We're talking about it because despite weeks and weeks

25  and weeks, no one has disabused the pensioners of the notion

1    that their pension rights are -- that they are intending to
2    impair their pension rights.  That's why we're talking about
3    it.  It simply does not -- here they are in Chapter 9; right?
4    They're in Chapter 9.  They've got the benefit of the
5    automatic stay.  They've gotten their stay against the pre-
6    petition lawsuits.  They want to have a bar date motion.
7    They're getting all of the -- you know, all of the features,
8    right, of Chapter 9.  And the threshold question that has to
9    be asked is can they be here, and the threshold question can
10   only relate to the form in which they show up on the court's
11   doorstep.  And the form in which they show up on the court's
12   doorstep is the June 14th proposal, which is abundantly clear
13   on the subject of invading -- impairing accrued pensions.
14   What else would the Court -- what else would we be dealing
15   with?  What else would your Honor be dealing with if not for
16   the fact that they evidenced their plan?
17          THE COURT:  I think the answer to that question may
18   be the governor's authorization.  He says we are here to
19   adjust the city's debts in conformity with law.
20          MS. CECCOTTI:  He says that at that end we do that,
21   but what does it mean -- what is supposed to go on before we
22   get there?  It can't be that we have a sort of quasi eligible
23   debtor going through all of the -- you know, using all of the
24   processes I just described and then we have a big
25   conflagration at the end.  I mean it just --

1          THE COURT:  Why not?

2          MS. CECCOTTI:  Chapter 9 presupposes through the

3     front door under state law, specially authorized under -- by

4     state law.  That is what 109(c) says.  It is plain as day.

5     And state law means state law, and it requires giving -- if

6     they hadn't put in this -- the pages --

7          THE COURT:  So in response to my question to Mr.

8     Gordon, you would say that if state law requires a different

9     priority scheme than the Bankruptcy Code, the municipality is

10    eligible only if the Court is willing to enforce that state

11    law priority scheme rather than the Bankruptcy Code priority

12    scheme?

13         MS. CECCOTTI:  I think that I would say that if a

14    state legislature -- we're not talking about the Constitution

15    here.  You're just talking about, in effect, the PA 436 of

16    whatever that state is.  I would say that those are the

17    terms.  We have -- we allow the states -- states have a

18    variety of authorization.  Some of them have no

19    authorization.  It is a state-by-state --

20         THE COURT:  Every bankruptcy case that has addressed

21    that question has held the other way, hasn't it?

22         MS. CECCOTTI:  Well, I don't know the answer to

23    that, your Honor.  In the Chapter 9 context?

24         THE COURT:  Yes, in the Chapter 9 context.

25         MS. CECCOTTI:  Okay.  Well, I --

1        THE COURT:  Every Bankruptcy Court has held once

2   you're in the door, it's the Bankruptcy Code priorities that

3   apply, not the state law priorities --

4        MS. CECCOTTI:  Right.  Well, right.  And now we're

5   getting into the --

6        THE COURT:  -- because the state consents to the

7   Bankruptcy Code or it doesn't.

8        MS. CECCOTTI:  Well, and I would say that a state

9   that passes a law such as your Honor proposed maybe, in fact,

10  looked at those cases and said, no, we don't really want to

11  go there.  We want to -- you know, we'll let you go if it's

12  this other way.  I think the through the door -- once we're

13  in the door -- I know what <u>Harrisburg</u> says.  You know, I have

14  a lot of trouble with it just because I think that the

15  doctrine has not evolved in a sufficiently precise manner.

16  You don't always see what the conflict is.  You have to come

17  up with notions of what the purpose is.  Remember the ancient

18  Supreme Court cases here said bankruptcy is about discharge;

19  right?  So can states have discharge laws?  So we're way, way

20  far away from that now, so I think -- again, I think we'd

21  have to have a lot more conversations about what happens

22  through the door.  Right now we're talking about you're at

23  the door, and you're at the door, and you're presenting

24  yourself, and what you're wearing, right, is something that

25  says we are going to violate Article IX, Section 24.

1    Just want to see if there is anything -- see if I've
2    left anything out here that I wanted to cover.  I have some
3    minutes here.  I guess I could barter away my minutes, Judge,
4    or I could give them to you to barter them away.  Let me just
5    take a quick moment here.  I think -- I mean, again, I think
6    we're going to get to the point of duplication if I continue
7    unless, your Honor, you'd like to ask me anything else.  I
8    think I've hit the points I wanted to hit.

9         THE COURT:  Okay.  Thank you.

10        MR. WERTHEIMER:  William Wertheimer, your Honor, on
11   behalf of the Flowers plaintiffs.  As I'm sure your Honor
12   will recall, although it seems like ages ago now, the Flowers
13   plaintiffs were plaintiffs in one of the state court cases
14   that preceded the bankruptcy, a state court case in which we
15   were making the claim that under state law the governor was
16   required to recognize Article IX, Section 24, if and when he
17   authorized a bankruptcy.  I'm not here to speak on bankruptcy
18   law.  When I heard the reference to Asbury Park, I thought of
19   the street in northwest Detroit.  I'm not a bankruptcy
20   lawyer.

21        THE COURT:  Okay.

22        MR. WERTHEIMER:  I just want to speak briefly on the
23   state law, which it was my understanding at the stay
24   proceedings everybody kind of understood, including the city
25   attorneys, that although our claim was being delayed, it was

1   not being changed in terms of its nature; that is, that this

2   Court would decide as a matter of state law whether this

3   bankruptcy was properly authorized.  It was just that the

4   forum was changing.

5           And I'd just like to make three points as to that

6   state law, three areas where I think this Court can look to

7   what it should do in deciding what I believe is that state

8   law issue; that is, the basic eligibility issue.  If you look

9   at the equivalent of legislative history of Article IX,

10  Section 24 -- that is, the constitutional convention

11  record -- there is certainly references to the fact that has

12  been mentioned here today that it was meant in part to deal

13  with the fact that pensions had been considered not to be a

14  matter of contract, but the only specific reference that I

15  found in that record -- and no one has cited anything to the

16  contrary -- is the comment of Mr. Van Dusen, which I -- with

17  the Court's permission, I'll take the liberty to quote.  It's

18  not long.  "An employee who continues in the service of the

19  public employer in reliance upon the benefits which the plan

20  says he would receive would have the contractual right to

21  receive those benefits" -- he didn't stop there -- "and" --

22  he didn't say "meaning" -- he said "and," in addition -- and

23  I think this goes to what Mr. Gordon was getting at, "and

24  would have the entire assets of the employer at his disposal

25  from which to realize those benefits."  That was the

1  understanding of Mr. Van Dusen.  There's no contrary

2  understanding on the record as to what the idea was on behalf

3  of the people who were writing Article IX, Section 24.

4  That's point number one, and I think if you look at what

5  Emergency Manager Orr did in his June 14th proposal, Mr. Van

6  Dusen, were he alive to take a look at it, would say, "That's

7  not what I meant," because on June 14th what Mr. Orr proposed

8  and he continues to propose is the retirees get treated like

9  any other creditor.  He didn't say words to the effect of

10  "all the assets of the employer," so that's the first piece

11  of state law in the broad sense of the term that I think you

12  can look to.

13          The second piece is the <u>Webster</u> and the <u>Flowers</u>

14  cases and the retirement case.  And I'm not repeating

15  Mr. Gordon's argument relative to collateral estoppel or the

16  res judicata argument.  I'm simply pointing out that as --

17  excuse me -- as Mr. Gordon indicated, that case was fully

18  briefed, and a state court judge looked at the exact issue --

19  well, maybe not exact but very close to the issue that is in

20  front of you, and that state court judge, after full

21  briefing, decided that in a manner consistent with our

22  position.  And I would point out there is no contrary law

23  anywhere.  I recognize this Court -- the cases that say you

24  look to the definitive ruling from the highest state court

25  and all that, but Judge Aquilina's decision -- decisions,

1  well-reasoned, are all that's out there.  She's a state court

2  judge deciding this issue.  That's the second piece of state

3  court law that, as far as I can tell, is out there.

4         There's one other, and that is we have the state

5  attorney general.  This isn't law, but the state attorney

6  general enters an appearance a little late in the game.  The

7  governor has already authorized the bankruptcy.  However, the

8  state attorney general, as an officer of the state, as the

9  chief legal officer of the state, tells this Court that

10 Article IX, Section 24, binds the emergency manager in

11 bankruptcy.  Now, we all know that that gets into the issue

12 of is it at the eligibility stage or the plan stage, and I --

13 that's been dealt with.  My point is simply that a state

14 officer, the attorney general of the state, saying that the

15 emergency manager in bankruptcy is bound by Article IX,

16 Section 24, is consistent and supports our position that the

17 governor, when he goes to authorize that bankruptcy, is also

18 bound by Article IX, Section 24.  And with all due respect to

19 the governor, we think it's up to this Court to hold the

20 governor to that.

21         THE COURT:  All right.  Thank you, sir.

22         MR. WERTHEIMER:  Thank you.

23         MS. PATEK:  Good afternoon, your Honor.  Barbara

24 Patek on behalf of the Detroit Police Command Officers

25 Association, the Detroit Police Lieutenants & Sergeants

1    Association, the Detroit Police Officers Association, and the

2    Detroit Fire Fighters Association defined in this case as the

3    Detroit Public Safety Unions.  As the Court is aware, these

4    are the men and women who provide the police and fire

5    protection that are essential to the survival of the city,

6    and these are exactly the essential services that Chapter 9

7    was designed to preserve and protect.

8           I want to use my time this afternoon to talk a

9    little bit about ripeness, talk very briefly about the

10   supremacy clause and the tension between the supremacy clause

11   and the Tenth Amendment, and then to try to answer some of

12   the questions that the Court has raised with some of the

13   other objectors today.

14          On the issue of ripeness and why this is a question

15   for eligibility, I think that goes to the very nature of

16   Chapter 9, which precisely because of the sovereign immunity

17   and the sovereignty of the State of Michigan, this Court, as

18   it's recognized in so many hearings, is limited in what it

19   can order the city to do.  In that respect, this -- not that

20   every bankruptcy isn't a consensual process and not that

21   every bankruptcy doesn't involve a lot of negotiating.

22   Chapter 9 is unique because it incorporates -- it's a largely

23   consensual process at some level precisely because this Court

24   cannot trump the state's sovereignty in particular

25   situations.  And in that regard, if one talks about imminent

1  harm, there is -- you know, it's in the record.  Mr. Gordon

2  alluded to the fact that the stay authorized the city to come

3  in this court for a very public purpose, and that purpose was

4  to impair the accrued vested pension rights of its public

5  servants.  That question, as the city points out in its

6  papers, no court has ever said they can't do it, and no court

7  has ever said they can.  It's an unanswered question.  We're

8  entitled to know what our rights are, and to suggest that by

9  knowing what our rights are in the door that is to knowing

10  what -- to know what the proper authority is here would

11  somehow skew the process or cause people to walk away from

12  the table I think is wrong.  This is a hard question that the

13  Court has to answer, but the Court is here to follow the law.

14  I think this is -- there is imminent harm to these

15  individuals here, and there's a second piece of that by

16  virtue of the vacuum in which there's no legal precedent on

17  this issue, and that is -- I'm just going to throw out to the

18  Court the idea that this is one of those issues where it's

19  capable of repetition but evading review.  If every time this

20  gets kicked down the road to confirmation, nobody is ever

21  going to know what their rights are when this issue comes up.

