# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

*Debtor In Possession*
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE−MI
Tax ID / EIN: 38−6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489−3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075−1505
248−359−7300
Fax : 248−359−7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky−Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359−7300
Fax : (248) 359−7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075−1505
(248) 359−7300
Fax : (248) 359−7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496−8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212−326−3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496−7591
Email: swansonm@millercanfield.com

***U.S. Trustee***                           represented by **Sean M. Cowley (UST)**
**Daniel M. McDermott**                       United States Trustee
                                              211 West Fort Street
                                              Suite 700
                                              Detroit, MI 48226
                                              (313) 226−3432
                                              Email: Sean.cowley@usdoj.gov

                                              **Richard A. Roble (UST)**
                                              United States Trustee
                                              211 West Fort Street
                                              Suite 700
                                              Detroit, MI 48226
                                              (313) 226−6769
                                              Email: Richard.A.Roble@usdoj.gov

***Retiree Committee***                      represented by **Sam J. Alberts**
**Official Committee of Retirees**            1301 K Street, NW
                                              Suite 600, East Tower
                                              Washington, DC 20005−3364

(202) 408−7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2315 | Transcript Order Form of Hearing October 21, 2013 − 1:00 p.m., Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
**TRANSCRIPT ORDER FORM**

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

| **Order Party: Name, Address and Telephone Number** | **Case/Debtor Name:** |
|---|---|
| Name: **David M. Eisenberg** | **Case Number:** 13-53846 |
| Firm: **Erman, Teicher, Miller, Zucker & Freedman, P.C.** | **Chapter:** 9 |
| Address: **400 Galleria Officentre, Suite 444** | **Hearing Judge** Hon. Steven Rhodes |
| City, State, Zip: **Southfield, MI 48034** | ⦿ Bankruptcy ◯ Adversary |
| Phone: **248-827-4100** | ◯ Appeal  Appeal No: _____ |
| Email: **deisenberg@ermanteicher.com** | |

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/21/2013 **Time of Hearing:** 1:00 p.m **Title of Hearing:** Eligibility Hearing

Please specify portion of hearing requested: ⦿ **Original/Unredacted** ◯ **Redacted** ◯ Copy (2nd Party)

⦿ Entire Hearing  ◯ Ruling/Opinion of Judge  ◯ Testimony of Witness  ◯ Other

Special Instructions: _____

**Type of Request:**
- ⦿ Ordinary Transcript - $3.65 per page (30 calendar days)
- ◯ 14-Day Transcript - $4.25 per page (14 calendar days)
- ◯ Expedited Transcript - $4.85 per page (7 working days)
- ◯ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com

FOR COURT USE ONLY
Transcript to be Distributed by:

Date  By
Order Received
Transcript Started
Transcript Received

**Signature of Ordering Party:**

/s/ David M. Eisenberg  Date: **12/26/13**

By signing, I certify that I will pay all charges upon completion of the transcript request.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
         MICHIGAN,            .
                              .      Detroit, Michigan
                              .      October 21, 2013
                  Debtor.     .      1:00 p.m.
. . . . . . . . . . . . . . .

HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9
PETITION (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  GEOFFREY S. IRWIN
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       State of Michigan
Michigan:              Michigan Department of Attorney General
                       By:  MATTHEW SCHNEIDER
                       P.O. Box 30754
                       Lansing, MI  48909
                       (517) 241-8403

APPEARANCES (continued):

```
For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City     65 Livingston Avenue
of Detroit           Roseland, NJ  07068
Retirees:            (973) 597-2374

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  ROBERT D. GORDON
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5882
Retirement System
of the City of
Detroit:

For the Detroit      Erman, Teicher, Miller, Zucker &
Fire Fighters           Freedman, P.C.
Association, the     By:  BARBARA A. PATEK
Detroit Police       400 Galleria Officentre, Suite 444
Officers Associa-    Southfield, MI  48034
tion and the         (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For the Inter-       Cohen, Weiss & Simon, LLP
national Union,      By:  BABETTE A. CECCOTTI
UAW:                      PETER D. DECHIARA
                     330 West 42nd Street, 25th Floor
                     New York, NY  10036-6976
                     (212) 356-0227

For Detroit          Silverman & Morris, PLLC
Retired City         By:  THOMAS R. MORRIS
Employees            30500 Northwestern Highway, Suite 200
Association,         Farmington Hills, MI  48334
Retired Detroit      (248) 539-1330
Police and Fire
Fighters Associa-    Lippitt O'Keefe, PLLC
tion, Shirley V.     By:  RYAN C. PLECHA
Lightsey, and        370 East Maple Road, Fl. 3
Donald Taylor:       Birmingham, MI  48009
                     (248) 646-8292
```

APPEARANCES (continued):

| | |
|---|---|
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390 |
| | Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please
2  be seated.  Recalling Case Number 13-53846, City of Detroit,
3  Michigan.
4        THE COURT:  And you may proceed.
5        MR. GORDON:  Thank you, your Honor.  Good afternoon.
6  For the record, Robert Gordon of Clark Hill on behalf of the
7  Detroit Retirement Systems.  Your Honor, we did not submit a
8  proposed line-up to the Court as we did for the October 15th
9  hearing; however, the objectors have all conferred with one
10  another over the weekend and have come up with an informal
11  line-up, if you will, and have discussed amongst themselves
12  sort of loosely how much time each party would need.  And so
13  rather than inform the Court of the time slots, we'll just
14  sort of try to self-police ourselves and inform the Court if
15  that's okay.
16        THE COURT:  Okay.
17        MR. GORDON:  Again, as with the October 15th
18  hearing, each party will try its best to identify before it
19  starts its rebuttal argument -- apprise the Court of what
20  issues it plans to touch upon.  Unlike the October 15th
21  hearing, of course, because time is short, various parties
22  will be trying to touch upon discrete issues and not overlap
23  with one another, so while each party may support the
24  arguments that are being made, for the record, I just need to
25  state that each party obviously reserves its right to make

1  similar arguments or diverge from those arguments in its
2  supplemental briefing.  Thank you.

3        With that, your Honor, just so the Court has an
4  understanding of the order in which we are proposing the
5  objectors rise, first would be Ms. Levine on behalf of
6  AFSCME, then Ms. Brimer on behalf of the Retired Detroit
7  Police Members Association, then myself on behalf of the
8  Retirement Systems, then Mr. Morris on behalf of the Retiree
9  Associations, then Ms. Patek on behalf of the Public Safety
10  Unions, then Ms. Crittendon as an interested party, and then
11  Mr. Montgomery on behalf of the Retiree Committee.

12        THE COURT:  All right.

13        MR. GORDON:  Oh, my goodness.  I'm sorry.  After --
14  I'm sorry.  After Mr. Morris, Ms. Ceccotti would be next on
15  behalf of the UAW.

16        THE COURT:  Thank you.  It's fine with me not to
17  keep track of your time individually if that's your request,
18  but I do have to cut off all rebuttal argument in one hour.

19        MR. GORDON:  Very well, your Honor.  Thank you.

20        THE COURT:  And one more thing.  You will notice
21  that on your tables we now have three microphones instead of
22  one.  I have been asked to advise you that this makes it much
23  more likely that our record will pick up your private
24  conversations, and you should be concerned about that because
25  we do post the audio unedited on our website every night.

1    And I should say if there is a private conversation that you

2    want to have at any point today or during the trial and

3    you're concerned about it getting on the microphone, just

4    request a brief pause from the recording.  We'll turn the

5    recording off.  You can have your conversation, and we'll

6    continue.

7            MS. LEVINE:  Good afternoon, your Honor.  Sharon

8    Levine, Lowenstein Sandler, for AFSCME.  Your Honor, I've

9    been given ten or twelve minutes and will address, per the

10   Court's suggestion, home rule and then perhaps if there's

11   time a sentence on Chapter 9 again.

12           THE COURT:  Okay.

13           MS. LEVINE:  Thank you, your Honor.  Your Honor,

14   similar to the arguments or the statements in the

15   conversation we had with the Court with regard to Chapter 9

16   and the interplay between the federal Constitution and the

17   state municipal governments under the Tenth Amendment, we

18   would respectfully submit that under the Cooley Doctrine and

19   the cases that have been decided here in Michigan that the

20   Michigan Constitution in Chapter 7 also reflects a very

21   strong view towards home rule, and what we mean by home rule,

22   your Honor, is that the local governments -- in this case,

23   Detroit -- are given a lot of respect by the state government

24   in order to manage and run their own local governments.  And

25   we would respectfully submit that the way that either 439 is

1    written or as applied in this case, that the grant of power

2    given the emergency manager here in Detroit violates the

3    state Constitution.

4          So, first, your Honor, we would note that the

5    emergency manager has been appointed by the state.  He was

6    not elected by the local electorate.  He was not elected the

7    way, for example, the mayor and the City Council were

8    elected.  He has supplanted them, and he was -- and he didn't

9    supplant them by a vote of the citizens, and he didn't even

10   supplant them with the consent of the locally elected

11   officials.  So first point is that we believe that the

12   emergency manager and 436 is inappropriate here because he's

13   not an elected official.

14         Two, your Honor, we would note that the breadth of

15   the powers granted the emergency manager even if the

16   appointment of the emergency manager were appropriate is

17   inappropriate here both as a matter of constitutional law and

18   as applied in this particular case because the governor

19   failed to appoint the emergency manager with any appropriate

20   contingencies in the letter of appointment, and that's

21   because of the scope of the power that the emergency manager

22   wields is well in excess of that which the Constitution --

23   the Michigan Constitution would permit.  So, for example,

24   even if the scope of the powers were not subject to -- sorry.

