# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

***Debtor In Possession***
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE−MI
Tax ID / EIN: 38−6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489−3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075−1505
248−359−7300
Fax : 248−359−7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky−Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359−7300
Fax : (248) 359−7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075−1505
(248) 359−7300
Fax : (248) 359−7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496−8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212−326−3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496−7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**                represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−6769
Email: Richard.A.Roble@usdoj.gov

*Retiree Committee*
**Official Committee of Retirees**      represented by **Sam J. Alberts**
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005−3364

(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2316 | Transcript Order Form of Hearing October 23, 2013, Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

---

**Order Party: Name, Address and Telephone Number**

Name _____ **David M. Eisenberg** _____

Firm __**Erman, Teicher, Miller, Zucker & Freedman, P.C.**__

Address _____ **400 Galleria Officentre, Suite 444** _____

City, State, Zip _____ **Southfield, MI 48034** _____

Phone _____ **248-827-4100** _____

Email _____ **deisenberg@ermanteicher.com** _____

**Case/Debtor Name:**

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** _Hon. Steven Rhodes_

◉ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/23/2013_ **Time of Hearing:** _9:00 a.m._ **Title of Hearing:** _Eligibility Hearing_ _____

Please specify portion of hearing requested:   ◉ **Original/Unredacted**   ○ Redacted   ○ Copy (2nd Party)

◉ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

---

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

○ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com



FOR COURT USE ONLY

Transcript To Be Prepared By

Date   By

Order Received

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ David M. Eisenberg _____ Date: **12/26/13** _____

By signing, I certify that I will pay all charges upon completion of the transcript request.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        October 23, 2013
                Debtor.         .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  GEOFFREY S. IRWIN
                            GEOFFREY S. STEWART
                            MIGUEL F. EATON
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       State of Michigan
Michigan:              Michigan Department of Attorney General
                       By:  MATTHEW SCHNEIDER
                       P.O. Box 30754
                       Lansing, MI  48909
                       (517) 241-8403

                       Dickinson Wright, PLLC
                       By:  STEVEN G. HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>     JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>     JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| | Clark Hill, PLC<br>By:  RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI  48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &<br>   Freedman, P.C.<br>By:  BARBARA A. PATEK<br>     JULIE BETH TEICHER<br>     DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>     PETER D. DECHIARA<br>     THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By: THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI 48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By: RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI 48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By: CLAUDE D. MONTGOMERY<br>ANTHONY B. ULLMAN<br>ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY 10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By: MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI 48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By: LYNN M. BRIMER<br>MEREDITH E. TAUNT<br>MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI 48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By: WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI 48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By: DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI 48304<br>(248) 540-3340 |

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

 1          THE CLERK:  Court is in session.  Please be seated.
 2    Case Number 13-53846, City of Detroit, Michigan.
 3          THE COURT:  Good morning.  Excuse me.  We have an
 4    attorney to admit to the Bar of the Court, Miguel Eaton.
 5          MR. EATON:  Good morning, your Honor.
 6          THE COURT:  Are you Mr. Eaton?
 7          MR. EATON:  Yes, sir.
 8          THE COURT:  Okay.  Are you prepared to take the oath
 9    of admission to the Bar of the Court?
10          MR. EATON:  Yes, your Honor.
11          THE COURT:  Please raise your right hand.  Do you
12    affirm that you will conduct yourself as an attorney and
13    counselor of the Court with integrity and respect for the
14    law; that you have read and will abide by the civility
15    principles approved by the Court; and that you will support
16    and defend the Constitution and laws of the United States?
17          MR. EATON:  I will.
18          THE COURT:  Welcome, sir.
19          MR. EATON:  Thank you, your Honor.
20          THE COURT:  We will take care of your paperwork for
21    you.  And we should go ahead and have appearances entered,
22    please.
23          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin
24    from Jones Day on behalf of the city.
25          MR. STEWART:  Geoffrey Stewart, Jones Day, also on

1  behalf of the city, your Honor.

2       MS. LEVINE:  Good morning, your Honor.  Sharon

3  Levine, and if I could introduce to the Court my partner,

4  Jack Sherwood, Lowenstein Sandler, for AFSCME.  Thank you.

5       THE COURT:  Welcome, sir.

6       MR. MONTGOMERY:  Good morning, your Honor.  Claude

7  Montgomery, Dentons US, for the retiree committee, and with

8  me in the courtroom today with possible speaking roles are

9  Anthony Ullman, partner in Dentons, and Arthur Ruegger back

10  there.  Thank you, your Honor.

11       MR. SCHNEIDER:  Good morning, your Honor.  Matthew

12  Schneider, chief legal counsel, Michigan Department of

13  Attorney General, on behalf of the State of Michigan, and

14  with me is Steven Howell, special assistant attorney general.

15       MS. CECCOTTI:  Good morning, your Honor.  Babette

16  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  I would

17  also like to introduce my partners, Tom Ciantra sitting here

18  at counsel table, Peter DeChiara over in the corner, both of

19  whom you will see predominantly at the trial.

20       THE COURT:  Thank you.

21       MR. WERTHEIMER:  William Wertheimer, your Honor, on

22  behalf of the Flowers plaintiffs.

23       MS. GREEN:  Good morning.  Jennifer Green on behalf

24  of the General and Police and Fire Retirement Systems, and I

25  have with me my colleagues Ron King and Bob Gordon.

1          THE COURT:  I'm sorry.

2          MS. GREEN:  Ronald King and Bob Gordon.

3          THE COURT:  Mr. King.  Okay.

4          MR. MORRIS:  Good morning, your Honor.  Thomas

5    Morris of Silverman & Morris on behalf of the Retiree

6    Association parties.  Also here representing those parties is

7    Ryan Plecha of Lippitt O'Keefe.

8          MS. PATEK:  Good morning, your Honor.  Barbara Patek

9    of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

10   Detroit Public Safety Unions, and with me this morning are

11   Julie Teicher and David Eisenberg.

12         MS. BRIMER:  Good morning, your Honor.  Lynn M.

13   Brimer appearing on behalf of the Retired Detroit Police

14   Officers Association.  Also with me this morning as trial

15   counsel are Meredith Taunt and Mallory Field from the firm

16   Strobl & Sharp, PC.

17         THE COURT:  Thank you.

18         MR. BENNETT:  Bruce Bennett of Jones Day on behalf

19   of the city, your Honor.

20         THE COURT:  Okay.  Then in terms of our order of

21   proceeding this morning, I'd first like to deal with the

22   motion in limine and then the three remaining discovery

23   motions, then the joint final pretrial order, and then we'll

24   begin the trial.  Is that order of proceeding okay with

25   everyone?  Okay.

1          Actually, first, dealing with the motion in limine,

2   I'm going to waive further oral argument on that and rely on

3   your papers and conclude, as I suggested I might the other

4   day, the Court must conclude that it is challenging, if not

5   difficult, if not impossible, to resolve this motion before

6   trial and before Mr. Moore is actually testifying.  Before

7   the Court can determine the admissibility of his proffered

8   testimony, the Court must have before it the questions that

9   the proponent of the witness asks of him, so in the

10  circumstances, I will deny the motion but without prejudice,

11  of course, to the right of any party to object to any of Mr.

12  Moore's testimony on any appropriate ground.

13          So let's turn our attention then to the three

14  discovery motions.  Who will argue those?

15          MR. CIANTRA:  I will start off, your Honor.  Thomas

16  Ciantra, Cohen, Weiss & Simon, for the UAW.

17          THE COURT:  Go ahead, sir.

18          MR. CIANTRA:  Your Honor, first I want to thank the

19  Court for its indulgence.  Obviously we have been under a lot

20  of strain and effort to complete discovery in this matter so

21  that the trial can take place on an expedited basis, and we

22  appreciate the Court's hearing these issues on an expedited

23  basis.  I'm not going to go over the papers extensively.  The

24  Court has seen the issues and I'm sure has read the papers,

25  but I will make a presentation, and it's going to be divided

1  basically chronologically.

2       The first part I want to discuss are the documents

3  and testimony concerning matters which antedate the retention

4  of Jones Day or the emergency manager's retention, and then

5  the second part of the argument deals with matters that come

6  after that point in time and that are really taken up with

7  our request that the Court revisit the issues that it ruled

8  upon back in September.

9       So let me begin then with the first part, the

10 matters that antedate Jones Day's retention, and the issue

11 has been crystallized by the position that counsel for the

12 city took in the October 15th e-mail that is attached as

13 Exhibit 6(d) to the UAW's motion papers with respect to the

14 city.  And what it involves are a series of memoranda that

15 Jones Day prepared in 2012, approximately at least a year

16 before the firm was retained to represent the city in this

17 matter, and these e-mails -- these memoranda are referenced

18 in an e-mail that discusses a meeting between partner Jones

19 Day that had been scheduled with Governor Snyder for June

20 5th, I believe, of 2012, and they're very specific e-mails,

21 your Honor.  They are identified there, and they go to

22 obviously issues that are at the heart of UAW and other

23 objectors' issues that they would raise here, the

24 constitutional protection of the retirees' pensions being the

25 most salient.  And obviously we are seeking production of

1    those documents as well as anything else that may be being

2    withheld that antedates the retention of Jones Day.

3         Now, the city has sort of taken a selective approach

4    with respect to these types of materials.  Obviously Jones

5    Day spent a lot of time and a lot of effort to get itself in

6    a position to impress the state and get hired to represent

7    the city in connection with this case.  There's a very

8    detailed pitch book that we have marked as an exhibit that

9    will be discussed throughout this proceeding.  They have

10   produced that.  They have withheld these e-mails -- these

11   memoranda that are attached to the e-mail.  And the principal

12   basis for that decision at this point is the work product

13   doctrine.  They have withdrawn attorney-client privilege.

14   They weren't retained by the state at any point.  And now

15   they are focusing on work product.

16        And, of course, going back to first principles, the

17   work product doctrine, as it developed, intended to preserve

18   a party's lawyer's work on developing the theories and facts

19   of a case.  I mean this is Hickman v. Taylor, the classic

20   example of an attorney who was interviewing witnesses to an

21   accident to assist his client's defense of that case.  That's

22   not what's involved here, of course.  Jones Day wasn't

23   retained by the state at any point, and they weren't retained

24   by the city in 2012.

25        THE COURT:  What do you contend was the relevance or

1   would be the relevance of these memoranda in this eligibility

2   trial?

3           MR. CIANTRA:  I think, your Honor, it gets to the

4   central question of what were the motivations and intent of

5   the decision-makers here.  We know from discovery -- and it's

6   going to be crystal clear -- that the governor and the state

7   were well-aware of the constitutional protections that apply

8   to retiree pensions.  They knew that.  They were well-aware

9   of what the position was with respect to the creditor

10  proposal that the emergency manager made in June.  The filing

11  was authorized without any conditions.  We all know that.

12  These memos we believe will get beyond that, get into the

13  question of the specifics of knowledge, the specifics of the

14  intent of the parties to do that, and that's why we're

15  looking to get them.

16          THE COURT:  Okay.  Doesn't that statement of

17  relevance prove more conclusively perhaps than the city could

18  even on its own that these memoranda are prepared in

19  anticipation of litigation?

20          MR. CIANTRA:  They weren't, your Honor.  They were

21  prepared more than a year in advance of any litigation and by

22  a firm that was not representing anyone.  These were like the

23  pitch book.  They were prepared to market, to develop

24  theories and to market services.  All right.  There's no case

25  law that they cite that would support the assertion of work

1   product privilege for documents that are prepared in this

2   context.  They have selectively produced the pitch book.

3   It's the same type of material.  So for them at this point to

4   demand work product protection with respect to this we think

5   is just baseless.  I mean this is not a case where maybe a

6   memo is prepared, the client comes in to meet with the

7   attorney and reveals confidences, and those are protected.

8   We all know that.  That's basic attorney-client privilege

9   law, but this is not that situation.  This is their marketing

10  effort to the state to be retained, and we think it is not

11  entitled to --

12          THE COURT:  To be retained for what?

13          MR. CIANTRA:  To apparently be retained at some

14  point.  Who knows?  At that point there was no emergency

15  manager.  There obviously was no Chapter 9 case.  This is

16  devoid of a litigation context where you could claim work

17  product.  They're not representing a party at this point.

18  They're pitching.

19          THE COURT:  Well, I'm just struggling with what the

20  relevance of the fact that Jones Day was pitching the

21  governor a year before would be to this eligibility trial if

22  that's all you assert it was.

23          MR. CIANTRA:  Well, we know that.  We know that they

24  were pitching that.  That's clear.  They've admitted that.

25  What's relevant is --

1          THE COURT:  My question is relevance.

2          MR. CIANTRA:  Well, what's relevant is potentially

3    the content of the documents, which, of course, we haven't

4    seen.  That we think --

5          THE COURT:  To prove what, though?

6          MR. CIANTRA:  To prove what these people knew and

7    what they were intending to do.

8          THE COURT:  Regarding what, though?

9          MR. CIANTRA:  We think it would be relevant to

10   assess the conduct that we know occurred in 2013.

11         THE COURT:  Which was to file this Chapter 9 case?

12         MR. CIANTRA:  Which was to authorize the filing in

13   the face of the constitutional protections for the pension

14   benefits.

15         THE COURT:  Okay.  But doesn't that establish that

16   these memoranda were in anticipation of litigation?

17         MR. CIANTRA:  It can't, your Honor, because of the

18   simple distance in time.  They have not provided any

19   indication that the memoranda were demanded by the state;

20   that there was any retention that existed at that point in

21   time.  It's an effort like the pitch book, which is a very

22   detailed document, to get work.  They spent a thousand hours

23   to get work.  That's what law firms do, and that's what's

24   involved here.

25         Now, obviously we haven't been able -- we don't have

1    the memos.  I have the titles of the memos that are revealed

2    in the e-mail.  We don't have them.  I can't argue the

3    specific relevance of the content.  I would suggest at this

4    point --

5              THE COURT:  Do you have any case law that

6    specifically says that pre-retention work by a lawyer cannot

7    be the subject of the work product privilege?

8              MR. CIANTRA:  Well, your Honor, to be honest with

9    you, I have -- we have done the research.  I haven't been

10   able to find a case that has recognized work product in this

11   instance.  The text of the rule talks about --

12             THE COURT:  But you haven't found any that

13   specifically denies it either, huh?

14             MR. CIANTRA:  No, but the --

15             THE COURT:  Okay.

16             MR. CIANTRA:  But the purpose of work product and

17   the wording of Rule 26 contemplates a representation.  It

18   contemplates that the lawyer is working for a client

19   developing facts, developing theories.  It does not

20   contemplate a relationship between parties who never

21   consummated an attorney-client relationship.  Remember, of

22   course, Jones Day is not working for the State of Michigan

23   here.  That's who these discussions were with.  It wasn't

24   with the City of Detroit.  It was with the State of Michigan.

25   But as I said, your Honor, you know, we haven't had access to

1  the memos.  I would suggest --

2        THE COURT:  We know, don't we, that as a matter of

3  law the attorney-client privilege can extend to pre-retention

4  discussions; isn't that right?

5        MR. CIANTRA:  Well, of course.  It can extend if the

6  client -- if the prospective client reveals confidences, but

7  that's not what's involved here.  They're not claiming to

8  shield the confidences of the State of Michigan.

9        THE COURT:  No.  My question went to the next

10  question.  If the attorney-client privilege can extend pre-

11  retention, why not the work product doctrine, too, if it

12  would -- if it's otherwise in anticipation of litigation?

13        MR. CIANTRA:  Well, I think if there were notes of a

14  meeting that took place where client confidences would be

15  revealed, that would be -- that would be privileged, but I

16  don't believe --

17        THE COURT:  That's not what we're talking about.

18        MR. CIANTRA:  That's not what we're talking about,

19  at least -- I mean I haven't seen the memos, so I --

20        THE COURT:  Let's boil it down to a simple hypo.

21  Okay.  Client calls up attorney and says, "I'm thinking of

22  retaining you to pursue this claim I have against a potential

23  defendant.  When I interview you, I want to know what your

24  strategy will be."  They have a further conversation about

25  the facts.  The attorney prepares a memo.  They have their

1  meeting.  Client decides to retain that attorney.

2          MR. CIANTRA:  Right.

3          THE COURT:  Is that memo protected by work product

4  or not?

5          MR. CIANTRA:  I don't believe it's protected by work

6  product.  I believe parts of it would be protected by

7  attorney-client in terms of the --

8          THE COURT:  Okay.  But I'm talking about work

9  product.  You're talking about work product here.

10          MR. CIANTRA:  I am talking about work --

11          THE COURT:  Not protected by work product.  So the

12  defendant in that case could subpoena that memorandum from

13  that attorney?

14          MR. CIANTRA:  Subject to the client confidences that

15  were revealed in it cannot be -- would be attorney-client.

16  We're not challenging --

17          THE COURT:  Okay.  But otherwise it's disclosable.

18          MR. CIANTRA:  Otherwise I think it is.

19          THE COURT:  Discoverable.

20          MR. CIANTRA:  Yeah.  Otherwise I think it is until

21  there's a retention, especially if there's never been a

22  retention, which is the case here.  This is something that

23  happened a year before between parties that never had an

24  attorney-client relationship.

25          THE COURT:  Um-hmm.  Um-hmm.

1      MR. CIANTRA:  As I said, your Honor, we haven't

2  looked at the memos.  I don't know what's in them.  I would

3  suggest and we would request that the Court consider in

4  camera review of the documents and then make a ruling.

5      THE COURT:  Is it just these -- I think you said six

6  memoranda that are the subject of this dispute?

7      MR. CIANTRA:  At this point, that's what it's boiled

8  down to, your Honor, but we feel that we're entitled to a

9  decision with respect to this that if there's anything else

10  out there that we're not aware of -- and, frankly, your

11  Honor, there's been a lot of documents that have been

12  produced in a very exigent period of time -- we would like

13  the city to produce those.

14      THE COURT:  All right.  Well, we'll inquire -- we'll

15  inquire about that.

16      MR. CIANTRA:  Okay.  Now, let me turn to the

17  second -- let me turn to the second point, and this concerns

18  the issue that was litigated back in September, September

19  19th, on the joint --

20      THE COURT:  Well, on that one I need you to begin

21  with a response to the city's assertion that this motion is

22  late --

23      MR. CIANTRA:  It is --

24      THE COURT:  -- untimely.

25      MR. CIANTRA:  It is late, your Honor.  It is late.

1    THE COURT:  So why should it be considered?

2    MR. CIANTRA:  Well, I think it should be considered

3    because of the particular facts and circumstances that are

4    involved here.  Back in September as this issue was framed

5    and as the Court ruled, it was rather narrowly focused with

6    respect to the question of authorization.  That was the

7    hypothetical that the Court developed to support its

8    reasoning.

9    THE COURT:  Right.  I recall that.

10   MR. CIANTRA:  And what has happened since then --

11   and this, I think, is most clearly brought out in the

12   excerpts from Governor Snyder's deposition that are attached

13   to both of the motions that UAW filed -- is that that common

14   interest has moved and morphed well beyond the issue of

15   authorization that was presented in September to basically

16   every element of -- every material element with respect to

17   the case, the development of the creditors' proposal, the

18   discussion of Article IX, Section 24, and its protections

19   here, consideration to be provided to creditors under the

20   proposed plan, consideration to be provided to the pensioners

21   under the proposed plan.  It has just morphed into

22   essentially a cloak with respect to -- and excuse me; it's

23   very dry -- with respect to all of the deliberations

24   involving the emergency manager and the state, and while, you

25   know, we concede the city is correct, there is an attorney-

1   client privilege that they have, the -- it should be

2   construed narrowly in light of the public interest that's

3   involved here.  The emergency manager by law is the governing

4   body of the City of Detroit.  He has executive and

5   legislative authority rolled into one.  His actions obviously

6   affect the 700,000 residents of the city, and people have a

7   right, we submit, to know what his deliberations are, how

8   policy is being formulated, and it shouldn't be cloaked under

9   a very broad and we would submit legally unsupported

10   construction of the attorney-client privilege.  Discovery has

11   been curtailed, and it has put us in a position where now we

12   are facing trial, and we have not been able to -- because of

13   the extensive theory of privilege that the state and the city

14   have adhered to, to develop facts fully in deposition and

15   otherwise.

16         We would submit that the assertion of the privilege

17   that the governor has made, as revealed in the deposition

18   transcripts that has been taken throughout the discovery, is

19   extensive beyond what was considered in the Court's September

20   19th ruling, and we would ask the Court to -- respectfully to

21   reconsider it because otherwise we have secrecy.  We have

22   public actors here, your Honor.  The public has to be able to

23   hold political representatives accountable for their actions.

24   They have to know what policy decisions are being made, and

25   right now this privilege ruling has cloaked that in secrecy.

1    I don't have anything else, your Honor, to state.

2    THE COURT:  Thank you.

3    MR. CIANTRA:  I don't know if Mr. Wertheimer, who

4    has joined the motions for the Flowers plaintiffs, has

5    anything he would like to add.

6    THE COURT:  Okay.

7    MR. CIANTRA:  Thank you for your consideration.

8    MR. WERTHEIMER:  William Wertheimer, your Honor.

9    First, I would like to join in the UAW's motion vis-v-vis the

10   city.  I did formally join on the papers the motion vis-a-vis

11   the state.

12   I just have two points in addition to what Mr.

13   Ciantra just argued.  One relates to the Snyder deposition,

14   which I participated in, and kind of what it revealed about

15   the scope of the privilege arguments now being made and how

16   far we are from the day in court where you made it a point of

17   indicating to the state that transparency was necessary here.

18   At the governor's deposition essentially privilege was

19   invoked as to the entire content of weekly meetings that the

20   governor had with the emergency manager for months as to the

21   entire scope of those meetings making it virtually impossible

22   to examine the governor as to any of that.  That's point

23   number one.

24   And just one other point, and that is that in the

25   normal case -- well, let me back up.  Per the agreement the

1  parties made and given the position of the governor, we

2  agreed to limit our discovery deposition to three hours.  In

3  the normal case where privileges are alleged on privilege

4  logs like what we have here, you have an opportunity to go

5  beyond the privilege log and the cursory explanation for why

6  the privilege is being invoked by at deposition asking

7  witnesses questions, detailed questions about the particular

8  meeting at which they're claiming a privilege, you know, what

9  the other subjects were, how long the meeting took, did the

10  lawyer do anything at the meeting, et cetera, as to key

11  documents.  We have not had that opportunity here just given

12  the time, and I'm not -- no one is at fault for that.  It's

13  going too fast.  We had three hours with the governor.  We

14  did appropriate examinations.  But I think in this

15  circumstance that it would make sense for this Court to

16  examine certain of the documents in camera in order to assure

17  that the Court's desire and everybody's desire for

18  transparency is met.  I think this is a special case.  I

19  don't think --

20        THE COURT:  Are you referring to documents other

21  than these six memoranda attached to the e-mail?

22        MR. WERTHEIMER:  I am, your Honor.  I'm referring

23  specifically to documents that are in dispute that are in the

24  state's possession.

25        THE COURT:  Can you identify them any more

1  particularly for me or the record?

2          MR. WERTHEIMER:  We've attempted to identify them to

3  the state by indicating in logs documents that covered a

4  particular -- what we believe to be a key time period was.

5  We've also attempted to limit the request in terms of those

6  in which Mr. Orr and Mr. Snyder were directly involved, but I

7  must admit to the Court it still involves, at least at this

8  point, in terms of our back and forth, a fairly large number

9  of documents that I would respectfully suggest that the best

10 way to proceed -- given the fact that the governor is going

11 to be testifying on Monday at trial, the best way to proceed

12 may be for the Court to get involved in terms of in camera

13 review.

14         THE COURT:  And these are documents which you claim

15 were improperly withheld pursuant to the common interest

16 exception?

17         MR. WERTHEIMER:  Not just common interest, your

18 Honor, also just documents where they claimed attorney-

19 client.  And we're not claiming -- we don't know whether

20 they're improperly withheld I guess is what I'm trying to

21 say.  We're claiming that they may be --

22         THE COURT:  You're concerned.  Okay.

23         MR. WERTHEIMER:  -- and that we should not have to

24 rely upon the cursory description of counsel given --

25         THE COURT:  Well, but in order for me to accede to

1  your request to look at documents, we have to have identified

2  what documents you want me to look at and what documents you

3  want the city or the governor or the state -- excuse me -- to

4  produce to me.

5       MR. WERTHEIMER:  What I'm -- I agree, your Honor,

6  and what I'm suggesting is we did make such an effort on a

7  preliminary basis with the state in trying to resolve it, but

8  I'm acknowledging that that effort would still -- if we stop

9  there, would still leave your Honor with a large number of

10  documents.  We could continue that effort.  I agree that that

11  would be necessary, but I still think that it calls for in

12  camera review of relevant documents or potentially relevant

13  documents.  And we're happy to work with the state to try and

14  limit what that -- what the documents would be.

15       THE COURT:  Well, when are you going to do that

16  given that we're in trial all day today, tomorrow, and

17  Friday?

18       MR. WERTHEIMER:  Well, if we can't, we can't, and

19  then I would suggest to the Court that the limitation which

20  we did communicate to the state should be the one the state

21  should use -- or that we should use.  And as I recall, there

22  were at least two attempts to limit the documents.  One

23  related to time; that is, we said we think that the judge

24  should be able to take an in camera look at documents between

25  key players from date A to date B, and I don't have in front

1   of me exactly what those dates were.  And, second, we

2   indicated that the documents directly between the governor

3   and the emergency manager over a broader period of time

4   should be subject to in camera review.  If there's no time to

5   do anything else, our position would be that the Court should

6   examine those documents in camera.

7          THE COURT:  All right.  Thank you, sir.

8          MR. WERTHEIMER:  Yes, your Honor.

9          THE COURT:  While you're sitting down, I would

10  suggest you try to figure out what those dates are.  That

11  would be helpful.

12         MR. SCHNEIDER:  Your Honor, Matthew Schneider on

13  behalf of the state.  Mr. Wertheimer has raised some issues

14  that relate to this and also to the other motion, so in

15  expediency here I can kind of respond to both.

16         THE COURT:  Please.

17         MR. SCHNEIDER:  The first issue here that Mr.

18  Wertheimer's -- or the UAW and Flowers objectors raised

19  relates to a March 12 e-mail, and the objection was that it

20  should have been produced without redactions.  Now, the state

21  disagrees, but we want to resolve this dispute, and we have

22  produced that anyway, so we're not waiving the attorney-

23  client privilege or altering the common interest agreement or

24  anything by doing that, but I wanted to let you know at least

25  one issue has been resolved.  Secondly --

1      THE COURT:  When you say "has been resolved," you

2   say you have or are willing to turn over the memos?

3      MR. SCHNEIDER:  We have.  This is related to the

4   March 12 e-mail.

5      THE COURT:  March 12 --

6      MR. SCHNEIDER:  It's an e-mail from Richard Baird to

7   Kevyn Orr, and this was at issue.

8      THE COURT:  -- 2012?

9      MR. SCHNEIDER:  2013.

10      THE COURT:  Okay.

11      MR. SCHNEIDER:  Okay.  Secondly, there's another

12   argument that the state hasn't been specific on its privilege

13   log, and I think that's why this is kind of bleeding

14   together.  Again, the state disagrees.  We think the logs are

15   sufficient, but we've revised these anyway, and we've -- you

16   know, we're giving them to Mr. Wertheimer.  So, again, we're

17   not waiving anything, but we want to let the Court know that

18   we are working with them and are happy to do so.  But,

19   finally, third --

20      THE COURT:  It was a little frustrating that your

21   log didn't provide any identifying information regarding the

22   people involved other than their names.

23      MR. SCHNEIDER:  Well, we've corrected that.

24      THE COURT:  Where?  How?

25      MR. SCHNEIDER:  Well, Mr. Wertheimer asked for

1   additional information that's more specific on the privilege

2   log, and I believe we've done that, and --

3           THE COURT:  In the log itself because we looked at

4   the revised log -- at least I did, and all I saw were names?

5   Now, it's possible that I missed a page where the names were

6   identified, whether they're attorneys or officers of the

7   state or associated with the emergency manager.  I couldn't

8   tell who was who.

9           MR. SCHNEIDER:  My understanding is there's more

10  description about what actually is in there, but I will --

11  you know, I will continue to work with Mr. Wertheimer on this

12  so as to not -- not to delay.

13          The third issue here is relating to the common

14  interest agreement, and I think that's where the _Flowers_ and

15  the UAW objectors are really going here.  The state's

16  position ultimately at the end of the day -- the state's

17  position is is that your order, your Honor, that you entered

18  on September 19 was correct, and we believe that it was

19  correct then and it's correct today.  And the new position

20  that the objectors are raising is essentially that there's no

21  common interest privilege before the filing.  This is -- as

22  the Court is aware, this has been brought to your attention

23  literally -- literally -- on the eve of trial.  There was a

24  deposition in which the Court invited the parties to contact

25  the Court in case there were concerns.  They never did that.

1    They never raised a written objection after the deposition.

2    It's beyond the 14-day rule, and there's no defect or no

3    error shown, so I think there's a waiver here, and,

4    therefore, it should be denied on that ground.

5         In addition, the common interest agreement here as

6    to the argument that the objectors are trying to find

7    information that antedate the appointment of the emergency

8    manager, if you look at the common interest agreement itself,

9    it states that this isn't just about the appointment of the

10   emergency manager.  It states that the parties have a common

11   interest in relation to the city's financial emergency and

12   the bankruptcy case and the emergency manager, so this goes

13   to a lot more than just the Chapter 9 filing.  It goes to the

14   financial emergency and things in connection with the policy

15   issues and the legal discussions related to that.  Thank you.

16        THE COURT:  Thank you.

17        MR. IRWIN:  Thank you, your Honor.  I will address

18   the motion to compel the Jones Day materials first and then

19   the motion for reconsideration.  The request that has been

20   made as it relates to core Jones Day internal research

21   memoranda it seems to us is antithetical to the work product

22   privilege, and we think the Court's analogy is exactly right.

23   If a client prepares a legal -- if a lawyer prepares a legal

24   memoranda to assist him or her or a team of lawyers in order

25   to deliver legal advice to a potential client -- a client or

1    a potential client, even before there is an attorney-client
2    relationship, that is wholly protected by work product if it
3    reflects the attorney's mental impressions and it puts him or
4    her in a position where they can deliver appropriate legal
5    advice.  And it shouldn't matter if that attorney-client
6    relationship is ultimately consummated or not.  It is an
7    inviolable attorney work product that is -- belongs to the
8    lawyer who prepared it and puts them in a position where they
9    can effectually do their jobs and deliver legal advice.

10          Now, what happened in this particular situation,
11   just to put a finer point on it, is I think not the subject
12   of any real debate.  Everyone knew that Detroit was in
13   trouble in late 2011 and that there were people working this
14   problem, and that included people from the state.  It
15   included people from the city.  It included numerous advisors
16   and consultants.  It involved numerous law firms, and there
17   were lots of people who wanted to get involved.  And Jones
18   Day had the opportunity to do just that, and we --

19          THE COURT:  So why doesn't it matter that the work
20   product was for the state, for the governor or state
21   officials, and the ultimate client wound up being none of
22   those but the city?

23          MR. IRWIN:  Well, I think it was all part of the
24   same problem.  I think that the entity that had the problem
25   here was the city, and I think the law firms like Jones

1  Day -- and I think that the papers that we submit support
2  that -- were hoping and expecting to be retained and engaged
3  by the city.  And it's not -- it shouldn't surprise anyone
4  that Jones Day would have been doing legal research in order
5  to put itself in a position to assist the city in that
6  regard, and so it really didn't matter which of the entities
7  was -- not engaging in the sense of an attorney-client
8  representation, but was discussing these matters with Jones
9  Day.  Jones Day had to put itself in a position where it was
10 able to represent the city effectively, and in order to do
11 that, it had to investigate this entire situation.  There was
12 a legal analysis that you would expect to have been done on a
13 number of levels, and we have, you know, memoranda that came
14 about as a result.  And if the Court would be --
15        THE COURT:  Well, okay, but what's the foundational
16 basis for the work product privilege that shields otherwise
17 relevant facts from discovery and suggests that that basis
18 should apply to memoranda such as you claim privilege for
19 here?
20        MR. IRWIN:  Well, it's if they're prepared in
21 anticipation of litigation, and as we've indicated in the
22 papers, that's a broad standard.  You don't have to
23 anticipate a specific piece of litigation.  You can
24 anticipate litigation broadly.  You can anticipate that this
25 is a city in financial crisis and that they are going to need

1  assistance moving forward.  It might take the path of a

2  Chapter 9.  It might not.  It might take the form of numerous

3  private lawsuits against individual stakeholders in all of

4  this.  And a law firm has to be able to explore those various

5  options to put itself in a position where it can ably

6  represent the ultimate client here, which turned out to be

7  the city.

8           We also -- your Honor, the -- we're having a hard

9  time understanding the relevance here of the memoranda as

10  well.  We are happy to provide them to the Court in camera.

11  If the Court would like to see the memoranda, we have the

12  memoranda.  We can easily provide them, and the Court could

13  determine for itself if, in fact, it finds these memoranda

14  either surprising or relevant in some way.  And what we have

15  done here, your Honor, is we've proposed a structure or a

16  framework that I would submit is reasonably conservative

17  under the circumstances in terms of the number of privileges

18  and the nature of privileges that we could assert.  What we

19  have done here is we have, in fact, already released the --

20  many of the e-mails that reflect the conversations between

21  Jones Day lawyers and the folks in 2012 who were working on

22  this problem.  This, again, is before there's any attorney-

23  client relationship with anyone.  We've released those, and

24  we're not claiming those back.  We are seeking an order from

25  the Court is to protect our wholly internal memoranda or

1 | internal deliberations, which conversations are not --

2 | THE COURT: Now, when you say "wholly internal" --

3 | MR. IRWIN: Yes.

4 | THE COURT: -- do you mean that these memoranda were

5 | not shared even with the state officials?

6 | MR. IRWIN: We will make that determination, but we

7 | believe there are memoranda at issue here that were not

8 | shared with anyone from the state, so our -- we are asking to

9 | be able to withhold our internal research memoranda even

10 | though work product would protect that. The work product,

11 | because there's no waiver of work product, unlike attorney-

12 | client, as long as you share it with someone who is in a

13 | nonadversarial -- you share it in a nonadversarial way. It's

14 | not like attorney work -- it's not like attorney-client in

15 | that regard. We believe that we would still have work

16 | product protection over those materials, and so we are asking

17 | for the Jones Day research materials and the Jones Day

18 | internal conversations about how to proceed here and how to

19 | deliver advice should be protected.

20 | Now, there comes a point in time later in 2012 when

21 | a specific client opportunity presents itself in the form of

22 | being hired by the city, in the form of this RFP process, and

23 | the public document that is the pitch material that is in the

24 | record already and that we not seeking to disclose, but

25 | insofar as documents relating --

1          THE COURT:  You mean not seeking not to disclose?

2          MR. IRWIN:  I'm sorry, your Honor.  Yes.  It's in

3    the record right now.  We are not seeking to clawback or

4    anything like that.  That's not an issue here.  But we are --

5    we do believe that -- as the Court referenced, because pre-

6    engagement conversations between a lawyer and a potential

7    client are still protected by the attorney-client privilege,

8    we are seeking -- we are seeking protection for those

9    communications, communications -- outbound communications

10   from Jones Day in the retention period where we are receiving

11   confidential information and acting upon it.  We do think at

12   that period of time, attorney-client protection would attach

13   as well as attorney work product.  But in the 2012 time

14   period, which is what the UAW's motion is directed towards,

15   we are simply asserting work product for the Jones Day legal

16   research that was conducted to put ourselves in a position to

17   ultimately be hired in to assist the city.

