# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | |
|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE−MI<br>Tax ID / EIN: 38−6004606 | represented by **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489−3939<br>Email: bbennett@jonesday.com<br><br>**Judy B. Calton**<br>Honigman Miller Schwartz &Cohn LLP<br>2290 First National Building<br>Detroit, MI 48226<br>(313) 465−7344<br>Fax : (313) 465−7345<br>Email: jcalton@honigman.com<br><br>**Eric D. Carlson**<br>150 West Jefferson<br>Suite 2500<br>Detroit, MI 48226<br>313−496−7567<br>Email: carlson@millercanfield.com<br><br>**Timothy A. Fusco**<br>150 West Jefferson<br>Suite 2500<br>Detroit, MI 48226−4415<br>(313) 496−8435<br>Email: fusco@millercanfield.com<br><br>**Jonathan S. Green**<br>150 W. Jefferson<br>Ste. 2500<br>Detroit, MI 48226<br>(313) 963−6420<br>Email: green@millercanfield.com<br><br>**David Gilbert Heiman**<br>901 Lakeside Avenue<br>Cleveland, OH 44114<br>(216) 586−7175<br>Email: dgheiman@jonesday.com<br><br>**Robert S. Hertzberg**<br>4000 Town Center<br>Suite 1800 |

Southfield, MI 48075-1505
248-359-7300
Fax : 248-359-7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky-Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359-7300
Fax : (248) 359-7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075-1505
(248) 359-7300
Fax : (248) 359-7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496-8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212-326-3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496-7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**

represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226-3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226-6769
Email: Richard.A.Roble@usdoj.gov

*Retiree Committee*
**Official Committee of Retirees**

represented by **Sam J. Alberts**
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005-3364

(202) 408−7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.co

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2318 | Transcript Order Form of Hearing October 25, 2013, Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

---

**Order Party: Name, Address and Telephone Number**

Name _____ **David M. Eisenberg** _____

Firm __ **Erman, Teicher, Miller, Zucker & Freedman, P.C.** __

Address _____ **400 Galleria Officentre, Suite 444** _____

City, State, Zip _____ **Southfield, MI 48034** _____

Phone _____ **248-827-4100** _____

Email _____ **deisenberg@ermanteicher.com** _____

**Case/Debtor Name:**

**Case Number:**    **13-53846**

**Chapter:**    **9**

**Hearing Judge** _Hon. Steven Rhodes_

⦿ Bankruptcy    ◯ Adversary

◯ Appeal    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/25/2013_ **Time of Hearing:** _9:00 a.m._ **Title of Hearing:** _Eligibility Hearing_

Please specify portion of hearing requested: ⦿ **Original/Unredacted**   ◯ **Redacted**   ◯ Copy (2nd Party)

⦿ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: _____

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

◯ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com

FOR COURT USE ONLY

Transcript To Be Prepared By

Date    By

Order Received

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ David M. Eisenberg _____ Date: **12/26/13**

By signing, I certify that I will pay all charges upon completion of the transcript request.

13-53846-tjt   Doc 2335-17   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 4 of
13-53846-swr   Doc 2316   Filed 12/26/13   Entered 12/26/13 11:19:43   Page 1 of 1
251

4

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,              .
                              .        Detroit, Michigan
                              .        October 25, 2013
                Debtor.        .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>      JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>      JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| | Clark Hill, PLC<br>By:  RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI  48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &<br>  Freedman, P.C.<br>By:  BARBARA A. PATEK<br>      JULIE BETH TEICHER<br>      DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>      PETER D. DECHIARA<br>      THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>     ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>     MEREDITH E. TAUNT<br>     MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning, everybody.

4    ATTORNEYS:  Good morning, your Honor.

5    THE COURT:  I understand that the security lines

6  were long.  Does anyone know of anyone we need to wait for

7  here this morning, or can we get underway?

8    MS. BRIMER:  Your Honor, Ms. Patek is not here this

9  morning.  I don't know if anyone --

10    THE COURT:  Okay.  She probably is intending to be

11  here.  Let's see.  She's not directly involved in this

12  evidentiary issue we were going to start with here this

13  morning, so maybe we can proceed with that.  Okay.  So let's

14  do that.

15    The first thing I want to place on the record is

16  that the Court did review, as necessary, the Jones Day

17  memoranda that were submitted to it in camera.  The Court's

18  review of that material establishes really quite conclusively

19  that the material is attorney work product and that,

20  therefore, is not required to be disclosed by the city or its

21  counsel, and so the Court will so order.

22    In this regard, the Court will state for the record

23  that its review of that material was only cursory.  That was

24  really all that was necessary, and certainly the Court will

25  not take into account anything it saw in those memoranda in

1   deciding the issue of eligibility.  So, for the record, we

2   are going to return those materials to you, Mr. Stewart,

3   right now.  Will you come forward and accept them from us?

4          MR. STEWART:  Thank you.

5          THE COURT:  Thank you.  So the next order of

6   business will be for the Court to hear from counsel for the

7   objecting parties on the issue of lay versus expert testimony

8   here.  And, once again, before I forget, I want to again

9   request, counsel, that -- to remind counsel really that the

10  so-called rough transcript that you all have arranged for is

11  not the official transcript.  It is under no circumstances to

12  be cited in any pleading before the Court.  You may cite the

13  official transcript when and if it's produced, but the rough

14  transcript is for your purposes only and is not to be cited.

15  And as a result, I'm going to ask each of you to file amended

16  memoranda that strike your references to the rough

17  transcript.

18          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

19  on behalf of the Retiree Association parties from Lippitt

20  O'Keefe.  I just wanted to make clear on the record that

21  those objecting parties that are not making live objections

22  on the record or filing papers are relying on the evidentiary

23  objections made by those parties making those live

24  objections, and I just wanted to clarify that on the record.

25          THE COURT:  Absolutely.

1            MR. PLECHA:  Thank you, your Honor.

2            THE COURT:  And for the record, Ms. Patek has

3 arrived, so we can proceed.  Who would like to proceed?

4            MR. MONTGOMERY:  Good morning.  Claude Montgomery

5 for the Retiree Committee.  I am rising first, your Honor,

6 because I believe today's motions -- two part.  The city has

7 asked to reconsider your Honor's ruling with respect to the

8 exclusion of forecast testimony with respect to Mr. Malhotra,

9 and we have moved to strike the testimony of Mr. Buckfire as

10 having been unqualified expert testimony.  And so if I may,

11 first, I would like to point out to the Court I think you

12 will -- you may remember that the -- Mr. Malhotra testified

13 that he both examined and relied on a team of people to

14 examine both bank records and relied upon departments of the

15 city within which he was not employed in order to determine

16 what cash levels were.  Two, your Honor may recall that he

17 testified that he was not an officer or director,

18 shareholder, or owner of the city.  Of course, he couldn't a

19 shareholder.  Second -- third, your Honor may recall that

20 Mr. Buckfire, I believe, testified yesterday that they had

21 recourse to expert revenue and tax policy individuals that

22 were part of the forecasting team and that they -- I think

23 Mr. Buckfire testified yesterday that he was fortunate to

24 have had access to such people and that those individuals

25 participated in the generating of the forecasts.  Fourth,

1  your Honor, I think intuitively, at least intuitively for me,

2  the mere notion that using an Excel spreadsheet somehow

3  transforms the compilation of thousands of lines and

4  different kinds of formulas from being simple arithmetic into

5  something that a layperson can do by looking at their own

6  checkbook or bank accounts, quite the contrary.  I am not an

7  expert in using Excel.  It took me some training to be able

8  to do it, and I know from multiple efforts with my

9  secretaries that it is not something that the ordinary

10  layperson can do with a high school education.  And I, by the

11  way, think my secretaries are quite good.  And so, your

12  Honor, I think this falls squarely within the Sixth Circuit's

13  JGR Industries decision and which the debtor, the city,

14  acknowledges holds against them, excludes testimony, and does

15  so because there was no basis absent the -- in effect, the

16  owner being a part of the business exception and absent

17  individual effort at verification and absent simple

18  mathematics to allow the testimony to go forward.  And

19  perhaps, most importantly of all, there are cases where

20  historical records are allowed to be testified about.  I

21  believe the Sixth Circuit has a decision along those same

22  lines, your Honor, but this is a forecast.  This is

23  projecting into the future.  This is using assumptions,

24  assumptions that had to be created and referenced to some

25  specialized knowledge or understanding of not only how the

1    cash got into the city but how it will get into the city in

2    the future and what would be a reasonable basis to make an

3    assumption for a going-forward prospect, so we think under

4    those circumstances the cases, in particular, that the city

5    seems to rely on just don't help it, and I think both Sixth

6    Circuit cases are either squarely against it -- that is, the

7    JGR case -- or clearly distinguishable on the ownership

8    basis, which is the Lativafter Liquidating Trust, and that we

9    suggest to you is the controlling authority.

10            We would note that the recitation by the city of

11   United States versus Madison, another Sixth Circuit case,

12   again, did not offer or involve a future forecast.  The

13   analysis that was allowed in that case was retrospective

14   only.  And, secondly, it was -- there were no complex

15   formulas and no assumptions, no assumptions applied in using

16   the work.  It was purely, if you will, large scale

17   ministerial effort, and I think the Court allowed it in.  And

18   interestingly I find and perhaps your Honor might that that

19   particular case also cites the DIJO versus Hilton Hotels case

20   and JGR as authority to support its holding where in the DIJO

21   case it was complex formulas that -- appraising economic

22   values of a lost contract that were excluded, so the Sixth

23   Circuit in the Madison case cites the boundaries of what

24   should be excluded, finds that it's retrospective only, it's

25   ministerial in its efforts and, therefore, says it's not an

1   abuse of discretion.  It's permitted in.  And I think here,

2   your Honor, this is clearly being addressed to your

3   discretion.  It is well within the bounds and even the

4   directions under 701 to exclude such testimony, and,

5   therefore, we would ask you to adhere to your Honor's earlier

6   ruling and not permit the forecast testimony of Mr. Malhotra.

7           Now, if I may turn to Mr. Buckfire, yesterday at the

8   conclusion or near the conclusion --

9           THE COURT:  One second.

10          MR. STEWART:  Your Honor, I don't wish to interrupt

11  Mr. Montgomery; however, this motion on Mr. Buckfire is brand

12  new.  It came to us this morning.  I got it at 6:52 this

13  morning.  I would suggest, no, that was not part of the

14  original motion.  The original motion was made only by AFSCME

15  with respect to Mr. Malhotra.  The Buckfire motion is new.

16  We would ask leave to just put in a paper on it lest we be

17  pulled into something we've not had time to prepare on.

18          THE COURT:  There was a motion to strike at the

19  conclusion of the proceedings yesterday, and I --

20          MR. STEWART:  A motion was --

21          THE COURT:  -- and I deliberately deferred it to

22  this morning.

23          MR. STEWART:  Right.  I withdraw my --

24          THE COURT:  All right.

25          MR. STEWART:  Then I'll sit down.

1           THE COURT:  Go ahead, sir.

2           MR. MONTGOMERY:  Successfully thrown off my --

3           MR. STEWART:  I'm sorry.  I apologize.  I apologize.

4           MR. MONTGOMERY:  -- my game, your Honor.

5           THE COURT:  I'm sure that was not the intent, but

6  you were about to talk about Mr. Buckfire.

7           MR. MONTGOMERY:  I was.  Now, although we do not

8  have a transcript on which we can rely, I would ask your

9  Honor to look at the -- your Honor's memory of the questions

10  beginning with an explanation of the GO bonds, the general

11  obligation bonds.  You may recall that Mr. Buckfire then

12  launched into a fairly intriguing explanation of GO bonds and

13  matters that he tied to the marketplace and the nature of

14  risk and the nature of interest rate costs associated with

15  risk and the differences between interest rates for taxing

16  authorities and nontaxing authorities and how that all played

17  a role.  And he concluded at the end of his testimony, if I

18  remember correctly, that -- with an opinion on long-term

19  sustainability for the future of New York, again, pure expert

20  testimony regarding access to capital markets, a subject in

21  which he was clearly an expert, clearly had gained knowledge

22  over time, and it was -- it is something that is quite often

23  the subject of admissible expert testimony.  I think we

24  pointed out, your Honor, orally yesterday that this

25  individual was not identified as an expert in the pretrial.

1    In fact -- and I think the city made a quite conscious choice

2    that they weren't going to use experts at all in this case

3    and Mr. Buckfire just being the last and final manifestation

4    of that strategic or tactical decision, and we think that in

5    the case of Mr. Buckfire, while he put in a lot of factual

6    and historical information, those last questions that were

7    asked and answered beginning with the discussion of the GO

8    bonds are pure opinion, rely entirely on expert

9    understanding, rely entirely on information gathered that

10   would have been or is hearsay insofar as this Court is

11   concerned, and under 702, since he was not a qualified

12   expert, was not identified as an expert to be -- to testify,

13   that his testimony should be stricken.

14            THE COURT:  Thank you.

15            MR. DECHIARA:  Good morning, your Honor.  Peter

16   DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

17   the UAW International Union.  I'll begin with the Malhotra

18   piece of this issue.  We agree entirely with the city's

19   reliance on the key case of JGR, a Sixth Circuit 2004 case.

20   And that case, we agree with the city, is squarely on point,

21   and it's squarely on point in our favor.  The holding of that

22   case was remarkably similar to the facts here.  In that case,

23   the Court held that the admission of lay opinion by an

24   accountant about the company's lost profits was not

25   admissible, not admissible, when two things:  the accountant

1  was not the owner, officer, or director of the business, and,

2  two, relied for information principally on the business

3  itself.  Here what do we have?  We have Mr. Malhotra, who, as

4  I asked him at the very outset of my cross-examination

5  yesterday, I asked him whether he was an officer or whether

6  he had any elected or appointed position with the city, and

7  he indicated he was not, but then I went further, your Honor,

8  and I asked him was he directly involved in running the

9  business of the city, and Mr. Malhotra clearly indicated that

10  he was not directly involved in running the business of the

11  city.

12       Then the question becomes where did he get the

13  information he relied on.  Well, let's look at Mr. Malhotra's

14  declaration.  It's Exhibit 8 in the record, paragraph 14.

15  I'm going to start reading from the second sentence.  His

16  declaration says, quote, "EY used the city's publicly

17  available historical financial data," and then I'll skip over

18  the piece of it that just refers to the 2012 CFR, and then

19  the sentence continues, "and other information provided by

20  the city and its other advisors.  EY did not audit the city's

21  historical financial data.  Rather, EY relied upon the raw

22  data provided by the city, including the underlying data that

23  the city used to prepare 2012 CAFR and previous financial

24  reports."  So this case, the case of Malhotra, on this issue

25  is squarely on point with the binding decision and the

1   holding of the Sixth Circuit in the JGR case, and we think,

2   your Honor, that that is dispositive on the issue that

3   Mr. Malhotra's forecasts are inadmissible lay testimony.

4           There were a couple other points.  I think they were

5   sort of tangential points that the city made in its brief,

6   and I'd just like to address those.  In paragraph 7 of the

7   city's brief, it says that -- the city's brief says, "In any

8   event, even if the Court does not permit Mr. Malhotra to

9   provide lay testimony on the cash flow forecast he prepared

10  for the city, the economic projections offered in

11  Mr. Malhotra's testimony will still be probative of the

12  city's financial condition."  Well, that's -- what the city

13  is arguing there is that his -- Mr. Malhotra's forecasts

14  should come in for the truth of the matter as to what the

15  city's financial condition is.  That's exactly what it should

16  not be allowed to come in for.  And I think your Honor made

17  that clear in your prior rulings, and we think that should be

18  upheld.

19          And then one last point on Mr. Malhotra.  In

20  paragraph 8 of its brief the city argues that Mr. Malhotra's

21  forecasts were not prepared in anticipation of litigation.

22  Well, whether that's true or not is irrelevant.  The guiding

23  Sixth Circuit precedent, the JGR case, doesn't incorporate

24  that as an issue or a deciding factor, but -- and I think

25  this is interesting, your Honor.  It was interesting that in

1    arguing that Jones Day's memos were work product, the city
2    argued that going back months and months and months before
3    the bankruptcy filing that Jones Day was preparing these
4    memos because they knew something was going to happen.  The
5    financial condition of Detroit meant there was going to be
6    some legal proceedings or lawsuits.  So why is it consistent
7    for the city to argue that what Jones Day was doing was
8    somehow in anticipation of something related to litigation,
9    but Mr. Malhotra's forecasts, which were prepared in this
10   exact same time frame, why are those not in anticipation of
11   some legal proceedings?  But be that as it may, whether or
12   not it's prepared for litigation is irrelevant.  The key
13   points are he was -- it was inadmissible lay testimony by
14   someone who was not an officer or owner of the entity and who
15   relied on information obtained from the entity itself.
16            Let me now move to Mr. Buckfire.  Mr. Buckfire was
17   asked questions such as -- and I'm relying on my notes.  He
18   was asked during his direct whether it was economically
19   sensible, economically sensible, for the city to remove
20   blight.  He was asked what, in his view, was the alternative
21   for the city if the June 14th creditors' proposal was not
22   accepted, what was the long-term sustainable -- whether the
23   city's current finances were sustainable in the long term.
24   Now, your Honor, those are all expert questions, and the
25   thing is it seemed natural to all of us when we were

1  listening to Mr. Buckfire answer those questions -- it seemed

2  natural to hear his opinion because the truth of the matter

3  is -- the real fact is he is an expert.  He's an expert

4  investment banker who has a lot of experience in this area,

5  but for some unfathomable reason, the city has made a

6  decision not to use him and not to qualify him as an expert,

7  so for purposes of this proceeding, Mr. Buckfire's testimony

8  in response to those questions was no more deemed worthy of

9  credit than if we had taken a random person off the street.

10 If instead of putting on Mr. Buckfire the city had put on the

11 taxi driver who drove Mr. Buckfire here from the airport and

12 asked the taxi driver what is the -- is the city's finances

13 sustainable in the long term, does it make economic sense

14 to -- the Court would not have allowed the taxi driver to

15 answer those questions.  For purposes of this proceeding,

16 because the city made that strategic decision, Mr. Buckfire

17 is no more qualified to answer those questions than the taxi

18 driver.  Thank you.

19      MS. LEVINE:  Good morning, your Honor.  Sharon

20 Levine, Lowenstein Sandler, for AFSCME.  Trying not to

21 duplicate but making similar arguments, with regard to both

22 E&Y and Miller Buckfire, these are expert witnesses.  They're

23 relying on financial assumptions.  They're scrubbing numbers.

24 They're getting in hearsay evidence that would not otherwise

25 be admissible before this Court in the form of publicly

1  available financial information prepared by the city to

2  audited financial statements prepared by other experts not

3  called upon to testify before your Honor.  We would

4  respectfully suggest that it would be telling just to go back

5  to the statute itself.  If you take a look at Rule 401, if a

6  witness is not testifying as an expert, testimony in the form

7  of an opinion is limited to one that is rationally based on

8  the witness' perception, helpful to clearly understand the

9  witness' testimony or determining facts in issue, and not

10  based on scientific, technical, or other specialized

11  knowledge within the scope of Rule 2002.

12        So then we turn to Rule 2002.  A witness who is

13  qualified as an expert by knowledge, skill, experience,

14  training, education may testify to opinion.  That's exactly

15  what we have here, your Honor.  If you take a look at the

16  paragraph --

17        THE COURT:  I think you're referring to Rules 701

18  and --

19        MS. LEVINE:  702.

20        THE COURT:  -- 702.

21        MS. LEVINE:  Right.  To further assist in projecting

22  future economic trends -- and this is paragraph 16 of the E&Y

23  declaration; it's Docket Number 12 -- E&Y sought the advice

24  and input of its own internal team members with experience in

25  economic forecasts impacting the likely future property and

 1   income tax revenues.  The testimony on the stand, your Honor,

 2   similarly relies on input from Milliman, input from audited

 3   financial statements.  In addition to that and with regard to

 4   Ken Buckfire, same -- and I won't go through the examples.

 5   Your Honor already has them.  But it is not simply putting

 6   somebody on the stand with a factual understanding of the

 7   city's financial issues and giving testimony that any other

 8   layperson could give.  And more than that, your Honor,

 9   neither of these are elected officials or city employees,

10   which means not only is it not a business owner exception,

11   but it's not a hearsay exception.  In other words, there's

12   nobody who looks at these.  Neither E&Y nor Miller Buckfire

13   review the City of Detroit's books and records in the

14   ordinary course of business.  The way they come into every

15   single situation where they're an expert witness -- they're

16   brought in as an expert witness for that very purposes.

17   They're allowed to rely on the books and records of their

18   client, but this is not a business record exception.  It's

19   not a business owner exception.  It's not a hearsay

20   exception.  What it is, your Honor, is disguised expert

21   testimony.  If it's truly simple math, why do we have to hire

22   E&Y, Conway MacKenzie, and Miller Buckfire to do it for us?

23   Thank you.

24           THE COURT:  Anyone else?

25           MR. STEWART:  Thank you, your Honor.  It's going to

1  take me a minute to get organized.  So I submit that actually
2  this is a fairly easy question, not easy to resolve but easy
3  to analyze, and let me do so this way.  We're talking about
4  what does Rule 701 mean and how is it to be applied.  We
5  don't need to guess because the people that wrote it told us,
6  so let's put up the advisory committee -- while that's being
7  put up, I just want to deal with one issue in passing as to
8  Mr. Buckfire and also Mr. Malhotra.  The suggestion was made
9  that because they have all this expertise, they could only
10  testify as expert witnesses.  The paragraph -- keep that up,
11  if you'd like, Lauren.  The advisory committee actually
12  answered that, too.  This is not what's up on the screen.
13  It's the advisory committee comments to the 2000 amendments,
14  and I know these books come out every year, but mine is on
15  page 460.  And the committee wrote, "The amendment does not
16  distinguish between expert and lay witnesses but, rather,
17  expert and lay testimony.  Certainly it is possible for the
18  same witness to provide both lay and expert testimony in a
19  single case."  And I said I'm just really dealing with that
20  in passing because I want to put to one side the proposition
21  that the fact that these witnesses have expertise means that
22  they were precluded from giving lay testimony, but the reason
23  now I put this up is this is what the advisory committee that
24  wrote the rule said.  Although many cases have interpreted
25  it, what is useful about this is they told us what they

1    meant, and it says, "For example, most courts have permitted

2    the owner or officer of a business to testify to the value or

3    projected profits of the business, without the necessity of

4    qualifying the witness as an accountant, appraiser, or other

5    similar expert," and they cite a case called Lightning Lube,

6    Inc., which was from the Third Circuit.  So what I think we

7    ought to do is go to Lightning Lube since the authors of this

8    looked at that case and obviously were -- thought it was what

9    they wished to implement here.  Now, Lightning Lube -- and I

10   think I have copies of all -- of many of these, Judge, and if

11   you'd like I may pass them up.  I have a copy also for

12   counsel.  However --

13            THE COURT:  It's not necessary, sir.

14            MR. STEWART:  Okay.  Thank you, your Honor.

15            THE COURT:  If others would like them, that's fine,

16   but it's not necessary for me.

17            MR. STEWART:  So what happened in Lightning Lube?

18   Lightning Lube involved a man named Venuto, and he was

19   starting a chain of -- I don't know what you call them --

20   centers like a Jiffy Lube.  And he had a deal with one of the

21   lubricant oil companies, and the deal fell apart, and it

22   ended up in a large business failure case.  And one of the

23   interesting facts about the Third Circuit opinion is just

24   the -- all the lawyers that appeared in it, but the Court

25   said Mr. Venuto could testify about the projected profits

1  from his business.  It didn't say no forecast.  It didn't say

2  you can't have projections.  It said he was allowed to.  And

3  by the way, not only was he allowed to testify about the

4  projected profits from his business, the Court also said it

5  was not a problem in affirming the admissibility of this

6  evidence that he had relied on -- in part on a report that

7  came from a third party, so it's not required that it be only

8  his knowledge.  And, similarly, let me dispense with another

9  point.  The advisory committee made a distinction in this

10  rule and carved out what other courts have sometimes called

11  the owner-officer exception to the rule, and so there's a

12  sub-body of a case law on this.  There are other cases

13  involving criminal law and so on, but there's a line of cases

14  on owner-officers.  Few things are clearer than the fact that

15  is a label, not a requirement, and any number of the cases

16  allow people who are not owners or officers to testify as lay

17  experts under Rule -- I mean lay -- give lay opinion under

18  Rule 701.  The Sixth Circuit not long ago in a case I have

19  trouble pronouncing, but it seems to be something like

20  Lativafter, allowed an outside investor to do so, so I don't

21  think we should be confused by the name of the exception

22  since we know what it means.

23      So let's go back to Mr. Venuto, and Mr. Venuto --

24  this is -- I'm going to paraphrase or I could read from what

25  the Third Circuit said in Lightning Lube.  It says Mr. Venuto

1  calculated future profits, so we're not talking about

2  historical; we're talking about future profits -- in two

3  ways.  First, he calculated the profits he would have earned

4  on the 117 franchise contracts that he actually sold.  Venuto

5  predicted that after four years in business, each center

6  would have been generating $28,000 in royalty fees.  Given

7  this calculation plus the money the franchisees would have

8  earned in the first four years, Venuto predicted that he

9  would have earned $27,729,000 in future profits from the 117

10  existing contracts through 1996.

11         Next, Venuto calculated the lost profits on

12  franchises he expected to have sold based on projections he

13  developed with an accounting firm when he planned to take the

14  company public.  Venuto predicted that he would have sold 370

15  more franchises over the ten-year period; that all of them

16  would have opened, parens, 37 each year, close parens, and

17  that he would have earned $43,821,000 from these franchises

18  using the formula discussed above.

19         Now, if this were simply one of the various cases

20  that go back and forth on the subject, we'd say, well, that's

21  an interesting case, let's look at the others, and we will

22  look at others, but to make the obvious point, this is the

23  case the advisory committee cited, and it is the only case

24  the advisory committee cited.

25         So now let's go to the cases that have been cited by

1   the objectors, and let's start with the one that they began

2   with, JGR, a Sixth Circuit opinion from 2004. In JGR there

3   was a lay witness who was put on the stand. His name was, I

4   think, Gornik. And his lay testimony was going to be about

5   the value of the business. He was excluded. The reason he

6   was excluded was not that a lay witness can't talk about

7   future events at a company. He was excluded because he

8   didn't know about it from firsthand knowledge. He didn't

9   happen to be an officer or employee of the company, but more

10  to the point, his information was cobbled together at the

11  last minute, and he failed the leg of this that he had to

12  prove, that he had particularized knowledge of it. And as is

13  so often the case, the footnotes tell us a lot about this,

14  and this is what the Court wrote in footnote three. It said,

15  "The district court's apparent assumption that Gornik was a

16  'factual witness'" -- that was in quotes -- "who, quote,

17  'does JGR's books,' unquote, is false. In fact, Gornik was

18  never an accountant for JGR and never did its books. His

19  first experience with JGR was in March 1999 when he was

20  contacted by JGR's trial counsel for the purpose of, quote,

21  'putting down on paper what the financial statements of

22  Gerald's Furniture would have looked like had Thomasville

23  support to the business continued and had the owners been

24  able to carry through on how they planned to operate the

25  business.'" So JGR does not stand for any broader principle

1    than this, and I would suggest, your Honor, that there are

2    two steps to our analysis.  Step number one, does the witness

3    have personal particularized knowledge of the facts in

4    question?  Two, is he using that personal particularized

5    knowledge to give his testimony?

6            Now, I'm going to come back to that, but I also want

7    to deal with the DIJO case -- D-I-J-O, and I'm pronouncing it

8    as DIJO, and I think various lawyers mentioned it.  DIJO was

9    a hotel case of some sort, and there was -- this is a Fifth

10   Circuit case, but it's cited in the other cases.  And there

11   there were two witnesses.  There was a man named Skinner, and

12   Skinner didn't really work for the company, didn't know very

13   much.  They were offering him, once again, to testify about

14   projections, and they said he doesn't have the particularized

15   knowledge that's necessary, so they didn't let him testify.

16   Stuck in the back of the opinion, though, is something else.

17   It turns out in DIJO there were two witnesses.  There was a

18   man named Turner.  Quoting from the Fifth Circuit opinion,

19   "The Defendants also contend that the District Court erred

20   when it permitted Turner to testify about DIJO's lost

21   profits.  Turner testified that the proposed hotel would have

22   generated a net income of $633,000 a year.  Based on that

23   projection, he offered his opinion that the business would

24   have been worth 5.45 million if sold in its fifth year.

25   Turner was one of DIJO's two principals, and his estimates

1    were based on his own involvement in developing the Project.

2    In light of the foregoing discussion of the boundaries of

3    Rule 701, we cannot conclude that the district court abused

4    its discretion in admitting Turner's lost profit testimony."

5         So these cases do not stand for a hard-and-fast rule

6    about ownership.  They stand instead for the two steps that I

7    mentioned earlier.

8         Now, as to step one, did Mr. Malhotra have personal

9    and particularized knowledge of the city's finances and the

10   numbers that came out of the city's books and records?  I

11   think his testimony establishes that.  I had actually

12   excerpted all of it, but I did so from the transcript we are

13   not using, so I'm not going to go further in terms of

14   citations, but I think it was quite clear what his knowledge

15   was.  He was hired in May of 2011, about 30 months ago if my

16   counting is right.  He wasn't hired because of lawsuits nor

17   of impending bankruptcy.  His retention preceded, I think,

18   even the financial stability board.  It appears he was hired

19   because the city had laid off so many of its workers it

20   couldn't do this job itself, and so for the past two and a

21   half years Mr. Malhotra has accumulated information, he has

22   analyzed it, and that's where his work comes from.  I think

23   it's apparent -- and I don't think anyone is challenging

24   seriously that he has the level of personal and

25   particularized knowledge that's required by Rule 701.

1          So then the question becomes the second leg of it,

2     and that is is he using that particularized knowledge in

3     giving his opinion.  There was a case, for example, in the

4     Bankruptcy Court in New York, and it's cited, I believe, in

5     the objector's brief, called MarketXT.  Like all these cases,

6     they all -- since they're fact-based, are all illuminating no

7     matter where they come out.  And in MarketXT, there was a

8     witness -- and I don't remember his name, but I have the case

9     here, but it's not important -- who is a principal of -- I

10    guess it must have been the debtor.  And he was there to

11    testify about the things we talked -- projections, future

12    profits, current value, all of the things that we see in this

13    line of cases.  What they did, though, with this expert --

14    and I actually should dig it out because it's such an

15    interesting case -- they said, "You can't testify about that.

16    This model you've got has discounted cash flow values.  It's

17    got all kinds of theoretical economic elements to it.  And

18    that's not who you are, Mr. Witness, you are just the fellow

19    who worked for the company.  So they said, "We're not going

20    to let you talk about it," but then the Court gratuitously

21    said, "You know, if they'd offered him as a 701 witness, we

22    would have received his testimony," because then he would

23    have been talking about what he knew and he could have used

24    the standard types of approaches that the other 701 cases

25    have talked about.

1    So when you look at where these cases fall out --
2    and I think in the end it becomes something like a question
3    of fact -- what you find, I think, is this.  There's no hard-
4    and-fast rule that you have to be an owner or officer.  There
5    are cases where that's not the case.  There's no prohibition
6    on relying from information that comes from other people, and
7    there are any number of cases that certainly permit that to
8    be done.  LTV is one.  This case, Lativafter is one.
9    Lightning Lube itself was one.  There's no prohibition on a
10   lay witness having specialized technical information provided
11   that's not what he's using or that's not what he's talking
12   about.  He's not giving an expert opinion in that sense.
13   Instead, it is how does it relate to what he knows?  And in
14   cases like the one I just mentioned, MarketXT -- there's
15   another one, I think, called Lifewise where a 701 witness was
16   asked to testify about a complicated econometric model, and
17   the Court didn't accept it for that reason.  Where that's the
18   case, although the witness meets leg one, he or she doesn't
19   meet leg two.  However, one thing is quite clear.  Where the
20   witness is working from and has the particularized personal
21   knowledge and is using that to provide projections,
22   forecasts, and similar, the courts do allow it.
23      Now, I think one of the main objections we run into
24   here is, yes, that's true, but this is just a heck of a lot
25   of information, and it is a lot of information.  I think when

1  we're dealing with an enterprise the size of Detroit, there's

2  no getting around that.  The courts, though, never say this

3  rule only applies in narrow circumstances and when you're

4  dealing with a narrow data set.  The rule is instead do you

5  have the knowledge, and is that what you're using.  The fact

6  assumptions are used makes no difference.  Every single one

7  of the cases I recited and the rest, the witness uses

8  assumptions.  He or she has to.  They're forecasting future

9  profits, and every one of these cases is a case about future

10 profits or future value or future this or future that, so

11 that is not a disability.

12      What it comes down to then is how then did he use

13 his particularized knowledge to prepare his analysis, so

14 let's start with what the particularized knowledge was.  What

15 his particularized knowledge was -- hang on; I wrote it down

16 for myself so I wouldn't forget it -- the historical data

17 about the city, which he said in his declaration came from

18 the CAFR and many other publicly available sources; the

19 city's bank records; internal reports that he got from the

20 city; factual matters.  And by the way, this is not hearsay.

21 I established a business record exception for that when I

22 asked him at the beginning of his testimony, "Were these

23 materials that the city prepared in the ordinary course of

24 its business?  In your experience, do cities and other

25 enterprises prepare materials like these in the ordinary

1    course of their business?" And he said, "Yes," and that was

2    never challenged, and so he's not being used to get in

3    hearsay on that basis. These are business records, and I

4    don't think anyone ever contended otherwise.

5         What else did he add? He added known changes coming

6    in the future, the city's budgets, which are predictions;

7    cost of living clauses in contracts; information he did

8    receive from actuaries about changes in pensions. However,

9    the actuary in question was their actuary, Gabriel, Roeder.

