# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

**Debtor In Possession**
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE−MI
Tax ID / EIN: 38−6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489−3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075-1505
248-359-7300
Fax : 248-359-7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky-Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359-7300
Fax : (248) 359-7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075-1505
(248) 359-7300
Fax : (248) 359-7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496-8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212-326-3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496-7591
Email: swansonm@millercanfield.com

***U.S. Trustee***
**Daniel M. McDermott**         represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226-3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226-6769
Email: Richard.A.Roble@usdoj.gov

***Retiree Committee***
**Official Committee of Retirees**      represented by **Sam J. Alberts**
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005-3364

(202) 408−7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2319 | Transcript Order Form of Hearing October 28, 2013, Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name _____ **David M. Eisenberg** _____

Firm _ **Erman, Teicher, Miller, Zucker & Freedman, P.C.** _

Address _____ **400 Galleria Officentre, Suite 444** _____

City, State, Zip _____ **Southfield, MI  48034** _____

Phone _____ **248-827-4100** _____

Email _____ **deisenberg@ermanteicher.com** _____

**Case/Debtor Name:**

**Case Number:**  13-53846

**Chapter:**  9

**Hearing Judge** _Hon. Steven Rhodes_

⦿ **Bankruptcy**    ◯ **Adversary**

◯ **Appeal**    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/28/2013_ **Time of Hearing:** _9:00 a.m._ **Title of Hearing:** Eligibility Hearing _____

Please specify portion of hearing requested:  ⦿ **Original/Unredacted**   ◯ **Redacted**   ◯ **Copy** (2nd Party)

⦿ **Entire Hearing**    ◯ **Ruling/Opinion of Judge**    ◯ **Testimony of Witness**    ◯ **Other**

Special Instructions: _____

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

◯ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com



**Signature of Ordering Party:**

/s/ David M. Eisenberg _____ Date: **12/26/13** _____

By signing, I certify that I will pay all charges upon completion of the transcript request.

```
                    UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        October 28, 2013
                   Debtor.      .        9:00 a.m.
. . . . . . . . . . . . . . . .
```

              HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
               BEFORE THE HONORABLE STEVEN W. RHODES
                UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033
```

APPEARANCES (continued):

```
For AFSCME,            Lowenstein Sandler, LLP
AFL-CIO, and Sub-      By:  SHARON L. LEVINE
Chapter 98, City            JOHN K. SHERWOOD
of Detroit             65 Livingston Avenue
Retirees:              Roseland, NJ  07068
                       (973) 597-2374


For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT D. GORDON
General Retirement          JENNIFER K. GREEN
System of Detroit,     151 South Old Woodward, Suite 200
Police and Fire        Birmingham, MI  48009
Retirement System      (248) 988-5882
of the City of
Detroit:               Clark Hill, PLC
                       By:  RONALD A. KING
                       212 East Grand River Avenue
                       Lansing, MI  48096
                       (517) 318-3015


For the Detroit        Erman, Teicher, Miller, Zucker &
Fire Fighters            Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police              JULIE BETH TEICHER
Officers Associa-           DAVID EISENBERG
tion and the           400 Galleria Officentre, Suite 444
Detroit Police         Southfield, MI  48034
Lieutenants &          (248) 827-4100
Sergeants
Association:


For the Inter-         Cohen, Weiss & Simon, LLP
national Union,        By:  BABETTE A. CECCOTTI
UAW:                        PETER D. DECHIARA
                            THOMAS N. CIANTRA
                       330 West 42nd Street, 25th Floor
                       New York, NY  10036-6976
                       (212) 356-0227
```

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>     ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>     MEREDITH E. TAUNT<br>     MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1        THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3        THE COURT:  Looks like everybody is here.  Sir.

4        MR. CIANTRA:  Good morning, your Honor.  Thomas

5    Ciantra, Cohen, Weiss & Simon, LLP, for the UAW.  Before

6    bringing the evidentiary motion that I would like to present,

7    I just have one or two housekeeping matters.  We will be

8    providing the Court with binders with the separate UAW

9    exhibits tomorrow morning, with the Court's indulgence.  We

10   haven't been able to get that pulled together as of yet.

11       THE COURT:  Okay.

12       MR. CIANTRA:  And I would also indicate that I guess

13   there are one or two additional exhibits that will be

14   included, short documents, in the binder from what the Court

15   has presently in the stack.  So with the Court's indulgence

16   then, I would like to discuss the motion that I presented

17   during Mr. Moore's testimony and provide some additional

18   argument and record citation with respect to that.

19       THE COURT:  I wonder if, in light of our schedule

20   today, it would be okay with you if we considered this

21   tomorrow morning.

22       MR. CIANTRA:  That would be fine, your Honor.

23       THE COURT:  Thank you very much.  I just need an

24   assurance from someone that the work that I requested

25   regarding the exhibits has all been taken care of and we're

1   all -- we all have the same exhibit books with reconciled
2   exhibits and exhibit numbers.
3           MR. IRWIN:  Good morning, your Honor.  Ms. Ramirez
4   and I were in the courtroom yesterday, and we did our best to
5   reconcile exhibits with the materials we had, and my
6   understanding is that other objectors have brought new books
7   this morning.  I won't speak for them, but as of yesterday I
8   thought that we had moved this along as best we could.
9           THE COURT:  Okay.  Sir.
10          MR. ULLMAN:  Yes, your Honor.  For the Retiree
11  Committee, our understanding is that everything has been
12  done.  Either we did it on behalf of other objectors or some
13  of them have come in themselves and done it with the
14  exception of the UAW, which Mr. Ciantra explained.
15          THE COURT:  Okay.  Good.  Okay.  You may proceed
16  with the direct examination of Mr. Orr.
17          MR. ORR:  Good morning, your Honor.
18          THE COURT:  Good morning.
19          MR. SHUMAKER:  Good morning, your Honor.  Greg
20  Shumaker of Jones Day for the City of Detroit.
21          KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN
22               DIRECT EXAMINATION (CONTINUING)
23  BY MR. SHUMAKER:
24  Q   Good morning, Mr. Orr.
25  A   Good morning, Mr. Shumaker.

1  Q   Mr. Orr, on Friday afternoon when we last were here, I

2  believe you were sharing with the Court what you had

3  experienced regarding the city's provision of services upon

4  your arrival as the emergency manager.  Do you recall that?

5  A   Yes.

6  Q   I believe I interrupted you, and you were sharing what

7  you had experienced in the area of emergency medical

8  services.

9  A   Yes.  I believe I was talking about an event at City Hall

10  where the president of one of the unions was late to a

11  meeting because since all of our ambulances were out

12  typically by 7:30, a citizen woman had a seizure in the 1st

13  floor, and he was the only one available to administer her.

14  That's anecdotal, but, more importantly, I think it's been

15  fairly well-reported that the EMS services have substandard

16  equipment.  They are typically on a significant number of

17  calls every day.  The policy of the unit is that if they're

18  called to an event, they are to transport the patient to a

19  medical facility.  Oftentimes patients will call for things

20  such as, "I fell asleep, and my wrist is" -- "I feel asleep

21  on the couch, and my wrist is asleep," or, "I slipped, and I

22  hurt my ankle," to more serious injuries that are fairly

23  widely reported such as shootings and stabbings.

24  Q   Thank you.  What was the -- what did you learn about the

25  city's streetlight situation?

1    A    Here again, as has been widely reported, as in our June

2    14th presentation, roughly 40 percent plus of our lights are

3    out, 38,000 over some 78,000 roughly.  Large sloughs of the

4    city are unlighted.  More importantly, it's not just that the

5    lights are out.  The city infrastructure is somewhat

6    destroying it, I've been informed.  There are lights that are

7    either above ground -- there are switches that are below

8    ground.  To replace the switches sometimes below ground

9    requires excavation and a plan.  It is significant.  A lot of

10   our deferred maintenance has caused us to be, shall we say,

11   very much behind the technology curve in terms of the quality

12   of our lightings, whether they're still 1970s vintage

13   gaslights as opposed to LED, which provide more lights and

14   last for up to 15 years, for instance, therefore, reduce your

15   replacement cost.  Our grid and our lighting is so old that

16   typically PLD is very -- Public Lighting Department is very

17   overworked, and, in fact, many private contractors' insurance

18   companies and policies won't allow them to work in our

19   lighting grid.

20   Q    And how does that compare to other municipalities?

21   A    We've done some analysis to other municipalities.  I

22   don't think there's any other municipality considered a large

23   city, generally over 500,000 or so, that has as -- is as

24   unlit as we are citywide.

25   Q    What were your observations about blight in the city?

1    A    Blight is endemic.  It's apparent.  If you drive in on

2    94, take out the Lodge or go to any street in the city, it's

3    very clear, commercial and residential.  We have 78,000

4    buildings.  That's roughly 20 percent.  390,000 I think is

5    our total housing stock.  That's roughly 20 percent of our

6    housing stock.  No other city has that footprint.  Our lots

7    are about 66,000, which are quite significant, and it's not

8    just the fact that there's blight.  It's that the blight has

9    been here -- working its way here for 60 years but more

10   acutely in the past 15 to 20 years.  There are trees growing

11   out, growing on top of roofs, growing out of roofs.  They are

12   an attractive nuisance in the old language.  Crime, rapes,

13   dead bodies, and not to mention the impact it has on our

14   residents and particularly our children.  The Skillman

15   Foundation did a study of our schoolchildren and asked them

16   how they felt.  Fifty percent responded they were afraid.

17   And when it asked them what they're afraid of, they said

18   everything.  When they asked them how they coped with it,

19   they said they usually picked up a stick or a rod on their

20   way to school and on the way back because that's the way they

21   could protect themselves given what they had to walk through

22   to public school busses to get to school.

23            MR. DECHIARA:  Objection.  Hearsay.

24            THE COURT:  Overruled.  Go ahead, sir.

25            THE WITNESS:  That's what they had to walk through

1   to get to the bus stop for school.  It's been widely

2   reported.

3   BY MR. SHUMAKER:

4   Q   Your impression of any of the other city services that

5   made an impact on you?

6   A   Well, virtually all city services are generally

7   considered not where they should be.  Our city workers work

8   very hard for the most part to try to work through the

9   substandard level of services, whether it's in tax

10  collection, assessments, blight remediation, lighting.  Our

11  power grid -- we have a power grid that costs the city about

12  $30 million a year.  There are 115 customers on that grid.

13  Only five of those customers are residential, so we subsidize

14  power for about a hundred commercial and institutional uses.

15  Our grid -- in fact, the grid in City Hall is so old that

16  most providers, such as DTE, will not allow their workers --

17  because of various pernicious effluent that's down there,

18  asbestos and the like, will not allow them to go down into

19  the grid because it's too dangerous.  We have 38 stations and

20  one power factory, Mistersky, which is obsolete.  Our

21  stations are sorely in need of repair.  Our grid is a

22  patchwork of repairs that we tried even earlier this year --

23  the grid went out for a period of time, which was not

24  necessarily the grid.  It was that we were running a test,

25  and the test tripped the grid because it is so sensitive that

1   it turned off the lights for two and a half days.

2   Q   During this time, as you were becoming familiar with the

3   city's services, did anyone ever come up to you and say that

4   the services were adequate?

5   A   No one has ever said that the services are adequate for

6   the City of Detroit.

7   Q   Have you done anything to address the problems you've

8   described?

9   A   Yes.

10  Q   What are they?  What are they?

11  A   When we came in, we did an assessment in the first 30

12  days to try to get to the real meaning of things.  I sat

13  down, as I said before, with a number of stakeholders,

14  including all the City Council people.  I tried to restore a

15  sense of normalcy in the city by restoring compensation to

16  the mayor and the City Council and then delegating authority

17  to them to do most of the business of the city in the

18  ordinary course, and then we began our assessment of the city

19  operations.  Many of the contractors -- in fact, all of them

20  with the exception of Jones Day, the principal restructuring

21  contractors -- Milliman, Ernst & Young, Conway MacKenzie, and

22  Miller Buckfire were hired before 2013 to start assessing the

23  city's needs and restructuring, and they were already well

24  along their way of preparing reports.  I started reviewing

25  those reports and discussions, and I found out that much of

1   the city's structure needed to be reinvented, so we started

2   out looking at lighting.  We have since authorized the Public

3   Lighting Authority.  We found some money after the June 14th

4   default on the COPs payment.  We have created a $12 million

5   fund to get the Lighting Authority stood up with cash.  We

6   also found $1.8 million for them to have an operational

7   budget so they could run -- they are due to have two

8   demonstration projects up and running in terms of relighting

9   the city by the end of this year.  We are going through the

10  process of a bond issuance to get them additional tranches of

11  money to provide a lighting plan for the entire city.  We

12  stood up a Detroit Land Bank Authority and in conjunction

13  with MSHDA, the Michigan State Housing & Development

14  Authority, created a fast-track authority so that we could

15  deal with blight.  One of the things we found was that on the

16  City Code for the better part of 30 years there was the

17  ability to declare a blight emergency in addition to the

18  powers that I have under 436, so under that existing

19  authority we put those two together, and we abolished for a

20  time, being through the rest of this year, the requirement

21  for Class B licenses -- that is, the demolition of structures

22  35 feet or lower -- so that we could get at residential

23  blight in an expedited basis, expedited process, and allow

24  other contractors who are licensed by the state, although not

25  licensed by the city, to come into the city to help us with

1    blight remediation as quickly as possible.

2         We also began looking at the same process for Class

3    A licenses -- that is usually commercial or higher

4    structures, 35 feet or higher -- so that we could fast-track

5    the blight.  And most recently we appointed a chief land

6    officer in conjunction with the federal government to try to

7    use some of the hardest hit funds, which are funds designated

8    directly for blight, to get to blight.

9         We began looking at city services, and particularly

10   the revenue drivers, for tax collection.  For instance,

11   cities like Albion, Michigan, have a memorandum of

12   understanding with the Department of Treasury whereby they

13   will assist the city to collect some of its taxes.  That's

14   been in existence since 1997.  One of the things in the

15   financial stability agreement and the MOU that the city

16   agreed to was that they would look at that.  We've assigned a

17   taskforce to find ways to enter a similar situation so that

18   we can have enhanced tax collection.

19        We hired a new police chief, went through a fairly

20   long and competitive process to get him here.  He has opened

21   up -- he may have testified -- I'm not sure, but I suspect he

22   testified that he's opened up eight precincts that were

23   closed.  We had these virtual precincts where citizens after

24   dark would have to go to a blue phone in order to get

25   service.  If there was an incident on the east side, for

1  instance, they may have to go as far as ten miles to file a
2  report in the dead of night, oftentimes a victim being chased
3  by a perpetrator or alleged perpetrator.  We've opened up
4  those.  We flowed new money to the police force in addition
5  to the hundred cars that the philanthropic and civic
6  community donated on March 25th, the day I started.  We have
7  since purchased another 50 cars and have another 50 on order
8  for a total of a hundred, so we get new vehicles going to the
9  street.  We recently restructured the police department so
10 that you have more line authority pushed down as opposed to a
11 third of the department being involved in clerical work.
12 We're getting more officers on the street.
13          We've looked at a number of remediation plans also
14 for city-owned property, city-owned land, parking lots.  We
15 also issued a number of orders focused on dealing with
16 efficiency within the city and have a number of different
17 things in the works as we speak.
18 Q   What level of services are you trying to get to with
19 these efforts?
20 A   We're under no illusion that given the long term that
21 it's taken the city to get here and the fact that the
22 specifics of what's required by the city have been discussed
23 in detail since 2010, that we're going to get to an A+ or
24 honors level of services.  We're trying to get to an average
25 level of services, one that's acceptable, a C, C+.

