# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

---

***Debtor In Possession***
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE−MI
Tax ID / EIN: 38−6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489−3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075−1505
248−359−7300
Fax : 248−359−7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky−Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359−7300
Fax : (248) 359−7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075−1505
(248) 359−7300
Fax : (248) 359−7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496−8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212−326−3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496−7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**

represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−6769
Email: Richard.A.Roble@usdoj.gov

*Retiree Committee*
**Official Committee of Retirees**

represented by **Sam J. Alberts**
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005−3364

(202) 408−7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2321 | Transcript Order Form of Hearing November 4, 2013, Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name ___ **David M. Eisenberg** ___

Firm ___ **Erman, Teicher, Miller, Zucker & Freedman, P.C.** ___

Address ___ **400 Galleria Officentre, Suite 444** ___

City, State, Zip ___ **Southfield, MI 48034** ___

Phone ___ **248-827-4100** ___

Email ___ **deisenberg@ermanteicher.com** ___

**Case/Debtor Name:**

Case Number: **13-53846**

Chapter: **9**

Hearing Judge **Hon. Steven Rhodes**

⦿ Bankruptcy ◯ Adversary

◯ Appeal    Appeal No: ___

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **11/4/2013**   **Time of Hearing:** **9:00 a.m.**   **Title of Hearing:** Eligibility Hearing ___

Please specify portion of hearing requested:   ⦿ Original/Unredacted   ◯ Redacted   ◯ Copy (2nd Party)

⦿ Entire Hearing   ◯ Ruling/Opinion of Judge   ◯ Testimony of Witness   ◯ Other

Special Instructions: ___

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

◯ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com



**Signature of Ordering Party:**

/s/ David M. Eisenberg ___   Date: **12/26/13** ___

By signing, I certify that I will pay all charges upon completion of the transcript request.

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          November 4, 2013
                   Debtor.        .          9:01 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

```
For AFSCME,           Lowenstein Sandler, LLP
AFL-CIO, and Sub-     By:  SHARON L. LEVINE
Chapter 98, City           JOHN K. SHERWOOD
of Detroit            65 Livingston Avenue
Retirees:             Roseland, NJ  07068
                      (973) 597-2374


For Detroit           Clark Hill, PLC
Retirement Systems-   By:  ROBERT D. GORDON
General Retirement         JENNIFER K. GREEN
System of Detroit,    151 South Old Woodward, Suite 200
Police and Fire       Birmingham, MI  48009
Retirement System     (248) 988-5882
of the City of
Detroit:              Clark Hill, PLC
                      By:  RONALD A. KING
                      212 East Grand River Avenue
                      Lansing, MI  48096
                      (517) 318-3015


For the Detroit       Erman, Teicher, Miller, Zucker &
Fire Fighters             Freedman, P.C.
Association, the      By:  BARBARA A. PATEK
Detroit Police             JULIE BETH TEICHER
Officers Associa-          DAVID EISENBERG
tion and the          400 Galleria Officentre, Suite 444
Detroit Police        Southfield, MI  48034
Lieutenants &         (248) 827-4100
Sergeants
Association:


For the Inter-        Cohen, Weiss & Simon, LLP
national Union,       By:  BABETTE A. CECCOTTI
UAW:                       PETER D. DECHIARA
                           THOMAS N. CIANTRA
                      330 West 42nd Street, 25th Floor
                      New York, NY  10036-6976
                      (212) 356-0227
```

APPEARANCES (continued):

```
For Detroit          Silverman & Morris, PLLC
Retired City         By:  THOMAS R. MORRIS
Employees            30500 Northwestern Highway, Suite 200
Association,         Farmington Hills, MI  48334
Retired Detroit      (248) 539-1330
Police and Fire
Fighters Associa-    Lippitt O'Keefe, PLLC
tion, Shirley V.     By:  RYAN C. PLECHA
Lightsey, and        370 East Maple Road, Fl. 3
Donald Taylor:       Birmingham, MI  48009
                     (248) 646-8292

For the Official     Dentons
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:                 ANTHONY B. ULLMAN
                          ARTHUR H. RUEGGER
                     1121 Avenue of the Americas
                     New York, NY  10020-1089
                     (212) 632-8390

                     Brooks, Wilkins, Sharkey & Turco, PLLC
                     By:  MATTHEW E. WILKINS
                     401 South Old Woodward, Suite 400
                     Birmingham, MI  48009
                     (248) 971-1711

For Retired          Strobl & Sharp, PC
Detroit Police       By:  LYNN M. BRIMER
Members                   MEREDITH E. TAUNT
Association:              MALLORY A. FIELD
                     300 East Long Lake Road, Suite 200
                     Bloomfield Hills, MI  48304-2376
                     (248) 540-2300

For the Flowers      Law Offices of William A. Wertheimer
Plaintiffs:          By:  WILLIAM WERTHEIMER
                     30515 Timberbrook Lane
                     Bingham Farms, MI  48025
                     (248) 644-9200

For Ambac            Schafer and Weiner, PLLC
Assurance Corp.:     By:  DANIEL J. WEINER
                     40950 Woodward Avenue, Suite 100
                     Bloomfield Hills, MI  48304
                     (248) 540-3340
```

Court Recorder:          Letrice Calloway
                         United States Bankruptcy Court
                         211 West Fort Street
                         21st Floor
                         Detroit, MI  48226-3211
                         (313) 234-0068

Transcribed By:          Lois Garrett
                         1290 West Barnes Road
                         Leslie, MI  49251
                         (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.

4          MR. MONTGOMERY:  Good morning.

5          THE COURT:  It appears that everyone is here.

6    Before we continue with the trial, Mr. Montgomery, may I have

7    your attention for a moment, please?

8          MR. MONTGOMERY:  Yes, sir.

9          THE COURT:  As you know, the city has filed a motion

10   to adjourn the preliminary injunction hearing that we had

11   tentatively set for Friday.  Is it okay with you if we have a

12   hearing on that motion to adjourn tomorrow morning before the

13   trial?

14         MR. MONTGOMERY:  I think that would be fine, your

15   Honor.  I think the debtor had proposed that we file

16   objection papers today, and so I believe that is our

17   intention to file --

18         THE COURT:  If you feel the need to do that, that's

19   fine.  Otherwise we can just have a conversation about it

20   tomorrow morning.

21         MR. MONTGOMERY:  In any case, we will be here

22   tomorrow morning, your Honor.

23         THE COURT:  All right.

24         MR. MONTGOMERY:  Thank you.

25         THE COURT:  We'll notice that for hearing then.  All

1  right.  We will continue with Mr. Orr's testimony.

2          MS. BRIMER:  Good morning, your Honor.  Lynn M.

3  Brimer appearing on behalf of the Retired Detroit Police

4  Members Association.

5          KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

6                    CROSS-EXAMINATION

7  BY MS. BRIMER:

8  Q   Good morning, Mr. Orr.

9  A   Good morning, Ms. Brimer.

10  Q   Mr. Orr, I'd like to just go back over without

11  duplicating any of the testimony a couple of items just to be

12  sure I have everything clear.  When you were present at the

13  January 29 presentation by the Jones Day attorneys, were

14  you -- did you leave the room at any time during the Jones

15  Day presentation?

16  A   No.

17  Q   During the presentation, did you hear any of the members

18  of the Jones Day team advise the city, the mayor, or the City

19  Council that they had been involved with Treasurer Dillon and

20  other members of the state in connection with the drafting of

21  the consent agreement?

22  A   The mayor and the City Council weren't there, no.

23  Q   Did they advise anyone on behalf of the city that they

24  had been involved in drafting the consent agreement?

25  A   Not that I recall.

1  Q   To your knowledge, did they advise anyone on behalf of

2  the city that they had been involved in the redrafting or the

3  drafting of Public Act 436?

4         MR. SHUMAKER:  Objection, your Honor.  It states --

5  misstates facts not in evidence.

6         THE COURT:  Overruled.  Please answer the question.

7         THE WITNESS:  Not that I recall.

8  BY MS. BRIMER:

9  Q   When did you first learn that members of Jones Day had,

10  in fact, been involved with the drafting of the consent

11  agreement, if at all?

12  A   I don't know that.

13  Q   Okay.  You are aware that members of the Jones Day team

14  gave advice to Treasurer Dillon in connection with drafting a

15  law to replace PA 4 in the event PA 4 was repealed; correct?

16  A   No.

17  Q   I'd like to direct your attention to Exhibit 866.  In

18  January of 2013, you were with the bankruptcy department at

19  Jones Day; correct?

20  A   Yes.

21  Q   And you were in the Washington office?

22  A   Yes.

23  Q   What office was Mr. Moss in in January of 2013?

24  A   Washington.

25  Q   We've already talked about this exhibit, and that is you,

1  Kevyn, that is referred to a few paragraphs into the e-mail;
2  correct?
3  A   Yes.
4  Q   And I believe this e-mail is in evidence.  I did not ask
5  you -- it refers to, "Check with Mr. Moss regarding updating
6  our Chapter 9 paper."  What Chapter 9 paper, if you know, is
7  Ms. Ball referring to in that paragraph?
8  A   I don't recall.
9  Q   Are you familiar with a paper that was drafted by members
10 of Jones Day in connection with Chapter 9 and the treatment
11 of pensions?
12 A   At this time?
13 Q   At any time.
14 A   Yes.
15 Q   Do you recall the name of that article?
16 A   No.
17        MS. BRIMER:  Your Honor, may I, just to refresh his
18 memory?
19        THE COURT:  Yes.  So the question is whether what
20 Ms. Brimer just handed you refreshes your recollection on the
21 name of that article.
22        THE WITNESS:  No.
23 BY MS. BRIMER:
24 Q   Have you ever seen the article before, Mr. Orr?
25 A   I don't think so.

1  Q   What office was Mr. Ellman in in January of 2013?

2  A   Atlanta.

3  Q   Was Mr. Ellman a member of the bankruptcy department at

4  Jones Day?

5  A   Business restructuring and reorganization group.

6  Q   Is that different than the bankruptcy department, or is

7  that the department you were in as well?

8  A   It's the same one I was in.  It just has a broader

9  connotation.

10  Q   All right.  Now, I'd like to refer your attention to

11  Exhibit 860.  This is an e-mail from Ms. Ball, and as you'll

12  see, you'll note that you're one of the -- you are a

13  recipient of this.  Do you see that?

14  A   Yes.

15  Q   It's dated 1-28.  That's the day before the presentation

16  by Jones Day; is that correct?

17  A   Yes, I believe so.

18  Q   And do you recall reviewing this e-mail?

19  A   I suspect I did.

20  Q   You have no reason to believe you didn't review it at the

21  time?

22  A   That's correct.

23  Q   You'll notice the first sentence, "Just heard from

24  Buckfire."  Do you believe that is Ken Buckfire from Miller

25  Buckfire?

1  A   Yes.  Well, strike that.  I'm not sure.

2  Q   But it would be a representative of Miller Buckfire?

3  A   It could be, yes.

4  Q   Could it be anyone else?

5  A   I think it would be somebody affiliated with Miller

6  Buckfire.

7  Q   And you'll see a little bit further down "questions that

8  Miller Buckfire has drafted for interview."  See that?

9  A   Yes.

10 Q   So the Jones Day team had the interview questions prior

11 to the interview.  Is that what we can interpret from this?

12 A   I don't know that.  You could interpret that.

13 Q   Okay.  And then you'll see much further down how can the

14 costs, especially legal costs, be controlled, strong advice,

15 not to mention a thousand hours except to say we don't have

16 major learning curve.  Do you know what that thousand hours

17 is referring to?

18 A   No.

19 Q   Is that thousand hours referring perhaps to the thousand

20 hours that members of the Jones Day team already has in this

21 project?

22 A   I don't know.

23 Q   Did you ever discuss with any of the members of Jones Day

24 what they had done in order to prepare for the presentation?

25 A   Yes.

1  Q   And what were you advised by the other members of the
2  presentation team regarding the Jones Day preparation for the
3  project?
4  A   I get the gist of your question.  Nothing regarding
5  anything related to prior orders -- hours.  Anything we
6  discussed concerned putting on the presentation.
7  Q   Were any other members of the team that made the
8  presentation also in the Washington, D.C., office of Jones
9  Day?
10 A   Yes.
11 Q   And who was that?
12 A   Steve Brogan.
13 Q   That's the managing partner?
14 A   Yes.
15 Q   So your managing partner never discussed with you any of
16 the prior involvement that Jones Day had with the State of
17 Michigan relative to the City of Detroit's finances?
18 A   No, not that I recall.
19 Q   You indicated you had recused yourself from the Jones Day
20 RFP.  Do you recall when you did that?
21 A   I believe it was sometime in February.
22 Q   Was it early February, late February?
23 A   I don't recall a specific date.
24 Q   Was it before you submitted your application -- at some
25 point you submitted an application on line for the EM

1   position; is that correct?

2   A    Oh, yes.  It was before that.

3   Q    So do you recall when you submitted that application?

4   A    That would have been late February or March.

5   Q    Could it have been as early as February 15th?

6   A    It might.

7        MS. BRIMER:  I'd like to show him something else,

8   your Honor, to refresh his recollection.  The date is

9   important to my cross-examination.

10       THE COURT:  Refresh his recollection regarding the

11  date?

12       MS. BRIMER:  Regarding the date.

13       THE COURT:  Yes, you may.

14  BY MS. BRIMER:

15  Q    I don't believe that this is in evidence.  I'd just like

16  you to take a look at the paragraph in the middle of that

17  first page.  Does that refresh your recollection with respect

18  to the date that you submitted your application?

19  A    Yes.

20  Q    And so what date was that?

21  A    That says February --

22       THE COURT:  Well, the question is not what the

23  document says.  The question is what do you remember after

24  having reviewed the document.

25       THE WITNESS:  I thought it was later than this.  The

 1   document has a date up here, but I'm not sure it's affiliated

 2   with this e-mail.  It might well be.

 3   BY MS. BRIMER:

 4   Q   So was it about mid-February that you submitted your

 5   application on line?

 6   A   This appears to say so.

 7   Q   I'd like to direct your attention to Exhibit 865, and

 8   this exhibit is in evidence as well.  This is an e-mail from

 9   Ms. Ball directly to you.  Do you see that?

10   A   Yes.

11   Q   It's dated February 11th --

12   A   Yes.

13   Q   -- correct?

14   A   Yes.

15   Q   Do you recall reviewing this e-mail?

16   A   I have no independent recollection, but I have no reason

17   to believe that I did not review it.

18   Q   So if we could move down -- the third paragraph from the

19   bottom, do you see that paragraph?  "Given an alternative, I

20   am not sure that an immediate Chapter 9 is superior.  If we

21   can get time, it would be better.  The city is not ready for

22   a Chapter 9, hyphen, at least not the one we would like.  It

23   would be better to negotiate with creditors and assess city

24   management, et cetera."  Do you know who Ms. Ball is

25   referring to when she says "not the one we would like"?

1   A    No.

2   Q    If you look back up at the parties that this e-mail has

3   been addressed to, is there anyone other than Jones Day --

4   A    No.

5   Q    -- attorneys on that?

6   A    No.

7   Q    So other than Jones Day attorneys, you believe that the

8   "we" could have been referring to anyone other than the Jones

9   Day personnel?

10  A    It could have been; it could not have been.

11  Q    So at least as early as February 11th, the Jones Day

12  attorneys were contemplating and believed a Chapter 9 was

13  appropriate for the City of Detroit; is that correct?

14  A    No.

15  Q    What do you interpret from this paragraph that Ms. Ball

16  has sent out to the Jones Day attorneys?

17  A    It says it might be appropriate, it might be appropriate

18  to negotiate with creditors and assess city management.

19  Q    So other than the fact that an immediate -- "I'm not sure

20  an immediate Chapter 9 is superior, at a minimum, not the one

21  we would like," must be referring to Jones Day personnel, is

22  it -- does it not, because there's no one else on the e-mail?

23          MR. SHUMAKER:  Objection.  Asked and answered.

24          MS. BRIMER:  I'll withdraw it.

25          THE COURT:  All right.  The question is withdrawn.

1   BY MS. BRIMER:

2   Q   And we can also interpret this that at least in January

3   11th you're still involved with the Jones Day process;

4   correct?  I mean February 11th you're still involved with the

5   Jones Day application for appointment as counsel for the

6   city; correct?

7   A   I might have been.  I don't recall independently.

8   Q   Well, it is directed -- we'll go back up to who this is

9   directed to.  It's only directed to you, and the other

10  parties on it are carbon copies, not direct recipients;

11  correct?

12  A   Yes.

13  Q   So I'd like to direct your attention to Exhibit 8 -- 808.

14  This is a series of e-mails between yourself and the governor

15  and Mr. Baird; correct?

16  A   The one in the middle?

17  Q   Well, it starts -- if you go to page 2, it starts with an

18  e-mail from --

19          THE COURT:  Would you like the paper copy, sir?

20          THE WITNESS:  It would be helpful if counselor would

21  like me to read the whole e-mail.

22          MS. BRIMER:  I can hand him a paper copy, your

23  Honor.

24  BY MS. BRIMER:

25  Q   So it begins with an e-mail from Governor Snyder to you;

1    correct?

2    A    Yes.

3    Q    And then it continues with some other e-mails between

4    yourself and other representatives of the state, correct,

5    Richard Baird?

6    A    Yes.  There's e-mails copied to Mr. Baird.

7    Q    And the date of the -- then the final e-mail is dated

8    February 15.

9    A    Yes.

10   Q    It's an e-mail from you to Ms. Ball and other members of

11   the Jones Day team; correct?

12   A    Yes.

13   Q    So on February 15 at about the time you were applying --

14   submitting your application, you're still keeping the Jones

15   Day team -- in fact, it says, "They're pretty good at keeping

16   me in the loop," so you're still keeping your Jones Day team

17   in the loop on what's going on between yourself and the

18   representatives of the state; is that correct?

19   A    Yes.  That's what this e-mail says.

20   Q    This e-mail was three days after -- if you will recall,

21   three days after the governor had indicated that you were the

22   candidate he intended on supporting; is that correct?

23   A    I don't recall that.

24   Q    All right.  Well, then we can go back to an e-mail we

25   discussed, which is 807.  We discussed this e-mail, and I'm

1  trying not to duplicate testimony we've already had, but at a

2  minimum, on February 12th, if you'll scroll down, you'll see

3  that Mr. Baird has indicated to you -- and we discussed this

4  on Friday -- that you were the candidate that the governor

5  intended on supporting.  In fact, they were arranging for the

6  church and pastor is the language that Mr. Baird used,

7  correct, on the -- if you --

8       MS. BRIMER:  And I'll hand him a hard copy, your

9  Honor.

10       THE COURT:  Okay.

11       THE WITNESS:  Okay.  Thank you.  Okay.

12  BY MS. BRIMER:

13  Q   So at what point would you have thought it appropriate to

14  withdraw yourself from the Jones Day team that was

15  negotiating and dealing with the city and the state for its

16  engagement after you were already aware that the governor was

17  supporting your application for the appointment as --

18  A   I recused --

19  Q   -- emergency manager?  Okay.  Go ahead.

20  A   I recused myself at some point during the process.  I

21  believe there are two e-mails speaking to that recusal.  If

22  you have them to refresh my recollection, that would be

23  helpful.  I don't recall the specific date.

24  Q   So at what point did you become aware that the Jones Day

25  personnel were interested in filing a Chapter 9 for the City

1   of Detroit?

2   A    The documents speak to it and the presentation, but the

3   implication is that they were interested in filing it, and I

4   don't know if that's true.  The document you showed me said

5   that we should first negotiate.

6   Q    How about if we take a look at Exhibit 853?  This is an

7   e-mail the day prior to the Jones Day presentation dated 1-

8   28, 2013.  Do you see that?

9   A    Yes.

10  Q    And it is from Mr. Ellman to various members of the Jones

11  Day team.  You're included in that.

12  A    Yes.

13  Q    You recall reviewing this e-mail, Mr. Orr?

14  A    I have no independent recollection, but there's no reason

15  for me to believe I would not have reviewed it.

16  Q    So the first paragraph from Mr. Ellman, "The RFP process

17  will inevitably lead to some internal issues about the

18  various certifications and commitments that the city may

19  require and that Jones Day may not want to give," do you know

20  what certifications and commitments Mr. Ellman is referring

21  to?

22  A    No.

23  Q    Did you ever inquire with Mr. Ellman of the

24  certifications and commitments that he was referring to?

25  A    Not that I recall.

1  Q   You didn't think it was important prior to giving a

2  presentation for this engagement to understand what

3  commitments and commitments -- what certifications and

4  commitments may cause a problem for Jones Day?

5  A   Not prior to the presentation, no.

6  Q   Then if you'll look a little further down, there's an e-

7  mail from an Amy Ferber also at Jones Day.  It's to various

8  members of Jones Day, including yourself.  Do you see that?

9  A   Yes.

10  Q   I believe Debtwa News we've established is the Detroit

11  bankruptcy -- the Detroit engagement; correct?

12  A   I believe so.

13  Q   So just in paragraph 1, the last sentence, this is

14  discussing the other -- some of the other firms that would be

15  interviewing, one of them being Foley & Lardner, and they

16  would be taking Ken Klee with them.  Mr. Klee this indicates

17  is involved in the Jefferson County bankruptcy, and you'll

18  see the last paragraph.  "It should also prove interesting

19  that MB" -- MB must be Miller Buckfire -- "has said that no

20  one wants this bankruptcy to go the way of Jeff County,"

21  Jefferson County, which, of course, Ken is running, so no one

22  wants this bankruptcy.  It's already predetermined from this

23  e-mail, isn't it, Mr. Orr, that there will be a bankruptcy

24  for the City of Detroit?

25  A   No.

1  Q   Then I'll direct your attention down to paragraph 4.  "We

2  are to be as detailed as possible in our discussions of

3  specific issues facing the city, OPEB, but avoid pitfalls of

4  alienating the state.  If something happens to the city's

5  pensions, state will probably step up to deal with this but

6  thus far has failed to concede this point," so at least as

7  early as January 28th, you were aware and the Jones Day team

8  was aware that covering the unpaid pensions was a possibility

9  from the state; correct?

10 A   Was a possibility?

11 Q   Yes.

12 A   Anything is possible, yes.

13 Q   Have you requested that the state cover any shortfall for

14 the pensions as of today?

15 A   Not directly, no.

16 Q   So based on this e-mail, it's a foregone conclusion as of

17 January 28th that Detroit will be filing a bankruptcy, isn't

18 it?

19 A   No.

20        MS. BRIMER:  Your Honor, I'd like to move for the

21 admission of this exhibit.  It was not one of the stipulated

22 exhibits.

23        THE COURT:  What number is that?

24        MS. BRIMER:  853, your Honor.

25        THE COURT:  Any objections to 853?

1     MR. SHUMAKER:  I believe it's already in evidence,

2  your Honor.

3     THE COURT:  Ah, let's just check.  It wasn't on the

4  original list.  Kelli, do we show it in the meantime?  All

5  right.  Well, if it hasn't been admitted, we'll admit it now.

6     (Exhibit 853 received at 9:29 a.m.)

7     MS. BRIMER:  Thank you, your Honor.

8  BY MS. BRIMER:

9  Q   Were you at all involved in the preparation of the RFP by

10  Jones Day?

11  A   Yes.

12  Q   And what was your involvement?

13  A   Generally speaking, reviewing drafts, perhaps preparing

14  comments, things along those lines.

15  Q   Do you know when that process took place?

16  A   I believe it took place sometime in mid to late January.

17  That was my involvement.

18  Q   809.  Well, again, this isn't the e-mail that I had

19  marked as 809.

20     MS. BRIMER:  Your Honor, if I may approach the

21  witness.  I don't even need this in.  I was going to refresh

22  his memory.

23     THE COURT:  Okay.

24  BY MS. BRIMER:

25  Q   So from that e-mail it's clear that the RFP was not even

1    issued to the firms until February 27th; is that correct?

2    A   This e-mail?

3    Q   Well, see, that's an e-mail to you.

4    A   I think we are talking about different documents.

5    Q   A different RFP?

6            MR. SHUMAKER:  Objection, your Honor.  The issue is

7    whether it refreshed the witness' recollection, I believe.

8            THE WITNESS:  Yeah.  I have no knowledge of --

9            THE COURT:  Don't testify about the content of the

10   document.  The only issue is what you remember after having

11   read it.

12           THE WITNESS:  Nothing related to this document, your

13   Honor.

14   BY MS. BRIMER:

15   Q   Were you involved with the Jones Day RFP that was

16   submitted in early March?

17   A   No.

18   Q   So to this day you're still unaware that the members of

19   the Jones Day team have been involved with the City of

20   Detroit since March of -- at least March of 2012?

21   A   No.  I became aware of it as part of this process.

22   Q   And when was that?

23   A   At some point last week or week before.

24   Q   Do you know when Jones Day's engagement agreement with

25   the city was executed?

1  A   No.

2  Q   Do you know if it was after you were appointed as the

3  emergency manager?

4  A   It might have been.

5           MS. BRIMER:  I have nothing further, your Honor.

6           MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

7  on behalf of the Retiree Association parties.

8                          CROSS-EXAMINATION

9  BY MR. PLECHA:

10  Q   Good morning, Mr. Orr.

11  A   Good morning, Mr. Plecha.

12  Q   I just have a couple of quick questions for you.  Prior

13  to the June 14th proposal for creditors, had you at that

14  point advised retirees that the city intended to cut accrued

15  vested pension rights?

