# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE−MI<br>Tax ID / EIN: 38−6004606 | represented by | **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489−3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075−1505
248−359−7300
Fax : 248-359-7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky−Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359−7300
Fax : (248) 359−7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075−1505
(248) 359−7300
Fax : (248) 359−7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496−8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212−326−3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496−7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**  represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−6769
Email: Richard.A.Roble@usdoj.gov

*Retiree Committee*
**Official Committee of Retirees**  represented by **Sam J. Alberts**
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005−3364

(202) 408-7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971-1800
Email: hall@bwst-law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632-8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768-6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971-1800
Email: wilkins@bwst-law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/26/2013 | | 2323 | Transcript Order Form of Hearing November 7, 2013, Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Officers Association. (Eisenberg, David) (Entered: 12/26/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

**Order Party: Name, Address and Telephone Number**

Name _____ **David M. Eisenberg** _____

Firm **Erman, Teicher, Miller, Zucker & Freedman, P.C.**

Address _____ **400 Galleria Officentre, Suite 444** _____

City, State, Zip _____ **Southfield, MI 48034** _____

Phone _____ **248-827-4100** _____

Email _____ **deisenberg@ermanteicher.com** _____

**Case/Debtor Name:**

Case Number: **13-53846**

Chapter: **9**

Hearing Judge **Hon. Steven Rhodes**

◉ Bankruptcy  ○ Adversary

○ Appeal   Appeal No: _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _11/7/2013_ **Time of Hearing:** _9:00 a.m._ **Title of Hearing:** Eligibility Hearing _____

Please specify portion of hearing requested: ◉ **Original/Unredacted**  ○ Redacted  ○ Copy (2nd Party)

◉ Entire Hearing  ○ Ruling/Opinion of Judge  ○ Testimony of Witness  ○ Other

Special Instructions: _____

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

○ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

FOR COURT USE ONLY

Transcript To Be Prepared By

Date      By

Order Received

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ David M. Eisenberg _____ Date: **12/26/13** _____

By signing, I certify that I will pay all charges upon completion
of the transcript request.

13-53846-swr   Doc 2323   Filed 12/26/13   Entered 12/26/13 11:26:06   Page 1 of 1      4
13-53846-tjt   Doc 2335-22   Filed 12/27/13   Entered 12/27/13 13:42:26   Page 4 of
203

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        November 7, 2013
                Debtor.         .        9:02 a.m.
. . . . . . . . . . . . . . . .

        HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
         BEFORE THE HONORABLE STEVEN W. RHODES
          UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:     Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

                    Jones Day
                    By:  GEOFFREY S. IRWIN
                         GEOFFREY S. STEWART
                         GREGORY SHUMAKER
                         THOMAS CULLEN, JR.
                         MIGUEL F. EATON
                    51 Louisiana Avenue, N.W.
                    Washington, D.C.  20001-2113
                    (202) 879-3768

                    Pepper Hamilton, LLP
                    By:  ROBERT S. HERTZBERG
                         DEBORAH KOVSKY-APAP
                    4000 Town Center, Suite 1800
                    Southfield, MI  48075-1505
                    (248) 359-7333

For the State of    State of Michigan
Michigan:           Michigan Department of Attorney General
                    By:  MATTHEW SCHNEIDER
                         MARGARET NELSON
                    P.O. Box 30754
                    Lansing, MI  48909
                    (517) 241-8403

APPEARANCES (continued):

```
                        Dickinson Wright, PLLC
                        By:  STEVEN G. HOWELL
                        500 Woodward Avenue, Suite 4000
                        Detroit, MI  48226-3425
                        (313) 223-3033

                        Dickinson Wright, PLLC
                        By:  PETER H. ELLSWORTH
                        215 South Washington Square, Suite 200
                        Lansing, MI  48933-1816
                        (517) 371-1730
```

```
For AFSCME,             Lowenstein Sandler, LLP
AFL-CIO, and Sub-       By:  SHARON L. LEVINE
Chapter 98, City             JOHN K. SHERWOOD
of Detroit              65 Livingston Avenue
Retirees:               Roseland, NJ  07068
                        (973) 597-2374
```

```
For Detroit             Clark Hill, PLC
Retirement Systems-     By:  ROBERT D. GORDON
General Retirement           JENNIFER K. GREEN
System of Detroit,      151 South Old Woodward, Suite 200
Police and Fire         Birmingham, MI  48009
Retirement System       (248) 988-5882
of the City of
Detroit:                Clark Hill, PLC
                        By:  RONALD A. KING
                        212 East Grand River Avenue
                        Lansing, MI  48096
                        (517) 318-3015
```

```
For the Detroit         Erman, Teicher, Miller, Zucker &
Fire Fighters              Freedman, P.C.
Association, the        By:  BARBARA A. PATEK
Detroit Police               JULIE BETH TEICHER
Officers Associa-            DAVID EISENBERG
tion and the            400 Galleria Officentre, Suite 444
Detroit Police          Southfield, MI  48034
Lieutenants &           (248) 827-4100
Sergeants
Association:
```

APPEARANCES (continued):

```
For the Inter-        Cohen, Weiss & Simon, LLP
national Union,       By:  BABETTE A. CECCOTTI
UAW:                       PETER D. DECHIARA
                           THOMAS N. CIANTRA
                      330 West 42nd Street, 25th Floor
                      New York, NY  10036-6976
                      (212) 356-0227


For Detroit           Silverman & Morris, PLLC
Retired City          By:  THOMAS R. MORRIS
Employees             30500 Northwestern Highway, Suite 200
Association,          Farmington Hills, MI  48334
Retired Detroit       (248) 539-1330
Police and Fire
Fighters Associa-     Lippitt O'Keefe, PLLC
tion, Shirley V.      By:  RYAN C. PLECHA
Lightsey, and         370 East Maple Road, Fl. 3
Donald Taylor:        Birmingham, MI  48009
                      (248) 646-8292

For the Official      Dentons
Committee of          By:  CLAUDE D. MONTGOMERY
Retirees:                  ANTHONY B. ULLMAN
                           ARTHUR H. RUEGGER
                      1121 Avenue of the Americas
                      New York, NY  10020-1089
                      (212) 632-8390

                      Dentons US, LLP
                      By:  SAM J. ALBERTS
                           DAN BARNOWSKI
                      1301 K Street, NW
                      Suite 600 East Tower
                      Washington, DC  20005-3364
                      (202) 408-7004

                      Brooks, Wilkins, Sharkey & Turco, PLLC
                      By:  MATTHEW E. WILKINS
                      401 South Old Woodward, Suite 400
                      Birmingham, MI  48009
                      (248) 971-1711

For Retired           Strobl & Sharp, PC
Detroit Police        By:  LYNN M. BRIMER
Members                    MEREDITH E. TAUNT
Association:               MALLORY A. FIELD
                      300 East Long Lake Road, Suite 200
                      Bloomfield Hills, MI  48304-2376
                      (248) 540-2300
```

APPEARANCES (continued):

```
For the Flowers      Law Offices of William A. Wertheimer
Plaintiffs:          By:  WILLIAM WERTHEIMER
                     30515 Timberbrook Lane
                     Bingham Farms, MI  48025
                     (248) 644-9200

For Ambac            Schafer and Weiner, PLLC
Assurance Corp.:     By:  DANIEL J. WEINER
                     40950 Woodward Avenue, Suite 100
                     Bloomfield Hills, MI  48304
                     (248) 540-3340


Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Is everyone here?  Well, first, good

4  morning.

5    ATTORNEYS:  Good morning (collectively).

6    THE COURT:  Is everyone here, or are there people we

7  need to wait for?  All right.  No response, so I'll assume we

8  are all here.  Ms. Green.

9    ANDY DILLON, WITNESS, SWORN

10    DIRECT EXAMINATION (CONTINUING)

11  BY MS. GREEN:

12  Q   Good morning, Mr. Dillon.

13  A   Good morning.

14  Q   Jennifer Green on behalf of the Retirement Systems for

15  the City of Detroit.  I just have a few more small lines of

16  questioning.

17  A   Who is Brom Stibitz, and what is his position within the

18  Treasury Department?

19    MS. NELSON:  Asked and answered, your Honor.

20    MS. GREEN:  Maybe it's foundational.  I just really

21  don't recall what his position was.

22    THE COURT:  I'll ask it.  I'll permit it.  Go ahead.

23    THE WITNESS:  He works for the Department of

24  Treasury.  He serves without the same title but basically as

25  my chief of staff.

1  BY MS. GREEN:

2  Q   And Tom Saxton?

3  A   Tom is a chief deputy.

4  Q   And Terry Stanton?

5  A   Terry Stanton is the public information officer.

6  Q   Okay.  And so they all reported directly to you?

7  A   Yes.

8  Q   Do you recall questions in late June of 2013 from

9  reporters in the media regarding how general obligation bonds

10  would be handled with the City of Detroit?

11  A   With the Bond Buyer?

12  Q   Yes.

13  A   From the last deposition, I think I saw a story on that

14  interview --

15  Q   Okay.

16  A   -- if that's the one we're referring to.

17  Q   It is.  Who is R.W. Baird, and how is that company

18  involved with the Detroit matter?

19  A   R.W. Baird is a financial consultant.  They advise the

20  state.  They may have been involved with helping Detroit

21  issue some debt as well.

22  Q   And is Wayne Workman a financial advisor at R.W. Baird?

23  A   He was at the time.

24  Q   Okay.  And did he report to you in any way?

25  A   He worked directly with Tom Saxton.

1   Q   Okay.  And did you communicate with Mr. Workman about the

2   City of Detroit's financial condition?

3   A   When?

4   Q   In that time period, June of 2013.

5   A   I don't recall that.

6   Q   Do you recall when you would have communicated with him

7   about the situation?

8   A   We worked with him during my entire tenure on various

9   bond matters.  I don't recall having a specific discussion

10   with him about Detroit.  We did a bond deal in 2012 for the

11   city.  They may or may not have been engaged.  I suspect they

12   might have been.

13   Q   So would he have been privy to any of the timelines or

14   any of the dates that were planned for the bankruptcy filing?

15   A   I doubt it.

16   Q   Pardon me?

17   A   I doubt that he would have been.

18   Q   If there was e-mail correspondence between Brom Stibitz,

19   Tom Saxton, and Wayne Workman, would you have been aware of

20   those communications?

21   A   Not necessarily.

22   Q   Do you recall at any point Brom Stibitz, Mr. Stanton, or

23   Mr. Saxton asking you about the inquiry from Bond Buyer

24   magazine regarding the general obligation bonds?

25   A   I remember an incident.  I don't know if it was the one

 1  you're referring to.

 2          MS. GREEN:  Can we bring up Exhibit 848, please?

 3  BY MS. GREEN:

 4  Q    Does this document look familiar to you?  Is this the

 5  incident that you were referring to?

 6  A    I don't recall seeing this specific e-mail.

 7  Q    Do you recall questions within the Treasury Department

 8  about how to handle this issue?

 9          THE COURT:  Excuse me one second, please.  Who's

10  ever in charge of getting this monitor going, I need help

11  because it's not running.  Feel free to come right on up here

12  and work your magic.  Excellent.  Thank you, sir.

13          MS. NELSON:  Your Honor, I don't believe this e-mail

14  is in evidence, and I think it's inappropriate to display it

15  until it is.

16          MS. GREEN:  I was ask -- he mentioned an incident

17  with this exact situation.  I thought that he would be able

18  to testify or I was asking if he could testify is this the

19  incident that he was referring to a moment ago.  If you would

20  prefer, I can refresh his recollection with it instead if --

21          THE COURT:  I didn't quite hear the witness say that

22  there was something he didn't recall.

23          MS. GREEN:  He said there was an incident with Bond

24  Buyer magazine.  I believe this is the incident he was

25  referring to, so I had asked him if he recognized the

1  document, if this was the incident.

2         THE COURT:  Well, you can certainly ask the witness

3  if he has seen the e-mail before.  Otherwise, it's not

4  appropriate to show it to him.

5         MS. GREEN:  That was the -- I believe my question to

6  him was, "Do you recognize the document?  Is this the

7  incident you referred to?"

8         MS. NELSON:  And his answer was he did not recall

9  seeing it, so it's been asked and answered.

10        THE COURT:  Is that right, sir?  You don't recall

11 that specific e-mail?

12        THE WITNESS:  I do not.

13        THE COURT:  All right.  The objection is sustained.

14 BY MS. GREEN:

15 Q   Do you know why Mr. Workman would have been privy to

16 discussions relating to the court option with respect to the

17 City of Detroit?

18 A   The court option?

19 Q   Court option versus out-of-court option.

20 A   He was a consultant to Treasury.  He handles a lot of our

21 debt issuances.  I'm certain Mr. Saxton relies on his advice

22 regularly.

23 Q   Do you know if Mr. Saxton would have shared with him some

24 of the planning that was going on with respect to the City of

25 Detroit bankruptcy?

1  A    I can't answer that.

2  Q    Do you know if Mr. Stibitz or Mr. Saxton or Mr. Stanton

3  would have been involved with R.W. Baird relating to the

4  timing of the City of Detroit bankruptcy filing?

5  A    Can you rephrase that or restate it?

6  Q    Would any three of the individuals that worked at

7  Treasury that we just spoke of, Terry Stanton, Thomas Saxton,

8  or Brom Stibitz, have been in contact with R.W. Baird and Mr.

9  Workman relating to the City of Detroit bankruptcy filing?

10  A    I would highly doubt that Stibitz or Stanton would.  I

11  can't speak to what Mr. Saxton spoke to him about.

12  Q    If Mr. Workman was of the understanding that court seemed

13  like a foregone conclusion, would you have any reason to

14  believe that it was based on conversations with people from

15  the Treasury Department?

16         MS. NELSON:  Objection, your Honor.  Inappropriate

17  hypothetical.  Assumes facts not in evidence.  Lacks

18  foundation.

19         THE COURT:  The objection is sustained.

20  BY MS. GREEN:

21  Q    In March of 2013, do you recall planning for the

22  emergency manager's appointment and the topics that you

23  wanted him to handle when he was appointed?

24  A    I don't recall.  We had a lunch.  We met with him.  Tom

25  Saxton, Brom Stibitz, and I met for lunch with Kevyn and just

1  gave him our experience of working with emergency managers

2  and what the experience would be like.  It was a lunch.  It

3  was fairly informal.  I don't recall much more than that.

4  Q   And do you recall compiling a list of key items that you

5  wanted him to focus on as soon as he was appointed?

6  A   We may have done that.  I don't have a specific memory of

7  it.

8          MS. GREEN:  Can we pull up Exhibit 836, please?

9          MR. SHUMAKER:  Your Honor, this exhibit is not in

10  evidence either.  I don't think it's appropriate to display.

11          MS. GREEN:  Your Honor, I can ask him if he

12  recognizes it and then move for its admission if he does.

13          THE COURT:  You can do that.  You can put it back on

14  the screen for that purpose.

15  BY MS. GREEN:

16  Q   Mr. Dillon, do you recognize this e-mail?  Do you

17  recognize your name in the "To" --

18  A   Yes.

19  Q   -- column?  Do you recall receiving this e-mail in March

20  of 2013?

21  A   Can I read it?

22  Q   Sure.

23          UNIDENTIFIED SPEAKER:  I'm sorry.  Could you tell us

24  what number this is, please?

25          MS. GREEN:  836.

 1          UNIDENTIFIED SPEAKER:  836.

 2          THE WITNESS:  I'm sure I saw it at the time.  I

 3    don't have a specific memory today of it.

 4    BY MS. GREEN:

 5    Q    In the middle -- well, almost to the end paragraph, it

 6    begins with March 28th.  It states, "There may be a narrow

 7    window for taking action before lawsuits are filed."  What

 8    type of lawsuits were you expecting?

 9    A    We get sued all the time, and in our experience with

10    working with other cities where there were emergency

11    managers, there's all kinds of litigation that follows.

12    Q    So would it be safe to assume that you were relating

13    to -- or you were referring to PA 436 lawsuits?

14    A    Most likely, yes.

15    Q    Okay.  Do you recall if there were topics relating to --

16    or I'm sorry -- discussions relating to lawsuits relating to

17    Article IX, Section 24, of the Michigan Constitution?

18    A    I'm sorry.  Could you restate that?

19    Q    Would there have been discussions relating to lawsuits

20    involving Article IX, Section 24, of the Michigan

21    Constitution?

22    A    I don't have any memory of that.

23    Q    So would this be limited to the PA 436 lawsuits you were

24    expecting?

25    A    We got sued on open meetings acts.  All kinds of theories

 1  were surfacing, and I literally believe there's over a

 2  hundred lawsuits.  I mean there's a substantial number, so

 3  every theory I don't recall.

 4  Q   So they were certainly expected and somewhat planned for?

 5  A   Apparently.

 6  Q   The next paragraph just below that says "status and

 7  timing of the ongoing 312 arbitration."  Do you recall what

 8  that's referring to?

 9  A   I know there was an arbitration between the city and

10  maybe DPD.  There might have been some other uniform

11  arbitrations that were ongoing, and I believe, yes, there was

12  an ongoing arbitration at the time.

13  Q   And so when you say "timing of the ongoing arbitration,"

14  what specifically were you referring to?

15          MS. NELSON:  Well, I'm going to object, your Honor.

16  That mischaracterizes.  This is an e-mail to Mr. Dillon.

17  This is not Mr. Dillon's e-mail.

18          MS. GREEN:  He said they had a meeting where they

19  were discussing the topics.  I'll rephrase the question to

20  make it more clear.

21  BY MS. GREEN:

22  Q   Was this one of the topics that you discussed at your

23  meeting when you said that you were talking about the items

24  that you wanted Kevyn Orr to focus on when he took over as

25  emergency manager?

1    A    I described the meeting as a lunch where we just shared

2    with him generally what an experience of being an EM is.

3    That topic I highly doubt came up at that lunch.

4    Q    Okay.  Did this topic come up at any other time in your

5    discussions relating to the emergency manager?

6    A    Me personally?  I don't recall it.

7            MS. GREEN:  Your Honor, I'd move for the admission

8    of Exhibit 836.

9            THE COURT:  Any objections?

10           MS. NELSON:  No objection.

11           MR. SHUMAKER:  Hearsay, your Honor.

12           MS. GREEN:  Your Honor, it's an e-mail to him.  He's

13   the recipient of it.  It's a business record under 803(6),

14   and he spoke about the communications and was able to respond

15   to the substance of what was referred to in the e-mail.

16           THE COURT:  Well, do you remember receiving this e-

17   mail or not?

18           THE WITNESS:  I don't have a specific memory of it,

19   no.

20           THE COURT:  All right.  The objection is sustained.

21           MS. GREEN:  Your Honor, if I may, there have been

22   several e-mails that were -- where people did not have a

23   specific recollection of that we have all permitted to be --

24           THE COURT:  If there's an objection as opposed to by

25   stipulation, I have to deal with it.  If the witness can't

1    authenticate it, then it's not admissible.

2    BY MS. GREEN:

3    Q   When we last spoke, Mr. Dillon, you referred to a section

4    of the Michigan Constitution that you thought prohibited the

5    state from reimbursing the City of Detroit for the pension

6    underfunding.  Do you recall that?

7    A   I don't recall the topic, but I think you've

8    mischaracterized my testimony.

9    Q   Do you recall saying that you thought that you were

10   prohibited from lending credit --

11   A   Yes.

12   Q   -- to the City of Detroit?  What provision of the

13   Constitution were you referring to?

14   A   I don't know.  It's just the general understanding I had

15   serving in the role as treasurer.

16   Q   Were you referring to a prohibition against the state

17   guaranteeing obligations of the city?

18   A   It's my understanding that the interpretation of that

19   lending of credit is fairly broadly construed, so my

20   understanding would be a guarantee would be contrary to

21   what's permissible under the Constitution.

22   Q   But if there was legislation enacted that gave an

23   appropriation to a particular municipality, that would not be

24   prohibited; correct?

25   A   That's my understanding, yes.

1    MS. GREEN:  I have nothing further, your Honor.

2    THE COURT:  Any further questions for the witness?

3    MS. BRIMER:  Good morning, your Honor.  Lynn M.

4  Brimer appearing on behalf of the Retired Detroit Police

5  Members Association.

6                    DIRECT EXAMINATION

7  BY MS. BRIMER:

8  Q    Good morning, Mr. Dillon.  My name is Lynn Brimer.

9  A    Good morning.

10  Q    I represent an association of retired police personnel.

11  We've not met before, have we?

12  A    I don't believe so.

13  Q    One thing that no one has asked you yet is regarding your

14  background.  You hold a law degree, do you not?

15  A    I do.

16  Q    And when did you obtain your law degree?

17  A    1988.

18  Q    All right.  And you are admitted to practice law?

19  A    I am.

20  Q    And is that in the State of Michigan?

21  A    Yes.

22  Q    And when were you admitted to practice?

23  A    I believe '89.

24  Q    All right.  And you have continuously been admitted to

25  the Michigan State Bar since 1989, approximately?

1  A   Yes.

2  Q   All right.  Now, I'm going to go back to early 2012, and

3  without hopefully duplicating any of the answers you've

4  already given or questions you've already asked, I'd like to

5  go over some of the early dealings between the state and the

6  consultants, so in early 2012 Miller Buckfire and Huron

7  Consulting were hired to perform a 60-day review of the City

8  of Detroit; is that correct?

9  A   I believe so.

10  Q   And were you involved in the retention of either Huron

11  Consulting or Miller Buckfire?

12          MS. NELSON:  Objection --

13          THE WITNESS:  Yes.

14          MS. NELSON:  -- your Honor.  This line has already

15  been asked and answered.

16          THE COURT:  It has.

17          MS. BRIMER:  Your Honor, I believe I will ask some

18  questions that have not been asked of Mr. Dillon, and I will

19  try very hard not to be duplicative.  I understand the Court

20  and counsel's concern.

21  BY MS. BRIMER:

22  Q   So at the end of that 60-day review, was a report

23  produced by Miller Buckfire or Huron Consulting?

24  A   I don't specifically recall.

25  Q   All right.  So you don't specifically recall reviewing a

1  report then either?

2  A   I assume we got some financial data from Miller Buckfire.

3  I know we got some information on other matters from Huron,

4  but specifically I don't have a memory of reading a binder or

5  document that was put together that summarized everything.

6  Q   Now, at some point you testified that Miller Buckfire

7  brought in Jones Day in connection with the consent

8  agreement.  Do you recall when that happened?

9  A   Not specifically.

10  Q   Are you aware that in 2011 Jones Day had submitted a

11  response to an RFP in connection with the appointment of

12  emergency managers by the State of Michigan?

13  A   I didn't recall that recently.  That happens under my

14  department.  I don't -- I'm not involved in the specifics of

15  those, so I wasn't part of the decision group to put them on

16  the list, but I knew we did an RFP to assist with troubled

17  units.

18  Q   So you were aware that at least as early as March 2nd of

19  2011, multiple attorneys from Jones Day were working with

20  Miller Buckfire and Huron Consulting on the consent agreement

21  with Department of Treasury; correct?

22  A   Yes.

23  Q   Were you aware of the number of attorneys from Jones Day

24  that were working with Miller Buckfire?

25  A   No.

1          MS. BRIMER:  Exhibit 202, please.

2          UNIDENTIFIED SPEAKER:  I don't have 202.

3          MS. BRIMER:  Oh, I'll give you --

4          MS. NELSON:  Oh, wait.  There it is.

5          MS. BRIMER:  Oh, there you go.

6    BY MS. BRIMER:

7    Q   That's an e-mail dated March 3rd, 2012; is that correct?

8          MS. NELSON:  Your Honor, I don't believe this has --

9    objection.  This hasn't been admitted, and it would be

10   inappropriate to ask questions on the substance.  If she's

11   laying foundation, I don't have an objection, but to question

12   on the substance of the e-mail would be inappropriate at this

13   point.

14         MS. BRIMER:  Well, preliminarily, your Honor, last

15   evening the city and the RDPMA agreed to the admission of

16   this exhibit.

17         THE COURT:  Any objections to its admission?

18         MR. SHUMAKER:  No, your Honor.

19         THE COURT:  All right.  So that's 202, did you say?

20         MS. BRIMER:  Yes.  For the record, your Honor, we've

21   also stipulated to the admission of Exhibit 201.

22         THE COURT:  Is that right?

23         MR. SHUMAKER:  That's correct, your Honor.

24         THE COURT:  All right.  Exhibits 201 and 202 are

25   admitted.

