# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------- x
                                             :
In re                                        :        Chapter 9
                                             :
CITY OF DETROIT, MICHIGAN,                   :        Case No. 13-53846
                                             :
              Debtor.                        :        Hon. Steven W. Rhodes
                                             x
```

---

## DEBTOR'S COMBINED OBJECTION AND MEMORANDUM OF LAW OPPOSING PETITIONERS ROBERT DAVIS' AND CITIZENS UNITED AGAINST CORRUPT GOVERNMENT'S EMERGENCY MOTION FOR CLARIFICATION OF THE COURT'S JULY 25, 2013 STAY ORDER RELATING TO THE STATE COURT FILING OF A QUO WARRANTO ACTION AGAINST MAYOR-ELECT MIKE DUGGAN

The City of Detroit, Michigan ("City"), as the debtor in the above-captioned

case, objects to Petitioners Robert Davis' And Citizens United Against Corrupt

Government's Emergency Motion for Clarification of the Court's July 25, 2013

Stay Order Relating to the State Court Filing of a Quo Warranto Action Against

Mike Duggan [Dkt. No. 2102] ("Motion").[1]  For the reasons set forth below, the

---

[1] The movants do not request stay relief anywhere in the Motion, including in the prayer for relief, do not include it in the proposed order and do not address "cause" or any of the factors the Court must consider to determine if relief is warranted. Nor have the movants coded the submission in e-filing or paid the fee required to file a motion for relief.  The City will address only the relief actually requested in

Motion should be denied, and the Court should clarify that its stay orders and the stays under 11 U.S.C. §§362 and 922 apply to the Petitioners' quo warranto action they seek to bring against mayor-elect Duggan.

## BACKGROUND

1. On July 18, 2013, the City commenced this case under chapter 9 of title 11 of the United States Code ("Bankruptcy Code").

2. On July 25, 2013, the Court entered its Order Pursuant to Section 105(a) of the Bankruptcy Code Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code [Dkt. #167] ("Stay Confirmation Order").

3. Also on July 25, 2013, the Court entered its Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor [Dkt. #166] ("Stay Extension Order").

4. The citizens of the City of Detroit elected Mike Duggan Mayor of the City of Detroit on November 5, 2013. The mayor-elect takes his oath of office and will officially become Mayor on January 1, 2014.

5. On December 13, 2013, Robert Davis and Citizens United Against Corrupt Government ("Petitioners") filed the Motion seeking clarification that the Stay Confirmation Order and the Stay Extension Order (together, "Stay Orders")

the Motion and reserves the right to address a request for relief from the automatic stay if and when one is made by the movants.

do not apply to Petitioners' attempt to prevent mayor-elect Duggan from taking office on January 1, 2014, based upon Petitioners' allegation that the mayor-elect failed "to meet the nomination requirements set forth in the 2012 Detroit City Charter, as amended." Motion at p. 4.

6. The Petitioners attached to the Motion a draft Ex Parte Application for Leave to File Complaint for Writ of Quo Warranto ("Quo Warranto Application").

## **ARGUMENT**

The Motion requests that the Court clarify whether this Court's Stay Orders apply to the Quo Warranto Application and efforts by the Petitioners to prevent mayor-elect Duggan from taking office. Petitioners argue, incorrectly, that pursuit of Petitioners' *quo warranto* action against mayor-elect Duggan will have no impact on the Debtor, its property or the Debtor's pursuit of a plan of adjustment. Petitioners argue:

- The proposed *quo warranto* action against mayor-elect Duggan "has absolutely no impact whatsoever on the Debtor's Bankruptcy Petition or proceedings in this Court."

- The proposed *quo warranto* action against mayor-elect Duggan "will not affect, in any way, or disturb, or otherwise impact . . . the Debtor's assets and property."

- "And, none of the Debtor's pertinent parties, e.g., Kevyn Orr, Emergency Manager, to the Bankruptcy Proceedings pending before this Court, will be affected, disturbed or interrupted in the performance of their [sic] duties."

Each of these points is addressed below, but the brief answer is that the Petitioners' pursuit of a *quo warranto* action against the mayor-elect (and as of January 1, 2014, the Mayor) will negatively impact the property of the Debtor to the detriment of the Debtor and its creditors, interfere with the Debtor's administration of, and dominion over, its property, and interrupt and interfere with the Emergency Manager and Mr. Duggan's performance of their duties and management of the City's chapter 9 process, each of which would be a violation of the automatic stays of §§362 and 922 of the Bankruptcy Code.

## I. The Stay Applies Because Pursuit of the Quo Warranto Action Would Violate 11 U.S.C. §§922(a) and 362(a)(3) By Having a Negative Impact on the City's Property to the Detriment of the City and Its Creditors.

