# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

              Debtor.

_____/

Case No. 13-53846

In Proceedings Under
Chapter 9

Hon. Steven W. Rhodes

## SUPPLEMENTAL OBJECTION OF AMBAC ASSURANCE CORPORATION TO MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF, AS SUPPLEMENTED

Ambac Assurance Corporation ("Ambac"), a creditor and party in interest in the above-captioned case, files this supplemental objection (the "Supplemental Objection") to the Motion of Debtor (the "City") for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief [ECF No. 17] (the "Motion"), as supplemented on December 27, 2013 by the Supplement to the Motion [ECF No. 2341] (the "Supplement").[1]  This Objection

---

[1] This Objection also represents Ambac's response to the Mediators' Recommendation for Approval of Settlement Between the Debtor and Swap

incorporates by reference Ambac's Objection to the Motion, dated August 16, 2013 [ECF No. 410] and the exhibits thereto (the "Objection"). In support of its Supplemental Objection, Ambac respectfully submits as follows:

## INTRODUCTION

1.      The Motion, even as supplemented, should be denied. The compromise embodied in the Supplement is still far too rich given the strong and unrefuted arguments that the Swap Obligations and the pledge of Casino Revenue to the Swap Counterparties are void *ab initio*. Like the Motion, the Supplement contains no discussion of these arguments, and thus provides neither the Court nor the other creditors with any basis on which to evaluate the fairness of the settlement.

2.      At the trial on the Motion, the Court noted that in virtually every one of the hundreds or thousands of settlements the Court has been called upon to determine, "everyone knew what the claims were, what the defenses were, what the . . . alleged factual bases were for those claims, the alleged factual bases for the defenses, and where the strengths and weaknesses were on either side." December 18 Transcript ("12/18 Tr.") at 107. At the time the trial was adjourned, the Court observed that it did not yet have any of that information – not from the City's brief, not from the testimony of Mr. Buckfire and, at that point, not yet from

_____

Counter-Parties, [ECF No. 2343].

the testimony of Mr. Orr. *Id.* In light of that admonition, one would have expected the City to have made at least some effort in the Supplement to address the Court's concerns. Because it did not, the Court still has none of the information requested.[2]

3. This is especially troubling inasmuch as the most salient of the parties' claims and defenses are purely issues of law, not subject to any factual dispute. As Ambac detailed in its Objection, the City has forceful arguments that the Swap Obligations are void *ab initio* as contrary to state law, and are therefore null, void, and unenforceable by the Swap Counterparties. The City similarly has compelling arguments that the pledge of the Casino Revenue to secure the Swap Obligations is void *ab initio* as contrary to state law and therefore cannot be relied upon by the Swap Counterparties to trap the Casino Revenue. And finally, even if the Swap Counterparties had a valid prepetition lien on the Casino Revenue – which they do not – that lien is cut off with respect to Casino Revenue acquired by the City post-petition because the Casino Revenue does not qualify as "special

---

[2] Mr. Orr was deposed on December 31, 2013 regarding the revised settlement, and while he identified a number of issues and purported to discuss their pros and cons, he acknowledged that he had made no independent assessment of these issues, and repeatedly fell back on an advice-of-counsel assertion when asked to go beyond superficialities. Nevertheless, he continues to assert privilege with respect to some dozen or so legal analyses he testified have been prepared on these issues.

3

revenues," and therefore the post-petition Casino Revenue cannot be trapped by the Swap Counterparties. The robust arguments supporting these defenses must be taken into account in evaluating the fairness of the settlement. Upon appropriate consideration of these arguments, it becomes clear that the amount of this settlement is simply not reasonable.

4.      As the Court itself observed, "anyone who has been practicing in bankruptcy law as long as we all have, or in litigation even for that matter, knows that even if . . . a winning party gets a judgment, they'll take 75%." 12/18 Tr. at 126-27. In view of the strong arguments against the claims of the Swap Counterparties, the City, represented by two large and well-regarded law firms, plainly should have been able to obtain a far more favorable settlement than it has, especially since the new settlement the City has reached may well also be 75 cents on the dollar (or even more) by the time it is implemented.

