# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

      Debtor.

No. 13-53846

Chapter 9

HON. STEVEN W. RHODES

## ATTACHMENT

## APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

| Design-ation | Docket # | Filing Date | Description |
|---|---|---|---|
| 2. | 11 | 7/18/2013 | Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Attachments: Exhibit A; Exhibit B; Exhibit C; Exhibit D; Exhibit E; Exhibit F; Exhibit G; Exhibit H; Exhibit I; Exhibit J; Exhibit K; Exhibit L) |

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                            Chapter 9

CITY OF DETROIT, MICHIGAN                          Case No. 13-53846

    Debtor.                    Hon. Steven W. Rhodes

---

### CONSOLIDATED OBJECTION
### OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

The Retired Detroit Police & Fire Fighters Association ("RDPFFA"), Donald Taylor, individually and as President of the RDPFFA, the Detroit Retired City Employees Association ("DRCEA"), and Shirley V. Lightsey, individually and as President of the DRCEA (collectively "Retiree Association Parties") through their counsel, Lippitt O'Keefe, PLLC and Silverman & Morris, P.L.L.C., submit the following Consolidated Objection to the City of Detroit's Eligibility to be a Debtor Under Chapter 9 of the U.S. Bankruptcy Code:[1]

### BRIEF STATEMENT

The City of Detroit ("City") is not eligible to be a chapter 9 debtor because it does not satisfy the requirements of 11 U.S.C. § 109(c). The City cannot meet its burden to show that it: received valid authorization (any authorization received by

---

[1] Declarations of Shirley V. Lightsey and Donald Taylor in support of this Consolidated Objection of the Retiree Association Parties to Eligibility are attached as Exhibits A & B.

{00199051}1

the City was illegal, unconstitutional and erroneous); is insolvent; and/or that it negotiated in good-faith with creditors or that it was impracticable to do so (when in fact negotiations were practicable and welcomed). Therefore, for these reasons and for those reasons as more fully stated below the City is not eligible to be a chapter 9 debtor.[2]

## RELIEF REQUESTED

1.      The Retiree Association Parties seek an order dismissing the case for the reason that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code.

2.      The Retiree Association Parties further request that the order specifically state that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code because Article IX § 24 of the Michigan Constitution prohibits the City from diminishing or impairing accrued pensions.

## FACTS RELEVANT TO THIS OBJECTION

### I.      *Retirement Benefits Are a Substantial Debt of the City*

3.      The City has listed as the creditors holding the two largest unsecured claims the General Retirement System of the City of Detroit and the Police and Fire Retirement System of the City of Detroit (together, the "Retirement

---

[2] The Retiree Association Parties expect an objection filing by the Retiree Committee, being formed by the U.S. Trustee's office, and anticipate concurring with the position to be taken by the Retiree Committee.

Systems"). The Retirement Systems may in fact be the largest creditors in the sense that the ordinances establishing the Retirement Systems provide for the Retirement Systems to determine and collect from the City the amount necessary for the City to contribute in order that retiree pensions are properly funded, but the function of the Retirement Systems is to administer pension funds for the City for the benefit of the City's retired employees. The City is indebted to its retirees for their accrued benefits, and the Retirement Systems represent a mechanism through which the City is obligated to fulfill its responsibilities to its retired employees. It is the retirees who have the ultimate financial stake in the fulfillment by the City of its pension obligations.

4.     It is undeniable that the retirement benefits due to the retirees from the City are substantial. This is in part because the City's pension obligations represent a continuing obligation to its retirees.

## II.     *Article IX § 24 of the Michigan Constitution Prohibits the City from Diminishing or Impairing its Obligations for Accrued Pensions.*

5.     Article IX § 24 of the Michigan Constitution provides as follows:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

6.     Accrued public pensions were not protected by the Michigan Constitution until the adoption of the Michigan Constitution of 1963. The

applicable language was originally contained in Proposal 40 at the 1961 Constitutional Convention, which was adopted on April 19, 1962, by a vote of 117-1.

7. The City has stated, for example in its June 14, 2013 "Proposal for Creditors" (Docket # 11-1, filed 7/18/13, p. 109), its intention to treat its pension obligations as ordinary unsecured debt. Although the Court must determine the issue of the City's authority to propose a plan of adjustment which diminishes or impairs the "accrued financial benefits of [its] pension plan and retirement system," this issue will not be ripe for determination until the City has proposed such treatment under a plan. Nevertheless, the City's present posture on this issue, in contravention of the Michigan Constitution, precludes a finding that the City attempted to negotiate with the retirees in good faith (especially considering there were no negotiations at all). This lack of good faith negotiation by the City renders the City ineligible for relief under chapter 9.

### III. *The Retiree Associations Have Been and Continue to Be Natural Representatives for Retirees*

8. The Retiree Associations (RDPFFA and DRCEA) have provided and continue to provide a highly organized and representative voice of the retirees.

9. The combined membership of the Retiree Associations is estimated to be approximately 70% of all City retirees.

10. The RDPFFA has represented its constituent retirees for more than 30 years and has won and protected rights for them through litigation, lobbying and other forms of representation.

