UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| In re | No. 13-53846 |
|---|---|
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

# ATTACHMENT

# APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

| Design-ation | Docket # | Filing Date | Description |
|---|---|---|---|
| 9. | 486 | 8/19/2013 | Joinder of Local 517M, Service Employees International Union as interested party to Objections to Detroit's Eligibility for Relief Under Sections 109(c) and 921(c) of the Bankruptcy Code |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: <br><br> CITY OF DETROIT, MICHIGAN, <br><br> Debtor. | Chapter 9 <br><br> Case No. 13-53846 <br><br> Hon. Steven W. Rhodes |

# AFSCME'S SUPPLEMENTAL BRIEF ON GOOD FAITH NEGOTIATIONS

Pursuant to this Court's Notice Regarding Briefing on "Good Faith Negotiations" (Docket No. 1353), AFSCME submits that case law addressing good faith negotiations under the National Labor Relations Act ("**NLRA**"), 29 U.S.C. § 151 *et seq.*, applies to whether the City complied with its prepetition duty to negotiate with its creditors in good faith over a plan of adjustment under Bankruptcy Code § 109(c). However, because this pure question of law is unsettled (as shown by the need for further briefing); because the City's eligibility for chapter 9 turns on this and other pure and unsettled questions of law; and because the City's eligibility undeniably is a matter of the utmost public importance, the Court should include in its order on eligibility a certification for direct appeal to the Sixth Circuit under 28 U.S.C. § 158(d)(2), regardless of whether the Court rules for or against eligibility in whole or in part.[1]

## I. NLRA CASE LAW CONFIRMS THAT THE CITY FAILED TO SATISFY ITS DUTY TO NEGOTIATE IN GOOD FAITH UNDER 11 U.S.C. § 109(c)

### a. The NLRA Is The Touchstone Of Good Faith Negotiations

Section 109(c) requires that the City negotiate in good faith with its creditors over a plan of adjustment before filing a chapter 9 petition. The structure of § 109(c)(5) enforces that duty by denying relief to any municipality that could have negotiated over a plan with its creditors, yet failed either to (1) reach agreement with a majority of creditors in each class regarding its treatment in the plan before filing the petition, 11 U.S.C. § 109(c)(5)(A), or (2) negotiate in good faith to impasse over the terms of a plan, 11 U.S.C. § 109(c)(5)(B). *See In re City of Vallejo,* 408 B.R. 280, 296-97 (9th Cir. BAP 2009). Section 109(c)(5)(C), in turn, exempts a municipality in the limited circumstances where negotiations are impracticable, and § 109(c)(5)(D) provides a discrete exemption for one such circumstance – namely, where negotiation would have led to a prepetition transaction prohibited by § 547.

---

[1] By briefing the meaning of good faith in chapter 9, AFSCME does not concede chapter 9 is constitutional and reserves all arguments made previously in this case, including but not limited to in Docket Nos. 1156 and 1467.

1

13-53846-tjt  Doc 2368-9  Filed 01/03/14  Entered 01/03/14 09:44:25  Page 2 of 13
13-53846-swr  Doc 1699  Filed 11/12/13  Entered 11/12/13 19:39:32  Page 3 of 14

Neither § 109(c) nor §§ 1113 and 1114 – which require that a chapter 11 debtor negotiate in good faith before rejecting a CBA or retiree benefit – explicitly defines "good faith" or "negotiation." Nor does the Code's definitional provision. *See* 11 U.S.C. § 101.

Congress did not need to define the term of art "good faith negotiation" in the Code because "Congress was not writing on a clean slate," rather it was using a "universally understood" term with a long history of case law under the NLRA. *See ATU v. Donovan,* 767 F.2d 939, 949 (D.C. Cir. 1985) (Congress's "generic" use of the phrase "collective bargaining" in Transportation Code did not explicitly reference NLRA but nevertheless employed a "term of art" invoking "bedrock precepts" from the Act). When the duty to negotiate in good faith first appeared in the Code in 1976, *see* Pub. L. 94-260 § 84(2), Congress had the benefit of a generation of cases crystallizing the meaning of good faith negotiations, and it knew judges did too. *See Morrison v. United States,* 342 U.S. 246, 250 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.").

