Section 9.3    **Notice of Claims**.  If either Party becomes aware of any injury, damages, claim, demand, action, legal proceeding, or other loss that may involve the other Party, whether directly or indirectly, it shall inform the other Party in writing within fifteen (15) business days of receiving knowledge of the injury, damages, claim, demand, action, legal proceeding, or other loss.  Such notice(s) shall be provided in accordance with Section 12.7 of this Agreement.

Section 9.4    **Insurance**.  At all times during the term of this Agreement, each Party shall procure and maintain, at its sole cost and expense, the following types and amounts of insurance coverage issued by an insurance company reasonably acceptable to the other Party, unless otherwise agreed to by the Parties in writing:

(a)    Commercial General Liability, covering bodily and personal injury, property damage, and contractual liability insuring the activities of the Party under this Agreement, in a minimum amount of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(b)    Commercial Automobile Liability with limits of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(c)    Worker's compensation insurance in amounts required in accordance with applicable laws.

(d)    Errors and Omissions/Professional Liability with limits no less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the annual aggregate.

The insurance required of the City by this Agreement in the amounts, with the coverage and other features herein required, may be supplied by a fully funded self-insurance program of the City or a self-insurance pool in which the City is a participant; provided that such self-insurance program or pool will provide the full coverage required herein.

## ARTICLE X
## DISPUTES

Section 10.1   **Informal Dispute Resolution**.  The Authority and the City will attempt to settle any dispute through informal good faith negotiations.  The dispute will be escalated to appropriate senior level management of the Parties, if necessary.  Except as otherwise set forth herein, if such managers are unable to resolve the dispute within fifteen (15) business days of referral (or any other mutually agreed upon timeframe), the Parties will seek resolution of such disputes pursuant to Section 10.2.

Section 10.2   **Jurisdiction and Venue**.  Except as otherwise set forth herein, in the event of any disputes between the Parties over the meaning, interpretation, or implementation of the terms, covenants, or conditions of this Agreement, the matter under dispute, unless resolved any the Parties pursuant to Section 10.1, shall be submitted to the courts of the State of Michigan.

Page | **12 of 15**
13-53846-swr   Doc 1341-5   Filed 10/23/13   Entered 10/23/13 17:15:55   Page 13 of 30   51
13-53846-tjt   Doc 2379-2   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 1 of 50

# ARTICLE XI
## MISCELLANEOUS

**Section 11.1    Amendment**.  This Agreement can be modified or amended only by written agreement executed and approved by both Parties in the same manner as required for the initial effectiveness of the Agreement, as applicable.

**Section 11.2    Heirs, Successors, and Assigns**.  All provisions of this Agreement are and will be binding on the heirs, executors, administrators, personal representatives, successors and assigns of the Authority and the City.

**Section 11.3    Severability**.    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**Section 11.4    Governing Law**.  The internal laws of the State of Michigan will control in the construction and enforcement of this Agreement.

**Section 11.5    Third Party Beneficiary Rights.**  The Parties expressly acknowledge that the Utility Bondholders (and the Trustee on behalf of such Bondholders) are direct, intended third party beneficiaries of Article IV and Article V of this Agreement and of all other provisions of this Agreement relating to the Utility Taxes and Utility Revenues and as such, are entitled, but not obligated to enforce this Agreement and shall be afforded all remedies available hereunder or otherwise afforded by law against the Parties hereto.

**Section 11.6    Entire Agreement**.    This Agreement sets forth the entire agreement between the Parties and supersedes any and all prior agreements or understandings between them in any related to the subject matter of this Agreement.  It is further understood and agreed that the terms and conditions of this Agreement are contractual and are not a mere recital and that there are no other agreements, understandings, contracts, or representations between the Parties in any way related to the subject matter of this Agreement, except as expressly stated in this Agreement.

**Section 11.7    Notices**.    Any and all correspondence or notices required, permitted, or provided for under this Agreement to be delivered to any Party shall be sent to that Party by first class mail.  All such written notices shall be addressed to each other Party's signatory to this Agreement.  All correspondence shall be considered delivered to a Party as of the date that the notice is deposited with sufficient postage with the United State Postal Service.  A notice of termination shall be sent via certified mail to the address included with each Party's signature to this Agreement.  Notices shall be mailed to the following addresses:

If to the Authority:    Public Lighting Authority
                        65 Cadillac Square, Ste. 2900
                        Detroit, MI 48226

P a g e | **13 of 15**
13-53846-swr    Doc 1341-5    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 14 of 30    52
13-53846-tjt    Doc 2379-2    Filed 01/03/14    Entered 01/03/14 17:41:50    Page 2 of 50

| If to City: | City of Detroit |
| | Office of the Mayor |
| | 2 Woodward Avenue, 11th Floor |
| | Detroit, MI 48226 |

| With a copy to: | City of Detroit |
| | Office of the Emergency Manager |
| | Coleman A. Young Municipal Center |
| | 2 Woodward Ave. |
| | 11th Floor |
| | Detroit, MI 48226 |
| | Attn: Sonya Mays |

Section 11.8   **Force Majeure**.  Any delay or failure in the performance by either Party hereunder shall be excused if and to the extent caused by the occurrence of a Force Majeure. For purposes of this Agreement, Force Majeure shall mean a cause or event that is not reasonably foreseeable or otherwise caused by or under the control of the Party claiming Force Majeure, including acts of God, fires, floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism, accident, restraint of government, governmental acts, injunctions, labor strikes, other than those of the claiming Party or its suppliers, that prevent the claiming Party from furnishing the materials or equipment, and other like events that are beyond the reasonable anticipation and control of the Party affected thereby, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences, and which events or the effects thereof are not attributable to a Party's failure to perform its obligations under this Agreement.

Section 11.9   **Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

Section 11.10 **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties hereto.  No Party to this Agreement may assign its rights under this Agreement to any other person without obtaining the written permission of the other Parties in advance, provided that the Authority's right to terminate this Agreement may be collaterally assigned by the Authority.

Section 11.11. **Limited Obligation**.  Notwithstanding anything herein to the contrary, all of the Authority's obligations under this Agreement, other than the obligations which are payable out of proceeds of the insurance required to be maintained by the Authority pursuant to this Agreement, to the extent such obligations are payable out of those insurance proceeds, shall be limited obligations, payable from and expressly limited to those funds provided to the Authority in accordance with the Trust Agreement or the Amended and Restated Trust Agreement or any Bond Indenture, and not payable from any portion of the Utility Revenues needed to pay Financing Costs.

Section 11.12 **Emergency Manager Approval.**  If the City is under the management of an Emergency Manager pursuant to the EM Act, at the time of a decision for which the approval of

Page | **14 of 15**
13-53846-swr   Doc 1341-5   Filed 10/23/13   Entered 10/23/13 17:15:55   Page 15 of 30   53
13-53846-tjt   Doc 2379-2   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 3 of 50

the City, the City Council or the Mayor is required, then the approval of the Emergency Manager is hereby substituted in place of the approval of the City, the City Council or the Mayor, as applicable..

[SIGNATURE PAGE FOLLOWS]

This Agreement is executed by the Parties on the dates indicated below.

**CITY OF DETROIT**

Dated: _____

By: _____
      KEVYN D. ORR

Its:    Emergency Manager

**PUBLIC LIGHTING AUTHORITY**

Dated: _____

By: _____
      ODIS JONES

Its:    Executive Director

**Exhibit 1**

Lighting Plan



# PUBLIC LIGHTING AUTHORITY

# LIGHTING PLAN



| | |
|---|---|
| **Office Location:** | **65 Cadillac Square, Suite 2900** |
| | **Detroit, MI 48226** |
| **Project Location:** | **City of Detroit** |
| **Executive Director:** | **Odis Jones** |
| **Revision:** | **10** |
| **Date Issued** | **9-9-2013** |



**TABLE OF CONTENTS:**

A – Project Information …………………………………………………………………………….. 4

    1. Project Background ………………………………………………………………………… 4
    2. Facility Background …………………………………………………………………… 5
    3. Scope and Schedule ………………………………………………………………… 5
    4. Operations & Maintenance …………………………………………………………….. 6

B – Project Funding ……………………………………………………………………………… 7

C – Appendices

    1. Appendix A – PLA Articles of Incorporation
    2. Appendix B – Trust Agreement
    3. Appendix C – West PLA Pilot Area
    4. Appendix D – East PLA Pilot Area
    5. Appendix E – Detroit Zip Code Map
    6. Appendix F – Project Schedule
    7. Appendix G – Cash Flow/Budget



### A. Project Information

1. Project Background

The Public Lighting Authority ("PLA") was authorized by the Michigan Legislature in 2012 pursuant to a three-bill package that included: (1) the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL 123.1261 – MCL 123.1295 ("Act 392"), which authorized the creation of lighting authorities and granted the statutory authority for their operations; (2) an amendment to the City Utility Users' Tax Act, 1990 PA 100 as amended, MCL 141.1151 – MCL 141.1177 ("Act 100"), which required a city that creates a lighting authority to direct Twelve Million, Five Hundred Thousand Dollars ($12,500,000) to the authority from the revenues authorized under Act 100; and (3) an amendment to the City Income Tax Act, 1964 PA 284 as amended, MCL 141.501 – MCL 141.787, which authorized a city that creates a lighting authority to continue to assess an increased income tax rate in order to hold harmless the public safety departments from the mandatory diversion of revenues under Act 100.

