# PUBLIC LIGHTING AUTHORITY OF DETROIT
## BALANCE SHEET
## JULY 31, 2013

### ASSETS

| | |
|---|---|
| Cash | $ 1,029,411 |
| Employee Advances | 20,000 |
| Total Assets | $ 1,049,411 |

### LIABILITIES & FUND BALANCE

**LIABILITIES**

| | | |
|---|---|---|
| Accounts Payable | $ | 29,091 |
| Other Payables | | - |
| Total Liabilities | $ | 29,091 |

**FUND BALANCE**

| | | |
|---|---|---|
| Non-spendable | $ | - |
| Unassigned | | 1,020,320 |
| Total Fund Balance | | $ 1,020,320 |
| Total Liabilities & Fund Balance | | $ 1,049,411 |

## PUBLIC LIGHTING AUTHORITY OF DETROIT
## STATEMENT OF REVENUE, EXPENDITURES AND CHANGES IN FUND BALANCE
## FOR THE ONE MONTH ENDED JULY 31, 2013

|  | CURRENT | YEAR-TO-DATE |
|---|---|---|
| **REVENUE:** | | |
| Utility User Tax Revenue | $ - | $ 1,200,000 |
| Total Revenue | $ - | $ 1,200,000 |
| **EXPENDITURES:** | | |
| Salaries & Wages | $ 4,360 | $ 4,360 |
| Fringe Benefits | 338 | 338 |
| Auto Expenses | 518 | 518 |
| Bank Charges | 75 | 110 |
| Occupancy | 150 | 150 |
| Office Expenses | 608 | 608 |
| Legal Fees | 28,377 | 101,444 |
| Public Relation Services | 7,600 | 56,350 |
| Secretarial Services | 1,038 | 1,770 |
| Trustee Fees | 2,500 | 2,500 |
| Relocation Expenses | - | 10,000 |
| Telephone & Internet | 1,532 | 1,532 |
| Total Expenditures | $ 47,097 | $ 179,680 |
| Change in Fund Balance | $ (47,097) | $ 1,020,320 |
| Beginning Fund Balance | 1,067,417 | - |
| Ending Fund Balance | $ 1,020,320 | $ 1,020,320 |

**Exhibit 2**

Pilot Area Maps

**East PLA Pilot Area**



## West PLA Pilot Area



# EXHIBIT 6.2

## (O&M Agreement)

# INTERLOCAL AGREEMENT

BETWEEN

## THE CITY OF DETROIT

AND THE

## PUBLIC LIGHTING AUTHORITY

FOR THE

## OPERATION, MAINTENANCE AND MANAGEMENT
## OF A
## PUBLIC LIGHTING SYSTEM

P a g e | **1 of 16**

13-53846-tjt Doc 2379-9 Filed 01/03/13 Entered 01/03/14 17:41:50 Page 7 of 100
13-53846-swr Doc 1541-9 Filed 10/23/13 Entered 10/23/13 17:15:05 Page 2 of 99   107

The following recitals are made regarding this interlocal agreement between City of Detroit, a Michigan municipal corporation (the "City"), and the Public Lighting Authority, a Michigan municipal corporation (the "Authority", together with the City, the "Parties" and each a "Party"):

WHEREAS, the City has properly incorporated the Authority pursuant to the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL 123.1261 *et seq.* ("Act 392") for the purpose of providing an equitable and reasonable method and means of financing, operating, and maintaining a lighting system in sufficient quantities within the City; and

WHEREAS, Act 392 and the Urban Cooperation Act, 1967 PA 7, MCL 124.501 *et seq.*, each authorize interlocal public agency agreements between a city and a public lighting authority; and

WHEREAS, the City and the Authority have previously entered into an agreement for the financing and construction of a Public Lighting System (as amended, the "Construction and Financing Interlocal Agreement");

WHEREAS, the City and the Authority desire to enter into an agreement for the purposes of defining the roles and responsibilities of each of the Parties with respect to the operation, maintenance and management of the System within the City for the benefit of residents of and visitors to the City; and

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.1    Definitions**.  As used in this interlocal agreement:

"Act 392" has the meaning set forth in the Recitals to this Agreement.

"Agreement" means this Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System by and between the City and the Authority.

"Approving Entities" shall have the meaning set forth in Section 4.3.

"Certificate of Completion" means a certification in substantially the form attached hereto as Exhibit A, issued by the Authority that all construction, improvement, enlargement, reduction or extension of a geographically-specified portion of the System has been completed pursuant to the Construction and Financing Interlocal Agreement and the Lighting Plan.

"City Council" means the legislative body of the City of Detroit, established by §4-101 of the 2011 City Charter.

"Construction and Financing Interlocal Agreement" has the meaning set forth in the Recitals to this Agreement.

"CPI" means the Consumer Price Index for All Urban Consumers, Detroit-Ann Arbor-Flint, all items, (1982-84=100), published by the Bureau of Labor Statistics of the United States Department of Labor.

"Effective Date" has the meaning set forth in Section 7.1.

"EM Act" means the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 – 1575

"Emergency Manager" means the emergency manager appointed by the Governor of Michigan pursuant to the EM Act.

"Extraordinary Maintenance" means any non-routine maintenance of any System component(s), requiring replacement or repair of any System component(s) prior to the natural expiration of its expected useful life due solely to the criminal acts of third parties regardless of whether such acts are actually prosecuted or the offenders identified or arrested.

"Financing Costs" shall have the meaning given to such term in the Construction and Financing Interlocal Agreement.

"Improvements" means all of the work, investments, and activities made or conducted, in whole or in part, on the construction, improvement, enlargement, reduction or extension of the System as contemplated by the Construction and Financing Interlocal Agreement or Act 392.

"Industry Practices" means the practices, methods, techniques, standards and acts employed in the public lighting industry for the operation and maintenance of a public lighting system similarly sized to the System.

"Lighting Plan" means the plan required under MCL §123.1277.

"Managed System Area" shall mean that geographic portion of the System that has been constructed, improved, enlarged, reduced, or extended pursuant to the Lighting Plan, and the responsibility to manage, operate, and maintain such upgraded area has been assumed by Authority pursuant to Section 3.2.

"Mayor" means the executive of the City of Detroit, established by §5-101 of the 2011 City Charter.

"Overhead-Fed Streetlight" means any streetlight in the Managed System Area, which receives electricity directly from wires that travel above ground.

"Quarterly Statement" has the meaning set forth in Section 4.2.

"Services" shall mean all actions necessary to operate, maintain, and manage the Managed System Area required under this Agreement.

"Streetlight" means any Overhead-Fed Streetlight or Underground-Fed Streetlight.

"System" means all of the luminaires, lamps, photocells, brackets, conductors, lights, poles and foundations, ballasts, circuits, transformers, conduits, underground equipment that are not part of the distribution system, and other equipment and appurtenances, including any easements or other interests in real property, commencing at the point of connection to the electric distribution system and continuing to the luminaire, necessary for the operation of the street lights within the City. This definition specifically excludes the Mistersky Power Plant, any distribution assets of the City or DTE Energy, and any transmission assets of the City or DTE Energy, including any and all wires, distribution poles, transmission poles, substations, and transformers used for the distribution or transmission of electricity.

"Underground-Fed Streetlight" means any streetlight in the Managed System Area, which receives electricity directly from wires that travel below ground.

"Utility Revenues" shall have the meaning given to such term in the Construction and Financing Interlocal Agreement.

**Section 1.2    Captions and Headings**.   The captions, headings, and titles in this Agreement are intended as a convenience and not intended to have any substantive meaning or be interpreted as part of this Agreement.

**Section 1.3    Plural Terms**.   A term or phrase in this Agreement importing the singular number only may extend to and embrace the plural number and every term or phrase importing the plural number may be applied and limited to the singular number.

## ARTICLE II
## ASSURANCES

**Section 2.1    Assurances by the City**.   The City hereby makes the following assurances, representations, and warranties:

(a) Except as contemplated herein, that all necessary permissions, approvals, reviews, or any other forms of acquiescence have been obtained and conducted authorizing the City to enter into this Agreement.

(b) To the extent permitted by law and any agreement to which the City is a party, the City shall use commercially reasonable efforts to provide all information within its control requested by the Authority to the Authority necessary to effectuate the purposes of this Agreement.

**Section 2.2    Assurances by the Authority**.    The Authority hereby makes the following assurances, representations, and warranties:

(a) All funds paid by the City to the Authority pursuant to this Agreement shall be expended and accounted for according to accounting standards for governmental entities.

(b) The Authority shall take reasonable actions to minimize the costs associated with this Agreement, including future System operating costs, while providing the levels of operation and maintenance set forth herein.

(c) The Authority shall perform, or cause to be performed, all Services required under this Agreement with the typical level of skill as is customary in the public lighting industry.

(d) To the extent permitted by law and any agreement to which the Authority is a party, the Authority shall use commercially reasonable efforts to provide all information within its control requested by the City to the City necessary to effectuate the purposes of this Agreement.

## ARTICLE III
## OPERATION, MAINTENANCE, AND MANAGEMENT OF A PUBLIC LIGHTING SYSTEM

**Section 3.1    Operation and Management**.  Subject to the terms of Section 5.2 and the availability of funding from the City, the Authority shall commence and perform the Services for the Managed System Areas in accordance with Section 3.2.   The City shall purchase all electricity necessary to power the System from a third-party power provider.  The Authority is not obligated to provide or otherwise arrange for the purchase of electricity on the City's behalf under this Agreement.

**Section 3.2    Certificate of Completion**.  The commencement of the Services by the Authority of the Managed System Area shall be effectuated by the delivery of a Certificate of Completion to the City.  The Authority shall deliver such Certificate of Completion within thirty (30) calendar days of acceptance of the work in such area as required by the Lighting Plan and in conformity with the Construction and Financing Interlocal Agreement.   The City shall be responsible for all activities required for the proper operation, maintenance, and management of the portion of the System that are not included in any Managed System Area.  The Authority's responsibility to provide the Services is only applicable to the Managed System Area.  Upon the delivery of a Certificate of Completion, the obligation to operate and maintain any real property, facilities, equipment, or other personal property held and used by the City necessary for the Services in the Managed System Area, including, but not limited to, any part of the System, shall be automatically assumed by the Authority without the requirement of further action by the

Parties.  At the request of the City, the Authority shall execute documents that are reasonably necessary to evidence such assumption.

Section 3.3    **Service Requirements**.  The Authority shall ensure that the luminaires, lamps, photocells and lights in the Managed System Area are in operation and emitting light from daily dusk, defined as the half-hour after sunset, to dawn, defined as the half-hour before sunrise, in accordance with the service levels set forth in Section 3.7.

Section 3.4    **Outage Reporting System**.  The Authority shall establish a telephonic and internet reporting system, such that individuals may report outages of any System components in a Managed Service Area to the Authority, and the Authority shall use commercially reasonable efforts to ensure that the individuals that live or work in the geographic area of the Managed Service Area are aware of such reporting system.

Section 3.5    **Maintenance**.

3.5.1    **Routine Maintenance**.  The Authority shall conduct routine maintenance on an on-going basis according to Industry Practices to ensure that, at a minimum, the System provides the service levels described in Section 3.7.  The Authority shall plan and budget for equipment replacement and upgrades based on the expected useful life of System equipment and components based on manufacturer recommendations.

3.5.2    **Extraordinary Maintenance.**  Subject to the payment of funds under this Agreement in sufficient amounts, the Authority shall perform Extraordinary Maintenance as necessary to ensure that, at a minimum, the System provides the service levels described in Section 3.7.  The Authority shall make such personnel and equipment available as necessary to respond to and remediate any damage to or failure of the System or any individual System component on an as-needed basis.  In the event any portion or individual components of the System are damaged due to the criminal, intentional, or negligent acts of a third party, Authority may, but is not required to, seek such recovery in its own name from such responsible parties.

3.5.3.    **Maintenance Resulting from Vegetation.**  In the event that any System asset in the Managed System Area becomes non-functional due to the City's failure to maintain the vegetation on City property, the Authority shall remain obligated to make the repairs it is required to make under this Agreement, provided that the City shall reimburse the Authority for the costs directly related to such maintenance, including the costs of any necessary vegetation maintenance in connection therewith, which payment shall be in addition to the fees and costs set forth in Article IV, upon the City's receipt of invoices therefor and commercially reasonable documentation showing the required maintenance was due to the City's failure to maintain such vegetation.

Section 3.6    **Delegation of Responsibilities**.  Subject to the written consent of the City, which shall not be unreasonably withheld, the Authority can delegate any or all of its responsibilities under this Agreement to a third party contractor.  The City shall have fifteen (15) business days from the date of submission of a notice of intent to delegate responsibility under

this Section 3.6 to consent or not to consent to such delegation. If the City does not act within fifteen (15) business days, the City shall be deemed to have consented to such delegation.

**Section 3.7    Service Levels.**    The Authority shall repair any damaged individual System assets, or components thereof, that have been reported as non-functioning within the standard timeframe for such repair, which standard timeframe shall be the standard of DTE Energy for the southeastern Michigan region but in no event more than seven (7) days, of receiving such report of non-functionality, provided that if such damage cannot be reasonably repaired within such timeframe, then the Authority shall commence such repair within such timeframe and diligently prosecute such repairs until completion.

**Section 3.8    Asset Management**. The Authority shall operate and maintain the assets of the Managed System Area according to Industry Practices. Inspections and testing of the System components shall occur no less than once every six years. Structural inspections and risk assessments will be conducted on a rotating basis of distinct geographical portions of the System every three years. The Authority shall maintain an asset management database that includes, at minimum, the following information: the location and installation dates of all poles and components; the results of any inspections, testing, and risk assessments of the System components; the expected useful life of each of the components of an individual pole; the projected inspection and testing date of each component; the type and technical detail of each component; and an incident record of each occurrence that requires Extraordinary Maintenance, the type and costs of repairs performed, and any third parties that may be liable.

## ARTICLE IV
## BUDGETS AND FINANCING

**Section 4.1    Operation and Management Fees and Costs**. The City shall pay the Authority the following amounts for the Services, provided that in no event, shall the City be obligated to pay more in any given year than $8,024,000 (the "Annual Cap Amount"), excluding any payments for Extraordinary Maintenance:

(a) <u>Operations and Maintenance Costs</u>: $9.62 per month per Overhead-Fed Streetlight, and $17.66 per month per Underground-Fed Streetlight.
(b) <u>Extraordinary Maintenance Costs</u>:    The actual costs of any Extraordinary Maintenance performed during the second previous quarterly period, such that the City will pay the Extraordinary Maintenance costs performed for the period of January through March of any year on the Quarterly Statement for the July through September quarter of that year.
(c) <u>Administrative Costs</u>:  One Hundred and Twenty-Six Thousand and Two-Hundred and Fifty Dollars ($126,250) per month for the operation of the Authority.

The amounts to be paid under this Section 4.1 shall increase annually by the lesser of (i) three percent (3%) or (ii) the percentage increase in the CPI over the prior year.

**Section 4.2    Calculation of Quarterly Costs**. No later than thirty (30) days prior to the first date of each fiscal quarter (defined as January 1, April 1, July 1 and October 1 of each

calendar year), the Authority shall submit a statement to the City estimating the costs to be paid by the City for such fiscal quarter pursuant to Section 5.1 (the "Quarterly Statement"). The Quarterly Statement shall include detail of the fees for such fiscal quarter, including the number and type of Streetlights expected to be serviced, broken out by each of the cost categories in substantially the form provided in Exhibit B.

**Section 4.3    Adjustments to Quarterly Statements**.  To the extent the Authority deems it necessary to adjust any of the Quarterly Statements to address a change in circumstances outside the Authority's reasonable control, it shall submit such revisions to the City Council and the Mayor or their respective lawful designees (the "Approving Entities") for their approval, which approval shall not be withheld, except in the reasonable discretion of the Approving Entities.  The Approving Entities shall have fifteen (15) business days from the date of submission of the revisions under this Section to approve or disapprove the revision.  If either of the Approving Entities does not to disapprove the revision within fifteen (15) days, the revision shall be deemed approved.

