[Speaker Notes For Slide: 17]

Any restructuring plan should be designed so that it could be implemented in a chapter 9 case, if necessary.

Even if an out-of-court plan cannot be implemented, agreements that are reached can form the basis for a chapter 9 plan of adjustment, thus simplifying and shortening any chapter 9 case.

Creditors understand that a troubled municipality has greater leverage in a chapter 9 case. Accordingly, developing an out-of-court restructuring plan that can later be implemented in chapter 9 if necessary can create leverage in favor of a negotiated deal.
This is particularly the case if an Emergency Manager is appointed because the threat of a chapter 9 filing – including a potential moratorium on payments – will be more tangible, and possibly more imminent.
The combination of an Emergency Manager and a proposal that could be implemented in chapter 9 could be the most effective way to motivate investors in the municipal bond market.

A good-faith effort to pursue an out of court restructuring plan will establish a clear record of seeking creditor consensus before seeking chapter 9 relief.
This will deflect any eligibility complaints based on alleged failure to negotiate or bad faith.

DTMI00128748

18

**Confidential**

# If Chapter 9 Needed, Planning Is Key

- **Any Bankruptcy Filing Should Be Accompanied By:**

  ➤ **Fully Developed Plan of Adjustment / Detailed Term Sheet**

  **-OR-**

  ➤ **Clearly Articulated, Reasonable Restructuring Plan, Already Shared with Creditors**

*This approach will help demonstrate that Chapter 9 was commenced to facilitate realistic solutions to problems. Chapter 9 is <u>not</u> an additional symptom of those problems.*



Confidential

19

DTMI00128749

[Speaker Notes For Slide: 19]

If a chapter 9 case becomes necessary, the commencement of a bankruptcy should be accompanied by either:

(1) A fully developed Plan of Adjustment or detailed term sheet for a Plan of Adjustment

               – or –

(2) A clearly articulated, reasonable plan for resolving the City's financial difficulties – previously discussed with key constituencies – that can quickly be incorporated into a Plan of Adjustment.

~ ~ ~

This approach is intended to allow the City to describe a chapter 9 case as facilitating realistic solutions for the City's problems and not as an additional symptom or symbol of the intractability of those problems.

DTMI00128750

Confidential

# PART III – INITIAL PLANNING CONSIDERATIONS

DTMI00128751

Confidential



# Establish Long-Term Goals and Promote Inclusiveness

- **Reach Consensus of City Team on Long-Term Goals and Steps to Achieve Them**

- **Then, Include All Constituents in Planning and Negotiations**
    - ➢ **Obtain – and Seriously Consider – Input From All Sources**
    - ➢ **Defuse Political Opposition Through Listening and Documentation**
    - ➢ **Establish Sub-Teams for Key Issues**
    - ➢ **Coordinated "Hub-and-Spoke" Approach:  Sub-Teams Report to Central Hub**
    - ➢ **Establish a Strong Record of Inclusiveness and Consideration of All Options**

- ***The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects.  Any differences and tensions among these groups can and will be exploited by adversaries.***



DTMI00128752

Confidential

[Speaker Notes For Slide: 22]

Set Long-Term Goals and Build a Strategy of Inclusiveness

A key to a comprehensive restructuring plan will be to reach consensus at the City (in consultation with its advisors, the FAB and the State) on the restructuring steps needed to achieve a durable long-term solution to the City's issues.

Thereafter, as many constituents as possible should be included in planning and negotiations.

Input should be obtained from all sources, documented and treated seriously, even if proposals appear unrealistic.  Good listening skills are helpful.  This can help defuse political opposition.
Sub-teams can be established by the City and its advisors to address particular issues (labor, pension/benefits, asset sales, redevelopment, capital markets, etc.).
Individual groups can report regularly to central core team of key officials and advisors (i.e., the Hub).
Jones Day often uses this Hub-and spokes approach to manage a complex restructuring efficiently and in a coordinated manner.
Establish a strong record (i.e., for future litigation) of (i) inclusiveness with respect to all constituencies and (ii) consideration of all options and proposals received.

The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects.  Any differences and tensions among these groups can and will be exploited by adversaries.

DTMI00128753

**Confidential**

# Multi-Year Budget:  Set Spending Priorities Within Realistic Revenue Projections

- **Basis for Any Restructuring Agreements**

    - ➢ **Build on Budget Work to Date**
    - ➢ **Identify All Revenue Sources (Including Future Sources)**
    - ➢ **Strive for Conservative/Achievable Revenue Estimates**
    - ➢ **Incorporate Cost Savings from Outsourcing and Other Initiatives**

- ***The Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.***



Confidential

DTMI00128754

[Speaker Notes For Slide: 24]

Set spending priorities within realistic revenue projections.

A multi-year budget that includes revenue and expense projections will be the basis for determining amounts available for distribution to creditors – critical to any restructuring agreements in or out of court.
Jones Day understands that substantial work has been done in this area, and that this is a major challenge.
The City must create credibility in the face of an unsettled revenue picture.
All revenue sources should be identified, including future sources (such as monetizing assets or reallocation of state/county revenue).
At the same time, the City should strive for realistic (conservative) revenue projections to assist in planning and build credibility.
Cost savings through additional outsourcing and other initiatives should be incorporated where reasonable (e.g., exploration of regionally-based options/alternatives).

This Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.
Projected revenues should be targeted to reinvestment where possible, with a mechanism to cover shortfalls as necessary (e.g., business, state or federal partnerships).

DTMI00128755

25

**Confidential**

# Prepare to Defend the Budget

- Defend Spending at Levels Needed to Assure Long–Term Viability

  ➢ Focus on "Who Does Detroit Serve?"
  ➢ Establish Case for Reinvestment
  ➢ Defend Against Calls for Expense Reduction and Monetizing Assets to Pay Creditors

- Characterize Detroiters as "Customers "

  ➢ Must Treat Citizens with Respect
  ➢ Attractiveness of City to Residents and Businesses is Key

- Restructuring is About Revitalization, Not Just Creditor Recoveries



Confidential

DTMI00128756

Prepare to Defend the Budget.

The Budget will have to be defended against creditor criticism that it provides for excessive expenditures in light of the city's financial circumstances.
We are prepared to build this case and address any concerns, including Constitutional or other legal challenges.

Although there is not much law in this area, Jones Day believes that the City can defend a decision to spend revenues at a level necessary to assure that the City functions properly and can attract residents and businesses.
Focus on "Who does Detroit serve?"
The citizens of Michigan benefit from a revitalized Detroit serving as an engine/economic driver for the state economy.
Need to establish a credible case that stability and restoration are key elements of reinvestment in Detroit.
At the same time, need to defend against approaches that focus on expense reduction and monetizing assets to pay creditors.
This will require daily coordinated effort of the City and its advisors, in further collaboration with the State.
We learned this lesson from Orange County – daily collection of information, discussion of core group, documentation of actions taken or considered and communication are key.

City should characterize its residents as "customers," a class of constituents that ordinarily is accorded significant benefits in business reorganizations.

Creditors may attempt to characterize residents as the "owners" or "voters" who should make sacrifices to facilitate payment of creditor claims.
The changes in the population of the City indicates that citizens can "vote with their feet" by leaving. A viable restructuring for a strong and vibrant Detroit must treat its citizens with respect, just as a successful business in the private sector treats its customers.
But also must focus on "absentee" customers to obtain City services without contributing sufficiently to the City.

DTMI00128757

Confidential

27

# Explore All Avenues to Pay Creditors

- Creditors (and any Bankruptcy Court) Expect Reasonable Efforts to Minimize Shortfalls to Creditors

- Must Explore Long List of Options for Saving or Raising Money

  - ➤ Raising Taxes and Fees
  - ➤ Non-Core Asset Sales
  - ➤ Reducing Expenses
  - ➤ Borrowing Options
  - ➤ Pay-Per-Use Taxation
  - ➤ Regional Solutions

- Any Savings Must Be Consistent with the City's Revitalization Plans

*A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a Chapter 9 ultimately is commenced.*



Confidential

DTMI00128758

28

[Speaker Notes For Slide: 28]

Creditors – and ultimately the Bankruptcy Court if a chapter 9 case is filed – will expect that the City exert reasonable efforts to reduce or eliminate any shortfall in amounts available to pay creditors.

Must find the right way to fix the deterioration in the City's balance sheet, including the rate and maturity of debt.
Recent events have driven to too much short term debt (for a municipality).
Must be able to assure both municipal debtholders and legacy creditors that this is not just a process of imposing more undesirable terms.

In practice, the City will be required to develop long lists of options for saving or raising money, evaluate the practicality of each of the options identified and pursue promising approaches.

In past cases, creditors have suggested:
Raising taxes and fees.
Selling assets creditors deemed to be excess or not required.
Reducing expenses.
Borrowing against revenue streams generated by municipal assets.
Borrow surplus amounts in funds administered by the municipality

Revenue enhancement alternatives should be explored, encouraged and defended, even in a chapter 9 setting. For example:
Pay-Per-Use Taxation. Consider implement pay-per-use taxation model as (1) impetus for voluntary compliance with "Core Detroit" infrastructure and service rationalization initiatives and/or (2) means to capture revenue from surrounding suburban communities that have historically expanded as Detroit's city center shrunk.

Regional cooperation/solutions also should be explored.

Any savings ultimately must be consistent with the plans to revitalize Detroit.

A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a chapter 9 ultimately is commenced.
Even in chapter 9, all pre-bankruptcy efforts should be highlighted to demonstrate the City's good faith efforts to resolve issues.
This also will help drive a model of equitable shared sacrifice of all stakeholders.
Given initiatives underway relating to labor and benefits, it appears that the municipal bondholders, swap participants and monoline insurers likely will be the last contributor and must understand the entire picture of sacrifices obtained over time.

**Confidential**

29

DTMI0012875 9

# Exploring Creditor Recoveries: Challenges and Lessons Learned

- Raising Taxes:  Difficult and Possibly Counterproductive

  ➢ Tax <u>Relief</u> May Be Needed to Promote Investment

- Asset Sales Pose Challenges to Generating Substantial Revenue

  ➢ Sales of Assets to Pay Creditors May Not Promote Revitalization

- Reducing Expenditures Should Not Undermine Restructuring Goals

- Borrowing May Be Limited by Legal Restrictions

*Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.*



Confidential

DTMI00128760

13-53846-swr   Doc 2379-1   Filed 01/08/14   Entered 01/08/14 17:41:50   Page 13 of 76
13-53846-swr   Doc 2357-1   Filed 11/06/13   Entered 11/06/13 16:58:49   Page 31 of
119

DTMI00128761

[Speaker Notes For Slide: 30]

In Jones Day's experience:

Raising additional taxes, particularly given the economic hardship in Detroit, may be difficult (if not impossible) and may be counterproductive.
In fact, an evaluation of means to increase private investment dollars in Detroit suggest the need for tax relief and incentives.

Efforts by municipalities to sell or monetize asset often pose challenges to generating material value.
Disputes over the use of proceeds can undermine the benefits of an asset sale, while eroding the municipality's asset base.
Notwithstanding the foregoing, there are exceptions and unique and creative structures for asset monetization can and should be explored.
Working with the State to maximize asset revenues and cut costs could be a viable alternative to asset sales.
Regional initiatives also could be explored (joint redevelopment, sharing of services, joint purchasing arrangements).
Note: Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash).

Troubled municipalities have reduced expenditures repeatedly even before financial difficulties become acute. That is true in Detroit, but additional reductions should be evaluated where feasible without undermining the City's restructuring goals.
Given the recent sacrifices already imposed on employees and legacy creditors, the City should focus prompt attention on municipal debtholders and investors who have in some cases improved their positions.

Borrowing surplus amounts in funds administered by the municipality is complicated by State and/or Federal restrictions encumbering such funds.

Using proceeds of borrowings against revenue streams to pay City obligations is also affected by laws restricting use of the underlying assets and revenue streams.

Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.

**Confidential**

31

# Equitable Shared
# Sacrifice Among Creditor Groups

- **Equitable Does Not Mean Equal**
  - **Parties Have Different Rights and Protections (Constitutional, Contractual, Legal)**

- **Tension Between Employees/Retirees and Bondholders/Investors**
  - **Employee/Retiree Sacrifices Must Be Sufficient, but Should Not Undermine Ability to Recruit and Retain**
  - **Employees and Retirees Already Have Made Sacrifices, While Municipal Debtholders Have Improved Position**
  - **Should Look at Entire Restructuring Process: Equality of Sacrifice Cannot Be Measured at a Single Point in Time**

- **Legal Uncertainty Regarding Sixth Circuit Treatment of Legacy Claims**

- **Consider Expanding Sacrifices Regionally**

*The City will have to develop a proposal for*
*dealing effectively with the issues of equitable sacrifice.*

32



Confidential

DTMI00128762

Allocation of Sacrifice Among Competing Creditor Groups

In general, under United States bankruptcy law, including chapter 9 of the Bankruptcy Code, amounts available for distribution to creditors must be allocated in an equitable manner. "Equitable" generally means equally unless there are meaningful distinctions among the rights of competing creditors.

