UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re<br><br>CITY OF DETROIT, MICHIGAN,<br><br>Debtor. | No. 13-53846<br><br>Chapter 9<br><br>HON. STEVEN W. RHODES |

## ATTACHMENT

## APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

| Design-ation | Docket # | Filing Date | Description |
|---|---|---|---|
| 14. | 1458 | 10/30/2013 | Supplemental Brief filed by creditor David Sole (Attachments: Index of Exhibits; Exhibit 1; Exhibit 2) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

City of Detroit, Michigan,

    Debtor.

Chapter 9
Case No. 13-53846

_____/

**SUPPLEMENTAL BRIEF IN SUPPORT OF OBJECTION BY INTERESTED PARTY DAVID SOLE TO THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE [DOCKET 495]**

    Interested Party David Sole's Objection to the City of Detroit's Eligibility Petition for Relief under Chapter 9 of the Bankruptcy code centered on two issues: (1) that the authorizing statute, PA 436, specifically mandated that the Michigan Constitutional protection against the impairment of public pensions be a contingency of any bankruptcy filing under the statute, and (2) that including such a bar to the impairment of pensions in the Chapter 9 filing would not be preempted by federal law. Interested Party Sole offers this brief as a supplement to arguments put forward in his initial objection [Docket 495] and in oral argument in front of this honorable Court on October 15, 2013.

**I.**    **STATE LAW IS DETERMINATIVE AT THE ELIGIBILITY STAGE OF A CHAPTER 9 BANKRUTPCY**

    As outlined in Interested Party Sole's objection [Docket 495], 11 USC 109 states that a local municipality must be "specifically authorized by state law to file a Chapter 9 bankruptcy." The phrase "authorized by law" refers to the law of the state. *U.S. v Bekins*, 304 U.S. 27, 49, 58 SCt 811, 82 Led 1137 (1937) " "States act as gatekeepers to their municipalities to access to relief under the Bankruptcy Code." *In Re: City of Harrisburg*, 465 BR 744 (U.S. Bankruptcy Court Middle District of PA, 2011).

## II. PURSUANT TO THE STATE AUTHORIZING STATUTE, PA 436, AND APPLYING MICHIGAN PRINCIPLES OF STATUTORY CONSTRUCTION, THE CITY OF DETROIT'S CHAPTER 9 FILING MUST INCLUDE AS A CONTINGENCY THE MICHIGAN CONSTITUTION'S NON-IMPAIRMENT OF PUBLIC PENSIONS

Article IX Section 24 of the Michigan Constitution states:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Article IX Section 24, the constitutional non-diminishment of pension clause, is incorporated into two sections of PA 436. Section 12(1)(m), the section of PA 436 that designates the powers of an emergency manager relative to pension funds, specifically mandates that "the emergency manager shall fully comply with . . .section 24 of article IX of the state constitution of 1963." Section 12(1)(m)(ii).

Section 13 of PA 436 gives the emergency manager the discretion to reduce and even eliminate the salary, wages and other compensation of the chief administrative officer and members of the governing body of the local government. However, Section 13 "does not authorize the impairment of vested pension benefits."

Section 18 of PA 436 empowers the emergency manager to recommend a Chapter 9 bankruptcy filing to the governor, and states that the governor may place contingencies of a local government in order to proceed under chapter 9.

In *Pohutski*, 465 Mich at 683, 684 (2002), the Michigan Supreme held:

When parsing a statute, we presume every word is used for a purpose. As far as possible, we give effect to every clause and sentence. "HN6The Court may not assume that the Legislature inadvertently made use of one word or [***10] phrase instead of another." Robinson v Detroit, 462 Mich. 439, 459; 613 N.W.2d 307 (2000). **Similarly, we should take care to avoid a construction that renders any part of the statute surplusage or nugatory**.

At the October 15 hearing in front of this honorable Court, City of Detroit attorneys argued that because Article IX, Section 24, of the Michigan constitution was not specifically included into Section 18 of PA 436, the governor and emergency manager were not required to include a contingency barring the diminishment or impairment of pensions with the Chapter 9 filing.  However, this interpretation of PA 436 completely misapplies Michigan law on statutory construction.  It parses the statute and renders the sections of the statute incorporating the non-impairment of pensions nugatory, in express violation of the Michigan rules of statutory construction.

