UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                  Chapter 9
                                                        Case No. 13-53846
City of Detroit, Michigan,

    Debtor.
_____/

**SUPPLEMENTAL OBJECTION
OF INTERESTED PARTY DAVID SOLE TO MOTION FOR ENTRY
OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN
FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT
PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE,
(II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019,
AND (III) GRANTING RELATED RELIEF, AS SUPPLEMENTED**

Interested Party David Sole, by and through his attorneys, Jerome D. Goldberg, PLLC, files this supplemental objection to the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief [Docket 17, the Motion] as supplemented on December 27, 2013 by the Supplement to the Motion [Docket 2341]. This Objection incorporates by reference Interested Party David Sole's Objection to the Motion dated August 16, 2013 [Docket 361].

**INTRODUCTION/ PROCEDURAL BACKGROUND**

1.    Interested Party Sole filed his Objection to City of Detroit's Motion for Approval of Forbearance Agreement [Docket 17] on August 16, 2013.

2.    This Supplemental Objection is in response to the City of Detroit's Supplemental Motion filed on December 27, 2013 [Docket 2341], after the City of Detroit negotiated an amended Forbearance Agreement on December 24, 2013.

1

3. This Supplemental Objection incorporates by reference Interested Party Sole's previous objection and exhibits attached thereto [Docket 361].

## STANDARD OF REVIEW

On December 13, 2013, Judge Steven W. Rhodes articulated the standards by which this Motion would be determined at the pre-trial conference in preparation for the hearing on the Motion. Judge Rhodes stated that Court's role is to determine whether the settlement is fair and equitable and whether it is in the best interest of the estate as a whole.

Judge Rhodes further stated that the Forbearance agreement is clearly an attempt by parties to settle on a going forward basis the legal and economic issues they faced at the time. Accordingly, the possibility of success that the City might have if it pursued any challenge to the rights of other parties and to their own obligations as they existed at the time, is a major consideration.

Judge Rhodes noted that in this case, the collectability of the debtor is an issue to be considered in determining this motion, and if there are potential challenges to validity of security issue, those come into play.

Judge Rhodes further noted that complexity of litigation is only important because it bears on costs and determination to proceed.

Judge Rhodes stated that he would evaluate what impact the settlement's acceptance or rejection might have on the plan process – on the city and public's interest in reconstruction and revitalization.

Judge Rhodes stressed that in considering probability of success on issues compromised, it was not the Court's role to resolve those issues. Rather, on the issue of equitable subordination as raised by Interested Party Sole, and presumably disallowance of a claim as also raised by

Interested Party Sole and other objectors, Judge Rhodes noted that the purpose of the motion hearing at this stage of the proceedings was not to try that case – not to call witnesses in support of a claim the City has that some claim or another of a given party should be equitably subordinated. **"But still there should be some testimony by someone, or some evidence somewhere, of what the factual predicate, in a summary way, of such a claim might be," stated the Court on December 13, 2013, at the pretrial hearing.**

## FACTUAL BACKGROUND AND LAW

4. The City of Detroit is seeking approval of a forbearance agreement under which the City would pay Bank of America and UBS $165 million in termination fees to end the Interest Rate Swaps which are tied to the Pension Obligation Certificates.

5. The termination payment would be funded through a loan from Barclays Bank at an interest rate from 5.5 percent to 8.5 percent. Interest on the loan could amount to another $30 million in addition to the $165 million termination amount, and there would be an additional amount of $4 million in breakage costs.

6. The Barclays swap termination loan would be secured by a $4 million per month lien on City of Detroit income tax revenues over approximately the next four years.

7. Emergency Manager Kevyn Orr agreed in his testimony that the City of Detroit pegged the income tax revenue for 2013 as $232 million. This means that for the first four years post-bankruptcy, the residents of Detroit would be pledging 20 percent of income tax revenues, $48 million per year, to pay off UBS and Bank of America through the Barclays loan.

8. Emergency Manager Orr testified he hoped this scenario would be averted through some other form of financing, but none was in place at this time and none was pointed to by Mr. Orr.

9. However, in a rather interesting turn in the proceedings, Emergency Manager Orr actually gave rather detailed testimony of what the factual predicate for a claim for disallowing the claims of UBS and Bank of America against the City of Detroit would be, or in the alternative equitably for subordinating the claims even if there were allowed.

10. He actually testified that the City of Detroit had drafted such a complaint, and that if the City of Detroit was successful in prosecuting the complaint, it could potentially render the swap agreement void ab initio.

11. If the complaint was successful, the City of Detroit could recover the $300 million in swap payments made to UBS and Bank of America from 2008 through 2013, as well as eliminate the termination fees of approximately $200 million to $250 million.

12. Rather than paying out $165 million at high interest to the banks, the City could potentially recover $300 million from them.

13. Emergency Orr testified that his attorneys drew up a complaint against UBS and Bank of America alleging among other counts fraud, unjust enrichment, and breach of contract based on a breach of the implied duties of good faith and fair dealing, and was ready to file the complaint if no agreement was reached.