22  I submit that Michigan is a little bit unique, but I think

23  that there are plenty of reasons that this issue is ripe for

24  adjudication today.

25          I'd like to take a crack at some of the questions

1    that the Court raised.  You raised the issue of what if the
2    state law requires a different scheme of priorities than is
3    authorized by the Bankruptcy Court.  I think if you step out
4    of the weeds on that question and I think you look at what
5    the Code says here, the state has to give its consent to come
6    into Chapter 9.  And in giving its consent, the state agrees
7    to certain provisions of Chapter 9.  I think a state that
8    authorizes such a scheme simply can't give its consent to
9    come into Chapter 9.  I think that's the simple answer to
10   that question.

11          THE COURT:  So your answer then in that hypo would
12   be not eligible?

13          MS. PATEK:  Correct.  I also think -- the Court
14   asked the question and raised the 11th Amendment, and I'm
15   going to go out on a limb here on this and the question of
16   sovereign immunity because I think the answer to a lot of the
17   issues before the Court and whether or not, in fact, the city
18   can impair these rights or use the Court to impair those
19   rights is in some ways answered by the Code.  Section 106 of
20   the Code addresses the sections of the Code under which the
21   state waives its sovereign immunity.  109 is not one of them,
22   and I think that makes the eligibility issue as it's framed
23   by 109 a question of state law.  And the other place, if
24   we're going to jump ahead to where we'll be down the road,
25   where the state does not waive its sovereign immunity is

 1    under Section 943.  We know there are some places where to

 2    consent to come into this Court and get relief the state has

 3    to agree to conform to the rules.  365 is one of those that

 4    you've got <u>Bildisco</u>.  If you're going to come in and you look

 5    at -- that's a place where the state has to agree, consent to

 6    be governed by the federal rules.  The other place is the

 7    automatic stay.  But when you get down the road to the plan

 8    that only the city can propose, the state does not waive its

 9    immunity, and that --

10        THE COURT:  I think you might be overanalyzing my

11    question about sovereign immunity.  I was only analogizing to

12    the 11th Amendment cases that hold that the issue of whether

13    sovereign immunity is waived is a federal issue, not a state

14    issue.  I didn't mean to suggest, as you appear to understand

15    here, that there is -- that there are 11th Amendment issues

16    in this case.

17        MS. PATEK:  I'm not suggesting that you are, your

18    Honor, but I'm suggesting that -- and this sort of brings us

19    back to where Ms. Levine started out this morning with this

20    concept of -- this very basic concept, and one of the things

21    that makes this case so hard and one of the things that all

22    the commentators agree makes Chapter 9 so hard is this

23    tension.  We have a federalist system.  There are rules of

24    the road that were set up by the founders.  We have a limited

25    system of federal government.  All the other powers are

1   reserved to the states and the individuals. And there's no

2   question that wasn't done so that we could have big and

3   powerful states. That was done by the founders so that the

4   individuals close to the ground would have their rights

5   preserved, and I think within the structure of Chapter 9 and

6   within the limits of the Tenth Amendment, that the state

7   simply cannot use Chapter 9 to impair an express

8   constitutional promise. And I want to talk about that issue

9   for just one moment. This pensions clause is in a very

10   unusual place. Okay. This is -- I think it's fair to say --

11   you talk about there is a contracts clause in the state

12   Constitution just like there's a free speech clause and there

13   are a lot of things that mirror the Bill of Rights, but, as

14   Ms. Levine told us this morning, if somebody is violating my

15   free speech rights, I'm not in state Circuit Court. I'm

16   looking to the federal courts and the federal government to

17   protect those rights. If you're talking about fiscal

18   management, then that's a state issue, and in this case this

19   state and the people of this state chose to enshrine that

20   right to vested accrued -- this isn't all pension benefits,

21   this isn't future benefits, just what people have already

22   earned -- in its state Constitution and say those cannot be

23   impaired.

24         The Court asked the question about what if there's

25   not enough money, which sort of brings me back to the first

1    issue I was talking about.  This Court has to rule on the

2    legal issue that's before it, and if there's not enough money

3    just like if you're in a Chapter 11 that you don't want to

4    see liquidation, that's a hard question that the creditors,

5    including the pensioners, including my clients, have to

6    answer along with the city and try to solve this problem

7    within the limits of Chapter 9 because if we don't solve the

8    problem, the only remedy is a dismissal.

9          THE COURT:  Well, I guess even that answer troubles

10    me because if the Court holds here that there is this pension

11    right that cannot be impaired and because the governor didn't

12    condition this filing on the city recognizing that right in

13    the bankruptcy, what would happen upon dismissal?  There'd be

14    this court holding that there's this unconditional absolute

15    right not to have pensions impaired.  On behalf of your

16    retirees, you couldn't negotiate that, could you?  How could

17    you?

18          MS. PATEK:  I can't negotiate that upon my retirees,

19    but I suggest to the Court there is a solution to this

20    problem, and the solution is for the city to come back again

21    and to authorize -- have the state authorize the filing

22    within the confines of the Constitution, and we move forward

23    on that basis.  I don't -- I understand that this has -- you

24    know, we talk about the elephant in the room, but the larger

25    part, the healthcare benefits, are not protected, and the

1    city has already said effective yesterday -- and these aren't

2    my clients, but -- we're done providing that.  It's a

3    significant claim.  I don't want to minimize that, but I

4    think it is something, given our constitutional structure,

5    that has to be dealt with in the confines of these

6    proceedings, and there are negotiations.  There's a huge

7    consensual component to this, and that doesn't stop if the

8    Court rules the way that we've asked to rule.

9            I see my time is up.  I just want to wrap up very

10   quickly, and I guess I would say we came into court on the

11   first day, and we supported the city, and we've supported the

12   city in many respects throughout this.  We agree that there

13   should be the stay.  There has been the breathing space.  But

14   I think this is a hard, difficult question.  As Ms. Levine

15   said, democracy is hard.  This restructuring plan has to be

16   devised in accordance with applicable law, and the city on

17   the front end has to agree that it's going to -- it's going

18   to do so, and in the absence of that, I think they're not

19   eligible.  Thank you, your Honor.

20           THE COURT:  All right.  Thanks to each of you.

21   We'll take our afternoon break now and reconvene at 3:20, a

22   half an hour from now, for the city's arguments.

23           THE CLERK:  All rise.  Court is in recess.

24      (Recess at 2:50 p.m., until 3:20 p.m.)

25           THE CLERK:  Court is in session.  Please be seated.

1   Recalling Case Number 13-53846, City of Detroit, Michigan.

2           THE COURT:  And it looks like everyone is here.

3           MR. BENNETT:  Good afternoon, your Honor.

4           THE COURT:  Mr. Bennett, you may proceed.

5           MR. BENNETT:  Good afternoon, your Honor.  Bruce

6   Bennett of Jones Day on behalf of the city.

7           THE COURT:  The only thing I would ask of you, sir,

8   is to leave enough time before our closing time today for me

9   to ask some questions of Mr. Todd.  Doesn't need to be now.

10  It can be whenever it's convenient for all of you.

11          MR. BENNETT:  Okay.

12          MR. TROY:  Mr. Troy, your Honor.

13          THE COURT:  Mr. Troy.  I'm so sorry, sir.  And so I

14  want to do that today because I'm not sure what his travel

15  plans are.

16          MR. BENNETT:  Okay.  Your Honor should feel free to

17  interrupt me if you think I'm getting too close to the end.

18  And I actually have one procedural question that I'd like to

19  get settled, too, which really has to do with whether you're

20  expecting or would benefit from oral argument at the

21  beginning of the next -- opening argument at the beginning of

22  the next phase because that's -- so I don't know if --

23          THE COURT:  You mean tomorrow?

24          MR. BENNETT:  No.  On the evidentiary phase

25  beginning next week.

1      THE COURT:  Oh, well not so much oral arguments as

2  opening statements.

3      MR. BENNETT:  Opening statements is what I mean.

4      THE COURT:  Yes.

5      MR. BENNETT:  Okay.  Great.

6      THE COURT:  Yes.  I think opening statements are

7  very important.

8      MR. BENNETT:  Okay.  I want to start with some

9  general comments, some of which are designed to respond to

10  things that came up this morning and some of which I think

11  just help, I think, set the stage for what at least the city

12  believes is happening in this Chapter 9 case.  And I want to

13  start by saying that the purpose of the Chapter 9 case is to

14  adjust the city's debts, and that means all of their debts,

15  obligations evidenced by bonds, obligations under other

16  contracts, obligations to provide healthcare, and pension

17  obligations.  And so that there isn't any confusion, there's

18  been a lot of reference to statements that were made.  I

19  think the statement most cited and the one that I think is --

20  it's the same as all the other ones that have been made -- is

21  that there must be -- the statement was there must be

22  significant cuts in accrued vested benefits.  It's been cited

23  often, and it's true.

24      I want to make a couple of clarifications.  I don't

25  think anyone for the city ever said we were going to

1  eliminate pensions.  This has been about the underfunding

2  amounts.  It is the underfunding amounts that are problems.

3  I think your Honor understands that, but I think it's

4  important to remind everybody else that we've never said that

5  the objective is to eliminate pensions.  The objective is to

6  address the underfunding situation.

7       Now, why did we make that statement?  The

8  statement --

9       THE COURT:  Well, let me just put it right to you.

10  Is it your intent to propose a plan to reduce pensioners'

11  monthly checks?

12       MR. BENNETT:  To be very technical about it, what we

13  have -- what we have -- what we have noted is that it is

14  impossible for the city to fill the underfunding gap in the

15  existing pension trusts, and we have also said that likely

16  requires changing the amounts of pension benefits.  Now --

17       THE COURT:  By "changing," you mean reducing?

18       MR. BENNETT:  Reducing.  Now, I do want to -- I'm

19  going to skip a couple points and then come back.

20  Notwithstanding the fact that the Chapter 11 case has been

21  filed, it remains the city's hope that these adjustments will

22  be achieved on a consensual basis pursuant to agreements

23  reached with the holders of the obligations.  That is still

24  the objective.  And, of course, we are participating in

25  mediation that's intended to facilitate that goal, and,

1  frankly, we'll meet with anyone anyplace anytime to try to

2  achieve that goal.  And we're going to discuss at certain

3  points certain statements that have been made by others in

4  this case about this problem which may suggest that those

5  discussions are going to be particularly difficult, but I

6  want there to be absolutely no confusion about where the

7  city -- where the city stands on this.

8          And by the way, the filing doesn't say how

9  ultimately this case is going to end, whether it's going

10  to -- whether we're going to have a consensual plan, whether

11  we're going to have a nonconsensual plan, whether it'll be

12  partly a consensual plan or partly a nonconsensual plan.  And

13  although the city did make a proposal that certainly

14  contemplated cuts to the underfunding obligation and

15  ultimately to benefits that absolutely is a part of the June

16  14th proposal, it was a proposal in an out-of-court

17  negotiation, and I want to submit -- and we're going to come

18  back to this point later -- it can't possibly be

19  impermissible to ask to reduce benefits, particularly when

20  you can demonstrate a need to do so.  And so far, frankly,

21  that's what the city did pre-petition, and so far that's what

22  the city has done post-petition.  We haven't filed a plan

23  yet.  It will come soon.  And there has not been a request

24  for cramdown, so -- and I think as we get into other parts of

25  the argument -- the fact that we don't quite know what's

1  coming later may have some bearing on some of the legal

2  points that your Honor has talked about and that others have

3  talked about earlier today.