25   Let me say it differently.  Even if the Michigan Constitution

1  does allow, for example, taxation or even debt adjustment, it

2  doesn't allow the wholesale taking over of the local

3  government by the emergency manager.  So, for example, not

4  allowing there to be replacements to the City Council, day-

5  to-day negotiation of vendor contracts, labor contracts,

6  grievances, de minimis asset sales, these are the types of

7  things that are not necessarily --

8          THE COURT:  Well, but let me ask you to -- let me

9  ask you to pause there with this question.  Is the

10  constitution -- or would the constitutionality of PA 436, as

11  it pertains to those kinds of issues, be before this Court?

12  Are they necessary to decide in the context of eligibility?

13          MS. LEVINE:  They are, your Honor, because the way

14  this appointment has taken place, all of those individual

15  acts that the emergency manager has been allowed to engage in

16  ahead of a plan of adjustment which might deal with just the

17  debt makes the very decision that the emergency manager made

18  with regard to filing the Chapter 9 petition itself

19  unconstitutional or unconstitutional as applied to the facts

20  of this case because there was no limitation on what the

21  scope of his authority was just dealing with that one issue.

22  And that scope -- the unfettered scope, your Honor, is not

23  just related to the day-to-day business operations, and we've

24  seen that play out in the deposition of Mayor Bing and in

25  others who talk about the fact that they're bottlenecked with

1   regard to decision-making and that ordinary types of

2   decision-making is now deferred to the emergency manager or

3   his counsel, but we've seen that, your Honor, in the

4   unfettered scope that provides for no judicial review of

5   those decisions as well.  So, for example, if, in fact,

6   there's a dispute under a Chapter 11 or a Chapter 7 where you

7   have a debtor in possession or a trustee, a debtor in

8   possession, for example, a corporate debtor, has fiduciary

9   obligations under the direct language of the Bankruptcy Code

10  and has fiduciary obligations under state law.  A Chapter 7

11  or a Chapter 11 trustee similarly has fiduciary obligations,

12  and they are not allowed to take actions either outside the

13  ordinary course of business or under the course of a Chapter

14  7 without coming to this Court for approval, sales,

15  settlements, ultimate plans of reorganization.  Under Chapter

16  9, because we're dealing with the fact -- and we believe it's

17  the unconstitutional fact -- that there's a tension between

18  what the state can do and what the federal government can do,

19  we don't have that same access to judicial review, so under

20  904, 362, and even _Stern's_ there are a lot of decisions that

21  get made on the day-to-day basis.  And I'm not dealing with

22  the global jurisdictional issues, just the day-to-day basis

23  of tort claims, of contract disputes, of settlements with

24  individual creditors that don't ever see the light of day in

25  this court, and to the extent that there was a grievance or a

1  dispute about that under 362 in this Court's stay extension

2  orders, there's no other court where those disputes can be

3  taken.

4  So we have an unelected emergency manager who's in

5  place now because he's a contractor with the state

6  government, and we have unfettered rights where basically our

7  view is it's tantamount to all of the rights that were

8  granted to the city under Chapter -- under Article VII of the

9  Constitution are now within the power of the EM in this

10  particular case.  And we'd respectfully submit that that is

11  just not what the Cooley Doctrine or the state Constitution

12  envisioned even if it did envision in appropriate

13  circumstances debt restructuring.

14  Nine minutes.  With that, your Honor, I would just

15  close briefly on Chapter 9.  We would respectfully submit

16  that similar -- well, I'll --

17  THE COURT:  I'm not sure you've quite addressed the

18  central home rule question that at least I see.  The city and

19  the state argue that to whatever extent home rule powers

20  apply to the City of Detroit under the Michigan statutes,

21  they are effectively modified by PA 436 and that that

22  modification is not inconsistent with whatever the Michigan

23  Constitution says about home rule.  How do you deal with

24  that?

25  MS. LEVINE:  Your Honor, we understand the statement

1    has been made along those lines.  We don't see those

2    modifications in PA 436.  In other words, either in the

3    statute itself or in the authorization as granted under the

4    statute here, there is no limitation that we can see, and, in

5    fact, we've seen the opposite through the emergency manager's

6    orders and the emergency manager's right to run unfettered

7    the City of Detroit.  And in addition to that, one of the

8    issues that they talk about in terms of limiting his ability

9    is that his term is only 18 months, but that also is not

10   supported if you take a look at the statute and you take a

11   look at the statute in practice without any limitation in the

12   authorization because at the end of 18 months, the state has

13   the absolute right to continue the term.  The City Council

14   can only stop that by a two-thirds vote, but since the EM has

15   effectively taken over the City Council, we don't even have

16   the checks and balances that appear facially on the statute,

17   so we're saying two things.  We're saying they can say that

18   it's a limitation, but as far as we can tell, PA 436

19   virtually gives away to the emergency manager everything that

20   was referred to the states under Chapter 7 of the

21   Constitution, and not only that, there is no redress for

22   addressing violations of that unfettered right or stopping

23   the time line pursuant to which the EM can stay in office.

24   Thank you.

25           MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

1    Brimer appearing on behalf of the Retired Detroit Police

2    Members Association.  Your Honor, to begin with, I have

3    approximately ten to twelve minutes of the allotted time for

4    the objectors.  I am going to discuss, your Honor, the narrow

5    issue of whether or not PA 436 is constitutional under the

6    referendum provision of the Michigan Constitution.  As your

7    Honor will recall, Article II, Section 9, of the Michigan

8    Constitution specifically reserves to the people of Michigan

9    the right of referendum with respect to any law other than

10   those that contain a spending or appropriation provision.

11          When we were here on Tuesday, your Honor, last week,

12   I advised the Court that at that time the city and the state

13   neither had responded to the arguments that had been raised

14   by the RDPMA in its opening objection and, moreover, that at

15   that point in time we had not been able to find a case that

16   was factually similar to this case.  Today, we do have the

17   oral arguments that were presented by Ms. Nelson in response

18   to this argument during the state's opening arguments.  The

19   city has still not responded to this discussion, and we

20   still, your Honor, do not have a case that is even closely

21   factually similar to this case.

22          As the Court may recall, Ms. Nelson cited the case

23   of Reynolds v. Martin for the proposition that the governor

24   and the state legislature can completely disregard the will

25   of the people and thwart the people's constitutional right to

1    a referendum by placing an insignificant spending provision

2    at the tail end of an act that had previously been defeated

3    on referendum, pass such act during a lame duck session, and

4    consider it to be constitutional.  Reynolds v. Martin is so

5    factually distinguishable, your Honor, as to be of little or

6    no actual application to this case, and ultimately we would

7    conclude that its holding, in fact, supports the argument of

8    the RDPMA.  And I think it's very important to very briefly

9    discuss that case.  In Reynolds in 1994 the legislature

10   passed an act amending the state's Bingo Act.  That act was

11   referred for referendum.  However, before it was placed on

12   the 1994 ballot, certain of its signatures were questioned.

13   Therefore, it did not make the 1994 ballot.  The general

14   election was held in November of '94.  A new legislation --

15   legislators were elected.  They were seated in 1995.  In 1995

16   with the new legislation in -- legislative body in place, a

17   new act was passed.  Subsequently, in 1996 the 1994 act was

18   certified for the referendum, and it was, in fact, voted down

19   in the referendum.

20        A party challenged the denial of a license under the

21   1995 act on the grounds that it could not have been passed in

22   contravention of the referral of the 1994 act to the

23   referendum process under Article II, Section 9.  However,

24   your Honor -- and ultimately the 1995 act was upheld as

25   constitutional.

1    The state would argue that that case is factually
2  applicable and the holding consistent with their position
3  that PA 436 is constitutional.  However, there are two
4  significant distinctions between the holding and the facts in
5  Reynolds and the matter before this Court with respect to
6  436.  One, there was a general election after the matter had
7  been referred to referendum.  A new legislative body was in
8  place, and it was the new legislative body that had been, in
9  fact -- that passed the new act.  But more significantly,
10 your Honor, the 1995 act did not contain a spending
11 provision, and it was not, therefore, removed from the
12 referendum provisions of the Michigan Constitution.  In fact,
13 in Reynolds the appellate court relied on the Michigan
14 Supreme Court holding in Michigan Farm Bureau versus
15 Secretary of State at 379 Mich. 387, 1997, and noted that
16 should the legislators not be responsive to the will of the
17 people expressed at the referendum vote, the second
18 legislation itself is subject to the same right of referendum
19 as the original act.  That is simply not what we have with
20 respect to 436.

21    The question, your Honor, is why wasn't 436 subject
22 to the referendum vote?  It was not subject to the referendum
23 vote because the governor, the Michigan Department of
24 Treasury, and their consultants devised a scheme in the event
25 that PA 4 was defeated on referendum, that would remove a new

1    law from the referendum.  And how do we know that there was a

2    scheme that was devised?  We have communications that have

3    been produced during discovery that confirm that the spending

4    provisions in Section 34 and 35 were included in order to

5    avoid the referendum vote.  For example, as early as March

6    2nd, 2012, in communications between Mr. Ellman at Jones Day

7    and Ms. Ball at Jones Day, Mr. Ellman was discussing the

8    possibility that PA 4 would be defeated on referendum and

9    what the options would be in the event it was rejected by the

10   people.  He states in discussing the options, your Honor,

11   "The cleanest way to do all of this probably is new

12   legislation that establishes the board and its powers and" --

13   with the "and" in capital letters, your Honor -- "includes an

14   appropriation for the state institution.  If an appropriation

15   is attached to, parenthetical, included in the statute to

16   fund a state institution, parenthetical, which is broadly

17   defined, then the statute is not subject to repeal by the

18   referendum process."