18         THE COURT:  So are you telling the Court that you

19   don't have any objection to disclosing and don't claim work

20   product privilege as to any memoranda that was shared with

21   one or more state officials?

22         MR. IRWIN:  That's right.

23         THE COURT:  And have you already turned over all

24   such memoranda and communications that were given to state

25   officials?

1          MR. IRWIN:  No.  The answer is no, but we are

2     prepared to do that.  We are not standing on that.

3          THE COURT:  Okay.  Thank you, sir.

4          MR. IRWIN:  Yeah.  Does the Court wish to hear on

5     the motion for reconsideration?

6          THE COURT:  Yes.  Yes, I do.

7          MR. IRWIN:  Yes.

8          THE COURT:  If you'd like to address that, I'd like

9     to hear from you, of course.

10          MR. IRWIN:  I would, your Honor.  As we indicated,

11     we think this is late.  This is -- there is no -- there's

12     nothing in the papers that have been submitted that indicate

13     a good reason for reopening this.  There is no palpable

14     defect in the ruling, and there is nothing new.  There's no

15     new evidence.  There's no -- despite the fact that they occur

16     in the same motion, there's no linking of these two issues,

17     and so there's, therefore, no good reason -- and I haven't

18     heard one offered -- as to why this matter should be

19     reopened.  And the parties have, in fact, been relying on

20     this ruling in connection with all of the discovery

21     proceedings that have taken place since then.  We think the

22     ruling was sound.  The objectors have not indicated why there

23     is any reason to disturb the Court's analogy of a board of

24     directors and corporation counsel and the fact that they

25     should be permitted and need to talk to each other in order

```
 1    to reach a sound conclusion as to whether to do something
 2    like file for bankruptcy.  We think that's analogous here.
 3    The governor and his legal team and the emergency manager and
 4    his legal team need to be able to talk.  They need to be able
 5    to talk in confidence with regard to the common interest,
 6    which, again, this is counsel to what -- contrary to what we
 7    heard, broader than simply a Chapter 9 filing.  The common
 8    interest related to the city's financial -- the city's
 9    financial crisis more broadly and the right legal path
10    forward.  And insofar as the communications related to a
11    legal path forward, that privilege was properly invoked.  And
12    I do recall that the Court -- I read -- I was not here, but I
13    understand that the Court made itself available to the
14    parties if, in fact, there were specific questions because
15    it's very difficult to know exactly what form these questions
16    will take in making a ruling, and I believe the Court offered
17    its services to the parties if, in fact, there was any
18    impasse at the depositions, and I don't believe any objectors
19    took advantage of that, and so we believe that under the
20    circumstances, given that the ruling was fundamentally
21    correct, that there was no attempt at the time to seek
22    further court intervention and that we've been relying on
23    these rulings going forward, that there is no reason to
24    overturn them at this time.
25              THE COURT:  Thank you, sir.
```

1          MR. IRWIN:  Yeah.

2          THE COURT:  Brief rebuttal.

3          MR. CIANTRA:  Just very briefly, your Honor.  I just

4    want to draw the Court's attention to a couple of matters.

5    First, with respect to the Jones Day memos, to the extent the

6    Court determines to review the memoranda in camera, we'd

7    request that the Court also review the cover e-mail that

8    enclosed the memoranda.  And I'm not --

9          THE COURT:  This was an e-mail from who to whom?

10         MR. CIANTRA:  This was an e-mail from Heather Lennox

11   of Jones Day to certain of her partners at Jones Day that

12   references the meeting with the governor, and I'm not going

13   to read the e-mail because they've claimed in the October

14   15th correspondence to myself that it's privileged, but it

15   goes to the -- I think goes to the issue that the Court was

16   addressing with respect to --

17         THE COURT:  So these memoranda are internal in the

18   sense that they were not shared with any officials of the

19   state or the city?

20         MR. CIANTRA:  It is unclear to me that that can be

21   said with any degree of assurance, and it seems entirely --

22         THE COURT:  Well, but Mr. Irwin states it here on

23   the record.  Do we doubt it?

24         MR. CIANTRA:  I did not hear that.  I did not hear

25   him say definitively that those memos were not shared with

1   anyone at the state, and from the --

2        THE COURT:  Well, let's just ask to be sure.  Mr.

3   Irwin.

4        MR. IRWIN:  We will -- I will absolutely

5   investigate.  That's part of what we're saying.  We will

6   investigate that, and we'll have a clear answer.

7        THE COURT:  Oh, all right.

8        MR. CIANTRA:  So we don't have --

9        THE COURT:  So there you go.

10       MR. CIANTRA:  So we don't have a clear answer, but I

11  would suggest that if you -- if the Court reviews the e-mail

12  that they are claiming privilege with respect to, the

13  conclusion can be drawn that the substance of those memos was

14  surely shared in that meeting, and it would seem, at a

15  minimum, that would arguably constitute a waiver along with

16  the production of the pitch materials, which go into

17  considerable detail with respect to the legal theories that

18  were involved here.

19       THE COURT:  All right.

20       MR. CIANTRA:  The second issue I just wanted to just

21  very -- just brief clarification with respect to the

22  privilege logs.  We filed -- we requested that the state

23  supplement the privilege logs, and that is in the

24  correspondence that is attached to the motion that we filed

25  with respect to the state because there was no specification

1    in certain cases of who was involved in the communications,

2    who authored them, who received them, or the subject matter

3    of many of the -- of all of the communications, so we had no

4    way to assess the assertion of privilege based on the logs.

5    In response to that correspondence, they revised the logs, so

6    this is what the Court referred to, but we only received

7    those within the past day or two --

8          THE COURT: Right. I know.

9          MR. CIANTRA: -- so we haven't had the opportunity

10    to, you know, line that --

11          THE COURT: Right.

12          MR. CIANTRA: -- up, but I just wanted the record to

13    be clear with respect to that.

14          THE COURT: No. I appreciate that very much.

15          MR. CIANTRA: Yeah, yeah. Obviously with respect to

16    the -- having not filed this within 14 days, your Honor,

17    obviously the discovery here was enfolding well past the

18    deadline for the production, and we have not -- we've done

19    the best we could. This was not an intentional delay on our

20    part. As these issues developed, it became clear to us that

21    the scope of what was being withheld we felt was inconsistent

22    with what the Court had permitted.

23          THE COURT: All right. I'm going to take this under

24    advisement until ten o'clock, and I'll give you a decision

25    then.

1          THE CLERK:  All rise.  Court is in recess.

2      (Recess at 9:49 a.m., until 10:00 a.m.)

3          THE CLERK:  All rise.  Court is in session.  Please

4  be seated.  Recalling Case Number 13-53846, City of Detroit,

5  Michigan.

6          THE COURT:  All counsel are present.  Ma'am.

7          MS. GREEN:  Good morning, your Honor.  I apologize.

8  I think our motion got lost in the shuffle.  The Retirement

9  Systems filed a similar motion to the UAW's.  I just have a

10  few --

11          THE COURT:  I was actually going to hear it after,

12  but if you'd like to be heard now, that's fine.

13          MR. GREEN:  Oh, you know, I just -- it dovetailed

14  with what they were arguing, so I just had a few points --

15          THE COURT:  Okay.  Go ahead.

16          MS. GREEN:  -- to raise.  The first thing I wanted

17  to add is that at the time we drafted our motion, we thought

18  that the June 5th, 2012, e-mail was being reasserted as

19  privileged.  Mr. Irwin in his argument this morning has said

20  that they are not waiving privilege -- or they are now

21  waiving privilege to that.  It is back in the record.  So to

22  clarify, the e-mail does say that the memos were shared with

23  the treasurer.  It says they were memos that we did for Andy.

24  I presume that means they were shared with him.  I don't know

25  if that's actually true or not, but the memo does seem to

1    indicate that they were shared with a third party.

2           As far as the work product analysis, in our brief we

3    went through the relevant standard in the Sixth Circuit, your

4    Honor, and I don't believe that we talked about that yet

5    today.  There's a two-part test.  The first part of that test

6    is whether the document was prepared, quote, "because of the

7    party's subjective anticipation of litigation, as contrasted

8    with ordinary business purpose, and (2) whether that

9    subjective anticipation was objectively reasonable."  And,

10   furthermore, the driving force behind the preparation of the

11   document is what is key, and we assert that the "because of"

12   part fails.  They did it because of the fact that they were

13   trying to prepare themselves for the prospect of being hired,

14   not because of the fact that there was actually anticipated

15   litigation.  And, moreover, it's very attenuated that in 2011

16   they had some kind of crystal ball that they knew two years

17   from now they were going to be in this courtroom arguing

18   about eligibility under Chapter 9.  And we did cite case law

19   in our brief.  You had asked counsel this morning if there

20   was any case law regarding some kind of temporal factor, and

21   we cited two cases.  One states, "the mere fact that

22   litigation does eventually ensue does not, by itself, cloak

23   materials with work product immunity," so between that and

24   the next case that we cited, "The abstract possibility that

25   an event might be the subject of future litigation will not

1   support the claim of privilege," I think those are

2   dispositive.  This was two years before any of this even

3   arose.

4        Furthermore, I think that goes to whether or not the

5   anticipation of litigation could be objectively reasonable.

6   I don't know how two years prior to the litigation it could

7   be objectively reasonable that, number one, PA 4 still had to

8   get past the referendum.  Number two, it was ten months

9   before the EM was hired even if you assume that these were

10  prepared in June of 2012 when the memo -- memos were shared

11  with the governor or with Andy Dillon.  They may have been

12  prepared prior to that.  We don't know.  Moreover, the EM had

13  to be appointed.  PA 436 had to become effective.  All of

14  these things had to happen before we could be here today, and

15  Jones Day had to be retained.  So there are like at least

16  five or six major contingencies that had to occur before the

17  actual litigation would ensue.

18       Furthermore, even if they can establish the work

19  product, which we don't think they can, they still have to

20  overcome the waiver issue, and I don't -- I think that today

21  is a further example that they have selectively waived.  They

22  waived the memo itself but not the attachments.  Today the

23  state stood up and said, you know, "We have an e-mail from

24  March 3rd, 2013, between Kevyn Orr.  There are two attorneys

25  on it from the State of Michigan.  But to be cooperative, we

1   will give you that e-mail." Well, if they're saying it's

2   privileged but they're giving it to us, to me, again, that's

3   a selective waiver. They just give us what they want when

4   they want it, but they keep what they want as well, and I

5   don't see how they get past that.

6        In addition, my last point would be it's still not

7   clear who the client is that Jones Day is claiming they've

8   been representing. No city official, to my knowledge,

9   through any of my review of these documents or the e-mails --

10  there is not a single city official that is ever cc'd, bcc'd,

11  you know, sent the memos. It's purely between Jones Day

12  attorneys, Miller Buckfire, Huron Consulting, all of these

13  advisors that, again, when I think it comes to waiver,

14  clearly these are third parties and not the potential client.

15       The last point I will make because I want to be

16  brief -- I know you are ready to rule, I think -- is that I

17  think the wrong standard was stated earlier by the city. He

18  said that there's a different standard for waiver of the

19  attorney-client privilege versus work product, and that is

20  not true in the Sixth Circuit. We cited two cases in our

21  brief. The first one is New Phoenix Sunrise, and it says,

22  "Both the attorney-client privilege and work product

23  protection are waived by voluntary disclosure of private

24  communications to third parties." We also cited the In re.

25  Columbia case also --

1    THE COURT:  I'm sorry.  Are waived by what?  I just

2  didn't hear what you said.

3    MS. GREEN:  Disclosure of private communications to

4  third parties.  And he had said that some sort of different

5  standard applied when it was work product versus attorney-

6  client, and we also cited the In re. Columbia case that said

7  the same thing.  There's no compelling reason for

8  differentiating waiver of work product from waiver of the

9  attorney-client privilege, so to me it's a distinction

10 without a difference to say, "Well, we gave it to," and I

11 think the quote he said a minute ago was, "numerous

12 consultants and advisors as well as the state."  And to me

13 that is disclosing it to third parties; therefore, it was

14 waived when it was created a year or two ago, not to mention

15 the fact that as part of this litigation, they have

16 selectively waived certain e-mails that somewhat have to do

17 with this subject matter in that they relate to, for

18 instance, reviewing the consent agreement or reviewing and

19 commenting on PA 4 and the analysis related to PA 4.  And we

20 cited case law in our brief stating that if you waive the

21 privilege on selected pieces, you, therefore, waive it as to

22 the entire subject matter, and, therefore, you can't

23 selectively say, "Well, you can have the e-mail, but you

24 can't have the attachments," or, "You can have this e-mail,

25 but you can't have this e-mail."  So we would say that the

1  entire privilege has been waived by selectively waiving it as

2  to a few e-mails here and there.  Those are my comments.

3          THE COURT:  Thank you.

4          MS. GREEN:  Thank you.

5          MR. IRWIN:  I'll simply respond to those few points

6  that counsel made.  The first, in connection with whether the

7  timing of all of this should make a difference, I would

8  submit that that is arbitrary.  There are lots of things that

9  could have happened in the middle of 2012 that would have

10  been litigation events.  Maybe they didn't, but that doesn't

11  mean that at the time that all of this was being considered,

12  when legal advice -- or when Jones Day was considering some

13  of these issues, they weren't anticipating litigation.  It is

14  fortuitous that this happened two years later, actually, a

15  year and a half later or one year later, but that doesn't

16  mean that either potential clients or Jones Day were not

17  working in anticipation of litigation, which, as we indicated

18  in our brief, does not need to be a specific litigation

19  event.  You can anticipate litigation broadly.  You never

20  know what form it will take.  You know there are going to be

21  fights.  You know there will be disputes.  You don't know if

22  it'll be a private -- private lawsuits.  You don't know if

23  it'll be a Chapter 9 filing, but you can anticipate the need

24  for legal advice in an adversarial proceeding in some form

25  and meet the standard.

1          In terms of select -- whether there's been selective
2     waiver or subject matter waiver, as counsel suggests, this is
3     I think fundamentally incorrect.  The standard for subject
4     matter waiver is whether documents have been disclosed.  It's
5     the shield and sword problem.  It's if documents have been
6     disclosed and counsel intends to rely on them affirmatively
7     and yet withholds the balance of the documents that, in
8     fairness, should be considered, and I think this is codified
9     pretty clearly in the advisory committee notes to Federal
10    Rule 502 where they say, "Thus, subject matter waiver is
11    limited to situations in which a party intentionally puts
12    protected information into the litigation in a selective,
13    misleading and unfair manner.  Under both Rules, a party that
14    makes a selective, misleading presentation that is unfair to
15    the adversary opens itself to a more complete and accurate
16    presentation."  We are not -- we, the city, are not using any
17    of these materials affirmatively.  They are not on our
18    exhibit lists.  We are not introducing them through
19    witnesses.  We are not using them to our advantage that
20    should open us to some sort of claim of subject matter waiver
21    or selective disclosure under the rules.
22          And then lastly, I think fundamentally there is --
23    and I believe this is black letter law -- there are different
24    standards for whether there is waiver by disclosure under
25    attorney work product as opposed to attorney client.  If you

 1  disclose attorney-client communications to a third party, you

 2  are much more likely to be deemed to have waived that

 3  privilege, but with attorney work product, you can make

 4  disclosures.  And as long as they are disclosures to parties

 5  who are nonadversarial, then you can still enjoy that

 6  protection.  And that is a fundamental difference between the

 7  two privileges.  It is not something where they are -- where

 8  disclosures to folks who are within the potential group of

 9  clients or advisors who are working these problems operates

10  to waive the privilege.  And I think we've demonstrated that,

11  your Honor.

12          THE COURT:  I want to -- I want to be sure the

13  record accurately reflects your position regarding what's to

14  be disclosed and what isn't.  Is it correct that to the

15  extent any of these memoranda that were attached to this June

16  2012 e-mail from Ms. Lennox were disclosed to state

17  officials, you are willing to make them available to counsel

18  here?

19          MR. IRWIN:  Yes, your Honor, but the e-mail itself

20  suggests -- if memoranda was prepared to prepare a Jones Day

21  lawyer for a meeting with counsel, that would not be.  It's

22  not my understanding of what we're talking about.

23          THE COURT:  Okay.  But you don't know which of the

24  several memoranda were shared and which weren't?

25          MR. IRWIN:  We'll do that.

1          THE COURT:  How will you determine that or --

2          MR. IRWIN:  Because we have the -- the Jones Day

3   lawyers are accessible, and we can figure that out.

4          THE COURT:  All right.  Thank you.

5          MS. GREEN:  I have a brief rebuttal.

6          THE COURT:  Yes, of course.

7          MS. GREEN:  I think the hypo that you stated earlier

8   compared to what he just said -- you know, these were memos

9   preparing a Jones Day lawyer to go seek work -- is different

10  than the hypo that you stated earlier, which was you meet

11  with a client who wants to meet with you for the purpose of

12  retaining you, and you may make notes.  That's different to

13  me than, "I did memos to prepare myself to go pitch a

14  client."  To me those are two different scenarios, and

15  there's a distinction, I think, between did the state ask for

16  this work, or was Jones Day just doing it internally, again,

17  to prepare.  I think those are two distinct scenarios.

18          One other thing that occurred yesterday, you made a

19  note on the record about PA 4 and that perhaps the intent

20  behind the appropriation -- the inclusion of the

21  appropriation was a factual issue for this trial, and I think

22  that some of the e-mail correspondence may go to that issue,

23  quite frankly, because the PA 4 appropriation was extensively

24  discussed in all these e-mails, and for that reason I think

25  there is a possibility that it would become relevant to a

1  separate issue than what Mr. Ciantra stated this morning,

2  which was the good faith and the bad faith issues and things

3  like that.

4      The last thing I would offer is our Exhibits 31

5  through 65 have a lot of the e-mail correspondence that has

6  been produced by the city, and there is a lot of, I guess,

7  internal -- what they would consider their internal work

8  product in those e-mails.  I don't concede it's work product,

9  but according to what they are defining as work product, it's

10  in those e-mails, and it's already been produced, and it's

11  been waived.  So if you'd like to look at those e-mails to

12  sort of familiarize yourself with what we're talking about,

13  I've produced a copy of our binder for your clerk this

14  morning if you'd like to look at those.  Thank you, your

15  Honor.

16      THE COURT:  All right.

17      MS. BRIMER:  Your Honor, I'll be very brief.

18      THE COURT:  Why should I hear you?  You're not a

19  party to these motions.

20      MS. BRIMER:  I understand that, your Honor.  I want

21  to clarify one matter on the record that Ms. Green made,

22  and --

23      THE COURT:  I will let you clarify a statement on

24  the record, but I can't let you argue on one side or the

25  other of these motions.

1    MS. BRIMER:  That's fine, your Honor.  And Ms. Green

2    raised the issue of your ruling on Monday with respect to the

3    intent of the appropriation in PA 4, and I want to be sure

4    the record is very clear that it's the appropriation in PA

5    436 that your Honor ruled may be a factual issue that prior

6    to that was not considered a factual issue.  I want to be

7    sure the record is very clear on that, which law we are

8    addressing, your Honor.  It may have an impact on the memos.

9    Thank you.

10    THE COURT:  Thank you, I guess.  All right.  On the

11    issue -- on the first issue, which is the motion for

12    reconsideration of the Court's previous ruling on the common

13    interest doctrine, the Court concludes that the record does

14    not establish cause to consider that motion out of time, and,

15    accordingly, for that reason alone, the motion is denied.

16    But having said that, I want the record to be clear

17    and the parties to understand that to the extent a question

18    is asked of a witness and either a witness or counsel on the

19    witness' behalf claims attorney-client privilege and asserts

20    the common interest doctrine or any other privilege, for that

21    matter, the Court will take a fresh look at that and consider

22    counsel's arguments relating to that.

23    On the motions to compel, the Court appreciates the

24    city's willingness to disclose to counsel for the objecting

25    parties whatever memoranda it shared -- the city's counsel,

1  Jones Day, shared with state officials and would request that

2  that disclosure be accomplished as promptly as possible.

3       To the extent, however, that the moving parties seek

4  a ruling from the Court that the mere fact that memoranda or

5  other documents that would otherwise be protected by the work

6  product doctrine were prepared pre-retention means that they

7  are not protected by that doctrine, the Court must reject and

8  overrule that position.

9       Accordingly, to the extent that the city is

10  maintaining this privilege as to any of these memoranda that

11  were attached to Ms. Lennox's e-mail or any other memoranda,

12  for that matter, the Court will look at them in camera and

13  ask the city to produce them for that purpose, again, as

14  promptly as possible.

15       As to the documents that Mr. Wertheimer suggests

16  were improperly withheld in discovery, this presents a more

17  challenging request if only because the documents that are

18  the subject of Mr. Wertheimer's request are not identified,

19  and so, Mr. Wertheimer, all I can do in that regard is ask

20  you to identify, again, as promptly as possible, what

21  documents or range of documents you seek the city to be

22  compelled to disclose, review that with the city, and to the

23  extent you can't work it out, we will take a break from our

24  trial whenever you are ready and work our way through it.

25       MR. WERTHEIMER:  Yes, your Honor.  I believe you

1  meant the state.

2          THE COURT:  The state.  I did.

3          MR. WERTHEIMER:  Yes.

4          THE COURT:  Thank you.

5          MR. WERTHEIMER:  Thank you, your Honor.

6          THE COURT:  All right.  So are there any other

7  issues still open before we begin our opening statements?

8          MR. SCHNEIDER:  Your Honor, there is one, and that

9  is because there has been discussion about the trial

10  subpoenas that were issued to the governor, the treasurer,

11  Mr. Baird, and Mr. Ryan.  The last time I appeared before

12  you, I argued -- I opposed that.  I want the Court to know I

13  am not going to file a motion to quash.  The governor, in the

14  spirit of cooperation and because he wants to move this

15  proceeding along, is willing to testify, and we have made --

16  we will make all of those state witnesses available.  And we

17  believe that Monday between 1 p.m. and 3 p.m. the governor

18  would be available, and we think the other witnesses -- well,

19  the other witnesses will be available on Monday or Tuesday.

20          THE COURT:  Thank you.

21          MR. DECHIARA:  Good morning, your Honor.  Peter

22  DeChiara from the law firm of Cohen, Weiss & Simon for the

23  UAW.  The UAW and the Flowers plaintiffs appreciate the

24  state's decision to change its position and to produce the

25  state witnesses.  We just want to be careful to note for the

1  record that there's been no agreement that there should be

2  any set time for the testimony of the state witnesses,

3  including the governor.  While we realize the governor has a

4  busy schedule, it is also our view that the governor, perhaps

5  with the exception of Mr. Orr, is maybe the most important

6  witness in this case, and given the significance of his

7  testimony and given the significance of the fact that there

8  may be documents we may have to examine him on which we have

9  not yet seen, we would just want to note for the record that

10  there's been no agreement that his testimony would be limited

11  to two hours.  Thank you.

12          THE COURT:  Thank you.  Mr. Schneider.

13          MR. SCHNEIDER:  As of this point, your Honor, I fail

14  to see the reason for the objector's argument that the

15  governor would require to testify for a lengthy period of

16  time.  This Court is well aware of the governor's situation

17  and who he is in the state.  He is willing to do this, but I

18  think we will have to work with the objectors as to timing.

19          THE COURT:  Well, I would certainly encourage that,

20  but it's not for a witness who appears in any court to

21  condition his appearance on a specific time limit.

22          MR. SCHNEIDER:  He's certainly not doing that.

23  That's certainly not the case.

24          THE COURT:  The UAW certainly interpreted it that

25  way, and, frankly, I did, too.

1          MR. SCHNEIDER:  Well, I'm sorry about that, your

2    Honor, but I can tell you, as I indicated before, the

3    governor wants to be cooperative --

4          THE COURT:  All right.

5          MR. SCHNEIDER:  -- as possible.

6          THE COURT:  Good.  Thank you.  All right.  We do

7    have to get to the issue of the amended joint final pretrial

8    order.  If I read it correctly, one or more of the objecting

9    parties decided after our final pretrial conference to object

10   to a certain small number of exhibits, and the state was --

11   or excuse me -- the city was not willing to allow for a

12   statement of such a late asserted objection.  Is that what

13   this is about?

14         MR. ULLMAN:  Not really, your Honor.

15         THE COURT:  Not really?

16         MR. ULLMAN:  Not really, not in our view.

17         THE COURT:  Oh, so you're withdrawing your

18   objections?

19         MR. ULLMAN:  No.  Should I -- may I speak?

20         THE COURT:  Please.

21         MR. ULLMAN:  No.  The issue is not that we're trying

22   to add new objections.  This whole --

23         THE COURT:  So you're not trying to add new

24   objections --

25         MR. ULLMAN:  We are maintaining the same --

1      THE COURT:  -- so to the extent there are new
2  objections, we can strike them.
3      MR. ULLMAN:  No, your Honor.  Let me try to explain.
4  We had always told the state -- the city that for this subset
5  of documents -- I believe there are six of them -- that we
6  were not opposing admissibility in general, but we believe
7  that they were admissible for limited purposes only to show
8  that these documents were said, that they were, you know,
9  created, that they were given to people.  We weren't
10  contesting that they're authentic documents, but we spoke
11  with Mr. Irwin and told him but at the same time -- that's
12  why we're not contesting admissibility in general -- we do
13  not agree that they're admissible for the truth of what they
14  say.  Some of these documents have forward-looking
15  projections that we don't think there's been an adequate
16  foundation for, and in our discussions with Mr. Irwin, he
17  said, "Yeah, we understand that.  We're not asking you to
18  concede to the truth of what's in there."  And we said,
19  "Fine.  On that basis" --
20      THE COURT:  Well, but hang on.  The admission of a
21  document into evidence or the agreement of the admission of a
22  document into evidence is not a stipulation to the truth or
23  credibility of the document.  It just means that it meets the
24  criteria for admissibility under the rules.
25      MR. ULLMAN:  And that may be all that's going on

1    here.  The reason this came up is because I had heard -- I

2    was not here at the legal argument yesterday, but I had been

3    told that your Honor had indicated that if a document did not

4    have a note on it saying there was some sort of objection, it

5    would be admitted for any and all purposes, at which point I

6    said to Mr. Irwin, "Wait a minute.  There's a couple of

7    documents here that we know from our discussions" -- you

8    know, they're limited for -- we agree they're admissible for

9    limited purposes only, and we have the right --

10        THE COURT:  Well, but what -- for what purpose do

11   you assert these six documents are not admissible for?

12        MR. ULLMAN:  Just for the truth of what's in them,

13   the hearsay, expert opinion, and then lack of foundation.

14   Some of these have forward-looking numbers or values in them

15   as to the amount of the unfunded pension liability, and for

16   those we're saying we don't disagree that you gave these

17   documents out, but we're not agreeing that the numbers that

18   are in there are necessarily true numbers.  That's all we're

19   saying.  That was understood from day one with discussions

20   with Mr. Irwin, and we just wanted to make sure that your

21   Honor -- that if the document came in, that your Honor would

22   not assume that everything that was in it on these -- on

23   these six documents was true.  That's all that we cared

24   about.  We don't deny that they were either created, that

25   they were given to people, and for that purpose we have no

1   problem with admission.  And it may have been that we

2   misinterpreted what your Honor said.

3           THE COURT:  I'm having a hard time comprehending

4   what you're saying, frankly.  If a piece of evidence has

5   hearsay within hearsay --

6           MR. ULLMAN:  Um-hmm.

7           THE COURT:  -- which I think is what you're talking

8   about here; right?  The document itself is hearsay.

9           MR. ULLMAN:  Okay.

10          THE COURT:  And it contains hearsay statements.

11          MR. ULLMAN:  Yes.

12          THE COURT:  Okay.  If the document is admitted,

13  opposing parties waive -- if they agree to the admission,

14  they waive both hearsay objections.  That does not mean that

15  that party is stipulating to the truth of any of that

16  hearsay.  It just doesn't mean that.  All it means is it's

17  evidence.

18          MR. ULLMAN:  Okay.  And if, you know, I had been

19  given a misinterpretation or a misapplication of what your

20  Honor indicated the other day, then you're right.  This is a

21  moot issue, and there is no problem based on what your Honor

22  said.  I think that's true.

23          THE COURT:  Okay.  All right.  Then in that event,

24  the Court will enter the amended final pretrial order, and

25  based on the list of documents that are shown as having no

1  objections, the Court will prepare an order admitting all of

2  those documents into evidence.  Okay.  Opening statements.

3          MR. BENNETT:  One second, your Honor.  Good morning,

4  your Honor.  I'm assuming that you want to hear from us

5  first, notwithstanding that the order was different in the

6  other -- in the legal issues proceedings, but, in any

7  event --

8          THE COURT:  Well, you have the burden of proof;

9  right?

10          MR. BENNETT:  Correct.

11                      OPENING STATEMENT

12          MR. BENNETT:  First of all, I want to make crystal

13  clear -- many people have in different environments -- that

14  I'm not going to speak about any arguments that came up in

15  the context of the legal argument part of the proceedings.

16          THE COURT:  Thank you.

17          MR. BENNETT:  I appreciate that part, too.  And I'm

18  going to confine myself to the issues -- or the parts of the

19  eligibility standard and the part of 521(c) that have some

20  factual disputes that have been identified in connection with

21  them.  And toward the end I do want to spend a minute on the

22  materiality of facts relating to legislators' or governors'

23  intent relating to statutes because I think it was not

24  something that we did cover when we were here before.

25          So, first of all, I'm going to start with the issue

1   of insolvency, and what I'm going to say about that because I

2   could stand here for hours describing the evidence that is

3   going to come in on that subject, but I'm not going to do

4   that -- I'm going to say simply that the witnesses that we

5   will present on the subject are going to present a mountain

6   of evidence showing insolvency of the city.  Sadly, that

7   evidence will show that the city is insolvent on every

8   relevant standard.  And, your Honor, there's been at least

9   intimated in a lot of the papers about the significance that

10  no expert report has been submitted.  Quite frankly, that is

11  because no expert report is required.  This is one of those

12  cases where the data speaks very clearly and persuasively on

13  its own -- it needs no gloss -- and that only AFSCME is

14  objecting on the insolvency point, at least as I read the

15  papers, itself speaks volumes.

16          I want to say that from the near term perspective,

17  the city did not run out of cash because -- only because

18  actions were taken to prevent that from happening.  The

19  evidence will show that if the city just kept on paying debts

20  as and when they were becoming due, cash would have run out.

21  The fact that the city stopped doing that is the only reason

22  why there are positive cash balances.  As I said before,

23  there's no question that if the actions were not taken, cash

24  would have run out.

25          I will also say that the steps that the city took

1  during past years to pay many of its debts as they become due

2  didn't turn out particularly well.  One of the consequences

3  you'll see in the evidence and, in fact, a good document to

4  keep around at all times is the proposal for creditors dated

5  June 14th.  There's a section there that deals with this.  It

6  shows that there were numerous secured borrowings made to

7  create liquidity in the city in past years when there were

8  similar cash flow problems.  Each and every one of those

9  borrowings were done on a secured basis, and so the

10 consequence that we face today is that those borrowings

11 consume a very significant amount of cash otherwise available

12 for creditors generally, so that was -- so avoiding a

13 liquidity problem in the prior periods didn't exactly work

14 out well from the perspective of many other creditors.

15      Also, as will come into evidence, pension

16 contributions were deferred during at least the past two

17 fiscal years with the effect that the underfunding under

18 anyone's measure -- we don't have to worry about the fight

19 between the different measures of pension underfunding.  It's

20 greater than it might otherwise have been.

21      Finally, on the insolvency point, you are going to

22 hear from several witnesses, but most importantly perhaps

23 Chief Craig, about the fact that the city is failing to

24 provide basic services to its residents.  We don't think

25 about that as another one of the creditor claims or

1   obligations, but the reality is it's as important as anything
2   else.  As we've indicated before and as the witnesses will
3   indicate, without solving that problem, there may not be a
4   city to reorganize.

5           Now, AFSCME makes a few points that are worth
6   discussing how the evidence will deal with them.  First, much
7   is made over the dispute about the underfunding amount, and
8   it is asserted that because there's a dispute of the
9   underfunding amount, the city can't demonstrate it's
10  insolvent.  Well, as your Honor knows, the insolvency test
11  focuses on cash flow.  It focuses on near term and longer
12  term cash flow type measures, and in that connection, there
13  are cash flows that will be put into evidence.  There's also
14  a convenient place to find them in the proposal for
15  creditors.  There's different versions with different levels
16  of updates and different assumptions that are baked into
17  them, but the line items that talk about pension
18  contributions your Honor is going to learn don't change very
19  much whether you use the city's assumptions as to
20  underfunding amount or the city's calculation of underfunding
21  amount or the Gabriel, Roeder calculation of underfunding
22  amount, Gabriel, Roeder, of course, being the actuaries
23  retained by the pension funds, the pension fund management
24  themselves, to give them advice.  And so your Honor will be
25  taken through the numbers, and you will find that the

1  contribution amounts, which are the relevant numbers in the

2  insolvency calculation, don't move around very much

3  notwithstanding the very different calculations of

4  underfunding amounts, and the reason for that will be

5  explained.  Mr. Moore of Conway MacKenzie will be the witness

6  that will cover that area.

7       There's also a little bit of numerical confusion

8  concerning the percentage of the city's contribution to the

9  GRS Pension Fund that is attributable to DWSD employees.  You

10  will see in the papers a number bandied around, 62 percent.

11  Well, actually, the number is the reverse of that.  It's 38

12  to 39 percent.  Mr. Orr got that wrong in his deposition.  He

13  corrected it at the end, but, of course, the correction

14  wasn't cited in the papers.  There will be evidence on the

15  point so there won't be confusion on the point as we go

16  forward with the numbers.

17       Then AFSCME says that the city deferred sales of

18  assets, and they talk about two examples.  We will

19  demonstrate, of course, that that is not true.  First of all,

20  the Belle Isle deal, Belle Isle leased to the state in

21  exchange for the state taking over the maintenance and CAPX

22  requirements with respect to Belle Isle, never involved the

23  generation of incremental spendable cash.  It did and always

24  has involved a reduction of the cost on the city to maintain

25  Belle Isle.  And what the evidence will show is that those

1  anticipated savings were included in the projections that

2  were the basis for insolvency calculations, and they are in

3  the projections.  They're the basis for the proposal for

4  creditors or at least the lead-up to the proposal for

5  creditors in the June 14th presentation.

6         It's also very hard for us to understand how anyone

7  can say that art sales were deferred.  It is common

8  knowledge -- and I suspect we'll figure out a way to get this

9  into evidence as well -- that there's an attorney general

10  opinion out there that basically says that the art can't be

11  sold for creditors.  We, unfortunately -- in the absence of

12  some form of an agreement, there are no sales possible

13  without a significant change in current management of the

14  museum or litigation and -- maybe and/or litigation relating

15  to some of the points made in the attorney general's opinion.