10   Information about state revenue sharing, changes in tax

11   rates. What about assumptions given to him by others or that

12   he made, rate of growth or rate of decay in tax -- property

13   tax receipts, rate of growth or rate of decay in income tax

14   receipts, assumed rates of inflation, changes in population

15   of the city. Now, those are assumptions, but they are no

16   different qualitatively than what Mr. Venuto did when he

17   predicted how many franchises he thought he would be selling

18   in the next four years and how those franchises would do in

19   the next ten years. And the Court not only thought that it

20   was fine, so, too, did the advisory committee. What about

21   other things that went in? And let's, if we could, put up

22   Exhibit 9 I think it is, page 2. This is one of the

23   exhibits, your Honor, obviously we spent a lot of time on,

24   but it's illustrative. That tells you what is his

25   particularized knowledge, and there is a list of it on the

1   left-hand side, and we spent a lot of time going over what is

2   each of these things, but he has knowledge about things like

3   lumpiness of revenue receipts.  They don't come in a smooth

4   way.  Remember the testimony is you get a bunch and then

5   nothing happens for awhile.  When is it that the city

6   receives -- it's every other month -- its revenue sharing so

7   he could put in the spreadsheet when that arrives?  What is

8   the expected availability of the escrowed funds that came

9   from the state-sponsored financing that the city floated?

10  And perhaps also which of the numbers he gets from the city

11  are the most reliable?  Maybe it's a personal judgment which

12  ones he finds most materially useful to him.  So these are

13  all things that he gets as a result of his work.

14          Now, I think it was Mr. Montgomery raised the point

15  about using an Excel spreadsheet, so let me spend a minute on

16  that.  I think if you're above a certain age, maybe it's

17  not -- I think you're younger than me -- it may be more of a

18  challenge.  It comes preinstalled on every computer in this

19  courtroom.  It is the way business is now run.  It is the

20  standard method used not by experts but by everybody to

21  organize financial information.  There's nothing suspect

22  about taking the city's information and putting it into a

23  spreadsheet.

24          Now, what does a spreadsheet do and the real

25  question, does using a spreadsheet convert Mr. Malhotra's

 1   approach into one that used scientific or other technical or
 2   specialized knowledge, which was the test under 702, and 702
 3   gets imported into 701 by dint of 701(c), which is the very
 4   thing -- added in 2000, which is the very thing the advisory
 5   committee was talking about in the text we had on the screen.
 6   So what does he bring into it?  He brings in labels, which
 7   tells us what information he's talking about.  He brings in
 8   dates, what period he is forecasting.  He puts in the numbers
 9   that he has, and they repeat either verbatim or they repeat
10   based on knowledge he has such as when does the revenue
11   sharing money come in, or they repeat because he's using some
12   kind of a metric to increase or decrease them over time.

13        Now, what he's doing here is addition and
14   subtraction, maybe division, probably multiplication.  There
15   was no evidence and no one asked him this, that behind this
16   stood some kind of complicated econometric model of the sort
17   that other courts have rejected.  He was there to be
18   examined.  No one asked him that.  In fact, I asked him how
19   he calculated, and he said it was arithmetic.

20        Now, there is in the tone of the papers -- and I'm
21   not criticizing counsel at all -- the suggestion that this
22   was some sort of stealth means of springing a surprise on the
23   objectors.  The fact of the matter is that document was in
24   Mr. Malhotra's declaration, which the objectors have read
25   from this morning and has been in the public domain since

1    July 18.  Ernst & Young, who we don't control, wrote a letter

2    to the objectors saying, "If you wish our back-up papers,

3    you'll have to subpoena them, but serve a subpoena on us, and

4    we will produce them."  No subpoena was ever served.  We

5    identified this document as a back-up for hearsay purposes as

6    a compilation under Federal Rule of Evidence 1006, and we

7    sent a letter to the objectors saying, "If you want to see

8    the back-up materials, they're available for examination.

9    Please call Ernst & Young."  One objector called.  No one

10   ever came.

11          Mr. Malhotra was deposed not once but twice.  I was

12   there both times.  The first time especially he was examined

13   at no small length about his spreadsheets.  It went on for a

14   long time.  He answered every single question put of him.  If

15   after that first deposition there had been uncertainty, there

16   was a second deposition coming and an opportunity in the

17   meantime to go get any documents they might need if they

18   wanted to dig deeper with Mr. Malhotra.  That did not happen.

19   So this is not a case where there was surprise.  It's not a

20   case where this was concealment.  It is, instead, I think, a

21   fairly classic case of everything was available.

22          Is this complex?  Yes, it is.  I don't deny it.

23   Does that mean that it can only be addressed by an expert

24   witness under Rule 702?  The cases do not say that.  Now, the

25   advisory committee rule and the cases that speak about it are

1  quite clear.  A lay witness who has personal particularized
2  knowledge about facts may offer his opinion -- his opinion --
3  the rule says "opinion."  He can offer his opinion about
4  future profits, forecasted value, and those other things that
5  go off into the future, and it is admissible.  The issue
6  here, I think, is one only of magnitude when it comes to
7  Mr. Malhotra, but that was something we've all known from day
8  one.  It was disclosed on day one.  He's been deposed two
9  times.  There's been opportunity for other discovery, and he
10  was here and cross-examined.  I thank you, your Honor, for
11  your patience.
12          THE COURT:  You want to turn your attention to the
13  Buckfire issue?
14          MR. STEWART:  I will, your Honor.  I think a lot of
15  that is the -- it's the same basic analysis, so I -- with the
16  rule, and so I won't repeat any of that.  Mr. Buckfire
17  testified -- by the way, one other minor point here.  Cases
18  also say just because someone has scientific, technical, or
19  other specialized knowledge and that makes it easier -- we
20  can keep that up if you'd like because I was going to point
21  to that in a moment -- and that makes it easier for them to
22  do things like pull all this together, it doesn't convert
23  them into a 702 witness.  And they spoke at one -- it was one
24  of the cases, and I'm not sure I know it off the top of my
25  head, which spoke about a witness' computer knowledge making

1   it easier for that witness to put his or her projections

2   together, and there were others as well.  So the fact

3   somebody has a lot of expertise doesn't disqualify them or

4   change things.

5        Now, with Mr. Buckfire, one thing was apparent.

6   He's a highly skilled, very experienced, highly intelligent

7   investment banker who's been in the business a long time and

8   has done restructurings a long time and knows an immense

9   amount about it.  No question about that.  And he -- that

10   came out in his background and otherwise.  It's also clear

11   that when he was hired by the city, he began working very

12   hard to learn everything he could about the city, and he

13   relied, among other things, on Mr. Malhotra's work.

14        His subsequent testimony was about what that -- what

15   those -- how those projections fit into his other work and

16   what it was he did or felt he had to do based on the state of

17   the facts that he found when he came to this job.  And as I

18   understand the particular objections that we're facing to his

19   testimony, one had to do with his statement about GO bonds

20   and the accessibility of the credit market to the city.  I

21   think that somebody with his level of knowledge of the city

22   can say, "I'm looking at what their numbers are, and these

23   numbers will not allow you to borrow money on the bond market

24   because the numbers are negative."  And there were other

25   parts of the testimony as well, your Honor, but I think, as

1  Mr. Cullen said, at the end of Mr. Buckfire's testimony, much

2  of what he was talking about and asked about and testified

3  was about his own conduct and that his conduct and

4  conclusions were in and of themselves operative facts in the

5  lead-up to the city's decision to file for bankruptcy, and

6  they were certainly probative of good faith, but I assume

7  that's not what we're here to talk about.  And as a result,

8  Buckfire's testimony on the subject is also qualified lay

9  testimony because he was taking the facts that he had, which

10  were particularized and personal, and he was -- pardon me --

11  applying those looking forward as a projection as how this

12  affected the city's ability to borrow money, which is no

13  different than projecting an enterprise's ability to earn a

14  profit, and the city's ability to do other things.

15         One last point that troubled us on this -- and

16  actually on both, but I'll focus on Mr. Buckfire -- that

17  objection also came in a little late at the very end of his

18  testimony, and had it been made in a timely way, perhaps the

19  questioning could have taken a different course to avoid

20  this.  I'm not trying to impugn motives of anyone, but, as a

21  practical matter, it did change how the examination of

22  Mr. Buckfire went and I think may have led to some of the

23  very issues that they now raise, and it would have been

24  easier for us all perhaps had the objection been made at the

25  time.  And if the Court has no questions --

1     THE COURT:  No.  Thank you.  Excuse me.  Any brief

2   rebuttals, please?

3     MR. DECHIARA:  Your Honor, I find it interesting

4   that the city begins its legal analysis by reliance on the

5   advisory committee notes to the rule as if the advisory

6   committee notes to the rule were somehow in opposition to the

7   JGR case, the governing Sixth Circuit case.  Well, JGR quotes

8   from and discusses the advisory committee notes before it

9   reaches the holding that it does, so there's nothing

10   inconsistent between the advisory committee notes and the

11   Sixth Circuit's holding in the JGR case.  It's the JGR case

12   which is -- which governs here.

13     It's also curious counsel cited in his oral argument

14   just now the JGR case, and I think he said it's something

15   that we cited, we, the objectors, but that is the lead case

16   in the city's papers.  It's block quoted in paragraph 2 and

17   then cited throughout, so there's -- I don't think there's

18   any dispute between the parties here that JGR is the case

19   that's relevant here and that governs.  We're not -- there

20   was lengthy discussion by counsel about a Third Circuit case,

21   and if this courtroom were in New Jersey or Pennsylvania,

22   that would probably be more interesting, but this is a

23   courtroom in Michigan in the Sixth Circuit, and we're bound

24   by Sixth Circuit law, the JGR case.

25     Then, having cited it as its lead case, the city now

1    tries to run away and distinguish the case, and how does it

2    try to distinguish the case?  By citing facts in the

3    footnotes.  Well, there's a reason a court puts facts in the

4    footnotes, and it's because they're marginal.  The key facts,

5    the holding, is in the body of the decision, and let me just

6    read it.  It says very simply -- and this is 370 F.3d 256,

7    quote, "Gornik has never been an owner, officer or director

8    of JGR.  Additionally, the information upon which he relied

9    in making his calculations of lost profits and lost business

10   value came primarily from Yasowitz," who was someone -- a

11   principal of the company, "and Gornik admitted he did not

12   independently verify much of that information.  Therefore --

13   therefore, Gornik has no basis upon which to offer lay

14   opinion testimony about JGR's lost profits or lost business

15   value, and the district court abused its discretion in

16   admitting that testimony."  That's the holding of the case.

17   Counsel for the city comes up with his own formulation based

18   on his reading of a lot of case law, and he calors his own

19   standard.  We don't need to do that here.  We have the Sixth

20   Circuit telling us what the standard is and what the holding

21   is.  It's the JGR case, and it's squarely on point.

22          MS. LEVINE:  Your Honor, counsel spent some time

23   discussing the MarketX Holdings Corp. case.  Respectfully,

24   that case specifically cites to Rule 701 as -- and to the

25   advisory committee note with regard to 701 and specifically

1  points out that Rule 701 allows the admission of nonexpert
2  opinion testimony from a witness within limitations designed
3  to prevent the simple expedient of proffering an expert in
4  lay witness clothing and then goes on from there to conclude
5  an analysis based on specialized knowledge is excludable
6  where the witness has not been qualified as an expert and
7  then goes on to cite the exception when somebody is actually
8  a business owner, won't rehash that, but specifically
9  provides that even if a person is a business owner, if you
10 still go outside what that business owner's area of expertise
11 could be, then you exclude that as well.  Thank you.
12        MR. MONTGOMERY:  Your Honor, just a couple of final
13 points, not on the law because I think there's no possibility
14 in my mind that your Honor has any doubt as to the law and
15 the scope of this Court's discretion, so instead I'd like to
16 simply remind -- ask the Court to remember that Mr. Buckfire
17 testified that the forecasts were prepared by a team of
18 experts in revenue and tax policy.  Those are the same
19 forecasts that Mr. Malhotra said "we" many times.  I remember
20 the Court even asked Mr. Malhotra to say please speak in the
21 personal, not in the collective, but Mr. Malhotra repeatedly
22 discussed collective, and I think the reason is
23 straightforward.  We learned from Mr. Buckfire that, in fact,
24 a team was involved.  The second -- the notion raised by
25 counsel that Mr. Malhotra could testify on the -- or use

 1  reasonable assumptions on city population growth when he

 2  wasn't an economist, he was not a population forecaster, he

 3  had no -- didn't say anything about having skills in that

 4  particular environment, sort of cuts back from the notion

 5  that all he's doing is math, taking specific numbers, putting

 6  them in cells on a spreadsheet and simply putting auto sum

 7  for each column of the numbers.

 8          And last but not least, in his own detailed work, he

 9  repeatedly said he both looked at bank accounts and he looked

10  at documents prepared by others, which were the city

11  department budgets, in trying to assess whether identified

12  cash belonged in one column or another.  Your Honor, that is

13  not ordinary math.  It's not lay testimony.  Thank you.

14          THE COURT:  Thank you all.  The Court will take this

15  under advisement until 10:15 and return with a decision at

16  that time.

17          THE CLERK:  All rise.  Court is in recess.

18      (Recess at 10:00 a.m. until 10:15 a.m.)

19          THE CLERK:  Court is in session.  Please be seated.

20          THE COURT:  The matter is before the Court on the

21  city's request for reconsideration of the Court's previous

22  exclusion of so much of its exhibits and its witnesses'

23  testimony, especially from Mr. Malhotra, that dealt with the

24  cash flow projections which have been excluded from evidence

25  and also the motion to strike so much of Mr. Buckfire's

1  testimony as appeared to present opinion testimony based on

2  his expertise.

3        The Court concludes that the motion for

4  reconsideration should be granted and that the motion to

5  strike Mr. Buckfire's testimony should be denied.  These

6  decisions are controlled, as the parties suggest, by Rule 701

7  of the Federal Rules of Evidence, which provides that a lay

8  witness -- that is, one who is not testifying as an expert --

9  may only testify to, quote, "opinions or inferences which are

10 (a) rationally based on the perception of the witness; (b)

11 helpful to a clear understanding of the witness' testimony or

12 the determination of a fact in issue; and (c) not based on

13 scientific, technical, or other specialized knowledge within

14 the scope of Rule 7002 (sic)," close quote.

15       As has been noted here, Subsection (c) of Rule 701

16 was added to the rule in the year 2000 to eliminate the risk

17 that the reliability requirement set forth in Rule 702 would

18 be evaded through the simple expedient of proffering an

19 expert in lay witness clothing.  The advisory committee note

20 suggests a second reason as well, which was to prevent

21 litigants from evading the mandatory prediscovery disclosure

22 requirements for expert testimony as set out in Rule 26 of

23 the Federal Rules of Civil Procedure.

24       However, most significantly, the advisory committee

25 note for the 2000 amendment does further explain, quote,

1   "Most courts have permitted the owner or officer of a

2   business to testify to the value or projected profits of the

3   business, without the necessity of qualifying the witness as

4   an accountant, appraiser, or similar expert."  And here the

5   note cites Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153,

6   Third Circuit, 1993, and the Court notes parenthetically that

7   that case held that there was no abuse of discretion in

8   permitting the plaintiff's owner to give lay opinion

9   testimony as to damages as it was based on his knowledge and

10   participation in the day-to-day affairs of the business.  The

11   advisory committee note goes on to state, quote, "Such

12   opinion testimony is admitted not because of the experience,

13   training, or specialized knowledge within the realm of an

14   expert, but because of the particularized knowledge that the

15   witness has by virtue of his or her position in the business.

16   The amendment does not purport to change this analysis,"

17   close quote.

18       There are obviously a wide range of circumstances in

19   which the issue of whether lay opinion testimony will be

20   admitted arises, and it is certainly an appropriate

21   observation that ultimately the Court's decision on whether

22   to permit such testimony is highly fact-specific.  The

23   parties here largely have argued this issue in the context of

24   lay opinion testimony on lost profits or projected profits,

25   and the Court agrees that those are the most pertinent cases.

1    Accordingly, the Court will review some of those.

2         Perhaps the most controlling case is that which the

3    parties have argued here, JGR, Inc. v. Thomasville Furniture

4    Industries, Inc., 370 F.3d 519, Sixth Circuit, 2004.  In that

5    case, the Court stated, quote, "The primary issue in this

6    case concerns the admissibility of testimony by JGR witness

7    James Gornik, a certified public accountant and lawyer who

8    testified about the amount of lost profits and lost business

9    value that JGR allegedly suffered as a result of

10   Thomasville's breach of contract."

11        In the course -- close quote.  In the course of the

12   opinion, the Sixth Circuit relied heavily on a prior decision

13   by the Fifth Circuit in DIJO, Inc. v. Hilton Hotels Corp.,

14   351 F.3d 679, Fifth Circuit, 2003.  The JGR court held that

15   was a strikingly similar case to the one before it, and the

16   Sixth Circuit stated in regard to DIJO, quote, "In DIJO, the

17   Fifth Circuit held that the district court abused its

18   discretion in permitting a, quote, 'financial consultant,'

19   close quote, to testify as a lay witness regarding the

20   company's lost profits.  Although the witness was the

21   plaintiff's primary contact at a commercial lending facility

22   with which the plaintiff had a business relationship, he had

23   not served as an owner or officer of the plaintiff company.

24   Additionally, the witness's opinion was based primarily" --

25   excuse me -- preliminary -- "was based on preliminary income

1  figures and other information that he had received from the

2  plaintiff's founder, and his appraisal was not based upon his

3  own independent knowledge or observations."

4       And the Court further quoted from DIJO, "It is

5  telling that DIJO responds, not with evidence of the

6  witness's involvement with the plaintiff or the Project, but

7  only emphasizing his substantial business experience.  Such

8  generic industry experience does not pass Rule 701 scrutiny.

9  The plaintiff never attempted to qualify the witness as an

10  expert, and a lay witness who was never employed by or

11  directly involved in a business is unlikely to have the type

12  of first-hand knowledge necessary to provide reliable

13  forecasts of future profits.  The further removed a layman is

14  from a company's day-to-day operations, the less likely it is

15  that his opinion testimony will be admissible under Rule

16  701."  And that's the Sixth Circuit's quote from DIJO, 351

17  F.3d at 686.

18       So the Sixth Circuit noted that in light of the

19  witness' lack of the requisite firsthand personal knowledge

20  of the company about which he testified, the Fifth Circuit

21  held that the District Court abused its discretion in

22  permitting the witness to give lay witness -- lay opinion

23  testimony under Rule 701.

24       In the JGR case, the Court of Appeals noted that the

25  District Court's apparent assumption that Gornik was a

1    factual witness who does JGR's books was false.  The Court
2    noted that, in fact, Gornik was never an accountant of JGR
3    and never did its books.  His first experience with JGR was
4    in March of 1999 when he was contacted by JGR's trial counsel
5    for the purpose of putting down on paper what the financial
6    statements of Gerald's Furniture would have looked like had
7    Thomasville -- had the Thomasville support to the business
8    continued and had the owners been able to carry through on
9    how they planned to operate the business.

10           Now, it is true, as has been pointed out here, that
11   this observation by the Court of Appeals is in a footnote.
12   Nevertheless, the Court cannot conclude that it is,
13   therefore, a marginal fact.  It plainly formed a substantial
14   basis for the Court's ultimate disposition in the case.

15           And since the Sixth Circuit in JGR relied so heavily
16   on DIGO (sic) from the Fifth Circuit, the Court concludes
17   that it's appropriate to look further into what the Fifth
18   Circuit said in that case, so, for example, at 351 F.3d at
19   686 the Fifth Circuit stated -- the Fifth Circuit discussed
20   two other cases, these two from the Third Circuit, In re.
21   Merritt Logan, Inc., 901 F.2d 349, Third Circuit, 1990, as
22   well as Teen-Ed, Inc., v. Kimball International, Inc., 620
23   F.2d 399, F.3d, 1980.  And so in regard to these two cases,
24   the Fifth Circuit stated, quote, "In In re. Merritt Logan,
25   Inc. the plaintiff's company -- the plaintiff company's

principal shareholder, Logan, was permitted to testify about
the company's lost profits.  The facts recited in that
opinion demonstrate that Logan was not a passive outside
shareholder.  He was intimately involved with the investments
and management of the business.  Thus, the Third Circuit
correctly concluded that Logan could provide lay opinion
testimony given his personal knowledge of the enterprise.
Likewise, in Teen-Ed, Inc. v. Kimball International, the
Third Circuit decided that the appellant, Teen-Ed's, licensed
public accountant, Zeitz or Zeitz, could provide lost profits
opinion testimony.  Zeitz's testimony was based on the
personal knowledge of Teen-Ed's balance sheets, which Zeitz
had acquired firsthand as Teen-Ed's accountant and
bookkeeper.  Thus, the Court concluded -- this, the Court
concluded, qualified Zeitz as a witness eligible under Rule
701 to testify to his opinion of how lost profits could be
calculated and to inferences he could draw from his
perception of Teen-Ed's books.

Further supporting the Court's decisions on these
two matters is the Sixth Circuit's decision in Lativafter
Liquidating Trust v. Clear Channel Communications, Inc., 345
Federal Appendix 46, Sixth Circuit, 2009.  In that case, the
Court stated, quote, "Grady Vanderhoofven is a venture
capitalist, the Executive Vice-President of Southern
Appalachian Fund, which invested in Eon, and was a member of

1   Eon's board.  Vanderhoofven testified that Eon's value would

2   have been $57 million with the Clear Channel contract,

3   instead of the $17 million it sold for in 2006.  As an

4   investor in Eon, Vanderhoofven in 2005 investigated Eon's

5   financials, retaining a market research firm to verify Eon's

6   market potential.  When he became a member of Eon's board in

7   March 2005, he received Eon's monthly financial reports,

8   including income statements, balance sheets, and cash flow

9   statements.  Vanderhoofven testified that between June 2004

10  and June 2005, the number of stations Eon was streaming

11  increased by over 500 percent.  After June 2005, however, the

12  revenue from Clear Channel began to dwindle, and

13  Vanderhoofven determined that Clear Channel was moving its

14  streaming business to another company.  Vanderhoofven based

15  his $57 million valuation on the revenue Clear Channel had

16  been generating for Eon prior to the discontinuation of their

17  business, and the projection for the 12-month period prior to

18  Eon's sale.  As an investor who researched Eon's financial

19  condition, and later as a member of Eon's board,

20  Vanderhoofven had personal, particularized knowledge of Eon's

21  value.  The district court did not abuse its discretion in

22  permitting him to testify about Eon's projected value if it

23  had retained Clear Channel's business.  Moreover, contrary to

24  Clear Channel's assertions, Vanderhoofven's testimony rested

25  on a sufficient foundation - his personal research into Eon's

1  financial reports."

2       The Court's decision today is also consistent with

3  and supported by a Third Circuit decision in <u>Donlin</u> v.

4  <u>Philips Lighting North American Corp.</u>, 581 F.3d 73, Third

5  Circuit, 2009.  In that case, the Court stated that Rule 7001

6  (sic), quote, "does not mean that an expert is always

7  necessary whenever the testimony is of a specialized or

8  technical nature.  When a lay witness has particularized

9  knowledge by virtue of her experience, she may testify - even

10  if the subject matter is specialized or technical - because

11  the testimony is based on the layperson's personal knowledge

12  rather than on specialized knowledge within the scope of Rule

13  702.  At the same time, we have consistently required that

14  lay testimony requiring future projections of business or

15  operation come from someone who has intimate and thorough

16  knowledge of the business gathered from either a lengthy

17  tenure or a position of authority," close quote.

18       Most tellingly, the Court in <u>Donlin</u> stated, quote,

19  "A trial judge must rigorously examine the reliability of a

20  layperson's opinion by ensuring that the witness possesses

21  sufficient specialized knowledge or experience which is

22  germane to the opinion offered," close quote.

23       And, finally, just to cite some other opinions or

24  decisions that support this, <u>Van der Ruhr</u> v. <u>Immtech</u>

25  <u>International</u>, 570 F.3d 858, Seventh Circuit, 2009;

 1    Securitron Magnalock Corp. versus Schnabolk, 65 F.3d 256,

 2    Second Circuit, 1995; United States versus Valencia, 600 F.3d

 3    389, Fifth Circuit, 2010; and MCI Telecommunications Corp. v.

 4    Wanzer, 897 F.2d 703, Fourth Circuit, 1990.

 5            Ultimately, it is for the Court to determine whether

 6    the proffered testimony carries with it sufficient indicia of

 7    reliability arising from the witness' personal relationship

 8    with the proponent of the evidence.  Accordingly, it is

 9    certainly true that, as argued here, a taxicab driver would

10    not be permitted to testify to these matters, but that does

11    not mean that neither Mr. Malhotra nor Mr. Buckfire can

12    testify -- can't testify to the matters that they testified

13    to because of their personal knowledge of the city's

14    financial affairs, and in this regard, the Court will find

15    that both Mr. Malhotra and Mr. Buckfire had extensive

16    personal knowledge of the city's affairs that they acquired

17    during their -- the course of their consulting work with the

18    city and that formed the basis of their opinions and

19    conclusions.

20            Perhaps more fundamentally than any of this is this

21    key consideration in the Court's ultimate resolution of these

22    matters.  What both Mr. Malhotra did and what Mr. Buckfire

23    did are a substantial part of the facts and circumstances

24    that led to the filing of this case and that are, therefore,

25    highly relevant to the issues of eligibility that are before

1    the Court at this time.  Accordingly, not only what they did

2    but why they did what they did, as explained through the

3    documents and in the testimony that they have proffered, is,

4    in the Court's view, entirely admissible.  Accordingly, the

5    motion to reconsider is granted.  The documents that the

6    Court had previously admitted on a limited basis are now

7    admitted for all purposes, and the motion to strike is

8    denied.

9              We were about to begin the cross-examination of

10   Mr. Buckfire, I believe, so let's do that.

11             MR. STEWART:  Yes.

12             THE COURT:  Step forward, please, sir, and resume

13   the witness stand.  And, sir, you understand you are still

14   under oath.

15             MR. BUCKFIRE:  I do.

16             THE COURT:  You may proceed.

17      KENNETH A. BUCKFIRE, DEBTOR'S WITNESS, PREVIOUSLY SWORN

18                        CROSS-EXAMINATION

19   BY MR. MONTGOMERY:

20   Q   Good morning, Mr. Buckfire.

21   A   Good morning.

22   Q   My name is Claude Montgomery.  I believe we've met before

23   in connection with your deposition in this matter --

24   A   Yes.

25   Q   -- is that correct?

1  A    That's right.

2  Q    Good morning.  Now, Mr. Buckfire, if for any reason I

3  speak too quickly or you do not understand my question, I

4  would ask that you let me know.

5  A    Thank you.

6  Q    Now, do you recall the date of your deposition that I

7  took of you in connection with this matter?

8  A    Not specifically, no.

9  Q    It was September 20 of this year, was it not?

10 A    Okay.

11 Q    Okay.  Do you recall where the deposition took place?

12 A    New York City.

13 Q    Okay.  Do you recall what time it started?

14 A    I believe it was in the morning.

15 Q    Would 8:30 be right?

16        THE COURT:  You believe it was what, sir?

17        THE WITNESS:  In the morning.

18 BY MR. MONTGOMERY:

19 Q    Now, I believe you testified to the Court yesterday that

20 you're from this area or a native I think is the word you

21 used.

22 A    Yes.

23 Q    Okay.  And what did you mean by "native," sir?

24 A    I was born in Detroit.  My family lived here until 1965.

25 They moved to Southfield, Michigan.  Then I attended

1    Southfield-Lathrup Senior High School.  My family still lives

2    in the area as does my wife's.  Attended the University of

3    Michigan, and I come back here frequently.

4    Q    You're quite connected to the Detroit area; is that

5    correct?

6    A    Yes, I am.

7    Q    Okay.  Do you know Andy Dillon personally?

8    A    Not personally, no.

9    Q    Have you ever met him?

10   A    Yes.

11   Q    And when did you first meet him?

12   A    I met him for the first time in January or February of

13   2010.

14   Q    And in what connection?

15   A    I had been introduced to him by a gentleman from the

16   Business Leaders for Michigan.  I'd asked him to introduce me

17   to Treasurer Dillon in the ordinary course of my duties

18   trying to make sure he knew about our firm and that that

19   might be helpful sometime with respect to Detroit.

20   Q    I believe you told the Court yesterday that starting in

21   about 2009 you engaged in an effort to make sure that your

22   firm's resources were known to potential players in the City

23   of Detroit drama; is that correct?

24   A    No.  We simply started paying attention to Detroit after

25   it was downgraded.

1    Q   Okay.  And was your introduction to Mr. Dillon part of

2    that paying attention to the City of Detroit after it was

3    downgraded?

4    A   Yes.

5    Q   Okay.  Now, by any chance do you know the current

6    governor, Rick Snyder?

7    A   I met him a few times.

8    Q   Okay.  And in what connection, sir?

9    A   During the course of our discussions with the state and

10   the financial advisory board in 2012, I met with him once or

11   twice to present really on an educational basis, you know, a

12   description of what restructuring was and how it might be

13   employed in a corporate and governmental setting.

14   Q   Okay.  And do you recall when that was, sir?

15   A   It might have been in the spring.

16   Q   Of which year?

17   A   April 2012.

18   Q   And can you be more specific in what information you gave

19   to Governor Snyder at that time?

20   A   We had put together a very brief presentation really

21   describing the techniques of restructuring, how we go about

22   analyzing the problems of a company or a government, and

23   describing the various techniques that could be employed to

24   deal with those issues in the course of creating a

25   comprehensive long-term financial strategy.

1   Q   And among the information that you gave to the governor

2   at that time, did it specifically relate to municipal

3   restructurings as well as corporate restructuring?

4   A   Yes.

5   Q   Okay.  And did it include in any -- a discussion of

6   Chapter 9 as a vehicle for a municipal restructuring?

7   A   Only as one of many alternative techniques.

8   Q   And what other alternative techniques did you tell the

9   governor existed in the spring of 2012?

10  A   I told him the same thing I tell all of my clients, that

11  bankruptcy is to be avoided at all costs, but it's always

12  required to be studied as a last resort.

13  Q   Okay.  You are the city's financial strategist, are you

14  not?

15  A   Yes.

16  Q   Okay.  Are you its chief financial strategist?

17  A   I don't understand that question.

18  Q   Okay.  But you are its financial strategist?

19  A   Miller Buckfire is the city's investment bank, and part

20  of our responsibilities is to formulate and develop and

21  execute financial strategy.

22  Q   All right.  And for Miller Buckfire, you are managing

23  this engagement?

24  A   I am.

25  Q   Okay.  Now, is the June 14 proposal a public

1 manifestation of the city's financial strategies developed by

2 you, sir?

3 A   Yes, it is.

4 Q   Okay.  Now, is the June 14 proposal something you were --

5 in which you had input into the strategy and concept of that

6 document?

7 A   Yes.

8 Q   I believe you told that to Mr. Cullen in response to a

9 question yesterday; is that correct?

10 A   Yes.

11 Q   Okay.  In fact, the Court should expect you to have input

12 in strategy if you are the chief strategist; is that correct?

13 A   Yes.

14 Q   Okay.  Why did you tell me you had no involvement in the

15 production of the June 14 proposal when I asked you that

16 question at the deposition?

17 A   You asked me whether we had worked on or drafted or

18 formulated any part of that document, and I told you we had

19 not except for the portion that related specifically to the

20 restructuring plan and the development of the limited

21 recourse participation notes, so we did not develop that as a

22 work product of Miller Buckfire.  It was a manifestation of

23 the overall strategy that we had formulated in conjunction

24 with the city's other advisors beginning in January of this

25 year.

1 Q   But am I not correct, sir, that with respect to the June
2 14th proposal itself you told me that you did not participate
3 in its preparation?

4 A   I just answered that question.

5        MR. STEWART:  Objection, your Honor.  If he wants to
6 read a question and answer, that would be the appropriate way
7 to proceed.

8        THE COURT:  The objection is sustained.

9 BY MR. MONTGOMERY:

10 Q   Mr. Buckfire, I'm going to ask you if on the 20th of
11 September of this year during your deposition I asked you a
12 question which began at page 37, line 22,  "Mr. Buckfire,
13 I've handed you what has been marked as Buckfire Exhibit
14 Number 2.  Have you seen this before?"  Do you recall me
15 asking you that question?

16 A   No.

17 Q   Okay.  Do you recall that at line 25 you said, "Yes"?

18 A   No.

19 Q   All right.  That Mr. Buckfire said -- "Question:  What is
20 it, sir?"  Your answer at line 3 was, "It is the June 14
21 report and proposal to creditors."  My question to you at
22 line 5 was, "Did you participate in its preparation?"  And
23 your answer at line 7 was, "No."  Do you remember giving that
24 answer, sir?

25 A   No.

1  Q   Is it true that you had no involvement in the

2  preparation?

3  A   Neither myself or my firm drafted this presentation.  The

4  entire effort to restructure Detroit has been since January a

5  multi-disciplinary, multi-firm effort.  The financial

6  strategy incorporated in the June 14th plan was one that we

7  had helped to formulate.  We didn't draft the June 14th

8  document except to participate in the drafting of the

9  description of the plan for the creditors and the description

10  of the limited recourse participation notes.

11  Q   So your input into the June 14 proposal is the limited

12  participation notes?

13  A   I didn't say that.

14  Q   Okay.  Tell me again, sir.

15  A   It's a very lengthy document reflecting the work of five

16  months by many firms.  It does, of course, rely upon and is

17  meant to address the financial strategy that we helped the

18  city formulate beginning in January from an informational

19  perspective.  My firm did participate, as I testified

20  earlier, in the creation of the restructuring plan itself;

21  that is, the portion of the document reflecting proposed

22  treatment for the claims of the creditors of the City of

23  Detroit, and, in particular, the formulation of the terms of

24  the $2 billion of notes that we have identified as being

25  available for resolution of those claims.

1   Q   So it's your testimony today that the treatment of

2   creditors was essentially your idea?

3   A   As I said, it was a collaborative effort by multiple

4   firms.  We participated actively in that portion of the plan.

5            THE COURT:  Excuse me one second.  Again, we're

6   having a slight difficulty with our audio, so pull your

7   microphone two inches closer but no more.

8            THE WITNESS:  Yesterday it was too far.

9            THE COURT:  Go ahead.  Pull it closer.  There.

10            THE WITNESS:  Thank you, your Honor.

11            THE COURT:  Try that.

12  BY MR. MONTGOMERY:

13  Q   So, Mr. Buckfire, I take it you share all of the

14  recommendations that appear in the June 14 proposal.

15  A   I don't understand that question.

16  Q   I think you just told me it was a collaborative effort,

17  not necessarily your idea.

18  A   That's correct.

19  Q   Okay.  And so I'm asking you, as you are sitting here

20  today advising the Court, do you share all of the

21  recommendations that -- in the treatment of creditors that

22  appears in the June 14 proposal?