```
 1   Q    Okay.  On Friday you shared with the Court your efforts
 2   to get on top of the financial condition of the city and --
 3   A    Yes.
 4   Q    -- review of certain financial records.  I want to ask
 5   you is it fair to say that part of your job responsibilities
 6   as the emergency manager is to understand the city's
 7   financial condition?
 8   A    Yes.
 9   Q    And have you become familiar with the city's records --
10   A    Yes.
11   Q    -- financial records?
12   A    Yes.
13   Q    You understand how they operate?
14   A    Yes.
15   Q    You're in charge of implementing them?
16   A    Yes.
17   Q    One of the agreements that you referred to was something
18   called the consent agreement.  Do you recall that?
19   A    Yes.
20   Q    I'd like to show you what is the consent agreement, which
21   is Exhibit 23, and it has been admitted into evidence.  It
22   should appear on your screen there.
23   A    Yeah.  It's quite small.
24   Q    Allow you to get your glasses on.  Is that what you're
25   trying --
```

1  A    Yeah.  Okay.

2  Q    And is that -- that document is entitled the "Financial

3  Stability Agreement"; correct?

4  A    Yes.

5  Q    And is that the agreement you understand as the consent

6  agreement that you've testified about?

7  A    I'm assuming this is the May 4th, 2012, financial

8  stability agreement.

9  Q    We can get you a copy.

10  A    No.  If that's the document, yes.

11  Q    You recognize it?

12  A    Yes, I do.

13  Q    What was your understanding of the consent agreement?

14  A    The city, starting with the 2009 collateral pledge

15  agreement, June 15th, 2009, had experienced a number of

16  financial upheavals, if you will, consistently throughout

17  2009 and 2010.  The city again borrowed almost a quarter of a

18  billion dollars to try to stem those upheavals in addition to

19  the $1.4 billion that was borrowed in 2005 and 2006 and the

20  $250 million that was borrowed in 2006 in addition to the

21  1.4.  And this document was a result of a financial review

22  team examination of the city that was begun in December 2011

23  and I believe in January or February 2012 found that the city

24  was in financial distress.  That finding by the financial

25  review team also found that -- I think that finding or the

1  governor's recommendation in 2011 found that that finding was

2  a precursor to the appointment of an emergency manager.  This

3  document grew out of the requirement that the city, as a

4  result of the finding by the financial review team, engage in

5  certain specified things to correct the endemic and

6  widespread problems -- financial problems of the city --

7  would be required to agree to certain metrics to correct

8  those on a very short time frame as embodied in this

9  document, and I think it has five appendices as well.

10  Q   Let me ask you about that, but who signed this agreement?

11  A   This agreement was signed by four parties.  It was signed

12  by Deputy Mayor Kirk Lewis; the mayor, Dave Bing.  It was

13  signed by the governor and the treasurer.

14  Q   And do you have -- and when was this?  When was that

15  signed?

16  A   This was April 2012, April 5th, 2012, I believe.  I think

17  it's on the document somewhere.

18  Q   And what did you understand the state's obligations to be

19  under the consent agreement?

20  A   In one of the appendices, it spells out -- I think the

21  last one maybe, the fifth one, DRE -- it spells out certain

22  specified obligations that the state is going to do in

23  consideration for the city meeting certain metrics, fairly

24  widespread, regarding both finances, revenue projections,

25  estimation and metrics, operations, and long-term

1  liabilities.

2  Q   And what were the city's obligations under that

3  agreement?

4  A   The city, in a series of appendices to the document,

5  undertook about 40 obligations.  Oftentimes when this

6  document is referred to, people refer to the 21 obligations

7  in Appendix B, but that's incomplete.  The city, in Appendix

8  C and D as well, I believe, undertook certain specified

9  obligations in detail.  In Appendix B, for instance, for the

10  operational reforms, there were 21 specific requirements,

11  some having to do with payroll, having to do with collective

12  bargaining agreements, having to do with revenue estimation,

13  having to do with the Water Department, and then in the other

14  appendices there were obligations having to do with finance

15  and metrics and so on and so forth.

16  Q   What was your understanding of whether the city complied

17  with those obligations specified in the appendices you

18  referred to?

19  A   When I got here, the city had undertaken one of them.  I

20  believe in November 2012 they entered into a four-year, $32

21  million, ADP contract.  And I think there were one or two

22  more in Appendix B that were ongoing.

23  Q   And those are the only ones that were complied with?

24  A   Essentially, those were the only ones in any demonstrable

25  form that were ongoing, yes.

1    MR. SHUMAKER:  Can you put up -- Laurie, can you put
2    up Annex B at the back of that exhibit?
3    BY MR. SHUMAKER:
4    Q   Are these the obligations of the city that you were
5    referring to, Mr. Orr?
6    A   Yes, they are.
7    Q   And you indicated that the city had made progress on one
8    or two of these?
9    A   Yes.  I believe there were demonstrable ones.  There was
10   a demolition effort.  There was health and wellness
11   department changes.  I believe a privatization effort was
12   ongoing.  There was -- I believe I also said payroll was
13   involved.  Those were the ones that were ongoing at the time.
14   Q   Now, you -- and then you also were referred to Annex D.
15   Can you put that up?
16   A   Yes.  I would also say on Annex B there was an effort to
17   procure technical assistance from the federal Department of
18   Housing & Urban Development regarding grants management.
19   Q   Here's Annex D.
20   A   Yes.
21   Q   These are some of the additional obligations of the city?
22   A   Yes.  Those are the ones I referred to about collective
23   bargaining agreements.
24   Q   Now, you also testified on Friday about another
25   agreement.  I believe you referred to it as the milestone

1  agreement.

2  A    Yeah.  That agreement is called the milestone agreement

3  or the memorandum of understanding regarding the Detroit

4  Reform Program.

5  Q    And how did the milestone agreement and the consent

6  agreement relate?

7  A    The consent agreement, which was entered into in April

8  2012, also had two phases for Detroit Reform and certain

9  specified metrics that the city was to undertake.  Phase one

10  of Detroit Reform was specified in some of the appendices to

11  that agreement.  Throughout that year apparently -- I wasn't

12  here, but as I understood through reading through the

13  documents and talking to people, the city had failed to meet

14  some of those requirements within six or seven months of

15  entering into the consent agreement, so the memorandum of

16  understanding was negotiated and designed as a consideration

17  for the city to get access to another $137 million in

18  financial stabilization bonds later that year, and that's

19  commonly referred -- I believe that was in November 2012, and

20  that's commonly referred to as the memorandum of

21  understanding.

22  Q    I'd like to show you another document that's in evidence,

23  which is Exhibit 7, and ask you if you recognize -- that's

24  the cover page.

25  A    Yes.

1 Q   Do you recognize that document?

2 A   Yeah.  November 13th, 2012.

3 Q   Is that the milestone agreement you referred to?

4 A   Memorandum of understanding or milestone agreement.

5 Q   And who signed the milestone agreement?

6 A   Well, the milestone agreement had the signatures of the

7 treasurer, Andy Dillon; and then the finance director for the

8 city, Cheryl Johnson; the program director at that time for

9 Detroit Reform, Kriss Andrews; and the chief financial

10 officer, Jack Martin.

11 Q   Did the Detroit City Council have anything to do with

12 this document?

13 A   Yes.  The Detroit City Council approved aspects of this

14 agreement in two resolutions, one by a vote of 6-0, and one

15 says by a vote of 9-0, but I noticed that there's no check --

16 I thought there was no check for the president pro tem.

17 Q   And what was your understanding as to whether the city

18 had met its obligations under the milestone agreement?

19 A   When I came on board on March 25th it had not.  The city,

20 however -- all the understandings -- as a component for this

21 agreement, my understanding that is from 2010, 2011, and then

22 in stark relief starting in December 2011, it became apparent

23 that the city was in severe financial distress.  This

24 agreement, I believe, was a result of the city failing to

25 comply with some of its obligations in the appendices to the

1    MOU.  At this time, the city needed additional cash for
2    operations, so the state used some of its authority to
3    support the city in a bond issuance for 137 million.  I
4    believe from time to time it's referred to as a net of 129
5    million or so less fees and costs.  In order for the city to
6    have access to that cash, that cash was supposed to both fund
7    operations but also assist the city in going forward with
8    some of the reform that was specified in the MOU -- not MOU,
9    in the consent agreement.  This agreement also had certain
10   specified obligations of the city to change some of its
11   procurement obligations but also to retain financial
12   professionals to assist the city and to use the proceeds of
13   that bond issuance in part, after the retention of those
14   professionals, as a condition to using the money.
15   Q    And the city was unable to comply with the conditions of
16   this agreement?
17   A    The city was able to comply with the conditions of the
18   agreement for the retention of an actuary, Milliman; for
19   Ernst & Young, who had already been doing work as a city --
20   as its accountant but also for a restructuring effort; for
21   Conway MacKenzie for operational restructuring; and, although
22   not specified by name, I believe by December of this year the
23   return of the Miller Buckfire firm.  And it also retained
24   local counsel in the guise of Miller Canfield to assist with
25   the restructuring.

1   Q   How about with regard to the rest of the agreement?  How

2   is the city's compliance?

3   A   The city had not complied with more or less the

4   balance -- as I understood it from reading the documents, the

5   balance of the rest of the agreement.

6   Q   Did this lead to any consequences for the city?

7   A   Yes.  Less than approximately a month later, another

8   Detroit review team two was commissioned after finding the

9   city was in financial -- I think it went from financial

10   distress to severe financial crisis.  That review team spent

11   the holiday season, I believe, December and January,

12   reviewing the city's restructuring efforts, and in February

13   2013 I think it issued a report to the governor finding that

14   the city was in a financial emergency.

15   Q   And is it that financial emergency that led to your

16   appointment as emergency manager?

17   A   Well, that February 2013 Detroit review team report,

18   again, as in the prior Detroit review team, report number

19   one, in 2012, specifies that the finding of that emergency is

20   a precursor to the appointment of an emergency manager.

21   Q   Is that financial emergency still in effect?

22   A   Yes.

23   Q   I want to ask you about a couple of other things about

24   the city's finances aside from the consent agreement and the

25   milestone agreement. upon your arrival as emergency manager.

1   What did you learn about the city's cash situation when you
2   got here?  When did you arrive?  Let's start there.
3   A   As I said, I took office March 25th under Public Act 72
4   as the emergency financial manager, and then effective March
5   28th I became the emergency manager under Public Act 436.
6   Q   And on March 25th, March 28th, that time period, what did
7   you learn about the city's cash situation?
8   A   The cash situation was dire.  The city was on a billion
9   dollar budget roughly.  The city was by, I believe, the
10  middle of June -- it gets a little bump in the year from cash
11  collections that it holds onto, but by the middle of June,
12  the city was going to have on hand somewhere in the
13  neighborhood of only $7 million.
14  Q   How about the revenue situation upon your arrival?
15  A   Revenue situation was, likewise, trying.  The city's
16  revenues had seen a period of decline in the past ten years.
17  That's well-documented.  I think it's in my June 14th report.
18  And, likewise, the revenue collections were still
19  challenging, and so there was no hope that the revenues were
20  going to in some fashion make up for the shortfall in terms
21  of the cash flow.
22  Q   How about the city's liabilities at that time?
23  A   The city's liabilities were significant.  I had read as
24  part of my due diligence before taking the job that the
25  various statements of liability began in 2011 as all-in

1   liability, meaning both legacy costs and bond debt.  At 12
2   billion in 2012, that grew to 14 billion.  Between my
3   appointment and within a few weeks after that, it became that
4   the liability was approximately $4 billion larger than that,
5   about $18.5 billion total.  That's the long-term capital
6   liabilities, but also the city's operational liabilities were
7   quite significant, and we were not taking in enough cash to
8   meet operational obligations.
9   Q   Do you recall your general reaction upon learning all
10  this about the cash and the liabilities and the revenue?
11  A   Yeah.  I knew things were bad.  It was somewhat shocking
12  just how dire it was.  In fact, I think within a few weeks of
13  coming on board or just prior to the June 14th presentation,
14  I was informed that several of our employees had their checks
15  bounce.  They negotiated them later that day, but our cash
16  flow on any given day was so tight that it was unclear we'd
17  have sufficient cash on hand to meet payroll; that some of
18  our obligations with regard to our contractors as well as our
19  other suppliers were routinely pushed out beyond what should
20  be an average 30-day or 45-day net period between the
21  invoicing to the payment, oftentimes 180 days or greater;
22  that there was no plan in place to remediate the situation
23  and that the city was bumping along in the ordinary course in
24  a very dire set of circumstances.
25  Q   During this initial time frame, did the emergency manager

1  statute require anything of you?

2  A   Yes.  The emergency manager statute imposes upon me

3  certain obligations with regard to reporting.  I think the

4  first report I had due was the 45-day report, and then I was

5  obligated to have a public meeting within 30 days of issuing

6  that report.

7  Q   Let me show you an exhibit, which is Exhibit 75.  It's in

8  evidence.

9  A   Yes.

10  Q   And you see that document, sir?

11  A   Yes.

12  Q   And is that the 45-day plan that you just referred to?

13  A   Here again, assuming -- without reviewing the entire

14  document, yes, that's the May 12, 2013, financial and

15  operating plan.

16  Q   Okay.  Did you have anyone help you in putting together

17  that plan?

18  A   Yes, absolutely.

19  Q   And who was that?

20  A   My entire team, restructuring team, as well as members of

21  the city staff working with them, so that would be the

22  accountants, the operational consultants, the investment

23  bankers, the attorneys, as well as people in the finance

24  department and operational departments of the city.

25  Q   And this is a public document; correct?

1   A    Yes, it is.

2   Q    And obviously the document speaks for itself, but could

3   you summarize generally what you concluded in this initial

4   45-day plan?

5   A    Generally, we gave a snapshot of what we thought was the

6   city's true financial condition.  We both spoke to it in

7   terms of spreadsheets but also a series of charts as far as

8   demographic changes, crime rate, financial collections,

9   expenditures, a number of debt issuances over and above the

10  operational revenue collection in the document, and some of

11  the key operational issues such as public health, safety, and

12  welfare dealing with police, fire, EMS, and city operations.

13  Q    And do you recall this plan containing cash flow

14  projections?

15  A    Yes.

16  Q    Who put those together for you?

17  A    Those would have been put together by a combination of

18  the finance team and restructuring team, Ernst & Young,

19  probably Miller Buckfire to a degree, attorneys probably

20  lesser.

21  Q    Okay.  And were those put together at your direction?

22  A    Yes.

23  Q    Okay.  I'd like to show you page 40 of this exhibit.

24          MR. SHUMAKER:  If you could blow up the chart,

25  Laurie.

1        THE WITNESS:  Thank you.

2    BY MR. SHUMAKER:

3    Q    Mr. Orr, could you tell the Court what this is?

4    A    Yes.  This is a document that shows monthly cash flow as

5    a forecast -- that is, not actual numbers -- based upon

6    anticipated revenue collections and projections, property

7    tax, income tax, gaming revenue, municipal service fees from

8    casinos, state revenue share, other receipts and refinancing

9    proceeds.  It also shows disbursements, which include

10   payroll, benefit costs, other distributions, summarizes total

11   disbursements.  It shows what our net cash flow -- that is,

12   disbursements over revenue -- and then it shows what our cash

13   balances are going forward.

14   Q    And that line near the bottom, cash net of distributions,

15   what is that?

16   A    That line shows what cash we would have after all the

17   distributions were made.  And as a forecast issue, it shows

18   what cash we would have at the end of the year, December

19   2013.

20   Q    And your reaction upon receiving these cash flow

21   projections?

22   A    A high degree of concern.  Essentially, this document in

23   our analysis showed that we would have $900,000 at the end of

24   the year, which is below a margin of error for a billion

25   dollar budget, so it essentially showed that we either would

1 have no money or would be negative in terms of cash flow.

2 Q   And this plan, again, was issued on May 12th; is that

3 right?

4 A   On May 12th.  It's my financial and operating plan on May

5 12th.

6 Q   I'd ask you to turn -- I want to show you page 2 of that

7 plan.  There's a paragraph right at the bottom that carries

8 over to page 3.

9 A   Yes.

10        MR. SHUMAKER:  And I'd ask if you'd put that up,

11 too, Laurie.  If you could blow up that paragraph, please.

12        THE WITNESS:  Thank you.

13 BY MR. SHUMAKER:

14 Q   Mr. Orr, I'd like you to read that --

15 A   Yes.

16 Q   -- for the Court.  This was your conclusion, correct, one

17 of --

18 A   Yes.

19 Q   -- your observations?

20 A   Yes.  As of --

21 Q   What was that?

22 A   Well, it says as of April 20 -- would you like me to

23 summarize it or --

24 Q   Please do.

25 A   -- actually read it?

1  Q   You can read it.

2  A   Okay.  Okay.  As of April 26, 2013, the city had actual

3  cash on hand of 64 million but had current obligations of 226

4  million to other funds and entities in the form of loans,

5  property tax distributions, and deferred pension

6  contributions and other payments.  Therefore, the city's net

7  cash position was a negative $162 million as of April 26,

8  2013.  The city has been deferring and will need to continue

9  to defer payments of its current obligations in order to

10  avoid running out of cash.

11  Q   Is that an accurate summary of the city's cash flow

12  situation at that time?

13  A   Yes.

14        MR. SHUMAKER:  Let me ask you, Laurie, to put up

15  page 26, and that paragraph, if you could blow it up for

16  Mr. Orr, please.

17  BY MR. SHUMAKER:

18  Q   Mr. Orr, do you recall this entry into the -- in the

19  plan?

20  A   Yes.

21  Q   Would you read that for the Court?

22  A   The City of Detroit continues to incur expenditures in

23  excess of revenue despite cost reductions and proceeds from

24  long-term debt issuances.  In other words, Detroit spends

25  more than it takes in.  It is clearly insolvent on a cash

1  flow basis.

2  Q    Was this your view as of May 12th of the city's cash

3  situation?

4  A    Yes, it was.

5  Q    And you indicated that this document was publicly

6  released.  Did anyone after you released it come up to you in

7  any forum at any time and dispute whether the city was

8  insolvent?

9  A    No one on a serious basis has ever disputed to me that

10  the city was insolvent.

11  Q    Mr. Orr, do you recall giving an interview at or about

12  the time that this plan was released?

13  A    I gave several interviews.

14  Q    There was an interview by WWJ News Radio.  Do you recall

15  talking to them?

16  A    Yes.

17  Q    I'm going to read you a quote that -- you were asked a

18  question, and you were quoted as saying, quote, "The public

19  can comment, but it is under the statute.  It is my plan and

20  it is within my discretion and obligation to do it.  This

21  isn't a plebiscite.  We are not, like, negotiating the terms

22  of the plan.  It's what I'm obligated to do," unquote.  Do

23  you recall giving that quote?

24  A    On May 12th?

25  Q    On May 12th.

1   A   Yes.

2   Q   What plan were you referring to when you were saying that

3   it was a plebiscite?

4   A   There's only been one plan.  It's the financial and

5   operating plan.

6   Q   The plan you issued on May 12th?

7   A   Yes, the May 12th financial and operating plan.  That's

8   the only document I've referred to as a plan.

9   Q   And what did you mean when you said that?

10  A   That it was my statutory obligation to issue the

11  financial and operating plan and that this wasn't a document

12  to be negotiated.  It was supposed to be a true summary and

13  public disclosure of the city's true state of affairs.

14  Q   You indicated that after releasing the 45-day plan that

15  the emergency manager statute obligated you to have a public

16  informational meeting; is that correct?

17  A   Yes.

18  Q   And how soon after the plan came out were you supposed to

19  do that?

20  A   I was obligated to have that meeting within 30 days of

21  the publication of the financial and operating plan.

22  Q   Did you conduct such a meeting?

23  A   Yes.

24  Q   When did you have that meeting?

25  A   June 10th, 2013.

1   Q    Where was it held?

2   A    Wayne State University auditorium.

3   Q    Who was in -- I'm sorry.

4   A    The exact name of the auditorium escapes me, but it was a

5   large auditorium at Wayne State.

6   Q    Who was invited?

7   A    The public was invited.

8   Q    And how many people attended?

9   A    I believe it was perhaps 200.  I know there was an

10  overflow crowd, and some people couldn't get in, but the

11  auditorium was full.

12  Q    What was the thrust of your message at that meeting?

13  A    The thrust of my message -- I think I took some of the

14  slides from the May 12th financial and operating plan and

15  used them as a slide deck in a presentation of the meeting to

16  take the community through the financial and operating plan

17  on a graphic basis as opposed to having to slough through the

18  narrative and the spreadsheets.  But it was basically a

19  graphic depiction of the information we had contained in the

20  financial summary of the information we had contained in the

21  financial and operating plan.  I also said that we would have

22  to be making some very difficult decisions within the next 30

23  to 60 days.  I think I mentioned that there were some

24  powerful tools at my disposal, both the Public Act 436 as

25  well as Chapter 9, but I would prefer not to use Chapter 9;

1  that I was certainly making an overture -- I think I even

2  said an open hand -- for proposals from interested parties,

3  but that time was moving quite quickly, and I was going to

4  have to make some decisions because the city had been going

5  through this process in one form or another for the prior

6  almost two years.

7  Q   You mentioned you showed some slides at that meeting; is

8  that correct?

9  A   Yes.

10  Q   Okay.  I'd like to show you a document that is not in

11  evidence yet, so I don't want it to be shown on the screen,

12  but I would refer you to the book of the city's exhibits,

13  Exhibit 41.

14  A   One marked "City"?

15  Q   Yes, sir.

16  A   Okay.

17  Q   Again, that's 41.

18  A   Okay.  Yes, sir.

19  Q   You have it?

20  A   Yes, I do.

21  Q   If you'd take a look at it, are you familiar with that

22  document?

23  A   Yes.

24  Q   Did you prepare it?

25  A   Yes, with my team, yes.

1  Q    Is that the one you showed at the meeting?

2  A    Yes.

3           MR. SHUMAKER:  Your Honor, we would move to

4  introduce Exhibit 41 into evidence.

5           THE COURT:  Any objections?

6           MR. ULLMAN:  Your Honor, to the extent that it

7  contains the projections, we have the same objections as

8  previously.  I don't believe they were prepared by Mr. Orr

9  personally.

10          THE COURT:  Right.  I wonder, counsel, if you would

11 have any objection to me giving the objecting parties a

12 continuing objection on that issue so that they don't have to

13 rise and restate that every time.

14          MR. SHUMAKER:  Certainly.

15          THE COURT:  Is that all right with you, sir?

16          MR. ULLMAN:  Thank you, your Honor.

17          THE COURT:  All right.  That objection is overruled.

18 This document is admitted into evidence.

19     (Debtor's Exhibit 41 received at 9:40 a.m.)

20          THE COURT:  You may proceed.

21          MR. SHUMAKER:  Thank you.  Laurie, if you could put

22 41 up -- you've done that.  Thank you.

23 BY MR. SHUMAKER:

24 Q    Mr. Orr, what is the -- are there any differences between

25 this slide presentation and the 45-day plan that you were

1    just discussing?

2    A    No.  These graphs were generally contained in the 45-day

3    financial and operating plan with the exception of the graph

4    contained at page 8, which is a graphic depiction of the cash

5    flow projections we went over in the financial and operating

6    plan.

7          MR. SHUMAKER:  Laurie, could you put up page 8,

8    please?

9    BY MR. SHUMAKER:

10   Q    And could you tell the Court what this is, Mr. Orr?

11   A    Yes.  This is a graphic depiction of the short-term cash

12   flow projections from January 13 through December 13.

13   Actually, by the time this document was prepared, the ones

14   through approximately April, May, were actual numbers, and

15   the projections went forward as they did on the spreadsheet

16   on the financial and operating plan.  The dark blue line

17   shows the cash balance with deferrals -- that is, the

18   payments we weren't making for either long-term liabilities

19   or pension contributions -- and the light blue line shows

20   what it would have been like -- the city's financial

21   condition would have been like if we had not made those

22   deferrals.

23   Q    Okay.  And when you say "deferrals," what do you mean?

24   A    We weren't paying the money.  When we say "deferral,"

25   it's just another way of saying we weren't making the

1   payments.

2   Q   And what weren't you paying?

3   A   We weren't paying a hundred million dollars of pension

4   payments that year.  I think there were some deferrals with

5   regard to some reimbursable accounts that we weren't paying.

6   There are a number of different things that we weren't paying

7   at that time.

8           MR. SHUMAKER:  Laurie, could you put up page 1,

9   please?

10  BY MR. SHUMAKER:

11  Q   Mr. Orr, could I ask you to take a look at -- this is

12  page 1.

13  A   Yes, um-hmm.

14  Q   Could you read that slide for the Court?

15  A   Yes.  Detroit spends more than it takes in.  It is

16  insolvent.  It has borrowed hundreds of millions of dollars

17  and has deferred just as much in obligations in order to

18  support city operations.  This path is not sustainable.

19  Q   Do you believe that statement was true and accurate when

20  made?

21  A   Yeah.  I think actually this was one of the slides that I

22  personally worked on, yes.

23  Q   Okay.

24          MR. SHUMAKER:  Can we go to page 13 of that, Laurie?

25  BY MR. SHUMAKER:

1    Q    Do you recognize this page, Mr. Orr?

2    A    Yes.

3    Q    Could you tell us what that is --

4    A    Well --

5    Q    -- what you were intending to convey with that?

6    A    What we were -- we were trying to say that we are

7    currently evaluating options to adjust -- in other words, to

8    either not pay or adjust our funded debt obligations to

9    better fit our cash flow projections, which include a number

10   of arrangements, such as rescheduling principal amortization

11   without reduction in principal; that is, how you would pay

12   the obligations that you owe without actually reducing the

13   total amount, permanently reducing the principal amount of

14   debt outstanding.  That means giving someone a haircut.

15   We're not going to pay.  If we owe you a dollar, we're not

16   paying a dollar.  Reducing interest rates.  If we owe you a

17   dollar at credit card interest rates of 23 percent, we're not

18   going to pay that to achieve cost savings or compensate for

19   loss, extended principal, and issuing debt to provide for

20   certain cash recoveries to other creditors; that is,

21   refinancing high-cost debt with lower-cost debt to reduce our

22   obligations.

23   Q    And you presented each of these slides at the meeting?

24   A    Yes, yes.

25   Q    Was there an opportunity at the end of that meeting on

1    June 10th for the audience members to ask questions?

2    A    Yes.

3    Q    Did you answer them?

4    A    Yes.

5    Q    Did anyone at that time or any subsequent time come up to

6    you after the meeting or at the meeting and say that the city

7    wasn't insolvent?

8    A    No.  Most of the people who came up to me after the

9    meeting expressed a level of shock.  They hadn't -- some of

10   them hadn't seen this before, and some actually expressed

11   some gratitude for finally disclosing the true state of

12   affairs.  I think some of those comments I saw on video feeds

13   either in newspapers or on You Tube.

14   Q    You had another meeting a few days later; correct?

15   A    Yes.

16   Q    June 14th?

17   A    Friday, June -- yes.  This meeting was Monday, June 10th,

18   and then we had the June 14th meeting for creditors.

19   Q    Okay.  I'd like to refer you to two documents in

20   evidence.  One is Exhibit 43, and if you could refer to that

21   in your binder.

22   A    Yes.

23   Q    And then also 44, so one is entitled "City of Detroit

24   Proposal for Creditors," and the other one is entitled "City

25   of Detroit Proposal for Creditors Executive Summary."

1   A    Yes.

2   Q    Could you share with the Court what the difference is

3   between those documents?

4   A    The substance of the documents is essentially the same.

5   44, the executive summary, is basically a shortened or

6   truncated version of Exhibit 43.  We'd refer to them as the

7   small slide deck and the large slide deck, but they're both

8   the proposal for creditors that was presented to creditors on

9   Friday, June 14th.  I believe we gave the executive summary

10  out either at or during the meeting and then gave the larger

11  deck out at the conclusion of the meeting.

12  Q    Okay.  And so during the meeting, the executive summary

13  slides is what was shown to the audience?

14  A    Yes, I believe so.

15  Q    Okay.

16  A    Yes.  I'm trying to think.  Did we show the slides?  I

17  think so.

18  Q    Okay.  What were the differences between the 45-day

19  report issued in May and the June 14th proposal to creditors?

20  A    Yeah.  What we were trying to do with the 45-day report

21  was to give a true report on the condition of the city

22  without any cant or any gloss.  What we were trying to do

23  with the June 14th report, which is essentially a month

24  later, was to try to say, well, based upon this document, the

25  true state of the city, this is what we can offer you in the

1   nature of a proposal.  This was not a plan.  It's what we
2   were saying to creditors we would propose to deal with all
3   these obligations that we reported in the May 12th report.
4   Q    Was there any update on cash flows?
5   A    I believe so, yes.
6   Q    Okay.  Who was invited to the June 14th meeting?
7   A    We tried to invite all record debt holders of the city,
8   according to their documents.  We tried to invite all of the
9   labor partners for the city or representatives of the labor
10  partners.  Occasionally there were parties who would call in
11  who also wanted to be invited or wanted their
12  representatives, either attorneys or financial advisors, to
13  attend the meeting, and we tried to accommodate them as well.
14  Q    Okay.  Do you know how they were invited?
15  A    We invited them through a number of ways.  We followed
16  the notice provisions of the actual debt instruments and
17  documents.  I think we did e-mails.  I think we did mail as
18  well, as well as phone calls.
19  Q    I'm sorry.  How many showed up?
20  A    Oh, there were several hundred in the room.
21  Q    Did this represent the entire universe of the city's
22  creditors?
23  A    No.
24  Q    Why do you say that?
25  A    Well, there are individual bondholders in terms of the

1  city creditors as well as trade creditors as well as labor

2  unions as well as individual employees, both current active

3  employees and retirees.  The potential creditor core of the

4  city probably numbers into the thousands, if not tens of

5  thousands.

6  Q   Who presented at the meeting?

7  A   Me and my team.  There was a panel on a DS.  I believe it

8  was David Heiman, who was a lead attorney, bankruptcy

9  attorney, at Jones Day; Ken Buckfire, our investment banker

10 at Miller Buckfire; Gaurav Malhotra at Ernst & Young.  I

11 believe Chuck Moore for Conway MacKenzie was there, and I

12 also believe Bruce Bennett from the Jones Day law firm was

13 there.

14 Q   And they all contributed to the presentation?

15 A   Yes.

16 Q   What were the highlights of the presentation to the

17 audience, as you recall?

18 A   Well, generally, the presentation was designed to sort of

19 take all the parties through a summary of the city's

20 financial and operational condition, operational both health,

21 safety, and welfare, police, fire, EMS, operations,

22 obligations.  Then we went through an analysis of more or

23 less the city's various buckets of assets, the bridge, the

24 tunnel, city-owned parking, city-owned land, DWSD, DIA,

25 whatever.  I think there were approximately 12 to 15 buckets

1  of assets that we discussed.  And then we went through an

2  explanation of how we were going to classify the various

3  creditor cores.  Generally the way you do in any

4  restructuring is secured parties are treated in a different

5  way than unsecured parties are.  That's just like your -- the

6  mortgage on your house has a different value to a lender as

7  opposed to your credit card as a secured party.  And then we

8  concluded by both putting forward a proposal in exchange for

9  downsizing or not paying the unsecured portion of the debt

10  that we would create a note that all the parties in that pool

11  of unsecured, whether it was a creditor or labor or a GO

12  bond, whatever it was, would share in the note.  And I think

13  on the last page of the document we set out a timetable for

14  both negotiations, evaluations, and decision-making.

15  Q    Did you indicate anything about the city's payment plans

16  with regard to various creditors?

17  A    Yes.

18  Q    What were they?

19  A    Well, we announced that going forward that we would

20  continue to pay our secured debt, the $6 billion or so, at

21  DWSD, but that we were not going to be paying our unsecured

22  debt, and some of the deferrals that had already been made on

23  the year, we would continue with those.  And, in fact, that

24  day we were defaulting on our certificate of participation

25  payment.

1    Q    And why were you doing that?

2    A    We needed the money.

3    Q    Now, the title of this document is a proposal for

4    creditors.  Why did you call it a proposal?

5    A    As we said at the meeting, and we tried to be quite clear

6    both on June 10th and June 14th, we had some difficult

7    decisions that we were going to have to make in a very short

8    time frame; that we wanted to see responses from creditors

9    quickly; that as we spelled out at the back of the document,

10   we were going to be making some decisions based upon those

11   responses.  I think I said on June 10th and again on June

12   14th that if we saw proposals coming forward in the nature of

13   term sheets or agreements in principle or something

14   substantive and the like, we might extend our evaluation time

15   frame a little longer beyond the July 15th, July 19th time

16   frame, but if we did not, we were going to be making some

17   very difficult decisions.

18   Q    Did you tell the audience that the proposal was not

19   negotiable?

20   A    No.

21   Q    Now, did you say anything about a reinvestment plan in

22   this document?

23   A    Yes.  We mentioned the fact that one of the reasons we

24   needed to go through this process quickly was to prepare for

25   a reinvestments plan into the city to deal with the critical

1   issues we had discussed in the proposal, blight remediation,

2   lighting, public safety, health and welfare, so on and so

3   forth, along those lines.

4   Q   How much was that reinvestment plan going to cost the

5   city?

6   A   Over the ten-year projection -- and the reason we indexed

7   at the ten years is under 436 I'm obligated upon exit to

8   provide a two-year budget and then a ten-year projection, so

9   we indexed it to that period of time.  And all-in on average

10  over the ten years, it's $1.25 billion.

11  Q   And how much of that was going to be spent on remediating

12  blight?

13  A   Almost $500 million in the first five and a half years.

14  I think 50, 2014; 50, 2015; and then a hundred million

15  dollars or so for the next four years.

16  Q   How did you, as emergency manager, come to decide on what

17  reinvestments were needed for the city?

18  A   Well, it's been apparent for a long period of time, and

19  it's been memorialized in the consent agreement that all

20  parties on behalf of the city and the state agree to and the

21  memorandum of understanding that these priorities were key

22  priorities for the city.  It's just that the city had not

23  gotten at them in a meaningful way during that time, but we

24  tracked what had already been agreed to by the city and the

25  state.

1   Q    Did any of your advisors focus on that area?

2   A    On blight?

3   Q    No.  On the reinvestments for the city.

4   A    Oh, sure.  Oh, yeah, absolutely, yeah.

5   Q    And who was that?

6   A    Oh, all of our advisors in some capacity.  I mean Conway

7   MacKenzie had been hired at the end of 2012 to examine the

8   city's operations.  They had been doing that before I came on

9   board.  Ernst & Young I think had been on board prior in

10  2012.  Milliman was doing its analysis based upon information

11  obtained from the pension fund's regular actuary, Gabriel,

12  Roeder, so they were examining obligations in that regard,

13  and Miller Buckfire, which I believe was retained in 2012,

14  began work almost -- I think they had been working informally

15  prior, but they began work in earnest around that time, so

16  all of them participated in some fashion on what we needed to

17  do.

18  Q    Do you recall what Conway MacKenzie did with regard to

19  investigating reinvestment needs?

20  A    Yes.  There's another component in the financial

21  stability agreement is that the financial stability agreement

22  created what's called the FAB, Financial Advisory Board, and

23  they were supervising Conway's insertion of itself in all

24  operations of the city to examine ways to increase the

25  efficiency of the city, which they had been doing.

1  Q    Why do you believe this reinvestment is necessary?

2  A    Well, I think some of it is apparent.  As I said before,

3  if you drive around the city -- this is not the way any major

4  city or any city in America, for that matter, should operate

5  or should look.  The blight, while it has been tolerated for

6  a long time, is unacceptable.  Our police response rates by

7  any objective measure, whether it's Bureau of Labor

8  Statistics, Department of Justice, BJS, Bureau of Justice

9  Statistics, or whether it's Quizzle on the Internet, show a

10  low level of services.  Our violence is apparent.  I don't

11  think any serious person -- I've heard no one say that this

12  is the way the city should operate or that the city is not in

13  need in some form of remediation.

14  Q    Was the audience allowed to ask questions at this

15  meeting?

16  A    Yes.

17  Q    Did they?

18  A    Yes.

19  Q    Did you answer their questions?

20  A    Yes.

21  Q    All of them?

22  A    Yes.

23  Q    When you made that quote about the plan being a

24  plebiscite, were you talking about this one, the June 14th

25  proposal?

1    A    Absolutely not. Anybody who says that is taking the

2    quote out of context.

3    Q    Did you tell the audience that you would not negotiate

4    the proposal?

5    A    Absolutely not. We said it was a proposal. We were

6    looking forward to having a series of meetings the next week.

7    We were looking forward to counterproposals or suggestions.

8    Quite frankly, given the fact that the city had been working

9    through two Detroit review teams, three findings of financial

10    distress, financial crisis, until March 1st, 2013, a full-

11    blown financial emergency, all interested parties certainly