16  A   I don't think so.

17           THE COURT:  Excuse me, sir.  Could you point that

18  microphone more at you?  Just turn it.  There you go.  Thank

19  you.

20           MR. PLECHA:  Thank you.

21  BY MR. PLECHA:

22  Q   Then isn't it also correct that the retirees would not

23  have had two years to prepare for those cuts?

24  A   No.

25  Q   It's not true?

1  A    No.

2  Q    How would the retirees have known that cuts were coming?

3  A    Issues regarding pensions and potential reductions were

4  discussed in this city for a number of years prior to my

5  appointment.

6  Q    Okay.  When do you know or when was the first time you

7  were aware of that?

8  A    When I was doing --

9        THE COURT:  Excuse me.  Is the question when did he

10  become aware of it, or when does he understand they were --

11  that these issues were first discussed?

12        MR. PLECHA:  When does he believe they were first

13  discussed?  Thank you, your Honor.

14        THE WITNESS:  I don't know a specific date, but I

15  know that in doing some research for the position, I recall

16  discussions in late 2011 and 2012 regarding OPEB and

17  pensions.

18  BY MR. PLECHA:

19  Q    And did that involve cutting vested pension rights?

20  A    I don't recall.

21  Q    Okay.  You or someone on your staff has requested answers

22  from the union on whether they would represent retirees;

23  correct?

24  A    Yes.

25  Q    Did anyone on your staff contact the Detroit Retired City

1  Employees Association to ask if they would represent

2  retirees?

3  A   I don't know.

4  Q   Did you ask anyone on the DRCEA?

5  A   Not personally, no.

6  Q   Okay.  Did you ask the Retired Detroit Police and Fire

7  Fighters Association if they would represent retirees?

8  A   Personally?

9  Q   Correct.

10 A   I don't think so.

11 Q   Did anyone on your staff?

12 A   I don't know.

13 Q   Upon taking office, did you have conversations with City

14 Council members?

15 A   Yes.

16 Q   Did you ask them if there were any retiree

17 representatives you should speak with?

18 A   I don't recall.

19 Q   Isn't it true that retiree representatives are entitled

20 under the city charter to attend budget hearings and

21 legislative proceedings of the city?

22 A   I believe citizens -- yeah.  I believe citizens are

23 entitled to attend those meetings, yes.

24 Q   Isn't it true that the DRCEA has been formally invited

25 and participated in budget hearings before City Council?

1    A    They may well have.

2    Q    Isn't it true that the RDPFFA has been formally invited

3    and participated in budget hearings before the council?

4    A    They, too, may well have.

5    Q    But you're not aware?

6    A    Not with specificity, counsel.

7    Q    To your knowledge, is the RDPFFA a plaintiff or co-

8    plaintiff in any of the July 2013 litigation?

9    A    I don't recall.

10   Q    Do you know if the DRCEA was a plaintiff or co-plaintiff

11   in any of the July 2013 litigation?

12   A    I don't recall.

13   Q    Did you ask either of those groups if they were going to

14   file a lawsuit?

15   A    Not that I recall.

16   Q    Then isn't it true that the RDPFFA and the DRCEA were not

17   being litigious?

18   A    If they weren't filing suits?

19   Q    "Yes" or "no" is okay.

20   A    I don't know.

21   Q    So how would they be litigious if they weren't filing

22   lawsuits?

23   A    They may have been.  Sitting here today, I don't know if

24   they joined suits or were involved or if they were working

25   together behind the scenes.  I don't know.

1   Q   Did you ever ask them?

2   A   No, I don't think I have.

3   Q   Did anyone on your staff ask them?

4   A   I don't know.

5   Q   Mr. Orr, you testified that you never turned down a

6   request for a meeting; is that correct?

7   A   Me or my staff, yes.

8   Q   Okay.  Do you recall receiving a letter from Ms. Shirley

9   Lightsey on May 4th requesting a meeting?

10  A   No.

11          MR. PLECHA:  If we could please show Exhibit 309,

12  which has been admitted into evidence.

13  BY MR. PLECHA:

14  Q   Do you recall receiving this letter?

15  A   No.

16  Q   Do you see that it clearly requests a meeting?

17  A   Yes.

18  Q   And that meeting never happened?

19  A   Not that I recall with me.

20  Q   Did you or anyone on your staff schedule a meeting

21  specifically with the DRCEA?

22  A   I don't recall.

23  Q   And do you see that it says that the DRCEA has been the

24  eyes and ears of the GRS system retirees, now nearly 12,000,

25  since 1960?

1  A    I see what it says on the document.

2  Q    At any of the meetings you attended relating to

3  restructuring, you testified that you answered all questions;

4  correct?

5  A    Yes.

6  Q    Did you ask the individuals asking those questions if

7  you, in fact, answered their questions?

8  A    I don't recall.

9  Q    So it's possible that you responded without actually

10  answering the heart of the question?

11  A    I don't know.

12  Q    Is it possible?

13  A    Anything is possible.

14  Q    But you didn't ask them if their answer -- if their

15  questions were answered; correct?

16  A    I just said I don't --

17  Q    Did you ask them --

18  A    I just said I don't recall.

19  Q    Okay.  Okay.  Do you have any agreement with Jones Day to

20  rejoin the firm after your EM term expires?

21  A    No.

22  Q    Did you have any discussions with Jones Day about

23  rejoining the firm?

24  A    No.

25         MR. PLECHA:  No further questions.

1       MS. PATEK:  Good morning, your Honor.  Barbara Patek

2  on behalf of the Detroit public safety unions.

3                        CROSS-EXAMINATION

4  BY MS. PATEK:

5  Q   Good morning, Mr. Orr.

6  A   Good morning, Ms. Patek.

7  Q   Mr. Orr, I want to start with the idea of metrics and

8  milestones, which you talked about in your testimony last

9  week.  When you became the emergency manager, did you seek

10  out or ask the state, the treasurer, the governor, any

11  representative of the state about establishing milestones or

12  metrics with regard to your going forward as the emergency

13  manager?

14  A   In what respect?

15  Q   In terms of -- well, you told us last week that, for

16  example, there were certain milestones or metrics that were

17  set forth in past consent agreements with the city that the

18  city did not meet.

19  A   Yes.

20  Q   Did you make any effort when you became the emergency

21  manager to attempt to negotiate with the state additional

22  milestones and metrics that might have facilitated your

23  performance?

24  A   Not that I recall.

25  Q   And you were asked by Ms. Brimer with regard to whether

1  you had sought any additional support from the state since

2  becoming appointed emergency manager, and you said not

3  directly.  Have you indirectly sought such support from the

4  state?  And I want to focus my question on from the time

5  period that you were appointed the emergency manager until

6  the date of the filing of the bankruptcy petition.

7  A    Yes.

8  Q    And can you tell us what support you've sought and how?

9  A    The Belle Isle lease relieves the city of tens if not

10 hundreds of millions of dollars in liability over 30 years.

11 MMSA assisting the city with rolling out the benefit plan

12 relieves the city of several million dollars of obligation.

13 For instance, also having the state assist us with tax

14 collection provides the city with enhanced revenue collection

15 and milestones, things of those nature -- things of that

16 nature, which are operational.

17 Q    Have you indirectly or otherwise asked the state for any

18 assistance with the anticipated unfunded pension liability?

19 A    You mean cash assistance?

20 Q    Yes.

21 A    Not directly.

22 Q    And what about indirectly?

23 A    Not that I recall.

24 Q    At the time you took the job as emergency manager for the

25 City of Detroit, you were a very experienced bankruptcy and

1   restructuring professional.  Is that fair?

2   A    I had practiced in the area of bankruptcy and

3   restructuring for a long period of time, yes.

4   Q    And you had extensive experience in Chapter 11 with

5   corporate or business reorganizations?

6   A    Yes.

7   Q    Did you also have experience with municipal

8   reorganizations either inside or outside of court?

9   A    Municipal reorganizations?

10  Q    Yes.  Municipal restructuring.

11  A    Not in the sense that you mean, no.

12  Q    You had not before participated as counsel in a Chapter

13  9?

14  A    That is correct.

15  Q    And you had not, I take it from your testimony,

16  participated in -- on behalf of a municipality in a

17  restructuring or reorganization in an effort to address

18  municipal debt?

19  A    I think in my days in Florida I did land use and other

20  types of practices, but I don't think it's the nature of what

21  you're inquiring about.

22  Q    And had you ever been involved in a restructuring or

23  insolvency proceeding where public safety was an issue in the

24  case?  And so I'm clear, I'm talking about municipal

25  provision of public safety.

1  A   Do you mean like police, fire, and EMS --

2  Q   Yes.

3  A   -- as opposed to public safety at large?

4  Q   Yes.

5  A   I get the gist of your question.  There are cases I'm

6  involved with that certainly had public safety implications,

7  but the nature of your question is of this character, and I

8  think it's fair to say not in the sense that you mean.

9  Q   And you have an impressive resume, but I take it you,

10  before your appointment as an emergency manager, never worked

11  as a police officer or a fire fighter?

12  A   I never worked as a police officer or fire fighter.

13  Q   And I take it upon undertaking your responsibilities as

14  emergency manager, you undertook to educate yourself about

15  the jobs that the police and fire do in the City of Detroit?

16  A   Yeah.  I'd like to think I had done some of that before

17  becoming emergency manager, but, yes, specifically with

18  regard to police and fire in the City of Detroit.

19  Q   And you would agree with me that the ability of the City

20  of Detroit to provide effective public safety services is at

21  the core of what's essential to Detroit's survival?

22  A   Yes.

23  Q   And would you agree with me that at the time you assumed

24  the role of emergency manager, that the working conditions

25  for fire and police in the City of Detroit were, in fact,

1    deplorable?

2    A    The working conditions were substandard.

3    Q    Would you agree that at the time you assumed the position

4    of emergency manager, that the police department was, in

5    terms of its ability to provide effective public safety,

6    undermanned?

7    A    The reason I'm hesitating, I've seen studies that address

8    deployment, so on and so forth, and whether it's a manpower

9    issue and the number of people that are doing clerical jobs

10   as opposed to the 30 percent that should be on the street, so

11   I don't know how to answer your question.  I don't know.

12   Q    You don't know the answer to that?

13   A    I don't know the answer, no.

14   Q    With respect to its ability to provide adequate fire

15   protection for the citizens, businesses, and visitors to the

16   City of Detroit, would you agree that the Detroit Fire

17   Department was, at the time you assumed the position of

18   emergency manager, undermanned?

19   A    I would agree that it was substandard, yes.

20   Q    And would you agree that one of your most important

21   obligations in the course of this city's restructuring is to

22   ensure that at the end of the day that the City of Detroit

23   has enough qualified, committed, well-trained, and well-

24   equipped police and fire fighters to provide effective public

25   safety for its residents, businesses, and visitors?

1    A    Yes.

2    Q    At the time you were involved in the Jones Day pitch

3    proposal to the City of Detroit in late January and perhaps

4    into early February of this year, did you have any

5    understanding with regard to whether or not, as a general

6    matter, public safety officers -- that is, police and fire --

7    were participants in the federal Social Security program?

8    A    As of the pitch?

9    Q    Yes.

10   A    I don't recall.

11   Q    At the time you assumed the position of emergency manager

12   in March of 2013, did you have an understanding as to whether

13   or not police and fire in the City of Detroit were

14   participants in the federal Social Security program?

15   A    I don't recall.

16   Q    Do you know whether or not by the time you issued your

17   financial operating plan for the City of Detroit in May of

18   2013 whether you were aware at that time that police and fire

19   fighters for the City of Detroit were not participants in

20   Social Security?

21   A    Yes.

22   Q    And I take it then certainly at the time of the June 14th

23   proposal you were also aware that they were not participants

24   in Social Security?

25   A    Yes.

1  Q   And did you also have an understanding that for police or

2  fire fighters hired before March 31st of 1986 those

3  individuals also were not participants or did not have

4  access, at least through their employment with the City of

5  Detroit, to the Medicare program?

6  A   No.

7  Q   Do you understand that sitting here today?

8  A   Yes.

9  Q   At the time you took the position of the emergency

10  manager, you indicated that you went back and you looked back

11  at the relationship between the various unions, including

12  public safety unions, and the City of Detroit.  Is that fair?

13  A   I think I did some of that prior to me becoming emergency

14  manager, but I think your statement is fair.

15  Q   So you had reviewed at least what would have been the

16  existing collective bargaining agreements at the time you

17  became the emergency manager?

18  A   I don't recall.

19  Q   Was it your impression that the city, as of the time that

20  you became the emergency manager, had made great strides

21  under the consent agreement in reducing costs imposed by the

22  active and expired collective bargaining agreements that

23  affected the city's relationship with the various unions?

24  A   No.

25  Q   Was it your impression that some of the cost savings that

1    the city had achieved prior to your assuming the role of

2    emergency manager had actually been achieved through interest

3    arbitration awards under Act 312?

4    A   I think it's fair to say there were cost savings achieved

5    associated with police and fire, but there were also

6    arbitration awards that restored some of those savings.

7    Q   You would agree that some of the cost savings, however,

8    that had been achieved had been achieved through the --

9    through Act 312 interest arbitration awards?

10   A   Yes, some.

11   Q   At the time -- well, strike that.  Did you ever review

12   any of the concessionary agreements that had been negotiated

13   between the city and some of the public safety unions prior

14   to your assuming the role of emergency manager?

15   A   I don't recall.

16   Q   Are you aware sitting here today that such agreements, in

17   fact, existed?

18   A   Yes.

19   Q   And is it your understanding that those agreements were

20   never, in fact, implemented by the City of Detroit?

21   A   To be fair, there are aspects that may have been

22   implemented through CET's and through give-backs of costs,

23   but the agreements in toto I'm unaware of.

24   Q   So stated another way, there were, in fact, negotiated

25   agreements that included cost savings that were not made

1  effective or were not implemented in toto; correct?

2  A   Yes.

3  Q   And instead what happened was the city implemented the

4  aspects of those agreement that the city liked and imposed

5  them on the various unions?

6  A   I don't know the city liked or not.  I know that the city

7  implemented certain aspects of those agreements.

8  Q   And would it be fair to say that those -- they would --

9  well, strike that.  You were appointed -- or you assumed the

10  role of emergency financial manager on March 25th, 2013;

11  correct?

12  A   Yes.

13  Q   And that was three days before Public Act 436 became

14  effective?

15  A   Yes.

16  Q   And is it true that by virtue of your appointment on

17  March 25th, the city -- well, strike that.  Let me withdraw

18  that.  Were you or did you become aware of an Act 312 award

19  issued on or about March 25th, 2013, that involved the city

20  and the Detroit Police Officers Association?

21  A   Talking about the arbitrator, Mr. Roumell, DPOA award?

22  Q   Yes, I am.

23  A   Yes.  I think I became aware of that on or about the

24  25th.

25  Q   And did you review that award?

1  A   I don't recall, but I think I did.

2  Q   And do you recall -- did you play any role as the

3  emergency manager in any decision to appeal any portion of

4  the -- I'm going to call it the Roumell arbitration award?

5  A   I believe I was consulted and advised as to the reasons

6  why, so to that extent, yes.

7  Q   Okay.  And was it your understanding that the only

8  portion of the Roumell award that was appealed by the City of

9  Detroit was the portion of the award that would have given

10  back to the DPOA's members part of the ten-percent pay cut

11  that had been imposed on them?

12  A   Yeah.  If you're talking about the five-percent give-

13  back, that's -- there may have been other provisions, but I

14  recall that.

15  Q   And is it your understanding that the terms of that Act

16  312 award form now the basis of the contractual relationship

17  between the city and the Detroit Police Officers Association?

18  A   Without straying into a legal conclusion, I'm aware that

19  there's an Act 312 award.  I'm aware that there's an appeal

20  of the award.  I'm aware that it gave back five percent.

21  Q   And are you -- do you have an understanding here today as

22  to whether or not that Act 312 award, leaving aside the

23  appeal of the five-percent give-back, governs the

24  relationship between the City of Detroit and the Detroit

25  Police Officers Association and its members as we sit here

1  today?

2          MR. SHUMAKER:  Objection, your Honor.  Relevance.

3          MS. PATEK:  Your Honor, I think it's absolutely

4  relevant.  I think the -- I think to date the city has not

5  directly acknowledged that there is a contract between the

6  Detroit Police Officers Association and the city, and it's

7  our position that there is.

8          THE COURT:  How is that relevant to eligibility?

9          MS. PATEK:  I think it's relevant to eligibility

10 from the standpoint of the city's obligations with respect to

11 negotiating.  It's a city's ability to impose terms in that

12 regard.

13         THE COURT:  All right.  It's arguable.  I'll permit

14 it.

15         THE WITNESS:  I don't know if it forms a contractual

16 relationship.

17         MS. PATEK:  Can I have City's Exhibit 75?  And I'm

18 looking at page 13.

19 BY MS. PATEK:

20 Q   Mr. Orr, I'm going to ask you to take a look at City

21 Exhibit 75 and look at the first few lines of -- under

22 "Bargaining Unit Overview."  And I'm going to ask you if

23 the -- reading that -- well, strike that.  This is a document

24 that you authored; correct?

25 A   Can we just verify which document you're talking about?

1  This is the report?

2  Q   Yes.  This is City Exhibit 75 --

3  A   The May 12th report.

4  Q   -- the financial May -- yes.

5  A   Okay.  That's the financial and operating plan.  Okay.

6  Q   And you authored this document?

7  A   I and my team authored this document.  I didn't write it

8  out longhand.

9  Q   And this is the document that you told us was not a

10  plebescite.  This is just the fact of the way it is for the

11  City of Detroit as of May 12th, 2013.

12  A   Yes.  This is the document caught up in that interview

13  and all that statement.

14  Q   And --

15  A   Can we go back?

16  Q   Looking at the first sentence under "Labor Initiatives,

17  Bargaining Unit Overview, and Collective Bargaining Agreement

18  Consolidation," does that refresh your recollection as to

19  whether, in fact, the city had made great strides under the

20  consent agreement in reducing costs imposed by its numerous

21  active and expired collective bargaining agreements?

22  A   Yes, for all 48 CBA's.

23  Q   And some of those cost savings, as we've already

24  established, included the cost savings received by -- through

25  interest arbitration awards?

1   A    Yes.  I think we just talked about that.

2            MS. PATEK:  Can I have 720?  And if we can go to the

3   second page --

4   BY MS. PATEK:

5   Q    One of the things that Public Act 436 did was to allow

6   you, at your option, to suspend collective bargaining with

7   the various unions who had collective bargaining

8   relationships with the city; is that right?

9   A    Well, here again, without straying into legal

10  conclusions, I think the act does that by itself, but, yes,

11  it suspends collective bargaining for five years.

12  Q    You were not -- you could have at your option chose to

13  bargain collectively with the various unions.  Is that fair?

14  A    I'm not sure.

15  Q    Well, and, in fact, you did choose to do so with respect

16  to some of the transportation unions; isn't that right?

17  A    No.

18  Q    You did not continue to bargain collectively with the --

19  any of the transportation unions?

20  A    No.  I think I've instructed my team to make it very

21  clear that any discussions or negotiations we are engaged in

22  are not collective bargaining or waiving that provision under

23  the statute.

24           MS. PATEK:  I'm going to ask you to flip back to 75

25  for a moment, and I'd like page 14.

1  BY MS. PATEK:

2  Q   And if you look at the first sentence, Mr. Orr, when you

3  issued your March 12, 2013, report, was it accurate that the

4  city was currently bargaining with transportation employees

5  covered under Section 13(c) of the Federal Mass Transit Act?

6  A   Yes, but they have an exemption from other provisions,

7  which I think we validated at some point prior to this.

8  Q   So, in fact, the city was bargaining with the

9  transportation employees?

10 A   Transportation is separate under 13(c) of the Federal

11 Transportation Act.  They have an exemption which supersedes

12 the state provision of 436.

13 Q   Was it your understanding that you could not, even if you

14 wanted or chose to do so, bargain collectively with any of

15 the public safety unions after March 28th, 2013?

16 A   I'm not sure.  That may draw for -- call for a legal

17 conclusion.

18 Q   You don't know one way or the other?

19 A   Yeah.  I think that's correct.  I'd consult counsel.

20       MS. PATEK:  We can go back to page 2 of the

21 timeline.

22 BY MS. PATEK:

23 Q   Did you at some point in time shortly after your

24 appointment as emergency manager authorize city

25 representatives to file a motion in an effort to block Act

1    312 proceedings that had been filed by, among others, the

2    Detroit Police Command Officers Association and Detroit

3    Police Lieutenants and Sergeants Association?

4              MR. SHUMAKER:  Objection, your Honor.  Relevance.

5              MS. PATEK:  Again, your Honor, this goes to

6    negotiating in good faith.  I mean if --

7              THE COURT:  I'll permit it.  Go ahead.

8              THE WITNESS:  Yes, I believe so.

9    BY MS. PATEK:

10   Q    And do you know if you were aware at the time you

11   authorized the filing of that motion that the Detroit Police

12   Command Officers Association did not have a collective

13   bargaining agreement with the city?

14   A    DPCOA?

15   Q    Yes.

16   A    I don't recall.

17   Q    Were you aware that there were a number of collective

18   bargaining agreements, including the Detroit Police

19   Lieutenants and Sergeants Association's, which was scheduled

20   to expire on June 30th of 2013 at the time you authorized

21   that motion?

22   A    I believe a number of CBA's were due to expire on the

23   30th.  I don't recall with specificity if DPLSA's was one of

24   them.  I have no reason to believe that it was not.

25   Q    And are you aware that ultimately there was an order that

1  came out of the Michigan Employee Relations Commission, in

2  fact, on June 14th which blocked those Act 312 proceedings

3  from going forward?

4  A   I don't recall the date, but I remember an order.

5  Q   You knew before you assumed the role of emergency manager

6  that one of the issues you would have to find a way to

7  address was -- were the pension issues and the legacy costs

8  that faced the City of Detroit?

9  A   Yes, I believe so.

10  Q   And you certainly knew that that might entail having to

11  address the accrued vested pension rights of Detroit public

12  safety employees?

13  A   Yes, I believe so.

14  Q   And in terms of your ability to address those issues, you

15  had the benefit of multiple advisors, including Ernst &

16  Young, Conway MacKenzie, Miller Buckfire, Jones Day, Miller

17  Canfield, and the city legal department to help you get your

18  arms around what needed to be done to address those issues?

19  A   Yes.

20  Q   And all of those various advisors, I take it, assisted

21  you in preparing the first financial operating report that

22  was issued on -- or operating plan that was issued on May 12,

23  2013?

24  A   Yes.

25  Q   And Public Act 436, in fact, I think you testified

1    earlier, gave you 45 days to put together that financial

2    operating plan; correct?

3    A    Yes.

4    Q    And with the assistance of those advisors, you needed

5    every bit of those 45 days to do so?

6    A    We used 45 days, but there are analyses that were already

7    in the works.

8    Q    And we can agree that the financial operating plan was

9    not rolled out early, but it was rolled out in a timely

10   fashion?

11   A    Yes.  It was rolled out on time.

12   Q    And then you had -- I think we've talked about earlier on

13   June 10th you had your first public meeting at Wayne State

14   University to discuss that financial and operating plan?

15   A    Yes.

16   Q    And your first proposal with respect to what would happen

17   with the accrued vested pension benefits was rolled out four

18   days later on June 14th of 2013, about 75 days or two and a

19   half months after you took office?

20        MR. SHUMAKER:  Objection, your Honor.  Asked and

21   answered.

22        THE COURT:  Sustained.

23   BY MS. PATEK:

24   Q    And I don't want to go back over the time line of the

25   various meetings.  I want to jump ahead.  You know, we've

1  talked about the June 14th meetings, and I believe you

2  testified to some meetings June 20th, July 10th and 11th held

3  with the various unions, including the public safety unions.

4       MS. PATEK:  I'd like to bring up -- I think it's

5  704, and this is in evidence.

6  BY MS. PATEK:

7  Q   Mr. Orr, have you seen this letter before?  It's a letter

8  on Detroit Fire Fighters Association letterhead dated July

9  12th, 2013.

10  A   I believe so.

11  Q   And wasn't one of your goals in terms of when you rolled

12  out the proposal on June 14th to -- in addition to addressing

13  the legacy costs, to establish some uniformity among the

14  contracts between the city and its various unions?

15  A   I think that's fair, yes.

16  Q   And this June 12th letter went to Mr. Miller and Mr.

17  Heiman, who were two of the contact people to whom people

18  were directed at the June 14th meeting and at the later

19  benefits meeting?

20  A   Yes.

21  Q   And if we scroll down to the bottom, this letter came

22  from the presidents of each of the four public safety unions;

23  that is, the fire fighters, the Detroit Police Command

24  Officers Association, the Detroit Police Lieutenants and

25  Sergeants Association, and the Detroit Police Officers

1  Association?

2  A   Yes.  I see their initials behind their signatures, but I

3  assume there was authority for them to sign it, so the answer

4  is yes.

5  Q   And would you agree with me that at this point in time

6  that it may have been beneficial for the city in terms of its

7  effort to get uniform contracts to be able to negotiate with

8  these four public safety unions as a coalition?

9  A   It may or may not have been either as a coalition or

10  either individually.

11  Q   You don't have an opinion one way or the other?

12  A   No.

13  Q   Do you know whether or not historically these unions had

14  negotiated individually as opposed to as a coalition with the

15  City of Detroit?

16  A   I don't recall.

17  Q   And during this letter, the individuals who sent the

18  letter were requesting specific restructuring proposals from

19  the city.  Do you see that in the third full paragraph?