```
1          (Exhibits 201 and 202 received at 9:25 a.m.)
2               THE COURT:  You may proceed.
3               MS. BRIMER:  Thank you, your Honor.
4     BY MS. BRIMER:
5     Q   So that's an e-mail dated March 3rd, 2012, from Ms.
6     Lennox; correct?
7     A   Correct.
8     Q   And it's addressed to you; correct?
9     A   Correct.
10    Q   Do you recall reviewing that e-mail?
11    A   I recall during my deposition having my memory refreshed
12    about it.
13    Q   So as you'll note -- I'd actually like to go back up to
14    the caption -- it's from Ms. Lennox, who's an attorney at
15    Jones Day, and in the carbon copy there's Ms. Ball, Jeffrey
16    Ellman, David Kates and Thomas Wilson, so we have five
17    attorneys from Jones Day involved in the Detroit consent
18    agreement; correct?
19              MS. NELSON:  I'm going to object.  I don't believe
20    there's a foundation for those attorneys' specific
21    involvement with the consent decree.
22              THE COURT:  It's a question, so the objection is
23    overruled.  If you can answer, sir.
24              THE WITNESS:  What's the question again?
25    BY MS. BRIMER:
```

1  Q   Well, there's five attorneys from Jones Day that are

2  being copied in connection with the involvement of Jones Day

3  on the drafting of the consent agreement for the City of

4  Detroit; correct?

5  A   I only know what this document shows me.

6  Q   And it shows us five attorneys involved or at least

7  copied on this e-mail; correct?

8  A   Yes.

9  Q   And then there's a number of consultants both from Huron

10 Consulting and Miller Buckfire; correct?

11 A   Yes.

12 Q   All right.  Now, if we go down to the body of the e-mail,

13 it's an e-mail addressed directly to you from Ms. Lennox;

14 correct?

15 A   Yes.

16 Q   So you were dealing directly with Ms. Lennox in drafting

17 the consent agreement for the city; correct?

18 A   A very limited basis.

19 Q   And it indicates that, "Attached for your consideration

20 is a consent agreement reviewed by Miller Buckfire and

21 Huron," meaning Huron Consulting; correct?

22 A   Correct.

23 Q   All right.  So you're aware that these three consulting

24 firms, which at this point in time you've testified were not

25 hired by the city in connection with the consent agreement,

1  were working on the consent agreement; correct?

2  A    They were providing advice, but we had -- the state had

3  its own counsel in negotiations of the consent agreement.

4  Q    And who was that?

5  A    There's probably an AG and Steve Liedel from Dykema

6  Gossett.

7  Q    So was Dykema Gossett aware that Jones Day was working

8  with you on drafting a consent agreement?

9  A    They were providing input that I'm certain certain items

10  were shared with them.  They may have reviewed the documents.

11  I don't recall.

12  Q    Would they have reviewed the documents directly from

13  Jones Day, or would they have been provided to Dykema from

14  someone at Treasury?

15  A    I can't answer that.

16  Q    And at this time, none of these consulting or lawyers are

17  charging Department of Treasury for the services they're

18  providing in connection with the consent agreement; correct?

19  A    Not correct.  I think we testified that we did retain

20  Miller Buckfire for a brief period of time.

21  Q    In connection with the 60-day review -- financial review

22  of the city?

23  A    That's right.

24  Q    And were their duties expanded to include the consent

25  agreement?

1  A    We engaged them as we were going through the review and

2  in preparation of the consent agreement.  We were working

3  closely with Huron Consulting as well as Miller Buckfire.

4  Q    Okay.

5  A    Those firms reached out to lawyers and provided advice we

6  didn't -- generally we asked for, but they, I think, were

7  supplementing their efforts to help us out.

8  Q    And the drafting of the consent agreement took a fairly

9  lengthy period of time, at least 30 days; correct?

10  A    Yes.

11  Q    And Jones Day, Miller Buckfire, and Huron Consulting were

12  involved during that entire 30-day process; correct?

13  A    There's a negotiation.  We met probably five or more

14  times with the City of Detroit and their lawyers.  It was an

15  arm's length bargain negotiated aggressively, and I don't

16  recall any of them being in the room during those

17  negotiations.

18  Q    But they did continue to review the consent agreement and

19  its multiple revisions; correct?

20  A    I don't specifically recall when their input ended or

21  necessarily even began, but --

22        MS. BRIMER:  Can we see Exhibit 841, please?

23  BY MS. BRIMER:

24  Q    You'll notice about midway down there is an e-mail that

25  is addressed to you; correct?

1    A    Can we grow the font size here?  Okay.  I'm sorry.  Could

2    you restate the question?

3    Q    So that's an e-mail to you.  That's from someone at

4    Miller Canfield, also a law firm the city works with;

5    correct?

6    A    Correct.

7    Q    And it's regarding the --

8            MS. NELSON:  Objection, your Honor.  This has not

9    been admitted into evidence.  It would be inappropriate to

10   ask substantive questions regarding this e-mail.

11   BY MS. BRIMER:

12   Q    So the e-mail is addressed to you; correct?

13   A    I see my name there, yes.

14   Q    Do you recall reviewing this e-mail?

15   A    I bet we turned that document six to ten times, so I

16   remember these incidents where we would get versions from the

17   city, and they would get them from us, so generally I

18   remember these types of e-mails.

19   Q    Do you have any reason to believe that you did not review

20   this e-mail from Mr. McGee dated March 29th addressed to you?

21   A    No.  I would think I seen it, yeah.

22           MS. BRIMER:  Your Honor, I'd move for the admission

23   of this Exhibit 841.

24           THE COURT:  I'm sorry.  Was your answer you have

25   seen this or --

1          THE WITNESS:  I believe I saw it at the time, yes.

2          THE COURT:  You do.  All right.  Any objections?

3          MR. SHUMAKER:  Yes, your Honor.  It's hearsay.

4          THE COURT:  Hold on one second.  Well, are you

5    offering the -- I'm sorry --

6          MS. BRIMER:  Thanks.

7          THE COURT:  -- offering the entire document or just

8    the e-mail that Mr. Dillon received?

9          MS. BRIMER:  Well, I'd actually like to offer the

10   entire document, your Honor, because I think it establishes

11   what Treasury has done with it.

12         THE COURT:  The issue isn't relevance.  The issue is

13   hearsay.

14         MS. BRIMER:  But it is forwarded, your Honor, by a

15   member of the State of Michigan who works -- and Mr. Dillon

16   indicated that Mr. Stibitz works directly for him, so that

17   would become an exception as a party --

18         THE COURT:  May I see the paper copy of this,

19   please?

20         MS. BRIMER:  If I may, your Honor, it has only

21   highlighting similar --

22         THE COURT:  Okay.  All right.  I will return this to

23   you.  The Court will admit so much of the document as begins

24   from McGee, comma, Michael P., but not the part above it.

25         (Exhibit 841 excerpt received at 9:34 a.m.)

1          MS. BRIMER:  Thank you, your Honor.

2          THE COURT:  And that was Exhibit -- what number

3    again?

4          MS. BRIMER:  841, your Honor.

5    BY MS. BRIMER:

6    Q    So, Mr. Dillon, do you know when the consent agreement

7    was executed by the city?

8    A    I think on or around April 4.  That might have been the

9    date City Council voted on it.  I'm not sure.

10   Q    So is it in the ordinary course for the Department of

11   Treasury to receive that type of consulting from outside law

12   firms that have not yet been retained by the Department of

13   Treasury or any other agency for the state?

14   A    I can't say that it hasn't happened in another unit of

15   government.  On occasion some will provide some pro bono

16   services if we have an urgent need.  I know that happened

17   with DPS and a little bit with Flint, a little bit with

18   Highland Park, so it's not unusual.

19   Q    Were Jones Day providing any other consulting services in

20   connection with any other matters before the Department of

21   Treasury?

22   A    Not to my memory.

23   Q    So at some point in time Jones Day became involved with

24   the -- with Public Act 4 and a concern with respect to

25   whether or not that might be repealed; is that -- or rejected

1  on the referendum; is that correct?

2         MS. NELSON:  Objection.  Lacks foundation and is

3  vague.

4         THE COURT:  Overruled.  You may answer the question.

5         THE WITNESS:  Could you restate that?

6  BY MS. BRIMER:

7  Q   At some point Jones Day also became involved with the

8  Department of Treasury and concerns regarding the rejection

9  of PA 4 on referendum; correct?

10 A   I wouldn't characterize it that way.  What we were

11 working on was a consent agreement that we wanted to survive

12 even if PA 4 was repealed, so there's other provisions of

13 state law that would allow for the consent agreement to have

14 legal standing and substance, so I believe they looked at

15 those other provisions of the law to make certain the

16 agreement we worked so hard to develop would survive a repeal

17 of PA 4.

18 Q   Did anyone at Jones Day give either you or anyone at the

19 Department of Treasury any advice in connection with how to

20 react or an approach to take in the event PA 4 was, in fact,

21 repealed?

22 A   Only what would be in that document, but it wasn't -- you

23 know, Steve Liedel is an expert on this at Dykema.  Actually,

24 I think we relied on him more than Jones Day on that issue.

25        MS. BRIMER:  So I'd like Exhibit 201, please.  No.

```
 1   I think that's 202.  201.
 2             THE COURT:  It says 201.
 3             MS. BRIMER:  Oh, it's possible this is the second
 4   page.  Is there a first page?  Okay.  It's also marked as an
 5   Exhibit 8 -- 846, so 846 would be, your Honor, admitted since
 6   it's the same document as 8 -- as 201, which the city has
 7   stipulated to.
 8             THE COURT:  Is that all right?
 9             MR. SHUMAKER:  That's correct, your Honor.
10             THE COURT:  All right.  Thank you.
11   BY MS. BRIMER:
12   Q   So this is an e-mail dated March 2nd, 2013.  Do you see
13   that?
14   A   Yes.
15   Q   And it's just addressed from Mr. Ellman to other
16   attorneys at Jones Day.
17             MS. NELSON:  I would just like to correct the
18   record.  I think Ms. Brimer indicated this was dated March 2,
19   2013, and it's 2012.
20             MS. BRIMER:  Oh, '12, 2012.
21             MS. NELSON:  Thank you.
22             THE COURT:  Thank you.
23   BY MS. BRIMER:
24   Q   You're not copied on that e-mail; correct?
25   A   I don't see my name.
```

1    Q    Have you ever seen this e-mail before?

2    A    I believe in preparation for deposition and this

3    testimony, I may have seen it.

4    Q    All right.  So it indicates in the first paragraph that,

5    "We spoke to a person from Andy's office."  That Andy, that

6    would be you?

7    A    I suspect that.

8    Q    So when you prepared for your deposition, did you read

9    this e-mail all the way through?

10   A    I glanced through it.

11   Q    Okay.  It further indicates, "I thought MB was also going

12   to try to follow up with Andy directly about the process for

13   getting this to the governor."  Do you recall anyone from

14   Miller Buckfire discussing with you, if you've read this, the

15   content of this e-mail?

16   A    I'd like to read the whole document before I answer.  I

17   don't --

18   Q    Take your time.

19   A    Okay.  Could you restate the question?

20   Q    Do you recall at about this time someone from Miller

21   Buckfire discussing the content of this e-mail with you

22   directly?

23   A    We were having daily conversations at this time.  I'm

24   certain we discussed items in this e-mail.

25   Q    So you'll see about midway down if PA 4 is repealed or

1  suspended, there may be an argument that some or all of this

2  does not work, so there was a concern by Treasury, Miller

3  Buckfire, Jones Day that what was being put in place in

4  connection with the consent agreement might be in jeopardy in

5  the event PA 4 was repealed; correct?

6  A   That's what it says, yes.

7  Q   Then if you go a little further down, "The cleanest way

8  to do all of this is probably new legislation that

9  establishes the board" -- I assume that's the Financial

10 Review Board -- "and its powers and" -- and the "and" is in

11 capital letters -- "includes an appropriation for a state

12 institution.  If an appropriation is attached to and included

13 in the statute to fund a state institution, which is broadly

14 defined, then the statute is not subject to repeal by the

15 referendum process."  Do you see that?

16 A   I do.

17 Q   So is it -- it's correct that by March of 2012 the

18 consultants that were working with Treasury and Treasury are

19 already contemplating new legislation that would include a

20 spending provision in order to avoid a referendum in the

21 event PA 4 was rejected?

22 A   I think you're overstating the case here.

23 Q   Okay.

24 A   Even if PA 4 stayed in law, the advice and recommendation

25 we were getting was to have something like -- the model we

1   were following is the MAC that was put into existence in the

2   late '70s in New York City.  The advice we were getting is

3   that the state should have some statute that defines what the

4   role -- in this case it became the FAB, the Financial

5   Advisory Board -- what its powers and duties may be, so this

6   is, I guess, related in some way to PA 4 or PA 72, but their

7   advice was and remains today that the state should have some

8   statutory construction around what is the role of a Financial

9   Advisory Board.

10  Q   And so at least as early as March of 2012, that advice is

11  coming to Department of Treasury from the Jones Day

12  attorneys; correct?

13  A   The person lobbying me or recommending and pushing me to

14  do this even before this date was Miller Buckfire.

15  Q   And it was Miller Buckfire that brought in Jones Day?

16  A   Yes.

17  Q   So the concern was just how much control the state would

18  have over a city that was subject to the appointment of a

19  financial emergency manager; correct?

20  A   Can you restate that question?

21  Q   The concern that you just indicated that was being raised

22  was the level of control that the state would have over a

23  city in the event an emergency manager was appointed?

24  A   There's other provisions in state law that give us the

25  ability to negotiate a consent agreement, so we examined what

1   those other ones were in case PA 4 was resolved.  And you go

2   through all this effort of creating the consent agreement,

3   and if PA 4 was repealed and it didn't rely on those other

4   provisions of state law, then there would have been an issue,

5   and a lot of that work and effort to have a viable working

6   consent agreement would have been lost.

7           MS. BRIMER:  So if we could see Exhibit 840.

8   BY MS. BRIMER:

9   Q   You'll see about a third of the way down an e-mail from

10  Laura Marcero -- Marcero -- and it's addressed to you;

11  correct?

12  A   Correct.

13  Q   It's dated March 25th, 2012; correct?

14  A   Correct.

15  Q   Do you recall seeing this e-mail?

16  A   Yeah.  I have a memory of this.

17  Q   You have a memory of this?

18          MS. BRIMER:  Just to be clear, your Honor, I'd like

19  to move for the admission of the e-mail -- the portion of

20  this exhibit that is an e-mail addressed to Mr. Dillon.

21          THE COURT:  And what number again is that?

22          MS. BRIMER:  840, your Honor.

23          THE COURT:  Any objections?

24          MR. SHUMAKER:  Yes, your Honor.  It's hearsay.

25          THE COURT:  All right.  That objection is overruled.

```
 1            MS. BRIMER:  Thank you, your Honor.

 2            THE COURT:  The document is admitted or this much of

 3   the document is admitted.

 4       (Exhibit 840 excerpt received at 9:48 a.m.)

 5   BY MS. BRIMER:

 6   Q   And if you'll go down to paragraph 4, the first sentence,

 7   this e-mail is regarding concerns, you would agree, over a

 8   draft of the consent agreement that the city had sent back to

 9   Treasury; correct?

10   A   I'm sorry.  I was reading it when you were asking -- let

11   me -- can I read it --

12   Q   Go right ahead.

13   A   -- over again?  Okay.

14   Q   So the content of the e-mail regards a revised draft of

15   the consent agreement that had been forwarded to Treasury

16   from the city; correct?

17   A   Correct.

18   Q   Okay.  And you'll see paragraph 4, the first sentence,

19   "The ability to call defaults on projects and diminish the

20   mayor's authority seems to have limitations now," so the

21   concern was drafting an agreement that would allow the state

22   to take control and authority from the mayor; correct?