The automatic stay "is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." *Javens v. City of Hazel Park (In re Javens)*, 107 F.3d 359, 363 (6th Cir. 1997) (quoting H.R. REP. NO. 95-595, at 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296). The stay of §362 applies to all debtors, while §922 imposes a stay that applies only to municipalities in chapter 9, supplemental to the stay under §362. The stay of §922 is broader, in

part, than the one under §362 because it applies to both pre-petition and post-petition legal proceedings.

### A. Pursuit of the Quo Warranto Action would violate the stay of §922(a) because it is the pursuit of an indirect claim against the Debtor through a lawsuit against one of its officers.

Bankruptcy Code §922 provides in relevant part:

> (a) A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of –
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor .

The § 922(a) stay as it applies to an action brought against a municipal official was addressed by the bankruptcy court in *In re City of Stockton, California*, 484 B.R. 372 (E.D. Cal. 2012). In the City of Stockton's chapter 9 case, the court found that §922(a) stayed an action against city officials who were entitled to defense and indemnity by the debtor municipality under California law. The court refused to lift the stay to allow an action asserting a variety of state and federal claims based upon the termination of Stockton's Fire Chief, to proceed against the City Manager and Deputy City Manager. The *Stockton* court explained:

> For the same reason that geometry holds that the shortest distance between two points is a straight line, the additional automatic stay of § 922(a), rather than the § 362 automatic stay, directly protects municipal officers in chapter 9 cases without the need for a court to perform the mental gymnastics required to extend the § 362 automatic stay.

*Id.* at 375-376.

Among the findings made by the Stockton court in support of this conclusion were: (1) that §922(a) augments the stay of §362(a); (2) that §922(a) squarely covers the collection of judgments against a public official as well as the prosecution of such litigation; (3) that the phrase "to enforce a claim against the debtor" in §922(a) encompasses both direct and indirect claims against a municipality; (4) that §922(a) is embedded in the sovereign immunity landscape; and (5) that §922(a) was designed to deal with situations where public officials of a debtor are sued. *Stockton,* at 378.

In another municipal bankruptcy, §922(a) was held to bar the commencement or maintenance of a suit seeking declaratory relief, injunctive relief, *mandamus* and *quo warranto* against some of the commissioners of the county in bankruptcy. *See In Re Jefferson County, Alabama*, 484 B.R. 427 (S. D. Ala. 2012) (holding that a post-petition action against three of Jefferson County's Commissioners was barred by §922(a), and explaining that unlike §362(a), §922(a) extends to post-petition claims).

The Court stated explicitly in its Stay Confirmation Order that the §922 stay would apply to City Officers, which certainly includes the Mayor, first restating §922(a) and then providing this further clarification:

5.      For the avoidance of doubt, the protections of section 922(a)(1) of the Bankruptcy Code with respect to officers and inhabitants of the City, as set forth in paragraph 4(a) above, apply in all respects to: (a) the Emergency Manager; and (b) the City Officers, in whatever capacity each of them may serve.

Stay Confirmation Order at pp. 3-4.  So, the stay of §922(a) applies to the Mayor if

there is a "claim" against the City.

"Claim" is broadly defined in Bankruptcy Code §101(5) as a "right to

payment" or an equitable remedy that gives rise to a right to payment.  In the

chapter 9 context, this has included the obligation to pay to defend an officer of a

debtor municipality.  *Stockton*, *supra*, at 378.

By statute, a plaintiff who prevails in an action for *quo warranto* is entitled

to recover costs against the defendant, and the court has discretion to impose a fine

of up to $2,000.00.  While Petitioners have agreed to waive these penalties, under

1984 Detroit Code §13-11-1 *et seq*., the City defends and indemnifies its officers

and employees named in civil litigation which arises out the performance of acts

within the employees' authority.  In this case, the Mayor is entitled to defense and

indemnity under the City Code, and the Emergency Manager has already agreed to

pay the Mayor's legal fees incurred while in office.  This constitutes a "claim" for

purposes of §922(a).  Therefore, the Petitioners' proposed lawsuit presents a claim

against the City through an action brought against one of its officers.[2]  Pursuit of

the Quo Warranto Application and subsequent suit against Mike Duggan after he

takes office in a few days would violate the §922(a) stay.