5.      Significantly, the City calculated the purported 62% value of the settlement as of December 10, 2013 – an arbitrary date fully two weeks prior to the settlement discussions that yielded the new compromise, and seven weeks prior to the first possible termination date of January 31, 2014. The City thus appears to be using an outdated December 10, 2013 valuation in an attempt to make the new settlement appear better than it actually is. The revised settlement is likely far more favorable to the Swap Counterparties than the nominal 13% reduction from

the original settlement touted by the City, because rising interest rates have already resulted in a significant decline in the face amount of the termination payment. Mr. Orr testified at trial that he believed the termination payment to be between $300 million and $400 million at the time the original settlement was being negotiated. 12/18 Tr. at 78. By November 29, 2013, the amount of the termination payment had dropped to $277.7 million, *see* MTM Valuation as of Close, dated November 29, 2013, attached hereto as Exhibit A, and by December 10, 2013, only *eleven days* later, it had dropped an additional 4.35 % to $266.1 million. *See* Supplement at 3 (representing that 62% of the termination payment calculated as of December 10, 2013 was $165 million). If interest rates continue to rise, the undiscounted amount of the termination payment will continue to drop and the $165 million settlement amount will represent an increasingly higher percentage of the termination payment. Therefore, $165 million amount may approach or even conceivably exceed the original settlement percentage. If, for example, the trend over the approximately two week period from November 29 to December 10 were to continue for the seven and a half weeks between December 10, 2013 and the termination date of January 31, 2014, the amount of the termination payment would drop to $211.4 million, and the $165 million settlement would represent 78

cents on the dollar.[3]  In other words, if the present trend continues, the revised

settlement will be even *less favorable* to the City than the prior settlement.

6.    With interest rates continuing to trend upwards, the situation is made

even worse by the fact that the revised settlement now permits the Swap

Counterparties to terminate the Swap Obligations as early as January 31, 2014, as

opposed to the prior settlement, which did not permit them to terminate until June

30, 2014.  By locking in a termination amount rather than a percentage, and by

providing the Swap Counterparties the option of terminating fully five months

earlier than before, the City gave up its right and flexibility to gain even further

from the rising interest rates.

7.    In summary, this Court should deny the Motion as supplemented for

the simple reason that it still embodies a settlement that is far too costly for the

City given the strong and compelling defenses available to it.  As detailed below,

these defenses would not only eliminate the City's liability for the Swap

Obligations, they would also preclude the Swap Counterparties from trapping or

otherwise asserting any claims against the Casino Revenue.

---

[3] Based on the City's own representations, the termination payment dropped at the
rate of 0.395% per day between November 29 and December 10, 2013.
Extrapolating this for 52 days between December 10, 2013 and January 31, 2014
yields a termination payment of $211.4 million as of January 31, 2014.

## I. NEITHER THE HOME RULE CITY ACT NOR THE BANKRUPTCY CODE'S SAFE HARBORS CAN REHABILITATE THE SWAP OBLIGATIONS, WHICH ARE VOID *AB INITIO*

8.     Because the City has virtually dispositive arguments that the Swap Obligations are void *ab initio*, it has a high likelihood of success in invalidating any claims that may be asserted by the Swap Counterparties.  Indeed, the City may even be entitled to an affirmative recovery from the Swap Counterparties to the extent of the payments it has already made on these invalid obligations.[4]  An evaluation of this issue compels the conclusion that the settlement is not reasonable.

9.     As explained in Ambac's Objection, the Swap Obligations are void *ab initio* because they were incurred by the City in violation of Michigan law.  *See* Objection, ¶¶ 15-36.  In incurring the Swap Obligations, the City violated Act 34, the statute that governs the manner in which Michigan municipalities may incur interest rate swap liabilities.

---

[4] As explained below, the Code's safe harbors do not bar the avoidance of payments made on account of obligations that are void *ab initio*.  As the mediators observed, in the event the City is successful in invalidating the Swap Obligations, it could "force[] [the Swap Counterparties] to disgorge and pay back to the City all of the payments they received under the swaps."  *See* Mediators' Recommendation, [ECF No. 2343], at 2.  Since the City has been making payments to the Swap Counterparties since 2006, and currently pays at the rate of $4.2 million per month or $50.4 million per year, *see* December 17 Transcript ("12/17 Tr.") at 62, this could amount to hundreds of millions of dollars.