11. The DRCEA has represented its constituent retirees for more than 50 years and has won and protected rights for them through litigation, lobbying and other forms of representation.

12. Both the RDPFFA and DRCEA's primary purpose is to represent the interests of their respective retiree members. Each of the Retiree Associations operates under its own by-laws and governing documents and serves its members through its elected and/or appointed board of directors and officers.

13. The Retiree Associations are the natural representatives of the retirees capable of bargaining on their behalf.

14. The Retiree Associations are in the process of obtaining proxy forms from their members providing that the retiree appoints his or her respective association to represent him or her in these proceedings. The Retiree Associations have in a short period received over 5,000 proxies and they expect to receive thousands more in the near future.

{00199051}5

13-53846-tjt swr Doc 2368-2 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 5 of 28
13-53846-swr Doc 3497 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 6 of 32

## IV.    The Retiree Associations' Histories of Negotiating and/or Representing Retirees

## A.    The DRCEA

15.    Over the past 53 years, the DRCEA has been integral in securing pension improvements, protections and/or payment of entitled benefits. The list below is a summary of the many accomplishments made by the DRCEA on behalf of retirees and examples of DRCEA's involvement retiree advocacy:

- 1971: Retiree representative appointed by the mayor begins service as a member of the General Retirement System Board of Trustees.

- 1974: New city charter requires retiree representative serving on the General Retirement System Board of Trustees to be elected by retirees

- 1981: Option to withdraw annuity savings when leaving city service prior to retirement while retaining a right to a vested pension permitted.

- 1996: Pre-July 1992 retirees win part of equity lawsuit in circuit court. City ordered to raise pension payments to reflect 1.56% factor for service beyond 10 years.  Retirees do not receive adjustment until February 1999.

- 1996: DRCEA helps defeat Proposal T which would have limited and reduced distribution of excess earnings on investments to retirees.

- 1997: Factors for service years of pre-July 1992 retirees increased to 1.63% by court-ordered pension equity adjustment.  Retirees receive increased rate in November 1999.

- 2000-2003:  Medical insurance premiums reduced by 50% for retirees and beneficiaries of retirees who retired between July 1, 1984 and June 30, 1994.

- 2008: Most pre-July 1998 retirees receive a $30 monthly stipend to pay a portion of Medicare Part B monthly health-care premium. (Recently taken away by the City).

{00199051}6

## B.    The RDPFFA

16.    Over the past thirty-plus years, the RDPFFA has been integral in securing over eighty million dollars in pension improvements, protections and/or secured payment of entitled benefits.  The list below is a summary of the many accomplishments made by the RDPFFA on behalf of retirees:

- 1992: Yank/Gentile lawsuit. When a dispute arose between the City and its police and firemen over the determination of pension benefits, after extensive litigation, the Wayne County Circuit Court ruled that certain fringe benefits such as longevity pay, certain types of holiday pay, and vacation pay, leave time, overtime, shift differential, and cost-of-living allowance were payments made in the course of the policemen and firemen's work for regular work done and must all be included when calculating pension payments.

- 2001: Secured payment of 13th checks totaling $13,820.00 for each eligible retiree (1999-2000-2001).

- 2009: *Weiler v. City of Detroit* healthcare settlement agreement, $12,000,000.00 in direct payment back to retirees and guaranteed life-time healthcare benefits. In July 2006, the City of Detroit changed healthcare benefits for police and fire fighter retirees by increasing co-payments, deductibles, and contributions for monthly healthcare premiums.  A representative action was filed against the City of Detroit over these changes on behalf of approximately 8,000 retirees, their spouses, surviving spouses, and dependents.  The case resulted in a settlement which provided restitution to the class members, along with healthcare cost and benefit-level certainty, broadly reducing the overall financial impact of rising healthcare costs on class members. Importantly, the City agreed that these terms, including the healthcare benefits, were "unchangeable".

- 2011: House Bill 4135 signed into law Public Act 25 of 2011 requiring enforcement of Detroit City Charter placing retiree on Police & Fire Retirement Board.

- 2012: House Bill 5192 signed into law Public Act 12 of 2012 clarifying language contained in PA 25 of 2011 requiring retiree representation on Police & Fire Retirement Board.

- 2011: Amended Detroit City Charter to require two retiree representatives on Police & Fire Retirement Board, one police and one firefighter retiree elected by all retirees.

- 2012: Senate Bill 1189 passed signed into law PA 492 of 2012 requiring equal treatment of elected retiree representatives.

- 2012: Senate Bill 409 passed and signed into law PA 597 of 2012 addressed the issue of pension tax for those that retired from governmental agencies that did not participate in Social Security.

## *V.* *The Retiree Associations Were Ready, Willing and Able to Negotiate with the City*

### *A.* *The DRCEA*

17. The DRCEA, through its President, Shirley V. Lightsey (accompanied by counsel on two occasions), attended three restructuring meetings held by the City and led by attorneys from Jones Day. The meetings were purely informational. At no point during any of these meetings was there an opportunity for negotiation or even for the consideration of the position of the retirees. The meetings are summarized as follows:

June 20, 2013, 10:00 a.m. at the 13th floor auditorium of the Coleman A. Young Municipal Center. Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. A take-it-or-leave-it (unconstitutional) proposal was made by the City which called for pension obligations to be treated as general unsecured debt which violates the Constitution because the proposal would both diminish and

{00199051}8

13-53846-tjt wr Doc 2368-2 Filed 08/09/14 Entered 08/09/14 09:24:05 Page 9 of 32
13-53846-swr Doc 3497 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 8 of 32

impair accrued pension obligations. No negotiation was permitted by the City. The City provided a "data room" to enable the Retiree Associations to research financial and other information.