For this reason, courts interpreting the duty to negotiate in good faith under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, "look[] for guidance to case law interpreting the National Labor Relations Act." *In re Indian Gaming Related Cases,* 147 F. Supp. 2d 1011, 1020-21 (N.D. Cal. 2001), *aff'd,* 331 F.3d 1094 (9th Cir. 2003). The IGRA is not a labor statute at all and, like the Bankruptcy Code, does not expressly define "good faith" or "negotiation." To fill this gap, courts use case law from the NLRA as the interpretive guide for

"the meaning of good faith negotiations under the IGRA" because the "meaning of good faith negotiations in the area of labor law has been well-developed over the course of many years." *Flandreau Santee Sioux Tribe v. South Dakota*, 2011 WL 2551379, at *3 (D.S.D. 2011). *See also Big Lagoon Rancheria v. California,* 700 F. Supp. 2d 1169, 1178-80 (N.D. Cal. 2010). The approach of these courts under the IGRA is of equal application to § 109(c).

b. **The City's "Surface Bargaining" Was Bad Faith Negotiation**

Applying NLRA case law, courts analyzing the IGRA have recognized that "what is known as 'surface bargaining'—going through the motions of negotiating, without any real intent to reach an agreement—does not constitute good faith bargaining." *Flandreau,* 2011 WL 2551379, at *3 (quoting *K–Mart Corp. v. NLRB*, 626 F.2d 704, 706 (9th Cir.1980)). Under the IGRA as illuminated by the NLRA, "[g]ood faith 'presupposes a desire to reach ultimate agreement' and not simply 'an attitude of take it or leave it.'" *Id.* (quoting *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485 (1960)). Thus, to smoke out surface bargaining in violation of the statutory duty to negotiate in good faith, courts must look beyond "the record of negotiations between the parties" and further "inquir[e] into the parties' state of mind and all of the facts and circumstances." *Big Lagoon Rancheria,* 700 F. Supp. at 1178.

Here, because the City engaged in surface bargaining, it never "failed to obtain the agreement" of its creditors, including AFSCME, as required by § 109(c)(5)(B). "That parties bargain in good faith is a prerequisite for a finding that the parties had reached a valid impasse." *U.S. Ecology Corp. v. NLRB,* 26 Fed. App'x 435, 439 (6th Cir. 2001) (citing *NLRB v. Plainville Ready Mix Concrete Co.*, 44 F.3d 1320, 1326 (6th Cir.1995)) (enforcing NLRB order on surface bargaining). As AFSCME's Director of Collective Bargaining testified at trial, AFSCME previously negotiated concessionary agreements affecting retiree benefits with the City of

Detroit. Yet other trial testimony demonstrated not only that the City never engaged AFSCME in "negotiations" over retiree benefits at all, but also that it conducted its so-called "discussions" with creditors "as a kind of charade or sham, all the while intending to avoid reaching an agreement." *NLRB v. Hardesty Co., Inc.,* 308 F.3d 859, 865 (8th Cir. 2002) (quotation omitted). Like the employer who exchanges views with the union on the surface, but whose "away from the table" actions demonstrate its true intent "to wait . . . and seek decertification" of the union later, *id.* at 866-67, the City engaged in surface bargaining when it scheduled meetings with its unions *after* the City had already resolved to file its petition.

Employing the meaning of "good faith" under the NLRA, Judge Graves held that the duty to bargain in good faith under § 1113 also demands "conduct indicating an honest purpose to arrive at an agreement through the bargaining process." *Matter of Walway Co.,* 69 B.R. 967, 973 (Bankr. E.D. Mich. 1987) (citing *Cap Santa Vue Inc. v. NLRB,* 424 F.2d 883 (D.C. Cir. 1970)). Accordingly, courts recognize that a "non-negotiable, take-it-or-leave-it proposal" by a debtor fails to comply with the duty to negotiate in good faith required by §§ 1113 and 1114. *In re Delta Air Lines,* 342 B.R. 685, 697 (Bankr. S.D.N.Y. 2006). To the extent that cases decided under §§ 1113 and 1114 apply the duty to bargain in good faith under the NLRA, they may inform this Court's analysis. But to the extent they allow the debtor more flexibility, they are inapposite because §§ 1113 and 1114 govern bargaining during, as opposed to before, bankruptcy, and accordingly delineate a detailed procedure "designed to encourage such a negotiated voluntary modification." *In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 90 (2d Cir. 1992) (citation omitted). In contrast, as one court analyzing the legislative history of § 109(c) explained, "Congress consciously sought to limit accessibility to the bankruptcy court by municipalities" by insuring "that the creditors have an opportunity to negotiate concerning a plan