The City Council and Mayor of the City of Detroit ("City") properly incorporated and perfected the formation of the PLA as required under Act 392, with an effective formation date of April 5, 2013. The approved Articles of Incorporation ("Articles") commit the City to the annual payment of $12.5 million to the Authority. (*See* Appendix A, Articles of Incorporation, Art. XIII, Sec. 1). The PLA and the City have executed a Trust Agreement with Wilmington Trust, N.A. as Trustee, wherein the City has irrevocably directed all of the Utility Users' Tax Revenue to the Trustee to be disbursed pursuant to the Trust terms. (See Appendix B, Trust Agreement). The disbursement terms provide that the revenues will be directed as follows: of the first $12.5 million, first to any holders of bonds or debt of the PLA and second to the PLA, if any is left; and third, to City for all of the revenues exceeding $12.5 million.

Consistent with Act 392 and the Articles, the PLA is overseen by an independent, five-member board. The PLA board includes former State Rep. Maureen Stapleton, who serves as chair, Michael Einheuser, John L. Davis, Marvin Beatty and Cedric Dargin. As stated under Act 392, the purpose of the PLA is to provide an equitable and reasonable method and means of financing, operating, and maintaining a lighting system to supply lighting in sufficient quantities to the City of Detroit. The PLA anticipates making a multi-year, large scale, city-wide investment in the public lighting infrastructure including poles, ballasts, circuits, transformers, and distribution connections. The PLA anticipates funding the improvements through: (i) a bridge loan in the amount of $60 million; and (ii) the subsequent sale of approximately $153 million in bonds. The financing will be paid back with the mandatory payment of $12.5 million per year as required under Act 100.

The PLA staff will consist of an Executive Director and support staff. DTE Energy has been selected as the owner's representative. In addition, the PLA has or will procure the services of



legal, accounting, engineering, public relations, construction, and maintenance through contracting. Gregory Terrell & Company will provide financial accounting, the Allen Law Group, P.C. will provide legal service and Berg Muirhead and Associates will provide public relations.

2. Facility Background

The Detroit street light system is in need of repair and improvement. Detroit's street light system of 88,000 lights is in disrepair, with approximately 55,000 lights being fed by DTE Electric and the remaining 33,000 being fed by Public Lighting Department (PLD). Although it is estimated that half of the lights in the system are not working, the status of the street light system is unknown and will require a survey of each light. Most of the underground fed lighting circuits within Detroit are made up of series circuits consisting of multi-generation light fixtures.

3. Scope and Schedule

The implementation of the lighting plan is being segregated into a short-term and long-term plan. Two pilot areas have been chosen for the short-term plan implementation, the outcomes of which will inform the long-term process. (*See* Appendices C and D for maps of the selected areas). Both the short and long-term plans will be implemented in several segments, specifically consisting of survey, design and construction work. All contracts will be awarded pursuant to a competitive bid process. The short-term plan implementation will commence in 2013 with completion projected in 1st quarter 2014. The field survey will include collecting status information on each pole and recording in a geographical mapping system. The owner's engineer will provide engineering, material specifications and work packages for construction. A specific improvement will be converting "series" circuits to "multiple" circuits. The overhead and underground construction contractors will perform all field installations and provide field records. Quality and safety audits will be performed throughout the project. Each area has approximately 2,500 lights, for a total of approximately 5,000 street lights.

The long term plan, scheduled from 1st quarter 2014 through 4th quarter 2016, would consist of progressive geographic implementation using Detroit zip codes, as shown on Appendix E, as improvement project areas. (*See also* Appendix F for the long term schedule of project areas). New project areas will begin approximately every other month and take approximately nine months to complete. The final number of street lights will be approximately 46,000. After the two pilot areas, contiguous areas will be addressed including those defined as high priority areas by the City of Detroit. To inform the public of changes and facilitate outage reporting, public notice will be made by way of door hangers and public meetings.

The project design criteria are as follows:
a) Lighting will remain essentially the same in densely populated areas and thoroughfares

Page 5 of 7

13-53846-swr   Doc 1341-5   Filed 10/23/13   Entered 10/23/13 17:15:55   Page 23 of 30   61
13-53846-tjt   Doc 2379-2   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 11 of 50



Public Lighting Authority of Detroit

b) All intersections will have lighting
c) Streets blocks greater than 600 feet long will have a street light in the middle of the block
d) All new lamp heads should be one cost effective style
e) All new light arms should be 6 foot in length, centering new lamp head illumination in the street
f) Standardize on two sizes of lights for majority of fixtures (150Watt (W) High Pressure Sodium (HPS) & 250W HPS)
g) Overhead feeds will be standard where allowable
h) Existing lights that do not fit in the above criteria, such as alley lights, will be removed as part of the improvement model
i) All applicable codes and regulations will be followed

4. Operation & Maintenance

The PLA has drafted a proposed operations & maintenance agreement ("O&M Agreement") with the City of Detroit. Please note that negotiations on the O&M Agreement have not commenced, therefore the information contained in this section should be considered prospective and subject to modification.

Financially, the O&M Agreement will cover two separate costs associated with operating the street light system: the cost of energy to actually light the lights, and the cost of on-going operations and maintenance of the system. The O&M Agreement contemplates the annual establishment of rates to be charged to the City for the services provided.

With respect to the purchase of energy, the O&M Agreement provides two options: one is for the City to purchase electricity directly from a third-party power provider at regulated rates, and the second is for the PLA to purchase power and pass through that purchase to the City at cost. Under either option, DTE Energy will supply the energy under the Michigan Public Service Commission-approved DTE Energy Municipal Street Lighting Rate E.1 – Option III tariff.

With respect to the ongoing operations and maintenance, it is contemplated that the PLA will enter into an agreement with DTE Energy for the duration of the project wherein DTE Energy will operate and maintain the System on a per unit cost basis. Maintenance will include replacement material and equipment as may be necessary to ensure that the refurbished street light system is fully operational with an anticipated 30 year expected useful life. This includes both preventative and reactive maintenance services. The maintenance program will also include outage notification methods with repair time requirements. Upon completion of the project, the PLA will competitively bid this service.

The estimated annual costs for these operations and maintenance services, including PLA administrative costs, is $11M to $12M based on the criteria contained in Section A.3. The


source of the City funds for the payment of rates has not been identified yet, but it should be anticipated that the source will be the City of Detroit General Fund.

**B. Project Funding**

The total estimated project cost for capital improvements is $153 million, excluding the operations and maintenance and PLA administrative costs. This is the anticipated total investment to be repaid through the Utility Users Tax of $12.5 million per year for an expected 30 years. (*See* Appendix G for the cash flow projections for the project by quarter). As stated, street light energy, operation and maintenance are not included in the project costs and will likely be supported by the City of Detroit General Fund.

A strict change control process will be deployed throughout the project.

**C. Appendices**
    a) Appendix A – PLA Articles of Incorporation
    b) Appendix B - Trust Agreement
    c) Appendix C – West PLA Pilot Area
    d) Appendix D – East PLA Pilot Area
    e) Appendix E – City of Detroit by Zip Code
    f) Appendix F – Schedule Summary
    g) Appendix G – Cash Flow/Budget

Page 7 of 7

13-53846-swr    Doc 1341-5    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 25 of 30    63
13-53846-tjt    Doc 2379-2    Filed 01/03/14    Entered 01/03/14 17:41:50    Page 13 of 50

# APPENDIX A

# ARTICLES OF INCORPORATION
## OF THE
## PUBLIC LIGHTING AUTHORITY

These Articles of Incorporation are executed and adopted by the City Council of the City of Detroit for the purpose of establishing a Public Lighting Authority pursuant to Act 392 of the Public Acts of Michigan of 2012.

## Article I
### Name

The name of the corporation and Authority is the Public Lighting Authority (the "Authority").

## Article II
### Definitions

As used in these Articles of Incorporation, the following words have the following meanings:

**Section 1.**  The *"Act"* means Act 392 of the Public Acts of Michigan of 2012, and such amendments as may be hereinafter adopted.