**Section 4.4    Limited Obligation**s.  Nothing in this Agreement, including but not limited to this Article IV, shall require the Authority to pay the costs associated with the performance of any Services or other obligations under this Agreement from Utility Revenues.

**ARTICLE V**
**PAYMENT**

**Section 5.1    Payments.**

**Section 5.1.1    Budgeted Payments**.  At the beginning of each fiscal quarter (which shall be January 1st, April 1st, July 1st, October 1st of each calendar year), the City shall pay the Authority the amount for such quarter set forth in the Quarterly Statement provided pursuant to Article IV, such that the City shall pay on January 1, 2014 the budgeted amount for January, February and March 2014.  The City shall pay such payments by check, payable to the Public Lighting Authority, which must be received by the Authority by the fifth (5th) business day following the beginning of the fiscal quarter.  Any payment not received by the fifth (5th) day following the beginning of a fiscal quarter shall be subject to a ten percent (10%) late payment penalty.

**Section 5.1.2    Quarterly Reconciliation**.  Within ten (10) days after the end of each fiscal quarter (which shall be March 31st, June 30th, September 30th and December 31st of each calendar year), except for the fiscal quarter coinciding with the Authority's fiscal year-end, and within thirty (30) days after the Authority's fiscal year-end, the Authority shall provide to the City a detailed reconciliation of the actual out-of-pocket costs and expenses incurred by the Authority in the performance of the Services for such fiscal quarter based on the actual number of Streetlights serviced.  If the reconciliation discloses an overpayment by the City for the previous fiscal quarter, the Authority shall credit the difference to the City against the next amounts that may become due under this Agreement.  If the reconciliation shows an underpayment by the City for the previous fiscal quarter, the City shall remit the difference to the Authority within fifteen (15) business days of such reconciliation pursuant to the procedures set forth in Section 5.1.1; provided, however, that, in no event, shall the City be obligated to pay

13-53846-tyj   Doc 2379-3   Filed 00/03/14   Entered 00/03/14 17:41:59   Page 94 of 21   114
13-53846-swr   Doc 2379-3   Filed 00/23/14   Entered 00/23/14 17:45:59   Page 94 of 121
100

more in any given year than $8,024,000, excluding any payments for Extraordinary Maintenance. In no event shall the Authority perform any Services under this Agreement once the cumulative costs for a given year submitted by the Authority in the Quarterly Statements for such one year period equal the Annual Cap Amount unless the City has agreed in writing to pay the Authority for such costs above the Annual Cap Amount pursuant to the payment procedure set forth in this Agreement or the Authority has otherwise has identified and earmarked available sources of revenue to pay for those Services in excess of the Annual Cap Amount. In the event that the City determines that it, in good faith, believes that the reconciliation does not fully and accurately set out the actual out-of-pocket expenses of the Authority that the City is responsible to reimburse pursuant to this Agreement, it shall provide notice to the Authority within fifteen (15) business days of receipt of the reconciliation, and such dispute will be reconciled pursuant to the procedures set forth in Article X. If the City provides notice of such dispute, the City shall remain obligated to pay any undisputed amounts required pursuant to this Section 5.1.3, and the City shall deposit the maximum disputed amount in escrow pending resolution of the dispute.

**Section 5.2    No Service Without Payment.** In the event that the City does not make a payment pursuant to Section 5.1 or otherwise due hereunder, the Authority shall not perform the Services until such time as the City has made such payment; provided, however, (i) if there is a good-faith dispute about the amount owed pursuant to the reconciliation procedure set forth in Section 5.1.2, then the City's delivery of the contested amount to escrow rather than the Authority pursuant to the terms herein shall not permit the Authority to cease performing the Services until such time as the dispute is resolved and (ii) the Authority may perform Services following a nonpayment by the City but only if it has identified and earmarked available sources of revenue other than the Utility Revenues. In the event the City makes any payments less than the amounts included in the Quarterly Statement, as may be revised pursuant to this Agreement, the Authority is authorized to apply any payments to and continue that portion of the Services it deems to be the highest priority and is excused from providing any other Services.

**Section 5.3    Other Revenues.** The Authority shall not be entitled to any revenues arising from pole attachment fees, lease payments, or other payments for the use or right to attach property to any System assets.

**ARTICLE VI**
**DATA SHARING, ACCESS, COOPERATION, AND SYSTEM DAMAGE**

**Section 6.1    Data and Information**. To the extent permitted by law and any agreements to which the City is a party, the City shall provide the Authority full access to all data and information in its possession or control, which is reasonably accessible, including all data and information contained in the documents commonly known as the "series streetlight maps," necessary to provide the Services. To the extent permitted by law and any agreements to which the Authority is a party, the Authority shall provide the City full access to all data in the Authority's possession or control, which is reasonably accessible, reasonably related to the System.

**Section 6.2    Access to Assets**. The City hereby grants the Authority a license to access all facilities, assets, easements or appurtenances owned, operated, or maintained by the City's

P a g e | **9 of 16**

13-53846-swr    Doc 2379-3    Filed 01/09/14    Entered 01/09/14 17:41:50    Page 15 of 21
13-53846-swr    Doc 1347-9    Filed 10/23/13    Entered 10/23/13 17:15:50    Page 15 of 21    115
100

Public Lighting Department or any other City department necessary to provide the Services. The Authority may only use such license for the performance of its obligations pursuant to this Agreement and all activities reasonably related thereto. In using such license, the Authority shall not interfere with the City and its representatives, contractors or employees in the performance of their duties. The Authority shall permit the City full access to all facilities, assets, easements or appurtenances owned, operated, or maintained by the Authority related to the System, if any, and shall not impair access to any public rights of way.

Section 6.3    **Cooperation**.  The Parties hereby agree to cooperate with each other to the fullest extent possible to effectuate the purposes of this Agreement.

Section 6.4    **Permits**.  The City shall process and issue any permit(s) required under City Charter, City Code of Ordinances, or any other local regulatory requirements to the Authority, its employees, agents, or contractors within fifteen (15) business days of receiving a request for such permit(s) provided that such request includes the detail and documentation otherwise required to issue such permit; *provided, however*, that if there are any permit(s) required to conduct any work specified herein that are not within the direct control of the City, the City shall use commercially reasonable efforts to ensure that such permits are issued within a commercially reasonable timeframe.  The City shall not charge a fee to the Authority for any permits, approvals, reviews, or other actions required by the City, but in the event that the City does charge a fee to the Authority, such fees can be included as a cost to be reimbursed by the City pursuant to this Agreement.

Section 6.5    **System Damage**.  The Authority shall not be responsible for any damage to the System, or any component thereof, resulting from the criminal, intentional, or negligent acts of any third parties, except for its maintenance obligations set forth herein that are fully compensated pursuant to this Agreement.  In the event any portion of the System or Improvements are damaged by the negligent acts of a third party and the City refuses or is unable to seek recovery of funds for such damage, the Authority may, but is not required, to seek such recovery in the City's name.

Section 6.6    **System Status Meetings**.  The Parties shall meet monthly to review data and information relevant to the entire System.  Such meetings shall include a review of system outages, Extraordinary Maintenance issues and updates, any outstanding financial issues, and any other issues relevant to this Agreement.

**ARTICLE VII**
**EFFECTIVE DATE, TERM, DEFAULT, TERMINATION**

Section 7.1    **Effective Date**.  This Agreement shall become effective on the later date that each of the following events have occurred: (i) the approval and execution by the City; (ii) the approval of the Agreement pursuant to the procedures set forth in the EM Act; (iii) the approval of the Agreement by resolution of the Authority; and (iv) the execution by the Executive Director of the Authority (the "Effective Date").

P a g e | **10 of 16**

13-53846-swr    Doc 2379-3    Filed 01/09/14    Entered 01/09/14 17:41:50    Page 16 of 21
13-53846-swr    Doc 13479-3    Filed 10/23/13    Entered 10/23/13 17:15:50    Page 16 of 116
100

**Section 7.2    Term**.  This Agreement shall commence on the Effective Date and shall continue for a period of three years.  This Agreement shall automatically renew for additional three-year terms unless the non-renewing Party provides notice to the other Party of its intent not to renew no later than one year prior to the expiration date of a term. The non-renewal of the Agreement shall be approved by the same process as is required to terminate the Agreement under Section 7.5.

**Section 7.3    Default.**

**Section 7.3.1   City Default.**  The City shall be in default of this Agreement if the City does not make the payments required hereunder, whether in whole or in part, including any late payment penalty authorized under Section 5.1.1, within ten (10) days after the due date set forth in Section 5.1; provided, however, that the City shall not be in default hereunder if the City is in good faith contesting the amount of such payment pursuant to Section 5.1.2.

**Section 7.3.2   Authority Default.**    Subject to Section 5.2, the Authority shall be in default of this Agreement if the Authority fails to perform any of its obligations hereunder after the Authority has received thirty (30) days' notice of such default, provided that if such failure cannot be remedied within such thirty (30) day period, the Authority shall not be in default if it commences to remedy the default and diligently pursues the remedy to its completion.

**Section 7.4    Remedies upon Default.**

**Section 7.4.1   Remedies for City Default.**  Upon the occurrence of a default by the City under Section 7.3.1, the Authority shall first satisfy itself from funds paid in advance to the Authority pursuant to Section 5.1.  In the event such amounts are not sufficient to cover all payments then due to the Authority, this Agreement shall immediately terminate upon notice from the Authority, provided that if such default is cured by the City at any time during the thirty (30) consecutive days immediately following termination of this Agreement, such termination shall be deemed void and of no further force or effect, provided that the Authority shall have no obligations hereunder, financial or otherwise, during such period when the City's default remains uncured or during the 10 day grace period set forth in Section 7.3.1

**Section 7.4.2   Remedies for Authority Default.**  Upon    default    by    the Authority under this Article VII, the City may, at its sole option, (i) perform such obligation of the Authority without further notice, and the Authority shall reimburse the City for all costs incurred by the City in such performance, but in no event shall the Authority be required to reimburse the City any amount in excess of the amounts paid to the Authority in advance pursuant to section 5.1.1; or (ii) terminate this Agreement by providing thirty (30) days' written notice to the Authority of the City's intent to terminate, which notice shall describe in detail the Authority's default; provided that, if the default is cured by the Authority at any time during the thirty (30) day notice period, the notice shall be deemed void and of no further force or effect.

**Section 7.5    Termination for Convenience**.    Either Party may terminate this Agreement, for any reason or no reason, with one year advance notice that is approved by a two-

P a g e | **11 of 16**

13-53846-swr    Doc 2379-3    Filed 01/08/14    Entered 01/08/14 17:41:50    Page 17 of 21
13-53846-swr    Doc 13479-3    Filed 10/23/13    Entered 10/23/13 17:15:50    Page 17 of 21    117

100

thirds vote of the governing body of the Party. If the terminating Party is the City, then the approval of the Mayor is required in addition to the vote of the City Council.

## ARTICLE VIII
## BOOKS, RECORDS, AND FINANCES

**Section 8.1    Books and Records**.    The Authority shall provide for a system of accounts for the Authority to conform to a uniform system required by law and for the auditing of the accounts of the Authority. The Authority shall obtain an annual audit of the Authority's books and records by an independent certified public accountant and report on the audit and auditing procedures in the manner provided by sections 6 to 13 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.426 to 141.433. The audit also shall be in accordance with generally accepted government auditing standards and shall satisfy federal regulations relating to federal grant compliance audit requirements.   The audit shall be provided to the City within thirty (30) days of acceptance by the Board of Directors of the Authority but in no event more than one hundred and twenty (120) days following the end of the Authority's fiscal year.   The City may examine the books and records of the Authority related to the Authority's finances or the System and make copies and extracts therefrom at its own expense, all during regular business hours as may be reasonably requested and reasonably agreed to by the Authority in advance.

**Section 8.2    Enterprise Fund**.    The Authority shall maintain its books and records and its funds on an enterprise fund basis. The Authority shall not pay any net proceeds or profits to its local government, other than for services received by the Authority.

## ARTICLE IX
## INDEMNIFICATION, LIABILITY, DAMAGES, NOTICE, AND INSURANCE

**Section 9.1    Indemnification**.   To the extent permitted by law and subject to Section 4.4, each Party shall indemnify and hold harmless the other Party and the other Party's employees, agents, directors and officers against all liability arising out of, or resulting from any third party claim, suit, action or proceeding arising out of or resulting  from (i) the failure of a Party or any of its agents, employees or contractors, to comply with the terms of this Agreement or any applicable law; or (ii) any injury, loss, claim or damages arising from the actions or omissions of a Party or an agent, employee, director, officer or contractor of the Party.

**Section 9.2    Limitation of Liability; No Special Damages**.   Notwithstanding any other provision of this Agreement, neither Party shall be liable to the other for any damages for loss of profits, loss of revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement services, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Agreement. Nothing in this Agreement shall be construed as a waiver of governmental immunity, where applicable.

**Section 9.3    Notice of Claims**.  If either Party becomes aware of any injury, damages, claim, demand, action, legal proceeding, or other loss that may involve the other Party, whether

P a g e | **12 of 16**
13-53846-swr   Doc 2379-3   Filed 01/08/14   Entered 01/08/14 17:41:50   Page 18 of 21
13-53846-swr   Doc 13479-3   Filed 10/23/13   Entered 10/23/13 17:15:50   Page 18 of 118
100

directly or indirectly, it shall inform the other Party in writing within fifteen (15) business days of receiving knowledge of the injury, damages, claim, demand, action, legal proceeding, or other loss.

**Section 9.4    Insurance**.  At all times during the term of this Agreement, each Party shall procure and maintain, at its sole cost and expense, the following types and amounts of insurance coverage issued by an insurance company reasonably acceptable to the other Party, unless otherwise agreed to by the Parties in writing:

(a)     Commercial general liability, covering bodily and personal injury, property damage, and contractual liability insuring the activities of the Party under this Agreement, in a minimum amount of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(b)     Commercial automobile liability with limits of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(c)     Worker's compensation insurance in amounts required in accordance with applicable laws.

(d)     Errors and Omissions/Professional Liability with limits no less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the annual aggregate.

The insurance required of the City by this Agreement in the amounts, with the coverage and other features herein required, may be supplied by a fully funded self-insurance program of the City or a self-insurance pool in which the City is a participant; provided that such self-insurance program or pool will provide the full coverage required herein.

## ARTICLE X
## DISPUTES

**Section 10.1   Informal Dispute Resolution**.  The Authority and the City will attempt to settle any dispute through informal good faith negotiations.  The dispute will be escalated to appropriate senior level management of the Parties, if necessary.  Except as otherwise set forth herein, if such managers are unable to resolve the dispute within fifteen (15) business days of referral (or any other mutually agreed upon timeframe), the Parties will seek resolution of such disputes pursuant to Section 10.2.

**Section 10.2   Jurisdiction and Venue**.  Except as otherwise set forth herein, in the event of any disputes between the Parties over the meaning, interpretation, or implementation of the terms, covenants, or conditions of this Agreement, the matter under dispute, unless resolved any the Parties pursuant to Section 10.1, shall be submitted to the courts of the State of Michigan.

.

Page | 13 of 16
13-53846-swr   Doc 2379-3   Filed 01/09/14   Entered 01/09/14 17:41:50   Page 19 of 21
13-53846-swr   Doc 13479-3   Filed 10/28/13   Entered 10/28/13 17:15:50   Page 19 of 119
100

# ARTICLE XI
## MISCELLANEOUS

**Section 11.1   Amendment**.   This Agreement can be modified or amended only by written agreement executed and approved by both Parties in the same manner as required for the initial effectiveness of the Agreement, as applicable.

**Section 11.2   Heirs, Successors, and Assigns**.   All provisions of this Agreement are and will be binding on the heirs, executors, administrators, personal representatives, successors and assigns of the Authority and the City.