Recent chapter 9 cases and out of court negotiations involving troubled municipalities have involved significant disputes about whether or not workforce related claims (including claims for pension and other retiree benefits) should have some form of priority over claims for borrowed money and other commercial claims.

Pension and employee benefit commitments often are included in executory contracts. This reality may also permit some kinds of distinctive treatment from other creditor claims. In that regard, cuts in employee benefits and wages should be reasonably calibrated so that Detroit civil service compensation is market appropriate: cuts should not be so severe that the City cannot attract and retain qualified civil servants.

While legacy creditors are already being asked to make sacrifices, and have done so over the past number of months, municipal debt investors have been improving their positions. Municipal bondholders, swap participants and monoline insurers must be asked to make sacrifices compared to legacy creditors over an extended look back period. Equality of sacrifice cannot fairly be measured at a single point in time.

Tensions between statutes that protect the rights of municipal employees and the ability of municipal debtors to impair collective bargaining agreements have led to differing outcomes in bankruptcy court.
Outside of bankruptcy, Michigan employees enjoy certain constitutional protections for benefits (primarily accrued pension benefits). These protections have analogues in Michigan statutes and Detroit regulations, separate and apart from protections that may be included in CBAs, but are nevertheless considered "contractual" promises. Section 365 of the Bankruptcy Code – which is applicable to Chapter 9 proceedings – would provide Detroit with the ability to evaluate all of its "executory contracts" (including CBAs). Moreover, certain stringent restrictions on the rejection of CBAs otherwise applicable in bankruptcy do not apply in chapter 9.
Sections 903 and 904 of the Bankruptcy Code protect the power of a State to control municipalities and prohibit bankruptcy courts from interfering with the governmental power of the debtor. These provisions can be read to limit the ability of bankruptcy courts to disregard state law within chapter 9.
Thus, bankruptcy courts presiding over chapter 9 proceedings have reached differing conclusions with respect to the extent to which state laws protecting employees impact a debtor's ability to address CBA or other contractual benefits issues.
&gt;&gt; For example, in Orange County, certain county employee coalitions successfully prevented the debtor from modifying CBAs in a manner inconsistent with California law in connection with certain seniority rights.
&gt;&gt; On the other hand, in Vallejo, the bankruptcy court held that the filing of a Chapter 9 petition effectively foreclosed the application of state law in the CBA context. The Stockton court generally seconded Vallejo's approach regarding the primacy of federal law in chapter 9 in upholding the debtor's ability to reduce contractual OPEB benefits.
It is unclear whether bankruptcy courts within the Sixth Circuit – perhaps the most pro-union Circuit in the nation – would adopt the Orange County or the Vallejo/Stockton approach to incorporation of state law into chapter 9 proceedings.

The City also could look to expand sacrifices regionally, particularly in connection with shared services and shared benefits. Pursuing regional sacrifice may generate untested legal issues.

The City will have to develop a proposal for dealing effectively with the issues of equitable sacrifice.

DTM001287763

# PART IV – COMPONENTS AND CONSIDERATIONS FOR RESTRUCTURING PLAN

DTMI00128764

Confidential



# Key Plan Components

- **Pensions and Benefits**
- **Labor**
- **Municipal Debt**
- **Funds for Reinvestment**

Confidential



DTMI00128765

# Contrasting Approaches
# in Recent Chapter 9 Cases

- Stockton, California
  - ➤ Continued Pension Contributions to CalPERS as Protected by State Law
  - ➤ Ceased Retiree Health Plan Premiums
  - ➤ Proposed Impairment of Certain Bond Debt, Pensions Unimpaired
  - ➤ Restructuring Opposed by Municipal Bondholders

- San Bernardino, California
  - ➤ Ceased Pension Contributions to CalPERS, Seeking Impairment
  - ➤ Restructuring Opposed by CalPERS and Labor, and Supported by Municipal Bondholders

- Central Falls, Rhode Island
  - ➤ New State Law Created Lien in Favor of Municipal Debt Service Payments
  - ➤ Bondholders Paid 100%; Pensions/Benefits Sharply Cut
  - ➤ Policy to Favor Investors and Protect Credit Ratings



Confidential

DTMI00128766

Pensions and Benefits in pending California cases

The City of Stockton (population 300,000) and the City of San Bernardino (population 215,000) filed chapter 9 cases within a month of each other in mid-2012.

Like many California municipalities, both cities have very large liabilities in respect of unfunded pension and employee benefit obligations. However, each has a taken a different course of action with respect to those liabilities.
Upon filing for bankruptcy, San Bernardino ceased contributions to the California Public Employee Retirement System (CalPERS) for amounts due in respect of unfunded pension obligations (both pre- and post-bankruptcy filing), and indicated that it intends to impair the claims of CalPERS like any other unsecured claim in the bankruptcy case.
Stockton, on the other hand, has continued making contributions to CalPERS and vowed to leave all CalPERS claims (the largest claims in the case) unimpaired under any plan of adjustment.

Stockton – supported by CalPERS – asserts that its obligations to CalPERS are mandated by state law and cannot be impaired in a chapter 9 case due to the limitations of sections 903 and 904 of the Bankruptcy Code.

Interestingly, Stockton has ceased paying retiree health care premiums related to promised health care benefits. Upon motion by the retirees to seek to force the city to resume such payments, the bankruptcy court issued a lengthy and important opinion touching on many questions of state sovereignty and supremacy of bankruptcy law, ultimately holding that section 904 of the Bankruptcy Code prohibited the court from granting the requested injunction against the city. In re City of Stockton, 478 B.R. 8 (Bankr. E.D. Cal. 2012). The effect of the court's opinion was to leave the retirees without a remedy, except for negotiating their treatment under the chapter 9 plan of adjustment.

The Stockton and San Bernardino cases are proceeding along parallel but opposite tracks.

In San Bernardino, due to the city's cessation of contributions to CalPERS, both CalPERS and labor groups have objected to the city's chapter 9 petition and argued, among other things, that the city will be incapable of confirming a plan of adjustment that impairs the CalPERS claims. Bondholders and bond insurers have responded in support of the city and in opposition to the CalPERS and labor objections.

In Stockton, due to the city's statement that it will not seek to impair CalPERS (and instead will seek only to impair bondholders and other unsecured creditors), it is the bondholders and bond insurers who have objected to the city's chapter 9 petition, arguing among other things that the city will be unable to confirm a chapter 9 plan of adjustment that does not impair the CalPERS claim. CalPERS has responded in support of the city and in opposition to the bondholders and bond insurers.

The cases likely will produce one or more decisions that touch upon the role and efficacy of state pension and labor law in a chapter 9 case and, when appeals ensue, ultimately may produce circuit-level authority regarding whether or not federal bankruptcy law governs in this context.

~ ~ ~

In Rhode Island, a municipality effectively accorded priority to borrowed money creditors.

Central Falls, Rhode Island filed for chapter 9 protection in August 2011, suffering from structural budget deficits and burdensome/unpayable pension and retiree benefit obligations.

DTMI00128767

# Legacy Creditors – Pensions and OPEB

- Unfunded OPEB and Pension Liabilities Pose Challenges

  ➤ Unfunded OPEB Liabilities Pose the Greater Challenge

- Pensions Have Substantial Underfunding, but Also Significant Plan Assets

  ➤ OPEB is Much Larger and Unfunded
  ➤ Health Premiums Exceed Debt Service on General Obligations

- Equitable Restructuring of Legacy Obligations Possible

  ➤ Fewer Legal Protections for OPEB Than Pensions
  ➤ Pensions Constitutionally Protected, but Reasonable Changes Possible

- *Formulation of Unified Labor Negotiation Strategy Critical to Success*



DTMI00128768

Confidential

38

[Speaker Notes For Slide: 38]

Legacy Creditors (Pensions and OPEB)

Detroit has significant OPEB liabilities and unfunded pension liabilities (i.e., unfunded actuarial accrued liabilities reported as approximately $5.7 billion and $643 million, respectively).
Recent work by Milliman suggests that unfunded pension liabilities are substantially greater than $643 million and may exceed $2 billion.

Given the magnitude of these liabilities, sound and long-term restructuring of Detroit's obligations will require across the board sacrifice from legacy creditors.

As between pension and retiree health (OPEB), OPEB poses the greater liability challenge. Pensions have substantial underfunding, but also significant plan assets; by contrast, there is no funding of OPEB and it is a significant cash drain. The City's annual health premiums far exceed principal and interest payments on general obligations.

Tools are available for an equitable restructuring.
OPEB has less legal protections under state law than pensions, providing a greater ability to cut and equitably restructure.
Pensions have certain state constitutional protections, but reasonable pension changes may be made that avoid the legal strategy of having to argue that federal bankruptcy law under chapter 9 overrides state constitutional protections.

Formulating a unified labor negotiation strategy will be critical to success. The benefit structure should be holistically analyzed to determine what changes are appropriate and necessary and can be rationally justified by other retained benefits.

DTMI00128769

**Confidential**

39

# Potential Pension Reform Initiatives

- Jones Day Has Significant Public and Private Pension Experience

  - ➤ We Know, Respect and Are Prepared to Work with the City's Other Advisors on Benefit Issues
  - ➤ Plan Must Be Developed Collaboratively Between City and Its Advisors

- A Framework for Pension Reform Could Include the Following Elements:

  - ➤ Require All New Employees to Participate in DCPs, Rather than DBPs
  - ➤ Prospectively Eliminate COLAs for active members
  - ➤ Raise Retirement Ages, Reduce Early Retirement Subsidies
  - ➤ Consider Changes to Secondary/Ancillary Features of DBPs

- *We believe that existing basic pension formulas can be preserved for current active members while saving significant sums for Detroit*



Confidential

DTMI00128770

40

[Speaker Notes For Slide: 40]

Potential Pension Reform Initiatives.

We understand that the City has engaged other pension and benefit experts on these issues.
We know, regularly work with and respect the City's other advisors and would look forward to working with them to refine the recommendations to fit within a restructuring or chapter 9 strategy.
We have significant public pension experience, and well know the differences between federally-regulated private sector arrangements and public plans.

We have begun the process of evaluating the pension issues facing the City. Any plan would need to developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for pension could include the following elements:
Require all new employees to participate in defined contribution plans, rather than defined benefits plans.
Prospectively eliminate COLAs for all active members.
Raise retirement ages for certain employees, reduce early retirement subsidies.
Additional changes to secondary and ancillary features of defined benefit pension arrangements.

Proposed changes could allow most existing basic pension formulas to be preserved for current active members while saving significant sums for the City. But legislative action – e.g., amendment to the City Charter and Ordinances – may be necessary to achieve certain of these changes.
If needed, chapter 9 could be used as a means to further cut back or compromise "accrued financial benefits" otherwise protected under the Michigan Constitution.

Confidential

DTMI00128771

# Potential OPEB Reform Initiatives

- Evaluate Benefits of De-linking Retiree Health Plan from Active Employee Health Plan Design and Contribution Structure

- Design of a New Replacement OPEB Plan Could Include the Following:
  - ➤ Increase Retirement Age
  - ➤ Transition Younger Retirees to State-Based Exchanges and Federal Subsidies under Affordable Care Act
  - ➤ Increase Use of the Medicare Programs – Part A, Part B, and Part D
  - ➤ Impose Reasonable Retiree Premiums (For Existing Retirees, Link to COLAs)
  - ➤ Audit Records to Cut Off Funding to Unqualified Dependants
  - ➤ Consider Defined Contribution Model for Future Retirees

- Consider Funding of OPEB through Tax-Exempt Trust

- Evaluate Required Scope of Coverages under City Code

- Be Prepared for Argument that Adverse 6th Circuit Law Applies
  - ➤ 6th Circuit Adverse Cases Involve Private Sector Plans, but Unions Likely Will Argue They Are Applicable Here



Confidential

42

DTMI00128772

[Speaker Notes For Slide: 42]

Potential OPEB Reform Initiatives.

We have begun the process of evaluating the OPEB issues facing the City. Any plan needs to address both the long-term OPEB liability, and the significant annual cost for coverage. This would need to be developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for OPEB obligations could include some or all of the following elements:

The City Should Evaluate "De-Linking" of Benefits Under Retiree Health Plans from Plan Design and Contribution Structure for Active Employees.
Linking OPEB benefits to plan for active employees generates large inefficiencies and costs. It will be more difficult to address the $5.7 billion underfunding of OPEB benefits without severing this link.

Design New Replacement OPEB Plan
Retiree healthcare currently is provided to many younger individuals who are not objectively recognized as retirees. Modifications could increase retirement age to cover only "true" retirees (as opposed to persons in their 40s), to decrease costs and transition younger retirees to state-based exchanges (based on residence) and available federal subsidies under Affordable Care Act.
Better use of the Medicare programs – Part A, Part B, and Part D (drug benefits) to provide the fundamental coverage to true retirees.
Impose reasonable retiree premiums; link retiree premiums to pension COLAs.
Audit records to cut off funding of benefits to ineligible dependents.
Consider defined contribution model for retirees.