In *General Motors Acceptance Corporation v Citizens Commercial & Savings Bank*, 2001 Mich App LEXIS 295, the Michigan Court of Appeals noted that the *Pohutski* interpretation on statutory construction even extends to separate statutes that relate to the same subject matter.  The Court held:

> Generally, statutes that 'relate to the same subject or share a common purpose are in pari materia and must be read together as one law.  Reviewing courts should also avoid any statutory construction that would render a statute, or merely part of it, surplusage or nugatory. [internal citations omitted]

In this case, the court interpreted the two statutes in a manner consistent with both in rendering its decision.

**Exhibit 1, attached.**

In *Bolhuis v Public School Retirement System*, 2011 Mich App LEXIS 1392, the court read various sections of the statute in conjunction with each other in making a determination as to what constitutes compensation under that law.  Significantly, the Court noted the exclusion of certain amounts from the calculation of compensation in one part of the statute played a role in making its determination on how to interpret a separate section of the statute.

**Exhibit 2, attached.**

3

13-53846-tjt Doc 2280-1 Filed 01/03/14 Entered 01/03/14 17:52:08 Page 4 of 9
13-53846-swr Doc 1436 Filed 10/30/13 Entered 10/30/13 15:54:08 Page 3 of 9

In *Knight Enterprises v Fairlane Car Wash*, 482 Mich 1006 (2008), the Michigan Supreme Court overturned a lower court decision on contract interpretation, where the lower court's interpretation would have rendered one section of the contract surplusage or nugatory. The Court held: "Courts must give effect to every word, phrase and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." Michigan courts apply the same principles of construction to contract interpretation as they do to statutes. *Klapp v United Insurance Agency, Inc.*, 468 Mich 459 (2003).

In the present case, the fact that PA 436 incorporates the Michigan constitutional non-impairment of pensions bar into two sections of the law, including the section that specifically delineates the powers of the emergency manager relative to pension funds, demonstrates the legislative intent to insure that this constitutional protection of pensions is to be respected and upheld, even in the context of a Chapter 9 bankrutpcy filing.

This legislative intent is further demonstrated by the absence of the power to impair pensions in Section 12 of PA 436, which provides the emergency power with the power to break all sorts of other contracts including collective bargaining agreement, but specifically excludes pensions. Michigan courts follow the doctrine of expression unius exclusion alterius (the expression of one thing is the exclusion of another). *Smitter v. Thornapple Twp.*, 494 Mich. 121 (Mich. 2013)

In *In re City of Vallejo, CA,* 432 BR 262, 270 (2010)(US Dist Ct., Eastern District CA), , while the Court held on appeal that the California statute authorizing a Chapter 9 filing did not preclude the modification of labor contracts, the Court's explanation is relevant to the facts of this fact. The Court noted:

> State labor law is not explicitly identified in California Government Code Section 53760 as an exception to the general grant of authority for municipalities to

pursue Chapter 9 bankruptcy. **If California had desired to restrict the ability of its municipalities to reject public employee contracts in light of state labor law, it could have done so as a pre-condition to seeking relief under Chapter 9**. (emphasis added)

In present case, the Chapter 9 authorizing statute, PA 436, specifically incorporates the Michigan constitutional protection of pensions into the law. Because the legislature in its writing of PA 436 evidenced its intent to maintain the constitutional protections of public pensions, any Michigan Chapter 9 filing pursuant to PA 436 must incorporate the non-impairment of pensions as a contingency attached to Chapter 9 filing.

The failure to incorporate the non-impairment of pensions into the City of Detroit's Chapter 9 filing violates the specific authorization for the filing under Michigan law. As a result, the City of Detroit's bankruptcy filing must be declared void ab initio, or at the minimum, this honorable Court must amend the petition to include a contingency protecting public pensions into the City of Detroit's bankruptcy filing.

### III. PA 436 ANTICIPATES A PENSION SHORTFALL BUT STILL MAINTAINS THE CONSTITUTIONAL BAN ON IMPAIRMENT OF ACCRUED PENSIONS

At the October 15, 2013, this honorable Court focused on whether the Michigan constitutional bar on impairment of accrued pensions could be maintained if there was, in fact, a pension shortfall.