14. The fraud count would in part be based on problems with the LIBOR index as documented relative to UBS, which has admitted wrongdoing in connection with rigging the LIBOR index in various prosecutions worldwide.

15. In addition, the claims for fraud, unjust enrichment and breach of contract based on breach of implied duty of good faith and fair dealing would be based on the following theories which Emergency Manager Orr set forth under oath:

4

a. That the counterparties had superior knowledge when they entered into this complex financial transaction with the City and had a duty to make clear the terms of the transaction.

b. That the counterparties misrepresented that there was a low risk of default and termination in connection with the swaps.

c. That Bank of America and UBS did not explain to the City the potential dangers that a termination event would mean for the City, i.e., that the City could immediately have to pay tens of millions or hundreds of millions of dollars in interest payments and the termination fee.

d. That the City was a ticking time bomb for a default based on the lowering of the City's bond rating because of the City's financial history.

e. That the fact that the Chief Financial Officer, Sean Werdlow, took a job with SBS in 2005, approximately five months after the swaps were transacted, raised a red flag, a concern.

16. Emergency Manager Orr testified that his legal counsel had investigated these allegations prior to drawing up the complaint.

17. Fed. R Civ. P 11 states:

Signing Pleadings, Motions, and Other Papers; Representations to the Court;
 (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
   (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
   (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

18. Thus, Emergency Manager Orr's testimony establishes that there was a factual predicate for pursuing claims against UBS and Bank of America for termination of the swaps at no cost to the City of Detroit as well as restitution of the $300 million already paid to the banks.

19. Significantly, the claims raised by Emergency Manager Orr against the banks mirror similar complaints against banks and financial institutions initiated by the Securities and Exchange Commission (SEC), and which have led to consent judgments and settlements against the banks.

20. For example, the July 26, 2012, Report on the Municipal Securities Market prepared by the SEC (Exhibit 1328 to Motion Hearing) noted that the extent of the risks to municipal entities engaging in swaps and security based swaps has been illustrated by several high-profile enforcement actions such as Orange County, California, and Jefferson County, Alabama.

21. According to the report, in addition to these cases, to date, the Commission has filed five settled enforcement actions against major financial institutions (Bank of America, UBS, JPMorgan, Wachovia Bank and GE Funding Capital Services) for their role in a series of complex, wide-ranging bid-rigging schemes involving derivatives utilized by municipalities.

22. In August 2011 a civil injunctive action was brought involving five Wisconsin school districts based on misrepresentation of the risk of the investments and failing to disclose material facts to the school districts. Investments were a complete failure. While the heavy use of leverage and the structure of the swaps exposed the districts to a heightened risk of

6

13-53846-tjt    Doc 2417    Filed 01/06/14    Entered 01/06/14 17:56:41    Page 6 of 12

catastrophic loss, the school districts were told that it would take "15 Enrons" or a catastrophic overnight collapse for the investments to fail.

23. Enforcement actions in Orange County focused on the need to provide disclosure regarding the risks relating to investment strategies, including risks to the municipal issuer arising from the use of derivative instruments, including swaps. Orange County ended up in bankruptcy just like Detroit.

24. The report also noted that swap advisors are inherently conflicted for a number of reasons: (1) their compensation is contingent on completion of a transaction; (2) they rely on financial institutions for referrals; and (3) their relationships with the municipal entities are typically limited to the duration of the transaction, rather than lasting for the life of the swap (meaning that they would be unlikely to advise the municipal entity to pass up a particular transaction).

25. That was the situation in the present case where the City of Detroit's swap advisors were paid by the banks.

26. Emergency Manager Orr testified that he spoke with the SEC about their involvement in investigating the Detroit swaps matters and they were willing to have further discussion. Discussions took place between August 30, 2013, and January 3, 2014.

27. Mr. Orr testified that he was aware that the SEC has a right to intervene as an interested party in a Chapter 9 bankruptcy and was aware that the Commission has been involved in enforcement actions.

28. Bringing the SEC's expertise and agents to investigate the swaps could mitigate any cost of pursuing actions against the banks.

29. Emergency Manager Orr further testified that the gap between the floating interest rate on the COPS and the fixed interest rate that was the basis for the City's derivative payments, dramatically changed in approximately 2008-2009. And that was due to a precipitous drop in interest rates. The City was on the right side for a little while and then was very much on the wrong side of the swap.

30. Mr. Orr agreed that the precipitous drop in interest rates was due to the financial meltdown caused by a number of reasons (including the subprime mortgage crisis). He acknowledged the reduction of interest rates to near zero was part of the Federal Reserve's bailout of the banks, in order to stimulate the banks and keep them moving during that period. Mr. Orr referenced the purchase of $1.75 trillion in mortgage securities as part of QE 1.

31. Exhibit 1326 to the Motion hearing, City of Detroit Planning and Development Department Neighborhood Stabilization Program Plan - January 2009, outlined just how devastating the subprime lending crisis and resulting foreclosures were to the City of Detroit.

32. The report noted that as of the time it was written, Detroit had the highest home foreclosure rate among the nation's 100 largest metropolitan areas, making it one of the cities hardest hit by the national foreclosure and subprime lending crisis.