4          THE COURT:  Is it the city's position that the State

5  of Michigan does not have the obligation under the Michigan

6  Constitution to guarantee the city's underfunding?

7          MR. BENNETT:  I don't know if the city has a

8  position.  I will tell you that I have read all of the

9  materials probably more than anyone else in the city's team,

10  and I don't think the state has an obligation to guarantee

11  the pension obligations of a municipality.  I think actually

12  when you look at the --

13          THE COURT:  Isn't it in the city's best interest to

14  say that -- or to assert that the state does have that

15  obligation?

16          MR. BENNETT:  I don't know whether it is or is not

17  in the city's best interest to even take a position on that

18  point, and that's why I said I don't think the city has a

19  position on that point, but I have done a lot of the work,

20  and I think I've made up my own mind as to what I think is

21  there.  I do think it's in the city's position that if we

22  could get money from the state, we would want it, and it

23  would be a great thing, and I'm reasonably certain that that

24  sentiment has been expressed on more than one occasion.

25          THE COURT:  Well, is there any reasonable prospect

1   that the state will comply with that request in the absence

2   of a legal obligation -- a determined legal obligation?

3         MR. BENNETT: I don't know the answer to that

4   question. Thus far the state has been of the view that the

5   city has to reorganize based upon its own financial

6   resources.

7         Okay. The next point I wanted to touch on is the

8   fact that there are a large array of state and federal

9   statutes that say in all kinds of different ways that the

10   city is obligated to pay its debts. In fact, they say that

11   the city is obligated to pay its debts in all kinds of

12   different ways. And the city itself and the state has no --

13   and we'll get into this in much more detail -- no ability in

14   order to overcome those laws or very, very, very limited

15   ability to overcome those laws. One important point about

16   them that didn't --

17         THE COURT: You mean comply with those laws?

18         MR. BENNETT: No. To overcome them to get past them

19   if they can't pay all of their obligations. And, again, it's

20   a situation that the city is going to prove it's in, but

21   that's for another hearing. The point I wanted to make here

22   that I don't think was made earlier today was that a lot of

23   these priorities collide with each other in all kinds of

24   different ways. We heard, by the way, about the all assets

25   at their disposal comment that was, I guess, from the

1  constitutional convention.  Assuming for a second that that

2  is what was intended, the problem is is that the legislature

3  has also passed a law that describes certain debts -- the

4  obligation to pay certain debts as a, quote, "first budget

5  item," close quote.  I don't remember the rest of the

6  sentence, but those words are there.  There's also other

7  state statutes that don't actually grant a lien but that say

8  proceeds of certain things must be used in certain orders to

9  pay.  And when you sit down and try to figure out in any

10  environment where you don't have enough, how do you fit all

11  these different things together, you run into a problem very,

12  very, very quickly.  And these are the provisions, by the

13  way, that are protected by the federal contracts clause and

14  also by the Michigan contracts clause because many of these

15  provisions are in ordinances or resolutions that form part of

16  bond contracts, and others are in ordinances and resolutions

17  that form part of employment contracts.  So you wind up -- if

18  you look at the world before you even start talking about

19  bankruptcy, you don't just have coherent commands, this is

20  how you pay and this is how you go about doing it and

21  everything works, you have a whole bunch of priorities that

22  actually don't work, and this, frankly, is --

23          THE COURT:  Well, but the objecting parties say all

24  of those contract obligations that have protection merely

25  under the contracts clause, federal or state, can be adjusted

1  consistent with state and federal law, but the pension

2  obligation under the state Constitution is inviolate.

3          MR. BENNETT:  And we'll get to that if you'll give

4  me a chance.  I will explain why --

5          THE COURT:  Okay.

6          MR. BENNETT:  -- they are, in fact, no different,

7  but I guess my point here is that outside of bankruptcy, you

8  have a -- you don't have coherence, and this is really to the

9  whole point of does it really make any sense to have a rule

10  that says if the state conditions its filing a proceeding

11  based upon complying with its priorities, what do you even

12  have.  And in many circumstances, you have something that is

13  just not meaningful in the context of where there's not

14  enough to go around.  I think that's the narrow point for the

15  time being.  We will generalize when we get to the whole

16  issue of how the --

17          THE COURT:  Okay.

18          MR. BENNETT:  -- different clauses work.  I also

19  want to say that contrary to the papers that were filed --

20  and I'm now referring to the UAW's papers -- the June 14th

21  proposal didn't take broad aim at the city's workers and

22  retirees.  It was very, very carefully drafted to try to

23  treat as many classes of creditors the same as we possibly

24  could denying preferences to any except in cases where we

25  were legally compelled to provide them.  We thought and the

1   emergency manager thought that that was the best way to go
2   about the problem that confronted us, and, of course, we're
3   not under any illusion that that's going to be the last word
4   on this question.  There will be negotiations.  There will be
5   a plan filed, which I'm certain will differ from the proposal
6   that was issued on June 14th in part to respond to creditor
7   input, and it will be subjected to enormous and exacting
8   procedures by this Court before it is ever confirmed.

9           I also want to spend just a second about the point
10  that was made using some of the letters, the letters that
11  were exchanged between the emergency manager and the
12  governor.  If your Honor hasn't already, I commend you to
13  read all of them, not just the parts that were quoted.  I
14  think it's -- I think to fairly summarize the points made in
15  both letters, the city has been -- the city services, city
16  residents, the ability of the City of Detroit to be a city
17  that provides adequate services to its residents has
18  gradually been lost as a result of the constant and
19  consistent diversion of current tax revenue paid by current
20  tax revenue to legacy liabilities, including but not limited
21  to pension claims.  That is the problem.  It is not as if
22  everything is fine, let's take some money from pensioners and
23  put it to the benefit of residents to make things better.
24  The diversion already occurred.  State law has been followed.
25  Pensions have not been impaired or diminished.  A consequence

1  has been that the resources available for services, that the
2  resources available for investment have, in fact, been
3  significantly impaired and significantly diminished to the
4  point that lots of the city's infrastructure is no longer
5  serviceable, thus the reference to need for investment.  It's
6  not for the new and wonderful.  It's to put back things that
7  really need to be updated and, in fact, replaced because
8  they're worn out, and it's to restore budgetary items,
9  budgets that have, in fact, been cut too great.  And I think
10 that sense -- if you read the entire document, you will see
11 that that is the historical view of the current situation.
12 Again, it will be proved next week.  And the solution is in
13 part a reinvestment program.  Again, just to be technically
14 correct, it's 1.25 billion over ten years, not over five
15 years.  Five years would be better.  I don't think anyone
16 thinks we can afford it.

17       I think the next point and the last point I'm going
18 to make by way of introduction is really to address one of
19 your Honor's questions, which is what happens if the city
20 can't adjust its debts.  I think we have to start with the
21 following.  Most business owners and residents are smart
22 enough and sophisticated enough to figure out that it's a
23 problem to be the highest -- residents of the highest taxed
24 jurisdiction in the State of Michigan where somewhere between
25 42 and 65 cents of every dollar is spent on something other

1    than services to current residents.  That is not a stable

2    situation.  That is just not going to work out well.  The

3    consequence will be continuing declines in revenue.  It may

4    be that debts of all kinds would be paid for awhile, but

5    ultimately debts of all kinds will not be paid, and no

6    provision of any Constitution will change this.  Thus, the

7    stakes are very high not just for the city but also for its

8    residents and its creditors, and I think that puts a very

9    sharp point on your Honor's question about what is a

10    constitutional provision worth when you're confronting an

11    economic crisis such as this.

12          Unless your Honor wants to hear much about it, I was

13    next going to talk about your jurisdiction to decide the

14    eligibility question, but no one else raised it on oral

15    argument, and since it wasn't raised on oral argument, I'll

16    leave it to the papers unless your Honor has any particular

17    questions with respect to that point.

18          THE COURT:  No.

19          MR. BENNETT:  And I'd like to take the same

20    prerogative that if I intentionally pass over a topic because

21    it wasn't covered today, if it's in our papers, we still care

22    about it.

23          THE COURT:  Of course.

24          MR. BENNETT:  I'm just going to try to use time

25    wisely.  So the first place I'm going to spend some time is

1    on the constitutionality of Chapter 9, and I'm going to do it

2    a little bit differently because I think, frankly, if we do a

3    really careful look at <u>Bekins</u> -- and I'm going to call it

4    <u>Bekins</u> because it's a really big company in California that

5    has -- the name is spelled B-e-k-i-n-s, and everybody calls

6    it Bekins, but I don't know what the correct pronunciation in

7    this particular case is concerned.  A very careful analysis

8    of <u>Bekins</u> -- and believe it or not, the Cardozo dissent in

9    <u>Ashton</u> is going to provide us with the guidepost to answer a

10    lot of the questions that may not be constitutional questions

11    but that ultimately are resolved by those cases.  First, I

12    have to say because it's important that it isn't this Court's

13    place to overrule <u>Bekins</u>.  <u>Bekins</u> has been the law for lots

14    of years.  And as the U.S. Attorney pointed out, it's not

15    only that <u>Bekins</u> hasn't been overruled, it's actually never

16    been challenged or questioned or otherwise suggested to be

17    worthy of reconsideration by anything that the Supreme Court

18    has done.  And, moreover, in all of the discussion that your

19    Honor heard about why <u>Bekins</u> should not be regarded as good

20    law anymore, no one actually said that the -- that Chapter 9

21    has been changed in any material way from the law that was

22    before the Court in <u>Bekins</u>, and that's because in all the

23    ways that mattered it really hasn't changed, not just -- not

24    by a little but really not at all.  However, we don't want

25    the Court to write an opinion that says, well, you feel

1  constrained not to overrule _Bekins_.  You think it should be

2  overruled.  So I'm going to spend some time talking about why

3  _Bekins_ is absolutely right and why _Asbury Park_ and anything

4  else didn't change anything.

5       Let me start with just a quick word on _Asbury Park_.

6  Even to the Supreme Court, if you read their own words,

7  _Asbury Park_ is kind of considered an outlier.  It has -- the

8  Supreme Court has never since approved a municipality's

9  modification of its own contract on the basis of emergency or

10  anything else.  Every time it's been asked to, it's basically

11  talked about _Asbury_ as being, number one, confined to its

12  facts and extraordinary situation and not reflective of a

13  broad doctrine.  This same argument was made to Judge Bennett

14  in the Jefferson County case, and he commented on it.  I

15  think we've cited to that case in our papers.  He does an

16  even better job than I just did of explaining why _Asbury_ is

17  an outlier.  It doesn't provide much comfort to any

18  municipality thinking it's going to modify its debts without

19  the help of the Bankruptcy Code and is no good reason to

20  reconsider _Bekins_.

21       Now, the next thing I want to talk about is what

22  _Bekins_ really does, and the -- a reality that you can find in

23  _Bekins_ if you're looking really hard, but unfortunately you

24  have to look really hard, is that there were two

25  constitutional provisions at stake when the Chapter 9's

1   predecessor was subject to Supreme Court review.  One was the

2   Tenth Amendment, and some people have talked about that.  And

3   the second part was the contracts clause.  And when you read

4   <u>Bekins</u>, the Court kind of touches on all the different

5   features that matter but isn't particularly careful about

6   matching up which features were needed to overcome which

7   constitutional problem.  And, frankly, in there we're going

8   to find the answers to a lot of the -- a lot of the other

9   questions that come up in this case.