19        In fact, Mr. Orr himself has acknowledged this

20   concern with respect to PA 436.  On January 31st, 2013, he e-

21   mailed Ms. Ball stating the following:  "Michigan's new EM

22   law is a clear end-around the prior initiative that was

23   rejected by the voters in November."  He then discusses some

24   of the provisions of PA 436 and concludes with the following

25   statement:  "So although the new law provides the thin veneer

1  of a revision, it is essentially a redo of the prior rejected

2  law."  Your Honor --

3          THE COURT:  What was the date of that?

4          MS. BRIMER:  That, your Honor, was January 31st,

5  2013.  So, your Honor, despite Ms. Nelson's contention that

6  the spending provisions were not added in an effort to avoid

7  the referendum vote, we would suggest that the evidence and

8  the discovery proves otherwise.

9          Ms. Nelson also argued that the $5,780,000 spending

10  provisions were meaning provisions not designed to avoid the

11  referendum.  First, I would suggest quite to the contrary,

12  your Honor.  A review of the state's financial statements for

13  the fiscal year ending 9-30, 2012, suggests that $5,780,000

14  represents approximately .011 percent of the state's

15  expenditures for the prior fiscal year.  With respect to the

16  pensioners that are before this Court making an average of

17  $18,000 in their pension, that would represent $1.98.  I

18  would suggest that's hardly a meaningful spending provision.

19          But second and more significant is that we have the

20  words of the debtor's attorney in the e-mails that I read to

21  you that the spending provisions were added with the intent

22  of avoiding the referendum.  We also have testimony from the

23  state's 30(b)(6) witness, Howard Ryan, the legislative

24  liaison for the Department of Treasury during the period for

25  the drafting of 436, in which he testified in his deposition

1   on October 14th that the spending provisions were added to

2   avoid the referendum.

3          "Question:  Based on your conversations with the

4          people at the time, was it your understanding that

5          one or more of the reasons to put the appropriation

6          language in there was to make sure it could not --

7          that the new act could not be defeated by

8          referendum?

9          Answer:  Yes.

10         Question:  Where did you get that knowledge

11         from?

12         Answer:  Well, having watched the entire process

13         unfold over the past two years.

14         Question:  The governor's office knew that that

15         was the point of it?

16         Answer:  Yes."

17       Your Honor, we would suggest that those spending

18  provisions were, one, de minimis, and, two, added solely for

19  the purpose of removing this act from the constitutional

20  right of the people to a referendum vote.

21       I'm uncomfortable with the amount of time I have

22  left here, your Honor.  Two more points.  Ms. Nelson argued

23  that PA 436 has substantially changed PA 4.  We prepared a

24  comparative analysis, your Honor, of the relevant provisions,

25  those with respect to the appointment of an emergency manager

1   and those with respect to the authorization for the filing of

2   a Chapter 9.  Those provisions are virtually identical.  Our

3   comparative analysis has been attached and submitted to the

4   Court as Exhibit B to our pretrial brief.  Those provisions

5   were, in fact, your Honor, subject to the provision in the

6   Constitution which provides that no law as to which the power

7   of referendum properly has been invoked shall be effective

8   thereafter unless approved by a majority of the electors

9   voting thereon in the next general election.

10          Your Honor, the Michigan Supreme Court, which should

11   be our controlling court here, has, in fact, suggested that

12   the right of referendum is so important to this state and so

13   important to our constitutional rights that in Kuhn -- I'm

14   trying so hard to get through my time -- that in the matter

15   of Kuhn v. Department of Treasury the Court said that this is

16   a reserved right to the people which must be liberally

17   construed.  This Court must liberally construe the right of

18   the people to the referendum, find that the Michigan Supreme

19   Court would, in fact, determine that PA 436 violates Article

20   II, Section 9, of the Michigan Constitution, and, therefore,

21   cannot have been a proper basis for authorization of the

22   filing of this Chapter 9 under Section 109(c) of the

23   Bankruptcy Code.

24          THE COURT:  Thank you.

25          MR. GORDON:  Again, for the record, Robert Gordon of

1  Clark Hill.  Your Honor, I want to touch upon, if I may, an

2  issue that was raised on the 15th regarding who is

3  essentially the impairer of contracts in a Chapter 9 process

4  and then touch upon one other small matter that came up in

5  colloquy on that day.

6      Your Honor, during the oral argument, city's counsel

7  argued that in a Chapter 9 case, the law  views the federal

8  government as the sole relevant actor impairing contracts of

9  the debtor municipality and that, therefore, the prohibition

10 in the pensions clause against the state and its subdivisions

11 impairing accrued pension benefits is of no moment in this

12 matter because it will be the federal government and not the

13 state or the city that is doing the impairing.

14     In making the argument, the city's counsel relies on

15 the language of a dissenting opinion of Justice Cardozo in

16 the <u>Ashton</u> case and then suggests that the viewpoint

17 expressed therein is adopted by the <u>Bekins</u> court, which

18 overruled <u>Ashton</u>.  We submit that the analysis is incorrect.

19 First, it is not entirely clear that the expansive

20 interpretation of Justice Cardozo's opinion suggested by the

21 city comports with his intended meaning.  However, even if

22 that interpretation is accurate, there is no indication that

23 his views were adopted in <u>Bekins</u>, a decision in which Justice

24 Cardozo did not even participate.

25     Contrary to the city's argument, as we've pointed

1   out in our papers, it is the municipality alone that can file

2   a plan and propose the impairment of claims, and it is the

3   municipality alone that can solicit votes and ask the Court

4   to approve such a plan.  Indeed, your Honor, the reality of

5   the active role played by the debtor is reflected clearly in

6   Section 109 itself.  109(c)(5) provides, and I quote, "(a) An

7   entity may" -- excuse me.  It provides under 109(c), I quote,

8   "An entity may be a debtor under Chapter 9 of this title if

9   and only if such entity," and then under (5)(A) it says, "has

10  obtained the agreement of creditors holding at least a

11  majority in amount of the claims of each class that such

12  entity intends to impair under a plan in a case under such

13  chapter," and there's similar language under 109(c)(5)(B).

14  Both of those provisions talk about the municipal debtor

15  being the one who intends to impair under the plan.  It

16  doesn't say that the municipal entity intends to ask the

17  Court to impair.  So 109(c)(5) reflects the reality that we

18  just discussed.

19          Moreover, contrary to the city's argument, your

20  Honor, Chapter 9 jurisdiction turns on the basic concept that

21  the state can consent to subjecting a political subdivision

22  to federal bankruptcy law.  Having thus consented, federal

23  law will then apply, but it is still the state and its local

24  governmental unit that is actively availing itself of the

25  Bankruptcy Code in the Bankruptcy Court.  The city has not

1    and we submit cannot cite to any case law that describes a

2    Chapter 9 debtor as standing mute and passive in the

3    Bankruptcy Court during the plan process and simply accepting

4    whatever impairment of contracts the Court may mete out.

5    It's an unsupportable and unsupported proposition, we submit.

6              Since the state and its political subdivision is

7    clearly the impairer of contracts in the Chapter 9, then

8    absent the relief that's been requested by the Retirement

9    Systems and other objectors, the state or the city in this

10   case would be directly breaching the pensions clause, which

11   it cannot do.  To the extent it is asking the federal court

12   to assist, it cannot do so since the state government and its

13   subdivisions are bound by the pensions clause and cannot

14   delegate to another entity authority that they do not have to

15   abrogate Michigan's Constitution.  And we've cited several

16   cases in our reply brief at page 15 for the axiom that the

17   state and its various branches cannot do indirectly what they

18   cannot do directly.

19              Since the state and the city cannot violate the

20   Michigan Constitution and specifically the pensions clause

21   outside of the Chapter 9 process, they can no more do so in

22   Chapter 9, and the requirement that the Retirement Systems

23   and other objectors have advocated for -- i.e., an explicit

24   conditioning of the bankruptcy upon the protection of the

25   pensions clause -- is absolutely proper and mandated by

1 | Section 109(c)(2)'s respect for state law. Any other
2 | conclusion we submit eviscerates 109(c)(2) and its
3 | requirement to uphold the Tenth Amendment and the sovereignty
4 | of state law. Moreover, your Honor, there was --
5 |     THE COURT: So is the end result of that argument
6 | that no municipality in Michigan can file a Chapter 9?
7 |     MR. GORDON: The end result would be that they
8 | cannot file a Chapter 9 without the explicit understanding
9 | that they will not impair accrued pension benefits in
10 | violation of the pension clause.
11 |     THE COURT: Well, but that violates the Bankruptcy
12 | Code.
13 |     MR. GORDON: How so, your Honor?
14 |     THE COURT: Well, it gives a priority to one
15 | unsecured creditor over all the others, or one group of
16 | unsecured creditor over all the others.
17 |     MR. GORDON: We disagree, but the priority issue I'm
18 | going to defer to Mr. Morris on. He was going to speak about
19 | that issue, but we disagree that it can be characterized as a
20 | priority issue, your Honor. I just don't want to steal his
21 | portion.
22 |     THE COURT: Okay.
23 |     MR. GORDON: But it is not a priority --
24 |     THE COURT: No pressure, Mr. Morris.
25 |     MR. GORDON: It is not a priority issue, your Honor.

1    Moreover, your Honor, the city's counsel had suggested, I

2    believe, on October 15th that Section 943(b) may not contain

3    any bar to adjusting debts but only technical restrictions on

4    how debt adjustment may be implemented.  If he is correct --

5    and we think not -- then all the more reason why the

6    protection of pension benefits under the pensions clause must

7    be addressed at the eligibility stage.

8         The only other thing, your Honor, I wanted to touch

9    upon was at, I think, page 103 of the written transcript of

10   the hearing on the 15th we had a discussion in which I

11   likened the accrued pension benefits to a nondischargeable

12   debt, and the Court questioned whether that concept was truly

13   applicable in a Chapter 9.  I wish to simply note to the

14   Court that while Section 523 of the Bankruptcy Code was not

15   incorporated into Chapter 9, Section 944(c) provides that the

16   debtor is not discharged under Subsection (b) of this section

17   from any debt excepted from discharge by the plan or order

18   confirming the plan.  So, indeed, concepts of

19   nondischargeable debt do exist under Chapter 9 of the

20   Bankruptcy Code, and because it is not governed by Section

21   523 of the Bankruptcy Code, it must be assumed -- because

22   there's no other basis identified in the Bankruptcy Code

23   itself, it must assumed that the bases for

24   nondischargeability would arise under state law such as the

25   absolute and impermeable protection of accrued pension

1  benefits under the state's Constitution.