16  There were no pre-filing opportunities to liquidate art.

17         Next, AFSCME talks about the swap deal, which, of

18  course, your Honor is familiar with because it's before you

19  in still another adversary setting in this case.  The swap

20  deal itself, you will hear, does not provide adequate cash

21  relief, but the transaction hasn't been approved yet.  And

22  there is, unfortunately, no assurance as we stand here today

23  and certainly as we stood here several months ago, that it

24  will be done.  It turns out that some of the objectors in

25  this proceeding are also objectors in that one, and so I'm

1   not sure how we're supposed to even count the anticipated

2   cash flow relief attributable to the swap transaction as

3   something that could have even affected the city's insolvency

4   calculations.

5          And lastly, there is the assertion -- and I'm

6   anxious to hear what the evidence will be to support this

7   one -- that the appointment of the emergency manager

8   prevented the city from taking actions designed to raise

9   revenue and avoid insolvency.  Of course, in the briefs that

10  have been filed, there is no suggestion about exactly what

11  steps those are that the City Council or the mayor or whoever

12  else has been displaced in the view of AFSCME have been

13  planning and anxious to implement that would solve the city's

14  financial problem.  No such actions have ever been specified.

15  We have no idea where that evidence is coming from.  It will

16  be quite a surprise if there is any.

17         It was for these reasons, the insolvency and the

18  fact that there really weren't anything left, that the city

19  or the state could think of to do to address the problems

20  that the June 14th presentation was put together, and it

21  proposes a plan that includes significant reductions in the

22  city's obligations, including bonds, including other post-

23  employment benefits, including other unsecured claims, and

24  including pension underfunding claims.  Whatever the law

25  turns out to be concerning protections to be afforded to

1  various claims, there is no law prohibiting the city from
2  trying to commence negotiations to resolve its financial
3  problems, and that's what we were trying to do.
4  　　　　Now, while we're near this subject, there is an
5  issue that ripples through actually several of the standards,
6  which is whether or not the proposal that's included in the
7  proposal to creditors -- and I'm referring to the materials
8  that are, I think, between pages 101 and 109 or thereabouts
9  of that document -- whether that proposal was a -- was close
10  enough to a confirmable plan of adjustment to qualify for the
11  purposes of, open paren, one, demonstrating that the city
12  desires to implement a plan; open paren, two, that the city
13  was in good faith as part of the good faith negotiations
14  because they had to be talking about a certain kind of plan
15  that is asserted; and, three, whether the city was acting in
16  good faith generally.  And I think the proposal for
17  creditors, that June 14th document, has been admitted into
18  evidence, again, for all purposes, but very clearly for the
19  purpose of showing this is what the proposal was that the
20  city presented as its initial presentation to creditors, and
21  so it speaks for itself.  We can look at it.  We don't need
22  testimony.  It's reasonably detailed.  In fact, I would
23  argue your Honor sees disclosure statements, summaries of
24  plans all the time, and you will see this measures up quite
25  nicely to the standard that's applicable even in disclosure

1  statements to what a plan should look like.  It is -- it has

2  a classification scheme.  It defines treatment for all

3  classes.  It includes a very extensive term sheet for notes

4  that are proposed to be distributed to creditors, and it is a

5  plan, your Honor, that for that reason is a plan that could

6  be confirmable.

7  Now, there is clearly disputes over what law should

8  be applied by this Court in determining whether or not it

9  would confirm that plan if it was fleshed out, put into plan

10  form, and presented to your Honor.  I told your Honor in

11  prior hearings that I doubt that's the way this case is going

12  to come out, but that's the relevant standard for today.

13  And the reality is is that on the city's very

14  reasonable view of the law, there is no question that it

15  could be confirmed.  I understand that with respect to the

16  retiree constituents' views of the law, they say it can't be,

17  but that doesn't render the proposal inappropriate for

18  purposes of a Chapter 9 case.  We are dealing with issues

19  that your Honor has heard argument about, is going to

20  ultimately decide, but the plan hangs together as an

21  appropriate expression of the kind of debt relief the city

22  should be able to get based upon one very reasonable view of

23  the law.  We think it's absolutely the right view.

24  The other assertion as to why the plan isn't an

25  appropriate plan is that it doesn't adequately liquidate

 1    claims, and here again they're talking about the pension

 2    underfunding amount.  But I think we know both from the

 3    structure of the Bankruptcy Code itself and from many, many,

 4    many other cases that the liquidation of claims is not a

 5    prerequisite to confirmation of a plan.  Plans are confirmed

 6    all the time with the treatment specified as the treatment is

 7    specified in the plan in the proposal for creditors that is

 8    not claim size dependent.  It's by plan.  It makes

 9    distributions based upon pro rata interests in the overall

10    claims pool.  It was designed that way because there is, in

11    fact, uncertainty concerning the aggregate amount of certain

12    claims.  Frankly, the city believes there's more questions

13    relating to the size of the OPEB, or other post-employment

14    benefit, claim pool than there is with respect to the pension

15    claim pool, but there's uncertainty on these issues.  It is

16    acknowledged there is uncertainty of issues.  Those are not

17    confirmation problems.  At least they're not confirmation

18    problems with some plan structures, and they're certainly not

19    confirmation problems with the plan structure that was

20    offered by the city.

21            So for these reasons, that is a plan that is

22    sufficiently detailed, more detailed than it has been in many

23    other of the other reported Chapter 9 cases, and it is

24    appropriate for all purposes as a starting point for good

25    faith negotiations, demonstration of the city's intent to

1    implement a plan in Chapter 9, and demonstration of the

2    city's overall good faith in commencing its Chapter 9 case.

3    And so I think we've dispensed of that component of the

4    different standards.

5         We now turn to impracticability.  Can I have a

6    second for a glass of water?  Thank you, your Honor.  Moving

7    to impracticability, the record shows in numerous places that

8    the city has many, many issues of bonds outstanding, and

9    another reason to keep the proposal for creditors nearby is

10   that toward the back of it -- and I think it's between pages

11   like 115 and 130, thereabouts -- there is an extensive list

12   in a type size not so good for people who wear bifocals.  I

13   think you will hear in the evidence, if it's not already

14   clear from the record, that most of the individual bond

15   issues do not have indenture trustees as we think of them in

16   the commercial context or any other equivalent holder

17   representative.  In fact, holders reserve more rights in most

18   muni structures or assign them to their insurers, to bond

19   insurers if insurers are involved.  And so what you have here

20   is that in order to compromise principal or interest as well

21   as many other terms of debt that have to be addressed in

22   connection with resolving the city's financial problems

23   either under the proposed plan that was in the proposal for

24   creditors or in any other plan, there is going to have to be

25   extensive solicitation, efforts to find relevant bondholders

1    to get the right consents.  The bankruptcy process is going

2    to make it a little bit easier because, of course, it will be

3    majorities of those who vote, and the solicitation rules are

4    clearer.  Outside of a proceeding you might have to get

5    everybody in order to implement changes.  In fact, you do

6    have to get everybody with respect to most of the issues.

7    There are a couple where there might be an exception if the

8    insurer exercises certain extensive levels of control.  The

9    bottom line is it is an awful mess.  There is many, many,

10   many, many issues, many, many, many holders, and this, of

11   course, is the definition of impracticability in a lot of

12   ways in the Bankruptcy Code because the whole reason we have

13   impracticability was because of New York's case back in the

14   '70s.  New York back then -- the numbers were different;

15   times have changed -- didn't have materially more and may

16   have had less bond issues and bondholders than Detroit has

17   today.  And the purpose of the impracticability standard was

18   to recognize the fact that with that kind of a debt

19   structure, having good faith negotiations with creditors in

20   advance of a proceeding in an effort to have an out-of-court

21   workout were, frankly, pointless or would have been

22   pointless.

23           And, frankly, for the most part, the objectors don't

24   disagree with anything I've just said.  It's hard to.  What

25   they say instead is that whether -- however negotiations

1   might have been practicable with bondholders, negotiations
2   were practicable with them, with the -- in some senses, self-
3   appointed or appointed representatives of particular labor
4   groups or retirees, and we're going to talk about that in
5   detail in a second, but we have a point first, which is if
6   you have a situation where it's admitted or almost
7   admitted -- and the Court may have to decide -- that
8   negotiations are impracticable with a huge universe of
9   creditors but they might be practicable with respect to
10  another universe of creditors, what do you do?  And the
11  Retiree Committee actually is good about admitting there's
12  law on this in one of their footnotes, and the law is that if
13  you've got an impracticability problem, you have an
14  impracticability problem; that negotiating with the groups
15  you can groups with are kind of pointless.  I think that if
16  we think about it a little bit, that has to be right because,
17  of course, if -- let's take a hypothetical that you've got,
18  you know, a group over here not organized, and then you've
19  got one bank debt piece, which is clearly organized and you
20  can clearly negotiate it.  Well, you try to do everything you
21  can with the bank, but at some point the bank is going to say
22  what's going to happen with them, all those people that you
23  can negotiate with, because no one ever makes a deal in a
24  vacuum.  And even if you could get all the way to conclusion
25  with a bank and you still have to file a Chapter 9 case,

```
 1   doesn't that make you start -- effectively start all over
 2   again with the one that was easy to negotiate with?  And even
 3   if it doesn't, even if it's possible to negotiate a deal with
 4   both the bank and the city decides this is it, we're going to
 5   make this deal no matter what happens in the Chapter 9 case
 6   that you need for everybody else, you still have to go
 7   through the Chapter 9 case.  And waiting to file a Chapter 9
 8   case while you work with the bank and finally reach the deal
 9   that you're going to have with the bank that's going to be
10   permanent, you've wasted a lot of time because you have to
11   start a Chapter 11 case and go through that process anyway.
12   So I submit that the couple of cases that have focused on
13   this that we cite in our papers and that the Retiree
14   Committee cites in a footnote have got it exactly right.  If
15   you have an impracticability with respect to a material part
16   of your capital structure, you have an impracticability
17   problem, period, so I think by looking at this -- and by the
18   way, before we go off, I want to say there's one paragraph of
19   the AFSCME brief that I think is just terribly important on
20   this.  They argue this point a lot, but then they have
21   paragraph 102 at page 46, and it's only two sentences, so I'm
22   going to -- three sentences, so I'm going to read the whole
23   thing.  "AFSCME is not suggesting that pre-petition
24   negotiations could have bound everyone" -- hold that
25   thought -- "or must have involved all of the city's thousands
```

1  of creditors."  I don't under -- I think that sentence means

2  we're done because if the pre-petition negotiations couldn't

3  have bound everyone, how would you get a plan done?  And if

4  it didn't involve all the city's thousands of creditors, how

5  would you get a plan done?  So I think they're conceding that

6  our situation has to be regarded as impracticable, but they

7  go on.  They say, "Some level of negotiation with principal

8  creditors could have led the city to a nonbankruptcy

9  solution."  I think that's a non sequitur.  If you're not

10  talking to everyone, you can't possibly have a solution.  But

11  then they go on further, "By way of analogy, Section

12  109(c)(5)(B) of the Bankruptcy Code contemplates pre-

13  bankruptcy negotiations with creditors that the

14  municipality" -- there's a "the" missing -- "intends to

15  impair, not all creditors."  Well, one of the complaints of

16  AFSCME is that the city intends to impair substantially all

17  of its material creditors.  It has no other choice.  So I

18  suppose there's a circumstance if the city was arguing that

19  we have a huge group of creditors as to which negotiations

20  are impracticable, but we're not going to impair them, and we

21  have another group of creditors that we really can talk to,

22  and we're going to impair them, if the city said no

23  discussions, that would be a rather extreme and silly

24  position.  It's just not our case.  We need impairment pretty

25  much across the board.  We have proposed impairment pretty

1   much across the board.  And in that circumstance, the fact

2   that huge chunks of the relevant constituencies are not

3   organized, can't be organized, can't be found, that is to me

4   the end of the impracticability discussion.

5        But maybe we should go on.  Maybe we should try to

6   figure out whether it was really impracticable to negotiate

7   with the unions themselves.  And, your Honor, I think the

8   answer to whether or not it was impracticable to negotiate

9   with the unions themselves -- and I include here the unions

10  and the other retiree groups -- is, frankly, what happened

11  when we asked the unions whether or not they could represent

12  retirees and the other groups or they could represent

13  retirees, and we have a demonstrative that we'll come back to

14  and put into evidence later on, but I think it's useful to

15  pause on, and I think it can go up on -- oh, you have a --

16  oh, okay.  Okay.  We have a big one there, and I have a few

17  that I can hand out to people, so with the Court's

18  permission --

19        THE COURT:  Yes, sir.

20        MR. BENNETT:  I think it's also in the -- I think

21  it's also in the binders.  Now, there's a lot of information

22  on this chart, and I'm not going to try to take us all the

23  way through it, but I want to zero in on the fourth line of

24  data, which is the -- which is -- well, first of all, the

25  third line of data, which says, "Was a letter sent to a

1   creditor?"  What that is is a letter that basically asked,

2   "Are you in a position to represent retirees and which ones?"

3   You'll see it.  It'll be in evidence.  And then the next line

4   is, "Respondent is able to represent retirees," and I'll give

5   you the key.  "X" means they said no, the green check means

6   they said yes, and the question mark is there was no response

7   or it's not clear, and your Honor is going to hear some

8   evidence on that.  And so look across the line.  I have a

9   number of your most vigorous objectors who said, "No, we

10  can't represent retirees," so I'm going to come back to this

11  in the context of good faith, but let's -- we can start

12  thinking about it now.  What is -- what do you expect of the

13  city having made a proposal heavily supported, certainly,

14  again, as standards go in this -- in similar circumstances,

15  had lots of meetings to explain, answered every question,

16  every question that was asked at the meetings -- there will

17  be evidence on that, too -- and your negotiating partner says

18  to you, in many instances in writing, "We actually can't

19  represent the people who are impaired by your proposal"?  To

20  say that anything that happened afterwards is not in good

21  faith, you've got to have a good answer as to what do you do.

22  What's the next sentence in the dialogue?  You're getting

23  feedback from someone who doesn't have authority to give

24  feedback if they give you any feedback.  By the way, the

25  bottom line is feedback.  "X" means no.  There's no other

1   term we need to define.  If they say -- if they said --

2   responded otherwise constructively, which was either "No, but

3   I might do this," or "Yes, if you make the following

4   changes," that's okay, but that just came from somebody who

5   said they don't represent the person who's going to be

6   affected.  What is the next step in a negotiation where the

7   person who said they're here to negotiate says to you, "We

8   really don't represent the person who's affected by the plan

9   we're discussing"?  None of the objectors say how that

10   question is supposed to be answered.

11        The reality is is the city said, "Tell us your

12   suggestions anyway."  And if we got suggestions, feedback, we

13   would have had to then figure out what to do with it in that

14   very unusual circumstance that I, frankly, haven't confronted

15   very often in my career, but we weren't even put to that hard

16   question because what the other part says is is that -- and

17   this is more toward the good faith negotiation part than this

18   one, but as long as I've got the chart up, as the bottom line

19   indicates, the evidence will show that from this creditor

20   constituency, not from others -- I'll get to that in a

21   second -- we received no concrete proposal or comprehensive

22   feedback.  We got a lot of "no," but I'll come to that later.

23        With respect to this part, again, impracticability,

24   AFSCME cites results of past collective bargaining as an

25   example of negotiations with unions that have succeeded.

1   That doesn't surprise me in the slightest, but there's also

2   no evidence and I don't think there will be any that those

3   past discussions began with unions disclaiming power to

4   bargain on behalf of the relevant constituency.  As the

5   evidence will demonstrate, that's how these discussions did.

6        So the bottom line, again, with respect to this

7   part, is even if -- and it's not -- the standard for

8   impracticability of negotiations is impracticability with

9   every major constituency, I think the fourth line of this

10  chart demonstrates that negotiations were impracticable with

11  the retiree side, and they were impracticable with the

12  bondholder side.

13       Good faith negotiations.  Again, this is a question

14  I don't think we have to reach because I think we've

15  demonstrated that those kinds of negotiations were

16  impracticable, but we tried really hard anyway.  The evidence

17  will show that we presented the June 14th plan.  Mr. Buckfire

18  of Miller Buckfire, who was integral to all the negotiations,

19  but others, Mr. Moore, Mr. Malhotra, people

20    you will hear from, they also extensively participated

21  and will testify about what happened in the rooms.  The city

22  told the creditors essentially the following.  The city would

23  have discussions with all parties willing to speak for the

24  city for about a month after the June 14th presentation so

25  that the city could listen to people and figure out if there

1  was an out-of-court solution possible for this enormously

2  complex and dire circumstance.  The city representatives

3  asked for feedback, including proposals that the creditors

4  would accept if they weren't going to accept the city's

5  proposal.  And the city said in writing and separate -- and

6  verbally that it would evaluate what it heard during the

7  following month, during the week beginning July 15th, 2013,

8  and decide what came next.  It's conceivable -- I think

9  people would say they doubted it would happen -- that one of

10  the things that would have come next were consensual

11  negotiations on the effort to build some kind of plan.  That

12  could have commenced.

13        THE COURT:  You said July.  Did you mean June?

14        MR. BENNETT:  No.  July 15th was the evaluation

15  week.

16        THE COURT:  Oh, okay.

17        MR. BENNETT:  The June 14th proposal and July 15th

18  evaluation week, meetings in the middle.  I'll have a

19  timeline at some point, and you'll see how this fits

20  together.

21        THE COURT:  Okay.

22        MR. BENNETT:  So one of the things that might have

23  happened next would have been negotiations on a consensual

24  plan, but if the -- after the month of discussions and after

25  the evaluation week the city could not see a path to an out-

1   of-court restructuring that could be implemented outside of

2   court, a Chapter 9 case was absolutely a possibility.  No one

3   was shy about that.  And, frankly, it should not be

4   surprising to anyone that the evidence shows that work on

5   both contingencies was proceeding throughout this entire

6   period.  Much is made of the fact that there's contingency

7   planning going on for a Chapter 9 case.  Absolutely there

8   was.  It would have been irresponsible not to.  By the way,

9   nothing in the Jones Day pitch is inconsistent with this way

10  of organizing a case.  And there's a lot of complaints about,

11  well, people thought they had to keep a record, make a

12  record.  Absolutely they have to keep a record and make a

13  record.  Making a record of out-of-court steps taken in a

14  Chapter 9 negotiating process is just sensible when everybody

15  knows, based upon the play book executed in the last six or

16  seven major cases have involved vigorous objections to

17  eligibility by bondholders and labor unions, depending upon

18  the case which, sometimes both, and in every single one of

19  those cases, the judge has to go through pages and pages and

20  pages about what happened during the out-of-court phase to

21  determine whether people were in good faith.  So courts

22  through their opinions have sent a message to people who are

23  serious about Chapter 9 restructurings.  Keep records, and we

24  did.

25          There is a lot of criticism in the papers that there

1   were instances where the city said these are not negotiations

2   or particular meetings were not negotiations.  I confess that

3   this implicates an area of law that I'm not tremendously

4   familiar with.  It has to do with collective bargaining.  As

5   the evidence will show, the collective bargaining was

6   suspended as a result of a statute passed, and there was a

7   clear concern by the city that they were not going to waive

8   the -- or reverse the suspension of collective bargaining and

9   all of the baggage that came with that.  However, we don't

10  really have to deter ourselves much over that incident

11  because it's admitted by the objectors that the city sought

12  feedback.  The evidence will show that.  It's admitted that

13  there were, quote, discussions, close quote, and by the way,

14  the leading case that people cite as the -- I think it's

15  Endicott Schools case that is cited for the proposition of,

16  you know, what is a nonnegotiated process or absence of

17  negotiations.  That case talks about absence of discussions.

18  That's the actual quote if you go back to the case itself.

19        So, in any event, there is no dispute that dialogue

20  was something that was encouraged and not discouraged.

21  Nobody said we don't care what you think.  Never happens;

22  evidence will show never happens.

23        Now, again, assuming for a second that what the city

24  did in the negotiations has any relevance at all given the

25  clear impracticability in this case, what is required of the

1    city in good faith negotiations -- and I intimated that when

2    we started talking about the chart -- is informed what

3    creditors -- by what creditors said and did.  Okay.  Mr.

4    Buckfire will testify about some of that being especially

5    careful not to talk about proposals that other people made

6    because they were made with an intent that they be kept

7    confidential, but we got permission at least in one instance

8    to talk about the fact that a proposal was made.  And what

9    Mr. Buckfire is going to tell the Court is that the proposals

10    that the city got back were proposals that basically said,

11    "Our position is better than everybody else.  We should do

12    better than everybody else," and they were, frankly,

13    completely insensitive to the overall problems that the city

14    faced.  Again, the fact that we did get proposals from people

15    other than the labor negotiators is going to be --

16    Mr. Buckfire will testify to it, but there's a letter in

17    evidence, and I don't have the number.  I forgot to put it on

18    this morning.  There's a letter in evidence -- a cover letter

19    to a proposal that came from three major insurers in the pre-

20    filing period.  And, your Honor, that demonstrates that a

21    party that's represented by qualified professionals, as a

22    number of the labor/retiree constituents were, knew exactly

23    what you're supposed to do when you receive a proposal and

24    you don't like it.  The way you -- the way you respond to a

25    proposal and you don't like it is you send back something

1  that you do like, and that's how a negotiation gets started.

2  Whether it would have worked or not is a different question.

3  The point is is that it wasn't a mystery to anybody how to

4  start a negotiation if someone really wanted to start one.

5      What did labor do besides respond maybe we're not

6  the right person to talk to, which is a problem in and of

7  itself?  Well, here the UAW's papers are particularly

8  instructive, and in many places in their papers, particularly

9  their supplemental objection -- I think it's also in the

10  pretrial brief; I'm just not remembering that as clearly

11  today -- the UAW says, "Well, of course we weren't going to

12  say yes to any modifications of retiree benefits or pension

13  benefits in the pre-filing scenario because we had a

14  constitutional guarantee.  Any proposal that doesn't pay

15  these in full and does not impair retiree benefits is a

16  proposal we cannot accept," or, "we will not accept."  I

17  think it says both those things in different places.

18      So, again, I think we have to ask the most crucial

19  question in evaluating the city's good faith.  When you get

20  back a response that says, "We're never going to agree to

21  anything but nonimpairment," what exactly is the city

22  supposed to do next?  What's the next step in that

23  negotiations?  "Gee, we were just kidding.  We found the

24  money in a mattress.  We'll do that"?  I don't think that's

25  the right response.  I don't think there is a right response.

1    I think at that point you can determine that negotiations
2    have failed and they're not going to succeed.

3          The Retiree Committee goes even further in their
4    papers, their pretrial brief.  They say that negotiations
5    were not in good faith because they included an impairment,
6    meaning the city wasn't in good faith because we didn't agree
7    with them from day one.  Okay.  Again, I ask the question,
8    what exactly -- if anyone is going to contend that the city
9    was in bad faith negotiations and got that response, what
10   exactly were they supposed to do next in the negotiations
11   that would have helped matters?

12         And as I said before, many retiree groups said,
13   "We'd love to talk to you, but we don't represent the
14   relevant people."

15         Clearly, your Honor, we received many requests for
16   additional information.  You will see some interesting charts
17   that show what was in the data room, at least in terms of
18   volumes, how the data room is populated.  The evidence will
19   show that the city did its best to comply with information
20   requests.  I'm absolutely certain that no one was completely
21   satisfied with what the city gave them.  In some instances,
22   that's because the city doesn't always have everything that
23   people want.  In some instances, I suspect it's -- we will
24   find that -- to the end of this case we will not find -- we
25   will find certain people who will never agree that they've

1   gotten everything that they want or they're satisfied with
2   the information they received.  It's a hard problem, but the
3   evidence will show that the city created a database, worked
4   really hard to populate it, populated it with enormous
5   amounts of information, and did not withhold information as a
6   basis to obtain a negotiating advantage.

7              Final point with respect to this section.  In almost
8   all the papers -- and I want to -- it could be all -- there
9   is a statement quoted by Kevyn Orr concerning the financial
10  and operating plan at a meeting to discuss the financial and
11  operating plan, which is not the proposal for creditors.  The
12  financial and operating plan is a document required by
13  statute to be filed 40 days -- 45 days after his appointment.
14  It's about facts, and he's reporting facts.  And someone
15  asked him about negotiating the financial and operating plan,
16  and he said, "This is not something to negotiate.  This isn't
17  a plebiscite.  This is a report.  I'm supposed to file it."
18  So that quote, which I think the objectors would have you
19  think applied to the restructuring plan, and it does not, did
20  not, and it applies to something completely different, and I
21  think the evidence will show that.

22             For the foregoing reasons, I think the city did act
23  in good faith in all of the negotiations that it conducted.
24  Those negotiations were unsuccessful and, thus, that
25  prerequisite for filing a Chapter 9 case and being eligible

1   for relief has been met.

2           I'm now going to turn to good faith generally, spend

3   a little time on it, 921(c).  Here again, I want to borrow

4   AFSCME's papers because they're just very instructive and

5   really help us with this.  Paragraph 109 on page 48, "The

6   relevant considerations regarding good faith under Chapter 9

7   include," and they point to five points out of the Stockton

8   case.  I'll accept them.  Number one, whether the city's

9   financial problems are of a nature contemplated by Chapter 9.

10  The evidence will show that if Detroit's financial problems

11  are not the financial problems of the nature contemplated by

12  Chapter 9, I don't know what city's is, so we think we will

13  satisfy that one very easily.  Number two, whether the

14  reasons for filing are consistent with Chapter 9.  I think

15  the form and substance of the plan that was proposed and,

16  frankly, everything that the city has been saying about it

17  are indicative that the city is trying very hard to use the

18  powers subject to the limitations included in Chapter 9 to

19  effectuate a financial restructuring for the city.  I don't

20  think we'll have any difficulty demonstrating that with the

21  evidence.  Number three, the extent of the city's pre-

22  petition efforts to address the issues.  Here I want to pause

23  and put on a timeline, and there's -- it's really long, so

24  there's two pieces, but for this purpose it's the first piece

25  that's the most relevant.

1          THE COURT:  Let me ask you to pause for just a
2     second.  We should have the record reflect what exhibit
3     number that chart is.
4          UNIDENTIFIED SPEAKER:  It's Exhibit Number 36.
5          MR. BENNETT:  I have better.  They'll try and put it
6     up, but I also have some copies of it.  Here's what I'm going
7     to do.  I'm going to distribute the first piece now, with the
8     Court's permission, and the second piece in a minute, so --
9     after I get through this, so here's the first piece.  Again,
10    I think everyone has seen this already.  If you don't have
11    it, it's okay.  Everyone else is going to have it in a
12    second.  Obviously in a bunch of ways this chart summarizes
13    lots and lots of evidence that is going to go into the
14    record, but what is going to be seen in the record was that
15    it wasn't a bunch of people up at night on June 13th working
16    on a presentation of a plan for June 14th.  The efforts to
17    address the -- the pre-petition efforts to address the issues
18    stretch probably before December 21, '11, but I think at
19    least, as I understand the history and as the evidence will
20    certainly show, no later -- excuse me -- no later than
21    December 21, 2011, December 2011, a number of people within
22    state government and city government started focusing on the
23    fact that the Detroit financial situation was very serious
24    and had to be addressed.  And there were a number of efforts
25    that were attempted all through 2012 to try to grapple this

1    problem -- with this problem short of requiring concessions

2    from creditors, short of Chapter 9.  Kind of everything else

3    you might think of doing was done by a large number of really

4    devoted and qualified people.  Regrettably, it all failed,

5    and -- but the part about -- you know, this first chart,

6    which covers almost a year and a half on one page -- it was a

7    lot of time and a lot of effort in a search for alternative

8    solutions.  So forgetting the near-in -- what happened in the

9    June and July time frame, which we'll get to in a second,

10   the -- it is clear that there was a tremendous amount of time

11   and effort considering the issues.

12           Next is the fourth item in the AFSCME list, the

13   Stockton list, the extent that alternatives to Chapter 9 were

14   considered.  I think alternatives broadly construed include

15   all of this, but then we'll turn to the time frame -- and all

16   of a sudden -- we just got this one up -- the time frame of

17   June and July, which we've blown up because so much happened,

18   onto its own separate chart, so let me pass this one out.

19           THE COURT:  So, ma'am, what's the number of that one

20   that you're just now taking down?

21           UNIDENTIFIED SPEAKER:  They're both Exhibit 104.

22           THE COURT:  Oh, both 104.  Okay.

23           MR. BENNETT:  And because so much more happened, at

24   least in terms of dates and places, in the June and July time

25   frame, we've blown that one up so that the last two months

1  are their separate page.  And June was devoted to heavily

2  trying to figure out whether the last round of possible

3  alternatives, any conceivable kinds of out-of-court

4  restructuring, could work, and what the evidence will show is

5  that on this page, which shows all kinds of meetings and all

6  kinds of different interactions with creditors, a concerted

7  decision was made to exclude meetings with individual

8  creditors or individual creditor representatives because it

9  wouldn't be readable anymore, so this is just organized

10  meetings with different groups for different specific

11  purposes.  The other key to interpretation is when it says

12  "nonunion," it means the bonds, so the union -- for

13  purposes --

14         THE COURT:  Means what, sir?  Pardon?  It means

15  what?

16         MR. BENNETT:  The bonds.  "Nonunion" means --

17         THE COURT:  Bonds.

18         MR. BENNETT:  -- the bonds and other borrowed money

19  because there is a collection of notes involved in that side

20  of the case as well.  Where it says "union," it's really the

21  retiree representatives, which at the time were predominantly

22  union.  And so what this demonstrates -- again, it may be

23  part of the good faith piece, too, but for purposes of the

24  fourth prong of the Stockton test, I would say both of these

25  are relevant, both the long-term assessment of alternatives

1  that were short of debt restructuring, then the close-in

2  effort to figure out whether there was any conceivable way to

3  get something accomplished out of court.  It is perfectly

4  clear that there was an extensive effort to evaluate every

5  conceivable alternative that anyone could think of.

6          And then the last factor, factor five, whether the

7  city residents would be prejudiced by Chapter 9 relief.  As

8  we said in argument last week -- and the Court will hear

9  through extensive evidence -- and it's a really important

10  part of the case both for purposes of eligibility and for

11  everything that will follow -- the residents are dramatically

12  prejudiced by denying Chapter 9 relief.  Many of the problems

13  the city confronts in providing services to its residents is

14  because so many of its tax dollars are devoted to dealing

15  with bonds and other legacy liabilities.  That's the problem.

16  The taxpayer in Detroit puts up a dollar and gets back --

17  right now the number is something -- right now the number is

18  something like 58 cents, and the projections show it could be

19  some day 35 cents.  That's an unstable situation.  It's not

20  working now, it's not going to work in the future, and it has

21  to be changed.

22          The other side of the coin.  Very often the first

23  reaction in cases like this is raise taxes.  The evidence

24  will show -- it's summarized, by the way, in the June 14th

25  proposal -- that the taxes in Detroit are already the highest

1  in any municipality in Michigan; that we're already having

2  enforcement problems.  The city is already having enforcement

3  problems with respect to property taxes; that the property

4  tax assessments may be too high, not too low, indicating that

5  that revenue source is stressed as well.  There's nothing

6  left to do here.  There is no revenue solution.  So we have

7  come to a case, which is not necessarily like other Chapter 9

8  cases, where we have a very finite revenue pool, and it just

9  isn't enough to provide services and to pay debt, and, thus,

10  Chapter 9 is more needed here than in any other scenario you

11  can possibly think of.  The evidence will show that.

12       Last topic, and this gets a lot more technical, but

13  this is responsive to your Honor's suggestion that we had to

14  deal with a disputed issue of fact, and that was the

15  motivation for the inclusion of appropriations provisions in

16  PA 436.  Your Honor, I think the following is intended to

17  really indicate that that question isn't material, but I

18  think it's also -- when we did the research, we found that

19  it's also not a legitimate question for judicial review, so

20  I'm going to give you some citations, and I'm going to read a

21  very few quotes, and your Honor is clearly going to find more

22  when you look at this question.

23       In the State of Michigan, frankly, I think in other

24  places, et al. -- other places as well, the judiciary is not

25  supposed to engage in guessing about the legislature's

1  intent.  The leading case about this turns out to be a

2  referendum case in Michigan.  It's called <u>Michigan United</u>

3  <u>Conservation Clubs</u> versus <u>Secretary of State</u>.  It's found at

4  630 N.W. 2d 297.  <u>Michigan United</u> involved a review of a

5  Court of Appeals decision -- I think it's called the Court of

6  Appeals here -- a Court of Appeals decision that held, in

7  fact, that the -- that an appropriations provision in gun

8  control legislation was not going to prevent that legislation

9  from being subject to a referendum, and the Supreme Court

10  reverses and says that that -- that the inclusion of that

11  provision is going to insulate that statute from the

12  referendum process.  And along the way, the Court was not

13  fractured in result but was fractured a little bit in

14  reasoning.  There's a collection of -- I think it's three

15  concurring opinions.  There's one judge who writes a

16  dissenting opinion.  I think it's just one, but I'm not a

17  hundred percent positive about that.  And so the lead -- the

18  first concurring opinion has this to say.  "This court has

19  repeatedly held that courts must not be concerned with the

20  alleged motives of a legislative body in enacting a law, but

21  only with the end result - the actual language of the

22  legislation."  And then there's a whole series of cases that

23  are cited to support that proposition that I won't read the

24  citations in the record unless your Honor wants them.

25       The next concurring opinion, Judge Corrigan's,

1    quotes from Justice Cooley's constitutional law thesis or
2    textbook.  It looks like it may be a textbook.  And the
3    quote, I think, is also instructive.  It's a little bit
4    longer.  It says the following:  "to make legislation depend
5    upon motives would render all statute law uncertain, and the
6    rule which should allow it could not logically stop short of
7    permitting a similar inquiry into the motives of those who
8    passed judgment.  Therefore, the courts do not permit a
9    question of improper legislative motives to be raised, but
10   they will in every instance assume that the motives were
11   public and benefitting (sic) the station.  They will also
12   assume that the legislature had before it any evidence
13   necessary to enable it to take the action it did take."

14        Then, your Honor, the next case you would find if
15   you looked at this is Houston versus Governor, which is a
16   2012 case.  There's a longer -- 491 Michigan 876, 810 N.W. 2d
17   255.  And right near the front of the opinion there's a
18   paragraph.  I'm only going to read two parts of the paragraph
19   to save time.  "There is nothing that is relevant in this
20   regard" -- that's in terms of interpreting a statute -- "that
21   can be drawn from the political or partisan motivations of
22   the parties."  I'm going to skip a sentence.  "Moreover, this
23   court possesses no special capacity and there are no legal
24   standards by which to assess the political propriety of
25   actions undertaken by the legislative branch."