23  A   You're referring specifically to the proposed treatment

24  of creditors?

25  Q   Yes, sir.

1    A    Yes, I do.

2    Q    Okay.  Now, does that include the recommendation that

3    retiree pension and healthcare benefits must be significantly

4    reduced?

5    A    I do.

6    Q    Okay.  And did you ever personally make that

7    recommendation to the emergency manager?

8    A    No.

9    Q    Since this was a collaborative effort, who made that

10   recommendation to the emergency manager?

11   A    Well, it was a function of the city's insolvency and lack

12   of cash.  There was no way for the city to satisfy its

13   unsecured creditors to the extent that their claims indicated

14   because the claims of the pension fund and healthcare

15   retirees are unsecured claims, therefore, pari passu with

16   those of the general obligation and COP bondholders, clearly

17   there wasn't enough value to satisfy them all, and they would

18   have to be reduced.

19   Q    Mr. Buckfire, I believe the question I asked required

20   identification of a person.  Who made the recommendation

21   since you didn't make it?

22   A    Well, it was a function of the mathematics.  I'm not sure

23   that there was any particular recommendation made.  The math

24   and the financial condition of the city simply didn't support

25   continued satisfaction of all of its unsecured obligations as

1   previously promised.

2   Q   Are you suggesting it was so self-evident no one had to

3   say it?

4   A   Yes.

5   Q   So, in fact, you didn't say it?

6   A   I didn't have to.  The mathematics indicates that was the

7   unfortunate result.

8   Q   Did Conway MacKenzie say it?

9   A   I don't know.

10  Q   Did Ernst say it?

11  A   I don't know.

12  Q   Did Jones Day say it?

13  A   I don't know.

14  Q   So let's turn to the topic of how this no one had to say

15  it aspect of the proposal came to be pursued.  When, sir, is

16  the first time you recall you and Mr. Orr discussing the

17  reduction of pension benefits and healthcare benefits if

18  ever?

19  A   I don't recall.

20  Q   Okay.  It never happened?

21  A   I said I don't recall.

22  Q   Did it ever happen?

23  A   I don't recall.

24  Q   Okay.  Change the topic.  You were involved in the

25  negotiations -- strike that.  What role, if any, did you have

1  in discussions or presentations to creditors following the

2  June 14 proposal?

3  A   I was delegated by Mr. Orr with the responsibility of

4  negotiating and discussing with the funded debt creditors of

5  the city the June 14th proposal.

6  Q   Did you, sir, personally have any involvement with any

7  current or former employee groupings of creditors?

8  A   I was present at at least one or two meetings here in

9  Detroit with representatives of retirees, but I was not

10  taking a lead role in those discussions.

11  Q   When you say "present," were you talking about the June

12  14th meeting itself?

13  A   No, afterwards.

14  Q   Afterwards.  Are you talking about the June 20th meeting

15  that may have occurred?

16  A   It may have been that week, but I know I was present at

17  at least one or two.

18  Q   Okay.  Are there any others other than that one that may

19  have occurred on June 20?

20  A   Well, it was a very, very busy time for me.  I was trying

21  to get the forbearance agreement done with the swap

22  counterparties, so after that initial set of meetings I

23  didn't directly participate.  Other members of my firm, I

24  believe, did.

25  Q   So you were not involved in a June 25 meeting; correct?

1  A   I may have been.  I just don't recall the dates.

2  Q   Okay.  And you were not involved in a July 10 meeting; is

3  that correct?

4  A   I just don't recall.

5  Q   And, again, same question with respect to July 11?

6  A   I don't recall.

7  Q   And July 12?

8  A   I don't recall.

9  Q   Okay.  But do you recall participating in meetings with

10  funded debt creditors?

11  A   Yes, I do.

12  Q   Okay.  And which days do you remember for that?

13  A   I can't put specific dates to it.  After the June 14th

14  presentation in which I participated, we gave all of the

15  city's creditors a week to study the plan and supporting

16  information, which obviously made sense because it was a

17  bombshell for them, and we immediately began discussions with

18  as many creditors as was willing to meet with us the week

19  after that, so that would be, I guess, the 20th or 21st.  And

20  we began meeting with groups of the creditors primarily in

21  New York City all that week, and that extended into the week

22  following.  At the same time, I was meeting or having

23  discussions almost every day with the swap counterparties.

24  Q   Should I understand that you had a determination,

25  Mr. Buckfire, that it was more important for you to meet with

1  the funded debt creditors than with the retiree and employee

2  creditors?

3  A    No.  It was just a division of labor.  The bondholders

4  and the bond insurers were organized.  They told us that they

5  could rely upon them to represent the interests of the

6  underlying creditors, so because of the fact that we're an

7  investment bank and have long experience in managing creditor

8  relationships of that kind, it was determined that we should

9  take the lead in those discussions while the lead in

10  discussions with the retirees and other claim holders would

11  be taken by others.

12  Q    And you participated in making that decision as the chief

13  financial strategist for the city; is that correct?

14  A    Well, you keep saying I'm the chief financial strategist.

15  I am a financial strategist, and the city asked my opinion,

16  and that was my recommendation.

17  Q    Okay.  Thank you.  Now, do you recall yesterday in

18  response to a question by Mr. Cullen indicating that you

19  regarded the June 14 proposal as even-handed and fair?

20  A    Yes.

21  Q    Okay.  And as you sit here today, do you still think it

22  is even-handed and fair?

23  A    Yes.

24  Q    Now, I'm correct, am I not, that the June 14 proposal

25  provides for no cash payments to the Retirement Systems on

1  account of the city's promised pensions; is that correct?

2  A   I'm not sure I understand what you're saying.

3  Q   Are -- it's a simple question.  Retiree creditors for

4  pensions, are there any cash payments at confirmation or

5  shortly thereafter that the June 14 proposal plans to be made

6  to the Retirement Systems?

7  A   Yes.

8  Q   Okay.  And what are those, sir?

9  A   They would receive their share on a pro rata basis with

10  the other unsecured creditors of the proposed $2 billion of

11  notes that would be provided upon exit from bankruptcy.

12  Q   All right.  But those are notes in which there is no

13  mandatory payment of principal required; is that correct?

14  A   There's a mandatory payment of interest, and there's an

15  optional payment of principal if the city can afford it.

16  Q   But my question was no mandatory requirement.

17  A   That's correct.

18  Q   Okay.  And with respect to interest, it's one and a half

19  percent; is that correct?

20  A   That's all the city can afford.  That's correct.

21  Q   But that's what it proposes, one and half percent?

22  A   That's correct.

23  Q   Okay.  So no cash at confirmation, one and a half percent

24  interest over time, and no mandatory principal repayments; is

25  that correct?

1  A    That's correct.

2  Q    Now, the same is true for the healthcare creditors; is

3  that correct?

4  A    No.  The plan did propose a continued payment of

5  healthcare benefits to actives and retirees.  I don't have

6  the plan in front of me, but I think you'll see a line item

7  in the financials that do assume continued payment of

8  healthcare premiums.

9  Q    That's for actives, is it not?

10  A    I don't recall exactly the distinction, but it's in the

11  plan.

12  Q    In fact, the plan proposes for active employees defined

13  contribution payments for future pension accruals; is that

14  correct?

15  A    Are you talking about healthcare or pension now?

16  Q    Right now I switched back to pension because you

17  mentioned both.

18  A    Okay.

19  Q    It is correct that insofar as past pension entitlements

20  are concerned, the only recovery proposed under the plan is a

21  share of a note; is that correct?

22  A    Yes.

23  Q    Okay.  And but for what the city may or may not be doing

24  right now, the only proposal for retiree -- existing retiree

25  healthcare is whatever funding is provided by the note; is

1  that correct?

2  A   Well, the healthcare benefits for retirees would be

3  provided to an insurance exchange, and some of that would be

4  supplemented by payments made by the city.

5  Q   The insurance -- okay.  Insurance exchanges is not the

6  city, though, is it?

7  A   No.

8  Q   Okay.  And there is no vehicle proposed in the plan for

9  delivering cash to retirees to participate in the exchange,

10  is there?

11  A   Not to my knowledge, no.

12  Q   All right.  Now, are you familiar with the term "Dutch

13  auction"?

14  A   Yes.

15  Q   Would you tell the Court what a Dutch auction is?

16  A   A Dutch auction is a technique used in the financial

17  markets to ensure that a company or a government when issuing

18  securities will always get the most favorable price for

19  itself.  In other words, you don't want to have a situation

20  where you sell a bond or a note or a share of stock and it

21  turns out that after you've done so, the price has doubled

22  because you mispriced the security because you misjudged the

23  demand for that security, so a Dutch auction is intended to

24  allow interested buyers of securities to, in effect, make an

25  offer to sell into the tender securities at whatever price

1  they deem fair, and then the city or the government in that

2  case would look at the total tally of bids or offers and

3  decide what is the lowest price that will clear the entire

4  market.  So anybody who made the mistake of offering to sell

5  a security for too high a price would not have its offer

6  accepted.

7  Q   So, sir, it's basically creditors fight to see who can

8  make the lowest bid in order to get the greatest amount of

9  whatever distribution or security is being offered; is that

10  correct?

11  A   Yes.

12  Q   Okay.  So in this particular context, your plan proposes

13  that pension creditors and healthcare creditors should

14  compete for the lowest possible price in order to be entitled

15  to a distribution under your notes; is that correct?

16  A   It's an option.  They don't have to take it if they don't

17  want to.

18  Q   But if they don't take it, if any creditor offers to sell

19  their note for a distribution, that creditor will get it, and

20  the retiree creditors will get nothing; is that correct?

21  A   It sets up a very interesting situation.  If a creditor

22  offers to sell his note back to the city at too low a price,

23  then a rational other buyer -- for example, a well-advised

24  pension fund in this case -- would probably decide not to

25  sell.  They would retain their notes.  And as the pool of

1  other noteholders shrinks, having sold at too low a price,

2  they would benefit by a higher price later.

3  Q    But in the context of this plan, if you needed cash

4  sooner rather than later, you'd have to bid rather than wait;

5  is that correct?

6  A    No.  You would have the option of selling your note into

7  the open market to presumably people who understand this

8  mechanic, who understand the city's credit, and they would be

9  offering you what they would deem is a fair market determined

10 price.

11 Q    But the bottom line, sir, is basically creditors under

12 your proposal have to compete for the lowest price --

13 A    No.  They don't have to --

14 Q    -- offered to the city?

15 A    They don't have to sell.  They can keep it and sell into

16 the market as an alternative to selling into a sinking fund

17 process run by the city.  No mandatory requirement to do so

18 and no coercion.

19 Q    But you can't get cash without participating in the bid?

20 A    Or selling in the open market.

21 Q    Can't get cash from the city, sir, without participating

22 in the bid?

23 A    That's true.

24 Q    And that's even-handed and fair insofar as retirees are

25 concerned?

1  A   They are being treated no worse or no better than any

2  other unsecured creditor of the city.

3  Q   Now, the note is -- that the June 14 proposal puts

4  forward is a $2 billion nominal value note; is that correct?

5  A   Correct.

6  Q   Okay.  And it is proposed to be distributed among

7  unsecured creditors on a pro rata basis; is that correct?

8  A   Yes.

9  Q   So that if a creditor had a billion dollar note and there

10  were $11 billion of unsecured claims, that billion dollar

11  note would be 1/11th; is that correct?

12  A   That's right.

13  Q   Okay.  Now --

14          MR. STEWART:  Your Honor, if I may, I think we are

15  straying a little bit into plan as opposed to eligibility

16  issues.

17          THE COURT:  I think the objection is relevance.

18          MR. MONTGOMERY:  Your Honor, in order for the

19  debtor's proposal to have been made in good faith, it must be

20  one that manifests both subjective and objective standards

21  with respect to good faith, and how creditors are proposed to

22  be treated I think is quite relevant to whether or not, "A,"

23  a plan has been proposed, and, "B," whether or not it's in

24  good faith.

25          THE COURT:  I agree.  The objection is overruled.

BY MR. MONTGOMERY:

Q   If a creditor -- if the city -- strike that.  Under the
note proposal, asset sales by the city play a role in the
funding of that note; is that correct?

A   Yes.

Q   And it's on a formula basis; is that correct?

A   Yes.

Q   And with respect to asset dispositions, it's 75 percent
goes into the note pool, and 25 percent goes to the city?

A   Yes.

Q   But it's capped at an aggregate distribution of $2
billion; is that correct?

A   That's correct.

Q   So that if the city were to sell $2-1/2 billion worth of
assets, you would completely defease the $2 billion note and
the city would get a half a billion dollars; is that correct?

A   That's correct.

Q   If the city were to sell $5 billion of assets, the
creditors would get $2 billion and the city would get 3; is
that correct?

A   After the bankruptcy, that's correct.

Q   Is that fair and even-handed, sir?

A   It was an opening offer.  There are obvious things we
expected our creditors to come back and object to or ask to
negotiate.

1   Q   Okay.

2   A   But to answer your question, it was fair because it

3   treated our unsecured creditors exactly the same.

4   Q   And for you that's the key indicia in fairness?

5   A   Starting out a process like this, it's complicated, and

6   one must be very sensitive to the competing interests of all

7   of our creditors.  Other cites that have tried to do

8   consensual out-of-court restructurings have tended to favor

9   one group of creditors over the other.  That has not proven

10  to be a very successful strategy.  We elected to treat

11  everyone exactly the same, and we obviously expected there to

12  be vigorous negotiation among all of our unsecured creditors

13  because clearly everybody wanted to be treated more specially

14  than everybody else.  We decided because we didn't know where

15  this would go that the city should be viewed as being

16  impartial in how it would treat it's unsecured creditors.

17  Q   And treating -- in your mind, sir, treating the pension

18  obligations of the city for accrued financial benefits or --

19  strike that -- for pension benefits, in your mind, it's fair

20  to treat those exactly the same as general unsecured

21  creditors, trade creditors?

22  A   They're unsecured claims.

23  Q   Okay.  Isn't the city actually paying trade creditors

24  now, sir?

25  A   They are.

1 Q   The June 14 proposal that you made, there's some missing

2 information from it, is there not, if -- strike that.  Let me

3 rephrase the question.  Assume I'm a creditor, a hypothetical

4 creditor, and I want to make a decision on whether or not to

5 vote for your plan or not.  If I was just looking at the June

6 14 proposal, there would be some missing information;

7 correct?

8 A   I don't know what you're referring to.

9 Q   Are there any asset values listed in the June 14

10 proposal?

11 A   No.

12 Q   There's absolutely no balance sheet information of any

13 kind anywhere in that document; is that correct?

14 A   That's correct.

15 Q   Is there any information regarding major disputes that

16 the city has that might yield future cash or assets?

17 A   I don't understand your question.

18 Q   Is there any information regarding disputes over

19 collection of past due contract debts?

20 A   I believe we did make some references to that.

21 Q   And do you recall what those references were?

22 A   Well, the city has historically had a very difficult time

23 collecting delinquent property tax revenues.  I believe the

24 past due on that particular line item is several hundred

25 million dollars.  The city, from an administrative

1   perspective, has never been very good at collecting taxes,

2   and that's a potentially significant asset, but, again, the

3   ability of the city to collect on that has always been very,

4   very doubtful.

5   Q   But the June 14 proposal doesn't actually say anything

6   like several hundred million dollars, does it?

7   A   No.  I think there's a reference to it -- I don't have it

8   in front of me -- to the past due income taxes the city has

9   not been able to collect, but I'd have to have it in front of

10  me to find the reference to it.

11  Q   Understood.  Now, as part of your information provision

12  strategies for creditors, you created a data room; is that

13  correct?

14  A   My firm did organize one, yes.

15  Q   Okay.  And basically all creditor information is supposed

16  to show up there?

17  A   Yes.

18  Q   Okay.  Is there any information in that data room

19  regarding the value of art?

20  A   Not that I'm aware of.

21  Q   Is there any information in that data room regarding the

22  value of the Department of Water and Sewer?

23  A   Not that I'm aware of.

24  Q   Okay.  And there's no information on the value of either

25  of those two in the actual June 14 proposal, is there?

1    A    It was not available at the time.

2    Q    Okay.  Is it available today?

3    A    Well, they're both ongoing asset evaluations that the

4    city is managing.  I've already testified that the city did

5    retain Christie's to do an evaluation of city-owned art, and

6    the results of that hopefully will be available soon.

7    Q    Could you pause there for a second, sir?  Have there been

8    any preliminary reports by Christie's?

9    A    No.

10   Q    Nothing of any kind?

11   A    No.

12   Q    Are you in the information trail between Christie and the

13   city, sir, meaning are -- strike that.  What role, if any,

14   did you have in the selection of Christie's?

15   A    I recommended that the city interview them for the role

16   of appraising the city-owned art.

17   Q    And when did you make that recommendation?

18   A    I believe it was in late May, early June of this year.

19   Q    Would it have been before or after May 7?

20   A    Oh, after.

21   Q    Going back to information that's in the data room or in

22   the June 14 proposal itself, I asked you if there was any

23   information regarding the Department of Water and Sewer

24   there, and you said no.

25   A    No.  I didn't say -- I said I don't know.

1   Q   Oh, you don't know?

2   A   I don't have a record of every scrap of information

3   that's in the data room in my head.

4   Q   Okay.

5   A   I apologize.

6   Q   But is there any in the June 14 proposal itself?

7   A   We made reference to it as we've already testified to the

8   fact that we were working on it as potential source of value

9   to the city, but as is well-known, it is operated on a

10   nonprofit basis.  The city has never received any cash from

11   the Water and Sewer Department through which it provides

12   services to the customers all through southeastern Michigan,

13   and there has been no business plan up until the time we

14   commissioned one on that department in order to determine

15   what the value could be.

16   Q   Two follow-up questions perhaps.  One, it's true, isn't

17   it, that the Department of Water and Sewer makes

18   contributions to the Retirement System -- the General

19   Retirement System on behalf of its employees and retirees; is

20   that correct?

21   A   Yes.

22   Q   And that's actually a substantial number, isn't it?

23   A   I believe so.

24   Q   Now, it's also true that the Department of Water and

25   Sewer pays retiree healthcare benefits for its former

1   employees; is that correct?

2   A    With respect to its former employees?

3   Q    Well, retirees.

4   A    I don't know.

5   Q    And those payments -- strike.  Let me rephrase that.

6   You're familiar with the bonds that are secured by the

7   revenues of the Department of Water and Sewer, are you not?

8   A    I am.

9   Q    All right.  That's actually part of your firm's special

10  charge here is to understand those values; is that correct?

11  A    Yes.

12  Q    Okay.  And you understand that -- are you familiar with

13  the concept of a waterfall?

14  A    Lower case or upper case?  Yes.

15  Q    Okay.  In the context of a secured creditor's entitlement

16  to money, could you tell the Court what a waterfall is?

17  A    In our technical vocabulary, a waterfall describes the

18  application of cash flows in terms of priority of creditor

19  claims, so if a creditor has a lien against revenues, that

20  lien is supposed to be satisfied before any money may be paid

21  to any other creditor who has an interest subordinate to that

22  lien.

23  Q    So in the waterfall for the bonds secured by the

24  Department -- the assets belonging to the Department of Water

25  and Sewer, net operating expenses are paid first before the

 1  bonds, are they not?  Is that not correct?

 2  A    You know, it's a good question.  The way the rate

 3  agreement works in that context, it's not clear that it's a

 4  strict waterfall in the context used in creditor documents.

 5  It is -- we are allowed to seek reimbursement for operating,

 6  maintenance, and debt service costs from our rate payers, but

 7  I don't know whether it specifically says those costs are

 8  senior to the payments made to the secured creditors.

 9  Q    Sir, isn't it true that the bondholders are entitled to

10  the revenues after payment of net operating expenses?

11  A    Again, I'd have to read the agreement.

12  Q    Sir, you understand this asset perhaps better than

13  anybody in this room.  Are you telling me you don't know the

14  answer to the question?

15  A    I'm saying I'd have to read specific language to give you

16  an accurate answer.

17  Q    But as you're sitting here today, you don't know the

18  answer?

19  A    I'd have to read the language to give you an accurate

20  answer.

21  Q    Does that mean as you're sitting here today, you do not

22  know the answer without reading the document?

23  A    It's a very technical provision, and I would want to make

24  completely sure I gave you an accurate answer by rereading

25  that language.

1  Q   Okay.  Are you familiar with the size of the operating

2  revenues that either the sewer fund or the water fund

3  receive?

4  A   Yes.

5  Q   Okay.  And, sir, is it -- am I correct that the sewage

6  disposal fund had revenues in excess of $430 million a year?

7  A   In fiscal 2012, that seems correct.

8  Q   Okay.  And same question with respect to the water fund,

9  in excess of $350 million a year?

10 A   That sounds right.

11 Q   Would you regard those numbers as being material?

12 A   Yes.

13 Q   Okay.  But they are not mentioned in the June 14

14 proposal?

15 A   No.

16 Q   When thinking about asset values for purposes of being a

17 hypothetical creditor, is an understanding of the future

18 value of -- strike that.  Is the understanding of a fair

19 market value of that asset something that a creditor would

20 like to know?

21 A   Yes.

22 Q   Is there any fair market value information anywhere in

23 the June 14 proposal?

24 A   No.

25 Q   Okay.  Another way of understanding value for a creditor

1  is to understand historical costs; is that true?

2  A   Yes.

3  Q   Is there any historical cost information in the June 14

4  proposal?

5  A   No.

6  Q   And, lastly, another way is third-party appraisals.  As

7  of June 14th, are there any third-party appraisals in the --

8  mentioned or described in the June 14 proposal?

9  A   No.

10  Q   As the city's financial strategist, has the city

11  commissioned any appraisals other than Christie's?

12  A   Well, let's see.  I testified yesterday we have requested

13  an audit be done of the Detroit-Windsor Tunnel.

14  Q   I think I said appraisals, sir.

15  A   No.

16  Q   We'll get to audits.  Appraisals.

17  A   No.

18  Q   No.  Okay.  So let's turn to audits.  Is there any

19  information in the June 14 proposal with respect to audits of

20  any of the assets?

21  A   Not as of that time.

22  Q   And if I could for the purpose of this question consider

23  valuations, appraisals, and historical cost being asset value

24  information -- can I just use that as asset value

25  information?

1  A   If you wish.

2  Q   Okay.  So there's no asset value information regarding

3  the City Airport in the June 14 proposal, is there?

4  A   No outside appraisal?  No.

5  Q   No.  The three buckets, appraisals, valuation, or

6  historical cost.  I'm calling it asset value information.

7  A   No.

8  Q   Okay.  Is there any on noncore real estate?

9  A   No.

10  Q   Is there any on the municipal parking system?

11  A   No.

12  Q   And I think you already testified there was nothing on

13  the Detroit-Windsor Tunnel; correct?

14  A   Correct.

15  Q   And you've also told me that there was no information on

16  potentially past due tax receivables; correct?

17  A   Well, we identified, I believe, how large a number it

18  was.  That's a matter of accounting entry.

19  Q   But nothing else?

20  A   That's right.

21  Q   Okay.  Has a business plan been developed by you or

22  somebody working with you for the Department of Water and

23  Sewer?

24  A   Yes.

25  Q   Okay.  And what role, if any, did Miller Buckfire play in

1   the development of that business plan?

2   A   None.

3   Q   You did not give any assumptions or make any

4   recommendations with respect to how that business plan should

5   be developed?

6   A   No.

7   Q   Okay.  So it's entirely the work of Conway MacKenzie?

8   A   And other consultants who were brought in to review the

9   Water and Sewer Department's capital improvement plan.

10  Q   Okay.  And who were those consultants, sir?

11  A   There was five or six firms involved.  I don't have all

12  their names.

13  Q   Are you speaking of engineering firms?

14  A   Yes.

15  Q   Oh, okay.  Now, have you read the business plan?

16  A   Yes.

17  Q   Have you made it part of a proposal that you have made to

18  anyone?

19  A   I don't understand.

20  Q   Have you made any proposals since the presentation to you

21  of the Conway MacKenzie business plan for the Department of

22  Water and Sewer to any third parties?

23  A   No.

24  Q   Have you made a -- have you made a proposal to the

25  emergency manager?

1   A   I don't understand what you mean by "proposal."

2   Q   Let's try again.  Have you been involved in any

3   negotiations regarding Department of Water and Sewer with

4   anybody not employed by the city or the emergency manager

5   since the Conway MacKenzie business plan was produced?

6   A   Yes.

7   Q   Okay.  And can you tell me what you have done in that

8   regard?

9           MR. STEWART:  I beg your pardon.  Could I hear the

10  question again?

11  BY MR. MONTGOMERY:

12  Q   The question was what have you done in that regard?  Do

13  you understand the question, sir?

14  A   Well --

15  Q   Obviously not.  Your eyes are wrinkling, and you can't

16  understand, so let me -- may I rephrase?

17  A   Of course.

18  Q   Thank you.  You were in charge of monetization of the

19  Department of Water and Sewer as an asset of the city, were

20  you not?

21  A   Yes.

22  Q   Okay.  And you've actually taken steps since the

23  production of the business plan to achieve that goal; is that

24  correct?

25  A   Yes.

1   Q   Okay.  And that has involved formulating a proposal to

2   third parties; is that correct?

3   A   Well, it's a very --

4   Q   Is that a "yes" or a "no" you're about to give me and

5   then answer?

6   A   Can you rephrase -- can you repeat the question?

7   Q   Sure.  I asked you if you had made a proposal to third

8   parties.

9           THE COURT:  And I would only ask you to specify,

10  counsel, a time period.

11          MR. MONTGOMERY:  Since the production of the Conway

12  MacKenzie business plan.

13          THE COURT:  To today?

14          MR. MONTGOMERY:  To today.

15          THE WITNESS:  No.

16  BY MR. MONTGOMERY:

17  Q   You've had no meetings with the regional water customers

18  of the city making a proposal to them?

19  A   I have not made a proposal on behalf of the city yet.

20  Q   Okay.  Did you have a meeting with the regional water

21  customers for the Department of Water and Sewer after

22  production of the Conway MacKenzie business plan?

23  A   We had a presentation of that plan after we met with our

24  creditors and presented the same information.

25  Q   Okay.  So you presented --

1       THE COURT:  I have to ask for a pause here.  I'm

2   concerned about the relevance of any of this information as

3   it may apply to work the witness has done since the case was

4   filed.

5       MR. MONTGOMERY:  Your Honor, if I may, this is a

6   line of inquiry that's actually designed to show that there

7   was potentially disclosable value in the June 14 proposal

8   that simply was not.

9       THE COURT:  Okay.  You can certainly ask about that,

10  but I don't think it's appropriate to ask the witness about

11  specific activities that he has undertaken to monetize

12  property since the case was filed.  The issue is was the --

13      MR. MONTGOMERY:  I understand, your Honor.

14      THE COURT:  -- city eligible on the date it filed.

15      MR. MONTGOMERY:  Okay.  Thank you, your Honor.

16  BY MR. MONTGOMERY:

17  Q   Mr. Buckfire, a central part of the June 14 proposal is

18  to free the Department of Water and Sewer from the legacy

19  pension and healthcare costs.  Is that not correct?

20  A   No.

21  Q   It's not correct, so --

22  A   It's not correct.

23  Q   Under the June 14 proposal, the city contemplates the

24  Department of Water and Sewer continuing to pay past pension

25  and healthcare obligations?

1   A    That wasn't what you asked me.  You asked me if we
2   contemplated freeing the department from legacy pension
3   liabilities.  That was not contemplated.  What was
4   contemplated was attempting to create a transaction that
5   might create value for the city but only if there was a buyer
6   on the other side willing to pay value for it.
7   Q    So two questions.  Does the June 14 proposal contemplate
8   that the retirees of the Department of Water and Sewer will
9   continue to have payments made by the city for either
10  pensions or healthcare?
11  A    Well, there are two scenarios.  In one case, the city
12  would continue to own the Department of Water and Sewer,
13  which is currently the most likely situation the city has,
14  and in that case the retirees would be treated exactly as we
15  identified in the plan with respect to their unsecured
16  claims --
17  Q    No.
18  A    -- in that scenario.  In the scenario in which we are
19  successful in selling Water and Sewer to its customers, which
20  would only be done if it created value back to the city, then
21  the use of that value would be up to the plan.
22  Q    When you say the use would be up to the plan, you mean
23  would be resolved as part of the plan of adjustment?
24  A    It would be a very fortunate outcome if we, in fact, are
25  able to get our customers to pay something for the use of

1 these assets.  What we do with that stream of value would

2 obviously be the subject of negotiation with our creditors

3 for whom benefit this is being done.

4 Q   Okay.  And am I not correct that the Conway MacKenzie

5 business plan identifies fairly significant streams of value

6 that are capable of being discussed?

7 A   In theory, yes.

8         MR. STEWART:  Objection, your Honor.  The plan was

9 provided and its detail was provided in the -- under the

10 confidentiality order in connection with the mediation

11 ordered by the Court.  I would object to any questioning

12 based upon that plan.

13         THE COURT:  Was that the question?

14         MR. MONTGOMERY:  No.  That was not actually the

15 question, but --

16         THE COURT:  All right.  Let's rephrase the question,

17 and we'll see if there's still an objection.

18 BY MR. MONTGOMERY:

19 Q   I think I asked you whether or not the Conway MacKenzie

20 business plan identified material streams of value.

21         MR. STEWART:  Same objection, your Honor.

22         THE COURT:  Was this Conway MacKenzie business plan

23 proffered to creditors or attorneys for creditors as part of

24 the mediation process?

25         MR. MONTGOMERY:  I believe we and others received

1  it.  That's why I was asking the question earlier whether or
2  not the witness had met with third parties.
3        THE COURT:  It was proffered as -- and you've seen
4  it as part of the mediation process?
5        MR. MONTGOMERY:  I have not asked -- yes.
6        THE COURT:  Is that right?
7        MR. MONTGOMERY:  Yes.
8        THE COURT:  Then the objection is sustained.
9        MR. MONTGOMERY:  Thank you.
10  BY MR. MONTGOMERY:
11  Q   Change of topic, sir.  You've been engaged twice in
12  connection with the City of Detroit; is that correct?
13  A   Yes.
14  Q   Okay.  And the first time was in 2012?
15  A   Yes.
16  Q   I believe you told Mr. Cullen yesterday that your first
17  engagement started around March; is that correct?
18  A   That's my recollection.
19  Q   That's March of 2012.  Do you recall telling me that your
20  first engagement was in July of 2012?
21  A   Yes.  I think I was wrong.
22  Q   So the July -- what you referred to in your deposition
23  transcript as July you now mean as March?
24  A   That's right.
25  Q   Thank you.  Were you involved with matters relating to

1   the city prior to March of 2012?

2   A    Only in a very limited sense.  We had tried to build a

3   relationship with the city and with the state obviously, as I

4   testified earlier, for about a year.  In the context of that,

5   at some point in early 2012 -- I can't recall when -- I was

6   contacted by Treasurer Dillon, who asked me if there was any

7   relevant experience that he could look at that might guide

8   him in constructing a agreement with the city to provide

9   future funding, so we did a little research, and I sent him

10  some documents related to the creation of the New York City

11  Financial Control Board and Municipal Assistance Corporation,

12  both of which were done in the 1970s, and answered a few of

13  his questions about that.

14  Q    Did you transmit to him any form of consent agreement?

15  A    No.

16  Q    Did you discuss these matters with Jones Day?

17  A    I recall asking someone at Jones Day what they thought

18  about this example as a structure that could be used by the

19  State of Michigan and the City of Detroit.

20  Q    And was that before or around March of 2012?

21  A    It was sometime in early 2012.  I can't recall the date.

22  Q    Okay.  Do you recall creating a model for use by

23  Treasurer Dillon?

24  A    A financial model?

25  Q    A model for a consent agreement?

1   A   I might have given him a model in the strict sense of an

2   outline, but that's all.

3   Q   Okay.  And did you share that outline with anybody else?

4   A   I don't recall.

5   Q   Did you share it with Jones Day?

6   A   I might have.

7   Q   Specifically Corrine Ball?

8   A   I might have.

9   Q   You communicate a lot with Corrine Ball, do you not?

10  A   I communicate with many attorneys.

11  Q   Did you not tell me in your deposition that you have had

12  almost daily contact with her as a result of a totally

13  different case?

14  A   That's true.

15  Q   Okay.  And were you having extensive contact with her in

16  March of 2012?

17  A   On another matter, that's correct.

18  Q   Okay.  But you also did talk with her or communicate with

19  her regarding this matter, did you not?

20  A   I did.

21  Q   Okay.  Do you recall communicating with Treasurer Dillon

22  about the possibility of repeal of PA 4?

23  A   No.

24  Q   No.  Do you recall communicating with Jones Day about the

25  possibility that the voters in the State of Michigan might

1  repeal PA 4?

2  A    No.

3  Q    Sir, do you remember telling me that -- in 2013 that the

4  city's information was not reliable?

5  A    That's correct.

6  Q    Do you recall participating in a meeting with E&Y and the

7  emergency manager on or about May 7?

8  A    Yes.

9  Q    Okay.  Do you recall telling me that that is the moment

10  in time in which you concluded the city was not solvent?

11          MR. STEWART:  Your Honor, if I may, if he could

12  answer the question -- ask the question directly, and then if

13  he doesn't recall, he can refresh his recollection or impeach

14  him with the deposition.  Asking whether he recalls the

15  deposition without the deposition in front of him is just an

16  improper way to proceed.

17          THE COURT:  The objection is sustained.  Just ask

18  the question.

19  BY MR. MONTGOMERY:

20  Q    When did you decide that the city was insolvent?

21  A    I didn't decide the city was insolvent.

22  Q    When did you conclude in your own mind that the city was

23  insolvent?

24  A    Well, if you use the definition of insolvency as the

25  inability to continue to pay debts when due, which I think is

1   relevant here, that's when it became, I think, factually

2   pretty evident to me that that would be a serious problem for

3   the city.  The city could not, therefore, make the

4   representation that it could pay its debts when due in the

5   short term, and, therefore, if you want to call that

6   insolvency, I would agree with you.

7         THE COURT:  The question was when did you come to

8   that conclusion?

9         THE WITNESS:  Around May 7th when I first saw the

10   projection from Ernst & Young.

11   BY MR. MONTGOMERY:

12   Q   That was the projection from Ernst & Young that --

13   A   The short-term cash flow forecast, yes.

14   Q   Okay.  Sir, I'm going to change topics, if you don't

15   mind.  I'd like to draw you back to a meeting that took place

16   at the City Airport, the law firm retention meetings, which I

17   believe you were in attendance at; is that correct?