12    had opportunity to all of those documents for over two years,

13    to all of the metrics and timetables contained in both the

14    MOU and the consent decree, and what was required in all

15    aspects, both debt and labor. We anticipated that certainly

16    very sophisticated and interested parties that were in that

17    room had already had over two years to consider the condition

18    of the city and would be coming forward to us with proposals.

19          MR. SHUMAKER: Laurie, could you put up page 61 of

20    the summary? Could you blow that up, please?

21    BY MR. SHUMAKER:

22    Q    Mr. Orr, do you recognize this slide?

23    A    Yes.

24    Q    What is it?

25    A    This is the page 61, Section 9, of the proposal, whether

1    it's the full deck or the executive summary, and it sets out

2    a timetable, as I said before, for how we're going to handle

3    requests for additional information; that we wanted to have

4    discussions with stakeholders throughout this time,

5    essentially a month; and that we were going to evaluate those

6    discussions following mid-July or so.

7    Q    How much time did you say you had?

8    A    I said I didn't have any time; that I felt at that point

9    that I was running out of time both under Public Act 436;

10   that my term and the powers that come with the emergency

11   manager expire in September 2014; that some of the work we

12   needed to get at, given that it had been discussed in detail

13   on a number of different documents with specificity -- and I

14   can only guess that it had been published throughout that

15   time quite apparently throughout the city; that anyone paying

16   attention knew that we had been working our way here

17   certainly throughout 2012 and 2011 and that the time had come

18   to make some very difficult decisions, to not delay, and that

19   the regular order of things, whether it was delay, whether it

20   was collective bargaining, whatever it was, that the regular

21   order of things was suspended, and we were in a financial

22   emergency and were going to have to move very quickly.

23   Q    At this time, on June 14th, 2013, did you think that the

24   city had to file for Chapter 9?

25   A    No.

1    Q    Why not?

2    A    No.  I thought that given the state of affairs in the

3    city, given the amount of publicity surrounding the Financial

4    Advisory Board, the agreements we discussed, the apparent

5    condition of the city -- you know, if you live in a city

6    where the bumpers on your police cars are falling off and

7    every neighborhood, even the good ones, have some level of

8    blight, you cannot possibly reasonably think that something

9    doesn't need to be done, so I thought parties were going to

10   be coming in with a discussion.  In addition, we were already

11   in discussions with other parties and had reached an

12   agreement in principle on the swap agreement with Bank of

13   America, Merrill Lynch.

14   Q    I want to return to this time frame, but around this

15   time, which is mid-June, you were involved in the city's

16   budgeting process; is that correct?

17   A    Yes.  The budget is due June 30th.  Yes.

18   Q    Okay.  And this is for the fiscal year budget; correct?

19   A    Yes.  July 1 through June 30 of each fiscal year.

20   Q    Okay.  Could you describe for the Court what the process

21   was in coming up with the city's budget?

22   A    Sure.  There's a budget estimation process.  There's a

23   review of all the costs done by -- the city has 44

24   departments.  Cost is done by departments, what the revenue

25   is.  The budget director and finance director get to go --

1  get together and discuss it, look at possible collections.

2  The City Council then undertakes the mayor's budget.  As he

3  puts that together, that's sent to the council.  The council

4  makes recommendations and adjustment.  The mayor gets to

5  review it.  And ultimately under 436 I have to approve or

6  disapprove the budget.

7  Q   Okay.  So PA 436 requires you to look at the budget after

8  the City Council passes it; is that correct?

9  A   Yeah.  I don't think -- I don't know if I have to look at

10  it afterwards.  I mean I could take it up, but I had

11  delegated to the mayor and the council the authority to

12  operate generally the city in the ordinary course, and that

13  was part of the process.

14  Q   Okay.  I'd like to show you an exhibit that's in

15  evidence.  It's Exhibit 74.  Take a look at that first page.

16  And that's your signature, Mr. Orr?

17  A   Yes, it is.

18  Q   Okay.  And what is this document?

19  A   This document is the quarterly report that's necessary

20  under 436 to the Treasury.

21  Q   And does it include the city's fiscal year 2014 budget?

22  A   I believe so, yes, a summary of it, not the entire budget

23  but a summary --

24  Q   Right.

25  A   -- of the budget, yes.

1  Q   Right.  I'd like to show you Appendix D of this report.

2           MR. SHUMAKER:  Laurie, if you could blow up the

3  first three sentences maybe up at the top?

4  BY MR. SHUMAKER:

5  Q   And is this what you were describing, Mr. Orr, about the

6  process?

7  A   Yes, more or less.  I mean we summarized it here, but I

8  have an obligation to approve the budget.  The budget is

9  apprised -- comprised of input from the City Council as well

10 as their review of the mayor's cut and that to reconcile

11 those figures with new ten-year projections under our

12 projections and that this is the budget we're going to adopt.

13 Q   Okay.  If I could direct your attention to the middle of

14 that page with the revenues.  Obviously we know what the

15 revenues are, but what were the total revenues at that point

16 in time?

17 A   Well, the total revenues, if you look at the general fund

18 amount, are 988 million.  If you include other funds, the

19 total goes down in the bottom right-hand corner about 2.4

20 billion.

21 Q   How about below that, the expenditures?  Could you

22 summarize that for us?

23 A   Yes, yeah.  Under the general fund it shows there are

24 expenditures of about $380 million above revenues in the

25 general fund.

1  Q   Below there on the line under -- well, it says "total

2  expenditures before concessions."

3  A   Yes.

4  Q   What -- and then concessions below that of 379; is that

5  correct?

6  A   Yes.

7  Q   What are concessions?

8  A   Well, concessions can mean both agreed to or unilaterally

9  imposed adjustments to obligations, things you're supposed to

10  pay.

11  Q   And when you made the reference to concessions, what did

12  that -- what did that mean?

13  A   That meant both payments perhaps to -- for deferred

14  obligations -- we knew we weren't paying a hundred million

15  that year to the pension funds -- payments to creditors that

16  we may not make, generally concessions we needed in that

17  amount in order to balance the budget, the 988 over and above

18  the 1.367.

19  Q   Those are the payments that the city wouldn't be able to

20  make in fiscal year 2014?

21  A   Those are payments that the city would not be able to

22  make as well as borrowings that the city was not going to

23  engage in again.

24  Q   Are you aware of any payments that the city has not been

25  able to make in fiscal year 2014?

1   A   Yes.

2   Q   What are those?

3   A   Oh, they're payments to trade creditors.  We are still

4   behind on our payments, for instance, to parts supplies that

5   we have not made in several millions of dollars.  There are

6   creditors that we have not paid in connection with supply

7   contracts, some of them in connection with the new police

8   station, for instance.  There are a number of different

9   payments we have not made this year.

10  Q   Let me return to --

11          MR. SHUMAKER:  You can take that down, Laurie.

12  BY MR. SHUMAKER:

13  Q   Let me return to the time frame after -- immediately

14  after the June 14th creditors' meeting, if you will.

15  A   Yes.

16  Q   At that meeting, I believe you indicated that one of the

17  topics discussed was the city's cash situation; correct?

18  A   Yes.

19  Q   Is one of the sources of the city's revenues or cash

20  referred to as the casino revenues?

21  A   Yes.  Casino and developer fees, casino revenue and

22  developer fees.

23  Q   Now, what are the casino revenues as you understand them

24  to be?

25  A   There are three casinos in the city, and in consideration

 1   for some time ago passing legislation for the casinos, they
 2   remit to us a portion of a tax that comes into the city in
 3   the sum of approximately $180 million a year total.  A
 4   portion of that is used to pay certain creditors, and then a
 5   portion of that comes back to the city.
 6   Q   Is that an important revenue source for the city?
 7   A   That is probably -- yes, and it's probably the most
 8   stable source of revenue for the city.
 9   Q   Now, are those casino revenues freely available to the
10   city?  Are there any restrictions on the casino revenues?
11   A   In 2009 the city entered into a collateral pledge because
12   it was in default under the swap agreement.  That collateral
13   pledge gave a security interest to the swap counterparties.
14   Under that collateral pledge, those counterparties, upon an
15   event of default, had the option to execute on the totality
16   of those payments, so they were not freely available to the
17   city until we entered into the Bank of America, Merrill Lynch
18   forbearance and optional termination agreement, which I
19   believe we announced in principle on June 14th.
20   Q   Okay.  Let me ask you, you referred to swap
21   counterparties.
22   A   Yes.
23   Q   Who were the swap counterparties?
24   A   Bank of America, Merrill Lynch, and then U.S. Bank as
25   trustee generally.

1   Q   So there was some restriction in the ability of the city

2   to get those revenues directly from the casinos?

3   A   Yes.  There was a mechanism by which the revenue was

4   paid.  I think the revenue is paid on a daily basis, about

5   $500 million, into a holdback account.  Then there's another

6   distribution account when it reaches a certain level that

7   that money is then -- about 4.2 million a month is then taken

8   away and put into another account for the counterparties, and

9   then every quarter that money, roughly a million or so, is

10  then paid over to the counterparties.

11  Q   I think you said 500 million a day.

12  A   500,000 a day, roughly --

13  Q   Okay.

14  A   -- somewhere in that --

15  Q   I wish it would be 500 million.

16  A   I wish it were 500 million a day.

17  Q   So -- and this arrangement, does it have a name, a

18  commonly referred to name?

19  A   You mean the holdback account --

20  Q   Yeah, the holdback account.

21  A   -- or the swap?  It's generally called a swap.

22  Q   Have you heard of the phrase "lockbox arrangement"?

23  A   Sure, yeah.  That's a common term in financing, holdback

24  account, lockbox, and the like.

25  Q   After the June 14th meeting, did anything happen with

1   regard to the casino revenues?

2   A   Yes.

3   Q   What was that?

4   A   On the following Monday, one of the parties that was a

5   monoline insurer -- that is, insurer for some of these

6   obligations -- called Syncora claimed that they had an

7   interest in the swap agreement, which we very strongly

8   disputed, and sent a letter to counterparties alleging that

9   their interest prohibited them from performing on the

10  agreement in principle that we had announced on Friday, the

11  14th.

12  Q   So they sent a letter to UBS and Bank of America, Merrill

13  Lynch?

14  A   I think it was U.S. Bank --

15  Q   Okay.

16  A   -- and Bank of America, Merrill Lynch.

17  Q   Okay.  U.S. Bank, was U.S. Bank a swap counterparty, or

18  were they something else?

19  A   They were like a trustee.

20  Q   A trustee.  Okay.

21  A   Yeah.  They were a trustee for the counterparties.

22  Q   So you had the swap counterparties, which are UBS and --

23  A   And Merrill Lynch.

24  Q   -- Merrill Lynch?

25  A   Then you have U.S. Bank, which is a trustee.

1    Q    Okay.

2    A    Um-hmm.

3    Q    And why would they send a letter to U.S. Bank?

4    A    Well, we didn't know.  We interpreted them -- our

5    understanding was they had made a payment based upon our

6    default under the certificate of participation as an insurer

7    for the COPs, which is a separate structure.  Under the

8    swaps, which they did not have an agreement in the collateral

9    pledge agreement, it appeared to us that they were trying to

10   assert some interest under the swaps to bolster their

11   position under the COPs.  We thought that was inappropriate

12   and unfounded.

13   Q    What did U.S. Bank do in response to the letter it

14   received from Syncora?

15   A    Understandably, as a trustee, U.S. Bank more or less

16   froze, and they froze the account.

17   Q    What did that freezing of the account mean for the city?

18   A    Well, it actually meant the city was in worse condition

19   than it was on June 14th because not only were we getting

20   that -- not getting that portion of the revenue,

21   approximately $132 million that should come to us in the

22   course of a year, but we weren't getting the benefits of the

23   swap agreement that we had reached with them just that

24   Friday.

25   Q    Had you been counting on the money, the casino revenues?

1  A    Yes, absolutely.

2  Q    What did you do in response to Syncora's actions?

3  A    I think I instructed our legal team to reach out to them.

4  There was a letter.  I think I wrote -- there was a series of

5  letter exchanges over the next couple of weeks.  I think I

6  wrote back saying your position is unfounded to a -- to one

7  of the principals, I think a Mr. LeBlanc at Syncora.  I think

8  he then wrote back to me, and this went on for about two

9  weeks, and then I wrote another letter or two back to him,

10 but there were a series of what we used to call nastygrams

11 going back and forth about the parties' respective interest

12 and how we felt they were unfounded and how they felt that

13 they had a right to assert them.

14 Q    Were you asking Syncora to change its position?

15 A    Yes.  We were very -- we were telling Syncora they did

16 not have a position, that they were causing damage to the

17 city, and they needed to cease and desist immediately.

18 Q    Did your letters or meetings with Syncora work?

19 A    No.

20 Q    What was the next step that you took --

21 A    Well --

22 Q    -- with regard to the casino revenues?

23 A    Well, we were relying on the casino revenue strongly to

24 relieve the cash flow pressures that we were under from March

25 to June because we -- mid-June we were going flow pretty

1  skinny cash flow negative.  They refused apparently to reach
2  some sort of accommodation.  We told them if they didn't, we
3  would have to pursue our legal remedies, and I think in this
4  time frame we were also going through the discussion with the
5  counterparties, certainly in the next week -- we spent that
6  following week, the 17th through the 22nd -- 17th, 18th,
7  19th, 20th, 21st, 22nd -- yeah -- 17th through the 22nd
8  having plenary meetings with a number of interested parties.
9  We were writing these letters to Syncora.  After several
10  weeks of this, we eventually decided that we were going to
11  have to sue them to stop, get a preliminary injunction -- or
12  TRO, temporary restraining order.
13  Q   Was what Syncora was doing affecting your negotiations
14  with the swap counterparties --
15  A   Yes.
16  Q   -- the agreement you were talking about?
17  A   Yes.  It interfered with those negotiations quite
18  severely.
19  Q   So you decided to pursue legal action?
20  A   Yes.
21  Q   And when you say "legal action," what do you -- what do
22  you mean?
23  A   Well, after discussion with our team, we decided to sue
24  Syncora.
25  Q   Okay.  And how did you go about doing that?

1  A    We filed a complaint for a temporary restraining order in

2  early July, July 5th, I believe.

3  Q    Were you successful in obtaining the TRO?

4  A    Yes, we were.

5  Q    And what did that mean for the city?

6  A    Well, that mean that Syncora had to cease and desist from

7  interfering with the settlement agreement we had reached with

8  Bank of America and Merrill Lynch and UBS; that the casino

9  revenue begin to flow again so we had some relief from the

10 financial pressures that we were feeling in terms of cash

11 flow and that we could refocus quite clearly with that relief

12 on trying to reach some agreements with other parties.

13 Q    If the city hadn't gotten that TRO, what would it have

14 meant to the city?

15 A    It would have been pretty catastrophic.  Without the

16 casino revenue, even our projections for cash flow would not

17 have flowed.  We would have been short, in addition to the

18 money we saw -- we lost on that blue graph that we discussed

19 on the June 10th presentation, we have lost another $132

20 million a year, which would have put the city in dire

21 straits.  You could not cut enough city services to make up

22 for that difference.  We couldn't go back to the financial

23 markets because we had exposed the true state of the city

24 affairs, and any lending at that time perceivably without

25 this revenue stream would have been very high.  It would have

1  been very dire.

2  Q   And you got this TRO on July 5th, you said?

3  A   I believe it was July 5th.

4  Q   Do you know how long a TRO typically lasts?

5  A   In federal court it can last for a period of time, but I

6  think this was in state court, and it had a 14-day life, I

7  believe.

8  Q   Mr. Orr, while you were dealing with the Syncora

9  situation after the June 14th meeting, were there subsequent

10 meetings between representatives of the city and its

11 creditors?

12 A   Yes, throughout that week, the following week.

13 Q   I'd like to show you Exhibit 104, which has been admitted

14 for demonstrative purposes.  Do you see that, Mr. Orr?

15 A   Yes.

16 Q   And you see June 14th over on the left side of that

17 document?

18 A   Yes.

19 Q   Could you walk us through any meetings that you

20 participated in during this time period?

21 A   Yes.  I was at the June 10th meeting on the bottom, June

22 14th meeting, June 20th meeting.  I believe -- I think at one

23 other meeting or one other one-off meeting at some point the

24 week after that, which would have been July 25th or so,

25 thereabouts.

1    Q    Or June 25th?

2    A    Yeah. June. I'm sorry. June 25th.

3    Q    Now, at these meetings, Mr. Orr, what did you tell those

4    who came to them?

5    A    I think at the June 20th meeting it was the afternoon

6    session that I attended. I told them that we were -- same

7    thing I said at June 14th essentially. We were working hard

8    to try to get some concessions; that we were fighting very

9    hard from a concession that we had obtained from Bank of

10    America, Merrill Lynch; that we were looking -- we thought

11    that that settlement as well as our willingness to default on

12    the COPs payment would have told all interested parties that

13    we were serious about trying to get some negotiations done

14    fairly quickly; that we were working on a very tight time

15    frame; and that we meant what we said in our June 14th

16    proposal for creditors; that that was the time frame we were

17    going to stick to.

18    Q    Let me focus your attention on the meeting on June 20th

19    with the nonuniformed union and retiree representatives.

20    A    Um-hmm.

21    Q    At that meeting, did you tell them that you would not

22    negotiate with them?

23    A    No. What I said was that we would not waive our rights

24    under 436; that collective bargaining was suspended for five

25    years under the statute, but that as long as everybody

1    understood we weren't engaging in collective bargaining, we'd

2    be willing to have discussions and other negotiations short

3    of calling it collective bargaining.

4    Q    Did you tell the meeting participants in the afternoon

5    session with the uniformed union and retiree representatives

6    the same thing?

7    A    Yes.

8    Q    How about the meeting on June 25th with the nonunion

9    creditors and representatives from the Retirement System?

10   A    You know, I don't -- I'm trying to see if I meant at that

11   meeting or if I had a separate one-off, but I think either

12   way I was trying to tell everyone that we were meeting with

13   the same message.  We want to have discussions.  We want to

14   have proposals.  We want to have negotiations, but we are not

15   waiving our rights under the statute.

16   Q    Did you tell the meeting participants that you -- the

17   city would not accept proposals or counterproposals to what

18   you had exhibited at the June 14th meeting?

19   A    No.  If anything, we kept telling people that we would

20   accept counterproposals and we were looking for them.

21   Q    Now, you didn't go to all the meetings; correct?

22   A    No, I did not.

23   Q    How did you stay informed as to what was happening at

24   those meetings?

25   A    My team kept me regularly informed.  Typically either

1  during or after -- immediately after those meetings, they
2  would stop by my office.  We would have daily telephone
3  calls.  We have a number of standing calls called work in
4  progress calls beginning of the week.  At the end of the week
5  we have team calls.  During the middle of the week we have
6  various operational calls and other calls with all the
7  consultants.  We have regular meetings and calls on a daily
8  basis.  In addition, lead counsel, David Heiman, as well as
9  our investment banker, Ken Buckfire, speak to me essentially
10 almost daily, maybe Ken not as much daily, but David
11 certainly does on a regular basis.  And any particular
12 taskforce like the pension taskforce with Evan Miller, Jones
13 Day, or Conway MacKenzie through Chuck Moore or Ernst & Young
14 or any of their other partners would meet with me daily.
15 Q   Do you think that any important developments at those
16 meetings would have been reported to you?
17 A   Without a doubt.
18 Q   What was -- who was your team of -- who was the team that
19 you had that went to the meetings you did not attend?
20 A   Well, we had various teams for different obligations.
21 For instance, on labor, we had a team headed up by Jones Day
22 attorneys on pension and benefits.  We had a team with Jones
23 Day's attorneys, Conway MacKenzie, Ernst & Young on debt.  We
24 had a team with various attorneys as well as our investment
25 bankers.  Each sort of group between debt, labor, benefits,

1  employees would have members assigned to it who would attend

2  those meetings, have follow-up calls, exchange e-mails, come

3  back and forth with proposals.  There were a number of

4  letters that were exchanged which would routinely be shared

5  with me.

6  Q   Did you tell any of the members of your team not to

7  negotiate with those who came to the meetings?

8  A   Absolutely not.  What I said is if there any serious

9  proposals, I'm a phone call away.  Typically what would

10 happen, they would relay those proposals to me, and we'd make

11 a consensual decision about how to respond or whether or not

12 they were proposals that we thought were moving us forward,

13 but, no, I was involved at every stage of that process.

14 Q   Did you participate in these meetings in good faith?

15 A   Yes, absolutely.

16 Q   Do you believe your team did?

17 A   Yes, I do.

18 Q   Aside from the meetings that are set forth on Exhibit

19 104, were there other contacts with the city's creditors --

20 A   Yes.

21 Q   -- that you had?

22 A   Yes.

23 Q   What kinds of contacts?

24 A   Various parties would routinely stop by my office, ask

25 for meetings, either drop by when they were in other meetings

1    or we'd have set-up meetings.  To this day, I routinely meet

2    with various interested groups on behalf of the city.  I

3    don't think there's a point at which I have turned down a

4    request for a meeting.  Maybe if I'm busy, not immediately at

5    that moment, but I generally will try to make myself

6    available for any reasonable request for a meeting.

7    Q    You believe you were available during this time?

8    A    Yes.

9    Q    Did any creditors submit proposals or counterproposals to

10   you after the June 14th meeting and before July 18th?

11   A    Yes.

12   Q    Who did?

13   A    I think a group of creditors led by Ambac, I believe,

14   submitted a proposal, and then there was another sort of

15   proposal, a single-page letter that was admitted --

16   submitted.

17   Q    Let me show you Exhibit 102 and ask you, if you could, to

18   identify it for the Court.

19   A    I believe this was a letter that was submitted by Ambac

20   and NPF, National Public Finance Guarantee Corporation.

21   Q    And it was a proposal made to you after the June 14th

22   meeting?

23   A    Yes.  I believe it was made roughly on the day that's

24   referenced, July 15th, Monday, July 15th.

25   Q    Okay.  Aside from this proposal and the other one that

1   you referenced, did you receive any proposals between June

2   14th and July 18th from the unions?

3   A   Nothing I would call a proposal.  I think there was

4   reference to -- may have been reference to a letter that

5   requested collective bargaining but not a proposal.

6   Q   How about the bondholders?

7   A   No.

8   Q   The retirees?

9   A   No.

10  Q   Pension funds?

11  A   No.

12  Q   Any other stakeholders?

13  A   No.

14  Q   At some point after the June 14th meeting, did you

15  authorize your team to start preparing for a Chapter 9

16  filing?

17  A   Yes.

18  Q   When did you do that?

19      (Phone interruption at 10:24 a.m.)

20          THE COURT:  I guess we have to pause our proceedings

21  for a second to address this.  Okay.  Hold on one second.

22  Letrice -- we're going to just pause in place here for a

23  moment while we get the phone working again.

24          MR. SHUMAKER:  Your Honor, this is somewhat of a

25  breaking point if you would like to, or --

1    THE COURT:  Ah, let's talk about that.  Okay.  Just

2  let me know when you're ready again, Letrice.  Okay.  On the

3  issue of a break, because of our commitment to hear the

4  governor's testimony beginning at one, it was my intent to

5  call for lunch at 11:30 since the vote was to have an hour-

6  and-a-half lunch, so in light of that, it was my intent to

7  just plow ahead until 11:30.

8    MR. SHUMAKER:  Fine.  That's wonderful.

9    THE COURT:  Okay.  And you may proceed.

10    MR. SHUMAKER:  Thank you, your Honor.

11  BY MR. SHUMAKER:

12  Q   Mr. Orr, I forget the question.

13  A   Okay.

14  Q   You indicated that at some point after the June 14th

15  meeting you authorized your team to start preparing a

16  potential Chapter 9 filing.  I believe I'd asked you when you

17  thought that occurred.

18  A   I think approximately late June, early July.

19  Q   Okay.

20  A   Maybe -- yeah, yeah.

21  Q   Well, why did you need to start planning for a Chapter 9

22  filing at that point at the same time you were negotiating?

23  A   It's basically contingency plan filing.  I mean, you

24  know, pray for peace, prepare for war.  Any prudent person

25  always prepares for the contingency that what you hope for

1  doesn't occur.  To do so -- not do so would be irresponsible.

2  Q   Do you believe these preparations for a possible Chapter

3  9 filing affected your ability to negotiate in good faith?

4  A   Absolutely not.

5  Q   How about your team?

6  A   Absolutely not.  We were willing to accept any agreement

7  that came over the transom.

8  Q   About this time -- I'm talking now July -- July 5th was

9  the TRO.

10 A   Yes.

11 Q   And the negotiations that were on Exhibit 104 were -- the

12 meetings that were taking place were going on.  Did you

13 become aware of any lawsuits filed around that time regarding

14 the emergency manager statute?

15 A   Yeah.  There had been filed prior to this whole time

16 frame lawsuits seeking to invalidate the statute.  We were in

17 a running gun battle with Syncora with the exchange of

18 correspondence.  We were trying to negotiate with a number of

19 parties, I think 48 or so, 49 bargaining units, 44 or so bond

20 issuers, 9 bond insurers.  And also I believe that week, the

21 first week of July, just before the July 4th holiday -- I

22 think it was July 3rd -- two lawsuits -- two or three were

23 filed against us, not against me personally at that time.  I

24 think they were filed against the state, the governor, and

25 the treasurer, the Flowers and Webster's lawsuits, and then

1  we went to court.  July 4th, I think, was a Thursday, and

2  then we went to court to enjoin Syncora on the 5th, which I

3  believe was a Friday.

4  Q    Okay.  So you believe that the <u>Flowers</u> and the <u>Webster</u>

5  lawsuits were filed on July 3rd?

6  A    Yes, I believe so.

7  Q    Okay.  What was your understanding of what these suits

8  were alleging?

9  A    There had been a lot of discussion prior to filing the

10  suits as to whether or not the constitutional requirements of

11  the Michigan state Constitution prohibited the adjustment of

12  vested pension rights, and I thought these lawsuits were

13  seeking to prohibit a Chapter 9 filing if it would include

14  adjusting vested pension rights.

15  Q    How did the filing of these lawsuits affect you in your

16  role as emergency manager?

17  A    They initially didn't really concern me.  I assumed that

18  parties were pursuing their legal rights.  We were trying to

19  negotiate.  Frankly, I ignored them when they were initially

20  filed and continued to try to reach some sort of negotiated

21  solution with our interested parties and labor partners.

22  Q    Did they tell you anything about the negotiations?

23  A    Well, they suggested to me that parties were pursuing a

24  litigation role or option as opposed to a sincere good faith

25  negotiation option when we had already said that time was

1    running out.  We were coming to the end of our 30 days; that

2    they thought for whatever reason it was in their best

3    interest to pursue litigation as opposed to coming --

4    proposing some sort of agreement.

5    Q    Did this concern you?

6    A    Yes.  It wasn't -- it certainly wasn't showing of a

7    willingness to enter into some sort of concessions or

8    agreements.  It said they wanted to sue.

9    Q    Now, there was another lawsuit filed after the Flowers

10   and Webster lawsuits; correct?

11   A    Yes.

12   Q    And when was that?

13   A    I think that was the following week.

14   Q    How did these lawsuits affect your negotiating posture?

15   A    Well, from our perspective, we continued to say that we

16   would negotiate even in the sort of litigious -- what I mean,

17   we had been in a situation of opposition and some level of

18   conflict from the beginning.  We expected that, and that

19   wasn't going to change our willingness to try to reach some

20   sort of agreement.  In fact, even in the face of litigation

21   and some very contentious negotiations and statements, we

22   continued to try to move forward.

23   Q    Now, you indicated that in the Flowers and Webster

24   lawsuits the governor and the treasurer were named as

25   defendants.

1  A   Yes.

2  Q   In the pension fund lawsuit that you referenced --

3  A   Yes.

4  Q   -- on July 15th --

5  A   Yes.

6  Q   -- were those the same defendants?

7  A   No.  In the pension lawsuit, GRS, I believe, sued me

8  along with some other parties, and they named me and the

9  governor, I believe.

10  Q   Did you continue to meet with the pension funds after

11  they sued you?

12  A   Yeah.  We continue to meet with them now.  We'll continue

13  to meet with them, yes.

14  Q   Did these lawsuits affect your decision to seek the

15  governor's authorization to file for Chapter 9 bankruptcy?

16  A   Yes, to some degree.  It appeared --

17  Q   How so?

18  A   Well, between the Syncora litigation, that injunction was

19  only going to last for two weeks, I believe, through the 19th

20  or so, Friday, the 19th, I think it was -- the Webster and

21  Flowers litigation suggested to me that an agreement was not

22  going to be forthcoming.  There was a lot of publicity

23  regarding those lawsuits and what I viewed to be chest

24  thumping, people saying what they were going to do and they

25  weren't going to make any movement until we agreed as a

1   condition -- it appeared to be as a condition to going

2   forward that we had to observe these sort of philosophical

3   differences, these sort of philosophical positions that you

4   couldn't touch vested pension rights.  There was a lot of

5   discussion in the general obligation bond community that

6   unless we agreed to observe the implied full faith and credit

7   of the city beyond our GO bond debt, that they weren't going

8   to make any concessions.  We had tried to tell them we could

9   not comply with the $12 billion of unfunded -- unsecured

10  liability, and the situation seemed to be growing more and

11  more precarious and somewhat out of control.

12  Q   Let me show you Exhibit 28, which is in evidence.

13  Mr. Orr, do you recognize this document?

14  A   Yes, I do.

15  Q   And what is it?

16  A   This is my recommendation to the governor, copying the

17  treasurer, that I be given authority to file Chapter 9.

18  Q   And it's dated as of July 16th; is that correct?

19  A   Yes, it is.  I believe that was a Tuesday.

20  Q   Why did you send the governor this letter on that date?

21  A   Well, as I said, I believe at that time there was a

22  mounting level of conflict.  There were a number of pieces of

23  litigation going on.  There were a number of what appeared to

24  be conditions all parties were setting before we'd have

25  discussions that we'd have to agree to.  I was running out of

1    time.  I meant what I said on June 14th that we were going to

2    have to go through an evaluation period, and that was coming

3    to a close.  We hadn't received any real counterproposals

4    from any parties.  The only one actually we received in

5    writing was from Ambac Assured and National Public Finance.

6    We hadn't received any from the other parties, and time was

7    running out that we said we'd have to do an evaluation, and I

8    wanted to get the authority in hand to file Chapter 9 if we

9    weren't receiving any proposals.

10   Q    And is that what you told the governor in this letter?

11   A    Yes.  I told him about the condition of the city, the

12   budget deficits, the growing liabilities, the ongoing

13   financial emergency that he had declared now back in March, I

14   believe March 1, 2013.  We discussed our meeting with

15   creditors and why there were certain barriers to reaching

16   agreement and that it was time to make a decision.

17   Q    Why did you recommend Chapter 9 bankruptcy for the city

18   at this time?

19   A    Well, it seemed to me that after going through a series

20   of negotiations in the time frame that we said we would,

21   after standing by and suffering a number of different

22   lawsuits aimed at denuding us of the authority to make

23   decisions under 436, after parties taking strong

24   philosophical positions about what they would or wouldn't do

25   based upon our position; that I had made a pledge of the time

1  I was going to keep open; that nobody was coming forward --

2  and I said it was approximate within that time frame -- and

3  that I was running out of time.  We had said for some of the

4  things that we needed to accomplish we had to make some

5  decisions, and, furthermore, given the amount of litigation,

6  it was clear to me that there was going to be no other way to

7  pursue a comprehensive and orderly resolution of the city's

8  problems in an expeditious way.

9  Q   On July 16th when you sent this letter, were you aware of

10 any hearings in the Flowers or Webster or pension fund

11 lawsuits that were upcoming?

12 A   There were hearings that were scheduled at that time for

13 the 22nd, I believe, the following week.

14 Q   Were you aware of any other hearings on July 16th?

15 A   Not on July 16th.

16 Q   How long between concluding that bankruptcy was

17 appropriate and sending this letter to Governor Snyder?

18 A   Well, I think I reached the final conclusion the prior

19 week, so drafts of the letter were probably prepared over the

20 weekend and that Monday, and when I sent it, I was prepared

21 to file.

22 Q   Prior to sending this letter to the governor, did you

23 have any agreement with the governor regarding what his

24 response might be?

25 A   No.

1    Q    Did the governor respond to this letter?

2    A    Yes.

3    Q    I show you Exhibit 29, please.  Do you recognize this

4    document, Mr. Orr?

5    A    Yes, I do.

6    Q    It's in evidence.  Could you give an overview of what the

7    governor told you in this letter?

8    A    The governor said that he had reviewed my recommendation;

9    that he looked at the obligation of the city first and

10    foremost to provide basic needs, basic obligations to its

11    citizens, which were not being met; that it could not meet

12    its basic obligations to creditors; that its failure to meet

13    these obligations prohibited it from providing basic needs to

14    the citizens and to its creditors; and that the only

15    reasonable path to resolving this would be the filing of a

16    bankruptcy.

17    Q    And did he authorize you to file for a Chapter 9 --

18    A    Yes.

19    Q    -- bankruptcy?

20    A    Yes, he did.

21    Q    When on July 18th -- that's the date you received this

22    letter; correct?

23    A    Yes, it is.

24    Q    When on July 18th did you receive this letter?

25    A    I believe I received this letter late morning, maybe

1  early afternoon.

2  Q   How did you receive it?

3  A   I think someone on my staff brought it to me at first.

4  Q   Hard copy?

5  A   Yeah.  I think it was either e-mail or fax, yeah.

6  Q   What did you do upon receiving this letter?

7  A   I called the attorneys and instructed them to prepare to

8  file the bankruptcy case.

9  Q   Why do you believe this Chapter 9 filing was in the best

10  interest of the citizens of Detroit?

11  A   I believe that the city had been dealing with the issues,

12  as I said before, both on the creditors' side and some of its

13  city operations and work rules for a long time.  I believe

14  that they had been agreed -- the city and the state and then

15  the city officers and the state had agreed over a long period

16  of time to resolve some of these issues.  They had spelled

17  them out in detail; that for whatever reason they were not

18  being addressed in a timely fashion; that there are a number

19  of efforts and safeguards that the parties had agreed to to

20  redouble those efforts in specificity in the financial

21  stability agreement, Detroit Reform 1 and Detroit Reform 2;

22  that they failed to meet those obligations, so they started

23  to put milestones in place to try to achieve those

24  obligations.  Those were not met; that the city had gone

25  through between 2012 and 2013 essentially three different

1    reviews that had all gone from financial distress to
2    financial crisis to financial emergency; that upon my
3    appointment we were trying to look at some of those very same
4    issues.  We had specified to people that given this length of
5    time that those issues had been discussed, that after our
6    June 14th presentation we were going to take a certain period
7    of time to do evaluation for counterproposals, which we
8    thought were forthcoming; that they were not forthcoming;
9    that we were running out of time both in terms of what was
10   required in the statute and any reasonable period of time to
11   get through a bankruptcy filing; that I had to make a
12   difficult decision to try to resolve these issues once and
13   for all in a comprehensive and orderly way under the guise of
14   federal law so that they could be all resolved finally and
15   the city could move forward to deal with some of the
16   amazingly necessary reforms that have been agreed to by
17   everyone in the city for two years.
18   Q    Do you still believe that this bankruptcy filing is in
19   the best interest of the citizens of Detroit?
20   A    Yes.
21   Q    If the city isn't eligible for Chapter 9, what's next?
22   A    If the city isn't eligible for Chapter 9, there's either
23   free-fall crisis -- I mean this city -- and I'm certainly --
24   the people that live here have seen this.  This city for ten
25   years, from 2000 to 2010, lost a city the size of Romulus or

1    Wyandotte every year, 24,000 people on average.  That is

2    free-fall flight out of the city.  The services have degraded

3    to a point that they are severely substandard, and they are

4    apparent.  To put the city either back in the status quo,

5    which is clearly unacceptable -- and nobody of any serious

6    note disagrees with that.  No one says that we should go back

7    to the way it is.  No one says that our ability to meet our

8    creditors should continue to be deferred or we should borrow

9    more debt upon debt that for ten years averaged over a

10   hundred million dollars deficit; that we have $1.4 billion

11   that was supposed to resolve our pension obligations in 2005

12   and 2006.  No one says that's an adequate way to proceed.  If

13   we do not go through Chapter 9, this city --

14            MR. DECHIARA:  Objection, your Honor.

15            THE WITNESS:  -- will continue to fail.

16            MR. DECHIARA:  I would just object.

17            THE COURT:  What is your objection, sir?

18            MR. DECHIARA:  Speculation.  He's speculating about

19   events that are counterfactual and about the future.

20            THE COURT:  The objection is overruled.

21            MR. SHUMAKER:  Thank you, Mr. Orr.  That's all I

22   have.

23            THE WITNESS:  Yes, sir.

24            THE COURT:  All right.  Cross-examination.  Okay.

25            MR. ULLMAN:  Your Honor, may I tilt the lectern so