20  A   Yes.  I see what it says.

21  Q   And we've covered this earlier.  You can agree that while

22  there was a statement that accrued vested pension benefits

23  would have to be significantly impaired, there was no

24  specific proposal as to by how much?

25  A   On June 14?

1  Q    Yes.

2  A    Yes.

3  Q    And I take it that would also have been true as of the

4  date of this letter as of July 12th?

5  A    I don't recall.

6  Q    Do you have any information sitting here today that there

7  was a more specific proposal provided to any of the Detroit

8  Fire Fighters Association, the Detroit Police Command

9  Officers Association, the Detroit Police Lieutenants and

10 Sergeants Association, or the Detroit Police Officers

11 Association as of July 12th, 2013?

12 A    Do I have any specific information that more detailed

13 information was provided?  Is that your question?

14 Q    That specific proposal --

15 A    Oh, okay.

16 Q    -- a more specific proposal was provided.

17 A    I don't recall.

18 Q    Do you know whether or not you received a copy of this

19 letter from anyone at or around July 12th, 2013?

20 A    I received it at some point.  I don't recall if it was at

21 or around the 13th, but somewhere in that time frame.

22 Q    Do you know whether or not you, as the emergency manager,

23 played any role in directing the city's response to this

24 communication from the four public safety unions?

25 A    There were a lot of discussions about reaching out to the

1  public safety unions, and that may have included this time or
2  later more information, so I don't recall with specificity if
3  it was at or around this time.
4  Q   And I want to skip down to the next paragraph in that
5  letter and actually the next two paragraphs.  The letter
6  states that the four public safety unions were reviewing and
7  will provide the city with specific proposals, but it would
8  be productive if the city could provide us with its specific
9  proposals on pension benefit restructuring as soon as
10 possible.  Do you see that?
11 A   Yes.
12 Q   This was six days before the city filed its bankruptcy
13 petition; correct?
14 A   I believe so.
15 Q   Do you know whether or not anybody either from Jones Day
16 or from your office made any effort to contact any of these
17 four individuals with regard to providing them with
18 counterproposals?
19 A   I know there were a lot of discussions with certain
20 groups here.  I don't know if they were provided with
21 specific proposals.
22 Q   I want to jump ahead to Exhibit 705.  And we know in
23 terms of our timeline that on July 16th you had already
24 written the governor to ask for authorization to file for
25 Chapter 9 protection; correct?

1  A    Yes.

2  Q    And have you seen this letter before, that being Exhibit

3  705, which is a July 17th, 2013, letter on Jones Day

4  stationery?

5  A    Yes.

6  Q    And the letter is addressed to the four presidents of the

7  four Detroit public safety unions, is it not?

8  A    Yes.

9  Q    And the letter itself does not indicate whether it was

10  transmitted by e-mail, regular mail, or some other means?

11  A    That's correct.  I don't see it.

12  Q    The letter starts out, "Thank you for your letter of July

13  12th, and thank you for further continuing to discuss in good

14  faith the difficult issue of pension restructuring.  The

15  office of the emergency manager appreciates your strong

16  cooperation."  Do you know if you directly authorized the

17  sending of this letter?

18  A    I instructed my team to continue cooperating and reaching

19  out to the various stakeholders.  I don't recall if I

20  directly authorized this particular letter.

21  Q    Was it your impression and understanding that as of July

22  17th, 2003 (sic), that the four public safety unions were

23  cooperating and, in fact, providing strong cooperation in

24  terms of being willing to discuss and negotiate and address

25  the difficult legacy cost issues that were facing the city?

1   A    It was my understanding that there were ongoing

2   discussions without characterizing the level of cooperation.

3   Q    You certainly would not have authorized the lawyers at

4   Jones Day to put something that was not true in a letter

5   going out to the public safety officers?

6   A    I certainly would hope not.

7   Q    Is it your position prior to the filing of the

8   bankruptcy -- well, strike that.  As a bankruptcy

9   practitioner, you've been involved in, I take it, many

10  difficult negotiations.

11  A    Yes.  I think that's fair.

12  Q    And we can all agree that -- even those of us who are

13  litigators, that a consensual solution is generally

14  preferable to a litigated solution?

15  A    Yes.  We can agree with that.

16  Q    Because it gives both parties input into and control --

17  at least some control over the outcome?

18  A    There are a number of reasons, but those are part of

19  them, yes.

20  Q    And it also gives the participating parties some

21  ownership of whatever that decision turns out to be?

22  A    There are a number of reasons.  Among them may be those

23  reasons as well.

24  Q    You are certainly aware of the give and take that's

25  necessary in such negotiations for them to be successful?

1  A    Yes.

2  Q    And you're also aware that sometimes, especially when the

3  issues are complicated and long-standing, that they can take

4  an extended period of time?

5  A    Sometimes they can; sometimes they can't.

6  Q    Did you ever consider upon assuming the role of emergency

7  manager at any time prior to the filing of the bankruptcy

8  petition using the opportunity to potentially extend the

9  contracts of the four Detroit public safety unions as a

10 bargaining tool to address the difficult legacy and pension

11 issues facing the city?  And that's a "yes" or --

12 A    I may have.  I don't recall with specificity.

13 Q    You elected not to do so, however?

14 A    We may have with regard to some of the bargaining units.

15 I just don't recall.

16 Q    Did you consider, based upon your prior experience as a

17 bankruptcy practitioner, whether it might chill your ability

18 to negotiate these difficult pension restructuring issues

19 with the public safety employees to tell the unions that you

20 were exercising your right not to bargain collectively with

21 them?

22 A    No.

23 Q    With respect to -- well, strike that.  The June 14th

24 proposal that was put out at the airport, did that proposal

25 contain terms that could be accepted or rejected within the

1    time frame between June 14th and July 18th?

2    A    It might have.

3    Q    You can't say one way or the other?

4    A    No.  I'm saying people may have been willing to accept

5    terms in the proposal.  It might have.

6    Q    Well, there was no -- I think we've already established

7    there was no specific proposal with respect to how the

8    accrued vested pension benefits were going to be impaired by

9    that proposal.

10   A    I think that's correct.

11   Q    And so even if the public safety unions or one of the

12   other unions had been willing to accept, there really was not

13   a proposal with enough -- let's call it meat on it for them

14   to accept at that time?

15   A    I don't know what they would have required to accept, so

16   there might have been.

17   Q    Was it your -- well, in terms of the active employees,

18   you certainly understood by the time of the June 14th

19   proposal that for the police and -- active police and fire

20   employees that if their pension benefits were significantly

21   impaired by the restructuring, that they would not have

22   through their employment at the City of Detroit the benefit

23   of falling back on Social Security?

24   A    I think that's fair.

25   Q    And you also understood -- strike that.  Did you have an

1  understanding in terms of the pension restructuring as to how

2  that restructuring would affect their ability to receive duty

3  disability; that is, for police and fire fighters who were

4  disabled as a result of on-the-job injuries, whether and how

5  they would be impacted by the restructuring proposal?

6  A    Did I have an understanding when?

7  Q    As of June 14th when you made -- when you put the

8  restructuring proposal out at the airport --

9  A    Right.

10  Q    -- did you have an understanding as to how significant

11  impairments of accrued vested pension benefits would affect

12  disabled police and fire fighters?

13  A    I think sometime around this time, I had a general

14  understanding, including disability and physical therapy.  I

15  don't recall if it was with the level of specificity you seem

16  to be implying.

17  Q    Can you tell me generally what your understanding was?

18  A    Well, my understanding was that there would have been

19  impacts to some of their coverage, and we were discussing

20  perhaps ways of addressing that.

21  Q    As rolled out, the June 14th proposal did not address

22  those issues, though; correct?

23  A    I don't think the proposal itself did.

24        MS. PATEK:  I think that's all I have, Mr. Orr.

25        THE WITNESS:  Thank you.

```
 1            THE COURT:  Any other questions for the witness?
 2    All right, sir.  You are excused.
 3            MR. SHUMAKER:  Your Honor, I do have a few redirect
 4    if I could.
 5            THE COURT:  Oh, you do?
 6            MR. SHUMAKER:  Yes, if I may.
 7            THE COURT:  I didn't hear you reply.
 8            MR. SHUMAKER:  I'm sorry.  I thought you were asking
 9    the objectors.
10            THE COURT:  Go for it.
11            MR. SHUMAKER:  Sorry about that, your Honor.  For
12    the record, Gregory Shumaker of Jones Day for the city.
13                        REDIRECT EXAMINATION
14    BY MR. SHUMAKER:
15    Q   Good morning, Mr. Orr.
16    A   Good morning, Mr. Shumaker.
17    Q   I'm going to jump around here a little bit, but I'd like
18    to ask you a few questions about some of the questions you've
19    been asked over the last three days of cross-examination.
20    I'd like to show you Exhibit 418, and I believe Mr. Ullman,
21    if you can recall back that far, asked you a few questions
22    about this document, and this is the Jones Day pitch book;
23    correct?
24    A   Yes.
25    Q   Mr. Ullman showed you a page where Jones Day discussed
```

1  filing a Chapter 9 case if one was warranted.  Do you recall

2  that?

3  A    Yes.

4  Q    I want to show you a page that Mr. Ullman did not show

5  you.

6          MR. SHUMAKER:  Go to page 13.  Thank you.  And could

7  you blow up the top there, Laurie?

8  BY MR. SHUMAKER:

9  Q    Mr. Orr, you just testified in response to some of Ms.

10  Patek's questions that out-of-court solutions are preferred.

11  Was this -- first of all, was this slide shown to the

12  participants of the January 29th --

13  A    Yes.

14  Q    -- meeting?  And did you agree with this slide when it

15  was shown?

16  A    Yes.

17  Q    Why would out-of-court solutions be preferred?

18  A    For a number of reasons listed here but also because, as

19  I think I testified during my cross with Mr. Ullman, the

20  issues that are being discussed in this deck had been

21  examined by the city over a number of years.

22  Q    And the benefits listed are the ones that you're

23  referring to down below?

24  A    Yes.

25  Q    When you became emergency manager, did you agree that an

1  out-of-court solution was preferable?

2  A    Yes.

3  Q    Is that what you were aiming for in the months from March

4  25th through July 18th?

5  A    Yes.

6        MR. MONTGOMERY:  Objection.  Leading, your Honor.

7        THE COURT:  No.  That question is not leading.  I'll

8  permit it.  Go ahead.

9        THE WITNESS:  Yes, your Honor.

10  BY MR. SHUMAKER:

11  Q    Mr. Orr, at the bottom of that slide, there's a point

12  that says "extremely difficult to achieve in practice."  Do

13  you see that?

14  A    Yes.

15  Q    Do you have any understanding as to why Jones Day would

16  share that message with the city?

17  A    Yes.

18  Q    And why is that?

19  A    Typically out-of-court solutions require parties to agree

20  to significant concessions in some cases to deal with legacy

21  issues that have been under discussion and under review for a

22  long period of time.  Oftentime parties are unwilling for a

23  number of reasons to do that.

24  Q    Is there anything in your subsequent experience as

25  emergency manager that has made you believe in any way that

1  Jones Day was wrong in that assessment?

2  A    No.

3  Q    Mr. DeChiara showed you Exhibit 44.

4        MR. SHUMAKER:  If we could put that up, please.

5  BY MR. SHUMAKER:

6  Q    And he showed you page 61 of that document.

7        MR. SHUMAKER:  If you could blow that up, please.

8  BY MR. SHUMAKER:

9  Q    Mr. DeChiara asked you a number of questions and

10 suggested that you had not stuck to the schedule because you

11 had filed on July 18th instead of July 19th.  Do you recall

12 that?

13 A    Yes.

14 Q    He also indicated that someone had started drafting your

15 letter requesting authorization to file a Chapter 9 filing

16 earlier that week or later in the prior week.  Do you recall

17 that testimony?

18 A    Yes.

19 Q    Did you believe that having someone start drafting up

20 your request for authorization was inconsistent with what you

21 had told the June 14 meeting participants?

22 A    No, not at all.

23 Q    Why was that?

24 A    We had said at the meeting that we had to make some very

25 difficult decisions.  If we were getting proposals in in the

1  nature of term sheets or agreement in principles, we might

2  extend it for another 30 days, but if we were not within that

3  time frame, that we were going to have to make a hard call.

4  I think I said the same thing at the June 10th meeting for --

5  public meeting and that, in fact, we were not getting

6  progress along those lines within this time frame.

7  Q   So you mentioned the fact of possibly having to file a

8  Chapter 9 at both the June 10th and the June 14th meetings?

9  A   Yes.

10 Q   Were you keeping that fact, that there might have to be a

11 Chapter 9 filing, from those meeting attendees?

12 A   No.

13 Q   Mr. DeChiara also showed you another document.  It was

14 Exhibit 620.

15         MR. SHUMAKER:  If you could put that up, please.

16 BY MR. SHUMAKER:

17 Q   I'm looking -- he was asking you about the second e-mail

18 down.  It starts out "Kevyn."

19         MR. SHUMAKER:  Yes.  Thank you.

20 BY MR. SHUMAKER:

21 Q   And Mr. DeChiara focused your attention on, I believe,

22 the last sentence there.  Do you see that?  It starts with

23 "if you agree."

24 A   Yes.

25 Q   Okay.  My question is -- and he referred you, if you

1 recall, to the last clause of that sentence that talked

2 about, "Then I think that clearly establishes that you are

3 already behaving as an agent of the state committed to

4 getting Detroit back on track." Do you recall that?

5 A   Yes.

6 Q   And this e-mail was dated February 22nd, 2013; correct?

7 A   Yes.  That's what it says.

8 Q   On that date, did you believe you were acting as an agent

9 of the state?

10 A   No.  I believe Mr. Baird was just salesmanship and

11 puffing, no legal conclusion.

12 Q   Had you been offered the job of emergency manager at that

13 time?

14 A   I don't think so.

15 Q   Had you accepted the job of emergency manager at that

16 time?

17 A   No.

18 Q   Ms. Levine asked you a number of questions.  If you

19 recall, she asked you about a note that Ed McNeil had taped

20 to your door.  Do you recall that?

21 A   Yes.

22 Q   And she asked you a series of questions about whether you

23 had any meetings or phone calls with anybody from AFSCME

24 between March 25th and June 13th.  Do you recall that?

25 A   Yes.

1  Q   She even asked you if you'd ever been in the same room

2  with AFSCME officials?

3  A   Yes.

4  Q   And you couldn't recall; correct?

5  A   What are the dates?

6  Q   March 25th through June 13th.

7  A   Yes.

8  Q   You couldn't recall?

9  A   I couldn't recall.

10  Q   And Ms. Patek just asked you some questions about --

11  related questions about this, but was there anyone on your

12  team responsible for contacting the unions?

13  A   Yes.

14  Q   Including AFSCME?

15  A   Yes.

16  Q   Who were those team members?

17  A   We had a number.  Brian Easley of Jones Day would be

18  involved with the unions as well as Evan Miller.  Lamont

19  Satchel had contacts with the unions.  In fact, in the second

20  day, I believe AFSCME submitted a new two-year CBA, I think,

21  on the 27th, on the eve of the 28th.  There would have been

22  other members of the legal team involved whose names escape

23  me right now.

24  Q   I'm sorry.  Did you say Mr. Miller?

25  A   Yeah, Evan Miller, Brian Easley.  Another is Lamont

1  Satchel, who is the city's labor negotiator, and others.

2  Q   Do you know whether they ever made any contact with the

3  unions --

4  A   I believe so.

5  Q   -- during this time frame from March 25th through June

6  13th?

7  A   Yes.

8  Q   How about with AFSCME?

9  A   I believe so.

10  Q   Do you know whether they ever met with those officials?

11  A   I believe they did, but I don't know with which

12  officials.

13  Q   Do you know whether they sent them letters?

14  A   Yes.

15  Q   Did you instruct the team to contact the unions?

16  A   Yes.

17  Q   Including AFSCME?

18  A   Yes.

19  Q   Are you aware of communications between this team that

20  you just described and the unions?

21  A   Yes.

22  Q   I'd like to refer you to a document that is not in

23  evidence.

24          MR. SHUMAKER:  I do not know -- this document is

25  Exhibit 32, your Honor.  It's a composite exhibit, and it's a

 1  lengthy one.  It's about 148 pages.  It is the -- provides

 2  the underpinnings of Exhibit 32, which has been admitted into

 3  evidence.  32 is the big chart.

 4          THE COURT:  You mentioned 32 twice now.

 5          MR. SHUMAKER:  Oh, I'm sorry.  Did I?  36.  I think

 6  it's 36.

 7          THE COURT:  36 is the one you're talking about?

 8          MR. SHUMAKER:  Yes, your Honor.  Can you put up 36

 9  now, please?

10          THE COURT:  36 is admitted.

11          MR. SHUMAKER:  Yes, your Honor.  And the question --

12  this document is not in evidence now.  We'd like to move into

13  evidence.  This is not 36.  I'm referring to --

14          THE COURT:  Which is the one you're moving now?

15          MR. SHUMAKER:  Exhibit 32.

16          THE COURT:  All right.  So you're making that motion

17  now?

18          MR. SHUMAKER:  Yes, your Honor.

19          THE COURT:  Is there any objection to the admission

20  into evidence of Exhibit 32?  All right.  It is admitted.

21      (Debtor's Exhibit 32 received at 10:33 a.m.)

22          MR. SHUMAKER:  Okay.  If you could put up City

23  Exhibit 32.

24  BY MR. SHUMAKER:

25  Q   Mr. Orr, do you have the -- could I refer you to the

1  binder of the exhibits that should be right in front of you?

2  A   Yes.

3  Q   There's a number of pages there, I know.  I'd like to

4  direct your attention first, if you will, to the following

5  Bates number.  For the record, it's DTM100084885.  And for

6  convenience, Mr. Orr, if I could, I'll just refer to the last

7  three numbers of the Bates number from now on if that's okay

8  with you.

9  A   Yes.  That's fine.

10  Q   Mr. Orr, do you see on the next page that you're cc'd on

11  this letter?

12  A   Yes.

13  Q   Will you take a look at that letter?  Do you recognize

14  this letter?

15  A   Yes.

16  Q   And was it sent at your direction?

17  A   Yes.  I instructed my team generally to correspond and

18  reach out to all interested parties.

19  Q   And who was this letter sent to?

20  A   Mr. Garrett, who's president of AFSCME Council 25.

21  Q   Now, I'd like you to take a look --

22        MR. SHUMAKER:  If you could blow that up, Laurie,

23  just the -- no, just the address.

24  BY MR. SHUMAKER:

25  Q   I'm sorry.  When you say president of a local, what do

1  you mean by that?

2  A    I think he's president of the council for the state,

3  AFSCME's Council 25, which includes the local here in

4  Detroit.

5  Q    So this letter was sent to AFSCME on May 20th, 2013?

6  A    Yes.  That's what it says.

7  Q    I ask you to take a look at the next several pages behind

8  this one, specifically to pages 889 through 924.  And I know

9  that's a number of pages, but if you could take a look at

10  that, and if you will, I'd like to direct your particular

11  attention to the addressees of those letters.

12  A    Yes.

13  Q    First of all, could you count the number of letters that

14  I've referred you to, including the one to Mr. Garrett?

15  A    One, two, three, four, five, six, seven, eight, nine,

16  ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen,

17  seventeen, eighteen, twenty -- I believe it comes in at

18  twenty.

19  Q    And the addressees of those letters, who are they to?

20  A    I believe the one to Mr. Garrett, as I said, is the

21  president of the council, and I believe the others are to the

22  presidents of the locals in various units.

23  Q    So is it fair to say that your team that was dealing with

24  the unions sent out 20 letters to the presidents of AFSCME

25  locals?

1  A    Yes.  Well, 19 to the locals and 1 to the council

2  president.

3  Q    Now, I'd like to -- do you know whether the unions ever

4  responded to these letters?

5  A    I never received a response.  I don't know if they

6  responded to someone else.

7  Q    Did any of your team members ever share with you that

8  some of those letters had been responded to?

9  A    No.

10  Q    I'm going to refer you to page 811 through 812.

11  A    Yes.

12  Q    Are you there, Mr. Orr?  Okay.  And what's the date of

13  this letter?

14  A    May 24th.

15  Q    I'd ask you who signed this letter.

16  A    Mr. Edward McNeil.

17  Q    Is Mr. McNeil the person who taped the message on your

18  door?

19  A    Yes, at least to the best of my knowledge.  I didn't see

20  him do it.

21  Q    I'd like to direct your attention to the first paragraph,

22  if you will.  Would you take a look at the second sentence of

23  that paragraph, please, sir?

24  A    Yes.

25  Q    It says, "Please be advised that in accordance with

 1   Michigan law we have no authority in which to renegotiate the

 2   pension or medical benefits that members of our union

 3   currently receive."  Do you see that?

 4   A   Yes.

 5   Q   Is this -- was this sentiment shared by Mr. Easley and

 6   others on your team that was dealing with the unions to you

 7   during this time frame?

 8   A   Yes.  I'd asked them to reach out and see if they would

 9   represent retirees as well, and it came back to me that they

10   declined to do so.

11   Q   Do you know whether other unions responded in this

12   fashion?

13   A   As far as I knew, that was the general response, that no

14   one wanted to represent the retirees at this time.

15   Q   Let me direct you to page 790, if you would.

16   A   Yes.

17   Q   And what is that, Mr. Orr?

18   A   This appears to be a May 22nd, 2013, letter to Mr. Brian

19   Easley from John Cunningham, the international representative

20   of UAW Region Number 1.

21           MR. SHUMAKER:  I'd ask if you could blow up the

22   first paragraph, please, Laurie.

23   BY MR. SHUMAKER:

24   Q   Mr. Orr, could you read the third sentence there?

25   A   "These locals do not, however, represent current retirees

1    and have no authority to negotiate on their behalf."

2    Q    Is this consistent with the feedback you were receiving

3    from your team dealing with the unions regarding other unions

4    as well?

5    A    Yes.

6    Q    Your team kept you apprised of its dealings with the

7    unions during this time; is that correct?

8    A    Yes, they did.

9    Q    Did that include between June 14th and July 18th?

10   A    Yes.

11   Q    Was the position that's set forth in the UAW letter

12   consistent with what you were hearing from that team during

13   that time?

14   A    Yes.  I was informed that no one wanted to represent the

15   retirees.

16   Q    Did the positions of the unions ever change during that

17   time?

18   A    Not that I'm aware of.

19   Q    Mr. Orr, Ms. Green asked you a few questions, and she

20   asked you a number of questions regarding your efforts to

21   negotiate with the swap counterparties.  Do you recall that?

22   A    Yes.

23   Q    She referred to the swap transactions as extraordinarily

24   complex.  Do you recall that testimony?

25   A    Yes, I believe so.

1 Q   That was Ms. Green's words.

2 A   Yes, I remember.

3 Q   My question is why during this time frame -- and I'm

4 focusing now on the June, July time frame -- why were you

5 able to negotiate with the swap counterparties?

6 A   Well, I think we were able to negotiate with the swap

7 counterparties because we had laid out sort of the broad

8 sketch of what we needed and the urgency with which we needed

9 it and that the concessions were essential for the city to

10 receive the cash flow that it needed to operate, and also the

11 city was in somewhat of a crisis because starting in mid-June

12 the city would have, at best, on a billion dollar budget

13 about four to $7 million of free cash and was at some risk of

14 going below the line.

15 Q   You were able to reach an agreement with the swap

16 counterparties; correct?

17 A   Yes.

18 Q   How long did it take you to reach an agreement regarding

19 this extraordinarily complex transaction?

20 A   I think it took from the end of May until it was

21 announced on June 14th.  I believe we actually reached an

22 agreement in principle on June 12th or 13th.

23 Q   Based upon what you were hearing from the team dealing

24 with the unions, did you think you were able to achieve

25 similar results in negotiations with them?

1   A    Yes.  I thought their issues had been talked about both

2   in the 2012 MOU and the 2012 consent agreement.

3   Q    And you negotiated with those unions in the same way that

4   you negotiated with the swap counterparties?

5   A    Yes.  I thought the issues that we were going to be

6   discussing had been discussed for many years.

7   Q    I just have a couple more questions, Mr. Orr.

8   A    Um-hmm.

9   Q    One is Ms. Green showed you a couple of video clips from

10  the June 10th, 2013, meeting.  Do you recall those?

11  A    Yes.

12  Q    And one of those clips you were quoted as saying

13  something about vested pension rights being sacrosanct, that

14  they couldn't be touched.

15  A    Yes.

16  Q    Do you recall that?

17  A    Yes, I do.

18  Q    When you made that statement to the June 10th meeting,

19  what were you attempting to convey with your words?

20  A    Despite the implication, I wasn't attempting to mislead

21  anyone.  I was simply trying to say we understood that there

22  were these issues regarding pensions.  I believe at that time

23  they had been discussed before, but they were going to have

24  to be addressed, and we were going to address them coming on

25  in the following part of the week.

1   Q   Were you attempting to mislead that gentleman who asked

2   the question?

3   A   No, not at all.

4   Q   Were you trying to give him misinformation?

5   A   No.

6   Q   Ms. Green showed you another video snippet.

7           THE COURT:  Excuse me one second.  What would you

8   say to that retiree now?

9           THE WITNESS:  About what, your Honor?

10          THE COURT:  Okay.  What would you say to him --

11          THE WITNESS:  You know, I mean what I said then

12  or --

13          THE COURT:  What would you say to that retiree now

14  about his rights?

15          THE WITNESS:  I would say that his rights are in

16  bankruptcy now.  I would say that his rights are subject to

17  the supremacy clause of the U.S. Constitution.