23   A   I believe that this was in conjunction with the financing

24   we did, and money was in escrow.  And there were certain

25   milestones the city had to meet to achieve a consent
```

1  agreement, which we wanted to achieve as well.  We didn't

2  want to go to emergency status, so when we negotiate a

3  consent agreement, whether it be with Detroit or any other

4  unit, there's certain expectations that we have, and these

5  units have to hit certain milestones or benchmarks to stay in

6  a consent agreement relationship where they have their

7  authority, so, yeah, there's certain requirements that we

8  had, and with Detroit being such a significant operation, we

9  had expectations that they would meet during the consent

10  agreement so that they could stay in it.

11  Q   So was the milestone agreement executed before the

12  consent agreement?

13  A   It became part of it.

14  Q   Was it executed before, though, or after?

15  A   Actually, the milestones were pretty much universally

16  agreed between the city and the state.  By that I mean there

17  wasn't a lot of dispute about what should be in there.

18  Q   So even after the consent agreement was drafted, Miller

19  Buckfire, Huron Consulting, and Jones Day continued to advise

20  Treasury and you yourself individually in connection with the

21  situation in the City of Detroit; correct?

22  A   I don't believe so.

23        MS. BRIMER:  Your Honor, I'd like to show an exhibit

24  that I believe has not yet been admitted.  842 has not been

25  admitted, has it?  I'll show Ms. Nelson.  If I may approach,

1  your Honor --

2          THE COURT:  I'm sorry.  I can't permit you to have a

3  private conversation with the witness.  If there's something

4  you'd like to say to him, you can feel free to say it at --

5          MS. BRIMER:  I directed him to look, your Honor --

6          THE COURT:  I'm sorry.  You can feel free to say it

7  at the microphone so that it is on the record.

8          MS. BRIMER:  For the record, your Honor, I directed

9  him to the paragraph that I identified for Ms. Nelson that I

10 believe may refresh his recollection.

11         THE WITNESS:  Okay.  Could you restate the question?

12 BY MS. BRIMER:

13 Q   Does that refresh your recollection with respect to the

14 continued advice and consulting that Treasury and you

15 individually were receiving from Jones Day, Miller Buckfire,

16 and Huron Consulting even after the consent agreement was

17 finalized?

18 A    Yeah.  After the -- before the consent agreement was

19 finalized, there was very, very frequent, if not daily,

20 conversations with Hugh Sawyer and Laura and Miller Buckfire

21 to maybe a lesser extent, very little dialogue with us and

22 Jones Day other than for a few of these e-mails and some of

23 their comments on the drafts.  After the consent agreement

24 was in place, we stayed in touch but on a much less frequent

25 basis.

1  Q   And after the consent agreement, what matters did you

2  remain in touch with the -- Jones Day and other -- Miller

3  Buckfire and Huron Consulting individuals in connection with?

4  A   I don't recall any contacts with Jones Day after it until

5  2013 let's say, and then -- I mean throughout -- there could

6  be various issues that came up, and we may pick up the phone

7  and ask for advice from Hugh or Laura, and I think there was

8  similar infrequent contact with Miller Buckfire.

9  Q   So I believe Ms. Green asked you whether or not you were

10 aware of a meeting in June between Ms. Lennox, Mr. Buckfire,

11 and the governor, and I don't recall your answer to that.

12 A   I think I said I didn't remember.

13 Q   So it's possible that the governor's office continued to

14 remain in contact with the Jones Day attorneys without your

15 being aware of that?

16        MS. NELSON:  I'm going to object.  Inappropriate

17 hypothetical and lacks foundation.

18        THE COURT:  The objection is sustained.

19 BY MS. BRIMER:

20 Q   Now, at some point Public Act 4 was, in fact, repealed;

21 correct?

22 A   Correct.

23 Q   And a new law was enacted, what we've referred to as

24 Public Act 436; correct?

25 A   Correct.

1  Q   Who was responsible for drafting PA 436?

2  A   Right after the election, there was -- I probably

3  attended two or three meetings with the governor and Brom

4  Stibitz from my staff and maybe a few folks from the

5  Governor's Office to discuss, you know, what about PA 4 could

6  be improved.  There were some items that we just learned by

7  working with PA 4 that we wanted in a new law, and then some

8  of the criticisms of PA 4 we genuinely sought to address,

9  giving locals more control, different options than just going

10  into emergency, so I attended -- I don't know -- two to four

11  maybe meetings during mid- to late November through early

12  December.  The governor drew up -- kind of put a little chart

13  together that showed what the new law could look like.  From

14  that point forward, it was folks on my staff and the

15  Governor's Office that moved the legislation through the

16  legislature.

17  Q   Now, to be clear, the appointment of Kevyn Orr was under

18  PA 72; correct?

19  A   I believe so, for three days.

20  Q   And he automatically became the emergency manager under

21  PA 436; correct?

22  A   That's my understanding, yes.

23  Q   So the city did not have any of the other options that

24  were added into PA 436 to avoid the appointment of an

25  emergency manager; correct?

1  A    Correct.

2  Q    Okay.  Now, one of the things PA 436 included were some

3  spending provisions.  Do you recall those?

4  A    Yes.

5  Q    Who drafted those provisions?  Do you know?

6  A    I don't.

7  Q    Have you reviewed those spending provisions?

8  A    Yeah.  I know that my office did the calculation of how

9  much money -- one of the new requirements of 436 was that

10  Treasury would have to pay emergency managers.  That was one

11  of the criticisms of PA 4, that you put someone in place and

12  then you make them pay for them, so I know my office did the

13  calculations to identify how much we would need to pay the

14  salaries of the EM's that were in place throughout the state,

15  and I believe that number was about 780,000.

16  Q    So when you performed your calculation, did you only

17  address those emergency managers that were in place at the

18  time, or did you address the potential emergency managers

19  that the state was aware it intended on or hoped to put in

20  place?

21  A    Someone on my staff did that calculation.  I can't speak

22  to what the components of it were.

23  Q    Did you ever review the financial analysis that was

24  performed by your staff?

25  A    No.  I think they just shared the number with me, that

1  that's what we would need to get through the fiscal year.

2  Q   And there was then a second spending provision; correct?

3  A   Yes.

4  Q   And that provided for funds to cover consultants;

5  correct?

6  A   Correct.

7  Q   And that was approximately $5 million?

8  A   Right.

9  Q   Do you believe those spending provisions were adequate to

10  cover both the salaries for the emergency managers and the

11  professionals that emergency managers may retain?

12  A   I'm pretty certain they were -- the emergency manager

13  number was probably quite close because it was very

14  predictable.  The consultant costs, you know, those

15  consultants, you never can trust them.  They get really

16  expensive.

17  Q   Well, let's just talk about the consultants for a moment.

18  As time went on, was that, in fact, sufficient to cover the

19  fees of the consultants in connection, for example, with the

20  City of Detroit?

21  A   Well, so far we haven't had to go back to the legislature

22  to ask for additional money, so I -- so far it's been

23  adequate.

24  Q   So the $5 million has covered the Jones Day attorneys'

25  fees, the Miller Buckfire, the Conway MacKenzie, and the

1   Ernst & Young fees in connection with the City of Detroit

2   from -- I believe it would have just been from the effective

3   date, March 28th, through September?

4   A   You'd have to ask -- I go to Brom Stibitz when I want to

5   know how we're doing on resources to hire consultants, and he

6   just tells me we're fine or we're not fine.  I can't speak to

7   the specifics.

8   Q   Well, at some point you did become concerned, did you

9   not?

10  A   I worry about a lot of things.

11          MS. BRIMER:  Your Honor, I'd like to show the

12  witness an exhibit, an e-mail that is, in fact, from him.  I

13  shared it with Ms. Nelson.

14          THE COURT:  What are you showing him?  Is it an

15  exhibit number?

16          MS. BRIMER:  Well, we can mark it as Exhibit 206,

17  your Honor.

18          THE COURT:  Okay.

19      (Exhibit 206 marked at 10:02 a.m.)

20          MR. SHUMAKER:  Your Honor, we would state an

21  objection.  This is not -- this document was not a mystery

22  and wasn't placed on their exhibit list at the beginning of

23  trial.

24          THE COURT:  Well, let's see if it's offered into

25  evidence, and then I'll hear your objection.  Are you asking

1  the witness to have a look at it?

2  BY MS. BRIMER:

3  Q    Have you had a chance to review that?

4  A    Yes.

5  Q    That's an e-mail from you --

6  A    Yes.

7  Q    -- dated June 11, 2013?

8  A    Yes.

9  Q    Do you recall sending this e-mail?

10 A    Very much so.

11           MS. BRIMER:  Your Honor, it was not offered at the

12 time the pretrial was prepared.  I believe this runs directly

13 to the issue of whether or not the spending provision was, in

14 fact, ever properly evaluated.

15           THE COURT:  Isn't relevance.  It's why wasn't it on

16 the original exhibit list.

17           MS. BRIMER:  I think I can explain, your Honor.

18 Your Honor only on the day -- the day before the pretrial was

19 finalized suggested that your Honor would take evidence

20 regarding the intent on the referendum, and this exhibit,

21 your Honor, was produced by the city.  It was used in Mr.

22 Dillon's deposition.  It is certainly not a shock and

23 surprise to the parties.

24           THE COURT:  It certainly would not have surprised

25 you that I would be willing to take evidence on that point

1   since you advocated that.  You didn't think you were going to

2   lose, did you?

3           MS. BRIMER:  No, your Honor, but your Honor had

4   suggested that it was a legal issue.  I think I can ask the

5   witness a few questions then if -- I believe it's relevant.

6   I believe it should be admitted.

7           THE COURT:  The issue is not relevance.

8           MS. BRIMER:  I understand that, your Honor.

9           THE COURT:  In light of the failure to list it and

10  the lack of cause for that, the Court sustains the objection.

11  BY MS. BRIMER:

12  Q   So isn't it true, Mr. Dillon, that by June 11 of 2013,

13  the state was already running out of money in connection with

14  the fees of the consultants?

15  A   What I was referring to here was a forecast of what --

16          THE COURT:  Mr. Dillon, the document has not been

17  admitted into evidence, so don't tell us what's in it.  Just

18  answer the question.

19          THE WITNESS:  All right.  Going forward, sure, the

20  money would not have been adequate.

21  BY MS. BRIMER:

22  Q   Now, you testified to Ms. Levine -- when she asked you

23  why Jones Day was involved with the state in March of 2012,

24  you indicated that you knew that they were always interested

25  in this case, so you knew as early as March of 2012 that

1  Jones Day was interested in a Chapter 9 for the City of

2  Detroit; correct?

3          MR. SHUMAKER:  Objection.  Asked and answered.

4          MS. NELSON:  Same objection, your Honor.

5          THE COURT:  Sustained.

6  BY MS. BRIMER:

7  Q   So then you were involved in the March -- excuse me --

8  the interview process for the preliminary interview in

9  January of 20 -- January 29th, 2013, for the attorneys;

10 correct?

11 A   Correct.

12         MS. NELSON:  Objection.  Asked and answered.

13 BY MS. BRIMER:

14 Q   And that initial interview on January 29th was merely to

15 narrow down the firms that would then be invited to submit a

16 response to the RFP that would later be issued; correct?

17         MS. NELSON:  Objection, your Honor.  This whole line

18 has been asked and answered on Tuesday.

19         MS. BRIMER:  I have two or three questions that have

20 not been asked.  That question was not asked.

21         THE COURT:  I don't think that specific one was, so

22 you may answer that, sir.

23         THE WITNESS:  There's very specific procurement

24 rules, so I hesitate to say "yes," but I did participate in a

25 day of meetings at the airport where several law firms were

1    interviewed.  Now, legally, what follows from that to

2    actually make them eligible to be hired, I won't -- I'm not

3    an expert on the procurement practices of the city or the

4    state.

5    BY MS. BRIMER:

6    Q    Were you aware that Miller Buckfire had provided the

7    interview questions to the Jones Day attorneys prior to the

8    interview?

9    A    I don't think I ever saw the questions myself, so I don't

10   know that, no.

11   Q    Okay.  So after the interview process, who drafted the

12   RFP?  Do you know?

13   A    I do not.

14   Q    Could it have been Miller Buckfire?

15   A    Is it possible that they did?  I mean is that the

16   question?

17   Q    Yes.

18          MS. NELSON:  I'm going to object.  Calls for

19   speculation.  He's already indicated he doesn't know.

20   BY MS. BRIMER:

21   Q    Was it someone on the staff of Treasury that drafted the

22   RFP?

23          MS. NELSON:  Same objection, your Honor.  That's

24   been asked and answered.  He indicated he doesn't know.  This

25   would call for speculation.

1      THE COURT:  Do you know the answer to that question?

2      THE WITNESS:  I don't know who drafted it.

3  BY MS. BRIMER:

4  Q   Do you recall asking Brom Stibitz to put together a

5  stable of bankruptcy attorneys for future Chapter 9's?

6  A   It doesn't sound unlikely.  I knew that we would probably

7  need some in case these things --

8      THE COURT:  The question is do you remember doing

9  that?

10     THE WITNESS:  Generally, yes.

11  BY MS. BRIMER:

12  Q   And did Mr. Stibitz provide you with a list of potential

13  bankruptcy attorneys?

14  A   I think we did an RFP.  We've done two RFP's, I believe,

15  at Treasury to get people on a list that we can tap if we

16  need.

17  Q   And was Jones Day one of the firms that responded to

18  either of those RFP's?

19  A   I don't have a memory, but apparently they did because I

20  think I've seen something during this process where their

21  name is on the state list as well.

22  Q   Okay.  Did you ever disclose to anyone with the City of

23  Detroit that Miller Buckfire had performed a 60-day review

24  for the city -- for the state of the city's finances in early

25  2012?

1  A   I think they were very familiar that they were doing

2  that, yes, because they worked with the city.  They were

3  present in City Hall.

4  Q   Did you advise the city that -- prior to the engagement

5  of Jones Day that Jones Day had been working with the state

6  on the consent agreement?

7  A   I don't believe I did.

8  Q   Did Jones Day have any involvement in the drafting of PA

9  436?

10  A   Not to my knowledge.

11  Q   Do you know whether or not anyone on your staff provided

12  Jones Day with copies of drafts of PA 436?

13  A   I don't recall that.

14  Q   Have you ever heard of the hundred day plan?

15  A   Yes.

16  Q   And what was that?

17  A   It can be a term of art, but generally when you come in,

18  you -- if you're in a turnaround situation, you have a goal

19  to accomplish certain things within a hundred days.

20  Q   And in the event those goals aren't accomplished, a

21  bankruptcy would then be filed?  Is that --

22  A   Not necessarily, no.

23  Q   Did the state institute a 100-day plan in connection with

24  the City of Detroit?

25  A   I believe we had one during the -- for the consent

1    agreement, and then I believe -- under 436 there's certain

2    reports that have to come in with a certain number of days,

3    and I don't think any of those reports line up to a hundred

4    days.  I think there's 45 days and six months, what's in the

5    law.

6    Q    And isn't it true that at least as early as March of 2012

7    Treasury personnel who worked directly for you were

8    discussing a Chapter 9 on behalf of the city with the Jones

9    Day attorneys?

10   A    I don't know what you mean by "discussing."  Chapter 9

11   was always an option, but it was the last resort.  We

12   obviously were fighting to get to a consent agreement with

13   the city and wanted to avoid even emergency, so if we were

14   thinking of Chapter 9, then we would not have gone consent

15   agreement because you couldn't get into 9 that way.

16   Q    But under the then existing law, the consent agreement

17   was the way to proceed; correct?

18   A    No.  Under a consent agreement, you can't enter Chapter

19   9.

20   Q    Okay.

21          MS. BRIMER:  I have nothing else, your Honor.

22          THE COURT:  Thank you.  Any other questions for the

23   witness?

24          MS. PATEK:  Your Honor, Barbara Patek on behalf of

25   the Detroit public safety unions.

1    DIRECT EXAMINATION

2  BY MS. PATEK:

3  Q   Mr. Dillon, I represent the Detroit public safety unions.

4  Good morning.  I have a handful of questions for you.  At or

5  about the time of Mr. Orr's appointment -- well, strike that.

6  Going back to your involvement with the situation in the City

7  of Detroit even from the time you became state treasurer,

8  were you aware that the police and fire fighters for the City

9  of Detroit were not eligible through their employment at the

10  City of Detroit for Social Security?

11  A   It was a -- we were aware that that was very likely the

12  case.  I never saw a report that said who was and who wasn't,

13  but we knew that was a real issue.

14  Q   And was that an important issue to you?

15  A   Yes.

16  Q   And at any time before Mr. Orr's appointment, did you

17  take it upon yourself to confirm whether or not, in fact, the

18  City of Detroit fire fighters and police were eligible for

19  Social Security?

20  A   We asked quite often -- my memory is that there may be

21  some that were eligible at some point, but I couldn't tell

22  you what percentage are eligible versus not.

23  Q   Do you know whether or not police officers and fire

24  fighters hired before March 31st, 1986, are eligible for

25  Medicare?

1          MS. NELSON:  I'm going to object to this line of

2    questioning, your Honor, as irrelevant.  I don't know how

3    this has any relevance to the eligibility issues or Mr.

4    Dillon's testimony.

5          THE COURT:  No.  I see the relevance.  I'll permit

6    it.  Go ahead.

7          THE WITNESS:  I was aware of the issue.  It was

8    important to me, but the specific dates and numbers I

9    didn't -- I wasn't familiar with.

10   BY MS. PATEK:

11   Q   Did you ever determine whether or not for those officers

12   not covered by Social Security they had to, as a matter of

13   federal law, be provided a certain minimum level of

14   retirement benefits by the state?

15   A   I'm not familiar with that.

16   Q   And you're not aware of that sitting here today?

17   A   No.

18   Q   You would agree with me in these Chapter 9 proceedings

19   that one of the things that cannot happen is that the City of

20   Detroit cannot be liquidated?

21   A   I don't know if it's a legal impossibility, but it's not

22   something that we ever envisioned.  I think the City of

23   Detroit will need to carry on and move forward.

24   Q   And among the City of Detroit's obligations in carrying

25   on and moving forward is providing effective police and fire

1  services.  Would you agree with that?

2  A   Very much so.

3  Q   And that would be absolutely essential to any

4  restructuring?

5  A   Yes.

6  Q   Do you believe that -- well, strike that.  I want to -- I

7  want to go back to an issue that came up earlier with Ms.

8  Green.  You were asked some questions about an Act 312

9  arbitration.  Do you know what Act 312 is?

10 A   I do.

11 Q   And that's a procedure or a statute that provides for a

12 mechanism, including mediation and arbitration, by which the

13 public safety unions resolve their employment disputes with

14 the particular municipality; is that right?

15 A   That's right.

16 Q   And isn't it true that at or near the time Mr. Orr was

17 about to be appointed as the emergency manager of the City of

18 Detroit, that there was a pending Act 312 arbitration

19 proceeding involving the Detroit Police Officers Association

20 and the City of Detroit?

21 A   Yes.

22 Q   Was there a concern on the part of Treasury that if --

23 well, strike that.  Do you understand that when an Act 312

24 award is issued following the conclusion of those

25 proceedings, that the results of that award become part of

1   the collective bargaining agreement between the union and the

2   municipality?

3   A    That's my general understanding.

4   Q    And did you have an understanding that if, in fact, an

5   Act 312 award were to issue in connection with the ongoing

6   proceedings between the city and the Detroit Police Officers

7   Association, that that would potentially extend the length of

8   the collective bargaining agreement between the Detroit

9   Police Officers Association and the City of Detroit?

10  A    I assume it could do a lot of things.

11  Q    And would that be one of them, to extend the length of

12  the agreement?

13  A    I'm not an expert on 312.  I can't say that it was not

14  one of the things that could have happened, but I do recall

15  that he had -- I don't recall extending the CBA is an item,

16  but it very may well have been.

17  Q    Were you concerned about the Act 312 award providing

18  certain terms to the Detroit police officers that would be

19  contrary to what the state was thinking would be an

20  appropriate restructuring plan?

21  A    I had concerns about an award that could -- that the city

22  couldn't afford, that it was a possibility.

23  Q    Were you looking for a mechanism to prevent those Act 312

24  proceedings involving the city and the Detroit Police

25  Officers Association from coming to a conclusion?

1    A    Mechanisms to prevent?  I can tell you I was concerned

2    about whipsawing the police and fire and having something

3    come out that wasn't sustainable and may have to be adjusted

4    in an emergency status, so I had concerns, yes.

5    Q    You didn't want them, for example, to get some wage cuts

6    reinstated only to have those reimposed again by an emergency

7    manager?

8    A    It was a concern of mine.

9    Q    Do you believe -- or did you believe as state treasurer

10   that the morale of the Detroit public safety unions,

11   including the Detroit Police Officers Association, was

12   important to their ability to provide the public safety

13   services required by the City of Detroit?

14   A    Yes.  And I also believe that they, unfortunately, are

15   underpaid.  If you look at them compared to comparable

16   cities, they're not overpaid, and it's just unfortunate the

17   city didn't have the resources to pay more.

18   Q    And would you also agree that as a general matter, based

19   upon your knowledge as state treasurer at the time, that they

20   were undermanned; this is, that there were not enough of them

21   out there to really provide effective public safety?

22   A    That's a tougher question because a lot of the

23   information we had is that two-thirds of the police, for

24   example, worked behind desks rather than on the street, so I

25   don't know if it was a lack of personnel or just they could

1  be better utilized.  As it relates to the fire, I don't have

2  that similar information.

3  Q   And with respect to the police, let me reframe the

4  question.  With respect to police officers on the street, was

5  your understanding that there was an inadequate number of

6  those?

7  A   I believe there may have been.

8  Q   Was there -- well, strike that.  Was it part of the

9  restructuring plan, at least as it was envisioned by the

10  state, to have all of the collective bargaining agreements

11  for the public safety unions expire sometime in the summer of

12  2013?

13  A   I don't know if I understand the question.

14  Q   Was there -- was part of the goal of the restructuring to

15  put the -- either the state, through an emergency manager, or

16  the city in a position to impose terms without having to

17  bargain or negotiate with its public safety employees?

18  A   In what time frame?

19  Q   In the time frame leading up to and after the appointment

20  of Mr. Orr as the emergency manager.

21  A   In 2013, I think that was less of a consideration because

22  the emergency manager has that power if he needs to do it.

23  Q   Are you aware whether or not the Act 312 -- an Act 312

24  award ever issued in the arbitration between the City of

25  Detroit and the Detroit Police Officers Association?

1  A    My memory is that one did.

2  Q    And is it your understanding in that regard that that

3  agreement then became part or that award then became part of

4  the collective bargaining agreement between the city and the

5  Detroit Police Officers Association?

6  A    That's my memory.

7  Q    You told me earlier that the issue of whether or not

8  police and fire received Social Security benefits was an

9  important issue to you, and let me step back from that as a

10 moment -- your understanding is if they don't -- if the city

11 doesn't contribute and they don't participate in Social

12 Security, they are also not eligible through their city

13 employment for Social Security Disability benefits; is that

14 right?

15 A    I don't think my understanding related to disability.

16 Q    You didn't have any understanding one way or the other as

17 to whether or not these fire fighters and police officers

18 would be eligible for Social Security Disability whether or

19 not the city participated in the Social Security program?

20 A    Yeah.  I don't recall the aspect of Social Security as it

21 relates to disability being discussed in any of the meetings

22 I attended.

23 Q    Do you think disability is a significant issue for police

24 and fire fighters?

25 A    I understand it may well be.

1  Q   Do you think it would be an important part of the
2  equation in terms of the city's ability to provide the
3  essential services of public safety?
4  A   Yes.
5  Q   And is that why the Social Security issue was, in part,
6  important to you?
7  A   I'm not -- I viewed it more in terms of retirement.  I'm
8  not certain -- and I'm not a benefits experts -- about if
9  you're an active employee and you are injured on the job
10  site, is it your employment insurance or Social Security
11  Disability?  I'm not an expert to have an opinion on that.
12  Q   Would it trouble you to know that police officers
13  currently who do not have from some other source access to
14  Social Security are not entitled to Social Security
15  Disability given what has been proposed by the emergency
16  manager in terms of impairing their pension benefits?
17           MS. NELSON:  Objection.  Relevance.
18           THE COURT:  Sustained.
19  BY MS. PATEK:
20  Q   You told us, based upon your experience as treasurer,
21  that you did not see any scenario where the Michigan
22  legislature would be willing to help the City of Detroit with
23  its pension funding problem; is that correct?
24  A   I was asked the question about would the funds come from
25  the state, and I answered it with, I think, I thought it

1  might be difficult to get the Michigan legislature to

2  appropriate funds for that.

3  Q   Would it be fair to say that it's your impression that

4  the Michigan legislature lacks the political will to provide

5  such assistance?

6          MS. NELSON:  Objection.  Relevance and speculation.

7          MS. PATEK:  Your Honor, I think this is entirely

8  relevant to the issue of bad faith and eligibility in terms

9  of the purpose for which these Chapter 9 proceedings are

10  being used.

11          MS. NELSON:  If I may address that, your Honor,

12  she's clearly asking a political question, which is outside

13  the scope of not only the Court's jurisdiction but the

14  eligibility factors that are to be considered for purposes of

15  this case.

16          MS. PATEK:  If I may respond, your Honor, I would

17  think that if these Chapter 9 proceedings were, in fact,

18  being used for a political purpose, which I think is not

19  unfathomable given the record --

20          THE COURT:  My only problem with the question is the

21  phrase "political will."  I'm not sure what that means.  You

22  can ask him why he has this belief, but --

23          MS. PATEK:  I think --

24          THE COURT:  -- I think a more direct question there

25  would be appropriate.

1  BY MS. PATEK:

2  Q   I'll take the Court's question, Mr. Dillon.  Why do you

3  have the belief that there would be no set of circumstances

4  that you can envision in which the Michigan legislature would

5  provide support to the City of Detroit for its pension

6  problem?

7  A   I don't know if I described the situation that way, but

8  having served in the legislature for six years and

9  understanding a lot of the mentality of people that don't

10  come from the Detroit area, I think it would be very

11  difficult to get them to subsidize or fund or support Detroit

12  with an appropriation.

13          THE COURT:  Excuse me one second.  Would you just

14  slide back a little bit from the microphone?  Thank you.

15  BY MS. PATEK:

16  Q   You're saying it would be difficult to get the Michigan

17  legislature to support Detroit with an appropriation for any

18  purpose?

19  A   I didn't say that, but I think if it was funding

20  something about a historical liability, I think that would be

21  much more difficult.

22  Q   In terms of revitalizing the city, providing blight

23  relief, is that something that you believe they might fund?

24  A   I think it would have a much better chance.

25  Q   You were asked a couple questions about -- or by Ms.

1    Green and then later Ms. Brimer about the timing of the

2    appointment of Mr. Orr as the emergency manager, and it's

3    true, is it not, that by appointing Mr. Orr on March 25th

4    three days before the effective date of Public Act 436, that

5    that removed from the City of Detroit the right to choose

6    some of the new options available under Public Act 436?

7            MS. NELSON:  Asked and answered, your Honor.

8            MS. PATEK:  This is foundational, and I can go to

9    my --

10           THE COURT:  Please.

11   BY MS. PATEK:

12   Q    One of those options was a negotiated -- or a period of

13   negotiations to attempt to do an out-of-court workout; is

14   that right?

15   A    Can you start from the beginning?

16   Q    Yeah, yeah.  Are you generally familiar with Public Act

17   436 and those four options it gave to a municipality?

18   A    Yes.

19   Q    And among those options were a consent agreement, which

20   the City of Detroit had already done; correct?

21   A    Yes.

22   Q    And the consent agreement itself, did that provide if the

23   City of Detroit didn't make its metrics that an emergency

24   manager would be put into place?

25   A    You can have a default of a consent agreement that then

1 | leads to a different option.

2 | Q  I'm asking you, though, in this particular case, the

3 | April 4th, 2012, consent agreement, that did not have as a

4 | default option the appointment of an emergency manager, did

5 | it?

6 | A  I'd have to review the document.

7 | Q  With respect to Public Act 436 --

8 |         MS. PATEK:  Can you put up -- I think it's 721.

9 | This is just actually the act itself, and I want Section 25.

10 |         MR. SHUMAKER:  Your Honor, 721 is not on the exhibit

11 | list.

12 |         MS. PATEK:  And I'm just going to ask the -- I'm

13 | just putting up the text of Public Act 436 --

14 |         THE COURT:  I'll permit that.

15 |         MS. PATEK:  -- which is --

16 | BY MS. PATEK:

17 | Q  Mr. Dillon, you see the text of Section 25 of Public Act

18 | 436 in front of you there?

19 | A  Yes.

20 | Q  And one of the options given to a community or a

21 | municipality under Public Act 436 was a neutral evaluation

22 | process; isn't that right?

23 | A  Right.

24 | Q  And that neutral evaluation process provided by Public

25 | Act 436 is not unlike the mediation process now ongoing in

1  these Chapter 9 proceedings; isn't that right?

2          MS. NELSON:  Objection.  Calls for a legal

3  conclusion and speculation.  He's not participating in that

4  process.