**B.    Pursuit of the Quo Warranto Application would violate the stay of
§362(a)(3) because it would interfere with the Debtor's property
by diminishing its assets.**

As a result of the City's Chapter 9 filing, specifically the automatic

application of 11 U.S.C. §§ 362 and 922(a), and the explicit terms of this Court's

Stay Confirmation Order, the stay applies to "any act . . . to exercise control over

property of the [Debtor]."[3]  11 U.S.C. §362(a)(3).  The Quo Warranto Application

and any subsequent action by the Petitioners to oust Mr. Duggan from his elected

---

[2] Contrast this situation with Mr. Davis' pursuit of a *quo warranto* action against
City Council President Saunteel Jenkins.  Ms. Jenkins was defended by the City
Law Department by salaried staff attorneys, so there was no additional expense to
the City for outside attorneys' fees giving rise to a "claim."  Mr. Duggan, on the
other hand, has been embroiled in several lawsuits with Mr. Davis associated with
the general election and has used and will continue to use outside counsel from
those lawsuits specializing in election law.  This will be at the City's expense
starting January 1, 2014.  The cases include *Barrow, Citizens, White v. City,
Winfrey, Duggan, et al.*, 13-008926-AW (3rd Circuit Court, Wayne County,
Michigan) and *Davis, White v. City Election Com'n, Winfrey, Accuform, WCBd. of
Canvassers and Duggan, intervenor*, 13-013071-AW (3rd Circuit Court, Wayne
County, Michigan).  Davis, either directly or through Citizens United, filed
Applications For Leave to Bypass the Court of Appeals in each case (denied each
time by the Michigan Supreme Court, expressly reserving judgment to award costs
and attorneys' fees).  Both cases are now consolidated before the Court of Appeals.
If this pattern holds, Mr. Duggan's litigation with Mr. Davis will be expensive for
the City.

[3] Pursuant to §902(1), "property of the estate" in this context means "property of
the debtor."

office as Mayor for the City of Detroit is also a violation of the automatic stay imposed by §362. Because of the City's indemnification obligation for legal fees, this indirect action by the Petitioners would have a direct negative impact on the assets of the Debtor in violation of the stay under §362(a)(3).

**II.** **The Stays of §§922(a) and 362(a)(3) Apply to the Mayor-Elect by Extension Through the Court's Use of Its Equitable Powers Under §105(a) and its Stay Extension Order, and Petitioners' pursuit of a *quo warranto* action against mayor-elect Duggan would violate the Chapter 9 stay by interfering with the City's chapter 9 case, its administration of, and dominion over, its assets, and its attempts to obtain confirmation of a plan of adjustment.**

In addition to the "breathing spell" from creditor collection actions, bankruptcy law provides an additional and equally important protection: an opportunity to negotiate and formulate a plan. *In re Javens*, at 363. Interference with a debtor's ability to reorganize under chapter 11 (the equivalent of obtaining approval of a plan of adjustment under chapter 9) has repeatedly been stayed by extension of the automatic stay of §362 through §105(a) to preserve this important right of a debtor. For example, In *Lomas Financial Corporation v. The Northern Trust Company (In re Lomas Financial Corporation)*, 117 B.R. 64 (S.D. N.Y. 1990), the district court upheld the bankruptcy court's conclusion that the continuation of a lawsuit against certain corporate officers of the debtor would cause irreparable harm to the debtor's reorganization effort. *Id*. At 66-67. The district court in *In re MCSi, Inc. Securities Litigation*, 371 B.R. 270 (S.D. Ohio

2004) noted that the *In re Lomas Financial Corporation* court's decision focused

almost entirely on the impact of the litigation on the debtor's ability to reorganize:

> At bottom, however, the Court in *Lomas* was concerned that
> permitting the suit to continue as to the non-debtor Lomas officers
> would severely and adversely impact the reorganization of the
> bankruptcy estate. Notably, a close reading of *Lomas* suggests that
> the Court's foremost concern was that subjecting the non-debtor
> defendants to immediate suit would impair the corporate defendant's
> reorganization due to the fact that the individual defendants were
> continuing in their positions with the corporation and, in fact, played
> vital roles in developing the reorganization plan.

*Id.* at 273.

In *Lomas*, the court found that litigation against non-debtors may interfere

with the plan process. But it can also directly interfere with the debtor's dominion

over its property, as this Court has already found in this case. Specifically, the

Court found that the *Webster* case, a lawsuit naming only third-party defendants,

and not the Debtor, but seeking to prevent the City from pursuing its chapter 9 case

was an attempt to exercise control over property of the Debtor in violation of the

stay. *In re City of Detroit, Michigan*, __ B.R. __, 2013 WL 6331931 (Bankr. E.D.

Mich.) at p. 58.