7

10.     No one contends that the City complied with the requirements of Act 34.  Under Act 34, the City could incur Swap Obligations only if the Swap Obligations would be payable pursuant to a limited tax full faith and credit pledge of the City, Mich. Comp. Laws Ann. § 141.2317(4)(a), or the swap was entered into in connection with a municipal security and was secured by the same money or revenue source as that municipal security.  Mich. Comp. Laws Ann. § 141.2317(4)(b).  *See* Objection, ¶ 23.  Neither condition is met here.  According to the City's own ordinances, the Swap Obligations are not payable pursuant to a limited tax full faith and credit pledge.  *Id.*, ¶ 24.  The swaps were also not entered into in connection with a "municipal security" as that term is defined in Act 34, nor are they payable from or secured by any revenue sources from which any "municipal security" is payable.  *Id.* ¶¶ 25-26.  Neither the City nor the Swap Counterparties have made any effort whatsoever to dispute these legal conclusions.

11.     Because the City and the Swap Counterparties cannot dispute that the City failed to comply with Act 34 in incurring the Swap Obligations, they argue instead in their respective replies [ECF Nos. 2029 ("City Reply"), 2033 ("SCP Reply")] that the City could incur valid Swap Obligations without complying with Act 34.  They further argue that even if the Swap Obligations are contrary to state law, they can nevertheless be saved by the operation of the safe harbor provisions

of the Bankruptcy Code and/or the doctrine of estoppel. These arguments are wholly without merit.

### A. The City Was Required to Comply with Act 34

12. Neither the creation of the Service Corporations nor the City's powers under the Home Rule City Act excuse the City's undisputed non-compliance with Act 34. As to the former, the City and the Swap Counterparties point out that it was the Service Corporations, not the City, that entered into the Swap Contracts with the Swap Counterparties. Because Act 34 governs municipalities and not the Service Corporations, they urge, the statute is not implicated. To hold otherwise, the City claims, would require "that the Service Corporations . . . be disregarded." *See* City Reply ¶ 55; *see also* SCP Reply at 27. As Ambac explains in its Objection, however, this argument elevates form over substance. *See* Objection ¶¶ 18-21. The clear intent, as well as the practical effect, of this transaction was to obligate *the City*; the Service Corporations are not and were not independent entities, but rather were created as mere alter egos ostensibly to permit the City to do indirectly what it could not lawfully do directly.[5] In fact, both the City and the

---

[5] The Swap Counterparties claim that disregarding the Service Corporations for the purposes of the analysis here would have far reaching consequences and disrupt legitimate financial structures. This is simply not true. Cities in Michigan and other states do establish not-for-profit entities and public benefit corporations to perform functions not performed by those cities. However, as noted *infra*, ¶ 13, the purpose of these structures is to facilitate off balance sheet financing so that

Swap Counterparties concede that the swaps are in reality a transaction with *the City*. *See* 12/17 Tr. at 22 (Ms. Ball) ("There is no doubt that the swap banks are swap participants."); SCP Reply at 30 (stating that the Swap Counterparties are swap participants). The term "swap participant" is, of course, defined in Code § 101(53C) as an entity that has a swap agreement with *a debtor*.[6]

13. Michigan law suggests, moreover, that the City's use of the Service Corporations as a pass-through for its otherwise unlawful obligation was itself unauthorized and improper. The legislative history of the statute that authorized the creation of nonprofit corporations by municipalities reflects that the intent was to permit the use of nonprofit corporations to foster off balance sheet financing for which only the nonprofit corporation, not the City, would be obligated. *See* MI

_____

cities themselves do not take on additional debt. In contrast, while the transaction involving the Service Corporations and the Swap Obligations was created to look like an off balance sheet transaction, it is not, because the City itself is liable for the Swap Obligations – obligations it could not lawfully take on.

[6] The testimony at trial fully corroborates that the Service Corporations lack any independence from the City. Mr. Buckfire testified, for example, that the Service Corporations were not at any of the meetings that led to the original settlement, and that he never engaged in any negotiations with them or witnessed anyone else doing so. 12/17 Tr. at 171. He further testified that it was his understanding that the Service Corporations are controlled by the City and that the City was acting on their behalf in negotiating the Forbearance Agreement. *Id.* Most significantly, Mr. Buckfire testified that that it was his understanding that Mr. Orr *directed* the Service Corporations to execute the Forbearance Agreement, and that that is what they did. *Id.* at 171-72 (emphasis added).