July 10, 2013, 1:00 p.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. Attorney David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the Pension Fund configuration, a "four-step process." The presentation did not get past step one, the presentation by the City of information. No negotiation occurred.

July 11, 2013, 10:00 a.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. David Heiman and other attorneys from Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation took place because the meeting was purely informational.

18.   Ms. Lightsey also sent a letter to Mr. Orr on May 4, 2013, requesting a meeting with him to discuss pension and other retirement benefits. This letter and request went unanswered by Mr. Orr. Counsel for the Retiree Associations also requested additional meetings with Mr. Orr and his representatives and these requests went unanswered.

### B.    The RDPFFA

19.   The RDPFFA, through its president, Don Taylor, met with Michigan Treasurer,    Andy Dillon, to discuss pension and other retiree issues. Representatives from the RDPFFA (accompanied by counsel on three occasions) also attended various meetings with the City and its representatives. The meetings

{00199051}9

13-53846-swr Doc 236-7 Filed 04/08/13 Entered 04/08/13 08:44:05 Page 10 of 32
13-53846-swr Doc 236-7 Filed 04/08/13 Entered 04/08/13 10:29:05 Page 10 of 32

were purely informational.  At no point in the meetings was there an opportunity

for negotiation or even for the consideration of the position of the retirees.  The

meetings are summarized as follows:

April 18, 2013, 10:00 a.m. at the Coleman A Young Municipal Center – Meeting with Emergency Financial Manager, Kevyn Orr. The meeting was presentational and Mr. Orr informed the group that he had no intention of impairing pensions or health benefits for retirees.  More specifically, Mr. Orr stated that he had no intention to violate the state constitution or to set aside the settlement reached in *Weiler*.  No negotiation occurred.

June 14, 2013 at Detroit Metropolitan Airport. The meeting was led by Jones Day attorneys and other professionals representing the City.  Mr. Orr and Mr. Dillon were in attendance but did not speak. An initial proposal was presented during the meeting.  No negotiation occurred.

June 20, 2013, at the Coleman A. Young Municipal Center, 13th-floor auditorium - Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. A take-it-or-leave-it (unconstitutional) proposal was made by the City. The proposal made by the City called for pension obligations to be treated as general unsecured debt, which violates the Constitution because the proposal would both diminish and impair accrued pension obligations. No negotiation occurred. The City informed the Retiree Associations of the data room as a source for further information.

July 10, 2013, at the Coleman A. Young Municipal Center, 3rd-floor Labor Relations Conference Room. - David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the pension fund configuration, a "four-step process."  The presentation did not get past step one of the "four-step process." No negotiation occurred.

July 11, 2013, at the Coleman A. Young Bldg. 3rd floor Labor Relations Conference Room. David Heiman and associates from

{00199051}10

13-53846-tjt Doc 23687-2 Filed 08/09/13 Entered 08/09/13 10:24:05 Page 11 of 32
13-53846-swr Doc 497 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 11 of 32

Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation was invited and the presentation was unilateral.

## VI. Inaccuracies and Omissions in the City's Filings and Declarations.

20. The City in its "Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code" (Docket # 10) stated that it "is unable to negotiate (or further negotiate) with creditors because such negotiation is impracticable". *Id.* ¶ 5. That statement is not accurate as it relates to retirees.

21. The City goes on to state that it "nevertheless, has negotiated in good faith with creditors who *are represented and organized* and has failed to obtain the agreement of creditors..." *Id.* That statement is likewise not accurate as it relates to retirees.

22. The retirees are represented and organized through the Retiree Associations, but no negotiations with the Retiree Associations occurred.

23. The "Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code" (Docket # 11) only discusses "meetings" with parties concerned with employee legacy obligations (i.e. retirees), but makes no mention of negotiations with retirees, whereas; Mr. Orr specifically mentions "negotiations" with other creditors, such as Swap counterparties and insurers.

{00199051}11

13-53846-tis wr Doc 23687 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 12 of 32
13-53846-swr Doc 497 Filed 08/09/13 Entered 08/09/13 09:44:25 Page 11 of 32

24.     The Retiree Associations do not object to the formation of a Retiree Committee as requested by the City, but dispute some of the statements made by Mr. Orr in his declaration regarding the formation of a Retiree Committee insofar as those statements may be relevant to the City's lack of pre-petition negotiations with retirees, and therefore the City's eligibility for relief under chapter 9:

A.     Mr. Orr's statement that "most of [the City's] approximately 23,500 retirees are not familiar with chapter 9 and lack the means to obtain sophisticated representation in this case on an individual basis", *Id.* ¶ 124, is misleading because most of the City's retirees are members in their respective Retiree Associations, and the Retiree Associations at all times have had the means to obtain sophisticated representation and, in fact, have representation.