*on a level playing field with the debtor before their rights are further impaired*" by the automatic stay and the resultant weakening of the creditors' "negotiating posture" during bankruptcy. *In re Cottonwood Water & Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992).

      c. ***Bildisco* And Pre-*Bildisco* Legislative History Further Confirm That Vested Pension Benefits Are Sacrosanct**

A more robust duty of good faith applies under § 109(c) than that announced in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513 (1984). The *Bildisco* Court harmonized the duty of good faith bargaining from the NLRA, a non-bankruptcy statute, with the countervailing "goal of Chapter 11" to achieve a successful reorganization via, in part, the rejection of executory contracts. 465 U.S. at 527. Section 109(c), in contrast, contains an explicit duty of good faith. Moreover, § 109(c) serves a gatekeeping function immune from the pressures of the rest of the Code. Unless § 109(c) is satisfied, successful municipal reorganization is not a goal to be balanced against good faith negotiation in the first place.

When, prior to *Bildisco,* Congress first inserted the duty to negotiate in good faith into the chapter 9 eligibility requirements, the Senate Conference Report focused on the provision, now codified at 11 U.S.C. § 903, preserving the authority of state law to control municipal powers, including expenditures. While the report suggested on the one hand that state labor law, like the NLRA as interpreted by *Bildisco,* would not prevent the rejection of all CBAs in bankruptcy, it also confirmed that state law nevertheless continues to protect pension rights from discharge under the Bankruptcy Code as AFSCME has argued. *See* **Exhibit A** attached hereto (Senate Conference Report on H.R. 10624); AFSCME Supp. Br. On Elig. at 1-4 (Docket No. 1467).

In the report, Senator Javits (R-NY) sought and obtained from Senator Burdick (D-ND) confirmation that "the right of an individual pensioner drawing his pension . . . will not be subjected to the Bankruptcy Act and one whose pension is vested" by a state constitution will not

5

be "affected by the bankruptcy" of a city. Exhibit A at S4376-77. Under the New York constitutional provision at issue, like the Pensions Clause in the Michigan Constitution, pension benefits "shall not be diminished or impaired." *Id.* at S4377. Consistent with AFSCME's argument that such constitutional pension rights receive absolute protection akin to state property rights in bankruptcy, *see* Docket No. 1467 at 2-3, Senator Burdick's reply left no doubt that due process "preserves the *rights* of a person which have become vested in his pension plan" despite a municipal bankruptcy, and a state constitutional right to vested pension benefits "would be, at the very least, a paramount claim on any assets of the bankruptcy." Exhibit A at S4377.

These were not theoretical questions for Senator Javits, a former bankruptcy lawyer, and his constituents. "The magnitude" of New York City's "severe economic problems" in 1976 "prompted Congress to expedite the consideration of" the amended municipal bankruptcy statute in 1976, *Cottonwood,* 138 B.R. at 977-78 – less than a year after President Ford infamously refused New York federal financial assistance. Senator Javits was nevertheless confident that the report would "give great assurance to many employees who have served faithfully and thought they had something until they ran into the present financial problems." Exhibit A at S4377. That same assurance should extend to AFSCME Retirees who have served Detroit faithfully.

## II. THE COURT SHOULD INCLUDE IN WHATEVER ORDER IT ISSUES ON ELIBILITY A CERTIFICATION FOR DIRECT APPEAL

This Court should follow the lead of the BAP in the *Vallejo* case and certify its order on eligibility to the court of appeals in the text of the order itself. *See* 408 B.R. at 285 n.3.