**Section 2.**  *"Authority"* means the Public Lighting Authority incorporated under these Articles of Incorporation pursuant to the Act.

**Section 3.**  *"Best Value"* means a contract and procurement process to be followed by an authority that encourages and considers bids from locally headquartered companies and that considers use of the local workforce.

**Section 4.**  *"Board"* or *"Authority Board"* means the Board of Directors of the Authority.

**Section 5.**  *"Bonds"* mean bonds and notes issued by the Authority and includes any Ancillary Facility (as defined in Act) or other financing instruments entered into by the Authority if the facilities are permitted by the contract entered into between the City and the Authority.

**Section 6.**  *"City"* means the City of Detroit, located in Wayne County, Michigan.

**Section 7.**  *"City Council"* means the City Council of the City of Detroit.

**Section 8.**  *"Lighting System"* or *"System"* means plants, works, instrumentalities, and properties used or useful in connection with providing lighting and necessary resources and appurtenances for the System.

**Section 9.**  *"Mayor"* means the Mayor of the City of Detroit.

**Section 10.**  *"Utility Users Tax"* means the tax levied by the City authorized by Utility Users Tax Act.

**Section 11.** *"Utility Users Tax Act"* means the City Utility Users Tax Act, Act 100 of the Public Acts of Michigan of 1990, as last amended by Act 393 of the Public Acts of Michigan of 2012.

## Article III
## Purpose and Intent

**Section 1.**     It is the intent of these Articles of Incorporation to provide an equitable and reasonable method and means of financing, operating, and maintaining a Lighting System to supply lighting in sufficient quantities to the City.

**Section 2.**     The City, by majority vote of its City Council, hereby incorporates the Authority comprising the territory within its respective limits for acquiring, constructing, consolidating, purchasing, operating, or maintaining a municipally owned Lighting System. The Authority is a public municipal corporation with the rights, powers, and duties as provided by the Act.

**Section 3.**     The powers of the Authority shall be carried out in a manner authorized by the Act.

**Section 4.**     Nothing in the Act or these Articles of Incorporation shall be construed as transferring the ownership of any Lighting System assets to the Authority unless the transfer is specified in these Articles of Incorporation and the transfer is ratified in accordance with all applicable laws.

**Section 5.**     A transfer of ownership or operational control of a Lighting System to the Authority shall not be considered a sale, lease, or disposal of any kind of an asset by the City under any state or local law.

## Article IV
## Franchises

**Section 1.**     Nothing in these Articles of Incorporation shall be considered to alter the laws and regulations regarding utility franchises unless explicitly stated. The creation of the Authority shall not be considered to create a new franchise as long as the Authority only provides service within the City and any area that the City may be serving or permitted to serve under law on the effective date of the Act.

## Article V
## Powers, Duties and Limitations

**Section 1.**     The Authority is a public municipal corporation. The Authority is a public body corporate with the power to sue and be sued in any court of this state. The Authority possesses all the powers necessary to carry out the purposes of its incorporation. The enumeration of any

powers in the Act or in these Articles of Incorporation shall not be construed as a limitation on the Authority's general powers.

**Section 2.**     The Authority may do any of the following:

a.     Adopt bylaws for the regulation of the Authority's affairs and the conducting of its business.

b.     Adopt an official seal and alter the seal at its pleasure.

c.     Maintain an office at a place or places within the City as it may designate.

d.     Sue and be sued in its own name, plead and be impleaded.

e.     Determine the location of any project constructed by it under the Act and determine, in its discretion and without reference to any other provisions of the Act or any other law, the design, standards, and the materials of construction, and construct, maintain, repair, and operate the project.

f.     Issue Bonds of the Authority for any of its corporate purposes under those means as provided by the Act.

g.     Adopt and promulgate rules and regulations for the use of any project operated or constructed by it under the provisions of the Act.

h.     Acquire, hold, lease and dispose of real and personal property in the exercise of its powers and the performance of its duties under the Act.

i.     Engage engineering, legal, and other professional services as considered necessary to effectuate the purposes of the Authority.

j.     Enter into contracts for any purpose necessary or incidental to its purposes under the act, including, but not limited to, contracts with the City necessary for financing the Lighting System.

m.     The Authority shall possess all powers necessary to carry out the purpose of its incorporation, including any powers authorized by the Act or the incidental power necessary thereto.

**Section 3.**     The Authority shall maintain its books and records and its funds on an enterprise fund basis. The Authority shall not pay any net proceeds or profits to the City, but may pay the City for services provided.

**Section 4.**     Following the appointment of the Authority Board, the Board shall implement a Best Value supply chain and procurement practice and shall annually report thereon to the City Council.

## Article VI
## Authority Board

**Section 1.**     The Authority shall be directed and governed by a Board of Directors consisting of 5 members appointed as provided by the Act.

**Section 2.**     The Board shall consist of members with the qualifications as required by the Act. Such Board members shall be appointed and serve terms of service as provided by the Act.

**Section 3.**     Each Board member shall make such certifications as required by the Act. A person shall not begin service as a Board member until he or she completes and files the certification with the Michigan Attorney General as required under this Article.

**Section 4.**     If the required certification is not filed by a Board member as required by the Act as described in a report of the Michigan Attorney General, the term of office for that Board member who fails to make the required certification as required by the Act shall automatically terminate as required by the Act.

## Article VII
## Authority Organization

**Section 1.**     Within 30 days following the appointment of the last Board member to the Board, the Board shall hold its first meeting.

**Section 2.**     At its first meeting, the Board shall select a chairperson, treasurer, and any other officers as the Board considers necessary. The Board shall require the treasurer to post a suitable bond of not less than $100,000.00 issued by a responsible bonding entity, with the cost of the premium of the bond paid for by the Authority.

**Section 3.**     The Board shall select, employ, and fix the compensation for employees of the Board and contract for those engineering, legal, and other professional services that the Board considers necessary to effectuate the purposes of the Authority.

**Section 4.**     A majority of the members of the Board constitute a quorum for the purpose of conducting business and exercising powers of the Authority. Official action may be taken by the Authority upon the vote of a majority of the Board members present.

**Section 5.**     The Board shall adopt rules and bylaws governing its procedures and the holding of meetings. The Board shall designate an office or location within the City as its principal place of business.

**Section 6.**     The business of the Board shall be conducted at a public meeting of the Board held in compliance with the Open Meetings Act, 1976 PA 267, MCL 15.261 to 15.275. Public notice of the time, date, and place of the meeting shall be given in the manner required by the

Open Meetings Act, 1976 PA 267, MCL 15.261 to 15.275. After organization, the Board shall adopt a schedule of regular meetings and adopt a regular meeting date, place, and time.

**Section 7.**     The Board shall keep a written or printed record of each meeting, which record and any other document or record prepared, owned, used, in the possession of, or retained by the Authority in the performance of an official function shall be made available to the public in compliance with the Freedom of Information Act, 1976 PA 442, MCL 15.231 to 15.246.

**Section 8.**     The Board shall provide for a system of accounts for the Authority to conform to a uniform system required by law and for the auditing of the accounts of the Authority. The Board shall obtain an annual audit of the Authority by an independent certified public accountant and report on the audit and auditing procedures in the manner provided by Sections 6 to 13 of the Uniform Budgeting and Accounting Act, 1968 PA 2, MCL 141.426 to 141.433. The audit also shall be in accordance with generally accepted government auditing standards and shall satisfy federal regulations relating to federal grant compliance audit requirements.

**Section 9.**     The Board shall provide a monthly progress report to the Mayor and the City Council and shall make that monthly progress report available on the Authority's internet website.

**Section 10.**     The Board shall provide an annual progress report to the chairpersons of the Michigan Senate and House Government Operations Committees and shall make that annual progress report available on the Authority's internet website. The annual progress report shall detail the Authority's operating revenues, expenditures, vendor contracts, and all major decisions on lighting within the City, including all rulings concerning the future locations of streetlights within the City.

## Article VIII
### Lighting System Planning

**Section 1.**     On or before March 15 after the creation of the Authority, and on or before March 15 of every second year after the creation of the Authority, the Board shall prepare and submit to the City Council a plan for the next 3 succeeding fiscal years. The plan shall contain all of the following:

a.     The number and placement of streetlights in the City.

b.     A budget that includes, but is not limited to, the following:

  i.     Anticipated expenses of administration, operation, and maintenance of the Authority and the Lighting System.

  ii.     Any reserve to be established for the administration, operation, and maintenance of the Authority and the Lighting System.

     iii.    A statement showing the amounts necessary to retire all principal and interest on any Bonds of the Authority maturing during the applicable fiscal years.

     iv.    A plan to implement Best Value practices.

     v.    Any other item specified in these Articles of Incorporation.

c.    The budget prepared by the Authority shall provide that any money derived from the collection of rates and charges shall be applied and used by the Authority in the following manner and in the following priority:

     i.    To provide for the payment during each fiscal year of all current expenses of administration, operation, and maintenance as may be necessary to preserve the Lighting System in good repair and working order, including payments required under Bonds incurred in accordance with the authorization contained in the Act.

     ii.    In the discretion of the Board, there may be set aside during each fiscal year money to provide a reserve fund for replacements or major repairs and improvements not anticipated or considered to be a part of current expenses of administration, operation, or maintenance of the Lighting System.