**Section 11.3   Severability**.   If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**Section 11.4   Governing Law**.   The internal laws of the State of Michigan will control in the construction and enforcement of this Agreement.

**Section 11.5   Intentionally Omitted.**

**Section 11.6   Entire Agreement**.   This Agreement sets forth the entire agreement between the Parties and supersedes any and all prior agreements or understandings between them related to the subject matter of this Agreement.  It is further understood and agreed that the terms and conditions of this Agreement are contractual and are not a mere recital and that there are no other agreements, understandings, contracts, or representations between the Parties in any way related to the subject matter of this Agreement, except as expressly stated in this Agreement.

**Section 11.7   Notices**.   Any and all correspondence or notices required, permitted, or provided for under this Agreement to be delivered to any Party shall be sent to that Party by first class mail.  All such written notices shall be addressed to each other Party's signatory to this Agreement.  All correspondence shall be considered delivered to a Party as of the date that the notice is deposited with sufficient postage with the United State Postal Service.  A notice of termination shall be sent via certified mail to the address included with each Party's signature to this Agreement.  Notices shall be mailed to the following addresses:

If to the Authority:   Public Lighting Authority
65 Cadillac Square, Ste. 2900
Detroit, MI 48226

If to City:   City of Detroit
Office of the Mayor
2 Woodward Avenue, 11th Floor
Detroit, MI 48226

P a g e | **14 of 16**
13-53846-swr   Doc 2379-3   Filed 01/08/14   Entered 01/08/14 17:41:50   Page 20 of
100
13-53846-swr   Doc 13479-3   Filed 10/23/14   Entered 10/23/14 17:15:50   Page 20 of 120

With a copy to:     City of Detroit
Office of the Emergency Manager
Coleman A. Young Municipal Center
2 Woodward Ave.
11th Floor
Detroit, MI 48226
Attn: Sonya Mays

**Section 11.8  Force Majeure**.  Any delay or failure in the performance by either Party hereunder shall be excused if and to the extent caused by the occurrence of a Force Majeure. For purposes of this Agreement, Force Majeure shall mean a cause or event that is not reasonably foreseeable or otherwise caused by or under the control of the Party claiming Force Majeure, including acts of God, fires, floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism, accident, restraint of government, governmental acts, injunctions, labor strikes, other than those of the claiming Party or its suppliers, that prevent the claiming Party from furnishing the materials or equipment, and other like events that are beyond the reasonable anticipation and control of the Party affected thereby, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences, and which events or the effects thereof are not attributable to a Party's failure to perform its obligations under this Agreement.

**Section 11.9  Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

**Section 11.10 Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties hereto.  No Party to this Agreement may assign its rights under this Agreement to any other person, without obtaining the written permission of the other Parties in advance.

**Section 11.11 Emergency Manager Approval.**  If the City is under the management of an Emergency Manager pursuant to the EM Act, at the time of a decision for which the approval of the City, the City Council or the Mayor is required, then the approval of the Emergency Manager is hereby substituted in place of the approval of the City, the City Council or the Mayor, as applicable.

**Section 11.12 No Third Party Beneficiaries.**  Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the Parties to this Agreement or their respective successors or permitted assigns any legal or equitable right, remedy or claim under or in respect of this Agreement it being the intention of the Parties that this Agreement and the transactions contemplated hereby shall be for the sole and exclusive benefit of such Parties or such successors and permitted assigns.

[SIGNATURE PAGE FOLLOWS]

P a g e | **15 of 16**

13-53846-swr  Doc 2379-3  Filed 01/09/14  Entered 01/09/14 17:41:50  Page 21 of 121
13-53846-swr  Doc 13479-3  Filed 01/28/13  Entered 01/28/13 17:15:50  Page 16 of 21
100

This Agreement is executed by the Parties on the dates indicated below.

**CITY OF DETROIT**

Dated: _____          By: _____
                                          KEVYN D. ORR
                                  Its:    Emergency Manager


**PUBLIC LIGHTING AUTHORITY**

Dated: _____          By: _____
                                          ODIS JONES
                                  Its:    Executive Director

**EXHIBIT A**

**Form Certificate of Completion**

Please see attached.

# PUBLIC LIGHTING AUTHORITY
## CERTIFICATE OF COMPLETION

In compliance with the Lighting Plan of the Public Lighting Authority of Detroit ("PLA"), the Improvements to the System have been completed for the following geographic area and shall now become a Managed System Area of the PLA:

| | |
|---|---|
| **Zip Code** | |
| **Date of Acceptance** | |
| **Number of Street Lights** | |
| **Northern Boundary** | |
| **Southern Boundary** | |
| **Western Boundary** | |
| **Eastern Boundary** | |

In addition to the Street Lights located within the Managed System Area, the following operation, maintenance, and management of the following property, facilities, or other System assets, including any easements or rights-of-way, shall also be assumed by the PLA:

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

A Map of the Managed System Area is attached to this Certificate of Completion as Exhibit A.

Submitted and certified by:

_____     _____
Signature                                                      Date

_____     _____
Name                                                           Title

The contents of this document may be amended from time to time by written mutual consent of the Parties.

Last Rev: 10.23.2013

13-53846-swr   Doc 2379-3   Filed 01/09/14   Entered 01/09/14 17:45:50   Page 24 of 124
13-53846-swr   Doc 1347-3   Filed 10/23/13   Entered 10/23/13 17:15:56   Page 24 of 100
100

**EXHIBIT B**
**Public Lighting Authority**
**Operations and Maintenance**
Quarterly Statement

| Table 1: Summary of Estimated Costs For This Quarter | |
|---|---|
| **Cost Category** | **Total** |
| Operations and Maintenance Costs (See Table 2) | $[    ] |
| Extraordinary Maintenance Costs (See Table 3) | $[    ] |
| Administrative Costs (See Table 4) | $[    ] |
| | |
| **Estimated Quarterly Total Costs** | $[    ] |

| Table 2: Estimated Operations and Maintenance Costs | | | |
|---|---|---|---|
| **Period** | **Estimated Number of Streetlights** | **Per Streetlight Cost** | **Total** |
| Month 1 | | | |
| *Overhead-Fed Streetlight* | [    ] | $[   ] | $[   ] |
| *Underground-Fed Streetlight* | [    ] | $[   ] | $[   ] |
| *Overhead-Fed Streetlight (LED)* | [    ] | $[   ] | $[   ] |
| *Underground-Fed Streetlight (LED)* | [    ] | $[   ] | $[   ] |
| Month 2 | | | |
| *Overhead-Fed Streetlight* | [    ] | $[   ] | $[   ] |
| *Underground-Fed Streetlight* | [    ] | $[   ] | $[   ] |
| *Overhead-Fed Streetlight (LED)* | [    ] | $[   ] | $[   ] |
| *Underground-Fed Streetlight (LED)* | [    ] | $[   ] | $[   ] |
| Month 3 | | | |
| *Overhead-Fed Streetlight* | [    ] | $[   ] | $[   ] |
| *Underground-Fed Streetlight* | [    ] | $[   ] | $[   ] |
| *Overhead-Fed Streetlight (LED)* | [    ] | $[   ] | $[   ] |
| *Underground-Fed Streetlight (LED)* | [    ] | $[   ] | $[   ] |
| | | | |
| **Operations and Maintenance Costs – Quarterly Subtotal** | | | $[   ] |

| Table 3: Estimated Extraordinary Maintenance Costs | | | |
|---|---|---|---|
| **Period** | **Estimated Number of Streetlights** | **Per Streetlight Cost (as determined in Table 3a)** | **Total** |
| Month 1 | [    ] | $[   ] | $[   ] |
| Month 2 | [    ] | $[   ] | $[   ] |
| Month 3 | [    ] | $[   ] | $[   ] |
| **Extraordinary Maintenance Costs – Quarterly Subtotal** | | | $[   ] |

| Table 3a: Prior Six Month Extraordinary Maintenance Per Streetlight Costs | | | |
|---|---|---|---|
| Period | Total Actual Cost of Extraordinary Maintenance | Actual Number of Streetlights Serviced | Per Streetlight Total |
| Prior Month 1 | [          ] | [          ] | $[      ] |
| Prior Month 2 | [          ] | [          ] | $[      ] |
| Prior Month 3 | [          ] | [          ] | $[      ] |
| Prior Month 4 | [          ] | [          ] | $[      ] |
| Prior Month 5 | [          ] | [          ] | $[      ] |
| Prior Month 6 | [          ] | [          ] | $[      ] |
| | | | |
| **Prior Six-Month Average Extraordinary Maintenance Costs (Sum of prior six months divided by six)** | | | $[____] |

| Table 4: Administrative Costs | |
|---|---|
| Period | Total |
| Month 1 | $[     ] |
| Month 2 | $[     ] |
| Month 3 | $[     ] |
| | |
| **Administrative Costs – Quarterly Subtotal** | $[     ] |

# **EXHIBIT 6.3**

# **(Trust Agreement)**

# AMENDED AND RESTATED TRUST AGREEMENT

THIS AMENDED AND RESTATED TRUST AGREEMENT is made and entered into as of _____, 2013, by and among: the Public Lighting Authority, a Michigan municipal corporation *("Authority");* the City of Detroit, a Michigan municipal corporation *("City");* the Michigan Finance Authority (the *"MFA"*) and Wilmington Trust, National Association, a national banking association lawfully authorized to conduct business in the State of Michigan *("Trustee ").* Collectively, the signatories are referred to as the Parties, and individually, as a Party. Capitalized terms used in this Amended and Restated Trust Agreement and not otherwise defined shall have the meanings given to them in their respective contexts under the laws of the State of Michigan (the *"State"*) or under such other authority as otherwise indicated herein.

## RECITALS

WHEREAS, the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL §§123.1261 *et seq. ("Act 392"),* authorizes municipalities to create public lighting authorities for the purposes of providing an equitable and reasonable method and means of financing, operating, and maintaining a municipally owned lighting system to supply lighting in sufficient quantities to a city; and

WHEREAS, the City has duly incorporated the Authority pursuant to Act 392 for the purpose of constructing, improving, enlarging, reducing, extending, financing, operating or maintaining the City's street lighting system (the *"System"*); and

WHEREAS, the Emergency Manager of the City (the *"Emergency Manager"*), appointed under the Local Financial Stability and Choice Act, 2012 PA 436, MCL §§141.1541 *et seq.,* has entered Order No. 6 approving the initial funding for the Public Lighting Authority (*"Order No. 6");* and

WHEREAS, the Authority and the City have entered into an Interlocal Agreement for the Construction and Financing of a Public Lighting System, pursuant to Act 392 (the *"Contract"*); and

WHEREAS, the Authority is authorized to issue bonds of the Authority, pursuant to appropriate action of its Board of Directors (the *"Authority Board"*), and to enter into Ancillary Facility, also as referred to herein "Ancillary Facilities" (as defined in Act 392) with respect to the bonds, to provide the funds therefor, payable from proceeds described in the resolution authorizing the bonds, which proceeds may include revenues pledged directly to support the bonds of the Authority pursuant to the Contract, specifically, the revenues to be received by the City pursuant to the City Utility Users Tax Act, 1990 PA 100, MCL §§141.1151 *et seq. ("Act 100"),* to finance certain improvements to the System, together with all related appurtenances and attachments (the *"Improvements"*); and

WHEREAS, on _____, 2013, the Authority Board adopted a resolution (the *"Bond Resolution"*) authorizing the issuance of bonds in the principal amount of not to

1

exceed $_____ (the *"Authority Bonds"*), authorizing the Authority to enter into an Ancillary Facility (as defined in Act 392) with respect to the Authority Bonds (together with the Authority Bonds, the *"Bonds"*), to pay the costs of the Improvements, authorizing certain officers to negotiate the terms and enter into agreements as may be necessary to accomplish the sale and delivery of the Bonds, and to take such other actions and make such other determinations as may be necessary or desirable to accomplish the sale and delivery of the Bonds; and

WHEREAS, before the pledge of revenues for payment of the Bonds and the Contract become effective, the Authority shall, among other things, enter into an agreement with the City, the MFA and the Trustee to provide for the collection of utility tax revenues pursuant to Act 100 (the *"Utility Revenues"*), and to direct payment of those Utility Revenues to the Trustee to be held in trust for the benefit of bondholders of the Bonds and any additional bonds, Ancillary Facilities or obligations issued by the Authority (the "*Additional Obligations*", together with the Bonds, the *"Obligations"*, and each singularly, an *"Obligation"*), or to be used by the Authority for lawful purposes of the Authority, provided that not more than $12,500,000 of the Utility Revenues may be used to satisfy the Obligations or to further other lawful purposes under Act 392 as directed by the Authority; and

WHEREAS, the Emergency Manager has directed all public utilities and resale customers that collect Utility Revenues pursuant to Act 100 (the *"Customers"*) to remit such revenues directly to the Trustee for deposit in the Trust Fund; and

WHEREAS, the Authority, the City and the Trustee have previously entered into a Trust Agreement, effective as of August 1, 2013 (the *"Trust Agreement"*), and approved by Order No. 14 of the Emergency Manager (*"Order No. 14"*, and together with Order No. 6, the *"Orders"*), providing for the creation of a trust to receive and disburse Utility Revenues pursuant to the Orders, Act 100 and Act 392; and

WHEREAS the Authority, the City and the Trustee desire to amend and restate the Trust Agreement (as amended and restated herein, this *"Agreement"*), and to add the MFA as a Party; and

WHEREAS, the Emergency Manager has issued Order No. \_\_, approving the execution of this Agreement.

NOW, THEREFORE, IN CONSIDERATION OF THE RESPECTIVE COVENANTS, AGREEMENTS AND REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, THE PARTIES TO THIS AGREEMENT, INTENDING TO BE LEGALLY BOUND, AGREE AS FOLLOWS:

## ARTICLE I

### ESTABLISHMENT OF FUNDS AND ACCOUNTS

Section 101.     <u>Establishment of Trust Fund and Appointment of Trustee</u>.  The City and the Authority hereby direct the Trustee to establish a trust account designated and

2

maintained by the Trustee for the deposit of all Utility Revenues collected and so designated under this Agreement by the Authority (the *"Trust Fund"*).  Pursuant to Act 392, Act 100, and the Orders of the Emergency Manager on behalf of the City, the Customers are directed to deliver all such Utility Revenues to the Trustee for deposit in the Trust Fund held by the Trustee, not more frequently than monthly.  All such deposits of Utility Revenues shall become part of the Trust Fund.  The direction of funds by the Emergency Manager on behalf of the City as described in this Section 101 is irrevocable for so long as any Obligations are Outstanding pursuant to their terms.  The Trust Fund shall be held and disbursed pursuant to this Agreement or a successor trust agreement as contemplated under Section 303 of this Agreement.  Exhibit D attached hereto and made a part hereof contains delivery instructions to the Trustee.

The City and the Authority hereby appoint the Trustee as depository and trustee for the Trust Fund pursuant to the terms of this Agreement.  Trustee hereby agrees to act as trustee and to receive, hold, invest and disburse funds from the Trust Fund pursuant to the terms and conditions of this Agreement.  The Trustee shall deposit Utility Revenues in the Trust Fund and allocate and set aside Utility Revenues into the Debt Retirement Escrow Fund in accordance with Section 103 and in the amounts as required for disbursements under Section 105 herein below.

Section 102.    Establishment of Funds and Accounts Within Trust Fund.  (a)    The City and the Authority hereby establish and create within the Trust Fund the following special, separate and segregated accounts which shall be held by the Trustee:

    A.    Debt Retirement Escrow Fund.
    B.    PLA Fund.
    C.    City Disbursement Fund.

The Executive Director of the Authority is hereby authorized to direct the Trustee to establish such accounts, subaccounts or funds within the Debt Retirement Escrow Fund as shall be required for each series of Obligations, if any, to accommodate the requirements of such Obligations to the extent permitted by Act 100, Act 392 and other applicable law.