Also Consider Funding of OPEB through a Tax Exempt Trust
Available in the non-ERISA, governmental plan setting based on existing IRS guidance (e.g., Private Letter Ruling 201136007; September 9, 2011).
Provides more flexibility than a VEBA, but still need cash or other assets to fund such a trust, so this may not be a viable approach.

Language in the Detroit City Code establishing the OPEB obligations may allow argument that the scope of currently offered coverages is not required.

Also, unlike accrued pension benefits, OPEB obligations are not constitutionally protected.

Must be aware, and wary, of Sixth Circuit law that is favorable to unions/retirees and adverse to actions the City may wish to take.
Much of the most concerning Sixth Circuit law is predicated on federal ERISA and the Labor Management Relations Act (relating to private sector plans), which are inapplicable to municipal plans.
But we should anticipate an argument that this reasoning should be applied as a matter of state law to municipal plans, and the City should be prepared for that.

Chapter 9 could be used, or threatened, as a means to accomplish a compromise of benefit costs (rejecting contracts or compromising claims).

Confidential

43

DTMI00128773

# Labor Issues

- Renegotiation of CBAs Must Focus on Economic Stability

- Immediately Conduct Supporting Financial Analysis

  ➤ Establish Necessary Savings

  ➤ Demonstrate Fair Allocation Between Personnel and Non-Personnel Costs

- Demonstrate a Commitment to the Unions That They Are Partners

  ➤ Demonstrate That Near-Term Sacrifices Provide Long-Term Benefits

- Formulate Easy-to-Understand Messages for Membership/Public

- Consider Need to Amend City Charter and Code, or other Legislative Action, for Pension/OPEB Changes



Confidential

DTMI00128774

44

Labor

Renegotiating collective bargaining agreements to terms that provide economic sustainability will be key to the City's recovery.

Financial analysis must be conducted at the outset – and must be unimpeachable – to show the savings needed and how those necessary savings are being allocated between personnel vs. non-personnel related costs.

Will need to demonstrate a commitment to unions that they are partners in this process and the near term sacrifices will provide longer term benefits to their members (preservation of jobs – a return to financial health for Detroit).

In addition to conveying these economic needs at the bargaining table, we must be prepared to provide simple, easy to understand messaging to the membership and the public.

City charter and ordinances governing pensions may provide an additional hurdle that will need to be overcome via legislative amendment. Renegotiating collective bargaining agreements will not automatically supersede ordinances and charter. There appears to be somewhat more flexibility on the retiree medical expenses, but here too there may be a need for legislative action.

DTMI00128775

# Municipal Debt – Overview of Approach

- **Viable Threat of Chapter 9 is Critical**

  - ➢ **Only Chapter 9 Allows Non-Consensual Impairment of Municipal Debt**

- **Fair Sacrifice Needed from Municipal Debtholders**

  - ➢ **Employees/Retirees Already Sacrificed (and May Again)**
  - ➢ **Investors Accepted City's Credit and Were Compensated for Risk**
  - ➢ **Investors Have Adjusted Credit Terms to Their Benefit as City's Finances Worsened**

- **City Should Make Clear That It is Not Prepared to Dedicate Scarce Resources to Prefer Debtholders over Residents, Businesses and Revenue-Driving Activities**

- **Refinanceable Bond Debt Presents a Unique Opportunity**

  - ➢ **Potential for Advantageous Fixed Rates Over an Extended Term**



46

Confidential

DTMI00128776

Municipal Debt   [Emphasize Jones Day's significant expertise/experience with respect to municipal finance, a core competency that may separate Jones Day from other firms.]

Chapter 9 is only real mechanism to impair significant debt without consent, so the viable threat of chapter 9 is critical especially to deal with municipal debtholders.  This creates real leverage.
Sacrifice by municipal debtholders is important, especially since employees and retirees have already made real personal sacrifices, and may be asked for more.
Providers and investors in funded debt accepted the City's credit and were compensated for the risk.
We are prepared to deal with these parties as creditors of the City in transparent and fair manner.
It should be made clear that the City is not prepared to dedicate scarce  resources to prefer debtholders over residents, businesses and revenue driving activities.
Any effort of General Obligation creditors to obtain the collateral protections of special revenue bonds should be approached with caution.

Different types of debt receive different treatment in municipal bankruptcy cases.
General obligation bonds are treated as general debt in chapter 9.   A municipality is not required to make payments of either principal or interest on account of such bonds during the case.
Certain restrictions on how debt may be readjusted in traditional bankruptcy proceedings do not apply in chapter 9.  Thus, Detroit would be able to impose favorable terms upon general obligation bonds (e.g., the imposition of non market interest; drastically extended repayment terms; delays in cash payments) pursuant to a Plan of Adjustment, the only caveat being that such terms are consistent with State law.
Chapter 9, however, provides certain protections to creditors holding liens upon special project revenues.  This may be of particular importance to Detroit, given the scope of its special project debt (e.g., bonds issued in connection with the construction/overhaul of water and sewer plants, collateralized with the revenues and fees earned by such projects).
Specifically, the "special revenues" from these projects remain subject to the liens of the bondholders in the specific projects and those revenues (1) must be used to fund the "necessary operating expenses" of the special project or to pay back bondholders and (2) may not be diverted to support the general obligations of the municipality.
Defining what constitutes the "necessary operating expenses" of a given special project has been the subject of litigation in other chapter 9 cases (most recently, Jefferson County); courts appear inclined to interpret the phrase narrowly.  The Jefferson County case is for review by the Eleventh Circuit.

With a credible threat of chapter 9, the City has leverage:
Cramdown in chapter 9 is possible if there is one accepting impaired class, meaning that a non-accepting class of debtholders could be bound by the Plan of Adjustment to compromise their debt.
Amortizations of debt suggest that municipal debt holders have been adjusting their credit terms to their benefit as the City's finances have worsened.  This supports a greater sacrifice at this point by debtholders.
This also appears to a readily re-financeable structure, and there is a unique opportunity to obtain advantageous fixed rates for an extended period if the negotiations are conducted properly.

Confidential

DTMI00128777

# Municipal Debt – Other Issues

- Carefully Evaluate POC Debt and Related Swaps
    - ➤ Unique Structure Could Raise Restructuring Issues

- Swap Termination Issues
    - ➤ Termination Rights Generally Protected in Bankruptcy
    - ➤ Recent Grant of Collateral Still Can Be Evaluated for Fraudulent Transfer
    - ➤ Consider Other Market Transactions to Address Swaps

- Engage Monoline Insurers Promptly with Coordinated Message

- Coordinate Funding Solutions with State
    - ➤ State Likely Instrumental in Financing, Revenue-Generating and Cost-Cutting Transactions
    - ➤ Several Recent Examples
    - ➤ Consider Eligibility Ramifications

- Should Pursue Achieving Some Excess Debt Capacity, Flexibility



Confidential

48

DTMI00128778

DTMI00128779

[Speaker Notes For Slide: 48]

Treatment of POC debt and related swaps should be carefully evaluated because the unique structure could raise issues in a restructuring.

Swap counterparties may assert termination rights and must be addressed promptly.
Can build on negotiations that have been ongoing.
Termination rights not impacted by bankruptcy do to safe harbors, but treatment of claims may remain an issue.
Notwithstanding safe harbors, recent granting of collateral on swap debt could be avoidable if there was fraud. LIBOR rate cases may be relevant.
City should consider addressing swaps through market transactions.

For substantial insured debt, the credit insurers will have to be engaged in a meaningful way at the outset.
Jones Day is experienced dealing with monoline insurers with the economic interest relating to insured debt.
Monolines are involved in both bond and POC debt.

Funding solutions should be coordinated with the State, which is expected to be an instrumental party in any new financing transaction or other revenue generating or cost cutting transactions (e.g., Belle Isle lease, regional transportation authority, funding to support Detroit Downtown Development Authority and possible new arena and commercial developments).
Again, receipt of State funding out-of-court may implicate eligibility concerns.

Debt negotiations should account for need for some excess debt capacity to cover potential shortfalls, provide flexibility and, if needed, fund any legacy debt solutions.

**Confidential**

49

# PART V –
# ADDITIONAL PROCESS POINTS

Confidential

50



DTMI00128780

# Pay Careful Attention to Political Implications of Restructuring

- All Decisions and Actions Will Have Political Implications and Consequences

- Political Implications of Proposals Should Be Identified and Vetted as Early as Possible

- Ensure that All Statements Are Consistent with Overall Communications Plan

*The Jones Day team has extensive experience in cases of national significance and understands this imperative.*



Confidential

DTMI00128781

51

[Speaker Notes For Slide: 51]

Every decision and action taken by the City in responding to its financial crises will have political implications and, potentially, political consequences.

Political aspects of all proposed actions have to be identified and vetted as early as possible.

Every statement (including any court filings or arguments in court) must be consistent with an overall communications plan.

Statements made in collective bargaining must be carefully considered. Prospect of negotiation positions and statements being leaked to media outlets is significant.

Must be strong sensitivity to public relations campaigns by various constituencies.

The Jones Day team has extensive experience in cases of national significance and interest and understands these imperatives.

**Confidential**

DTMI00128782

# Understand and Anticipate Positions of Creditors

- Employees/Retirees Will Argue:
  - Obligations Cannot Be Modified as a Matter of Law
  - Modifications Make City Less Attractive to Qualified Job Candidates
  - Continuing Contractual Relationship Should Be Preferred over Debt

- Debtholders/Monoline Insurers Will Argue:
  - Repayment of Debt Essential to Continuing Access to Credit Markets
  - State Has a Moral/Practical Obligation to Ensure Repayment
  - Defer – and Provide Security for – Obligations Instead of Impairment

- City Responses Must Be Reasoned and Consistent

- Concessions Will Not Be Made to Give Any Group an Unfair Advantage

- Critically, New Revenues Must Be Preserved for Reinvestment
  - New Funders Cannot Be Compelled to Accede to Creditor Demands
  - Earmark New Money for Legally/Politically Sound Revitalization Activities



Confidential

DTMI00128783

Anticipated Positions of Creditors:

Municipal employees and their representatives will contend:
Obligations to them cannot be modified as a matter of law.
Obligations to employees should not be modified because the City has to be able to attract job candidates and cannot fall behind pay and benefit packages provided by either nearby municipalities or other unionized businesses.
Obligations to employees do not have to be impaired to the same extent as borrowed money creditors because their claims are connected to contracts that have to continue in effect.

Debt holders and insurers will contend:
Repayment of borrowed money claims is essential to access to financing markets going forward. This argument is used to justify extreme budget austerity and asset sales, whether or not beneficial on a long term basis.
The State of Michigan has a moral or practical obligation to ensure repayment of City debt. This argument is used to attempt to convince the State to contribute State resources to the satisfaction of City debt and to induce the State to pressure the City to make choices favoring debt repayment over other priorities.
Deferral of obligations, even if ability to pay in the future is uncertain or questionable, is a preferred approach to deal with inability to satisfy obligations. Usually this approach is coupled with demands for security that will improve the position of borrowed money creditors in any subsequent debt restructuring.

The City must be prepared to respond to these competing points of view in a reasoned and consistent manner.

Concessions should not be made to one group – such as debtholders – to give them an unfair advantage.

Most critically, as the City gains access to new revenues, it must develop an approach that preserves those revenues for reinvestment in the City and not just to pay off preexisting debts.
As seen in the Chrysler case, new funders or buyers cannot be compelled to accede to creditor demands.
New money may be earmarked for revitalization activities as long as the transaction is legally and politically sound.

DTMI00128784

54

**Confidential**

# Plan of Adjustment Issues

- Enabling Legislation May Be Necessary

  - ➢ <u>E.g.</u>, Authorization of Financing Techniques
  - ➢ Identify and Draft Necessary Legislation Early to Avoid Delays

- Best Interests Test

  - ➢ Demonstrate Reasonable Efforts to Satisfy Debts to the Extent Possible

- Cram Down:  Impose Terms of Plan on Dissenting Creditor Classes

  - ➢ A Municipality Must Raise Taxes to the Extent Possible Without Triggering a "Death Spiral"
  - ➢ Expert Testimony on Tax Burdens May Be Needed

  *It is crucial to focus on the plan approval standards throughout the debt adjustment process in case a Chapter 9 case is required.*



Confidential

55

DTMI00128785

[Speaker Notes For Slide: 55]

Plan of Adjustment

The goal of a chapter 9 filing for Detroit would be to emerge with a successful "Plan of Adjustment," in which the City's debts are reduced and/or restructured in a manner that is feasible given its budget and consistent with its long term revitalization strategy

The Plan of Adjustment is a document that would establish the treatment of the various classes of creditors' claims against Detroit.

Enabling Legislation May Be Necessary

Often, transactions contemplated by or specified in a Plan of Adjustment must be also authorized by legislation.

Examples of such legislation include authorization of financing techniques.

Needed legislation should be identified and drafted as early in the process as possible to avoid delays as bills move their way through the legislature.

Key Confirmation Standards

Best Interests Test

Applicable to all creditors, whether or not the creditor is in a class that has accepted the plan.