Significantly, PA 436, Section 12(1)(m) anticipates such a shortfall and offers the emergency manager remedies to restructure the pension fund operation in the face of such a shortfall. However, Section 12(1)(m)(ii) specifically mandates that even in the fact of such a shortfall the emergency manager must full comply with the constitutional prohibition on impairing pensions pursuant to Article IX Section 24. The explicit language of PA 436 makes

5

clear that even in the face of financial difficulties including in the funding of the pensions themselves, the constitutional bar on impairment of accrued pensions is to be adhered to.

In addition, while PA 436 affords the emergency broad latitude to renegotiate or even abrogate most municipal contracts, and even to stop paying local officials, the legislative intent to maintain the constitutional bar on diminishing accrued pensions is explicitly affirmed by the Act's language that the emergency manager shall fully comply with section 24 of article IX of the Michigan constitution even with regard to public officials whose wages and benefits are otherwise cut-off pursuant to Section 13.

Viewing the statute in its entirety, the only possible interpretation of PA 436 is that non-impairment of accrued pension must be a contingency for a Chapter 9 filing to be strictly authorized under PA 436.

## IV. SIXTH CIRCUIT PRECEDENT UPHOLDS THE POWER OF A STATE TO LEGISLATE LIMITATIONS ON BANKRUPTCY

During the October 15 hearing, the City of Detroit attorneys argued that a contingency protecting accrued pensions attached to the City of Detroit's Chapter 9 filing would be in violation of federal preemption. However, in his objection, Interested Party Sole noted that pursuant to the 2012 Sixth Circuit decision in *Richardson v Schafer*, 689 F3d 601 (2012), a narrow state limitation on the scope of the relief available in a Chapter 9 bankruptcy is not preempted by federal law.

In *Schafer*, supra, the Court noted that the interpretation of the phrase "uniform laws" by both the Supreme Court and this Court permits states to act in the arena of bankruptcy exemptions even if they do so by making certain exemptions available only to debtors in bankruptcy, and that such exemptions schemes are not invalidated by the Supremacy clause." *Id*. at 603.

6

The Sixth Circuit cited to its own holding in *Rhodes v Stewart*, 705 F2d 159 (6th Cir 1983) for the proposition that states have concurrent authority to promulgate laws governing exemptions applicable in bankruptcy cases. The Court further noted that "this understanding that the federal power was exclusive eventually gave way to an acceptance that states could, in the absence of federal legislation, pass laws on bankruptcy." *Id*. at 606. The Court noted that the standard in evaluating whether a state activity was preempted by federal law was conflict preemption., whether "the laws in question conflict such that it is impossible for a party to comply with both laws simultaneously, or where the enforcement of the state law would hinder or frustrate the full purposes and objectives of the federal law." Id. at 611.

In *Rhodes v. Stewart*, 705 F.2d 159, 163, the Sixth Circuit held:

> It is fundamental that the state and federal legislatures share concurrent authority to promulgate bankruptcy laws, *Sturges v. Crowninshield*, 17 U.S. (4 Wheat) 122, 4 L. Ed. 529 (1819), and that the Supremacy Clause and the doctrine of preemption will serve to invalidate state promulgations to the extent that they are inconsistent with or contrary to federal laws. *Perez v. Campbell*, 402 U.S. 637, 91 S. Ct. 1704, 29 L. Ed. 2d 233 (1971). It is equally axiomatic, however, that Congress has not preempted an area wherein it has legislated when it expressly and concurrently authorizes the state legislatures to disregard or opt-out of such federal legislative area. In such instance, rather than preempting the area, Congress expressly authorizes the states to "preempt" the federal legislation. Congress did not intend to preempt bankruptcy exemptions through promulgation of 11 U.S.C. § 522(d) since it vested in the states the ultimate authority to determine their own bankruptcy exemptions. 11 U.S.C. § 522(b)(1).