33. This report said that from 2004 to 2006, there were approximately 330,000 mortgages originated in Detroit. During the same time, 38,000 new mortgages were sold, presenting 11 percent of total mortgages. About 27,500 or 73 percent of new mortgages were high cost loans defined as loans with interest rates at least 3 percent above Treasury securities. Refinances accounted for 15 percent of new mortgage loans. As of 2006, about 29,000 adjustable rate mortgages or 9 percent of all existing mortgages reset, triggering higher payments for loan recipients. An additional 16,000 mortgages were scheduled to reset from 2008 to 2010.

8

34. The report noted that the result of the exorbitant numbers of high cost loans in Detroit was disturbing. From 2005 to 2007, Detroit experienced an astounding 67,000 foreclosures, more than 20 percent of all household mortgages. There were 4,600 tax foreclosures in the first six months of 2008, with over $25 million in taxes due on those properties. Early estimates indicate that at least two-thirds of tax or mortgage foreclosed properties stand vacant causing tremendous problems for Detroit on many levels.

35. The report further noted that a foreclosed property that stays on the market for an extended period of time can become an administrative and economic drain on a city; a study by the Homeownership Preservation Foundation found that a city can lose about $20,000 per home in lost property taxes, unpaid utility bills, property upkeep, sewage and maintenance. High foreclosure rates also causes disinvestment by nearby residents, which contributes to neighborhood decline, affects surrounding property values, and leads to population loss and increased crime.

36. Interested Party Sole contends that as part of a complaint to recover the $300 million that was paid to UBS and Bank of America for the illegal and unconscionable interest rate swaps, the City of Detroit could include counts demanding these banks, who themselves were large-scale subprime mortgage lenders, be held accountable for the destruction of Detroit's neighborhoods engendered by their fraudulent, predatory lending practices.

37. Exhibit 1324 to the Motion Hearing is an excerpt from the Senate Select Committee on Wall Street and the Financial Crisis which outlines the fraudulent practices of the banks in connection with the foreclosure epidemic that particularly impacted Detroit.

9

## CONCLUSION

38. The City of Detroit's decision to enter into a forbearance agreement with the banks, under which it will pay Bank of America and UBS $165 million through a Barclays loan at 5.5 percent to 8.5 percent interest, secured by a lien of $4 million a month on City of Detroit income tax revenue, is not fair and equitable and not in the best interest of the estate as a whole.

39. If approved, the forbearance agreement means UBS and Bank of America will have profited to the tune of $465 million for placing the City of Detroit in highly questionable and potentially illegal interest rate swaps.

40. It means UBS and Bank of America, banks which helped precipitate the financial crisis in Detroit and nationwide through their predatory subprime mortgage lending practices, particularly in the City of Detroit, that led to the collapse of interest rates that made them the beneficiaries of the hedging derivatives, will be rewarded with hundreds of millions of dollars for their illicit activity.

41. It means that rather than making the banks pay for the destruction they have caused to Detroit's neighborhoods and helping to fund the rebirth of the City, instead the residents of Detroit will continue to be indentured to the banks, paying them 20 percent of the City's income tax dollars for the next four years.

42. The public interest of the people of Detroit in the reconstruction and revitalization of the City will be derailed by diverting desperately needed funds for jobs, services and pensions to two banks with notorious histories of predatory lending against the City of Detroit and its residents.

43. It was refreshing to hear that Emergency Manager Orr seriously considered legal action against the banks to recover the hundreds of millions of dollars removed from the City treasury.

44. The people of Detroit will be far better served by that effort than by having their tax dollars utilized to pay off Bank of America and UBS.

WHEREFORE, Interested Party David Sole hereby respectfully requests that this honorable Court deny the City of Detroit's motion as the amended forbearance agreement is neither fair nor equitable or in the best interest of the people of Detroit.

        Respectfully submitted,

        JEROME D. GOLDBERG, PLLC

        By:   */s/ Jerome D. Goldberg*
        Jerome D. Goldberg (P61678)
        Attorney for David Sole, Party in Interest
        2921 East Jefferson, Suite 205
        Detroit, MI 48207
        Phone: 313-393-6001
        Fax: 313-393-6007
        Email: apclawyer@sbcglobal.net

DATED: January 6, 2014

11

13-53846-tjt    Doc 2417    Filed 01/06/14    Entered 01/06/14 17:56:41    Page 11 of 12

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                                   Chapter 9
                                                                        Case No. 13-53846

City of Detroit, Michigan,

      Debtor.

_____/

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed with the Clerk of the Court electronically on January 6, 2014, and that such document will in turn be served automatically by electronic means to all ECF participants in this case.

                                              JEROME D. GOLDBERG, PLLC

                                              By:    */s/ Jerome D. Goldberg*
                                              Jerome D. Goldberg (P61678)
                                              Attorney for David Sole, Party in Interest
                                              2921 East Jefferson, Suite 205
                                              Detroit, MI 48207
                                              Phone: 313-393-6001
                                              Fax: 313-393-6007
                                              Email: apclawyer@sbcglobal.net

DATED: January 6, 2014