10       So let's start with the Tenth Amendment.  Of course,

11   the Tenth Amendment, if you quote the whole thing -- and when

12   your Honor confronted earlier, I'm not sure the first six or

13   so words were quoted, "powers not delegated to the United

14   States by the Constitution, nor prohibited by it to the

15   states are reserved to the states respectively, or to the

16   people."  For starting purposes, "powers not delegated to the

17   United States" are important words, and one of the things

18   <u>Bekins</u> very clearly says is uniform laws on the subject of

19   bankruptcies are delegated to the United States and that laws

20   on the subject of bankruptcies include municipal debt, and I

21   think they used "composition" as opposed to "adjustment," but

22   composition statutes.  So it's actually not a close call that

23   the -- at least as far as the Supreme Court is concerned --

24   and I think that's all that matters for this purpose is that

25   we're going to have a municipal Bankruptcy Code that at least

1  covers subjects of bankruptcy and that those are clearly
2  federal functions.  Where a Bankruptcy Code applicable to
3  municipalities --

4        THE COURT:  Well, but we know from several Supreme
5  Court cases that the mere fact that Congress legislates
6  within its authority does not necessarily by itself mean that
7  it's consistent with the Tenth Amendment.

8        MR. BENNETT:  Well, actually I think --

9        THE COURT:  Right?  You've got _Printz_ --

10        MR. BENNETT:  Well --

11        THE COURT:  -- in New York at a minimum that hold
12  that.

13        MR. BENNETT:  Well, that was the commandeering
14  point.  We'll get to commandeering.  There's no commandeering
15  in the Bankruptcy Code.

16        THE COURT:  Well, I don't mean to suggest that there
17  is, but in the laws that Congress passed that the Supreme
18  Court held unconstitutional there, they were legislating
19  within their commerce clause or other enumerated power.

20        MR. BENNETT:  Okay.  In the radioactive waste case,
21  the New York case, it was because they used means that were
22  inappropriate that offended the solvency -- excuse me --
23  offended the sovereignty of the states.  In the Bankruptcy
24  Code -- in the context of the _Bekins_ case, I think when you
25  read the case, they were worried about something different.

1    They were worried about the -- in <u>Ashton</u> the majority was

2    clearly worried about the bankruptcy parts going too far and

3    intruding on insolvent -- on sovereignty issues that weren't

4    actually close enough to the core bankruptcy problem.  That's

5    where we got the governmental and political powers type

6    exception that we have today, and so -- but I don't think

7    there is -- your Honor is correct.  If the way that the --

8    that Congress chose to legislate on the subject of

9    bankruptcies affecting municipalities was to tell state

10   courts what state courts had to do, then you would

11   conceivably have a problem, but there's nothing about the

12   Bankruptcy Court that tells -- state any things what states

13   have to do.  What the Bankruptcy Code tells courts, what it

14   tells federal courts what they should do when confronted with

15   a municipality that petitions for relief and petitions for

16   relief with proper authorization.  And so I don't think that

17   is -- that doesn't implicate the second half of the Tenth

18   Amendment.  It only implicates the first half of the Tenth

19   Amendment, and, quite frankly, it's protected by it.

20          And this is going to come up with something later.

21   When we think about the issue of priorities -- and that's a

22   word that encompasses lots of different things, and we can

23   break it down further if we need to -- priorities are at the

24   core of the subject of bankruptcy, absolutely solidly in the

25   core, so a point I want to make and we'll come back to is

1   that we're not really dealing with the part of the Bankruptcy

2   Code that gets closest to offending sovereignty.  We are

3   really dealing with -- when we talk about where pension

4   claims stand in the world and where they can be impaired, we

5   are dealing something that is core to the subject of

6   bankruptcies.  It's not at the edge of the things that made

7   the difference between the constitutionality and

8   nonconstitutionality of the Bankruptcy Code under the Tenth

9   Amendment.

10         THE COURT:  Well, I think possibly your colleagues

11  on the other side might take issue with that because they

12  analogize the pension right to a property right, which is a

13  matter of state law, at least under our present Bankruptcy

14  Code.  It probably doesn't need to be, as a matter of

15  constitutional law, but it is.

16         MR. BENNETT:  We will come later, and believe it or

17  not, it's going to be implicated in other aspects of the

18  Chapter 9 case not having anything to do with pensions to

19  where the line is between a priority and a property right.

20  When we talk later -- I'll get to it later.  I have a whole

21  section on why in this instance a pension is an unsecured

22  claim and not a property right.

23         THE COURT:  Okay.

24         MR. BENNETT:  If we -- just to take a short part

25  about it now, as I read the cases, there are some cases that

1  talk about an entitlement to money being a property right,

2  but in every single one of those cases the money was there,

3  so, for example, it was in a bank account and the balance was

4  there.  In another circumstance, you were dealing with a --

5  an entity was reducing the amount of money that was supposed

6  to be paid to an employee, but there was a hundred cent

7  dollars there, and the three percent that was going to be

8  carved out was going someplace else.  There is no

9  constitutional case that deals with a promise that there -- a

10  promise that might or might not be satisfied because there's

11  not enough money and say that kind of a promise is a property

12  right.  So I think that if you -- if we apply carefully the

13  Supreme Court cases -- and when I get to them, I'll remember

14  the citations -- we are going to find that an unsecured

15  promise where the actual sum of money can't be pointed to

16  because it's not there yet, that's not a property right and

17  never has been, and so the Fifth Amendment is not implicated

18  here.  This is absolutely a contracts clause case, and we'll

19  get to the contracts clause -- clauses in a second.

20          Okay.  So I want to -- last point with respect to

21  the Tenth Amendment, of course, Bekins says it's

22  constitutional under the Tenth Amendment.  The Bankruptcy

23  Code, in particular, its part relating to municipalities,

24  it's constitutional under the Tenth Amendment.  It finds that

25  the combination -- that apart from the fact that it's subject

1   to bankruptcies, it finds that the fact that the Code, then

2   the Act, had carefully carved out governmental and political

3   powers, kind of the -- that is, the relationship between a

4   municipality and its subjects -- it's carved that out.  It

5   says that is an appropriate safeguard to states retaining

6   sovereignty, and they say, "And, oh, by the way, there's a

7   consent requirement."  So those two things, the consent

8   requirement, the -- what I'll call the 903-904 carveout, and

9   the fact that the uniform laws on the subject of bankruptcies

10   are fair game for the federal government, those three things

11   are the three points that the <u>Bekins</u> court says it's okay for

12   Tenth Amendment purposes.

13         Now, it's time to work about -- talk about the

14   contracts clause problem.  Your Honor is clearly familiar

15   with what the contracts clause problem is.  You have a

16   contracts clause -- and I have a cheat sheet for everyone.

17   I've provided my colleagues on my left with a copy during the

18   break.  If your Honor --

19         THE COURT:  Sure.

20         MR. BENNETT:  -- will, I'd like to pass up --

21         THE COURT:  If you'd like me to look at it, sure.

22         MR. BENNETT:  -- copies.  And here we have the three

23   clauses that we need to talk about, the federal contracts

24   clause, the state contracts clause, and the pensions clause.

25   As far as the <u>Bekins</u> court is concerned, it's talking only

1    about the federal contracts clause, and where I'm going is

2    it's not going to make any difference.  And what the

3    Bekins -- the Bekins court doesn't think that consent of the

4    state has anything to do with getting beyond this clause

5    probably because it knows that there's no consent out to the

6    contracts clause.  Instead, it finds that the reason why that

7    the municipal bankruptcy act is constitutional is because the

8    entity that is actually impairing or changing contracts is

9    not the state.  It's not the municipality acting by the

10   state.  It is the court itself.  And the key quote is the

11   state invites the intervention of the federal, my word,

12   bankruptcy power to save its agency -- that's really a

13   synonym for municipality -- which the state itself is

14   powerless to rescue.  And the reason the state is powerless

15   to rescue it is because of the contracts clause.  Through its

16   cooperation with the national government, the needed relief

17   is given.  So under -- so as far as Bekins is concerned,

18   under Chapter 9 the federal government, through its courts,

19   is the pertinent actor.

20          Now, you could write this more elegantly, and it

21   wasn't in our briefs because I actually didn't find it until

22   last night, and that is Ashton.  You know, I have to

23   confess --

24          THE COURT:  That is what, sir?

25          MR. BENNETT:  Pardon?

1          THE COURT:  What did you say it was?

2          MR. BENNETT:  _Ashton_.  Until yesterday I'd never

3    read _Ashton_.  After all, everybody knew it had been overruled

4    by _Bekins_.  But I read it last night, and I got to the end,

5    and I realized there was a dissent by Cardozo.  And I read it

6    because it was by Cardozo because he writes really well.  And

7    he took this particular issue head on, and so I'm going to

8    read a lot of sentences from it.  It's on page 142.  And

9    here's what he says.  He, of course, is dissenting, so he's

10   finding the last version constitutional, and he gets to the

11   contract clause problem.  And by the way, one of the things

12   about Cardozo's dissent is that he's also much better about

13   dividing the Tenth Amendment analysis from the contracts

14   clause analysis.  He kind of does it explicitly separately.

15   And he says this.  This is about the contracts clause.  "The

16   act does not authorize the states to impair through their own

17   laws the obligation of existing contracts.  Any interference

18   by the states is remote and indirect."  I'm going to skip

19   some things, some citations and some things that aren't that

20   important, and get to something that's more important.  "If

21   contracts are impaired, the tie is cut or loosened through

22   the action of the court of bankruptcy approving a plan of

23   composition under the authority of federal law.  There, and

24   not beyond in an ascending train of antecedents" -- it's an

25   amazing sentence -- "is the cause of the impairment to which

1  the law will have regard," skipping some citations.

2  "Impairment by the central government through laws concerning

3  bankruptcies is not forbidden by the Constitution.

4  Impairment is not forbidden unless effected by the states

5  themselves.  No change in obligation results from the filing

6  of a petition by one seeking a discharge, whether a public or

7  a private corporation invokes the jurisdiction."  We're going

8  to use that sentence again when we talk about whether -- how

9  much we have to decide today.  "The court, not the

10  petitioner, is the efficient cause of the release."

11       For some reason Cardozo didn't participate in

12  Bekins.  The Bekins court, I think, said the same thing.  I

13  just think they said it a lot less clearly and a lot less

14  elegantly.

15       So I think this is very informative about the right

16  way to think about who is doing what and will become

17  important when we get to the authorization problem, which

18  we're going to be at very soon, but I want to --

19       THE COURT:  Where do you think in Bekins the

20  majority of the court or the court itself said the same

21  thing?

22       MR. BENNETT:  The words I read at the -- I'm sorry.

23  I got to find the back pages.  The words I started with,

24  the -- it's at page 54.  The state invites the intervention

25  of the federal bankruptcy power to save its agency -- means

1 | municipality -- which the state itself is powerless to
2 | rescue -- that's the reference to the contracts clause.
3 | Through its cooperation with the national government, the
4 | needed relief is given.  I think the -- I think they're doing
5 | exactly the same thing and just managed to do it in a lot
6 | fewer words but with -- losing a teeny bit of precision in
7 | the process, but it is the same thing.  They are basically
8 | adopting the Cardozo view of why the bankruptcy law is
9 | constitutional under the contracts clause, the federal
10 | contracts clause.

11 | And, you know, I quoted these words, but there are
12 | words before it and words after it that basically zeroes in
13 | on that they're dealing with this particular issue at this
14 | particular point in time.  This is just as much as they say.