2          THE COURT:  Why isn't it safer to assume that that

3  provision is in there to facilitate parties' negotiations

4  regarding how to treat debts?

5          MR. GORDON:  I don't know that it's mutually

6  exclusive.  It could be nondischargeability.  It could be as

7  a matter of law --

8          THE COURT:  Okay.

9          MR. GORDON:  -- or by negotiation, your Honor.

10          THE COURT:  Okay.

11          MR. GORDON:  We would simply submit that with

12  respect to a state constitutional protection, it can't be the

13  subject of negotiation.  Thank you, your Honor.

14          THE COURT:  Okay.

15          MR. MORRIS:  Good afternoon, your Honor.  Thomas

16  Morris on behalf of the Retiree Association parties.  There

17  was discussion last week and, in fact, this morning, today,

18  this afternoon, regarding the manner in which the pensions

19  clause operates.  Specifically, there were comments by Mr.

20  Bennett which characterize the pensions clause as

21  establishing a payment priority.  Mr. Bennett would have the

22  Court view the pensions clause as the equivalent of a state

23  law which designates a public pension obligation as a

24  priority claim in bankruptcy.  This is an incorrect

25  characterization of the pensions clause.

1       The pensions clause is a state law which controls
2  the city in the exercise of its political or governmental
3  power.  The pensions clause establishes a constitutional and,
4  therefore, fundamental rule addressing the authority of a
5  municipality to reduce or impair its pension obligations.  It
6  is an essential definition of the state -- of the duties of
7  the state and its subdivisions.  The pensions clause simply
8  doesn't provide for a priority payment.  The usual way for a
9  state to provide for a priority is to specify that the debt
10  is entitled to priority.  An example is found in the Worker's
11  Compensation Disability Act, MCL 418.821, which provides that
12  liability of an employer for Worker's Compensation claims or
13  Worker's Compensation payments shall be paramount to other
14  claims except for wages and taxes.  Another way to ensure a
15  priority is to provide for a statutory lien, so we've got
16  lien -- a lien under Section 211.40 of the Michigan Compiled
17  Laws for property taxes that are secured by a first lien,
18  prior, superior, and paramount.  And MCL 324.3115 provides
19  that certain fines for environmental liabilities constitute a
20  lien on all property of any kind or nature owned by the
21  defendant.  And a construction lien is entitled to priority
22  under state law.

23       In Orange County -- in the case if Orange County
24  found at 151 B.R., there's a quote on page 1017.  In Orange
25  County there was a statute at issue, a California statute

1  that was found by the Orange County court to be preempted by
2  the Bankruptcy Code.  Now, that statute provided that --
3  provided for certain funds to be treated as trust funds, and
4  that statute, as interpreted by the Court, apparently or was
5  argued to provide for there to be no tracing requirement, so
6  the Court in that case found that statute to effectively
7  establish a priority in bankruptcy and found it to be
8  preempted.  That case is distinguishable.  The Michigan
9  pensions clause provides for no priority of payment.  It
10 simply provides an ongoing indestructible duty of the
11 municipality or the state to not impair and not reduce
12 pensions.

13          Now, the priorities provided for in Section 507 are
14 applicable in Chapter 7 cases, for example, because Chapter 7
15 is a process of liquidation, liquidation of assets and the
16 distribution of those assets, so you need to determine who's
17 going to get the assets.  Who gets paid first?  That's the
18 priority.  Those priorities are also applicable in Chapter 11
19 because in every Chapter 11 case, liquidation is an
20 alternative.  Liquidation is the implied alternative, and
21 it's a standard by which a plan of reorganization in a
22 Chapter 11 case is measured.  Liquidation is not provided for
23 in Chapter 9.  Therefore, priorities are not provided for in
24 Chapter 9 with one exception.  That one exception is
25 507(a)(2), which provides for administrative expense

1 priorities.  That's a --

2          THE COURT:  But doesn't the best interest test of

3 943(b)(7) implicate the priorities of the Bankruptcy Code?

4          MR. MORRIS:  It doesn't.  It doesn't implicate the

5 priorities of a liquidation as an alterative unlike in

6 Chapter 11.  That's what's done -- in a Chapter 11 you look

7 at the unsecured creditors.  What would they get in

8 liquidation?

9          THE COURT:  Your position is that there's nothing in

10 a municipal bankruptcy case that would prohibit one group of

11 unsecured creditors from insisting on payment before or in

12 full while other unsecured creditors are paid later or not in

13 full.

14          MR. MORRIS:  Well, in confirmation of a case where

15 the pensions are unimpaired, you have a possible

16 discrimination claim by other creditors.  The bondholders

17 might claim that it's unfair discrimination, and I think the

18 response would be any bondholders who purchased their bonds

19 prior to 1963 when the Michigan Constitution was adopted,

20 you've got a different argument, but those bondholders who

21 purchased their bonds after 1963, which is all of them, don't

22 have an argument.  They're aware of the political climate.

23 They're aware of the Constitution.  They're aware that the

24 municipality cannot --

25          THE COURT:  Right, but the city's response to that

1  is the people who lobbied for and got the pensions clause in

2  the Constitution were aware of the Chapter 9 possibility.

3  How do I deal with that, or how do you deal with that?

4          MR. MORRIS:  Mr. Gordon dealt with that.

5          THE COURT:  Okay.  I will look at what he said.

6          MR. MORRIS:  But I don't want to -- I don't want to

7  repeat it, but the city is not permitted to restrict or

8  impair the pensions.  They are an inviolate obligation that

9  the city will live with even if it reorganizes under Chapter

10  9.  That's just a fact.  If the City of Detroit were to cease

11  to exist, if there were to be some horrendous natural

12  catastrophe that wiped the city off the state -- wiped the

13  city off the map, then we believe the city would still owe

14  that obligation, and it might cause a constitutional crisis.

15  Maybe the state would have to -- let's say the city remained

16  with only one resident, and that one resident couldn't

17  possibly pay the taxes to pay this.  It would cause a

18  constitutional crisis.  There'd have to be a resolution.

19  Maybe the state would step in.  I don't know.  That's beyond

20  conjecture.

21          THE COURT:  The city says we're there now.  I'm

22  sensing from Ms. Ceccotti having risen that your time may be

23  up.

24          MR. MORRIS:  Yes, it is.  Thank you.

25          MS. CECCOTTI:  Your Honor, I actually rose because I

 1    was planning to address the question that you just asked --

 2              THE COURT:  Okay.

 3              MS. CECCOTTI:  -- about -- and I was going to

 4    actually spend less time on it, but I think I'll just

 5    dispense with -- I was going to -- first of all, for the

 6    record, Babette Ceccotti, Cohen, Weiss & Simon, LLP, for the

 7    UAW, and good afternoon again.

 8              I was going to spend some time on talking about the

 9    pension clause, the language of the pension clause, and how

10    the courts in Michigan address constitutional provisions when

11    called upon to review them and the principles that they

12    apply, but I'm going to move actually right to your Honor's

13    question because I do think that a lot of -- some of the

14    questions that your Honor has asked, particularly this

15    afternoon, really do go to what I think is going to be the

16    crux of this.

17              First of all, on the city's point that the pension

18    clause doesn't seem to make any -- doesn't, in fact, make any

19    reference to the possibility of municipal bankruptcy, I think

20    we have to go and ask ourselves a couple of questions.

21    First, what did municipal bankruptcy mean at the time, and

22    what did pension rights mean at the time?  And so we have to,

23    you know, sort of bring ourselves back in the legal regime --

24    in two legal regimes to 1963.  First, the city's brief cites

25    to a law that was on the books in Michigan, PA 72, dating

1   from 1939, and the law refers to the 1898 Bankruptcy Act and

2   basically says that any taxing agency or instrumentality as

3   defined in the bankruptcy law may proceed to do something

4   called secure a composition of its debts, and the law then

5   goes on to describe rules about who can file the petition and

6   who can agree to the plan of composition and what kinds of

7   things can be in the plan of composition and also provides

8   that the composition is binding on the instrumentality.