1          Now, of course, much of this makes sense because one
2    of the problems we scratched our heads about when we got back
3    to think about how we would address your Honor's question is
4    there are a whole bunch of legislators in two Houses that
5    conceivably had all kinds of different reasons for supporting
6    the appropriations.  It could well be that most of them put
7    the appropriations there because they really thought they
8    needed the money even if some thought they were putting it
9    there because it was a problem relating to the referendum
10   process.  I will tell you a very, very persuasive example of
11   the hazards of trying to figure out the intent of statutes
12   was impressed upon me by a law school, an example I learned
13   in law school, which was about the age 55 -- or the 55-mile-
14   per-hour speed limit, and it -- research turns out to show
15   that the purpose of that speed limit was to save fuel, and
16   the reason that it wasn't increased for a long time is
17   because it saved lives.  And so also the purpose of
18   legislation actually can change over time or the reason why
19   it stays there, so I think it's a hazardous inquiry.  I don't
20   think we know where to start.  I don't think we can drag all
21   the legislators in here and ask them all, and I think the
22   only other evidence you're going to see about this is,
23   frankly, inadmissible hearsay.
24          Maybe more importantly than this, I think I
25   indicated to your Honor in argument last week that I didn't

think there was any consequence to a determination by this
Court that the appropriation provisions might prevent a
referendum.  I said that the statute wouldn't be
unconstitutional.  It just would be subject to referendum.
Well, it turns out in the Michigan United case, one of the
concurrences goes back and gives everybody the history of
what happened in that case, and so how did that case wind up
in court to begin with?  And it wound up in court because the
persons, the group that wanted to have a referendum went out
and got the required number of signatures, went to the
appropriate office where the election is going to be held,
and the first response was no referendum because of the
provisions, and then they went to court to test it.  So I
think we're in a situation where, frankly, the only
circumstance where this issue of whether or not the
appropriate -- whether or not the appropriation provisions
are in there for an appropriate purpose would conceivably
come up is when a person or organization desiring a
referendum within the time specified by the statute -- and it
could conceivably have run; I couldn't figure that out --
actually collects the signatures, goes down to the
appropriate place and tries.  That never happened.

          It also appears that even if a group or person
doesn't do that, there is an initiative process, which is
different from a referendum process, which they could have

1  triggered, and that process is not dependent in any way on
2  whether or not there's an appropriation provision in the
3  relevant statute.

4       And, finally, I think it was pointed out when we
5  were together last that the PA 436 contains a severability
6  clause, so what's left to have happen at this point is if
7  that provision is somehow inappropriate and has to be
8  stricken for some legally cognizable reason, the rest of the
9  statute is still there.  So I would say, again, summarizing
10  from where I started, there's two points here.  One is is
11  that I think your Honor has asked for an inquiry that is not
12  only impractical, it's not one for courts, but, in any event,
13  it's not material to anything because it doesn't lead us
14  anywhere that would change the result that we have PA 436 or
15  at least every single one of its provisions with or without
16  the appropriation provision to apply, and it's not upset by
17  reason of the possibility that a referendum could have been
18  attempted in some circumstances where one never apparently
19  has been attempted.

20       With that, if you have no more questions, I think
21  I'm done.

22       THE COURT:  Thank you.

23       MR. BENNETT:  Thank you.  I've been asked to offer
24  104 for demonstrable purposes only because it would not be on
25  the relevant lists.

1      THE COURT:  Is there any objection to 104 for

2  demonstrative purposes only?  All right.  The Court will

3  admit it for that purpose.

4      (Debtor's Exhibit 104 received at 11:25 a.m.)

5      MS. LEVINE:  Good morning, your Honor.  Sharon

6  Levine, Lowenstein Sandler.

7      THE COURT:  Let's just have the record clearly state

8  this.  Does the State of Michigan wish to make an opening

9  statement on the issue of the city's eligibility?

10      MR. SCHNEIDER:  No, your Honor.  However, we may

11  wish to make a closing statement.

12      THE COURT:  Thank you.  You may proceed.

13      MS. LEVINE:  Thank you, your Honor.  Sharon Levine,

14  Lowenstein Sandler, for AFSCME.  I'm actually here in the

15  role of emcee.  As with the oral arguments, we have agreed to

16  work together to try and not duplicate efforts and to make a

17  cohesive presentation, so just to give your Honor a little

18  bit of an understanding, the Retirement System is going to,

19  in essence, go first, spend about 20 minutes going through

20  the timeline as we see it.  Following that, the Retired

21  Detroit Police Members Association will react to the city's

22  final portion of their statement and also to their particular

23  issues as reflected in the timeline and apply it to the

24  facts.  The UAW, the Public Safety Unions, the Retired

25  Association Parties, and AFSCME will each spend just a few

1  minutes indicating how we see any additional facts or how the

2  facts apply to our particular situations, and then the

3  Retiree Committee probably for 20 or 30 minutes will give a

4  global overview of applying the facts that came out in the

5  timeline to the law.  Thank you.

6          THE COURT:  Okay.  Well, do you think it's okay with

7  your group if at a convenient break around noon we take our

8  lunch break?

9          MS. LEVINE:  That would be great.

10          THE COURT:  Okay.

11          MS. GREEN:  Your Honor, can I move the -- oh, I'm

12  sorry.

13          THE COURT:  Yes.  Can we arrange to move that easel,

14  please?  You can try.

15          MS. GREEN:  Your Honor, Jennifer Green on behalf of

16  the Retirement Systems.

17          THE COURT:  Be sure you speak right into the

18  microphone even though you've angled the lectern there.

19                    OPENING STATEMENT

20          MS. GREEN:  As Sharon mentioned, we have put

21  together a slideshow presentation of the timeline.  We

22  believe that these facts will later be used to support

23  certain legal arguments that we will be raising throughout

24  trial regarding the fact that Chapter 9 was a foregone

25  conclusion well before any creditor negotiations occurred;

1   that Chapter 9 was filed in bad faith to circumvent the

2   pension clause, and we submit, respectfully, we disagree with

3   the city's assertion a moment ago that Chapter 9 was a mere

4   contingency, and our assertion is that it really was a

5   foregone conclusion before any of the creditor negotiations

6   ever occurred, and with that I will begin.

7           You may ask why we're going back this far to 2011,

8   but at his deposition, your Honor, Governor Snyder testified

9   that this has been a highly structured process for close to

10  three years, so we begin in January 2011 when Richard Snyder

11  takes office as the governor of the State of Michigan.

12          Shortly thereafter, just three months later, the

13  governor signs into law what we now refer to as PA 4.  The

14  legislation makes its way through both Houses within just 34

15  days.  February 2012, Stand Up for Democracy files with the

16  Secretary of State a petition to invoke a referendum on PA 4.

17  Just days later, within -- actually, within three days of

18  Stand Up for Democracy's petition, discussions begin

19  regarding ways to insulate PA 436 -- or what will become PA

20  436 eventually from referendum.  There are notations that

21  discussions were had with Andy Dillon, the treasurer of the

22  State of Michigan's office, and there are notes about Miller

23  Buckfire are going to follow up with Andy directly about the

24  process for getting this to the governor and a notation that

25  the cleanest way to do all of this is new legislation that

1   establishes a board and includes an appropriation for a state

2   institution.  If an appropriation is attached, it concludes,

3   then the statute is not subject to repeal by the referendum

4   process.

5          In April of 2012, the city enters into the consent

6   agreement with the State of Michigan.  Shortly thereafter,

7   Heather Lennox of Jones Day and Ken Buckfire of Miller

8   Buckfire purportedly meet with Governor Snyder on June 6th,

9   2012, to discuss the Detroit -- the City of Detroit's

10  financial crisis and issues related to potential 9 Chapter --

11  or Chapter 9 bankruptcy.

12         Prior to the meeting, in the e-mail that we

13  discussed earlier and that I quoted for you earlier during

14  oral arguments, there is a notation that Mr. Buckfire

15  suggested that all the memos be put together, the ones that

16  were done for Andy.  A list of those memos were compiled, and

17  three of those we think are pertinent to some of the issues

18  at trial in this case.  One of the memos was regarding a

19  summary and comparison of PA 4 and Chapter 9.  One was a

20  memoranda on constitutional protections for pension and OPEB

21  liabilities, and a third memo was analysis of filing

22  requirements of Section 109(c)(5) of the Bankruptcy Code, in

23  particular, negotiation being impracticable and negotiating

24  in good faith.

25         Two weeks after the meeting with Governor Snyder,

1  Miller Buckfire is engaged by the State of Michigan to
2  perform an analysis and review of the city's financial
3  condition.  Shortly thereafter, Ken Buckfire testified that
4  after he got this engagement, he started receiving phone
5  calls from law firms seeing if he would be interested in
6  helping them get inserted in --

7          THE COURT:  I need to interrupt you for a second.

8          MS. GREEN:  Am I going too fast?

9          THE COURT:  Yes.

10         MS. GREEN:  I was trying to get done by noon.  I was
11 trying to get done by noon because you said you wanted to
12 break at noon.

13         THE COURT:  I really want to follow what you say,
14 so --

15         MS. GREEN:  I will slow down.

16         THE COURT:  -- I need you to slow down.

17         MS. GREEN:  I knew I only had 30 minutes, so I was
18 trying hard.

19         THE COURT:  Well, we don't have to stop right at
20 noon.

21         MS. GREEN:  Okay.  I will slow down.

22         THE COURT:  But slow down for me by about 50
23 percent.

24         MS. GREEN:  Wonderful.  I get this a lot, so I know
25 I'm a fast talker.  The discussion continues.  Mr. Buckfire

1    testified that Corrine Ball had wanted him to meet one of her

2    partners, who was successful in a Chapter 9 case.  This is in

3    2012.  In October of 2012, PA -- before PA 4 is even rejected

4    by the voters, the Treasury Department and the Governor's

5    Office begin discussing creation of a new emergency manager

6    statute just in case the referendum is passed.  Howard Ryan,

7    who is the 30(b)(6) witness for the State of Michigan, will

8    testify to that.  Shortly thereafter, November 6th of 2012,

9    the Michigan electorate rejected PA 4.

10        In December Senate Bill 865, which would eventually

11   become PA 436, was introduced in the Michigan legislature.

12   The final version is adopted by both Houses just 14 days

13   later on December 15th, and around that same time the

14   treasurer commences a preliminary review of the city's

15   finances under PA 72 and determines that a serious financial

16   problem exists in the City of Detroit.

17        At the end of December, the governor of Michigan

18   signs PA 436 into law, submits it to the Secretary of State.

19   The entire process for PA 436 took only 26 days, and it is

20   insulated from public referendum because it contains what the

21   objecting parties submit is a minor appropriation of $5.8

22   million, which is less than .009 of the state budget, and

23   below we have the citation from the exhibit that sets forth

24   the amount of the state budget.

25        In connection with the PA 436 appropriation, the

1  state 30(b)(6) witness testified at his deposition that he

2  was aware that the appropriation was included for the purpose

3  of insulating it from referendum.  He was asked the question,

4        "Do you recall when that provision of the

5        legislation was added to the draft bill?"

6        Pretty early on, I believe.  It was quite early,

7        maybe from the inception."

8        He was then asked,  "Based on your conversations

9  with the people at the time, was it your understanding that

10  one or more of the reasons to put the appropriation language

11  in there was to make sure it could not -- the new act could

12  not be defended by a referendum?"  He answered, "Yes."

13        "Where did you get that knowledge from?

14        Well, having watched the entire process unfold

15        over the two -- past two years.

16        The governor's office knew that was the point of

17        it?

18        Yes.

19        That your department" -- his is the treasury --

20        "knew that was the point of it?

21        Yes."

22        In January of 2013, Miller Buckfire was reengaged,

23  this time by the City of Detroit, to continue its evaluation

24  of the city's financial condition.  Mr. Buckfire was then

25  asked by Treasurer Dillon to make arrangements for the city

1   and state officials to meet and interview Jones Day and seven

2   other law firms that were interested in serving as

3   restructuring counsel.

4         The day before the pitch presentation with the City

5   of Detroit, Kevyn Orr, who attends the pitch, receives an e-

6   mail recounting conversations with Mr. Buckfire -- Mr.

7   Buckfire will be testifying live during this trial -- and

8   listed are the questions that will be asked the following day

9   at the pitch.  They all relate to Chapter 9.  "Given the

10  issues that Detroit faces, how can they address them outside

11  of Chapter 9?" is the first, but all the rest are, "Under

12  what circumstances should Chapter 9 be used?"  "How would one

13  execute a low-cost fast Chapter 9?"  "Given Chapter 9

14  experience, what went wrong with JeffCo and Orange County?"

15  And at the bottom, "If Miller Buckfire finds a way to

16  monetize assets and create liquidity, how would that impact

17  eligibility?"

18        The next day on January 29th, Jones Day presents its

19  restructuring strategy to the city and state officials, and

20  it explains that while out-of-court solutions are preferred,

21  they conclude they are extremely difficult to achieve in

22  practice.  They note that Chapter 9 can create negotiating

23  leverage negotiating with the backdrop of bankruptcy, which

24  we submit is not good faith.

25        They further conclude in their strategy that an out-

1  of-court plan should contemplate the possibility of Chapter 9

2  because it creates leverage, you can negotiate in the shadow

3  of Chapter 9, and it helps bolster your eligibility and your

4  success in a Chapter 9 by establishing a record of seeking

5  creditor consensus.

6          There are notes on the slide that state, "A good

7  faith effort to pursue an out-of-court restructuring plan

8  will establish that clear record and will deflect any

9  eligibility complaints based on alleged failure to negotiate

10  or bad faith.  If needed, though, Chapter 9 could be used as

11  a means to further cut back or compromise, quote, 'accrued

12  financial benefits otherwise protected under the Michigan

13  Constitution.'"

14          The next day Richard Baird, who's Governor Snyder's

15  consultant, reaches out to Jones Day to inquire about hiring

16  Kevyn Orr as the emergency manager.  The following day,

17  Mr. Orr calls PA 436 a clear end-run around the prior

18  initiative that was rejected by the voters in November and

19  also comments, "So although the new law, PA 436, provides the

20  thin veneer of a revision, it is essentially a redo of the

21  prior rejected law and appears to merely adopt the conditions

22  necessary for a Chapter 9 filing."

23          THE COURT:  What do those statements appear in?

24          MS. GREEN:  It's Orr Exhibit 4, JDRD0000295.  It's

25  an e-mail.

1        THE COURT:  Right, but what is that?

2        MS. GREEN:  An exhibit.  It's an e-mail.

3        THE COURT:  An e-mail.  Thank you.

4        MS. GREEN:  E-mail.  I'm sorry.  In February of

5   2013, Mayor Bing was approached by Mr. Baird regarding Kevyn

6   Orr as the candidate for the emergency manager position, and

7   Mayor Bing recalls that the only salient qualifications he

8   was offered about Mr. Orr was his bankruptcy experience.  Mr.

9   Baird told him about Kevyn Orr's experience in part of the

10  Chrysler bankruptcy team, and Mr. Orr -- Mayor Bing was

11  asked, "Did you ask Mr. Baird anything else about Mr. Orr's

12  qualifications to serve as emergency financial manager?"  And

13  then he answers, "He -- yes, I did, and he felt that not only

14  was he a lawyer that dealt with bankruptcy for over 30 years,

15  but he also had some qualification as it related to

16  restructuring."  "And did Mr. Baird indicate that Orr had

17  qualifications concerning restructuring outside the context

18  of bankruptcy?"  "That would be no" was his response.

19       In March the governor declared that a local

20  government financial emergency existed in the City of

21  Detroit.  At the end of March, Kevyn Orr was appointed

22  emergency manager of the City of Detroit.  On March 28th PA

23  436 becomes effective, and in April of 2013 Jones Day is

24  engaged as legal counsel for the City of Detroit.

25       After being appointed emergency manager, Kevyn Orr

1  is quoted on May 12th, 2013 -- we've all heard this quote,

2  but I'll say it again -- that the public can comment on the

3  city's financial and operating plan, but we are not, like,

4  negotiating the terms of the plan.

5       The day before presenting its proposal to the

6  creditors, Mr. Orr gives an interview with the Detroit Free

7  Press and expresses his intent to evade the pensions clause

8  through a federal Chapter 9 bankruptcy proceeding, and we

9  have quoted for you the portion of that interview and

10  highlighted it in yellow.  He states, "If you think your

11  state-vested pension rights, either as an employee or

12  retiree -- that's not going to protect you.  If we don't

13  reach an agreement one way or the other, we feel fairly

14  confident that the state federal law, federalism, will trump

15  state law."

16       On June 14th, the emergency manager held a meeting

17  at the Detroit Metropolitan Airport and presented the city's

18  proposal for the creditors.  The evidence will show that the

19  city proposed to fully -- fully intended to impair or

20  diminish accrued financial benefits.  This is an excerpt from

21  the proposal for creditors, and it clearly states that with

22  respect to unfunded pension liabilities, quote, "such

23  contributions will not be made under the plan."  And it

24  further states there must be, quote, "significant cuts in

25  accrued vested pension amounts for both active and currently

1   retired persons."

2          On June 20th, the emergency manager undertook a

3   presentation regarding the city's finances and plan

4   restructuring to both uniform and nonuniformed retirees.

5   Numerous witnesses who attended this meeting, several of

6   which will be testifying at trial, will testify that they did

7   not observe or participate in any negotiations regarding the

8   city's financials and that these meetings were purely

9   informational.

10          On June 27th following this presentation that I just

11  spoke of, the city sends a letter to the UAW thanking them

12  for their time in participating in the meeting, and in that

13  letter even the city acknowledged that the unions would need

14  more information moving forward.  The letter here is quoted,

15  "The city recognizes that representatives of active and

16  retired employees will need access to additional information

17  to analyze the restructuring proposals outlined in the June

18  20 meetings.  Information relevant to these proposals will be

19  made available in the on line data room," but at this time on

20  June 27th, that information, as they were saying, was not yet

21  available.

22          Five days later on July 23rd Gracie Webster and

23  Veronica Thomas commenced lawsuits against the State of

24  Michigan, the governor, and the treasurer seeking a

25  declaratory judgment that PA 436 violated the pensions

1   clause, and they also sought an injunction.

2           In July when several of the creditor meetings took

3   place, the evidence will show that the city had no intention

4   of actually negotiating with its creditors.  By July 8th you

5   will see an e-mail with an attachment of a timeline and a

6   communications roll-out demonstrating that the city had

7   already determined that its Chapter 9 petition was going to

8   be filed on July 19th.  There's a timeline crafted by the

9   State of Michigan that identifies July 19th as a filing date

10  despite the fact that the creditor meetings had not yet

11  occurred.  Therefore, the objecting parties submit that

12  Chapter 9 was already a foregone conclusion before the city

13  met with its creditors on July 10th and 11th.  In fact, here

14  is a copy of that Chapter 9 roll-out, communications roll-out

15  that I spoke of.  In an e-mail from Kevyn Orr's press

16  secretary, Bill Nowling, to certain state officials, he lays

17  out the communications plan.  And if you go down to the

18  yellow portion, it starts with, "We negotiated in good faith

19  with all of Detroit's creditors."  Mind you, several of the

20  meetings had not yet even occurred.  "We presented a

21  comprehensive restructuring plan to creditors in June.  At

22  this point, it would be impractical to continue discussions

23  out of court because it is clear that we will be able to

24  reach agreement with some creditors only through a court-

25  supervised process, and the State of Michigan has authorized

1  the emergency manager to take this step."  This is on July

2  8th.

3        The timeline attached to that communications roll-

4  out on Thursday, July 18th, states that, "Last minute

5  revisions will be made to all the key documents," and on

6  Friday, July 19th, which is in bold and capital letters

7  called "The Filing Day," at nine o'clock the Governor's

8  Office is supposed to transmit the authorization letter to

9  the emergency manager, and at ten o'clock on the 19th the

10 necessary paperwork is supposed to be filed with the court

11 system, and then a series of press conferences are to be

12 held.

13       The following day, on July 9th, an e-mail from

14 Treasurer Dillon to the governor of the State of Michigan

15 states that, "We are still in the informational mode."  This

16 e-mail is interesting for several reasons.  First, it states

17 that Kevyn will meet the Detroit pensions the following day,

18 on July 10th.  It says there will be no exchange of documents

19 and that he will not translate that -- the information that

20 he gives into an impact on retiree or employees' vested

21 rights.  Treasurer Dillon continues and says that there are a

22 lot of creative options that we can explore to address how

23 they will be treated in restructuring with respect to the

24 pensions, but at his deposition when he was -- when he was

25 asked whether these creative options were ever explored

1   directly with the Retirement Systems, Dillon said no.  And

2   it's not up there, but he also was asked if they were ever --

3   these creative options were put into written reports or

4   formal proposals, and he also said, no, they were not.

5        Further in the e-mail he says to the governor,

6   "Tomorrow's meeting could lead to questions directed to you

7   about your view on this topic.  In my view, it's too early in

8   the process to respond to hypothetical questions.  We remain

9   in many ways in the -- at the informational stage."  This was

10  just one week before the filing.  And Mr. Dillon admitted at

11  his deposition that nothing changed between July 9th and the

12  filing date of July 18th that would take them out of this

13  informational stage, as he called it.

14       On July 10th and 11th, there were a series of

15  creditor negotiations -- alleged creditor negotiations that

16  took place.  The emergency manager himself did not even

17  attend, but witnesses who did attend the meeting will testify

18  that they did not observe or participate in any negotiations

19  regarding the city's finances and that, again, these meetings

20  were purely informational.  And this is consistent with the

21  state treasurer's report to the governor that as of July 8th,

22  we are still in the informational mode.  It's also consistent

23  with Mr. Orr's admission at his deposition when he was

24  questioned, "There were no actual negotiations at the June

25  14th meeting, were they?"  And he answers, "No, not as it's

1  generally understood."

2       Lastly, the fact that there were no negotiations on

3  July 10th and 11th is consistent with the city's and the

4  state's communications roll-out, which already adopted the

5  excuse that negotiations were going to be impractical.

6       On July 12th, following those meetings, the Detroit

7  Fire Fighters Association sends a letter to the emergency

8  manager asking for more information and stating, "It would be

9  productive if the city could provide us with its specific

10  proposals on pension benefit restructuring as soon as

11  possible.  We have two meetings with the city where pension

12  benefits were addressed and still have only the city's

13  general observation that pension benefits must be reduced."

14  At trial Mark Diaz, the president of the Detroit Police

15  Officers Association, and Dan McNamara, president of the

16  Detroit Fire Fighters Association, will testify that no

17  specific proposals were ever given by the city after this

18  letter, and instead the city filed bankruptcy just six days

19  later.

20       On July 15th the Webster defendants filed a response

21  brief and a motion for summary disposition.  In that court

22  paper, the state asserted that a bankruptcy filing by the

23  City of Detroit is, quote, "only a possibility that

24  plaintiff's claims were, quote, 'unripe, premature, and based

25  on a speculative threat of future injury.'"  And mind you,

1    this position is taken in open court, which conflicts with
2    the timeline that had already been circulated within the
3    Governor's Office that slated the filing date as just four
4    days later.
5           On July 16th Mr. Orr submitted the bankruptcy
6    recommendation letter to Governor Snyder and Treasurer
7    Dillon.  In that letter he stated that dramatic but necessary
8    benefit modifications must be made.  The governor
9    acknowledged that he read that letter before authorizing the
10   filing and that he knew that the city's request for
11   authorization that dramatic cuts be given would be part of
12   any Chapter 9 process.  He also testified that he knew,
13   quote, "based on the facts going into it, there was a
14   likelihood accrued pension benefits would be reduced in the
15   Chapter 9 case."
16          The next day, the Detroit Public Safety Unions
17   received correspondence from the city thanking them on behalf
18   of the emergency manager for their, quote, "strong
19   cooperation regarding the City of Detroit pension
20   restructuring."  Later that same day, the Retirement Systems
21   filed their lawsuit against the governor and the emergency
22   manager in Ingham County Circuit Court seeking declaratory
23   relief.  That same night at 6:23 p.m. the governor's press
24   secretary, Sara Wurfel, circulates an updated timeline that
25   still shows the bankruptcy filing date of Friday, July 19th.

1  This is July 17th at 6:23 p.m.  The following day, the
2  Retirement Systems filed a motion for a TRO seeking an
3  injunction.  At 3:05 p.m. that afternoon, Margaret Nelson of
4  the Attorney General's Office received a telephone call
5  informing her that Retirement Systems were in court seeking a
6  TRO.  At 3:47 the governor e-mailed his authorization letter
7  to Orr and to Treasurer Dillon, and at 4:06 Orr changes the
8  date on the filing papers from July 18th, crosses out the 19
9  because it was supposed to be filed the 19th, handwrites in
10 an 18 and files the petition one hour and one minute after
11 finding out that the Retirement Systems were in court seeking
12 a TRO, which is inconsistent with the timeline sent at 6:30
13 the night before saying it was going to be on Friday.

14         And at 4:10 p.m. the attorney general appears for
15 the TRO hearing in Ingham County.  This is reflected in the
16 papers filed by the state, the docket history and the hearing
17 transcripts.  Orr later admitted that he was being counseled
18 that it would be, quote, irresponsible not to file the
19 petition sooner rather than later given all the lawsuits that
20 were popping up.

21         On July 19th, the following day, the declaratory
22 judgment was entered against the governor, the treasurer, and
23 the State of Michigan and that declaratory judgment states PA
24 436 is unconstitutional and in violation of Article IX,
25 Section 24, of the Michigan Constitution, and it further

1  states the governor is prohibited from authorizing an

2  emergency manager to proceed under Chapter 9, yet the city

3  filed its Chapter 9 petition despite the fact that each of

4  its advisors uniformly testified at their depositions that

5  the city's financial information was still incomplete as of

6  the filing, and, in fact, today it is still incomplete.

7  Charles Moore, senior managing director at Conway

8  MacKenzie, testified that quote, when he was asked, "Has

9  there been a specification of those level of cuts that the

10  city contends must occur?"  He says, "I mean have you put a

11  dollar amount on it?"  He answers, "No.  Our analysis of this

12  continues.  Right now we still don't know what assets could

13  be available to put toward the pensions.  We still have not

14  had the type of dialogue that we would like to have related

15  to the calculation of the unfunded amount, so because of

16  those two uncertainties, among others, we don't know what

17  cuts, if any, there may need to be."

18  The state treasurer also agreed that as of July 8th,

19  just a week before the filing, "I thought that the situation

20  was not understood enough for the governor to go on record

21  yet because I couldn't even tell him with any degree of

22  confidence what level of funding the pension funds had, so

23  why should he get in the middle of a debate about this?"

24  In addition, as of the petition date -- and I

25  believe the city's witnesses will testify consistent with

1  their depositions -- that to date the city still -- the city

2  still does not know the value of two of its primary assets,

3  including the Water and Sewage Department and the city-owned

4  artwork at the Detroit Institute of Arts.  Because the city

5  still does not know what assets are available to satisfy

6  liabilities, does not know the scope of the liabilities, it

7  is the objecting parties' position that the Chapter 9 filing

8  was premature and not made in good faith.  Thank you.  I

9  believe Mr. Ullman may be following me.

10         THE COURT:  Okay.

11         MS. GREEN:  I apologize.  It's Lynn Brimer.

12         THE COURT:  Okay.  Perhaps we should move that

13  lectern back to center, huh?

14         MS. BRIMER:  I can do that.

15         THE COURT:  Okay.  Thank you.

16         MS. BRIMER:  Is this good, your Honor?

17         THE COURT:  That's great.  Let me just ask will

18  there be other uses of the projector during openings?

19         ATTORNEY:  Yes, your Honor.

20         THE COURT:  Okay.

21                  OPENING STATEMENT

22         MS. BRIMER:  Good morning, your Honor.  And, your

23  Honor, I thank Mr. Bennett for raising the legal issues with

24  respect to the spending provision because it at least makes

25  me more comfortable as to why I thought it's so important we

1  clarify the record on the discovery matters with respect to

2  which law had a spending provision added onto it.

3          THE COURT:  Okay.

4          MS. BRIMER:  So rather than address my opening issue

5  to begin with, would the Court like me to address the legal

6  issues raised by Mr. Bennett, or would you like the legal

7  issue -- I am prepared to briefly discuss those.  I don't

8  have a written preparation, but I do think it's important for

9  the Court to understand I did look at the case that

10  Mr. Bennett cited.  I didn't disregard any case law when

11  coming to this Court and believing that there was a factual

12  issue.

13          With respect to the <u>Michigan United</u> case, I think

14  it's factually distinguishable again.  That case did not

15  involve an original law that did not have a spending

16  provision that was overturned on referendum and then a new

17  law presented.  In that case, your Honor, the issue was

18  whether or not the spending provision itself added in the

19  original law such that it was not subject to referendum was,

20  in fact, an appropriate provision taking it out of the

21  referendum provision.  You know, under -- your Honor, that is

22  not the facts that we have before us today.

23          In addition, your Honor, I have reviewed Justice

24  Corrigan's opinion, which, by the way, was a concurring

25  opinion, not the Court's majority opinion, but she addressed

1  the issue of intent and that, generally speaking, we do not

2  look to the motive or intent of the legislature --

3  legislative body when passing a law, but she said this is

4  because -- and she notes this in a footnote -- this is

5  because, generally speaking, we do not have any testimonial

6  record regarding motive or intent.  That would be, your

7  Honor, in her concurring opinion.  There is no testimonial

8  record in the -- in this original action regarding the motive

9  or intent.  Well, your Honor, that is simply not the case in

10 this matter.  As Ms. Green read to you and as I quoted from

11 the state's own 30(b)(6) witness, we have evidence regarding

12 the motive of the inclusion of the spending provisions on an

13 act that had previously been rejected on referendum.  We

14 believe that factual issue is important to this Court in

15 determining that whether or not some or all of PA 436 should

16 have been subject to the second provision that everyone seems

17 to gloss over in Article II, Section 9, of the Constitution,

18 which states specifically that no law that has properly been

19 submitted to referendum can then -- and rejected can then be

20 passed without a referral back to the general electorate.

21      Your Honor, the cases cited by the state, Ms.

22 Nelson, of Reynolds v. Martin and the case cited this morning

23 just simply are not factually similar enough to PA 436 to be

24 controlling, and we do -- and, you know, my closing -- my

25 opening can be as simple as, your Honor, the evidence will

1    show that the motive of including the spending provisions was

2    to, in fact, take an act that had previously been overturned

3    on referendum and disregard the will of the people, and it's

4    very clear.  The state's attorney argued yesterday that we

5    knew what the people's will was because we have the media.

6    Well, we know what the people's will was.  The people's will

7    was that we not have an emergency manager who would supplant

8    the democratically elected officials in the City of Detroit,

9    and that was very clear, and yet we now have PA 436, which

10   disregarded that, which added a spending provision to it, and

11   the facts will demonstrate that we can establish what the

12   motive was in adding those spending provisions.  And,

13   moreover, we can establish that the emergency manager,

14   Mr. Orr, was fully aware of that at the time he accepted his

15   appointment as the emergency manager.  I'll conclude --

16        THE COURT:  Well, how do you -- how do you deal with

17   Mr. Bennett's argument that if the issue is ever appropriate

18   for court review, it is not appropriate until petition

19   signatures are collected on the bill that has the spending

20   provision in it and the petitions are rejected because it's

21   not the kind of a law that can be subject to a referendum?

22        MS. BRIMER:  Well, certainly I don't think there's

23   any case law that would suggest that the people be required

24   to take an act which on its face would be rejected.  I'm not

25   sure I'm aware of any case law that would suggest that the

1  people had to refer that case -- the law to a referendum and

2  have it denied because of the failure -- or the inclusion of

3  the spending provision.  At issue here, your Honor, is

4  whether or not the act is sufficiently similar enough, not

5  that it had to go back to referendum, but whether it's

6  sufficiently similar enough that the second provision would

7  require that it be deemed to be unconstitutional because it

8  was not presented to the people again.

9         THE COURT:  Okay.  All right.  Let's take our lunch

10  break now.  Before we do, I want to remind everyone that we

11  are guests here in this building, and we need to maintain

12  decorum and silence while we are in the hallways.  Please

13  don't linger in the halls.  You can have your conversations

14  here in the courtroom over lunch if you'd like to do that, or

15  in the elevator or on the 1st floor, but please maintain

16  silence in the hall.  Let's see.  It's noon.  We'll reconvene

17  at 1:30, please, and that's it.

18         THE CLERK:  All rise.  Court is in recess.

19      (Recess at 11:59 a.m., until 1:30 p.m.)

20         THE CLERK:  Court is in session.  Please be seated.

21         THE COURT:  Counsel are present.  We have a couple

22  of housekeeping matters that we need to address before we

23  continue with our opening statements, please.  The first is

24  that in the amended final pretrial order that was submitted

25  through our order processing program, on Attachment G, which

1  is the attachment from the Retirement Systems, the exhibit

2  numbers were omitted.  I'm sure that was inadvertent, so

3  please fix that and resubmit it as soon as possible so that

4  we can get it entered.  Okay?

5         ATTORNEY:  Of course, your Honor.

6         THE COURT:  And then a second brief housekeeping

7  matter is -- is Ms. Green still here?

8         ATTORNEY:  She's not here yet, your Honor.

9         THE COURT:  Okay.  Mr. Gordon, just to keep the

10  record a hundred percent clean, we need to put an exhibit

11  number on a paper version of the slide presentation so that

12  for the record that is identified, whatever exhibit number

13  you want to put on it.

14         MR. GORDON:  All right.  Very well, your Honor.

15         THE COURT:  Okay.

16         MR. IRWIN:  Your Honor, will counsel be provided a

17  copy of that when it's done in that way?

18         THE COURT:  Can you do that?

19         MR. GORDON:  Yes, absolutely.

20         THE COURT:  Okay.  All right.  We are ready to

21  proceed.

22                    OPENING STATEMENT

23         MR. WERTHEIMER:  William Wertheimer, your Honor, on

24  behalf of the Flowers plaintiffs.  I'll be very brief, and I

25  just want to add a couple of points relevant to the timeline

1  that Ms. Green was showing you.  I do not have a clicker, but

2  I'll just state them.

3             THE COURT:  Okay.

4             MR. WERTHEIMER:  That is, first, on July 3rd the

5  Flowers lawsuit was actually filed before the Webster

6  lawsuit.  They were both filed on July 3rd, so they were both

7  filed that day.  Second, on the same day, both Flowers and

8  Webster cases, Judge Aquilina signed orders to show cause

9  setting a hearing for the preliminary injunction that we were

10  seeking for July 22nd so that -- and those were served on the

11  governor and the treasurer on July 3rd so that at the point

12  in time on the timeline a few days later when they're setting

13  the putative bankruptcy for July 19th, Friday, they know that

14  the state court preliminary injunction hearing is being

15  scheduled for July 22nd, the following Monday.  That's it.

16  Thank you.

17             THE COURT:  Okay.

18                    OPENING STATEMENT

19             MS. CECCOTTI:  Good afternoon, your Honor.  Babette

20  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  Ms.

21  Green's timeline was very complete and detailed.  I do want

22  to just -- because I don't think this particular slide was up

23  there, so I would like to mention the pitch book again.  Ms.

24  Green had a slide from the Jones Day pitch book from January

25  20, 2013, and one thing that -- when your Honor goes through

1    the pitch book you'll notice that there are, you know, a

2    few -- quite a few, I would say, or certainly more than one

3    or two references to the use of Chapter 9 either itself or

4    the shadow of Chapter 9 as leverage vis-a-vis creditors, vis-

5    a-vis specific proposals and claims related to labor costs,

6    and I think Ms. Green showed the slide with the quote on

7    there about using Chapter 9 to reduce accrued financial

8    benefits.

9         The other thing that I'd like to mention about the

10   pitch book, which really does become something of a

11   blueprint, I think, for what follows, is at page 57 there's a

12   slide that reads, "Any Chapter 9 process should be

13   comprehensive," and it starts with the bullet, "plans of

14   adjustment address narrow range of economic compromises."

15   And then it talks -- and then there are other bullets that

16   follow, "other fundamental changes must occur outside the

17   plan context," "any Chapter 9 process should pursue as many

18   revitalization initiatives as possible," "negotiating in

19   Chapter 9 or its shadow is a powerful tool for

20   revitalization," and, finally, "the city should take

21   advantage of its opportunity for long-term comprehensive

22   solutions."