18   A   I think you mean Metropolitan Airport.

19   Q   Metropolitan.  Did I say City Airport?

20   A   You did.  No one would have a meeting there if they could

21   avoid it.

22   Q   My apologies.  My apologies.  Even I know the difference

23   between the City Airport and the Metro Airport.  At the Metro

24   Airport?

25   A   Yes.

1  Q   Okay.  And were you in the room when Jones Day made its

2  presentation?

3  A   I was in the room for all the presentations, including

4  Jones Day's.

5  Q   Okay.  Do you recall anyone at Jones Day during that

6  presentation making a statement to the effect that asset

7  monetization outside of a bankruptcy may implicate

8  eligibility requirement that city be insolvent?

9  A   No.

10 Q   Sir, do you recall anybody at Jones Day making a

11 statement that statutes, codes, case law may require that

12 funds received from disposition be allocated?

13 A   No.

14 Q   Do you recall anyone at Jones Day making a statement that

15 any transaction should be reviewed and structured to address

16 any eligibility issues by earmarking of funds?

17 A   No.

18 Q   Was there any conversation during that meeting regarding

19 asset dispositions?

20 A   As I recall, the topic was addressed by all the law firms

21 that made presentations.  I can't recall what specifically

22 any one law firm said about it.

23 Q   In your experience as a financial strategist, leading up

24 to a Chapter 9, is asset monetization an issue that needs to

25 be watched closely for eligibility purposes?

1    A    I think you're asking me for a legal conclusion.  My

2    focus is purely and simply on cash, and we looked at all the

3    assets of the city with the objective of determining whether

4    any of the assets of the city could be converted into cash on

5    a fast basis because we needed the cash.  I really wasn't

6    worried about eligibility implications of that.

7    Q    Do you recall having any conversations with Emergency

8    Manager Moore (sic) regarding the timing of asset

9    monetizations prior to June 14, 2014 (sic)?

10   A    Yes.

11   Q    And when did that conversation -- first, was it one

12   conversation or more than one conversation?

13   A    That was multiple conversation over many months.

14   Q    Okay.  And so when was the first time you discussed the

15   impact of asset monetization?

16   A    Well, after he was appointed emergency manager -- I

17   believe it was close to the end of March.  We had already

18   been engaged for several months before that.  We briefed him

19   on our preliminary assessment of the situation, including

20   whether or not any assets were available for rapid conversion

21   to cash.  I believe it was that time we went through our list

22   of what I would call non-core assets and helped him

23   understand what any of them might be worth in a sale

24   transaction.

25   Q    But your conclusion was that nothing could be done in the

1  short term?

2  A   Correct.

3  Q   Okay.  And did the emergency manager charge you to begin

4  the long-term effort as a result of those conversations?

5  A   We continued to evaluate all of the city's assets after

6  that conversation as we have continued to do so to try to

7  maximize value for the city.

8  Q   So did the emergency manager change your work plan with

9  respect to asset monetization in any way?

10  A   No.

11       MR. MONTGOMERY:  Your Honor, subject to conferring

12  with my colleagues, I believe I'm done with this witness.

13       THE COURT:  All right.  I'll give you a moment to do

14  that.

15       MR. MONTGOMERY:  Your Honor, the Retiree Committee

16  has finished with Mr. Buckfire.  Thank you.

17       THE COURT:  All right.  Thank you.

18       MR. MONTGOMERY:  It'll take a moment to move my

19  papers from underneath the podium.

20                      CROSS-EXAMINATION

21  BY MR. CIANTRA:

22  Q   Good afternoon, Mr. Buckfire.  Thomas Ciantra, Cohen,

23  Weiss & Simon.  We're counsel for the UAW.  I don't have a

24  lot, but I do want do -- did want to ask you about one of the

25  topics that you testified about in your direct examination,

1   and that was, as I understand it, you were tasked to

2   negotiate with the city's bondholders and specifically the

3   bond insurers.  Is that correct?

4   A    That we took the lead role in those negotiations, yes.

5   Q    Okay.  And just by way of -- just by way of background,

6   would it be correct that some of the city's debt, both the

7   secured debt and the unsecured debt, is insured by municipal

8   bond insurers?

9   A    Substantially all of it is.

10  Q    Substantially all of it, so can you put a percentage on

11  that?

12  A    Well, there is approximately $6 billion of water and

13  sewer debt, and of that total about 5-1/2 billion, I believe,

14  is insured.

15  Q    Okay.

16  A    And of the city's general obligation debt, which includes

17  the certificate of pension payment debt, substantially all of

18  that is insured as well.

19  Q    Okay.  So how the insurance works -- would it be correct

20  that the insurers for the cost of the premium take on an

21  obligation to pay both interest payments when due and

22  repayment of principal in the event of a default?

23  A    Yes.

24  Q    So the bondholder, by purchasing the insurance,

25  essentially is reducing the credit risk of the underlying

1  bond?

2  A    That's the theory, yes.

3  Q    Right.  And the theory would be the way the market would

4  function is the issuer then is able to charge a lower

5  interest rate for the underlying bond obligation because of

6  the insurance?

7  A    The issuer, if it's done correctly, is supposed to be

8  able to borrow at a lower cost.

9  Q    Got it.  So in the proposal for creditors, there are

10  appendices that specify the various bond issues that are

11  outstanding?

12  A    Yes.

13  Q    And they identify the -- with respect to each bond issue,

14  the identity of the relevant insurer?

15  A    I believe that information is in the document, yes.

16  Q    Okay.  And would I be correct that there are -- it looks

17  to me as though there are six bond insurers that are

18  identified?

19  A    Yes.

20  Q    MBIA, Assured Guaranty, FGIC -- looks like Berkshire

21  Hathaway might be involved with some of the FGIC issues --

22  Syncora and something called Ambac?

23  A    That's correct.

24  Q    Did I miss any?

25  A    No.

1  Q   So in terms of the city's negotiation with respect to the

2  bond debt, those negotiations could really effectively be

3  done by those six bond insurers?

4  A   Well, it's not clear what would have ultimately happened

5  and what will happen in this case.  Certainly we began with

6  them, but we did not expect to end with them.

7  Q   Okay.  But it would be correct that from your perspective

8  in terms of handling the negotiation, the bond debt was --

9  debt holders were organized through the insurers; correct?

10  A   We could start there, yes.

11  Q   Right.  And the insurers could be effectively relied upon

12  to speak for the bondholders?

13  A   Well, again, we were opening what we expected to be a

14  long series of negotiations.  The bond insurers represented

15  themselves as holding the economic risk of these bonds

16  because of their insurance.  Therefore, we began our

17  discussions with them.

18  Q   Okay.  And as we said, that's six entities --

19  A   Correct.

20  Q   -- that cover the substantial majority of the city's

21  outstanding secured and unsecured debt; correct?

22  A   That's right.

23  Q   Do you know whether the city's unsecured pension

24  liabilities are insured?

25  A   I don't know.

1  Q   Okay.  So if I'm a bondholder -- let's say I'm a little

2  old lady in Pasadena who's relying on insured municipal bonds

3  from the City of Detroit for my retirement income.  I would

4  have recourse with respect to that income to the bond

5  insurer; correct?

6  A   Only if the bond insurer itself is solvent.

7  Q   Okay.  Assuming that they're solvent, is that --

8  A   Can't make that assumption here because some of them

9  aren't.

10  Q   I understand that some of them are having financial

11  difficulties, but at least it's possible.  It was possible

12  for the bondholder to purchase an insured product; correct?

13  A   In theory.

14         MR. CIANTRA:  No further questions.

15         THE COURT:  You may proceed, sir.

16         MR. SHERWOOD:  Hello, your Honor.

17                    CROSS-EXAMINATION

18  BY MR. SHERWOOD:

19  Q   Mr. Buckfire, Jack Sherwood, Lowenstein Sandler.  I'd

20  like to ask the technician to put up City Exhibit 7, which I

21  think you discussed yesterday on your direct.  Do you

22  remember discussing this agreement yesterday, Mr. Buckfire?

23  A   I do.

24  Q   And this agreement was executed before you were retained.

25  Is that fair to say?

1  A    Yes.

2  Q    And one of the parties to this agreement is the

3  Department of Treasury of the State of Michigan; correct?

4  A    Yes.

5  Q    And the other is the City of Detroit.  And I'd like to

6  ask you to clarify some of your testimony yesterday for me

7  about this agreement.  I thought I heard you say that it was

8  pursuant to this agreement that -- or that there was

9  something about this agreement that led to your engagement.

10  Is that accurate?

11  A    Yes, paragraph 1.

12  Q    Paragraph 1.  Is that the paragraph that talks about

13  restructuring assistance; correct?

14  A    Correct.

15  Q    And would you call yourself part of that restructuring

16  assistance that was agreed to for the city pursuant to this

17  agreement?

18  A    Well, my firm was selected pursuant to this paragraph 1

19  requirement.

20  Q    Okay.  And is it your understanding that, in addition to

21  your firm, Ernst & Young and Conway were also selected

22  pursuant to this paragraph 1 to provide restructuring

23  assistance?

24  A    No.  Ernst & Young had already been working for the city

25  pursuant to the March 2012 consent agreement.  I believe

1    paragraph 2 of this memorandum is the entry point for Conway

2    MacKenzie being awarded the contract to provide operational

3    assistance.

4    Q    Okay.  So you were engaged pursuant to paragraph 1,

5    Conway MacKenzie pursuant to paragraph 2, and Ernst & Young

6    was already on the scene; correct?

7    A    Correct.

8    Q    And did you -- so when was the exact date that you

9    actually got selected pursuant to this agreement?  It was

10   January of 2013; right?

11   A    Well, we signed our contract with the city on January the

12   5th, but we had been told we had won the award, as it were,

13   in December.

14   Q    Okay.  So you started work in earnest pursuant to this

15   agreement in January of 2013; is that right?

16   A    Yes.

17   Q    And same for Conway?

18   A    I don't know when they began, but it was -- certainly the

19   first time I met with them was in January.

20   Q    Okay.  And do you know whether Conway began their

21   services in January?  Maybe you just answered the question.

22   I'm sorry for asking it again.  Just to be clear, you don't

23   know whether Conway actually began their work in January of

24   2013?

25   A    I don't.  That's just when I first met them.

1   Q   Okay.  But you met them in the context of you're both

2   working on your engagement for the City of Detroit; isn't

3   that right?

4   A   Yes, because we both reported to the same city officers.

5   Q   Now, if you turn to paragraph 8 of this agreement -- I

6   think it's on page 5.  Can you -- it talks about milestones

7   for draws, and I think you testified a little bit yesterday

8   about -- and there has been some testimony over this money

9   that was loaned by the state and held in escrow.  Do you

10  recall that testimony?  Is that accurate?

11  A   No, it's not accurate.  I testified that the city had

12  been assisted by the state in raising $130 million on the

13  capital markets.  I think it was in March or April of 2012.

14  Q   Okay.  And you understood that to be the case when you

15  came on board in January of 2013?

16  A   Yes.  I knew there was still some money in escrow from

17  that bond financing.

18  Q   Okay.  And do you know what the amount in escrow was

19  in -- I just heard yesterday numbers like 30 million, 80

20  million, 50 million.  Do you know how -- let's see if we can

21  go date by date.  Do you know how much was in escrow in

22  November of 2012, the date of this agreement?

23  A   Well, paragraph 8 says there was $80 million, so I assume

24  it --

25  Q   Okay.

1  A   -- was $80 million.

2  Q   And do you know how much was in escrow on the date that

3  the bankruptcy petition was filed?

4  A   I believe it was around 60 million.

5  Q   Okay.  And do you know -- so at least 20 million was

6  distributed from that escrow between the period of November

7  2012 and July 2013; right?

8  A   Yes.

9  Q   And is this -- was it sort of like an advance and then a

10  repayment, or do you know how that worked?

11  A   Well, it was meant to be a release from the escrow.  I

12  don't really recall what the mechanism was.  I don't recall

13  there being any requirement for the city to put it back

14  because the city would not have the ability to do that once

15  the money was spent.

16  Q   Okay.  So you don't know whether it was 80 and then it

17  was below 60 and then -- you don't know whether the city ever

18  paid any of that money back?

19  A   I don't.

20  Q   Okay.  Do you know whether the city pays interest on that

21  money?

22  A   I don't.

23  Q   And is it true that that escrow money is releasable to

24  the city in the discretion of the state treasurer?

25  A   That's my understanding.

1 Q   So if the state treasurer wanted to release that money to

2 the City of Detroit, it could in the exercise of its

3 discretion?

4 A   I assume so.

5 Q   Now, the release of this -- would you agree that your

6 engagement and the engagement of Conway pursuant to this

7 agreement was sort of a condition of the city having access

8 to this escrow money?

9 A   Well, that was part of the paragraph 1 and 2 requirements

10 of this agreement.

11 Q   Right.  So if the city didn't retain -- and I'm not

12 saying you personally, but a financial advisor and a business

13 advisor, then they couldn't get access to this money.  Is

14 that your understanding?

15 A   Yes.

16 Q   Now, when this -- the date of this agreement was November

17 2012.  That was the same time that PA 4 was repealed by the

18 voters of the State of Michigan; isn't that right?

19 A   I don't know.

20 Q   And in your conversations with the state concerning this

21 agreement, do you know whether there was any connection

22 between this agreement and the referendum with respect to PA

23 4?

24 A   No.

25 Q   Now, after you were engaged in January of this year along

1    with Miller Buckfire, your understanding is you were working

2    for the City of Detroit; isn't that right?

3    A    That's who our contract is with.  That's correct.

4    Q    Okay.  But you reported to a board which include

5    representatives from the state, for the State of Michigan?

6    A    No.  We reported to Kriss Andrews and Jack Martin.

7    Q    Just the city?

8    A    That's correct.

9    Q    Okay.  And I assume you tried to fulfill your duties as a

10   professional, and I'm sure, based on your observations, the

11   folks at Conway MacKenzie were doing what they could to

12   provide financial advice and restructuring advice and to

13   implement initiatives for the City of Detroit from January

14   2013 through the appointment of the emergency manager;

15   correct?

16   A    As directed by the city.  That's correct.

17   Q    Let me just jump to your discussion earlier about your

18   communications with Jones Day.  You talked about March 2012

19   being your engagement date.  You made a mistake at your

20   deposition, so it was March 2012.  So your initial engagement

21   by the city ended, because I think it was a 60-day

22   engagement, so did it end in May of 2012?

23   A    I can't remember.  It was only 60 days, and it was a very

24   limited scope, so it was around that time.

25   Q    So just running the math -- and we don't have to be exact

1    here, but, generally speaking, you were really not -- you

2    were kind of on the sidelines during the period from, say,

3    May of 2012 through the end of the year when you were engaged

4    pursuant to this new deal; right?

5    A    That's right.  We had developed a relationship with the

6    city which we maintained during that period.

7    Q    Now, during that period of time, you continued to

8    maintain contact with Jones Day and continued to exchange

9    information with Jones Day about the City of Detroit and

10   their financial issues; isn't that right?

11   A    And other law firms.  That's correct.

12   Q    Let me stay on this topic because I want to try to do

13   this in some type of logical order.  Let me jump now to the

14   meeting of the law firms at the airport on January 29th.

15   Isn't it true that you had a telephone conversation with the

16   Jones Day law firm on the day before that meeting?

17   A    I did, along with all the other law firms.

18   Q    You had a telephone conversation with all of the 14 or 15

19   law firms on the day before that meeting?

20   A    Many of them called looking for last-minute advice and

21   guidance on how to conduct themselves in the presentation.

22   Q    Okay.  Do you recall in your conversation with Jones Day

23   in particular advising Jones Day to address the issue if

24   Miller Buckfire finds a way to monetize assets, how will that

25   affect eligibility?

1  A   No.

2  Q   You don't recall that, any discussions with Jones Day

3  about that particular topic?

4  A   No.

5  Q   Do you recall what you said to Jones Day in advance of

6  the meeting to help them prepare to give their pitch?

7  A   I recall telling them the same thing I told all the other

8  law firms.  In general, make sure that they presented as

9  thoughtful a range of alternatives to the city and the state

10  as they could; to emphasize, to the extent they could, their

11  deep connections to the City of Detroit and the State of

12  Michigan; if they could speak to it, their midwestern roots

13  and any other things that would indicate that they cared

14  about this assignment.

15  Q   And just to be clear for the record, your testimony is

16  that you don't recall any discussions with Jones Day on

17  January 28th, 2013, asking them to address asset monetization

18  and the impact of that on eligibility under Chapter 9?  Is

19  that your testimony here today?

20  A   We might have talked about how we would handle an asset

21  monetization, but I don't recall any other implications of

22  that.  Asset monetizations always have to be considered in

23  any restructuring process as a source of cash and recovery

24  for creditors.

25  Q   Do you know discussing with them the impact of asset

```
 1   monetization on eligibility for Chapter 9?

 2   A    No.

 3           MR. SHERWOOD:  Can I have one second, your Honor?

 4           THE COURT:  Yes, sir.

 5           MR. SHERWOOD:  Can we have Exhibit 860, please?

 6   Your Honor, I don't think that this exhibit is in evidence.

 7   I'm trying to use it to refresh the witness' recollection.

 8           THE COURT:  Well, if that's so, I would ask you to

 9   take it off the screen and just hand him a paper copy.

10           MR. SHERWOOD:  I'm sorry, your Honor.  I don't have

11   a paper copy.

12           MS. GREEN:  It's in the binder.

13           THE COURT:  Did you say 860?

14           MR. SHERWOOD:  Yes, sir.

15           THE COURT:  My order says that it is admitted into

16   evidence.

17           MR. SHERWOOD:  Then we can put it on the screen,

18   your Honor.

19           MR. STEWART:  No.  I think the -- don't we have the

20   objection on attorney privilege and on attorney work product

21   on that?

22           ATTORNEY:  We had one, yes.

23           MR. STEWART:  Did we recede from it?

24           ATTORNEY:  Yes, we did.

25           MR. STEWART:  Okay.  I'm sorry.  We receded from our
```

1   objection.

2           MR. SHERWOOD:  All right.  So can I put it back up,

3   your Honor?

4           THE COURT:  Okay.

5           MR. SHERWOOD:  I'm sorry.  Nw, if you can -- can I

6   ask that we go down to the text and sort of the line that

7   starts "Miller Buckfire" and blow that part up, please?

8   BY MR. SHERWOOD:

9   Q    Bottom sentence in the block that says, "If MB finds a

10  way to monetize assets to create liquidity, how would that

11  impact eligibility?"  And just for the -- just so we're

12  clear, Mr. Buckfire, you're not on this e-mail.  This is an

13  e-mail in evidence, and it -- and take your time reading the

14  whole thing, but basically it describes, I think, a

15  conversation at Jones Day describing their conversation with

16  you, and, you know, the last question is, "If MB" -- I assume

17  that means Miller Buckfire -- "finds a way to monetize

18  assets, how would that impact eligibility?"  Does that

19  refresh your recollection as to the content of your

20  conversation with Jones Day that day?

21  A    This is not an e-mail that I'm part of.

22  Q    Fair.

23  A    May I read the whole thing?  You're showing me one little

24  paragraph.

25  Q    Yeah.

1  A   This is an internal e-mail from Jones Day?

2  Q   Yes, it is, sir.

3  A   Yeah.  I'm sorry.  It's -- okay.  Can you blow this up?

4  I can't even read it.  Thank you.

5  Q   Is that better?

6  A   Thank you.  Okay.

7  Q   Does that refresh your recollection as to whether -- when

8  you had your conversation with Ms. Ball from Jones Day on the

9  28th, whether you told her to address the issue at the

10  meeting the next day if Miller Buckfire finds a way to

11  monetize assets, how would that impact eligibility?

12  A   I simply pointed out to her, as I did to everybody else,

13  that we were looking at ways of creating value, and we needed

14  to consider whether that could be done inside or outside of a

15  bankruptcy.  Obviously in the course of a normal bankruptcy,

16  Chapter 11 in particular, selling an asset prior to a

17  bankruptcy proceeding may often be challenged in hindsight by

18  creditors.  If we did find a source of value, we'd want to

19  make sure it didn't happen that way.

20  Q   So are you saying now that you recall the -- you

21  specifically --

22  A   No.

23  Q   -- recall the conversation, or are you just speculating

24  as to what you might have --

25  A   I'm speculating as to what this means and what she

1  thought she was writing about.

2  Q   All right.  We can take that down now.

3          MR. STEWART:  I'd move to strike the testimony, your

4  Honor.

5          THE COURT:  I'm sorry.  On what grounds, sir?

6          MR. STEWART:  Speculation.

7          MR. SHERWOOD:  I don't mind.

8          THE COURT:  All right.  It is so ordered.

9  BY MR. SHERWOOD:

10  Q   Now, in your previous cross -- I don't want to take too

11  much time with this because you've been up there a long time

12  and everybody is (inaudible) to lunch, but -- and just so the

13  record is clear, you were asked about whether Jones Day at --

14  whether you recall at the meeting on the 28th whether Jones

15  Day actually made part of their pitch with Mr. Orr a

16  statement about the impacts of asset monetization and

17  eligibility, and just so we're clear, you don't recall any

18  such statements being made by Jones Day during the course of

19  their presentation, or do you?

20  A   I don't.

21  Q   Let me try to pick up on the whole even-handed and fair

22  discussion.  I think you testified -- I'm sorry.  Is it your

23  understanding that at $12 billion of total liabilities the

24  projected recovery for unsecured claims under the proposal

25  was 16 cents on the dollar?

1   A   That's correct.

2   Q   And in concluding that the plan, as presented, is even-

3  handed and fair, did you consider the argument that the

4  vested pension claims are protected by the Constitution of

5  the State of Michigan?

6   A   I am aware of that argument.

7   Q   Did you incorporate that argument into the proposal?

8   A   No.

9   Q   And do you consider that argument -- you don't give that

10  argument much value, do you, when you conclude that the

11  proposal made on June 14th is even-handed and fair; isn't

12  that right?

13   A   We didn't give any weight to the obligation -- the

14  statement of the general obligation bondholders that their

15  tax pledge was important either. We regarded them both as

16  covenants that the city could not honor.

17   Q   I'm sorry. I just asked you about the vested pension

18  benefits and their mention in the Constitution.

19   A   They don't have --

20   Q   I asked you -- I asked you whether you give the

21  constitutional protection any value in either the proposal --

22   A   Um-hmm.

23   Q   -- or your statement that the proposal was even-handed

24  and fair.

25   A   They don't have a security interest, and, therefore, we

1   did give it weight, but we did not regard it as relevant to

2   our claims classification.

3   Q   They didn't have a security interest, but -- so, in your

4   view, a security interest is more valuable than

5   constitutional protection?

6   A   If a creditor has a security interest in an asset or

7   revenue stream, that gives them a claim on that revenue

8   stream or asset.  What is a covenant?

9   Q   Let me -- staying with the proposal, do you remember

10   looking at a page of the proposal that had a -- sort of a

11   timeline?  Would you like to see that again?

12   A   Yes, to make sure I understand which page --

13   Q   Yeah.  Can we pull up --

14   A   Which exhibit is that?

15   Q   It's 408, among others.  We're going to pull it up.

16   A   Are you referring to Exhibit 43?

17   Q   Yeah.  That's your number, yeah.  The city's number is

18   403.  That works.

19   A   Okay.

20   Q   Now, if you turn to page 113 of that -- and I believe

21   that is the page 113 that was on the original document.  Yes.

22   That's it.  Now, when this proposal -- I think you testified

23   yesterday that this was not a take it or leave it proposal;

24   correct?

25   A   Correct.

1  Q   And you and counsel referred to this calendar of contacts

2  and this page.  Was this calendar and contacts information --

3  was that highlighted at the end of the meeting on June 14th?

4  A   Yes, it was.

5  Q   Okay.  So there was a period for requests for additional

6  information June 17th to June 24th, and then initial round of

7  discussions.  The initial round of discussions ends on July

8  2nd; correct?

9              ATTORNEY:  July 12th?

10             THE WITNESS:  July 2nd?

11             MR. SHERWOOD:  July 12th.  Thank you.

12             THE WITNESS:  That was the plan, yes.

13 BY MR. SHERWOOD:

14 Q   Right.  And that was just to be the initial round of

15 discussions; correct?

16 A   We had to start someplace.

17 Q   Correct.  And then there's an evaluation period July 15th

18 through July 19th.  Do you see that?

19 A   I do.

20 Q   And the city filed bankruptcy on July 18th; isn't that

21 right?

22 A   I believe that's right.

23 Q   On this calendar and contacts, it doesn't say anything

24 like if we don't reach an agreement we're going to file on

25 July 18th, 2013; isn't that right?

1   A    It doesn't say that.

2   Q    And that wasn't said at the meeting, July 18th we're

3   going to file.  Nobody said that?

4   A    We hoped we didn't have to.

5   Q    One of the big concerns from your perspective in the --

6   in regard to the swaps counterparties -- we can put that down

7   there.  I think it was your testimony that you were really

8   concerned about these negotiations with the swaps.  You were

9   involved in that.

10  A    That's right.

11  Q    And your big concern was that absent a deal with these

12  guys, the city could lose the casino revenue, and that's a

13  big part of the city's revenue; right?

14  A    And then it got worse.  That's correct.

15  Q    Okay.  Isn't it true that -- though, that on July 17th a

16  forbearance agreement was executed with the swap

17  counterparties?

18  A    That's true.

19         MR. SHERWOOD:  Can we put up Exhibit 558, please?

20  It's AFSCME 558.  I'll move on to something else and see if I

21  can get back to that, your Honor.

22         THE COURT:  I'm feeling like this is a good time to

23  break for lunch.

24         MR. SHERWOOD:  Your Honor, I was hoping to get done

25  before lunch, which is -- I'm sorry about that, but --

1          THE COURT:  I'd like to actually conduct a

2   referendum among counsel here.  One hour, one hour and 15

3   minutes, or one hour and 30 minutes for lunch?  How many vote

4   for one hour?  Nobody.  How many vote for an hour and 15

5   minutes?  A couple people.  How many an hour and 30?

6   Everybody else.  All right.  Fine.  An hour and 30 it is.

7   We'll reconvene at 1:45.

8          MR. SHERWOOD:  Your Honor, just --

9          THE COURT:  Sir.

10          MR. SHERWOOD:  -- for everybody's benefit, I'm 15

11   minutes from --

12          THE COURT:  Okay.

13          MR. SHERWOOD:  Just so everybody can plan.

14          THE COURT:  We'll pick it up then.

15          MR. STEWART:  Another question now?

16          THE COURT:  Sir.

17          MR. STEWART:  I would like to ask the Court's

18   guidance.  We have Mr. Malhotra here, and I assume that for

19   fairness sake, since those exhibits are now in for the truth,

20   that there will be additional cross-examination of

21   Mr. Malhotra and probably brief additional direct.

22          THE COURT:  Well, let's take this up at 1:45.

23          MR. STEWART:  Okay.

24          THE COURT:  Counsel, I want you to think about the

25   question whether you need further examination of Mr. Malhotra

1    or whether he can be excused as a witness.

2           THE CLERK:  All rise.  Court is in recess.

3        (Recess at 12:15 p.m. until 1:45 p.m.)

4           THE CLERK:  Court is back in session.  Please be

5    seated.  Recalling Case Number 13-53846, City of Detroit,

6    Michigan.

7           THE COURT:  Looks like everyone is here.  You may

8    proceed, sir.

9    BY MR. SHERWOOD:

10   Q   Mr. Buckfire, before lunch I was trying to get ahold of

11   this exhibit that we've marked as 588.  Can you see it on the

12   screen, or would you like a hard copy?

13   A   If you could blow up the one I have here, that would be

14   helpful.  Yes, I see it.  There's only half the document.  Do

15   you have a hard copy just if you don't mind?

16          MR. SHERWOOD:  May I approach, your Honor?

17          THE COURT:  Yes.

18          MR. SHERWOOD:  Would the Court like a hard copy,

19   too?

20          THE COURT:  No.  That's all right.

21          THE WITNESS:  Thank you.

22          THE COURT:  Do you have a question for the witness?

23          MR. SHERWOOD:  Oh, I'm sorry.

24   BY MR. SHERWOOD:

25   Q   Have you reviewed the document?  Do you recognize it?

1   A    I do.

2   Q    And did you write this e-mail to the governor, Treasurer

3   Dillon, and others on July 17th, 2013?

4   A    I did.

5   Q    And does it accurately describe the state of affairs with

6   respect to negotiations -- the negotiation of a forbearance

7   agreement with the swap counterparties?

8   A    Yes.

9   Q    Okay.

10          MR. SHERWOOD:  Your Honor, I would move this

11   evidence into evidence.  I don't think it's been stipulated

12   in.  I think we've laid a proper foundation.

13          MR. STEWART:  No objection, your Honor.

14          THE COURT:  All right.  The exhibit was 588, did you

15   say?

16          MR. SHERWOOD:  Yes, sir.

17          THE COURT:  Exhibit 588 is admitted.

18      (Exhibit 588 received at 1:47 p.m.)

19   BY MR. SHERWOOD:

20   Q    Mr. Buckfire, just before lunch, just to follow up on

21   something I asked you, you indicated that one of the people

22   at the city that you reported to before the appointment of

23   the EM was a person by the name Jack Martin.  Do you remember

24   that?

25   A    Yes.

1  Q   And isn't it true that Mr. Martin was hired pursuant to a
2  consent decree and appointed by Governor Snyder?
3  A   Well, I know he was hired as chief financial officer
4  after the consent agreement was signed in March of 2012,
5  chief financial officer of the City of Detroit.  I don't
6  recall him being appointed by the governor.
7  Q   Isn't it true that he's now the EM for the Detroit Public
8  Schools?
9  A   Yes.
10 Q   And in that post, was he appointed by the governor?  Do
11 you know?
12 A   I don't know.
13 Q   Let me ask you just about the artwork and the Christie's
14 appraisal.  I think you said that you engaged them in either
15 May or June.  Do you remember that?
16 A   May.
17 Q   Was it May?
18 A   May 15th or so.
19 Q   May 15th.  Okay.  So they've had all of June, July,
20 August, and September, and I mean it's been like five months
21 since their engagement.
22 A   No.  I didn't say that.  I said I met with the DIA May
23 15th --
24 Q   When were they --
25 A   -- and I recommended to the emergency manager that an

1    appraisal be conducted sometime in June, and I contacted

2    Christie's on behalf of the city to find out if they had an

3    interest in taking on this assignment.  As I recall, the

4    emergency manager did not sign their agreement until sometime

5    in August.

6    Q    August.  Okay.  So they've only had August, September,

7    October to do their appraisal work.  Is that what you're

8    saying?

9    A    I believe they actually started in early September.

10   Q    Okay.  And in that time they haven't even produced a

11   preliminary report on valuation?

12   A    No.

13   Q    You testified yesterday about -- in connection with the

14   Coleman Young Airport.  I think you said something about

15   consulting with one of your colleagues at Miller Buckfire who

16   had expertise in matters concerning to airports and financing

17   and so forth.  Do you recall that?

18   A    I do.

19   Q    And what was the name of that individual?

20   A    John McKenna.  He's a managing director at Miller

21   Buckfire, a lot of experience with airlines.  Among other

22   things, he had been a director of U.S. Airways at one point.

23            THE COURT:  The question simply was who was that.

24            THE WITNESS:  John McKenna.

25   BY MR. SHERWOOD:

1  Q   And at Miller Buckfire, you guys have over 30

2  professionals.  Do the professionals within your firm -- do

3  they specialize in specific industries?

4  A   They don't set out to do so, but after you've worked with

5  one company and one industry, you tend to do others, so they

6  do acquire industry expertise.

7  Q   And what other types of industry expertise would you say

8  that Miller Buckfire has as a strong part of their practice?

9  A   Sovereign restructuring.  We have one large country,

10  which has been a client of ours now for several years.  We've

11  done other work for other municipalities in the United

12  States.  In terms of private sector work, airlines, electric

13  utilities, merchant power companies, retailers, steel

14  companies, telecommunications companies, yeah.  I could go

15  on, but those are the primary ones.

16  Q   And in connection with your firm's work, do you testify

17  in court on behalf of your clients?

18  A   Yes.

19  Q   And in your experience testifying in court, have you been

20  qualified as an expert before?

21  A   Yes.

22  Q   Was it your decision to be a nonexpert witness in this

23  case?

24  A   No.

25  Q   Do you know whose it was?

1   A    No.

2          MR. SHERWOOD:  Thank you, Mr. Buckfire.  Thank you,

3   your Honor.  I have no further questions.

4          THE COURT:  Anyone else have questions for the

5   witness?

6          THE WITNESS:  You want this exhibit?

7          THE COURT:  I guess just set it down there.

8                        CROSS-EXAMINATION

9   BY MS. GREEN:

10  Q   Good afternoon, Mr. Buckfire.  My name is Jennifer Green.

11  I represent the General and Police and Fire Retirement

12  Systems for the City of Detroit.  We've actually met before.

13  I was at your deposition.  I just wanted to get the timeline

14  straight that you just testified about.  You were initially

15  engaged by the State of Michigan in 2012; correct?

16  A   Correct.

17  Q   And at that time, your engagement was limited to the time

18  frame of March to April?

19  A   It was 60 days.

20  Q   And at that time, it was your job to identify assets of

21  the City of Detroit; correct?

22  A   No.  I didn't testify to that.  I testified we were asked

23  to do a general financial review of the city's financial

24  condition based on public information.

25  Q   Okay.  And then in 2013 when you were reengaged, you

1  discovered that the artwork could be a potential asset?

2  A    Among other things, yes.

3  Q    And you did not know that during your engagement in 2012;

4  correct?

5  A    No.

6  Q    You met with Christie's in May of 2013?

7  A    I first called them late May, and I believe I met with

8  them either late May or early June to ascertain whether they

9  might have an interest in appraising the art at the DIA.

10  Q    And were you told by Christie's at that time how long it

11  would take to perform the valuation?

12  A    They told me it would take several months.

13  Q    You knew even if you started in May that it would not be

14  done until the end of summer; correct?