```
1    I'm more facing the witness?
2                        CROSS-EXAMINATION
3    BY MR. ULLMAN:
4    Q   Good morning, Mr. Orr.
5    A   Good morning, Mr. Ullman.
6    Q   Now, we've met before, haven't we?
7    A   Yes.  Yes, we have, several times.
8    Q   Twice, I think.  I'm going to -- just preliminarily let
9    me ask you a few questions.  Now, apart from a college
10   degree, do you have any degree other than a law degree?
11   A   No.
12   Q   You're not a CPA?
13   A   No.
14   Q   You're not an actuary?
15   A   No.
16   Q   Okay.  I believe you testified that you've been with
17   Jones Day since 2001; is that right?
18   A   2001 until March 15th, 2013.
19   Q   Okay.  So you were --
20            THE COURT:  Excuse me.  Would you point the
21   microphone more towards you?
22            MR. ULLMAN:  Is this better?
23            THE COURT:  Yes.
24            MR. ULLMAN:  Sorry.
25            THE COURT:  Thank you, sir.
```

1          MR. ULLMAN:  Okay.

2    BY MR. ULLMAN:

3    Q    So you were a practicing attorney at Jones Day for about

4    12 years prior to becoming the emergency manager; is that

5    right?

6    A    Yes.

7    Q    And I think you indicated you were primarily in the

8    bankruptcy and restructuring group?

9    A    Yes, litigation at first and then bankruptcy and

10   restructuring.

11   Q    Right.  Now, you also mentioned that you'd been at the

12   U.S. Trustee's Office; is that right?

13   A    Yes.

14   Q    And that was from around 1995 through 2001, if I recall?

15   A    Yes.

16   Q    Okay.  And while you were there, did you ever serve as an

17   actual trustee in a bankruptcy case?

18   A    No.

19   Q    And prior to the U.S. Trustee's Office, I believe you

20   indicated you were at the RTC?

21   A    Yes.

22   Q    Okay.  And that would have been from about '92 to '95 if

23   I got the dateline right?

24   A    Yeah.  We originally came in as attorneys at FDIC.  We

25   were then assigned to RTC.  RTC then got authority to hire

1   its own attorneys, and I became an attorney at the RTC

2   proper.

3   Q   Okay.  So that's the general time frame, '92 to '95, that

4   you were there?

5   A   Yes.  '91 through '95.

6   Q   Okay.  And I believe you mentioned that while you were at

7   the RTC you served as the chief legal officer for a savings

8   and loan company that had a sub-subsidiary or holding company

9   called Landmark Land?

10  A   Yes.

11  Q   And you indicated that you ended up being responsible for

12  the disposition of the assets of that company?

13  A   Yes.

14  Q   Okay.  And those, I think you said, were golf courses and

15  country clubs?

16  A   There were a number -- golf courses, country clubs,

17  vacant land, financial assets, yes, number of assets.

18  Q   Okay.  And the golf courses and country clubs, of course,

19  are relatively high-value assets or --

20  A   Yeah.  They were at the time.

21  Q   And that was all around 18 years ago; is that right?

22  A   Whatever the math works out to, Mr. Ullman.

23  Q   Okay.  I think that's it.

24  A   Um-hmm.

25  Q   And is it correct that prior to becoming the emergency

1  manager, you never ran a city?

2  A    No.  Most governors haven't --

3  Q    Okay.

4  A    -- nor mayors.

5  Q    Okay.  And prior to becoming emergency manager, you never

6  had responsibility for budgeting all of the various

7  departments that are involved in running a city or a state;

8  is that right?

9  A    That is correct.

10  Q    And you've never been employed by a corporation, have

11  you, putting aside governmental like the RTC, in a private

12  company?

13  A    Well, there were times in college jobs that I was

14  employed by corporations, but do you mean --

15  Q    Well, after.

16  A    -- during my professional career?

17  Q    Yeah, in your professional career.

18  A    I've been an attorney, then in government, and then an

19  attorney again, yes.

20  Q    Okay.  And is it fair to say that other than being a

21  bankruptcy and restructuring attorney, you have no particular

22  expertise in finance?

23  A    Well, I've been either a litigator or a regulator, a

24  banking regulator, at FDIC, RTC, or an investigator when I

25  handled the Whitewater investigation on behalf of the RTC for

1  six years.  Whatever that amounts to is what it amounts to.
2  Q    Okay.
3  A    But are you saying do I have any particularized degrees
4  or certifications?
5  Q    I'm asking if you could answer my question, Mr. Orr,
6  because --
7  A    Sure.
8  Q    -- I really don't believe you did, and it was -- the
9  question was simply whether it's fair to say that other than
10 being a bankruptcy and restructuring attorney, you have no
11 particular expertise in finance?
12 A    That's a broad question, but I'll grant you this.  That's
13 what I've been throughout the balance of my career.
14         THE COURT:  Excuse me one second.  I need you to
15 move back from the microphone just a bit.
16         MR. ULLMAN:  Okay.
17         THE COURT:  Maybe not that much.
18         MR. ULLMAN:  Okay.
19         THE COURT:  Go ahead.
20 BY MR. ULLMAN:
21 Q    Okay.  So is the simple answer to my question "yes," that
22 what I said is true?  That would be a fair statement?
23 A    If that's your characterization -- and I don't mean to
24 joust with you, Mr. Ullman, but I think that accomplishes a
25 number of things, but to move forward, I'll say your question

1  a fair representation.

2  Q    Thank you.  Let's go back to your time at Jones Day.

3  Now, you indicated you were there as of 2012.  Yes?

4  A    Yes.

5  Q    Okay.  And Jones Day, of course, is the restructuring and

6  bankruptcy counsel to the city, of course; right?

7  A    Yes.

8  Q    And we know that Jones Day got that work following a

9  pitch that it made to various representatives of the city and

10 the State of Michigan in January 2013; is that right?

11 A    That is correct.

12 Q    And you were part of the Jones Day pitch team at that

13 time?

14 A    Yes, I was.

15 Q    And is it correct that one of the things that Jones Day

16 was pitching at that meeting, at that presentation was its

17 expertise and experience in municipal bankruptcy work?

18 A    I think that's a fair statement.

19 Q    And Jones Day prepared a pitch book, did it not?

20 A    Yes, we did.

21       MR. ULLMAN:  Can we put Exhibit 418 on the screen,

22 which is the common exhibit 418?

23 BY MR. ULLMAN:

24 Q    And what we have here is the cover of that pitch book;

25 correct?

1  A    I believe so.

2  Q    And you were engaged in -- or you participated and took

3  part in the preparation of this pitch book; right?

4  A    Yes, to some degree.

5  Q    And among other things, this pitch book laid out Jones

6  Day's thoughts and insights on subjects, including municipal

7  bankruptcy; is that right?

8  A    Yes, I believe so.

9  Q    Okay.  And it also addressed issues relating to the

10  appointment of an emergency manager; is that true?

11  A    Yes, I believe it did.

12  Q    Okay.  And is it correct that the thoughts and insights

13  prepared by the Jones Day pitch team and addressed in this

14  pitch book included the possibility of a Chapter 9 bankruptcy

15  filing made by the emergency manager?

16  A    Yes, I believe it did.

17  Q    Okay.  And is it also the case that the Jones Day

18  thoughts and insights specifically included using the

19  backdrop of a bankruptcy filing, a Chapter 9 filing, as a

20  tool for gaining leverage with creditors?

21  A    I think it certainly contained -- if you're talking about

22  the presentation, it certainly contained the potential pros

23  and cons of Chapter 9, yes.

24  Q    Okay.

25          MR. ULLMAN:  And could we put up page 15?

1  BY MR. ULLMAN:

2  Q   Okay.  And so there's no question that it talked about

3  that specifically.  This is page 15.  The heading you see is

4  "Impact of Possible Emergency Manager Appointment."  Do you

5  see that?

6  A   Yes.  Thank you for putting up the page.  If that's what

7  you're talking about, that's what it says.

8  Q   And the third bullet talks about the ability to commence

9  a Chapter 9 filing quickly if warranted?

10  A   If warranted, yes.

11  Q   And the next bullet point talks about how that can create

12  negotiating leverage, as they phrased it here, negotiating

13  with the backdrop of bankruptcy; is that right?

14  A   Yes.

15  Q   Okay.  And that's one of the points that the Jones Day

16  team was making to the city and the state at this January

17  presentation; correct?

18  A   Yes.  That's a point I echoed during my June 10th

19  presentation.

20  Q   Okay.  And the Jones Day team also referred to this as,

21  quote, "negotiating in the shadow of Chapter 9."  Is that

22  another phrase that you recall being used?

23  A   It may have been used.  This says "negotiating with the

24  backdrop of bankruptcy," but "shadow," "backdrop,"

25  essentially the same.

89

1  Q   Okay.  And if we turn to page 17 of this presentation, we

2  see right down there in the arrows that are following the

3  third bullet, "negotiating in the shadow of Chapter 9";

4  right?

5  A   Yes.  It's essentially the same.

6  Q   That's spelled out expressly, isn't it?

7  A   Yes.  Shadow, backdrop.

8  Q   And is it fair to say that Jones Day was recommending the

9  use of Chapter 9 as a threat in dealing with creditors?

10  A   Your question implicates a threat.  We will stand by --

11  or, rather, we were trying to say here that this was an

12  alternative, as I said at June 10th.

13  Q   Okay.  So you'd rather stand by what's said in the pitch

14  book; is that right?

15  A   Sure.

16  Q   Okay.  Well, let's go to page 18 of the pitch book.

17  Okay.  And I'd like you to focus on the third paragraph, if

18  we can highlight, and it says, "Creditors understand that a

19  troubled municipality has greater leverage in a Chapter 9

20  case.  Accordingly, developing an out-of-court restructuring

21  plan that can later be implemented in Chapter 9, if

22  necessary, can create leverage in favor of a negotiated

23  deal."  It goes on and then says, "This is particularly the

24  case if an emergency manager is appointed because the threat

25  of a Chapter 9 filing -- threat of a Chapter 9 filing,

1    including potential moratorium on payments, will be more

2    tangible and possibly even more imminent."  Did I read that

3    correctly?

4    A    Yes, you did.

5    Q    Okay.  And didn't Jones Day, in fact, say that having a

6    viable threat of Chapter 9 was critical to Detroit's being

7    able to restructure its debt?

8    A    If that's in the document, yes, that's what we said.

9    Q    Okay.  And just so we can confirm whether it is or not,

10   let's look at page 46.  And if we look at the first bullet

11   point right on the top, that's exactly what it says, isn't

12   it?

13   A    Yes.

14   Q    So there's no question this is what Jones Day was telling

15   the city and state in January of 2013?

16   A    Yes.  It's in the document.

17   Q    And is it correct that Jones Day was also specifically

18   recommending Chapter 9 as a way for Detroit to avoid payment

19   of vested pension benefits?

20   A    I believe we were recommending possibly filing a Chapter

21   9 as a way to avoid a number of things, included pension

22   rights.

23   Q    Okay.  And isn't it correct that the Jones Day team

24   specifically told the city that, in their view, Chapter 9

25   could, in fact, be potentially used to get out of accrued

1    financial benefits that were otherwise protected under the

2    Michigan Constitution?

3    A    You mean in the document?

4    Q    The document.

5    A    Yeah, I believe so.

6    Q    And just so we can see whether that's right or not, can

7    we look at page 41?  And, in fact, that language appears

8    there in what I've just highlighted; isn't that right?

9    A    Yes.  I said so.

10   Q    Okay.  Now, is it correct that the reference that we've

11   just seen here that's still on the screen where it says

12   cutting back or compromising the phrase "accrued financial

13   benefits otherwise protected under the Michigan

14   Constitution," that that's referring to accrued financial

15   benefits that are protected under what's known as the pension

16   clause of the Michigan Constitution?

17   A    I believe so.

18   Q    Okay.  And were you aware of the -- and just for clarity,

19   the pension clause is Article IX, Section 24, of the Michigan

20   Constitution?

21   A    I believe that's the appropriate section.

22   Q    Okay.  And were you aware of the pension clause prior to

23   becoming the emergency manager?

24   A    Yes.

25   Q    Okay.  And on becoming emergency manager, you took an

1  oath, didn't you?

2  A   Yes, I did.

3  Q   Okay.  And I'm going to read you something.  I'd like you

4  to tell me whether it's correct that this is the oath you

5  gave.  Quote, "I do solemnly swear that I will support the

6  Constitution of the United States and the Constitution of

7  this state and that I will faithfully discharge the duties of

8  the Office of Emergency Financial Manager, City of Detroit,

9  according to the best of my ability."

10  A   I believe that's the oath I took, yes.

11  Q   And were you speaking truthfully when you gave that oath?

12  A   Yes.

13  Q   And I believe you've previously indicated that you

14  understood that that same oath applied to your conduct as

15  emergency manager as well; is that right?

16  A   I believe so.

17  Q   And I believe you've testified that upon becoming the

18  emergency manager, you set about formulating a restructuring

19  plan -- let me withdraw that.  I guess on becoming emergency

20  manager, you first put together a plan that showed the

21  financial situation of Detroit and also made some

22  observations or recommendations as to what you believe needed

23  to be done; is that right?

24  A   Yes.

25  Q   Okay.  And that's the May 12th document that we looked at

1   earlier.

2   A    The May 12th financial and operating plan.

3   Q    Right.

4        MR. ULLMAN:  And let's put the first page of that on

5   the screen.

6   BY MR. ULLMAN:

7   Q    Okay.  I'm just going to ask you a few questions about

8   this.  If we can go to page 21 -- and just to give the

9   context, I think you've already testified this morning that a

10  lot of this document was spent detailing what you perceived

11  to be the financial situation of Detroit as it stood after

12  you assumed your post as emergency manager; right?

13  A    Yes.  I believe that's correct.

14  Q    Okay.  And is it correct that as part of the initial

15  review that you did, which was -- which culminated in the

16  document that we have on the screen, which is Exhibit 407,

17  that you made a determination that, in your view, accrued

18  rights to pensions -- to pension benefits had to be cut?

19  A    I think it's fair to say that we came to that conclusion,

20  yes.

21  Q    Okay.  And you had come to that as of May 12th, 2013, the

22  date of this operating plan and proposal; is that right?

23  A    I think as of May 12th we made a representation that all

24  stakeholders would have to be adjusted, yes.

25  Q    Okay.  So that we're clear, that at this point in time

1  you had made the determination that, in your view, vested
2  pension benefits of Detroit's retirees had to be cut back; is
3  that right?
4  A   I think that's a fair characterization of what we're
5  saying.
6  Q   Okay.  And at the time that you made that determination,
7  you said you were aware of the pension clause in the Michigan
8  Constitution?
9  A   I think I said -- yes.
10  Q   Okay.  So you were aware at the same time that you made
11  that determination that the pension clause specifically
12  provided against the diminution or impairment of accrued
13  financial benefits?
14  A   Well, that's a conclusion.  I think you'll remember, Mr.
15  Ullman, during my deposition I said that, you know, we might
16  either have concessions or we might have to go Chapter 9, but
17  I think your characterization is fair one way or the other.
18  Q   Let's turn now to the proposal that you made to
19  creditors.  That's the June 14 proposal.
20        MR. ULLMAN:  Let's put the first page on the screen.
21  BY MR. ULLMAN:
22  Q   And this is -- what we have here is common Exhibit 408.
23  It's just a different -- I think you were shown this earlier
24  today.  I think the city used its exhibit number.  We have
25  the same document, just a different exhibit number --

1  Q    Yeah.

2  A    -- but it's the same.

3  A    If you tell me it's the same thing, that's fine.

4  Q    It's the same.  Okay.  Now, this, of course, is the

5  proposal that you made to creditors in June -- on June 14,

6  2013.

7  A    Yes.

8  Q    And I believe it states expressly in here that, in your

9  view, there have to be significant cuts to vested pensions;

10  is that right?

11  A    I believe so.

12  Q    Okay.  And just so we can see that, if we look at page

13  109 -- right -- we see the phrase that there must be

14  significant cuts in accrued vested pension amounts for both

15  active and currently retired persons; correct?

16  A    Yes.

17  Q    Okay.  And is it correct that under this proposal, it

18  shows current employees being switched to a defined

19  contribution plan?

20  A    That was our suggestion, yes.

21  Q    Okay.  And that would be a totally new plan from the one

22  that had been in effect up to this point in time; is that

23  right?

24  A    We would be going from a defined benefit plan to a new

25  defined contribution plan, yes.

1 Q   And is it correct that under the June 14 proposal there
2 would be some ongoing pension contributions for active
3 employees under the new defined contribution plan but no
4 pension contributions for active employees on account of
5 pension benefits that were already vested?
6 A   I think so.  In other words, you're talking about closing
7 the plan --
8 Q   Yeah.
9 A   -- the current plan?  Yes.
10 Q   Okay.  So for the vested pension benefits, the
11 contributions for those would be cut entirely for actives; is
12 that right?
13 A   I think the plan would be closed.  I don't know if they'd
14 be cut in the entirety, but what you mean -- there would be
15 benefits under the existing plan that would continue to be
16 paid out in some portion.
17 Q   Well, what I meant is that under this proposal, it shows
18 the city not making any more pension contributions for active
19 employees for vested pension rights; is that true?
20 A   Yeah.  I think we switched to a different plan and would
21 make contributions for a defined contribution plan as opposed
22 to defined benefit plan.
23 Q   All right.  And under the defined benefit plan, the
24 vested benefits, no more contributions being made by the
25 city?

1   A   It would be a different plan.  That is correct.

2   Q   And is it correct that under the June 14 proposal the

3   pension contributions for retirees would be cut in their

4   entirety?

5   A   You know, Mr. Ullman, you keep saying "cut in their

6   entirety."  I don't want to give the wrong impression that

7   somehow there'd be no pensions under the prior plan.  When

8   you say "cut in the entirety" --

9   Q   Let me --

10  A   -- if you mean -- let me finish my thought -- if you say

11  "cut in their entirety," you mean that that plan would no

12  longer continue, then your statement is accurate.

13  Q   Well, I think what I was asking about was the pension

14  contributions which are made by the city.  The city would

15  stop making pension contributions for retirees; correct?

16  A   For retirees?

17  Q   For retirees.

18  A   Yes.

19  Q   I've turned -- I'm asking about retirees now.

20  A   Yes.

21  Q   So what I said is true, that the pension contributions

22  that had previously been made by the city on account of

23  retirees are shown under this proposal as being cut in their

24  entirety; right?

25  A   The city would no longer make contributions.  Here again,

1    for purposes of public concession, I don't want to say there
2    are not going to be pensions for retirees.  That's the only
3    difference.
4    Q    Okay.  So we're clear, I am not saying that there would
5    not be some ongoing pension amounts paid because of funds
6    that were already there.  I'm talking about contributions for
7    vested pensions being made by the city.  Under this proposal,
8    those are over; right?
9    A    With that clarification, yes.
10   Q    Okay.  And is it also correct that this proposal is
11   showing health benefits for retirees being cut entirely; in
12   other words, under the financials that are shown in this
13   proposal, there's no more line item showing that the city is
14   going to be paying out health benefits for retirees?
15   A    Well, it shows that the current benefit plan will be cut.
16   There will be payments made to some retirees with a stipend,
17   either 120 or $125 a month, but that plan will be cut, yes.
18   Q    Okay.  I was asking specifically about this document.  Is
19   there anything in this document that shows anything other
20   than the health benefit payments to retirees being cut?
21   A    No, but I want to be clear on the record and also clear
22   for the public.  The fact that it's not in this document
23   doesn't mean that that hasn't evolved, so let's not give a
24   bad impression.
25   Q    Mr. Orr --

1    A    The reality -- let me finish my thought.  The reality is

2    your statement is correct under this plan, but that has

3    evolved, and you know that.

4    Q    Mr. Orr, I would request that you confine your answer to

5    asking -- your answer to responding directly to my

6    question --

7    A    Um-hmm.

8    Q    -- as opposed to volunteering information or providing

9    extraneous information.

10             MR. ULLMAN:  Your Honor, if you could ask the

11   witness simply to respond, things would go more quickly.

12             THE COURT:  Please just respond to the question.

13             THE WITNESS:  Yes, your Honor.

14             MR. ULLMAN:  Thank you, your Honor.

15   BY MR. ULLMAN:

16   Q    So my question was that what's shown in this June 14

17   proposal shows healthcare payments that otherwise or in the

18   past had been made by the city to retirees being cut

19   completely; true?

20   A    Yes.  We would close a defined plan and change to a

21   different plan, yes.

22   Q    We're talking about healthcare.

23   A    Yeah, I understand.

24   Q    Okay.

25   A    I'm just saying -- I'm using those terms, yes.

1  Q   And so we're really clear, does this -- this specific
2  document, this June 14 proposal, actually show the city in
3  the future making any payments to retirees on account of
4  healthcare?
5  A   I don't believe it's contained in this document.
6  Q   Thank you.  And is it correct that under this proposal,
7  the June 14 proposal, that all the retirees would get is some
8  share of the notes that the -- the $2 billion or so in notes
9  that the City of Detroit would be issuing?
10 A   Yes.   That was the proposal.
11 Q   And is it correct that under the June 14 proposal,
12 there's no way to tell how much in cash value any retiree
13 would actually get if this proposal were accepted or
14 otherwise went through?
15 A   No.  The proposal was a proposal, and we asked for
16 responses, so, no --
17 Q   Again --
18 A   -- in the proposal there's no way to tell.
19 Q   Yeah.  If you could just answer the question, Mr. Orr,
20 I'd appreciate it.
21 A   I was doing that.  Under the proposal the answer is yes.
22 Q   Okay.  "Yes" in the sense that there is no way that
23 anyone would know -- there's no way to tell how much the
24 retirees would get in cash value; is that correct?
25 A   I think that's fair.

1  Q   Okay.  Now, this is June of 2013 that we're talking,

2  right, this proposal?

3  A   Yes, June 14th, 2013.

4  Q   And at this point in time, did you have any ability as

5  the emergency manager to actually impose the cuts on pension

6  benefits that we've shown are reflected in this proposal if

7  the retirees did not agree to it?

8  A   Unilaterally?

9  Q   Yes.

10 A   I want to be responsive.  I think it's fair to say --

11          THE COURT:  If you can't answer the question "yes"

12 or "no," just say that.

13          THE WITNESS:  Okay.  Please repeat your question.

14 BY MR. ULLMAN:

15 Q   As of this point in time -- and we're talking June 14,

16 June 2013 -- did you have any ability as the emergency

17 manager to actually impose the cuts on pension benefits that

18 are reflected in this proposal that we've discussed if the

19 retirees did not agree to it?

20          THE WITNESS:  Your Honor, that may call for a legal

21 conclusion, and I don't want to be evasive.

22          MR. ULLMAN:  I'm not --

23          THE WITNESS:  Pardon me.

24          MR. ULLMAN:  I'm not asking for his legal

25 conclusion.  I asked him what he believed, what he understood

1  his authority to be as emergency manager.

2          THE WITNESS:  Let me say this, Mr. Ullman.  I

3  believe that my authority under 436 by itself would not give

4  me that authority.

5  BY MR. ULLMAN:

6  Q   Is the answer to my question then "no"?  It's not that

7  tough.

8  A   No, it's not, but it implicates other things, but I'll

9  give a "no" --

10          THE COURT:  Well, I would say it's an extremely

11  tough question.

12          THE WITNESS:  Yeah.  I mean it --

13          MR. ULLMAN:  I never argue with the Court, your

14  Honor.

15          THE COURT:  I've got mountains of briefs to prove

16  it.

17          THE WITNESS:  Yeah.

18  BY MR. ULLMAN:

19  Q   But, again, Mr. Orr, we're just talking as of June 2013.

20  A   I understand the time frame we're talking, Mr. Ullman,

21  but the reason I'm -- I'm not trying to joust with you here.

22  The reason I'm trying to not follow your question with a

23  simple "yes" or "no" answer is because that's a large debate

24  as to what's required under 436, whether or not the

25  provisions of 436 somehow can be trumped or implicated by the

1   Constitution, and whether or not there's a federal law
2   overlay, so I want to be very careful.  I understand what
3   you're trying to ask me --
4   Q    Let me --
5   A    -- but -- let me finish my thought, please.  I understand
6   what you're trying to ask me, but I'm trying to relay to you
7   that it's a much more complex question.
8   Q    Okay.  And I'm specifically asking as of the June 2013
9   time frame because at this point in time the Chapter 9
10  petition had not been filed.
11  A    Yes.
12  Q    Okay.  So at this point in time, when the Chapter 9
13  petition had not yet been filed, did you have the ability, as
14  you understood it, as emergency manager, to actually impose
15  the cuts on the pension benefits that are reflected in this
16  proposal if the retirees did not agree to it?
17  A    I don't know.
18          MR. SHUMAKER:  I'm going to object.  Calls for a
19  legal conclusion.
20          THE COURT:  That objection is overruled.
21          THE WITNESS:  Yeah.  I don't know.
22  BY MR. ULLMAN:
23  Q    And did you address that question?  Did you analyze it?
24  A    Yes.
25  Q    Okay.  And did you take into account in your analysis the

1  pension clause?

2  A   Yes.

3  Q   Okay.  And isn't it correct that you understood that as

4  of June '13, again, prior to the Chapter 9 filing, that you,

5  as emergency manager, during that time frame, did not have

6  the ability to actually impose the cuts on pension benefits

7  if the retirees didn't agree?

8  A   I don't know.

9  Q   Okay.  Did you obtain legal advice on that from Jones

10 Day?

11 A   Yes, from a number of different sources, yes.

12 Q   Okay.  And what did Jones Day tell you?

13       MR. SHUMAKER:  Objection, your Honor.  Calls for

14 attorney-client communications.

15       MR. ULLMAN:  Fair enough.

16       THE COURT:  All right.  The objection is sustained.

17 BY MR. ULLMAN:

18 Q   Isn't it correct, Mr. Orr, that absent a consensual

19 resolution, the only way that the proposal set out in the

20 June 14 document could be implemented, if at all, was in the

21 context of a Chapter 9 filing?

22 A   No.  I don't know if that's correct.

23 Q   Okay.  And what other avenues did you think were

24 available to you, if any, again, putting aside a consensual

25 resolution or a Chapter 9 filing?

1  A    A court might conclude that under 436 I would have the
2  authority to achieve those results.
3  Q    Okay.  So was it your contention that under PA 436 you
4  were authorized without a Chapter 9 filing to take actions
5  that were in contravention of the pension clause of the
6  Michigan state Constitution?
7  A    Mr. Ullman, you're trying to get at this a different way.
8  Here again, there are a number of different potential legal
9  outcomes, and I want to be very careful.  Let me help you, if
10 I can, to try to move along.  Okay.  A bland reading of the
11 statute might get to your conclusion, but that ignores a
12 number of different factors that have to be analyzed and
13 concluded possibly by a court.
14 Q    I'm just asking your position, Mr. Orr.  Was it your
15 position, again, in the June 2013 time frame, that you had
16 some -- that the authorization that you had, the powers you
17 had under PA 436 enabled you to take actions that were in
18 contravention of the pension clause of the Michigan state
19 Constitution?
20 A    It's my position that 436 might have given me that
21 authority.
22 Q    Okay.  And is it -- was it your position that the state
23 legislature could amend the state Constitution simply by
24 enacting legislature -- or legislation that authorized state
25 actors to do things in contravention of the pension clause?

1  A   I don't know the answer to that question, Mr. Ullman.

2  That's a legal issue.

3  Q   Okay.  Now, nothing in -- but it was, nonetheless, your

4  position that you thought you could do things that were

5  specifically prohibited by the pension clause of the Michigan

6  Constitution; is that right?

7  A   That's a conclusion that you're making.  What I'm trying

8  to say to you is those were a number of legal issues that

9  were being analyzed, and sitting here today, I don't know

10 what the exact answer is.

11 Q   Okay.  Now, nothing in this document, this June 14

12 proposal, acknowledges -- well, let me ask you this question.

13 In the course of your analysis on that issue, did you

14 identify any case law that indicated to you that the

15 emergency manager had powers under PA 436 to take actions

16 that were prohibited by the Michigan Constitution?

17 A   Mr. Ullman, I'm not acting as an attorney in this job,

18 so, no, I did not identify any case law.

19 Q   Okay.  Is there any other authority that you can identify

20 that you recall having looked at?

21 A   Without getting into the content of the discussions,

22 there are discussions that I had with attorneys, but I would

23 not have done that research.

24 Q   Okay.  So I take it then at this point in time, the

25 implications and the restrictions of the pension clause in

1    the Michigan Constitution were something that you were

2    specifically focused on; is that right?

3    A    I was aware of it, yes.

4    Q    And you were aware that that was something that,

5    depending on how things ultimately turned out, could be

6    interpreted to prohibit your taking action that diminished or

7    impaired accrued financial benefits that were due to

8    retirees?

9    A    Yes.  I think that's a fair statement.

10   Q    Now, there's nothing -- going back to the June 14

11   proposal, is there -- we've talked about the effect that the

12   restructuring that's shown in here would have on the

13   pensions.  Is there anything in this June 14 proposal that

14   acknowledges that accrued pension benefits are protected

15   under the Michigan state Constitution?

16   A    I don't think so.

17   Q    Okay.  Now, I think you made some reference in your

18   testimony to how potentially there could be, you know,

19   thousands of individual retirees that might be affected by

20   this?

21   A    I think there are thousands of individual retirees.

22   Q    And you said that in theory -- at least in theory they

23   could come and make proposals or talk to you about this June

24   14 proposal; is that right?

25   A    Well, what we said was any party could come and make a

1  proposal, but we asked the unions early on would they
2  represent retirees.  They declined to do so, and so we said
3  we needed a Retiree Committee.
4  Q   Mr. Orr, you're really going well beyond what I asked
5  you, so I would just appreciate if you'd focus on my question
6  and answer it.  If you think my question is confusing, let me
7  know, and I'll be glad to rephrase it.
8  A   No.  I'm just trying to give you a complete answer.
9  Q   Okay.  And I just -- I would appreciate if you'd give me
10 an answer to the direct question.
11 A   I will.
12 Q   So, now, with respect to the retirees, you understood
13 that this was a document the retirees themselves,
14 individuals, might well have access to and look at?
15 A   We put it on the website, yes.
16 Q   Okay.  And you understand that retirees -- individual
17 retirees are not necessarily fully aware of all of the legal
18 provisions that exist in the State of Michigan?
19 A   Some may be; some may not be.
20 Q   Okay.  And given that you envisioned that this document
21 might be read by individual retirees, you still didn't see
22 fit anywhere in here to mention that one of the things this
23 proposal was doing, if it went through, is taking away
24 pension rights that were protected under the Michigan
25 Constitution?

1   A    I think we made a proposal and were offering solutions.

2   The proposal is what it is.

3   Q    Um-hmm.

4   A    I think the issue of retiree benefits had been fairly

5   widely discussed in a number of different forums.

6   Q    Um-hmm.

7   A    I think anybody could have come in with a

8   counterproposal.

9   Q    Okay.  And so in the interest of complete disclosure and

10  putting all the things on the table, you still didn't feel it

11  either necessary or appropriate to mention anywhere in

12  this -- is it a hundred-some-odd-page document that one of

13  the things that the proposal was proposing to take away were

14  pension rights that were specifically protected under the

15  Michigan Constitution?

16  A    I think we said that in the highlighted portion.

17  Q    That the pension rights were protected under the Michigan

18  Constitution?

19  A    No.  I think there must be significant cuts in accrued

20  vested pension rights.

21  Q    That wasn't my question.

22  A    If you're trying to get to the point as whether or not we

23  should have -- we should have said Michigan Constitution, I

24  think that was discussed quite broadly throughout this time

25  period.

1 Q   You're really still not answering my question, Mr. Orr.

2 Given the fact that in this document, this some -- hundred-

3 some-odd-page document that you said could be, you know, seen

4 and reviewed by retirees, and given that this document -- the

5 proposal, if it went through, would be taking away protected

6 pension benefits, you didn't see fit anywhere in here to

7 mention at all, even in passing, that the pension rights that

8 this proposal shows as being cut in their entirety were

9 specifically protected under the Michigan Constitution?

10 A   The protections of the Michigan Constitution are not

11 contained in this document.

12 Q   And you didn't think that's something that ought to be

13 mentioned, did you?

14 A   I think everybody knew that, Mr. Ullman.

15 Q   Okay.  So you didn't believe that that was something you

16 thought you needed or felt appropriate to mention in this

17 document; correct?

18 A   Mr. Ullman, it was quite public at that time that the

19 attorney general had taken a position on that point.  I think

20 everybody was aware of it.

21 Q   Okay.  And in light of that, is that the only reason you

22 didn't see fit to mention it?

23 A   No.  I think we mentioned what our proposal was, and

24 whether or not the intent to include the Constitution was a

25 decision that we made.

1  Q   Now, Chapter 9 isn't mentioned anywhere in this June 14

2  proposal either, is it?

3  A   I don't believe so.

4  Q   And isn't it correct that this proposal was made against

5  the context that if an agreement on the proposal wasn't

6  reached, the city would, in fact, be filing for Chapter 9?

7  A   I think I said on June 10th that I had a powerful

8  statute; that we have another powerful tool called Chapter 9,

9  but I don't want to use it, but we're going to have to make

10  some difficult decisions.

11  Q   So to go back to my question, is it correct that this

12  proposal was made against the context that if agreement on

13  the proposal wasn't reached, the city would file for Chapter

14  9?

15  A   No.

16  Q   Okay.

17  A   What we said was that the proposal was a proposal, and we

18  were looking for counteroffers and that we were going to have

19  to make some evaluations within the next 30 days; if we had

20  received agreements in principle and the like, we perhaps

21  might extend that, but the proposal does not say that if we

22  don't receive those agreements, we're going to file Chapter

23  9.

24  Q   Well, hadn't you publicly stated around this time that

25  the June 14 proposal -- around the time the June 14 proposal

1  was made that you intended to try to use Chapter 9 to try to
2  trump the state Constitution?
3  A   I think what I said at that time was that we had powerful
4  tools, as I said before on June 10th.  Chapter 9 was one of
5  them, but I didn't want to use it.
6  Q   Okay.  And didn't you state that one of the -- that the
7  state Constitution provision that you were trying to trump
8  was the pension clause?
9  A   I think I may have said at some point, either that time
10 or before, that I felt federal law would trump state law.
11 Q   Yeah.  Do you remember at your deposition I asked you
12 some questions about an interview you gave on June 14?
13 A   Yes, I believe you did.
14 Q   Okay.
15 A   I don't remember exact -- if you want to refresh my
16 recollection.
17 Q   Were you testifying truthfully when you gave your
18 testimony?
19 A   Yes.
20 Q   Okay.  And do you recall giving the following testimony
21 when I deposed you about one of the -- some of the things you
22 said on June 14?
23        MR. ULLMAN:  Do we have the clip?  It's around lines
24 113.
25     (Videotape of deposition at 11:19 a.m. as follows:)

1  BY MR. ULLMAN:

2          "You gave an interview that I'm sure you're

3          familiar with with the <u>Detroit Free Press</u> on or

4          around June 14th.  Do you remember?  I'll just tell

5          you what I believe you said, and you can tell me --

6          I'm sure you remember this one, and you can tell

7          me -- if not, I have the quote.

8          Yeah.  You can give me the quote.  There's so

9          many interviews, but I'll trust your quote.

10         Okay.  This is the quotation.

11         'Question:  You said in this report, referring

12         to the June 14th proposal, that you don't believe

13         there is an obligation under our state Constitution

14         to pay pensions if the city can't afford it.

15         Answer:  The reason we said it that way is to

16         quantify the bankruptcy question.  We think federal

17         supremacy trumps state law.'

18         Yes.

19         Okay.  You don't deny making that statement?

20         No.  I think I've said that several times.

21         Okay.  And the state law you were referring to

22         that you referred to as being trumped was Article

23         IX, Section 24, of the state Constitution; is that

24         right?

25         I believe so."

1     (Videotape concluded at 11:20 a.m.)

2   Q   Do you recall that testimony, Mr. Orr?

3   A   Yes, I do.

4   Q   Now, we're talking here -- this is June 14, the date of

5  your proposal.  Now, can you tell me -- refresh my

6  recollection.  I think you mentioned, but when exactly was it

7  that you had given your oath to uphold the Michigan

8  Constitution?

9   A   I think it was March 25th.

10   Q   Okay.  So that was within 90 days of June 14th; is that

11  right?

12   A   Yes.

13   Q   Now, prior to the June 14 proposal, did you make any

14  inquiries as to the size of the unfunded pension liability?

15   A   Yeah, I believe we did.

16   Q   Okay.  And who did you ask?

17   A   I believe I asked our consultants, principally Conway,

18  Ernst & Young, the entire crowd.

19   Q   Okay.  And who from Conway?

20   A   There are a number of people from Conway.  That team is

21  led by Chuck Moore, but I may have talked with Chris Gannon

22  and others.  We had regular conversations.

23   Q   Okay.  And the amount of the -- the size of the unfunded

24  pension liability isn't something that you have any personal

25  knowledge of, is it?