18          THE COURT:  That's a bit different than sacrosanct,

19  isn't it?

20          THE WITNESS:  No.  What I was trying to convey, your

21  Honor, without being misleading, is to say that I understood

22  there were these issues, but I also think I said during that

23  meeting that they would have to be resolved by a federal

24  court.  I believe I also said at June 14th -- June 14th and

25  June 10th that I had been involved in other cases.  I think I

1   said it June 14th, as a matter of fact, and June 10th that I

2   had been involved in other cases where the supremacy clause

3   had been employed in other contexts.

4   BY MR. SHUMAKER:

5   Q   Ms. Green showed you another snippet from the June 10th

6   meeting.  Do you recall that?

7   A   Yes.

8   Q   And the one that I'd like to refer you to is that you --

9   she showed the part where you were talking about there being

10  a caveat regarding PA 436 and Chapter 9 being powerful

11  statutes.  Do you recall?  You said that there was a caveat,

12  and 436 and Chapter 9 were powerful statutes?  Do you recall

13  that?

14  A   Yeah.  I think I said we have a powerful tool in 436,

15  even more powerful one in Chapter 9.

16  Q   What I want to show you is what she didn't show you was

17  the lead-up to that statement, if I could --

18  A   Um-hmm.

19  Q   -- show you that quickly.

20      (Videotape played at 10:46 a.m. as follows:)

21      "MR. ORR:  But I need your help because the way I'm

22  trying to do this collaboratively, cooperatively is the way I

23  think is appropriate because, quite frankly, I think the city

24  has suffered through enough errors of strife and pain and

25  anguish and finger pointing and vitriol and bile.  To what

1  end?  Where's it got us?  What have we achieved?  What's the

2  end result?  More of the same.  Now, I'll say that with this

3  caveat."

4      (Videotape concluded at 10:47 a.m.)

5  BY MR. SHUMAKER:

6  Q   Was that an important part of the message you were giving

7  to the meeting on June 10th, Mr. Orr?

8  A   Yes.  I was trying to say it's time for us to put beyond

9  conflict and continued strife and let's try to reach a

10 consensual resolution.

11      MR. SHUMAKER:  That's all I have, your Honor.  Thank

12 you, Mr. Orr.

13      THE COURT:  Any other questions for the witness?

14      MS. LEVINE:  Short redirect, your Honor.

15                    RECROSS-EXAMINATION

16 BY MS. LEVINE:

17 Q   Good morning, Mr. Orr.  Sharon Levine, Lowenstein

18 Sandler, for AFSCME.

19 A   Good morning, Ms. Levine.

20 Q   Very briefly, so Ed McNeil on behalf of the coalition of

21 unions requests a meeting of you on the day you're appointed,

22 which is March 25; correct?

23 A   As far as I know, yes.

24 Q   And you wait until May 20 to send a response basically

25 asking for meetings which were the exact meetings that Mr.

1   McNeil asked you for on March 25; is that correct?

2   A   I don't know if that's correct, Ms. Levine.

3   Q   And then on March 24, your counsel just pointed out to

4   you a letter that said that the unions were taking the

5   position that they couldn't negotiate retiree benefits; is

6   that correct?

7   A   Yes.

8   Q   And you're saying that based upon that letter, you

9   assumed that there was no ability to negotiate with the

10  unions over retiree benefits; is that correct?

11  A   No.  I don't think it was just on the basis of that

12  letter.

13  Q   Well, after that letter, you invited AFSCME along with

14  the other unions to the June 14, June 20, July 10, and July

15  11 meetings; correct?

16  A   Yes.  I think there were representatives at the June 10th

17  meeting, yes.

18  Q   I'm asking if you invited them.

19  A   I know we did at the 14th, and I know we did at the other

20  ones.  I'm not as sure about the June 10th meeting, but I

21  believe we did.

22  Q   Well, you invited them -- would it refresh your

23  recollection as to whether or not you invited them to know

24  that they actually came to those meetings?

25  A   Yeah.  The only reason -- Ms. Levine, I get your measure,

1  but the only reason I say the June 10th, because it was a

2  public meeting, and we -- it may not have been as formal as

3  the 14th and the other --

4  Q   Did you invite them to the June 11 meeting?

5  A   Well, I'm finishing.  It was a public meeting, and it may

6  not have been as formal as the other ones, but they were

7  generally invited.

8  Q   Did you invite them to the June 11 meeting -- sorry --

9  the July 11 meeting?

10  A   Okay.  I believe so.  I don't recall with --

11  Q   And that meeting was specifically to discuss pension

12  issues; correct?

13  A   I believe so.

14  Q   And they attended all four of those meetings; correct?

15  A   To the best of my knowledge.

16  Q   And they made information requests with regard to the

17  cost savings you were requesting, the benefit changes you

18  were requesting, and the pension changes you were requesting;

19  correct?

20  A   I think the information requests were going both ways,

21  but I think information requests were made.

22  Q   I'm just asking what AFSCME requested of you, and they

23  requested information of you either through Jones Day or

24  through Miller Buckfire or to you directly with regard to

25  cost savings, benefits, and pensions; correct?

1    A    I don't recall if they made any to me directly.  I do

2    think they made them to my representatives.

3    Q    And they also signed the confidentiality agreement you

4    requested; correct?

5    A    The nondisclosure agreement, yes.

6    Q    And they were in the data room; correct?

7    A    I believe they were in the data room.

8    Q    And you provided some information in response to those

9    information requests that were populated into the data room;

10   correct?

11   A    Yes, I believe we did.

12   Q    But not all of the information that was requested was

13   provided prior to July 18, 2013; correct?

14   A    I don't know that.

15   Q    I believe you testified that the team to talk to AFSCME

16   were two lawyers from Jones Day and Lamont Satchel; correct?

17   A    No.  I believe that I recall with specificity Brian

18   Easley, Evan Miller, and Lamont Satchel, and there might have

19   been others.

20   Q    Did any of those three or others at any time meet with

21   anybody from AFSCME --

22   A    I don't recall.

23   Q    -- between March 25 and June 13?

24   A    I don't recall.

25   Q    Do you recall running into -- do you recall you

1  personally running into Ed McNeil at events in the city at

2  any time between March 25 and July 18?

3  A   You asked me about a meeting.  Now you're just asking

4  about run-ins?

5  Q   You can -- we can do it both ways.  First I'm asking if

6  you ran into him at other events, and, second of all, I'll

7  ask you if you ran into him -- if you actually had a meeting

8  with him.

9  A   I believe I've run into him in other events from time to

10  time.

11  Q   And isn't it true that every time he's seen you during

12  that period of time he asked you to schedule a meeting with

13  AFSCME to discuss these issues?

14  A   No.  I don't think that's true.

15  Q   Did you -- you were starting to talk about the fact that

16  you had a meeting with Ed McNeil.  Did you meet one on one

17  with Ed McNeil at any point in time between March 25 and July

18  18?

19  A   I don't think so.

20  Q   Did you have a meeting with him with others between March

21  25 and July 18th?

22  A   I may have, but I don't recall.

23  Q   Do you recall whether or not you discussed with him

24  specifically the proposal other than just the presentations

25  made at the four meetings that were public presentation

1  meetings?

2  A   I don't think I personally discussed it with him, no.

3         MS. LEVINE:  No further questions, your Honor.

4         MR. MONTGOMERY:  Your Honor -- excuse me.

5                   RECROSS-EXAMINATION

6  BY MR. MONTGOMERY:

7  Q   Mr. Orr, Mr. Ullman is not here today, so I have the

8  honor of talking to you.  One quick clarification.  I believe

9  you just testified in response to a question by Mr. Shumaker

10 that your negotiations with the swap counterparties started

11 in May of 2013; is that correct?

12 A   They may have started towards the end of May 2013 or

13 June.  I believe I said it could have been May through June,

14 but it was in that time frame.

15 Q   Now, isn't it true, sir, that those negotiations began in

16 2012?

17 A   Not to my knowledge.

18 Q   Isn't that what you told the governor in your letter of

19 recommendation, sir?

20 A   Those specific negotiations regarding the swap deal, to

21 my knowledge, the specific ones we're talking about, began in

22 May and June.

23         MR. MONTGOMERY:  Could I have Exhibit 409 shown on

24 the screen, specifically page 8?  Could you go to the fourth

25 bullet and amplify that for the witness, please?

1  BY MR. MONTGOMERY:

2  Q  Now, sir, isn't it true that you told the governor that

3  negotiation with the pension-related swap contracts had been

4  going on since 2012?

5  A  Yes, Mr. Montgomery.  This document speaks for itself,

6  but the question I was asked was the specific ones regarding

7  the counterparty agreement that's since been reached.

8  Q  Now, your Honor -- sir, negotiations had been going on

9  since 2012, not May of 2013; is that not correct?

10  A  As I said, the specific ones regarding the deal we

11  eventually reached began sometime in late May and went on

12  until June 12th or 13th.  This letter speaks about ongoing

13  negotiations which may have occurred.  I was speaking about

14  the specific ones that yielded the agreement we now have.

15  Q  And the negotiations which yielded the agreement which

16  you now have, your words, actually commenced in 2012; is that

17  not correct?

18          MR. SHUMAKER:  Objection, your Honor.  Asked and

19  answered.

20          MR. MONTGOMERY:  He did not, in fact, answer the

21  question.

22          THE COURT:  No.  Overruled.  Please answer the

23  question.

24          THE WITNESS:  To the best of my knowledge, the

25  negotiations regarding the swap, as this statement has said,

 1   have been ongoing since 2012, but --

 2            MR. MONTGOMERY:  Thank you.

 3            THE WITNESS:  -- the specific ones related to the

 4   agreement were in May to June just like labor negotiations.

 5            MR. MONTGOMERY:  No further questions, your Honor.

 6            MR. PLECHA:  Ryan Plecha for the Retiree Association

 7   parties.

 8                        RECROSS-EXAMINATION

 9   BY MR. PLECHA:

10   Q   Mr. Orr, did Mr. Easley or Mr. Miller send letters to the

11   DRCEA or the RDPFFA to request whether they would represent

12   retirees?

13   A   I don't recall with specificity.  If you have a document

14   to refresh my recollection, I'm happy to look at it.

15   Q   All right.  The answer is fine.  Did you instruct Mr.

16   Miller or Mr. Easley to contact anyone that was not a union

17   to see if they would represent retirees?

18   A   Generally we instructed them to reach out to anyone who

19   was willing to represent unions who appeared to have the

20   authority to do so.

21   Q   And in your answer I believe I heard you use the word

22   "union."  Anyone besides unions?

23   A   You got to reach out to all parties, interested parties,

24   is what I said --

25   Q   Okay.

1  A   -- not just in my testimony, but that's what I said then.

2  Q   Okay.  Is it not true that the DRCEA informed the city

3  that it was willing to represent general retirees?

4  A   I don't recall.

5        MR. PLECHA:  Could I have Exhibit 309, please?  Just

6  blow up the middle paragraph, please.

7  BY MR. PLECHA:

8  Q   Did you receive this letter, Mr. Orr?

9  A   I believe so.

10  Q   And did you instruct Mr. Easley or Mr. Miller to send a

11  letter to the DRCEA to see if they would represent retirees?

12  A   I don't recall.

13  Q   Isn't it true that you received -- or that the city was

14  informed that the RDPFFA informed the city that it was

15  willing to represent uniformed retirees?

16  A   I don't recall that.

17  Q   Isn't it true that neither of the retiree association

18  denied the request to represent retirees?

19  A   I don't know.  I don't recall receiving a letter.  If you

20  have something to refresh my recollection, I'd be happy to

21  see it.

22  Q   In all of those letters that Mr. Shumaker had you review

23  the addressees on, did any of those letters come from either

24  retiree association party saying that they did not want to

25  represent retirees?

1  A    None of the ones I reviewed today.

2  Q    And to your knowledge, are those all of the letters?

3  A    I don't know.  There are a lot of letters.

4           MR. PLECHA:  No further questions.

5                        RECROSS-EXAMINATION

6  BY MR. WERTHEIMER:

7  Q    Good morning, Mr. Orr.

8  A    Good morning.

9  Q    I just have a follow-up on a question that Lynn Brimer

10 asked you.

11          MR. WERTHEIMER:  Could you put 866 up, please?

12          MR. SHUMAKER:  Your Honor, I'm going to object to

13 the extent that this is outside the scope of the redirect.

14          MR. WERTHEIMER:  It is, your Honor, and I'd request

15 permission.  There was a -- seemed to me an obvious follow-up

16 to a question Ms. Brimer asked.

17          THE COURT:  All right.  One question I'll permit.

18          MR. WERTHEIMER:  Thanks.  Could you highlight the

19 paragraph that begins "Kevyn"?

20 BY MR. WERTHEIMER:

21 Q    Mr. Orr, did you check in with Dan Moss regarding the

22 Chapter 9 paper that Jones Day was putting together as

23 Corrine Ball suggested you should?

24 A    I don't recall, but I have no reason to believe that I

25 did not.

1  Q   Is that another way of saying you probably did?

2  A   I just don't recall.

3          MR. WERTHEIMER:  Okay.  Fair enough.  Thank you.

4                    RECROSS-EXAMINATION

5  BY MS. PATEK:

6  Q   Two quick things, Mr. Orr.  Barbara Patek again on behalf

7  of the Detroit public safety unions.  I believe you told Mr.

8  Shumaker that you negotiated with the unions in the same way

9  that you negotiated with the swap counterparts on his

10  redirect.  Is that your testimony?

11  A   Generally, that's the gist of it, yes.

12  Q   But, in fact, that's not accurate, is it?

13  A   Why not?

14  Q   Well, in fact, didn't you rely under Public Act 436 on

15  the -- what you talked about as the suspension of your duty

16  to bargain to not engage in the kind of robust hard give-and-

17  take negotiations that presumably occurred with the swap

18  counterparties?

19  A   No.  I wouldn't agree with that as a characterization of

20  what I said.

21  Q   You would not agree with that, that that's -- well,

22  strike that.  Are you testifying now that you did engage in

23  give-and-take hard negotiations with the public safety

24  unions?

25  A   Ms. Patek, you're using your characterization.  When I

1   said that I engaged with the unions in the same way we did

2   with the creditors, it was to mean that we reached out to

3   them.  We expected responses, and we would have responded in

4   kind.

5   Q   But it was not to suggest that you were engaging in the

6   kind of hard give-and-take negotiations with the unions that

7   you engaged in with the swap counterparts?

8   A   I don't know how to answer your characterization.

9   Q   I want to talk just for a minute about the supremacy

10  clause because I think you told us that that's -- you told

11  the Court that that was what made -- you know, took

12  sacrosanct sort of out of play once we got into bankruptcy.

13          THE COURT:  I think we've had enough testimony

14  regarding the supremacy clause, and besides it's not really

15  within the scope of this trial.

16          MS. PATEK:  Okay.  Thank you, your Honor.

17          THE COURT:  Any other questions?  You are excused

18  this time, sir.

19          THE WITNESS:  Thank you, your Honor.  The young

20  woman --

21          MS. BRIMER:  I'll take the compliment.

22          THE WITNESS:  Thank you, your Honor.

23      (Witness excused at 11:02 a.m.)

24          THE COURT:  And we will take a recess until 11:20,

25  please.

1          THE CLERK:  All rise.  Court is in recess.

2      (Recess at 11:02 a.m. until 11:20 a.m.)

3          THE CLERK:  Court is in session.  Please be seated.

4          THE COURT:  It appears that everyone is here.  Sir.

5          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

6  Jones Day, on behalf of the city.  I wanted to advise the

7  Court that that concludes the city's case in chief.  We don't

8  intend to call additional witnesses as part of our case in

9  chief.  We do reserve the right, of course, to introduce new

10 evidence and call witnesses as part of our rebuttal case, but

11 we'll have that determination after we see the objectors'

12 proofs.

13         I also wanted to advise the Court and come back to

14 something that we had talked about in connection with or at

15 the pretrial conference.  The only other exception to the

16 city's case in chief relates to deposition designations.  We

17 have been working with objectors pretty cooperatively on

18 this, and we're trying to put something together that would

19 be the easiest for the Court to deal with in that regard.  We

20 are designating and counter-designating and talking about a

21 system whereby we would have a single transcript if the Court

22 would like, and it would be color-coded with objections and

23 keyed with testimony from each side.  There are also some

24 videotape depositions that I think the objectors would like

25 the Court to consider, and we are, again, working with them

1  to submit those all together.  I think we would be in a

2  position to do that shortly, but I just wanted to advise the

3  Court that we are continuing to work on that, and that is

4  part of the city's affirmative case.

5          THE COURT:  Thank you.  The city rests.  Who'd like

6  to call a witness?

7          MR. IRWIN:  I'm sorry.  I thought Mr. Ruegger was

8  going to address that as well.  I have one other --

9          THE COURT:  Oh, I'm sorry.

10          MR. IRWIN:  -- administrative issue to --

11          MR. RUEGGER:  Good morning, your Honor.  Arthur

12  Ruegger from Dentons on behalf of the Retiree Committee.

13  Yes.  I'd just like to agree with Mr. Irwin's comments.  We

14  do have some videotape depositions that we'd like your Honor

15  to review.  We can present them in two different formats,

16  though.  One is a PowerPoint, which your Honor could review

17  on a computer.  Another would be a DVD that obviously you

18  could read on a DVD player.  The latter format would take us

19  some hours to prepare, but whatever your Honor --

20          THE COURT:  Whatever is easiest for you is fine with

21  me.

22          MR. RUEGGER:  Very well, your Honor.  We should have

23  the videotapes and the hard copies at least for the

24  depositions that I've discussed with Mr. Irwin ready no later

25  than tomorrow for your Honor.

1          THE COURT:  All right.

2          MR. RUEGGER:  Thank you.

3          MR. IRWIN:  Just one other administrative matter,

4    your Honor.  We have been coordinating with objectors in

5    terms of trying to get a preview of their witness lists and

6    estimates, nonbinding, but estimates on their direct

7    examinations and trying to budget accordingly.  We are all, I

8    think, looking forward and looking ahead to closing

9    arguments.  We don't know entirely when that will happen, but

10   we're all starting to prepare for those.  The city -- and

11   we've reached out to objectors yesterday.  We were wondering

12   if the Court had direction to the parties in terms of any

13   time limits or allocations of time between and among the

14   parties along the lines of what the Court did at the legal

15   argument stage of the eligibility proceeding, and we would

16   obviously take our direction from the Court in that regard.

17         THE COURT:  Frankly, I had decided, in light of the

18   importance of these issues, not to set any specific time

19   limits.  Having said that, I will assume counsel will be

20   responsible about this latitude that I am allowing to them,

21   and so that's my conclusion on it.  Is it your -- are you

22   trying to tell me that you think there should be time limits?

23   I didn't quite hear that.

24         MR. IRWIN:  I'm not -- I am not suggesting that

25   there need be time limits.  I'm looking -- we were wondering

1   if the Court was expecting something from us either

2   because --

3              THE COURT:  No.

4              MR. IRWIN:  -- we should work something out between

5   us or the Court had some expectation that we needed to know

6   about.

7              THE COURT:  No, no.

8              MR. IRWIN:  All right.  Thank you, your Honor.

9              THE COURT:  All right.  Are we ready to begin the

10  objectors' case now?

11             MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

12  on behalf of the Retiree Association parties.  I would like

13  to call Shirley Lightsey.

14             SHIRLEY LIGHTSEY, OBJECTOR'S WITNESS, SWORN

15             THE COURT:  Please sit down.

16                         DIRECT EXAMINATION

17  BY MR. PLECHA:

18  Q   Good morning, Ms. Lightsey.

19  A   Good morning.

20  Q   Could you please state your full name for the record?

21  A   Shirley Virginia Lightsey.

22  Q   And are you retired from employment with the City of

23  Detroit?

24  A   Yes.

25  Q   Do you currently receive a pension from the City of

1    Detroit?

2    A    Yes.

3    Q    Do you currently receive healthcare benefits from the

4    City of Detroit?

5    A    Yes.

6    Q    Would you be negatively impacted if pension benefits were

7    reduced?

8    A    Yes.

9    Q    Would you be negatively impacted if healthcare benefits

10   were reduced?

11   A    Yes.

12   Q    Have you already taken financial planning measures to

13   prepare for potential cuts to pension and benefits?

14   A    Yes.

15   Q    Before you began your work with the city, could you

16   please explain your education after high school?

17   A    I went to Wayne State University and eventually graduated

18   from Wayne State University.

19   Q    And did you obtain a degree?

20   A    Pardon?

21   Q    Did you obtain a degree?

22   A    Yes.

23   Q    And what was that?

24   A    Bachelor of Arts in Sociology.

25   Q    What was your final position with the City of Detroit?

1  A   Was personnel manager, which would now be equated to

2  human resources manager two.

3         THE COURT:  Excuse me one second.  Would you just

4  push the microphone a bit away from you or sit back a bit

5  from it?  That's better.  Thank you.

6  BY MR. PLECHA:

7  Q   Ms. Lightsey, how long did you work for the city?

8  A   Thirty years.

9  Q   And what were your job duties as the personnel manager?

10  A   I was responsible for the budget of that department,

11  which included several support functions, which would be

12  safety, labor relations, security, payroll, personnel

13  activities, training, and I also had an administrative

14  section that took care of EEOC and Workers' Comp cases.

15  Q   And could you briefly describe that budget for me for the

16  Water and Sewerage Department?

17  A   Question again?

18  Q   What size, approximately, was the budget for the Water

19  and Sewerage Department?

20  A   I'm not sure of the total budget for the Water and

21  Sewerage Department.  I know we had 3,000 employees, but my

22  budget was a little over three million.

23  Q   Okay.  While you worked with the city, did you have any

24  positions with any labor organizations?

25  A   Yes.

1  Q    Okay.  What position was that?

2  A    I was a steward.

3  Q    Okay.  Are you familiar with an organization known as the

4  DRCEA?

5  A    Yes.

6  Q    What does the DRCEA stand for?

7  A    Detroit Retired Employees -- DR -- Detroit Retired City

8  Employees Association.

9  Q    Okay.  Thank you.  What is the DRCEA?

10  A    It's an organization established in 1960 to -- in my

11  words, we are the eyes and ears of the general systems

12  retirees.

13  Q    Okay.  And are you a member of the DRCEA?

14  A    Yes.

15  Q    How long have you been a member?

16  A    Approximately 27 years.

17  Q    And do you hold a position with the DRCEA?

18  A    Yes.

19  Q    What position is that?

20  A    President.

21  Q    How did you obtain that position?

22  A    I was elected into the position.

23  Q    And how long have you held that position?

24  A    Fourteen out of sixteen years.

25  Q    Okay.  Can you please summarize briefly for the Court

1   your duties as president of the DRCEA?

2   A   I'm sorry.  I didn't hear the question.

3   Q   Could you please summarize your duties as DRCEA

4   president?

5   A   I conduct the meetings.  I appoint committees every year.

6   I recommend our nominating committee to the full board.  I

7   keep the board and the members informed of anything that they

8   may be involved -- that may involve retirees, and I'm sure

9   there's some other duties I just can't remember right now.

10  Q   Okay.  Ms. Lightsey, is the DRCEA incorporated?

11  A   Yes.

12          MR. PLECHA:  If I could please have Exhibit 305

13  displayed.  This has been admitted into evidence.

14  BY MR. PLECHA:

15  Q   Are you familiar with this document, Ms. Lightsey?

16  A   Yes.

17          MR. PLECHA:  And I believe there is a hard copy of

18  exhibits, if we could also provide that to Ms. Lightsey so

19  she doesn't have to read it off the screen.

20          THE COURT:  You can do that, counsel.

21          MR. PLECHA:  Thank you.

22  BY MR. PLECHA:

23  Q   Ms. Lightsey, could you please read Article 2 for me,

24  please?

25  A   I'm sorry.  The exhibit number?

1  Q  Oh, it's Exhibit 305.  I'm sorry.

2  A  Yes.

3  Q  Could you please read Article 2 for me, please?

4  A  "To take appropriate action to promote the pension rights

5  of the retired employees of the City of Detroit and generally

6  to engage in such lawful activities as are determined by the

7  board of directors to promote the best interest of the

8  retired employees of the City of Detroit."

9  Q  And is that statement consistent with the DRCEA's current

10 purpose?

11 A  Yes.

12 Q  Has the association been in continuous existence since

13 its formation?

14 A  Pardon?

15 Q  Has the DRCEA been in continuous existence since its

16 formation?

17 A  Yes.

18 Q  Does the DRCEA have by-laws?

19 A  Yes.

20       MR. PLECHA:  If I could please have Exhibit 303.

21 BY MR. PLECHA:

22 Q  Do you recognize this document, Ms. Lightsey?

23 A  Yes.

24 Q  Are these the current by-laws for the DRCEA?

25 A  Yes.

1        MR. PLECHA:  If I could please display page 2.

2        THE WITNESS:  Page 3?

3        MR. PLECHA:  Two.

4        THE WITNESS:  Two?

5   BY MR. PLECHA:

6   Q    Could you read Article 2 for me, please?

7   A    "The Detroit Retired City Employees Association is a

8   service organization existing for the purpose of representing

9   and protecting the interests of the civilian City of Detroit

10  retirees, the spouses or deceased retirees and other

11  beneficiaries of deceased retirees."

12  Q    Does this currently state the -- does this accurately

13  state the purpose of the association?

14  A    Yes.

15  Q    Okay.  Is the DRCEA governed by a board of directors?

16  A    Yes.

17  Q    How often are board meetings conducted?

18  A    Once a month.

19  Q    How many individuals serve on the board of directors?

20  A    Five officers, seventeen board members, and one pension

21  representative.