5          MS. PATEK:  Well, I believe the state has been

6  ordered into the process.

7          THE COURT:  You can ask the witness his

8  understanding.

9  BY MS. PATEK:

10 Q   Are you aware that there is in these Chapter 9

11 proceedings confidential mediation proceedings supervised by

12 the Court?

13 A   I'm aware that they're ongoing.

14 Q   And is the neutral evaluation process provided by Public

15 Act 436 similar to the mediation process in these

16 proceedings, to your knowledge and understanding?

17 A   We've never had one in Michigan, so -- and I'm not part

18 of these here, so I can't answer that.

19 Q   We can agree, however, by appointing Mr. Orr three days

20 before the effective day of Public Act 436 this neutral

21 evaluation option was taken away from the City of Detroit?

22 A   I don't recall what triggered the emergency, whether

23 if -- I don't recall the date the governor decided that he

24 was going to declare an emergency in Detroit.

25 Q   So you can't answer -- you don't know the answer to that

1  question?

2  A   I don't know if it's triggered by the date Kevyn Orr

3  started or by the governor's declaration of emergency.  I

4  don't recall the -- what the statute says on that point, but

5  I would guess it's the date the governor declares the

6  emergency is what would answer your question, not the date

7  that the manager is hired.

8  Q   Well, isn't it accurate that one of the things that

9  Public Act 436 did was to make sure that actions that had

10  been taken under former Public Act 4 or former Public Act 72

11  would be sustained and continue on?

12  A   Right.

13  Q   And that included an appointment, for example, of an

14  emergency manager under Public Act 72?

15  A   Right.

16          MS. PATEK:  That's all I have.

17                  DIRECT EXAMINATION

18  BY MR. MONTGOMERY:

19  Q   Good morning, Mr. Dillon.

20  A   Good morning.

21  Q   Claude Montgomery.  Real simple line of inquiry regarding

22  one topic.  You were very much involved in trying to

23  understand the pension questions for the state, were you not,

24  for the City of Detroit?

25  A   I wouldn't say very much involved.

1  Q   You would not say you were very much involved?

2  A   Well, there was -- the consultants on the ground were

3  very focused on it, and a professional firm was hired to do

4  evaluation, so I was aware that those were going on, but I

5  was not in day-to-day work groups working through those

6  numbers.

7  Q   But you were trying to follow the issue as best you could

8  as treasurer, were you not?

9  A   Yes.

10 Q   And from time to time you would inform the governor of

11 your views with respect to pension issues, did you not?

12 A   I did, yeah.

13 Q   And focusing on the time period on or about July 9, 2013,

14 do you remember having formed the conclusion that from your

15 perspective you were still in the informational stage with

16 respect to pensions?

17 A   Yes.

18 Q   And do you recall telling the governor that on or about

19 July 9?

20 A   Yes.

21 Q   And did you do so by e-mail?

22 A   Yes.

23         MR. MONTGOMERY:  Could you put on the screen,

24 please, common Exhibit 438?  If you could expand the "to" and

25 "from" line, please, first.

1  BY MR. MONTGOMERY:

2  Q   Did you, in fact, send this e-mail on or about July 9,

3  2013?

4          MS. NELSON:  Your Honor, this has been asked and

5  answered and was admitted as an exhibit on Tuesday through

6  the treasurer's testimony, and he testified about this e-mail

7  and specifically the "to" and the "from."

8          MR. MONTGOMERY:  Well, that's interesting because my

9  notes still had objected to hearsay, so I was going to move

10  its admission to make sure it was part of the record.

11          THE COURT:  What number is it?

12          MR. MONTGOMERY:  438.

13          MR. SHUMAKER:  The city does object because it's

14  hearsay, your Honor.

15          MR. MONTGOMERY:  There we go.

16          THE COURT:  Kelli, do we show it admitted?  Can you

17  open up the exhibit for me to see the whole thing?  Thank

18  you.  And do you recognize this exhibit, sir?

19          MR. MONTGOMERY:  Yes.

20          THE COURT:  It's admitted.

21      (Exhibit 438 received at 10:35 a.m.)

22          MR. MONTGOMERY:  Thank you.

23  BY MR. MONTGOMERY:

24  Q   And so just to conclude, sir, on or about July 9, you

25  shared with the governor your opinion that you were still in

1  the informational stage with respect to pensions, did you

2  not?

3  A   Yes.

4  Q   Okay.  And --

5          THE COURT:  Sir, I'm advised that you need to be

6  closer to the microphone or have it pointed more at you

7  because the other room is having trouble hearing you.

8          MR. MONTGOMERY:  Is that better, your Honor?

9  Better?

10         THE COURT:  There you go.

11         MR. MONTGOMERY:  Okay.

12         THE COURT:  Try that.

13 BY MR. MONTGOMERY:

14 Q   So, again, I believe my question was on or about July 9,

15 you informed the governor of your opinion that with respect

16 to pensions you were still very much in the informational

17 stage?

18 A   Yes.

19         MR. MONTGOMERY:  All right.  Thank you.  No further

20 questions, your Honor.

21         THE COURT:  Any other questions from counsel on

22 this?  Cross-examination.

23         MS. NELSON:  No questions, your Honor.

24         MR. SHUMAKER:  The city has no questions, your

25 Honor.

1           THE COURT: All right. Mr. Dillon, thank you very

2 much for your testimony. You're excused.

3           THE WITNESS: Thank you, Judge.

4     (Witness excused at 10:36 a.m.)

5           THE COURT: And let's take our morning break now and

6 reconvene in 15 minutes at 10:50, please.

7           THE CLERK: All rise. Court is in recess.

8     (Recess at 10:36 a.m. until 10:50 a.m.)

9           THE CLERK: All rise. Court is in session. Please

10 be seated.

11           MR. WERTHEIMER: William Wertheimer, your Honor, on

12 behalf of the Flowers plaintiffs and the UAW for this

13 witness, and we will call Richard Baird. I would indicate

14 that -- or request that the Court give permission to allow

15 the examination pursuant to Rule 611(c).

16           THE COURT: Thank you. Any objections to that?

17           MR. SHUMAKER: No objection, your Honor.

18           THE COURT: You may.

19           MR. ELLSWORTH: Your Honor, I'm Peter Ellsworth on

20 behalf of the state.

21           THE COURT: Welcome, sir. Step forward, please,

22 sir. Just step over here, and then I will administer the

23 oath to you.

24               RICHARD BAIRD, WITNESS, SWORN

25           THE COURT: Please sit down.

1                    DIRECT EXAMINATION

2     BY MR. WERTHEIMER:

3     Q    Would you state your name for the record, please?

4     A    Richard L. Baird.

5     Q    Mr. Baird, you are appearing here pursuant to subpoena;

6     is that correct?

7     A    Yes.

8     Q    And are you currently a state employee?

9     A    Yes.

10    Q    When did you become a state employee?

11    A    October 16th.

12    Q    Of this year?

13    A    Yes.

14    Q    You were involved with working indirectly for the

15    governor from the time he took office, were you not?

16    A    Yes.

17    Q    I'd like to ask you just a couple of questions about what

18    your relationship was at that -- at the time from your

19    beginning with the governor up until you became a state

20    employee a couple of weeks ago.  Okay?

21    A    Sure.

22    Q    Are you familiar with an organization called MI Partners,

23    LLC?

24    A    Yes.

25    Q    And what is it?

1   A    It is a limited liability corporation incorporated in the

2   State of Michigan, and it does organization development and

3   consulting.

4   Q    And are you an employee -- or were you an employee during

5   that time period -- that is, from 2011 up until a couple of

6   weeks ago -- of MI Partners, LLC?

7   A    I was the founder and the only employee.

8   Q    And you're the owner of it?

9   A    Yes.

10  Q    No other owners?

11  A    No.

12  Q    And what business does it -- is it in or was it in during

13  the time period we're talking?

14  A    Predominantly organizational consulting, team

15  development, talent selection.

16  Q    And how --

17        THE COURT:  One second, please.  Can you either pull

18  the microphone a few inches closer to you or sit closer to

19  it?

20        THE WITNESS:  Is this better?

21        THE COURT:  Yes, but not too close.  Thank you, sir.

22  BY MR. WERTHEIMER:

23  Q    During the period from the beginning of 2011 up until a

24  couple of weeks ago, how many clients did this entity have?

25  A    One client.

1  Q   And who was that client?

2  A   It was the New Energy to Reinvent and Diversify Fund.

3  Q   And tell us what that fund was.

4  A   That fund was a 501(c)(4) that was formed to further good

5  government at nontaxpayer expense.

6  Q   And has it sometimes in the public gone by an acronym

7  NERD?

8  A   Yes.

9  Q   Would you generally describe for the Court what role you

10 played vis-a-vis the state and particularly the governor from

11 the time the governor came in in January of 2011?

12 A   I was involved in helping source and select members of

13 the governor's team and also critical positions for other

14 departments or for state oversight operations such as failing

15 school districts or municipalities.

16 Q   Did you play any particular role relative to the issues

17 that were in place from when the governor first came in

18 relative to the financial problems of the City of Detroit?

19 A   I'm sorry.  Did I play a role relative to --

20 Q   The work the Governor's Office was doing on that problem.

21 A   Yes.

22 Q   And what role did you play?

23 A   My role was predominantly focused on assessing talent for

24 potential positions that may come as a result of a failing

25 school district or municipality.

1  Q   Did you play a particular role relative to the ultimate

2  hiring of an emergency manager for the City of Detroit?

3  A   I played a role in the identification, sourcing, and

4  recommendation to the governor, who then made recommendations

5  to the Emergency Loan Board, which made the selection of the

6  emergency manager.

7  Q   Okay.  Would it be fair to say that you worked intimately

8  with the governor on this issue?

9  A   I worked intimately with the governor on the planning for

10  contingency, but my degree of interaction with him didn't

11  become what I would call intimate until I had live candidates

12  for his consideration.

13  Q   All right.  And were you the person who made the at least

14  tentative decision to move forward relative to Kevyn Orr

15  becoming emergency manager?

16  A   I was the person that made a recommendation to both the

17  governor and the treasurer that Kevyn Orr had the

18  qualifications and capabilities that led me to believe he

19  should be a candidate for consideration should a

20  recommendation to the ELB be made.

21  Q   And were you -- did you attend the pitch meeting in late

22  January of this year?

23  A   Yes.

24  Q   And was it the day after that meeting that you made an

25  initial outreach to the Jones Day law firm to talk to someone

1  there about the possibility of Kevyn Orr being considered for

2  that position?

3  A    Yes.

4  Q    And who is the person that you made that outreach to at

5  Jones Day?

6  A    I called Steve Brogan, a managing partner.

7  Q    By the way, at this point, did you have any knowledge

8  that Jones Day had been working for the state on the problems

9  it was having with the city, in fact, was helping it in the

10 negotiations over a consent agreement in March of 2012; that

11 is, about nine or ten months before the initial consideration

12 of Mr. Orr?

13 A    I don't believe so.

14 Q    And in your conversation with Mr. Brogan -- this initial

15 conversation would have been on January 30th?

16 A    Yes.  That's correct.

17 Q    The pitch meeting having been on the 29th?

18 A    You call it a pitch meeting.

19 Q    I'm sorry.  Go ahead.

20 A    I did not view the 29th meeting as a pitch meeting.  It

21 was bringing in several highly competent restructuring

22 oriented legal advisors to help the city in the preparation

23 for its RFP.

24 Q    When you talked to Mr. Brogan on the 30th, did you make

25 it a point to tell him at that point in this initial contact

1  that Jones Day would be neither hurt nor helped if you went

2  further relative to recruiting Mr. Orr for the emergency

3  manager position?

4  A   I'll tell you what I recall that I said in that

5  conversation.

6  Q   Can you answer my question?

7  A   Those exact words, no.

8  Q   Go ahead.  Tell me what you recall.

9  A   I said -- I asked for the managing partner's permission

10  to speak with Kevyn Orr.  I said if it was -- whether it was

11  granted or not and further discussions took place, that

12  should not help or hurt Jones Day in any potential bid for

13  work with the city or the state.

14  Q   And you were speaking as a representative of the state to

15  the Jones Day managing partner at that time, were you not?

16  A   No.  I was never a representative of the state.

17  Q   Who did you hold yourself out as in your discussions with

18  Mr. Brogan?

19  A   An independent consultant to the governor and his team

20  involved in talent sourcing.

21  Q   But you were working for the governor.  He would have

22  understood that.

23  A   Well, I was working with the governor.

24  Q   You weren't working for the City of Detroit, were you?

25  A   No.

1  Q   If you were working for anybody, it would have been the

2  governor?

3  A   I was working for the NERD Fund.

4  Q   Okay.  Which is the -- which is a fund that -- set up

5  either directly or indirectly by the government -- or the

6  governor.  You understood that, did you not?

7  A   No, I don't understand that.

8  Q   Okay.  Had you talked to anyone -- had you talked to

9  anyone with the state to get the approval for the

10 representation you made to Mr. Brogan; that is, that Jones

11 Day would neither be hurt nor helped if you went forward

12 relative to Orr?

13 A   No, and I've testified in my deposition that upon

14 recollection of that, I did not have the right to make that

15 assertion.

16 Q   You never withdrew that assertion from Mr. Brogan or

17 anyone else at Jones Day, did you not?

18 A   Not that I recall.

19 Q   And you always acted consistent with it, did you not?

20 A   I believe I did.

21 Q   In fact, you pushed for Jones Day to be hired by the

22 city, did you not?

23 A   Define "push," sir.

24 Q   You spoke in their favor, talked to people, suggested

25 that Jones Day would be a good choice, something like that?

1  A    I said any of those five firms that presented that day

2  would be a good choice.

3  Q    Did you tell Kevyn Orr on January 31st that you were --

4  at the time you were soliciting him, that you were also going

5  to be pulling for Jones Day?

6  A    I believe I did.

7  Q    And you told him that because, in fact, you were going to

8  be pulling for Jones Day; correct?

9  A    I hoped that they would be successful, yes, sir.

10  Q    What did you mean by the term "pulling" when you used it

11  in your conversations with Mr. Orr?

12  A    That I hoped they would be successful.

13  Q    It's like a wish?

14  A    It's a hope.

15  Q    "Pulling" implies a little bit more than a hope, does it

16  not?

17  A    Not in my view, sir.

18  Q    You're the governor's right-hand man at the time, are you

19  not?

20  A    There's nothing in my job description or my contractual

21  agreement that puts that label on me, sir.

22  Q    Is there anybody you know of who was closer to the

23  governor in terms of this operation relative to who's going

24  to be hired as emergency manager and who's going to do the

25  legal work than you?

1   A    My job was to source talent.

2   Q    Anybody that you knew from your involvement in the

3   process had any more in a role of it than you?

4   A    I don't have a perspective to tell you.  My job was to

5   source talent.  There were a lot of people involved in the

6   City of Detroit issues.

7   Q    But you were the one that was involved to source talent;

8   correct?

9   A    Correct.

10  Q    And part of sourcing talent was your determination that

11  Orr would be good talent for the emergency manager's job;

12  correct?

13  A    My job was to assess his experience and qualifications

14  for that job, yes.

15  Q    Okay.  And part of your role in assessing talent would be

16  to assess that the Jones Day law firm would also be a good

17  choice for the City of Detroit, would it not?

18  A    No, sir.  That was not my role.

19  Q    I thought you said your role was in talent

20  identification.

21  A    Well, there's a difference between talent identification

22  for an emergency manager possibility and recommending a law

23  firm to a city that has to make its own decision.

24  Q    What did Kevyn Orr say to you when you told him on

25  January 31st that you'd be pulling for Jones Day?

1  A   I don't recall what he said at that time.

2  Q   Do you recall a conversation a couple weeks later with

3  Kevyn Orr where you talked both about his retention and the

4  retention of Jones Day?

5  A   I'm sorry.  Ask the question again.

6  Q   Do you recall having a conversation with Kevyn Orr around

7  the middle of February of this year in which you talked to

8  Mr. Orr both about the possibility of his being retained and

9  in that same conversation him bringing up the possibility of

10  Jones Day being retained?

11  A   I don't recall explicitly, but I would have said probably

12  the same thing to Kevyn Orr that I said to Steve Brogan,

13  which is in my -- which I've already testified I probably had

14  no right to say, but my issue was I wanted permission to talk

15  to Kevyn Orr about the prospects for this opportunity, and I

16  did not want it to have a positive or a negative impact on

17  anything occurring between Kevyn Orr's firm and the City of

18  Detroit.

19  Q   Mr. Baird, isn't pulling for Jones Day a little bit

20  stronger than not having it hurt Jones Day?  Don't you

21  recognize a difference between those two phrases?

22  A   No, sir, I don't.  I know it's --

23  Q   You've answered my question.  Thank you.

24          MR. WERTHEIMER:  Would you put 807 up, please?

25  BY MR. WERTHEIMER:

1   Q   I'm going to ask you, Mr. Baird, if this refreshes your

2   memory as to the specifics between you and Mr. Orr around

3   February 13th.  This is an e-mail he's sending to you

4   February 13th, and I'm directing your attention down to he's

5   saying to you, "In the interim" -- you with me --

6   A   Yes.

7   Q   -- "when you have time, I'd like to speak with you about

8   the timing and process for both the retention of the EM" --

9   i.e., him -- "and legal counsel" -- i.e., Jones Day.  Do you

10  recall Mr. Orr e-mailing you asking you if you could have --

11  he could have that conversation with you?

12  A   Well, I recall this e-mail, but I didn't specifically

13  recall this part about the request and process for timing of

14  the EM and legal counsel.

15  Q   Do you recall it now?

16  A   Well, I see it's here, so -- and I read the rest of the

17  e-mail, so I now agree that it's part of the same e-mail.

18  Q   Okay.  And you agree that Kevyn Orr wants to communicate

19  that information to you; correct?

20  A   Well, I mean I agree that he says, "In the interim, when

21  you have time, I'd like to speak with you about the timing

22  and process for both the retention of the EM and legal

23  counsel."  That's what this memo says.

24  Q   And didn't you understand when you received it that what

25  Orr was doing was continuing the pitch, this time both for

1   himself and for Jones Day, to make sure that both things

2   would be accomplished?

3   A   No, sir.

4   Q   No?  Do you recall talking to Mr. Orr after receiving

5   this e-mail about this per his request?

6   A   I spoke with Mr. Orr several times over this period of

7   time, and I don't recall talking about this request.

8          MR. WERTHEIMER:  That's all I have, Mr. Baird.

9   Thank you.

10                  DIRECT EXAMINATION

11   BY MS. LEVINE:

12   Q   Good morning, Mr. Baird.

13   A   Good morning.

14   Q   Sharon Levine, Lowenstein Sandler, for AFSCME.  Just a

15   couple of questions if you would.  You testified that when

16   you were with your consulting firm before you were retained

17   by the state, your client was the NERD Fund; correct?

18   A   Correct.

19   Q   And in that capacity, the NERD Fund paid you, but you

20   provided services benefitting the state; correct?

21   A   Yes.

22   Q   Do you know if the NERD Fund paid for any other

23   consultants that provided services benefitting the state or

24   the City of Detroit?

25   A   I don't know.

1  Q   Do you know if there are any other funds or affiliations

2  that paid for the services of consultants that provided

3  services to the city in connection with Detroit?

4  A   No.

5  Q   No, there aren't any, or, no, you don't know?

6  A   I don't know.

7  Q   I apologize.  It was my -- it was my question that was

8  off.  Okay.  So when did you start providing services to the

9  governor, again?

10  A   In January of 2011.

11  Q   And at the point in time that you started providing those

12  services, was it your understanding that the governor's view

13  was that Detroit was already financially distressed?

14  A   It was my understanding that the governor was concerned

15  about Detroit's financial condition, yes.

16  Q   In addition to the assistance you provided the governor

17  in connection with the selection of Jones Day and the

18  emergency manager, did you have any involvement in the

19  selection or retention of Ernst & Young, Miller Buckfire, or

20  Conway MacKenzie?

21  A   Not in the selection or retention, no.

22  Q   During the course of the time that you provided services

23  for the governor, did you interact with Ernst & Young?

24  A   Yes.

25  Q   Did you interact with them in 2002?

1    A    I'm sorry. Two thousand --

2    Q    Two. I'm sorry. 2012. Sorry. I'm tired.

3    A    I would have to check that.

4        THE COURT: Ms. Levine, could you pull the

5 microphone a little closer to you, please?

6        MS. LEVINE: Yes, your Honor. I'm sorry.

7        THE COURT: Thank you.

8 BY MS. LEVINE:

9    Q    Were you involved at all with the -- providing services

10 to the governor -- actually, let me start a different way.

11 Are you aware that in late 2011, early 2012, there were

12 negotiations with a coalition of unions and the City of

13 Detroit with regard to some concessionary bargaining?

14    A    I believe I was, yes.

15    Q    And that Ernst & Young was involved in those or attended

16 those negotiations as a consultant for the city?

17    A    I don't know that or at least I don't recall that.

18    Q    How did you become aware of those negotiations?

19    A    I believe through the newspapers.

20    Q    Did you have any involvement or discussions about those

21 negotiations other than through learning about them through

22 the press?

23    A    Not that I recall, no.

24    Q    Did you have any discussions with the governor about

25 those negotiations?

1  A    No.

2  Q    Did you have any discussions with Mr. Dillon about those

3  negotiations?

4  A    Not that I recall.

5        MS. LEVINE:  I have no further questions.  Thank

6  you.

7                    DIRECT EXAMINATION

8  BY MS. GREEN:

9  Q    Good morning, Mr. Baird.  Jennifer Green on behalf of the

10  General Retirement System and the Police and Fire Retirement

11  Systems for the City of Detroit.

12  A    Good morning.

13  Q    Who is Dennis Muchmore?

14  A    He's the governor's chief of staff.

15  Q    And do you interface with him on a regular basis?

16  A    Yes.

17  Q    Do you recall discussing the issue of the governor's

18  authorization letter for the Chapter 9 filing in or about

19  July of 2013 with Mr. Muchmore?

20  A    Not the authorization letter, no.

21  Q    How about the request letter from Kevyn Orr?

22  A    No.

23  Q    Do you remember a meeting in or around July 12th relating

24  to the governor's authorization of the Chapter 9 filing?

25  A    I'm sorry.  A meeting -- say that again.

1  Q    Do you recall a meeting in or around July -- on or around

2  July 12th relating to the governor's authorization for the

3  Chapter 9 filing?

4  A    There were several meetings, and they were subject to

5  attorney-client privilege.  And I was in some of them and not

6  in others, but I don't recall the specific one that you're

7  asking about.

8  Q    When you say the "attorney-client privilege," which

9  attorney do you recall being at the meeting?

10 A    Well, it wasn't always the same one, but it would be

11 usually Mike Gadola or someone in Mike Gadola's shop.

12        MS. GREEN:  Your Honor, I believe that the privilege

13 has been waived with respect to that meeting.  There's a

14 document that was admitted into evidence.  It's UAW Exhibit

15 625, and I believe that all privilege assertions have been

16 waived with respect to that meeting.  We discussed this

17 meeting yesterday.

18        THE COURT:  Well, I suggest you ask your questions,

19 and we'll see what objections, if any, we get on this ground,

20 and we'll deal with it on a question-by-question basis.

21        MS. GREEN:  I will certainly do so.  I was trying to

22 head off an objection that I felt was coming, so --

23 BY MS. GREEN:

24 Q    You do recall a meeting with Mike Gadola the week of July

25 12th?

1  A   Counselor, we have a lot of meetings, and so I'd have to

2  go back and check that specific one and look for triggers to

3  help my recollection.

4  Q   Sounds like an invitation for me.

5          MS. GREEN:  Can we pull up Exhibit 625, please?

6  BY MS. GREEN:

7  Q   The top part of that e-mail discusses a Monday meeting

8  the week of July 12th, which actually it would have placed

9  the meeting earlier in the week.  Does that refresh your

10  recollection as to whether you had a meeting with certain

11  state officials relating to the governor's authorization?

12  A   Well, I don't recall a specific meeting, but it says here

13  that Mr. Gadola spoke to me, Rich, this morning, and so I

14  would have no reason to think that's not accurate.

15  Q   Do you recall discussing and taking the position that the

16  governor should take a more deliberative approach to his

17  authorization of the Chapter 9 filing?

18          MR. ELLSWORTH:  Your Honor, I object.  The privilege

19  has been waived with respect to the document but not the

20  discussions.

21          THE COURT:  The objection is overruled.  Please

22  answer the question.

23          THE WITNESS:  Would you repeat the question?

24  BY MS. GREEN:

25  Q   Can I repeat the question?  I don't remember the exact

 1  wording, but my question was do you recall discussing the

 2  issue of the governor's authorization and whether or not a

 3  more deliberative approach should be taken with respect to

 4  that authorization?

 5  A   I don't recall "more deliberative" ever being part of a

 6  conversation between Mike and I.  I do recall perhaps what

 7  he's referring to.

 8  Q   Okay.  Can you explain what that would be?

 9  A   We had had conversations about whether it might be

10  advisable to have contingencies around this process, and I

11  had provided the opinion that I thought a contingency would

12  be appropriate, and that contingency would be in the form of

13  a control that the governor would have to approve certain

14  areas of concern.

15  Q   And what were these certain areas of concern?

16  A   I don't recall specifically, but it would have covered

17  any of the entire spectrum of liabilities or claims by

18  creditors.

19  Q   Was one of those areas of concern the pension benefits?

20  A   Well, certainly the pension liabilities were a

21  significant component.

22  Q   So you agreed with other state officials that a more

23  deliberative approach should be taken due to this contingency

24  issue?

25  A   I'm not sure I would have termed it as "a more

1   deliberative approach."  What my particular opinion was --

2   and I come from a long time with a large public accounting

3   firm -- that I thought it would be advisable to have an

4   internal control or a check and balance relative to the

5   governor's approval of certain things that might go into a

6   plan of adjustment.

7   Q    And others shared your view; correct?

8   A    I didn't have conversations with anyone other than Mike

9   Gadola on this.

10  Q    Did you have a discussion with Treasurer -- you did not

11  have a discussion with Treasurer Dillon then?

12  A    I don't believe so.

13  Q    Do you recall a discussion with Lieutenant Governor Brian

14  Calley on this issue?

15  A    I don't recall talking to either of those individuals.

16  From this memorandum, it would appear that Mike Gadola did,

17  though.

18  Q    Do you know ultimately why such a contingency was not

19  included with the authorization of the Chapter 9 filing?

20  A    I would have to speculate.  I mean I know that the

21  governor did not agree, but I'd have to speculate as to what

22  the reason might be.

23  Q    Outside of Lieutenant Governor Calley, Attorney General

24  Mike Gadola, Treasurer Dillon, and yourself, were there

25  others that also shared the belief that a contingency was

1  appropriate?

2  A   I don't know that.

3  Q   Do you know if there were people within the city that

4  believed that a contingency was appropriate?

5  A   I don't know that.

6  Q   Do you recall communicating with Dennis Muchmore via e-

7  mail the week of July 12th relating to this issue separate

8  and apart from this e-mail?

9  A   No, I don't.  I don't believe I did, but I don't recall

10  if I did.

11        MS. GREEN:  Your Honor, I have a new e-mail that was

12  produced by the state after the pretrial order was already

13  entered, so it is not on the pretrial list, but I believe

14  because it was produced on the 25th of October it is

15  appropriate to be able to use the document, and I have copies

16  for counsel.

17        THE COURT:  Okay.  One second.  Do you have a number

18  for it?

19        MS. GREEN:  It's 872.

20        THE COURT:  872.

21        MS. GREEN:  May I approach?

22        THE COURT:  Are you going to ask the witness to

23  identify it?  Is that your plan?  Okay.  And I guess we'll

24  need copies, too, at some point.  Thank you, sir.

25  BY MS. GREEN:

1   Q   Do you recognize the document that I just handed to you,
2   sir?
3   A   I'd like to read it, please.
4   Q   Absolutely.
5   A   Yes.  I recall this.
6   Q   Okay.  And do you agree that the vast majority of the e-
7   mail is the same as Exhibit 625 that I just showed you with
8   the exception of a slight modification to the top of the
9   document, which is a new portion of an e-mail?
10  A   I'm not sure I follow your question, but I believe that
11  it was -- that I was not copied on any of this e-mail until
12  Dennis Muchmore sent me what you've just provided me.
13  Q   My question was just that the -- 75 percent of this e-
14  mail is the exact same e-mail chain that we just discussed.
15  That was Exhibit 625.  Do you recognize that they are the
16  same document largely?
17  A   I'm still confused.
18  Q   We can move on.  I was just asking if you recall that we
19  just discussed the same e-mail, which is a slightly
20  different --
21  A   May I add to my testimony because this has jogged my
22  recollection?
23  Q   Okay.
24  A   I did not recall a specific meeting with lieutenant
25  governor and Treasurer Dillon, and the reason I didn't recall

1  it is because we had dinner together as part of a -- of

2  something another staff person who lectures at University of

3  Michigan had arranged for some of his students, and so we did

4  have a few moments before that dinner began, and I remember

5  we did talk about contingencies.

6  Q   Okay.

7  A   So I'd like to amend my testimony.  I recall that.

8  Q   Is there anything else that you recall relating to that

9  conversation regarding contingencies specifically?

10  A   No.

11  Q   Okay.  The top of the e-mail to you, you wrote "left a

12  voicemail for you," and that is a voicemail to Dennis

13  Muchmore, correct, the chief of staff?

14  A   Correct.

15  Q   He wrote back to you --

16          MS. GREEN:  And if we could pull up Exhibit 872.

17  It's a July 12th, 2013, e-mail.

18  BY MS. GREEN:

19  Q   "Thanks.  This La Costa" --

20          THE COURT:  You have not offered this yet.

21          MS. GREEN:  Oh, I'm sorry.  I actually wanted to

22  make sure that he recognized the top part before I offered

23  it.  I was going to ask him --

24          THE COURT:  Well, you can just ask that question.

25          MS. GREEN:  Okay.

1          THE COURT:  Sure.

2   BY MS. GREEN:

3   Q   Mr. Baird, do you recognize the top half of the e-mail?

4   That's the new portion.

5   A   I now know what he's referring to, but I don't recognize

6   the e-mail.  I'm not even sure I read it.

7   Q   So you know what he's referring to, but you don't know if

8   you read the e-mail?

9   A   Well, what I'm saying is he refers to this "La Costa is

10  not all it's cracked up to be," and I recall --

11          THE COURT:  Don't tell us what's in it until we

12  admit it into evidence.

13          THE WITNESS:  I'm sorry, your Honor.

14          THE COURT:  The only question before you now is do

15  you recognize the top portion of the e-mail?  Have you seen

16  it before?

17          THE WITNESS:  I don't recall having seen this e-mail

18  before.

19          THE COURT:  All right.

20  BY MS. GREEN:

21  Q   Do you deny that you would have received the e-mail?  You

22  just don't specifically remember it?

23          MR. SHUMAKER:  Objection.  Asked and answered.

24          MS. GREEN:  Well, I think the -- I thought it was a

25  different question.  I mean --

1          THE COURT:  It is a different question, but it's not

2   a particularly relevant question.

3          MS. GREEN:  Okay.

4   BY MS. GREEN:

5   Q   What was the reference to -- that you remembered?

6          THE COURT:  I'm sorry.  What?  Could you rephrase

7   that?

8          MS. GREEN:  He said that he had -- it referred him

9   to something, and he remembered.  I'm asking --

10          THE WITNESS:  The Judge just admonished me.  I don't

11   care to be admonished again.

12          MS. GREEN:  Your Honor, I guess I'm asking can I

13   refresh his recollection with it?  Is that okay?  Can I

14   refresh his recollection as to what his reference was?  I

15   believe even if it's not admitted I can refresh his

16   recollection as to what he was -- what this meant.

17          THE COURT:  It sounds like you're asking him what's

18   in the document, and I can't permit that.  If you have a

19   different question, we can try it.

20          MS. GREEN:  Okay.

21   BY MS. GREEN:

22   Q   Do you recall having conversations with Dennis Muchmore

23   the week of July 12th regarding the process related to

24   Chapter 9?

25   A   No.

1  Q   Do you recall communicating with Dennis Muchmore via e-

2  mail relating to the process of Chapter 9?

3  A   I do not recall, no, while he was away.

4  Q   If there is a -- was there a shared understanding that

5  the process was becoming long?

6  A   I don't know that.

7  Q   Would there have been some sort of shared sentiment that

8  the process was becoming worn or lengthy?

9  A   I don't know that.  I mean --

10       MS. GREEN:  Your Honor, if I might try it this way,

11  I believe that this document is a party admission.  We've

12  been admitting e-mails from state officials throughout the

13  proceeding as an admission of a party, and this is another e-

14  mail nearly identical to Exhibit 625 that was admitted as a

15  party admission.

16       THE COURT:  Any objection?

17       MR. ELLSWORTH:  Well, I object.  He says that he

18  doesn't recognize the document.  He can't identify it, so it

19  shouldn't be admitted.

20       THE COURT:  It can only be a party admission if it's

21  authenticated, and the witness can't authenticate it.

22       MS. GREEN:  I believe there's a difference between

23  not specifically remember reading an e-mail and being able to

24  authenticate it.  Yes, this is to me.  I recognize the date.

25  I recognize the people on it.  I recognize this is an e-mail

1   that I would have received but for perhaps I don't

2   specifically recall reading e-mails from several months ago.

3   I think the authentication bar is much lower than being able

4   to substantively testify to it.

5           THE COURT:  As low as it is, still the witness has

6   to be able to testify that he has seen it before, and he does

7   not remember seeing it before.  Am I right about that, sir?

8           THE WITNESS:  That's correct.

9           THE COURT:  All right.  So the objection is

10  sustained.

11          MS. GREEN:  My last attempt is it was produced via

12  subpoena by the State of Michigan specifically by a request

13  from the parties on October 25th.  I believe the

14  authentication bar is very low in the fact that they produced

15  it and that --

16          THE COURT:  Did the state produce this e-mail, sir?

17          MR. ELLSWORTH:  Yes.

18          THE COURT:  Doesn't that establish its

19  authentication?

20          MR. ELLSWORTH:  Well, I don't think that establishes

21  the authentication.  You can't admit a --

22          THE COURT:  Why wouldn't it?  The state wouldn't --

23          MR. ELLSWORTH:  Because this witness --

24          THE COURT:  The state wouldn't produce an

25  inauthentic e-mail, would it?

1           MR. ELLSWORTH:  No, your Honor, but this witness

2    doesn't recognize the document and doesn't recall receiving

3    it.

4           THE COURT:  Right, but you just admitted the

5    document is authentic.

6           MR. ELLSWORTH:  The state produced the document,

7    yes, your Honor.

8           THE COURT:  All right.  And what is the document

9    offered for?  And we're talking about the top part of it,

10   right --

11          MS. GREEN:  Yes.  He had a --

12          THE COURT:  -- because the rest of it was already

13   admitted?

14          MS. GREEN:  It sparked his recollection about he

15   knew what this reference was to, and he -- when I showed him

16   the e-mail he remembered, and he said he had testimony he

17   knew what this meant, so the question is what is this

18   reference to and what does it mean to you and --

19          THE COURT:  All right.  The Court will reverse its

20   prior ruling and admit the document into evidence.  What

21   number was it again?

22          MS. GREEN:  Exhibit 872.

23          THE COURT:  All right.

24      (Exhibit 872 received at 11:30 a.m.)

25   BY MS. GREEN:

1    Q   Mr. Baird, you've read the e-mail now.  At the top of the

2    e-mail you stated earlier that this sparked your recollection

3    of either a conversation or an incident or something of that

4    nature.  Can you explain that, please?

5    A   I recollect that members of the governor's team had

6    discussed contingencies as a recommendation to the governor

7    and that the chief of staff said it's time to take this to

8    the governor and get a decision.

9    Q   What did you understand to be meant by the "kind of worn"

10   phrase?

11   A   He's talking about the resort where that particular

12   conference was being held.

13   Q   Oh, okay.

14   A   That's what sparked my recollection.

15   Q   Recollection of -- okay.

16        MS. GREEN:  Your Honor, I don't have any further

17   questions.  However, Exhibit 836 was also produced by the

18   state.  I don't know if that would mean that the -- your

19   ruling that it's authentic because it was produced by the

20   state would also apply equally to that.  It was an Andy

21   Dillon e-mail produced by the State of Michigan.

22        MR. SHUMAKER:  Your Honor, that was a hearsay

23   objection.  It was not an authentication objection.

24        THE COURT:  Let's just pause for just a second.  Can

25   you produce that for me again?

1          MS. GREEN: 836?

2          THE COURT: Please.

3          MS. GREEN: Yes.

4          THE COURT: I remember seeing it, but I need to see

5 it again. Okay. Ms. Green, we have it here, so we're all

6 set. Thank you, Kelli. So stand by one second, please.

7 Counsel, did the state produce Exhibit 836 in discovery?

8          MR. ELLSWORTH: Yes, your Honor.

9          THE COURT: All right. Then the Court will reverse

10 its earlier denial of the admission of this document and

11 admit it into evidence.

12    (Exhibit 836 received at 11:33 a.m.)

13          MS. GREEN: Thank you, your Honor. I have nothing

14 further for Mr. Baird.

15          MR. RUEGGER: Good morning, your Honor.

16                   DIRECT EXAMINATION

17 BY MR. RUEGGER:

18 Q   Good morning, Mr. Baird.

19 A   Good morning.

20 Q   You probably don't remember me. I appeared at your

21 deposition but didn't ask you any questions. My name is

22 Arthur Ruegger from the Dentons firm. We represent the

23 Retirees' Committee. I have a couple of issues I'd like to

24 talk to you about this morning. Shouldn't be too long,

25 though. The first is the date when Mr. Orr accepted your

1   invitation or the state's invitation to become emergency

2   manager.  Do you remember the specific date he said yes?

3   A    No.

4   Q    You'll recall Mr. Wertheimer showed you an exhibit.  It

5   was 807.  I think it was an e-mail dated February 13th, and

6   that, if I read it correctly, seems to indicate he had not

7   yet made his mind up.  Is that consistent with your

8   recollection?

9   A    Yes.

10  Q    I'm going to ask to show you a document that may refresh

11  your recollection about the timing of his acceptance.  I have

12  a document marked for identification RC Exhibit 460.

13            MR. RUEGGER:  With your Honor's permission, I'll

14  present it to the witness.

15            THE COURT:  Yes, sir.

16            MR. RUEGGER:  It's not on the list, gentlemen.  It's

17  just marked for identification.  I haven't offered it yet.

18            THE WITNESS:  All right.  I've completed my review.

19  BY MR. RUEGGER:

20  Q    Does that refresh your recollection, sir, about the date

21  that Mr. Orr accepted the position as emergency manager?

22  A    No, sir.

23  Q    Do you recognize that document?

24  A    I believe I have seen this document, yes.

25  Q    Can you tell us what it is?

1    A    It is a --

2         MR. SHUMAKER:  Your Honor, we would object before

3    the witness gets into the exhibit that this exhibit was not

4    on the pretrial exhibit list.

5         MR. RUEGGER:  It was only recently produced, and I

6    only found it within the last day or so, so I don't believe

7    it was produced before the date of the pretrial order.

8         MR. SHUMAKER:  This is a document produced in the

9    Davis litigation.

10        MR. RUEGGER:  I don't have any basis to question

11   your --

12        THE COURT:  Counsel, I have to ask you to address

13   your comments to the Court, not to each other.

14        MR. RUEGGER:  Sorry, your Honor.

15        THE COURT:  So the question is when was this

16   document produced or how?

17        MR. SHUMAKER:  Your Honor, again, this was not on

18   the pretrial exhibit list, and the indications are that it

19   was a document produced in the Robert Davis litigation, which

20   predated the deadline of the pretrial order.

21        THE COURT:  And just so we're clear, what number

22   exhibit are we talking about?

23        MR. RUEGGER:  It's Exhibit Number 460, your Honor.

24        THE COURT:  Okay.

25        MR. RUEGGER:  We've only marked it today.  It's not

1  on the pretrial list.  Mr. Shumaker is correct about that.

2  And I believe there's an objection to my question as to

3  whether the witness can identify the document.

4          MR. SHUMAKER:  You were asking him questions about

5  the document's contents.  That's why I objected.

6          MR. RUEGGER:  Well, I believe my question was

7  whether he could identify the document.

8          THE COURT:  No.  He said he could recall it.  Then

9  you asked him --

10         MR. SHUMAKER:  What is it?

11         THE COURT:  -- what is it?

12         MR. SHUMAKER:  Another objection --

13         THE COURT:  I'll allow it to be identified for the

14  record, but if you offer it in evidence, we're going to have

15  to deal with this issue of it not being on the list.  Can you

16  just tell us generally what the document is without telling

17  us the contents?

18         THE WITNESS:  The document is a -- is the forwarding

19  of a prospective timetable of communications and

20  announcements predicated upon Kevyn final decision, which at

21  the time of this document had not been made.

22  BY MR. RUEGGER:

23  Q   So is it your testimony, sir, that as of the date of this

24  document, Mr. Orr had not made any final decision?

25  A   Yes.

1  Q   But I believe your testimony was that you were forwarding

2  to him a proposed timetable on the contingency that he would

3  make a final decision?

4  A   I can't answer your question without the judge's

5  permission because there's a key part of this that I believe

6  you're ignoring.

7  Q   Apart from the document, sir, did you forward to Mr. Orr

8  a proposed timetable related to his potential acceptance of

9  the emergency manager position and the events that would

10 follow from that acceptance?

11 A   Pursuant to his decision, yes.

12 Q   And which decision was that?

13 A   The decision of whether he would accept this nomination

14 if recommended.

15 Q   And you forwarded that timetable before he gave you his

16 decision?

17 A   Yes.

18 Q   Do you recall how far in advance of his decision you

19 forwarded that timetable?

20 A   I don't remember his exact date.

21 Q   So even before his decision, the state had a proposed

22 timetable for events that were to follow from receipt of his

23 decision?

24 A   It was a -- it was a tentative plan, yes.

25 Q   Okay.  And can you tell us what dates or events were part

1  of that timetable?

2  A   Well, that would be giving the content of the memorandum.

3  Q   Without -- sorry, your Honor.  Without basing your

4  testimony on the document in front of you, from your

5  recollection, can you recall those events?

6  A   No, I cannot.

7         MR. RUEGGER:  Okay.  I would offer Exhibit 460 in

8  evidence.

9         MR. SHUMAKER:  Same objection, your Honor, and

10  hearsay.

11         THE COURT:  Well, what do you have to suggest that

12  you only recently got this document, for example, after the

13  final pretrial?

14         MR. RUEGGER:  Your Honor, the Retirees' Committee

15  was not part of the Davis litigation.  We did not serve a

16  subpoena on Jones Day in any litigation.  We've learned about

17  some of these productions in the course of the depositions

18  leading up to this trial, but we were behind the eight ball,

19  if you will, in terms of learning about this.  We tried to

20  follow up when we could.  It was a hectic schedule.  We only

21  got these documents in the last 48 hours, to the best of my

22  knowledge.

23         MR. SHUMAKER:  Your Honor, the Retiree Committee has

24  multiple documents that are based -- are documents produced

25  in the Davis litigation, specifically Exhibits 400, 401, 402,

1  403, so clearly Retirees' Committee had time in advance of

2  the joint pretrial order to submit this document.

3          THE COURT:  May I see a copy, please?

4          MR. SHUMAKER:  May I approach?

5          MR. RUEGGER:  Your Honor --

6          THE COURT:  The Court concludes -- I'm sorry.

7          MR. RUEGGER:  I'm sorry, your Honor.  In response to

8  Mr. Shumaker's objection that we had documents from the Davis

9  litigation, we attended the Orr deposition.  Someone

10  marked -- was it -- I don't know if it was ours -- some

11  documents from certain of these litigations, but, to the best

12  of my knowledge, we were behind the eight ball trying to get

13  these documents.  I don't have a personal knowledge as to

14  exactly when we did get these.

15          THE COURT:  The Court concludes that the record does

16  establish cause for the late addition of this document to the

17  exhibit list.  The other objection is overruled.  Exhibit 460

18  is admitted.

19      (Exhibit 460 received at 11:43 a.m.)

20          MR. RUEGGER:  Thank you, your Honor.  May I proceed?

21          THE COURT:  Yes.  Did we give you your document

22  back?

23          MR. RUEGGER:  Do you want an extra copy?  You're

24  okay.

25          THE COURT:  Oh, yes.  I need a copy.  So that's our

1   copy that we have?  Okay.

2   BY MR. RUEGGER:

3   Q   Mr. Baird, can you tell us now what Exhibit 460 is?

4   A   Exhibit 460 is my forwarding a tentative communications

5   timetable that was given to me by the governor's press

6   secretary to Kevyn Orr on February 21st, 2013.

7   Q   And that timetable contemplates a date where the governor

8   would announce his recommendation of Mr. Orr as emergency

9   financial manager; correct?

10          THE WITNESS:  May I read from the document, your

11  Honor?

12          THE COURT:  Yes.

13          THE WITNESS:  "A Thursday, March 14th, date for

14  governor to confirm the emergency post-hearing as required

15  legally and recommend ELB candidate and for the ELB to

16  confirm and make the emergency financial manager

17  appointment."

18  BY MR. RUEGGER:

19  Q   And if you turn to the last page of that document, the

20  timetable also contemplated that Mr. Orr would start in his

21  official capacity as of March 25th; correct?

22  A   That was the working timetable, yes, sir.

23  Q   And would this timetable have slipped at all if Mr. Orr

24  had not accepted the position on or about the date you sent

25  this timetable?

1   A    For Mr. Orr, yes.

2   Q    So there were other candidates that the governor might

3   have recommended to comply with this timetable?

4   A    I'm sorry.  Say that again.

5   Q    If I understood your testimony correctly, you said that

6   if Mr. Orr had not accepted promptly on or about the date you

7   sent the timetable, the timetable would have slipped for

8   Mr. Orr.

9   A    Mr. Orr had not made his decision at the time of this,

10  and it was predicated on something needing to happen that had

11  not yet happened, and so this was all very tentative.

12  Q    You state in the first paragraph on the first page that,

13  "We would like you here physically for announcement,

14  stakeholder meetings, and media on March 15 and as much of

15  the following week as you could manage before the start date

16  of March 25th."

17            THE COURT:  What is your question?

18  BY MR. RUEGGER:

19  Q    My question is did Mr. Orr say he could be physically

20  available on those dates?

21  A    I don't recall him saying because it was contingent upon

22  something else happening.

23  Q    Do you recall approximately -- or specifically when after

24  you sent this e-mail Mr. Orr accepted the position?

25  A    Well, Mr. Orr never accepted the position.  He only

1   accepted the nomination of the governor to the Emergency Loan

2   Board, so there was no acceptance of position until that

3   action had occurred.

4   Q   I stand corrected.  When did Mr. Orr indicate to you he

5   accepted whatever positions or contingencies you were

6   offering?

7   A   I don't remember the exact date, but I know it was after

8   this memo.

9   Q   Thank you, sir.  I'd like to switch time and subject

10  slightly to July of this year.  Do you recall whether you had

11  any role in the structuring of the city's advisors' fees in

12  the upcoming Chapter 9 proceeding?

13  A   I'm sorry.  Say that again, please.

14  Q   In July of this year, as everyone in this courtroom

15  knows, there was a petition for Chapter 9 relief on behalf of

16  the city.  Leading up to that petition, did you have any role

17  in the structuring of the fees for the city's various

18  advisors in that Chapter 9 proceeding?

19  A   Not structuring of the fees, no, sir.

20  Q   What role, if any, did you have?

21  A   I was requested by the emergency manager to go back to

22  members of the restructuring team and discuss putting a finer

23  point on their fees, which the original estimates were higher

24  than what the emergency manager believed were affordable.

25  Q   Do you recall compiling proposed fees for each of the

1 | advisors to the city in that connection?

2 | A    Compiling fees?

3 | Q    Did you determine any approximate fees for those advisors

4 | going forward?

5 | A    I had conversations with the principals of those entities

6 | about reducing the estimates that they had previously

7 | provided.

8 | Q    So if I understand you correctly, the advisors had given

9 | estimates for their fees in the Chapter 9 proceeding, and you

10 | were tasked with engaging with them about whether those fees

11 | could be reduced?

12 | A    Yes.

13 | Q    Do you recall communications with Mr. Saxton and Mr.

14 | Dillon at Treasury on this subject?

15 | A    Yes, I do.

16 | Q    What did you tell them?

17 | A    When?

18 | Q    On or about July 16th, 2013.

19 | A    I don't recall the exact -- can you tell me is that

20 | before or after I had the conversations with the

21 | restructuring team principals?

22 | Q    Well, I'm not allowed to tell you that, sir, but if I

23 | can --

24 | A    Then I don't recall.

25 |        MR. RUEGGER:  Can I approach the witness with an

1  exhibit that I believe will help refresh his recollection?

2            THE COURT:  You may.

3            THE WITNESS:  Yes.  This is consistent with my prior

4  testimony and does help me recollect.

5            THE COURT:  Excuse me, sir.  The only question was

6  does that document refresh your recollection on this point.

7            THE WITNESS:  Yes, it does.

8  BY MR. RUEGGER:

9  Q    Thank you.  Do you recall on or about that date giving

10  Mr. Saxton and Mr. Dillon estimated fees for the advisors to

11  the city in Chapter 9?

12  A    Well, estimated reductions, which netted to estimated

13  fees, yes, sir.

14  Q    Okay.  Can you tell us without discussing the content

15  what the document that's been marked as 458 is?

16  A    Well, yes.  It's hard to -- the content is all numbers,

17  so -- but effectively it is -- as I said before, it is a

18  communication to Tom Saxton from -- to Tom Saxton and Andy

19  Dillon from me that deals with conversations that I had had

20  with Ernst & Young, Miller Buckfire, Jones Day, and Conway

21  MacKenzie dealing with a reduction in fee estimates.

22            MR. RUEGGER:  Your Honor, we offer 458 in evidence.

23            MR. SHUMAKER:  Objection, your Honor.  It's another

24  brand new one.  Also, it's hearsay.

25            MR. RUEGGER:  Your Honor, it was produced by the

1  State of Michigan.  Again, as with the earlier document, we

2  were behind the eight ball in terms of receipt of these

3  documents.  We did not subpoena them ourselves.  The other

4  parties did, but I only received this document in the last 24

5  hours.

6          THE COURT:  All right.  For the same reason, the

7  Court will overrule the objection and admit it into evidence.

8      (Exhibit 458 received at 11:52 a.m.)

9          MR. RUEGGER:  Thank you, your Honor.

10 BY MR. RUEGGER:

11 Q   So, Mr. Baird --

12         THE COURT:  Before we proceed, however, I will ask

13 you over the lunch break, which we will take here shortly, to

14 advise counsel for the city and the state if there are any

15 other exhibits that you intend to offer into evidence on the

16 same grounds.  All right?  Will you do that?

17         MR. RUEGGER:  I can certainly do it.  I can state

18 now that are no such documents related to this witness, your

19 Honor, but I will ask my colleagues related to any other

20 witnesses.

21         THE COURT:  And we need a copy of Exhibit 458.  Can

22 you provide that for us, please?  Thank you, sir.

23 BY MR. RUEGGER:

24 Q   Mr. Baird, in the e-mail that's at the middle of the page

25 going to the bottom, which is, I believe, addressed from you

1    to Messrs. Saxton and Dillon, are those, as you testified

2    earlier, your determination of the fee reductions you believe

3    are achievable in the Chapter 9 case?

4    A    I would testify that these are an accurate summary of my

5    conversations with each of those parties.

6    Q    And you believe that the total fees from the four

7    advisory firms were approximately $75.2 million; is that

8    correct?

9    A    Well, that's the mathematical exercise, yes.  That's what

10   the memo says.

11   Q    So what's the -- can you explain the difference between

12   the breakout of the four sets of fees that's in the beginning

13   of that e-mail and then the four sets of fees that's at the

14   bottom of that e-mail?

15            THE COURT:  Excuse me, sir.  I'm going to interrupt

16   your answer to that question.  What's the relevance of all of

17   this?

18            MR. RUEGGER:  Your Honor, there's several pieces of

19   relevance, one of which is whether the advisors had an

20   incentive to rush to Chapter 9 vis-a-vis the cap that might

21   have been on their fees before the Chapter 9, and that's one.

22   Another is the reasonableness of the $5 million advisory cap

23   that is stated in the appropriations part of PA 436.  I'm not

24   going to spend a lot of time on this, Judge.

25            THE COURT:  Yeah.  I don't think any of those --

1   either of those is reasonably arguable, so I'm going to ask

2   you to move on.

3            MR. RUEGGER:  Very well.  I have no further

4   questions of this witness.  Thank you.  Thank you, Mr. Baird.

5                    DIRECT EXAMINATION

6   BY MS. BRIMER:

7   Q   Good morning, Mr. Baird.  My name is Lynn Brimer.  I

8   represent the Retired Detroit Police Members Association.  I

9   only have a handful of questions for you.  You indicated you

10  participated in the January 29 interview process for the law

11  firms.  Were you aware that Miller Buckfire had shared the

12  interview questions with the Jones Day team?

13  A   No.

14  Q   Would you have considered it appropriate to have shared

15  the interview questions with the teams in advance of the

16  meeting?

17  A   Well, you've characterized this as an interview.  It was

18  not an interview.

19  Q   So if it wasn't an interview, what was the meeting -- the

20  January 29 meeting intended to be?

21  A    It was bringing together credentialed firms to address

22  various considerations to assist the city in creating a

23  request for proposal which would have had to go out

24  subsequent to that time.

25  Q    You're aware that Jones Day put together what they

1   considered to be a pitch book for that meeting; correct?

2   A   I'm aware that all of those firms invited would have

3   hoped to have been candidates for any future successful RFP.

4   Q   Were you aware that Miller Buckfire had presented or

5   brought in Jones Day in the -- to Treasury in the process of

6   drafting the consent agreement?

7   A   I don't believe so I was.

8   Q   Okay.  Were you aware that Miller Buckfire -- I mean that

9   Jones Day had provided advice in connection with revising

10  Public Act 4 to members of Treasury?

11  A   No.

12  Q   Do you know who drafted the RFP that was ultimately

13  issued in connection with the retention of counsel?

14  A   I don't know who specifically drafted it.

15  Q   Do you know whether or not Miller Buckfire participated

16  in the drafting of the RFP?

17  A   I do not.

18  Q   Now, you indicated you were not aware of when Mr. Orr

19  actually accepted his nomination by the governor.  Do you

20  know when it was that the governor had finally -- or had

21  determined that Mr. Orr would be the candidate he nominated?

22  A   I was asked about the exact date, and I did not recall

23  the exact date.  And I would say that I don't recall the

24  exact date where the governor was involved in saying this is

25  my person either.

1         MS. BRIMER:  Could we see Exhibit 807?

2    BY MS. BRIMER:

3    Q   And I believe, Mr. Baird, this exhibit has already been

4    admitted into evidence.  You'll see midway down there's an e-

5    mail from you to Mr. Orr.  Do you see that?

6    A   Yes.

7    Q   That's dated February 12th; correct?

8    A   February 12th, yes.

9    Q   All right.  And if you look at the second page or

10   perhaps -- yeah.  We'll look at the second page.  There's a

11   sentence in that very top paragraph, "Anyway, I need you to

12   clue me in" -- "to clue me in you are" -- if -- I believe

13   you're missing the word "if" -- "if you are feeling

14   differently because the boss" -- does the boss refer to the

15   governor --

16   A   In this context, I think it did.

17   Q   -- all right -- "and his team are already arranging for

18   the church and pastor, and I need to talk them off the ledge

19   if you tell me we are misreading the relationship."  So was

20   it by at least -- was it by February 12th that the governor

21   had determined -- can you interpret from this that the

22   governor had determined that Mr. Orr would be the candidate

23   he nominated?

24   A   I think the governor had determined by this point that

25   subject to further due diligence and research that he would

1  be very comfortable with this individual as his nomination.

2  Q   Were you aware that after February 12 Mr. Orr continued

3  to share the e-mails that you and the governor had shared

4  with him with members of his team at Jones Day?

5  A   Not at the time.

6  Q   Have you since learned that?

7  A   I believe I've seen some e-mails since then, yes.

8  Q   Was Mr. Orr the only candidate that the governor

9  nominated in connection with this -- the EM position?

10  A   Nominated to the ELB?

11  Q   Yes.

12  A   Yes.

13         MS. BRIMER:  I have nothing further, your Honor.

14         THE COURT:  Thank you.  We'll stop for lunch now and

15  reconvene at 1:30, please.

16         THE CLERK:  All rise.  Court is in recess.

17      (Recess at 12:01 p.m. until 1:30 p.m.)

18         THE CLERK:  All rise.  Court is in session.  Please

19  be seated.  Recalling Case Number 13-53846, City of Detroit,

20  Michigan.

21         THE COURT:  It appears everyone is here.  You may

22  proceed.

23         MS. PATEK:  Good afternoon, your Honor.  Barbara

24  Patek on behalf of the Detroit public safety unions.

25                     DIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Good afternoon, Mr. Baird.

3  A   Good afternoon.

4  Q   Just a couple questions for you.  You indicated in your

5  testimony this morning that you had advised the governor to

6  perhaps have some internal controls about what could go into

7  the plan.  Can you tell me what those internal controls that

8  you advised were?

9  A   There was really only one that was on my mind.

10 Q   And what was that?

11 A   That the governor reserved the right to approve decisions

12 taken of a particular magnitude before they were executed.

13 Q   When you say "decisions of a particular magnitude," can

14 you explain what you mean by that?

15 A   Proposed plan of adjustment kind of conditions of a

16 material nature.

17 Q   Are you talking about diminishment or impairment of

18 certain obligations of the city?

19 A   It could have been diminishment or impairment, but

20 specifically I didn't have monetary notion in mind.  I had an

21 internal control of a secondary approval in mind.  I can't

22 speak for the others relative to their notion of

23 contingencies.

24 Q   So I take it those internal controls or contingencies

25 were not directly related to the pension issues in the case?

1   A    Not in my mind, no.

2   Q    Last series of questions.  You indicated also that at

3   some point -- I think it was in June of 2003 (sic) -- the

4   emergency manager had raised some concerns about the fees of

5   the various professionals, and he consulted with you in that

6   regard.

7   A    I don't recall if it was -- if it was the emergency

8   manager and the treasurer or just the emergency manager, but

9   I do recall the conversation with the emergency manager was

10  that he had not had an opportunity to talk with the members

11  of the restructuring team, the external lenders, the

12  professional firms, about their fee estimates, and that was

13  something that really needed to be done prior to any

14  potential filing.

15  Q    And you said you put together some figures for him?

16  A    I did.  I put together some -- I put together an approach

17  that suggested here are two different approaches that we

18  might take in conversations with those individuals.

19  Q    And who -- and for whom were you working at the time you

20  put those figures together?

21  A    Well, I was doing this at the request of Emergency

22  Manager Kevyn Orr.

23  Q    And did you see yourself as working at that point on

24  behalf of the state or on behalf of the city?

25  A    I actually saw that I continued to work on behalf of my

1  own company, but I'd been asked to take on a task, and I

2  agreed to do that.

3  Q    Okay.  And did you see any conflict in that regard?

4  A    No.

5           MS. PATEK:  That's all I have.  Thank you.

6           THE COURT:  Anybody next?  Questions from the state

7  or the city?

8           MR. ELLSWORTH:  No, your Honor.

9           MR. SHUMAKER:  The city has no questions, your

10 Honor.

11          THE COURT:  Mr. Baird, you are excused.  Thank you

12 very much for your testimony today.

13          THE WITNESS:  Thank you, your Honor.

14     (Witness excused at 1:33 p.m.)

15          MR. KING:  Good afternoon, your Honor.  Ron King

16 with Clark Hill on behalf of the Retirement Systems.  The