On January 1, 2014, upon taking his oath of office, Mike Duggan becomes

not only the Mayor of the City of Detroit, an officer of the City, but also an agent

of the Emergency Manager, acting under his delegation of authority. Under the

Delegations of Authority and Transition Protocols (Exhibit A), the Emergency

Manager has agreed to delegate oversight of the day-to-day operations of the City

to Mr. Duggan.[4]  The Emergency Manager retains overall responsibility and will

concern himself primarily with functions that directly relate to the formulation of

the plan of adjustment and rehabilitation plan for the City, while Mr. Duggan will

be managing the day-to-day operations of the City.  Thus, the Emergency Manager

has authorized the Mayor to perform certain administrative functions of his office,

freeing up the Emergency Manager to focus his efforts on the bankruptcy-related

needs of the City.

> In the Stay Extension Motion, the City specifically requested that:
>
> the Court further exercise its equitable power under section 105(a) of
> the Bankruptcy Code to extend the Chapter 9 Stay[5] to actions or
> proceedings against the City's Agents and Representatives that,
> directly or indirectly, seek to enforce claims against the City, interfere
> with the City's activities in this chapter 9 case or otherwise deny the
> City the protections of the Chapter 9 Stay.

---

[4] Pursuant to P.A. 436 of 2012, Sec. 9 (2), the Emergency Manager may delegate to
and authorize the Mayor of the City of Detroit to exercise his powers of office:
"Under appointment, an emergency manager shall act for and in the place and
stead of the governing body and the office of the chief administrative officer of the
local government.  . . . Following appointment of an emergency manager and
during the pendency of receivership, the governing body and **the chief
administrative officer of the local government shall not exercise any of the
powers of those offices except as may be specifically authorized in writing by
the emergency manager** or as otherwise provided by this act **and are subject to
any conditions required by the emergency manager**." (Emphasis added.)

[5] "Chapter 9 Stay" is defined as "the automatic stay provisions of sections 362 and
922 of the Bankruptcy Code."  Stay Extension Motion, p. 1.

The term "City Agents and Representatives" is defined in the Stay Extension Motion as the "agents and representatives of the Emergency Manager," and in a few days, on January 1, 2014, it will apply to Mr. Duggan. While he is an officer of the City in his capacity as Mayor, when he is acting under the delegation of authority from the Emergency Manager, he is also a City Agent. His role in the City's restructuring effort is of great importance. The Emergency Manager would ordinarily be required to both run the City's day-to-day operations and negotiate and formulate the chapter 9 plan. Through the delegation of a large part of the operational duties to Mr. Duggan, the Emergency Manager will be freed of substantial constraints to his time and a drain on his energies and be able to focus much more on the bankruptcy aspects of his duties. In other words, the Emergency Manager will be able to work primarily on the plan of adjustment and revitalization of the City because Mr. Duggan will be overseeing the City's day-to-day operations.

If the Emergency manager is forced to resume management of some or all of the tasks delegated to the mayor-elect because Mr. Duggan is compelled to devote time defending Petitioners' *quo warranto* action, pursuit of that action will interfere with the Emergency Manager's duties in the chapter 9 case and the plan process itself.

The automatic stay prohibits Petitioners from filing the Quo Warranto Application and interfering with mayor-elect Duggan's performance of his duties in his dual capacities as mayor and as a City Agent, under the authority and delegation of power by the Emergency Manager.

## **CONCLUSION**

For the reasons set forth above, the Quo Warranto Application and Petitioners' attempts to interfere with mayor-elect Duggan taking office and performing his duties as both Mayor of Detroit and agent of the Emergency Manager is subject to the stays of §§362 and 922 and the Stay Extension Order. Pursuing the Quo Warranto Application and attempting to prevent Mr. Duggan from becoming Mayor or seeking to oust him once he does will violate the stay.

WHEREFORE, for the foregoing reasons, the City respectfully requests that this Court: (a) confirm the applicability of the automatic stay to the Quo Warranto Application and deny the Motion; (b) confirm the applicability of the automatic stay to the Petitioners' attempts to pursue a *quo warranto* action against Mr. Duggan and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: December 27, 2013          Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)

MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

## Offices of the Emergency Manager and Mayor
## DELEGATIONS OF AUTHORITY AND TRANSITION PROTOCOLS

This memorandum sets forth the specific delegations of authority and transition protocols intended to govern the division of responsibilities and reporting requirements between the Office of the Emergency Manager ("EM") and the Office of the Mayor ("Mayor") for the City of Detroit effective January 1, 2014. The overall intent of the following is to establish a clear set of guidelines to enable the Mayor to oversee day-to-day operations of the City, and to provide for collaboration and shared responsibility between the EM and the Mayor when in the City's best interests, while upholding the law under Public Act 436 which grants specific powers and final decision-making authority to the EM.