S.F.A. B. An., S.B. 360, 7/18/2001 (providing an example of a city's use of a nonprofit corporation, and observing, "[t[]he nonprofit corporation may issue bonds for the construction of the project at the lowest interest rate *without putting any city funds at risk*.") (emphasis added). Similarly, the legislative history notes that the "[c]reation and operation of a nonprofit corporation *will not necessitate a change in a local unit's revenues or expenditures*." *Id.* (emphasis added). Nonprofits such as the Service Corporations were not to be used as a pass-through to permit a city to incur additional financial obligations itself, and especially not where, as here, the City lacked the legal authority to incur those obligations.

14.     Equally important, the arguments of the City and the Swap Counterparties flatly ignore the fact that the *City's liability to the Service Corporations itself represents an impermissible swap obligation* in violation of Act 34. It is undisputed that the City is liable to the Service Corporations for the entirety of the Service Corporations' swap liability to the Swap Counterparties. For example, Mr. Buckfire testified unequivocally that "the original swap transactions, of course, were *entered into by the [C]ity* in 2006. 12/17 Tr. at 133. In fact, if the Swap Obligations were not a liability of the City, there would be no need for the Forbearance Agreement or the Motion. And Act 34 governs *any* "interest rate exchange or swap, hedge, or similar agreement." Mich. Comp. Laws § 141.2317(1), (2). Thus, the City's liability to the Service Corporations is clearly

the type of swap obligation regulated by Act 34; *no one* contends otherwise.

Therefore, the argument that the City incurred the Swap Obligations in violation of

Act 34 does not require this Court to disregard the Service Corporations; it requires

only an objective analysis of the transaction as a whole and the nature of the City's

obligations to the Service Corporations.

15.     The Home Rule City Act also does not excuse noncompliance with

Act 34.  As detailed in the Objection, Michigan law is clear that even though

Michigan municipalities have significant autonomy under the Home Rule City Act,

that autonomy is expressly "subject[] to constitutional and statutory limitations."

*See* Objection ¶ 28 (citing *Mack v. City of Detroit,* 649 N.W.2d 47, 52 (Mich.

2002); Mich. Const. art 7, § 22).  The City and the Swap Counterparties concede as

much.  *See* City Reply at 32, n.12; SCP Reply at 27.  Thus, where the State has

already spoken on an issue through a statute, the authority of the municipalities is

restricted such that they may not take any action in contravention of the State's

dictates.  *See* Mich. Comp. Laws § 117.36.  State statutes thus preempt any

municipal ordinance that lies in conflict.  *See*, *e.g.*, *People v. Llewellyn,* 257

N.W.2d 902, 904 (Mich. 1977); *Mich. Coal. for Responsible Gun Owners v. City

of Ferndale,* 662 N.W.2d 864, 868 (Mich. Ct. App. 2003).  Likewise, where a state

statutory scheme "occup[ies] the field of regulation which the municipality seeks

to enter," municipal ordinances purporting to govern the same issue will also be

12

preempted. *Llewellyn,* 257 N.W.2d at 322; *see also Capital Area Dist. Lib. v. Mich. Open Carry, Inc.,* 826 N.W.2d 736, 743 (Mich. Ct. App. 2012) (same)

16.    As detailed in the Objection, ¶¶ 27-36, based on the content, legislative history, and pervasive regulatory scheme of Act 34, that statute occupies the field and governs exclusively municipal borrowing, in general, and swap transactions, in particular.  The regulatory regime imposed by Act 34 therefore represents a state law limitation to which the City's Home Rule City Act powers are "subject."  *See* Mich. Const. Art. VII, Sec. 22; Mich. Comp. Laws § 117.4j(3).

17.    The City completely fails to address *Llewellyn* preemption, while the Swap Counterparties limit their discussion to a single conclusory assertion that does not substantively address the arguments advanced in the Objection.  *See* SCP Reply at 29, n. 22.  The Swap Counterparties are also incorrect in asserting that "other Michigan law regulates" swaps.  *See id.* (citing Mich. Comp. Laws §§ 141.422b(5)(b), 141.424).  The cited provisions merely govern the manner in which municipalities must disclose their *investments* in swaps; they do not regulate the manner in which municipalities may *incur* swap obligations.  *See* Mich. Comp. Laws §§ 141.422b(5)(b) (defining "derivative instrument or product" to include swaps), 141.424 (requiring a disclosure of "whether there are derivative instruments or products in the local unit's nonpension investment portfolio at fiscal year end.").  Act 34 is the *sole* Michigan statute that governs municipal swap

obligations, and it provides the *sole* mechanism by which municipalities may incur swap obligations.