B.     Mr. Orr states that the "small number of unions and retiree associations that have offered to represent retirees possess no legal authority to bind those individuals to restructure pension and retiree health benefits," but Mr. Orr's statement  fails to recognize that all negotiations relative to retirees will be on a representative basis and subject to ratification by the retirees.  Even the Retiree Committee requested by the City and being formed by the United States Trustee's Office does not have the unilateral power to bind all retirees.  Likewise, Mr. Orr ignores the history of the Retiree Associations which have in the past negotiated on behalf of and won significant benefits for retirees.

{00199051}12

13-53846-tis-wr Doc 2368-2  Filed 08/09/13  Entered 08/09/13 09:24:05  Page 13 of 32
13-53846-swr  Doc 497  Filed 08/09/13  Entered 08/09/13 10:29:05  Page 12 of 32

## BASIS FOR RELIEF

25.     The Retiree Association Parties object to the City's eligibility because it has failed to meet its burden to show that it has satisfied all of the eligibility requirements of 11 U.S.C. § 109(c).

26.     11 U.S.C §109(c) codifies the eligibility requirements for a municipality to qualify as a chapter 9 debtor, and provides:

> An entity may be a debtor under chapter 9 of this title if and only if such entity—
>
> (1) is a municipality;
>
> (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
> (3) is insolvent;
>
> (4) desires to effect a plan to adjust such debts; and
>
> (5)     (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

27.     The burden of establishing eligibility as a chapter 9 debtor is on the municipality. *In re City of Harrisburg*, 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011)(citing *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008)); *In re Barnwell County Hosp.*, 459 B.R. 903, (Bankr. D. S.C. October 27, 2011); *In re Pierce County Housing Authority*, 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009); UNITED STATES TRUSTEE PROGRAM POLICY & PRACTICES MANUAL, Vol.5, CHAPTER 9 ADMINISTRATION 6 ("The municipality filing the petition bears the burden of proving each element in the chapter 9 eligibility calculus.").

28.     The Retiree Association Parties do not contest that the City is a municipality.

29.     The Retiree Association Parties also do not contest that the City desires to effect a plan to adjust its debt.

30. The Retiree Associations dispute that: (*I*) the City received a lawful authorization to file for bankruptcy under Chapter 9; (*II*) that the City is insolvent; and (*III*) that the City negotiated in good-faith with creditors (i.e., the retirees) when negotiations were practicable.

I.      ***Any Unconditional Authorization Received by the City to File for Bankruptcy that Could Impair or Diminish Accrued Pensions was Illegal, Unconstitutional and Erroneous.***

{00199051}14

13-53846-tjt wr Doc 2368-2 Filed 08/09/13 Entered 08/09/13 09:44:05 Page 15 of 32
13-53846-swr Doc 897 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 15 of 32

31.     Governor Snyder is an executive officer of the state of Michigan and has sworn to "support the…Constitution of this state."

32.     Governor Snyder also has the obligation to ensure that the laws of the state "be faithfully executed." Mich. Const. 1963, Art. V, §8.

33.     Kevyn Orr, as Emergency Manager of the City, has also sworn to "support the…Constitution of this state."

34.     Article IX § 24 of the Michigan Constitution prevents the state and its political subdivisions from impairing or diminishing accrued pensions of the state and its political subdivisions. Mich. Const. 1963 Art. XI, § 1.

35.     The Constitutional protections provided to accrued public pension benefits cannot be abrogated by state statute, state executive action or any other state action short of a duly adopted constitutional amendment. Specifically, nothing in PA 436 or any other statute gives the power to Governor Snyder or Mr. Orr to impair or diminish accrued pension obligations of the City.

36.     Contrary to the oaths taken by Governor Snyder and Mr. Orr, each has taken, and/or threatened to take, affirmative steps to impair or diminish accrued pension obligations.

37.     Mr. Orr's request for Governor Snyder to authorize the City to file for bankruptcy, without excluding accrued pension obligations from the request, is unconstitutional.

{00199051}15

13-53846-tjt   Doc 2369-2   Filed 08/09/13   Entered 08/09/13 10:29:05   Page 16 of 32
13-53846-swr   Doc 3697   Filed 04/09/14   Entered 04/09/14 09:44:35   Page 15 of 32

38.     Section 18 of PA 436 provides Governor Snyder with the power to authorize Mr. Orr to file for bankruptcy on behalf of the City as follows:

> If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and state treasurer that the local government be authorized to proceed under chapter 9.  If the governor approves of the recommendation, the governor shall inform the state treasurer and emergency manager in writing of the decision…Upon receipt of this written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101-1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

39.     Governor Snyder, under section 26(2) of PA 436, also has the power to "place contingencies on a local government in order to proceed under chapter 9."

40.     Despite the constitutional protection of accrued public pensions, Governor Snyder failed to condition his authorization for the City to file bankruptcy on the requirement that all accrued pension benefits not be impaired or diminished.