The statute governing appeals of bankruptcy court orders provides that a bankruptcy court "shall" certify an order for direct appeal to the court of appeals if the bankruptcy court determines that the order meets any one of the following conditions: (1) it "involves a matter of public importance"; (2) it involves a question of law for which there is no "controlling decision"

of the court of appeals or the Supreme Court; (3) it involves "a question of law requiring resolution of conflicting decisions"; or (4) an immediate appeal "may materially advance the progress of the case or the proceeding in which the appeal is taken." 28 U.S.C. § 158(d)(2). The statute's use of "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

Whatever decision this Court reaches on eligibility, at least two independently sufficient conditions for certification will be satisfied. First, whether Detroit, by far the largest and most economically significant city ever to file for chapter 9 bankruptcy, is eligible to proceed under chapter 9 undeniably is a matter of the utmost "public importance." Indeed, no matter how large and economically significant a municipality may be, a bankruptcy court's resolution of eligibility in a chapter 9 case is by its very nature a watershed event in that case which—in fairness to all parties involved—cries out for the most expeditious appellate review possible. The large number of bankruptcy court decisions addressing the issue of chapter 9 eligibility further evidences its importance. *See In re Ransom,* 380 B.R. 809, 812 (9th Cir. BAP 2007).

Second, there is no Sixth Circuit or Supreme Court decision that even addresses, much less "control[s]" the disposition of, the many pure questions of law that have been raised by the objectors to the City's eligibility, including but not limited to the constitutionality of chapter 9 under either the Contracts Clause of the Federal Constitution or under federalism in the wake of *Asbury Park* and *New York* and as amended to prohibit state municipal debt adjustment schemes since 1946; the constitutionality of PA 436 under the Pensions Clause and/or home rule provisions of the Michigan Constitution; and the meaning of the statutory eligibility factors from § 109 of the Code, including the "good faith" negotiations issue addressed in Part I above. *See Weber v. U.S. Trustee,* 484 F.3d 154, 158 (2d Cir. 2007) (Congress' intent in providing for direct

7

appeals under 28 U.S.C. § 158(d)(2) was to "facilitate" the "provision of guidance" by the courts of appeals "on pure questions of law" in order to combat "widespread unhappiness at the paucity of settled bankruptcy-law precedent").

No matter how this Court rules on the eligibility issue, AFSCME is hard-pressed to conceive of any valid objection that the City might have to certification of the Court's eligibility order. If the Court rules in favor of eligibility, chapter 9 stands in the way of a stay of that ruling pending appeal, *see* 11 U.S.C. § 921(e), and the City will no doubt endeavor to make good on its publicly stated intention of submitting a plan for this Court's approval by the end of the year even if the Sixth Circuit were to authorize a direct appeal upon this Court's certification (as the Sixth Circuit would be required to do under 28 U.S.C. § 158(d)(2) for such a direct appeal to proceed). Conversely, if this Court's ruling is against eligibility, the City presumably would have an affirmative interest in expediting the appellate process to the greatest extent possible.

### III. CONCLUSION

For the foregoing reasons, this Court should apply NLRA law on the meaning of good faith negotiations to hold that the City is not eligible for relief under § 109(c), and should include in whatever order it issues on eligibility a certification for direct appeal to the Sixth Circuit.

Dated: November 13, 2013

| **LOWENSTEIN SANDLER LLP**<br>By: /s/ *Sharon L. Levine*<br>Sharon L. Levine, Esq.<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>(973) 597-2500 (Telephone)<br>(973) 597-6247 (Facsimile)<br>slevine@lowenstein.com | Herbert A. Sanders, Esq.<br>THE SANDERS LAW<br>FIRM PC<br>615 Griswold St., Suite 913<br>Detroit, MI 48226<br>(313) 962-0099 (Telephone)<br>(313) 962-0044 (Facsimile)<br>hsanders@miafscme.org | Richard G. Mack, Jr., Esq.<br>Miller Cohen, P.L.C.<br>600 West Lafayette<br>Boulevard<br>4th Floor<br>Detroit, MI 48226-3191 |

*Counsel to AFSCME Michigan Council 25 and Sub-Chapter 98, City of Detroit Retirees*