**Section 2.**    The City Council may vote to accept or reject the plan as provided by the Act. The City Council does not have the power to amend the plan in any respect. Unless the City Council votes to reject the plan within 45 days of its submittal, the plan is considered approved.

**Section 3.**    If the City Council rejects the plan as provided in Section 2, the Authority shall revise the plan and shall submit the revised plan to the City Council within 30 days of the vote that rejected the plan as provided by the Act.

**Section 4.**    The City Council may vote to accept or reject the revised plan within 30 days of its submittal as provided by the Act. Unless the City Council votes to reject the revised plan, the revised plan is considered approved as provided by the Act.

**Section 5.**    If the City Council votes to reject the revised plan, the City Council must contemporaneously adopt, by a vote of at least 2/3 of the members of the City Council elected and serving, a resolution that includes a list of items that, if altered, would result in a vote to adopt the plan as provided by the Act. Failure to adopt a resolution in compliance with this Section is considered acceptance of the revised plan by the City Council as provided by the Act.

**Section 6.**    If the City Council votes to reject the revised plan and submits the required resolution as provided in Section 5, the Authority shall prepare a final proposed plan not more than 20 days following the vote to reject the revised plan. The final proposed plan shall be sent to the Mayor, and the Mayor shall make the final proposed plan available on the City's internet website as soon as is practicable. The final proposed plan shall also be made available at a public hearing to be held not more than 10 days after the final proposed plan is complete. Public

comment shall be taken at the public hearing concerning the final proposed plan. On or after the tenth day after the public hearing, the Authority shall vote on the final proposed plan.

**Section 7.**    Except as otherwise provided in this Section, if 2/3 of the Board members of the Authority vote to adopt the final proposed plan, it is adopted. If the final proposed plan incorporates a majority of the items identified in the appropriate resolution or resolutions adopted by the City Council, then the final proposed plan is adopted if approved by a majority vote of the Board of Directors of the Authority.

**Section 8.**    If a plan is not adopted on or before July 1 of the year in which a plan is required to be prepared under Section 1, then the adopted plan shall be the final proposed plan, except that all changes identified in the resolution of the City Council submitted under Section 5 are considered amendments to the final proposed plan so that the plan as adopted contains all changes listed in the resolution from the City Council.

**Section 9.**    A plan adopted by the Board may be amended by a vote of 4 of the 5 members on the Board as provide by the Act.

## Article IX
## Fiscal Year

**Section 1.**    Unless the Board, by resolution, establishes a different fiscal year, the fiscal year of the Authority shall commence on July 1 of each year and end on the following June 30.

## Article X
## Employment Relations

**Section 1.**    The City has the responsibility, authority, and right to manage and direct on behalf of the public the services performed or exercised as provided in these Articles of Incorporation to the extent the Articles of Incorporation are consistent with, and not otherwise limited by, the Act.

**Section 2.**    The contents or language of these Articles of Incorporation shall be a permissive subject of collective bargaining between the City and a bargaining representative of its employees. If the City and a bargaining representative of its employees engage in collective bargaining before these Articles of Incorporation are approved and the City and that bargaining representative reach an agreement on issues that would obligate an entity that will function as an employer in the Authority, these Articles of Incorporation shall include those obligations.

**Section 3.**    Nothing in these Articles of Incorporation creates an employment relationship between the existing employees of the City and the Authority.

**Section 4.**    The Authority shall be effective through these Articles of Incorporation at least 180 days before the actual transfer of any City personnel and equipment. Before the Authority's

effective date, the City shall affirm in writing to the Authority those City employees, if any, who will be transferred to the Authority.

**Section 5.**     If any City employees who are to be transferred to the Authority are represented by a labor organization, those employees are subject to their previous terms and conditions of employment until those terms and conditions of employment are modified in accordance with 1947 PA 336, MCL 423.201 to 423.217, or for 6 months after the transfer to the Authority, whichever is earlier. Negotiations on a collective bargaining agreement with the Authority shall begin no later than 180 days before the date that such represented City employees, if any, transfer to the Authority.

**Section 6.**     Subject to Section 7, a representative of the City employees or group of employees who previously represented or was entitled to represent the City employees or group of employees under 1947 PA 336, MCL 423.201 to 423.217, shall continue to represent the City employees or group of employees if those employees or group of employees are transferred to the Authority.

**Section 7.**     This Section does not limit the rights of City employees, under applicable law, to assert that a bargaining representative protected by Section 6 is no longer their representative. The employees of the Authority are eligible as of the day the Authority becomes effective through these Articles of Incorporation to choose their representative under 1947 PA 336, MCL 423.201 to 423.217. This Section does not extend the time limits as provided in Section 4.

**Section 8.**     If multiple labor organizations assert the right to represent all or part of the Authority's workforce or where a substantial portion of the transferred employees were not previously represented, in the absence of a voluntary mutual agreement, at the request of any party or on the initiative of the Michigan employment relations commission, the Michigan employment relations commission shall conduct a representation election.

**Section 9.**     In the absence of a voluntary mutual agreement, the Authority's workforce shall be merged by using a single seniority list in accordance with the Act. Disputes concerning the single seniority list or its use shall be heard in the manner provided for by the Act.

**Section 10.**     Nothing in this Section requires the City or the Authority to assume a collective bargaining agreement between another local government and its employees.

**Section 11.**     An employee who left the employ of the City to enter the military service of the United States shall have the same employment rights as to the City or the Authority as he or she would have had under 1951 PA 263, MCL 35.351 to 35.356.

**Article XI**
**Authority Borrowing and Bonds**

**Section 1.** For the purpose of constructing, acquiring, improving, enlarging, or extending a Lighting System, including the payment of engineering, legal, and financing expenses, and after the establishment of the initial service rates and the execution of contracts for the provision of construction services, purchase of power, and other related activities within the corporate limits of the Authority, the Authority may borrow money and issue Bonds and Notes for the purposes provided by the Act subject to limitations provided by the Act. The Authority may also enter into Ancillary Facilities and Contracts, including trust indentures and contracts with the City, relating to such Bonds and Notes as provided by the Act.

**Article XII**
**Public Purpose**

**Section 1.** The property of the Authority is public property devoted to an essential public and governmental purpose. Income of the Authority is for a public and governmental purpose.

**Section 2.** Except as otherwise provided in this Section or by law, the property of the Authority and its income, activities, and operations are exempt from all taxes and special assessments of this state or a political Subsection of this state. Property of the Authority and its income, activities, and operations that are leased to private persons are not exempt from any tax or special assessment of this state or a political subdivision of this state. Property of the Authority is exempt from any ad valorem property taxes levied under the General Property Tax Act, 1893 PA 206, MCL 211.1 to 211.155, or other law of this state authorizing the taxation of real or personal property. The Authority is an entity of government for purposes of Section 4a(1)(a) of the General Sales Tax Act, 1933 PA 167, MCL 205.54a, and Section 4(1)(h) of the Use Tax Act, 1937 PA 94, MCL 205.94.

**Article XIII**
**Implementation**

**Section 1.** As provided in the Utility Users Tax Act, upon the formation of the Authority, notwithstanding any ordinance of the City to the contrary, the City shall pay $12,500,000.00 annually to the Authority from the proceeds of the Utility Users Tax. If the Authority issues Bonds pursuant to a contract with the City and pledges revenues from Utility Users Tax, those revenues shall be deposited and used as provided Utility Users Tax Act. After a contract is entered into with the City relating to Bonds pursuant to the Utility Users Tax Act, the trustee, after setting aside funds as required by the trust indenture, shall pay to the Authority $12,500,000.00, less the amount set aside. The trust indenture shall provide that the remaining revenues are returned to the City. Nothing in these Articles of Incorporation shall obligate the City to remit to the Authority more than is collected from taxes levied under the Utility Users Tax Act.

**Section 2.** As provided by the Utility Users Tax Act, notwithstanding any ordinance of the City, if the City enters into a contract with the Authority, all of the following shall apply:

(a) The City shall send notice to each public utility and resale customer (each as defined in the Utility Users Tax Act) to remit taxes collected under the Utility Users Tax Act to a trustee until notified by that trustee to return the funds to the City.