(b)    The Utility Revenues held by the Trustee shall be subject to a lien in favor of the holders of Outstanding Obligations, provided that the Authority and the City have an interest in the Utility Revenues, but only to the extent of the transfers made pursuant to Section 105(b)(ii) and Sections 105(a)(ii) and 105(b)(iii) respectively, and once the Utility Revenues have been disbursed from the Trust Fund, they shall be disbursed free and clear of all liens.  The lien in this Section 102(b) is paramount and superior to all other liens and interests of any kind, including any interest of the Authority or the City, and shall be for the sole purpose of ensuring payment of the principal, interest and related administrative and issuance costs of the Obligations.  The lien is created and perfected without delivery, recording or notice.

(c)    Notwithstanding the provision in Section 102(b) hereinabove, no Party shall permit or cause to be created against the Trust Fund any lien, attachment, trustee process or any other judicial process of any creditor.  Trustee shall hold and safeguard the Trust Fund, at the cost and expense of the Authority and the City, until no Obligations remain Outstanding and the Trust Fund is released pursuant to Section 105(d) of this Agreement.  Notwithstanding the

3

foregoing, if the Trust Fund shall be attached, garnished or levied upon pursuant to judicial process, or the delivery of the funds held in the Trust Fund shall be stayed or enjoined by any court order, or any court order shall be made or entered into affecting the Trust Fund, or any part thereof, the Trustee is hereby expressly authorized to obey and comply with such judicial process, stay, injunction or court order, and shall provide the Authority and the City as much advance written notice as is reasonably practicable thereof. In the event the Trustee obeys or complies with any judicial process or court order, it shall not be liable to any Party or Customer, or to any other person, firm (public or private) or corporation (public or private) by reason of such compliance, notwithstanding the subsequent reversal, modification, annulment or setting aside of such judicial process, stay, injunction or court order.

Section 103. <u>Debt Retirement Escrow Fund</u>. A fund within the Trust Fund to be designated the Debt Retirement Escrow Fund (the *"Debt Retirement Escrow Fund"*) shall be established and created under this Trust Agreement for the purpose of disbursing Utility Revenues pledged to payment of the Bonds to the party designated in an agreement (the *"Bond Trust Indenture"*) among the Authority, the purchaser or purchasers of such Bonds and Wilmington Trust National Association, as trustee appointed by the Authority to act as trustee, transfer agent and paying agent for the Bonds (the *"Bond Trustee"*), and to any party designated in an agreement (each, a *"Trust Indenture"*) among the Authority, the purchaser or purchasers of any Additional Obligations and a trustee appointed by the Authority to act as transfer agent and paying agent for such Additional Obligations, for the purpose of paying debt service on Bonds and Additional Obligations issued by the Authority, including any related reserve requirements as provided in the Bond Trust Indenture or another Indenture (*"Reserve Requirements"*), and any administrative and issuance costs associated with the Bonds or Additional Obligations.

Section 104. <u>PLA Fund; City Disbursement Fund</u>. (a) A PLA Fund (the *"PLA Fund"*) is hereby created within the Trust Fund, as provided in Section 105 herein below. Moneys in the PLA Fund shall be used by the Authority for any purpose permitted by Act 392, provided that no Utility Revenues shall be deposited to the PLA Fund so long as the Bonds are Outstanding and no Additional Obligations have been issued.

(b) The Executive Director of the Authority is authorized and directed to expend money from the PLA Fund for costs permitted by Act 392.

(c) In the event that the Authority has no remaining expenses or use for moneys as permitted by Act 392, any balance in the PLA Fund shall be (i) transferred to the Debt Retirement Escrow Fund for disbursement to the Bond Trustee in accordance with Section 103 hereof, or (ii) if no Obligations remain Outstanding, upon agreement by the Parties (other than the Trustee), transferred to a general City Disbursement Fund (the *"City Disbursement Fund"*), which the Trustee is hereby directed to create within the Trust Fund. The Trustee is hereby authorized to disburse moneys from the City Disbursement Fund to the City for deposit to the General Fund of the City in the City's account specified on Exhibit E attached hereto, free and clear of all liens as provided in Sections 105(a)(ii), 105(b)(iii) and 105(d).

Section 105. <u>Disbursements from the Trust Fund</u>. The available funds in the Trust Fund shall be disbursed by the Trustee on the 1st day of each month, or the next Business Day (defined herein as any day other than a Saturday, a Sunday, a day on which banking institutions

4

in the city in which the designated corporate trust office of the Trustee is located are closed, or a day on which the New York Stock Exchange is closed), if the 1st day is not a Business Day, as follows:

(a)    For disbursements made beginning the 1st day of the month, or the next Business Day if the 1st day is not a Business Day, immediately following the date of this Agreement through December 31, 2013:

(i)    Each month, from the available funds in the Trust Fund, the lesser of (i) the available funds in the Trust Fund and (ii) $1,783,333, shall be transferred to the Debt Retirement Escrow Fund and following such transfer, on the same day of such month, such amount shall be remitted directly to the Bond Trustee for the purpose of paying any principal of and interest on the Obligations, including any Reserve Requirements, any administrative and issuance costs associated with the Obligations and to be further disbursed as provided in the relevant Bond Indenture.

(ii)    Any amounts remaining in the Trust Fund after making the disbursement as provided in Section 105(a)(i) shall be transferred to the City Disbursement Fund.  The Trustee is hereby authorized to disburse moneys from the City Disbursement Fund to the City for deposit to the General Fund of the City free and clear of all liens.

(b)    For disbursements made from January 1, 2014 until no Obligations are Outstanding, on the 1st day of each month, or the next Business Day, if the 1st day is not a Business Day, as follows:

(i)    Each month, from the available funds in the Trust Fund, the lesser of (i) the available funds in the Trust Fund and (ii) $1,041,666 (for a maximum annual aggregate amount of not to exceed $12,500,000 per calendar year), shall be transferred to the Debt Retirement Escrow Fund and following such transfer, on the same day of such month, such amount shall be remitted directly to the Bond Trustee or an Additional Obligation Trustee for the purpose of paying any principal of and interest on the Bonds and any Additional Obligations, including any Reserve Requirements, any issuance costs associated with Additional Obligations and to be further disbursed as provided in the relevant Bond Indenture.

(ii)    After making the disbursements in Section 105(b)(i) above, from the remaining available funds in the Debt Retirement Escrow Fund, in an amount which including the amount of the deposit made pursuant to Section 105(b)(i) above does not exceed $1,041,666 per month (and not to exceed an annual aggregate amount of $12,500,000 per calendar year, which, for the avoidance of doubt, shall be inclusive of the amount of the deposit made pursuant to Section 105(b)(i) above) shall be deposited to the PLA Fund.

(iii)    Any amounts remaining in the Trust Fund after making the deposits as provided in Sections 105(b)(i) and 105(b)(ii) shall be transferred to the City Disbursement Fund.  The Trustee is hereby authorized to disburse moneys from the City Disbursement Fund to the City for deposit to the General Fund of the City free and clear of all liens.

5

(c)     The Trustee shall furnish the Authority and the City with a monthly written accounting of the complete account activity of, and transactions executed with respect to, the Trust Fund, within fifteen (15) days after the end of such month.

(d)     Within 45 days of the retirement of all Outstanding Obligations issued by the Authority, the Trustee shall use best efforts to notify each Customer (identified with contact information provided by the City or Authority) to remit Utility Revenues collected under Act 100 to the City, and if the Trustee receives any funds following the retirement of all Outstanding Obligations issued by the Authority, the Trustee shall transmit such funds directly to the City. Thereupon the Trust Fund shall be released.

Section 106.    Additional Obligations.    The Trustee, Authority and the MFA may enter into Supplements to this Trust Agreement (each, a *"Supplement"*) without the consent of the City of the limited purpose of providing for the issuance of Additional Obligations to be secured by this Trust Agreement pursuant to this Section 106.

The issuance and delivery of Additional Obligations secured shall be conditioned upon the following:

(a)     A certificate of the Executive Director or other authorized officer of the Authority, as provided in Exhibit B (the *"Authorized Officer"*) certifying that the maximum aggregate principal and interest due and payable in any one calendar year on all Obligations that are Outstanding shall not exceed $12,500,000 and that all the conditions precedent to the issuance and delivery of Additional Obligations have been met.

(b)     A Supplement executed by the Trustee, the Authority and the MFA.

(c)     Delivery to the Trustee, the MFA, the City and the Authority of an opinion of counsel to the Authority that the Supplement has been duly authorized and is legal, binding, valid and enforceable in accordance with its terms.

For purposes of this Agreement *"Outstanding"* means, in the case of any Obligations, all such Obligations secured by the Trust Agreement which have been issued except any such portion thereof canceled after purchase or surrendered for cancellation or because of payment at or redemption prior to maturity, any such Obligations in lieu of which other Obligations have been duly incurred and any such Obligations which are no longer deemed Outstanding under their respective terms and with respect to which the Authority is no longer liable under the terms of such Obligations.

Section 107.    Utility Tax Revenue Information.

(a)     *Delivery of Information*.    The City shall direct all Customers to send to the Trustee the information to be submitted in connection with the Utility Revenues, including, but not limited to, the utility users tax form (the *"Utility Tax Revenue Information"*) to the Trustee in connection with the Customers' delivery of the Utility Revenues.  Upon receipt of such Utility Tax Revenue Information, the Trustee shall deliver to the individuals specified on Exhibit F an electronic copy in PDF form of such Utility Tax Revenue Information.  The Trustee will use commercially reasonable efforts to deliver such Utility Tax Revenue Information within one (1) business day of its receipt, but in no event no later than three (3) business days after receipt.  The

6

City may alter or amend the information on Exhibit F by delivery of written notice to the Trustee and the Authority.

(b)  *Records*.  The Trustee shall keep the original Utility Tax Revenue Information with its records for the Trust Fund, provided that the Trustee shall, upon request of the City and Authority, send such original Utility Tax Revenue Information to the address set forth below within ten (10) business days of receipt of the request:

> City of Detroit Finance Department
> Income Tax Division
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, Suite 1220
> Detroit, MI 48226
> ATTN:  Utility Users Tax

(c)  *Trustee's Role*.  The Trustee's duties with respect to the Utility Tax Revenue Information is limited to the duties expressly set forth herein, and, for the avoidance of doubt, all Parties hereby agree and acknowledge that the Trustee has no oversight duties as to correctness or completeness of any Utility Tax Revenue Information and the Trustee's receipt of the Utility Tax Revenue Information shall not constitute constructive notice of any information contained therein.

## ARTICLE II

## INVESTMENT OF FUNDS

Section 201.  <u>Investment of Funds</u>.  All moneys held by the Trustee pursuant to this Agreement shall be invested by the Trustee in accordance with written instruction from an Authorized Officer of the Authority, which instruction shall be in accordance with the laws of the State.  Such moneys will be held uninvested by the Trustee unless and until such joint written instruction is received.  The Trustee shall be entitled to rely on said investment instruction as to the suitability and legality of such investments.  The Trustee shall not be liable for losses on investments made in compliance with the provisions of this Agreement or such investment instructions.  The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.  The Trustee shall not be responsible for providing broker confirmations or investment advice.

Section 202.  <u>Eligibility of Financial Institutions</u>.  Except as provided in Section 1(5) of the Investment of Surplus Funds of Political Subdivisions Act, 1943 PA 20, MCL §§ 129.91, *et seq*., the Authority and City shall not instruct the Trustee to deposit or invest the funds in a financial institution that is not eligible to be a depository of funds belonging to the State under a law or rule of the State or the United States.  For purposes of this Section 202, "financial institution" means a state or nationally chartered bank or a state or federally chartered savings and loan association, savings bank or credit union whose deposits are insured by an agency of the United States government and that maintains a principal office or branch office located in the State under the laws of the State or the United States.

7

## ARTICLE III

## THE TRUSTEE

Section 301.    Powers and Duties of Trustee.

(a)    The Trustee hereby agrees and covenants with the Parties hereto that it will perform all of its obligations under this Agreement and will not deliver custody or possession of any of the Trust Fund to anyone except pursuant to the express terms of this Agreement.

(b)    The responsibilities of the Trustee are administrative in nature and are strictly limited to those specifically set forth herein.  No implied duties, covenants or obligations shall be read into this Agreement against the Trustee including, without limitation, the obligation to make any discretionary decisions.  No fiduciary relationship exists between or among the Trustee or the City.  The Trustee undertakes to perform such duties as are specifically set forth in this Agreement only and shall have no liabilities or obligations with respect to the Trust Fund or its administration of this Agreement except for the Trustee's negligence or willful misconduct.  The Trustee shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in any notices given to it in accordance with the notice provisions of this Agreement.  The Trustee shall incur no liability with respect to any action taken by it or for any inaction on its part in reliance upon any notice, direction, instruction, consent, statement or other document believed by it in good faith to be genuine and duly authorized, nor for any other action or inaction except for its own negligence or willful misconduct.  The Trustee may consult legal counsel selected by it in the event of any dispute or question of the construction of this Agreement or seek the assistance of a court of competent jurisdiction, and shall incur no liability and shall be fully protected in acting in accordance with the opinion or advice of such counsel or the direction of such court.  The Trustee shall not be liable for any error of judgment made in good faith by a responsible partner, director, officer, affiliate, employee, employer, professional, agent or representative of the Trustee unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.  In no event shall the Trustee be liable for incidental, indirect, special, punitive or consequential damages.  The Trustee shall have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees, and shall not be responsible for the misconduct or negligence of such agents, attorneys, custodians and nominees appointed by it with due care.  None of the provisions contained in this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers vested in it by this Agreement, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.   The permissive rights of the Trustee to do things enumerated in this Agreement shall not be construed as duties.  The Trustee shall not be accountable for the use or application of any money paid over by the Trustee in accordance with the provisions of this Agreement.  The

8

Trustee shall have no duty to collect any Utility Revenues which are required to be deposited with it hereunder.

(c)     The Authority shall defend, at its cost and expense, but only from funds other than Utility Revenues, any claim (by whomever asserted) against the Trustee arising out of or in connection with the acceptance, administration, exercise or performance of its duties under this Agreement.  The Authority shall satisfy any liability, judgment and cost, of or relating to such claim, except to the extent that a court of competent jurisdiction has determined that such claim, liability or expense is attributable to the Trustee's negligence or willful misconduct.  The Trustee may have separate legal counsel and the Authority shall pay the reasonable fees and expenses of such separate legal counsel.

The Trustee shall notify the Authority promptly of any claim against for which it may seek defense. Failure by the Trustee to so notify the Authority shall not relieve the Authority from its obligations hereunder. The Trustee shall cooperate in the defense. The forgoing shall survive the termination of this Agreement pursuant to Section 402 hereof.

(d)     The Trustee agrees to accept and act upon written instructions or directions pursuant to this Agreement sent by unsecured e-mail (in pdf file format), facsimile transmission or other similar unsecured electronic methods, provided, however, that the instructions or directions shall be signed by a person as may be designated and authorized to sign for the Authority or the City, respectively, or in the name of the Authority or the City, respectively, by an authorized representative of the Authority or City, respectively, and the Authority or the City, respectively shall provide to the Trustee an incumbency certificate listing such designated persons, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing.  If the Authority or City, respectively, elects to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction.  The Authority and City agree:  (i) to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Trustee and that there may be more secure methods of transmitting instructions than the method(s) selected by the Authority or the City; and (iii) that the security procedures (if any) to be followed in connection with their transmission of instructions provide to them a commercially reasonable degree of protection in light of their particular needs and circumstances.

Section 302.   Fees and Expenses of the Trustee.   The Authority shall pay to the Trustee from time to time such compensation as shall be agreed upon in writing between the Authority and the Trustee for its acceptance of this Agreement and services hereunder.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Authority shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the

9

compensation for its services, including extraordinary time and services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and legal counsel. The Authority agrees that it shall pay all such fees owed the Trustee within 30 days of receipt of an invoice.