As generally applied, requires a troubled municipality to make reasonable efforts under all the circumstances to satisfy its debts to the greatest extent possible. The strategy outlined above should help us support this finding.

Cram Down

Confirmation of a non-consensual plan is possible under chapter 9.

Senior classes must be paid before more junior classes can receive any distribution.

Applied to municipalities with unlimited taxing power, a municipality must use its ability to raise taxes the extent possible without triggering a "death spiral" that would ultimately destroy the municipality.

Traditionally, this question has been determined based upon expert testimony.

Tax burdens in other comparable municipalities should be important as well.

It is crucial to focus on these standards through the debt adjustment process and continuing to build the case that if necessary, the City can confirm a Plan of Adjustment that does not provide for payment in full of all indebtedness.

DTMI00128786

# Any Chapter 9 Process
# Should Be Comprehensive

- Plans of Adjustment Address Narrow Range of Economic Compromises

- Other Fundamental Changes Must Occur Outside the Plan Context

- Any Chapter 9 Process Should Pursue as Many Revitalization Initiatives as Possible

- Negotiating in Chapter 9 – or Its Shadow – Is a Powerful Tool for Revitalization

- The City Should Take Advantage of Its Opportunity for Long-Term, Comprehensive Solutions

DTMI00128787

Confidential



JONES DAY®

[Speaker Notes For Slide: 57]

Any Chapter 9 Process Should Be Comprehensive

A chapter 9 Plan of Adjustment can only accomplish a narrow band of economic compromises.

This type of debt restructuring is critical, but other fundamental changes of great importance can only occur outside of the Plan of Adjustment.

If a chapter 9 case is commenced, the City should use the process to address as many additional items as possible, not just the core debt readjustment issues in a Plan of Adjustment.

Negotiating in the chapter 9 environment – or even in the shadow of chapter 9 – is a powerful tool to pursue the City's revitalization agenda.

DTMI00128788

Confidential

58

13-53846-swr   Doc 2379-1   Filed 01/08/14   Entered 01/08/14 17:51:50   Page 59 of 76
13-53846-tjt   Doc 13579-1   Filed 11/08/24   Entered 11/08/13 16:58:49   Page 41 of
119

# Key Restructuring Lessons

- **Develop Comprehensive Plan, Supported by Defensible Budget and Assumptions**

- **Develop Out-of-Court Approach That Translates to Chapter 9**

- **Set Clear Positions Early**

- **Be Inclusive and Communicate**

- **Pursue Shared Sacrifice Without Compromising Long-Term Revitalization Goals**

**Confidential**

59



DTMI00128789

[Speaker Notes For Slide: 59]

Key Restructuring Lessons

Develop comprehensive plan, supported by defensible budget and assumptions.

Develop out-of-court approach that will work if needed in chapter 9.

Set positions early.

Be inclusive and communicate.

Pursue shared sacrifice without compromising long-term revitalization goals.

**Confidential**

DTM00128790

13-53846-swr   Doc 2379-1   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 43 of 76
13-53846-swr   Doc 1537-1   Filed 11/06/13   Entered 11/06/13 16:56:49   Page 61 of 76
119

# P<span>ART</span> VI – O<span>THER</span> I<span>SSUES</span>

DTMI00128791

Confidential



# Select Asset Monetization Issues

- **Evaluate Impact of Any Asset Sale on Chapter 9 Eligibility**

- **Water and Sewer**
  - ➤ **Various Legal and Practical Challenges Facing Monetization of DWSD Assets**
  - ➤ **Regional Stakeholders Will Seek Input**
  - ➤ **Consider Collaboration with EPA and Regional Partners to Develop Creative Solutions**

- **Lease/Operating Agreements**
  - ➤ **Could Evaluate for Airport or Other Assets**
  - ➤ **Recent Collaborations with State Could Be a Model**

- **Airport Privatization Under FAA Pilot Program**



**Confidential**

DTMI00128792

62

13-53846-swr   Doc 2379-1   Filed 01/09/14   Entered 01/09/14 17:41:50   Page 45 of 76
13-53846-swr   Doc 1557-1   Filed 11/06/13   Entered 11/06/13 16:58:49   Page 65 of 124
119

[Speaker Notes For Slide: 62]

Asset Sale/Privatization/Monetization Issues (Select Issues)
Concerns regarding eligibility for Chapter 9 may be implicated by asset monetization.
Any transaction should be reviewed and structured to address any eligibility issues (e.g., earmarking of funds).

Water and Sewer
Detroit Water and Sewer Department services much of southeast Michigan (Wayne, Oakland, Macomb counties).
Much of the DWSD's infrastructure is owned and operated by these surrounding counties (and the communities located therein), complicating efforts at restructuring.
DWSD services nearly 100 "first-tier" and "second-tier" customers (e.g., from the surrounding counties), all of whom would seek input with respect to restructuring.

Monetization of assets could be challenging.
The Detroit City Charter prohibits the sale of "any city-owned public utility furnishing water and sewerage services, unless approved by a majority of city voters voting on the question at a regular or special election."
Statutes/codes/caselaw may require that funds received from disposition be allocated (e.g., to pension/OPEB liabilities) in a fashion that frustrates ability to allocate funds towards restructuring initiatives.
Monetization of assets may trigger consequences under existing debt and derivative documents.
Open question whether limited universe of "purchasers" could assume liabilities.
An emergency manager, a chapter 9 proceeding or changes to law could be required to overcome obstacles.

Consider different rate structures, regional authority.

EPA litigation complicates the circumstances.

Possibly could explore with EPA and other recipients of services how to make this self-sustaining and profitable.

Negotiating in the shadow of bankruptcy could provide useful leverage for creative solutions.

Combination Lease/Operating Agreement
Could be used for airport or other assets.
The proposed Belle Isle lease may be a model for this kind of transaction.
With respect to the Coleman Young airport, for example, Detroit could evaluate entering into an arrangement combining a lease of airport property with an airfield operating agreement, with the end result being similar to the transfer of possession and operating responsibility to a private operator while falling short of a full lease of the airport.
Under this model, Detroit would remain responsible for major operating and development decisions, but the burden of operating the airport on a daily basis would be alleviated.
Might be more attractive to airport than FAA pilot program to sell asset that we can discuss (comes with various conditions).

Airport Privatization Under FAA Pilot Program [De-emphasize in light of potential unavailability of program]
Privatization of Detroit airports historically impeded by federal aviation law preventing cities from retaining the proceeds of an airport sale or transfer.
A recent FAA pilot program – adopted by Congress in 1996 – for the privatization of airports, however, may allow Detroit to privatize an airport freed from federal restrictions on the use of proceeds.
Program recently used to sell Midway Airport, with cash value going to the City of Chicago
Under the program, the FAA is authorized to exempt up to ten airports from the relevant federal statutory and regulatory requirements (i.e., to repay Federal grants; return

DTMI00128793

# Prepare for Legal Challenges

- In a Chapter 9 Setting, Legal Challenges of Various Actions Are Inevitable

  - ➢ Jones Day Is Well Positioned to Address These Challenges
  - ➢ Substantial 6th Circuit Experience
  - ➢ Knows How to Expedite Review

- Various Challenges to PA 436/Emergency Manager Authority Possible

  - ➢ Challenges at Ballot Box: Renewed Referendum Process
  - ➢ Other Legal Challenges in Court
  - ➢ Challenges Could Cause Delay, Threaten Progress
  - ➢ Jones Day Can Work With the City's Current Advisors to Address Efficiently

JONES DAY

Confidential

DTMI00128794

Prepare for Legal Challenges

If a chapter 9 case is commenced, it is anticipated that parties will to raise numerous legal challenges to the City's efforts.
Jones Day is well prepared and positioned to address these challenges.
We have substantial 6th Circuit experience.
Also know how to expedite proceedings.

The City also should be prepared to address expected challenges to PA 436 and the Authority of any Emergency Manager.
These challenges could delay restructuring initiatives or threaten to overturn progress made under these authorities.

Challenges could include:
Challenges at Ballot Box. Critics of PA 436 have already indicated that legal challenges to the law will be forthcoming. Stand Up for Democracy (which led the effort to reject PA 4) has suggested that it will begin a similar referendum process with respect to PA 436 (although appropriation component of PA 436 may insulate it).
Legal Challenges. Critics of PA 436 are likely to challenge the statute on grounds that the powers over contracts granted to emergency managers (including the power to reject, modify or terminate CBAs) violate the Contracts Clause of the U.S. Constitution.
Further challenges could include (1) whether PA 436 can be insulated from the referendum process through inclusion of a minor appropriation, (2) whether the law properly grants unelected emergency managers the power to displace elected officials/disenfranchise the electorate and (3) whether PA 436 was properly enacted in light of the voter rejection of PA 4 (which has been characterized by some as "substantially similar").

DTMI00128795

# EPA Litigation Issues

- **Restructuring Strategy Must Account for EPA Litigation and Rulings of Judge Cox**

- **Consider Approaches to Consolidate Issues with the Rest of the Restructuring Process**

- **Consider How EPA Litigation Could Impede or Assist Detroit in Chapter 9**

DTMI00128796

Confidential

66



[Speaker Notes For Slide: 66]

Other EPA Litigation Issues

Need to coordinate strategy with relevant aspects of EPA litigation, including rulings regarding CBAs and bargaining

Consider approaches to consolidate these discrete issue with the rest of the restructuring process.

Consider how EPA case could impede or be used to assist in any chapter 9 case.

DTMI00128797

**Confidential**

67

13-53846-swr   Doc 2379-1   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 50 of 76
13-53846-swr   Doc 1557-1   Filed 11/06/13   Entered 11/06/13 16:56:49   Page 68 of 76
119

# Part VII – Conclusion

Confidential



DTMI00128798

13-53846-swr   Doc 2379-1   Filed 01/09/14   Entered 01/09/14 17:41:50   Page 51 of 76
13-53846-swr   Doc 1537-1   Filed 11/06/13   Entered 11/06/13 16:58:49   Page 59 of 76
119

# Jones Day Is the Right Choice for Detroit

- We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots

- We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit

- We have a wealth of experience, expertise, creativity and energy throughout our firm

- We are here to help, as part of the team, in whatever way we can

DTMI00128799

Confidential

69



13-53846-swr    Doc 2337-1    Filed 01/09/14    Entered 01/09/14 17:41:50    Page 52 of 76
13-53846-swr    Doc 1557-1    Filed 11/06/13    Entered 11/06/13 16:58:49    Page 70 of 25
119

[Speaker Notes For Slide: 69]

Jones Day Is the Right Choice for Detroit:

We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots.

We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit.

We have a wealth of experience, expertise, creativity and energy throughout our firm.

We are here to help, as part of the team, in whatever way we can.

**Confidential**

DTMI00128800

# ANNEX A:
# THE REST OF THE JONES DAY TEAM

DTMI00128801

Confidential

71

13-53846-swr   Doc 2379-1   Filed 01/09/14   Entered 01/09/14 17:41:50   Page 54 of 76
13-53846-swr   Doc 1557-1   Filed 11/06/13   Entered 11/06/13 16:58:49   Page 54 of 76
119



# The Jones Day Team



**Jeffrey Ellman**

Restructuring



**Evan Miller**

Employee Benefits



**Sarah Heck Griffin**

Public Pensions



**David Kates**

Public Finance



**Brian Sedlak**

Public Projects
& Infrastructure



**Peter Clarke**

Public Projects
& Infrastructure



**Rebecca MacPherson**

Public Projects
& Infrastructure



**Naveen Rao**

Public Projects
& Infrastructure

DTMI00128802

Confidential



13-53846-swr   Doc 2379-1   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 55 of 76
13-53846-swr   Doc 1537-1   Filed 11/06/13   Entered 11/06/13 16:56:49   Page 73 of 76
119

# The Jones Day Team



**Robert Louis Ford**

Labor



**Lawrence DiNardo**

Labor



**Wesley Johnson, Jr.**

Mergers & Acquisitions



**Beth Heifetz**

Issues & Appeals



**Richard Deane**

Litigation



**Yvette McGee Brown**

Litigation



**Jayant Tambe**

Litigation



**Chad Readler**

Litigation



DTMI00128803

Confidential

# A<u>NNEX</u> B:
# C<u>ERTAIN</u> R<u>EFERENCES</u>

Confidential



DTMI00128804

# References

The Honorable John E. Ryan (Retired)
United States Bankruptcy Court for the Central District of California
760-522-6016

Thomas W. Hayes
Former Treasurer and Director of Finance, State of California
916-806-6200

Chris Varelas
Founding Partner, Riverwood Capital
650-618-7377

DTMI00128805

Confidential

75



# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Debtor.

_____/

Case No. 13-53846

In Proceedings Under
Chapter 9

Hon. Steven W. Rhodes

# JOINDER OF AMBAC ASSURANCE CORPORATION
## IN THE LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION

Ambac Assurance Corporation ("Ambac"), a creditor and party in interest in the above-captioned case,[1] by and through its undersigned counsel, hereby joins in the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction [Docket No. 1557] (the "Limited Objection"). In support of this joinder, Ambac adopts and incorporates the arguments in the Limited Objection in their entirety as if fully set forth in this joinder.