The principle of concurrent state and federal authority to determine bankruptcy exemptions is especially apt in the Chapter 9 setting, where Congress has delegated to individual states whether or not to even authorize a Chapter 9 filing, and approximately half of the states have chosen to not do so. A contingency attached to the City of Detroit bankruptcy would not fundamentally conflict with the bankruptcy scheme under Chapter 9. It allows ample room for adjustment of debt, even debt associated with retiree benefits where unaccrued pension benefits

7

are not afforded the constitutional protection and it is questionable whether health benefits for retirees are covered as well.

It should be noted that the legislative purpose behind PA 436 is in part to provide necessary services essential to the public, health, safety and welfare. Certainly, the protection of what amount to pretty meager pension benefits is consistent with that public purpose, where retirees are a significant portion of the population in the City of Detroit.

Moreover, at the same time the City of Detroit contends that it should have the right to reduce pensions to as little as 16 cents on the dollar owed, the City has the audacity to ask this Court to approve a forebearance agreement it negotiated with Bank of America and UBS, allowing for payment of 80 cents to the dollar on termination fees associated with interest rate swaps that the City admits have drained the treasury while providing no public benefit except to line the pockets of the bankers for engineering hedging derivatives to their own benefit.

**CONCLUSION**

For the reasons stated herein and in the objection filed by Interested Party David Sole [Docket 495], Interested Party Sole respectfully requests that this honorable Court deny the City of Detroit's (through the Emergency Manager) eligibility for filing this Chapter 9 bankruptcy because the petition violates the state authorization statute which mandates that any Chapter 9 filing under PA 436 must be subject to the Michigan constitutional limitation on not diminishing or impairing accrued pensions, or in the alternative, that this honorable Court specifically exclude any diminishing or impairing of accrued pension benefits as part of the City of Detroit's restructuring of debt pursuant to this Chapter 9 bankruptcy.

Respectfully submitted,

JEROME D. GOLDBERG, PLLC

By: */s/ Jerome D. Goldberg*
Jerome D. Goldberg (P61678)
Attorney for David Sole, Party in Interest
2921 East Jefferson, Suite 205
Detroit, MI 48207
Phone: 313-393-6001
Fax: 313-393-6007
Email: apclawyer@sbcglobal.net

DATED: October 30, 2013

9

INDEX OF EXHIBITS

1. *General Motors Acceptance Corp. v Citizens Commercial Bank*

2. *Bolhuis v Public Schools Retirement System*

# EXHIBIT 1



**GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff-Appellant, v CITIZENS COMMERCIAL & SAVINGS BANK, Defendant-Appellee.**

No. 222080

**COURT OF APPEALS OF MICHIGAN**

*2001 Mich. App. LEXIS 295*

**December 18, 2001, Decided**

**NOTICE:** [*1] IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** Genesee Circuit Court. LC No. 97-057734-CK.

**DISPOSITION:** Affirmed.

**JUDGES:** Before: Owens, P.J., and Holbrook, Jr. and Gage, JJ.

**OPINION**

PER CURIAM.

Plaintiff appeals as of right from a trial court order denying its motion for summary disposition against defendant Citizens Commercial & Savings Bank, as well as a judgment of no cause of action against defendant following a bench trial. Plaintiff had sought to recover from defendant under a conversion theory. We affirm.

The underlying facts in this matter are not in dispute. On October 30, 1992, Lafonza and Joan Washington purchased a new 1993 Pontiac Transport Van. As part of the purchase, the Washingtons executed a purchase security agreement with plaintiff ("GMAC loan"), which required them to make weekly payments of $ 84.81. A final payment of $ 8,221.68 was due on November 4, 1996.

On April 1, 1996, the Washingtons executed an installment loan agreement with NBD Bank, which apparently was intended to both pay off the balance of the GMAC loan and provide the Washingtons approximately $ 1,000. NBD [*2] Bank issued a cashier's check for $ 9,126.87, made payable to both plaintiff and the Washingtons, and gave the check to the Washingtons. The title for the vehicle was modified to both reflect NBD Bank's new security interest and delete plaintiff's security interest. The Washingtons endorsed the check and presented it to defendant without plaintiff's endorsement. Defendant erroneously accepted the cashier's check without plaintiff's endorsement, and paid the Washingtons the entire check proceeds. However, in the absence of plaintiff's endorsement, NBD Bank refused to honor the check.