15 | The Bekins court, of course, there's no dissenting
16 | opinions.  There's two judges that say they dissent for the
17 | reasons expressed by the majority in Ashton.  That's all they
18 | do.  And so that may well be one of the reasons why the court
19 | was a little bit less careful.  Of course, what Cardozo said
20 | isn't precedent.  It's just very, very clear thinking,
21 | elegantly written about exactly the problem we have in this
22 | courtroom today, and I think it's awfully persuasive, and I
23 | think it is reflective, although certainly done better, than
24 | the work that was done by the Bekins court.

25 | A couple of other constitutional issues before we

1   move on to the authority points and the different contracts

2   clauses.  AFSCME does take the position in their papers that

3   the contracts clause continues to constrain all municipal

4   bankruptcies.  Of course, the federal contracts clause we

5   know from the Supreme Court does not.  We'll talk about

6   whether there's any difference in the state courts soon.  But

7   why AFSCME takes that position is they know full well that if

8   the contracts clause is easily bypassed by a municipal

9   bankruptcy case -- and we think that it is for precisely the

10  reasoning of Judge -- Justice Cardozo -- then this is over

11  because the contracts clauses, as we're about to get to, are

12  very, very similar.  They're almost identical to each other,

13  and they're identical in all the ways that matter.  We will

14  go through it very carefully.

15          There was next the point that was made about

16  accountability.  I don't think there's any confusion about

17  accountability.  I think, again, I appeal to Cardozo's

18  language but also to Bekins on this point.  If you don't like

19  the powers that a court has in Chapter 9, write your

20  Congressman.  If you don't like the way Detroit was managed

21  so that it wound up in Chapter 9, don't let the people who

22  used to be in office be in office again in Detroit.  If you

23  don't like the emergency manager and don't think he was

24  qualified and don't like what he was doing, write the

25  governor or your state legislator.  There is no

1  accountability question if you break it down in the way that
2  Cardozo broke it down.  And by the way, the other thing
3  Cardozo says and I think also <u>Bekins</u> says, there's nothing
4  wrong with asking.  You have to ask if you're going to do
5  this consensually.  The emergency manager on behalf of the
6  city had to ask the retirement funds directly, retirees more
7  indirectly, to reduce or change benefits in order to
8  accommodate the needs of current city residents and the
9  ability of the city to survive.  They could also ask the
10  Court to exercise its authority to help, too.  That doesn't
11  mean they are the one loosening the knot or cutting the knot.
12        We talked about <u>Asbury Park</u>.  Anti-commandeering
13  cases.  Again, I think -- well, the federal government's
14  brief does a much nicer job on this than I ever could in
15  pointing out that the essence of the commandeering cases are
16  the federal direction to state actors -- in this case, maybe
17  it would be state judges or the emergency manager or the
18  governor -- to do something in a particular way.  And, in
19  fact, the -- that's not what happens.  That is not the
20  structure of Chapter 9 at all.  The structure of Chapter 9 is
21  that there is certain power that is vested in this Court, and
22  that power can be used in certain ways.  Frankly, your Honor
23  can't tell the city what kind of plan to file, but your Honor
24  can say whether or not you will approve a plan that is filed,
25  so the request has to be made by the city, and the power has

1  to be exercised by your Honor.  Again, the city itself is

2  powerless to escape the contracts clause, but it does not --

3  at no point does the federal government say I have a policy

4  that I am going to ask the states or demands that the states

5  implement for me.  That doesn't happen anywhere in Chapter 9,

6  and, frankly --

7      THE COURT:  Well, but Ms. Ceccotti doesn't agree

8  with that.  What she says is Congress says if you want to

9  adjust your debts, we prescribe the priority scheme to the

10  exclusion of the state.  The state can't come in with its own

11  notion of what the priorities should be so that the division

12  of sovereignty that results violates the Tenth Amendment.

13      MR. BENNETT:  Well, first, there's a logical failure

14  there, and it has to do with Asbury Park.  The UAW starts

15  with the proposition that there is some kind of viable state

16  restructuring process that can actually work and that the

17  federal government took it away from them and made the

18  bankruptcy -- the Chapter 9 exclusive.  That isn't reality.

19  Asbury Park, as we've seen, first of all, is an unbelievably

20  exceptional case, which, by the way, the end holding is that

21  that restructuring was done for bonds and made bonds better.

22  That is the holding at the end of the day or the key facts at

23  the end of the day in Asbury Park.  Asbury Park is not and

24  never has been construed to be -- and no one cited any case

25  to your Honor showing that in the period of time before

1　Congress claimed the field for itself that there was any

2　viable municipal debt adjustment opportunity created by what

3　we have to call the Asbury Park exception to the contracts

4　clause.  And if you believe everything in the UAW's belief --

5　brief and believe their interpretation of the pensions

6　clause, it gets even worse, that even if there were -- was

7　Asbury Park wiggle room and then in the absence of the

8　Bankruptcy Code the pensions clause is absolute, you have

9　worse than nothing.  You have worse than the almost

10　meaningless Asbury Park exception.  So I don't think it's

11　coercion for the -- for Congress to say you can't do

12　something that you can't do.  And I think the prohibition on

13　competing state municipal schemes is, frankly, recognition

14　that they're not possible or workable, and, again, no one has

15　been able to show you either before or after that provision

16　of the Bankruptcy Code what this wonderful municipal scheme

17　is out there that would have been a choice.  Cardozo doesn't

18　think there's any choice.  Bekins doesn't think there's any

19　choice.  And that's the same court that decided Ashton, so

20　I -- about the same time actually or Blaisdell was about the

21　same time.  Ashton may have been later.  This is a -- I

22　think -- I don't think Congress coerced anybody.  I don't

23　think that's possible on the facts.

24　　　　Okay.  So to summarize, we've shown that Chapter 9

25　is constitutional and that, in particular, it does not offend

1  the contracts clause in the United States Constitution.  I

2  think along the way we've demonstrated that the state's

3  authorization of a municipality's resort to Chapter 9 for

4  relief from contracts generally does not constitute a state

5  impairment of contract because otherwise no -- not a single

6  Chapter 9 would work.  We have also along the way noted that

7  the filing of a petition itself doesn't constitute impairment

8  of anything in any event and that if there is an impairment,

9  it's by the federal Bankruptcy Court, so now let's look at

10  our contracts clause cheat sheet and try to find out whether

11  there's any difference because of the fact that there's a

12  state contracts clause or because there's a pensions clause.

13          First, with respect to the state contracts clause, I

14  don't think anyone has suggested to the Court that this is

15  any different than the federal contracts clause, and, in

16  fact, there isn't.  There's no difference, and no one

17  suggested it, so -- but, by the way, Justice Cardozo, again,

18  as -- more elegantly and more precisely but -- and the Bekins

19  court both would believe that the state contracts clause --

20  okay -- is also focused on the state.  It doesn't bind the

21  federal government.  And since the federal government is the

22  relevant actor, the state contracts clause does not impose

23  any obstacle at all to a municipality invoking Chapter 9

24  relief.

25          The only thing I want to pause to say is it couldn't

1  be otherwise because if it were otherwise -- I skipped a

2  step.  Every state -- at least every state I looked at, so

3  there may be an exception, but every state has a state

4  contracts clause.  It's not surprising.  Copied it from the

5  federal Constitution.  So if it were the case that the

6  state's contracts clause was different than the federal

7  contracts clause and that it was a barrier to invoking

8  Chapter 9 relief, then every single bondholder in every

9  single -- I should say every single lawyer for every single

10 bondholder in every prior Chapter 9 case has probably been

11 guilty of malpractice because they might have been able to

12 escape their prior Chapter 9 cases -- and there are now

13 hundreds on the books -- on this basis alone.  But, again,

14 for the reasons expressed in <u>Bekins</u> and more elegantly by

15 Judge -- Justice Cardozo, they can't.

16       So now we finally get -- we reach the pensions

17 clause also quoted in front of you, and we say, okay, is this

18 pensions clause any different than --

19       THE COURT:  But hang on.  Isn't there a difference

20 between reconciling the bankruptcy clause with the federal

21 contracts clause on the one hand and trying to reconcile how

22 a state that prohibits itself from impairing contracts with

23 taking advantage of the bankruptcy power that the federal

24 court has enabled -- or that the federal Congress has enabled

25 because of the sovereignty of the state?

1        MR. BENNETT:  No difference.  Why?  Let's remember.

2  The reason why I spent so much time talking about why was the

3  Debt Adjustment Act under the Bankruptcy Act constitutional

4  as far as the federal contracts clause was concerned -- it

5  wasn't about the language of the federal contracts clause.

6  It was because the state isn't an actor.  The federal

7  contracts clause acts only on states.  The relevant actor is

8  the federal government.  It's the Bankruptcy Court.  That was

9  the reason why there was no federal contracts clause problem

10  with the Bankruptcy Act in <u>Bekins</u>, and it was the only

11  reason -- the only part of the opinion that had to do with

12  the federal contracts clause part of the problem.  The state

13  contracts clause acts again only on the state, not on the

14  federal government.  Accordingly, if you believe -- and the

15  Supreme Court has held that the relevant actor for purposes

16  of untying or cutting the knot is the federal Bankruptcy

17  Court and not the state, then the state contracts clause

18  forms no additional barrier to the use of the Bankruptcy Code

19  than the federal contracts clause did.  They are the same,

20  and they are both not relevant for the same reason.

21        THE COURT:  And your position is that it's a matter

22  of federal law that the pertinent actor is the federal court,

23  not the state entity that's in bankruptcy?

24        MR. BENNETT:  The Supreme Court told us along the

25  way to approving the Bankruptcy Act the first -- for

1  municipalities the first time that it's --

2        THE COURT:  So even if the state law were to say

3  it's the city that's the pertinent actor, that's not relevant

4  because it's a federal law question.

5        MR. BENNETT:  Correct.  So for purposes of federal

6  law, the Supreme Court has told us it's the federal

7  Bankruptcy Court that is the relevant actor.

8        So now we get to the pensions clause, and we've got

9  to find that there's a difference.  And I think I want to

10  start here.  This is going to be somewhat repetitive of the

11  brief.  There's nothing in the pensions clause that says

12  anything like, quote, "and the state shall not authorize any

13  municipality to commence a bankruptcy case that would allow a

14  federal court to impair or diminish pension claims."  It just

15  doesn't say that.  And, of course, it is words like that that

16  the objectors are saying have to be imported into the

17  pensions clause.

18        It's hard, I think, because at the end of the day,

19  apart from the fact that the pensions clause is, quote, "more

20  specific," and it's, of course, more specific because they

21  were looking at pensions because the law in Michigan at the

22  time they were looking at the pensions clause was that

23  pensions weren't a contract.  That's the only reason it's

24  more specific.  It wasn't because -- there's no other

25  evidence for why it was more specific.  The only

1  difference -- the only words that are different are the

2  words, quote, "be diminished." Excuse me.  Quote,

3  "diminished or."  That's the only difference.  "Impaired" is

4  used in all of them.  "Prohibition of impairment" is used in

5  all of them.  All of them are absolute about prohibitions of

6  impairment.

7          And I'm going to take this in two steps.  First of

8  all, the objectors say --

9          THE COURT:  Well, but hang on.  There's the next

10  sentence, which you didn't include on here, the next sentence

11  of the pension clause.

12          MR. BENNETT:  Okay.  The funding sentence?

13          THE COURT:  Yes.

14          MR. BENNETT:  Okay.  Well, frankly, that's not

15  focusing on today, and it sounds like it's a --

16          THE COURT:  Well, but the objectors argue that this

17  additional consideration that the Michigan Constitution gave

18  to pensions which it didn't give to contracts elevates it,

19  makes it, if not absolute, more absolute than contracts.