9         In 1963 -- okay.  So that's the law that's on the

10   books.  In 1963 as well the municipal bankruptcy law that is

11   being referenced looks a lot more like the '37 law than it

12   does the law that we have today.  On the sort of time line of

13   Chapter 9 changes starting with the law that was declared

14   constitutional by the Supreme Court in '37, while there are

15   some changes that take effect in 1946, you really don't get a

16   major overhaul until 1976 and the events surrounding the New

17   York City fiscal crisis, so from that point forward -- from

18   that amendment forward, Chapter 9 looks a lot closer to the

19   Chapter 9 that we're dealing with today, but in 1963 it

20   really didn't look like that.  And, frankly, the notion

21   that -- and this is where we get to the pension regime part

22   of my answer.  The notion that the pension clause coming in

23   as it did to take a situation where employees working for the

24   state had, in effect, no vested right to deferred

25   compensation they had earned with services that they provided

1   to the state, that was -- that's the gratuity and the gift --

2   that changes with the pension clause, which then provides the

3   protection for accrued financial benefits.  This is a new

4   thing under the state Constitution.  So it's not -- to me

5   it's not surprising at all that you wouldn't find a reference

6   to the plan of composition or municipal bankruptcy because we

7   have really these arcane terms that it is very unlikely

8   anyone would have applied to vested pension rights.  It's not

9   until 11 years later that ERISA is enacted in the federal

10  regime.  ERISA, of course, has language -- sets forth a

11  comprehensive scheme to protect pensions and uses words like

12  "nonforfeitable benefits" and "vested pensions" and "accrued

13  pensions" and the like.  And as we talked about last week,

14  that regime includes the pension termination system, and you

15  get then developing in the private sector bankruptcy world,

16  the Chapter 11 world, the Chapter 7 world, where the

17  priorities do function, what is the status of a pension

18  contribution given the fact that it is based on services that

19  were rendered to the debtor pre-petition?  All of that law

20  comes up after 1963.  There just simply wouldn't be a way to

21  think about a pension benefit in the context of a debt

22  composition, or at least that is -- that seems very likely to

23  me because you just don't get this law -- all of this law

24  coming up until you get to ERISA and the concept of plan

25  termination and the priorities that apply in Chapter 11 and

1    Chapter 7 years and years later.  And now, you know, to my
2    way of thinking about it, unfortunately, we have seen a lot
3    of pension terminations, and so there's a lot of law on that
4    subject now, but it didn't exist in 1963, and it couldn't
5    possibly have been fairly contemplated.  So I think that
6    we're then left with a section, which is the pension clause,
7    Article -- of the pension clause of the Michigan Constitution
8    that is very much standing on its own without reference to
9    any exception, and we can see why, I think, no -- in
10   particular no reference to the concept of municipal
11   bankruptcy working very much, in effect, each word being
12   given effect by the courts of Michigan who have construed it
13   a number of times to protect accrued pensions.  And it's
14   standing on its own effectively against impairment or
15   diminishment by, as we spoke about last week, the state, the
16   state officials, or governance -- government and political
17   subdivisions to which it applies, so I think the --
18          THE COURT:  I have to interrupt you and ask this
19   question about bankruptcy.  Is there anywhere else in the
20   Bankruptcy Code where a party's nonbankruptcy law right to
21   payment is given an absolute status in the bankruptcy?
22          MS. CECCOTTI:  Well, your Honor, I think that there
23   are a number of places in the Bankruptcy Code where state law
24   is referenced, and we had a reference to the effect given to
25   certain types of liens, which are given effect, but I think

1   the --

2           THE COURT:  Well, but even there there are many

3   circumstances in which security interests are not given

4   absolute effect in bankruptcy.

5           MS. CECCOTTI:  Your Honor, here's --

6           THE COURT:  Cramdown, of course, is a perfect

7   example of that.

8           MS. CECCOTTI:  Here's where I think the crux of this

9   is.  We have a regime in Chapter 9 that must operate by

10  maintaining the state's sovereign control over the political

11  and governmental affairs, including the expenditures

12  therewith under 903.  Chapter 9 is not Chapter 11, and so,

13  therefore, the question to start with is what is the -- what

14  limited things can be done in Chapter 9, not necessarily

15  let's look at the whole of the Bankruptcy Code and try to

16  sort of plug in examples that are going to cross between a

17  Chapter 9 debtor and a Chapter 11 debtor.

18          THE COURT:  I understand that argument, but isn't

19  the end result of that argument that a state like Michigan

20  that has this clause, if it is to be given absolute impact,

21  cannot authorize its municipalities to file bankruptcy?

22          MS. CECCOTTI:  Cannot authorize its municipalities

23  to file for bankruptcy if a purpose is to diminish or impair

24  accrued pensions.  That's correct, and that is --

25          THE COURT:  But what you're not saying there is that

1  if there is the intent not to diminish pensions, they can

2  file municipal bankruptcy?

3      MS. CECCOTTI:  In this case, your Honor, the intent

4  was made abundantly clear going in.  If they had hidden the

5  intent, we might --

6      THE COURT:  No.  I understand that.  I'm trying

7  to --

8      MS. CECCOTTI:  -- we might not be standing here

9  today.

10      THE COURT:  I'm trying to figure out where your

11  argument goes because there are two possible outcomes here.

12  One is when a municipality is subject to the state

13  constitutional provision, it can file bankruptcy and still

14  impair, or it can file bankruptcy without the intent to

15  impair, or I suppose there's a third alternative, which is

16  the one I'm asking about, which is they can't file bankruptcy

17  because bankruptcy doesn't permit that kind of

18  discrimination.

19      MS. CECCOTTI:  I think -- your Honor, I think it's a

20  false choice, frankly.  I really do.  And we've seen some --

21  we've seen enough instances, I guess, of the more modern use

22  of Chapter 9, particularly the cases out in California,

23  where -- and this is -- and CalPERS has been just on the

24  forefront of this, as I'm sure you know -- where they're not

25  touched.  I just -- I don't see what is so accepted or that

 1  it's a black and white choice between filing for bankruptcy
 2  and not filing for bankruptcy simply based on the pension
 3  question.  I mean this is a -- this is a very -- this is a
 4  large, large municipality to be seeking Chapter 9 relief.
 5  There is a lot going on.  This very much reminds me, Judge,
 6  of going from the very small Chapter 11's at the beginning of
 7  the '78 Code and then all of a sudden finding companies like
 8  LTV Steel filing for bankruptcy and suddenly declaring that
 9  retiree health was a general unsecured claim, someone no one
10  had thought of before.  This very much feels to me like that
11  type of a moment where the size of this city and the
12  magnitude of what it's trying to accomplish simply cannot be
13  easily fit within the rules that might otherwise apply in a
14  smaller -- in a smaller context or with less going on or with
15  less money available for fewer options.  It's very much a
16  moment, I think, where -- it's one of those moments that I
17  think we will look back on and say this is where Chapter 9
18  changed.  And we are very much hoping it does not change in
19  the direction of violating what we believe are legitimate --
20  a legitimate basis for a municipality to say, "I need to
21  adjust my debt, but I am going to adhere to a state law, a
22  state constitutional provision like the pension clause, and I
23  can accomplish both."  I very much think that those things
24  are possible, and if we don't have a bankruptcy system that
25  allows for that duality -- the dual sovereignty to have play

1   like that, then we are simply wiping aside centuries of

2   constitutional law.  And I'm really -- my colleagues are

3   going to be very upset with me.

4           THE COURT:  Eleven minutes left.

5           MS. CECCOTTI:  I'm sorry.

6           MS. PATEK:  Your Honor, given the time

7   limitations -- again, Barbara Patek on behalf of the Detroit

8   Public Safety Unions -- I want to address for the moment the

9   Court's question about whether there's anywhere else in the

10  Code, and I don't -- I believe the answer to that question is

11  no, but I think also the Tenth Amendment answers that

12  question.  And I think even if you assume for the sake of

13  argument that there are -- that what the -- what is being

14  said here, that this is just a priority issue, that this

15  constitutional promise that was made to these public servants

16  is to be treated like general unsecured debt as if it were

17  credit card debt, I think a careful look at the Code answers

18  that question to the contrary, and I think you can start with

19  the Orange County versus Merrill Lynch case, which talks

20  about 507 and the reason for the exclusion of (a)(1) and

21  (a)(3) through (9) from the Code.  And in a footnote it talks

22  about what were then (a)(3) and (a)(4) being excluded because

23  they had to do with employment rights and collective

24  bargaining agreement rights potentially of employees which

25  could affect the ability of the municipality to continue its

 1   operation.  I suggest it's no accident that those two

 2   sections were excluded.  I suggest that it's no accident --

 3   we heard a lot about electoral will or political will last

 4   week -- that this provision is tucked away in the Michigan

 5   Constitution so it's difficult to change.  This is a promise

 6   that's made to people as part of the sovereignty of the State

 7   of Michigan to the people who are necessary in this case,

 8   talking about my clients, the Public -- the members of the

 9   Public Safety Unions, and I would suggest that it would be a

10   violation of the Tenth Amendment to read the Code otherwise.

11   Thank you, your Honor.

12        MR. MONTGOMERY:  Your Honor, Claude Montgomery for

13   the Retiree Committee.  I had four things that I was going to

14   try to address today in my seven minutes.  One was ripeness.

15   One was whether or not there is an issue, despite the Cardozo

16   dissent, and, three, I'd like to answer the question of

17   whether or not intent matters for the governor and the

18   emergency manager, a question raised by the state, and,

19   finally, if I have any time left, that Studier does not

20   undercut Seitz v. Probate Judges System.

21        But I'd also like to take the opportunity to answer

22   the last question or at least offer a thought -- whether or

23   not it's considered useful or not, I will, of course, leave

24   to the Court -- and that Bekins itself tells us what the best

25   interest question was, and it wasn't relative treatment of

1    creditors.  It was whether or not bondholders could get tax

2    people to actually levy on property that was either worthless

3    among the municipalities or couldn't be sold for the amount

4    or tax levy marshals and whatnot were running away from

5    creditors.  So the best interest of creditors that _Bekins_ saw

6    being made possible by the plan of adjustment was better than

7    zero, not a relative priority vis-a-vis other creditors but

8    an ability to get paid where the state was actively, through

9    its minor officials, resisting paying anything.  And so I

10   think that is the best interest of creditors that 943(7) is

11   looking to, and I have further statutory construction for

12   that.  At least I offer it.  One is that neither 1129(a)(7)

13   nor 1129(a)(11) are actually adopted by Chapter 9, and so

14   the -- what is the best interest of creditors as in feasible

15   is not necessarily identical to those statutory -- those two

16   statutory provisions to which no reference is made.