23        So that's actually a good segue to June 14th

24   proposal because, as we've talked about before in the other

25   arguments that we've had, this is really a massive

1   comprehensive revitalization proposal that really has

2   elements of more or less what that slide that I just read you

3   is talking about.  It's got -- the plans include a $1.25

4   billion spending program going out over ten years.  There are

5   many detailed wide-ranging initiatives that have to do with

6   improvement of services, upgrades, reinvestment, and the

7   like, and there is also a restructuring proposal.  There's a

8   section called "restructuring proposal."  I don't have to

9   take you through that because we've been through it a number

10  of times.  You know what the pension proposal -- what the

11  pension proposal is, but the point being that the -- just the

12  four corners of the proposal itself, what that reflects in

13  terms of what it is that the city is trying to pursue through

14  Chapter 9.

15          In terms of the events following the launch of that

16  proposal on June 14th, I think that we see a number of

17  things, and the evidence will show this.  As we saw actually

18  from Mr. Bennett's slide, the number of meetings that

19  actually occur on this proposal -- regarding this proposal

20  are relatively few.  It's a limited number of sessions.

21  Regardless of how we're characterizing them, there's at least

22  one document that refers to one of the meetings as

23  informational, in fact.

24          We have the data room issue.  Ms. Green read the

25  letter or showed the letter to the UAW regarding the fact

1   that the data room wasn't quite up and running yet, but what

2   is also true about the data room, as your Honor knows from

3   the early days of this case, is that in order to access the

4   data room, one had to sign a confidentiality agreement and an

5   additional release to get the Milliman pension materials, and

6   my client, at least, took issue with that prior to the

7   bankruptcy, and others may -- other groups may have as well,

8   so you had this quite massive proposal, a series of really a

9   handful of meetings being held with the data that the city

10   was loading into the data room about the proposal not readily

11   available.

12         In addition, as I mentioned, these were not -- there

13   were just a few of these meetings, and I think the evidence

14   will show that they wouldn't really constitute labor

15   negotiations.  The unions, you know, have various ways that

16   they talk about that in the evidence.  They are fairly

17   well -- I guess I'll just use the word "highly organized" or

18   the phrase "high organized" by the city, including one

19   meeting where -- at least one meeting where if there were

20   questions about the proposal, those in attendance were

21   required to submit them on cards, and the cards would be read

22   as opposed to any sort of free flowing give and take that one

23   might associate with a meeting with stakeholders that we

24   might think about in terms of going over a restructuring

25   proposal or even a labor proposal.

1   So now I'd like to get to Mr. Bennett's comments
2   about the UAW because I think this really does -- that this
3   is really a very important point.  Yes, it is true that, as
4   we know, the proposal included the cessation of funding to
5   the Retirement System and the statement about -- the
6   statement that significant cuts to accrued vested pension
7   benefits would be necessary, so, yes, on its -- the UAW's
8   position is, yes, on its face, looking at that on page 109,
9   if that's the right page, that is a proposal that violates
10  the Michigan state Constitution, and the immediate questions
11  that arises on its face just looking at it like that is how
12  could it be accepted.  How could it be accepted by a labor
13  union?  How could it be accepted by anyone purporting to
14  speak for or represent actives or retirees?  So, yes, on its
15  face the proposal was not acceptable, and we believe that
16  that has legal consequences as distinct from fact
17  consequences, so I do want to make that point about the --
18  about our objection -- our amended objection in that regard.
19  We very much believe that that has legal consequences.

20      As a factual matter, however, and notwithstanding
21  the fact that the proposal on its face could not be accepted,
22  you couldn't simply hand it to the union with a signature
23  line and say, "Here, sign," the UAW, through its general
24  counsel, contacted Jones Day on July 9th, and we'll have a
25  witness to this effect, and we have an exhibit on it as well,

1    to raise a couple of points, one regarding the data room and

2    the confidentiality issue that I mentioned already.  Then in

3    response to the letter that Mr. Bennett's chart showed trying

4    to ask the labor organizations and the retiree groups if they

5    would be representing their retirees, the e-mail to Jones Day

6    reads as follows:  "Further to its reservation of rights, the

7    UAW continues to seek an answer from Mr. Orr and your firm as

8    to the following:  Please cite the basis for any claim that

9    the UAW has the authority to compromise the vested benefits

10   of active and/or retired UAW or former UAW members employed

11   or formerly employed by the City of Detroit and its

12   affiliates.  As I presume you know, Article IX, Section 24,

13   of the Michigan Constitution provides in pertinent part that,

14   quote, 'the accrued financial benefits of each pension plan

15   and Retirement System of the state and its political

16   subdivisions shall be a contractual obligation thereof which

17   shall not be diminished or impaired thereby,' unquote.

18   Please tell me what authority your firm and/or Mr. Orr

19   believe gives the UAW the right to compromise vested pension

20   benefits despite the contrary provisions of Article IX,

21   Section 24.  Please tell us -- please also tell us whether

22   Mr. Orr and/or your firm take the position that Article IX,

23   Section 24, of the Michigan Constitution is not or may not be

24   binding on the City of Detroit, the State of Michigan,

25   Governor Snyder, Mr. Orr, or the UAW and state, if that is

1  the case, under what circumstances you believe that Article

2  IX, Section 24, would not bind some or all of these persons

3  or entities.  We also seek the answer to the same question

4  with regard to vested post-retirement insurance benefits,"

5  and then there's a reference to the Supreme Court's decision

6  in the <u>Pittsburgh Plate Glass</u> case.  And the letter makes it

7  clear that, again, from the UAW's perspective, "We do not

8  understand the July 10 and 11 multiple stakeholder meetings

9  to which we have been invited to be a forum for negotiations

10  of your proposed pension and retiree healthcare changes but

11  are willing to attend and obtain for our union whatever

12  information may be provided at those meetings," and then --

13  and, finally, "Your full answers to the questions posed in

14  the foregoing paragraphs of this message will help the UAW

15  determine the scope of any such negotiations and the UAW's

16  decisions regarding its representative capacity in them about

17  which your firm has inquired."  So we very much have a

18  factual case as well as a legal case regarding the

19  implications of the proposal, and I did want to make that

20  clear for the record, the point being that what is in this e-

21  mail represents some fairly fundamental questions about the

22  ground rules upon which discussions or negotiations with the

23  city regarding its proposal can proceed.

24          I should note that -- and we'll have testimony to

25  this effect -- that no answer was forthcoming from the city

1  and, as far as I know, has not been forthcoming regarding the

2  questions posed other than obviously when we got into

3  bankruptcy, your Honor solved the problem of the data room.

4          Time frame.  Putting aside the lawsuits and all of

5  the activity surrounding all of that, it does appear that the

6  city set out a timeline for itself that only had about a 30-

7  day period for this launch notwithstanding everything that's

8  in that proposal and everything that was expected apparently

9  to be accomplished by it.  I think I heard Mr. Bennett refer

10  to something like evaluation week, which was supposed to

11  occur on or which probably did occur -- I gather it did occur

12  on July 15th.  That's really a month later.  So one -- now,

13  Mr. Bennett's timeline, of course, goes way back -- I think

14  it was to 2011 and the various initiatives to deal with

15  Detroit's problems, and we are certainly not denying any of

16  those or -- and I'm sure everyone is fully cognizant of --

17  particularly those who live here are fully cognizant of all

18  of those efforts, but we think, as a legal matter, that those

19  efforts really don't legally count.  They obviously count to

20  the citizens of Detroit, but for purposes of eligibility, the

21  relevant time frame, from our perspective, is the proposal is

22  launched on June 14th and then apparently evaluated -- the

23  response or reaction apparently evaluated merely -- a mere

24  four weeks later.

25          So during this time, again, the evidence, we

1  believe, will show that during the same sort of compressed

2  time period, we know that the governor and the emergency

3  manager are meeting on a fairly regular basis.  We know that

4  the governor had seen the June 14th proposal.  He had a draft

5  of it before it was launched.  He knew about the pension

6  proposal.  He knew that there was an issue -- a legal issue

7  with respect to Article IX, Section 24, of the Michigan

8  Constitution and the effect, if any, of the Bankruptcy Code

9  and federal law on the continued enforcement of that section.

10 He knew it was a serious issue.

11       We know, again, since we've discussed it most

12 recently last week at the argument that we then march through

13 the timeline to get to Mr. Orr's July 16th request and the

14 governor's July 18th response.  We know that the governor

15 obviously from the dates signed it only two days later

16 apparently with a review of all of the material that was

17 contained in Mr. Orr's letter, I think could probably best be

18 characterized as limited.  It does not appear that there was

19 an independent evaluation that the governor conducted

20 regarding many of the sort of predicate items that Mr. Orr

21 laid out in his letter.  The governor was also aware, as we

22 know from the slides that Ms. Green showed, that the pension

23 numbers were very much still up in the air and in question.

24 Nevertheless, both the July 16th and the July 8th -- the July

25 16th letter from Mr. Orr and the July 18th approval letter

1  from the governor lay out the -- what I will characterize as

2  the shift in spending priorities.  This is the part of the

3  proposal that relates to revitalization, and we know that the

4  governor in his letter approves of the manner in which

5  Mr. Orr has proposed to proceed in that regard, and so he

6  signs the letter, and, of course, the bankruptcy petition is

7  filed on the 18th.

8          So what all of this adds up to we think at the end

9  of the day in terms of the legal cases -- in terms of our

10 legal objections is a fairly deliberate plan to use Chapter

11 9.  We think that really knitting -- connecting all of the

12 dots here, that the plan was to use Chapter 9.  We've saved

13 for another day all of the legal issues associated with that,

14 the state's authorization.  There's really -- well, we won't

15 get into those because we'll have closing, and we've had --

16 and we'll have other briefs on all of that, but the sort of

17 deliberate plan, which starts whenever you'd like to start it

18 on the timeline but certainly from the governor's appointment

19 of Mr. Orr leaving his -- leaving the Jones Day firm, the

20 Jones Day retention by the city, this really several month

21 timeline leading from the end of March to the middle of July,

22 we believe the evidence establishes this as a deliberate plan

23 to use Chapter 9 to, in effect, find a way to undermine the

24 Michigan state Constitution through the use of bankruptcy.

25 We believe that that is evidence of a lack of bad faith under

1   921(c), a lack of bad faith in connection with --

2           THE COURT:  You mean a lack of good faith?

3           MS. CECCOTTI:  I'm sorry.  A lack of -- yes.

4   Apologies, your Honor.  Not enough sleep, once again, I'm

5   afraid.

6           THE COURT:  Okay.

7           MS. CECCOTTI:  Now I'm afraid to open my mouth.  No

8   good faith --

9           THE COURT:  I'll help you.

10          MS. CECCOTTI:  Yes.  All right.

11          THE COURT:  I'll help you.

12          MS. CECCOTTI:  No good faith, a lack of good faith

13  negotiations under 109(c)(5), and not a valid plan of

14  adjustment for Chapter 9 purposes.  Thank you.

15                      OPENING STATEMENT

16          MS. PATEK:  Good afternoon, your Honor.  Barbara

17  Patek again on behalf of the Detroit Fire Fighters

18  Association, the Detroit Police Officers Association, the

19  Detroit Police Lieutenants & Sergeants Association, and the

20  Detroit Police Command Officers Association, who have been

21  collectively referred to in these proceedings as the Detroit

22  Public Safety Unions or the Public Safety Unions.

23          As the evidence in this case will show, the public

24  safety unions are the recognized collective bargaining

25  representatives of the nearly 3,200 men and women employed by

1    the Detroit Fire Department and the Detroit Police

2    Department.  I'm sure we'll hear from Chief Craig either

3    today, tomorrow, or sometime this week about the very

4    daunting and difficult conditions in which they work to

5    provide -- excuse me -- police and fire services to -- that

6    are so essential to the survival and the revival of the City

7    of Detroit.

8            The public safety unions piece of this in terms of

9    the evidence is a small but important part of the timeline

10   that was gone over this morning by Ms. Green and also by

11   Mr. Bennett.  First, I think I want to say at the outset that

12   the public safety unions have never in these proceedings

13   disputed that the city was in severe financial distress

14   beginning in the time period where I believe both Mr. Bennett

15   and Ms. Green's timelines began.  The public safety unions do

16   not, however, believe that the city can meet its burden of

17   showing that it is eligible for these Chapter 9 proceedings

18   because of the issue of the good faith negotiations, what we

19   believe was a -- as Ms. Ceccotti referred to, a deliberate

20   effort to sort of create a record of impracticality where

21   they set themselves up for failure, and we also believe that

22   the evidence will show, based upon the same set of facts,

23   that the petition was not filed in good faith as required by

24   Section 921(c).

25           While we acknowledge the legal nature of the

1   constitutional questions that this Court must wrestle with,

2   we also believe that the evidence that this Court will hear

3   in this eligibility trial may help inform those decisions by

4   providing the Court with a practical and very real platform

5   in which those questions can be applied.

6           Because the public safety unions will rely on and

7   adopt certain proofs submitted by the other objectors, I'm

8   going to try to avoid repeating what was said this morning,

9   but I do want to briefly address where our proofs will fit in

10  the chronology the Retirement Systems put up this morning.

11  And for ease of the Court's reference -- and I apologize in

12  advance.  This will also have to be marked, and we'll get a

13  paper copy, and I believe --

14          THE COURT:  Okay.

15          MS. PATEK:  -- it'll be Exhibit 720.  Our facts --

16          THE COURT:  And I'll have to ask you to understand

17  that I'm going to be looking at what's there on this little

18  screen here just because it's easier for me.  It's not that

19  I'm not paying attention to you.  I'm looking at it here.

20          MS. PATEK:  That's okay.  That's okay.  The public

21  safety unions' piece of it are in red, and the portions in

22  black are portions from Ms. Green's timeline, and we did that

23  so the Court could see where they fit in.  And we start in

24  December of 2011 and January of 2012, but before we start

25  talking about that time period, I do want to take a moment

1  because I think it's important to this negotiations issue,

2  and I think it's also important to some of the state labor

3  law issues that inform how we ended up in Chapter 9 to take

4  the Court back about 44 years ago.  In the fall of 1969,

5  again, not long after the city had been through some very,

6  very trying times, then Governor Milliken, a Republican

7  governor, signed into law an act found beginning at MCL

8  423.231 that has become -- come to be known as Act 312.  Act

9  312 is, as the Court may be aware, the platform on which

10  public safety unions negotiate their labor agreements under

11  the auspices of the Michigan Employment Relations Commission.

12  Before the emergency manager, terms and conditions of

13  employment were negotiated pursuant to this process.  That

14  process, which will be described by one of our witnesses, the

15  Detroit Police Command Officers' labor attorney, Mary Ellen

16  Gurewitz, is designed to provide for a period of mediation

17  followed by, if the mediation fails, compulsory arbitration,

18  including the opportunity to send the parties back to

19  mediation, and it's designed to be expeditious and to keep

20  labor peace and, if might say, might be a tool that if it

21  could be applied to everybody in this proceedings, some of

22  the mediators working so hard to try to resolve our

23  differences might find useful.  Ms. Gurewitz will explain

24  much better than I can the mechanics of the Act 312 process

25  and also her experience in negotiating with the city and the

1    DPCOA in the relevant time period.

2            We start with 2011 and two thousand -- December 2011

3    and January of 2012, and I believe that was also on

4    Mr. Bennett's initial timeline.  Interestingly, at that time,

5    there were negotiations between the city, recognizing the

6    financial difficulties that were present, and each of the

7    Detroit public safety unions of concessionary agreements or

8    tentative agreements.  These agreements were never adopted,

9    but our purpose in offering them is to show that where

10   there's a will, it could be done.  Our intention is not to

11   suggest in this setting that such negotiations would be easy,

12   and that's precisely taking up on Ms. Ceccotti's point why

13   that 30-day period that the city gave itself was doomed to

14   fail.

15           During the same time period as the various acts were

16   being repealed and reenacted and shortly after the governor

17   signed PA 436 into effect, Mark Diaz, the president of the

18   Detroit Police Officers Association, will tell the Court that

19   pursuant to Act 312 proceeding, there was an award that

20   became the contract for the Police Officers Association

21   through June of 2014.  This is important because, as I'm

22   going to talk about continuing along this timeline to the

23   period after the appointment of the emergency manager, which

24   takes us to our second slide, there were acts that the city

25   took to specifically remove this tool from the tool kit of

1 the city and its labor unions, and I'm not suggesting that

2 that removal was not perhaps authorized, although the unions

3 dispute that as a matter of labor law under Public Act 436,

4 but I think that it's important to suggest that in light of

5 the concept that there was a plan and design going back a

6 long way, it was no accident that, you know, the city filed

7 an emergency motion on April 18th of 2013, and on June 14th,

8 2013, the very same day it rolled out its proposal, it

9 obtained an opinion from MERC blocking the Police Lieutenants

10 & Sergeants Association, the Police Command Officers

11 Association, and the fire fighters from resorting to Act 312

12 arbitration finding that Public Act 436 had divested MERC of

13 jurisdiction to address those disputes.  And that becomes

14 important because if you consider that there's a plan on June

15 30th, 2013, the collective bargaining agreements between the

16 city, the DFFA, and the DPLSA all expired just two and a half

17 weeks before the Chapter 9 petition was filed.

18         The president of the Fire Fighters Association, Dan

19 McNamara, the president of the Lieutenants & Sergeants, Mark

20 Young, and the president of the DPOA, Mr. Diaz, as previously

21 referred to, will each tell the Court that very quickly after

22 the emergency manager's appointment on March 28th, they were

23 each informed by the city that it was exercising its right

24 under Public Act 436 not to bargain.  I know we've heard

25 through some of the testimony that that was done to somehow

1    not waive their rights not to bargain, but the Court will

2    have to consider whether it accepts that as a credible

3    explanation for what happened next.

4            Following the June 14th presentation, again, as

5    Ms. Ceccotti referred to, things moved very quickly.  There

6    was a presentation by the city the week of July 10th, and on

7    July 12th -- and it was up on the screen earlier today in Ms.

8    Green's presentation, and I believe it is in the record as

9    Exhibit -- give you the right number here -- I'm not seeing

10   it, but it's a letter from each of the presidents of each of

11   the Detroit public safety unions addressed to Jones Day

12   indicating in response that they were, in fact, interested in

13   making a counter-proposal.  They were seeking more

14   information and a concrete proposal from the city in that

15   regard.  Four days later, on June -- or July 16th, the

16   governor -- or I'm sorry -- Mr. Orr sent his letter to the

17   governor seeking authorization.  The following day Jones Day

18   sent correspondence back to the four public safety unions

19   thanking them on behalf of the emergency manager for their

20   strong cooperation in the City of Detroit's pension

21   restructuring efforts.  The next day the petition was filed.

22           Your Honor, we believe that when the Court has heard

23   all the evidence, that it will be difficult for the Court not

24   to conclude that in this case that there was, in fact, a

25   calculated effort by the city going back over an extended

1　period of time to use Chapter 9 to both, in Mr. Orr's words,

2　trump that constitutional provision but also, as suggested in

3　some of the arguments last week, to obtain the political

4　cover that would be provided by this Court to do so.  That's

5　all I have to say.

6　　　　　THE COURT:  Thank you.

7　　　　　MS. PATEK:  Thank you very much.

8　　　　　　　　　OPENING STATEMENT

9　　　　　MR. MORRIS:  Good afternoon, your Honor.  Thomas

10　Morris of Silverman & Morris on behalf of the Retiree

11　Association parties.  Your Honor, the Court heard a

12　comprehensive opening statement from the Retirement Systems

13　and opening statements from other opponents of the city's

14　eligibility.  Those statements chronicle the voluminous

15　evidence weighing against eligibility.  In our pretrial

16　brief, we focused on the evidence which we will offer through

17　Shirley Lightsey, president of the DRCEA -- that's the

18　Detroit Retired City Employees Association -- and Donald

19　Taylor, the president of the RDPFFA.  That's the Retired

20　Detroit Police & Fire Fighters Association.  My opening

21　statement will, likewise, address that evidence.

22　　　　　Mr. Taylor and Ms. Lightsey will testify that their

23　associations have a long and active history.  They're not

24　organizations which came into being just to respond to the

25　present situation, but they are and were prepared to deal

1    with it.  The police and fire fighters have had a retiree
2    association since 1946.  The DRCEA was formed in 1960.  The
3    elected leadership of these associations includes persons
4    who, had they been working for the city, would be the ones
5    responsible for helping resolve the city's problems.  Members
6    and management of the associations include a past chief of
7    police, a deputy chief, city budget director, personnel
8    managers, a Retirement Systems trustee, and city financial
9    and legal staff.  These are people who were leaders during
10   their active service for the city, and they continue to be
11   leaders for the retirees.

12          More than 12,000 retired nonuniform city employees
13   are members of the DRCEA, and more than 8,000 retired Detroit
14   police officers and fire fighters are members of their
15   organization.  Both of these organizations serve city
16   retirees in a number of ways, but they have particular
17   expertise in the pension and benefits areas.  Although the
18   associations do not have the power of a governmental body to
19   enter into agreements that bind their members, the elected
20   leadership is responsible to the membership and responsive to
21   the membership.  They communicate with the retirees.  The
22   associations go beyond service to their members.  Together
23   they represent the class of retired Detroit employees, all
24   Detroit retirees, not just the members who send in their
25   dues.  The associations have appeared before City Council.

1    They have lobbied the state legislature.  They have been

2    party to the lawsuits involving pension and benefit issues.

3    The evidence will show that the associations are the natural

4    representatives of the retirees capable of negotiating on

5    their behalf.

6           Upon the emergency manager's appointment, each of

7    the associations contacted the emergency manager in writing,

8    sent him a letter.  Mr. Orr did not respond to the letters,

9    but he did invite the association -- associations to

10   informational sessions which they conducted, the city

11   conducted, in April, June, and July.  Both Ms. Lightsey and

12   Mr. Taylor attended those meetings.

13          The evidence will show that the city in its meetings

14   never got beyond the first step of presenting information.

15   The city never offered to meet with the retirees to discuss

16   the city's proposal or to negotiate.  The retiree

17   representatives were relegated to being members of the large

18   audience.  The associations had their attorney contact the

19   city's attorneys, Jones Day, to request the opportunity to

20   specifically address retiree issues, but nothing came of

21   that.  Instead, on July 18, in a tactical rush, the city

22   filed its petition.

23          The evidence will show that negotiations with the

24   retirees was possible.  The membership of the associations is

25   more than a majority of the retirees.  Overall it's

1    considerably more than two-thirds.  By working with the

2    membership, the city had the opportunity to make an agreement

3    with a majority of the retirees and thereby satisfy Section

4    109(c)(5)(A) either by not impairing the class or by reaching

5    an agreement.

6         The evidence will show that negotiation was not

7    impracticable, certainly not with the retirees who, prior to

8    the appointment of the emergency manager, had already elected

9    their leaders.  The retirees had built and maintained through

10   the work of generations of dedicated volunteers organizations

11   which were prepared to work on behalf of the retirees for the

12   best outcome of Detroit -- for Detroit.  The evidence will

13   show that the emergency manager and his advisors rejected the

14   opportunity to attempt to resolve matters as to the retirees.

15   The city, therefore, does not satisfy the eligibility

16   requirements of Section 109(c)(5).  Thank you.

17        THE COURT:  Thank you.

18             OPENING STATEMENT

19        MS. LEVINE:  Good afternoon, your Honor.  Sharon

20   Levine, Lowenstein Sandler, for AFSCME.  Very briefly and not

21   to be repetitive, with regard to solvency, the city addressed

22   AFSCME's brief with regard to our request that there should

23   actually be expert testimony in order to meet the burden of

24   proof with regard to this issue, and the city's response is

25   basically what we've seen in some smaller debtor cases, which

1    is the debtor can testify to its own numbers.  And we're not
2    necessarily disputing that line of cases.  What we're saying
3    here, Judge, is that this is not the debtor that's testifying
4    to its own numbers.  We don't have anybody from the budget
5    department.  We don't have any of the elected officials.
6    What we have are hired experts who are being offered as fact
7    witnesses, so we're bringing in experts like Ernst & Young,
8    Conway MacKenzie, Miller Buckfire, being paid millions of
9    dollars, who routinely appear as expert witnesses and, for
10   reasons that we submit are not appropriate here, are just
11   simply being offered without having to give their expert
12   testimony with regard to solvency.

13          With regard to impracticality and the issue of good
14   faith, we would respectfully submit that the argument that
15   there are simply too many classes of bondholders doesn't make
16   a lot of sense.  The June 14 date that the proposal was
17   presented and the filing date of July 18th was only one month
18   and three days.  Even if we went by the city's own originally
19   projected timeline, the filing date was projected to be July
20   19th.  That's only one month and four days.  It takes more
21   months than that to negotiate out-of-court workouts in simple
22   small single level of debt Chapter 11 cases.  We respectfully
23   submit that the timeline that the city set for itself was a
24   timeline that was designed not to allow an out-of-court
25   negotiation to fully take place.

1          The city also looks to the fact that there are too

2     many bondholders and, therefore, it was impractical to

3     negotiate with bondholders, and they cited to a New York

4     case.  The only New York case we were able to find that

5     addressed the issue was the Off-Track Betting case, which

6     dealt with a six-month period before that case, which wasn't

7     even an entire city, said that there wasn't enough -- there

8     wasn't an ability to get it done out of court, and they had

9     run out of time.

10          The other issue there is too many bondholders means

11    that you've met the impracticality standard means that what

12    you're doing is you're writing the need to respond to labor

13    out of the Code.  If you have too many bondholders, it's

14    impractical, and, therefore, you don't even have to go

15    further.  We would respectfully submit that that would be a

16    sad day for Detroit if we're actually writing the need to

17    negotiate with labor out of the Code.

18          The June 14 meeting is the meeting where the

19    proposal was presented.  We've heard the city say that at

20    that meeting, they invited questions.  Okay.  So we have a

21    meeting that lasts a couple of hours.  We have a proposal

22    that's in excess of 110 pages.  The amount of time it takes

23    to even read the slides takes up the lion's share of that

24    meeting, and in addition to that, the questions which were

25    permitted were in a very controlled environment and under the

1  guise that the city was, quote, unquote, begging for

2  feedback.  All right.  The city announced at that meeting

3  that these are not negotiations.  Now, whether that

4  announcement was made to preserve a technical reservation of

5  rights under PA 436, they invited a room full of labor

6  negotiators, and they held a meeting that was basically a

7  classroom type instruction meeting, and then they announced

8  after a brief Q&A period these are not negotiations.  And

9  somehow or other this room full of labor negotiators was

10  supposed to understand that, well, while they're not

11  technically legally negotiations per PA 436, we really are

12  asking for negotiations to meet the good faith requirement

13  under the Bankruptcy Code.  That's not a -- that's not a

14  realistic or fair interpretation of the facts here coupled

15  with the fact that we have sophisticated bankruptcy counsel

16  and all of these sophisticated outside consultants who

17  apparently, when receiving a letter from these same labor

18  negotiators that assert in response to the June 14 proposal,

19  well, we have factual and legal reasons why we think we can't

20  negotiate with you, that causes them to immediately think

21  negotiations are impossible.  That's not an -- that's not a

22  fair reaction either.  I've never walked into a labor

23  negotiation where the company said to the union, "Here's your

24  1113 proposal.  What do you think?" and the union has said,

25  "Oh, good idea."  It takes a little bit more than that, your

1    Honor.  In addition to that --

2          THE COURT:  Well, you raise an interesting point

3    here that has been on my mind, and that is the extent to

4    which the standard of good faith negotiation in 1113 is

5    related to or overlaps with the standard of good faith

6    negotiation in Section 109 or even, for that matter, the

7    extent to which it overlaps with whatever the law of good

8    faith negotiation is in labor law outside of bankruptcy.  I

9    think it would help me if anyone would be interested in

10   briefing that subject.  I'm not surprised.  And there are

11   really two distinct questions there.  The one is is there

12   this overlap, should there be this overlap, and, second, how

13   might the law in those other circumstances, 1113 and labor

14   law more generally, help to resolve the issue here of whether

15   there was good faith negotiation.

16         MS. CECCOTTI:  Your Honor, may we join with that

17   effort as well?

18         THE COURT:  Yes.  The invitation is an open

19   invitation.

20         MS. LEVINE:  Thank you, your Honor.  We accept the

21   invitation, and if your Honor sets a deadline by which you'd

22   like that brief, we will --

23         THE COURT:  Oh, a deadline.  I don't know.  What's

24   convenient for you all?

25         MS. CECCOTTI:  After the 30th.

1          MS. LEVINE:  Busy this week.

2          THE COURT:  Got that.

3          MS. LEVINE:  Two weeks?  Is that sufficient, or is

4   that too long?

5          THE COURT:  Two weeks is fine with me.

6          MS. LEVINE:  Thank you, your Honor.

7          THE COURT:  All right.  Two weeks from today then.

8   I'll enter an order just so the record has it there.

9          MS. LEVINE:  Your Honor, but moving past that, okay,

10  so we have the -- we have the city saying that these are not

11  negotiations and labor negotiators are supposed to glean that

12  they are negotiations, and then we have labor negotiators

13  taking a hard line at the initial proposal and the city

14  accepting that then there can't be any negotiation and

15  somehow or other this proves that the city acted in good

16  faith or that the negotiations were impractical.  We

17  respectfully submit that's false.  And not only is it false,

18  but for the reasons that you've heard from some of the other

19  folks already, we, too, sent requests to the city for

20  additional information to understand what the ask was, what

21  the savings -- what the proposed savings were, and for better

22  information to understand, while it was a long slideshow, a

23  little bit more about what the assumptions behind the

24  proposal or the alleged proposal were so that we could, in

25  fact, like in an 1113 context, truly engage in a meaningful

1   negotiation. And AFSCME itself, your Honor, just a mere 18

2   months prior to the bankruptcy filing, on behalf of itself

3   and with a coalition of 30 unions, did agree to a tentative

4   agreement which resulted in substantial savings for active

5   and retirees' benefits, and those were ratified by all of

6   those respective unions but not implemented by the city. So

7   I'd respectfully submit that not only was there an ability to

8   negotiate in good faith over a period of just a couple of

9   months, but there's a proven track record that on this side

10   of the table, we have been able to actually do those

11   negotiations and accomplish results, so if --

12          THE COURT: Why not implemented?

13          MS. LEVINE: You'd have to ask the city and the

14   state, your Honor.

15          THE COURT: Okay.

16          MS. LEVINE: It does remain a mystery to us because

17   it also included, for example, changes to the pension

18   benefits on a go-forward basis, and to the extent that there

19   are other or different issues that they needed to address

20   now, those, too, should have been addressed through

21   negotiations. What we seem to be hearing and what is also a

22   very important point for the City of Detroit and for Chapter

23   9 on a go-forward basis is that if you have legacy

24   liabilities and you have to deal with retiree benefits, then

25   you automatically get to say it's impractical, and I don't

1  have to show good faith at all.  And we would respectfully

2  submit that that would be a very sad place for the City of

3  Detroit to take Chapter 9 and all cases on a go-forward

4  basis.

5       We respectfully submit, your Honor, that the city

6  can't meet its burden of proof and that it's not eligible in

7  this case at this time to be a Chapter 9 debtor.  Thank you.

8       THE COURT:  Thank you.

9                 OPENING STATEMENT

10      MR. ULLMAN:  Good afternoon, your Honor.  Anthony

11  Ullman from Dentons.  I'll be speaking for the Retiree

12  Committee.  But first Ms. Patek asked me to tell you that

13  Exhibit 704 was the number of the joint public union --

14  safety union's letter that she couldn't find previously --

15      THE COURT:  Okay.

16      MR. ULLMAN:  -- so I've done that.  Your Honor, of

17  course, we're here today on what the Court has identified as

18  factual issues which arise in the context of eligibility,

19  which the city has the burden of proof on.  And you've heard

20  an overview of a lot of the evidence that the objectors

21  expect to bring to the hearing, much of it in chronological

22  order.  And what I'm going to try to do is put that in the

23  framework of the legal issues that relate to eligibility and

24  try to explain how the evidence that we expect to come out at

25  the hearing fits in with those legal issues.  I'm going to be

1    focusing, of course, on the issues that the Retiree Committee

2    is advancing, which I think are common to most, if not all,

3    of the objectors.

4          Now, it's the committee -- it's the committee's

5    contention and the contention of the objectors in general

6    that the city has failed to meet its burden of proof on a

7    number of specific elements that it has to meet to be

8    eligible for Chapter 9 and that it also has failed to meet

9    its burden of showing that its filing has been made in good

10   faith, and so what I'd like to do is kind of go through those

11   elements serially and put into context our view of how the

12   evidence falls into that and how the evidence should shape

13   your view of the law and application of the law, and

14   basically our points are as follows.

15         The committee itself, of course, doesn't contest

16   that Detroit is a municipality, and the committee is not

17   contesting insolvency, although AFSCME, of course, is, but we

18   do contest that other necessary elements have been met.  I

19   mean specifically it's our contention that the city can't

20   show that the emergency manager, first of all, was

21   specifically authorized to make this Chapter 9 filing.  We

22   also contend that the city has failed to meet the eligibility

23   criteria that are set out in 109(c)(5), and there are, of

24   course, two prongs of that.  We say the city has not shown

25   that it negotiated in good faith, which was required under

1  Subprong (c)(5)(B).  And we say the city can't show that the

2  good faith negotiations were impracticable, which is a prong

3  under Sub (c)(5)(C), and, finally, the committee says that

4  the city cannot show that it filed its petition in good

5  faith, which is required under 921(c).

6           So taking that from the top, this is, first of all,

7  what Section 109(c)(2) requires, and it requires specifically

8  that the city be specifically authorized or the person acting

9  for the city be specifically authorized to be a debtor under

10  state law, and we don't think the city can show this as a

11  factual matter because in filing the Chapter 9 petition, the

12  emergency manager did so with the specific intent of taking

13  actions and achieving results that are prohibited by the

14  Michigan state Constitution, namely the pension clause,

15  Article IX, Section 24.  And we believe that that renders the

16  filing ultra vires, ineffective, and void, and this point

17  also obviously ties in with the view that in filing the

18  Chapter 9 petition, the emergency manager didn't act in good

19  faith under Section 921(c), so what I'm going to do is review

20  the evidence on the intent in filing, particularly relative

21  to the pension clause, for both purposes of the specific

22  authorization and good faith under 921(c) together.

23           Now, as the Court may recall, there's also another

24  aspect that we've raised with respect to Section 921(c) and

25  good faith, and that is what we contend are the misleading

1   statements and omissions that were made in connection with

2   the Chapter 9 filing, and I'll deal with those later in the

3   presentation.

4        So turning now to the emergency manager's intentions

5   as regards the pension clause, we think that the evidence is

6   very clear, and I'll summarize some of the key points.  First

7   of all, we know that Mr. Orr was made the emergency manager

8   under PA 436, and that, of course, as you've heard, was the

9   replacement law for PA 4, the prior emergency manager law

10  which had given the emergency manager very broad powers and

11  then was repealed by voter referendum, and PA 436 was passed

12  in its place.  And as we know, it was passed with a minor

13  appropriation provision, and we believe that the evidence

14  will show that that was intended to immunize the law from

15  Michigan voter review and, in fact, was a strategy that had

16  been devised and suggested by the Jones Day law firm itself.