15  A    Correct.

16  Q    The meeting with the DIA, what date in May was that?

17  A    May 15th.

18  Q    Was that the only meeting you had with the DIA?

19  A    No. It was the first meeting I had with the DIA.

20  Q    What other meetings did you have with the DIA?

21  A    Well, I met with representatives of the DIA and the

22  chairman of the trustees several times after that meeting to

23  again reiterate the city's position that the city owned the

24  art and the building and that it would be useful to everybody

25  to arrive at a consensual resolution that would create value

1   for the city.  Those discussions did not prove fruitful.

2   Q   And who is the chairman that you just mentioned?

3   A   Gene Gargaro.

4   Q   And who is Richard Manoogian?  Is he also involved with

5   the DIA?

6   A   I don't know.  I assume he -- I've heard the name, but I

7   never met him.

8   Q   And David Meador, how is he involved with the DIA?

9   A   He's a trustee.

10  Q   And did you meet with him as well in May or June?

11  A   I did.  I met him when DTE was working with the city on

12  the formation of the public lighting authority.

13  Q   And when you met with Mr. Meador, did you discuss the

14  potential of a Chapter 9 filing on behalf of the City of

15  Detroit?

16  A   I told him that it was certainly a risk given the city's

17  financial position.

18  Q   Did you identify a particular date that the city may file

19  Chapter 9?

20  A   No.

21  Q   Did you share with any of the other trustees of the DIA

22  that there was a particular date or month that a Chapter 9

23  might be filed on behalf of the city?

24  A   No.

25  Q   Mr. Buckfire, do you remember receiving an e-mail from

1  David Meador, the Mr. Meador that we just spoke about, on

2  July 11th of 2013?

3  A   I recall getting numerous e-mails from him.  That sounds

4  like I might have gotten one on that date.

5  Q   We'll pull up a copy of it for you to look at.  Do you

6  recognize this as being the e-mail that you received from Mr.

7  Meador in July of 2013?

8  A   Yes.

9  Q   I'd like to direct your attention to the top of the e-

10  mail where it says "Ken, here's the outline that I provided

11  Gene."  Is that Gene Gargaro, who we just spoke of?

12  A   Yes.

13  Q   "As a pre-read to our call, I don't think any action is

14  needed on your part.  I just wanted you to be aware of what I

15  had shared with him."

16  A   I see that.

17  Q   Okay.  The e-mail below has a date of, if you look down,

18  June 22nd.  And if you scroll to the last page of the e-mail,

19  there's a bullet point list of topics that were discussed.

20  Bullet point number --

21          MR. CULLEN:  Before we get into the topics, unless

22  we're going to refresh his recollection, I would like to have

23  a proper foundation for the rest of the e-mail or for his

24  ability to discuss the substance of this.

25          MS. GREEN:  Your Honor, it's actually going to be

1   impeachment because he just said that he didn't tell them
2   something, and that's all I'm using it for.
3           THE COURT:  Well, let's just get the record
4   straight.  Is this e-mail an exhibit?
5           MS. GREEN:  It is not yet an exhibit, your Honor.
6           THE COURT:  Okay.  Well, for identification
7   purposes, let's just put a number on it, and you'll tell me
8   what that number is.
9           MS. GREEN:  It would be Exhibit 868.
10          THE COURT:  868.  Okay.  We'll put that number on
11  it.
12      (Exhibit 868 marked at 1:57 p.m.)
13          THE COURT:  Is this an e-mail that the witness
14  received in the ordinary course?
15          MS. GREEN:  I believe he just testified that he
16  generally recalls receiving an e-mail from Mr. Meador
17  following their meeting.
18          THE COURT:  Did you receive this e-mail?
19          THE WITNESS:  I did.
20          THE COURT:  All right.  You may proceed.
21  BY MS. GREEN:
22  Q   Bullet point number five states the EFM has to have a
23  plan in place by mid-July.
24  A   Um-hmm.
25  Q   The second line states, "A bankruptcy filing will likely

1    be in July.  The team would like to include a conceptual

2    framework for the DIA assets in that filing.  A formal plan

3    will be submitted in the fall, November or earlier, and a

4    hearing next May."  And as you recall, an e-mail that you

5    received stated, "I just wanted you to be aware of what I had

6    shared with him."  Had you shared this information with a

7    board member of the DIA?

8    A    Well, this is his e-mail to Gene Gargaro.  It's not from

9    me to him.

10   Q    I understand that.  I'm asking if it's -- if it is your

11   testimony that you did not share at your meeting that a

12   bankruptcy filing will likely be in July.

13   A    I never shared with anybody at DIA that a bankruptcy

14   filing was likely in mid-July, but at this point -- and this

15   is dated -- when was this dated again?  When was it sent?

16   Q    June 22nd.

17   A    Okay.  We had already had our meeting with creditors on

18   June 14th.  All right.  We were already in the middle of

19   discussions with them.  He had called me to find out where

20   this left DIA, and I explained to him that, you know, given

21   where we were with the cash position of the city -- and this

22   is an important point -- we still didn't have a forbearance

23   agreement in place -- that that raised the risks of a

24   bankruptcy to a high level, and, therefore, it would be nice

25   to have something in place as soon as possible.

1  Q   Did you respond to his e-mail and deny that you ever told

2  him a bankruptcy filing would be coming in July?

3  A   I never said it was coming in July.

4  Q   His e-mail --

5  A   This is his e-mail.

6  Q   I understand that.  His e-mail says that a bankruptcy

7  filing will likely be in July, and you had just met with him.

8  And the e-mail to you said, "I wanted you to be aware of what

9  I had shared with him."  Did you respond and say, "I didn't

10  share any information of this nature with you"?

11  A   I'm confused.  This is what he wrote to his colleagues

12  about what he believed would be the state of play.

13  Q   Can we go back to the initial e-mail to Mr. Buckfire,

14  please?

15  A   Can you hand me a hard copy because it's actually hard to

16  follow this from the screen?

17  Q   Mine has writing, so --

18  A   What?

19  Q   Mine has writing.

20        MR. CULLEN:  Don't you have a --

21        THE COURT:  Do you have a clean copy?

22        MR. CULLEN:  You don't have a clean copy?

23        MS. GREEN:  Don't have a clean copy.

24        MR. CULLEN:  Well, it's more important that he have

25  it than I do, your Honor.

```
 1            THE COURT:  Okay.  Thank you, sir.
 2   BY MS. GREEN:
 3   Q   I just wanted to direct your attention again to the
 4   sentence that says -- it's an e-mail from Mr. Meador to you
 5   saying, "I wanted you to be aware of what I had shared with
 6   him."
 7   A   Um-hmm.
 8   Q   Had you shared that information?
 9   A   Well, he's referring to what he had shared with Gene, not
10   what I had shared with him.  That's what it says.
11   Q   My question to you was are you denying that you were the
12   one that told them that a bankruptcy filing would be coming
13   in July?
14   A   I never told him that.  I did, however, tell them that
15   the city was at great risk of action because we didn't have a
16   forbearance agreement.  We just had our meeting with
17   creditors.  I didn't know what was going to happen, and,
18   therefore, they should be concerned about doing something
19   about DIA as soon as possible.
20   Q   Did the emergency manager himself have a meeting with Mr.
21   Meador or Gene Gargaro?
22   A   Not to my knowledge.
23   Q   Who all was in the meeting in May of 2013 with you and
24   Mr. Meador?
25   A   Let's see.  It was Mr. Gargaro, Richard Levin from
```

1   Cravath, Alan Schwartz from Honigman Miller, Bruce Bennett

2   from Jones Day, and myself.

3   Q   Do you think it's possible that one of the other people

4   at that meeting shared with the representatives from the DIA

5   that a bankruptcy filing would be coming in July?

6   A   Well, all the people at that meeting were from the DIA

7   except for Mr. Bennett and myself.

8   Q   That's what I'm asking you.  Did someone else at the

9   meeting, perhaps Mr. Bennett, share with the DIA

10  representatives that the emergency -- or I'm sorry -- that a

11  bankruptcy filing would be coming in July?

12  A   I have no idea.

13  Q   Do you recall any discussion about a formal plan that

14  would be submitted in November as the e-mail states?  Do you

15  recall any discussions of that nature in your meeting?

16  A   Yes.  I explained to Mr. Meador that in the ordinary

17  course, if we were successful in crafting a plan with our

18  creditors, we would move this along as rapidly as we could,

19  and the earliest we could potentially file a plan would be

20  end of this year with a goal of having an exit from

21  bankruptcy, if necessary, by the end of next year.

22  Q   And the portions regarding having a plan in place by July

23  or bankruptcy filing in July never came up?

24  A   No.  We were referring to having a plan with our

25  creditors.

1  Q   And you never corrected this what you now say is an

2  inaccurate recollection or an inaccurate summary of your

3  meeting?

4  A   This is not my meeting, and it's not my e-mail, so I

5  don't know what you're talking about.

6  Q   You didn't correct his understanding that there was not

7  to be a bankruptcy filing in July?

8  A   I didn't feel it necessary to respond to every e-mail I

9  receive because he's not an employee or officer --

10         THE COURT:  "Yes" or "no," sir?

11         THE WITNESS:  No.

12 BY MS. GREEN:

13 Q   Thank you.  I believe you testified earlier when Mr.

14 Montgomery was questioning you whether you had any

15 communications with Jones Day regarding the possibility of a

16 repeal of PA 4, and you answered, "No."

17 A   Okay.

18 Q   Do you consider e-mails a form of communication?

19 A   Yes.

20 Q   I'd like to direct your attention to Exhibit 842.  Do you

21 recognize this document?

22 A   No.

23 Q   Do you recognize your e-mail address at the top of it?

24 A   I do.  It was sent to me.  That's correct.

25 Q   Correct.  So you -- do you recall receiving it generally?

1  A   No.

2  Q   When it says at the top, "FYI ahead of your meeting,"

3  what meeting is that relating to in June of 2012?

4  A   I can't recall which meeting that might be referring to.

5  Q   Did you meet with the governor of the State of Michigan

6  in June of 2012?

7  A   I may have, yes.

8  Q   Who all was at the meeting with the governor in June of

9  2012?

10  A   It was a meeting where we briefed him about restructuring

11  alternatives in general.  I believe it was attended by

12  Treasurer Dillon, one of his aides, Brom Stibitz.  Dennis

13  Muchmore, chief of staff, was there.

14  Q   What was the substance of the conversations during this

15  meeting on June -- I think it would be June 6th?  If it's the

16  following day, it would be June 6th.

17  A   Yeah.  Well, as I testified, they were interested in the

18  application of restructuring technique to the problems of the

19  City of Detroit, how these issues could be resolved, and they

20  asked me to come up and brief them about those things, which

21  I did.

22  Q   Were any representatives of Jones Day at the meeting on

23  June 6th?

24  A   I don't recall.

25  Q   I'd like to draw your attention to another exhibit.  It

1   is an e-mail dated June 5th, 2012.  I believe it's 845, 844.

2   A    This is dated March 24th?

3   Q    Yeah.  I think it's off one.  It should be 844.  Okay.

4   The next page of that e-mail -- I'll direct your attention to

5   the top line, and it says, "Guys, I'm going with Ken Buckfire

6   to talk to the governor in Michigan tomorrow," and it's an e-

7   mail from Heather Lennox.  Does that refresh your

8   recollection at all about whether someone from Jones Day

9   joined you at the meeting?

10  A    Yes.

11  Q    Was Heather Lennox, indeed, there?

12  A    She was.

13  Q    Were there any other representatives of Jones Day at the

14  meeting?

15  A    Not that I recall.

16  Q    Do you recall if there were any discussions relating to a

17  Chapter 9 filing at that meeting?

18  A    I'm sure we talked about it.  It's something you have to

19  consider when you have a high level of insolvency.

20  Q    Did you discuss Chapter 9 filing specifically in

21  connection with any particular sorts of liabilities such as

22  the pension liabilities of the City of Detroit?

23  A    I don't recall that either.

24  Q    Do you remember if there were any memos or reports

25  relating to constitutional protections of the pension

1   liabilities discussed at this meeting?

2   A   No.

3   Q   Do you recall if any -- do you recall being given at any

4   time memos from Jones Day relating to Chapter 9 filing issues

5   vis-a-vis the City of Detroit?

6   A   In general, yes, but not specifically with respect to

7   Detroit.

8   Q   I couldn't -- I didn't hear the last --

9   A   Not specifically with respect to Detroit but in general,

10  yes.

11  Q   Do you remember any discussion at the meeting with the

12  governor relating to the bankruptcy filing requirements under

13  109(c)(5) and negotiations and the good faith requirements --

14  A   No.

15  Q   -- listed thereunder?  No?  Do you remember any

16  memorandums being shared with the governor on that topic?

17  A   No.

18  Q   Do you remember, as stated in the e-mail, suggesting that

19  Jones Day put together all the memos that they had done for

20  Andy?

21  A   I don't recall any of those memos.

22  Q   No.  Do you recall suggesting to them that they compile

23  the memos in advance of the meeting?

24  A   Yes.

25  Q   And what prompted you to do that?

1  A   I thought that the state would find it helpful to see

2  their research.

3  Q   And when it says "the memos we did for Andy," is that for

4  Andy Dillon?

5  A   Yes.

6  Q   And do you remember specifically what types of memos had

7  been requested by Mr. Dillon prior to this meeting?

8  A   He didn't request any specific memo.  He just wanted to

9  get an education on the issues.

10  Q   So they prepared the memos on their own volition?

11  A   Yes.

12  Q   I'd like to go back to what I believe is Exhibit 843.  We

13  talked a little while ago about your denial of any

14  communications relating to the repeal of PA 4.  Do you

15  recognize this e-mail?

16  A   No.

17  Q   Do you see your name at the top as a recipient?

18  A   I see my name as a recipient, but I don't recall reading

19  it.

20  Q   So you just ignored the e-mail or you just --

21  A   I guess.

22  Q   -- generally don't recall getting it?

23  A   I get a lot of e-mails.  I don't recall reading this one

24  at the time.

25  Q   Okay.  Well, let's look at the context, and maybe that

1    will remind you whether or not you read it.  The first bullet

2    point talks about the appeals court should soon rule on the

3    repeal efforts related to Public Act 4.  Does that ring a

4    bell to you?

5    A    Yes.

6    Q    And the second paragraph talks about a separate challenge

7    to the state unrelated to the efforts to repeal PA 4.

8    A    Yes.

9    Q    Do you now remember getting the e-mail and having

10   communications about the repeal of PA 4?

11   A    No.

12   Q    What about Exhibit Number 846?  Oh, these are all off

13   one.  You know, it must be 8 -- I think it's 845.

14           MR. CULLEN:  Is it copied on 846, counsel?

15           MS. GREEN:  No.  It's 845.  They're all off by one

16   for some strange reason.  There we go.

17   BY MS. GREEN:

18   Q    Do you see this e-mail, and do you recognize it?

19   A    I see the e-mail.  I don't recall it, but I'm sure I

20   received it.

21   Q    And you see your name at the top of the e-mail?

22   A    I do.

23   Q    And you see a discussion in paragraph 1 about the state

24   and city were concerned that PA 4 may not survive the

25   petition challenge?

1  A   I do.

2  Q   I direct your attention to the second page of this e-mail

3  where it states, "The state was likely looking at declaring

4  at emergency and appointing and EFM with a likely subsequent

5  step of a Chapter 9."

6  A   Sorry.  You lost me.  Where are you reading from?  Oh,

7  okay.  Okay.

8  Q   And then the following paragraph where it talks about if

9  PA 4 is pulled back at the end of April, is this another

10  example of communications relating to the repeal of PA 4?

11  A   It seems to be.

12  Q   I have several more, but I would -- I don't need to go

13  over them.  Do you have a reason why you said before you had

14  no communications relating to the PA 4 repeal?

15  A   I didn't send this e-mail.

16  Q   You didn't what?

17  A   I didn't send this e-mail.

18  Q   But you received it.

19  A   I don't remember it.

20  Q   As part of your position with the team of E&Y, Conway

21  MacKenzie, and Miller Buckfire Advisors, were you privy to

22  any timelines or communication rollout plans prepared by

23  Kevyn Orr's staff?

24  A   Are you referring to a public communication strategy?

25  Q   I'm referring to any kind of timeline or communications

1    rollout plan that would have been shared with you in your

2    role as the lead advisor for the financial team.

3    A    I might have received a document from his communications

4    director at some point this year laying out a proposed time

5    schedule for public communications, but I can't recall

6    specifically.

7    Q    Do you recall when that would have been?

8    A    No.

9    Q    And his press secretary is Mr. Nowling?

10   A    Yes.

11   Q    Do you recall the substance of that timeline and what the

12   date was for the bankruptcy filing?

13   A    No.

14   Q    Did you not review the e-mail from Mr. Nowling for its

15   substance?

16   A    I just don't remember it.

17   Q    You were the lead advisor of the financial team, and you

18   don't remember an e-mail with the date for the bankruptcy

19   filing?

20   A    No.

21   Q    Do you think that would have been an important thing for

22   you to know as the lead negotiator on the swap transaction

23   and negotiating with the creditors?

24   A    I had advised Mr. Orr that if he were to decide to seek

25   protection, he shouldn't do it until we had a forbearance

1  agreement executed.

2  Q   And at the time leading up to the negotiation of the

3  forbearance agreement, you and Mr. Orr were in daily contact;

4  correct?

5  A   Yes, up until the time we got the forbearance agreement

6  executed.

7  Q   And that was executed on July 15th; correct?

8  A   I think it was the 16th.

9  Q   July 16th?

10 A   July 16th.  That's right.

11 Q   Is it your testimony that as of July 16th, you didn't

12 know what the filing date, if any, would be for the City of

13 Detroit?

14 A   That's correct.

15 Q   How far in advance did you know that the bankruptcy was

16 going to be filed?

17 A   Well, I knew after the forbearance agreement was executed

18 that the decision to seek a filing was being discussed

19 between Mr. Orr and the state.  I was not part of any of

20 those discussions.

21 Q   So as of the date of the forbearance agreement, you had

22 no idea that the bankruptcy petition would be filed two days

23 later?

24 A   No.

25 Q   Were you shared any -- I'm sorry.  Were any timelines or

1  communications rollouts shared with you that were prepared by

2  the governor's staff?

3  A   Not that I recall.

4  Q   Was the one that was shared with you by Mr. Nowling by

5  any chance dated July 8th of 2013?

6  A   I don't know.

7  Q   Why don't we pull it up, and we'll see if you recognize

8  it?  It would be Exhibit 831.  And if you scroll to the next

9  page, there's a communications rollout plan.  Can you tell me

10 if it looks like the one that you think you saw?  There's a

11 document checklist, and the next --

12 A   It looks familiar.

13         MR. CULLEN:  Do you have a hard copy for the

14 witness, counsel?

15         MS. GREEN:  There's a binder up there if you want me

16 to --

17         MR. CULLEN:  Allow me.

18         MS. GREEN:  I can give him the binder.

19         MR. CULLEN:  May I, your Honor?

20         THE COURT:  What are you doing?

21         MR. CULLEN:  Giving him the exhibit, the hard copy

22 of the exhibit.

23         THE COURT:  Okay.

24 BY MS. GREEN:

25 Q   Have you reviewed it?  Does that look like the one that

1  was shared with you?

2  A   Yes.  This was the contingency planning documents I knew

3  they were working on.

4  Q   I think you have to speak into the microphone.

5  A   I'm sorry.  This is the contingency planning document

6  that they'd been working on.  That's correct.

7  Q   Okay.  And on the next page, if you scroll through to the

8  timeline itself, the end, all the way to the end -- there we

9  go.  There are various dates and there are various milestones

10  that are listed there.

11  A   Okay.

12  Q   And as of on the Friday, July 19th, date -- is that what

13  you're looking at?

14  A   I'm sorry.  You're at July 19th?

15  Q   Yes.

16  A   Yes, yes.

17  Q   Okay.  And do you see where it says "filing day" in big

18  capital letters?

19  A   Yes.

20  Q   And this is the document that you think you saw on July

21  8th?

22  A   Yes.  It's a contingency plan.

23  Q   On the 18th, it talks about document preparation.

24          MS. GREEN:  Your Honor, I'd ask to strike that last

25  part.  I had no question pending when he offered that last --

1          THE COURT:  The motion is granted.

2     BY MS. GREEN:

3     Q    And it says, "make last-minute revisions to all key

4     documents."  I don't see the words "contingency."  Do you see

5     the words "contingency"?

6     A    The whole thing is a contingency plan.

7     Q    And the date -- the following date on the 19th says

8     "filing date, July 19th."  Does it say "contingency"?

9     A    No, but this document is dated July the 8th.

10    Q    Are the words "contingency" anywhere on the document?

11    A    No, but it says "draft document."

12    Q    As of July 8th?

13    A    Right.

14    Q    Do you recall seeing an updated timeline shared with you

15    after that?

16    A    No.

17    Q    Were you ever told that the filing date of July 19th was

18    going to be changed?

19    A    No.

20    Q    When the filing came on the 18th, did it surprise you?

21    A    Yes.

22    Q    Do you know if the members of the Conway MacKenzie team

23    were also shared the timeline?

24    A    I don't know.

25    Q    What about the members of the Ernst & Young team?

1  A   I don't know.

2  Q   Do you know?  I believe you testified at your deposition

3  that in May of 2013 you received a Milliman report?

4  A   No.  It was in April.

5  Q   April.  And at that time, you discovered that according

6  to Milliman, at least, the underfunding level was $3.5

7  billion?

8  A   That's right.

9  Q   And I believe you testified that you did not investigate

10 the Milliman report for accuracy or ask anyone else to verify

11 those numbers; correct?

12 A   Correct.

13 Q   And you testified that you just assumed they were true

14 based on Milliman's expertise.

15 A   That was their job.  I relied on their work.

16 Q   What about all the caveats listed on the face of the

17 Milliman report?  Did you read those?

18 A   I believe I did.

19 Q   Do you recall being cautioned that a more robust

20 projection model could vary the results?

21 A   Yes.

22 Q   You testified at your deposition that you thought before

23 the Milliman report came out that the underfunding might be

24 at a modest enough level where we could deal with it in a

25 different way.  What other different options did you have in

1    mind prior to the Milliman report?

2    A    Well, we thought if we had sufficient time to monetize

3    some of the city's assets, in particular, the Water and Sewer

4    Department, maybe we could use that as a funding source to

5    fully fund the pension underfunding.

6    Q    Were any of these different options explored with the

7    Retirement Systems or any of the unions or retirees?

8    A    At that time?

9    Q    At any time.

10   A    Well, they were well-aware of the fact that we were

11   exploring monetization of Water and Sewer as of the June 14th

12   report, but we hadn't been able to make any progress on it at

13   that point.

14   Q    That wasn't my question.  I asked you if you shared with

15   them your different options.

16   A    Not on June 14th, no.

17   Q    The data room that you put together, I believe you said

18   that you had been developing it for about five months prior

19   to its launch in June?

20   A    I didn't say that.

21   Q    How many months did it take you to put the data together?

22   A    Well, the data began to be assembled by Ernst & Young,

23   Conway, and ourselves probably in early February because that

24   was part of our engagement.  I can't recall exactly when we

25   set up the data room specifically, but I do know all the data

1  that went into it had been created by either our respective

2  firms or by the city itself.

3  Q   My question was how long did it take?

4  A   To do what?

5  Q   To put the data together for the data room.

6  A   Months.

7  Q   Months.  Can you give me a rough estimate of how many

8  months?

9  A   Well, we began working in January.  It took until June.

10 Q   So six months?

11 A   That's correct.

12 Q   A little longer?

13 A   Yes.

14 Q   Because it was up on June 20th; correct?

15 A   That sounds right.

16 Q   And when it was initially launched, it was not fully

17 populated with all of the data; correct?

18 A   I don't recall what was not in there at the time.  I know

19 our intent was to put everything in there we could.

20 Q   And the proposal for creditors was laid out on June 14th.

21 A   Correct.

22 Q   And then in June you were tasked with assisting in the

23 negotiation process; correct?

24 A   That's right.

25 Q   And you did not attempt to form a subgroup of any

1  retirees that you could negotiate with directly at that time,

2  did you?

3  A  Well, no.  We did meet with all of the representatives

4  that we could find, including the unions, pension trustees,

5  and the bond and note trustees and bond insurers.

6  Q  My question was you did not attempt to form a subgroup of

7  retirees that you could negotiate with directly; correct?

8  A  No.

9  Q  And do you recall testifying that it was discussed but it

10  was reported back to you that it was impractical to do so?

11  A  Yes.

12  Q  And who was it that reported back to you that it would be

13  impractical to attempt to directly negotiate with smaller

14  groups of people?

15  A  Jones Day.

16  Q  So after being told that it would be impractical to

17  divide the constituencies into smaller subgroups, you did not

18  attempt do so; correct?

19  A  I personally did not, no.

20  Q  During these negotiations, you didn't even have authority

21  to actually bind the city; correct?

22  A  Well, as the lead negotiator for the city, my

23  responsibility was to negotiate with our creditors.  I don't

24  have any decision-making authority.  I'm not an executive of

25  the city.  I would take back whatever came to the city and

1   make a recommendation.

2   Q   So your answer is, yes, you did not have authority to

3   bind the city?

4   A   I wasn't given that authority, but I was authorized to

5   negotiate on behalf of the city.

6           THE COURT:  All right.  One second.  Mr. Buckfire,

7   with all due respect, probably less than half the questions

8   that have been asked of you have you given a straight answer

9   that doesn't volunteer all kinds of information that wasn't

10  asked.  In order for us to get through this, I'm going to ask

11  you from now on just to answer the questions and not

12  volunteer any information.  Okay?

13          THE WITNESS:  Thank you, your Honor.

14          MS. GREEN:  I was actually done, but I appreciate --

15          THE COURT:  Well, okay, but --

16          MS. GREEN:  I appreciate the --

17          THE COURT:  That's great, but are there going to be

18  any more?

19          MS. GREEN:  Yes.

20          THE COURT:  Who else?  Three more?  Three more?  Can

21  I give you ten minutes each?

22          MR. WERTHEIMER:  Fine.

23          THE COURT:  Ten minutes.  Start the clock.

24          MR. WERTHEIMER:  Okay.

25                          CROSS-EXAMINATION

```
 1   BY MR. WERTHEIMER:

 2   Q   Mr. Buckfire, my name is Bill Wertheimer.  I represent

 3   what's been called the Flowers plaintiffs.  Those are five

 4   retirees or employees who filed a lawsuit against the state

 5   before the bankruptcy was filed, and I've got a few

 6   questions.  You had mentioned, I believe, that in June of

 7   2012 you were involved in some discussions with state

 8   officials having to do with the possibility of restructuring

 9   the city or the city's finances; is that correct?

10   A   Yes.

11   Q   Did the governor participate in those discussions?

12   A   Yes.

13   Q   You indicated that in at least one of those discussions

14   you thought the possibility of a Chapter 9 filing came up; is

15   that correct?

16   A   Yes.

17   Q   Do you recall the governor being present at that

18   discussion?

19   A   Yes.

20   Q   And what, if anything, did he say about that?

21   A   I don't recall him saying anything.

22   Q   Do you recall who brought it up?

23   A   I believe it was Treasurer Dillon.

24   Q   I'm sorry.

25   A   I believe it was Treasurer Dillon.
```

1  Q   And what do you remember him saying, as best you recall?

2  A   What does Chapter 9 mean?

3  Q   Simple as that?

4  A   Yes.

5  Q   And someone explained what Chapter 9 meant?

6  A   That's correct.

7  Q   Okay.  Was it -- that was about it?

8  A   Yes.

9  Q   Okay.  You indicated that you had seen a document which

10  showed a rollout which was going to -- at least at one point

11  in the rollout there was going to be a bankruptcy filing

12  scheduled for the 19th.  Do you recall?

13  A   Yes.

14  Q   And then we know, in fact, that the bankruptcy was filed

15  on the 18th; correct?

16  A   Yes.

17  Q   And you indicated in your testimony that you were

18  surprised by that change.

19  A   Yes.

20  Q   Would I be correct in understanding that the reason for

21  your surprise was that normally when you have a rollout as

22  detailed as this, you stick with it, particularly such a key

23  event as the filing itself?

24  A   Yes.

25  Q   Would that be fair?

1    A    That's fair.

2    Q    And did you talk to anyone after the filing to learn --

3    to try to learn why it was that the date had been changed

4    from the 19th to the 18th?

5    A    No.

6    Q    So you were surprised on the 18th; correct?

7    A    Yes.

8    Q    You never talked to Mr. Orr about why it was switched?

9    A    No.

10   Q    Never talked to anybody?

11   A    I did later, but it just wasn't very important.

12   Q    All right.  Well, to you.  Who did you talk to later?

13   A    Counsel at Jones Day and my own colleagues.

14   Q    And what did you learn?

15             MR. CULLEN:  Objection, your Honor, to the extent it

16   calls for legal work of Jones Day.

17             MR. WERTHEIMER:  Your Honor, that's hardly legal

18   advice after the fact if he's learning why something was

19   done.  I don't think the privilege covers that.

20             THE COURT:  Well, first, who did you speak to about

21   this question?

22             THE WITNESS:  Mr. Heiman.

23             THE COURT:  Anyone else?

24             THE WITNESS:  Ms. Ball and Ms. Lennox.

25             THE COURT:  Anyone who's not an attorney with Jones

1   Day?

2           THE WITNESS:  I spoke with Mr. Orr at some point a

3   week later about this.

4           THE COURT:  What did Mr. Orr tell you about that?

5           THE WITNESS:  All he told me was that the decision

6   had been made to expedite the filing because they were

7   concerned about losing control of the process, and that's

8   what he told me.

9           THE COURT:  In the circumstances, I will hold that

10  the witness' conversations with attorneys from Jones Day on

11  the subject are protected conversations.

12  BY MR. WERTHEIMER:

13  Q   The conversation you had with Mr. Orr when he talked

14  about losing -- the possibility of losing control of the

15  process, did he identify part of the reason for that

16  possibility of losing control being the fact that there were

17  lawsuits out there in state court dealing with the bankruptcy

18  issue?

19  A   Yes.

20  Q   Did he identify them as the lawsuits in front of Judge

21  Aquilina in Lansing or in any way pinpoint the lawsuits he

22  was talking about?

23  A   If that judge is in Ingham County, then the answer is

24  yes.

25  Q   She is in Ingham County.

1  A   Then that's correct.

2  Q   Okay.  So Orr told you that one of the reasons for moving

3  up the filing was because of the litigation that was pending

4  in Ingham County?

5  A   Yes.

6  Q   Did he indicate that that litigation was in part an

7  effort to assure that if, in fact, the city filed bankruptcy,

8  that it would be done in a way that would protect the pension

9  rights under the state Constitution even generally?  In other

10  words, I understand he wouldn't have necessarily used those

11  words.

12          MR. CULLEN:  I'll object to the form of the

13  question.

14          THE COURT:  Please rephrase.

15          MR. WERTHEIMER:  Okay.

16  BY MR. WERTHEIMER:

17  Q   When you talked to Mr. -- well, just tell us.  What

18  did -- how did Mr. Orr characterize those Ingham County

19  lawsuits?

20  A   I don't recall he did.  He simply said there were

21  lawsuits pending that might have made it very difficult for

22  us to move forward, and they had to expedite the filing.

23  Q   In Ingham County?  In other words, he at least gave you

24  that?

25  A   Well, I knew they were in Ingham County, but that's --

1   Q   Okay.

2   A   But it was only because of the impact on the timetable.

3   Q   What did you know about those lawsuits?

4   A   Very little.

5   Q   Did you know at least generally that they were efforts to

6   in some way protect the pensions of city employees based on

7   state law?

8   A   I knew they had something to do with it, yes.

9   Q   Okay.  I believe you indicated it was on July 8 that you

10  saw the rollout or maybe that's the date of the rollout

11  document.

12  A   Yes.

13  Q   Okay.  And the rollout anticipated a bankruptcy filing on

14  the 19th; correct?

15  A   That's right.

16  Q   Which was a Friday; correct?

17  A   That's right.

18  Q   I'll state to you that these Ingham County lawsuits were

19  filed on July 3rd.  Do you recall on July 8 knowing about the

20  existence of those lawsuits at that time?

21  A   No.

22  Q   Do you recall knowing on July 8 that the Ingham County

23  judge had hearings already scheduled for July 22nd -- that

24  is, the Monday after the 19th -- in order to determine

25  whether she should issue injunctive relief?

1  A    No.

2  Q    Did you know anything about that as of July 8?

3  A    No.

4         MR. WERTHEIMER:  That's all I have, Mr. Buckfire.

5  Thank you.

6         THE COURT:  Mr. Wertheimer, will you yield the

7  balance of your time to Ms. Brimer, who seems to think she

8  needs more than ten minutes?

9         MR. WERTHEIMER:  I will.

10        THE COURT:  All right.

11                        CROSS-EXAMINATION

12  BY MS. PATEK:

13  Q    Good afternoon, Mr. Buckfire.  Barbara Patek.  I

14  represent the Detroit Police Officers Association, the

15  Detroit Police Lieutenants & Sergeants Association, the

16  Detroit Police Command Officers Association, and the Detroit

17  Fire Fighters Association.  You and I have not met before; is

18  that right?

19  A    That's correct.

20  Q    You told us in your testimony that becoming involved in

21  this case was somewhat personal for you; isn't that right?

22  A    Yes.

23  Q    And that was because you're from here, being Detroit, and

24  you care about the city?

25  A    That's right.

1  Q   And you have, in the course of your successful

2  professional career, been an expert in many bankruptcy

3  situations; is that right?

4  A   Yes.

5  Q   Most of those were probably Chapter 11 proceedings?

6  A   Yes.

7  Q   And some of them were Chapter 9; correct?

8  A   Never in Chapter 9.

9  Q   Never in Chapter 9.  Have you -- you served as a

10  consultant in <u>Stockton</u> in Chapter -- in that Chapter 9

11  proceeding?

12  A   Yes.

13  Q   And as a restructuring expert, you certainly understand

14  that there are different rules that govern Chapter 9 and

15  Chapter 11 proceedings; isn't that right?

16  A   Yes.

17  Q   And one of the differences, you would agree with me,

18  between Chapter 11 and Chapter 9 is that there can't be a

19  liquidation in a Chapter 9; that is, that the City of Detroit

20  in these proceedings must continue to provide its core and

21  essential services; isn't that right?

22  A   Yes.

23  Q   You also told us -- and I'm going to condense, so you can

24  tell me if anything about my statement is inaccurate -- that

25  what drove the city's July 18th, 2013, filing was the need --

1    or the concern that it would run out of cash it needed to pay

2    for its core and essential services.  Is that an accurate

3    summary?