```
1   A    No.  Those calculations are made both by Gabriel, Roeder
2   and Milliman's review of Gabriel, Roeder's information, and
3   since Milliman has made an independent calculation.
4   Q    Okay.  Mr. Orr -- and I believe my question really called
5   for a "yes" or "no."  I simply asked whether the unfunded
6   pension liability was something you had personal knowledge
7   of.
8   A    Okay.
9             MR. SHUMAKER:  Again, your Honor, if he --
10            THE WITNESS:  Well --
11            MR. SHUMAKER:  -- could just say "yes" or "no" where
12  appropriate.
13            THE WITNESS:  But to the extent I've read the
14  reports, I have personal knowledge.
15            THE COURT:  Hold on.  I've been --
16            THE WITNESS:  Oh, I'm sorry.
17            THE COURT:  I've been asked to do something here.
18  The question is ambiguous, and I'm going to ask you to
19  rephrase it.
20            MR. ULLMAN:  Okay.
21  BY MR. ULLMAN:
22  Q    Did you have personal knowledge, based on work that you
23  yourself had done, analysis you yourself had done, as to the
24  size of the unfunded pension liability?
25  A    No.
```

1   Q   And, now, you indicated that you made inquiries as to the

2   size of the unfunded pension liability prior to making the

3   June 14 proposal; right?

4   A   Yes, I believe so.

5   Q   Okay.  And was there any further work on the actuarial

6   analysis that you recall being brought to your attention

7   between June 14th and the date of the Chapter 9 filing?

8   A   Yes.

9   Q   And what was the subsequent work that you recall being

10   done?

11   A   I don't remember the exact dates, but the basic

12   chronology was that Gabriel, Roeder, as part of the 2012

13   report, had done an analysis; that Milliman had done an

14   analysis of Gabriel, Roeder's work, and that Milliman either

15   was in the process of doing its own independent analysis or

16   had completed that.

17   Q   Okay.  Do you recall -- do you recall hearing a figure

18   for the unfunded pension liability of 3.5 billion at any

19   point in time?

20   A   Yes.

21   Q   When do you recall first hearing that?

22   A   I don't recall the exact date that I first heard that,

23   but I remember we had discussions in May, I believe.

24   Q   I'm sorry.

25   A   In May.

1  Q    In May.  Okay.  And was that prior to the filing of the
2  May 12th report that we looked at previously?
3  A    Yes, I believe so.
4  Q    Okay.  And as of May then -- that May report, based on
5  what you were told, did you believe that the 3.5 billion was
6  an accurate figure for the unfunded pension liability?
7  A    Yes.
8  Q    And did anything change on that between May and June 14?
9  A    No, I don't think so.
10 Q    Okay.  And did you -- did what you wrote in the May 12th
11 report accurately reflect the state of your knowledge as of
12 that date regarding the size of the unfunded pension
13 liability?
14 A    Yes.
15 Q    Okay.  So if we can turn back to Exhibit 407 -- okay.
16 Now, do you recall at the time that this proposal -- or this
17 report was written, do you recall whether this 3.5 billion
18 figure was being reported to you as something that was
19 preliminary in nature and not yet final or something that was
20 hard-fast and accurate?
21 A    I think we felt at this time that that was an accurate
22 analysis of the amount of the unfunded pension liability, but
23 we certainly had said throughout that time that there were
24 factors that went into that calculation that would be subject
25 to discussion.

1    Q   Um-hmm.  So at this point in time, was it your

2    understanding that as a fact the liability -- the unfunded

3    liability was $3.5 billion and has been determined to be that

4    figure by the Milliman actuarial firm?

5    A   Yes.  Based upon reasonable calculations, yes.

6    Q   Okay.  So if we look at page 3 of this document -- okay.

7    In the first full paragraph I'd like you to focus on the last

8    sentence.

9    A   Yes.

10   Q   Okay.  It goes on.  It says, "In addition, the city's

11   pensions are underfunded by at least 0.6 billion and perhaps

12   significantly more once appropriate actuarial assumptions and

13   current data are considered."

14   A   Yes.

15   Q   Was that an accurate reflection of the state of how you

16   understood things to be regarding the unfunded pension

17   liability as of the date this document was written?

18   A   Yes.  I think at that time we thought it was at least 600

19   million but probably more once you consider certain factors.

20   Q   Okay.  And, in fact, this one says "perhaps significantly

21   more"; correct?

22   A   Yes.  As I said, I don't remember the exact dates that we

23   were getting the calculations in, but we were looking over

24   the reports that had been made by Gabriel, Roeder and doing

25   our own analysis.

1  Q   Um-hmm.  And if we look at page 37 -- okay.  And if we

2  look at the top paragraph, there's a sentence that begins,

3  "As of June 30."  Do you see that?  We can pull that out,

4  just the "As of June 30" sentence.

5  A   Yes.

6  Q   All right.  And what that says is, "As of June, 30, 2011,

7  the most recent actuarial reports provided to the city by the

8  pension funds showed the pension UAAL" -- that's unfunded

9  actuarially accrued liabilities; right?

10 A   Yes.  And to be accurate, I think you have to read the

11 sentence right after that as well.

12 Q   I haven't -- I'm planning to.

13 A   Good.

14 Q   I just wanted to clarify what UAAL meant.

15 A   Yes.  That's what it means.

16 Q   Okay.  So it says the -- it showed the pension UAAL at

17 646 million.  Then it continues -- and please highlight the

18 next sentence as well -- "Using more current data and/or more

19 conservative assumptions could cause that deficiency to rise

20 into the billions of dollars."  You see that?

21 A   Yes.

22 Q   And does that also accurately reflect the state of your

23 knowledge as of the date that Exhibit 407 was prepared, which

24 is May 2003 (sic)?

25 A   Yes.  As I said before, I don't understand -- I don't

1  remember the specific dates that we were receiving data from

2  Milliman based upon Gabriel, Roeder or Milliman by itself,

3  but I think this is a fair characterization because that work

4  was ongoing.

5  Q   Okay.  And did -- what is --

6          MR. ULLMAN:  By the way, I would like to move to

7  strike everything in his last answer after the word "yes,"

8  your Honor, because I think --

9          THE COURT:  Any objections?

10          MR. SHUMAKER:  Your Honor, I think he was clarifying

11  his answer.

12          THE COURT:  The motion is granted.  If you are

13  unable, Mr. Orr, to answer a question "yes" or "no," please

14  say that.

15          THE WITNESS:  Okay.

16          THE COURT:  Otherwise, if it's a yes/no question,

17  just answer "yes" or "no" or "I don't know."

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  All right.  We're going to take our

20  break now for lunch, but before we do, please, I have to ask

21  you a question about your line of questioning of the witness

22  regarding the Michigan Constitution.  Is it your position

23  that the Michigan Constitution prohibits a city from even

24  asking its retirees to negotiate its retirement benefits in

25  such a way that might work an impairment?

1          MR. ULLMAN:  Subject to what my co-counsel says, no.

2     I don't --

3          THE COURT:  The answer to that question is no?

4          MR. ULLMAN:  No.  If they can ask?

5          THE COURT:  All right.

6          MR. ULLMAN:  No.

7          THE COURT:  We will break for lunch now.  We are

8     going to remain in place for a few moments so that Mr. Orr

9     can make his exit, and then we'll all go, so we'll be in

10    recess now, and you may go, sir.

11         THE WITNESS:  Thank you, your Honor.

12         THE CLERK:  All rise.  Court is in recess.

13       (Recess at 11:30 a.m. until 1:00 p.m.)

14         THE CLERK:  All rise.  Court is in session.  Please

15    be seated.  Case Number 13-53846, City of Detroit, Michigan.

16         THE COURT:  All right.  It appears that everyone is

17    here.  Sir, would you please stand and raise your right hand?

18              GOVERNOR RICK SNYDER, WITNESS, SWORN

19         THE COURT:  Please sit down.  And just so the record

20    is clear, we are interrupting the city's case to allow the

21    objecting parties to call this witness.

22         MR. WERTHEIMER:  Yes, your Honor.

23         THE COURT:  And you may proceed, sir.

24         MR. WERTHEIMER:  Thank you.  William Wertheimer,

25    your Honor, appearing on behalf of the Flowers plaintiffs.

1   Your Honor, before I begin questioning the governor, I would

2   request permission of the Court to examine him under Federal

3   Rule of Evidence 611(c)(2) -- that is, to ask leading

4   questions -- as I believe he is clearly a party -- a

5   witness -- excuse me -- a witness identified with an adverse

6   party.

7           THE COURT:  Any objections?

8           MR. SCHNEIDER:  No objections.

9           MR. SHUMAKER:  No objections, your Honor.

10          THE COURT:  All right.  Your motion is granted, sir.

11                      DIRECT EXAMINATION

12  BY MR. WERTHEIMER:

13  Q    Good afternoon, Governor.

14  A    Good afternoon.

15  Q    Thank you for appearing here this afternoon.  You are

16  appearing here pursuant to a subpoena that was issued by the

17  UAW, are you not?

18  A    I believe so.

19  Q    When were you elected governor?

20  A    January 1st, 2011.

21  Q    And when were you sworn in as governor?

22  A    Oh, I'm sorry.  I was sworn in January 1st, 2011.

23  Q    Okay.

24  A    I was actually elected in November of 2010.

25  Q    Okay.  And I've got in front of me the oath that I think

1  you swore.  I'm going to read it to you and ask you if you

2  recall swearing to that oath.  "I do solemnly swear that I

3  will support the constitution of the United States and the

4  constitution of this state, and that I will faithfully

5  discharge the duties of the office of governor according to

6  the best of my ability."  Do you recall that as being the

7  oath you swore to?

8  A    Yes.

9  Q    Did you know anything about Article IX, Section 24, of

10  the Constitution, the one that we've now all heard so much

11  about, relating to pension benefits of municipal employees at

12  the time you were sworn in as governor?

13  A    Yes.

14  Q    Do you have an understanding, Governor, as to how a

15  constitutional provision like that could be amended just

16  generally?  It's not a civics lesson, but -- and I'm --

17  A    Yes.

18  Q    Just generally.  Would you tell us?

19  A    Yeah.  It could go to a vote of the people.  It could be

20  an item that would be proposed as an amendment to the

21  Constitution and changed that way.  It could be put on the

22  ballot either by petition or by vote of the legislature.

23  Q    But you would agree with me that you do not have the

24  power to amend the state Constitution?

25  A    That's correct.

1  Q   Would it be fair to say, Governor, that at your

2  deposition and actually for some time before then, you have

3  taken the position publicly and at your deposition that while

4  you've been supportive of -- you've been supportive of

5  improved services for the citizens of the City of Detroit,

6  you have not been supportive of the notion of the repayment

7  of debts of the city, including any debt created by the

8  pension; is that correct?

9  A   Yes.

10  Q   And have you taken that position throughout your time as

11  governor?

12  A   Yes.

13  Q   And you've done so publicly?

14  A   Yes.

15  Q   Have you told Mr. Orr that that's your position in one

16  way, shape, or form?  In other words, does he know that

17  that's your position?

18  A   I couldn't speak to him -- I couldn't speak to his

19  presumption, but I had publicly made those statements.

20  Q   Did you ever make them in the presence of Mr. Orr?

21  A   I don't recall.

22  Q   How many times have you met with Mr. Orr since he became

23  emergency manager either one on one or in groups?

24  A   I would have to speculate.  It would be a reasonably

25  significant number.

1  Q   Well, let's try it this way.  How often -- from the time

2  he became emergency manager, how often would you regularly

3  see him?  Every week or two, every month?  Can you

4  characterize it like that?

5  A   Yeah.  Typically weekly.

6  Q   Weekly.

7  A   In terms of not necessarily in person but on the phone or

8  in person.

9  Q   Either on the phone or in person weekly?

10 A   Yes.

11 Q   Okay.  In any of those conversations, did the subject

12 come up of your position being that you did not want the

13 state to be obligated to pay any of the pension benefits at

14 issue in this case?

15 A   That would be a different question than my other

16 statements in the sense that I view that as a legal matter in

17 terms of if the court was deciding that we had a

18 constitutional obligation, then we would pay it.

19 Q   My question, Governor, was whether you had ever

20 communicated that to Mr. Orr in any of these meetings that

21 you've had with him weekly since he became emergency manager.

22 A   Those meetings would have had our legal counsel present,

23 where I was asking for their advice on topics such as that.

24 Q   So do I take that to mean that you're asserting the

25 attorney-client privilege as to that question?

1       MR. SCHNEIDER:  And I'm objecting on the grounds
2   that this question might implicate the attorney-client
3   privilege.
4       MR. SHUMAKER:  The city joins the objection.
5       THE COURT:  Well, no.  I think the witness can
6   testify to what he told Mr. Orr on this question.  Did you
7   ever tell Mr. Orr what your position was on whether the State
8   of Michigan has an obligation to pay the city's pension
9   obligations?
10      THE WITNESS:  What I told him was is I viewed that
11  as a legal question that I thought best left to the courts to
12  decide because anything else on my part would have been
13  speculative in the fact if I had an opinion, it would get
14  reviewed anyway, and I would rather have the most competent
15  people make that decision to start with.
16  BY MR. WERTHEIMER:
17  Q   Fair enough.  While we're on the issue of your
18  conversations with Mr. Orr during the period that he was
19  emergency manager, these weekly or so conversations, at your
20  deposition you refused to answer any questions related to
21  whether you discussed the specifics of Article IX, Section
22  24, of the Constitution in those meetings.  Does that remain
23  your position?
24  A   I think I made mention that it was an attorney-client
25  issue.

1  Q   Again, Governor -- I'm getting confused, Judge,

2  Governor -- I just need to know whether you can -- I don't

3  want to go through all those questions if that remains your

4  position.

5  A   It does, so the answer, yes.

6  Q   All right.  I believe you also asserted the attorney-

7  client privilege or your attorneys did at your deposition as

8  to those weekly meetings as it related to any discussions

9  between you and Mr. Orr relating to the potential filing of a

10  Chapter 9 proceeding; is that correct?

11  A   Yes.

12  Q   And that remains your position; that is, that because

13  attorneys were present either on the phone or in the room at

14  each of those meetings, as you recall, you are asserting the

15  attorney-client privilege?

16  A   Yes.

17  Q   Thank you.  I'd like to ask you a couple of questions

18  about other -- well, let me start with your involvement.  I

19  think we all know you have been involved since you became

20  governor with the financial problems that relate to the City

21  of Detroit.  You inherited that as an issue.  Would that be

22  fair?

23  A   Yes.

24  Q   And it was a big issue?

25  A   I'd describe it as the largest issue in our country.

1  Q   From day -- well, leaving aside the largest in our
2  country, it's been a big issue for you from day one.
3  A   This has been a large issue for 60 years.
4  Q   Okay.  When did -- and I think we all know that then
5  Treasurer Dillon has been involved in assisting you on that
6  issue; is that correct?
7  A   Yes.
8  Q   When did his involvement begin --
9  A   It would have --
10  Q   -- approximately?
11  A   It would have began when he became treasurer.
12  Q   Which was?
13  A   It would have been about the same time I took office or
14  shortly thereafter.
15  Q   Early 2011?
16  A   Yes.
17  Q   Would that be fair?  Okay.  We also heard some testimony
18  here that a Mr. Buckfire, an investment person, has been
19  involved in this issue on your behalf; is that -- or on the
20  state's behalf; is that correct?
21  A   I don't -- I wouldn't characterize it as on the state's
22  behalf.  Mr. Buckfire came several times and presented
23  information, and in some of those cases I didn't ask for him
24  to come, and I'm not sure of all the grounds, whether it was
25  with the treasurer or not, that they made the decision to

1    come.

2    Q    Who was he being compensated for for the work he was

3    doing at this early point, as far as you understood?

4    A    My understanding is he wasn't necessarily getting

5    compensated.

6    Q    He was just doing it?

7    A    There were a number of parties that during the course of

8    this -- that first year, in particular, that offered

9    unsolicited advice on Detroit.

10   Q    Okay.  Without going further with that, would it be fair

11   to say that Mr. Buckfire and the people who work for his

12   company were offering advice to the state?

13   A    They were presenting information to the state, yes.

14   Q    Not to the city.  As far as you knew, they were trying to

15   get your ear and Treasurer Dillon's ear.  Would that be fair?

16   A    I couldn't speak to that.  I also know -- I also believe

17   they were potentially talking to the city also.

18   Q    Well, but didn't you understand that they were talking to

19   the city as part of their efforts to help you out for the

20   state as opposed to being an independent actor for the city?

21   A    The way I would perceive it at that point in time, I

22   perceived it as they were more presenting information to

23   potentially get themselves hired for an engagement most

24   likely --

25   Q    Well, that's what I was getting to.

1  A   -- but not necessarily by the state or by the city.  I'm

2  not going to speculate on who.

3  Q   Okay.  Fair enough.  The Jones Day law firm, when did

4  they first get involved in assisting the state in dealing

5  with the problems relating to Detroit?

6  A   Again, you're making the statement in the same fashion

7  you did before.  I believe they were presenting information

8  to the state.  I don't believe -- they were not hired by the

9  state --

10  Q   Well --

11  A   -- to my knowledge.

12  Q   So you would assume that they were looking for business

13  also?

14  A   Yes.

15  Q   Okay.  And don't you think, as sophisticated as they

16  were, that they recognized, given all that was going on, that

17  it would be you or people at your end who would be calling

18  the shots relative to how the city's financial restructuring

19  ultimately took place?

20          MR. SCHNEIDER:  Objection.  Calls for speculation.

21          MR. WERTHEIMER:  I don't think it does.  It seems --

22          THE COURT:  If you can answer that question from

23  your personal knowledge, I'll permit it.

24          THE WITNESS:  I didn't believe that to be the case

25  because, in fact, the city ended up hiring Jones Day without

1   me making a statement.

2   BY MR. WERTHEIMER:

3   Q   You met with Jones Day and with Ken Buckfire in June of

4   2002 (sic), did you not?

5   A   I don't recall the specific meeting.

6            MR. WERTHEIMER:  Could you put up -- it's Retirement

7   Systems' Exhibit 844, the second page.

8   BY MR. WERTHEIMER:

9   Q   You should see this on your screen if it works, you know.

10  That's a letter that's in evidence in this case from Heather

11  Lennox at Jones Day to someone at her end where she's saying

12  that she's going with Ken Buckfire to talk to the governor in

13  Michigan tomorrow, and it's an e-mail dated June 5, 2012.  Do

14  you recall meeting with Heather Lennox and Ken Buckfire in

15  June of 2012?

16  A   I recall meeting with Mr. Buckfire.  I apologize to Ms.

17  Lennox, but I literally do thousands of meetings, so I don't

18  recall the specific meeting.

19  Q   Okay.  I won't get into identifications.  It's not that

20  kind of case.  Do you recall there being one or more Jones

21  Day lawyers there with Mr. Buckfire?

22  A   Yes.

23  Q   And they were together talking to you about ways that the

24  state could deal with the problem that you, as the governor,

25  faced vis-a-vis the City of Detroit.  Would that be fair?

1  A   Yes.

2  Q   If you look at that same document on the bottom where it

3  lists the attachments, there's an attachment -- a listing of

4  an attachment.  I'll skip the numbers, but it says, "City of

5  Detroit - Memo on Michigan Constitutional Pension Plan

6  Protections.DOC."  Do you see that?

7  A   Yes.

8  Q   Do you recall the Jones Day people or Buckfire at that

9  meeting talking to you about that issue?

10  A   No.

11  Q   That is, the constitutional pension plan protection?

12  A   No.

13  Q   You're not saying it didn't happen.  You're saying you

14  don't recall one way or the other whether it did?

15  A   Yeah.  I believe that's how you stated your question.

16  Q   It is.  It is.  It is.  Do you recall whether or not the

17  Jones Day attorneys provided you or any of your -- let me

18  back up.  Do you recall who was at this meeting?

19  A   I don't recall all the participants.  Generally the

20  treasurer, I believe --

21  Q   Okay.

22  A   -- and Ken Buckfire.

23  Q   Okay.  So Treasurer Dillon.  Would any of -- either of

24  your aides have attended in the normal course?

25  A   It would have been likely.

1   Q   Likely.  Okay.  Do you recall whether the Jones Day
2   lawyers -- excuse me -- provided either you or any of your
3   people there with any legal documents?  Did they share any
4   legal documents with you?
5   A   I don't recall legal documents.  I recall a PowerPoint
6   kind of presentation.
7   Q   Made by Jones Day?
8   A   No.  More Ken Buckfire.
9   Q   Okay.  Do you recall whether in the PowerPoint
10  presentation Mr. Buckfire referenced the constitutional --
11  the state constitutional provision relating to pensions in
12  any way, shape, or form?
13  A   Don't recall.
14  Q   Okay.  Again, you don't recall one way or the other?
15  A   That's correct.
16  Q   Sometimes my questions aren't as clean as they should be,
17  and I'm just trying to make sure that --
18  A   Okay.
19  Q   You were involved in the selection of Mr. Orr as
20  emergency manager, were you not?
21  A   Yes.
22  Q   Can you approximate when the process began that ended up
23  with the hiring of Mr. Orr?
24  A   The process generally would have started late '12, early
25  '13 in terms of looking for potential emergency manager

1   candidates as a contingency plan.

2   Q   Did you interview Mr. Orr?

3   A   Yes.

4   Q   Did you interview him more than once?

5   A   I believe so.

6   Q   How many times?

7   A   I recall a couple.

8   Q   Okay.  Did you interview anybody else?

9   A   Yes.

10  Q   How many people?

11  A   At least one.

12  Q   Okay.  During the interview process with Mr. Orr -- when

13  I mean process, I mean not just the interviews but any

14  communications you had with him up to the point he became

15  emergency manager -- did you discuss whether vested pension

16  benefits could be reduced or modified in a Chapter 9

17  proceeding?

18  A   I don't --

19  Q   Did you discuss that issue?

20  A   I don't recall.

21  Q   Do you recall discussing -- or do you recall discussing

22  with Mr. Orr in any of these preliminary discussions before

23  he became emergency manager anything regarding vested pension

24  benefits?

25  A   No.

1   Q   No, or "I don't recall"?

2   A   Again, I thought you --

3   Q   Well, again, I'm trying to fine-tune my question, and now

4   I confused you.  I'm sorry.

5   A   Well, I thought you started, as I recall --

6   Q   You don't recall any such conversations?

7   A   I was trying to get better and just do "yes" or "no" --

8   Q   Me, too.

9   A   -- to show I was a good listener.

10  Q   No.  You were.  Me, too, but we missed each other, you

11  know.

12  A   Okay.

13  Q   I switched, and you switched to say --

14  A   "I don't recall" would be the summary answer.

15  Q   Okay.  Thank you.  As part of the hiring of Mr. Orr, it's

16  true, is it not, that parts of his expenses are being

17  reimbursed by the NERD Fund, N-E-R-D Fund?

18  A   Yes.

19  Q   And what parts of his expenses?

20          MR. SCHNEIDER:  Objection as to relevance.

21          THE COURT:  What is the relevance?

22          MR. WERTHEIMER:  I think it goes to the potential

23  conflict issue; that is, I think that Mr. Orr is in a

24  position where he has the state paying expenses for him and

25  at the same time he has to make decisions relative to the

1  position he should take as to whether or not the state should

2  be obligated to do something relative to the city's pension

3  problems under Article IX, Section 24, of the Constitution.

4          THE COURT:  Is this fund a state fund?

5          THE WITNESS:  No.  It's a separate nonprofit that

6  was organized to help offset the cost of government.

7          THE COURT:  The objection is sustained.

8  BY MR. WERTHEIMER:

9  Q   I'm going to direct your attention now, Governor, to June

10 of 2013, the point in time when Mr. Orr was -- specifically

11 June 14th when he made a proposal.  You're familiar with the

12 June 14th proposal?

13 A   Yes.

14 Q   And I know you were asked about it at your deposition, so

15 you know what I'm talking about.

16 A   Yes.

17 Q   Okay.  Did you participate in the development of that

18 proposal?

19 A   I reviewed drafts of it.

20 Q   And suggested -- either you or one of your people

21 suggested changes in it, I would assume?

22 A   I don't recall.

23 Q   Okay.  But you do recall reviewing drafts of it?

24 A   At least one draft.

25 Q   And do you recall that that proposal included -- I'll

1  read from it -- apologize, Governor -- "Because the amounts
2  realized on the unfunding claims will be substantially less
3  than the underfunding amount, there must be significant cuts
4  in accrued vested pension amounts for both active and current
5  retired persons"?  Do you recall that as being part of his
6  June 14th proposal?
7  A   Yes.
8  Q   And in your review, did you suggest any changes in that?
9  A   No, because it was to be a mutual negotiation.  It was a
10  preliminary proposal.
11         MR. WERTHEIMER:  Your Honor, I would ask the witness
12  to simply respond to the question.
13         THE COURT:  You may.
14         MR. WERTHEIMER:  I didn't ask why.  I don't mean to
15  make a big deal, but I think it would go smoother.
16         THE COURT:  You may ask the witness that.
17         MR. WERTHEIMER:  Thank you.
18  BY MR. WERTHEIMER:
19  Q   Do you understand -- did you understand, Governor, that
20  at the time this proposal was being made, that the
21  retirees -- the proposal was that the retirees would get
22  treated as the other unsecured creditors in the language --
23  in the legal language would, including bondholders?  They'd
24  be treated the same way.  Would that be fair?
25  A   Yes.

1   Q   Did you understand at the time you looked at -- or

2   reviewed this proposal that the guarantees of pension

3   benefits that there are in this country relate to private

4   employees only under the Pension Benefit Guarantee

5   Corporation?  Did you understand that at the time?

6   A   Yes.

7   Q   In other words, you knew these people weren't being

8   protected by any federal program --

9   A   Yes.

10  Q   -- "these people" being the retirees and those with

11  vested benefits?

12  A   Yes.

13  Q   Did you also understand that the bondholders at least had

14  insurance, at least many of them did?  They were insured

15  bonds?

16  A   I was not clear on who had insurance and who did not.

17  Q   Well, you were clear on the fact that the individual

18  retirees didn't have insurance, weren't you?

19  A   Yes.

20  Q   Did you have any sense as to the impact these cuts might

21  have on individual retirees at the time you reviewed the

22  proposal?

23          MR. SCHNEIDER:  Objection.  Calls for speculation.

24  It's also not relevant.

25          MR. WERTHEIMER:  I'm just asking if he did or not,

1    your Honor.

2         THE COURT:  Again, if you can speak from personal

3    knowledge, I will accept your answer.

4         THE WITNESS:  I viewed that as speculation at that

5    point in time, in particular, that my understanding is the

6    funded part of the pension plan would not be involved, but

7    the unfunded was the part at issue.

8    BY MR. WERTHEIMER:

9    Q    Okay.

10   A    And that was a matter still to be determined.

11   Q    Did you understand what the range of the pensions were of

12   City of Detroit retirees; that is, how much money they would

13   receive if they were getting a full pension?

14   A    Not specifically.

15   Q    How did you understand it?  How generally, if you could

16   just identify it in any way that is consistent with what you

17   understood?

18   A    Well, they would get a monthly payment of so much per

19   month.

20   Q    Did you have a sense as to whether there were many of

21   them who were getting monthly payments of $10,000 or anything

22   like that amount?

23   A    That would be at the very high end.

24   Q    Okay.  Fair enough.  I'll drop it.  Did you know at

25   around this time -- I think it was before it, but I don't

1  have the time line in front of me.  You recall Mr. Orr making

2  a statement to the Detroit Free Press that got publicized

3  pretty widely that federal law would trump Article IX,

4  Section 24, of the Constitution.  Do you recall that being in

5  the papers?

6  A   I recall that from the questions that you and your

7  colleagues asked me from the deposition.

8  Q   Do you recall knowing that Orr had made a statement like

9  that at the point you were reviewing his -- what became his

10  June 14th proposal?

11  A   I accepted the fact you were making a truthful assertion

12  when you told me that.

13  Q   No, but did you know at the time?

14  A   I don't recall.

15  Q   You know, as you sit here, I suspect, that the Attorney

16  General has weighed in on this issue of the relationship

17  between the state constitutional provision and the bankruptcy

18  proceedings?

19  A   Yes.

20  Q   And you know that he has taken the position that in

21  bankruptcy Mr. Orr is obligated to honor Article IX, Section

22  24, in proposing a plan of adjustment, do you not?

23  A   Yes.

24  Q   And you know that Mr. Orr in no way, shape, or form has

25  indicated that he would be proposing any such plan of

1  adjustment, do you not?

2  A   Well, no plan of adjustment has been presented, so that

3  would be just speculative.

4  Q   Has Mr. Orr ever said anything either in your

5  conversations with him or that you've heard about secondhand

6  that would indicate that he has any intent to honor the state

7  constitutional provision when he proposes a plan?

8           MR. SCHNEIDER:  I would object to the extent that

9  this calls for secondhand conversation.  The governor would

10  not have firsthand knowledge of that.

11          THE COURT:  The objection is overruled.  What is

12  your answer, sir?

13          THE WITNESS:  Could we repeat the question?

14          MR. WERTHEIMER:  Can you repeat the question,

15  whoever is --

16          THE COURT:  We don't have that ability.

17          MR. WERTHEIMER:  Oh, I'm sorry.  I'll ask it another

18  way.

19  BY MR. WERTHEIMER:

20  Q   Has Mr. Orr ever communicated anything to you either

21  directly or indirectly that would indicate to you that at the

22  point he is going to propose a plan, that he is going to

23  propose a plan which would not adversely impact the retirees?

24  A   I have not discussed a specific plan with Mr. Orr in any

25  regard.

1    Q   Let me ask it another way.  Has Mr. Orr ever said

2    anything to you inconsistent with what he said to the <u>Detroit</u>

3    <u>Free Press</u> to the effect that he was going to use the federal

4    bankruptcy law to trump Article IX, Section 24, of the state

5    Constitution?

6    A   The question is those discussions would have been with

7    counsel present.

8    Q   So you're asserting the attorney-client privilege?

9    A   The way you stated that, yes.

10   Q   Okay.

11         MR. SCHNEIDER:  I'm objecting on privilege grounds

12   as well.

13         MR. SHUMAKER:  The city joins the objection.

14   BY MR. WERTHEIMER:

15   Q   When did you first learn that the attorney general was

16   going to take the position that he did?

17   A   On a phone call a couple days --

18   Q   And what --

19   A   -- a day or so ahead.

20   Q   A day or so ahead of his --

21   A   Filing.

22   Q   -- filing?  Okay.  And by "filing," to make sure we're

23   talking about the same thing, the filing he made in federal

24   court relative to his position at least on this issue?

25   A   Yes.

1  Q   Did you consult with the attorney general on this issue

2  of the interrelationship of Article IX, Section 24, of the

3  Constitution and bankruptcy anytime before this phone call?

4  A   I did not personally.

5  Q   Did you ask anybody on your behalf to do that?

6  A   No.

7  Q   Would it be fair to say that the call that he made to you

8  a day or two before was a courtesy call?

9  A   Yes.

10 Q   He was letting you know one politician to another that

11 I'm taking this position that may be adverse to you?

12 A   I wouldn't describe it as one politician to the other.  I

13 would describe it as the chief --

14 Q   I knew you wouldn't, and I apologize for framing it that

15 way.

16         THE COURT:  All right.  So restate your question,

17 sir.

18 BY MR. WERTHEIMER:

19 Q   Why don't just tell us what was said between you and

20 Attorney General Schuette --

21 A   Yeah.  The chief legal officer of the state called the

22 chief executive of the state to --

23 Q   Okay.

24 A   -- let me know he was --

25 Q   I accept your amendment.

1  A   -- he was going to file a brief or a position on this

2  issue, and I appreciated that, that he had his constitutional

3  responsibilities, as did I, and we respect other and are good

4  working colleagues.

5  Q   I'd like to move you now to a different subject, and that

6  is the Flowers and Webster lawsuits.  Do you recall being

7  asked about that at your deposition?

8  A   Yes.

9  Q   I'm going to ask you hopefully fewer questions than at

10 your deposition about that.

11 A   Thank you.

12 Q   You're welcome.  You learned of those lawsuits within a

13 day or so after they would -- let me back up.  I'll state for

14 the record that they were filed on July 3rd.  You learned

15 about their filings within a day or two, did you not?

16 A   I would assume so.  I know it was relative -- yes.

17 Q   Okay.  And you also learned at the same time or shortly

18 thereafter that the court had scheduled a hearing on

19 preliminary injunction requests in both of those two cases

20 for Monday, July 22nd, did you not?

21 A   I didn't recognize it as simply about preliminary

22 injunctions.  I believed it was simply a hearing on the

23 lawsuits, which could include preliminary injunctions.

24 Q   Let me read to you a question and answer from your

25 deposition and see if it's accurate, and I'm at page 125,

1  line 21.  "You did know" -- and I'm asking the question.

2  "You did know, did you not, shortly after those suits were

3  filed -- it was all over the papers -- that Judge Aquilina

4  was going to hold a hearing on whether to issue an injunction

5  Monday, July 22nd, did you not?"  Your answer was, "Yes."

6  A   No.  I was simply stating I believed it included that.  I

7  wasn't sure what else might have been in that hearing.

8  Q   Okay.  Fair enough.  And I believe your counsel -- do you

9  recall at your deposition we asked for the transmission --

10 the e-mail transmission of your authorization to Mr. Orr, and

11 there were a bunch of questions because the only transmission

12 that we had at the time was late in the evening or like seven

13 something p.m.?  Do you recall that?

14 A   Yes.

15 Q   And then later your counsel found the correct e-mail and

16 provided it to us.  Do you recall that --

17 A   I actually found it.

18 Q   -- learning that?  Oh, I'm sorry.  You found it?

19 A   Yes.

20 Q   Okay.  And at the end of the deposition, you said you

21 would, correct, that you would find it?

22 A   Yes.

23 Q   And you did?

24 A   Took me about 30 seconds once I got on my computer.

25 Q   Okay.  And your counsel sent them to us or you instructed

1   your counsel, I assume, to do that?

2   A   Yes.

3   Q   And do you recall that that transmission occurred at 3:47

4   p.m.?

5   A   Yes.

6   Q   So it was not until 3:47 p.m. that Mr. Orr got written

7   authorization from you to file the bankruptcy; correct?

8   A   Yes.

9   Q   Okay.  When did you first learn that Mr. Orr was

10  seriously considering filing Chapter 9?  When I say

11  "seriously," I mean to the point of preparing papers as

12  opposed to just generally having it out there as a

13  possibility.

14  A   It probably would have been about a week, in the time

15  frame of two or three to seven days or so before he sent his

16  letter to me.

17  Q   And he sent his letter to you on the 16th, so sometime

18  maybe between July 6 and the 16th, somewhere in there?

19  A   I couldn't speak to what specific day, but it was --

20  Q   I understand.

21  A   -- generally that time frame.

22  Q   Okay.  To your knowledge, did the state play any role in

23  drafting the request that Mr. Orr made?

24  A   Not to my knowledge.

25  Q   Do you know one way or another whether Mr. Orr sent a

1    draft of his request to somebody on your team to take a look

2    at and for input?

3    A    That would have been at meetings that would have had

4    counsel present.

5    Q    So you're asserting attorney-client privilege?

6    A    Yes.

7              MR. SCHNEIDER:  Objection based on attorney-client

8    privilege.

9              MR. SHUMAKER:  The city joins the objection.

10             MR. WERTHEIMER:  Your Honor, for the record, I

11   believe the privilege has been waived as to that based on a

12   document that the state voluntarily produced and waived the

13   privilege as to, but it is not a document to or from the

14   governor, so I'll delay examination relative to it.

15             THE COURT:  Okay.

16             MR. SCHNEIDER:  Of course, we object that there's

17   been no waiver.

18             MR. WERTHEIMER:  Understood.

19   BY MR. WERTHEIMER:

20   Q    And I think we know from your deposition that as late as

21   July 7th -- and let me back up.  I apologize.  If we're in

22   this week that ends up the 19th, let's say earlier that week,

23   if I can put you back there -- 15th is Monday, if I'm doing

24   it right.  You know that Judge Aquilina is going to hold a

25   hearing on an injunction request the following Monday, the

1  22nd; correct?

2  A   Yes.

3  Q   And you know -- without getting into all the legalese,

4  you know that the requests to Judge Aquilina are that she in

5  one way or another make sure that if you authorize a

6  bankruptcy, it will only be with a contingency that Article

7  IX, Section 24, be honored.  Would that be fair as to your

8  knowledge?

9  A   No, because I wouldn't speculate on what a judge is going

10 to do in doing the order or not doing the order or what they

11 might say in the order.

12 Q   Well, you had been -- you were served on July 3rd with

13 the complaint, the motion for preliminary injunction, the

14 brief in support, and the order to show cause, were you not?

15 A   I didn't personally receive all those documents.

16 Q   Fair enough, but your office was served on that day.  You

17 don't dispute that.

18 A   Again, I can't confirm nor dispute.  You have better

19 information on that than I do.

20 Q   Okay.  I mean for the record, we have documents showing

21 that that's the day, and we didn't serve you personally.  It

22 was served at --

23 A   My office.

24 Q   -- the Romney Building at your office where you kindly

25 always accept service.  Let me ask you this.  Did you at

1   least look at the complaint or talk to somebody about the
2   contents of these complaints generally to get an idea what
3   they were about?
4   A   That would have been subject to attorney-client
5   privilege.
6   Q   Okay.  Back to the beginning of the week.  We're at
7   Monday, the 15th.  If we move to Wednesday, the 17th, there's
8   a communications rollout document that we showed you at your
9   deposition.  Do you recall that?
10  A   Yes.
11  Q   Three- or four-page document showing a rollout of the
12  bankruptcy filing that went into a lot of events that would
13  occur before the filing; correct?
14  A   Yes.
15  Q   A bunch of events that would occur after it; correct?
16  A   Correct.
17  Q   Down to, you know, who you were interviewing with the
18  following Monday and stuff like that.  Am I -- is that
19  correct?
20  A   Yes.
21  Q   Okay.  And that document that we showed you that was
22  dated -- was dated the 17th, do you recall that?
23  A   Yes.
24  Q   So that's Wednesday, and on Wednesday the rollout listed
25  that the filing would occur on the 19th; is that correct?

1  A   Yes.

2  Q   And it didn't occur on the 19th, did it?

3  A   No.

4  Q   And we know, do we not, that the filing -- the actual

5  physical paper filing the bankruptcy had a typed in nine that

6  Mr. Orr at his deposition indicated he switched to an eight.

7  A   That's what you explained to me in the deposition.

8  Q   And you have no reason to dispute it, but you don't know

9  it of your own knowledge?

10  A   Yes.

11  Q   Would it be fair to say that the fact that you, Mr. Orr,

12  and others knew that a state court judge would be considering

13  whether she should be imposing conditions on you authorizing

14  a bankruptcy played a role in when you transmitted your okay

15  to Mr. Orr at 3:47 on the 18th?

16  A   I believe I explained this in my deposition that it was

17  more the filing of the lawsuits and the fact that bankruptcy

18  is a very last resort and that these actions showed that

19  there wasn't a meeting of the minds; that there was not going

20  to be a mutual understanding here to resolve this short of

21  bankruptcy.  And that was part of my decision-making process

22  to say when I was comfortable to sign a letter authorizing

23  bankruptcy, which was a tremendously difficult decision to

24  make but the right one given the circumstances.

25  Q   Fair enough.  Just one other question, I think, related

1  to that. When you said "lawsuits" in that answer, would you
2  have been referring to the <u>Flowers</u> lawsuit, the <u>Webster</u>
3  lawsuit, and by that time the third lawsuit filed by the
4  Retirement System?
5  A  Yes, and an expectation that there could be many other
6  lawsuits from debt holders and many other parties.
7  Q  Okay. Fair enough. But no other specific lawsuits other
8  than the three I identified?
9  A  Correct.
10 Q  I'm going to have you identify some documents, and then
11 I've got some questions as to one, and then we're done,
12 Governor.
13       MR. WERTHEIMER:  Could you put UAW 616 up?
14 BY MR. WERTHEIMER:
15 Q  Governor, can you confirm that this is an e-mail that you
16 received from Andy Dillon?
17 A  Yes.
18 Q  And that you read it on or around July 8?
19 A  Yes.
20 Q  And that it's part of the communications that went on
21 between you and your people relative to this issue of the
22 bankruptcy filing?
23 A  I'm not sure. That last question, me and my people --
24 Q  Well, I'm sorry. I apologize. It's an e-mail that
25 involves Mr. Dillon's role in helping you with the Detroit

1  problem.

2  A   Yes.

3          MR. WERTHEIMER:  Move for its admission.  I believe

4  that was not admitted.

5          MR. SHUMAKER:  Your Honor, the city objects on

6  hearsay grounds.

7          MR. WERTHEIMER:  It goes to the state of mind of the

8  state officers, the back and forth.  It's not being offered

9  for its truth as to any of the statements.  It's being

10  offered as to their state of mind.  Good faith is an issue.

11          MR. SHUMAKER:  Your Honor, state of mind is not at

12  issue.  This is for hearsay purposes.

13          THE COURT:  Well, technically what's it --

14          MR. WERTHEIMER:  I have one other point, your Honor,

15  and that is it's an admission.  We have a common interest

16  privilege asserted when they want to keep documents from us,

17  but they are not agents of each other for purposes of the

18  hearsay rule, so it's -- not only is it offered as state of

19  mind, not for its truth, but even were it offered for its

20  truth, it should come in as an admission.

21          THE COURT:  Well, what's at issue here in the

22  eligibility trial is the good faith of the city in filing the

23  case, so I would question how the good faith of the governor

24  is an issue at all.

25          MR. WERTHEIMER:  Your Honor, we will present

1    through --

2         THE COURT:  Could you do me a favor and pull that

3    microphone back closer to you?  I think it got knocked

4    somewhere in the meantime.

5         MR. WERTHEIMER:  Yeah.  I'm sorry.  We'll be

6    providing evidence indicating -- establishing that the state

7    helped Mr. Orr draft the July 16th request, so the idea that

8    we're going to in any way separate out state of minds here I

9    think just is counterfactual.

10        THE COURT:  Well, but how does this memo bear upon

11   the city's good faith at all?  That's the question.

12        MR. WERTHEIMER:  Well, I think that the city, with

13   all due respect to Mr. Orr, was acting at the behest of the

14   state.  I think that there is all kinds of evidence of that,

15   and there will be further evidence of it.  And given that, we

16   think that if -- pulling the strings may be a little strong,

17   but if the state is involved in that decision-making, the

18   state of mind of the two principal state actors, by the

19   way -- we're not offering, you know, someone at Department of

20   Treasury whose name we've got to look up.  This is Dillon to

21   Snyder.

22        THE COURT:  All right.  This is arguable.  I'll

23   permit it.

24        MR. WERTHEIMER:  Thank you.

25        MR. SCHNEIDER:  Your Honor, I have an objection,

1    however.  If this is to go to state of mind, this can't

2    possibly go to the governor's state of mind because this is

3    not a message sent from the governor.  This is sent from the

4    treasurer.  Not only that, but no one from the city is --

5              THE COURT:  Well, but who received it?

6              MR. SCHNEIDER:  The governor.  He received --

7              THE COURT:  Yeah.  That objection is overruled.

8              MR. WERTHEIMER:  Thank you.

9              THE COURT:  The document is admitted.  What's the

10   number again?  616?

11             MR. WERTHEIMER:  616, UAW 616.

12             THE COURT:  616 is admitted.

13        (Exhibit 616 received at 1:46 p.m.)

14             MR. WERTHEIMER:  Would you now show 615?

15             MR. SCHNEIDER:  Same objection, your Honor, on

16   hearsay grounds.

17             THE COURT:  You're objecting to 615?

18             MR. SCHNEIDER:  615.

19             THE COURT:  Okay.  Hold that until it's actually

20   offered.

21             MR. SCHNEIDER:  I'm sorry, your Honor.

22             MR. WERTHEIMER:  Can you blow up that a little bit

23   at the top?  Yeah, just there.  That's great.  Thank you.

24   BY MR. WERTHEIMER:

25   Q   Is that on your screen now, governor, the July 9 e-mail?

1   A   Yes.

2   Q   Okay.  And this is Andy Dillon to you, a response to

3   the -- or a follow-up to the e-mail of the day before?

4   A   Yes.

5          MR. WERTHEIMER:  Move for its admission again for

6   the same reason, your Honor.

7          MR. SHUMAKER:  Objection, your Honor.  Hearsay.  I'd

8   also like to ask if counsel is going to attempt to introduce

9   documents not in evidence already that they not be displayed

10  to you prior to you making a ruling as to their introduction.

11         THE COURT:  Well, that's interesting because

12  sometimes I actually need to see the document to see if it's

13  relevant, so I will not ask him to make that request.  And

14  you have your same objection, counsel?

15         MR. SCHNEIDER:  Yes, your Honor.

16         THE COURT:  All right.  Both objections are

17  overruled, and this document -- 615, did you say --

18         MR. WERTHEIMER:  Yes, your Honor.

19         THE COURT:  -- is admitted.

20         MR. WERTHEIMER:  Thanks.

21      (Exhibit 615 received at 1:47 p.m.)

22  BY MR. WERTHEIMER:

23  Q   I have just one other document to ask you about, and it's

24  not in evidence yet, so I'm going to -- we're going to do it

25  the old way.  I'm going to show you a hard copy, and then

1  I'll come back here and ask you some questions about it.  Do

2  you have that document in front of you, Governor?

3  A    Yes, 625.

4  Q    And who's Dennis Muchmore?

5  A    He's my chief of staff.

6  Q    And was he your chief of staff in July?

7  A    Yes.

8  Q    Okay.  And who is Mike Gadola?

9  A    He's the legal counsel to the governor.

10  Q    And who is John Roberts?

11  A    Deputy chief of staff.

12  Q    And Greg Tedder?

13  A    He's the state liaison to Kevyn Orr.

14  Q    And do I read this document right that this is an e-mail

15  that Mr. Gadola sent to Mr. Muchmore and Roberts and that

16  Muchmore then sent on to you?

17  A    Yes.

18  Q    And you received it on July 12th?

19  A    Yes.

20  Q    And you read it?

21  A    Yes.

22  Q    Both Mr. Muchmore's message and the underlying message

23  from Mr. Gadola?

24  A    Yes.

25  Q    And it does relate to your decision-making relative to

1  the decision to authorize?

2  A   I'm not sure I understand your question.

3  Q   Well, I'll stop at this point.

4        MR. WERTHEIMER:  I'd move for its admission at this

5  point, your Honor.

6        MR. SHUMAKER:  Objection.  Hearsay, your Honor.

7        THE COURT:  And that's number what?

8        MR. WERTHEIMER:  625.  And, again, I think we've got

9  the same arguments we had before, identical; that is --

10        MR. SCHNEIDER:  Same objection.

11        MR. WERTHEIMER:  Well, I won't repeat them, your

12  Honor, and I'd like to -- I mean obviously I'll be examining

13  the governor as to their content, but I thought it made sense

14  to move for their admission first.  I'm happy to answer --

15  ask any follow-up questions the Court thinks it needs.  And I

16  would also indicate for the record, your Honor, that --

17        THE COURT:  One second.

18        MR. WERTHEIMER:  I'm sorry.

19        THE COURT:  So, Governor, have you seen this e-mail

20  before?

21        THE WITNESS:  I've seen it before.  I'd like time to

22  read it again --

23        THE COURT:  Go ahead.

24        THE WITNESS:  -- if possible.

25        THE COURT:  Sure.  Go ahead.