22  Q    Okay.  And does the DRCEA board have committees?

23  A    Yes.

24  Q    Do any of those committees deal with pension or other

25  retiree benefits?

1    A    Yes.

2    Q    What committee would that be?

3    A    For retiree benefits we have the pension.  Then we have

4    the medical benefits board -- committee.  I'm sorry.

5    Q    Okay.  And are you aware of any board of directors

6    individuals who have professional experience with the

7    finances of the City of Detroit?

8    A    Yes.

9    Q    Who would that be?

10   A    Gerald Fischer, Tom Sheehan, Pam Scales -- Pamela Scales.

11   I think that's all.

12   Q    And could you just very briefly give me a description of

13   what those individuals did for the city?

14   A    Well, Gerald Fischer had many positions.  He was an

15   appointee.  I know he was the assistant director of the

16   Water -- Detroit Water and Sewerage Department.  He was also

17   an appointee to the finance or budget departments, and that's

18   about all I can really state.  I don't know what his

19   positions or titles were.

20   Q    What about Mr. Sheehan?

21   A    Mr. Sheehan worked for the finance department and --

22   total of years, but I don't really remember what his title

23   was.

24   Q    Okay.  What about Ms. Scales?

25   A    Ms. Scales worked until the last year or two, and she was

1   the budget director.

2   Q    Is that the budget director for the entire city?

3   A    Yes.

4   Q    Is there any member on the board of directors that has

5   professional experience with the city as it relates to labor

6   relations?

7   A    Yes.

8   Q    Who would that be?

9   A    Barbara Wise Johnson.

10  Q    What did Ms. Johnson do?

11  A    She was director of labor relations, which included

12  benefits.

13  Q    Is there any member on the board of directors who has

14  professional experience with the city as it relates to

15  pensions?

16  A    Yes.

17  Q    Who would that be?

18  A    That would be Tom Sheehan.  He was a trustee as an active

19  employee, and he is now a trustee of the retirees.

20  Q    Okay.  Is there any member on the board of directors who

21  has professional experience with the city as it relates to

22  legal matters?

23  A    Yes.

24  Q    Who would that be?

25  A    Kay Schloff, who was an attorney, and Marian Harper, who

1   was an attorney.

2   Q   What did Ms. Schloff do at the city?

3   A   She codified the charter.

4   Q   Can you please tell me what the DRCEA does for general

5   city retirees?

6   A   I don't understand the question.

7   Q   Okay.  Can you please tell me what the association does

8   for its general city retiree members?

9   A   We maintain a watch over benefits and pension issues.

10  Q   Do you provide information to general retirees?

11  A   Yes.

12  Q   Do you advocate for general city retirees?

13  A   Yes.

14  Q   Do you organize general city retirees?

15  A   Organize?

16  Q   Hold meetings with them --

17  A   Yes.

18  Q   -- luncheons?

19  A   Yes.

20  Q   Do you communicate with general city retirees?

21  A   Yes.

22  Q   Do you represent general city retirees?

23  A   Yes.

24  Q   Does the association provide all services to members and

25  nonmember general city retirees?

1  A    Yes.

2  Q    Okay.  Has the DRCEA ever had the occasion to appear

3  before the City Council in budget-related matters?

4  A    Yes.

5        MR. PLECHA:  If I could, your Honor, I would like to

6  have the Court judicially notice Section 9-601 of the city

7  charter that's entitled "Retirees Representation," which

8  states, "Retired general city employees are entitled to be

9  represented in the city legislative and budgetary proceedings

10 on issues affecting their interest by persons elected by

11 them."

12       THE COURT:  Thank you.  Any objections?

13       MR. IRWIN:  I have no notice of this.  If it's being

14 read accurately, I have no objection, your Honor.

15       THE COURT:  All right.  Well, have a look at it, and

16 at some point when you're ready let me know if you have any

17 objection to this.

18       MR. IRWIN:  Thank you, your Honor.

19 BY MR. PLECHA:

20 Q    Ms. Lightsey, has the DRCEA been formally invited to

21 those budgetary meetings?

22 A    Yes.

23 Q    Did the DRCEA, in fact, participate in those meetings?

24 A    Yes.

25 Q    To your knowledge, did any other group appear at those

1    meetings on behalf of general city retirees?

2    A    No.

3    Q    At any time, did the DRCEA have an open invitation to

4    appear before City Council?

5    A    Yes.

6    Q    Did the DRCEA serve on the charter revision commission

7    for the City of Detroit?

8    A    Yes.

9    Q    Has the DRCEA ever filed a lawsuit against the City of

10   Detroit?

11   A    No.

12   Q    What about any that it joined with the City Council?

13   A    Yes.  We did join back in the '90s when council was

14   challenged on their legal rights to do what they were doing.

15   Q    Did you file any lawsuits in July 2013?

16   A    No.

17   Q    Approximately how many members does the DRCEA currently

18   have?

19   A    Members?  Approximately 70 -- between 76 and 7,800.  I

20   don't have the exact number.

21   Q    And that's out of approximately how many general --

22   A    12,000.

23   Q    Okay.  And do your members pay dues?

24   A    Yes.

25   Q    Is it a voluntary association?

1    A    Yes.

2    Q    Do the officers and board members serve as volunteers?

3    A    Yes.

4    Q    Has the DRCEA ever had pamphlets that it would provide to

5    your members and nonmembers to provide information about the

6    DRCEA?

7    A    Yes.

8              MR. PLECHA:  If I could please have Exhibit 315

9    displayed.

10   BY MR. PLECHA:

11   Q    Do you recognize this document, Ms. Lightsey?

12   A    Yes.

13   Q    If I could have you page -- turn to page 7 -- I'm

14   sorry -- page 5.  Could you read the bottom paragraph in the

15   lower right-hand corner?  It's on the screen if that's easier

16   for you, Ms. Lightsey.

17   A    Pardon?

18   Q    It's on the screen if that's easier for you.

19   A    "The watchdog for city retirees.  DRCEA maintains a year-

20   round watch on the city administration, mayor, City Council,

21   and the General Retirement System board of trustees

22   continually monitoring actions that may affect your pension

23   or retirement benefits."

24   Q    Is that statement accurate today for the DRCEA?

25   A    Yes.

1  Q   Does the DRCEA conduct regular membership meetings?

2  A   Yes.

3  Q   How often are those meetings held?

4  A   We have one annual meeting and schedule any others when

5  needed.

6  Q   Does the DRCEA hold special meetings?

7  A   Yes.

8  Q   Who's invited to those special meetings?

9  A   All general retirees.

10 Q   And are there regular communications to general retirees?

11 A   Yes.

12 Q   What type of communications?

13 A   We have a newsletter that goes out every three, sometimes

14 four times a year.  We have a website.  We have e-mails for

15 some of our members.

16 Q   What type of information is posted on your website,

17 Ms. Lightsey?

18 A   News articles.  Every now and then I write a letter to

19 them, coming events, and anything we deem informational for

20 our retirees.

21 Q   Is the contact information listed on the website?

22 A   Yes.

23 Q   Are there benefit resources on the website?

24 A   Yes.

25 Q   Pension resources?

1    A    Pension resources, I'm not sure.

2    Q    Links to places that --

3    A    Links.  We have links, right, to -- yeah.

4    Q    Has the DRCEA ever sent out correspondence to all general

5    retirees that requested a return mailing --

6    A    Yes.

7    Q    -- or a response?

8    A    Um-hmm.

9    Q    Okay.  Could you tell me about that?

10   A    Well, recently, the most recent one, we sent out the

11   consent form.  We had recommended eight of our members for

12   the -- to the trustees -- to the Justice Department trustees

13   for the Retiree Committee.

14   Q    Okay.  And did you receive feedback from those

15   communications?  Did you receive responses back?

16   A    Yes.

17   Q    Do you know approximately how many?

18   A    There were thousands.  I don't know because I wasn't -- I

19   haven't been brought up to date on that.

20   Q    Okay.  And do you know approximately how long it took to

21   get these thousands of responses back?

22   A    I would say the first couple of thousand came in within

23   seven days.  After that, I'm -- they came in in batches.

24   Q    Okay.  How did the general retirees generally communicate

25   to the DRCEA?

1   A    I'm sorry.  Repeat that.

2   Q    How did the general retirees generally communicate to the

3   DRCEA?

4   A    By notes, by comments on the cards that we send for

5   renewals, by e-mail, by voicemail, and socially anywhere they

6   can find a DRCEA member to ask questions.

7   Q    So they recognize you and stop you in public?

8   A    Pardon?

9   Q    They recognize you and stop you in public to ask you

10  questions?

11  A    I didn't understand that question.

12  Q    Do members recognize you and ask you questions as it

13  relates to retiree matters in public?

14  A    Our members, yes.

15  Q    Does anyone on behalf of the association read those

16  letters that are sent in?

17  A    Yes.

18  Q    Does the board generally respond to those letters?

19  A    We respond to some.  Others are just information that

20  they're giving us or comments that they're making that don't

21  require a response.

22  Q    Have you received expressions of concern from general

23  retirees regarding their pensions and benefits?

24  A    Recently, yes.

25  Q    Have any of your members told you that they've already

1   made financial planning changes based on the potential cuts

2   to their pensions?

3   A   Yes.

4          MR. IRWIN:  Your Honor, I object to the relevance of

5   this line of questioning.  I also find the questions fairly

6   leading.

7          MR. PLECHA:  I believe they're relevant as ripeness

8   has been contested in this matter, and it goes to the present

9   impact of the proposed cuts that they're already taking

10  measures directly related to those proposed cuts.

11         THE COURT:  This is arguable.  I'll permit it.  Go

12  ahead, sir.

13  BY MR. PLECHA:

14  Q   Ms. Lightsey, has any of the members let you know that

15  they've made financial planning changes based on the proposed

16  cuts to pensions?

17  A   Yes.

18  Q   Okay.  I'm going to switch topics a little bit.  Did you

19  become aware that Mr. Orr was appointed as the emergency

20  manager for the city?

21  A   Yes.

22  Q   Have you ever met Mr. Orr?

23  A   Yes.

24  Q   When did you first meet Mr. Orr?

25  A   I attend pension board meetings throughout the year, and

1  Mr. Orr was at a meet-and-greet pension board meeting the end

2  of April.  I think it was the last Wednesday in April.  I'm

3  not sure.  I think that's when it was.

4  Q   Do you recall how you were introduced to Mr. Orr?

5  A   I was introduced to Mr. Orr as the president of the GRS

6  retirees.

7  Q   After meeting Mr. Orr, did you ever contact him?

8  A   Only by letter.

9          MR. PLECHA:  If I could have Exhibit 309 displayed,

10  please.

11  BY MR. PLECHA:

12  Q   Do you recognize this document?

13  A   Yes.

14  Q   Is this the letter you, in fact, sent to Mr. Orr?

15  A   Yes.

16  Q   And why did you send this letter to Mr. Orr?

17  A   To have a meeting to understand what it was that the

18  retirees were expected to discuss or --

19  Q   Did you ever receive a response to this letter?

20  A   No.

21  Q   Did you ever receive a meeting response for this letter?

22  A   No.

23  Q   Did you ever receive a letter from the city or its

24  professionals requesting information about who the DRCEA

25  represents?

1    A    Yes.

2    Q    Did you respond to that letter?

3    A    Yes.

4    Q    Did you inform them that you were willing to represent

5    retirees?

6    A    If that was what was on the letter.  I don't remember the

7    questions, but I'd have to see my response.  I responded to

8    whatever the questions were.

9              MR. IRWIN:  I have a best evidence objection to the

10   witness testifying as to the contents of a letter that is not

11   in evidence and that I'm not aware of.

12             THE COURT:  The objection is sustained.

13   BY MR. PLECHA:

14   Q    Did you happen to attend a meeting on June 14, 2013?

15   A    No.

16   Q    Why not?

17   A    I wasn't invited.

18   Q    Did you ever learn that other retiree associations

19   attended this meeting?

20   A    Yes.

21   Q    When did you learn this?

22   A    I really don't remember.  I just remember that I didn't

23   receive an invitation --

24   Q    How did you learn this?

25   A    -- for the DRCEA.  Pardon?

1   Q   How did you learn this?

2   A   How did I what?

3   Q   How did you learn that other associations attended?

4   A   Through conversation, and I really don't remember.  It

5   wasn't anything official.  It was probably through a member

6   or it may have been the news.  I don't know.  I don't

7   remember.

8   Q   Did you attend a meeting on June 20th, 2013?

9   A   Yes, I did.

10  Q   Was your invitation limited in any way?

11  A   It was limited to two people.

12  Q   And who attended on behalf of the DRCEA?

13  A   Myself and Marian Harper.

14  Q   And was this meeting only for retirees?

15  A   I'm not sure.

16  Q   Was there any attendees on behalf of AFSCME?

17  A   Yes.

18  Q   The UAW?

19  A   Yes.

20  Q   The public safety unions?

21  A   Not that I recall.

22  Q   Who was there on behalf of the city?

23  A   Ms. Lennox, Mr. Heiman.  I can't think of the other

24  gentleman's name, but there were about five or six that were

25  there that day.

1  Q   Was Mr. Orr there?

2  A   No.

3  Q   Did anyone ask you to present the DRCEA's position at

4  this meeting?

5  A   No.

6  Q   Were you permitted to submit questions at this meeting?

7  A   Yes.

8  Q   Did you ask any questions?

9  A   No.

10  Q   Why not?

11  A   Others had asked questions.  I didn't see any need to

12  repeat the same questions.

13  Q   Were you comfortable with asking retiree-specific

14  questions in this meeting setting?

15  A   I'm sorry.  I don't understand that.

16  Q   Were you comfortable asking retiree-specific questions in

17  this meeting setting?

18  A   Not really.

19  Q   Was there an opportunity at this meeting to break out in

20  smaller groups to discuss retiree-specific issues?

21  A   No.

22  Q   Following the June 20th meeting, did you take any actions

23  or communicate with the city?

24  A   Yes.

25  Q   And who did you communicate with?

1    A    Pardon?

2    Q    Who did you communicate with?

3    A    Mr. Easley.

4    Q    Do you recall why you sent a letter to Mr. Easley?

5    A    In response to what was, I guess, discussed at the

6    meeting.

7    Q    Did you ask him how the DRCEA should proceed?

8    A    Yes.

9    Q    Did anyone from the city ever respond to your letter?

10   A    No.

11   Q    Anyone from Jones Day?

12   A    No.

13   Q    Okay.  Did you attend a meeting on July 10th?

14   A    Yes.

15   Q    Were you invited to this meeting?

16   A    Yes.

17   Q    Was your invitation limited in any way?

18   A    Two people.

19   Q    Did anyone ask you to present the DRCEA's position at

20   this meeting?

21   A    No.

22   Q    Was there an opportunity for you to break out and discuss

23   retiree-specific issues?

24   A    No.

25   Q    Did you attend a meeting on July 11th?

1   A   Yes.

2   Q   Were you invited to that meeting?

3   A   Yes.

4   Q   Was your invitation limited?

5   A   Two people.

6   Q   Did you ask any questions at this meeting?

7   A   Yes.

8   Q   What questions did you ask?

9   A   I asked if the city proposed to offer vision and dental

10  to retirees in 2014.

11  Q   And was your question answered?

12  A   Yes.

13  Q   Did that answer cause you to do anything following the

14  meeting?

15  A   Yes.

16  Q   What did it cause you to do?

17  A   Inform our board and immediately start to look for vision

18  and eye care possibilities for our members.

19  Q   So you started to look for alternatives?

20  A   Yes.

21  Q   Did you have enough time between July 11th and July 18th

22  to prepare counterproposals as it relates to dental and eye

23  care?

24  A   No.

25  Q   During the July 11th meeting, did you have the

1  opportunity to break out into smaller groups to discuss

2  retiree-specific issues?

3  A    No.

4  Q    Following the June 20th meeting, did you take any action

5  as it relates to communicating with Jones Day?

6  A    20th.  That was -- yes.

7  Q    What did you do?

8  A    Four days later on the 24th, I think it was, I sent a

9  request for information.

10  Q    Was that ever responded to?

11  A    No.

12  Q    Did you ever request your attorney send a letter to Jones

13  Day to request a meeting with the DRCEA?

14  A    Yes.

15  Q    Did the city ever respond?

16  A    No.

17  Q    In any of your meetings with the city, were there

18  breakout sessions for retirees?

19  A    No.

20  Q    Did anyone at these meetings ever tell you that they were

21  going to have breakout sessions specific for retirees?

22  A    No.

23  Q    Did anyone tell you that they intended to create breakout

24  meetings for retirees?

25  A    No.

1    Q    Prior to July 18, 2013, did the city provide you with a
2    copy of the June 14th proposal to creditors?
3    A    No.
4    Q    Prior to filing the bankruptcy by the city, did you ever
5    consider general retirees as creditors of the city?
6    A    What was the date that you said?
7    Q    July 18th before they filed for bankruptcy.
8    A    I had heard it enough that we were now looked at as
9    creditors, so that would have been prior to July 18th through
10   the media and other areas.
11   Q    Did anyone on behalf of the city at any of these meetings
12   specifically request counterproposals from the DRCEA?
13   A    I didn't receive it that way, no.
14   Q    Did anyone on behalf of the city say that if
15   counterproposals were not received by July 19th, a Chapter 9
16   case would be filed?
17   A    I don't remember hearing that.
18   Q    Prior to July 18th, did you have enough information to
19   make counterproposals?
20   A    No.
21   Q    Has the DRCEA ever advocated for benefit enhancements to
22   retirees that was applied to all general city retirees?
23   A    Yes.
24   Q    How did the DRCEA do that?
25   A    Through the budget process.

1    Q    Is that with City Council?

2    A    That would be through the mayor first and then the City

3    Council, yes.

4    Q    That applied to all general retirees regardless of

5    membership?

6    A    Yes.

7    Q    In this current bankruptcy case, has the DRCEA ever

8    claimed to be able to legally bind its members?

9    A    No.

10    Q    Is the DRCEA a collective bargaining unit?

11    A    No.

12    Q    Following each of the meetings you had with the city, did

13    you discuss those meetings with your board of directors?

14    A    Yes.

15    Q    Did the city ever provide you with a proposal to take

16    back to the board of the DRCEA as it relates to retiree

17    issues?

18    A    No.

19    Q    Would the board have been able to accept and consider a

20    proposal?

21    A    Yes.

22    Q    Could the board have then communicated that information

23    to the general city retirees?

24    A    Yes.

25    Q    Was negotiation with the DRCEA as it relates to retiree

1   issues possible?

2   A    Yes.

3           MR. PLECHA:  No further questions.

4           THE COURT:  Any cross-examination?

5           MR. IRWIN:  Yes, your Honor.

6                         CROSS-EXAMINATION

7   BY MR. IRWIN:

8   Q    Good morning, Ms. Lightsey.

9   A    Good morning.

10  Q    I believe I heard you testify that your organization has

11  been around for more than 50 years; is that right?

12  A    Yes.

13  Q    And you consider yourself and the organization to be

14  advocates of retirees; is that right?

15  A    Yes.

16  Q    And I think we heard some examples in that regard.  I

17  think you talked about how you advocated for enhancements

18  before the City Council.  Do you recall that?

19  A    Yes.

20  Q    And I heard you testify in connection with the articles

21  of incorporation of your organization that your mission is to

22  promote rights of retirees; is that right?

23  A    Correct.

24  Q    And you've also described the mission of the organization

25  to be a conduit for information.  You have the ability to

1 pass along information to your members; is that right?

2 A   Yes.

3 Q   And you have, in fact, lobbied on behalf of your

4 organization; is that right?

5 A   Yes.

6 Q   And you've been granted legal standing in courts on

7 behalf of your organization; is that right?

8 A   Repeat that again.

9 Q   You've been granted legal -- you've been involved in

10 lawsuits, is that right, the organization?

11 A   Yes.

12 Q   Okay.  One of the things that I don't believe you've

13 mentioned yet is whether your organization -- or you haven't

14 mentioned an instance in which the DRCEA has with binding

15 effect negotiated health or pension reductions on behalf of

16 your membership; is that right?

17 A   We cannot do binding.

18 Q   That's right.  The organization doesn't have the

19 authority or the power to enter into any binding agreements

20 with regard to health or pension benefits on behalf of its

21 members; is that right?

22 A   Correct.

23 Q   Okay.  And that was true at all points in time leading up

24 through the bankruptcy filing in this case on July 18th; is

25 that right?

1    A    Well, that depends on how far you go back as all time.

2    Q    Are you --

3    A    Are you going back to 1960, or are you going back to last

4    year?

5    Q    I'll go back to information that's within your personal

6    knowledge, so as long as you've been involved with the

7    organization, the organization has not entered into binding

8    agreements to reduce pension or health benefits on behalf of

9    the membership?

10   A    No.  I can't make that statement because I've been on the

11   board for 27 years, but I can't make that statement.  I was

12   not always the president, so I don't remember.

13   Q    But you're not -- is it fair to say that you're not aware

14   of a situation in which the organization has entered into a

15   binding agreement to reduce pension or healthcare benefits

16   for its membership?

17   A    I'm not aware.

18   Q    All right.  Let's turn -- Ms. Lightsey, do you recall a

19   point in time in this proceeding when the DRCEA was in

20   receipt of written questions or interrogatories, and it was

21   incumbent upon the organization to respond to those?

22   A    I don't remember.

23   Q    Okay.  Maybe I'll -- we can take a look at them, and it

24   may refresh your recollection.

25              MR. IRWIN:  Can we put up Exhibit -- can we put up

1  Exhibit -- city 83, please?

2  BY MR. IRWIN:

3  Q   Ms. Lightsey, there's an exhibit on your screen in front

4  of you.  Do you see that?

5  A   Yes, yes.

6  Q   Does this exhibit refresh your recollection at all in

7  terms of questions that were put to the organization that

8  needed to be answered?

9  A   Yes.

10 Q   Okay.  And you personally participated in this exercise;

11 is that right?

12 A   I turned this document over to my attorneys.

13 Q   Yes, but you also provided and verified the responses

14 that were given to the city; isn't that right?

15 A   I would have to see the responses.

16 Q   Okay.

17        MR. IRWIN:  Well, let's turn to the -- I think it's

18 page 16 of the document, please, and if we could blow up the

19 signature block in the lower right corner.

20 BY MR. IRWIN:

21 Q   Ms. Lightsey, is that, in fact, your signature on this

22 document?

23 A   Yes, it is.

24 Q   Okay.  Does that refresh your recollection that you

25 participated in the responses that were delivered in

1  connection with these questions?

2  A    Yes.  Now I understand your question.

3  Q    Okay.  And did you review these answers before you signed

4  your name to the end of this document?

5  A    I reviewed -- I'm pretty sure I reviewed most of them,

6  yes.

7  Q    And that's a fair point.  There are questions that relate

8  to a different organization, and there are questions that

9  relate to the DRCEA.  It's a combined set of questions and

10  answers; is that right?

11  A    Right.

12  Q    And you responded on behalf of the DRCEA; is that right?

13  A    I would imagine so.  I'm not sure.  I'd have to look at

14  them again, but I'm pretty sure I did.

15  Q    Okay.  Well, let's look at some of the specific questions

16  if we could.  If you could please turn to --

17  A    I'm not reading this well on this screen, so --

18  Q    And we're going to -- we're going to publish the pages

19  for you so that you can --

20  A    Okay.

21  Q    -- follow along.  We're going to look at page 8 of the

22  document, which is Interrogatory Number 6.  Do you see that,

23  Ms. Lightsey?

24  A    Yes.

25  Q    We're going to -- we're going to read it, so you can --

1    we can read along together, but the interrogatory to the

2    DRCEA reads as follows, "Identify any person or persons who

3    have knowledge of any agreement entered into by the DRCEA and

4    the City of Detroit in which the DRCEA agreed to reduce,

5    limit, or abridge the health benefits provided by the City of

6    Detroit to existing DRCEA member retirees."  Did I read that

7    right?

8    A    Yes.  Is that --

9    Q    This is Number 6, ma'am.

10   A    Oh, Number 6.  Yes.

11   Q    And did you understood -- and this is one of the

12   interrogatories that's directed to the DRCEA, so am I correct

13   in assuming that this was a question and response that you

14   participated in drafting the answer to?

15   A    Yes.

16   Q    Okay.  And the question asks for -- the question asks for

17   the DRCEA to identify anyone who has knowledge of a prior

18   agreement between the DRCEA and the city where health

19   benefits were reduced.  You understood that?

20   A    Yes.

21   Q    Okay.  And let's look at the response.  The answer

22   below -- there are some objections that are posed in the

23   first couple lines, but if you look about halfway down, the

24   answer reads, "However, without waiving said objections and

25   in the spirit of cooperation, the DRCEA states that it is not

1  aware of any individual with knowledge responsive to this

2  interrogatory."  Do you see that?

3  A    Yes, I see it.

4  Q    All right.  And it continues, and it says, "By way of

5  further statement, the purpose of the DRCEA has always been

6  and remains to protect and preserve benefits of retirees, not

7  to reduce such benefits."  Do you see that?

8  A    Yes.

9  Q    And so am I correct in interpreting this response that

10 there has never been, to the best of your knowledge, any

11 agreement between the DRCEA and the city where the DRCEA has

12 agreed to reduce health benefits?