17 next witness we're going to call is Brad Robins.

18          THE COURT:  Step forward, please, sir, and before

19 you sit down, please raise your right hand.

20              BRADLEY ROBINS, WITNESS, SWORN

21          THE COURT:  Please sit down.

22                     DIRECT EXAMINATION

23 BY MR. KING:

24 Q    Good afternoon, Mr. Robins.

25 A    Good afternoon.

1  Q   For the record, will you please state your name and

2  business address, please?

3  A   Yes.  My name is Bradley A. Robins.  I'm a managing

4  director at Greenhill & Company, 300 Park Avenue, New York,

5  New York.

6  Q   And, Mr. Robins, could you briefly describe for the Court

7  your educational background?

8  A   Sure.  I have a BA in economics from Middlebury College

9  in Middlebury, Vermont.  I have a law degree from the

10  University of Pennsylvania.

11  Q   And where did you graduate from Middlebury College?

12  A   1986.

13  Q   And when did you attend law school?

14  A   University of Pennsylvania.

15  Q   And when did you graduate from law school?

16  A   1990.

17  Q   And for the benefit of the Court, we'd like to just go

18  through your professional background and experience.  After

19  you graduated from law school, were you employed?

20  A   Yes.  My first job was as a law clerk to Judge Walter

21  Stapleton on the Court of Appeals for the Third Circuit, U.S.

22  Court of Appeals for the Third Circuit, and after --

23  Q   And how long were you clerking?

24  A   That was a one-year job.  After that I was an attorney at

25  Wachtell, Lipton, Rosen & Katz in New York in the creditors'

1    rights department.

2    Q    How long were you employed at Wachtell?

3    A    I was employed there about six or so years, little more

4    than six years.

5    Q    And what types of work did you do as an attorney at

6    Wachtell?

7    A    As an attorney at Wachtell, I did restructurings,

8    bankruptcies, and financings along with leveraged buyouts.

9    Q    When did you leave Wachtell?

10   A    I left Wachtell in late 1998 or sometime in 1998,

11   thereabouts.

12   Q    And did you take another position at that point?

13   A    I did.  I went to the investment banking firm of

14   Houlihan, Lokey, Howard & Zukin, and I joined the financial

15   restructuring group there.

16   Q    And what type of work did you do at Houlihan Lokey?

17   A    There again it was on the banking side rather than legal,

18   but I did restructurings, distressed M&A transactions,

19   assignments like that.

20   Q    Can you give us some examples of the types of assignments

21   that you performed?

22   A    We advised United Artists, the movie theater chain, when

23   they went through bankruptcy, worked with some oil and gas

24   companies doing out-of-court restructurings as well as

25   bankruptcies.

1  Q    And what type of work were you specifically doing?

2  A    Well, I was a vice president -- a senior vice president,

3  so I was kind of leading the execution team and overseeing

4  the associates and analysts on the assignments.

5  Q    When you say "execution team," for my benefit, what does

6  that mean exactly?

7  A    It means doing the day-to-day work on the assignments.

8  Q    And how long were you at Houlihan Lokey?

9  A    About two years, a little over two years.

10  Q    And after you left Houlihan Lokey, where were you

11  employed?

12  A    At Greenhill & Company.

13  Q    And that is your present employer?

14  A    Yes, it is.

15  Q    And what year did you start with Greenhill?

16  A    I began in late 2000 or the beginning of 2001.

17  Q    And generally what types of work were you performing at

18  Greenhill?

19  A    Very similar to Houlihan Lokey, so advising companies,

20  investors, stakeholders in companies that were distressed, in

21  and outside of court restructurings or companies looking to

22  invest in distressed companies.

23  Q    And can you give us a little more specific understanding

24  of the types of work or the types of engagements that you're

25  undertaking?

1   A    Sure.  A lot of the clients are companies, so advising

2   companies who are recognizing or thinking about needing to

3   restructure.  Those have included Loral, for example, AT&T

4   Canada, Refco, which was a commodities broker.  We also

5   worked with creditors.  And another significant client over

6   the years has been the Pension Benefit Guaranty Corporation,

7   which is the sort of quasi governmental entity that

8   guarantees -- insures private company pensions, and for them

9   I advise them in connection with a number of big

10  bankruptcies, American Airlines most recently, also --

11  Q    Let me --

12  A    Sorry.

13  Q    Well, let me stop you there.

14  A    Yep.

15  Q    About how many engagements do you believe you've

16  undertaken for the PBGC?

17  A    The PBGC, maybe six, six or so.

18  Q    And for my benefit, can you explain exactly what the PBGC

19  does?

20  A    Sure.  I mean their role is to insure corporate pensions.

21  In bankruptcy cases, if a company terminates the pension

22  plan, the PBGC has to take on that -- take on the plan, so

23  the role for the PBGC in a bankruptcy is to really --

24  particularly in cases where companies are thinking about

25  terminating the plans, work to due diligence, negotiate

1  pushbacks so they keep the plans if possible and, if they

2  don't, figure out whether they can at least keep some, and

3  then negotiate the treatment they would receive in the

4  bankruptcy case if a plan is terminated.

5  Q   Can you give us a specific example of where you were

6  performing those types of services?

7  A   Yeah.  I mean the most recent is American Airlines, and

8  American Airlines filed for bankruptcy a couple years ago,

9  you know.  And when they did, they announced pretty quickly

10  they intended to terminate all the pension plans, so that was

11  a pretty good example of working with PBGC both as a member

12  of the creditors' committee but also to really diligence and

13  negotiate over that, the treatment of the pensions in the

14  plans.

15  Q   Well, let me stop you there.  Describe what you mean by

16  "diligence and negotiate" with respect to the pension

17  benefits.

18  A   Okay.  Well, you know, the question when American

19  Airlines -- American said they couldn't afford the pensions

20  anymore.  They weren't affordable.  One of the things that

21  happens early on in a restructuring discussion usually is a

22  company puts out a proposed business plan, so a big part of

23  the early work is reviewing that business plan, diligencing

24  that business plan, spending time with the leaders at the

25  airline who run the different parts of the business that

1  generate those revenues, understand it, really ask questions

2  and probe.  Usually what ends up happening is changes are

3  made to a company's business plan during that process, so,

4  you know, that was the initial stage at American Airlines.

5  Also negotiating and talking to other creditors about what

6  the effect would be if the company did successfully terminate

7  the plans and together make the case that they couldn't

8  successfully do it if they tried and they --

9  Q   I'm sorry.  They could not successfully do it if they

10 tried?

11 A   Yes.

12 Q   And why was that?

13 A   Because we were working to make the case and show that

14 they did have sufficient cash flows to afford the pension

15 plans in that case.

16 Q   And what was the ultimate outcome in the American

17 Airlines matter?

18 A   Ultimately, the plan that was confirmed keeps all the

19 pensions.  It hasn't consummated yet because they're awaiting

20 the anti-trust trial with U.S. Airways, but the plan that's

21 been confirmed has all the pension plans still in place.

22 Q   And what was your specific role in that engagement?

23 A   I led the Greenhill team that advised PBGC.  We, you

24 know, engaged in the negotiations on behalf of the business

25 folks at PBGC and deeply involved in the financial diligence

1  of American's business plan.

2  Q    Is it possible for you to quantify the number of

3  restructurings that you'd been involved in in let's say the

4  last five years?

5  A    Not specifically, but it would be dozens I would say.

6  Q    It would be enough so that if I asked you if you could

7  define what your understanding of a proposal is that you

8  could do it; is that right?

9  A    Yes.

10 Q    And how would you define a proposal in the context of the

11 restructuring work that you performed?

12 A    Well, a proposal would be a company or a debtor coming

13 forward with some pretty specific changes it wanted to make

14 to either debt or other obligations and laying out both the

15 specific changes it wants and the reasons for that.

16 Q    Along those same lines, in your experience, how would you

17 define negotiations in the context of the restructuring work

18 you performed?

19        MR. CULLEN:  Objection, your Honor.  Is there a

20 point to having a lay witness define a common term?

21        MR. KING:  This is his understanding of these terms,

22 your Honor, in the context of his experience and his work in

23 this industry.

24        THE COURT:  I agree.  I'll permit it.

25        THE WITNESS:  Can you repeat the question?

1  BY MR. KING:

2  Q    Sure.  In your experience in the context of the

3  restructuring work you've done, what's your definition or how

4  would you define negotiations?

5  A    Typically it would involve the initial proposal from the

6  party in a restructuring who wants to make changes to the

7  debt or other obligations it has, and then the creditors and

8  other stakeholders reviewing that proposal, coming back with

9  alternatives saying yes, no, or providing some other

10  alternative, and then there's a back and forth.  It's based

11  on a combination of, you know, information that's available

12  and business leverage and negotiations.

13  Q    In your professional experience, have you developed

14  proposals -- excuse me -- developed proposals addressing the

15  affordability of pension benefits?

16  A    Yes.

17  Q    And so that would be similar to the work that you did for

18  American, for example?

19  A    Yes.

20  Q    And in that same context, have you personally been

21  involved in negotiations regarding the treatment of pension

22  benefits?

23  A    In a Chapter 11, yes.

24  Q    So that's a good point.  Have you ever had an engagement

25  involving a Chapter 9 proceeding?

1  A   I have not.

2  Q   Your experience is limited to Chapter 11?

3  A   Yes.

4  Q   Now, by virtue of the fact that you're sitting here

5  today, at some point you have been engaged in some capacity

6  to participate in the bankruptcy proceeding or the Detroit

7  restructuring matter?

8  A   Correct.

9  Q   Can you explain for the Court how you became involved in

10  this matter?

11  A   Yes.  I was contacted this spring by an attorney, Bob

12  Gordon, one of your partners, to ask if we'd be interested in

13  pitching for the role of financial advisor to the Retirement

14  Systems in contemplation of a potential restructuring of

15  Detroit.

16  Q   And when you were initially contacted, what was your

17  understanding of the scope of that engagement?

18  A   Well, my understanding -- it was certainly from the press

19  clear there were issues financially in Detroit.  I was also

20  aware that they hadn't made some of the recent pension

21  payments that they were obligated to make, so, you know, it

22  was unclear exactly what the scope would be, but we expected

23  it would involve a fair amount of diligence on the city's

24  financial situation, and we expected there'd be negotiations

25  with the city over the treatment at least of the payments

1    that hadn't been made and maybe other items and also maybe

2    just advising the pensions' interest in the context of an

3    overall restructuring, including potentially a Chapter 9.

4    Q    But initially it was really to assist in what -- if I

5    understand it correctly, was it to assist in what the

6    Retirement Systems believed would be a restructuring

7    negotiation on a going forward basis?

8    A    Yes.

9    Q    And you're aware that at least conceptually a Chapter 9

10   had been discussed either in the media or elsewhere?

11   A    Yes.

12   Q    Was it your understanding that you -- that Greenhill was

13   retained specifically to advise the Retirement Systems with

14   respect to a Chapter 9 filing?

15   A    No.

16   Q    And what is your understanding of the scope of the

17   testimony that you've been asked to provide today?

18   A    My understanding is that I'm being asked to testify about

19   whether there were negotiations that took place between the

20   city and the Retirement Systems in advance of the Chapter 9

21   filing.

22   Q    And in your judgment, had any negotiation -- did any

23   negotiations take place between the city and the Retirement

24   Systems prior to the Chapter 9 filing?

25   A    No.

1    Q    You're familiar with the June 14, 2013, proposal for

2    creditors?

3    A    Yes.

4    Q    And you're aware that there was a meeting that was

5    conducted at the Detroit airport with respect to that

6    proposal?

7    A    Yes.

8    Q    And did you attend that meeting?

9    A    I did not.

10    Q    Have you subsequently come to an understanding of what

11    occurred at that meeting?

12    A    Yes.

13    Q    And what's your understanding?

14    A    My understanding is that Kevyn Orr and others took the

15    people who were there through a 120-page deck, and I'm not

16    sure exactly in what detail, but really starting to make the

17    case that the city was in serious financial issues and would

18    want to engage in restructuring discussions with the

19    creditors who were there.

20    Q    And the deck you're referring to is the document that's

21    titled "Proposal for Creditors"?

22    A    Correct.

23    Q    And have you personally reviewed that document?

24    A    I have.

25    Q    And have members of your team reviewed that document?

1  A   Yes.

2  Q   Is it possible to characterize how many hours you or your

3  team may have spent analyzing the materials that were

4  presented in that deck, as you described it?

5  A   I mean the deck itself I'm sure we've each spent at least

6  a few hours on it and then more diligence to the items behind

7  it.

8         MR. KING:  Can we look at Exhibit 43, page 109,

9  please?

10  BY MR. KING:

11  Q   And if I can turn your attention to the paragraph almost

12  at the bottom referring to claims for unfunded pension

13  liabilities.

14  A   Yes.

15  Q   See where I'm referring?

16  A   Yes.

17  Q   And you're familiar with that paragraph; correct?

18  A   I am.

19  Q   And would you consider this to be a proposal with respect

20  to the unfunded pension liabilities?

21  A   It may be a proposal for the unfunded liabilities, but I

22  didn't consider it a proposal in terms of how to treat the

23  pension plans overall.

24  Q   There's a note in there that discusses underfunding of

25  approximately $3.5 billion.

1    A    Yes.

2    Q    Do you know what -- do you know what that is referring

3    to?

4    A    Yes.   That's referring to the city's estimate of the

5    underfunded actuarial accrued liability for -- combined for

6    the two pension funds.

7    Q    And do you know how that number was derived?

8    A    I believe it was derived by Milliman running the math

9    based on assumptions that representatives of the city gave

10   it.

11   Q    And do you have an understanding of how the pension

12   liability is proposed to be treated as set forth in this

13   proposal or in this document?

14   A    Yes.

15   Q    And what's that understanding?

16   A    The understanding is that in this document it proposes

17   that underfunding would be treated ratably with the other

18   unsecured creditors, although, again, I think that's what it

19   says.   It's not entirely clear.   The other groups on that

20   page you see there's a bullet treatment, and it says what the

21   treatment is.   It doesn't say that here.   But I think this is

22   probably what it's trying to do.   And it would propose that

23   those groups share ratably in this note that is laid out in

24   the proposal here.

25   Q    Let me refer you back to the reference to the treatment

1  under the other bullet points.  Your testimony is that there

2  isn't, you know, a, quote, unquote, bullet point for

3  treatment under the unfunded pension liabilities; correct?

4  A   Correct.

5  Q   And I'm sorry.  What did you -- you thought there might

6  be some significance with respect to that omission?

7  A   No.  I just note that although this may be a proposal for

8  how to treat the underfunding, you know, it's not a hundred

9  percent clear, and I'm just noting that, for example, it

10  identifies treatment for all the other classes.  It doesn't

11  do so for the unfunded pension liabilities.

12  Q   And your testimony was that the unfunded pension

13  liability would be treated ratably.  Can you explain what

14  that means?

15  A   Yeah.  What it looks like, each line lists -- each

16  category on this page 109 lists out an aggregate estimated

17  claim amount for these different groups, and I believe this

18  proposal suggests that those claims would each get their pro

19  rata share of the new $2 billion note that is proposed in

20  this deck.

21  Q   And what's your understanding of the $2 billion note?

22  A   You know, I guess it's sort of the city's opening shot.

23  I mean I viewed it more as just a shot across the bow that

24  they're looking to negotiate, which is why there's a hundred

25  pages of information leading up to this.  The note itself I

1   thought was not really a serious proposal but may be a
2   placeholder.
3   Q   Why didn't you think it was serious?
4   A   You know, essentially, although it says it's a $2 billion
5   note, there's no maturity.  It's really promising to pay $30
6   million a year for 20 years, but they're calling it a $2
7   billion note, and I just -- I didn't view that as a serious
8   proposal.
9   Q   When you say there's no maturity, there's no obligation
10  for the city to pay?
11  A   Correct.
12  Q   And is there any income stream or security that would
13  guarantee payment of the note?
14  A   No.  It does provide for annual interest at one and a
15  half percent, and it has provisions for the note to collect
16  on extra revenue that gets collected from asset sales or fund
17  for blight removal, but there's no obligation for the city to
18  pursue any of that or, you know, any incentive for the city
19  to pursue any of that to pay the note.
20  Q   Did you take that as a serious proposal for the
21  creditors?
22  A   No.  I took it as the city sending -- putting the
23  creditors on notice that it wanted to begin the process of
24  having a discussion about a restructuring.
25  Q   And did you attend a June 20th, 2014 (sic), meeting with

1  the city and its financial advisors?

2  A   I did.

3  Q   And who -- I'm sorry.  Where was that meeting?

4  A   It was in the Coleman Young Building.

5  Q   And who attended that meeting?

6  A   There were two meetings that I attended that day, one in

7  the morning and one in the afternoon.  One of the meetings

8  was -- and the city was the host of both.  Representatives of

9  the city presented to the uniformed retirees in one and the

10  nonuniformed retirees in the other meeting, and it was meant

11  to, I believe, provide that group specifically more

12  information on the healthcare proposal that had been made and

13  to start to address, you know, their concerns the city had

14  about the pension funds as they currently existed.

15  Q   Did you attend both meetings?

16  A   I did.

17  Q   And were there any materials handed out at that meeting?

18  A   There were.

19       MR. KING:  Can we look at Exhibit 49, please?  And

20  we'll refer to page 21.

21  BY MR. KING:

22  Q   Mr. Robins, do you recall seeing page 21 of the materials

23  that were passed out at the June 20th meeting?

24  A   Yes.

25  Q   And what's your understanding of what's set forth in this

1  page?

2  A    What is set forth -- this page followed a number of pages

3  where the city kind of summarized some financial information

4  to explain -- start to really explain its view that it needed

5  to change the pension plans as they currently exist, and then

6  what it stated is it concluded -- or near concluded with this

7  saying that these are its objectives for restructuring in

8  this case of the PFRS pension fund.

9  Q    Would you characterize these objectives as a proposal?

10 A    No.

11 Q    And did you ever provide any feedback to the city or any

12 of its professionals with respect to these objectives?

13 A    The feedback really was, you know, when will the data

14 room be open so we can start to do the work and do the

15 information gathering we need to engage in a negotiation with

16 you.

17 Q    At the June 20th meeting, were there any negotiations

18 between the Retirement Systems and the city or its

19 professionals?

20 A    No.

21 Q    And there's been some prior testimony with respect to the

22 data room, but can you explain to the Court your

23 understanding of the data room and its function in the

24 capacity of the Detroit restructuring?

25 A    Sure.  It's an electronic data room where the city has

1    loaded onto, you know, a virtual data room, as they call it,

2    financial legal information about the city, its assets, its

3    historical finances, you know, the business plan going

4    forward and the back-up and build-up to that business plan.

5    Q    Is the use of a data room a fairly common practice in the

6    context of the restructuring engagements that you've been

7    involved in?

8    A    Yes.

9    Q    And what's the benefit or the value of populating a data

10   room with financial information?

11   A    Well, it lets a debtor or in this case the city provide

12   information to all of its creditors or the creditors it wants

13   to -- needs to negotiate with in a pretty efficient manner

14   and makes sure all the creditors are getting the same

15   information at the same time.

16   Q    Did you or anyone on your team -- let me back up.  When

17   did the Greenhill term first obtain access to the data room?

18   A    I believe it was June 21st.  I think it was just after

19   these meetings.

20   Q    And in the context of gaining access, Greenhill had to

21   execute certain nondisclosure agreements and confidentiality

22   agreements.  Is that accurate?

23   A    That is true.

24   Q    And have you or members of your team accessed the

25   information that's contained in the data room?

1   A   Yes.

2   Q   And when you accessed that information, did you come to

3   an understanding of whether or not the information that was

4   in the data room as of June 21st was complete?

5   A   Yes, I did.

6   Q   And what was that understanding?

7   A   It was not complete.

8   Q   And what did you find to be lacking?

9   A   Lots of information on values of assets, different

10  projections and build-ups, and it really is typical.  A data

11  room is loaded.  People start looking.  They ask questions.

12  That leads to more requests for additional information, and

13  that's a typical -- it's an iterative process, which is

14  typical, and that's what's happened here and is ongoing.

15  Q   In the data room, were there any proposals with respect

16  to pension benefits?

17  A   No.

18  Q   You described an iterative process that would involve

19  asking questions.  Did you or anyone on your team at

20  Greenhill subsequently ask the city or its professionals for

21  additional information following your review of the

22  information in the data room?

23  A   Yes.

24  Q   And which professionals particularly have you had contact

25  with?

1    A    At Greenhill or at --

2    Q    At the city.

3    A    At the city?  The diligence questions mostly go through

4    Miller Buckfire, the formal questions.  The request is that

5    formal lists be made and sent around.  A lot of the

6    conversations, though, also take place with Conway MacKenzie

7    and, in addition, professionals from Ernst & Young.

8    Q    Since June 21st, how often would you say that Greenhill

9    has requested information from the city or its professionals?

10   A    I would say formerly -- formerly -- sorry -- formally in

11   writing maybe a half dozen times, but there's a lot of, you

12   know, conversation that goes on pretty regularly as we try to

13   work through that.

14   Q    And by a conversation, I'm assuming that's your team

15   picks up the phone and contacts someone from, say, Miller

16   Buckfire, for example?

17   A    Correct; correct.

18   Q    And is that happening on a regular basis?

19   A    Yes.

20   Q    And for the most part, have the professionals of the city

21   been responsive to your requests?

22   A    They've been responsive.  I think they had struggled at

23   times to get information that we have asked them for, but

24   they have been responsive in acknowledging the receipts

25   and -- the receipt of our requests and trying to track it

1  down, I believe.

2  Q   When you say that they've been frustrated, what do you

3  mean by that?

4  A   I think some of the information that's been requested --

5         MR. CULLEN:  Objection, your Honor.  He's

6  characterizing somebody else's state of mind.

7         MR. KING:  I'm just asking the witness whether --

8  what his understanding was of the discussions that he's

9  having with the professionals from the city, your Honor.

10         THE COURT:  He can testify to what they said.

11         MR. KING:  That's fair.

12  BY MR. KING:

13  Q   What did they say, Mr. Robins?

14  A   They have at times expressed -- I won't say frustration,

15  but that they are having difficulty getting the information

16  that we've asked them for.

17  Q   Do you believe that prior to July 18th Greenhill was

18  furnished complete information to fully evaluate what was

19  laid out in the June 14 proposal to creditors?

20  A   No.

21  Q   Can you give a couple of examples of the type of

22  information that you requested but did not receive prior to

23  July 18th?

24  A   I mean a major category is the value of assets.  I mean,

25  you know, there's two main sources of recovery for creditors

1    here.  One is from cash flows, and one is from assets.  And

2    there's been very little information available on the value

3    of assets, for example.

4    Q    And did you attend diligence meetings on July 9th?

5    A    I did.

6    Q    And what were the nature of those meetings?

7    A    Those meetings were conducted primarily by Conway

8    MacKenzie and Ernst & Young, and it was to provide an

9    opportunity for creditors and creditors' advisors -- you

10   know, the audience was primarily the financial advisors for

11   some of the different creditor groups -- opportunity for them

12   to ask questions and engage in some discussion about how the

13   ten-year projections were constructed and put together.

14   Q    Where was that meeting conducted?

15   A    That was held -- I believe it's called Cadillac Plaza in

16   midtown here in Detroit.

17   Q    And were there any proposals set forth at that meeting?

18   A    No.

19   Q    Were there any negotiations that occurred at that

20   meeting?

21   A    No.

22   Q    Did you attend a meeting on July 10th with the city and

23   its advisors?

24   A    Yeah, several.  The diligence meeting of July 9th carried

25   over to July 10th, so that -- I was there till about one

1  o'clock, and then in the afternoon certain city advisors met

2  with I guess the representatives of the retirees again, one

3  meeting with the uniform, one nonuniform, but a smaller

4  group.

5  Q    And who was there on behalf of the city?

6  A    At which meeting?

7  Q    The smaller meetings that you're describing that occurred

8  on the afternoon of July 10th.

9  A    It was David Heiman and Evan Miller from Jones Day, Chuck

10 Moore from Conway MacKenzie, and I think Gaurav Malhotra from

11 E&Y was there as well.

12 Q    At any of the meetings that you attended on July 10th,

13 were there any proposals presented to you or your team?

14 A    There were no proposals for treatment of the pensions.

15 There was discussion about setting up a structure really to

16 diligence -- I thought of it as to continue the diligence on

17 pension issues.

18 Q    Were there any negotiations at any of those meetings?

19 A    No.

20 Q    Do you think that prior to July 18th that the city had

21 thought it presented a proposal to you to consider?

22 A    No.

23 Q    Why is that?

24 A    There were at least two occasions, meetings I was at,

25 where there was discussion specifically of OPEB and the

1   treatment of healthcare, and financial advisors to other

2   creditors asked the city advisors, "Have you made a proposal

3   as to pensions?" and the answer was no.

4   Q   Just a couple more questions.  Prior to July 18th, did

5   the city or any of its professionals ever present to you or

6   your team any scenario which did not contemplate the

7   impairment or diminishment of pension benefits?

8   A   No.

9   Q   Could they have done so?

10          MR. CULLEN:  Objection.  Foundation, your Honor.

11          THE COURT:  I'm not sure what the question means,

12  could they have done so.

13  BY MR. KING:

14  Q   Was there sufficient data prior to July 18th to come up

15  with a proposal that didn't contemplate impairment or

16  diminishment of pension benefits, in your judgment?

17  A   I hadn't seen it.  I don't know if they had it or not.

18  Q   In your experience, do you believe that the 35 days

19  between the June 14th meeting and the July 18th bankruptcy

20  filing was a reasonable period of time for your team to

21  evaluate data, perform the analysis that you deemed

22  appropriate, and come up with solutions or proposals for the

23  city's consideration?

24  A   No.

25  Q   And I assume the same answer is true for the 28-day

1  period that elapsed between the time Greenhill was provided

2  access to the data room on June 21st and the filing of the

3  bankruptcy on June 18th -- July 18th?  Excuse me.

4  A   That is correct.

5  Q   So last question and important question.  Throughout your

6  entire experience in the process of working with the city and

7  its advisors, were there ever any negotiations with respect

8  to pension benefits?

9  A   Ever or pre-petition?

10  Q   Pre-petition.

11  A   Pre-petition, no.

12          MR. KING:  Thank you.

13          THE COURT:  Thank you.  Other questions for the

14  witness?

15          MR. CULLEN:  If I may, your Honor --

16          THE COURT:  One second.  We have Ms. Levine who

17  wants to ask some questions.

18          MR. CULLEN:  Oh, I'm sorry.

19                     DIRECT EXAMINATION

20  BY MS. LEVINE:

21  Q   Sharon Levine, Lowenstein Sandler, for AFSCME.  Good

22  afternoon.

23  A   Hello.

24  Q   You just testified that you didn't think the month and

25  three or four days was sufficient time to negotiate a

1  proposal and come up with a consensual resolution; correct?

2  A   Correct.

3  Q   Do you believe it was -- one of the things the city seems

4  to be contending is that it was impractical and it couldn't

5  have been done no matter how much time you had.  Do you

6  believe, given a reasonable period of time, you could have

7  come up with a proposal or a solution or a consensual

8  arrangement with the city?

9  A   Yes.

10         MS. LEVINE:  Thank you.

11         MR. CULLEN:  Good afternoon, your Honor.

12                   CROSS-EXAMINATION

13  BY MR. CULLEN:

14  Q   Good afternoon, Mr. Robins.  I'm Thomas Cullen of Jones

15  Day representing the city.

16  A   Good afternoon.

17  Q   I believe we met briefly in one of those big rooms a

18  couple weeks ago.

19  A   I believe that's right.

20  Q   All right.  A few questions for you.

21         MR. CULLEN:  If I could have Exhibit 48, which is

22  one of the document -- which is the other document from the

23  June 20th meeting, the presentation with regard to the

24  nonuniform retirees.

25  BY MR. CULLEN:

1  Q   Do you see that, sir?  Do you see it in front of you?

2  A   I do, yeah.

3  Q   Remember this document?

4  A   Yes, I do.

5  Q   Okay.  And I'm going to direct you to -- my basic

6  question is going to be with respect to this document, was

7  the city presenting ideas for the restructuring that it

8  wanted a response from you on in this document?

9  A   Unclear.  I mean this document clearly presents a

10  proposal on healthcare.  When it comes to pensions, it talks

11  about objectives, and I think is this one possible ideas, so,

12  you know, again, I viewed this, I think I said before, as

13  part of the city wanting to kick off discussions, you know.