**ORGANIZATIONAL STRUCTURE:**

The attached organizational chart for the executive branch sets forth the reporting relationships between the EM, the Mayor and the direct operational reporting relationships for each. Consistent with the reporting relationships set forth on the organizational chart, certain dual reporting relationships have been established. With respect to such dual reporting relationships, the primary reporting relationship is designated by a solid line and the secondary designated with a dotted line. To further clarify these dual-reporting relationships, the following guidelines shall apply:

- Primary reporting for all finance functions will remain with the EM, but financial matters relating to day-to-day management of city government will report to the Mayor.
- Primary reporting relationships relating to the work of the Blight Task Force will be to the Mayor, but matters with specific impact on the chapter 9 Plan of Adjustment (as determined by the EM) or compliance with commitments made to the Federal government will report to the EM.
- As set forth on the organizational chart, it is anticipated that there will be a centralization of federal grants management, which will report to the EM, subject to joint collaboration with the Mayor as to specific strategies for grant utilization.

**APPOINTMENT OF PERSONNEL:**

Subject to final approval by the EM (and where specified in the Charter, approved by the City Council) the Mayor will appoint all non-civil service positions within the Executive Branch as well as all appointments to boards and commissions. All appointments made by the EM in consultation with the Mayor during the transition period between November 5 and January 1 will stand. Further, Executive Order # 11 regarding the appointment of the Chief of Police will remain in effect, however the Chief of Police and the Mayor are requested to have recurring consultation as it relates to the public safety strategy design, execution and measures of effectiveness.

**PARTICIPATION IN MEETINGS OF EM AND MAYOR'S OFFICE:**

- The EM, the Mayor, the Deputy Mayor and the Deputy EM will be invited join all scheduled staff and departmental meetings for both offices.
- The Mayor may join recurring meetings between the Governor and the EM, as requested by the Governor and/or the EM.

**CAVEATS ACROSS ALL AREAS OF RESPONSIBILITY:**

- No decisions will be made or actions will be taken by the Mayor that would be inconsistent with or may compromise the financial restructuring, the Plan of Adjustment or the chapter 9 case. The Mayor and the EM will maintain open lines of communication with each other so that issues that could impact the chapter 9 case can be identified.
  - Any such decisions or actions will be privately raised and will be subject to prior approval from the EM.

- There are numerous restructuring initiatives across many departments that are in some stage of implementation. The EM and the Mayor shall collaborate to achieve the objectives of such initiatives. It is agreed that the Mayor and/or his department heads have the authority to modify or terminate a particular restructuring initiative with the prior consent of the EM and with the understanding that the outcome of such modification or termination otherwise achieves the same or equivalent anticipated financial savings or revenue generation. With respect to any initiatives for which an RFP has already been issued or contract executed, any proposed modification will be made only with the approval of the EM or the Deputy EM.
- Labor negotiations will continue to be led by restructuring counsel, under direction of the EM, with involvement and guidance from Mayor's Office particularly as it relates to operational elements, such as work rules. The EM agrees that, to the fullest extent possible, transparency shall exist between the EM and the Mayor consistent with the chapter 9 court proceedings and principles of attorney-client privilege.
- Restructuring and financial consulting engagements will remain under the direction of the EM, however, the Mayor and the EM will consult on an ongoing basis as to scope of work and deliverables. The Mayor will have access to all deliverables and to consulting professionals (consistent with the chapter 9 court proceedings), and his input will be considered as it relates to new contracts, change orders, and delegation of tasks/workgroups.
- When feasible, press announcements should be made jointly. When such cannot happen, both the EM and the Mayor agree to 24-hour notice to the other with briefing overview of topic.
- Nothing in this memorandum is intended to diminish or modify the rights and duties of the EM under Public Act 436.

**OTHER ITEMS REQUIRING PRIOR APPROVAL FROM THE EM:**

- All hires/ dismissals of FTE's above $50,000/year.
- All material department restructurings (merging, dissolution, major reengineering, or creation of new department).
- All outsourcing of City functions/activities.
- All investments in infrastructure of more than $50,000.
- Discussions concerning asset dispositions, potential financings, or public private partnerships.

**ITEMS REQUIRING APPROVAL BY BOTH THE EM & THE STATE:**

- Execution of all contracts (including Personal Service Contracts) greater than $50,000.
- All reports and requirements as delineated in Public Act 436 (asset disposition, sale/lease, etc.)

Respectfully,

Kevyn D. Orr
Emergency Manager
City of Detroit

Michael E. Duggan
Mayor-elect
City of Detroit



Executive Branch Organizational Chart
1/1/14