18. Because Act 34 governs the manner in which the City can incur swap obligations, and the Swap Obligations here at issue do not comply with Act 34, the City has a virtually dispositive argument that the Swap Obligations were void *ab initio* under well-settled Michigan law. Michigan law distinguishes between *ultra vires* municipal transactions that, by their terms, exceed the scope of the municipality's legal authority, and those that, while *intra vires*, suffer from formalistic or curable defects. While the latter type of transaction creates a voidable obligation that remains valid until a formal legal challenge is asserted and sustained, *ultra vires* obligations are void *ab initio*, i.e. null and void from their inception. *See Utica State Sav. Bank v. Village of Oak Park*, 273 N.W. 271, 275 (Mich. 1937) (contract violated village charter provision and was therefore "void ab initio [and] could not be and was not validated by ratification through acts of municipal officers"); *Wayne County v. Reynolds*, 85 N.W. 574, 574-75 (Mich. 1901) (payment made to county official that exceeded the amount allowable by charter was void and repayable to the county); *see also Kaplan v. City of Huntington Woods*, 99 N.W.2d 514, 517 (Mich. 1959) (city's attempt to enter into an agreement with homeowners without complying with applicable constitutional and charter provisions was "*ultra vires*" and "void[]"); *U.S. v. City of Sault Ste.*

*Marie*, 137 F. 258, 259-260 (W.D. Mich. 1905) (contract that purported to create liability in violation of state law was "*ultra vires* and void"); 10 McQuillin Mun. Corp. § 29:14 (3d ed.) ("If a contract is *ultra vires*, it is wholly void.")

19.     A municipality acts *ultra vires* when it acts "outside the scope of its authority" granted by constitution, statute, or charter.  *Michigan Mun. Liability & Prop. Pool v. Muskegon Cnty. Bd. of Cnty. Rd. Comm'rs*, 597 N.W.2d 187, 187 & n.2 (Mich. 1999).  Such an *ultra vires* contract cannot be ratified through the city's words or actions.  *See Salzer v. City of East Lansing*, 249 N.W. 16, 18 (Mich. 1933) (city's failure to observe state statute rendered its contract for the purchase of property "void"); *Black v. Common Council of City of Detroit*, 78 N.W. 660, 662 (Mich. 1899) (municipal corporation could not "by a subsequent ratification make good on an act of its agent which it could not have directly empowered him to do.  Where the contract is void, a contractor cannot recover of the corporation in any form. . . . All who deal with a municipal corporation must see that the contract upon which they rely is within its powers.").

20.     Here, the City could incur valid swap obligations only by complying strictly with Act 34.  The City has failed to do so because its liabilities to the Service Corporations include a swap component that is neither payable as a limited tax full faith and credit obligation (Mich. Comp. Laws § 141.2317(4)(a)) nor accompanies a validly issued municipal security (Mich. Comp. Laws

15

§ 141.2317(4)(b)). The Swap Obligations were thus incurred in violation of Act

34, and are void *ab initio*.

### B. Neither the Bankruptcy Code Safe Harbors Nor Estoppel Can Resurrect Void Swap Obligations

21. Because the Swap Obligations are an unenforceable nullity, nothing in

the Bankruptcy Code, including the Code's safe harbor provisions, can resurrect

obligations that were invalid from the start. As one court aptly put it:

> If a transaction were unlawful under the statutory scheme then, as a matter of [state] law, a party seeking payment could not have enforced the obligation against [the debtor] because the transaction was a nullity. Therefore, if [the debtor*] had defaulted in the payment obligation . . . [it] could not have been forced to pay.*
> . . . .
> *The safe harbors were enacted to preserve markets by protecting payments made regarding securities transactions, not to create markets by protecting securities transactions that are a "nullity" under state law.*

*In re Enron Corp.*, 323 B.R. 857, 876 (Bankr. S.D.N.Y. 2005) (emphasis added).