41.     In drafting chapter 9 eligibility requirements in the Bankruptcy Code, Congress contemplated federalism concerns and stated that a municipality may only be a chapter 9 debtor if it "is specifically authorized, in its capacity as a

municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization *_empowered by State law to authorize such entity to be a debtor under such chapter._*"

42. Congress, in section 109(c) of the Bankruptcy Code, does not discuss the treatment of contracts or any other obligation once a municipality meets the eligibility requirements of 109(c) and is a chapter 9 debtor, but **only** articulates eligibility requirements. The treatment of debts once a municipality is a chapter 9 debtor is a completely different question and is irrelevant to the inquiry here.

43. Congress tempered its bankruptcy power over municipalities in section 109(c) and provided that the states and only the states have the ability to authorize municipalities to seek relief as a chapter 9 debtor.

44. Nothing in the Bankruptcy Code alters the hierarchy of state laws and in the state of Michigan the constitution is supreme. All laws of the state and all persons acting on behalf of the state must comply with the Michigan Constitution. *Campbell v. Detroit*, 51 Mich. App. 34, 37 (1973) (internal citations omitted) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never passed.")

45. No state law, governmental officer or organization is empowered by the laws of the state of Michigan to violate the Michigan Constitution.

{00199051}17

13-53846-tjt-swr Doc 2368-2 Filed 08/09/13 Entered 08/09/13 09:24:05 Page 18 of 32
13-53846-swr Doc 3497 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 17 of 32

46.     Mr. Orr's request for unconditional authority from the governor to file for chapter 9 bankruptcy violates the Michigan Constitution because it is a step (the first step and a significant step) towards the unconstitutional impairment or diminishment of accrued pension benefits.

47.     Governor Snyder's unconditional approval for Mr. Orr to file chapter 9 bankruptcy is unconstitutional because it fails to protect accrued pensions as required by the Constitution.

48.     Any unconditional authorization given by the state for the City to file bankruptcy that does not expressly preclude impairing or diminishing accrued pension benefits is unconstitutional, illegal, and void. *Taxpayers of Michigan Against Casinos v. State*, 478 Mich. 99, 107-08 & n.3 (2007) (even "broad discretion" granted to Governor by statute to act unilaterally must be exercised "within the limits of the constitution").

49.     The City did not receive an authorization empowered by and lawful under State law.

50.     The City fails to satisfy the eligibility requirement of 11 U.S.C. § 109(c)(2) and, therefore, the City is not eligible to be a chapter 9 debtor.

## II.     *There are Issues of Fact with respect to Insolvency*

51.     To qualify as a chapter 9 the City must meet its burden of showing that the City is insolvent.

52.    Section 101(32)(C) of the Bankruptcy Code defines insolvency for a municipality as having a financial condition such that the municipality is:

> **(i)** generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
>
> **(ii)** unable to pay its debts as they become due.

53.    The City in its "Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code" (Docket # 11) claims that the "City is insolvent." *Id. ¶* 3.

54.    The City's financial statements and analyses submitted during the bankruptcy proceeding have been the subject of much scrutiny, criticism and concern.   The critiques concerning the accuracy of the City's financial statements and analyses range from disputes over actuarial assumptions to questions pertaining to more basic accounting issues.   Such concerns, include, but are not limited to:

A.    President of the Detroit Fire Fighters Association, Dan McNamara, has publicly stated that Mr. Orr "is engaged in a propaganda campaign, using, 'deeply flawed research that grossly inflates pension liabilities to the city's police and fire fighters." (July 24, 2013, Press Release from Detroit Fire Fighters Association).

{00199051}19

13-53846-tjt-swr  Doc 2368-2   Filed 08/09/13   Entered 08/09/13 09:24:05   Page 20 of 32
13-53846-tjt  Doc 3497   Filed 08/09/13   Entered 08/09/13 16:29:05   Page 19 of 32

B.     Reuters reporter, Cate Long, has also questioned the pension assumptions by stating "[t]here is a question as to whether the EM's plan is inflating pension liabilities. The unfunded pension liability was adjusted from $650 million reported in 2011 to approximately $3.5 billion – increasing more than five times over two years through unspecified changes to accounting assumptions."

C.     Gabriel Roeder Smith & Company, a highly regarded actuarial firm, has pegged the city of Detroit's liability at $977 million, a far cry from the $3.5 billion alleged by Milliman, a company hired by the City and directed by Mr. Orr.

D.     Milliman has described their own conclusions and actuarial reports as "guesstimates."

E.     Richard P. Larkin, Sr. VP, Director of Credit Analysis at HJ Sims & Co., recently questioned the City's debt calculation in a commentary article published in the Bond Buyer.  Richard P. Larkin, *Why Detroit Could Have Avoided Bankruptcy*, THE BOND BUYER, Aug. 8, 2013, available at http://www.bondbuyer.com/ issues/122_153/ richard-larkin-detroit-bankruptcy-commentary-1054496-1.html. One of Larkin's main criticisms of the City's financial analyses is the calculation of its long term liabilities.  Larkin stated "Detroit's bankruptcy is NOT $18 billion; it's only $15.7 billion."