8

13-53846-tjt Doc 2368-5 Filed 01/03/14 Entered 01/03/14 09:44:25 Page 10 of 14
13-53846-swr Doc 1695 Filed 11/13/13 Entered 11/13/13 18:44:32 Page 10 of 13

# **EXHIBIT A**

CONGRESSIONAL RECORD
Proceedings and Debates of the 94th Congress
LD-4a (Rev. Jan. 71)

SENATE

| BILL | DATE | PAGE(S) |
|---|---|---|
| H.R. 10624 | March 25, 1976 | S4376-4378 |

ACTION:

Bankruptcy: Senate agreed to the conference report (in disagreement) on H.R. 10624, adding a new chapter to the Bankruptcy Act to provide for the adjustment of debts of major municipalities. Senate then agreed to the House amendment to the Senate amendment to the bill, thus clearing the measure for the White House.

Pages S4376-S4378

## AMENDMENT OF THE BANKRUPTCY ACT—CONFERENCE REPORT

Mr. BURDICK. Mr. President, I submit a report of the committee of conference on H.R. 10624, and ask for its immediate consideration.

The PRESIDING OFFICER (Mr. FORD). The report will be stated by title.

The second assistant legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House of Representatives to the bill (H.R. 10624) to revise chapter IX of the Bankruptcy Act, having met, after full and free conference, have been unable to agree.

The PRESIDING OFFICER. Without objection, the Senate will proceed to the consideration of the conference report.

There being no objection, the Senate proceeded to consider the report.

(The conference report is printed in the RECORD of House of Representatives of March 25, 1976.)

Mr. BURDICK. Mr. President, I move that the Senate agree to the conference report in disagreement.

The PRESIDING OFFICER. The question is on the motion.

Mr. JAVITS. Mr. President, I wish to be recognized.

Mr. President, I am not in opposition to this report at all. But there is a critically important question which the Senator and I have straightened out between us, and it should occur in the record before the report is acted on, as it is a question of interpretation of the report.

Mr. President, one of the major questions raised in this report is what happens to the governmental powers of States and municipalities in a bankruptcy. The doctrine of preemption and exclusivity in bankruptcy is very clear, but the doctrine also runs into the other doctrine of the tenth amendment to the Constitution respecting the integrity of the States and the sovereignty of the States in the way in which our Government is organized.

Therefore, specifically, I ask my colleague, the manager of the conference report, respecting the interpretation of section 83 which seeks to reserve State power to control governmental functions of political subdivisions. That is its title. This question may relate to other functions of the State.

But I am going to confine it to one function which will be illustrative and also make the legislative history for the particular function I have in mind. The question is this:

Assume that this bankruptcy provision, which we are adopting tonight, is availed of. Then what happens to the individual pensioner of the subdivision of a State or of a State itself, or the one whose rights have been vested for a pension under State law or appropriate local law? May that pension or the vested right to a pension be dealt with in this bankruptcy proceeding in such a way as to change or modify it substantively?

In my State, for example, the constitution in article V, section 7 states as follows:

13-53846-tjw Doc 2368-9 Filed 01/03/14 Entered 01/03/14 09:44:25 Page 12 of 14

After July 1, 1940, membership in my pension or retirement system of the State or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired.

That is the State constitution.

The section in question seeks, I believe—of course, the Senator from North Dakota will give us the answer—to preserve that right by its language which reads as follows:

Nothing contained in this chapter shall be construed to limit or impair the power of any State to control by legislation or otherwise any municipality or any political subdivision of or in such State in the exercise of its political or governmental powers, including expenditures thereof, provided, however, that no State law prescribing a method of compensation of indebtedness of such agencies shall be binding upon any creditor who does not consent to such composition and no judgment shall be ordered under such State law which will bind the creditor to such composition without his consent.

The meaning, it seems to me, clearly, then, of that section—and that is what I would like the confirmation of the Senator about—will preserve the right of an individual pensioner drawing his pension so that it will not be subjected to the Bankruptcy Act and one whose pension is vested in terms of the State law or State Constitution not being affected by the bankruptcy of that particular governmental entity.