(b) After receiving a notice described in subdivision (a), each public utility and resale customer so notified shall remit taxes as directed by the notice to the trustee until notified by the trustee to remit taxes to the City.

(c) The trustee shall notify each public utility and resale customer to remit taxes collected under the Utility Users Tax Act to the City within 45 days of the retirement of debt service on the Bonds issued by the Authority.

**Section 3.**  Notwithstanding any ordinance of City, any utility, resale customer, other entity, or person that collects a tax or any money represented to be a tax authorized under the Utility Users Tax Act holds the amount so collected in trust for the benefit of the City, or for Bondholders secured by a pledge with the Authority.

## Article XIV
## Best Value Objectives

**Section 1.**  The Board shall provide for a contract and procurement process to be followed by the Authority that encourages and considers bids from locally headquartered companies and that considers use of the local workforce.

## Article XV
## Miscellaneous

**Section 1.**  The Authority may acquire property for a Lighting System by purchase, construction, lease, gift, or devise, either within or outside the City. The Authority may hold, manage, control, sell, exchange, or lease the property, except that if the property at issue was purchased, constructed, gifted, devised, leased, or otherwise came into the Authority's ownership or control from the City, the Authority may not sell, exchange, or otherwise dispose of the property unless the other party to the transaction is the City so that the property will return to the ownership of the City.

**Section 2.**  The City Council may advance or loan to the Authority any money required for administrative expenses or for the purpose of obtaining maps, plans, designs, specifications, and cost estimates of a proposed Lighting System. An advance or loan may be included as a part of any Bond issue by the Authority under the Act and repaid to the City upon the sale of the Bonds.

**Section 3.**  The powers granted under the Act and these Articles of Incorporation are in addition to those granted by any charter or statute.

**Section 4.**  The Act and these Articles of Incorporation shall be liberally construed in the interest of the public health, safety, and welfare of the persons and property within the City.

**Section 5.**     These Articles of Incorporation may be amended by a majority vote of the City Council in the same manner that these Articles of Incorporation were adopted; provided, however, that no such amendment shall impair any obligation related to Bonds.

**Section 6.**     One printed copy of these Articles of Incorporation certified as a true copy by the person or persons designated by the certification, with the date and place of the publication, shall be filed with the Michigan Secretary of State and the Wayne County Clerk. The Authority shall become effective upon the filing with the Secretary of State and the County Clerk. The City Clerk shall publish these Articles of Incorporation in a newspaper that is used for publication of other legal notices of the City.

**Section 7.**     The validity of the Authority is conclusively presumed unless questioned in an original action filed in the Michigan Court of Appeals within 60 days after the creation of the Authority.

The foregoing Articles of Incorporation were adopted by the City Council of the City of Detroit, Wayne County, Michigan, at a meeting held on the 6ᵗʰ day of February, 2013.

Dave Bing, Mayor                     Dated: 3/21/13
City of Detroit

## CERTIFICATION

Janice M. Winfrey, City Clerk of the City of Detroit, certifies that the foregoing document is a true copy of the Articles of Incorporation adopted by the City Council of the City of Detroit at a meeting held on the 5ᵗʰ day of February 2013, which Articles of Incorporation were duly published as required by law on the 1ᵗʰ day of March 2013, in Detroit Legal News.

_(signature)_ Dated: 3/22/13          (Seal)

Janice M. Winfrey, City Clerk
City of Detroit


Filed with the Michigan Secretary of State on: _____

    Acknowledged by: _____

                   Title: _____          (Seal)


Filed with the Wayne County Clerk on: _29ᵗʰ March 2013_

    Acknowledged by _(signature)_

              Title: _Department Administrator_          (Seal)

20.766.298 3\088888-03795



STATE OF MICHIGAN
RUTH JOHNSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

April 23, 2013

City of Detroit
Adam Hollier
Coleman A. Young Municipal Center
2 Woodward Ave., Ste. 1126
Detroit, MI 48226

RE: Detroit Public Lighting Authority

Dear Mr. Hollier:

This will acknowledge receipt of a copy of the Articles of Incorporation for the Detroit Public Lighting Authority, under the provisions of Act 392, Public Acts of 2012, filed on April 5, 2013, with the Secretary of State, Office of the Great Seal.

Sincerely,

Office of the Great Seal
1-888-767-6424

# APPENDIX B

# TRUST AGREEMENT

**THIS TRUST AGREEMENT** (this "*Agreement*") is made and entered into as of July 31, 2013, by and among: the Public Lighting Authority, a Michigan municipal corporation ("*Authority*"); the City of Detroit, a Michigan municipal corporation ("*City*"); and Wilmington Trust, National Association, a national banking association lawfully authorized to conduct business in the State of Michigan ("*Trustee* "). Collectively, the signatories are referred to as the Parties, and individually, as a Party. Capitalized terms used in this Agreement and not otherwise defined shall have the meanings given to them in their respective contexts under the laws of the state of Michigan or under such other authority as otherwise indicated herein.

# RECITALS

**WHEREAS**, the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL §§123.1261 *et seq.* ("*Act 392*"), authorizes municipalities to create public lighting authorities for the purposes of providing an equitable and reasonable method and means of financing, operating, and maintaining a lighting system in sufficient quantities within a city; and

**WHEREAS**, City has passed a resolution and approved the Articles of Incorporation forming the Public Lighting Authority of the City of Detroit (the Authority), pursuant to which Authority shall construct, improve, enlarge, reduce or extend City's street lighting system; and

**WHEREAS**, the Emergency Manager of the City, appointed under the local financial stability and choice act, 2012 PA 436, MCL §§141. *et seq.*, has entered Order No. 6 approving the Initial Funding Agreement for the Public Lighting Authority (the "*Order No. 6*") and Order No. 14 approving the Trust Agreement by and among the City of Detroit, the Public Lighting Authority, and the Trustee (the "*Order No. 14*" together with Order No. 6, the "*Orders*"); and

**WHEREAS**, the Emergency Manager desires to direct all public utilities and resale customers that collect utility users tax revenues pursuant to the City Utility Users Tax Act, 1990 PA 100, MCL 141.1151 to MCL 141.1171 ("*Act 100*"), to remit such revenues ("*Utility Revenues*") directly to a trustee to be used by Authority or for the benefit of bondholders of any bonds issued by Authority; and

**WHEREAS**, the Authority and the City seek to create a trust to receive Utility Revenues and disburse such funds hereinafter held in trust pursuant to the Orders, Act 100 and Act 392.

**NOW, THEREFORE**, in consideration of the respective covenants, agreements and representations and warranties set forth herein, the Parties to this Agreement, intending to be legally bound, agree as follows:

1. Establishment of Trust and Trust Fund.

(a) Establishment of Trust and Deposit of Trust Fund. The City and the Authority hereby direct the Trustee to establish a trust account designated and maintained by the Trustee for the deposit of all Utility Revenues collected and so designated under this Agreement by the Authority ( the "*Trust Fund*"). Pursuant to Act 392, Act 100, and direction of the Emergency Manager, all public utilities and resale customers that collect Utility Revenues are required to

deliver all such Utility Revenues to Trustee for deposit in the Trust Fund by the Trustee, not more frequently than monthly. All such deposits of Utility Revenues shall become part of the Trust Fund. The direction of funds by the Emergency Manager is irrevocable during the term of this Agreement. The Trust Fund shall be held and disbursed pursuant to this Agreement or a successor trust agreement as contemplated under <u>Sections 6(i), 7, or 8</u> of this Agreement. Exhibit C contains delivery instructions to the Trustee.

(b) <u>Appointment of Trustee</u>. Authority and City hereby appoint and designate Trustee as trustee to receive, hold, invest and disburse the Trust Fund in accordance with the terms of this Agreement. Trustee hereby agrees to act as trustee and to hold, safeguard and disburse funds from the Trust Fund pursuant to the terms and conditions of this Agreement. The Trustee shall invest and reinvest funds held in the Trust Fund as directed in writing by an authorized agent of both the City and the Authority. Such funds will be held uninvested by the Trustee until such joint written direction is received. The Trustee shall be entitled to rely on the investment directions of the Authority as to the suitability and legality of such investment. The Trustee shall not be liable for losses on investments made in compliance with the provisions of this Agreement. The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees. The Trustee shall not be responsible for providing broker confirmations.