Section 303.   <u>Successor Trustee</u>.

(a)   In the event the Trustee becomes unavailable or unwilling to continue as Trustee under this Agreement, the Trustee may resign and be discharged from its duties and obligations hereunder by giving its written resignation to the Parties to this Agreement. In addition, the Trustee may be removed at any time, with or without cause, upon 30 days prior written notice delivered to the Trustee and the Bond Trustee (and any trustee for any Additional Obligations) and executed by each of the Parties. Such resignation or removal shall not take effect until the successor has been appointed and has accepted its appointment. In such event, the Authority may appoint, with the consent of the City and the MFA which consent shall not be unreasonably withheld, a successor trustee, which shall be a commercial bank, trust company or other financial institution qualified to act as a trustee under Michigan law. If the Authority fails to appoint a successor trustee within fifteen (15) days after receiving the Trustee's written resignation, the Trustee shall have the right to apply to a court of competent jurisdiction for the appointment of a successor trustee. The successor trustee shall execute and delivery to the Trustee an instrument accepting such appointment, and the successor trustee shall, without further acts, be vested with all the estates, property rights, powers and duties of the predecessor Trustee as if originally named as Trustee herein. The Trustee shall act in accordance with written instructions from the Authority, the City and the MFA as to the transfer of the Trust Fund to a successor trustee.

(b)   Any corporation, association or other entity into which the Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or otherwise transfer all or substantially all of its corporate trust assets and businesses or any corporation, association or other entity resulting from any such conversion, sale, merger, consolidation or other transfer to which it is a party, <u>ipso facto</u>, shall be and become successor Trustee hereunder, as applicable, vested with all other matters as was its predecessor, without the execution or filing of any instrument or any further act on the part of the Parties hereto, notwithstanding anything herein to the contrary.

ARTICLE IV

REMEDIES

Section 401.   <u>Events of Default</u>.

Each of the following events is hereby declared an "event of default":

(a)   failure of the any of the Parties to apply the Utility Revenues as required hereby; or

10

(b)     any judgment, writ or warrant of attachment or of any similar process shall be entered or filed against the Utility Revenues and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period of 60 days.

Upon the occurrence and during the continuance of an event of default described in this Section 401 and known to a responsible officer of the Trustee who is responsible for the administration of this Agreement, the Trustee shall give written notice to the City, the Authority and the MFA and the Bond Trustee.

Section 402.     Remedies; Rights of Obligation Holders.

Upon the occurrence of any event of default, the Trustee may, but is not required to, pursue any available remedy including a suit, action or proceeding at law or in equity to enforce the payment of the principal of, premium, if any, and interest on the Outstanding Obligations hereunder and any other sums due hereunder and may collect such sums in the manner provided by law out of the Utility Revenues, subject to the provisions of applicable State and federal law.

No remedy by the terms of this Agreement conferred upon or reserved to the Trustee (or to the beneficiary or holder of any Outstanding Obligations) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Trustee or to the holders of Outstanding Obligations hereunder now or hereafter existing at law or in equity or by statute.

No delay or omission to exercise any right or power accruing upon any default or event of default shall impair any such right or power or shall be construed to be a waiver of any such default or event of default, or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

No waiver of any default or event of default hereunder, whether by the Trustee or by the holders of Outstanding Obligations, shall extend to or shall affect any subsequent default or event of default or shall impair any rights or remedies consequent thereon.

Section 403.     Direction of Proceedings by Holders.

The Bond Trustee or the holders of a majority in aggregate principal amount of the Outstanding Obligations which have become due and payable in accordance with their terms and have not been paid in full in the case of remedies exercised to enforce such payment, or the Bond Trustee or the holders of not less than a majority in aggregate principal amount of the Outstanding Obligations in the case of any other remedy, shall have the right, subject to the Trustee's right to be indemnified to its satisfaction, at any time, by an instrument or instruments in writing executed and delivered to the Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Agreement.

The foregoing notwithstanding, the Bond Trustee or the holders of not less than a majority in aggregate principal amount of the Outstanding Obligations which are entitled to the exclusive benefit of certain security in addition to that intended to secure all or other Outstanding Obligations shall have the right, subject to the Trustee's right to be indemnified to its

11

satisfaction, at any time, by an instrument or instruments in writing executed and delivered to the Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Agreement and any supplemental agreement, if any, pursuant to which such Outstanding Obligations were issued or so secured or any separate security document in order to realize on such security; provided, however, that such direction shall not be otherwise than in accordance with the provisions of law and of this Agreement and that the Trustee shall have the right to decline to comply with any such request if the Trustee shall be advised by counsel (who may be its own counsel) that the action so directed may not lawfully be taken.

Section 404.  <u>Application of Moneys</u>.

All moneys received by the Trustee pursuant to any right given or action taken under the provisions of this Article shall, after payment of the cost and expenses of the proceedings resulting in the collection of such moneys and of the fees of, expenses, liabilities and advances incurred or made by the Trustee, be applied as follows:

First:  after payment as provided above in this Section, to the payment to the persons entitled thereto of all installments of interest then due on the Outstanding Obligations, in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or privilege; and

Second:  to the payment to the persons entitled thereto of the unpaid principal and premium, if any, on the Outstanding Obligations which shall have become due (other than Outstanding Obligations called for redemption or payment for payment of which moneys are held pursuant to the provisions of this Agreement), in the order of the scheduled dates of their payment, and, if the amount available shall not be sufficient to pay in full the Outstanding Obligations due on any particular date, then to the payment ratably, according to the amount of principal and premium due on such date, to the persons entitled thereto without any discrimination or privilege; and

Third:  to the payment to the persons entitled thereto of all unpaid principal and interest on Outstanding Obligations, payment of which was extended by such persons as described in Section 401 hereof.

Whenever moneys are to be applied by the Trustee pursuant to the provisions of this Section 404, such moneys shall be applied by it at such times, and from time to time, as the Trustee shall determine in its sole discretion, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Trustee shall apply such moneys, it shall fix the date (which shall be an interest payment date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and shall not be required to make payment to the holder of any unpaid Outstanding Obligations until

12

13-53846-swr    Doc 2379-10    Filed 01/03/13    Entered 01/03/13 17:15:05    Page 39 of 139
13-53846-swr    Doc 1341-10    Filed 10/23/13    Entered 10/23/13 17:15:05    Page 39 of 139
120

such Outstanding Obligations shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

Whenever all Outstanding Obligations and interest thereon have been paid under the provisions of this Section 404 and all expenses and charges of the Master Trustee have been paid, any balance remaining shall be paid as provided above.

Notwithstanding any of the provisions in this Article above, the Trustee shall only apply moneys held by it that have been deposited in the Debt Retirement Escrow Fund or the PLA Fund pursuant to Section 105 hereof and in no event shall the amount applied pursuant to this Section 404 exceed $12,500,000 per calendar year. If any Ancillary Facility is entered into pursuant to a supplemental indenture, the Trustee shall apply moneys to such Ancillary Facility as provided in such supplemental indenture and in accordance with this Section, provided that any such supplemental indenture shall state whether the related Ancillary Facility will be treated as interest or principal for purposes of the application of moneys pursuant to this Section 404.

Section 405. Remedies Vested in Trustee.

All rights of action including the right to file proof of claims under this Agreement or under any of the Outstanding Obligations may be enforced by the Trustee without the possession of any of the Outstanding Obligations or the production thereof in any trial or other proceedings relating thereto and any such suit or proceeding instituted by the Trustee shall be brought in its name as Trustee without the necessity of joining as plaintiffs or defendants any holders of the Outstanding Obligations, and any recovery of judgment shall be for the equal benefit of the holders of the Outstanding Obligations.

Section 406. Rights and Remedies of Obligation Holders.

No holder of Outstanding Obligations shall have any right to institute any suit, action or proceeding in equity or at law for the enforcement of this Agreement or for the execution of any trust hereof or for the appointment of a receiver or any other remedy hereunder, unless a default shall have become an event of default and (a) the holders of 25% or more in aggregate principal amount (i) of the Outstanding Obligations which have become due and payable in accordance with their terms and have not been paid in full in the case of powers exercised to enforce such payment or (ii) the Obligations then Outstanding in the case of any other exercise of power, and unless the Trustee shall thereafter fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit or proceeding in its own name; and such notification, request and offer of indemnity are hereby declared in every case at the option of the Trustee to be conditions precedent to the execution of the powers and trusts of this Agreement and to any action or cause of action for the enforcement of this Agreement, or for the appointment of a receiver or for any other remedy hereunder; it being understood and intended that no one or more holders of the Outstanding Obligations shall have any right in any manner whatsoever to affect, disturb or prejudice the lien of this Agreement by its, his or their action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of the holders of all Outstanding Obligations. Nothing in this Agreement contained shall, however, affect or impair the right of any holder to enforce the payment of the principal of, premium, if

13

13-53846-swr   Doc 2379-10   Filed 01/03/13   Entered 01/03/13 17:41:35   Page 40 of
13-53846-swr   Doc 2379-10   Filed 01/03/13   Entered 01/03/13 17:41:35   Page 40 of
100
140

any, and interest on any Outstanding Obligations at and after the maturity thereof, or the obligation of the Authority to pay the principal, premium, if any, and interest on each of the Outstanding Obligations issued hereunder to the respective holders thereof at the time and place, from the source and in the manner in said Outstanding Obligations expressed.

Section 407.    Termination of Proceedings.

In case the Trustee shall have proceeded to enforce any right under this Agreement by the appointment of a receiver, or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee shall, subject to any determination in such proceeding, be restored to their former positions and rights hereunder with respect to the Utility Revenues pledged and assigned hereunder, and all rights, remedies and powers of the Trustee shall continue as if no such proceedings had been taken.

Section 408.    Trustee or Bondholders Deemed to be Related Obligation Holders.

For the purposes of this Agreement, any trustee appointed pursuant to the Bond Trust Indenture or a Trust Indenture shall be deemed the holder of the Obligation or Obligations pledged to secure the related MFA bonds for which the trustee is acting pursuant to the related Trust Indenture, unless said trustee elects to the contrary or contrary provision is made in the related Trust Indenture, in which event the related Trust Indenture shall provide that the holders of the Obligation or Obligations pledged to secure the MFA Bonds shall be deemed the holders of the Obligation or Obligations to the extent of the principal amount of the Obligation or Obligations to which the MFA Bonds secured by such Obligation or Obligations relate.

ARTICLE V

MISCELLANEOUS

Section 501.    Notices.    All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid) to the following addresses and marked to the attention of the person (by name or title) designated below (or to such other addresses or person as a Party may designate by written notice to the other Parties):

**If to the Authority:**

>Public Lighting Authority
>Executive Director
>65 Cadillac Square, Suite 2900
>Detroit, MI 48226

with a mandatory copy to (which copy shall not constitute notice):

>The Allen Law Group, P.C.
>2500 Fisher Building
>3011 West Grand Boulevard
>Detroit, MI 48202

14

**If to the City:**

> City of Detroit
> Office of the Mayor
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, 11th Floor
> Detroit, MI 48226

with a mandatory copy to (which copy shall not constitute notice), while applicable:

> City of Detroit
> Office of the Emergency Manager
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, 11th Floor
> Detroit, MI 48226

**If to the MFA:**

> Michigan Finance Authority
> Department of Treasury
> Austin Building, 1st Floor
> 430 West Allegan Street
> Lansing, MI 48922

**If to the Trustee:**

> Wilmington Trust, National Association
> Corporate Trust Services
> 25 South Charles Street, 11th Floor
> Baltimore, MD 21201

with a mandatory copy to (which copy shall not constitute notice):

> Drinker Biddle & Reath
> Kristin Going
> 1500 K. St., N.W., Suite 1100
> Washington, DC 20005

Section 502. <u>Termination</u>. This Agreement will terminate 30 days following the date on which no Obligations are Outstanding. Following such termination, this Agreement shall be of no further force or effect, and no further fees or expenses shall be invoiced by the Trustee pursuant hereto except for unbilled fees or expenses incurred by the Trustee prior to such time.

15

13-53846-swr Doc 2379-10 Filed 01/03/13 Entered 01/03/14 17:15:05 Page 42 of
13-53846-swr Doc 1341-10 Filed 10/23/13 Entered 10/23/13 17:15:05 Page 16 of 142
100

Section 503. <u>Interpretation</u>. Unless the context otherwise requires, references in this Agreement to Sections and Exhibits refer to the Sections and Exhibits to this Agreement. The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All references to dollar amounts contained in this Agreement shall mean United States dollars. References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement.

Section 504. <u>Entire Agreement</u>. This Agreement and the other agreements referred to herein constitute the entire agreement of the Parties to this Agreement and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof.

Section 505. <u>Parties in Interest</u>. Except as expressly provided herein, none of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the Parties hereto and their respective successors and assigns (if any), the Bond Trustee, the purchasers of Obligations and of the MFA Bonds and the trustee for any Additional Obligations.

Section 506. <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 507. <u>Governing Law; Jurisdiction and Venue</u>.

(a) This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Michigan (without giving effect to principles of conflicts of laws).

(b) Each Party to this Agreement (other than the MFA):

(i) irrevocably submits to the exclusive jurisdiction of the Circuit Court for the County of Wayne in the State of Michigan and any state appellate court therefrom within the State of Michigan for the purpose of any legal proceeding directly or indirectly based upon, relating to arising out of this Agreement or any transaction contemplated hereby or the negotiation, execution or performance hereof or thereof and irrevocably agrees that all claims in respect of such action or proceeding shall be brought in, and may be heard and determined, exclusively in such state or federal courts;

(ii) irrevocably consents to the service of the summons and complaint and any other process in any other action or proceeding relating to the transactions contemplated by this Agreement, on behalf of itself or its property, by personal delivery of copies of such process to such Party at the addresses set forth in Section

16

501, provided that nothing in this Section 507 shall affect the right of any Party to serve legal process in any other manner permitted by law;

(iii)     acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such Party hereby irrevocably and unconditionally waives any right such Party may have to a trial by jury in any legal proceeding directly or indirectly based upon, relating to or arising out of this Agreement or any transaction contemplated hereby or the negotiation, execution or performance hereof or thereof; and

(iv)     certifies and acknowledges that (A) no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of any legal proceeding, seek to enforce the foregoing waiver in Section 507(b)(iii); (B) each Party understands and has considered the implication of such waiver; (C) each Party makes such waiver voluntarily and (D) each Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 507.

Section 508.   <u>Rules of Construction</u>.   The Parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

Section 509.   <u>Assignment and Successors</u>.   No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, except with respect to a successor trustee as set forth under Section 303(b) of this Agreement.   This Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the Parties, including the holders of the Obligations.

Section 510.   <u>Further Assurances</u>.   Each Party hereto shall execute and cause to be delivered to each other Party hereto such instruments and other documents, and shall take such other actions, as such other Party may reasonably request for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

Section 511.   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.   The exchange of copies of this Agreement and of signature pages by facsimile or pdf transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes.   Signatures of the Parties hereto transmitted by facsimile or pdf shall    be    deemed    to    be    their    original    signatures    for    all    purposes.

IN WITNESS WHEREOF, the Parties hereto have duly caused this Agreement to be executed as of the date first written above.

PUBLIC LIGHTING AUTHORITY

By _____

Its:  Executive Director

Witness for the Public Lighting Authority

_____


CITY OF DETROIT

By _____

Its:  Emergency Manager

Witness for the City of Detroit

_____


MICHIGAN FINANCE AUTHORITY

By _____

Its:  _____

Witness for the Michigan Finance Authority

_____

WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE

By _____

Its:  _____

Witness for Wilmington Trust, NATIONAL ASSOCIATION

_____

18

13-53846-swr   Doc 2379-10   Filed 01/03/13   Entered 01/03/13 17:41:58   Page 45 of
13-53846-swr   Doc 1341-10   Filed 10/23/13   Entered 10/23/13 17:15:35   Page 19 of 145
120

**Public Lighting Authority Trust**

**Exhibit A**

**<u>Fee Schedule</u>**

Administrative Fee                    $2,500.00 per annum, payable at closing

- Assumes proceeds are placed with Wilmington Trust, National Association's non-collateralized escrow depository account.