_____

[1] Ambac is a creditor and party in interest as it is the bond insurer of certain of the City's general obligation bonds. Specifically, Ambac insures approximately $170,000,000 of the City's general obligation bonds. As bond insurer, Ambac is obligated to pay to bondholders the full scheduled principal of and interest on the insured bonds when due as required by its bond insurance policy to the extent the City does not satisfy such obligations under the insured bonds. Under relevant provisions of the applicable bond documents, insurance policies, and applicable law, to the extent Ambac makes payments under its policies, it is subrogated to the rights of bondholders and effectively steps into the shoes of the bondholders.

WHEREFORE, for the reasons set forth in the Limited Objection, Ambac respectfully requests that the Court (i) grant the relief requested in the Limited Objection, and (ii) grant such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

**ARENT FOX LLP**

Dated:  November 7, 2013

By:  /s/ Carol Connor Cohen
CAROL CONNOR COHEN
CAROLINE TURNER ENGLISH
1717 K Street, NW
Washington, DC  20036-5342
(202) 857-6054
Carol.Cohen@arentfox.com

DAVID L. DUBROW
MARK A. ANGELOV
1675 Broadway
New York, NY 10019
(212) 484-3900

and

**SCHAFER AND WEINER, PLLC**

DANIEL J. WEINER (P32010)
BRENDAN G. BEST (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
bbest@schaferandweiner.com

*Counsel for Ambac Assurance Corporation*

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## JOINDER OF THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES TO THE LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION

Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") through its counsel, hereby joins in the limited objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. ("**Syncora**") dated November 6, 2013 [Docket No. 1557] (the "**Limited Objection**") to the Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction [Docket No. 1341] (the "**Motion**"). AFSCME respectfully adopts and incorporates the arguments of Syncora set forth in the Limited Objection and further respectfully states as follows:

1. While AFSCME has no *per se* objection to the City seeking to address its problem with street lights for the safety and benefit of all of the City's residents, AFSCME Is particularly concerned given the apparent bare bones disclosures in the Motion and further concerns set forth at length by Syncora, including that (i) 27% of the amount of the proposed bond funding (representing approximately $192 million of the $705 million financial

commitment in the transactions proposed in the Motion) will be utilized to simply finance the transaction; (ii) the City previously anticipated spending a total of approximately $1.7 million on public lighting capital improvements in the June 14, 2013 Creditors Proposal (and yet now seeks to enter into an approximately $705 million financial commitment); and (iii) the City will be locking up millions of dollars a year in utility tax revenues **for 30 years** to finance the transactions.

2.      The pledge **now** of these critical revenue streams, when viewed in conjunction with revenues potentially being pledged by the City in its recently filed Postpetition Financing Motion [Docket No. 1520], could better be utilized to help revitalize the City and at the same time provide for a more meaningful recovery to all creditors, including the City's active and retired employees. At minimum, in a case such as this, the City has not explained or demonstrated why significant pledges of the City's limited revenue streams should be pursued at this juncture as opposed to at a later date at which time all interested parties may be in the process of negotiating and formulating a comprehensive plan of adjustment.

WHEREFORE, for the reasons set forth in the Limited Objection, AFSCME respectfully requests that the Court deny the Motion and grant such other and further relief as the Court may deem just and proper.

Dated: November 8, 2013

                                LOWENSTEIN SANDLER LLP
                                By: /s/ *Sharon L. Levine*
                                Sharon L. Levine, Esq.
                                John K. Sherwood, Esq.
                                Philip J. Gross, Esq.
                                Keara M. Waldron, Esq.
                                65 Livingston Avenue
                                Roseland, New Jersey 07068
                                (973) 597-2500 (Telephone)
                                (973) 597-6247 (Facsimile)
                                slevine@lowenstein.com

-2-

13-53846-tjt   Doc 2370-4   Filed 01/08/14   Entered 01/08/14 17:44:10   Page 62 of
13-53846-swr   Doc 1603   Filed 11/08/13   Entered 11/08/13 14:46:10   Page 62 of 4
119
262

jsherwood@lowenstein.com
pgross@lowenstein.com
kwaldron@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

-3-

13-53846-tjr   Doc 2360-1   Filed 01/08/14   Entered 01/08/14 17:44:10   Page 63 of
13-53846-swr   Doc 1603   Filed 01/08/14   Entered 01/08/14 14:46:50   Page 63 of 4
119                                                                         263

In re:                                         )          Chapter 9
                                               )
CITY OF DETROIT, MICHIGAN,                     )          Case No. 13-53846
                                               )
                            Debtor.            )          Hon. Steven W. Rhodes
                                               )

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 11, 2013, *Joinder of the Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees to the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to the Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:    November 8, 2013                     */s/ Lisa M. Bonito*
                                               Lisa M. Bonito
                                               **LOWENSTEIN SANDLER LLP**
                                               65 Livingston Avenue
                                               Roseland, New Jersey 07068
                                               (973) 597-2500 (Telephone)
                                               lbonito@lowenstein.com

28579/2
11/08/2013 27406111.1

13-53846-swr   Doc 2370-4   Filed 01/08/14   Entered 01/08/14 17:44:50   Page 64 of 4
13-53846-swr   Doc 1603   Filed 11/08/13   Entered 11/08/13 14:43:10   Page 64 of 4
119
264

|  |  |
|---|---|
| In re | ) |
| | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) |
| | ) Case No. 13-53846 |
| Debtor. | ) |
| | ) Hon. Steven W. Rhodes |
| | ) |

## JOINDER OF FMS WERTMANAGEMENT AöR TO THE LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION

FMS Wertmanagement AöR ("**FMS**") through its counsel, hereby joins (the "**Joinder**") in the limited objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. ("**Syncora**") dated November 6, 2013 [Dkt. No. 1557] (the "**Limited Objection**") to the Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction [Dkt. No. 1341] (the "**Motion**")[1].  In support of this Joinder, FMS respectfully states the following:

1.     FMS asserts the arguments set forth in the Limited Objection and incorporates those paragraphs as if fully set forth herein.

2.     The City is seeking this Court's authority to enter into the PLA Transaction, with the goal of improving the City's public lighting system.  Unfortunately, the City's Motion fails to provide its creditors and other parties in interest in this Case with sufficient information to evaluate this Motion on its merits.  Without more fulsome disclosures, FMS cannot decipher if this Motion is in the City's best interest, let alone the best interest of the City's creditors and citizens.

---

[1] Capitalized terms used in this Joinder but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

3.      As the Limited Objection states in more detail, it is premature for the City to pursue public reinvestment initiatives which are better addressed during and through a plan of adjustment.

WHEREFORE, for the reasons set forth in the Limited Objection and this Joinder, FMS respectfully requests that the Court deny the motion and grant such other and further relief as may be just and proper.

Dated: November 8, 2013                    Respectfully submitted,

                                           **SCHIFF HARDIN LLP**

                           By:    */s/ Karen V. Newbury*
                                  Rick L. Frimmer
                                  Karen V. Newbury
                                  Michael W. Ott
                                  SCHIFF HARDIN LLP
                                  233 South Wacker Drive
                                  Suite 6600
                                  Chicago, IL 60606
                                  Tel. 312-258-5500
                                  Fax. 312-258-6500
                                  Rfrimmer@schiffhardin.com
                                  knewbury@schiffhardin.com
                                  mott@schiffhardin.com

                                  *Attorneys for FMS Wertmanagement AöR*

13-53846-swr   Doc 2379-5   Filed 01/08/14   Entered 01/08/14 17:41:50   Page 26 of 2
13-53846-tjt   Doc 2161-5   Filed 01/08/14   Entered 01/08/14 18:49:54   Page 26 of 2
119

266

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (Southern Division)

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) | |
| | ) | Case No. 13-53846-swr |
| Debtor. | ) | |
| | ) | Hon. Steven W. Rhodes |
| | ) | |
| _____ | ) | Re: Docket Nos. 1341 & 1557 |

**JOINDER OF HYPOTHEKENBANK FRANKFURT AG, HYPOTHEKENBANK FRANKFURT INTERNATIONAL S.A., AND ERSTE EUROPAISCHE PFANDBRIEF- UND KOMMUNALKREDITBANK AKTIENGESELLSCHAFT IN LUXEMBURG S.A. IN THE LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE, INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION**

Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively "EEPK"), by its undersigned attorneys, hereby joins in the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance, Inc. (Docket No. 1557) (the "Syncora Objection"), to Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction (Docket No. 1341) (the "Motion").

Accordingly, for the reasons set forth in the Syncora Objection, EEPK requests that this Court deny the Motion and grant it such other and further relief as is just and proper.

1

267

Dated: November 11, 2013.　　　　　　　　/s/ Matthew G. Summers

Matthew G. Summers, Esquire
Ballard Spahr LLP
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Telephone:  (302) 252-4428
Facsimile:  (302) 252-4466
E-mail: summersm@ballardspahr.com

Vincent J. Marriott, III, Esquire
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Tel:  (215) 864-8236
Fax: (215) 864-9762
E-mail: marriott@ballardspahr.com

-and-

Howard S. Sher, Esquire
Jacob & Weingarten, P.C.
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Tel:  (248) 649-1200
Fax:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

*Attorneys for Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.*

2

**<u>CERTIFICATE OF SERVICE</u>**

I, Matthew G. Summers, state that on November 11, 2013, I filed a copy of the foregoing Joinder in the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance, Inc. to Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction of with the Clerk of Court using the Court's ECF system and I hereby certify that the Court's ECF system has served all registered users that have appeared in the above-captioned case. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ Matthew G. Summers
Matthew G. Summers
E-mail: summersm@ballardspahr.com

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|                                   |     |                          |
|-----------------------------------|-----|--------------------------|
|                                   | )   |                          |
| In re                             | )   | Chapter 9                |
|                                   | )   |                          |
| CITY OF DETROIT, MICHIGAN,        | )   | Case No. 13-53846        |
|                                   | )   |                          |
|     Debtor.   | )   | Hon. Steven W. Rhodes    |
|                                   | )   |                          |

## MOTION OF THE OBJECTORS FOR (I) CLARIFICATION REGARDING THE PURPOSE OF THE HEARING FOR DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND GRANTING OTHER RELATED RELIEF AND (II) LEAVE TO CONDUCT LIMITED DISCOVERY

The Objectors[1] submit this motion for (i) clarification of the purpose of the hearing set for *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief* [Docket No. 1341] (the "PLA Motion"); and (ii) leave to conduct limited discovery relating to the PLA Motion pursuant to Local Rule 7026-3 of the United States Bankruptcy Court of the Eastern District of Michigan. In support of this motion, the Objectors respectfully represent as follows:

---

[1] Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"), Ambac Assurance Corporation, and Michigan Counsel 25 of the American Federation of State, County and Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees join in this motion.

## **BACKGROUND**

1.     On October 23, 2013, the City of Detroit (the "City") filed a motion requesting authorization pursuant to section 364(c) of the Bankruptcy Code to pledge approximately $12.5 million of its annual utility tax revenues to secure the Public Lighting Authority's (the "PLA") issuance of approximately $153 million of debt to fund the City's public lighting system upgrade (the "PLA Transaction"). (PLA Mot. ¶ 17).  The PLA Motion also requests that the Court find that the PLA Transaction constitutes a "good faith" financing transaction under section 364(e) of the Bankruptcy Code.  (*Id.*)

2.     The transaction structure, broadly, is as follows: the Michigan Finance Authority (the "MFA") first issues certain bonds ("MFA Bonds") to third party lenders.  (PLA Mot. ¶ 6.)  The proceeds from this sale are then used to purchase approximately $153 million of bonds issued by the PLA pursuant to Act 392 (the "Act 392 Bonds").  (PLA Mot. ¶ 6.)  The City, in turn, pledges to the trustee for the Act 392 Bonds the lesser of (a) $12.5 million and (b) the total revenues generated by a utility tax which the City continues to levy pursuant to MCL §§ 141.1151 to 141.1177 ("Act 100").  This pledge is provided pursuant to a trust agreement and Act 392.  It requires the transfer of all of the City's right, title, and interest in the utility tax to the trustee for the Act 392 Bonds and is the primary source for repayment of the Act 392 bonds.  (PLA Mot. ¶ 7.)  The lighting improvements will

13-53846-swr   Doc 2879-4   Filed 11/12/13   Entered 11/12/13 20:36:35   Page 27 of 93
119
13-53846-swr   Doc 2384   Filed 01/03/14   Entered 01/03/14 07:41:50   Page 27 of 93   271

be financed with the proceeds from a $60 million "bridge loan," and subsequently the Act 392 bonds.  (Ex. 6.1 to PLA Mot. p 22.)