The Washingtons continued making payments on the GMAC loan, but eventually defaulted. The vehicle was involved in an accident on October 24, 1996, resulting in NBD Bank--the party holding a security interest according to the title--receiving insurance proceeds for the van's salvage value. Plaintiff filed an action against the Washingtons and NBD Bank, and subsequently amended its complaint to add defendant as a party under

a conversion theory. NBD Bank eventually transferred the insurance proceeds to plaintiff, and was voluntarily dismissed from the lawsuit. The trial court, however, denied plaintiff's [*3] motion for summary disposition against defendant on the conversion claim. In addition, following a bench trial, the trial court ruled that plaintiff could not recover for conversion against defendant because NBD Bank never honored the cashier's check.

On appeal, plaintiff argues that the trial court erred as a matter of law by ruling that defendant was not liable for conversion of the cashier's check. Plaintiff contends that defendant, as the depository bank, converted the cashier's check when it paid funds to the Washingtons without plaintiff's endorsement. However, defendant contends that it did not convert the check because NBD Bank (the drawee bank) dishonored the check, thereby prevented it from receiving any check proceeds. The parties' arguments concern the application of 440.3420(1), which provides in pertinent part:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. [*4]

We must decide whether a depository bank that improperly pays on a presented check to one of multiple intended payees is liable to the other intended payees for conversion under *MCL 440.3420(1)* if the drawee bank dishonors the check (i.e., the depository bank does not receive proceeds on the check).

We review de novo conclusions of law. *Walters v Snyder*, 239 Mich. App. 453, 456; 608 N.W.2d 97 (2000). Issues of statutory construction are also reviewed de novo. *Hinkle v Wayne Co Clerk*, 245 Mich. App. 405, 413-414; 631 N.W.2d 27 (2001). In regard to statutory construction, we have opined:

> The primary goal of statutory interpretation is to give effect to the intent of the Legislature. This determination is accomplished by reviewing the plain language of the statute itself. If the statutory language is unambiguous, it is presumed that the Legislature intended the clearly expressed meaning, and judicial construction is neither required nor permitted. If the statutory language is ambiguous, only then may we look outside the statute to ascertain the Legislature's intent. [*Hinkle, supra at 414* [*5] (citations omitted).]

Generally, statutes that "relate to the same subject or share a common purpose are in pari materia and must be read together as one law." *Ypsilanti Housing Comm'n v O'Day*, 240 Mich. App. 621, 625; 618 N.W.2d 18 (2000). Reviewing courts should also avoid any statutory construction that would render a statute, or merely part of it, surplusage or nugatory. *Id. at 624*.

Here, defendant contends that *MCL 440.3420(1)* should be read to impose conversion liability on a depository bank when it obtains payment on a check and a drawee bank when it makes payment on a check. In contrast, plaintiff contends that the statutory language should be read to allow both a drawee bank and a depository bank to be liable for *either* making or obtaining payment. At first glance, plaintiff's construction seems consistent with the term "a bank," rather than the more specific breakdown suggested by defendant. However, a drawee is a party ordered to *make* payment on a check, and, by definition, does not ever *obtain* payment on a check. See *MCL 440.3103(1)(b)*.[1] As such, plaintiff's interpretation [*6] of *MCL 440.3420(1)* conflicts with another pertinent statute. At the very least, therefore, we find an ambiguity in *MCL 440.3420(1)* that mandates statutory construction. *Hinkle, supra at 414*.

1   This definition occurs within the negotiable instruments section of the Uniform Commercial Code, as codified in Michigan. Sharing a common subject and purpose, we believe that these statutes-- *MCL 440.3420(1)* and *MCL 440.3103(1)(b)*--are in pari materia and must be read together. *Ypsilanti, supra at 625*.

Generally, the remedies allowed by the various UCC provisions "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ." "A conversion is any distinct act of dominion wrongfully exerted over another person's personal property." *Pamar Enterprises*,

*Inc v Huntington Banks of Michigan,* 228 Mich. App. 727, 734; [*7] 580 N.W.2d 11 (1998). A check is the personal property of the designated payee or payees. *Id.;* *MCL 440.3420(1).* An intended payee may bring a conversion action against either the drawee bank or the depository bank. *Pamar, supra* at 734. For example, where a depository bank improperly allows one of multiple intended payees to cash a check, and the drawee bank honors the check and pays the depository bank, it follows that either the depository bank or the drawee bank should bear the responsibility of making the other intended payees whole.