20          MR. BENNETT:  Well, let's talk about -- I

21  specifically wanted to talk about that because --

22          THE COURT:  Okay.

23          MR. BENNETT:  -- first of all, why is it -- we

24  should ask ourselves question number one.  Why is it that the

25  federal contracts clause and the state contracts clause

1   became less than absolutely binding?  It wasn't because of

2   the inadequacies of the language.  It was -- in fact, what

3   the courts have done is they put the word "substantial" in

4   front of the word "contract," so an insubstantial impairment

5   doesn't count, and a substantial impairment has some extra

6   hurdles that you have to go over before you can make it.  So,

7   frankly, if what they were trying to do was to tighten the

8   pensions clause and make it more distinctive -- and if they

9   went to the books because, of course, all of the cases, you

10   know, Worthen versus Thomas, Home Building & Loan Association

11   versus Blaisdell, these are like cases from the mid-'30s, so

12   they were all on the books in 1961 through 1963, so they knew

13   that, and they knew that the problem was the incorporation of

14   the substantialness concept.  So if they were really after

15   solving that problem, why didn't they just put the words

16   right before "impairment" "substantial or insubstantial

17   impairment"?  And they could have tightened it up in the way

18   that it had been loosened.  They could have prohibited

19   substantial and insubstantial impairments.  That would have

20   dealt with -- if they were trying to say we're opting the

21   pensions out of the judge-made doctrines and exceptions that

22   have burdened the federal contracts clause and the state

23   contracts clause, that's how they might do it.

24        Now, by the way, it would be irrelevant to this

25   argument because remember the pensions clause, just like the

1   state contracts clause, just like the federal contracts

2   clause, acts on states and municipalities.  It doesn't act on

3   the Bankruptcy Court.  It doesn't act on the federal

4   government.  And once again, if the right actor -- if the

5   actor that unties the knot or cuts the knot is the federal

6   Bankruptcy Court and the federal government and not the state

7   and not the municipalities, as the Supreme Court says, then

8   the pensions clause, even with the words "substantial or

9   insubstantial" in front of it, doesn't get you all the way

10  home.  What they next needed to do in the pensions clause is

11  to say by enacting the pensions clause and giving it -- and

12  making pensions special, we now want to do something else.

13  We really want to say -- objectors thinks the Constitution --

14  that the convention -- that the conventioneers really wanted

15  to say, well, in a municipality that has material pension

16  claims, they can't resort to a federal court to seek relief.

17  That's what they really want us to find in the pensions

18  clause.  But, frankly --

19        THE COURT:  No, no.  I don't hear that at all.  What

20  I hear is you are welcome to come in that door so long as the

21  city's assets, according to Mr. Dusen, are first allocated to

22  pensions.

23        MR. BENNETT:  Well, if there was a lawyer around

24  there at the constitutional convention who was doing

25  research -- and I suspect that there was -- they should be

1    charged with figuring out that the only way to stop the

2    federal courts -- if there is even a way, but the only way to

3    stop federal courts from having the power to impair contracts

4    that maybe a state can't impair is to cut off the -- is to

5    basically say the state cannot ever go to a federal court for

6    a federal -- then it was called composition, you know,

7    federal debt composition case.

8         And the other point that your Honor should note is

9    that -- and we say this in our papers -- during the entire

10   constitutional convention, for years before and almost

11   continuously thereafter, the State of Michigan had authorized

12   the municipalities to file Chapter 9 cases, so if they were

13   really elevating pensions in the way of taking them --

14   distancing themselves from the federal power to impair them

15   and they knew, open paren, one, that the federal debt

16   composition scheme had been determined to be constitutional

17   by the Supreme Court in part because the federal court was

18   doing the work of impairing contracts and they knew -- they

19   have to be presumed to know that Michigan had opted in and

20   had continuously all through the period -- in fact, I think

21   in our papers we say when they repealed it.  I think they

22   repealed it around 1980 when general authorization was all

23   that was necessary, so they kind of covered the entire

24   period.  No one ever said, gee, we better as hell change

25   this.  And in all of the legislative history of the

1    constitutional convention, you don't have a word about

2    bankruptcy and pensions, and the words that you do have --

3    the words that were quoted to you in the papers just filed --

4    I have to find it.  Okay.  Here's AFSCME's best quote from

5    the official record of the constitutional convention, 2

6    Official Record, page 3402.  This is a new section that

7    requires that accrued financial benefits of each pension plan

8    and retirement system of the state and its political

9    subdivisions be a contractual obligation which cannot be

10   diminished or impaired by the action of its officials or

11   governing body.  It's in AFSCME's papers, paragraph -- the

12   new ones, the supplemental papers.  Actually, those are

13   amended and restated, paragraph 19, page 11.  Same brief,

14   paragraph 142, page 71.  Pension benefits constitute, quote,

15   "deferred compensation for work performed which should not be

16   diminished by the employing unit after the service has been

17   performed," close quote.  Those are the quotes that you were

18   offered by AFSCME about the seriousness and importance of the

19   work done in the constitutional convention from 1961 to 1963,

20   this against the background where it's been the law of the

21   land, at least as far as the Supreme Court is concerned,

22   since 1930 -- I can't remember exactly.

23           THE COURT:  So is it your view that the only

24   effective way that the Michigan Constitution could have

25   provided the protection for pensions that the objectors seek

1  here is by the Constitution prohibiting a Chapter 9 filing?

2        MR. BENNETT:  Prohibiting authorization of a Chapter

3  9 filing or -- yes, your Honor.  That's exactly what they

4  would have had to do, and that's not the kind of thing that

5  they can do by implication.

6        I want to talk a little bit more because I think

7  there's a lot of stress that's put on the words "diminished

8  or," and there is the assertion that "diminished or" has to

9  be given some meaning, but, frankly, the only meaning it

10  could be given is to somehow expand "impaired."  I don't

11  personally think it does expand "impaired," and there's -- I

12  want to point out before moving on with a whole bunch of

13  authority to that effect that it's really dangerous for a

14  court to decide that "diminished or" added anything to

15  "impaired" because if the Court decides that "diminished or"

16  filled some gap that's related to the word "diminished and

17  impaired," then in the next case someone is going to come to

18  your Honor and say, "You know that state contracts clause?

19  There's no 'diminished' there, and 'impaired' has to mean

20  less than 'diminished or impaired' in the pensions clause."

21  So it's actually a good thing that there's law out there on

22  this subject -- we had it in our brief -- that basically says

23  that if you run into one of these problems where you've got a

24  list and you want to say that they all have an independent

25  and separate meaning, you've got to propose an independent

and separate meaning for the terms on the list that actually
solve the problem.  And in this case, trying to find an extra
meaning for "diminished or" -- again, it's consistent with
its place in the sentence -- does -- creates a mess in the
state contracts clause in Article I, Section 10.

Apart from that, it turns out that when you go look
at the books -- and this is not in our papers because this
was an issue raised in the responsive papers -- is that every
time we found the definition of "impair" in the cases or in
dictionaries, it includes diminishment, which should not be
terribly surprising.  It's a very common sense answer.  But
if you want a list -- and you might need them in connection
with putting together an opinion -- you could start with the
Bank of Minden case, which is a Supreme Court case, 256 U.S.
126 at 128.  Then if you want to go to the Sixth Circuit,
Riverview Health Institute, 601 Fed. 3d 505.  Black's Law
Dictionary, Webster's Third, and then there's a bunch of
state courses -- state cases from other states that all say
the same thing.  I could read the quotes, but I'll save the
time because it really is kind of a commonsensical -- a
common -- it's common sense that "impaired" has to include
"diminished."  "Impaired" is much broader than "diminished,"
and every so often this is either a -- there's a rhetorical
flourish that works its way in, and this may well be what
that is, and that's all it can be.

1          Okay.  Moving on to the issue of whether or not the

2     authorization to file Chapter 9 is ineffective because the

3     emergency manager or the governor recognized that impairment

4     of pension benefits may be necessary.  I don't want to add

5     additional arguments to the constitutional provisions.

6     That's not the purpose of this section.  The purpose of this

7     section is to deal with the point made, I think, by only one

8     or two of the objectors that the -- that there's an

9     instruction to the emergency manager to comply with the

10    pension statute, and that should apply to the filing of a

11    Chapter 9 case as well.  I'm sure your Honor has your own

12    copy of the Local Financial Stability and Choice Act, Act

13    436, and when you look at the -- most importantly, when you

14    look at the Chapter 9 authorization section, there is no

15    instruction that the emergency manager comply with the

16    protections affecting pensions.  By the way, that may well

17    make sense.  There are a whole bunch of other provisions that

18    talk about what the emergency manager is supposed to do out

19    of court, and not surprisingly it talks about him having to

20    comply with many laws and to pay many debts and to do many

21    things.  He resorts to Chapter 9 when he can't accomplish

22    those things out of court.  And if one thought that anything

23    about the emergency manager law meant to say that the

24    emergency manager had to in Chapter 9 continue to not impair

25    pensions, you would think it would belong in the section that

1  is applicable when the emergency manager files Chapter 9.

2          In addition, I think the part that was read to your

3  Honor earlier this morning has a lead-in clause that didn't

4  make it into the record.  It reads, "If the emergency manager

5  serves as sole trustee of the local pension board, all of the

6  following should apply," and that's where the provision that

7  was located was read to you, so there is nothing in the

8  emergency manager law -- and, in fact, the structure of the

9  emergency manager law itself suggests that a lot of bets are

10  off in a Chapter 9 context that may not be -- including

11  things that the emergency manager is supposed to try to

12  accomplish if he's in an out-of-court world.

13          Next argument, failing to condition authorization on

14  nonimpairment of --

15          THE COURT:  One second.  Does that suggest that in

16  order to accomplish what Mr. Orr thinks is necessary to

17  accomplish with regard to pensions, he needs to be a trustee

18  of the plan?

19          MR. BENNETT:  No.  It's that -- no.  He has the

20  right to remove trustees of the plan for other purposes, and

21  these are these extra requirements that are imposed upon him

22  just in those circumstances that it -- I think when your

23  Honor gets a chance to look at it -- what did I do with it?

24  I had it here a second ago, so I'll give you -- let me give

25  the exact section referenced so it's easy to find.

1          THE COURT:  Okay.

2          MR. BENNETT:  The part I read from is in Section

3     12(m), and it is confined to that relatively narrow

4     circumstance.

5          Okay.  First of all, on the issue of whether or not

6     the governor's failure to put conditions on authorization

7     makes the authorization invalid, we indicate in our brief

8     that we don't think that conditions on authorization could be

9     valid, that -- and as I think -- I think I got ahead of

10    myself earlier, so I don't want to take too much time in

11    covering it again now, but we're talking here about one of

12    the core subjects of bankruptcy, which is priorities, who

13    gets paid when there's not enough to go around.  If that's

14    not a core subject of bankruptcy -- not in the core versus

15    related, but if that's not the absolute center of the subject

16    of bankruptcies, I don't know what it is.  And we've cited a

17    lot of law, and your Honor has pointed out there are many

18    cases, none decided the other way, that say particularly in

19    the context of things touching on priorities and who gets

20    paid first and who gets paid second, who doesn't get paid at

21    all, that the -- that you buy the Bankruptcy Code as a whole.

22    You buy the scheme as a whole.  You don't buy parts of it.

23    And in this sense federal law is supreme because once there

24    is a proper bankruptcy case before the Court, it is the

25    federal priority scheme that applies.  It is legitimate that

1  the federal priority scheme applies because it's legislation

2  on the subject of bankruptcies, and because it's legislation

3  on the subject of bankruptcies, it is absolutely supreme,

4  period, end of story.