17          So now I'd like, if you will, turn my attention to

18   the Cardozo dissent, which I must say I thought Mr. Bennett

19   made a very interesting offer to the Court as a foundation

20   for _Bekins_, but I would like to suggest and only suggest,

21   your Honor, that there is a key -- two key parts to the

22   Cardozo consent that the Court may wish to pay attention to.

23   One is that the Court action on which Mr. Bennett relies was

24   the discharge of the debt.  It wasn't what happened inside

25   the plan process.  It was the actual discharge, which

1    couldn't be accomplished without court intervention.  The

2    second thing that was critical to Justice Cardozo's thinking

3    and, according to Mr. Bennett, ultimately adopted by the

4    Bekins court, which was this concept of consent.  Well,

5    Justice Cardozo characterized it as a waiver of a privilege,

6    right, but here what controls how the state exercises the

7    waiver of the privilege?  Well, obviously that has to be a

8    question of state law.  It can't be transformed into a

9    question of federal law.  And what is the state law that

10    controls the exercise of the waiver of the privilege?  Well,

11    it's this Michigan state Constitution.  So if the Michigan

12    state Constitution is the bedrock on which the waiver takes

13    place and the Michigan Constitution says, according to the

14    Seitz case and according to the Musselman case, no act can be

15    taken that results in a diminishment of pensions, not affects

16    the value of those pensions but actually diminishes the

17    amount of those pensions, then the state actors cannot do

18    anything in that regard.  And I would further answer the

19    question your Honor asked earlier, was if the Michigan

20    Constitution is a proscription on the behavior designed to

21    undercut the Constitution, does that mean that no city can

22    file a Chapter 9?  Well, obviously ones that don't have

23    pension issues don't even have to ask the question, so 436

24    and the Michigan Constitution are clearly not a bar where

25    there's no desire to impair pensions because they don't have

1    pensions, but if they do have pensions --

2              THE COURT:  Well, I'm not sure that's so.

3              MR. MONTGOMERY:  Well, as your Honor -- forgive me.

4              THE COURT:  I mean my question would be in that

5    case -- I mean you can construct a hypothetical in which the

6    city proposes to impair bonds and the bondholders are saying,

7    "Wait a minute.  There's this other asset over here, the

8    pension assets, you know.  We have to impair everybody, not

9    just us."

10             MR. MONTGOMERY:  I presume your Honor meant pension

11   obligations.

12             THE COURT:  Pension, yeah.  Thank you.

13             MR. MONTGOMERY:  The one difference between the

14   state constitutional provision on impairment of contracts and

15   Article IX, Section 24, is that Article I, Section 8, of the

16   Michigan Constitution speaks of legislation whereas Article

17   IX, Section 24 --

18             THE COURT:  And I don't mean to frame this in terms

19   of a constitutional protection for bonds because that's not

20   the point of it.  The point of it is that the bondholders

21   could argue that under the Bankruptcy Code, pension holders

22   do have to be impaired, even if the municipality doesn't want

23   to, to achieve fairness in treatment.

24             MR. MONTGOMERY:  Well, first, they would have to, of

25   course, start on a class basis because obviously --

1           THE COURT:  Right.

2           MR. MONTGOMERY:  -- the unfair discrimination starts

3    there, but, secondly, the key issue here for whether or not

4    there is an unfair discrimination is whether or not there are

5    differences in the protections afforded each claim.  It is

6    well-established that you can make distinctions between

7    creditors based on the nature of the obligation and that you

8    can make differences in treatment based on the nature of the

9    obligation, so the only question is whether or not it's

10   unfair, and how could it be unfair to let the pension rights

11   of the City of Detroit retirees pass through a Chapter 9 case

12   if the Michigan Constitution says it's unconstitutional to

13   try to impair them?

14          THE COURT:  The bondholders say protected by

15   Constitution or not, in bankruptcy they are unsecured claims.

16          MR. MONTGOMERY:  Right.  And so if, your Honor, the

17   only possibility of dealing with a pension obligation is that

18   it has to be done in a Chapter 9 and it is unconstitutional

19   for the actor, the state actors to ask for Chapter 9, I think

20   you're blocked.  You can't ask for the Chapter 9 position.

21   And we find nothing inconsistent with that roadblock because

22   the people of Michigan retain the right and the ability to

23   change the law if they wish to give their municipalities

24   greater access to Chapter 9.  If, in fact, Article IX,

25   Section 24, is a roadblock -- and we assert it is a

1  roadblock -- the people of Michigan, not the federal

2  government, but the people of Michigan retain the right to

3  make that change.

4       THE COURT:  One more minute.

5       MR. MONTGOMERY:  Yes, sir.

6       THE COURT:  Ripeness.  I would simply commend your

7  attention to U.S. Postal Service v. National Association of

8  Letter Carriers, which your Honor no doubt has read and which

9  ripeness focuses on the timing of the action rather than the

10  party that brings the action, and the key question there for

11  the Court was whether or not there was a reasonable threat of

12  liability if compliance with the arbitration order violated

13  the CSRA, which was the relevant statute, and we say the

14  analogy to that is whether or not there's a reasonable threat

15  of harm to the pensioners as a result of the city's action.

16       THE COURT:  Um-hmm.

17       MR. MONTGOMERY:  And I think that's -- at least we

18  would offer to your Court that is a difficult thing to

19  dispute.  And I think that exhausts my ten minutes, your

20  Honor.

21       THE COURT:  Thank you.

22       MR. SCHNEIDER:  Your Honor, Matthew Schneider, chief

23  legal counsel, Michigan Department of Attorney General, on

24  behalf of the state.  Your Honor, I'd only like to discuss

25  two topics here.  One is home rule and then, secondly, the

1    referendum issues regarding PA 436.

2         So if we start with the home rule argument, if we

3    look at Article VII, Section 22, just setting aside the text,

4    we have to look at the text and ask what does this do.  What

5    does this provision of the Constitution do?  It gives local

6    citizens the power to adopt their own governing structure and

7    ordinances.  And what it allows citizens to do is gives them

8    a City Council.  The City Council can adopt ordinances and

9    resolutions.  And the citizens have a right to that power.

10        In this case, what did the citizens do with that

11   power?  Look at Detroit City Charter, Section 1-102.  They

12   enacted as part of that charter a provision that reads,

13   quote, "The City has the comprehensive home rule power

14   conferred upon it by the Michigan Constitution, subject only

15   to the limitations on the exercise of that power contained in

16   the Constitution or this Charter or imposed by statute."  So

17   the charter itself states that the home rule power is limited

18   to what is imposed by statute.

19        But even if it didn't say that, if the charter

20   didn't say that, we know that when the citizens of Detroit go

21   to the ballot box and they elect their City Council members,

22   those same members, those same citizens, have an opportunity

23   to vote for their state senator and their state

24   representative and their governor, and those representatives

25   in Lansing, who the city has an ability to vote for, pass

1  laws that govern those city residents as well.  Those

2  representatives passed PA 436.

3          This cannot possibly violate the home rule concept.

4  Let's look at what those representatives did.  They passed

5  the Home Rule City's Act, MCL 117.36.  Quote, "No provision

6  of any city charter shall conflict with or contravene the

7  provisions of any general law of the state," unquote.

8          And we have to look at this through another third

9  and final prism.  In 1963 the residents of this city had an

10  opportunity to vote another time, and they voted to ratify

11  the state Constitution.  Article VII, Section 22, contains a

12  very important line that now binds those city residents.  A

13  city, quote, "shall have the power to adopt resolutions and

14  ordinances related to its municipal concerns, property and

15  government, subject to the Constitution and law," unquote.

16  The law is passed by the legislature.  In other words, you

17  can only pass local laws that are subject to the Constitution

18  and the laws passed by the legislature, and this is all about

19  representative government.  This is how it works in our

20  constitutional republic.  The city residents still govern

21  themselves.  They voted for the people enacting the city

22  charter.  The city residents voted for a legislature that

23  enacted PA 436, and the city residents had a hand in the

24  Michigan Constitution as well.

25          If you look at the legal priority here, we know, as

1  I've stated, that the acts of the legislature can take
2  priority over local acts.  The Michigan Supreme Court in <u>Mack</u>
3  v. <u>City of Detroit</u>, 467 Mich. 186, a 2002 case, explained
4  this.  There was a Detroit city charter provision that
5  created a private cause of action for discrimination.  A city
6  police officer brought a discrimination suit under the
7  charter, but in this case the legislature had already passed
8  a governmental immunity statute that prevented these actions
9  against the city.  And the Michigan Supreme Court held that
10  the charter provision conflicted with the law as passed by
11  the legislature, and so the legislation took priority over
12  the charter.
13          PA 436 is not a local act.  It can be applied to any
14  other city, and we can see in the newspapers today about the
15  issue of PA 436 being raised in other cities or
16  municipalities.  So there's a much larger point here, your
17  Honor.  The objectors, I think, are incorrect in the overall
18  approach to the home rule argument.  They're arguing that PA
19  436 trumps home rule and ignores the will of the voters and
20  that the legislature somehow just wanted to overrule the
21  citizens of Detroit, but we have to look at PA 436 and know
22  that there were incredibly compelling reasons for PA 436.
23  The point of that, as spelled out in the Act, was to help
24  distressed cities and school districts.  The evidence showed
25  that this was a problem that was not going away.  It was true

1   before PA 4, after PA 4, before PA 436, and after it.  And
2   the language of PA 436 shows that the legislature wanted to
3   fix it, but it also responded to the voters' rejection of PA
4   436.  If we look at the governor's testimony in his
5   deposition, he indicates as such.

6           THE COURT:  Well, but the fact that there may have
7   been compelling reasons for 436 wouldn't justify it if it's
8   otherwise unconstitutional, would it?

9           MR. SCHNEIDER:  No, but there's no -- it's not
10  unconstitutional.  That's my point.

11          THE COURT:  I'm just wondering why you're arguing
12  that it was compelling.  What's the point?

13          MR. SCHNEIDER:  It's a point because -- just to say,
14  your Honor, there's a much larger point here, and the point
15  is is this wasn't done arbitrarily.  This was done for a very
16  specific purpose.