17       Now, PA 436 was enacted in November 2002 with an

18  effective date of March 2013, and it was against this

19  background that the emergency manager, Mr. Orr, was selected

20  for his post.  Now, Kevyn Orr we know is a bankruptcy lawyer

21  by trade.  That, of course, in and of itself, doesn't prove

22  anything, but the evidence will show that before becoming the

23  emergency manager, he was a bankruptcy lawyer at Jones Day,

24  and, as I believe the Court has heard, he participated in the

25  pitch that Jones Day made to the city and to the state to get

1    its current assignment as restructuring counsel.

2         Now, we've already seen from Ms. Green's

3    presentation that prior to the pitch that Jones Day made,

4    which was in late January 2013, Mr. Orr was specifically

5    asked about the availability and use of Chapter 9

6    specifically relative to the City of Detroit, and the

7    evidence will show that in connection with that pitch, the

8    Jones Day team was not only focused on Chapter 9 but was also

9    specifically aware of the Michigan state pension clause and

10   had already thought of using Chapter 9 as a means to try to

11   get around it.

12        Now, this is the cover of the Jones Day pitch book,

13   and here's a slide from it which we're blowing up, and what

14   it says specifically is that if needed, Chapter 9 could be

15   used as a means to further cut back or compromise, quote,

16   "accrued financial benefits," close quote, otherwise

17   protected under the Michigan Constitution.  And that

18   quotation, "accrued financial benefits," I believe, are words

19   that are lifted right out of the pension clause itself.  So

20   this is from the pitch book that Jones Day prepared, and, as

21   we've said, Mr. Orr himself was a major player and part of

22   the pitch book -- the Jones Day pitch team.

23        And the evidence further is that from his own review

24   of the circumstances of PA 436 and PA 4, Mr. Orr concluded

25   that the new law, PA 436, in reality, was nothing more than a

1    thin veneer -- those are Mr. Orr's words -- a thin veneer of

2    a revision that's essentially a redo of the prior PA 4 that

3    the voters had rejected and an end-run around the voter

4    rejection.  This is from an e-mail that Mr. Orr wrote, and I

5    believe -- it's a little hard to read because we didn't blow

6    that top part up, but I believe it's January 31 of 2013.  And

7    this is from one of the exhibits that was gone over with

8    Mr. Orr in his deposition.

9         Now, central to the issue of bad faith and

10   authorization is the Michigan Constitution's pension clause.

11   I'll just put a copy of that up on the screen.  And as we

12   see, the same word, the financial -- accrued financial

13   benefits, the same words that appeared in the Jones Day pitch

14   book, are right there in the Constitution.

15        Now, the evidence will show that Mr. Orr was

16   personally aware of the pension clause, and the evidence will

17   also show that when he became the emergency manager, Mr. Orr

18   took an oath requiring him to uphold the pension clause --

19   the state Constitution, of which the pension clause is part.

20   And this is from Mr. Orr's testimony where he acknowledged

21   that, yes, he took the oath of office, and he solemnly swore

22   to support the Constitution of the United States and the

23   Constitution of this state; that is, of the State of

24   Michigan.  But the evidence will show that instead of

25   adhering to the strictures of the pension clause, Mr. Orr

1   decided, contrary to his sworn oath, to engage in a course of

2   action that was deliberately designed to thwart it through

3   the vehicle of a Chapter 9 filing, and what I'm going to go

4   through now are some highlights of what I think the evidence

5   will show, some of which you've seen before, some of which

6   you may not have.

7          Now, the evidence will show that as early as May

8   2013, which was less than two months after he became the

9   emergency manager, Mr. Orr made the decision to cut pension

10  benefits that were owed to -- excuse me -- to retirees, and

11  it will show that he understood that he was unable to

12  identify any viable way to achieve that end just under state

13  law.  And the evidence will show that the emergency manager,

14  therefore, decided to try to accomplish that end through the

15  means of a Chapter 9 filing.  And even more specifically, the

16  evidence will show that the emergency manager decided to try

17  to use Chapter 9, the Chapter 9 filing, as a vehicle

18  specifically to, quote, "trump" the pension clause of the

19  Michigan Constitution.

20         Now, this all came together in the proposal to

21  creditors that the emergency manager made on June 14th of

22  2013, and in his proposal the emergency manager made no

23  pretense that he was intending to protect accrued financial

24  benefits as is required and provided for in the Michigan

25  Constitution.  For example, here's an excerpt from page 109

1   where he specifically says that under this proposal, there

2   must be significant cuts in accrued vested pension amounts

3   for both active and currently retired persons.

4         And under this June 14th proposal, the emergency

5   manager, in fact, said that the city would not make any

6   further pension contributions on account of retirees.  For

7   retirees the defined pension benefits were to be cut entirely

8   from the forecast of the city's expenses going forward as

9   were the retiree healthcare benefits.  And for active

10  employees, they were being shown as switched from a defined

11  benefit plan to a defined contribution plan with the level of

12  the city's funding of the contributions slashed dramatically

13  from the present levels.  Now, for the actives, this is a new

14  plan, and the contributions are being made only on a going-

15  forward basis, so for the active employees' vested pensions

16  under this proposal, no further contributions would be made

17  for those either.

18        Now, the June 14 proposal, although it was very

19  lengthy, well over a hundred pages, didn't mention anywhere

20  in it the prospect or even the potentiality of a Chapter 9

21  filing, but the evidence will show very clearly that the

22  emergency manager understood that his proposal could not be

23  implemented outside of the context of Chapter 9 specifically

24  because of the pension clause and that he, therefore,

25  intended to use Chapter 9 as a vehicle to, again, in his

1    words, trump that very clause, the Constitution's pension

2    clause.  And he's freely admitted that it's the state

3    Constitution -- the pension clause and no other provision of

4    the Michigan Constitution that the emergency manager was

5    trying to trump.  This is an excerpt from his deposition.  I

6    think you may have seen parts of this before, but he says --

7    he goes on to say that -- he answers, "We don't believe

8    there's an obligation under the state Constitution to pay

9    pensions."  He says, "Yes, that's right."  He says, "No.

10   I've made that statement many times."  And then we go on to

11   ask him, "And the state law that you were referring to as

12   being trumped was Article IX, Section 24; isn't that right?"

13   He says, "Yes.  That's right."  We asked, "Is there any other

14   state law that you viewed as relevant to the pension -- to

15   the pension issue that you were trying to trump?"  He says,

16   "No," there's no other state law that he's trying to trump.

17   It's specific, the pension clause.  This Chapter 9 filing was

18   done specifically to try to get around the pension clause of

19   the Constitution, and there's no other way to read the

20   evidence on that.  And these admissions also confirm the

21   city's recognition that the pension clause, in fact, applies

22   directly to what the city is trying to do through this

23   Chapter 9 proceeding and that the pension clause is in direct

24   conflict with what the emergency manager is trying to do here

25   as regards pensions.  There's no question about it.  They are

1    trying to do something that they acknowledge is in conflict

2    with the pension clause.  If that weren't the case, there'd

3    be no context in which the federal law could trump anything.

4    There would be nothing to trump.  There's a direct --

5            THE COURT:  I don't mean to cut you off, but haven't

6    we been through this?

7            MR. ULLMAN:  To some extent, your Honor, and I'm

8    trying not to repeat exactly --

9            THE COURT:  Any extent to which we haven't?

10           MR. ULLMAN:  Yes, I believe there is, your Honor.

11   I'm trying to -- I'm trying to bring additional evidence to

12   make the -- largely the same points but in a more summary

13   fashion and then move on to the eligibility issues.

14           Now, the emergency manager did all this in

15   circumstances where he himself has admitted that he was not

16   aware of any court decision that allowed the use of a federal

17   bankruptcy proceeding to trump a provision of the state law

18   Constitution.  And the emergency manager did this in

19   circumstances where the Jones Day law firm itself had

20   previously advised that the emergency manager's ability to

21   cut pensions through Chapter 9 was, at best, uncertain.  That

22   comes from the Jones Day pitch book itself.  They said it was

23   uncertain.  And he did this in circumstances where the

24   emergency manager had been advised by the state attorney

25   general that the pensions were protected under Michigan state

1    law and that what the emergency manager was doing in terms of

2    trying to cut them was contrary to the Michigan Constitution.

3        And, finally, on this point, we think that the

4    timing of the filing itself is very significant.  You've seen

5    already that there were -- there was state court litigation

6    that was pending, and you've heard that there was a TRO

7    hearing that was scheduled and that the hearing on the TRO

8    was scheduled to take place on the 18th.  And what the

9    evidence shows -- I'm sorry.  Yeah.  It was on the 18th, and

10   the evidence shows, as you've seen already, that the

11   bankruptcy filing had been originally scheduled for the 19th

12   and then had been moved up to go -- to coincide on the 18th

13   immediately prior to when the TRO hearing was supposed to

14   take place, and the evidence on that is as follows, and I'll

15   just skip to this particular slide.

16       Mr. Orr was asked specifically about the timing of

17   the filing of the bankruptcy petition and, in particular,

18   about the timing relative to the TRO proceeding, he was

19   asked, "Is there a particular reason why the filing was made

20   when it was, at the time it was, other than to try to get a

21   jump on the state court decision?"  And the emergency manager

22   answered that, to the best of his knowledge, there was no

23   such reason.

24       So to sum up on all this, we think that it boils

25   down to the simple proposition that a state actor who takes

1   actions that are intentionally designed to achieve results
2   that are in plain violation and in direct odds with the state
3   Constitution is not acting within the scope of his authority
4   and is not acting in good faith, and we believe the evidence
5   will show that that's the situation here.

6         I'm going to turn now to the issues of eligibility,
7   and there are -- as we've said, there are two prongs here.
8   The city can prove by -- the good faith negotiation or the
9   impracticability issue either by showing that it engaged in
10  good faith negotiations or by showing that those were
11  impracticable.

12        Now, on the good faith negotiation prong, we believe
13  the evidence is going to show two things.  First of all, the
14  emergency manager has argued that the presentations and
15  discussions that followed his June 14th proposal to creditors
16  constituted attempts at good faith negotiations.  However,
17  the evidence will show that at the time of the presentations
18  and meetings, the emergency manager did not have what he
19  believed was a plan of adjustment and specifically that the
20  emergency manager himself viewed the June 14th proposal only
21  as a proposal and not as a plan of adjustment.  Now, we've
22  heard this morning from Mr. Bennett that the city is
23  apparently trying to backtrack on this now, but when Mr. Orr
24  was questioned at his deposition, he not only acknowledged
25  but was adamant that what he presented on June 14th, which

1   was the subject of the following discussions and meetings,

2   was not a plan but merely a proposal that he had put out to

3   seek the general creditor feedback.  He said this very

4   specifically.  "We never called this a plan.  We never called

5   it a deal.  We always called it a proposal."  So it was never

6   considered -- whatever the city is saying now, at the time

7   that the proposal was made, which, of course, was well before

8   we filed our pretrial brief, which is at the same period when

9   Mr. Orr testified prior to the filing of our pre-trial brief,

10  Mr. Orr was quite clear that what they put on the table on

11  June 14th was not a plan of adjustment, was not intended as a

12  plan of adjustment.  It was just intended as a proposal,

13  something to be discussed.  And we believe this is important

14  because under the clear -- what we believe is the clear

15  weight of the law, in order for the negotiations that are

16  referred to in Subpart (c)(5)(B) --

17          THE COURT:  One second.  I have been asked to ask

18  you to move back from the mike just a bit.

19          MR. ULLMAN:  Okay.  Is that better?

20          THE COURT:  Maybe a little bit more.

21          MR. ULLMAN:  Little bit more?

22          THE COURT:  There you go.

23          MR. ULLMAN:  Okay.  The reason this is important is

24  because under Subpart 109(c)(5)(B), the negotiations that are

25  referred to in that subpart have to be negotiations over what

1  is a plan of adjustment as that term is used in the
2  Bankruptcy Code.  The legal analysis on that, the authorities
3  we cite are all in our brief, and I'm not going to repeat
4  that here, but the point is that for the good faith
5  negotiation prong to be met, the negotiations that have to
6  be -- at issue have to take place over a plan of adjustment,
7  and the evidence shows that per the emergency manager's own
8  testimony in this case, no plan of adjustment was ever
9  presented to the creditors, and so a fortiori the
10  negotiations required under Subprong (c)(5)(B) never took
11  place.
12         And so there's no confusion on this, I want to be
13  clear that the question of whether the city presented the
14  creditors with a plan of adjustment is a very different
15  question from whether the city intended to impair or diminish
16  protected pension payments.  On the one hand, as I've gone
17  through, the evidence will show that the city never presented
18  creditors with anything that they considered a plan of
19  adjustment, and on the other hand, as I've gone through and
20  Ms. Green has summarized, the evidence will show that the
21  emergency manager did intend to impair the protected pension
22  benefits.  In fact, this latter point is not even subject to
23  question.  The city has actually admitted in an RFA in this
24  proceeding that's binding on it that it, in fact, intends to
25  impair the pension rights as part of this proceeding, and

1   that's from the city's answer to the RFA that was served on

2   it, Number 12, where they admit that the city intends to seek

3   to diminish or impair accrued financial benefits.  That,

4   again, is the term that's used in the pension clause of the

5   Constitution.  So that's what the evidence will show on the

6   existence of a plan of adjustment.

7            Now, we also believe and you've heard before that

8   even if there were a plan of adjustment, even if there had

9   been one presented, there were no good faith negotiations.

10  For example, there was no way to know from the evidence --

11  or, rather, from the information that was provided at the

12  June 14 meeting how in actual monetary terms the individuals

13  that the city sought to affect under the June 14 proposal

14  would be impacted, and specifically in terms of both the

15  proposed pension cuts and the OPEB where the city was saying

16  that the retirees would instead get some share of notes,

17  there was no way for the retirees to know what the cash value

18  was of what the city was proposing.  And, in fact, the

19  evidence will show that for -- at least for retirees at the

20  time of the discussions over the June 14 proposal, the time

21  those discussions were proceeding, the city itself did not

22  even know what the real size of the unfunded pension

23  liability was.  In other words, there was no way to know what

24  the parties were even negotiating over.  And here's some of

25  the evidence quickly on the negotiations.  First of all, the

1   emergency manager has admitted -- this is a question asked as

2   regards to the June 14 meeting.  We asked him, "Were there

3   negotiations there?"  His answer, "No.  There were not

4   negotiations.  I'm going to be careful how I use the word,

5   but no.  As we generally use the word, there were none."

6           There were other meetings that then took place.  The

7   next meeting, as I recall, took place on June 20, and this is

8   from a letter that Jones Day wrote, and it called them

9   informational meetings and acknowledged that actives and

10  retired employees will need access to additional information

11  to analyze the proposals that are being -- that are proposed

12  in the June 14th document.  And here's another letter from

13  Jones Day.  This is dated, I believe, July 17th, and what it

14  says is, "We think it first makes sense to try to reach

15  common ground with the unions and associations on actuarial

16  assumptions and methods and the amount of the underfunding."

17  First we got to figure out what the amount of the

18  underfunding is and then tackle the contributions and

19  attendant benefit changes.  You have to know what the size of

20  the underfunding is before discussions can even take place,

21  so, again, there wasn't even anything concrete to negotiate

22  over.

23          And, finally, on this point, we believe the evidence

24  will show the city never really intended to engage in good

25  faith negotiations.  I'm going to put this document up

1    briefly.  I think we've gone through this before.  This is a

2    document from Bill Nowling of the emergency manager's office,

3    and what he's basically saying -- this is as of July 8th --

4    that they've already concluded what their key filing messages

5    would be.  July 8th they're saying it's impracticable.  This

6    is before the meetings that took -- that were scheduled for

7    July 10th and 11 even took place.  So what we can see is that

8    even as the city was telling the world that it wanted to have

9    more meetings, it had already internally and secretly decided

10   that it would claim impracticability.  So the meetings that

11   were followed were really nothing more than an effort to

12   create a record that would allow the city to claim good faith

13   negotiations when, in truth, there were no real negotiations

14   and the city wasn't negotiating, we believe, in good faith.

15          With respect to the impracticability prong, we

16   believe the situation is similar.  At the outset, as we've

17   explained in our pretrial brief, the committee believes that

18   the requirement that there be a plan of adjustment applies

19   equally to the impracticability test, and this only makes

20   sense because without an actual plan identifying who the city

21   intends to impair and how, there's no way to assess whether

22   negotiations would be practicable.  And specifically, as

23   we've said, the only document that was on the table was the

24   June 14 proposal, and that was a proposal, not a plan.

25          And further, as we've set out, we believe and the

1 law is that to show impracticability, the city has to show

2 impracticability with respect to each class of creditors. It

3 has to try to negotiate with those with whom negotiations are

4 possible, and, as you've heard, the evidence will show that

5 we believe there were certainly a number of classes of

6 creditors with whom that was possible. And as we saw from

7 the last slide, the evidence indicates that the city really

8 never intended to try to negotiate but really just tried to

9 use impracticability as a tool to get out of it. So from a

10 factual viewpoint, we believe the impracticability prong will

11 not be met either.

12        Now, finally, I want to talk briefly about Section

13 921(c), which is the good faith requirement. I've already

14 addressed one aspect of the good faith, the emergency

15 manager's pursuit of a course of action that's contrary to

16 the pension clause of the Constitution, but there's also

17 another aspect to it, and that is this, that we believe that

18 in connection with his filing of the petition, the emergency

19 manager made a number of misrepresentation -- or of

20 representations that we believe the evidence will show were

21 at minimum misleading and incomplete, and I'll give you some

22 examples.

23        First of all, in his declaration -- this is the

24 declaration that the emergency manager filed with the

25 petition -- he stated that the city has over 18 billion in

accrued liabilities and including specifically over 6.4
billion in bonds that are backed by enterprise revenues or
otherwise secured.  Now, that, of course, sounds like a huge
liability for the struggling City of Detroit to bear, but the
evidence will show that what's not stated in this is that the
vast majority of these bonds that we see referred to here,
the 6.4 billion, are bonds that are issued by the Detroit
Water and Sewerage Department, which is operated as a
separate authority and is fully responsible for the payment
of those bonds.  And the evidence will show that the
Department of Water and Sewers itself has the financial
wherewithal to make those payments.  We put this question to
the emergency manager in his deposition.  He said, yes, the
Department of Water and Sewers, it generates its own
revenues, and it pays its debts as they come due.  So right
off the bat, the total liabilities that, according to the
emergency manager, he has to struggle to meet are effectively
reduced by at least a third.

Now, also in his declaration the emergency manager
stated that in terms of the unfunded pension liability, that
the unfunded pension liability is $3.5 billion, and this is
stated here as a fact, not subject to qualification, and as
we all know, the unfunded pension liability -- how big it is
and what, if anything, will be done about it, those are
central issues that will have to be addressed if this action

1  proceeds, but for present purposes, the evidence will show

2  that this $3.5 billion number that Mr. Orr stated in his

3  declaration is not a fact.  We think the evidence will show

4  that the fact is that at the time the petition was filed, the

5  city did not know the actual size of the unfunded pension

6  liability as its analysis on that was ongoing and hadn't been

7  completed and, indeed, still hasn't been completed today.

8  And this, for example, is from the deposition testimony of

9  Charles Moore, who is the city's -- from Conway MacKenzie,

10  which is the city's operational restructuring advisor.  Mr.

11  Moore also put in a declaration addressing unfunded pension

12  liabilities, and at his deposition Mr. Moore candidly

13  admitted that, in fact, the city didn't know what the actual

14  amount of the unfunded liability was and that work was going

15  on to try to make that determination.  He says specifically,

16  most importantly, the city's actuary has not completed its

17  analysis on the unfunded position, and until that work is

18  done, no one really knows what the unfunded liability is.

19  And, indeed, we believe the evidence will show that the last

20  full actuarial evaluation of the unfunded liability was done

21  around June of 2011, and the unfunded amount that was shown

22  in that evaluation was about 643, 644 million.  And the

23  evidence is also going to show that of that total amount, the

24  644 or so, only about 250 million is allocable to the general

25  fund, which is the fund that the city is most concerned

1  about, which it pays most of its bills.  That is not a charge

2  on the general fund.  The evidence will show that a very

3  large chunk of that is, in fact, allocable to other

4  departments such as the Department of Water and Sewerage,

5  which, again, is responsible for that and pays its own bills.

6          Now, during the -- Mr. Bennett's arguments, he

7  suggested that we had somehow misstated what Mr. Orr said at

8  his deposition, failed to cite all the appropriate parts.

9  That's not accurate.  At his deposition Mr. Orr was put

10  through the numbers, and there was an initial error.  He then

11  corrected that arithmetic error.  At the end of the

12  deposition, Mr. Orr said that it appeared to his knowledge at

13  that time the portion of the unfunded pension liability that

14  was allocable to the Department of Water and Sewerage was

15  about 68 percent.  Mr. Bennett is suggesting that maybe 68

16  percent isn't the right number, and the right number should

17  be 38 percent.  Be that as it may, 38 percent is still in

18  this context a huge chunk of the unfunded pension liability,

19  which is something that's borne by Department of Water and

20  Sewerage and payable from those funds without any strain on

21  the general fund.  And the evidence will show that the

22  emergency manager has acknowledged that even if the unfunded

23  pension liability were ultimately found to be greater than

24  the $644 million number, even if it were found to be --

25  excuse me -- as high as the $3.5 billion number that you've

 1  heard, that same principle would hold true, that there's a

 2  significant portion of it that is not allocable to the

 3  general fund but is borne entirely and payable by and fully

 4  funded by the Department of Water and Sewers.  And as I said,

 5  the evidence will show that that department is solvent and

 6  capable of meeting its obligations, and, indeed, the Water

 7  and Sewerage pension payments even have priority over secured

 8  claims in that they're included in net operating expenses.

 9       So we believe the evidence will show that the amount

10  of the underfunding on the pension liability is not nearly as

11  severe as -- still substantial -- we're not denying that, but

12  not nearly as severe as was portrayed in the emergency

13  manager's declaration.

14       And finally, related to all this, the evidence will

15  show that the city does, we believe, have substantial assets

16  that can be monetized.  Chiefly but not alone among them is

17  the art that's owned by the city that's maintained at the

18  Detroit Institute of Arts, and we're talking about art that's

19  owned outright by the city, not art that's subject to any

20  charitable trust.  And the evidence will show that there's

21  that asset, and also the Department of Waters and Sewers is a

22  valuable asset that could be monetized.  The city may well be

23  in a position to obtain substantial cash inflows from these

24  assets and we understand is actively pursuing these

25  opportunities.  Those assets, those cash flows could

1　obviously be used to fund other obligations as well, yet none

2　of that was factored in any way into the Orr declaration even

3　though that could dramatically change the mix of what happens

4　in terms of paying not only pension obligations but other

5　obligations as well.

6　　　　So that, your Honor, is what we believe the evidence

7　will show.  Based on that, we believe the city cannot meet

8　its burdens of proving eligibility or good faith, and we look

9　forward to proceeding.  Thank you, your Honor.

10　　　　THE COURT:  Thank you.

11　　　　MR. ULLMAN:  Oh, and I do -- we will have a bound

12　copy of the slides that I used for you marked.  Thank you.

13　　　　THE COURT:  All right.  Thank you.

14　　　　MS. LEVINE:  Your Honor, I apologize, but I got a

15　flurry of e-mails after I stepped away from the podium saying

16　two weeks, what are you, crazy?

17　　　　THE COURT:  What was your answer to that question?

18　　　　MS. LEVINE:  I have to ask the judge if I'm crazy or

19　not.  I guess --

20　　　　THE COURT:  I take it you're asking for more time.

21　　　　MS. LEVINE:  If we could have another week, your

22　Honor, that would be --

23　　　　THE COURT:  Sure.  Three weeks.  Absolutely.  Okay.

24　So does that conclude your opening statements?  All right.

25　We'll take a recess now until ten after three, and we'll

1 begin with the evidence at that time.

2       THE CLERK:  All rise.  Court is in recess.

3     (Recess at 2:51 p.m. until 3:10 p.m.)

4       THE CLERK:  Court is in session.  Please be seated.

5       THE COURT:  Okay.  It appears everyone is here.  You

6 may proceed.

7       MR. STEWART:  Thank you, your Honor.  Geoffrey

8 Stewart, Jones Day, for the city.  Our first witness will be

9 Gaurav Malhotra, but before we call him, I wanted to put on

10 the record a stipulation that the parties have reached with

11 regard to the sequestration of witnesses.  We've agreed that

12 witnesses should be sequestered with the exception of those

13 who, by definition, are representatives of a party.

14       THE COURT:  That's fine.  I ask counsel, please, to

15 supervise this sequestration because you know who your

16 witnesses are.

17       ATTORNEY:  Thank you, your Honor.  We will.

18       THE COURT:  Okay.

19       MR. STEWART:  May we call Mr. Malhotra to the stand?

20       THE COURT:  Yes, yes, of course.  Step forward,

21 please, sir.  Before you sit down, please raise your right

22 hand.

23       GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN

24       THE COURT:  Please sit down.  You may proceed, sir.

25                   DIRECT EXAMINATION

1  BY MR. STEWART:

2  Q   Good afternoon.  Mr. Malhotra, could you please, for the

3  record, give us your full name and your home address?

4  A   Gaurav Malhotra, and I live in Chicago, Illinois.

5  Q   And are you presently employed?

6  A   Yes.

7  Q   Who are you employed by?

8  A   Ernst & Young.

9  Q   And what is Ernst & Young?

10 A   Ernst & Young is a Big Four accounting firm.

11 Q   And how long have you worked for Ernst & Young?

12 A   For close to four years since I recently joined.

13 Q   In what part of Ernst & Young's practice do you work?

14 A   Restructuring specifically.

15 Q   And just for the record, tell us what that means when you

16 say "restructuring"?

17 A   Our practice predominantly represents corporations and

18 public sector clients in order to assist with business plan

19 assessments, liquidity analyses, as well as developing

20 restructuring proposals.

21 Q   Tell us, if you could, about your college education and

22 any post-graduate education that you had.

23 A   I went to college in New Delhi, India, and I did my MBA

24 in Finance and Business Policy from Case Western, and I'm

25 also a CFA.

1  Q   Certified financial analyst?

2  A   That is correct.

3  Q   After you left Case Western, what was the first job that

4  you had?

5  A   I joined Ernst & Young.

6  Q   And how long were you at EY at that point?

7  A   At EY, I joined in May of 2000, and EY's restructuring

8  practice was, I believe, in 2004, sold to Giuliani Capital

9  Advisors.  I transitioned with that team.  That team was

10  subsequently sold to Macquarie, an Australian investment

11  bank, and I transitioned with that team and came full circle

12  back to EY about four years ago.

13  Q   And what is your title at EY now?

14  A   I'm a principal.

15  Q   And what does that mean?

16  A   It's a non-CPA partner of the firm.

17  Q   So you're an equity partner of EY?

18  A   I am an equity partner of EY.

19  Q   Could you tell us some of the clients you have worked for

20  as part of your work in restructuring?

21  A   I worked for Delta Airlines.  I did work for Detroit

22  Public Schools, doing work for Liberty Medical right now,

23  worked at Collins & Aikman, and those are some of the clients

24  that I've worked with in addition to others.

25  Q   Did there come a time when EY was retained by the City of

1    Detroit to perform work for the city?

2    A    Yes.  We started our work in about the May, June of 2011

3    time frame.

4    Q    So over two years ago?

5    A    That's right.

6    Q    At the time the city approached you or at any time since,

7    was EI -- EY -- sorry -- retained to serve as an expert for

8    the city in any litigation, including Chapter 9 litigation?

9    A    No.  In fact, it's very clear in our letter that we will

10   not serve as an expert.

11   Q    What were you hired to do in May of 2011?

12   A    Generally, it was to get a handle on the city's liquidity

13   position and try and get our arms around in terms of the

14   city's short-term liquidity forecast over the next 12 months

15   or so.

16   Q    And this was back in 2011.  That was what you were asked

17   to do?

18   A    That is correct.

19   Q    Did there come a time earlier this year when the scope of

20   work the city asked of EY was expanded?

21   A    Yes.  In the front end of this calendar year, our role

22   was expanded to look at a ten-year forecast for the city,

23   predominantly on the general fund, and to ascertain what the

24   deficit as well as cash projections would be over a longer

25   time frame versus a shorter time frame.

1   Q   Now, you just used the term "general fund."

2   A   Yes.

3   Q   What is the general fund?

4   A   The general fund is basically where the day-to-day

5   activities for a municipality are recorded. i.e., collection

6   of taxes, payment of operating expenses and administrative

7   expenses as well as debt service that is not related to an

8   enterprise fund.

9   Q   Why is the general fund a logical place to look when

10  you're analyzing the city's financial position?

11  A   Because that's where the tax revenues or the fees are

12  recorded, so the enterprise funds specifically charge their

13  own fees for that specific service, but the general fund is

14  where the core operating deficit of a city is recorded in

15  municipal accounting across the country.

16  Q   Now, you've used the term a couple of times "enterprise

17  funds."  For the record, what are the enterprise funds?  What

18  are examples of the enterprise funds?

19  A   Enterprise funds generally are -- have a specific fees

20  that is charged for the services that are provided by that

21  fund.  It's generally break-even.  For example, the Water and

22  Sewer department is an enterprise fund of the city.  The

23  Detroit Department of Transportation is an enterprise fund of

24  the city, although the Department of Transportation requires

25  a subsidy from general fund, so it's not break-even.

1    Q   Now, in your analysis of the city's financial position

2    and of the general fund, did you take into account the

3    enterprise funds?

4    A   We looked at some of the cash activity of the enterprise

5    funds back in 2011 but focused majority of our efforts on the

6    general fund and those enterprise funds that require a

7    subsidy from the general fund like DDOT, which is the

8    Department of Transportation.

9    Q   Now, in the course of your work, what materials or

10   information from the city did you rely upon?

11   A   We looked at a CAFR.

12   Q   I'm going to stop you right there.

13          MR. STEWART:  Can we put up Exhibit 6?  And I

14   believe, your Honor, the CAFR, which is Exhibit 6, has been

15   stipulated into evidence.

16   BY MR. STEWART:

17   Q   Is this the CAFR?

18   A   Yes.  That's the CAFR for 2012.  It's the Comprehensive

19   Annual Financial Report, which is the city's audited

20   financial statements.

21   Q   Those were audited?

22   A   Yes.

23   Q   By Ernst & Young?

24   A   No.

25   Q   And what does the CAFR tell you?

1　A　It gives you a detailed snapshot of revenues and expenses

2　as well as the deficit position of the general fund as well

3　as some activity of the enterprise funds.

4　Q　Is this a public document?

5　A　Yes, it is.

6　Q　What else did you look at in the course of your work to

7　learn about the details of the finances of the city?

8　A　We looked at the city's budgets.  We looked at internal

9　financial reports that we had access to from the city.

10　Q　What kind of financial reports?

11　A　They were generally department-specific revenues and

12　expenses as we had available.  We also looked at receipts and

13　disbursements activity for different bank accounts to try and

14　get our arms around the financial position of the city.

15　Q　Now, were these materials you looked at records -- the

16　financial records that the city had kept in the ordinary

17　course of its business?

18　A　Yes.

19　Q　And in your experience, is it in the ordinary course of

20　an enterprise or city's business to keep records such as the

21　ones you were looking at?

22　A　Yes.

23　Q　And did the records appear to you to be accurate?

24　A　Generally, yes.  I mean there were always questions about

25　assumptions like specifically on budgets, but we did not find

1   any material discrepancies at least in the information that
2   we were trying to get our arms around specifically like the
3   CAFR.
4   Q   Well, what did you do to check the reliability of the
5   information the city gave you?
6   A   What we did is we looked at the information that was made
7   available.  We spoke to various members of the city's
8   management team, the finance department at the city, various
9   department heads.  We looked at the receipts and
10  disbursements activity as generally cash was a telling
11  barometer in terms of the quality of information we were
12  receiving, so we went through and tried to scrub the data to
13  the best of our ability.
14  Q   You just used the term "we."  I should have asked you
15  earlier how many people from EY worked with you on this
16  project?
17  A   On the front end of this engagement, we had a team of
18  about four or five, and that team is larger now.
19  Q   What deliverables were expected of E&Y as a result of its
20  work?
21  A   It was generally cash flow updates, whether they be short
22  term or medium term, generally going out on a monthly basis,
23  variance reports in terms of how the city was performing in
24  context of those cash flows.  As time progressed, our work
25  expanded to helping develop the long-term projections in

1  conjunction with other members of the city, so we also helped

2  in terms of updating the financial advisory board on a

3  monthly basis in terms of where some of the cash position of

4  the city was.

5  Q   And in terms of organizing and presenting your data, what

6  methods did you use?

7  A   It was generally Excel spreadsheets or PowerPoint

8  presentations.

9  Q   Okay.  And an Excel spreadsheet is what?

10  A   It's a software that allows you to compile, organize, or

11  make calculations in terms of the data that we have

12  available.

13  Q   And the calculations are arithmetical calculations?

14  A   Yes.

15  Q   Now, let me ask you this.  Did there come a time when you

16  learned that an emergency manager had been appointed for the

17  City of Detroit?

18  A   Yes.

19  Q   And do you remember when you learned of it?

20  A   Right around March.

21  Q   And when did you meet Kevyn Orr for the first time?

22  A   The first time I met Kevyn Orr was during the interview

23  process of various law firms where Jones Day was one of the

24  firms that was presenting its credentials to represent the

25  city.

1  Q   And after Mr. Orr was appointed as emergency manager, how

2  often did you meet with him?

3  A   Generally weekly.

4  Q   And has that continued to this day?

5  A   Yes, either meetings or phone conversations.

6  Q   Okay.  Are you aware of something called a 45-day report?

7  A   Yes.

8  Q   What is a 45-day report?

9  A   It's a report that an emergency manager has to present 45

10 days after his or her appointment to provide a snapshot of

11 the financial and operating condition of the city.

12 Q   Now, we put up on the monitor before you Exhibit -- I

13 think it's 75 for identification.  Is that the 45-day report?

14 A   Yes, it is.

15 Q   And you've seen this before?

16 A   I have.

17 Q   And do you understand why it was Mr. Orr was required to

18 submit a 45-day report?

19 A   I believe it's per statute under PA 436.

20 Q   Did you yourself contribute any part of the content of

21 the 45-day report?

22 A   We did.  We helped work on the financial section of the

23 document as well as some short-term liquidity projections

24 that were available as of that point in time.

25 Q   Let me ask if we could go to page 40 of the --

1          MR. STEWART:  And if we blow it up for the monitor,

2   please, Lauren, so we can see it better --

3   BY MR. STEWART:

4   Q   Mr. Malhotra, do you have that before you, page 40 of the

5   report?

6   A   Yes, I do.

7   Q   And what is that?

8   A   That is a snapshot of the monthly receipts and

9   disbursements activity of the general fund and the cash

10  balance available for the general fund along with any

11  deferrals that we were able to identify as of that --

12  Q   And is this a spreadsheet that you or someone at E&Y

13  working at your direction prepared?

14  A   Yes.

15  Q   Without going --

16          MR. SHERWOOD:  Your Honor, I'd just like to

17  interpose an objection at this time.

18          THE COURT:  Would you identify yourself, sir?

19          MR. SHERWOOD:  I'm sorry, your Honor.  I was

20  introduced this morning.  I'm Jack Sherwood from Lowenstein,

21  counsel for AFSCME.  I'm Ms. Levine's partner.