4    A    Yes.

5    Q    And among those core and essential services you would

6    agree with me are police and fire protection?

7    A    Yes.

8    Q    And you would agree with me that the work of providing

9    police and fire protection in the City of Detroit is a

10   difficult and dangerous job?

11   A    Yes, I would.

12   Q    And, in fact, probably much more difficult and dangerous

13   than what you do or what I do for a living?

14   A    Certainly.

15   Q    And you told us -- well, strike that.  In terms of the

16   June 14th proposal, that proposal lumped together in terms of

17   how it was going to treat the accrued vested constitutionally

18   protected pension benefits of Detroit workers and retirees;

19   isn't that right?

20   A    Yes.

21   Q    And that would include those active police and fire

22   fighters?

23   A    That's correct.

24   Q    And it's your testimony here today that it is fair to

25   treat the city's unsecured obligation, including the accrued

1  vested pension benefits of those active police and fire

2  fighters, the same as it is the other unsecured creditors,

3  including the bondholders?

4  A   Yes.

5          MS. PATEK:  That's all I have, your Honor.

6          THE COURT:  Nineteen.

7          MS. PATEK:  Thank you, your Honor.  I will be as

8  quick as I can.

9                         CROSS-EXAMINATION

10  BY MS. BRIMER:

11  Q   Good afternoon, Mr. Buckfire.  My name is Lynn Brimer.  I

12  represent the Retired Detroit Police Members Association.

13  You and I have never met before; is that correct?

14  A   That's correct.

15  Q   And I did not attend either of your depositions; is that

16  correct?

17  A   That's correct.

18  Q   So with my limited time, I would like to step back a bit

19  and go back to some of the history of your relationship with

20  the City of Detroit and the State of Michigan in connection

21  with the City of Detroit.  Now, sometime in -- you testified

22  earlier that sometime in the spring of 2012 you had some

23  discussions with the treasurer, Dillon, regarding the

24  financial condition of the City of Detroit; is that correct?

25  A   Yes.

1  Q   Okay.  Was that before or after your engagement by the

2  city to perform a financial review?

3  A   It was around the same time.

4  Q   So your engagement in connection with the financial

5  review that you performed, was that pursuant to an RFP that

6  was issued by the state?

7  A   Yes, it was.

8  Q   Okay.  And was it by a particular department of the

9  state?  Was it Treasury or the Governor's Office, if you

10  recall?

11  A   I believe it was Treasury.

12  Q   Okay.  And you testified that the scope of your work in

13  connection with the financial -- 60-day financial review was

14  limited.  Can you identify or describe what the scope of your

15  work was?

16  A   We had been asked actually together with another firm,

17  Huron Consulting, which was part of the same RFP, to review

18  the city's financial results and come up with a coherent

19  evaluation of the balance sheet and the city's ability to

20  sustain its obligations, which we did, based on public

21  information.

22  Q   So in connection with that, you reviewed historical

23  public information of the city's financial records; correct?

24  A   Correct.

25  Q   Was there a particular time frame of records that you

1   reviewed?

2   A    We went back and looked at the last five years as well as

3   the city's current budget, which was made available to us by

4   the city.

5   Q    So you reviewed the records from approximately 2007

6   through 20 --

7   A    '11.

8   Q    -- 11?

9   A    And then the current fiscal year budget.

10  Q    Okay.  And did you issue a written report in connection

11  with that review?

12  A    We did.

13  Q    Did you draw any conclusions in that report?

14  A    Well, I'd have to go back and read it again.  I think we

15  pointed out that the city continued to spend more than it was

16  taking in from revenues; that it had limited ability to raise

17  capital in the capital markets; and that without a long-term

18  financial forecast it would be hard to understand that the

19  city had the ability to continue to pay its obligations.

20  Q    So at that point in time, you had already concluded that

21  the city could not pay its obligations on an ongoing basis;

22  is that correct?

23  A    No, no.  I didn't say that.

24  Q    What was your conclusion?

25  A    It was concluded that we didn't have enough information

1  to make that evaluation, but certainly it was a risk.

2  Q   What additional information would you have needed in

3  order to reach that conclusion?

4  A   Well, we would have needed a five- or ten-year financial

5  forecast that would accurately reflect the city's potential

6  revenues, and we'd also have to have an accurate

7  understanding of the city's long-term claims and requirements

8  to pay on those claims.

9  Q   So at that point in time, you did not have an

10 understanding of the city's long-term obligations?

11 A   We had an understanding of those obligations as publicly

12 reported.

13 Q   Okay.  And you performed that review with the -- with

14 Huron Consulting?

15 A   Correct.

16 Q   Were there any other consultants or advisors that were

17 engaged in connection with that review?

18 A   No.

19 Q   At any time was the scope of your engagement expanded?

20 A   No.

21 Q   Was your engagement ever expanded to include a review of

22 the consent agreement with the City of Detroit?

23 A   No.

24 Q   Did you have any role in connection with the drafting of

25 the consent agreement that was entered into with the City of

1    Detroit?

2    A    I was asked for some comments on it, yes.

3    Q    Who asked for comments?

4    A    Brom Stibitz.

5    Q    And who's that?

6    A    A senior advisor to Treasurer Dillon.

7    Q    Now, during the time frame that you were drafting the

8    financial report, do you know whether or not Jones Day had

9    been retained by the State of Michigan in any -- in

10   connection with any of the City of Detroit's financial

11   issues?

12   A    They had not been retained, to my knowledge.

13   Q    So did you work with anyone at Jones Day in connection

14   with the drafting of the consent agreement that was executed

15   by the City of Detroit?

16   A    No.

17           MS. BRIMER:  Your Honor, I'd like to show the

18   witness an exhibit that has not been entered into evidence.

19   If he has our binder, I could identify -- direct him to where

20   it is in the binder or, given the time frame, I could hand

21   him a copy.

22           THE COURT:  Yeah.  Why don't you just hand it to

23   him?  What exhibit is it?

24           MS. BRIMER:  I believe it's 202, your Honor.

25           THE COURT:  Okay.

1  BY MS. BRIMER:

2  Q   Do you see on that exhibit, Mr. Buckfire, your e-mail as

3  a carbon copy recipient of the e-mail?  Do you see that?

4  A   I do.

5  Q   And have you had an opportunity to review the e-mail?

6  A   Just now, yes.

7  Q   Does it refresh your recollection with respect to whether

8  or not you had any involvement with the Jones Day law firm in

9  the drafting of the consent agreement that was provided to

10  the City of Detroit?

11  A   They'd asked me for some comments.  I knew they were

12  talking to the state and trying to find a role for

13  themselves.  I apologize for going on about this, but, you

14  know, they had given them some comments, and I'd reviewed

15  them.

16  Q   So that would be a "yes."  You were --

17  A   That's a "yes."

18  Q   You had provided some comments to Jones Day in connection

19  with the consent agreement that was provided to the City of

20  Detroit?

21  A   Yes.

22  Q   And then you were aware that that consent agreement was

23  then provided to Treasurer Dillon for presentation to the

24  City of Detroit; correct?

25  A   No.

1  Q   Do you recall receiving this e-mail?

2  A   Not specifically.

3  Q   Have you reviewed the consent agreement that was

4  ultimately executed by the City of Detroit?

5  A   Yes.

6  Q   Is it the consent agreement that you had commented on

7  with the Jones Day law firm?

8  A   No.

9  Q   How is it different from the --

10  A   I recall the one that I was shown by Jones Day as being

11  materially different from the one the state ultimately signed

12  with the city.

13  Q   Can you identify some of the terms that were materially

14  different?

15  A   I'd have to go back and look at it.  I don't recall, but

16  I know it wasn't the same one.

17  Q   But sitting here today, you can identify that it wasn't

18  the agreement you had worked with Jones Day on, and yet you

19  can't recall any of the specifics on why it was not the same

20  agreement?

21  A   It wasn't the same agreement.

22  Q   Okay.  Just yes.  You are sitting here today.  You know

23  it was not, but you cannot recall any of the specifics?

24  A   That's correct.

25  Q   Okay.  Now, you've also indicated that at some point in

1  time you became aware that the State of Michigan and Jones

2  Day -- and maybe -- I don't want to put words in your mouth,

3  but at some point in time you became aware that the State of

4  Michigan and the City of Detroit -- Jones Day had addressed

5  issues in connection with the filing of a Chapter 9 by the

6  City of Detroit; is that correct?

7  A   I'm sorry.  I don't understand the question.

8  Q   Okay.  So when did you first learn that the State of

9  Michigan was considering a Chapter 9 bankruptcy filing for

10 the City of Detroit?

11 A   Well, it was on the table at all times really after June

12 14th.  I don't know when specifically they began to discuss

13 it.  It was always an option.

14 Q   Was it on the table in 2012?

15 A   Not that I recall.

16        MS. BRIMER:  Your Honor, I think this exhibit is in

17 evidence.  I believe it's 845.

18 BY MS. BRIMER:

19 Q   Do you recall discussing this exhibit with Ms. Green just

20 a few minutes ago?

21 A   Yes.

22 Q   I'd like to direct your attention to the second page

23 perhaps midway down, the paragraph that begins, "The state

24 believes."  And you were a recipient of this e-mail; correct?

25 A   Yes.

1   Q   And that paragraph reads, "The state believes it needs PA

2   4 or worst case PA 72 to file a Chapter 9 case based on law.

3   As such, state legal counsel and Jones Day provided guidance

4   on whether a Chapter 9 filing in April could be upheld if PA

5   4 is pulled back at the end of April."  Is that what that

6   says?

7   A   Yes, it does.

8   Q   You were a recipient of this e-mail; correct?

9   A   I am.

10  Q   So is it fair to say that at least as early as March of

11  2012, the state and Jones Day were discussing a Chapter 9

12  filing for the City of Detroit?

13  A   Yes.

14          THE COURT:  What exhibit number did you say that

15  was?

16          MS. BRIMER:  846, your Honor.

17          ATTORNEYS:  845.

18          MS. BRIMER:  Oh, 845.

19  BY MS. BRIMER:

20  Q   So, now, later in 2012, in November of 2012 an RFP was

21  issued by the City of Detroit in connection with the consent

22  agreement; is that correct?

23  A   Yes.

24  Q   And you completed that RFP?

25  A   We did.

1  Q   And then you were ultimately engaged by the city in

2  December; correct?

3  A   January of 2013.

4  Q   But in December you were aware that you would --

5  A   We'd been chosen, yes.

6  Q   -- receive the contract?

7  A   Right.

8  Q   Do you recall the questions that were asked on that

9  request for production -- request for an offer?

10  A   No.

11  Q   Do you recall whether or not specifically you disclosed

12  to either Mayor Bing or the City Council that you were aware

13  that at least as early as March of 2012 the state and Jones

14  Day had been contemplating a bankruptcy filing on behalf of

15  the city?

16  A   I don't understand that question.

17  Q   Well, we just went over -- you were aware that at least

18  as early as March of 2012 --

19  A   Um-hmm.

20  Q   -- the State of Michigan and the law firm, Jones Day, had

21  been discussing a Chapter 9 filing on behalf of the city;

22  correct?  We just went over that.  Your answer was, "Yes."

23  A   Yes.

24  Q   So I'm asking you at the time you completed your RFP or

25  prior to executing a contract, did you ever disclose to the

1  City Council or Mayor Bing that you were aware that at least

2  as early as March 2012 the State of Michigan along with Jones

3  Day had discussed and were contemplating a Chapter 9 filing

4  on behalf of the city?  It's a "yes" or "no" question.

5  A    No.

6  Q    Now, you were also involved in the interview process

7  sometime in January for the law firms that were selected by

8  the city; correct?

9  A    Yes.

10  Q    And it was the City Council and the mayor at that point

11  in time that were in place; is that correct?

12  A    That's correct.

13  Q    So Mr. Orr had not yet been selected at that point in

14  time; correct?

15  A    Correct.

16  Q    And one of those law firms was Jones Day; is that

17  correct?

18  A    Correct.

19  Q    At any point in time during the interview process for the

20  law firms, did you disclose to the mayor or the City Council

21  that you were aware that at least one of the law firms they

22  were interviewing had been discussing with the state and

23  providing guidance on the filing of a Chapter 9 by the City

24  of Detroit?

25  A    No.

1  Q   So now I want to go over a few issues in connection with

2  the fair and even-handed treatment of the bondholders vis-a-

3  vis the pension beneficiaries.  And it's been your testimony

4  all along, if I understand correctly, that you think it is

5  fair and even-handed treatment to treat the bondholders, who

6  have insurance, in the same class or category as the pension

7  beneficiaries on the grounds that they're all unsecured

8  creditors; is that correct?

9  A   Yes.

10  Q   So isn't it true that when bondholders determine that

11  they will issue a bond or extend credit to the City of

12  Detroit, when they made that determination they had the

13  opportunity to review the financial data of the city and

14  evaluate the risk?  Is that accurate?

15  A   I hope so.

16  Q   To the best of your knowledge, if you have any, do you

17  believe any of the pension beneficiaries have had an

18  opportunity prior to accepting employment to review the

19  financial data of the City of Detroit and evaluate the risk

20  of whether or not their pensions would be honored?

21  A   Is that calling for a "yes" or "no"?

22          THE COURT:  Yes.

23          THE WITNESS:  No, I don't know.

24  BY MS. BRIMER:

25  Q   Do you believe they would have been provided that

1 opportunity?

2 A    I don't know.

3 Q    Now, I believe you testified earlier that in connection

4 with the June 14th proposal the obligations owed to

5 pensioners that were employees of the Department of Water and

6 Sewage, their obligations were included in the $3.5 billion

7 underfunding and that their -- they were included in the

8 restructuring proposal for the underfunded pensions; is that

9 correct?

10 A    Yes.

11 Q    You also testified, though, that the revenue stream

12 generated by Department of Water and Sewage was not included

13 in the revenue that was reflected in the July -- the June 14

14 proposal; is that correct?

15 A    It's a nomenclature issue.  The Water and Sewer

16 Department collects revenues, but there is no net cash flow

17 to the city from those revenues.

18 Q    But isn't it true that those revenues represent

19 contributions on behalf of their employees into the pension

20 fund?  They use their own revenues.  The Department of Water

21 and Sewage pays -- makes contributions to the pension fund on

22 behalf of its employees; correct?

23 A    Yes.

24 Q    And it uses the revenues it generates to make those

25 contributions; correct?

1  A    Yes.

2  Q    Now, you also talked about, I believe --

3            THE COURT:  Your time is up.  You're looking at me

4  like you want more time.

5            MS. BRIMER:  Perhaps just a few questions, your

6  Honor.  I have two brief areas I want to ask, and I'll be

7  brief.

8            THE COURT:  Does that mean two questions?  It's just

9  a question.

10           MS. BRIMER:  Just a handful, your Honor.  It may

11  depend on how he answers.

12           THE COURT:  Five questions.  Go ahead.

13           MS. BRIMER:  Okay.  All right.  Let me think then.

14  BY MS. BRIMER:

15  Q    So you testified yesterday that -- in connection with

16  reviewing Water and Sewage again, that one avenue of

17  generating additional revenue could not be increasing water

18  rates because -- well, let me stop there.  Is that correct?

19  Do you recall?  You testified that the city could not

20  increase water and sewage rates because of utility laws, that

21  it's a regulated industry, and so it just could not

22  arbitrarily increase rates; correct?

23  A    Correct.

24  Q    Okay.  So at the time the June 14th proposal was put

25  together, did you take into consideration the fact that the

1  city did not have any authority under the Michigan

2  Constitution to impair the pension benefits?

3  A    I don't understand the question.

4  Q    So on the one hand, you certainly took into consideration

5  the legal -- the authority of the city to raise the utility

6  rates in connection with Water and Sewage; correct?

7  A    Correct, not a source of cash.

8  Q    But you did not take into consideration any constraints

9  on the city's ability to impair the pension rights?

10  A    That's correct.

11  Q    One other brief area.  You also discussed that you did

12  not consider it a viable option, for example, to look at

13  avenues for increasing collection on the taxes as generating

14  a significant amount of -- or any amount of additional

15  revenue; is that correct?

16  A    That's not what I testified to.

17  Q    So what did you testify to in connection with the unpaid

18  tax obligation?

19  A    That the city had been very ineffective in collecting its

20  unpaid taxes, and we didn't believe they would change anytime

21  soon and collect those taxes.

22  Q    Was that in connection with both income taxes as well as

23  property taxes?

24  A    Primarily property taxes.

25  Q    Do you know or have -- can you estimate what the unpaid

1  income taxes are that are due to the city?

2  A    No.

3         MS. BRIMER:  I have nothing further, your Honor.

4         THE COURT:  All right.  We'll take our afternoon

5  break at this time.  Well, let me just ask first will there

6  be any redirect?

7         MR. CULLEN:  Three or four questions.

8         THE COURT:  All right.

9         MR. CULLEN:  Do you want to do it now, or do you

10  want to --

11         THE COURT:  No.  We'll take our recess now and

12  reconvene at 3:15.

13         THE CLERK:  All rise.  Court is in recess.

14      (Recess at 3:01 p.m. until 3:16 p.m.)

15         THE CLERK:  All rise.  Court is in session.  Please

16  be seated.

17         THE COURT:  It appears that everyone is here.  You

18  may proceed, sir.

19         MR. CULLEN:  Good afternoon, your Honor.

20                    REDIRECT EXAMINATION

21  BY MR. CULLEN:

22  Q   Very briefly, Mr. Buckfire, you talked about beginning

23  with the bond insurers, and you mentioned it was the

24  beginning and not the end.  What would the end be?

25  A   The end would have been an active negotiation with all

1  the bondholders and all the other unsecured creditors of the

2  city.

3  Q   And what would have been the steps between the beginning

4  and the end?

5  A   Well I would have expected after making our initial offer

6  we would have received responses that would have formed

7  effectively the counter-bid.

8  Q   And when you said you'd have to go to all of the

9  individual bondholders, what does that mean?

10  A   We would have to frame an offer supported by the bond

11  insurers that they would hopefully recommend to the bond

12  insurers and get their support for.

13  Q   The bondholders, you mean?

14  A   The bondholders themselves, yes.

15  Q   Did the bond insurers have authority to either bind

16  the -- did the bond insurers have the authority to either

17  bind the bondholders or to change the terms of the bond?

18  A   No.

19          MR. CULLEN:  That's all I have, your Honor.

20          THE COURT:  All right, sir.  You may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23      (Witness excused at 3:17 p.m.)

24          THE COURT:  Sir.

25          MR. SCHNEIDER:  Your Honor, Matthew Schneider on

1  behalf of the State of Michigan.  When we earlier discussed

2  this in the last few days, we had planned on the governor

3  coming at 1 p.m. on Monday, and because of the pace of the

4  proceedings here, I want to just confirm with the Court that

5  that is still the case no matter what stage we're at.

6          THE COURT:  A good question.  Anyone object if the

7  governor appears at one o'clock on Monday regardless of where

8  we are otherwise in the case?

9          MR. WERTHEIMER:  No, your Honor.

10          THE COURT:  Hearing no objection, you may count on

11  it.

12          MR. SCHNEIDER:  Thank you.

13          THE COURT:  Sir.

14          MR. STEWART:  Your Honor, Geoffrey Stewart, Jones

15  Day, for the city.  Two matters.  One is we would at this

16  stage ordinarily call Mr. Malhotra back in connection with

17  the matters that were resolved by your ruling; however, I was

18  only going to call him for the purpose of getting four

19  documents into evidence.  Counsel for the objectors and I

20  have agreed that they'll stipulate to the admissibility of

21  those while retaining any objections they may have to your

22  ruling, but rather than me put words in their mouth, let me

23  have them put that on the record themselves.

24          THE COURT:  What are the numbers of those four?

25          MR. STEWART:  Number 9, 10, 11, and 38.

1          THE COURT:  All right.  Sir.

2          MR. RUEGGER:  Arthur Ruegger from Dentons on behalf

3    of the Retiree Committee.  Yes, your Honor, that is correct.

4    We've consulted with the other counsel for the objectors, and

5    we believe that those four exhibits fall within your Honor's

6    ruling.  We want to preserve for the sake of the record our

7    objection and rights related to that ruling, but we --

8          THE COURT:  Yes.

9          MR. RUEGGER:  -- feel that is a fair interpretation,

10   and on that basis we have no objection to that admission.

11         THE COURT:  All right.  Thank you.  The admission of

12   those four into evidence is granted.

13      (Debtor's Exhibits 9, 10, 11, and 38 received at 3:19

14      p.m.)

15         MR. STEWART:  That being the case, your Honor,

16   unless there are questions the Court has or anyone else has,

17   I would suggest we excuse Mr. Malhotra as a witness.

18         THE COURT:  Anyone have any questions for the

19   witness, or may we excuse him?

20         ATTORNEY:  No questions for the witness, your Honor.

21         THE COURT:  All right.  He is excused.

22      (Mr. Malhotra excused at 3:19 p.m.)

23         MR. STEWART:  A second housekeeping matter is Mr.

24   Ciantra had mentioned the other day that he would have a

25   motion to strike or similar vis-a-vis Mr. Moore.  That motion

1   has not yet been made.  Mr. Moore then has been kept on the

2   status of an active witness.  We have been physically

3   sequestering witnesses --

4           THE COURT:  Yes.

5           MR. STEWART:  -- while they're on the stand.  I

6   spoke earlier with counsel.  He said he's still studying his

7   motion.  I don't mean to put words in his mouth, but he has

8   no objection to us unsequestering Mr. Moore.  However, we

9   will instruct Mr. Moore to not discuss his testimony with

10  anyone pending the filing and adjudication of Mr. Ciantra's

11  motion.

12          MR. CIANTRA:  Yes, your Honor.  I would intend to

13  bring that issue to the Court Monday morning --

14          THE COURT:  Okay.

15          MR. CIANTRA:  -- if that's acceptable.

16          THE COURT:  Absolutely.

17          MR. CIANTRA:  And I would have no objection to

18  releasing --

19          THE COURT:  All right.

20          MR. CIANTRA:  -- Mr. Moore.

21          MR. STEWART:  Thank you, your Honor.

22          THE COURT:  We'll unlock the doors to Mr. Moore's

23  confinement.  I have one more housekeeping matter.  Hold on

24  there.  Based on some confusion that has been stated here on

25  the record about exhibits and exhibit numbers, I am concerned

1  about whether everyone's versions of the exhibit books

2  correspond with the exhibits and exhibit numbers in the

3  attachments to the joint final pretrial order, so I would

4  like to task someone with the responsibility of checking all

5  of the exhibit books and all of the lists and numbers of

6  exhibits that are attached to the joint final pretrial order.

7  Any volunteers?

8         MR. MONTGOMERY:  Dentons will do so for the Retiree

9  Committee for the objectors, your Honor.

10         THE COURT:  For all the objectors?

11         MR. MONTGOMERY:  For all the objectors.

12         MR. IRWIN:  Geoff Irwin, your Honor.  We have the --

13  the city had the pleasure of putting together the 130- or 40-

14  page pretrial order, and we worked with the Dentons firm.  I

15  would be happy to do that personally.

16         THE COURT:  All right.  So I'd like a report from

17  you Monday that this has been accomplished, please.

18         MR. MONTGOMERY:  Yes, sir.

19         MR. IRWIN:  Yes, your Honor.

20         THE COURT:  And this task includes checking our

21  exhibits book up -- exhibit books up here as well, please.

22         MR. IRWIN:  Of course.

23         MS. PATEK:  While we're on housekeeping, Barbara

24  Patek for the Public Safety Unions.  The Court asked and we

25  did provide the additional books, and in those additional

1   books is a marked version of the display, the demonstrative.

2   I've given copies to Jones Day, and we'll --

3           THE COURT:  Good.

4           MS. PATEK:  -- send them, so I just wanted to make

5   that clear for the record.

6           THE COURT:  Thank you.  Okay.  Next witness.

7           MR. HERTZBERG:  Yes, your Honor.  Robert Hertzberg,

8   Pepper Hamilton.  I'm going to call Chief Craig to the stand.

9           THE COURT:  Okay.

10          MR. HERTZBERG:  May I turn the podium a little bit?

11          THE COURT:  If you'd like.

12          MR. HERTZBERG:  Thank you.

13          THE COURT:  Step forward, please, sir.

14          MR. CRAIG:  Thank you.

15          THE COURT:  And before you sit down, would you

16  please raise your right hand?

17              JAMES CRAIG, DEBTOR'S WITNESS, SWORN

18          THE COURT:  Please sit down.  And you may proceed.

19                      DIRECT EXAMINATION

20  BY MR. HERTZBERG:

21  Q   Could you state your name for the record, please?

22  A   James Craig.  Last name is spelled C-r-a-i-g.

23  Q   And where do you reside currently?

24  A   City of Detroit.

25  Q   And are you employed by the City of Detroit?

1   A   I am.

2   Q   In what position are you employed?

3   A   Police chief for the Detroit Police Department.

4   Q   And when did you first commence your position as police

5   chief?

6   A   July 1st, 2013.

7           THE COURT:  Excuse me one second.  Could you do me a

8   favor?  If you're going to sit back like that, that's fine.

9   Just pull the microphone a little bit closer.

10          THE WITNESS:  Okay.

11          THE COURT:  That's good right there.

12          THE WITNESS:  Okay.

13          THE COURT:  Not too close, but that's good right

14  there.  That's good.

15  BY MR. HERTZBERG:

16  Q   Chief Craig, did you grow up in Detroit?

17  A   I did.

18  Q   Were you born in the city?

19  A   I was.

20  Q   And how long did you stay in the city?

21  A   Twenty-four years.

22  Q   Did you go to school at Cass Tech High School?

23  A   I did.

24  Q   Do you have any parents or siblings that live in the

25  city?

1    A    I do.

2    Q    And how many?

3    A    Five siblings and both parents still alive.

4    Q    Okay.  Let's spend a minute and go over your educational

5    background.  Where did you go to college?

6    A    West Coast University in Los Angeles, but prior to that

7    Lawrence Institute of Technology here in -- I think it's

8    Dearborn.  Also attended University -- well, Mercy College,

9    which is now U of D Mercy, while employed as a Detroit -- as

10   a Detroit police officer.  Then later, after attending West

11   Coast University in Los Angeles, I attended the University of

12   Phoenix.

13   Q    Before we get to that, when did you graduate from West

14   Coast University?

15   A    I'm not absolutely certain on the date.  I'd have to --

16   Q    Approximately the year.

17   A    Probably in the late '90s.

18   Q    And did you receive a degree?

19   A    I did.

20   Q    And what type of degree?

21   A    Business management.

22   Q    And did you go to the FBI National Academy at Quantico?

23   A    I did.

24   Q    And when did you do that?

25   A    At the rank of lieutenant, once again, probably late

1  '90s, early 2000s.

2  Q   And you graduated from there?

3  A   I did.

4  Q   Have you ever received a master's degree?

5  A   I did.

6  Q   From where?

7  A   University of Phoenix.

8  Q   And when did you receive that degree?

9  A   Possibly -- oh, 2010.

10  Q   Have you ever studied for a doctoral degree?

11  A   I did.

12  Q   And what's the status of that?

13  A   It's on hold right now.  When I accepted the job with the

14  Detroit Police Department, that is when I placed the work on

15  hold.

16  Q   How far along were you?

17  A   I immediately entered after my -- obtaining my master's,

18  so a couple years, three years.

19  Q   Was your first job as a police officer with the City of

20  Detroit?

21  A   It was not my first job.

22  Q   What was your first job?

23  A   Delivering papers in high school.

24  Q   No, but as a police officer, was that your first --

25  A   Oh, my first police job was, yes, 1977 in the City of

1  Detroit.

2  Q   And how long did you work for the City of Detroit?

3  A   Roughly two and a half years until I was laid off in

4  1980.

5  Q   And what position did you hold with the City of Detroit?

6  A   Police officer.

7  Q   After you were laid off by the City of Detroit, where did

8  you next seek employment?

9  A   City of Los Angeles.

10  Q   And were you employed there?

11  A   Yes, as a police officer.

12  Q   For what period of time did you work as a police officer

13  in Los Angeles?

14  A   For 28 years starting in 1981 until the date I retired in

15  2009 after being selected as a police chief for Portland,

16  Maine.

17  Q   I assume you held numerous positions while you were with

18  the police department in Los Angeles?

19  A   I did.

20  Q   Could you describe some of those positions that you held?

21  A   Ranged from both administration, field.  I, as a police

22  officer, worked in community relations, worked in a gang

23  unit, promoted to sergeant, worked as an internal affairs

24  investigator, also as an advocate, a grievance investigator

25  and advocate for the police chief, promoted to lieutenant,

1  ran a defense rep unit with the unit -- with the union.  From

2  that I became an adjutant to the chief of police and after

3  that promoted into captain.  I worked several positions as a

4  command level officer from juvenile division, specialized

5  division, then the Wilshire area, also southwest area twice

6  as a captain, later as the area commanding officer, and then

7  at that time I retired.  Well, for one month prior to

8  retirement I was a commanding officer of West Los Angeles

9  area.

10  Q   And you said you retired from Los Angeles when?

11  A   In 2009.

12  Q   And did you take a job after that?

13  A   I did.

14  Q   And where did you take a job?

15  A   Portland, Maine, as the police chief.

16  Q   And what were your duties as police chief of Portland,

17  Maine?

18  A   Overall management, leadership of the police department.

19  Q   And how big of a staff was that?

20  A   Sworn and civilian staff of about 215.

21  Q   And how long did you act as police chief of Portland,

22  Maine?

23  A   Roughly two years.

24  Q   And after that, did you take another job?

25  A   I did.

1   Q   And where was that?

2   A   Cincinnati, Ohio, police chief.

3   Q   And what was your start date, approximately, for that

4   job?

5   A   2010, August, I think.  Stayed there two years.

6   Q   August of 2010?

7   A   Right, if my memory serves me correct.

8   Q   And what was the general description of your duties as

9   police chief of Cincinnati?

10  A   Basically the same, overall management, leadership of the

11  Cincinnati Police Department.

12  Q   How big of a police force was Cincinnati?

13  A   Sworn and civilian, roughly 1,700 employees.

14  Q   What was the residential size, the people in City of

15  Cincinnati?

16  A   The actual residential population was about 300,000, but

17  what makes unique -- a unique characteristic of Cincinnati is

18  it had a metropolitan statistical area of 2.2 million, which

19  is the largest in the State of Ohio.

20  Q   When you talk about the metropolitan statistical area, do

21  you consider that part of your jurisdiction as the police

22  chief of Cincinnati?

23  A   Yes, because of the people that will work, attend school

24  that live in the city represent that population.

25  Q   How did you become the police chief of the City of

1  Detroit?

2  A   A recruiter contacted me.

3  Q   And when was that?

4  A   Probably February, March, roughly, early part of the

5  year, of this year.

6  Q   2013?

7  A   Yes.

8  Q   And what did you do once you were contacted by the

9  recruiter?  Did you meet with anyone at the City of Detroit?

10 A   I did.

11 Q   And who did you meet with?

12 A   I met with a number of people through a series of

13 interviews.  I met with the recruiter, of course, initially,

14 and from that I met with city officials, the mayor, the

15 emergency manager.

16 Q   Being Kevyn Orr?

17 A   Kevyn Orr.

18 Q   Met with the monitor, federal monitor, at some point

19 during the process, Mr. Baird out -- who works for the

20 Governor's Office, State of Michigan, and that was it.

21 A   At some point you were offered a job as the police chief

22 of Detroit?

23 Q   I was.

24 Q   And when was that?

25 A   Started in July, possibly June.

1  Q   And when did you actually -- when was your first day of

2  work?

3  A   June -- I mean July 1st.

4  Q   Why were you interested in taking the job as police chief

5  of Detroit when you were already police chief in Cincinnati?

6  A   It was a great opportunity.  I knew that the city was

7  facing a myriad of challenges.  This was home, certainly the

8  place I started my policing career, so certainly when I look

9  across at -- this now is my third job as a police chief -- to

10  come back here was very significant to my career.

11  Q   When you started as the new police chief of the City of

12  Detroit, what steps did you take to familiarize yourself with

13  the police department?

14  A   As I do in the past in other departments that I held the

15  chief's position, I certainly tried to meet as many people as

16  I could, both internal and external to the police department.

17  As it relates to inside, certainly I met with a cross-section

18  of rank and file prior to starting, had a chance to attend a

19  union meeting, so I got to meet the union president from the

20  DPOA, met some of the members at that meeting.  From that,

21  after I actually started, I continued to meet with the union

22  president, and I began to make my rounds, if you will, and

23  talking to a cross-section of people inside the department.

24  Q   And what was that -- what did the cross-section consist

25  of, the people you met with inside of the department?

1   A    I met with the executive management team.  I met with

2   rank and file.  I physically visited some of the stations,

3   some of the work locations where the specialized units were

4   housed.

5   Q    When you said you met with the executive management team,

6   who consists or who was part of the executive management team

7   at the time you took the job?

8   A    The deputy chiefs, assistant chiefs, commanders, then

9   inspectors.  I've also met with the civilian counterparts,

10  the civilian deputy chiefs that held several positions in the

11  police department.

12  Q    How many meetings do you figure you had when you first

13  took the job as police chief?

14  A    Virtually met every day, still meet every day, many

15  meetings.  I would be making a guess at how many meetings,

16  but depends on what time period.

17  Q    Did you --

18  A    From the beginning until now -- that's a difficult one --

19  in excess of 50 meetings.

20  Q    Okay.  Did you meet with any city officials after you

21  took the position as police chief?

22  A    I have.

23  Q    And who did you meet with?

24  A    I have had a meeting or two with the mayor, certainly --

25  Q    Mayor Bing?

1   A    Mayor Bing.  Certainly met and have been continuing to

2   meet with the emergency manager, Kevyn Orr, on a number of

3   occasions.  I've met with several on the council, in

4   particular, the council president, Saunteel Jenkins.  I have

5   met with the now president and former president of the police

6   commission.

7   Q    Did you meet with any community business leaders before

8   or after you took the position as police chief?

9   A    I did.

10  Q    And what did you do to meet with the community business

11  leaders?

12  A    There were several meet-and-greets, met business leaders.

13  There was a meet-and-greet at Comerica Park early during my

14  arrival, maybe within the first month, so I had a chance to

15  meet a variety of business leaders as well as community

16  stakeholders, Wayne County prosecutor, which I left out, had

17  a chance to meet with her.  And then there's been several

18  other smaller meet-and-greets, one at Detroit Athletic Club

19  where, once again, I met with local business leaders.