```
 1              THE WITNESS:  Thank you.
 2              MR. WERTHEIMER:  Your Honor, while he's doing that,
 3    if I could inform the Court this was a document that was
 4    withheld based on attorney-client privilege.  It was
 5    privilege log Number 6 of the state's log.  It was produced
 6    as part of the agreement that the state and I ended up making
 7    relative to those privilege logs that we argued in front of
 8    this Court a couple days ago, and in producing it, they
 9    specifically waived in writing the attorney-client privilege.
10              THE COURT:  Thank you, sir.
11              MR. WERTHEIMER:  Yes.
12              THE COURT:  Did you receive this e-mail?
13              THE WITNESS:  Yes.
14              THE COURT:  All right.  The objections are
15    overruled, and Exhibit 625 is admitted into evidence.
16         (Exhibit 625 received at 1:52 p.m.)
17              THE COURT:  Can we get a couple more copies of this,
18    please?  Do you have --
19              MR. WERTHEIMER:  Yes.
20              THE COURT:  -- extras to provide?
21              MR. WERTHEIMER:  Yes, you can.  I've got a couple
22    here that are not marked 625.
23              THE COURT:  All right.  We'll take care of the
24    marking.  Don't worry about that.
25              MR. DECHIARA:  Your Honor, we're going to -- UAW is
```

 1 going to submit binders tomorrow that will have multiple

 2 copies of that exhibit.

 3          THE COURT:  Okay.  That'll work, too.  Thank you,

 4 sir.

 5 BY MR. WERTHEIMER:

 6 Q    All right, Governor.  My last round of questions is I'd

 7 like to go through the contents of this e-mail, specifically

 8 that part of it from Mr. Gadola ultimately to you, but

 9 indirectly to you.

10 A    Um-hmm.

11 Q    Okay.  On the third line he indicates, Mr. Gadola does,

12 that he spoke to Rich this morning.  In context, would I be

13 right in suspecting that that would be Rich Baird?

14 A    I would assume so.

15 Q    Okay.  And Andy would be Andy Dillon?

16 A    Yes.

17 Q    And LG would be the lieutenant governor?

18 A    Yes.

19 Q    And who is the lieutenant governor, for the record?

20 A    Brian Calley.

21 Q    And one of the things that Mr. Gadola is communicating to

22 you is that Baird is now in favor of a more deliberative

23 approach at your end; correct?

24 A    He's stating what Rich Baird's view is.

25 Q    Yes.

1   A   Yes.

2   Q   Fair enough.  By the way, would it be correct -- if I

3   could move you off the document for just a minute, would I be

4   correct in recalling from your deposition that the only

5   investigation you did of the -- Orr's request on the 16th

6   related to assessing the lawsuits and taking his word for

7   some of the content of that letter; is that right?

8           MR. SCHNEIDER:  Objection, your Honor.  That's not a

9   correct statement, I believe, of what was taken at the

10  deposition.

11          MR. WERTHEIMER:  Well, it may not be, your Honor.

12  If I can go back, I'll get the correct statement.  I don't

13  want to -- I have no intention of misrepresenting.

14  BY MR. WERTHEIMER:

15  Q   I think I'm going to have to read a couple of questions

16  and answers to get this in context, if you'll bear with me,

17  because I want to make sure I'm accurate.  There was a

18  question, and this is on page 77, line 20.  "And did you

19  undertake any independent investigation or cause to be

20  undertaken any independent investigation to determine

21  whether, in fact, Mr. Orr's representation to you that there

22  had been" --

23          MR. SCHNEIDER:  Your Honor, I object.  There's no

24  foundation for this.  If he wants to ask the governor a

25  question, that's fine, but that's not what's going on here.

1          THE COURT:  The objection is sustained.  Just ask
2    the governor a question.
3          MR. WERTHEIMER:  All right.
4    BY MR. WERTHEIMER:
5    Q   Tell me what investigation you took between July 16th
6    when you received the Orr request and July 18 when you sent
7    the authorization back?
8    A   I actually asked and built in additional time to think
9    about it because of the consequence of this in terms of
10   decision-making process, so I had them expand the calendar
11   originally through that process to give me an extra night or
12   so to sleep on something like this and to go through my
13   process.  And I went back -- and I know you didn't care for
14   this last time, but literally I went back to since the time I
15   became governor walking through the entire process with Mayor
16   Bing about the prior review cycle at the end of 2011, 2012,
17   about the consent agreement.  I reviewed the other financial
18   review team reports.  I reviewed his 45-day report.  I
19   reviewed his proposal to creditors.  So I didn't go out and
20   find independent parties to do this, but I reviewed the file
21   and went back through the decision-making process to
22   recognize this was two and a half years of effort, and
23   basically then I made a decision.
24   Q   Fair enough.  And in fairness to you, I think I broadened
25   in my question what you were asked.

1   A    Yeah.

2   Q    And let me go down to the next question and answer, and I

3   think that --

4   A    Um-hmm.

5   Q    -- where we're only talking about -- or the question only

6   relates to the good faith negotiations, and I apologize for

7   being broader than I should have been.  At page 78, line 14,

8   this is --

9         MR. SCHNEIDER:  Same objection, your Honor.  He's

10  just reading the transcript.

11        THE COURT:  If you're trying to impeach the witness,

12  that's fine, but otherwise just ask a question.

13        MR. WERTHEIMER:  Okay.  Fair enough.

14  BY MR. WERTHEIMER:

15  Q    Would it be true, Governor, that the only thing you did

16  to check out the assertion that there had been -- there had

17  been good faith negotiations was to take a look at the

18  lawsuits or that issue and accept what Mr. Orr had in his

19  July 16th letter?  Did you do anything else relative to the

20  assertion that there had been good faith negotiations?

21  A    Well, I'd gone through multiple meetings where attorneys

22  were present where I would get updates on how meetings had

23  gone, and it wasn't just Mr. Orr.  Mr. Dillon was present and

24  those -- and other people that were monitoring this process.

25        MR. WERTHEIMER:  Well, your Honor, then I would

1  offer two questions and answers to impeach, and this is page

2  78, line 14, through 78, line 21.

3  BY MR. WERTHEIMER:

4  Q   "Question:  So just so I understand your answer, your

5  acceptance of the truth of the assertion that there had been

6  good faith negotiations were based on what you read in the

7  July 16th letter" -- "Uh-huh" -- that was the answer --

8  "Question:  -- and also the fact that certain lawsuits had

9  been filed?"  "Answer:  Yes."  "Question:  Was there anything

10  else that you relied on to conclude that there had been good

11  faith negotiations?"  "Answer:  No."  Were those answers

12  truthful?

13  A   Well, I don't see the difference because in the letter --

14  Q   I'm not suggesting there is.

15  A   Okay.

16  Q   I'm just asking the question whether those answers were

17  truthful, Governor.

18  A   Yeah, in the context of he cited meeting dates that were

19  during the process where we had other meetings going on, and

20  I got updates.

21  Q   Fair enough.  Let's go back to 625.  The next sentence,

22  "Am I right in understanding that it's not just Baird, but

23  it's now Dillon and the lieutenant governor who are on board

24  with a more deliberative approach?"

25  A   That's what this e-mail says.

1  Q   And then what they suggest is you writing a letter back

2  to Mr. Orr and then the process continuing from there; is

3  that correct?

4  A   That's, again, what this e-mail says.

5  Q   Let's go to the next paragraph of the letter -- or I'm

6  sorry -- of the e-mail.  Mr. Gadola then says, "I favor this

7  approach for a number of reasons, but primarily because I

8  think we should exercise the governor's ability under PA 436

9  to include conditions upon his authorization for a bankruptcy

10 filing."  Do you recall receiving that opinion from your

11 attorney, Mr. Gadola, through this e-mail?

12 A   I saw it through this e-mail, and I had other

13 confirmation of that.

14 Q   In fact, it was your office that was instrumental in

15 getting the contingency language put into 436; isn't that

16 true?  That is, the Governor's Office.  I'm jumping around,

17 and I apologize.  We took a -- we took a deposition of the

18 state official from Treasury, who was authorized to speak for

19 the state about the issue of who was doing what relative to

20 the passage of 436.

21         THE COURT:  Counsel, it's not appropriate to advise

22 one witness of what another witness has said --

23         MR. WERTHEIMER:  I'm just trying --

24         THE COURT:  -- when they are sequestered.

25         MR. WERTHEIMER:  I understand, your Honor.  I'll

1  drop it.

2  BY MR. WERTHEIMER:

3  Q   Mr. Gadola specifically mentions vested pension benefits,

4  does he not?

5  A   Yes.

6  Q   And it's in the context of talking or recommending to you

7  that you put contingencies on a bankruptcy filing; correct?

8  A   I'm not sure what sentence you're looking at.  The one

9  I'm looking at said "could also include."

10  Q   Yes.

11  A   So it doesn't imply he's saying it has to but could

12  include.

13  Q   That's right, could include, but what -- the overall --

14  A   And it talks --

15  Q   -- subject of this paragraph is the contingency issue;

16  isn't that right?

17  A   It talks about vested pension benefits, GO debt,

18  disposition of assets, and assets greater than a certain

19  amount.

20  Q   Fair enough.  I didn't ask about those, but it does say

21  other things; correct?

22  A   Yes.

23  Q   Okay.

24       MR. WERTHEIMER:  I have nothing further subject to

25  checking with my co-counsel.  I have no further questions,

1   Governor.  Again, thank you for your time.

2           MR. DECHIARA:  Good afternoon, your Honor.  Peter

3   DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

4   the UAW International Union.

5                       DIRECT EXAMINATION

6   BY MR. DECHIARA:

7   Q   Good afternoon, Governor.

8   A   Good afternoon.

9   Q   Governor, did Mr. Orr send a draft of his July 16th

10  letter to you before he sent the actual letter on July 16th?

11  A   I don't recall that.

12  Q   Do you know whether he sent a draft of the letter to your

13  staff?

14  A   I don't recall.

15  Q   Do you know whether he sent a draft of the letter to Mr.

16  Dillon?

17  A   I don't recall.

18  Q   Do you know if he sent a draft of the letter to Mr.

19  Dillon's staff?

20  A   I don't recall.

21  Q   Okay.  Now, it's true that you were sent a draft of the

22  June 14th proposal to creditors; correct?

23  A   Yes.

24  Q   And you reviewed it?

25  A   Yes.

1  Q   And you gave feedback on it; correct?

2  A   I don't recall much feedback on it.

3  Q   Well, do you recall giving feedback?

4  A   No.  I don't recall specific feedback.

5  Q   I'm not asking you whether you recall specific feedback.

6  Do you recall giving any feedback?

7  A   I recall letting him know I read through it.

8  Q   But no feedback?

9  A   No.

10  Q   Do you recall giving a deposition on October 9th, 2013,

11  in this proceeding?

12  A   Yes.

13  Q   And did you testify truthfully at that deposition?

14  A   Yes.

15  Q   I'd like to refer you to page 61 of the deposition, line

16  1.

17              "Question:  Okay.  Did you comment on the draft?

18              Answer:  I generally reviewed it and just gave

19          general feedback."

20      Does that refresh your recollection about whether

21  you gave feedback on the draft?

22  A   Yeah.

23  Q   Did you give feedback on the draft?

24  A   Well, again, just general comments, thanks for sending me

25  the draft.

1  Q   And you saw in the proposal, did you not, that there was

2  language that said that there must be significant cuts to

3  accrued pension liabilities?

4  A   Yes.

5  Q   Okay.  Did you raise any -- did you comment on that

6  language?

7  A   No.

8  Q   Okay.  So by that answer, I assume you did not say to

9  Mr. Orr or to his staff that you opposed that position;

10 correct?

11 A   In their presentation in the draft in the way they

12 described it to me, this was just the opening to describe the

13 factual situation to start a dialogue with creditors.

14 Q   That's not my question.  Let me ask this question.  Did

15 you say to Mr. Orr or his staff that you opposed the position

16 that was laid out in the proposal that said that there must

17 be significant cuts to accrued pension liabilities?

18         MR. SCHNEIDER:  I object to any question that might

19 be leading us into the area of attorney-client privilege,

20 which I believe this may be.

21         MR. DECHIARA:  Your Honor, there's been absolutely

22 no testimony that there are any lawyers involved, and even if

23 there were, the governor commenting on the proposal --

24 there's already been testimony on it.  And in any event, it's

25 not -- doesn't go to attorney-client privilege.

1          THE COURT:  The objection is overruled, but having

2  said that, counsel, I would ask you and caution you not to

3  ask the very same questions that Mr. Wertheimer asked.

4          MR. DECHIARA:  Your Honor, I'll try my best.  I

5  really will.

6          THE COURT:  I must insist on it.

7          MR. DECHIARA:  I will try my best.  Let me ask the

8  same question.

9          THE COURT:  Okay.  I'm going to assume you didn't

10  mean that.

11          MR. DECHIARA:  Oh, your Honor, I don't believe there

12  was any -- this was asked on the prior examination, and I

13  think this is -- I don't recall --

14          THE COURT:  Okay.  I'll give you --

15          MR. DECHIARA:  -- this being asked on the prior

16  examination.

17          THE COURT:  I'll give you one more shot.  Go ahead.

18          MR. DECHIARA:  Okay.  Thank you.

19  BY MR. DECHIARA:

20  Q   Governor, did you say anything to Mr. Orr after you

21  reviewed the June 14th creditors' proposal that you objected

22  to the position that was set out there, namely that there

23  must be significant cuts to accrued pension liabilities?

24  A   Again, there would have been attorneys present, but I'm

25  confused enough now where --

1        THE COURT:  Well, if you are claiming the privilege,

2   we will deal with that.  Is that your claim, sir?

3        MR. DECHIARA:  Your Honor, I believe you overruled

4   counsel's attorney-client objection, so is -- are you

5   sustaining the governor's objection?

6        MR. SCHNEIDER:  Renewing my objection, your Honor.

7        MR. DECHIARA:  You're withdrawing it?

8        THE COURT:  Okay.

9        MR. SCHNEIDER:  I'll renew it.

10        THE COURT:  Hang on.  Hang on.  All right.  So I

11   already permitted testimony on this, and, if so, why are we

12   asking the question again?

13        MR. DECHIARA:  The question has not been answered.

14   My recollection of the sequence of events was I asked the

15   question, counsel objected, you overruled the objection.  I

16   asked the question again.  The witness objected.  So I think

17   that's where we are.

18        THE COURT:  No, but when Mr. Wertheimer was

19   questioning, wasn't this exact question asked?  In fact,

20   after the attorney-client privilege was overruled, I asked

21   the question.  Let's move on here.

22        MR. DECHIARA:  Should I not ask the question, your

23   Honor?

24        THE COURT:  Let's move on.

25        MR. DECHIARA:  Okay.

1  BY MR. DECHIARA:

2  Q   Governor, do you support -- at the time you read that

3  language in the proposal, did you support -- do you agree

4  with that position that there must be significant cuts in

5  accrued pension liabilities?

6  A   No.

7  Q   You do not agree with that position?

8  A   Again, I think it's speculation at this point in time.

9  Q   I'm asking you at the time that you read the proposal,

10 did you agree with what was set out in the document?

11 A   It used the word "must," and it was to go through a

12 negotiation process, so good faith parties could come up with

13 any arrangement they wanted to.  Again, the numbers could be

14 difficult to get there, but to say it's impossible, I

15 couldn't say that.

16 Q   Let me try to simplify it.  Do you agree with the

17 position that there must be -- as you sit here today, do you

18 agree with the position that there must be significant cuts

19 to accrued pension liabilities?

20 A   Again, that's one of the issues in Chapter 9.  I view

21 this as not a matter of speculation.  It depends on the plan

22 and the judge's approval.

23 Q   I'm not asking for any speculation.  I'm asking if you

24 agree with that position.

25 A   Well, again, there's no plan been submitted yet.

1  Q   I'm asking if you agree with that position, Governor.

2  A   I don't necessarily know there have to be, and, again,

3  it's not my decision to make that call.

4  Q   Did you believe -- when you received the July 16th

5  request by Mr. Orr for permission to file for bankruptcy,

6  there was reference to the June 14th creditors' proposal in

7  it, was there not?

8  A   Yes.

9  Q   Okay.  And you approved the request to file for

10  bankruptcy; correct?

11  A   Yes.

12  Q   Okay.  Did you undertake any investigation before you

13  approved the filing for bankruptcy of what impact that

14  proposal would have on the retirees of the City of Detroit?

15  A   Yes.

16  Q   What investigation did you undertake?

17  A   Well, not investigation, but understanding from the

18  creditors' proposal it would have a dramatic impact, but also

19  the points in Mr. Orr's letter -- he pointed out why the

20  creditors' proposal didn't appear to be feasible.

21  Q   Did you know the -- when you approved the bankruptcy

22  filing, did you know the extent of the cuts to pension

23  liabilities that were being proposed by Mr. Orr?

24  A   Again, they were contingent, so it could have been any

25  amount of numbers, and it was subject to negotiation.

1    Q   So you didn't know how much Mr. Orr -- when Mr. Orr said

2    there must be significant cuts, you didn't know what he had

3    in mind in terms of the extent of the cuts, if he had

4    anything in mind.  Is that a fair statement?

5    A   Yes.

6    Q   Did you ask Mr. Orr before you approved the bankruptcy

7    filing how much he intended to cut people's -- retirees'

8    pensions?

9    A   Those would have been in meetings subject to attorney-

10   client privilege.

11   Q   So are you refusing to answer the question on attorney-

12   client privilege?

13          MR. SCHNEIDER:  Objection based on attorney-client

14   privilege.

15          MR. DECHIARA:  Your Honor, are you sustaining the

16   objection?

17          THE COURT:  Would you like to be heard on whether

18   it's an appropriate claim of privilege?

19          MR. DECHIARA:  Yes.  I don't think just the fact

20   that there were attorneys present makes the communication

21   between the governor and the emergency manager privileged.

22   It doesn't deal with a legal issue.  It's just a question

23   about whether he inquired of Mr. Orr.  It goes directly to

24   the question of authorization.

25          THE COURT:  Well, I assume it's relevant, but that

1   doesn't make it any less protected by the attorney-client

2   privilege.  If there were attorneys there, I will sustain the

3   claim of privilege.

4   BY MR. DECHIARA:

5   Q   Before you approved the bankruptcy filing, apart from

6   the --

7            THE COURT:  By the way, as a matter of procedure,

8   counsel, when the witness claims privilege, there's no need

9   to object on the grounds of privilege.  If counsel wishes the

10  witness to be compelled to answer in the face of the claim of

11  privilege, he will make such a motion, and then you'll be

12  heard.

13           MR. SCHNEIDER:  That's fine, your Honor.  Thank you.

14  BY MR. DECHIARA:

15  Q   Did you understand that the proposal provided that in

16  exchange for the cuts in accrued pension liabilities the

17  retirees would get certain notes?

18  A   Yes.

19  Q   Okay.  And did you know what the value of those notes

20  would be that the retirees would get?

21  A   I knew the principal amount of the notes.

22  Q   But did you know how much the value of the notes would be

23  that the retirees would get?

24  A   Not to a specific number.

25  Q   Okay.  Did you have any idea?

1  A    It would be a significant discount for the unfunded part
2  of the obligation.
3  Q    Was it your understanding that the notes would be
4  interest only; in other words, that the retirees would not
5  have an entitlement to receive principal on the notes?
6  A    I don't recall.
7  Q    You didn't know that?
8  A    That's different than "I don't recall."
9  Q    Okay.  So let me clarify the question.  Did you know at
10 the time that you approved the bankruptcy filing whether or
11 not the notes would be interest only?
12 A    Again, that's where I don't recall.
13 Q    You don't recall whether you knew or not?  Is that your
14 answer?
15 A    I don't recall what the notes said specifically in terms
16 of their terms other than understanding there was a
17 contingent note.
18 Q    Did you, before you approve the bankruptcy filing,
19 undertake -- apart from anything you said to Mr. Orr,
20 undertake any investigation or have any investigation
21 undertaken for you to assess how much the cuts in pension
22 liabilities would impact the retirees?
23        THE COURT:  Asked and answered, your Honor, and I
24 believe Mr. Wertheimer also went into this area.
25        MR. DECHIARA:  I'll strike that question.

1  BY MR. DECHIARA:

2  Q   Did you investigate how much an average retiree of the

3  City of Detroit receives annually in retirement benefits?

4           MR. SCHNEIDER:  Again, your Honor, asked and

5  answered.  We're covering the same ground.

6           MR. DECHIARA:  I don't believe it was, your Honor.

7           THE COURT:  I'll permit this one.  Go ahead, sir.

8  Please answer.  Did you do such an investigation?

9           THE WITNESS:  I had seen accounts in the press of

10  what pension benefits were for a number of the retirees.

11  BY MR. DECHIARA:

12  Q   And did you rely on those accounts in the press?

13  A   Some of them, yes.

14  Q   Okay.  Did you undertake any investigation -- given the

15  powers of your office and the resources at your disposal, did

16  you undertake or have an investigation undertaken to

17  determine the annual average pension benefits received by

18  retirees?

19  A   No.

20  Q   You just -- whatever -- you just read about it in the

21  newspaper.  Is that your testimony?

22  A   Again, there would have been meetings subject to

23  attorney-client privilege.

24  Q   I'm not asking anything about meetings or attorney-client

25  privilege.  I'm asking you did you rely on what you read in

1  the newspaper?

2  A    I had other information that would have been in meetings

3  provided to me where attorneys were present.

4  Q    And what was your understanding of the average annual

5  pension benefit received by a retiree?

6  A    Again, it would have been in the thousand to $2,000-a-

7  month range.

8  Q    Okay.  So about 12,000 to 24,000 annually; is that -- am

9  I doing the math right?

10 A    Sounds like it.

11 Q    Okay.  Did you do any investigation or cause any

12 investigation to be undertaken whether a retiree whose

13 pension is between 12 and $24,000 a year, if significant

14 amounts of that income was cut, whether the retirees would be

15 able to pay their mortgages or pay their rent necessary to

16 stay in their homes?

17          MR. SCHNEIDER:  Objection.  Relevance.

18          MR. DECHIARA:  Your Honor, the governor approved the

19 bankruptcy filing based on -- he said he read the proposal --

20 based on the proposal.  I'm trying to inquire into the state

21 of the governor's knowledge when he approved the bankruptcy

22 filing.  I think to say -- let me just say this.  To say

23 that -- these questions all go to the impact that these cuts

24 that Mr. Orr has proposed and that the governor knew about

25 and that the governor approved -- to say that the impact of

1  these cuts are going to have on the retirees and whether

2  they're going to be able to put food on the table and pay

3  their rent --

4        MR. SCHNEIDER:  Objection, your Honor, to --

5        MR. DECHIARA:  To say that's irrelevant to this

6  proceeding --

7        MR. SCHNEIDER:  -- not only --

8        THE COURT:  I need to hear the response to your

9  objection, sir.

10       MR. SCHNEIDER:  I believe he's testified --

11       MR. DECHIARA:  To say that's irrelevant to this

12  proceeding I think is incorrect.

13       THE COURT:  Well, but your objection to eligibility

14  is that this bankruptcy will impair the pensions regardless

15  of their impact; right?

16       MR. DECHIARA:  I'm sorry, your Honor.

17       THE COURT:  Your objection to eligibility here is

18  that pensions will be impaired regardless of their impact.

19  Yes?  Yes?

20       MR. DECHIARA:  We object to any impairment of

21  accrued pension liabilities.  That's correct.

22       THE COURT:  All right.  So it's not on the grounds

23  of impact.  Its on the grounds of the Constitution.  Yes?

24       MR. DECHIARA:  Correct, but that's not our only --

25       THE COURT:  All right.  So the objection is

1    sustained.

2    BY MR. DECHIARA:

3    Q    You testified earlier that since Mr. Orr has been

4    emergency manager, you've had regular meetings with him;

5    correct?

6    A    Yes.

7    Q    And those are both meetings in formal settings without

8    other advisors present, other staff and advisors present, and

9    also one-on-one meetings; correct?

10   A    Yes.

11   Q    In Mr. Orr's July 16th letter to you requesting

12   permission to file bankruptcy, he asserted, did he not, that

13   there were $3.5 billion in accrued pension liabilities that

14   the city had?

15   A    Yes.

16   Q    Okay.  And you accepted that number as true?

17   A    I --

18   Q    It's a "yes" or "no" question.

19   A    I took that as a number that he was presenting in his

20   letter.  There's a variety of numbers out there.

21   Q    My question is did you take that number that he presented

22   as true?

23   A    I believed he was presenting a number he believed was a

24   true estimate.

25   Q    And did you agree that it was true?

1    A    I believe that there could be some reasonable range on

2    that, but it was within the reasonable range.

3    Q    And when you received the July 16th letter, you knew that

4    the emergency manager had not completed an analysis of what

5    assets of the city could monetized; correct?

6    A    Correct.

7    Q    And when you approved the bankruptcy filing, you were

8    aware or were -- let me ask you.  When you approved the

9    bankruptcy filing in your July 18th letter, were you aware

10   that a significant portion of the underfunded pension

11   liability of the City of Detroit was allocable to the Water

12   and Sewer Department?

13   A    I didn't know what percentage, but there would be some

14   portion --

15   Q    Did you know --

16   A    -- to Water and Sewer.

17   Q    Did you know that there was some percentage that was

18   allocatable?

19   A    Yes.

20   Q    Okay.  Let me refer you back to your deposition.  I'm

21   referring to page 59, line 2.

22              "Question:  Do you know whether a significant

23          portion of Detroit's unfunded pension liability is

24          allocable to the city's Water and Sewer Department?

25              Answer:  I'm not aware of that relationship."

1    Was that true at your deposition when you said you

2  were not aware of that relationship?

3  A   At that time.

4  Q   At the time of the deposition?

5  A   Yeah.

6  Q   And so since you -- so since then you've learned.  Okay.

7  My question was not that.  My question was at the time -- on

8  July 18th before your deposition, going back to July 18th --

9  A   I'm sorry.  I missed --

10 Q   Okay.  Okay.

11 A   That would be correct.

12 Q   We're not on the same page.

13 A   Yes.

14 Q   I think we are now.  At the time of the July 18th letter

15 that you issued approving the bankruptcy filing, were you

16 aware then that a significant portion of the city's pension

17 liability was allocable to the Water and Sewer Department?

18 A   Not at that time.

19 Q   You were aware, were you not, that under law you could

20 have, had you chosen, put a contingency on your approval and

21 made the bankruptcy filing contingent on Mr. Orr not seeking

22 to impair accrued pension liabilities?  Are you aware that

23 you had that power?

24 A   Yes.

25 Q   Okay.  And you chose not to exercise it?

1   A   Yes.

2   Q   Did you speak to Mr. Orr at any time about using Chapter

3   9 to get -- to eliminate pension liabilities of the city?

4   A   Those discussions would have been with attorneys.

5   Q   Okay.  So are you refusing to answer the question?

6   A   Yes.

7   Q   Okay.  Did you speak to Mr. Orr at any time about the

8   timing of the bankruptcy filing?

9   A   Those discussions would have been with attorneys present.

10  Q   And you're refusing to answer that question?

11  A   Yes.

12          MR. DECHIARA:  Your Honor, I'm sorry if I'm taking

13  some time.  I'm trying to eliminate so --

14          THE COURT:  Okay.

15          MR. DECHIARA:  -- I don't duplicate.

16          THE COURT:  Take your time.  Actually, while you're

17  doing that, I'm going to consult with my court security

18  officer here, so give me just a minute, please.  You may

19  proceed whenever you are ready, sir.

20          MR. DECHIARA:  Thank you, your Honor.

21  BY MR. DECHIARA:

22  Q   Are you aware, Governor, that revenue sharing by the

23  state with the city -- in other words, monies given by the

24  state to the city -- have been reduced substantially over --

25  in recent years?

1    MR. SCHNEIDER:  Objection to relevance.

2    THE COURT:  No.  That objection is overruled.

3  Please answer the question.

4    THE WITNESS:  Yes.

5  BY MR. DECHIARA:

6  Q   And is -- that's true, that it has been reduced

7  substantially over recent years?

8  A   It has been reduced, yes.

9  Q   Okay.  Is it true, in your view, that if that state

10  revenue sharing had not been reduced, there might have been

11  monies to maintain the pensions of the Detroit retirees?

12  A   That would be speculative.

13  Q   Well, if the city had more money from the state, wouldn't

14  that -- wouldn't it not have more money available to pay for

15  pensions?

16  A   Again, that's speculative because there are approximately

17  somewhere between 15 and $18 billion worth of debt and needs

18  in the services for better services -- excuse me -- the

19  citizens having better services within the city.

20  Q   Did Mr. Orr at some point ask you whether his decision

21  whether or not to become emergency manager would impact the

22  decision on whether or not Jones Day would be hired as

23  restructuring counsel for the city?

24  A   Would you repeat that again?

25  Q   Sure.  It was a little complicated.  Did you -- excuse

1   me.  Did Mr. Orr at any point when he was a candidate for

2   emergency manager -- did he ever have a conversation with you

3   where he said something to the effect of, "I don't want my

4   decision as to whether or not I accept the job to impact

5   Jones Day's chances of being hired as restructuring counsel

6   for the city"?  Did Mr. Orr ever say anything to you --

7   A   I don't recall.

8   Q   -- along those lines?

9   A   I don't recall that.

10   Q   Did Mr. Orr ever come to you at any point since he's been

11   emergency manager asking whether or not the state would share

12   in the financial burden of some or all of Detroit's pension

13   liabilities?

14   A   That would have been in meetings with attorneys present.

15   Q   I'm just asking whether that conversation occurred.

16   A   That particular question I don't recall being ever

17   brought up.

18   Q   You don't recall whether it was ever brought up, but if

19   it did, it was -- it happened before attorneys?  Is that your

20   testimony?

21   A   Well, again, we had discussions on pensions, but

22   attorneys were present in those meetings.

23   Q   Right, but this is a specific question.  Did Mr. Orr ever

24   have discussions with you about the state sharing in the

25   financial burden in whole or in part of Detroit's financial

1   liabilities?

2   A   I don't recall.

3           MR. DECHIARA:  Nothing further, your Honor.

4           THE COURT:  All right.  Hang on.  We're going to

5   take our afternoon break at this time for 15 minutes.  Well,

6   actually until 2:45.  I will, however, ask everyone to remain

7   seated until the governor can make his exit, and so give us a

8   couple minutes for that, and then we'll reconvene at 2:45.  I

9   think the court security officer or one of them will show you

10  to the judges' conference room down the hall.

11          THE WITNESS:  Okay.  Just trying to show the right

12  etiquette, Judge.

13          THE COURT:  I'm sorry, sir.

14          THE WITNESS:  That you were leaving first.

15          THE COURT:  No, no, no.  I'm going to sit here with

16  everyone else, and then when you're all settled, we will go.

17  Okay.  All right.  We're going to be in recess.

18          THE CLERK:  All rise.  Court is in recess.

19      (Recess at 2:27 p.m. until 2:45 p.m.)

20          THE COURT:  You may proceed.

21          MS. LEVINE:  Good afternoon, your Honor.  Sharon

22  Levine, Lowenstein Sandler, for AFSCME.  Just to clarify the

23  record, AFSCME also served a trial subpoena and appreciated

24  the acceptance of service by the state.  Thank you.

25                      DIRECT EXAMINATION

1  BY MS. LEVINE:

2  Q    Good afternoon, Governor.

3  A    Good afternoon.

4  Q    Briefly, do you recall a coalition of unions negotiating

5  a tentative agreement with the City of Detroit back in -- in

6  or around February of 2012?

7  A    I don't recall.

8  Q    If I could try just to refresh your recollection for a

9  moment, there were about 30 unions that negotiated a

10 tentative agreement that was a concessionary agreement that

11 resulted in savings for the city.  The unions ratified that

12 agreement and then were advised by the city that the state

13 asked them not to implement it.  Are you familiar with that?

14 A    I recall the general topic but no specifics.

15 Q    Do you know why the state asked the city not to implement

16 the terms of the concessionary agreement, which would have

17 provided for savings to the city?

18         MR. SCHNEIDER:  Objection to relevance.

19         THE COURT:  Overruled.  Please answer.

20         THE WITNESS:  I don't recall.

21 BY MS. LEVINE:

22 Q    Governor, it's true, is it not, that in a nonmunicipal

23 bankruptcy case, the Pension Benefit Guarantee Corp. or the

24 PBGC provides insurance coverage for retirees if their

25 pensions are terminated; correct?

1   A   For private entities, I believe that's true.

2   Q   For private entities with, for example, single employer

3   defined benefit plans; correct?

4   A   Yes.

5   Q   And the current level of protection provided by the PBGC

6   is $57,500; is that correct?

7   A   I wouldn't be aware of that number.

8   Q   Well, isn't it true that -- our understanding is that the

9   average pension in Detroit is approximately $18,000 a year,

10  but even using your figure of between one or $2,000 a month,

11  which is slightly higher, isn't it true that all of the

12  retirees in Detroit would fall within the limits of the PBGC

13  protections?

14  A   Again, I'm relying on your statements.

15  Q   So it's true, though, that all of the retirees would fall

16  within the limits of about $57,000, in fact, substantially

17  under $57,000 a year?

18  A   Again, I don't know to a fact that every retiree is under

19  that number.

20  Q   Okay.  We'll try this a different way.  You reviewed the

21  June 14th proposal prior to the time of the June 14

22  presentation; correct?

23  A   Yes.

24  Q   Were you present at the June 14 presentation?

25  A   No.

1  Q   Kevyn Orr was present at the June 14 presentation?  Yes?

2  A   Yes.

3  Q   But he had discussions with you prior to that time?

4  A   Yes.

5  Q   And you reviewed the presentation before it was made;

6  correct?

7  A   Yes.

8  Q   And on page 109 of the presentation, which was Exhibit

9  43, and on page 59 of the executive summary of the

10  presentation, which is Exhibit 44, there is a comment with

11  regard to underfunded pension, and I'm just going to read it

12  so we don't have to find the document right now.  "Because

13  the amounts realized on the underfunding claims will be

14  substantially less than the underfunding amount, there must

15  be significant cuts in accrued vested pension amounts for

16  both active and currently retired persons."  Do you recall

17  that?

18  A   Yes.

19  Q   Did you read that before June 14?

20  A   Yes.

21  Q   Now, with regard to the amount of the underfunding, I

22  believe you previously testified today that you don't know

23  what it is, is that correct, as we sit here today?

24  A   Yes.

25  Q   And it would be speculative to guess what it would be as

1  you sit here today; correct?

2  A   Yes.  There could be a wide range on that.

3  Q   So there is nothing in this so-called proposal to

4  creditors, for example, that would say to a retiree that if

5  they earn currently $18,000 a year, that after the proposal

6  was implemented, if it's implemented, their annual benefit

7  will drop to nine, five, four, or zero; correct?

8  A   Well, that was a proposal subject to mutual negotiations,

9  so it didn't --

10  Q   No, no, but under the proposal, regardless of what the

11  mutual negotiation is, if I'm a retiree -- Sharon Levine is

12  86 years old.  I live in Detroit.  I look at this proposal,

13  and I say to myself, okay, I currently get $18,000 a year.

14  After the proposal, my vested accrued pension benefit payment

15  will now drop to nine, five, seven, whatever the number is.

16  You can't tell that from this proposal; correct?

17  A   I believe that would be difficult.

18  Q   And in addition to that, it talks about a $2 billion note

19  for all of the unsecured creditors to share; correct?

20  A   Yes.

21  Q   And we don't know what the total universe of all

22  unsecured claims are, do we?

23  A   I believe -- well, there's an estimate in the proposal to

24  creditors.

25  Q   Right, but as we sit here today, exactly what that number

1  is going to be, we don't know what it is, do we?

2  A   Correct.

3  Q   And so any individual creditor doesn't really know, as we

4  sit here today, what their share of the $2 billion note will

5  be over the term of that note; correct?

6  A   Well, you said "will be."  You're assuming that will be

7  the case.  That's past tense now that --

8  Q   Let's go back.

9  A   -- we're in bankruptcy.

10 Q   Let's go back to June 14 again.  I'll try it again.

11 Okay.  On June 14 the city made a proposal that you read

12 before it was made.

13 A   Yes.

14 Q   Okay.  And a retiree reading that proposal doesn't know

15 what their post-proposal, if it's implemented, retiree annual

16 benefit is going to be post-proposal.  We just had that

17 conversation.  We don't know if 18 is dropping to 9 or 4 or 7

18 or whatever the number is going to be; correct?

19 A   I'm not trying to be difficult, but you're speaking in

20 the future tense.

21 Q   No.  I'm speaking in the past.  In other words, one of

22 the things we're looking at --

23 A   You said what it will be --

24 Q   Okay.  I'll rephrase it.

25 A   -- or what it would have been.

1  Q   I'll rephrase.

2  A   Yeah.

3  Q   I'll rephrase.

4  A   I'm sorry.  I'm just trying to make sure I'm answering --

5  Q   I'll rephrase.  Going back to June 14, we're making a

6  proposal; right?  We have a proposal.  It's the so-called

7  proposal to creditors.  A retiree is a creditor; correct?

8  A   Yes.

9  Q   Okay.  An individual retiree picks up the proposal or

10 takes it off the website or comes to one of the public

11 meetings.  They currently get $18,000 a year.  They take a

12 look at this proposal.  There is nowhere in that proposal

13 that tells them what they're going to get if the proposal is

14 implemented on that -- what they now know to be their $18,000

15 a year; correct?

16 A   Yes.

17 Q   Okay.  And in addition to that, whatever that

18 underfunding is would -- if I understood your testimony

19 correctly, would be part of what gets paid under the $2

20 billion note; correct?

21 A   Yes.

22 Q   Okay.  Now, there's nothing in that proposal, though,

23 that would tell an individual creditor or an individual

24 retiree exactly what their proportionate share of the $2

25 billion note would be; correct?

1   A   I thought you already asked that, but yes.

2   Q   Well, but we were -- okay.  So that's good.  So we don't

3   know what we're getting on our annual pension benefit

4   anymore, and we don't know what our claim is going to be

5   worth as we read the June 14 proposal for creditors; correct?

6   A   Yes.

7   Q   Okay.  In addition to that, as we sit here today, is it

8   your understanding that the individual retiree asserts a

9   claim for the underfunding portion, or is it, as the city

10  contends, only the Retirement System that asserts that claim?

11  A   That would be a legal question that I'd leave to the --

12  Q   So a retired person who is coming to the June 14 meeting

13  doesn't know what their annual pension benefit is going to be

14  reduced to, doesn't know what their pro rata share of this $2

15  billion note is going to be, and doesn't even know if they're

16  going to be allowed to assert a claim to share in the $2

17  billion note; is that correct?

18  A   If you're speaking in the present tense, I believe one of

19  the first things that was requested by the city during the

20  bankruptcy process was to have someone represent the

21  creditors so they would have a voice at the table, so I view

22  that as one of the constructive issues that I looked at that

23  retirees weren't having the kind of representation I thought

24  they deserved until we got into this process.

25  Q   Okay.  But I'm going to ask my question again.  On June

1  14, if you're a retiree and you're reading this proposal --

2  okay -- you cannot tell -- it's correct that you can't tell

3  what your -- and I'm using a hypothetical -- $18,000 a year

4  is going to be reduced to, you can't tell what your pro rata

5  share of the $2 billion note is going to be in real

6  quantifiable dollars, and you don't know even if you're going

7  to be allowed to assert that claim or whether that claim only

8  gets asserted by the pensions themselves; isn't that correct?

9  A    The first two statements I would say yes.  The third one

10  is a legal question that I don't know the answer to.

11  Q    But, Governor, if you don't understand it, how does the

12  86-year-old retiree understand it?

13  A    Again, that's --

14        MR. SCHNEIDER:  Objection.  Speculation.

15        THE COURT:  Overruled.  Can you answer the question?

16        THE WITNESS:  That would have been the part of the

17  negotiate process because I believe Mr. Orr was trying to

18  have meetings with various union and other representatives to

19  potentially represent the retirees.  My understanding is in

20  many cases they would not take up that interest in

21  representing the retirees.

22  BY MS. LEVINE:

23  Q    Governor, are you aware that AFSCME wrote several letters

24  to Jones Day and Miller Buckfire requesting meetings prior to

25  the filing of the bankruptcy case on July 17 requesting

1    meetings with regard to negotiations?

2    A    No.

3    Q    Were you aware that those requests were declined?

4    A    No.

5    Q    In response to earlier questioning, you said if the Court

6    ordered you -- sorry.  In response to prior questioning with

7    regard to not diminishing or impairing vested pension

8    benefits, I believe you testified, and I quote, here today,

9    if the court ordered you had to pay them, you would pay them.

10   Is that a true statement?

11   A    I will follow a lawful order of a court every time.

12   Q    So if this Court finds --

13   A    That's my goals as governor.

14   Q    So if this Court finds that it's unconstitutional or

15   unconstitutional as applied to impair or diminish vested

16   pension benefits, are you, as the governor of the State of

17   Michigan, saying that the state will pay those pension

18   benefits?

19   A    I think you're asking a broader question in that context

20   because the case is with the City of Detroit, not the State

21   of Michigan.

22   Q    Your comment was if the court ordered you had to pay

23   them, you would pay them.

24   A    If the court through this process -- if I have a valid

25   judicial order that's been reviewed and gone through the

1  judicial system ordering me to take an action, I'm going to
2  follow the action of the court.
3  Q   As we sit here today, have you or has anyone on behalf of
4  the state offered to Detroit or Kevyn Orr state funding to
5  avoid impairing or diminishing pension benefits?
6  A   Those discussions would have been with attorneys present.
7  Q   I'm not asking you what the discussions were.  I'm not
8  asking what you said or what they said.  I'm asking as we sit
9  here today, have you or has anyone on your behalf or on
10 behalf of the state offered Detroit or Kevyn Orr state
11 funding to avoid impairing or diminishing vested pension
12 benefits?
13         THE COURT:  I'm going to ask you to answer that
14 question but with one further limitation, which is I don't
15 want you to disclose any conversations that you have had or
16 that you are aware has been had in the context of the
17 District Court's mediation here.
18         MS. LEVINE:  And we weren't looking for that, your
19 Honor.
20         THE COURT:  So with that limitation, would you
21 answer the question?
22         THE WITNESS:  Could you walk through that one more
23 time for me?  Sorry.
24 BY MS. LEVINE:
25 Q   As we sit here today --

1          THE COURT:  That's all right.  That's all right.

2    BY MS. LEVINE:

3    Q   -- have you or has anyone on your behalf or on behalf of

4    the state offered Detroit or Kevyn Orr state funding to avoid

5    impairing or diminishing vested pension benefits?

6    A   No.

7          MS. LEVINE:  No further questions, your Honor.

8                         DIRECT EXAMINATION

9    BY MR. KING:

10   Q   Good afternoon, Governor.

11   A   Good afternoon.

12   Q   My name is Ron King, and I represent the two Detroit

13   Retirement Systems.  If I understood your testimony

14   correctly, leading up to the June 18th authorization, you'd

15   indicated that this was a two-and-a-half-year-in-the-making

16   process.  Is that accurate?

17   A   I had been involved with serious discussions on Detroit's

18   financial condition over the last two and a half years, yes.

19   Q   And as part of those discussions, is it safe to assume

20   that there was substantial review of financial information,

21   compilation of multiple reports, in-depth analysis of cash

22   flow, and other factors that would go into evaluating the

23   financial condition of the city?

24   A   Yes.

25   Q   And, additionally, even dating back to 2012, the city had

1  professionals on board, consultants on board, that were

2  engaged in the process of conducting and compiling this

3  information and performing those types of reviews, to your

4  knowledge; correct?

5  A    Yes.

6  Q    So this has been a very lengthy ongoing process leading

7  up to your authorization on July 18th.  Is that accurate?

8  A    Yes.

9  Q    And you indicated that you were familiar with the June

10  14th proposal to creditors; correct?

11  A    Yes.

12  Q    And I believe you agreed that that June 14 proposal

13  actually used the language that there would be significant

14  cuts to pension benefits.  Is that accurate?

15  A    Yes.

16  Q    And I think you also stated just a moment ago -- and I

17  know you also did in your deposition -- that one of your

18  concerns understandably was that retirees would have a voice

19  in this process.  Is that accurate?

20  A    Yes.

21  Q    If the city were to put forth a proposal that didn't

22  contemplate an impairment or diminishment of pension

23  benefits, then there wouldn't be a need for the retirees to

24  have a voice, would there be?

25           MR. SCHNEIDER:  Objection.  Calls for speculation.

1          THE COURT:  Sustained.

2   BY MR. KING:

3   Q   Do you know if the city has set forth any other proposals

4   to creditors other than the June 14 proposal?

5   A   I wasn't present for the follow-up negotiations, the

6   meetings that would have taken place in terms of I wasn't

7   present in those meetings with all those various creditors.

8   Q   And do you know whether or not the city contemplated a

9   proposal that would not impair or diminish pension benefits?

10  A   I don't recall.

11  Q   Have you and Mr. Orr had any discussions that would

12  contemplate a proposal that would not include the impairment

13  or diminishment of pension benefits, and that's subject to

14  Judge Rhodes' caveat that obviously you can't include

15  anything that was done in the context of the mediation?

16  A   I'm trying to recall.

17  Q   And I can -- let me -- you want me to repeat the question

18  for you?  Have you or Mr. Orr had any discussions prior to

19  your June 18 -- your July 18th authorization about putting

20  forth a proposal to creditors that does not contemplate the

21  diminishment or impairment of pension benefits?

22          MR. SCHNEIDER:  Objection if the question is calling

23  for attorney-client privileged information.

24          MR. SHUMAKER:  Same objection.

25          THE COURT:  You can answer that question if it does

1   not involve communication with counsel.

2          THE WITNESS:  It did involve counsel.

3          THE COURT:  All right.

4   BY MR. KING:

5   Q   Thank you, Governor.

6          MR. KING:  Can we see Exhibit 615, please?

7   BY MR. KING:

8   Q   And, Governor Snyder, if I could just focus your

9   attention to the last sentence of the first paragraph, and

10  this is the e-mail from then Treasurer Dillon to you, and

11  that sentence says, "Because pensions have such a long life,

12  there are a lot of creative options we can explore."  Have

13  you explored any of these creative options that Treasurer

14  Dillon set forth in this e-mail to you?

15  A   In terms of this particular e-mail, what would have

16  happened is -- what happened is I believe there was a phone

17  conversation that he called me that evening and had a general

18  discussion on that.  I listened to what he had to say.  I

19  appreciated what he had to say.  And then I passed it on to

20  discussions with Kevyn Orr and the city in meetings that

21  attorneys were present at and giving advice on.

22  Q   Did any of these creative options contemplate a scenario

23  where pension benefits were not diminished or impaired?

24  A   I don't recall that specifically.

25  Q   And let me -- if we could put up -- oh, one more question

1  on this.

2        MR. KING:  Could we go back to the full text of the

3  e-mail, please?

4  BY MR. KING:

5  Q   In this e-mail, there's also a reference to at least

6  Governor -- or excuse me -- Treasurer Dillon's statement that

7  it's early in the process, and this is still in the

8  informational stage.  As of July 9th of 2013, did you believe

9  that statement to be true?

10 A   Which part?  I'm sorry.

11 Q   The part that's now --

12       THE COURT:  Would you just rephrase the question?

13       MR. KING:  Sure.

14 BY MR. KING:

15 Q   In this e-mail Treasurer Dillon says, "In my view, it's

16 too early in the process to respond to hypothetical

17 questions.  We remain in many ways at the information stage,"

18 and my question was as of July 9th, do you agree with that

19 statement?

20 A   That's what he shared with me, so I took that as

21 accurate.

22 Q   Do you agree that that's the case even today, as we sit

23 here today?

24 A   There's more work that's been done on the subject matter,

25 and I believe people are still analyzing data on this

1   question.

2   Q   Thank you.

3         MR. KING:  Can you put up UAW 625, please?  And can

4   you scroll down to the second full paragraph where it starts

5   "I favor"?  Thank you.

6   BY MR. KING:

7   Q   Now, this was an e-mail from your counsel to you, and --

8   A   Actually, it was not to me.  This e-mail wasn't -- you're

9   quoting the part from Mike Gadola to a number of people that

10   Mike Gadola -- that Dennis Muchmore then forwarded to me.

11   Q   Fair enough.  Did you see this statement here?

12   A   Yes.

13   Q   And did Mr. Gadola ever share with you his opinion that

14   you should exercise your ability under PA 436 to put

15   contingencies on the bankruptcy filing?

16   A   Yeah.  I don't want to be difficult here.  I just need

17   some help --

18   Q   Sure.

19   A   -- in the sense that it's in this document that's now an

20   exhibit, but Mike Gadola is my counsel, so he shared

21   information on this topic, but that's where I just need help

22   to know is that subject to privilege or because it's here

23   it's not anymore?

24        MR. KING:  Your Honor, I'm not familiar with the

25   agreement that Mr. Wertheimer entered into with the city, but

1  it's my understanding that there was a waiver of privilege at

2  least with respect to this document.

3         MR. SCHNEIDER:  Your Honor, the waiver is only as to

4  this document, nothing else.

5         MR. WERTHEIMER:  The waiver is as to this and other

6  documents but nothing beyond the documents.

7         MR. KING:  Let me move on, your Honor.

8         THE COURT:  All right.

9  BY MR. KING:

10  Q   At some point, you elected not to include any

11  contingencies with the authorization that you sent to Mr. Orr

12  on July 18th; correct?

13  A   Correct.

14  Q   And at the time that you sent that authorization to

15  Mr. Orr, you were aware of his public position and, of

16  course, the position set forth in the June 14 proposal that

17  he believed pension benefits needed to be significantly

18  reduced; is that correct?

19  A   Again, I didn't take the June 14th proposal as

20  conclusive.  Again, that was part of the mutual negotiation

21  process to avoid the bankruptcy.  Now that we're in

22  bankruptcy, it's really contingent on waiting for a plan on

23  bankruptcy to be presented to the judge.

24  Q   But at your deposition you indicated that you were aware

25  at the time that you executed the July 18th letter that it

1  was Mr. Orr's position that there had to be significant cuts

2  in accrued pension benefits?

3  A   It was what he presented in the proposal to creditors.

4  Q   And why is it that you chose not to put a contingency in

5  the July 18th authorization related to accrued pension

6  benefits?

7  A   I made a decision not to put a contingency with respect

8  to any conditions because my concern was is this is an

9  extremely difficult process; that we're in a crisis mode; and

10 that we have serious issues here.  And I felt it could be an

11 issue causing more delays, concern, complexity to a very

12 complex case to begin with; that I have confidence in the

13 judicial process, and that's why I actually asked that

14 additional statement to be added in that paragraph that any

15 plan that comes out of this has to be a legal plan.  I

16 thought it was a good opportunity to get people that are the

17 appropriate people to make decisions that then I can help

18 support the city in the implementation.

19 Q   But ultimately you decided that the July 18th

20 authorization should not have any contingencies?

21 A   Yes.  I made that decision.

22 Q   And I'm going to finish up, I think, where you started,

23 which was -- I think you testified very, very early on that

24 you believe that the issue affecting the Detroit bankruptcy

25 is one of I think national importance.

1   A    Not national importance.  It could be viewed that way.

2   My concern is with the citizens of Michigan and the City of

3   Detroit, including the retirees.  To the degree it affects

4   things nationally, that's a national issue.  What I was

5   putting in is if you look at difficult problems around our

6   country, this is a problem that's been accumulating for 60

7   years and had not been solved before, and there are not many

8   problems of this magnitude in our country.

9   Q    So you certainly would agree that the situation in

10  Detroit impacts the citizens of the State of Michigan?

11  A    Yes.

12  Q    And do you agree with me that until such time that the

13  people of the State of Michigan, through a lawful amendment

14  to the Constitution, choose to modify Article IX, Section 24,

15  that the state should otherwise honor that obligation?

16  A    I believe I'm following Michigan's Constitution and the

17  Constitution of the United States, and the article says

18  accrued financial benefits shall be treated as a contractual

19  obligation.

20          MR. KING:  Thank you, Governor.  Appreciate your

21  time.

22                    DIRECT EXAMINATION

23  BY MS. PATEK:

24  Q    Good afternoon, Governor.  Barbara Patek.  I represent

25  the four public safety unions that represent the police and

1   fire fighters of the City of Detroit, and I have just a

2   handful of questions for you.  I want to start with Public

3   Act 436.  Obviously you're the chief executive of our state,

4   and you're not a legislature, but Public Act 436 was an act

5   that you favored; is that right?

6   A    Yes.

7   Q    And you favored it because it provided a number of tools

8   that could be used in circumstances like that facing the City

9   of Detroit; correct?

10  A    That was very general.  I'd be happy to give you more

11  specific reasons.

12  Q    And I'm going to ask you about --

13  A    Okay.

14  Q    -- some of the -- I mean I'm not suggesting that there

15  aren't reasons --

16  A    Okay.

17  Q    -- but I'm going to ask you about some of those reasons.

18  Among those tools, it did allow, upon a finding of a

19  financial emergency, for the appointment of an emergency

20  manager like Mr. Orr; right?

21  A    Public Act 436 actually gives options to communities

22  about one of four courses to follow, which --

23  Q    Correct.

24  A    -- was an improvement on Public Act 4.

25  Q    I think you and I are talking about the same thing, but

1    I'm just asking about specific --

2    A    Okay.

3    Q    -- aspects of that.  So among those options is, under the

4    appropriate circumstances, an emergency manager like Mr. Orr

5    can be appointed.

6    A    A city may select that.

7    Q    And that occurred in this particular case; correct?

8    A    What happened in this particular case is Kevyn Orr

9    came -- originally this process was under Public Act 72; that

10   then he transitioned to Public Act 436.

11   Q    But at the time Kevyn Orr became first the emergency

12   financial manager under Public Act 72 or former Public Act

13   72, everyone knew that a few days hence that he would become

14   the emergency manager under Public Act 436; isn't that right?

15   A    He became -- it was under Public Act 72 that he would be

16   transitioning to 436, yes.

17   Q    And when that happened, you knew and the others involved

18   with the City of Detroit knew that within a few days after

19   that appointment because Public Act 436 would become

20   effective on March 28th of this year, that he would then --

21   Kevyn Orr would then become the emergency manager under

22   Public Act 436.

23   A    He would transition from one act to the other.

24   Q    And one of the -- one of the things that Public Act 436

25   also does is it allows an emergency manager to seek your

1  authorization to file for Chapter 9; correct?

2  A    Correct.

3  Q    And as we know, that, indeed, occurred in this case?

4  A    Correct.

5  Q    And we've talked a lot about -- well, strike that.

6  Another thing that Public Act 436 does is it is designed to

7  in a financial emergency situation reduce or eliminate under

8  certain circumstances the collective bargaining rights of

9  public employees.

10  A    It allows contracts to be changed in some fashion, yes.

11  Q    Including collective bargaining agreements, and it has --

12  A    There is a process, though, that has to be followed.

13  It's not simply a decision of the manager.

14  Q    And if that process is followed, those -- the right to

15  bargain collectively can be suspended?

16  A    Yes.

17  Q    And we talked about the June 14th proposal, and as I'm

18  hearing your testimony sitting here this afternoon, one of

19  the things that I hear you saying is it was the expectation

20  that there would be some kind of more robust give-and-take

21  negotiating process once that proposal was made that would

22  potentially result in a solution to one or more of the

23  problems facing the City of Detroit?

24  A    I'm not sure I follow you.  Could you --

25  Q    The June 14th proposal, I think you've indicated a number

 1  of times you expect -- you expected that proposal to trigger

 2  negotiations between the various interested parties.

 3  A    Yes.

 4  Q    And was it your expectation that that negotiating process

 5  would take some time?

 6  A    Given that it's an environment of crisis, it would -- it

 7  could take some time, but hopefully it would be done promptly

 8  and thoughtfully given the urgency.

 9  Q    And one of the difficulties, as Ms. Levine went over with

10  you a few moments ago, with respect to the impairment of the

11  accrued vested pension benefits was the fact that there were

12  a lot of numbers missing from the equation; that is, exactly

13  what that impairment meant wasn't quite clear as of the time

14  of the June 14th proposal.  You would agree with that?

15  A    In the proposal itself there were open issues, but that

16  was the point of it being a proposal that needed further

17  negotiation.

18  Q    And I think you also told us when you made the decision

19  in response to Mr. Orr's July 16th letter to authorize the

20  Chapter 9 filing, you really went back over your term as

21  governor and reviewed for yourself the process of -- you

22  know, everything sort of that the City of Detroit had gone

23  through and the milestones that perhaps had not been met

24  and -- before you granted the authorization.

25  A    Yes.

1  Q   You are familiar, as the governor of the state, with Act

2  312?

3  A   Yes.

4  Q   And you know that that provides a mechanism that includes

5  mediation and arbitration of disputes between public safety

6  employees like police and fire with their various

7  municipalities?

8         MR. SCHNEIDER:  Objection as to the relevance.

9         THE COURT:  Overruled.  Go ahead.

10        THE WITNESS:  Yes.

11        MS. PATEK:  Can we have 720?  Hopefully this will

12  work.  You can go to the second page, please.

13  BY MS. PATEK:

14  Q   Were you monitoring or following closely the activities

15  in terms of what was going on with the financial emergency in

16  the City of Detroit after Mr. Orr's appointment on March

17  28th?

18  A   Well, I'm not sure how you define "following closely."  I

19  followed it.

20  Q   Were you aware that there were a number of collective

21  bargaining agreements among the public safety unions that

22  were due to expire as of June 30th of 2013?

23  A   I believe there were some.

24  Q   And would you agree with me -- well, strike that.  Are

25  you aware or did you play any role in the city's decision to

1    block the Act 312 proceedings associated with those efforts

2    to negotiate and extend those collective bargaining

3    agreements?

4    A    No.

5    Q    Would you agree with me that if the city were, in fact,

6    looking to negotiate and address the problem of the accrued

7    vested pension benefits, that, first of all, as a general

8    matter, there was at least some question as to whether

9    outside of bankruptcy those benefits could be impaired

10    because of the state Constitution? Would you agree with

11    that?

12    A    I don't think I have enough knowledge to answer that

13    question.

14    Q    Would you agree that in the context of a negotiation and

15    perhaps as a quid pro quo for an extension of the term of the

16    contract, that that might be a place for the city to begin to

17    address on a relatively expeditious basis the accrued vested

18    benefits, at least of the active public safety employees

19    involved in those negotiations?

20         MR. SCHNEIDER: Objection. Calls for speculation.

21         THE COURT: Overruled. Excuse me. Overruled.

22    Please answer.

23         THE WITNESS: Again, I don't have enough knowledge

24    of the specifics of the situation that I would just be

25    speculating.