13 A    I would imagine not.

14 Q    And that has --

15 A    Not that I can recall, no.

16 Q    And that has never happened?

17 A    I can't say that it's never happened.  I don't know.

18 Q    Best of your knowledge, it has never happened?

19        MR. PLECHA:  Objection.  Asked and answered.

20        THE COURT:  Objection sustained.

21 BY MR. IRWIN:

22 Q    And, Ms. Lightsey, let's look at the very next question

23 because it's a little bit different.  Do you see Number 7?

24 A    Yes.

25 Q    Okay.  I'm going to read Number 7.  "Identify any person

1  or persons who have knowledge of any attempt prior to July

2  19th, 2013, by the DRCEA to obtain any form of legal

3  authority from its members to appoint DRCEA their

4  representative in connection with negotiations" --

5          MR. PLECHA:  Objection, your Honor.  I think this

6  exceeds the scope of direct.

7          THE COURT:  The objection is overruled.  Go ahead,

8  sir.

9  BY MR. IRWIN:

10  Q   Any form of legal authority from its members to appoint

11  DRCEA their representative in connection with negotiations to

12  reduce, limit, or abridge health benefits provided by the

13  City of Detroit to retirees.  Do you see that?

14  A   Yes, I see it.

15  Q   So it's a similar question, but it's asking if there's

16  ever even been an attempt to get authority from the

17  membership to negotiate to reduce health benefits; is that

18  right?

19  A   Right.

20  Q   Yes.  And let's look at the answer, which is on the next

21  page.

22          MR. IRWIN:  I'd like to pull the answer up, please.

23  BY MR. IRWIN:

24  Q   And the answer -- I'm skipping to the middle paragraph

25  again, but it's the same answer.  However, without waiving

1  said objections and in the spirit of cooperation, the DRCEA

2  states that it is not aware of any individual with knowledge

3  responsive to this interrogatory.  Do you see that?

4  A   Yes.

5  Q   It further states that the purpose of the DRCEA has

6  always been and remains to protect and preserve benefits of

7  retirees, not to reduce such benefits.  Do you see that?

8  A   Yes.

9  Q   So, to your knowledge, never in the history of the DRCEA

10 has it ever sought approval from its membership to reach an

11 agreement to reduce health benefits; is that right?

12 A   In the history of the DRCEA?

13 Q   Yes, according to this response.

14 A   I didn't construe it as meaning the full history of the

15 DRCEA back --

16 Q   Well, how about to the history of the --

17 A   -- to 1960.

18 Q   How about to the history of the DRCEA to your knowledge?

19 A   DRCEA, to my knowledge, I could -- I could agree, I

20 guess, on that.

21 Q   All right.  Now, let's look at one more, which is the

22 next interrogatory.  It's Number 8.  It's the very next one.

23 Now, we're shifting gears a little bit because this question

24 relates to pension benefits.  The two that we were talking

25 about before were health benefits.

1   A     Um-hmm.

2   Q     So here's Number 8.  "Identify any person or persons who

3   have knowledge of any attempt prior to July 19th, 2013, by

4   the DRCEA to obtain any form of legal authority from its

5   members to appoint DRCEA as their representative in

6   connection with DRCEA negotiations to reduce, limit, or

7   abridge pension benefits on a prospective basis only provided

8   by the GRS."  Do you see that?

9              MS. LEVINE:  Your Honor, objection.  Isn't the

10  purpose of the interrogatory to refresh recollection after

11  the witness answers?  There hasn't been any --

12             THE COURT:  It's not limited to that purpose.  The

13  objection, if there was one, is overruled.

14             THE WITNESS:  Now, question again.

15  BY MR. IRWIN:

16  Q     Did I read that correctly?

17  A     You're reading it correctly.

18  Q     Okay.  And did you understand it to -- did you understand

19  the question to be asking for if, to your knowledge, the

20  organization had ever sought authority from its membership to

21  negotiate to reduce pension benefits?

22  A     Not to my knowledge.

23  Q     I understand that.  You understood -- you understand

24  that's what the question is asking for.

25  A     Right.

1 Q   Right.  Okay.  Let's look at the answer.  Again, about

2 halfway through the answer -- and this is an answer -- this

3 is a document which you have affixed your signature -- the

4 DRCEA states that it is not aware of any individual with

5 knowledge responsive to this interrogatory.  Do you see that?

6 A   Yes.

7 Q   And so it is your understanding and your testimony that

8 the DRCEA has never even attempted to get authority from its

9 members to reduce pension benefits?

10 A   Not that I can recall.

11 Q   Right.  And, in fact, there's a new -- there's a new

12 sentence here at the end of this response which I would like

13 to direct your attention to, and it says the DRCEA would not

14 take any action to obtain or solicit authority from its

15 members to do something prohibited by the Michigan

16 Constitution.  Do you see that?

17 A   Yes, I see that.

18 Q   Okay.  You understand that your attorneys have filed

19 papers in this case, and you understand the position that

20 you've taken in this case is that pension benefits are

21 protected by the Michigan Constitution, do you not?

22 A   Yes.

23 Q   Okay.  And is this sentence in this interrogatory

24 response when it says "something prohibited by the Michigan

25 Constitution," you are referring to the pension protection in

1   the Constitution; right?

2   A   Yes.

3   Q   Okay.  And so what you're saying here is that the DRCEA

4   would not take any action to solicit authority from its

5   membership to reduce pension benefits because they're

6   protected by the Michigan Constitution; is that right?

7   A   Yes.

8   Q   Okay.  And did you make that plain to anyone from the

9   city in connection with any of the meetings you attended?

10  A   No.

11  Q   You did attend meetings; right?

12  A   Yes.

13  Q   Yes.  I think we heard about some of those on direct.

14  And you did not make any counterproposals to the city either

15  at or after any of the meetings you attended; is that right?

16  A   No.

17  Q   And that is because you did not have the authority from

18  your membership to make those counterproposals; is that

19  right?

20  A   No.

21  Q   No, you did not have that authority; right?

22  A   No.  That's not true.

23  Q   Okay.  Did you have authority from your members to make a

24  counterproposal to the city at or after any of these meetings

25  to reduce healthcare or pension benefits?

1    A    I never understood any of those meetings as being

2    meetings that they were presenting proposals for me to even

3    do what you just asked.

4    Q    Okay.  But I'm asking a slightly different question.  I'm

5    asking whether you had authority from your membership to make

6    a binding counterproposal to either reduce healthcare or

7    pension benefits at the meetings?

8    A    I've never had the authority to make a binding, and I've

9    never asked for that from the membership.

10            MR. IRWIN:  Okay.  Thank you.  That's all I have,

11   your Honor.

12            THE COURT:  Any more questions for the witness?

13            MR. PLECHA:  I have some redirect, your Honor.

14            THE COURT:  Yes, sir.

15                      REDIRECT EXAMINATION

16   BY MR. PLECHA:

17   Q    Ms. Lightsey, has the City of Detroit ever filed Chapter

18   9 bankruptcy before?

19   A    No, not that I --

20            THE COURT:  Seriously?

21            MR. PLECHA:  I think that goes directly to --

22            THE COURT:  Ask your next question.

23            MR. PLECHA:  Okay.

24   BY MR. PLECHA:

25   Q    To your knowledge, Ms. Lightsey, has the city ever

1  requested a reduction in benefits from the DRCEA?

2  A   I'm not sure.  I can't answer that "yes" or "no."

3  Q   So you don't recall if they ever asked the DRCEA to

4  negotiate reductions?

5  A   Not that I can recall.

6  Q   In all of the meetings you attended before City Council,

7  were you advocating for enhancements to benefits?

8  A   Yes.

9  Q   So there would be no need to seek authority to reduce

10 benefits in that situation?

11 A   No.

12 Q   And Mr. Shumaker asked you some questions from the

13 requests for interrogatories, one of which related to the

14 answer addressing the Michigan Constitution or the

15 protections of pensions; correct?

16 A   Correct.

17 Q   And that was asking for any attempt prior to July 19th;

18 correct?

19 A   Correct.

20 Q   And that was prior to the filing of the bankruptcy?

21 A   Correct.

22         MR. PLECHA:  No further questions.

23         THE COURT:  Any more questions for the witness?  You

24 are excused, ma'am.  Thank you very much for your testimony

25 today.

1        THE WITNESS:  All right.

2     (Witness excused at 12:16 p.m.)

3        THE COURT:  Let's take our lunch break now and

4  reconvene at 1:45, please.

5        THE CLERK:  All rise.  Court is in recess.

6     (Recess at 12:16 p.m. until 1:45 p.m.)

7        THE CLERK:  All rise.  Court is in session.  Please

8  be seated.  Recalling Case Number 13-53846, City of Detroit,

9  Michigan.

10        THE COURT:  Sir.

11        MR. MORRIS:  Good afternoon, your Honor.  Thomas

12  Morris on behalf of the Retiree Association parties.  I

13  believe it's our turn to call the next witness, and the

14  Retiree Association parties call Donald Taylor.

15         DONALD TAYLOR, OBJECTOR'S WITNESS, SWORN

16        THE COURT:  All right.  You may sit down.

17                    DIRECT EXAMINATION

18  BY MR. MORRIS:

19  Q   Good afternoon, Mr. Taylor.  Would you please state your

20  full name for the record?

21  A   Donald Taylor.

22  Q   Mr. Taylor, you're a retired Detroit police officer; is

23  that correct?

24  A   Yes.

25  Q   And do you receive a pension from the city?

1   A   Yes, I do.

2   Q   And post-employment benefits as well; is that correct?

3   A   Yes.

4   Q   How long did you work for the city?

5   A   Twenty-six years.

6   Q   And during your employment with the city, did you ever

7   hold a position with any labor organization?

8   A   Yes, I did.

9   Q   And what position was that?

10   A   It was a union steward, chief steward, and executive

11   board member with the Detroit Police Officers Association.

12   Q   Are you familiar with an organization known as the

13   RDPFFA?

14   A   Yes.

15   Q   And what do those initials stand for?

16   A   Retired Detroit Police and Fire Fighters Association.

17   Q   And what position do you hold with that organization?

18   A   President.

19   Q   And how long have you been president?

20   A   Seven years.

21   Q   Were you elected to that position?

22   A   Yes.

23   Q   And how long have you been a member of the RDPFFA?

24   A   Fifteen years.

25   Q   Did you hold any prior elected position prior to being

1    president?

2    A    Vice president.

3    Q    Do you hold any positions with any other organizations at

4    this time?

5    A    By virtue of my position as president of the Retired

6    Detroit Police and Fire Fighters Association, I'm also a

7    member of the board of trustees of the C.O.P.S. Trust.

8    That's Coalition of Public Safety.  It's an organization that

9    provides healthcare benefits to public safety officers.

10   Q    Is that a statewide organization?

11   A    Yes.

12   Q    Would you please summarize for the Court your duties as

13   president of the association?

14   A    Day-to-day operation.  We have a full-time office open

15   five days a week, and I manage the day-to-day operations,

16   also conduct the meetings, chair the meetings at our board

17   meetings, general membership meetings.  I'm also the

18   representative for the association in hearings with the state

19   or city level and whatever else is necessary in signing,

20   counter-signing checks, things of that nature.

21   Q    Is the association governed by a board of directors?

22   A    Yes, it is.

23   Q    How often are board meetings conducted?

24   A    Once a month.

25   Q    And how many persons serve on the board?

1  A    Right now there's ten.

2  Q    Can you tell me, please, when the association was formed?

3  A    It was originally formed, I believe, back in the 1950s.

4  At that time, it was an organization of just retired police

5  officers, and in the '70s it merged with fire and became

6  known as the name that it operates under now.

7  Q    Would you please take a look at the document that's been

8  labeled as Exhibit 304?  I'm sorry.  Is there an exhibit book

9  up there for you?

10  A    No.

11           THE COURT:  On the table there to your right.

12           THE WITNESS:  That could be it.

13           MR. MORRIS:  Yes, please.  Can you display 304,

14  please?

15           THE WITNESS:  Okay.

16  BY MR. MORRIS:

17  Q    Can you tell me, please, if you can identify this

18  document?

19  A    It's the restated by-laws for the association.

20  Q    And would you take a look, please, at page 6, page 6 by

21  paper?  It's the numbered page 1.

22  A    Okay.

23  Q    And look at Article II, Section 1, and can you tell me,

24  please -- tell the Court what that states?

25  A    It's to provide the members with information concerning

1  the status of pensions, hospitalization, and insurances and

2  to keep the members informed on all matters relative to the

3  best interest of the association and its members.

4  Q   And is this stated in the by-laws as the purpose of the

5  organization?

6  A   Yes, sir.

7  Q   And is that an accurate statement of the association's

8  objectives and purpose, as far as you understand it?

9  A   Yes.

10  Q   And does the association, in fact, provide its members

11  with information concerning the status of pensions,

12  hospitalization, and insurances?

13  A   Yes, it does.

14  Q   How does it provide that information?

15  A   A number of different ways.  Like I mentioned earlier, we

16  have a full-time office where the members have access to the

17  office.  We have a website which the information is posted on

18  our website.  We regularly send out e-mails.  We have 3,000

19  of our members on e-mail.  We have regular general monthly

20  membership meetings, and we inform the members at those

21  meetings also.

22  Q   Does the association also provide information to

23  nonmember retirees?

24  A   Yes.

25  Q   And how does it do that?

1   A    It's available on our website.  Our website is not

2   password protected, and all of our information is displayed

3   on that website.  Also, on an annual basis we send out a copy

4   of our monthly Unity magazine to all members, nonmembers and

5   the like, and whenever it's necessary when very important

6   issues come up, we notify by mail all retired police officers

7   and fire fighters, and we've done that on a number of

8   occasions.

9   Q    Do you have the capacity to communicate by e-mail as

10  well?

11  A    Yes.  Like I said, we have about 3,000 members on e-mail.

12  Q    And are regular membership meetings conducted?

13  A    Yes, once a month.

14  Q    Is there information on the website relating to the

15  bankruptcy case?

16  A    Yes, there is.

17  Q    Do police and fire retirees communicate with the

18  association?

19  A    Yes.

20  Q    And how do they communicate with the association?

21  A    By phone, by e-mail, at the general membership meeting,

22  by letters.

23  Q    Have you noticed an increase in the number of letters

24  since the bankruptcy has been filed?

25  A    Yes.  I think we received around 900 letters in the last

1  couple months from the members.

2  Q    And how many members does the association have?

3  A    Right around 6,500.

4  Q    How many total police and fire retirees are there?

5  A    I believe it's right around 8,000.

6  Q    Do the members pay dues?

7  A    Yes.

8  Q    Is membership in the association automatic when you

9  retire from police or fire service?

10  A    No.  It used to be automatic for the fire fighters

11  because the Fireman's Fund used to provide the first year's

12  membership, but they don't do that.  They quit this year.

13  Q    Has the association in the past been a party to any

14  lawsuit regarding benefit for police and fire -- benefits for

15  police and fire retirees?

16  A    A number of lawsuits.

17  Q    Has the association ever been a party to any compromise

18  regarding healthcare benefits?

19  A    Yes, they have.

20  Q    And can you please tell me about that?

21  A    Yeah.  The latest would be referred to as the Weiler

22  settlement agreement.  I think that was reached in 2009; had

23  to do with reductions in healthcare benefits to retired

24  police officers and fire fighters.

25  Q    And did the association participate in that settlement --

1  A   Yes, they did.

2  Q   -- or that reduction, I should say?

3  A   Yes, they did.

4  Q   How did that occur?

5  A   Once the benefits were changed, we initiated a lawsuit

6  against the City of Detroit, and during the hearings on that,

7  there were some negotiations started to take place with our

8  attorneys and with Judge Torres, and we were able to come up

9  with what we felt was a compromise.  And we addressed that to

10  our memberships in advance, and we told the -- advised our

11  attorney to go ahead with the settlement agreement.

12  Q   And was that settlement, in fact, implemented?

13  A   Yes, it was.

14  Q   Has the association ever lobbied the state legislature on

15  behalf of police and fire retirees?

16  A   Yeah, on a number of occasions.

17  Q   Can you tell me about one of those occasions --

18  A   Well, we --

19  Q   -- for example?

20  A   We had three different pieces of legislation that we

21  assisted in drafting, had to do with the composition of the

22  police and fire pension board in the City of Detroit.

23  Q   As president of the association, have you ever been

24  consulted by elected officials to discuss proposed

25  legislation at the state level?

1    A    At the state, yes, I have.

2    Q    Can you give me an example of that?

3    A    Andy Dillon has contacted me as the president of the

4    association to discuss legislation up there, and also the

5    mayor of the City of Detroit contacted me to discuss

6    legislation on the city.

7    Q    Have you ever served on a committee regarding benefits

8    legislation?

9    A    Yes, I have. When Andy Dillon -- when he was the Speaker

10    of the House -- I think it was about four years ago -- he

11    proposed legislation that would establish a statewide

12    healthcare program for public employees within a committee

13    that he chaired, and there was a breakout committee for

14    retirees, and I was asked to serve on that breakout committee

15    representing retirees.

16    Q    Mr. Taylor, are you registered as a lobbying agent?

17    A    As a lobbying agent for the retired Detroit Police and

18    Fire Fighters Association.

19    Q    Has the association ever expressed a position before the

20    City Council on behalf of retirees?

21    A    A number of occasions.

22    Q    Was the association involved with the Detroit City

23    Charter Revision Committee --

24    A    Yes, it was.

25    Q    -- or Commission, I should say?

1  A    Commission.

2  Q    Was it the Detroit --

3  A    Yeah, to revise.

4  Q    -- City Charter Revision Commission?

5  A    Revise the charter, yes.

6  Q    And when was the Charter Revision Commission active?

7  A    I believe the election was in 2011, so 2010, 2011.

8  Q    What was the purpose of your association participating in

9  the commission?

10  A    As the president of the association, I was invited to

11  participate in the portion of the charter revision that

12  referred to the pensions, and I was -- took part in the

13  board, questions from the public and from the board.

14  Q    Have you met with state officials on behalf of the

15  association?

16  A    Yes, a number of them.

17  Q    Did you meet this spring with State Treasurer Dillon?

18  A    Yes, I did.

19  Q    And did you request that meeting?

20  A    Yes, I did.

21  Q    Why did you want to meet with Mr. Dillon?

22  A    It was shortly after the new emergency manager

23  legislation had been passed, and I notified him that I wanted

24  to meet with him to discuss any possible effect that it could

25  have on retired police officers and fire fighters.

1    Q    Did you advise Mr. Dillon of any concern for payment of

2    pensions and benefits?

3    A    At that meeting?

4    Q    Yes.

5    A    Yes.   We discussed a number of issues at the meeting.

6    Q    Did you ask Mr. Dillon about the effect the legislation

7    might have on police and fire retirees?

8    A    Yes.   During the discussion, I brought up what proposals

9    or what possible changes that he could see on a number of

10    issues.   One of those included the composition of the police

11    and fire retirement board, and he indicated that there may be

12    some changes on that board, but it would not affect retirees'

13    positions.   I then asked him if there was anything that he

14    would see as possible changes on the pensions or anything of

15    that nature, and he informed me that there would be no

16    changes because the current retirees' pensions were

17    guaranteed by the state Constitution, but they were looking

18    at possible changes for future retirees on the way in which

19    their pensions may be calculated in the future.   And I also

20    asked him about our healthcare settlement, the Weiler

21    settlement agreement, if he's seen any possibility that that

22    would be affected during these hearings, and --

23    Q    Did you receive a response to that question?

24    A    Yes.   He informed me it was the State of Michigan's

25    intention to attempt to set aside that agreement or overturn

1 that agreement.

2      MR. IRWIN:  Your Honor, I have an objection to the

3 testimony as hearsay.

4      THE COURT:  This was -- these were statements that

5 Mr. Dillon made to you?

6      THE WITNESS:  Directly to me, yes, sir.

7      THE COURT:  The objection is overruled.  You may

8 proceed.

9 BY MR. MORRIS:

10 Q   Mr. Taylor, did you become aware this spring of the

11 appointment of Mr. Orr as emergency manager for the City of

12 Detroit?

13 A   Yes, I did.

14 Q   And following his appointment, did you contact Mr. Orr?

15 A   Yes.  I sent a letter and requested a meeting.

16 Q   Did you receive any response?

17 A   Yes, I did.  His office contacted me by phone and set up

18 a date for a meeting.

19 Q   And did you eventually meet with Mr. Orr?

20 A   Yes, I did.

21 Q   And do you recall when that meeting occurred?

22 A   It was towards the end of April.  I think it was April

23 18th.

24 Q   And who was at that meeting?

25 A   It was the secretary treasurer of our association, Allan

1   Grant; the vice president of our association, Greg Trozack;

2   Mr. Orr; and myself.

3   Q    And what was discussed at the meeting?

4   A    There was a number of issues.  We had a 45-minute

5   meeting, and, first of all, I introduced who we were and what

6   our organization does, and I asked him some of the same

7   questions I had spoke with with Mr. Dillon.  I asked him if

8   he seen changes in the composition of the pension board, and

9   he said he hadn't made any decisions on that yet.  I asked

10  him if he was -- about the pensions of retirees.  He said

11  that he was fully aware that the pensions were protected by

12  the state Constitution, and he had no intention of trying to

13  modify or set aside it or change the state Constitution, and

14  I went on.  I asked him if he was familiar with the Weiler

15  settlement agreement.  He indicated that he was, and he

16  indicated to me that he was -- assured me that under the

17  Emergency Manager Act, he had no authority to set aside that

18  agreement or modify that agreement.  After he made that

19  statement, I told him that I'd had a meeting with Andy

20  Dillon, and Andy Dillon had indicated that the state's

21  intention was to attempt to overturn that settlement

22  agreement.  He indicated that he doesn't speak for the state,

23  but that was not his intention, and he had no intention of

24  trying to set aside that agreement.

25  Q    Was there any discussion at that meeting about the

1    possibility of having future meetings with Mr. Orr?

2    A    Yeah.  Following the meeting, Mr. Orr indicated to me as

3    he was just starting to proceed and there was more

4    information that he was gathering, and as the process moved

5    along, he would contact our association for further meetings.

6    Q    After this meeting, did you communicate the results to

7    the board of directors of the association?

8    A    Yes, I did, and also to the membership.  I sent out an e-

9    mail regarding our meeting.

10    Q    Was an e-mail sent to the membership?

11    A    Yes.

12    Q    To the e-mail list?

13    A    Yes.

14    Q    After your meeting with Mr. Orr, did you receive a

15    communication from the city asking who the association

16    represents?

17    A    Yes, I did.

18    Q    And did you respond to that?

19    A    Yes, I did, that we represent all police and fire

20    retirees.

21    Q    After meeting with Mr. Orr, did you hear again from Mr.

22    Dillon's office?

23    A    Yes.  I received an e-mail from Mr. Dillon's office -- I

24    think it would be towards the end of May, maybe the first

25    part of June -- advising me that I should contact

1  Mr. Buckfire's -- Ken Buckfire and one other member of his

2  team regarding things that may affect police and fire in the

3  bankruptcy proceedings.

4  Q   Did you contact Mr. Buckfire?

5  A   Yeah.  I sent e-mails to Mr. Buckfire, and I don't recall

6  the other representative's name.  And I also called

7  Mr. Buckfire by phone and left a message with his secretary.

8  Q   Did you receive --

9  A   I assume it was his secretary.

10  Q   Did you receive a response?

11  A   Yes, I did, in both occasions, by e-mail and by phone.

12  Q   And what was the response?

13  A   Mr. Buckfire indicated to me by phone that they would be

14  in touch and they would be setting up meetings and would get

15  back with me at a later time, and that was pretty much --

16  both e-mails came back from both representatives saying

17  basically the same thing, that they would be in touch and

18  meetings would be set up in the future.

19  Q   And were further meetings set up?

20  A   Not with our organization.

21  Q   But did you attend a meeting on June 14th at the Metro

22  Airport?

23  A   Yes, I did.

24  Q   And were you invited to attend that meeting?

25  A   Yes, I was.

1   Q   Who invited the association to attend the meeting?

2   A   It was done by e-mail.  It was from representatives from

3   Jones Day.  I don't recall the name.

4   Q   Who attended on behalf of the association?

5   A   We were limited to two, and it was the secretary-

6   treasurer, Allan Grant, and myself.

7   Q   Do you recall how many persons were in the audience at

8   that meeting?

9   A   It was maybe at least a couple hundred.

10  Q   Do you know what groups were represented at that meeting?

11  A   There was -- pretty much every group was represented

12  there, the active associations, the pension board, the

13  bondholders, every --

14  Q   Was the proposal for creditors document that's been

15  referred to circulated at that meeting?

16  A   Yes, it was.

17  Q   Did you receive a copy?

18  A   Yes.

19  Q   Did you furnish a copy to the association's attorneys?

20  A   Yes, I did.

21  Q   At that meeting, were you or other representatives of the

22  association given an opportunity to discuss your position?

23  A   No, not to discuss the position.

24  Q   Was there an opportunity to submit questions?

25  A   You could submit written questions.

1  Q   Did you submit a question?

2  A   No.

3  Q   And was there a reason why you didn't submit a question?

4  A   At that point, I had met with the state treasurer and

5  Mr. Orr, and I was under the impression that the members of

6  the Retired Police Officers and Fire Fighters benefits were

7  not at that great a risk at that point, and I was informed

8  that Mr. Orr would notify me and would set up future meetings

9  with our association if it became necessary.

10 Q   And following that meeting, did you report back to the

11 board of directors?

12 A   Yes.

13 Q   Did you attend another meeting on June 20?

14 A   Yes.

15 Q   And do you recall where that meeting occurred, where that

16 was held?