14  Our reaction was when is the data room open because we need

15  to start digging and understanding your position.

16  Q   So let's flip through it just quickly.

17  A   Sure.

18  Q   Let's look at page 8.  Eight.  Here we go.  That's what

19  you talked about in terms of objectives for retiree

20  healthcare restructuring; is that right?

21  A   No.

22  Q   That wasn't in the document?

23  A   That's not what I was referring to.

24  Q   Okay.  But it is part of the document that was presented

25  to you on this date; right?

1  A   It is, yes.

2  Q   Okay.  And it set forth some objectives for the city for

3  this process of restructuring, did it not?

4  A   It does.

5  Q   All right.  And did you discuss those objectives?

6  A   I did not.

7  Q   Okay.  And did you offer any ideas for different ways to

8  address those objectives?

9  A   No.

10 Q   Okay.  Let's look at the next page, page 9, for Medicare

11 eligible retirees, proposed design solution.  Do you see

12 that, sir?

13 A   I do.

14 Q   And was that discussed at this meeting?

15 A   It was discussed at the meeting, yes.

16 Q   And what was your part of that discussion?  What did you

17 say?

18 A   I listened.

19 Q   You didn't say anything?

20 A   I said nothing.

21 Q   Okay.  Did you understand the page?

22 A   Yes.

23 Q   Let's look at page 10 where it presents the rationale for

24 that structure.  Did you discuss with the city the rationale

25 for that structure as presented in that meeting?

1  A   I did not.

2  Q   Okay.  Let's look at page 11 where it says "proposed

3  design solution."  Was that presented at the meeting?

4  A   It was.

5  Q   Okay.  And what was your response -- did you discuss it?

6  A   No.

7  Q   You just listened?

8  A   Yes, I did.

9  Q   Okay.  And on page 12 where we talk about the rationale,

10 did you discuss the rationale or take issue on the rationale?

11 A   I did not.

12 Q   Did you understood -- you understood what was being

13 presented in those --

14 A   I did.  I understood a healthcare restructuring proposal

15 was being made.

16 Q   Okay.  All right.  So when we look at page 14 and --

17 well, it's 13 and 14 for both.  You understood that there was

18 a proposed design solution being suggested for healthcare.

19 A   Yes.

20 Q   And you understood that in the course of this meeting as

21 a whole, the city was conveying to you the message that it

22 wanted to work cooperatively with the creditors on these

23 issues; correct?

24 A   Yes.

25 Q   All right.  And by "work cooperatively on those issues,"

1    it wanted you to engage in discussion of these ideas so that

2    progress could be made; correct?

3    A    I don't know.  I'd be speculating.

4    Q    Was that your understanding?

5    A    Yes.

6    Q    Okay.  And as a matter of fact, on page 15 under the

7    heading "Key Message," that's exactly what the city was

8    telling you; correct?

9    A    Correct.

10   Q    Now, let's move on through the document to page 20, if we

11   could, please.  Twenty.  Once had a trial where in the middle

12   the whole system went down.  The woman running it nearly had

13   a heart attack, and there was mad copying going on in the

14   halls.  She nearly had to be sedated.  You see this, plan

15   freeze contributions, GRS --

16   A    I do.

17   Q    -- right?

18   A    Yes.

19   Q    And this was proposal of an idea with respect to -- and

20   the impact of an idea or scenario on pension benefits;

21   correct?

22   A    I'm not sure if it was a proposal of an idea or an

23   illustration of a scenario, but --

24   Q    It was one or the other?

25   A    I viewed it as an illustration of a scenario as they're

1  laying out their case.

2  Q   And, again, this is something you just listened, you had

3  nothing to say about.

4  A   Correct.

5  Q   All right.  And if you look on the next page where it

6  gets to possible GSR restructuring ideas -- no, no.  Let's go

7  to 22.  Possible GRS restructuring ideas.  You see that?

8  A   I do.

9  Q   Is that right?

10 A   Yep.

11 Q   And these were ideas that the city was putting forward --

12 A   That is right.

13 Q   -- restructuring the plan?

14 A   Correct.

15 Q   And we can agree that they're ideas and they're

16 discussable ideas?

17 A   Yes, we can.

18 Q   And from your field, you understand these ideas and how

19 you could discuss them; correct?

20 A   Correct.

21 Q   Because you had already had some exposure to the data

22 here because you had full access to the systems actuary,

23 Gabriel, Roeder; correct?

24 A   Correct.

25 Q   And so in order to get information about how the system

1  was actually being run and the actual liabilities of the

2  system, you had firsthand knowledge of that; correct?

3  A   Correct.

4  Q   And there were no restrictions placed upon your access to

5  Gabriel, Roeder?

6  A   No.

7  Q   Now, but again with respect to -- going back to 21 now

8  for just a second, in terms of the objectives for the GRS

9  restructuring, was there any discussion of those objectives?

10 A   I don't recall specifically.  I mean we were in a very

11 large conference room.  Questions were only accepted in

12 writing on note cards.  So I think, you know, it was really a

13 presentation by the city, so it was not a small back-and-

14 forth discussion.

15 Q   And, again, you just listened?

16 A   I did.

17 Q   And after the meeting, with respect to all of these

18 things that you just listened to --

19 A   Yes.

20 Q   -- at the meeting, with respect to the scenarios and the

21 ideas of the structures and the rationale --

22 A   Yep.

23 Q   -- presented at this meeting --

24 A   Yep.

25 Q   -- did you pick up the phone and say, "Explain this to me

1  better"?

2  A   I did not say that.  I said, "When will the data room be

3  open?" is what I said.

4  Q   Okay.  And even after the data room was open, as you

5  indicated, this would be an iterative process --

6  A   Absolutely.

7  Q   -- by which you mean that more production yields more

8  questions --

9  A   Yes.

10 Q   -- and so on and so on; correct?

11 A   Yes.

12 Q   All right.  And, again, page 23 here, work cooperatively

13 to equitably restructure GRS pensions consistent with the

14 city's severe financial limitations, do you see that?

15 A   Yes.

16 Q   Did you understand again here consistent with your

17 understanding of what was being attempted by the city on June

18 14th that the city was trying to coax a response or ideas out

19 of you; correct?

20 A   Not clear to me at all really since, again, the data room

21 wasn't even open.  I viewed this as an opening salvo where we

22 don't want to work with you, but the first step of that is

23 getting the data room open, so --

24 Q   Do you have your deposition there available?  Do you have

25 your deposition available?

1  A   No.

2  Q   Please.

3          MR. CULLEN:  May I approach, your Honor?

4          THE COURT:  Yes.

5  BY MR. CULLEN:

6  Q   And if you look at page 46, items -- lines 2 through 6,

7  where you were asked, "What did you understand the city's

8  request for cooperation to mean?" and the answer was, "Well,

9  I understood that they were looking to have negotiations at

10  some point over the OPEB and the pension obligations."

11          MR. KING:  Your Honor, objection.  To the extent --

12  to the best of my knowledge, all we have is a rough draft,

13  uncertified copy of the deposition transcript today.  As long

14  as the witness doesn't mind answering or can answer the

15  questions, I don't have a problem with proceeding.  I just

16  want to, you know, bring that to the Court's attention

17  because I know the Court is sensitive to having the official

18  record available.

19          THE COURT:  Thank you, sir.

20          MR. CULLEN:  Is it all right if I proceed, your

21  Honor?

22          THE COURT:  Yes.

23          MR. CULLEN:  All right.

24  BY MR. CULLEN:

25  Q   Would you agree that the Jones Day's generally --

1  attorneys in this meeting generally took an approach that,

2  look, we think there is this problem, here's some possible

3  ideas that we thought of, but we're going to want to get you

4  to see or work cooperatively to equitably restructure these

5  pensions consistent with the city's severe financial

6  limitations?  Do you agree with that, sir?

7  A    I'm sorry.  Were you just reading from the --

8  Q    If you take a look at 46, 7 through 17.

9  A    46, 7 -- yeah.  You're reading my answer there?

10 Q    Yes.

11 A    Yeah, I do agree with that.

12 Q    Okay.  All right.  Now, as of this time and at no time in

13 terms of the ideas that the city was coming up with and

14 bouncing off you in this meeting, did you ever have any

15 substantive response to any of these ideas?

16 A    No, other than we really need to dig in to do the work on

17 the diligence.

18 Q    Okay.  All right.  Now, let's -- in terms of your

19 relationship with your client throughout this period, did you

20 ever have authority to negotiate any diminution or impairment

21 of vested pension rights?

22 A    No.  I mean there was no specific proposal that I took

23 back to them, so there's no reason they would have given me

24 that.

25 Q    Did you take these ideas back to them, the ideas we've

1  talked about in the January 20th proposal?

2  A   Yes.  We told them about the meeting, and some of the

3  trustees were there, so they were aware of those ideas.

4  Q   And did you ask for authority to discuss any of these

5  ideas?

6  A   No.

7  Q   Did they ever give you authority to discuss any of these

8  ideas?

9  A   No.

10  Q   These, I take it, are all ideas in which you have

11  competence, training, and the expertise to address and

12  discuss; correct?

13  A   With sufficient information, yes.

14  Q   Okay.  And it's true, is it not, that with respect to

15  vested pension benefits, it was your understanding that there

16  would be no retreat or compromise beyond a hundred cents on

17  the dollar unless and until there was no alternative

18  whatsoever?  Is that true, sir?

19  A   I know it would be our starting point that the vested

20  benefits should be unaffected for sure.

21  Q   Did you ever indicate any willingness to move beyond that

22  starting point?

23  A   Probably not.

24  Q   And did you, in fact, indicate affirmatively that you had

25  no authority nor any intention of moving beyond that starting

1  point?

2  A    I don't believe so.

3  Q    Okay.  Did members of your client in meetings before the

4  date of filing indicate that position either to you or to

5  representatives of the city?

6  A    I don't know.

7  Q    If I'll take you forward to the meeting on -- the small

8  group meeting on July the 10th, I believe it was --

9  A    Yes.

10  Q    -- with representatives of Jones Day --

11  A    Yes.

12  Q    -- and I believe at that meeting the Jones Day lawyers

13  were trying to set up a process to deal with your diligence

14  problem, correct, among other things?

15  A    Yes.

16  Q    And they were trying to set up a four-step process;

17  correct?

18  A    Yes.

19  Q    Do you remember the four steps?

20  A    I believe so.

21  Q    Do you?

22  A    I believe I do, yes.

23  Q    Could you tell us?

24  A    I will try.

25  Q    Okay.

1   A    The proposed four steps were to first have the actuaries

2   spend time together to see if they could agree on what the

3   underfunded liability is.  The second step was to have the

4   financial advisors spend time working with each other to see

5   if they could agree on how much cash was available to fund

6   pension funds.  The third step would be, in light of the

7   results of the diligence on those first two, to see if

8   parties could agree on whether or not any changes needed to

9   be made to the pensions.  And the last step would be if

10  changes were required, what mechanisms could be put in place

11  to restore benefits if things turned out better later on.  I

12  believe that is what they proposed.

13  Q    And at that meeting, there was at least discussion in

14  which you participated of the merits of that four-step

15  process; correct?

16  A    Correct.

17  Q    And you took the viewpoint that deciding what was

18  available in terms of assets or funding should precede

19  looking at the amount of the underfunding; correct?

20  A    Correct.

21  Q    And you and representatives of the city argued the merits

22  of the two different positions; correct?

23  A    Correct.

24  Q    And you didn't come to a conclusion at that meeting?

25  A    That is correct.

1  Q   Okay.  Was it in your view that whether step one came

2  first or step two came first, was that a deal breaker for you

3  or your client?

4  A   No.

5  Q   All right.  But, nonetheless, you had to go back to your

6  client to get authority even for that; correct?

7  A   Correct.

8  Q   And the authority you were going to get from your client

9  was in a meeting some eight days later?

10  A   About --

11  Q   Was to be --

12  A   Yes.

13  Q   -- in a meeting some eight days later?

14  A   Yes.

15  Q   Okay.  And sometime during that eight-day period, were

16  you feeling any sense of urgency about these negotiations at

17  this time?

18  A   No.

19  Q   Okay.  And during this eight-day period, your client

20  decided to file a suit against the city, the state, the

21  governor, and the financial manager; correct?

22  A   I believe that's right, but --

23  Q   Yeah.  When did you know that they were going to file a

24  suit with the stated objective in the suit filed July 17th

25  that neither the governor nor the emergency manager either

1    inside or outside bankruptcy had any authority to impair any

2    vested pension rights?  That was the point of the suit, as

3    you recall it; right?

4    A    I believe that's correct, yeah.

5    Q    All right.  When did you know that they were preparing

6    that suit?

7    A    I don't know.

8    Q    Was it before or after July the 10th?

9    A    I believe it was after, but I'm not sure of that.

10   Q    All right.  Were you working out of the same offices as

11   Clark Hill at some times during this engagement?

12   A    At some times, yes.

13   Q    Yeah.  Did you ever become aware that they were preparing

14   for this litigation while you were in their offices?

15   A    No.

16   Q    Did you ever discuss it with the lawyers for Clark Hill?

17   A    After it was filed I think I did.

18   Q    All right.  So with respect to this lawsuit, was it your

19   understanding that by virtue of either negotiations or to the

20   law -- or through the lawsuit, that the -- that your client,

21   the Retirement Systems, would exhaust every legal remedy

22   before they would negotiate any diminution in vested pension

23   rights?  Was that your understanding?

24   A    No.

25   Q    All right.  Tell me what you have that's inconsistent

1  with that understanding.  What authority did you have pre-

2  petition to address those issues, even to address ideas?

3  A   Again, I don't know that I had any specific authorities.

4  I didn't request it.  The advice to my client was we need a

5  lot more information before we're ready to engage on this.

6  Q   Well, let's just take a for instance.  This is a defined

7  benefit -- the current plan is a defined benefit plan, is it

8  not?

9  A   It is.

10  Q   And the city was proposing a defined contribution plan,

11  was it not?

12  A   Correct.

13  Q   Were you ever asked to your -- by your client or did you

14  suggest to your client that you could address a hybrid plan

15  which maintained elements of both?  Does that make sense to

16  you as a concept, sir?

17  A   It does, yes.

18  Q   Okay.  Within the range of your gifts and expertise to

19  put together such a plan; correct?

20  A   With some help from the actuaries, yes.

21  Q   All right.  And it was also within the range of your

22  expertise to address the fourth point on the four-point

23  program, which would be how to get back some of the lost

24  pension funding that might have been lost in the early years

25  of the reinvestment; correct?

1  A   Correct.

2  Q   All right.  And prior to the petition date, did you ever

3  address that in detail?  Did you ever propose anything?

4  A   Look, as I told you, where I wanted to start is

5  affordability.  All right.  So the primary issue for us was

6  getting together with the city, understanding the business

7  plan, and seeing whether we agreed with their view they could

8  afford it or not.  We were nowhere on that, so the rest of

9  this you're just -- you're getting ahead of yourselves.

10 Q   Okay.  Ms. Levine asked you how long you thought a proper

11 negotiation process would take for this set of obligations

12 for the city.  Do you remember that question?

13 A   I don't think that's what she asked, but --

14 Q   Well, I'll ask you.  How long do you think it would take?

15 A   It's really a function of a lot of things, including

16 information availability, so I don't know.  I don't know.

17 Q   Did you ever make a representation to the city that if I

18 get "X" information, that I can -- we can clear this up in

19 some finite amount of time?

20 A   No.

21 Q   So you at no point offered the city any finite

22 negotiation path; correct?

23 A   That's correct.

24 Q   All right.

25         MR. CULLEN:  That's all I have, your Honor.

1      THE COURT:  Any other questions for the witness?

2      MR. KING:  Just a couple, your Honor.

3      THE COURT:  Go ahead, sir.

4                   REDIRECT EXAMINATION

5  BY MR. KING:

6  Q   Mr. Robins, in your engagement with the Retirement

7  Systems, have you been asked to take a direct role in

8  evaluating healthcare benefits for retirees?

9  A   No.

10      MR. CULLEN:  I was just going to direct him to pre-

11  petition, so -- but if it's no, it's no.

12      THE WITNESS:  No.

13  BY MR. KING:

14  Q   You're not -- you haven't been asked to evaluate OPEB at

15  all with respect to retiree benefits?

16  A   Correct.

17      THE COURT:  The questions were focusing on pre-

18  petition, please.

19      MR. KING:  Pre-petition.

20      THE WITNESS:  Understand.

21  BY MR. KING:

22  Q   And your testimony was that you believe Greenhill first

23  had access to the data room on June 21st?

24  A   Correct.

25  Q   And at any time prior to the filing of the petition, did

1    you feel you had sufficient information to make any

2    meaningful proposal to your client?

3    A    No.

4    Q    And on the July 10th meeting you just testified regarding

5    the four-step process, do you recall that testimony?

6    A    Yes.

7    Q    As of July 10th, did you believe that you had sufficient

8    data or information to meaningfully respond to that four-step

9    process?

10   A    Well, I viewed the process -- and I think the question

11   from Jones Day characterized it this way, I agree -- as a

12   process really to address the diligence issues around -- the

13   diligence issues around pension issues.

14   Q    At that July 10th meeting, did you have or gain an

15   understanding of what the city's position was relative to the

16   treatment of pension benefits going forward?

17   A    Not specifically, no.

18   Q    Did you understand their position to be that in all

19   circumstances there had to be an impairment or diminishment

20   of those pension benefits, at least as presented as of July

21   10th?

22   A    Well, I think they made it clear that they needed some

23   sorts of changes, and, you know, consistent with the

24   materials from June 20th, they had some different ideas they

25   had in mind, but they didn't have a specific proposal.

1  Q   Can you engage in meaningful negotiations in a

2  restructuring setting without an overall asset picture of the

3  restructuring entity, the City of Detroit in this case?

4  A   Not very effectively, no.

5  Q   At any time prior to the pension systems filing its

6  lawsuit on July 17th, did anyone from the pension systems

7  ever tell Greenhill to cease and desist discussions, phone

8  calls, e-mails, with the city or any of the city's

9  representatives?

10  A   No.

11          MR. KING:  Nothing further, your Honor.

12          THE COURT:  Any further questions?

13          MR. CULLEN:  No redirect, your Honor.

14          THE COURT:  Thank you, sir.  You may step down, and

15  you are excused.

16          THE WITNESS:  Thank you.

17          MS. LEVINE:  Your Honor, sorry.

18          THE COURT:  I'm sorry.

19          MS. LEVINE:  Just a couple.

20          THE COURT:  Oh, I'm sorry.  Yes.  You're not

21  excused.

22                    REDIRECT EXAMINATION

23  BY MS. LEVINE:

24  Q   Just going back to the colloquy with regard to what was a

25  reasonable period of time --

1   A   Yes.

2   Q   -- in the American Airlines case, for example, that was a

3   complex pension issue; correct?

4   A   Yes.

5   Q   And at the time that the company filed, the debtor's

6   position was that the pensions were going to be terminated;

7   correct?

8   A   Correct.

9   Q   And within the time period -- it took, in fact, less than

10  the time period it took for that company to run through its

11  1113 process, you had -- the PBGC already negotiated and

12  resolved and entered into a settlement agreement to resolve

13  the pension issues; is that correct?

14  A   I believe that is correct, yep.

15  Q   Okay.  Going back to United Airlines, Greenhill was also

16  a financial advisor in that case as well; correct?

17  A   Correct.

18  Q   And the pension issues were resolved also within a

19  relatively -- one-, two-, maybe three-month period of time;

20  correct?

21  A   I honestly don't recall the timing on that, Sharon.

22  Sorry.

23  Q   All right.  Thank you.

24  A   Okay.

25          THE COURT:  All right, sir.  You are excused.  Thank

1  you.

2         THE WITNESS:  Thank you.

3       (Witness excused at 2:34 p.m.)

4         MS. PATEK:  Good afternoon, your Honor.  Barbara

5  Patek on behalf of the public safety unions, and at this time

6  the public safety unions call Mary Ellen Gurewitz.  And can I

7  just check to make sure our exhibit book is up here?

8         THE COURT:  Yes.

9             MARY ELLEN GUREWITZ, WITNESS, SWORN

10        THE COURT:  Please sit down over there.

11        MS. PATEK:  Your Honor, if I might approach again,

12  it doesn't look like the book --

13        THE COURT:  Yes.

14                    DIRECT EXAMINATION

15  BY MS. PATEK:

16  Q   Good afternoon.  Can you state your name, please?

17  A   Mary Ellen Gurewitz.

18  Q   And can you briefly tell the Court what it is you do for

19  a living?

20  A   I'm sorry.  What?

21  Q   What it is you do for a living.

22  A   Oh, I'm an attorney with Sachs Waldman.

23  Q   And what kind of law do you practice?

24  A   Union side labor law and political and election law.

25  Q   And how long have you been an attorney?

1   A   Since 1974.

2   Q   Can you give us a very brief overview of your education

3   and professional background?

4   A   I graduated from the University of Michigan in 1965 and

5   from Wayne Law School in 1974.  I then clerked for Judge

6   James Churchill in the Eastern District of Michigan, and then

7   from 1975 through 1979 I was an attorney with the National

8   Labor Relations Board.  And then I joined the law firm that

9   I'm with now.

10  Q   And in that capacity, do you represent the Detroit Police

11  Command Officers Association?

12  A   Yes, I do.

13  Q   And what is the Detroit Police Command Officers

14  Association?

15  A   It's a bargaining unit consisting of the commanders and

16  captains in the Detroit Police Department.

17  Q   And for how long have you represented the Detroit Police

18  Command Officers --

19  A   My office has represented them since about 1995, and I

20  have been their principal attorney since, I believe, 2003.

21  Q   And what kind of matters do you handle for the DPCOA?

22  A   The whole gamut of representation of a labor union, and

23  that has included grievance arbitration, negotiation.  I did

24  an Act 312 for the DPCOA, so whatever arises where they need

25  representation.

1   Q   I want to talk for a moment about Act 312. What are Act

2   312 proceedings?

3   A   Act 312 is the statute called compulsory arbitration for

4   police and fire disputes, compulsory labor arbitration, so it

5   is a supplement to the Public Employment Relations Act. And

6   when parties are unable to resolve their contract to reach

7   agreement on a collective bargaining agreement, they can

8   submit the dispute for compulsory arbitration. It is

9   available only to police and fire.

10   Q   And to your understanding, is there a reason for that?

11   A   Because of the importance of public safety and because

12   they have no right to strike, it is a way to resolve their

13   disputes.

14   Q   And how are Act 312 proceedings triggered?

15   A   They are triggered when either the employer or the union

16   files a request for Act 312 with the Michigan Employment

17   Relations Commission.

18   Q   And is there a state agency that oversees Act 312

19   proceedings?

20   A   Right. It is the Michigan Employment Relations

21   Commission. We call it MERC.

22   Q   Ms. Gurewitz, I'd like you to take a look at in the

23   exhibit book that I handed you at the start of your testimony

24   Exhibit 718 and 719. We'll start with 718.

25   A   All right.

1  Q    Okay.  Can you identify for the record what 718 is,

2  please?

3  A    Yeah.  718 is a MERC decision which issued in June of

4  this year.  Do you want to know the substance of it?

5  Q    Not yet.  Are MERC opinions such as Exhibit 718 public

6  records?

7  A    Yes, they are.

8  Q    And are they matters on which the Michigan Employment

9  Relations Commission has a legal duty to report?

10  A    Yes.

11  Q    And as far as you know, are they maintained as public

12  records by the State of Michigan and by the Michigan

13  Employment Relations Commission?

14  A    Yes, they are.

15  Q    And are they available to anyone who wants to access them

16  on the state website?

17  A    Yes, they are.

18          MS. PATEK:  Your Honor, at this time I would move

19  for the admission of Exhibit 718.

20          MS. KOVSKY-APAP:  Your Honor, we object on the

21  grounds of relevance and hearsay.

22          THE COURT:  The objections are overruled.  The

23  document is admitted.  What was the number again, please?

24          MS. PATEK:  718.

25          (Exhibit 718 received at 2:40 p.m.)

1   BY MS. PATEK:

2   Q   And, Ms. Gurewitz, if you could take a look at Exhibit

3   719.

4   A   Yes.

5   Q   Is that also a MERC opinion?

6   A   Yes, it is.

7   Q   And if I were to ask you the same series of questions

8   about its status as a public record, would your answers be

9   the same?

10  A   Yes.

11        MS. PATEK:  Your Honor, at this time we'd move for

12  the admission of Exhibit 719.

13        MS. KOVSKY-APAP:  Your Honor, the same objections.

14        THE COURT:  All right.  The objections are

15  overruled.  Exhibit 719 is admitted.

16      (Exhibit 719 received at 2:41 p.m.)

17  BY MS. PATEK:

18  Q   I want to ask you some general questions regarding your

19  knowledge and understanding with respect to issues related to

20  the DPCOA that they've had during the time you've been

21  representing them.  First of all, have you represented the

22  DPCOA with regard to negotiations related to pension and

23  healthcare?

24  A   Pension and healthcare are always subjects for collective

25  bargaining, so in negotiations we have certainly addressed

1  those issues.

2  Q    And as a result of your representation of the DPCOA in

3  that capacity, do you know whether or not through their

4  employment with the city DPCOA members are entitled to Social

5  Security?

6  A    They are not.

7  Q    And do you know whether or not they are entitled to

8  Medicare?

9  A    People became entitled to Medicare or it became mandatory

10  for contributions to be made for Medicare in 1986, so anyone

11  hired before 1986 is not Medicare eligible.

12  Q    And what impact does that have on DPCOA members upon

13  their retirement?

14  A    Well, they are -- assuming that they were hired before

15  1986, they are not eligible at the time they retire and they

16  will never be eligible for Medicare, and Social Security is

17  also unavailable to them, so their entire retirement income

18  comes from the pension system.

19  Q    And in the event that a DPCOA member suffers a either

20  duty- or nonduty-related disability, can you tell the Court

21  whether or not such individuals are eligible for Social

22  Security Disability?

23  A    They are not.

24  Q    And do you have an understanding as to the basis on

25  which -- well, strike that.  Do you know whether or not the

1   same rules with regard to Social Security and Medicare apply

2   to the other Detroit public safety unions; that is, the fire

3   fighters, the Police Officers Association, and the Police

4   Lieutenants and Sergeants Association?

5   A   Yes.  Exclusion from Social Security is for police and

6   fire employees.

7   Q   Do you have an understanding as to the rationale for

8   excluding police and fire from Social Security?

9   A   I think early on Social Security did not -- was not

10  available or did not cover employees of state and municipal

11  governments at all, and then gradually there were amendments

12  to the statute so that more people were brought under its

13  coverage.  It is -- there are certainly statements in the

14  legislative history and in the legislation itself that says

15  that the exclusion from Social Security is based upon the

16  fact -- or occurs only -- can only occur when the employees

17  are covered by a public retirement system which meets certain

18  standards established by the IRS.

19          MS. KOVSKY-APAP:  Your Honor, we object to this

20  testimony.  The witness is giving legal opinions.  She was

21  not called as an expert witness, and to the extent she's able

22  to give facts testimony, this isn't within her personal

23  knowledge.  She's reciting the law.

24          THE COURT:  No.  The Court will permit it, but, Ms.

25  Kovsky, I caution you that if you object to testimony, it's

1  better to do it before.

2  BY MS. PATEK:

3  Q   Moving on, Ms. Gurewitz, do you recall the last Act 312

4  proceeding in which you were involved on behalf of the DPCOA?

5  A   Yes.  We had hearings in 2009, and we got an Act 312

6  award in January 2010.

7  Q   And can you tell the Court when the last collective

8  bargaining agreement with the City of Detroit applicable to

9  the DPCOA expired?

10  A   It actually expired in June 2009 so that the Act 312

11  award that we got had already expired by the time that we got

12  it, so it was for a period from 2005 through 2009.

13        MS. PATEK:  Your Honor, at this time, I'd like to

14  bring up Exhibit 717, which previously was identified by Mr.

15  Malhotra has an agreement that was negotiated between the

16  city and the DPCOA back in 2011, 2012.  He identified the

17  city's signature on the agreement.  And I'd like to move for

18  its admission.

19        MS. KOVSKY-APAP:  Your Honor, we object on hearsay

20  and relevance.

21        THE COURT:  One second, please.  Oh, can you put it

22  back on the screen for me, sir?  Thank you.    The objection

23  is overruled.  The document 717 is admitted.

24     (Exhibit 717 received at 2:46 p.m.)

25  BY MS. PATEK:

1  Q   Ms. Gurewitz, are you familiar with Exhibit 717?

2           THE COURT:  Give me one second before you proceed.

3  Ms. Gurewitz, could you do us a favor and sit back a couple

4  of inches from the microphone?  There you go.  Thank you.

5  Now you may proceed.

6  BY MS. PATEK:

7  Q   Ms. Gurewitz, do you recognize Exhibit 717?

8  A   Yes, I do.

9  Q   And what is that?

10 A   It is a tentative agreement that was reached between the

11 DPCOA and the City of Detroit in about -- well, it's signed

12 February 2012.

13 Q   Do you know whether Exhibit 717 included -- was a

14 concessionary agreement?

15 A   Yes, it was.

16 Q   And do you know whether those concessions included

17 changes to pension?

18 A   You know, quite frankly, I'm not sure.

19 Q   Do you know whether Exhibit 717, while ratified by both

20 parties, was ever implemented?

21 A   It was not.

22 Q   And why is that?

23 A   It was rejected, as I understood it, by the State of

24 Michigan.

25 Q   And in that regard, between the negotiation of this

1    concessionary agreement and the appointment of the emergency

2    manager on March 25th, 2013, did the DPCOA make any further

3    effort to engage the city in collective bargaining?

4    A    We did.  After the rejection of the tentative agreement,

5    we periodically sought to further negotiate an agreement

6    because we had not had one for such a long time.  In July

7    2012 the city imposed new terms and conditions of employment.

8    It was called the CET.