22. The *Enron* court was equally explicit in holding that the safe harbor

for swap payments under Section 546(g) is not applicable where the underlying

obligation is void *ab initio*:

> Where a transaction is rendered void by state law, it is a nullity. Thus, the purpose of subsection 546(g) is not implicated. The transaction is void and there is no recognized financial instrument to protect from the uncertainties regarding [its treatment] under the Bankruptcy Code. *Rather, the treatment of the financial instrument is the result of state law voiding the entire transaction.* If it is determined that the transaction violated [state] law, the agreement would be a nullity and have no legal effect. As a consequence, the transfer would not have been made under or in connection with a swap agreement and it would

16

not be protected from avoidance under section 546(g) of the
Bankruptcy Code.

*Id.* at 878 (emphasis added).

23.     *Enron* is fatal to any reliance on the Bankruptcy Code safe harbors to rehabilitate the invalid Swap Obligations.  The law is clear that the safe harbors do not apply to transactions that are void *ab initio*, and neither the City nor the Swap Counterparties cite any authority to the contrary.

24.     The City has suggested, erroneously, that a decision from the Eighth Circuit evidences a circuit split on this issue.  The City was apparently referring to *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009), the only Eighth Circuit case that has cited *Enron*.  That case, however, stands only for the unremarkable proposition that the safe harbors may be implicated by transactions that are merely voidable as opposed to void *ab initio*.  *See id.* at 988 ("As CIC cites no authority indicating Nevada would consider the transaction at issue void, the *Enron* holding provides no support for CIC's position.").  Here, as in *Enron*, the Swap Obligations are void *ab initio* by operation of state law, and accordingly, the decision in *Contemporary* does not support the City's argument.

25.     The authority cited by the City in its Reply in an attempt to diminish the impact of *Enron* is equally inapposite.  First, neither *In re Lancelot Investors Fund, L.P.*, 467 B.R. 643, 652 (Bankr. N.D. Ill. 2012), nor *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 330 (2d Cir. 2011) diminish

the precedential value of *Enron* on the issue of whether transactions that are void

*ab initio* are protected by safe harbors. *See* City Reply at 32-33, n. 13. Unlike

*Enron*, those cases considered whether the safe harbors applied to *valid*

transactions that were fraudulent in nature or otherwise "extraordinary." *See*

*Lancelot*, 467 B.R. at 652 (declining to "accept the Trustee's position that the

redemption payments herein are not settlement payments eligible for safe harbor

protection because they may be tainted by fraud" and contrasting *Enron* where "a

bankruptcy court noted that [the] safe harbor provisions do not protect transfers

that are illegal and unenforceable under state law."); *Enron Creditors Recovery*

*Corp.*, 651 F.3d at 330 ("§ 546(e)'s safe harbor does not protect Enron's payments

from avoidance because they were made to retire debt, not to purchase securities,

and because they were extraordinary.").

26. Second, the City argues that the bankruptcy safe harbors preempt a

state law-based challenge to the validity of the Swap Obligations, *see* City Reply at

32 (citing *In re Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 74 (D. Del. 2002)

and *Whyte v. Barclays Bank PLC*, 494 B.R. 196 (S.D.N.Y. 2013)), but the

authority it cites to support this argument falls far short of the mark. As Judge

Gonzales succinctly explained in *Enron, Hechinger* is simply not applicable to

obligations that are void *ab initio*:

> In the *Hechinger* case, the court precluded the debtor from availing itself of
> a state law claim for unjust enrichment where the result would have been to

circumvent the safe harbor of section 546 of the Bankruptcy Code. The *Hechinger* court reasoned that a state law unjust enrichment claim could not be used to frustrate the protections afforded by the Bankruptcy Code with respect to a "transaction that the court has already found is an unavoidable settlement payment."

Here, however, [the debtor] is asserting that because of the violation of . . . state law, the transaction does not qualify as a "settlement payment" in the first instance and, therefore, does not fall within the statutory protection of section 546 of the Bankruptcy Code.

323 B.R. at 872 (citations omitted). In other words, with respect to obligations that are void *ab initio*, "the Bankruptcy Code is congruent with . . . state law and neither conflict nor field preemption apply." *Id. Whyte*, 494 B.R. at 200, involved a situation identical to *Hechinger*, where the transaction to be avoided was not challenged as being void *ab initio* under state law, and accordingly, the court held that the trustee could not side-step the safe harbor by relying on inconsistent provisions of state fraudulent conveyance law.