{00199051}20

13-53846-tjt Doc 23687-2  Filed 08/09/13  Entered 08/09/13 10:29:05  Page 21 of 32
13-53846-swr Doc 2368-2  Filed 08/09/13  Entered 08/09/13 09:44:05  Page 20 of 32

F.     Larkin also comments on the improper use of 4% to 9% annual salary increases, "In general, if you assume high future salary increases, pension liabilities will grow faster because pensions are based on final salaries. In Detroit, the assumption is that salary increases will range from 4% to 9% annually. In light of Detroit's economic and financial distress, I don't believe that raises of that magnitude are realistic." Moreover, the City has actually enforced two 10% pay cuts on City employees in the past 3 years.

55.     The Retiree Association Parties do not take a position on the accuracy or validity of the many critiques concerning the City's financial analyses or even of the City's own figures and analyses.

56.     However, the Retiree Association Parties **_do assert_** that the presence of so many questions and uncertainties about the City's finances shows that the City has not met its burden of establishing insolvency.

57.     Since the City fails to satisfy the eligibility requirement of 11 U.S.C. § 109(c)(3), the City is not eligible to be a chapter 9 debtor.

### III.     _The City Did Not Negotiate in Good-Faith With Retirees When Negotiation Was Practicable_

58.     Negotiation is[a]process of submission and consideration of offers until [an] acceptable offer is made and accepted.  _Gainey v. Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Exp. & Station Emp., D.C. Pa.,_ 275 F. Supp. 292, 300 (E.D. of PA 1967).  The deliberation, discussion, or conference upon the terms

{00199051}21

13-53846-tis Doc 2369-2  Filed 08/10/13  Entered 08/10/13 09:24:05  Page 22 of 32
13-53846-swr Doc 3697  Filed 08/10/13  Entered 08/10/13 10:29:05  Page 22 of 32

of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction. Black's Law Dictionary, 5th Edition, 1979.

59.     The City does not contend that it negotiated with retirees in this case.

60.     The City did not negotiate with retirees in this case.

61.     To the extent that the City views its meetings with the unions and Retiree Associations, or its presentation of its take-it-or-leave-it (unconstitutional) proposal, as negotiations, the negotiations were not in good faith because the proposed diminution and impairment of pension obligations is prohibited by the Michigan Constitution. *City of Bethany v. Public Employees Relation Board of the State of Oklahoma*, 904 P.2d 604, 611 (Okl. 1995) (a party violates "their duty to bargain in good faith when they assert a position…if accepted, require the other side to agree to terms contrary to those mandated by statute); *In re White Crane Trading Co.,* 170 B.R. 694 (E.D. of Cal 1994) (actions taken in violation of law are not made in good-faith).

62.     The City does not satisfy the requirement of 11 U.S.C. § 109(c)(5)(a).

63.     Therefore, the City is ineligible to be a chapter 9 debtor, unless it can meet its burden to show that negotiation with retirees was impracticable.

64.     The City cannot meet this burden of showing that negotiation was impracticable because negotiation was practicable.

{00199051}22

13-53846-tjt  Doc 2368-2  Filed 08/09/13  Entered 08/09/13 09:44:05  Page 23 of 32
13-53846-swr  Doc 3497  Filed 08/09/13  Entered 08/09/13 10:29:05  Page 23 of 32

65.	The determination of "whether negotiations with creditors is impracticable depends on the circumstances of the case." *In re City of Vallejo*, 408 B.R. 280, 298 (9th Cir. B.A.P 2009).

66.	Impracticability is defined as a "circumstance that excuses a party from performing an act…., because (though possible) it would cause **extreme and unreasonable** difficulty." *Id.* (emphasis added; internal citation omitted).

67.	The City alleges that negotiation with retirees was impracticable because there is no representative body that can bind each and every retiree.

68.	The City may be correct in its assertion that there is not a single body that can bind all of the City's retirees, but that is irrelevant because the City does not use the proper legal standard. *In re City of Stockton, California*, ___ B.R.____, 2013 WL 2629129 ( E.D. Cal. 2013).

69.	The proper legal standard, as announced in *Stockton*, is whether there is a "natural representative capable of bargaining on their behalf." *Id.* p 23. The Court in *Stockton* did state a requirement that the "natural representative" have the legal authority to bind all of the retirees. *Id.*   Even the retiree committee formed in *Stockton* and the one being formed in the present case do not or will not have the authority to bind any retiree.

70. In *Stockton*, the court reasoned that in order for negotiations with numerous retirees to be practicable, there needs to be "natural representative capable of bargaining on their behalf."

71. The Retiree Associations are the natural representatives of the retirees and are capable of bargaining and negotiating on their behalf. The Retiree Associations (with counsel) attended presentational meetings held by the City and its representatives. The City could have engaged in good-faith negotiations with retiree representatives at these meetings, but chose not to do so. Follow-up requests to the City by the Retiree Associations (and counsel) for additional meetings were ignored.

72. The City has not and cannot argue that it would have "cause[d] ***extreme and unreasonable*** difficulty" to engage in negotiations at the many meetings held and attended by the Retiree Associations (with counsel) or at future meetings that it could have held and at which the Retiree Associations (with counsel) would have been prepared to negotiate.