Mr. BURDICK. The due process clause of the U.S. Constitution, of course, preserves the rights of a person which have become vested in his pension plan, if the pension plan is fully executed. Under New York law it would be, at the very least, a paramount claim on any assets of the bankruptcy.

Mr. JAVITS. I thank my colleague very much. His answer will give great assurance to many employees who have served faithfully and thought they had something until they ran into the present financial problems.

I thank him further.

Mr. BURDICK. Mr. President, I move that the Senate agree to the conference report in disagreement.

The PRESIDING OFFICER. The question is on the motion of the Senator from North Dakota.

The motion was agreed to.

Mr. CURTIS. Mr. President, I move to reconsider the vote by which the motion was agreed to.

Mr. JAVITS. I move to lay the motion on the table.

The motion to lay on the table was agreed to.

Mr. HRUSKA. Will the distinguished Senator from North Dakota yield for a question about the intent of a portion of the legislation?

Mr. BURDICK. I will yield to the question from the distinguished Senator from Nebraska.

Mr. HRUSKA. The conference report and statement of managers are silent on the rejection of a collective bargaining agreement by a municipality. Could you explain the intent of the legislation in that regard?

Mr. BURDICK. Yes. The Senate report in its version of the bill, S. 2597, makes this clear on page 15. The House report has similar language on pages 8–9. The bill provides in section 82(b)(1) that the court shall have the power to permit the rejection of executory contracts by the petitioner. It is contemplated that all continuing obligations of the petitioner including collective bargaining agreements will be considered executory contracts.

Mr. HRUSKA. But, does not the House report imply that local laws, such as those governing the negotiation and renegotiation of collective bargaining laws, might apply in such a case?

Mr. BURDICK. I am familiar with the language to which you refer. To use an example, it is my understanding that some States have laws which require the negotiation or renegotiation in good faith of all collective bargaining agreements and that during the period of negotiation and renegotiation the employees must remain on their jobs at the same salaries, conditions and terms. It is the intent of this legislation that any such laws should not be allowed to frustrate the purposes of the bankruptcy proceedings.

Mr. HRUSKA. Would these statutes be given no weight because of the bankruptcy and supremacy clauses of the Constitution?

Mr. BURDICK. I think that is certainly the case but it should be made clear that notwithstanding the constitutional considerations it is the intent of the legislation that if a State has such laws they would not apply to the petitioner negotiating or renegotiating any collective bargaining agreement during the bankruptcy proceedings.

Mr. HRUSKA. Does the distinguished Senator read section 83 of the chapter to limit section 82(b)(1)? Section 83 is the section which states that no provision of this chapter shall limit a State in the exercise of its political or governmental powers. Could a State labor law passed before the enactment of this bill and which prohibits the rejection of a collective bargaining agreement of a municipality as an unfair labor practice be deemed to supersede the power of rejection in section 82(b)(1)?

Mr. BURDICK. Definitely not. The power to reject executory contracts in section 82(b)(1) is an integral part of the legislation and is not in any way limited by section 83. The latter section is merely being carried over in this bill in deference to the Supreme Court's decisions in *Ashton* v. *Cameron Water Improvement District No. 1*, 298 U.S. 513 (1936) and *Bekins* v. *United States*, 304 U.S. 27 (1938) and is intended to have no new application because of this bill and to be construed as narrowly as possible.

Mr. HRUSKA. It is my understanding that there are some recent cases which hold that in chapter XI cases a debtor in possession may reject collective bargaining agreements on the grounds that there is no conflict in the bankruptcy and labor laws because the debtor in possession is a new entity and not a party to the collective bargaining agreement. Would the holdings of those cases limit the power of the petitioner in chapter IX to reject any contract or collective bargaining agreement?

Mr. BURDICK. No. In the context of chapter IX the petitioner is as much a new entity as the debtor in possession in chapter XI. The bill recognizes this in section 85(h) where the avoiding powers are given to the petitioner to set aside its own previous transactions. In any case where the labor laws conflict with the powers of the petitioner under this Act, it is the intent of the legislation that the Federal, State, and local labor laws should be overridden.

Mr. HRUSKA. As a practical matter do you not expect that the petitioning municipality will renegotiate most rejected collective bargaining agreements much in the same manner of its prebankruptcy experience?