(c) <u>Trust Fund</u>. No Party shall permit or cause to be created against the Trust Fund any lien, attachment, trustee process or any other judicial process of any creditor. Trustee shall hold and safeguard the Trust Fund, at the cost and expense of the City and Authority, until it is released pursuant to <u>Section 2</u> of this Agreement. Notwithstanding the foregoing, if the Trust Fund shall be attached, garnished, or levied upon pursuant to judicial process of competent jurisdiction, or the delivery of funds held in the Trust Fund shall be stayed or enjoined by any court order of competent jurisdiction, or any court order shall be made or entered into affecting the Trust Fund, or any part thereof, Trustee is hereby expressly authorized to obey and comply with such judicial process or court order, and shall provide Authority and City as much advance written notice as is reasonably practicable thereof. In the event Trustee obeys or complies with any judicial process or court order, it shall not be liable to any Party, public utilities, resale customers or to any other person, firm or corporation by reason of such compliance, notwithstanding the subsequent reversal, modification, annulment, or setting aside of such court order.

(d) Trustee shall furnish Authority and City with a monthly written accounting of the complete account activity of, and transactions executed with respect to, the Trust Fund, within fifteen (15) days after the end of such month.

2. <u>Administration and Disbursements of Trust Fund</u>. The available funds in the Trust Fund shall be disbursed by Trustee beginning August 17, 2013, on the 17th of each month thereafter, or the next Business Day (defined herein as any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of Michigan), if the 17th is not a business day, as follows:

a. For disbursements made from July 1, 2013 through December 31, 2013:

i. The first One Million, Seven Hundred and Eighty-Three Thousand, Three Hundred and Thirty-Three Dollars and Zero/100 ($1,783,333.00) in each month, as follows:

   1. First, to the parties and in the amount directed by the Authority to satisfy any obligations under any bonded indebtedness of Authority, including the following costs: principal and interest on the bonds, including any payments due under an ancillary credit facility entered into by Authority; the administrative costs associated with the bonds; and any other bonds issued by the Authority that may be secured by the Utility Revenues;

   The Authority shall notify the Trustee by the 12th of each month of any bonded indebtedness secured by the Trust Fund by the filing of a certificate with the Trustee detailing all obligations of the Authority and the name, address and wire information of each person to which payment should be made. Trustee is entitled to rely on such certificate. If the Trustee has not received such a certificate from the Authority by 5 pm (eastern) on such date, it can assume the Authority has no such bonded obligations and may make disbursements to the Authority pursuant to Section 2.a.i.2. below.

   2. Second, any amount remaining to the Authority, to be used as directed by an authorized officer of the Authority in compliance with Act 392 and this Agreement. The Trustee has no responsibility for determining such compliance with Act 329 or this Agreement.

ii. Any monthly amounts that exceed the amounts in Section 2.a.i., to City.

b. For disbursements made from January 1, 2014 through the termination of this Agreement, on the 17th of each month, or the next Business Day if the 17th is not a Business Day:

   i. The first One Million, Forty-One Thousand, Six Hundred and Sixty-Six Dollars and Zero/100 ($1,041,666.00) in each month, as follows,

      1. First, to the parties and in the amount directed by the Authority to satisfy any obligations under any bonded indebtedness of Authority, including the following costs: principal and interest on the bonds, including any payments due under an ancillary credit facility entered into by Authority; the administrative costs associated with the bonds; and any other bonds issued by the Authority that may be secured by the Utility Revenues.

The Authority shall notify the Trustee by the 12th of each month of any bonded indebtedness secured by the Trust Fund by the filing of a certificate with the Trustee detailing all obligations of the Authority and the name, address and wire information of each person to which payment should be made. Trustee is entitled to rely on such certificate. If the Trustee has not received such a certificate from the Authority by 5pm (eastern) on such date, it can assume the Authority has no such bonded obligations and may make disbursements to the Authority pursuant to Section 2.b.i.2. below.

    2. Second, any amount remaining to the Authority, to be used as directed by an authorized officer of the Authority in compliance with Act 392 and this Agreement. The Trustee has no responsibility for determining such compliance with Act 329 or this Agreement.

  c. Any monthly amounts that exceed the amounts in Section 2.b.i., to City.

The Trust Fund shall be disbursed pursuant to this Section 2 on no less than a monthly basis, or as otherwise directed under a successor trust agreement.

3. Covenant of Trustee. Trustee hereby agrees and covenants with the Parties hereto that it will perform all of its obligations under this Agreement and will not deliver custody or possession of any of the Trust Fund to anyone except pursuant to the express terms of this Agreement.

4. Fees and Expenses of Trustee. The Authority shall pay to the Trustee from time to time such compensation as shall be agreed upon in writing between the Authority and the Trustee for its acceptance of this Agreement and services hereunder. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Authority shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services, including extraordinary time and services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and legal counsel. The Authority agrees that it shall pay all such fees owed the Trustee within 30 days of receipt of an invoice.

5. Limitation of Trustee's Liability. The responsibilities of the Trustee are administrative in nature and are strictly limited to those specifically set forth herein. No implied duties, covenants or obligations shall be read into this Agreement against the Trustees including, without limitation, the obligation to make any discretionary decisions. No fiduciary relationship exists between or among the Trustee, the City or the Authority. Trustee undertakes to perform such duties as are specifically set forth in this Agreement only and shall have no liabilities or obligations with respect to the Trust Fund or its administration of this Agreement except for Trustee's negligence or willful misconduct. Trustee shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in any notices given to it in accordance with the notice provisions of this Agreement. Trustee shall incur no liability with respect to any action taken by it or for any

inaction on its part in reliance upon any notice, direction, instruction, consent, statement or other document believed by it in good faith to be genuine and duly authorized, nor for any other action or inaction except for its own negligence or willful misconduct. Trustee may consult legal counsel selected by it in the event of any dispute or question of the construction of this Agreement or seek the assistance of a court of competent jurisdiction, and shall incur no liability and shall be fully protected in acting in accordance with the opinion or advice of such counsel or the direction of such court. The Trustee shall not be liable for any error of judgment made in good faith by a responsible partner, director, officer, affiliate, employee, employer, professional, agent or representative of the Trustee unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts. In no event shall Trustee be liable for incidental, indirect, special, punitive or consequential damages. The Trustee shall have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees, and shall not be responsible for the misconduct or negligence of such agents, attorneys, custodians and nominees appointed by it with due care. None of the provisions contained in this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers vested in it by this Agreement, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. The permissive rights of the Trustee to do things enumerated in this Agreement shall not be construed as duties. The Trustee shall not be accountable for the use or application of any money paid over by the Trustee in accordance with the provisions of this Agreement. The Trustee shall have no duty to collect any Utility Revenues which are required to be deposited with it hereunder.

The Authority shall defend, at its cost and expense, any claim (by whomever asserted) against the Trustee arising out of or in connection with the acceptance, administration, exercise or performance of its duties under this Agreement. The Authority shall satisfy any liability, judgment and cost, of or relating to such claim, except to the extent that a court of competent jurisdiction has determined that such claim, liability or expense is attributable to the Trustee's negligence or willful misconduct. The Trustee may have separate legal counsel and the Authority shall pay the reasonable fees and expenses of such separate legal counsel.

The Trustee shall notify the Authority promptly of any claim against for which it may seek defense. Failure by the Trustee to so notify the Authority shall not relieve the Authority from its obligations hereunder. The Trustee shall cooperate in the defense. The forgoing shall survive the termination of this Agreement pursuant to Section 6 hereof.

The Trustee agrees to accept and act upon written instructions or directions pursuant to this Agreement sent by unsecured e-mail (in .pdf file format), facsimile transmission or other similar unsecured electronic methods, provided, however, that the instructions or directions shall be signed by a person as may be designated and authorized to sign for the Authority or the City, respectively, or in the name of the Authority or the City, respectively, by an authorized representative of the Authority or City, respectively, and the Authority or the City, respectively shall provide to the Trustee an incumbency certificate listing such designated persons, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing. If the Authority or City, respectively, elects to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be

deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Authority and City agree: (i) to assume all risks arising out of the useof such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Trustee and that there may be more secure methods of transmitting instructions than the method(s) selected by the Authority or the City; and (iii) that the security procedures (if any) to be followed in connection with their transmission of instructions provide to them a commercially reasonable degree of protection in light of their particular needs and circumstances.

6. <u>Termination</u>. This Agreement will automatically terminate upon the earlier of the following: (i) the execution of a trust agreement between Authority, City, the Michigan Finance Authority, and a trustee in connection with the issuance of bonds by Authority as authorized under Act 392 with a notice of such execution delivered to the Trustee; or (ii) receipt by the Trustee and the City of a notice delivered by the Authority of the final receipt of Utility Revenues under <u>Section 1.a.</u> and the final disbursement of the Trust Fund pursuant to <u>Section 2</u> of this Agreement. Following such termination, this Agreement shall be of no further force or effect, and no further fees or expenses shall be invoiced by Trustee pursuant hereto except for unbilled fees or expenses incurred by Trustee prior to such time.