- Assumes one account.

*<u>The fees as quoted and the acceptance of our duties as escrow agent (Trustee ) are subject to the satisfactory review and acceptance of all related financing documents by the escrow agent, our counsel and the New Business Acceptance Committee.  In the event the escrow changes prior to or after closing, Wilmington Bank reserves the right to review and renegotiate the fees accordingly.</u>*

19

**Public Lighting Authority Trust**

**Exhibit B**

**<u>Certificate as to Authorized Signatures</u>**

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Public Lighting Authority and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Trust Agreement to which this Exhibit B is attached, on behalf of the Public Lighting Authority.

<u>Name/Title/Phone Number</u>                     <u>Specimen Signature</u>

_____          _____
Name                                    Signature
_____
Title
_____
Phone Number

_____          _____
Name                                    Signature
_____
Title
_____
Phone Number

_____          _____
Name                                    Signature
_____
Title
_____
Phone Number

_____          _____
Name                                    Signature
_____
Title
_____
Phone Number

20

**Public Lighting Authority Trust**

**Exhibit C**

**Certificate as to City's Authorized Signatures**

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the City and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Amended and Restated Trust Agreement to which this Exhibit C is attached, on behalf of the City.

Name/Title/Phone Number                    Specimen Signature

_____              _____
Name                                 Signature

_____
Title

_____
Phone Number


_____              _____
Name                                 Signature

_____
Title

_____
Phone Number


_____              _____
Name                                 Signature

_____
Title

_____
Phone Number


_____              _____
Name                                 Signature

_____
Title

_____
Phone Number

21

**Exhibit D**

**Payment Instructions**

**By Wire:**

Bank:  M & T Bank
ABA:  022000046
Account:  Corporate Trust Clearing
Account No.:  3088001950200
ffc Public Lighting Trust
Attn:  Jay Smith

**By Check:**

Payable to:  Wilmington Trust, National Association

**Mailed to:**

Wilmington Trust, National Association
Global Capital Markets
25 S. Charles Street, 11th Floor
Baltimore, MD 21201
Attn:  Jay Smith

22

13-53846-swr   Doc 2349-10   Filed 01/03/14   Entered 01/03/14 17:41:58   Page 49 of
13-53846-swr   Doc 1341-10   Filed 10/23/13   Entered 10/23/13 17:15:05   Page 23 of
100
25
149

**Public Lighting Authority Trust**

**Exhibit E**

**City Account Information**

City Account Information

| | |
|---|---|
| Bank: | Comerica Bank |
| ABA: | 072000096 |
| Account: | City of Detroit Utilities |
| Account No. | 1850-706191 |

23

**Public Lighting Authority Trust**

**Exhibit F**

**City Recipients**

Tanya Stoudemire – tanya@detroitmi.gov

Karen King – kingk@itax.ci.detroit.mi.us

Kimberly Dancy-Walker – kimdan@detroitmi.gov

Shyam Karwande – shyamk@itax.ci.detroit.mi.us

21522619.11\060531-00072
21,522,619.11\060531-00072
21,522,619.12\060531-00072
21,522,619.12\060531-00072
21522619.12\060531-00072

24

# **EXHIBIT 6.4**

## **(Emergency Manager Order)**



# EMERGENCY MANAGER
# CITY OF DETROIT

## ORDER No. 18

## APPROVAL OF CERTAIN AGREEMENTS RELATED TO THE PUBLIC LIGHTING AUTHORITY

By the Authority Vested in the Emergency Manager
For the City of Detroit
Pursuant to Michigan's Public Act 436 of 2012,
Kevyn D. Orr, the Emergency Manager,
Issues the Following Order:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Further, section 9(2) of PA 436 prohibits, during the pendency of receivership, the Detroit Mayor and City Council from exercising "any powers of those offices except as may be specifically authorized in writing by the [EM] or as otherwise provided by [PA 436] and are subject to any conditions required by the [EM]; and

1

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of [PA 436], including but not limited to, orders for the timely and satisfactory implementation of a financial and operating plan" or "to take actions, or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan"; and

Pursuant to section 12(1)(b) of PA 436, the EM is empowered, "notwithstanding any charter provision to the contrary," to "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Pursuant to section 12(1)(c) of PA 436, the EM is empowered, "notwithstanding any charter provision to the contrary," to "[r]eceive and disburse on behalf of the local government all federal, state, and local funds earmarked for the local government. These funds may include, but are not limited to, funds for specific programs and the retirement of debt;" and

Section 12(1)(g) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary" to "[m]ake, approve, or disapprove any appropriation, contract, expenditure, or loan...;" and

Section 12(1)(r) of PA 436 authorizes the EM to "[subject to Section 19 of PA 436], if provided in the financial and operating plan, or otherwise with the prior written approval of the governor or his or her designee, sell, lease, convey, assign or otherwise use or transfer the assets, liabilities, functions or responsibilities of the local government" (a "Proposed Transaction"), "provided the use or transfer of assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of residents of the local government or unconstitutionally impair a bond, note, security, or uncontested legal obligation of the local government."

Pursuant to section 12(1)(y), the EM is empowered, "notwithstanding any charter provision to the contrary," to "[e]nter into agreements with other local governments, public bodies, or entities for the provision of services, the joint exercise of powers, or the transfer of functions and responsibilities;" and

Pursuant to section 19(1) of PA 436, the EM, before executing the Proposed Transaction, "shall submit the [Proposed Transaction] to the governing body of the local government [which] shall have 10 days from the date of submission to approve or disapprove the [Proposed Transaction]. If the governing body of the local government does not act within 10 days, the [Proposed Transaction] is considered approved by the governing body of the local government and the emergency manager may then execute the [Proposed Transaction];" and

Pursuant to Section 19(2) of PA 436, "[i]f the governing body of the local government disapproves a [Proposed Transaction] within 10 days, the governing body of the local government shall, within 7 days of its disapproval of the [Proposed Transaction], submit to the local emergency financial assistance loan board an alternative proposal that would yield substantially the same financial result as the [Proposed Transaction]. The local emergency financial assistance loan board shall have 30 days to review both the alternative proposal submitted by the governing body of the local government and the [Proposed Transaction] and to approve either the alternative proposal submitted by the governing body of the local government or the [Proposed Transaction]. The local emergency financial assistance loan board shall approve the proposal that best serves the interest of the public in that local government;" and

2

The Public Lighting Authority (the "PLA"), created pursuant to the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL §§ 123.1261 *et seq.* ("Act 392"), is responsible for constructing, improving, enlarging, reducing or extending the City's street light system and providing an equitable and reasonable method and means of financing, operating and maintaining a lighting system in sufficient quantities within the City; and

The EM issued Order No. 6, the "Approval of Initial Public Funding Agreement for the Public Lighting Authority," on May 2, 2013 and Order No. 14, the "Approval of Trust Agreement Between and Among the City of Detroit, the Public Lighting Authority and the Trustee"; and

Pursuant to the City Utility Users Tax Act, 1990 PA 100, MCL 141.1151 *et seq.* ("Act 100"), the City has levied a utility users tax to be collected by public utilities and resale customers (the "Utility Taxes"); and

The PLA is in the process of issuing bonds, pursuant to Act 392, that will be secured by the revenues that the PLA will receive from the Utility Taxes.

Pursuant to Act 100 and Act 392, PLA is authorized to receive in each calendar year the "Utility Revenues", defined as the lesser of (i) $12,500,000 and (ii) the revenues received from the Utility Taxes in any given year; and

The EM, acting on behalf of the City, has the power under Section 25 of Act 392 to pledge the revenues received from the Utility Taxes in connection with bonds issued by the PLA; and

In connection with those bonds and pursuant to Act 392, the City and the PLA will enter into an Interlocal Agreement for the Construction and Financing of a Public Lighting System (the "C&F Interlocal Agreement"), in substantially the form attached hereto as Exhibit 1.

Pursuant to the C&F Interlocal Agreement, the PLA has agreed to construct and improve the public street lighting system of the City pursuant to the lighting plan created by the PLA, and the City has agreed to pledge all revenues received from the Utility Taxes to the bonds to be issued by the PLA to finance such construction and improvement, provided, however, the PLA shall only be entitled to the Utility Revenues; and

Contemporaneous with the C&F Interlocal Agreement, the City and the PLA will enter into an Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System (the "O&M Interlocal Agreement"), in substantially the form attached hereto as Exhibit 2.

Pursuant to the O&M Interlocal Agreement, the PLA will cause the street public lighting system constructed and improved pursuant to the C&F Agreement to be operated and maintained and which will relieve the City of the obligation to so maintain the system and the City shall pay the PLA a fee therefor; and

In order to fulfill the requirements of Act 392, the EM, on behalf of the City, the PLA, the Michigan Finance Authority and a Trustee will enter into a Amended and Restated Trust Agreement for the establishment of a trust and trust fund (the "Trust Agreement"), in substantially the form attached hereto as Exhibit 3, whereby all revenues received from the Utility Taxes shall be deposited, which Trust Agreement shall amend and restate the Trust Agreement by and among the City, the PLA and the Trustee, approved pursuant to EM Order No. 14; and

3

The Utility Revenues will be used by the PLA as permitted by Act 392, the C&F Interlocal Agreement and the Trust Agreement; and

Consistent with the EM's May 12, 2013, Financial and Operating Plan the EM believes that the C&F Interlocal Agreement, the O&M Interlocal Agreement and the Trust Agreement (collectively, the "Agreements") will allow the PLA to provide necessary governmental services essential to the public health, safety, and welfare. The PLA will be able to use the Utility Revenues to, among other things, secure any debt obligations (bonds) of the PLA to reconfigure the City's streetlight footprint to provide reliable public lighting service and safety to the City's citizens in a timely manner.

**It is hereby ordered that:**

1. The Agreements are hereby approved in all respects. In furtherance of the City's obligations under the C&F Interlocal Agreement, the City hereby pledges the revenues received from the Utility Taxes to secure the bonds of the PLA issued pursuant to such agreement, but it is hereby reiterated that, in accordance with Act 392 and Act 100, the PLA shall only be entitled to the Utility Revenues from the revenues received from the Utility Taxes. The full faith and credit of the City is not pledged to the obligations of the City under the C&F Interlocal Agreement.

2. The EM hereby directs all public utilities and resale customers that collect Utility Taxes within the geographic City limits to remit all revenues received from the Utility Taxes to the Trustee to be deposited into the trust fund established by the Trust Agreement.

3. The revenues received from the Utility Taxes shall be disbursed in accordance with the Trust Agreement.

4. The PLA is hereby directed to serve a copy of this Order on all public utilities and resale customers that collect Utility Taxes within the geographic City limits as directed by the EM or his designee in writing.

5. Pursuant to section 19 of PA 436, the C&F Interlocal Agreement is hereby submitted to the City Council, and City Council is hereby instructed to review the C&F Interlocal Agreement and to either approve or disapprove the C&F Interlocal Agreement within 10 days from the date hereof.

6. Pursuant to section 19 of PA 436, the O&M Interlocal Agreement is hereby submitted to the City Council, and City Council is hereby instructed to review the O&M Interlocal Agreement and to either approve or disapprove the O&M Interlocal Agreement within 10 days from the date hereof.

7. Nothing in this Order shall be interpreted as contrary to Federal law.

8. If any component of this Order is declared illegal, unenforceable or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

9. This Order is effective immediately upon the date of execution below.

4

10. The EM may modify, amend, rescind, replace, supplement or otherwise revise this Order at any time; provided, however, that the direction set forth in paragraph 2 hereof shall be irrevocable until all debt obligation secured by Utility Taxes shall have been paid in full.

11. This Order shall be distributed to the Mayor, City Council members and all department heads.

Dated: October 23rd, 2013

By: _____

Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
       Mayor David Bing
       Members of Detroit City Council
       Chief Financial Officer of the City of Detroit
       Public Lighting Authority
       Michigan Finance Authority

## Exhibit 1

## C&F Interlocal Agreement

Please see attached.

6

## Exhibit 2

## O&M Interlocal Agreement

Please see attached.

7

13-53846-swr   Doc 2379-31   Filed 01/03/43   Entered 01/03/43 17:41:59   Page 59 of 9
13-53846-tjt   Doc 1341-31   Filed 10/28/13   Entered 10/28/13 17:15:95   Page 59 of 9   159
100

## Exhibit 3

### Trust Agreement

Please see attached.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Re: Docket No. 1341** |

## LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this limited objection to *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief* [Docket No. 1341] (the "Motion").  In support of this limited objection, Syncora respectfully states as follows:

### Preliminary Statement

1.     Well before the City[1] filed its bankruptcy petition, it embraced the idea that Chapter 9, first and foremost, is a public revitalization process — not a process to allow the City to provide *essential services* while *minimizing creditor*

---

[1]   Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion.

*loss*, as legislative history and case law dictate.[2]  Indeed, in Jones Day's very first pitch to the City to become its legal counsel, it explained how it intended to transform the Chapter 9 *debt adjustment process*[3] into a public revitalization process that is subsidized by cuts to creditor recoveries:

- "[A]ny [C]hapter 9 process should pursue as many revitalization initiatives as possible."[4]

- "[A]s the City gains access to new revenues, it must develop an approach that preserves those revenues for reinvestment in the City and not just to pay off preexisting debts."[5]

- The City should "defend against approaches that focus on expense reduction and monetizing assets to pay creditors."[6]

---

[2]  *See* H.R. Rep. No. 95-595, at 263 (1977) ("[T]he primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors."); H.R. Rep. No. 94-686, at 524 (1975) (same); *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 564–66 (9th Cir. 1940) (holding that a Chapter 9 debtor's "top-heavy and extravagant" infrastructure spending "of at least twice the sheer necessity of the situation" to be subsidized by cuts to creditor recoveries rendered plan of adjustment non-confirmable because "it would be highly unjust to allocate their cost to the bondholders" and such plan treatment was neither fair and equitable nor in the best interest of creditors).

[3]  *See In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 648–51 (Bankr. E.D. Mich. 1994) (describing Chapter 9 as a "debt adjustment process" that allows "municipalities to continue in existence" pursuant to a confirmable plan of adjustment that is "fair, equitable, and feasible, and does not discriminate unfairly in favor of any creditor or class of creditors").

[4]  Presentation to the City of Detroit, 57 (Jan. 29, 2013), attached hereto as Exhibit 1.

[5]  *Id.* at 54.

[6]  *Id.* at 27.

2

- The Chapter 9 process should be used "to address as many additional items as possible, not just the core debt readjustment issues in a Plan of Adjustment."[7]

The City's philosophical approach to this case conflicts with the way Congress intended Chapter 9 to operate and with the standards set forth therein — *e.g.*, a plan of adjustment must be in the "best interests of creditors," "fair and equitable," and submitted in good faith. While there is no question that the City of Detroit faces many challenges, the means by which these challenges are addressed must be integrated into the overall purpose of Chapter 9, which focuses on fairly adjusting the debts of the City's creditors.

2. Since that initial presentation, the City and its advisors have continued to focus on politically popular public revitalization projects, while at the same time marginalizing the City's many creditors. In its Creditors Proposal, for example, the City put forward a plan where it would spend $1.25 billion on public improvement projects such as a roof replacement for the Manoogian Mansion, an unspecified airport expansion, and approximately $300 million of unspecified "Additional Operating Expenses."[8] Similarly, in its DIP financing proposal, the

---

[7] *Id.* at 58.

[8] *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] Ex. A (the "Creditors Proposal"), at 127–28.