3.     The financing is intended to support a short term and long term plan for implementation, which is described on two pages of the Public Authority Lighting Plan in general terms.  (Ex. 6.1 to PLA Mot. pp. 23–24.)  The operation and maintenance of the City's lighting infrastructure is the subject of an operations and maintenance agreement ("O&M Agreement") over which negotiations have not yet begun.  (Ex. 6.1 to PLA Mot. p 22.)  The City's Lighting Plan states that it anticipates that it will pay for operations, maintenance, and PLA administrative costs with $11–12 million a year from the City's General Fund.[2]  (*Id.*)

4.     The City claims that the PLA Transaction is necessary "to finance the cost to construct, improve, enlarge, reduce or extend the City's Public Lighting System for the benefit of the City."  (PLA Mot. ¶ 6.)  The City also suggests that "it is well known that the City and its residents suffer from the City's inability to maintain the street light system," and as such the PLA Transaction represents the "best (and perhaps only) opportunity to remedy this public safety concern."  (PLA Mot. ¶ 21.)

5.     The PLA Transaction is a large transaction that may adversely affect the position of creditors of the City because it contemplates the diversion of a

---

[2]     However, the proposed O&M Agreement itself caps the City's general fund contribution to $8,024,000.  (Ex. 6.2 to DIP Mot. p 8.)

significant source of the City's revenues. For this reason and others, Syncora has submitted its Limited Objection to the PLA Motion which explains the numerous concerns regarding the PLA Transaction [Doc. No. 1557]. As of the filing of this motion, Ambac Assurance Corporation, FMS Wertmanagement AöR, Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("AFSCME"), and Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively "EEPK") (collectively, the "Objectors") have joined in Syncora's Limited Objection.

6.     The Court issued a Notice of Hearing regarding the PLA Motion [Doc. No. 1579] setting a hearing date for the PLA Motion for November 27, 2013. There is no indication of whether this hearing will be evidentiary in nature. The Objectors now bring this motion to clarify the purpose of the November 27 hearing and to seek leave to conduct limited discovery related to the PLA Transaction.

## **JURISDICTION**

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The Objectors respectfully requests the entry of an order substantially in the form attached hereto as <u>Exhibit 1</u> (i) clarifying the purpose of the hearing on the PLA Motion and (ii) granting the Objectors leave to conduct limited discovery relating to the PLA Motion.

**BASIS FOR RELIEF**

**A.      Clarification of the Purpose of the Hearing on the PLA Motion**

9.      The hearing on the PLA Motion was set by this Court for November 27, 2013 [Doc. No. 1579].   However, there is no indication whether this hearing will be evidentiary in nature.  The Objectors believe they will be prejudiced in their ability to participate in a comprehensive hearing on the PLA Motion if the hearing is held prior to their ability to conduct discovery with respect to the PLA Transaction.  Accordingly, the Objectors respectfully request that the Court clarify the purpose of the November 27, 2013 hearing.

**B.      The Objectors' Request for Leave to Seek Limited Discovery Relating to the PLA Motion.**

10.      Local Bankruptcy Rule 7026-3 states that "[d]iscovery in a contested matter is permitted only upon a court order for cause shown."  E.D. Mich. LBR 7026-3.  The Objectors submit that, in this case, good cause exists for limited discovery surrounding the PLA Motion.

11.    Courts consider the following factors to determine whether the terms of a postpetition financing transaction under section 364 of the Bankruptcy Code are appropriate: (a) whether the proposed transaction is an exercise of the debtor's reasonable business judgment; (b) whether alternative financing is available on any other basis; (c) whether the proposed transaction is in the best interests of both the estate and its creditors; (d) whether any better offers, bids, or timely proposals are before the court; (e) whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business; (f) whether the terms of the proposed financing are fair, reasonable, and adequate given the circumstances; and (g) whether the proposed transaction was negotiated in good faith and at arm's length.    *In re Farmland Industries, Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003).    Discovery is necessary in order to competently assess whether the PLA Transaction meets these requirements.

12.    *First*, the Objectors and other creditors have little to no substantive information regarding the negotiation and structuring of the PLA Transaction.  The City seeks to secure an order that provides that section 364(e) of the Bankruptcy Code, which states that the negotiations related to this transaction were the result of good faith, arm's length negotiations, applies to and protects the PLA Transaction.  (Ex. 1 to PLA Mot. ¶ E.)  The City states it needs this determination in order to secure financing from MFA bond buyers in the face of potential appeal

13-53846-swr   Doc 2073-4   Filed 11/19/13   Entered 11/19/13 20:36:35   Page 75 of 93
13-53846-tjt   Doc 2393   Filed 01/03/14   Entered 01/03/14 07:41:50   Page 67 of 93    275
119

of any potential Court order. (PLA Mot. ¶ 25.) However, the PLA Motion does not provide any meaningful information regarding the negotiations among the PLA, MFA, City, and prospective purchasers. Discovery is required to assess whether the negotiations of the PLA Transactions were conducted in good faith.

13. *Second*, the City does not explain in the PLA Motion whether it entertained alternate lighting or financing proposals or whether any alternative proposals existed. The City claims that PLA Transaction was the "best (and perhaps only) opportunity" to address the City's lighting concerns. (PLA Mot. ¶ 21.) However, it does not specify any alternative proposals it entertained or why the PLA Transaction is superior to other proposals. Discovery is required to assess whether the PLA Transaction was in fact the best opportunity to address the City's concerns.

14. *Third,* the PLA Motion does not specify the basis for the necessity of the PLA Transaction or nature of the relationship between the PLA Transaction and the City's other initiatives or crime problems. In fact, the City does not provide any detailed information regarding the costs and benefits associated with its plan for the City's lighting or the ultimate scope of the improvements to be made using the proceeds of the PLA Transaction. In order to assess the necessity of the transaction, and consequently the PLA Transaction's value to the City, its

7

13-53846-swr   Doc 2073-4   Filed 11/19/13   Entered 11/19/13 20:36:35   Page 76 of 93
13-53846-swr   Doc 2084   Filed 01/03/14   Entered 01/03/14 07:41:50   Page 76 of 93
119
276

creditors, and other stakeholders, discovery regarding the City's plan and objectives for the use of the PLA Transaction's proceeds is required.

15.     *Fourth,* the PLA Motion and exhibits are unclear as to the actual cost of and other relevant details of the PLA Transaction.  For instance, the PLA Motion does not disclose the amount of borrowing or the interest rate.  The Lighting Plan states that the borrowing will be $153 million and the budget attached to the plan contemplates an approximately 7.5% interest rate.  (App. G to Ex. 6.1 to DIP Mot. p 2.)    However, neither makes clear whether these amounts are contemplated based on the lighting needs or the contemplated permitted debt service payments.  Further, the City's Proposal to Creditors contemplated that any PLA plan would move operations and maintenance costs to the Public Lighting Authority.  (*See* Ex. B to Dec. of Kevyn D. Orr p 43[Doc. No. 11].)  However, the documents are unclear as to the City's full continuing contribution.  The O&M Agreement indicates that the City will not pay more than approximately $8 million for operational and maintenance costs.  (Ex. 6.2 to DIP Mot. p 8.)  However, the Lighting Plan contemplates this amount to be between $11 and $12 million, (Ex. 6.1 to PLA Mot. p 22), and this payment is not included as a source of revenues in the Plan's budget.  (App. G to Ex. 6.1 to DIP Mot. p 2.)  Consequently, discovery is needed to clarify the details of the City's plan and the costs of the PLA Transaction.

16.    Given the limited information that is currently available to the Objectors on these issues, the Objectors request leave to seek limited discovery on topics such as the following:

(a) The process and analysis surrounding the PLA Transaction;

(b) The PLA Transaction's compliance with PA 436 and PA 392;

(c) The current lighting outages affecting the City and the necessity of fixing the lighting system;

(d) The intended use of the proposed proceeds of the PLA Transaction.

The Objectors may also request depositions of:

(a) Odis Jones, the Executive Director of the Public Lighting Authority;

(b) Parties that structured and negotiated the PLA Transaction on behalf of the City, the PLA, and the Michigan Finance Authority.

## STATEMENT OF CONCURRENCE SOUGHT

17.    Local Bankruptcy Rule 9014-1 provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied."  Local Rule 9014-1(g).

18.    Counsel for Syncora sought concurrence from opposing counsel for the relief requested in this motion on November 11, 2013.  Counsel for the City agreed that the Objectors were entitled to certain discovery regarding the PLA

9

13-53846-swr   Doc 2079-4   Filed 11/19/13   Entered 11/19/13 20:36:35   Page 78 of 93
13-53846-swr   Doc 2084   Filed 11/19/13   Entered 11/19/13 20:41:50   Page 78 of 93   278
119

Motion.  Specifically, counsel for the City stated that it had no objection to the discovery regarding the process and negotiation of the PLA Transaction.  The City also stated that it would not move to quash or object to any of the Objectors' proposed depositions.

19.    However, counsel for the City stated that the City would object to any discovery relating to the City's need for, and intended use of, the PLA transaction proceeds.  According to the City's counsel, information relating to the City's need for, and intended use of, the PLA transaction proceeds is irrelevant and not something that the Court can consider.

## RESERVATION OF RIGHTS

20.    The Objectors file this motion without prejudice or waiver of its rights under the Bankruptcy Code.


WHEREFORE, the Objectors respectfully request that this Court (a) enter an order substantially in the form attached hereto as Exhibit 1, granting the relief sought herein; and (b) grant such other and further relief as the Court may deem proper.

[*Remainder of this page intentionally left blank.*]

| Dated: November 11, 2013 | /s/ *Stephen C. Hackney* |
|---|---|

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By:  /s/ *Carol Connor Cohen*
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

11

13-53846-tjt   Doc 2379-4   Filed 01/03/14   Entered 01/03/14 20:36:35   Page 80 of
13-53846-swr   Doc 1808   Filed 11/21/13   Entered 11/21/13 20:36:35   Page 11 of 13   280
119

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

**LOWENSTEIN SANDLER LLP**
By: */s/ Sharon L. Levine*
Sharon L. Levine, Esq.
John K. Sherwood, Esq.
Philip J. Gross, Esq.
Keara M. Waldron, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
jsherwood@lowenstein.com
pgross@lowenstein.com
kwaldron@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

12

13-53846-tjt   Doc 2379-4   Filed 01/03/14   Entered 01/03/14 20:34:50   Page 81 of
13-53846-swr   Doc 1808   Filed 11/11/13   Entered 11/11/13 20:36:35   Page 12 of 13   281
119

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

## SUMMARY OF ATTACHMENTS

Exhibit 1     Proposed Form of Order

Exhibit 2     Notice of Motion and Opportunity to Object

Exhibit 3     None [Brief not required]

Exhibit 4     None [Separate Certificate of Service to be Filed]

Exhibit 5     None

Exhibit 6     None

**<u>Exhibit 1</u>**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER (I) CLARIFYING THE PURPOSE OF THE HEARING FOR THE MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND GRANTING OTHER RELATED RELIEF AND (II) GRANTING LEAVE TO CONDUCT LIMITED DISCOVERY

This matter coming before the Court on the motion of the Objectors[1] clarifying the purpose of the hearing for the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief* [Docket No. 1341] (the "PLA Motion") and entering an order granting leave to conduct limited discovery relating to the PLA Motion; the Court having reviewed the Objectors' Motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Objectors' motion.

13-53846-swr Doc 2373-2 Filed 01/03/14 Entered 01/03/14 17:46:58 Page 85 of 3
13-53846-swr Doc 1678-2 Filed 11/11/13 Entered 11/11/13 20:36:58 Page 5 of 9
119   285

1.      The Objectors' motion is GRANTED.

2.      Good cause exists for the Objectors to conduct limited discovery relating to the PLA Motion.  The Objectors may now commence discovery.

3.      The Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____

STEVEN W. RHODES
United States Bankruptcy
Judge

2
119

13-53846-swr   Doc 2373-2   Filed 01/03/14   Entered 01/03/14 17:41:58   Page 86 of 3
13-53846-tjt   Doc 1638   Filed 11/11/13   Entered 11/11/13 20:36:58   Page 86 of 3   286

## Exhibit 2

**Notice of Motion and Opportunity to Object**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## NOTICE OF MOTION OF THE OBJECTORS FOR (I) CLARIFICATION REGARDING THE HEARING DATE FOR DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND GRANTING OTHER RELATED RELIEF AND (II) LEAVE TO CONDUCT LIMITED DISCOVERY

**PLEASE TAKE NOTICE** that on November 11, 2013 the Objectors filed the *Motion of the Objectors for (I) Clarification Regarding the Hearing on Debtor's Motion for Entry of an Order Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and Granting Other Related Relief and (II) Leave to Conduct Limited Discovery* (the "PLA Discovery Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to clarify the hearing date on the City of Detroit's motion seeking an order authorizing it to enter into certain transactions related to the Public Lighting Authority (the "PLA Motion") and to seek limited discovery related to the City's PLA Motion.

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors' Motion or you want the Bankruptcy

Court to consider your views on the Motion, by **November 25, 2013** you or your attorney must:[1]

1.  File with the court a written response to the Motion. explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

---

[1]  Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the PLA Discovery Motion. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline.

[2]  A response must comply with F. R. Civ. P. 8(b), (c) and (e).