However, plaintiff seeks to make defendant liable even though the drawee bank did not honor the check. In other words, defendant would have to pay plaintiff the face value of the cashier's check. If so, this remedy would essentially "punish" defendant twice for one error because both the Washingtons and plaintiff would have received the full face value of the cashier's check. Plaintiff's risk in financing the Washington's automobile would be eliminated. Similarly, NBD Bank, who assumed the risk of loaning money to the Washingtons, would not have to pay anything. In other words, the two parties [*8] who knowingly assumed the risk of dealing with the Washingtons would have their risk obviated by one error. Even though defendant erroneously accepted the cashier's check from the Washingtons, we do not believe that such a "double punishment" is consistent with the UCC goal of leaving the parties in as good a position as they would have been in but for the error.

Again, had defendant received money from NBD Bank, defendant would have commensurate liability to plaintiff for conversion. Indeed, under this scenario, the drawee bank (NBD Bank) would have "made payment" and the depository bank (defendant) would have "obtained payment"--the circumstances suggested by defendant's interpretation of *MCL 440.3420(1).*

Moreover, in *Alumax Aluminum Corp v Norstar Bank, NA,* 168 A.D.2d 163, 572 N.Y.S.2d 133, 135 (NY App., 1991), a case involving similar facts, the court reached the same conclusion: "In order to be liable for conversion under the statute, the depositary [sic] bank must, at some point, have received the proceeds of the wrongfully accepted check." We agree. Therefore, we hold that a depository bank is liable for conversion under *MCL 440.3420(1)* [*9] only if the drawee bank honors the improperly accepted check. Because NBD Bank did not honor the cashier's check in the instant matter, we conclude that the trial court did not err as a matter of law by dismissing plaintiff's conversion claim.

Affirmed.

/s/ Donald S. Owens

/s/ Donald E. Holbrook, Jr.

/s/ Hilda R. Gage



MARGARET K. BOLHUIS, Petitioner-Appellee, v PUBLIC SCHOOL
EMPLOYEES RETIREMENT SYSTEM and PUBLIC SCHOOL EMPLOYEES
RETIREMENT BOARD, Respondents-Appellants.

No. 298279

COURT OF APPEALS OF MICHIGAN

2011 Mich. App. LEXIS 1392

July 26, 2011, Decided

**NOTICE:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**SUBSEQUENT HISTORY:** Leave to appeal denied by *Bolhuis v. Mich. Pub. Sch. Employees' Ret. Sys.,* 2012 Mich. LEXIS 452 (Mich., Apr. 18, 2012)

**PRIOR HISTORY:** [*1]
Ingham Circuit Court. LC No. 09-001515-AA.

**JUDGES:** Before: BECKERING, P.J., and FORT HOOD and STEPHENS, JJ.

**OPINION**

PER CURIAM.

Respondents, Public School Employees Retirement System and Public School Employees Retirement Board (board), appeal by leave granted the circuit court order reversing their calculation of pension benefits and remanding for a determination whether the lump sum longevity payment to petitioner, Margaret K. Bolhuis, is "creditable compensation" pursuant to the retirement act. We vacate the circuit court order and reinstate the order of respondent board.

Following petitioner's application for retirement, an estimate of benefits was prepared. According to the estimate, petitioner's final average compensation (FAC) of $71,376.25 was premised on the last three years of employment when her wages were $62,892.74 for the 2002/2003 school year, $85,695.61 for the 2003/2004 school year, and $65,540.40 for the 2004/2005 school year. On March 1, 2006, a benefit award letter mailed to petitioner concluded that her FAC was $72,044.21, with a monthly pension of $2,522.39. However, the wage calculation of $85,695.61 included a retroactive lump-sum longevity payment of $10,247 covering the years [*2] from 1989 to 2003. The lump sum payment of $10,247 was actually erroneously included twice. Petitioner testified that she was unaware of any error in the computation of her income for the 2003/2004 school year because she received the lump sum longevity payment, mentored two teachers, and was the head of the English Department. She also testified that the lump sum longevity payment of $10,247 was included in her paycheck. In May 2006, petitioner sent a letter seeking an adjustment to her pension benefits because a contract was not in place for the last eighteen months of her employment, and a settlement had recently resolved the outstanding contract issue. In April 2007, petitioner received a response by letter indicating that the contract settlement was taken into account with regard to her FAC. However, the letter also advised that $20,494 in