5      So, as to your Honor's hypothetical, if anyone walks

6  into the federal court and says, "I want federal judicial

7  relief.  I want to use that federal power to untie and cut

8  knots, but I want the ultimate distribution or really any

9  part of the distribution to be conducted in accordance with

10  my terms," whether they're found in a statute or in a state

11  Constitution, it doesn't matter.  The federal law on this

12  issue is supreme, and it's supreme over Constitutions and

13  over statutes, period, end of story.

14      It seems kind of small when done with that to point

15  out that 436 permits but doesn't require conditioning.  We

16  can imagine a whole bunch of conditions that might have been

17  very sensible and that might not offend federal jurisdiction

18  like it could have been -- there could have been suggestions

19  or requirements as to exactly how the emergency manager

20  should interact with other elected representatives or with

21  other people.  Actually, the governor does have one -- it's

22  not quite a condition.  It's a suggestion, but I think he'd

23  be offended if it wasn't followed, which is he wants Mr. Orr

24  to continue to communicate with the governor and the

25  treasurer relating to what he's doing.  So I think we can

1  think of several things that could be -- that you could use

2  for the PA 436 conditioning power that would be perfectly

3  okay, but going in and saying, "Gee, as a matter of this

4  particular state law" -- and, by the way, it's -- the

5  governor would -- to do that, he's got to ignore the

6  conflicts that I discussed earlier between a law that says

7  thou shall not impair this one with another law that says

8  you're the first money out.  It's mind-boggling what he'd

9  have to reconcile, but the instruction would be, yeah, this

10  one we really meant and the others we didn't really mean,

11  follow that one first.  I think that that would be an invalid

12  authorization.  I think the Court would have to say that

13  authorization isn't okay for federal court purposes.  I think

14  as a prudential matter, the federal court should not get

15  involved in a case where the authorization is conditioned in

16  a way that would offend the federal scheme, but understanding

17  that there may be very extreme and difficult circumstances

18  involved, a creative federal court might want to give people

19  some time to kind of take a couple steps back and figure out

20  how to do it better.

21          THE COURT:  Let me ask about Section 943.

22          MR. BENNETT:  I need to get a case if you're going

23  to do that because I -- from the --

24          THE COURT:  This is the Bankruptcy Code.

25          MR. BENNETT:  Yeah.

1          THE COURT:   943(b)(4).

2          MR. BENNETT:  Right.  There's actually one case

3    that's dealt with that previously, and I think it's --

4          THE COURT:  Let me just get my question out.

5          MR. BENNETT:  Okay.

6          THE COURT:  Thank you.  So the question is what does

7    this section mean if it doesn't mean that the state can

8    dictate the priorities?

9          MR. BENNETT:  Because it says "from taking any

10   action necessary to carry out the plan," and I --

11         THE COURT:  What does that -- what does that

12   language mean?  What meaning does it have?  How does it come

13   into effect?

14         MR. BENNETT:  Okay.  I think the best way to work

15   through that is the Sanitary Improvement District Number 7

16   case, 98 B.R. 970, and this is a really fascinating case

17   because the facts gave you every conceivable issue under the

18   sun in terms of the interpretation of this section.  What

19   happened in Sanitary Improvement District is that the debtor

20   had -- you know, had claims against it.  Let's call them a

21   hundred.  I'm using representative numbers, not the actual

22   numbers.  As a result of the bankruptcy case, they issued

23   paper, and I think it was like 60.  Okay.  And the -- but the

24   paper that was 60 had in it a provision that said that if the

25   debtor paid it in full within a certain number -- within a

1   certain number of months -- I think it was 18 months -- after

2   the bankruptcy case is over, it only had to pay 95 cents on

3   the dollar or something like that, and so the creditors came

4   in, and they attacked the whole plan, pointed to a state law

5   that says thou shall pay your bonds.  By the way, there are

6   laws like that in Michigan, too.  And the court decides very

7   easily that the takedown from a hundred to 60, well, that's

8   supremacy clause bankruptcy.  You can do that notwithstanding

9   state law.  What you can't do, though, is because state law

10  says you have to pay bonds at a hundred percent of principal,

11  you can't have the five-percent discount feature because

12  that's -- after the bankruptcy, you issued this new bond, you

13  know, with 60 being the new hundred, but you've said that you

14  can still pay that off at a discount.  That violates

15  943(b)(4).  So what this case illustrates is that this looks

16  at the obligations after they've been restructured and says

17  that the Bankruptcy Court does the restructuring.  By the

18  way, very consistent with the Cardozo and the Bekins view of

19  the world, you -- and you're finished.  The bankruptcy --

20  there's a confirmation order.  New instruments are issued.

21  Those instruments, the ones that you walk out of Bankruptcy

22  Court with, have to be instruments that you can perform in

23  accordance with state law.

24          THE COURT:  So this provision, in your view, says

25  nothing about the requirement of the plan itself or the order

1   confirming plan to comply with state law.

2          MR. BENNETT:  I don't know if there's any case that

3   says that.  There may be.  I think <u>Sanitary and Improvement</u>

4   <u>District Number 7</u> has got it right, that it does not say

5   anything about the Bankruptcy Code restructuring process.  It

6   only acts on the debt that is issued after the case is over.

7          I don't think I have to spend time on it, so I'm

8   going to skip over -- again, it's in our papers.  There's an

9   assertion in the papers that the Tenth Amendment is not

10  reserved -- that the Tenth Amendment reserves every issue

11  relating to municipal pensions to the states.  I think we've

12  dealt with that enough in the constitutional section, and I

13  don't have to deal with -- this really is the -- an argument

14  was built, constructed based upon the fact that in the case

15  of ERISA the federal government didn't make ERISA -- didn't

16  make states or municipalities applicable to ERISA, didn't

17  create the insurance program, PBGC, and the assertion is made

18  because the federal government chose not to go into those

19  areas, they must have done that because they were absolutely

20  precluded from doing so, ergo they are precluded from using

21  the bankruptcy power to modify pensions.  I think that fails

22  logically in a lot of places, but most importantly maybe to

23  start with is that it's not clear that there is no possible

24  way for the federal government to apply the ERISA statute or

25  the PBG statute to state municipalities, maybe to states but

1  not to municipalities, and -- at all, by the way, and that

2  Congress didn't may have reflected political realities at the

3  time and not actual constitutional limitations, so I think

4  the starting point of that argument just fails, and I think

5  we've seen that federal -- that a federal bankruptcy power

6  can be applied by the federal court to obligations.  Pensions

7  are clearly within the federal bankruptcy power, no dispute

8  in the private context.  There's nothing different about

9  Chapter 9 context.  And so there is no such part of the Tenth

10  Amendment that constrains this aspect of the subject of

11  bankruptcies.

12        The next point is a really important one, and I

13  could easily have started with it, and I know your Honor has

14  been concerned with it throughout, which is whether or not

15  your Honor really has to deal with the -- whether or not

16  pensions can be impaired in bankruptcy in the context of

17  authorization.  I hope it's clear to your Honor that the city

18  is perfectly comfortable with you dealing with it now or

19  perfectly comfortable with dealing with it later.  We don't

20  think that this is -- some of these things may be a little

21  bit conceptually difficult and complex, but the

22  constitutional law on the subject is really pretty clear, and

23  so we're prepared to have it decided.  We think that there's

24  only one way to decide it.  There is, though, a way for your

25  Honor to decide not to decide it, which is to find -- and the

1   next to the last sentence I read from Justice Cardozo in his

2   dissent where he says, "just the filing is not doing

3   anything," we say that, too.  It is starting a bankruptcy

4   case.  I have said at the beginning -- I mean it -- there is

5   nothing inevitable.  A cramdown of revisions to pension

6   benefits, a cramdown of a particular treatment of the

7   underfunded portion of the pension obligation is not

8   necessarily the way this case is going to end, and it's not

9   necessarily the next step in this case.  We just don't know.

10  The next -- obviously right now mediation is an important

11  milestone.  The next important milestone is the plan, and

12  since your Honor has been around the Bankruptcy Courts for a

13  good long time, you know that the plan that we file before

14  the end of this year is not likely to be the plan that we

15  ultimately confirm.  It would be actually a good exercise for

16  different people to figure which amended plan is going to be

17  the plan.  The bottom line is nobody really knows.  And so it

18  is possible to adopt Justice Cardozo's view that no change in

19  obligation results from the filing of a petition by one

20  seeking a discharge whether a public or private corporation

21  invokes the jurisdiction and basically say since nobody has

22  done anything yet, we're not going to decide anything more.

23  You could do that.  I will say that the -- I think that the

24  assertion that there is an imminence that -- an imminence of

25  harm represented by the filing of the Chapter 9 case that

 1   requires this Court to act is, frankly, not a fair statement
 2   of the law.  I think one of the more important cases is
 3   Donohue.  It's been cited by objectors.  The most important
 4   part -- Donohue is the Nassau County financial restructuring
 5   case, and the most important part of Donohue that led the
 6   Court to act I think is mentioned by the Court.  It's kind of
 7   near the end of the opinion.  The Court says the law, the
 8   ordinance that gave the county executive all the powers,
 9   "provides expansive and seemingly limitless power to the
10   County Executive without any reasonable restraints other than
11   the procedural mechanism of an executive order."  This case
12   would be a lot simpler if all Kevyn Orr had to do to
13   reorganize the debts of Detroit was to say how he wanted to
14   do it and sign it as an order.  He doesn't think he has that
15   power.  I don't think he has that power.  No one in this room
16   thinks he has this power.  We've talked about the fact that
17   to get to a debt adjustment plan that is nonconsensually
18   confirmed, it has to be filed.  There has to be disclosure
19   statement approved.  There has to be voting.  There has to be
20   more discovery.  There has to be a confirmation hearing, and
21   there has to be an order of this Court.  That is a very
22   different procedure or array of protections than was
23   available in the Donohue case, which is, frankly, the closest
24   case to this one in terms of the kinds of things that we're
25   talking about here.  If your Honor goes through the other

1  cases that have been cited for the proposition of imminent

2  harm, you will find that in all of them there was no judicial

3  step going to occur before the harm might be inflicted.  In

4  all of --

5       THE COURT:  Let me ask that question here.  Can

6  you -- are you willing to identify here on the record or can

7  you identify here on the record any conceivable circumstance

8  in which retiree benefits, pensions won't be impaired by a

9  plan?