17          Secondly, your Honor, I want to respond to the issue
18  regarding the right to referendum.  I believe Assistant
19  Attorney General Margaret Nelson explained this quite
20  adequately yesterday, but I do want to address the fact that,
21  you know, there's been argument raised here that there were
22  documents produced in discovery that lawyers at Jones Day
23  discussed how PA 436 would be, you know, going around the
24  referendum power.  Well, neither of these people were members
25  of the legislature.  If we look at the governor's position

1 itself, the state has produced discovery in this case

2 explaining the governor's position, and it was not to go

3 around the legislature. The governor had directed -- I

4 believe it was Dick Posthumus, the former lieutenant

5 governor, and his legislative director, how are we going to

6 craft -- how would PA 436 be crafted? It would be crafted

7 not to ignore the will of the voters. It would be crafted in

8 order to make sure that different changes were made to make

9 it better. And, you know, as to --

10 THE COURT: But how does anyone know whether the

11 changes that 436 incorporated over the rejected law, PA 4,

12 responded to the will of the voters or not? How does anyone

13 know that?

14 MR. SCHNEIDER: Well --

15 THE COURT: I mean all we know is PA 436 was

16 repeal -- PA 4 was repealed.

17 MR. SCHNEIDER: Folks aren't blind, I think, to the

18 media coverage as well. When an act is --

19 THE COURT: Rely on media coverage?

20 MR. SCHNEIDER: Well, they have constituents. Laws

21 are passed only through the regular process of legislators

22 responding to their constituents, and that is the will of the

23 voters. And when the governor wants a new structure, PA 436,

24 or the members of the legislature want that, their

25 constituents will go to the media as well or will speak

1  directly to them, so it was in direct response to fixing the

2  problems that the will of the voters pointed out.

3       If you have any other questions on these topics, I'd

4  be happy to answer them or I could defer to Mr. Bennett on

5  the other issues.

6       THE COURT:  Thank you, sir.

7       MR. SCHNEIDER:  Thank you.

8       MR. BENNETT:  Good afternoon, your Honor.  Bruce

9  Bennett of Jones Day on behalf of the city.  I got a little

10  bit of an organizational challenge here.  One comment with

11  respect to the last point concerning the right of referendum,

12  if the defect in 436 is that there was a right -- there

13  should have been a right to referendum anyway,

14  notwithstanding what the statute says, well, I suppose the

15  remedy is for someone to try to mount a referendum, not to

16  wait till you come to a Bankruptcy Court and ask the

17  Bankruptcy Court to decide there should have been a

18  referendum.  If there had been a referendum, it would have

19  been rejected, and, therefore, we're going to hold it

20  unconstitutional.  It seems that there's a whole -- there's a

21  few steps that are being skipped in the relief that's been

22  requested of you here.

23       There's a number of topics, and I can only refer to

24  the other Mr. Bennett to cover all the different questions,

25  so I'm going to try to organize it, but if it falls apart a

1    little bit, I apologize.

2         First, there was an appeal to the other California

3    cases, which has to refer to <u>Vallejo</u>, where, of course,

4    pension claims were not impaired, debt claims were impaired,

5    in what was a largely consensual plan.  I think I said in

6    another appearance before this Court that today <u>Vallejo</u> may

7    well be in trouble again and perhaps because it did not get

8    enough relief from its debt generally, but that's not the

9    reason I refer to it this time because I think you can't

10   refer to <u>Vallejo</u> without referring to <u>Central Falls</u> in Rhode

11   Island.  And in <u>Central Falls</u> in Rhode Island, what happened

12   was was that the pension claims, pension and benefit claims,

13   took haircuts and the debt did not, again, a consensual

14   outcome.

15        If the economics were a little different, perhaps we

16   could have a consensual outcome one way or another in

17   Detroit's case, but I'm pretty sure that the bondholders, who

18   I think are listening on the phone and not here today, would

19   say that they are not in a position and would not consent to

20   allowing pension claims in this case to be unimpaired, and

21   I've certainly heard the various representatives of those

22   holding pension and other retiree benefit claims here and

23   indicating that they're not in a position or willing to let

24   bondholders leave unimpaired.  And it may well be that this

25   is the first case where irrespective of consent from one side

1    or another, we could not achieve that result, so I think

2    the -- that a consensual outcome could come out differently

3    and could come out with only part of a capital structure

4    being impaired unfortunately says nothing about the

5    controversy we have today.

6              The second point I want to cover is the point about

7    the discharge language in Bankruptcy Code Section 944.  It's,

8    of course, important whenever reading a provision in a

9    statute to figure out where it is in the statute, and the

10   provision relating to discharge is in the effect of a

11   confirmation order.  And the line is that the discharge

12   applies -- excuse me -- the debtor is not discharged --

13   there's a broader discharge provision that comes ahead --

14   from any debt exempted from discharge by the plan or order

15   confirming the plan.  This is not a claim that has some

16   inherent nondischargeability.  This is a reference to a plan

17   exempting from the provision before it, and I suppose that

18   what this is intended to do is to say that obligations as

19   modified will continue if the plan or the order confirming

20   the plan says so.  Otherwise, if you go up and look at the

21   discharge, it covers all claims, period, and so I think this

22   is a provision that makes a plan that partially and does not

23   fully discharge claims work, and I think that's all it is.

24   It's not a recognition --

25              THE COURT:  Well, but what Mr. Gordon argues, if I

1  understand it correctly, is that this provision of the Code

2  allows a municipal debtor to waive the discharge of the

3  claims of a class, and, therefore, this city can pursue a

4  Chapter 9 case that addresses all of the debt other than the

5  pension debt which can't be pursued or at least impaired

6  because of the Michigan Constitution.

7       MR. BENNETT:  Well, once again, this provision is

8  one section in a Bankruptcy Code that contains lots of other

9  sections, and a couple of them were touched upon by your

10 Honor and other people addressing you just a few minutes ago.

11      First, there was a discussion about whether it

12 creates a priority or not.  I don't think that's terribly

13 relevant.  The issue that the Bankruptcy Code sets up is that

14 it has a distribution scheme imbedded in it.  The

15 distribution scheme in some places is given effect through a

16 combination of a declaration that a particular claim has

17 priority and then a treatment requirement that you would find

18 in 1129.  In others there's no explicit priority, but there's

19 a treatment -- there's a treatment requirement in 1129, and

20 that treatment requirement works two ways, and I think this

21 came out in the discussion.  One, there's the ranking, which

22 is basically what 1129(b) does between secured claims,

23 unsecured claims, subordinated claims, and not in Chapter 9

24 equity.  But it also has the nondiscrimination provisions,

25 and I actually think that counsel for the retiree committee

1   slightly misspoke when he said, well, nondiscrimination,

2   that's an issue between classes, and it is, but within

3   classes there's actually a stronger nondiscrimination

4   provision.  The treatment within a class has to be the same.

5   Between classes the rule is unreasonable discrimination.  And

6   so the discharge -- the provision in 944, the ability to have

7   an exception in the confirmation order from discharging all

8   claims that existed on the petition date and leaving some

9   around to some extent, I don't think is a license to confirm

10  a plan that doesn't meet with the requirements of 1129, both

11  the priority -- what I called priority, but the

12  distributional entitlement requirements and the creditor

13  justice requirements, whether they are unlawful

14  discrimination or same treatment within a class.  And so you

15  get to the point where your Honor was, I think, which is that

16  these claims are --

17         THE COURT:  Well, but Mr. Morris pointed out

18  astutely that Chapter 9 itself prohibits -- or I should say

19  requires that a plan be fair and equitable.  Yes?

20         MR. BENNETT:  It has a different meaning than the

21  provision in the Chapter 11 --

22         THE COURT:  Right.

23         MR. BENNETT:  -- for -- yes.

24         THE COURT:  Right.

25         MR. BENNETT:  But he referred to best interest, but,

1  yes, it has a fair and equitable provision.

2      THE COURT:  So he argues how can a provision that

3  impairs pensions be fair and equitable in the face of the

4  constitutional protection of them?

5      MR. BENNETT:  I think you go back to the -- again,

6  what came up when we were last here, which is that you can

7  say as a constitutional matter these cannot be impaired for

8  one -- by the municipality, but the reality is at the end of

9  the day there isn't enough money.  And when the reality is

10  there isn't enough money to pay them, then if you went

11  through all and exhausted all of the nonbankruptcy procedures

12  for enforcing a debt, where would you be?  That is the --

13  that is essentially the best interest benchmark.  And we've

14  got a lot of law on this.  Bekins, which was referenced, is

15  one of them.  The fact pattern that you see in cases

16  involving very distressed municipalities in the cases, which

17  a lot of them are from the depression era, of course, is

18  situations where the municipality, notwithstanding an

19  obligation to raise taxes, just can't collect any more money

20  no matter what it does.  Sadly, that fact situation, albeit

21  with more modern features, presents itself in Detroit.  And I

22  think it would be what the city will have to prove, open

23  paren, one, in the event it does not achieve a consensual

24  plan, which it still hopes to and that the -- that it is

25  object -- the plan is objected to by relevant constituents

 1   representing retirees, the city will ultimately have to prove
 2   that the distributions on account of underfunding claims
 3   offered by the plan are better than the contributions that
 4   could be achieved if there wasn't a Chapter 9 case and if the
 5   creditors were free to pursue their remedies, all creditors
 6   were free to pursue their remedies, and if the residents
 7   reacted as we can predict residents would react because they
 8   have been doing so for the past several decades.  And if the
 9   city -- if the retiree -- committees represented by the
10   retiree groups are able to prove that the environment for
11   them outside of Chapter 9 is better than the results we are
12   able to achieve in this Chapter 9 case, they may get a chance
13   to prove to themselves whether they were right or wrong
14   because that's where we'll be.  We'll be in a dismissed case.
15   There will be lots of unsatisfied bond debt.  There will be
16   lots of unsatisfied pension debt.  There will be lots of
17   unsatisfied OPEB debt, and we'll see how it turns out.  I
18   think that will not be a good outcome.
19          So this kind of brings me back to how the system
20   works, and I think, frankly, why don't I start with really
21   Justice Cardozo's reasoning?  And first I wanted to spend a
22   minute to take away some of the mystery that seems to be
23   surrounding who was where in 1936 and 1938.  It was mentioned
24   that Judge Cardozo for some reason didn't participate in the
25   decision in Bekins.  Unfortunately, that's because Justice