22          THE COURT:  Okay.  Go ahead, sir.

23          MR. SHERWOOD:  I believe that this testimony in

24  terms of forecasts of future performance by the city is

25  improper lay opinion testimony and should be disallowed.  We

1    submit that this testimony is in the nature of financial

2    projections, requires special expertise, training, and so

3    forth and under Federal Rule of Evidence 701(c) should be

4    excluded.  Thank you.

5            MR. STEWART:  Well, your Honor, two responses.

6            THE COURT:  Excuse me one second.

7            MR. STEWART:  Yes.  I'm sorry.

8            THE COURT:  Is it the exhibit you object to or the

9    testimony about it?

10           MR. SHERWOOD:  Both, your Honor.

11           THE COURT:  The exhibit is already in evidence;

12   right?

13           MR. SHERWOOD:  Well, then the testimony about it.  I

14   think it has been stipulated into evidence.  I think this

15   document is in evidence, but I do believe that any testimony

16   about these projections is expert testimony and should be

17   disregarded.

18           THE COURT:  Sir.

19           MR. STEWART:  Well, first of all, I don't believe

20   the witness is going to be asked any opinion about this, and

21   he has testified earlier he has not been hired as an expert.

22   More fundamentally, I think the rule is clear that to the

23   extent a witness, even one who has expertise, is simply

24   performing arithmetic or similar calculations on voluminous

25   data, it is not expert testimony, and I think the leading

1    Sixth Circuit case on that, your Honor, is -- I think it's

2    the Madison case, 226 Federal Appendix 535, which is a 2007

3    case, and it cites at length an Eleventh Circuit case that

4    says that in greater detail and on the different facts, and

5    so that is why I asked the questions I asked a few minutes

6    ago about the source of the data, were they business records,

7    what did he do with them.  They went into a spreadsheet.

8    What does a spreadsheet do?  And at this stage I'm still

9    trying to explain how he went about compiling his

10   spreadsheets, but counsel is correct.  I'm going to ask him

11   at some point what were the results or the calculations.  I'm

12   not going to ask him his opinion on what anything ought to

13   be.  It is simply going to be, "After you compiled the

14   information, as you testified, what did the number turn out

15   to be?"

16        MR. SHERWOOD:  Just briefly, your Honor.  Anything

17   that projects future revenues or forecasts is opinion.  It's

18   not fact.  It's not adding numbers that exist.  I understand

19   that a fact witness can testify what our expenses and

20   payments were on a given month or even that are due this

21   month, but this is forecasting into the future in terms of

22   not only expenses but also receipts, things like property

23   taxes, utility taxes, various types of revenues going out

24   through the end of this year, and I think that by definition

25   that requires some type of expertise, specialized training,

1   certainly not something that anyone can do, is properly the

2   subject of expert testimony and shouldn't be allowed.

3           MR. STEWART:  And I think what the Sixth Circuit

4   wrote, your Honor, was that there are many things that

5   require expertise.  For example, it requires expertise to

6   read the records and know what part of the city's records are

7   important.  But where the calculations themself do not

8   require expertise beyond simple mathematics, it's not expert

9   testimony.  They distinguish being an expert and expert

10  testimony.

11          THE COURT:  What was the specific last question that

12  you asked?

13          MR. STEWART:  I believe it was how he went about

14  preparing -- or his staff went about preparing the

15  spreadsheet we see before us on the screen.

16          THE COURT:  I'll permit that question.

17  BY MR. STEWART:

18  Q   You may answer.

19  A   The way we helped pull this spreadsheet together or any

20  of the spreadsheets on the cash flows were we looked at the

21  information that was available in the different budgets.  We

22  were able to look at the different receipts and disbursements

23  on an actual basis in terms of what was actually coming into

24  the city and break that down into the different categories

25  and then, based on the assumptions that we had collectively

1  in conjunction with the city, forecast what the monthly

2  receipts and disbursements could be over this forecast

3  period.

4  Q   And you populated the spreadsheet with those numbers?

5  A   That is correct.

6  Q   And you performed addition and subtraction on them to

7  reach the conclusions that are shown here; is that correct?

8  A   Yes.

9  Q   And now may I ask you just as to this, what did you

10 conclude the short-term cash flow forecast would yield to in

11 terms of the city's available cash as of the end of calendar

12 year 2013?

13         MR. SHERWOOD:  I'd renew the same objection, your

14 Honor.

15         THE COURT:  That objection is sustained.

16         MR. STEWART:  Okay.

17 BY MR. STEWART:

18 Q   Mr. Malhotra, let me also ask you to look at -- actually,

19 I'll come back to that in just one minute.  Okay.  Did there

20 come a time, Mr. Malhotra, that you learned that the

21 emergency manager had scheduled a meeting with creditors of

22 the city for June 14 of this year?

23 A   Yes.

24 Q   And when did you learn of the meeting?

25 A   It was right around, I think, in that June time frame.

1  Q   And did you attend the meeting?

2  A   I did.

3  Q   Where was it held?

4  A   At the Westin at the airport.

5  Q   And how many people attended?

6  A   I would say about a couple of hundred.

7  Q   How long did it last?

8  A   Four, five hours.

9  Q   Did you speak or present anything at the meeting?

10 A   I did.

11 Q   Let me -- and were materials passed out at the June 14

12 meeting?

13 A   Yes.

14 Q   Let me first put up on the screen Exhibit 43.  You see

15 Exhibit 43?

16 A   I do.

17 Q   Is that a document entitled "Proposal for Creditors" that

18 was distributed on June 14?

19 A   It was.

20 Q   And let's put up Exhibit 44.  Is that an executive

21 summary of the proposal that was also distributed that day?

22 A   That is correct.

23 Q   Now, at that meeting -- this is entitled "Proposal for

24 Creditors."

25 A   Yes.

1  Q   That's the title of it.  What's being proposed?

2  A   What the city was proposing was a framework for

3  restructuring of its long-term liabilities showing that the

4  city was going to be unable to meet its obligations as they

5  came due.

6  Q   Now, I think you testified that you prepared certain

7  parts of this document?

8  A   That is correct.

9  Q   Okay.  And let me direct your attention, if I could, to

10  page 8 of the document.

11          MR. STEWART:  Can that be blown up, Lauren?

12  BY MR. STEWART:

13  Q   Is this a spreadsheet that you or others at E&Y prepared?

14  A   Yes, it was.

15  Q   And what does it purport to show?

16  A   The first column on that spreadsheet --

17  Q   Well, first of all, what's the title of the spreadsheet?

18  A   It says "Fiscal Year 2013 Forecasted Cash Flow to Year-

19  End."

20  Q   Now, it uses the term "fiscal year '13."  What is the

21  fiscal year of the City of Detroit?

22  A   July 1 to June 30th.

23  Q   So at the time of this meeting, the fiscal year '13 had

24  about 16 days to go?

25  A   Yes.  June -- the month of June 2013 was still a

1   forecast.

2   Q   So let's -- before we go further, let's look at our

3   spreadsheet here.  How many months of this spreadsheet are

4   actual numbers?

5   A   The first column has 12 months of fiscal year 2012, and

6   subsequent to that 11 of the 12 months are actuals, and

7   there's a month of forecast.

8   Q   And that information you obtained from where?

9   A   It was compiled from the information that was given to us

10  by the city.

11  Q   Okay.  And what I'd like to do because we're going to be

12  dealing with some of these issues later is to go over some of

13  the elements of operating receipts and operating

14  disbursements that we see here on the spreadsheet.

15          MR. STEWART:  And I don't know if that can be blown

16  up to be even larger or not, Lauren.  I don't know if

17  everyone can see them.  Let's just blow up operating receipts

18  if we could.  There.

19  BY MR. STEWART:

20  Q   I've asked the technical assistant here to blow these up

21  so we can all see them better, and let me ask you about some

22  of the operating receipts.  Property taxes and income and

23  utility taxes are just what they say they are?

24  A   That's right.  That's what they contain.

25  Q   And gaming taxes, what are gaming taxes?

1   A   Those are the taxes the city receives from the three

2   casinos.

3   Q   Next is municipal service fee to casinos.

4   A   Those are generally additional fees that the city

5   collects from the casinos for additional services that are

6   provided.

7   Q   And then our next line is state revenue sharing?

8   A   That's state aid that the city receives every other

9   month.

10   Q   And below that we have other receipts.  Could you tell us

11   what the other receipts are?

12   A   Sure.  Those are a combination of fees from the different

13   departments.  It has grant revenue in there as well as any

14   other one-time items that are also captured in there.

15   Q   And the final item is called refinancing proceeds?

16   A   Yes.  Those generally reflect the monies that the city

17   was borrowing from the escrow account that was set up with

18   the state, so it was essentially additional debt borrowings.

19   Q   Okay.

20         MR. STEWART:  Let's go back if we could, Lauren, to

21   the -- if you could just then expand for us the part of our

22   chart that says "Operating Receipts."  "Operating Receipts."

23   That would still be the top part, I think.  Now, "Operating

24   Receipts," that would be the rows there entitled "Operating

25   Receipts."  Okay?

1  BY MR. STEWART:

2  Q   Now, your spreadsheet purported to tabulate what the

3  operating receipts were.  I think the first column is actual

4  for fiscal year '12.  What did you determine the city's

5  operating receipts had been for that fiscal year?

6  A   For the general fund predominantly the operating -- total

7  operating receipts were 1.765 billion of which 50 million was

8  related to so-called proceeds from debt issuance or

9  borrowings from the escrow fund.

10 Q   And then for fiscal year 2013, you had 11 months actual

11 and 1 month forecast; is that right?

12 A   That is correct.

13 Q   Okay.  And can you tell me what your forecast was with

14 those 11 actual and 1 forecasted month for --

15         MR. SHERWOOD:  Object.  I'm sorry.

16 BY MR. STEWART:

17 Q   -- the operating receipts for fiscal year '13?

18         MR. SHERWOOD:  Your Honor, I object to testimony

19 based on forecasts.

20         MR. STEWART:  Your Honor, what we have -- he spoke

21 not only about the actual -- the city's actual receipts.  He

22 also spoke about the city's budgets not as a forecast he made

23 but as a budget the city had, which was itself a factual

24 document.  To the extent he's talking about what the city has

25 budgeted, especially when he tests it against actual

1 | experience for reliability, I believe he can talk about what

2 | the forecast result is to look like.  I would add that this

3 | is one where 11/12ths of the data is actuals that had, in

4 | fact, already come to pass.

5 | THE COURT:  Sir, is the number for the column

6 | forecast June 13 of 125 your number or the city's number?

7 | THE WITNESS:  It was generally a collaborative

8 | effort in which we used the numbers that were, your Honor,

9 | developed by the city originally.  We scrubbed them along

10 | with the city.

11 | THE COURT:  What does "scrub" mean?

12 | THE WITNESS:  So we looked at, your Honor, the

13 | historical actuals in terms of how the amount of collections

14 | that were received in that particular month in conjunction

15 | and comparison with the overall tax row, so it was -- you

16 | know, actually, you are looking through the historical

17 | information that we had available as well as the best

18 | forecast information we had available to demonstrate what the

19 | one month of forecast would have looked like.

20 | THE COURT:  Well, all right.  I'll permit the

21 | testimony as to the full year for actual and forecast but

22 | subject to credible admissible evidence regarding June '13.

23 | MR. STEWART:  Your Honor, we will provide that.

24 | BY MR. STEWART:

25 | Q   And then, Mr. Malhotra, as to the full year operating

1   receipts for 2012, what did you calculate?

2   A   For the full year of fiscal year 2013, the total

3   operating receipts were -- with 11 months of actual and 1

4   month of forecast were 1.582 billion, which included roughly

5   $30 million of borrowings from the escrow account as shown in

6   the line item up above.

7   Q   Okay.  And so the line you're referring to is the line

8   that says "refinancing proceeds"?

9   A   That is correct.

10  Q   And you better tell us what the escrow account is.

11  A   It's an account -- escrow account that's set up that's

12  subject to an escrow agreement between the city and the state

13  where there are roughly about $70 million of cash that is

14  sitting in that escrow account today.  It was projected that

15  $20 million of that 70 would have been collected, your Honor,

16  in June of 2013, but that has not happened.  We are

17  anticipating to collect that $20 million from the escrow

18  account in the subsequent months going forward, but it is

19  subject to -- the amount in there is subject to an escrow

20  agreement between the city and the state.

21  Q   Okay.  Thank you.  Lets, if we could, now --

22          THE COURT:  Excuse me one second.  So the 20 billion

23  you're talking about is the 20 that's shown in forecast June

24  '13?

25          THE WITNESS:  Yes, your Honor.  That's the 20

1   million.

2           THE COURT:  That didn't happen.

3           THE WITNESS:  That did not happen.  That is correct,

4   your Honor.

5   BY MR. STEWART:

6   Q   At the time you wrote it, you expected that it would

7   happen?

8   A   That is correct.

9           MR. STEWART:  Could we now expand the segment of the

10  chart that talks about operating disbursements, just the

11  title so we can see them all?  No.  That's fine.

12  BY MR. STEWART:

13  Q   Now, we've now expanded on the screen, Mr. Malhotra, the

14  segment of the spreadsheet that speaks of operating

15  disbursements.  Let me ask you if we could go through this.

16  The first line is payroll taxes and deductions, and I assume

17  that's self-explanatory.  That's what it says.

18  A   Yes.

19  Q   Next is benefits.  What are benefits?

20  A   Those are generally health benefits.

21  Q   Okay.  Below that is something called pension

22  contributions?

23  A   That is correct.

24  Q   And those are pension contributions to who?

25  A   To either the police Retirement System or the General

1   Retirement System.

2   Q   And those are both defined benefit plans?

3   A   Those are defined benefit plans, yes.

4   Q   Now, I understand that some portion of the benefits from

5   the General Retirement System goes to city employees who work

6   for the Department of Water and Sewer?

7   A   That is correct.

8   Q   And how do you account for that in this spreadsheet?

9   A   Those are not accounted for here because this shows the

10  activity predominantly of the general fund.  The

11  contributions that the Water and Sewer Department makes for

12  pension go directly to the Retirement System and --

13         THE COURT:  Excuse me, sir.  You need to lean back

14  away from the microphone a little bit because when you get

15  too close, it cuts out.

16         THE WITNESS:  All right.

17         THE COURT:  And while we have a break here, I think

18  your tech person needs to redo that chart because her effort

19  to line up the headings isn't working very well separately.

20         MR. STEWART:  Okay.  Thank you.

21         THE COURT:  That's better.

22         MR. STEWART:  That's better.  A little to the left,

23  yes.

24         THE COURT:  Thank you.

25  BY MR. STEWART:

1  Q   We were talking, I guess, about pension contributions.

2  Next we have -- and for actual year 2012, those had amounted

3  to how much?

4  A   For actual fiscal year '12, there were pension

5  contributions of 103.9 million made by the general fund.

6  Q   And for fiscal year 2013, what is the number?

7  A   That reflects 11 months of actuals and 1 month of

8  forecast, but about $30.8 million of pension contributions

9  that were made.

10  Q   Why is that so much lower than the pension contributions

11  that had been made in 2012?

12  A   Because the city was trying its best to preserve

13  liquidity during this time frame where liquidity was

14  extremely tight and was deferring pension contributions.

15  Q   Now, let's -- let me ask you about this.  When you say

16  "deferring pension contributions," what do you mean?

17  A   It's essentially not making the scheduled payments as

18  they came due and as were laid out by the city's other

19  systems actuaries, so I would say it was more or less

20  borrowing money from the pension system to fund ongoing

21  operations.

22  Q   So just to be clear, the money was owed to the pension

23  systems; correct?

24  A   That is correct.

25  Q   But the city did not pay the pension systems the money it

1  owed them?

2  A    That is correct.

3  Q    And that is called deferral?

4  A    Yes.  That's what we are calling deferral.

5  Q    And do you know looking at this what the amount of

6  deferrals were for fiscal year 2013?

7  A    For fiscal year 2013, I would say compared to the

8  beginning of fiscal year 2012 there was probably another 70-

9  odd million dollars that was deferred compared to the

10 beginning of fiscal year 2012, an additional 70 million.

11 Q    Okay.

12        THE COURT:  And may I interrupt for one moment?

13 Just so the record is clear and everyone understands, would

14 you describe in more plain English what you mean by the

15 concept of "liquidity was tight"?

16        THE WITNESS:  Sure, your Honor.  The city was during

17 this time frame paying very close attention to its cash

18 position, and in order to ensure that the city did not have a

19 payless payday or run out of complete cash in its bank

20 account, the amount of cash available for the city's general

21 fund to continue to operate was dwindling.  And in order to

22 make sure that the cash position did not get to an

23 unsustainable level where the core operations of the city

24 were put at peril, that's what, your Honor, I meant by

25 liquidity being extremely tight.  It's the cash that was

1    available to run the operations of the general fund.

2          MR. STEWART:  If we can go back to the full chart

3    for just a minute, please.

4    BY MR. STEWART:

5    Q   And before we go further, just on this same point, this

6    chart is a projection of cash flow for the city for the past

7    year and for fiscal year 2013; correct?

8    A   It's actuals for --

9    Q   Actuals and then -- okay.  Now, you just talked about

10    deferrals as something the city did to preserve cash.  Is

11    there something called pooled funds?

12          THE COURT:  I'm sorry.  Something called what?

13          MR. STEWART:  Pooled funds.  And I'm going to ask

14    him what they are.

15    BY MR. STEWART:

16    Q   Can you tell us what pooled funds are?

17    A   The pooled funds are cash that has been available in

18    other accounts for specific purposes such as the solid waste

19    fund or the street fund or the risk management fund that has

20    been pooled with the general fund cash so that the general

21    fund cash is higher because of the result of the pooling of

22    cash from these other accounts.

23    Q   Now, these other accounts are not -- well, first of all,

24    you better tell us what these other accounts are.

25    A   As highlighted in the city's CAFR, the city had roughly

1    $92 million of pooled cash from the solid waste fund, the

2    street fund, and the risk management fund, cash that was

3    combined with the general fund, that is currently reflected

4    in the cash balances reported for the general fund.

5    Q   And so that I understand, so because of the liquidity

6    problems the city faced, it took the $90 million out of the

7    street fund, the solid waste fund, and the public safety or

8    emergency fund and commingled it with money in the general

9    fund?

10   A   I don't know when it was done, but that would generally

11   be yes.  The commingling has probably happened some time ago,

12   but the answer would be yes.  It would be to further

13   supplement the cash available for the general fund.

14   Q   And if the city had not done that, what would have been

15   the effect on its liquidity position?

16   A   Well, at the end of fiscal year '12 where the cash net of

17   distributions was shown as 1.9 million, if the city had to go

18   ahead and segregate or unpool almost $92 million, that cash

19   net of distributions or cash available to the general fund

20   would have been significantly lower dollar for dollar.

21   Q   It would have been $92 million lower?

22   A   Yes.  That is my understanding.

23   Q   Let's go back now to our operating disbursements that we

24   were talking about.  All right.  The next item there is

25   something called subsidy payments.  What are subsidy

1   payments?

2   A    Subsidy payments are the cash payments that the general

3   fund fund makes to DDOT, which is the Department of

4   Transportation, because the Department of Transportation

5   requires an annual subsidy every year from the general fund.

6   Q    And below that we have distributions, and there are three

7   different lines.  There's distributions, tax authorities,

8   then distributions, UTGO, and then distributions, DDA.

9   Please tell us what those items are.

10  A    Those are distributions to other taxing authorities.  In

11  the first line when we saw property tax collections, the city

12  collects property taxes not only for itself but also on

13  behalf of other taxing authorities like Detroit Public

14  Schools, Wayne County, and what the city does then is once

15  the gross property taxes are collected, it distributes to

16  these other entities on behalf of whom the cash has come in.

17  Q    So, in other words, it's cash the city has but that it

18  has to turn over to someone else?

19  A    Yes.  That is correct.

20  Q    And below that we have income tax refunds, account

21  payables, and other disbursements and professional fees.

22       MR. STEWART:  Now let's go back to the full chart if

23  we could, and for purposes of simplicity, why don't we simply

24  expand actual fiscal year '12 along with the descriptions of

25  items that would help us walk through them?  All the way to

1   the bottom.  Thank you.  Okay.

2   BY MR. STEWART:

3   Q    Now, our next line has total disbursements.  Do you see

4   that?

5   A    Yes.

6   Q    And that's just the sum of all the operating

7   disbursements?

8   A    That is correct.

9   Q    And below that there's something called net cash flow.

10  What is net cash flow?

11  A    That's the total operating receipts less the total

12  disbursements.

13  Q    And what was it for fiscal year 2012?

14  A    It was negative $65.5 million after including $50 of

15  proceeds from the escrow fund.

16  Q    And why were those excluded?

17  A    Those were already a part of the negative 65.5.  Had they

18  been excluded, the net cash flow would have been negative

19  115.5.

20  Q    I see.  And then the next line is beginning cash balance,

21  and what is that?

22  A    That would be reflective of the cash balance the city's

23  general fund had in its account including the pooled cash.

24  Q    And you subtract from that the net cash flow that we just

25  talked about; correct?

1  A    Yes.

2  Q    And we end up with cash before required distributions of

3  $29.8 million?

4  A    That is correct.

5  Q    And then there's something subtracted from that, and what

6  is subtracted?

7  A    Those are the accumulated property tax distributions, so

8  when the city collects its property taxes, makes the

9  distributions to the different taxing authorities -- excuse

10 me -- there still is a holdback in terms of amounts that are

11 being reconciled where the city and the different taxing

12 authorities are going back and forth in terms of what the

13 final amount is that is due to those authorities.  That is

14 the estimate that the city has available at that point of

15 time in terms of additional monies that were due to these

16 other taxing authorities but had not been paid yet, so we

17 reserved for that cash that it will eventually be paid out.

18 Q    Okay.  What's an example of one of these other

19 authorities that is owed to which the money has to be paid

20 out by the city?

21 A    It would include the Detroit Public Schools.  It would

22 include Wayne County.  It would include the library.  Those

23 would be some of those examples.

24 Q    And so our last line here says cash net of distributions,

25 and that's $1.9 million?

1   A    That is correct.

2   Q    And what does that represent?

3   A    That would be the net cash available for the general

4   fund, including pooled cash, that was available for the

5   general fund's operations at that point of time.

6   Q    At the end of --

7   A    Fiscal year 2012.

8   Q    -- 2012, which would be June 30th, 2012; correct?

9   A    Yes.

10  Q    And below you have something that says "memo," and the

11  first line is accumulated deferrals?

12  A    Yes.

13  Q    Is that what you told us about earlier which were pension

14  contributions the city owed but had not paid?

15  A    That is correct, about 64.4 million.

16  Q    And below that refunding bond proceeds in escrow, what

17  are those?

18  A    Those are the escrow account's amounts that were still in

19  escrow and had not been drawn upon that were still subject to

20  this escrow agreement with the state.

21  Q    From the refunding financing that you told us about

22  earlier?

23  A    Yes.

24  Q    And finally reimbursements owed to other funds, what is

25  that?

1  A    That is where we've highlighted the amounts -- or we

2  haven't put an amount in off the funds that would subject --

3  be subject to the unpooling of the cash that is shown in the

4  general fund, but the city did not have a specific view in

5  terms of when and how the unpooling of some of that cash

6  would take place.

7          MR. STEWART:  Now, if we could now highlight the far

8  right column, which is the fiscal year 2013, it says 11(a)

9  plus 1(f), and let's look at that.  And then, Lauren, if you

10  could put the categories next to it so he could --

11  BY MR. STEWART:

12  Q    I'm going to ask you the same questions, but I'm going to

13  be quicker when it comes to the fiscal year 2013.  You

14  already told us, I think, that the operating receipts were

15  thought to be 1.52 -- 582.2 billion.  What were the total

16  disbursements expected to be?

17  A    1.5 --

18          MR. SHERWOOD:  Objection.

19          MR. STEWART:  This is the same point I think we

20  argued earlier.

21          THE COURT:  What is the objection, please?

22          MR. SHERWOOD:  The objection --

23          THE COURT:  Excuse me one second.  And I've been

24  asked to ask you to pull that microphone closer to you when

25  you speak.  Closer, closer, closer.

1     MR. SHERWOOD:  I object --

2     THE COURT:  Closer yet, please, sir.  There you go.

3     MR. SHERWOOD:  Okay.  I object based on the fact

4  that the disbursements include projections for June of 2013,

5  and that requires expert testimony.  That's improper lay

6  opinion testimony.

7     THE COURT:  All right.  Subject to the same

8  condition I indicated earlier, the Court will permit this.

9  Go ahead.

10  BY MR. STEWART:

11  Q   And to repeat the question then, the total disbursements

12  for fiscal year 2013 are shown to be what here?

13  A   1.578.2 billion.

14  Q   And so the net cash flow for the city in fiscal 2013 was

15  how much?

16  A   $4 million positive.

17  Q   And then we had cash before required distributions of how

18  much?

19  A   Before required distributions, $33.8 million.

20  Q   And then cash net of those distributions for fiscal year

21  2013 came to what?

22  A   $14.1 million.

23  Q   And by then, what was the accumulated -- was the amount

24  of accumulated deferrals, and what was owed to the pension

25  funds?

1 A    By then the amount of accumulated deferrals predominantly

2 due to the pension funds had increased from roughly $65

3 million at the end of fiscal year 2012 all the way to $118.7

4 million at the end of fiscal year 2013.

5 Q    And where did the number come from in terms of what was

6 owed to the pension funds?

7 A    The amount of funding that would have been scheduled for

8 the General Retirement System and the Police and Fire

9 Retirement System would have come from the payments that the

10 actuaries of the systems had suggested to be made but had not

11 been made over the course of this time frame.  That was

12 predominantly what -- where those numbers came from.

13 Q    So the numbers came from the pension plans themselves or

14 their actuaries.

15 A    The schedule came --

16         MR. SHERWOOD:  Objection.  Hearsay.  Move to strike.

17         MR. STEWART:  He can know this.

18         THE COURT:  The objection is overruled.  It was,

19 however, a leading question.

20         MR. STEWART:  It was, your Honor.  I was trying to

21 clarify, but let me ask it again.

22 BY MR. STEWART:

23 Q    Where, if anywhere, did these numbers come from?

24 A    The accumulated deferral number, which predominantly is

25 made up of the pension deferrals, would have been a sum of

1  the pension payments that were not made during the course of

2  fiscal year 2013 and it would have been in the amount of the

3  scheduled payments the systems actuaries had suggested that

4  should have been made on a monthly basis but were not.

5  Q    So who is it who tells the city how much the pension

6  payments ought to be?

7  A    It's the system's actuaries.

8  Q    The system being the General Retirement System and the

9  Police and Fire Retirement System; correct?

10  A    That is correct.

11  Q    Did there come a time when you spoke with Mr. Orr about

12  what you had found in the course of this analysis?

13  A    We showed Kevyn Orr in terms of what the actual activity

14  was and the magnitude of the deferrals that were taking place

15  to sustain the city's cash position on a monthly basis.

16  Q    Do you remember what you said to him and what he said to

17  you?

18  A    Not specifically, but it was generally showing as to what

19  the magnitude of the -- what the magnitude of the dire

20  liquidity position of the city.

21          THE COURT:  I'm sorry.  What?  The magnitude what?

22          THE WITNESS:  How dire the --

23          THE COURT:  I didn't hear what you said.  What did

24  you say?

25          THE WITNESS:  Your Honor, I said the dire liquidity

1  situation of the city.

2  BY MR. STEWART:

3  Q   Let me -- let's now go to page 9 of this same exhibit,

4  and the control number on this, if that makes it easier, ends

5  with 7289.  And could you just tell us what this is?

6  A   This is the fiscal year 2014 forecasted cash flow to

7  year-end on a monthly basis.

8  Q   And is this a document you or others at Ernst & Young

9  prepared?

10 A   Yes, it is.

11 Q   Did you show it to Mr. Orr?

12 A   Yes, we did.

13 Q   Did you discuss it with Mr. Orr?

14 A   Yes.  We discussed the receipts and disbursements

15 activity, yes.

16 Q   As shown in this document?

17 A   That is correct.

18 Q   And do you remember what you said to him and he said to

19 you?

20        MR. SHERWOOD:  Your Honor, object to the extent that

21 the question calls for testimony about these forecasts.  This

22 document -- this particular page relates to 2014, which is

23 all projections.

24        MR. STEWART:  And that's why I'm asking the

25 questions I'm asking, only was this shown to Mr. Orr and did

1  he discuss it with him, and I won't go any deeper into it

2  right now.

3        MR. SHERWOOD:  I didn't object to those questions.

4        THE COURT:  No.  I believe the witness can testify

5  as to what he said to Mr. Orr about these documents.  It goes

6  to what Mr. Orr knew or at least what he was advised of at

7  the time, so just tell us what you said to him about these

8  documents or this document.

9        THE WITNESS:  Your Honor, my recollection what I

10  would have said on this particular document would have been

11  that the fiscal year two thousand --

12        THE COURT:  Well, hold on.  Are you reconstructing

13  what you would have said, or are you remembering what you did

14  say?

15        THE WITNESS:  Your Honor, I am trying to recall what

16  I would have said.  I do not remember specifically what I

17  would have said.

18        THE COURT:  All right.  If you don't know the answer

19  to a question, just say that.  Don't guess or try to

20  reconstruct.

21        THE WITNESS:  Yes, your Honor.

22        THE COURT:  Okay.

23  BY MR. STEWART:

24  Q    Did you provide this document to Mr. Orr?

25  A    I did.

1   Q   Did there come a time that he raised it with you?

2           THE COURT:  I'm sorry.  Was there what?

3   BY MR. STEWART:

4   Q   Did there come a time when Mr. Orr raised this document

5   with you?  Did he call you up or ask to have a conversation

6   with you about it that you can remember?

7   A   We had several discussions about this particular document

8   and the overall contents of the numbers, yes.

9   Q   And my only question to you is going to be, if you

10  remember, what did you say to him, and what did he say to

11  you, just that?

12  A   What I would have said on this particular document --

13  Q   Not would have said, what you did say if you remember,

14  and if you don't remember, just tell me you don't remember.

15          THE COURT:  If you don't remember, just say that.

16          THE WITNESS:  I don't remember specifically what I

17  would have said to Mr. Orr on this particular page in a

18  specific conversation around that, but --

19  BY MR. STEWART:

20  Q   Then let me ask the question a different way.  In the

21  time frame around June 14, did you have discussions with

22  Kevyn Orr about the liquidity situation of the city?

23  A   I did.

24  Q   And do you remember what you said to him about the

25  liquidity situation of the city?

1  A    I do.

2  Q    And will you tell us what you told him?

3  A    The point -- what I said is that the fiscal year '14 cash

4  receipts could fall short of cash disbursements to the tune

5  of $185 million.

6  Q    What did he say to you?

7  A    I do not remember specifically about what he said to me

8  directly.

9  Q    Let's go, if we could, now to another page of this, page

10 47, which has control number 227327.  Could you just tell us

11 the -- what this document is?  What's the title of this

12 document?

13 A    "Ten Year Projections for the General Fund Only on the

14 Steady State."

15 Q    And what is a steady state?

16 A    The steady state would have reflected no restructuring of

17 the city's long-term obligations or legacy liabilities.

18 Q    I'm not going to ask you about the content of this, but

19 I'm going to ask you to tell us how you prepared it.

20 A    The way we prepared this is through different line items

21 in terms of the revenue assumptions.  We looked into

22 specifically the overall State of Michigan forecast.  We

23 looked at the historical information with respect to the City

24 of Detroit.  We also went ahead and looked at analyses in

25 terms of what the property taxes recently were for the city

1  and what the -- where the City of Detroit was faring in
2  conjunction with the State of Michigan to come up with a
3  forecast in terms of what the assumptions were for the
4  revenue and property tax and income tax assumptions over the
5  next ten years.  We did it in conjunction with the management
6  team of the city.  We went through income taxes in a great
7  level of detail between residents and nonresidents,
8  corporations, to build up assumptions from the standpoint of
9  what the revenues would look like over the next ten years.
10 We looked at the casino taxes with respect to all three
11 casinos, what their growth had been historically, where they
12 were projected to be in the future, state aid.  We got those
13 numbers directly from the budget department of the State of
14 Michigan in terms of where they saw the overall sales taxes
15 that were due to the city were projected to be over the next
16 ten years.  That's generally how we came up with the revenue
17 forecast, and I can highlight how we went through the
18 expenses as well.
19 Q   Well, yes, if you could, the expense and, finally, the
20 legacy cost without getting into what the numbers actually
21 are, just what your methodology was.
22 A   With respect to the salaries, wages, and overtime, we
23 started with what the current wage levels and the headcount
24 was.  It was built up by department to try and ascertain what
25 the exact headcount was by department.  From there on we had

1  fairly simplistic assumptions with respect to wage level
2  increases of two percent on a year-over-year basis over the
3  forecast period.  For the health benefits for the active
4  employees, we used assumptions that the city's health
5  actuaries have developed on a per head basis, which is what
6  we used based on a per headcount basis to extrapolate over
7  the next ten years.  On the other operating expenses, it was
8  developed by individual department to look at every single
9  department, their budgets, to help ascertain what were the
10 ongoing operating expenses of each one of those departments
11 on a ongoing basis.
12        MR. DECHIARA:  Objection, your Honor.  Peter
13 DeChiara of Cohen, Weiss & Simon for the UAW.  We object to
14 this.
15        THE COURT:  Are you pulling your microphone nice and
16 close for me, please?
17        MR. DECHIARA:  Objection based on relevance.  The
18 only relevance it would have to how this witness performed
19 these numbers would be if the numbers were coming in for the
20 truth of the matter.  Otherwise it has no relevance.
21        THE COURT:  I'm concerned about that, Mr. Stewart.
22 First of all, just so the record is clear, what exhibit
23 number is this page 47 of?
24        MR. STEWART:  It is Exhibit 44.
25        THE COURT:  All right.  So the --

1      MR. STEWART:  44 is in evidence.

2      THE COURT:  Right.  So the question is what weight

3  is page 47 of this exhibit entitled to --

4      MR. STEWART:  Correct.  It goes to weight.

5      THE COURT:  -- if the witness has not been qualified

6  as an expert?

7      MR. STEWART:  Well, Judge, what I was going to do

8  was lay a greater foundation for how it was put together, and

9  then I was going to simply ask the witness this question,

10  which I will ask him now.

11  BY MR. STEWART:

12  Q   Where in here, Mr. Malhotra, did you insert your own

13  personal assumptions?

14  A   All of the assumptions were done in collaboration with

15  the city.

16  Q   Well, where did the numbers come from?

17  A   The numbers came from either the actuaries that we were

18  working with with the city or the city's debt documents with

19  respect to the long-term liabilities of the city or, in terms

20  of the revenues, it was assumptions that we worked on in

21  conjunction with the city.

22      MR. DECHIARA:  Your Honor --

23      MR. STEWART:  And so, your Honor, my point on this

24  is the following.  The fact something is a future projection

25  does not make it an opinion in the sense of being an expert

1  opinion.  If one is relying on numbers from another source --

2  in this case, all the sources Mr. Malhotra told us about --

3  it is their numbers, not his numbers but their numbers, and

4  what he is doing is tabulating them and calculating them.

5         THE COURT:  I heard him say that at least some

6  portion of this, which he didn't specify, was done in

7  collaboration.