20  Q    Who's the Bratton Group?

21  A    The Bratton Group is a consultant firm.  Bratton is a

22  former police chief of Los Angeles, also former commissioner

23  of New York, Boston, and Boston Transit.

24  Q    Were they providing -- when you started as police chief,

25  were they providing consulting services to the Detroit Police

1    Department?

2    A    Yes, they were.

3    Q    And what kind of services did you understand that they

4    were providing?

5    A    Looking at the organizational structure, for the most

6    part, there were actually several consulting firms working

7    with the Detroit Police Department, but I actually had a

8    conversation with Bill Bratton prior to being selected.

9    Q    Is he the CEO of the Bratton Group?

10          MS. LEVINE:  Your Honor, objection.  We don't have a

11   certification or a declaration from the police chief.  I was

12   just wondering if we could get some understanding as to how

13   this is relevant to eligibility.

14          MR. HERTZBERG:  Sure, your Honor.  First, your

15   Honor, I'm laying a foundation for the witness, but, second,

16   one of the aspects, as cited in the brief that the city

17   filed, is one of the tests is service delivery insolvency.

18   And the chief is here to testify as to the public safety and

19   whether the services are being provided to the community,

20   being the --

21          THE COURT:  Is this foundation for that?

22          MR. HERTZBERG:  Yes.  This is foundation.

23          THE COURT:  All right.  I'll permit it.  Go ahead.

24          MR. HERTZBERG:  Thank you.

25   BY MR. HERTZBERG:

1   Q   So you met with the Bratton Group; correct?

2   A   I did.

3   Q   And what did they tell you about the state of the Detroit

4   Police Department?

5   A   That -- if I just might summarize it in a very short way,

6   that everything is broken, deplorable conditions, crime is

7   extremely high, morale is low, the absence of leadership.

8   Q   And after you took the job as police chief, did you meet

9   with anyone from Conway MacKenzie?

10  A   I did.

11  Q   And who did you meet with?

12  A   Chris Gannon, one of the consultants.

13  Q   What did you talk to -- or what subject did you cover

14  with him?

15  A   Essentially the same as I did with the Bratton Group, the

16  staff, low morale, working conditions.

17  Q   Did you review any reports that have been prepared or any

18  information when you joined the force as police chief?

19  A   I had reviewed different reports, some in more detail

20  than others.  I don't recall which.  There was a lot written,

21  but there were no real reports from the consultants as it

22  related to the state of the department.

23  Q   After you became police chief, did you -- you said you

24  went and saw some of the police stations.  Did you go out at

25  crime scenes?  Did you go out and meet officers in the field,

1  anything of that nature?

2  A    I have, and I did.

3  Q    Can you describe that please?

4  A    I've had a chance to go by all of the precincts, and

5  certainly in most, if not all, the conditions of the stations

6  were in some instances deplorable.  One comes to mind.

7  During a visit I had with one of our leased facilities where

8  our crime lab technicians work out of, a location where I'm

9  told by the staff the heat sometimes works, it's dirty,

10  deplorable working conditions, not a lot of space.  Certainly

11  as I made my rounds, that was consistent.  In fact, even as

12  recently as yesterday at a community meeting, community

13  members brought up the deplorable state of the police

14  stations and asked what I plan to do about that.

15  Q    Let's talk about crime in the City of Detroit at the time

16  you took over as police chief and what we call clearance

17  rates.  What is clearance rates on crime?

18  A    Solving the crime basically.  I knew coming in that the

19  homicide clearance rate for Detroit was roughly 11 percent.

20  Q    Before we go there, let me ask you a few additional

21  questions.  Do police departments ordinarily maintain

22  statistics on crime?

23  A    Yes.

24  Q    And where are those reported to?

25  A    Reported to the FBI.

1   Q   And does Detroit maintain these type of reports and

2   statistics?

3   A   They do now.

4   Q   When you started as police chief, did you consider

5   Detroit -- after you met with your commanders, met with

6   people, citizens, and moved around and looked at the

7   different police stations, met with people on your staff, did

8   you consider Detroit a violent city?

9   A   I did.

10  Q   How violent?

11  A   Extremely violent.  In comparison to cities I've worked,

12  primarily Los Angeles and Cincinnati, it was the most violent

13  city I've ever worked, so I knew that I would be facing a

14  significant challenge in focusing on reducing crime, violent

15  crime in particular.

16  Q   You started to talk about the homicides in Detroit.  How

17  many homicides were there in the city from the beginning of

18  the year until the time you took your job in June?

19  A   I'm not certain what the exact number was at that time.

20  Q   Were you aware of what it was in 2012?

21  A   I was aware that it was, I think, 384.  It was ranked,

22  according to a recent report by the FBI, as the second most

23  violent city in America only exceeded by Flint, so I was

24  aware of the homicide rate.

25  Q   You started to talk about clearance rate, solving of

1  crimes.  What was the clearance rate on the homicides in

2  Detroit?

3  A    The information that I received was around 11 percent.

4  Q    Is that a good clearance rate?

5  A    It's deplorable.

6  Q    What did you see as the clearance rate when you were

7  working in Los Angeles?

8  A    Sixty-five to seventy percent.  Cincinnati, 70 percent.

9  Q    Seventy-percent clearance rate on homicides?

10  A    Kind of fluctuates between 60 and 70.

11  Q    Was the clearance rate similar on other violent crimes in

12  the City of Detroit?

13  A    As low or lower.  In fact, if my memory serves me, I

14  think like for using the crime of robbery, I think the crime

15  of robbery, the clearance rate was about eight percent.

16  Q    Is that low?

17  A    Extremely low.

18  Q    What was the clearance rate, approximately, in Los

19  Angeles when were you employed there?

20  A    As I recall, just looking at the one station, it would go

21  between 25-, 35-percent clearance rate.

22  Q    In Cincinnati when you were chief?

23  A    About the same.  Robbery clearances tend not to be as

24  high.  There are more reported crimes, but roughly about the

25  same, 25 to 35 percent.

1    Q   You said -- you testified earlier that the police

2    department was having extreme problems.  Was there problems

3    of accountability with police officers?

4    A   Accountability was for the most part, in my judgment,

5    absent.  The one thing that I acknowledge the department did

6    well in terms of -- and when I talk about accountability, I'm

7    talking about at the executive and management levels.  I'm

8    not referring to the rank and file police officer.  There was

9    an absence of accountability, but the department certainly

10   could be lauded for its success just recently two years ago

11   where the consent judgment -- they were at about 24-percent

12   compliant, and they rose to about 91, 92 percent over a two-

13   year period.  But when you look at the other areas of the

14   department, it didn't seem to be that certainly the executive

15   and managers were being held accountable.

16   Q   Was there an urgency, in your mind, to drive down violent

17   crime?

18   A   Both violent crime and raise morale of the police

19   officers.

20   Q   What was the morale like for the everyday police officer

21   in the City of Detroit when you took over as chief?

22   A    In my judgment, it was the lowest I have seen of any

23   police department I've ever worked, including when I worked

24   here in the '70s.

25   Q   Do you have any idea what caused that?

1  A    A number of factors.  Certainly the fact that they had

2  lost ten percent pay; that they were forced into a 12-hour

3  work schedule.  They had no real voice in the department, no

4  real decision-making, and as I met with officers through my

5  visits to different operational entities, the thing I heard

6  most was they just wanted to be police officers again, and

7  they felt that they didn't have leadership that would allow

8  them to do that.

9  Q    Were police officers, in your mind, when you took over as

10  police chief being deployed in the correct way?

11  A    They were not.

12  Q    Can you explain that, please?

13  A    It appeared and later found out that Detroit police

14  management had taken what I call a cookie cutter approach to

15  staffing or deployment, and there was no real science behind

16  how police officers were deployed.  And specifically what I'm

17  talking about is looking at issues of calls for service,

18  crime, and population.  And so it was after my staff started

19  to take a good look at -- we made some adjustments in

20  staffing because one indicator was the fact that not only was

21  the response time a big issue, but when officers came to

22  start their 12-hour work schedule, there were anywhere

23  between 40 and 60 calls being held to be answered.

24  Q    Let's talk about response time.  What is the average

25  response time on a call to a police station right at the time

1   you took over as police chief, approximately?

2   A    What was reported out to me was roughly 50 minutes to an

3   emergency call.

4   Q    And when you were in L.A. as a captain, what was the

5   normal response time you saw there?

6   A    It was an average response time of seven minutes.

7   Q    How about when you were chief in Portland, Maine?

8   A    Three to four minutes.

9   Q    And when you were chief in Cincinnati?

10  A    Five to six minutes.

11  Q    Do you think this 50-minute response time put residents

12  at risk of their safety?

13  A    I did.

14  Q    Why is that?

15  A    Because if a community member is calling for police

16  services in an emergency situation, certainly the expectation

17  that police will get there as soon as possible, so what I

18  heard coming in from community members, what I heard before I

19  got here, is the fact that there were times when Detroit

20  police officers were called, and no one would ever show up.

21  In fact, we have two dispatchers now facing criminal charges

22  based on the allegation of not sending police officers to a

23  call for service, one where the allegations involving a woman

24  who died as a result of a domestic situation, and the other

25  one I think was a stabbing.

1  Q   And the dispatchers never dispatched police officers to

2  the --

3  A   It's a pending matter, but that's the allegation, yes.

4  Q   Okay.  Let's talk about where police officers were

5  working when you took over as police chief.  Were some of

6  them working in non -- or jobs that were not on the street

7  policing crimes and stuff?

8  A   It was very odd to me when I came in.  First, I took a

9  look at my office, and, for example, one officer -- a full

10  duty officer was -- sole assignment was to gas and wash my

11  car.

12  Q   And this was a police officer?

13  A   A police officer.  Then there were several other police

14  officers in my office that were performing clerical duties,

15  and so those individuals -- I took action to move them out,

16  and then we started to look at the rest of the department.

17  Q   Well, before you go there, when you say "move them out,"

18  do you mean place them on the street patrolling?

19  A   In a more -- in an operational assignment, which doesn't

20  necessarily mean they went back to a uniform patrol, but in

21  another operational, something where a police officer would

22  be assigned.

23  Q   Let's talk about the mayor's personal protection force.

24  When you took over as the police chief in the City of

25  Detroit, was protection provided by the Detroit Police

1  Department to Mayor Bing?

2  A    Yes, it was.

3  Q    And how many police officers were used for that

4  protection?

5  A    Twenty-three.

6          MS. LEVINE:  Your Honor, objection, again, with

7  regard to relevance.  I'm just not sure where this fits into

8  109.

9          MR. HERTZBERG:  It's, as I said, service insolvency.

10  We're going to show that there were police officers not being

11  used correctly on the street, which jeopardized the safety of

12  the residents, and when he took over as chief the residents

13  were at risk because of this, and we were showing service

14  insolvency.

15          THE COURT:  The relevance is arguable, so I'll

16  permit it.

17          MR. HERTZBERG:  Thank you.

18          MS. LEVINE:  Your Honor, just for the record --

19          THE COURT:  Yes.

20          MS. LEVINE:  -- our understanding is that solvency

21  we've determined here is whether or not the city can pay its

22  debts as they come due, and that's a financial mathematical

23  problem.  So while this is sympathetic testimony, we would

24  respectfully submit it doesn't go to the issue of whether or

25  not this debtor is eligible.

1    MR. HERTZBERG:  As I indicated to the Court, and

2  I'll just repeat --

3    THE COURT:  You may proceed, Mr. Hertzberg.

4    MR. HERTZBERG:  Okay.  Thank you, your Honor.

5  BY MR. HERTZBERG:

6  Q   You were telling us about the personal protection staff

7  on Mayor Bing.  How many officers was it?

8  A   Twenty-three officers.

9  Q   And how many now are being used?

10  A   Six.

11  Q   And are you the one who reduced the staff?

12  A   I was.

13  Q   And where are those officers deployed now?

14  A   They went back to operational assignments.  Six remain

15  working for the mayor in executive protection, one was de-

16  appointed, and the remaining were sent out to a variety of

17  assignments.

18  Q   How many police officers were there when you took over as

19  police chief?

20  A   Roughly 2,400.

21  Q   In order for the city, in your mind, to be safe, how many

22  police officers do you need?

23  A   In my estimation, if we had 3,000 police officers today,

24  that would help tremendously, but before I could put a hard

25  number to it, I need to make an evaluation on how we are

1  deploying current officers, and so when you talk about moving

2  staff from the mayor's executive protection detail, there's

3  also a move to civilianize some of the positions now held by

4  police officers, and one key example is our dispatch.

5  Dispatchers in the Detroit Police Department are sworn police

6  officers, and so I wanted to make sure that we were

7  effectively deploying sworn officers the best that we could

8  so I would have an idea of how many officers we actually

9  need.

10 Q   Okay.  Let's turn to the equipment.  Do the officers get

11 as part of their -- or as police officers, are they given

12 bullet-proof vests?

13 A   They are.

14 Q   And what's the state of the bullet-proof vests when you

15 took over as police chief?

16 A   Deplorable.  There were roughly 350-plus vests, and I

17 think it's up now to roughly 400 -- it might even be higher;

18 I think it's 500 when we include our narcotics unit -- that

19 are expired.  Even the police chief does not have a vest

20 except the one I brought with me from Cincinnati.

21 Q   When you say "expired," bullet-proof vests have

22 expiration dates on them?

23 A   Yes.  Five years.

24 Q   And after that they're not safe to wear?

25 A   That's correct.

1   Q   Let's talk about the vehicle, police vehicles.  What

2   condition were the police vehicles in when you took over?

3   A   I saw vehicles with obvious damage.  I saw vehicles that

4   appeared to be unsafe.  In fact, when I stopped one officer,

5   there was one vehicle that had -- the right front brake

6   wasn't working properly, so I directed him to turn the

7   vehicle in.  Paint peeling off the vehicle.  In fact, in the

8   field on one call where it was an officer needs help, a back-

9   up car that I responded to in the eastern district where they

10   were looking for a wanted suspect, which we ultimately

11   identified and arrested, as the officers were preparing to

12   leave, one of the police vehicles would not start up.  The

13   officer proceeded to climb underneath the vehicle and jump-

14   started the vehicle to get it running.  When I asked the

15   question, "Is this the norm?" several of the officers said

16   for the most case it is the norm, and either they jump it

17   that way or they push the car to get it started, not all

18   vehicles but some.

19   Q   And what was the mileage on the vehicles?  Was it normal

20   mileage for the year of the vehicle?

21   A   I'm not certain on the mileage, but I am told that 66-

22   percent of our fleet has excessive wear, is well beyond the

23   normal -- I guess it's three years that police cars are

24   deployed.

25   Q   The condition of the police cars, does this put citizens

1    at risk?

2    A    It does.

3    Q    Does it put visitors to the city at risk?

4    A    It does.

5    Q    And does it put the safety of people who work in the city

6    at risk?

7    A    It does, including the police officers.

8    Q    You received some new police cruisers once you took over

9    as police chief; is that correct?

10   A    That's correct.

11   Q    And where did you receive those from?

12   A    Penske Corporation and a group of other local businesses

13   that were part of this effort to bring a hundred new police

14   cruisers.

15   Q    So you received -- have you taken possession of the

16   hundred new police cruisers?

17   A    We have.

18   Q    Are all of them operating on the street right now?

19   A    No, they're not.

20   Q    How many are actually operating on the street?

21   A    Roughly 20 or so.  I'm not actually certain.  I check

22   weekly.  Some of them are still being outfitted by the

23   outfitter, and they're being pushed out, but we do have

24   possession of the 100 police vehicles.

25   Q    Let's spend a minute and talk about the fire department

1    and EMS.  You don't oversee those departments, do you?

2    A    I do not.

3    Q    Have you had an opportunity to observe as police chief

4    those departments and how they're operating?

5    A    I have.

6    Q    And what have you seen?

7    A    The thing I've seen -- two things that would have been

8    most notable is the fact that Detroit police officers on a

9    routine basis I'm told transport injured victims to the

10   hospital and in all cases children.

11   Q    Is this a normal function for the police department?

12   A    Not anyplace I've worked.

13   Q    And why is the police department in Detroit doing that?

14   A    I'm told because EMS did not have vehicles or staff that

15   could respond in a timely manner, and so the decision was to

16   transport.  And when I asked how long this has been going on,

17   it's certainly been more acute in the last five years, but

18   one of my staff as recent as this morning said that they've

19   been doing it since the '80s.  Now, to what degree I am not

20   certain, but it is routine that Detroit police officers

21   transport injured youth victims of crimes or that have been

22   injured.

23   Q    And do you work closely with the fire department?

24   A    Work in the same building.  We have communication.  We

25   talk about a variety of issues.

1   Q   Have you seen any issues that have caught your attention

2   with the fire department?

3   A   Yes, one notable issue.

4   Q   And what's that?

5   A   The fact that there have been since I've been here two

6   occasions but this year four occasions where fire fighters

7   have responded to a fire and put out the fire, left the

8   location, and a deceased person was found in the location

9   later.

10   Q   By the police department?

11   A   By the police -- well, someone would call us and say

12   there was a dead body in the location.  Police department

13   would respond out and start its investigation only to find

14   out that the fire department had been at the location and put

15   out the fire.

16   Q   One more area I want to cover with you, blight.  What is

17   blight in the city?

18   A   Abandoned homes, streetlights out, traffic signals not

19   working, overgrown shrubbery.

20   Q   Is that a safety issue?

21   A   It is.

22   Q   In which way?

23   A   It affords someone who wants to engage in criminal

24   behavior to do it under the cloak of darkness.  Certainly

25   abandoned homes are a key location where violent crimes take

1  place.  And using the broken windows concept, certainly when

2  an area is deplorable or broken, it tends to attract criminal

3  behavior.  So if an area is clean, it's well-lit, people take

4  pride in the neighborhood, crime seems to be lower.

5  Q   Did you -- when you took over as police chief, did you

6  notice blight in the City of Detroit?

7  A   I have.

8  Q   And how bad was it, in your mind?

9  A   Significant.

10  Q   When you say "significant," could you describe it?

11  A   Well, just blocks where it may be only one home, home

12  could be partially burned, certainly streetlights that were

13  not working, which certainly contribute to a safety issue

14  both for pedestrians and certainly a place where crime takes

15  place, traffic signals not working, which certainly puts

16  motorists at harm as they travel through the City of Detroit.

17  Q   When you arrived as police chief and took over, do you

18  think that the residents, visitors, people who worked in the

19  city were at risk of violent crime?

20  A   I did and do.

21        MR. HERTZBERG:  I have no further questions, your

22  Honor.

23        THE COURT:  Any questions for the witness?

24                CROSS-EXAMINATION

25  BY MS. PATEK:

1    Q    Good afternoon, Chief Craig.  Welcome back to Detroit --

2    A    Thank you so much.

3    Q    -- right in the eye of the storm.  In spite of all the

4    challenges you've described, we can agree for those of us who

5    grew up here and have families here that this is a place with

6    some rich history and some wonderful things to offer; isn't

7    that right?

8    A    Absolutely.  I agree with that.

9    Q    I want to start with your comments about the DFFA.  I

10   take it you have no firsthand knowledge as to whether or not

11   the DFFA faces some of the same undermanning or morale

12   problems that are present in the Detroit Police Department?

13   A    Only what I've heard from police officers and -- but I

14   have not firsthand, not like I have in the police department.

15   Q    Is it your understanding that they're in a similar

16   situation as the Detroit Police --

17   A    Yes.

18   Q    -- Department?  And in that respect, I heard you say, I

19   think, that the Detroit Police Department is currently

20   undermanned; correct?

21   A    I would say so, yes.

22   Q    And the individual officers are in many cases underpaid?

23   A    Yes.

24   Q    And the working conditions, as you described them,

25   were -- are deplorable?

1  A   Yes.

2  Q   And they -- as a consequence, when you came here in July,

3  you found a department in very low morale?

4  A   Yes.

5  Q   And I don't know how much research or how much you were

6  paying attention, but is it your understanding that there was

7  a series of chiefs before you that stepped down in a variety

8  of less than -- let's say less than auspicious circumstances?

9  A   Yes.  I'm aware.

10  Q   And is it your understanding that that was, in large

11  part, what left the department leaderless?

12  A   Yes.  That certainly was a significant contributing

13  factor.

14  Q   And as I understand it, since you've been here, you've

15  brought on new deputy and assistant chiefs?

16  A   A new executive and management team with maybe one or two

17  exceptions.

18  Q   Okay.  And some of that executive management team has

19  been pulled directly from the command staff; that is, people

20  who are members of the Detroit Police Command Officers

21  Association?

22  A   That's correct.

23  Q   Because when you came here, in spite of the difficulty of

24  the situation, you found that there were dedicated

25  professional men and women there who you wanted to elevate to

1   be part of your new leadership team?

2   A   Yes.

3   Q   And with respect to the lieutenants and sergeants, some

4   of those who had actually been acting as inspectors have now

5   been formally appointed as inspectors?

6   A   Yes, now called captains, yes.

7   Q   And you also mentioned meeting with on a number of

8   occasions the president of the Detroit Police Officers

9   Association, Mark Diaz?

10  A   Yes.

11  Q   And in your meetings -- and I don't know if he's still

12  here.  He was here earlier in the courtroom today.  In your

13  meetings with Mr. Diaz, have you found him to be interested

14  in the restructuring and revitalization of the Detroit Police

15  Department?

16  A   I have, yes.

17  Q   And willing to be flexible with you in terms of trying to

18  try new things to better deployment, better strategy in terms

19  of getting more officers out on the street?

20  A   Yes, in every instance.

21  Q   And obviously I think it goes without saying from what

22  you described the work these officers do every day out on the

23  street is very dangerous work?

24  A   Yes, it is.

25  Q   And they're literally putting their lives at risk?

1  A   Yes, they are.

2  Q   And would it be fair to say that that would go for

3  probably the police and the fire fighters as well?

4  A   Yes, it would.

5  Q   And do you -- and if you don't know, it's a fair answer.

6  Do you know anything about the restructuring proposal that

7  has been made by the City of Detroit with respect to what is

8  to occur with the accrued vested pension benefits of the

9  active and retired Detroit police and fire fighters?

10 A   I've heard.  I don't have intimate understanding of it.

11 Q   And would it be -- do you believe sitting there and even

12 understanding the financial challenges that it would be fair,

13 given what these officers face every day, to impair those

14 accrued vested and previously earned pension benefits?

15 A   I do support the public service workers having their

16 pension, but I also understand the necessity to take some

17 very bold action as it relates to addressing this fiscal

18 crisis in the City of Detroit.  I'm certainly not the expert

19 on what should happen or what the balancing would be to that,

20 but I am certainly concerned about pensions.  I have the good

21 fortune of having served 28 years with the Los Angeles Police

22 Department, and I have my pension, so that certainly does

23 concern me.

24 Q   And when you went to work for the Los Angeles Police

25 Department and you did the very hard work that you did for 28

1   years, you understood that you were earning that pension?

2   A   That's correct.

3   Q   And you had an expectation that at the end of the day it

4   would be paid to you?

5   A   That's correct.

6           MR. HERTZBERG:  Objection, your Honor.  This is --

7           MS. PATEK:  I have nothing further.

8           MR. HERTZBERG:  Okay.  I'll withdraw the objection

9   then.  Let her testify.

10                        CROSS-EXAMINATION

11  BY MS. LEVINE:

12  Q   Good afternoon.

13  A   Good afternoon.

14  Q   Sharon Levine, Lowenstein Sandler, for AFSCME.

15  A   Yes.

16  Q   You mentioned there was a morale issue with regard to

17  lost pay, increased schedule, and a lack of leadership, I

18  believe; correct?

19  A   All kind of combined in one.

20  Q   Combined?

21  A   All played varying roles in morale.

22  Q   Isn't it true that reducing pensions and reducing health

23  benefits would also contribute to further morale loss?

24  A   I am certain.

25  Q   The city actually produced a lot of documents for us in

1  discovery in connection with this case.  I don't recall --

2  and I may have just missed it -- a proposed budget with

3  regard to fixing the Detroit Police Department.  Have you

4  provided that kind of a budget to the city?

5  A    I have not.

6  Q    Would you be -- would you be supportive of using existing

7  vested pension benefits to fund that kind of a budget?

8         MR. HERTZBERG:  Objection, your Honor.  Way beyond

9  the scope of direct examination.

10         THE COURT:  Overruled.  Please answer the question,

11  sir.

12         THE WITNESS:  I would have to take a look at the

13  full picture.  I mean there have been some steps I've taken

14  to reduce the fiscal liability.  One such action I took was

15  dramatically reducing the command and executive team, thereby

16  resulting in a $1 million annual savings in salaries, so we

17  are in budget discussions talk right now, so I'm not prepared

18  to answer the question to the level of detail you're asking.

19  BY MS. LEVINE:

20  Q    You mentioned using civilians for certain job functions,

21  including, for example, dispatchers.  Just so I understand,

22  is that outsourcing those jobs?  Is that what you're talking

23  about?

24  A    Not outsource -- not outsourcing but redeploying sworn

25  officers that hold those jobs back into traditional policing

1  functions.  Most police agencies across America use civilians

2  as dispatchers, and Detroit has used sworn dispatchers from

3  the time I was here now over 36 years ago, and so this was an

4  effort to more equitably deploy police officers back into the

5  field.

6  Q   So it would either be hiring the citizens of Detroit at

7  probably a lower pay scale and/or outsourcing those jobs?  Is

8  that -- do I --

9  A   That's probably a strategy that could be used, but it

10  would definitely be hiring people from the city.

11  Q   And from your time with the Los Angeles Police

12  Department, in addition to a pension, do you enjoy health

13  benefits?

14        MR. HERTZBERG:  Objection, your Honor.  It's

15  irrelevant.

16        THE COURT:  No.  I'll permit it.  Go ahead, sir.

17        THE WITNESS:  I do.

18        MS. LEVINE:  Thank you.

19        THE COURT:  Other questions for the witness?

20        MR. KING:  Please, your Honor.  Ron King on behalf

21  of the Pension Systems.  I just didn't want to displace Ms.

22  Green.  Sorry.

23                    CROSS-EXAMINATION

24  BY MR. KING:

25  Q   Thank you for your service.

1  A    Thank you.

2  Q    Chief Craig, are you aware that there are approximately

3  400 active duty officers that have less than ten years of

4  service in the department?

5  A    I didn't know it was that few.

6  Q    Are you concerned at all that if their pension benefits

7  are not vested, that you will have a difficult time retaining

8  those people?

9  A    I am concerned about retention and hiring.

10 Q    Do you think that impairing or diminishing pension

11 benefits will have an impact on your ability to recruit and

12 retain police officers?

13 A    It could.

14         MR. KING:  I don't have anything further.

15         THE COURT:  Thank you.

16                   CROSS-EXAMINATION

17 BY MS. BRIMER:

18 Q    Good afternoon.  My name is Lynn Brimer.  I represent the

19 Retired Detroit Police Members Association.  It's an

20 association of approximately 350 retired Detroit police

21 personnel, officers through chiefs.  Now, I'm going to try

22 not to repeat anything that's already been put in the record,

23 but you did indicate you do receive a pension, and you do

24 receive healthcare benefits; is that correct?

25 A    I do.

1  Q    And when you accepted your position as a police officer

2  in Los Angeles, you considered those benefits, both the

3  pension and your healthcare benefits, to be part of your

4  compensation package; is that correct?

5  A    That's correct.

6  Q    Now, you indicated that there were a number of what

7  appear to be management problems with the police department

8  when you took over.  For example, you indicated that the

9  mayor's personal protection at the time you took over

10  consisted of 23 officers; is that correct?

11  A    That's correct.

12  Q    And you've reduced that to six?

13  A    Yes.

14        THE COURT:  All right.  Ms. Brimer, I am going to

15  ask you not --

16        MS. BRIMER:  Okay.

17        THE COURT:  -- to ask any more duplicative

18  questions.

19        MS. BRIMER:  Okay.

20  BY MS. BRIMER:

21  Q    Do you know --

22        THE COURT:  Any question that begins with "you

23  testified that" --

24        MS. BRIMER:  Okay.

25        THE COURT:  -- is going to be a duplicative

1  question.

2  BY MS. BRIMER:

3  Q   Do you know whether or not the decision to put -- well,

4  let me think of how I want to ask this.  So the decision to

5  put 23 officers on the mayor's protection order was a

6  management decision, not a financial decision.  Would you

7  agree with that?  It was driven by management rather than the

8  amount of resources available to the department?

9  A   It's both.

10 Q   Okay.  Why is it a financial decision?

11 A   Police officers cost money.  It's a financial resource.

12 So if you decide to put 23 officers on an executive

13 protection detail, that's the equivalent to a shift in a

14 Detroit police station, the precinct.  So it's like me saying

15 I'm going to close the Tenth Precinct on the midnights.

16 That's why it's important.

17 Q   So now you've freed up 18 to go back to shifts at a

18 precinct; correct?

19 A   Not all went back to a precinct.  Some did.

20 Q   Okay.

21      MS. BRIMER:  And I think, your Honor, I -- I will

22 say that everything else I was going to ask has been asked.

23 Thank you.

24                          CROSS-EXAMINATION

25 BY MR. MONTGOMERY:

1  Q    I'm Claude Montgomery from the law firm of Dentons.  We

2  are representing the Official Committee of Retirees in this

3  case, so I have just a couple of quick questions.  I think I

4  heard you say that you believe that bold action is required

5  on many levels?

6  A    I may have said that, and I do agree that bold action has

7  to happen.

8  Q    And you have a huge job in front of you to try to protect

9  700,000 people from what you found to be an incredibly

10  violent situation; is that correct?

11  A    Absolutely.

12  Q    All right.  Do you think the governor should be playing a

13  role in that, in helping you tackle that job?

14  A    I think that I don't see a problem or an issue with that.

15  Q    Okay.  Do you think that there should be any assets that

16  the City of Detroit has that should be blocked off from your

17  access to help the citizens of the City of Detroit?

18  A    I'm not understanding your question.

19  Q    Do you think there are any -- if the City of Detroit has

20  an asset that can be sold to help you, do you think it should

21  be sold to help you?

22  A    It depends on the asset.

23  Q    So there are some assets you think are less available to

24  you than others?

25          MR. HERTZBERG:  Your Honor, I'm going to object.

1  This is beyond the scope of direct examination and far

2  afield.  Asking the chief of --

3          THE COURT:  It is that, but in the Court's

4  discretion, the Court will permit it, nonetheless.  Go ahead,

5  sir.

6          THE WITNESS:  Again, as I indicated, possibly some

7  assets could be sold to support, say, public safety.

8  BY MR. MONTGOMERY:

9  Q    Thank you.  And anything in that regard from your vantage

10  point has to be directed towards helping you keep people

11  alive inside the City of Detroit?

12  A    Public safety is critical.

13  Q    Okay.  And, again, I think you said earlier that having a

14  police force of men and women that are dedicated and have

15  high morale is part of that?

16  A    Absolutely.

17  Q    Okay.  And part of that is how their promise -- the

18  promises made to them are kept; is that correct?

19  A    Promises are important, but also how they're treated is

20  important.

21  Q    It's got to be fair?

22  A    Fairness is important.  Transparency is important.

23          MR. MONTGOMERY:  No further questions.

24          THE COURT:  Any others?

25                          CROSS-EXAMINATION

1   BY MR. PLECHA:

2   Q   Good afternoon, Chief Craig.  I represent the Retiree

3   Association parties, which includes the Retired Detroit

4   Police and Fire Fighters Association.

5          THE COURT:  Could you back off of the mike a bit,

6   please?

7          MR. PLECHA:  Oh, I'm sorry.

8   BY MR. PLECHA:

9   Q   I will be very brief.  Would you support any plan or

10  initiative that could potentially increase blight?

11  A   An initiative to increase blight?  I wouldn't support an

12  initiative to increase blight.  Did you say decrease blight?

13  Q   No.  I said increase blight.

14  A   No.  I wouldn't be supportive of it.  I can't -- I don't

15  understand an initiative that would do that.

16  Q   So if retirees were financially forced to leave their

17  home, vacating those homes, increasing blight, you would not

18  be in favor of that?

19  A   I would not like to see retirees leave their homes.  I

20  don't -- it's not my call, but I don't like the question.

21  Q   Well, I appreciate that, but thank you.  Would you agree

22  that the retiree community is a stable part of the Detroit

23  community?

24  A   I would say that there are many retirees that offer

25  stability to the Detroit community.  My dad is one.

1          MR. PLECHA:  Thank you very much.  No further

2   questions.

3          THE COURT:  All right.  Anything further for the

4   chief?  Redirect?

5          MR. HERTZBERG:  None, your Honor.

6          THE COURT:  All right.  Thank you very much for

7   coming today, sir, and also thank you for your service.

8          THE WITNESS:  Thank you very much.

9      (Witness excused at 4:18 p.m.)

10         MR. IRWIN:  Move this, your Honor?

11         THE COURT:  Yes, sir.

12         MR. IRWIN:  Your Honor, our next witness is Mr. Orr.

13  He is in the building.  We would need to locate him, but

14  given the hour, we just didn't know how the Court wished to

15  proceed.  We can --

16         THE COURT:  I wish to proceed.

17         MR. IRWIN:  That's fine.  We will get him.

18         THE COURT:  We'll wait here for him.

19         MR. IRWIN:  He'll be here as soon as we can get him.

20         THE COURT:  All right.  Would everyone take their

21  seats as promptly as possible, please?  One second, please.

22  Everyone sit down, please.  Mr. Orr, would you raise your

23  right hand?

24              KEVYN ORR, DEBTOR'S WITNESS, SWORN

25         THE COURT:  Please sit down.

1          THE WITNESS:  Thank you.

2          MR. SHUMAKER:  Good afternoon, your Honor.  Greg

3    Shumaker of Jones Day for the City of Detroit.

4                    DIRECT EXAMINATION

5    BY MR. SHUMAKER:

6    Q    Good afternoon.

7    A    Good afternoon, Mr. Shumaker.

8    Q    Would you state your full name for the record?

9    A    Kevyn Duane Orr.

10   Q    Mr. Orr, what is your current occupation?

11   A    My current occupation is the emergency manager for the

12   City of Detroit.

13   Q    Where did you go to college, sir?

14   A    The University of Michigan, Ann Arbor.

15   Q    When did you graduate from there?

16   A    December 1979.

17   Q    And after college, did you proceed to employment or to

18   another post-graduate school?