```
1              THE COURT:  Okay.
2    BY MS. PATEK:
3    Q   Do you know whether or not pursuant to Public Act 436 in
4    this case the collective bargaining rights of the public
5    safety employees were at least in some cases suspended by the
6    emergency manager?
7    A   I believe they had been suspended for some time under the
8    prior emergency manager laws.
9    Q   And that allowed the state to impose terms?
10   A   Again, it's not the state.  It would be the City of
11   Detroit.
12   Q   I'm sorry.  That allowed the city to impose terms.
13   A   Yes.
14   Q   Well, by the time the emergency manager took his role
15   under Public Act 436, if we focus on March 28th, 2013,
16   whether -- without getting into the specifics, would it be
17   fair to say that the legacy costs facing the City of Detroit
18   were in issue?
19   A   They had been an issue for some time.
20   Q   And having the opportunity to have a negotiation with the
21   public safety unions could provide a venue in which that
22   issue could be addressed?
23   A   That would be possible.
24   Q   Now, in terms of the proposed significant impairments to
25   pension benefits that we've been talking about, do you
```

1  understand that included in those accrued vested pension

2  benefits are the benefits belonging to the active public

3  safety -- that is, police and fire fighters -- who are

4  working today for the City of Detroit?

5  A    Yes.

6  Q    And do you understand that in addition to -- well, strike

7  that.  Are you aware that the police and fire fighters in the

8  City of Detroit do not have the benefit of Social Security?

9  A    Yes.

10  Q    And am I correct that in order for the City of Detroit to

11  be exempted from paying Social Security on behalf of those

12  fire fighters and police officers, it has to have a Section

13  218 agreement with the federal agreement?

14  A    I'm not aware of that.

15  Q    Are you aware that there has to be some sort of agreement

16  with the federal government under which the federal

17  government has to be satisfied that there is a qualified

18  pension plan to provide pension and disability benefits to

19  the affected employees?

20  A    No.  I'm not familiar with those federal statutes.

21  Q    And if I were to ask you whether or not you were aware of

22  the requirement that such a pension plan provide any minimum

23  level of benefits, I take it you're unaware of that?

24  A    With regard to federal law.

25  Q    And would it be fair to say that you were unaware of that

1   at the time you authorized the bankruptcy filing on July

2   18th, 2013?

3   A    Yes.

4           MS. PATEK:  I think that's all I have.

5           THE COURT:  Any other questions for the witnesses?

6           MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

7   Brimer.

8                      DIRECT EXAMINATION

9   BY MS. BRIMER:

10  Q    Good afternoon, Governor.  My name is Lynn Brimer.  We've

11  not met.  I represent an association, the Retired Detroit

12  Police Members Association, in this matter.  Your Honor,

13  my -- Governor, my line of questioning will probably be a bit

14  different, and if you don't mind to indulge me, I'd like to

15  ask just a few questions to get a little bit of the lay of

16  the land.  Treasurer Dillon is an appointee that you

17  appointed; correct?

18  A    Yes.

19  Q    And Treasurer Dillon and his staff ultimately would be

20  responsible for reporting to you in connection with their

21  activities on behalf of the State of Michigan.  Is that a

22  fair assumption?

23  A    Yes.

24  Q    Now, Richard Baird, do you mind explaining to me who

25  Richard Baird is?

1  A   Yeah.  He works as part of the executive office in terms

2  of his title is transformation manager with his primary

3  responsibilities involving human relations, HR functions, in

4  terms of sourcing people, finding people, counseling people.

5  Q   And does he report directly to you, or does he report to

6  some other representative in the executive office?

7  A   No.  He reports to me.

8  Q   Now, at some point in 2011, Public Act 4 was referred --

9  a petition was circulated, and the matter was referred for

10 being placed on the 2011 ballot for a referendum; is that

11 correct?

12 A   I believe it was the 2012 ballot.

13 Q   You know, your Honor -- Judge -- Governor, yes, you are

14 right.  It was in early 2012.

15 A   It was suspended and then went on the ballot in November

16 of two thousand --

17 Q   Do you recall when PA 4 was suspended?

18 A   I don't recall the specific date, but it would have been

19 in the earlier part of 2012.

20 Q   And do you have an understanding of what the implications

21 were of PA 4 being suspended?

22 A   It meant that PA 72 came back, and that somewhat changed

23 the rules.  PA 72 has been around since 1990.  It provided

24 for emergency managers.

25 Q   So once it was suspended, you were no longer authorized

1  to appoint an emergency manager under PA 4; is that correct?

2  A   That's correct.

3  Q   And when PA 4 was placed on the ballot for referendum, it

4  became a concern to the state that it may be rejected; is

5  that correct?

6  A   It became a concern that I think it had some value.  I

7  wouldn't say to the state necessarily.  People had different

8  opinions of it.

9  Q   Did it become a concern to you personally that PA 4 may

10  ultimately be rejected?

11  A   Yes.

12  Q   So at some point in time, the state began drafting a new

13  law to replace PA 4.  Do you recall when that took place?

14  A   It was after PA 4 was eliminated.

15  Q   Are you aware of any discussions prior to the repeal of

16  PA 4 regarding the drafting of a law to replace PA 4 in the

17  event it was rejected?

18  A   There were many discussions about alternatives and issues

19  relating to PA 4's potential replacement because there were

20  actually issues with PA 4 in terms of approvement, so as soon

21  as PA 4 was passed, through that entire process, there was

22  issues talking about how PA 4 could be improved, and they

23  were talking about different options and ideas should PA 4 be

24  eliminated.

25  Q   Now, some --

1  A   But the actual process, the main process didn't take

2  place until after it was eliminated, as I recall.

3  Q   Sometime in approximately March of 2012, Miller Buckfire

4  was retained by the State of Michigan to perform a financial

5  review of the City of Detroit.  Are you familiar with that

6  engagement?

7  A   No.  I don't recall them being hired by the state.

8  Q   You are familiar that during the early months of 2012,

9  Miller Buckfire was, in fact, involved with a review of the

10 City of Detroit?

11 A   They could have been.  That could have been hired by the

12 city or -- again, they were doing work on the project

13 relating to the city.

14 Q   Are you aware of the law firm of Jones Day being retained

15 by the State of Michigan at any point in time in connection

16 with the City of Detroit?

17 A   No.

18 Q   Are you aware that representatives of Miller Buckfire and

19 Jones Day were involved with the Department of Treasury and

20 Mr. Dillon specifically in connection with negotiating the

21 consent agreement that was -- or drafting the consent

22 agreement, rather, that was presented to the City of Detroit?

23 A   Yeah.  I don't recall that.

24 Q   So if those activities were taking place, Miller Buckfire

25 was hired by the State of Michigan to perform a financial

1    review and Miller Buckfire and Jones Day were engaged in

2    drafting or working with Andy Dillon in connection with

3    drafting a consent agreement, you were not apprised of that?

4    A    Again, I would have been working with the treasurer on

5    the consent agreement.  They have lots of consultants that

6    they work with on a multitude of projects.

7    Q    So were you involved in the drafting of the law that was

8    ultimately passed and became PA 436?

9    A    Yeah.  Switching subject -- yes.

10   Q    And what was your involvement?

11   A    Well, as governor of the state, I am involved in the

12   legislative process, so I was involved in helping define some

13   of the key parts of Public Act 436 that I viewed as

14   improvements over Public Act 4 listening to what our citizens

15   said, and then ultimately I signed the bill into law.

16   Q    So one of those key provisions would have been, I think

17   you testified a few moments ago, that cities have the

18   opportunity to request that an emergency manager be

19   appointed; is that correct?

20   A    That would have been one of the improvements.

21   Q    In the case of the appointment of Mr. Orr, he had

22   actually, though, been appointed under PA 72; correct?

23   A    Correct.

24   Q    And he automatically became the emergency manager when PA

25   436 was effective; is that correct?

1   A   Correct.

2   Q   So the City of Detroit did not have the opportunity to

3   exercise any of the options that were presented in PA 436; is

4   that correct?

5   A   Yes.  PA 436 didn't apply.  They had opportunities to

6   speak and comment under --

7   Q   But, yes --

8   A   -- the PA 72 process.

9   Q   Governor, I just -- that was a "yes" or "no" question.

10  The City of Detroit did not have the opportunity to exercise

11  any of the options that were presented in PA 436, and you --

12  A   Correct.

13  Q   Correct.  Okay.  So PA 436 contains a spending provision.

14  Are you familiar with that?

15  A   Yes.

16  Q   Are you familiar with Article II, Section 9, of the

17  Michigan Constitution?

18  A   Yes.

19  Q   And is it true that Article II, Section 9, of the

20  Constitution reserves to the people the right of referendum;

21  is that correct?

22  A   Yes.

23  Q   Other than those provisions, Governor, that contain a

24  spending provision; is that correct?

25  A   Correct.

1  Q   Are you familiar with the provision of Article II,

2  Section 9, which provides that -- and I'll read it to you.

3  "No law as to which the power of referendum properly has been

4  evoked shall be effective thereafter unless approved by a

5  majority of the electors thereon at the next general

6  election."  Are you familiar with that provision?

7  A   Yes.

8  Q   And did you discuss that provision -- I'm just asking if

9  you discussed, not the content -- that provision with your

10  counsel prior to passing PA 436?

11  A   PA 436 was a different act.

12  Q   I just asked -- Governor --

13  A   Yes.

14  Q   -- "yes" or "no"?  Did you discuss this provision with

15  your counsel prior to passing PA 436, this provision?

16  A   This provision?

17  Q   Yeah.

18  A   Yes.

19  Q   Now, PA 4 was rejected on appeal on November 6, 2012;

20  correct?

21  A   I believe that's the date.

22  Q   Do you know the date that the law that was ultimately

23  signed as PA 436 was presented to Congress, the State of

24  Michigan's legislators, and ultimately passed by both Houses?

25  A   I believe it would have been in December.

1   Q   Do you know what date in December?

2   A   No, not without looking.

3   Q   You ultimately signed it on December 26th; is that

4   correct?

5   A   I believe so.

6   Q   Okay.  So less than 60 days a new law was drafted,

7   presented.  I believe there was even a bill that was the

8   combined bill of the two Houses, made its way through both

9   Houses, and you signed it; is that correct?

10  A   We work much more efficiently than Congress.

11  Q   Now, the spending provisions, those are Sections 34 and

12  35 of the bill.  Section 34 provides for $780,000 to cover

13  the salaries of the emergency managers and their staff.  Do

14  you know whether or not anyone -- let me step back.  Did you

15  analyze whether or not $780,000 was a sufficient

16  appropriation for the then appointed emergency managers or

17  those emergency managers that you anticipated appointing

18  under PA 436?

19  A   I relied on the Treasury Department to make those

20  calculations.

21  Q   Are you aware of whether or not Treasury made those

22  calculations?

23  A   I believe so.

24  Q   Did you review those calculations?

25  A   No.

1  Q   There were, though -- there were at the time a number of

2  emergency managers in place in the State of Michigan; is that

3  correct?

4  A   I believe it was approximately seven or eight in both

5  cities and school districts.

6  Q   And the $780,000 was to cover their salaries.  Do you

7  know what the salary for the emergency manager that was

8  appointed to the Detroit Public School system was?

9  A   I would just be speculating.

10  Q   Then there's a second provision for $5 million for the

11  financial consultants.

12  A   Yes.

13  Q   Okay.  Do you know whether or not any financial analysis

14  had been performed, I assume, then again, by Treasury, in

15  order to determine whether or not that was a sufficient

16  spending provision?

17  A   Treasury did make some analysis of that.

18  Q   Did you review that analysis?

19  A   No.

20  Q   Was the analysis presented to you?

21  A   No.

22  Q   Did you ever discuss the analysis with the treasurer?

23  A   I don't recall.

24  Q   Would it be common for you to review the analysis of a

25  spending provision in a law that you are signing?

1   A    Quite often I do.

2   Q    In which instances do you determine that it's not

3   necessary for you -- I understand your background -- for you

4   to review the financial analysis of a spending provision?

5   A    The State of Michigan's budget is approximately $40

6   billion, so it's quite significant.  So in terms of going

7   through every line item, that's the point of having a

8   treasurer and a budget office that are very good at what they

9   do, so in many respects I count on the work of Treasury.

10  Quite often they're checked by DTMB, the Department of

11  Technology, Management & Budget.

12  Q    So in light of an approximate $40 billion budget,

13  $5,780,000 as a spending provision is not significant, is it,

14  Governor?

15  A    It is significant.  Every taxpayer dollar is significant.

16  In terms of the numbers, the $5 million, we had quite a bit

17  of experience, having been through emergency managers going

18  back to my predecessor, in understanding the cost from 2011

19  and 2012.  The number -- the 700,000-and-some thousand

20  dollars for emergency managers, you may wonder why it's that

21  number.  If you look at -- it's probably a half-year number

22  because -- or less than a full-year number because it's

23  during the middle of a year, and for us to follow through to

24  implement the legislation, we needed legislative

25  authorization to have the dollars to pay them, which was one

1  of the improvements of 436 over 4.

2  Q    So the prior laws didn't require a spending provision,

3  did they?

4  A    The prior laws -- we were expending money on consultants

5  and resources to help cities because we really do care about

6  these cities and their citizens, so we thought it appropriate

7  to provide additional resources so we could carry some of

8  those opportunities and burdens through state resources.

9  With the emergency manager, that was specifically done in

10 response to concerns that were raised through the ballot

11 initiative on PA 4.  Previously emergency managers were paid

12 by the city.  In looking at it in retrospect, that wasn't

13 appropriate, so we thought we should pay for them through the

14 state.

15 Q    Okay.  You were aware, though, that by adding a spending

16 provision, PA 436 would not be subject to the referendum;

17 isn't that true?

18 A    Yes.  That would be one of the consequences with my

19 reasoning being we needed the dollars to pay the consulting

20 and the --

21 Q    I just asked.  You were fully aware that by adding a

22 spending provision, PA 436, which is replacing a law that had

23 just within weeks been repealed or rejected by the citizens

24 of the State of Michigan, would not be subject to referendum?

25 A    Yes.

1  Q   Are you aware of any discussions between Mr. Dillon and
2  the Jones Day attorneys in early 2012 with respect to the
3  inclusion of a spending provision on a revised law in the
4  event PA 4 was rejected?
5  A   No.
6  Q   So if he had such discussions, he kept -- he did not
7  share them with you?
8  A   Not that I recall.
9  Q   Now, I'd just like to -- if I could look at 44,
10 Retirement Systems 44, you looked at this exhibit with
11 Mr. Wertheimer in connection with the second page.  Do you
12 recall that?  And he pointed out a memo in connection with
13 the constitutionality of the pension provisions.
14 A   Yes.
15 Q   Okay.  But if you'll see on the very top line of the
16 attachments, "Memo Re. Public Act 4 and Chapter 9" -- do you
17 see that?
18 A   Yes.
19 Q   So if Mr. Dillon received a copy of a memo regarding
20 Public Act 4 from the Jones Day attorneys, he did not share
21 that with you?
22 A   I don't recall.
23 Q   And this e-mail, if you can go up just a bit in the
24 paragraph, it's dated June 5th, 2012.  Do you see that?
25 A   Yes.

1  Q   So is it fair to conclude that Mr. Dillon, at a minimum,

2  on behalf of the state, is addressing issues with respect to

3  the repeal of PA 4 at least in June of 2012?

4         MR. SCHNEIDER:  Objection, your Honor.  Calls for

5  speculation.

6         THE COURT:  Any response?

7         MS. PATEK:  I'll withdraw the question.

8         THE COURT:  Okay.

9  BY MS. PATEK:

10 Q   Do you have regular meetings with Mr. Dillon?

11 A   Yes.

12 Q   And during 2012, did you have regular meetings with Mr.

13 Dillon?

14 A   Yes.

15 Q   In your experience, does Mr. Dillon conduct business on

16 behalf of the State of Michigan without informing you as his

17 executive, chief executive?

18 A   He has to make decisions as to what he thinks is most

19 important to bring to my attention.

20 Q   Now, Mr. Orr sits at your pleasure; correct?  You could

21 terminate him with or without cause?

22 A   Yes.

23 Q   Now, Mr. Baird -- you testified a few moments ago he

24 reports directly to you.  Are you aware of that?  That was

25 your testimony; correct?

1   A    Yes.

2   Q    Are you aware that in early January 2013 that Mr. Baird

3   was conducting a review of the law firms that were

4   presenting -- making presentations to the City of Detroit?

5   A    I believe the city had asked him to help them in that

6   process.

7   Q    Are you aware that one of his concerns was the bankruptcy

8   background of those law firms?

9   A    I don't recall.

10  Q    When do you recall the state first discussing the filing

11  of a Chapter 9 by the City of Detroit?

12  A    There was a lot of people that brought information to us

13  about Chapter 9.  In terms of discussions, in terms of the

14  serious part, we had that discussion earlier.  It literally

15  was the week before because we were working through it as a

16  last resort to the fact that the negotiations were not being

17  successful.  There were contingency plans put in place going

18  back some time to say in the event things don't work, you

19  needed to be thoughtful about it, but the serious discussion

20  of getting the recommendation was really in that week before.

21  Q    So if Mr. Dillon was having discussions with the

22  attorneys at Jones Day regarding a filing of a Chapter 9 on

23  behalf of the city in April of 2012, you were not a party or

24  aware of those discussions?

25  A    Again, I don't recall.

1   Q   Were you at all involved or did you have any discussions

2   with Mayor Bing regarding his selection of Miller Buckfire as

3   financial consultants to the City of Detroit?

4   A   I don't recall any specific discussions.

5   Q   Did you have general discussions with the mayor regarding

6   the selection of a financial consultant in late December of

7   2012 or early January?

8   A   Again, I don't recall.

9   Q   Did you have any discussions with the mayor regarding the

10   selection of counsel, specifically ultimately Jones Day, and

11   the selection process?  Did you have --

12   A   I don't recall.  Those were city decisions.

13   Q   Did you ever advise the mayor that the State of Michigan

14   had retained Miller Buckfire to perform a 60-day financial

15   review of the City of Detroit in March of 2012?

16   A   I did not.

17   Q   Did you ever advise the mayor or the City Council that

18   Jones Day had been discussing the repeal of PA 4 with the

19   Department of Treasury and its implication?

20   A   I did not.

21   Q   Did you ever discuss with the mayor or the City Council

22   the fact that the Jones Day attorneys had been discussing

23   with the treasurer the potential of filing a Chapter 9 on

24   behalf of the city as early as April of 2012?

25   A   No.

1        MS. BRIMER:  May I have one moment, your Honor?

2        THE COURT:  Yes.

3        MS. BRIMER:  Thank you, your Honor.  Thank you,

4   Governor.

5        THE COURT:  Any other questions for the governor?

6        MR. MONTGOMERY:  None from the Retiree Committee,

7   your Honor.

8        MR. WERTHEIMER:  Your Honor, I know I'm out of turn,

9   but I have one follow-up to Ms. Brimer's question.  I

10  promise, two minutes.

11       THE COURT:  Well, let me see if there's any

12  examination of the governor by either the state or the city,

13  and then we'll get back to redirect.

14       MR. SCHNEIDER:  Yes, your Honor.  Could we have just

15  one moment?

16       THE COURT:  Yes.

17                     CROSS-EXAMINATION

18  BY MR. SCHNEIDER:

19  Q   Good afternoon, Governor.  Governor, what did you do

20  prior to becoming governor?

21  A   I was a venture capitalist and entrepreneur.  Prior to

22  that, I was an executive at a computer company running that,

23  and prior to that, I was in public accounting as a CPA.

24  Q   So is it safe to say that your background involves the

25  review of financial statements, financial documents; is that

1    correct?

2    A    I have extensive experience in those matters.

3    Q    And do you have extensive experience in reading and

4    understanding balance sheets as well?

5    A    Yes.

6    Q    How long in your career have you been working in issues

7    of finance of accounting?

8    A    Since 1982.

9    Q    Does your educational background also involve finance and

10    accounting?

11    A    It does.  I have an MBA from the University of Michigan

12    and basically a number of accounting classes in my

13    undergraduate plus a law degree.

14    Q    You're also a CPA; is that correct?

15    A    That's correct.  That's where the nerd thing came from.

16    Q    Your Honor -- or, Governor -- a reoccurring problem in

17    this courtroom apparently.  After you --

18          THE COURT:  I'm wondering if there's some interest

19    in a judicial position that you haven't disclosed to us.

20          THE WITNESS:  I'm not that qualified, your Honor.

21    BY MR. SCHNEIDER:

22    Q    Your Honor, you -- Governor, you testified -- you

23    testified regarding your review of financial reports after

24    you became governor related to the City of Detroit.  Do you

25    remember that testimony?

1   A   Yes.

2   Q   Did you review reports regarding cash flow for the city?

3   A   Yes.

4   Q   And through this process, were you able to determine

5   whether or not there was a cash flow problem with the City of

6   Detroit?

7   A   There's a serious cash flow problem.

8   Q   And is it safe to say that the longer you stayed in

9   office as governor, the cash flow problems worsened; is that

10  correct?

11  A   Yes.  The most nonaccounting description I would use is

12  the word hemorrhaging.

13  Q   Okay.  In fact, you received some reports from the

14  financial review teams calling it a cash crisis; is that

15  correct?

16  A   Yes, including statements by the mayor going back to, I

17  believe, 2011 talking about the city even at that point

18  potentially running out of cash.

19  Q   Okay.  So the dialogue of -- and the discussion of

20  running out of cash had been continual; correct?

21  A   Yes.

22  Q   And things were getting worse and not better.  Is that

23  accurate?

24          MR. DECHIARA:  Objection.

25          THE WITNESS:  Yes.

1    MR. DECHIARA:  That was leading.

2    THE COURT:  Yes.  Please don't ask leading

3    questions.  The objection is sustained.

4    BY MR. SCHNEIDER:

5    Q   Ultimately, however, Mr. Orr was appointed as emergency

6    manager; correct?

7    A   Yes.

8    THE COURT:  Yes, that was another leading question.

9    MR. SCHNEIDER:  I'm sorry, your Honor.

10   BY MR. SCHNEIDER:

11   Q   Governor, there's been a lot of talk here about Chapter 9

12   filing, and I want to ask you during this process about cash

13   flow discussions and your review of the reports, where was

14   Chapter 9 in your mind?

15   A   It was a last resort.  When you looked at the entire

16   process, I tried to be very diligent about this in a very

17   difficult situation.  If you go back to the time I took

18   office, first it involved working with the mayor.  I actually

19   attended the State of the City address to show support for

20   the mayor in a public fashion to help work in a collaborative

21   fashion through that process.  Then it became clear -- he

22   made the statement, for example, that they were going to run

23   out of cash, and there were other issues, so we started

24   the -- the Treasury began a preliminary review of the city's

25   finances, I believe, in late 2011.  That's an objective

1    process.  That's not a subjective process.  They came out

2    with their findings that then led to a financial review team

3    that did an objective process again under Public Act 4

4    finding there's severe financial distress.  There was a

5    series of options given to me at that point in time that

6    include there's no distress, there's a consent agreement, or

7    there's a need for an emergency manager.  We worked very hard

8    and very diligently to do a consent agreement, and we finally

9    got a consent agreement done that included an appendix that

10   had 20-some items, I believe 23 different items to follow

11   through on, again, to avoid more serious consequences, so

12   there was a lot of work done through the summer on the

13   consent agreement.  Unfortunately, by fall it appeared that

14   most of the items in that consent agreement were not being

15   implemented.  Again, people worked hard on doing those

16   things, but they didn't happen.  So another review took place

17   along with continuing cash crises, so another review cycle

18   was begun under Public Act 72 because this is a crisis.  It

19   still is a crisis today.  And so we went through that

20   exercise, and then they found that the consent agreement was

21   not going to end up in a satisfactory plan that led to the

22   emergency manager situation, and so, again, we went through a

23   hearing process there.  I appointed an emergency manager.

24   The emergency manager went through a process of negotiation

25   proposing something to creditors to work out.  He came to me

1    then and said that was not successful.  I authorized

2    bankruptcy, and now that's where we're at.  One of the things

3    that doesn't come across very often is an overriding concern

4    for the citizens of Detroit.  That is, while all this is

5    taking place, all we've seen is more blight, more lights

6    going out, challenges on the police force.  These things have

7    to get resolved.  It's an unacceptable situation.

8    Q   So is it correct to say that you -- when you were

9    reviewing these reports, you did not do so with the intention

10   to authorize or seek a filing?

11   A   I worked very diligently to avoid this process in good

12   faith and to go through this process to say what are all the

13   other steps possible and, again, avoid subjectivity and do it

14   as objectively understanding that the subjective piece is

15   people are suffering, the 700,000 citizens of Detroit.

16   Q   Let me ask you some questions regarding PA 436.  You

17   testified that it gives options to communities.  Can you

18   explain just a little bit about what you meant by that?

19   A   Yeah.  One of the issues with Public Act 4 is it really

20   had those three choices that I mentioned.  What now happens

21   is there's an opportunity for four different choices that the

22   community has.  They can do a consent agreement.  There's an

23   option for an emergency manager.  There's an option for

24   looking at a negotiated settlement to try to go to creditors

25   to work things out, and then there's potentially bankruptcy.

1   Q    Let me ask you more specifically about PA 436.  You were

2   asked regarding the appropriations provisions.  For you what

3   was the point of those appropriations, the purpose?

4   A    Yeah.  We were in the course of the middle of a fiscal

5   year, and under Michigan's Constitution, I can't -- we cannot

6   expend funds without an appropriation.  Part of Public Act

7   436 is saying we were going to relieve the cities of the

8   burden of paying for the emergency manager because that is a

9   burden on them, so we needed an appropriation to do that, and

10  it was the simplest best way to do it, in my view, along with

11  the fact significant dollars were being spent on consultants

12  in some capacity, whether it be the city or the state, and

13  for us to continue to do consulting work to help cities out

14  across our state is by having that additional appropriation

15  we'd have those resources available.  That was done to get us

16  through that budget year with a view that I would include

17  similar numbers for the following budget year, which was

18  proposed in February, and that took effect this October 1.

19  Q    Well, you signed the bill, so was your purpose to make it

20  referendum-proof?

21  A    No.  It was to deal with this issue of paying for

22  emergency managers and having financial resources in a crisis

23  available.

24  Q    Can the state make an expenditure without an

25  appropriation?

1  A    No.

2  Q    So in order to pay for these salaries, an appropriation

3  was required; is that correct?

4  A    Yes.

5  Q    And was the most efficient or best way to do this by

6  putting the appropriation in the bill?

7         MR. WERTHEIMER:  Object.  I think we're back to the

8  leading.

9         THE COURT:  Yes.  That was a leading question.

10        MR. SCHNEIDER:  Okay.

11        THE COURT:  The objection is sustained.

12 BY MR. SCHNEIDER:

13 Q    Did either PA 4 or PA 72 require the state to pay for

14 emergency managers' salaries?

15 A    No.

16 Q    So after the bill took effect, after PA 436 takes effect,

17 was there ever a later appropriation in a budget bill to

18 handle this type of issue?

19 A    For ongoing expenses, I proposed it in the February

20 budget message that I put forward.  That would have been

21 included in the budget adopted in the June time frame that

22 began this October 1.

23 Q    What was the purpose of that?

24 A    Again, for ongoing, to help pay for the ongoing costs of

25 emergency managers and consultants.