17 A   I think that was the one in the auditorium at City County

18 Building.

19 Q   And was there someone that invited you to attend?

20 A   Yes, same way, by e-mail.

21 Q   And who attended on behalf of the association?

22 A   Once again, it was restricted to -- I was -- myself and

23 our attorney, Brian O'Keefe.

24 Q   And this -- you said it was restricted.  What do you mean

25 by --

1    A    We had two positions, yes.

2    Q    You were allowed to have two people attend?

3    A    Yeah.

4    Q    Do you recall how many persons were in the audience?

5    A    I'm going to guess 50, 60.

6    Q    And what groups were represented?

7    A    All the active labor organizations were there, and I

8    think there was probably representatives from the pension

9    board and some that I'm not familiar with who they were, but

10   there was a number of people there.

11   Q    Did the city at this meeting tell you what it intended to

12   do with police and fire pensions?

13   A    No, they didn't.

14   Q    Were you asked your position?

15   A    No.

16   Q    Did you submit any questions at this meeting?

17   A    No.

18   Q    And why not?

19   A    Once again, I had no reason to submit.  I was still under

20   the impression -- I wasn't sure what they were referring to

21   and --

22   Q    How many different retiree groups were represented at

23   that meeting?

24   A    One.

25   Q    Basically two people there on behalf of your association?

1  A   Yeah.  I was the only retiree and an attorney, as far as

2  I know.  There may have been some individual retirees with

3  him, but there was no retiree association.

4  Q   Now, did you attend another meeting with the city?

5  A   Yes.

6  Q   In July?

7  A   Yeah.

8  Q   Do you recall the date of that meeting?

9  A   There was two in a row.  I think they were the 10th and

10 11th.

11 Q   And were you invited to attend that meeting?

12 A   Not initially, no.

13 Q   Did you hear about it somewhere?

14 A   Yeah.  One of our board members is -- he also is a member

15 of the Police Officers Association of Michigan, and he was

16 invited as a representative for the EMS.  And once he was

17 invited, he sent me a copy of his e-mail, and once I received

18 his e-mail that these meetings were set up, I contacted the

19 phone number at the bottom of his and asked if we would be

20 allowed to attend to represent the interest of retirees, and

21 I don't recall the name of the person, but they was from

22 Jones Day, and they indicated that they would run it up the

23 chain and get back with me.

24 Q   And did you receive a response?  Did you receive a --

25 A   No.  I also forwarded that e-mail to our attorney, and he

1   indicated he also called and requested a meeting, and a few

2   hours later that day he notified me that they were going to

3   give us one position.

4   Q   Now, are EMS part of the police and fire?

5   A   No.

6   Q   Was there also a limit on the number of persons permitted

7   to attend this meeting on behalf of the --

8   A   Yeah.  Initially it was just going to be one, and then

9   the attorney indicated to me that he called them back, and

10  they were allowed -- I was allowed to bring an attorney.

11          THE COURT:  Allowed to bring what, sir?

12          THE WITNESS:  The attorney.

13  BY MR. MORRIS:

14  Q   And who was in attendance at this meeting?  Who was in

15  the audience?

16  A   Once again, it was all the public safety unions and

17  different labor organizations and I think probably the

18  pension board and pension trustees, the actuaries, and

19  depends on what you --

20  Q   Did the city make a proposal at that meeting with respect

21  to police and fire retirees?

22  A   No.  Well, which meeting are you referring to?

23  Q   July --

24  A   I assume the pension meeting was first, right, the

25  pension -- that was the 10th?

1  Q   July 10 I'm referring --

2  A   Yeah.

3  Q   -- to, the first of the two meetings.

4  A   Yeah.

5  Q   Was there a discussion at this meeting regarding active

6  employees?

7  A   Yes.  There was a lot of discussion because it was pretty

8  much all active members there with the exception of myself,

9  and there was some discussion over modifications on how their

10 pensions were going to be altered or administered in the

11 future, so most of the meeting geared around the active

12 members.

13 Q   Are those issues that concern your association?

14 A   No.

15 Q   Was there discussion regarding retiree issues?

16 A   Not that I recall.

17 Q   At this meeting, were you asked your position on any

18 issues?

19 A   No.

20 Q   Did you have any questions at this meeting?

21 A   No.

22 Q   Did the city at this meeting state that it intended to

23 reduce or impair police and fire pensions for current

24 retirees?

25 A   Not for current retirees.

1   Q   Now, you also said there was another meeting --

2   A   The next day.

3   Q   -- the next day?

4   A   Yes.

5   Q   And was that -- did that meeting regard --

6   A   Healthcare.

7   Q   -- healthcare?

8   A   Yeah.

9   Q   And were you invited to this meeting?

10   A   In the same method as the previous one.  It was done at

11 the same time.

12   Q   Two meetings go together.

13   A   Yeah.  They were published at the same -- together as

14 joint meetings.

15   Q   And was the audience similar to the July 10 meeting?

16   A   Yes.  There may have been a little -- I'm not sure at the

17 second meeting if the actuaries from the pension board was

18 there or not.

19   Q   Did the city at this meeting make a proposal regarding

20 police and fire retirement benefits?

21   A   They passed out a -- I guess you could call it a

22 proposal.  It was a four-line -- just one paragraph that had

23 four options for healthcare benefits for retirees.

24   Q   Like the names of healthcare plans?

25   A   There was two options from Blue Cross and two options

1   from HAP.

2   Q    Did you ask any questions at this meeting?

3   A    Yes.  I asked one question regarding whether their

4   intention was to modify or to include those that were covered

5   by the Weiler settlement agreement in this healthcare

6   proposal.

7   Q    Did you receive an answer to your question?

8   A    Not a direct -- at that point, once I asked that

9   question, the attorney who represented us in the -- Mr.

10  Legghio, Mr. Chris Legghio, was present, and he kind of took

11  over once I brought up the question, and then there was an

12  exchange of legal back and forward between that attorney and

13  the Jones Day attorneys.  And they indicated that there was

14  some legal questions regarding whether they would be able to

15  enforce that, and that was still being looked into by the

16  attorneys.

17  Q    The attorney you referred to, Mr. Legghio, had he been

18  involved in the Weiler litigation?

19  A    Yeah.  He was the -- he was the attorney that handled the

20  class action.

21  Q    Following this meeting, did you have the opportunity to

22  ask for a separate meeting with the emergency manager's

23  representatives?

24  A    Yeah.  I don't recall the exact procedure.  It was either

25  after that meeting or the previous one.  As I was leaving the

1  meeting with our attorney, Brian O'Keefe ran into one of the

2  Jones Day senior attorneys.  Once again, I'm not good with

3  names, you know, but we -- they had a brief discussion in the

4  hallway.  At that time, I indicated to him that we would like

5  to have a meeting on our own, a breakout meeting just

6  affecting retired Detroit police and fire fighters.

7  Q    Did that meeting ever occur?

8  A    No.  He indicated to our attorney that -- asked that the

9  attorney, you know, put that in writing, forward it to him,

10  and forward the request to him.

11  Q    Following this meeting or these meetings on July 10 and

12  July 11, did you meet with any of the other persons in the

13  audience to discuss issues?

14  A    Following the meeting?  After the second meeting, the

15  active unions, we all met out in the hallway for a short

16  time, you know, right outside the meeting, and then we

17  decided to all go over to the office of the Detroit Police

18  Officers Association and discuss what had just transpired.

19  Q    And did you attend that meeting at the --

20  A    Yes, I did --

21  Q    -- DPOA headquarters?

22  A    -- along with our attorney.  We all went to the offices

23  of the Detroit Police Officers Association.

24  Q    Did you hear testimony previously regarding a letter sent

25  by the public safety unions to the city manager?

1  A   Yes.

2  Q   Do you recall that letter that was being discussed?

3  A   Not at that particular -- what we discussed at that

4  meeting when we all got in, we decided that as a group we

5  would select like a lead organization to represent us as a

6  group and request further meetings, and at that meeting we

7  decided that the lead would be the Detroit Police Officer --

8  the president of the Detroit Police Officers Association, and

9  he asked that we all submit questions to him so that he could

10  forward this information or request on to the city's

11  representatives.

12  Q   So is it fair to state that you participated in

13  discussions that led up to a letter being sent?

14  A   Yeah.  I was involved in a meeting with the Detroit

15  Police Officers Association.

16  Q   Did the association -- after the bankruptcy was filed,

17  did the association send out a mailing to police and fire

18  retirees?

19  A   Yeah.  That's what we considered -- referred to as a

20  consent agreement where we sent letters out to all the

21  retired police officers and fire fighters asking if they

22  wanted to -- us to represent them in the bankruptcy

23  proceedings.

24  Q   Was this sent immediately after the bankruptcy was filed?

25  A   Yes.

1   Q   And who was this sent to?

2   A   All retired police officers and fire fighters.

3   Q   And what responses were received?

4   A   We got back at this point I think a little over 5,300.

5   Q   Did you receive any responses from nonmembers?

6   A   Yes.

7   Q   Did you receive any responses that indicate that the

8   association should not represent the retirees?

9   A   Yes, we did.

10  Q   How many of those did you receive?

11  A   One.

12  Q   Did you receive any responses that indicated that the

13  retirees wanted the association to represent the retirees?

14  A   Yes, as I said, 5,300, over 5,300.

15  Q   Did you receive feedback from police and fire retirees

16  regarding the city's bankruptcy petition?

17  A   You're going to have to repeat that.

18  Q   Did you receive feedback?  Did the association receive

19  feedback from police and fire retirees regarding the city's

20  bankruptcy petition?

21  A   Oh, yeah.  As I said, we have a full-time office, and the

22  phones have -- basically, like I say, ringing off the hook.

23  We were constantly receiving phone calls, e-mails, and

24  letters asking what's going to happen, are they going to --

25  many times before the first of the month we got calls to ask

1  if they're going to get their pension check, is our pension

2  check still coming, what's going to happen on January 1st.

3  We -- it's hundreds of inquiries.

4  Q  Was the board of directors of the association in a

5  position to receive a proposal from the city regarding police

6  and fire retirees?

7  A  Yes.

8  Q  Was it in a position to consider such a proposal?

9  A  Yes.

10  Q  Was the board in a position to transmit any such proposal

11  or other information to the membership?

12  A  Yes.

13  Q  Was the board in a position to transmit that information

14  to the retirees, the police and fire retirees who were not

15  members?

16  A  Yes.

17        MR. IRWIN:  Objection.  This is very leading, your

18  Honor.

19        THE COURT:  No.  I'll permit this.  Go ahead, sir.

20  BY MR. MORRIS:

21  Q  Did the city ever make a proposal specifically to police

22  and fire retirees?

23  A  No, not that I'm aware of, not to our organization.

24  Q  Did you ever inform Mr. Orr that the RDPFFA did not want

25  to represent police and fire retirees?

1   A   No.

2   Q   Did negotiations occur with the RDPFFA?

3   A   No.

4   Q   Was it possible for the city to negotiate with the

5   RDPFFA?

6   A   Yes.

7   Q   Has the uncertainty regarding future pensions -- pension

8   and benefit payments affected your members?

9   A   Yes.

10  Q   Has it affected you personally?

11  A   Yes.  Everything affects everybody.  You're not sure

12  what's going to happen, whether on January 1st -- my personal

13  thing, my daughter has asked me to loan her money for a down-

14  payment on a house, and I told her we're going to have to

15  wait a few months, see what happens.  My car currently has

16  250,000 miles on it.  It's still running, but it's got 250,

17  so I'm holding off any big expenditures until I get a better

18  picture of what's going to -- the future is going to hold.

19          MR. MORRIS:  Thank you, Mr. Taylor.  I have no

20  further questions.

21                      CROSS-EXAMINATION

22  BY MR. IRWIN:

23  Q   Good afternoon, Mr. Taylor.

24  A   Good afternoon.

25  Q   I just want to revisit briefly something that you

1  described in connection with your background and the

2  background of the organization, the --

3  A   Okay.

4  Q   -- RDPFFA.  We saw earlier in connection with the by-laws

5  of the organization that there are actually two missions, if

6  you will, for the organization.  One was to provide

7  information.  Do you recall that?

8  A   Yes.

9  Q   And the other was to promote goodwill among the

10 membership; is that right?

11 A   Yes.

12 Q   And did the organization start or did it have roots as a

13 social organization of some sort?

14 A   Oh, yes.  Yes.

15 Q   And it was formed over 50 years ago?

16 A   Yes.

17 Q   And you consider the organization to be advocates for the

18 membership; is that right?

19 A   Yeah, advocates for all retired police officers and fire

20 fighters.

21 Q   Correct.  And I believe that you have indicated that the

22 organization has been involved in lawsuits before; is that

23 right?

24 A   Yes.

25 Q   And is it a true statement that the only time that the

1  organization has been able to bind the members in connection

2  with a reduction in benefits has been by court order or by

3  consent of all the retirees; is that right?

4  A   Yeah.  It was either by court order or consent.  There

5  was a time when we used consent on the 13th check agreement.

6  Q   And in connection with the settlement agreement that you

7  were talking about, that was done with the consent of the

8  members; is that right?

9  A   Yes.

10  Q   And -- well, I'll return to that in just a moment.  The

11  Weiler settlement agreement that you were talking about

12  previously, do you recall that --

13  A   Yes.

14  Q   -- testimony?  And that was a topic that had actually

15  come up at a number of the meetings that you had with the

16  city; is that right?

17  A   Yes, with the city and the state.

18  Q   And I think you mentioned that at your first meeting with

19  Mr. Orr -- I think you said that was late April; is that

20  right?

21  A   Yes.  April 18th I think was the date.

22  Q   And you said that that was -- that particular consent

23  decree was important enough to you that you wanted to make

24  sure that there was some discussion about that at the

25  meeting; is that right?

1   A    Yes.

2   Q    Okay.  Did you at that meeting indicate to Mr. Orr that

3   you had any authority from the membership of the organization

4   to renegotiate the Weiler consent decree?

5   A    No.  I wouldn't seek that in advance.  Why would I seek

6   that in advance?

7   Q    Did you ever -- did you ever in the -- did you ever,

8   prior to the time that the bankruptcy was filed, seek

9   authority from the membership of your organization to reduce

10  the benefits that were memorialized in the Weiler consent

11  decree?

12  A    No.  I don't see that as part of the negotiating process.

13  I was a member of the Detroit Police Officers Association

14  from 20 years as an executive there, and we never sought in

15  advance permission from the members to reduce benefits then

16  either.  That's not something -- I don't see that as part of

17  the bargaining process.

18  Q    Is that a "no"?  Is it a fair statement to say that you

19  did not, in fact, get authorization from the membership at

20  any time prior to the bankruptcy filing to renegotiate the

21  Weiler consent decree?

22  A    I didn't feel it was necessary at that point.

23  Q    Okay.  And did you ever indicate -- I assume then you

24  never indicated to Mr. Orr or any city officials at your

25  meetings that you were prepared to renegotiate the Weiler

1  consent decree?

2  A   No.   Mr. Orr --

3           MR. MORRIS:  Objection.  Asked and answered.

4           THE COURT:  It's a slightly different question.  You

5  may answer it, sir.

6           THE WITNESS:  Mr. Orr never indicated to me at our

7  meeting -- I think I said that -- that he intended to reduce

8  our benefits, so I wasn't going to suggest that he reduce our

9  benefits.

10 BY MR. IRWIN:

11 Q   Did you ever indicate -- or the discussion that you

12 described at one of the meetings -- I think it was the -- one

13 of the July meetings, and you said there was an attorney

14 there for the class in the Weiler consent decree.  He was

15 present at the meeting.

16 A   Yeah.  Chris Legghio.

17 Q   And do you recall observing the communications or the

18 dialogue back and forth between Mr. Legghio and the Jones Day

19 attorneys?

20 A   Yes.

21 Q   Okay.  Did you observe -- in what you saw and heard, did

22 you observe Mr. Legghio at any time make an offer to

23 renegotiate the terms of Weiler?

24 A   No.

25 Q   And did anyone at that meeting indicate to anyone at the

1   city that they had authority from the members of your

2   organization to renegotiate Weiler?

3   A   Once again, I think you're putting things ahead of time.

4   Why would we negotiate something before anything is offered?

5          THE COURT:  Is the answer "no"?

6          THE WITNESS:  No.  The answer is "no."

7   BY MR. IRWIN:

8   Q   Did you believe that the city had the right to

9   renegotiate the terms of Weiler at that meeting?

10  A   Through consent, yes.

11  Q   And have you at any point in time, even after the

12  bankruptcy filing, approached your membership and asked for

13  consent or authorization to renegotiate Weiler?

14  A   Once again, I repeat the same thing.  I don't have -- it

15  would be premature.

16  Q   Is that a "no"?

17  A   That's a "no."

18  Q   Okay.  And is it also true, Mr. Taylor, that your

19  organization, the RDPFFA, has not negotiated in a binding way

20  a reduction in healthcare costs -- or sorry -- healthcare

21  benefits for its membership?

22  A   No, that's not true.  We did do -- we did negotiate a

23  reduction in healthcare benefits.

24  Q   Are you talking about the Weiler --

25  A   Yes.

1  Q   -- consent decree?  Setting Weiler aside, which was a

2  class action lawsuit --

3  A   Yeah.

4  Q   -- has there ever been any other instance where the

5  organization has had the authority and has negotiated with

6  binding effect to reduce healthcare benefits to the members?

7  A   No.  It was never necessary.

8  Q   Okay.  And has there ever been any other attempt by the

9  organization to get authority from its members to reduce

10  healthcare benefits in a binding way?

11  A   No.  It was never necessary.

12  Q   So the way the process would need to work then, if I

13  understand it, is that the organization would, if invited,

14  participate in negotiations with the city; is that right?

15  A   Yes.

16  Q   Okay.  And then what would happen -- if the city were to

17  make a proposal to the RDPFFA, that is a proposal that the

18  RDPPFFA (sic) could consider; is that right?

19  A   That's right.

20  Q   And it could negotiate -- it could pass along that

21  information to the members; is that right?

22  A   Yes.

23  Q   And it could even perhaps recommend that the membership

24  accept that proposal; is that right?

25  A   That's what we've done in the past, yes.

1  Q   But ultimately is it not true that it would be up to the

2  individual members of the association to decide if they would

3  accept or reject that offer?

4  A   Yes.

5  Q   Okay.  And so it could be the case certainly that the

6  city could negotiate with your organization and make a

7  proposal and, in fact, reach an agreement in principle only

8  to find that the vast majority if not all of the members

9  rejected it?

10  A   And that would be true with the actives the same.  They

11  vote on their contracts.

12  Q   And in that case, the city would have to negotiate with

13  the individual members themselves if they wanted to reach an

14  agreement to reduce benefits?

15  A   No.  I believe we could follow the same procedure that we

16  followed with the Weiler.  We'd bring in the assistance of

17  attorneys and a court.

18  Q   But in terms of a straightforward negotiation, though,

19  the city would have to negotiate with members individually in

20  that case; is that right?

21  A   Not necessarily.  I just said we did it with the Weiler

22  through a class action.  I believe they could follow the same

23  proceeding.

24  Q   Outside of a class action setting where the members are

25  suing the city, if we're just talking about a negotiation

1  where the city is attempting to reduce healthcare benefits,

2  if the city made a proposal, it would ultimately have to

3  negotiate with the individual members; is that right?

4  A   Yeah.  I believe they could put it out --

5          MR. MORRIS:  Objection, your Honor.

6          THE WITNESS:  -- for a vote, and the members --

7          MR. MORRIS:  Calls -- I'm sorry.

8          THE COURT:  What is your objection, sir?

9          MR. MORRIS:  Calls for a legal conclusion.

10         THE COURT:  Well, the witness can give us his

11 understanding if he feels comfortable doing that.

12         THE WITNESS:  Yes, sir.  I'll give an answer.  I

13 believe that the city could propose that to the retired

14 police officers and fire fighters, and they could vote on the

15 proposal.

16 BY MR. IRWIN:

17 Q   They would decide for themselves if they wanted to accept

18 the proposal; is that right?

19 A   Yes, they would.

20 Q   All right.  We've been talking about healthcare benefits;

21 right?  We've been talking about the Weiler settlement and --

22 A   Yes.

23 Q   -- healthcare benefits.  Let's talk about pension issues

24 for a moment, if we could.

25 A   Okay.

1  Q   It is your position, is it not, Mr. Taylor, that the

2  organization -- your organization is not empowered to enter

3  into binding agreements with the city in order to reduce

4  pension benefits?  Is that a true statement?

5  A   Not on our own, and it would have to be done in the same

6  method, and it would have to -- obviously that one would have

7  to be a consent, and that is a more legal question than I

8  could answer.

9          MR. IRWIN:  Well, let's put -- why don't we put

10  up -- let's put up Exhibit 302, if we could.

11  BY MR. IRWIN:

12  Q   Do you see Exhibit 302 in front of you, Mr. Taylor?

13  A   Yes, I do.

14  Q   Do you recall -- do you recall providing a declaration in

15  connection with the legal proceedings in this case?

16  A   Yes.

17  Q   And is this a true and accurate copy, to the best you can

18  tell, of that declaration?

19  A   Yes.

20  Q   And did you sign it on or around August 19th of this

21  year?

22  A   If that's the date, yeah.  It would be around then.

23  Q   We can confirm it.

24  A   Yeah.

25  Q   It's on the last page of the document.

1    A    Okay.  Yeah.

2    Q    Is that your signature on the last page?

3    A    Yes, sir.

4    Q    Okay.  If I could direct your attention, please, to

5    paragraph 6 of that document -- it's on the second page at

6    the bottom.

7    A    Okay.

8    Q    Have you had a chance just to read that paragraph?

9    A    Yes.

10   Q    I'd like to direct your attention to the second line

11   where you state, "The RDPFFA is not empowered to enter into a

12   binding agreement with the city regarding pension benefits."

13   A    Yes.

14   Q    Do you see that?

15   A    I stated that, not without outside assistance.

16   Q    Not without outside assistance.  You mean the consent of

17   the members?

18   A    Yes, or through the legal process through a court.

19   Q    Right.  So the organization does not have the authority

20   absent the consent --

21   A    Consent, yes.

22   Q    -- of the members who you would purport to bind --

23   A    Right.

24   Q    -- in order to reduce pension benefits?

25   A    Right, yeah.

1   Q   Which means that if the city were to wish to negotiate a

2   reduction in pension benefits, ultimately it would need to

3   negotiate with the individual members; correct?

4   A   Not the individual members.  They could put a proposal

5   and present it for their vote, yes.

6          MR. IRWIN:  And if we could -- while we're on the

7   subject of pension benefits, if we could also put up --

8   Laurie, if you could put up Exhibit 83.

9   BY MR. IRWIN:

10   Q   Do you see Exhibit 83 in front of you, Mr. Taylor?

11   A   Yes.

12   Q   Do you recall participating in responding to written

13   questions that were posed to your organization in connection

14   with this proceeding?

15   A   Yes.

16          MR. IRWIN:  And could we go to the last page of

17   document, Laurie, the signature page?  If you could blow up

18   that bottom left section --

19          THE WITNESS:  Yeah.  I can see it.

20   BY MR. IRWIN:

21   Q   Can you see it okay?

22   A   Yeah.

23   Q   Okay.  Is that your signature, Mr. Taylor?

24   A   Yes.

25   Q   Does that indicate that you personally participated in

1  the preparation of the responses to these questions?

2  A   Yes.  I reviewed them, yeah.

3  Q   To the extent they applied to your organization.

4  A   Yeah.

5  Q   This was a composite set of questions and answers, some

6  of which applied to your organization and some to another; is

7  that right?

8  A   That's right.

9  Q   And to the extent that there are questions and answers

10 that relate to your organization, may I presume that you were

11 the person who provided the substantive responses and

12 verified them; is that right?

13 A   Yes.

14 Q   Okay.  And you signed this believing that these answers

15 were truthful and accurate?

16 A   Yes.

17 Q   Okay.

18         MR. IRWIN:  Could we then turn to -- let's look at

19 response Number 3 -- sorry -- response Number 5 is the one I

20 wanted to focus on, the question and answer Number 5.  I

21 think it's one more page.  There we go.  Could you blow that

22 up?

23 BY MR. IRWIN:

24 Q   All right.  This is a question, and I'll read it -- and

25 I'd like you to make sure I've read it right -- where we

1  ask -- the city asks to identify any person or persons who

2  have knowledge of any attempt prior to July 19th, 2013, by

3  the RDPFFA to obtain any form of legal authority from its

4  members to appoint RDPFFA as their representative in

5  connection with negotiations to reduce, limit, or abridge

6  pension rights or benefits on a prospective basis only

7  provided by the PFRS.  Do you see that?

8  A    Yes.

9  Q    And did you understand the question at the time you were

10  responding to it?

11  A    Yes.

12  Q    And is it a fair summary to say that the question is

13  asking for individuals with knowledge of any prior attempt to

14  get authority to negotiate a reduction in pension benefits on

15  behalf of the membership?

16  A    Yes.

17  Q    Okay.

18  A    Like I said, it would be premature.

19  Q    Yes.  But you answered this question, did you not?

20  A    Yes, I did.

21  Q    Okay.  And let's look at your answer.  It actually

22  extends onto the next page of the document.  There are

23  several lines where there are some objections that are

24  stated, and then there's a response that begins on the next

25  page.  Do you see that?

1   A    Yes.

2   Q    Okay.  And the answer provides -- there's a sentence that

3   begins, "However," and it says, "without waiving said

4   objections and in the spirit of cooperation, the RDPFFA

5   states that it is not aware of any individual with knowledge

6   responsive to this interrogatory."  Do you see that?