9    Q    The city employment terms?

10   A    Yes.

11   Q    And as part of those city employment terms, was the

12   DPCOA -- was one of the things that was eliminated was their

13   right to just cause on termination?

14   A    That's correct.

15   Q    And that was under Public Act 4, is that correct, former

16   Public Act 4 that the CET --

17   A    Public Act 4 was in effect, and the CET was imposed.  The

18   city had no -- took the position that it had no obligation to

19   bargain and that it could impose terms without negotiation.

20   Q    And did there come a time when Public Act 4 was

21   subsequently suspended?

22   A    It was suspended in August of 2012.

23   Q    And at the time of its suspension, did you or the DPCOA

24   make any further effort to engage the city in negotiations

25   with regard to terms and conditions of employment for the

1   DPCOA members?

2   A   We did.  The city, prior to the imposition of the CET,

3   had actually itself initiated 312 proceedings, so when PA 4

4   was suspended, we tried to resuscitate those proceedings.

5   The city withdrew its request, and we then filed our own

6   request for Act 312.

7   Q   And did the process for Act 312 begin at that point in

8   time?

9   A   It did, and MERC appointed an arbitrator.

10  Q   And can you tell us just very briefly what happened in

11  those proceedings?

12  A   We had a number of hearing days scheduled in March of

13  2013, and prior to those hearings, the city approached us to

14  negotiate.  It was really the first time that they had

15  negotiated with us in several years.  And we had some fairly

16  productive negotiations in March of 2013, and, in fact, we

17  did postpone the hearings that had been scheduled.  We were

18  not able to reach an agreement, a complete agreement, and

19  then the emergency manager was appointed.

20  Q   And what happened once the emergency manager was

21  appointed?

22  A   Then our negotiations ceased.

23  Q   And did the city take any action in regard to ensure that

24  there were no further negotiations?

25  A   Yeah.  The city filed a motion to dismiss the Act 312

1 proceedings that the DPOA had -- excuse me -- the DPCOA had

2 pending, and there were also -- there were motions that were

3 heard by MERC to dismiss both the DPCOA Act 312, an Act 312

4 that was pending for the Detroit Police Lieutenants and

5 Sergeants Association, and an Act 312 that was pending for

6 the Police Officers Association of Michigan, which

7 represented the emergency services.

8 Q    And was the result of that motion by the city the opinion

9 that we previously identified as Exhibit 718?

10 A    Yes, it is.

11 Q    And that opinion was issued on June 14th, 2013?

12 A    Yes, it did.

13 Q    You were not involved in the meetings between the DPCOA

14 and the city that began with the meeting of creditors at the

15 airport on June 14th, 2013; is that correct?

16 A    I was not.

17 Q    And were you involved in any of the subsequent meetings

18 with the city that took place on -- the record has

19 established June 20th, July 11th, and July 10th of 2013?

20 A    No, not prior to the bankruptcy.

21 Q    Did you become involved at some point prior to the

22 bankruptcy in advising the DPCOA with regard to the issues

23 that were facing it as to the City of Detroit?

24 A    Right.  I recommended to the DCPOA and helped organize a

25 coalition of the Detroit public safety unions -- that would

1  be the lieutenant and sergeants and the commanders and the

2  DPOA and the fire fighters -- to retain bankruptcy counsel.

3          MS. PATEK:  I don't have anything further, your

4  Honor.

5          THE COURT:  Thank you.

6          MS. KOVSKY-APAP:  Deborah Kovsky-Apap on behalf of

7  the city.

8                        CROSS-EXAMINATION

9  BY MS. KOVSKY-APAP:

10 Q    Ms. Gurewitz, it's nice to see you again.  We met at your

11 deposition.  The DPCOA does not represent current retirees;

12 is that correct?

13 A    That's correct.

14 Q    So the DPCOA would not be empowered to negotiate on

15 behalf of current retirees; correct?

16 A    That is correct.

17 Q    And the DPCOA would not be authorized to enter into

18 binding agreements on behalf of current retirees; correct?

19 A    Correct.

20         MS. KOVSKY-APAP:  Thank you.  I have no further

21 questions.

22         THE COURT:  Any further questions of the witness?

23         MS. PATEK:  One question.

24         THE COURT:  Yes.

25                      REDIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Why is it that the DPCOA cannot bargain on behalf of

3  current retirees?

4  A   The statute provides that a union is authorized to

5  represent employees for purposes of negotiating over wages,

6  hours, and terms and conditions of employment, and retirees

7  are not employees.

8            MS. PATEK:  Thank you.

9            THE COURT:  All right.  You may step down.  You're

10 excused.  Thank you very much.

11    (Witness excused at 2:53 p.m.)

12            MS. PATEK:  Your Honor, at this time, the Detroit

13 public safety unions call Mark Diaz.

14                  MARK DIAZ, WITNESS, SWORN

15            THE COURT:  All right.  Please sit down.  Before we

16 proceed with questioning the witness, may I ask how many more

17 witnesses?

18            MS. PATEK:  I think this is it, your Honor.  I don't

19 want to speak out of turn, but I'm pretty --

20            THE COURT:  Anyone else have any other witnesses?

21 Any rebuttals for the city that you foresee?

22            MR. SHUMAKER:  No, your Honor.

23            THE COURT:  Or the state for that matter?  All

24 right.

25                  DIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Sir, can you state your name for the record?

3  A   Mark Diaz.

4  Q   By whom are you employed?

5  A   The Detroit Police Department.

6  Q   And are you employed by anybody else?

7  A   Yes, I am.

8  Q   And who is that?

9  A   I am employed by the Detroit Police Officers Association

10  as well as the Township of Holly.

11  Q   And with respect to the Township of Holly, what do you do

12  there?

13  A   I'm a planning commissioner.

14  Q   And with respect to -- well, first of all, what is the

15  Detroit Police Officers Association?

16  A   It's the collective bargaining unit that represents the

17  police officers of the Detroit Police Department.

18  Q   How long have you been employed by the DPOA?

19  A   I've been employed by the DPOA since January 1st of 2013.

20  Q   And how was it that you became employed by the DPOA on

21  January 1st of 2013?

22  A   I was elected by the members of the Detroit Police

23  Officers Association.

24  Q   To what office?

25  A   To the position as president.

1  Q  And how long have you been employed by the Detroit Police

2  Department?

3  A  Just under 20 years, since March 21st of 1994.

4  Q  Can you tell me a little bit just briefly about your work

5  historically with the Detroit Police Department?

6  A  As a new police officer, I worked various positions,

7  including patrol.  I worked undercover operations.  I worked

8  in community relations.  I worked in special operations,

9  which essentially is the booster crew going after -- my main

10  role was to investigate part one crimes and -- which is

11  essentially major felonies, as well as apprehending suspects

12  associated with those crimes.  I've also been an instructor

13  at the Detroit Police Academy for -- since -- well, for seven

14  years.

15  Q  And what do you teach, or what have you taught at the

16  Detroit Police Academy?

17  A  As an instructor at the Academy, I have taught the state

18  computer systems.  I was an administrator for that.  I taught

19  first-aid, CPR, AED.  I taught officers to operate and use

20  the department motorcycles as well as I taught cultural

21  diversity and advanced police ethics.

22  Q  And tell us a little bit about your educational

23  background.

24  A  Well, out of high school I began attending Schoolcraft

25  College until I was hired by the Detroit Police Department

1  shortly thereafter.  Since then I've attended Oakland

2  Community College, Wayne County Community College, and I've

3  been enrolled studying accounting with the University of

4  Phoenix for the last two years.

5  Q   And in addition to that course -- well, first, let me ask

6  you this.  Do you have any affiliation besides the fact that

7  you're a beneficiary with the Police and Fire Retirement

8  System of the City of Detroit?

9  A    Yes.  I'm an elected trustee on the Police and Fire

10  Retirement System board.

11  Q   And how long have you held that position?

12  A   Since July 1st of 2011.

13  Q   And have you taken any kind of continuing education in

14  that capacity?

15  A   Yes, I have.

16  Q   And can you tell us what that was?

17  A   It ranges but specifically executive portfolio

18  management.  I've taken that course at the Wharton University

19  twice.

20  Q   And what is executive portfolio management?

21  A   Essentially, it gives the -- it's a very rigorous course

22  that gives a trustee a basic foundation of the fundamentals

23  of running a pension system and the -- again, a basic

24  foundation for the various investments.

25  Q   You are not a finance expert, are you?

1  A   By no stretch, no, I'm not.

2  Q   And you are also not an actuary?

3  A   No, I'm not.

4  Q   As a member of the Detroit -- well, as a member of the

5  Detroit Police Department, does the city contribute to Social

6  Security on your behalf?

7  A   No.

8  Q   If you become disabled, are you entitled to receive

9  Social Security Disability?

10  A   No.

11  Q   And is -- do you have an understanding as to whether or

12  not your members are entitled to receive Social Security

13  Disability?

14  A   Not through the Detroit Police Department they are not.

15  Q   And can you tell the Court how the issue of disability is

16  addressed for DPOA members?

17  A   With respect to officers who are injured in the line of

18  duty?

19  Q   Yes.

20  A   Well, officers who are injured in the line of duty

21  ultimately are -- at this point in time, they are carried in

22  a disabled status and -- well, in essence, they receive a

23  portion of their base pay, and, again, at this time they are

24  also receiving medical benefits as well.

25  Q   And how is that funded, to your knowledge and

1 understanding?

2 A  Through the pension system.

3 Q  I want to focus your attention on the time period

4 beginning in late 2012, early 2013, and ask you this

5 question.  When was the election held that resulted in your

6 being elected the president of the DPOA?

7 A  As I recall, that was in September.  It was either

8 September or November of 2012.

9 Q  And at the time of your election, were there ongoing Act

10 312 proceedings relative to the DPOA?

11 A  Yes.

12 Q  And were those -- you became the president on January

13 1st, 2013?

14 A  That's correct.

15 Q  Upon your election, did you do anything to familiarize

16 yourselves with the ongoing Act 312 proceedings?

17 A  As president elect, I began attending the 312

18 proceedings.

19 Q  And did you continue when you became the president in

20 January of 2013 to attend and participate in those

21 proceedings?

22 A  Yes.

23 Q  And what was the result of those proceedings?

24 A  Ultimately the result was an arbitration award for the

25 Detroit Police Officers Association.

1  Q    And do you recall approximately when that award was

2  issued?

3  A    I believe it was March 25th or 26th of 2013.

4  Q    Okay.  I'm going to ask you -- there's a notebook of

5  exhibits there, and if you look at -- I believe it is 706,

6  707, and 708.

7        MS. PATEK:  May I approach the witness for just a

8  moment?

9        THE COURT:  Yes.

10  BY MS. PATEK:

11  Q   We'll start with Exhibit 706, and I know that's a rather

12  voluminous exhibit, but if you can turn towards the back,

13  you'll see on the last several pages -- come to the signature

14  pages --

15  A    Okay.

16  Q    Okay.  Can you identify -- well, strike that.  First of

17  all, is Exhibit 706 part of the arbitration award that was

18  issued by the arbitrator in the DPOA's Act 312 proceedings?

19  A    It appears to be, yes.

20  Q    And with respect to the signature pages, do you recognize

21  the signatures on those pages?

22  A    If I'm looking at the correct pages here, there are

23  several.

24  Q    Okay.

25  A    And the --

1  Q   Is one of them the signature of the arbitrator, George

2  Roumell?

3  A   Yes, it is.

4  Q   And is one of them the signature of the city's

5  representative?  I believe it was a Mr. Schafer.

6  A   Craig Schwartz.

7  Q   Schwartz?  And is one of them the DPOA's representative?

8  A   Yes.

9  Q   And that would be Mr. Iorio, I-o-r-i-o?

10  A   Yes.

11  Q   And if you could move forward to 707 and 708, and I'd ask

12  you to take a look at those signature pages as well.  And if

13  you don't mind doing them both together, we can try for a

14  twofer here.

15  A   Okay.  For 707 I see the same three signatures for Mr.

16  Roumell, Mr. Schwartz, as well as Mr. Iorio.  However, on 708

17  I only see the signature for Mr. Roumell.

18  Q   Okay.

19      MS. PATEK:  Your Honor, at this time we would move

20  for the admission of 706 and 707, which are the arbitration

21  awards issued to the DPOA.

22      MR. STEWART:  Your Honor, no objection other than

23  we -- I assume if we ask the witness he would establish

24  there's a public record foundation for these to deal with

25  hearsay objections as you did with the previous witness, or

1   if you can represent that to the Court, that'll be fine.

2   BY MS. PATEK:

3   Q   Is this record, Mr. Diaz, publicly available on the DPOA

4   website?

5        MR. STEWART:  Well, I think the actual issue is is

6   it issued by a government agency pursuant to its charter.

7        MS. PATEK:  I'm not sure it's --

8        MR. STEWART:  That's the exception in the rule of

9   evidence for it, not whether it's publicly available.  Is it

10  issued by a public body?

11       THE COURT:  Okay.  Counsel, again, I have to ask you

12  to address the Court rather than each other.

13       MR. STEWART:  All right.

14       MS. PATEK:  Your Honor, this is signed by a private

15  arbitrator.  It is overseen and administered by MERC, as Ms.

16  Gurewitz previously testified, and I believe it is a public

17  record available to anybody, but I will --

18       THE COURT:  Well, but it wasn't issued by a public

19  body.

20       MS. PATEK:  Well, it also, however, is part of a

21  proceeding in which the City of Detroit, in fact,

22  participated, had a representative sign off on and, as we

23  heard Mr. Dillon testify earlier today, to his understanding,

24  becomes part of the collective bargaining agreement between

25  the City of Detroit and the DPOA, and I think that's an

1  additional basis on which it ought to be admitted.

2       MR. STEWART:  Perhaps, your Honor, we'd have no

3  dispute if we agree it's being introduced only for what it

4  purports to say as opposed for any internal hearsay that it

5  might contain.

6       MS. PATEK:  I have no problem with that, your Honor.

7       MR. STEWART:  In other words, its rulings --

8       THE COURT:  All right.

9       MR. STEWART:  -- holdings, or award.  If that's

10 acceptable, then we would not object to it.

11      THE COURT:  With that limitation, 706 and 707 are

12 admitted.

13      (Exhibits 706 and 707 received at 3:06 p.m.)

14 BY MS. PATEK:

15 Q   To your knowledge, Mr. Diaz, did the city take any action

16 with regard to the Act 312 award that we've been talking

17 about?

18 A   Yes.

19 Q   Did it appeal a portion of the award?

20 A   Yes.

21 Q   And can you tell us about that?

22 A   The city appealed a portion of the 312 award that spoke

23 to a five-percent restoration for DPOA members which was to

24 take effect January 1st of 2014.

25 Q   And does that appeal remain pending?

1  A    Yes.

2  Q    And is it your understanding it's stayed by these

3  bankruptcy proceedings?

4  A    Yes.

5  Q    I want to focus on the time period now after Mr. Orr's

6  appointment as emergency manager.  First of all, at or around

7  that time, did you become aware that the City of Detroit was

8  searching for a new police chief?

9  A    Yes.

10  Q    And can you tell the Court what, if anything, you did and

11  in what time frame on behalf of the DPOA with regard to that

12  search?

13  A    In around March or April of 2013, I had learned of

14  several individuals who had applied or shown interest in

15  becoming the chief of police for the City of Detroit.  One of

16  the individuals I was not familiar with, I learned that he

17  was the chief of police in Cincinnati.  I then began, I

18  guess, sporadically or no real method to the madness but

19  contacting different police officers in Cincinnati and asking

20  them questions about their chief.

21  Q    Was that Chief Craig?

22  A    Yes.

23  Q    And what did you find out as a result?

24         MR. STEWART:  Objection.  Asks for hearsay.

25  BY MS. PATEK:

1    Q    Well, let me ask you this.  Did there come a point in

2    time when you actually reached out to Chief Craig?

3    A    Yes.

4    Q    And did that happen prior to him assuming the job as

5    chief of the City of Detroit Police Department?

6    A    Yes.

7    Q    And since he has become the chief of the City of Detroit

8    Police Department, have you and your members reached out to

9    him?

10   A    Yes.

11   Q    And to your knowledge, have the members of the other

12   police unions done the same?

13   A    Yes.

14   Q    And in terms of -- I'm not talking about collective

15   bargaining issues, but I'm talking about issues related to

16   the management and restructuring of the Detroit Police

17   Department.  Have you participated actively in those efforts?

18   A    Yes.

19   Q    And do you consider that there has been a give and take

20   and a sharing of ideas and exchanging of proposals in that

21   regard?

22   A    Yes.

23   Q    Do you think that you are making progress in that regard?

24   A    I do.

25   Q    With regard -- and the next series of questions I'm going

1   to ask you are going to be going only up through the date the

2   bankruptcy petition was filed on July 18th.  With respect to

3   that time frame and since the Act 312 arbitration award was

4   issued by the city, has the city engaged the DPOA in any

5   further negotiations with regard to terms of employment,

6   healthcare benefits, anything of the like?

7   A    You're referring to the time pre-petition?

8   Q    Yes.

9   A    No.

10  Q    Did you -- we've heard a lot in this courtroom, and I

11  know you, as the DPOA's representative, have sat through this

12  part of -- part of the trial, but let me ask you this, first

13  of all.  With regard to your membership, are you -- since

14  assuming the job of president -- and let's just take up

15  through the date of the filing of the bankruptcy petition,

16  have you been generally in touch with them on a day-to-day

17  basis?

18  A    Yes.

19  Q    Do you have regular communications?

20  A    Yes.

21  Q    Do you have a sense as to -- as their president as to

22  their morale?

23  A    Yes.

24  Q    Do you have a sense of the issues that are of concern to

25  them?

1  A    Yes.

2  Q    And is the issue of pension and disability an issue of

3  significant concern?

4  A    Yes, it is.

5  Q    Now, with regard to those issues, did you attend a

6  meeting at the airport on June 14th, 2013, regarding the

7  city's unveiling of a proposal for creditors?

8  A    Yes, I did.

9         MS. PATEK:  And if you could -- could I have Exhibit

10  43, page 109?

11  BY MS. PATEK:

12  Q    First of all, Mr. Diaz, with regard to the June 14th

13  meeting for creditors, was there any statement by the city or

14  its representatives as to whether or not that meeting was a

15  negotiation?

16  A    No.

17  Q    And in terms of -- in terms of your particular interests,

18  looking at page 109, I take it of particular significance is

19  the claim for unfunded pension liabilities that we see on

20  109?

21  A    Yes.

22  Q    And when you were at that meeting, first of all, were

23  people allowed to ask questions verbally; that is, was there

24  any back-and-forth discussion?

25  A    No, not that I recall.

1  Q   Do you recall at that particular meeting submitting any

2  questions?

3  A   I did not.

4  Q   Did you review this document; that is, the proposal for

5  creditors, and, in particular, page 109?

6  A   Yes, I did.

7  Q   Did you view what you saw on page 109 as a proposal to

8  the DPOA?

9  A   I did not.

10  Q   And did you -- well, strike that.  Did you attend

11  subsequent meetings on June 20th, July 10th, and July 11th on

12  behalf of the DPOA?

13  A   I believe those were the dates, yes.

14  Q   And were any of the -- at any of those meetings was there

15  any statement by the city with regard to whether or not

16  negotiations would take place at those meetings?

17  A   I'm not entirely sure I can answer that question with a

18  "yes" or "no."

19  Q   Okay.  Why not?

20  A   With respect to whether at any of those meetings --

21  excuse me -- it was portrayed to me as a union representative

22  that these meetings were negotiations, at one of the meetings

23  it was definitely portrayed to me that it was -- these were

24  not negotiations.

25  Q   And tell me how you came to understand that.

1  A    I asked a question if, in fact, these meeting -- this

2  meeting was a negotiation, and I was informed that it was

3  not.

4  Q    Subsequent -- or, well, as these meetings were

5  proceeding, were you taking any action with regard to the

6  restructuring issues facing the City of Detroit as the

7  president of the DPOA?

8  A    Yes.

9  Q    Did there come a point in time when you began

10  communicating with members of the other public safety unions

11  and their executive boards?

12  A    Yes.

13  Q    And can you tell the Court approximately when that was?

14  A    It was shortly after -- as memory serves, shortly after

15  the June 14th meeting.

16  Q    And did there come a point in time when you and the

17  presidents of the other three public safety unions -- that

18  is, the Detroit Fire Fighters, the Police Lieutenants and

19  Sergeants Association, and the Detroit Police Command

20  Officers Association -- decided as a group to reach out to

21  the city?

22  A    Yes.

23        MS. PATEK:  And if I could have -- I believe it is

24  704, and this is in evidence.

25  BY MS. PATEK:

1   Q   Mr. Diaz, do you recognize Exhibit 704?

2   A   I do.

3   Q   And before we talk about this, I wanted -- I'm sorry to

4   do this to you, but I want to step back to one point I just

5   forgot to cover.  In approximately May of 2013 and before the

6   meeting of creditors, do you recall receiving correspondence

7   from an attorney at Jones Day regarding pension issues?

8   A   As I recall, yes.

9   Q   And did that -- was it an inquiry to ask if you would

10   represent the retirees who were former DPOA members?

11   A   That's exactly what I remember, and I --

12   Q   Did you respond promptly to that request?

13   A   I did, yes.

14   Q   And can you tell the Court what your response was?

15   A   That I do not represent retirees.  I represent active

16   DPOA members and their future retirement benefits.

17   Q   And is there anything unique with regard to your active

18   employees with regard to some of them actually receiving, at

19   least in an escrow account, retirement benefits while they're

20   still active?

21   A   Yes.  There is a -- I don't want to use the word

22   "hybrid," but there is an element of active employees who

23   are, in fact, having a portion of their retirement set aside

24   in an escrow account, and for all intents and purposes, in

25   the view of the pension system, they are, in fact, receiving

1    a pension benefit under a form of a retirement status which

2    is referred to as the deferred retirement option plan.

3    Q    And as I understand it, that means that once they elect

4    to DROP, D-R-O-P --

5    A    Correct.

6    Q    -- their retirement benefit is frozen at that level?

7    A    That is correct.

8    Q    And they cannot access it until they actually retire?

9    A    Correct.

10   Q    Going back to this letter on July 12th, this was sent to

11   Jones Day on behalf of the four public safety unions; is that

12   correct?

13   A    Yes.

14   Q    And you were indicating -- well, strike -- what was the

15   purpose of this letter?

16   A    Well, as pointed out in the first paragraph, the purpose

17   was -- is a follow-up to the July 10th meeting with the city

18   to discuss pension restructuring proposals.

19   Q    And were the four public safety union presidents willing

20   to attempt to engage the city in some kind of counterproposal

21   or proposal with regard to pension benefits?

22   A    I'm sorry.  You're asking if we were prepared to do so?

23   Q    I'm asking not whether you were prepared to do so but

24   whether you were willing to do so at that time.

25   A    Yes.

1    Q   And you made a request to the city in that regard for

2    some additional information?

3    A   Yes.

4    Q   And do you recall receiving a response from the city?

5    A   I have not, no.

6            MS. PATEK:  If we could put up 705.

7    BY MS. PATEK:

8    Q   Mr. Diaz, does this -- looking at 705, does that refresh

9    your recollection as to whether or not you ever received a

10   response?

11   A   I do not personally recall receiving this response.

12   Q   That response is, however, from Jones Day?

13   A   Yes, it is.

14   Q   Thanking you for your strong cooperation?

15   A   Yes.

16   Q   Dated the day before the bankruptcy petition was filed?

17   A   That's correct.

18   Q   During the time period from -- you sent your letter on

19   July 12th until July 18th, the date the bankruptcy petition

20   was filed, did anyone from either the emergency manager's

21   office or Jones Day reach out to you with regard to providing

22   further information or talking more about restructuring

23   proposals?

24   A   For the sake of clarity, I personally did not send the

25   letter to Jones Day on July 12th, but to follow up with the

1    remainder of that question, the answer is no.

2    Q    Mr. Diaz, do you consider the services your members

3    provide essential to the City of Detroit?

4    A    They are.

5    Q    Are you and your members committed to the City of

6    Detroit's restructuring?

7    A    Yes, we are.

8    Q    And do you want to be a positive force in that process?

9    A    Yes.

10   Q    With respect to the Act 312 arbitration award -- well,

11   strike that.

12          MS. PATEK:  That's all I have.

13          THE COURT:  All right.  We'll take our afternoon

14   recess now until 3:40, please.  Before we do that, can I get

15   an estimate on the length of closing arguments, please, on

16   each side?

17          MR. BENNETT:  Your Honor, I'm planning my opening

18   statement to be about an hour and a half, and I don't know

19   how much I will need on the back end.  It will depend partly

20   on how much time the objectors do so.

21          MR. SCHNEIDER:  Probably 20 to 30 minutes for me.

22          THE COURT:  Thank you, sir.

23          MR. MONTGOMERY:  Your Honor, we've undertaken to

24   sort of collect the estimates, and I think we're running

25   about three hours for the objectors as a whole.

1      THE COURT:  All right.  In light of those estimates,

2  it would be my intent to conclude court after the balance of

3  the examination of this witness and start with our closing

4  arguments tomorrow morning.  And what did I say?  3:40,

5  please.

6      MR. STEWART:  Your Honor, my cross-examination is

7  going to be extremely brief with this witness if you wanted

8  me to just get it out of the way before the break and perhaps

9  dispense with the need for a break and then return as the

10 Court wishes.

11     THE COURT:  Okay.  Go for it.

12                    CROSS-EXAMINATION

13 BY MR. STEWART:

14 Q   Good afternoon, Mr. Diaz.  I'm Geoffrey Stewart of Jones

15 Day.

16 A   Good afternoon.

17 Q   Just a few questions for you.  You testified that with

18 the exception of those active employees who had the -- I

19 guess you called it the DROP or DROP's escrow arrangement for

20 their pensions, your union does not represent retirees?

21 A   That's correct.

22 Q   You don't negotiate on their behalf?

23 A   No.

24 Q   You cannot bind them either?

25 A   No.

1  Q  Okay.  Then one other thing.

2        MR. STEWART:  Can you put up Exhibit 60, please?

3  BY MR. STEWART:

4  Q  You, I think, were asked about various meetings that you

5  attended.  Do you remember a meeting that you attended on

6  July 11 on the subject of healthcare?

7  A  To narrow that down, there were two meetings we had on

8  healthcare.  There was one at the Coleman A. Young Municipal

9  Building.  Well, actually, they were both there.

10  Q  Right.

11  A  One was in the auditorium.  One was in a smaller room.

12  Could you narrow it down as to which room we're talking

13  about?

14  Q  You know, I can't.

15  A  Okay.

16  Q  Do you remember attending a meeting on the 11th where

17  specific healthcare proposals were made to you?

18  A  Yeah.  With the specific date, I can't.  I do not -- I

19  can't give you that answer.

20  Q  Could you look at Exhibit 60 and tell me if you've seen

21  it before?

22  A  I believe I have, yes.

23  Q  Does it refresh your recollection as to the date of a

24  meeting and what happened at the meeting?

25  A  This document in and of itself does not refresh my

1  recollection as to which meeting we're referring to.

2  Q   Do you remember a meeting, though, at which these

3  healthcare options were presented to you as proposals by the

4  city?

5  A   As I recall, yes.

6          MR. STEWART:  Thank you very much.  That's all I

7  have.

8          THE COURT:  Any other questions for the witness?

9          MR. KING:  I'm sorry, your Honor.  This will take

10 two minutes.

11                    CROSS-EXAMINATION

12 BY MR. KING:

13 Q   Ron King on behalf of the Retirement Systems.  Good

14 afternoon, Mr. Diaz.

15 A   Good afternoon.

16 Q   You testified that you also serve as a trustee of the

17 Police and Fire Retirement System?

18 A   Correct.

19 Q   And in your capacity as a trustee, are you familiar with

20 the operations generally of the Retirement Systems staff and

21 the systems themselves?

22 A   Vaguely, yes.

23 Q   And do you have interaction with the staff members at the

24 Retirement System?

25 A   I do.

1   Q   Are you aware of whether the Retirement System keeps a

2   database of all the retirees of the City of Detroit?

3   A   Yes.

4   Q   And does the Retirement System maintain a website?

5   A   Yes.

6   Q   Does the Retirement System have the capabilities of

7   reaching out to the Retirement Systems either through its

8   database or by way of its website?

9   A   Very easily, yes, it does.

10  Q   Are you aware of any effort on the part of the city to

11  ask the Retirement Systems to use its resources to contact

12  retirees in the context of restructuring proposals?

13  A   Not at all.

14          MR. KING:  Thank you.  Nothing further.

15          MR. STEWART:  Just one question unless -- other

16  questions?

17                      RECROSS-EXAMINATION

18  BY MR. STEWART:

19  Q   Did the city impede your ability to reach out to those

20  retirees?

21  A   For the purpose of --

22  Q   Anything at all.

23  A   Not to my knowledge, no.

24          MR. STEWART:  Thank you.

25          THE COURT:  Is that it then?  All right.  Sir, you

1    may step down.  You are excused.  Thank you for your

2    testimony.

3          (Witness excused at 3:26 p.m.)

4                THE COURT:  And we'll be in recess for the day, and

5    we'll reconvene for our closing arguments tomorrow morning at

6    nine o'clock.

7                THE CLERK:  All rise.  Court is adjourned.

8          (Proceedings concluded at 3:26 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Andy Dillon | 5/16<br>48/61 | | | |
| Richard Baird | 66/77<br>80/94<br>108/111 | | | |
| Bradley Robins | 114/139 | 140 | 157/159 | |
| Mary Ellen Gurewitz | 161 | 173 | 173 | |
| Mark Diaz | 174 | 194/196 | | 197 |

| EXHIBITS: | Marked | Received |
|---|---|---|
| Exhibit 201 | | 20 |
| Exhibit 202 | | 20 |
| Exhibit 206 | 40 | |
| Exhibit 438 | | 63 |
| Exhibit 458 | | 106 |
| Exhibit 460 | | 100 |
| Exhibit 706 | | 183 |
| Exhibit 707 | | 183 |
| Exhibit 717 | | 168 |
| Exhibit 718 | | 164 |
| Exhibit 719 | | 165 |
| Exhibit 836 | | 94 |
| Exhibit 840 (excerpt) | | 33 |
| Exhibit 841 (excerpt) | | 25 |
| Exhibit 872 | | 92 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                              November 12, 2013

_____        _____
Lois Garrett