27.    In contrast to the City, the Swap Counterparties assert that the invalid Swap Obligations are somehow rehabilitated by operation of the safe harbors in Sections 362(b)(17) and 560. *See* SCP Reply at 29-30. But these provisions are inapplicable for the same reasons Section 546(g) is inapplicable. The exception from the automatic stay embodied in Section 362(b)(17) does not permit the Swap Counterparties to enforce Swap Obligations that are null and void *ab initio* under state law. "If a transaction were unlawful under the statutory scheme then, as a matter of [state] law, a party seeking payment could not have enforced the

obligation against [the debtor] because the transaction was a nullity. Therefore, if [the debtor] had defaulted in the payment obligation . . . [it] could not have been forced to pay." *Enron*, 323 B.R. at 876. Indeed, even if Section 362(b)(17) could be interpreted to permit the Swap Counterparties to sue to enforce void Swap Obligations during the pendency of the bankruptcy case, the suit would be futile, because the City would have no obligation to pay.

28. Section 560 also fails to resurrect the void Swap Obligations. As the Swap Counterparties concede, that section protects the exercise of contractual rights of swap participants or financial participants from being "stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title." *See* SCP Reply at 30 (citing 11 U.S.C. 560). However, the Swap Obligations are void *not* by operation of the Bankruptcy Code or order of this Court; rather, they were void *ab initio* because they were incurred in violation of state law. As stated by Judge Gonzalez, this consequence is not "a result of the bankruptcy filing" but is instead "simply a function of state law." *Enron*, 323 B.R. at 876.

29. Finally, the doctrine of estoppel also cannot validate the void *ab initio* Swap Obligations, because the doctrine simply does not apply to an *ultra vires* transaction:

> A contract of a corporation, which is ultra vires, in the proper sense, that is to say, outside the object of its creation as defined in the law of

20

its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. When a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities, which are prerequisites to its existence or to its action, because such requisites might in fact have been complied with. *But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws.*

*Cent. Transp. Co. v. Pullman's Palace Car Co.*, 139 U.S. 24, 59-60 (1891)

(emphasis added); *see also See Michigan Mun. Liab. & Prop. Pool v.*

*Muskegon Cnty. Bd. of Cnty. Rd. Comm'rs*, 235 Mich. App. 183, 195 (1999)

(county road commission is not estopped from raising the defense of *ultra*

*vires*); *Parker v. West Bloomfield Twp.,* 60 Mich.App. 583, 593, 231 N.W.2d

424 (1975) ("Michigan falls within the general rule that the doctrine of

estoppel is inapplicable to [u]ltra *vires* acts" of municipalities).

30.    In summary, the Swap Obligations are void *ab initio* and cannot be

rendered enforceable by either the Bankruptcy Code safe harbors or the doctrine of

estoppel.

## II. THE PLEDGE OF CASINO REVENUE TO SECURE THE SWAP OBLIGATIONS WAS UNAUTHORIZED UNDER STATE LAW AND THEREFORE VOID *AB INITO*

31.     As with the Swap Obligations, the pledge of the Casino Revenue to

secure them violates Michigan law and is void *ab initio*.  And, as with the Swap

Obligations, nothing in the Bankruptcy Code, including specifically the safe

harbors, can revive the invalid pledge.

32.     Two important consequences flow from this conclusion.  First, the

invalidity of the pledge goes directly to one of the key factors applicable to

whether the settlement amount is reasonable, *i.e.*, collectability.  If the pledge is

invalid, the Swap Counterparties can only collect – even assuming they can obtain

a judgment on which to collect – from the allegedly meager amounts available to

the City's general unsecured creditors.  Second, the invalidity of the pledge is fatal

to any claim that the Swap Counterparties may trap the Casino Revenue, and

completely undermines the City's claim that it was forced to rush into this

settlement to avoid running out of cash.