73. The City cannot prove that good-faith pre-petition negotiations were impracticable.

74. Therefore, the City fails to satisfy the eligibility requirement of 11 U.S.C. § 109(c)(5)(d) and, accordingly, the City is not eligible to be a chapter 9 debtor.

{00199051}24

13-53846-tls-wr Doc 2368-2 Filed 08/09/13 Entered 08/09/13 10:29:05 Page 25 of 32
13-53846-swr Doc 3497 Filed 04/03/14 Entered 04/03/14 09:44:05 Page 25 of 32

## CONCLUSION

75.     For the reasons stated above, the Retirees Association Parties are entitled to an Order:

A.      Dismissing the case for the reason that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code.

B.      Specifically stating that the City is ineligible to be a debtor under chapter 9 of the Bankruptcy Code because Article IX § 24 of the Michigan Constitution prohibits the City from diminishing or impairing accrued pensions.

Dated: August 19, 2013                    Lippitt O'Keefe, PLLC

<u>/s/ Ryan C. Plecha</u>
Brian D. O'Keefe (P39603)
Ryan C. Plecha (P71957)
Counsel for Retiree Association Parties
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
(248) 646-8292
rplecha@lippittokeefe.com

SILVERMAN & MORRIS, P.L.L.C.
Thomas R. Morris (P39141)
Co-Counsel Retiree Association Parties
30500 Northwestern Highway,Suite 200
Farmington Hills, Michigan 48334
(248) 539-1330
morris@silvermanmorris.com

{00199051}25

13-53846-tis wr Doc 2369-2   Filed 08/09/13   Entered 08/09/13 09:24:05   Page 26 of 32
13-53846-swr  Doc 697   Filed 08/19/13   Entered 08/19/13 10:29:05   Page 26 of 32

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Chapter 9

CITY OF DETROIT, MICHIGAN                        Case No. 13-53846

      Debtor.                             Hon. Steven W. Rhodes

---

## EXHIBIT LIST

## CONSOLIDATED OBJECTION
## OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

A.     Declaration Of Shirley V. Lightsey In Support Of Consolidated Objection Of The Retiree Association Parties To Eligibility

B.     Declaration Of Donald Taylor In Support Of Consolidated Objection Of The Retiree Association  Parties To Eligibility

{00199057}

13-53846-tjt Doc 2308-1 Filed 01/03/14 Entered 01/03/14 09:44:25 Page 27 of 32
13-53846-swr Doc 497 Filed 08/19/13 Entered 08/19/13 16:29:05 Page 1 of 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

---

## DECLARATION OF SHIRLEY V. LIGHTSEY IN SUPPORT OF CONSOLIDATED OBJECTION OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

1. Except as otherwise stated herein, I make the statements contained herein from personal knowledge, and if sworn as a witness, will testify to the truth thereof.

2. I am the President the Detroit Retired City Employees Association (DRCEA).

3. Approximately 7,900 of an estimated 12,100 "non-uniformed" retirees of the City of Detroit (i.e. retirees who were not employed as police officers or fire fighters) are members of the DRCEA. The DRCEA operates under its own by-laws and governing documents and serves its members through its elected board of directors and appointed officers.

4. The DRCEA was founded more than fifty-two years ago and has been active in protecting and improving pensions for retirees since its inception. The DRCEA has been integral in advocating on behalf of retirees before the City and state governments, and has participated in court cases and administrative actions on behalf of retirees as a group.

5. The DRCEA, through its President, Shirley V. Lightsey (together with counsel two occasions), attended three restructuring meetings held by the City and led by attorneys from Jones Day. The meetings were purely informational and conducted as unilateral presentations; at

/001990281

---

no point during any of these meetings was there bilateral negotiation. The meetings are summarized as follows:

> June 20, 2013, 10 a.m. at the 13th floor auditorium of the Coleman A. Young Municipal Center. Several Jones Day attorneys and financial advisors presented a 23-page document and discussed the information. No proposal was made by the City and no negotiation was permitted by the City. The City provided a "data room" to enable the DRCEA to research financial and other information.

> July 10, 2013, 1 p.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. Attorney David Heiman led the discussion and other Jones Day attorneys were present. There were presentations regarding potential changes to the Pension Fund configuration, a "four-step process," was discussed.

> July 11, 2013, 10 a.m. at the Coleman A. Young Municipal Center, 3rd floor Labor Relations Conference Room. David Heiman and other attorneys from Jones Day conducted the presentation. The primary topic was health care. A draft of "Medicare Advantage Plan Design Options" was passed out. No negotiation took place because the meeting was purely informational.

6. Although, like the committee of retirees to be appointed by the United States Trustee in this case, the DRCEA is not empowered to enter into a binding agreement with the City regarding pension benefits, the DRCEA is the representative of the interests of its members and other non-uniformed City retirees and was at all times relevant to this matter in a position to negotiate on their behalf. The DRCEA retained counsel to assist it in the discussions with the City.

7. No negotiation with the City occurred with the DRCEA, or, to the best of my knowledge, any other organization purporting to represent the interests of retirees. The DRCEA also reached out to Mr. Orr directly to discuss pension and other retirement benefit issues, that request went unanswered.