Mr. BURDICK. Yes, but I want to make it clear that it will not be obligated to follow State or local law in that regard.

Mr. HRUSKA. Thank you for clarifying this matter.

Mr. BURDICK. Will the distinguished Senator from Nebraska answer a question about the intent of another portion of the legislation?

Mr. HRUSKA. Yes, I would be pleased to do so.

Mr. BURDICK. The Senate version of the legislation, S. 2597, required the court to find as a condition to confirmation that "it appears from petitioner's current and projected revenues and expenditures that the budget of the petitioner will be in balance within a reasonable time after adoption of the plan." What is the intent of the legislation in this regard?

Mr. HRUSKA. The balanced budget requirement as an enumerated requirement was deleted in conference between the House and Senate on the bill. This was done upon the premise that the fair, equitable and feasible requirement which is enumerated requirement section 94(b)(1) will encompass the balanced budget requirement. The court will be required to consider whether the petitioner's plan will balance its budget within a reasonable time after adoption of the plan as an essential part of its finding that the plan is fair, equitable, and feasible.

Mr. BURDICK. The House bill did not contain such a requirement and the House report at pages 32–33 contained citations to cases interpreting the "fair, equitable and feasible requirement." Is it the intent of the legislation to limit the court to those cases in applying the balanced budget requirement of the legislation?

Mr. HRUSKA. No. The intent is that the court should make the determination on a case-by-case basis and not be limited by any prior case law. The court probably will be required to have the benefit of expert testimony as to the projected balance or inbalance of petitioner's budget, based upon generally accepted accounting principles.

Mr. BURDICK. The distinguished Senator will remember that the Senate receded from its position which would have permitted the court to enforce the conditions attached to certificates of indebtedness as in section 805(g) of the Senate bill. What is the intent of the legislation with respect to enforcement

13-93840-swr    Doc 1699    Filed 01/03/14    Entered 01/03/14 19:14:32    Page 12 of 13

of conditions attached to certificates of indebtedness?

Mr. HRUSKA. It is contemplated that in the usual case the court as a condition to the issuance of certificates of indebtedness under section 82(b)(2) will require that the petitioner give consent pursuant to section 82(c) to the enforcement of all conditions attached to the certificate of indebtedness. The consent of the petitioner as provided in section 82(c) may be given prospectively.

Mr. BURDICK. I thank the Senator from Nebraska for clarifying these portions of the legislation.

Mr. President, I move that the Senate concur in the House amendments to the Senate amendments to the bill H.R. 10624.

The PRESIDING OFFICER. The question is on the motion of the Senator from North Dakota.

The motion was agreed to.

Mr. BURDICK. That is all.

PROGRAM

Mr. LONG. Mr. President, on behalf of our colleague, the Senator from West Virginia (Mr. ROBERT C. BYRD), I wish to remind Senators that the Senate will meet at 9 a.m. and will first take up the toxic substances bill, S. 3149, under a time limit. Then the Senate will take up H.R. 9721, the Inter-American Development Bank bill, under a time limit. There will be rollcall votes during the day.

S. 3065—AUTHORIZATION FOR TECHNICAL AND CLERICAL CORRECTIONS

Mr. LONG. Mr. President, I ask unanimous consent that the Secretary of the Senate be authorized to make technical and clerical corrections in the engrossment of S. 3065, the Federal Election Campaign Act amendment of 1976, and that the bill as passed be printed.

The PRESIDING OFFICER. Without objection, it is so ordered.

ADJOURNMENT TO 9 A.M. TOMORROW

Mr. LONG. Mr. President, if there be no further business to come before the Senate, I move, in accordance with the previous order, that the Senate stand in adjournment until 9 a.m. tomorrow.

The motion was agreed to; and at 6:47 p.m. the Senate adjourned until tomorrow, Firday, March 26, 1976, at 9 a.m.

WITHDRAWAL

Executive nomination withdrawn from the Senate March 25, 1976:

Albert C. Hall, of Maryland, to be an Assistant Secretary of the Air Force, vice Walter B. LaBerge, resigned, which was sent to the Senate on March 3, 1976.