7. <u>Successor Trustee</u>.

    (a) In the event Trustee becomes unavailable or unwilling to continue as trustee under this Agreement, Trustee may resign and be discharged from its duties and obligations hereunder by giving its written resignation to the Parties to this Agreement. In addition, Trustee may be removed at any time, with or without cause, upon 30 days' prior written notice delivered to Trustee and executed by both Authority and City. Such resignation or removal shall take effect not less than thirty (30) days after notice is given to all Parties hereto. In such event, Authority may appoint, with the consent of City, which consent shall not be unreasonably withheld, a successor trustee, which shall be a commercial bank, trust company or other financial institution qualified to act as a trustee under Michigan law. If Authority fails to appoint a successor trustee within fifteen (15) days after receiving Trustee's written resignation, Trustee shall have the right to apply to a court of competent jurisdiction for the appointment of a successor trustee. The successor trustee shall execute and deliver to Trustee an instrument accepting such appointment, and the successor trustee shall, without further acts, be vested with all the estates, property rights, powers and duties of the predecessor Trustee as if originally named as Trustee herein. Trustee shall act in accordance with written instructions from Authority and City as to the transfer of the Trust Fund to a successor trustee.

    (b) Any corporation, association or other entity into which the Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or otherwise transfer all or substantially all of its corporate trust assets and businesses or any corporation, association or other entity resulting from any such conversion, sale, merger consolidation or other transfer to which it is a party, <u>ipso facto</u>, shall be and become successor Trustee hereunder, as applicable, vested with all other matters as was its predecessor, without the execution or filing of any

instrument or any further act on the part of the Parties hereto, notwithstanding anything herein to the contrary.

8. Miscellaneous.

(a) Amendment; Waiver. Any agreement on the part of a Party to any extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such Party with a copy sent to the other Parties. A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by any Party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time. This Agreement may not be amended, modified or supplemented except by written agreement of all of the Parties.

(b) Notices. All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid to the following addresses and marked to the attention of the person (by name or title) designated below (or to such other address or person as a Party may designate by notice to the other Parties):

**If to Authority**:

>Public Lighting Authority
>65 Cadillac Square
>Suite 2900
>Detroit, MI 48226

**with a mandatory copy to** (which copy shall not constitute notice):

>The Allen Law Group, P.C.
>2500 Fisher Building
>3011 West Grand Boulevard
>Detroit, MI 48202

**If to City**:

>City of Detroit
>Office of the Mayor
>Coleman A. Young Municipal Center
>2 Woodward Ave.
>11th Floor
>Detroit, MI 48226

**with a mandatory copy to** (which copy shall not constitute notice):

>City of Detroit
>Office of the Emergency Manager

Coleman A. Young Municipal Center
2 Woodward Ave.
11th Floor
Detroit, MI 48226

**with a mandatory copy to** (which copy shall not constitute notice):

City of Detroit
Corporation Counsel
660 Woodward Ave, Ste 1650
Detroit, MI 48226

**If to Trustee**:

Wilmington Trust, N.A.
Corporate Trust Services
25 South Charles Street, 11th Floor
Baltimore, MD 21201

**with a mandatory copy to** (which copy shall not constitute notice):

Drinker Biddle & Reath
Kristin Going
1500 K. St., N.W., Suite 1100
Washington, DC 20005

(c) Interpretation. Unless the context otherwise requires, references in this Agreement to Sections and Exhibits refer to the Sections and Exhibits to this Agreement. The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All references to dollar amounts contained in this Agreement shall mean United States dollars. References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement.

(d) Entire Agreement. This Agreement and the other agreements referred to herein constitute the entire agreement of the Parties to this Agreement and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof.

(e) Parties in Interest. Except as expressly provided herein, none of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the Parties hereto and their respective successors and assigns (if any).

(f) Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

(g) Governing Law; Jurisdiction and Venue.

   (i)   This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Michigan (without giving effect to principles of conflicts of laws).

   (ii)   Each Party to this Agreement:

      (1)   irrevocably submits to the exclusive jurisdiction of the Circuit Court for the County of Wayne in the State of Michigan and any state appellate court therefrom within the State of Michigan for the purpose of any legal proceeding directly or indirectly based upon, relating to arising out of this Agreement or any transaction contemplated hereby or the negotiation, execution or performance hereof or thereof and irrevocably agrees that all claims in respect of such action or proceeding shall be brought in, and may be heard and determined, exclusively in such state or federal courts;

      (2)   irrevocably consents to the service of the summons and complaint and any other process in any other action or proceeding relating to the transactions contemplated by this Agreement, on behalf of itself or its property, by personal delivery of copies of such process to such Party at the addresses set forth in Section 8(b), provided that nothing in this Section 8(g) shall affect the right of any Party to serve legal process in any other manner permitted by law;

      (3)   acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such Party hereby irrevocably and unconditionally waives any right such Party may have to a trial by jury in any legal proceeding directly or indirectly based upon, relating to or arising out of this Agreement or any transaction contemplated hereby or the negotiation, execution or performance hereof or thereof;

      (4)   certifies and acknowledges that (a) no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of any legal proceeding, seek to enforce the foregoing waiver in Section 8(g)(3), (b) each Party understands and has considered the implication of such waiver, (c) each Party makes such waiver voluntarily, and (d) each Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 8(g).

(h) <u>Rules of Construction</u>. The Parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

(i) <u>Assignment and Successors</u>. No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, except with respect to the Trustee as set otherwise forth under <u>Section 7(b)</u> of this Agreement. This Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the Parties.

(j) <u>Further Assurances</u>. Each Party hereto shall execute and cause to be delivered to each other Party hereto such instruments and other documents, and shall take such other actions, as such other Party may reasonably request for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

(k) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have duly caused this Agreement to be executed as of the day and year first above written.

**PUBLIC LIGHTING AUTHORITY**

By: Odis Jones
Its: Executive Director

Date: 7/31/13

Witness for Public Lighting Authority:

**CITY OF DETROIT**

By: Kevyn D. Orr
Its: Emergency Manager

Date: _____

Witness for City:

**Wilmington Trust, N.A., AS TRUSTEE**

By: _____
Its: _____

Date: _____

Witness for Trustee:

**IN WITNESS WHEREOF**, the Parties have duly caused this Agreement to be executed as of the day and year first above written.

**PUBLIC LIGHTING AUTHORITY**

_____

By: Odis Jones
Its: Executive Director

Date: _____

Witness for Public Lighting Authority:


_____


**CITY OF DETROIT**

_____

By: Kevyn D. Orr
Its: Emergency Manager

Date: _August 1, 2013_

Witness for City:


_____


**Wilmington Trust, N.A., AS TRUSTEE**

_____

By:
Its:

Date: _____

Witness for Trustee:


_____

**IN WITNESS WHEREOF,** the Parties have duly caused this Agreement to be executed as of the day and year first above written.

**PUBLIC LIGHTING AUTHORITY**

_____

By: Odis Jones
Its: Executive Director

Date: _____

Witness for Public Lighting Authority:

_____

**CITY OF DETROIT**

_____

By: Kevyn D. Orr
Its: Emergency Manager

Date: _____

Witness for City:

_____

Wilmington Trust, N.A., AS TRUSTEE

_____

By: JAY SMITH
Its: VICE PResident

Date: 7-31-13

Witness for Trustee:

_____

# Public Lighting Authority Trust

### Exhibit A
### Fee Schedule

Administration Fee                    $2,500.00 per annum, payable at closing

- Assumes proceeds are placed in Wilmington Trust's non-collateralized escrow depository account.

- Assumes one account.

*The fees as quoted and the acceptance of our duties as Escrow Agent are subject to the satisfactory review and acceptance of all related financing documents by the Escrow Agent, our counsel and the New Business Acceptance Committee. In the event the escrow changes prior to or after closing, Wilmington Bank reserves the right to review and renegotiate the fees accordingly.*

**Public Lighting Authority Trust**

Exhibit B
**Certificate as to Authorized Signatures**

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Public Lighting Authority and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit B is attached, on behalf of the Public Lighting Authority.