3

City contemplates spending reportedly $120 million "to fund expenditures that are designed to contribute to the improvement of the quality of life in the City."[9]

3. Meanwhile, the City previously announced that it proposes to pay certain unsecured creditors only approximately 16.8 cents on the dollar on account of their claims despite the size of the City's asset base and potential mutually beneficial and creative opportunities to enhance creditor recoveries.[10] These cuts to creditor recoveries are projected to fund approximately $650 million of the City's public improvements spending in what literally amounts, at best, to a zero-sum proposition.[11]

---

[9] *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* [Docket No. 1520] ¶ 47; *City of Detroit Receives Commitment for up to $350 Million of Post-Petition Financing*, PRNEWSWIRE, Oct. 11, 2013 *available at* http://www.prnewswire.com/news-releases/city-of-detroit-receives-commitment-for-up-to-350-million-of-post-petition-financing-227423391.html (estimating approximately $120 million for quality of life expenditures as of Oct. 11, 2013). The City's DIP financing proposal is connected with its *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 17] (the "Forbearance Motion"), wherein the City seeks to pay one group of creditors — the swap counterparties — ahead of and before all others.

[10] Creditors Proposal, *supra* note 8, at 23–29, 107.

[11] Hr'g Tr. 137:6–14, Oct. 24, 2013; *see also id.* at 132:21–24 (Charles Moore confirming that "with respect to the [June 14] proposal . . . an important

4.     And yet, despite the obvious plan implications of these proposals, the City has consistently failed to provide its creditors — as well as the City Council — with the information necessary to properly evaluate the merits of its proposals. For example, the City refused to provide parties in interest with all necessary and requested documentation in connection with the DIP financing proposal and the Forbearance Motion.[12]

5.     The Motion is yet another example of the City's approach to its Chapter 9 case. Though the City's desire to remedy the problems with its street lights is understandable, the process surrounding, and substance of, the Motion suffers from a number of fundamental flaws that have similarly plagued many of the City's other proposals.

---

component of it is reinvestment in the infrastructure and operations of the City of Detroit.").

[12] *See, e.g.*, *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy Procedure 2004* [Docket No. 1342] ¶ 9 (requesting DIP term sheets and commitment letter that the City refuses to provide); *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366] ¶ 1 (detailing the City's secretive negotiations in connection with the Forbearance Motion).

6.  *First*, the Motion lacks the detail necessary to evaluate the merits of the proposed transaction.  Among other things, the Motion fails to address why, as the City contends, the PLA Transaction is "the best (and perhaps only) opportunity."[13]  It further fails to describe what that opportunity really is — the lighting plan seems to exist in a vacuum divorced from the City's needs and any anticipated economic benefit.  And it does not answer why, of all things the City can do to protect its citizens and generate revenues, jobs, and investment, upgrading the City's *entire* lighting infrastructure makes sense for the City at this time.

7.  *Second*, the detail that the City *has* provided indicates that the transaction may be economically unsound.  For example, though the City points out that only $12.5 million of the Pledged Revenues will fund the Act 392 Bond payments, it fails to explain why it is necessary to pledge **all** of the utility tax revenues in the first instance, which currently stand at approximately $40 million a year.[14]  Additionally, as set forth in the exhibits attached to the Motion (but not referenced in the Motion itself), the City will also obligate itself generally to fund

---

[13]  Motion ¶ 22.

[14]  Creditors Proposal, *supra* note 8, at 3.

approximately $11 to $12 million of operating and maintenance costs under the PLA Transaction.[15]

8.     *Third*, the Motion is yet another attempt by the City to push through a public reinvestment initiative that would be more appropriately addressed at the plan of adjustment stage — and only then after creditors have been given the opportunity to evaluate and shape the proposal or propose other approaches. Though all parties prefer to see this case move quickly, speed should not come at the expense of due process.  Yet, by operating outside the plan of adjustment framework, the City is attempting to avoid many of the procedural and substantive plan confirmation requirements that are designed to protect creditors from precisely this type of transaction — which then requires creditors to respond to protect their rights.  If the City would instead negotiate with its creditors towards a holistic solution (*i.e.*, a mutually-agreeable plan of adjustment) — as opposed to these contested piecemeal proposals that lack the requisite detail this case would proceed more quickly and on a more consensual basis.

9.     For these reasons, Syncora submits the instant Limited Objection.

---

[15]   *See* Motion Ex. 1 to Ex. 6.1 (the "<u>PLA Lighting Plan</u>"), at A.4.

## **Limited Objection**

**A.**     **Relevant Details Surrounding the PLA Transaction.**

10.     The City created the PLA as a separate municipal corporation to manage and maintain the City's public lighting system.[16] The PLA "is responsible for constructing, improving, enlarging, reducing or extending the City's street light system."[17]

11.     In connection with the Motion, the City seeks an order under section 364(c)(2) of the Bankruptcy Code (a) authorizing the City to enter into and perform under the PLA Transaction Documents, and (b) authorizing and approving the PLA financing transaction and the granting of a pledge and lien in, and the irrevocable transfer of, the Pledged Revenues.

12.     To secure the financing for the PLA Transaction, the City has agreed to "irrevocably pledge and cause the existing and future revenue generated from the Utility Tax . . .  as security for, and the primary source for the repayment of, the Act 392 Bonds."[18] The amount of Pledged Revenues to which the PLA is entitled is the lesser of (a) $12.5 million, and (b) the total revenues generated by the Utility

---

[16]   Motion ¶ 6.

[17]   Motion Ex. 6.4, at 3.

[18]   Motion ¶ 7.

Tax.[19]  The City notes, however, that certain key transactional documents the City

asks this Court to approve are "prospective and subject to modification."[20]  As its

justification for this transaction, the City contends that the public lighting

initiatives the Act 392 Bonds finance and the Pledged Revenues secure will allow

the PLA to "construct, improve, enlarge, reduce or extend the City's Public

Lighting System for the benefit of the City."[21]  According to the City, the "PLA

Transaction represents the City's best (***and perhaps only***) opportunity to remedy

this public safety concern."[22]

      13.    To support these claims, the Motion provides some high-level details

surrounding the transaction.  However, it makes no attempt to quantify or analyze

how the PLA Transaction will benefit the City and its stakeholders.  Nor does it

contain any evidence that the City considered any alternative financing

structures.[23]

---

[19]  *Id.*

[20]  *E.g.*, PLA Lighting Plan, *supra* note 15, at A.4 ("Please note that negotiations on the O&M have not commenced, therefore the information contained in this section should be considered prospective and subject to modification.").

[21]  Motion ¶ 19.

[22]  Motion ¶ 22 (emphasis added).

[23]  It is also puzzling why the City did not wait for the City Council to analyze the terms of this proposal — or, for that matter, submit an alternative proposal (as they are entitled under PA 436) — before submitting the Motion.  Though the City Council's powers have been dramatically circumscribed by PA 436, it

**B.    The City's Motion Suffers from a Number of Fundamental Flaws.**

14.    The City must demonstrate that the proposed financing is "necessary to preserve the assets of the estate" and that the terms of the transaction are "fair, reasonable, and adequate."[24]  Courts consider the following factors, among others, to determine whether the terms of a postpetition financing transaction under section 364 of the Bankruptcy Code are appropriate: (a) whether the proposed transaction is an exercise of the debtor's reasonable business judgment; (b) whether alternative financing is available on any other basis; (c) whether the proposed transaction is in the best interests of both the estate and its creditors; (d) whether any better offers, bids, or timely proposals are before the court; (e) whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business; (f) whether the terms of the proposed financing are fair, reasonable, and adequate given the

---

retains the key right and obligation to evaluate dispositions of City Assets. Moreover, the City Council will be a critical part of any plan of adjustment. Giving the City Council the full statutory time to consider the proposal would seem to accord with at least minimal standards of comity.

[24]    *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (noting that debtor must also establish that it was unable to obtain alternative financing).

circumstances; and (g) whether the proposed transaction was negotiated in good faith and at arm's length (collectively, the "Farmland Factors").[25]

15.     As discussed below, the City cannot satisfy the Farmland Factors. First, the Motion fails to provide sufficient information to analyze the merits of the PLA Transaction.     Second, the little information the City has provided demonstrates that the economics behind PLA Transaction may not be in the best interests of the City or its stakeholders.   Third, the City is yet again asking this Court to approve a transaction that should be addressed within the procedural framework of a plan of adjustment.

### 1.     The City Has Failed to Provide Adequate Information to Evaluate the Proposed Transaction.

16.     Syncora favors the City of Detroit having adequate lighting to protect citizens (including considering reasonable prospective population growth) and to support other initiatives for the City's and its stakeholders' recovery.  But Syncora does not support any proposal — like the one at issue in the Motion — that lacks all of the information necessary to evaluate that proposal.

---

[25]  *In re Farmland Industries, Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying Farmland Factors).

17.     Here, the City has failed to provide many of the important details surrounding the PLA Transaction.   Among other omissions, the City has not provided the following information:

- What, if any, process it conducted (*e.g.*, competitive bidding for the bonds);

- Whether alternative financing structures were considered;[26]

- Any objective measure of the costs and benefits associated with the relief sought;

- The identity of the engineers and/or other professionals consulting on the lighting systems project and their related analyses;

- Why the PLA Transaction is "the best (**and perhaps only**) opportunity" to address public lighting issues;

- The ultimate scope of the lighting systems upgrade over the life of the project (*e.g.*, short-term and long-term objectives); and

- How this financing transaction is necessary, essential, or appropriate to preserve the City's assets for its continued operation.[27]

---

[26]  *See* 11 U.S.C. § 364(c) ("If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt . . . ."); *Crouse Grp.*, 71 B.R. at 549 (same).

[27]  *See, e.g.*, H.R. Rep. 94-686, at 546–47 (1975) ("[B]y facilitating borrowing to meet current expenses, the court was actually preserving former secured creditors' collateral by preserving the business as a going entity.   Thus, there was no actual or effective taking of property prohibited by the Fifth Amendment in giving new security that would prime the former liens of secured creditors.   In the municipal context, this reasoning is similarly applicable.   While the 'business' of government will continue whether it is insolvent or not, without cash to continue to provide **essential government services**, the only asset available for the creditors, the municipality's tax base,

13-53846-swr   Doc 2359-3   Filed 11/06/13   Entered 11/06/13 16:53:45   Page 72 of 22
100
13-53846-tjt   Doc 2357-3   Filed 01/06/14   Entered 01/06/14 14:34:50   Page 72 of 22   172

18.     While it may be true that certain improvements are necessary to the City's infrastructure, this is first and foremost a Chapter 9 debt adjustment process that requires the disclosure of certain information.     Notwithstanding that requirement, the City has not demonstrated that these reinvestment initiatives are necessary or how they map on to a plan of adjustment that benefits all of the City's stakeholders.     Nor, for that matter, has the City detailed the process behind the PLA Transaction.

19.     Without this information, it is impossible to assess the merits of the Motion and determine whether the PLA Transaction was presented in good faith, is in the best interest of creditors, or is fair and equitable.[28]     Put simply, it is not enough to say, without any supporting evidence, that the "PLA transaction represents the City's best (and perhaps only) opportunity to remedy this public safety concern."     The City's financial commitment to this project is at least $23.5 million per year for approximately 30 years, or approximately $705 million in

---

may be seriously eroded by flight of the city's businesses and residents.") (emphasis added); *see also In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) ("A debtor may not obtain approval for extending secured credit unless it first establishes that it is otherwise unable to reasonably obtain unsecured credit, ***and the credit is necessary for continued operation***.") (emphasis added).

[28]     See the Farmland Factors; *see also* 11 U.S.C. §§ 901(a), 943(b)(1), 943(b)(7), 1129(b)(2), 1129(a)(3) (analogous Chapter 9 plan confirmation requirements).

total.[29]  Of this $705 million, approximately $192 million, or 27%, will be used simply to finance the transaction (based on the City's own estimates).[30]  This projected $192 million financing cost is yet another material fact that is not disclosed by the City in the Motion.  For a transaction of this type and size, much more than the City's bare-bones disclosure is required.

20.    In addition, the timing of this transaction is suspect given that (a) the Act 392 Bonds are not projected to be issued until June 2014,[31] (b) the City previously anticipated spending a total of approximately $1.7 million on public lighting capital improvements in the Creditors Proposal,[32] and (c) the City Council had not yet had the opportunity to review and act on the PLA Transaction at the time the City filed the Motion.

   **2.    The Economic Terms that the City Has Revealed Indicate that the PLA Transaction May Not Be in the Best Interests of the City and its Stakeholders.**

21.    While the City has failed to provide a full view of the economic burden that this transaction will place on the City, what little detail it has disclosed is troubling — both from the perspective of the City's taxpayers and its creditors.

---

[29]  *See* PLA Lighting Plan, *supra* note 15, at A.4, B (estimating $12.5 million pledged to repay bonds and $11-12 million in operating and maintenance costs).

[30]  *See id.* App. G.

[31]  *Id.*

[32]  Creditors Proposal, *supra* note 8, at 127.

14

13-53846-swr    Doc 2359-3   Filed 11/06/13   Entered 11/06/13 16:53:45   Page 74 of 22
100
13-53846-swr    Doc 2359-3   Filed 11/06/14   Entered 11/06/14 16:41:50   Page 74 of 22   174

22.     To begin, the PLA Transaction will actually cost the City more than the Motion reveals.  For example, hidden amidst the details of the exhibits attached to the Motion is the fact that the City has committed to fund the operation and maintenance of the PLA-managed lighting system.[33]  Though the City states that it assumes no liability for the Act 392 Bonds or C&F Agreement,[34] the estimated $11–$12 million in annual operational and maintenance expenses the City will pay out of its general fund almost doubles the $12.5 million per year price tag attached to the face of the Motion.[35]  Furthermore, of the approximately $150 million in projected bond proceeds, approximately $60 million will be used immediately to pay off the PLA's "bridge loan," which is yet another undisclosed financing device buried in the PLA's plan and budget that receives no mention in the Motion.[36]  As discussed above, of the City's total $705 million financial commitment,

---

[33]  *See* PLA Lighting Plan, *supra* note 15, at A.4 ("The estimated annual costs for these operation and maintenance services, including PLA administrative costs, is $11M to $12M based on the criteria contained in Section A.3.  The source of the City funds for the payment of rates has not been identified yet, but it should be anticipated that the source will be the City of Detroit General Fund.").

[34]  Motion ¶ 9.

[35]  *See* PLA Lighting Plan, *supra* note 15, at A.4; *see also* Motion Ex. 6.2, at 4.1 (stating that the annual cap for operations and maintenance will be $8.024 million, plus "Extraordinary Maintenance" payments).  A comparison of current costs to these estimates is impossible because the City has not disclosed the current operating and maintenance costs associated with its lighting infrastructure.

[36]  *See* PLA Lighting Plan, *supra* note 15, at A.1; *id.* App. G.

approximately $192 million, or 27%, will be used simply to finance the transaction.[37]  Finally, the City is quick to point out that only $12.5 million of the Pledged Revenues will fund the Act 392 Bond payments, but it fails to explain why it is pledging $40 million of utility tax revenues when only $12.5 million is necessary for the transaction.[38]

23.    The PLA Transaction is just as unfavorable to the City's creditors.  As part of the transaction, the City anticipates "making a multi-year, large scale, city-wide investment in the public lighting infrastructure."[39]  To do so, the City seeks to lock-up the Pledge Revenues for 30 years.[40]  All told, the City's financial commitment to this project is at least $23.5 million per year for approximately 30 years, or approximately $705 million in total.  Notably though, the Pledged Revenues are City resources that could be used to fund recoveries to creditors that invested their time and resources in the City's operations and pensions for decades — creditors that are now being asked to accept 16.8 cents on the dollar.[41]

---

[37]  *See* PLA Lighting Plan, *supra* note 15, App. G.

[38]  *E.g.*, Motion ¶ 17; Creditors Proposal, *supra* note 8, at 3.

[39]  PLA Lighting Plan, *supra* note 15, at A.1.

[40]  *Id*. at B.