2

2.    If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

*[Remainder of this page intentionally left blank]*

Dated: November 11, 2013        Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Stephen C. Hackney*_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

      - and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

**Exhibit 3**

**None [Brief Not Required]**

13-53846-tjt   Doc 2373-4   Filed 01/03/14   Entered 01/03/14 20:36:58   Page 92 of 1
13-53846-swr   Doc 1678-4   Filed 11/11/13   Entered 11/11/13 17:44:53   Page 92 of 1   292
119

**Exhibit 4**

**None [Separate Certificate of Service to be Filed]**

**Exhibit 5**

**Affidavits**
**[Not Applicable]**

**Exhibit 6**

**Documentary Exhibits**
**[Not Applicable]**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) **Expedited Consideration** |
| | ) **Requested** |

## *EX PARTE* MOTION FOR SHORTENED NOTICE AND EXPEDITED HEARING ON THE MOTION OF THE OBJECTORS FOR (I) CLARIFICATION REGARDING THE PURPOSE OF THE HEARING FOR DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND GRANTING OTHER RELATED RELIEF AND (II) LEAVE TO CONDUCT LIMITED DISCOVERY

The Objectors[1] submit this *Ex Parte* Motion for an Order Shortening the Notice Period and Scheduling an Expedited Hearing with Respect to the *Motion of the Objectors for Clarification Regarding the Purpose of the Hearing for Debtor's Motion for Entry of an Order Authorizing the Debtor to Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and Granting Other Related Relief and (II) Leave to Conduct Limited Discovery* (the "PLA Discovery Motion") and respectfully represent as follows:

---

[1] Capitalized terms not defined herein have the meanings given to them in the Objectors' PLA Discovery Motion.

13-53846-tjr Doc 2373-4 Filed 01/08/14 Entered 01/08/14 17:41:50 Page 96 of
13-53846-swr Doc 2369 Filed 01/03/14 Entered 01/03/14 21:02:18 Page 1 of
119
296

## Jurisdiction and Venue

1.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## Relief Requested and Basis for Relief

2.     Pursuant to Bankruptcy Rule 9006(c) and Local Bankruptcy Rule 9006-1(b), this Court may, *ex parte*, shorten the notice period provided by Local Bankruptcy Rule 9014-1 for a party to take any action or file any paper.  Fed. R. Bankr. P. 9006(c); E.D. Mich. LBR 9006-1(b).

3.     The Objectors respectfully request that, pursuant to Bankruptcy Rule 9006(a) and Local Bankruptcy Rule 9006-1(b), the Court shorten the notice period with respect to the PLA Discovery Motion and schedule an expedited hearing on the PLA Discovery Motion on **November 14, 2013.**

4.     Contemporaneously with the filing of this *Ex Parte* Motion, the Objectors filed the PLA Discovery Motion.  For the reasons stated in the PLA Discovery Motion*,* the Objectors seek the entry of an order granting the Objectors leave to conduct limited discovery with respect to the PLA Transaction.  The Objectors submit that further discovery is required in connection with the PLA Transaction to assess whether it can meet the requirements for approval by this Court.

2

13-53846-tjt   Doc 2373-4   Filed 01/03/14   Entered 01/03/14 17:41:59   Page 27 of
13-53846-swr   Doc 1639   Filed 11/13/13   Entered 11/13/13 17:02:18   Page 27 of
119                                                                                  297

5. The hearing on the City's PLA Motion is scheduled for November 27, 2013 pursuant to this Court's order [Doc. No. 1579]. Cause exists to shorten the notice period on the Objectors' PLA Discovery Motion because, absent shortened notice and hearing, the Objectors' PLA Discovery Motion could be heard at the earliest on November 25, 2013, two days prior to the hearing on the City's PLA Motion. Under these circumstances, shortened notice and an expedited hearing are appropriate because they allows the Objectors to obtain the requisite discovery and effectively prepare for the November 27, 2013 hearing on the City's PLA Motion.

6. The Court has set an Omnibus Hearing for November 14, 2013. The Objectors respectfully submit that, for the reasons stated above, good cause exists to shorten the notice period and expedite hearing and request that the Objectors be heard at the November 14, 2013 Omnibus hearing regarding their PLA Discovery Motion.

7. The Objectors will serve this *Ex Parte* Motion to the parties in the above-captioned proceedings and will provide notice of the *ex parte* order upon issuance pursuant to E.D. Mich. LBR 9006-1(b).

## Statement of Concurrence Sought

8. In accordance with Local Bankruptcy Rule 9006-1(b), counsel for Syncora sought concurrence from opposing counsel for the relief requested in this

13-53846-tjt  Doc 2373-4  Filed 01/03/14  Entered 01/03/14 17:41:50  Page 98 of
119
13-53846-swr  Doc 1633  Filed 11/11/13  Entered 11/11/13 17:02:18  Page 98 of  298

motion on November 11, 2013. Counsel for the City did not object to a November 14, 2013 hearing on the Objectors' PLA Discovery Motion.

## Conclusion

WHEREFORE, The Objectors respectfully request that the Court enter an Order, substantially in the form attached as Exhibit 1, granting the relief requested in this *Ex Parte* Motion and granting such further relied as this Court deems appropriate.

*[Remainder of this page intentionally left blank]*

Dated:  November 11, 2013          /s/ *Stephen C. Hackney*
_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

        - and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*


By: */s/ Carol Connor Cohen*
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway

5

New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

**LOWENSTEIN SANDLER LLP**
By: */s/ Sharon L. Levine*
Sharon L. Levine, Esq.
John K. Sherwood, Esq.
Philip J. Gross, Esq.
Keara M. Waldron, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
jsherwood@lowenstein.com
pgross@lowenstein.com
kwaldron@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

6

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

**<u>Exhibit 1</u>**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING *EX PARTE* MOTION FOR SHORTENED NOTICE AND EXPEDITED HEARING ON THE MOTION OF THE OBJECTORS FOR (I) CLARIFICATION REGARDING THE PURPOSE OF THE HEARING FOR DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND GRANTING OTHER RELATED RELIEF AND (II) LEAVE TO CONDUCT LIMITED DISCOVERY

This matter having come before the Court on the motion (the "*Ex Parte Motion*") of the Objectors for the entry of an order shortening the notice period and scheduling an expedited hearing on the *Motion of the Objectors for (I) Clarification Regarding the Purpose of the Hearing for Debtor's Motion for Entry of an Order Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and Granting Other Related Relief and (II) Leave to Conduct Limited Discovery* (the "PLA Discovery Motion"), the Court having reviewed the Objectors' motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1.     The Objectors' *Ex Parte* Motion is GRANTED.

2.     The hearing with respect to the Objectors' PLA Discovery Motion shall be held on November 14, 2013 before Hon. Steven Rhodes.

3.     The joining Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____

STEVEN W. RHODES
United States Bankruptcy
Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                               Chapter 9
                                                     Case No. 13-53846
City of Detroit, Michigan,                           Hon. Steven W. Rhodes

        Debtor.
_____/

### Order Denying Motion for Clarification and Motion to Expedite Hearing

Syncora Guarantee Inc., Syncora Capital Assurance Inc., Ambac Assurance Corporation, and Michigan Counsel 25 of the American Federation of State, County and Municipal employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees have filed a motion for clarification regarding the purpose of the hearing for debtor's motion for entry of an order authorizing the debtor to enter into and perform under certain transaction documents with the public lighting authority and for leave to conduct limited discovery. (Dkt. #1638)  The objectors have also filed a motion to expedite the hearing on their motion. (Dkt. #1639) The Court concludes that cause has not been established for an expedited hearing.  Accordingly, that motion is denied.

The Court further concludes no hearing is necessary to resolve the motion for clarification and that the motion should be denied.  The moving party is referred to this Court's "Order Establishing Motion Procedure" entered on August 2, 2013. (Dkt. #283)

.

**Signed on November 12, 2013**

                                         _____/s/ Steven Rhodes_____
                                              **Steven Rhodes**
                                              **United States Bankruptcy Judge**

13-53846-tjt  Doc 2370  Filed 01/03/14  Entered 01/03/14 17:40:56  Page 106 of
13-53846-swr  Doc 1864  Filed 01/12/13  Entered 01/12/13 13:39:58  Page 1 of 2
119                                                                          306

13-53846-tjt Doc 2370-4 Filed 01/03/14 Entered 01/03/14 17:41:56 Page 107 of
13-53846-swr Doc 1061 Filed 01/12/13 Entered 01/12/13 18:39:50 Page 107 of 2
119
307

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name **Syncora Guarantee & Syncora Capital Assurance**

Firm **Kirkland & Ellis LLP**

Address **300 N. LaSalle**

City, State, Zip **Chicago, IL 60654**

Phone **312.862.3200**

Email **dustin.paige@kirkland.com**

**Case/Debtor Name: City of Detroit, MI**

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** _ Hon. Steven Rhodes

⊙ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **11/27/2013**   **Time of Hearing:** **9:00am**   **Title of Hearing:** Hearing re Detroit Bankruptcy

Please specify portion of hearing requested: ⊙**Original/Unredacted**   ○ **Redacted**   ○**Copy** (2nd Party)

⊙Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

---

**Type of Request:**

⊙ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

○ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com

**Signature of Ordering Party:**

Dustin Paige   Date: 12/2/13

By signing, I certify that I will pay all charges upon completion of the transcript request.

FOR COURT USE ONLY

Transcript To Be Prepared By

_____
Date        By

Order Received:

Transcript Ordered:

Transcript Received:

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------------------x

In re
                            :
                            :

CITY OF DETROIT, MICHIGAN,   :   Chapter 9
                            :
              Debtor.  :   Case No. 13-53846
                            :
                            :   Hon. Stephen W. Rhodes

**Re: Dkt. 1341**

-----------------------------------------------------------------x

## SUPPLEMENT TO JOINDER OF THE OFFICIAL COMMITTEE OF RETIREES TO THE LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION

DENTONS US LLP

Claude D. Montgomery
Carole Neville
1221 Avenue of the Americas
New York New York 10020
Tel:  (212) 768-6700
claude.montgomery@dentons.com
carole.neville@dentons.com

- and -

Sam J. Alberts
DENTONS US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005-3364
Tel: (202) 408-6400
sam.alberts@dentons.com

- and -

Matthew E. Wilkins
Paula A. Hall
BROOKS WILKINS SHARKEY & TURCO
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Tel: (248) 971-1800
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees*

The Official Committee of Retirees (the "Committee") files this supplement to joinder (Dkt. 1713) to the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. dated November 6, 2013 (Dkt. 1557) to the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief* (the "Motion") (Dkt. 1341).

## PRELIMINARY STATEMENT

1.      The City of Detroit (the "City") created the Public Lighting Authority (the "PLA") as a separate municipal corporation to manage and maintain the City's public lighting system.  (Motion, at 4.)   The PLA reportedly "is responsible for constructing, improving, enlarging, reducing or extending the City's street light system." (*Id.*, Ex. 6.4, at 3.) Upon completion of the transaction that is the subject of the Motion, (the "PLA Transaction"), "the PLA will commence the improvement of the City's public lighting system and will assume operational control of the portions of the public lighting system the PLA improves." (*Id.*, at 2.) In order to provide funding for the aforesaid activities by the PLA and induce the PLA to provide the public lighting system improvements contemplated by  the PLA Transaction, the City has agreed to "irrevocably pledge and cause the existing and future revenue" generated from the utility tax normally imposed by the City on public utilities and other resellers of electricity "as security for, and the primary source for the repayment of, the [Public Act 392] [b]onds." (*Id.*, at 5.)  The utility tax revenue to which the PLA is entitled to "is the lesser of (i) $12.5 million, and (ii) the total revenues generated by the [u]tility [t]ax." (*Id.*)

2.      Miller Canfield, P.L.C. ("Miller Canfield") has been and currently is counsel for the City in the Chapter 9 case.  During the eligibility proceedings, the Committee and other objectors (collectively, "Objectors") questioned the good faith of the City and the Emergency

1

Manager. Miller Canfield participated in the defense of the City, which defense proved to be successful at the conclusion of the trial. Thereafter, during the November 27, 2013 Hearing on the Motion (the "11/27/13 Hearing"), the Court, as well as other interested parties, learned for the very first time that Miller Canfield also represents the PLA in its negotiations with the City over the PLA Transaction and in connection with the Motion. Following this revelation, the Court was understandably sensitive to the questions of conflict and good faith on the part of others towards the City and raised questions as to (a) whether Miller Canfield's simultaneous representation of the City and the PLA is in compliance with the Michigan Rules of Professional Conduct (hereinafter "M.R.P.C."), particularly Rule 1.7, and (b) the implications of any conflict due to such simultaneous representation, even if waivable, regarding whether the PLA Transaction was entered into in good faith for purposes of 11 U.S.C. § 364(e).