compensation had erroneously been reported for the 2003/2004 wages. Therefore, petitioner's FAC was reduced to $66,111.75.

Petitioner appealed the reduction in her benefits to the circuit court. The circuit court held that the decision by respondent board was arbitrary and capricious because there was no clear definition or standard to determine [*3] when an amount was earned under the retirement act. The circuit court remanded the case to respondent board to determine whether a lump sum longevity payment was "creditable compensation." We granted respondents' application for leave to appeal.

The Michigan Constitution provides for judicial review of administrative decisions, stating in relevant part:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. [*Const 1963, art 6, § 28.*]

The application of the standard of review is contingent on the type of challenge at issue and must be in accordance with separation-of-power principles. *In re Complaint of Rovas Against SBC Mich, 482 Mich 90, 97-99; 754 NW2d 259 (2008).* The agency's interpretation [*4] of a statute "is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *Id. at 103.* Rather, a reviewing court must give "respectful consideration" to the agency's construction of the statute and provide "cogent reasons" for overruling an agency's interpretation. *Id.* When the law is doubtful or obscure, the agency's interpretation can be particularly helpful. *Id. at 108.* Therefore, "[w]hen considering an agency's statutory construction, the primary question presented is whether the interpretation is consistent with or contrary to the plain language of the statute." *Id.* Respectful consideration is not equal to deference. *Id.* Ultimately, the key issue is the proper construction of the plain language of the statute, and the agency's interpretation cannot conflict with this meaning. *Id.*

The rules regarding statutory construction are well established:

> Our primary task in construing a statute is to discern and give effect to the intent of the Legislature. The words contained in a statute provide us with the most reliable evidence of the Legislature's intent. In ascertaining legislative intent, this Court gives effect [*5] to every word, phrase, and clause in the statute. We must consider both the plain meaning of the critical words or phrases as well as their placement and purpose in the statutory scheme. This Court must avoid a construction that would render any part of a statute surplusage or nugatory. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended. If the wording or language of a statute is unambiguous, the Legislature is deemed to have intended the meaning clearly expressed, and we must enforce the statute as written. A necessary corollary of these principles is that a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself. [*Zwiers v Growney, 286 Mich App 38, 44; 778 NW2d 81 (2009)* (citations and quotations omitted).]

"When a statute specifically defines a given term, that definition alone controls." *Haynes v Neshewat, 477 Mich 29, 35; 729 NW2d 488 (2007).*

The public school employees retirement act of 1979, MCL 38.1301 et seq., contains a provision defining compensation:

> (1) Except as otherwise provided in this [*6] act, "compensation" means the

remuneration earned by a member for service performed as a public school employee.

(2) Compensation includes salary and wages and all of the following:

(a) Remuneration earned for all services performed as a public school employee including, but not limited to, teaching, coaching, and participation in extracurricular activities.

(b) On a current basis, investments made in a tax sheltered annuity for a public school employee as remuneration for service under this act. The remuneration shall be valued at the amount of money actually paid into the annuity.

(c) All amounts deducted from the pay of a public school employee, including amounts deducted pursuant to the member investment plan.

(d) Longevity pay.

(e) Overtime pay for service performed outside of what is considered normal working hours for the affected employee.

(f) Pay for vacation, holiday, and sick leave while absent from work. As used in this subdivision, "sick leave" includes weekly worker's disability compensation payments received for personal injury in the employ of and while employed by a reporting unit.

(g) [*7] Items of deferred compensation, exclusive of employer contributions to the retirement system.

(h) Merit pay as established by a reporting unit for the purpose of rewarding achievement of specific performance objectives.

(3) Compensation does not include any of the following:

(a) Payments for unused sick or annual leave.