10      MR. BENNETT:  You know, your Honor, at this point

11 there are a number of major things that I don't know, and I

12 will say I don't know that there won't be money from outside,

13 although I tend to doubt it.  I don't know that.  I do not

14 know whether there will be -- whether certain other assets

15 will, in fact, be available to the city to address its debts,

16 and I will point out in this regard that while the objectors

17 have cited over and over and over again a pleading filed by

18 the attorney general asserting the primacy of pension claims,

19 they've all managed to have forgotten a formal opinion he's

20 given concerning the accessibility of certain assets in this

21 bankruptcy case, particularly the art, and -- but I have no

22 idea, number one, what's going to happen with that, and I

23 have no idea what the -- whether or not there will, in fact,

24 be a transaction involving the departments of water and

25 sewerage and whether those transactions will deliver material

1   dollars.  So while I'd be kidding myself and kidding the
2   Court and kidding everyone here if I said that I thought it
3   was anything but likely that there would be some impairment
4   of the underfunding claims in this case, it's not fair to ask
5   me and I don't think I could say that there's no scenario
6   where impairment will not be necessary.  I just don't think I
7   can even say that today.
8           THE COURT:  Okay.  Even with that much of a
9   disclosure here, why isn't that enough to say there's an
10  impairment here?
11          MR. BENNETT:  I'm sorry.
12          THE COURT:  Why isn't that enough to say at this
13  point in time there's an impairment?
14          MR. BENNETT:  Well --
15          THE COURT:  There's a sufficient impairment to get
16  past ripeness anyway.
17          MR. BENNETT:  You know, I don't think you can say
18  there's impairment because the Supreme Court has told us
19  there is not.  There won't be impairment, your Honor, until
20  you say so.  Is there a risk of impairment?  There's a risk
21  of impairment.  Is the risk of impairment enough to make this
22  ripe?  And the answer is is that -- I think this is the
23  answer when -- I mean the Donohue case is a good example, but
24  I think it ripples through all the others, which is that if a
25  court is presented with a situation where there's a risk of

1  impairment and the impairment can occur before there's

2  another opportunity or requirement that people show up in

3  front of a judge, then they start thinking about whether

4  there's interim harm, but there's not a single case that has

5  been cited to you that says there is imminent harm in

6  circumstances where no one is going to suffer anything until

7  and unless a court enters an order after notice,

8  opportunities for discovery, opportunities for hearing, and

9  all the other protections that are available in connection

10  with a plan confirmation process in a Bankruptcy Court.  It's

11  just totally different.  The cases are dealing with a totally

12  different situation, particularly the Donohue case.

13          Do you have -- we're 20 minutes to.

14          THE COURT:  Twenty till five.

15          MR. BENNETT:  Do you want to save time for your

16  questions or --

17          THE COURT:  If you want to stop now, and we'll pick

18  it up with the government's attorney, that's fine with me,

19  and then we'll pick up the balance of your argument tomorrow.

20  Is that what you're --

21          MR. BENNETT:  I think it's a good break point.

22          THE COURT:  Okay.

23          MR. BENNETT:  I have very minor things left.

24          THE COURT:  Good.

25          MR. TROY:  Matthew Troy, your Honor, Department of

1    Justice, Civil Division, on behalf of the United States.  If

2    it makes any difference to your Honor or the other parties, I

3    am here for tonight and can be available tomorrow as well.

4           THE COURT:  I appreciate that, but since you're

5    here, let's have at it.

6           MR. TROY:  Fair enough.

7           THE COURT:  Well, my primary questions relate to how

8    you address the arguments here that the objecting parties

9    made in response to your brief regarding ripeness.

10          MR. TROY:  To be honest with you, your Honor, I've

11   only reviewed those very quickly because I filed the brief on

12   Friday and then went back to furlough status.  And on

13   Monday --

14          THE COURT:  That.

15          MR. TROY:  And on Monday --

16          THE COURT:  Well, would it be your preference to

17   have overnight to think about how to respond to the

18   objectors' concerns regarding ripeness?

19          MR. TROY:  Sure.  I can do that.

20          THE COURT:  Would that be your preference?

21          MR. TROY:  That would be, yeah, a more fulsome

22   discussion, I think.

23          THE COURT:  All right.  Then you are excused, and I

24   will hear from you tomorrow regarding that.  Do you want to

25   stop for the day now and pick it up tomorrow?

1        MR. BENNETT:  Your pleasure, your Honor.  I can keep

2   going, but I can also stop.  I'm not going to -- I don't

3   have -- less than 30 minutes left, in fact, significantly

4   less than 30 minutes left.

5        THE COURT:  Well, do you think you can finish in the

6   20 minutes that are left before five?

7        MR. BENNETT:  I'll try.

8        THE COURT:  All right.  Then I would invite you to

9   try.

10       MR. BENNETT:  Let me just get a little bit

11  reorganized.  Okay.  The next topic on my list is collateral

12  estoppel, and, your Honor, I think with respect to collateral

13  estoppel, a couple of points are worth focusing on.  First of

14  all, our very, very first point on this -- and I think it's

15  dispositive -- is that when this case was filed, this Court

16  had the most exclusive jurisdiction it ever gets about

17  anything, absolutely exclusive interest -- exclusive

18  jurisdiction under 1334(a) to decide matters in the case, and

19  eligibility is a matter in the case.  And the assertion by

20  the objectors is that the Webster court really didn't decide

21  eligibility.  The Webster court was deciding some abstract

22  issues of state law.  And, your Honor, two things.  Number

23  one, the objectors can't even say that without mentioning the

24  eligibility determination, and here I'm looking at the

25  funds -- Mr. Gordon's brief at page 32.  The Webster judgment

1  rules squarely on the constitutionality of PA 436 and the
2  governor's authorization of the emergency manager to proceed
3  under Chapter 9 in light of the pensions clause of the
4  Michigan Constitution.  There was absolutely no confusion in
5  the judge's mind or anyone around that courtroom's mind that
6  what they were trying to do was to get an early determination
7  of eligibility.  It might have succeeded, but this case was
8  actually filed first.  And by the way, although the attorney
9  general will probably have more to say about this, there was
10 no adjournment sought for purposes of filing the Chapter 9
11 case, and the transcript shows no such thing.  And they know
12 more about the circumstances than I do, and they can address
13 it tomorrow when it's their turn.

14         But there's an even more important point, which is
15 that the order that was entered by the judge purports to
16 enjoin the emergency manager directing him to have the case
17 dismissed and not file another one, so I just -- I can't
18 abide the assertion and the record does not support the
19 assertion that what happened in that court was not an effort
20 at an eligibility determination, so, number one, that was
21 within the exclusive jurisdiction of this Court.  If it was
22 within the exclusive jurisdiction of this Court, it wasn't
23 within the jurisdiction of that Court to do anything about
24 it, and, therefore, any judgment that was entered after the
25 filing for that reason alone is void.

1        Now, second point we make is that the automatic stay
2   applied as well because the entire event, even though the
3   city was not a party, was an effort to gain control over the
4   city's assets and an effort to enhance collection of the
5   debt.  Again, there can't be much dispute about that, open
6   paren, one, partly because of the way the whole proceeding
7   evolved and how everyone understood it, but more importantly,
8   here again we have the judge explicitly talking about the
9   Chapter 9 case and attempting to stop the Chapter 9 case
10  because of the perception that the Chapter 9 case might
11  impair pensions, and those kinds of acts are clearly within
12  the automatic stay.  Again, I think that the --
13        THE COURT:  Just to be clear, you're talking about
14  the automatic stay of Section 362 --
15        MR. BENNETT:  Yes.
16        THE COURT:  -- the Bankruptcy Code.
17        MR. BENNETT:  Correct, the Bankruptcy Code's
18  automatic stay, or 942.  The other half of it is in the -- is
19  in Chapter 9 as well.
20        Full and fair opportunity to litigate.  Again, I
21  would ask the Court to look at the record in that case.
22  There had been -- it is certainly true that a whole bunch of
23  briefs that were filed -- I don't think the hearing where
24  this all occurred had previously been calendared and noticed
25  to anybody.  The hearing was set on an emergency basis, and

1  someone got on the phone and called for the attorney

2  general's office because they thought it might be a good idea

3  to tell him about it about an hour before the hearing.

4  That's actually not the way things are fully and fairly

5  litigated in any courts I visit, and I don't think that when

6  your Honor ticks through the procedural elements of what

7  happened in that case in Lansing is going to be convinced

8  that there was a full and fair opportunity to litigate.

9       THE COURT:  Let me ask you just a sort of

10  administrative question regarding this.  Do we have in our

11  record here all of the pleadings and papers and dockets and

12  transcripts from that case?

13       MR. BENNETT:  I don't know if they're there yet.

14       MS. NELSON:  I believe I can answer that, your

15  Honor.  Assistant Attorney General Margaret Nelson.  It's my

16  understanding, no, those have not been submitted.  I do have

17  all of the transcripts, which I was prepared to present to

18  the Court when I make my argument, which now appears to be

19  tomorrow.  If the Court would like the submission of the

20  pleadings, we'll be happy to do that, although it's --

21       THE COURT:  Well, my understanding is that some of

22  the pleadings have been attached to various briefs, but I'm

23  just not sure if it's everything.

24       MS. NELSON:  There was only a -- there was --

25       THE COURT:  Just to --

1          MR. BENNETT:  We'll get it in.

2          THE COURT:  Yeah, exactly.  Just to be complete --

3          MS. NELSON:  Yes.

4          THE COURT:  -- let me make my request to you that

5   our record here include everything from that case, including

6   the docket.

7          MS. NELSON:  There's three cases, your Honor.

8          THE COURT:  Okay.

9          MS. NELSON:  And so -- that were filed separately --

10         THE COURT:  Well, but I think the --

11         MS. NELSON:  -- so I will submit everything --

12         THE COURT:  I think the one that's at issue here is

13  the one in which a judgment was entered.

14         MS. NELSON:  Correct.

15         THE COURT:  That's the one I need.

16         MS. NELSON:  So you want everything in the case in

17  which the judgment was entered the next day, including the

18  docket entries.

19         THE COURT:  Thank you.

20         MS. NELSON:  Would you also like the Court of

21  Appeals materials --

22         THE COURT:  Yes.

23         MS. NELSON:  -- because the Court of Appeals

24  materials were --

25         THE COURT:  Yes.

1  　　　　MS. NELSON:  -- filed and a stay order entered

2  thereto?

3  　　　　THE COURT:  Just for --

4  　　　　MS. NELSON:  Webster?

5  　　　　THE COURT:  For completeness, yeah.  All right.  I

6  have to -- I have to pause here.  I've been advised that the

7  people in our overflow room couldn't hear this exchange, so I

8  will just restate it for the record.  The attorney general's

9  representative has agreed to provide to the Court in this

10  case the complete record from the Webster litigation not only

11  at the trial court level but at the Court of Appeals level,

12  including all pleadings and papers, transcripts, and docket

13  entries, the docket itself.  You may proceed, sir.

14  　　　　MR. BENNETT:  Okay.  Lastly, the last factor with

15  respect to collateral estoppel, your Honor, is the issue of

16  whether or not the judgment would be binding on the city in

17  any event.  Of course, the city was not a party to those

18  proceedings.  The assertion is made that the -- that there is

19  privity between the city and the state because they have a

20  common legal interest in some matters in connection with this

21  Chapter 9 case.  Frankly, I don't think those are the same

22  standard, and I think we covered that in our papers, but I

23  will say one other thing is that to the extent that there --

24  that the plaintiffs in those cases believed that the city was

25  in privity with the state with respect to those cases is an

1  additional reason why the automatic stay applied from the

2  very beginning because if they thought that they were in a

3  case with the state really trying to bind the city, then it

4  is perfectly clear that they violated the automatic stay.

5          I don't think I have any other material topics that

6  I think we need to cover based upon the argument by others.

7  If I've missed something or if your Honor has any questions,

8  I'd be happy to take them.  Otherwise I'll allow the attorney

9  general to take the floor tomorrow.

10         THE COURT:  Um-hmm.

11         MR. BENNETT:  We'll be done early.

12         THE COURT:  Okay.  Good.  We'll be in recess now

13  until 10 a.m. tomorrow morning.

14         MS. NELSON:  Your Honor, before you leave the bench,

15  may I just ask do you want those pleading -- do you want

16  everything submitted electronically?

17         THE COURT:  Yes, yes, in the record of this case.

18  Thank you.

19         THE CLERK:  All rise.  Court is adjourned.

20     (Proceedings concluded at 4:51 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            October 20, 2013
_____       _____
Lois Garrett