1  Cardozo had a heart attack at the end of 1937, a stroke at
2  the beginning of 1938, and he died in early July 1938, about
3  ten weeks after the decision in <u>Bekins</u>.  The reality was is
4  Justice Cardozo was too sick to participate.  His opinion was
5  joined by, quote, the chief justice, Justices Brandeis and
6  Justice Stone -- excuse me -- Justices Brandeis and Stone.  I
7  actually didn't know when we were here last for certain that
8  the chief justice at the time of the dissent was the same
9  Chief Justice Hughes who wrote the opinion in <u>Bekins</u>.  It
10 turns out he was.  I was able to verify that during the
11 break.  And I think I offer what Justice Cardozo had to say
12 because its logic is irrefutable.  By the way, its reasoning
13 wasn't assailed by any of the retiree representatives.  It's
14 joined by a very distinguished group of justices, and all of
15 them except for Cardozo participated in the ultimate reversal
16 of <u>Ashton</u> in <u>Bekins</u>.  The opinion, of course, was written by
17 Hughes, who joined the dissent, and I think, therefore, it's
18 an excellent aid to interpretation.
19        I admitted last time that <u>Bekins</u> is a little hard to
20 interpret because it's dealing actually with three specific
21 constitutional challenges.  It spends most of its column
22 inches on the Article X problem.  It spends exactly one
23 column inch on the Fifth Amendment problem and really only
24 talks about the commerce clause problem because the
25 legislative history that it quotes for the changes made

1  between Ashton and Bekins touches on the commerce clause

2  issue, and the Court basically is agreeing with the treatment

3  that accompanied it -- accompanied the statute in the

4  legislative history.

5       It turns out that Cardozo didn't write on a clean

6  slate.  He cited a case, Imperial Irrigation District, 10

7  Fed. Supp. 832, which is probably where he borrowed the

8  concept, and I quote from that case, "The impairment of

9  contracts is brought about by the national law, and not by

10  the state measure, and local consent similar in effect to

11  that sanctioned by the California statute."  The judge in

12  that case -- so it's obviously a district judge -- it's not

13  even an appellate judge -- is dealing with the same problem

14  that you would have if you tried to ground the

15  constitutionality of the Bankruptcy Court -- Bankruptcy Code

16  as against the contracts clause on anything other than the

17  reality that it is the federal power that is impairing

18  contracts.  You wind up with a situation that you have

19  basically destroyed Chapter 9 and maybe parts of Chapter 11

20  as an avenue for impairing contracts in many circumstances,

21  not just pensions.

22       In short, you've proven too much.  You've proven

23  that contracts clauses in every state -- and I said last time

24  I think there's a contracts clause in every state

25  Constitution, but I could be off by one or two -- that would

1  prevent the impairment of bonds.  That would prevent the

2  impairment of trade claims.  In fact, you would have

3  effectively preempted all impairments, and Chapter 9 would be

4  completely a dead letter.  And so we have to look for other

5  interpretations or we should be looking very hard for other

6  interpretations, and we don't have to look very far.  And as

7  I said before, I think while Bekins says -- crunches it into

8  a couple of sentences, Justice Cardozo's reasoning joined by

9  Hughes, Stone, and Brandeis explains to us why,

10 notwithstanding the federal contracts clause, notwithstanding

11 state contracts -- state Constitution contracts clauses, and

12 notwithstanding the pension clause, we still have an

13 effective bankruptcy power to implement debt restructurings

14 and debt impairments in cases where there are necessary --

15 where they are necessary.  Nothing about eligibility is

16 dealing with the question that your Honor sensibly asked,

17 which is, "Don't you have to show that a plan is in the best

18 interest of creditors?"  Clearly we do.  Is there anybody

19 going to use Chapter 9 as a method for impairing contracts if

20 they're not in financial extremis?  No, they should not, and,

21 no, they will not.  It is in those circumstances where the

22 federal government comes to the aid of states and

23 municipalities that can't on their own restructure their

24 financial affairs.

25           And by the way, a nice corollary of looking at it

1  this way is that it dovetails precisely with one of your

2  Honor's observations, which is the last word -- I think it's

3  the last word of the relevant sentence of the pensions

4  clause, the words "thereby," which relate back to the state,

5  relate back to the municipality, but don't say that they

6  can't be impaired by anybody, just says the pension --

7  accrued pension benefits cannot be diminished or impaired

8  thereby, "thereby" being the state and the municipality.  So

9  adopting the language and approach in the California case

10  just cited, in the Cardozo dissent joined by the other

11  justices, and in _Bekins_ itself, albeit not quite as

12  precisely, you wind up with federal law that happens to fit

13  nicely with the actual language of the state law with a

14  bankruptcy system that does still work and has not been

15  crippled and made unable to deal with every financial --

16  every municipality in financial distress and a Bankruptcy

17  Code that is constitutional, as _Bekins_ said it was.

18       I don't think I have many more points.  First, I

19  wanted to make clear -- someone mentioned that the city had

20  not in oral argument taken positions on certain points

21  relating to PA 436.  We've been relying and join in the

22  arguments of the attorney general.  I think I dealt with

23  that.  Oh, there was an assertion that the 1963 bankruptcy

24  law was somehow different than the fact that throughout --

25  beginning in the '30s but all the way through '61, '63, all

1     the way up until the Bankruptcy Code made specific

2     authorization unnecessary for awhile, Michigan authorized all

3     of its municipalities to resort to the composition law.  This

4     1963 law still had impairment of contracts as one of its

5     central elements.  In fact, if you look at <u>Bekins</u>, which

6     stands, of course, for many things, <u>Bekins</u> is a case where

7     it's a 60-percent -- it's a 60-cent distribution on account

8     of debt, and it was a mercifully simple case.  There was one

9     class, so we didn't have to deal with discrimination and all

10     those other things.  But <u>Bekins</u> is a debt impairment case.

11     It turned out to be that 86 percent of the creditors by

12     amount approved it, and it's the 14 percent who are

13     complaining.  And so it really isn't fair to say that the

14     bankruptcy laws as they apply to municipalities were vastly

15     different than the laws that -- the laws that are here now.

16     They're probably a little bit more advanced in certain

17     respects, informed by the New York experience, but the idea

18     that contracts between a municipality or obligations of a

19     municipality because very often they're not just in the form

20     of contracts, they're in the form of ordinances, and its

21     creditors can be -- could be -- could have been in 1963 and

22     in 1961 impaired as a matter of federal bankruptcy law.  It's

23     the absence of any mention at all of this issue or problem

24     anywhere in -- specifically in the pensions clause itself,

25     but also in the convention history leads to the conclusion

 1   that people weren't thinking or it's hard to find any
 2   evidence that anyone was thinking that anything that happened
 3   in the structuring of the pensions clause was intended to
 4   take Chapter 9 relief away from a municipality, period, in
 5   any circumstances.  And we think, again, that even if it did
 6   or tried to -- and I think this is important -- even if it
 7   did or tried to, the Justice Cardozo, Hughes, Stone, and
 8   Brandeis reasoning would say it doesn't matter, that at the
 9   end of the day, the -- unless there's an explicit direction
10   not to file Chapter 9, the state can only protect pension
11   claims so much.  They can't protect them ultimately from
12   federal power.
13              I think those are all the points I need to cover.
14   If your Honor has any questions that I could answer --
15              THE COURT:  No.  Thank you.
16              MR. BENNETT:  Thank you.
17              THE COURT:  All right.  Ladies and gentlemen, I
18   promised you one deliverable at the conclusion of these
19   arguments, which was a decision on whether or not there are
20   any genuine issues of material fact that should be addressed
21   at the upcoming trial relating to these issues which I had
22   preliminarily determined were strictly legal issues.  I'm
23   going to take ten more minutes to just think about that.  I
24   think there might actually be one.  So we'll reconvene at
25   2:45.  In the meantime, I want to remind you, please, that

1  when you are in the hallway, you must remain absolutely

2  silent, no talking in the halls.  If you want to talk, you

3  can talk in here or down on the first floor.

4       One other housekeeping matter, which, again, I want

5  to bring up just in case I forget later.  It was requested of

6  the Court permission to have in the courtroom a transcriber

7  to provide -- I guess it's called realtime transcripts, and

8  that's fine with the Court so long as we all understand that

9  that transcript is not the official transcript of the court

10  and may not be used in lieu of what would otherwise be

11  required to be used, the official transcript.  So 2:45 we'll

12  reconvene.

13       THE CLERK:  All rise.  Court is in recess.

14  (Recess at 2:34 p.m., until 2:46 p.m.)

15       THE CLERK:  Court is in session.  Please be seated.

16  Recalling Case Number 13-53846, City of Detroit, Michigan.

17       THE COURT:  Counsel are present.  I want to

18  emphasize again what I think I stated the other day, that the

19  Court certainly will take into account in deciding these

20  issues which I have preliminarily determined are legal issues

21  any facts that come out in the trial that bear upon them.

22  Having said that, though, there is one issue of fact that

23  needs to be identified because the parties do disagree about

24  it, and it might have a bearing on one of these legal issues,

25  and that specific factual issue is what was the purpose of

1 | adding the spending provision to PA 436.

2 | Anything further for today?  All right.  We will

3 | begin our trial at nine o'clock Wednesday morning in this

4 | room.  Oh, I urge you to get here early because the security

5 | lines are longer at that hour in the morning than they are at

6 | the times we've been starting.

7 | THE CLERK:  All rise.  Court is adjourned.

8 | (Proceedings concluded at 2:48 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett           October 23, 2013
_____    _____
Lois Garrett