8         MR. STEWART:  Well, let me -- but that's why I asked

9  him this other question about which of these --

10  collaboration, and I will ask him this --

11        MR. DECHIARA:  Your Honor, may I be heard?

12        THE COURT:  One second.

13        MR. STEWART:  It sounded from his testimony he met

14  with him and worked with him to learn the numbers.  When I

15  asked him which assumptions were his assumptions, not the

16  assumptions of the people who gave him the numbers, the

17  answer were they're not his assumptions.

18        THE COURT:  His answer was, "We collaborated."

19        MR. STEWART:  Well, I thought -- maybe I heard

20  him -- I must have heard him differently than your Honor

21  heard him.  I thought the answer -- well, should we ask him

22  again?

23  BY MR. STEWART:

24  Q   Mr. Malhotra, of these numbers, which ones are your

25  assumptions?

1 A   EY has made no assumptions that these are EY's numbers.

2 I want to make that -- that's what I'm making clear.

3 Q   So these numbers came to you from who?

4 A   The numbers with respect to -- there are a lot of numbers

5 on this page.  The numbers with respect to all of the debt

6 service would have been picked up from the city's CAFR.  The

7 numbers on the health benefits or pension retiree

8 contributions would have come from the city's actuaries.  The

9 numbers for the actual headcount for all of the departments

10 and the associated costs would have come from the city and

11 its departments.  The numbers with respect to the health

12 costs for the active employees on a per head basis would have

13 come from the city's actuaries.  The numbers with respect to

14 state revenue sharing would have come from the state

15 directly.  The numbers for property taxes, income taxes, and

16 wagering taxes, those numbers, in terms of the assumptions,

17 were validated, collaborated, between our team and the city

18 in terms of the assumptions behind the revenue assumptions.

19 Q   When you say "assumptions," you mean --

20         THE COURT:  One second.

21 BY MR. STEWART:

22 Q   -- the number that's there?

23         THE COURT:  I need to hear from counsel at this

24 point.

25         MR. STEWART:  Okay.  Go ahead.

1          MR. DECHIARA:  Your Honor, to the extent the

2     information in this exhibit comes from actuaries who are not

3     on the witness stand, those numbers are hearsay and should

4     not come in.

5          THE COURT:  Well, but the document is already in

6     evidence.

7          MR. DECHIARA:  Your Honor, and also I would say,

8     too, the witness is testifying about a process that took a

9     high degree of expertise.  I don't think I or most of the

10    people in this room, let alone the man on the street, would

11    be able to take these raw data and convert them into ten-year

12    projections.  It took the sophisticated work of an Ernst &

13    Young team to put it together.  This is in the nature -- this

14    is the very essence of expert testimony.

15         THE COURT:  I agree.  I do.

16         MR. STEWART:  All right.  Your Honor, what we may

17    ask leave to do is to submit perhaps a memoranda raising this

18    with your Honor later on so we can move on now.

19         THE COURT:  You may, of course.

20         MR. STEWART:  Yeah.  Okay.  Your Honor, since --

21         UNIDENTIFIED SPEAKER:  May I ask you --

22         MR. STEWART:  Yes.  Your Honor, one other thing.

23    Since it's in evidence, I assume I am allowed to at least ask

24    the witness what it says, and objections go to weight.

25         THE COURT:  Well, it's duplicative to do that, but I

1  suppose to make a point you could ask briefly for the witness

2  to review what it says.

3         MR. STEWART:  Well, I'm going to just ask him to

4  look at the far right column, and then I'm going to -- pardon

5  me, your Honor.  I'll move on to my next question.

6         MR. RUEGGER:  Excuse me.  Objection.  Arthur Ruegger

7  from Dentons on behalf --

8         THE COURT:  I need you to move that microphone

9  closer, sir.

10        MR. RUEGGER:  I'll try, Judge.  Is this better?

11        THE COURT:  Hold the base closer.

12        MR. RUEGGER:  Don't spill the water.

13        THE COURT:  There you go.  Much better.  Much

14  better.  Thank you.

15        MR. RUEGGER:  Your Honor, we submit the document

16  speaks for itself.  Any further narrative from this witness

17  is in the nature of asking for his expertise on that.

18        THE COURT:  Well, it doesn't take an expert to read

19  it, so I'll permit it.

20        MR. RUEGGER:  Very well, your Honor.

21        MR. STEWART:  Could we simply blow up the far right

22  column?

23  BY MR. STEWART:

24  Q   As a result of your calculations, Mr. Malhotra, what did

25  your spreadsheet conclude was the ten-year adjusted deficit

1  the city was facing?

2  A    The spreadsheet would have said that revenues would be

3  10.4 billion, operating expenditures would be 7.4 billion,

4  and legacy expenditures would be 7 billion over this ten-year

5  time frame for a surplus/deficit of almost $4 billion, a

6  negative $3.93 billion.

7  Q    All right.  So did there come a time when you sat down

8  with the emergency manager to talk about these projections?

9  A    Yes.

10 Q    Now, in preparing the projections, what did you do to

11 make them as accurate as you knew how to make them accurate?

12         MR. SHERWOOD:  Objection.  Calls for analysis of

13 projections that have been --

14         THE COURT:  I'm sorry, sir.  I can't hear you.

15         MR. SHERWOOD:  Objection.  Calls for improper

16 opinion testimony.  These are -- he's being asked to testify

17 about projections that are properly the subject of expert

18 testimony.

19         MR. STEWART:  I think I asked him what he did to try

20 to be accurate.

21         THE COURT:  No.  The objection is sustained.

22         MR. STEWART:  Okay.

23 BY MR. STEWART:

24 Q    In your conversations with Mr. Orr, what did you say to

25 him about your ten-year projections?

1        MR. SHERWOOD:  Same objection.

2        THE COURT:  That objection is overruled.  Please

3   answer.

4        THE WITNESS:  What we said is that if you look at

5   simply the operating --

6        THE COURT:  You said --

7        THE WITNESS:  I said.

8        THE COURT:  You said, "we said."

9        THE WITNESS:  What I said is if you look at the

10  total operating revenues and the total operating

11  expenditures, the city still has a surplus of roughly $3

12  billion.  However, when you layer in the legacy costs of

13  roughly $7 billion over the next ten years, the city has a

14  deficit of almost $4 billion over that ten-year time frame.

15  BY MR. STEWART:

16  Q   And what did he say to you?

17  A   I don't remember specifically about what he said back to

18  me.

19  Q   Now, June 14 was the date of a meeting we've been -- I've

20  been asking you about, I believe.  This document was a

21  document passed out that day; correct?

22  A   Yes.

23  Q   Before moving on from the meeting, let me ask you this.

24  Were questions asked by anyone at that meeting on June 14?

25  A   Yes.  There were questions asked.

1  Q    Do you remember any of the questions that were asked or

2  who asked them?

3  A    I don't know who asked them, but there were questions

4  about the assumptions and the liquidity position of the city.

5  Q    And am I correct in understanding that when you addressed

6  the people attending that meeting that day, you were speaking

7  about the spreadsheets I've asked you about this afternoon?

8  A    That is correct.

9  Q    And were questions asked of you then about those

10  spreadsheets?

11  A    There were -- yes, there were questions about it.

12  Q    Okay.  Let me move to another subject.  You're aware of a

13  security called the certificates of participation --

14  A    Yes.

15  Q    -- or sometimes called pension obligation certificates?

16  A    Yes, I am aware.

17  Q    For the record, can you tell us what those are?

18  A    Those are -- certificates of pension are the funds that

19  the city borrowed back in about 2005 to help fund the

20  underfunding on the two pension systems.

21  Q    And did the city have obligations to service the interest

22  or principal of those securities?

23  A    Yes.

24  Q    And do you know what the city's obligation was?

25  A    As of June of 2013, the city had a $40 million payment

1  that was due to those -- on behalf of those POC's.

2  Q   And what did the city do with respect to that payment?

3  A   The city did not make that payment.

4  Q   The city defaulted on it?

5  A   Yes.  That is correct.

6  Q   What effect did that default have upon the city's cash

7  position?

8  A   It improved the cash position by $40 million at the end

9  of -- June 30, 2012.

10  Q   What conversations, if any, did you have with the

11  emergency manager or his advisors on the subject of the

12  decision to default on the COPs?

13  A   I do not recall of a specific discussion with Kevyn Orr

14  on defaulting on the swaps.

15  Q   Let's move on to another set of meetings.  Did you attend

16  meetings held on June 20th, 2013, with representatives of the

17  pension plans?

18  A   I do.

19  Q   And am I correct in remembering there were two meetings

20  that day?

21  A   That is correct.

22  Q   The morning meeting was with the nonuniformed pension

23  plan, the GRS?

24  A   Yes.

25  Q   And the afternoon meeting was with who?

1    A    With police and fire.

2    Q    Okay.  And we have put up the first exhibit -- I believe

3    this is in evidence -- Exhibit 48.  Can you tell me what

4    Exhibit 48 is?

5    A    It's the presentation that was used for the meeting with

6    the nonuniform retirees on June 20th.

7    Q    And let's go back.  Just ask you a question.  Towards the

8    back of this, are there projections that were included in

9    here that you or Ernst & Young had prepared?  Let's look at

10   page 4 and page 5.  Are these projections you prepared?

11   A    Page 4 was a summary of the legacy expenditures,

12   historical, actual, and forecast.  That would have been

13   information on the pension and health benefits we received

14   from the city's actuaries.

15   Q    Okay.  And the next page?

16   A    Page 5 was the ten-year projections for the general fund

17   only under a restructuring scenario that highlighted claims

18   or amounts that were available to service unsecured claims.

19   Q    Now let's go back to the meeting itself.  How long did

20   the morning meeting last?

21   A    Probably about three hours.

22   Q    And who was there?

23   A    It was the city's advisors along with the members from

24   the -- some retirees and some of the members from the

25   Retirement System.

1  Q   Were questions asked?

2  A   There were some questions asked.

3  Q   Do you remember the questions?

4  A   They were questions about the cash position of the city.

5  They were questions about the city's ability to make any

6  changes to specific legacy liabilities.

7  Q   Do you remember any questions being directed to you?

8  A   They were -- yes.  I remember questions that came up with

9  respect to the cash flows of the city.

10 Q   And do you recall who in particular asked you those

11 questions --

12 A   No, I don't.

13 Q   -- or what you said in response to them?

14 A   No, I don't.

15 Q   Was Mr. Orr there that day?

16 A   He was not.

17 Q   Let's go to the next exhibit, if we could, which is

18 Exhibit 49.  Is this the handout that was given in the

19 afternoon meeting?

20 A   Yes, it was.

21 Q   And tell me about the afternoon meeting.  First of all, I

22 should have asked where these meetings were held.

23 A   These meetings were held at City Hall.

24 Q   And how long did the afternoon meeting last?

25 A   About two or three hours.

1   Q   Who attended?

2   A   It was the city's advisors along with some

3   representatives from the Retirement Systems as well as I

4   thought some active employees.

5   Q   And, once again, if you look towards the back, are there

6   portions of this document that was prepared by you or someone

7   else at E&Y?

8   A   Yes.  We helped pull together pages 4 and 5 for this

9   particular presentation.

10  Q   Okay.  Now, page 4, which we have, has legacy

11  liabilities, some for fiscal years that have already ended --

12  A   That is correct.

13  Q   -- and others that are projected?

14  A   Yes.

15  Q   And where did your numbers come from for these?

16  A   The debt service numbers, the scheduled debt service, as

17  the amortization tables exist today, the POC principal and

18  interest payments were, again, based on the current

19  amortization schedules.  The POC swaps payments were based on

20  the existing swap schedule.  The pension contributions and

21  the health benefits for retirees would have come based on the

22  assumptions that were provided to us by the city's actuaries.

23  Q   Now, let me ask you about the substance of the meeting.

24  Did you make any part of the presentation that afternoon?

25  A   I did.

1  Q   What parts of the presentation did you make?

2  A   I would have focused on pages 4 and 5 in terms of laying

3  out what the financial position of the city was.

4  Q   Were questions asked of you that day, that afternoon?

5  A   I don't remember specific questions that afternoon.

6  Q   Where were matters left at the end of the morning

7  meeting?

8  A   They were generally left to have an open dialogue and

9  communication flow between the city's advisors and the

10  participants in the meeting.

11  Q   And at the end of the afternoon meeting?

12  A   It was the same.

13  Q   Let's look at the next exhibit, Exhibit 51.  Can you tell

14  us what Exhibit 51 is?

15  A   Exhibit 51 is the ten-year plan in terms of the forecast

16  that was available at that point of time as of June 21st.

17  Q   Did you attend a meeting on June 25th with

18  representatives of the bondholders?

19  A   I did.

20  Q   And where was that meeting held?

21  A   That meeting was held in New York.

22  Q   Who attended?

23  A   It was bondholders and bond insurers and their financial

24  advisors.

25  Q   Was Exhibit 51 a document given to them that day?

1   A   Yes.  That was the document that we went through on that

2   particular day.

3   Q   Do you remember which bond insurers you met with or

4   bondholders you met with on the 25th?

5   A   Yes.  Ambac was there.  I think Assured was there.

6   National, advisors from FGIC, advisors from Syncora.  Those

7   are actually some of the ones that I remember specifically.

8   It was a pretty big meeting.

9   Q   And I apologize if I asked you this.  How long did you

10  meet with them?

11  A   We met with them for at least four to five hours.

12  Q   What was the purpose of that meeting?

13  A   The purpose of the meeting was to have a subsequent

14  discussion and Q&A on the assumptions behind the information

15  that was shared as of June 20th.

16  Q   Do you remember any questions you were asked?

17  A   There were a lot of questions with respect to the

18  assumptions underlying the ten-year projections and the

19  details in terms of how those numbers were built up.

20  Q   And once again, where were matters left at the end of the

21  June 25th meeting?

22  A   They were left to have follow-up meetings on an

23  individual basis with certain bondholders or the insurers to

24  have more specific discussions around the business plan.

25  Q   Let me direct your attention to July 9.  Were there

1   meetings that day with bondholders or insurers for

2   bondholders?

3   A   Yes.

4   Q   And where were those meetings?

5   A   Those meetings were held in Detroit.

6   Q   And did you attend them?

7   A   Yes.

8   Q   How long did they last?

9   A   The morning meeting lasted about four or five hours.

10  Q   And then I assume there was an afternoon meeting as well?

11  A   Yeah.  There was an afternoon meeting.  My recollection

12  is with the pension systems, I believe.  There were a lot of

13  meetings during this time frame.

14  Q   How long was your meeting with the pension systems?

15  A   I think we had a meeting for about two or three hours.

16  Q   What was the purpose of the morning meeting?

17  A   The morning meeting was generally to have additional

18  dialogue and discussions around the assumptions of the

19  business plan.

20  Q   Do you remember who you met with in particular that

21  morning?

22  A   I remember it was the financial advisors for National.

23  It was the financial advisors for FGIC, Assured were the some

24  of the names that at least come to mind.

25  Q   In this period, did the city, to your knowledge, make any

1   proposals to the bondholders to resolve their claims?

2   A   The city made a proposal or a framework for a proposal in

3   its June 14th presentation.

4   Q   Did the bondholders at any point or any subgroup of

5   bondholders make a proposal to the city at some point?

6   A   My understanding is yes.  I have not reviewed a proposal

7   from the bondholders in detail.

8   Q   Do you remember when that proposal was made?

9   A   My recollection is it was prior to the city filing.

10  Q   Okay.  Now, in the afternoon meeting, what was the reason

11  for meeting with the two pensions on the afternoon of July 9?

12  A   It was to have additional discussions around the

13  assumptions that the city's actuaries were using with respect

14  to not only the size of the claim but also to ascertain the

15  contribution levels required over the next ten years for the

16  pension systems.

17  Q   And I apologize if I've asked you this before.  At the

18  end of that afternoon meeting with the pensions, what was

19  supposed to happen next, if anything?

20  A   There was supposed to be a process to try and understand

21  the assumptions, the actuarial assumptions, and thereby

22  derive -- have an understanding of the amount of the claim

23  and then have subsequent discussions around the amount of

24  funding that the city may or may not able to afford over the

25  long term.

1   Q   Okay.  Now, let's now go to July 18.

2           THE COURT:  Excuse me, Mr. Stewart.

3           MR. STEWART:  Yes.

4           THE COURT:  I'm sorry to be such a nuisance about

5   this, but please try not to wander so far from the

6   microphone.

7           MR. STEWART:  Oh, sorry, Judge.

8           THE COURT:  Part of our issue here is that we have

9   overflow courtrooms where people are trying to hear what we

10  say, so it's not just a question of the recording, which is

11  important, but other people are listening in as well.

12          MR. STEWART:  I'll do better, your Honor.  Sorry.

13  BY MR. STEWART:

14  Q   Let me direct your attention, if I could, now to July 18.

15  Were you asked on or about July 18 to execute a declaration

16  in connection with Detroit's bankruptcy filing?

17  A   Yes, I was.

18  Q   How many days before July 18 did you start working on

19  your declaration?

20  A   I don't recall the specific number of days.  It was

21  sometime in June.  Late June is I think where we started it.

22  Q   And do you -- how much of your declaration did you write,

23  and how much of it was written by others for you?

24  A   A majority of it -- of the declaration was written by me

25  in conjunction with counsel.

1  Q   Now, your declaration has a number of attachments to it,

2  and I'm going to put them up before I question you about

3  them.  And let's start with Exhibit -- Attachment A, which is

4  Exhibit 9.  And is that one of the exhibits to your

5  declaration?

6  A   It is.

7  Q   And is this a document you or someone else at E&Y

8  prepared?

9  A   Yes.

10 Q   And what is it?

11        MR. RUEGGER:  Your Honor, objection.  We objected to

12 this document.  It is forecasts, which we think would require

13 expert testimony.  We believe any testimony related to it

14 should be excluded on that grounds.

15        THE COURT:  The document is in evidence?

16        MR. RUEGGER:  No, your Honor.

17        THE COURT:  It's not?

18        MR. STEWART:  It's not, Judge.  I'm going to ask him

19 now about his dealings with Mr. Orr on the document; however,

20 we also designated this document and the next two as

21 summaries under Federal Rule of Evidence 1006 since they

22 accumulate voluminous evidence which we made available to the

23 objectors.

24        THE COURT:  What does this document purport to do or

25 to be without telling me what its contents are?

1    THE WITNESS:  It was meant to be to show the two

2  years of actual cash activity for the general fund and what

3  the city's cash position was at the end of fiscal year 2013

4  and fiscal year 2012, the magnitude of the deferrals over

5  that time frame, your Honor, and then the two-year forecast

6  beyond that time frame.

7    THE COURT:  And so how was the document compiled?

8    THE WITNESS:  Your Honor, the actuals for the first

9  two years were compiled based on the receipts and

10  disbursements activity that we were able to ascertain for the

11  bank accounts.  Your Honor, for the next two years, with

12  respect to the different line items, I can walk through the

13  assumptions, but --

14    THE COURT:  By "the next two years," you mean fiscal

15  year '14 and '15?

16    THE WITNESS:  That is right, your Honor.

17    THE COURT:  No need.  I'll admit the document as to

18  actual and preliminary for 2012 and 2013, but the objection

19  is sustained as to the forecasts.

20    MR. STEWART:  Thank you, your Honor.

21    (Debtor's Exhibit 9 received at 4:33 p.m.)

22  BY MR. STEWART:

23  Q   Is this a document you discussed with the emergency

24  manager or his advisors, Mr. Malhotra, on or before the date

25  you executed your declaration?

1  A   Yes.

2  Q   And why did you discuss it with them?

3  A   Because it showed the status of the city's liquidity

4  position right around that time frame and in the subsequent

5  few months.

6  Q   And what did you say to the emergency manager or his

7  advisors about the city's liquidity position at that time or

8  in the coming periods?

9  A   What I said is that the city's liquidity position at the

10  end of fiscal year 2013 had improved by roughly $40 million

11  because the city did not make the POC payment that was due in

12  June -- on June 15, 2013.  And what I said is that over the

13  next two years the city was going to have a significant cash

14  burn for each particular year based on the disbursements

15  significantly exceeding receipts.

16  Q   What did you tell Mr. Orr --

17         THE COURT:  Excuse me one second.  Again, we have to

18  clarify your language.  You used the phrase P-O-C.  What does

19  that mean?

20         THE WITNESS:  Your Honor, I was referring to the

21  pension obligation certificate --

22         THE COURT:  Okay.

23         THE WITNESS:  -- and the payment that was due on

24  June 15th.

25         THE COURT:  And then you used the phrase "cash

1  burn."  What does that refer to?

2         THE WITNESS:  Your Honor, that refers to the city's

3  operating disbursements exceeding its receipts or its --

4  city's total disbursements exceeding its receipts thereby

5  reducing the cash over a specified time frame.

6  BY MR. STEWART:

7  Q   And so you've told us what you said to Mr. Orr.  Did you

8  tell him what the cash position was going to be at this rate

9  in the coming years?

10  A   Yes, I did.

11  Q   And what did you tell him?

12  A   I would have -- what I said is that the city's cash

13  position net of deferrals could be approximately $143 million

14  negative at the end of fiscal year 2014 not making -- while

15  not repaying any of the deferrals that had already been made

16  as of that point of time or without unpooling any of the cash

17  that the city had -- has currently pooled.

18  Q   And if the city had unpooled the cash or paid up the

19  deferrals, what did you tell him the cash position was going

20  to be?

21  A   What I said is that the city's cash position for -- would

22  have been almost $150 million worse off if the pension

23  contributions that had been deferred till that time frame

24  were made as well as if the deferred POC payment had been

25  made.  If the pooled cash had to be unpooled, that amount

1 | would be roughly an additional $90 million based on what was
2 | in the CAFR.
3 | Q   For a total cash shortfall of how much?
4 | A   Before the --
5 |         MR. DECHIARA:  Objection.
6 |         THE WITNESS:  -- unpooling of cash, it would --
7 |         MR. DECHIARA:  Objection.  Your Honor, I just am
8 | objecting to the extent that this -- what the witness is
9 | recounting he's saying to Mr. Orr, I just want to make clear
10 | that that's not coming into the record as the truth of the
11 | matter -- of the statements he's making to Mr. Orr.  If
12 | that's clear, I have no objection, but the line is getting
13 | pretty blurred, and I think it's getting pretty close to the
14 | line.
15 |         THE COURT:  I'm concerned about that.  I share your
16 | concern.  You used a phrase again that needs clarification,
17 | "unpool."
18 |         MR. STEWART:  We were talking about the pooled
19 | funds, your Honor.  Those were the --
20 |         THE COURT:  I'm asking the witness.
21 |         MR. STEWART:  Thanks.
22 |         THE COURT:  What does "unpool the cash" mean?
23 |         THE WITNESS:  Your Honor, what I was -- what I meant
24 | to say is if the pooled cash had to be restricted or
25 | segregated out of the general fund, that's what I was

1    referring to the unpooling of cash.

2           THE COURT:  Okay.

3    BY MR. STEWART:

4    Q   What did Mr. Orr say to you?

5    A   On this particular document, the discussions with Mr. Orr

6    or specifically also the other advisors was the magnitude --

7           MR. RUEGGER:  Your Honor, I'm sorry to interrupt the

8    witness, but I thought the question was what did Mr. -- what

9    was the conversation with Mr. Orr.

10          MR. STEWART:  Or his advisors.

11          MR. RUEGGER:  And I thought the witness was just

12   describing a conversation that might not have been with

13   Mr. Orr but might have been with the advisors.  If I

14   misheard, then I apologize.

15          MR. STEWART:  I thought I said Mr. Orr or his

16   advisors, but if not I'll reask the question.

17          MR. RUEGGER:  Thank you.

18          THE COURT:  Okay.

19   BY MR. STEWART:

20   Q   What did Mr. Orr or his advisors say to you?

21   A   The specific discussions on this particular page were

22   around the magnitude of the city's cash disbursements

23   exceeding its cash receipts in terms of how dire the

24   situation was with respect to the general fund's cash

25   position.

1  Q   Page 2 of our exhibit is -- let's put it up there, and

2  let me ask you just what this is.

3           MR. RUEGGER:  Your Honor, objection.  It's a

4  forecast.  I'd rather not have any testimony on this.

5           THE COURT:  I'm sorry.  Did you say you'd rather not

6  have any testimony about it?

7           MR. RUEGGER:  And I'll rephrase my objection with

8  all due respect, your Honor.  Objection.  It's a forecast,

9  your Honor.

10          MR. STEWART:  My question is what is this document?

11          THE COURT:  Yeah.  I think we can get at least that

12  much in.

13          MR. STEWART:  Yeah.

14  BY MR. STEWART:

15  Q   What is this document?

16  A   It's the monthly cash flow forecast for fiscal year 2014

17  under base case.

18          THE COURT:  I'm sorry.  Under what?

19          THE WITNESS:  Under base case.

20          THE COURT:  Base case, which means --

21          THE WITNESS:  So, your Honor, on this it means the

22  city continuing to make its payments for both all unsecured

23  claims per schedule and no restructuring initiatives such as

24  any benefits from the bankruptcy protection may avail.  It

25  was the city paying its payments as they came due based on

1    the information that we had, including information from the

2    actuaries.

3              THE COURT:  Like steady state before?

4              THE WITNESS:  That is correct, your Honor.

5    BY MR. STEWART:

6    Q    And did you discuss your conclusions with Mr. Orr or his

7    advisors?

8    A    Yes.

9    Q    Let's put up the next exhibit, 10, for identification.

10   Mr. Malhotra, I think we have Exhibit 10 for identification,

11   which is Exhibit B to your declaration.  Is this a ten-year

12   financial projection?

13   A    Yes, it is.

14   Q    Did you discuss this with Mr. Orr or his advisors?

15   A    Yes, I did.

16   Q    And what did you say to him, and what did he say to you

17   or his advisors say to you about the ten-year projections?

18   A    What the --

19             MR. RUEGGER:  Objection.  Your Honor, this is the

20   same issue that Mr. DeChiara raised.  A discussion of

21   forecasts is essentially I think a back door around your

22   ruling, so we'd object to the question and the answer.

23             THE COURT:  Well, I'll permit the witness to answer

24   this question with the understanding that the document is not

25   in evidence and the witness' testimony about what the

1  document says is only for the purpose of the truth of what he
2  told Mr. Orr, not for the truth of the statements themselves.
3         MR. RUEGGER:  Thank you, your Honor.
4  BY MR. STEWART:
5  Q   And what did you say to Mr. Orr about the conclusions you
6  had reached in the document?
7  A   What I said is that the city's revenues over the ten
8  years, approximately $10-1/2 billion, and the city's
9  operating expenditures over these next ten years,
10 approximately $7-1/2 billion, for roughly a $3 billion
11 operating surplus.  What I said specifically around the
12 legacy liabilities was based on the current amortization
13 schedule and the information that we have received from the
14 actuaries, the legacy costs could be in excess $7 billion
15 over the ten years, which would result in a potential
16 operating -- a potential deficit to the tune of $4 billion
17 over the next ten years.
18        MR. STEWART:  Let's put up Exhibit 11 if we could.
19 BY MR. STEWART:
20 Q   Can you tell us what Exhibit 11 is?
21 A   Exhibit 11 is the five years of actual legacy
22 expenditures and five years of a forecast on the scheduled
23 debt service as it exists today or the pension and health --
24 retiree healthcare information we received from the
25 actuaries.

1    MR. STEWART: Let's blow up, if we could, the part

2  that deals with the fiscal years ended between 2008 and 2012.

3  BY MR. STEWART:

4  Q   Are those numbers numbers relating to years that had

5  already -- where the books had already been closed?

6  A   That is correct.

7  Q   Where did your numbers come from?

8  A   The numbers would have come from -- for the debt service,

9  the POC's, would have come from the city.  The pension

10  contributions and the health benefits, the retirees -- for

11  the retirees would have also come from the city in

12  conjunction with the city's actuaries on the allocation of

13  what was for public safety versus nonpublic safety or DDOT.

14    MR. STEWART: Your Honor, I would move this portion

15  of the document into evidence since it reflects only

16  historical data.

17    THE COURT: Any objections?  All right.  The Court

18  will admit this document.  What was the exhibit number again

19  just so we're clear?

20    MR. STEWART: 11, I believe, Judge.

21    THE COURT: All right.  Admitted Exhibit 11, 2008

22  through '12 only.

23    (Debtor's Exhibit 11 received at 4:45 p.m.)

24  BY MR. STEWART:

25  Q   And then go back to the full document if you could, and

1  as to the overall document, Mr. Malhotra, did you have

2  discussions with the emergency manager or his advisors about

3  it?

4  A   Yes, I did.

5  Q   And why did you discuss it with them?

6  A   We discussed it in the context of the legacy expenditures

7  continuing to have an increasing percentage of the overall

8  general fund revenues compared to where the city was five

9  years ago, compared to where the city was headed by 2017,

10 that the weight of the legacy expenditures was almost going

11 to close to double based on the projections that we had been

12 given.

13 Q   And what did the -- Mr. Orr or his advisors say to you in

14 response to the points that you made?

15 A   Specifically, they were surprised in terms of the

16 magnitude of the increase in pension and retiree healthcare

17 costs over the next five years.

18       MR. DECHIARA:  Objection.  Lack of foundation.

19 Testifying to the state of mind of the --

20       THE COURT:  It actually wasn't the question.  The

21 question was what did they say.

22       THE WITNESS:  They basically said that the costs

23 going up from where they were five years ago to where they

24 were ten years ago -- I specifically remember that it was

25 almost going to double -- was the response that I got back on

1   this particular page.

2           THE COURT: Okay. Can you try to specify for us

3   when these conversations were that Mr. Stewart has been

4   asking you about?

5           THE WITNESS: Sure. On this particular document we

6   would have had -- which was also as a part of the June 14th

7   proposal, your Honor, so we would have had meetings with

8   Mr. Orr and the other advisors all through the June time

9   frame and even in some of the May time frame, so there were a

10  series of meetings that we had.

11          THE COURT: At which these documents were discussed?

12          THE WITNESS: Yes. The June 14th proposal, your

13  Honor, was pulled together over a period of time, so there

14  were specific documents that were discussed in those

15  meetings.

16          MR. STEWART: Your Honor, I have a demonstrative

17  exhibit I would like to use, but before putting it up on the

18  screen, since there have been objections, it's Exhibit 38.

19  Why don't we put it up on the screen? Judge, this is a

20  graphic representation of what the witness already has

21  testified to that he told Mr. Orr was the city's cash

22  position as the witness had seen it, and what I would like to

23  ask the witness is does this represent what you told Mr. Orr

24  or his advisors about what you believe the city's cash

25  position was going to look like in the coming year?

1      MR. RUEGGER:  Objection.  Leading, and it's also a

2  forecast.

3      MR. STEWART:  I can ask it in a nonleading way,

4  Judge, but --

5      MR. RUEGGER:  Then just forecast.

6      THE COURT:  Yeah.  You can fix the question.  No.

7  The objection is sustained.

8      MR. STEWART:  Okay.  Now, your Honor, as to these

9  last three exhibits and actually also this chart, I'd like to

10  move them into evidence on another ground.  And as I

11  mentioned, we identified these to the objectors as documents

12  that qualified as summaries over Federal -- under Federal

13  Rule of Evidence 1006.  In other words, they compiled and

14  pulled together voluminous records that could not

15  conveniently or easily otherwise be made into proofs.  That

16  was done with proper notice.  As the rule requires, we

17  notified the objectors of this.  We told them we have the

18  underlying records available for your examination.  If you

19  wish to see them, please come and do so.  One person did call

20  to say they'd like to see them but never, in fact, came.  I

21  would submit that we have actually satisfied the requirements

22  of Rule 1006 by doing this and that as simple summaries of

23  voluminous information they qualify for admission.

24      MR. RUEGGER:  Your Honor, I think Mr. Stewart

25  misunderstands our objection.  It's not that there's a lot of

1  data underlying any of these documents.  That might very well

2  be, but they are forecasts, which require, in our view,

3  expert testimony, which is not in the courtroom, so we're not

4  objecting due to the volume of the underlying data.  It's

5  because they are forecasts.

6         THE COURT:  I do agree with that.  The motion is

7  denied.

8         MR. STEWART:  Well, your Honor, could I be heard

9  just one more --

10         THE COURT:  All right.

11         MR. STEWART:  -- one more moment on this?  The fact

12  they are forecasts doesn't, per se, change anything.  They

13  would have to be opinions before they're excludable.  It's

14  been testified he --

15         THE COURT:  But why isn't the forecast an opinion

16  about what's being forecast?

17         MR. STEWART:  Well, it's possible to have forecasts

18  that are factual, that are extrapolations, that are not

19  really opinions, and there are forecasts rendered many times

20  that don't involve experts.  In fact, the two decisions I

21  cited earlier involved financial analysts much like

22  Mr. Malhotra who pulled together documents from which then

23  conclusions could be reached about the probability of

24  something happening or not happening.  The fact --

25         THE COURT:  They involve forecasts?

1        MR. STEWART:  These did not.

2        THE COURT:  Financial forecasts?

3        MR. STEWART:  These involved complicated personal

4   financial records, but they did involve an ultimate issue

5   such as could this person have possibly afforded this item

6   based on his or her income or --

7        THE COURT:  In the past.

8        MR. STEWART:  Well, it's past, but if a forecast is

9   based on information that is either historical or is made

10  available as information about a forecast --

11       THE COURT:  I have to say I'm not persuaded, but if

12  you can find me a case which says that a forecast does not

13  involve expertise, I'll certainly consider it.

14       MR. STEWART:  Okay, your Honor.  We will do that.

15       THE COURT:  We'll leave it open to that extent.

16       MR. STEWART:  Thank you.  That's all I have of this

17  witness, your Honor.

18       THE COURT:  All right.  Well, we won't press on with

19  cross-examination now.  We will break for the day and

20  reconvene at nine o'clock tomorrow morning.  Before we go --

21  ah, Ms. Patek has something, and then I have something.

22       MS. PATEK:  Your Honor, this is just a brief

23  housekeeping matter about a matter of a summary exhibit that

24  came in at the beginning of the day, and this was something

25  Mr. Irwin and I had talked about, and there was an error on

1  it.  It was to be corrected, and it didn't get corrected, but

2  it's going to be corrected on the --

3          THE COURT:  All right.  Let me ask the two of you to

4  consult about that and get back to me first thing in the

5  morning.  I have been asked to remind you that although this

6  courtroom will be locked overnight, there may and probably

7  will be people in here doing what they regularly do, the IT

8  staff, court staff, cleaning staff, so you are free to leave

9  your equipment and property here with that understanding or,

10  of course, you can take it with you.  And I remind you once

11  again please be quiet, perfectly quiet in the hallways.  And

12  we'll reconvene at nine o'clock tomorrow morning.

13          THE CLERK:  All rise.  Court is adjourned.

14      (Proceedings concluded at 4:53 p.m.)

INDEX

                                                    Page

Opening Statement by Mr. Bennett              56
Opening Statement by Ms. Green                94
Opening Statement by Ms. Brimer              112
Opening Statement by Mr. Wertheimer          117
Opening Statement by Ms. Ceccotti            118
Opening Statement by Ms. Patek               128
Opening Statement by Mr. Morris              135
Opening Statement by Ms. Levine              138
Opening Statement by Mr. Ullman              145

WITNESSES:          Direct   Cross   Redirect   Recross

Gaurav Malhotra        168


EXHIBITS:                                    Received

Debtor's Exhibit 9                              228
Debtor's Exhibit 11                             236
Debtor's Exhibit 104                             93


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.




/s/ Lois Garrett                October 27, 2013

_____         _____
Lois Garrett