19   A    I took a little time off and went out west to do some

20   skiing but eventually went to graduate school.

21   Q    And where did you go to graduate school?

22   A    The University of Michigan Law School, Ann Arbor.

23   Q    And when did you graduate from there?

24   A    I graduated from law school in May 1983.

25   Q    And for the Court, where did you grow up?

1  A    I was born and grew upon Fort Lauderdale, Florida,

2  Broward County.

3  Q    Your parents are from Florida?

4  A    Yes.

5  Q    Have any -- do they have any involvement with the State

6  of Michigan?

7  A    My mother went to the University of Michigan graduate

8  school in education.

9  Q    Could you give us a brief summary of your professional

10  background?

11  A    Sure.  After graduation from law school, I went back to

12  Florida in private practice with the law firm of Arky Fried,

13  which eventually became Stearns, Weaver, Miller, Weissler,

14  Alhadeff & Sitterson, where I specialized in litigation,

15  eventually became a bankruptcy trial practitioner with who is

16  now Chief Judge Robert Mark at that law firm.  After five

17  years, I was voted into the partnership of that law firm in

18  1988.

19        I eventually took what I thought was going to be a

20  two-year leave of absence from that law firm in 1991 to go

21  into federal government first in the FDIC, Federal Deposit

22  Insurance Corporation, then into the Resolution Trust

23  Corporation in 1992.  While at the RTC, I had a specialty

24  first as a line attorney, as a counsel, then a senior

25  counsel, in litigation and bankruptcy-related matters.  I was

1    eventually promoted to assistant general counsel of complex
2    litigation and bankruptcy under then Deputy General Counsel
3    Jerry Patchan.  I stayed there from '92 to '95.
4    Q    Can I just stop you one second?  You said you started at
5    the FDIC; is that correct?
6    A    Yes.
7    Q    What was your position there at the FDIC?
8    A    At the FDIC I was counsel in the legal division.
9    Q    Okay.  And then you went to the Resolution Trust
10   Corporation?
11   A    Yes.  The Resolution Trust Corporation was originally
12   staffed by attorneys at FDIC, and then it got its own
13   independent hiring authority, and we were assigned there
14   permanently.
15   Q    Did you have any particular responsibilities at the RTC?
16   A    Yes.
17   Q    What were they?
18   A    While at the RTC, I not only had line responsibilities
19   for litigation and litigation-related matters, I also had
20   responsibilities as a liaison from the legal division with
21   the agencies, Office of Minority and Women Owned Business and
22   Women Owned Law Firms called MWOLF's and MWOB's.  I was also,
23   during the course of that, assigned as the chief
24   restructuring officer of a bank holding company in New
25   Orleans for a period of time and eventually became

1   responsible for the agency's supervision and management of

2   all cases implicating federal preemption and the primacy of

3   the Financial Institutions Reform, Recovery and Enforcement

4   Act of 1989 over various state laws.

5   Q   I'm sorry.  You went on from the RTC to where?

6   A   After the RTC, I was going to return to private practice

7   to my old firm in Miami.  The supervisor that I had at the

8   RTC had moved on to become director of the Executive Office

9   for United States Trustees at the Department of Justice, a

10  retired bankruptcy judge by the name of Jerry Patchan.  He

11  asked me to come over for what was then going to be a year or

12  two as his deputy, and I ended up staying there for

13  approximately six years.

14  Q   And what did you do, if you could tell us, at the United

15  States Trustee program?

16  A   I was initially the deputy director of the U.S. Trustee's

17  program where I was responsible as the -- more or less the

18  chief operating officer for the agency at the director of

19  the -- at the direction of the director.  The EOUST and the

20  U.S. Trustee's program is one of 36 ranking components within

21  the United States Department of Justice.  It is responsible

22  for the administration and oversight regarding the integrity

23  of the bankruptcy practice in all 50 states with the

24  exception of North Carolina and Alabama.

25  Q   Were there any specific duties that you had in that

1  position that you think translates into your role as the

2  emergency manager of the City of Detroit?

3  A   Yes.  I mean we had over 1,100 employees throughout the

4  United States, 93 offices throughout the United States.  I

5  think our budget at that time was somewhere in the

6  neighborhood of over a hundred million dollars, which we

7  administered.  In that capacity, we also had reporting

8  requirements for the -- to the Department of Justice through

9  the associate attorney general to the then Attorney General

10  Reno for most of the time that we were there.  We also had

11  supervisory, administrative, and operational responsibility

12  for the 21 United States Trustees Offices.  I was also

13  responsible for both preparing and giving oversight testimony

14  to the various oversight committees in Congress both on the

15  House side and the Senate side and coordinating budget

16  reviews on a regular basis during the regular budget season

17  but oftentimes one-offs as well with House Majority, House

18  Minority, and the U.S. House, Senate Majority, Senate

19  Minority, budgeting with the White House as well as budgeting

20  issues with respect to the Department of Justice's overall

21  annual budget.

22  Q   During your time in the federal government from your

23  position at the FDIC, the RTC, and the United States Trustee

24  program, did you have any restructuring experiences?

25  A   Yes.

1  Q   And what were those?

2  A   Well, because I'd had some experience as a bankruptcy

3  practitioner in South Florida, then in the Southern District

4  of Florida, principally in front of Judge Cristol but others,

5  I was initially selected to participate as the chief legal

6  officer with the Savings & Loan because a subsidiary down in

7  Atlanta was -- down in New Orleans was a -- had a large

8  holding company called the Landmark Land Company.  At that

9  time, the Landmark Land Company held a series of golf courses

10 and country clubs, five of which were some of the most well-

11 regarded country clubs, highly rated ones in the nation at

12 the time, such as Kiowa, Mission Hills, PGA West, Oak Tree --

13 trying to think of the other ones -- Palm Beach Polo and

14 Country Club, places I typically couldn't have gone to, but

15 very significant clubs at that time, high-end properties, and

16 I initially became responsible for supervision of the

17 restructuring of the holding company, but I also ended up

18 becoming responsible for asset disposition during that

19 process.

20 Q   After you left the federal government, where did you go?

21 A   In 2000 I was selected by the Attorney General to

22 become -- go from being the deputy director to becoming the

23 director, and that went from being a career position to a

24 political appointee after White House vetting and approval

25 during President Clinton's administration.  As a political

1    appointee -- most of the agency heads are -- it is typical

2    for the President of the United States, upon a new

3    election -- that was Bush v. Gore first election -- to put in

4    his own people, and I think the President gets, on average,

5    somewhere in the neighborhood of 60,000 appointments, U.S.

6    Attorneys, others, ambassadors, so on and so forth.  So it

7    became clear that I was at the end of my tenure as a

8    political appointment in an agency, and I was going back to

9    my old law firm in Miami.  I was approached by Jones, Day,

10   Reavis & Pogue to consider an overture to join them, and I

11   pursued that overture, and, much to my surprise, I ended up

12   staying with Jones Day in Washington, D.C., office.

13   Q    Why did you select Jones Day?

14   A    Jones Day had been an opponent when I was at the

15   Trustee's Office on the other side.  We had met with a number

16   of different law firms in that capacity, as you might

17   imagine.  In federal government you handle a number of

18   different matters, a number of law firms.  We had always been

19   pretty strong adversaries but never enemies.  They conducted

20   themselves in a very professional and honorable manner.  I

21   could not have said the same for some of the firms that we

22   interfaced with.  I felt that even though we had been

23   adversaries, we had a very professional relationship, and I

24   admired the way they conducted business.  I felt that I could

25   do business with them on a handshake in any particular

1 litigation.  They would keep their word.  And, frankly, I was

2 somewhat surprised by the approach because I'd already hired

3 movers to go back to Miami, but after spending some time with

4 them, my initial impressions of the firm were borne out after

5 meeting with some of their leadership.

6 Q   And you joined Jones Day in what year?

7 A   I joined Jones Day May 2001.

8 Q   And you said you had your bags packed for Miami, but you

9 didn't get to Miami?

10 A   No, no.  I had already gone back to my old firm and had

11 hired movers, and I was ready to go, but I changed my plans

12 and joined the firm, joined Jones Day.

13 Q   Okay.  And which office were you in?

14 A   I was in the Washington, D.C., office.

15 Q   And what practice area?

16 A   I initially joined in the litigation practice of the firm

17 and within a year or two was assigned to the restructuring

18 practice.

19 Q   And what kind of restructuring practice does Jones Day

20 have or did it have when you joined?

21 A   Jones Day had and still has principally a fairly well-

22 regarded restructuring practice.  The firm has usually been

23 rated in the top tier, if not the top, one, two, three, or

24 four of restructuring practices as well as the firm overall

25 consistently.  Its practice focused largely on large

 1  corporate matters, oftentimes precedent-setting, and
 2  typically debtor side representations as opposed to creditor
 3  representations.
 4  Q   Could you share with the Court some of the more
 5  significant representations that you worked on?
 6  A    Sure.  At the firm, the Laidlaw bankruptcy at that time
 7  concerned one of the largest transportation companies, both
 8  ambulances, busses.  I think they owned both Trailways and
 9  Greyhound.  The Dana case.  Renaissance Cruise Lines
10  concerned a series of seven cruise ships in Tahiti concerning
11  a cash security agreement which was negotiated in Paris,
12  France, as an economic development process with the EU, and
13  we had to negotiate the almost $7 billion in debt for that
14  one.  I've handled very obviously the Chrysler case, which I
15  think everybody is fairly familiar with.  I was the team
16  leader on the dealer team having to reject dealer franchise
17  state agreements as well as dealing with throughput and
18  rationalizing the dealer network and a number of other fairly
19  large cases.
20  Q   You talked a little bit about the dealer network.  What
21  did you do with regard to the dealer network in Chrysler?
22  A   The company had been considering rationalizing -- that
23  is, downsizing its dealer network -- for the better part of a
24  decade.  And with the advent of the financial crisis come to
25  bear full-borne in 2008, the company had to begin -- had

1  begun considering how it was going to rationalize the dealer
2  network so it could increase what was then called throughput;
3  that is, the ability to sell more vehicles through its dealer
4  network and increase profitability while at the same time
5  downsizing its dealer network so that it did not create
6  inefficiencies because of a very wide footprint, which is
7  very hard to maintain.  The company took that project, and we
8  originally were in the company September 2008 discussing
9  alternative solutions, both out-of-court and in-court
10 solutions, with the company, including how we would
11 rationalize the dealer network in a very analytical and
12 scientific process.  As you might recall, two of the auto
13 companies, GM and Chrysler, were both considering this
14 process.  GM had a little bit more of a blanket process.  I
15 think they established a certain line of profitability, and
16 all dealers below that line were cut.  Chrysler examined a
17 fairly complex formula, almost a logarithm, to make that
18 determination as to which dealers would be candidates for
19 rejection.
20 Q   Did you have to review financial records, statements, in
21 connection with that role on the Chrysler team?
22 A   Yes.  The Chrysler analysis was quite complex.  They had
23 a spreadsheet, dealer spreadsheet, which was over three dozen
24 factors, a dealer location footprint; whether the dealer was
25 dueled, which is with other dealers; multi-dealer with other

1   brands and makes; the dealers' seasonal, annual, daily sales;

2   the dealers' longevity; notes a number of a different

3   factors.  They knew their network quite well.  And also for

4   each of those dealers, they had the financial information

5   both in regard to retail financing, wholesale financing,

6   operational costs, parts and servicing requirements, warranty

7   service under the dealer, everything you would think that

8   would go into a dealer, fleet sales, the percentage of sales

9   compared to their other dealers within their region,

10   everything that you would think would go into a fairly

11   complex and sophisticated analysis of a business vis-a-vis

12   its ability to put more vehicles out into the public and

13   increase profitability both for the dealer but as well as for

14   the manufacturer, which was the company.

15   Q   At Jones Day, did you have any nonlegal, say,

16   administrative roles?

17   A   Yes.

18   Q   And what were they?

19   A   I initially came into the firm not knowing anyone from

20   Adam's off ox but was eventually admitted to the partnership,

21   I believe, within two and a half, three years later.  I was

22   asked to become initially the administrative partner for the

23   Washington, D.C., office, which is sort of chief operational

24   function for the entire office, which at that time had 200 --

25   approximately 220, 230 attorneys and 500 or so support

1   personnel.  I then went on and was asked to become the

2   firmwide diversity partner for all of the firms.  I think

3   there are 2,500 attorneys in 37 offices, and I performed that

4   firm -- that function for a number of years, and eventually I

5   was elected to be the firmwide hiring and diversity partner

6   responsible for all recruiting, hiring for the firm

7   throughout the firm's system both here and internationally.

8   Q    And I'd like to ask you a few questions about how you

9   became the emergency manager of Detroit.

10  A    Yes.

11  Q    What indication did you have that you were being

12  considered as the emergency manager?

13  A    We originally came out to pitch the restructuring --

14  legal restructuring work for the city in late January.  I

15  believe it was January the 29th.  And I think either later

16  that day or the next day I was informed by the firm's

17  managing partner, Steve Brogan, that he had received a call

18  from one of the review team members at the pitch who wanted

19  to talk to me about potentially pursuing the position of

20  emergency manager.

21  Q    And what was your reaction to Mr. Brogan's call?

22  A    I was surprised, flattered, but was very firmly resistant

23  and against taking the position.

24  Q    Why was that?

25  A    I was involved in several significant matters with the

1  firm, in the midst, as a matter of fact, of a very large case
2  that we were mediating with one of the largest private
3  investment banks in the world at the time.  It appeared that
4  we were going to resolve that case quite successfully for the
5  firm.  I was also very concerned about walking away from
6  other clients.  I had been selected earlier that year to be
7  the new partner in charge -- to be the partner in charge of
8  the firm's new Miami, Florida, office, which was an
9  opportunity to go home, and we were in the midst of lease
10 negotiations and operation negotiations with several
11 landlords in Miami.  There were also some fairly significant
12 personal hardships.  My wife is a professional.  She's a
13 surgeon, perinatology, high-risk obstetrics, at Johns
14 Hopkins.  She has a very active practice and takes call at
15 night.  We have two young children, seven and six, who are
16 the apples of my eye.  I very much enjoy spending time with
17 my family, and the thought of being away from them for
18 extended periods of time was not attractive to me.  And,
19 frankly, I was at a very good place both personally and with
20 my career, and I'd done secondments, if you will, or long-
21 term assignments away.  They're quite trying, and they would
22 take me away from both family and my existing position for a
23 long period of time, which wasn't something I was either
24 asking for or expecting.
25 Q   What made you change your mind?

1  A   There was an initial overture that I -- when Steve
2  brought me into his office, said Mr. Baird has called, Rich
3  Baird, who had been one of the team members.  There were six
4  of us during the pitch.  There was me, Steve Brogan -- we
5  were the only firm to bring our managing partner -- Corrine
6  Ball, who is a fairly well-known bankruptcy practitioner.
7  Heather Lennox was in that group; Aaron Agenbroad, partner in
8  charge of the San Francisco office; and Bruce Bennett.  And
9  we had given a fairly robust presentation of what we thought
10 were our credentials for the firm, and Steve called me in the
11 office and said, "We think we did a nice presentation, but
12 they want to talk to you about being the EM -- EFM" at that
13 time, emergency financial manager.  And I said, "Steve, as
14 you know, I'm very excited about what we're doing in Miami,"
15 and, you know, I was also -- had just come back from Sao
16 Paulo.  We were opening the Sao Paulo office, and we'd gone
17 to Rio.  We had also -- I was also a member of the Jones Day
18 Foundation.  It's a charitable foundation that does good
19 works throughout the world, and we had come back from Haiti,
20 both Cite du Soleil and Port-au-Prince.  In Cite du Soleil,
21 which is one of the most poverty ridden areas certainly on
22 the face of the world if not the western hemisphere, the firm
23 was sponsoring two schools and a hospital, health facility
24 there, and I wanted to see that through.  And so I told Steve
25 I'm not interested in becoming -- leaving the firm, becoming

1  emergency financial manager.  I will talk to Rich and try to

2  explain to him that I'm very flattered, but I'm very dug in

3  here, would certainly be more than willing to work side by

4  side with anyone they wanted selected as the firm's -- as the

5  city's attorneys, but that I would respectfully decline.

6  Q    So is Rich -- you may have identified him, but --

7  A    Yes.

8  Q    -- who is Rich?

9  A    Rich Baird was the governor's -- I think his title was

10  transformation manager, and he was one of the members on the

11  review team on the 29th at the Detroit Westin Hotel at the

12  airport that was reviewing -- I think there were 12 to almost

13  20 law firms presenting their credentials that day.

14  Q    And so you said that you would help Detroit find a

15  emergency financial manager?

16  A    No, not so much help them find it, but that I would work

17  with whoever they -- I assumed they had a number of different

18  candidates they were looking at, and I would work with

19  whoever that person would -- in a legal capacity, but because

20  I had these other issues, family, professionally,

21  administratively, and commitments I had made, I was quite

22  happy in my position and had expected a different course for

23  this year.

24  Q    So it sounds like you still haven't changed your mind.

25  What made you change your mind?

1   A   After the initial entry, Mr. Baird said he understood.

2   Rich said, "Look, you know, we looked at your credentials,

3   your background and what you've done. Would you at least

4   talk to us? We have other candidates that we're looking at,

5   but we'd like to have the ability to speak with you." And I

6   said, "Well, let me give it some thought. I have to go talk

7   to my boss lady, my wife, and sort of get some feedback

8   there, and let me talk with my partners, and maybe we'll talk

9   again." I think I said in a day or two.

10   Q   And I take it you did --

11   A   Yes.

12   Q   -- talk to Detroit?

13   A   Yes. As part of this process, we've been through some e-

14   mails that show me having conversations I think on the 30th

15   and in early February about that process and that I was going

16   to take it under consideration.

17   Q   And so you took it under consideration. What time frame

18   is that?

19   A   That's January 30th into early February.

20   Q   Okay. So what did you do next in the progression to

21   becoming the emergency financial manager?

22   A   I went on and talked to my wife and said, "Hey, honey,

23   I've been approached about this crazy idea about me working

24   full-time, leaving the firm and working full-time in

25   Detroit," and I thought she would shut it down fairly

1  quickly.

2  Q   She did not?

3  A   She did not.

4  Q   What did she say to you?

5  A   Well, somewhat to my surprise, she said, "Honey, we

6  were" -- our first year of marriage she was doing a

7  fellowship in New Haven, and I was in D.C., so we spent our

8  first year of marriage actually apart.  And she said, "Look,

9  this is a career opportunity for you.  If you want to do

10 it -- you've done public service before."  I left my law firm

11 in Miami for what I thought was going to be two years, and

12 that turned into ten years.  And she said, "You know, you sit

13 around here Sunday morning like I suspect a lot of husbands

14 browsing about the Sunday morning talk shows and why doesn't

15 somebody do something about things," and she said this was a

16 call to action; that I had to look inside my own soul and

17 make a decision as far as if you're called to do something

18 and you turn it down, how are you going to feel later.  And

19 she said we would be able to work it out, and she would find

20 a way to make the family obligations get met no matter what I

21 did.

22 Q   So what was your next step then?

23 A   I then came back and talked to Steve, Steve Brogan, the

24 managing partner, and said, "You know, I talked to my wife,

25 and, you know, she more or less has given me the green light

1   for me to make a decision."

2   Q   And did you get back in touch with Mr. Baird?

3   A   Yes.  After talking to Steve, who essentially said

4   something very similar, that, "Kevyn, this is a call to

5   action.  Yes, you'll have to step out of, you know, what

6   we're doing in the firm, but, you know, sometimes you have to

7   ask yourself and the question you have to answer is not how

8   you feel right now but in a year, five, ten years from now

9   when you're asked again what's going to be your response,

10   that you didn't step up," and that whatever happened he would

11   support me in whatever decision I decided to do, decided to

12   make, so I called Mr. Baird back.

13   Q   And what did Mr. Baird ask you to do?

14   A   You know, just generally summarizing, Mr. Baird said

15   great, why don't we have further talks.  I think in -- he

16   started sending me some information.  I started doing some

17   research on the emergency manager process and the history

18   behind the crisis that was going on in Detroit.  I'd

19   obviously been aware of it, some of the criminal

20   investigations and what not, as well as the city's slide for

21   a period of time.  I have a great deal of affinity having

22   gone -- gotten both degrees here, and I think I've come back

23   to the state or the city every year since I graduated in 1983

24   either recruiting for my law firm, a visit while I was in

25   federal government, or recruiting for my new law firm at

1   Jones Day, so I'd been coming to the city for the better part
2   of 33 years.  And I told him, "Well, let's start talking
3   about what the job entails."
4   Q   And did you do that over the phone?  Did you visit
5   Detroit?  What steps did you take?
6   A   We initially had an e-mail exchange, and then he said,
7   "Well, I think the next step is for you to come and visit
8   with some of the executive members of the state, including
9   Andy Dillon; Brom Stibitz; Tom Saxton, who's deputy
10  treasurer; as well as the governor and Rich Baird and the
11  governor's chief of staff and his deputy chief of staff.
12  Q   And did you do that?
13  A   Yes, we did that in mid-February.
14  Q   In those meetings, did you talk about Chapter 9?
15  A   No.
16  Q   At what point in time did you decide "I would be okay
17  with being a candidate"?
18  A   I think at some point either just before or after those
19  meetings, I decided that I'd throw my hat into the ring, and
20  I think I sent out an e-mail to the firm and the rest of the
21  team recusing myself from the firm's consideration process as
22  a law -- I think I sent out two e-mails.  I sent out an e-
23  mail to the immediate core team that was doing the pitch and
24  working on the analysis of the city, and then an associate
25  inadvertently sent me some more information, and I sent an e-

1  mail back to him just saying, "You may not have heard, but

2  I've recused myself from any involvement in the firm's pitch

3  and potential retention by the city because I'm being

4  considered for emergency financial manager."

5  Q    Okay.  And when was that about?

6  A    Mid-February.

7  Q    When did you learn that you were a finalist?

8  A    I think there was a series of e-mail exchange with Rich,

9  and after the meeting with the governor I think the governor

10  would send me attaboy e-mails, "Hey, glad to meet you.  Hope

11  you take this seriously.  We're still looking at some other

12  candidates, but it seems like you're the odds-on favorite."

13  I think that was towards the end of February, maybe early

14  March.

15  Q    When were you, in fact, appointed emergency manager or

16  emergency financial manager?

17  A    I was appointed emergency financial manager effective

18  March 25th, 2013.

19  Q    Was there any connection between your being considered as

20  emergency financial manager and Jones Day being retained as

21  Detroit's restructuring counsel?

22  A    No.

23          ATTORNEY:  Your Honor -- sorry.  I was going to

24  object.  That calls for speculation.  Lack of foundation.

25          THE COURT:  You understand that this question asks

1  you of your own knowledge and not speculation.

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  So to your own knowledge, was there any

4  such connection as counsel described?

5          THE WITNESS:  No, your Honor.  In fact, I think I

6  made it fairly clear.  I think even in e-mails I said now

7  that I'm a candidate, I don't want this -- my candidacy to

8  either hurt or help the firm.  In fact, if it would -- if it

9  would have hurt the firm, then I probably wouldn't consider,

10  but the firm will stand on its own.

11  BY MR. SHUMAKER:

12  Q   Who did you tell that to?

13  A   I think I told that to Mr. Dillon.  I think I told that

14  to Rich Baird.  I may have said that in my meeting with the

15  governor.

16  Q   Did you accept the appointment of emergency financial

17  manager for the money?

18  A   No.  It's a -- no, no.

19  Q   Was there ever any understanding between you and the

20  governor or any member of his staff that you met or anyone

21  that you ever came across that you would file for Chapter 9

22  on the city's behalf if you were named emergency manager?

23  A   Not at all.

24  Q   What was the first thing you did upon being appointed

25  emergency financial manager?

1  A   Well, there were several things.  One of the first things

2  I did -- the week before I was appointed, there was what

3  people called a rollout, which was a series of press events

4  and stakeholder meetings throughout that week.  I think the

5  week prior to me actually taking office on the 25th I engaged

6  in somewhere in excess of five dozen meetings and pressers,

7  as I've come to know them, but immediately upon coming into

8  the office on the 25th, I went to City Hall, and I started

9  asking the various consultants and experts who had been hired

10  before I got there -- a number of them had been hired as a

11  result of a consent agreement that was entered into in March

12  2012 and then a memorandum of understanding that was entered

13  into with the city in November 2012, so they were already on

14  the ground.  In fact, I think Ernst & Young had been on the

15  ground for a year prior to that.  And so I began meeting with

16  them to try to get a sense of the city's financial condition

17  and operational --

18  Q   Did you -- I'm sorry.  Did you meet with anyone other

19  than the advisors, Ernst & Young and --

20  A   Oh, yeah.  Prior to taking office, I had met with Mayor

21  Bing a couple of times in D.C., and I met with stakeholders

22  throughout the city and with members of -- I believe I met

23  with members of Treasury during that first week, too.

24  Q   Did you meet with any union members?

25  A   Yes.  I set up a series of stakeholder meetings in that

1  first week.  I met with each councilperson individually.  I

2  met with members of the various uniform unions, some

3  nonuniform, while I was there.  And I think the first thing I

4  did was to issue an order under the statute 72, which was due

5  to be overtaken by statute 436, Public Act 436 -- the

6  compensation and benefits of the City Council and the mayor

7  were going to be extinguished, so I think the first order I

8  did was restore their compensation and benefits by EM Order

9  1.

10  Q    Did you meet with any of the city's pension boards?

11  A    I think -- not that first week, but I think I met with

12  both pension boards at some point later that month.

13  Q    Did you meet with any citizens?

14  A    Oh, God -- oh, yes.  Oh, good, yes, met with lots of

15  citizens, numerous stakeholders, civic leaders, faith

16  community ministers, business leaders, CEO's, many of the

17  pedagogical institutes, the presidents of some of the

18  universities, a lot of stakeholder meetings.

19  Q    Now, you mentioned that you reviewed a couple of

20  agreements.  Did you -- were there generally financial

21  records that you took a look at?

22  A    There were financial and restructuring agreements.  After

23  my initial approach in January, I went and reviewed several

24  press reports that had made various statements about the

25  upcoming law, but then after I decided to throw my hat in the

1   ring and become a serious candidate, I started pulling down
2   the actual public documents, and there are a lot of them.
3   The city had been in some form of financial review or
4   financial crisis from at least 2009. It had taken out $250
5   million in addition to the 1.4 billion in 2005 and 2006. In
6   2009 it had taken out another -- 2010 it had taken out
7   another 250 million. In 2011 there was a Detroit review team
8   that was commissioned in December that issued a report the
9   following -- I believe the following January. The governor
10   issued another report, a lot of correspondence with Treasury.
11   I believe they entered into an escrow agreement in March of
12   2012, and then in -- later in April of 2012 they entered into
13   the financial stability agreement, also called the consent
14   agreement. There was a lot of correspondence going back and
15   forth since then. Subsequently, in November 2012, there was
16   a memorandum of understanding regarding the Detroit Reform
17   Program that was contained in the consent agreement. After
18   that in December 2012 another Detroit review team was
19   commissioned. They issued their report in 2013, I believe
20   February, and the governor issued his findings of fact in
21   March declaring a financial emergency. I hadn't looked at
22   all those -- the March document prior to taking the job, but
23   I looked at it -- I think maybe immediately prior to taking
24   the job, but my due diligence regarding the other documents
25   occurred between the January through early March time frame.

1  Q    It sounds like you looked at a lot.

2  A    I looked at a lot of documents.  I found in each of those

3  documents there were two -- at least two review teams, and

4  each of them concluded that the review team process was a

5  precursor to the appointment of an emergency manager.

6  Q    I'd like to ask you a few questions about those documents

7  in a little bit, but --

8  A    Sure.

9  Q    -- first I wanted to ask you, did you -- when you took

10 over the position, did you go out and visit the city when you

11 got here?

12 A    Oh, yeah.  I still do.  I mean we -- there is quite a

13 robust outreach effort under the state's aegis and the MEDC

14 or others, Cadillac.  Harvey Hollins in Urban Affairs helps

15 run that, and I would have meetings, sometimes two or three a

16 week, with various community groups and stakeholders.

17 Q    And you went out and saw parts of the city?

18 A    Yeah.  Usually after work I'd ask to be driven around the

19 city.  I sort of -- when I studied, the city had over 184

20 neighborhoods, in some of my briefing materials, and some of

21 the neighborhoods are very notable, Boston-Edison, East

22 Indian Village, Marina District, Milwaukee Junction.  But the

23 city has a spoke system that goes out, Michigan, Grand River,

24 Woodward, Gratiot, and others, and I would sort of -- I've

25 done this when I've gone to other cities.  I would sort of

1  methodically try to go through each neighborhood to get a
2  sense for the difference of the various neighborhoods and
3  their relationship to the city overall.
4  Q   Based on those visits and the records that you were
5  looking at and your due diligence generally, what did you
6  come to learn about the services that the city was providing
7  to its residents?
8  A   I had read that the services were substandard.  As part
9  of my due diligence, if you'll call it, I had -- having been
10  an ex-federal government official, I went immediately to the
11  federal government resources, Bureau of Justice Statistics,
12  Department of Labor Statistics, Department of Commerce, the
13  census stats, some of which -- Michigan CRC or the State
14  Research Council, and it sort of compiled in my mind
15  academically a composite of the city and statistics about the
16  quality of service in addition to meeting with various
17  members, and the services reflected quite broadly in looking
18  at them what I had heard.  They were substandard.  Lights
19  were off in the city.  I since came to know that almost half,
20  38,000 of 78,000 or so are off.  Twenty percent of the city's
21  housing stock is in some form of blight, 78,000 dwellings out
22  of 390 roughly; that between the year 2000 and 2010 the city
23  lost 238,000 residents.  That's the equivalent of a city the
24  size of Romulus, Allen Park, or Wyandotte leaving the city
25  every year.  That was driving down tax revenue.  That the

1  infrastructure not only appeared broken, but actually I'd
2  gone back and looked at some of the -- some of the press
3  reports about how the lights would go out, some during the
4  election in 2005, but other things along those lines.
5  Q   I'm sorry.  I didn't mean to interrupt, Mr. Orr, but what
6  did you -- what did you learn about the police department?
7  A   Well, I'd known that the police department, like many,
8  New Orleans, L.A., and others, was under a consent decree --
9  actually, two, I think -- with the Department of Justice that
10 had spanned 12 years by the time I got here.  I knew that
11 their fleet, roughly 1,300 vehicles, the majority of which
12 were quite old -- I had looked at BJ -- Bureau of Justice
13 Statistics stats, and typically a service vehicle runs three
14 years, 90,000 miles.  Typically most police forces -- not
15 most but some lease those vehicles.  Our fleet in some cases
16 had over 200,000 miles on them.  Bumpers were literally
17 falling off.  Paint was delaminating.  They didn't have the
18 high tech that modern vehicles have.  Our call rates -- our
19 response rates were low for a city that had been rated by
20 BJS, Bureau of Justice Statistics, as well as such sites like
21 Quizzle, which is an Internet neighborhood site, as being a
22 highly dangerous city subject to carjacking, violent crime in
23 the city and a highly armed populous.  Basically everything
24 that I had read was substantiated in very stark relief once
25 you get out into the city.  The call rates -- our officers

1    were on 12-hour shifts.  When I met with the officers, DPLSA,

2    DPOA union, they explained to me how, you know, if you want

3    people to have court time to get at some of the perpetrators

4    and you keep them on a 12-hour shift, 24-hour day, they

5    barely have time to get home, take a shower, go to court, see

6    their families, and they're back on shift and that, as a

7    consequence, sometimes they miss shifts and that the

8    perpetrators, in addition to laughing at them as they drive

9    down the street, know that more than likely they're not going

10    to get the testimony they need and they're going to get off,

11    and they'll end up actually suing the city for false arrest

12    and recovering because the city settles many of its claims.

13    We don't have a very robust defense process in the city.

14    Q    And how about the -- how about the fire department?  Can

15    you give us some examples of what you learned there?

16    A    Sure.  I knew academically that the fire department had

17    an old fleet, but I've learned at 88 departments the

18    foundations were very poor.  Our firemen were oftentimes

19    flowing the fires with inadequate equipment, equipment that

20    was broken, pumps on pumper trucks that didn't work, leaky

21    tanks in pumper trucks.  Our ladders hadn't been certified

22    for a number of years because we didn't have the money to do

23    it.  Since I was here, the mayor managed to get -- I think it

24    was State Farm to give us a donation to get our ladders

25    certified because otherwise you can't go to high-rise fires.

1   Many of our firemen had not been trained on the equipment, so

2   they were injuring themselves, such as standing on the ladder

3   as it went up and you cut your foot.  Many of our firemen

4   were very frustrated both by lack of equipment and inadequate

5   training.  In addition, they, too, were quite fatigued

6   because of the number of fire calls.  I think it was 18,000

7   or so.  Sixty percent are unnecessary.  They're either to

8   abandon structures or blight or arson, so our firemen -- the

9   majority of our calls for our fire department are actually

10  false calls, but they're real because the buildings are

11  either on fire either through abandoned structure or through

12  intentional arson.

13  Q   How about the --

14          THE COURT:  Mr. Shumaker, we do have to stop now.

15  We're going to take a recess in a minute.  I'm going to ask

16  everyone to remain seated while Mr. Orr leaves the courtroom,

17  so let's just sit here while he takes his leave, and we'll

18  see you Monday morning, sir.  Stand by another moment,

19  please.

20          All right.  So I'm going to take my leave now.  Good

21  weekend, everyone.  We'll see you Monday morning, 9 a.m.

22  until 5.  I'm going to ask you to stay until our CSO's do

23  excuse you.  I'm going to let you all go first, and my staff

24  and I will remain in chambers while you take your leave.

25          THE CLERK:  All rise.

1        MR. SHUMAKER:  Thank you, your Honor.

2        THE CLERK:  Court is adjourned.

3     (Proceedings concluded at 5:03 p.m.)

4                         * * *


                          INDEX

WITNESSES:              Direct  Cross  Redirect  Recross

Kenneth A. Buckfire             49/93/97  170
                                120/145
                                152/155

James Craig             176  203/208
                             210/211
                             213/215

Kevyn Orr               218

EXHIBITS:                       Marked        Received

Debtor's Exhibits 9, 10, 11, 38               173

Exhibit 588                                   116
Exhibit 868                     124

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.



/s/ Lois Garrett               November 2, 2013
_____       _____
Lois Garrett