```
1              MR. SCHNEIDER:  Thank you, your Honor.

2              THE COURT:  Questions from the city?

3              MR. SHUMAKER:  Your Honor, the city has no questions

4      for the governor.

5              THE COURT:  All right.  Mr. Wertheimer, do you have

6      questions?

7              MR. WERTHEIMER:  Yes, I do.

8              MS. LEVINE:  Your Honor, a point of process, so that

9      there's time for all the objectors who want to redirect, can

10     we talk about perhaps time limits?

11             MR. WERTHEIMER:  I'll be two, three minutes.

12             THE COURT:  Well, of course, your redirect of the

13     governor should be limited to what was covered on his cross-

14     examination, which wasn't much.

15             MS. LEVINE:  Yeah.  No, no.  I'm going to be brief,

16     your Honor, but I --

17             THE COURT:  I don't mean to minimize his testimony,

18     but it didn't take very long.

19             MS. LEVINE:  Plan to be brief, your Honor, but I am

20     third in the queue, so I just want to make sure third doesn't

21     show up at five.

22             THE COURT:  All right.  Let me just see a show of

23     hands.  How many of you propose to ask redirect examination

24     at this point?  Just the three of you?  All right.  I think

25     we'll be all right then.
```

1                    REDIRECT EXAMINATION

2    BY MR. WERTHEIMER:

3    Q   Governor, would you agree with me that the fact that

4    these problems that Detroit has that we all recognize, that

5    they have to be resolved and have to be resolved

6    expeditiously, does not mean that they have to be resolved on

7    the backs of retirees making one or $2,000 a month?

8              MR. SCHNEIDER:  Objection.  Relevance.

9              MR. WERTHEIMER:  Your Honor, the governor made a

10   long statement in response to a question that implied that

11   all he was doing was dealing with the problem expeditiously,

12   and I'm simply attempting to make the point that I'm

13   attempting to make that seems obvious to me.

14             THE COURT:  I'll permit it.  Go ahead, sir.  Can you

15   answer the question?

16             THE WITNESS:  Again, I have concerns about the

17   retirees also.  I'm concerned about the 700,000 citizens of

18   Detroit, the citizens of Michigan, which include these

19   retirees.

20   BY MR. WERTHEIMER:

21   Q   Governor, I did not ask you whether you had concerns.

22   Again, I'll ask you the same question again, and try to just

23   answer that, please.  Would you agree with me that the fact

24   that the problems that you've identified that have to be

25   resolved and have to be resolved quickly, that that does not

```
 1    mean that they have to be resolved on the backs of the city
 2    retirees?
 3    A   I think you're asking me to speculate because we're still
 4    in this process where there isn't even a plan on the table to
 5    say how to resolve this issue.
 6    Q   All right.  I'll let it go.  Ms. Brimer asked you a
 7    question about you having the ability to fire Mr. Orr.  Do
 8    you recall that?
 9    A   Yes.
10    Q   You were also the person who recommended that he be
11    hired, were you not?
12    A   Yes.
13            MR. WERTHEIMER:  That's all I have.  Thank you.
14                      REDIRECT EXAMINATION
15    BY MS. LEVINE:
16    Q   Good afternoon again, Governor.  Sharon Levine,
17    Lowenstein Sandler, for AFSCME.  In response to your
18    counsel's questions, you went through your education, your
19    CPA, your law degree, and some other financial experience
20    that you've had; correct?
21    A   Yes.
22    Q   And that you also discussed the fact that going back to
23    even 2011 you were having discussions with the mayor of
24    Detroit about the fact that the mayor of Detroit was running
25    out of cash; correct?
```

1   A   It was a public statement.  I was quoting a public

2   statement the mayor made back, I believe, in November of 2011

3   where he publicly came out and said there was a concern about

4   running out of cash.

5   Q   So you were aware -- you were watching Detroit and its

6   cash position going back as far as 2011; correct?

7   A   Yes.

8   Q   Okay.  Does that refresh your recollection with regard to

9   why the state stopped the implementation of the tentative

10  agreement in February of 2012, which was ratified by a

11  coalition of 30 unions and provided for substantial cash

12  savings for the City of Detroit?

13  A   No.

14  Q   You also testified that Chapter 9 was a last resort and

15  that you were looking to try to resolve it some other way in

16  good faith; is that correct?

17  A   Yes.

18  Q   So then I'm going to go back to the June 14 proposal to

19  creditors, and with your CPA and all of your financial

20  background, if you didn't understand exactly what was being

21  offered in dollars and cents to the retirees, how is it good

22  faith if the retirees couldn't understand that either?

23  A   What I would say is is if you looked at that package, it

24  was described as preliminary, that there are many pieces

25  needed to be fleshed out, including there's a section in

1  there about there had been no real evaluation of the assets

2  of the city, so it was an open question as to where it would

3  go.  And the way I viewed it is in a situation like this, you

4  had to start the discussion at some starting point, and this

5  was something to get out on the table to say now people can

6  have informed discussions, have dialogue, have questions,

7  have answers, and then hopefully move towards a conclusion.

8  In the case of retirees, in particular, though, in

9  retrospect, I think there was a real challenge to say who was

10  going to step up to represent them.  And I felt that was one

11  of the problems in that whole process that I thought could

12  get resolved by authorizing the bankruptcy; that then

13  somebody could be appointed to represent them.

14  Q   So this is not a proposal for creditors or an offer for

15  creditors.  All it is is an invitation to start a process?

16  A   No.  I hope -- I believe it was a good faith negotiation,

17  put something on the table based on the facts that were

18  available.  Again, you know, I --

19  Q   I'm just trying to clarify.  Is it a -- is it an

20  invitation to negotiate, or is it an actual proposal to

21  creditors?

22  A   I believe it was a proposal, but then you start a

23  dialogue because, again, it needed to be mutually agreed to.

24  Q   Okay.  So as a proposal --

25  A   I don't think those two comments are mutually exclusive.

1  Q   As a proposal to creditors, is it your testimony that it

2  actually clarified how those creditors were going to be

3  treated, including specifically how the retirees were going

4  to be treated?

5  A   I think it helped clearly clarify the financial situation

6  of Detroit saying here are the resources available, here's

7  where dollars need to go, and have a discussion as to what's

8  possible.

9           MS. LEVINE:  Thank you, Governor.

10                    REDIRECT EXAMINATION

11  BY MS. BRIMER:

12  Q   Just a very brief follow-up, Governor.

13           MS. BRIMER:  And I'd like to ask him if he's ever

14  seen this e-mail.  It's Retirement Systems Number 46.  No.  I

15  want to ask if he's ever seen it first.  If he's not seen it,

16  then I have no questions on it.  I'd like to ask the governor

17  if he's seen an e-mail that has been presented as an exhibit.

18  He's not a part of it, but I may have questions if he's seen

19  it.  May I approach?

20           THE COURT:  You may.  What exhibit is it?

21           MS. BRIMER:  It is the Retirement Systems Number

22  846.

23           THE COURT:  You may ask the witness if he has seen

24  it.

25  BY MS. BRIMER:

1    Q    Have you --

2              MR. SCHNEIDER:  Your Honor, before we go any

3    further, I object because this is outside the scope of my

4    examination.

5              MR. SHUMAKER:  The city joins the objection.

6              MS. BRIMER:  I believe -- I believe I will be able

7    to tie it to his examination, your Honor.

8              THE COURT:  All right.  Have you seen this before,

9    sir?

10             THE WITNESS:  I don't recall.

11             MS. BRIMER:  And if he's not recall -- does not

12   recall seeing it, your Honor, I'll take it back from him, ask

13   him a few questions --

14             THE COURT:  Okay.

15             MS. BRIMER:  -- not on it, but --

16   BY MS. BRIMER:

17   Q    Governor, do you recall who suggested that the

18   appropriation provisions in PA 436 should be included in the

19   act?

20   A    I don't recall.

21   Q    Were you the one who suggested if -- that they should be

22   included?

23   A    Again, I said I don't recall --

24   Q    Okay.

25   A    -- because, again, that's an interactive process on

1    legislation, and clearly I do several hundred bills a year.

2             MS. BRIMER:  I have nothing else, your Honor.

3             THE COURT:  All right.

4             MR. KING:  Your Honor, I just have a few questions.

5                      REDIRECT EXAMINATION

6    BY MR. KING:

7    Q   Governor, you indicated that you had reviewed a host of

8    financial information and other documentation in the course

9    of your review of Detroit's financial situation.  I think

10   that was what you just testified to with Mr. Schneider.  Did

11   you ever have an opportunity to review any information

12   regarding funding levels of other Retirement Systems in the

13   state relative to the two pension systems in Detroit?

14   A   No.

15   Q   So you wouldn't know one way or the other whether or not

16   the Detroit systems, for example, are significantly better

17   funded than either the Michigan State Employees Retirement

18   System or the Michigan Public School Employees Retirement

19   System?  You wouldn't know one way or the other whether the

20   Detroit systems are better funded than either -- better

21   funded than either of those two state systems?

22   A   Correct.

23            MR. KING:  Thank you.

24            THE COURT:  All right.  We have concluded the

25   witness' testimony.  Sir, you are excused.  Thank you very

1  much for coming today.  Appreciate it.

2       (Witness excused at 4:08 p.m.)

3           THE COURT:  We will remain in place while the

4  governor takes his leave.  Mr. Ciantra, I had indicated we

5  would take up your issue tomorrow morning, but since we have

6  time yet today, is it okay with you if we take up your issue

7  today?  All right.

8           MR. SHUMAKER:  Your Honor, the attorneys that have

9  been dealing with that issue are not present for the city.

10          THE COURT:  Oh.

11          MR. SHUMAKER:  I'm sorry about that.

12          THE COURT:  Okay.  Well, that's a problem.  Remind

13  me who that -- remind me who that was.

14          MR. SHUMAKER:  It was Mr. Stewart.

15          THE COURT:  Of course; of course.  All right.  Well,

16  we'll deal with it first thing tomorrow morning then.  Is

17  there anything else we can do today?  All right.  We'll be in

18  recess till tomorrow morning.

19          MR. SHUMAKER:  Thank you, your Honor.

20          THE CLERK:  All rise.  Court is adjourned.

21       (Proceedings concluded at 4:09 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | 6 | 81 | | |
| Governor Rick Snyder | 122/166 185/196 204/213 | 228 | 236/238 241/243 | |


| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 41 | 35 |
| Exhibit 615 | 155 |
| Exhibit 616 | 154 |
| Exhibit 625 | 158 |

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.




/s/ Lois Garrett                        November 3, 2013
_____        _____
Lois Garrett