7   A    Yes.

8   Q    And may I interpret that to mean that there is no --

9            THE COURT:  Excuse me.  What answer were you reading

10  from?

11           MR. IRWIN:  The response to Number 5.  Maybe we

12  didn't have it pulled up the right away.

13           THE COURT:  Yeah.  Let's get this --

14           MR. IRWIN:  Yeah.

15           THE COURT:  -- set up properly here.

16           MR. IRWIN:  Yeah.  I think it was just a problem

17  with the screen.  I was reading from Number 5, and I'll do it

18  again.

19           THE COURT:  Here we go, yes.  It was the second page

20  on the screen that wasn't the correct second page, so --

21           MR. IRWIN:  Yeah.

22           THE COURT:  -- let's just hold on.

23           MR. IRWIN:  We'll blow it up.

24           THE COURT:  Hold on.

25           MR. IRWIN:  Yeah.

1      THE COURT:  Yeah.  Hold on one second.

2      MR. IRWIN:  Right.

3      THE COURT:  Okay.  Now you may proceed.

4   BY MR. IRWIN:

5   Q   I apologize, Mr. Taylor.  I think we've got this right

6   now.

7   A   All right.  I was confused anyway.

8   Q   Sorry?  We have it.  Okay.  I think we've got it right

9   now.

10  A   Okay.

11  Q   Okay.  And I'll read it.  I'll read from the answer.

12  A   Yeah.

13  Q   It says, "However, without waiving said objections and in

14  the spirit of cooperation, the RDPFFA states that it is not

15  aware of any individual with knowledge responsive to this

16  interrogatory."  Do you see that?

17  A   Yes.

18  Q   And do I correctly interpret that to mean that you are

19  not aware of any prior instance where the organization has

20  asked for authority from the membership to negotiate a

21  reduction in pension benefits?

22  A   In advance, no, we haven't.

23  Q   We have not.  And it is true that you did not ask for

24  permission in advance in this case here to negotiate with --

25  A   No.

1   Q   -- the city.

2   A   No.

3   Q   "No," that's correct?

4   A   Yes, that's correct.

5   Q   Okay.  Then I want to skip down to the end of the answer.

6   There's a sentence here that reads, "The RDPFFA would not

7   take any action to obtain or solicit authority from its

8   members to do something prohibited by the Michigan

9   Constitution."  Do you see that?

10  A   Yes.

11  Q   And you're aware that your organization has advanced a

12  claim in this case that pension benefits are protected by the

13  Michigan Constitution?

14  A   Yes.

15  Q   And is that the reference that you're making in this

16  answer?

17  A   Yes.

18  Q   Yes.  And the answer states that the organization would,

19  in fact, not ever seek authority from its members to reduce

20  those pension benefits because they're protected by the

21  Constitution?

22  A   Yes.

23  Q   Am I reading that right?

24  A   Yes, not without their consent.

25  Q   And did you make that plain to officials from the city at

1 any of the meetings that you attended?

2 A   No.

3 Q   Okay.  But it was your belief at the time that you would

4 not seek authority to negotiate a reduction in pension

5 benefits?

6 A   At the meetings I was at, it wasn't only my belief, it

7 was that of Mr. Orr and Mr. Dillon, so, once again, I'm not

8 sure why I would make such a statement.

9 Q   And at no point prior to the filing of the bankruptcy did

10 you make it plain to anyone at the city that you would not be

11 willing to negotiate pension benefits?

12 A   No.  What --

13         MR. MORRIS:  Objection.  Asked and answered.

14         THE COURT:  Well, I'll permit it.  I'll permit it

15 one more time.  Go ahead.

16         THE WITNESS:  Rephrase it again.

17 BY MR. IRWIN:

18 Q   Sure.  At any point in time prior to the filing of the

19 bankruptcy, did you come to understand that pension benefits

20 might, in fact, need to be renegotiated?

21 A   No, not the filing, not as it related to police and fire

22 pensions.

23 Q   And so, therefore, you did not indicate that you were

24 unwilling to negotiate reductions in pension benefits to

25 anyone at the city?

1   A    No, because I was told all along this process that the
2   pensions for police and fire were protected by the state
3   Constitution by Mr. Orr and by Mr. Dillon.
4   Q    And in connection with the meetings that you did attend,
5   you were provided -- you received either presentation
6   materials or you saw things that were presented to you; is
7   that right?
8   A    Yes.
9   Q    And did you at any point in time -- did you at any point
10  in time seek guidance from any advisors outside of counsel in
11  terms of how to interpret those presentations?
12  A    No, because I was -- at that point, I was still waiting
13  for a call back from Mr. Orr, and he had notified me when I
14  met with him if it came to the point where we were affected,
15  he would notify me, and we would be invited back to meet with
16  him, and that, I assumed, would be the time we would discuss
17  things that affected police and fire retirees.
18  Q    And if Mr. Orr at one such meeting had indicated to you
19  that he, in fact, did intend to impair pension benefits, it
20  was your belief at the time that that could not be done under
21  the Constitution?
22  A    He didn't indicate that to me.
23  Q    I understand that.
24  A    Yeah.
25  Q    But it was your belief that that could not be done?

1   A    Yes.

2   Q    Okay.

3           MR. IRWIN:  That's all I have, your Honor.

4           MR. MORRIS:  Could I have -- I'm sorry.  Go ahead.

5           MS. PATEK:  Good afternoon, Mr. Taylor.  Barbara

6   Patek, your Honor, again, on behalf of the Detroit public

7   safety unions.

8                       CROSS-EXAMINATION

9   BY MS. PATEK:

10  Q    In your testimony talking about the July 11th meeting,

11  you mentioned an attorney by the name of Chris Legghio, who

12  represented you in the Weiler litigation.

13  A    Yes, ma'am.

14  Q    To your knowledge, do you know whether or not Mr. Legghio

15  also represents the Detroit Fire Fighters from time to time

16  in their labor relations with the City of Detroit?

17  A    Yeah.  I believe that's why he was at that meeting as

18  their representative.

19  Q    And you also mentioned going over to the Detroit Police

20  Officers Association offices after that meeting on the 11th?

21  A    Yes.

22  Q    And there was some discussion that the president of the

23  DPOA would be sort of taking the lead on moving this process

24  forward?

25  A    Yes.

1  Q   Can you tell us who that individual was?

2  A   Mark Diaz.

3          MS. PATEK:  That's all I have.

4          THE COURT:  Redirect.

5          MR. MORRIS:  Could I have Exhibit 302 on the screen,

6  please, specifically paragraph 6 we were looking at before?

7                    REDIRECT EXAMINATION

8  BY MR. MORRIS:

9  Q   Mr. Taylor, do you have that there?  I'm looking at

10 paragraph 6 of Exhibit 302.

11 A   Page 2?

12 Q   Yes, it is, page 2.

13 A   Yes.

14 Q   Page 2 to page 3, yes.  Mr. Taylor, would you please read

15 that paragraph?  Now, on cross-examination you were asked to

16 read a part of this.  Would you please read the complete

17 paragraph 6 for the Court?

18 A   Although like a committee of retirees to like the --

19 although like a committee of retirees to -- appointed by the

20 United States Trustee in this case, the RDPFFA is not

21 empowered to enter into binding agreement with the city

22 regarding pension benefits.  The RDPFA (sic) is a

23 representative of the interest of its members and other

24 police and fire retirees and was at all times relevant to

25 this matter in a position to negotiate on their behalf, to

 1  communicate and comment upon proposals made by the city and

 2  to recommend to its members and to all police and fire

 3  retirees an acceptable proposal.  The RDPFFA retained counsel

 4  to assist in the discussions with the city.

 5  Q    Thank you.  Mr. Taylor, is that an accurate statement?

 6  A    Yes.

 7          MR. MORRIS:  No further questions.

 8          THE COURT:  All right, sir.  You may step down.

 9  Thank you very much for your testimony today.  You're

10  excused.

11      (Witness excused at 2:37 p.m.)

12          MS. LEVINE:  Your Honor, we just have to find

13  Mr. Kreisberg.  He's been sequestered.

14          THE COURT:  Okay.  Thank you.

15          STEVEN KREISBERG, OBJECTOR'S WITNESS, SWORN

16          THE COURT:  Please sit down.

17                          DIRECT EXAMINATION

18  BY MS. LEVINE:

19  Q    Good afternoon, Mr. Kreisberg.

20  A    Good afternoon.

21  Q    Can you state your name and spell your last name for the

22  record, please?

23  A    My name is Steven with the "V."  Last name is

24  K-r-e-i-s-b-e-r-g.

25  Q    And by whom are you employed?

1   A   The American Federation of State, County and Municipal

2   Employees, AFSCME.

3   Q   Is that the International?

4   A   Yes, it is.

5   Q   And what's your title?

6   A   I'm the director of collective bargaining and healthcare

7   policy.

8   Q   And how long have you held that position?

9   A   In different titles about 17 years.

10  Q   In your role as director of collective bargaining and

11  healthcare policy, do you provide assistance to AFSCME locals

12  such as AFSCME Michigan Council 25 in their collective

13  bargaining efforts?

14  A   I do.

15  Q   Do you or does your department in the ordinary course

16  retain copies of the various collective bargaining agreements

17  negotiated and ratified by the various AFSCME locals?

18  A   Yes.

19          THE COURT:  Ms. Levine, could you slow down a little

20  bit for me, please?

21          MS. LEVINE:  This is slow.

22          THE COURT:  Slow?  Well --

23          MS. LEVINE:  Yes, your Honor.

24          THE COURT:  -- okay.  Slow down a little bit more

25  then.

1  BY MS. LEVINE:

2  Q    About how many collective bargaining agreements do you

3  have access to in your capacity as the AFSCME director of

4  collective bargaining and healthcare policy?

5  A    Approximately 8,000.

6  Q    Does the AFSCME constitution require that the AFSCME

7  locals share a copy of all of their negotiated agreements

8  with the AFSCME International?

9  A    Yes.

10  Q    As part of the -- as part of the CBA negotiation process,

11  does AFSCME and its locals negotiate CBA's that provide

12  health plan and pension benefits?

13  A    Yes.

14  Q    As part of the CBA negotiation process, does AFSCME and

15  its locals negotiate CBA provisions requiring employee

16  contributions to health plan and pension benefits?

17  A    Employee and employer contributions.

18  Q    Prior to July 18 -- and I'm not suggesting anything

19  changed after July 18.  It just happens to be the date that

20  the city filed its bankruptcy petition.  Prior to July 18th,

21  in Detroit before the consent decree and before the CET's,

22  the city employment terms, on retirement, did a retired

23  AFSCME employee continue to receive health plan and pension

24  benefits on the terms that were in effect under their

25  collective bargaining agreement on their retirement?

1    A    Yes.

2    Q    And prior to July 18, in Detroit after the consent decree

3    and after the CET's, on retirement, did a retired AFSCME

4    employee continue to receive health and pension benefits on

5    the same terms as those in effect under the CET's on their

6    retirement?

7    A    Yes.

8              MS. LEVINE:  Can we have AFSCME Exhibit 505, please?

9    BY MS. LEVINE:

10   Q    Mr. Kreisberg, I'm going to show you what's been marked

11   as Exhibit 505.  It's a -- it's what we've been referring to

12   as the February 1, 2012, tentative agreement.  Do you see

13   that document?

14   A    Yes, I do.

15   Q    Is this one of the 8,000 CBA documents you have access to

16   in your role as the director of collective bargaining and

17   healthcare policy for AFSCME?

18   A    Yes.

19   Q    Can you identify this tentative agreement from your own

20   personal knowledge or from your review of the records kept in

21   AFSCME's ordinary course of business?

22   A    Yes.

23             MS. LEVINE:  Your Honor, we'd like to move this

24   document into evidence, please.

25             THE COURT:  Any objections?

1          MR. STEWART:  Yes, your Honor.  What's the relevance

2    of it?

3          THE COURT:  The Court overrules the relevance

4    objection.  The document is admitted into evidence.

5       (Exhibit 505 received at 2:42 p.m.)

6          MS. LEVINE:  Thank you, your Honor.

7    BY MS. LEVINE:

8    Q   Did this agreement cover certain AFSCME locals here in

9    Detroit?

10   A   It did.

11   Q   Did the agreement also cover certain other local unions

12   representing various other Detroit city employees?

13   A   Yes.

14   Q   Was this agreement negotiated by a coalition of local

15   Detroit unions working together?

16   A   Yes.

17   Q   Is this a concessionary agreement?

18   A   Yes.

19   Q   And by "concessionary agreement," does that mean that

20   this agreement reflects reductions in the terms and

21   conditions of employment that were previously in effect?

22   A   Yes, specifically compensation levels.

23   Q   Was this agreement ratified or approved by the unions who

24   were parties to this agreement?

25   A   It was.

1  Q   Does that mean that the city represented employees

2  actually voted "yes"?

3  A   Yes, it does.

4  Q   Was this agreement ever put in effect?

5  A   No, it was not.

6  Q   What's your understanding as to why it wasn't put in

7  effect?

8  A   The City Council had never voted to approve the agreement

9  based on instructions it had received from state officials.

10 Q   Under this agreement, would retiree benefits have been

11 affected?

12 A   Yes.

13 Q   And it was a concessionary agreement, so there would have

14 been -- there would have been concessions to those retiree

15 benefits; correct?

16 A   That is correct.

17 Q   And would that have affected active as well as retired

18 employees?

19 A   Yes.

20 Q   Okay.  Turning now to --

21      THE COURT:  Excuse me one second, please.  What

22 state officials did you understand directed the City Council

23 not to approve Exhibit 505?

24      THE WITNESS:  My understanding that it was Treasurer

25 Dillon and perhaps Mr. Baird.

1          MS. LEVINE:  That was for tomorrow, your Honor.

2          THE COURT:  Oh, I jumped the gun.  My apologies.

3          MS. LEVINE:  No.  That's fine.  I just -- I wasn't

4    sure he had personal knowledge.

5    BY MS. LEVINE:

6    Q    Turning now to the good faith negotiations or the lack of

7    good faith negotiations, did you attend the June 14

8    presentation with the city with regard to the so-called

9    proposal to creditors?

10   A    Yes.

11   Q    About how long did the presentation last?

12   A    The entire meeting lasted a little less than two hours.

13   Q    Did the city present certain slides at that meeting?

14   A    They did.

15   Q    What was the title?

16   A    "Proposal to Creditors, City of Detroit."

17   Q    Do you recall about how many slides were presented?

18   A    The slide presentation was approximately 50 slides out of

19   a fuller deck that was made available to us at the end of the

20   meeting.

21   Q    The fuller deck was the full -- there was an executive

22   summary that was presented at the meeting.  Is that your

23   understanding?

24   A    Yeah, a shortened version of the full proposal.

25   Q    Were questions permitted during the slide presentation?

1    A    No.

2    Q    Were questions permitted after the slide presentation?

3    A    Yes, in written form.

4    Q    Were you told one way or the other at that meeting

5    whether or not it was a negotiation?

6    A    We were told it was not a negotiation.

7    Q    Who made that comment?

8    A    The leaders of the meeting.

9    Q    Was that --

10   A    City officials and their attorneys.

11   Q    Was Mr. Orr present at that meeting?

12   A    He was.

13   Q    As the director of collective bargaining and healthcare

14   policy for AFSCME, have you participated with AFSCME locals

15   in collective bargaining sessions?

16   A    Yes.

17   Q    About how many CBA negotiations have you attended?

18   A    Hundreds, thousand, I mean if you're talking about

19   individual discrete sessions.

20   Q    In your experience, was the June 14 presentation a

21   negotiation?

22   A    No.

23   Q    Did you attend the June 20 presentation with the city?

24   A    Yes.

25   Q    And did you also attend the July 10 and the July 11

1  presentations?

2  A    I did, yes.

3  Q    To try and shortcut them, I'm going to sort of ask these

4  questions together.  Did the city make presentations at all

5  three of those meetings as well?

6  A    Yes, they did.

7  Q    Was Mr. Orr present at any of those meetings?

8  A    No, he was not.

9  Q    Did they permit questioning during the presentations?

10  A    Not during the June 20th meeting.  Again, it was written

11  questions at the end of the presentation.

12  Q    And what about during the July 10 and July 11 meeting?

13  A    July 10 and 11 meetings, questions were permitted in a

14  less formal and structured manner.

15  Q    How long did the June 20 meeting last?

16  A    Approximately two hours, maybe a bit less.

17  Q    And what about the July 10 presentation?

18  A    The same.

19  Q    And what about the July 11 presentation?

20  A    The same as well.

21  Q    What was the topic of the June 20 presentation?

22  A    Legacy costs.

23  Q    And what about the July 10?

24  A    July 10th meeting pertained to pensions.

25  Q    And what about the July 11 meeting?

1    A    Retiree healthcare.

2    Q    Were you told whether or not any of these meetings were

3    negotiations?

4    A    We were expressly told they were not negotiations.

5    Q    At each meeting that announcement was made?

6    A    Yes.

7    Q    In your mind, were these negotiations?

8    A    No, they were not.

9    Q    Was Mayor Bing at any of these meetings?

10   A    No, he was not.

11   Q    Between June 14 and July 18, were you or AFSCME invited

12   to any other presentations by the city?

13   A    No.

14   Q    Between June 14 and July 18th, was AFSCME invited to any

15   meeting you would consider a negotiation or where there was a

16   discussion, a give-and-take about the June 14 proposal?

17   A    Other than the ones we described, no.

18   Q    Did you request any financial or other information from

19   the city between June 14 and July 18 to better understand the

20   information provided at those meetings?

21   A    Yes, we did.

22   Q    Did you request information about the city's financial

23   condition?

24   A    Yes.

25   Q    Did you request information to better understand the

1  health benefits?

2  A   Not directly.  Understand the retiree healthcare?

3  Q   All right.  Did you request information to better

4  understand retiree health benefits?

5          MR. STEWART:  Objection, your Honor.  We've had a

6  series of leading questions.  Could we perhaps not have so

7  many leading questions?

8          THE COURT:  No.  The Court does not consider these

9  leading, so you may continue.

10          MS. LEVINE:  Thank you, your Honor.

11  BY MS. LEVINE:

12  Q   Did you request information to better understand the

13  pension portion of the June 14 proposal and the discussions

14  that were had on June 20, July 10, and July 11?

15  A   Yes.  I requested information regarding the funding

16  levels of the pension.

17  Q   Did you personally sign a NDA or confidentiality

18  agreement to access the city's data room?

19  A   I did.

20  Q   Did you access the city's data room?

21  A   Yes, I did.

22  Q   Was certain information in response to your request

23  posted to the data room?

24  A   Yes, it was.

25  Q   Was all of the information you requested posted to the

1   data room?

2   A    No.

3   Q    Did you consider any of the information you requested

4   inconsistent with the type of information you would normally

5   request in the context of a CBA negotiation?

6   A    No, I did not.

7   Q    Prior to the July -- prior to July 18, did the city ever

8   ask you to agree to or to sign a document waiving the right

9   to assert that the city had waived any of its rights under PA

10  436 to facilitate discussions or a give-and-take with regard

11  to the city's proposal?

12  A    The city never sought such a waiver from me.

13  Q    Prior to July 18th, was the June 14th proposal ever

14  modified or revised with regard to the retiree health or

15  pension benefits?

16  A    No.

17  Q    The average AFSCME retiree has what level -- collects

18  what level of pension benefit?

19  A    In the City of Detroit, it's approximately 18 to $19,000

20  a year.

21  Q    In your position as director of collective bargaining and

22  healthcare policy, do you have an opportunity to review from

23  time to time what the poverty level is?

24  A    I do.

25  Q    What is the poverty level for a family of three?

1  A   Family of three, approximately $19,500 annually.

2  Q   And what's the poverty level for an individual?

3  A   Approximately $11,500.

4  Q   Based upon the proposal to creditors provided here, can

5  you tell whether or not AFSCME retirees will be reduced below

6  the poverty level as a result of this proposal as it

7  currently sits?

8  A   It's hard to say.  The proposal was not to pay into the

9  pensions,  and it was -- the representatives of the city

10 declared that there would be no funding of the pensions in

11 terms of the unfunded obligations.  It has been not described

12 to this date that I'm aware of what impact would be and what

13 the effect would be on particular benefits, and, of course,

14 the benefits for individuals vary based on their years of

15 service and their salary levels at the time of retirement.

16 Q   There was a letter that was written by Ed McNeil in May

17 where he indicates that he's not negotiating on -- or is not

18 going to negotiate pensions or retiree benefits.  Are you

19 familiar with that letter?

20 A   I am.

21 Q   And so the questioning seems to indicate that the city is

22 concluding that as a result of that letter, AFSCME was either

23 refusing to negotiate on behalf of its retirees or couldn't

24 negotiate on behalf of its retirees.

25          MR. STEWART:  Objection, your Honor.

1   Characterization of another witness' testimony and also

2   hearsay since she's speaking about the substance of a

3   document that's not before the witness or in front of us but

4   I should add asking the witness to speculate about the

5   contents of that document.

6          THE COURT:  I need you to just ask a question.

7   BY MS. LEVINE:

8   Q   Is it your understanding that AFSCME has from time to

9   time taken the position that it can't negotiate retiree

10  health or pension benefits?

11  A   Yes, we have.

12  Q   But in the February tentative agreement that we were

13  discussing earlier, February 2012, did that agreement affect

14  retiree health benefits?

15  A   It did affect retiree health benefits.

16  Q   And are there other recent examples where AFSCME has

17  worked around the issue of both protecting its members' right

18  to retiree health and pension benefits but also come up with

19  a work-around to effectively negotiate a businesslike

20  solution to an economic problem like this one?

21         MR. STEWART:  Objection to form.

22         THE COURT:  Overruled.  Please answer, sir.

23         THE WITNESS:  Well, across the nation, you know --

24  it's a diverse country, as we all know, and we've -- we enter

25  into all sorts of agreements.

1          THE COURT:  Well, let me interrupt you.

2          MS. LEVINE:  Well, let me -- actually, let me try --

3          THE COURT:  You're talking about --

4          MS. LEVINE:  Let me do -- let me go narrower, your

5   Honor.

6          THE COURT:  -- here in the city?

7          MS. LEVINE:  Actually, I have a specific --

8   BY MS. LEVINE:

9   Q    What are you guys doing right now in Illinois?

10  A    Okay.

11         THE COURT:  By "you guys," you mean AFSCME?

12         MS. LEVINE:  AFSCME.

13         THE WITNESS:  Yeah, the union.  The State of

14  Illinois passed legislation in the recent past which would

15  impair our retiree healthcare benefits.  Traditionally, state

16  employees, upon retirement, would enjoy health benefits

17  without being assessed any premium charge for the healthcare.

18  The state enacted a statute requiring that retirees now pay

19  for some cost of their retiree healthcare but did not specify

20  a rate, and instead the legislation required that the state

21  negotiate the rate that would be charged to the retirees with

22  the active employees' union, which is an AFSCME affiliate,

23  Council 31, so at the collective bargaining table over their

24  most recent state agreement, those negotiations took place.

25  However, our position -- the union's position is that that

1  particular statute is unconstitutional under Illinois'

2  Constitution, which also has a nonimpairment very similar to

3  the one here in Michigan.  And based on that, the

4  understanding we've reached with the state was we are not

5  waiving our rights to challenge the statute and the

6  requirement for payment, so by entering into that agreement,

7  it was very clear that we were not prejudicing our rights.

8  We were not waiving our rights to eventually -- and we are

9  right now in court challenging the legality of imposing the

10  premium payments on the retirees.

11  BY MS. LEVINE:

12  Q   So you both negotiated a good faith solution on the

13  assumption that you would -- you might lose in court, and you

14  continued to preserve your rights with regard to your -- what

15  you believe to be your constitutional rights in court;

16  correct?

17  A   Correct.  We thought that was -- yeah.

18          MS. LEVINE:  Your Honor, I have no further questions

19  for Mr. Kreisberg.

20          THE COURT:  I do need to stop at three.  Do you want

21  to start now, or do you want to just pick it up in the

22  morning?

23          MR. STEWART:  May be better in the morning.  I'll

24  have to break it up otherwise, your Honor.

25          THE COURT:  All right.  In the meantime, is someone

1  willing to volunteer me from the -- volunteer for me on the

2  objectors' side how long the case might take for our planning

3  purposes?

4          MR. MONTGOMERY:  Your Honor, we have shared with the

5  city estimated times for witnesses.  I would say it's fair

6  that the sum of direct and cross for the two witnesses have

7  started -- has gone beyond the time estimates.  I would say

8  on current projections we would finish sometime Thursday

9  morning, so in theory Thursday afternoon is available for the

10  start of closing.  Again, if all changes are simply additive

11  and not plowed earth.

12          THE COURT:  Right.  Okay.  So our closings would

13  then be on Thursday, perhaps into Friday.

14          MR. MONTGOMERY:  Yes, sir.

15          THE COURT:  All right.  And I've been asked to

16  remind you that we are back in this room tomorrow.  We are

17  not going to Room 100.  We're back in this room.  And I think

18  that's it for today, so we'll be in recess.

19          THE CLERK:  All rise.  Court is adjourned.

20      (Proceedings concluded at 2:56 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | | 6/23/29 | 55 | 73/78/80 82/83 |
| Shirley Lightsey | 88 | 114 | 126 | |
| Donald Taylor | 128 | 155/174 | 175 | |
| Steven Kreisberg | 176 | | | |

| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 32 | 63 |
| Exhibit 505 | 180 |
| Exhibit 853 | 21 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    November 8, 2012

Lois Garrett