33.     The latter point is particularly cogent given the testimony at trial from

Mr. Buckfire, the City's chief negotiator, regarding his reasons for entering into the

original settlement.  Mr. Buckfire testified that he went into the negotiations with

the Swap Counterparties with the assumption that they had valid liens.  12/17 Tr. at

187-88.  He testified unequivocally that the Swap Counterparties had the right "at

any time" to trap the Casino Revenues, and that "the ability of the city to survive if the gaming revenues were lost would be cataclysmic." *Id.* at 135, 136. He believed that he "didn't have a very strong negotiating position" and "didn't really have any good way of preserving [the City's] access to gaming revenues without [the Swap Counterparties'] consent." *Id.* at 138. He concluded that he "could not afford to recommend to the emergency manager we take the risk that litigation would be our way of securing our access to gaming revenues because, in fact, *they* [the Swap Counterparties] *had secured rights*." *Id.* at 142. In fact, however, strong and persuasive arguments exist that the Swap Counterparties' lien is void and unenforceable, and that, as a consequence, they could not trap the Casino Revenue. Taking those arguments into account, the settlement, even as revised, is neither fair nor reasonable.

34. As detailed in the Objection, ¶¶ 37-47, the pledge of the Casino Revenue to secure the Swap Obligations was in violation of the Michigan Gaming Control and Revenue Act, Mich. Comp. Laws § 432.201 *et seq.* (the "Gaming Act") because the Gaming Act authorizes the use of Casino Revenue only for specific purposes, none of which include the pledge at issue here. The City and the Swap Counterparties argue to the contrary, asserting that the pledge fits "squarely" within two of the uses permitted by the Gaming Act. City Reply at 33; SCP Reply at 31-32. But their assertions are wholly disingenuous. The simple fact is that the

Casino Revenue was pledged to collateralize a generic financial obligation. It is not being used to improve the quality of life of the City's citizens, or to relieve the City's taxpayers from one or more taxes. Nothing in the Gaming Act authorizes the use of Casino Revenues as collateral for a financial obligation, and the pledge was, accordingly, made in violation of state law.[7]

35.     Under Michigan law, pledges given in violation of state law are *void ab initio* and cannot be enforced or ratified. *See Smith v. Vainik*, No. 303140, 2012 WL 3054145, *3 (Mich. Ct. App. July 26, 2012) (finding one partial owner of a property did not have legal capacity to unilaterally convey a lien on the property because he was a tenant of the entireties, and as such the lien was "*void ab initio* and [could] not be ratified" (citing *Utica State Sav. Bank v. Vill. Of Oak Park*, 273 N.W. 271 (1937)); *Ypsilanti Charter Tp. v. Kircher*, 761 N.W.2d 761, 782 (Mich. Ct. App. 2008) (holding void a lien that was "entirely unauthorized by law")).

36.     Thus, contrary to the suggestion of the City, City Reply at 33, for all of the same reasons that the invalidity of the Swap Obligations themselves cannot be erased by resort to the bankruptcy safe harbor provisions are the doctrine of

---

[7] For all of these same reasons, the pledge of the Casino Revenue to secure the post-petition financing may also be void *ab initio*. The current post-petition financing the City seeks to have approved does not commit to *any* specific use of proceeds, and thus, on its face, does not comply with the requirements of the Gaming Act.

estoppel, the invalidity of the pledge can likewise not be erased by the safe harbors or estoppel. The City's invocation of the Home Rule City Act and the self-serving statements made in an ordinance at the time the pledge was given, City Reply at 33, are equally unavailing, because, as discussed above, the City's powers under the Home Rule City Act (including the power to enact ordinances) are subject to limitations imposed by state law, including the Gaming Act.

37. In short, the City has strong arguments that the pledge of the Casino Revenue is void *ab initio*, and that the Swap Counterparties did *not* have the right to trap the Casino Revenue. Had these arguments been properly considered, no reasonable person could have entered into a settlement that will allow the Swap Counterparties to receive the deal embodied in the motion.

## CONCLUSION

For all of the reasons described above and in Ambac's Objection, which is fully incorporated by reference herein, the settlement as revised should not be approved.

Respectfully Submitted,

Dated: January 2, 2014

**ARENT FOX LLP**
By: /s/ Carol Connor Cohen
CAROL CONNOR COHEN
CAROLINE TURNER ENGLISH
1717 K Street, NW
Washington, DC 20036-5342
(202) 857-6054
Carol.Cohen@arentfox.com

DAVID L. DUBROW
MARK A. ANGELOV
1675 Broadway
New York, NY 10019
(212) 484-3900

and

**SCHAFER AND WEINER, PLLC**
DANIEL J. WEINER (P32010)
BRENDAN G. BEST (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
bbest@schaferandweiner.com

Counsel for Ambac Assurance Corporation

26