/001990281

8.  The sole proposal made by the City with respect to pensions called for the City's pension obligations to be treated as a non-priority unsecured claim, notwithstanding the prohibition contained in the Michigan Constitution of the City's impairment or diminishment of "the accrued financial benefits of each pension plan and retirement system."

9.  It is therefore my belief that the City did not engage in good-faith negotiations with retirees.

10.  The DRCEA was prepared and willing to enter into good-faith negotiations with the City.

11.  My counterparts with the Retired Detroit Police and Fire Fighters Association expressed to me their willingness to enter into good-faith negotiations with the City, and I believe that they were likewise prepared and willing to enter into good-faith negotiations.

12.  Negotiations between the City and its retirees were therefore practicable.

I certify under penalty of perjury that the foregoing is true and correct.


Executed on August 19, 2013.

Shirley V. Lightsey

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

## DECLARATION OF DONALD TAYLOR IN SUPPORT OF CONSOLIDATED OBJECTION OF THE RETIREE ASSOCIATION PARTIES TO ELIGIBILITY

1.     Except as otherwise stated herein, I make the statements contained herein from personal knowledge, and if sworn as a witness, will testify to the truth thereof.

2.     I am the President the Retired Detroit Police and Fire Fighters Association (RDPFFA).

3.     Approximately 6,500 of an estimated 7,800 "uniformed" retirees of the City of Detroit (i.e. retirees who were employed as police officers or fire fighters) are members of the RDPFFA. The RDPFFA operates under its own by-laws and governing documents and serves its members through its elected board of directors and elected officers.

4.     The predecessor of the RDPFFA was founded in 1946 and became known, in 1970, upon the merger of two organizations, as the RDPFFA. The RDPFFA has been active in protecting and improving pensions for police and fire retirees since its inception. The RDPFFA has been integral in advocating on behalf of retirees before the City and state governments, and has participated in court cases and administrative actions on behalf of police and fire retirees as a group.

5.     The RDPFFA, through its President, Donald Taylor (together with counsel on three

occasions), attended five restructuring meetings held by the City and led by attorneys from Jones

Day. The meetings were purely informational and conducted as unilateral presentations; at no

point during any of these meetings was there negotiation.  The meetings are summarized as

follows:

> April 18, 2013, 10 a.m. at the Coleman A Young Municipal Center – Meeting
> with Emergency Financial Manager, Kevyn Orr.  The meeting was
> presentational and Mr. Orr informed the group that he had no intention of
> impairing pensions or health benefits for retirees.  More specifically, Mr. Orr
> stated that he had no intention to violate the state constitution or to set aside
> the settlement reached in *Wieler*.  No negotiation occurred.

> June 14, 2013 at Detroit Metropolitan Airport. The meeting was led by Jones
> Day attorneys and other professionals representing the City.  Mr. Orr and Mr.
> Dillon were in attendance but did not speak. An initial proposal was presented
> during the meeting.  No negotiation occurred.

> June 20, 2013, at the Coleman A. Young Municipal Center, 13th-floor
> auditorium - Several Jones Day attorneys and financial advisors presented a
> 23-page document and discussed the information. No negotiation occurred.
> The City informed the RDPFFA of the data room as a source of further
> information.

> July 10, 2013, at the Coleman A. Young Municipal Center, 3rd-floor Labor
> Relations Conference Room. - David Heiman led the discussion and other
> Jones Day attorneys were present. There were presentations regarding
> potential changes to the pension fund configuration, and a methodology for
> negotiating the proposed changes- a "four-step process."  The presentation did
> not get past step one of the "four-step process." No negotiation occurred.

> July 11, 2013, at the Coleman A. Young Municipal Center, 3rd floor Labor
> Relations Conference Room. David Heiman and associates from Jones Day
> conducted the presentation. The primary topic was health care. A draft of
> "Medicare Advantage Plan Design Options" was passed out.

6.     Although, like a committee of retirees to appointed by the United States Trustee in this

case, the RDPFFA is not empowered to enter into a binding agreement with the City regarding

pension benefits, the RDPFFA is the representative of the interests of its members and other

police and fire City retirees and was at all times relevant to this matter in a position to negotiate on their behalf, to communicate and comment upon proposals made by the City, and to recommend to its members, and to all police and fire retirees, an acceptable proposal. The RDPFFA retained counsel to assist it in the discussions with the City.

7.     No negotiation with the City occurred with the RDPFFA, or, to the best of my knowledge, any other organization purporting to represent the interests of retirees.

8.     The sole proposal made by the City with respect to pensions called for the City's pension obligations to be treated as a non-priority unsecured claim, notwithstanding the prohibition contained in the Michigan Constitution of the City's impairment or diminishment of "the accrued financial benefits of each pension plan and retirement system."

9.     It is therefore my belief that the City did not engage in good-faith negotiations with retirees.

10.    The RDPFFA was prepared and willing to enter into good-faith negotiations with the City.

11.    My counterparts with the Detroit Retired City Employees Association expressed to me their willingness to enter into good-faith negotiations with the City, and I believe that they were likewise prepared and willing to enter into good-faith negotiations.

12.    Negotiations between the City and its retirees were therefore practicable.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2013.

Donald Taylor

{00199035}