Name / Title / Phone Number         Specimen Signature

ODIS JONES
Name

EXECUTIVE DIRECTOR
Title

(313) 324-8290
Phone Number

      Signature

_____
Name

_____
Title

_____
Phone Number

      Signature

_____
Name

_____
Title

_____
Phone Number

      Signature

# Public Lighting Authority Trust

### Exhibit C
### Payment Instructions

**By Wire**:

Bank:  M & T Bank
ABA: 022000046
Account: Corporate Trust Clearing
Account No.: 3088001950200
ffc  Public Lighting Authority Trust
Attn: Jay Smith

**By Check**:

Payable to: Wilmington Trust, National Association

**Mailed to**:

Wilmington Trust, National Association
Global Capital Markets
25 S. Charles Street, 11th Floor
Baltimore, MD 21201
Attn: Jay Smith

CHI-1898778v2

# Appendix C

**West PLA Pilot Area**





Appendix D

East PLA Pilot Area



Appendix E

Appendix E

City of Detroit by Zip Codes

East Pilot Area

West Pilot Area



Appendix F

Public Lighting Authority
Short Term and Long Term Summary Schedule

# APPENDIX G

**Public Lighting Authority of Detroit**
**Budget**

| | 30-Jun-14 | 30-Jun-15 | 30-Jun-16 | 30-Jun-17 | 30-Jun-18 | 30-Jun-19 | 30-Jun-20 | 30-Jun-21 | 30-Jun-22 | 30-Jun-23 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue Sources** | | | | | | | | | | |
| Utility User Tax | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 | $ 12,500,000 |
| City of Detroit Admin Fees | $ 329,348 | $ 658,696 | $ 1,317,392 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 |
| Bridge Loan Proceeds | $ 60,000,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Bond Proceeds (Net of D.S. Reserve Fund ) | $ 135,504,992 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | |
| **Total Revenue** | $ 208,334,340 | $ 13,158,696 | $ 13,817,392 | $ 14,015,000 | $ 14,015,000 | $ 14,015,000 | $ 14,015,000 | $ 14,015,000 | $ 14,015,000 | $ 14,015,000 |
| | | | | | | | | | | |
| **Administrative Budget** | | | | | | | | | | |
| Salaries & Benefits | $ 534,114 | $ 566,160 | $ 594,468 | $ 616,000 | $ 620,000 | $ 620,000 | $ 620,000 | $ 620,000 | $ 620,000 | $ 620,000 |
| Insurance | $ 78,500 | $ 83,316 | $ 87,482 | $ 89,000 | $ 90,000 | $ 90,000 | $ 90,000 | $ 90,000 | $ 90,000 | $ 90,000 |
| Auto Expenses | $ 15,000 | $ 16,023 | $ 16,414 | $ 16,500 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 |
| Professional Fees | $ 626,100 | $ 429,346 | $ 419,843 | $ 327,385 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 |
| Occupancy | $ 58,093 | $ 51,677 | $ 45,976 | $ 48,275 | $ 50,000 | $ 55,000 | $ 60,000 | $ 65,000 | $ 70,000 | $ 75,000 |
| Office | $ 152,000 | $ 161,120 | $ 165,000 | $ 170,000 | $ 175,000 | $ 180,000 | $ 185,000 | $ 190,000 | $ 195,000 | $ 200,000 |
| Conferences & Meetings | $ 25,000 | $ 26,500 | $ 27,825 | $ 28,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 |
| Others | $ 315,000 | $ 333,900 | $ 350,595 | $ 280,000 | $ 283,000 | $ 273,000 | $ 263,000 | $ 253,000 | $ 243,000 | $ 233,000 |
| | | | | | | | | | | |
| **Total Operating Budget** | $ 1,804,506 | $ 1,668,052 | $ 1,707,603 | $ 1,569,159 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 | $ 1,515,000 |
| | | | | | | | | | | |
| **Capital Project Expenditures** | | | | | | | | | | |
| DTE - Project Management | $ 1,200,000 | $ 1,200,000 | $ 900,000 | $ 300,000 | $ - | $ - | $ - | $ - | $ - | - |
| Surveys | $ 1,950,000 | $ 2,200,000 | $ 94,731 | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Engineering & Design | $ 3,876,555 | $ 6,307,326 | $ 3,153,663 | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Over Head Removal | $ 3,230,485 | $ 4,826,266 | $ 4,826,266 | $ 2,413,133 | $ - | $ - | $ - | $ - | $ - | - |
| Under Ground Removal | $ 727,993 | $ 1,087,604 | $ 1,087,604 | $ 543,802 | $ - | $ - | $ - | $ - | $ - | - |
| Over Head Installation | $ 4,221,358 | $ 7,316,305 | $ 7,316,305 | $ 3,658,153 | $ - | $ - | $ - | $ - | $ - | - |
| Under Ground Installation | $ 18,228,856 | $ 26,780,858 | $ 28,019,278 | $ 17,497,608 | $ - | $ - | $ - | $ - | $ - | - |
| Communications | $ 26,400 | $ 5,400 | $ 4,050 | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | | | | | | | | | | |
| **Total Capital Projects** | $ 33,461,648 | $ 49,723,759 | $ 45,401,897 | $ 24,412,696 | $ - | $ - | $ - | $ - | $ - | - |
| | | | | | | | | | | |
| **Debt Service Expenditures** | | | | | | | | | | |
| Principal payment - Bridge Loan | $ 60,000,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Principal payment - Bond | $ - | $ - | $ 1,525,000 | $ 1,595,000 | $ 1,675,000 | $ 1,760,000 | $ 1,855,000 | $ 1,950,000 | $ 2,060,000 | $ 2,185,000 |
| Interest Expenses - bond | $ - | $ 5,990,788 | $ 10,973,113 | $ 10,902,613 | $ 10,820,863 | $ 10,734,588 | $ 10,644,613 | $ 10,546,488 | $ 10,438,938 | $ 10,311,588 |
| Interest Expenses - Bridge Loan | $ 1,350,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Issuance Expenses - Bond | $ 2,233,275 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Issuance Expenses - Bridge Loan | $ 660,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Trustee Fees | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 |
| | | | | | | | | | | |
| **Total Debt Service** | $ 64,246,275 | $ 5,993,788 | $ 12,501,113 | $ 12,500,613 | $ 12,498,863 | $ 12,497,588 | $ 12,502,613 | $ 12,502,488 | $ 12,501,938 | $ 12,499,588 |
| | | | | | | | | | | |
| **Total** | $ 99,512,429 | $ 57,385,599 | $ 59,610,612 | $ 38,482,468 | $ 14,013,863 | $ 14,012,588 | $ 14,017,613 | $ 14,017,488 | $ 14,016,938 | $ 14,014,588 |
| | | | | | | | | | | |
| Change | $ 108,821,910 | $ (44,226,903) | $ (45,793,220) | $ (24,467,468) | $ 1,137 | $ 2,012 | $ (2,613) | $ (2,488) | $ (1,938) | 412 |
| | | | | | | | | | | |
| Beginning Fund Balance | $ 6,117,415 | $ 114,939,325 | $ 70,712,422 | $ 24,919,202 | $ 451,733 | $ 452,870 | $ 454,882 | $ 452,269 | $ 449,781 | $ 447,843 |
| | | | | | | | | | | |
| Ending Fund Balance | $ 114,939,325 | $ 70,712,422 | $ 24,919,202 | $ 451,733 | $ 452,870 | $ 454,882 | $ 452,269 | $ 449,781 | $ 447,843 | $ 448,255 |

**Assumptions:**

**Revenue:**

**Utility User Tax:** This is the revenue from City's utility tax that will be used to repay the bond.

**City of Detroit Admin Fees:** City has agreed to pay 15% of the electricity operating cost as an admin fee. PLA estimated the number of lights available during the pilot program are 10,000 and 20,000 for the first two years

**Bridge Loan Proceeds:** PLA will initially borrow $60 million to start the project. The loan will be paid as soon as the $149 Million bond is issued. The loan will have interest rate equal to 1 month LIBOR index plus 16% margin. ( estimated 3%)

**Bond Proceeds:** This assumption is based on PLA will sell $149 million in bonds by June 15, 2014. This will be repaid through Utility user tax @$12.5M per year for 30 years. The bond is a 30 year bond issuance and carries an interest rate ranging from 4 to 8 percent. The bond analysis was prepared by Robert W. Baird & Co.
Note: City will be paying all operating and electricity cost

**Administrative Budget**

**Salaries & Benefits:** These expenditures are based on the number of employees that PLA will utilize.

**Insurance:** Consist of Officers and Directors, liability and umbrella insurance.

**Auto Expenses:** Consist of the employee parking and auto allowance

**Professional Fees:** Consist of accounting, auditing, legal and public relation professionals

**Occupancy:** Consist of rent and repairs & maintenance of the PLA office

**Office :** Consist of office expenses

**Conferences & Meetings:** Board and staff meeting.

**Others:** All other unexpected expenses

**Capital Project Expenditures:** Estimated total cost of the project will be $153 Million

**Debt Service Expenditures:** Bridge loan in the amount of $60 million which will paid within a year with an estimated interest of $1.35M.
Bond will be issued 1st quarter of fiscal year 2015. The first principal payment is scheduled on July 2016 and the first interest payment is January 2016.
Estimated trustee and others fees of $3,000 per annum.