[41]  *See In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

### 3. The Motion Should be Presented as Part of a Plan of Adjustment.

24. In connection with the PLA Transaction, the City is attempting to restrict a revenue stream for 30 years in a way that diminishes creditor recoveries. Given the impact of this transaction, the City should have included it as part of its plan of adjustment.[42] To the contrary, the City has instead decided to hurriedly present this transaction to the City Council and ultimately the Court.

25. Ignoring for the moment that the City cannot meet the requirements for approval of the Motion, the City's tactics here signal an awareness that it cannot meet the procedural and substantive plan confirmation requirements designed to protect creditors from precisely this kind of amorphous transaction.[43]

26. For instance, to protect those entitled to vote on a plan of adjustment, a Chapter 9 debtor must provide "adequate information" in respect of the transactions contemplated thereunder, which means:

---

[42] *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (transactions that dictate the terms of any future plan of restructuring, or alter creditors' rights without otherwise requiring the satisfaction of the disclosure and confirmation standards of the Bankruptcy Code are *sub rosa* plans); *see also In re Swallen's, Inc.*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) ("[A] bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.")

[43] *See, e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records … that would enable [] a hypothetical investor of the relevant class to make an informed judgment about the plan.[44]

Here, at a minimum, and as set forth above, the City should be required to provide detailed financial information, a description of its process, and its underlying assumptions in respect of the PLA Transaction.

27. Moreover, sections 943(b)(7) and 1129(a)(3) of the Bankruptcy Code require that a plan of adjustment be in the best interests of creditors and proposed in good faith, respectively. And section 1129(b)(1) of the Bankruptcy Code provides that a plan of adjustment may be confirmed even if a class of claims rejects the plan so long as "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The application of "fair and equitable" in Chapter 9, for instance, requires that "the amount proposed to be paid under the plan was

---

[44] 11 U.S.C. § 1125(a)(1); *In re Malek*, 35 B.R. 443 (Bankr. E.D. Mich. 1983) (finding debtor did not disclose adequate information where debtor did not include, *inter alia*, certain financial information, how a plan was to be executed, and a projection and underlying assumptions related to its operations); *see also In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("This disclosure requirement does not attach only to the preparation of disclosure statements. 'Full and fair' disclosure is required during the *entire* reorganization process; it begins 'on day one, with the filing of the Chapter 11 petition.'") (citations omitted).

all that the creditors could reasonably expect under the circumstances."[45]  Collier has taken the position that a plan of adjustment is not fair and equitable or in the best interests of creditors if it invests heavily in facility improvements to the detriment of creditors:

> [A Chapter 9] plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interest of creditors. *For example, a debtor that had invested heavily in improvements in its facilities at a time when it was unable to pay the claims of its bondholders cannot rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements*.  Such a plan is not fair and equitable and is not in the best interest of creditors.[46]

In order to determine whether a proposed treatment of creditors is fair:

> [T]he court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors.  And where, as here, different classes of creditors assert prior claims to different sources of revenue, there must be a determination of the extent to which each class is entitled to share in a particular source, and of the fairness of the allotment to each class in the light of the probable revenues to be anticipated from each source.  To support such determinations, there must be findings, in such detail and exactness as the nature of the case

---

[45]  *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (citing *West Coast Life Insurance Co. v. Merced Irrigation District*, 114 F.2d 654, 678 (9th Cir. 1940); *see also* 6 Collier on Bankruptcy ¶ 943.03[1][f][i][B] (16th ed. 2013) (noting that the "fair and equitable rule has additional content in chapter 9 cases" while quoting the "reasonable expectations" standard set forth in *Lorber*).

[46]  6 Collier on Bankruptcy ¶ 943.03 (citing *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563 (9th Cir. 1940)).

19

permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated.[47]

Proposals like the City's financing of the PLA Transaction are precisely what the fair and equitable and best interests tests are designed to address, and the City should not be able to short-circuit the confirmation process — including the detailed findings that must accompany the Court's ultimate fairness determination — with the Motion.

28.    Similarly, in the context of section 364(e), where a debtor fails to provide sufficient information to support a finding of good faith, the court should not rubber-stamp the debtor's request for a finding under that section.[48]  Rather, where, as here, the City has not provided the necessary information to make such a finding, a section 364(e) good faith finding is not appropriate.

29.    Finally, it also makes more sense, from a practical perspective, to address the issues in the Motion as part of the confirmation process given that there are many outstanding that may impact the PLA Transaction but have not yet been

---

[47]  *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 420 (1943).

[48]  *E.g.*, *In re White Crane Trading Co., Inc.*, 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994) ("Parties similarly lack good faith when they fail to reveal material facts."); *cf. In re Buerge*, 479 B.R. 101, 107 (Bankr. D. Kan. 2012) ("The court cannot infer good faith from an evidentiary record silent on the question because such an inference would invert the burden of proof onto the objecting party.") *motion for relief from judgment denied*, 11-20325, 2013 WL 934836 (Bankr. D. Kan. Mar. 7, 2013).

13-53846-tjt   Doc 2359-3   Filed 01/06/14   Entered 01/06/14 17:41:50   Page 80 of 82
13-53846-swr   Doc 1357   Filed 11/06/13   Entered 11/06/13 16:53:45   Page 80 of 82   180
100

addressed.  For example, many of the City's pleadings have noted just how large the City of Detroit is and the difficulties that the City has experienced in providing municipal services over such a large area.[49]  The City has also described the large number of property foreclosures that it has experienced and questioned what it will do with all of this land.[50]  Presumably, the City will address issues relating to its infrastructure (*i.e.*, the land) as part of its proposed plan of adjustment.  These issues, however, will likely impact the lighting issues that the City is seeking to address through the Motion.  Syncora submits that the City would be better-served by addressing all of these issues at the same time as opposed to the piece-meal approach that the City is currently employing.

### Conclusion

30.     For the foregoing reasons, Syncora respectfully respects that the Court deny the Motion.

*[Remainder of page intentionally left blank.]*

---

[49]  *See, e.g.*, *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] ¶ 31 (discussing the City's 139-square mile footprint and challenges related to providing municipal services).

[50]  *See, e.g.*, *id.* ¶¶ 34–35 (discussing the City's large number of foreclosures); Creditors Proposal, *supra* note 8, at 16–17 (same).

Dated: November 6, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

22

13-53846-tjt    Doc 2379-3   Filed 01/03/14   Entered 01/03/14 14:34:50   Page 82 of
100
13-53846-swr    Doc 1357   Filed 11/06/13   Entered 11/06/13 16:53:45   Page 22 of 22    182

## Exhibit 1

## Presentation to the City of Detroit





# Presentation to The City of Detroit

Detroit, Michigan
January 29, 2013

**Confidential**

1

DTMI00128731

# PART I – INTRODUCTION

DTMI00128732

**Confidential**



# The Jones Day Team



**Stephen Brogan**



**Corinne Ball**



**Heather Lennox**



**Kevyn Orr**



**Bruce Bennett**



**Aaron Agenbroad**



**Confidential**

DTMI00128733

3

[Speaker Notes For Slide: 3]

The Jones Day Team:

Stephan Brogan
Corinne Ball
Heather Lennox
Kevyn Orr
Bruce Bennett
Aaron Agenbroad

[Brogan voiceover:   Although I will not be heavily involved in the representation, I wanted to (i) provide my personal statement of Jones Day's commitment to this project and (ii) highlight the qualities of the team members that will manage this project on a day-to-day basis. ]

**Confidential**

4

DTMI00128734

# Jones Day's
# Qualifications and Commitment

- **Midwestern Roots – Continuing Presence and Practice**

- **Substantial Ties to Michigan and the 6th Circuit**

- **Belief in the Importance of a Strong Detroit**

- **Unsurpassed Expertise Where Detroit Needs It**

- **Historical Focus on Teamwork and Collaboration**

- **Know and Work Well With City's Other Advisors**

- **Firm-Wide Commitment to Detroit**



**Confidential**

DTMI00128735

5

Jones Day's Commitment to the Detroit Project

Jones Day's roots are in the Midwest and a large part of our practice is centered there.

Many of Jones Day's clients are based in Detroit and in Michigan.
(Over 100 Michigan-based clients in the past 2 years.)
Long-standing representation of GM.
Special benefits counsel to, and good contacts with, Blue Cross of Michigan.
25 lawyers were 6th Circuit Clerks.
27 lawyers were clerks in federal courts in the 6th Circuit (Ohio, Michigan, Tennessee, Kentucky).
28 lawyers were US Supreme Court Clerks.
116 lawyers have one or more degrees from Michigan institutions (including 98 lawyers with 111 degrees from the University of Michigan alone).

We believe that a strong Detroit is vital to the state, the region and the country.

Jones Day has unsurpassed expertise and capabilities in the areas of greatest importance to Detroit and would be honored to be called upon to help.

Jones Day has a longstanding reputation for teamwork and collaboration, both within our own organization and when working with clients, related parties and other professional firms.
This strength will be particularly important in this matter.
We know and can work well with the other advisors retained by the City and it will be critical that everyone pulls together in the same direction.

When a client engages Jones Day, it engages the entire firm, and this would be regarded as an engagement of utmost importance for the firm as a whole.
We are committed to providing whatever resources are needed to advance Detroit's restructuring goals.
The City will have the support of each and every part of the Firm.

DTMI00128736

**Confidential**

6

# PART II – GENERAL OBSERVATIONS

DTMI00128737

Confidential



[Speaker Notes For Slide: 7]

Jones Day's Priority for Today's Meeting

It is much more important that we discuss issues the City, the State and the FAB want to discuss rather than issues that we have identified.

We are prepared to walk through the presentation and invite dialog along the way, but are also prepared to put our presentation to one side and cover topics that interest you and address your questions and concerns.

We have studied Detroit's situation extensively and we have some preliminary views on a path forward.

**Confidential**

DTMI00128738

# Detroit's Substantial Progress

- Improved Cash Flows
- Significant Headcount Reduction
- Implementation of CETs
- Planning to Address Pension/OPEB
- Payroll Systems Outsourcing
- Public Lighting Authority
- Regional Transportation Authority
- Initiatives to Drive Revenue/Reduce Expenditures



DTMI00128739

Confidential

9

13-53846-swr    Doc 2337-3    Filed 01/03/14    Entered 01/03/14 17:41:50    Page 92 of 76
13-53846-swr    Doc 1537-3    Filed 11/06/13    Entered 11/06/13 16:58:49    Page 10 of
100

[Speaker Notes For Slide: 9]

The City, working with the FAB and the State, already has made substantial progress in addressing its financial challenges.

Improved Cash Flows (Expected improvement of ~$62MM in FY 2013)

Significant Headcount Reduction (from ~12K in Nov. 2011 to ~10K in Nov. 2012)

Implementation of CETs (Despite delays, large majority of CETs are in place)

Planning to Address Pension/OPEB (e.g., recently closed the Police & Fire Retirement System to new employees, retention of Milliman to assist in revamping benefits for retirees and active employees)

Payroll Systems Outsourced

Public Lighting (Public Lighting Authority established; rate increases)

Regional Transportation Authority (authority established; new funding committed)

Initiatives to Drive Revenue or Reduce Expenditures (Belle Isle lease to the state, funding support for new arena and commercial development via Detroit Downtown Development Authority, grant and loan support for Detroit's Eastern Market through the Community Revitalization Program)

**Confidential**

10

DTMI00128740

# Formidable Challenges Remain

- **Substantial Debt (Bonds, POCs, Swaps)**
- **Pension/OPEB Liabilities**
- **Labor Issues (Costs, Work Rules)**
- **Detroiters' Quality of Life/Redevelopment of the City**
- **Development of Multi-Year Budget**
- **Reversing Economic Trends**
- **Encouraging New Investment in Detroit**
- **Political Obstacles to Reform**
- **EPA/Clean Water Act Case**
- **High Unemployment and Crime Rates**



DTMI00128741

Confidential

[Speaker Notes For Slide: 11]

Notwithstanding the foregoing, many challenges remain.

Debt and related obligations (e.g., swaps)

Pensions and other retiree benefits (OPEB).

Labor costs, work rules and related issues.

Implementation of strategies to improve Detroiters' quality of life and redevelop the City.

Development of multi-year budget upon which restructuring can be based.

Identification of further options for saving/raising funds and stabilizing revenues (reversing trends) and encouraging new investment in Detroit.

Political obstacles to reform.

EPA and Clean Water Case before Judge Cox.

High unemployment.

High crime rate.

**Confidential**

DTMI00128742

# Out of Court Solutions Are Preferred

- Benefits of Well Planned Out-Of-Court Restructuring

  - ➤ **Less Disruptive**
  - ➤ **Less Publicity**
  - ➤ **Less Expensive**
  - ➤ **Less Reputational Damage**
  - ➤ **Less Political Impact**

- Consensus or Near Consensus Necessary for a Successful Out-of-Court Restructuring

  - ➤ *Extremely Difficult to Achieve in Practice*



DTMI00128743

Confidential

13

[Speaker Notes For Slide: 13]

A well planned and carefully implemented effort to resolve Detroit's difficulties out of court is vitally important for several reasons:

An out-of-court solution is preferable for a number of reasons.
Less disruptive.
Less publicity during process.
Less expensive.
Less damage to City reputation.
Less political impact.

An out of court solution requires consensus or near consensus of affected constituencies.
This is extremely hard to achieve in practice.

Note: Could mention the possibility of a moratorium on payments being negotiated in support of an out of court solution.

DTMI0012B744

**Confidential**

14

13-53846-swr    Doc 2379-3    Filed 01/03/14    Entered 01/03/14 17:41:50    Page 97 of 76
13-53846-swr    Doc 1537-3    Filed 11/06/13    Entered 11/06/13 16:56:49    Page 19 of
100

# Impact of Possible
# Emergency Manager Appointment

- Expansive Power
  - ➤ Power of City Government
  - ➤ Ability to Reject, Modify or Terminate CBAs
  - ➤ Ability to Commence Chapter 9 Filing Quickly, if Warranted
  - ➤ *Can Create Negotiating Leverage (Negotiating with the Backdrop of Bankruptcy)*

- Hot-Button Political Issue

- Relationship With Elected Officials Must Be Established

- Possible Legal Challenges (Delay and Risk)

Confidential



DTMI00128745

[Speaker Notes For Slide: 15]

Appointment of an Emergency Manager may offer the City greater powers to address some issues.

The appointment of an Emergency Manager could impact the City's restructuring efforts in a number of ways:

Expansive powers over all aspects of City government could be used to promote and expedite restructuring (e.g., budget; procurement; contracts; labor negotiations; ability to adopt ordinances related to financial condition).
Could streamline certain political/bureaucratic/legal requirements to restructuring activities.
Ability to reject, modify or terminate CBAs under certain circumstances.
Ability to commence chapter 9 filing quickly under PA 72 and PA 436 (assuming State approval).
Emergency manager powers can create negotiating leverage (negotiating in the backdrop of bankruptcy).
Hot-button political issue.
Potentially unpopular option with certain segments of the public, unions, other stakeholders.
The Emergency Manager's relationship with elected officials would have to be developed.
Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.
Appointment of an Emergency Manager could result in legal challenges (e.g., federal & state constitutional challenges)
Could delay progress until resolved
Could lead to challenges of the legality and enforceability of any actions taken by the Emergency Manager.

DTMI00128746

Confidential

16

# Out-of-Court Plan Should Contemplate the Possibility of Chapter 9

- **Simplify and Shorten Any Chapter 9 Case, if Out-of-Court Effort Fails**

    ➤ **Out-of-Court Agreements Can Be Used in Chapter 9**

- **Creates Leverage in Creditor Negotiations**

    ➤ **Negotiating in the Shadow of Chapter 9**
    ➤ **Motivate Municipal Bond Market Participants**

- **Bolster Eligibility for – and Success in – Chapter 9 By Establishing Good-Faith Record of Seeking Creditor Consensus**

**Confidential**

17



DTMI00128747