3.       The Committee submits that, in the unique circumstances present here, Miller Canfield is in a conflict of interest position that cannot be cured by client consent and that the ethical violations resulting therefrom preclude a finding that, in entering into the PLA Transaction and extending credit to the City in connection therewith, the PLA was acting in good faith for purposes of 11 U.S.C. § 364(e). Specifically:

(a) Miller Canfield's representation of the PLA in the public lighting negotiations is directly adverse to the City, since it actively represents the City in the Chapter 9 bankruptcy proceedings, and a disinterested lawyer would conclude that, by reason of the knowledge it has necessarily obtained in that latter capacity as to the City's financial strategies, Miller Canfield could not simultaneously represent the PLA without using that knowledge, whether consciously or subconsciously, to the advantage of the PLA and the detriment of the City. This presents a conflict of interest that cannot be cured by consent from either the City or the PLA; and

2

13-53846-swr   Doc 2373   Filed 01/08/14   Entered 01/08/14 23:41:50   Page 111 of
119
13-53846-tjt   Doc 13934   Filed 12/08/14   Entered 12/08/14 13:41:54   Page 311 of   311

(b) Under Michigan law, the actions and knowledge of Miller Canfield are imputed to the PLA. Accordingly, the PLA must be treated as having negotiated with the City in a situation where it presumptively had and employed, to its advantage, confidential information of the City to which it should not have had access. From this, it necessarily follows that, for purposes of 11 U.S.C. § 364(e), this Court cannot conclude that, in its negotiations with the City, the PLA acted in good faith. This lack of good faith is further compounded by the PLA's failure to disclose that Miller Canfield was representing it in connection with the PLA Transaction until the 11/27/13 Hearing when, to the surprise of the Court and Objectors, Miller Canfield stood up and announced that, as regards the PLA Transaction, it was in fact not acting for its client the City, but rather was acting for the PLA.

## I. MILLER CANFIELD'S SIMULTANEOUS REPRESENTATION OF BOTH THE CITY AND THE PLA GAVE RISE TO AN ETHICAL CONFLICT THAT IS NOT CURABLE BY CLIENT CONSENT

4.      Miller Canfield is counsel before this Court for the City. As such, it has among other things participated, as an advocate for the City, in proceedings before this Court, including the recent eligibility trial. Miller Canfield has now violated M.R.P.C. Rule 1.7 by simultaneously representing the PLA in direct, adversarial negotiations against the City, while in possession of inside knowledge of the City's financial condition and strategic plans, including its ability and willingness to commit its scarce financial resources to achieve various ends. This presents a conflict of interest that cannot be waived.

5.      According to M.R.P.C. Rule 1.7(a), "A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation." Compliance with this prong is assessed under the "disinterested lawyer" standard; under that standard, "when a disinterested lawyer

3

would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." Rule 1.7(a), Cmt. 5, "Consultation and Consent."

6.     Under M.R.P.C. Rule 1.7, as well as other analogous rules in other states, a non-waivable conflict exists where an attorney is privy to certain confidences of one client that can be used to the disadvantage of the other. *See* MI Eth. Op. RI-66, 1990 WL 504887, at *2 (Dec. 21, 1990) (attorney could not represent individual despite client consent because attorney would be in possession of information gained from one representation that would necessarily affect his conduct in other, to the detriment of one of the two clients, even though the two matters were unrelated); IL. Adv. Op. 851, 1983 WL 190427, at *2 (Nov. 8, 1983) (attorney representing a corporation in a bankruptcy proceeding could not also simultaneously file a Workmen's Compensation claim on behalf of a former employee of the corporation because during the attorney's representation of the corporation he may "have learned confidential information which would be susceptible of use on behalf of the individual claimant"; opinion issued pursuant to Illinois Code Rule 5-105, which is substantively similar to Rule 1.7); *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.,* 722 F. Supp. 2d 295, 307 (E.D.N.Y. 2010) (disqualifying firm that represented plaintiff in suit against school Board where one firm associate, who was not working on matter, served as vice-president of Board, since associate had access to confidential Board information that could be used to benefit plaintiff).[1]

7.     In this case, Miller Canfield represents the City in the bankruptcy proceedings, and by virtue of this representation, has necessarily become privy to certain confidential

---

[1] S*ee also* MI Eth. Op. RI-307, 1998 WL 1053845, at *3 (May 8, 1998) (due to the differing interests and obligations of each entity, "it is difficult to conceive of a situation in which a disinterested lawyer could confidently and reasonably believe that the lawyer's obligations to the county will not adversely affect the representation of the municipality" by simultaneously representing each in property tax assessments and appeal matters).

4

information that would not otherwise be known, including the City's financial condition and internal strategies as relate to its willingness and ability to commit funds to secure the PLA Transaction. *See* ¶ 4 above. The City's interest is to effectuate the public lighting improvements contemplated by the PLA transaction while maximizing its general fund access to utility tax revenues. The PLA's interest is in extracting as much secure funding as possible from the City to support the payments due on the bonds issued by it.

8. Irrespective of any client consent, a disinterested lawyer could not reasonably conclude that Miller Canfield could properly represent both clients. By virtue of its representation of the City, Miller Canfield acquired information concerning the City that would be of substantial advantage to the PLA -- and corresponding detriment to the City -- in the PLA's negotiations with the City. In those circumstances, Miller Canfield's simultaneous representation of both the City and the PLA was in violation of M.R.P.C. Rule 1.7(a). *See* authorities cited at ¶ 6 above. *See also Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 236 (2d Cir. 1977) ("Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it to telling advantage in the subsequent litigation . . . .").[2]

---

[2] The City's recent assertion that there is no conflict because the City, PLA and MFA have a "common interest" in providing "cost effective financing" (Dkt. 1927, at 4) misses the point--that, because the PLA is a separate municipal entity and will rely on the pledged utility revenues for repayment of the bonds issued by it, the PLA intrinsically and necessarily has an interest in maximizing the amount of the pledged revenues, whereas the City clearly has an interest that is opposite and antagonistic to that, namely to pledge as little utility revenues as possible. The City's unsupported suggestion that Miller Canfield can avoid the conflict by somehow "not" representing the PLA on discrete matters, within the scope of the same representation, on which "the City and the PLA may represent different interests" is made up out of whole cloth. A lawyer either represents a client or does not, and, if there is a representation, the lawyer owes a full and complete duty of loyalty to the client. In this case, the duty of loyalty owed by Miller Canfield to the PLA covers all matters in which the PLA has an interest. In this regard, the City concedes that Miller Canfield represented the PLA in connection with the "PLA Financing Agreements," which include Amended and Restated Trust Agreement (Dkt. 1341, Ex.

## II. BECAUSE MILLER CANFIELD'S ACTIONS AND KNOWLEDGE ARE IMPUTED TO THE PLA, THE PLA CANNOT MEET THE "GOOD FAITH" REQUIREMENT SET FORTH IN 11 U.S.C. § 364(e)

9.     Section 364(e) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under this section to obtain credit and incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that **extended such credit in good faith**, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. (emphasis added).

10.     Section 364(e) encourages extending "credit to debtors in bankruptcy by eliminating the risk that any lien securing the loan will be modified on appeal." *Keltic Fin. Partners, LP v. Foreside Mgmt. Co., LLC (In re Foreside Mgmt. Co., LLC)*, 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009).   However, in order to take advantage of this safe harbor provision, an entity extending post-petition credit to a debtor must have done so in "good faith".   While the Bankruptcy Code itself does not provide a definition of "good faith," it has been defined as "honesty in fact in the conduct or transaction concerned." *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988).

11.     As discussed in further detail below, under Michigan law, Miller Canfield's actions and knowledge arising from its concurrent and unethical representation of both the PLA and the City are imputed to the PLA.  As a result, during its negotiations with the City, the PLA presumptively had access to confidential City information and was in a position to take unfair advantage of the City in these negotiations.  The PLA's honesty has been rendered suspect and in

---

6.3) to which both the City and the PLA are parties and which governs the utility pledge amounts. The existing tension between the City's interests and those of the PLA was further demonstrated by the PLA's  request made mid-hearing that the City drop its request for approval of the Operations and Maintenance Agreement.

6

these circumstances and on this record the PLA cannot be found to have acted in good faith within the meaning of 11 U.S.C. §364(e).

### A. Under Michigan Law, Miller Canfield's Actions and Knowledge Are Imputed to the PLA

12. Under Michigan law, the attorney's relationship with the client is one of agency, and an attorney's actions and knowledge are generally imputed to the client. *See, e.g., Manni v. United States*, No. 89-CV-73621-DT, 1990 U.S. Dist. LEXIS 19579, at *8, n. 4 (E.D. Mich. Jan. 31, 1990) ("'it is well settled that the knowledge of an attorney is imputable to his client'") (quoting *Orgeron v. Mine Safety Appliances Co.*, 603 F. Supp. 364, 369 (E.D. La. 1985)); *Creswell v. Comm'r of Soc. Sec.,* No. 11-CV-12492, 2011 U.S. Dist. LEXIS 117756, at *6 (E.D. Mich. Sept. 12, 2011) ("'the actions of a privately retained attorney are imputed to the client'"); *Krim v. Osborne*, 20 Mich. App. 237, 242 (1969) ("'each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney'") (quoting *Link v. Wabash R.R. Co*., 370 U.S. 626, 634 (1962)); *see also In re Estate of Widdifield*, No. 252678, 2005 WL 1522160, at *2 (Mich. App. June 28, 2005) ("[T]he relationship between an attorney and his client is one of agency, and an attorney's assertions and arguments are imputed to the client he represents.").

13. This rule of imputation applies equally in bankruptcy cases. *See, e.g., Matter of Frankina*, 29 B.R. 983, 985-86 (Bankr. E.D. Mich. 1983) (holding that an attorney's notice of a bankruptcy proceeding is imputed to his client); *In re Shaw*, 210 B.R. 992, 996 (Bankr. W.D. Mich. 1997) (denying party's request to vacate consent judgment that was agreed to by his attorney because "it is well-settled that a party to litigation is bound by the acts of his attorney and is charged with notice of facts to the extent the attorney is so charged").

14. Accordingly, and as a matter of law, the actions and knowledge of Miller

7

Canfield, including its concurrent representation of the PLA in the PLA's Chapter 9 negotiations with Miller Canfield's other Chapter 9 client , the City, are imputed, and chargeable, to the PLA.

**B.     Because it Stands in the Shoes of Miller Canfield, the PLA Did Not Act in Good Faith**

15.     Given that the acts and knowledge of an attorney are imputed to the client, it necessarily follows that, for purposes of 11 U.S.C. § 364(e), the PLA did not conduct itself in good faith.  By virtue of the imputation, the PLA stands in the shoes of Miller Canfield and conducted negotiations with the City while in possession of the confidential City information, discussed above, to which Miller Canfield was privy.  That exceeds the bounds of honesty in fact, and put the PLA in a position to take gross advantage of the City in the bargaining process.

16.  The foregoing is further compounded by the PLA's apparent intent to obscure the dual role played by Miller Canfield.  For reasons unknown, the PLA Transaction documents that were prepared in connection with the PLA Transaction and filed with this Court by the City in support of its Motion identify the PLA's counsel as, and only as, The Allen Law Group, P.C. (s*ee* Motion, Ex. 6.3, at 14) -- Miller Canfield is not disclosed as counsel for the PLA anywhere therein. It was not until the 11/27/13 Hearing in the City's bankruptcy case that it came out -- and then only serendipitously  -- that, so far as the PLA Transaction was concerned, Miller Canfield was in fact acting not for the City but rather for the PLA.  The PLA's failure to disclose the conflicted role played by Miller Canfield provides an additional reason why the PLA has not acted with "honesty in fact".[3]

---

[3] The Committee acknowledges that, if the Court were to conclude either that Miller Canfield's simultaneous representation of the City and the PLA did not give rise to a conflict or that it did but the conflict was both waivable and properly waived (which it should not), then there would be no basis for a determination that the PLA transaction was not entered into in good faith for Section 364(e) purposes.

8

13-53846-swr   Doc 2173-4   Filed 01/08/14   Entered 01/08/14 23:41:50   Page 117 of 119
13-53846-swr   Doc 1709   Filed 01/08/14   Entered 01/08/14 17:31:50   Page 117 of 119
119     317

## CONCLUSION

Wherefore, for the above reasons, the Committee respectfully requests that the Court deny the Motion.

Dated: December 4, 2013
New York, New York

DENTONS US LLP

By:  */s/ Claude D. Montgomery*
Claude D. Montgomery
Carole Neville
1221 Avenue of the Americas
New York New York 10020
Tel:  (212) 768-6700
claude.montgomery@dentons.com
carole.neville@dentons.com

- and -


Sam J. Alberts
DENTONS US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005-3364
Tel: (202) 408-6400
sam.alberts@dentons.com

- and -


Matthew E. Wilkins
Paula A. Hall
BROOKS WILKINS SHARKEY & TURCO
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Tel: (248) 971-1800
wilkins@bwst-law.com
hall@bwst-law.com


*Attorneys for the Official Committee of Retirees*

**CERTIFICATE OF SERVICE**

I, Claude D. Montgomery, hereby certify that service of this Supplement to Joinder of the Official Committee of Retirees to the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief was filed and served via the Court's electronic case filing and noticing system on December 4, 2013.

                                                    _/s/_ Claude D. Montgomery

10