(b) Bonus payments.

(c) Payments for hospitalization insurance and life insurance premiums.

(d) Other fringe benefits paid by and from the funds of employers of public school employees.

(e) Remuneration paid for the specific purpose of increasing the final average compensation.

(f) Compensation in excess of an amount over the level of compensation reported for the preceding year except increases provided by the normal salary schedule for the current job classification. ... [MCL 38.1303a.]

The retirement board must determine whether any form of remuneration paid to a member is included in the definition of compensation, MCL 38.1303a(2), (3), and if not identified as compensation, determine if it should be compensation reportable to the retirement system. MCL 38.1303a(5). "In any case where a petitioner seeks to have remuneration included in compensation reportable to the retirement [*8] system, the petitioner shall have the burden of proof." MCL 38.1303a(6).

In the present case, the circuit court erred in holding that the decision by respondent board was arbitrary and capricious. The issue in this case involves a matter of statutory construction. Accordingly, a reviewing court does not examine the decision under the arbitrary and capricious standard, but rather, must determine if the agency's interpretation is consistent with the plain language of the statute. Rovas, 482 Mich at 103.

MCL 38.1303a(1) defines "compensation" as "remuneration earned by a member for service performed as a public school employee." The statute further provides that salary and wages are compensation as well as longevity pay. MCL 38.1303a(2)(d). However, the statute also delineates items that are not compensation and prohibits inclusion of payments deliberately designed to increase the final average compensation, such as payment of unused sick or annual leave. MCL

*38.1303a(3)(a), (e)*. Additionally, as set forth above, compensation does not include: "(f) Compensation in excess of an amount over the level of compensation reported for the preceding year except increases provided by the normal salary [*9] schedule for the current job classification." *MCL 38.1303a(3)(f)*. In the present case, although petitioner received a lumpsum payment of $10,247.00 to govern the underpayment of longevity, she also received an itemization of the year and the corresponding amount of the longevity pay earned that year. For example, in 1989, petitioner's longevity pay was only $392, in 1995, she received $1095, and in 2003, she received $673.

The plain language of *MCL 38.1303a* details the items that are compensation, including longevity pay, *MCL 38.1303a(2)(d)*, but also excludes from compensation amounts that exceed the prior year unless it is a normal increase, *MCL 38.1303a(3)(f)*. The plain language of *MCL 38.1303a(3)(f)* precludes the aggregation of retroactive longevity payments into a lump sum for purposes of calculating compensation for a given year. *Zwiers, 286 Mich App at 44*. Rather, it requires that compensation include the amount designated for a particular year by holding that only normal increases are to be included and requires an examination of compensation to the extent that it deviates substantially from the preceding year. This statutory interpretation of the plain language of the statute [*10] is consistent with the decision rendered by respondents.[1] Accordingly, the circuit court erred in holding that the decision was arbitrary and capricious. We vacate the decision of the circuit court and remand for reinstatement of the decision by respondent board.

---

1 Contrary to the assertions raised by petitioner, this decision is consistent with case law regarding calculation of a retiree's average final compensation, albeit when considered under another statutory provision. In *Stover v Retirement Bd of the City of St Clair Shores Firemen & Police Pension Sys, 78 Mich App 409, 412-413; 260 NW2d 112 (1977)*, this Court held that payments for unused sick and vacation days should not be included in calculating a retiree's average final compensation, because those payments were not pay that an employee received "for work done that year." See also *Lansing Firefighters Ass'n Local 421 v Bd of Trustees of the City of Lansing Policemen's & Firemen's Retirement Sys, 90 Mich App 441, 445; 282 NW2d 346 (1979)*. Petitioner's reliance on the tax code is not properly presented for review. It was not raised in the statement of questions presented by respondents, see *Leavitt v Monaco Coach Corp, 241 Mich App 288, 312 n.4;* [*11] *616 NW2d 175 (2000)*, and petitioner failed to file a cross appeal. See *MCR 7.207*. Moreover, petitioner's reliance on the federal tax code is misplaced in light of the statute at issue in the present case.

Vacated and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane M. Beckering

/s/ Karen M. Fort Hood

/s/ Cynthia Diane Stephens